# Exhibit A

**ASSET PURCHASE AGREEMENT**

by and between

[Name of Seller],
as Seller

and

W.R. GRACE & CO.-CONN,
as Purchaser

Dated as of April __, 2006

MEI\5595723.1

# TABLE OF CONTENTS

Page

**ARTICLE I DEFINITIONS** ............................................................................................ 1
    1.1      Certain Defined Terms. .................................................................... 1
    1.2      Additional Definitions. .................................................................... 8
    1.3      Terms Generally. ............................................................................ 9

**ARTICLE II CLOSING; PURCHASE PRICE AND ADJUSTMENT** ...................................... 10
    2.1      Sale and Transfer of the Assets ...................................................... 10
    2.2      Assets Not Transferred .................................................................. 11
    2.3      Assumed and Excluded Liabilities ................................................. 12
    2.4      Closing; Purchase Price; Pre Closing Adjustment. ......................... 13
    2.5      Post Closing Adjustment. ............................................................... 13
    2.6      Tax Allocation ............................................................................... 15
    2.7      Transfer Taxes .............................................................................. 16
    2.8      Tax Proration ................................................................................ 16

**ARTICLE III CONDITIONS TO CLOSING** .................................................................. 16
    3.1      Purchaser's Obligation .................................................................. 16
    3.2      Seller's Obligation ........................................................................ 18

**ARTICLE IV REPRESENTATIONS AND WARRANTIES OF SELLER** ............................... 18
    4.1      Authority; No Conflicts; Governmental Consents; Corporate
                Matters ........................................................................................ 18
    4.2      Taxes. .......................................................................................... 19
    4.3      Assets Other than Owned Improvements ........................................ 20
    4.4      Real Property ................................................................................ 20
    4.5      Intellectual Property ...................................................................... 20
    4.6      Contracts ...................................................................................... 21
    4.7      Litigation; Decrees ....................................................................... 22
    4.8      Compliance with Laws .................................................................. 22
    4.9      Environmental Matters .................................................................. 22
    4.10    Employee Benefits Matters ............................................................ 22
    4.11    Labor and Employee Relations ...................................................... 23
    4.12    Brokers ........................................................................................ 23
    4.13    Receivables .................................................................................. 23
    4.14    Inventory ...................................................................................... 23
    4.15    Financial Statements. .................................................................... 23
    4.16    Adequacy of Assets ...................................................................... 24
    4.17    Exclusivity of Representations. ...................................................... 24

**ARTICLE V REPRESENTATIONS AND WARRANTIES OF THE PURCHASER** .............. 25
    5.1      Authority; No Conflicts; Governmental Consents .......................... 25
    5.2      Financing ..................................................................................... 25

i

MEI\5595723.1

| | | |
|---|---|---|
| 5.3 | Brokers | 26 |
| 5.4 | Litigation | 26 |

**ARTICLE VI COVENANTS OF SELLER** ............................................................ 26

| | | |
|---|---|---|
| 6.1 | Access to Information | 26 |
| 6.2 | Ordinary Conduct | 27 |
| 6.3 | Insurance | 28 |
| 6.4 | Accounts Receivable | 28 |
| 6.5 | Confidential Information | 28 |
| 6.6 | Permits | 29 |
| 6.7 | Environmental | 29 |
| 6.8 | Seller's Covenant Not to Compete | 29 |
| 6.9 | Confidentiality and Non-Use | 30 |
| 6.10 | Termination of Employee Confidentiality Restrictions | 30 |

**ARTICLE VII COVENANTS OF THE PURCHASER** ........................................... 30

| | | |
|---|---|---|
| 7.1 | Confidentiality | 30 |
| 7.2 | Waiver of Bulk Sales Law Compliance | 31 |
| 7.3 | Use of "[Name of Seller]" or "[_____]" Name | 31 |
| 7.4 | Non-Business Receivables | 31 |
| 7.5 | Environmental | 31 |
| . | 31 | |
| 7.6 | Buy Back Opportunity | 32 |
| 7.7 | Facility Guidelines | 33 |

**ARTICLE VIII MUTUAL COVENANTS** ............................................................. 33

| | | |
|---|---|---|
| 8.1 | Permits; Novations and Consents | 33 |
| 8.2 | Reasonable Best Efforts | 34 |
| 8.3 | Publicity | 34 |
| 8.4 | Cooperation | 34 |
| 8.5 | Records | 34 |
| 8.6 | Tax Matters | 35 |
| 8.7 | Litigation Support | 36 |
| 8.8 | Non-Solicitation | 37 |

**ARTICLE IX EMPLOYEE BENEFIT MATTERS** ................................................. 37

| | | |
|---|---|---|
| 9.1 | Transferred Employees | 37 |
| 9.2 | Indemnification for Employment Costs and Employment Liabilities | 37 |
| 9.3 | Health and Welfare Plans; Insurance Claims | 37 |
| 9.4 | Health and Welfare Plans and Limitations | 38 |
| 9.5 | Severance | 38 |
| 9.6 | Participation in Seller Plans | 38 |
| 9.7 | Retirement Plans | 38 |
| 9.8 | COBRA | 39 |
| 9.9 | Workers' Compensation | 39 |
| 9.10 | WARN | 39 |

Page

9.11       Flexible Spending Accounts ............................................................ 39

**ARTICLE X** INDEMNIFICATION ............................................................................ 40
10.1       Survival of Representations ........................................................... 40
10.2       Indemnification by Seller ............................................................... 41
10.3       Indemnification by the Purchaser ................................................. 41
10.4       Limits on Indemnification .............................................................. 42
10.5       Procedures Relating to Indemnification (Other than for Tax
            Claims) .......................................................................................... 43
10.6       Exclusive Remedies ....................................................................... 44

**ARTICLE XI** GENERAL PROVISIONS ..................................................................... 45
11.1       Assignment .................................................................................... 45
11.2       No Third-Party Beneficiaries ......................................................... 45
11.3       Termination ................................................................................... 45
11.4       Expenses ........................................................................................ 46
11.5       Equitable Relief ............................................................................. 46
11.6       Amendments .................................................................................. 46
11.7       Notices ........................................................................................... 46
11.8       Interpretation; Exhibits and Schedules ......................................... 48
11.9       Counterparts .................................................................................. 48
11.10     Severability .................................................................................... 48
11.11     Waiver of Compliance; Consents .................................................. 48
11.12     Entire Agreement .......................................................................... 48
11.13     Foreign Currencies ........................................................................ 48
11.14     Dispute Resolution ........................................................................ 49
11.15     Governing Law; Submission to Jurisdiction .................................. 49

EXHIBITS

Bills of Sale ........................................................................................... Exhibit A
Facilities Agreement ............................................................................. Exhibit B
Real Estate Lease .................................................................................. Exhibit C
Restrictive Property Deed ..................................................................... Exhibit D
Transition Services Agreement ............................................................. Exhibit E
Services Agreement ............................................................................... Exhibit F
License Agreements ............................................................................... Exhibit G
Confidentiality Agreement .................................................................... Exhibit H

MEI\5595723.1

## List of Schedules

| | |
|---|---|
| Schedule 1.1 | Knowledge of Seller |
| Schedule 1.2 | [_____] Site – Plot Plan |
| Schedule 1.3 | Leased Facilities |
| Schedule 1.4 | Leased Real Estate |
| Schedule 1.5 | ISRA Liens |
| Schedule 2.1(d) | Intellectual Property |
| Schedule 2.2 | Excluded Assets |
| Schedule 2.5(a)(i) | Inventory Practices and Procedures |
| Schedule 2.5(a)(ii) | Form of Closing Statement |
| Schedule 2.6 | Tax Allocation |
| Schedule 4.1(b) | Consents |
| Schedule 4.1(c) | Governmental Consents |
| Schedule 4.2 | Taxes |
| Schedule 4.3(a) | Liens |
| Schedule 4.5 | Intellectual Property |
| Schedule 4.6 | Material Contracts |
| Schedule 4.7 | Litigation |
| Schedule 4.8 | Compliance with Laws |
| Schedule 4.9 | Environmental Matters |
| Schedule 4.10(a) | Compliance with Law with respect to Employee Benefit Plans |
| Schedule 5.1(b) | Purchaser Consents |
| Schedule 5.1(c) | Purchaser Governmental Consents |
| Schedule 5.4 | Litigation |
| Schedule 6.2(a) | Conduct of Business |
| Schedule 6.2(b) | Certain Employees |
| Schedule 6.10 | Termination of Employee Confidentiality Restrictions |
| Schedule 9.1 | Employees |

MEI\5595723.1

## ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT (this "Agreement"), dated as of April __, 2006, by and between [Name of Seller], a Delaware corporation ("Seller") and W.R. GRACE & CO.-CONN, a Connecticut corporation ("Purchaser").

WHEREAS, on [____], the Seller acquired certain assets from [____] (as defined below), including substantially all of the assets used exclusively in the Business (as defined below); and

WHEREAS, the parties hereto desire that the Seller sell, transfer, convey and assign to Purchaser substantially all of the assets, properties, interest in properties and rights of the Seller used exclusively in the Business, and that Purchaser purchase and acquire the same, subject to the assumption by Purchaser of certain of the liabilities and obligations of the Seller relating to the Business, upon the terms and subject to the conditions hereinafter set forth.

NOW THEREFORE, in consideration of the premises and the mutual representations, warranties, covenants and agreements hereinafter set forth, the parties hereto hereby agree as follows:

## ARTICLE I

## DEFINITIONS

1.1     Certain Defined Terms.  As used in this Agreement, the following terms shall have the following meanings:

"Action" means any claim, action, suit, arbitration, inquiry, proceeding or investigation by or before any Governmental Authority.

"Affiliate" of any Person shall mean any other Person, which, directly or indirectly, controls or is controlled by or is under common control with such Person. A Person shall be deemed to "control," be "controlled by" or be "under common control with" any other Person if such other Person possesses, directly or indirectly, power to direct or cause the direction of the management or policies of such Person whether through the ownership of voting securities or other ownership interests, by contract or otherwise.

"[____]" means [____], a public limited liability company organized under the laws of the [____], [____], a Delaware corporation, [____], a Delaware limited liability company, [____], a private limited liability company organized under the laws of the [____] and [____], an entity organized under the laws of [____].

"Ancillary Agreements" means the Real Estate Lease, the Facilities Agreement, the Transition Services Agreement, the License Agreements, the Confidentiality Agreement and the Services Agreement.

"Assigned Contracts" means all Contracts to which the Seller is a party that relate exclusively to the Business, including all Contracts listed on Schedule 4.6 to which the Seller is a party, and all such Contracts entered into by the Seller through the Closing Date upon notice to Purchaser.

"[      ] Contract" means the Manufacturing Agreement, dated [_____], between Seller, as assignee, and [_____] and any related Contracts including the Supported Catalyst Component Sales Agency and Shipment Agreement, dated [_____], between Seller and [_____], the Supported Catalyst Component Sales Agency and Shipment Agreement, dated [_____], between Seller and [_____] ("[_____]") and the Catalyst Support Supply Agreement, dated [_____], between Seller and [_____].

"Bill of Sale" means one or more bills of sale in substantially the form attached hereto as Exhibit A.

"Building Number 10" means the building numbered 10 on the [_____] Site-Plot Plan.

"Building Number 24" means the building numbered 24 on the [_____] Site-Plot Plan.

"Business" means the business, as conducted at the Facility, of (i) blending, repackaging, marketing and selling TiCl4, TiCl3, VACAC, VOCL3 and VTI Blends for use as catalysts components, as conducted in Building Number 24 and (ii) the custom manufacture, as conducted in Building Number 10, of TiCL3, polypropylene and polyethelene catalysts, silica supported Ziegler and Chromium polyethelene catalysts, and single site supported polypropylene and polyethelene catalyst systems including metallocene under contract on a per unit toll basis. The term "Business" shall be descriptive and shall not be construed as referring to a legal entity or any of Seller's Affiliates.

"Business Day" means any day that is not a Saturday, a Sunday, other day on which banks are required or authorized by Law or executive order to be closed in New York, New York.

"Confidentiality Agreement" means the Confidentiality Agreement between the Purchaser and the Seller in substantially the form of Exhibit H attached hereto.

"Code" means the U.S. Internal Revenue Code of 1986, as amended from time to time.

"Collective Bargaining Agreement" means the Agreement, dated [_____], between [_____] and the International Union of Electronic, Electrical, Salaried, Machine and Furniture Workers/ Communications Workers of America, AFL-CIO Local Union No. 81496 ("IUEES"), adopted by Seller and as amended by that certain Memorandum of Agreement entered into between Seller and IUEES on or about [_____].

"Contract" means any contract, agreement, license, lease, sales or purchase order or other legally binding commitment, whether written or oral.

MEI\5595723.1

"Data Room" means the data room containing documents and information relating to the Business made available by [_____] to Purchaser and Seller at [_____] facility located in [_____].

"Disclosure Schedule" means the Disclosure Schedule of Seller attached hereto, dated as of the date hereof, and forming a part of this Agreement.

"[_____] Site – Plot Plan" means the [_____] Site – Plot Plan annexed hereto as Schedule 1.2.

"Employees" means the Salaried Employees and the Hourly Employees.

"Employee Benefit Plan(s)" shall mean any plan, program, contract, agreement or other material arrangement providing for compensation, severance, termination pay, deferred compensation, performance awards, stock or stock-related awards, fringe benefits or other employee benefits or remuneration of any kind, whether written, unwritten or otherwise, funded or unfunded, including each "employee benefit plan," within the meaning of Section 3(3) of ERISA, which is or has been maintained, contributed to, or required to be contributed to, by Seller or any ERISA Affiliate for the benefit of any Employee, or with respect to which Seller or any ERISA Affiliate has or may have any liability or obligation to any Employee.

"Employment Costs" means:

(a)     the amounts payable or paid in respect of the employment of the relevant Employee (including salary, wages, tax and social security contributions, employer's contributions to benefit plans, bonus, or insurance premiums); and

(b)     the costs of providing any noncash benefits which the employer is required to provide, by law, contract, or which it agreed to provide in connection with such employment.

"Employment Liabilities" means any and all Losses arising out of or connected with employment or the employment relationship, or the initiation or the termination of employment, or of the employment relationship (including all Losses in connection with any claim, award, judgment or agreement for redundancy pay, or damages or compensation for unfair or wrongful dismissal or breach of contract or discrimination and any claims arising under employment related statutes or regulations including the "Age Discrimination in Employment Act", the "Americans with Disabilities Act", the "Fair Labor Standards Act" and the "Occupational Health and Safety Act", and any applicable employment related state statutes).

"Environmental Claim" means any claim made by any Person (including enforcement notices or proceedings) in connection with any Environmental Condition or any non-compliance (or alleged non-compliance) with Environmental Laws.

"Environmental Condition" means the presence of Hazardous Substances on, under, or emanating from the Leased Real Estate in concentrations which necessitate a requirement under applicable Environmental Laws to give any notification to or file any report with Governmental Authorities or to perform or pay for any Remedial Action.

3

"Environmental Laws" means any applicable foreign, federal, provincial, state, municipal and local statute, law, ordinance, regulation, or rule, any orders issued by, and other requirements of, any Governmental Authority with the force of law, or any rule of common law, relating to pollution, the protection of the public health or the environment, the use, handling, manufacture, generation, storage, treatment, transport, disposal or release of Hazardous Substances, occupational health and safety, or storage and transportation of goods, which are applicable to the Business, as in effect and applied as of the Closing Date, including the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. § 6901, et seq. ("CERCLA"), the Resource Conservation and Recovery Act, 42 U.S.C. § 6901, et seq., the Clean Air Act, 42 U.S.C. § 7601, et seq., the Federal Water Pollution Control Act, 42 U.S.C. § 5501, et seq., the New Jersey Spill Compensation and Control Act, N.J.S.A. 58: 10-23.11, et seq.; the New Jersey Air Pollution Control Act, N.J.S.A. 26:2C-1, et seq., the New Jersey Water Pollution Control Act, N.J.S.A. 58: 10A-1, et seq., the New Jersey Solid Waste Management Act, N.J.S.A. 13:1E-1, et seq. and the New Jersey Industrial Site Recovery Act, N.J.S.A. 13: 1K-6 et seq. ("ISRA") (together with the rules and regulations promulgated thereunder).

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time.

"ERISA Affiliate" means any entity that is required to be treated as a single employer together with Seller under Section 414 of ERISA.

"Facilities Agreement" means one or more agreements regarding utilization by Purchaser of certain facilities and services of the Seller at the Facility in substantially the form attached hereto as Exhibit B.

"Facility" means the production site owned by the Seller and located at [_____].

"GAAP" means generally accepted accounting principles and practices in effect from time to time in the United States of America.

"Governmental Authority" means any nation or government, any federal, state, local, municipal or other political subdivision thereof, any government or quasi-governmental entity of any nature, and any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government, including the NJDEP.

"Governmental Order" means any order, writ, judgment, injunction, decree, stipulation, determination or award entered by or with any Governmental Authority.

"Gross Purchase Price" means the Purchase Price prior to any adjustments pursuant to Section 2.5(e).

"Hazardous Substances" means any solid, liquid or gaseous substance, material, pollutant, contaminant, irritant or waste that is or may be dangerous, hazardous, explosive, toxic, corrosive, flammable, infectious, radioactive, carcinogenic or mutagenic, that is defined or listed in Environmental Laws as a "pollutant" or as a "hazardous," "extremely hazardous" or "toxic" substance or waste, or that is otherwise regulated under Environmental Law, including asbestos,

4

asbestos-containing material, polychlorinated biphenyls, formaldehyde, petroleum, petroleum products, and derivatives and distillates of petroleum.

"Hire Date" means 7:01 p.m. New York City Time on the Closing Date.

"Hourly Employees" means those employees of Seller working for the Business and listed as "Hourly Employees" on Schedule 9.1.

"Indebtedness" means, with respect to any Person, (a) all indebtedness of such Person for borrowed money, (b) all obligations of such Person evidenced by notes, bonds, debentures, drafts or other similar instruments, or in respect of letters of credit, guaranties, and surety bonds, (c) all indebtedness created or arising under any conditional sale or other title retention agreement with respect to property acquired by such Person and (d) all obligations of such Person as lessee under leases that have been or should be, in accordance with GAAP, recorded as capital leases.

"Indemnified Person" means, with respect to any Loss, the Person seeking indemnification hereunder.

"Indemnifying Person" means, with respect to any Loss, the Person from whom indemnification is being sought hereunder.

"ISRA" means the New Jersey Industrial Site Recovery Act, N.J.S.A. 13:1K-6 et seq. (together with the rules and regulations promulgated thereunder) and any supplements or amendments thereto as from time to time may be enacted, adopted or promulgated.

"Knowledge of Purchaser" with reference to any of the representations and warranties of Purchaser, means the actual knowledge of the Persons listed on Schedule 1.1(b), without inquiry or investigation on the part of such Persons, and does not refer to the knowledge of any other Person.

"Knowledge of Seller" with reference to any of the representations and warranties of Seller, means the actual knowledge of the Persons listed on Schedule 1.1(a), without inquiry or investigation on the part of such Persons, and does not refer to the knowledge of any other Person.

"Law" means any foreign, federal, state or local statute, law, ordinance, regulation, rule, code, order, requirement or rule of common law.

"Leased Facilities" means the facilities described on Schedule 1.3 to be leased by Purchaser from Seller pursuant to the Facilities Agreement.

"Leased Real Estate" means the real property described on Schedule 1.4 to be leased by Purchaser from Seller pursuant to the Real Estate Lease.

"License Agreements" means one or more agreements regarding the non-exclusive license by Seller to Purchaser of certain patent rights pursuant thereto in substantially the form of Exhibit G attached hereto.

"Lien" means any mortgage, pledge, hypothecation, charge, assignment, encumbrance, option, right of first refusal, lien (statutory or other) or other security agreement of any kind or nature whatsoever.

"Material Adverse Effect" means any circumstance, change or effect that is materially adverse to the business, assets, financial condition or results of operations of the Business taken as a whole.

"NJDEP" means the New Jersey Department of Environmental Protection.

"Owned Improvements" means the buildings, improvements and structures located on the Leased Real Estate.

"Permit" means any permit, license, certificate, registration approval or qualification required pursuant to any Law, including Environmental Laws, for the ownership, occupancy, use or operation of the Assets, including the Owned Improvements , the Leased Facilities and the Leased Real Estate, or the conduct of the Business (as such Assets, Owned Improvement, Leased Facilities, Leased Real Estate or Business are owned, occupied, used, operated or conducted on the Closing Date).

"Permitted Liens" means (x) such of the following as to which no enforcement, collection, execution, levy or foreclosure proceeding shall have been commenced:  (a) Liens for Taxes, assessments, and governmental charges or levies not yet due and payable; (b) Liens imposed by Law, such as materialmen's, mechanics', carriers', workmen's and repairmen's liens and other similar Liens arising in the ordinary course of business securing obligations that (i) are not overdue for a period of more than thirty (30) days and (ii) are not in excess of $75,000 in the aggregate at any time; (c) pledges or deposits to secure obligations under workers' compensation laws or similar legislation or to secure public or statutory obligations; (d) Liens arising under conditional sales contracts and financing leases with third parties entered into in the ordinary course of business; and (e) minor survey exceptions, reciprocal easement agreements and other customary encumbrances on title to real property that (i) were not incurred in connection with any Indebtedness of the Business, (ii) do not render title to the property encumbered thereby unmarketable and (iii) do not, individually or in the aggregate, materially adversely affect the value of or the use of such property for its present purposes; (y) any Lien on the Leased Real Estate or the Owned Improvements contained in, arising out of, or resulting from the Restrictive Deeds or any other deed restriction, classification exception area declaration or similar Lien or restriction required by any Governmental Authority in connection with the remediation of the Leased Real Estate or the Owned Improvements, including any Liens pursuant to ISRA described on Schedule 1.5; and (z) any Lien created by or on behalf of the Purchaser or any of its Affiliates.

"Person" means an individual, partnership, corporation, limited liability company, business trust, joint stock company, trust, unincorporated association, joint venture, Governmental Authority or other entity of whatever nature.

"Purchaser's Plans" means any plan, scheme, insurance contract or other arrangement which Purchaser offers to the Transferred Employees after the Hire Date.

MEI\5595723.1

"Real Estate Lease" means one or more leases in substantially the form attached hereto as Exhibit C.

"Remedial Action" shall mean, in relation to Hazardous Substances, all actions required by governmental mandate under Environmental Laws to (i) investigate, sample, monitor or access such Hazardous Substance or otherwise determine the nature or extent of a release of the same into the environment; and (ii) remove, treat, contain, abate or remediate such Hazardous Substances including the procurement, installation, operation, maintenance, inspection, repair and replacement of remedial systems or equipment, and the installation, monitoring, maintenance, inspection and certification of institutional or engineering controls.

"Restrictive Deeds" means the Restrictive Ground Water Deed and the Restrictive Property Deed.

"Restrictive Ground Water Deed" means an institutional control approved by the NJDEP pursuant to N.J.A.C. 7:26E-8.3 et seq. which provides notice that there is ground water pollution in a localized area caused by the discharge from the Owned Improvements.

"Restrictive Property Deed" means the restrictive deed for the Owned Improvements, in substantially the form attached hereto as Exhibit D.

"Retirement Benefits" means all retirement benefits, survivors' benefits and retirement termination benefits of the Employees accrued as of the Closing Date that are payable, in the form of lump sums, periodic payments or annuities, under a plan maintained by Seller or its Affiliates (other than a state or statutory or mandatory social security arrangement).

"Salaried Employees" means those employees of Seller working for the Business and listed as "Salaried Employees" on Schedule 9.1.

"Services Agreement" means one or more agreements under which Seller will perform certain services for Purchaser, in substantially the form attached hereto as Exhibit F.

"[____] Reports" means the Phase I Environmental Site Assessment and Material Compliance Evaluation reports prepared by Sovereign Consulting with respect to the Facility, dated as of [____], and provided to Seller and Purchaser by [____].

"Subsidiary" means, with respect to any Person, an entity in which such Person, directly or indirectly, through one or more Subsidiaries, owns a majority (a) of the voting power of the issued and outstanding shares of capital stock or other ownership interests in such entity entitled to vote generally in the election or appointment of directors or members of the governing body of such entity or (b) of the ownership interests in such entity.

"Tax" or "Taxes" means any federal, state, local or foreign income, gross receipts, net wealth, net worth, equity, sales, use, turnover, ad valorem, value-added, environmental, capital, unitary, intangible, franchise, profits, license, withholding, payroll, employment, social security contribution, excise, severance, stamp, transfer, real estate transfer, occupation, premium or property tax, customs duty or other tax, governmental fee or other like assessment or

charge of any kind whatsoever, together with any interest or penalty, addition to tax or additional amount imposed with respect thereto.

"Tax Return" means any return, statement, report or form required to be filed or submitted to any Governmental Authority in connection with the determination, assessment, collection or payment of any Tax or in connection with the administration, implementation or enforcement of or compliance with any Law relating to any Tax.

"Transaction Documents" means (a) this Agreement, (b) the Ancillary Agreements and (c) any other agreement entered into in connection with the Transactions.

"Transactions" means the transactions contemplated by the Transaction Documents.

"Transferred Employees" means each Employee who is listed on Schedule 9.1 and who is employed by Purchaser or any of its Affiliates as of the Hire Date.

"Transition Services Agreement" means the Transition Services Agreement to be executed by Seller and Purchaser in substantially the form attached hereto as Exhibit E.

"VAT" means, within European Union, such Tax as may be levied in accordance with (but subject to derogations from) the Directive 77/338/EEC, and outside the European Union, any Taxation levied by a jurisdiction outside the U.S. by reference to added, value, sales or other similar items.

"Working Capital" means, with respect to the Business, determined in accordance with GAAP, the aggregate of (a) all amounts with respect to the Inventory, plus (b) all amounts with respect to the Receivables, and the Prepayments and Other Short-term Receivables *less* (c) all amounts with respect the Payables and Other Short-term Liabilities.

1.2    Additional Definitions. The following additional terms have the meaning ascribed thereto in the Section indicated below next to such term:

| Defined Term | Section |
| --- | --- |
| Accounting Arbitrator | 2.5(d) |
| Assets | 2.1 |
| Assumed Liabilities | 2.3(a) |
| Business | Recitals |
| Closing | 2.4(a) |
| Closing Date | 2.4(a) |
| Closing Statement | 2.5(a) |
| Closing Working Capital Amount | 2.5(b) |
| Confidentiality Agreement | 7.1 |
| Deed | 2.4(c) |
| Dispute | 11.14(a) |
| Excluded Assets | 2.2 |
| Excluded Liabilities | 2.3(b) |

8

| **Defined Term** | **Section** |
|---|---|
| Excluded Intellectual Property | 2.2(d) |
| Final Closing Working Capital Amount | 2.5(e) |
| FSA Deficit | 9.11 |
| FSAs | 9.11 |
| Hire Date | 9.1 |
| Intellectual Property | 2.1(d) |
| Inventory | 2.1(c) |
| IRS | 4.10(b) |
| ISRA Clearance | 6.8(a) |
| Loss | 10.2(a) |
| Material Contract | 4.6 |
| Other Short-term Liabilities | 2.3(a)(iv) |
| Payables | 2.3(a)(iii) |
| Prepayments and Other Short-term Receivables | 2.1(j) |
| Purchase Price | 2.4(b) |
| Purchaser | Preamble |
| Purchaser's S&I Plan | 9.7 |
| Receivables | 2.1(i) |
| Records | 2.1(h) |
| Representatives | 6.5 |
| Retained Names and Marks | 7.3 |
| Seller | Preamble |
| Seller Trade Payable | 2.3(a)(iii) |
| Seller Trade Receivable | 2.1(i) |
| Tax Claim | 8.6(c) |
| Tax Indemnitee | 8.6(c) |
| Tax Indemnitor | 8.6(c) |
| Termination Date | 11.3(a)(i) |
| Transferee | 7.5(a) |
| Transfer Taxes | 2.7 |
| Third-Party Claim | 10.5(a) |
| WARN | 9.10 |
| WARN Obligations | 9.10 |

1.3    Terms Generally. The definitions set forth or referenced in Sections 1.1 and 1.2 shall apply equally to both the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation". The words "herein", "hereof" and "hereunder" and words of similar import refer to this Agreement (including the Exhibits and Schedules) in its entirety and not to any part hereof unless the context shall otherwise require. All references herein to Articles, Sections, Exhibits and Schedules shall be deemed references to Articles and Sections of, and Exhibits and Schedules to, this Agreement unless the context shall otherwise require. Unless otherwise specified, any references to any agreement or other instrument or Law are to it as amended and supplemented from time to time (and, in the case of a Law, to any successor

9

provisions). The phrase "made available" in this Agreement shall mean that the information referred to has been made available to the Purchaser during its due diligence investigation of the Business. Any reference in this Agreement to a "day" or number of "days" (without the explicit qualification of Business Day) shall be interpreted as a reference to a calendar day or number of calendar days. If any action or notice is to be taken or given on or by a particular calendar day, and such calendar day is not a Business Day, then such action or notice shall be deferred until, or may be taken or given on, the next Business Day.

## ARTICLE II

## CLOSING; PURCHASE PRICE AND ADJUSTMENT

2.1    Sale and Transfer of the Assets.  Subject to the terms and conditions of this Agreement, on the Closing Date the Seller will sell, convey, transfer, assign and deliver to Purchaser, and cause to be sold, conveyed, transferred, assigned and delivered to Purchaser, all right, title and interest in and to all of the business, properties, rights, claims and assets (except the Excluded Assets) of the Seller to the extent that they are used exclusively in the operations of the Business, as the same shall exist on the Closing Date (collectively, the "Assets"), free and clear of all Liens except Permitted Liens.  Subject to the terms and conditions of this Agreement, on the Closing Date, Purchaser will purchase, acquire and accept from the Seller all of such persons' right, title and interest in and to the Assets, free and clear of all Liens other than Permitted Liens.  The Assets include, but are not limited to, the following:

(a)    the Owned Improvements;

(b)    the tangible personal property located upon or affixed to or normally located in, at or upon, the Leased Facilities or the Leased Real Estate and exclusively used in the Business, including the returnable cylinder fleet wherever located;

(c)    the inventory, raw materials, work-in-process, finished goods spare parts and supplies relating exclusively to the Business (collectively, the "Inventory");

(d)    the trade secrets and know-how used exclusively in or relating exclusively to the Business and listed on Schedule 2.1(d) and copyrights and invention disclosures listed on Schedule 2.1(d) (collectively, the "Intellectual Property");

(e)    all Assigned Contracts;

(f)    all right, title and interest of lessee in and under leases of equipment and vehicles used exclusively in connection with the Business, and listed in Schedule 4.6;

(g)    all transferable licenses, permits, orders, approvals, qualifications and other authorizations by any Governmental Authority used exclusively in or relating exclusively to the Business or the other Assets;

(h)    the books and records (other than Tax records), relating exclusively to the Business, including sales literature, customer lists, product information, employment records and files and other information and/or data related to or used by Seller exclusively in the operation of

10

MEI\5595723.1

the Business and located at the Facility (collectively, the "Records");

(i) the insurance proceeds (in excess of self-insured retentions and deductibles) paid or payable by any insurance provider, other than Seller or any Affiliate of Seller, for any Asset that is destroyed or damaged after the date hereof and prior to the Closing (other than insurance proceeds applied to the repair, rebuilding or renovation of any such destroyed or damaged Asset);

(j) the notes, drafts and accounts receivable or portions thereof, arising exclusively out of the Business (collectively, the "Receivables");

(k) the prepaid expenses, advances, deposits and other short-term receivables, or portions thereof, arising exclusively out of the Business (collectively, the "Prepayments and Other Short-term Receivables");

(l) except as provided in Section 2.2(f), all causes of action, claims and rights against third parties to the extent that they relate exclusively to the Assets or the Business, including all express and implied warranties and guaranties received from vendors, suppliers or manufacturers with respect to the Assets or the Business;

(m) all goodwill related to the other Assets or the Business and the right to represent to third parties that Purchaser has purchased the Assets and will conduct operations similar to the Business; and

(n) the fixed assets, machinery, equipment and other assets in Building Number 10 and Building Number 24.

2.2    Assets Not Transferred. Notwithstanding anything herein to the contrary, the following assets are not included in the Assets and shall be retained by the Seller (the "Excluded Assets"):

(a) All rights, and any business, properties, claims or assets held or used by the Seller for the development, manufacture, marketing and sale of supported catalysts under or pursuant to the [_____] Contract, a redacted copy of which was provided to Purchaser in the Data Room;

(b) all cash and cash equivalent items, including checking accounts, bank accounts, lock box numbers, certificates of deposit, time deposits, securities, and the proceeds of accounts receivable, including uncashed checks in payment thereof, received by the Seller on or prior to the Closing Date where the associated accounts receivable are not included in the Closing Working Capital Amount;

(c) rights to or claims for refunds or rebates of Taxes and other governmental charges for periods ending on or prior to the Closing Date and the benefit of net operating loss carryforwards, carrybacks or other credits of the Seller, whether or not attributable to the Business;

(d) proprietary or confidential business or technical information, records and

11

policies that relate generally to the Seller and are not used exclusively in the Business, including organization manuals, strategic plans and Tax records and related information;

(e) any know-how, trade secrets, processes, domain names, inventions, formulae, trademarks, trademark rights, trade names, trade name rights, patents, patent rights, service marks, copyrights, pending applications for patents and copyrights, proprietary computer programs or other software and databases and other intellectual property not set forth on Schedule 2.1(d) (the "Excluded Intellectual Property");

(f) all causes of action, claims, demands, rights and privileges against third parties that relate to any of the Excluded Assets or Excluded Liabilities, including causes of action, claims and rights under insurance policies to the extent relating thereto;

(g) all other assets used primarily in connection with Seller's corporate functions (including the corporate charter, taxpayer and other identification numbers, seals, minute books and stock transfer books), whether or not used for the benefit of the Business;

(h) any facilities, equipment or other assets of Seller not exclusively related to the Business except to the extent expressly leased to Purchaser pursuant to the Facilities Agreement;

(i) the assets, properties or claims of the Seller set forth on Schedule 2.2; and

(j) all insurance policies and agreements.

2.3    Assumed and Excluded Liabilities.

(a) On the Closing Date, Purchaser shall hereby assume and agree to pay, perform and discharge when due, the following liabilities and obligations of Seller and its Affiliates arising out of the Business or the Assets (collectively, the "Assumed Liabilities"):

(i)    all obligations arising under the Assigned Contracts arising after the Closing Date;

(ii)    all trade payables arising in the ordinary course of business to providers of services, equipment, goods and supplies to the Business and relating exclusively to the Business to the extent reflected in the Final Closing Working Capital Amount (collectively, the "Payables"); and

(iii)    all other current liabilities and accrued expenses of the Business arising in the ordinary course of business to the extent reflected in the Final Closing Working Capital Amount (collectively, the "Other Short-term Liabilities").

(b) Notwithstanding anything herein to the contrary, the Assumed Liabilities shall not include the following liabilities (the "Excluded Liabilities"):

(i)    any liability, responsibility or obligation with respect to any Employee Benefit Plan;

(ii)     any liability for Taxes of the Seller, other than the Taxes that are the responsibility of Purchaser pursuant to Section 2.7 or 2.8;

(iii)     any liability arising from or related to the Excluded Assets;

(iv)     all Indebtedness other than Payables;

(v)     any liabilities, obligations or commitments of the Seller that are not included within the definition of Assumed Liabilities, other than Purchaser's contractual obligations hereunder, including indemnification obligations.

2.4     Closing; Purchase Price; Pre Closing Adjustment.  The closing (the "Closing") of the purchase and sale of the Assets and the assumption of the Assumed Liabilities shall be held at the offices of the Purchaser, 7500 Grace Drive, Columbia, Maryland, at 10:00 a.m. on the last Business Day of the month following the date on which the conditions to Closing set forth in Article III hereof shall have been satisfied or waived unless otherwise agreed by the Seller and Purchaser.  The date on which the Closing shall occur is hereinafter referred to as the "Closing Date."

(b) The aggregate purchase price for the Assets (the "Purchase Price"), shall be twenty million dollars ($20,000,000) (the "Estimated Purchase Price"), together with the assumption of the Assumed Liabilities as provided in Section 2.3, plus any increase, or less any decrease, in the amount of the Closing Working Capital Amount from the Base Working Capital Amount.  The "Base Working Capital Amount" means three million five hundred thousand dollars ($3,500,000).  The Estimated Purchase Price shall be payable on the Closing Date by wire transfer in immediately available funds to an account or accounts designated by Seller, and shall be adjusted in accordance with the terms of this Agreement.

(c) At the Closing, (i) Seller shall deliver or cause to be delivered to Purchaser executed copies of, (x) the Bill of Sale, (y) the Ancillary Agreements and (z) all other necessary or customary instruments of conveyance to transfer the Assets to Purchaser and (ii) Purchaser shall deliver to the Seller executed copies of (w) the Ancillary Agreements, (x) the Bill of Sale, (y) the written acknowledgement and agreement of Purchaser as to the matters set forth in Section 7.5 and (z) all necessary instruments for Purchaser to assume the Assumed Liabilities.

2.5     Post Closing Adjustment.

(a) Purchaser and Seller shall cooperate to close the accounting records of the Seller pertaining to the Business, as of the close of business on the Closing Date, all on a going concern basis, and take a physical count of the Inventory of the Business on a date after the Closing that is mutually acceptable to Seller and Purchaser.  Such inventory count shall be taken in accordance with the inventory-taking practices and procedures specified in Schedule 2.5(a)(i).  Within forty (40) Business Days after the Closing Date, Seller shall prepare and deliver to Purchaser a statement of the amount of the Working Capital of the Business as of the close of business on the Closing Date (the "Closing Working Capital Amount").  Except as provided below, this statement (the "Closing Statement") will be in a format comparable to the statement of Working Capital set forth on Schedule 2.5(a)(ii).  Purchaser shall cooperate with Seller in connection with, and shall furnish to Seller all such information as Seller may reasonably

13

require, in the preparation of the Closing Statement. In the event that the Business Day immediately preceding the Closing Date does not occur at a financial week or month end for accounting purposes, the parties shall agree on mutually acceptable roll forward or roll back procedures. Purchaser shall cause the employees of the Business to assist Seller in the preparation of the Closing Statement.

(b) The parties hereto agree that the Closing Statement, the Closing Working Capital Amount, and the purchase price adjustments provided for in this Section 2.5, shall be determined in U.S. dollars on a going concern basis, in accordance with GAAP applied on a basis consistent with those used in the determination of the Base Working Capital, which are set forth in Schedule 2.5(b); and no other accounting methods, policies, practices, procedures, classifications or estimation methodologies will be used for such purposes. The Closing Statement will not include any changes in assets or liabilities as a result of purchase accounting adjustments arising from or resulting as a consequence of the Transactions. Each party shall provide the other party and its representatives with reasonable access to books and records and relevant personnel during the preparation of the Closing Statement and the resolution of any disputes that may arise under this Section 2.5.

(c) If Purchaser disagrees with the determination of the Closing Working Capital Amount as shown on the Closing Statement, Purchaser shall notify Seller in writing of such disagreement within twenty-five (25) Business Days after delivery of the Closing Statement, which notice shall describe the nature of any such disagreement in reasonable detail, identify the specific items involved and the dollar amount of each such disagreement and provide reasonable supporting documentation for each such disagreement. After the end of such twenty-five (25) Business Day period, Purchaser may not introduce additional disagreements with respect to any item in the Closing Statement or increase the amount of any disagreement, and any item not so identified shall be deemed to be agreed to by Purchaser and will be final and binding upon the parties. Similarly, a disagreement by Purchaser does not provide any right to Seller to introduce any changes to working capital not directly related to the disputed item. During the twenty-five (25) Business Day period of its review, Purchaser shall have reasonable access to any documents, schedules or workpapers used in the preparation of the Closing Statement.

(d) Purchaser and Seller agree to negotiate in good faith to resolve any such disagreement. If Purchaser and Seller are unable to resolve all disagreements properly identified by Purchaser pursuant to Section 2.5(c) within thirty (30) Business Days after delivery to Seller of written notice of such disagreement, then such disagreements shall be submitted for final and binding resolution to Ernst & Young LLP (the "Accounting Arbitrator"). The Accounting Arbitrator will only consider those items and amounts set forth in the Closing Statement as to which Purchaser and Seller have disagreed within the time periods and on the terms specified above and must resolve the matter in accordance with the terms and provisions of this Agreement (including Section 2.5(b) above). The Accounting Arbitrator shall deliver to Purchaser and Seller, as promptly as practicable after its appointment, a written report setting forth the resolution of any such disagreement determined in accordance with the terms of this Agreement and the reasons for such determination. The Accounting Arbitrator shall make its determination based solely on presentations and supporting material provided by the parties and not pursuant to any independent review. The parties agree that Seller shall supply Purchaser, and Purchaser shall supply Seller, with any written representations that are made to the Accounting

14

Arbitrator and that each party and its representatives, accountants and other advisors may be present while oral presentations are made to the Accounting Arbitrator. The determination of the Accounting Arbitrator shall be final and binding upon Purchaser and Seller. The fees, expenses and costs of the Accounting Arbitrator shall be borne one-half by Purchaser and one-half by Seller.

(e) The Closing Statement shall be deemed final for the purposes of this Section 2.5 upon the earliest of (A) the failure of Purchaser to notify Seller of a dispute with respect to the Closing Statement within twenty-five (25) Business Days of Seller's delivery of the Closing Statement to Purchaser, (B) the resolution of all disputes with respect to the Closing Statement pursuant to Section 2.5(d), by Seller and Purchaser, and (C) the resolution of all disputes with respect to the Closing Statement pursuant to Section 2.5(d), by the Accounting Arbitrator. Within three (3) Business Days of the Closing Statement being deemed final, an adjustment to the Purchase Price shall be made as follows:

(i)    in the event that the Base Working Capital Amount exceeds the Closing Working Capital Amount as reflected on the final Closing Statement (the "Final Closing Working Capital Amount"), then the Purchase Price shall be adjusted downward in an amount equal to such excess; and

(ii)    in the event that the Final Closing Working Capital Amount exceeds the Base Working Capital Amount, then the Purchase Price shall be adjusted upward in an amount equal to such excess.

(f) If any adjustment under this Section 2.5 results in a downward adjustment in the Purchase Price, Seller shall pay to Purchaser the amount of such downward adjustment, and if any adjustment results in an upward adjustment in the Purchase Price, Purchaser shall pay to Seller the amount of such upward adjustment, in each case, by wire transfer of immediately available funds to an account designated by the party receiving payment within five (5) Business Days after the final determination of the amount of such reduction or increase in the Purchase Price, plus interest on the amount of such downward adjustment or upward adjustment from and including the Closing Date through the date of such payment thereof at the per annum rate equal to six percent (6%), compounded monthly.

2.6    Tax Allocation. **[Under Discussion]** Schedule 2.6 sets forth the principles for an allocation of the Gross Purchase Price among the Assets. All such allocations shall be made in accordance with the rules set forth in Section 1060 of the Code and the treasury regulations promulgated thereunder. Unless the parties reach a written agreement by the Closing Date to alter Schedule 2.6 based upon an appraisal prepared by a professional appraisal firm, such allocations will be used by the parties as the basis for reporting asset values and other items for purposes of all required Tax Returns. Each party agrees to negotiate in good faith regarding the possible alteration of Schedule 2.6 based upon the above-mentioned appraisal, and neither party shall unreasonably withhold its consent to such possible alteration. Each party agrees that neither it nor its Affiliates will take any position inconsistent with such allocations in connection with any Tax Return, Tax filing or other matter related to Taxes. Unless otherwise required by Law, the parties shall treat any adjustment made pursuant to Section 2.5 for foreign, federal, state and local income Tax purposes as an adjustment to the Gross Purchase Price and as being

MEI\5595723.1

allocable to the Assets with respect to which the adjustment relates in accordance with the principles of this Section 2.6.

2.7    Transfer Taxes. Purchaser and the Seller shall cooperate, where necessary, in the preparation, execution and filing of Tax Returns for sales, use, real estate transfer, transfer, intellectual property transfer, turnover, VAT and similar Taxes relating to the purchase and sale of the Assets ("Transfer Taxes"). Each party shall pay fifty percent (50%) of all Transfer Taxes. The consideration paid under this Agreement in respect of the sales described herein is exclusive of any VAT. To the extent that VAT is chargeable, Purchaser shall, against delivery of a valid VAT invoice, in addition to any amount otherwise payable hereunder by Purchaser, pay to Seller the amount of such VAT. Under no circumstances shall Purchaser's obligation hereunder or the Taxes giving rise thereto be reflected as a liability on the Closing Statement. Such Tax Returns shall be prepared in a manner that is consistent with the allocations contemplated by Section 2.6.

2.8    Tax Proration. Any ad valorem, property or similar Taxes with respect to the Assets shall be prorated on a per diem basis, with the Seller being responsible for all of such prorated Taxes attributable to the period on or before the close of business on the Closing Date and Purchaser being responsible for all of such prorated Taxes attributable to the period after the close of business on the Closing Date. Promptly upon receipt, Purchaser or Seller, as appropriate, shall provide the other with copies of all bills for such items for which the other is responsible pursuant to this Section 2.8. The resulting amount payable by Purchaser or Seller shall be paid promptly upon demand by the party to whom such payment is owed.

## ARTICLE III

## CONDITIONS TO CLOSING

3.1    Purchaser's Obligation. The obligations of the Purchaser to purchase and pay for the Assets are subject to the satisfaction as of the Closing of the following conditions:

(a) The representations and warranties of Seller contained in this Agreement shall be true and correct in all material respects as of the Closing with the same force and effect as if made as of the Closing (other than such representations and warranties as are made as of another date which shall be true and correct in all material respects as of the date made), except as would not, individually or in the aggregate, result in a Material Adverse Effect; provided, however, that if any portion of any representation or warranty is already qualified by materiality or similar qualifiers, for purposes of determining whether this Section 3.1(a) has been satisfied with respect to such portion of such representation or warranty, such portion of such representation or warranty as so qualified must be true and correct in all respects; and Seller shall have performed or complied in all material respects with all obligations and covenants required by this Agreement to be performed or complied with by Seller by the time of the Closing. Seller shall have delivered to the Purchaser a certificate, dated the Closing Date and signed by a duly authorized officer, to the foregoing effect.

(b) Seller shall have delivered the documents and agreements required by Section 2.4(c) to be delivered by Seller.

16

(c) No injunction or order shall have been issued by any Governmental Authority against Seller, or the Purchaser that would restrain or prohibit any of the Transactions.

(d) To the extent required by applicable Law, Seller shall have obtained ISRA Clearance and delivered written evidence of the same to Purchaser.

(e) The Restrictive Property Deed shall have been delivered to the Purchaser.

(f) Purchaser shall have obtained a final, non-appealable order in form acceptable to the Seller in its commercially reasonable discretion from the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") approving the Transactions in In re: W.R. Grace & Co. et al., Debtors, Chapter 11, Case Nos. 01-1139 et al. (JFK) (Jointly Administered), in the Bankruptcy Court ("Bankruptcy Proceeding").

(g) There shall be no material permit, consent, approval or authorization of, or declaration to or filing with, any Governmental Authority required in order to consummate the transactions contemplated by this Agreement that has not been accomplished or obtained or that is likely not to be accomplished or obtained after the Closing without Material Adverse Effect.

(h) The third party consents set forth on Schedule 3.1(h) shall have been obtained at or prior to the Closing.

(i) Seller shall have delivered to Purchaser a certificate of its secretary or assistant secretary certifying copies of the organizational documents of Seller, all requisite resolutions or actions of Seller's board of directors and stockholders approving the execution and delivery of this Agreement and the consummation of the Transactions and certifying to the incumbency and signatures of the person executing this Agreement and any other Transaction Document to which Seller is a party.

(j) After the date hereof, there shall not have occurred any damage or casualty loss to the Assets in an amount in excess of $3,000,000, or that could reasonably be expected to result in a loss of revenue to the Business after the Closing in excess of $3,000,000.

3.2    Seller's Obligation. The obligation of the Seller to sell and deliver the Assets to Purchaser is subject to the satisfaction as of the Closing of the following conditions:

(a) The representations and warranties of the Purchaser contained in this Agreement shall be true and correct in all material respects as of the Closing with the same force and effect as if made as of the Closing (other than such representations and warranties as are made as of another date which shall be true and correct in all material respects as of the date made), except as would not, individually or in the aggregate, materially and adversely affect the consummation of the Transaction; provided, however, that if any portion of any representation or warranty is already qualified by materiality or similar qualifiers, for purposes of determining whether this Section 3.2(a) has been satisfied with respect to such portion of such representation or warranty, such portion of such representation or warranty as so qualified must be true and correct in all respects; and the Purchaser shall have performed or complied in all material respects with all obligations and covenants required by this Agreement to be performed or complied with by the Purchaser by the time of the Closing. Purchaser shall have delivered to the

17

Seller a certificate, dated the Closing Date and signed by a duly authorized officer, to the foregoing effect.

(b) Purchaser shall have delivered the documents and agreements required by Section 2.4(c) to be delivered by Purchaser.

(c) No injunction or order shall have been issued by any Governmental Authority against Seller or the Purchaser that would restrain or prohibit any of the Transactions.

(d) Seller shall have obtained ISRA Clearance.

(e) The Restrictive Property Deed shall have been delivered to the Purchaser.

(f) Purchaser shall have obtained a final, non-appealable order in form acceptable to the Seller in its commercially reasonably discretion from the Bankruptcy Court approving the Transactions in the Bankruptcy Proceeding.

(g) Purchaser shall have delivered to Seller a certificate of its secretary or assistant secretary certifying copies of the organizational documents of Purchaser, all requisite resolutions or actions of Purchaser's board of directors and stockholders approving the execution and delivery of this Agreement and the consummation of the Transactions and certifying to the incumbency and signatures of the person executing this Agreement and any other Transaction Document to which Purchaser is a party.

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES OF SELLER

Seller hereby represents and warrants to the Purchaser as follows:

4.1     Authority; No Conflicts; Governmental Consents; Corporate Matters.

(a) The Seller is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware. The Seller has all necessary corporate power and authority to enter into the Transaction Documents to which it is a party, to carry out its obligations thereunder and to consummate the Transactions. This Agreement has been, and each of the other Transaction Documents to which it is a party, when executed, will be, duly authorized, executed and delivered by the Seller, and (assuming due authorization, execution and delivery by the Purchaser) constitute a legal, valid and binding obligation of the Seller, enforceable against the Seller in accordance with their respective terms, except as enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium and other similar laws relating to or affecting creditors' rights generally or by general equitable principles (regardless of whether such enforceability is considered in a proceeding in equity or at law).

(b) The execution, delivery and performance by the Seller of this Agreement does not, and of the other Transaction Documents to which it is a party will not, (i) violate or conflict with the organizational or governing documents of the Seller, (ii) conflict with or violate any Law or Governmental Order applicable to the Seller or by which any of the assets of the

18

Business are bound or affected, or (iii) result in any breach of, or constitute a default (or event which with the giving of notice or lapse of time, or both, would become a default) under, or give to others any rights of termination, amendment, acceleration, suspension, revocation or cancellation of, or result in the creation of any Lien on any of the assets of the Business, pursuant to, any Contract of the Seller relating to the Business or by which any of the assets of the Business is bound or affected, except (x) for the consents, approvals or authorizations set forth on Schedule 4.1(b), (y) for the consents, approvals, authorizations and other actions described in Section 4.1(c) and (z) in the cases of clauses (ii) and (iii), as would not reasonably be expected to result in a Material Adverse Effect.

(c) No consent, approval, license, permit, order or authorization of, or registration, declaration or filing with, or notification to, any Governmental Authority is required to be obtained or made by or with respect to the Seller in connection with the execution and delivery of the Transaction Documents or the consummation of the Transactions, except (i) as described in Schedule 4.1(c), (ii) for compliance with and filings under ISRA (if applicable), (iii) as may be required solely by reason of the Purchaser's participation in the Transactions and (iv) where failure to obtain such consent, approval, authorization, license, permit or order, or to make such filing, declaration, registration or notification, would not prevent Seller from performing any of its material obligations under this Agreement, and would not result in a Material Adverse Effect.

4.2    Taxes.  Except as disclosed in Schedule 4.2, (i) the Seller has filed or caused to be filed all Tax Returns of the Seller, which have become due (taking into account valid extensions of time to file) prior to the date hereof, and have paid or caused to be paid all Taxes shown thereon to be due, with respect to the Business, in each case to the extent Purchaser would incur liability under a successor liability (or similar) statute for failure to file such Tax Returns or pay such Taxes by reason of its acquisition of the Business, (ii) to the Knowledge of Seller there are no outstanding Tax Liens that have been filed by any Tax authority against any property or assets of the Business except for Taxes that are not yet due and payable; and (iii) to the Knowledge of Seller no claims are being asserted in writing with respect to any Taxes relating to the Assets for which Purchaser could be held liable under a successor liability (or similar) statute by reason of its acquisition of the Business.

4.3    Assets Other than Owned Improvements.

(a) Except as disclosed on Schedule 4.3(a), the Seller has good and marketable title to all Assets of the Business, except those sold or otherwise disposed of in the ordinary course of business consistent with past practice, in each case free and clear of all Liens except Permitted Liens.        .

(b)    The equipment owned or used in the Business is adequate for the uses to which it is being put.

(c) This Section 4.3 does not relate to real property or interests in real property, such items being the subject of Section 4.4.

19

4.4    Real Property.

(a) Seller holds good, valid and marketable title to the Owned Improvements and the Leased Real Estate free and clear of all Liens other than Permitted Liens.

(b) The Owned Improvements and the Leased Real Estate do not use or occupy any leased real estate, and are subject to no tenancy or other right of use or occupancy. All Owned Improvements and other structures on the Leased Real Estate are located entirely within the boundary lines of such Leased Real Estate. All utility services necessary for the operation of the Business are available to the Owned Improvements, and in fact service the Owned Improvements, including, without limitation, water, storm and sanitary sewer facilities, gas, steam, electricity, and telephone. The Leased Real Estate has the benefit of all easements and rights of ingress and egress necessary for all such utilities. To the Knowledge of Seller, neither [____] nor Seller has received any formal or informal notice, of any threatened or pending condemnation proceeding or purchase or dedication in lieu thereof relating to all or any portion of the Leased Real Estate.

4.5    Intellectual Property.

(a) Except as described in Schedule 4.5, to the Knowledge of Seller (a) the Seller holds or has a right to hold, all right, title and interest to, or licenses or sublicenses all the Intellectual Property, (b) no claim, action, suit or proceeding has been made or asserted or is pending against the Seller in connection with the operation of the Business or any of the assets and properties of the Business, either (i) based upon, challenging or seeking to deny or restrict the use of any of the Intellectual Property in the operation of the Business, or (ii) alleging that any services provided or products manufactured or sold, or Intellectual Property used, are being provided, manufactured, sold or used in violation of any intellectual property rights of any third person, and (c) no third party is infringing upon or, with respect to trade secrets, is otherwise violating any Intellectual Property right relating to the Business.

(b) The operation of the Business by Purchaser after the Closing as it is currently conducted will not violate any trade secrets or other intellectual property rights of Seller or its Affiliates.

(c) The Transactions and Purchaser's conduct of the Business after the Closing does not and will not violate any agreement between Seller and [____].

4.6    Contracts. Schedule 4.6 lists the following Contracts relating to the Business (each a "Material Contract", and collectively the "Material Contracts") in effect as of the date of this Agreement to which the Seller is a party:

(a) any Contract under which the Seller has granted a Lien on any of the Assets purchased hereunder;

(b) any Contract pursuant to which the Seller provides services or goods in connection with the Business, which is likely to involve consideration of more than $1,000,000 in the aggregate over the remaining term of such Contract;

20

(c) any lease involving an annual expense in excess of $75,000 that is not cancelable without penalty or further payment upon ninety (90) days' or less notice;

(d) any distribution or supply Contract (other than purchase orders in the ordinary course of business) under which the Seller purchases products or services relating to the Business involving total annual payments in excess of $1,000,000, and which is not terminable on sixty (60) days' or less notice or as to which the cost to terminate such Contract equals or exceeds $250,000;

(e) any Contract establishing any joint venture, strategic alliance, or other collaboration relating to the Business and any Contract relating to the Business between [_____] or Seller, on the one hand, and Seller or an Affiliate of Seller, on the other hand;

(f) each Contract or outstanding purchase orders relating to capital expenditures of the Business involving total payments of more than $250,000; and

(g) all Contracts with any present or former officer or employee of the Business pursuant to which such officer or employee is entitled to receive base compensation in excess of $150,000 on an annual basis.

Seller has provided Purchaser with a correct and complete copy of each of the Material Contracts.

4.7    Litigation; Decrees. Except as set forth in Schedule 4.7, (a) there are no claims, actions, proceedings or investigations pending or, to the Knowledge of Seller, threatened against the Seller pertaining to the Business or any of the Assets, or before any Governmental Authority pertaining to the Business or any of the Assets, and (b) neither the Seller nor the Assets of the Business, is subject to any Governmental Order.

4.8    Compliance with Laws. Except as disclosed in Schedule 4.8 and except for violations the existence of which would not be material to the continued operation of the Business, to the Knowledge of Seller the operation of the Business is being conducted in accordance with all applicable Laws (other than Environmental Laws which are governed solely by Section 4.9) and Governmental Orders and the Seller is not in violation of any such Law or Governmental Order, applicable to the Business.Environmental Matters. Seller has provided to Purchaser complete and correct copies of the [_____] and any other of its environmental due diligence relating to the Seller's acquisition of the Business from [_____]. Except as disclosed therein or in Schedule 4.9:

(i)    To the Knowledge of Seller, the Seller is conducting the operations of the Business in material compliance with all Environmental Laws;

(ii)    To the Knowledge of Seller, since March 31, 2004 the Seller has not received any notice of (x) non-compliance with or liability under any Environmental Law in respect of the ownership, occupancy, use or operation of the Owned Improvements, the Leased Facilities, the Leased Real Estate, the Assets or the operation of the Business, or (y) the existence of any actual or potential Environmental Condition;

MEI\5595723.1

(iii)    To the Knowledge of Seller, the Seller is not subject to any consent decrees or settlement agreements which impose obligations upon the Business as of the date of this Agreement arising out of, or relating to, Environmental Laws.

4.10    Employee Benefits Matters.

(a) Except as disclosed in Schedule 4.10(a), with respect to the Employee Benefit Plans, except as would not reasonably be expected to result in a Material Adverse Effect, each Employee Benefit Plan has been operated in all material respects in accordance with its terms and applicable Law. As of the Closing Date, all required contributions under any Employee Benefit Plan qualified under Section 401(a) of the Code will have been timely made.

(b) Seller's SIP has received a favorable determination letter from the Internal Revenue Service ("IRS") that such plan is so qualified. No fact or event has occurred since the date of such letter that could reasonably be construed as affecting the qualified status of such Plan.

(c) None of the Seller's Employee Benefit Plans is a multiemployer plan (as defined in Section 3(37) of ERISA). Neither Seller nor any ERISA Affiliate has any liability with respect to a multiemployer plan of any type whatsoever.

4.11    Labor and Employee Relations. Other than the Collective Bargaining Agreement, the Seller is not legally bound by any collective bargaining or other labor union contract applicable to persons who will be Transferred Employees. As of the date hereof, there is no labor dispute, strike or work stoppage, or, to the Knowledge of Seller, union organizational activity against or involving the Business pending or, to the Knowledge of Seller, threatened which would materially interfere with the Business.

4.12    Brokers. No broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the Transactions based upon arrangements made by or on behalf of the Seller, that is or will be payable by Purchaser.

4.13    Receivables. To the Knowledge of Seller, all the Receivables included in the Closing Statement (a) represent actual indebtedness incurred by the applicable account debtors; and (b) have arisen from bona fide transactions in the ordinary course of the Business.

4.14    Inventory. Each item of Inventory, is generally of useable and saleable quality in all material respects in the ordinary course of the Business (subject, in the case of raw materials and work-in-process, to the completion of the production process).

4.15    Financial Statements.

(a) Schedule 4.15(a) contains the management-prepared net asset statement of the Business as at June 30, 2005 (the "Business Net Asset Statement") and the related operating income statement for the half-year ended June 30, 2005 (the "Financial Statements"). The Financial Statements, to the Knowledge of Seller, present fairly in all material respects the financial position and results of operations of the Business (on a carve out basis) as of the date thereof and the periods covered thereby.

22

(b) To the Knowledge of Seller, since June 30, 2005, the Business has been conducted in the ordinary course of business and consistent with past practice, and there has not been any damage, destruction or loss to any of the material assets or properties of the Business or any other occurrence that constitutes a Material Adverse Effect.

4.16    Adequacy of Assets. Except for those assets made available under the Ancillary Agreements, services provided by [_____] and Seller from outside the Facility, including pursuant to the Services Agreement, and as otherwise disclosed in Schedule 4.16, the Assets constitute all of the assets, tangible and intangible, necessary to operate the Business in the manner in which it has been operated for the past year.

4.17    Exclusivity of Representations.

(a) The representations and warranties made by Seller in this Agreement or in the other Transaction Documents are in lieu of and are exclusive of all other representations and warranties. Except for the representations and warranties made by Seller in this Agreement or in the other Transaction Documents, the Assets are sold and the Assumed Liabilities are transferred hereby on an "as is," "where is" basis and Seller makes no representation or warranty, express or implied, written or oral and hereby disclaims any such representation or warranty to the maximum extent permitted by applicable Law No misstatement or inaccuracy contained in any documentation or other information in the Data Room shall be deemed a representation or warranty hereunder or otherwise.

(b) The Purchaser acknowledges that the representations and warranties contained in Sections 4.2, 4.4, 4.5, 4.9 and 4.10 are the only representations and warranties being made with respect to (A) Taxes, (B) the Owned Improvements, (C) Intellectual Property, (D) compliance with or liability under Environmental Laws and (E) ERISA or similar foreign laws, respectively, or with respect to any environmental, health or safety, Intellectual Property, employee, or Tax matter related in any way to the Business or to this Agreement or its subject matter.

(c) None of the representations or warranties made by Seller in this Agreement is or shall be construed or deemed to be made with respect to any Excluded Asset or Excluded Liability or any Contract, note or other instrument or document constituting, evidencing or relating exclusively to any Excluded Asset or Excluded Liability.

(d) Any information set forth in any one Disclosure Schedule attached hereto shall be deemed to be disclosed in all Disclosure Schedules attached hereto.

(e) If at any time prior to the date hereof, to the Knowledge of the Purchaser there is any inaccuracy of any representation, warranty, or other statement of the Seller in this Agreement or in any instrument or certificate delivered by Seller to Purchaser pursuant hereto, the Purchaser shall immediately so notify the Seller.

MEI\5595723.1

## ARTICLE V

## <u>REPRESENTATIONS AND WARRANTIES OF THE PURCHASER</u>

The Purchaser hereby represents and warrants to Seller as follows:

    5.1    <u>Authority; No Conflicts; Governmental Consents</u>.

    (a) The Purchaser is a corporation duly organized, validly existing and in good standing under the laws of the State of Connecticut. The Purchaser has all necessary power and authority to enter into the Transaction Documents to which the Purchaser is a party, to carry out its obligations thereunder and to consummate the Transactions. This Agreement has been, and each of the other Transaction Documents to which the Purchaser is a party, when executed, will be, duly authorized, executed and delivered by the Purchaser, and (assuming due authorization, execution and delivery by the other parties thereto), constitute legal, valid and binding obligations of the Purchaser, enforceable against the Purchaser in accordance with their respective terms except as enforceability may be limited by general equitable principles (regardless of whether such enforceability is considered in a proceeding in equity or law).

    (b)    The execution, delivery and performance by the Purchaser of this Agreement does not, and of the other Transaction Documents to which it is a party will not (i) violate or conflict with the organizational or governing documents of the Purchaser, (ii) conflict with or violate any Law or Governmental Order applicable to the Purchaser, or (iii) result in any breach of, or constitute a default (or an event which with the giving of notice or lapse of time, or both, would become a default) under, or give to others any rights of termination, amendment, acceleration, suspension, revocation or cancellation of, or result in the creation of any Lien on any of the assets of the Purchaser pursuant to, any Contract to which the Purchaser is a party or by which any of its assets is bound or affected, except (x) for the consents, approvals or authorizations set forth on Schedule 5.1(b), which have been obtained, (y) the consents, approvals, authorizations and other actions described in Section 5.1(c) and (z) in the case of clause (iii) as have not resulted and would not reasonably be expected to result in a material adverse effect on the ability of the Purchaser to consummate the Transactions.

    (c) Except as set forth on Schedule 5.1(c), no consent, approval, license, permit, order or authorization of, or registration, declaration or filing with, or notification to, any Governmental Authority is required to be obtained or made by or with respect to the Purchaser in connection with the execution and delivery of the Transaction Documents or the consummation of the Transactions.

    5.2    <u>Financing</u>. Purchaser's available funds are sufficient to consummate the Transactions, and to perform Purchaser's and its Affiliates obligations under, the Transaction Documents, and any certificate or other document delivered pursuant to the Transaction Documents and to pay the fees and expenses it incurs in connection with such transactions and obligations.

MEI\5595723.1

5.3   Brokers. No broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the Transactions based upon arrangements made by or on behalf of the Purchaser, that is or will be payable by the Seller.

5.4   Litigation. Except for the Bankruptcy Proceeding, there are no (a) claims, actions, proceedings or investigations pending against the Purchaser before any Governmental Authority or (b) Governmental Orders to which the Purchaser is subject that, individually or in the aggregate, could prevent the Purchaser from performing its material obligations under the Transaction Documents or prevent or materially delay the consummation of the Transactions.

## ARTICLE VI

## COVENANTS OF SELLER

Seller covenants and agrees as follows:

6.1   Access to Information.

(a) Subject to the provisions of Section 7.1, from the date hereof until the Closing Date, upon reasonable notice, Seller shall, and shall cause each of its officers, directors, employees, agents, accountants and counsel, to afford the officers, employees and authorized agents, accountants, counsel, and representatives of the Purchaser reasonable access, during normal business hours and upon reasonable notice, to the offices, properties, plants, other facilities, and Records related to the Business; provided, however, (i) that such access does not unreasonably disrupt the normal operations of the Business, (ii) that Seller is under no obligation to disclose to the Purchaser any information, the disclosure of which is restricted by Contract or Law, except in strict compliance with the applicable Contract or applicable Law and (iii) that Seller is under no obligation to disclose to the Purchaser any information as to which the attorney-client privilege may be available; and provided, further, that Seller shall not be required to furnish any information which requires Seller to incur any out-of-pocket cost or expense unless or until the Purchaser enters into arrangements reasonably satisfactory to Seller pursuant to which the Purchaser will bear or reimburse Seller for such cost or expense.

(b) In order to facilitate the resolution of any claims made by or against Seller or any of its Affiliates relating to the Business prior to the Closing, for a period of seven (7) years, or such longer period as may be required by Law, after the Closing, the Purchaser shall (i) retain the Records relating to periods prior to the Closing in a manner reasonably consistent with the prior practices of the Business, (ii) upon reasonable notice, afford the officers, employees, authorized agents, accountants, counsel and representatives of the Seller reasonable access (including the right to make, at such party's expense, photocopies), during normal business hours, to such books and records, (iii) upon reasonable notice, furnish to the officers, employees, authorized agents, accountants, counsel and representatives of the Seller, such additional financial and other information regarding the Business as such party may from time to time reasonably request and (iv) upon reasonable notice, make available to the Seller, the employees of the Business and any successors whose assistance, testimony or presence is necessary to assist such party in evaluating any such claims and in defending such claims, including the presence of such persons as witnesses in hearings or trials for such purposes; provided, however, that such

25

investigation shall not unreasonably interfere with the business or operations of the Purchaser.

(c) In connection with its investigation of the Business and review of information and documentation relating to the Business, the Purchaser has received certain estimates, projections and other forecasts for the Business, and certain plan and budget information. The Purchaser acknowledges that there are uncertainties inherent in attempting to make such estimates, projections, forecasts, plans and budgets, that they shall make their own evaluation of the adequacy and accuracy of all estimates, projections, forecasts, plans and budgets so furnished to it, and that it will not assert any claim against Seller or any of its Affiliates or any of their respective directors, officers, employees, agents, stockholders, consultants, investment bankers, accountants or representatives, or hold the Seller or any such persons liable with respect thereto. Accordingly, the Seller makes no representation or warranty with respect to any estimates, projections, forecasts, plans or budgets referred to in this Section 6.1(c).

6.2    Ordinary Conduct. Except as contemplated by this Agreement or as set forth in Schedule 6.2(a), or except as specifically required by the terms of any Contract referenced on any Schedule hereto, from the date hereof to the Closing Date, the Seller covenants and agrees, unless the Purchaser shall otherwise agree in writing (such agreement not to be unreasonably withheld or delayed):

(a) to cause the operations of the Business to be conducted in all material respects in the ordinary course and consistent with past practice; provided, however, that no action by the Seller with respect to matters specifically addressed by any provision of Section 6.2(b) shall be deemed a breach of this Section 6.2(a) unless such action would constitute a breach of any such provision of Section 6.2(b); and

(b) that it will not take any of the following actions:

(i)    except in the ordinary course of business consistent with past practice, sell, assign, transfer, lease or otherwise dispose of or agree to sell, assign, transfer, lease or otherwise dispose of any of the material assets or personal and real property of the Business;

(ii)    subject to any Lien (other than any Permitted Liens), any of the material assets (whether tangible or intangible) or personal or real property of the Business;

(iii)    amend, terminate, cancel, settle or compromise any material claim of the Business other than any claim with respect to an Excluded Asset or Excluded Liability;

(iv)    make any change in any method of accounting or accounting practice or policy used by the Business other than changes that are required by GAAP or applicable Law;

(v)    enter into any agreement, arrangement or transaction with any Affiliate of Seller with respect to the Business other than as contemplated by the Transaction Documents;

26

(vi)    except in the ordinary course of business consistent with past practice, amend, modify or supplement any Material Contract;

(vii)    enter into, modify or terminate any labor or collective bargaining agreement relating exclusively to the Business or make any commitment or incur any liability to any labor organization relating to Transferred Employees except in the ordinary course of business and except as contemplated by that certain Memorandum of Agreement between Seller and IUEES entered into on or about March 7, 2006; or

(viii)    enter into or amend any contract, agreement, commitment or arrangement with respect to any matter set forth in this Section 6.2(b).

Notwithstanding anything herein to the contrary, the parties hereby acknowledge that the limitations on the conduct of the Seller set out in this Section 6.2(b) shall not apply if, in the reasonable opinion of Seller, the circumstances require immediate action from the Seller or management of the Business; provided, that Seller provides Purchaser with notice of such action as soon as possible thereafter.

6.3    Insurance.  Seller shall keep, or cause to be kept, all insurance policies presently maintained relating to the Business or the Assets, or replacements therefor, in full force and effect through the Closing.  Immediately following the Closing, coverage for the Business and the Assets under all such insurance policies shall be cancelled and terminated, and Seller shall have no obligation to insure the Business or the Assets against any Loss in or under any insurance policy of Seller or its Affiliates, and the Purchaser shall have no rights or obligations with respect to any such policy.

6.4    Accounts Receivable.  The Seller agrees to promptly forward to Purchaser any and all proceeds from Receivables of the Business that are received by the Seller after the Closing Date and included in the Final Closing Working Capital Amount.

6.5    Confidential Information.  For a period of seven (7) years after the Closing, Seller will hold, and will use its reasonable efforts to cause its officers, directors, employees, accountants, counsel, consultants, advisors and agents ("Representatives") to hold, in confidence, unless compelled to disclose by any applicable Law or Governmental Order, all confidential documents and information concerning the Business, except to the extent that such information is (a) in the public domain through no fault of Seller or any of its Representatives or (b) later lawfully acquired by Seller on a non-confidential basis from sources other than Purchaser or any of its Affiliates.  The obligation of Seller to hold any such information in confidence shall be satisfied if it exercises the same care with respect to such information as Seller would take to preserve the confidentiality of its own similar information.

6.6    Permits.  Prior to and, as necessary, after the Closing, the Seller shall use commercially reasonable efforts to make the filings, applications and submissions with or to Governmental Authorities, necessary or required to transfer to the Purchaser all Permits so that Purchaser may continue to own, occupy, use and operate the Assets, including the Owned Improvements Leased Facilities or Leased Real Estate, and to conduct the Business, after the Closing without unreasonable interruption and in a similar manner as prior to the Closing

MEI\5595723.1

(subject to the actions necessary for Seller or [____] to implement or complete any Remedial Actions for the Facility or other actions required by a Governmental Authority). To the extent Seller reasonably determines that it is impracticable to transfer any such Permits to the Purchaser, the Seller shall, to the extent authorized by applicable Law, permit the Purchaser to operate under the aegis of the Permit issued to the Seller, subject to the terms and conditions of the Transition Services Agreement and Paragraph 10.3 of this Agreement.

      6.7    Environmental.

      (a) Prior to the Closing, Seller shall apply for and use commercially reasonable efforts to obtain at its sole expense either (i) a written determination of the NJDEP that ISRA is not applicable to the Transactions; or (ii) written authorization by the NJDEP to complete the Transactions issued pursuant to N.J.S.A. 7:1K-11.5 (such determination or authorization is referred to herein as "ISRA Clearance").

      (b) Seller and Purchaser acknowledge that, as of the date hereof, [____] is performing Remedial Actions on the Facility pursuant to ISRA. The Purchaser agrees that [____] shall have full control over matters relating to compliance with [____]'s ISRA obligations, and further agrees to have no contact with Government Authorities or other third parties regarding [____]'s activities in connection with its compliance with ISRA (except to the extent necessary to respond to inquiries from NJDEP or other Governmental Authority, provided the Purchaser shall have given prior written notice to [____] and to Seller of the inquiry and the proposed response no less than five (5) Business Days prior to such response).

      6.8    Seller's Covenant Not to Compete. For a period of five (5) years after the Closing Date, neither Seller nor any of its Affiliates (the "Seller Group") shall engage, or have any ownership interest in any Person that engages, directly or indirectly, in **[blending, repackaging, marketing, selling and/or distributing TiCl4, TiCl3, VACAC, VOCL3 and VTI blends, in those countries where the Business currently operates or where the products of the Business are currently offered for sale]**; except that nothing in this Section shall prohibit the Seller Group (i) from owning up to 1% of the outstanding voting securities of any publicly traded entity or (ii) from engaging in a business which utilizes TiC13 or TiCl4 in a supported catalyst system.

      6.9    Confidentiality and Non-Use. From and for a period of seven (7) years after the Closing Date, the Seller Group (and the successors and assigns of any members thereof) shall keep strictly confidential and not use proprietary technology and other non-public information relating exclusively to the Business and the Assets. This Section 6.9 shall not apply to the extent that such information is (a) in the public domain through no fault of Seller or any of its Representatives or (b) later lawfully acquired by Seller on a non-confidential basis from sources other than Purchaser or any of its Affiliates, provided that such source is not known by Seller to be prohibited from disclosing such information by a legal, contractual or fiduciary obligation to the Purchaser and did not obtain the information from an entity or person prohibited from disclosing such information by a legal, contractual or fiduciary obligation to the Purchaser. This Section 6.9 shall only take effect if the Closing occurs.

6.10    Termination of Employee Confidentiality Restrictions. Effective as of their commencement of employment by Purchaser, all restrictions on the Transferred Employees (other than those Transferred Employees listed on Schedule 6.10) respecting disclosure and use of intellectual property and other confidential information of the Seller Group relating exclusively to the Business shall terminate and be of no further force or effect.

## ARTICLE VII

## COVENANTS OF THE PURCHASER

The Purchaser covenants and agrees as follows:

7.1    Confidentiality. The Purchaser acknowledges that the information being provided to it by Seller, its Affiliates and their respective representatives is subject to the terms of a Confidentiality Agreement between the parties dated March 8, 2006 (the "Confidentiality Agreement"), the terms of which are incorporated herein by reference. Notwithstanding anything to the contrary contained in the Confidentiality Agreement, effective upon, and only upon, the Closing, the Confidentiality Agreement will terminate; provided, however, that the Purchaser acknowledges that the Confidentiality Agreement will terminate only with respect to information relating solely to the Business; and provided, further, however, that the Purchaser acknowledges that any and all other information provided to it by Seller, its Affiliates or their respective existing or former representatives, agents or employees concerning the Seller prior to the Closing shall remain subject to the terms and conditions of the Confidentiality Agreement after the date of the Closing. **[Without limiting the foregoing, Purchaser acknowledges that the Transferred Employees will possess confidential information concerning Seller and agrees to hold in confidence, unless compelled to disclose by any applicable Law or Governmental Order, all confidential documents and information concerning the Seller's business, other than the Business; provided, however, that the foregoing shall not be construed or interpreted to impose liability upon Purchaser for noncompliance with, or breach by any such Transferred Employee of, any terms or conditions of any confidentiality agreement or arrangement between Transferred Employee and the Seller.]**

7.2    Waiver of Bulk Sales Law Compliance. The Purchaser hereby waives compliance by Seller with the requirements, if any, of Article 6 of the Uniform Commercial Code as in force in any state in which Assets are located and all other Laws applicable to bulk sales and transfers, to the extent applicable to the Transactions; and Seller agrees to indemnify and hold harmless Purchaser from any Losses resulting from the failure to comply with such Laws.

7.3    Use of "[_____]" or "[_____]" Name. Notwithstanding any other provision of this Agreement to the contrary, no interest in or right to use the name "[_____]" or "[_____]" or any other corporate name of [_____] or the Seller or any Affiliate thereof or any domain name, logo, trademark, service mark or trade name or any derivation thereof, alone or in combination with other elements, of [_____] or Seller or its Affiliates with respect to, or associated with, [_____] or Seller or its Affiliates or their businesses (collectively, the "Retained Names and Marks") is being transferred to the Purchaser pursuant to the Transactions. The Purchaser, on or promptly following the Closing Date, will, and will cause its Affiliates to, remove or obliterate

29

all the Retained Names and Marks from signs on the Leased Real Estate or Owned Improvements and, within sixty (60) days will not, and will cause its Affiliates not to, use any such names or marks on any purchase orders, invoices, sales orders, labels, letterheads, shipping documents, and other items and materials related to the Business and otherwise, and shall not use or put into use after such sixty (60) day period after the Closing Date any such items and materials not in existence on the Closing Date that bear any Retained Names and Marks or any name, mark or logo similar thereto; provided, however, that such sixty (60) day period shall not apply to any cylinders that are not located at the Facility as of the Closing Date and the Purchaser agrees to use its commercially reasonable efforts to remove or obliterate all such Retained Names and Marks on any such cylinders upon their return to the Facility.

7.4    <u>Non-Business Receivables</u>. After the Closing Date, following receipt of proceeds from any right, interest, claim or other asset of Seller or any of its Affiliates that is not included in the Assets, and determination that such proceeds are not proceeds of the Assets and are assets of Seller or any of its Affiliates, the Purchaser agrees to, and will cause its respective Affiliates to, promptly forward to Seller or Seller's Affiliate, as applicable, any and all such proceeds that are received by the Purchaser after the Closing Date.

7.5    <u>Environmental</u>.

(a) In order to facilitate (i) [_____]'s or Seller's compliance with any investigative, monitoring, sampling, remedial, or other requirements imposed on [_____] or Seller in connection with [_____]'s or Seller's obligations to NJDEP (or any other Governmental Authority) pursuant to ISRA with respect to the Owned Improvements, the Leased Facilities or the Leased Real Estate, or (ii) the Seller's compliance with the contractual obligations to [_____] in relation to the satisfaction of such requirements with respect to the Owned Improvements, the Leased Facilities and the Leased Real Estate disclosed in Schedule 7.5, Purchaser (i) shall, and shall cause each of its officers, employees, agents, advisors and representatives, to cooperate with [_____] and/or Seller in complying with such obligations, including affording the officers, employees, advisors and representatives of [_____] or Seller reasonable access, during normal business hours and upon reasonable notice, to the Owned Improvements, the Leased Facilities and the Leased Real Estate; and (ii) agrees that, in connection with any transfer, sale, lease or other disposition by Purchaser to any Person ("<u>Purchaser Transferee</u>") of the Owned Improvements or its leasehold interest in the Leased Facilities or the Leased Real Estate, the Purchaser will require that, as a condition to the consummation of any such transfer, such Purchaser Transferee agree in writing (in a form and content reasonably acceptable to [_____] and the Seller) to comply with, and to require that its subsequent transferee comply with, the obligations and restrictions in this Section 7.5(a) including this subclause (ii).

(b) The Purchaser (i) acknowledges that it is aware of the contents of the Restrictive Property Deed and agrees to comply with any restrictions contained in the Restrictive Property Deed, and (ii) agrees that in connection with any transfer, sale, lease or other disposition of, or granting of a Lien on the Owned Improvements by the Purchaser, or its leasehold interest in the Leased Facilities or the Leased Real Estate, the Purchaser will require that, as a condition to the consummation of any such transfer, such Purchaser Transferee agree in writing (in a form and content reasonably acceptable to Seller) to comply with, and to require that its subsequent transferee comply with, the obligations and restrictions in this Section 7.5(b),

including this subclause (ii).

7.6     <u>Buy Back Opportunity</u>  .  **[Under Discussion]**

(a) If in the absence of any offer to purchase all or a substantial portion of the Purchaser's assets at the Facility,  the Purchaser's board of directors determines that the Purchaser will cease to conduct business at the Facility, either by (i) shutting down or discontinuing its business or (ii) selling all or a substantial portion of its assets at the Facility, Purchaser shall give written notice thereof to Seller within ten (10) days following such determination (the "<u>Proposed Disposition Notice</u>").  The Proposed Disposition Notice shall offer the Seller the first right to negotiate with the Purchaser for the purchase by the Seller of the assets.  If the Seller elects to accept the First Right of Negotiation, then the Seller and the Purchaser shall, during the thirty (30) day period immediately following receipt by the Seller of the Proposed Disposition Notice, negotiate in good faith for the purchase by the Seller of the assets or a portion thereof.  Purchaser shall in good faith consider any offer to purchase the assets received from Seller but, except as provided in Section 7.6(b), shall not be obligated to accept any such offer.

(b) If the Purchaser receives an unsolicited offer (an "Offer") from a third party to purchase all or a substantial portion of its assets at the Facility from Purchaser, before Purchaser may accept the Offer, Purchaser shall disclose in writing to Seller the terms of the Offer and provide Seller with no fewer than ten (10) days in which to elect (by written notice to Purchaser) to buy such assets on terms equal to those contained in the Offer.  Notwithstanding the foregoing, Purchaser shall have no obligation to provide Seller with notice of the Offer or the opportunity to purchase such assets if:  (i) Purchaser does not intend to (and in fact does not) accept the Offer; or (ii) disclosure of the terms of the Offer is prohibited by one of the terms of the Offer.  If the Purchaser does not accept the Offer and negotiates further with the offeror, it will provide the Seller the opportunity to bid on the assets.

(c) The foregoing provisions of this Section 7.6 shall apply to the discontinuance of business or the sale of assets solely at the Facility, and shall not apply to any sale or discontinuance of business at the Facility as part of the sale of a broader business line by Purchaser or part of a larger sale transaction by Purchaser.

7.7     <u>Facility Guidelines</u>.  The parties shall establish health, safety and other regulations (the "Site Rules") applicable to the conduct of the Business and the activities conducted by the Purchaser at the Facility.  The Site Rules shall be based upon the Seller's current rules and regulations at the Facility and Purchaser shall have the right to suggest modifications thereto.  The parties shall use their best efforts to cause their employees, consultants, representatives and agents, including the Transferred Employees of the Purchaser to, comply with the Site Rules.  The parties further agree that their respective employees, consultants, representatives and agents, including the Transferred Employees, shall be subject to any and all disciplinary action or sanctions which are applicable generally to such employees, consultants, representative and agents as a result of a violation of such Site Rules.

31

## ARTICLE VIII

## MUTUAL COVENANTS

Each of Seller and Purchaser covenants and agrees as follows:

8.1     Permits; Novations and Consents.

(a) As promptly as practicable after the date hereof, Purchaser and Seller shall make all filings with any Governmental Authority and other regulatory authorities, and use their reasonable best efforts to obtain all permits, approvals, authorizations and consents of all third parties, required to consummate the Transactions, including without limitation pre-merger filings in Germany and any other jurisdiction where such filings are required. Purchaser and Seller shall furnish promptly to each other all information that is not otherwise available to the other party and that such party may reasonably request in connection with any such filing. Seller and Purchaser shall promptly furnish the other with copies of notices or other communications received by them or their respective Affiliates from any Governmental Authority with respect to the Transactions.

(b) Nothing contained in this Agreement shall be construed as an attempt or agreement to assign, convey or transfer any Contract, or any claim, right or benefit arising thereunder or resulting therefrom, that is not capable of being validly assigned, conveyed and transferred without an approval or the consent of a third party unless such approval or consent shall have been obtained and remains in full force and effect at the Closing. If any such an approval or consent in respect of a Contract is not obtained prior to the Closing or does not remain in full force and effect at the Closing, the Purchaser and the Seller shall use reasonable efforts to continue to obtain such consent and to enter into a mutually agreeable, reasonable and lawful arrangement under which the Purchaser obtains the benefits and assumes the obligations in respect of such Contract from and after the Closing Date in accordance with this Agreement, including subcontracting, sublicensing or subleasing to the Purchaser, and under which the Seller would enforce for the benefit of the Purchaser, with the Purchaser assuming the obligations, any and all rights of the Seller against a third Person party thereto. Notwithstanding the foregoing, the Seller shall not be required to pay consideration to any third party to obtain any such consent or approval.

8.2     Reasonable Best Efforts. Subject to the terms and conditions of this Agreement, each party hereto will use its reasonable best efforts to take, or cause to be taken, all appropriate action, and to do, or cause to be done, all things necessary, proper or advisable under applicable Laws, and execute and deliver such documents and other papers, as may be required to carry out the provisions of this Agreement and to consummate and make effective the Transactions. Each of Seller and Purchaser will promptly notify the other after learning of the occurrence of any event or circumstance which would reasonably be expected to cause any condition to Closing not to be satisfied or to cause Closing to be delayed.

8.3     Publicity. The Seller and the Purchaser agree that, from the date hereof through the Closing Date, no public release or announcement concerning the Transactions shall be issued without the prior consent of each party (which consent shall not be unreasonably

32

withheld or delayed), except as such release or announcement may be required by any Law, in which case the party required to make the release or announcement shall allow the other party reasonable time to comment on such release or announcement in advance of such issuance.

8.4    Cooperation. Purchaser and Seller shall cooperate with each other and shall cause their officers, employees, agents, auditors and representatives to cooperate with each other after the Closing to ensure the orderly transition of the Business to Purchaser and to minimize any disruption to the respective businesses of Seller or the Business that might result from the Transactions. Neither party shall be required by this Section 8.4 to take any action that would unreasonably interfere with the conduct of its business.

8.5    Records. On or after the Closing Date, Seller, at Purchaser's request, shall deliver or cause to be delivered to Purchaser all Records in their possession which are material to and pertain exclusively to the Business (to the extent not then in the possession of the Business), except any Records relating to Excluded Assets or Excluded Liabilities (including to Seller's Tax liability for which Purchaser has no successor liability under applicable Law, or to any litigation or claim not assumed by Purchaser hereunder). After the Closing, upon reasonable written notice, Seller agrees to furnish or cause to be furnished to Purchaser and its representatives (including its auditors), access at reasonable times and during normal business hours to such information relating to the Business in Seller's possession as is reasonably necessary for financial reporting and accounting matters and Seller will permit Purchaser or such representatives to make abstracts from, or copies of, any of such information as may be reasonably requested by Purchaser at Purchaser's sole cost and expense; provided, however, that such access does not unreasonably disrupt the normal operations of Seller. For a period of five (5) years following the Closing, Seller will retain all of such information relating to the Business. Notwithstanding anything to the contrary contained herein, Seller and its Affiliates will retain files pertaining to the patents and trademarks included in the Assets until such time as all actions of Seller to effect the transfer of such patents and trademarks is completed.

8.6    Tax Matters.

(a) Seller shall prepare or cause to be prepared and timely and properly file or cause to be timely and properly filed all Tax Returns of or with respect to the Business for all periods up to and including the Closing Date (taking into account valid extensions of time to file), and shall timely and properly pay or cause to be timely and properly paid the Taxes required to be paid with respect to such Tax Returns. Purchaser shall prepare or cause to be prepared and timely and properly file or cause to be timely and properly filed all other Tax Returns of or with respect to the Business, and shall timely and properly pay or cause to be timely and properly paid the Taxes required to be paid with respect to such Tax Returns. Seller and Purchaser shall cooperate, provide to the other party such information and render to the other party such other assistance, including the timely completion of Tax information requests or packages, as may reasonably be requested in order to ensure the proper and timely preparation and filing of Tax Returns.

(b) Seller shall be liable for and shall indemnify and hold harmless Purchaser and its Affiliates from any and all Taxes which relate to or result from any liability for Taxes imposed on or with respect to the Business for any Tax period ending on or before the Closing or

33

the portion of any other Tax period on or before the Closing, but excluding (i) Purchaser's share of any Transfer Taxes pursuant to Section 2.7 and (ii) any Taxes for which Purchaser is liable under Section 2.8. Purchaser shall be liable for and shall indemnify and hold harmless Seller and its Affiliates from any and all Taxes which relate to or result from any liability for Taxes imposed on or with respect to the Business for any Tax period beginning after the Closing or the portion of any other Tax period that is after the Closing. For purposes of this Agreement, ad valorem, property, capital or similar Taxes, shall be prorated on a per diem basis. Unless otherwise required by Law, the parties shall treat any indemnification payment under this Section 8.6 for foreign, federal, state and local income Tax purposes as an adjustment to the Purchase Price.

(c) If notice of an audit, examination or other proceeding is received from any Tax authority, which, if successful, might result in an indemnity payment to any Person hereunder (a "Tax Indemnitee"), the Tax Indemnitee shall promptly (in no event later than fifteen (15) days after receipt of such notice) notify the party against whom indemnification is or may be sought (the "Tax Indemnitor") in writing of such potential claim (a "Tax Claim") and if notice of a Tax Claim is not timely provided to the Tax Indemnitor, the Tax Indemnitor shall not be liable to the Tax Indemnitee to the extent that the Tax Indemnitor's ability to effectively contest such Tax Claim is actually prejudiced as a result thereof.

With respect to any Tax Claim, the Tax Indemnitor shall control all audits, examinations and other proceedings in connection with such Tax Claim (including selection of counsel) and, without limiting the foregoing, may in its sole discretion pursue or forego any and all administrative appeals, proceedings, hearings and conferences with any Tax authority with respect thereto and may, in its sole discretion, either pay any Tax claimed and sue for a refund where applicable Law permits such refund suits or contest the Tax Claim in any permissible manner; provided, however, that the Tax Indemnitor shall not settle or compromise a Tax Claim without giving fifteen (15) days' prior notice to the Tax Indemnitee, and without the Tax Indemnitee's consent, which shall not be unreasonably withheld or delayed, if such settlement or compromise would have a material adverse effect on the Tax liabilities of the Tax Indemnitee for which the Tax Indemnitor would not be required to indemnify the Tax Indemnitee. The Tax Indemnitee, and each of its Affiliates, shall cooperate with the Tax Indemnitor in contesting any Tax Claim, which cooperation shall include the retention and (upon the Tax Indemnitor's request) the provision to the Tax Indemnitor of records and information which are reasonably relevant to such Tax Claim, making employees available on a mutually convenient basis to provide additional information or explanation of any material provided hereunder or to testify at proceedings relating to such Tax Claim, providing to the Tax Indemnitor necessary authorizations, including powers of attorney, to control any audits, examinations and other proceedings which the Tax Indemnitor is entitled to control pursuant to this paragraph (c) and executing any documents necessary for the Tax Indemnitor to settle any such audit, examination or other proceeding.

8.7    Litigation Support. In the event and for so long as either Purchaser or Seller actively is contesting, defending against, or otherwise involved in, any action, suit, proceeding, hearing, arbitration, investigation, charge, complaint, claim, or demand in connection with (a) any transaction contemplated under this Agreement or (b) any fact, situation, circumstance, status, condition, activity, practice, plan, occurrence, event, incident, action, failure to act, or

34

transaction on or prior to the Closing Date involving the Business, including any such matters between Seller and [____], the other party will cooperate with the contesting, defending or involved party and its counsel in the contest or defense, make available its personnel, and provide such testimony and access to its books and records as shall be reasonably necessary in connection with the contest or defense, all at the sole cost and expense of the contesting or defending party (unless the contesting or defending party is entitled to indemnification therefor under Article X below). Neither Purchaser nor Seller shall be required by this Section 8.7 to take any action that would materially interfere with the conduct of its business or materially disrupt its normal operations. This Section 8.7 shall not be applicable with respect to disputes between the Seller and the Purchaser arising under this Agreement.

8.8     Non-Solicitation. From the date hereof, neither party nor its Affiliates shall solicit the employment, offer employment, or hire any Person other than the Employees who is an employee of the other party or its Affiliates at the Facility at the time of such solicitation, offer or hire, without the prior written consent of such other party.

## ARTICLE IX

## EMPLOYEE BENEFIT MATTERS

9.1     Transferred Employees. Within ten (10) days prior to the Closing Date, Seller will deliver to Purchaser an updated Schedule 9.1 which contains a then-current list of Employees. Schedule 9.1 shall include a complete and accurate list showing for each Salaried and Hourly Employee, as applicable: (i) employee name, position held, annual base salary, target incentive compensation and equity compensation; (ii) credited service date; (iii) vacation eligibility for calendar year 2006; (iv) leave status (including type of leave, expected return date for non-disability related leaves and expiration dates for disability leaves); (v) hourly salary; and (vi) the name of any union, collective bargaining agreement or other similar labor agreement covering such Employee. Purchaser shall offer employment to all of the Employees. Purchaser agrees that it will offer terms and conditions of employment with Purchaser to each Employee (i) who is a Salaried Employee on or before the Hire Date that are substantially similar to the terms and conditions of employment of other similarly situated newly hired employees of Purchaser and (ii) who is an Hourly Employee on or before the Hire Date that are consistent with the requirements of the Collective Bargaining Agreement and any revisions thereto in connection with the Transactions.

9.2     Indemnification for Employment Costs and Employment Liabilities. The Seller shall be responsible for and agree to indemnify the Purchaser against and hold it harmless from any and all Employment Costs and Employment Liabilities arising in respect of any Transferred Employee on or prior to the Hire Date. The Purchaser shall be responsible for and agree to indemnify the Seller against and hold harmless from any and all Employment Costs and Employment Liabilities arising in respect of any Transferred Employee after the Hire Date.

9.3     Health and Welfare Plans; Insurance Claims.

(a) Seller shall be responsible for medical services rendered in connection with employer-sponsored plans to each Transferred Employee and his eligible spouse and dependents

on or prior to the Hire Date. Purchaser shall be responsible for medical services rendered in connection with employer-sponsored plans to each Transferred Employee and his dependents after the Hire Date solely to the extent to which such Transferred Employees and eligible dependents may be entitled under the terms of the Purchaser's medical plans.

(b) Effective as of the Hire Date, Purchaser shall be responsible for any and all benefits (including post-retirement life insurance) for Transferred Employees and their eligible dependents, under group life, travel and accident insurance plans or policies sponsored by Purchaser or its Affiliates to the extent such benefits are available under such plans and solely to the extent such Transferred Employees (or their eligible dependents) may be eligible for benefits under such plans. Seller shall be responsible for any claims or benefits incurred prior to the Hire Date but on or after the date a Transferred Employee became employed by Seller under any Employee Benefit Plans.

9.4     Health and Welfare Plans and Limitations. Effective as of the Hire Date, Purchaser shall permit each Transferred Employee to enroll in a group health plan sponsored or maintained by Purchaser and cause to be waived any waiting periods and any preexisting condition limitations under such group health plan applicable to each Transferred Employee or his dependents on and after the Hire Date.

9.5     Severance. In the event: (i) a Transferred Employee's employment is involuntarily terminated (other than for cause) by the Purchaser or any of its Affiliates within twelve (12) months of the Closing Date, (ii) the Purchaser offers a severance program for such terminated Transferred Employee, and (iii) such severance program includes a component related to years of service (including for purposes of eligibility and vesting accrual), then the Purchaser shall give such Transferred Employee credit for his or her years of service with Seller, [____],[____], and [____], and [____] (collectively, the "[____] Companies").

9.6     Participation in Seller Plans. Except as provided herein regarding flexible spending accounts in Section 9.11, as of the Hire Date, Transferred Employees and their beneficiaries and dependents shall cease to participate in and accrue benefits under all Employee Benefit Plans and other benefit programs, policies and arrangements of Seller and its Affiliates. Except as provided herein regarding flexible spending accounts in Section 9.11, Purchaser shall not assume sponsorship, maintenance or administration of any Employee Benefit Plan (or other benefit programs, policies and arrangements of Seller and its Affiliates) or receive or assume any assets or liabilities in connection with any such plan, program, policy or arrangement.

9.7     Retirement Plans.

(a) Purchaser shall offer to Transferred Employees participation in all of Purchaser's employee pension benefit plans, as defined in ERISA Section 3(2)(A) (the "Purchaser's Pension Plans"), as of the Closing Date under the same terms as offered to other similarly situated newly hired employees of Purchaser. Service of Transferred Employees with Seller or any of its Affiliates and the [____] Companies, will be credited for participation and vesting purposes, but will not be credited under Purchaser's Pension Plans for benefit accrual purposes.

36

(b) Seller and Purchaser shall cooperate and take all steps reasonably necessary or appropriate so that, as soon as practicable following the Closing Date, the Transferred Employees who are participants in the Seller's Savings and Investment Plan (the "Seller's SIP") may elect to rollover their individual account balances into Purchaser's Section 401(k) plan ("Purchaser's S&I Plan"), subject to and in accordance with the terms of Purchaser's S&I Plan. To the extent a Transferred Employee's account balance consists, in whole or in part, of an outstanding loan, the Transferred Employees will have a one-time opportunity to elect to rollover the full account with the loan into Purchaser's S&I Plan, and if so elected Seller's SIP trustee shall transfer and assign to Purchaser's S&I Plan trustee, and Purchaser's S&I Plan trustee shall accept and assume in lieu of cash, the promissory notes and related documents evidencing such loan. Purchaser's S&I Plan shall be tax-qualified under Section 401(a) of the Code when the transfers described herein are made.

9.8    COBRA. Seller shall remain responsible for providing Consolidated Omnibus Reconciliation Act of 1985, as amended ("COBRA") continuation coverage for any individual who is receiving or who is eligible to receive continuation coverage under Section 4980B of the Code under a group health plan of Seller for events occurring prior to the Hire Date, and Purchaser shall not have any responsibility to provide COBRA continuation coverage with respect to any such individual.

9.9    Workers' Compensation. Effective as of the Hire Date, Purchaser shall provide Transferred Employees with coverage for workers' compensation benefits for claims arising as a result of events occurring on or after the Hire Date. Seller shall remain solely responsible for providing Employees with workers compensation benefits for any claims arising from events occurring prior to the Hire Date, but on or after the Transferred Employees become employed by Seller.

9.10    WARN. To the extent that any obligations might arise under the Worker Adjustment Retraining Notification Act ("WARN"), 29 U.S.C. Section 2101 et seq., or under any similar provision of any applicable Law (hereinafter referred to collectively as "WARN Obligations") as a consequence of the Transactions, Seller shall be responsible for any WARN Obligations arising as a result of any employment losses occurring prior to the Hire Date, and Purchaser shall be responsible for any WARN Obligations arising as a result of any employment losses occurring on or after the Hire Date.

9.11    Flexible Spending Accounts. On the Closing Date, Seller shall transfer to Purchaser (a) all records pertaining to the 2006 health care spending accounts and the dependent care spending accounts of all Transferred Employees under the Seller's flexible spending accounts (such accounts are referred to hereinafter, collectively, as the "FSAs") and Purchaser shall assume the obligation to pay benefits under the FSAs for the remainder of the then applicable calendar year with respect to a Transferred Employee's valid claims incurred during 2006 that have not been paid by Seller as of the Closing Date (solely to the extent such Transferred Employee would be entitled to payment under the terms of a Purchaser FSA arrangement), and (b) a cash payment equal to the amount by which the aggregate salary reductions (and other contributions) made for 2006 by Transferred Employees under the FSAs on or before the Closing Date exceed the aggregate claims for 2006 paid to Transferred Employees under the FSAs on or before the Closing Date; provided, however, that to the extent

37

the aggregate salary reductions (and other contributions) made for 2006 by Transferred Employees under the FSAs on or before the Closing Date are exceeded by the aggregate claims for 2006 paid to Transferred Employees under the FSAs on or before the Closing Date (the "FSA Deficit"), Purchaser shall transfer to Seller a cash payment equal to the FSA Deficit. All claims submitted by a Transferred Employee during 2006 (other than those that were previously paid by Seller prior to the Closing Date) shall be governed by and subject to the terms of the applicable Purchaser FSA. Within a reasonable period of time after signing of this Agreement (and, in any event, prior to the Closing Date), Seller shall provide to Purchaser copies of the Seller's flexible spending accounts elections for 2006 of all Transferred Employee. As soon as practicable but no later than thirty (30) days following the Closing Date, Seller shall provide the Purchaser with the calculation of the amount to be transferred or owed pursuant to clause (b) above and shall provide Purchaser's administrator with copies of all 2006 claims already reimbursed to Transferred Employees in 2006 prior to the Closing Date.

## ARTICLE X

## INDEMNIFICATION

10.1    Survival of Representations.

(a) The representations and warranties of Seller contained in this Agreement shall survive the Closing and (i) in respect of the representations and warranties made by Seller in Section 4.2 (*Taxes*), shall terminate upon the expiration of the statute of limitations period applicable to claims that may be asserted against Seller or the Assets; (ii) in respect of Sections 4.1(a) (*Authority*), 4.3(a) *(Assets)*, 4.4(a) *(Real Property)*, and 4.12 (*Brokers*), shall survive indefinitely; (iii) in respect to Section 4.9 (*Environmental Matters*) shall terminate as provided in Section 10.4(b); and (iv) in respect of all other representations and warranties made by Seller, shall terminate on the date which is eighteen (18) months from the Closing Date, in each case regardless of any investigation that may have been made or may be made at any time by or on behalf of the Purchaser.

(b) The representations and warranties of the Purchaser contained in this Agreement (i) in respect of Sections 5.1(a) (*Authority*) and 5.3 (*Brokers*) shall survive indefinitely and (ii) all other representations and warranties made by the Purchaser shall survive the Closing for a period of eighteen (18) months from the Closing Date.

10.2    Indemnification by Seller.

(a) General Indemnification. Seller agrees from and after the Closing, subject to the other terms and conditions of this Agreement, to indemnify the Purchaser and hold it harmless from any and all liabilities, losses, damages, claims, costs and expenses, interest, awards, judgments and penalties (including reasonable attorneys' fees and expenses) (hereinafter a "Loss") arising out of or resulting from (i) the breach of any representation or warranty of Seller herein (other than that contained in Section 4.9), (ii) the breach or non-fulfillment of any covenant or agreement of Seller herein or (iii) the Excluded Liabilities. Notwithstanding the foregoing, Seller shall not have any indemnification obligations hereunder with respect to any Environmental Claim other than those obligations set forth in Section 10.2(b) below.

38

(b) <u>Indemnification for Environmental Matters</u>. From and after the Closing Date, Seller shall indemnify the Purchaser and its officers, directors and employees against, and hold them harmless from, any Losses actually suffered or incurred by the Purchaser arising out of or resulting from:

            (i)      the breach of any representation or warranty set forth in Section 4.9;

            (ii)     any Third-Party Claim under Environmental Laws alleging personal injury, sickness, death, property damage or damage to natural resources arising from or relating to the ownership, occupancy, use or operation of the Owned Improvements, the Leased Facilities or the Leased Real Estate, or the conduct of the Business, prior to the Closing Date;

            (iii)    any other Environmental Claim arising from or relating to the ownership, occupancy, use or operation of the Owned Improvements, the Leased Facilities or the Leased Real Estate, or the conduct of the Business, prior to the Closing Date;

            (iv)    any release by Seller of Hazardous Substances, any failure by Seller to comply with Environmental Laws or the terms and conditions of any Permit issued to Seller or Purchaser under Environmental Laws and any Environmental Claim in relation to the ownership, operation, occupancy or use of, or the Seller's conduct of the business, other than the Business, at the Facility, after the Closing Date;

provided, however, that any such obligation to indemnify under this Section 10.2(b) shall not apply to Losses (i) to the extent caused by or attributable to releases of Hazardous Substances occurring in connection with the ownership, occupancy, use or operation of the Assets or the Leased Facilities or Leased Real Estate, or the operation of Business, after the Closing Date.

      10.3    <u>Indemnification by the Purchaser</u>. The Purchaser shall, subject to the other terms and conditions of this Agreement, indemnify Seller and each of its Affiliates and hold Seller and each of its Affiliates harmless for any and all Losses arising out of or resulting from (a) the breach of any representation, warranty, covenant or agreement of the Purchaser herein, (b) any release by Purchaser, any failure by Purchaser to comply with Environmental Laws or the terms and conditions of any Permit issued to Seller or Purchaser under Environmental Laws and any Environmental Claim in relation to the Purchaser's ownership, operation, occupancy or use of the Assets, including the Leased Facilities and the Leased Real Estate, or the Purchaser's conduct of the Business, after the Closing Date; (c) any Environmental Claim arising from the ownership, operation, occupancy or use of the Assets, including the Leased Facilities and the Leased Real Estate, or the conduct of the Business, after the Closing Date; (d) any and all Losses suffered or incurred by Seller or any of its Affiliates by reason of or in connection with any claim or cause of action of any third party to the extent arising out of or resulting from the operation or any Liability of the Business (including any of the Assets or Assumed Liabilities) after the Closing Date, except for any claims with respect to which Seller is obligated to indemnify the Purchaser under Section 10.2; or (e) the Assumed Liabilities.

10.4    Limits on Indemnification.

(a) Notwithstanding anything to the contrary contained in this Agreement, Seller shall not be required to indemnify, defend or hold harmless the Purchaser against or reimburse the Purchaser for any Loss pursuant to Section 10.2 (other than Section 10.2(a)(ii) or 10.2(a)(iii) or Losses pursuant to 4.3(a) and 4.4(a)), unless (i) the Purchaser has notified Seller in writing in accordance with Section 11.7 within the applicable survival period, if any, set forth in Section 10.1 or the last sentence of this Section 10.4(a), (ii) such Loss exceeds $100,000 (nor shall such item of $100,000 or less be applied to or considered for purposes of calculating the aggregate amount of the Purchaser's Losses under Section 10.2), and (iii) the aggregate of all of the Purchaser's Losses under Section 10.2 exceeds $500,000 (in which event Seller shall be liable for the full amount of such Losses); provided, however, that, except as provided in Section 10.4(b) below, in no event shall the aggregate liability of Seller under this Agreement exceed an amount equal to thirty-five percent (35%) of the Purchase Price.  Notwithstanding anything to the contrary contained in this Agreement, Seller's obligation to indemnify the Purchaser for Losses pursuant to Section 10.2(b) shall terminate on the date which is one hundred twenty (120) months from the Closing Date.

(b) Notwithstanding anything to the contrary contained in this Agreement and in addition to the other limitations contained herein, Seller's obligation to indemnify the Purchaser for Losses pursuant to Section 10.2(b) shall be limited as follows:

| Purchaser's claim first asserted on or before the fifth anniversary of the Closing Date. | An amount equal to 50% of the Purchase Price. |
| Purchaser's claim first asserted after the fifth anniversary of the Closing Date and on or before the tenth anniversary of the Closing Date. | An amount equal to 20% of the Purchase Price. |
| Purchaser's claim first asserted after the tenth anniversary of the Closing Date. | Seller has no obligation to indemnify. |

and further under no circumstances shall Seller be required to indemnify or hold the Purchaser harmless (or otherwise be liable to the Purchaser in any way) for any Loss arising out of or resulting from Purchaser's change of use, alteration of landscape or structures on or impacting the Owned Improvements, the Leased Facilities or the Leased Real Estate including any excavation, drilling, disturbance, construction, demolition, renovation or refurbishment activity.

(c) Notwithstanding anything to the contrary contained in this Agreement, Seller shall not be required to indemnify, defend or hold harmless the Purchaser against or reimburse the Purchaser for any Losses pursuant to Section 10.2 if any such claim or demand otherwise was raised (whether or not accepted) in connection with the purchase price adjustment procedures set forth in Section 2.5.

(d) Notwithstanding anything to the contrary contained in this Agreement,

MEI\5595723.1

Purchaser shall not be required to indemnify, defend or hold harmless the Seller against or reimburse the Seller for any Loss pursuant to Section 10.3, unless the Seller has notified Purchaser in writing in accordance with Section 11.7 within the applicable survival period, if any, set forth in Section 10.1.

(e) The amount of any Loss for which indemnification is provided under this Article X shall be net of (i) any amounts actually recovered, on a commercially reasonable basis, by the Indemnified Person under insurance policies and (ii) any related reserve in respect of such Loss reflected in the Final Closing Working Capital Amount.

(f) Notwithstanding anything to the contrary elsewhere in this Agreement, no Indemnifying Person shall, in any event, be liable to the other party for any consequential damages, including loss of revenue or income, cost of capital, diminution in value, or loss of business reputation or opportunity relating to the breach or alleged breach of this Agreement. Each party agrees that it will not seek punitive damages as to any matter under, relating to or arising out of the Transactions. The foregoing shall not be interpreted, however, to limit indemnification for Losses incurred as a result of the assertion by a claimant (other than the parties hereto and their successors and assigns) in a Third-Party Claim of claims for damages of the foregoing type.

10.5    Procedures Relating to Indemnification (Other than for Tax Claims).

(a) In order for an Indemnified Person to be entitled to any indemnification provided for under this Agreement (including Environmental Claims and claims pursuant to Article IX but other than for Tax Claims) in respect of, arising out of or involving a claim or demand made by any third party against the Indemnified Person (a "Third-Party Claim"), such Indemnified Person must notify the Indemnifying Person in writing, and in reasonable detail, of the Third-Party Claim within ten (10) Business Days after receipt by such Indemnified Person of written notice of the Third-Party Claim; provided, however, that failure to give such notification shall not affect the indemnification provided hereunder except to the extent the Indemnifying Person shall have been prejudiced as a result of such failure (except that the Indemnifying Person shall not be liable for any Losses incurred during the period in which the Indemnified Person failed to give such notice). Thereafter, the Indemnified Person shall deliver to the Indemnifying Person, within five (5) Business Days after the Indemnified Person's receipt thereof, copies of all notices and documents (including court papers) received by the Indemnified Person relating to the Third-Party Claim.

(b) If a Third-Party Claim is made against an Indemnified Person, the Indemnifying Person will be entitled to participate in the defense thereof and, if it so chooses, to assume the defense thereof with counsel selected by the Indemnifying Person and reasonably satisfactory to the Indemnified Person. Should the Indemnifying Person so elect to assume the defense of a Third-Party Claim, the Indemnifying Person will not be liable to the Indemnified Person for legal fees and expenses subsequently incurred by the Indemnified Person in connection with the defense thereof. If the Indemnifying Person assumes such defense, the Indemnified Person shall have the right to participate in the defense thereof and to employ counsel, at its own expense, separate from the counsel employed by the Indemnifying Person, it being understood that the Indemnifying Person shall control such defense. The Indemnifying

41

Person shall be liable for the reasonable fees and expenses of one counsel employed by the Indemnified Person for any period during which the Indemnifying Person has not assumed the defense thereof (other than during any period in which the Indemnified Person shall have failed to give notice of the Third-Party Claim as provided above). If the Indemnifying Person chooses to defend or prosecute any Third-Party Claim, all the parties hereto shall cooperate in the defense or prosecution thereof. Such cooperation shall include the retention and (upon the Indemnifying Person's request) the provision to the Indemnifying Person of records and information which are reasonably relevant to such Third-Party Claim, and making employees available on a mutually convenient basis to provide additional information and explanation of any material provided hereunder. Notwithstanding anything to the contrary contained in this Section 10.5, in the event a Third-Party Claim is made against an Indemnified Person as to which such Indemnified Person is entitled to seek indemnification hereunder and the Indemnified Party obtains a written opinion of counsel that a conflict of interest makes separate representation by the Indemnified Party's own counsel advisable, then the Indemnified Person may elect to retain and control the defense of such Third-Party Claim with one counsel in each applicable jurisdiction selected by such Indemnified Party and reasonably satisfactory to the Indemnifying Party and will be entitled to be reimbursed by the Indemnifying Person for reasonable fees and expenses of its counsel incurred in such defense. Whether or not the Indemnifying Person shall have assumed the defense of a Third-Party Claim, the Indemnified Person shall not admit any liability with respect to, or settle, compromise or discharge, such Third-Party Claim without the Indemnifying Person's prior written consent. No Indemnifying Party shall settle or compromise any Third-Party Claim in which any relief other than the payment of money damages is sought against the Indemnified Party unless the Indemnified Party consents in writing to such settlement or compromise. All Tax Claims (as defined in Section 8.6(c)) shall be governed by Section 8.6(c).

10.6   Exclusive Remedies. Anything herein to the contrary notwithstanding, no breach of any representation, warranty, covenant or agreement contained herein shall give rise to any right on the part of any party, after the consummation of the Transactions, to rescind this Agreement or any of the Transactions. Each party acknowledges and agrees that its sole and exclusive remedy following the Closing Date with respect to any and all claims relating to this Agreement, the Transactions and the Business (other than claims of, or causes of action arising from fraud), shall be pursuant to the indemnification provisions expressly set forth in this Agreement. Each party waives, from and after the Closing Date, to the fullest extent permitted by applicable Law, any and all rights, claims and causes of action (other than claims of, or causes of action arising from fraud), it or any of its Affiliates may have against the other (and its Affiliates) arising under this Agreement, the Transactions and the Business (except pursuant to the indemnification provisions set forth in this Agreement). In any event, however, the limitations on remedies and waivers provided in this Section 10.6 shall not apply to Losses to the extent a party's indemnification rights are unenforceable as a matter of law.

## ARTICLE XI

## GENERAL PROVISIONS

11.1   Assignment. This Agreement and the rights and obligations hereunder shall not be assignable or transferable by the Seller, on the one hand, or, the Purchaser, on the other hand, (other than by operation of law or in connection with a merger or sale of substantially all the

MEI\5595723.1

assets of the Seller or Purchaser, or the sale of substantially all assets of Seller or Purchaser at the Facility) without the prior written consent of the other.

11.2    No Third-Party Beneficiaries.  This Agreement is for the sole benefit of the parties hereto and their permitted assigns and nothing herein expressed or implied shall give or be construed to give to any person or entity, other than the parties hereto and such assigns, any legal or equitable rights hereunder.

11.3    Termination.

(a)  This Agreement may be terminated (except as provided in Section 11.3(c)) and the Transactions may be abandoned at any time prior to the Closing :

(i)     by Purchaser or Seller if the Closing shall not have occurred for any reasons by August 1, 2006 (the "Termination Date"); or

(ii)    by Seller, if the Purchaser materially breaches this Agreement such that the closing conditions set forth in Section 3.2, would be incapable of being satisfied by the Termination Date; or

(iii)   by Purchaser, if Seller materially breaches this Agreement such that the closing conditions set forth in Section 3.1, would be incapable of being satisfied by the Termination Date; or

(iv)    by Purchaser or Seller, in the event that an injunction or order is issued by any Governmental Authority against any of Seller or its Affiliates, the Purchaser, restraining or prohibiting the Transactions, and such injunction or order shall have become final and nonappealable; or

(v)     by the mutual written consent of Purchaser and Seller.

(b)  In the event of termination by Seller or Purchaser pursuant to this Section 11.3, written notice thereof shall forthwith be given to the other party and the Transactions shall be terminated, without further action by either party.  If the Transactions are terminated as provided herein all confidential information received by the Purchaser and its Affiliates with respect to the Business, Seller and its Affiliates shall be treated in accordance with the Confidentiality Agreement which shall remain in full force and effect notwithstanding the termination of this Agreement.

(c)  If this Agreement is terminated and the Transactions are abandoned as described in this Section 11.3, this Agreement shall become void and of no further force and effect, except for the provisions of (i) Section 8.3 relating to publicity, (ii) Section 11.4 relating to certain expenses, and (iii) this Section 11.3.  Nothing in this Section 11.3 shall be deemed to release either party from any liability for any breach by such party of the terms and provisions of this Agreement or to impair the right of either party to compel specific performance by the other party of its obligations under this Agreement.

11.4    Expenses. Whether or not the Transactions are consummated, and except as otherwise provided in Sections 2.7 and 8.1, or elsewhere in this Agreement, all fees, costs and expenses incurred in connection with this Agreement and the Transactions shall be paid by the party incurring such fees, costs or expenses.

11.5    Equitable Relief. The parties hereto agree that irreparable damage would occur in the event that any provision of this Agreement was not performed in accordance with the terms hereof and that the parties shall be entitled to specific performance of the terms hereof, in addition to any other remedy at law or equity without the necessity of demonstrating the inadequacy of monetary damages or the posting of a bond.

11.6    Amendments. No amendment to this Agreement shall be effective unless it shall be in writing and signed by the parties hereto.

11.7    Notices. All notices or other communications required or permitted to be given hereunder shall be in writing and shall be delivered by hand or telecopy (which is confirmed), or sent, postage prepaid, by registered, certified (return receipt requested) or express mail, or reputable overnight courier service (providing proof of delivery) and shall be deemed given when so delivered by hand or telecopied, or if mailed, upon receipt, to the parties at the following addresses (or at such other address for a party specified by like notice, provided that notice of a change of address shall be effective only upon receipt thereof) as follows:

> (i)     if to the Seller, to:
>
> [Name of Seller]
> [Address]
> [City, State Zip]
> Attention:
> Telephone:
> Facsimile:

44

*with a copy to (which shall not constitute notice)*:

[___]
[Address]
[City, State Zip]
Attention:
Telephone:
Facsimile:

*and*

[Law Firm]
[Address]
[City, State Zip]
Attention:
Telephone:
Facsimile:

(ii)    if to the Purchaser, to:

W.R. GRACE & CO.-CONN.
7500 Grace Drive
Columbia, Maryland 21044
Attention: Corporate Secretary
Telephone: 410-531-4212
Facsimile: 410-531-4545

11.8    Interpretation; Exhibits and Schedules. The headings contained in this Agreement, in any Exhibit or Schedule hereto and in the table of contents to this Agreement, are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement. All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any capitalized terms used in any Schedule or Exhibit, but not otherwise defined therein, shall have the meaning as defined in this Agreement.

11.9    Counterparts. This Agreement may be executed in counterparts, all of which shall be considered one and the same agreement, and shall become effective when such counterparts have been signed by each of the parties and delivered to the other party.

11.10    Severability. If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced by any Law or public policy, all other terms and provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the Transactions is not affected in any manner materially adverse to any party. Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect

45

the original intent of the parties as closely as possible in an acceptable manner in order that the Transactions are consummated as originally contemplated to the greatest extent possible.

11.11  Waiver of Compliance; Consents.  Except as otherwise provided in this Agreement, any failure of the parties to comply with any obligation, covenant, agreement or condition herein may be waived by the party entitled to the benefits thereof only by a written instrument signed by the party granting such waiver, but such waiver or failure to insist upon strict compliance with such obligation, covenant, agreement or condition shall not operate as a waiver of, or estoppel with respect to, any subsequent or other failure.

11.12  Entire Agreement.  This Agreement, including the exhibits hereto and the documents, schedules, certificates and instruments referred to herein, the other Transaction Documents and the Confidentiality Agreement embodies the entire agreement and understanding of the parties hereto in respect of the Transactions.  There are no restrictions, promises, representations, warranties, covenants or undertakings, other than those expressly set forth or referred to herein or therein.  This Agreement supersedes all prior agreements and understandings between the parties with respect to Transactions.

11.13  Foreign Currencies.  Unless otherwise stated, all currency specified in the Transaction Documents shall be in United States dollars.  All foreign currency shall be converted to United States dollars equivalents determined on the basis of the spot rate of exchange (closing mid-point) published in the European edition of the *Financial Times* on the Business Day immediately prior to the Closing Date (or, if the *Financial Times* is not published on such date, the next preceding date on which it is published).

11.14  Dispute Resolution.  The Seller and Purchaser shall, and shall cause their respective Subsidiaries to, resolve any dispute, controversy or claim whatsoever arising out of or in connection with this Agreement, the Transaction Documents or the Transactions (a "Dispute") (other than a dispute with respect to the determination of the Final Closing Working Capital Amount which shall be governed by the procedures set forth in Section 2.5) in accordance with the following procedure:

(a)  Within thirty (30) Business Days after Seller or Purchaser has served written notice on the other pursuant to Section 11.7 setting forth the nature of the Dispute, Seller and Purchaser shall attempt to resolve the Dispute through good faith negotiations at a meeting which shall be attended by a representative of Seller and a representative of Purchaser having decision-making authority as well as by management-level personnel of Seller and Purchaser who have not previously been directly engaged in directing or responding to the Dispute.

(b)  If the Dispute is not resolved after the requirements of Section 11.14(a) have been complied with, the Dispute shall be submitted to mediation upon written notice by either Seller or Purchaser under the supervision of and in accordance with the Model Mediation Procedure of the Centre for Effective Dispute Resolution.  The language of the mediation shall be English.  Any foreign language documents presented during the mediation shall be accompanied by an English translation.  The mediation shall take place in Baltimore, Maryland.

(c)  If the Dispute has not been finally resolved by mediation as provided in

46

Section 11.14(b), the Dispute shall be finally and exclusively settled by arbitration under the rules of the American Arbitration Association by one arbitrator appointed in accordance with said rules. The place of the arbitration shall be Baltimore, Maryland, and the language of the arbitration shall be English.  By agreeing to arbitration pursuant to this Section 11.14(c), Seller and Purchaser irrevocably waive their right to any form of appeal, review or recourse to any state court or other judicial authority, insofar as such waiver may be validly made.

(d) Notwithstanding anything to the contrary in any of the Transaction Documents or documents delivered pursuant thereto, Seller and Purchaser hereby agree that any and all disputes arising out of or in connection with the Transaction Documents and such documents shall be settled exclusively on the basis of the procedure set forth in this Section 11.14 other than as provided in the first paragraph of this Section 11.14.

11.15   Governing Law; Submission to Jurisdiction.

(a) This Agreement shall be governed by and construed in accordance with, the internal laws of the State of Delaware applicable to agreements made and to be performed entirely within such State, without regard to the conflicts of law principles of such State.

(b) The Seller and the Purchaser irrevocably submit to the non-exclusive jurisdiction of the courts of the State of Delaware solely for the limited purpose of supporting and assisting the arbitration process pursuant to Section 11.14(c), including if necessary the grant of interlocutory relief pending the outcome of that process.

*[The remainder of this page has been left blank intentionally.]*

MEI\5595723.1

**IN WITNESS WHEREOF,** the parties have caused this Agreement to be duly executed as of the date first written above.

**PURCHASER:**

W.R. GRACE & CO.-CONN

By: _____

      Name:  Gregory E. Poling
      Title:    Vice President

**SELLER:**

[Name of Seller]

By: _____

      Name:
      Title: