IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W. R. GRACE & CO., et al.,[1] | ) | Case No. 01-01139 (JJF) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |

## MOTION FOR ENTRY OF AN ORDER AUTHORIZING DEBTORS TO MAKE LEGALLY REQUIRED MINIMUM CONTRIBUTIONS TO DEFINED BENEFIT PENSION PLANS COVERING DEBTORS' EMPLOYEES

The above-captioned debtors and debtors in possession (collectively, the "Debtors") respectfully move this Court for the entry of an order authorizing the Debtors to make the minimum contributions to the defined benefit retirement plans covering the Debtors' employees in the United States (the "Grace Retirement Plans") required under federal law during the period July 15, 2006 to April 15, 2007 inclusive (the "06-07 Funding Period"). The total of the legally required minimum contributions for the 06-07 Funding Period under current law will be approximately $105.3 million.[1] In support of this Motion, the Debtors respectfully

---

[1] The Debtors consist of the following 62 entities: W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.), W. R. Grace & Co. Conn., A-1 Bit & Tool Co., Inc., Alewife Boston Ltd., Alewife Land Corporation, Amicon, Inc., CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace II, Inc., Creative Food 'N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC (f/k/a Dewey and Almy Company), Ecarg, Inc., Five Alewife Boston Ltd., GC Limited Partners I, Inc., (f/k/a Grace Cocoa Limited Partners I, Inc.), GC Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC Management Corporation, GN Holdings, Inc. GPC Thomasville Corp., Gloucester New Communities Company, Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical Company of Cuba, Grace Culinary Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe, Inc., Grace H-G Inc., Grace H-G II Inc., Grace Hotel Services Corporation, Grace International Holdings, Inc. (f/k/a Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W. R. Grace Capital Corporation., W. R. Grace Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-Caribe Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai Development Company, L B Realty, Inc., Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH, Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Inc., MRA Holdings Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (F/k/a Nestor-BNA, Inc.), MRA Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental Liability Management, Inc., E&C Liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin & Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country Staffing), Hayden-Gulch West Coal Company, H-G Coal Company.

[1] As explained herein, if certain provisions of currently applicable federal law under the Pension Funding Equity Act of 2004 (the "PFEA") are not extended for the 06-07 Funding Period (see paragraph 30 below), the legally required minimums for that Period would increase to approximately $121.7 million.

state as follows:

## Jurisdiction

1. The Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157(b)(2)(A) and (O). Venue of this proceeding and this Motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory predicate for the relief sought herein is §§ 105(a) and 363(b) of title 11 of the United States Code (the "Bankruptcy Code").

## Background

2. On April 2, 2001 (the "Petition Date"), each of the Debtors in these chapter 11 cases (collectively, the "Chapter 11 Cases") filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Chapter 11 Cases have been consolidated for administrative purposes only, and, pursuant to §§ 1107(a) and 1108 of the Bankruptcy Code, the Debtors continue to operate their businesses and manage their properties as debtors in possession.

3. As further explained below, in each of the last three calendar years (i.e., 2003, 2004 and 2005), the Debtors have requested and received Court permission to make contributions to the Grace Retirement Plans (collectively, the "Prior Funding Motions"). With respect to each such submission, prior to the applicable hearing date, the management of the Debtors discussed the applicable motion with the Official Committee of Unsecured Creditors, the Official Committee of Property Damage Claimants, the Official Committee of Personal Injury Claimants and the Official Committee of Equity Security Holders (collectively, the "Committees") and the Future Claimants' Representative (the "FCR"), as requested.

4. The Court entered orders approving the requests under each Prior Funding Motion. In accordance with those orders, the Debtors contributed approximately $40 million to

the Grace Retirement Plans in 2003[2], approximately $20 million in 2004, approximately $16.2 million in 2005[3] and approximately $24 million in the first half of 2006[4].

5.  In this Motion, the Debtors are proposing to continue funding the Grace Retirement Plans consistent with the funding approach specified in the most recent Prior Funding Motion and the Court's order dated June 22, 2005, which approved the funding of the Grace Retirement Plans for the period from July 2005 until April 2006 (inclusive). The Debtors believe the continuation of this approach is in the best interest of the Debtors' estate and its creditors.

6.  The Debtors have provided each of the Committees and the FCR with a prior draft of this Motion and have discussed the Motion with them and their representatives who have requested such discussions.

## Grace Retirement Plans

7.  The Prior Funding Motions included considerable background regarding the Grace Retirement Plans and the importance of maintaining those Plans and supporting their financial viability. That background continues to be valid. In summary, the following is a review and update of some of the information noted originally in the Prior Funding Motions:

- The Grace Retirement Plans currently consist of thirteen funded, defined benefit pension plans, each of which is qualified under section 401(a) of the Internal Revenue Code (the "Code").

- The most significant Grace Retirement Plan is the W. R. Grace & Co. Retirement Plan for Salaried Employees (the "Grace Salaried Plan"), which comprises approximately 79% of the assets and 82% of the liability of the Grace Retirement Plans in the aggregate (depending on the measure of liability).

---

[2] In 2003, the Debtors also contributed approximately $8.5 million for the Curtis Bay union pension plan, based on a separate motion and court order dated March 3, 2003 [Docket No. 3445].

[3] In 2005, the Debtors also contributed approximately $7.9 million to two union pension plans covering union employees at its Lake Charles, Louisiana and its Chattanooga, Tennessee plants, based on a separate motion and court order dated June 22, 2005 [Docket No. 8666].

[4] The amount of contribution for the first half of 2006 would be approximately $29 million, if the PFEA is not extended, see paragraph 30 below.

- The Debtors have a long history of providing employees with defined benefit pension plans.

- Many of the Grace Retirement Plans are maintained pursuant to collective bargaining agreements.

- The employers that are considered competitors or peers of the Debtors' businesses generally maintain defined benefit pension plans for their employees.

- The "plan year" of each Grace Retirement Plan is a calendar year.

### Funded Status of the Grace Retirement Plans

8. Exhibit A to this motion updates several different calculations to measure the liabilities and assets of the Grace Retirement Plans, which were originally used in the Prior Funding Motions. All amounts on Exhibit A have been calculated by the actuary of the Grace Retirement Pension Plans.

9. As indicated on Exhibit A, the Grace Retirement Plans are currently underfunded by any generally accepted measure. As of January 1, 2006, the amount by which the Plans are underfunded ranges from $43 million to $350 million, depending on the measure used.

10. Also as indicated on Exhibit A, the amount of the underfunding has not changed significantly from January 1, 2005 to January 1, 2006.[5]

11. As a result of the underfunded status of the Grace Retirement Plans, the Debtors were required to make an ERISA section 4010 filing with the Pension Benefit Guaranty Corporation (the "PBGC") for the 2005 plan year. That filing reported that the Grace Retirement Plans were underfunded by approximately $544 million as of December 31, 2005, calculated on

---

[5] The increase in the asset value during 2005 was the result of the Debtors' contribution of approximately $24.1 million to the Grace Retirement Plans and asset returns of approximately 6.4% during 2005; offset by approximately $87 million that was paid out of the Plans during 2005.

the basis required by the PBGC for such filing.[6]

12. From a cash flow perspective, the Debtors believe that annual benefit payments and other expenses from the Grace Retirement Plans will continue to be significant for the foreseeable future. The Debtors project that in 2006 approximately $70 to 75 million will be paid out of the Grace Retirement Plans for benefit payments and to satisfy other expenses. As specified on Exhibit A, the total market value of assets as of January 1, 2006 was approximately $645.5 million. The Debtors continue to believe that the amounts paid out each year represent a high proportion of total assets, when compared to comparable funded retirement plans of other employers, and highlights the necessity to continue to make significant contributions to the Grace Retirement Plans in order to assure their long-term financial viability.

### Employees Covered by the Grace Retirement Plans

13. Virtually all of the Debtors' current employees are covered by one of the Grace Retirement Plans. The Grace Salaried Plan alone covers over 1,900 active, salaried employees (of a total U.S. workforce of approximately 3,100 employees), or over 60% of the Debtors' U.S. workforce.

14. The Debtors' employees continue to consider ongoing benefit accruals under the Grace Retirement Plans and the financial viability of those Plans as among the most important aspects of their employment relationship with the Debtors.

15. The Debtors' employees continue to closely monitor the financial viability of the Grace Retirement Plans through the Debtors' ERISA and SEC disclosures, as well as other research techniques.

---

[6] The Debtors were also required to make an ERISA section 4010 filing for previous years. As of the end of 2003 and 2004, that filing specified that the Grace Retirement Plans were underfunded by approximately $394 million and $487 million, respectively.

16. The Debtors' employees continue to emphasize to the Debtors' management the importance of the Grace Retirement Plans.

17. The Debtors' management and employees continue to be motivated to work towards successfully creating value for the Debtors' estates by growing the revenues and profits of the Debtors' businesses, with the expectation that at least a portion of the cash generated by those efforts would be used to provide the funding necessary to assure the long-term viability of the Grace Retirement Plans.

18. The Debtors' management believes that continuing to make at least the legally required minimum contributions to each of the Grace Retirement Plans is essential to maintaining the morale of the Debtors' workforce and its confidence in management, and thereby the productivity and long-term profitability of the Debtors' businesses. The employees are vital to maintaining and enhancing the value of the Debtors' estate and to the Debtors' successful reorganization.

## **Prior Funding Motions**

19. Each of the Prior Funding Motions was tailored to recognize the concerns of the Debtors' employees regarding the financial viability of the Grace Retirement Plans, and the value of the employees to the Debtors' estates and their vital role in a successful reorganization of the Debtors. In addition, those motions considered the concerns voiced by the Committees and their advisors - some of which expressed concern regarding the conservation of the Debtors' cash, while others expressed an interest in maintaining the morale of the Debtors' workforce.

20. The funding approaches specified in the 2003 and 2004 funding motions were designed to address several specific objectives.[7]

---

[7] For further information regarding the 2003 and 2004 funding approaches, please see the 2004 and 2005 funding motions.

21. In the 2005 funding motion, the funding approach was simplified to satisfy only the single most important goal of the multiple objectives previously considered in the 2003 and 2004 funding motions – i.e., making only the legally required minimum contributions for a 12 month period commencing July 2005. As specified in that motion, the Debtors' management believed that simplifying the funding approach in this manner recognized the concerns of the Committees regarding the continued conservation of the Debtors' cash, while addressing employee concerns regarding the continued viability of the Grace Retirement Plans.

22. The Court signed the order approving the funding approach of the 2005 funding motion on June 22, 2005. In accordance with that order, the Debtors will contribute $40.6 million (or $45.2 million if PFEA is not extended; see paragraph 27 below) to the Grace Retirement Plans during the period July 2005 to April 2006 (inclusive).

### 06-07 Funding Approach

23. Consistent with the funding approach established by the 2005 funding motion and this Court's related order, the funding approach specified herein for the 06-07 Funding Period (the "06-07 Funding Approach") will satisfy only the single most important one of the multiple objectives that were considered in the Prior Funding Motions -- to make only those contributions to the Grace Retirement Plans that are necessary to satisfy the minimums that are legally required by applicable law.[8] Each such contribution shall be made no sooner than 1 month before the deadline imposed by federal law (unless a significant corporate income tax advantage may be achieved by making a contribution of the same amount earlier).

---

[8] Consistent with last year's funding approach, the 06-07 Funding Approach does not include the objective of eliminating the requirement of the Grace Retirement Plans to pay PBGC variable rate premiums. It is estimated that the Grace Retirement Plans will be required to pay approximately $3.2 million in PBGC variable rate premiums for 2006. In order to avoid the requirement to pay all such premiums for 2005, the Debtors would be required to contribute approximately $101 million to the Plans by September 15, 2006, in addition to the legally required minimums.

24. The legally required minimum contributions to the Grace Retirement Plans for the 06-07 Funding Period are specified in the following schedule (the "Schedule"):

| Payment Due Date[9] | Contributions[10] | Plan Year |
|---|---|---|
| **2006** | | |
| July 15 | $15,596,358 | 2006 |
| September 15 | 44,893,500 | 2005 |
| October 15 | 15,671,395 | 2006 |
| **2007** | | |
| January 15 | $16,280,010 | 2006 |
| April 15 | 12,900,000 | 2007 |
| **Total** | **$105,341,263**[11] | |

25. The contribution listed on the Schedule for the 2005 plan year has been finalized, and is not subject to change as a result of future market performance of the assets of the Grace Retirement Plans or any contemplated changes in applicable law.

26. The contributions for the 2006 plan year are finalized. The contributions for the 2007 plan year are estimates, and may change depending on market performance of the assets of the Grace Retirement Plans and any changes in applicable federal law, as well as any changes in

---

[9] Debtors may slightly accelerate the timing of the legally required minimum contributions during the 06-07 Funding Period to maximize tax benefits, as well as to minimize required PBGC variable rate premiums for the Grace Retirement Plans.

[10] All contributions specified in this motion and the exhibits hereto have been calculated by the actuary of the Grace Retirement Plans. The Schedule assumes that Congress extends the interest rate provisions of the PFEA. For informational purposes, two other schedules specifying all projected minimum required contributions for the 2005, 2006 and 2007 calendar years are attached hereto as Exhibit B and Exhibit B-1. Exhibit B assumes Congress extends the PFEA; and Exhibit B-1 assumes Congress does not extend that Act. (See paragraph 30 below.)

[11] Along with this Motion, the Debtors are also submitting a motion to the Court with regard to pension benefit increases under the Debtors' union pension plan for unionized employees at the Chicago, 51st Street Plant. The listed amounts assume that the motion is granted. In that case, under the union pension plan motion, an additional pension contribution of approximately $0.9 million would be made to the union plans by no later than September 15, 2006 (or $1.2 million if PFEA is not extended). Therefore, the total of all retirement plan contributions during the 06-07 Funding Period would be approximately $106.2 million (or $122.9 million if PFEA is not extended); and no additional contributions to the union plans would be required for the 06-07 Funding Period. If, on the other hand, the motion is not granted, then the amount of each required contribution currently listed in the Schedule would increase slightly --by approximately .5%-- since that union pension plan would then also require additional minimum contributions for the 06-07 Funding Period.

the Plans' demographics.

27. There are two possible changes in applicable federal law that could affect the amount of the minimum contributions required to be made to the Grace Retirement Plans:

> (a) If Congress fails to extend the interest rate provisions of the Pension Funding Equity Act of 2004 (the "PFEA") for the period commencing April 2006, then the minimum contributions required by applicable law will be greater than the amounts listed on the Schedule. Exhibit B-1, attached hereto, projects the minimum required payments assuming that Congress fails to extend the PFEA. (The Schedule and Exhibit B assume that Congress extends the PFEA. Exhibit B-1 assumes Congress does not extend the PEFA; in such case, the total of contributions during the 06-07 Funding Period would be approximately $121.7 million.)
>
> (b) If a version of the pension funding reform legislation, which is currently under consideration by Congress, is enacted in 2006, it is likely that the minimum required contributions for 2007 and subsequent years will increase. While the final provisions of any pension funding reform legislation are uncertain at this time, Debtors have been advised that enactment of such reform could increase the legally required minimum contributions by 15 to 25%, and that such increase would likely be effective for the 2007 plan year. (There is only one payment for the 2007 plan year within the 06-07 Funding Period.)

28. The order sought herein provides for contributing only the legally required minimums. If the market performance of the Grace Retirement Plans' assets or any changes in applicable law (or any other factors) result in lesser legally required minimum contributions during the 06-07 Funding Period, then the Debtors would make only the lesser required minimum contributions, not the amount listed on the Schedule. If market performance or any changes in applicable law (or other factors) result in larger legally required minimum contributions during the 06-07 Funding Period, then the larger contributions would be made when due.

29. It is necessary to secure Court approval for the payment of legally required minimum contributions for the 06-07 Funding Period at this time because the first due date with respect to such contributions is July 15, 2006.

30. The Debtors request the Court approve payment of the legally required minimum

contributions due during the full period encompassed by the 06-07 Funding Period. This will eliminate the need for the Debtors (and the Committees and the Court) to incur the time and expense associated with the submission of another funding motion within 6 or so months, again seeking approval to only contribute the legally required minimums.

31. If the Court approves the Debtors' motion to fund the legally required minimums for the 06-07 Funding Period, then the Debtors do not anticipate filing another Grace Retirement Plan funding motion for approximately 1 year, in order to secure approval to make legally required minimum contributions for the subsequent 12 month period. The first such contribution would be due in July 2007, as specified in Exhibits B and B-1.

### Addressing Employees' and Creditors' Concerns

32. The Debtors believe that the legitimate concerns of the employees will be addressed if management can report to the employees that the Court has approved the legally required minimum funding for the Grace Retirement Plans for the entire 06-07 Funding Period, since that approval would permit the Debtors to make significant contributions to the Plans for the next 12 months. Conversely, the Debtors believe that the concerns of the Debtors' employees will be heightened if the Debtors are, in addition to this Motion, required to again seek approval to make only the legally required minimum contributions in less than one year.

33. The 06-07 Funding Approach will not satisfy the objective, specified in the 2003 and 2004 funding motions, to make contributions that would permit the Debtors to avoid the requirement to distribute to its employees the pension underfunding notices required by ERISA section 4011. If the Debtors make only the legally required minimum contributions, as proposed, employees will be notified that the Grace Retirement Plans are underfunded for the

2007 plan year. Such notification would occur by mail in the last quarter of 2007.[12]

34. The 05-06 funding approach also did not satisfy the objective described in paragraph 33 above. Therefore, the Debtors will notify their employees by mail during the last quarter of 2006 that the Grace Retirement Plans were underfunded for 2006. It is anticipated that this notice will have a negative effect on the morale of the Debtors' employees. However, Debtors believe that such effect will be ameliorated by informing the employees that the Debtors have secured Court approval to make all legally required minimum contributions for the entire 06-07 Funding Period, and the fact that those contributions will be in significant amounts.

35. The Debtors also believe that the legitimate concerns regarding the Debtors' conservation of cash will continue to be addressed by the 06-07 Funding Approach because the cash of the Debtors will only be used to satisfy the minimum contribution requirements imposed by applicable law, and not to make any additional contributions to satisfy any other objective.

36. Since the inception of the Chapter 11 Cases through April 2006, the Debtors have repatriated over $450[13] million from non-debtor affiliates, and during that same time period have contributed a total of approximately $117.8 million to the Grace Retirement Plans (or $122.4 million if PFEA is not extended). If the Court approves the 06-07 Funding Approach, the total contributions to the Grace Retirement Plans since the inception of the Chapter 11 Cases through the 06-07 Funding Period, would be approximately $223.1 million (or approximately $244.1 million if PEFA is not extended), which would still be significantly less than the total funds repatriated by the Debtors through April 2006.

---

[12] In order to avoid the requirement under current law to distribute a 2007 underfunding notice to employees, it would be necessary to make a contribution to the Grace Retirement Plans of approximately $87 million by September 15, 2007, in addition to the legally required minimum contributions. However, note that Congress is currently considering changes to these notice requirements that could require that all defined benefit plans to provide all participants notice of their plan's funded status, whether or not the plan is underfunded.

[13] The funds have been repatriated using various mechanisms, including dividends, interest, royalties, and loan

## Relief Requested

37. By this Motion, the Debtors seek authority to make the minimum contributions required by applicable federal law to one or more of the Grace Retirement Plans for the period July 15, 2006 to April 15, 2007 (inclusive).

## Basis for Relief

38. Section 105(a) of the Bankruptcy Code "permits the court to issue any order that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). Section 363(b) of the Bankruptcy Code provides, in relevant part, that "the trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business property of the estate." 11 U.S.C. § 363(b). A court has the statutory authority to authorize a debtor to use property of the estate pursuant to § 363(b)(1) of the Bankruptcy Code when such use is an exercise of the debtor's sound business judgment and when the use of the property is proposed in good faith. *In re Delaware & Hudson Ry. Co.*, 124 B.R. 169, 176 (D. Del. 1991); *In re Lionel Corp.*, 722 F.2d 1063, 1071(2d Cir. 1983), *see also Fulton State Bank v. Schipper*, 993 F.2d 513, 515 (7th Cir. 1991) (a debtor's decision must be supported by "some articulated business justification"); *Stephen Indus., Inc. v. McClun*, 789 F.2d 386, 390 (6th Cir. 1986) (adopting the "sound business purpose" standard for sales proposed pursuant to section 363(b); *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (Bankr. D.Del. 1999); *In re Ernst Rome Ctr Inc.*, 209 B.R. 974, 979 (Bankr. W.D. Wash. 1997).

39. Under section 363(b) of the Bankruptcy Code, a debtor has the burden to establish that it has a valid business purpose for using estate property outside the ordinary course of business. *See Lionel Corp.*, 722 F.2d at 1070-71. Once the debtor has articulated such

---

payments from non-debtor affiliates to the Debtors.

a valid business purpose, however, a presumption arises that the debtor's decision was made on an informed basis, in good faith and in the honest belief that the action was in the debtor's best interest. *See In re Integrated Res., Inc.*, 147 B.R. 654, 656 (S.D. N.Y. 1992). A party in interest seeking to challenge the debtor's valid business purpose must "produce some evidence supporting its objections." *Montgomery Ward*, 242 B.R. at 155.

### The Proposed Transactions Are Supported by Sound Business Judgment

40.  The Debtors respectfully submit that implementing the 06-07 Funding Approach is the least costly approach to funding the Grace Retirement Plans in accordance with the requirements imposed by applicable federal law. Such implementation will also allow for the funding of the Grace Retirement Plans in a manner that helps to maintain the morale and productivity of Debtors' employees throughout the United States, and that maintains competitive employee benefits vis-a-vis the Debtors' competitors and peers, which is key to continuing to maintain a dedicated, motivated and loyal work force. Such work force is a vital component of the Debtors' estates and restructuring efforts.

41.  The Debtors have determined in their business judgment that implementing the 06-07 Funding Approach is in the best interests of the Debtors' estates and creditors. As specified above, clear business reasons exist to justify, under section 363(b) of the Bankruptcy Code, such implementation.

### Notice

42.  Notice of this Motion has been given to (i) of the Office of the United States Trustee, (ii) counsel to the Debtor-In-Possession lenders, (iii) counsel to each Official Committee appointed by the United States Trustee, and (iv) those parties that requested papers

under Fed.R.Bankr.P.2002. In light of the nature of the relief requested, the Debtors submit that no further notice is required.

### No Prior Request

43. No prior Application for the relief requested herein has been made to this or any other Court.

WHEREFORE, the Debtors respectfully request that the Court enter an order (i) authorizing the Debtors to make the minimum contributions to the Grace Retirement Plans for the 06-07 Funding Period required by federal law, and (ii) granting such other and further relief as the Court deems just and proper.

Wilmington, Delaware
Dated: April 10, 2006

Respectfully submitted,

KIRKLAND & ELLIS LLP
David M. Bernick, P.C.
Janet S. Baer
Salvatore F. Bianca
200 East Randolph Drive
Chicago, ILL 60601
(312) 861-2000

and

PACHULSKI STANG ZIEHL YOUNG JONES
& WEINTRAUB LLP

_____
Laura Davis Jones (Bar No. 2436)
James E. O'Neill, III (Bar No. 4042)
919 North Market Street, 17th Floor
P. O. Box 8705
Wilmington, Delaware 19899-8705
Telephone: (302) 652-4100
Facsimile: (302) 652-4400

Co-Counsel for the Debtors and Debtors-In-Possession