UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE


IN RE:                              .    Chapter 11
                                    .
W.R. GRACE & CO., *et al.,*         .    Case No. 01-01139(JKF)
                                    .    Jointly Administered
          Debtors.                  .
                                    .    March 27, 2006 (2:04 p.m.)
                                    .    (Wilmington)


TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE JUDITH K. FITZGERALD
UNITED STATES BANKRUPTCY COURT JUDGE


Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

1          (The hearing was already in progress before the

2     recording system was activated.)

3          THE COURT: . . . John O'Connell, Tiffany Cobb,

4     Elizabeth DeCristofaro, Warren Smith, Roger Frankel, Peter

5     Shawn, Michael Brown, Terence Edwards, Stephen Vogel, Kevin

6     Cassidy, and Kris McLean.  I'll take entries in court,

7     please.

8          MR. BERNICK: Good afternoon, Your Honor.  David

9     Bernick for the debtor.

10         MR. O'NEILL: James O'Neill for the debtor, Your

11    Honor.

12         MS. HAND: (Microphone not recording.)

13         MR. BECKER: Gary Becker for the Equity Committee.

14         MR. KRAMER: Matt Kramer for the PD Committee, Your

15    Honor, and I believe Mr. Baena and Mr. Sacral (phonetical)

16    are on the phone as well.

17         THE COURT: Okay, just one second, please.  Okay,

18    thank you.

19         MR. TACCONELLI: Theodore Tacconelli for the PD

20    Committee, Your Honor.

21         MR. LOCKWOOD: Peter Lockwood for the Asbestos

22    Claims Committee, Your Honor.

23         MR. ESSERMAN: Good morning, Your Honor.  Sander

24    Esserman on behalf of Baron & Budd and other law firms.

25         MR. HURFORD: Mark Hurford for the ACC.

1          THE COURT: Mr. Bernick, you're back in a cast

2    again.

3          MR. BERNICK: Ah yes.  No, actually, it's not a

4    cast.  It's less cumbersome but more uncomfortable.  I had

5    another bike accident four blocks from my last one, which

6    tells you something about people not learning their lesson,

7    but I broke a collarbone, but I'll recover, and it's not

8    cast.  So, it's difficult to sleep at night, but it's

9    otherwise not that much of a problem.

10          THE COURT: Okay.

11          MR. BERNICK: But I appreciate Your Honor's noting

12    it.  The agenda is mostly, I think, really administrative

13    matters, and Mr. McNeill's going to handle all items except

14    items 7, 8, and 13, which I will address as will Ms. Harding

15    who is here with me today.  So if we can just turn it over to

16    Mr. O'Neill for purposes of those other items and then we'll

17    come back.

18          THE COURT: All right.  With respect to items 1, 2,

19    4, 5, and 10, I do not know yet whether the orders have been

20    entered but either CNOs or COCs were submitted with those,

21    and they will be.

22          MR. O'NEILL: They have been entered, Your Honor.

23          THE COURT: Okay, thank you.

24          MR. O'NEILL: They do appear on the docket.  James

25    O'Neill for the benefit of the record.  Also, just for the

1   benefit of those parties who are participating at today's

2   hearing with respect to item number 10, which is the

3   eighteenth quarterly interim applications, I know Your Honor

4   noted that Mr. Smith was appearing by telephone, Your Honor

5   has entered that order, and it has been docketed.

6          THE COURT: All right, if anyone is participating

7   simply for the purpose of fee applications, you're excused.

8          MR. O'NEILL: Thank you very much, Your Honor.  Just

9   going back.  As Your Honor noted, item number 1, the order

10  has been entered.  Item number 2, the order has been entered.

11  Item number 3, Your Honor, is the debtors' motion for

12  expansion of Latham & Watkins as special counsel.  Your

13  Honor, we did receive informal comments from the United

14  States Trustee on this.  They related to a provision in the

15  engagement letter which seemed to require arbitration of

16  disputes and also had some inaccurate or cost information,

17  expense reimbursement information that didn't comply with our

18  local rules.  The engagement letter has been revised, and it

19  has been clarified that disputes regarding the engagement

20  will be referred to the Bankruptcy Court, and the expense

21  items for which reimbursement will be sought will be sought

22  in compliance with local rules.  And I believe that that

23  satisfied the United States Trustee.  That order was

24  submitted on certification of counsel.  It has not been

25  entered as yet, but I do have a copy that I can hand up, if

1    Your Honor would like.

2              THE COURT: Okay, was a COC submitted, because -

3              MR. O'NEILL: It was.

4              THE COURT: Okay.  All right, I'll take it.

5              MR. O'NEILL: Thank you.

6              THE COURT: Thank you.  Okay, that order is signed.

7              MR. O'NEILL: Thank you, Your Honor.  Item number 4,

8    the order has been entered.  Item number 5, the order has

9    been entered.  Item number 6, which is the motion of BDM

10   Construction Company, that matter has been continued to our

11   April 17th date.  Mr. Bernick's going to address items number

12   7 and 8.  Item number 9, Your Honor, is the debtors' fifth

13   omnibus objection to claims.  There are just two sets of

14   claims related to those claims by claimants named Archer and

15   also by Weatherford.  The order which I'm going to hand up,

16   Your Honor, continues the Weatherford claim objections to our

17   next omnibus date.  That claim is currently in negotiation

18   and also sets forth certain scheduling with respect to the

19   Archer claims and schedules a hearing on that for our May

20   15th, 2006 omnibus.

21             THE COURT: All right.

22             MR. O'NEILL: If I can hand that up.

23             THE COURT: Thank you.  Okay, that's signed.

24             MR. O'NEILL: Thank you.  That was item number 9.

25   Item number 10, as we noted at the beginning of the hearing

1    on the eighteenth quarterly fee applications, that order has

2    been entered.  Item number 11 and 12 are related to the

3    debtors' actions against the State of New Jersey.  Your

4    Honor, we're continuing to talk to New Jersey, and as in the

5    past when these matters have been carried, we have an agreed-

6    upon order extending the automatic stay, and I can hand that

7    up.

8             THE COURT: All right.  Okay, this one's continued

9    till May?

10            MR. O'NEILL: It is.  Both of these matters, number

11   11 and 12, are continued until May and the order which I

12   handed up extends the stay to that date.

13            THE COURT: Okay.

14            MR. O'NEILL: Your Honor, I have a couple of

15   housekeeping matters which I'm also going to address.  We

16   have, as the Court will recall, filed our amended case

17   management orders for property damage and also for personal

18   injury.  Those were filed both on March 14th.  As of today,

19   the orders haven't been entered yet, but I do have copies

20   with me that I can hand up to the Court.

21            THE COURT: I do not remember finalizing reading

22   them.

23            MR. O'NEILL: Okay.

24            THE COURT: I'll take them.

25            MR. O'NEILL: Very good, Your Honor.

1          THE COURT: But I'm not going to sign them now.  I

2    will take them back, hopefully get them entered either later

3    today or tomorrow.

4          MR. O'NEILL: All right, that's fine, thank you.

5          THE COURT: Are they without objection now?

6          MR. O'NEILL: Yes, Your Honor, both orders are

7    without objection.

8          THE COURT: Okay, let me just see, because I had

9    some of these things at home over the weekend.  Okay,

10   actually, I think with respect to the PI one, which is at

11   Docket No. 9301, I had instructed staff to enter it.  It

12   probably has not been entered because that's undoubtedly

13   waiting until I get back to Pittsburgh and let me take a look

14   at the PD one.  Okay, I'll enter both of these now and then

15   just cancel, because I did leave instructions but, as I said,

16   my staff wouldn't have gotten them yet, so - And, just a

17   minute, Mr. O'Neill, until I make a note.

18         MR. O'NEILL: Certainly.

19         THE COURT: Okay, thank you.

20         MR. O'NEILL: Thank you, Your Honor.  Also, there,

21   we filed last week, Your Honor, on March 22nd, a stipulation

22   that we've entered into with the Speights & Runyon firm with

23   respect to 45 asbestos property damage claims.  By agreement,

24   these claims are going to be expunged.  They are either

25   duplicate or amended claims.

1          THE COURT: All right, that I haven't seen.

2          MR. O'NEILL: It was just filed at the end of last

3    week.  I can hand up a copy now of the order, if Your Honor

4    would like it.

5          THE COURT: All right, and this is a stipulation?

6          MR. O'NEILL: Yes, it does - there was a stipulation

7    which was entered into pursuant to which it was agreed upon

8    that these 45 claims would be expunged.

9          THE COURT: All right, I'll take that too.  Thank

10   you.  I take it, though, based on a case management order

11   there is till more that are in litigation with Speights &

12   Runyon.

13         MR. O'NEILL: I believe there are, Your Honor.

14         THE COURT: Okay.  That's Docket No. 9315.  Okay,

15   that's entered.

16         MR. O'NEILL: And last cleanup item, Your Honor, as

17   part of the January property damage hearings that we had in

18   Pittsburgh on January 24th, one of the group of claims which

19   were addressed were the claims which were held by GI Holdings

20   and their affiliates.  Your Honor, we've reached agreement

21   with GI Holdings pursuant to which certain of their claims

22   are no longer going to be asbestos property damage claims.

23         THE COURT: Yeah, I've seen that too.  That's

24   another one if you have it I'll that too.

25         MR. O'NEILL: I do have the form of order which I

1   can hand up.

2          THE COURT: All right, I'll take it because that's

3   another one that I instructed staff to enter, but they don't

4   know it yet.  Just a minute until I make a note.

5          MR. O'NEILL: Certainly.

6          THE COURT: Was that part of the fifth omnibus too?

7   Because it has the same docket number, the 9315?

8          MR. O'NEILL: That is part of the - I don't think

9   9315 is the fifth omnibus, Your Honor.

10          THE COURT: I'm sorry.

11          MR. O'NEILL: 9315, it was part of the property

12   damage claim objection.

13          THE COURT: Okay.  The Speights & Runyon order and

14   this order both should be docketed related to 9315?

15          MR. O'NEILL: That's correct.

16          THE COURT: Okay.

17          MR. O'NEILL: And, Your Honor, that's it for the

18   administrative items.  I'm going to turn the podium back over

19   to Mr. Bernick.

20          THE COURT: Okay.

21          MR. BERNICK: Your Honor, items 7, 8, and 13 pertain

22   to discovery matters that are of some importance.  Item 13 is

23   on for a status report which I'll give very briefly to the

24   Court.  Items 7 and 8 were going to be on for the merits, but

25   they've now been deferred till May - I guess, maybe it's

1    April the 17th at the next omnibus hearing in light of some of

2    the lateness of the papers that came to the Court.  I would

3    just want to flag the first two as being of some consequence,

4    and then spend a little bit more time on the third

5    understanding that, obviously, if we move forward to

6    resolution within this narrow window of time as we are all

7    optimistic - always optimistic will be the case, that maybe

8    some of these matters will no longer need to be litigated

9    before the Court.  But the reason for raising them is that

10   they're all three of them - really they come down to two,

11   fairly labor intensive, and in the event that we do have to

12   move forward it's going to be, we believe, very critical for

13   the Court to address them pretty promptly.  Items 7 and 8

14   reflect an issue that has now moved to the forefront for a

15   variety of reasons.  The issue really is whether people who

16   allege personal injury as a result of exposure to asbestos in

17   connection with the Libby mine have a unique forum of

18   asbestos-related disease.  Almost all of these people have

19   seen one doctor, a Dr. Whitehouse, who has diagnosed and

20   treated them and gathered various kinds of information while,

21   before the bankruptcy was filed, the representations that

22   were made to Congress actually by counsel representing these

23   claimants was that they had a typical form of asbestos-

24   related illness.  It's now emerged during the course of this

25   bankruptcy proceeding that Dr. Whitehouse believes that they

1   have a unique form of disease that might entitled them to

2   separate treatment or a different kind of compensation scheme

3   that might otherwise be applicable to other asbestos bodily

4   injury claimants.  The issue was going to come up sooner or

5   later, probably sooner in connection with the estimation

6   process, anyhow, because as Your Honor will recall, we've

7   been given leave of Court to take discovery from the doctors,

8   and we initiated that process with respect to Dr. Whitehouse.

9   There's already been an objection from the government because

10  in connection with the government's criminal prosecution,

11  some of these same claimants are potential witnesses, and Dr.

12  Whitehouse is a potential expert, and because they're

13  witnesses rather than being claimants they have privacy

14  rights that have to be respected, and because expert

15  testimony's created differently in the context of a criminal

16  prosecution than it is in the context of a civil proceeding

17  such as the one that we have here, for all those reasons,

18  Judge Malloy in connection with the criminal case allowed

19  discovery with respect to Dr. Whitehouse, but subject to some

20  fairly significant limitations.  The government's come in

21  here and said, Well, those same limitations ought to apply

22  here.  Obviously, we disagree.  The claimants themselves have

23  appeared through counsel in this case that are claimants in

24  this case.  They submitted to the jurisdiction of the Court

25  in this case, and they're making claims, and we're going to

1  have to find out whether those claims have any reasonable

2  basis.  The privacy issues are not material nor are the rules

3  the same in a criminal proceeding, and there's been no

4  demonstration of any prejudice that the government will

5  experience.  So, that matter was going to come up before Your

6  Honor in any event and fairly promptly.  More recently, there

7  are two other areas that have caused this matter to have some

8  particular focus.  One that's pending before Your Honor is a

9  request that the estate pay certain fees and expenses

10  associated with the prosecution of these claims.  Again, on

11  the theory that the Personal Injury Committee has claimants

12  that are differently situated.  There may be a potential

13  conflict of interest.  The Libby claimants with this unique

14  disease, therefore, are entitled to separate representation.

15  They've asked for separate fees.  That matter is before Your

16  Honor, and it's one of the other matters that's being

17  deferred to the 17th.  And then even more recently it may be,

18  and I've underscored this is not something that's actually

19  been tied down, it may be that the Futures Representative,

20  and Mr. Frankel's on the phone and can speak for himself, I

21  spoke with him very briefly before this afternoon, and based

22  on correspondence that they've issued, the Futures

23  Representative may be contesting whether this special disease

24  actually exists, and obviously, this is all going to be

25  wrapped up in the question of whether there's some kind of

1    resolution here, but if there's not, it may be that the other

2    constituencies in this case will want to move this issue of

3    is there a unique disease up front by reason of its potential

4    implications for the resolution of the balance of this case.

5    So for all those reasons, we think it's an important matter

6    and one of the things I just want to underscore, the reason

7    that this has got to be addressed with some degree of

8    promptitude is that there's a longer lead time for this kind

9    of analysis.  This is not just a question of finding out what

10   individual data there is to support an individual's claim or

11   how more traditional criteria for the diagnosis of disease or

12   the gathering of diagnostic information ought to be applied.

13   This is a question of whether there's a whole new diagnostic

14   entity.  And to answer that question, you've got to take a

15   look at the data for the group as a whole to see if there's a

16   pattern, and that takes time, and so, it is an important

17   matter that we just wanted to alert the Court to, and I

18   understand that we'll take up on the 17th, but it is something

19   that should be flagged.  In the same vein, the status report

20   on item 13 relates to the question - there's been received

21   back so far, as Your Honor will recall the deadline for the

22   completion and submission of questionnaires has been extended

23   under the most recent case management order.  They don't come

24   due until May, but we've received an not-insignificant

25   collection of them.  We have no idea whether they're

1    representative or not, but they're disturbing.  Some of the

2    questionnaires give rise to or tend to confirm some of the

3    concerns that we've already expressed to the Court by way of

4    asking for the questionnaires.  Many of the doctors - we've

5    got six doctors who have been implicated in connection with

6    the diagnostic practices that were obviously the focus of

7    Judge Jack's opinion, and for that matter, they've also been

8    implicated over the years in connection with other audits

9    that have been done, I think going back to 1998.  Many of the

10   same doctors are on these questionnaires as being people with

11   responsive information, so clearly we're going to have a

12   significant matter there.  Dr. Heron, Dr. Ray Heron, Dr.

13   Andrew Heron, both were deposed and invoked the Fifth

14   Amendment.  They're very much involved in some of the same

15   issues, but of relevant concern for today, are the following

16   basic facts: 3,353 out of 5,290 people who have submitted

17   questionnaires or approximately 56 percent object rather than

18   answer at least question.  Remember, I remember, Your Honor,

19   I proposed that we defer those objections till later.  Your

20   Honor pointed out very properly we're going to have to deal

21   with the objections anyhow, let's deal with them up front,

22   and we still have this kind of thing coming back.  2,700 out

23   of the 5,290 or about 45 percent attached documents rather

24   than provide answers to at least one question.  So we get the

25   thing that says, Well, gee, I ought to have an option under

1    the interrogatory rule to provide documents instead of

2    providing answers.  That strategy or that approach is the

3    subject of much more careful constraints than that position

4    would otherwise indicate under the rules for interrogatories,

5    but all that's kind of irrelevant here because the whole

6    purpose of having the questionnaire was to answer the

7    questions.  We don't have to go around figuring out from the

8    documents what the answers should be.  We want to know what

9    the contention actually is by the claimant or by his counsel,

10   and this is not a way in which to develop the kind of

11   statistical data that we're going to need and the Court's

12   going to need.  2,146 or about 36 percent did not sign the

13   questionnaire.  216 claimants' attorneys did not sign the

14   questionnaire.  Now, as Your Honor understands from or will

15   understand from the status report that we've submitted,

16   obviously we want to provide an opportunity for people to

17   cure these defects, and we've come up with a procedure for

18   doing that, but I'm concerned this is something that I know

19   we've discussed previously, and maybe Mr. Esserman can tell

20   me that we shouldn't be worrying about any of these things

21   because it will all be - or Mr. Lockwood can provide us the

22   assurance that none of these things will be problematic.

23   But, the last thing that we can afford in a process that's

24   designed to move us towards resolution is to re-litigate the

25   issue of the questionnaire now for a third time.  The time

1    has come to provide the data, and we need the data, and we're

2    in a position to analyze it very, very promptly.  We think

3    it's going to be highly instructive to the Court, but if

4    people were to look at this as another round of discovery

5    litigation, it's going to impede the process.  So, that is

6    our status report.  I don't believe there's - Did anybody

7    else with a status report?  So no one has pointed out that

8    we're grossly in error.  Maybe they've learned since the due

9    date for the responses, but that's our status report, Your

10   Honor.

11            THE COURT:  Mr. Lockwood?

12            MR. LOCKWOOD: Are we barred from -

13            MR. BERNICK: I never proposed to bar Mr. Lockwood.

14            MR. LOCKWOOD: Your Honor, Mr. Bernick made a

15   reference to the last time we were here arguing about the

16   questionnaire, and Your Honor can refer to the statement in

17   the transcript where Your Honor said, Let's go through the

18   questionnaire now.  Your Honor, however, made a number of

19   other statements in that hearing which made it clear, we

20   submit at least, that Your Honor accepted the proposition

21   that this questionnaire was a discovery mechanism.  It was

22   not a proof of claim.  It was a discovery mechanism.  And Mr.

23   Bernick, under the guise of making a status report in the

24   absence of any of the claimants who might be here in a

25   position to explain what they did and why they did it, has

1    blithely said that essentially the rules in the Bankruptcy

2    Rules, the Federal Rules of Civil Procedure governing

3    responses to, for example, interrogatories, which is the form

4    of written questions that the rules govern, they don't have a

5    special rule for questionnaires, are inapplicable.  If you

6    get asked a question and the rules quite clearly say that if

7    it's as easy for you to produce a document from which the

8    answer to the question can be ascertained, it's as easy for

9    the recipient to determine the answer from that as it is from

10   you, you can provide the documents.  My recollection is,

11   indeed, that Your Honor's appointed a mediator, and what was

12   the mediator appointed to do?  Resolve discovery disputes

13   between individual claimants who Your Honor recognized, I, in

14   may capacity as counsel to a committee don't represent, and

15   the debtor.  So, why are we here listening to a status report

16   - I didn't hear any reference to mediation or the outcome of

17   mediation or anything else.  All I heard was an attempt to

18   what I would in another context regard as conditioning the

19   market, which is an attempt to prejudice Your Honor in

20   advance of having any of these disputes with the actual

21   protagonists in front of you discussing particular answers to

22   particular questions to sort of, you know, get Your Honor's

23   mind set to be thinking that, well, we've got a lot of

24   uncooperative people here who are behaving unreasonably, et

25   cetera.

1        THE COURT: I can assure, I've been in this case

2    long enough, that I don't take anything that any of you say

3    in the context of the argument as informing my mind-set for

4    what happens later.

5        MR. LOCKWOOD: I'm quite sure that that was the

6    case, but just under the theory that no good deed goes

7    unpunished and no argument should remain un-responded to, I

8    felt it incumbent upon me to make the point.  I mean, even

9    the percentages, I mean, they talk about 56 percent of the

10   lawyers objecting to at least one question.  Well, how many

11   of them objected to only one question, and maybe it was a

12   good objection?  Forty-five percent attached documents in

13   response to at least one question.  Well, was it one question

14   or 20 questions, I mean, there's really not much beef there,

15   Your Honor, and I suggest that we can all appropriately abide

16   the results of the mediation and address these matters when

17   they're properly presented to the Court with real controversy

18   with real people.  Thank you.

19       THE COURT: Okay, well, now tell me what I'm really

20   more interested in, which is what is the status of the

21   mediation?

22       MR. LOCKWOOD: I think - Well, Judge Pointer has had

23   at least two sessions that I know of, and there was one

24   session - Mr. Bernick may want to comment on this.  I have

25   not personally been participating.  My partner, Mr. Inselbuch

1    has on behalf of the Committee, so if I get something wrong,

2    I'm sure David will correct me, but there was one large

3    mediation to begin with, and then there has been at least one

4    subsequent mediation between the personal injury and the

5    property damage claimants presided over by Judge Pointer, and

6    as far as I'm aware, those mediations in some form or another

7    are continuing.  There's, not to my knowledge, been any

8    resolution of anything in particular between any one or more

9    constituencies, but Judge Pointer has not decided that the

10   effort is so unfruitful as to warrant ending it.  Beyond

11   that, I really can't say, Your Honor.

12            THE COURT: Okay, Mr. Bernick?

13            MR. ESSERMAN: Your Honor, may I respond to what Mr.

14   Bernick said before, before he gets to respond again?

15            THE COURT: Yes.  Well, I was just going to ask

16   about the status of the mediations.  That's okay.

17            MR. ESSERMAN: No, go ahead.

18            MR. BERNICK: I would like to be more informative

19   than - or as informative, as I should say, as Mr. Lockwood,

20   although I heard somebody refer to Mr. Lockwood this

21   afternoon as Dr. Lockwood when he came in - as Mr. Lockwood

22   indicated to the Court, but it's difficult for me to be that

23   way.  We had, and I don't want to get into any of the content

24   of the mediation process, but we had a very successful

25   process of finding a mediator that everybody could agree to.

1    We had calls with all of the constituencies to the case.  We

2    got information on a variety of candidates.  We followed a

3    process that everybody found to be satisfactory, and we found

4    a mediator that met with unanimous approval.  I can't say

5    there's a long list of mediators who would have met with

6    unanimous approval but that worked out very, very well, and

7    Judge Pointer - and I know that you probably are familiar

8    with Judge Pointer by background, very distinguished retired

9    judge, was the MDL judge in connection with the breast

10   implant litigation.  Judge Pointer has moved forward promptly

11   in his usual graceful and yet pointed fashion to get the

12   process going.  Everybody convened in New York at the end of

13   last week for two days, and there were a series of meetings.

14   I can't tell you very much about that beyond that because we

15   have not been - the mediation process thus far has not really

16   included the debtor - the substance of discussions or

17   negotiations have not included the debtor or the General

18   Unsecured Creditors or the Equity Committee, thus far, and I

19   don't know if this is going to change or not, and, as I said,

20   I'm optimistic that we will make progress.  The substantive

21   negotiations have taken place between the personal injury

22   property damage constituencies, and I was not present nor was

23   any representative that I'm aware of from either the debtors

24   or the general unsecured creditors or equity was present at

25   the second session, which took place, I guess it was earlier

1   this week, and I have not nor have I heard any report

2   delivered either by Judge Pointer or anybody purporting to

3   speak on behalf of those who were involved as to what

4   actually has taken place or whether anything further will

5   take place.  So, I just don't really know, and that's pretty

6   much the answer to Your Honor's question.

7            THE COURT: All right, thank you.  Mr. Esserman?

8            MR. ESSERMAN: Sandy Esserman for Baron & Budd and

9   various firms.  As to the mediation issues, I think Mr.

10  Lockwood and Mr. Bernick gave you a fair picture of what's

11  going on.  I was able to participate in some of those

12  sessions, and although I don't recall whether or not there

13  were any representatives of equity other than Mr. Bernick and

14  Grace itself, I know the Unsecured Creditors Committee were

15  there for some discussions and did in fact participate, at

16  least their counsel was there, and I concur with what Mr.

17  Lockwood said is the current status of the mediation.  There

18  have been further meetings between the personal injury group

19  and the property damage group, and perhaps those will be

20  successful.  They are continuing.  Very briefly, and I know

21  Your Honor doesn't want to hear a lot about the

22  questionnaire, but having thrown the skunk in the room, I

23  wanted to at least try and get it out of the room.  I think

24  we do have a mediator that has been appointed to mediate

25  these disputes.  I think that's part of the first stock that

1   they have to go, but I do want Your Honor to know, for

2   example, Grace contends that the lawyers aren't signing the

3   questionnaire that they've got and these are sort of

4   fundamental disputes, and they can go to the mediator and get

5   resolved, but the fact remains that the lawyers are not

6   supposed to sign the personal injury questionnaire, that the

7   only signature is for either the claimant themselves, who are

8   signing the questionnaire, or the legal representative of the

9   injured person, the legal representative being like the

10  estate representative in death or otherwise.  And during the

11  questionnaire itself, there's multiple references to legal

12  counsel or counsel, which are the lawyers, clearly, and not

13  legal representatives which are clearly - which is clearly in

14  the plain meaning of the word, legal representatives.  So,

15  the questionnaire itself doesn't call for the lawyers to sign

16  it.  It calls for the claimants to sign it, and that,

17  frankly, makes sense.  That's the way Grace designed it.

18  That's the way they wanted to do it, and frankly there's some

19  logic to that, and where the claimant is deceased, you'll

20  have a legal representative sign it, and that's - nowhere in

21  there is their legal counsel to sign it nor is the

22  information really requested of legal counsel, but once

23  again, this is a sideshow for now, and I don't want to divert

24  the Court's attention.  We have responses similar to that for

25  every complaint that Grace might make, and I would like to

1   point out that this - there was no response filed to this

2   issue because this was filed March 20th, a week ago, with no

3   response date.  And frankly, it's probably improper to put on

4   the docket if there's going to be a responsive period to

5   this, but I think it's proper procedurally to put this on a

6   docket as a status report, which is what Grace did.  So, I

7   don't want the Court to take the fact that there are no

8   responses, written responses, filed as any issue of consent.

9   This really wasn't a matter to be litigated today as Mr.

10  Bernick himself point out and properly so.  We've got the

11  mediator to handle, this and perhaps we'll be back here later

12  on disputes, but we've got a process that we've all

13  undertaken, and we've got a mediation - not a mediation on

14  the questionnaire, which is one mediation, but a bigger

15  mediation that I think everybody's focused on including Grace

16  and everyone's, of course, hopeful for a resolution and no

17  one knows whether one will come or not.  Thank you.

18          MR. BERNICK: Very briefly, Your Honor, just to be

19  clear, I think I accurately represented the participants in

20  the mediation process, and I accurately said that all people

21  were there at the beginning, but that there had been no

22  substantive negotiations with the debtors, the general

23  unsecured creditors, or equity, and that is a fact.

24          THE COURT: Well, that's okay.  I mean, you've got

25  to take it a piece at a time.  I just wanted to know whether

1    it is going on a piece at a time.

2            MR. BERNICK: It is in fact going on, and we're not

3    here to argue that anything changed.  Your Honor was very

4    clear in setting this window of time to get things done, and

5    we're going to wait and see, obviously, what happens, but I

6    wanted to make sure that Your Honor - there wasn't any lack

7    of clarity on that particular point.  It is, though, I mean,

8    it's very hard to ignore - Let me just put it this way: This

9    was a status report.  We're not arguing, we're not asking the

10   Court to resolve anything now, but part of the reason of

11   making this status report to begin with is to alert the Court

12   as to what's going on, and if the answer to all of this is

13   going to be that we have to go back to a mediator to re-

14   litigate matters that already were litigated before the Court

15   at length and after, my gosh, it's taken us four years really

16   to get this questionnaire in place for a whole variety of

17   reasons, that the answers going to be - the answer that you

18   heard today which is nothing that the Committee did really is

19   binding on individual claimants, many, if not all of whom,

20   through counsel had notice of the fact, and certainly with

21   respect to Baron & Budd on whose behalf Mr. Esserman has

22   participated in these proceedings, basically Baron & Budd has

23   already set out what their position is.  They could have set

24   it out before.  The idea that a legal representative didn't

25   mean counsel is laughable in light of the briefing that took

1  place.  It couldn't have been clearer.  Indeed that was

2  specifically argued before the Court, that is whether counsel

3  had to sign, and this was the result of that.  In any event,

4  that the answer's going to be that we now have to go back to

5  mediate the same issues all over again, law firm by law firm

6  -

7           THE COURT: Well, what difference if the claimants

8  sign, what do you need the attorney to sign for?

9           MR. BERNICK: Because the attorney is in possession

10  of knowledge on behalf of the client, knowledge as of

11  objective facts that are relevant to this questionnaire that

12  the attorney has and if the client is not cognizant of some

13  of the information that's on here, the attorney has - Your

14  Honor very specifically said, and this is why we went through

15  each and every one of these things specifically by reference

16  to this, and this exact argument was considered and basically

17  the sequence that was developed was first of all, the

18  claimants have to fill out the questionnaire based upon what

19  they know or what has been gathered in connection with the

20  case that they are aware of.  Secondly, we are entitled to go

21  and get information from doctors, but the doctors are

22  supposed to be supplying the information that's used in this

23  questionnaire.  Your Honor was very, very clear on this.  All

24  we're doing is asking a claimant for what your x-rays were.

25  We're not going to get very much information.  The medical

1  information had to be provided.  Well, who's got the medical

2  information?  It's the lawyers that have the medical

3  information.  All these law firms gather the information for

4  their clients.  So, if in fact the questionnaire is blank and

5  doesn't have the medical information that's been gathered by

6  the doctors and the lawyer says it isn't required to verify

7  that it's accurate, then we're going to get a whole bunch of

8  blank questionnaires because the claimants don't have the

9  information.  And that is exactly why the questionnaire was

10  worded the way that it was, and Your Honor could not have

11  been clearer that the information had to be provided, and in

12  order to assure that it has been provided or asking that the

13  lawyer verify that the questionnaire answers are true and

14  complete and accurate.  And we went through all of this.

15  Now, Your Honor deferred the whole idea of conducting

16  discovery of the lawyers, and that's true, and we wanted the

17  discovery of lawyers because we felt and still believe that

18  it bears upon the reliability of the information that's been

19  obtained if, for example, the law firm has a financial

20  relationship with the doctors.  But to have a questionnaire

21  that's designed to get medical information, objective medical

22  information, that the claimant does not have but the lawyers

23  do requires the participation of the lawyers, and God knows,

24  we know that they're participating because they correspond

25  with us in order to object to all kinds of things, and having

1    participated for purposes of providing the information that's

2    necessary, they have to attest that the information is there.

3    It's just that simple.    Now, we can go over that issue, and

4    we can go over the other issues with 30 different law firms

5    involved here, 50 different law firms involved here, and go

6    through the mediation process first.    That is a guarantee of

7    exactly the kind of delay that we have seen repeatedly

8    throughout this case.    Your Honor painstakingly went through

9    the construction of this questionnaire in order to gather up

10    - Grace is now the only case that's left where this

11    information is being obtained.    USG has now resolved their

12    differences, God bless, they were able to do that, and the

13    statement that there was no equity of course that they made

14    repeatedly and it turns out they had $3 million worth of

15    equity when the plan was ultimately done.    The USG case is

16    now gone.    The only case where this information has to be

17    gathered is the Grace case.    This is a very critical,

18    critical process, and Your Honor, by way of - and I'm now

19    happy that we made the status report because if as it appears

20    now likely, indeed is pretty patent, the position coming in

21    in response to our motion is not going to be to deal with the

22    merits, but to say, Well, you know, gee, we did our best, but

23    now all the different law firms have got to come in, and we

24    have to mediate these issues.    We're not going to see the

25    data for these questionnaires for quite sometime to come, and

1   if that is Your Honor's determination, we accept and

2   understand that, but I don't think that that's where this

3   case has been headed, and the debtor would vigorously,

4   vigorously take issue with the idea that at this like stage,

5   this case, if we can't resolve these issues will now flounder

6   yet again, not on the truth of whether there's a claim that's

7   to be made here that's valid but on the timeliness of the

8   process and adequacy of the process to find out if these

9   claims are subject to the same kinds of defects that Your

10  Honor is now very familiar with in the context of Silica at

11  the hands of exactly the same doctors who are now taking the

12  Fifth Amendment rather than tell the Court what they know

13  about whether the same problem's inherent in this process.

14       THE COURT: Well, I don't know those doctors'

15  involvement in the asbestos arena.  I hear what you're

16  saying.  The only deposition transcripts that I was provided

17  in a different case had to do with Phillip claims.

18       MR. BERNICK: I understand, Your Honor.

19       THE COURT: And so, I cannot at this point opine

20  with respect to their involvement, lack of involvement,

21  appropriate processes, or whatever in this case.  I simply

22  don't know what they did.

23       MR. BERNICK: And I understand that, and we were

24  very clear.  We went back to the transcript of that case and

25  are very familiar with how careful Your Honor was to express

1  no view, and we're not asking Your Honor to express a view.

2  We're asking Your Honor to enable us to get exactly the same

3  kind of information relating to exactly the same doctors who

4  were in fact involved in exactly the same screening processes

5  in this case.

6           THE COURT: Well -

7           MR. LOCKWOOD: Your Honor, that's exactly the

8  problem.  This is supposed to be a status report, and Mr.

9  Bernick just admitted that what he's doing is standing here

10  asking Your Honor to decide various things and making

11  predictions about all of the awful things that are going to

12  happen to people if they have the temerity to question some

13  particularized piece of a questionnaire that was directed at

14  them and their clients, and he can sit here and say all he

15  wants to that all of this stuff was resolved, but the

16  obligations and the ability as Your Honor - I mean if we want

17  to have a battle of the transcripts of what Your Honor said

18  at various places in response to various arguments -

19           THE COURT: Hopefully not.

20           MR. LOCKWOOD:  - he can file a motion and we'll

21  file a response, and Your Honor will have the ineffable

22  pleasure of reading Your Honor's own words as well as the

23  words of counsel that lead up to and follow them to get it

24  all on context, but all I can say, Your Honor, is this was

25  supposed to be a status report, and that's - Let's just leave

1   it at that, okay?  He's gone way beyond it, but let's not

2   keep getting up and making pitches about, you know, what's

3   got to happen and what people can or can't do in response to

4   this, and you know, he got you to authorize and to issue

5   180,000 questionnaires and they're out there.  Their due date

6   is May the 12th, and he's got the ability, if he wants to,

7   because he got some early returns to institute mediations.

8   He says he's sending out letters, and he just, you know,

9   there's a string that needs to be played out here and the

10  level of urgency that's now being presented here.  This case,

11  Your Honor, is five years old almost.

12          MR. BERNICK: That's exactly the -

13          MR. LOCKWOOD: And Mr. Bernick has run this case to

14  suit his and his client's convenience from the get-go, and -

15          THE COURT: Well, I don't know if he could agree

16  with that.

17          MR. LOCKWOOD:  - it ill lies in his mouth to tell

18  us -

19          MR. BERNICK: That is just - Your Honor -

20          THE COURT: Okay, guys, it is a status conference.

21  That's enough.

22          MR. BERNICK: It's a status conference.  It was

23  pointed out to me that I wasn't clear.  The Fifth Amendment

24  that was taken by these doctors was actually in depositions

25  in this case not the civil case.

1            THE COURT: Well, you know -

2            MR. LOCKWOOD: Okay, if we're going to talk about

3    that, how many of Grace's employees took the Fifth Amendment

4    in response to the government investigation in Libby?

5            MR. BERNICK: In not filling out the questionnaires.

6            MR. LOCKWOOD: I mean, you know, this is just an

7    effort to kind of prejudice people, Your Honor.   I don't get

8    up and talk about the Libby criminal indictment of this

9    company in front of Your Honor as though you were a jury.

10   This kind of stuff is just way out of line.

11           THE COURT: Okay.  My only concern at this point,

12   frankly, gentlemen, is try to simply keep these balls in the

13   air until the case mediation is over.  At that point in time,

14   you know, it's going to be a no-holds bar free-for-all, I

15   guess, if that's how it's going to get litigated.  You know,

16   that's not my preference in litigation, but I've been there

17   like you all have, and if that's the way this has to go, then

18   okay, sobeit, we'll tee it up that way.  You know, I prefer a

19   more orderly process, but if that's how it has to go, that's

20   how it has to go, but I think I did appoint a mediator for

21   the purpose of looking at discovery disputes.  So if you've

22   got discovery disputes, that was the purpose for my getting

23   you a mediator because I think you can get a resolution there

24   quicker than you can get another hearing in front of me.

25           MR. BERNICK: Well, but, Your Honor, we actually -

1   that is - I mean if Your Honor directs us to seek mediation

2   on that, that's fine.  We will go ahead and do that.

3          THE COURT: Well, I don't know if it's a dispute.  I

4   mean I hear from you in the status report that you're going

5   to dispute it.  All you've told me so far is that people have

6   taken some action that you didn't expect, that you expected

7   to get answers and didn't get answers.

8          MR. BERNICK: In point of fact, we kind of did

9   suspect it, and that's why we then asked Your Honor, if

10  you'll recall, to establish a bar date so we didn't have a

11  problem of people then claiming that they were not subject to

12  the jurisdiction of the Court in going through this whole

13  process, and we tell the law firm that.  A mediator is fine

14  with respect to things that are still kind of in process and

15  subject to negotiation, but Your Honor, we would submit, and

16  I think this is absolutely the case, the mediator is not

17  there to resolve matters that already have been decided, and

18  if they have got issues with what has to be done in order to

19  comply with the questionnaire as opposed to some other matter

20  that may relate to filling out the questionnaire, if they

21  have questions about (a) does a lawyer have to sign, (b) is

22  it enough to simply attach documents, those are matters that

23  go to the face and requirements of the questionnaire only,

24  Your Honor, to resolve them, and in fact, Your Honor already

25  has resolved them because we went through this in detail, and

1    I can't help but point out, Your Honor, we sought this back

2    in 2001, and it didn't happen because Judge Wolin put this

3    issue at the back of the queue, and as soon as we had to deal

4    with personal injury, it came back up in front of the queue

5    and it took us a year to get this questionnaire in place and,

6    you know the property damage people all say this, they

7    litigated the issue of the questionnaire but when it was

8    finally done, they filled the thing out, not all of them did

9    but the ones that we believe that, you know, claims are

10   litigible claims, they filled the questionnaires out.  We

11   didn't go through another round of litigation on the theory

12   that the claimants themselves now were entitled to a second

13   bite of the apple.  That's what's happening here, and all I

14   would ask, Your Honor, is we will do anything that Your Honor

15   believes is appropriate at the appropriate time.  We're not

16   asking Your Honor to tell us today as opposed to the end of

17   the mediation period.  Anything Your Honor wants, I take very

18   seriously what you said the last time, you want a period of

19   time to see if it can all work out.  We're happy to defer

20   this, but at the end of the day, if something is going to be

21   a ripe issue, we didn't want to be accused of having spent -

22   having done anything less than immediately prompt in seeking

23   to bring these matters before Your Honor for Your Honor's

24   attention so that if it was going to take time to get

25   resolved, it wasn't going to count on our nickle, because we

1  have been - I think Your Honor would have to agree, as

2  diligent as we possibly can be to get this information.

3       THE COURT: Well, the debtor has certainly been

4  asking for a claims bar date and to get the PI issues

5  resolved since I think my first involvement in the case, that

6  much I can agree on, and I have taken the view that I have

7  not thought that the proof of claim was necessary because the

8  trust distribution processes in 524(g), injunction processes

9  that apply, you know, from a personal point of view, I don't

10  care whether the trust processes work their way through the

11  case before the case is over or at the end.  I don't have -

12  It doesn't matter to me.  They need to get worked out, but to

13  the extent that people need time to put documents together

14  and have some experts take a look at whatever required

15  medical literature is going - and documents are going to be

16  required to support the claim through the trust, you know, I

17  think that's a good process.  The trust processes have worked

18  in other cases.  I don't know why that process can't work

19  here.

20       MR. BERNICK: Your Honor, I think that we had this

21  questionnaire approved - It was sent out September 12th of

22  last year.  So effectively, the period has been - and for

23  good reason extended, so -

24       THE COURT: You know, they've had time.  I think

25  that -

1          MR. LOCKWOOD: Your Honor, I don't believe Mr.

2     Bernick identified at any point in his status report that

3     people were sending back letters to him saying, I'm not going

4     to answer your questionnaire because the Court doesn't have

5     jurisdiction over me.  If that's a problem, I suppose it can

6     be presented with respect to those people, and Your Honor can

7     consider what sort of sanction.  We went through this whole -

8          THE COURT: We did.

9          MR. LOCKWOOD:  - proof of claim thing, and I don't

10    see any utility to - under the guise once again of being a

11    status report and rearguing it.  If Mr. Bernick thinks

12    mediation is not useful here, I suppose he could ask the

13    Court for permission to bypass it and just make motions to

14    compel responses.  I mean, he's got a lot of things.  He

15    doesn't need to come here and ask Your Honor to tell him how

16    to seek the information and to prove his incessant statements

17    that various issues have been resolved against these

18    claimants in their absence by prior hearings at which the

19    Committee and he participated.  He can make his motions, and

20    as Your Honor says, people will respond to him and that's the

21    way the thing goes.  When you seek discovery from somebody

22    under the Federal Rules you don't just have the ability to

23    sort of decide unilaterally what their response obligations

24    are to discovery, and you don't have the ability to get some

25    judge to rule on them in their absence.

1          THE COURT: And I'm not making any rulings.

2          MR. LOCKWOOD: I understand that, Your Honor.  I'm

3     just trying to -

4          THE COURT: I'm not even being asked to make any

5     rulings.

6          MR. LOCKWOOD: I'm trying to put this into some kind

7     of context because my friend, Mr. Bernick, here incessantly

8     says that all these things have been resolved, and he's got a

9     questionnaire, and the questionnaire supercedes the Federal

10    Rules of Civil Procedure and the Federal Bankruptcy Rules,

11    and you've decided all of this stuff, and maybe you've

12    decided some things and maybe you haven't decided some

13    things, but the appropriate time to deal with them is when

14    somebody who's on the receiving end of a questionnaire either

15    doesn't respond, to which they can then make a motion to

16    compel a response, or responds in a way that they consider

17    unsatisfactory, in which event they're supposed to go to

18    mediation, but I guess they could file a motion with the

19    Court or just unilaterally decide to blow off the mediator

20    and say, well, we're we know we're not going to successfully

21    mediate that, so we're just going to go directly to Your

22    Honor, but that's not today.

23         MR. BERNICK: Your Honor, I only add one thing

24    because I well know the rules of litigation and all the

25    different moves that are available.  I'm very, very familiar

1    with them.  It's been my impression in a bankruptcy case that

2    the parties have a higher obligation as well.  Obligation

3    number one is to resolve the case, which we'd all very much

4    like to do.  Obligation number two is to act solely for

5    purposes of bringing about an ultimate resolution to the case

6    that complies with the law.  From that point of view, counsel

7    for the Committees, the Committees themselves, myself as

8    counsel for the debtors have an obligation to be candid and

9    transparent with the Court on how to get this case moving and

10   get it to the point of resolution.  All we were doing by way

11   of the status report was to see if we had an underlying

12   problem, which we thought we did, and we now know that we

13   had.  What we want is the same candor from the other

14   representatives of the other constituencies.  It is the

15   position of the Committee and the position of the other

16   constituencies that they represent that they're not bound by

17   any of Your Honor's prior determinations with respect to this

18   questionnaire, and that the process that we went through was

19   simply a process whereby we kind of went through a kind of a

20   - a small gauntlet that was a preliminary gauntlet to the

21   ultimate gauntlet so that the Committee can have a crack at

22   the questionnaire only then to have everybody else have a

23   crack at the questionnaire, and by the way, then have all of

24   that arbitrated.  If that's their position, let's get it up

25   front and in the open right now and ask Your Honor to rule on

1   it.  To simply say, Well, we're going to make that argument

2   ultimately and you'll just have to wait to see what everybody

3   says, that's a litigation tactic that wouldn't be accepted

4   even in the district courts with respect to ordinary

5   litigation.

6           THE COURT: But I don't know of any motion that I

7   currently have before me.  I have a status report that's been

8   filed with respect to the questionnaire.  I've heard some

9   numbers, you know, put on the record today.  They may be

10   meaningful, they may not be, I really don't know because I

11   don't know the context in which the objections to the

12   questionnaire have been raised.

13           MR. BERNICK: That's -

14           THE COURT: I'm not in any position to rule.  I

15   don't have a motion before me that puts things in a context.

16           MR. BERNICK: That's fine, and I think what we will

17   do is to simply file a motion before the Court.  It doesn't

18   have to be heard before the end of the mediation date, that

19   flags this issue as a procedural issue so that we can just

20   get some up-front clarity on what is the venue in which the

21   questions can go to the content of the questionnaire.  What's

22   the venue in which those matters get resolved and who's going

23   to be or what is the effect of the prior litigation perhaps,

24   but we'll file that motion.  The only other thing that I'd

25   add is that there's some suspicion here that, you know, these

1    questionnaires are unusual and they're basically concealed

2    interrogatories and, gee, we'll just litigate them in the

3    ordinary course.  It is ironic because Judge Pointer in the

4    MDL that is non-bankruptcy litigation directed that any

5    claimant who wanted to pursue a claim in the MDL proceeding

6    fill out a questionnaire and attach documents and sign that

7    questionnaire.  That questionnaire, I think, ran to 20 or 30

8    pages, and it required detailed medical histories, histories

9    concerning product use.  Every single person had to fill it

10   out, and once he issued that order and that questionnaire

11   went out, we didn't see objections seeking to re-litigate all

12   those same matters by every attorney that represented a

13   claimant, and the whole point is, it's not simply an

14   interrogatory.  It basically is a specialized device that's

15   designed to make this process more efficient.  It's not an

16   excuse for mediations, arbitrations, and more litigation,

17   it's supposed to streamline litigation.  Again, we're happy

18   to take these matters up on whatever course Your Honor feels

19   appropriate.  I think that we're now left with no choice but

20   simply file a motion and ask for the Court's guidance.

21          THE COURT: Okay, well, whatever you file, you know,

22   we'll get put on to an agenda and I'll deal with in context.

23   This is just not something especially to the extent that it's

24   a dispute over questionnaires, it's not something that I can

25   give opinions about without looking at each one of the things

1  that you say is objected to and finding out why there is an

2  objection.

3         MR. LOCKWOOD: I would just say, Your Honor, that in

4  response to -

5         THE COURT: And I appointed a mediator for that

6  purpose, and I do think you should go to the mediator first,

7  because to the extent that there is an issue with respect to

8  the scope of response to the questionnaires, that was the

9  whole point for trying to get a mediator in place who could

10 address those issues with you promptly, and I think you will

11 be able to get a more prompt resolution from a mediator than

12 you will from me.  I, you know, if you've got 500 of these

13 already that are coming up, and I've got to look at each one

14 separately, you'd like to go to plan confirmation hopefully

15 in our lifetime.

16        MR. BERNICK: Your Honor, that's fine.  I guess

17 we'll just then proceed before the mediator because that's

18 Your Honor's position, but I have to say that the whole

19 purpose of litigating the questionnaire and having these very

20 issues get raised at the time was to get it resolved, and I

21 certainly - it never even crossed my mind that after that

22 whole process not only were we going to get all the law firms

23 to come in and object, one by one, but on generic questions,

24 not this question or that question, on generic questions that

25 was the purpose of appointing a mediator.  If that were true,

1    then the mediation appointment is one where we most certainly

2    would have created an exception for matters that have already

3    been resolved by the Court.

4            THE COURT: Well, to the extent that I've already

5    resolved something, I don't think you need a mediator, you've

6    got an order somewhere.  To the extent that somebody doesn't

7    understand an obligation and has a dispute with the debtor as

8    to what compliance with my order is, I think your first round

9    is to the mediator.  So, you know, call him up.  Say, here's

10   our first dispute, what are you going to do about it.

11           MR. LOCKWOOD: Your Honor, just on this business

12   about transparency and being candid with the Court, which I

13   take to be sort of an insinuation that I and my Committee

14   have somehow or another misled Your Honor -

15           THE COURT: Mr. Lockwood, you and your Committee

16   have a thicker skin than that.  I know you have.

17           MR. LOCKWOOD: I have a thicker skin, but I think

18   it's been pretty clear, Your Honor, every time I've been in

19   front of you that I've said that the Committee doesn't

20   represent individual claimants and that while the Committee

21   did attempt to participate in the questionnaire process to

22   make the questions better, make them more answerable, if you

23   want to go back to the transcript, I repeatedly said I'm not

24   a plaintiff's lawyer.  I don't know what these lawyers have

25   in their offices.  I don't know what they're blue-collar

1    clients can answer about their diseases and their exposure

2    and this, that, and the other thing.  Mr Bernick's

3    questionnaire was drafted by Mr. Bernick for Mr. Bernick's

4    client.  It wasn't drafted as some sort of *amicus curiae*

5    document to help the Bankruptcy Court streamline its

6    litigation procedures such that it would then be adopted as a

7    new exception to the Federal Rules of Civil Procedure.

8            THE COURT: No, look, I understood that the purpose

9    was so that we could get teed up for an estimation process.

10           MR. LOCKWOOD: That's correct.

11           THE COURT: The debtor wants to figure out what

12   claims are legitimate claims - in quotes, "legitimate claims"

13   in order to figure out what funding has to be committed

14   through this plan to the personal injury claimants versus

15   anybody else.  That's the sole limited purpose for which this

16   questionnaire was approached, brought into the Court,

17   approved by me, and sent out.  And frankly, it would seem to

18   me to be in every claimant's best interest to do their darn-

19   est to try to answer it effectively and adequately because to

20   the extent that there are really sick people out there, they

21   should be getting paid and they should be getting paid

22   sooner, and to the extent that there really aren't sick

23   people out there, the debtor ought to know that it has to

24   commit more of its resources to pay the really sick people.

25   That's what it's all about.

1          MR. LOCKWOOD: I understand that, Your Honor, and I

2     would suggest, respectfully, that the time for Your Honor to

3     decide whether people are or are not fulfilling their

4     obligations under the questionnaire is when there's a dispute

5     teed up in front of Your Honor -

6          THE COURT: I agree.

7          MR. LOCKWOOD:  - about that, and not listening to

8     rhetoric from lawyers in the courtroom in the absence of

9     anything resembling a record.

10          THE COURT: I agree, because I can't do it on this -

11     to the extent that this is a record, I can't do it on this

12     record because I don't know what even the objections are all

13     about.

14          MR. LOCKWOOD: And I don't either.

15          THE COURT: But I'm certainly not going to make

16     rulings when I have no clue what the objections are all

17     about.  So, if a motion's filed, it will get put on the next

18     agenda.  Every motion gets put on my agenda.  I think in the

19     meantime, if you folks have some dispute, especially the

20     things like generic questions, you ought to talk to (a) each

21     other, that would be very helpful, and (b) the mediator next

22     because by the time you have to file a motion, you might get

23     it resolved.

24          MR. LOCKWOOD: Your Honor, that's the problem.  I

25     don't have a dispute with Mr. Bernick, because I'm not

1  answering the questions.  My firm isn't answering the

2  questions.  So the "you folks" are a bunch of people that

3  didn't get notice of this hearing, that didn't get served

4  with the status report -

5         THE COURT: Well, I don't know -

6         MR. LOCKWOOD: And you're hearing a one-sided view

7  of their misbehavior.

8         THE COURT: I don't know that there's any

9  misbehavior.  I'm not putting that spin on it.  Don't put

10 words in my mouth.  I have enough trouble with my own

11 verbiage.

12        MR. LOCKWOOD: Your Honor, I was putting Mr.

13 Bernick's words in Mr. Bernick's mouth, not yours.

14        THE COURT: Oh.  All right.

15        MR. LOCKWOOD: Thank you, Your Honor.

16        THE COURT:  I don't know of any misbehavior.  I

17 simply know that if I get a motion, it's going to get

18 scheduled.  If I don't get a motion, hopefully, you folks

19 have resolved it. To the extent, Mr. Bernick, that Mr.

20 Esserman's here and it's any of his questionnaires, talk to

21 him, he's here.  I see him right here in the courtroom even

22 though he's listed as being on the phone, he's not.  He's

23 here.  Talk to him.

24        MR. BERNICK: That is absolutely right, and I not

25 only encourage Mr. Esserman who has contacts with all of

1    those firms, if he has generic objections to the

2    questionnaire, whether or not he believes they've been

3    resolved, just like we got a letter from Baron & Budd, his

4    client, we get another letter from Baron & Budd or whatever

5    clients he has - I'm not sure I know exactly - just list all

6    the generic questions, we'll send them off to the mediator.

7    We'll see if they can get resolved, and if they can't we'll

8    be back before Your Honor, and we likewise would like to see

9    the information because that would be helpful for exactly the

10    purpose that Your Honor has articulated.  We all got to

11    communicate, I know, with Mr. Lockwood, although I'm sure

12    that we will include him in the communications even though he

13    objected to the questionnaire left, right, and center, I now

14    know that . . . (microphone not recording).

15           MR. LOCKWOOD: The last time we were here, Your

16    Honor, I objected to the questionnaire and you said I didn't

17    have standing because I didn't represent -

18           THE COURT: Could I -

19           MR. LOCKWOOD:  - because I didn't represent people

20    that were going to have to respond to -

21           THE COURT: Could I just get you folks -

22           MR. LOCKWOOD: I will read that part of the

23    transcript -

24           THE COURT: Could I just get you folks to play on

25    the opposite football teams.  I would like to be at that

1  game.

2         MR. ESSERMAN: Your Honor, enough is enough.  You've

3  heard enough about this.  Suffice it to say that everyone has

4  issues with what everyone else is saying, and everyone's

5  trying to either pollute the record or correct the record or

6  create a record.  This isn't the time or the place for any of

7  that.  I think Your Honor has set forth what needs to be

8  done.  We've got a mediator process set in place by the

9  Court.  To the extent Mr. Bernick wants to utilize that

10  process on behalf of whatever clients I may represent, we'll

11  be happy to go that route.  To the extent Mr. Bernick wants

12  to ignore the processes of the Court and file a motion, we'll

13  deal with that when it's filed, but thank you very much.

14         THE COURT: Doesn't the Delaware Local Rule like the

15  Western District Local Rule have an assertion that if you

16  have a discovery dispute, you have to meet and confer and

17  assert before you file any motions that you've tried to

18  resolve it and you've been unable to?  Frankly, gentlemen,

19  most - thank you, yes.  Everybody's nodding yes.  I want the

20  record to reflect that the Delaware Local Rule does have in

21  place a conference process.  So, folks, you're ordered to

22  comply with the local rule, and I don't want to see hide nor

23  hair of any discovery disputes until you meet and confer with

24  respect to every single question, sub-question, answer, non-

25  answer, document, missing document, whatever so that I know

1    that in fact you've made a good faith effort to try to get

2    this resolved.  Then go to the mediator, and then come to me,

3    and you can do that within six weeks, because you've done

4    everything else within six weeks.  By the time your case

5    mediation is over, you should be able to get this resolved.

6    So, the local rule is in place.  Does anybody have any

7    questions about the local rule and it being in place and what

8    I'm requiring because I want a certificate from all counsel

9    that says when you met and conferred, what issues you've

10   talked about in terms of the questions that are in dispute,

11   and the fact that you can't get it resolved.

12             MR. BERNICK: We will do that, but -

13             THE COURT: Okay.

14             MR. BERNICK:  - just so I don't run afoul of that

15   instruction, our first step is going to be as I indicated,

16   which is to find out if there are generic issues -

17             THE COURT: That's fine.

18             MR. BERNICK:  - and then we'll go to individual

19   questionnaires.

20             THE COURT: That's fine.  Okay.  Having taken 40

21   minutes on an issue that wasn't up for today, is there

22   anything that is still left.

23             MR. LOCKWOOD: I think that was the last agenda

24   item, Your Honor.

25             THE COURT: Okay.  All right, with respect to your

1  numbers 7 and 8, I'm not sure Mr. Bernick, they're simply

2  continued to April; correct?

3          MR. O'NEILL: That's correct.

4          THE COURT: Okay, that's fine.  I should be prepared

5  to address them then, hopefully.  So - Okay, we're adjourned.

6  Thank you.

7          ALL: Thank you, Your Honor.

8          (Whereupon at 3:11 p.m. the hearing in this matter

9  was concluded for this date.)

10

11

12

13

14

15

16

17

18          I, Elaine M. Ryan, approved transcriber for the

19  United States Courts, certify that the foregoing is a correct

20  transcript from the electronic sound recording of the

21  proceedings in the above-entitled matter.

22

23  /s/ Elaine M. Ryan                    April 14, 2006
    Elaine M. Ryan
    2801 Faulkland Road
    Wilmington, DE 19808
    (302) 683-0221