UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE


IN RE:                          .    Chapter 11
                                .
W.R. GRACE & CO., *et al.,*     .    Case No. 01-01139(JKF)
                                .    Jointly Administered
                                .
        Debtors.                .    April 17, 2006 (2:05 p.m.)
                                .    (Wilmington)


TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE JUDITH K. FITZGERALD
UNITED STATES BANKRUPTCY COURT JUDGE


Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

1          THE COURT: Okay, this is the matter of W.R. Grace,

2     Bankruptcy No. 01-1139.  The participants that I have listed

3     by phone are: Isaac Pachulski, Joseph Gibbons, Richard Wyron,

4     David Austern, Van Hooker, Darrell Scott, Richard Park, Jay

5     Hughes, Sal Bianca, Sam Pointer, Carl Pernicone, Matthew

6     Kramer, Sara Gooch, Brian Kasprzak, Leslie Epley, Michael

7     Davis, Robert Gutman, Sander Esserman, Arlene Krieger, David

8     Parsons, Craig Moran, Sean Walsh, Daniel Glosband, Stephen

9     Vogel, Debra Felder, Jonathan Brownstein, Joseph Radecki,

10    Martha Brown, Paul Norris, David Siegel, Marc Casarino, Simon

11    Porter, Kevin Cassidy, Kris McLean, Tiffany Cobb, John

12    O'Connell, Kenneth Thomas, Craig Gilbert, Elisa Alcabes,

13    Barbara Seniawski, Elizabeth DeCristofaro, Andrew Craig,

14    Marti Murray, and Peter Shawn.  I'll take entries in court,

15    please.

16          MR. BERNICK: Good afternoon, Your Honor.  David

17    Bernick for Grace.

18          MS. BROWDY: Your Honor, Michelle Browdy for Grace.

19          MS. BAER: Janet Baer for grace.

20          MR. O'NEILL: James O'Neill for Grace.

21          MS. HARDING: Barbara Harding for Grace, Your Honor.

22          MR. PASQUALE: Ken Pasquale and Lewis Kruger from

23    Stroock for the Unsecured Creditors Committee.

24          MR. BECKER: Gary Becker from Kramer Levin for the

25    Equity Committee.

1          MR. BAENA: Scott Baena and Jay Sakalo for the

2     Property Damage Committee.

3          MR. FRANKEL: Good afternoon, Your Honor.  Roger

4     Frankel for the Future Claimants Representative.

5          MR. LOCKWOOD: Good afternoon, Your Honor.  Peter

6     Lockwood for the Asbestos Claimants Committee.

7          MR. COHN: Good afternoon, Your Honor.  Daniel Cohn

8     and Kerri Mumford for the Libby claimants.

9          THE COURT: Okay, Mr. Bernick?

10         MR. BERNICK: Yeah.  Your Honor, I think that we

11    have four matters to cover this afternoon.  First, I think

12    there are a series of uncontested matters where we'll be

13    asking the Court to sign some orders, and Ms. Baer will

14    handle that.  Second, I know that Your Honor will be very

15    focused on the question of whether progress has been made on

16    the settlement front, as you got a little bit of an

17    indication from Mr. Speights this morning, there has been

18    some progress made.  The debtor's not really in the best

19    position to give a report on that.  I believe that Your Honor

20    has spoken briefly with Judge Pointer and therefore has some

21    information, but I think what might be appropriate there is

22    to get a report from those who apparently have reached

23    agreement and to talk about the implications that that has

24    with respect to further mediation and also with respect to

25    exclusivity and also with respect to continuing proceedings

1  in this Court.  I think they all kind have fallen in the same

2  category which is what's going to happen for the next 60

3  days.  Then there are two specific matters that were on to be

4  heard this afternoon, beyond that, the first relates to a

5  request by the Libby claimants to have fees paid, fees and

6  expenses paid, for certain activities of their counsel.  I

7  think that's still pending before Your Honor.  I don't know

8  that it's been withdrawn, but if it is pending, then that

9  ought to be addressed this afternoon.  And then finally,

10  there is discovery with respect to Dr. Whitehouse, and I'm

11  happy to report that people on both sides of the aisle here

12  are hard at work to try to resolve that issue, including

13  discussions with the government, and I believe we have an

14  agreement, but it probably makes sense to have at least a

15  short report to the Court on the content of that agreement,

16  so Your Honor understands where that is, and we'll be asking

17  that an order be entered with respect to that, although, I

18  don't know that we'll have the order to tender yet this

19  afternoon.  So, that's the basic sequence and unless there's

20  a proposal by Your Honor or somebody else to proceed

21  differently, I would ask that Ms. Baer handle the uncontested

22  matters.

23          THE COURT: All right, that's fine, thank you.

24          MS. BAER: Good afternoon, Your Honor.

25          THE COURT: Good afternoon.

1           MS. BAER: Your Honor, matter number 1 on the agenda

2     is the motion of BDM Construction for an order granting the

3     modification of the automatic stay.  Your Honor, Grace has

4     tendered that matter to its insurance carrier and still has

5     not heard back.  So BDM has agreed that this matter should be

6     continued to the hearing on May 15th.

7           THE COURT: All right.

8           MS. BAER: Your Honor, matter number 2 is the motion

9     of the Scotts Company.  The parties are in discussions on the

10    best way to handle that matter going forward, and again,

11    they've asked that the matter be continued to May 15th.

12          THE COURT: Okay.

13          MR. BROWN: Your Honor, I apologize.  Michael Brown

14    for One Beacon and Seaton.  I just wanted to point out that

15    with respect to agenda item number 2, that the insurers had

16    not been involved in these discussions, and I'm not sure

17    they're all in agreement, but from my own client's

18    perspective, we would like to see this matter move forward.

19    I understand that Grace and Scotts are of a different view,

20    and some of the other insurers are of a different view, but

21    it's our position that this adversary needs to move forward

22    because among other things, there are indemnification

23    obligations that Grace has to settling insurers including my

24    clients.  Thank you.

25          THE COURT: Okay, well, I'm not sure that one

1   resolution is going to fit all parties, but to the extent

2   that someone is attempting to get a resolution together, I

3   guess it can wait until May.  It's waited several months now,

4   but -

5        MS. BAER: Your Honor, Mr. Brown sent a letter to

6   debtors' counsel.  I've spoken with Scotts.  We're aware of

7   his issues, and one of the reasons we wanted this continued

8   until May is because Scotts was attempting to contact other

9   insurers so they could get a sense of who wants to do what.

10  At this point in time, we know Mr. Brown's position.  We know

11  Scotts' position, but there are many insurers.  They all have

12  different interests, and it's really unclear to us right now

13  who wants to forward and who does not.

14       MR. BROWN: And that's right, Your Honor, and I'm

15  not quarreling with the idea of putting it over till May.  I

16  just wanted to be clear that we didn't agree to this.  It is

17  our preference either have it moved forward or work toward a

18  resolution, which we're trying to with Grace's counsel.

19       THE COURT: All right.  That's fine.

20       MR. BROWN: Thank you.

21       THE COURT: It will be continued till May.

22       MS. BAER: Your Honor, for now we'd like to skip

23  agenda items number 3 and 4, move onto agenda item number 5,

24  which is the debtors' fifth omnibus objections to claims.

25  Your Honor, we're down to two claims - related claims.  The

1    Weatherford claims which are environmental claims that are

2    being handled by our co-counsel in Delaware.  There are

3    settlement discussions ongoing there, but they have not been

4    concluded, therefore, we're asking that that matter be

5    continued to May 15th.  The other contested claims left from

6    the fifth omnibus are the Archer claims, and those matters,

7    Your Honor, we have a briefing schedule and the merits of

8    those will be argued in May.  I have an order continuing the

9    Weatherford claims to present.

10            THE COURT: All right.  Thank you.  Okay, I've

11    signed that order.

12            MS. BAER: Thank you, Your Honor.  Agenda item

13    number 6 is the debtors' sixteenth omnibus objections to

14    claims.  This is a non-substantive objection.  No responses

15    were received to this objection, Your Honor.  We have an

16    order to present to Your Honor.  There are three types of

17    claims: claims that were amended where the amended claim is a

18    surviving claim; claims that were duplicates where again the

19    duplicate, one of the claims is surviving, the other is

20    disallowed; and number three, a set of late claims, again, no

21    responses have been received, and therefore, on those we're

22    asking for the Court to disallow the late claims.

23            THE COURT: Okay.

24            MS. BAER: And I have an order to present.

25            THE COURT: Thank you.  That order is entered.

1          MS. BAER: Thank you, Your Honor.  That concludes

2     the non-contested routine-type matters.

3          THE COURT: Okay, thank you.

4          MR. BERNICK: As I indicated, I think it's probably

5     best to grant to Mr. Lockwood who is here this afternoon.

6     Mr. Baena can provide an update to the Court on the status of

7     the mediation process, and any proposals that they have for

8     going forward.  Again, we would be happy to respond.

9          THE COURT: Okay.  Let me put on the record first.

10    I did have a very brief discussion with Judge Pointer, and I

11    want to tell you what that discussion was.  He contacted me

12    to tell me that he thought that there had been some progress

13    made between the personal injury and property damage claims.

14    That you folks, in general, he did not name anybody, would be

15    giving me a status report today, and he did not know what, if

16    anything, you expected to do with respect to your positions

17    on exclusivity.  End of discussion.

18         MR. LOCKWOOD: Your Honor, Peter Lockwood.  I'm

19    please to report that Judge Pointer's report to you is

20    accurate.  We do believe that we have an agreement in

21    principal between the PI and the PD Committee with respect to

22    our respective claims and how we envisage handling those

23    going forward.  Because of that, and because of our view that

24    Judge Pointer was helpful in helping us reach that resolution

25    and also because we understand and agree that Judge Pointer

1    has scheduled a mediation session for next Wednesday, which

2    will involve the Unsecured Creditors Committee.  We would

3    propose that we continue the mediation process for another 60

4    days.  We would propose that during that 60 days, the parties

5    basically stand down on their various litigated efforts which

6    would include the questionnaires and various PD matters, and

7    that we would also consent to an extension of exclusivity for

8    another 60 days under the same general heading of make love

9    not war.  And, I think that pretty much sums up where we are

10   at this juncture.  If Mr. Baena has anything to add, I'm sure

11   he'll do so.

12          THE COURT: Mr. Baena?

13          MR. BAENA: May it please the Court, Scott Baena on

14   behalf of the PD Committee.  Yes, I would like to supplement

15   that.  Obviously, Judge Pointer's efforts were very helpful,

16   and obviously it bore fruit.  In addition, of course, the

17   dialogue and negotiations between Mr. Dies and Mr. Budd

18   continued right through last week in fact when the deal was

19   finally agreed upon.  So that relationship continued to work

20   and mind this field for us.  On the PD side, Your Honor, the

21   matters that we're talking about holding in abeyance

22   consistent with what happened over the last 60 days are

23   objections to property damage claims and the property damage

24   estimation proceeding, both phase one, which is the

25   methodology phase, and phase two, which is the general

1  valuation of - or estimation of the valuation of property

2  damage claims, and the only other thing I would respectfully

3  correct any mistaken connotation to how Mr. Lockwood put it,

4  the meeting with the general unsecured creditors is this

5  Thursday, not next Thursday.  Oh, Wednesday, we both got it

6  wrong.  This Wednesday.

7         THE COURT: Okay.

8         MR. BERNICK: But I think if you've got agreement on

9  numbers, it's a little bit more accurate.

10        MR. BAENA: Right.

11        THE COURT: Okay, so is there an objection at this

12  point, and, I guess, maybe from the debtors or from anyone

13  else to continuing the quote/unquote "standstill agreement"

14  or stay of proceedings for another 60 days but in conjunction

15  therewith the debtor has another extension of exclusivity for

16  that same period of time.

17        MR. BERNICK: Well, we're certainly not going to

18  object - If I could just briefly address the Court of the

19  debtors' perspective unless there's somebody else who wants

20  to give who was actually involved in the process, that wants

21  to add to what's already been said, I'm happy to do that.

22        THE COURT: Anyone wish to speak before Mr. Bernick?

23  The floor is yours, Mr. Bernick.

24        MR. BERNICK: Thank you.  As I think Your Honor came

25  to understand during the course of the last omnibus hearing,

1    this was a process that has worked very, very well for me in

2    the sense of a process point of view.  Your Honor instructed

3    us to take the lead in making this happen.  We reached out to

4    all of the constituencies.   We were able to get unanimous

5    agreement on the appointment of Judge Pointer.  Judge Pointer

6    has done a superb job in facilitating these discussions.  I

7    don't think there's any question about it.  It has, however,

8    emerged that the debtor has not been included in any of the

9    substantive discussions other than the very first sequence of

10   discussions where people kind of laid out some initial

11   positions, and, as I'm sure Judge Pointer has told you, the

12   fact that the debtor has not been included in any of the

13   subsequent discussions is not from any want of cooperation or

14   desire to do that.  That's just the way that this thing has

15   proceeded.  So, we are really in a position of where we know

16   nothing about the content of these discussions.  Don't know

17   what they hold out for the debtor, don't know what they hold

18   out for, really, anybody else.  In an effort to kind of break

19   the radio silence, last Friday, I placed several calls to

20   basically learn a little bit more on what is happening, and

21   most particularly to find out what people were going to say

22   today and inevitably folks asked, Well, what are you going to

23   say?  And I said, Well, I have no objection just at the very

24   beginning to the outset to the idea that the mediation

25   process should continue if there's anyway that that can be

1    brought about and result in a resolution that's terrific.

2    But beyond that, though, no one has even given us an

3    indication that the ultimate intent is to include the debtor

4    and the equity folks as consensual parties of the fully

5    consensual plan.  Indeed, all of the indications are that

6    nobody wants to talk to the debtor.  Now, apart from feeling

7    lonely and put out by that, which I'm not, I've experienced

8    that in this case before.  There really isn't anything that's

9    happened in the process that would leave the debtor to have

10   any comfort to do anything other than to come back to Your

11   Honor and say, Well, gee, it's been great.  Folks have used

12   this opportunity in an effort to try to resolve some issues,

13   but it hasn't changed our picture at all.  And to Mr.

14   Lockwood's credit and Mr. Baena's credit, Mr. Frankel's

15   credit, they didn't want to give - they didn't want to make

16   any substantive statements about what they had in mind for

17   the debtor or for that matter for the unsecureds who are to

18   meet with them on Wednesday.  This is the meeting with the

19   unsecureds.  It's not the debtor.  But beyond not being able

20   to make a substantive statement about what their proposal

21   was, their intent ultimately was to try to get this to be a

22   consensual plan.  That obviously was a very meaningful

23   statement from our point of view, and I take that totally at

24   face value.  So, we're neither optimistic or pessimistic.  We

25   just don't know.  I suppose nothing really turns on our

1   optimism or pessimism anyhow, but enough said that we believe

2   that the mediation process should continue.  We believe that

3   exclusivity should continue.  With respect to the litigation

4   that takes place before the Court, we believe that

5   essentially the same approach should be followed going

6   forward.  That is that we should not have folks burdened with

7   the necessity to appear in court to litigate contested

8   matters during the next 60 days.  There are only two

9   qualifications to that.  One really is a qualification that's

10  already in place, but it's worth some discussion, and another

11  is one that's not, but I had the opportunity to talk to Mr.

12  Baena and maybe we're close on it, and that is that we think

13  that in this period of time it's very, very essential

14  regardless of whether we're talking about settlement or

15  litigation to continue the process of informally trying to

16  resolve issues concerning the claims that are being made.

17  And really there are two prongs to that.  One is for the

18  personal injury claims.  As Your Honor knows, last time we

19  took up the question of the timing of resolving objections to

20  the questionnaire, and Your Honor told us that number one, we

21  were going to go back to the mediator to raise those issues,

22  and number two is, Your Honor didn't see any reason why these

23  matters should not be resolved within basically the six weeks

24  that were remaining of the 60 days.   So, in fact, Ms.

25  Harding has been good enough to write correspondence with the

1    top 25 personal injury law firms asking for them to express

2    any objections that they have by a date certain so we can

3    then submit it to the mediator and the like.  The answer -

4    we've only gotten one answer back and it comes form Mr.

5    Esserman.  Mr. Esserman, as I understand, is up in our

6    offices in New York trying to make good things happen in the

7    way of resolving finally the CE case.  So I don't mean to

8    pick on him, but the fact remains that we've now been told by

9    Mr. Esserman that they believe that there's no need for

10    people to make objections now, that they would prefer to make

11    the objections when they submit the questionnaires so that we

12    then have all these completed questionnaires, then we resolve

13    objections, and then we proceed to have more questionnaire

14    responses.  I don't believe that that's at all consistent

15    with what Your Honor anticipated and what we would propose

16    today, and I look for Mr. Esserman's partner, who apparently

17    is here someplace, and I - maybe on the phone, okay.  But

18    what we would propose is that to extend 60 days more the

19    responses to the questionnaires.  But that - and we would

20    further extend deadlines for people making objections to the

21    questionnaires and getting the mediation going, but we want

22    to have, and I'm prepared to talk with Mr. Esserman about the

23    details of the dates, we want to have a schedule that

24    produces resolution of these objections, and Your Honor knows

25    what our views are about this round of objections, and I can

1    go back over that, that produces resolution of these

2    objections say by the first of June.  The questionnaires will

3    be due on July the 12th, and that way we can get - July the

4    12th is when the questionnaires would be due.  We would shoot

5    to have any residual objections mediated and any remaining

6    matters raised before the Court and resolved by say the first

7    of June or the first week of June.  We shouldn't be talking

8    about it very much at all because we went through this whole

9    process before, but the idea is certainly not to go through

10   the process of receiving tens of thousands or hundreds of

11   thousands, I guess it's over a hundred thousand

12   questionnaires, only then to have people insist that, well,

13   they've all been submitted so we should be dealing with

14   objections, and it will be a mess to change it all over

15   again.  So, we're asking that the process that Your Honor

16   said should be done within six week, in fact, be done before

17   the questionnaires are now going to become due which is now

18   yet another two months down the road.  That's point one.  I

19   raised that with Mr. Lockwood, who tells me that he has the

20   authority to object today, but didn't have the authority to

21   agree.  I don't know if Mr. Esserman or somebody else from

22   his firm is on the phone, but we think it's appropriate that

23   process continue.

24          THE COURT: So, the debate is whether to have

25   objections to the questionnaire before the responses or to

1  have them come in with the response.

2          MR. BERNICK: That's correct, and we believe Your

3  Honor was clear last week in saying that these matters should

4  be raised in advance, and they clearly should be, and we're

5  providing more time for the response to the questionnaires,

6  so, we think this is the appropriate guidance for Your Honor

7  to give us, that is the sequencing.  The second matter

8  pertains to the PD claims.  We recognize as was said before

9  by Mr. Dies and by Mr. Speights and by Mr. Baena with fervor

10  that it would be impossible for them to be in two places at

11  once and to be litigating at the same time they're trying to

12  resolve things, and we understand that, and we think that

13  inasmuch as they believe that this process can continue

14  productively, we take that at face value, and they shouldn't

15  have to litigate.  At the same time, there are - there's a

16  lot of kind of filling in the blanks, housekeeping, getting

17  information that we believe is very important about the

18  claims, not relating to the big picture issues, but just the

19  claims themselves, and I've invited Mr. Baena to agree with

20  us that we'll provide him with a written list of what we

21  believe to be the questions that are outstanding with respect

22  to the claims, and we've asked them to agree that his clients

23  will respond really as part of the meet-and-confer process

24  and provide that information.  We're not going to litigate it

25  before the Court, but we believe that that process should

1    continue.  We would want that for settlement purposes as well

2    as we would want it for litigation purposes.  It relates all

3    to the question of how many claims there really are out there

4    that even present issues that are worthy of litigation.  So,

5    that's where we are.  We agree on mediation.  We agree on

6    exclusivity.  We agree with respect to the litigation

7    process.  We would seek only to have the informal meet-and-

8    confer resolve type of process continue as I've described it

9    during this period of time, and we look forward very much to

10   hearing from Judge Pointer when our turn comes to being at

11   the table.

12          THE COURT: Okay, well, Mr. Lockwood?

13          MR. LOCKWOOD: Your Honor, there's a bit of a no

14   good deed goes unpunished aspect to Mr. Bernick's proposal

15   here because only, as I understand it, only the firms that

16   have already in some sense responded prior to the due date of

17   the questionnaires are the ones that are going to have the

18   good fortune of participating in this informal objection

19   process.  I guess he characterized them as the top 25 firms.

20   For anybody who isn't in the courtroom today and whose only

21   communication is going to be with case management orders that

22   are made available on PACER or however, presumably, they've

23   been assuming that the time to respond to the questionnaire,

24   just like the time to respond to any other form of written

25   discovery, would be the time at which they would also make

1    their objections, if they had objections to responding to it.

2    So, it's somewhat unclear to me as to how Mr. Bernick's

3    proposal is going to work unless he's just going to sort of

4    say, Well, we'll just take the people that we've decided are

5    the big hitters, the top 25, and ask the Court to sort of

6    separate out from the questionnaire response process a subset

7    of objections to particular questions, and those objections

8    almost by definition are going to vary from firm to firm, and

9    possibly even among a firm's clients, from client to client

10   depending upon what sort of information that client has

11   available to respond to the questionnaire and what form it

12   doesn't as opposed to being - I mean, again, I'm in somewhat

13   of a disadvantage which is why I made the facetious comment

14   to Mr. Bernick that he quoted earlier, which is I have the

15   authority to object but not to agree, because I don't really

16   know what these firms' problems are with the questionnaire,

17   and I can't really speak for them.  But, my general notion in

18   all of this is as I said earlier, we had contemplated that

19   this period of standstill was going to be a real standstill,

20   and we were going to try and continue to work toward a

21   consensual resolution.  I, in fact, did tell Mr. Bernick that

22   the fact that he, the debtors have not been, as he put it, a

23   party to a substantive mediation session, yet, was a function

24   of the process.  It was not exhibiting any attempt on the

25   part of either my Committee, as far as I know, the PD

1    Committee, Judge Pointer or anybody else to say, Well, we're

2    just going to kind of blow off the debtors in this process

3    and never sit down with them.  It's just the process has been

4    evolving the way the process has been evolving, and it hasn't

5    gotten to the debtors of the Equity Committee yet.  So, my

6    view is that the appropriate way to proceed here is to have

7    objections presented when questionnaires are due rather than

8    to have a sort of a, Well, you know, those people who haven't

9    yet finished the process can continue not to have to finish

10   the process, but the people who have gotten farther along in

11   the process are going to get to do battle with Mr. Bernick

12   over whether they have well-founded objections, whether in

13   Mr. Bernick's opinion the Court has already ruled against

14   them on those objections, and what form of mediation process

15   is going to go forward.  So, I don't really think that's

16   appropriate.

17           THE COURT: I guess under, you know, under the

18   circumstances where if it looks as though you're making real

19   progress and can get to a consensual plan, I don't know at

20   this point what the litigation is going to advance if in fact

21   there is a consensual plan, at least on the PI side.  I'm

22   just not clear.  On the PD side, to the extent that you need

23   to know what the claims are that are going to go into

24   whatever the resolution is, you know, a trust and not trust,

25   the payment of some sort, that litigation probably is going

1    to have to be done even if there is some agreement between

2    the PI and the PD as to how resources that will come out of

3    the debtors' estate will be shared between them, and that's

4    an assumption on my part.  I don't know if that's what the

5    whole agreement is, but I would assume that that must be a

6    piece of it, if not all of it.

7           MR. LOCKWOOD: Your Honor, first I will invite Mr.

8    Baena to respond to that, but as a general proposition I

9    really do not think it would be a good idea for us to get

10   into describing how the particular agreement between PI and

11   PD would operate at this time except to say that at least as

12   far as I'm aware, it doesn't necessarily require the

13   litigation of any set or subset of PD claims prior to the

14   confirmation of a consensual plan.

15          THE COURT: Okay, well, this is the difficulty that

16   I see.

17          MR. LOCKWOOD: If it's with PD, I should cede the

18   lectern to Mr. Baena, Your Honor.

19          THE COURT: No, it's just a general case related

20   difficulty that I see.  The debtor has been pretty intent on

21   attempting to get the litigation done and to a certain extent

22   I've been letting the debtor go forward and to a certain

23   extent I haven't.  Recently, I've been holding the debtor up

24   at the same time that I'm trying to put its feet to the fire,

25   which kind of gives it somewhat of a, you know, Hobson's

1   choice, I guess , as to what to do, because I want to see

2   some progress in the case, and it seems to me that as a

3   condition of exclusivity, the debtor ought to be establishing

4   that it is on track for getting a plan that's confirmable

5   whether consensual or not together.  At this point that seems

6   to be on track.  So I don't see a reason to terminate

7   exclusivity with it right now.  So, to the extent that, you

8   know, you agree to another 60-day extension in order to

9   continue to mediate and see what you can resolve, that's fair

10  enough.  It seems to me that the debtor is in the process of

11  managing its business, and you know, doing the business-

12  related issues that a debtor has to do.  With respect to the

13  claims litigation, the debtor has been trying really since

14  the outset of the case to get some handle on what this

15  litigation is all about, and I think recently has been making

16  some progress, but part of the objections to exclusivity have

17  been coming from the creditor constituents saying that the

18  debtor isn't making much progress.  Well, the debtor can't

19  make much progress if I keep telling the debtor, No, you

20  can't do this; no, you can't do that; no, you can't go

21  forward.  So the difficulty I see is, if I grant this

22  additional 60 days and stop all the litigation then, you

23  know, at this point where the case having been five years

24  old, frankly, I can't be too worried about the fact that the

25  debtor may end up in bankruptcy for an additional 60 days.

1   That just doesn't trouble me a whole lot, but the reality is

2   that when it comes to terminating exclusivity, what I'm not

3   going to hear is that the debtor hasn't been making progress,

4   because the debtor's trying and the creditor constituents

5   fortunately they're mediating in order to get the stay in

6   place and not go forward with what the debtor wants to do or

7   holding the debtor up.  So, there's, in a nutshell, what I

8   see as the difficulty with the case.

9        MR. LOCKWOOD: I accept that, Your Honor, and it is

10  a bit of a problem.  On the other hand, from the perspective

11  of the Asbestos PI/PD constituency, the debtors proposed

12  litigated solution is, as we have stated, I'm sure ad nauseam

13  from Your Honor's perspective by this point, a recipe for

14  years of additional litigation, and the only way we've ever

15  been able to see to short circuit this process is to have

16  some mechanism by which either by a wholly consensual plan or

17  by some sort of largely consensual plan, you get yourself in

18  the position in which you can move forward, and exclusivity

19  is clearly a weapon for the debtor in that regard, because

20  you simply can't propose alternatives to the debtor's

21  litigation only mechanism as long as the debtor maintains

22  exclusivity, in effect.  So, it kind of cuts both ways is

23  what I'm saying.  I mean, we - believe me, as creditors, we

24  don't regard it as beneficial to have the debtor be in

25  bankruptcy one day longer than is absolutely necessary to do

1  so.  We don't believe the debtor's going to be paying post-

2  petition interest on the asbestos liabilities, and maybe the

3  debtor thinks that it is, but we don't.  And so, this has -

4  up until fairly recently, we have not been the ones asking

5  for delays in the process as such.  We may have been making

6  arguments that led to delays, but that's because we didn't

7  think the process was going to work or was working.  Here,

8  this is the second time - the first time being the last

9  hearing on the subject, that the asbestos constituencies have

10  come in and sort of said, Yeah, we think that it's a good

11  idea to let things pretty much stay on ice, and indeed, the

12  first time we were here was Mr. Bernick that was the one that

13  was making the case -

14        THE COURT: That's right.

15        MR. LOCKWOOD:  - for the 60-day extension, and I

16  understand that, you know, he's not happy with the way the

17  process has worked out in which the debtor is, to some

18  extent, on the sidelines for the moment, but, as I said

19  earlier, that's - everybody understands that we're going to

20  have to talk to the debtor and the Equity Committee at some

21  point in time.  I mean, this is just not - we may or may not

22  reach an agreement with them or we may not reach an agreement

23  with the Unsecured Creditors Committee.  Nobody really knows.

24  We're doing this in a step-by-step process, but we did have a

25  good result, and I will say, one aspect of that is the Zone

1    Light claims, Your Honor.  I mean, you'll recall, at least

2    from my perspective, I have always been of the view that the

3    Zone Light situation had the potential for being the

4    messiest, most complicated and time consuming aspect of this

5    whole thing, and we've got a situation right now in which the

6    Zone Light folks are onboard with the PD/PI resolution here,

7    and frankly, although I will not and cannot get into the

8    mechanics and details of that, I think that's really a very,

9    very, very positive development, and I would urge the Court

10   under those circumstances to take that into account in

11   concerns of Mr. Bernick's request, and now I'll let Mr. Baena

12   speak.

13          MR. BAENA: May it please the Court, Scott Baena for

14   the PD.  Your Honor, I couldn't agree with Mr. Lockwood more

15   even, you know, there's really no -

16          THE COURT: There's a transcript being made here,

17   Mr. Baena.

18          MR. BAENA: Judge, this whole process has been a

19   sociological experiment, and it speaks tongues about the very

20   question you pose, and the mere fact that asbestos has

21   resolved these problems alone could be considered in some

22   quarters as cause for terminating exclusivity to facilitate a

23   plan that accommodates those agreements, but I think all I

24   would suggest is, we ought not today prejudge the grounds

25   upon which you would extend or terminate exclusivity.  We

1    ought to allow this process to conclude.  We've asked only

2    for 60 more days to do so.  It is our expressed intention to

3    speak with each constituency in that period of time to the

4    extent that we can to see if we can reach agreements.  And

5    this may all become very easy for the Court if there's

6    sufficient critical mass that has consented to an agreement

7    for the Court to provide a facility for us to put it forward,

8    but I think that there's too much risk in the course of

9    settlement discussions which are ongoing for the Court to

10   suggest one way or the other how it will react, because we

11   can't predict what we're coming back here with, and we ought

12   not chill the imagination, in all due respect, that is so

13   critical to coming to a conclusion by preordaining the result

14   in any particular iteration of a plan.

15            THE COURT: Oh, Mr. Baena, I'm not preordaining any

16   result.  I've just tried to articulate what I see is the

17   process, that the debtor is trying to move forward and has

18   been to a certain extent trying to move forward in some

19   matters.  The committees seem to have a different view as to

20   where, as you say, the critical mass ought to go in the case,

21   and so, at the moment, if I keep holding things in abeyance,

22   which I'm willing to do.  I mean, it seems that you've made

23   some progress, and I think some is better than none, so, it's

24   wise to let you continue on that road, but, by the same

25   token, if it isn't totally successful, the debtor is going to

1   be back here saying, But wait, you held me up for 120 days

2   and now I want the time to go forward with what my game plan

3   was originally, and I'm going to be kind of hard-pressed not

4   to say, Okay, you know, if we're in litigation mode then

5   let's get to it.  That's all.

6          MR. BECKER: Your Honor, Gary Becker for the Equity

7   Committee.  Your Honor, on the theory that one should hope

8   for the best but plan for the worst, I think it would be wise

9   to go forward with the dispute over what the proper answers

10  to the personal injury questionnaires are, at least to go

11  forward with the discussions with the discovery mediator.  As

12  was mentioned, some of the disputes involve whether Your

13  Honor has ruled already on these issues, and whether further

14  objections will be heard at all.  It seems to me, Your Honor,

15  that regardless of whether there are still people who have

16  yet to answer the questionnaire or not, that issue can be -

17  once decided by the Court will be dispositive with respect to

18  all of the respondents.

19         THE COURT: Well, let me see if I can put that issue

20  to bed.  What I think I ruled on is what the questions were

21  that could go out in the questionnaire.  Now, I thought

22  that's what the proceedings were that went on so far, and do

23  I expect the people who are given the questionnaire are going

24  to answer them?  Yeah, of course, I do.  I mean, that was the

25  whole purpose for going forward with that in the first place.

1    Do people have legitimate objections to providing some type

2    of information?  I don't know, maybe they do.  If they do,

3    I'm obviously going to have to hear them or the mediator,

4    actually, I think, is first going to have to hear them.  But,

5    to the extent that an objection is to the question that's

6    being asked, I don't expect either a mediator or me to have

7    to go through that.  I've already decided that's an

8    appropriate question to be asked.  You know, how the answers

9    come in, I don't know how the answers are going to come in.

10   Who does until you see them.

11        MR. BECKER: Your Honor, my point on this is that if

12   we hold off on addressing any of these issues about the

13   questions, the delay is more than just two months, and you

14   can put the response delay, the response deadline back two

15   months, but as I understand the way we've worked out the

16   whole process, it was that there would be answers to these

17   questions, and that the processors of the responses would be

18   able to put them in a data base and show us the responses -

19        THE COURT: Right.

20        MR. BECKER:  - in a relatively short time.  If we

21   wait until after the questionnaires are served and then

22   address, start to address the objections, that process will

23   be stretched out a lot longer than two months, Your Honor.

24        THE COURT: But, well, okay.  Maybe I'm

25   misunderstanding, but I don't even know how I can understand

1    what an objection is at this point in time unless it's to the

2    question, and as I said, I'm not going to hear objections to

3    the question.  I've already said if the debtor wants to ask

4    those questions, the debtor can ask those questions.  We had

5    two or three hearings on that topic, so I don't expect to

6    have a fourth now that the questionnaires are ready, but -

7            MR. BECKER: I'll let Mr Bernick -

8            MR. BERNICK: We're easy today here, Your Honor.

9            THE COURT: Like I said, there's a transcript being

10   made.

11           MR. BERNICK: No, I've got them down here.  Mr.

12   Baena says, Don't prejudge what you might do in exclusivity.

13   I know Your Honor very well from what's now many years of

14   being here, and I know that Your Honor is extremely

15   deliberate and every hearing's a different hearing, and we're

16   not asking Your Honor to prejudge that.  I don't think that I

17   said a word about the next hearing on exclusivity.

18           THE COURT: No, I did.  That was directed toward me.

19           MR. BERNICK: I understand that.  So, but, enough

20   said that we'll see where things stand, and I know Your Honor

21   appreciates our situation and the dynamics of the case very,

22   very well.  An observation was made concerning the

23   significance of bringing the ZAI claimants in by Brother

24   Lockwood here, and Mr. Lockwood is also the person who coined

25   the term that used to be of great currency in the case, back

1   before Your Honor had the pleasure and pain of dealing with

2   it, which was the very early hearing saying, Well, you know,

3   ZAI could be the 800 pound gorilla, and that statement maybe

4   then said, I completely disagree with their claims, but they

5   could be the 800 pound gorilla, and it's true that there is

6   that kind of, you know, threat out there that it's class

7   certified, it was this, that, if, if, a lot of ifs.  It could

8   be a big deal.  I have views on that.  I don't think they're

9   the same as Mr. Lockwood's views, but they're not

10  particularly germane.  If they've got to deal with the ZAI

11  people, I guess that might be good.  I just don't know.

12          THE COURT: You'll find out.

13          MR. BERNICK: I'll find out and so -

14          THE COURT: There's a guarantee you're going to find

15  out before I do, and I'm just as curious as you are.

16          MR. BERNICK: I am not so sure that I will find out

17  before Your Honor does.  I was asking Mr. Kruger, Well, can

18  you just give me a call on Wednesday and give me a hint

19  about, you know, what the terms are.  But the point is that

20  we just don't know the contours of the deal.  All we know is

21  that people who are on the other side who are creditors think

22  that they've got a good deal amongst themselves.  That

23  doesn't really - that's meaningful to the Court.  It's

24  meaningful to us, but it doesn't really tell you anything

25  about the merits that they've agreed on what they - whatever

1   it is that they've agreed on.  And that's the key thing is

2   that (a) we have to find out, and (b) for us to be meaningful

3   participants in this process, there's a certain respect in

4   which the - it's not the litigation track per se.  We can

5   participate in this settlement process, you know, right now.

6   The litigation track is out there, everybody knows, I think,

7   what it could turn out to be or they at least have differing

8   views about that.  We can participate in the settlement

9   process now.  But there is a very, very important part of

10  what's taken place already which is highly germane to the

11  settlement process and which I am urging the Court allow to

12  continue.  And that is just basically finding out what kinds

13  of claims are out there.  I mean, in every case that I have

14  ever been a part of, you're asked to settle the case and your

15  client says, Well, what kind of claims are there, you know,

16  and what are those claims really like, and notwithstanding

17  all the effort that's been devoted to it on the PD side over

18  the last several months, including effort by counsel for both

19  sides and Your Honor, that whole effort still has not even

20  gotten us to the point of dealing with real contested issues

21  of fact, it's just finding out what claims get to the start

22  line.  So, you go down the settlement discussion, and I still

23  would like to know answers to some very, very simple

24  questions on an informal basis with respect to the PD claims

25  specifically.  I also would like to get assurance that we're

1    moving forward so that when we get the questionnaire answers

2    back, it's really a pretty complete set.  People at least

3    answered the questions.  Why do I say that?  Because if we

4    can't settle them, I think that that information may be

5    highly useful in plan development.  We're basically taking,

6    as Your Honor will recall, a snapshot of all the claims that

7    were pending as of the time the debtor filed so that it will

8    be a - right out of history, and we're saying, Okay, what did

9    those look like?  And the more information that we get, the

10   better off everybody is in assessing where that stands.  I

11   was mistaken in saying that we asked for the top 25 and Mr.

12   Lockwood then properly took me to task for having picked on

13   some people even though they might be the big players.  It

14   turns out that we sent the letter out to the top 39 firms,

15   that is all firms that have a thousand claims or more.  So,

16   we're still picking on the big people, but we're picking on

17   some people who are also medium size.  But, all that I'm

18   saying is that, Your Honor, I say I'm easy.  We don't have to

19   do any of this.  We don't have to go forward with - We don't

20   have to go forward with, you know, the questionnaire process.

21   We don't have to do any of that.  We can participate in the

22   settlement process, but that's going to get real, all that

23   we're really saying is for this process to be meaningful, if

24   we can or we cannot reach agreement, people have got to know

25   what the basic universe is like, otherwise it's very hard to

1    say, Well, gee, there's too much money here or there's not

2    enough money there.  So, we would like to continue - We would

3    certainly believe that there's no sense whatsoever in getting

4    a bunch of questionnaires returned and then the objections

5    are made.  Why not do it up front?  I mean, that's the whole

6    idea is to do it up front so the questionnaires are

7    meaningful.

8           THE COURT: But I think I'm confused as to what

9    other objection can be raised but for an answer coming in

10   saying - just to pick something, We don't have this

11   information.  Or, I'm not -

12          MR. BERNICK: Well, it's things like - It's things

13   like we gave a couple of examples.  One was, people who say

14   you can find the answers to these questions in documents.  Go

15   look at the documents.  So, the questionnaire has all a bunch

16   of - Go look at the documents, go look at the documents,

17   instead of answering the question, and obviously, if all the

18   people do is to do that, we don't get their view of what's in

19   the documents.  This is not an interrogatory.  This is a

20   questionnaire that you fill out.  That's going to be an

21   issue.  Another issue is whether the lawyers have to sign.  A

22   position that was taken by Mr. Esserman is that

23   representative, as it was referred to in the questionnaire

24   form, doesn't refer to counsel, it refers to a

25   representative, for example, of a decedent.  We don't think

1    that that's true.  Beyond that, we don't have any idea.  So,

2    that's why we asked.  We sent the letter out pursuant to Your

3    Honor's suggestion, we sent the letter out to all these

4    people saying, Tell us what your objections are, and thus

5    far, nobody has sent us any objections beyond the ones that

6    were sent by Mr. Esserman on behalf of three firms before.

7    So, we literally don't know what might be objected to, but if

8    there are going to be objections, what we know is that it

9    makes all the sense in the world to get that matter resolved

10   now so that when the questionnaires come in they're

11   meaningful.  And God bless if we resolve the case before the

12   questionnaires are due, which we're totally willing to do if

13   it looks like it's feasible, then we don't have to worry

14   about anything.  But it's certainly a little bit of work

15   that's involved in figuring out what the objections are, and

16   indeed we would say that about, you know, maybe Mr. Baena

17   believes that that process - and again, Your Honor says, I

18   don't, you know, I really want a cool down period, nothing

19   happens.  We'll accommodate that, but I really think that

20   that may not anticipate as Mr. Becker says the ultimate

21   outcome here and may not even be useful for settlement

22   purposes, but we'll take it anyway Your Honor would like to

23   have it.  We're just saying that we think that these are good

24   things to do.

25              MR. LOCKWOOD: To quote Brother Bernick, Your Honor,

1  let's get real.  We're talking about a 60-day standstill.

2  So, the worst case, with all due respect to Mr. Becker, is

3  that we're in the same position 60 days from now as we are

4  today.  So we might lose 60 days.  With respect to the

5  relevance of the questionnaire, I'm sure Your Honor is well

6  aware that the questionnaire is the debtor's mechanism for

7  attempting to challenge the validity of claims in the context

8  of an estimation procedure.  If we had a deal, we wouldn't

9  need to have an estimation proceeding, a fully consensual

10  deal, but the debtor cannot with a straight face say that

11  they can't negotiate with us without the answers to 180,000

12  questionnaires, because if -

13       THE COURT:  No, no, he didn't say that.

14       MR. LOCKWOOD:  I understand that, but I'm trying to

15  tie the relevance of the questionnaire to the process that

16  we're going and to the costs and benefits of it.  As Your

17  Honor is well aware, numerous debtors whose cases are before

18  Your Honor have managed to struggle through and arrive at

19  deals on the scope of their asbestos liability without having

20  had questionnaires from 180,000 people.  So, the real issue,

21  and I think Mr. Bernick actually phrased it very well at the

22  end of his last said remarks, is, Are we going to have a

23  period where we're going to try and concentrate on resolving

24  the case as a whole without the need for estimations and

25  questionnaires and objections and all of that, or are we

1    going to do it kind of a halfway thing in which we'll

2    postpone parts of the litigated effort, but we will continue

3    with other parts of it.  That's really what this boils down

4    to, it seems to me.  And our view is that we have agreed to a

5    60-day extension of exclusivity, not a 60-day extension of

6    part of exclusivity but there's another part of exclusivity

7    that we'll come in and argue about.  As I said in my earlier

8    remarks, the mediation could proceed without either a stay of

9    litigation or a continuation of exclusivity.  There's nothing

10   about exclusivity being continued that either plays into or

11   is inconsistent necessarily with mediation.  From my

12   constituencies' perspective, I want to make it absolutely

13   clear, and I got up here at the beginning and said, We are

14   happy to extend exclusivity for 60 days.  It was part and

15   parcel of the notion of let's have a period where we continue

16   not to fight about this stuff for 60 days.  If we're going to

17   have a period in which we're going to do a fair amount of

18   fighting over the next 60 days, then I frankly would no

19   longer view it appropriate to extend exclusivity because, as

20   I said earlier, I think that gives the debtor a pretty big

21   hammer here, and -

22          THE COURT: Well, look, let me just cut through

23   this.  It seems to me that to the extent that you are

24   attempting to get a consensual plan, I don't know if it will

25   work or not, but you can only knock the issues and the

1  parties down one at a time.  You know, you have to build a

2  base from somewhere.  It seems that you've at least got one

3  level of that base if the PI and PD, especially including the

4  ZAI, for which my law clerk who's been working on this

5  opinion for ten or eleven months, since I'm undoubtedly not

6  going to be happy, because that's okay.  We'll push that off

7  to another day if you've got this issue resolved, then it

8  seems to me that you've got a big base because that is, no

9  matter how you look at it, that's a lot of claims that have

10  to be addressed.  So, to the extent that there are - there

11  is this agreement, it seems to me that there is a baseline at

12  least to believe that maybe other constituents will get

13  onboard and that you can get to a consensual plan.  To me

14  that's worth the peace and the pull-down period, and the

15  extension of the stay for 60 days.  And so, I'll agree that

16  the stay that I put in place for everything in this case will

17  continue for an additional 60 days - Well, I'm saying 60

18  days.  I guess it's going to go to the conclusion of an

19  omnibus hearing that's about that time.  Let's see - I'm

20  sorry?  Okay, so it would be -

21          MR. LOCKWOOD: No, wait.  The 60 days was to May the

22  12th.  You, yourself, said that the 60 days would end on July

23  the 12.

24          THE COURT: Right, so it would be -

25          MR. LOCKWOOD: We're in the middle of the first 60.

1    We've only had 30 days of the first 60 days.

2            THE COURT: Right, actually, though, I think because

3    my hearings in July are the 24th -

4            MR. LOCKWOOD: Right.

5            THE COURT:  - that I would want to extend it

6    through that hearing on July 24th.  So -

7            MR. BERNICK: So, we're talking now about -

8            THE COURT: Extending exclusivity and the stay of

9    all matters essentially until July 24th, and I know if you

10   have to get back into litigation mode, I understand that

11   that's going to extend the time.  I think on balance to the

12   estate that it's better to keep the stay in place and extend

13   the exclusivity through that time frame even though it may

14   mean a delay in the event that you have to get into

15   litigation posture.

16           UNIDENTIFIED SPEAKER: (Microphone not recording.)

17           THE COURT: They are?

18           MS. BAER: Exclusivity is up today.  The question .

19   . . (microphone not recording) that was May and then July.

20           MR. LOCKWOOD: Well, we had envisaged the two being

21   synonymous.  So I guess that gives Mr. Bernick 90 days on

22   exclusivity.

23           MR. BERNICK: I'm not really, Your Honor, I'll being

24   saying that exclusivity is important, and it is, but if

25   exclusivity - we've got to move forward.  That is our

1    principal concern.  If Your Honor wants to do it until July,

2    that's fine, because I'm easy today.  But it really is of

3    critical importance to use this period of time to assure that

4    if the questionnaires are going to come in on the 12th of July

5    or the 24th of July, that they reflect what is now going to be

6    the questions that people have to ask.  Otherwise, we're

7    going to have questionnaires that come in -

8          THE COURT: I think the questionnaires will not be

9    coming in in July.

10          MR. BERNICK: Well, now they're be coming in in

11    August.

12          THE COURT: In August.

13          MR. BERNICK: But you'll still have exactly the same

14    -

15          MR. LOCKWOOD: No, no, no.  The questionnaires will

16    be coming in July the 12th.

17          MR. BERNICK: No, you're picking the date for the

18    questionnaires.  If exclusivity is going to be extended until

19    July instead of June, then the questionnaire date also is to

20    be done not in 60 days but 90 days.

21          MR. LOCKWOOD: That was not what I contemplated,

22    Your Honor, and maybe we've gotten the dates fouled up.  We

23    have used the 60/60 as essentially sort of paralleling

24    themselves.  In other words, we get 60 days, you get 60 days.

25    We didn't contemplate that we would be back here arguing

1    about exclusivity before we would have seen where we were

2    going on the mediation.

3        THE COURT: All right.

4        MR. LOCKWOOD: But I mean, if you know, if Mr.

5    Bernick wants to make it the exclusivity only go 60 days from

6    today, that's okay too.

7        THE COURT: Well, I think a better plan at the

8    moment is to keep the July 12th questionnaire date, extend

9    exclusivity through July 24th.  We can address exclusivity

10   again that day in conjunction with some, hopefully, final

11   resolution as to whether or not there is or isn't mediation -

12   a settlement through mediation.  If there is no settlement

13   through mediation, then on July 24th, I'll just have to look

14   at the questionnaires with the debtor, if you're prepared to

15   do it, if not, we'll do it in August as to what the

16   objections are and deal with them at that time.  I think it

17   will be more meaningful to me to understand the objections in

18   the context of the questions.  Now, if you want to raise

19   certain issues in advance, like, who is the representative

20   who has to sign that questionnaire, I mean, maybe some of

21   those discrete issues could be raised.  If you haven't gotten

22   responses to those letters in the meantime, I take it nobody

23   but Mr. Esserman is concerned.

24       MR. BERNICK: Let me make a proposal here that works

25   with that.  Peter, let me make a proposal - I want people who

1   are getting this letter to believe that it's not simply . . .

2   (microphone not recording) it is the deadline.  So we will

3   send out a notice to all the people who got this letter

4   saying, Any and all objections have to be received by May 1,

5   and we've raised this with the Court.  People then make their

6   objections.  We'll then seek to mediate those objections.

7   So all that can take place.  If we believe that there are

8   matters that are of sufficiently great importance, that it

9   would be beneficial to get them resolved before we actually

10  get the questionnaires in, and we're not able to agree on

11  things that are, we think, very important, we will then seek

12  permission from the Court to raise them with the Court, and

13  Your Honor, you know, has the discretion of saying, No, I'll

14  wait until after the questionnaires come in; or, Yes, I'll

15  hear them in advance.  But by virtue of the same reasoning if

16  Your Honor says, I may want to see the questions in the

17  context of the questionnaires, because it's kind of an

18  abstract issue, we'll know what the issues are if we follow

19  this informal process, very quickly, and then Your Honor can

20  make a decision not in the abstract, but much more concretely

21  though than if you want to hear them earlier.

22          THE COURT: Okay, that's fine, in terms of, as you

23  put it, the abstract.  The difficulty I have is, I don't know

24  that any specific person can take a look at the

25  questionnaire, start working through the answers and know

1    until they start working through the answers that they have

2    an objection to a specific question.  It may not be the

3    structure of the questionnaire that's involved.  It may be

4    whether or not - for example - I'll just pick something

5    hypothetical.  Okay.  A particular person may say, I'm not

6    going to answer that question because it's privileged.  Okay,

7    I can't deal with the fact that they're going to have

8    privilege issues in a vacuum.   I need an answer.

9         MR. BERNICK: Right.  I understand that, but again,

10   I think we'll know that, Your Honor.  I mean, these people

11   have known about - the questionnaires were sent out when?

12   They were sent out last September.

13        THE COURT: Well, I understand that, and so for -

14        MR. LOCKWOOD: That's an argument in favor of making

15   them answer the questionnaires as well, Your Honor.  I mean

16   it proves too much.  I mean, the issue here, as I thought

17   Your Honor had accepted a few minutes ago, is are we going to

18   be spending the next 60 or 90 days fighting among ourselves.

19   I mean this is just - he calls it informal discovery and, you

20   know, as though it was kind of let's all sit down and have

21   tea, but I mean it's really not that.  People are going to be

22   asked or forced, told by Mr. Bernick, this is what the Court

23   has approved.   You've got to put your objections in there

24   and then you've got to sit down with me and we've got to

25   argue about them, and if we don't reach an agreement, then we

1   need to go to a mediator and then if I don't like where all

2   that comes out, I get to bring a motion to the Court, and all

3   of that's going to be happening during this so-called

4   standstill period.  That seems to me like a lot of

5   litigation.

6           MR. BERNICK: With all due respect, the negotiations

7   are being conducted by a very small handful of people.  I

8   believe that there are actually two plaintiffs' lawyers who

9   directly are participating, and then there's Mr. Insulbach.

10  So you've got a total of three lawyers.  These are questions

11  that go to the law firms.  We've heard a lot about how the

12  law firms are or are not represented by the Committee, and

13  most of the law firms are not represented by the Committee.

14  So, there's no reason to lie.  These same people, every day

15  of the week, spend time dealing with these claims.  Can't

16  have to sit down and just talk about real simple stuff.  The

17  Court worked very hard on that questionnaire as did all

18  counsel present here, and for people now to come in and say,

19  Well, gee, we'd like to participate in the conference calls

20  every other day with respect to settlements, or we can't

21  participate in the conference call because of objections, I

22  really think that -

23          MR. LOCKWOOD: With all due respect, Your Honor,

24  that's not the argument that I'm making.  I'm not making -

25          MR. BERNICK: I'm sorry, I'm sorry -

1          THE COURT: Okay, both of you, enough.  All right,

2     the questionnaire answers are still going to be due July 12th.

3     Exclusivity will be extended through the conclusion of the

4     hearing on July 24th.  If there is need to raise a further

5     extension or to object to a further extension, it will be

6     heard on July 24th.  So, give me whatever you need.  I want a

7     report on each omnibus hearing between now and July 24th on

8     the status of the mediation to know, you know, whether it's

9     still progressing, who's onboard, who isn't, and so forth.

10    If at any point in time the mediation falls apart, at that

11    point, Mr. Bernick, I will address this issue of opening up

12    the questionnaires to some objection process before the

13    responses are in.  As long as at every status conference, I'm

14    getting the sense that people are moving forward and in fact

15    it's moving toward a consensual plan, and between now and

16    July, I do expect that it's going to get to the point where

17    the debtor and the Equity Committee are invited in.  I mean,

18    there are only so many levels of constituents, and you need

19    to be invited in before then.  So, I think based on the fact

20    that it seems to me right now that there is a base for a

21    settlement that hopefully will not require an estimation

22    hearing, I am not going to enforce requiring anybody to file

23    any objections as of today until the responses to the

24    questionnaire are due.  But if at any time the mediation

25    falls apart, then I am ordering the mediator to notify me

1    that the mediation has terminated or has been stymied,

2    whatever the appropriate word is, so that I know that at that

3    point I will do an order directing Mr. Bernick to either

4    contact the Court with all the parties or if it's close to an

5    omnibus hearing, put it back on the hearing list, whatever,

6    so that we can address getting the objection issues resolved

7    before the questionnaires come in.  I'm not going to do it at

8    this point because I don't want to create additional expense

9    if in fact there's going to be a consensual plan and no need

10   for these estimation hearings, and I just don't know that

11   right now.  I understand you don't know either, and it would

12   be more comforting to know, but there is no way to know right

13   now.  So, that's the best I can do with the representations I

14   have on the records, so I will deny your request today, but

15   it's without prejudice to reconsidering it on an expedited

16   basis if at any point in this process the mediation is no

17   longer beneficial to the estate.

18          MR. BERNICK: Fine.  I think then that there are two

19   matters that are left.  One is the request for fees and

20   expenses.  I don't know if that's still being pursued by the

21   Libby claimants or if that's something -

22          MR. COHN: Your Honor, may I request a ten-minute

23   recess, please.

24          THE COURT: Yes.

25          MR. COHN: Thank you.

1          MR. BERNICK: But maybe before we do that, we can

2    just get a short report on the Whitehouse discovery, and then

3    that will be the only -

4          MR. COHN: I think that they're related, Your Honor,

5    and what I need to discuss with the parties over the ten-

6    minute recess concerns that too.

7          THE COURT: All right, we'll take a ten-minute

8    recess.

9          MR. COHN: Thank you, Your Honor, I appreciate it.

10          (Whereupon at 3:09 p.m. a recess was taken in the

11    hearing in this matter.)

12          (Whereupon at 3:24 p.m. the hearing in this matter

13    reconvened and the following proceedings were had:)

14          THE COURT: Please be seated.  Mr. Bernick?

15          MR. BERNICK: Your Honor, I think that we're

16    prepared to proceed on both of the remaining issues, and I

17    guess it's Mr. Cohn's motion with respect to the request for

18    payment of fees and expenses out of the estate for

19    representation of Libby claimants, and then we'll have a very

20    short report.  I understand that the agreement that's been

21    reached with respect to discovery is not to be discussed

22    substantively this afternoon, so we'll just give you a very

23    short overview of that.

24          THE COURT: All right.  Mr. Cohn.

25          MR. COHN: Yeah, I'm sorry, Your Honor, but I just

1    agree with Ms. Harding that it would make logical sense for

2    Ms. Harding to proceed first with the report on the discovery

3    agreement, so -

4            THE COURT: All right, that's fine.

5            MR. COHN:  - I'll defer to that, thank you.

6            MS. HARDING: Good afternoon, Your Honor.

7            THE COURT: Good afternoon.

8            MS. HARDING: Thank you.  Your Honor, in February

9    the debtors filed a motion to obtain discovery from Dr.

10   Whitehouse, and the discovery was in connection with the

11   Libby claimants' contention that they suffered from a unique

12   tremolite disease.  As Your Honor knows, the PI Committee

13   filed a limited objection to that motion, and the Libby

14   claimants and the government filed objections to that motion.

15   At the direction of the Court, following the Court's

16   direction from the last hearing, the debtors requested a

17   mediation session with Judge Whalen in connection with our

18   motion.  All the parties agreed to participate in the

19   mediation session.  We had our first session last Thursday.

20   Representatives of the Libby claimants, the U.S. Attorney's

21   Office in Montana, the PI Committee, the PD Committee, the

22   unsecureds, and the Equity Committee, and the Futures

23   Committee all participated in the negotiations.  We made

24   substantial agreement after about two and a half hours.  We

25   exchanged orders over the weekend and participated in about

1  two or three conference calls this morning with Judge Whalen,

2  and I'm happy to report about two hours ago we reached

3  agreement.  At Judge Whalen's suggestion we agreed not to

4  present the substance of the agreement to the Court because

5  it is quite complicated.  The debtors will circulate tomorrow

6  a proposed final order and then we'll file a CAC with the

7  Court later this week with the proposed order.

8           THE COURT: Okay.

9           MS. HARDING: Thank you.

10          THE COURT: Thank you.

11          MR. COHN: Your Honor, Daniel Cohn for the Libby

12  claimants.  I would just like to add on the subject of the

13  discovery agreement that that will entail substantial efforts

14  on behalf of counsel to the Libby claimants over the period

15  of the next couple of months in order to meet our

16  obligations, that we have agreed to under the discovery

17  order.  Your Honor, on the motion concerning the allowance of

18  fees for Libby claimants' counsel to be paid by the estate,

19  I'm not going to repeat the arguments that I know that you

20  have familiarized yourself with in the pleadings, but simply,

21  highlight what I think are some of the issues that have been

22  placed in contest so as to provide a context for the relief

23  that we're seeking.  First, Your Honor, the scope of relief.

24  I want to make it very clear that the scope of relief that is

25  being sought is limited in the sense that the subject matter

1   areas in which fees and expenses would be sought are limited

2   to exactly two subjects.  One is the estimation proceeding,

3   including the discovery that the debtors have elected to

4   pursue even during the period of the otherwise standstill

5   that's been agreed to.  And then the other topic is the plan

6   negotiation process, and in that regard, that process is

7   active, it's ongoing.  The Libby claimants are active

8   participants, and I think every constituency that has

9   participated in those will acknowledge that there are unique

10  interests of Libby claimants that need to be represented in

11  connection with that process.  Now, the word "unique" by the

12  way, has been thrown around a little bit here, and I would

13  agree that our position here is unique.  I'm uncomfortable

14  with the word "unique" being applied to the asbestos disease

15  that the Libby claimants have.  It is a distinct disease, but

16  the nature of this type of asbestos is that there could be

17  other types of anthrable (phonetical) asbestos or other

18  diseases that are similar.  We just don't know.  This is the

19  one that has widespread people suffering from it, and this

20  has been studied.  There are now published studies on it,

21  peer review studies which establish the medical indicia of

22  Libby tremolitis mastis (phonetical) disease, but, so, we

23  would certainly say it is distinct from chrysotile  disease,

24  which is the disease that is almost all of the other asbestos

25  claimants in this case, but we do not want the word "unique"

1    to be associated with Libby tremolite asbestos disease

2    because we just don't know.  Now, who is this Libby

3    constituency that we're talking about, Your Honor?  As you

4    know, we are counsel to approximately 700 claimants whose

5    claims rise from exposure to asbestos in the Libby area.  The

6    Center for Asbestos-Related Disease in Montana has diagnosed,

7    we are told, in the neighborhood of 1,500 people as having

8    asbestos disease.  We do not represent 1,500 people, so we

9    can hypothesize that there are perhaps 800 others out there

10   who have this disease, who might or might not ever become

11   claimants in this proceeding, but many of them surely will.

12   And the reason I'm making this point, Your Honor, is that we

13   are not here simply in terms of the estimation process and

14   the plan process just representing our own clients.  There is

15   a whole constituency out there of which we, yes, represent a

16   substantial portion, but there are many others who will also

17   benefit from these efforts and who do constitute with us a

18   distinct constituency in this case.  If, for example, Your

19   Honor, there were not a Commercial Creditors Committee, but

20   some of the large commercial creditors would surely appear in

21   this Court to try to defend their interests, the result would

22   be that other people similarly situated would benefit from

23   those efforts, and it would be appropriate for those efforts

24   to be compensated from the estate because everyone would

25   agree that the commercial creditors are a distinct

1   constituency.

2          THE COURT: But I have a Committee here that

3   represents all asbestos personal injury claims.

4          MR. COHN: That is correct, Your Honor, and that has

5   worked very well up to the point where our interests have

6   diverged at present because of certain aspects of the Libby

7   situation.

8          THE COURT: But it's not unusual to have divergent

9   aspects on a committee, in fact, the United States Trustee

10   has an obligation to make sure that the committee represents

11   the cross-section of all of the constituents that it

12   represents, and for the most part, that usually means that

13   there are differing views about things.

14          MR. COHN: That's correct, Your Honor.  We agree

15   with that proposition in general, and I think that some of

16   the papers that have been filed even point out that you had

17   meso-claims represented on the Committee and you also have

18   pleural-claims represented, and those folks are all

19   represented on the Committee.  The Committee advances the

20   interests of all of those constituencies, and when that

21   works, that's done.  The problem rose here, Your Honor, and I

22   think you need to understand exactly how it arose, because it

23   starts off really with the asbestos estimation methodology

24   that was proposed by the debtors, which would entail dealing

25   with medical criteria, the medical and legal allow-ability of

1    claims as opposed to an analysis simply of past verdicts and

2    settlements.  Then what arrived on our desk was witness

3    disclosures from the debtor and as recited in the papers,

4    Your Honor, almost all of the debtors' proposed witnesses are

5    people who are essentially going to testify about the Libby

6    claims.  But we, of course, worked in conjunction with the PI

7    Committee to make sure that the PI Committee would designate

8    experts to deal with Libby medical criteria and the Libby

9    claims.  This the PI Committee declined to do.  Now, as we've

10   pointed out in our papers, we understand that decision in the

11   sense that there is a divergence of interest between the

12   Libby disease victims and people who have been exposed to

13   chrysotile asbestos in the sense that we are asserting that

14   Libby asbestos is more toxic, that it progresses more - at a

15   much higher percentage, and that for those reasons, ought to

16   be the subject of a higher claim amount.  But for whatever

17   reason, the Committee did indeed say to us that they would

18   not designate - they would not designate Libby-related

19   experts.  And so we face the situation of if the estimation

20   process ultimately goes forward in the way that the debtor

21   wants it to, namely dealing with medical criteria, the debtor

22   has designated all of these witnesses and their contentions

23   will simply go unanswered unless we step up to the plate and

24   answer them.  And so, accordingly, we filed witness

25   disclosures whereby we have designated two witnesses to

1    address Libby medical criteria.

2          THE COURT: Well, okay -

3          MR. COHN: If we don't do it, nobody else will, Your

4    Honor.

5          THE COURT: But, well, you say that the Whitehouse

6    studies have been peer reviewed.  I mean, I don't know

7    anything about the Whitehouse studies at this point or

8    whether they've been peer reviewed, but it seems to me that

9    to the extent the Libby claimants want to form their own

10   group, as you've been here representing them for many years

11   now, Mr. Cohen, and they feel that they want to participate

12   actively independently of the Asbestos Committee, they can

13   designate their experts and, you know, if it's ripe for a

14   Daubert hearing then we'll find out whether in fact the

15   methodology has been subject to peer review and what the

16   experts have to say about it and go from there, but I'm not

17   sure that's a reason why because there is a difference of

18   opinion between the Asbestos Committee and the Libby

19   plaintiffs as to who the experts ought to be, that that means

20   that the Libby plaintiffs ought to have all of their fees and

21   expenses paid.  I mean, they can take a divergent view, but

22   what benefit is that adding to the estate?

23         MR. COHN: Well, you could argue that whenever any

24   creditor is represented there's no benefit to the estate

25   because the creditor is trying to - the general creditors'

1    committees are trying to get more money for their

2    constituency and maybe that in a sense takes away from other

3    people, but -

4            THE COURT: But they are part of their constituency.

5    In this instance, the Libby plaintiffs are part of the

6    constituency.

7            MR. COHN: Which the PI Committee has decided it

8    cannot represent for purposes of these particular issues on

9    which we are seeking to be represented separately at the

10   estate's expense.

11           THE COURT: Well, I think the issue, if that's the

12   case, as to whether or not the Libby plaintiffs ought to be

13   compensated their fees and expenses is premature.  If in fact

14   we get to the point where there is an evidentiary hearing

15   that's required, and if in fact Libby plaintiffs are

16   uncomfortable with the designation of experts by the

17   Committee and want to do their own and somehow convince me

18   that in fact they have a different disease - you don't like

19   the word "unique", I'm not sure what else to use with it, but

20   something that differs -

21           MR. COHN: Different is fine, yeah.

22           THE COURT: All right, differs from the chrysotile

23   asbestos and therefore has to be treated somehow separately,

24   then perhaps at that point in time, they will have

25   substantiated that they had enough of a difference that they

1   should not have been part of the Asbestos Committee process,

2   but right now it's very premature.  If in fact the

3   settlements go forward, I don't think we're ever going to get

4   to an estimation hearing, number one, and number two, if they

5   don't go forward and we need an estimation hearing then I'm

6   going to want some evidence that this Dr. Whitehouse study is

7   in fact something that is medically acceptable, has been peer

8   reviewed -

9            MR. COHN: Absolutely.

10            THE COURT:  - meets the other Daubert standards -

11            MR. COHN: Absolutely.

12            THE COURT:  - and once we get past that level and

13   he's accepted as an expert, then maybe this motion has some

14   merit to it, but right now I think it's premature.

15            MR. COHN: Well, the problem that that presents to

16   us, Your Honor, is that in the meantime we're going forward

17   bearing enormous expenses and -

18            THE COURT: Yeah, but you'd be doing that whether

19   you were litigating these claims in the state court system or

20   here.  I mean, you've got the same burden to demonstrate that

21   the disease is somehow different, more - I don't know if

22   virulence is the right word -

23            MR. COHN: That's fine.

24            THE COURT: Whatever it is that makes it different -

25            MR. COHN: No, that's what it is, more virulent,

1   Your Honor.

2          THE COURT: - than the chrysotile asbestos disease.

3   You've got that burden to convince whatever the fact finder

4   is, in this instance you just happen to do it here.

5          MR. COHN: I understand, Your Honor.  The concern,

6   of course, then becomes totally apart from the issue of

7   bearing the expenses in the meantime is the issue of whether

8   ultimately if allowed motion - will be allowed nunc pro tunc,

9   and I think one thing that we've at least accomplished by

10  bringing the motion right now is that even though as I

11  understand it's being denied, is that it has at least placed

12  people on notice that this is a type of relief that will be

13  sought in the future.

14         THE COURT: Well, I mean, you can always seek relief

15  in the future if in fact, you know, it seems appropriate, but

16  what I'm not understanding from reading the papers right now

17  is why the Asbestos Creditors Committee is not appropriately

18  representing all of its constituents given its current

19  construct, and it may have a difference of opinion as to who

20  the appropriate experts are, that's why you get committees.

21  They choose the experts.  If there is a group of individuals

22  who are unhappy with it and they want to band together and

23  submit their own experts, you know, I think under these

24  circumstances there are enough Libby plaintiffs, if there are

25  1,500 who want to band together, that if they choose to take

1    a different strategy for litigation purposes, that's

2    certainly a representative enough group to do it, but I'm not

3    going to deny the Asbestos Creditors Committee the ability to

4    represent all of its constituents at the outset, which is

5    what I think granting your motion right now would do.

6            MR. COHN: May I ask, Your Honor, that the denial be

7    without prejudice to it being renewed -

8            THE COURT: It would be without prejudice to being

9    renewed if, you know, as I said, if in fact there is some

10   differing disease and it is established on the record, then,

11   you know, I guess at that point in time I have to rethink

12   this, but right now, I don't know that there's a differing

13   disease, and I think given the posture of the case with

14   everybody in settlement mode, this isn't necessarily the

15   right time for me to take on that issue either.

16           MR. COHN: Then Your Honor, we'll prepare a form of

17   order then that denies without prejudice.

18           THE COURT: All right.

19           MR. COHN: Thank you, Your Honor.

20           THE COURT: Thank you.

21           MR. BERNICK: I know that - Well, I don't know

22   anymore, that folks on the asbestos claimants' side will want

23   to speak to this issue.  I think that we have to be maybe a

24   little bit candid on the dynamics that are taking place here,

25   and the only reason that I rise to speak to this at all is

1   because of what is now being created to the extent that it is

2   being created, a record that says that at some point if they

3   are successful in establishing that there's a unique disease,

4   they can not only come back but come back and get their fees

5   all the way back to -

6        THE COURT: No, I never said that.  What I said is,

7   if in fact they succeed in establishing a different disease,

8   they can file motions at that point seeking to be

9   compensated.

10        MR. BERNICK: Seeking to compensate that disease.

11        THE COURT: Well, and if necessary, seeking to

12   compensate their attorneys for proving that it's a different

13   disease, but I haven't made any rulings about nunc pro tunc

14   or not nunc pro tunc or even whether it's compensable, just

15   that the motion can be brought at that time.

16        MR. BERNICK: If I - that's really the only thing

17   that troubles me a little bit, Your Honor, because if they

18   bring that motion, the motion is now a motion for attorneys'

19   fees for having prosecuted the claims of their own clients.

20   See, what's happening here is they made the allegation that

21   there is a conflict.  The conflict exists today, and the

22   conflict impairs their ability to participate in two

23   processes: One, the negotiation; and the other is the

24   estimation.  Now the estimation, obviously, is being put over

25   because everything is being delayed.  So, for that reason

1    alone, the matter - for that reason alone, I would suppose at

2    least in that respect the matter is not ripe, but the

3    negotiations are taking place.  That matter is ripe, but if

4    there's some reason why the Committee is not representing

5    their interests, that ought to be disclosed so that we don't

6    operate going forward on the presupposition the Committee

7    does represent their interests when it does not, and then

8    more than that, have to face a request for fees associated

9    with their participation in the negotiation process.  I

10   suspect what actually is happening is very plain, which is

11   that they're prepared to go along with the negotiations that

12   have taken place so far, but those negotiations haven't yet

13   reached the issue that's most important to them, which is

14   what their distribution is under the plan.  I can speak about

15   that because I don't know anything about the negotiations,

16   but I suspect that given all that we've heard so far, they do

17   believe that there's a different disease.  They believe that

18   they take more than other claimants that are otherwise

19   similarly situated.  They've taken that position.  The

20   Futures Representative has written saying, No, we don't buy

21   that, and that issue has not impeded the negotiations so far

22   because it simply hasn't been reached.  I think that that's

23   fine if it hasn't been reached, that's fine if they're

24   onboard with the Committee so far, that's great.  I haven't

25   heard a representation to that on the record, but I did hear

1   one off the record before we convened here after the recess.

2   The problem is that if they're going to take the view down

3   the road that they do have a different position, that they

4   then say, We're not signing on because the distribution is

5   not right, and by the way, we want all of our fees going all

6   the way back because that's always been our view, then our

7   preference would be to take up the issue now.  Do they have a

8   need for separate representation by a committee?  Is there a

9   conflict or is there not?  Because otherwise -

10          THE COURT: I'm not being asked to form a committee.

11  That's not even up to me.  That's up to the U.S. Trustee and

12  quite frankly, a committee for 1,500 people doesn't make a

13  whole lot of sense.

14          MR. BERNICK: They represent every single claimant

15  who's made a claim.  It's not like their firm doesn't already

16  represent all the people who are present before the Court in

17  this case, they do.

18          THE COURT: Well, but they represent those people

19  whether the bankruptcy was here or not, and if there were no

20  bankruptcy, the debtor wouldn't be paying the attorneys'

21  fees.  So, that's what I think I've already said.  They have

22  to prove that in fact there is some different disease, get

23  through all of the Daubert processes before I can see any way

24  that the Creditors Committee doesn't represent - In fact, I'm

25  not even sure I see that the Creditors Committee doesn't

1   represent their interest even if there is a different

2   disease.

3        MR. BERNICK: That's the whole point.  They can vote

4   - God knows, we've had lots of cases in which the regular

5   personal injury claimants represented by different counsel

6   had dramatically different views about who gets what, and

7   sometimes there are votes, and people get out-voted.  That's

8   just the way the process works.

9        THE COURT: Look, I go back to what I said.  This is

10  premature.  At the moment, the Committees are in settlement

11  mode.  The Committee represents all levels of disease for

12  every asbestos plaintiff's injury whether or not any specific

13  person is going to vote for a plan, assuming we get that far

14  as a result of this settlement.  Let's just take the best of

15  all possible worlds.  We're out for a vote for a plan.

16  Whether any specific individual's going to vote for it or

17  not, there's no way to know, but that doesn't mean that it's

18  not up to the Committee to negotiate that plan.  That's their

19  statutory duty, that's what they're doing.  So, I don't see

20  any reason at this point to interfere with what the Committee

21  is doing, and I don't see a reason to separate out a group of

22  plaintiffs.  I mean, why not, if I separate out Mr. Cohn's

23  group, then why not separate out, you know, particular meso-

24  or particular other subsets of asbestos personal injury

25  claims.  I don't see it right now.  If there is some basis

1   that develops on the record later, I'm going to deny that

2   motion without prejudice because I think they've the right to

3   come in at any point in time that they think their entitled

4   to get fees compensated and file a motion, but I'm not ruling

5   that there is an entitlement or that there isn't an

6   entitlement.  I just don't think it's now.  Mr. Lockwood,

7   I'll tell you what Judge Diamond told me when I was trying

8   one of my first cases, Don't shoot yourself in the foot.

9          MR. LOCKWOOD: Well, Your Honor, I don't - I wasn't

10  either a proponent or an opponent of this motion.  So, I'm

11  not sure I have any feed at the steak at the moment.

12          THE COURT: Okay.

13          MR. LOCKWOOD: But there's been a lot of statements

14  made about my Committee here, and I feel some obligation to

15  the Court, at least, to try and explain what's going on here.

16          THE COURT: All right.

17          MR. LOCKWOOD: The Committee does represent the

18  Libby claimants for most purposes.  There's no question about

19  it.  Indeed, Mr. Hebberling (phonetical), counsel to the

20  Libby claimants, is a member of my Committee.  So, that part

21  of what Mr. Bernick, who violated the old principle of when

22  you've won a motion, you don't get up and reargue it, is

23  correct about.  On the other hand, we've got precedent in

24  this case for a situation where a litigation involving a

25  constituency is being presented to the Court and the debtor

1   has identified a subset of that constituency as needing

2   special litigated attention, much in the way Mr. Cohn

3   described the debtors' list of witnesses for the estimation

4   proceeding, and that's the Zone Light situation.  The Court

5   surely recalls that in the Zone Light situation, the debtors

6   actually, I think, ultimately agreed that Mr. Westerbrooke

7   and others, would be paid - Mr. Westerbrooke being a member

8   of the PD Committee, much as Mr. Hebberling is of the PI

9   Committee here, would be paid for representing the Zone Light

10  claimants in litigation aimed at attacking their specific

11  type of claims, and the reason that was that the PD Committee

12  as a whole said we couldn't do this because it's not - it's a

13  subset, if you will, of our constituency, and we have

14  conflicting interests.  It is true that probably the majority

15  of the members of my Committee have yet to be convinced that

16  Mr. Cohn's constituency does in fact represent a different

17  and more - for want of a better term, valuable or costly,

18  however you want to put it, form of disease, and when it

19  became clear that the estimation would propose to have an

20  estimation of sort of what I'll call regular PI claims and

21  then a Libby component by itself, but the Committee found

22  itself in an internal conflict on that issue.  Now, I'm not

23  trying to say - I think Your Honor may well be correct that

24  it's premature to address this because we're not at the

25  estimation process today.  We've gotten a stay of that for

1  some period of time, but I don't want it to be any mistake

2  about what the Committee's view of the world is, and that is

3  that if it's sauce for Zone Light it ought to be sauce for

4  Libby.

5          THE COURT: No, it's a different issue, I'm sorry,

6  but part of the problem was that Mr. Baena made a very

7  convincing argument that his law firm was unable to handle

8  the scope of the ZAI litigation.  That was number one.

9  Number two, the ZAI litigation, if in fact it can be proven

10  that ZAI existed in a number of homes that the ZAI plaintiffs

11  say it does, could involve as many as - I forgot the numbers

12  now, five million homes and a 150 million people who've lived

13  in those homes over time.  That is a whole lot different than

14  1,500 Libby plaintiffs.

15          MR. LOCKWOOD: That's true.  On the other hand,

16  Libby, for example, involves a situation much different from

17  the standard personal injury claims.  Normally, what you're

18  talking about is occupational exposure.  In the Libby

19  situation there's a tremendous amount of bystander exposure,

20  residents in the community, et cetera.  My firm is no better

21  equipped, (a); (b), there's almost - there's very little pre-

22  petition settlement history with respect to Libby.

23          THE COURT: If the Asbestos Committee wants special

24  counsel to intervene with respect - I don't mean intervene in

25  a case, I mean to take on the issue just with respect to

1    Libby counsel, I guess I'll get that motion.  I mean right

2    now as I see it, the Libby plaintiffs are part of the

3    asbestos personal injury claims, and the Asbestos Committee

4    represents those interests, and unless and until I find out

5    that there is a conflict, which I can't see how it's going to

6    come up until there is an estimation process underway, which

7    based on your settlement I don't think there is going to be,

8    I'm hard-pressed to see how this isn't premature.  Now, you

9    want to talk me into it and Mr. Bernick wants to talk me to

10   addressing it now?

11        MR. LOCKWOOD: Your Honor, no.  I want to make it

12   clear.  I'm not trying to dispute the prematurity issue.  I

13   just felt like -

14        THE COURT: Get the gun out.

15        MR. LOCKWOOD: I just felt like it was important for

16   the record that the people that are debating the stance of my

17   Committee understand what the stance of my Committee is, and

18   I believe I fairly described it, and as far as I'm concerned

19   that's the end of it or at least until and unless we come

20   back here in accordance with Your Honor's instruction.

21        THE COURT: Anybody else want to try?  Okay.  Mr.

22   Cohn, I go back to what I said.  I think it's premature.  I'm

23   denying it without prejudice.  All right, what else?

24        MR. BERNICK: I think from the debtors' point -

25        MS. BAER: There are a couple of matters related to

1    Mr. Speights.  We'll just have those continued to the July

2    hearing.

3              THE COURT: Is that acceptable to Mr. Speights, who

4    left?

5              MR. COHN:  I guess that was going to happen any

6    how; right?

7              THE COURT: All right.

8              MR. COHN:  Thank you.

9              THE COURT: Thank you, we're adjourned.

10             (Whereupon at 3:52 p.m. the hearing in this matter

11   was concluded for this date.)

12

13

14

15

16

17

18             I, Elaine M. Ryan, approved transcriber for the

19   United States Courts, certify that the foregoing is a correct

20   transcript from the electronic sound recording of the

21   proceedings in the above-entitled matter.

22

23   /s/ Elaine M. Ryan                         April 20, 2006
     Elaine M. Ryan
     2801 Faulkland Road
     Wilmington, DE 19808
     (302) 683-0221