UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: | . | Chapter 11 |
| | . | |
| W.R. GRACE & CO., *et al.,* | . | Case No. 01-01139(JKF) |
| | . | Jointly Administered |
| Debtors. | . | |
| | . | May 15, 2006 (2:07 p.m.) |
| | . | (Wilmington) |

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE JUDITH K. FITZGERALD
UNITED STATES BANKRUPTCY COURT JUDGE

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

1          THE COURT: In the W.R. Grace matter, the parties I

2    have participating by phone: Roger Frankel, Stephen Vogel,

3    Stuart Kovensky, Arlene Krieger, Ken Pasquale, Lewis Kruger,

4    Sandy Esserman, David Parsons, Martin Dies, Alex Mueller,

5    Barbara Seniawski, Marti Murray, Paul Norris, David Siegel,

6    Mark Sheinitz, Juy Baron, David Liebman, Jacob Cohn,

7    Christopher Candon, Daniel Cohn, Matthew Kramer, Andrew

8    Craig, Curtis Plaza, Sam Pointer, Sal Bianca, Peter Shawn,

9    Terence Edwards, Tiffany Cobb, Elizabeth DeCristofaro, John

10   O'Connell, Nicole Botcheos, Sarah Edwards, Edward Westbrook,

11   Sean Walsh, Darrell Scott, Richard Wyron, Debra Felder,

12   Jonathan Brownstein, Kenneth Thomas, Craig Gilbert, Brian

13   Kasprzak, Leslie Epley, and Mark Plevin.  Operator, can you

14   make sure, please, that parties are not - I'm getting some

15   feedback, like a pen or some scratching or something on the

16   phone.

17          TELEPHONE OPERATOR: Okay, I'll make sure all lines

18   that are supposed to be muted are muted.

19          THE COURT: Thank you, and those of you who are not

20   speaking, please make sure you have your mute buttons on and

21   then turn it off to speak so that we don't get the feedback,

22   please.  Good afternoon.  I'll take - Hello?  Operator, I'm

23   sorry, but there is somebody who is not paying attention.

24   Can you identify it and cut that person off, please.

25          TELEPHONE OPERATOR: I sure will.

1              THE COURT: Thank you.  Mr. Bernick?

2              MR. BERNICK: David Bernick for W.R. Grace, Your

3    Honor.

4              MS. BAER: Janet Baer for W.R. Grace.

5              MR. O'NEILL: James O'Neill for W.R. Grace.

6              MR. BECKER: Gary Becker for the Equity Committee.

7              MR. BAENA: Scott Baena and Jay Sakato for the PD

8    Committee, Your Honor.

9              MR. HURFORD: Mark Hurford for the ACC.

10             MR. LOCKWOOD: Peter Lockwood for the ACC.

11             MR. BROWN: Your Honor, Michael Brown for One Beacon

12   America Insurance Company and Seaton Insurance Company.

13             MR. BESKRONE: Good afternoon, Your Honor.  Don

14   Beskrone for BDM Construction.

15             THE COURT: Ms. Baer, good afternoon.

16             MS. BAER: Good afternoon, Your Honor.  Your Honor,

17   it looks like there's a long agenda, but there's really not

18   much that's contested up.  Your Honor, matter number 1 has

19   been continued to the June 19th hearing.  Matters number 2 and

20   3 relate to the New Jersey matter.  Those matters are still

21   in settlement discussions, and that matter is also being

22   continued - both of those are being continued to the June 19th

23   hearing.  Your Honor, you entered an order on matter number

24   4, matter number 5, and matter number 6, already.  Your

25   Honor, that takes us to matter number 7, which is the

1   debtors' motion for settlement of Claim No. 851 with CHL

2   Administration.  It's an environmental claim.  There were no

3   objections filed, and we did file a certificate of no

4   objections.

5           THE COURT: Oh, you did?   When was that?

6           MS. BAER: Your Honor, the certificate of no

7   objections was filed on May 3rd, Docket No. 12367.

8           THE COURT: 12367, okay.

9           MS. BAER: We do have a copy of the order in court

10  if it would be more convenient.

11          THE COURT: I'll just have it entered on line, I

12  just hadn't seen the CNO, so, okay.

13          MS. BAER: Your Honor, matter number 8, the motion

14  for entry of order to acquire a catalyst components business.

15  Once again, Your Honor, a CNO was filed on that matter.  We

16  did then subsequently file the final signed asset purchase

17  agreement, the one that was filed with the motion was

18  redacted to keep out the names.  That's all now been added

19  in, and it is the final agreement.  Again, a CNO was filed on

20  that one on May 3rd, Docket No. 12224.

21          THE COURT: All right, I'll have that one entered

22  too.  Again, I'm sorry, I just hadn't seen those.

23          MS. BAER: Your Honor, matter number 9, the same

24  thing.  This is a motion for entry of an order on a small

25  union pension plan.  No objections were filed.  We filed a

1    certificate of no objection on May 3rd, Docket No. 12369.

2             THE COURT: Okay, thank you.

3             MS. BAER: Your Honor, that takes us to agenda item

4    number 10, which is one of the few contested matters on the

5    agenda.  It's the motion of BDM Construction Company to lift

6    the automatic stay.  Your Honor, very briefly, this is a lift

7    stay so that BDM can proceed with a cross-complaint that they

8    did in fact file against Grace as a cross-defendant.  It's a

9    complaint by Mondavi Winery against BDM related to a

10   construction contract that was done in March of '99.  Mondavi

11   alleges that in September of '03, the roof which some

12   materials were supplied by Grace failed, caused leakage.

13   Mondavi filed a suit in September of '04.  BDM filed a cross-

14   complaint on October 29th, '04 in violation of the automatic

15   stay against W.R. Grace.  Your Honor, BDM seeks to lift the

16   automatic stay, liquidate their claim against the debtors,

17   and effectively collect from the debtors' insurance.  Your

18   Honor, there are issues with respect to the insurance that I

19   will go into in detail, but it is at this point unclear

20   whether an insurance carrier will defend.  The debtor opposes

21   the motion.   We believe that, in fact, the cross-complaint

22   was filed in violation of the automatic stay, and the motion

23   should be denied.  BDM's counsel is here, and I will resume

24   my other remarks for his argument.

25             THE COURT: All right.  Mr. Beskrone, good

1   afternoon.

2          MR. BESKRONE: Good afternoon, Your Honor.  May it

3   please the Court, Don Beskrone, Ashby & Geddes for BDM

4   Construction.  I appreciate debtors' counsel giving you a

5   background on the matter which is essentially accurate.  With

6   regard to the filing of the complaint or the cross-claim

7   post-petition, Your Honor, I can agree that a complaint filed

8   against the debtor subject to the automatic stay is avoid.  I

9   think as far as the issues that are before the Court today

10  are concerned, it's of no effect, however, I'd modify my

11  request to allow us to re-file the complaint as to Grace.  I

12  should give a caveat on my prior statement.  The cross-claim

13  avoid as to Grace only.  And I request that we be permitted

14  to go ahead and re-file the complaint against Grace.

15         THE COURT: But why should BDM liquidate its claim

16  ahead of the other creditors and simply not file a claim here

17  if that's what the issue is all about?

18         MR. BESKRONE: I believe BDM ultimately has a claim

19  here, but there are circumstances that exist in the state

20  court litigation at this point that I think are compelling

21  and BDM good cause under the Rexenne standard to lift the

22  automatic stay.  And if Your Honor will permit, I'll address

23  -

24         THE COURT: Yeah, please, because I'm not sure why -

25         MR. BESKRONE: Okay.

1        THE COURT:  - BDM should have any advantage that

2  the other creditors don't have.

3        MR. BERNICK: I'm sorry, if I could ask counsel to

4  speak up just a little bit.

5        THE COURT: Yes, it's a little hard to hear you, Mr.

6  Beskrone.

7        MR. BESKRONE: Sorry, Your Honor, I'll try - Is that

8  better?

9        THE COURT: Yes, thank you.

10        MR. BESKRONE: I'm going to get a little closer to

11  the microphone, thank you.  As Your Honor's familiar, under

12  the Rexenne test there are three factors that the Court has

13  to consider.  You know, one is whether continuation of the

14  suit will cause any great prejudice to the debtor.  The

15  second factor is whether the hardship to the movant

16  considerably outweighs the hardship to the debtor, and third,

17  whether the movant has a probability of success on the

18  merits.  With regard to the first factor, the prejudice, Your

19  Honor, BDM submits that there will be no great prejudice to

20  the debtor.  I suppose there's always some prejudice that

21  goes along with lifting a stay to allow state court

22  litigation to go forward, but the test is actually whether

23  there is great prejudice.  First, Your Honor, we're seeking

24  to proceed only against insurance proceeds, and further,

25  we're willing to further limit that request to only to

1   insurance policies where there is no deductible or no self-

2   insured retention.  Secondly, Your Honor, we submit that this

3   litigation will not divert the debtors from concentrating on

4   the reorganization effort that's before the Court here.  I

5   mean, essentially, our case involves warranty and negligence

6   claims which would likely only require the deposition of one

7   individual who is the - I guess one individual employed by

8   Grace who was involved during the construction phase of this.

9   Given the size of the claim, the demand of the claim is $3

10  million.  Given the size and the nature of the claim, Your

11  Honor, we submit that this would likely not effect the

12  individuals who are responsible for the high level planning

13  in this reorganization case and to the extent it might

14  involve those individuals, it would not involve any

15  considerable time.  And the third, Your Honor, I know the

16  debtor's concerned that the floodgates will open and that

17  there will be a host of cases filed by other claimants, and

18  it's obvious BDM is not an asbestos claimant.  It's not

19  similarly situated to the asbestos claimants whose claims in

20  this case really are the cornerstone of the case, the claims

21  that drive what the outcome of the case will be, and whose

22  claims are addressed by other procedures that are unique to

23  the nature of those claims.  BDM is a very small construction

24  company, and they're faced with what for them is a rather

25  substantial suit, and they may be in a situation where they

1    have to bear the burden of that suit without ever being able

2    to put liability over onto Grace, which is where they submit

3    at least some of the liability should lie.  I think this

4    isn't the type of claim that's driving this Chapter 11 case,

5    and I think the situation's plainly distinguishable from, you

6    know, the varied and large number of asbestos claims in this

7    case.  I don't think anyone could reasonably argue that

8    lifting the stay here would signal that the door's open for

9    everybody to bring their claims before the Court.  I'm sure

10   there are other litigation-type claims against the debtor,

11   and as I started to address and I'll just further, I think

12   the situation that BDM finds itself in is somewhat unique and

13   distinguishes itself from other claimants.  The other thing I

14   think I should mention is the case has been in bankruptcy for

15   quite awhile.  It's been five years, and it may be

16   appropriate at this point in appropriate circumstances for

17   litigation claimants who have been waiting to have the stay

18   lifted so they can litigate their claims in state court.

19           THE COURT: Well, this case hasn't been - the BDM is

20   not one of those claimants, based on the fact that it just

21   only recently filed the cross-claim.  So that may be true of

22   somebody else, but I don't see how it's true of BDM.

23           MR. BESKRONE: Understood.  BDM's claim - the claim

24   against BDM arose in 2004.  The complaint was filed in 2000.

25           THE COURT: Right.

1      MR. BESKRONE: That's correct.  Second, Your Honor,

2   the Court's required to consider the balance of hardships

3   here, and as I submit before, the continuation of the stay

4   will considerably prejudice BDM, and I think our primary

5   concern here is that BDM will lose its opportunity to either

6   favorably resolve a case or to litigate its claims against

7   Grace.  The state court litigation, as I understand it, is at

8   somewhat of a critical juncture, and they need to settle the

9   case now or get lined up and go to trial and litigate the

10   case.  Unfortunately, some of the discussions are not going

11   forward because nobody's willing to put anything on the table

12   unless they know whether Grace is in or out of the case.  So,

13   unless we can be permitted to go forward now, we're likely to

14   lose the opportunity to try to obtain a favorable settlement

15   of the case, and we're likely left to actually go ahead and

16   litigate it.  If we actually go to trial and if we would be

17   unsuccessful in that trial, of course, we'd be forced to re-

18   litigate the same issues in this Court.  So there will be the

19   attendant costs and duplication of effort.  There will be

20   some delay, and of course, we'll have to be litigating

21   California-based claims here in Delaware, all of which, you

22   know, serve to BDM's detriment.  As I mentioned before, this

23   case has been pending for quite awhile, and it looks like it

24   might be awhile before claims such as BDM's would be

25   administered, you know, evidence ages, witnesses' memories

1    fade, people move.  If we have to litigate this as part of a

2    claims process years down the road in this case, you know,

3    we're likely not to have the fair opportunity to litigate it

4    just because of circumstances.

5         THE COURT: But you have a cross-complaint - I'm

6    sorry, it's a liability over a complaint against Grace?

7         MR. BESKRONE: Yes.

8         THE COURT: So you have a contingent claim against

9    this estate until there is some determination that in fact

10   your client was negligent?

11        MR. BESKRONE: I believe that's correct.  I believe

12   that if there is no liability on our part then we'll have no

13   claim order against Grace.

14        THE COURT: Right.  So why do you need Grace in at

15   this stage?  I mean if it's just a contingent claim, you

16   ought to defend the action, find out whether in fact you're

17   liable, and if you're not then there's never a claim against

18   Grace at all.  So, why should I lift the stay to put Grace

19   into a suit that Grace may never have to defend?

20        MR. BESKRONE: Your Honor, the nature of the

21   litigation is such that, you know, Grace's product was used.

22   Grace's consultant had made recommendations on the project.

23   Everybody believes that there's some liability that properly

24   belongs to Grace.

25        THE COURT: Well, I think that's -

1          MR. BESKRONE: And maybe that's an overstatement,

2     but there's some likelihood that that claim exists, and

3     that's the allegation that's been made, and by the nature of

4     litigation, you know, parties assess what their risks are,

5     that's how cases get settled or not settled.

6          THE COURT: Well, I don't have any problem with

7     people attempting to contact counsel to see if they want to

8     be involved in the settlement, but I do have a lot of trouble

9     being involved in the litigation at this stage.  I think

10    that's what the proof of claim process is all about.  This

11    doesn't appear to be anything more than a garden variety type

12    of claim that would normally be filed by way of a proof of

13    claim if in fact there is some liability that the parties

14    think should be laid on Grace's doorstep, but to the extent

15    that BDM is successful in defending, there will not be that

16    claim.

17         MR. BESKRONE: The last part's correct, Your Honor.

18    I'm not sure that it's just a garden variety claim.  We do

19    have a claim that is potentially covered by insurance, which,

20    I think, creates a different situation.  It's just a

21    situation where our claim would be swapped out for the

22    insurance company's claim - their subrogation claim would in

23    fact substitute for our claim.  So it's transparent as to the

24    estate.  There's no prejudice to the estate by simply

25    swapping out one claim for the other claim.

1          THE COURT: Well, I don't know in this sense the

2    nature of the insurance policies.  Are their policies the

3    same policies that will be accessed by other groups of

4    creditors depending on how other claims are resolved, or is

5    there something unique about this project that had special

6    insurance policies for this project?

7          MR. BESKRONE: I don't know the answer to that, but

8    I believe debtors' counsel would be prepared to address the

9    insurance issues -

10         THE COURT: All right.

11         MR. BESKRONE:  - and I suppose, well, I think we've

12   agreed that's not confidential.  It's my understanding that

13   we're really talking about one policy, that there's one

14   policy that has no self-insured retention and that we're

15   talking about.

16         THE COURT: All right.

17         MR. BESKRONE: So, just to close the loop on that

18   issue, Your Honor, BDM is a small construction company and we

19   believe the burden of this falls more heavily on them then on

20   Grace if the Court would permit the claim to proceed.

21   Finally, Your Honor, the third issue the Court has to

22   consider is the likelihood of success on the merits.  As we

23   pointed out in our papers, Your Honor, the standard is not a

24   stringent one.  We just need to show that our chances are

25   very slight.  We've attached my co-counsel's affidavit which

1   shows that evidence that they've adduced so far in the case

2   indicates that Grace's representative provided the

3   recommendations regarding the installation of the product,

4   and that Grace's product may have failed, and I think for

5   purposes of the <u>Rexenne</u> test, that's sufficient to satisfy

6   that.  Unless Your Honor has any questions, I request the

7   Court lift the stay to let us go forward.  Thank you.

8           THE COURT: Okay, thank you.  Ms. Baer?

9           MS. BAER: Your Honor, I think you summed it up best

10  a little bit earlier when you said that this is just another

11  garden variety claim against Grace.  We probably have fifty

12  to a hundred of these in this case, many of which, maybe five

13  or six, I should say, have come before you before, and you've

14  kept the stay in place.  This one is no different.  If there

15  was a way to have this not affect the Grace estate, we would

16  be willing to work with BDM and in fact try to.  The problem

17  is, Your Honor, there are the potential for three different

18  insurance carriers in three different situations depending

19  upon when the insurance carrier determines that the cause of

20  action accrued.  One of the policies is a non-deductible

21  policy.  We tendered the defense to the carrier in the hopes

22  that if they would take up the coverage, there would be no

23  issue here.  The carrier has not responded to us formally,

24  but informally they've indicated that they do not believe

25  though the appropriate carrier that if they would take up the

1 defense it would be on a reservation of rights. So that kind

2 of gets us nowhere. The other two carriers both are

3 substantial deductible policies. So any way you look at it,

4 Your Honor, if the stay was lifted, Grace had to defend,

5 Grace would incur costs. It would put its insurance at risk.

6 This is not insurance policies just for this. These are

7 insurance policies that cover entire years of coverage for

8 many different kinds of claims against the estate. Your

9 Honor, the burden is heavily on BDM to justify the lifting of

10 the stay. They really cannot meet the <u>Rexenne</u> test although

11 I realize it puts them in a somewhat difficult position, but

12 this is nothing more than a cross-complaint against Grace.

13 They have the right to file a claim against Grace. The case

14 is in its infancy. As I understand it from the documents

15 that were filed, no discovery has occurred. They're trying

16 to mediate, and I think the real question is, is Grace going

17 to pony up any money or not. The answer is, our insurance

18 carrier is not willing at this time to step in and take this

19 over. Under those circumstances, it would cause prejudice to

20 Grace. We would have to hire counsel. We would have to

21 defend, and it could ultimately effect the estate. They can

22 file their proof of claim and reserve their rights that way.

23 There's really no justification for lifting the stay to give

24 them the unique opportunity to pursue Grace when there are

25 hundreds, and hundreds, if not thousands of others in the

1    same position who cannot.

2         THE COURT: Okay.  Anyone else?  Mr. Beskrone, I

3    mean further final comments?

4         MR. BESKRONE: I guess not, Your Honor.  If I was

5    to, I would simply repeat some of the arguments that I

6    already made.  I think the most important one I want to make

7    again at this point is that it's transparent to the estate.

8    It's either our claim or it's the insurance company's claim,

9    and given the circumstances where we find ourselves and given

10   the fact that BDM's poorly situated to deal with a claim of

11   this magnitude, and I think the circumstances should weigh in

12   favor of lifting the stay.  Thank you.

13        THE COURT: Well, I appreciate that for BDM it may

14   be a large claim, but I really don't see that there's any

15   difference between BDM's action as a pre-petition claim and

16   anybody else's action as a pre-petition claim in the estate

17   at this time especially since it appears to be contingent as

18   to the debtor so that BDM has to basically incur an

19   obligation before it has a liability over theory against the

20   debtor.  So, I think that at this point the concession that

21   the action against Grace violated the stay as to Grace is

22   correct.  The complaint has to be dismissed as to Grace for

23   violation of the stay, and I think at this point I'm not

24   going to grant relief from stay.  However, let me find out

25   what the status of the plan progress is at this point because

1   I do agree that the case is old, getting old, and at some

2   point the estate can't stay in place forever and a day, so,

3   maybe we can get some indication from someone as to how

4   negotiations are headed and whether we're headed toward plan

5   issues.

6            MR. BESKRONE: Thank you, Your Honor.

7            THE COURT:  All right, Mr. Beskrone, do you want to

8   prepare or - Do you and Ms. Baer want to prepare an order

9   that will deny the motion, but I just want to make sure THAT

10  you agree that the language in the order reflects my ruling,

11  and Ms. Baer, do you want to submit it on a certification of

12  counsel?

13           MS. BAER: I'd be happy to, Your Honor.

14           THE COURT: All right, thank you.

15           MR. BESKRONE: Thank you.

16           MR. BERNICK: I haven't brought any notes because

17  there's not an awful lot unfortunately that's taken place.

18  If Your Honor will recall last time that there was an

19  announcement of progress at least insofar as the asbestos

20  claimants' constituency was concerned, we didn't have the

21  details of that, and I'm not suggesting that somehow we

22  should have been provided with those details, although we did

23  ask for that at the time, but we were told that an agreement

24  had been reached as between the different asbestos claimant

25  constituencies.  That was at the end of the 60-day period

1   originally set out for that purpose, that is for mediation

2   purposes, and I think in light of that, everybody said, Gee,

3   well, that's some progress.  Let's see if we can move forward

4   and make some more.  Your Honor has extended the mediation

5   period.  We agreed to that.  There was a meeting that was set

6   to take place the day after the last omnibus hearing, and

7   that meeting was to involve the same asbestos claimant

8   constituencies, but also, in addition, reaching out to the

9   general unsecured creditors.  That meeting did take place

10  within 24 hours, that is the following day.  You'd have to, I

11  guess, others can report if there's any detail to be

12  reported, but my understanding is that progress was not made

13  at that meeting, at least no progress has been reported to

14  us.  Last week there was then the second fact of what's

15  occurred in the last 30 days which is Judge Pointer's partner

16  reached out to try to set up an additional meeting, again,

17  the day after the omnibus hearing, that is tomorrow, now to

18  include the other constituencies in the case, that is the

19  general unsecured creditors, but in addition, equity and the

20  debtor.  Because of the shortness of notice, the debtors were

21  not able to attend that meeting tomorrow.  This is the once

22  in the year all their top notch men get together, that's

23  today, tomorrow, and then - isn't it tomorrow, Wednesday, and

24  the next day.  So we decided to try to split the meeting up

25  into two meetings, that is a meeting would take place

1    tomorrow in order to meet the schedule of others in the case.

2    That will involve the unsecured creditors and equity.  I will

3    be there on behalf of Grace, but my clients will not be able

4    to attend, and then a follow-up meeting to involve the

5    debtors themselves.  So that meeting has yet to be scheduled,

6    and that's basically the current status.  I can only observe,

7    that I remember very distinctly that Your Honor in a

8    different courtroom 90 days ago thought it was appropriate to

9    pry Brother Baena's hands from around my throat - I was

10   trying to reach his throat, but he's bigger than I am, so if

11   I could have, I would have, but I couldn't, so I didn't.  In

12   any event, you told us to stand down, that there should be a

13   cooling off period, and obviously that was appropriate.  I

14   think there is something that has come out of it that's good,

15   that is if the asbestos claimants can agree with one another,

16   but I think that the intendment of this period of time was to

17   have discussions about a consensual plan and thus far I would

18   have to say that there has been no contact with the debtor

19   about a consensual plan of any kind.  I've asked both

20   informally and formally to find out, well, is this ever

21   really going to include the debtor on a consensual basis

22   because if it won't, then we should reactivate the rest of

23   the case.  And I'm not suggesting that Your Honor should

24   reconsider in any way the period of time that's been set out

25   for the continuation of these mediations.  You know, again,

1    if that's where we're going to go, that's fine, and let's see

2    what happens, but at this point in time, this period now 90

3    days long, has produced no contact of any kind or evidence of

4    any kind of an actual intention to produce a consensual plan,

5    and I would defer to my brethren on the other side if they

6    have more detail to report on the discussions that have taken

7    place.

8            THE COURT: All right, thank you.  Mr. Baena?

9            MR. BAENA: May it please the Court, Scott Baena on

10   behalf of the Property Damage Committee.  Actually, Judge,

11   there has been quite a bit going on.  Indeed, the ACC and the

12   Property Damage Committee before the last hearing reached an

13   agreement amongst themselves as to how they would proceed

14   towards a larger global resolution of this case.  Since the

15   last hearing, the ACC and the Property Damage Committee have

16   continued to consider the dimensions and contours of a

17   restructuring of this debtor and a reorganization plan.

18   There are, as the Court can only imagine, lots of pieces to

19   this process.  We have a meeting scheduled tomorrow morning

20   between the ACC and the PD Committee to consider further the

21   perspectives that we've reached in that regard which is to

22   precede a further meeting with the general unsecureds and

23   presumably equity, although I'm not prepared to suggest that

24   we'll meet with equity and the unsecureds in one meeting.

25   I'm not sure.  But we are indeed moving towards a consensual

1    plan, if it's possible.  There is an awful lot of good will

2    that has been developed through this process particularly on

3    this side of the asbestos constituencies, and I think that

4    that good will will also permit us to generate lots of

5    productivity in this process, it already has.  The asbestos

6    constituencies probably have more experience in this process

7    than any other constituency in these cases, and so, that good

8    will has certainly created a lot of currency for creating a

9    reorganization plan.  I don't want to talk specifics.  I

10   don't think in this context it's appropriate, and I also

11   don't think that the specifics are necessarily going to be

12   relevant tomorrow or the next day.  This is shifting sands

13   which is typical of a multitude of parties trying to resolve

14   their differences, but I don't want the Court to think that

15   nothing has transpired.  There's been a great deal of

16   interaction between the asbestos constituencies since the

17   last hearing.  It didn't get ginned up just to have something

18   to tell you today.  This has been a work in process.  The

19   financial advisors have been gainfully involved in this

20   process, and indeed, some large period of time was consumed

21   by the activities of our respective financial advisors that

22   we each sent out to do things as part of this whole process.

23   And so we are meeting tomorrow morning at 10 o'clock, it will

24   be our first meeting; 2 o'clock will be our second meeting.

25              THE COURT: Okay.  Anyone else?  I am confident that

1    between now and the next omnibus hearing the debtors will be

2    invited to participate in some form of consensual plan

3    negotiations; correct?

4            MR. LOCKWOOD: Your Honor, the were invited to

5    participate tomorrow.  It's just as Mr. Bernick stated, there

6    was this conflict -

7            THE COURT: Yes.

8            MR. LOCKWOOD: Mr. Bernick will be there tomorrow,

9    and the debtors' management at some later date will be there.

10   So -

11           THE COURT: Before the next omnibus.

12           MR. LOCKWOOD: Yes.

13           THE COURT: All right.

14           MR. BERNICK: Your Honor, to be clear, we were

15   invited.  We were invited on 6-days' notice and a scheduling

16   conflict was for tomorrow and the next day and the next day

17   because of this meeting with my clients.  We then gave three

18   alternative days none of which were acceptable because they

19   weren't acceptable to Mr. Lockwood's partner, Mr. Inselbach.

20   So this is not a situation.  Your Honor gave me an

21   instruction last fall that this was the priority to make

22   things happen.  I've taken that very, very seriously, but

23   with all due respect, this is not simply a question of our

24   just playing coy or making this a second priority.  We very

25   much do want to schedule it, and it was then a suggestion of

1   Judge Pointer's partner that we schedule two separate

2   meetings, and I then stressed the importance of scheduling

3   that second meeting right away, and I still haven't heard a

4   date proposed.  So, I don't think it's fair that there be any

5   implications somehow the debtor has been less than diligent

6   here.  But I took Your Honor's question to be not just a

7   question of scheduling but scheduling something that is

8   substantive and substantively described as fully consensual

9   plans that involve the debtor.  What we're concerned about is

10  that, and I listened to all of the words that were used by

11  Mr. Baena very, very carefully, and there were dimensions and

12  contours and restructuring and good will and currency and the

13  like, but there was no indication, pursuant to our request,

14  no indication that there's any intent to develop a consensual

15  plan insofar as equity and the debtor are concerned.  If all

16  that they're doing is working very hard to figure out how

17  they would like to restructure Grace, I can certainly

18  understand that.  They're entitled to make those kinds of

19  proposals.  They've suggested in the past that they intend to

20  make those kinds of proposals, but they do not have to do

21  that on the Court's time.  We should be moving forward with

22  the case if we're not going to have truly consensual

23  negotiations because otherwise, what is the case here for?

24  It's not simply to give everybody an opportunity to figure

25  out how to develop their plan.  God knows they've got tons of

1    lawyers working on this case.  They can develop a plan on

2    their own time, and we should go back to reactivating the

3    case.  Again, I'm not asking for that today.  Your Honor has

4    chartered a course.  I have agreed to it, but I'm just

5    alerting the Court to the fact that thus far, this time has

6    not been used for purposes of developing a consensual plan.

7             THE COURT: Well, all right, gentlemen, I take it

8    you're trying to develop a consensual plan a piece at a time.

9             MR. BAENA: Yes, Your Honor, and you know, everybody

10   has their own view of the sequence of events that are

11   appropriate.  We recall how the debtor came to its consensual

12   plan which just happened to omit the asbestos constituencies.

13   We just think that it's a different cadence that ought to be

14   applied.  We're trying to reach an agreement on the

15   creditors' side before we discuss with equity what they might

16   be entitled to under a plan.  We did meet with the

17   unsecureds. They did not like the initial proposal.  We are

18   meeting with them again.  We see that as the continuum for

19   arriving at a consensual plan.

20            THE COURT: Okay.

21            MR. LOCKWOOD: Your Honor, my only comment is, I did

22   not mean to trivialize the absence of the debtors from

23   tomorrow's meeting.  I thought I was merely describing the

24   facts of the event.  I don't know why Mr. Bernick prepared to

25   take umbridge of my description, but if I offended him or his

1   client in some way, I deeply apologize.  All I'm saying is,

2   they're on the list.  We tried to set up a meeting through

3   Judge Pointer.  They couldn't be there for reasons that seem

4   to me to be perfectly acceptable.  I didn't intend to

5   disparage anything, and as for my partner's availability or

6   lack thereof on some other days, I'm really not in a position

7   to respond, but we understand our obligations to the Court

8   and our instructions, and we will meet with the debtors.

9         MR. BAENA: To come to Mr. Lockwood's defense, Mr.

10   Inselbach is trying the Armstrong confirmation proceeding

11   next week, and he has limited time this week.

12         THE COURT: Okay, but why do we need Mr. Inselbach

13   when we have Mr. Lockwood.  Mr. Lockwood's the one comes to

14   all the hearings.  He has just as much knowledge about all

15   this as Mr. Inselbach does, and I heard him use the word

16   "partner"?

17         MR. LOCKWOOD: I'm going to sit down now. This is an

18   incondestine (phonetical) problem, it's not mine.

19         THE COURT: It is.

20         UNIDENTIFIED SPEAKER: Didn't you hear the Wiel

21   Gotshal folks this morning at the fee hearing describe the

22   division of labor.

23         THE COURT: Yes.  I think I'm imposing some

24   additional division of labor on you, Mr. Lockwood, because at

25   this point in time this needs to move forward, and -

1          MR. BERNICK: I don't think Mr. Lockwood followed

2    the distinction that was made this morning . . . (microphone

3    not recording).

4          MR. LOCKWOOD: You didn't hear me say a word.

5          THE COURT: Actually, you're right, I didn't.  Okay,

6    I really do expect there are going to be meaningful meetings

7    with the debtor and with equity between - and I guess you've

8    got to start with the unsecureds.  I understand you have the

9    unsecureds and the equity lined up for meetings, but you do

10   need meaningful meetings with the debtor, and I really do

11   want them before the next omnibus hearing.  So, whatever

12   Judge Pointer has to do to curb you cats into a room, that's

13   what I expect him to do, and frankly, no excuses will be

14   tolerated including the fact that you're bound over for trial

15   in some other court.  If that's the case, get one of your

16   partners and get busy.  So, I really expect some movement in

17   this case.  Mr. Baena?

18         MR. BAENA: I don't want to leave any

19   misapprehension.  We asked Judge Pointer if they would

20   assemble everybody.  We weren't being, you know, cold and not

21   being actively involved in this process.

22         THE COURT: No, I appreciate that it is not a matter

23   of inactivity.  I want to see more activity.  Let me make it

24   clear, you're 90 days into a 120-day process.  I haven't yet

25   heard anything that puts a term sheet on the table.  I expect

1    by June I'm going to see a term sheet.  That's what I want, a

2    term sheet.  So if that involves people getting busy and I

3    really expect it to be busy.  So, let's get moving folks.

4    Okay, back to the agenda.

5            MS. BAER: Your Honor, that takes us to matter

6    number 11, which is the Scotts Company matter.  This matter,

7    Your Honor, is up for status, and I'll briefly report or

8    summarize where the status of things are, and I think Scotts'

9    counsel is on the phone.  Your Honor, this is Scotts' motion

10   to modify this Court's preliminary injunction so that they

11   can proceed on their declaratory judgment action related to

12   shared insurance.  As you might recall, Your Honor, Scotts is

13   being sued around the country on asbestos cases, and there's

14   an issue as to whether their turf builder contained Libby

15   vermiculite.  The matter was stayed by this Court sometime

16   ago, and from time to time, this comes up to see whether or

17   not that stay should remain in place.  Grace, Your Honor,

18   believes that the stay should still remain in place.  We have

19   talked with Scotts and some of the insurers, and I think all

20   but one insurer that we have talked to and Scotts agreed that

21   it is premature at this point to go forward, that the matter

22   should remain in place.  I don't know whether or not the

23   other insurer, One Beacon, who is here in Court today, has

24   changed their position since they were last in Court where

25   they thought the matter should go forward.  I did send a

1   letter to One Beacon in response to a letter they had sent to

2   me indicating why we believed going forward at this time is

3   premature.  Very simply, Your Honor, if this matter goes

4   forward, it would be complicated insurance litigation.  It

5   would be terribly distracting to all parties especially given

6   where we are in this Chapter 11 case, and, Your Honor,

7   frankly, until we know what's going to happen in the Chapter

8   11 plan, whether it's consensual or not and whether the

9   insurance proceeds go into the trust or remain with the

10  reorganized debtor, which is what the debtors' current plan

11  says, it really does make a tremendous difference.  We don't

12  know who the real party in interest is, viz-a-viz, the Scotts

13  litigation and viz-a-viz, the indemnity claims that would

14  come out of the Scotts litigation because a lot of these

15  insurers, Your Honor, have settled with Grace.  Therefore, if

16  it would be found that their insurance coverage was somehow

17  insurance coverage that Scotts would be entitled to share in,

18  it comes back to Grace, because they settled with us.  They

19  have indemnities from us and, therefore, that becomes a claim

20  potentially against Grace.  So, we need to know where the

21  insurance proceeds are going to go, where the insurance

22  itself is going to go, and whether or not any indemnity

23  claims would be general unsecured claims or would be claims

24  that would be treated like the underlying asbestos claims

25  under the trust.  For all of those reasons, Your Honor, we

1  believe it is quite premature right now to go forward with

2  the Scotts litigation, and, Your Honor, if we have a

3  consensual plan that's possible that we could resolve this

4  problem in the consensual plan.  So for all those reasons,

5  Your Honor, we believe the stay of this litigation should

6  remain in place.

7          THE COURT: Mr. Brown?

8          MS. COBB (TELEPHONIC): Your Honor, this is Tiffany

9  Cobb on behalf of the Scotts Company.

10         THE COURT: Yes.

11         MS. COBB (TELEPHONIC): May it please the Court?

12         THE COURT: Sure, go ahead.

13         MS. COBB (TELEPHONIC): A little over a year ago, on

14  April 25th of last year, to be precise, there was a hearing on

15  Scotts' motion and at that time Your Honor noted among other

16  things that the plan as crafted at that time did not set up a

17  trust to be paid with insurance proceeds, and given this,

18  Your Honor had stated over a year ago that you were not sure

19  that Scotts actually needed to go forward at that time.

20  Nothing has changed with respect to the currently proposed

21  plan as was true in April of last year, the current plan of

22  which we are aware does not set up a trust to be paid with

23  insurance proceeds.  We are not aware of any actions taken by

24  Grace to deplete the coverage and unless and until Grace's

25  insurance policies or proceeds become an issue, we do not see

1    a need to lift the injunction at this time.  We would,

2    however, ask for the ability to revisit this matter if and

3    when a future proposed plan changes to perhaps implicate the

4    policies or the proceeds.

5            THE COURT: All right.  Thank you.

6            MS. COBB (TELEPHONIC): And Scotts did have

7    subsequent communications with counsel for One Beacon and

8    Uniguard, and it sounds like - and I apologize, it sounds

9    like he's - Michael's right there in the courtroom, I'll

10   certainly turn it over to him.

11           THE COURT: Mr. Brown.

12           MR. BROWN: Thank you, Your Honor.  Just a little

13   bit of background.  I represent One Beacon American Insurance

14   Company which is the successor to Commercial Union and Seaton

15   Insurance Company which is the successor to Uniguard.  Both

16   Commercial Union and Uniguard settled all or virtually all of

17   their asbestos-related coverage with Grace back in the 1990s.

18   All but one of the policies issued by these carriers are

19   deemed to be resolved policies under the current plan,

20   meaning that there's no further asbestos-related coverage

21   available.  The settlement, I won't give the specific amount,

22   but the settlement figure between the two carriers was well

23   over nine figures.  It was an enormous sum of money and one

24   of the things that the carriers bought in exchange for that

25   was hopefully peace through an indemnification obligation on

1    the part of Grace, and we filed a proof of claim with respect

2    to that indemnification obligation, and the adversary

3    proceeding that Scotts has brought directly implicates the

4    indemnification obligations of Grace.  Now, Ms. Baer spoke

5    briefly that there's a lot of things that we don't know about

6    what, you know, what's going to happen with this plan.  One

7    thing we do know is that at least as to the policies that are

8    resolved, which is virtually all of them for my two clients,

9    there's not going to be an assignment because there's nothing

10   left to assign.  There's no asbestos-related coverage that

11   the ACC would be interested in receiving.  What we do know

12   though is that there's an indemnification obligation, and our

13   settlements back in the 1990s did not obviously include

14   Scotts, and so our concern here is that primarily how our

15   claims are going to be dealt with, and I've examined the

16   plan, and I've corresponded with Ms. Baer about how these

17   claims will be treated, and under the current plan, they are

18   to be channeled to the Trust, which strikes us as an improper

19   classification.  These are contract claims, and they're going

20   to be channeled to a trust for asbestos claimants.  We don't

21   think that they should be, and according to the

22   correspondence I have from Grace, they may not be, the final

23   plan may be different, but the long and short of it is at

24   this point, we don't know, we certainly don't know what the

25   merits of Scotts' claim is ultimately going to be.  They

1    certainly have some case law that supports their position.

2    On the merits of the case we are aligned with Grace, but we

3    think this issue has to get resolved sooner rather than later

4    because although it's a contingent and a liquidated claim at

5    this point, it has a potential at least to be a very large

6    claim.  And if we're going to be competing with the ACC for

7    funds in the Trust, I think that's something we need to know

8    about.  If we're going to be a general unsecured creditor, we

9    need to know that as well, and we think it's appropriate to

10   move forward with the litigation at this point to get that

11   issue resolved, find out whether, you know, what the claim

12   is, what the magnitude of the claim is, and whether this is

13   actually going to be a potential problem for this debtor.

14           THE COURT: Well, I think, Mr. Brown, you and Ms.

15   Baer are basically saying the same thing except that she

16   wants the stay while you figure it out and you want to go

17   forward while you figure it out, but what has to be figured

18   out, I think, is what status the claims have and whether

19   there is some obligation either under the insurance policies

20   to pace whatever liabilities Scotts may incur and/or whether

21   or not the debtor has some indemnity obligation to anybody

22   for any of this.  So, I'm not sure that at this point until

23   we get through this at least next 30 days of mediation that

24   that shouldn't go forward and in fact, maybe it's one more

25   issue that ought to be added to the mediator's plate to see

1   whether or not it can be consensually carved out.

2          MR. BROWN: Well, I think that's right.  I think

3   that would be useful, Your Honor, because it's very difficult

4   to get anything resolved until we know exactly how we're

5   being treated.  I mean, most constituencies in connection

6   with this plan at least know what treatment their claim is

7   going to get, that is how it's being classified.  We're told

8   at this point that we're an asbestos claim.  We don't think

9   we should be, but we're also told that that may change

10  depending on what the ultimate plan looks like.

11         THE COURT: Right, and I think until you do know,

12  it's probably not wise to go forward because who goes forward

13  and in what capacity may ultimately be affected by the status

14  of the claim and the treatment under it.  You know, if you're

15  treated as a general unsecured creditor your position about

16  this whole thing may be a whole lot different than if you

17  have to share in the asbestos trust.

18         MR. BROWN: I think that's correct, Your Honor, and

19  I think the position of the asbestos constituencies may

20  differ as well, but we've not yet been involved, and I

21  attended the first mediation session.  This was obviously not

22  one of the largest items on the agenda, and, you know, we

23  haven't been involved in the mediation at all.  My concern is

24  we're going to get to a point where there will be some type

25  of consensual plan, that Scotts' adversary will have been

1   sidelined for years, and this issue's going to come back

2   because, I mean, the one thing our client bought was a

3   shifting of the risk for this problem to Grace, and we

4   certainly don't want to see it swept under the rug.

5        THE COURT: Okay.  I think we should simply put this

6   back on for another status conference.  I guess - When is -

7   Is it July, June or July, when the next 60-day period ends?

8   I'm not sure.

9        MS. BAER: July.

10       THE COURT: July.  Let's put this back on for

11  another discussion in July, and, gentlemen, I don't know if

12  Judge Pointer is on the phone or not.  I saw his name on the

13  list, but I don't know that he's really there.  Somebody get

14  in touch with him and ask him to add this issue at some point

15  in the process before July.

16       MR. BROWN: Thank you, Your Honor.

17       THE COURT: Okay, thank you.

18       MS. COBB (TELEPHONIC): Thank you, Your Honor.

19       THE COURT: When I was talking term sheets, two

20  gentlemen by the way, I think I mentioned the next omnibus.

21  I really mean the July omnibus.  I expect the debtors to be

22  involved in the negotiations by the next hearing, but I

23  expect the term sheet by the end of this period.  So, let me

24  clarify that.  Okay, Ms. Baer.

25       MS. BAER: Thank you, Your Honor.  That moves us to

1   agenda item number 12, which was the Libby Claimants' motion

2   to designate a substitute expert.  There were no objections.

3   A certificate of no objection was filed on that one on May

4   4th, Docket No. 12370, and we would simply ask that order be

5   entered.

6           THE COURT: All right, it will be.

7           MS. BAER: Your Honor, agenda item number 13, the

8   debtors' fifth omnibus objections.  Your Honor, there were

9   two matters that were left over.  One was some claims related

10  to the Archers.  The debtor has since filed a notice of

11  mediation on those claims, and the other claims are the

12  Weatherford claims being handled by co-counsel in Delaware.

13  They are exchanging settlement offers.  They have not yet

14  resolved it, and therefore, we have an order to enter, Your

15  Honor, continuing the matter to the June 19th hearing.

16          THE COURT: All right.  Thank you.  Okay, that order

17  is now signed.

18          MS. BAER: Thank you, Your Honor.  Agenda item

19  number 14 was the status report on mediation, which we have

20  done.  Agenda item number 15, Your Honor, is Grace's motion

21  for authorization to seek discovery from Dr. Alan Whitehouse.

22  Your Honor, that matter went to the settlement mediator.

23  They have achieved resolution.  There is both a discovery

24  order and a protective order that I understand the parties

25  have agreed upon.  We just received the orders a little while

1   ago, and we saw a few blanks in them, so what we'd like to do

2   is submit them on a certification of counsel in the next

3   couple of days.

4          THE COURT: Okay.  This is - What is going to be

5   submitted again?  I'm sorry.

6          MS. BAER: It would be a discovery order ordering

7   certain discovery from Dr. Alan Whitehouse and a protective

8   order with respect to certain of that discovery.  There are

9   implications with the Montana criminal case, and the United

10  States Government has been involved in and has agreed to the

11  forms of these orders.

12         THE COURT: All right.

13         MS. BAER: Your Honor, that concludes the formal

14  agenda.  There are, as we went back and looked at

15  certifications of counsel, three outstanding orders that have

16  all been submitted on certification of counsel.  We could

17  either submit them now for signature or just remind the Court

18  what they are and follow up.

19         THE COURT: Why don't you give them to me and tell

20  me on the record what they are too, so I have notes.

21         MS. BAER: Your Honor, the first order is the

22  certification of counsel that was filed on April 19th, Docket

23  No. 12268.  It relates to an order approving a stipulation

24  resolving a claim with South Carolina Department of

25  Environmental Protection.  It's a very small claim, Your

1  Honor, but the parties apparently wanted an order, and so we

2  do in fact have an order with respect to that matter.

3          THE COURT: All right, I'll take it.  Thank you.

4          MS. BAER: Your Honor, that did not relate to a

5  pending motion, just the claim, so I put the claim number on

6  the document.

7          THE COURT: Okay.

8          MS. BAER: Your Honor, the next matter was a

9  certification of counsel filed with respect to a stipulation

10 and order concerning withdrawing an objection of the City of

11 East Hampton.  This relates to the fifteenth omnibus

12 objection.  It's a clean-up matter.  The certification of

13 counsel was 12395.  It was filed last week, and I do have the

14 order here.

15         THE COURT: Okay.  Thank you.  All right.

16         MS. BAER: Your Honor, the last matter also

17 referring to Docket No. 9315, the fifteenth omnibus

18 objection, a certification of counsel filed at Docket No.

19 12404.  It's withdrawing objections to three, what turns out

20 to be, environmental claims.  And, Your Honor, for the

21 record, it's just withdrawing the objection on the fifteenth

22 omni.  It's reserving all rights with respect to the

23 underlying merits of the claims as environmental claims.

24         THE COURT: Okay.

25         MS. BAER: And, Your Honor, one last certification

1  of counsel filed on May 1st.  This was with respect to the

2  agenda last month, the Libby claimants had filed a motion for

3  fees.  Your Honor denied that.  This certification of counsel

4  and order was submitted, Docket No. 12346, and the order is

5  denying without prejudice their motion.  They did agree to

6  the form of this order.

7          THE COURT: All right.  Thank you.  Okay.

8          MS. BAER: Your Honor, that's all we have on the

9  agenda for today.

10         THE COURT: All right.  Anyone else, any matters.

11 Okay, we're adjourned.  Thank you.

12         MS. BAER: Thank you.

13         ALL: Thank you, Your Honor.

14         (Whereupon at 3 p.m. the hearing in this matter was

15 concluded for this date.)

16

17

18

19         I, Elaine M. Ryan, approved transcriber for the

20 United States Courts, certify that the foregoing is a correct

21 transcript from the electronic sound recording of the

22 proceedings in the above-entitled matter.

23

24 /s/ Elaine M. Ryan                      May 22, 2006
   Elaine M. Ryan
   2801 Faulkland Road
   Wilmington, DE 19808
   (302) 683-0221