**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W.R. GRACE & CO., *et al.*, | ) | Case No. 01-1139 (JKF) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | **Hearing Date: June 19, 2006 @ 2:00 p.m.** |
| | ) | **Related to Docket No. 12432** |
| | ) | |

**OBJECTION OF THE OFFICIAL COMMITTEE OF ASBESTOS PERSONAL
INJURY CLAIMANTS TO THE MOTION OF DEBTORS FOR AN ORDER
APPROVING THE SETTLEMENT AGREEMENT AND MUTUAL RELEASE
<u>WITH LLOYD'S UNDERWRITERS [DI 12432]</u>**

The Official Committee of Asbestos Personal Injury Claimants (the "PI Committee"), by

and through its undersigned counsel, respectfully submits this objection to the motion of W.R.

Grace & Co., et al. ("Debtors") for an order approving the settlement agreement and mutual

release by and between the Debtors and certain underwriters at Lloyd's London[1]  (the "Motion").

In support of this objection, the PI Committee states as follows:

<u>**INTRODUCTION**</u>

1.       On April 2, 2001 (the "Petition Date"), in the face of 'overwhelming asbestos-

related lawsuits,' the Debtors commenced the instant proceedings by filing voluntary petitions

for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") with the

Clerk of this Court.

2.       No trustee or examiner has been appointed in these cases.  On April 12, 2001, the

United States Trustee for the District of Delaware appointed the PI Committee, the Official

Committee of Asbestos Property Damage Claimants (the "PD Committee") and the Official

---

[1] Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the
Debtors' Motion.

{D0060898:1 }

1

Committee of Unsecured Creditors (the "General Creditors' Committee").  On June 18, 2001, the

U.S. Trustee appointed the Official Committee of Equity Security Holders (the "Equity

Committee").   On May 24, 2004, this Court signed an Order appointing David T. Austern as the

Legal Representative for Future Asbestos Claimants (the "Futures Representative").

3.      On November 13, 2004, the Debtors' Plan of Reorganization (the "Plan") was filed

without the support of any other constituency.  A Disclosure Statement and an Exhibit Book

accompanied the Plan.  On January 13, 2005, the Debtors, the General Creditors Committee, and

the Equity Committee ("Plan Proponents") filed the Amended Joint Plan of Reorganization[2]

("Amended Plan") and Amended Disclosure Statement.  As with the Plan, the Amended Plan

separates asbestos claims into three classes, but envisions the pass-through of all asbestos claims

to a post-bankruptcy trust established under 11 U.S.C. § 524(g) (the "Trust"), which would

process and pay the claims post-confirmation.  Under § 7.6.1(v) of the Plan, the Court must find

that the aggregate amount of the Asbestos PI-SE Class Fund, the Asbestos PD Class Fund, and

the Trust Expenses Fund "is not greater than $1,483,000,000" as a condition to confirmation.

4.      Grace entered chapter 11 for the avowed purpose of resolving its crushing

liabilities to its asbestos creditors.  According to Grace, "[o]n the Petition Date, the Debtors were

defendants in lawsuits asserting approximately 118,000 Asbestos PI claims."  Disclosure

Statement, at 14.  For over five years now, Grace and its asbestos creditors have been locked in

an adversarial posture on asbestos issues.  As more fully discussed below, this Motion is yet

another example of the Debtors' adversarial posturing towards its asbestos creditors in this

bankruptcy case, having only notified the asbestos creditors after this settlement was finalized

---

[2] The PI Committee, the Futures Representative, and the PD Committee have each filed objections
to the Amended Disclosure Statement on the grounds that the Amended Plan is patently
unconfirmable on its face.

{D0060898:1 }                                                   2

and refusing to address any of the concerns raised by the PI Committee in conference calls and discussions held thereafter.

## THE SETTLEMENT MOTION

5.      Through the Motion, the Debtors seek approval of a $90 million settlement (the "Settlement Funds") between the Debtors and Lloyd's Underwriters for, as Debtor inadequately describes, a "full and complete satisfaction of the Lloyd's Underwriters' obligations under the 1995 London Agreement and the obligations that the Lloyd's Underwriters may have to the Debtors under policies issued to Grace after June 30, 1985."  Motion, 7."  In fact, the Debtor's description of the Settlement Agreement omits the fact that the overly broad release of the Subject Policies amounts to nothing less than a complete buy-back of all general liability insurance sold to Grace by the London Underwriters.  Full and complete satisfaction of the Lloyd's Underwriters' obligations under the 1995 London Agreement, however, would not result in the total release of the Subject Policies provided for in the Settlement Agreement.

6.      The Settlement Funds will be deposited into a settlement account and, upon the effective date of a plan of reorganization and after the satisfaction of certain other requirements, "will be paid to the Debtors" and not into any Trusts established pursuant to section 524(g) of the Bankruptcy Code.  Motion, ¶ 8.  (*See also*, Section II (B) of the Settlement Agreement which provides that on "the Trigger Date, the Parties shall direct the Settlement Account Agent to release the Settlement Amount in full to Grace or as otherwise provided in the Plan, provided that this

Settlement Agreement has not earlier been terminated in accordance with its terms. . .").  Quite

clearly, the Settlement Agreement does not require the Settlement Funds to go to the Trust.[3]

7.    As described in the Motion, the Settlement Agreement also requires, among other

things, the following:

> a.    a channeling injunction pursuant to section 524(g) of the Bankruptcy Code that
>
> applies to Lloyd's Underwriters and Equitas;
>
> b.    an injunction pursuant to section 105(a) of the Bankruptcy Code that applies to
>
> Lloyd's Underwriters and Equitas;
>
> c.    an indemnification of Lloyd's Underwriters and Equitas by the Reorganized
>
> Debtors [and the Trust]; and
>
> d.    the Reorganized Debtors and the section 524 (g) trust shall be bound by the
>
> Settlement Agreement with the same force and effect as if they were parties to
>
> the Settlement Agreement from its date of execution.[4]

Motion, ¶ 8.

---

[3] Despite the fact that Lloyd's Underwriters and Equitas are seeking a channeling injunction in
any plan confirmed under section 524(g) of the Bankruptcy Code, the Settlement Agreement
does not require the Settlement Amount to go to the Trust.  This is not permitted by the
Bankruptcy Code.  Specifically, section 524(g)(4)(B)(ii) of the Bankruptcy Code prohibits a
channeling injunction to third parties unless the Court determines that such channeling injunction
is "fair and equitable with respect to the persons that might subsequently assert such demands, in
light of the benefits provided, or to be provided, to such trust on behalf of such . . . third party."
The PI Committee notes that the Settlement Agreement does allow the Settlement Amount to be
directed as "provided in the Plan."  As a result, the PI Committee considers this to be a plan
confirmation issue, but notes, for the record, its intention to object to the inclusion of a
channeling injunction to the benefit of Lloyd's Underwriters or Equitas, if the Settlement
Amount is not disbursed from the Settlement Account directly to the Trust.
[4] Section VII (D) of the Settlement Agreement provides that: "Upon its creation, and without
limiting the obligations of Grace under this Agreement, the Trust (i) automatically and without
need for further action shall become a Party to this Agreement and shall be bound by all the
obligations of Grace under this Agreement to the maximum extent possible; and (ii) promptly
shall execute this Agreement."

8.      The Settlement Agreement's intention to force the Trust to become a party to the Settlement Agreement is significant due to other provisions contained in the Settlement Agreement, including provisions relating to document and information sharing.  Specifically, Section IX of the Settlement Agreement requires the Reorganized Debtors and the Trust to allow Lloyd's Underwriters "to review and obtain" certain information, not limited to, "information from any database maintained by the Reorganized Debtors or the Trust, any information that the Reorganized Debtors or the Trust collects in the connection with its payment of Asbestos Claims" (the "Reporting Requirements").  In addition, specific information is to be provided to Lloyd's Underwriters for all claim files related to Asbestos Claims (as that term is defined in the Settlement Agreement).[5]  Alternatively, the Reorganized Debtors and the Trust are required to submit reports, on a quarterly and annual basis, to Lloyd's Underwriters containing certain specified information.[6]

9.      The Reporting Requirements appear to be the result of the Settlement Agreement's failure to require the Settlement Funds to be directed to the Trust.  Due to this failure, Lloyd's Underwriters cannot satisfy, for itself and its reinsurers, that the Settlement Funds will be used to pay asbestos claims covered by the Subject Policies.  It appears that Lloyd's Underwriters will use the Reports and information obtained from the physical inspection of the Trust's databases as evidence of payment of covered claims.  Obviously, if the Settlement Funds were directed by the Settlement Agreement to the Trust, it would not be burdened with these Reporting Requirements.

---

[5] The PI Committee will object to these Reporting Requirements during the plan confirmation process for the same reasons set forth in footnote 3 above.

[6] Although the Reorganized Debtors and the Trust have the ability to satisfy the Reporting Requirements through the submission of Reports, the Reorganized Debtors and the Trust are still obligated to make the Trust's databases available for review and inspection by Lloyd's Underwriters.

## STANDARD FOR APPROVAL OF THE SETTLEMENT AGREEMENT

10.     Bankruptcy Rule 9019 provides a bankruptcy judge with the authority to approve a compromise of a claim.  The "process of bankruptcy court approval requires a bankruptcy judge to assess and balance the value of the claim that is being compromised against the value to the estate of the acceptance of the compromise proposal." *Myers v. Martin (In re Martin)*, 91 F.3d 389, 393 (3d Cir. 1996).  *See also, In re Key3Media Group, Inc.*, 336 B.R. 87, 92 (Bankr. D. Del. 2005) ("In exercising this discretion, the bankruptcy court must determine whether the compromise is fair, reasonable, and in the best interest of the estate").

11.     In considering a proposed settlement, this Court should examine four factors.  These factors are: "(1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interests of the creditors.  *In re Martin*, 91 F.3d at 393. Importantly, "[i]n order to make such a determination, the bankruptcy court must be appraised of all relevant information that will enable it to determine what course of action will be in the best interest of the estate." *Id.*, at 394.

12.     The "[b]ankruptcy court has a duty to make an informed, independent judgment that the compromise is fair and equitable." *Key3Media Group, Inc.*, 336 B.R. at 92.   Failure to make findings of fact on these four elements can lead to a remand by the appellate court. *See, Fry's Metals, Inc. et al. v. John J. Gibbons, Trustee et al. (In re RFE Industrial, Inc.)* 283 F.3d 159, 165 (3d Cir. 2002).

13.     "The [d]ebtors carry a burden of persuasion to provide the court with sufficient information to conclude that the compromise falls within the reasonable range of litigation possibilities.  This is not, however, a burden of proof regarding the underlying claim.  While a court

generally gives deference to a [d]ebtors' business judgment in deciding whether to settle a matter, the [d]ebtors have the burden of persuading the bankruptcy court that the compromise is fair and equitable and should be approved." *Key3Media Group, Inc.*, 336 B.R. at 93 (internal citations omitted).

## <u>OBJECTION</u>

14.     The PI Committee has serious concerns with the Settlement Agreement and, therefore, opposes the entry of an order approving the Motion.  Through conference calls, as well as other less formal discussions between representatives of the Debtors and the PI Committee, the Debtors were advised of the objections which the PI Committee has with the Settlement Agreement. Indeed, the Debtors were aware of these issues well before the instant Motion was filed. Nevertheless, the Debtors determined to proceed with the Motion over the objection of the PI Committee.  Although this would not ordinarily be significant, it is surprising, in light of the objections expressed by the PI Committee, that the Debtors' have failed to provide this Court with even the basic information needed to make an informed decision on the Settlement Agreement. Having failed to provide this Court with even this basic information, it obviously follows that the Debtors' Motion fails to provide this Court with a reasonable explanation as to how the four factors of the *Martin* test are met and the Motion should be approved.  Since the Motion fails to provide this Court with the information required to make an informed, independent judgment that the settlement is fair and equitable, the Motion must be denied.

15.     One of the most glaring examples is the Debtors' failure to advise the Court of the separate policy limits available for the separate types of insurance coverage available under the Subject Policies.  What types of insurance are available and what categories of claims are covered under the Subject Policies?  What is the face amount of each separate type of insurance?

To what extent have these separate policy limits been eroded by prior payment or otherwise?  In addition, and although the Motion concedes that the 1995 London Agreement obligates Lloyd's Underwriters "to make liability payments and pay defense costs in connection with asbestos-related and other claims" *Motion*, ¶ 6, the Debtors' have failed to advise this Court of the negotiated value of its asbestos liabilities under the Settlement Agreement.  This Court cannot make an informed decision of the reasonableness of the Settlement Agreement without understanding: (a) the face value of the Subject Policies being compromised through the settlement; and (b) the negotiated value of the Debtors' asbestos liabilities assumed through the compromise.

16.     The Motion does indicate that the Settlement Funds represent a present value of the asbestos liabilities allocable to Lloyd's Underwriters under the 1995 London Agreement.  According to the Debtors, this amount was negotiated under the "products-completed operations" coverage available to the Debtors and without regard to the "premises-operations" coverage available under the Subject Policies and is based upon a value of the Debtors' asbestos personal injury liabilities in excess of $3 billion dollars.  The Motion fails to explain the reasonableness of this resolution as to the products-completed operations coverage only.

17.     Building on these omissions, the Motion does not explain the failure of the Settlement Agreement to include consideration for the "premises-operation" coverage available to W.R. Grace.  Lloyd's Underwriters' share of W.R. Grace's potential premises insurance coverage for asbestos bodily injury claims under general liability insurance policies subscribed to in whole or in part (along with other London Insurance Companies) totals at least $199,939,875.00.[7]  This coverage potentially is applicable, for example, to claimants injured by

---

[7] The precise amount of premises-operations coverage could be far more valuable depending upon determinations of insurance coverage issues such as aggregate limits, exhaustion of

exposure to tremolite asbestos from Grace's operations in and near Libby, Montana (the "Libby Claimants").  This separate and distinct coverage specifically was not released in the 1995 Lloyd's Settlement and no reason is given for now releasing premises-operation coverage specifically preserved by the earlier settlement agreement.

18.     Premises-operation coverage typically protects the policyholder from asbestos-related injuries to third parties on the business premises, or from injuries that occur during operations away from the policyholder's normal business premises while the policyholder retained control of a job site.  Here, the Motion fails to evaluate the nature of underlying asbestos claims relating to the Libby Claimants or even the possibility that their asbestos-related claims arose in the context provided for by premises-operation coverage.

19.     In *Porter Hayden*, a Maryland appeals court explicitly acknowledged premises-operations coverage for asbestos-related liabilities.  *See Commercial Union Ins. Co. v. Porter Hayden Co.*, 698 A.2d 1167, 1207 (Md. App. 1997).  In that case, an insurance company denied coverage for its policyholder's asbestos-related liabilities on the basis that the policyholder lacked "products hazard" coverage.  In rejecting the insurance company's narrow classification of asbestos-related claims, the court held that the asbestos liabilities potentially were insured under the "premises operation" coverage purchased by the policyholder.  *Porter Hayden*, 698 A.2d at 1207, *et seq.*

20.     The Debtors' failure to explain why it would forego premises-operations coverage particularly is unreasonable here where the existence of "premises coverage" with separate limits specifically was recognized – and preserved – in the 1995 London Agreement.  In that settlement agreement, the parties limited the scope of the release under the same general liability policies

underlying policies, and the number of occurrences.  Debtor's Motion obviously does not address these issues.

that are the subject of this motion to those claims "within the scope of the products/completed

operations hazards." 1995 London Agreement, § XIII. at 45. The parties further explicitly

recognized the value of the premises coverage by limiting the definition of "bodily injury

claims" to exclude premises-operations coverage:

> 2. "Bodily Injury Claim" shall mean any claim, demand, suit,
> action or request for relief or action, or any portion of same, that seeks
> monetary damages from any member of the Grace Group for bodily injury
> alleged to have been caused, in whole or in part, by exposure to asbestos-
> containing materials manufactured, sold or distributed by any member of
> the Grace group or any of its licensees; *except as follows*:
>
> ….
>
> b. Claims against the Grace Group which do not arise out
> of products liability, including but not limited to claims by or on behalf of
> *individuals who allege that they were injured as a result of exposure to*
> *asbestos at premises owned or operated by the Grace Group* shall not be
> considered bodily injury claims for purposes of this Agreement.

1995 London Agreement, § II.E.2.b. at 8-9 (emphasis added.).

21.     Thus, in addition to the Debtors' failure to adequately justify the reasonableness

of the settlement with respect to products-completed operations coverage, it is respectfully

submitted that this Court also should find the Lloyd's Settlement unreasonable in light of the

failure of the Motion to even address, let alone justify, foregoing at least $200 million in solvent,

separate, and unreleased premises-operations policy limits.

22.     The Motion fails to provide this Court with other information necessary for it to

make an informed decision as to why the Settlement Agreement is fair, reasonable, and in the best

interests of the estate. Specifically:

> a.  The Motion does not explain why it is fair, reasonable, and in the best interests
>
> of the estate for the Reorganizing Debtors and the Trust to have an unlimited
>
> indemnity obligation to the benefit of Lloyd's Underwriters and Equitas. The

Motion does not explain why this indemnification obligation is not even limited to the value of the compromise;

b.  The Motion fails to explain the discount rate used to reach the $90 million settlement and why that discount rate is fair and reasonable;

c.  The Motion does not provide the Court with sufficient information to make an informed decision as to the impact which the 1995 London Agreement has on the Debtors' probability of success if these issues were litigated to a conclusion;

d.  The Motion does not provide the Court with sufficient information to make an informed decision as to the impact which the 1995 London Agreement has on the complexity of litigating the Lloyd's Underwriters obligations arising thereunder;

e.  The Motion does not provide the Court with justification as to why this Motion should not be stayed pending an estimation of the Debtors' asbestos personal injury and property damage liabilities through the Estimation proceedings;

f.  The Motion fails to present any evaluation of risk with respect to payment of a judgment against Lloyd's Underwriters or Equitas, including consideration of their financial statements, reinsurance, and reserves; and

g.  The Motion does not contain any justification as to why the Reporting Requirements are in the paramount interests of the creditors.

**JOINDER IN THE FUTURE CLAIMANTS' REPRESENTATIVE'S OBJECTION**

23.  The PI Committee hereby joins in The Future Claimants' Representative's Objection to the Motion of Debtors for an Order Approving the Settlement Agreement and Mutual Release with Lloyd's Underwriters [DI 12573] (the "FCR Objection"). The PI Committee hereby adopts the

positions set forth in the FCR Objection relating to the indemnification obligations contained in the

Settlement Agreement.  For the reasons set forth in the FCR Objection, the Motion should also be

denied.

## **CONCLUSION**

24.     Quite obviously, the Debtors have failed to carry their burden of proof that the

Motion should be approved.  The Motion fails to provide this Court with even the basic

information necessary to begin a review of the reasonableness of the Settlement Agreement.

From the failure to provide this information comes the failure to include an explanation as to

how that information meets the four-pronged standard of *Martin*.  Beyond the Motion's

deficiencies, the PI Committee objects to the release of at least $200 million in previously

preserved premises-operations policy limits in exchange for no consideration.

*25.*     As representatives of the present holders of asbestos personal injury claims against

the Debtors, the creditors whose claims will be compensated in part by this very coverage, its

interests and position on this Motion should be paramount and the Motion should be denied.  *See,*

*Martin*, 91 F.3d 389.  *See also, Key3Media Group, Inc.*, 336 B.R. at 97 (While "creditors objections

are not controlling, emphasis is placed on the paramount interests of creditors and proper deference

given to reasonable views set forth in their objections").

(Remainder of page intentionally left blank)

WHEREFORE, for the foregoing reasons, the PI Committee respectfully requests that the

Court deny Debtors' Motion for an Order Approving the Settlement Agreement and Mutual Release

with Lloyd's Underwriters.

Date: June 2, 2006                          CAMPBELL & LEVINE, LLC

                                            /s/ Mark T. Hurford
                                            Marla R. Eskin (No. 2989)
                                            Mark T. Hurford (No. 3299)
                                            800 King Street, Suite 300
                                            Wilmington, DE  19801
                                            (302) 426-1900

                                               -and-

                                            CAPLIN & DRYSDALE, CHARTERED
                                            Elihu Inselbuch
                                            375 Park Avenue, 35th Floor
                                            New York, NY  10152-3500
                                            (212) 319-7125

                                               -and-

                                            CAPLIN & DRYSDALE, CHARTERED
                                            Peter Van N. Lockwood
                                            Nathan D. Finch
                                            One Thomas Circle, N.W.
                                            Washington, D.C.  20005
                                            (202) 862-5000

                                               -and-

                                            ANDERSON KILL & OLICK, P.C
                                            Robert M. Horkovich
                                            Robert Y. Chung
                                            1251 Avenue of the Americas
                                            New York, NY 10020-1182
                                            (212) 278-1039

                                            Counsel to the Official Committee of
                                               Asbestos Personal Injury Claimants

{D0060898:1 }                          13