IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | **Chapter 11** |
| | ) | |
| **W. R. GRACE & CO., et al.** | ) | **Case No. 01-01139 (JKF)** |
| | ) | |
| Debtors. | ) | **(Jointly Administered)** |

**Re: Dkt. Nos. 9315 and 11408**
**Hearing date: July 24, 2006, 12:00 p.m.**
**Objection Deadline: July 7, 2006**

## MOTION FOR A SCHEDULING ORDER REGARDING CERTAIN OF THE DEBTORS' FIFTEENTH OMNIBUS OBJECTIONS TO PD CLAIMS (SUBSTANTIVE)

By this motion, the Debtors seek (1) permission from this Court to proceed immediately

to adjudicate the Debtors' substantive objections to all remaining Canadian PD claims in Canada

as part of the pending proceeding *In the Matter of S. 18.6 of the Companies' Creditors*

*Arrangement Act, R.S.C. 1985, c. C-36, As Amended and In the Matter of Grace Canada, Inc.*,

Court File 01-CL-4081, Ontario Superior Court of Justice, Commercial List (the "CCAA

proceeding") and (2) to set for hearing as part of the PD Estimation Phase 2 trial the Debtors'

substantive objections to U.S. traditional property damage claims on the grounds of (a) lack of

sufficient product identification, (b) claims brought too late, and (c) claims providing no proof of

hazard. All of these PD objections were previously raised in the Debtors' 15th Omnibus

Objection. *See* Docket 9315 at Sections II.C (objections to PD claims providing insufficient

information), II.D (PD claims brought too late), II.E (PD claims providing no proof of hazard)

and II.F.5 (Canadian claims). A list of the remaining U.S. PD claims affected and the remaining

objections raised to those claims in the 15th Omnibus Objection is attached hereto as Exhibit 1.

A list of the remaining Canadian PD claims affected is attached hereto as Exhibit 2.

The instant motion, seeking to schedule the time and place for hearings on certain of Grace's previously registered PD objections, is simply the latest step in the ongoing staged objection and estimation process previously established in this Court's PD Case Management Orders. *See, e.g.,* Docket 9300 (PD Objections CMO); Docket 9302 (PD Estimation CMO); Docket 12053 (Amended PD Estimation CMO); Docket 12150 (Order Modifying PD Estimation deadlines); *see also* Docket 11408 (Modified Scheduling Order regarding certain of Debtors' 15th omnibus objections). Specifically, Grace's PD claims objections and estimation processes have always been designed to work together hand in glove. As the Debtors told this Court in the 15th Omnibus Objection, as well as in their brief in support of the entry of PD Case Management Orders, to the extent that claims are disallowed through objections, those claims need not be estimated. And, to the extent that estimation determines common issues affecting large numbers of claims, those claims may in turn be disallowed. *E.g.,* 15th Omnibus Objection, Docket 9315 at ¶ 28; Debtors' Brief in Support of PD CMOs, Docket 8993 at p. 3.

The first dimension of the joint objections/estimation relationship, the early use of simple, non-evidentiary based claims objections to reduce the number of claims remaining to be estimated, has already borne substantial fruit. By filing all objections to PD claims in September 2005 and setting certain of those objections for hearings beginning fall 2005, PD claims volume has been reduced from 4003 claims to 901.[1]  While substantial, this reduction was obtained primarily by weeding out claims that were completely lacking in procedural and/or substantive merit and should never have been filed in the first place. It is only now that the Debtors and this

---

[1] Based on pending PD claims objections, the Debtors anticipate that this 901 number will fall still further in advance of the Phase 2 estimation proceeding. For example, rulings on objections to hundreds of PD claims heard in January 2006 remain pending.

2

Court are beginning the second dimension, estimating and addressing the merits of claims involving more complex legal and/or evidentiary issues. The Debtors' current motion seeks to streamline this adjudication by implementing a process through which findings made during estimation will be used both for purposes of plan feasibility and claims allowance.

The following graphic helps to explain the basis for the Debtors' motion. Notably, as the PD claims volume has decreased, it is easier to discern patterns in the remaining claims:[2]



**Total Remaining Asbestos PD Claims: 901**



---

[2] Moreover, it has become clear not only that PD claims have been reduced substantially, but also that the number of parties and their counsel has become more manageable as well. *See, e.g.,* Exhibits 1 and 2. For example, as discussed further below, every single one of the remaining 291 Canadian claims was signed and filed by Speights & Runyan ("Speights"). The 109 Category 2 claims were submitted by only 3 counsel. And together, Dies & Hile ("Dies") and Speights are responsible for 436, or fully 87% of the remaining traditional 501 US claims: Speights submitted 92 claims on behalf of two California universities, plus 85 other claims (more than 75% of which remain subject to challenge on late authority grounds); Dies submitted 160 claims, mainly for buildings owned by states or municipalities in Arkansas, Arizona, Oregon, Oklahoma, Louisiana and Texas, and Dies is also apparently associated with the 99 claims submitted by 4 Louisiana firms on behalf of school districts in Louisiana. The remaining 65 US claims include 18 filed by Motley Rice, 16 filed by the State of California, 8 filed by Prudential Insurance, plus a handful of individual claims.

As this graphic illustrates, the 901 current PD claims break out as follows: 501 traditional U.S. claims, 291 Canadian claims (all filed by Speights & Runyan) and 109 "Category 2" claims for property damage allegedly resulting from Grace's mining, milling or processing operations.

In order to estimate the value of the 901 (or fewer) PD claims remaining as of the Phase 2 estimation hearing, this Court will need to consider liability and damages concepts as they apply to three distinct types of claims: (1) traditional U.S. claims, (2) Canadian PD claims, and (3) Category 2 claims.

*First*, to estimate the value, if any, of the remaining traditional U.S. claims, this Court will necessarily be asked to address core liability issues including statutes of limitations, product identification and proof of hazard, specifically as those concepts apply to the universe of 501 or fewer distinct U.S. buildings that remain. These exact objections, however, have already been lodged as to these very buildings through the 15th Omnibus Objection. Because the identical issues raised in the Debtors' 15th Omnibus Objection will already be addressed in the Phase 2 trial, this scheduling motion seeks to clarify that the C- (product ID), D- (late claims) and E- (lack of hazard) objections will simply be heard once and for all as to these claims, as part of the estimation hearing. *See, e.g.,* Docket 8993, Brief in Support of PD CMOs at p. 7 ("In contrast, other objections registered by September 1, 2005 yet requiring the development of a more significant evidentiary record for the Court's review, such as statutes of limitations, *may be easier addressed through estimation....*") (emphasis added); Docket 9315, 15th Omnibus Objection at ¶ 31 ("Other contested objections, such as constructive notice or lack of proof of hazard, will be best dealt with *through the estimation process*") (emphasis added). Indeed, this Court has already anticipated such a structure. *E.g.,* Docket 9302, PD Estimation CMO at ¶ 2 ("Any party who filed a PD Claim ('PD Claimant') may elect to participate in the PD

4

Estimation. Regardless, the Court's determination of all procedural and substantive matters relating to the estimation of PD claims shall be binding on all PD Claimants.").

*Second*, for the Speights Canadian claims, identified in the 15th Omnibus Objection at objection F-5, the Debtors submit that these PD claims can be addressed most efficiently as part of the existing CCAA proceeding in Canada. As the Debtors explained in the 15th Omnibus Objection, these claims are governed by Canadian substantive law, which differs in several material respects from corresponding U.S. law. Thus, the Debtors' pending Plan of Reorganization calls for Canadian claims to be adjudicated in Canada, under a Canadian litigation protocol. Docket 7560, Amended Joint Plan of Reorganization at p. 14; *see also* Docket 9315, 15th Omnibus Objection at ¶ 165 ("Consistent with the terms of the Debtors' Plan, the merits of these [Canadian] claims will ultimately be adjudicated in Canada but this Court will still need to address these claims as part of Estimation Phase II."); Transcript 1/25/06 at p. 9 (merits of Canadian claims to be adjudicated in Canada). As explained further below, with PD claims now down to a manageable number, the Debtors suggest the time is ripe to send Speights' Canadian claims to be adjudicated by the CCAA court, so that this bankruptcy court will have rulings it can take into account in time for the Phase 2 estimation proceeding.

*Third*, in the interest of completeness, the Debtors note that objections to the third type of PD claim, Category 2 claims for milling, mining and processing operations, were also addressed in the 15th Omnibus Objection, at objections G-1 through G-5. The claims objection process thus far has cut these claims more than in half, from 250 to 109, and the Debtors are awaiting this Court's decision on the pending objection to 54 of the remaining 109 claims on the ground that Minnesota does not recognize a tort claim for stigma to property, argued in January 2006. While retaining all objections to all remaining Category 2 claims, the Debtors anticipate that any

5

'value' to the remaining Category 2 claims would be de minimis.  Rather than waste time or

resources separately addressing liability for Category 2 claims at the Phase 2 estimation hearing,

the Debtors currently anticipate that they will at most address the minimal nature of the damages

sought during estimation.  Thus, by this motion, the Debtors are not at this time seeking to

schedule the adjudication of individual Category 2 claim objections as part of Phase 2

estimation.

In further support of this scheduling motion, the Debtors state as follows.

I.      **Traditional US Claims May Be Estimated For Purposes Of Allowance And Disallowance**

By virtue of the notice and bar date process, all PD claims are currently before this Court.

Through the 15th Omnibus Objection, all substantive objections to these claims have already

been raised and claimants have been on notice of these objections for months.  As anticipated by

this Court's CMOs, the simplest, non-evidentiary based claims objections have already been

heard or will be set for hearing over the next few months.  *E.g.*, Docket 11408, Scheduling Order

setting hundreds of PD claims objections for hearings in January 2006 (including, e.g., A-

objections to improperly submitted PD claim forms, B- objections to previously settled or

adjudicated claims, C-3 (a-c) objections to claims containing no product identification

documents of any kind, G-1 objections to Minneapolis claims of 'stigma' and H objections to

claims for contribution and/or indemnification); Docket 12150, Order modifying various

deadlines regarding claims objections and setting further hearings for April, May and June 2006.

As a result of the claims objection process to date, PD claims have already been reduced from

4003 to roughly 900, including 501 U.S. traditional PD claims.

The substantive PD objections to U.S. traditional claims remaining to be heard include

issues relating to product identification, statutes of limitations and proof of hazard.  *See, e.g.*,

6

Exhibit 1 and Docket 9315 (C-, D- and E- objections). As noted in the Debtors' brief in support

of a PD CMO, these types of objections implicate more complex evidentiary issues than the

simple objections teed up to date. These are also the exact same substantive issues this Court

will be asked to address as part of the PD Phase 2 estimation process. Accordingly, the Debtors

request that the Court use the Phase 2 estimation proceeding not only to estimate the value of

remaining PD claims for plan feasibility purposes, but also to estimate for purposes of allowing

or disallowing the U.S. traditional PD claims to which the Debtors objected in the 15th Omnibus

Objection.

This solution is authorized by 11 U.S.C. § 502(c), which calls for the estimation of claims

where, as is the situation in this Chapter 11, litigation of individual claims would otherwise delay

the closing of the case. 11 U.S.C. § 502(c) (West Supp. 1989) ("There *shall be estimated for*

*purposes of allowance under this section- (1) any contingent or unliquidated claim, the fixing or*

*liquidation of which, as the case may be, would unduly delay closing of the case. . .*") (emphasis

added). As envisioned by 502(c) and applicable federal rules of civil procedure and evidence,

using estimation for plan feasibility and estimation represents the most efficient mechanism that

this Court could implement to streamline resolution of this Chapter 11.

In cases such as this Chapter 11, where liability is being disputed, procedure is governed

by the applicable federal rules of civil procedure and evidence. *See, e.g., Oaks v. Bank One*

*Corp.*, 126 Fed. Appx. 689, 691 (6th Cir. 2005) (applying the Federal Rules of Civil Procedure

and Evidence to claims objection). Those rules permit the determination of central issues for the

purpose of resolving large numbers of claims based on dispositive legal determinations, and

those rules preclude duplicative litigation of issues. In particular, Federal Rule of Civil

Procedure 42(a) (Consolidation; Separate Trials) provides that, "[w]hen actions involving a

7

common question of law or fact are pending before the court, it may order a joint hearing or trial

of any or all the matters in issue in the actions; it may order all the actions consolidated; and it

may make such orders concerning proceedings therein as may tend to avoid unnecessary costs or

delay." F.R.C.P. 56 (Summary Judgment), in turn, allows for the disallowance of claims where

dispositive legal determinations would preclude the claimants from recovering. Further, under

collateral estoppel, once a court has decided an issue of fact or law necessary to its judgment,

that decision necessarily precludes relitigation of the issue in that or any other cause of action

involving a party to the first case. *See Allen v. McCurry*, 449 U.S. 90, 103 (1980). Accordingly,

under applicable federal rules of civil procedure and evidence, this Court not only has the *power*

to consolidate issues for the purpose of estimating Asbestos PD Claims (F.R.C.P. 42), but the

Court's findings during estimation *will necessarily be applicable* to Individual Asbestos PD

Claims for purposes of allowance and disallowance. *See also* Docket 9302 at ¶ 2.

Section 502(c) does not provide specific guidelines for estimation. *Bittner v. Borne

Chemical Co., Inc.*, 691 F.2d 134, 135 (3d Cir. 1982) ("The Code, the Rules of Bankruptcy

Procedure, 11 U.S.C. app (1977), and the Suggested Interim Bankruptcy Rules, 11 U.S.C.A.

(1982), are silent as to the manner in which contingent or unliquidated claims are to be

estimated."). However, historically courts have appropriately applied the aforementioned

principles from the federal rules of civil procedure and evidence as part of 502(c) estimation.

*E.g., In re Armstrong World Indus.*, Case No. 00-04471, slip. op. at 48, Docket No. 6255 (Bankr.

D. Del. December 19, 2003) (asbestos claims litigated on a consolidated basis, and the court

noted that "[estimating] claims is more an imprecise art than a science, and the best way anyone

can do is try to find an estimate that is not unreasonable."); *Bittner*, 691 F.2d at 135 ("Despite the

lack of express direction on the matter, we are persuaded that Congress intended the procedure to

8

be undertaken initially by bankruptcy judges, *using whatever method is best suited to the particular contingencies at issue. The principal consideration must be an accommodation to the underlying purposes of the code.*") (emphasis added); *see also Kool, Mann, Coffee & Co. v. Coffey*, 300 F.3d 340, 356-57 (3d Cir. 2002).

One principle that informs all decisions made pursuant to the Code is the need to ensure that the estimation of claims is done in a manner that is efficient and equitable. *In re G-I Holdings, Inc.*, 295 B.R. 211, 216 (D.N.J. 2003) ("The importance of case management in large bankruptcy reorganizations cannot be overstated. Efficient case management is ever more imperative in mass tort bankruptcies..."); *see also Bittner*, 691 F.2d at 136-137. Operating within these parameters, and in accordance with applicable state laws and federal rules governing the underlying merits of the claim, bankruptcy judges have the authority to summarily dispose of claims, adjudicate claims, and estimate the value of claims, as appropriate. In setting forth the authority of bankruptcy judges to manage claims, 28 U.S.C. § 157(b) states that:

> (b)(1) Bankruptcy judges *may hear and determine* all cases under title 11 and all core proceedings arising under title 11...
>
> * * *
>
> (2) Core proceedings include, but are not limited to --
>
> * * *
>
> (B) *allowance or disallowance of claims* against the estate or exemptions from property of the estate, and *estimation* of claims or interests for the purpose of confirming a plan under chapter 11...

28 U.S.C. § 157(b) (emphasis added).

The Third Circuit agreed that the bankruptcy judge in *Bittner* had the authority to estimate the value of a claim by first determining the merits of the claim under state laws. "If the bankruptcy court estimated the value of the Rolfite stockholders' claims according to the

ultimate merits of their state court action, such a valuation method is not inconsistent with the principles which imbue Chapter 11." *Bittner*, 691 F.2d at 137.

Cases such as this demonstrate this Court's authority to structure proceedings to determine the merits and value of claims using methods that are in accord with the federal rules and state substantive law, while achieving the ends of efficiency and equity. "Although much of the bankruptcy process is administrative, bankruptcy courts also supervise litigation conducted under streamlined, technical procedures. ... Bankruptcy courts exercise surprisingly far-reaching substantive influence. They frequently adjudicate and issue written opinions on matters of state law, including the UCC, tax, and even family law issues." *In re G-I Holdings*, 295 B.R. at 216.

A necessary adjunct to a bankruptcy judge's ability to efficiently handle claims is the court's power to group cases together and decide both legal and factual issues on a consolidated basis. Bankruptcy Rule 7042 incorporates Rule 42 of the Federal Rules of Civil Procedure which provides in relevant part as follows: "[w]hen actions involving a common question of law or fact are pending before the court, it may order a joint hearing or trial of any or all the matters in issue in the actions; it may order all the actions consolidated; and it may make such orders concerning proceedings therein as may tend to avoid unnecessary costs or delay." Fed. R. Civ. P. 42(a) (West 2004); *In re G-I Holdings*, 323 B.R. 583, 626 (Bankr. D.N.J. 2005) (allowing Debtor to "move for summary judgment on certain issues on a claims-wide basis pursuant to Federal Rule of Bankruptcy Procedure 7042").

Other courts have also employed Rule 42 consolidation in mass tort bankruptcies. For example, after an in-depth review of the considerations under Rule 42, Judge Spector determined in *In re Dow Corning Corporation* that consolidation of claimants for purposes of trials on universal issues would be appropriate to serve the ends of justice and judicial economy. Judge

10

Spector explained that application of the rule was consistent with the rule's purpose of permitting the Court to conduct its business "with expedition and economy." 211 B.R. 545, 582 (Bankr. E.D. Mich. 1997) (*quoting Advey v. Celotex Corp.*, 962 F.2d 1177, 1180 (6th Cir. 1992)). The court further held that, "the question of '[w]hether cases ... should be consolidated for trial is a matter within the discretion of the trial judge.'" *Id.* (*quoting Stemler v. Burke*, 344 F.2d 393, 396 (6th Cir. 1965)).

In sum, the Court has the power to adjudicate and estimate claims for allowance or disallowance purposes, both individually and on a consolidated basis. Claims may be disallowed entirely or be assigned an estimated value of zero using summary judgment or an evidentiary hearing on the merits. One bankruptcy court has summarized the Court's alternatives as follows: "[o]ptions for the court in estimating claims include accepting the claimant's claim at face value, estimating the claim at zero and waiving discharge of the claim . . ., arriving at its independent estimation of the claim, or utilizing a jury trial to obtain an accurate estimation." *In the Matter of Federal Press Co.*, 116 B.R. 650, 653 (Bankr. N.D. Ind. 1989) (footnote omitted).

By providing for the use of findings made during Phase 2 for purposes of both plan feasibility and claims allowance, the Debtors' proposal would streamline resolution of this Chapter 11, as envisioned by Section 502(c). Of necessity, the Phase 2 proceeding will include an evidentiary hearing addressing the merits of the Debtors' 15th Omnibus Objections to claims on the grounds of product identification, lack of hazard and statute of limitations. Through the requested scheduling order, this Court can now clarify that the estimation proceeding will be used not only to estimate the value of PD claims collectively for the purpose of determining the feasibility of the Debtors' Plan of Reorganization, but will also be used to estimate the remaining traditional US PD claims individually for purposes of allowance and disallowance.

11

As an example of how this procedure will work, suppose the remaining 501 traditional U.S. PD claims were numbered sequentially 1-501 and that the 15th Omnibus Objection had registered objections as follows:



**Example: Estimation/Allowance**

**501**
*U.S. Claims*

Claims 1 - 150: Objection C - RE: Lack of Product ID

Claims 100 - 250: Objection D - RE: Statute of Limitations

Claims 200 - 450: Objection E - RE: Lack of Proof of Hazard

**6/19/2006**
*Active Claims*

As part of the PD estimation, the Debtors will be offering documentary and testimonial evidence in support of the position that claims 1-450 should be estimated at zero because the Debtors have no *liability* for those claims. This exact evidence also provides the basis for this Court to estimate the underlying claims under section § 502(c): "There *shall be estimated* for purposes of allowance under this section - (1) any contingent or unliquidated claim, *the fixing or liquidation of which, as the case may be, would unduly delay the administration of the case*." *Id.* (emphasis added). The Debtors should not have to present that evidence twice, nor should this Court be forced to hear it twice. PD claimants are and have been on notice for months of the substantive objections the Debtors have to their claims, and the exact objections that will be put at issue and the PD claims to which they apply.

12

## II.    The Merits Of Speights' Canadian Claims Can And Should Be Adjudicated In Canada In Advance Of The Phase 2 Estimation Hearing

The 291 Canadian claims filed by Speights (many of which lack any product identification whatsoever) are simply unsupportable. *Cf.* Docket 9311, Thirteenth Omnibus Objection. As set out in the 15th Omnibus Objection at objection F-5, prior to Speights' filing hundreds of claims in Grace's bankruptcy case, there was no ongoing asbestos PD litigation in Canada. *E.g.*, Docket 9315 at ¶ 180. Speights acknowledged as much in the solicitation letter sent by his Canadian colleagues to building owners, yet promised potential claimants that despite the fact that no Canadian property owners had ever successfully sued U.S. manufacturers, the Speights firm would be able to use the U.S. bankruptcy process to *lower the standard of proof applicable to Canadians and force Grace to settle Canadian claims*. *See* Exhibit 3. That solicitation letter instructs potential claimants to contact Donald Pinchin, Speights' Canadian expert, who, for at least some of Speights' Canadian PD claimants, is being compensated on a contingency fee basis in exchange for his "independent" opinions. *See* Appointment of Legal Counsel and Expert Consultant for the City of Edmonton re Asbestos Claims ("In addition, Pinchin will receive 11.5% of the amount of monies recovered by the City [of Edmonton] in the U.S. Bankruptcy proceedings.") (attached as Exhibit 4). Fortunately, the Canadian courts are well suited to see through Speights' maneuvers. As described below, the pending CCAA proceeding in Canada is the appropriate place to adjudicate Speights' Canadian PD claims promptly, and with this Court's permission, Grace seeks to do so between now and the Phase 2 estimation hearing.

### A.    Speights' Canadian Claims Are An Improper Attempt To Use The U.S. Courts To Manufacture Canadian Litigation

As set out in the Debtors' 15th Omnibus Objection, there was no active Canadian asbestos PD litigation until Speights attempted to create it out of whole cloth by filing hundreds of claims

13

in this bankruptcy. Indeed, it is interesting to note that despite millions of dollars being spent on a notice program for PD claims in the U.S. and Canada, *not a single Grace Canadian traditional PD claim* exists other than the 291 filed by Speights.

The *Privest* decision helps to explain the absence of Canadian traditional asbestos PD litigation. *Privest Properties Ltd. v. Foundation Co. of Canada* (1995), 11 B.C.L.R. (3d) 1 (S.C.), *aff'd* (1997), 31 B.C.L.R. (3d) 114 (C.A.), *leave to appeal to the Supreme Court of Canada refused*, [1997] S.C.C.A. No. 216. In the mid-1990s, under Canada's "loser pays" system, Grace litigated the merits of a Monokote-3 fireproofing claim in British Columbia. The Canadian trial court heard 182 days of evidence in a bench trial and issued a 309 page decision on point. Justice Drost acknowledged that certain courts in the U.S. had found MK-3 to be dangerous, but "after consideration of the testimonial and documentary evidence presented in this case, [the court] do[es] not agree with those American courts that have found Monokote MK-3 to be a dangerous product and thus awarded judgment against Grace-Conn." *Privest*, 11 B.C.L.R. at ¶716. Specifically, the court stated as follows:

> I have no hesitation in concluding that the asbestos fibres contained in the MK-3 did not "contaminate" the Building, nor did they expose its occupants and workers to an increased risk of contracting any of the asbestos-related diseases. Nor did any asbestos fibres that were released into the atmosphere of the Building by that product cause any damage to property.

> From these conclusions, it follows that there has been no negligence, no breach of duty of care to warn, and no misrepresentation. (*Id.* at ¶ 712-13)

The *Privest* court went further, awarding Grace costs against the plaintiff at the highest tariff level. In doing so, the trial judge expressly acknowledged *Privest's* precedential power:

> Appendix B of the [British Columbian] Rules states that, in order to attract scale 5 costs, the matter must be of "unusual difficulty or importance." The import of the action must apply to the public at large, or at least to other litigation of a similar nature. *As noted, this was the first asbestos case in Canada and many other interested parties were following its progress. Had the plaintiffs' action been successful, it is likely that many others would have pressed similar claims,*

14

> *mirroring the plethora of litigation in the United States concerning the use of*
> *asbestos and asbestos-containing products*. . . It is true that the Grace Defendants
> defended this case with a view to avoiding a precedent-setting decision which,
> had they lost, would have probably cost them many more millions of dollars in
> similar law suits.

*Privest Properties Ltd. v. Foundation Co. of Canada Ltd. et al* (1998), 37 C.P.C. (4th) 126

(B.C.S.C.), at paras. 46 and 48 (emphasis added).

Acknowledging the lack of successful traditional asbestos PD litigation in Canada,

Speights' Canadian colleagues nonetheless actively solicited Canadian claimants for the Grace

Chapter 11 in advance of the March 2003 Bar Date by promising them that a lower standard of

proof could be applied in the U.S. bankruptcy, forcing Grace to settle these claims. *See* Exhibit

3. Noted in the solicitation letter: "*[o]f particular importance at this time is Mr. Speights' role*

*in the current bankruptcies*. He is co-chair of the PD Committee in the Grace bankruptcy, he is

one of two PD representatives in the joint asbestos committee in U.S. Mineral Bankruptcy and he

is one of only two lawyers active in Federal Mogul. As a result of this daily involvement in the

bankruptcies our clients will have a representative who is present at the negotiating table at all

times. *This, in our opinion, is the best and possibly the only way, for a Canadian property owner*

*to be successful*." *Id.* at p. 3 (emphasis added).

Speights' letter recognized that "no Canadian Property owners have ever successfully

sued U.S. manufacturers," and went on to discuss "Why have Canadian Building Owners not

been in a position to recover such costs in the past." *Id.* at p. 1. The letter acknowledged many

reasons for this failure:

> Firstly there are significant differences in the liability laws between Canada and
> the U.S. Such theories as "strict liability" for a defective product and suits for
> pure economic loss are viable in the U.S. Courts but much less likely to succeed
> in Canada. The U.S. cases have historically taken many, many years to settle or
> come to court and the cost have been so great that that the only effective way for
> building owners to succeed was by engaging specialty lawyers on contingency --
> a much less common practice in Canada. The only case tried in Canada

15

(commonly referred to as the Privest case) also brought into question the Statute of Limitations for such suits in Canada.

For all these reasons, particularly the doubtful outcome and costs involved, the extensive time such litigation takes and Canadians' historic reluctance to use the courts, Canadian Property Damage cases have never been widely considered.

*Id.* at p. 1.

Nonetheless, the letter explained, "it is likely that *the standard of proof and even the applicable jurisdiction may have changed as a result of these companies now being in bankruptcy negotiation,*" going on to note that "these companies (at least Federal Mogul and W.R. Grace) are not bankrupt and in fact are quite solvent and will continue operating. The bankruptcy is, however, their method of avoiding the increasing number of frivolous claims from unimpaired plaintiffs (plaintiffs with no bodily injury) who are suing based on any exposure to their product whatsoever." *Id.* at pps. 1-2 (emphasis added).

While Grace certainly agrees with Speights' colleagues that the company remains solvent, the letter's premise regarding burden of proof is blatantly false. It is well established that Canadian law applies to the Canadian PD claims. *See Butner v. United States*, 440 U.S. 48, 55 (1979) (in addressing claims, United States bankruptcy courts apply the substantive law of the jurisdiction governing the subject property right); *In re Federal-Mogul Global, Inc.*, 330 B.R. 133 (D. Del. 2005) (applying U.K. law for purposes of estimating the UK asbestos liabilities of the Chapter 11 debtor's UK subsidiary). As the Debtors argued in the 15th Omnibus Objection and Speights' colleagues state in the Canadian letter, Canadian law differs from U.S. law with respect to several aspects. Despite Speights suggestion to the contrary, these standards are not changed or lowered simply because Daniel Speights sits on the Grace PD committee. It is now time to apply *Canadian* law to the *Canadian* PD claims and, as set out in the next sections, the court currently presiding over Grace's CCAA proceeding in Canada is best suited for doing so.

16

B.    **U.S. Law Permits This Court To Send Canadian Claims To Be Adjudicated In Canada**

Speights' Canadian PD Claims were filed in this Chapter 11 and, as a result, the resolution of these claims constitutes a "core proceeding" for which this Court has jurisdiction arising "under" Title 11. *U.S. v. Gurley*, 434 F.3d 1064, 1067 (8th Cir. 2006) ("Adjudication of the filing of and objection to a proof of claim in a bankruptcy case is a core proceeding arising under Title 11."); *In re Wood*, 825 F.2d 90, 97 ("If the proceeding is one that would arise only in bankruptcy, it is also a core proceeding; for example, the filing of a proof of claim or an objection to the discharge of a particular debt."). Nonetheless, this Court is not obligated to exercise this jurisdiction with respect to the Canadian claims. Instead, the Bankruptcy Code specifically provides that this Court may abstain from addressing the merits of these claims and, instead, adopt a Canadian court's findings with respect to these claims. Specifically, 28 U.S.C. § 1334(c)(1) provides that "[e]xcept with respect to a case under chapter 15 of title 11, nothing in this section prevents a district court in the interest of justice, or in the interest of comity with State courts or respect for State law, from abstaining from hearing a particular proceeding arising under title 11 or arising in or related to a case under title 11."

While 1334(c)(1) does not expressly refer to foreign proceedings, "it does not follow that Congress would expressly allow the federal district courts to defer by abstention to state courts, 'in the interest of justice [or comity],' but would at the same time implicitly divest them of their inherent power to abstain when the interest of justice [or comity] would be served ... in a foreign tribunal where the action arose." *Baumgart v. Fairchild Aircraft Corp.*, 981 F.2d 824, 833 (5th Cir. 1993) (in the context of parallel proceedings); *see also Turner Entertainment Co. v. Degeto Film GmbH*, 25 F.3d 1512, 1518 (11th Cir. 1994) (In certain ... "international disputes the prudent and just action for a federal court is to abstain from the exercise of jurisdiction."); *United*

17

*Feature Syndicate, Inc. v. Miller Features Syndicate, Inc.*, 216 F.Supp.2d 198, 210 (S.D.N.Y.

2002) (11 U.S.C. § 1334 gives federal courts the "inherent, discretionary power to abstain from

exercising that jurisdiction in order to extend comity to related proceedings pending in other

countries.").

General principles of comity also provide this Court with the ability to allow the

Canadian court to address the substantive merits of the Canadian Asbestos PD Claims. *In re*

*Maxwell Comm. Corp.*, 93 F.3d 1036 (2d. Cir. 1996); *In re Regus Business Centre Corp.,* 301

B.R. 122, (Bankr. S.D.N.Y. 2003). International comity has been defined as voluntary

"recognition" of foreign "legislative, executive or judicial acts." *Hilton v. Guyot*, 159 U.S. 113,

164 (1895). Under the comity doctrine, nations recognize foreign laws in their jurisdiction out of

"grace," not as an "obligation." *United States v. Nippon Paper Indus. Co., Ltd.*, 109 F.3d 1, 8

(1st Cir. 1997) ("Comity is more an aspiration than a fixed rule, more a matter of grace than a

matter of obligation"); *see also Franklin supra,* 23. The decision "[w]hether to abstain from a

case on the basis of international comity is a matter within the discretion of the [federal] district

court..." *United Feature Syndicate,* 216 F.Supp. at 212.

Bankruptcy courts often defer to international proceedings in the interest of comity. For

example, in *In re Maxwell Comm. Corp.,* three European banks engaged in transactions with a

chapter 11 debtor during the debtor's preference period. English claimants brought preference

actions against the chapter 11 debtor in the debtor's U.S. bankruptcy case. The European banks

(with whom the debtors were alleged to have made preferential transfers) moved for dismissal

under the doctrine of international comity and the presumption against extraterritoriality. The

U.S. Bankruptcy Court ruled in favor of the banks, stating that "the presumption against

extraterritoriality precludes" the actions and "considerations of comity dictate" the dismissal

18

because "England has the greater interest in applying its law." *Maxwell Comm. Corp. plc v.*

*National Westminster Bank plc*, 170 B.R. 800, 818 (Bankr. S.D.N.Y. 1994). The District Court

affirmed; the Second Circuit also affirmed, holding that where there is a case "involving

cooperative parallel bankruptcy proceedings seeking to harmonize two nations' insolvency laws

for the common benefit of creditors, the doctrine of international comity precludes application of

the American avoidance law to transfers in which England's interest has primacy." *Maxwell,* 93

F.3d at 1054-1055.

Similarly, in *In re Regus Business Centre Corp.,* 301 B.R. 122, (Bankr. S.D.N.Y. 2003),

the unsecured-creditors committee in the jointly administered Chapter 11 cases of an English

corporation and its U.S. subsidiaries objected to legal fees that were set off by bank against

accounts maintained by debtor. The bankruptcy court held that discretionary abstention was

warranted. The bankruptcy court explained its reasoning as follows:

> In this case, however, no compelling reason appears for this Court to retain
> jurisdiction over a dispute between English parties with respect to property
> situated in England which must be resolved under English law and can be
> resolved promptly and fully by an English court which specializes in the
> resolution of such disputes. Therefore, the Court will exercise its inherent and
> discretionary power to abstain from resolving the issue at hand out of concerns of
> international comity, respect for the capacities of foreign and transnational
> tribunals, and sensitivity to the need of international commercial system for
> predictability in the resolution of disputes.

*Id.* at 129 (internal citations and quotations omitted).

Nothing in the Bankruptcy Code precludes this Court from exercising its discretion to

abstain from addressing the Canadian claims. For example, courts have held that the Bankruptcy

Code's jurisdictional provisions do no not deprive a bankruptcy court from its inherent powers to

abstain from addressing claims that would be more-appropriately handled by a foreign tribunal.

19

See, e.g., *Baumgart v. Fairchild Aircraft Corp.*, 981 F.2d 824 (5th Cir. 1993); *Robert v. Bell*

*Helicopter Textron, Inc.*, 2002 WL 1268030 (N.D. Tex. 2002).

In *Baumgart, 981 F.2d 824* (5th Cir. 1993), nineteen German citizens filed suit in Texas

state courts following the crash of an aircraft in Germany. *Id.* at 827. Thereafter, the defendant-

manufacturer filed a Chapter 11 bankruptcy and removed these cases to the district court where

its bankruptcy was pending. *Id.* at 827-28. Following removal, the district court dismissed the

cases based on the doctrine of *forum non conveniens* and ordered the plaintiffs to file suit in

Germany. The Fifth Circuit affirmed this decision, concluding that consolidation of actions in

the district where the bankruptcy is pending is *"permissible,* but *not mandatory."* In reaching its

decision, the court stated as follows:

> Congress's express conference of power on the district court in which the
> bankruptcy is pending to fix venue in the jurisdiction in which a plaintiff's cause
> of action arises, plainly indicates Congress's recognition (1) that that jurisdiction,
> as the site of the wrongful death, may have an actual interest in litigating the
> matter, and (2) that most eyewitnesses to the incident and at least some evidence
> may be located there. In light of such a provision, [the court] cannot fairly impute
> to Congress an intention implicitly to remove from the courts their inherent power
> also to effect the transfer of an appropriate wrongful death claim to a foreign
> forum where the cause of action arose. (*Id.* at 831-32.)

Indeed, for the reasons stated, the Court also has the authority to abstain from addressing

the Canadian Claims under 11 U.S.C. § 305(a)(1), which provides that, "The [C]ourt, after

notice and a hearing, may dismiss a case under this title, or may suspend all proceedings in a

case under this title, at any time if the interests of creditors and the debtor would be better served

by such dismissal or suspension." In this instance, the interests of both the Debtors and their

creditors would both be served by having the Canadian claims adjudicated by a Canadian court

that is already familiar with the Canadian PD claims and the Canadian law that governs them.

### C. The CCAA Proceeding is Ideally Suited For Hearing The Merits Of Speights' Canadian Claims

20

Grace is already actively participating in a parallel proceeding in Canada directly related to this Chapter 11. On April 4, 2001, two days after the Chapter 11 filing, Justice Farley of the CCAA court issued an Order recognizing the Chapter 11 proceedings in Canada, noting that the proposed cross-border filing was "just and convenient to manage the asbestos litigation potential." Since April 2001, the CCAA court has continued as an ancillary jurisdiction to follow and support the progress of this Chapter 11 by recognizing in Canada the steps taken in this Chapter 11. Grace's Plan of Reorganization has already anticipated that Canadian PD claims would be litigated in Canada under a Canadian litigation protocol. *See* Docket 7560 at p.14. A proposed Canadian litigation protocol for Speights' PD claims is attached as Exhibit 5.

Not only is the Canadian CCAA court already familiar with the issues pending in Grace's U.S. bankruptcy, but it has become directly involved in Grace's Asbestos PD Claims process with the approval of the Court's PD claim notice program for use in Canada. For example, on December 5, 2002, the CCAA court recognized this Court's April 22, 2002 Order establishing the claims bar date for Asbestos Property Damage Claims, the procedure for notifying claims set by this Court and the form of proof of claim. *See Order Recognizing Grace's U.S. Claims Bar Date and Notice Program, In the Matter of S. 18.6 of the Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36, As Amended and In the Matter of Grace Canada, Inc.*, Court File 01-CL-4081, Ontario Superior Court of Justice, Commercial List (December 5, 2002).

The cross-border coordination of Chapter 11 cases with the CCAA court is not novel and has precedent in, among other Chapter 11 cases, *Laidlaw Inc. (Re)*, (2003) 39 C.B.R. (4th) 239; *Matlack Inc. (Re)*, (2001) C.B.R. (4th) 45; *Noma Co. (Re)*, (2004) 135 A.C.W.S. (3d) 373; *Androscoggin Energy LLC (Re)*; [2004] O.J. No. 5273; *Loewen Group Inc. (Re)*, (2001) 22 B.L.R. (3d) 134; *PSINet Ltd. (Re)*, (2002) 30 C.B.R. (4th) 226; *Teleglobe Inc. (Re)*, (2005) 143

21

A.C.W.S. (3d) 622; *Atkins Nutritionals, Inc. (Re)*, (2005) 14 C.B.R. (5th) 157; *A.G. Simpson Automotive Inc. (Re)*, [2001] O.J. No. 3912; *United Air Lines, Inc. (Re)*, (2005) 9 C.B.R. (5th) 159; *Philip Services Corp. (Re)*, (1999) 13 C.B.R. (4th) 159; *Babcock & Wilcox Ltd. (Re)*, (2000) 5 B.L.R. (3d) 75.

Canadian courts have adopted a flexible approach to the case management of trans-border insolvency proceedings, depending on the particular facts, with a view to the twin goals of fairness and efficiency. For example, in *Matlack Inc. (Re)*, (2001) C.B.R. (4th) 45, the court stated as follows:

> In an increasingly commercially integrated world, countries cannot live in isolation and refuse to recognize foreign judgments and orders. The Court's recognition of a foreign proceeding should depend on whether there is a real and substantial connection between the matter and the jurisdiction. The determination of whether a sufficient connection exists between a jurisdiction and a matter should be based on considerations of order, predictability and fairness rather than on a mechanical analysis of connections between the matter and the jurisdiction.

Also, in *Roberts v. Picture Butte Municipal Hospital*, [1998] A.J. No. 817, the court noted that, "[c]omity and cooperation are increasingly important in the bankruptcy context. As internationalization increases, more parties have assets and carry on activities in several jurisdictions. Without some coordination, there would be multiple proceedings, inconsistent judgments and general uncertainty."

This Court has already acknowledged that the CCAA court can adjudicate the Canadian claims. During the January 26, 2006 hearing, where certain of the Debtors' 15th Omnibus Objections were heard, the Court stated, "[t]o the extent the Canadian litigation is going to take place somewhere, *that's not a large number of claims and it can be done here, it can be done in Canada,* it'll be done somewhere, and that's the bulk of the claims that are left." 1/26/2006 Hearing Transcript, p. 75, lns. 18-22 (emphasis added).

22

Not only is the CCAA court bestowed with the authority to adjudicate the Canadian claims, experienced with cross-border issues and familiar with the particular issues in this Chapter 11, but also the circumstances of this Chapter 11 make it ideal for the CCAA court to adjudicate the Canadian PD claims.

*First*, the Canadian Asbestos PD Claims were filed on account of buildings located in Canada and, therefore, the alleged injury occurred in Canada, and Canadian substantive law governs. *Butner v. United States*, 440 U.S. 48, 55 (1979); *In re Federal-Mogul Global, Inc.*, 330 B.R. 133 (D. Del. 2005) (applying U.K. law for purposes of estimating the UK asbestos liabilities of the Chapter 11 debtor's UK subsidiary). As such, Canada has a direct interest in the outcome of the litigation. *Id.* ("the interpretation of United Kingdom law for purposes of the United Kingdom administration is a matter for the United Kingdom courts."). *Id.* at 153.

*Second*, as the Debtors' noted in the 15th Omnibus Objection, and Speights' colleagues specifically noted in their letter to potential Canadian claimants, Canadian law differs from U.S. law in several material respects. The CCAA court is already familiar with the Canadian legal principles to be applied, including the Canadian threshold for liability in product liability cases, provincial limitations law, and Canadian limitations to recovery for economic loss. Therefore, adjudicating these claims in Canada is considerably more efficient than forcing this Court and U.S. parties to become conversant in relevant Canadian law as part of the estimation proceeding.

*Third*, the convenience of interested parties would be served by adjudicating these claims in Canada. The Canadian PD claims involve, at least in part, the Debtors' Canadian operations, and the principal witnesses and documentation are located in Canada. Also, this solution would presumably be more convenient for Canadian claimants, who would not have to travel to the United States to prosecute their claims.

23

*Fourth*, the Debtors' proposal would not result in any delay. The CCAA court has significant experience in multi-jurisdictional matters and is already very familiar with this matter. While the CCAA court has currently stayed all litigation in Canada against Grace in favor of the U.S. bankruptcy, with this Court's approval, the CCAA court has shown throughout this case its willingness and ability to move matters towards resolution as expeditiously and efficiently as possible. Indeed, Grace's Plan of Reorganization has already anticipated that the Canadian PD claims would be litigated in Canada under a Canadian litigation protocol involving Canadian substantive law. *See* Docket 7560 at p. 14.

*Fifth*, by sending the Grace PD claims to Canada now to be adjudicated, rather than waiting until post-confirmation, this Court can reap the benefits of the Canadian court's assessment of the Canadian PD claims and apply that court's findings in the Phase 2 estimation proceeding. Indeed, Canadian counsel anticipates that the CCAA court can act quickly enough to have merits-based rulings well in advance of a Phase 2 hearing. The CCAA court, as a dedicated commercial court, has both the expertise and the case management process to facilitate the speedy and fair resolution of claims. The proposed Protocol is merely a further example of a strong cross-border relationship founded on comity, respect and the efficient adjudication of complex insolvencies. Just as in *Maxwell*, using the CCAA proceeding to address Speights' Canadian PD claims offers a unique opportunity to "involv[e] cooperative parallel bankruptcy proceedings seeking to harmonize two nations' insolvency laws for the common benefit of creditors." *In re Maxwell Comm. Corp.*, 93 F.3d at 1054-55 (2d. Cir. 1996).

*Finally*, the Court has already acknowledged that the CCAA court is well suited to address the merits of the Canadian claims. In particular, during the January 25, 2006 hearing,

where this Court heard argument relating to certain of the Debtors' 15th Omnibus Objections, the

Court noted as follows:

> Yes, frankly, I think that's a good solution, because I agree with Mr. Speights.
> Some of his clients may want to go to Canada, and others probably won't, and I
> am also a bit ambivalent about whether the litigation ought to go forward here or
> in Canada.  But if there's going to be that much of a record issue, it probably
> should be in Canada, because it'll be a lot harder to get records if it goes forward
> here than it will be there and a Canadian court is in charge of the litigation.

1/25/2006 Hearing Transcript, p. 18, lns. 15-23.

### D.      Relief Requested with Respect to the Canadian Claims

Therefore, for all of the reasons stated above, the Debtors request that the Court

abstain from addressing the merits of the Canadian claims in favor of the Canadian court

administering the CCAA proceeding.

### Notice

Notice of this Motion has been given to: (i) the United States Trustee, (ii) counsel to the

DIP Lender, (iii) counsel to each of the official Committees, (iv) counsel for every PD claimant

and the pro se claimants who have pending claims against the Debtors, and (v) all those parties

that requested service and notice of papers in accordance with Fed. R. Bankr. P. 2002.  In light of

the nature of the relief requested, the Debtors submit that no further notice is required.

### Conclusion

WHEREFORE, for the reasons stated above, the Debtors respectfully request that (1) the

Debtors be permitted to adjudicate the merits of all remaining Canadian PD claims immediately

in Canada as part of the pending CCAA proceeding and (2) that this Court set for hearing as part

of the PD Estimation Phase 2 trial, the Debtors' substantive objections to U.S. traditional

property damage claims on the grounds of (a) lack of sufficient product identification, (b) claims

brought too late and (c) claims providing no proof of hazard.  (A proposed order is attached as

25

Exhibit 6).  All of these PD objections were previously raised in the Debtors' 15th Omnibus

Objection.  A list of the remaining U.S. PD claims affected and the objections raised to those

claims in the 15th omnibus objection is attached hereto as Exhibit 1.  A list of the remaining

Canadian claims affected is attached hereto as Exhibit 2.


Wilmington, Delaware                     Respectfully submitted,
Dated:  June 19, 2006

                                         KIRKLAND & ELLIS LLP
                                         David M. Bernick, P.C.
                                         Michelle H. Browdy
                                         Janet S. Baer
                                         Samuel L. Blatnick
                                         200 East Randolph Drive
                                         Chicago, Illinois 60601
                                         (312) 861-2000

                                         *And*

                                         PACHULSKI STANG ZIEHL YOUNG JONES
                                         & WEINTRAUB LLP

                                         *James E O'Neill*
                                         _____
                                         Laura Davis Jones (Bar No. 2436)
                                         James E. O'Neill (Bar No. 4042)
                                         919 North Market Street, 17th Floor
                                         P.O. Box 8705
                                         Wilmington, DE 19899-8705
                                         (302) 652-4100