UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

IN RE:                              .   Chapter 11
                                    .
W.R. GRACE & CO., *et al.,*         .   Case No. 01-01139(JKF)
                                    .   Jointly Administered
          Debtors.                  .
                                    .   June 19, 2006 (1:56 p.m.)
                                    .   (Wilmington)


TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE JUDITH K. FITZGERALD
UNITED STATES BANKRUPTCY COURT JUDGE


Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

1          THE COURT: Are the parties on Grace ready?

2          THE CLERK: Yes.

3          THE COURT: This is the matter of W.R. Grace, 01-

4     1139.  The participants I have listed by phone: Elizabeth

5     Cabraser, Christopher Candon, Steven Eisman, Andrew Chan,

6     Stuart Kovensky, Debra Felder, David Austern, Eric Conecka,

7     Robert Horkovich, Alex Jachmich, David Siegel, Paul Norris,

8     Mark Shelnitz, James Rieger, Alex Mueller, Sal Bianca, Sam

9     Pointer, Barbara Harding, Brian Kasprzak, Mark Plevin ,

10    Leslie Epley, Robert Guttman, Craig Gilbert, Arlene Krieger,

11    March Coleman, Matthew Kramer, Barbara Seniawski, I'm sorry,

12    S-e-n-I-a-w-s-k-I, sometime I'm going to learn how to

13    pronounce that name and not have to spell it.  I apologize.

14    Stephanie Kwong, Sandy Esserman, David Parsons, Sara Edwards,

15    Richard Wyron, Jonathan Brownstein, Joseph Radecki, Martin

16    Dies, Daniel Speights, Michael Davis, Tiffany Cobb, Peter

17    Shawn, Kenneth Thomas, John O'Connell, Warren Smith,

18    Elizabeth DeCristofaro, Sara Gooch, Darrell Scott, Sean

19    Walsh, Daniel Glosband.  Those of you on the phone, please

20    put your mute buttons on so that we're not hearing the

21    background noise, please.  I'll take entries in court.

22          MR. BERNICK: Good afternoon, Your Honor.  David

23    Bernick for W.R. Grace.

24          MS. BAER: Good afternoon, Your Honor.  Janet Baer

25    for W.R. Grace.

1          MR. O'NEILL: Good afternoon, Your Honor.  James

2    O'Neill for W.R. Grace.

3          MR. KRUGER: Lewis Kruger, Your Honor, for the

4    Official Committee.

5          MR. PASQUALE: Ken Pasquale for the Official

6    Committee.

7          MR. BECKER: Gary Becker for the Equity Committee.

8          MR. INSELBUCH: Elihu Inselbuch for the Asbestos

9    Creditors.

10          MR. LOCKWOOD: Peter Lockwood for the Asbestos

11    Creditors Committee.

12          MR. BAENA: Scott Baena for the Property Damage

13    Committee.

14          MR. FRANKEL: Roger Frankel, Your Honor, for David

15    Austern, the Future Claimants Representative.

16          MR. ACKWOOD: Chase Ackwood for the Property Damage

17    Committee.

18          MR. HURFORD: Mark Hurford for the ACC.

19          THE COURT: Anyone else?  Okay.  Mr. Bernick.

20          MR. BERNICK: I think, Your Honor, that the only

21    item on the agenda for this afternoon is a report on what is

22    happening with the mediation process, and I know that I'm

23    sure everybody will be prepared to address the Court on that

24    matter.  It might be best, actually, if Your Honor were to

25    take a report from those creditors that are more actively

1    involved in the discussions.  Those discussions still really

2    have not included the debtor in a meaningful way, and I'm

3    prepared to comment on that as well, but it might be best - I

4    don't know if Your Honor's received a report yet from Judge

5    Pointer?

6            THE COURT: I received a very brief oral phone call

7    from Judge Pointer some day last week.  I don't recall

8    offhand what day, but really, basically, I don't have much

9    information, and I was relying on you folks to tell me what I

10   need to know.

11           MR. BERNICK: Okay.  Well, put simply, I - at least

12   as I understand it and Mr. Inselbuch, who is directly

13   involved in the discussions for the asbestos claimants as was

14   Mr. Baena and Mr. Frankel, I'm sure they'll be able to give

15   the Court a little bit more flavor for it, and again, we have

16   our own comments on it, but there was only one discussion

17   that the debtor was invited to, and pretty much all of the

18   substantive discussions that have taken place have involved

19   other constituencies.  So, maybe it would be best to get the

20   report from others.  As I understood it from Judge Pointer,

21   he at least has concluded that there doesn't seem to be any

22   foothold for moving forward with any further discussions.  As

23   Your Honor heard last time, there was an agreement that was

24   reached as between the personal injury claimants and the

25   property damage claimants and at least my understanding again

1    from him is that further discussions beyond that have not

2    borne fruit.  He asked us whether we saw any point to

3    continuing the discussions.  It was our observation that

4    maybe something would emerge during the course of the

5    following weeks, nothing really has emerged, so the debtor

6    kind of waits with interest to see what those who were

7    involved have to say about it.  Beyond taking that report,

8    there are some matters of immediacy that we think should be

9    taken up today in terms of how the case should move forward.

10   We're cognizant of the fact that we have a hearing on

11   exclusivity in July and think that probably that's the more

12   appropriate time to have a detailed discussion about where

13   we're going from here, but there are a few things that the

14   debtor would like to raise that we think should be taken up

15   right now because they're matters of some urgency.

16   Obviously, the first one being is there any point in

17   continuing the mediation procedure as a formal procedure.  We

18   think that that's one thing the Court needs to address today.

19   And there are a couple of others as well, but with that, if

20   it's all right with Your Honor, we would turn it over to the

21   creditors who we're involved in the discussions to make a

22   report on their sense of where things are going.

23           THE COURT: All right, that's fine.  Mr. Kruger?

24           MR. KRUGER: Your Honor, before we start down this

25   route, it seems to me that the mediation was a confidential

1  process, and it may not be appropriate for the parties to

2  give their view of what took place or not took place or how

3  it took place, other than to say that there was no fruition

4  successful of the mediation.  I think Mr. Bernick has said

5  that, and I think that that is correct, and maybe that is

6  sufficient for these purposes.

7       THE COURT: Well, it may or it may not be, frankly.

8  I mean, I don't want to know all the nitty-gritty of the

9  mediation details, but I do want to know what the stumbling

10  block is because if mediation isn't the right solution, then

11  something else is.  So -

12       MR. KRUGER: Your Honor, the stumbling block is

13  always the same.  There's a bid and ask in these processes,

14  and they didn't come together.

15       THE COURT: Well -

16       MR. KRUGER: More than that gets into detail about

17  what precisely those words mean, and that's my concern.

18       THE COURT: Well, I'm not - I don't know in terms of

19  detail, but it seems to me that I can get a little more

20  information than that, because there has to be a reason why

21  things aren't coming together.  So, is it the fact that the

22  Fair Act is still, you know, rearing out there in the

23  background?  Is it the fact that -

24       MR. KRUGER: I think that's a modest part of it.  I

25  think a more significant part of it is that there is a

1   significant disagreement about the valuation and the value to

2   be placed on the claims of the asbestos claimants, and that

3   makes a difference in the perspective outcome of the

4   proceedings, and that varies greatly, and it obviously varies

5   greatly the amount that various creditor groups are perceived

6   that are entitled to it as a result of ultimately an

7   estimation process or the like, and so, it's very hard under

8   those circumstances to come to an agreement since the parties

9   have very widely divergent views as to what those numbers

10   are.

11          THE COURT: Well, okay.  This process in this case

12   is somewhat frustrating and maybe I need - if that's the

13   issue, then maybe I need to back up and let the debtor do

14   what the debtor wants.  Set a bar date, and let's find out

15   what claims get filed, because if we're going to have to go

16   down this route, then maybe we just ought to invest in the

17   whole nine yards, because it seems to me the alternative, if

18   you folks don't come to some agreement soon, is a

19   liquidation.  Either a controlled one in a Chapter 11 or a

20   Chapter 7 liquidation where probably no one is going to

21   benefit as much from that, but I don't know what it is that

22   the stumbling blocks are.  Something is obviously impairing

23   or impeding the ability of the parties to come together, and

24   if that's the ultimate result, then maybe it's time to pull

25   the plug, and that's the question that I am wrestling with.

1          MR. KRUGER: Well, I think the debtor's operations

2     don't need to have the plug pulled on them.  What I do think

3     needs to happen is that there does need to be the completion

4     of the process that the debtor has begun with the

5     questionnaires and the like in order to try to put some

6     handle on where these claims truly are.

7          THE COURT: Well, okay.  I mean, there is a range of

8     numbers, and I don't know what that range is.  Obviously, I

9     know what the debtor thinks the range is because it's

10    proposed a plan that puts a finite number in, and I have a

11    guess about the fact that probably that's a multiple of what

12    the other creditors or what the creditors think it is, and in

13    all probability that multiple is going to be five to seven

14    times higher because that's how it usually is in these cases,

15    and that's just a guess, nothing more.  So, let me just

16    assume for a moment that I'm in a ballpark range at somewhere

17    between $1.7 and 7 - maybe even $9 billion worth of claims.

18    Where is the funding going to come from for that in the

19    debtor's current market share with what the debtor's

20    performance is in the bankruptcy cases?  I mean, if you folks

21    don't come to some realistic agreement as to how this is

22    going to get resolved, all I can see at this point is there's

23    going to be a liquidation, which is not going to help the

24    futures.  It's certainly not going to help equity because

25    from what I can tell, equity is under water, clearly, and

1    unless you can come to some negotiated agreement, there isn't

2    going to be a return for equity.  So, what is it -

3            MR. KRUGER: Your Honor, isn't that a function what

4    ultimately estimation and this process ultimately determines

5    those claims to be?

6            THE COURT: Maybe.

7            MR. KRUGER:  And it may well be that as that

8    process continues to unfold, it may well be that the parties

9    will find more occasion to speak, and perhaps the parameters

10   will get narrower, and the conversation will be more

11   productive.

12           THE COURT: Well, okay.  You talked about the

13   estimation issue.  Is there a valuation issue with respect to

14   the debtor too?  Or is that something the parties are going

15   to come to an agreement on?

16           MR. KRUGER: I don't know.  I'm always reluctant to

17   start down the process of getting all of this information out

18   because obviously these are all public companies.  They're

19   debt trades, their shares trade, and the like.  I think that

20   there is a blanket one could put over the various enterprise

21   values that is a lot more encompassing than the blanket that

22   you could put on over the various estimations of the claims,

23   if you will.  That's a much broader universe.

24           THE COURT: I'm sorry, I really -

25           MR. KRUGER: Maybe if I put that more bluntly is

1    that I think on the enterprise value the parties are apart,

2    but not wildly apart, not the way they are, if you will, on

3    other issues.

4          THE COURT: Okay.  Mr. Inselbuch.

5          MR. INSELBUCH: Good afternoon, Your Honor.  I would

6    invite, before I spoke, any comments that Judge Pointer might

7    want to make on what he perceived to be what happened and

8    where we are.

9          THE COURT: Judge Pointer, if you're comfortable

10   making some statement that doesn't, you know, divulge any of

11   the nitty-gritty, I'd be happy to hear it.  Is Judge Pointer

12   on?

13         MR. INSELBUCH: He has to take off the mute button.

14         THE COURT: Can someone un-mute Judge Pointer for me

15   if he's on the phone, please?

16         TELEPHONE OPERATOR: This is the operator.  Judge

17   Pointer has never dialed in.

18         THE COURT: He didn't dial in.  Okay.

19         MR. INSELBUCH: Well, in that case, in answer to

20   your question, Your Honor, let me tell you what happened and

21   why I don't think it involves nitty-gritty, but why there

22   really were no further discussions.  The simple fact is that

23   the Committee that Mr. Kruger represents does not have on

24   that Committee any substantial number of the real parties in

25   interest.  The real parties in interest, when we discovered

1    that, and quite frankly Mr. Kruger was quite forthright in

2    telling us that, when we discovered that, we said, Well,

3    let's have another meeting and let's bring the real parties

4    in interest, and Mr. Kruger undertook to go and see whether

5    they would come.  The difficulty that presented was those

6    parties did not want to come to a negotiation or a mediation

7    under circumstances where then they would have to be

8    restricted in trading, and they were unwilling to do that,

9    and that's their entitlement.  But what we're faced with was

10    a situation where we had nobody to talk to, and there were no

11    negotiations, and there's no nitty-gritty really to report,

12    and if we stay where we are in that context, we will not make

13    any progress.  Not surprisingly, if you look at the market

14    cap for the securities and for the equity and the debt

15    securities, it is publicly reported, it very much tracks the

16    allocations of resources that are found in the debtor's plan,

17    and presumably, unless something new happens here, those

18    people who are the real parties in interest will presumably

19    continue to trade the securities that they hold with an eye

20    toward what the debtor's plan says they will be paid.  And

21    that is, as someplace as Shakespear said, There's the rub.

22    And, of course, this is not the time to talk about

23    exclusivity, but we will be coming to see you in July to urge

24    you quite strongly to relieve exclusivity once and for all

25    because the constituency that has come together, we've had

1    our preliminary discussions and, of course, I'm no way able

2    to say what we will propose or how we will propose it, unless

3    and until Your Honor says we can, but we're confident that we

4    can put together a plan of that in the fullness of time can

5    be confirmed whether or not it's over the objection of the

6    unsecured creditors and whether or not it's over the

7    objection of the equity.  On the other hand, the debtors

8    plan, as Your Honor has commented on a number of occasions,

9    will never get us from here to there no matter how much time

10   we spend, no matter how many questionnaires we file.  We're

11   not suggesting and will not suggest in July that Your Honor's

12   orders with respect to the questionnaires be changed in any

13   way.  What we hope to be able to suggest, Your Honor, is

14   another route.  It might be a little bit quicker and a little

15   bit less expensive for us all to follow to get to a

16   confirmation hearing on a plan that can be confirmed.  I

17   think - anything more at this time?  Mr. Baena?  Mr. Frankel?

18   That's where we are, Your Honor, and your questionnaires are

19   due in a week - in a month.  I know Mr. Bernick who wants to

20   talk about objections to the few questionnaires that have

21   already been filed.  We see no real point in doing that since

22   we can't bind the people who haven't filed their third-party

23   witnesses, and we might as well have all of the

24   questionnaires and all of the objections if he wants to go

25   through 200,000 sets of objections and pursue that route when

1   it occurs and as it unfolds.  But short of that, we believe

2   that structurally we are at the end of the mediation, and

3   that the only way we're going to get from here to there is if

4   we change the context in which this case is proceeding and

5   has been proceeding for five years.

6        MR. BERNICK: Let me take my hat off to Mr.

7   Inselbuch.  He put much more succinctly what I was going to

8   do by way of characterizing their position.  I don't think

9   that he's really supplied any information to the Court,

10  however, about what really is holding this process up.  What

11  he has said is unmistakably true, however, which is that if

12  Your Honor goes back to December of last year, and we were in

13  a different courtroom, I think we were in Pittsburgh at that

14  time, and I confessed and I confessed since that time that I

15  had been distracted by another trial, and I hadn't been as

16  diligent as perhaps I should have been in following through

17  on Your Honor's injunction of late last fall, which is that

18  it was the debtors' responsibility to try to initiate a

19  consensual plan process, and Your Honor was unhappy with me

20  that day, and we undertook several things subsequent to that.

21  One, is that we did in fact come up with our own direct

22  proposal to the plaintiffs - to the asbestos claimants a

23  proposal that was very consistent with the proposal that got

24  so close to producing a resolution in this case 18 months

25  ago.  The second is that, again, at Your Honor's suggestion

1    really in December, we initiated a mediation process.

2    Everybody was very cooperative.  I don't want to take credit

3    for that except to say that we were the ones who tried to

4    facilitate the appointment of a mediator with universal

5    consent.  That took place in Judge Pointer.  Judge Pointer

6    did the best job he possibly could in encouraging the parties

7    to meet and get together, and throughout this process the

8    debtor's done absolutely everything that Judge Pointer or

9    Your Honor has asked us to do.  And as Your Honor has

10   repeatedly enjoined, there should be substantive discussions

11   involving the debtor.  Where we have come in this process,

12   and I think it's very plain from what Mr. Inselbuch has said,

13   is that they have structured this process to produce one

14   result.  It's the only way to account for everything that's

15   happened, and that one result is a deal among a certain

16   number of constituents in this case, the asbestos claimants.

17   And that deal was deliberately structured to facilitate the

18   plan or the strategy that Your Honor has heard now from Mr.

19   Inselbuch which to ask for a termination of exclusivity so

20   they can file a cram-down plan.  That's exactly where it is

21   that they're going, and that is why, notwithstanding, the

22   passage of six months, there's not been a single proposal

23   made to the debtor or to equity, not one.  There's not been a

24   single substantive negotiation with the debtor or with

25   equity, not one.  There's today over $700 million of market

1    cap in equity.  There have been at times a billion dollars

2    within the last 12 months of market value for equity, and

3    this is not an uninformed marketplace.  This is not a

4    marketplace that somehow is dominated by a plan that the

5    debtor filed 18 months ago.  This is a totally informed

6    marketplace.  You can read the analysts.  They called it

7    exactly the way that it is, and they see companies like USG

8    where exactly the same speeches were made, exactly the same

9    threats were made, and all of a sudden it turns out they've

10   got $3, $4 billion worth of equity and the claims aren't

11   worth what was said originally.  So this is an informed

12   marketplace that says that there's substantial value in

13   equity, and what is their response?  Their response is, the

14   marketplace is mislead, we're not prepared to talk with the

15   debtor, we're not prepared to talk with anybody about

16   anything that includes the debtor or equity.  That's where

17   they're going.  Now under these circumstances it's

18   unquestionably true, Mr. Inselbuch has reiterated, there is

19   no place for these negotiations to go.  Mr. Kruger has said

20   there is no place for the negotiations to go.  We don't see

21   anyplace for the negotiations to because we're not even being

22   included in those negotiations.  So we have a standoff, and

23   the standoff does revolve around what is the value of these

24   claims?  Not what's the value of Grace; what's the value of

25   these claims?  There may be some dispute about the value of

1   Grace.  There's no dispute, however, but that Grace is a

2   viable, strong, good company.  It's a company that nobody has

3   questioned the management of and where it's going, the fact

4   that value has increased.  So we are at a stalemate, we are

5   at a crossroads because there is a disagreement fundamentally

6   about the value of these claims.  Now, Your Honor, it seems

7   to us, therefore, that the mediation should be suspended.  If

8   have a need for Judge Pointer, we can ask him to come back

9   again, but it should be suspended because right now, there's

10  no point in undergoing the costs and the distraction of what

11  is essentially a formality.  We are going to be making a

12  request for certain additional things that relate to the

13  mediation.  For example, what is the deal between the

14  different asbestos constituencies because we think that that

15  deal itself is going to stymie the negotiation process rather

16  than enhance it.  But, clearly, we have to go forward, and we

17  have to go forward to address the essential issue of what's

18  the value of these claims, and now let's get down to not the

19  nitty-gritty, but really the question that Your Honor has

20  asked.  Your Honor has repeatedly observed from the bench

21  last fall and then again early in the winter and then again

22  right now, saying, Well, the debtor has put out a plan, and

23  the debtor has provided a finite value, and perhaps the range

24  of values goes north of that by multiples of four or five.

25  Your Honor, with all due respect, I think that that is an

1  observation that gives heart to those who don't want to see

2  any negotiation.  It creates leverage over the debtor because

3  for some reason Your Honor believes that it's already a given

4  that the value of these claims -

5  THE COURT: Oh, I haven't said anything about what I

6  think the value of the claims is.  I don't know anything

7  about the value of the claims.  What I said was that given

8  the other cases and the positions that debtors have taken

9  versus the positions that the committees has started in, that

10  seems to be a pretty typical range of multiples.

11  MR. BERNICK: And that is exactly what they want you

12  to believe, and that is driven by the particular

13  circumstances of those cases, and it has absolutely no

14  relationship whatsoever -

15  THE COURT: Okay.

16  MR. BERNICK:  - to the actual evidence in this

17  case, of which there has been, Your Honor, zero, zero.

18  THE COURT: Right, which is why I reiterate, I have

19  not formed an opinion of value and I don't want you to think

20  that I have.  I haven't, and maybe I'm wrong about what the

21  view the parties hold is with respect to the values of the

22  case, but I'd be surprised at that.

23  MR. BERNICK: Well, Your Honor, I would make this

24  one observation about the plan.  The plan, remember, that was

25  filed was held up for 30 days.  It was held up for 30 days

1    because both sides thought they were incredibly close.  That

2    is the plan on file, not something that was kind of a

3    lowball, let's see where we go.  That was a hair's-breadth

4    away of clearing market.  Instead of pulling it back, and

5    saying, Oh, no, no, all bets are off.  We're going back to

6    where we were before.  We just filed it.  So whatever people

7    may come up and say here today about, Oh, well, the estimates

8    will be three or four or five times as much, and I know that

9    Brother Inselbuch will stand up and say, Oh, well, you know,

10   we've done Armstrong and all the rest of these things, which

11   have no relationship to this case in terms of the kind of

12   evidence that was presented.  The simple fact of the matter

13   is, that there's only one set of numbers that comes close to

14   an actual market, and that was the set of numbers in our plan

15   based upon the negotiations that had taken place and came

16   this close to being where we want, and for some reason, all

17   of a sudden, it's a brave new world, and it's no longer

18   satisfactory to the constituencies that were then interested

19   in doing a deal.  They want to pull back.  They want to pull

20   back from that.  They want to pull back from what the did

21   with USG, and they want to come and tell Your Honor,

22   Terminate exclusivity and we're going to go forward.  Now,

23   procedurally, God knows, there are many alternatives that

24   Your Honor will have.  Your Honor has indicated some of them.

25   I can't quarrel with the fact that Your Honor would believe

1    that those options are legally available, but no matter what

2    path this case goes down, whether we simply have the

3    estimation, whether we have some kind of liquidation, whether

4    we have some exclusivity, no exclusivity, and I don't mean to

5    say that those are not insignificant things to take place,

6    they are, but nothing can happen in this case until there is

7    some adjudication of what the actual liability is.  It's just

8    a plain fact.  Judge Specter wrestled with the same problem

9    in the Dell Corning case.  There the bid and the ask was 10

10   billion versus a billion dollars.  Ten to one.  Enormous gap,

11   and ultimately it was, Oh, we're going to have - everybody

12   was saying do estimates there.  What did he - Well, we really

13   can't do an estimate of personal injury.  Let's have Rule 42

14   determinations, and that's where he went down.   But the

15   point is not what path he chose by way of fixing the value of

16   the claims, what counts was that you can't structure around

17   the gorilla in the room.  The gorilla in the room is, what

18   are these claims worth.  Now, what's so distinctive here, is

19   that we do have the questionnaires.  For the first time in

20   any case, we have the questionnaires.  So, it seems to us

21   that the right way to proceed is to go down the road.  If

22   they're going to submit their questionnaires by the 12th of

23   July, they should submit their questionnaires by the 12th of

24   July, and we should go forward, and we should deal with that

25   and Your Honor should figure out what you would like to have

1    us do by way of fixing the value of these claims.  Now, I'm

2    making a general statement.  They're really very, very

3    different.  Jan, if you could just bring up to the Court,

4    just give her all of the charts.  We have a few charts that

5    give Your Honor a status report on what is happening with

6    respect to these questionnaires, because they're already

7    revealing, and let's just begin with the property.

8            THE COURT: Okay, thank you.

9            MR. LOCKWOOD: Your Honor, can anybody else in the

10   courtroom get a look at these documents?

11           MR. BERNICK: Yeah, we've got copies.  When have we

12   ever left you out here.

13           MR. LOCKWOOD: Thank you.

14           MR. BERNICK: There are two - the first two slides

15   deal with property damage, and Your Honor's probably, perhaps

16   unfortunately, more acquainted with the numbers here, but we

17   know that before we even get to the merit of any of these

18   claims, you have 901 claims that are left.  Of those, 291 are

19   claims filed by Mr Speights in Canada, and as the second

20   chart indicates, Mr. Speights generally has more than half of

21   all of the PD claims remaining, including the 291 Canadian

22   claims.  Of those, we think that there's no product ID on 200

23   of Mr. Speights' 468, and we're somewhat hopeful that that

24   can reach a consensual resolution because the product ID is

25   not there.  If that were so, then 901 claims would come down

1    to about 700 claims, and we would then go through the

2    estimation process.  So, the PD - traditional PD is a pretty

3    well defined population.  We have to negotiate a case

4    management order to give cognizance to the fact that there's

5    some slippage in the overall schedule.  I'm not going to get

6    into what that involves for the simple reason that I've not

7    been directly involved in some of the scheduling discussions,

8    but my understanding is that there's a shared desire to

9    negotiate a new CMO.  Obviously, they're going to want to

10    terminate exclusivity so we don't deal with any of this

11    stuff, but if it has to continue we need a new CMO.  That

12    does not include ZAI, and, Your Honor, we would ask that Your

13    Honor has said before that the Court has crafted an opinion

14    on the ZAI issue.  We think that the time has come for that

15    opinion to issue.  Your Honor has told us in no unmistakable

16    terms that nobody's going to like it, but we don't see any

17    way to get beyond where we are today.  That's just the fact

18    of the matter.  Everybody's very cognizant of that fact and I

19    remember the conversation that we had telephonically where

20    Your Honor made that observation clearly, and I think that

21    everybody - at least I feel on that call, that it was a good

22    idea to resolve it.  See, that's one of the things, that's

23    kind we want to know what the deal is because it seems to me

24    that the folks on that call want to resolve that claim.  Well

25    that resolution, now, is now part of a broader package, and

1    as we understand it, there is no ability to negotiate any

2    component of the package.    That is that they're sitting on

3    an agreement that forecloses any negotiation of the

4    individual constituent parts, and if that's not true then

5    we'd like to know.    If it is true, then we'd like - We all

6    know what the deal is because if we can't negotiate with

7    individual constituencies, that's a significant impediment to

8    the process.    Number one, is we'd ask Your Honor to issue the

9    opinion on ZAI.

10          THE COURT: Well, let me just address the ZAI issue

11    for a moment.    If in fact there is in quotes, "a deal" over

12    what the ZAI claims are, I suggest the parties who are

13    involved in that deal get something filed very promptly

14    because otherwise, you're going to get an opinion and, I

15    mean, maybe you'll have appeal routes, but the likelihood

16    that you're going to get it settled after an opinion is

17    probably less likely than it will be that you'll get it

18    settled beforehand.

19          MR. INSELBUCH: Could I just ask a question abut

20    that.    Basically, our arrangements are part of or will be

21    part of a proposed plan.    I mean are you asking us to file

22    that?

23          THE COURT: I'm not asking you to file a proposed

24    plan.    If you've got a settlement that is negotiated of

25    certain parts of the claims, I think you ought to file a

1   motion to get the settlement approved.  Let's find out

2   whether it's going to work.

3        MR. INSELBUCH: What we have is an agreement among

4   all of our constituents to participate in a plan of

5   reorganization in a particular manner.

6        THE COURT: Then why haven't you broached it with

7   the debtor?

8        MR. INSELBUCH: We have never objected to broaching

9   it with the debtor.  We've just been accused of keeping

10  things from the debtor.

11       THE COURT: Well -

12       MR. BERNICK: We specifically asked for that.

13  That's a misrepresentation.

14       THE COURT: Just wait - We're not going to start -

15       MR. INSELBUCH: I'll tell you right now, Your Honor.

16       THE COURT: Gentlemen, we are not going to start the

17  bickering at the bar.  Okay, you can bicker at the bar after

18  court not at this bar, please, so let's just stop it now.

19  Mr. Inselbuch, for several months -

20       MR. INSELBUCH: Would you like me to tell you right

21  now?

22       THE COURT: No.  For several months, I have been

23  asking to get the debtors included in the mediation process

24  at some level so that they can find out essentially what

25  this, in quotes, "deal" is to see whether or not it will come

1   forward with a plan that will essentially incorporate those

2   terms and whatever else is left undone since the agreement

3   doesn't include all creditor constituents yet.  The debtor

4   still has need to bring onboard the other creditor

5   constituents.

6           MR. INSELBUCH: It is difficult to respond to Mr.

7   Bernick under a rubric that says I can't talk about the

8   nitty-gritty of what goes on.

9           THE COURT: But you can talk to him about it.

10          MR. INSELBUCH: Yes, I have talked to him about it,

11  but then he represents to you that he wasn't involved in the

12  discussions, and I can't respond to that because I can't tell

13  you what he told us in those discussions and what I told him

14  about it.

15          MR. BERNICK: Your Honor, that is such an

16  irresponsible -

17          THE COURT: Look, gentlemen, I'm not -

18          MR. INSELBUCH: That's true.

19          THE COURT: Gentlemen, look, I really don't want to

20  put you on the witness stand over a collateral issue like

21  this, so, you know, can I just set up a process whereby I

22  order, and I do mean order, you all to get together with

23  debtor's counsel, discuss whatever the structure of your

24  agreement is so far with the debtor to see whether or not

25  there will be something copasetic that comes out of it.

1    There may not be, but if there is, then the debtor,

2    obviously, at the moment, still has exclusivity and can

3    attempt to put together some plan that meets with the

4    creditor constituencies' approval.  It may not be all

5    creditor constituencies, I don't know, but then at least if

6    the debtor knows the overall structure for what the asbestos

7    side of things he's looking at, maybe the debtor can then go

8    back and do the negotiations that I thought the debtor should

9    have been doing for quite some time.  You're saying it's not

10   going to work.

11        MR. BERNICK: Your Honor, if I could be permitted -

12        MR. INSELBUCH: (Microphone not recording.)

13        THE COURT: I did, Mr. Inselbuch - I did ask Mr.

14   Inselbuch.  He was shaking his head.

15        MR. INSELBUCH: What I know, and what I can't

16   describe here is that what we have agreed is not relevant to

17   what Mr. Bernick thinks is relevant nor to what Mr. Kruger

18   tells us he has nobody to talk to us about.

19        THE COURT: Well, then -

20        MR. INSELBUCH: But I'm perfectly happy to describe

21   that to Mr. Bernick, but the Court shouldn't think for a

22   minute that it's going to make any difference.

23        THE COURT: Okay, well, if it's not going to make

24   any difference then I need to get back to scheduling orders

25   and figure out a process to go into estimation.  So, let's do

1    that.

2          MR. BERNICK: Right, and on that score, Your Honor,

3    I will not respond to anything that Mr. Inselbuch has said

4    here this afternoon.  We do have a need for the - well, I

5    guess for two things that relate to that, and I think we'll

6    probably, instead of spending more time on this this

7    afternoon we'll file appropriate formal request before the

8    Court.  One will relate to confidentiality because statements

9    have been made about the substance of this negotiation in

10   many of these conferences by people that I won't identify

11   here in court, and we further will make a request formally to

12   get the documentation to also determine not only what the

13   plan would call for but whether they have some side deal to

14   not have any negotiations that break up the package, that is,

15   we don't even know who gets what under the package and that

16   becomes very important because with respect to the

17   traditional property damage claims, Your Honor, we now have

18   Shardant (phonetical) here.  We know for a fact based upon

19   settlement history what those settled for.  We know.  ZAI,

20   that's genuinely ambiguous, and that's why I think Your Honor

21   is going to have to rule because there is no history of

22   settling ZAI claims.  There's nothing at all, so we have

23   these questions that have been put before Your Honor, but

24   there's no way in a sense to, you know, calculate in a sense

25   what the value of the claims is as opposed to traditional

1    property where we've done the calculation, and we've told

2    them what the calculation is.  And no one's said that our

3    calculation is wrong.  To the contrary, they've said that

4    they don't have any reason to disagree with that calculation,

5    which makes unpacking the package become so critical.  But

6    still, as Mr. Inselbuch indicates, and he's basically telling

7    Your Honor not only a prophecy, but he's basically laying

8    down the law here in the case, none of it's going to do any

9    good.  And why is none of it going to do any good?  Because

10   his constituency is not prepared to negotiate along the lines

11   of an actual calculation of personal injury liabilities,

12   which means that we have to go ahead and gather information.

13   Now, if Your Honor will take a look at page 1 on the

14   questionnaires.  We've received approximately 10,000

15   questionnaires back for personal injury.  They have been -

16   about 7,000 of them have been processed.  There are three

17   major deficiencies - I'll call them deficiencies, problems,

18   issues, whatever, that are visible on the face of the

19   answered questionnaires.  One, there are objections that have

20   been made instead of answers given.  Approximately 59/60

21   percent of the questionnaires contained objections in lieu of

22   answers, and I can go through the individual numbers, but

23   that's a figure that applies to a questionnaire where there

24   is one question that has been objected to rather than

25   answered, but I'll give Your Honor a figure, almost half of

1    the questionnaires that have been process, the objection

2    means that the entire section of the questionnaire is

3    objected to.  Not just one question, but the entire section

4    of the questionnaire.  For example, exposure to non-Grace

5    asbestos containing products, that is products other than

6    Grace.  We went through and litigated this whole thing, it

7    should be on the questionnaire.  Thirty-two hundred

8    questionnaires are returned to answer not one of those

9    questions.  They're all objected to.  Information regarding

10   the pulmonary function test, 1,268, which is roughly, you

11   know, it's roughly a quarter of the claims, an entire section

12   objected to.  Information regarding the diagnostic process,

13   904, no questions answered.  They're just all objected to.

14   So that's problem one, is, people just decided, well, you're

15   supposed to answer what the questionnaire says, but we're

16   going to object instead.  Attachments, as opposed to

17   answering, where they don't answer, but they just say, the

18   information is somewhere or they produce a volume of

19   documents and they say the answer is somewhere.  Sixty-seven

20   percent of the questionnaires have attachments or make

21   reference to attachments either there or elsewhere rather

22   than answer, and again, this is not a situation where it is

23   just one.  The 67 percent is where there's at least one, but

24   you have for example, claims regarding asbestos and/or

25   silica, other claims being maintained against others.  The

1    entire section is objected to by 1,064, one-seventh of all of

2    the answers.  Exposures to non-Grace asbestos containing

3    products.  In case of 1,500 questionnaires, the entire

4    section is - they simply say, here's the attachment.  So, I

5    could go on and on, but these are major, major deficiencies.

6    And then here's the last statistic that's of relevance.

7    Beyond the problems that we had with the face of the answers,

8    over 43 percent of the questionnaires that have been

9    processed to date, name one or more doctors that Grace

10   suspects of using unreliable and medically unsupportable

11   diagnostic procedures, and Your Honor says, Well, you know,

12   isn't that really a technical matter, et cetera, et cetera.

13   Your Honor, the outside world for the last three years really

14   is a consequence of the Fair Act, is all over the question of

15   the medical diagnoses - so-called medical diagnoses that have

16   been used to sponsor these claims, and it's not just Judge

17   Jack anymore, it's not just Judge Jack, in fact, the trusts

18   that have been created in years past to process asbestos

19   claims have now started to reject, refuse to accept so-called

20   diagnoses that come from a list of doctors, including the

21   Manville trust, a full -

22          THE COURT: But other plans have fixed - in quotes,

23   "fixed that problem" by simply requiring that more than one

24   diagnosis come in in the event that the diagnosis is from

25   that doctor.  I mean there is a way around those problems.

1          MR. BERNICK: There's definitely a way around all of

2     these problems.  The way around all of these problems is to

3     do - for the Court to require what the diagnostic procedures

4     themselves require, which are replicated B-reads.  Replicated

5     B-reads where you don't have the B-reader who's got his hand

6     in the pocket of the plaintiff's asbestos friend.  This is

7     what this is all about.  Twenty percent, 20 percent of the

8     questionnaires that have been processed to date come from

9     doctors or use information coming from doctors whose

10    diagnoses are no longer accepted by these trusts.  So, it may

11    be that there is a proper diagnosis that can be rendered.  We

12    don't have it yet, that's the whole purpose of this process.

13    If we got replicated B-reads by truly independent B-readers,

14    we're not going to sit there and say that the medical

15    standards shouldn't be followed.  The whole problem here is

16    that this whole system in all of these multiples, these

17    estimates which are 5, 7, $8 billion.  They're all built on

18    the facts of this system that everybody knows is - well, now,

19    you've heard this speech before?  End of speech.  My point

20    about it is very simple which is that it has big impact in

21    this case.  Product ID.  What is the Grace product?  How much

22    exposure was there, particularly if you're talking about a

23    diagnosis of asbestosis?  Is it a doctor who's simply on the

24    pay a plaintiff's firm?  If you use just these parameters,

25    we're not talking about, way this stuff up here, we're kind

1    of talking about what happened with Mr. Speights where we had

2    4,000 claims and now all of a sudden it's down to 400 claims.

3    We're talking about multiples.  What about that multiple, the

4    multiple between a pie-in-the-sky number that frankly didn't

5    comply with any of the rules of this Court and what is now

6    actually on the books as a claim before you even get to the

7    merits.  So, you know, we can talk about numbers and ranges

8    of numbers, the point is, Your Honor, this debtor is prepared

9    to live with the result of an estimation that's done on the

10   basis of admissible evidence.  It's just that simple.  Why is

11   this case worth billions of dollars in their view any less

12   amenable to and any less entitled, worthy of, scrutiny based

13   on the evidence.  That's what we have always, always said,

14   and we've tried to negotiate and in our system of justice

15   where you don't have a negotiation that works, the

16   alternatives is to follow the rules of evidence.  That's all

17   we want, and we are now poised to get it.  We want to go

18   ahead and get it and we want to get it fast.  We're not

19   interested in delaying this case, and our specific proposal

20   with respect to the objections is on the last couple of

21   pages.  We have seen that - and one of these charts shows

22   this, that the debtor first requested a questionnaire a year

23   and a half ago, November of 2004.   After a process that

24   lasted the better part of eight months, in August of '05,

25   Your Honor approved that questionnaire.  The questionnaires

1    were served in September of '05, and the first questionnaires

2    were - the questionnaires were due in January of this year.

3    So, we're now already seven months past what was the original

4    deadline.  These people have been on notice ever since the

5    beginning that the debtor was going to take the position that

6    it is taking today with respect to these questionnaires.  Our

7    goal is not to have further delay.  So the only way that we

8    can see that this is going to remain somewhat on track is on

9    the second two charts.  Your Honor was very clear in April in

10   saying that there should be a complete freeze on all

11   litigation associated with these questionnaires.  That is to

12   say, Your Honor, we wanted to go forward with a mediation

13   process on the objections.  Your Honor demurred at that and

14   said, No, let's keep the mediation focused on, you know,

15   settlement rather than taking up objections, but Your Honor

16   was very careful to say, As soon as I know that the mediation

17   has not worked then I will be amenable to expedited

18   proceedings to handle the objections, and further Your Honor

19   cautioned that you did not want the mediator to hear and you

20   didn't want to have to hear objections that went to the face

21   of the questionnaire.  That is something didn't have to be

22   answered.  So, we're taking Your Honor up on exactly that

23   proposition, which is to have an expedited process that's

24   designed to resolve these three maybe four real simple

25   questions.  Do you have to answer the questions?  Can you

 1    say, Gee, we're objecting because we don't think the

 2    information is relevant, it shouldn't be asked, which is

 3    another way of saying, We don't think the questionnaire was

 4    properly framed.  Does the claimant have to sign the

 5    questionnaire and does the attorney have - 40 percent of

 6    these questionnaire responses are not signed both by the

 7    claimant and by the attorney.  So we think that these matters

 8    can be raised very, very quickly.  We would ask to have these

 9    issues, that is the go to the face of the questionnaire

10    mediated, and we've actually proposed to do that mediation

11    next week. Everybody knows exactly what the issues are.  All

12    these other people that are law firms that are kind of

13    waiting for their opportunity to speak, forward their

14    independent views, and I won't comment on how independent

15    those views are, they can all come.  They've all got skin in

16    this game, they can all come to the mediation.  We can then

17    have the mediator's decision due in the first week or so of

18    July and then we can take up on an expedited basis at the

19    next omnibus hearing in July these three or four very simple

20    questions, and anybody who hasn't answered the questions on

21    that basis will then have a period of time for a cure, say

22    21/30 days.  That way, by the time we get into August, we

23    will in fact have these questionnaires filled out.  Now there

24    may be other more specific objections, and we've got an

25    alternative schedule for those that goes out a little bit,

1   but right now the single greatest impediment that we have for

2   getting information about what these claimants really have,

3   and Your Honor, these are claims that have all been pending

4   for now it's 5 years.  These are just a snapshot of claims

5   that were pending as of the time Grace went into Chapter 11.

6   So these folks have had 5 years to take their best shot at

7   their claims.  God knows, most of them probably have settled

8   with every other defendant that's in the tort system and

9   they've had the opportunity, indeed the obligation to develop

10  the facts that relate to their claims.   All we're asking

11  them to do is provide presumably what they've had available

12  in order to litigate or settle their claims.  So we would

13  ask, Your Honor, three things for today: First, that Your

14  Honor suspend the mediation.  Second, with respect to the

15  property damage claims, that Your Honor issue the ZAI

16  decision, and third, with respect to the personal injury

17  claims, we ask that Your Honor basically indicate to the

18  parties that issues going to the face of the questionnaire

19  will be taken up on an expedited basis at the next omnibus,

20  and that the parties, if they want to mediate and Grace is

21  more than happy to and prepared to mediate, to accomplish

22  that mediation on a timely basis so that the mediator can

23  render a decision that will inform the Court of the issues

24  and the basis for the decision on a timing basis such that it

25  can be raised at the next hearing.  If Your Honor wants to

1    talk more about structure and, you know, what kind of legal

2    process that we can take up, that's fine, but presumably that

3    will be up for the next discussions, and we look forward to

4    that.  No matter how it's cut, this is a case where once

5    there is disputed liability and in our court system in the

6    United States, we're entitled to an adjudication on the

7    merits, whether it's an estimate or at some other procedure,

8    and therefore, whatever they want to file, you know, they're

9    going to ask to go ahead and file it.  And maybe Your Honor

10   will allow them to file, maybe Your Honor won't allow them to

11   file.  It's not going to advance this case one iota.  The

12   only thing that's going to advance this case is an

13   adjudication on what these claims are worth.  Thank you.

14        MR. INSELBUCH: Just a few matters, Your Honor.  Mr.

15   Bernick would like to make a big fuss about what he calls the

16   bad low-end claims and suggests that the estimates that Your

17   Honor made reference to in the other cases with us inflated.

18   In fact, those estimates in each of those cases reflected

19   more than 60 percent of the values were for cancer claims.

20   And then another substantial amount of the values were for

21   impaired asbestonic claims.  Mr. Bernick would like to make a

22   big fuss about the so-called unimpaired claims which while

23   they are large in number figure very small in the amounts in

24   issue.  That's for another day.  He claims that these are 5-

25   year old claims, and they should have been able to develop

1    their claims, but of course they haven't been able to develop

2    their claims against Grace because there's been a stay that's

3    been in place all this time.  They have not had any discovery

4    from Grace in the normal course of events.  That's also for

5    another time, because we are not suggesting that Mr. Bernick

6    is wrong in the overall view that we must go forward to see

7    what these claims are worth in order to resolve matters.

8    Where he is wrong, and where he is false, is when he tells

9    the Court that we were not prepared to negotiate based on the

10   values of the claims.  We were fully prepared to do that, but

11   we were stymied because we had no one to negotiate with, and

12   we cannot accept the notion that basically $1.7 million is

13   where we are.  We have rejected that out of hand as Your

14   Honor understands.  Deficiencies in the responses.  The

15   procedural posture is whatever the committees have to say and

16   whatever the debtor has to say these questionnaires on Your

17   Honor's orders have been sent out to third-party witnesses.

18   They are not just widgets.  Just as the debtor has procedural

19   due process in this court, so do those respondents.  They

20   have a right to make whatever objections they deem in good

21   faith to be properly made.  They are entitled to respond as

22   they deem fit to these questionnaires within the general

23   rubric of the Rules of Federal Procedure, and if the debtor

24   is unhappy with those responses, as the debtor may well be,

25   those issues have to be presented somewhere, presumably to

1    this Court or to an appointee of this Court, but those people

2    have a right to be heard, and you can't just simply eliminate

3    their rights because the debtor is in a hurry.  Just because

4    someone in answer to what is in effect a written

5    interrogatory makes reference to a series of documents that

6    are attached in response to that inquiry, doesn't make the

7    response defective.  That is a perfectly valid way to respond

8    to interrogatories, and that's in a sense what these

9    questionnaires are.  Mr. Bernick is very glib, and he says,

10   There's nothing in evidence here.  Nobody knows what the

11   evidence here is except for Mr. Bernick.  He knows that at

12   the end of the day his evidence will prove that these claims

13   have no value or have very little value.  We're prepared to

14   tell Mr. Bernick and to tell Mr. Kruger what our

15   understanding is, and if our understanding is something that

16   can be blended into a plan that, in structure at least, would

17   make sense, we fully expect it would be because it doesn't

18   have any dollar amounts attached to it of any kind.  So it

19   shouldn't be an impediment to anybody's negotiation.  If

20   we're going to negotiate though, Your Honor, we need a

21   partner at the table.  The other largest creditor, the

22   unsecured creditors constituency, has not been at the table.

23            THE COURT: Okay.  I'm a little confused.  How is it

24   that I have a Committee that doesn't have representative

25   parties on it?

1          MR. INSELBUCH: It does.

2          THE COURT: Okay.

3          MR. INSELBUCH: But the parties on the Committee are

4    the members of the Committee, and they are in this Court, but

5    every claimant out in the world is not subject to this Court

6    other than as a third-party witness.  If you wanted to get

7    information from Mr. Kruger's clients, and you served

8    subpoenas on them, they would have the authority as third-

9    party witnesses to respond, object, or do whatever they want.

10          THE COURT: No, I'm asking a different question.

11          MR. INSELBUCH: I'm sorry, Your Honor.

12          THE COURT: I'm trying to get to why Mr. Kruger's

13    constituency is not at the bargaining table.  I thought you

14    told me earlier that they -

15          MR. INSELBUCH: They are at the bargaining table,

16    but they tell us that none of them are real parties in

17    interest, and as a result, are not in a position to even

18    respond to an offer that we made to them, and they tell us

19    that the real parties in interest, who might be people who

20    would respond one way or the other to the offer that was made

21    to them, won't come to the table because they won't be

22    restricted.

23          MR. KRUGER: May I respond?

24          THE COURT: Yeah, I think, because is your Committee

25    all claims trading?

1          MR. KRUGER: No, not at all, Your Honor.  We have

2     creditors on the Committee, actual living live creditors.

3     Unfortunately, and I don't want to be specific, the proposal

4     that was put forth to us was one that our Committee would not

5     accept and that we are quite confident that if it became part

6     of an incorporated plan, would be rejected by the creditors

7     who my Committee represents.  So there was no purpose to be

8     served by going down that route, and we informed both the

9     mediator and Mr. Inselbuch and friends that the proposal that

10    they had put forth was one that would not be accepted either

11    by our Committee or by our greater constituency.  I could

12    conceive of a situation in which there was some proposal that

13    the greater constituency might think appropriate, even though

14    the Committee might not think appropriate, but that is not

15    the case here.  Both those correspond in my mind.  The

16    Committee found the proposal unacceptable and there is little

17    doubt in my mind that if it had been put forth to the greater

18    constituents that we represent, they would have found it

19    totally unacceptable.

20          THE COURT: But that's the purpose of negotiation.

21    They make an offer, you make a counter offer.  You don't just

22    stop it there.

23          MR. KRUGER: Well, Your Honor, that presumes that

24    the offer that is made is one that merits a counter proposal,

25    other than that which the marketplace has already determined

1    is the right recovery for the constituency that we represent,

2    and I just remind the Court and Mr. Bernick has pointed out,

3    this company has a market cap in excess of $700 million.

4            THE COURT: I don't really care what the market cap

5    is.

6            MR. KRUGER: But our clients care about that, Your

7    Honor, so -

8            THE COURT: But your clients aren't get anything

9    unless you can come to some reasonable valuation.

10           MR. KRUGER: No, Your Honor, our clients will get

11   something and Mr. Bernick is correct in determining what the

12   value is of these claims.  They will get paid what they are

13   entitled to receive, and we believe that that is payment in

14   full with interest because we also believe that there was a

15   recovery present here for the equity, and so long as there is

16   a recovery for the equity, then we are entitled to payment in

17   full with interest.

18           THE COURT: Okay.  I think if that's the case, I

19   need some valuation hearings, because frankly I can't see

20   where anybody is coming up with that -

21           MR. KRUGER: Your Honor, the valuation is only a

22   part of this.  The real issue is - and it isn't the valuation

23   that's in dispute, the real issue is what are these claims

24   worth?

25           THE COURT: No, the real issue is, we need to get

1    onto the same planet not just into the same mediation, but

2    onto the same planet.  You folks aren't even in the same

3    orbit at the moment.

4            MR. KRUGER: But, Your Honor, that's not necessarily

5    wrong on our side.  The reality of it is that so long as the

6    asbestos bar believes that their claims are some multiple of

7    1.7 and the rest of the world, quite frankly, doesn't believe

8    that, that doesn't mean that the rest of the world is wrong.

9            THE COURT: I'm not saying who's right and who's

10    wrong.  I'm saying that there is no mediation or other

11    settlement process that's going to work unless somebody is

12    willing to move off of your own position.  That's my

13    understanding of what negotiation is.  You don't take fixed

14    positions on the polar ends and then not come to the middle -

15            MR. KRUGER: Your Honor, I don't believe -

16            THE COURT: In fact, in not taking that type of

17    attitude is, in my view, not in good faith.  The purpose of

18    going -

19            MR. KRUGER: Your Honor, so long -

20            THE COURT: - to mediation is so that you do try to

21    come to some point.  When I say "middle", I don't mean mid-

22    point but something between the polar ends.  That's the whole

23    purpose.

24            MR. KRUGER: Your Honor, so long as there is equity

25    value in this company, it is not conceivable as fiduciaries

1    that my Committee can accept a recovery -

2              THE COURT: That's what I said.

3              MR. KRUGER:  - that is less than payment in full

4    plus interest.

5              THE COURT: That's exactly what I said.  First I

6    want to see where the Committee is coming up with the idea

7    that there is equity value.

8              MR. KRUGER: Well, as soon as we know the results of

9    estimation, we'll know the answer to that question.

10             THE COURT: Well, then, I think what we do is start

11   over again.  Let's set a bar date and we'll figure out what

12   the estimation process is.  We don't need to worry about

13   questionnaires.  We set a bar date, we'll find out what

14   claimants think -

15             MR. KRUGER: Well, Your Honor -

16             THE COURT:  - their claims are, and then we'll have

17   the known universe of asbestos claims.  At that point you'll

18   have your experts, who can look at them, and they'll tell me

19   in their view what they're worth, and if it -

20             MR. KRUGER: But, Your Honor, you don't -

21             THE COURT:  - takes a second B-read for you to do

22   it, then we'll order a second B-read.

23             MR. KRUGER: But isn't the only way to get to that

24   result to go through the questionnaire process that this

25   Court has already approved more than a year ago in terms of

1    its being forthcoming -

2            THE COURT: The questionnaire may be some of the

3    discovery.

4            MR. KRUGER: Well, but don't we need to complete the

5    discovery process so that the debtor and all of the other

6    relevant committees, the ACC and the others -

7            THE COURT: Sure, and while -

8            MR. KRUGER:  - have an ability to understand -

9            THE COURT: Absolutely.

10            MR. KRUGER: - what those claims are.  If we had

11    that process, we might be able to find a negotiated

12    conclusion, but until that process unfolds further -

13            THE COURT: Well, I think the way to make sure that

14    the process unfolds completely is to set a bar date because

15    otherwise all I'm going to be doing at this point is spinning

16    wheels trying to figure out how many estimates of claims

17    there are.  So, let's find out.

18            MR. BERNICK: Your Honor, Mr. Lockwood and others

19    are - like the sun just rose over here.  There are all these

20    beaming smiles, and the reason that there are all these

21    beaming smiles is that Your Honor now has come to at least

22    the impression that Mr. Kruger's clients are relying upon

23    there being equity in this company and, therefore, are not

24    coming to the table, and therefore there's no negotiations,

25    and I think that that's Your Honor's sense.

1          THE COURT: I think that's what he's telling me.

2          MR. BERNICK: Your Honor, this is so critical here.

3     Every time we're here before Your Honor, and I'll be totally

4     candid, this has happened now for several months.  Your Honor

5     has an impression about what these claims are worth.  Your

6     Honor has -

7          THE COURT: I do not.

8          MR. BERNICK: Your Honor, you just told Mr. Kruger

9     that his client was essentially not operating in good faith

10    because they were saying that there's still equity here.

11         THE COURT: I said they weren't operating in good

12    faith by going to a mediation, taking a fixed position, and

13    not moving off of it.  That's what I said.

14         MR. BERNICK: Well, that's not what's going on here.

15    What's going on here is there's only one fixed position.  The

16    debtor has moved dramatically off of its beginning figure.

17    The debtor moved to a figure that was a hair's breadth of

18    being a deal, and we didn't pull back from it, we filed it

19    knowing that that was going to set a new floor.  So this is

20    not a, Oh, we're not going to negotiate.  Mr. Kruger knows

21    that, and his client knows that.  There's only one

22    constituency who doesn't want to negotiate over equity and

23    that's the constituency that's on this side of the room.

24         THE COURT: Wait, this is not helpful.  Here is the

25    situation.  I sent you to mediation.  I kept everything on

1    stay so that parties could attempt to come to some

2    resolution.  You don't come to a resolution by taking a

3    position, Oh, no, I've got the football, and I'm not going to

4    share it, and that's what has happened.

5           MR. BERNICK: No, Your Honor, that is false.  That

6    is not what happened.

7           THE COURT: Mr. Bernick, you told me you weren't

8    there.  Now, you're going to tell me that it's false?

9           MR. BERNICK: Yes, because I was there enough - No,

10   I'm sorry, Your Honor, with due respect to the Court, Your

11   Honor, my client has been in bankruptcy for a long time, and

12   we have been -

13          THE COURT: I know, I've been here.

14          MR. BERNICK: We have been in this with Your Honor

15   in trying to get the merits of this matter decided based on

16   the evidence, not based upon what people are reciting to the

17   Court, and thus far, Your Honor -

18          THE COURT: Exactly.

19          MR. BERNICK: Excuse - and this far, we have been

20   unsuccessful in that process.

21          THE COURT: Exactly, and you started this case off

22   with one of my first hearings telling me you wanted a bar

23   date, and I told you it was foolish.  I have come full

24   circle.  I disagree with that premise in this case.  I don't

25   think it's always necessary.  In this case, you were right, I

1    was wrong.  Let's set a bar date.

2            MR. BERNICK: Well, but here's what's going with

3    that, because we've been very careful about this process.  If

4    Your Honor sets a bar date, it will be gamed.  It will be

5    gamed in the same way I learned it could be gamed in the

6    Babcock & Wilcox case, and the bar date that was set there

7    says, You just give me all the claims that are pending out

8    there as of the bar date, and you will see the entire

9    plaintiff's personal injury bar in the asbestos area file any

10   claim they can possibly imagine, and we know from Babcock &

11   Wilcox, it was overwhelmingly junk -

12           THE COURT: Well, maybe -

13           MR. BERNICK: It was - Your Honor, I'm sorry.

14           THE COURT: Maybe that judge, Mr. Bernick, was not

15   quite as frustrated.  I am willing to refer for criminal

16   prosecution anybody that is shown to file a false claim

17   against this estate at this point in time.

18           MR. BERNICK: That has not happened so far in this

19   case.  We've had thousands of claims that were filed without

20   any basis and without any authority and all that's happened

21   so far is the claims have been withdrawn.  There's been no

22   sanction levied in connection with that in this case.

23           THE COURT: No one has asked, if you're talking

24   about Mr. Speights.  I'm not done with Mr. Speights yet.  If

25   you're talking about the personal injury claims, I don't have

1    a bar date, so I'm not aware that any claims have been filed.

2    If you're talking about somebody other than Mr. Speights,

3    frankly, I don't know what you're talking about.

4         MR. BERNICK: I was talking - Enough said, but what

5    we -

6         THE COURT: No, it's not enough said.  If I'm off on

7    the wrong page, then tell me.

8         MR. BERNICK: Well, here's where I would like to

9    help Your Honor because we have done nothing in this area

10   that in trying to get these matters set our for a sensible

11   adjudication but to think about exactly these issues and

12   exactly how the process can work consistently with the rules

13   so that it's meaningful, and we get bound by the result,

14   whatever it might be, and Your Honor, this went through an

15   evolution.  It went through an evolution with Judge Wolin,

16   who wanted all kinds of ideas about this.  He actually

17   proposed some for the USG case, and it's gone through another

18   evolution yet in connection with this case, as we try to

19   focus the estimation process.  We made a very specific

20   choice.  What we said was that rather than asking for an

21   overall bar date, you asked for a bar date with respect to

22   those people who had claims pending against the company at

23   the time the company went into Chapter 11; why?  Because that

24   number of people was not gamed.  It was gamed in some ways

25   but it wasn't gamed as a bar date.  It was simply a snapshot

1    of claims that were extant against the company as of the time

2    the company filed for Chapter 11.

3            THE COURT: Okay.

4            MR. BERNICK: So, we then asked to have the

5    questionnaires sent out to them because we knew that if could

6    develop in that snapshot which claims, what kinds of claims,

7    what percentages of claims were good, bad, or indifferent,

8    you could then take and extend that curve, like all these

9    estimates do, to figure out not what the claims would be in

10   the future if all the junk that ever came in continued to

11   come in, but what would the claims in the future be if only

12   claims that met basic evidentiary standards could come in.

13   So, when we came back and asked Your Honor for a bar date,

14   and we did so within the last few months, we were very

15   specific.  We could ask for a bar date for all claims, and we

16   could deal with all the consequences of that, but what we

17   wanted to do is come and ask for a bar date for people to

18   file claims, those people who had claims pending against the

19   company at the time.

20           THE COURT: Fine, fine.

21           MR. BERNICK: And then, with respect to them, we

22   would know if they hadn't filed a questionnaire, we would

23   know, Well, do they have a claim or not, and with respect to

24   ones that did file a questionnaire, we wouldn't have this

25   argument that somehow these are third-party witnesses and we

1    have to have this, that, and the other, and all hundred

2    thousand of them have the opportunity to come before the

3    Court because if they come before the Court in the form of a

4    claim, they're already here.

5         THE COURT: Right.

6         MR. BERNICK: So, we do want to put on a bar date

7    proposal, a motion for a bar date, applicable to that

8    population, that snapshot population, so that we have a

9    process here that is transparent, that can't be gamed, and

10   we'll be asking the Court for that.  But, Your Honor, what

11   I'm reacting is the sense that in some fashion we have a

12   bogie here to establish to Mr. Kruger's clients that there is

13   no equity, and we shouldn't have any bogie. The parties have

14   tried to negotiate in good faith.  I know my client has sat

15   there and listened to what their proposal was, as much as

16   they would tell us, and they have moved not - the idea of

17   intransigence here coming from this side of the room, is

18   nothing short of unbelievable in light of the change that

19   took place from 18 months ago to the present time, but this

20   is not a situation where there's any bogie to be met.  This

21   is a situation where in any court of law, it sounds corny, in

22   any court of law in the United States and particularly in an

23   asbestos case, we have to reestablish that the rules of

24   evidence and procedure apply, and that there is no bogie and

25   there is no other agenda even if it's bankruptcy.

1          THE COURT: Mr. Bernick, I'm really not sure what

2     soapbox you're on.  I am willing to give you a bar date.  If

3     you want it for pre-petition claims, fine.  Like you, I

4     started out as a trial lawyer.  I am fully in accord with the

5     rules of evidence being applied in a litigated proceeding in

6     the Bankruptcy Court, and I will do my best to apply them to

7     the best of my ability from this end of the bench, just like

8     I did from that end of the bench.  That's the best I can

9     offer at this point in time.

10          MR. BERNICK: That's all we're asking for.

11          THE COURT: With respect to the questionnaires, I

12     think that's the problem.  There is an allegation that they

13     are, in quotes, "third-party witnesses".  I don't see them as

14     third-party witnesses.  These are people who are going to be

15     pursuing claims against a trust that the debtor has to fund.

16     That means that they are, in quotes, "claimants" or "demand

17     holders" depending on how they come out, whether it's a

18     current claim or a future demand.  So one way or another,

19     they are going to be recognized as creditors even if they

20     have not yet filed a claim.  Let's get a bar date.  Let's

21     find out what claims come in, and then I think all of the

22     expert witnesses will be able to look at the same set of

23     claims, and I think we can proceed in a logical fashion.

24     Now, with respect to the concern I have about whether or not

25     there is a return to equity, I think Mr. Kruger's correct.  A

1    part of that issue is going to depend on what the claims, the

2    asbestos claims, will turn out to be both present and future,

3    and I think that is a correct statement.  So, I'm not in any

4    way at this point challenging it.  My frustration is the fact

5    that your litigation position and your settlement position,

6    as we all know, are two different things, and because someone

7    thinks that you can get a better deal, perhaps, through

8    litigation than settlement, I mean, that happens from time to

9    time - I'm not talking about you, Mr. Bernick, I'm talking

10   about the committees that refuse to make counter offers

11   because the whole concept is unacceptable.  That, in my view,

12   is not negotiating at all, let alone not negotiating in good

13   faith.

14        MR. BERNICK: I apologize, Your Honor, for my tone.

15   Sometimes I've gotten heated here this afternoon.  We have

16   all the respect in the world for the Court.  It is a

17   difficult process, but speaking for the debtor and I will

18   also speak for Mr. Kruger and his constituency, to my

19   observation, this is not a situation where people are

20   entrenched.  We have tried to make movement.  I'll say to the

21   other side, even though I sometimes look for it unavailingly,

22   I assume that they're operating in good faith and would

23   negotiate as well.  The real problem is we just - we've got

24   to get to the courthouse steps or nothing is going to happen.

25        THE COURT: Fine, so get together between now and

1   the next omnibus hearing and put together an order that will

2   create a bar date.

3          MR. KRUGER: Your Honor, just a final comment if you

4   will, and that is with respect to whether or not our

5   Committee has negotiated in good faith when negotiating.  We

6   were present at the mediation and participated in the

7   mediation.  We understood the offer that was made to us.

8   That offer was not acceptable.  It was not acceptable in a

9   level that required a response, quite frankly, and there's

10  little doubt in my mind that if the Committee had accepted

11  that offer that was made, it would have been voted down,

12  maybe not quite unanimously, by the vast majority of the

13  constituency.  It just would never - it would have been an

14  Armstrong situation which the Committee says yes and the

15  constituency votes it down.  In this case, the Committee

16  recognized that the offer was unacceptable to the members of

17  the Committee let alone to the constituency.  It's very hard

18  to respond to that, particularly when you realize that so

19  long as the Equity Committee believes that there is equity

20  and the marketplace believes that there is equity in this

21  debtor, so long as those are present, it's not possible for

22  the Creditors Committee to accept a proposal that is less

23  than payment in full.  And so and until such time as there is

24  either an estimation process that demonstrates that there is

25  no value to the equity or some other result, we are where we

1    are, and that is indeed acting in the very, very best of

2    faith because we believe on behalf of our constituency that

3    there is equity, and that we are entitled, therefore, to be

4    paid in full with interest and that program is the debtor's

5    program.  It's our program, it's the Equity Committee's

6    program, and until something occurs to change that view, then

7    negotiations are not possible, and to suggest, for example,

8    that we come back with some proposal that says, Oh, yes,

9    we'll take that offer, it's unacceptable, obviously, to the

10   Equity Committee which would oppose it.  It's unacceptable to

11   the debtor, and it would be unacceptable to our constituency.

12         THE COURT: That isn't your burden.

13         MR. KRUGER: My burden is my Committee.

14         THE COURT: Your constituency.

15         MR. KRUGER: Right, and my constituency recognizes

16   that there is equity value present, and therefore, insists

17   that they indeed be paid in full with interest until

18   something occurs to demonstrate to the contrary.

19         MR. BECKER: Your Honor, Gary Becker for the Equity

20   Committee.  Just to back up what Mr. Kruger says.  The Equity

21   Committee was at every one of the mediations to which we were

22   invited with the chairman of the Equity Committee and the

23   single largest shareholder.  We were never approached once by

24   the Asbestos Creditors.  We were there to negotiate.  Nobody

25   wanted to negotiate with us, and, Your Honor, we believe that

1    there's equity in this company, and the only way to really

2    determine that question is to go forward with the resolution

3    of the personal injury claims.  It's unfortunate, but we have

4    to do it.

5         THE COURT: All right.

6         MR. INSELBUCH: A couple last thoughts, Your Honor.

7    Just so we're clear.  What we proposed to Mr. Kruger and his

8    constituents, is if they would bring the folks who might

9    listen, we would bring our estimation expert to a meeting so

10   that indeed they could evaluate what that estimation expert

11   had to say, and they would then be in a position to employ

12   that information in a negotiating process.  They wouldn't

13   come to that meeting.  That's why we can't go forward.  I do

14   not fault Mr. Kruger.  That's a situation he found himself

15   in.  We will work with Mr. Bernick to create a bar date for

16   the pre-petition claims, but I don't want Your Honor to think

17   that our view of how estimation goes forward involves use of

18   the unresolved pre-petition claims.  Just so we're clear, the

19   surrogate for the future are the resolved claims, taking into

20   account what changes might reasonably be expected in the tort

21   system, not the undeveloped pre-petition claims.

22        THE COURT: Well, I understand that your evidence

23   may be different from the debtor's evidence.

24        MR. INSELBUCH: Fine, Your Honor.

25        THE COURT: I understand that.

1        MR. INSELBUCH: And that's why come later in July,

2   that is when we come to exclusivity, we would like to be in a

3   position to go forward so that both sets of evidence can be

4   prepared at the same time, and so we can have a hearing where

5   we put on our evidence, the debtor will put on its evidence,

6   and then the Court will be in the position to determine which

7   of two plans can be confirmed.

8        THE COURT: Well, I don't know about which of two

9   plans.  I'm not sure on which of any plan at the moment.  I

10  think what I need is to get an estimation and then we'll see

11  where we go with plans.

12       MR. BERNICK: Between now and July, Your Honor, can

13  we - We would ask that with respect - I don't know if Your

14  Honor still wants to have objections that go to the face of

15  the questionnaire mediated -

16       THE COURT: Frankly, if you're going to set a bar

17  date, I don't think that's going to be necessary, because at

18  some point in time, I'm going to treat the questionnaires as

19  an appropriate interrogatory, and if there are legitimate

20  objections, we're going to take the objections, and if not,

21  then I'll do an order that compels people to answer.  I think

22  that's what needs to happen but it needs to happen in a

23  fashion that gives everyone the due process notice that

24  they're entitled to have and to raise whatever issues are

25  there.  So, it's up to you, Mr. Bernick, if you want to try

1    to pursue it and get notice out to everybody, I'm here.  I'll

2    do it.

3         MR. BERNICK: Well, then, we'll go ahead and try to

4    do that because, and there's probably a difference between,

5    you know, a very claim specific objection and some of these

6    broader objections that go to what we actually litigated

7    before Your Honor last year, and our priority - really to

8    kind of be able to tell the Court what these questionnaires

9    are showing is to be able to have these very simple

10   objections resolved soon so we can get the questionnaires and

11   keep this process going.  The questionnaires, I mean, it's

12   not something that's sort of mysterious.  Questionnaires have

13   been used in litigation, to my knowledge, for a long time,

14   certainly in the last ten years.  We had extensive

15   questionnaires in the breast implant litigation.  Actually

16   they were filled out without objection.  So it should not be

17   that difficult - I'm sorry.  Go ahead, Mr. Baena.

18        MR. BAENA: I have no drama to add to this, Judge.

19   I just, if I may, Scott Baena on behalf of the Property

20   Damage Committee.  In response to the last point that Mr.

21   Inselbuch made, the Court registered some circumspect about

22   plans, be it one or two, and I just would like to address

23   that one issue.  I'm not going to raise this to an emotional

24   level.  We've heard repeatedly throughout today's hearing

25   about the inability of the unsecured creditors to

 1    meaningfully engage in this mediation process.  And what

 2    we've heard is their fervent belief, based upon market

 3    forces, that they're in the money at the equity level, and

 4    therefore, the unsecureds are entitled to a hundred percent

 5    of their claims, plus post-petition interest.  And Mr.

 6    Inselbuch alluded to this.  It was denied by those opposing

 7    his comments, but it actually, Judge, is worth reflecting on

 8    the opposition because what Mr. Inselbuch said is

 9    irrefutable.  The market - As informed as the market ever

10    gets, the market is reacting to all of these asbestos cases

11    to what's happening in court.  And if we just freeze for a

12    second and realize where we are and realize how clever the

13    debtor was to put us in this position.  What we have is a

14    plan on file.  One plan, despite the many attempts over the

15    past several years of the FCR, the ACC, the Property Damage

16    Committee to wrest exclusivity away from the debtor, we were

17    unsuccessful.  But in our failure, the debtor was able, in

18    fact the Court compelled the debtor to file the plan, and the

19    market is reacting to a plan which the debtor filed to invest

20    the unsecured creditors and the equity in their plan, and the

21    way they invested them was, they put a cap on PD and PI and

22    they said, We'll give you whatever you want, whatever you

23    want.  And so, the market is reacting to that.  That distress

24    debt dealers aren't paying a hundred cents on a dollar today.

25    We see this tickers come across our desk everyday.  They're

1   not paying a hundred cents for unsecured claims, and the

2   market is being dominated by, you know, non-institutional,

3   large investors who are just - to borrow a word that's been

4   used before, gaming the fact that there's a plan on the table

5   that would pay unsecureds in full with post-petition

6   interest.  And so, when Mr. Inselbuch suggests, Well, let us

7   put a plan on the table.  It's not a nefarious proposition,

8   and indeed, it makes a great deal of sense at many levels

9   including on the level that it will then send a new dynamic

10  to that so-called informed marketplace, and we will test the

11  marketplace.  Of course, nobody in the world accepts the

12  proposition, no court in the world accepts the proposition

13  that what the stock is trading at is what you need to find in

14  respect to the solvency of a company, but it will be one less

15  complaint, I assure you, when a plan that is based on true

16  value is also on the table.  And I would suggest, Judge, that

17  if you're not going to accept Mr. Inselbuch's suggestion,

18  then you ought to get rid of their plan because it's the fact

19  of one plan and not two plans that is creating the impasse as

20  much as anything else in this case.  And so it is that this

21  becomes a self-fulfilling prophecy.  We leave that plan on

22  the table while we do absolutely nothing with it.  We're not

23  promoting it.  We're not objecting to it.  We have no

24  confirmation hearings set up.  We didn't even get through a

25  disclosure statement hearing.  It's just there taking up

1    court space in the file and creating this information in the

2    investment public.  And it's creating an obstacle to a

3    consensual resolution of this case.  So, respectfully, I

4    think that Mr. Inselbuch was right.  Let us put something on

5    the table too.  If you want to shelve everything and put it

6    to the side, that's fine.  We would like to put something on

7    the table and propose to you a way to move this case along to

8    confirmation on one plan or the other without another two-

9    year sideshow over estimation as a discreet exercise in the

10   course of all of this.  Or get rid of their plan.  Thank you,

11   Judge.

12        THE COURT: Well, are you suggesting you don't need

13   an estimation hearing?

14        MR. BAENA: I'm not suggesting that there won't come

15   a time where we don't have to put some contours on the value

16   of claims, but what I'm suggesting is, it can occur in all

17   different kinds of contexts.  In this context, the one we're

18   developing here, it's just sort of happening as a cosmic

19   experience.  There's a plan out there.  Not necessarily - I

20   don't think there's a person in this room that believes that

21   that plan is really the plan that we're all going to pursue

22   at the end of the day.  Indeed, Mr. Kruger even suggests, you

23   know, maybe through this litigation activity we'll find other

24   opportunities to be in the same courtroom with one another

25   and maybe negotiate a little bit more.   Everybody's holding

1  out hope for a negotiated result.  That plan is holding us

2  hostage.  That's what I'm saying.

3       MR. BECKER: Your Honor, Gary Becker for the Equity

4  Committee.  I think Mr. Baena's argument proves too much.  If

5  in fact the plan that's on the table drove the valuation of

6  the equity in the market, it would never change.  But since

7  the plan has been filed, equity has traded from around $8 to

8  $18 and back down to about $12 today.  Obviously, when people

9  buy or sell stock, it's in anticipation of future events.

10  It's driven by the fact that the plan that's on the table may

11  not be the plan that gets confirmed.  I think it would be

12  extremely short-sighted and naive to believe that just

13  because a plan is on file, that drives the market and

14  precludes any sort of a resolution of this case.  What we

15  really need is to have a decision on ZAI and to have the

16  personal injury claims fixed.  Thank you, Your Honor.

17       MR. BAENA: Judge, if I may.  The response to that

18  is up until recently, the market has been trading on the

19  legislation.  And they've not been immune to that trading

20  too.

21       MR. BERNICK: Your Honor, all these statements that

22  have been made about what the marketplace is doing, I guess

23  the folks in this courtroom are actually smarter about the

24  market than the market is.  That's a pretty tough proposition

25  for anybody to demonstrate.  I mean, if they want to come in

1   and make a pitch in connection with exclusivity and actually

2   prove to the Court that somehow the plan on file is governing

3   the decisions of people who are trading in tens and hundreds

4   and millions of dollars worth of securities, let them come in

5   and do it.  We have the analyst reports that say everything

6   he's representing to the Court is just flat out false,

7   including the notion of the Fair Act.  I think that what's

8   happening here takes me back to April.  In April, Mr. Baena

9   was concerned because Your Honor said at that time that if a

10  consensual negotiation process doesn't work out, you've been

11  holding up the litigation - Your Honor been holding up the

12  litigation with our concurrence.  We all thought it was

13  worthwhile, and if mediation didn't work out there was going

14  to have to be time for the litigation track to proceed.  Mr.

15  Baena was very worried at that time that, Oh, my gosh, you're

16  already deciding exclusivity against them.  He stood to

17  argue, just as he argued today, and Your Honor said, Oh, Mr.

18  Baena, I'm not preordaining any result.  I'm just trying to

19  articulate what I see as the process that the debtor is

20  trying to move forward, and it has been to a certain extent

21  trying to move forward in some matters.  Your Honor, we don't

22  think that you're predetermining anything now, and there's no

23  point in arguing about all these matters and exclusivity and

24  what the market is doing or not doing.  We'll be back in

25  July, and we'll take up the issue of exclusivity, and we'll

1  talk about whether or not it's appropriate to terminate

2  exclusivity.  We will of course come back to the fact that

3  there's been a hiatus.  They'll come back and make whatever

4  arguments they want about the market, but what are we doing

5  arguing about this now for?

6          THE COURT: Well, I guess what you're all saying is

7  that the coin toss process of deciding what market value for

8  the stock is really applicable doesn't apply and that it's

9  some other method that people use to determine market value

10 of stock, and so I imagine that probably the experts have a

11 better way of doing the coin toss that some of the studies,

12 back in the '70s, used to tell you that the coin toss theory

13 was sometimes just as predictable.  So -

14         MR. INSELBUCH: If I understand, Your Honor, what

15 you've now told us you want done is there will be a bar date,

16 and thus, the pre-petition claimants will have their claims

17 filed, presumably Form 10, and they'll respond to their

18 questionnaires, and then there may or may not be, for

19 particular claimants, disputes or attempts by the debtor to

20 disallow the claims.  I think in that context to be fair to

21 the claimants, you have to relieve the stay that bars them

22 from seeking discovery against the debtor if we're going to

23 have contests about whether or not those claims can proceed.

24         THE COURT: Well, I think what I need from you folks

25 is a bar date order that sets a bar date, and then I'll

1    figure out what type of discovery we need.  The purpose that

2    I see for setting the bar date is to figure out what the

3    universe of at least the pre-petition known claims is.  At

4    least that way, all experts can work from the same page.  It

5    won't be a guesstimate as to what claims there are pre-

6    petition.  It will be a known factor, and that number,

7    obviously there may be some dispute as to whether, you know,

8    so many of them belong in the - I'll use the word, in quotes,

9    "unimpaired" class as opposed to some other class, but people

10   will have the information to be able to make reasonable

11   assessments and go forward with the evidence.  So, it seems

12   to me at this point with this ball not having advanced

13   anywhere that it can't hurt anything to know what the claims

14   are that are going to be filed, because once they're filed,

15   that's it.  There's not going to be a second opportunity for

16   people to file claims against the trust.  They're getting one

17   chance to file, as to the people who will be subject to the

18   bar date.

19        MR. INSELBUCH: Well, the claims against the trust

20   follow a whole different posture.  They have to satisfy

21   whatever the trust procedures are.

22        THE COURT: There are not going to be second

23   opportunities to file claims against the trust -

24        MR. INSELBUCH: Oh -

25        THE COURT:  - for the people who are getting a bar

1    date.

2           MR. INSELBUCH: But you're not suggesting that they

3    won't have to file additional papers with the trust?

4           THE COURT: No, I don't know what they're going to

5    have to file.  What I'm saying is, if they don't file a claim

6    against the debtor -

7           MR. INSELBUCH: They'll be barred.

8           THE COURT:  - they're going to be barred.

9           MR. INSELBUCH: I understand.  But, just so we're -

10   I want to make sure I make full disclosures.  We understand

11   what Your Honor has decided, and we will certainly do what

12   Your Honor has instructed, but just so we're clear in terms

13   of estimation, the universe that's going to file this bar

14   date is the smallest of all the universes that gets

15   estimated.  That estimate - because in addition you've got

16   five years of people since that time and forty years of

17   futures.

18          THE COURT: Well, with respect to the post-petition

19   issue, the experience in the other cases has borne out that

20   when a bar date is set, claims come in that may not otherwise

21   have come in.

22          MR. INSELBUCH: As they must because the lawyers

23   can't be sure whether or not they would otherwise be barred.

24          THE COURT: So, the - you know, if the people who

25   are going to be looking at a trust, one way or another, want

1    a separate bar date, because I do think that maybe it should

2    be in two tracks, to get the post-petition known claims

3    filed, I don't see any reason why that can't be done.  The

4    difficulty, of course, is that I am not at this point

5    envisioning having to deal with objections to 200,000 claims,

6    or however many, a 100,000 are going to be filed in this

7    case.

8           MR. INSELBUCH: Well, you could have that many

9    anyway.

10           THE COURT: Well, we may have that many anyway.  I

11    mean that's entirely possible, I don't know.  But if there is

12    some value from your expert's point of view to set the bar

13    date for the post -

14           MR. INSELBUCH: No, there's none.

15           THE COURT: Okay.

16           MR. INSELBUCH: There's none in doing that.  There's

17    none, from our point of view and RS's point of view, there's

18    no more value in the bar date at all because the filing of

19    pre-petition claims is a known fact.  It's in their records.

20           THE COURT: Well, what's in the records is with

21    respect to people who have made them known that they had a

22    claim pre-petition, but that's not necessarily the whole

23    universe.

24           MR. BERNICK: Your Honor -

25           MR. INSELBUCH: It should be the same.

1          THE COURT: Well -

2          MR. BERNICK: It shouldn't.  If I can just -

3          THE COURT: If you want to rely on the fact that

4    it's the same, maybe we don't need a bar date.

5          MR. BERNICK: (Microphone not recording.)

6          THE COURT: Well, the reason that I thought a bar

7    date might make some sense at this point is to figure out

8    what the pre-petition universe of claims is.  If the debtor

9    is comfortable that you've got that universe, I don't know if

10   you need a bar date.  If you do, okay.

11         MR. BERNICK: (Microphone not recording.)

12         THE COURT: I want to make sure I understand.  You

13   want to set a bar date -

14         MR. BERNICK: Yes.

15         THE COURT:  - only for claims that are known to the

16   debtor.  You do not want to do, for example, a publication to

17   find claims that might exist pre-petition that might be valid

18   claims, but as to which the debtor, as of today, or as of the

19   date of filing, that is, pardon me, has no knowledge.

20         MR. BERNICK: (Microphone not recording.)

21         MR. INSELBUCH: (Microphone not recording.)

22         THE COURT: Sue or notify, I suppose.  Sue or notify

23   the debtor that they have a claim.

24         THE CLERK: (Making adjustment on microphones.)

25         MR. INSELBUCH: If that's what he wants to do, fine.

1    That's fine, but I would suggest, Your Honor, that it has no

2    statistical validity at all because if we're trying to

3    measure as of a point in time how many claims existed, it

4    doesn't depend upon whether you drew that curtain or that

5    somebody had filed or made the claim as of that date.  It

6    depends upon whether or not there was a claim as of that

7    date, but I - but it's a matter of indifference to me because

8    at least this way, it will be very simple for people to say

9    to themselves, did I make a claim against Grace as of that

10   date, and it will be a little bit more complicated for the

11   lawyers to figure out whether or not there was in fact a

12   cause of action as of that date.  Now he wants to go on and

13   test what he calls the propensity/validity.  If we get to the

14   next stage, Your Honor, as what I said before, if we're going

15   to have in effect a claims disallowance process, then in fact

16   that implicates other procedures in this Court and must give

17   the claimants an opportunity now to do discovery,

18   particularly on issues like exposure to the defendant's

19   products that they have been unable to do for five years

20   because the stay has been in place.

21           THE COURT: Well, I don't understand that the

22   debtor's actually asking for a claims allowance process.  I

23   think they're looking for information for their experts for

24   the estimation, but maybe I'd better find that out from Mr.

25   Bernick.

1          MR. BERNICK: That's exactly right.  It's in

2   contrast to the situation with respect to the property damage

3   claims which we've made clear.  Your Honor, we had this

4   discussion, I believe it was earlier this year, because Your

5   Honor, you know - we'll take responsibility for the lack of

6   communication - Your Honor was under the impression we were

7   seeking to disallow claims.  The answer's, no, we're not.

8   We're simply seeking to estimate those claims and because

9   we're seeking to estimate them, we're seeking the information

10   that would say that under the rules of evidence these claims

11   have value.  That result will not be binding on the

12   distribution with respect to a particular claim, that is to

13   say, we're not going to take the position that if somebody's

14   claim doesn't work, that they are barred from any kind of

15   recovery.  We're not doing that.  We were doing that

16   originally.  It's part of our process of trying to get to

17   something that got us what we needed as opposed to what we

18   wanted.  We were doing that originally but our bar date does

19   not seek to do that.  It says, with respect to those people

20   who had asserted a claim - you've got to put up or shut up.

21   If you want your claim to be pursued at all, you've got to

22   file the questionnaire.  If you don't file the questionnaire,

23   you're out of luck, period.  That would be binding, but if

24   you filed the questionnaire, the information you give in that

25   questionnaire would then be used by the experts in the

1  estimation process, and the outcome of the estimation would

2  not be the disallowance of any particular claim.  It would be

3  the estimation of what the claims are worth.

4          MR. INSELBUCH: But the response to the

5  questionnaire has to be done with one arm tied behind your

6  back -

7          MR. BERNICK: No.

8          MR. INSELBUCH: Please let me finish, Mr. Bernick.

9  His expert will say, My goodness, this plaintiff, this

10  claimant could not show that there was such and such, an

11  asbestos product at such and such a place, couldn't prove

12  that Grace in fact delivered its product to this place.

13  Well, how is that claimant, how is our expert to counter that

14  argument unless there is an opportunity where that contest is

15  made and where that argument is made to seek the necessary

16  evidence.  Just as they get a questionnaire, why don't we get

17  a questionnaire.

18          MR. BERNICK: The answer's very simple.  If you were

19  to have the full rules of discovery available to both sides,

20  then we would take depositions of all of these people.  They

21  could conduct claimant-specific discovery with respect to

22  Grace, and, of course, we would never get done.  It would not

23  be an estimation at that point.  It would be the litigation

24  of each individual claim.  What's necessary is for the Court

25  to strike a balance between what evidence that is

1    discoverable under the rules is necessary for there to be an

2    estimate, which is a streamlined process.  We are satisfied

3    with the questionnaire.  There's more that we could ask for

4    too.  Mr. Inselbuch's folks have asked for access to all of

5    our documents.  They've had our documents for years, and

6    they've had depositions that have been taken for years to

7    find out any and all kinds of products and where they were.

8    If for some reason that discovery is inadequate, that is to

9    say, there's some real reason why they need more discovery,

10   I'm not saying they can't come before the Court and ask for

11   it.  But to say that their individual claimant can't fill out

12   the questionnaire with the benefit of the law firms that have

13   been pursuing this litigation for 20 or 30 years, and those

14   law firms have access to all the documentation in the world,

15   and these are people who have been in the tort system at

16   least for five years, that just can't be right.  This is not

17   the beginning.  This is the very tail end of very mature

18   litigation.  So, we said we're satisfied with the

19   questionnaire.  It was extensively litigated.  They sought

20   access to our documents in discovery.  We gave them the

21   documents.  If they want to come back and say for some reason

22   they need more, I guess they can always frame a request.

23        MR. INSELBUCH:  The problem is, who's "they"?  The

24   Committee can't act for each of the 200,000 claimants out

25   there.  Each of those claimants has its own series of

1    questions, has its own discovery that it might need to seek,

2    but Mr. Bernick has conceded and Your Honor has sat silent,

3    and he said we can come back and ask for more discovery if

4    and when we need it, depending on how this goes, I'm prepared

5    to stay with that.

6         THE COURT: Yeah, that's fine.  I'm just having some

7    trouble getting a grip on exactly what the bar date process

8    is going to do.  I thought that if we set a bar date, that

9    was going to be the means all and end all for the people who

10   got the notice with respect to filing claims.

11        MR. INSELBUCH: It would be.

12        MR. BERNICK: Then we would be.

13        THE COURT: So then they do have the right to do

14   discovery if there is going to be some - What you're telling

15   me is that as a precondition to having a claim transmitted to

16   the trust, assuming we get a plan confirmed that has a trust

17   in it, the debtor would have had to - not the debtor, pardon

18   me.  The claimant who got notice would have had to have filed

19   the proof of claim, answered the questionnaire, and then

20   that's it, because the only purpose for that in this process

21   right now is for parties' use in the estimation, but so that

22   there is a known universe for those people who got the notice

23   to file the bar date, it's a one time good deal only.  They

24   don't get to file it against the trust unless they file it

25   here.

1          MR. BERNICK: That is to say that in the same

2     fashion as with any bar date, if you don't file your claim by

3     the bar date, your claim is barred.  So we have exactly the

4     same thing, and it stands in service then of getting

5     information that informs the estimation process.

6          THE COURT: Okay, I'm worried about the next level.

7     So, at the trust level -

8          MR.  BERNICK: Right.

9          THE COURT:  - the person who filed the claim in the

10    Bankruptcy Court and his claim is now transmitted to the

11    trust for allowance and payment -

12         MR. BERNICK: Right.

13         THE COURT:  - can take whatever discovery, submit

14    whatever -

15         MR. INSELBUCH: No.

16         THE COURT:  - documents - No.

17         MR. INSELBUCH: Doesn't work that way.  What's going

18    to happen here -

19         MR. BERNICK: I'm sorry -

20         MR. INSELBUCH: What's going to happen here -

21         MR. BERNICK: You can speak for what we're going to

22    do, but I think it might be more worthwhile for us to say

23    what it is that we intend to do, and if you object, then just

24    say you object.  What we would do is then say, they answer

25    the questionnaire, and they provide the information.  Now,

1  they, by filing the claim by the bar date, become claimants

2  in this process.  They are subject to the jurisdiction of the

3  Court.  If they want to come in at that point in time and

4  say, Oh, well, we really want to litigate our claim.  That

5  is, we want to find out if our claim is valid or not.  I

6  suppose Your Honor could entertain that, but that's

7  premature.  That is to say, what they might want to show in

8  order to support their claim, is for another day if we

9  litigated their claim.  But if they come back and they fill

10  out the questionnaire and the questionnaire is done in an

11  incomplete fashion, and Your Honor says, you now, you've got

12  to fill in the questionnaire, they don't do it, at the end of

13  the day, you can't make them do it for purposes of claims

14  allowance or disallowance.  We'll just know they were subject

15  to the jurisdiction of the Court.  They declined to fill out

16  the questionnaire in a certain way, and then that will have

17  to be taken into account at the estimation.  All that this -

18          MR. INSELBUCH: This all misses the point.

19          MR. BERNICK: No - All this is designed to do, Your

20  Honor, is to assure that the estimate is based upon evidence

21  that is as reliable as possible in the context of an

22  estimation.

23          MR. INSELBUCH: But not the evidence -

24          MR. BERNICK: I'm sorry.

25          MR. INSELBUCH:  - that would otherwise be

1    developed.

2          MR. BERNICK: No.

3          THE COURT: I can only hear one of your at a time.

4          MR. BERNICK: Mr. Inselbuch wants to have, wants to

5    say, Well, these people are entitled to conduct their

6    discovery, their own discovery.  It completely misses the

7    point.  We're not trying to litigate their claims.  We're

8    trying to provide an adequate foundation for an expert to

9    express an opinion regarding what kinds of claims and what

10   kinds of defenses apply to what kinds of - what portion of

11   these claims that are being filed.

12         THE COURT: Okay, but, where I'm still missing the

13   point with respect to that then, Mr. Bernick, is, if I go

14   back to your analysis.  You already know the entire universe

15   of people who notified the debtor pre-petition that they had

16   a claim against the debtor.  You don't know whether there are

17   other people out there who haven't so notified, but your bar

18   date process isn't going to derive that.

19         MR. BERNICK: That's why -

20         THE COURT: So the propensity to sue issue is really

21   not something you need to ferret out here because you've

22   already got the universe of known claims in the debtor's

23   possession.

24         MR. BERNICK: We assume that the propensity to sue

25   is what is reflected in the tort system.  That is whatever it

1    is.  You take that snapshot as of that point in time.  The

2    inquiry now is, which of those claims that have been lodged

3    have a reasonable prospect of being litigated to have value,

4    that is their estimated value.

5         THE COURT: I understand that, but I'm not sure why

6    the information that's already available to the debtor

7    doesn't already give your expert that information.

8         MR. BERNICK: Because at the time that we filed for

9    Chapter 11, these cases were in various states of being

10   prepared.  There was information in the file or there's not

11   information in the file; okay?  So if you want the best

12   information that is available as to - these people have filed

13   a claim.  They're part of the 80 percent.  New inquiry is if

14   they had prosecuted their claim or if they are going to

15   prosecute the claim, is that a claim that's likely to have

16   validity or not?  With respect to that, you're asking the

17   questions in the questionnaire.  That's designed to find out,

18   was their claim a good one or bad one.  For example, Your

19   Honor, let's assume that you have - and we've seen this with

20   respect to - this happened in Babcock & Wilcox.  Let's assume

21   that a claim is filed and so and so says, I have a claim

22   against Babcock & Wilcox, and the you then say, Well, how do

23   you know you have a claim against Babcock & Wilcox?  And you

24   say, What's your basis for product ID, and they said, Well, I

25   worked over here at this plant.  Well, it turns out at that

1    plant there were no Babcock & Wilcox boilers at all.  Just

2    never there.  So we know that that's a person who asserted a

3    claim back at this point in time but didn't have the evidence

4    to support it.

5         THE COURT: All right, so what you're going to do

6    with this information is put into bucket categories.

7         MR. BERNICK: Yes, that's absolutely correct.

8    Bucket categories but based on hard data.  All you do is you

9    take those questionnaires and that's how we framed the

10   questionnaires, and say, Okay, with respect to the following

11   people, these are people, none of them who could actually

12   identify a Grace product.  With respect to the following

13   people, these are people who are diagnosed by a doctor that

14   we already know doesn't cut it with a bunch of trusts.  With

15   respect to these people, they have non-replicated B-reads.

16   With respect to these people, you know, so each one of the

17   questions in the questionnaire goes to an element that would

18   drive the validity of the claim.  And so we get the

19   questionnaires filled out - this is exactly what happened in

20   connection with the Babcock case, you get the questionnaires

21   filled out, in that place there was a claim form, and you

22   then can do the runs, and, Your Honor, then we would have a

23   contested proceeding before Your Honor where Your Honor isn't

24   just working with how many people had claims.  Your Honor's

25   working with how many people had claims based on evidence,

1    because an estimation as a contested proceeding takes place

2    under the Federal Rules of Evidence and the Federal Rules of

3    Civil Procedure.  That's the way it has to be.  It's a

4    streamlined estimate of the value of the claim, and the only

5    thing that's unique about this case and it wasn't unique - it

6    was in Dell Corning is that where there is a contest over

7    liability, Your Honor has to focus on determining, as best

8    you can based upon the estimate, what are the prospects of

9    there being liability.  And all that I'm saying, it's not -

10   Mr. Inselbuch is fond of saying, Well, that's Mr. Bernick's

11   view of the world.  There is no other way, and we will brief

12   this before Your Honor.  We have before.  You read the rules.

13   A contested proceeding, which this is, under the Bankruptcy

14   Rules is governed by specified rules of evidence and

15   specified rules of civil procedure.  You cannot estimate

16   unless you're estimating based upon state substantive law and

17   the Federal Rules of Evidence and the Federal Rules of Civil

18   Procedure, period, end of statement.  That's the way that it

19   works.

20            MR. INSELBUCH: And, of course, that gives the other

21   side an equal opportunity to discover evidence.  As Mr.

22   Bernick said, these cases, when the curtain came down were

23   undeveloped.  They couldn't be further developed because the

24   stay was in place.  All I'm suggesting to Your Honor is

25   whatever the utility of this bar date is if it's going to be

1   used, if the questionnaire evidence is going to be used for

2   any purpose in this courtroom, there has to be an opportunity

3   for people to contradict the evidence that that suggests, to

4   fill in the holes, to do the discovery that as Mr. Bernick

5   says would naturally follow under the Federal Rules of Civil

6   Procedure and the Federal Rules of Evidence.  Otherwise, it's

7   a stacked deck.

8            THE COURT: Well, okay, it could be a stacked deck.

9   I think with respect to some of the objections, however,

10  maybe it's easy to un-stack the deck, and that is to the

11  extent that the B-reads are by some of the, you know, doctors

12  whose conduct may have been -

13           MR. INSELBUCH: So they'll get more B-reads.

14           THE COURT: They'll get more B-reads.

15           MR. INSELBUCH: So -

16           THE COURT: So, that -

17           MR. INSELBUCH: That can be done.

18           THE COURT: Right.  So maybe one thing we should do

19  is start about that process so people will know that if

20  that's going to be an issue and they're one of these doctors,

21  they're going to have to do it for the trust anyway.

22           MR. INSELBUCH: Also, Your Honor, the fact that some

23  doctor was criticized in some other court doesn't suggest

24  that the doctor's report in this particular case is in anyway

25  invalid.

1          THE COURT: Well, yes, I suppose that's true, but I

2     did read those transcripts in connection with another case,

3     and I'm here to tell you, I would not approve a trust that

4     relied solely on those doctors' reports.  It was outrageous

5     conduct, and to the extent that the doctors were doing it in

6     one case, I don't see any reason to suppose that they weren't

7     doing it here.  If you want to take their depositions, if

8     they'll testify, and tell me to the contrary, I'll certainly

9     listen, but with them taking the Fifth Amendment, being under

10    criminal investigation, and having read those transcripts, at

11    this point I'm willing to assume that the evidence is subject

12    to challenge.

13          MR. INSELBUCH: Let me ask you - Let me make one

14    other point - Mr. Bernick.

15          MR.  BERNICK: I'd like to respond -

16          MR.  INSELBUCH:  Mr. Bernick -

17          THE COURT: Mr. Bernick, stop, please.  He has the

18    floor now.  You'll get your chance again.

19          MR. INSELBUCH: Before we go too far down this road,

20    because this is a long and difficult path, which it may turn

21    out must be followed.  I would urge Your Honor to give our

22    constituency an opportunity to make a presentation about what

23    kind of plan we would file and how we would propose to go to

24    estimation, because we think, although we have not been in

25    the position to put it together or to put it on paper,

1  because it would be premature, we think we may have a better

2  way to do all of this, because as I pointed out before, the

3  cases that Mr. Bernick is worrying about with his B-readers

4  are a very small part of the estimation dollars that are

5  involved here.

6        MR. BERNICK: Your Honor, it would be very good to

7  be able to address those kinds of questions when we get the

8  questionnaires filled out.  It is our analysis that says that

9  this problem goes way beyond - 81 percent of the claims

10  pending against Grace were for nonmalignant disease, 81

11  percent, and of those claims that were -

12        MR. INSELBUCH: That's probably correct.

13        MR. BERNICK: Right away we know that a very

14  substantial number of the claims that drive that curve are

15  claims that are amenable precisely to this problem, but it

16  goes to the malignant claims as well.  Our issues don't just

17  relate to the nonmalignant claims, they relate to the

18  malignant claims to -

19        THE COURT: Well -

20        MR. BERNICK: But, but - I'm sorry, Your Honor.  But

21  - Well, you know, I guess it is, that's what - when we're

22  going to go ahead and litigate the estimation issue, you'll

23  see exactly how that is so.  It will be in our report as

24  something that if you read the prior papers in the prior

25  cases, you'd know already, because it's already out there in

1    spades.  But, Your Honor, to be clear, Mr. Inselbuch wants to

2    come in and without the benefit of the questionnaires say,

3    Here's how we would handle this case.  He has had - His

4    people have had - He has had for the last four years the

5    opportunity to file all kinds of briefs that talk about what

6    to do and where this thing is going.

7            MR. INSELBUCH: He's going to have the

8    questionnaires next month.

9            MR. BERNICK: Your Honor, can I have - Can I please

10   have the floor at this point?  We've had the - He's had the

11   opportunity for four years to present an alternative vision.

12   The only alternative vision that they presented, the only

13   one, is to simply work . . . (microphone not recording).

14           THE COURT: Well, Mr. Bernick, I don't know.  Maybe

15   that opportunity has been presented out of court, but I

16   haven't provided the opportunity to present it in court.

17           MR. BERNICK: (Microphone not recording) . . . An

18   opportunity was presented, indeed it was mandated twice.

19   First by Judge Farnan and then by Judge Wolin.  This whole

20   idea of estimation was gone through over and over and over

21   again.  All he wants to do, he wants to bring in Dr. Peterson

22   to say, Well, now, based upon the latest iteration of my

23   model - I've cross-examined Dr. Peterson.  We all know the

24   game.  All he's trying to do is to avoid going through a

25   process of finding out what these questionnaires really say.

1    Now, if, in fact, they're prepared to stipulate that whatever

2    comes out of these questionnaires, is all that's going to go

3    into the estimate, that is to say, they can use whatever they

4    got from Grace's files, but we don't need to go through a bar

5    date to find out what - they're going to submit all these

6    questionnaires.  If they're not going to submit the

7    questionnaires, all we're going to have is a bunch of people

8    who don't show up, and then they'll insist that, Oh, well,

9    that's just because they didn't want to fill out the

10   questionnaires.

11          THE COURT: Wait, we're way off, we're way off -

12          MR. INSELBUCH: We're going to submit the

13   questionnaires.  We're not arguing about that.  We're not

14   arguing about his bar date.  We think it's silly, but we'll

15   do it.

16          MR. BERNICK: What I want to know is -

17          THE COURT: I thought it was bad when Mr. Baena was

18   up here arguing.  I've decided, Mr. Baena, you know, you

19   probably need some aggressive lessons here maybe to -

20          MR. BERNICK: The point being, Your Honor, that the

21   purpose of the bar date is to get people to provide the

22   information that's relevant to a touchstone, and the

23   touchstone is an estimate.  If we would get the information

24   without it, we would take it.

25          THE COURT: Okay.  I understand your position.  This

1    question started with, Don't you already have it in your

2    files?  Your answer is, No, you don't.

3            MR. BERNICK: Right.

4            THE COURT: Okay, fine.  Then I will set the bar

5    date so you can get it.  I'm not sure exactly what you're

6    going to get since the debtors haven't been able to do -

7    Pardon me, since the asbestos plaintiffs haven't been able to

8    do much in order to make their claims more mature while the

9    bankruptcy estate has been in place.  But if you want to

10   ferret out that information, you certainly may.

11           MR. BERNICK: We'll see, Your Honor.  Because that,

12   again, is a statement that was made that sounded kind of

13   good, but the problem is that these are people who have been

14   in the tort system for four years.

15           THE COURT: Yes, they have, but not suing Grace.

16           MR. BERNICK: See, that's -

17           THE COURT: Or many of the other asbestos creditors.

18           MR. BERNICK: See, that's what's so crazy, Your

19   Honor, is that they've been suing Grace, the law firms that

20   represent them, these are people who are recruited from

21   industrial sites all over the country.  Everybody knows this.

22   This is a process that's been out there for years and years

23   and years.  It's the law firms that have the information.

24   It's the law firms that conducted discovery against Grace.

25   They have a whole repository of documents that are available

1 to them.  These claimants didn't come out of the woodwork and

2 then, Oh, well, gee, they now need to find out what their

3 claims are all about.  Judge Vance down in New Orleans said,

4 How can you say to these - in fact he said it to Mr.

5 Inselbuch, Mr. Inselbuch, how can you say that you need

6 discovery to find out if you've got a claim against Grace.

7 That's ridiculous.  You should have the information by the

8 time that you're filing the claim.  And if you've got the

9 information, you ought to be affording it to the debtor.

10   THE COURT: Well, wait, wait.  Let me stop it

11 because you're only going to send out notice to people you

12 already know about.  You've already told me that.  So we're

13 not going to be ferreting out of the woodwork people who

14 don't know that they have claims against Grace -

15   MR. BERNICK: That's what he's saying.

16   THE COURT: No, you're saying that.

17   MR. BERNICK: I'm sorry, Your Honor.  That's not -

18 with due respect that is not what I said.

19   THE COURT: Well, wait. I need to understand this.

20 Let me articulate what I understand because maybe I'm

21 confused.  The debtor wants to do a bar date only for

22 claimants that it already knows about who held pre-petition

23 claims.

24   MR. BERNICK: Correct.

25   THE COURT: That's what I thought I said.  Okay, if

1    I didn't say that, I want the record to reflect it amended to

2    say just that.  The debtor wants a bar date for a known to

3    the debtor -

4            MR. BERNICK: Yes, right.

5            THE COURT: - claimant.

6            MR. BERNICK: Right.  People who asserted claims as

7    of the time that the Chapter 11 was filed.

8            THE COURT: Was filed.

9            MR. BERNICK: Right.

10           THE COURT: So the bar date is going to say, if you

11   had a claim against the debtor that was unpaid as of the bar

12   date, then file this proof of claim and attach to it the

13   answer to your questionnaire or you're going to get the

14   questionnaires in now, but there may be other people who may

15   file claims who -

16           MR. BERNICK: But, no, it is all those people who

17   belong to this category, Your Honor, this population, they've

18   all gotten the questionnaires.

19           THE COURT: All right, and if -

20           MR. BERNICK: So, all they have to do by the bar

21   date is file a proof of claim because presumably we're going

22   to get all the answers to the questionnaires by the 12th of

23   July.

24           THE COURT: Okay, fine.

25           MR. BERNICK: Okay.   The reason that there's this,

1    I think, a disconnect, respectfully, Your Honor, is Mr.

2    Inselbuch then says, Oh, you're going to be asking them in

3    the questionnaire for all kinds of things that they don't

4    know because they haven't had the opportunity to prosecute

5    their claim against Grace.

6         THE COURT: Well, I already went through that issue

7    in deciding that the questions were appropriate.

8         MR. BERNICK: Right.

9         THE COURT: So, I'm not going to revisit that issue

10   except as to particular plaintiffs who may really not have

11   the information for whatever reason.  And Mr. Inselbuch's

12   point that they have the right to raise an objection, I

13   think, is a valid one.  They do have that right.

14        MR. BERNICK: They do have that right, but to then

15   further say they've not been able or their law firms haven't

16   been able to find out whether people have got claims against

17   Grace because of the stay, I don't think that that is being

18   forthright with the Court.  In the sense that, this is very

19   mature litigation.  The products that Grace made have been a

20   subject to exhaustive discovery.  I don't dispute that there

21   may be, you know, a handful of people or some number of

22   individuals with respect to whom there really hasn't been

23   discovery that would relate to a product where in some

24   fashion that can be identified.  And that's fine, but the

25   touchstone, Your Honor, is not whether each individual

1    claimant is getting the discovery that they're entitled to.

2    The question is whether the experts who are going to appear

3    before Your Honor on estimation are getting the information

4    that they need in order to perform the estimate because we're

5    not seeking to bar individuals from pursuing their claims

6    because they haven't had discovery against Grace.

7         THE COURT: Well, I'm sure the experts will tell me

8    if they -

9         MR. INSELBUCH: And that's our experts too.

10        THE COURT: Yes, everybody's experts.

11        MR. BERNICK: Yes, but their experts, as Mr.

12   Inselbuch just told you, ships cross in the night, they've

13   now testified in ten different cases, twenty different cases.

14   Their whole world is driven by what Grace decided to pay pre-

15   Chapter 11, and they don't care as long as Grace paid, they

16   don't care that there's any information or evidence to

17   support the claim.  All they know is that if it was good

18   enough for Grace, it's good enough for them.  Of course, in

19   the tort system as we know it, pre-Chapter 11, that could

20   well have been true.  But that's not the tort system that's

21   open to rules of evidence that apply here.

22        MR. INSELBUCH: Your Honor, it's really not fair for

23   him to characterize what went on in other trials.  I don't

24   think Your Honor wants me to stand here and tell you what we

25   proved up in these estimation proceedings.

1          MR. BERNICK: I'm not the one that raised it.

2          MR. INSELBUCH: What?  Yes, you are.

3          MR. BERNICK: No, you talked -

4          MR. INSELBUCH: Excuse me, Your Honor.  Excuse me,

5    Your Honor.  The simple truth is, yes, the settled claims are

6    the surrogate and all of those defendants trotted out their

7    lawyers who came into court at these estimation hearings and

8    said, We did our best not to pay claims that had no value.

9    We only paid claims that could defeat summary judgment.  We

10   only paid claims that had legitimate medical evidence and

11   that had proof of exposure.  He wasn't there.  I was there,

12   and that's when we got estimations of 7 billion and $9

13   billion.

14          THE COURT: Okay, well, in any event, we're going to

15   have an estimation trial.  I'll hear it from the experts and

16   much as I respect both of your opinions, gentlemen, and know

17   the fact that you've been around in the tort system, you're

18   not the experts who are going to be testifying on the

19   estimation process, so, I'll rely on the experts if you don't

20   mind.

21          MR. BERNICK: That's fine.

22          MR. INSELBUCH: For sure, but all I was suggesting

23   is my expert's entitled to discovery if that expert needs

24   facts as well.

25          THE COURT: I am not at this point concerned about

1    expert discovery.  You folks know how to get expert discovery

2    if you need it.   We're not to that level, but I want to do

3    is get a case management order that's going to lay all this

4    out.

5           MR. INSELBUCH: I'm not talking about expert

6    discovery.  I'm talking about evidence that the experts will

7    need to offer their opinions.

8           THE COURT: Yes, I understand.  They want some

9    factual and other background -

10          MR. INSELBUCH: Yes, ma'am.

11          THE COURT:  - in order to form a report to offer an

12   opinion.  They know how to ask for that, and so do you.

13          MR. INSELBUCH: Yes, ma'am.

14          MR. BERNICK: That's fine.

15          THE COURT: All right, here's what I want you to do.

16   This is an order.  I'm putting it in terms of want but it is

17   an order, and I am going to - if I need to put you under oath

18   to make sure that you do it between now and July, that's what

19   I'm going to do.  So I don't want any excuses about it not

20   being done.  If you're on vacation, then figure out a way to

21   do it on a day that you're not on vacation.  If your wife is

22   going to have a baby, then make sure it's on some other day,

23   but I want it done between now and the July omnibus hearing.

24   I want the parties who have come to some negotiated agreement

25   that occurred during the mediation process to meet with the

1   debtor and explain the parameters of what it is you're

2   looking for.  I want the debtor to take that information to

3   whatever level it needs to within its own organization to see

4   whether or not the debtor can live with that portion of this

5   proposal.  And if so, to figure out how to get the other

6   constituents involved in the process.  I'm not expecting that

7   you will get the other constituents involved between now and

8   the other omnibus hearing, but I want phases one and two.  A

9   meeting between the people, the groups that have settled and

10  the debtor to that proposal back within its own organization

11  and see what you can do with it.  Okay.  At the next hearing,

12  I'm going to find out whether you met and again, I don't want

13  to know at this point the specifics but I do want to know

14  what happened during the meeting.  You can tell me that

15  without telling me the specifics, and I'm going to want to

16  know from the debtor what the debtor proposes to do next.

17  So, and I will ask those questions.  That's to be item number

18  one on the agenda.  I want it before we cover anything else

19  on the agenda in July.  All right, that's number one.  Number

20  two, I would like you to try to get together to see if you

21  can come up with a reasonable bar date.  I don't know

22  whether the debtor at this point intends to use the standard

23  proof of claim form; is that what you want for the asbestos

24  personal injury people?

25          MR. BERNICK: I think in light of - It has to be

1  tied in with what's going on in the questionnaires.  I think

2  it's probably going to be something like just the standard

3  proof of claim form because all they're really doing is

4  incremental to the questionnaire is saying do they want to

5  prosecute a claim by the bar date.

6          THE COURT: All right.

7          MR. BERNICK: So, we can figure out what that

8  language is.  I'm not sure about that.

9          THE COURT: Okay.  Then the debtor is to draft it

10 and send the proposal to the committees.  The committees are

11 to make whatever comments you need to make and send it back

12 to the debtor so that by the hearing, I have hopefully an

13 agreed upon order.  If I don't have an agreed upon order at

14 least the issues will be defined and narrowed so I can focus

15 on something and give you rulings.  Number three, I want a

16 case management order that is going to govern the rest of

17 this discovery process, and I don't intend at this point in

18 time to back off this order.  I've sort of backed off several

19 times for a variety of reasons.  I don't expect to do it now.

20 So, we're going to go full steam ahead on the estimation

21 process.  All right, what else?

22         MR. INSELBUCH: Exclusivity.

23         THE COURT: Exclusivity is on the agenda for July.

24 Yes, so, I'll hear whatever positions you have.

25         MR. BERNICK: We're assuming that when Your Honor

1   gave the instruction with respect to the case management

2   order, that would also apply to the property damage claims as

3   well.

4          THE COURT: Well, if you want to do them on the same

5   track.

6          MR. BERNICK: I don't think that they would be, but

7   I'm just saying in terms of coming to the next hearing with

8   an agreed CMO if we can on property damage.  I'm assuming

9   that you didn't mean to say that we shouldn't do that with

10  property as well.

11         THE COURT: No, I was only concentrating on the

12  personal injury.  I didn't realize that there was still some

13  issue about being able to work out a case management order

14  with property.

15         MR. BERNICK: I don't think there necessarily is

16  one.  I just think in terms of timing we should be prepared

17  to have a new CMO on PD.  I don't know if that - I don't

18  think that that's problematic.

19         THE COURT: Mr. Baena, has the Committee started to

20  draft that order?  Has the debtor a new CMO?

21         MR. BAENA: No, Judge.  What we've done in the past

22  was while there were adjournments of various activities, we

23  just used the old CMO and rolled those dates forward.

24         MR. BERNICK: I think that's worth talking about.

25  This is not an invention out of something new.

1          THE COURT: Oh, you want the same dates, the same

2     time frames.

3          MR. BERNICK: The same time frame -

4          MR. BAENA: I think he wants the same activities.

5          MR. BERNICK: Yeah, we've just have to have new

6     dates.

7          THE COURT: Okay, that's fine, then why don't you

8     work out the new dates, if that's the case, and I'll - I'm

9     not sure at this point how far in the future you're looking

10    at an actual evidentiary hearing, so, we probably need to

11    discuss that in July.  Or, I don't know, perhaps if you folks

12    can give me an estimate of when, you know, four months, five

13    months, I'm not sure.

14         MR. BERNICK: I think that we're talking about

15    basically a three-month rollover from where we were before.

16    That's how long the hiatus has been.   But if not, I mean,

17    that's what the debtor's been thinking.

18         MR. INSELBUCH: Why doesn't he just propose what he

19    thinks, and we'll look at it.

20         THE COURT: Okay, well, the reason I was asking, Mr.

21    Inselbuch, I thought if I could have Mr. O'Neill or Ms. Baer

22    call my office, I might be able to lock in some dates for the

23    actual evidentiary hearing, but I need a time frame to do

24    that.

25         MR. INSELBUCH: I couldn't begin to do that today.

1          THE COURT: Okay.

2          MR. BAENA: And it's been five months since I've

3     looked at that order, Judge.  If I could just get back to my

4     office and look at it.

5          MR. INSELBUCH: Your Honor, if Mr. Bernick is

6     available, we'll meet with him right now after the close of

7     this court to discuss your item one.

8          THE COURT: All right.

9          MR. BERNICK: That would be terrific.  If you're

10    going to take a train back to New York, I'll meet with you on

11    the train back to New York.  I have to catch a train.

12         MR. INSELBUCH: I'm sorry we'll have to -

13         MR. BERNICK: Well, we accommodated Mr. Inselbuch -

14         MR. INSELBUCH: These gentlemen are not going on the

15    train.

16         MR. BERNICK: Well, that's fine.  I don't think the

17    Court should have to set a schedule.  I'm in New York now

18    three days a week.  I'm sure we can find a time - Well, I'll

19    leave it at that.  I think that we've been more than

20    available to the mediation process.

21         THE COURT: All right.  I will expect to get all of

22    this information at the latest by the time set for the

23    binders for the July hearing, but if you can figure out the

24    time frames in advance and someone can call my staff, I might

25    be able to put the trial dates in it for you.  If not, then

1   it's going to have to wait until after July's hearing, that's

2   all - So I can give you the dates.  I'll have to take them

3   back and find them.  All right, what else, folks.

4          MS. BAER: Your Honor, there are other mattes on the

5   agenda, of a more routine nature, that we could take care of.

6          THE COURT: All right.

7          MS. BAER: Your Honor, going through the agenda, you

8   entered an order on item number 1 which was the pension plan

9   matter.  On item number 2, Your Honor, it was the motion of

10  the debtors to approve a settlement with respect to Wauconda

11  environmental cleanup.  You entered the order on the

12  settlement with the PRP Group.  The EPA filed in conjunction

13  with that a notice of lodging the settlement agreement

14  whereby they're going to be withdrawing their claim and

15  giving us contribution protection.  EPA had to submit that

16  for public comment.  The public comments came in, and based

17  on those comments, they need to make an adjustment to the

18  settlement agreement to respect it being governed and

19  available for all debtors, not just the debtor against whom

20  they filed the claim.  The EPA will be submitting a new

21  settlement agreement and then an order - We'd like to put

22  that on the agenda for July so we can get that taken care of.

23          THE COURT: That's fine.

24          MS. BAER: Okay.  Your Honor, item number 3 was

25  continued to the July 24th hearing.  Item number 4, Your

1    Honor, was the debtors' motion with respect to New Jersey,

2    items 4 and 5.  The agenda had indicated that would be

3    continued to the July hearing.  They've actually asked that

4    we continue it to the August hearing.  New Jersey expects to

5    give us a settlement agreement within two weeks. By the time

6    we get that and review it, we'll already be at the hearing.

7    So, I have an order, Your Honor, extending the New Jersey

8    injunction and setting it over for the August hearing.

9         THE COURT: All right.  Thank you.  Okay, that's

10   entered.

11        MS. BAER: Your Honor, item number 6 was the

12   quarterly fee applications.  You entered those orders, I just

13   want to point out two certificates of counsel that will be

14   coming in that relate.  Number one, a protivity (phonetical),

15   which is the debtor's Surbanes Oxley (phonetical) experts,

16   made a mathematical error.  We will be submitting a new order

17   to reflect the difference between what your order entered and

18   what the number should be.  It's a slight increase.  That

19   will come by a separate order with a certificate of counsel.

20        THE COURT: All right.

21        MS. BAER: In addition, Your Honor, Blackstone filed

22   their fee applications on a little bit different time frame.

23   They were not included in the order that you entered.

24   However, we understand the fee auditor has decided not to

25   review those or has reviewed those and has his opinions, and

1    we would expect to submit a certification of counsel on the

2    Blackstone fees as a separate order.

3         THE COURT: Why are they not in the same track as

4    everyone else?

5         MS. BAER: I believe they're supposed to be, Your

6    Honor.  Why they didn't get on it, I'm not quite sure, but

7    the fee auditor does adjust with respect to certain things

8    depending upon the issues they have.  Beyond that, I don't

9    have an answer for why they came in on a different time

10   frame, but I will certainly tell them that they need to get

11   on the same time frame because this shouldn't happen.

12        THE COURT: Well, I think the fee order is pretty

13   clear that if they're not in the same time frame, they can

14   wait until the next fee application process and make up the

15   difference and not get paid in the meantime.  So -

16        MS. BAER: I understand, Your Honor.

17        THE COURT: All right, I'll take the certification

18   this time.  I have not seen - as I recall, I haven't seen

19   Blackstone's, so I'm not sure what's been filed.  Maybe it

20   was and I just don't remember it because there was an issue.

21   I don't know, but I don't remember Blackstone's.

22        MS. BAER: We'll look at it, Your Honor, and submit

23   the appropriate certification.

24        THE COURT: All right.

25        MS. BAER: Item number 7, Your Honor, you entered an

1   order, actually entered orders on 7, 8, and 9, which were

2   some leftover fees from the fraudulent conveyance case.  Item

3   number 10, Your Honor, is the debtors fifth omnibus

4   objection.  There is still one outstanding objection.  The

5   Weatherford claims, settlement discussions are ongoing, and

6   we have an order continuing that matter to the next hearing.

7        THE COURT: All right.  Thank you.  Okay, that's

8   entered.

9        MS. BAER: Item number 11 on the agenda was a status

10  on plan mediation, which we have taken up, and then, Your

11  Honor, your chambers contacted me to ask that we raise the

12  issue of fee applications being filed in the case.  As I

13  understand it, the order that was entered by the Court on the

14  fee applications provided that all applicants needed to file

15  with the Court and serve on you copies of the fee

16  applications, and I understand that you're being bombarded by

17  a lot of paper you don't necessarily want to be bombarded

18  with.

19       THE COURT: Actually, I'm getting duplicates,

20  because by the time I get the quarterly fees and the monthly

21  fees, and the paper coming here and also - well, sometimes it

22  comes here.  It always comes to Pittsburgh.  I really am not

23  - I'm getting too many copies of the same thing.  So, is

24  there a better process that we can work out?

25       MS. BAER: I guess the question, Your Honor, is do

1    you want one set?  Do you not want any?  Or do you only want

2    the ones that are contested when we come for a hearing?  We

3    can amend the order any way that you would like.

4            THE COURT: Well, I would like to see all of the fee

5    applications.  I think I have to review all the fee

6    applications.  So, I don't want to abrogate that process, but

7    I don't need them both as monthlies and as quarterlies.  So,

8    I am content if you're serving them on the U.S. Trustee and

9    the parties, that if there is some objection to the monthly

10   that is going to be heard before the quarterly, which has

11   never yet happened -

12           MS. BAER: No, it doesn't.

13           THE COURT:  - then maybe I could get just that

14   contested monthly, but otherwise, really, all I want is the

15   quarterlies.

16           MS. BAER: Your Honor, we will look at the fee order

17   and amend it to provide that you only get the quarterlies.

18   The fee auditor only does objections on a quarterly basis, so

19   there won't be any monthly ones.

20           THE COURT: Right, okay.  That would be much better.

21           MS. BAER: Okay, we will do that.

22           THE COURT: Okay.

23           MS. BAER: That's all I have on our agenda, Your

24   Honor.

25           THE COURT: All right, any housekeeping matters?

1   Okay, we're adjourned.  Thank you.

2            MS. BAER: Thank you.

3            (Whereupon at 4:15 p.m. the hearing in this matter

4   was concluded for this date.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18            I, Elaine M. Ryan, approved transcriber for the

19   United States Courts, certify that the foregoing is a correct

20   transcript from the electronic sound recording of the

21   proceedings in the above-entitled matter.

22

23   /s/ Elaine M. Ryan                      June 25, 2006
     Elaine M. Ryan
     2801 Faulkland Road
     Wilmington, DE 19808
     (302) 683-0221