IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W. R. GRACE & CO., et al.,[1] | ) | Case No. 01-01139 (JKF) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |
| | ) | Re: Docket Nos. 11067, 12405 |
| | ) | |
| | ) | Hearing: July 24, 2006 at 2:00 p.m. |

## Debtors' Supplemental Brief in Support of a Further Exclusivity Extension

To appropriately consider the Debtors' most recent request for an extension of exclusivity, it is critical to begin and end with a fact that cannot be disputed and cannot be ignored. Specifically, absent a consensual deal, the Court must now decide what has always been the basic issue in this case: whether, after a fair and legally proper valuation of Grace's asbestos liabilities, all creditors will be paid in full under a plan, and the shareholders will be permitted to retain their equity interests. Grace has urged since the inception of these cases that such a fair and legally proper valuation requires a merits-based adjudication of its asbestos

---

[1] The Debtors consist of the following 62 entities: W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.), W. R. Grace & Co.-Conn., A-1 Bit & Tool Co., Inc., Alewife Boston Ltd., Alewife Land Corporation, Amicon, Inc., CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace II, Inc., Creative Food 'N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC (f/k/a Dewey and Almy Company), Ecarg, Inc., Five Alewife Boston Ltd., G C Limited Partners I, Inc. (f/k/a Grace Cocoa Limited Partners I, Inc.), G C Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC Management Corporation, GN Holdings, Inc., GPC Thomasville Corp., Gloucester New Communities Company, Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical Company of Cuba, Grace Culinary Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe, Inc., Grace H-G Inc., Grace H-G II Inc., Grace Hotel Services Corporation, Grace International Holdings, Inc. (f/k/a Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W. R. Grace Capital Corporation, W. R. Grace Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-Caribe Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai Development Company, L B Realty, Inc., Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH, Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Inc., MRA Holdings Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (f/k/a Nestor-BNA), Inc.), MRA Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental Liability Management, Inc., E&C Liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin & Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country Staffing), Hayden-Gulch West Coal Company, H-G Coal Company.

liabilities. The asbestos claimants, on the other hand, have argued for a resolution that avoids the need for such an adjudication.

The Court, itself, repeatedly has recognized that, absent a consensual resolution, the proper mechanism for valuing of Grace's asbestos liabilities is through the estimation procedures established under the Bankruptcy Code. Such an estimation process will accomplish precisely the merits-based valuation that Grace seeks. And, its impact promises to be dramatic. Current scrutiny of property damages claims illustrates this. Over 80% of the total claims tested have already failed to meet threshold challenges. Grace will show that once personal injury claims are put to a merits-based test, a similar result will be achieved, particularly as to those claims based on junk science.

Lifting exclusivity, on the other hand, will do nothing to advance formulation of a plan. Without a consensual resolution, the only way to permit the parties to frame a plan will be through good faith negotiations informed by the fair and proper valuation of Grace's asbestos liability. Indeed, the goal of accomplishing a negotiated settlement, which lies at the heart of exclusivity, is far more likely to be served if the essential facts of Grace's asbestos liability have been established through the estimation process. Thus, as Grace describes in detail below, the Court should fully implement the estimation process using merits-based procedures. Along the way, the claimants will have ample opportunity, as they have had already, to share their "vision" for these cases. But that vision will be informed by facts respecting Grace's asbestos liability that have been developed under proper and legally required rules and methodology.

I.   **OVER THE YEARS, THE PARTIES HAVE REPEATEDLY DEBATED AND THE COURT HAS RECOGNIZED THE NEED FOR A MERITS-BASED ESTIMATION**

Since the first day these chapter 11 cases were filed in April 2001, Grace repeatedly has sought a merits-based adjudication of its asbestos liability, and the claimants repeatedly have sought to avoid such an adjudication:

- *April 2001*: On the first day of these cases, Grace filed an Informational Brief[2] explaining exactly why the key task in the cases was to define the scope of its actual legal asbestos liabilities.

- *May 2001*: Judge Farnan directed the Debtors to propose case management procedures for adjudication of the liability issues.

- *June 2001*: Grace proposed specific case management procedures to determine its asbestos liability using (i) detailed proof of claim forms and a court-established bar date and (ii) traditional Fed.R.Civ.P. 42 common issue litigation before plan confirmation.[3]

- *September 2001:* The asbestos claimants objected to Grace's proposed case management procedures, asserting that the merits of their claims need never be decided.[4]

- *November 2001:* The hearing on the proposed case management procedures was cancelled hours before it was to take place, and the cases were reassigned to Judge Wolin.

- *February – August 2002*: Following the reassignment, Grace further explained and refined its case management proposals for personal injury claims.[5] In an effort to reduce the burden of the litigation process, Grace narrowed the process to focus on those claimants who already had asserted asbestos pre-petition litigation claims.

- *May 2004:* Grace's proposals were never addressed, Judge Wolin was recused and the cases were, again, reassigned.

---

[2]  See Informational Brief filed on April 2, 2001 [Docket No. 6].

[3]  *See* Motion for Entry of Case Management Order, Establishment of Bar Date, Approval of Proof of Claim Forms & Approval of Notice Program filed on June 27, 2001 [Docket No. 586].

[4]  *See* Response and Memorandum of the Official Committee of Asbestos Property Damage Claimants in Opposition to Debtors' Motion for Entry of Case Management Order filed on April 2, 2001 [Docket No. 900]; Opposition of the Official Committee of Asbestos Personal Injury Claimants to Debtors' Motion for Entry of Case Management Order filed on September 10, 2001 [Docket No. 901].

[5]  *See* February 12, 2002 memorandum [Docket No. 1666]; June 21, 2002 supplemental brief [Docket No. 2275]; August 21, 2002 reply brief [Docket No. 2581].

- *November 2004:* Recognizing this Court's desire to proceed quickly to plan confirmation, Grace proposed a further alternative protocol which called for an estimation of liability pre-confirmation (not for purposes of allowance/disallowance) with common issue litigation to follow confirmation.[6] Central to Grace's proposed estimation was the establishment of an asbestos pre-petition litigation bar date and the approval of an asbestos personal injury questionnaire.

- *December 2004:* The asbestos claimants objected to Grace's alternative protocol, and again argued for an estimation based on settlement history rather than actual liability.[7]

- *January 2005:* This court ordered the parties to negotiate case management orders for the merits-based estimation of PI and PD claims.

- *May 2005:* Grace filed its Motion to Approve the PI CMO and Questionnaire, which sought an order (i) approving a proposed case management order regarding the estimation of asbestos personal injury claims, and (ii) requiring each holder of an asbestos personal injury claim who filed a lawsuit prior to the petition date to complete and return a proposed questionnaire as a means of discovery in connection with the estimation hearing.[8]

- *June 2005:* Again, the asbestos claimants objected to the PI CMO and Questionnaire, arguing for an estimation based on settlement history rather than actual liability.[9]

- *August 2005:* The initial PI CMO and Questionnaire were approved. The parties proceeded with discovery and the preparation of expert reports, until the Court temporarily stayed litigation pending plan mediation.

While the various reassignments of these cases deferred for several years the task of coming to grips with Grace's asbestos liability, the District Court did recognize its duty to address the *merits* of that underlying liability. Judge Wolin (in *USG*) plainly articulated the Court's role in a merits-based estimation:

---

[6] *See* Debtors' Motion for Entry of an Order Seeking the Estimation of Asbestos Claims and Certain Related Relief, November 13, 2004 [Docket No. 6899]

[7] *See* PI Committee Objection, December 21, 2004 [Docket No. 7314]; Libby Claimant's Objection, December 22, 2004 [Docket No. 7335]; Future Claimants' Representative's Objection, December 22, 2004 [Docket No. 7340]

[8] See Debtors Motion to Approve PI CMO, May 10, 2005 [Docket No. 8394].

[9] See Objection of PD Claimants, June 30, 2005 [Docket No. 8817]; FCR's Objection, June 30, 2005 [Docket No. 8818]; Objection of the PI Committee, June 30, 2005 [Docket No. 8847]; Opposition of Libby Claimants, June 30, 2005 [Docket No. 8846].

> The Court exists to assist the parties in resolving their differences.
> It does so by providing a framework within which the parties can
> litigate those differences to a Court-imposed result or compromise
> then based upon the parties' expectation of a predictable outcome.
> In bankruptcy ... if the debtor maintains that its creditors are not
> legitimate and that, properly analyzed, claims against it do not
> exceed its assets, the Court must assist ... *In an asbestos
> bankruptcy, the Court will, within the constraints of the law,
> reject unsubstantiated claims, bogus medical evidence and
> fanciful theories of causation. The Court will protect those who
> have been truly harmed.*

*In re USG Corp.*, 290 B.R. 223, 225 (Bankr. D. Del. 2003) (emphasis added).

While at every turn the asbestos claimants have sought to brush aside this basic truth, this

Court too has recognized that, if there is no fully consensual plan, the only way for these cases to

proceed to conclusion is for the Court to engage in estimation:

> MR. BERNICK: . . . we're struggling with a practical problem, which is how to
> move this case forward where *we don't really know how much the liability is.
> That's been the problem since the beginning of the case.* (Tr. of Hr'g at 76:20-
> 23 (Jan 21, 2005)) (emphasis added).[10]
>
> MR. LOCKWOOD: The purpose for the estimation, here, would be to give all of
> the parties to this bankruptcy some idea of what, for the trust, is likely going to
> have in the way of claims, for purposes of determining what kind of a plan. Right
> now, the debtor's view of the world and the asbestos claimant's view of the world
> is widely divergent on the value of the future claims. *And the only way
> anybody's ever going to get over the gap is to have some Court referee that
> dispute.* (*Id.* at 110: 8-16) (emphasis added).
>
> THE COURT: Well, I'm willing to do that . . . . . . . I'd like to try to figure out
> what pieces we need to do, and in what order, to get a plan proposed that,
> hopefully, will be a consensual plan. *I'm not minimizing what the debtor has
> now, but it's obviously not a consensual plan. So, if an estimation is going to
> do it, let's tee up an estimation hearing.* (*Id.* at 110: 17; 111: 2-7) (emphasis
> added).

                                    * * *

---

[10] Copies of the cited pages of the transcripts are attached as group Exhibit A.

THE COURT: ...creditors have the right to determine whether the distributions are fair and reasonable with — coming either from the — that the debtor would put into the trust, on the one hand, versus what the debtor would be paying to the other creditors whose claims don't go into the trust, on the other. But, *I think the first piece of that is the estimation process.* (*Id.* at 155: 16-22) (emphasis added).

Likewise, on July 19, 2005, as the parties were struggling to finalize the PI Questionnaire, the Court again recognized that, whatever the plan is to be, an estimation is necessary: "Well, of course, but the *issue still is what is the predicted I suppose estimate of what those claims will be*, at what disease levels, so that whatever plan is proposed make sure that it is appropriately funded." (Tr. of Hr'g at 166: 15-18 (July 19, 2005)) (emphasis added).

On this note, the PI and PD CMO's were entered, the Questionnaires were approved, and discovery and expert work proceeded.

On February 21, 2006, in the context of a request by the asbestos committees for a stay of the estimation litigation, the Court again acknowledged the need for litigation (absent consensus):

THE COURT: I will give sixty days to let these negotiations attempt to get finished without involving anybody else being sidetracked in any way, shape, or form, but at the end of that sixty days, if in fact there is not a consensus by everyone that it should be continued — this, in quote, "standstill" should be continued for some other period of time, *then we're marching down the litigation road again, and at that point we'll just let the chips fall where they may on dual tracks.* (Tr. of Hr'g at 59: 21-25; 60: 1-4 (Feb. 21, 2006)) (emphasis added).

On April 17, 2006, when the asbestos parties once again requested a stay of the estimation litigation, the Court pointed explicitly to the fact that the Debtors' efforts to move forward to confirmation by completing the estimation litigation were being hampered:

THE COURT: . . . The debtor has been pretty intent on attempting to get the litigation done and to a certain extent I've been letting the debtor go forward and to a certain extent I haven't. *Recently, I've been holding the debtor up at the same time that I'm trying to put its feet to the fire*, which kind of gives it somewhat of a, you know, Hobson's choice ...*With respect to the claims litigation, the debtor has been trying really since the outset of the case to get*

*some handle on what this litigation is all about, and I think recently has been making some progress, but part of the objections to exclusivity have been coming from the creditor constituents saying that the debtor isn't making much progress. Well, the debtor can't make much progress if I keep telling the debtor, No, you can't do this; no, you can't do that; no, you can't go forward.* (Tr. of Hr'g at 20: 20-25; 21: 1-21 (April 17, 2006)) (emphasis added).

Finally, reacting at the last omnibus hearing to news that the plan mediation had not produced a consensual plan, the Court re-iterated once more the inescapable fact that estimation of liability must be the next step:

> THE COURT: . . . Now, with respect to the concern I have about whether or not there is a return to equity.... A part of that issue is going to depend on what the claims, the asbestos claims, will turn out to be both present and future... (Tr. of Hr'g at 50: 24-25; 51: 1-2 (June 19, 2006)).

> \* \* \*

> THE COURT: . . . *what I need is to get an estimation and then we'll see where we go with plans.* (*Id.* at 55: 10-11) (emphasis added).

So ... after repeated hearings have thus produced consistent, repeated guidance from the Court, has any of this had any perceptible impact on the asbestos claimants? Amazingly, no. Their refrain has not changed. Explicable, not on the basis of any principle of law or procedure, but only as a transparent strategy for seeking cramdown, the refrain is:

- Estimation is *unnecessary.*

- Estimation should be *delayed* (and has been now for literally years).

- The *DEBTORS* have delayed the case and *exclusivity thus should be terminated.*

- It is impossible to estimate on the basis of actual legal liability, so pre-petition *settlement values can stand in place of the rule of law.*

Instead, this case must progress in accordance with the Court's prior guidance and the Bankruptcy Code. The time for re-visiting issues for the umpteenth time passed long ago.

## II.    THE POTENTIAL IMPACT OF ESTIMATION ON THE SCOPE OF GRACE'S LIABILITY AND ON THE RESOLUTION OF THESE CASES IS ENORMOUS

Facing what the asbestos claimants describe shrilly as the daunting task of estimation, the Court in recent times has pointedly questioned Grace on whether in fact it is solvent; that is, whether it really believes the estimate will ultimately show that the Debtors/equity have a say in these cases. Because there is no record of Grace's insolvency (to the contrary, as reprised briefly below, there is a significant record showing that Grace is the target of huge numbers of "junk" claims), the Court can only be making reference to estimations in other cases. As set forth in detail during the July 19, 2005 hearing, the other cases must be examined with care because estimations have been done for different purposes, with agreements on various procedures, and in non-asbestos as well as asbestos contexts. Rather than reiterating the catalogue of cases, Grace responds below to the Court's question with the legal constraints that read right out of the Bankruptcy Code (and are fully consistent with prior decisions) and the facts of THIS case, albeit the proof of the pudding will be the facts set forth in properly answered Questionnaires.

### A.    Whether in or out of bankruptcy, "liability" means "legal" liability established in accordance with rules of procedure and evidence.

Outside of bankruptcy, a claimant must prove liability before recovering against a defendant. The Bankruptcy Code does not abrogate this requirement — rather, it specifically bars recovery for claims that are not enforceable. *See* 11 U.S.C. § 502(b)(1) (the court must not allow any claim that is "unenforceable against the debtor and property of the debtor, under any agreement or applicable law . . .");[11] 11 U.S.C. § 558 (reserving debtor's right to assert any and

---

[11] *See, e.g., In re G.I. Indus., Inc.*, 204 F.3d 1276, 1281 (9th Cir. 2000) ("[a] claim cannot be allowed [under section 502(b)(1)] if it is unenforceable under nonbankruptcy law."); *In re Sanford*, 979 F.2d 1511, 1513 (11th Cir. 1992) ("a claim against the bankruptcy estate will not be allowed in a bankruptcy proceeding if the same claim would
(Continued...)

all defenses to claims: "[the] estate shall have the benefit of a defense available to the debtor as against any entity . . .").[12]

The Bankruptcy Code implements this principle in two ways. *First*, it calls for a detailed claims objection process, to ensure that only valid claims receive compensation. *See* 11 U.S.C. § 502(a). *Second*, it incorporates the federal rules of procedure and evidence to resolve disputes regarding liability. *See* Fed. R. Bankr. P. 9017 ("The Federal Rules of Evidence . . . apply in cases under the Code."); Fed. R. Bank. P. 9014 (incorporating Federal Rules of Civil Procedure to "contested matters").

Traditional principles of liability do not magically evaporate under the gentle heat of estimation. An estimation is simply a streamlined adjudication of the merits of claims. Thus, courts have been clear that, in engaging in an estimation, "[t]he court is bound by the legal rules which may govern the ultimate value of the claim." *Bittner v. Borne Chem. Co., Inc.*, 691 F.2d 134, 135 (3d Cir. 1982); *In re Aspen Limousine Serv., Inc.*, 193 B.R. 325, 337 (D. Colo. 1996) (same); *In re Kaplan*, 186 B.R. 871, 874 (Bankr. D.N.J. 1995) (same); *In re O.P.M. Leasing Serv., Inc.*, 79 B.R. 161, 166 (S.D.N.Y. 1987) (same). Accordingly, an estimation can only assign value to claims that (1) prove liability under state substantive law, and (2) comport with applicable federal procedural law. In other words:

- *Estimation must resolve, rather than ignore, liability disputes.* Where liability is disputed, claims cannot be presumed to have value in an estimation -- rather, the court can assign an estimated value of zero. *See, e.g., In the Matter of Federal*

---

not be enforceable against the debtor outside of bankruptcy"); *In re Buchholz*, 224 B.R. 13, 19 (Bankr. D.N.J. 1998) (disallowing claim that was "defective under both Federal and New Jersey State law").

[12] *See also In re Nuisance Corp.*, 17 B.R. 80, 82 (Bankr. D.N.J. 1981) ("If . . . the claim falls within one of the paragraphs of §502(b), it is simply not allowable . . . . To the extent that applicable law, including state law, provides the debtor a defense to the claim of a creditor, absent bankruptcy, such defense is available . . . in objecting to the claim.").

9

*Press Co.*, 116 B.R. 650, 653 (Bankr. N.D. Ind. 1989) ("[o]ptions for the court in estimating claims include accepting the claimant's claim at face value, estimating the claim at zero and waiving discharge of the claim . . ., arriving at its independent estimation of the claim, or utilizing a jury trial to obtain an accurate estimation.").

• ***Estimation is Governed by the Federal Rules.*** The application of the Federal Rules of Evidence in bankruptcy cases is not altered in the estimation context. Estimation is a "contested matter" under Bankruptcy Rule 9014, and the rules of evidence <u>control</u> in such proceedings. *See, e.g., In re USG Corp.* 290 B.R. 223, 227 (Bankr. D. Del. 2003) (court held that in presenting defenses during an estimation proceeding regarding asbestos personal injury claims, the debtors may "attack certain medical evidence under the Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharm. . . .*").

The bottom line is that, in chapter 11 cases, claims cannot be paid beyond proven legal liability. So important is this bedrock principle, that the bankruptcy court in *Dow Corning's* breast implant-driven chapter 11 insisted upon full-fledged Rule 42 litigation. *See, In re Dow Corning Corp.,* 211 B.R. 545 (Bankr. E. D. Mich 1997). There, as here, there were tens of thousands of claims. There, as here, there were important disputed liability issues. There, as here, the court was asked to determine the contours of an estimation process. After hearings and extended briefing, the court issued a 66 page opinion, exhaustively addressing the estimation process. Recognizing fully the burdens of litigation, the court at no point deviated from the requirement that disputes about liability be resolved on the basis of the law. In fact, the court was so concerned about adherence to that principle that it decided to proceed straight to litigation in order to decide the key issues finally. *See Id.* at 566 (noting that liquidation of personal injury claims is necessary and cannot be eliminated by estimation). While Grace originally proposed the same approach here, it has sought (so far unsuccessfully) to expedite the resolution of these cases by agreeing to an estimate that will not involve the final adjudication of personal injury claims.

B.    **Lessons already learned from the property claims about the likely impact of claim scrutiny.**

What result will adherence to the Bankruptcy Code produce in these cases? The Court does not have to take on faith the Debtors' insistence that a merits-based analysis will have a substantial impact on these cases. The proposition has already been tested with the traditional PD claims. The results so far have been exactly what the Debtors predicted - subjected even to the first, minimal tests, the actual claims that survive are a small percentage of those asserted.

As a result of the PD bar date process, a whopping 4,200 asbestos PD claims were filed initially. We now know that, so far, this deluge of claims was due solely to gamesmanship. The Debtors' efforts uncovered several classes of defects with which the Court is now extremely familiar, and to date, 2,507 of Speights claims - or 85% of the PD claims that Speights filed in these cases - have either been withdrawn or expunged.[13]

---

[13] *See, e.g.,* Speights & Runyan Notices of Withdrawal, 6/29/05 (Dkt. Nos. 8710-8715, 8717-8727, 8729-8732, 8734, 8736, 8748 - 8767, and 8769 - 8779); Speights & Runyan Notices of Withdrawal, 6/30/05 (Dkt. Nos. 8784-8785, 8788-8814, 8819-8826, 8828, and 8830-8843); Speights & Runyan Notices of Withdrawal, 7/01/05 (Dkt. Nos. 8849-8871 and 8873-8895); Speights & Runyan Notices of Withdrawal, 7/05/05 (Dkt. Nos. 8911-8936, 8943, 8991, and 9297); Order Allowing Withdrawal of Certain Claims Filed by the Law Firm of Speights & Runyan, 9/27/05 (Dkt. No. 9517); Order Granting the Relief Sought in Debtors' Fourteenth Omnibus Objection to Claims (Non-Substantive), 10/26/05 (Dkt. No. 10829); Order (Bench Filed) For the Withdrawal and Expungement of 1495 Asbestos Property Damage Claims, 10/31/05 (Dkt. No. 10961); Order Disallowing and Expunging Anderson Memorial-Based Asbestos Property Damage Claims Filed by Speights & Runyan, 11/15/05 (Dkt. No. 11080); Notice of Withdrawal of Claim No. 10738 (Rockrose f/k/a 127 John Street, New York, NY) Filed by Speights & Runyan, 02/10/06 (Dkt. No. 11749). Notices of Withdrawal of Claims Filed by Speights & Runyan, 02/15/06 (Dkt. Nos. 11802 - 11816); Order Disallowing and Expunging Forty-Five Asbestos Property Damage Claims, 3/29/06 (Dkt. No. 12147).

In total, between July 2005 and July 2006, the Debtors have been able to reduce the pending PD claims from 4,003 to 901, as outlined below:



The 901 PD claims left, include (i) 501 traditional U.S. claims, (ii) 291 Canadian PD claims (all filed by Speights), and (iii) 109 Category 2 claims.[14]

This reduction is before common issues going to the merits have even been reached. And, the cases are perfectly positioned for resolution of those issues. Traditional PD claimants have filed their claims and provided detailed information through the court-approved claim form,

---

[14] On June 19, 2006, the Debtors petitioned the Court to transfer traditional Canadian claims to Canada for purposes of estimation and distribution [Dkt. No. 12679]. Should the Court enter that order, then the 291 pending traditional Claims will be transferred to Canada, leaving 501 traditional Asbestos PD claims to be estimated by this Court. Regardless of whether this Court or the Canadian court estimates Speights' 291 Canadian claims, it is clear that they have no basis under Canadian law and, therefore, the Debtors expect that these claims will either be disallowed or estimated at zero. The claims objection process has also cut the number of Category 2 claims by more than half, from 250 to 109. The Debtors are awaiting this Court's decision on their pending objection to 54 of the remaining 109 claims on the ground that Minnesota does not recognize a tort claim for stigma to property, argued in January 2006. While retaining all objections to all remaining Category 2 claims, the Debtors anticipate that any 'value' to the remaining Category 2 claims will be de minimis.

including salient information pertaining to the claimants, the subject properties, and the bases for their claims. This information has proven invaluable in the claims objection process, and will now afford the Court and interested parties the ability to estimate those claims that remain. The PD claims adjudication process has also resulted in the identification of common issues that now can be addressed in the two phases of the PD estimation.

The PD claims process to date already has demonstrated the impact of merits-based adjudication. The remaining procedural issues have easy answers.

- **Will the estimation process require the complete adjudication of each and every claim?** No, that is not what 502(c) calls for. It will be litigation of common issues that have been identified for (and tied to) groups of the claims. Surviving claims then can be valued based upon historical values.

- **Will there be extensive discovery on each and every claim?** No. That is not necessary. Of course, discovery is appropriate in estimation, following the basic standards called out by the Federal Rules. But the amount of discovery should be more limited in the same fashion that the ultimate adjudication is more streamlined than a full trial. In this case, discovery has been efficiently conducted through the claim forms.

- **Will there be extensive discovery of Grace?** No. That is not appropriate. As just discussed, discovery need not be as extensive as it is in full litigation. Here, Grace has already provided extensive discovery from its own files. While counsel have suggested that claimants should be entitled to conduct further discovery in order to fill in the blanks in their claims, it is not the proper function of any litigation to provide the plaintiff discovery in order to find out if the case should have been brought to begin with. Critically, the estimation at hand comprises cases that have been pending already for years. Claimants thus have had years in which to find evidence, including from Grace, to support their claims.[15]

Section 502(c) calls for a streamlined process to ascertain the value of claims. Based on all of the work to date, the Court is now in the position to address the core liability issues posed by the remaining claims, including statutes of limitations, product identification and proof of

---

[15] Grace has already produced to the PD Committee thousands of boxes of documents (primarily in electronic format) regarding its historical asbestos operations and products, its insurance litigation files, and its electronic case management data base for traditional PD claims.

hazard. Testing the filed PD claims has led to an 80% reduction to date. Completing the merits-based process will further reduce the scope of claims that have demonstrable value.

C. **The contested estimation of personal injury claims promises a clean demarcation of actual legal liability vs. "liability" improperly imputed from settlements.**

Two competing approaches to the estimation of Grace's asbestos personal injury claims have been presented to this Court on numerous occasions. Grace proposes estimation of its actual legal liability for asbestos personal injury claims. The asbestos claimants, on the other hand, propose an estimation based solely on past settlement history. Grace's proposal alone adheres to the basic rules of evidence and procedure incorporated in the Bankruptcy Code.

K&E 11230085.5

**FIRST, THE ASBESTOS CLAIMANTS' APPROACH:**



1.  **Step 1:** **The analysis begins with historical settlement rates and substitutes settlement for legal liability.**

For the first step, the asbestos claimants' expert, Dr. Mark Peterson, accepts at face value the company's historical settlement rates and values as the basis for his estimates. Thus, his approach does not depend upon whether the claimants actually had Grace exposure, whether that exposure was sufficient to cause disease or whether they, in fact, had a real disease. This is typical of Dr. Petersen's approach. Thus, as Dr. Peterson conceded with respect to his estimation in the *Babcock & Wilcox* case where he also relied on historical filings and settlement rates, he had no proof of the size of the population *exposed* to B&W boilers insulated with asbestos, the *level of exposure* resulting from that asbestos, or the extent of *disease, if any, caused by asbestos used in a B&W boiler. (See,* Tr. of Babcock & Wilcox Trial at 60-62, 116-118 (Oct.

23, 2001); Tr. of Babcock & Wilcox Trial at 80-82 (Nov. 2, 2001)) (emphasis added).[16] Likewise, Dr. Peterson admitted that, far from being based upon the adjudication of evidence, "the historical liability of this Defendant is represented by its average settlements." (Tr. of Babcock & Wilcox Trial at 198: 11-12 (Oct. 22, 2001)).

> **2.    Steps 2-3: The analysis assumes that past settlement rates actually reflect disease rates and will continue to do so in the future.**

In the second and third steps, Dr. Peterson assumes that the historical ratios between settled claims against Grace and the nationwide malignant disease trend will continue into the future.    In the *Babcock & Wilcox* case, Dr. Peterson conceded, however, "that non-epidemiological factors — like the legal environment, victim's knowledge of claiming options, and changing payment levels — play a big role" in the decision to file a claim against a company. (Tr. of Babcock & Wilcox Trial at 70: 17-22 (Oct. 23, 2001)).    Nevertheless, in *Babcock & Wilcox*, Dr. Peterson did not make any effort to quantify scientifically or statistically these non-epidemiological factors as part of his model. (Tr. of Babcock & Wilcox Trial at 73: 14-19 (Oct. 23, 2001)).    And, when confronted with this obvious disconnect between medically valid claims and asserted claims as a basis for establishing *Babcock & Wilcox's* liability, Dr. Peterson admitted: *"It's not medicine.    It's about legal claims."* (Tr. of Babcock & Wilcox Trial at 109: 19-20 (Oct. 23, 2001)).

> **3.    Step 4: Estimate of Grace's future claims.**

The fourth step in Dr. Peterson's analysis is to calculate Grace's future claims.    He does so by mechanically taking the historical ratios between the number of settled claims against Grace and the number of nationwide malignant diseases and applying those ratios to the future.

---

[16]    Copies of the cited pages of the Babcock & Wilcox trial transcripts are attached as group Exhibit B.

The result is Dr. Peterson's estimate of future settlements.

Created historically in order to support a whole series of consensual plans and since used for a variety of purposes other than the actual determination of liability, application of this approach as a substitute for legal liability runs roughshod over the Bankruptcy Code and basic principles of our jurisprudence. The detailed explication of these problems is for another day, but we briefly point out the following obvious and fatal flaws:

- *Settlement* is substituted for liability

- There is *not even an effort* to demonstrate actual liability

- At the same time, *settlement trends* are assumed -- with no support -- to follow *disease trends*, with the effect that claims against a company are assumed to stretch out for decades.

- The disease trend that constitutes the backbone of the estimates relates only to *malignant disease*, yet it is assumed with no support to govern *non-malignant* disease as well.

These basic facts have been established out of the mouth of the claimants' own expert.

The outrageousness of excising the legal liability requirements out of our system and substituting in their place settlement values has also a strong cynical element — because the historical settlements are the tainted product of precisely the broken system that has brought company after company to the bankruptcy courts for relief. Effectively, the claimants' estimation approach is used to transform the haven back into the storm. Since Grace first set out before the Court the wide recognition that has been given to the problems of the asbestos tort system, that recognition has become all but universal:

- Even the most dedicated plaintiffs' experts have acknowledged the problem: "plaintiffs' lawyers 'shop around' x-rays to numerous B-readers until a positive reading is reported." David Egilman, Letter to the Editor, *Asbestos Screenings*, 42 Am J. of Indus. Med. 163 (2002).

- Plaintiffs' attorney Steven Kazan has testified that the increase in claims "is conjured up through systematic, for-profit screening programs designed to find potential

plaintiffs with some X-ray evidence consistent with asbestosis" and concluded that "[i]f this were medicine, it would be malpractice. But it is not medicine: It is the medical side of legal entrepreneurship." *Asbestos Litigation Crisis Continues: It is Time for Congress to Act, Hearing Before the Senate Committee on the Judiciary,* 108th Cong. (Mar. 5, 2003) (statement of Mr. Steven Kazan).

- Judge Janice Graham Jack issued her well-publicized opinion in *In re Silica Products Liability Litigation,* 398 F. Supp. 2d 563 (S.D. Tex. 2005), finding that a number of doctors employed unsupported and unreliable methods of diagnosing claimants with silicosis and other silica-related disease.

- The Claims Resolution Management Corporation, which manages the Manville Personal Injury Trust, stated that it would no longer accept reports prepared by the doctors and screening facilities that were the subject of Judge Jack's opinion. The Eagle-Picher Personal Injury Settlement Trust, the DII Industries, LLC Silica PI Trust, and the Celotex Asbestos Settlement Trust have since followed the Manville Trust example.

- Various doctors implicated in the Silica MDL -- including two subpoenaed in this case -- have refused to answer questions regarding their alleged diagnoses on Fifth Amendment grounds. *See* Deposition Transcript of Dr. Ray A. Harron (Dec. 15, 2005); Deposition Transcript of Dr. Andrew W. Harron (Jan. 12, 2006). Other doctors have withdrawn or disavowed thousands of diagnoses.

- Babcock & Wilcox's audit of its claims in bankruptcy found that the vast majority of proofs of claim failed to provide the most basic information needed to establish liability, including, in most cases, even a *prima facie* showing that the claimant worked near a B&W boiler or had exposure sufficient to cause disease.[17] According to information provided in their proofs of claim, over 68% of the approximately 221,000 B&W claims (i.e., over 150,000 claims), were based on alleged exposure at sites that were shown to have *never housed B&W boilers*.

- Scientific studies and expert analyses confirm the consistent and prevalent over-diagnosis of asbestos-related conditions.

    - R.B. Reger, W.S. Cole. E.N. Sargent & P.S. Wheeler, *Cases of Alleged Asbestos-Related Disease: a Radiologic Re-Evaluation,* Vol. 32, No. 11, Journal of Occupational Medicine 1088 (Nov. 1990) (finding that over 96.4% of tire workers' claims failed to present evidence of asbestos-related disease);

    - A.R. Localio et al., *Biostatics Section, Dept. of Health Evaluation Services,*

---

[17]  *See* Babcock & Wilcox Claims Analyses, *In re The Babcock & Wilcox Co.,* B&W's Supplemental Brief in Further Support of its Proposed Litigation Protocol & Report to the Court Regarding Asbestos Developments Generally and the Proofs of Claims Filed Here, Case Nos. 00-0558, 00-10992 (Oct. 18, 2001 and Jan. 7, 2002).

*Penn. State Univ. College of Medicine & Center for Clinical Epidemiology
and Biostatics, The Manville Personal Injury Settlement Trust X-Ray Audit:
An Assessment of the Identification of the Underlying Disease Process
Implications for Medical Review by Certified B-Readers (1998))* (finding that
41% of claims failed to present evidence of asbestos-related disease);

- Babcock & Wilcox Claims Analyses, *In re The Babcock & Wilcox Co.*,
  B&W's Supplemental Brief in Further Support of its Proposed Litigation
  Protocol & Report to the Court Regarding Asbestos Developments Generally
  and the Proofs of Claim Filed Here, Case Nos. 00-0558, 00-10992 at 45, (Oct.
  18, 2001 and Jan. 7, 2002) (hereinafter "Babcock & Wilcox Claims
  Analyses") (finding that 74% of claims did not allege diagnostic results
  consistent with lung impairment or asbestosis)

- Joseph N. Gitlin, Leroy L. Cook, Otha W. Linton & Elizabeth Garrett-Mayer,
  *Comparison of "B" Readers' Interpretations of Chest Radiographs for
  Asbestos Related Changes*, Acad. Radiol. 2004; 11:843-856.) (independent B-
  readers found that 95% of claims failed to present evidence of asbestos-related
  disease, while plaintiffs' B-readers diagnosed 96% as showing abnormalities);
  and

- Expert Report of Dr. Gary K. Friedman,  *In re Owens-Corning*, Case Nos. 00-
  3837 to 3854 (Bankr. D. Del. 2002)) (finding that almost 87% of claims failed
  to meet minimal standards set by the Owens-Corning NSP).

In maintaining that all is well in the asbestos tort system, the asbestos claimants blink away the

reality of what the rest of the world clearly knows.

**GRACE'S APPROACH, ON THE OTHER HAND, ESTIMATES GRACE'S** *ACTUAL* **LIABILITY:**



If the only objective here were to determine Grace's actual current liability, Grace would have sought a bar date for *all current* personal injury claims, not only the claims pending *as of the petition date*. Here, however, it is necessary to estimate the future claims against Grace by extrapolating from Grace's historical claims. If a bar date were set to include claims not yet filed against Grace, the historical experience would be distorted and would not be useful for any proper extrapolation into the future. Accordingly, Grace has sought a bar date only for the claims pending as of the petition date. These pending claims represent a *snapshot* of the historical claims against Grace.

The estimation proposed by Grace seeks to (1) estimate the number of claims pending against Grace as of the petition date that contain sufficient exposure, causation and medical evidence to establish that there is legal liability, and then (2) use its estimate of the number of

valid pending claims to show how, even if disease-based extrapolation is used, the future values fall far short of those advocated by the claimants.[18]  The estimation of pending claims would essentially follow the same approach that is being used in connection with PD claims:

- *First*, based on responses to the PI Questionnaires, claims will be analyzed to determine if they can prevail on identified common issues.

- *Second*, Grace will then raise before the Court threshold issues for adjudication on the merits.

- *Third*, the completed personal injury questionnaires and the Court's rulings regarding the common issues will be applied to the claims pending as of the petition date in order to then determine Grace's actual legal liability for such claims.

Estimating the *validity* of Grace's pending claims is overwhelmingly likely to substantially reduce the scope of Grace's estimated liability for personal injury claims.  Of Grace's pending claims, 30% allege a non-malignant disease, 4% allege a malignant disease and Grace cannot determine the alleged disease for 66% of the claims (they are "unknowns").  Grace's preliminary analysis (without the benefit of completed Personal Injury Questionnaires) indicates that less than 20% of the non-malignant claims allege a valid disease and less than 25% of the unknown claims will be able to allege a valid disease:

---

[18]  Grace will dispute on multiple grounds the validity of the claimants' disease-based extrapolation methods.



In addition, based upon Grace's preliminary analysis (i) less than 10% of the non-malignant claims will be able to allege real disease and Grace exposure sufficient to cause disease; (ii) less than 15% of the unknown claims will be able to allege real disease and Grace exposure sufficient to cause disease; and (iii) approximately 50% of the malignant claims will be unable to allege Grace exposure sufficient to cause disease:



K&E 11230085.5

Any estimation of Grace's actual legal liability for future PI claims must be tested against this estimation of the actual legal liability for pending claims. Specifically, only the remaining valid pending claims could be used for any scientifically-based extrapolation into the future. Based on Grace's preliminary analysis, because a substantial majority of the claims pending as of the petition date are not valid, any estimate of Grace's future actual liability will also be significantly smaller than if the estimate had been based upon all of Grace's historical claims.[19]



A review of the PI Questionnaires already submitted reveals that many of the claims will not be found valid. For example, over 40 % of the claims include diagnoses from doctors whose diagnoses will be challenged. Similarly, over 80 % of the non-malignant claims do not allege impairment of the lung functions. Finally, only 12 % of the claims are from the construction

---

[19]    Again, this is true even assuming (as the chart herein does) application or a valid disease-based extrapolation method. The claimants have no such method.

industry, the industry associated with Grace products.    Thus, these preliminary analyses demonstrate that only a minority of the claims filed against Grace will be valid.

### D.    Estimation of Grace's actual liability for ZAI Claims.

Grace believes it has proven that disturbing ZAI does not pose an unreasonable risk.    The value of the ZAI claims will turn on how the Court rules on the ZAI science issues.    If any ZAI claims survive the science trial process, those claims will also have to be estimated.    The Debtors are prepared to move quickly to such estimation.    The Debtors respectfully request that the Court promptly issue its ruling on the science issues so that, if necessary, a ZAI estimation can proceed in conjunction with the traditional PD and PI estimation processes.

### III.    TERMINATION OF EXCLUSIVITY CANNOT FINESSE THE NEED FOR AN ESTIMATE AND WILL ONLY ENRICH LAWYERS AT THE EXPENSE OF THE ESTATE

### A.    There is no alternative to litigating the disputed issues of liability.

There is no non-consensual path that can bypass disputed issues of liability.    Unless all parties can agree on the amount of the asbestos liability, no proponent of any chapter 11 plan can obtain confirmation without an estimation.

The asbestos claimants argue that if they could propose a plan, the path to confirmation would be easy.    This is simply untrue.    The requirements of the Bankruptcy Code cannot be undercut by an agreement among the asbestos committees that forecloses a merits-based adjudication of the liability issues or ignores the court's determination of the merits of certain claims. If the asbestos claimants filed a plan based on their alleged valuation of their claims, general unsecured creditors would not be paid in full and the equity holders would get nothing. These groups have clearly indicated that they will reject such a proposed plan.    In fact, equity would be deemed to reject the plan if it provided no distribution to them.    *See* 11 U.S.C. § 1126(g).    To confirm their plan, the asbestos claimants would then have to show that it was fair

and equitable with respect to the rejecting classes. *See* 11 U.S.C. § 1129(b)(1). Among other things, the fair and equitable standard prohibits any creditor from receiving more than the allowed amount of its claim. *See* 7 Collier on Bankruptcy ¶ 1129.04[4][a][ii] at 1129-89-91 (15th ed. revised). To make a fair and equitable showing, asbestos claimants need to prove both the value of the Debtors' estates and the allowable amount of their claims. Thus, a plan proposed by the asbestos creditors does not provide any shortcut to confirmation: all roads lead to a merits-based estimation of asbestos liability.

**B.    Opening these cases up to competing plans would serve no useful purpose and would delay progress toward resolution.**

Permitting other parties to file competing plans would serve no useful purpose. In fact, it would only serve to increase administrative expenses and delay the cases. The CMO's for PD and PI estimation contain aggressive schedules for discovery and trial; so aggressive, in fact, that the PD Committee has been pushing the Debtors to extend the dates beyond those recently obtained from the Court. If at the same time the parties are engaged in estimation litigation the asbestos committees are also drafting a plan and accompanying disclosure statement,[20] the claimants would use the parallel tasks to argue for more delay — at least of the estimation.

The only parties to gain from competing plans are, frankly, the lawyers whose legal fees would mount at the expense of the estates, all to engage in a wasteful and pointless competing plan process. The Court has established a framework for determining the value of the asbestos liabilities. Permitting competing plans to be filed would not aid that process and would distract the parties and the Court.

---

[20]    The disclosure statement currently on file is a year and a half old and will need substantial updating in addition to addressing whatever plan it accompanies.

K&E 11230085.5

**C.     Claimants' insistence that exclusivity has muzzled them and prevented them from sharing their vision for these cases has no credibility.**

During the June, 2006 omnibus hearing, the PI Committee and the PD Committee indicated that they would seek a termination of exclusivity to propose an alternative plan of reorganization. The implication was that exclusivity needs to be terminated to allow them to participate in the plan process. *See, e.g.,* Tr. of Hr'g at 60: 1-2 ("MR. BAENA: . . . That plan is holding us hostage. That's what I'm saying.").

This assertion is baseless. The asbestos committees have been free all along to set out their view of how the cases should be resolved. And, they have done so. They have suggested that an estimation based on historical, pre-petition litigation and settlement history alone should be pursued and that the outcome of that estimation will show that the Debtors are insolvent. With that result in mind, the asbestos creditors' plan would provide that the entire value of the Debtors' estates be distributed to its creditors, with the vast majority available for asbestos claims. The Debtors, the equity holders and the unsecured creditors, by contrast, believe that there is equity available after payment of all legitimate claims. The only way to determine which position is correct is to determine the value of the asbestos claims.

**D.     The assertion that the market has been lulled by the debtor's plan is untrue and irrelevant.**

Counsel for the PD Committee asserted at the June 19th hearing that the market for Grace stock is being misled by the plan of reorganization that is on file with the Court, and that this is creating an obstacle to a consensual resolution of these cases.[21] This argument is irrelevant to the factors that must be considered in connection with exclusivity, and it has no basis in fact.

---

[21] *See* Tr. Of Hr'g at 57-59 (June 19, 2006)

A chart which tracks Grace's stock price from April of 2001 to today, the entire duration of these chapter 11 cases, is attached as Exhibit C. As that chart shows, Grace's stock price was relatively flat until the middle of 2004, when news of progress on a national asbestos trust fund pushed the price from approximately $3 per share to nearly $15 per share in only 6 months. Published reports at the time recognized that the proposed legislation was driving price increases. *See* Jerry Knight, *Big Improvements Were Scattered in Quiet 2ⁿᵈ Quarter*, Wash. Post, July 5, 2004, at E1 ("[Grace] gained 99 percent to $6.20 a share as investors bet Congress would eventually pass legislation to create a nationwide asbestos compensation fund to pay victims' medical and other claims and limit the liability of Grace and other companies."); David Brinkerhoff, *U.S. Companies optimistic for asbestos tort reform*, Reuters News, November 3, 2004 ("U.S. Companies battling asbestos litigation felt optimistic on Wednesday that stalled legislation to limit corporate liability would be pushed through a Republican-controlled Congress after President George W. Bush's re-election. Investors drove up shares of chemical and other firms faced with lawsuits from people sickened by asbestos, hoping that there would be quick resolution to the issue, which has cost companies billions in settlements and forced some into bankruptcy. ... [Grace] saw its stock rise $1.96, or 19 percent, to $12.55.").

Indicators of progress toward a consensual resolution with the asbestos claimants also drive stock price increases, according to published reports. *See* Kathleen Johnson Jarboe, *Taking Stock – Dark clouds clearing at last for W.R. Grace & Co.?*, The Daily Record (Baltimore, MD), October 18, 2004 (reporting a 23.6 percent increase in the stock price caused by Grace's announcement that negotiators had made enough progress to consider filing a mutually supported plan of reorganization).

When negotiations toward a mutually supported plan broke down in late 2004 and Grace filed a plan without the support of asbestos claimants, the market reacted with *disappointment*. Charts tracking the share price of Grace's stock for the two week period following the filing of the original plan of reorganization (on November 13, 2004) and the amended plan of reorganization (on January 13, 2005) are attached as Exhibits D and E, respectively. Those charts show that the price of Grace's stock actually *dropped* 6 percent after the first plan was filed and *dropped* by 10.2% after the amended plan was filed. The market was not buoyed by the plan at the time it was filed and it is certainly not propped up by that plan a year and a half later.

Grace's stock currently trades at levels much higher than it did before the hopes of a legislative solution drove prices up, but much lower than its peak values over the last two years. One explanation for the retention of the trading value may be the continued hope that the legislation will re-emerge or that a consensual resolution can be reached along the lines of *USG*.

For years, the asbestos claimants in the *USG* bankruptcy cases chanted the same mantra of insolvency. The asbestos claimants' expert in that case, Mark Peterson, used prepetition litigation and settlement history to estimate the present value of asbestos personal injury claims and demands against *USG* at approximately $9.4 billion.[22] Despite this alleged overwhelming liability, the asbestos claimants in *USG* eventually supported confirmation of a plan of reorganization under which the *USG* debtors would pay either $900 million or $3.95 billion (depending on the outcome of the FAIR legislation) to satisfy asbestos personal injury claims. [23]

---

[22] *See* Declaration of Mark A. Peterson at 4 (USG Docket #11597).

[23] *See* Findings of Fact and Conclusions of Law Regarding Confirmation of the First Amended Joint Plan of Reorganization of USG Corporation and its Debtor Subsidiaries, as Modified at 14 (USG Docket #11687).

The *USG* plan, which preserved the equity in the debtors and left all classes of claims and interests other than the asbestos PI claims unimpaired, was accepted by well over 99% of the asbestos PI claimants who voted. *Id.* at 2. This Court found that the *USG* plan was fair and equitable to future claimants and satisfied the best interests test as to asbestos claimants, and that the settlement of asbestos claims incorporated in the plan was fair and reasonable. *Id.* at 23, 35, and 37-8.

Even in this case, in November, 2004, the parties came very close to reaching consensus on a chapter 11 plan. So close, in fact, that they agreed to delay filing a chapter 11 plan in the hope that they could conclude a fully consensual deal. Unfortunately, the deal fell apart and the asbestos claimants are once again asserting that there is no equity available for existing shareholders. As shown by the *USG* case, the repeated claim by the asbestos committees that overwhelming asbestos liabilities render the debtors insolvent must be taken for what it is — the "official position" of the asbestos committees until they either get serious about concluding a consensual deal or their position is tested by a merits-based estimation process.

### E. Permitting competing plans would perpetuate an agreement that is in direct conflict with the Bankruptcy Code

The Debtors understand that the PI Committee has struck a bargain with the PD Committee specifying how any funds paid to asbestos claimants under *any plan* proposed by *any party* will be divided (the "Asbestos Agreement").[24] Specifically, no matter what the plan or Court orders provide, the Asbestos Agreement apparently dictates that a certain percentage of any funds distributed with respect to asbestos claims will go to pay PI claims and a certain percentage will go to pay PD claims. Further, the PD distribution shall be divided in a fixed

---

[24] The Debtors have requested a copy of the Asbestos Agreement or documentation that outlines the Agreement. Thus far, that documentation has not been supplied.

29

percentage between traditional PD claims and ZAI claims. Debtors understand that the Asbestos

Agreement is to apply regardless of the Court's ruling on ZAI, disallowance of more PD claims

or its ultimate determination among constituents in the estimation. In other words, despite the

Court's finding on the value of certain claims, the asbestos committees have agreed to ignore

such findings and divide the funds according to the terms of their Agreement.

There are three fundamental problems with the Asbestos Agreement:

- **The Asbestos Agreement obstructs consensual plan negotiations and is against public policy even outside of bankruptcy.** The agreement has the effect of eliminating the possibility that the Debtors could settle with PI, traditional PD, or ZAI separately, because agreeing to a settlement with one of them would lock in corresponding distributions under the Asbestos Agreement with the other two that may be wholly off the mark. Agreements that hinder partial settlement violate public policy and should be voided. *See In re San Juan Dupont Plaza Hotel Fire Litigation,* 1989 WL 996278, at *1 (D. P.R. 1989) (Judgment/Settlement Sharing Agreement rejected: "in practical terms, the Agreement discourages settlements with the plaintiffs, and enhances an unnecessarily recalcitrant position by the defendants towards the plaintiffs"). This concern applies *a fortiori* in bankruptcy, where jurisprudential policy overwhelmingly favors negotiated resolution.

- **The Asbestos Agreement is in direct conflict with the Bankruptcy Code's explicit claim allowance and distribution rules.** As outlined above, the Bankruptcy Code provides a framework for distinguishing between valid claims and invalid claims and for paying only the former. Only holders of allowed claims may receive distributions. *See* 4 Collier on Bankruptcy ¶ 502.01 at 502-9 (15th ed. revised). The Bankruptcy Code also calls for equal treatment for equally situated claimants. *See* 11 U.S.C. § 1123(a)(4) (requiring that a plan "provide the same treatment for each claim or interest in a particular class, unless the holder of a particular claim or interest agrees to less favorable treatment of such particular claim or interest."). Unless this Court's estimates of the various claims comes out in exactly the same proportions as the Asbestos Agreement, some asbestos claimants will be paid a higher percentage than others. This violates section 1123(a)(4) of the Code and renders any plan based on the Asbestos Agreement likely unconfirmable.

- **The Asbestos Agreement mandates an unconfirmable plan.** While the asbestos committees may recommend that their constituents accept a plan only if it comports with the Asbestos Agreement, the committees do not control the voting. Absent 100% acceptance by all of the hundreds of thousands of holders of claims in the asbestos class, a plan that unfairly discriminates among the holders of that class is not confirmable. If even one asbestos claimant who will be paid less than another asbestos claimant because of the Asbestos Agreement votes to reject the plan, it cannot be confirmed. *See In re M. Corp Financial, Inc.* 160 B.R. 941, 962-3 (S.D.

Tex 1993) (addressing on the merits a § 1123(a)(4) objection to confirmation raised by a creditor whose class had voted to accept the plan).

**F.      Exclusivity should be extended**

Permitting the filing of competing plans will serve no useful purpose and will delay progress toward resolution of these cases. It may also serve to perpetuate an agreement among the asbestos committees that is wholly against public policy, violates the Bankruptcy Code and would make any plan that contained its terms unconfirmable.

In April, 2006, the Court refused to put any absolute cut off on exclusivity. While the Court agreed to stay the estimation litigation, the Court also recognized that, absent a consensual plan, that stay was delaying progress:

> THE COURT: . . . *I'm not preordaining any result* . . . the debtor is trying to move forward and has been to a certain extent trying to move forward in some matters. The committees seem to have a different view as to where, as you say, the critical mass ought to go in the case, and so, at the moment, if I keep holding things in abeyance, which I'm willing to do . . . but, by the same token, if it isn't totally successful, the debtor is going to be back here saying, But wait, you held me up for 120 days and now I want the time to go forward with what my game plan was originally, and *I'm going to be kind of hard-pressed not to say, Okay, you know, if we're in litigation mode then let's get to it.* (Tr. of Hr'g at 25: 15-25; 26: 1-5) (April 17, 2006) (emphasis added)

And, in ruling to extend exclusivity on April 19, 2006, the Court already recognized that if there was no consensual deal, the time would have to be further extended to accommodate the estimation litigation:

> THE COURT:  . . . *I know if you have to get back into litigation mode, I understand that that's going to extend the time.* I think on balance to the estate that it's better to keep the stay in place and extend the exclusivity through that time frame even though it may mean a delay in the event that you have to get into litigation posture. (*Id* at 37: 9-15) (emphasis added)

For all of the foregoing reasons, the Debtors respectfully request that the Court enter an order: (a) extending the Debtors' exclusive filing period through and including the conclusion of the estimation hearings; and (b) extending Debtors exclusive solicitation period through and

31

including an additional 60-days thereafter; and (c) granting such other relief as may be fair and equitable.

Dated:  July 7, 2006

KIRKLAND & ELLIS LLP
David M. Bernick, P.C.
Janet S. Baer
Salvatore F. Bianca
200 East Randolph Drive
Chicago, Illinois 60601
Telephone:  (312) 861-2000
Facsimile:  (312) 861-2200

and

PACHULSKI, STANG, ZIEHL, YOUNG, JONES & WEINTRAUB LLP

_James G. O'Neill_

Laura Davis Jones (Bar No. 2436)
James E. O'Neill (Bar No. 4042)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705 (Courier 19801)
Telephone: (302) 652-4100
Facsimile:  (302) 652-4400

Co-Counsel for the Debtors and Debtors in Possession

32