# Exhibit A

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

IN RE:                              .    Case No.  01-01139
                                    .
                                    .
   W. R. GRACE & CO., et al,        .    5490 USX Tower
                                    .    600 Grant Street
                                    .    Pittsburgh, PA 15219
            Debtors.                .
                                    .    January 21, 2005
. . . . . . . . . . . . . . . . .        9:00 a.m.

TRANSCRIPT OF AGENDA MATTERS
BEFORE HONORABLE JUDITH K. FITZGERALD
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtor:                Kirkland & Ellis, LLP
                               By:  DAVID M. BERNICK, ESQ.
                                    THEODORE L. FREEDMAN, ESQ.
                                    JANET S. BAER, ESQ.
                               200 Randolph Drive
                               Chicago, IL   60601

                               Pachulski, Stang, Ziehl, Young,
                                 Jones, & Weintraub, PC
                               By:  DAVID W. CARICKHOFF, ESQ.
                               919 N. Market Street
                               16th Floor
                               P. O. Box 8705
                               Wilmington, DE   19899-8705

For the Official Committee     Kramer, Levin, Naftalis,
of Equity Security Holders:      & Frankel, LLP
                               By:  PHILIP BENTLEY, ESQ.
                               919 Third Avenue
                               New York, NY   10022

Audio Operator:                Janet Kozloski

Proceedings recorded by electronic sound recording, transcript
              produced by transcription service.

J&J COURT TRANSCRIBERS, INC.
268 Evergreen Avenue
Hamilton, New Jersey 08619
E-Mail:  jjcourt@optonline.net
(609) 586-2311  Fax No.  (609) 587-3599

1  with the view that they're probably impaired because the plan

2  probably will not provide for a trust that pays all claims 100

3  cents on the dollar, either in the allowed sense, or in the

4  sense that they're filed against the trust.

5          And rather than send out a plan for a vote that

6  ignores that issue, it seems to me we're better off permitting

7  people to vote and then dealing, in the plan context, whether

8  or not that trust is adequately funded, which is a confirmation

9  issue.  And I think that's where the focus belongs.

10         So, it seems to me that all claimants -- the -- I'm

11 talking about the personal injury claimants, at the moment,

12 ought to be able to vote.  How we go about that process, maybe

13 is something that can be determined at a later date, but I

14 think it's better to send it out for vote and deal with whether

15 it was proper at the plan hearing.

16         MR. BERNICK:  May I be heard on that, Your Honor?

17         THE COURT:  Yes.

18         MR. BERNICK:  Let me make a couple preliminary

19 comments and then get back to that question, because it has --

20 I want to -- obviously, we're struggling with a practical

21 problem, which is how to move this case forward where we don't

22 really know how much the liability is.  That's been the problem

23 since the beginning of the case.

24         The argument is made that the only way to argue for,

25 in a sense, statutory impairment as opposed to plan impairment,

1 need more evidence, whether it be by bar date, or whatever,

2 after I've heard the experts, I'll decide which ones I believe

3 and I'll either conclude that the experts gave me enough to

4 come up with an estimation, or I'll move on and we'll do some

5 additional steps.

6          THE COURT:  All right.  But what's the purpose for

7 the estimation then?

8          MR. LOCKWOOD:  The purpose for the estimation, here,

9 would be to give all of the parties to this bankruptcy some

10 idea of what, for the trust, is likely going to have in the way

11 of claims, for purposes of determining what kind of a plan.

12          Right now, the debtor's view of the world and the

13 asbestos claimant's view of the world is widely divergent on

14 the value of the future claims.  And the only way anybody's

15 ever going to get over that gap is to have some Court referee

16 that dispute.

17          THE COURT:  Well, I'm willing to do that.  I just

18 want to know what the process ought to be to do it.  I've been

19 saying since the -- since I got assigned this case, that if in

20 fact I have the capability of doing it, I'd move it.  I now

21 have that capability, so let's go to it.  But how?

22          MR. LOCKWOOD:  Well, Mr. Bernick -- let me back up a

23 minute.  I, again, we're sort of jumping ahead to estimation

24 and my brethren over here haven't had an opportunity to speak

25 to the impairment issue at all, and -- I -- do you want to go

1 ahead with that right now, or should --

2        THE COURT:  I'd like to try to figure out what pieces
3 we need to do, and in what order, to get a plan proposed that,
4 hopefully, will be a consensual plan.  I'm not minimizing what
5 the debtor has now, but it's obviously not a consensual plan.

6        So, if an estimation is going to do it, let's tee up
7 an estimation hearing.  Because, perhaps at the point in time
8 when everybody gets at least some numbers from a Court that
9 looks at it, subject to how ever many appeals you're going to
10 take, nonetheless, at least you'll have somebody's view of what
11 the -- that estimated number is going to be.

12        MR. LOCKWOOD:  Well, right now Mr. Bernick wants you,
13 essentially, to take his word for what the evidence ought to be
14 in an estimation proceeding.

15        I mean, he's basically said -- he got up, and he drew
16 his graphs, and he described Mark Peterson's methodology of
17 going about estimating claims, and he says, that's ridiculous,
18 because everybody knows the tort system is broken.

19        THE COURT:  I know what he wants me to do.  I had him
20 go over it, very specifically, so I had no doubt about what he
21 wanted me to do.  What do you want me to do?

22        MR. LOCKWOOD:  What I want you to do is to be -- is
23 to tell the parties to meet and confer about having a case
24 management procedure for the estimation proceeding, not for
25 post-confirmation litigation, and have that teed up as the

155

1          THE COURT:  And to the extent that the presents are

2   channeled to the trust, they essentially waive the claim

3   against the debtor's estate, in favor of what the trust is

4   going to pay them.

5          MR. KRUGER:  Well, but that -- but, Your Honor,

6   that's an illusion.  Those funds come from the debtor's estate,

7   so therefore creditors -- other creditors are entitled to look

8   to see --

9          THE COURT:  I don't --

10         MR. KRUGER:  -- whether the funds that are going into

11  that trust are appropriate.

12         THE COURT:  I don't think the Court's view that as an

13  illusion.  I think they view it as a statutory requirement

14  under 524.

15         But, I agree with you with your ultimate conclusion,

16  which is creditors have the right to determine whether the

17  distributions are fair and reasonable with -- coming either

18  from the -- that the debtor would put into the trust, on the

19  one hand, versus what the debtor would be paying to other

20  creditors whose claims don't go into the trust, on the other.

21         But, I think the first piece of that is the

22  estimation process.

23         MR. KRUGER:  And a questionnaire of some kind.

24         THE COURT:  Well, yes.  I'm -- I think the

25  questionnaire's a good idea, but it's not going to be 50 pages.

**J&J COURT TRANSCRIBERS, INC.**

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

IN RE:                          . Case No.  01-1139 (JFK)
                                .
                                .
  W.R. GRACE & CO.,             . Courtroom A, 54th Floor
                                . U.S. Steel Tower
                                . Pittsburgh, PA
                 Debtor.        .
                                . July 19, 2005
. . . . . . . . . . . . . . . . . 8:42 a.m.

TRANSCRIPT OF HEARING
BEFORE HONORABLE JUDITH K. FITZGERALD
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtors:                Pachulski, Stang, Ziehl, Jones &
                                Weintraub, P.C.
                                By:  DAVID CARICKHOFF, ESQ.
                                919 North Market Street, 16th Fl.
                                Wilmington, Delaware  19899

                                Kirkland & Ellis LLP
                                By:  DAVID BERNICK, ESQ.
                                     MICHELLE H. BROWDY, ESQ.
                                     JANET BAER, ESQ.
                                     BARBARA HARDING, ESQ.
                                200 East Randolph Drive
                                Chicago, Illinois  60601

Audio Operator:                 Cathy Younker

Proceedings recorded by electronic sound recording, transcript
         produced by transcription service.

J&J COURT TRANSCRIBERS, INC.
268 Evergreen Avenue
Hamilton, New Jersey 08619
E-mail:  jjcourt@optonline.net

(609) 586-2311  Fax No.  (609) 587-3599

1  allowance.  If you read 502(c), it says, "We are estimating

2  claims for purposes of allowance."  Most of this estimation --

3  80 percent of it -- is going to involve future claims.  We're

4  certainly not allowing the future claims, and the fact is that

5  even with respect to the present claims where you could have

6  some notional idea that you're talking about allowance, the

7  fact is all of those claims are going to get sent to a trust

8  unsupervised by the Bankruptcy Court, and the Trust is going to

9  resolve them not allow them.  An allowance is something that

10 happens under the supervision of a bankruptcy judge pursuant to

11 provisions in the bankruptcy rules and the Code.  What the

12 Trust is going to do with them isn't going to have a judge and

13 bankruptcy rules and the Bankruptcy Code.  It's going to have a

14 TDP, a trust distribution process.

15          THE COURT:  Well, of course, but the issue still is

16 what is the predicted I suppose estimate of what those claims

17 will be, at what disease levels, so that whatever plan is

18 proposed make sure that it is appropriately funded.  I mean you

19 can put it in terms of feasibility if you want, but it's still

20 a confirmation standard --

21          MR. LOCKWOOD:  I agree.

22          THE COURT:  -- and we still have to go through the

23 process if you folks can't agree.

24          MR. LOCKWOOD:  I agree.  The question is whether you

25 do that by simply, as Mr. Bernick derisively described, through

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

IN RE:                                  .    Chapter 11
                                        .
W.R. GRACE & CO., *et al.*,              .    Case No. 01-01139(JKF)
                                        .    Jointly Administered
          Debtors.                      .
                                        .    Feb. 21, 2006 (2:03 p.m.)
                                        .    (Wilmington)


TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE JUDITH K. FITZGERALD
UNITED STATES BANKRUPTCY COURT JUDGE


Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

1  arguing this since the beginning of the case, so I'm not -

2  this is in no way an issue of, you know, the pot trying to

3  call the kettle black or putting fault in or whatever symbol

4  you would like to use.  You have been saying since the

5  beginning of the case that we need to get the litigation

6  concluded in order to get the case finished.  That has been

7  your position on behalf of this estate -

8          MR. BERNICK: That's correct.

9          THE COURT:  - since the first day that I met you in

10 connection with this case.

11         MR. BERNICK: That's correct.

12         THE COURT: And to a certain extent, that track has

13 been stymied and not really through any fault of anybody.

14 It's just been stymied in some respects.  There was one other

15 - I'll call it cooling off period, I think, earlier on about

16 the time that the debtor was filing the plan when it appeared

17 that maybe some settlement negotiations were going to come to

18 fruition.  They failed.  I think I am willing at this point

19 because it is five years into the case, to agree that another

20 sixty day cooling off period will be fine, but I'm not going

21 to do it again.  So, that is a ruling.  I will give sixty

22 days to let these negotiations attempt to get finished

23 without involving anybody else being sidetracked in any way,

24 shape, or form, but at the end of that sixty days, if in fact

25 there is not a consensus by everyone that it should be

1  continued – this, in quote, "standstill" should be continued

2  for some other period of time, then we're marching down

3  litigation road again, and at that point we'll just let the

4  chips fall where they may on dual tracks.

5  MR. BERNICK: That's fine, Your Honor, and the only

6  thing that I would then ask to be precise there, is that that

7  literally is true.  That is that we're not going to hear

8  sixty days from now all we have – no, we've taken time off

9  and it's going to take us more time to wrap up, that is, the

10 dates that we've all agreed to are deferred by sixty days,

11 and we'll see where things are.

12 THE COURT: That's what I think we should do.

13 MR. BERNICK: That's fine, Your Honor.

14 THE COURT: When is the status conference, I'm

15 saying sixty days, but it may actually be a little bit

16 different time.  When is the status conference set in April?

17 MS. BAER: April 17th.

18 THE COURT: Okay, well, it seems to me that that's a

19 good time to put all these issues back on, because on April

20 17th, you ought to be able to tell me whether one more week is

21 going to do it or not, and at that point, if in fact, as I

22 said, there is not some consensus that you in fact are moving

23 towards settlement and that some additional period of time

24 should be agreed on, then we're going to go down parallel

25 tracks.  So, Mr. Baena, you've got your sixty days, but

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

IN RE:                                   .    Chapter 11
                                         .
W.R. GRACE & CO., *et al.*,              .    Case No. 01-01139(JKF)
                                         .    Jointly Administered
                                         .
            Debtors.                     .    April 17, 2006 (2:05 p.m.)
                                         .    (Wilmington)


TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE JUDITH K. FITZGERALD
UNITED STATES BANKRUPTCY COURT JUDGE


Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

1  to have to be done even if there is some agreement between

2  the PI and the PD as to how resources that will come out of

3  the debtors' estate will be shared between them, and that's

4  an assumption on my part.  I don't know if that's what the

5  whole agreement is, but I would assume that that must be a

6  piece of it, if not all of it.

7      MR. LOCKWOOD: Your Honor, first I will invite Mr.

8  Baena to respond to that, but as a general proposition I

9  really do not think it would be a good idea for us to get

10  into describing how the particular agreement between PI and

11  PD would operate at this time except to say that at least as

12  far as I'm aware, it doesn't necessarily require the

13  litigation of any set or subset of PD claims prior to the

14  confirmation of a consensual plan.

15      THE COURT: Okay, well, this is the difficulty that

16  I see.

17      MR. LOCKWOOD: If it's with PD, I should cede the

18  lectern to Mr. Baena, Your Honor.

19      THE COURT: No, it's just a general case related

20  difficulty that I see.   The debtor has been pretty intent on

21  attempting to get the litigation done and to a certain extent

22  I've been letting the debtor go forward and to a certain

23  extent I haven't.  Recently, I've been holding the debtor up

24  at the same time that I'm trying to put its feet to the fire,

25  which kind of gives it somewhat of a, you know, Hobson's

1    choice, I guess , as to what to do, because I want to see

2    some progress in the case, and it seems to me that as a

3    condition of exclusivity, the debtor ought to be establishing

4    that it is on track for getting a plan that's confirmable

5    whether consensual or not together.  At this point that seems

6    to be on track.  So I don't see a reason to terminate

7    exclusivity with it right now.  So, to the extent that, you

8    know, you agree to another 60-day extension in order to

9    continue to mediate and see what you can resolve, that's fair

10   enough.  It seems to me that the debtor is in the process of

11   managing its business, and you know, doing the business-

12   related issues that a debtor has to do.  With respect to the

13   claims litigation, the debtor has been trying really since

14   the outset of the case to get some handle on what this

15   litigation is all about, and I think recently has been making

16   some progress, but part of the objections to exclusivity have

17   been coming from the creditor constituents saying that the

18   debtor isn't making much progress.  Well, the debtor can't

19   make much progress if I keep telling the debtor, No, you

20   can't do this; no, you can't do that; no, you can't go

21   forward.  So the difficulty I see is, if I grant this

22   additional 60 days and stop all the litigation then, you

23   know, at this point where the case having been five years

24   old, frankly, I can't be too worried about the fact that the

25   debtor may end up in bankruptcy for an additional 60 days.

1  ought to allow this process to conclude.  We've asked only

2  for 60 more days to do so.  It is our expressed intention to

3  speak with each constituency in that period of time to the

4  extent that we can to see if we can reach agreements.  And

5  this may all become very easy for the Court if there's

6  sufficient critical mass that has consented to an agreement

7  for the Court to provide a facility for us to put it forward,

8  but I think that there's too much risk in the course of

9  settlement discussions which are ongoing for the Court to

10  suggest one way or the other how it will react, because we

11  can't predict what we're coming back here with, and we ought

12  not chill the imagination, in all due respect, that is so

13  critical to coming to a conclusion by preordaining the result

14  in any particular iteration of a plan.

15          THE COURT:  Oh, Mr. Baena, I'm not preordaining any

16  result.  I've just tried to articulate what I see is the

17  process, that the debtor is trying to move forward and has

18  been to a certain extent trying to move forward in some

19  matters.  The committees seem to have a different view as to

20  where, as you say, the critical mass ought to go in the case,

21  and so, at the moment, if I keep holding things in abeyance,

22  which I'm willing to do.  I mean, it seems that you've made

23  some progress, and I think some is better than none, so, it's

24  wise to let you continue on that road, but, by the same

25  token, if it isn't totally successful, the debtor is going to

1    be back here saying, But wait, you held me up for 120 days

2    and now I want the time to go forward with what my game plan

3    was originally, and I'm going to be kind of hard-pressed not

4    to say, Okay, you know, if we're in litigation mode then

5    let's get to it.   That's all.

6            MR. BECKER: Your Honor, Gary Becker for the Equity

7    Committee.   Your Honor, on the theory that one should hope

8    for the best but plan for the worst, I think it would be wise

9    to go forward with the dispute over what the proper answers

10   to the personal injury questionnaires are, at least to go

11   forward with the discussions with the discovery mediator.  As

12   was mentioned, some of the disputes involve whether Your

13   Honor has ruled already on these issues, and whether further

14   objections will be heard at all.   It seems to me, Your Honor,

15   that regardless of whether there are still people who have

16   yet to answer the questionnaire or not, that issue can be -

17   once decided by the Court will be dispositive with respect to

18   all of the respondents.

19           THE COURT: Well, let me see if I can put that issue

20   to bed.   What I think I ruled on is what the questions were

21   that could go out in the questionnaire.   Now, I thought

22   that's what the proceedings were that went on so far, and do

23   I expect the people who are given the questionnaire are going

24   to answer them?   Yeah, of course, I do.   I mean, that was the

25   whole purpose for going forward with that in the first place.

1    We've only had 30 days of the first 60 days.

2            THE COURT: Right, actually, though, I think because

3    my hearings in July are the 24th –

4            MR. LOCKWOOD: Right.

5            THE COURT:  – that I would want to extend it

6    through that hearing on July 24th.  So –

7            MR. BERNICK: So, we're talking now about –

8            THE COURT: Extending exclusivity and the stay of

9    all matters essentially until July 24th, and I know if you

10    have to get back into litigation mode, I understand that

11    that's going to extend the time.  I think on balance to the

12    estate that it's better to keep the stay in place and extend

13    the exclusivity through that time frame even though it may

14    mean a delay in the event that you have to get into

15    litigation posture.

16            UNIDENTIFIED SPEAKER: (Microphone not recording.)

17            THE COURT: They are?

18            MS. BAER: Exclusivity is up today.  The question .

19    . . (microphone not recording) that was May and then July.

20            MR. LOCKWOOD: Well, we had envisaged the two being

21    synonymous.  So I guess that gives Mr. Bernick 90 days on

22    exclusivity.

23            MR. BERNICK: I'm not really, Your Honor, I'll being

24    saying that exclusivity is important, and it is, but if

25    exclusivity – we've got to move forward.  That is our

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: | . | Chapter 11 |
| | . | |
| W.R. GRACE & CO., *et al.,* | . | Case No. 01-01139(JKF) |
| | . | Jointly Administered |
| Debtors. | . | |
| | . | June 19, 2006 (1:56 p.m.) |
| | . | (Wilmington) |

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE JUDITH K. FITZGERALD
UNITED STATES BANKRUPTCY COURT JUDGE

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

1          THE COURT: Mr. Bernick, I'm really not sure what

2     soapbox you're on.  I am willing to give you a bar date.  If

3     you want it for pre-petition claims, fine.  Like you, I

4     started out as a trial lawyer.  I am fully in accord with the

5     rules of evidence being applied in a litigated proceeding in

6     the Bankruptcy Court, and I will do my best to apply them to

7     the best of my ability from this end of the bench, just like

8     I did from that end of the bench.  That's the best I can

9     offer at this point in time.

10          MR. BERNICK: That's all we're asking for.

11          THE COURT: With respect to the questionnaires, I

12    think that's the problem.  There is an allegation that they

13    are, in quotes, "third-party witnesses".  I don't see them as

14    third-party witnesses.  These are people who are going to be

15    pursuing claims against a trust that the debtor has to fund.

16    That means that they are, in quotes, "claimants" or "demand

17    holders" depending on how they come out, whether it's a

18    current claim or a future demand.  So one way or another,

19    they are going to be recognized as creditors even if they

20    have not yet filed a claim.  Let's get a bar date.  Let's

21    find out what claims come in, and then I think all of the

22    expert witnesses will be able to look at the same set of

23    claims, and I think we can proceed in a logical fashion.

24    Now, with respect to the concern I have about whether or not

25    there is a return to equity, I think Mr. Kruger's correct.  A

 1    part of that issue is going to depend on what the claims, the

 2    asbestos claims, will turn out to be both present and future,

 3    and I think that is a correct statement.  So, I'm not in any

 4    way at this point challenging it.  My frustration is the fact

 5    that your litigation position and your settlement position,

 6    as we all know, are two different things, and because someone

 7    thinks that you can get a better deal, perhaps, through

 8    litigation than settlement, I mean, that happens from time to

 9    time - I'm not talking about you, Mr. Bernick, I'm talking

10    about the committees that refuse to make counter offers

11    because the whole concept is unacceptable.  That, in my view,

12    is not negotiating at all, let alone not negotiating in good

13    faith.

14             MR. BERNICK: I apologize, Your Honor, for my tone.

15    Sometimes I've gotten heated here this afternoon.  We have

16    all the respect in the world for the Court.  It is a

17    difficult process, but speaking for the debtor and I will

18    also speak for Mr. Kruger and his constituency, to my

19    observation, this is not a situation where people are

20    entrenched.  We have tried to make movement.  I'll say to the

21    other side, even though I sometimes look for it unavailingly,

22    I assume that they're operating in good faith and would

23    negotiate as well.  The real problem is we just - we've got

24    to get to the courthouse steps or nothing is going to happen.

25             THE COURT: Fine, so get together between now and

1        MR. INSELBUCH: And that's why come later in July,

2   that is when we come to exclusivity, we would like to be in a

3   position to go forward so that both sets of evidence can be

4   prepared at the same time, and so we can have a hearing where

5   we put on our evidence, the debtor will put on its evidence,

6   and then the Court will be in the position to determine which

7   of two plans can be confirmed.

8        THE COURT: Well, I don't know about which of two

9   plans.  I'm not sure on which of any plan at the moment.  I

10  think what I need is to get an estimation and then we'll see

11  where we go with plans.

12       MR. BERNICK: Between now and July, Your Honor, can

13  we - We would ask that with respect - I don't know if Your

14  Honor still wants to have objections that go to the face of

15  the questionnaire mediated -

16       THE COURT: Frankly, if you're going to set a bar

17  date, I don't think that's going to be necessary, because at

18  some point in time, I'm going to treat the questionnaires as

19  an appropriate interrogatory, and if there are legitimate

20  objections, we're going to take the objections, and if not,

21  then I'll do an order that compels people to answer.  I think

22  that's what needs to happen but it needs to happen in a

23  fashion that gives everyone the due process notice that

24  they're entitled to have and to raise whatever issues are

25  there.  So, it's up to you, Mr. Bernick, if you want to try

1  to pursue it and get notice out to everybody, I'm here.  I'll

2  do it.

3  　　　　MR. BERNICK: Well, then, we'll go ahead and try to

4  do that because, and there's probably a difference between,

5  you know, a very claim specific objection and some of these

6  broader objections that go to what we actually litigated

7  before Your Honor last year, and our priority - really to

8  kind of be able to tell the Court what these questionnaires

9  are showing is to be able to have these very simple

10  objections resolved soon so we can get the questionnaires and

11  keep this process going.  The questionnaires, I mean, it's

12  not something that's sort of mysterious.  Questionnaires have

13  been used in litigation, to my knowledge, for a long time,

14  certainly in the last ten years.  We had extensive

15  questionnaires in the breast implant litigation.  Actually

16  they were filled out without objection.  So it should not be

17  that difficult - I'm sorry.  Go ahead, Mr. Baena.

18  　　　　MR. BAENA: I have no drama to add to this, Judge.

19  I just, if I may, Scott Baena on behalf of the Property

20  Damage Committee.  In response to the last point that Mr.

21  Inselbuch made, the Court registered some circumspect about

22  plans, be it one or two, and I just would like to address

23  that one issue.  I'm not going to raise this to an emotional

24  level.  We've heard repeatedly throughout today's hearing

25  about the inability of the unsecured creditors to

1    meaningfully engage in this mediation process.  And what
2    we've heard is their fervent belief, based upon market
3    forces, that they're in the money at the equity level, and
4    therefore, the unsecureds are entitled to a hundred percent
5    of their claims, plus post-petition interest.  And Mr.
6    Inselbuch alluded to this.  It was denied by those opposing
7    his comments, but it actually, Judge, is worth reflecting on
8    the opposition because what Mr. Inselbuch said is
9    irrefutable.  The market - As informed as the market ever
10   gets, the market is reacting to all of these asbestos cases
11   to what's happening in court.  And if we just freeze for a
12   second and realize where we are and realize how clever the
13   debtor was to put us in this position.  What we have is a
14   plan on file.  One plan, despite the many attempts over the
15   past several years of the FCR, the ACC, the Property Damage
16   Committee to wrest exclusivity away from the debtor, we were
17   unsuccessful.  But in our failure, the debtor was able, in
18   fact the Court compelled the debtor to file the plan, and the
19   market is reacting to a plan which the debtor filed to invest
20   the unsecured creditors and the equity in their plan, and the
21   way they invested them was, they put a cap on PD and PI and
22   they said, We'll give you whatever you want, whatever you
23   want.  And so, the market is reacting to that.  That distress
24   debt dealers aren't paying a hundred cents on a dollar today.
25   We see this tickers come across our desk everyday.  They're

1    not paying a hundred cents for unsecured claims, and the

2    market is being dominated by, you know, non-institutional,

3    large investors who are just - to borrow a word that's been

4    used before, gaming the fact that there's a plan on the table

5    that would pay unsecureds in full with post-petition

6    interest.  And so, when Mr. Inselbuch suggests, Well, let us

7    put a plan on the table.  It's not a nefarious proposition,

8    and indeed, it makes a great deal of sense at many levels

9    including on the level that it will then send a new dynamic

10   to that so-called informed marketplace, and we will test the

11   marketplace.  Of course, nobody in the world accepts the

12   proposition, no court in the world accepts the proposition

13   that what the stock is trading at is what you need to find in

14   respect to the solvency of a company, but it will be one less

15   complaint, I assure you, when a plan that is based on true

16   value is also on the table.  And I would suggest, Judge, that

17   if you're not going to accept Mr. Inselbuch's suggestion,

18   then you ought to get rid of their plan because it's the fact

19   of one plan and not two plans that is creating the impasse as

20   much as anything else in this case.  And so it is that this

21   becomes a self-fulfilling prophecy.  We leave that plan on

22   the table while we do absolutely nothing with it.  We're not

23   promoting it.  We're not objecting to it.  We have no

24   confirmation hearings set up.  We didn't even get through a

25   disclosure statement hearing.  It's just there taking up

1    court space in the file and creating this information in the

2    investment public.  And it's creating an obstacle to a

3    consensual resolution of this case.  So, respectfully, I

4    think that Mr. Inselbuch was right.  Let us put something on

5    the table too.  If you want to shelve everything and put it

6    to the side, that's fine.  We would like to put something on

7    the table and propose to you a way to move this case along to

8    confirmation on one plan or the other without another two-

9    year sideshow over estimation as a discreet exercise in the

10   course of all of this.  Or get rid of their plan.  Thank you,

11   Judge.

12          THE COURT:  Well, are you suggesting you don't need

13   an estimation hearing?

14          MR. BAENA:  I'm not suggesting that there won't come

15   a time where we don't have to put some contours on the value

16   of claims, but what I'm suggesting is, it can occur in all

17   different kinds of contexts.  In this context, the one we're

18   developing here, it's just sort of happening as a cosmic

19   experience.  There's a plan out there.  Not necessarily – I

20   don't think there's a person in this room that believes that

21   that plan is really the plan that we're all going to pursue

22   at the end of the day.  Indeed, Mr. Kruger even suggests, you

23   know, maybe through this litigation activity we'll find other

24   opportunities to be in the same courtroom with one another

25   and maybe negotiate a little bit more.  Everybody's holding

1    out hope for a negotiated result.    That plan is holding us

2    hostage.    That's what I'm saying.

3            MR. BECKER: Your Honor, Gary Becker for the Equity

4    Committee.    I think Mr. Baena's argument proves too much.    If

5    in fact the plan that's on the table drove the valuation of

6    the equity in the market, it would never change.    But since

7    the plan has been filed, equity has traded from around $8 to

8    $18 and back down to about $12 today.    Obviously, when people

9    buy or sell stock, it's in anticipation of future events.

10   It's driven by the fact that the plan that's on the table may

11   not be the plan that gets confirmed.    I think it would be

12   extremely short-sighted and naive to believe that just

13   because a plan is on file, that drives the market and

14   precludes any sort of a resolution of this case.    What we

15   really need is to have a decision on ZAI and to have the

16   personal injury claims fixed.    Thank you, Your Honor.

17           MR. BAENA: Judge, if I may.    The response to that

18   is up until recently, the market has been trading on the

19   legislation.    And they've not been immune to that trading

20   too.

21           MR. BERNICK: Your Honor, all these statements that

22   have been made about what the marketplace is doing, I guess

23   the folks in this courtroom are actually smarter about the

24   market than the market is.    That's a pretty tough proposition

25   for anybody to demonstrate.    I mean, if they want to come in

# Exhibit B

1.

UNITED STATES BANKRUPTCY COURT

EASTERN DISTRICT OF LOUISIANA

NEW ORLEANS

```
*  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
                                          *
IN THE MATTER OF:                         *     CASE NO. 00-10992
                                          *     through  00-10995
THE BABCOCK & WILCOX CO., ET AL,          *     (Jointly Administered)
                                          *
         DEBTORS.                         *     SECTION "B"
                                          *
*  *  *  *  *  *  *  *  *  *  *  *  *  *  * *     CHAPTER 11
                                          *
THE ASBESTOS CLAIMANTS'                   *     ADVERSARY NO. 01-1155
COMMITTEE, ET AL,                         *
                                          *
         PLAINTIFF-INTERVENORS,           *
                                          *
VERSUS                                    *
                                          *
BABCOCK & WILCOX INVESTMENT               *
COMPANY, ET AL,                           *
                                          *
         DEFENDANTS.                      *
                                          *
*  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
```

MORNING SESSION

Transcript of the proceedings taken in the above-
captioned matter on Tuesday, October 23, 2001, the Honorable
Jerry A. Brown, United States Bankruptcy Judge, presiding.

AUDIO OPERATOR:    Demond Smith

TRANSCRIPTIONIST:  Dorothy Bourgeois

Proceedings recorded by electronic sound recording,

transcript produced by transcription service.

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.  800-626-6313

Peterson - Cross

60

1    many mesothelioma claims actually were claimed against Babcock

2    & Wilcox during this period of time; true?

3    A.    Subject to the imputation of the unknown claims, yes.

4    Q.    Okay.  And, isn't it true that, during this period of

5    time, that represented no less than 33 percent of all of the

6    mesothelioma cases in the entire United States?

7    A.    That's right.

8    Q.    Babcock & Wilcox had a 33 percent market share in the

9    whole United States for mesothelioma claims, correct?

10   A.    I don't know what you mean by "market share."  The

11   propensity to sue was 33 percent.

12   Q.    It's an enormous market share, isn't it?

13   A.    No, I don't think so.  I think that one -- two-thirds of

14   the people that mesothelioma did not file claims against B&W.

15   I don't know relative to what.

16   Q.    Well, let's talk about it this way:  First of all, with

17   regard to all of these different claims, isn't it true that

18   you have nowhere determined that Babcock & Wilcox asbestos

19   caused any of those claims?  Isn't that true?

20   A.    This calculation, the propensity to sue, as illustrated

21   there is a projection of filings.  It has nothing -- there's

22   not an issue of evaluation.  These are how many claims will be

23   filed.  So, that doesn't come into this issue.

24   Q.    Let me make it even clearer.  Isn't it true that you have

25   nowhere determined whether and how much malignant disease was

Peterson - Cross

1    actually caused by exposure to Babcock & Wilcox products?

2    You've never determined that?

3    A.   No one can determine that.   Only God knows that.

4    Q.   Dr. Peterson, would you please just answer the question?

5    A.   No.

6    Q.   You have not determined that Babcock & Wilcox caused any

7    of that mesothelioma, have you?

8    A.   I've been unable to determine, on a case-by-case basis,

9    which -- whose asbestos caused it.   No one can do that.

10   That's what we have juries for.

11   Q.   Didn't I ask you the following question and didn't you

12   just give the following answer in your deposition:

13       Question:   "Is it true that you've nowhere determined

14   whether and how, how much malignant disease was actually

15   caused by exposure to Babcock & Wilcox products?"

16       Answer:   "No, I've not determined that."

17       Was that your answer to my question, under oath,

18   Dr. Peterson?

19   A.   Yes, and I just said it again.   Of course, not.   I can't

20   do it and I didn't do it.

21   Q.   Let's talk about dose.   I've looked through your expert

22   report and I nowhere see that you have determined the dose of

23   asbestos exposure that any of those claimants had from Babcock

24   & Wilcox asbestos.   Isn't that true, it's nowhere in your

25   report?

62

Peterson - Cross

1    A.   No, it's nowhere in my report.

2    Q.   Isn't it true that, when it comes to exposure, even

3    exposure to Babcock & Wilcox asbestos, that nowhere do you

4    verify that any of the claimants against Babcock & Wilcox for

5    malignant disease actually were exposed to the asbestos,

6    itself?

7    A.   I don't think that's entirely true.

8    Q.   Have you done a study of what people that ever filed

9    claims against Babcock & Wilcox actually came into contact

10   with the insulation that was in its boilers?

11   A.   I've done an analysis of -- I'm familiar with and have

12   read many documents as to how B&W processed their claims, and

13   for them to pay a claim, they required that a claimant provide

14   information that they were at a site where there was a B&W

15   boiler.  So, there is a verification that's been done by B&W

16   with regard to the presence of exposure, and I'm familiar with

17   that and that's referenced in my report, certainly.

18   Q.   Well, you were here for Mr. McKnight's testimony, were you

19   not?

20   A.   Yes.

21   Q.   Okay.  And, we all heard Mr. McKnight testify, and when

22   Mr. McKnight testified, he talked about what actually was

23   required for somebody to satisfy the exposure requirement.  Do

24   you recall that?

25   A.   Yes, I do.

Peterson - Cross

1   A.  I just said it, yes.

2   Q.  And, the kinds of processes that one would have to go

3   through if you filed a lawsuit or made a claim is how easy or

4   difficult it would be to recovery, correct?

5   A.  Well, it's more than that.  It's how burdensome and

6   personally unpleasant it is.

7   Q.  Okay.  It's also a question of how easy it is to get

8   money; true?

9   A.  Yes, there's enough of an economist in me to believe that,

10  yes.

11  Q.  Okay.  And, in fact, these kinds of factors -- I want to

12  show you an excerpt from one briefs that's been filed in this

13  case.  These kinds of factors, non-epidemiological factors,

14  play a big role in determining what kinds of payments are

15  going to be made, correct?

16  A.  Can I look at what you put up?

17  Q.  It's a brief that was filed, a consolidated reply brief

18  that was filed, totally acknowledging that non-epidemiological

19  factors, like the legal, victim's knowledge of claiming

20  options and changing payment levels play a big role in the

21  claiming process.

22      · Would you agree with that or not?

23  A.  I agree with that wholeheartedly.

24  Q.  Okay.  So, when it comes to figuring out, of all the

25  people who are sick in the United States, who decides to zero

Peterson - Cross

1   activity of the plaintiffs' bar?  Where is it?

2   A.   It is quantitative in the effect that it is one a number

3   of factors that I consider in picking the period of time,

4   which is a quantitative calculation.  It is a matter that I

5   take into account in assessing whether it is reasonable to

6   expect that the propensity to sue will continue into the

7   future.  That was a quantitative calculation.

8        The reasonableness and the application of that to the

9   future is a quantitative determination that's driven, in part,

10  by these sets of considerations.

11  Q.   What you're telling me is that, when you came up with your

12  decision to use the ratio, you considered these factors.

13  That's not my question.

14       My question is whether you have done a statistical study

15  that actually ties and quantifies the impact of money, the

16  impact of the unions, and the impact of the plaintiffs bar on

17  claims against Babcock & Wilcox.  Have you done that

18  statistical study?

19  A.   No, I've done no study like that.

20  Q.   I'm sorry?

21  A.   No, I've done no study like that.

22  Q.   Let's talk about, now, how you move to the future.  In the

23  future, you use an epidemiological forecast for total

24  mesothelioma deaths, correct?

25  A.   Yes, I continue to use the same forecast.

1

2                UNITED STATES BANKRUPTCY COURT

3                EASTERN DISTRICT OF LOUISIANA

4                        NEW ORLEANS

5     * * * * * * * * * * * * * * * *
                                      *       CASE NO. 00-10992
6     IN THE MATTER OF:               *       through   00-10995
                                      *       (Jointly Administered)
7     THE BABCOCK & WILCOX CO., ET AL,*
                                      *       SECTION "B"
8              DEBTORS.               *
                                      *       CHAPTER 11
9     * * * * * * * * * * * * * * * * *
                                      *       ADVERSARY NO. 01-1155
10    THE ASBESTOS CLAIMANTS'         *
      COMMITTEE, ET AL,               *
11                                    *
              PLAINTIFF-INTERVENORS,  *
12                                    *
      VERSUS                          *
13                                    *
      BABCOCK & WILCOX INVESTMENT     *
14    COMPANY, ET AL,                 *
                                      *
15             DEFENDANTS.            *
                                      *
16    * * * * * * * * * * * * * * * * *

17                     AFTERNOON SESSION

18

19          Transcript of the proceedings taken in the above-

20    captioned matter on Tuesday, October 23, 2001, the Honorable

21    Jerry A. Brown, United States Bankruptcy Judge, presiding.

22    AUDIO OPERATOR:   Demond Smith

23    TRANSCRIPTIONIST:  Dorothy Bourgeois

24    Proceedings recorded by electronic sound recording,

25    transcript produced by transcription service.

Peterson - Cross

1  true?

2  A.  Yes, the ratio that I labeled the non-malignant

3  multiplier.  It's multiplied times the sum of cancers in each

4  of those future years, that's correct.

5  Q.  Now, help me out on this for just a minute.  There is no

6  epidemiological forecast for the future non-malignant claims

7  arising from asbestos, generally, is that true?

8  A.  There is no forecast of yearly -- what's called an

9  incidence.  The cancers, year-by-year, is called incidence.

10  There's no incidence for non-malignancies, no.

11  Q.  Likewise, your projection for the malignant disease claims

12  against Babcock & Wilcox is not the output from some

13  epidemiological study that you've done; true or not?

14  A.  No, it's not.  I've done no -- I'm not an epidemiologis'

15  Q.  Okay.  So, this is line that we've got here for future

16  malignant disease claims is not an epi-forecast; is that fair?

17  A.  It's the -- it is derived, in part, from an

18  epidemiological forecast, but, by itself, of course, it's not

19  an epidemiological forecast, that's correct.  It's not

20  medicine.  It's about legal claiming.

21  Q.  And, therefore, when we take a look at these claims that

22  you're projecting against Babcock & Wilcox for non-malignant

23  disease, they're basically claims -- this is a claim

24  projection that is not an epidemiological forecast; is that

25  true or not?

Peterson - Cross

1  & Wilcox asbestos, can we?

2  A.  I think that's not true.

3  Q.  Well, you tell me the dose estimate for -- I guess where

4  I'm falling a little bit -- if you don't have a group

5  defined, how can you know what their dose was?

6  A.  The dose -- the people who were exposed to Babcock &

7  Wilcox asbestos were also exposed, almost universally, to the

8  asbestos products of other defendants, other manufacturers,

9  because including -- in addition to the boilers, there are

10  pipes.  I mean, a boiler is an instrument for heating.  There

11  are hot pipes that are around it.  Those pipes are insulated.

12  So, people are exposed to asbestos from a number of sources.

13      The Nicholson and KPMG estimates provide estimates of the

14  dose that people were exposed to, and the population of

15  persons exposed to products -- to asbestos by B&W were also

16  exposed to the products of these other people.

17      So, those estimates, that are Nicholson, are what you

18  would use to estimate the dose for the persons exposed to B&W,

19  as well.

20  Q.  No.  Then I'll be more precise in my question.

21      Is there anywhere in your report where we can find the

22  dose of people exposed to Babcock & Wilcox asbestos, the dose

23  that resulted from that asbestos exposure, as opposed to other

24  kinds of asbestos exposure?

25  A.  You can't -- then if you do that, you can't apply the

Peterson - Cross

1    medical model, because the medical model is based upon all

2    the exposure, all of the asbestos people were exposed to.

3    Q.  Okay.  So, if we don't know how much the exposure was to

4    Babcock & Wilcox asbestos, in particular, we can't do

5    epidemiological forecasts for the resulting disease; is that

6    fair?

7    A.  It's a meaningless exercise.  You can't do it, because --

8    you cannot conduct a meaningful epidemiological study of the

9    impact of asbestos exposure of an individual defendant when

10   they've been exposed to asbestos from a variety of defendants,

11   because it's the effect of the exposures across all of the

12   defendants that, together, cause the probability of getting

13   the disease.

14   Q.  So, if we want to know the extent of disease actually

15   caused by exposure to Babcock & Wilcox asbestos, science does

16   not give us a way of quantifying that disease; fair?

17   A.  You're talking in an aggregate, the total number of

18   persons?

19   Q.  Yes.

20   A.  I don't believe they can do that, no.

21   Q.  Okay.  Now, in point of fact, we come back to your

22   testimony that I think has already been shown to the Court.

23   Does that testimony remain true today, which, as I asked you,

24   "Is it true that you have nowhere determined whether and how

25   much malignant disease was actually caused by exposure to

Peterson - Cross

1  Babcock & Wilcox products?"

2      Your answer was:  "No, I've not determined that."

3      Does that testimony remain true today?

4  A.  Well, actually, I think I probably answered only part of

5  your questions.  It was a compound question.  The "whether,"

6  yes, I have determined that there are people who have cancer.

7  The "how much malignant disease," I can't and still have not

8  determined, no.

9  Q.  Nor does your model tell us how much malignant disease

10  will result from Babcock & Wilcox asbestos in the future;

11  fair?

12  A.  The model is all based upon the total incidence of these

13  diseases caused by asbestos, in the total population, as I've

14  said before.  That's the total estimate.  We've gone over

15  that.  That's compared with the number of claims.

16      The estimate of the total -- you can hypothetically

17  estimate what that is, but you cannot actually estimate the

18  total number of incidences of cancer from B&W's asbestos, no.

19  Q.  Maybe you've answered it:  You can't and you've nowhere

20  determined how much disease either has or will result from

21  Babcock & Wilcox asbestos, specifically; fair?

22  A.  Solely from asbestos.  It's a meaningless concept.

23  Q.  Okay.  Now, I want to focus back on your statement today

24  about claims; that is that you are dealing with claims, right?

25  A.  That's what I'm projecting.

1

UNITED STATES BANKRUPTCY COURT

EASTERN DISTRICT OF LOUISIANA

NEW ORLEANS

```
* * * * * * * * * * * * * * * *
                              *    CASE NO. 00-10992
IN THE MATTER OF:             *    through  00-10995
                              *    (Jointly Administered)
THE BABCOCK & WILCOX CO., ET AL,  *
                              *    SECTION "B"
        DEBTORS.              *
                              *    CHAPTER 11
* * * * * * * * * * * * * * * *
                              *    ADVERSARY NO. 01-1155
THE ASBESTOS CLAIMANTS'       *
COMMITTEE, ET AL,             *
                              *
        PLAINTIFF-INTERVENORS, *
                              *
VERSUS                        *
                              *
BABCOCK & WILCOX INVESTMENT   *
COMPANY, ET AL,               *
                              *
        DEFENDANTS.           *
                              *
* * * * * * * * * * * * * * * *
```

        Transcript of the proceedings taken in the above-
captioned matter on Friday, November 2, 2001, the Honorable
Jerry A. Brown, United States Bankruptcy Judge, presiding.

AUDIO OPERATOR:   Gene Ann Avenel

TRANSCRIPTIONIST:  Dorothy Bourgeois

Proceedings recorded by electronic sound recording,

transcript produced by transcription service.

Peterson - Cross

1   A.   Good afternoon, Mr. Bernick.

2   Q.   I want to begin by asking you some questions about --

3   well, it's going to be a short examination, we're running out

4   of paper.

5   A.   Mr. Inselbuch stole it.

6   Q.   All right.   You have some testimony about multiple

7   exposures.   You said that the people who worked at facilities

8   that had Babcock & Wilcox boilers had exposure to Babcock &

9   Wilcox asbestos, and then also to asbestos from other sources,

10  or something to that effect, is that right?

11  A.   That's true, yes.

12  Q.   Okay.   Now, in point of fact, you don't know the size of

13  the group of people who were actually exposed to Babcock &

14  Wilcox asbestos, do you?

15  A.   No.

16       Well, I know in order of magnitude but I certainly don't

17  know a precise number.

18  Q.   Did you testify in this trial at Page 115, as follows, Dr.

19  Peterson:   "Now, when it comes to Babcock & Wilcox, isn't it

20  true that nobody has determined -- we can't find out in your

21  report, in any event -- we can't find in your report a defined

22  group of people who are the people actually exposed to Babcock

23  & Wilcox asbestos, can we?"

24       "I have not provided such an estimate, no."

25       You do not have an estimate of that exposure proof, do

Peterson - Cross

1   you?

2   A.   No, I do not have an estimate of the number of persons who

3   were exposed to Babcock & Wilcox, which is another reason why

4   it's difficult to do an epidemiological model specific to

5   Babcock & Wilcox.

6   Q.   Let's talk about causation of disease.  Isn't it true that

7   with respect to causation of disease, you don't know the

8   number of people who have gotten sick from Babcock & Wilcox

9   asbestos, correct?

10   A.   That's precisely the point.

11   Q.   Let's talk about a different group of people.  Let's talk

12   about people who have got claims.  As of 6/98, as of June

13   1998, the total number of people who had pursued claims

14   against Babcock & Wilcox.  You don't know how many of the

15   people exposed to Babcock & Wilcox actually made claims, do

16   you?  You don't know the percentage or degree to which people

17   who had been exposed actually made claims, do you?

18   A.   That's correct.

19   Q.   You don't know the percentage of the people who got sick

20   from Babcock & Wilcox asbestos, who actually made claims, do

21   you?

22   A.   That's correct.

23   Q.   In fact, the figure that you provided when you said,

24   "Well, the number of claims that had actually been paid by

25   Babcock & Wilcox were a very small percent," they were a very

Peterson - Cross

1    small percent of the total number of people who had been

2    exposed to asbestos from any source.  That's the percentage

3    you gave us, correct?

4    A.  Yes, it's the number of persons that Dr. Nicholson

5    estimated were exposed to asbestos and were alive in 1980.

6    They were -- they had an occupational exposure to asbestos in

7    one of the identified industries which were specified in

8    Nicholson and which correspond to the industries from which

9    claims arise for B&W.

10   Q.  And you don't know -- you don't know the number of people

11   that actually got exposed to Babcock asbestos and the

12   relationship that that bears to the total of number of people

13   who got exposed to asbestos from any source, correct?

14   A.  We don't -- because we're unable to do an epidemiological

15   study for B&W, we cannot know -- well, first of all, you can't

16   do a count of that, but what I also said on my -- on the

17   rebuttal, is that be it --

18   Q.  Would you just answer the question first, please.  You

19   don't know the percentage or the relationship between the

20   total number of people actually exposed to Babcock & Wilcox

21   asbestos and the total number of people exposed to asbestos

22   from all sources, do you?

23          MR. INSELBUCH:  Your Honor, I object to the Counsel

24   interrupting the Witness' answers.  If he doesn't like the

25   answers, if he thinks they're not responsive, he can move to

1

UNITED STATES BANKRUPTCY COURT

2

EASTERN DISTRICT OF LOUISIANA

3

NEW ORLEANS

4

5

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

6

IN THE MATTER OF:

7

THE BABCOCK & WILCOX CO., ET AL,

8

DEBTORS.

9

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

10

THE ASBESTOS CLAIMANTS'
COMMITTEE, ET AL,

11

12

PLAINTIFF-INTERVENORS,

13

VERSUS

14

BABCOCK & WILCOX INVESTMENT
COMPANY, ET AL,

15

DEFENDANTS.

16

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

FILED

2001 OCT 23 P 3:35
CLERK
UNITED STATES
BANKRUPTCY
NEW OR...

CASE NO. 00-10992
through 00-10995
(Jointly Administered)

SECTION "B"

CHAPTER 11

ADVERSARY NO. 01-1155

17

18

AFTERNOON SESSION

19

Transcript of the proceedings taken in the above-

20

captioned matter on Monday, October 22, 2001, the Honorable

21

Jerry A. Brown, United States Bankruptcy Judge, presiding.

22

AUDIO OPERATOR:    Demond Smith

23

TRANSCRIPTIONIST:  Dorothy Bourgeois

24

Proceedings recorded by electronic sound recording,

25

transcript produced by transcription service.

Peterson - Direct                    198

1    what claims were actually -- that had been filed and were
2    still pending at that date.  And I make that calculation
3    separately by disease, because the projections and
4    calculations are made differently by disease, because of the
5    different values of a disease and because the epidemiology
6    differs among diseases.

7         The next is, of course, what's the average values of
8    these claims.  The average values in this case are all
9    settlements, as we've heard.  There is no Plaintiff's verdict
10   in this case.  So, the historic values of claims and
11   resolutions of claims of historic liability of this Defendant
12   is represented by its average settlements.

13        The next, I have to consider what percent of claims
14   weren't paid.  Like every Defendant, some portion of the filed
15   claims are not paid.  The pending claims give me the number of
16   claims that have been filed and are still around, but I need
17   to get rid of some of them because, historically, not all got
18   paid and I don't assume in the future, all will get paid....

19        And finally, the increase for one year is --
20   represents the fact that over the decade of the 1990s there
21   has been a substantial annual increase, year after year, in
22   the settlements by -- entered into by B&W.  There are, as
23   you'll see, there are about 58,000 pending claims.  They're
24   not all going to be resolved immediately, it will take time.
25   So, my assumption is, as over the course of that time, the

# Exhibit C



GRA 5 Year Trading Peaks & Troughs

Thomson Financial Corporate Advisory Services

# Exhibit D



Trading Highlights for Two Week Period Following November 13th, 2004 (POR Filed)

-6.0% Price Change from 11/12/04 to 12/2/04

$14.41
$14.00
$13.23
$12.95
$12.80
$12.80
$13.19
$13.28
$13.83
$13.20
$13.20
$13.60
$13.82
$13.54

CLOSE

*Note: No trading on 11/13/2004

# Exhibit E



Trading Highlights for Two Week Period Following January 13th, 2005 (Amended POR Filed)

CLOSE

$13.15
$13.17
$13.25
$12.93
$12.79
$12.80
$12.05
$11.77
$11.38
$11.20
$11.19
$11.33
$11.81

-10.2% Price Change
from 1/13/05 to 2/1/05

$14.00
$13.00
$12.00
$11.00
$10.00

1/13/2005
1/14/2005
1/18/2005
1/19/2005
1/20/2005
1/21/2005
1/24/2005
1/25/2005
1/26/2005
1/27/2005
1/28/2005
1/31/2005
2/1/2005

Thomson Financial Corporate Advisory Services