# EXHIBIT "A"

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| IN RE: | ) | Chapter 11 |
|  | ) |  |
| W.R. GRACE & CO., et al., | ) | Case No. 01-01139 (JKF) |
| Debtors. | ) | Jointly Administered |
|  | ) |  |

## GENERAL OBJECTIONS TO CLAIMANT DISCOVERY QUESTIONNAIRE

_____ ("Claimant") hereby makes the following general objections to the W.R. Grace Asbestos Personal Injury Questionnaire (the "Discovery Questionnaire"):

1. Pursuant to Federal Rule of Civil Procedure 26(b)(4)(B), Claimant objects to the Discovery Questionnaire to the extent that it seeks disclosure of facts known or opinions held by any expert who has been retained or specially employed in anticipation of litigation or preparation for trial and who is not expected to be called as a witness at trial. Without limiting the foregoing, Claimant objects to the following provisions of the Discovery Questionnaire as violative of Fed. R. Civ. P. 26(b)(4)(B):

   (a) Claimant objects to Section C of the Instructions to the extent that it requests the completion of Part II of the Discovery Questionnaire "if you received diagnoses and diagnostic tests relating to the same condition by multiple doctors."

   (b) Claimant objects to Section C of the Instructions to the extent that it requests the production of "any and all documents" that "support or conflict with your diagnosis."

   (c) Claimant objects to Section C of the Instructions to the extent that it requests the production of "all x-ray readings and reports."

   (d) Claimant objects to Section C of the Instructions to the extent that it requests the production of "all pulmonary function test results, including the raw data and all spirometric tracings, on which the results are based."

   (e) Claimant objects to Section J of the Instructions to the extent that it requests the production of "any and all documents" that "support or conflict with your diagnosis."

   (f) Claimant objects to Part II of the Discovery Questionnaire to the extent that it requests disclosure of "diagnoses and diagnostic tests" by "multiple doctors" concerning "previous or subsequent diagnoses or diagnostic tests that change or conflict with the original diagnoses." Claimant urges this objection with regard to all "conditions" for which disclosure is requested.

2. Claimant further objects to the Discovery Questionnaire to the extent that it seeks disclosure of any privileged communication between Claimant, and/or a representative of Claimant, and any attorney for Claimant, and/or a representative of any attorney for Claimant. In

1

addition, pursuant to Federal Rule of Civil Procedure 26(b)(3), Claimant objects to the Discovery Questionnaire to the extent that it seeks disclosure of the work product of any attorney for Claimant, including but not limited to the mental impressions, conclusions, opinions or legal theories of any attorney or other representative of Claimant. Specifically, and without limiting the foregoing, Claimant objects to the following provisions of the Discovery Questionnaire as violative of the attorney-client communication and/or attorney work product privileges:

(a) Claimant objects to Part II of the Discovery Questionnaire to the extent that it asks if Claimant "retained counsel in order to receive any of the services performed by the diagnosing doctor."

(b) Claimant objects to Part II of the Discovery Questionnaire to the extent that it asks if "the diagnosing doctor was referred to you by counsel."

(c) Claimant objects to Part II of the Discovery Questionnaire to the extent that it asks if Claimant is "aware of any relationship between the diagnosing doctor and your legal counsel" unless Claimant's knowledge was obtained other than through communication with Claimant's legal counsel and/or his/her representative.

(d) These objections are urged with regard to each instance that the above questions are asked in sections 2, 3, 4, 5, 6 and 7 of Part II of the Discovery Questionnaire.

3. Claimant further objects to Part VII the Discovery Questionnaire to the extent that it seeks disclosure of information relating to litigation and claims regarding silica as irrelevant to the issues concerning Claimant's asbestos claim against W.R. Grace & Co. and/or its affiliated debtors.

4. Claimant further objects to Section a.6 of Part VII of the Discovery Questionnaire to the extent that it seeks disclosure of settlements reached with other defendants that are subject to binding confidentiality agreements.

5. Claimant further objects to providing the information sought in Part I, Part II, Part III, Part IV, Part V, Part VI, Part VII, Part VIII and Part IX pursuant to Federal Rule of Civil Procedure 26(b)(2)(i) on the basis that this information is unreasonably cumulative or duplicative, or is obtainable from some other source that is more convenient, less burdensome, or less expensive, because it has previously been provided. A lawsuit against various asbestos manufacturers was filed by claimant in the state of Texas. Pursuant to the Master Asbestos Standing Order governing discovery that was entered by the Court, the claimant provided the requested information to all defendants. The debtor was either a party to the suit at the time the discovery was produced or has the ability to gather the information.

6. Claimant further objects to the Discovery Questionnaire pursuant to Federal Rule of Civil Procedure 26 (b)(2)(iii) to the extent that the burden and expense imposed upon the law firm of Chris Parks & Associates and each of its' clients in responding to this questionnaire outweighs its likely benefit, taking into account the needs of this case, the amount in controversy, the parties' resources, the importance of the issues at stake in the litigation, and the importance of the proposed discovery in resolving the issues.

Specifically, to fully answer all questions and provide all responsive documents for a single client to one questionnaire, the most experienced Certified Legal Assistant at Chris Parks & Associates (who is also a Registered Respiratory Therapist) spent 4.5 hours searching one client's file for different information, making phone calls, looking up addresses, running database queries, making copies of form pages, reviewing instructions, etc. In this amount of time, she completed all sections except Part III (exposure to Grace products chart), Part V (exposure to non-Grace products chart) and Part VI (employment history other than those listed in Parts III and V.

To complete sections III, V and VI would have taken an additional three or four hours. This particular client worked at a small number of job sites over his working life. For clients with a large number of work sites, the questionnaire would have taken even longer. Parts III and V would be especially difficult since Part III requires a separate page for each job site and Part V requires a separate page for each Defendant in each client's lawsuit and there can be anywhere from 1 to 150 Defendants in a given suit.

Therefore, it would take approximately nine hours of time from our best, most experienced staff member and certainly more from our less experienced staff. Allotting only ten hours per questionnaire to our 1,060 W.R. Grace claimants, our firm would have to spend 10,600 hours to respond to these Questionnaires. Additionally, each of our clients would have to spend additional time searching for additional information, making phone calls, searching for addresses, etc. All this time would be spent with absolutely no regard for whether or not any client would later be eligible to file a claim in this bankruptcy. Even assuming the client is later deemed qualified, the average payout in past bankruptcies has rarely exceeded $5,000.00 for a non-malignant claim.

Over 25% of our clients are deceased and, of the living clients, more than half are over the age of 70. Few can swear they worked directly with Grace products or name any of the Grace products they worked with over 30 years ago, yet most worked at recognized Grace sites in trades which exposed them to Grace products. (Grace products were at most of our local refineries and chemical plants and Grace settled with several local firms in the past paying those who worked at these locations. See Docket No. 9604, Response and Objection of Reaud, Morgan & Quinn, Inc. In Opposition to Debtors' Emergency Motion for Leave to Take Discovery of Claimants' Attorneys and Exhibit "A," the Settlement Agreement attached thereto which refers to a list of "Agreed-Exposure Plants.")[1] Asking an 80 year old man or his widow to spend hours searching his records or to sit with our staff for hours with no assurance he will even qualify to file a claim is, based upon our experience, incredibly burdensome and usually results in the client giving up rather than providing the information. Our clients believe the amount in controversy for them is anywhere from zero to a few thousand dollars. Given this and their usually limited resources, we have been unsuccessful in the past getting responses to detailed questions even when posed during in-office interviews or depositions.

---

[1] For a complete copy of the Settlement Agreement which includes a list of "Agreed-Exposure Plants," see Docket No. 40 in *W.R. Grace & Co.-Conn v. National Union Fire Insurance Company of Pittsburgh, PA v Reaud, Morgan & Quinn, Inc. and Environmental Litigation Group*, Adversary No. 02-01657 (Bankr.D.Del. 2002).

3

Since "the parties resources" are to be considered when determining whether the burden and expense of discovery outweighs the benefit, it is relevant to note that our firm employs three attorneys and four legal assistants. We have explained to our clients that we will continue to work on their asbestos files as long as it makes economic sense to do so. Since Hurricane Rita closed our office in part of September and October, 2005, we have worked full time trying to keep our asbestos files open in light of the recent changes in Texas law. Because of the new Texas asbestos law, none of our non-malignant clients have a realistic chance of ever having their claims tried in a court of law and they are aware of this fact. The only available future compensation to our non-malignant clients (or income from our asbestos files) will come from current receivables which accumulated before the change in Texas law last fall and future bankruptcies. Because of this stark financial reality, our clients individually and our firm staff collectively cannot reasonably expend 10,600+ hours completing a questionnaire for a bankruptcy for which they may never qualify. (Assuming a legal assistant works 2,000 hours a year, it would have taken ten legal assistants working full time over six months to complete these Questionnaires, meaning we would have had to hire six more legal assistants.)

Despite these burdens, our firm spent hundreds of hours and each client who has chosen to do so has responded to the best of their ability to the attached Questionnaire subject to our objections.

7.  These general objections are made in addition to, and without waiver of, any specific objections contained within the responses to the Discovery Questionnaire itself. This covering sheet is intended to be, and is hereby, incorporated into the Discovery Questionnaire as if repeated therein verbatim in full.

Respectfully submitted,


Chris Parks