### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W. R. GRACE & CO., *et al.* | ) | Case No. 01-01139 (JKF) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | Hearing Date: August 21, 2006 at 2:00 PM |
| | ) | Objection Deadline: August 4, 2006 at 4:00 PM |

## MOTION TO COMPEL ASBESTOS PERSONAL INJURY CLAIMANTS TO RESPOND TO THE W.R. GRACE ASBESTOS PERSONAL INJURY QUESTIONNAIRE

Debtors W.R. Grace & Co. and its affiliated companies (collectively, "Grace" or "Debtors"), respectfully request that this Court order that all persons who have improperly completed the W.R. Grace Asbestos Personal Injury Questionnaire (the "Questionnaire") be ordered to cure such deficiencies within a period to be prescribed by the Court (the "Cure Period").

After exhaustive litigation, this Court ordered all holders of pre-petition asbestos personal injury litigation claims (the "Claimants") to answer the questions in the Questionnaire. The purpose of this order was to allow for streamlined discovery consistent with the estimation proceeding. As early as March 2006, it became evident that the Claimants were providing their answers in a manner that was inconsistent with the Court's prior rulings and would subvert the Questionnaire's clear purpose. In particular, instead of responding to the questions pursuant to the Court-ordered instructions, Claimants made generic objections, including relevance and burden objections, or simply wrote "see attached." Many Claimants and their counsel also refused to sign the Questionnaires. With more than 56,000 Questionnaires now received, it is obvious that these deficiencies are pervasive. Accordingly, Grace moves the Court for a relatively simple order: require the Claimants to provide a narrative answer to all questions,

fully and completely, on the Questionnaire form unless there is a particularized privilege objection.

This brief will demonstrate:

- This Court is fully empowered under the applicable laws and rules to carefully craft discovery tailored to the task at hand: rendering an aggregate estimate of Grace's personal injury liabilities;

- Rather than waiting for objections after the fact from tens of thousands of individual claimants, the Court ruled *ex ante* after extensive litigation approving the use of the Questionnaire, the instructions for the completion of the Questionnaire, and the individual questions contained within it;

- Because the estimation is not for purposes of claims disallowance, the PI Committee is fully authorized to lodge objections to the Questionnaire and this is precisely the role the Committee fulfilled in the proceedings that have already taken place before this Court; and,

- Notwithstanding the Court's clear instructions, law firms have responded to the Questionnaire by objecting to it, failing to answer the questions asked and "hiding the ball" by cross-referencing undifferentiated and substantial collections of documents. This problem can only be cured and this estimation can only be kept on track if the Court directs the law firms to respond to the Questionnaire as instructed and, in particular, rules: (1) that generic objections to the form of the question may not excuse the provision of a narrative response to the questions contained in the Questionnaire; (2) that attachments may not be provided in lieu of providing a narrative response to the questions contained in the Questionnaire; and (3) that Claimants and their counsel are required to attest to the truth, accuracy and completeness of the responses contained in the Questionnaire.

## BACKGROUND

### A. The Court Approved The Questionnaire After Extensive Briefing, Argument And Consideration.

On August 29, 2005, this Court ordered that all holders of pre-petition asbestos personal injury claims complete and return the W.R. Grace Asbestos Personal Injury Questionnaire. The purpose of the Questionnaire is to provide Grace and the other parties to the estimation with basic factual information about the pre-petition litigation claims so that the information can be used by the parties in the estimation of Grace's asbestos personal injury liabilities. The Court's

approval followed nearly nine months of briefing, argument and consideration. While the Court is all-too-familiar with the events that led to the approval of the Questionnaire, the following paragraphs summarize the key events relevant to this Motion that took place during the Questionnaire approval process.

Grace first requested the Court's permission to serve some form of discovery questionnaire consistent with the streamlined estimation proceeding on November 13, 2004. *See* Debtors' Motion for Entry Seeking the Estimation of Asbestos Claims and Certain Related Relief at 4 (Docket No. 6889) (Nov. 13, 2004) (seeking approval for "claims questionnaires" which were designed to "enable the parties to develop a detailed 'snapshot' of the actual medical conditions and exposure histories of the claiming population as it existed on the Petition Date"). In that same pleading, Grace made known to both the Court and the parties to the estimation that its intention in proposing a questionnaire was so that the responses to the questions posed would be "compile[d] ... into a navigable database and [made] available to the Debtors' and various official committees' estimation experts, if any" for use in the estimation. *Id.* at 9.

At the January 21, 2005 omnibus hearing, the Court recognized that a questionnaire may be "an appropriate way to get discovery done." *See* Tr. of Hr'g at 117 (Jan. 21, 2005). It also recognized the potential burden of a questionnaire. *Id.* at 132 (noting that the Court would not permit the Questionnaire to "be 50 pages" long). To help alleviate concerns over the burden, the Court ordered the Official Committee of Asbestos Personal Injury Claimants ("PI Committee"), the Future Claimants Representative ("FCR") and the Debtors to "negotiate ... the form of the Debtors' proposed proof of claim/questionnaire for asbestos personal injury pre-petition litigation claims[]." *See* Order Setting Briefing Schedule and Hearing Regarding Case Management Order and Proof of Claim/Questionnaire for the Estimation of Asbestos Personal

3

Injury Liabilities (Docket No. 8324) (Apr. 24, 2005) (memorializing Court's Jan. 19, 2005 oral rulings).

Pursuant to the Court's order, the parties engaged in extensive negotiations, but neither the PI Committee nor the FCR would agree to Grace's proposed questionnaire. Thus, on May 10, 2005, Grace moved that the Court approve the Questionnaire over the objection of the PI Committee and the FCR. *See* Memorandum and Points of Authority in Support of W.R. Grace & Co.'s Motion to Approve PI CMO & Questionnaire ("Points of Authority") at Tab 4, 13 (Docket No. 8395) (May 10, 2005) (seeking Questionnaire that would allow Grace to obtain "discovery of the basis on which claims are asserted for its use in [Grace's] proposed estimation approach"). In its opposition to Grace's motion, the PI Committee specifically objected to the Questionnaire proposed by Grace on the grounds, *inter alia*, that it sought "irrelevant information" and that the Questionnaire "would be extraordinarily expensive [for the Claimants' law firms] to implement." *See* Opposition of the Official Committee of Asbestos Personal Injury Claimants to Debtors' Motion to Approve PI CMO and Questionnaire at 61, 67 (Docket No. 8847) (Jun. 30, 2005); *see also* Tr. of Hr'g at 172 (Jul. 19, 2005) ("[Grace is] asking for an incredibly burdensome questionnaire.").

While the motion was pending, the parties continued to negotiate the scope of the Questionnaire. Certain disputes were narrowed, but the PI Committee and the FCR maintained their respective opposition to the Questionnaire. At the July 19, 2005 omnibus hearing, the Court affirmed that the Questionnaire was an appropriate vehicle for the Debtors to obtain the discovery it sought concerning the pre-petition litigation claims. *See* Tr. of Hr'g at 175 (Jul. 19, 2005) ("My bottom line position is I think a questionnaire, to the extent the debtor or the other parties want to do discovery[,] is fine."). The Court voiced some concern that the Questionnaire,

as presented by Grace, went "a little far" and suggested that the Court and the parties should "go through [the Questionnaire] line by line and figure out what's appropriate and what isn't." *Id.* at 176. The Court explained that one of the purposes for engaging in such an analysis was to stave off future objections from individual Claimants on relevance and burden grounds, stating:

> [B]ut *what they'll say,* Mr. Bernick, in answer to the question is *I object, it's not relevant, and it's burdensome*, and then *I'm going to be right here making rulings on it anyway*, so why don't we just do it and get it done?

Tr. of Hr'g at 176-77 (Jul. 19, 2005) (emphasis added).

After the line-by-line analysis was undertaken, Grace revised the Questionnaire to incorporate the Court's July 19 rulings. The parties then again conferred to continue negotiating the final language of the CMO and Questionnaire, conferring on two occasions. After these discussions concluded, four substantive areas of disagreement remained between the parties. *See* Debtors' Report to the Court Pursuant to July 19, 2005 Ruling Regarding Personal Injury Claims and Estimation Proceedings (Docket No. 9263) (Aug. 26, 2005). The four areas of disagreement were as follows:

- Whether additional language was required in the Questionnaire instructions regarding the use of the information sought in the Questionnaire and the consequences for failing to return the Questionnaire in a timely manner;

- Whether Claimants were required to attach their PFT tracings to their Questionnaire responses;

- Whether additional text boxes were required in the section of the Questionnaire seeking information relating to the criteria upon which the Claimant's diagnosis was based; and,

- Whether for non-Grace exposures, Grace was entitled to information relating to more than one exposure site.

*See id.* These four issues were argued before the Court at the August 29, 2005 omnibus hearing. At that hearing, the Court approved the final Questionnaire as revised by Grace, with only minor changes.

5

Grace served nearly 179,000 Questionnaires on the Claimants and their counsel on September 12, 2005.[1] Pursuant to the Case Management Order for the Estimation of Asbestos Personal Injury Liabilities ("PI CMO"), the responses to the Questionnaire were to be completed and returned on or before January 12, 2006. PI CMO at ¶ 3.A.[2] That deadline was subsequently extended three separate times by 60 days each time. *See* Order Modifying the Case Management Order for the Estimation of Asbestos Personal Injury Liabilities Regarding the Extension of Time for Claimants to Respond to Questionnaires and Designate Non-Expert Witnesses (Docket No. 11403) (Dec. 21, 2005); Order Modifying the Case Management Order for the Estimation of Asbestos Personal Injury Liabilities Regarding the Extension of Time for Claimants to Respond to Questionnaires (Docket No. 11885) (Feb. 21, 2006); Order Modifying the Case Management Order for the Estimation of Asbestos Personal Injury Liabilities Regarding the Extension of Time for Claimants to Respond to Questionnaires (Docket No. 12314) (Apr. 27, 2006). Thus, the Questionnaire was ultimately due to be completed and returned on July 12, 2006. Once returned, the responses to the Questionnaire were to be compiled by Rust Consulting, Inc. ("Rust"), the Debtors' claims processing agent, into a navigable database that would be made available to all parties for use in the estimation. *See* Amended Case Management Order for the Estimation of Asbestos Personal Injury Liabilities ("Amended PI CMO") at ¶ 2(B) (Docket No. 12151) (Mar. 27, 2006). To date, approximately 56,000 Questionnaires have been returned. *See*

---

[1]   Grace believes that there are approximately 129,000 persons holding pre-petition litigation asbestos personal injury claims. Out of an abundance of caution, where more than one law firm was listed as counsel of record for an individual Claimant, all counsel of record were served with copies of the Questionnaire.

[2]   The Court subsequently clarified the PI CMO to make clear that only those individuals who had not entered into an enforceable settlement agreement with Grace prior to Grace's bankruptcy petition date, April 2, 2001 were required to complete and serve the Questionnaire. *See* Modified Order Granting Motion of Reaud Morgan & Quinn, Inc. and Environmental Litigation Group, P.C. for Clarification of Case Management Order (Docket No. 10825) (Oct. 24, 2005).

Declaration of Gina G. Washburn at ¶ 3 (Jul. 17, 2006) ("Washburn Decl.") (attached as Exhibit A).

## B.    The State Of The Submitted Questionnaires.

As soon as Grace and Rust began to receive completed Questionnaires, it became apparent that there were a number of recurring deficiencies present in the responses to the Questionnaire. Notably, the three problems most frequently observed by Grace and Rust are:

- Objecting to the questions on pro forma grounds, by reference to a long list of general objections, including, *inter alia*, that the questions asked are "not relevant" or "unduly burdensome," instead of providing answers to the questions posed in the Questionnaire;

- Responding to the questions asked by means of: (1) designating thousands of pages of documents as supporting numerous Questionnaires without specifying which documents support which claims; (2) referring to documents in the public record; (3) attaching voluminous records to the Questionnaire; or (4) referring to documents located in various counsels' offices, rather than providing responses to the questions in the space provided in the Questionnaire; and

- Failure of either the Claimant or his or her counsel to sign the Questionnaire as required in Part X of the Questionnaire.

Grace first alerted the Court to these issues in its March Status Report. *See* W.R. Grace & Co.'s Status Report Regarding Completion of the W.R. Grace Asbestos Personal Injury Questionnaire (Docket No. 12093) (Mar. 20, 2006). These issues were discussed with the Court at the April 17, 2006 omnibus hearing in connection with the discussion of the extension of the exclusivity period. At that time, the Court found that, while objections to the Questionnaire need not be lodged by the Claimants until the Questionnaires are submitted, "to the extent that an objection is to the question that's being asked, I don't expect either a mediator or [the Court] to have to go through that. *I've already decided that's an appropriate question to be asked.*" Tr. of Hr'g at 27 (Apr. 17, 2006) (emphasis added); *see also id.* at 28 ("*I'm not going to hear objections to the question. I've already said that if the Debtor wants to ask those questions,*

*the Debtor can ask those questions*.") (emphasis added). The Court further stated that it "expect[ed] that the people who are given the questionnaire are going to answer [it]." *Id.* at 26.

In an effort to expedite resolution of the deficiencies in Questionnaire responses, Grace invited counsel for all Claimants to participate in a mediation session regarding their objections to the Questionnaire. *See* Ltr. from B. Harding to Counsel (Jun. 26, 2006) (attached as Exhibit B). The response to Grace's invitation was minimal. Led by the PI Committee, who objected to the proposed mediation as premature and not sufficiently noticed, many Claimants' lawyers objected to appearing at any mediation for the same reasons.

Nevertheless, representatives of two plaintiffs' firms attended the July 6, 2006 mediation: Robert Phillips of SimmonsCooper LLC and Richard Rescho of the Law Offices of Christopher E. Grell. With respect to the parties to the estimation, certain committees participated as observers only: Jeffrey Schneider attended on behalf of the Official Committee of Asbestos Property Damage Claimants, Gary Becker attended on behalf of the Equity Holders Committee, and Debra Felder attended on behalf of the FCR. The PI Committee attended the mediation neither in person nor telephonically.

At the mediation, the Claimants again complained that the mediation was premature and that there were no formal papers explaining the parties' relative positions. They also argued that, regardless of Debtors' position that the Court had already addressed certain aspects of the Questionnaire, those decisions are not binding on them as they are not represented by the PI Committee or any other committee that participated in the Questionnaire-approval process.

After discussion with the mediator, and with the mediator's recommendation and consent, the parties agreed to brief for the Court the issues of: (1) whether it is improper to submit Questionnaires that are unsigned by either Claimants or their counsel; (2) whether it is

improper to interpose generic objections to the form of the questions contained in the Questionnaire in lieu of providing substantive responses to the questions; and (3) whether it is improper to respond to the Questionnaire via attachment or reference other documents in lieu of providing responses in the form required by the Questionnaire. This briefing will allow the Court an opportunity to address these common issues at one time if it is so inclined. Alternatively, if the Court first wants these three issues put before the mediator, the Debtors have agreed to participate in a second mediation session on August 29, 2006, and for the Court to hear issues not resolved by the mediator in a chambers conference to be held on September 12, 2006.

Immediately after the mediation, Grace, certain Claimants' counsel, and the mediator discussed this schedule with Sander Esserman of Stutzman, Bromberg, Esserman & Plitken, who represents several plaintiffs' law firms in the Bankruptcy and joined via teleconference on behalf of his clients. He agreed to this schedule. Grace understands that the mediator has addressed this proposed schedule with the Court privately.

Accordingly, by copy of this Motion, Debtors formally notice all Claimants and their counsel of the following:

1. Responses to this Motion to Compel are due, pursuant to Amended Order Scheduling Omnibus Hearing Dates for 2006 (Docket No. 11561) (Jan. 18, 2006) on **August 4th, 2006** at 5:00 PM EDT. All responses must be filed in accordance with this Court's Order Establishing Case Management Procedures and hearing Schedule ("Scheduling Order") (Docket No. 1948) (Apr. 17, 2002) and Del. Bankr. L. R. 2002-1(b).

2. This Motion is scheduled to be heard on **August 21, 2006** at 2:00 PM at the United States Bankruptcy Court for the District of Delaware, 824 North Market Street, 3rd Floor, Wilmington, DE 19801-3024. All parties who wish to participate in the hearing are invited to attend in person or by telephone. Any party wishing to appear telephonically at a hearing must make arrangements with CourtCall by phone (866-582-6878) or facsimile (866-533-2946) no later than 12:00 p.m. two (2) business days prior to the hearing. All parties must provide CourtCall with the following information: (a) case name and number, (b) the name of the judge conducting the hearing, (c) the hearing date and time, (d) the participant's name, address and telephone number, (e) the party whom the

participant represents, and (f) the matter on which the participant wishes to be heard or whether the participant intends to monitor the proceedings in "listen-only" mode.  Additionally, all parties participating via telephone, including those participating in "listen-only" mode, must send notification to the Debtors' local counsel of (i) their intention to participate in the hearing and (ii) the information set forth in (a) through (f) above.  Such notice should be sent to Patricia Cuniff of Pachulski Stang Ziehl Young Jones & Weintraub LLP via e-mail (pcuniff@pszyjw.com) or facsimile (302-652-4400).

3.      Any and all issues raised in this Motion, but not resolved by the Court at the August 21, 2006 hearing will be the subject of a mediation session presided over by the Court-appointed mediator, Judge Roger M. Whelan, on **August 29, 2006**. The mediation will take place at the offices of Kirkland & Ellis, LLP, 655 Fifteenth Street, N.W., Suite 1200, Washington, DC, 20005.  If at the conclusion of the August 21, 2006 hearing, the Court finds that such a mediation session is necessary, the Debtors will notify all parties who have filed responses to this Motion, by overnight mail, Federal Express, or similar bulk carrier, of this Court's ruling, the time of the mediation, and a call-in number for those parties who wish to appear by telephone.[3]

## ARGUMENT

## I.      THE BANKRUPTCY COURT POSSESSES BROAD DISCRETION TO FORMULATE APPROPRIATE DISCOVERY.

### A.      The Court Has Broad Discretion To Fashion the Procedures Used in an Estimation of Claims.

The Bankruptcy Court has broad discretion to fashion the procedures by which it estimates the values of claims, including discovery procedures.  That power is derived from multiple provisions of the Bankruptcy Code.  First and foremost, the Court has the power to tailor the methods by which the estimation is conducted, including the manner and method of discovery, pursuant to 11 U.S.C. § 502.

Section 502(c) provides that:

There shall be estimated for purpose of allowance under this section ... any contingent or unliquidated claim, the fixing or liquidation of which, as the case may be, would unduly delay the administration of the case.

---

[3]   Debtors have also filed a formal notice of possible mediation which will contain a copy of this schedule.

11 U.S.C. § 502(c).

Accordingly, consistent with the Code, courts have held that "Congress intended the [estimation hearing] to be undertaken initially by the bankruptcy judges, ***using whatever method is best suited to the particular contingencies at issue***." *Bittner v. Borne,* 691 F.2d 134, 135 (3d Cir. 1982) (emphasis added); *see also Kool, Mann, Coffee & Co. v. Coffey,* 300 F.3d 340, 356 (3d Cir. 2002) (noting that "there was no requirement that a particular kind of procedure be employed in estimating the value of [a] claim"); *In re Corey,* 892 F.2d 829, 834 (9th Cir. 1989) ("A court has broad discretion when estimating the value of an unliquidated claim."). The Court's chosen method for conducting the estimation will not be disturbed absent an "abuse of discretion." *See Kool, Mann, Coffee & Co.,* 300 F.3d at 356.

Second, the Bankruptcy Court's discretion in tailoring procedures that are suited to facts and circumstances of a particular case – including discovery procedures – is further derived from and confirmed by 11 U.S.C. § 105, which provides that:

> The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [Chapter 11].

11 U.S.C. § 105(a). Indeed, the Court's power under Section 105 has been found to extend specifically to matters concerning discovery. *In re Summit Corp.,* 891 F.2d 1, 5 (1st Cir. 1989) (finding that "discovery decree" was an order within the meaning of 11 U.S.C. § 105); *In re Rimsat, Ltd.,* 230 B.R. 362, 368 (N.D. Ind. 1999) (finding that sanctions against attorney for discovery misconduct were proper under 11 U.S.C. § 105); *Cohen v. Doyaga,* 2001 WL 257828, at *3 (E.D.N.Y. Mar. 9, 2001) (holding that civil contempt sanctions for failure to comply with discovery order were permissible pursuant to 11 U.S.C. §105).

Put differently, implicit in the Court's ability to tailor the estimation to meet the needs of the case is the ability to prescribe the form of the discovery. One recognized way in which

bankruptcy courts exercise this discretion – and reduce the time, burden and expense to the parties to the estimation – is through the use of a discovery questionnaire or similar device. *See In re A. H. Robins Co. Inc.*, 880 F.2d 694, 699 (4th Cir. 1989) (discussing use of questionnaire as basis for estimation in Dalkon Shield bankruptcy litigation where number of claimants would make individualized discovery too burdensome); *compare In re Celotex Corp.*, 204 B.R. 586, 593 (Bankr. M.D. Fla. 1996) (discussing court-approved special asbestos proof of claim form); *In re Eagle-Picher Indus., Inc.*, 158 B.R. 713, 716 (Bankr. S.D. Ohio 1993) (discussing court-approved detailed asbestos proof of claim form).

### B.    In An Estimation Proceeding, It Is Proper To Use A Questionnaire To Streamline Discovery To Meet The Needs Of The Estimation.

As this is a contested matter, it is undisputed that, under the Bankruptcy Rules, Grace is entitled to the full panoply of discovery. See Fed. R. Bankr. P. 9014. This would include deposition, interrogatories, requests for production and all other discovery tools. Indeed, under Grace's original proposal for full litigation of threshold issues concerning the validity of certain claims, it would have undoubtedly utilized all of these discovery methods. *See* W. R. Grace & Company's Informational Brief at 62 (Docket No. 6) (Apr. 2, 2001). But instead of pursuing that tact, Grace elected to pursue the more streamlined estimation proceeding.

Both Grace and the Court recognized, however, that because estimation is a more streamlined and focused proceeding, designed to address issues common to significant numbers of claims, the discovery should be equally focused and streamlined. Of course, even under this streamlined procedure, the Court recognized Grace's right to obtain the necessary information about the claims for purposes of the estimation:

> The debtor has the right to discovery to know what the current claims are, and that will be a much better basis for estimation of current claims and possibly future claims than anything else. So let's get it done. Let's find out what the claims are, what people say they have by way of claims ....

Tr. of Hr'g at 80 (Jun. 27, 2005).

For that reason, Grace sought, and the Court approved the Questionnaire – a device that is tailored to provide the Court with information focused on common and generic issues in a consistent manner with respect to, *inter alia,* (1) whether the claim for an asbestos-related personal injury is supported by objective and verifiable medical tests and (2) whether the claim is supported by objective and verifiable evidence of an exposure to a Grace asbestos-containing product sufficient to cause disease. *See* Points and Authorities at Tab 4, 1-2. Because discovery questionnaires are ideally suited to accomplish this purpose, they are common in mass toxic tort litigation outside the bankruptcy context to similarly streamline discovery. *See In re Diet Drugs,* MDL 1203, 1999 WL 387322 at *1 (E.D. Pa. May 19, 1999) (utilizing claim forms in order to "minimize time consuming and expensive exchanges of discovery"); *In re Food Lion, Inc.,* 1998 WL 322682, at *11 (4th Cir. Jun. 4, 1998) (noting use of questionnaires to "streamline discovery" and "provide basic information about each plaintiff's claim"); *In re Orthopedic Bone Screw Prods. Liab. Litig.,* MDL 1014, 1997 WL 704702, at *4 (E.D.Pa. Aug. 22, 1997) (noting use of "questionnaire that requested, among other things, pertinent medical, employment, and worker's compensation information").

The Questionnaire here, as in many cases, is a hybrid form of discovery, part fact interrogatory, part contention interrogatory, part document request, and part deposition by written question. In adopting this approach, the Court recognized that this hybrid discovery tool – as opposed to more common discovery methods – was the best way to provide Grace the discovery to which it was entitled in the context of an estimation, stating:

> I will approve a claim form of some sort. I'm not saying what sort, but I will, folks, approve a claim form because it may be useful to all parties in the estimation, and I will consider it appropriate discovery. Rather than taking

*depositions* of 400,000 personal injury plaintiffs, we're going to do it through claim forms. So it will be approved.

Tr. of Hr'g at 71-72 (Jun. 27, 2005) (emphasis added).

But the Debtors' decision to seek discovery through the Questionnaire and the Court's decision to order it presuppose that the questions will be answered in a manner conducive to compilation in a navigable database. *See* Debtors' Motion for Entry Seeking the Estimation of Asbestos Claims and Certain Related Relief at 9; Points and Authorities at Tab 4, 1 ("Third, information from the Questionnaire will be compiled into a navigable database made available to the Debtors' and the official committees' experts."); Amended PI CMO at ¶ 2.B (ordering that "Debtors' claims processing agent shall compile the Questionnaire information into a navigable database"). Responding by objecting and cross-referencing undifferentiated and substantial mass of documents systematically undermines the entire purpose of the Questionnaire. Instead of providing consistent information concerning common issues in a manner that would alleviate – rather than exacerbate – the burden of discovery, Claimants' methods of responding turn the entire estimation process on its head, reverting back to the full litigation model. This is not what was ordered: "[D]o I expect the people who are given the questionnaire are going to answer [it]? Yeah, of course I do." Tr. of Hr'g at 26 (Apr. 17, 2005).

## II.    THE QUESTIONNAIRE MUST BE PROPERLY COMPLETED BY ALL ASBESTOS PERSONAL INJURY PRE-PETITION LITIGATION CLAIM HOLDERS.

As discussed above, the manner in which Claimants' counsel have chosen to respond to the Questionnaire subverts the estimation process as structured by the Court. They are also inconsistent with the modern model of litigation, which explicitly provides for the cooperative exchange of certain types of basic information about a party's claim. *See, e.g.*, Fed. R. Civ. P. 26 (requiring mandatory initial disclosures and prescribing contents of expert witness disclosures);

*Abrahamsen v. Trans-State Exp., Inc.*, 92 F.3d 425, 428 (6th Cir. 1996) ("Our system of discovery was designed to increase the likelihood that justice will be served in each case, ***not to promote principles of gamesmanship and deception*** in which the person who hides the ball most effectively wins the case.") (emphasis added). Disturbingly, the practices employed by Claimants' counsel – such as inviting Grace to a lawyer's office to review a mass of documents and objecting to the relevance of court ordered questions – are clearly intended to "hide the ball," and harken back to the abusive discovery practices that the Court sought to avoid when it approved the Questionnaire. *Cf.* Tr. of Hr'g at 71-72 (Jun. 27, 2005) (expressing preference that "400,000 depositions" not be taken). This subversion, if condoned, could derail the estimation process. In order for the estimation process, as envisioned by the parties and the Court, to be kept on track, these litigation tactics, designed to obscure the facts underlying the Claimants' claims, must be curtailed, and the parties must be ordered to provide proper, narrative responses to the questions that are asked and to verify that such responses are "true, accurate and complete."

### A.    Generic Objections Such as Burden and Relevance To The Questions Posed In The Questionnaire Are Improper.

The form and substance of each and every question contained in the Questionnaire was approved by this Court during the July 2005 and August 2005 omnibus hearings, after having been fully briefed on the relevant issues and entertaining several hours of argument from the Debtors, PI Committee and FCR. Indeed, the PI Committee argued that certain questions were overly broad or would pose undue burden. *See, e.g.,* Tr. of Hr'g at 257-65 (Jul. 19, 2005) (concluding that requiring a Claimant to complete a separate Part III for each site of alleged exposure is not overly broad or burdensome); Tr. of Hr'g at 147 (Aug. 29, 2005) (rejecting argument that requiring one page of responses per exposure is too burdensome). The PI

Committee likewise argued that certain information sought by the Questionnaire was not relevant. *See, e.g.,* Tr. of Hr'g (Jul. 19, 2005) at 227-29 (holding industry codes related to non-Grace exposure sites resulting in a claim are, in fact, relevant); *id.* at 256 (holding information regarding Claimants' tobacco use history is relevant to Questionnaire); *id.* at 257 (Jul. 19, 2005) (overruling objection on relevance grounds to questions regarding height and weight information as it was calculated to lead to admissible evidence); *id.* at 272-74 (holding prior industrial work history during the past 20 years is also relevant). Since that time, this Court has repeatedly affirmed that it expects the Claimants to answer the questions that are posed in the Questionnaire as opposed to objecting and refusing to answer. Tr. of Hr'g at 26 (Apr. 17, 2005) ("Do I expect the people who are given the questionnaire are going to answer [it]? Yeah, of course I do.").

Unfortunately, many Claimants have objected to the Court-approved Questionnaire (and individual questions) and refused to answer certain questions, on the grounds that, *inter alia*, the Questionnaire is overly broad, vague, unduly burdensome, oppressive and requests information not reasonably calculated to reasonably lead to discoverable evidence, or other similar burden, relevance, and form objections. Based on Grace's preliminary analysis, as of June 19, 2006, approximately 59% of the returned and processed questionnaires contained at least one question to which a generic objection was lodged and no substantive answer was provided. Further anecdotal review since that time has confirmed that this phenomenon is ongoing. *See, e.g.,* Plaintiffs' Objections to the W.R. Grace Asbestos Personal Injury Questionnaire (filed by Wallace & Graham, P.A.) (Docket No. 12772) (Jul. 11, 2005); Questionnaire Response of H. B. (submitted by The Ferraro Law Firm) (attached as Exhibit C) (objecting to questions relating to

whether physician was referred by counsel and whether the Claimant was treated for the disease on relevance grounds and refusing to answer); Washburn Decl. at ¶ 3.[4]

During the course of discovery in normal litigation, such objections might be proper grounds for withholding otherwise discoverable information. But this situation – an estimation – is clearly distinguishable. Through adoption of the Questionnaire after a line-by-line review, the Court has *ex ante* ruled that these questions are relevant, not unduly burdensome, and, therefore, unobjectionable. Accordingly, such form and content objections should not be entertained by this Court, as they are merely an attempt to delay the actual provision of accurate information and to ask the Court to reconsider its prior rulings regarding the propriety of the questions posed in the Questionnaire.

The fact that each Claimant did not appear at the hearings where the Questionnaire was reviewed and approved is not a basis for the Court to reconsider its decision on this issue. First, in the proceeding where these very issues were litigated, the interests of the individual Claimants were collectively and adequately represented by the PI Committee, who vigorously opposed the Questionnaire, and the form of the questions contained in it, at every turn. An "official committee of creditors," like the PI Committee, "plays a pivotal role in the bankruptcy process." *In re Refco, Inc.*, 336 B.R. 187, 194 (Bankr. S.D.N.Y 2006). It "may raise and may appear and be heard on any issue" in a Chapter 11 case, 11 U.S.C. § 1109(b) – and is "purposely intended to represent the necessarily different interests and concerns of the creditors it represents." *In re Refco, Inc.*, 336 B.R. at 195. Indeed, such representation is necessary as it is axiomatic that "the

---

[4]    For reasons of confidentiality, Claimants are referred to only by their initials and all identifying information has been redacted from the Questionnaire and associated attachments. Moreover, the citation to and attachment of certain Questionnaires is intended by way of example only. Grace is not seeking rulings on any particular Questionnaire and expressly reserves all rights to challenge the response to any Questionnaire, whether attached to this Motion or not, on any grounds whether or not presented in this Motion.

role of the creditors' committee would be obliterated if … the bankruptcy court is required to solicit the views of the entire body of creditors each time" an issue comes before the court that might affect the individual creditors.  *Loop Corp. v. U.S. Trustee*, 379 F.3d 511, 519 (8th Cir. 2004).  Accordingly, where issues have been fully and fairly litigated by a committee in an estimation, they should not be revisited.[5]  *See, e.g., Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 815-16 (1988) ("law of the case" doctrine applies when a court makes a decision on a rule of law and the decision then governs the same issues in the later stages of the same litigation) (citation omitted); *AL Tech Specialty Corp. v. Allegheny Intern. Credit Corp.*, 104 F.3d 601, 605 (3d Cir. 1997) (refusing to reexamine whether claim for reimbursement was barred under law of the case doctrine where argument had previously been fully and fairly litigated in same case); *In re Ameriserve Food Distribut., Inc.*, 315 B.R. 24, 35 (Bankr. D. Del. 2004) (holding creditor could not reassert defense that had previously been decided upon in earlier stage of same case).

Second, the only purpose served by Claimants appearing to individually litigate objections and responses to the questionnaire is to delay and obstruct the estimation.  It is certainly true that the Court has gone out of its way to invite and allow the participation of the individual Claimants and their counsel, and certain Claimants' counsel have taken advantage of that opportunity.  For example, the law firms of Reaud Morgan & Quinn, Inc., and the Environmental Litigation Group, P.C., moved the Court on behalf of the individual Claimants they represent to clarify that the Questionnaire was not to be completed by those individuals who had entered into enforceable settlement agreements with Grace.  *See* Motion of Reaud, Morgan,

---

[5]  Although the PI Committee might not represent each individual Claimant, *see In re Kensington*, 368 F.3d 289, 315 (3d Cir. 2004), that does not mean the Court must first litigate every issue with a Committee and then relitigate these identified issues with every Claimant.

Inc., and the Environmental Litigation Group, P.C., for (i) Clarification, or (ii) Alternatively, for Modification of Case Management Order for the Estimation of Personal Injury Liabilities (Docket No. 9457) (Sept. 19, 2005). Similarly, individual personal injury Claimants who reside in Libby Montana have chosen to participate in the estimation individually, rather than relying on the representation of the PI Committee. *See* Libby Claimants' Motion for Payment of Certain Expenses in Connection with Claims Estimation and Plan Process (Docket No. 11867) (Feb. 20, 2006).

But as Grace and the Court have reiterated on numerous occasions, the estimation is not – and is in no way intended to be – a claims disallowance process. Tr. of Hr'g at 116 (Jul. 19, 2005) ([Mr. Bernick]: "[Grace is] not seeking to disallow claims when it comes to the estimation that applies to the personal injury claims."); *id.* at 240 ([The Court]: Nobody is disallowing claims . . . Your objection is overruled. This is not an allowance process. It's an estimation process."). The result of the estimation process will be that the Court will estimate Grace's *aggregate* personal injury liabilities. Accordingly, as the PI Committee is the party that will participate in the estimation and represent the interests of the Claimants as a whole, it is the party who should – and did – advocate with respect to the Questionnaire. There is simply no need – or reason – to allow the individual Claimants to relitigate these issues.

Third, even if this Court had not already made extensive rulings regarding the appropriateness of the Questionnaire, generic form objections should not be allowed at this late date for reasons of judicial economy. The over 120,000 Claimants with pre-petition litigation claims against Grace are represented by approximately 1,000 law firms. If the Court were to relitigate the objections of these Claimants, each Claimant will certainly argue that an individualized inquiry into the burden a particular question will place on him or her is necessary.

This means that the Court will have to individually litigate hundreds, if not thousands of burden

objections.  This is not the purpose of proceeding by way of estimation – and will undoubtedly

cause the estimation process to come to a grinding halt.[6]  *See Abrahamsen*, 92 F.3d at 428.

**B.     Attachments May Not Be Submitted In Lieu Of Responding To The Questions Asked In The Questionnaire.**

As troubling as certain Claimants' decisions to stand on generic objections are, the most

significant deficiency observed in the Questionnaire responses is Claimants' decisions not to

respond to questions at all -- but instead write "see attachment," "see exhibit" or some variation

thereof.  This deficiency has presented itself in various forms, including:

- Answering the question by stating "see attached" (either with or without referencing the specific attachment which contains the information necessary to respond to the question).  *See, e.g.*, Questionnaire of J. A. (submitted by Baron & Budd P.C.) at 5 (attached as Exhibit D) (citing "attached medical documentation, *if applicable*" (emphasis added); Questionnaire of J. F. (submitted by Kelley & Ferraro LLP) (attached as Exhibit E);

- Answering the question by stating documents will be made available for inspection at Grace's expense at the offices of counsel.  *See, e.g.*, Questionnaire of M. A. (submitted by Silber Pearlman LLP) (attached as Exhibit F) (noting in cover letter that "[d]ue to volume, these documents are not attached to the Questionnaire but will be made available for inspection and/or copying in the Dallas offices of Silber Pearlman LLP during reasonable office hours upon reasonable notice"); and

- Answering the questions by stating that the documents are publicly available.  *See e.g.*, Exhibit E, Questionnaire of J. F. (stating in response to question whether asbestos litigation brought by Claimant was dismissed against any defendant, "objection: burdensome.  Please see docket and pleadings filed in case which are public records").

Claimants have even taken this obstructionist tact when responding to questions that merely

require them to check "yes" or "no."  *See, e.g.*, Exhibit C, Questionnaire of H. B. at 10.  All of

---

6    By requesting that the Court compel responses to questions for which Claimants withheld discoverable information based on generic objections to the form and contents of the Questionnaire, Grace is in no way seeking to limit an individual Claimant's ability to raise substantive objections such as objections on the basis of a privilege or confidentiality interest.  Grace merely asks that this Court not reconsider its prior rulings regarding the form and content of the questions posed in the Questionnaire and require Claimants who have refused to provide the information requested in the Questionnaire on these grounds to produce such information.

these methods of answering via attachment or reference to undifferentiated and substantial documents in lieu of providing the answers in the Questionnaire itself are improper, and the Court should order that Claimants provide a narrative answer to the Questionnaire in the form requested in the Questionnaire.

          1.      The Court has ordered the Claimants to answer the questions so that they could be compiled into a navigable database.

The Questionnaire does not provide for answers to be submitted solely by means of attachment. The instructions to the Questionnaire – as approved and ordered by the Court – expressly state that "[y]our completed Questionnaire must (i) be written in English *and* (ii) attach relevant supporting materials as instructed further below." Questionnaire at ii (emphasis added). The substitution of attachments in place of answers is not permitted either in the instructions or by any order of the Court.[7] The requirement that the answers to the questions posed in the Questionnaire be answered is consistent with the use of the Questionnaire as a streamlined discovery tool.

The necessity of providing responses to the questions where indicated in the Questionnaire rather than by attachment is evident when placed in the context of the use of those responses. The purpose of the Questionnaire is to use the information provided in the Questionnaire responses to construct a navigable database. That task is being performed by Rust Consulting in connection with its appointment as the Debtors' claims processing agent. The Case Management Order specifically orders Rust to "compile the Questionnaire information

---

[7]   Indeed, the only question with respect to the Claimants' documents was whether such documents must be produced to support the Claimants' contentions. *See* Questionnaire at ii (Instructions "A.3") (requiring Claimant to "attach relevant supporting materials"); *id.* (Instructions "C") ("This questionnaire must be accompanied by copies of any and all documents . . . that support or conflict with your diagnosis."); *id.* at iii (Instructions "D") ("In Part III, please provide the requested information for the job and site at which you were exposed to Grace asbestos containing products . . . Attach copies of any and all documents establishing that exposure to Grace asbestos containing products had a substantial causal role in the development of the disease."); *id.* at iv (Instructions "J") (instructions for providing "supporting documentation").

into a navigable database." PI CMO at ¶ 3.B; Amended PI CMO at ¶ 2.B.  Pursuant to the

Amended PI CMO, that database must be completed and made available to the parties to the

estimation within 60 days of the Questionnaire due date.  Amended PI CMO at ¶ 2.B.[8]  When

Rust originally estimated the time necessary to construct such a database, it, like Grace,

understood that the responses to the questions in the Questionnaire would be provided in the

Questionnaire itself.  However, that has not been the case.

    Thus far, on average, each Questionnaire is being submitted with approximately 38 pages

of attachments.  *See* Washburn Decl. at ¶ 3.  Based on a preliminary analysis of the first 6,993

Questionnaires that Rust processed, Grace estimates that nearly 67% of returned Questionnaires

contained at least one question in which the Claimants' attorneys attached documents in lieu of

providing a substantive answer to the question.  Based on a spot-analysis of the submissions of

the law firms who received the most Questionnaires, this trend is continuing.

    In many instances, there is nothing in either the Questionnaire or the attachment itself to

indicate which page of the attachment contains the information responsive to which questions.

*See, e.g.*, Exhibit E, Questionnaire of J. F.; Questionnaire of J. G. (submitted by Chris Parks &

Assocs.) (attached as Exhibit G).

    To cite an egregious example, the law firm of Goldberg Persky & White P.C. responded,

for each of its 1,853 Claimants, to Section III, requesting the Claimant identify, *inter alia*, the

Grace product to which Claimant was allegedly exposed, the site of the alleged exposure, and the

duration of the alleged exposure, by stating that in addition to an affidavit from those Claimants

---

[8]   The Court is presently considering a second amended case management order to which all parties have agreed.
    *See* Certification of Counsel Regarding Order Amending Case Management Order for the Estimation of
    Asbestos Personal Injury Damage Liabilities (Docket No. 12815) (Jul. 14, 2006).  In the Second Amended Case
    Management Order, the completed navigable database is due to the parties within 90 days of the Questionnaire
    due date.  *See id.* at Exhibit A, ¶ 2.B (noting that navigable database must be made available on or before
    "October 12, 2006").

who were able to provide such information, Goldberg Persky "provided 3 boxes of product identification evidence . . . and . . . 2 computer disks containing product identification and exposure evidence that are applicable to all claimants." *See* Ltr. from M. Meyer to Rust Consulting (Jul. 11, 2006) (attached as Exhibit H). Those materials total approximately 30,000 pages of information that would need to be analyzed, culled, and input for each of the over 1,800 Goldberg Persky Claimants by data entrants who are not familiar with the documents. This is information regarding the basic facts of exposure that could have been easily provided by the Claimants and their counsel, who are in possession of the information and are most familiar with it. *See* Tr. of Hr'g at 257-65 (Jul. 19, 2005) (requiring Claimant to complete separate Part III of Questionnaire for each site of exposure to a Grace containing product); *T. N. Taube Corp. v. Marine Midland Mortgage Corp.*, 136 F.R.D. 449, 454 (M.D.N.C. 1991) ("An important – often key – factor in weighing the respective burdens on the parties is the interrogated party's familiarity with its own documents.") (citing 4A Moore's Fed. Practice para. 33.25). This is simply a "document dump."

In other instances, firms have stated that the answers to certain questions may be derived by inspecting the documents at the offices of the law firm. *See, e. g.*, Exhibit D, Questionnaire of J. A. The logical consequence of this unauthorized, unilateral procedure would require Rust's data entrants to move from their Bloomington, Minnesota location for weeks on end. Apart from being a logistical nightmare, this tactic creates a more fundamental problem: there is no way to ascertain which of these voluminous records the Claimant believes are *actually* relevant to his or her claim. *See T. N. Taube Corp.*, 136 F.R.D. at 455 ("[D]irecting the opposing party to an undifferentiated mass of records is not a suitable response to a legitimate request for discovery.") (citations omitted); *Blake Assocs., Inc. v. Omni Spectra, Inc.*, 118 F.R.D. 283, 289 (D. Mass.

1988) (reply that party will make available "documents responsive to this interrogatory" is "patently insufficient" under Rule 33).

In short, to ask data entry personnel, who have no specialized legal or medical training, to search through scores of attached documents and to try to glean which information may be responsive is an impossible task. *See* Washburn Decl. at ¶ 4. It defeats the very purpose of the Questionnaire as a streamlined discovery vehicle. Even the PI Committee's estimation expert has recognized the problem posed by attachments, stating that to render the information from the Questionnaires in any way navigable, "the parties would have to retain expensive medical coders and doctors to help analyze hundreds of thousands of pages of medical records." Affidavit of Mark Peterson at ¶ 30 (Sept. 6, 2001). More importantly, if the parties or the Court believed it made sense to engage in this type of discovery, Debtors would have served document requests and interrogatories instead of proceeding by Questionnaire in an estimation proceeding.

> 2.      Claimants may not rely on Federal Rule of Civil Procedure 33(d) to justify their document dump.

In various Claimant letters and objections, Claimants have contended that their decision to say "see attached" in response to the questions contained in the Questionnaire is rooted in Federal Rule of Civil Procedure 33. This attempt to escape response to the Questionnaires is a fundamentally flawed and misguided attempt to "hide the ball" in clear violation of the Court's rulings and the Federal Rules. *See Abrahamsen*, 92 F.3d at 428.

As explained above, *see* Section I.A, the Questionnaire is not merely the equivalent of a set of interrogatories or document requests issued to the parties to the personal injury cases pursuant to the Federal Rules of Civil Procedure. Instead, it is a streamlined discovery tool, approved by the Court as part of its discretionary powers pursuant to the Bankruptcy Code, particularly 11 U.S.C. § 502(c), which allows for the estimation of "any contingent or

unliquidated claim." In particular the Court recognized that this Questionnaire would alleviate the need for the Debtor to conduct hundreds of thousands of depositions as well as issue other discovery. Tr. of Hr'g at 71-72 (Jun. 27, 2005). Claimants cannot merely single out and designate the Questionnaire as a set of Rule 33 interrogatories and respond as though it were such. *Compare In re G-I Holdings, Inc.*, 218 F.R.D. 428, 438 (D.N.J. 2003) ("The option afforded by Rule 33(d) is not a procedural device for avoiding the duty to give information.")

Even if Rule 33(d) would apply to a discovery device like the Questionnaire, individual Claimants in this case may not invoke Rule 33(d). Rule 33(d) states that:

> Where the answer to an interrogatory may be derived or ascertained from the *business records of the party* upon whom the interrogatory has been served or from an examination, audit or inspection of such business records ... and *the burden of deriving or ascertaining the answer is substantially the same for the party serving the interrogatory as for the party served*, it is a sufficient answer to such interrogatory to specify the records from which the answer may be derived or ascertained .... *A specification shall be in sufficient detail to permit the interrogating party to locate and to identify, as readily as can the party served, the records from which the answer may be ascertained.*

Fed. R. Civ. P. 33(d) (emphasis added). The attachments that are provided in response to the Questionnaires do not satisfy the requirements.

First, for the reasons described above, the burden imposed on Grace by being required to derive the answers to its discovery responses solely from the attached documents is *not equal* to the burden on an individual Claimant to provide information about his or her claims from documents familiar to the Claimant and his or her counsel. *See* Advisory Committee Note on 1970 Amendment to Rule 33 ("A respondent may not impose on an interrogating party a mass of records to which research is feasible only for one familiar with the records."); *see also T. N. Taube Corp.*, 136 F.R.D. at 455. Each Claimant need only fill out one Questionnaire. The relevant burden contemplated by Rule 33 is the burden upon the Claimant, *not* his or her law firm. Fed. R. Civ. P. 33(d) (allowing documents to be specified in response to an interrogatory

only where "the burden of deriving or ascertaining the answer is substantially the same for the party serving the interrogatory as for *the party served*") (emphasis added). Claimants' counsel should not be permitted to aggregate their clients' burden, and use that as an excuse to fail to properly respond to the Questionnaire. The fact that certain plaintiffs' law firms believe they suffer an unfair burden is the result only of their decision to bring claims on behalf of thousands of Claimants. *See* Objections of Waters and Kraus and Chris Parks & Assocs. (Docket Nos. 12772 and 12776) (Jul. 11, 2006).

Second, Rule 33(d) may only be invoked where the answer to the interrogatory may be derived from the "*business records of the party upon whom the interrogatory has been served*." Fed. R. Civ. P. 33(d) (emphasis added). A business record is "made at or near the time by, or from information transmitted by, a person with knowledge, [and] kept in the course of a regularly conducted business activity, and ... it was the regular practice of that business activity to make the memorandum, report, record or data compilation, all as shown by the testimony of the custodian or other qualified witness." Fed. R. Evid. 803(6). While medical records clearly constitute a business record, *see id.*, they are the business records of the doctor, not the patient. *See Bradley v. Val-Mejias*, 2001 WL 1249339, at *3 (D. Kan. Oct. 9, 2001). Accordingly, a person's own medical records are **not** business records within the meaning of Fed. R. Civ. P. 33(d) and may not be attached in lieu of providing a substantive response to the discovery request. *See Bradley*, 2001 WL 1249339 at *3 (finding that in personal injury action the plaintiff's personal "medical records ... *are not the business records of Plaintiff* and the Rule 33(d) option to produce business records is inapplicable") (emphasis added). For this same reason, a person's employment history cannot properly be attached in lieu of a substantive response regarding the Claimant's previous employment.

To the extent certain parties are referencing prior discovery responses, it is improper for a party to direct the person requesting the discovery to prior discovery responses, such as depositions and interrogatory responses, rather than providing substantive answers to the discovery request. *Securities and Exch. Comm'n v. Elfindepan, S.A.*, 206 F.R.D. 574, 577-78 (M.D.N.C. 2002) ("Pleadings, depositions, exhibits and affidavits ... are not Rule 33(d) business records."); *Tabb v. Philip Morris*, 1999 WL 191647 at *2 (E.D. Pa. Apr. 1, 1999) ("Answering interrogatories by reference to deposition testimony does not achieve the level of disclosure contemplated by the [Federal Rules of Civil Procedure]."); *Smith v. Loganport Community School Corp.*, 139 F.R.D. 637, 650 (N.D. Ind. 1991) (finding that where party invoked Rule 33(d) in response to interrogatory and cited only to deposition testimony such an answer was "evasive and clearly insufficient").

Third, Rule 33(d) requires that the party invoking the Rule must "specify the records from which the answer may be derived or ascertained . . . in sufficient detail" to allow the party seeking the discovery to discern the answer "*as readily as can the party*" from whom the discovery is sought. Fed. R. Civ. P. 33(d) (emphasis added). Tactics such as providing tens of thousands of pages of undifferentiated documents violate this rule by its terms as the Claimant fails to specify in sufficient detail which documents it believes are relevant to his or her claim. *See T. N. Taube Corp.*, 136 F.R.D. at 455 (holding that it is "decidedly improper" to direct party to "undifferentiated mass of records").

C.   **The Questionnaire Must Be Signed By Both Claimants And Their Lawyers Alike.**

The Debtors believe these Questionnaire responses will provide the Court with the most accurate measure of the Debtors' personal injury liability. But the process will only work if all parties are committed to ensuring that the Questionnaires contain complete and accurate

information. The Court therefore ordered that the Questionnaire include a signature line for Claimants to swear, "under penalty of perjury," that the information contained in the Questionnaire is "true, accurate and complete." Questionnaire at 14 (Part X) and Tr. of Hr'g at 241 (Jul. 19, 2005).

The Court also recognized the critical role counsel plays in ensuring that the information presented to the Court is true, accurate and complete. It therefore ordered that the Questionnaire include a signature line for Claimants' legal representative (*i.e.,* their counsel) to swear that "the information contained in this Questionnaire is true, accurate, and complete." Questionnaire at 14 (Part X) and Tr. of Hr'g at 243 (Jul. 19, 2005). Thus, the failure to sign the Questionnaire violates the Court's order that the Questionnaire must be completed. [9]

---

[9] Since the Questionnaire was approved, counsel for certain Claimants have argued that the term "legal representative" in Part X "is a clear reference to the representative of a deceased Claimant's estate who must sign on behalf of a deceased Claimant. This is a discovery questionnaire ... and those returned by Claimants whom we represent will not be counter-signed by legal counsel." Ltr. from J. Duncan (Leblanc & Waddell) to B. Harding (Feb. 28, 2006) (attached as Exhibit I); Ltr. from M. Hanners (Silber Pearlman) to B. Harding (Feb. 28, 2006) (attached as Exhibit J); Ltr. from N. Duncan (Baron & Budd) to B. Harding (Feb. 24, 2006) (attached as Exhibit K). This "interpretation" of the requirement that a legal representative attest that the information contained in the Questionnaire is "true, accurate and complete" is directed at anyone other than the Claimants' attorney is wholly unsupported by the record. Indeed, the record indisputably reflects that Part X is directed to the counsel for the individual Claimants:

[Mr. Bernick]:   Well, the lawyer ... also signs off, and that's absolutely critical.

[Mr. Lockwood]: I would note that in the normal [discovery] responses in the Federal Rules of Civil Procedure, Your Honor, there's no provision for having a lawyer sign his client's [discovery] answers.

***

[The Court]:   Actually, I don't see ... a place where the *lawyer* is -- oh, it says, "*To be completed by the legal representative.* I swear that this information is true and accurate." ....
Okay it seems to me that [it] can simply be directed to the legal representative ... you must sign Part [X] ... and then [Part X] should be amended [to require the certification to read true, accurate and complete to the best of my knowledge].

*See* Tr. of Hr'g at 242-243 (Jul. 19, 2005) (emphasis added). *Compare* Fed. R. Civ. P. 26(g)(2) (requiring that "[e]very discovery request, *response,* or objection made by a party represented by an attorney *shall be signed by at least one attorney of record*") (emphasis added).

Despite the Court's plain rulings, many Claimants and their counsel are refusing to sign the Questionnaire. As the Court has ruled already, this issue should not be relitigated. *See Christianson*, 486 U.S. at 815-16. That said, the Debtors are certainly troubled by the refusal of Claimants to swear that their Questionnaires are accurate, and counsels' refusal to swear that the Questionnaires are accurate and complete to the best of their knowledge. The primary purpose of this requirement is to provide assurance to the Court and to the parties to the estimation that an appropriate inquiry was undertaken to fully and properly respond to the Questionnaires.

Put differently, the Debtors are asking Claimants and counsel to treat the Questionnaire with the care due any paper filed in federal court. Rule 11 requires that parties, through their counsel if represented, certify that "to the best of the persons's knowledge, information, or belief" that the "factual contentions" made in the paper they are submitting to the Court "have evidentiary support, or if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery." Fed. R. Civ. P. 11(b)(3); *see* Fed. R. Bankr. 9011 (applying Fed. R. Civ. P. 11). That requirement is neither burdensome nor unnecessary – but is to help ensure the Court has accurate information for the estimation.

## CONCLUSION

The W.R. Grace Asbestos Personal Injury Questionnaire was intended to provide streamlined discovery of the basic information underlying individual Claimants' personal injury claims. However, in responding to the Questionnaire, Claimants have subverted that purpose, undermining the fundamental nature of the estimation process. Grace respectfully requests that the Court order that the Claimants cure the deficiencies outlined above within 60 days, so that the estimation process may remain on track.

Wilmington, Delaware
Dated: July 17, 2006

Respectfully submitted,

KIRKLAND & ELLIS LLP
David M. Bernick, P.C.
200 East Randolph Drive
Chicago, Illinois 60601
(312) 861-2000

KIRKLAND & ELLIS LLP
Barbara M. Harding
David Mendelson
Brian T. Stansbury
Amanda C. Basta
655 Fifteenth Street, NW
Washington, D.C. 20005
Telephone:    (202) 879-5000
Facsimile:     (202) 879-5200

*and*

PACHULSKI STANG ZIEHL YOUNG JONES
& WEINTRAUB LLP

Laura Davis Jones (Bar No. 2436)
James E. O'Neill (Bar No. 4042)
919 North Market Street, 16th Floor
P.O. Box 8705
Wilmington, DE 19899-8705
(302) 652-4100

Co-Counsel for the Debtors and Debtors in Possession

30