```
                    UNITED STATES BANKRUPTCY COURT
                       DISTRICT OF DELAWARE


IN RE:                      .    Case No.  01-1139
                            .
W.R. GRACE & CO.,           .
                            .    824 Market Street
                            .    Wilmington, DE  19801
                            .
         Debtor.            .
                            .    July 24, 2006
. . . . . . . . . . . ..          2:00 p.m.
```

```
                 TRANSCRIPT OF OMNIBUS HEARING
            BEFORE HONORABLE JUDITH K. FITZGERALD
             UNITED STATES BANKRUPTCY COURT JUDGE
```

APPEARANCES:

```
For the Debtor:         Kirkland & Ellis, LLP
                        By:  DAVID M. BERNICK, ESQ.
                             JANET S. BAER, ESQ.
                             MICHELLE H. BROWDY, ESQ.
                        200 East Randolph Drive
                        Chicago, IL  60601

                        Reed Smith, LLP
                        By:  JAMES J. RESTIVO, JR., ESQ.
                        435 Sixth Avenue
                        Pittsburgh, PA  15219

                        Pachulski, Stang, Ziehl, Young, Jones
                          and Weintrabu, LLP
                        By:  JAMES E. O'NEILL, III, ESQ.
                        919 North Market Street, 17th Floor
                        P.O. Box 8705
                        Wilmington, DE  19899-8705

Audio Operator:         Matthew J. Yovino
```

Proceedings recorded by electronic sound recording, transcript
               produced by transcription service.

---

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@optonline.net**
**(609)586-2311      Fax No. (609) 587-3599**

APPEARANCES (CONT'D):

```
For the Official          Stroock & Stroock & Lavan, LLP
Creditors Committee:      By:  KENNETH PASQUALE, ESQ.
                               LEWIS KRUGER, ESQ.
                          180 Maiden Lane
                          New York, NY  10038-4982


For the Equity            Kramer, Levin, Naftalis & Frankel, LLP
Committee:                By:  PHILIP BENTLEY, ESQ.
                          1177 Avenue of the Americas
                          New York, NY  10036


For the Futures           Orrick, Herrington & Sutcliffe, LLP
Claim Representative:      By:  ROGER FRANKEL, ESQ.
                          Washington Harbour
                          3050 K Street, N.W.
                          Washington, DC  20007


For the Property          Bilzin, Sumberg, Baena, Price &
Damage Committee:            Axelrod, LLP
                          By:  SCOTT L. BAENA, ESQ.
                               JAY M. SAKALO, ESQ.
                          200 South Biscayne Boulevard
                          Suite 2500
                          Miami, FL  33131-5340


                          Dies & Hile, LLP
                          By:  MARTIN DIES, ESQ.

For the Asbestos          Caplin & Drysdale
Creditors Committee:      By:  ELIHU INSELBUCH, ESQ.
                          375 Park Avenue, 35th Floor
                          New York, NY  10152-3500


                          Caplin & Drysdale
                          By:  PETER VAN N. LOCKWOOD, ESQ.
                               JEFFREY A. LIESEMER, ESQ.
                          One Thomas Circle, N.W.
                          Washington, DC  20005

For the Baggett McCall,   Stutzman, Bromberg, Esserman & Plifka
Real Morgan and Quinn,    By:  SANDER L. ESSERMAN, ESQ.
Environmental             2323 Bryan Street, Suite 2200
Litigation Group,         Dallas, TX  75201
Law Offices of Peter
Angelos and Silver
Perlman firms:
```

**J&J COURT TRANSCRIBERS, INC.**

APPEARANCES (CONT'D):

For the Scotts Company:    Vorys, Sater, Seymour & Pease, LLP
                           By:  TIFFANY STRELOW COBB, ESQ.
                           52 East Gay Street, P.O. Box 1008
                           Columbus, OH  43216-1008

For Speights and           Speights & Runyan
Runyan:                    By:  DANIEL A. SPEIGHTS, ESQ.
                           200 Jackson Avenue, East
                           P.O. Box 685
                           Hampton, SC  29924

For Prudential:            Riker, Danzig, Scherer, Hyland &
                             Perretti, LLP
                           By:  CURTIS M. PLAZA, ESQ.
                           Headquarters Plaza
                           One Speedwell Avenue
                           Morristown, NJ  07962-1981

For One Beacon, Seaton     Drinker, Biddle & Reath, LLP
Insurance Company:         By:  DAVID P. PRIMACK, ESQ.
                           1100 North Market Street, Suite 1000
                           Wilmington, DE  19801-1243

For the Official           Anderson, Kill & Olick, PC
Committee of Asbestos      By:  ROBERT M. HORKOVICH, ESQ.
Claimants:                 1251 Avenue of the Americas
                           New York, NY  10020-1182

For Simmons Cooper:        Simmons Cooper
                           By:  ROBERT PHILLIPS, ESQ.

**J&J COURT TRANSCRIBERS, INC.**

4

1            THE COURT:  Please be seated.  This is the matter of

2  W.R. Grace, Bankruptcy Number 01-1139.  Is the court call

3  connected, Matt?  Yes.

4            UNIDENTIFIED SPEAKER:  Yes, Your Honor.

5            THE COURT:  Okay, thank you.  The appearances I have

6  by phone:  Brian Kasprzak, Oscar Mockridge, Mark Plevin, Leslie

7  Epley, Marti Murray, John Waters, Paul Norris, David Siegel,

8  Robert Tarola, Alfred Festa, Jay Hughes, Richard Mansouri, Sara

9  Gooch, Peter Shawn, Robert Guttman, Michael Davis, Tiffany

10 Cobb, John O'Connell, Arlene Krieger, Debra Felder, David

11 Austin, Matthew Kramer, Stephen Vogel, Joseph Radecki, Joshua

12 Katz, Jonathan Brownstein, Richard Park, Christopher Candon,

13 Daniel Cohn, Alan Madian, Christina Kang, Andrew Chan, Stuart

14 Kovensky, David Parsons, Martin Dies, Oliver Butt, Sal Bianca,

15 Theodore Freedman, Andy Chang, Simon Porter, Carl Pernicone,

16 James Hughes, David Liebman, Jacob Cohn, Alex Jachmick, Kenneth

17 Thomas, Guy Baron, Stephanie Kwong, Barbara Seniawski, Andrew

18 Craig and Elizabeth DeCristofaro.  I'll take entries in court,

19 please.

20            MR. BERNICK:  Good afternoon, Your Honor, David

21 Bernick for the debtors.

22            MS. BROWDY:  Michelle Browdy for the debtors.

23            MR. O'NEILL:  James O'Neill for Grace.

24            MS. BAER:  Jan Baer for the debtors.

25            MR. PASQUALE:  Ken Pasquale for the Official

**J&J COURT TRANSCRIBERS, INC.**

1 Creditors Committee.

2        MR. KRUGER:  Lewis Kruger for the Official Creditors

3 Committee.

4        MR. BENTLEY:  Philip Bentley for the Equity

5 Committee.

6        THE COURT:  Wait one second, excuse me.  Okay, thank

7 you.

8        MR. RESTIVO:  Jim Restivo for the debtors.

9        MR. FRANKEL:  Roger Frankel, Your Honor, for the

10 Future Claims Representative.

11        MR. BAENA:  Good afternoon, Your Honor, Scott Baena

12 on behalf of the Property Damage Committee.

13        MR. INSELBUCH:  Elihu Inselbuch, Your Honor, for the

14 Asbestos Creditors Committee.

15        MR. LOCKWOOD:  Peter Lockwood for the Asbestos

16 Creditors Committee.

17        MR. ESSERMAN:  Sandy Esserman on behalf of the

18 Baggett McCall, Real Morgan and Quinn, and Environmental

19 Litigation Group, law offices of Peter Angelos and Silver

20 Perlman firms.

21        MR. LIESEMER:  Good afternoon, Your Honor, Jeffrey

22 Liesemer on behalf of the Asbestos Creditors Committee.

23        MR. SAKALO:  Good afternoon, Your Honor, Jay Sakalo

24 on behalf of the Property Damage Committee.

25        THE COURT:  Anyone else?

1                    (No verbal response)

2              THE COURT:  Okay, Mr. Bernick.  Oh --

3              MS. COBB:  Your Honor, Tiffany Cobb on behalf of the

4    Scotts Company.

5              THE COURT:  Tiffany Cobb for Scotts?

6              MS. COBB:  Yes, Your Honor.

7              THE COURT:  Thank you.  Mr. Bernick?

8              MR. BERNICK:  Thank you, Your Honor.  The agenda is a

9    very, very full agenda, as I know Your Honor is clear with

10   firsthand.  And I've tried to come up with an order that may

11   both facilitate the proceedings this afternoon so that they

12   kind of fall in what I think is -- hope is logical order.  But,

13   essentially, I know Your Honor's number one concern is whether

14   any progress has been made with respect to mediation and we

15   ought to keep that number one.  Then, it goes to personal

16   injury.  We have a status report that's been requested.  We're

17   obviously prepared to deliver on that with respect to what's

18   happening on the questionnaires.  As you recall, the

19   questionnaire due date was July the 12th.  So, we've had an

20   opportunity to gather some more information.

21             We have the bar date motion and then amendments to

22   the CMO.  The next -- on each one of these items I put the

23   corresponding number on the agenda, so Mediation is 1, PI

24   status is 16, bar date, 15, CMO, 17.  There are then a series

25   of matters that relate to property damage claims, and I tried

1 to group these as well, beginning again with the status report

2 on what's happening with respect to property damage, then going

3 to the procedures motion which actually has two parts.  That's

4 Item 12 on the agenda.  The CMO, which is Item 14 on the agenda

5 -- and the reason I skipped over 13 is that it's kind of a

6 collection of more of miscellaneous things, but it's time we've

7 heard (inaudible) for awhile.

8      Then we need to deal with exclusivity.  And from the

9 thinking behind putting exclusivity a little bit later is that

10 -- at least in our experience, exclusivity ends up taking us

11 into many other aspects of the case.  And rather than do it

12 twice, the idea is to go through those other aspects first so

13 that exclusivity is something that the Court can resolve in a

14 relatively expeditious fashion.  And on the second page, it

15 looks worse than it actually is.

16      THE COURT:  No, Mr. Bernick, it doesn't.

17      MR. BERNICK:  We have Scotts.  There are two matters

18 that were scheduled to be heard and will be heard albeit very

19 briefly.  One is the Scotts' matter, which is Item 9, and then

20 the ELG status report on the environmental litigation group

21 which is Item 10.  And then there is one matter which was

22 deferred and that is Item 8 on the agenda.  And then finally,

23 four, five -- excuse me, three, four, five, six, seven, ten and

24 eleven all have orders that have been furnished to Your Honor.

25 So, we're told that the Scotts and ELG matters will take a very

1 short period of time.  So, again, our hope is that the second

2 page will go pretty quickly.  But, the first page obviously is

3 going to take a good deal of time.

4        I'll begin with the mediation report which is

5 relatively brief, that is that pursuant to Your Honor's

6 instruction last time, that the parties confer with respect to

7 the agreement that had been reached as between the property

8 damage asbestos claimants and the personal injury asbestos

9 claimants.  Mr. Inselbuch sees the initiative and in fact asked

10 that we meet right after court.  That didn't happen, but we met

11 very shortly thereafter in our offices in New York at a meeting

12 between the debtor, the asbestos property damage committee, the

13 futures representative and the personal injury -- asbestos

14 personal injury committee.

15        And I did have the opportunity, Your Honor, to ask

16 all kinds of questions that were helpful from our point of view

17 in informing us on some of the details that were associated

18 with that agreement.  There was then some discussion that I

19 won't -- I don't think is appropriate to get into about future

20 aspects of the case.  But, at least from our point of view,

21 there was no follow-up meeting and I am not under the

22 impression that anything that happened that day changed the

23 basic state of play on mediation.  And that basic state of play

24 I think has been discussed by each of the submissions in

25 connection with exclusivity.

**J&J COURT TRANSCRIBERS, INC.**

1          So, I think from our point of view, the number one

2 task is to proceed down the road towards estimation.  That

3 really is what we think should occupy the time of the parties

4 to this case.  And if at any point in time it looks like there

5 is an opportunity to restart the discussions, God knows

6 everybody knows each other very well in this process and there

7 is now a lot of history in the mediation process.  Judge

8 Pointer also has offered to become available if that's

9 appropriate.  And so, we can take that up in due course if the

10 opportunity arises.  Something obviously has to change before

11 further progress is going to be made on the negotiation front.

12 I know we're going to talk about that again in connection with

13 exclusivity.  But, at least from our point of view, there was a

14 follow-up pursuant to Your Honor's instructions and there was a

15 meeting.

16          There's only one fact about the agreement that came

17 out in that meeting that's worthy of further note, and that

18 does pertain to what I'll call a side agreement that relates to

19 the agreement between the property damage folks and the

20 personal injury folks.  But, again, I'm prepared to take that

21 up in connection with the exclusivity discussion.  I don't

22 think it is worth spending more time on now before we go onto

23 the meat of the agenda.

24          THE COURT:  All right.  Anybody wish to follow-up?

25          MR. BAENA:  May it please the Court, Scott Baena.

1 That is absolutely correct, the recitation of what occurred at

2 the meeting.  Your Honor will recall that you directed us to

3 meet with the debtor, provide the debtor with information

4 concerning the agreements that were reached by the asbestos

5 constituencies, for the debtor to consider those and to report

6 back to us.  I presume we have now received the reports back

7 from the debtor.

8         MR. BERNICK:  That's correct, together with what we

9 set forth in our papers, which I think gives at least our

10 perspective on the state of play in negotiations.

11         THE COURT:  I hope somebody understands that, what

12 that means to get that from the debtor because, frankly, I

13 don't know what that means.

14         MR. BAENA:  I take it to mean that the debtor didn't

15 hear anything at that meeting about the agreements that were

16 reached that would serve as a platform for further discussions

17 that might reach consensual agreements that are a little bit

18 broader than the asbestos constituency.

19         MR. BERNICK:  That's correct.  The agreement that's

20 been reached between the property damage and personal injury

21 constituencies is basically an agreement that divides up the

22 assets that are available to them or become available to them

23 during the course of the proceedings, however that evolves.

24 There was no change in the status quo ante before that meeting,

25 which is that in all of the discussions, there was no

1 substantive offer that was made that did anything to address

2 what are the essential points of this proceeding from the

3 debtor's point of view, and that is the determination about

4 which of the asbestos claims really have validity.  There was

5 no proposal that was made that would pay a dime to equity.

6 And, obviously, under those circumstances, we didn't believe as

7 the debtor that it was in the best interest of the estate to go

8 down the road to negotiate a plan at this time given the

9 agreement that's been reached.

10        Now, this takes me very quickly into this side

11 agreement.  But, again, rather than taking up time with that

12 because I think it's going to become a contested matter that

13 relates to exclusivity and the discussion there, I would just

14 as soon defer it.  But, there is a part of the agreement

15 between the property damage claimants and the personal injury

16 claimants that has a very direct bearing on the debtor's

17 ability to go forward and negotiate, and that's what I want to

18 take up at that point in time.

19        THE COURT:  All right.  Mr. Frankel?

20        MR. FRANKEL:  Your Honor, this is the first that we

21 saw that the agenda order changed.  And while we don't have any

22 problem for -- speaking for the FCR, I just want to make sure

23 that the end result of that is that we don't run out of time as

24 we have in past hearings and not get to exclusivity.

25        THE COURT:  You have me from now until 8:30 tomorrow

1    when I start Chapter 13's, Mr. Frankel.

2            MR. FRANKEL:  Thank you, Your Honor.

3            THE COURT:  Anybody else?

4                    (No verbal response)

5            THE COURT:  Okay.  Mr. Bernick?

6            MR. BERNICK:  Thank you.  Going then to the personal

7    injury portion of the case, we have down the status report and

8    then the bar date motion and then a case management order.

9    And, obviously, the central information that drives this whole

10   process in talking about PI is the information we now have on

11   the questionnaires.  And there are two essential problems with

12   the questionnaires and two I think fairly readily apparent

13   solutions.  And I don't want to argue in detail some of these

14   matters, because they're going to be before Your Honor in the

15   context of a motion to compel.

16           But, by way of the status report -- and I'll make

17   this quite brief.  Your Honor, if I could approach the -- there

18   were a total of 116,000 questionnaires that were sent out to

19   the different firms.  And, again, these all relate to the

20   snapshot of claimants whose claims were, in the belief of the

21   debtor, pending at the time the case was filed.  It excludes

22   all people who have claims that Grace believes were settled.

23   Pursuant to Your Honor's prior determination, a letter went out

24   to all people who got these questionnaires.  A letter went out

25   to those of those people, that total group, that Grace believed

1  did have settled claims.  So, there was a separate I think

2  25,000 claimants that got a letter saying, you don't have to

3  fill out the questionnaire.

4          So, 116,000 is net of those people.  The 116,000

5  doesn't include anybody where Grace believes in fact the claim

6  was settled.  With respect to those 116,000, the total returned

7  number of questionnaires that were returned -- we're setting

8  aside how they were filled out -- was 54,000 or about 46.7

9  percent.  And these materials, Your Honor, we will furnish the

10 Court and all parties.  We have copies for the folks who are

11 here.  The firms -- there were 637 firms that received the

12 questionnaires.  A total of 124 of those firms returned

13 questionnaires representing only about 20 percent of the firms

14 or the lawyers that were involved.

15         Turning to the top 20 firms, we focused our efforts

16 to analyze these questionnaires on the top 20 firms so that we

17 could get some information to furnish the Court rather than

18 waiting to have complete information with respect to all the

19 116,000.  So, we focused on the top 20 firms who represent 64

20 percent of the prepetition personal injury claimants.  And Your

21 Honor will see in the material that we've broken out by firm

22 the number of claimants that we believe that each firm had, and

23 this of course trove the questionnaires that were sent to them,

24 into the number of questionnaires returned.  You can see that

25 there are some significant differences.  In some cases,

14

1 different firms supplied or answered or filled out the

2 questionnaires from the firms that received the questionnaires.

3        So, there is some -- you need to kind of see whether

4 a firm answered the questionnaires that went to another firm.

5 But, even within firms, you can see that there's a fairly

6 significant difference between the number of questionnaires

7 that were received, that is the number of claims that were

8 outstanding according to our records at the time the company

9 went into Chapter 11 on the one hand, and the number of

10 questionnaires that have been received back.  This further

11 breaks out the track records.  The next chart shows that there

12 were a total of 74,000 questionnaires that were sent to the top

13 20 firms.  Again, this is different from the 116 because we're

14 just talking about the top 20.  Of those 13,000 claims are

15 represented by I think it's about five firms that sent no

16 questionnaires back.

17        Then, among the firms that did send questionnaires

18 back, there would be a remaining 61,000 questionnaires that

19 were sent out to those who did return questionnaires.  But, of

20 those questionnaires only 37,000 were returned.  So, even of

21 the top 20, we're talking about a fairly significant difference

22 between the number of questionnaires that were sent out, that

23 is the number of claims that were outstanding, and the number

24 of questionnaires that were in fact answered.

25        Now, this tees up the first problem, which is that

**J&J COURT TRANSCRIBERS, INC.**

1  there is a -- I think it would be fair to say a poor response

2  rate.  Now, obviously if the people who are not responding are

3  simply saying, gee, we don't want to pursue the claim, that's

4  good information.  It's important to know that.  But, in

5  relatively few cases did we actually receive that kind of

6  explanation.  Some of the law firms said that and indeed

7  identified by name the claimants who are not going to be

8  pursuing their claims.  Others did not.  So, we have a

9  significant question about what it is that drives the

10 difference between 74,000 in 37,000 claims.

11          Now, the obvious solution to that or one obvious

12 solution is either to simply say their claims don't count or to

13 take further steps to bring these claimants within the

14 jurisdiction of the Court.  And if they decline to come within

15 the jurisdiction of the Court, basically bar their claims.  So,

16 this tees up the question of the bar date.  Now, I think we

17 have agreement that -- I shouldn't say that.  We originally

18 proposed that the bar date be sent out with respect to all of

19 the people other than those where we had agreement that their

20 claims were settled and people who simply said that their

21 claims were settled but we didn't agree.  Let me put it more

22 affirmatively and therefore clearly.

23          We originally proposed sending out the bar date to

24 everybody except those who had claims that we recognized were

25 settled.  So, we took off the top 25,000 or whatever it is.

1  However, when we wrote up the materials that would accompany

2  the bar date with respect to the notice and with respect to the

3  order, we excluded anybody who had a resolved claim.  And we

4  didn't make a distinction between whether they had a resolved

5  claim that we agreed was resolved or simply a resolved claim

6  that they thought was resolved.  And we realized that one of

7  the reasons why we might have this difference is that there is

8  a disagreement about who believes that their claim.  It's

9  settled.  And in fact we know from the experience that we had

10  in the Babcock and Wilcox case, there were literally thousands

11  of claims that were asserted to be settled from some of the

12  very largest firms.  And it turns out that we litigated that

13  issue and many of them were not in fact settled.

14         So, we want the bar date notice to go out and we want

15  the bar date claim form and questionnaires filled out by

16  anybody unless they are, according to our records, people that

17  we know in fact have settled claims.  If we don't do that, we

18  will never know whether the nonrespondents are people who are

19  simply not pursuing their claim or whether in fact they are

20  people who are pursuing their claim but feel that it's settled.

21  And, therefore, we really won't know what to do with that

22  population.

23         Now, this issue came to us very late because -- in

24  the week because -- or in reference to this hearing because

25  we've only just received the information and analyzed it.  But,

1  it's quite clear that this is a significant issue that we have.

2  We've had the opportunity to talk very briefly with Mr.

3  Esserman.  I think he can state his position.  But, we want the

4  bar date to apply to anybody who does not have what all agree

5  to be a settled claim so that we can then determine the status

6  of those claimants as well as gather information about the

7  nature of their claim.  Otherwise, we defeat the purpose of

8  doing this estimate, which is to get a snapshot of pending that

9  is unsettled claims as of a particular point in time.  And I

10  hope Your Honor -- I don't know if Your Honor has had the

11  opportunity to go through the charts in our exclusivity brief.

12         THE COURT:  I didn't.

13         MR. BERNICK:  Okay.  Well, I would just show you one.

14                (Pause)

15         MR. BERNICK:  The estimate hinges upon taking the bar

16  that is claims pending as of the petition date.  That claim

17  flow is part of a claim flow that is used by the personal

18  injury claimants to extrapolate from past history to the

19  future.  So, they take Grace's history of settlements by year

20  and they plot it.  They then say, well, if it were to continue

21  and follow an epidemiological curve, this is what the future

22  would look like, and they use that then to value the claim.

23         Essentially, what we're saying is that may have been

24  history, but we have to determine which of the claims actually

25  have validity.  So, we take a snapshot of the claims that were

1  pending as of that point in time, and we send out the

2  questionnaires and we get the information.  The problem that we

3  have is that if we don't peg which ones were settled, there is

4  -- that is, there is disagreement about what the settled number

5  is, you don't know where you are on this bar.  You're subject

6  to the possibility that the settled claims are higher or lower.

7  You just don't know because they're not required to tell you

8  and they're not required to furnish information.

9       So, again, we have simply said we want the bar date

10  to apply so that this process can work and, therefore, it

11  should apply to everybody as to whom there is not an agreement

12  that the claim is settled, which is not to say that the claim

13  can't be shown to be settled ultimately.  But, we got to get

14  the information about that claim in order for us to know enough

15  such that if it's determined not to have settled, we have the

16  complete information we need to go forward.

17       So, Your Honor, we actually have -- we circulated to

18  everybody -- we furnished copies of the order and notice as it

19  was originally formulated, and that was also submitted to the

20  Court.  I have here a clean copy that reflects the language

21  change that would extend enough to include -- that is a bar

22  date to include the lowest settled claims.  And we have

23  circulated that amended material as well.  I know it came very

24  late, so we were not able to -- I know the asbestos claimants

25  committee -- personal injury committee obviously got it very

1  late in the day and they may not be prepared to address it.

2  But, that is where we are with respect to the bar date and the

3  status on the questionnaires.  If I can then go to the second

4  part of the report on the questionnaires, and then maybe Your

5  Honor can hear from the other constituents with respect to the

6  question of the bar date.

7       MR. PHILLIPS:  Your Honor, I would like to say

8  something about this.

9       THE COURT:  You need to use the microphone.  I can't

10  hear you.

11       MR. PHILLIPS:  Your Honor, I did enter my appearance

12  earlier, Robert Phillips for Simons Cooper.  I wanted to make a

13  point with regard to Mr. Bernick's presentation about the

14  number of questionnaires that were answered or not that I think

15  might be useful before we move on to the bar date portion of

16  the hearing.  We received approximately 382 questionnaires.

17  This is another point that came up later.  A large number of

18  our cases have been settled in the six months prior to

19  bankruptcy and paid by Grace leaving us with a subset of our

20  claims that had been pending.

21       But, we received 382 questionnaires.  Of those, well

22  over half were for settled claims or for claims which were

23  distant claims.  We received questionnaires for people who had

24  sued Grace in 1987, 1989, 1993, whose claims had been dismissed

25  and there was no argument whatsoever in anyone's mind that

1  these claims were alive, which means that the debtors pointed

2  out 46.7 percent is the number of questionnaires as though

3  something nefarious is afoot among the plaintiff's firms.

4  Well, the number of questionnaires we received which actually

5  applied to live claims is less than that.  It's about 44

6  percent.

7           And, you know, maybe that means there should be a

8  claims bar date and so forth.  I'm not sure, but I think Your

9  Honor should be aware.  And the 382 number doesn't even count

10  the number of redundancies we received.  We had at least 30 or

11  more redundant claim forms for people.  So, when the debtor

12  says we sent out 129,000, 75,000, however many claim forms or

13  questionnaires were sent out, I really question how many of

14  those represented actual live claimants who should have

15  received claim forms or how many of those were simply erroneous

16  aspects of the debtor's records.

17           THE COURT:  Okay.  Well, that maybe another thing

18  that --

19           MR. BERNICK:  I accept that completely.  That's the

20  whole purpose of having the bar date so that we sort out what

21  claims are actually pending.  If the claims have been settled

22  and paid, I don't think we're very anxious and I know our

23  creditors aren't very anxious to have us pay them again.  So,

24  we're not going to have any interest in fighting on that issue.

25  And if they are not settled, we do want the information.  If

1  they're erroneous, we'd also like to know that.  But, that's

2  exactly what you learn when you have a bar date.  And we were

3  not suggesting anything nefarious about anybody's submission of

4  these questionnaires.  So, it's a nonissue from our point of

5  view, and we would be happy to either work with you directly or

6  in connection with the bar date to make sure that you fill out

7  the questionnaires the right way with respect to claims that

8  you actually have.

9          MR. PHILLIPS:  Well, Your Honor, we actually -- I had

10  provided Ms. Harding of the Kirkland firm with a list of

11  clients.  I characterized the number of people who were stale

12  claims, number of claimants who were settled, number of

13  claimants who were responding as having unliquidated claims and

14  so forth.  And, obviously, I think that would be preferable if

15  people when they not send in a response say, well, I'm not

16  sending in a response for these people and why.  But, I thought

17  it might be useful for Your Honor to hear.

18          THE COURT:  It was.

19          MR. PHILLIPS:  I think there is a significant issue

20  with regard to who was receiving the questionnaires in the

21  first instance.  So, I don't know if the aggregate numbers for

22  claims were accurate in terms of how many should have been sent

23  out in the first instance.

24          THE COURT:  Okay.

25          MR. BERNICK:  That's fine.  We have to err on the

1 side of sending questionnaires so nobody can claim not to have

2 gotten one.  But, that's fair and that's fine, and I appreciate

3 Mr. Phillips for speaking up on behalf of the Simmons firm.

4 The second problem that we have in connection with the

5 questionnaires relates to the nature of the responses that were

6 received from the firms that did in fact return responses.

7 And, again, these will be furnished to the Court.  But, we

8 have, first of all, the objections that were made.

9         This is an example of an objection that was filed by

10 the Baron and Budd firm.  And you can see that this has first

11 general objections, and there are several pages of those.

12 Actually, that's an overstatement.  There were several

13 objections.  There were two pages containing eight objections.

14 And then there are so-called claimant specific objections.

15 They go on from Page 3 to Page 20.  There is literally 20 pages

16 of objections from Baron and Budd.

17         Now, there's a little bit of a misnomer in that label

18 and it's very important.  What happened was that the Baron and

19 Budd firm submitted objections to virtually all if not all of

20 the questionnaires that were received.  We can see the general

21 objections are stated there, and they're obviously not only

22 specific to a claimant, they're not even specific to a

23 question.  They are in a sense what you would have in discovery

24 as being a general objection to all interrogatories.  And what

25 you then see as being the specific objections are not really

1  claimant specific.  They are specific questions.  So, you then

2  -- they go through question by question, instruction by

3  instruction, and they object to virtually all of them.  And

4  they do this with respect to virtually all of their claimants.

5       And this is a very, very tangible illustration in

6  fact that this approach, these objections are basically

7  revisiting -- they are in fact revisiting the objection process

8  that we went through at the outset with respect to the claim

9  form as a whole.  But, it goes further yet.  Not only did they

10 do that with respect to their claims, but exactly the same

11 script was used by the Silber Pearlman firm and by the law

12 offices of Peter Angelos.  They are identical, I mean word for

13 word exactly the same.  So, we have not just blanket objections

14 to all the different questions, but it's really kind of part of

15 what appears to be kind of an ad hoc committee that has chosen

16 to do this in exactly the same way.  They even object to any

17 inference that the claimants by supplying the questionnaires

18 are submitting to the jurisdiction of this Court.

19      Other firms use scripts that are almost identical.

20 And we've listed those here:  Foster and Sear, Campbell Cherry,

21 Motley Rice.  So, we have what would be by any fair definition

22 of the word a cooperative or concerted approach to lodge these

23 different objections in the same kind of way.

24      MR. INSELBUCH:  With all due respect, Your Honor,

25 he's made a motion to compel.  The motion is not due to be

1  responded to until August the 4th.  And the motion is on before

2  Your Honor on August the 21st.  We have a lot of other things

3  on the agenda here today and we don't really think it's

4  appropriate for Mr. Bernick to have an opportunity to preargue

5  his motion when no one has seen his papers.  No one knows what

6  his numbers are.  No one has any reason to believe he knows

7  what his numbers are.

8         MR. BERNICK:  Your Honor, I'll only take a few more

9  minutes.  But, with due respect to Mr. Inselbuch, (a) the

10 motion has already been filed and indeed was filed last week.

11 And so --

12        MR. INSELBUCH:  Yes, indeed, and it hasn't been

13 responded to.

14        MR. BERNICK:  I'm sorry, excuse me.  To represent to

15 the Court that nobody has seen it is incorrect.  The motion was

16 filed.  Number two, there was an effort also to mediate.

17 Everybody was invited to the mediation.  Number three, our

18 positions have been set forth in writing.  Number four, the

19 response that Mr. Inselbuch has given is part of the problem.

20 They want to relitigate every single issue and take time.

21 Nothing is more important to report to the Court about this

22 questionnaire process but the response rate and the nature of

23 the responses.

24        THE COURT:  Mr. Bernick, isn't it all going to be

25 moot?  If we do a bar date, then we're going to get the claims

1  in.  And if I think at that point in time if you want to do

2  some form of I'll call it discovery in the form of a

3  questionnaire or otherwise, I think you can do it.  I mean,

4  right now the purpose of this questionnaire is to try to get

5  together some information upon which the experts can decide

6  from the debtor's point of view what are "valid or not valid

7  claims," i.e., claims that would be paid in the tort system and

8  at what level so that some projections can be made going

9  forward.  If you really want to set a bar date, isn't it going

10  to be somewhat irrelevant?

11       MR. BERNICK:  Well, Your Honor, with respect to the

12  Court, we proposed at the outset having everybody submit for

13  the jurisdiction of the Court and then litigate their claims.

14       THE COURT:  You did.

15       MR. BERNICK:  And we backed off of that to do an

16  estimation.  And then the estimation it was clear required

17  information.  So, Your Honor approved the questionnaires.  And

18  all the lawyers sitting in this court stood around, with the

19  exception of the gentleman from Mr. Simmons and I'm sure he was

20  notified, stood around and litigate the claim form.  Okay.

21  What's happened now?  It took months to get that done.

22       Now, we finally got the claim forms sent back and

23  that also was delayed literally for months.  And what they're

24  now saying to the Court is, well, you go file a motion and then

25  don't argue it now, don't even tell the Court now what's going

1  on.  You go file a motion and then we'll deal with you later.

2  And I know what I'm going to hear later.  What I'm going to

3  hear later is everybody coming in and trying to relitigate the

4  issue or basically saying, you can't do the estimation.  Your

5  Honor, will do it any way because the information's not there.

6          THE COURT:  Oh, well that's why I think you need a

7  bar date.

8          MR. BERNICK:  Well --

9          THE COURT:  You have convinced me, Mr. Bernick, that

10  if the debtor is going to do this estimation, you need a bar

11  date.  You'll find out what claims are filed.  You'll find out

12  who it is whose filed them.  You'll know at what level of

13  disease if they contend they have one that will be there.  I

14  think at this point it's probably simply best for purposes of

15  the estimation to do the equivalent of a bar date.  Well, not

16  the equivalent, to do a bar date.

17          MR. BERNICK:  Right.

18          THE COURT:  And I think we can -- you know, if the

19  committees want to limit the scope of the purpose for filing

20  this to do the estimation, I think we can consider it.  If you

21  want to go at it full tilt, you know --

22          MR. BERNICK:  For purposes of the personal injury

23  claims, I think that that's where we are.  But, Your Honor, you

24  know, Grace is constantly greeted with the argument that the

25  case has become protracted.  And we are seeking at every point

**J&J COURT TRANSCRIBERS, INC.**

1  to tee up issues so that they can get resolved.  They are the

2  ones --

3        THE COURT:  Well, Mr. Bernick, you've been asking for

4  the bar date since my first day on this case as I can recall or

5  at least close to the first day on the case.  And I have been

6  basically telling you no because the bar dates haven't been

7  necessary in other cases, but other cases aren't this case.

8  And so, I think we need to get this teed up one way or another.

9  So, if you need a bar date, we'll set a bar date.

10        MR. BERNICK:  That's fine.  Enough said, Your Honor.

11  I'm prepared -- I think it would be -- it would be unfortunate

12  -- we'll go do all that.  It would be unfortunate if we can't

13  take advantage of the fact that objections now have been filed

14  to these questionnaires and to get the issue resolved.  There's

15  no reason --

16        THE COURT:  Oh, we'll get it resolved.  I mean, if

17  their responses are due next month, it will be teed up next

18  month.

19        MR. BERNICK:  Fair enough, that's fair enough.

20  That's good.

21        THE COURT:  I'll get it resolved.

22        MR. BERNICK:  That's fair.

23        MR. PHILLIPS:  One point --

24        MR. BERNICK:  I didn't say anything about your firm.

25        MR. PHILLIPS:  Well, we used the script as well, Your

1  Honor.  I'll confess to that.  It was an affirmative script.

2  What Mr. Bernick is leaving out or maybe he was going to get to

3  that is -- and I know in most other instances because I've

4  spoken with the lawyers in the various firms he's put up there,

5  Federal Procedure 101 says when you're responding to discovery,

6  you set forth your objections and then you answer them, or

7  perhaps you can say, I'm not going to answer specifically as to

8  this.  There's nothing wrong with the claimants in each

9  individual instance filing a set of objections and then

10 responding to each objection.

11          I know in our case and I know in pretty much every

12 case up there, it's not as though these firms and these

13 claimants do not provide the information.  Mr. Bernick and the

14 debtor may have arguments with the manner in which we provided

15 the information, this whole attachment issue and so forth.

16 But, these were responded to.  Just because we objected to

17 certain questions and went ahead and provided information, I

18 don't want the Court to somehow leave with the impression that

19 we didn't respond.  We gave them the information they wanted.

20          THE COURT:  Well, they're --

21          MR. PHILLIPS:  We may have objected to it as well to

22 preserve the objection because we owe that to our clients, but

23 we did respond.  And so, I don't want the inference to be laid

24 up here that we were somehow being obstructionists in refusing

25 to respond to these things just because we maintained our right

1 to object to these questions.

2          THE COURT:  Well, if the information is provided,

3 then there won't be much on a motion to compel.  If it isn't

4 provided, then I guess I'll get a motion to compel.  But, if

5 it's teed up for next month, I'll hear it next month.

6          MR. BERNICK:  Again, the gentleman -- I did not want

7 to actually go forward and argue it.  But, if he wants to say

8 the information has been provided, all of these firms did the

9 same thing.  They didn't answer the questions.  They just gave

10 -- wrote answers that say, see attached if applicable, and then

11 they didn't even attach things.  Many of these firms --

12          THE COURT:  Well, that's a problem.

13          MR. BERNICK:  I'm sorry?

14          THE COURT:  That might be a problem.

15          MR. BERNICK:  Yes.  Then they would say, well, come

16 to our offices.  Come down to the friendly confines.

17          MR. PHILLIPS:  Your Honor, that is arguing the point.

18          THE COURT:  Wait, gentlemen, stop.

19          MR. PHILLIPS:  We don't need to go there.

20          THE COURT:  Just stop a minute, please.  There is a

21 terrible feedback from that microphone.  Was it turned up and

22 can it be turned down?

23          THE CLERK:  I just instant messaged the automation

24 department.  They're going to come up.

25          THE COURT:  Okay.  It's --

**J&J COURT TRANSCRIBERS, INC.**

1          MR. BERNICK:  I think we'll have to keep our distance

2     then maybe a little bit better.

3          THE COURT:  I'm sorry.  With this head cold, it's

4     sort of reverberating in there and it's giving me a headache.

5     And I -- other things may give me a headache.  I don't need

6     that to add to it.

7          MR. BERNICK:  The fact of the matter is that all of

8     these issues were gone over last year.  Your Honor has said,

9     this is not the time to relitigate them.  We will see this in

10    connection with the motion to compel.  And if they're clean as

11    the driven snow and we can answer all the questions, so be it.

12         THE COURT:  That's fine.  Let's defer any further

13    argument on this issue.  Everybody's rights are preserved until

14    next month when the responses are due and I will hear the

15    argument.  So, please, don't state on the record that you're

16    preserving things.  I understand that.  I accept it.  It's a

17    given.

18         MR. PHILLIPS:  All right.  Thank you, Your Honor.

19         THE COURT:  Mr. Esserman?

20         MR. ESSERMAN:  Your Honor, I'll be brief, Sandy

21    Esserman.  And some of those firms I represent and I think that

22    there was a bevy of information provided in addition to the

23    questionnaires.  I think Mr. Phillips correctly stated it.  I

24    don't want to preargue my case.  I think Mr. Bernick has

25    preargued the case.  I'm going to stay away from that.  But,

1  Grace and Mr. Bernick keep on saying, well, these things are

2  decided.  These things are set in stone.  There's nothing that

3  was set in stone and there's nothing necessarily that was

4  decided previously that certain questions did or did not have

5  to be answered.

6         There were certain questions that Your Honor said

7  specifically, well, they can ask it and see what kind of

8  questions -- answers they get to it.  But, you will hear about

9  that in late August, but I did not want this to turn into an

10 argument over who is doing what, who is not doing what.  And

11 I'm afraid it's gone in that direction.

12        THE COURT:  No, Mr. Esserman, it is not going in that

13 direction.  I have decided since the mediation is apparently

14 not successful that we are going to get teed up every piece of

15 litigation that needs to get teed up.  If we need a bar date in

16 order to get the personal injury stuff off the ground, that's

17 what we're going to do.  To the extent we need a case

18 management order for that or for the property damage, that's

19 what we're going to do.  And we're going to be here as long as

20 it takes tonight until we get those couple of things done.

21        MR. ESSERMAN:  And let me briefly talk about the

22 mediation with regard to the questionnaire.  One of the things

23 Your Honor did was appoint a mediator for the questionnaire.

24        THE COURT:  I did.

25        MR. ESSERMAN:  There was a meeting in Washington.  I

1 participated by phone.  Mr. Phillips participated in person.

2 And we set some dates that were agreeable to the mediator to

3 mediate questions that might arise.  The mediation dates I

4 believe are set after the motion to compel will be heard by

5 this Court, which may or may not make sense in and of itself.

6 But, there will be a mediation and we will participate on

7 behalf of my clients.  And Mr. Phillips will participate also

8 in that mediation specifically over the issues of the

9 questionnaire.

10       MR. BERNICK:  And if Your Honor's preference is to do

11 it through mediation, that's fine.  I won't go further into it.

12 Just in terms of the scope, of the 37,000 questionnaires

13 returned, the attachments problem relates to 32,000 of them.

14 Objections without answers relate to 31,000 of them.  And the

15 attorney signature problems relate to --

16       MR. INSELBUCH:  I thought this was going to be

17 discussed when the motion was before Your Honor next month.

18       MR. BERNICK:  The merits are but the Court should

19 know how broad this problem is.  Do you have a problem with her

20 knowing how broad it is?

21       MR. INSELBUCH:  We don't -- we have a problem with

22 not knowing what your numbers are.

23       MR. BERNICK:  If you have the same date of the week,

24 go to Russ Consulting.

25       THE COURT:  Well, gentlemen, first of all, please

1  talk to me, not to each other.  Let's have some sense of

2  decorum.

3          MR. INSELBUCH:  I beg your pardon, Your Honor.

4          MR. BERNICK:  I apologize, Your Honor.

5          THE COURT:  That's number one.  Number two, we'll

6  take all of these issues up next month.  I would suggest, Mr.

7  Esserman, if you can get the mediator to meet with you before

8  next month that that would probably be a better process than

9  having me give you rulings that will tend to eliminate the need

10  for mediation probably.  And I intend to get to this next

11  month.  There's been a lot of delay in the case.  I don't see

12  any basis for continuing delay.  So, we really are getting teed

13  up.

14          MR. BERNICK:  Your Honor, what that would leave us is

15  --

16          MR. PHILLIPS:  One point, Your Honor, on that.  I was

17  at the mediation with Ms. Harding and the debtor and I

18  specifically made the point over and over, as did Judge Whalen,

19  that it made no sense to have the Court argue the issues the

20  Court had previously said it wanted mediated before it had to

21  argue and said, why don't you file a motion and defer it to

22  September docket or have another mediation once the

23  questionnaire comes in, then file a motion to compel.  And the

24  debtors unilaterally decided, no, we want to go to Your Honor

25  first.  We don't want an appointment with Judge Whalen prior to

1  getting the motion to compel teed up before Your Honor.  So, we

2  asked.  I specifically made that point in mediation and was

3  overruled by the debtors.

4         MR. BERNICK:  That again is I believe an incorrect

5  representation.  Ms. --

6         MR. PHILLIPS:  We're there.

7         MR. BERNICK:  Well, I understand that, but Ms.

8  Harding wasn't able to be here today because she just got back

9  from Montana recovering from three days of hearings last week.

10 The fact of the matter is as I understand is that the option

11 was simply presented.  We were prepared to go forward with the

12 mediation process and take the decision of the mediators.  Your

13 Honor knows that we have proposed doing it any way that gets it

14 done.  So, if it's to be mediated, that's fine.  If Your Honor

15 is to decide it, that's fine.  I don't know why having now been

16 told that we're not arguing this thing on the merits, we should

17 go back to a procedure where --

18         THE COURT:  Mona, would you check in Pittsburgh,

19 please, and see if we have a date that is after this August

20 omnibus hearing but very shortly after the omnibus.  When is

21 your mediation supposed to take place?

22         MR. PHILLIPS:  The 29th, Your Honor.

23         THE COURT:  Of August?

24         MR. BERNICK:  Of August.

25         MR. PHILLIPS:  That was one of Judge Whalen's only

1  available dates.

2          THE COURT:  See if we have a date like around the

3  first of September or thereabouts.  I know it can't be the

4  first, that's a Friday.  I already know it can't be that day,

5  but --

6          THE CLERK:  You want me to just check the calendar?

7          THE COURT:  Yes, please -- well, you may -- I don't

8  know.  Do you have access to the calendar, fine.  If you can

9  check it, that's fine.

10          MR. BERNICK:  And, Your Honor, I have to say that at

11  least my understanding is that mediator has that as a date, but

12  he also I think was of the view that he should discuss with

13  Your Honor whether it really makes sense to have him decide

14  these matters in the first sense.

15          THE COURT:  Sure it does.  It makes sense to have him

16  decide them because the purpose of mediation is to see whether

17  or not you can come to some agreement as to what should be

18  answered, what shouldn't be answered, what kind of answer.  And

19  to the extent that that provides a more formal forum for you

20  folks rather than duking it out with each other somewhere, I

21  think it will be helpful.  And if it isn't, then you'll get me,

22  you know, shortly thereafter.

23          MR. BERNICK:  That's fine.  I think that that --

24          MR. PHILLIPS:  That's fine, Your Honor.  That's

25  really what we requested and we were just reacting.  Grace

**J&J COURT TRANSCRIBERS, INC.**

1  wanted to do it the way they've set it up and we said, fine, we

2  thought it made more sense to have the mediation first and then

3  the court hearing, and I think it does make more sense.

4       THE COURT:  All right.  Well, as soon as Mona is able

5  to find a date that's after August 29th but before the next

6  omnibus, we will do in Pittsburgh a whole day on nothing but

7  questionnaires and if we need to revisions to case management

8  order, and any of the other what I will call procedural.  I

9  realize in a sense they maybe substantive because they may

10 involve answers to questions, but not what answers just whether

11 to answer.  So, from my point of view, I'm looking at this as a

12 time to tee up any procedural matter that we've got to get to

13 that's going to get the property damage litigation and the

14 personal injury litigation off dead center onto my calendar and

15 done.

16      MR. BERNICK:  That's fine.  And if we can then get --

17 I think the only really outstanding issue before we get to the

18 CMO itself, which presents I think a discrete issue, Your

19 Honor, that is worthy of your consideration this afternoon, is

20 to find out if there is anybody who objects to the materials

21 that have now been proffered to the Court to set up the bar

22 date.

23      MR. LOCKWOOD:  The answer is yes, Your Honor.  Should

24 I address it?

25      THE COURT:  Just a second, Mr. Lockwood, because Mona

**J&J COURT TRANSCRIBERS, INC.**

1 has given me a potential date for September 11th which is a

2 Monday.  How is that?

3          MR. ESSERMAN:  In Pittsburgh, Your Honor?

4          THE COURT:  In Pittsburgh.

5          MR. ESSERMAN:  That's fine.  What time, Your Honor?

6          THE COURT:  I think we probably should start at nine

7 unless that's a problem for those of you coming in.  Will most

8 of you have to come in the night before anyway?

9          MR. ESSERMAN:  No, we'll come in the night before.

10          THE COURT:  So, between -- but, I still think you

11 should file your responses to the extent that you need to.

12          MR. ESSERMAN:  Oh, we will file our responses on the

13 date that we -- that Grace had requested us to and Grace set

14 forth in their papers and --

15          THE COURT:  All right.  Then what I would like -- I'm

16 sorry, Mr. Esserman.

17          MR. ESSERMAN:  I was just saying we will do that.

18          THE COURT:  Okay.  What I would like is to the extent

19 that you do have something settled at this mediation, I would

20 like to get something that tells me don't bother looking at,

21 you know, A, B and C because it's not an issue anymore.  So --

22          MR. ESSERMAN:  The mediation will be on the 29th is

23 the date I have for the mediation.

24          THE COURT:  All right.

25          MR. ESSERMAN:  So, I'm not sure where that is.

**J&J COURT TRANSCRIBERS, INC.**

1  Washington?

2          MR. BERNICK:  Probably in DC.

3          MR. ESSERMAN:  Fine, Washington.

4          THE COURT:  Okay.  So, by -- if September 11th is a

5  Monday is it possible by Thursday night, you know, five o'clock

6  Thursday night to get something filed that says you only need

7  to focus on questions whatever?

8          MR. ESSERMAN:  Thursday night the seventh shouldn't

9  be a problem at all, Your Honor, as long as we've got the

10  decision from the mediator.

11          THE COURT:  Well, tell Judge Whalen is just going to

12  have to give you a decision when you're there because --

13          MR. ESSERMAN:  Okay.

14          MR. BERNICK:  I frankly think it will not take --

15          MR. ESSERMAN:  We'll file it.

16          MR. BERNICK:  It will not take him that long.

17          MR. ESSERMAN:  Okay.  Between Grace and us, we'll

18  file something to make that all issues that are resolved you

19  will have now.

20          THE COURT:  Yes, so that I know which things I still

21  need to concentrate on.  I will read everything in advance but,

22  you know, preparing -- as you know preparing for hearings

23  involves some time.  And so, I'd prefer just to look at the

24  things that are not resolved.  If nothing is resolved, it can

25  be a pretty simple sentence.  You can tell me that nothing has

1  been resolved, but I have greater confidence in Judge Whalen in

2  that.

3          MR. ESSERMAN:  Thank you, Your Honor.

4          THE COURT:  And frankly in all of you.

5          MR. ESSERMAN:  Hopefully we'll get some things

6  resolved.

7          MR. BAENA:  Judge, did I understand that you intend

8  to use that same hearing for miscellaneous property damage

9  matters as well?

10          THE COURT:  Well, I want to see how much we can get

11  through today, Mr. Baena.  But, if there is something that is

12  unresolved today, yes, I expect to use that day for any

13  procedural issue that comes up, any procedural issue.

14          MR. BAENA:  Is there any point in setting personal

15  injury in the morning and property damage in the afternoon or

16  vice versa?

17          MR. BERNICK:  Your Honor, if we could defer this, I

18  think that what we have here is a creeping.  Let's defer all

19  the different issues that can't get resolved.

20          THE COURT:  We're not deferring anything that's on

21  the schedule today.  If I can give you rulings, you're getting

22  rulings.  If there is something I can't give you a ruling about

23  or something that makes sense to defer, we're going to defer

24  it.  But, I've already said, gentlemen, I told you last -- a

25  couple of months ago, bring your toothbrushes for tonight.  I

1 meant it, so.

2          MR. BAENA:  I'm not looking to put anything off,

3 Judge.  There are a lot of people that might not wish to sit

4 through the others issues.

5          THE COURT:  Well, I think we can start with the

6 personal injury to the -- because the questionnaire issue is

7 the first thing that I am going to undertake.  So, we'll start

8 with that and then we can go into property damage after that,

9 but I can't tell you when, Mr. Baena, because I don't intend to

10 stop personal injury and then start property damage, you know,

11 say at one o'clock.  I'm going to start and go until we're

12 done.  Maybe we can get a better schedule by the end of today

13 then that.  I don't know, we'll try.

14          MR. BERNICK:  I think that Mr. Lockwood wanted to

15 stand and object.

16                        (Pause)

17          THE COURT:  Are you still on the status conference or

18 are you --

19          MR. LOCKWOOD:  No, I'm on -- this on the bar date --

20          THE COURT:  On the bar date?

21          MR. LOCKWOOD:  -- which is Item 15 on the agenda and

22 the second item --

23          THE COURT:  All right.

24                        (Pause)

25          THE CLERK:  Excuse me, Your Honor.

**J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  Yes.

2          THE CLERK:  I'd like to remind that all parties who

3     stand to speak please identify yourself and speak as close as

4     you can to a microphone.  I'm having trouble keeping track of

5     people and hearing people.

6          MR. LOCKWOOD:  I thought if we got too close to the

7     mike we were having reverberation problems.

8          THE CLERK:  It should be up.

9          MR. LOCKWOOD:  Okay.  Your Honor, we have two issues

10    with respect to these materials which we got over the weekend

11    and, therefore, really haven't had a chance to talk to the

12    debtor about them.  But, they're here and they've been teed up,

13    so we have to respond in this format.  One of them has to do

14    with substance, one of them has to do with form.  The substance

15    part of it is that what the debtor is seeking to do now is to

16    have a bar date for settled claims, which had not previously

17    been part of this.  And the rationale for it -- well, let's

18    back up.

19          The original rationale for the bar date was that they

20    needed to be able to have the Court take jurisdiction over the

21    people that were required to file questionnaires.  And the

22    people who required to file questionnaires were the people --

23          THE COURT:  I'm sorry, Mr. Lockwood, go ahead.

24          MR. LOCKWOOD:  -- who had unliquidated claims, the

25    validity of which Grace wanted to challenge.  There was no

1 prior to today any discussion about some process for

2 challenging the validity of allegedly settled claims, which

3 would be a whole different kettle of fish.  I mean, it's a

4 whole different bunch of issues.  I mean, the question is, did

5 you form a contract and what --

6          THE COURT:  I'm sorry.

7          MR. LOCKWOOD:  And under what state law, as Mr.

8 Bernick adverted to the extensive litigation that went on in

9 the Babcock and Wilcox case on that subject, which took -- you

10 know, I mean it went on for at least two or three years.  So

11 far at least it is unclear as to whether or not the debtor

12 contemplates in effect challenging the assertions by people

13 that would file these proof of claims as to whether their

14 claims were settled or not and, if so, why is that necessary as

15 part of the estimation.  And under normal circumstances if you

16 wanted to raise that issue, i.e., what amounts to the allowance

17 ro disallowance of a claim as a settled claim or not, you would

18 -- you know, you would tee it up directly by way of a motion

19 instead of trying to slide it in through the back door in the

20 way that's being done here.

21          If you look at the slide here, the bullet point in

22 the -- that's supposed to be the gap between the Grace history

23 and the exposed group what Grace needs is described as pending

24 claims not passing filter of real liability.  And the filters

25 we've been told were, you know, bad B readers and re-silica

1 retreads and all that sort of stuff, not disputes over whether

2 or not some alleged settlement agreement was or wasn't binding

3 on Grace.  So --

4          THE COURT:  Well, why don't -- can't we make this

5 easier?  If the debtor in fact has, pick a number, 25,000

6 claims that it expects are settled claims and has apparently

7 already sent a letter out that says, Grace thinks your claim is

8 settled, you don't have to respond, why don't we simply have

9 the debtor put together a list of claims it thinks is settled,

10 notified those folks that this is what Grace thinks your

11 settlement is and this is how we would purport -- this is what

12 Grace thinks your settled claim is.  If you have a difference

13 of opinion, file a proof of claim.  If you don't, Grace will

14 treat this as the proof of claim.

15          MR. LOCKWOOD:  I don't know whether Grace has that

16 list or not.

17          THE COURT:  Well --

18          MR. ESSERMAN:  Your Honor, can I respond to that?

19          MR. LOCKWOOD:  Sure.

20          MR. BERNICK:  Be free to speak for us.  I'll let you

21 know whether I agree or not.

22          MR. ESSERMAN:  Oh, well.  Your Honor, I represent the

23 Real Morgan and Quinn and Environmental Litigation Group, and

24 they've got about 10,000 of those claims.  And I've talked with

25 Grace's attorneys this morning, Ms. Baer, and it is their

1 stated intention to exclude those people from the proof of

2 claim form process.  And I think with that type of inclusion if

3 in fact they know of the settlement and they've excluded, what

4 I want to avoid is a situation whereby we sort of get into

5 satellite litigation over whether or not they're excluded or

6 not and whether or not what their settlement is and --

7          THE COURT:  Well, that's what I'm concerned about,

8 which seems to me to make more sense if the debtor either sends

9 out the proof of claim to everyone and if they agree that they

10 -- or if they think they have a settled claim, they should say,

11 we settled with Grace on such and such a date, you know,

12 through such and such a firm and that's the end of it.  Grace

13 will either agree or not agree.  You know, it probably at this

14 point doesn't really matter too much.  It's just what bucket

15 for purposes of the estimation hearing those claims are going

16 to go in.  So, one way or another, we ought to get the universe

17 of claims done, either by Grace saying, these are the claims

18 that we agree are settled and if you agree with it you don't

19 need to do anything else, but if you don't do anything else,

20 this is how we're treating your claim, or else, we should just

21 send out the bar date and have people -- you can put a check

22 off for them.  You know, was your claim settled?  If so, check

23 here.  Was it paid?  If so, check here.

24          MR. BERNICK:  Yes.  It really is pretty much already

25 that easy.  And I'm a little bit surprised that -- it's almost

1  an invitation to make it more complex.  Mr. Esserman is correct

2  in that there was an effort to identify the claims that Grace

3  does believe are settled.  They are the people that already got

4  a letter telling them that they didn't have to fill out the

5  questionnaire.  There's a list of them.  And if Mr. Esserman's

6  clients have claims that are -- if Mr. Esserman represents

7  claimants or clients who have claimants who are on those lists

8  with respect to those claims, there really isn't anything more

9  to be done.  And that's why I had thought that Mr. Esserman was

10 agreeable to the bar date materials that we had.  But, it is

11 not --

12            THE COURT:  I think he was.  I think I was the one

13 who was suggesting that we just ought to -- if we're going to

14 do it, I don't want to have to do it more than once.  Let's

15 just send out the proof of claims.

16            MR. BERNICK:  Yes, but --

17            MR. ESSERMAN:  I was agreeable.

18            MR. BERNICK:  Yes, he was agreeable, okay.  So, then

19 we have Brother Lockwood.  And as I understand Brother

20 Lockwood's invitation, he says, is the debtor actually now

21 going to seek to disallow or litigate some of these settlement

22 issues?  And that's an interesting concept but that is not what

23 we're about in the estimation process right now.  It maybe that

24 at some point in this process we get down into whether people

25 are making claims that they believe are settled claims.  If

1 they're settled or not, we have to do something like Babcock

2 and Wilcox.  That's not what we're proposing.

3          All we're proposing is that for estimation purposes,

4 we get the questionnaire information from those people who

5 don't have claims that Grace believes are settled.  So, we want

6 all of those people to be subject to the bar date --

7          THE COURT:  Wait, sorry.  You want information from

8 those people that Grace thinks --

9          MR. BERNICK:  That don't fall into the -- are not

10 part of the group of 25,000 where we agree that they have got

11 settled claims.  In other words, you've got --

12          THE COURT:  So, you want the information from people

13 that Grace thinks have not settled their claims.

14          MR. BERNICK:  That's correct, and -- because if we

15 don't get that information, we don't have a sufficient basis to

16 go -- we don't have the same kind of basis to go forward and do

17 the estimation process.  We are not seeking to litigate at this

18 point --

19          THE COURT:  Okay.

20          MR. BERNICK:  -- the validity of the settlements that

21 they are claiming.  But, we do want to know (a) are you

22 pursuing your claim, and (b) we want the questionnaire filled

23 out so that we've got the information that's necessary.  Now,

24 if they want to tell us, we are only going to pursue the claim

25 if it's a settled claim and we're not going to pursue it if

1 it's not a settled claim, that's also something else they can

2 tell us.  But, Your Honor, we're very much exactly where you're

3 going, which is get the bar date.  We will exclude the people

4 whose claims we recognize are settled and, therefore, need not

5 be considered for purposes of this estimation.  That's all

6 we're talking about is an estimation.  And with respect to

7 everybody else --

8          THE COURT:  I don't think they should be excluded.  I

9 think if you're going to do this, we should get a bar date for

10 all the personal injury people.  If you want to send out a

11 different form that says, Grace thinks your claim is settled,

12 if you agree fill out this form which is a checkoff, yes, my

13 claim is settled, sign it, that's the end of it, okay.

14 Otherwise, if you agree and you think your claim isn't settled,

15 then fill out this other proof of claim form.  I think you

16 should send it out to everybody so that we don't have an issue

17 down the road that somebody didn't get a proof of claim form

18 and should have.

19          MR. BERNICK:  Happy to do that as well.  But, with

20 respect to the questionnaires, that's also part of this bar

21 date --

22          THE COURT:  The questionnaires are a different, you

23 know -- to the extent you think that you don't need the

24 information from someone, it's your choice to send the

25 questionnaires out to who you want to send them to.

**J&J COURT TRANSCRIBERS, INC.**

1          MR. BERNICK:  That's fine.  And we will choose not to

2 send them to people who we believe have got claims that have

3 been settled based on where we are now.

4          MR. LOCKWOOD:  But, Your Honor, I think put your

5 finger on it that the people who believe they have claims that

6 are settled but who Grace disagrees with unless there is some

7 information from Grace that alerts them to the fact of that

8 disagreement are potentially not going to fill out the

9 questionnaire because they think they've got a settled claim.

10 So, Mr. Bernick's or the Court's suggestion to Mr. Bernick that

11 there -- if this sort of request for a proof of claim form,

12 vis-a-vis settled claims, goes out to people who only are the

13 ones that Grace doesn't believe have settled claims, the

14 accompanying materials should have some statement that says, if

15 you have not received a letter from Grace listing --

16          THE COURT:  Your claim as a settled claim.

17          MR. LOCKWOOD:  -- all your client's claims accurately

18 in terms of the fact that they're settled, then as to any

19 client who isn't on the list that you've received from Grace,

20 or if you haven't received any list at all from Grace, you

21 should fill out the proof of claim form as to whether or not

22 you contend you have a settled claim or not.  And then --

23          THE COURT:  Okay.  I think we should make it easier.

24          MR. BERNICK:  You're making it much more complicated

25 --

1           MR. LOCKWOOD:  Well, now wait a minute, please.  It's

2   complicated because I believe that people who -- and Your Honor

3   will have to decide this, but I believe that unlike Mr.

4   Esserman who, you know, it maybe fine and dandy for his client,

5   they got 10,000 claims and everybody agrees they're all

6   settled, there maybe people who believe they have a large

7   volume of claims that are settled that Grace disputes and whose

8   view of the world is, they shouldn't have to fill out a

9   questionnaire about the liquidated character -- the

10  unliquidated characteristics of their claim, B readers, all

11  that kind of stuff, simply because Grace unilaterally has

12  decided that in its opinion, their claim is not settled.  It

13  will be for this Court to determine whether the claim is

14  settled or not.

15          THE COURT:  Well, if I --

16          MR. LOCKWOOD:  And that will impact the estimation.

17          THE COURT:  If I ever have to look at what -- make a

18  determination as to what claims really are settled, then I want

19  the information in my possession to be able to do it.  So, the

20  proof of claim form should go out to everyone.  If it has a

21  checkoff block -- you folks can design it however you choose.

22  I'm not making findings.  I'm just making a verbal suggestion

23  so I can get from A to B, okay, that's all.  Let's say it has

24  something like a checkoff form that says, I settled my claim

25  with Grace on such and such a date, period, and Grace agrees.

1  Then Grace can choose to send out the questionnaire or not.  If

2  it says, I checked -- I settled with Grace on such and such a

3  date and the debtor doesn't agree, then the debtor will send

4  out the questionnaire with a note that says, you say you

5  settled.  We don't have any record of it or whatever.  We don't

6  think you're settled.  So, you know --

7          MR. BERNICK:  Your Honor, I think we must get that

8  even simpler.  We have a record of whose claims we believe are

9  settled.  We will send out the notice and bar date forms and if

10 -- we'll send them out to everybody who was pending at the time

11 the case was filed.  With respect to people -- and they'll have

12 the opportunity to say whether their claim was settled or not

13 in some fashion.  And I think that it really has to be

14 extremely simple so we can just get this thing done.  But, it

15 will basically say it's already -- yes, but that's -- is this

16 the claim form itself?  Okay, so it's the claim form itself

17 already gives them the opportunity.  Thank you.  So, the claim

18 form will give them the opportunity to indicate whether their

19 claim was settled or not.

20         With respect to the people who are in Grace's books

21 as being settled, we will send out the same letter to them

22 saying, they don't have to fill out the questionnaire.  They

23 have to fill out the bar date claim form because otherwise

24 they're going to lose their right, but they only have to fill

25 out the questionnaire for the same reasons that we've indicated

1  before.  However, with respect to everybody else, we believe

2  that they should fill out the questionnaire and, therefore,

3  these materials should read out that you would have to fill out

4  the questionnaire.

5          Now, Mr. Lockwood says it's not fair to have people

6  who believe that their claims are settled.  They have to fill

7  out a questionnaire.  And, frankly, it's not up to them and

8  this is not a question of whether Grace simply says something

9  or not.  We are in the process of gathering information.  If

10 people want to have claims that are pursued in this Court, they

11 have to cooperate in the process of providing information for

12 estimation purposes.  If they don't want to do that, they can

13 simply not do that.  But, they are subject to what the Court

14 has to say.  And the only way that we can go forward and have

15 effective estimation is to have everybody, unless there is a

16 clear agreement that everybody has got their claim as settled

17 is that everybody fill out the questionnaire.

18         And my concern right now is that we're now going to

19 take up yet more time in the calendar getting resolved a fairly

20 simple issue.  And what I would propose, Your Honor, is this,

21 is that we have the materials that are now before you, and they

22 basically say, you've got to fill out this claim form or your

23 claims maybe barred.  We will undertake today to say we'll send

24 out a letter to the 25,000 that we believe are settled saying,

25 you've got to fill out -- you only have to fill out the

1  questionnaire.  With respect to everybody else, our position

2  today, Your Honor, is that they have to fill out the

3  questionnaire.

4         And it really is up to Your Honor to determine

5  whether we want to get information that enables this estimation

6  to go forward effectively.  We're talking about a delta of

7  perhaps thousands of people.  So, the issue really becomes a

8  fairly simple one.  Should it be up to the claimants to say,

9  well, I think my claim is settled, Grace disagrees, so I don't

10  have to answer their questionnaire?

11         THE COURT:  No, I think if the debtor and all parties

12  agree that the claim is settled, then people don't need to fill

13  out the questionnaire.  You'll treat it as a settled claim

14  whatever the settlement value is.  If there is a dispute, then

15  they should still fill out the proof of claim form and the

16  questionnaire because at some point, that litigation will take

17  place.  It may not be before me but it's going to happen.  But,

18  for purposes of valuing the claim, it may make a difference to

19  the experts who have to look at it whether it goes into the

20  settlement bucket or not.  And they ought to know what's

21  disputed.

22         MR. LOCKWOOD:  It may very well, Your Honor, and

23  that's the problem.  Mr. Bernick sits here very eloquently and

24  announces how, oh, it's not our right that the claimant should

25  decide whether the claim is settled.  And instead his proposal

53

1  is, it's right that Grace should be the person that decides

2  whether it's settled.  And if Grace decides it's not settled,

3  the claimants has to fill out a very burdensome form based on

4  the premise that it's not settled.

5          THE COURT:  But, that's the case any time someone has

6  a dispute as to a proof of claim, Mr. Lockwood.  I mean, if

7  there is going to be some challenge to a proof of claim, if the

8  debtor disputes it, that's relevant information for the experts

9  to know.

10         MR. LOCKWOOD:  But, Your Honor, if I filed a proof of

11  claim form for a settled claim -- let's say I say Grace has

12  settled it for $10,000.  The proof, the documents that I attach

13  to my proof of claim form are the documents showing the

14  existence of the settlement.

15         THE COURT:  Right, that's --

16         MR. LOCKWOOD:  They are not the documents showing the

17  underlying merits of the personal injury claimants as to

18  whether there is a B read or an x-ray or a pulmonary function

19  test or something like that.  And Your Honor will --

20         THE COURT:  Mr. Lockwood, if there is -- are

21  settlement documents -- I mean, the debtor may have missed

22  something in its records.  If a person gets a claim form and

23  thinks that it's been settled and has a settlement document to

24  be attached, that's the first thing they ought to attach, the

25  settlement document.  The debtor will then take a look at it

1  and either send the person a letter saying, yes, we agree that

2  your claim form is settled, or else the debtor will say, we

3  don't have a record of this or whatever, you know, whatever the

4  debtor is going to say.  And then --

5          MR. LOCKWOOD:  That's fine, Your Honor.  The way Mr.

6  Bernick was saying it was that if the person didn't receive up

7  front a letter from Grace saying that Grace had already decided

8  their claim was settled, they automatically had to fill out the

9  questionnaire.

10         THE COURT:  No.

11         MR. LOCKWOOD:  That was his proposal.

12         THE COURT:  No, this is the -- this is my ruling.

13 I'm not having any more argument on it.  This is my ruling.  My

14 ruling is everybody is going to get a proof of claim form,

15 everyone.  And it's up to the claimant to make the assertion

16 that the claim has been settled and attach the relevant

17 documents.  If the debtor agrees, the debtor will then send out

18 a letter saying, we agree that your claim is settled.  You

19 don't need to send out the questionnaire.  If the debtor

20 doesn't agree, the debtor will send out a letter that says, we

21 got your proof of claim form saying it's settled.  We don't

22 agree.  Here's the questionnaire.  Fill it out.  Now, that will

23 put everybody on the same page.  Everybody will have all of the

24 same documentation to look at.

25         MR. BERNICK:  And if they get the questionnaire, they

1  are then supposed to presumably fill it out.

2           THE COURT:  Fill it out, that's right.

3           MR. BERNICK:  I'll accept that ruling, Your Honor.

4           MR. LOCKWOOD:  Well, I -- don't the people whose

5  rights are being --

6           MR. BERNICK:  Excuse me, Mr. Lockwood.  Could I

7  continue with what I was going to say and let --

8           MR. LOCKWOOD:  You filibuster routinely, Your Honor.

9  He -- I mean --

10          THE COURT:  All right, let me filibuster.  To the

11 extent that there is some challenge that, you know, the debtor

12 for whatever reason is sending out the letter saying we

13 disagree and the claimants challenges it, they can object to

14 filling out the questionnaire based on the fact that there is a

15 settlement.  I mean, we will some way or another --

16          MR. LOCKWOOD:  Thank you, Your Honor.  I accept that

17 ruling.

18          THE COURT:  But --

19          UNIDENTIFIED SPEAKER:  Your Honor, I wish to preserve

20 that point.

21          THE COURT:  You know, folks, we're going to terminate

22 for the day because, I'm sorry, I'm trying very hard not to be

23 impatient, but I really do want to get through this.  So,

24 please.  My ruling is the proof of claim form is going out to

25 everyone.  The claimant will have the initial obligation to

1 assert to Grace that either the claim has or hasn't been

2 settled and attach the relevant documents.  It will then be up

3 to the debtor and anybody else who chooses to look at these

4 proof of claim forms to agree, but the debtor specifically for

5 this purpose because it's the debtor's estimation process that

6 is driving this at the moment to say, yes, we agree.

7      And if they agree and want to send out a letter that

8 says, you don't have to do anything else, fine.  If they

9 disagree, then why don't we build a notice provision in.  The

10 debtor will give the claimant so many days' notice that says,

11 we disagree.  Here's why.  Okay.  And if you can't get it

12 resolved, they can send out the questionnaire along with the

13 letter, we disagree.  You know, here's why.  Here's the letter.

14 Either come back with the additional information that's

15 necessary or fill out the claim form.

16      If it's still disputed, you know, bring it here or

17 I'll send it to Judge Whalen if he's still willing to talk to

18 you folks after October 29th -- or August the 29th, or we'll

19 work out a process to deal with it.  The purpose is not for

20 allowance or disallowance of the claims at this point.  It

21 doesn't really matter for merit purposes whether they are or

22 aren't settled.  What it matters as to is to what bucket to put

23 the claims into, that's all.

24      MR. BERNICK:  Okay, that's fine, Your Honor.  Let me

25 suggest this by way of a time frame, because we are now talking

1  about more time to work out these materials.  I think that we

2  ought to be able to have an exchange of proposed materials.

3  And then what I'd like to be able to do if possible is to have

4  this thing get scheduled perhaps even in time for the next

5  omnibus.

6           THE COURT:  Fine.

7           MR. BERNICK:  Just so that we get that done.  But,

8  just so we're clear, everybody gets the claim form.  We will

9  have an opportunity for people to fill out indicating whether

10 it's settled or not.  If they believe it's settled, they can

11 attach the documentation.  From experience, Your Honor, I think

12 the issue is not with respect to the claims where there is

13 documentation.  It's with respect to claims where there is not

14 documentation, but we'll find that out.  It then will be

15 incumbent upon the debtor -- and we'll set out a very tight

16 timetable to indicate whether the claim is settled or not and

17 provide notice to the claimant about whether it's settled or

18 not.

19          At that point, my understanding of what Your Honor

20 has said is that we would then at that time send the

21 questionnaire also to be filled out and the claimant would fill

22 out that questionnaire.  We could continue to have a dispute.

23 It may even resolve it about whether the claim is settled or

24 not.  But, they should have to fill out the questionnaire.

25          THE COURT:  What I think I said was the debtor could

**J&J COURT TRANSCRIBERS, INC.**

1  send back some indication to the claimant that said, we

2  disagree that your claim was settled.  Here's why.  Either

3  provide the additional information to us within, you know, so

4  many days, and oh, by the way, here's the questionnaire.  Fill

5  out the questionnaire and return it if you disagree.  If there

6  is a dispute, we'll put it on my next omnibus hearing and I

7  will give you rulings.  If it takes all day long, we'll do ti

8  all day long one by one as to whether it looks as though the

9  claim was or wasn't settled for purposes of estimation.  That

10  means I will look at the documents and say, yes, it appears

11  that the debtor did settle, or no, it appears that the debtor

12  didn't or the claimant or whoever.  But, it's for purposes of

13  estimation only.

14          MR. BERNICK:  Only.  Now, Your Honor, so that I help

15  the Court not get into an endless process, because I think that

16  it could become endless.  The litigation track over whether it

17  was settled or not in Babcock was a very long robust track.

18          THE COURT:  Well, if you've got 25,000 people that

19  you think were settled and the rest are still in the process of

20  litigation, I don't quite --

21          MR. BERNICK:  Well, it ends up being a little bit

22  more complicated, because people assert that there were kind of

23  overall deal deals and there's isn't --

24          THE COURT:  Then let me define settlement.

25          MR. BERNICK:  Well --

1          THE COURT:  Settlement means signed on the dotted

2    line with everything but payment, including the releases

3    haven't been given if that was a demand.

4          MR. BERNICK:  Maybe that will solve this problem.

5          THE COURT:  If there are no releases, if there was no

6    payment, then that's that.

7          MR. BERNICK:  You'll get a chance to talk.

8          MR. PHILLIPS:  Well, I have a right to talk, too.

9          THE COURT:  Gentlemen, neither of you will say

10   another word.  No one in this courtroom will address another

11   person other than me for the rest of this day or your

12   toothbrushes will be needed for another reason other than

13   staying here late tonight.

14         MR. BERNICK:  That's fine.

15         MR. LOCKWOOD:  Your Honor?

16         MR. BERNICK:  Your Honor, so with respect to this, my

17   whole point was to take what then becomes a potential dispute

18   about whether there was a settlement or not and whatever the

19   purpose of that dispute might be.  What I'm saying is it should

20   go off on its own track and not hold up the process of getting

21   the additional information that's necessary for the estimation

22   about the underlying claim.

23         THE COURT:  Well, Mr. Bernick, I'll give you dates so

24   that it will not impede the returning of the questionnaire

25   process.  I'm going to give people who want an opportunity to

1  come in here and say, oh, yes, I did settle and the debtor

2  simply isn't looking at my settlement agreement, a chance to do

3  it.  Frankly, I don't see why that should happen, because if we

4  define settlement to mean you had to have signed the documents,

5  you had to have executed the releases, and everything has to

6  have been finished except the payment, that should make this

7  very easy.

8          MR. BERNICK:  With respect to each individual

9  claimant.

10          THE COURT:  Yes.

11          MR. PHILLIPS:  Your Honor, two points.  First thing,

12  I didn't want to argue the underlying merits, but I wanted to

13  refine what Mr. Lockwood was saying as somebody who is actually

14  filling questionnaires out and also objecting to them whether

15  by script or otherwise.  The issue is if someone disagrees -- a

16  claimant disagrees with Grace that they were settled or not,

17  there is the one issue as to whether indeed they're settled.

18  But, then if they're supposed to fill out a questionnaire,

19  there's a second issue there that maybe needs to be addressed

20  at the hearing we're having on questionnaires, because the

21  response is going to be from us and from similar law firms, we

22  don't believe the client should have to fill out a

23  questionnaire if the client -- if Grace participated in the

24  case, Grace deposed the witness, Grace was supplied with all

25  the documents and so forth.

1          THE COURT:  No, no, I'm not going there.

2          MR. PHILLIPS:  We're not going there.

3          THE COURT:  They're to fill out the questionnaire.

4          MR. PHILLIPS:  Right.  The other point, Your Honor --

5          THE COURT:  This is a bankruptcy case.  I don't care

6  what they said in the tort system.  I want to know for proof of

7  claim purposes what they're alleging here, and that's what the

8  questionnaire does.  So, that will not -- I will not go there.

9          MR. PHILLIPS:  All right, Your Honor.  But, I'm just

10 advertising -- not everyone is here, but I'm just -- I was just

11 trying to raise for Your Honor that that's the second issue

12 that I think --

13         THE COURT:  Well, that wouldn't --

14         MR. PHILLIPS:  -- Mr. Lockwood was alluding to that

15 people -- whether it's meritorious or not, Your Honor, that was

16 the argument that was going to be made.  But, the second point,

17 Your Honor, was just to clarify Your Honor's earlier statement.

18 If a claimant believes its claim is settled with Grace wouldn't

19 the controlling issue be whether or not under that state's

20 substantive law the case was settled on?  I mean, I don't know

21 what the law in Texas applies, what the law of Illinois.  But,

22 presumably there maybe differences as to whether a claim or not

23 is settled, a tort claim under that state's settlement law

24 because states do different --

25         THE COURT:  There maybe differences.

**J&J COURT TRANSCRIBERS, INC.**

1          MR. PHILLIPS:  Right.

2          THE COURT:  But, it would seem to me that unless

3   there are signed and sealed documents signed -- documents that

4   indicate that in fact there was a settlement, and everything

5   has been done preparatory to the debtor making the payment,

6   then it's been settled.  Otherwise, it hasn't been settled.

7          MR. LOCKWOOD:  Your Honor, I would urge you not to

8   make a ruling today on the issue of what it takes to be settled

9   as a matter of bankruptcy law.  As Mr. Bernick pointed out,

10  we've litigated this for two or three years in Babcock and

11  Wilcox.  We start out with the proposition to remember that

12  claims -- the validity claims are determined under state law.

13  And the question of whether you've entered into a contract,

14  which is what a settlement is, may vary as to whether or not --

15  and for example, a release maybe regarded as a condition

16  subsequent in many states to the -- to an enforceable

17  settlement agreement.  As Grace's own papers that they filed on

18  this issue have said, the question is, do you have a binding

19  and enforceable settlement agreement under state law that may

20  or may not require a release?  So, I'd urge you not to do that.

21         The other thing is Mr. Bernick and I have had a

22  little bit of sidebar conversation while you and Mr. Phillips

23  were talking.  I have -- there's some language issues about

24  some of their -- the wording here that was my second issue

25  which we're going to talk about later.  We'll try and see if we

1  can come up with something, and hopefully Mr. Phillips would

2  have an opportunity to look at the proposed language, and Mr.

3  Esserman.  And by the time of the next omnibus, I believe we

4  can have something that will -- and hopefully even before then

5  maybe Grace could file under a certificate of counsel, because

6  we now understand Your Honor has made the ruling on the scope

7  of the bar date.  And that's the, you know, kind of critical

8  feature of this.

9        THE COURT:  All right.  I agree with you, Mr.

10 Lockwood, that the issue is to be determined under state law.

11 If in fact the release is a condition subsequent somewhere and

12 that's not a component to the settlement, then I have no

13 problem defining it as a binding contract, but it has to be in

14 writing.  I don't care whether the underlying -- well, it says

15 it can be oral.  For my purposes in bankruptcy, that oral

16 contract would be the equivalent of a secret agreement.  It

17 will not be enforced and it's not going to be considered to be

18 a settlement.  So, if it's not in writing, it's not going to be

19 considered a settlement.

20       MR. LOCKWOOD:  Can I reserve my rights under

21 bankruptcy law?

22       THE COURT:  For something other than the estimation

23 hearing, yes.  But, for purposes of the estimation hearing,

24 that's the way I'm going to rule.

25       MR. LOCKWOOD:  Okay, thank you, Your Honor.

**J&J COURT TRANSCRIBERS, INC.**

1              THE COURT:  Okay.

2              MR. BERNICK:  But, that is not very different from

3  where it ultimately ended up in Babcock, actually for all

4  purposes in Babcock.  I think maybe Your Honor's guidance will

5  also expedite the process of responding to the bar date.

6              MR. LOCKWOOD:  On his third item, Your Honor, the CMO

7  --

8              MR. BERNICK:  Yes, that's what I was going to get --

9              MR. LOCKWOOD:  We don't have any disagreements.

10             MR. BERNICK:  Okay.

11             MR. LOCKWOOD:  It's okay.

12             MR. BERNICK:  Okay.

13             THE COURT:  Okay.  I think I had a question about the

14 CMO and I don't think I brought it.  I think it had to do with

15 the dates.  Somehow on the delays that have happened as the

16 result of the mediation and otherwise, I've gotten myself

17 confused between what's happening on the personal injury

18 litigation side and what's happening on the property damage

19 litigation side.  And something in the PI proposed CMO led me

20 to conclude that I maybe confused about when you're expecting

21 to go to trial on the PI estimation versus the PD estimation.

22 So, can --

23             MR. BERNICK:  Yes, it's the personal -- the personal

24 injury estimation time line is basically contemplates a trial

25 that would be after the PD trial.

1          THE COURT:  Okay.  Do you know when?

2          MR. BERNICK:  Yes, it has to be set.

3          THE COURT:  June?

4          MR. BERNICK:  According to this time line, I think we

5  meet in June to talk about the actual second.  I think about

6  June 4th replies to the pretrial motions for PI estimation is

7  due -- when is the last date though, Jan?  Yeah, Paragraph 8 is

8  the operative paragraph, "Ordered that a preliminary pretrial

9  conference on the asbestos PI estimation shall be held at the

10 first omnibus hearing after April" -- and April is blank -- "at

11 which time the Court may set a final pretrial conference date

12 in May and a trial date in June, 2007."

13         THE COURT:  All right.  Now, I know it's awfully

14 early.  How many days are you expecting to need reserved for

15 the PI estimation trial?

16         MR. BERNICK:  I really -- how long did Babcock take

17 us all together?

18         MR. LOCKWOOD:  A week.

19         MR. BERNICK:  No.

20         MR. LOCKWOOD:  That was -- the PI estimation was

21 really embedded in the confirmation process.

22         MR. BERNICK:  I know.

23         MR. LOCKWOOD:  And so, it really is --

24         MR. BERNICK:  Yes, I think it's going to take us

25 probably --

1    MR. LOCKWOOD:  You can't say -- it took four weeks

2 for the whole thing, but that clearly is way beyond --

3    MR. BERNICK:  Well, I know, but it was very sporadic,

4 Your Honor.  I would think that this is just rough ball park.

5 You're probably talking about eight days, eight trial days.

6 But, you know, I know I'm --

7    THE COURT:  How many witnesses are you expecting?

8    MR. BERNICK:  Well, it's not that there will

9 necessarily be that many witnesses.  It's the testimony at

10 least on estimation itself is pretty complicated testimony.

11 Those witnesses take awhile.  And -- well, you know, you're

12 going to have experts talking about the medical issues, then

13 experts talking about the exposure issues, then experts talking

14 about estimation modeling.  And the estimation -- maybe eight

15 is too many, maybe it's more like six.  But, I don't want to be

16 accused of low balling the thing either.  It just takes time to

17 go through -- I don't know if Elihu has a different sense.

18    MR. INSELBUCH:  I don't know whether Mr. Bernick is

19 included within his estimated time the time for our witnesses

20 on what we'll --

21    MR. BERNICK:  Yes.

22    MR. INSELBUCH:  Well, then I think he's a little off.

23 From the experience --

24    THE COURT:  We did the entire Combustion Engineering

25 trial in nine days including the estimation.

**J&J COURT TRANSCRIBERS, INC.**

1          MR. BERNICK:  Well, the estimation was -- well, there

2 were two estimation witnesses -- only two estimation witnesses

3 really.

4          MR. INSELBUCH:  But, there was no contest about the

5 estimation.

6          MR. BERNICK:  Well, there was a contest but it wasn't

7 the same kind of contest.

8          MR. LOCKWOOD:  There wasn't a methodology contest.  I

9 mean --

10          THE COURT:  Well, that's true.

11          MR. LOCKWOOD:  -- your estimation, Your Honor, you've

12 chosen not to decide which methodology.

13          THE COURT:  That's right.

14          MR. LOCKWOOD:  So, if Mr. Bernick's client had been

15 putting on one methodology --

16          THE COURT:  Yes, that's true.

17          MR. LOCKWOOD:  And Mr. Inselbuch will be putting on a

18 different methodology, and the ships will be passing in the

19 night --

20          THE COURT:  Okay.

21          MR. LOCKWOOD:  -- and at the end of the day, Your

22 Honor is going to have to sort that out.

23          MR. INSELBUCH:  I can tell Your Honor that we've just

24 done three estimations on our theory of the case in other of

25 these bankruptcies, and they require somewhere between three

1  and five days --

2          THE COURT:  Okay.

3          MR. INSELBUCH:  -- for our presentation, plus the

4  cross examination that comes with it.

5          THE COURT:  All right.  Then let me ask this

6  question.  Is it better for your schedules -- I can't block off

7  five trial days a week because I have to have a motions day.

8  If I can do something this far in advance that gets you four

9  days of trial, you know, for three weeks in a row --

10          MR. BERNICK:  Yes, that would be ideal.

11          THE COURT:  -- is that what you prefer, or do you

12  want to -- is three days better because --

13          MR. BERNICK:  No, I think -- you know, Your Honor

14  might try that many cases, and the more time that's created in

15  between the trial days, the longer the trial goes.

16          THE COURT:  Well, here's going to be the deal though.

17  I am not going to accept filings that are coming in on CMECF

18  while I'm sitting on the bench related to the trial.  I'm not

19  going to do it because that drove me nuts in Combustion

20  Engineering.  I can't read, listen to the witnesses, pay

21  attention to the documents, take notes and figure out what the

22  heck is going on in the case at the same time I'm trying to get

23  new documents being filed on CMECF.  So, it's not going to

24  happen.  I'm not taking trial documents.  Does that change

25  anybody's view about how long this is going to take?  Because

1 if you're going to make filings, I'm not going to pay attention

2 to them while the trial is going on?

3         MR. INSELBUCH:  No, you should impose on us the

4 obligation to provide a sensible pretrial order that will

5 provide for the submission agreement on all documents, all

6 exhibits well in advance of the trial.

7         THE COURT:  I will do that and I will expect this

8 time it's going to be live with.  So, okay, Mona, next project.

9 Can you see if you can get me -- I can't guarantee that I can

10 give you four days three weeks in a row.  I can't promise that.

11 I'm going to have to have Delaware dates, Virgin Island dates,

12 Chapter 13 dates, normal motions days.  So, I'll see what we

13 can do.  We'll try to work out a schedule now.  What I can't

14 give you today, Mr. Bernick, is when the omnibus hearings will

15 be for Delaware for next year.  I just got the final

16 information in on Friday from all of the cases and I haven't

17 had a chance to put it together yet.

18         MR. BERNICK:  That's fine.  So, what we did -- and I

19 just showed this to Mr. Lockwood -- is on Paragraph 8, it says,

20 "During the preliminary pretrial conference that will be held

21 on the first omnibus hearing after April 2."

22         THE COURT:  Okay.

23         MR. BERNICK:  It's just a date.  So, this order is

24 not -- doesn't require that you be able to discuss or have

25 discussed claims, but the actual last omnibus hearing date is

1 that we'll comply with the --

2          MR. INSELBUCH:  One request for the hearing is that

3 we do all of it in one city.

4          THE COURT:  I beg your pardon?

5          MR. BERNICK:  City.

6          MR. INSELBUCH:  One city.

7          THE COURT:  Oh, city.  I thought you said sitting.  I

8 didn't think I could quite do that, Mr. Inselbuch.

9          MR. INSELBUCH:  Well, with the disclaimers the judge

10 gave us before, I'm not surprised.  But, it would be very

11 difficult if we had to move -- we understand the complexities

12 of your schedule.  But, if at all possible, we would need a war

13 room to work out of somewhere.

14          THE COURT:  Oh, absolutely, yes.  No, it will be done

15 in one city.  That's why I can't promise that I can give you --

16          MR. INSELBUCH:  Understood.

17          THE COURT:  -- four days in a row that many weeks in

18 a row.

19          MR. INSELBUCH:  Understood.

20          THE COURT:  So, it will be in Pittsburgh.  I can tell

21 you that now.

22          MR. BERNICK:  That would be the safe bet.

23          THE CLERK:  Judge, when do you want me to start

24 looking?

25          THE COURT:  June, after June 4th.  The final

1  pretrials are due June 4th?

2          MR. BERNICK:  No, it's the -- the final pretrial is

3  supposed to be in May.  The trial is supposed to be in June.

4          THE COURT:  Okay, some time in June.

5          MR. BERNICK:  You want, Your Honor, to take a break

6  and then do PD?

7          THE COURT:  Well, I want to not leave this CMO issue

8  yet.  What you just handed me is the agreed upon CMO order?

9          MR. BERNICK:  Yes, the same CMO that we --

10          THE COURT:  Okay.  Let me take a look at this first

11  and make sure I didn't have any other problems.

12                      (Pause)

13          THE COURT:  All right.  Well, here's the other

14  problem possibly with the June trial date, and that's the fact

15  that you're talking about motions in limine, Daubert motions

16  and so forth filed not later than May 4, which would get them

17  probably argued in June.

18          MR. BERNICK:  Yes, but I think that if we're talking

19  about a bench trial, I don't know that that is wholly

20  inconsistent.  That is to say if we got those briefed and then

21  argued, I think that the ability that we have to basically

22  factor that into the estimation wouldn't be -- you know,

23  wouldn't be that difficult to do.  I'm trying to think through.

24  That's basically a standard deal to preserve opportunities.  To

25  a certain extent the Daubert arguments are -- I think there

1  will probably be some motions in limine that ought to be taken

2  up actually before the trial even starts.

3      But, because we're talking about a bench trial, I

4  don't know that it's as critical to get all the motions in

5  limine resolved before the trial starts.  There is no jury

6  here.  And while I don't want to bite off a principle that I'll

7  later regret because it's too general, I think that there

8  probably are -- there's going to be a difference between things

9  that we don't want to have even be part of the trial from the

10 get go as opposed to arguments that would go to the

11 admissibility of evidence that Your Honor can take up during

12 the course of the trial itself.

13     THE COURT:  Okay.  But, even if I take them up in the

14 course of the trial, this is talking about responses 21 days

15 after that.  So, let's say that's May 25th.  And then replies

16 ten days after that.  That's June 5th.  So, we're already into

17 the beginning of June -- excuse me -- just to get the pleadings

18 filed let alone just to try to get the arguments set.  Now, I'm

19 not opposed to using, you know, the opening day of a trial to

20 the extent we have to do something in advance for that purpose.

21     MR. BERNICK:  What I would suggest, Your Honor, is

22 let's get the thing entered if we could today.  And then if

23 there's some fine tuning there, we can take it up.  I don't

24 think that's going to be --

25     THE COURT:  But, the problem -- pardon me, Mr.

1 Bernick.  The problem is going to be that when I commit three

2 weeks of my schedule, there is not going to be any change, not

3 for reason of births, deaths, marriages, vacations, nothing.

4 That is going to be the trial.  People will change their

5 schedules if need be.  That's it.  So, there will not be a

6 change.

7                    MR. BERNICK:  That's fine.  That's the intent.

8                    THE COURT:  Okay.

9                              (Pause)

10                   THE COURT:  Okay, all right.  Let me finish reading

11 this first.  I want to go back and look at the calendar myself

12 before I commit these dates in June.  So, we will take a

13 recess, but let me finish going through this case management

14 order and make sure I don't have any other issues first.

15                             (Pause)

16                   THE COURT:  Okay.  I would like to make one change.

17 It says, "Copies of all" -- this is in Paragraph 14, Page 6,

18 talking about the pretrial stipulations.  It says, "Copies of

19 all exhibits to be offered and all schedules and summaries to

20 be used as the asbestos PI estimation hearing and stipulations

21 regarding the admissibility of same," I want them all premarked

22 for identification.  I do not want to waste time at trial

23 marking exhibits.  So, when I -- I'm going to say copies of all

24 exhibits to be offered and all schedules and summaries to be

25 used at the asbestos PI estimation hearing, I'm going to insert

1  premarked for identification.  And I take it I don't need to

2  have you people put them in binders or some appropriate --

3  right?  You'll just do that.  Thank you.

4        And with respect to stipulations regarding

5  admissibility, that's fine.  If you're going to stipulate to

6  admissibility, I actually would prefer to know what the

7  objection is.  So, if there is an objection, I'd like to know

8  what it is.  If it's relevance, I probably can't deal with that

9  until the witness is on the stand.  But, if it's something else

10 like authenticity, you ought to know that so you can be

11 prepared to have appropriate witnesses present.  So, I would

12 like to add a paragraph, Roman Numeral 4 under 14 that says,

13 objections to exhibits.  And I think that should be sufficient.

14 You should be able to state what the objection is.  Do you need

15 something more other than that?

16                    (No verbal response)

17        THE COURT:  Okay.  Paragraph 17 says that without any

18 further order, you can change deadlines.  Frankly, you can

19 change all deadlines except the date that the stipulations --

20 the pretrials are due, the final pretrial conference and the

21 trial dates.  I will not permit those to be changed because I

22 need those as well.  So, I'll add, "the deadlines specified

23 herein except the dates to file pretrial stipulations, the date

24 of the final pretrial conference and the trial dates" can be

25 extended by all of you by asking anything of the Court.  Then

1  it says, "I'm taking jurisdiction."  I'm going to add a

2  Paragraph 19 that says, "The trial will commence in Pittsburgh,

3  PA on" and I'll give you the date when we come back from our

4  recess.  We'll take a recess for ten minutes.

5                      (Recess)

6          THE COURT:  Okay.  I'm sorry that took so long.  It

7  just took me awhile to verify what was and wasn't on the

8  calendar.  So, these are the dates that I have.  We could start

9  June the 13th, which is a Wednesday.  You could have the 13th,

10 14th and 15th.  The next week starts with Monday the 18th.  You

11 can have the 18th, 19th, 20th and 21st.  The next week I have

12 to have an omnibus date for all hearings.  The 25th is Monday.

13 So, I'm going to do omnibus hearings in Pittsburgh on the 25th,

14 which will include Grace if Grace has any omnibus hearings that

15 day or you can defer them if you choose, whatever.  Then I'll

16 give you the 26th, the 27th, the 28th and the morning of the

17 29th.  I can't give you the afternoon.  That is ten and a half

18 days.  I think that should be enough.

19         MR. BERNICK:  That would be enough time for the

20 debtors.

21         THE COURT:  Anybody have an objection?  This is a

22 speak now or forever hold your peace deal.

23                 (No verbal response)

24         THE COURT:  Okay.  Then let me put this -- trial will

25 commence in Pittsburgh on June 13th, 2007 at 9:00 a.m. and be

1 continued from day to day thereafter as the Court determines.

2 That's all I'm putting in this order because I think a separate

3 pretrial order will probably have to go out at some point that

4 will lay the days out anyway.  Is that acceptable to everyone?

5                    (No verbal response)

6           THE COURT:  Okay.  To review, June 13 through 15, 18

7 through 21, 26 through 28, and the morning of the 29th.  Okay,

8 let me put those onto this proceeding memo first, too.

9           MR. BERNICK:  Your Honor, thank you for making that

10 time available.  Turning to --

11           THE COURT:  Wait, Mr. Bernick.

12           MR. BERNICK:  I'm sorry.

13           THE COURT:  Let me put them on my proceeding memo

14 first, please.

15           MR. BERNICK:  Sure.

16                         (Pause)

17           THE COURT:  Okay.  Yes, sir.

18           MR. BERNICK:  Turning to the property damage aspect

19 of the proceedings this afternoon, we have a status report on

20 what the current -- play is on the different claims.  There's

21 no actual docket item -- agenda item for that.  That's kind of

22 Roman 2 under PD.  We then have a motion that was filed by the

23 debtor that deals with the procedure -- certain procedural

24 aspects of the property damage estimation.  And it also

25 includes the issue of what should happen with Canadian claims.

                    **J&J COURT TRANSCRIBERS, INC.**

1 Then we have the CMO and that presents a discrete issue of

2 scheduling.  And then there are some other miscellaneous

3 matters that are set forth in Docket 13.

4         What might make sense, Ms. Browdy is going to give

5 the Court a status report.  I will note that Ms. Browdy, to my

6 firm's great loss, is going on to greener pastures and this

7 will be her last time here.

8         THE COURT:  Oh, what's greener?

9         MR. BERNICK:  I know for some it maybe hard to

10 imagine, but it's actually blue.

11         MS. BROWDY:  Your Honor, I'm going in-house to IBM.

12         THE COURT:  Oh, well, congratulations.

13         MS. BROWDY:  Thank you.

14         MR. BERNICK:  In any event, Brother Restivo here is

15 going to be playing a much more prominent role in connection

16 with the property damage claims.  As Your Honor well knows he's

17 the person from Grace who is most expert in property damage

18 issues.  But, we will of course find it very difficult to do

19 without Ms. Browdy.  In any event, she's going to give a status

20 report that just goes through how the claims break out.  And

21 then I think we should take up the procedures motion, the part

22 of it that deals with estimation procedure.  And I'll be

23 prepared to speak to that, and then maybe Mr. Baena and others

24 for the property damage committee can respond being they had to

25 respond to the status as well as the procedures motion.  We can

1  then go on and do Canada and the CMO.

2          THE COURT:  All right.  Ms. Browdy?

3          MS. BROWDY:  Thank you, Your Honor, Michelle Browdy

4  for the debtors.  There are a number of property damage issues

5  up, and I thought it would be helpful just to orient ourselves

6  just briefly to run through where we are in the claims.  This

7  is the latest iteration in the bar charge that the Court has

8  seen many times before.  The claims basically still fall into

9  three major chunks:  the U.S. traditional claims, the Canadian

10 claims and the Category 2 claims for milling and mining related

11 operations.

12          The core that we'll be dealing with, and you'll be

13 hearing more argument on today, are these U.S. traditional

14 claims.  You'll see that Mr. Speights has 177 of those claims,

15 Mr. Dies has 160 of those claims, 99 of those are Louisiana

16 school claims, and there are 65 claims that were filed by

17 anyone else.  And those aren't represented by 65 separate

18 claims.  There's eight Prudential claims and ten State of

19 California and the like.  So, you're really down to a very few

20 number of counsel representing these PD claimants.

21          The only Canadian claims remaining have been filed by

22 Mr. Speights.  And you'll hear again in a few minutes that we

23 believe the proper procedure for that is to send them up to

24 Canada to be adjudicated.  And there's only 109 of these

25 Category 2 claims remaining.  The Minnesota stigma claims that

**J&J COURT TRANSCRIBERS, INC.**

1    were argued in January that's fully briefed.  It's under

2    submission.  We're waiting for a ruling on that.

3              THE COURT:  That ruling I hope to get out next week.

4              MS. BROWDY:  Thank you, Your Honor.  And then some

5    claims related to Libby that I think we'll be moving on as

6    well.  But, this is the universe now of the PD claims.

7              THE COURT:  Okay.

8              MS. BROWDY:  And then I thought it would be helpful

9    again just for tracking purposes that we're really moving on

10   about five different litigation tracks.  They're all

11   interrelated but they address these claims.  First, we started

12   out with the 13th omnibus objection, which was objecting to Mr.

13   Speights authority to file claims.

14             MR. SPEIGHTS:  Your Honor, could I -- I hate to

15   interrupt.  Are we going to get copies of what she's putting --

16             THE COURT:  I hope so, Mr. Speights.

17             MS. BROWDY:  Yes, you will.

18             MR. SPEIGHTS:  -- because I'll just sit back and be

19   quiet if I'm going to have this package.

20             MS. BROWDY:  Yes, you will.

21             MR. SPEIGHTS:  Thank you.

22             MS. BROWDY:  The omnibus --

23             MR. BAENA:  Could I trouble counsel for a copy of

24   that now?  I can't read it.  I apologize.

25             MS. BROWDY:  I need to be able to read it.  I'll give

1  you my copy when I'm done.

2          MR. BAENA:  Oh, okay.

3          MS. BROWDY:  Okay.  But, the 13th omnibus objection,

4  Docket 9311, objected to Mr. Speights' authority to file

5  claims.  We started out objecting to almost 3,000 claims.

6  We're now down to 60 that we have remaining objections, and

7  those are all set for argument today.  The second track, which

8  is the 15th omnibus objection, Docket Number 9315 on September

9  1st of 2005, we tried to register all of our substantive

10  objections to all property damage claims.  And through the

11  January hearings that we had -- remember three days in

12  Pittsburgh -- we've really gotten through almost every single

13  of those objections that you're not going to need to take

14  testimony on.

15          There's some follow-up handful issues that we'll be

16  setting for omnibuses going forward.  But, for the most part,

17  everything that is nonevidentiary has been dealt with.  And

18  that's why, again, you'll hear me suggest wrapping the rest of

19  those objections into estimation.  The third track is

20  Estimation Phase 1, which is the Daubert hearing on dust

21  sampling methodology.  The fourth track is Estimation Phase 2.

22  And then the last track, and I'll call it that, is Mr.

23  Speights' attempt to file a new class on behalf of the Anderson

24  Memorial claimants.

25          THE COURT:  Don't give it away yet.

1          MR. BERNICK:  Your Honor, we will be furnishing a

2    copy of this whole status report as well.

3          THE COURT:  Okay.

4          MS. BROWDY:  Thank you, Your Honor.  I though it

5    might be instructive to give us a flavor particularly for the

6    U.S. traditional claims how these litigation tracks that we're

7    talking about marry up with the existing claims.  So, you'll

8    see in the first column we have the 501 remaining U.S.

9    traditional claims.  The second column shows you there's a

10   handful roughly 60 claims that are affected by the 13th omnibus

11   objection.  Those are Speights' claims other than California

12   University claims that we don't believe that he had timely

13   authority to file.  And again, we'll be addressing those in a

14   few moments.

15         The last three columns as you've seen we've indicated

16   they're implicated by both the 15th omnibus objection and Phase

17   2.  And again, this is spelled out at some length in the

18   procedures brief that Mr. Bernick will be arguing.  But, the

19   three substantive arguments that are implicated by the 15th

20   omnibus that we haven't brought on for a hearing yet because

21   it's going to require testimony and the like are issues that go

22   to hazard, issues that go to product identification, and issues

23   that go to statute of limitations.  And you can see that we're

24   working on marrying it up the objections that we registered

25   through the 15th omnibus.  You can see again which of these key

82

1  objections match up to which claims.  So, the same out of a big

2  picture issues that you'll be addressing substantively as part

3  of Estimation Phase 2 also then tie back exactly to specific

4  claims, and the claimants have been on notice since September

5  1st of 2005 which objections we are registering to their

6  claims.

7          Okay.  And then last item I have here is just to run

8  through some of the open items that I wanted to make sure that

9  we didn't lose track of.  The first was the Minnesota stigma

10 claims, which the Court has indicated you'll be ruling on.  The

11 second, we had argued at the January hearings that 224 of Mr.

12 Speights' 291 Canadian claims had no product ID at all.  It

13 wasn't a matter of us disputing whether it was sufficient.

14 There was simply none.  The Court gave Speights until March

15 10th, which then became April 28th, to provide product

16 identification.  On the 28th of April, we got roughly 33

17 supplemental responses.  So, that means here's 191 claims with

18 no product ID that we think ought to be disallowed and

19 expunged.

20          And I'm happy to tee that up now.  We gave a proposed

21 form of order to Mr. Speights.  And, in the alternative, we've

22 also said, take until August 3rd.  Tell us if you have

23 anything.  And if not, we can set it on the agenda that we

24 submit on August 4th and have a ruling on the merit on August

25 21st.  Now, I thought we had agreement on that and now I'm not

1  sure.

2           THE COURT:  Mr. Speights?

3           MR. SPEIGHTS:  I have a lot of things to say, Your

4  Honor.

5           THE COURT:  You want to wait?  Okay.

6           MR. SPEIGHTS:  I'm waiting to go through them.

7           THE COURT:  All right.

8           MS. BROWDY:  Okay.  Well, again, we think it would be

9  appropriate to disallow them now.  But, as a courtesy, again,

10  we are prepared to set it for the merits --

11           MR. SPEIGHTS:  Well, if the time has not run now,

12  Your Honor, the question is when does the time run?

13           MS. BROWDY:  Well, the time ran for every other

14  claimant, Your Honor, three years ago.  We think that Mr.

15  Speights has had more than enough time and that's, again, why

16  we went ahead and put this on the agenda.  How long are we

17  going to wait for almost 200 claims?  That's almost 25 percent

18  of the remaining claims.  There's no product identification.

19  Why are we wasting time on them?

20           Item 3, again, we wanted to remind the Court of.  It

21  was an issue that came up at the January hearings.  Question 18

22  on the questionnaire required claimants to answer, "When did

23  you first know of the presence of asbestos in the property of

24  the Grace product for which you are making this claim?"  And as

25  we set out and argued at the January hearings, we believe Mr.

84

Speights went ahead and answered 2003 for that, even without --
even for the claims that he submitted on behalf of claimants we
learned later he didn't represent.

We thought that was not a correct date.  The Court
ordered Speights to get signatures from every single claimants
to answer that question.  We still don't have it.  We don't
have a single response.  Mr. Speights again was originally
given to March 24th and then to May 26th.  We don't have a
single signature answering this question.  How long are we
going to drag out this process?  So, again, our proposal was
let's have until the 3rd.  So, if we don't have answers, we'll
set it when we submit the agenda on the 4th and have merits
argument on the August 21st omnibus.  Again, it does not seem
like it's a burden to Mr. Speights.  Everyone else was able to
answer this by 2003.

Two other issues we need to set a briefing schedule
on.  There were Georgia and Tennessee claims that we argued in
January, Your Honor, that originally were going to be set with
some follow on briefing for the May omnibus hearing.  We've
suggested dates in August, again, an August 4th response and an
August 11th reply.  So, we could set that up for the August
21st hearing.

THE COURT:  I'm sorry.  Which are these, the choice
of law?

MS. BROWDY:  There were choice of law claims.

1  Remember, he had buildings in Georgia and Tennessee that

2  essentially have essentially a statute of repose which is long

3  past.  And there was an argument whether it was actually

4  Georgia or Tennessee law that applied.  And it actually

5  originally came up in the context of Prudential's claims.  So,

6  we argued it in January.  There was a request for additional

7  briefing.  It was again originally set for the May omnibus and

8  we need to get that back on calendar.

9       The same thing for the Prudential Georgia claims

10 where we had argued that they were barred under Georgia statute

11 of limitations.  Prudential argued that Georgia was not the

12 proper state to look to.  So, for them as well there was an

13 additional briefly schedule that had led to the May omnibus

14 hearing.  And we have proposed with them as well briefing in

15 August and setting it for the hearing at the August omnibus.

16 Again, we don't have court dates on that.  And then the last

17 open item that I have on the PD side is getting the new CMO

18 dates, but that's going to be handled as a separate line item.

19 So, the main things for us right now are these -- the Speights'

20 Canadian claims, the answer to Question 18 and a briefing and

21 argument schedule for the Georgia and Tennessee claims.

22      MR. BERNICK:  Your Honor, I believe if I'm not

23 mistaken that the items that appear on this last list that Ms.

24 Browdy displayed before the Court are also encompassed as

25 matters to be heard under Item 13 of the agenda.  So, our goal

1  was to lay all this out but --

2            THE COURT:  The choice of law issues, you mean?

3            MS. BROWDY:  Yes.  Actually, I don't believe -- we

4  had under Roman 2 on the status report the Canadian claims and

5  the Speights' responses.  We can certainly wrap it back into

6  the miscellaneous at that --

7            MR. BERNICK:  Yes.  What I would propose is that we,

8  presuming that Mr. Speights says that he will want to address

9  this, is that we talk about the procedures motion now and then

10 have argument on the procedures motions, then do the CMO and

11 maybe Mr. Speights could address all of the -- some of the more

12 specific items, and that would be appropriate.  We'll then

13 proceed to the procedures motion which ties back in actually --

14           MR. SPEIGHTS:  Well, Your Honor, I really think I

15 should respond since I said I would to just the overview of my

16 claims.

17           THE COURT:  That's fine.

18           MR. SPEIGHTS:  I had not planned to respond.  But, I

19 didn't know that we were going to go --

20           MR. BERNICK:  Well --

21           MR. SPEIGHTS:  -- as far as we did.

22           MR. BERNICK:  Well, are we going to get -- okay.  I

23 guess I'm wondering are we going to resolve -- are you going to

24 hear substantive argue on this?

25           MR. SPEIGHTS:  No, this point --

1          THE COURT:  No, okay.  Go ahead, Mr. Speights.

2          MR. SPEIGHTS:  And I really hadn't planned to respond

3   at this point, Your Honor, but -- and I would like to state

4   that I would like a copy of what was shown.  I could not read

5   it back there -- and sometimes lawyers -- I probably do it, too

6   -- leave the courtroom and can't remember what was shown to the

7   Court.  But, I'm sure Mr. Baena would like a copy of

8   everything.

9          THE COURT:  So would I, Mr. Speights, so.

10          MR. SPEIGHTS:  And I would like a copy of everything.

11          THE COURT:  So, the debtor will submit copies.

12                        (Pause)

13          MR. SPEIGHTS:  Let me give my overview which is not

14   quite as fancy -- it was done on the 12-hour train ride last

15   night -- to give you my perspective on where we are on Speights

16   and Runyan claims.  Claims filed as of the 13th objection,

17   there are a total of 2,701 by my calculation.  I'm sure I could

18   be off a few.  I'm quite confident the debtor is substantially

19   off, because as you recall in Pittsburgh, the debtor

20   acknowledged that their processing route was to whoever for

21   counting amended claims as new claims and the numbers got

22   changed some.  In addition, as of the time they filed their

23   13th objection almost a year ago -- they talked about it about

24   this time last year and filed it the first of September -- my

25   total comes to 2,701.

                    **J&J COURT TRANSCRIBERS, INC.**

1          And I have broken those down as California colleges,

2   that's both the Board of Regents and the University of

3   California -- excuse me, Cal State, 1,275, and this under a

4   very broad umbrella of 1,423.  There were two class claims, one

5   for the South Carolina class and one for the putative class.

6   And there was one on Pine Street which had been litigated

7   against Grace for a number of years.  And, of course, Grace a

8   year ago suggested that all of these claims should be thrown

9   out by that 13th objection because there was no authority to

10  file these.

11          And as now -- we now know, first of all, Pine not

12  only was a filed case but we had a tolling agreement with Grace

13  before it was ever filed.  And after several nasty letters,

14  they finally withdrew the authority objection to that.  The

15  California colleges, 1,275, we had retainer agreements with

16  both the Board of Regents and with Cal State.  And after Your

17  Honor expressed your view on that issue, they withdrew the

18  authority objection to that.  And then we have the Anderson

19  situation, which I'm going to discuss in a minute, but roughly

20  2,701 claims.

21          Then -- that's September.  Now it's October, Your

22  Honor.  And I called Grace.  And I called Grace and I suggested

23  that as I had talked to Mr. Beaver -- Mr. Beaver is the former

24  general counsel of Grace.  I had talked to Mr. Beaver about it.

25  I thought we had an understanding about all the conspiracy

1   claims, that we would put them on the shelf.  This is before

2   war was declared on Speights and Runyan.  And in any event, in

3   October I had a discussion with Grace and I said, I will

4   withdraw all those conspiracy claims.  What are we doing?  My

5   concern is that other people might get paid for conspiracy and

6   I don't.  I'll withdraw all of the U.S.A. conspiracy claims at

7   that time because you've taken the position conspiracy claims

8   should not be paid and this is not 100 percent plan.  So, I

9   agree that the people with product isn't -- not as a matter of

10  law but as a matter of my view of what's fair in a bankruptcy

11  that I'll withdraw the conspiracy claims.

12          And so, we entered a stipulation, Your Honor.  And

13  that stipulation, which I have in my hand, withdrew 1,533

14  conspiracy claims.  This isn't an authority issue.  This is a

15  conspiracy issue.  Fifty-seven percent of the claims disposed

16  of were withdrawn because of Dan Speights picking up the phone

17  and suggesting that I would do what I had discussed doing with

18  Bob Beaver six months before.  And we entered the stipulation,

19  and something that is very important to me was Paragraph 2 of

20  the stipulation which says the debtors agree to make no

21  argument that Speights' withdraw of the PD claims pursuant to

22  this stipulation and/or the expungement of these claims in any

23  way improper or in any way reflects an improper conduct by

24  Speights.

25          And I say that because -- and I'll leave it to Your

1 Honor as to whether during the ensuing ten months anything has

2 been asserted that somehow something was amiss because I

3 withdrew 1,533 claims.  In any event, as of October -- there

4 were actually 50 more that were added in December -- there were

5 1,148 claims.  That's how we got a substantial chunk of claims

6 disposed of without litigating before you at all by way of

7 stipulation.  And then we had to litigate one issue before Your

8 Honor, and that was the position I took supported by an

9 affidavit, which when we talk substance I may well show you the

10 affidavit today, that I obtained advice from the leading ethics

11 professor in South Carolina telling me not only that I should

12 file -- not only that I could file Anderson putative claims,

13 but I would be breaching my fiduciary duty if I did not file

14 those.

15        And that resulted in 586 claims being teed up before

16 Your Honor some time I believe also last fall.  And Your Honor

17 disagreed with my position.  In effect, Your Honor said I was

18 putting the cart before the horse, that if I get the class

19 certified then you have the problem of whether I can file for

20 these people then because your concern is to whether they would

21 be barred by the bar date, but, in any event, that I could not

22 do that at that point in time and Your Honor dismissed the 586

23 claims.  And that's been the crux of the problem for some time.

24 However, Your Honor, I hasten to point out that the back door

25 is still open and we will talk about that on the class

1  certification issue.  And there was no need to appeal the

2  ruling of 586 because if Your Honor ultimately decides there is

3  no class, then I think it's a putative authority according the

4  cases, but the cases talking about the putative authority

5  disappearing.

6          But, that's where we were last fall so that roughly

7  80 percent of the claims were dismissed because I withdrew 57

8  percent.  And Your Honor made one ruling about on a legal issue

9  of whether I had the authority to file on behalf of the

10 putative class without actual authorization.  So, I appreciate

11 where we've come and we've come a long way.  But, we came most

12 of the way -- 80 percent of the way because of those two

13 rulings.

14         Now, Your Honor, I want to point out one other thing

15 on this.  And I really hadn't planned to stand up here on an

16 overview, but I was a little uncomfortable with the overview

17 that was given to you by Ms. Browdy.  And then Mr. Restivo and

18 I can go in a back room after all this and see if we can bring

19 this down to the real issues in dispute if he's going to be

20 handling the matter.

21         This is something you've never seen, Your Honor.

22 This is before the 13th objection was filed, Speights and

23 Runyan's statement of facts relating to its authorization to

24 file certain claims in this Chapter 11.  This is something I

25 negotiated with Mr. Bernick and with Ms. Browdy back I believe

92

1   in July of last year, several days before they filed the

2   pleading which led to the hearing when I was on the plane to

3   California.  And they had objected to several claims -- I think

4   it may have been 25, I haven't gone back and looked -- on this

5   whole Anderson issue.  And in that representation I made, I

6   consistently told them then, and I put it in writing, Speights

7   and Runyan believe they had authority to file those claims

8   based on Anderson Memorial Hospital.  Some of them I had

9   written authority for.  Some of them I believe I had authority

10  for the reason to be argued to you later, the 586 claims.

11          So, that was an issue that I brought up and

12  stipulated to before this war was ever started.  And I point

13  that out because at that time, I offered to enter a stipulation

14  for all of these.  We didn't need to go through this with 586.

15  I would have entered a stipulation for everything.  It's a

16  legal issue.  Your Honor has now ruled.  I respect Your Honor's

17  ruling.  But, that's where we were.  So, in any event, we're

18  down now to 562 as a result of -- I thought we were set up on a

19  series of hearings in Pittsburgh on dealing with these various

20  issues.  And as a result of the various hearings, some of mine

21  I voluntarily withdrew.  Some people decided not to go forward.

22  We reduced that to 86.  And if I find my second page, I can

23  wrap this up.

24                          (Pause)

25          MR. SPEIGHTS:  And I believe we are very close, Ms.

**J&J COURT TRANSCRIBERS, INC.**

1  Browdy and I, on the numbers that are at issue now.  I should

2  have left that up.  You also said, and this impacts Canada

3  procedurally.  I'm not arguing Canada yet.  I think Mr. Baena

4  will take the lead on that issue.  We also -- I subtracted 291

5  Canada claims because as you recall at the hearing in

6  Pittsburgh that they announced that it wanted to send those

7  under its plan to Canada.  And I said, I disagree they can do

8  that, but it's fine with me if they don't want to litigate

9  those.  Okay.  We'll find out what the plan says.  And I

10  understood that if the plan was confirmed allowing that, that's

11  what could happen.  And they understood that I would file an

12  objection.

13         But, the bottom line is that got us down to 185

14  claims.  And I think that's pretty close to Ms. Browdy's

15  number.  I couldn't read it from the back of the room a few

16  minutes ago, which is what I believe is at issue.  And

17  essentially what we have at issue are 92 California colleges,

18  we have roughly 90 Anderson claims, we still have the two class

19  claims and we have the Pine Street claim for 185 buildings.

20  Now, Your Honor, I have some feelings about what we should do

21  about these claims and I'll argue that when we get to the

22  substantive portion.

23         But, the main reason I arose, despite ten minutes

24  before I got to the main reason is, the issue about deadlines.

25  Why doesn't Mr. Speights go ahead and do these things now?

1  Well, Your Honor, I'm trying to comply with your order. That's

2  what set the deadlines. Your Honor had an order and an exhibit

3  to the order which provided the deadlines. And after Your

4  Honor entered this date, you set new deadlines. And it is

5  there I think we ran into -- I don't know how to address what's

6  going on in any of that. There's a hearing on the 20 claims.

7  It's supposed to be set for April 17th. And a hearing on the

8  68 claims is to be set on April 17th. And today is April 17th.

9  Today is April 17th because Your Honor then extended this date.

10  So, this is the April 17th hearing as I understand it. And

11  they have put both of those down in compliance with your order

12  on the agenda to be heard today. I'll be heard on those. I'm

13  not saying we should hear them today, but clearly I had notice

14  that those would be heard today.

15          And on the Canadian claims, Speights (inaudible) due

16  was 4/28/06. And Mr. Berry and I have interpreted that as

17  meaning I have 11 more days to get all that information in.

18  We're dealing with some additional product ID with Dr. Longo's

19  office to do (inaudible), and we will meet Your Honor's

20  deadlines. We're not asking it to be extended. We just don't

21  want it to be eliminated. And then, Your Honor, on the 2003

22  issue, which actually -- it was a little disingenuous the way

23  it was presented, the 2003 issue if you would agree -- but my

24  interpretation of the 2003 question and not Grace's but in

25  effect -- telling my claimants that they had to answer a

**J&J COURT TRANSCRIBERS, INC.**

1 special interrogatory on the 2003 issue. And we've been

2 working diligently on that. However, Your Honor --

3                    (Pause)

4         MR. SPEIGHTS: This is on your order. "Speights must

5 produce to us and the Kirkland and Ellis responses signed by

6 each of the claimants." And that's on May 26th, Your Honor.

7 And so, that's a month after the order. We are diligently

8 working. We will comply with your order. We'll reduce it. We

9 can count the days as it's there and Ms. Browdy can count the

10 days, and we will comply with that procedure. We are honoring

11 what Your Honor has ruled and we'll comply with Your Honor's

12 ruling. Thank you, Your Honor.

13         MS. BROWDY: Your Honor, if I could just respond very

14 briefly. We had taken a version -- actually, if I can take

15 this order for a second. We had taken a version of this order,

16 Your Honor, and recommended mechanically extending the dates to

17 reflect the additional three months. The order deals with both

18 the objections and the estimation. And we could not get

19 agreement with the other side. So, there is no formal

20 extension of this order extending it out 30 days. Now, what we

21 have said, Your Honor, is Speights has had three years more

22 than anyone else to answer these questions from the

23 questionnaire.

24         We're trying to make progress. The dates were set by

25 the Court. The Court can set new dates. Let's set them so

J&J COURT TRANSCRIBERS, INC.

1 that we can have merits heard at the August omnibus and move

2 this forward.  We shouldn't be carrying forward hundreds of

3 claims that he doesn't have authority to read, that he doesn't

4 have product ID for.

5 　　　　　THE COURT:  Well, look, truly the difference between

6 doing some of these today and the rest in September as opposed

7 to August, which I think would be the difference extending the

8 ones where the responses would be May 26th -- I wasn't even

9 trying to be funny that time.  The difference between I think

10 extending those out until either August or September at this

11 point for the ones that were -- the responses that were due on

12 May 26th frankly I think is not going to be that much of a

13 substantial difference, because I think you're going to have

14 plenty of work to do in the meantime anyway.  So, I think

15 that's what Mr. Speights is suggesting, if I understood, that

16 the May 26th date would become roughly August 26th.  So, it

17 would miss the August date but be on September.

18 　　　　　MS. BROWDY:  So, we can clarify that the Canadian

19 rank of product ID claims shall be heard on the merits in

20 August, and the Question 18 will be heard on the merits of the

21 September.

22 　　　　　THE COURT:  So, Mr. Speights, is that correct?

23 　　　　　MR. SPEIGHTS:  That's fine, Your Honor.

24 　　　　　THE COURT:  So, as to the Question 18, that's on the

25 September omnibus, and the Canadian claims were deferred until

**J&J COURT TRANSCRIBERS, INC.**

1  July.  So, that will be on the August omnibus.  Is that

2  correct?  I have that right?

3           MS. BROWDY:  Yes, Your Honor.

4           THE COURT:  Okay, that's fine.

5           MR. BERNICK:  Your Honor, I'm going to go ahead, and

6  Mr. Speights I guess was responding to this chart and basically

7  I guess telling his version of the history of how the 4,000

8  claims or 3,500 claims became must less.  I don't think that

9  that is necessarily germane to any issue that we have before

10 the Court today.  At some point in time, it maybe important to

11 revisit how the claims came to be filed originally.  But, I

12 don't have any -- I don't think that that's necessarily germane

13 to anything that we have to accomplish today.  So, I'm not

14 going to respond nor I believe is Ms. Browdy going to respond

15 to the statements of how Mr. Speights came to withdraw his

16 claims.

17          I do want to turn to Item 12, which is the procedures

18 motion and set out a little history.  And I think it would be

19 worthwhile if it's convenient to Your Honor to basically divide

20 the argument into two parts.  There are really two aspects of

21 this motion.  One basically frames the issue or asks the Court

22 to order that the estimation process that we've now been

23 involved in for quite some time converges on an estimate that

24 not only will be binding with respect to the aggregate amount,

25 but also will be binding with respect to the value of each of

**J&J COURT TRANSCRIBERS, INC.**

1 the claims that is in fact estimated.  That is, individual

2 claimants will not have the ability to come back in and say

3 that the estimate is not binding as to them.  That is the first

4 part of the procedures motion.

5        The second part of the procedures motion seeks to do

6 what Your Honor probably would find to be a first, which is to

7 send the litigation away rather than bringing more litigation

8 here, to take the 291 claims that Mr. Speights has filed in

9 Canada and have them be in fact adjudicated in Canada on a

10 timetable that's consistent with the estimation process that we

11 have here.  That's the second part of the procedures motion.

12 And I think that we should probably just divide it into two so

13 we can talk about the more general question first, and then

14 turn to the Canadian issue.  Would that be okay with you, Mr.

15 Baena?

16        MR. BAENA:  It's your presentation.

17        MR. BERNICK:  I take that to be a yes.  So, let me

18 talk a little bit about the procedures aspect of the motion.

19 And I think the -- in order to short -- perhaps short-circuit

20 some of the recitation of the facts that occur in connection

21 with some of the specific issues that have been raised, I'm

22 just going to go through very briefly the history of how this

23 motion came to be filed and what precedes it, because I think

24 the history really answers all of the specific questions.

25        Your Honor will recall -- and this basically now goes

1  back for 12 months -- the debtor filed a plan and the debtor

2  filed a series a motions relating to the plan.  There was then

3  a hearing and relatively extensive argument that took place --I

4  believe it was in January or February of 2005 -- where Your

5  Honor basically took up, where do we go from here.  That was a

6  hearing I believe that also involved some of the issues that

7  were raised with respect to the plan that Grace had on file.

8  And Your Honor basically announced at the conclusion of those

9  proceedings that you thought that the next inappropriate step

10 was to go forward and to do the estimation.

11         So, I believe Your Honor ordered at that time that

12 because the first -- the next order of business should be

13 estimation, that the parties should get together and try to

14 make an effort to develop case management orders that would

15 control the different litigated matters so that there would be

16 a case management process in place for the different aspects of

17 the case.  So, we had that with respect to personal injury and

18 that converged on the questionnaire.  But, we also had it with

19 respect to property damage.  And there was an effort that was

20 made in the first couple of months of 2005 to get together,

21 that is the debtor and the property damage claimants, in order

22 to try to agree a case management order.

23         And one of the issues that came out of that process

24 was this whole question that had been raised about, what would

25 be the use of the estimation?  What would be the use of the

1  estimation?  Would individual claimants be affected or not?

2  Would the be bound or not?  And we had that issue come before

3  the Court in July, July 19 of 2005.  And I'm only going to show

4  a couple of these because otherwise we won't get done.  But,

5  this is at Page 57 of the transcript at that time, where the

6  very issue of the use, that is, will this estimation also be

7  used for allowance and disallowance was raised.  And here's the

8  colloquy with the Court.  And the answer that was provided by

9  the Court was, "Yes, in fact it will be used for that purpose."

10       So, we thought we had guidance coming out of this

11  hearing, and I can show any -- another page where basically

12  Your Honor says the same thing.  It's reiterated at Page 80.  I

13  say, "And I want to be clear.  We can't go down the road and

14  have the position taken that somehow we're going to go through

15  this whole process where we're not really going to resolve

16  these merits based issues on any basis as finding with respect

17  to the claimants."  And the Court says, "Of course, we are."

18  With the guidance from the Court in July, we went back and

19  crafted or basically amended the case management order with

20  respect to the property damage claims.  And we came back in

21  August with new case management orders that were consistent

22  with what we believed the Court had ordered.

23       And, again, I can show the transcript.  It's Pages

24  107, 108 and 109, 113, and again at Page 115, that basically

25  focused on the exactly the same issue where Your Honor again

1   once again said, "It is going to be binding with respect to the

2   PD claimants, binding with respect to them individually, that

3   anything to do with process or anything to do with substance

4   that was addressed during the estimation would be binding with

5   respect to them."  And that resulted in the order that was then

6   entered on the 29th.  Your Honor will recall -- let's take a

7   look at Page 3 of the order.  This is the real -- this is one

8   heavy ELMO here today.  You can see that the language that was

9   at issue was the language that says, Paragraph 2, "Any party

10   who filed a PD claim may elect to participate in the PD

11   estimation.  Regardless, the Court's PD estimation ruling shall

12   be binding on all PD claimants."  That's what the debtor had

13   proposed based upon the colloquy in July.

14         And as a result of the colloquy in August, basically

15   it was made in more detail.  "Regardless of the Court's

16   determination of all procedural and substantive matters

17   relating to the estimation of PD claims shall be binding on all

18   PD claimants."  On the page before that, the Court made clear

19   that this was functionable but it's going to happen in the

20   estimation process.  "Whereas the Court is determined to

21   proceed in two phases.  Phase 1, that we bifurcate the deal

22   with two issues, <u>Daubert</u> methodology and constructive notice.

23   Phase 2 will consist of merit phase estimation of asbestos PD

24   claims."  So, once again, it was made clear that this

25   estimation process would be binding not only on procedural but

1  also on substantive matters with respect to individual

2  claimants.

3         On the strength of that CMO for property damage --

4  and this is key -- we then went to -- the debtors went through

5  a very extensive process of creating and filing the 15th

6  omnibus objections.  And this was filed on September 1.  And

7  this makes very apparent in the introduction that this relates

8  not just to the objections process but also to the PD

9  estimation.  It says that's set out in the case management

10  order which was approved by this Court during the August 29th

11  hearing.  "The debtor hereby object as follows to the asbestos

12  property damage claims."  And what this document does -- and it

13  goes on for the better part of close to 70 pages -- is that we

14  took each and every one of the remaining claims by building and

15  we lodged specific objections, and we also set forth the basis

16  of those objections, every single building, thereby living up

17  to the commitment to take the more general common questions or

18  objections and marry them to specific buildings.

19         We did this claim by claim.  We identified all of the

20  claims.  And, again, we did it in summary form at the outset.

21  We then say at Page 5, "These objections are the first step of

22  a multi-staged combined objection and estimation process for

23  dealing with the PD claims."  We spell out Phases 1 and 2.  And

24  we even give with respect to each of the types of objections

25  the date when we believe they should be heard.  We also explain

1  the law and the facts that drive the different objections.  The

2  point being that by this time, we had said both in court and we

3  had confirmed in court that the estimation and the objection

4  process were a unity.  They were being handled together.  That

5  the results of that process would be binding on all parties, be

6  binding with respect to the aggregate amount.  It would also be

7  binding with respect to individuals.  That was spelled out in

8  the Court's order.  It was spelled out in the objections.

9  Everybody was on notice.

10         We then had a further discussion on November the 14th

11  before the Court on exactly the same kind of thing where --

12  this is at Page 89.  Mr. Baena says, "Your Honor clarified this

13  was the context it was talking about, what Phase 1 was, that

14  essentially we were using estimation the same way that you were

15  thinking of summary judgment, that is focusing on legal issues,

16  marry them however to the facts as part of the estimation

17  process."  And Mr. Baena says, "Judge I appreciate that and I

18  only raised it because I don't want there to be any misgivings

19  about the fact that claimants have to be involved in this

20  process."  The Court said, "Well, they've said they've already

21  served the objections on the claimants."  Mr. Baena says,

22  "That's correct, but the claimants have to be involved in this

23  process."  Your Honor said, "They have the -- if they choose to

24  be, yes.  If they don't choose to be, they don't have to be,

25  they've been served."

1          As a result of this discussion, we had greater

2    clarity on what Phase 1 was to consist of.  There was no change

3    to the case management order in the process.  There was no

4    change that was made to the objection process.  There was no

5    change that was made to anything.  And in fact the individual

6    claimants and their counsel well knew what they were now

7    facing.  They had received the objections.  They knew which

8    buildings were objected to, what the objections were.  They

9    knew the contemplated process and they knew that they were

10   going to be bound.  And they then decided to follow the case

11   management order not just through the committee, but through

12   individual claimants represented by counsel.

13          For example, on October 3rd, Prudential Insurance

14   filed the initial disclosure of its fact and expert witnesses

15   anticipated for Phase 2 estimation proceedings.  So, you now

16   have an individual claimant that's decided to participate in

17   this process through counsel.  It's Prudential.  We now have

18   extensive lists of all kinds of fact witnesses and experts that

19   they intend to call.  We have a much more extensive submission

20   made on the 24th of October by claimants represented by Mr.

21   Dies.  This disclosure goes on for the better part of 79 pages.

22   And he gets endorsements from each, as far as I can see, at

23   least certain of the individual clients that he represents.

24   And in here Mr. Dies, on behalf of his particular claimants,

25   identifies a whole series of experts, talks about what they're

1  going to say, basically makes the disclosure called out for in

2  the case management order.

3        So, we have a history and a result of the history (a)

4  the claimants have been on notice that their claims will be

5  estimated and that they'll be bound by that estimate in terms

6  of process and in terms of substance, (b) we have their lawyers

7  coming forward to represent their interests individually to the

8  extent that they have chosen to do so, and (3) we have an

9  integrated proceeding that's basically designed to handle all

10  of the objections as a result of the process that Ms. Browdy

11  has described.  Many of the objections already have been

12  resolved and we're going forward.  And by the time we get to

13  Phase 2, we will have valuations for all of the claims both in

14  the aggregate and individually.

15        Now, we filed this motion so that there could not be

16  any lack of clarity on this.  We thought it was very clear, but

17  we wanted to absolutely eliminate any lack of clarity.  And,

18  sure enough, I guess you kind of make the mistake of getting

19  what you ask for.  As soon as we asked the Court to confirm

20  this, we now have all of the same objections all over again.

21  And I'm not going to spend a lot of time with it.  I'll just go

22  through them fairly quickly.

23        The first objection is to the idea that the estimate

24  would be binding on individual claimants for purposes of the

25  allowance and disallowance of their claims exactly as 502(c)

1 calls for.  First objection is no notice that these procedures

2 that is objection and estimation were to be integrated.  That's

3 what Prudential would say.  Oh, we've always had two CMO's and

4 we never knew that these two things were together.  That's

5 absolutely false.  The whole history says that they were on

6 notice of the integrated proceedings back in '05.  In fact, as

7 a result of that, they in fact complied with the CMO through

8 their own counsel.

9         The second case management order wasn't designed to

10 create a parallel track of doing exactly the same thing for a

11 different purpose.  But, the second CMO was entered at the

12 request of Mr. Baena and all it did is carve out a couple items

13 for separate handling.  But, basically, the CMO that governed

14 the estimation on the merits was the CMO pursuant to which

15 people submitted their expert disclosures.

16         The second objection is that the committee cannot

17 represent individual claimants in connection with their claims.

18 I don't think we have to address the issue of whether the

19 committee can or cannot do that.  The point is that any

20 individual claimants has the right to appear through counsel

21 and in fact they have done exactly that.  Mr. Dies has filed

22 disclosures.  Mr. Speights is appearing on behalf of his

23 clients.  Prudential is appearing through its own counsel.

24         Third, the position taken is that estimation cannot

25 be done for allowance or disallowance purposes.  That's exactly

1  what 502(c) calls for is for allowance and disallowance.  The

2  whole point is to have streamline proceedings.  It maybe Mr.

3  Lockwood's favorite refrain for personal injury claimants, and

4  on that he is correct that there is a carve out for personal

5  injury claims cannot be estimated for distribution purposes

6  under 502(c).  But, in case of property, there's no ambiguity.

7  The statute fairly permits it and indeed calls for it in the

8  event that full scale litigation would cause undue delay.

9          A related argument is that adjudication is different

10 from estimation.  Well, adjudication is -- can be different.

11 You can have -- if you're not estimating and you were in the

12 ordinary tort system, under the rules you would have summary

13 judgment.  You would have full trials, full discovery and you

14 would have a full adjudication.  Is that different from

15 estimation?  Yes, it's more extensive.  They both deal with the

16 merits, but the whole idea of estimation was to have a

17 streamlined adjudication.  It's not an adjudication in the

18 sense of full trial all the issues the same degree.  But, it is

19 an adjudication.  It's just a streamlined adjudication as

20 necessary in order to avoid delay.  But, the whole idea is we

21 can't do an estimate for all purposes.  That's flat out

22 contradictory to the code, the whole idea of 502(c).

23         The next argument is they don't know the issues that

24 are to be adjudicated.  Well, that's completely false.  The

25 15th omnibus lays out 70 pages describing all of the issues in

1  detail.  They've been fully on notice since the 15th omnibus

2  objection.  The next issues is we can't litigate these issues

3  in the abstract.  There's no such thing as a common issue here.

4  And the answer is, we're not trying to litigate anything in the

5  abstract.  The whole idea of the omnibus objections was to

6  identify common issues that have been married to the buildings

7  that Ms. Browdy has just demonstrated through this chart.

8          We actually have gone -- and, for example, product

9  ID.  We've now specified which of the different claims we

10 believe that there is not product ID on.  And they say, well,

11 that's a very individual issue.  It can be an individual issue

12 but there are certain common features.  For example, they point

13 out in their papers that Dr. Lee does a certain micrographic

14 examination to determine whether the fingerprint for Grace

15 asbestos is there.  They've got their own laboratory that

16 disagrees.  Now, it maybe that there is data from individual

17 buildings that the Court will see, but the Court doesn't have

18 to resolve the issue of Dr. Lee versus MAS Laboratories 85

19 different times.  It's one issue and then you marry it to the

20 building.

21         We've also gone through to determine which of the

22 claims are going to be barred by actual notice versus

23 constructive notice versus both.  Then with the question of

24 hazard, what data is there that says that there's a hazard?  Is

25 it dust, is it air, one or the other?  We are pursing these

1  claims exactly as they should be pursued, that is with

2  reference to individual buildings but identifying issues that

3  maybe cutting along the joints for presentation to the Court so

4  the Court then can do the estimate.  Otherwise, you say, well,

5  if they're not general issues and they can't be general, you go

6  all the way to saying, oh, we've got to litigate each one of

7  these claims one by one and we can't pay attention to what they

8  have in common.  That's just not so.  So, the idea that we're

9  litigating in the abstract is wrong.  You have to go claim by

10 claim.  You can't consider the commonalities also is wrong.

11         Finally, we get some arguments that say, well, gee,

12 we can't have a common issue approach because we argued in

13 connection with the State of Hawaii proposed class action back

14 in the 1990.  Common issues didn't predominate and, therefore,

15 class couldn't be satisfied.  We face the same argument in the

16 Grace case.  We face the same argument elsewhere.  The issue of

17 whether common issues predominate the class certification

18 purposes is not even relevant here.  The issue is now that

19 you've got all of the claims actually before the Court, you

20 don't have to worry about predominance.  The concern is and the

21 question is, can you point out commonalities that streamline

22 the litigation process?  That's exactly what the debtor has

23 done.

24         So, we ask the Court confirm what now has been part

25 of this process for a very, very long time, which is that we're

1 doing exactly what the code calls for.  We are estimating under

2 502(c) for all purposes, for feasibility purposes, for

3 allowance and disallowance purposes.  The idea is we have one

4 estimate, one estimation and one estimate and it controls

5 whatever it is comes out of the process for that estimate for

6 property damage claims.  Exactly one of the beneficial features

7 of the code is to remit this kind of streamline process.  We're

8 doing exactly what the code calls for.  And we cannot function

9 really in an environment that says, no, judge, we're going to

10 have 501 trials.  We're not here to have 501 trials.

11           THE COURT:  Mr. Baena?

12           MR. BAENA:  May it please the Court, Scott Baena on

13 behalf of the property damage committee.  The most astonishing

14 part of the presentation, Your Honor, is the notion that all

15 Grace seeks by this motion is clarification.  The motion asks

16 for relief that Your Honor has refused to grant to Grace every

17 single time it has come before the Court, every single time.

18 It's not clarification.  There asking for a Mulligan again they

19 would like you to consider one more time.  And, in particular,

20 that starts with the systemic issue of what is this estimation

21 all about.  Repeatedly we have argued before the Court and

22 repeatedly the Court has intoned that the purpose of this

23 estimation is to determine the total amount that would have to

24 be funded into a trust to pay property damage claims.

25           The Court has repeatedly referred to the process as

1 one that has to do with feasibility and not with the allowance

2 of individual claims.  And the Court has never once entered an

3 order, because it couldn't enter an order, in which the Court

4 said that this proceeding is based upon 502(c).  This

5 proceeding is part of the confirmation of a plan which we

6 believe and we've told you before was dead on arrival.  It had

7 certain features which require the Court to determine whether

8 the plan impairs the claims of asbestos constituencies.  And

9 among those features is caps that they put on the value of all

10 asbestos claims.  And it was in that context in January of '05

11 after the debtor filed its claim that the Court took this

12 matter onto the first time and concluded that we were going to

13 approach this estimation from the vantage of feasibility.

14          Along the way, the debtor persistently has attempted

15 to convert this estimation for one that has to do with

16 feasibility to one that has to do with the allowance of

17 individual claims.  I've told you.  Mr. Lockwood has told you.

18 Others have stood before you and reminded you about the fact

19 that 502(c) has never been used in a property damage

20 estimation, that 502(c) only contemplates the estimation of

21 single claims, and that it contemplates it for purposes of

22 allowance and it was inapposite to the process that was before

23 the Court.  You've never adopted 502(c) as the authority or the

24 process that we've undertaken.

25          The significance of the difference between why we're

1 undertaking the process can't be understated because it goes to

2 the heart of the dispute that is now before you in the context

3 of this so-called motion for clarification.  And it goes to

4 fundamental issues of due process which this Court articulated

5 at every juncture that the same proposal was put before the

6 Court.  The Court recognized repeatedly that there is a

7 difference between determining of the allowance of individual

8 claims.  There is a difference between determining the debtor's

9 affirmative defenses to individual claims from the process of

10 estimation where all you're seeking to do is put a value on all

11 claims that remain extant, haven't been denied or disallowed by

12 virtue of any objections that were lodged by the debtor or

13 anybody else for that matter, and for the purposes of

14 determining feasibility in respect of any plan.

15          And so in January '05, you made the point that the

16 estimation for purposes of plan funding doesn't require a claim

17 by claim analysis.  And in November of '05, you came back to

18 the very same subject and you said, there's a difference

19 between determining an affirmative defense is applicable and

20 estimating the value of property damage claims and that this

21 process wasn't about the former.  That was being left to the

22 process of claims objections.  In addition, I thought we all

23 understood it.  At the January hearing, Mr. Bernick stated, if

24 the estimate is done to create an overall aggregate amount, you

25 don't have to have claimant participation because it's not

1  dispositive of their particular claims.  But, he went on, but

2  if we want to estimate the claims for allowance purposes, the

3  claimants has to be involved.

4          And those are the due process concerns that we've all

5  bore in mind throughout this process.  Indeed, more recently in

6  September '05, District Judge Rodriguez in the <u>Federal Mogul</u>

7  case made the point as well, that estimation of asbestos

8  liability for limited purpose a plan formulation is a fruitful

9  endeavor because it promotes the speed and efficiency goals of

10 the bankruptcy code while not implicating the procedural rights

11 of individual claimants.  And so, that is the law and this is a

12 head thing.  This is not about clarification.  This is about

13 using some intellectually disingenuous way of getting you to

14 change the whole process.

15         And in as you consider this astonishing request, I

16 ask you to step back, Judge, and put it in the context of what

17 we've done so far and what has been accomplished so far and how

18 we accomplished it.  You'll recall that a claims objection

19 process was insisted upon by the Court.  And you'll recall that

20 in advance of that, there was a -- we started with a proof of

21 claim process.  And there was great controversy and

22 disagreement you'll recall about the proof of claim form.  Our

23 position was that this was -- and we're hearing that again

24 today in the context of personal injury.  Our position was that

25 that proof of claim form that went out to the world exceeded by

1  all reasonable bounds what proof of claim forms do, because the

2  proof of claim form that was designed and ultimately approved

3  in this case had one principle purpose, and that was to provide

4  discovery to the debtors for purposes of determining whether

5  they had any defenses to claims, to individual claims.

6       The process went forward.  The proof of claim forms

7  were returned by 4,200 people or building owners or operators.

8  The debtors made their analysis, and in July 2004 they came

9  back to you.  And they came back to you and they said, well,

10 this is a daunting prospect.  We've got 4,200 claims and we've

11 got lots of objections.  But, you know, we've paired down these

12 objections into buckets.  And we've got one bucket which we

13 call the Gateway objection.  And we think, Judge, if you give

14 us dispensation from local rules and practice, we can cut to

15 the chase real fast here with property damage claims.

16      And what they asked you was to allow them to bring

17 five different kinds of objections to property damage claims

18 without requiring them to file all substantive objections to

19 those claims, and also by forgiving them from compliance with

20 the local rule that limits the number of objections that you

21 can file to 150 and you said okay.  In July 2004, you said

22 okay.  How many Gateway objections have you disposed of, Your

23 Honor, by adjudication?  Zero, zero.  And on three different

24 occasions, you told them, bring those on.

25      Now, if you read this so-called motion for

**J&J COURT TRANSCRIBERS, INC.**

1  clarification, the issues that they want to now jump tracks

2  from the claims objection process to the estimation process,

3  guess what, the statute of limitations, product ID, all of the

4  Gateway objections that they made us argue about here in front

5  of you, made you rule upon, made you direct them ultimately to

6  comply with the process that they sought and they've never done

7  so.  But, now, now, because several years later they haven't

8  done so because the estimation proceeding is, you know, not yet

9  really underway, there's still an opportunity perhaps to shove

10  that camel into the tent.  And now, we can take what you called

11  as two processes running in tandem, we can just ignore all the

12  differences just like they've been saying since day one to

13  Judge Farnan to Judge -- to you to Judge Whalen to deaf ears.

14          And that's what this whole thing is about, Judge,

15  blowing the distinction between the objection process and the

16  estimation process, and kidding you to believe that because

17  everybody knew about the estimation process, there should be no

18  harm in now trying the objections, the individual claims,

19  without them being here if they don't choose to be here

20  latching onto a phrase that the Court uttered in a totally

21  different context.  You'll recall that you chastised me, Judge,

22  about quibbling over semantics when I was arguing that Phase 1

23  really was in an estimation process.  And that's what you were

24  talking about.  You were talking about that process, not Phase

25  2 where we're seeking to value property damage claims.

1          Indeed, every time that we've talked about valuing

2  property damage claims, you put the red flag up.  That's a

3  different process you've admonished everybody then putting --

4  then dealing with an affirmative defense to an individual

5  claim.  What they promise you, Judge, is a jihad that will last

6  forever.  It will never conclude this case.  And maybe that's

7  the motive here.  The insurrection that this will develop by

8  way of appeals to the end of time by interjecting the

9  individual determination of claims at the 11th hour is just

10  simply irrefutable.  Judge, in all due respect, it seems to me

11  that we have spent an enormous amount of time in keeping these

12  tracks separate.  We have spent an enormous amount of time just

13  reaching agreements on how to do this estimation.  We need to

14  abide by them.  We're prepared to abide by them.  We're not

15  asking for you to revisit anything we asked before and we

16  respectfully urge that you don't do so for the debtor either.

17          THE COURT:  Mona, can you see if you can get the air

18  conditioning turned back on, please.  Good afternoon.

19          MR. PLAZA:  Good afternoon, Your Honor, Curtis Plaza

20  from Riker, Danzig, Scherer, Hyland and Perretti on behalf of

21  the Prudential Insurance Company of America.  Your Honor,

22  Prudential joins the compelling arguments made by Mr. Baena and

23  the other property damage counsel and offers four of its own

24  reasons why the debtor's motion should be denied.  First, the

25  motion would unnecessarily complicate both the PD estimation

1  process and the claims adjudication process, two separate

2  processes already established and already proceeding on their

3  own tracks.  Your Honor, last August the Court entered two

4  separate case management orders for PD estimation and PD claims

5  adjudication.  Since that time, the PD estimation process and

6  the individual claims adjudication process have traveled on

7  their own tracks with the debtors and PD committee counsel

8  litigating issues as to aggregate PD liability and individual

9  claimants and the debtors litigating over the individual claims

10 issues and the objections thereto.

11      Your Honor, expanding the PD estimation process at

12 this point would require the consideration of volumes of

13 additional factual evidence relevant to individual as opposed

14 to aggregated claims, testimony from numerous additional fact

15 and expert witnesses with claim specific knowledge, lengthy

16 additional discovery and an opportunity for briefing and oral

17 argument by all of the hundreds of newly affected parties.

18 Quite simply, Your Honor, there's no reason to bog down this

19 process like that at this point.  Your Honor, second, the Court

20 has already denied the debtor's request for global adjudication

21 of certain claims issues.  The Court has recognized that issues

22 affecting individual as opposed to aggregated claims are fact

23 and claim specific and there can be no global determinations as

24 to these issues.

25      Third, Your Honor, the procedures proposed by the

**J&J COURT TRANSCRIBERS, INC.**

1 debtor's motion would violate the due process rights of PD

2 claimants as Mr. Baena has mentioned.  Claimants have a right

3 to have their claims heard and adjudicated individually on the

4 merits.  In violation of that right, the debtor's motion

5 envisions a broad brush process whereby the debtors could avoid

6 the hassle of addressing the specific merits of each claim.

7 Moreover, Your Honor, a PD estimation process is already well

8 underway with deadlines passed and determinations having been

9 made.  Changing the process now so as to affect individual

10 claimants would deprive claimants of their right to participate

11 in those aspects of the case that have already occurred and

12 would create due process concerns at the outset of these

13 proceedings.

14         THE COURT:  Well, that part I'm not too concerned

15 about because there hasn't been much that's happened.  So, I

16 think to the extent that we would have to backup to put

17 individual claims in, frankly I don't think that would be the

18 issue, but --

19         MR. PLAZA:  That maybe fair, Your Honor.  There have

20 been certain deadlines which have passed and there have been

21 certain determinations which have been made, including in the

22 Phase 2 proceedings.  And I will by segway mention that in fact

23 pursuant to one of those deadlines, Prudential did file a

24 witness designation as a voluntary participant as was

25 Prudential's right in the PD estimation proceedings.  That

1 witness designation was filed in the event that Prudential

2 wanted to later become involved in the Phase 2 estimation

3 proceedings.  Nevertheless, Your Honor, Prudential did not

4 expect that those proceedings would include adjudication of

5 individual claims.

6        In fact, Your Honor, Prudential's designation

7 specifically states at Paragraph 9 -- and I have a copy if Your

8 Honor would like to see it.  Prudential reserves the right to

9 object to the extent the debtors seek to use the PD estimation

10 proceedings for the individual adjudication of PD claims.

11 Prudential served that designation on the debtors last October

12 as required.  The debtors filed no response to that statement.

13 Clearly, at the time the designation was filed, the parties did

14 not contemplate that PD estimation included --

15        THE COURT:  I'm sorry, go ahead.

16        MR. PLAZA:  Okay.  Clearly, at the time the

17 designation was filed, the parties didn't anticipate that PD

18 estimation would include the adjudication of individual claims.

19 Moreover, as stated in the debtor's reply to our objection,

20 only five or so of the approximately 900 property damage

21 claimants filed witness designations with respect to the PD

22 estimation process by that October deadline.  That means that

23 895 claimants or 99 and a half percent did not file such

24 designations.  Clearly, those claimants also did not

25 contemplate that the PD estimation process would include

1 individual claims adjudication.  Moreover, I would say that the

2 debtors seek to join the adjudication of individual claims into

3 a process where 99 and a half percent of the participants have

4 not even had a chance to designate witnesses simply highlights

5 the due process concerns raised by the debtor's motion.

6         Fourth and finally, Your Honor, the motion would

7 cause claimants to appear in court on numerous occasions over

8 multiple days despite this Court's previous rulings that

9 claimants need not appear more than twice to defend their

10 claims.  In Prudential's case, for example, the debtors have

11 already subjected certain of Prudential's claims to hearings.

12 The debtors seek to have other aspects of those claims heard as

13 part of this entangled PD estimation proceeding.  And still

14 other aspects of those claims would remain subject to remaining

15 objections.  That's three bites at the apple and would be a

16 violation of this Court's order.

17         Your Honor, moreover, it would be unduly burdensome

18 to make every claimant sit through the hearings on adjudication

19 of hundreds of other claims where the debtors have identified

20 in the exhibit to their motion not three but 18 different

21 objection categories when you look at them as they've been

22 broken out, which categories as evidenced by the debtors'

23 papers, are not common to all claimants.  Your Honor, for the

24 foregoing reasons, Prudential would respectfully request that

25 this motion be denied and that these two separate processes as

1 already established pursuant to two case management orders to

2 be allowed to continue.  Thank you.

3          THE COURT:  Good afternoon.

4          MR. DIES:  Your Honor, may it please the Court,

5 Martin Dies on behalf of a number of state attorney generals.

6 We did file an objection to the motion.  We also join in the PD

7 motion.  I'm going to be brief and try to address only an issue

8 that was not addressed by the other speakers.  The primary

9 thrust to our objection is that Mr. Bernick and Grace has

10 failed to address the underlying basis of commonality.  You

11 can't just say, oh, the issues are common, so we're going to do

12 this is in some procedure.  He's not cited any cases, whether

13 they be PD cases or whether they be any other cases that deal

14 with common series of transactions, the nexus that would allow

15 commonality.

16          And I think that the reason for that is that the last

17 25 years, the debtor has consistently -- and I mean

18 consistently, Your Honor -- in any case I was ever in

19 vehemently taken the position that the cases are building

20 specific on each of the issues he talks about.  I could quote

21 you case after case after case.  And he says, they're class

22 actions.  They're not applicable.  As a practical matter, of

23 the six cases that I've been involved with in Grace in the last

24 25 years dealing with multiple buildings, literally thousands

25 of buildings in different states, only one of those cases was a

1 | class action.  The rest of them were based upon joinder,
2 | consolidation, these types of procedures.

3 | So, the problem I think is this.  What we're
4 | objecting to is he has never told this Court or anybody else
5 | how he's going to do this, how he's going to do this.  Yes, we
6 | filed a huge witness statement several years ago precisely
7 | because we didn't know what this procedure was going to be.
8 | And, of course, we reserved our rights to argue whenever we
9 | found that out.  But, I think, Your Honor, that the cases are
10 | clear that Mr. Bernick has the burden to show what the
11 | underlying basis of commonality is, how he's going to use Rule
12 | 42, and that's exactly what we're objecting to.

13 | And it just seems utterly fantastic that they can
14 | come into this Court after all these years and all these cases
15 | and say, oh, it can all be done by common issues.  Here's the
16 | problem, and I'll simplify it as best I can.  A number of
17 | courts have identified common issues.  And as I said in my
18 | paper, I was straightforward.  I said, I'd advocated common
19 | issues.  They never told this Court that they've always said
20 | the opposite.  The problem is if you get findings on common
21 | issues, where do you go after that?  Each of the courts that
22 | have looked at common issues have said, we will reserve -- this
23 | is a conditional certification.  We will reserve until after we
24 | hear how these cases are tried, either five full cases or one
25 | full case or ten full cases, reserve judgment on where we go

1  from there.  Where we go with regard to the individual issues

2  of causation, which they have identified for 25 years in these

3  cases, in comparity fall in all these other specific issues.

4         So, the fact of the matter is this is a Pandora's

5  box.  Where does it end?  And I submit, Your Honor, if he is

6  forced to carry his burden and show how these cases can be

7  tried in the way that he advocates, we're talking about years,

8  years of problems.  And I don't think that's in fairness what

9  the Court has anticipated.  And so, that is the basis of our

10 objection.  He has to carry that burden.  He has to show the

11 Court what he's going to do with all these individuations that

12 they have identified for years, the condition of the material,

13 friability, hazard, statute of limitation, product

14 identification.

15        Your Honor, product identification is an enormously

16 complex issue.  Mr. Bernick has never been involved in these

17 cases but I have.  And it's unbelievable how they assume a life

18 of their own.  I cited the Hawaii cases in example because in

19 that case alone, product identification as to Grace alone

20 lasted almost a year, maybe more.  I can't recall exactly.

21 But, there are so many myriad of issues that are -- and here is

22 how they arise, Your Honor.  They are implicated from the

23 affirmative defenses.  They come along and they say, oh, well,

24 that analysis shows cellulose.  Cellulose is not in our

25 formula.  Well, you go and you look at the building and guess

1  what, the ceiling is painted because that's what EPA said to

2  do.  Encapsulate them at certain times, and there's cellulose

3  in there.

4          So, it implicates an order from due process to us for

5  the claimant to effectively present our case because of all

6  these crazy issues they will raise.  And believe me, they will

7  raise them with Dr. Lee and others.  We've got to go show in

8  the buildings how those issues evolved.  So, I think that at

9  least he has an obligation to tell Your Honor how this is going

10  to play out.  He hasn't cited a single case.  Thank you, Your

11  Honor.

12          THE COURT:  Anyone else?  Mr. Bernick?

13          MR. BERNICK:  I went through a series of objections

14  and answers that we had provided to those objections that are

15  set forth in the papers.  And in many of those areas, I don't

16  think I've heard from anybody who has spoken any different

17  answer.  For example, their papers say the committee cannot

18  represent the individual claimants or bind the individual

19  claimants when it comes to individual issues.  Our answer was

20  everybody has been afforded notice.  The claimants if they want

21  to can have their own counsel come in and participate.  That

22  solves that problem.  There has been no answer to that

23  argument.  And in fact what you've now observed is two

24  different lawyers who have in fact stood up on behalf of their

25  own clients here and participated even in this preliminary

1 proceeding.

2          Next, they said they are objectionably responding to

3 was that these claims cannot be estimated for allowance and

4 disallowance purposes under 502(c).  And our answer to that was

5 that's exactly what 502(c) contemplates is estimation for

6 allowance and disallowance purposes.  This is a classic case

7 for doing this, because to have a full adjudication of each

8 individual claim separately and without commonality and without

9 estimation procedures would take an unduly long period of time.

10 That reads right out of the statute.  There was no answer to

11 that here this afternoon.

12          Mr. Dies -- I'll get back to Mr. Dies' remarks in

13 just a moment.  But, it's interesting that it's the debtor's

14 burden to establish that 502(c) actually controls this process

15 and permits exactly what it is that he opposes.  It ought to be

16 his burden to say why it doesn't apply because 502(c) --

17          THE COURT:  I'm sorry, go ahead.

18          MR. BERNICK:  It ought to be his burden to establish

19 why it doesn't' apply because 502(c) was designed on its face

20 for exactly that type of purpose.  That's why we have

21 estimation in bankruptcy.  If there aren't cases out there

22 under the class action precedence or under Rule 42, it's

23 probably because estimation is not something that's known

24 outside of the hallowed halls of bankruptcy, but I'll get back

25 to that in a moment.  No one has demonstrated to this Court

1 that 502(c) cannot be used for this purpose or is not designed

2 to be used for this purpose.

3         An objection that was made in the papers was that

4 they don't know what the issues are.  We've pointed it out in

5 our September 2005 omnibus objection.  We brought the

6 objections home to each individual building in detail.  There

7 was no answer to that.  I don't think anybody even mentioned --

8 I don't think that the omnibus objection and the grid

9 objections even slipped the lips of anybody who stood up this

10 afternoon to talk.  So, many of the contentions that -- and

11 answers that we have provided, objections that we have answered

12 have not been responded to here this afternoon.

13         So, we get three basic arguments.  First, there is

14 Mr. Baena's argument and able presentation of course as always.

15 The first point that he makes is that the record is agin us,

16 that somehow we're asking Your Honor, gosh, you've got to

17 change your mind.  We've repeatedly lost on this and we're

18 asking it again.  He said, you have repeatedly refused to do

19 what the debtors are now asking you to do.  Unfortunately, it's

20 exactly the opposite.  I used the July hearing.  I could go

21 through July, August, November and most importantly the case

22 management order which flatly says that these results are going

23 to be binding with respect to all procedural and substantive

24 matters that get taken up.  So, far from --

25         THE COURT:  Isn't that talking about Phase 1 though?

1 Here's my --

2          MR. BERNICK:  Phase 1 and Phase 2.

3          THE COURT:  Well, here's my disconnect I guess

4 because I do recall these discussions, but I don't recall all

5 of the specifics.  I guess I'm going to have to get the

6 transcripts, which I have not, and look at them.  What I

7 thought I was talking about was the fact that for purposes of

8 the <u>Daubert</u> hearings and the Phase 1 estimation process, that

9 is going to be binding on everybody.  And everyone has had

10 notice.  And to the extent that anyone wants to participate,

11 they are free to do it.  So, if they want to show up and

12 participate in the discovery, they should do so, because if

13 they don't do so, they have been put on notice that I'm going

14 to be making rulings and those rulings will apply, period.

15          But, with respect to Phase 2, there maybe some common

16 issues.  You know, for example, without looking at a latches

17 argument, just a statute of limitations argument for example --

18 and this is hypothetical.  We'll pick Pennsylvania.  The State

19 of Pennsylvania has a statute of limitations.  It would apply

20 to buildings and owners in Pennsylvania.  So, to the extent

21 that there are numerous buildings or owners in Pennsylvania and

22 there's a statute of limitations issue that affects

23 Pennsylvania, maybe you can make those arguments or the

24 evidentiary hearing with respect to that limitations period in

25 a common trial.

1          But, I think you do have to lay out -- and I think

2    the debtor had expected to lay out -- what those common issues

3    would be, which is why I think Ms. Browdy's chart pretty much

4    does try to lay that out.  The lack of hazard in one sense, the

5    lack of authority with respect to some of Mr. Speights' claims,

6    the product ID, those were issues that the debtor said could be

7    from the debtors' point of view adjudicated on a common issues

8    trial basis.  But, I think that's in the nature of an

9    affirmative defense that you've got to raise with respect to

10   individual claims on a liability basis.

11          To the extent that the issues have some overarching

12   legal consequence, yes, they'll be binding.  But, to the extent

13   that you want to attach that overarching ruling to a specific

14   building, I think the individual building owner has the right

15   to participate.  So --

16          MR. BERNICK:  Absolutely, absolutely.  I completely

17   agree with that.

18          THE COURT:  Okay.

19          MR. BERNICK:  So, you know, the way that -- I can't

20   leave the microphone here.  But, the way that it's actually

21   spelled out and this is the case management order that was

22   entered, you have this integrated process where estimation now

23   includes the claims objections.  You have -- and that is

24   incorporated in turn in our omnibus objection that was filed in

25   September and served on absolutely everybody.  It called out

1    the dates.  It called out the objections.  It called out the

2    particular buildings.

3           So, going forward what happens?  Well, we had

4    essentially the first phase with the authority issues and the

5    other matters that have been taken up.  And that has been

6    highly successful in focusing the claims.  We're now down to a

7    more manageable population of claims.  And I think we're going

8    to be down even further before Phase 1 ever takes place.

9           You then had Phase 1.  And because Phase 1 involves

10   an issue that potentially can relate to a number of claims, it

11   gets teed up as a general issue.  People have the opportunity

12   to come and participate and they can come and participate.  So,

13   that is a threshold issue.  The dust sampling issue is a

14   threshold issue.  We then have Phase 2.  In Phase 2 are all the

15   remaining objections that the debtor made.  And the objections

16   are down at the building specific level.  And anybody who has

17   that building or a claim relating to that building, yes, they

18   should have the notice and opportunity to show up and we have

19   given them the notice and opportunity to show up.  We're not

20   talking about a huge number of law firms.  We're not even

21   talking about a huge number of claims.  And that's Phase 2.

22          So, we -- there was notice of that in the case

23   management order which says that -- recites that there's going

24   to be Phase 1, Phase 2, recites in Your Honor's own handwritten

25   language that Phase 1 and Phase 2 will be binding on all

1  individual claimants down to the -- where the Court is

2  determined to proceed in two phases.  Phase 1 is to be

3  bifurcated to deal with two issues:  Daubert methodology and

4  constructive notice.  Phase 2 will consist of the merits phase

5  estimation of the asbestos PD claims.  And all of the

6  objections have been made to each and every one of those

7  claims.  That's what Estimation Phase 2 is going to be about.

8  What about the result?  Any party can file the claim.  They

9  elect to participate in the estimation.  Regardless, the

10 determination of all procedural and substantive matters

11 relating to the estimate of PD claims shall be binding on all

12 PD claimants.  And then the September omnibus objection laid

13 out --

14          THE COURT:  Right.

15          MR. BERNICK:  -- for each and every building exactly

16 what objections there are.  We can proceed step-wise, Your

17 Honor, because I want to get to your question about the common

18 issues here in just a moment.

19          THE COURT:  Well, let me tell you what I thought this

20 order -- what we were talking about in this order was about.  I

21 thought when we were discussing this order that Phase 1 was

22 going to be the two issues that you identified and Phase 2 were

23 going to be these other buckets, the hazard issues and so

24 forth.

25          MR. BERNICK:  Yes.

1          THE COURT:  Okay.

2          MR. BERNICK:  Yes.

3          THE COURT:  For those, if you want -- if bound on

4    individual claimants, you're going to have to give specific

5    notice --

6          MR. BERNICK:  Yes.

7          THE COURT:  -- to those individual claimants.

8          MR. BERNICK:  We did.

9          THE COURT:  Well --

10         MR. BERNICK:  The September 15th omnibus did exactly

11   that.

12         THE COURT:  You have broken out in that September

13   15th omnibus that the 15th omnibus objection does list --

14         MR. BERNICK:  Each -- well, all those --

15         THE COURT:  -- and cross references all the

16   objections, yes.

17         MR. BERNICK:  All of them.  This is it.  Every single

18   -- for every -- we went through the questionnaires.  They

19   served a purpose.  They gave us the information by and large

20   ultimately that we needed.  So, when we put together these

21   objections, Your Honor, we went through all of the claim files

22   and identified for each and every building what the issues were

23   and what the evidence was based upon their own questionnaires.

24   So, for example, if somebody had a report where they had actual

25   notice of the fact that asbestos was in their building, we put

1  down the statute of limitation was actual notice.  If it was

2  constructive notice that was listed, if it was both that was

3  listed, we have lack of product ID identified.

4       We also looked to see who had dust sampling, who had

5  air sampling, and what the sampling was.  And all that we've

6  done with respect to this chart is we've taken exactly the same

7  grid of objections and we provided Your Honor a bit more of an

8  update to say either they have no data, they have dust only,

9  which has been indicated.  They have air sampling that was done

10  but it wasn't done to test the ordinary conditions.  It was

11  done at the time the asbestos was removed.  Or they have air

12  sampling that was done but is equal to levels of asbestos in an

13  outdoor area.  So, we have -- we just want to provide the Court

14  with a little bit more texture so Your Honor can see how

15  specific this actually has become.

16       So, we did this.  We gave them notice, the

17  opportunity to participate, and we even listed -- this is Page

18  8 -- claims brought too late.  We then listed individual claim

19  codes, what they stand for and when they'll be taken up, Phase

20  2 hearing.  So, I remember we put those together.  It was a lot

21  of work and it was totally transparent.  And that's why when

22  Mr. Dies decided to come forward and the gentleman from Riker

23  Danzig decided to come forward, they in fact disclosed experts

24  who are going to be addressing all of these different things.

25  And they did so in October because they knew exactly what it

1  was that was going on.  Now, I want to get to -- I'm a little

2  bit in sequence here and I'm now off, but I want to get to the

3  common issue point here.

4          THE COURT:  One second.  Mona, could you please go

5  out and ask them to get in touch with the building manager and

6  get some air in here.  We're still here.

7          MR. ESSERMAN:  It's blowing here, Your Honor.

8          MR. BERNICK:  I think it's on now.

9          THE COURT:  It is, really?

10         MR. ESSERMAN:  Yes.  It may not have reached the --

11         MR. BERNICK:  It's not a lot.

12         THE COURT:  Okay.

13         MR. BERNICK:  You're the one who is doing more work

14  than anybody else.

15         THE COURT:  Maybe it will hit up here earlier than.

16  Okay.  I'm sorry, Mr. Bernick.

17         MR. BERNICK:  Okay.  Now, let me deal with the

18  commonality issue.  And I want to go back to a couple things

19  that were raised by the other folks here.  We have an

20  estimation.  And I think that a lot of the disconnect here is

21  due to the procedural posture under the rules of what we're

22  trying to accomplish.  Folks who are coming in here like Mr.

23  Dies, like others, myself included, are accustomed to dealing

24  with these kinds of questions in the context of class

25  certification for Rule 42.  And this is estimation, and it's

1 the same and it's different.

2         Estimation, we have 502(c).  And we then have the

3 code also spells out rules for contested matters.  I'll just

4 call them procedural rules.  And estimation under 502(c) if

5 it's contested -- it's a contested matter, these rules apply.

6 So, you have procedural rules like Rule 42.  But, 502(c) says,

7 wait a minute.  I don't want to have -- this is supposed to be

8 a streamlined process.  If individual adjudication would take

9 too long, you estimate.  Now, what does that mean?  It means

10 that you have an adjudication, a rule based adjudication based

11 upon the merits and the rules.

12         But, estimation is a subcategory of this.  It is an

13 estimation that doesn't include a lot of the process in detail

14 that you would have if you litigated each case individually

15 through a full trial.  Otherwise, the gentlemen are correct, we

16 went through building by building by building by building,

17 full-fledged discovery, full trial of each and every case, it

18 would probably take a very, very long time.  Estimation is

19 designed to avoid precisely that result and to cut at the

20 joints.

21         THE COURT:  But, the problem is if you're going to

22 pay the asbestos property damage claims through some form of

23 trust, and the point is to estimate those claims for I'll call

24 it again feasibility purposes, then you don't need to litigate

25 the individual claims now.  That's what the trust is set up to

1 do.

2        MR. BERNICK:  No, but that's not -- with respect to

3 PI, that's true.  There's no -- in a sense, there are other

4 limitations that apply to PI.  With respect to PD, Your Honor

5 has both the -- has the ability to estimate not only for

6 feasibility purposes but also for purposes of allowance or

7 disallowance -- and here is where I'm going -- is that sure, if

8 Your Honor wanted to have a full adjudication of each claim

9 either here or before the trust, that's certainly possible.  We

10 won't then get to the bottom of what the claims are worth.  And

11 the purpose of the estimation, which is to drive the plan and

12 also to drive, you know, the process of negotiating the plan,

13 will have been frustrated.  They say --

14        THE COURT:  Well, but that's not necessarily so

15 because once you estimate the full amount of the claim, then

16 you know for purposes of what folks who eventually prove their

17 claim are going to be tapped at in terms of a distribution what

18 they're going to get.  I mean, that's the whole basis upon

19 which most settlements work.

20        MR. BERNICK:  But, that is a necessity with respect

21 to personal injury.  With respect to property, it's not.  And

22 the reason this is very important is that so long as you have

23 an overall cap, you may have defined the total amount that has

24 to be put forward, but the individual constituencies within

25 that cap don't know exactly what they're going to get out of

1 that and --

2          THE COURT:  Well, you tell them.  That's why you do a

3 trust.

4          MR. BERNICK:  Well, no, but a trust -- Your Honor,

5 the problem is that a trust then channels this whole issue to

6 being a down the road issue --

7          THE COURT:  Yes.

8          MR. BERNICK:  -- whereas there are -- there is such

9 -- as we've already seen, there are so many problems that

10 attach to these claims, we have claimants that shouldn't

11 participate at all.  And all that estimation is designed to do

12 -- if Your Honor were correct, why have estimation at all for

13 purposes of allowance and disallowance whereas that's exactly

14 what the code says.  The code says that's exactly why you do

15 this.  You don't have to sit there and defer to a trust.  You

16 can go and have your estimation on the merits.

17          Let me be more concrete about why I think this

18 ultimate works, not only works but works in a very concrete way

19 that doesn't pose these very abstract issues to the Court

20 about, well, are these common issues really common or not.  You

21 have, for example, product ID.  Product ID will have broad

22 issues.  A lot of things have been said about Mr. Lee.  They

23 say, oh, Mr. Lee is wrong.  We've got our guys, MAS

24 Laboratories.  That's an issue.  The debate between those two

25 people you can have right here on the stand.  You can determine

1  whether there is a problem with product ID or not.  Now, there

2  maybe and there will be samples that they'll have taken, that

3  they'll have analyzed.

4          There maybe other things that pertain to whether

5  there is Grace product there or not.  For example, they say,

6  well, we have a plan that calls for Grace product.  Well,

7  that's great, but you had the plan.  We can go out and sample

8  right there.  If the stuff is actually there, we can determine

9  it.  So, what's the relevance of the plan?  Your Honor can

10 determine what's the relevance of architectural plans?  And the

11 point is that as a result of this process, we will translate

12 this to the individual claims.  They will have the ability if

13 they want to come in and put other issues that are on the

14 table.  That's not our burden, that's their burden.  These are

15 their claims.  They have to establish value for their claims.

16          And product ID is not our defense.  Product ID is

17 their burden of proof.  And nothing stops them from coming in

18 and saying, with respect to the following 15 buildings, we have

19 architectural plans that call for it.  Your Honor gets to hear

20 all of the -- all the facts that they believe are not picked up

21 by the common issues.  You can weigh all of these in coming up

22 with a value for the claims.  Maybe you'll decide, for example,

23 the claims where they have no data, no data to say what is

24 actually in the air, none, that those are worth nothing.  The

25 ones where they have dust only, we would say are worth nothing.

1  Maybe Your Honor would disagree, but you would know what the

2  debate was.

3         With respect to buildings where the air sampling

4  showed levels that were consistent with outdoor air, that is

5  basically clean air, maybe you'll decide that those are worth

6  zero.  And with respect to claims where they have air data that

7  shows elevated levels, they should be worth twice as much.  You

8  can see how these basic issues are -- these are fundamental

9  issues to the case.  Is the product there?  Is it at levels

10  that is in a way that leads to hazardous levels of fibers in

11  the air?  And is there a problem -- this is now our burden with

12  the statute of limitations.

13         We'll present this.  We'll present the common issues.

14  What that is is all laid out in our objections.  You don't have

15  to sit there and speculate about them.  The people who have

16  litigated for years will be very familiar with what these

17  issues are.  This is our position with respect to the

18  valuation.  If they want to come in with their own experts and

19  with people who will provide more evidence, they are free to do

20  that.  That certainly can be done.  No one is telling them they

21  can't do it.

22         This is fundamentally different from what you have

23  outside of Chapter 11, because outside of Chapter 11, Your

24  Honor wouldn't have the flexibility to decide, you know, where

25  to draw the line on how much evidence I'm going to consider.

**J&J COURT TRANSCRIBERS, INC.**

1  You wouldn't have that kind of latitude because the rules would

2  tie your hands.  Here, merit space and adjudication, merit

3  space estimation, Your Honor, has the ability to decide how to

4  weigh these different sources of evidence.

5        If you don't do this, you really don't have any other

6  choice but to accept their vision of the world.  What's their

7  vision of the world?  Their vision of the world is we can't do

8  merit space estimation because it's just going to take way too

9  long, or only do it in the broadest aggregate sense which

10 really doesn't tell us anything about what the claims are

11 actually worth.  The code specifically says you can do this.

12 It specifically gives you the rules for doing it.  And you now

13 have all the information.  And if we're wrong about the

14 estimate, we're wrong about the estimate.  We're prepared to

15 have that be tested in a proceeding rather than simply punt.

16       And that's our -- so, I think when it comes down to

17 it, first of all, is there a record that says that our efforts

18 have been rebuffed, that we're coming back again and again?

19 Your Honor repeatedly has said it's a different process and

20 it's only for feasibility.  No one showed you a single quote

21 from the record that said that, not a single quote.  No one

22 said -- showed you a record quote, oh, this is only for

23 feasibility purposes, or the processes are different, or the

24 processes are separate.  No one showed you that.  And in fact

25 the record says exactly the opposite, which is that they become

1 completely integrated.

2          So, there's a lot of talk about how we're coming back

3 to the well again.  We came to the well before.  We believe we

4 got clear determinations from the Court.  And it's they who

5 should have the burden of saying, you ought to change your

6 mind.  The argument made by Mr. Baena is that 502(c) was never

7 specifically adopted.  Well, it was argued until we're blue in

8 the face.  I guess we're now asking you to expressly adopt

9 502(c).  It clearly was what we were arguing all along.  Nobody

10 said 502(c) is not -- doesn't permit this because that's

11 exactly what 502(c) was designed to achieve.

12          The argument was made due process.  Mr. Baena made

13 the argument first.  And he cited the case <u>Federal Mogul</u>, Judge

14 Rodriguez's decision.  Judge Rodriguez's decision in <u>Federal</u>

15 <u>Mogul</u> pertained to estimation of personal injury claims, not

16 property damage claims.  Is there a requirement of due process

17 though with respect to property damage?  Absolutely.  There has

18 to be notice, there has to be an opportunity to be heard, and

19 there have to be rule based procedures.  Notice was furnished

20 in the case management order that was entered and notice was

21 furnished in our omnibus objection, the 15th objection, down to

22 the last building an opportunity to be heard.  Everybody has

23 had the opportunity to be heard, and in fact they are being

24 heard.

25          Rule based procedures, exactly so.  We are the ones

1 who have pointed out the rule basis for these procedures.  We

2 have cited the cases.  There is no due process issue.  The only

3 question I think what Your Honor is addressing is, sure, we can

4 do this.  Is it the most -- do we have to do it and is it the

5 most efficient way to do it?  Clearly, the most efficient way.

6 Anything else sends you down a road of individual claim

7 litigation which frankly would be needless even outside of

8 bankruptcy.  In bankruptcy, you have estimation.  Should you --

9 do you need to do this?  Absolutely, Your Honor.

10       Unless we get down to the brass tacks of wrestling

11 with these issues and getting them framed, if all that's

12 involved is kind of an aggregate number, then what Your Honor

13 is going to basically lead to here will in fact lead to it is

14 that we will have people just kind of doing rough numbers and,

15 well, it's this or that, pick something in the middle.

16 Estimation is not picking something in the middle.  Estimation

17 is an adjudication of the liability and damages that flow from

18 a claim.  It is merit space.  It's not, oh, well, I think this

19 is good for negotiation purposes, or let me pick a number.  And

20 I'm not suggesting that Your Honor would do this, but we have

21 seen that done before.  Estimation is merits.  What are the

22 merits of the claims?  Prudential comes -- well, I'll deal with

23 Prudential in a second.

24       So, Mr. Baena argues due process.  There has been

25 tones of due process here.  Then, he goes back and says, well,

1  you know, this has all been a failed effort.  This whole thing,

2  this jihad that -- and I have to say I've never been accused --

3  I've been accused of that with many things but never leading a

4  jihad.  But, he has suggested that somehow it's all been a

5  failure.  That's just absolutely astounding.  We started out

6  with a history of seven claims that were pending at the time of

7  the Chapter 11.  We then boomed to 4,000 claims with the bar

8  date.  And through the good work of people like Ms. Browdy and

9  many, many others, we have gotten rid of a lot of junk in the

10 system.  And we would be happy at an appropriate point in time

11 to go back over the history of how that happened with respect

12 to Mr. Speights and others, but it's not germane here.

13        The fact of the matter is we're now down to 500

14 claims.  That's a different world.  We've got the data on them.

15 We've got the questionnaires on them.  We have issues framed.

16 It is a dream menu for the Court slicing along the joints on

17 the basis of the merits and giving people guidance.  What we

18 hear from them is, oh, it's impossible.  It just can't be done.

19 Estimation was designed to deal exactly with that.

20        Two more points, Prudential.  Prudential says

21 literally, we did not realize that individual claims were

22 involved at the time that the initial disclosure was made.  We

23 did not realize that.  Well, take a look at the subjects of

24 testimony that are identified in their disclosure of October

25 the 3rd.  Prudential's claim against the debtors for asbestos

1  property damage at 1100 Millum, I think that's an individual

2  claim.  Century City Buildings, I think that's an individual

3  claim.  Short Hills, I think that's an individual claim.  First

4  Florida Tower, Brookhill, they've got their individual claims.

5  That's exactly what they identified their people for.  And this

6  is the best evidence the fact that they received and got notice

7  from the 15th omnibus.  We laid it all out.  Your Honor had the

8  CMO that says it's going to be binding.  And literally within

9  two or three weeks, that know that the individual claims are at

10 issue and they are identified, the people they need to be able

11 to litigate those claims, which is exactly what they should

12 have done.

13         So -- and if this were true, if it were true what Mr.

14 Baena says, oh, you litigated and you lost, you lost, you lost,

15 and what they were saying is true which is, oh, this is news to

16 us, we're going to have to backpedal, why would they be doing

17 this?  It's because they know exactly what was going on.  They

18 had gotten notice and they were interested in protecting their

19 rights.  Mr. Dies was interested in protecting his claimant's

20 rights.  He did the same thing.  So, now what's really

21 happening is that because time has passed, they now want to

22 reargue this.  And they're now taking us back to October of

23 last year and saying, pretend that what we understood didn't

24 exist and let's take this and put it on a different track.

25         THE COURT:  But, if the debtor is convinced that I've

1  already ruled this way, why do I have a motion for

2  clarification here?  I mean, we've now spent two hours --

3          MR. BERNICK:  I'll tell you why.

4          THE COURT:  -- on this motion that you say I've

5  already entered.

6          MR. BERNICK:  I'll tell you why.  I'll tell you why.

7  It's out of an abundance of caution.  And the very -- well,

8  there is chuckling over here from Mr. Lockwood because he

9  doesn't have a dog in this fight.  But, the fact of the matter

10  is that we were worried that because there had been this

11  history here and we had filed the omnibus and had gotten these

12  things going, we wanted to make sure that before we actually

13  filed a brief that said disallow, that there could be nobody

14  who would even raise a question on the record.  And we knew

15  that this was likely to probably re-raise the same arguments.

16  But, Your Honor, we felt that we couldn't take a risk of there

17  being any issue at all.  So, we put it just right on the table,

18  and that's what we did.

19          Now, maybe we made a mistake that way.  But, the fact

20  of the matter is this is what the record is and this is now the

21  fourth time I think that I have stood to make exactly the same

22  argument.  And, Your Honor, I want all those other times

23  included in the case management order.

24          THE COURT:  Then I don't know why you're back here.

25          MR. BERNICK:  Well, that's probably a good question.

**J&J COURT TRANSCRIBERS, INC.**

1  Now, one last thing I'll say and then I'll sit down.  And I

2  know that we're now going to get, oh, well, you know, well --

3  the fact of the matter is it is was the record says.  So,

4  Prudential, we've talked about Mr. Dies.  All I can say to Mr.

5  Dies is this.  It's relatively clear that outside of

6  bankruptcy, no claimant has to deal with this.  Outside of

7  bankruptcy, you have full adjudication.  You cannot

8  extrapolate, generally speaking, although there is some issue

9  about whether that might be true in certain contexts.  Every

10  defendant is entitled to insist upon full individual

11  adjudication.  Surprise of surprise, that's exactly what they

12  do.

13        And the only way that you can have aggregated

14  proceedings outside of Chapter 11 is either class

15  certification, where it's predominance requirement, or Rule 42

16  where the Court with all the claims before it to frame a common

17  issue.  I believe that there are certain common issues here,

18  but some of the issues that we have here are not common issues

19  in the classic nonbankruptcy sense of class issues.  So, it

20  would definitely be a stringent process outside of bankruptcy.

21  There would be a lot of focus on the common issues.  There

22  maybe more limitations to what we can do.

23        For example, constructive notice I think would be a

24  clear common issue outside of Chapter 11.  The Daubert issue is

25  a clear common issue outside of Chapter 11.  But, in Chapter

1  11, the usual rules that say you're entitled to individual

2  adjudication, they don't apply.  So, when he makes the argument

3  that says, oh my gosh, you know, in all the 25 years, this

4  never actually happened, it never actually happened because he

5  never had to do an estimation in Chapter 11.

6        THE COURT:  Well, I think it's going too far to say

7  that those rules don't apply.  502(c) is an exception not the

8  general rule.  And you have some things that you have to prove,

9  that it would not ordinarily delay the confirmation or progress

10 of the plan, essentially that the claim can't be estimated on

11 an individual basis sufficiently to get through the

12 confirmation process.  And that's where I'm having some

13 difficult.  I thought when this process started months ago that

14 the purpose for Phase 2 was in essence to pick up the

15 equivalent of legal questions about the claims, i.e., are they

16 barred by a statute of limitations which is in the nature of an

17 affirmative defense.  But, nonetheless, if it applies, we'll

18 bar the claim.

19        With respect to product ID, has the claimant met a

20 burden initially of coming forward with sufficient evidence to

21 show that its proof of claim is entitled to some weight in the

22 process?  I just have not seen this in the same construct that

23 you're arguing it today.  I did for Phase 1.  It seems to me

24 that I have to go through the Phase 1 process and determine

25 what standards are going to apply especially for, you know,

1 looking at expert analysis, what can -- what will apply.  And

2 everybody is going to have to live with that, which is why I

3 thought that claimants should be advised that they better come

4 forward if they want to participate because they're going to be

5 bound by it even if they don't, which is the reason I thought

6 we were giving this notice.

7        The Phase 2, to the extent that there is some -- and,

8 again, you're talking about burden of proof, and that's

9 probably true in some aspects.  I've been looking at it in the

10 nature of defenses to the claim.  But, in some aspects -- in

11 some situations, it is an element of the claim.  I agree with

12 that.  I thought if those were issues that could be looked at

13 in a global sense and will bind anybody for whom that issue

14 applies, then it's going to bind whoever comes in.

15        MR. BERNICK:  That's --

16        THE COURT:  But, I don't know how you get from that

17 to individual buildings.  And it seems to me that if you really

18 want this to go forward on the basis of binding individual

19 buildings, that we need to give a different kind of notice and

20 tell everyone this is going to be a trial on your objection to

21 claim, and discovery is open and here is the case management

22 order.  And if you don't show up, you can be subject to an

23 adverse judgment.  And if they come, they do.  If they

24 participate, they do.

25        MR. BERNICK:  Well, you know, Your Honor, I think

1  we've already seen them come and participate in --

2         THE COURT:  Well, some people are here, but I'm

3  hearing from them that -- with a different intent.  But,

4  frankly, when I read Prudential's submission, I thought it was

5  with the intent of coming forward to participate, too.

6         MR. BERNICK:  Yes.  Well, in Mr. Dies -- well, in --

7  well, what we're talking about here with Mr. Dies and Mr.

8  Speights, Prudential is down here.  You know, I don't mean to

9  diminish their role here, but they're not actually -- you know,

10  they're not the dog.  They're the tip of the tail.  The fact of

11  the matter is that overwhelmingly these claims are represented

12  by the very same people who participated in this entire process

13  from day one.

14         THE COURT:  Well, they may be.  But, to the extent

15  that there are 99 Louisiana that may not be --

16         MR. BERNICK:  Those are I believe included in Mr.

17  Dies.

18         THE COURT:  I'm sorry.  They're Mr. Dies.

19         MR. BERNICK:  Yes.

20         THE COURT:  So, we're looking at 65 claims?

21         MR. BERNICK:  Yes, I mean, that's --

22         THE COURT:  So, then let's give notice to the 65

23  buildings and say, this is your last chance to get involved in

24  the process.

25         MR. BERNICK:  Well, I don't have a problem --

1          MR. BAENA:  Judge, before you rule, can I be heard

2 again, please?

3          THE COURT:  Yes.

4          MR. BERNICK:  I don't -- we don't have a problem with

5 that.

6          MR. BAENA:  First, Judge, respectfully, this is a

7 defining moment in the context of this estimation proceeding.

8 And I don't know how to say this except candidly.  If you have

9 not read this motion and the papers filed in respect to it,

10 before you rule, you ought.

11          THE COURT:  Well, I have but I will read it again

12 before I rule because --

13          MR. BAENA:  Because it is --

14          THE COURT:  -- apparently the significance is gotten

15 quite big.

16          MR. BAENA:  Yes.  In regard to certain specific

17 comments that Mr. Bernick made, I think we need to debunk some

18 of the myths that he is applying here today.  It just never

19 happened.  I wasn't here for any of these hearings that he won.

20 Let me start with -- because he said we never said anything

21 about it -- the 15th omnibus objection.  This is their

22 objection.  And guess what, all the tons of due process about

23 how all of this was implicated in Phase 2, this is what they

24 told the PD claimants about how it was implicated irrespective

25 to the statute of limitations claims, irrespective to the

1  hazard claims, irrespective to the product ID claims.  After

2  estimation concludes, individual claims identified in Exhibit

3  D-3 through D-6 maybe addressed either at pre- or

4  post-confirmation.  They say the same thing in the next

5  paragraph.

6       They clearly gave every impression as far as this

7  omnibus objection that it was just that.  It was an omnibus

8  objection to claims.  Now, they start pointing to these charts

9  within the objection about when these things are going to be

10 heard.  I missed the hearing when he won that one because the

11 court rejected all of the proposals because we complained that

12 they would have claimants here five and six times.  Everything

13 that was in that motion was roundly and soundly rejected.

14      Just so there is no misapprehension about the 502(c),

15 apparently Mr. Bernick wasn't here when we complained

16 veraciously about 502(c)'s application here.  And on the very

17 same day, I was reading the -- I read the transcript on the

18 airplane this morning.  And even my memory banks can hold data

19 for about 12 hours.  And the very same hearing, Mr. Lockwood

20 was complaining about the same argument about 502(c) when we

21 told you 502(c) does cover -- does provide the Court with an

22 opportunity where there is evidence that there would be a delay

23 in respect to the adjudication of a claim to estimate that

24 claim for purposes of allowance.  It talks about one claim.  It

25 talks about one claim.

**J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  But, if you can estimate one, you can

2  estimate more than one.  You can --

3          MR. BAENA:  Arising out of the same operative facts.

4  But, these do not arise out of the same operative facts.  There

5  is absolutely no predicate proof that they arise out of the

6  same operative facts.  What's more, they haven't filed any

7  motions to estimate these individuals claims.  That's not the

8  process that's been teed up.  In fact, let me remind everybody

9  as well that the United States Supreme Court said, we can't

10  take 502(c) and perform this massage that's going on now

11  because it is very specific about the rights it conveys in-

12  house.  It says that's all, that's all it provides.  And they

13  didn't seek relief under that section, that was granted.  And

14  that's not why we are here.

15          On the issue of 502(c), the one point about 502(c)

16  which is I think the one that deserves the most discussion, and

17  I hate to say it but not even Mr. Bernick brought it up.  The

18  purpose of 502(c) is to avert an undue delay in the

19  reorganization of the debtor.  I think this case was filed in

20  April 2001.  I think it's still July 24th, 2006.  That's

21  happened.  And what's being asked of you?  The charge for not

22  doing what they want to do now by stealth is that the

23  recriminations are served up upon the claimants.  The claimants

24  get thrown into this cattle car with one another.  They're

25  forced to expend all the money that you didn't want them to

1  expend to defend against more than twice coming into this Court

2  objections against their claims.

3         And he describes this as a down the road issue, that

4  we would have it be a down the road issue.  It was a down the

5  road issue in April of 2001.  The road is way behind us at this

6  point in time in July 2006.  They have to suffer for not having

7  prosecuted the claims despite the fact that you told them on

8  numerous occasions to do so.

9         The CMO language, Judge, that was interlineated by

10 the Court at Paragraph 2, I don't want to talk about it,

11 because once again, they're taking it out of context.  I need

12 to bring it up.  You're absolutely right in your recollection

13 what happened.  There was a dispute about that paragraph.  We

14 wouldn't agree to that paragraph.  And the result that was

15 obtained was your interlineation that was rejected what they

16 proposed, accepted what we proposed.  And what essentially the

17 Court said and meant by that, as far as everybody in the

18 courtroom thought, was that there will be rulings in respect of

19 Phase 1.

20        At that point in time, remember they were asking for

21 two different determinations, constructive notice and

22 methodology.  You said we can come back later and we did.  We

23 knocked out constructive notice which, by the way,

24 parenthetically is kind of important in this context too,

25 because when you knocked out constructive notice was another

1 instance when he didn't win.  And you told him, that's claim

2 specific.  It's not part of an estimation process.

3        In any event, we all left understanding very clearly

4 that Phase 1 might result in rulings by the Court that would

5 determine the sufficiency of proof that PD claimants offered as

6 to the extent of contamination in their buildings.  You might

7 conclude that dust was no good, that air was no good, that dust

8 and air were no good, and it would affect anybody who is

9 relying upon any of those methodologies for determining the

10 extent of contamination in their buildings.  But, the fact of

11 contamination, you remarked when we were arguing about these

12 issues, was clearly a building by building analysis.

13        Your Honor, let me put this in proper perspective at

14 this late date and time.  The CMO that they're offering up

15 today would have Phase 1 tried in January and Phase 2 tried in

16 March.  Let's bear that in mind when we take into account now

17 implicating 900 claims in the process.  Thank you, Judge.

18        MR. BERNICK:  Your Honor, just a couple brief

19 comments.  I would indicate to the Court, because I think

20 you're probably going to want to go back and read the briefs,

21 what it was that was amended at Page 115.  This is in August.

22 This is now the second transcript where the Court can read what

23 our concerns are.  This is now August.  This was the transcript

24 of the case management order was entered.  You said, why don't

25 we redo this.  This is now the case management order itself

1  which was the interlineation that counsel has now said -- I'm

2  not sure what actually the issue was -- why don't we agree to

3  do this and simply say that the Court has determined to proceed

4  in two phases.  One is the argument to determine how Phase 1

5  will be heard on either November 14, November 22nd, whatever

6  it's going to be.  And at that time, I'm going hear the concern

7  about what methodologies can be used at the ultimate trial and

8  the issues on constructive notice.  So -- we're not saying --

9  talking about Phase 2, Phase 1.

10         And so, Phase 1 will be bifurcated by Phase 2 so that

11  Phase 1 will determine those two limited issues, the Daubert

12  standards and the constructive notice standards.  After Phase 1

13  is determined, we move to Phase 2 and do the trial on the

14  merits.  And that -- I said, and that's fine.  And the Court

15  consented.  Remember, this is what got translated in the

16  handwriting I believe -- I'm not sure if it was Your Honor's

17  handwriting or -- into the merits of the PD asbestos claims,

18  the merit space estimation of the PD claims.  And I think we

19  can then say everybody is notified.  You can show up or not

20  show up if you choose, but you're going to be bound by every

21  decision that I make until I issue a final ruling, which is

22  then, you know, taken on appeal of parties choose to appeal.

23         But, my concern about giving notice is to let

24  everybody know that this is it, folks.  If you have got a

25  property damage claim out there and you want me to hear

1 something about it, you've got to show up and tell me about it

2 now because otherwise you're not going to have a chance.

3 That's what I'm worried about.  And that together with the

4 language of the CMO which talks about merit space estimation of

5 the asbestos PD claims and on the next page the language that

6 says, "Regardless of the Court's determination of all

7 procedural and substantive matters relating to the estimation

8 of PD claims shall be binding on all PD claimants," we went

9 ahead and construed that to mean exactly how it reads.  It

10 doesn't say, only for feasibility purposes or -- so --

11          THE COURT:  Well, let me clarify this order.  First

12 of all, that is not my handwriting.  That is somebody else's

13 handwriting.

14          MS. BAER:  This is mine.

15          THE COURT:  Thank you.

16          MR. BERNICK:  Okay.

17          THE COURT:  Ms. Baer's handwriting.  Based on the

18 fact as I recall that the parties got together and decided what

19 language would reflect my ruling.  So, I signed it.  It's my

20 order.  My understanding of that order was that it was going to

21 apply to Phase 1.  Looking at this transcript, I have -- I

22 think that's not correct.  I apparently intended to go onto

23 Phase 2, which maybe why people have been submitting expert

24 reports, except I don't know what that's going to have to do

25 with Phase 2 at this point.

1          MR. BERNICK:  Well, here's what I was going to

2    suggest.  My purpose of going through this is to then lay the

3    groundwork for what happened next, which was the omnibus

4    objection on the 15th.  And that clearly spelled out the

5    objections on building by building --

6          THE COURT:  Yes, I ordered that --

7          MR. BERNICK:  Yes.

8          THE COURT:  -- because I wanted to make sure that

9    every claimant had a specific document that told them what

10   debtor's objection was going to apply to their buildings and

11   the cross reference.  That I have a recollection of.

12         MR. BERNICK:  Right.  And then with respect to that,

13   it actually goes on to say -- Mr. Baena kind of went through

14   this a little quickly.  It says, "For example, with respect to

15   failure to establish hazard, after this Court addresses dust

16   here, the Court will then be in a position to address whether

17   the claims identified on Exhibit E-1, E-3 and E-4 contain

18   sufficient supporting evidence to establish a hazard."  These

19   claimants, that's what it says.

20         "The individual claims identified in E-1, E-3 and E-4

21   maybe later addressed either pre- or post-confirmation."  What

22   does that mean?  It says, the sufficient supporting notice to

23   establish a hazard that is with a threshold question of whether

24   they even get to the point of establishing a hazard.  If Your

25   Honor were to determine that they do, then there maybe

1  individual claimed evidence that will be relevant either

2  pre- or post-confirmation that can be addressed.  But, the

3  point is that if they can't -- they don't have the information

4  sufficient to show there's a hazard, that's very relevant in

5  Estimation Phase 2 to establishing that they have very little

6  value at all.

7          So, this is very, very steady.  E-4 -- just to be

8  clear, E-1 to whatever it was, claims providing no proof of

9  hazard.  That's the way it's styled.  We're talking about do

10 people even have the data to be able to show that there's a

11 hazard at all.  So, if they don't have that data -- first of

12 all, if it's dust only, we say they're out.  Or if there are no

13 date, they're not.  If they've got air data, is it relevant air

14 data?  So, it's a threshold issue just like product ID is a

15 threshold issue.  Just like statute of limitations is our

16 burden but it's a threshold issue.  We --

17         THE COURT:  Well, that much I agree with.  I mean, I

18 thought the purpose -- maybe I'm not articulating this very

19 well.  I thought the purpose of the Phase 2 process was to --

20 I'm going to use the word put common issues before the Court to

21 make common rulings.  For example, if dust sampling applies,

22 then it will apply to anybody who has dust sampling.  If it

23 doesn't apply, it won't apply to anybody who has dust sampling.

24 So, that issue and that determination would apply.  But, it

25 won't say that as to the rest of the merits of the claim --

1 let's say that just a hypothetical.  Let's say dust sampling

2 does apply in whatever -- Building 35 uses dust sampling.  That

3 won't determine the merits of Building 35's claim.  It will

4 simply say that going forward to prove the claim, yes, you can

5 use dust sampling.  That's how I understood this process to

6 work.

7          MR. BERNICK:  Right.  We're all on the same page.

8 So, we can say --

9          THE COURT:  Well, I don't know if we are or not.

10          MR. BERNICK:  Well, so far.  So, then we go to --

11 well, if they don't have dust, do they have air and what does

12 the air data show?

13          THE COURT:  Well, that's fine.  But, what I'm trying

14 to get beyond is let's assume that somehow or other a

15 particular claim satisfies this lack of hazard standard.

16          MR. BERNICK:  Yes.

17          THE COURT:  They show that there is a hazard.

18          MR. BERNICK:  Yes.

19          THE COURT:  Okay.  That doesn't address the entire

20 merits of the claim.

21          MR. BERNICK:  Well, that's fair enough, Your Honor.

22 What we have teed up here are what we believe to be common

23 issues -- it's not every issue in the case -- common issues

24 that we believe are -- material to estimating the claim.  If

25 there are claims that after you get done, you say, oh, I think

1  they got product ID.  I think that they have got evidence to

2  show that there's a hazard.  They have sufficient evidence to

3  show there's a hazard, and they're not barred by the statute of

4  limitations.  We are going to be down to what we believe to be

5  a very small number of claims.  If I have proven wrong, there

6  will be a more substantial number of claims.  And then we will

7  have to get to estimating the value of those claims.

8          THE COURT:  Well, that --

9          MR. BERNICK:  And I think at that point for estimate

10  -- for purposes of estimating the value of the claims, you're

11  going to find that both sides will talk about the history of

12  what claims have been brought on a per square footage basis.

13          THE COURT:  But, I don't -- that's where I'm losing

14  track.  I haven't given a thought to Phase 3, what happens when

15  we get through this process.  Let's assume for purposes of a

16  trial judge's nightmare the worst of all possible worlds, that

17  all of these claims prove that they have merit, they pass the

18  lack of hazard, they pass the product ID, they pass the statute

19  of limitations.  Now I know that we have 500 claims that need

20  to be adjudicated somehow.  This doesn't constitute an

21  adjudication of the claim.  It sets the standards by which

22  they'll be adjudicated.

23          MR. BERNICK:  Well, yes and no.  With respect to what

24  you have determined, Grace of course will be precluded from

25  arguing against those issues --

1          THE COURT:  Correct.

2          MR. BERNICK:  -- on those points.  By the same token,

3  if you were to decide in Grace's favor on any one of these

4  things, any claimant whose claim was objected to on that basis

5  would be bound by that outcome.

6          THE COURT:  I agree with that.

7          MR. BERNICK:  And that is all that we're trying to

8  do.  That is, to the extent that these issues are litigated,

9  they do apply to individual claimants.  They're not just

10  aggregate determinations.  They apply to individual claimants

11  with respect to the group as a whole to the extent that we

12  satisfy the Court that they are in fact applicable to

13  individual claims.  If we have claims that pass all of these

14  different thresholds and are still left, Your Honor is correct.

15  We would then have to figure out some way of estimating those

16  claims.

17          THE COURT:  Well, maybe.  They have to be valued at

18  some --

19          MR. BERNICK:  They have to be valued in some way.

20          THE COURT:  Fashion, right.

21          MR. BERNICK:  And we believe that again that can be

22  done and we have disclosed the experts to be able to do that.

23  And it's probably going to come down to basic historical

24  averages for the resolution of those claims that occurred

25  before.  We would probably agree to do it on that basis.

1    THE COURT:  Well, I've been listening to this

2  argument for two hours.  I don't think anything has changed

3  from what I said before.  And I'm a little troubled by why I've

4  had this four times now when I don't think I'm coming out any

5  place any differently than where I was before and --

6         MR. BERNICK:  Well, what I --

7         THE COURT:  And I'm confused now.

8         MR. BERNICK:  Well, what I would propose is this,

9  Your Honor.  We put it to the Court.  We want it to be clear

10  that whatever comes out of Phase 2 is in fact binding down to

11  the individual claimant.  I think we had that before.  I don't

12  think Your Honor has disagreed with that.  If we have to

13  provide better notice to some of these 65 people here -- we'll

14  even re-notice the folks at Riker Danzig to tell Prudential

15  that this is going to happen.  We're happy to do that.  But,

16  the notice issue is not really going to change the picture with

17  respect to Mr. Speights and Mr. Dies, both of whom are very

18  capable of participating in this process and have participated

19  in this process fully.

20         THE COURT:  All right.  So, the debtor's concept of

21  what the common issues are -- and I do mean common issues --

22  the lack of hazard you're saying is simply a proof of claim

23  issue.  Someone either doesn't have expert analysis to show

24  that they have a respirable asbestos that will cause a problem

25  within the building that needs to be remediated in some

1  fashion.  And your argument, if I understand it, will be, for

2  example, some of the claims provided no data at all despite an

3  opportunity to supplement.  They should be disallowed for no

4  other reason than that.

5          Some claims provided only dust sampling.  You're

6  going to give me an expert report that says dust sampling isn't

7  relevant to determining the level of asbestos in the air as to

8  whether or not it causes a hazard, only that it can identify

9  that there is asbestos on the premises.  And as a result,

10 that's insufficient expert analysis and those claims should be

11 disallowed.

12         MR. BERNICK:  Yes.

13         THE COURT:  All right.  I don't know about the air

14 sample or not, but let me just go past that.

15         MR. BERNICK:  This is very simple.  If the air data

16 they have is the same -- shows the same is indoors and

17 outdoors, basically it's so low you can't argue that it's a

18 hazard.  This one here says that all the samples they have are

19 when they're knocking the asbestos down in the process of

20 remediation.  That's not relevant to what the conditions were

21 at the time the asbestos was --

22         THE COURT:  Okay.  Within that bucket, let me --

23 again, I'm just going to assume -- I don't know how many claims

24 that is and I don't -- I can't really read that chart very

25 well.  So, how many claims are in that lack of hazard bucket?

1      MR. BERNICK:  All of the claims are subject to this

2  problem.

3      THE COURT:  Okay.  So, 500 and --

4      MR. BERNICK:  There are different aspects of it, but,

5  yes.  That's what we've tried to do is to say, well, with

6  respect to the Louisiana claims, we've kind of shaded here that

7  they would have -- they have irrelevant -- that either data

8  that is -- shows that there's not a problem, that is outdoor,

9  or irrelevant air data.  And with respect to the rest, you just

10 don't have air data at all.  The same thing with Mr. Dies'

11 other claims.  With respect to Mr. Speights, you either have

12 dust data or you don't have any data.  So, that's how it breaks

13 out.  All we did is we went through their questionnaire

14 responses and we looked for this --

15     THE COURT:  All right.  So, of the 501 claims that

16 you want to put into this Phase 2, the first thing to be tried

17 is lack of hazard.  If you are able to knock out those 501

18 claims on that basis, that's the end of the game.

19     MR. BERNICK:  That's the end of the game.

20     THE COURT:  All right.  Now, let's assume you can't

21 knock them out.  Then the next thing is we look at the proof of

22 claim and see whether there is product ID.

23     MR. BERNICK:  Right.

24     THE COURT:  Your objection is based on the fact that

25 there is no product ID of Grace's product in the proof of claim

1 and it hasn't been supplemented.

2          MR. BERNICK:  Our objection there would be that they

3 have either not provided product ID or they provided proof of

4 product ID in the form of documentation such that it was in the

5 architect's plans or here's an invoice.  Whereas if they had

6 samples, our guy looks at their samples and then says, are

7 their samples really samples that show the Grace asbestos

8 fingerprint or not?

9          THE COURT:  All right.  Well, let me pick on Mr. Dies

10 for a moment.  Of his 160 claims, you have a small chart on the

11 bottom, a small indication that -- I'm not sure, maybe 20 just

12 to pick a number.  Let's say 20 of his claims have a lack of

13 product ID.  So, the other 140 of his claims aren't going to be

14 subject to any --

15          MR. BERNICK:  That's correct, not for product ID.

16          THE COURT:  -- prosecution defense on that issue.

17          MR. BERNICK:  On that issue, that's correct.  And

18 then last of all, you have the statute of limitations.  And

19 there, it's really pretty simple.  We will have a constructive

20 notice argument that will be history of, you know, who knew

21 what and when, should have known what when.  And then actually

22 which is we actually have people who say -- who have a report

23 in their files -- because remember the questionnaire asked for

24 that -- that says, you've got asbestos here.  Or for the

25 University of California, it maybe that the University of

1  California as a whole had information saying, you've got

2  asbestos in your building.  We believe we can establish that.

3          This is kind of -- and we've done this now, Your

4  Honor.  We've gone through the claim files and we've pulled the

5  documents.  This will be, here it is, Judge.  Here's the

6  notice.  You decide whether they're on actual notice or not.

7          THE COURT:  Well, okay.  Actual notice is one thing.

8  Constructive might be something quite different, but that's a

9  discussion for another day.

10          MR. BERNICK:  And this basically all this shows --

11  and we've broken that out for each individual claim.

12          THE COURT:  Okay.

13          MR. BERNICK:  So, I guess that's where we are.  If I

14  -- I have to say, Your Honor, that even if it turns out that

15  Your Honor decides to stay exactly where you are on this, I

16  think that (a) it is good to have had this discussion because I

17  think that there's more shared understanding of what's been on

18  Your Honor's mind, and maybe with the passage of months, you

19  know, this maybe has slipped at least my memory or others.  I

20  don't know, but this is what we're embarking on.  And we want

21  to make sure that the results that come out of this issue

22  oriented process -- and they can come back and argue as much as

23  they want that, oh, there's other evidence that says that what

24  he's saying is irrelevant, they can always come back and say

25  that.

1           THE COURT:  Okay.

2           MR. BERNICK:  Our position is going to be that these

3    issue should control and nobody should be able to come back and

4    relitigate them.

5           THE COURT:  Okay.  I think I understand.  It seems to

6    me, Mr. Baena, that you're correct that this is an issue for

7    individual claimants.  I think the committee actually can take

8    a position, but maybe only with respect to overarching legal

9    issues, not I think with respect out of the application of the

10   individual claimants.  I also think, however, that it is a

11   process that can get down to the level of an individual claim

12   the way Mr. Bernick has explained it.  But, I think at this

13   point, the reason it's for allowance or disallowance is because

14   these are Gateway objections.  If there is no product ID,

15   that's the end of it.  It doesn't need then to be estimated

16   because the claims is not allowed.

17          So, I guess it is an allowance process, but I don't

18   see it as a 502(c) estimation process at this level.  I think

19   we're looking at standard objections to claims, although maybe

20   we'll be looking at them in batches, you know, because the

21   debtor will say, this objection applies to the following 25

22   buildings and we'll have a hearing that relates to the

23   following 25 buildings.

24          MR. BAENA:  With the exception of the last statement,

25   Judge, I think you just articulated our position where we've

1 been saying that these issues just as they've been described in

2 the last five minutes by Mr. Bernick are classic claims

3 objections that are made all the time.  And they're made in

4 respect of the individual claims.  Now, whether Rule 402 could

5 ever be applied is a question for another day.  But,

6 respectfully, I would submit that they're going to have

7 difficult with that proposition because the nature of these

8 objections is so building specific.  As Mr. Bernick described

9 the objections to you, he described them in a building specific

10 way.

11         THE COURT:  Well, I think they are building specific.

12         MR. BAENA:  Yes.

13         THE COURT:  But, I think the same legal issue does

14 apply with respect to -- I don't want to go into the statute of

15 limitations.  That's --

16         MR. BAENA:  Yes, right.

17         THE COURT:  That's a different issue.  But, with

18 respect to product ID, for example, sufficiency of product ID

19 is essentially a legal question.  The fact is whether or not a

20 specific claim has substantiated that level of product ID.  And

21 to the extent that there is some, I don't know, expert

22 testimony that would set out what the level of product ID is, I

23 think the rulings on that can apply across the board to all

24 property damage claims because it's a threshold issue.

25         MR. BAENA:  I'm sure that in some context, you're

1  right.  I can't think of the example where that would apply.  I

2  mean, if we take the lack of hazard as an example, I mean,

3  clearly building by building specific, different product, and

4  the result maybe different even with the same overarching

5  principles from building to building.  If you take the no

6  product ID -- maybe that's even a better example.  You know,

7  whether or not it is an element of a claim, it is a matter of

8  state law.  That maybe different from state to state.  I'm not

9  defining the result.  You know, we're never going to get

10 through this, Judge, if this is how we treat one another.

11            MR. BERNICK:  I apologize.

12            MR. BAENA:  Accepted.  If product ID, you know, is

13 teed up by state law as being a required element of a -- you

14 know, proof of a property damage claim, I guess that's right.

15 Now, what the quantum of proof is may also be something that's

16 articulated in state law or it may not be.  And then -- but,

17 whether that claimant has come forward with a sufficient amount

18 of product ID is clearly a building specific determination.

19 And I guess I'm the only one that has all along been respecting

20 the difference between an estimation and a claims objection

21 process.

22            What we just heard in the last five minutes is a

23 regurgitation of the 15th omnibus objection.  That's all it is.

24 These are the objections we made in the 15th omnibus objection.

25 We did not have them heard by the Court yet.  Indeed, when we

1 tried to schedule it, the Court said, we won't schedule it the

2 way you propose.  And so, it sat out there.  The mischief of

3 the motion is the way they wish to now pick it all up, throw it

4 into the Phase 2 of the estimation.  Everybody's got enough

5 notice.  You know, it's a hell or high waters sort of a

6 proposition.  That's not how it works.  You know, they made the

7 objection.  People have responded to the objection.  Now, you

8 have to hear the objection.

9          THE COURT:  Okay.

10          MR. BAENA:  And indeed maybe overarching has come out

11 of all that, Judge.  I'm sure there will be a couple.  But,

12 it's not an estimation process which you so painfully take the

13 time to say the same way every time in the transcripts, is the

14 process of putting a value on the remaining claims.  It's not a

15 process to eliminate the claims.  That would be the claims

16 objection process.

17          MR. BERNICK:  Your Honor, if I could just add one --

18 I know we've got to get onto other things.  The fact remains

19 that the CMO that was entered in August called for Phase 2

20 estimation to be binding in the very respects that we're

21 talking about here today.  I think that there has been more

22 than adequate notice.  The omnibus objection on the 15th again

23 marries these two things together.  Nobody somehow came before

24 the Court and said, oh, that's not what the -- Your Honor

25 ordered.  To the contrary, they did exactly what the CMO called

1 for and they went down to the individual buildings.  But, I --

2            THE COURT:  Well, I think --

3            MR. BERNICK:  I really --

4            THE COURT:  I will make it clear I think.  I think we

5 need to give a different notice.  Mr. Speights is here, Mr.

6 Dies is here, counsel for Prudential is here.  I don't know,

7 Mr. Speights, whether you need additional time to supplement

8 whatever you have submitted.  Gentlemen, the same question for

9 you.  If you need some additional time to supplement because

10 you are going to participate on behalf of your clients in Phase

11 2, I'd like to work out a schedule to get it in.  Meanwhile,

12 the other 65 other claimants are to get a different notice -- a

13 new notice, I should say, that remind them that if they choose

14 to participate in this process, that whatever rulings come out

15 of it, you know, will be binding and not relitigated on an

16 individual claim basis, because my concern is this.  If the

17 debtor is successful in these Gateway objections, that ends the

18 claim.  It is an allowance process, but it isn't an estimation

19 process.

20            MR. BERNICK:  Well, Your Honor, I think that what we

21 had envisioned is relative really is the merits and it is in

22 the omnibus objection but put it differently.  First, because

23 these issues are Gateway issues and everybody is providing

24 notice, it ought to be up to them to show up if they have

25 interest in being heard.  And if they don't show up, as your

1  CMO indicated, they should be bound.

2          THE COURT:  Well, I think we'll give them a specific

3  notice that says, you know, this is your chance.  Discovery is

4  starting.  Lay it all out.  And if you do not participate in

5  discovery and do not come to the trial, then you may have you

6  claim disallowed for all purposes because --

7          MR. BAENA:  But, Judge --

8          MR. BERNICK:  I'm sorry.

9          THE COURT:  Because at this point, I do not believe

10 that we are into the estimation phase.  This is an allowance

11 and disallowance process.

12         MR. BERNICK:  Fair enough, Your Honor.  Now, the --

13 and this is I think just a question really of scheduling at the

14 end of the day.

15         THE COURT:  I'm talking about Phase 2.  I want the

16 record clear, Phase 2.

17         MR. BERNICK:  Yes, we're talking about Phase 2.

18         THE COURT:  Not Phase 1.

19         MR. BERNICK:  Now, what we had envisioned for being

20 the rest of Phase 2 is that if we -- we would then be able to

21 demonstrate to Your Honor how the different filters if adopted

22 would affect the overall -- the value of the claims.  In other

23 words, what --

24         THE COURT:  But, that's an estimation and I don't

25 know why that needs to be done for allowance purposes.  If

1  you're correct that you're going to filter these claims down to

2  a handful, we probably don't need an estimation process.

3         MR. BERNICK:  Fair enough.  I'm with -- well, that's

4  where I'm going, is that we want the determinations that come

5  out of the Phase 2 threshold Gateway litigation, the common

6  issue of litigation tied to buildings to be binding, period.

7  If it has the affect of allowance or disallowance, it should

8  have the affect -- if it has an affect on disallowance, it

9  should be disallowed.  We also envision though -- and you'll be

10  correct in this, Your Honor -- if we have claims that pass

11  those filters, we would then have an estimation that would not

12  be the valuation of those claims for distribution purposes.  It

13  would solely be for purposes of sizing a trust, whatever you

14  want.  And, therefore, it would be less perfect but more

15  concrete.

16         If we have claims that pass that filter, we would be

17  of the view that for purposes of determining how much those

18  claims are going to be worth in the aggregate, we would go and

19  then deal with the historical values that have been attached to

20  those claims.  And, therefore, coming out of this process, we

21  would essentially have a continuation of what's already taken

22  place.  There is a widdling down of claims.  And with respect

23  --

24         THE COURT:  Well, okay, but that's getting way to far

25  afield.  I'm still having trouble enough dealing with Phase 1

1 and Phase 2, let alone Phase 11.  So, let's --

2          MR. BERNICK:  Okay.

3          MR. BAENA:  But, respectfully, Judge --

4          MR. BERNICK:  But, one last thing before and then --

5 with respect to more discovery, the only thing -- there's been

6 Phase 1 discovery in the form of, you know, expert materials.

7 And we're not talking about changing that.  With respect to

8 Phase 2, the only obligation that's come due is the disclosure

9 of the experts.  We have not yet gotten to the point of having

10 expert reports and the like.  So, I'm -- I would be sympathetic

11 to the idea of somebody else new coming in and perhaps having

12 some more time.  But, there's nothing that's happened that now

13 has to be redone, unwound or whatever.  These were very

14 wholesome expert disclosures that came, for example, from Mr.

15 Dies' offices and --

16          THE COURT:  Well, I understand that's from your point

17 of view.  I'm asking them if they need additional time, because

18 I don't know whether the discussion on the record today is

19 taken off on the same track that the prior discussions are.

20 And if they need more time, I'm going to give them some, a

21 little, not a lot.  I really do want to get these things done,

22 folks, but I think I understand what the debtor is saying.  To

23 the extent that these are Gateway objections because they apply

24 to more than one claim, the debtor is using the word

25 estimation.  I don't really think that's the proper word.

1          MR. BAENA:  In fact, Judge, in all due respect, I

2    think we've got to stop calling it that.

3          THE COURT:  Probably.

4          MR. BAENA:  I think we ought to stop calling this

5    Phase 2.  I think we ought to stop referring to it as

6    estimation.  It informs the estimation process.  I agree that

7    if you get rid of a claim, you don't have to estimate it.  It

8    informs the process.  I think they would agree if they don't

9    get rid of the claim, then we do have to estimate its value,

10   but it's not estimation.  All they are doing now is prosecuting

11   the 15th omnibus objections.  That's all they're doing.

12         THE COURT:  Okay.

13         MR. BAENA:  And so, this has a profound impact at

14   many levels, because they're next going to ask you to sign a

15   CMO that sets these cases for trial, the Phase 2 for trial on

16   March 26th or something like that, whatever it is.  What are we

17   doing on March 26th?  Are we doing these large groups of

18   objections?

19         THE COURT:  Well, I think we need to work that out.

20         MR. BAENA:  Or are we putting a value on the

21   remaining claims?

22         THE COURT:  No.  At this point, I don't think

23   valuation is at issue because the debtor doesn't know how many

24   claims are out there that have to be valued.  So, at this

25   stage, I don't know whether we go into an estimation phase.  If

1  there are still 500 claims left, I may very well estimate them,

2  because I don't know how else we're going to get the plan

3  confirmation.  If they're down to two or three claims, it may

4  not be necessary to estimate them.

5       MR. BERNICK:  That's absolutely the same -- that's

6  our approach.

7       THE COURT:  So, I think the whole problem and the

8  reason that all of us have spent probably close to three hours

9  now on this issue is because it's the wrong use of the words.

10  This Phase 1 is an objection process.  It's really not the

11  estimation.  It's going to get us there in the debtor's view,

12  but it isn't there yet.  So, let's think of it --

13       MR. BAENA:  And I presume, Judge -- I presume -- let

14  me just -- one last point.

15       MR. BERNICK:  Okay.

16       MR. BAENA:  I presume that nothing that's transpired

17  has resulted in a ruling by the Court that these are in fact,

18  no matter how they bunch these claims -- objections, that they

19  are common.  You haven't predetermined that.

20       THE COURT:  No, what I've predetermined is that the

21  debtor is telling me that they're going to have, for example,

22  product ID objections to -- I'm making up the number -- 75

23  claims.  And I'm saying, fine, you can do them in the sequence

24  in which you choose to do them "at one time."  I mean, I don't

25  know what at one time means.  It maybe three days.  It maybe

1 two weeks.  It maybe two hours.  I don't know.  But, they can

2 begin and end in a bunch of product ID claims.

3         MR. BAENA:  And the claimants have all their rights

4 to complain about being in some cure and other -- or being left

5 out of the cure or --

6         THE COURT:  Being what?  I couldn't --

7         MR. BAENA:  Put into a block of objections.

8         MR. BERNICK:  I object to counsel's cross --

9         THE COURT:  Well, no.  I think at this point I think

10 the debtor has filed its omnibus objection.  Responses have to

11 have been due to that objection by now.  It was filed a year

12 ago almost.  So, responses surely are due.  So, the debtor

13 knows what is contested and what isn't.  And those buckets are

14 already fixed.

15         MR. BAENA:  But, we know which claims are subject of

16 those objections.

17         THE COURT:  Yes, we do.

18         MR. BAENA:  No question about it.  They have had an

19 opportunity --

20         THE COURT:  The 15th omnibus lays that out.

21         MR. BAENA:  -- with the exception I believe of Mr.

22 Dies' claims, the time has come and gone -- Mr. Speights'

23 claims, I'm sorry.  The time has come and gone under the

24 procedures with respect to the 15th omnibus objection for

25 people to respond.  I believe that's right.

1          THE COURT:  Right.

2          MR. BAENA:  But, what -- you know, when you say, you

3  know, those 75, the example you used, are going to come before

4  you on March 26th, there maybe some debate about the format in

5  which they come before you.

6          THE COURT:  Well, that should be, I would think as

7  lawyers usually do, the nature of motions before the trial

8  starts.  I mean --

9          MR. BAENA:  And I'm only saying that that's still on

10 the table.  That's all I'm saying.

11         MR. BERNICK:  That's fine.  Your Honor, the only

12 reason that I'm going to come back to the nomenclature issue is

13 that it is -- it's a very important issue.  And I think that we

14 have been clear about this in our papers, but I want to -- you

15 don't have to rule on it, but I want to alert the Court to a

16 very important point in thinking about it, which is this.  The

17 latitude that Your Honor has, if you'll read the code straight

18 out, estimation and then the application of the rules that are

19 incorporated by reference into the code from the Rules of Civil

20 Procedure and the rules of evidence, they tell you what the

21 parameters are.  The rules read out the way they do, and there

22 are certain rules that are not included.  There are other rules

23 that are.  And then, estimation, 502(c) says, you can estimate.

24 And there's a lot of laws that says, of course there's

25 flexibility.

1          THE COURT:  But, I don't need to estimate when you're

2  raising specific issues like the statute of limitations.

3          MR. BERNICK:  But, here's -- I'm sorry, Your Honor.

4  Hear me out for just a moment.  There maybe a flexibility that

5  Your Honor has in following the rules that are spelled out, the

6  procedural rules.  But, also with a flexibility that's

7  confirmed by 502(c) estimation not to go down the road to every

8  single dottle and dot that might be out there.  For --

9          THE COURT:  If all you're asking me to do is estimate

10  them for valuation feasibility purposes, I would agree.  If

11  what you're asking me to do is estimate them for allowance or

12  disallowance purposes, I think you need to prove the objection

13  to claim.  I think -- well, let me put it the other way.  I

14  think the claimant needs to prove its claim.

15          MR. BERNICK:  I agree with that.  All that I'm saying

16  is that when you then decide what kind of proof is sufficient

17  -- and here's where this is -- what kind of proof is

18  sufficient, if you were outside of bankruptcy, you couldn't

19  determine that really outside of a full bench trial with all

20  kinds of witnesses or a jury trial in many cases.  Under the

21  code because it's estimation, you have the -- because of

22  502(c), this is how the argument goes, Your Honor, and I think

23  it's right, you have the ability to decide that balance without

24  hearing, you know, every single issue and every single piece of

25  evidence in the entire world.

1       THE COURT:  But, I will -- but, I don't expect to do

2 that for allowance purposes.  I mean, the purpose of estimation

3 is to streamline.  You're quite correct.  But, most of the

4 time, it is not for allowance and disallowance of a whole group

5 of claims.  It's to look at a specific claim, figure out

6 whether a plan will be feasible if the claim is allowed in a

7 certain maximum amount, and then sometimes, most of the time,

8 it gets either resolved or tried later.  Not always.  There are

9 times where it's allowed for -- estimated for allowance

10 purposes.  If you're going to have objections --

11      MR. BERNICK:  Well, I know you're not there yet, but

12 that -- I know you're not there yet.  All I'm saying is that

13 it's something I think to bear in mind, because I could make

14 the argument I thought would be correct that particularly where

15 you have a huge number of claims that there is a threat to

16 bogging down the bankruptcy case.

17      THE COURT:  Well, you know what, frankly, I've heard

18 as much of this today as I want to hear.  Mr. Speights, I asked

19 you a question.  I'd like to get an answer from you, please.

20      MR. SPEIGHTS:  Mr. Bernick has said several times

21 that I was fully invested in this process and he misspoke.  I'm

22 sure he didn't realize that I have not been involved in this

23 process.  I know what estimation is.  I maybe the only lawyer

24 in this courtroom who has participated in the PD estimation.

25 And I thought there were two trains going down the track:  an

1  objection process -- and I've been before you several times on

2  the 15th objection -- and an estimation process.  And I knew

3  that if Your Honor estimated the claims to be worth something,

4  500 million, 100 million, a billion, I was bound by that.

5        But, before today, I did not know that you would be

6  allowing or disallowing claims on that track.  I don't have a

7  dog in this fight today about which way you should go.  I

8  understand which way you are going.  And I would just ask for

9  notice and an opportunity again to participate, because I

10 didn't understand when I saw that earlier notice and that order

11 that somehow you would be disallowing or allowing hopefully my

12 claim as a part of this estimation process.

13        THE COURT:  Well, okay.  I think that with respect to

14 the debtor's Gateway objections, that's really what this is.

15 If the debtor is successful in those Gateway objections, there

16 is no allowable claim.  So --

17        MR. SPEIGHTS:  But, I've been defending those

18 objections on the other railroad.

19        THE COURT:  Yes.

20        MR. SPEIGHTS:  But, now apparently there's some

21 merger going on here.

22        THE COURT:  Well, I don't know --

23        MR. SPEIGHTS:  All I'm asking is just for notice and

24 opportunity.

25        THE COURT:  I don't know about the merger.  I'm

1  tired.  I'm not sure I quite grasp it.  But, nonetheless, at

2  the moment, I'm looking at objections to claims processes.  So,

3  I will have the debtor redo the notice that will simply tell

4  everyone.  We'll have to work out a schedule that on a certain

5  date a certain track of these is going to start trial.  And

6  meanwhile, discovery is open.  And if you do not show up to

7  participate in discovery and/or at the trial, your claim maybe

8  disallowed.  But, it is an allowance process to make it clear

9  that that's what this will be at that stage -- at Phase 2.

10        MR. SPEIGHTS:  Thank you, Your Honor.

11        MR. BERNICK:  Can I make a proposal then in order to

12  get off this and onto something else, Your Honor?

13        THE COURT:  (No verbal response).

14        MR. BERNICK:  We will between now and the next

15  omnibus take the CMO, which I think that Mr. Baena has been

16  concerned about for a variety of reasons, we will take it off

17  the table for today and put it back on for the next omnibus.

18  And, in the meantime, we'll try to figure out an appropriate

19  notice, we'll try to figure out an appropriate schedule, and

20  we'll make sure to get the benefit of Mr. Speights' input on

21  how much time he needs and Mr. Dies' how much time he needs.

22  And our focus will be we'll keep Phase 1 because we've got

23  Phase 1.  On Phase 2, we will focus Phase 2 as Your Honor has

24  indicated on these Gateway objections and the litigation of

25  these Gateway objections.  And I think that's about as

1 ambitious as we should probably be because that will give us a

2 lot of work to be done.

3      Your Honor has created time -- there's a lot of time

4 in the schedule for January and for March with respect --

5 January on Phase 1 and March on Phase 2 with respect to your

6 available trial dates.  I know that it's been the heartfelt

7 position of the PD committee and the PD claimants that they

8 would rather have it be March and April for Phase 1 and Phase

9 2.  I think it's probably a little bit premature to resolve any

10 of those matters now.  I think that that's a scheduling issue

11 that we will take up during the course of discussion with them.

12 And as soon as we have the ability to give you feedback on your

13 schedule, if it's in advance of the omnibus, we'll let you know

14 before the omnibus whether there are dates that have been freed

15 up.  But, I'd like Your Honor to at least keep those dates

16 blocked if you could between now and the next omnibus in

17 August.

18      THE COURT:  I'll keep them because in January and

19 March and the dates that I had originally proposed in April, I

20 think I still have them block too, those are the only days I

21 have.  So --

22      MR. BERNICK:  Okay.  So, that -- so, the way we'll

23 leave it is we'll take off the agenda the CMO.  We will work

24 between now and the next omnibus to try to agree a notice in a

25 CMO.  We'll still stay within the confines of Phase 1, Phase 2,

1  and Phase 2 will be focused on issues for allowance and

2  disallowance -- the threshold issues for allowance and

3  disallowance.

4           THE COURT:  Right.

5           MR. BERNICK:  And that's where we'll go.

6           THE COURT:  Okay.  Mr. Baena, any objection to that

7  process?

8           MR. BAENA:  No.  If the process is that we'll sit

9  down and try and work out a program, that's fine.

10          THE COURT:  And to keep Phase 1 in place.

11          MR. BAENA:  But, I beg you, Judge, to direct us to

12  stop calling things Phase 1 and Phase 2.  That's what --

13          MR. BERNICK:  Well, no, that is -- way too much work

14  has been done (a) to provide notice, but (b) to cabin the

15  issues there.  If we don't have that nomenclature, we'll then

16  argue for the next omnibus about --

17          THE COURT:  Well, Phase 1 and Phase 2 are fine.  I

18  don't care about those words.  But, I would like to get rid of

19  the concept that Phase 2 is an estimation process for now.  I

20  mean, that maybe the next level but I don't think it's there

21  now.

22          MR. BERNICK:  Okay.

23          MR. BAENA:  That's all I was asking for.  Thank you.

24          THE COURT:  So --

25          MR. BERNICK:  Now, maybe in order for further

1 | expedite do we need to argue the -- no, Canada, I definitely --

2 | I think Canada is very short.

3 |     THE COURT:  Let's take a break --

4 |     MR. BERNICK:  Sure.

5 |     THE COURT:  -- because I don't think I can take any

6 | more argument for the next ten minutes.  So, we're in recess

7 | for ten minutes.

8 |                    (Recess)

9 |     THE COURT:  -- person for everything else that's on

10 | the agenda.  So, talk fast.

11 |     MR. BERNICK:  Okay.  It's counting against my time, I

12 | really appreciate Your Honor's procedural decision to do just

13 | that.  Okay.  The second part of the procedures motion related

14 | to claims that have been lodged in Canada, lodged here but

15 | relate to Canadian claimants.  And they're all claims by --

16 | where Mr. Speights is the lawyer and there are 291 of them.

17 | And our proposal is that these claims be litigated in the

18 | reorganization process, the parallel reorganization process

19 | that's now pending in Canada where we understand that they can

20 | be litigated very promptly, much more promptly apparently then

21 | is customary here in the United States.

22 |     THE COURT:  Well, this won't count against your five

23 | minutes, but I need a piece of information that I haven't been

24 | able to pick up by either the motion or the responses.  I don't

25 | now what the parallel process is.  Is it a reorganization of

1 the debtor's bankruptcy so that the claims can be filed in that

2 reorganization proceeding in Canada as though they were filed

3 here or is it something different?

4        MR. BERNICK:  It is -- I think that that would be how

5 it would be styled, but let me get to I think the -- of what

6 has been objected to and what we're prepared to do in order to

7 facilitate that.  The point is made that the U.S. Grace

8 entities are not parties to that proceeding and, therefore, why

9 should that proceeding have the claims when there is not the

10 same defendant there.  And I am authorized and we can submit to

11 the Court the appropriate document that accomplishes this to

12 state that the U.S. debtors, the debtors in this case, are

13 prepared to be bound by the outcome of that determination.  So,

14 the claims I believe would be lodged in the Canadian court in

15 the same fashion that they're lodged here.  They would be

16 disposed of yeah or nay before the Canadian court in a

17 reorganization process.  My understanding is we've represented

18 in the briefs is that they would be adjudicated on the merits

19 there.

20        THE COURT:  But, whose reorganization process?

21        MR. BERNICK:  This is the Grace -- the Grace Canada.

22 It is the Canadian Grace entities.  They are not debtors in

23 this case.  In other words, there is a separate Canadian

24 reorganization proceeding that was initiated at the time that

25 this case was initiated, the deal with the reorganization of

1 the Canadian Grace entities.

2          THE COURT:  And why are these claims not lodged in

3 the first instance against the Canadian Grace?

4          MR. BERNICK:  Maybe we could ask Ms. Baer to describe

5 a little bit more of what the Canadian proceeding is.

6          MS. BAER:  Your Honor, the Canadian proceeding is

7 called a CC double A proceeding, the Canadian administrative

8 proceeding.  It was commenced so that in Canada, the Canadian

9 court could give enforcement to claims in Canada against Grace

10 Canada, Inc. whatever you did here.  For example, when you

11 entered the Canadian -- or the bar date order here, we then had

12 the bar date recognized in Canada so Canadian claimants would

13 be bound by the bar date order.  And so, claimants who had

14 claims against the parallel Canadian company would also be

15 bound by the other.  The same thing with your preliminary

16 injunction.  When you entered it here, we then got the Canadian

17 court to enter an order recognizing it there so it could be

18 enforced in Canada.

19          Grace Canada, Inc. is the Canadian entity that filed

20 the CC double A proceeding.  They're not reorganization so to

21 speak.  They don't have -- they're a relatively new entity but

22 they're named in a lot of lawsuits because they are, of course,

23 a Grace entity.

24          THE COURT:  Okay.  So, the claims belong against this

25 debtor, the United States debtor, even though the buildings are

**J&J COURT TRANSCRIBERS, INC.**

1  in Canada.

2             MS. BAER:  Yes, and --

3             MR. BERNICK:  That's how they're lodged.

4             MS. BAER:  Yes, that's how their lodged, and that's

5  effectively correct because Grace Canada, Inc. is a relatively

6  new entity.

7             THE COURT:  Okay.

8             MR. BERNICK:  I didn't misspeak.  The nature was a CC

9  double A and I've only I guess in connection with this case and

10 one other become familiar with it.  But, maybe Your Honor well

11 knows, you don't have to -- you can get certain kinds of relief

12 in Canada without actually filing a full case or restructuring.

13            THE COURT:  Well, sure.

14            MR. BERNICK:  Yes.  So, the Grace entities in Canada

15 are not seeking a restructuring, but they are seeking to get

16 essentially some of the benefits of what is taking place here

17 in the United States.  So, there is an active proceeding there.

18 And we would ask that the claims that have been lodged here

19 against the U.S. entities be resolved in the Canadian court and

20 under that proceeding in the crux of the argument is relatively

21 simple, which is that these claimants have claims that are --

22 that must be interpreted in accordance with Canadian law.

23            And that court has the ability to apply Canadian law,

24 and Canadian law is not necessarily the same as U.S. law.  And

25 in fact, that fact was not lost upon these claimants or their

1 counsel as we have said in the brief that we furnished to the

2 Court.  There actually was a solicitation or whatever -- a

3 communication with Canadian claimants to have their claims

4 prosecuted in the U.S. courts in order to perhaps do better

5 than Canadian claimants had done briefly.  Our brief talks

6 about the _Prevess_ case which was very, very extensive

7 litigation that took place previously and was unfavorable to

8 the defense.

9 THE COURT:  But, how is the Canadian court going to

10 adjudicate claims against the U.S. debtor when the parallel

11 proceeding doesn't involve the U.S. debtor, because this isn't

12 a recognition proceeding in Canada of the U.S. debtor.  It's

13 another debtor that has some sort of relief that it maybe

14 entitled to because the U.S. debtor has filed.

15 MR. BERNICK:  It is that the U.S. debtors are

16 prepared to accept the outcome of the proceeding as binding

17 against them --

18 THE COURT:  But, does that give the case -- does that

19 give the Canadian court jurisdiction over the debtor here?

20 MR. BERNICK:  Well, if the Canadian court does not

21 have the ability, does not have the power to proceed, then that

22 would be a fairly fundamental issue.  But, I believe the

23 Canadian court does have the power to proceed.  That's an issue

24 of the jurisdiction of the Canadian court.  And it could have

25 very well be ancillary to the jurisdiction the Canadian court

1  has in connection with the CC double A proceeding involving the

2  Canadian Grace entities, like related to jurisdiction in the

3  United States to be able to adjudicate this matter even though

4  the U.S. entities are not debtors in Canada.  It would not be

5  --

6           THE COURT:  But, isn't their proceeding ancillary to

7  the U.S. proceeding?

8           MR. BERNICK:  Their proceeding is ancillary to the

9  U.S. proceeding.  Well --

10          THE COURT:  But, how do they get ancillary --

11          MR. BERNICK:  Well, I mean, ancillary -- and you're

12  obviously, Your Honor, pressing me on the question that relates

13  to Canadian proceedings and Canadian jurisdiction.  I don't

14  profess to be an expert in either one of them.  But, the Grace

15  -- the proceedings that are underway in Canada were designed to

16  be parallel to the proceedings here in the United States but

17  involve a different entity that was not seeking restructuring

18  but was still being affected by the same basic types of claims

19  that we have here in the United States.  They are claims

20  relating to Grace products that were consumed in Canada.  So --

21          THE COURT:  Well, yes, I appreciate that, but if the

22  claim -- if the debtor's position is that the claims are

23  properly lodged against the United States Grace entity --

24          MR. BERNICK:  I didn't say that they necessarily

25  were.  What I said was that they are lodged -- they are in fact

1  lodged here.  We believe that the best way to adjudicate those

2  issues is to adjudicate them under -- they had to be

3  adjudicated under Canadian law.

4          THE COURT:  I know, but the --

5          MR. BERNICK:  And the only question, therefore -- I'm

6  sorry.  The only question, therefore, is whether this Court has

7  the ability to in a sense farm out those claims to be

8  determined in Canada with Grace debtors in the United States

9  consenting to that process and agreeing to be bound by the

10 outcome.

11          THE COURT:  Well, that's -- I think that's the

12 problem, because the Supreme Court tells federal courts that we

13 cannot give up our jurisdiction lightly.  So, the only way that

14 I know I could do it, unless the Canadian court somehow has

15 jurisdiction over the claimants and the debtor, is to abstain

16 in favor of some proceeding.  Otherwise, I don't think I can

17 transfer claims to a different case in a different country.

18 So, if there -- I think I need something that tells me that the

19 abstention standards were apply.

20          MR. BERNICK:  Well, the abstention doctrine were -- I

21 mean, we have asked for this in the form of abstention.  I'm

22 familiar with the fact that abstention relates to an existing

23 proceeding.  There is an existing proceeding.  The question --

24          THE COURT:  But against the debtor.

25          MR. BERNICK:  But, that's not a question necessarily

1  of jurisdiction, that is to say the Court has the -- the Court

2  could decide these issues yourself and try to apply -- and

3  apply I'm sure ably Canadian law.  There is another court that

4  has expertise in applying Canadian law.  The debtor in this

5  case agrees to be bound.  There is no question that the

6  Canadian court would have the ability to bind the Canadian

7  clients as the Canadian claimants.  So --

8          THE COURT:  Yes, I don't challenge that, but you

9  can't confer subject matter jurisdiction in a federal court in

10 Canada any more than you can in a federal court in the United

11 States, can you?

12          MR. BERNICK:  I don't believe that we're conferring

13 subject matter jurisdiction.  I believe that we would be

14 recognizing the jurisdiction of the Canadian court to

15 adjudicate these claims.

16          THE COURT:  Well, somebody needs to give me a brief

17 on this issue.

18          MR. BERNICK:  We will submit a brief on -- the

19 question Your Honor has raised, and just to be precise, is

20 whether if the debtors here agree to be bound in Canada.  And

21 if we are talking about Canadian claimants, whether the court

22 presently sitting in connection with the CC double A proceeding

23 in Canada has under Canadian law the jurisdiction to do the

24 adjudication that we're asking for.

25          THE COURT:  And bind this debtor whether they consent

1 to the jurisdiction or not -- or whether they consent to be

2 bound or not.

3          MR. BERNICK:  Well, it -- well, that --

4          MR. BAENA:  And the claimants.

5          MR. BERNICK:  I'm sorry

6          THE COURT:  And the claimants.

7          MR. BERNICK:  Well, the --

8          THE COURT:  Well, the claimants are apparently

9 Canadian.

10          MR. BERNICK:  Yes.

11          MR. BAENA:  No.

12          THE COURT:  No?

13          MR. BERNICK:  No, they are Canadian.

14          MR. BAENA:  They're Canadian buildings, Judge.

15          MR. BERNICK:  Yes, they're Canadian buildings.

16          MR. BAENA:  They're Canadian buildings.  That doesn't

17 mean that they're automatically within the jurisdiction of this

18 particular Court.  This is like renting a judge.  It's like

19 renting a judge.  You have to be familiar with Canadian law.

20          THE COURT:  There's a new career.  I like that idea.

21          MR. BAENA:  I would like to find out from AAA if I

22 prefer to be in Manitoba as opposed to Toronto.  I mean, it

23 does -- it's ridiculous.

24          MR. BERNICK:  Well, it maybe ridiculous, but the

25 question is not whether folks believe it's ridiculous or they

1 believe it's rent a judge.  It's a question of whether a court

2 with expertise in this matter has the power to adjudicate these

3 claims I would say assuming the consent of the U.S. debtors.

4 It's not regardless of whether we are in fact consenting and

5 agreeing to be bound.

6       THE COURT:  Well, I think the issue may also be

7 whether the claimants consent.  If they filed the claims here

8 whether the Court can -- whether I can essentially transfer

9 those claims to a Canadian court without the consent of the

10 claimants.

11       MR. BERNICK:  The claimants, that's correct.  But,

12 the question of jurisdiction is does the -- that's a question

13 of whether Your Honor has the power to do it.

14       THE COURT:  Right.  Well, it's a two-fold question

15 though.

16       MR. BERNICK:  It's a two-fold question.

17       THE COURT:  I cannot transfer the claims if I don't

18 have the power.  I can't transfer the claims if the Canadian

19 court proceeding doesn't have the jurisdiction to assume them

20 if I do transfer them.

21       MR. BERNICK:  That's correct.

22       THE COURT:  So, it's a two-fold --

23       MR. BERNICK:  It's both.  But, the question of

24 whether the Canadian court has the power is something that we

25 would certainly be willing to brief.  And then whether the

1  Canadian court has the power to do this, whether the Canadian

2  court has power over the Canadian claimants whose buildings are

3  in Canada or maybe people that may reside in the United States

4  or elsewhere but had buildings in Canada.  We will address the

5  jurisdiction of the Canadian court.  We don't propose this, you

6  know, lightly.  The point is to be able -- Your Honor has all

7  of these things before you.  This clearly calls for the

8  application of Canadian law.  There is clear --

9          THE COURT:  Is that any worse than California law?

10          MR. BERNICK:  I'm sorry?

11          THE COURT:  Is that any worse than California law?

12          MR. BERNICK:  For whom?

13          THE COURT:  Me, for me.

14          MR. BAENA:  Not for this debtor.

15          MR. BERNICK:  Well, I don't know.  But, I do know

16  that the Court in Canada has the expertise in that.  It doesn't

17  have to learn it.  And there has been very significant

18  litigation over this same issue.  And this is all well known

19  because the claimants themselves -- claimant's counsel well

20  appreciate that the choice of law makes a big difference.  So,

21  for all those reasons, we say, well, maybe it makes sense to

22  have this issue litigated in Canada.  Your Honor, we -- if

23  there's not the jurisdiction to do it, there's not the

24  jurisdiction to do it.

25          THE COURT:  Okay.


**J&J COURT TRANSCRIBERS, INC.**

1          MR. BERNICK:  But, this is not just a, well, kind of

2  gee let's see where it goes.  It's driven by a pretty

3  fundamental fact which Mr. Baena's clients would like to avoid.

4  But, it is a fact about what Canadian law is and that's

5  something that's going to be important here.

6          THE COURT:  But, I would have to apply Canadian law

7  from the debtor's point of view anyway.  Now, yes, I would have

8  to learn admittedly.  But, nonetheless, my concern is I

9  understand the recognition -- the foregoing recognition

10  proceeding.  But, I believe since using the new Article 15 --

11  Chapter 15, that is, of the Bankruptcy Code, the main

12  proceeding is here.  So, Canada has recognized the main

13  proceeding -- there's an ancillary proceeding there.  The

14  claims are filed here.  I think -- I don't know that it's

15  exactly an abstention issue, but it may be.

16          I need someone to tell me what the appropriate

17  standard is.  Is it abstention?  Am I recognizing a foreign

18  ancillary proceeding?  If I can do that, which I think I can

19  recognize it, can't I then transfer claims from this case to

20  that case?  Do I have the power to do it and if -- over the

21  claimant's objection?  And if I do can the Canadian court

22  assume jurisdiction over both the debtor and the claimants to

23  adjudicate those claims?

24          MR. BERNICK:  Well, that's the threshold issue -- I

25  mean, the threshold issue, the Canadian court doesn't' have the

1 power to do this, and that's kind of the end of it.

2          THE COURT:  Right.  So, I --

3          MR. BERNICK:  And then if we assume -- if we

4 demonstrate the Canadian court has the power to do it, then the

5 question is apart from whether Your Honor believes it's

6 appropriate -- that is obviously something that we haven't

7 talked much about here.  But, you know, essentially what is the

8 jurisdictional rule.  So, the abstention is some other kind of

9 doctrine.  And we would be happy to address those things as

10 well.  These are the same claims where we're also expecting Mr.

11 Speights to give us product ID I think on about 191 of them.

12 So, there is some additional time, but we would be happy to

13 submit a brief to the Court.

14          THE COURT:  All right.  If the debtor submits the

15 brief now, can we just put this back on the August issue so

16 that anyone else can file response briefs on the August agenda?

17          MR. BAENA:  So, that would give them until the 15th

18 or something like that?

19          UNIDENTIFIED SPEAKER:  Well, the deadline to respond

20 for August is the 4th for pending motions.  Isn't that correct?

21          MS. BROWDY:  You respond by the 4th with a reply by

22 the 11th.

23          UNIDENTIFIED SPEAKER:  So, a brief from you by the

24 4th and us and then a reply by the 11th?

25          THE COURT:  Is that doable?

**J&J COURT TRANSCRIBERS, INC.**

1          MR. BAENA:  Sure, Judge, it's doable.  It's certainly

2  doable.

3          UNIDENTIFIED SPEAKER:  Curb your enthusiasm.

4          MR. BAENA:  Well, I'm not terribly enthusiastic

5  because you've identified each and every of the infirmities

6  with this motion, Judge.  And they're not going to go away

7  except as they may obscure those problems with their brief.

8  This is a bankruptcy proceeding that has nothing to do with any

9  of these debtors except by relationship to the debtor in

10  Canada, nothing otherwise to do with.  I don't know of anything

11  that's happened in that particular court to adjudicate either

12  the claims asserted against that debtor, which gives rise to

13  this special expertise that we've heard about, except for the

14  fact that we will presume that a Canadian jurist knows Canadian

15  law.  But, whether that Canadian jurist is any better at

16  applying a principle that that jurist never used before, then

17  this Court -- we can all speculate.

18          The fact of the matter is this Court set a bar date,

19  and that bar date required these claimants to assert these

20  claims in this Court.  And now, what they're asking you to do,

21  stop, don't rule on these, somehow they're different than you

22  applying California law, Texas law, Louisiana law.  Let's send

23  this off to some Canadian judge who they conveniently filed

24  Grace Canada's bankruptcy in front of for nonfinancial reasons.

25  It's all too packed, Judge.  It doesn't even smell good let

1 alone pass any constitutional muster at all.

2          THE COURT:  Okay.

3          MR. BAENA:  We have raised in our reply the fact that

4 neither permissive nor mandatory principles of abstention are

5 applicable in this instance.  We've already -- we've also, you

6 know, provided the Court with the authority for the fact that

7 this proceeding in Canada is in no way, shape or form to be

8 deemed ancillary to the proceedings here because it doesn't

9 relate to the same debtors.  And it is -- I mean, Judge, we

10 could --

11          THE COURT:  Aren't they affiliates?

12          MR. BAENA:  Excuse me?

13          THE COURT:  Are they not affiliates of some sort?

14          MR. BAENA:  Oh, they maybe affiliates now.

15          THE COURT:  Okay.

16          MR. BAENA:  I don't know that that company even

17 existed when Grace filed bankruptcy.

18          THE COURT:  Okay.

19          MR. BAENA:  I don't even know that it existed then.

20 And, you know, Judge, the ironies and -- of the existence of

21 that proceeding, the availability of that court and what have

22 you are not lost on us.  I'm sure they're not lost on you.

23 Maybe we ought to find out if there's another judge in Canada

24 that has adjudicated a property damage claim.  See if he's got

25 some extra time.  Maybe he would be willing to listen to your

1  cases.  That's ridiculous.

2          THE COURT:  You're getting better and better at this,

3  Mr. Baena.  I like these ideas.

4          MR. BERNICK:  The ideas are great, Your Honor.  But,

5  the tone of being cavalier with Your Honor's time, number one,

6  number two, with the substantive issues here is really I think

7  over the line.  And to talk about a smell test here, Mr.

8  Speights' associates in some fashion solicited these claims and

9  solicited them specifically recognizing that this litigation

10 went nowhere in Canada, not because there's some, you know,

11 desperately ambiguous issue in Canadian law.  It's because they

12 tried, they litigated and they dead well lost.  And they've now

13 come here to the United States to say, oh, well, maybe we can

14 do better.  And Mr. Baena is very sarcastic about the notion

15 that, well, gee, this is all totally kosher.  There's a bar

16 date they filed here.  Yes, they filed here.  They filed here

17 when Mr. Speights pointed out the opportunity to try to

18 reinvent law that that had been established against him.  Now,

19 I don't --

20          MR. BAENA:  Can we invoke the five-minute rule, Your

21 Honor?

22          MR. BERNICK:  I don't -- I don't --

23          MR. BAENA:  He's used the last 15 minutes of his five

24 minutes.

25          THE COURT:  Wait, let --

**J&J COURT TRANSCRIBERS, INC.**

1          MR. BERNICK:  Well, but I don't think that the tone

2   is appropriate here.  Your Honor has asked for jurisdictional

3   briefing.  We don't take lightly the idea of Your Honor having

4   to decide 291 claims.  If Your Honor wants them here, we'll

5   litigate here.  We simply provided another option, and we'll

6   file the brief and Your Honor can rule.

7          THE COURT:  Okay.  Whether I want them here or not,

8   they are here.

9          MR. BERNICK:  Right.

10          THE COURT:  The issue is, can and should I transfer

11  them?

12          MR. BERNICK:  Right.

13          THE COURT:  So, let's deal with the can I, first of

14  all, and then I'll worry about the should I later.  But, give

15  me some information that tells me that I can first.  And then,

16  we'll get to the shoulds.  Okay.

17          MR. BERNICK:  I think that that then leaves us with

18  -- is there agreement with respect to -- I think that we've

19  agreed with Mr. Speights to put over to the next hearing the

20  miscellaneous matters that were encompassed by Item 13 on the

21  agenda, thereby giving fruition to what Ms. Browdy predicted to

22  me privately before the hearing, which is that they would be

23  deferred for what is it now the four time, but now during a

24  period when she will no longer have the privilege of being able

25  to argue them.  So, we're going to defer Item 13 on the agenda.

1  And that I think leaves us with the exclusivity issues.  I

2  think the last major issue that we have.  Let me just make sure

3  with respect to Scotts and ELG, is there anything that needs to

4  be done with those?

5          THE CLERK:  I can take it up in five minutes.

6          MR. BERNICK:  Okay.  So, I think the last major

7  issues is --

8          THE COURT:  Well, why don't we do this.  If Scotts

9  and ELG are only going to be five minutes, why don't we do

10  those next.  And then we'll get to exclusivity.  Mr. Frankel?

11          MR. FRANKEL:  Your Honor, I was going to suggest that

12  in light of the hour and the five-minute rule and so on that we

13  would agree to a bridge order to the August hearing so that we

14  would have the proper time to deal with exclusivity.  We think

15  it's an important issue.  We think it's an issue that should

16  not be done at this house with a limitation on time which I

17  completely understand.  I've conferred with counsel on this and

18  they are agreeable to it.  I have not conferred with Mr.

19  Bernick on it.  But, we would like it to be heard early in the

20  next omnibus hearing if we're going to do that.  I am prepared

21  to spend five minutes on it if Your Honor would prefer to go

22  tonight, but I just think it's too important to do that.

23          THE COURT:  Well, I don't have an objection to a

24  brief order to get to August and to put this first on the

25  agenda.  I guess my concern is I've deferred a lot of things to

1 August, too.  And I think we're going to end up maybe in the

2 same position next month that we're in next month.  And that's

3 my concern, so --

4        MR. BAENA:  Can we get a special setting on this on

5 at issue?

6        MR. COURT:  On the -- this?

7        MR. BAENA:  Exclusivity.

8        THE COURT:  Well, so far as I know, what's happening

9 on September 11th, other than is there anything happening on --

10        MR. LOCKWOOD:  Your Honor, you moved the motion to

11 compel the September 11th, which was going to be the major item

12 I think on the August agenda.  So, I'm not sure that actually

13 August is really going to have a lot of long --

14        THE COURT:  Well, I think I'm deferring --

15        MR. LOCKWOOD:  -- hotly disputed manners on it, but

16 I'll defer to the debtor who may have a better handle on that

17 agenda than I do.

18        THE COURT:  Well, I've deferred the property damage

19 CMO based on this discussion.  I've deferred Mr. Speights'

20 matter.  I think I'm deferring all of the property damage

21 issues with respect to the new notice that has to go out.  You

22 know, if it takes another three hours to argue those, Mr.

23 Lockwood, that's pretty much most of the hearing dates.  So, I

24 guess my question whether --

25        MR. LOCKWOOD:  It's taken us five and a half hours to

1  get to this place, Your Honor.

2            THE COURT:  So, I guess my --

3            MR. LOCKWOOD:  And I think we all do have some

4  concerns that Your Honor said you were tired earlier.  I think

5  --

6            THE COURT:  I was tired of --

7            MR. LOCKWOOD:  Some of us are tired of hearing each

8  other's voices, to be honest with you.

9            THE COURT:  The question, Mr. Lockwood, that I was

10 trying to get to is, what's going to happen on September 11th

11 because maybe deferring this exclusivity motion until the

12 afternoon of August -- of September 11th would make more sense

13 than putting it on the omnibus.  That was my question.

14           MR. BERNICK:  That's probably -- can you give us a

15 moment to confer here and we might be able to -- is that

16 agreeable to you all?

17           MR. LOCKWOOD:  Is the motion to compel the only thing

18 that's on for September the 11th?  Is that why we're --

19           THE COURT:  As far as I know right now.  That's all

20 think is that's been deferred.  Anybody else recollect anything

21 else?

22                 (No verbal response)

23           THE COURT:  You know, let me raise this issue about

24 September 11th while we're thinking about it.  Is anybody going

25 to have any problem flying that day?

**J&J COURT TRANSCRIBERS, INC.**

1          MR. BERNICK:  Excuse me, Your Honor?  I'm sorry.

2          THE COURT:  Okay.  Is anybody going to have any

3    difficulty flying on September 11th?  Won't it be the fifth

4    anniversary of -- I'm serious.  It's a serious question.  Some

5    people are concerned about it and --

6          MR. LOCKWOOD:  No, I mean, that's a fair question.  I

7    mean, Al Qaeda maybe looking forward to making --

8          MR. ESSERMAN:  We'll be coming in the night before

9    because we're going to start at 9:00 a.m. on the motion.

10          MS. BAER:  It's a 9:00 a.m. hearing, yes.

11          THE COURT:  And then flying home?

12          MS. BAER:  It's Pittsburgh.  Pittsburgh is not a real

13    big target.

14          MR. BAENA:  No, Pittsburgh, yes.

15          UNIDENTIFIED SPEAKER:  It's been five years.

16          MR. BERNICK:  Well, Pittsburgh was a to rather than a

17    from.  Oh, there was a flight that took off from Pittsburgh.

18    Actually, that's probably a good indication that that's the

19    place to fly from because they're -- I don't --

20          THE COURT:  Okay.  I just -- I want to raise it

21    because I don't want to cause a problem on September 10th

22    having people telling me that they're not coming on September

23    11th.  If it's a concern, I want to address it now.  And I

24    hadn't thought about it earlier.

25          MR. LOCKWOOD:  Well, if the question is such there's

1 going to be some sort of self-created refusal to fly on

2 September --

3          MR. BERNICK:  The question is whether you -- the

4 question is whether you're going to be --

5          MR. LOCKWOOD:  I'm perfectly willing to fly home on

6 September 11th if that's the question.

7          MR. BAENA:  Yes, I am, too.

8          THE COURT:  All right.  Okay, that's fine.  Then my

9 question still stands about moving this to the afternoon of

10 September 11th.

11          MR. BERNICK:  We would be -- the debtors would be

12 agreeable to that, Your Honor.  We're also prepared to proceed

13 now too, but we understand the hour is very late.

14                              (Pause)

15          THE COURT:  Okay, gentlemen, five minutes is up.

16 It's sort of a yes or a no I think at this point because -- how

17 long will the -- does anybody have an idea about how long the

18 questionnaire issues will take?

19          MR. BERNICK:  I have a prediction which is that they

20 will take a very short period of time.  By then, we will have a

21 report -- either we'll have a resolution or a report and a

22 recommendation from the mediator.  And my understanding,

23 actually I talked with Ms. Harding, is that I think he already

24 kind of knows what the issues are and probably how he's going

25 to come out.  So, I think that that process actually is going

1 to be relatively short that day.

2          THE COURT:  Well, then what about starting on

3 September 11th in the morning with the exclusivity motion, and

4 as soon as it's finished moving to the questionnaire issue?

5          MR. BERNICK:  Is that a Monday now?

6          MR. BAENA:  Yes.

7          MR. BERNICK:  Well, one -- if it would be all right

8 with the Court, we would like probably to be able to travel out

9 that day, that morning.  So, maybe start -- yes, we wouldn't

10 have a problem in doing it before the questionnaires.

11          MR. LOCKWOOD:  Is September 11th going to be -- it's

12 going to be in Pittsburgh at 9:00 a.m.

13          MR. BERNICK:  Pittsburgh.

14          MR. BAENA:  9:00 a.m.

15          MR. LOCKWOOD:  So, if we go first, yes, that would be

16 fine.

17          MR. BERNICK:  Not at 9:00 a.m., 10:00 a.m.  Well, it

18 makes a difference depending upon whether you're coming from --

19          MR. BAENA:  No, I think the judge said --

20          MR. LOCKWOOD:  I thought she said -- Your Honor --

21          THE COURT:  Well, I had said nine, but it doesn't

22 matter to me.  I'll be there.  So --

23          MR. LOCKWOOD:  Mr. Bernick is revising the schedule

24 again unilaterally, Your Honor.

25          MR. BERNICK:  Well, for the sake of my -- for the

1 sake of Sunday night dinners, that's right.

2          THE COURT:  Look, the exclusivity argument will

3 hopefully not take more than three hours.  So, if we start at

4 ten --

5          MR. BAENA:  No, it won't take three hours, Your

6 Honor.

7          THE COURT:  Okay.  That will be done by lunchtime.

8 And then if -- the questionnaire will take however long it

9 does, hopefully not more than another hour.  So, I think that

10 would be a reasonable schedule if that works for all of you.  I

11 think that would be better than putting them onto another

12 omnibus and having this happen again.

13          MR. BERNICK:  But, Your Honor, I would just ask, I

14 mean, you know, I really think that we understand that from the

15 point of view -- from all sides, the debtor's side as well as

16 the other different constituencies, exclusivity is an important

17 issue.  At the same time, the briefs I think are supposed to

18 say what people had to say.  I mean, is there really a problem

19 with just getting it submitted to the Court now and having

20 short arguments and just doing it?  I don't understand what the

21 --

22          THE COURT:  I'm here.  I will stay as long as you

23 like if you want to do it tonight.  Otherwise, I think it makes

24 sense if you want to defer it rather than doing on this date.

25          MR. LOCKWOOD:  Your Honor, I think it will take, for

1  the reasons Mr. Bernick just stated, less than three hours to

2  do on the morning of the 11th too for the reasons he stated.

3          MR. BERNICK:  Well, but there's nothing like having

4  more time.  It gives people more opportunities to --

5          THE COURT:  Well, the briefing is closed.

6          MR. BERNICK:  Yes.

7          THE COURT:  I mean, unless there is some sizable

8  change and you folks come to an agreement, which hope does

9  spring eternal, they're -- I don't think the positions of the

10  parties will be changed very much and --

11          MR. BERNICK:  Well, as I said, we're prepared to do

12  it on the 11th.  Have you guys kind of bonded here and figured

13  out what you want?

14          MR. LOCKWOOD:  We vote by a majority of two to one --

15          MR. BERNICK:  Okay.

16          MR. FRANKEL:  And we understand it will be the first

17  item on the agenda.

18          THE COURT:  We'll start at ten o'clock on September

19  11th.  Let me correct this.  So, this is Agenda Item 2 to 10:00

20  a.m. on September 11 in Pittsburgh.  And it will be followed

21  immediately by the questionnaire problem.  All right.  And a

22  bridge order will be entered that will continue exclusivity

23  until the conclusion of the hearing on September 11th.  All

24  right.  The debtor's exclusivity is continued following that

25  until that proceeding ends.  Okay.

**J&J COURT TRANSCRIBERS, INC.**

1          MS. BAER:  Your Honor, there are a lot of items on

2   the agenda, orders to enter and Scotts and -- and I'll just do

3   them.  I'll just take the Scotts matter and the other matters

4   first because those people have been here for so very long.

5   Your Honor, with respect to the Scotts' matter, that, as you'll

6   recall, is the Scotts' motion to modify the preliminary

7   injunction so that --

8          THE COURT:  Which agenda number?  I'm sorry.

9          MS. BAER:  I'm sorry.  Agenda Item Number 9.

10         THE COURT:  Thank you.

11         MS. BAER:  Scotts' motion to modify the preliminary

12  injunction so they can go forward with their declaratory

13  judgment action with respect to shared insurance.  Your Honor,

14  the debtor's position and all but one insurer have continued to

15  take the position that this is premature, that until we get

16  further down the line in the plan process, it really doesn't

17  make sense to take up the Court's time with insurance

18  litigation.  That's still the debtor's position.  We would ask

19  that this matter be put over for a further status in a few

20  months to see where we're at in the plan process.

21         And, Your Honor, Tiffany Strelow Cobb, who represents

22  Scotts was in trial in another matter.  She had to leave.  We

23  are in agreement.  And I believe that's One Beacon Insurance

24  was the one insurer who was taking a different position.

25         THE COURT:  All right.

**J&J COURT TRANSCRIBERS, INC.**

1          MR. BAER:  And he's here, I think.

2          THE COURT:  Good evening.

3          MR. PRIMACK:  Your Honor, good evening.  David

4  Primack, Drinker, Biddle and Reath, for One Beacon and Seaton

5  Insurance.  We maintain our position that we'd like to see this

6  matter go forward, but we're in agreement that we will agree

7  that status hearing be continued only to the next omnibus

8  hearing in August.

9          THE COURT:  Well, I'm not sure doing it until the

10 next omnibus is going to help much based on what -- the

11 schedule that I've set up today frankly.  My concern -- and I

12 hate to rule with Ms. Cobb not present simply because I guess

13 she had to leave, and I understand that.  This has been a very

14 long day.  So, if the only agreement is to do it in August, I

15 would think at least it would be better to wait until September

16 when we see what happens with respect to exclusivity.  That may

17 or may not make a difference.  I don't know.  But, I'm not sure

18 that anything is going to change between now and the

19 exclusivity motion.  So, I think it would make more sense to

20 put it on to September for status conference rather than

21 August, but I'll leave it up to you.

22         MR. BAER:  Your Honor, I think it's September 25th

23 and that's agreeable to the debtor.  I'll see where we're at.

24         THE COURT:  Is that all right?  Okay.  All right.

25 Then this -- Item 9 is continued until the September omnibus.

**J&J COURT TRANSCRIBERS, INC.**

1          MR. BAER:  Your Honor, Item Number 10 is the motion

2  for entry of judgment filed by the environmental litigation

3  group.  Your Honor, we submitted a stipulation and agreed order

4  that sets out a briefing schedule for that matter and a

5  separate hearing date in Pittsburgh for I believe August 25th,

6  and we would just ask that Your Honor enter that order.

7          THE COURT:  Okay.  Did that date, August 25th, come

8  from my staff?

9          MS. BAER:  It did, Your Honor.  We got that date from

10 your staff.

11         THE COURT:  Okay.  I don't have that order here.  All

12 right, thank you.

13         MR. ESSERMAN:  Your Honor, Sandy Esserman for ELG.

14 That's a correct recitation.  I believe the time was 3:30.  I

15 don't know if the order says it.

16         THE COURT:  It does say that.

17         MR. ESSERMAN:  Okay.

18         THE COURT:  All right.  So, this will only be an

19 argument on that date, correct?

20         MR. ESSERMAN:  Yes.

21         MS. BAER:  Yes, Your Honor.

22         MR. ESSERMAN:  Thank you.

23                      (Pause)

24         THE COURT:  Okay, that order is entered.

25         MS. BAER:  Thank you, Your Honor.  I'm going to go

1  back and pick up everything else on the agenda so we can

2  conclude it.  Number 1, we've already dealt with.  Number 2 is

3  what you've just ruled on with respect to exclusivity.  Number

4  3, Your Honor was the debtor's motion to approve the agreement

5  between the debtors and the United States Environmental

6  Protection Agency.  It was an order, if you will, in eight of

7  the Waconda settlement that you had already approved.  I have a

8  copy of that order here, Your Honor.  It contains a revised

9  settlement.  The only change, Your Honor, was it made the

10 contribution protection, which is to the debtor's benefit to

11 apply to all debtors not just Grace Con.

12        THE COURT:  Okay.  Was the CNO or COC filed with this

13 because if so I didn't see that.

14        MS. BAER:  Yes, Your Honor, it was.  If you need a

15 copy, I can dig it out.

16        THE COURT:  No, that's fine.  I just want to make

17 sure that it was filed, because I had expected one to be but I

18 didn't see it.

19        MS. BAER:  Yes, I actually do have it right here.

20        THE COURT:  Okay, that order is entered.

21        MS. BAER:  Your Honor, Item Number 4 was the IOF

22 Department of Revenue's motion to file a late claim.  We did

23 not file an objection.  That was a proper claim.  In fact, we

24 filed amended tax returns.  The claim was consistent.  I

25 believe that Iowa submitted a certificate of no objection.

**J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  It did, and I have not had an opportunity

2  to have those orders entered yet.  But, with respect to Items

3  4, the CNO, 5, the COC, 6, the CNO, and 7, the COC, those items

4  will all be entered.

5          MS. BAER:  Your Honor, I have the other orders with

6  me today.  Would you like me to present them so you can do it

7  now or is that in process?

8          THE COURT:  Yes, I'll do them now if you have them --

9          MS. BAER:  I do.

10          THE COURT:  -- because I haven't had staff enter them

11  yet.

12          MS. BAER:  Your Honor, here is Items Number 5, 6 and

13  7.

14          THE COURT:  And four.

15          MS. BAER:  I don't have four.  That was Iowa's.

16          THE COURT:  Okay, just a second then.

17                        (Pause)

18          THE COURT:  Okay.  I'll sign these orders and take

19  care of getting them entered, Ms. Baer.  What's next?

20                        (Pause)

21          THE COURT:  Mona, can you pull the order that's on

22  the motion for Number 4 with the CNO and I'll get that one

23  entered?  That's fine.  Okay.

24          MS. BAER:  Item Number 8, Your Honor, that's the

25  debtor's motion for approval of the settlement agreement with

1  Lloyds Underwriters.  We are continuing to work with especially

2  the asbestos PI committee and the Libby claimants to try to

3  resolve that.  We still have a number of issues.  What we would

4  ask, Your Honor, is a separate hearing on that matter if we

5  could get a hearing date between now and the August omnibus.

6  Otherwise, I'm going to suggest we probably -- either we put it

7  over to the August omnibus or we set a separate hearing date

8  for it in Pittsburgh, either way.

9          THE COURT:  I have very few dates in August.  I think

10 this was may be better since we now have exclusivity moved

11 either to put on August or if you've got time on September 11th

12 and want to put it on then to do it then.

13         MS. BAER:  Your Honor, might I suggest let's put it

14 over to August in the hopes that we can either resolve it or

15 we'll argue it without the need for witnesses.  If we need

16 witnesses, then we may need to take advantage of September

17 11th.

18         THE COURT:  All right.

19         MR. HORKOVICH:  Your Honor, Bob Horkovich, insurance

20 counsel for the claimants committee.  So, that has been put

21 over to the August 21st omnibus?

22         THE COURT:  That's correct, for argument.

23         MR. HORKOVICH:  Thank you, Your Honor.

24         THE COURT:  Okay, Ms. Baer.

25         MS. BAER:  Your Honor, Agenda Item 11 is the debtor's

1 5th omnibus objections to claims.  There is one more left.

2 They are still negotiating to try to settle that claim.  So, I

3 have another order continuing it.

4          THE COURT:  All right, thank you.  Okay.

5          MS. BAER:  Your Honor, we've already addressed Item

6 Number 12.  Thirteen has been put over to August 21st.  We've

7 already addressed Items 14, 15, 16 and 17.  And so, Your Honor,

8 I do have copies of the slides to hand up to you, this is

9 everything from today, and I do have a number of copies for

10 other parties.

11          THE COURT:  All right.  And they relate to which item

12 now?

13          MS. BAER:  These were --

14          THE COURT:  Sixteen and 15?

15          MS. BAER:  Yes, they were --

16          MR. BERNICK:  They actually, Your Honor, relate --

17 they are simply the slides that we were showing in connection

18 with property damage status.  They are the slides that were

19 presented with the charts that were in our exclusivity brief.

20          THE COURT:  Okay.

21          MR. BERNICK:  They give the full scale of those.  And

22 I believe that's -- and there is also the --

23          MS. BAER:  The questionnaires.

24          MR. BERNICK:  -- the questionnaires.

25          THE COURT:  All right.

1          MS. BAER:  And that's everything that we showed

2  today.

3          THE COURT:  Okay, thank you.

4          MS. BAER:  I have a lot of copies here.  That's it,

5  Your Honor.

6          THE COURT:  Anyone have anything else?

7                    (No verbal response)

8          THE COURT:  Okay, see you next month.  Thank you.

9          MR. BERNICK:  Thank you, Your Honor.

10          MR. BAENA:  Thank you, Your Honor.

11                        * * * * *

12                     **<u>CERTIFICATION</u>**

13          I, CARLA M. OAKLEY, certify that the foregoing is a

14  correct transcript to the best of my ability, from the

15  electronic sound recording of the proceedings in the

16  above-entitled matter.

17

18  <u>/s/ Carla M. Oakley</u>                Date:  August 1, 2006

19  CARLA M. OAKLEY

20  J&J COURT TRANSCRIBERS, INC.

21

22

23

24

25