### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W.R. GRACE & CO., *et al.* | ) | Case No. 01-01139 (JFK) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | Hearing Date: August 21, 2006 at 2:00 p.m. |
| | ) | Objection Deadline: August 4, 2006 at 4:00 p.m. |

### MEMORANDUM OF LAW IN SUPPORT OF CLAIMANTS' OPPOSITION TO DEBTORS' MOTION TO COMPEL ASBESTOS PERSONAL INJURY CLAIMANTS TO RESPOND TO THE W.R. GRACE PERSONAL INJURY QUESTIONNAIRE

NOW COME certain asbestos personal injury claimants (each, a "Claimant") in receipt

of the "W.R. Grace Asbestos Personal Injury Questionnaire," (hereinafter, "Questionnaire"), by

and through their counsel, Thornton & Naumes, LLP, and hereby oppose the Debtors' Motion to

compel asbestos personal injury claimants to respond to the questionnaire because, contrary to

the Debtors' assertions, these claimants have properly completed the questionnaire. Thornton &

Naumes is aware of the fact that the Official Committee of Asbestos Personal Injury Claimants

("PI Committee"), is also opposing this motion. Thornton & Naumes supports the PI

Committee's efforts, but also seeks to provide information specific to our clients in this

memorandum. In support thereof, the Claimants state as follows:

### I.    Background

Debtors provided Thornton & Naumes with approximately 1102 Questionnaires that each

corresponded with the name of a client of the firm that Debtors deemed eligible. As Debtors

have noted, the purpose of the Questionnaire is "to provide Grace and the other parties to the

estimation with basic factual information about the pre-petition litigation claims so that the

3

information can be used by the parties in the estimation of Grace's asbestos personal injury liabilities." (Debtors' Motion, p. 2). Debtors claim that the questionnaire should allow for "streamlined discovery," yet the form is actually quite lengthy and detailed as the questionnaire is divided into ten parts with each part containing numerous questions, totaling around fourteen pages. Further, before Thornton & Naumes could even begin the daunting task of working with claimants to ensure that these questionnaires were properly completed, it was first necessary to sift through the vast amount of paper that Debtors had delivered to the firm and determine which questionnaires actually corresponded with our clients. Debtors chose to entitle each questionnaire with a name that theoretically should correspond with a claimant, however, besides first and last name, Debtors gave no other identifying information. Thus, it was difficult to determine who the rightful claimants were given the fact that many of our clients have similar or identical names. Further, we received questionnaires that seemingly did not correspond with any of our clients, questionnaires for clients who had previously settled with Debtors, and duplicate questionnaires. In sum, due to the fact that neither social security numbers nor any other identifying feature accompanied claimants' names, it was exceedingly difficult to determine which clients should be submitted.

After the proper claimants were finally identified, we then worked with that group of claimants to answer the lengthy questions and have each claimant sign the questionnaire by the July 12, 2006 deadline. In those cases where there was not enough available information to identify the claimant, the questionnaire was a duplicate, or the claimant had no claim, Thornton & Naumes did not submit a questionnaire for the claimant. Admittedly, there are some instances where the information provided for each claimant is not as complete as it would be if this were the final stages of the bankruptcy process, but the information is still complete enough to allow

4

Debtors the opportunity to conduct an "estimation" of asbestos personal injury liabilities. For

example, around 150 questionnaires were submitted without a signature due to the fact that some

clients may have been temporarily unreachable or unresponsive or because of a recently

deceased claimant or executor who obviously could not sign the document. In some of these

situations, the claimant's case is otherwise valid in terms of medical and exposure information.

Our approach to completing these questionnaires was to ere on the side of inclusivity; we were

cognizant of the fact that the main purpose of the questionnaire is both to preserve the rights of

claimants and to gather useful information for Debtors. Thus, Thornton & Naumes ultimately

submitted 850 questionnaires to Debtors, and these 850 questionnaires were identified as

corresponding to the correct claimants and properly completed.

## II.     Discounting Debtors' Allegations

### A.     Objections of the Type Raised by Thornton & Naumes' Claimants should be Allowed

The Debtors acknowledge that the questionnaire at issue is "a hybrid form of discovery,

part fact interrogatory, part contention interrogatory, part document request, and part deposition

by written question." (Debtors' Motion, p. 13).   Yet, despite the fact that all of these common

forms of discovery allow for objections, Debtors persist in the idea that combining these varied

discovery forms into one consolidated questionnaire somehow negates the basic right to object

guaranteed in the Federal Rules of Civil Procedure. *See* Fed R. Civ. P. 30 and 31; Fed. R. Civ. P.

33(b)(1) (allowing objections to interrogatories provided that the objecting party states the

reasons for the objection); Fed. R. Civ. P. 34(b) (describing procedure when objection is made to

production of document request). While Claimants are cognizant of the fact that the Debtors are

concerned with compiling a navigable database, that does not mean that any question—no matter

how confidential or irrelevant the information it is seeking—is fair game. Indeed, the kind of

5

mandatory and unquestioned responses that Debtors' motion is demanding would put Claimants

in an untenable position bordering on coercion: either answer inappropriate questions or

potentially lose one's right to proceed against the Debtors.

In addition to Thornton & Naumes' overall objection to the entire process, Claimants

represented by Thornton & Naumes offered four basic objections to some of the questions in the

questionnaire: (1) Claimant objects to this question as not reasonably calculated to lead to

discovery of relevant and/or admissible evidence; (2) Claimant objects to this question because

the information it seeks is equally available to the defendant; (3) Claimant objects to this

question as it calls for information that is confidential in nature and subject to attorney/client

privilege; and (4) Claimant objects to this question as it calls for information that is confidential

in nature and subject to doctor/patient privilege.   These objections were used primarily for

questions that asked for information concerning the relationship between claimants and their

doctors or prior legal proceedings in which the Claimants were involved.

One such example of our legitimate use of these objections occurs in Part II of the

questionnaire when Debtors enquired, "was the diagnosing doctor paid for the diagnostic

services that he/she performed?," to which claimants answered with Objections 1 and 4, that is

that the question would not lead to the discovery of relevant evidence and was confidential in

nature and subject to doctor/patient privilege.   Debtors also asked whether the diagnosing doctor

was referred to claimant by counsel, to which claimants answered with Objection 1 and 3, that is

that the question would not lead to the discovery of relevant evidence and was confidential and

subject to attorney/client privilege.  These same types of irrelevant and inappropriate questions

recurred in questions enquiring about chest x-ray readers, pulmonary function performing

doctors, and pathologists.  In each case the same objections were used as these types of questions

6

are not common in asbestos bankruptcy proceedings, infringe on our clients' personal affairs,

and it is not apparent what possible use that type of information would have for Debtors looking

to determine their own asbestos personal injury liabilities.

Another example of our legitimate use of these objections occurs in the Litigation section

of the questionnaire, Part VII(a), where Claimants from Thornton & Naumes answered all

questions regarding (1) whether the plaintiff had filed a lawsuit regarding asbestos or silica; (2)

the caption, case number, file date, and court name for the lawsuit; and (3) Was Grace a

defendant in the lawsuit.   However, Claimants objected to the following questions: (4) was the

lawsuit dismissed against any defendant; (5) has a judgment or verdict been entered; and (6) was

a settlement agreement reached in this lawsuit.  The information sought in those latter questions

runs the extremes of either being equally available to the Defendant or intruding into confidential

information as many, if not all, settlement agreements contain a confidentiality clause.  In any

case, it is not readily apparent how the information from those latter questions will aid Debtors in

estimating whether each claimant has an asbestos-related personal injury.

Interestingly, Debtors assert that the Court has approved every question in the

questionnaire by a line-by-line review, yet, Debtors only point to a few select questions that the

PI Committee objected to as being overly broad or posing an undue burden or being irrelevant

that were ultimately approved by the Court. (Debtors' Motion, p. 15).   Further, even if we were

to take the Debtors' assertions at face value—that each and every question was approved after

line-by-line review—it does not follow, as Debtors assert, that "these questions are relevant, not

unduly burdensome, and therefore unobjectionable."  First, as already noted, Debtors have only

highlighted a few select questions out of a lengthy questionnaire as being ruled on by the Court

as relevant and not unduly burdensome after those objections were raised; even more

7

importantly, however, those are not the only reasons that a question might be objectionable, as evidenced by the varied objections relied upon by claimants from Thornton & Naumes. Thus, for Debtors to argue that merely because a question has been deemed to be not unduly burdensome or irrelevant—both generally low bars to satisfy—it is otherwise "unobjectionable," flouts the basic principles of civil procedure.

Further, Debtors' blanket justification that individual claimants should not be able to object to questions because they were collectively and adequately represented by the PI Committee is misplaced. (Debtors' Motion, p. 17). While it is true that the PI Committee is often intended to advocate for the different interests and concerns of the various creditors, it is also equally true that the PI Committee does not, and indeed cannot, represent every individual creditor's interest in a case. *See In re Kensington*, 368 F.3d 289, 315 (3d Cir. 2004); *In re Levy*, 54 B.R. 805, 807 (Bankr. S.D.N.Y 1985). Indeed cases that discuss this distinction have noted that the duty of such committees to represent in bankruptcy and class actions should not infringe on the attorney-client relationship between individual creditors and their attorneys. *See id.* As such, Thornton & Naumes should be allowed to represent the individual claimants who have retained our firm, and one manner of properly representing our clients is objecting to improper questions.

Moreover, even to the extent that the PI Committee does represent all claimants, Debtors themselves acknowledged that it is only in those instances where the issues have been "fully and fairly" litigated by a committee in an estimation that they should not be revisited. (Debtors' Motion, p. 18). Yet, the same logic does not apply here because the objections that Claimants are making are for issues that have *not* been fully and fairly litigated. Debtors rely on several cases that discuss the "law of the case" doctrine, i.e., that once a court makes a decision on a rule

8

of law, that decision governs the same issue in the later stages of the litigation. *See Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 815-816 (1988); *AL Tech Specialty Corp. v. Allegheny Intern. Credit. Corp.*, 104 F.3d 601, 605 (3d Cir. 1997); *In re Ameriserve Food Distribut., Inc.*, 315 B.R. 24, 35 (Bankr. D. Del. 2004). Yet, the law of the case doctrine actually merely expresses a general practice of courts, it does not limit a court's ability to revisit an issue, should it choose to do so. *Messenger v. Anderson*, 225 U.S. 436, 444 (1912). Further, in those cases to which the Debtors have cited the litigants are involved in advanced stages of the litigation; in contrast, here, as Debtors have emphasized, we are only at an estimation stage. Given the fact that this is one of the first opportunities for individual claimants to participate in this important process, they should be given the opportunity to "fully and fairly" object to questions for reasons which have not been addressed before, or for reasons that may apply in individualized circumstances, rather than being forced to answer every question in the questionnaire without the opportunity of raising an objection.

> **B.    The Exhibits Claimants have Attached to the Questionnaire Answer the Questions Sufficiently to Allow Debtors to Construct a Navigable Database**

Debtors also label Claimants' decisions to respond to some questions in the questionnaire by relying on attached documents as a "deficiency." Yet, attaching documents to discovery requests when they more specifically or accurately answer a question than a mere narrative is a common practice, and Debtors themselves have referred to their questionnaire as a hybrid discovery tool, "part document request." (Debtors' Motion, p. 11). The main purpose of the Questionnaire is to use the information provided to construct a navigable database. In the case of the Thornton & Naumes claimants who submitted questionnaires, any attachments are attached as exhibits labeled alphabetically. For example, in the attached example from our law firm, "W.

9

R. Grace Asbestos Personal Injury Questionnaire, RE: Arcese, Wallace B," (Attached hereto as

"Exhibit A"), documents attached as "Exhibit A" contain medical records; "Exhibit B" contains

product identification/co-worker affidavits; "Exhibit C" contains litigation information: face

pages, pleading reports, etc; and "Exhibit D" lists the claimant's work history information.

Every answer that requires an attachment carefully delineates which Exhibit contains the answer,

and the Exhibits are not generally more than a few pages in length.   This practice does not result

in the undifferentiated "dumping" of documents that Debtors claim, but rather was meant to

ensure timeliness in reaching debtors and greater accuracy in reporting.   Many of the documents

attached, especially medical records, would be difficult to summarize or encapsulate in narrative

form without omitting potentially important information to the Debtors.  As neither the members

of our law firm and its support staff nor the claimants whom we represent are medical

professionals, we are in no better position than Debtors to sift though these medical records and

approximate an answer for Debtors.  Indeed, in doing so, it would be possible to omit

information that Debtors consider to be important.   Conversely, in other instances the attached

documents are self-explanatory and merely repeat the exact information Debtors are seeking, in

which case it is just as easy for the data entry personnel to enter the information as it is listed on

the attached document.  Furthermore, not every question can be answered in the limited space

provided, and in that case it would be permissible, indeed preferable, to attach additional sheets

to the questionnaire.  This begs the question, however, of whether there is really a difference

between attaching this information because the limited confines of the questionnaire dictate this

practice, and attaching well delineated exhibits containing the same information?

      While the questionnaire is admittedly a hybrid form of discovery, the benefit of such a

device is supposedly that it allows for a more "streamlined" process.  Yet, the answers that

Debtors are demanding are not correspondingly streamlined, but rather are more onerous than those that would be required if we were engaging in the normal discovery process. For example, when answering interrogatories, a party's answer will be deemed insufficient if it merely refers to voluminous records or an undifferentiated mass of documents; however, if there is no undue burden on the defendant and the plaintiff refers to a relatively short record the practice of attaching documents as an answer is allowed. *Sahley v. Tipton Co.*, 40 F.R.D. 495 (D.C. Del. 1966). Here, there is no undue burden on the debtors as the Claimants have specified which Exhibit answers each question and the exhibits are not "voluminous" in length. *See id.* Thus, the claimants here have properly answered the questionnaire.

### C.    Signatures have been Provided in All Circumstances where it was Possible to Do So in a Timely Fashion

Whenever possible Claimants affiliated with Thornton & Naumes signed the questionnaires themselves. However, there were some instances where given the time sensitive nature of this process, we were not able to attain everyone's signatures, often because the original claimant had passed away and the family had not yet obtained probate and appointed an executor. As this is a common situation, and one rectified as soon as these administrative matters are accomplished, the Claimant will have a valid claim. Given this fact, as well as our desire to preserve our clients' rights and to provide Debtors with the most accurate estimation possible, Thornton & Naumes submitted certain questionnaires without a signature, as long as the information required in the questionnaire was accessible.

Further, none of the attorneys from Thornton & Naumes signed the questionnaires because that is not the interpretation we have assigned to the term "legal representative." Although Debtors insists that the last line of the questionnaire "included a signature line for the Claimants' legal representative (*i.e.*, their counsel)," (Debtors' Motion, p. 28), there is nothing in

11

the questionnaire that defines that term as such. Further, consultation of Ballentine's Law

Dictionary, reveals that the term does not necessarily generally signify counsel, as it is defined as

"in primary meaning, an executor or administrator; in secondary meaning, one who succeeds to

the rights of another, such as an heir, next of kind, devisee or legatee, assignee, receiver, etc."

*Ballentine's Law Dictionary* (3d ed. 1969). Relying on this most common definition of the term

and without any other direction to proceed otherwise, it would have been improper for counsel to

sign on the "legal representative" signature line.

**III.    In the Event that Narrative Responses are Required, the Debtors' Sixty Day Cure Period in Not a Realistic Time Frame to Complete this Task**

The Claimants represented by Thornton & Naumes have answered Debtors'

questionnaire to the best of their ability given the time constraints that have been imposed upon

them. Debtors' request for narrative answers would merely create excess paper as it would

require Claimants to transcribe the same information already attached to their questionnaires on a

separate sheet of paper in order for the Debtors' data entry personnel to then transcribe the

information yet again. Thus, debtors' request seems like it would only be a waste of everyone's

time and energy. Yet, even in the event that narrative answers are ultimately required, it would

be nearly impossible to complete this task in the sixty day time frame suggested by Debtors.

Unlike the data entry personnel at Rust Consulting whose time will be completely devoted to

entering data, and who Debtors argue will still be unable to complete this task in the sixty days to

which they originally agreed, individual law firms do not have the luxury of appointing multiple

people to solely perform this narrative task for the next sixty days. In the case of Thornton &

Naumes, if we were to provide narrative responses for the 850 claimants we submitted, assuming

one person at our firm could devote 8 hours a work day, with no breaks, and work sixty days

12

straight, they would still have to re-transcribe the information that has already been submitted for at least two claimants' fourteen page questionnaires per hour.

WHEREFORE, the Claimants respectfully request that the Court deny Debtors' Motion as the 60 day cure period to produce narrative responses is neither realistic, nor necessary given that the Claimants have already responded to the Questionnaire in an adequate manner.

Dated: August 4, 2006

Respectfully submitted,

 /s/ Daniel K. Hogan
Daniel K. Hogan (De. Bar. No. 2814)
THE HOGAN FIRM
1311 Delaware Avenue
Wilmington, DE 19806
Phone: (302) 656-7540
Facsimile: (302) 656-7599

*and*

Garrett J. Bradley, Esq.
Thornton & Naumes, LLP
100 Summer Street, 30th Floor
Boston, MA 02110
Phone: (617) 720-1333
Facsimile: (617) 720-2445

Counsel for Claimants

13