## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | **Chapter 11** |
| | ) | |
| **W.R. GRACE & CO., et al.** | ) | **Case No. 01-01139 (JKF)** |
| | ) | |
| **Debtors** | ) | **(Jointly Administered)** |
| | | **Re: Dkt. Nos. 9315 and 11408** |

## DEBTORS' SUPPLEMENTAL MEMORANDUM IN SUPPORT OF PROTOCOL FOR DISPOSITION OF CANADIAN PROPERTY DAMAGE CLAIMS

The firm of Speights & Runyan ("Speights") filed hundreds of property damage claims involving buildings in Canada (the "Canadian PD Claims").[1] The Debtors (hereafter "Grace") have objected to the Canadian PD Claims[2] because they are not enforceable under applicable Canadian law and, therefore, they must be disallowed under Section 502(b)(1) of the Bankruptcy Code. Thus, to paraphrase this Court's recent decision involving the Minneapolis Stigma Claims, if Canadian law does not recognize the Canadian PD Claims, then there is no basis upon which they should be allowed.[3]

In precisely this situation, courts in the United States regularly turn to foreign courts to resolve issues of foreign law where there is a proceeding in the foreign jurisdiction that has concurrent jurisdiction with the United States case over the dispute. *See, e.g., In re Int'l Admin. Servs., Inc.*, 211 B.R. 88 (Bankr. M.D. Fla. 1997). In particular, where the issue to be resolved is one of foreign law and facts, and where the parties to the dispute are largely in the foreign

---

[1] At the time of the Debtors' original motion [Dkt. No. 11408], there were 291 of these claims pending. Speights has subsequently withdrawn 194 claims for which Speights admits it has no product identification. As a result, there are currently 97 pending Canadian PD Claims.

[2] Debtors Fifteenth Omnibus Objection (Substantive) to Asbestos Property Damage Claims ("Grace's Canadian PD Claims Objection") [Dkt. No. 9315] filed September 1, 2005, at 52-57.

[3] Memorandum Opinion [Dkt. No. 12888] dated July 31, 2006 at 4 ("If Minnesota law does not recognize such a claim, than there is no basis upon which this court can allow the Minneapolis Stigma Claim.")

jurisdiction, resolution of the dispute in that jurisdiction is appropriate. For instance, in *In re United Air Lines Inc.*, (2005) 9 C.B.R. 5th 159, a United States debtor ("UAL") was authorized to seek a ruling from a Canadian court as to whether UAL could be excused from paying contractual pension obligations to certain of its Canadian unions. The Canadian court in that case took jurisdiction over the dispute and made a substantive ruling on UAL's motion.[4]

Significantly, the Canadian proceeding in which UAL resolved that issue was commenced under a provision of the Canadian insolvency law, Section 18.6 of the Companies Creditors Arrangement Act ("CCAA"), which permits Canadian Courts to conduct proceedings ancillary to a non-Canadian insolvency case such as the then pending Chapter 11 case of UAL.

In *In re Matlack, Inc.*, (2001) 26 C.B.R. (4th) 45, a United States Chapter 11 debtor commenced a proceeding in Canada under Section 18.6 to stay the seizure of its property by a creditor in Canada. The Canadian court in that case not only granted the requested relief, but went on to agree to a Protocol whereby the parties in the Canadian proceeding and the Chapter 11 case "shall (a) cooperate with each other in connection with actions taken in both the U.S. Bankruptcy Court and the Canadian Court, and (b) take any other appropriate steps to coordinate the administration of the U.S. Cases and the Canadian Case for the benefit of the Matlock Companies' respective entities and stockholders." *Id.* at para. 10.

Babcock & Wilcox has also used Section 18.6 of the CCAA to have orders entered in its Chapter 11 case, made effective in Canada including the channeling injunction in its confirmation order. *Babcock & Wilcox Ltd.*, Re (2000) 18 C.B.R. (4th) 157 Ont. S.C.J. [Comm. List].

---

[4]    See Exhibit 1 attached hereto.

Grace is also the subject of a proceeding under Section 18.6 of the CCAA which

commenced shortly after Grace's petition date. In its pending *Motion for a Scheduling Order*

*Regarding Certain of the Debtors' Fifteenth Omnibus Objections to PD Claims (Substantive)*

[Dkt. No. 12679] (the "PD Scheduling Motion"), Grace has proposed that this Court permit

Grace to prosecute its Canadian law objections to the Canadian PD Claims before the Canadian

Court in the CCAA proceeding.[5]  Importantly, Grace is not asking this Court to abstain for the

ultimate allowance or disallowance under Section 502 of the Canadian PD Claims.  Rather,

because the ultimate allowance of the Canadian PD Claims (i) will be resolved under principles

of Canadian law, (ii) involves buildings located in Canada, and (iii) will turn on events that

occurred in Canada, established principles of United States law including international comity,

concurrent jurisdiction and forum non conveniens, compel that Grace be authorized to prosecute

its Canadian law objections to the Canadian PD Claims in the CCAA Proceeding.  Once Grace's

Canadian law objections to the Canadian PD Claims are resolved in Canada, then this court will

be in a position to enter appropriate orders allowing or disallowing those claims under Section

---

[5] *In the Matter of S 18.6 of the Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36, as Amended and In the Matter of Grace Canada, Inc.* , Court File 01-CL-4081, Ontario Superior Court of Justice, Commercial List (the "CCAA Proceeding").  Specifically Grace has asked this Court to authorize it to seek an order from the Canadian Court in the CCAA Proceeding adopting a Protocol (the "Proposed Protocol") which provides in relevant part:

> WHEREAS the Canadian PD Claims involve buildings situated in Canada which allegedly contain building products giving rise to a claim against the U.S. Debtors.

> AND WHEREAS substantive Canadian law governs the merits determination of the Canadian PD claimants' claims against the U.S. Debtors for buildings situated in Canada.

> The U.S. Debtors and Grace Canada propose this Protocol to address Canadian PD Claims as follows:

> 1.    The processes provided in this Protocol shall be utilized to assist the U.S. Court for the purposes of determining the validity of Canadian PD Claims as well as for the estimation of said claims.

> 2.    Any and all objections to the Canadian PD claims identified at Exhibit A shall be addressed by the C.C.A.A. Court pursuant to this Protocol.  Nothing in this provision, however, shall prevent or is intended to prevent any claimant from withdrawing a Canadian PD claim filed against the U.S. Debtors.

502(b)(1) of the Bankruptcy Code, with such decisions based on whether those claims are

enforceable against Grace under Canadian law.

## I.   BACKGROUND

The record is clear that the Canadian PD Claims were filed as a direct result of an

orchestrated ploy by Speights to induce Canadian property owners to circumvent the laws of

Canada regarding alleged property damage claims against Grace.  Thus, prior to the March 2003

Bar Date [Dkt. No. 1960], Speights and its Canadian colleagues actively solicited Canadian

property owners to file claims in this case (and other Chapter 11 cases pending before this

Court).[6]  The Speights Solicitation letter represents that:

- "Although no Canadian Property owners have ever successfully sued U.S. asbestos
  manufacturers (some cases in British Columbia were settled out-of-court for
  exceptional reasons), there is a current window of opportunity, which may allow
  many Canadian owners to recover a substantial amount of the money spent or to be
  spent on asbestos abatement."

- "[T]here are significant differences in the liability laws between Canada and the U.S.
  Such theories as "strict liability" for a defective product and suits for pure economic
  loss are viable in the U.S. Courts but much less likely to succeed in Canada.  The U.S.
  cases have historically taken many, many years to settle or come to court and the
  costs have been so great that the only effective way for building owners to succeed
  was by engaging specialty lawyers on contingency-a much less common practice in

---

[6]   *See* "Speights Solicitation Letter," a copy of which is attached as Exhibit 2.

Canada. The only case tried in Canada (commonly referred to as the Privest Case) also brought into question the Statute of Limitation for such suits in Canada."

- "[Because of] the doubtful outcome and costs involved, the extensive time such litigation takes and Canadians' historic reluctance to use the courts, Canadian Property Damage cases have never been widely considered."

- "Recently several of the major manufacturers of sprayed fireproofing and acoustic finishes (in particular W.R. Grace, Federal Mogul and U.S. Mineral) have either been forced into bankruptcy protection or voluntarily entered Bankruptcy Court in order to settle forever all potential liability arising from their manufacture, use or installation of asbestos products. These filings require these companies to notify and seek settlements not only within the United States but worldwide. Canada is in fact specifically named as eligible in some of the filings. It is likely that the standard of proof and even the applicable jurisdiction may have changed as a result of these companies now being in bankruptcy negotiation."

In fact, contrary to Speights' statement to its clients, Grace's commencement of this case has no effect on whether the holders of Canadian PD Claims can recover from Grace. As Grace makes clear in the *Debtors' Fifteenth Omnibus Objection (Substantive) to Asbestos Property Damage Claims* [Dkt. No. 9315] ("Grace's Canadian PD Claims Objection") filed September 1, 2005, at 52-57, the Canadian PD Claims are not enforceable against Grace under applicable Canadian law and, therefore, should be disallowed pursuant to Section 502(b)(1) of the Bankruptcy Code. In particular, the Canadian PD Claims fail because of applicable statutes of limitation and also underlying principles of Canadian tort law that reject the strict liability

5

principles adapted in the United States. *See Privest Properties Ltd. v. Foundation Co. of Canada* (1995), 11 B.C.L.R. (3d) 1 (S.C.). *aff'd* (1997), 31 B.C.L.R. (3d) 114 (C.A.), *leave to appeal to the Supreme Court of Canada refuse,* [1997] S.C.C.A. No. 216.

In the PD Scheduling Motion, Grace has urged the Court to exercise its authority to defer to the Canadian Court for purposes of determining the validity under Canadian law of the Canadian PD Claims. As discussed below, by taking that action, this Court will ensure that the dispute is resolved in the forum that (i) has the greatest understanding of the applicable law, (ii) the strongest interest in the outcome, and (iii) possesses jurisdiction over the claimants and authority to entertain those proceedings.[7]

## II.    THE CANADIAN COURT IN THE CCAA PROCEEDING HAS FULL AUTHORITY TO ADJUDICATE GRACE'S OBJECTIONS TO THE CANADIAN PD CLAIMS

Section 18.6 of the Canadian Companies Creditors Act provides, *inter alia,* that a Canadian Court may enter orders with respect to a "foreign proceeding" (e.g., a non-Canadian bankruptcy proceeding) "on such terms and conditions as the court considers appropriate in the circumstances" and may "on the application of…any interested person…[apply] such legal or equitable rules governing the recognition of foreign insolvency orders and assistance to foreign representatives are not inconsistent with the provisions of this Act." CCAA Section 18.6(3) and 18.6(4) (copy attached as Exhibit 3). In *Babcock & Wilcox Ltd.,* Re (2000) 18 C.B.R. (4th) 157 (Ont. S.C.J. [Comm. List] ("Babcock"), Justice Farley explained that the "CCAA as remedial

---

[7]    The Speights Solicitation Letter references not only Grace but also Federal Mogul. On July 24, 2006 the Debtors in *In re Federal Mogul Global Inc., T&N Ltd,* Case No. 01-10578 (JKF), filed a Twentieth Omnibus Objection (Substantive) to 181 Asbestos-Related Property Damages Claims which seeks to disallow certain Canadian property damages claims filed by Speights in that case. Federal-Mogul asserts that those claims should be disallowed under applicable Canadian statute of limitations principles. As set forth in Grace's Canadian PD Claims Objections, Speights' Canadian PD Claims filed in this case should also be disallowed on statute of limitations grounds. Thus, permitting Grace to determine the validity of the Canadian PD Claims in the CCAA Proceeding will also likely inform this Court's ultimate consideration of related issues in the *Federal-Mogul* case.

legislation should be given a liberal interpretation to facilitate its objectives." *Id.* at para. 11. He therefore agreed, on the application of Babcock & Wilcox's non-debtor subsidiary, Babcock & Wilcox Canada Ltd. ("B&W Canada"), to commence an ancillary proceeding under Section 18.6 of the CCAA to aid Babcock & Wilcox's then-pending Chapter 11 case. Moreover, Justice Farley proceeded to enter orders in that ancillary proceeding staying asbestos litigation against B&W Canada during the pendency of the Babcock & Wilcox Chapter 11 case, and, when Babcock & Wilcox's plan was confirmed, making the channelling injunction under that plan binding and effective in Canada. *See* Exhibit 4.

Grace's non-debtor Canadian subsidiary has sought precisely the same ancillary relief on behalf of Grace through the CCAA Proceeding. Thus, the CCAA Proceeding was commenced on April 4, 2001, *only two (2) days* after Grace's petition date. The initial order entered by the Canadian Court, pursuant to Section 18.6 of the *Companies' Creditors Arrangement Act*, provided for, among other things, recognition of Grace's Chapter 11 case as a "foreign proceeding" within Canada and the appointment of an information officer to serve as an officer of the court and report to the Canadian Court on no less than a quarterly basis.[8]

In addition to granting orders extending the stay of asbestos litigation in Canada, during the last five (5) years, the Canadian Court has heard a number of motions for the implementation of the Chapter 11 proceedings in Canada. For example:

---

[8]    Since the commencement of the CCAA Proceeding, the information officer has submitted quarterly and other special reports (the "Reports") each of which have provided the Canadian Court with an update on Grace's Chapter 11 case. In each Report, the information officer has listed certain pertinent motions in the Chapter 11 case and outlined the details of the ongoing issues being addressed by the Debtors, including the hearing regarding the scientific risks of Zonolite Attic Insulation ("ZAI"), personal injury claims and property damage claims ("PD Claims"). The information officer has also, from time to time, included other information in the Reports, such as updates on and copies of Grace's January 13, 2005 Amended Plan and disclosure statement and all information required in connection with motions for the approval of the PD Claims bar process.

- On December 5, 2002, the Canadian Court granted an order recognizing this Court's April 22, 2002 order setting the PD Claims bar date process and giving that order affect in the CCAA Proceeding;[9] and

- On November 14, 2005, the Canadian Court granted an order (the "November 14 Order") recognizing this Court's Modified Preliminary Injunction in Canada. The effect of the November 14 Order was to stay nine (9) separate class actions that had been commenced in Canada by third parties against, amongst others, certain of the Debtors, certain affiliated entities and third parties including Sealed Air (Canada) Co./CIE in favour of resolution of these claims through the Chapter 11 plan process.[10]

Thus, since the commencement of the CCAA Proceeding, the Canadian Court has provided assistance to Grace's Chapter 11 case by entering orders that affect the interests of Grace and Canadian third-parties that have claims involving Grace. These orders are consistent with the broad authority granted to the Canadian Court by the CCAA to aid this Court in the resolution of Grace's Chapter 11 case. As Justice Farley explained in *Babcock*, "once it has been established that there is a foreign proceeding within the meaning of Section 18.6(1) . . ., then this court is given ***broad powers and wide latitude [by Section 18.6(3)]***, all of which is consistent with the general judicial analysis of the [*Companies' Creditors Arrangement Act*] overall, to make any order it thinks appropriate in the circumstances." *Babcock, supra* at para. 17 (emphasis added); *See also In re Matlack Inc.,* (2001), 26 C.B.R. (4th) 45 at para. 10 (Ont. S.C.J. [Comm. List].

---

[9]    A copy of the Canadian Bar Date Order is attached as Exhibit 5.

[10]    A copy of the November 14 Order is attached as Exhibit 6.

In the past, Canadian courts have used this broad jurisdiction under Section 18.6 of the

CCAA to facilitate and cooperate with Chapter 11 proceedings. Thus, as discussed previously,

(1) in *In re United Air Lines*, supra the Canadian Court resolved a dispute between UAL and

certain of its Canadian unions over payment to UAL's Canadian pension obligation; (2) in *In re*

*Matlack*, supra the Canadian Court stayed a Canadian creditor of the Chapter 11 debtor from

seizing the debtor's property; and (3) in *In re Babcock & Wilcox*, supra the Canadian Court

entered orders making the debtor's confirmation order and asbestos channelling injunction

effective in Canada.[11]

These precedents make clear that the broad authority granted to the Canadian Court in the

CCAA Proceeding includes (i) the subject matter jurisdiction to adjudicate disputes in Canada

between Grace and third parties involving Canadian legal issues, and (ii) personal jurisdiction

over the claimants.[12] It is also important to emphasize that no procedural prejudice will result

from having the Canadian PD Claims adjudicated by the Canadian Court. *See Clarkson Co.,*

*Ltd. v. Shaheen*, 544 F.2d 624, 630 (2d Cir. 1976). (Canada is "a sister common law jurisdiction

with procedures akin to our own"); *see also Cornfeld v. Investors Overseas, Servs. Ltd.*, 471 F.

Supp. 1255, 1259-61 (S.D.N.Y. 1979) (courts need not be concerned with the adequacy of the

procedural safeguards of Canadian proceedings). Canadian rules of court provide procedural

fairness and due process to those appearing before it. Motions and other proceedings are brought

on notice to all affected parties and timetables for the expeditious hearing of matters are

---

[11]    In the reorganization of *The Loewen Group Inc.* (December 7, 2001), 99-CL-3384, the Canadian Court
implemented a Chapter 11 plan in Canada by ordering, among other things, the transfer of substantially all of
the assets of a Canadian parent company (who was both a debtor in the Canadian and the U.S. proceedings) to a
U.S. company and ordered that given its recognition of the Chapter 11 plan in Canada, no separate Canadian
plan was necessary.

[12] Grace will agree to be bound by the Canadian Court's ruling on Grace's Canadian law objections to the Canadian
PD Claims.

established by the Court. *See* Practice Direction for the Commercial List – Toronto Region, Rule 38.

The legislation governing the civil procedure of the Canadian Court provides for a full hearing on the merits with exchange of documentary evidence, examinations, and written submissions (*Courts of Justice Act* (Ontario), R.S.O. 1990, c. C.43, as amended and the *Rules of Civil Procedure* (Ontario), R.R.O. 1990, Reg. 194, as amended). Moreover the Canadian Court has the jurisdiction to control its own process and establish specific procedures with input from all affected parties to address any concerns or special requirements of a particular case. Indeed, the Canadian Court has already indicated its desire that the issues facing Grace be resolved expeditiously ([2005] O.J. No. 4868). Ultimately, and most significantly, Canadian claimants cannot complain since they will be subject to their own country's process before their own country's courts. Moreover, this Court still retains the discretion prior to adopting any findings of the Canadian Court to consider any failures of due process if they occur.

Thus, the Canadian Court has the authority to determine whether the Canadian PD Claims are enforceable against Grace under Canadian law.

### III.   THIS COURT HAS THE POWER AND AUTHORITY TO PERMIT GRACE TO PROSECUTE ITS OBJECTIONS TO THE CANADIAN PD CLAIMS IN THE CCAA PROCEEDING.

In its PD Scheduling Motion, Grace is not asking this court to abstain from addressing the Canadian PD Claims or to relinquish its jurisdiction over the Canadian PD Claims. Rather, Grace is proposing a mechanism for resolving a problem that was created when Speights chose to file, in this Case, claims which are entirely based on Canadian laws and facts. What Grace is proposing is the use of the expertise of the Canadian Court in the CCAA Proceeding to determine if the Canadian PD Claims can be allowed under Section 502(b)(1) as enforceable claims against Grace under Canadian law. Once the Canadian Court has ruled on these matters,

this Court will then be asked to apply those findings and rule on Grace's objection to the

allowance of the Canadian PD Claims. *See In re PRS Ins. Group, Inc.*, 335 B.R. 77, 81 (Bankr.

D. Del. 2005) ("Regardless of what court determines the underlying merits or amount of a claim,

the allowance of that claim and the amount to be distributed from the estate on that claim is the

exclusive province of the bankruptcy court if a proof of claim has been filed in the bankruptcy

court."); *see also* 4 *Collier on Bankruptcy* ¶ 502.03[1][a] (15th ed. rev. 2005) ("Regardless of the

method chosen for liquidation of a claim, the bankruptcy court always retains the jurisdiction and

sole right to determine the 'allowability' of the claim under the applicable standards set forth in

section 502.").

As discussed herein, there is abundant authority for this Court to grant the PD Scheduling

Motion. That authority arises from cases where the courts have addressed whether to seek the

aid of, and defer to, foreign courts and tribunals when the issues involved implicate foreign laws

and facts. Thus, 28 U.S.C.§ 1334(c)(1) provides (in relevant part) that "nothing in this section

prevents a district court in the interest of justice, or in the interest of comity with State courts or

respect for State law, from abstaining from hearing a particular proceeding arising under title 11

or arising in or related to a case under title 11." The authority is clear and well established that

this power of United States Bankruptcy Courts to permit issues arising in or related to a

bankruptcy case to be resolved in other forums extends to foreign courts and tribunals as well as

State courts. *See, e.g., Philadelphia Gear Corp. v Philadelphia Gear De Mexico,* 44 F.3d 187

(3d Cir. 1994); *In re Maxwell Comm. Corp.,* 93 F.3d 1036 (2d. Cir. 1996); *In re Regus Bus.*

*Centre Corp.,* 301 B.R. 122, (Bankr. S.D.N.Y. 2003); *Cunard S.S. Co. Ltd. v. Saleen Reefer*

*Servs., A.B.,* 773 F. 2d 452 (2d Cir. 1985); *Baumgart v. Fairchild Aircraft Corp.,* 981 F.2d 824,

833(5th Cir. 1993); *Turner Entm't Co. v. Degeto Film GmbH,* 25 F.3d 1512, 1518 (11th Cir.

11

1994); *In re Int'l Admin. Servs., Inc.* 211 B.R. 88 (Bankr. M.D.Fla.1997); *United Feature Syndicate, Inc. v. Miller Features Syndicate, Inc.,* 216 F.Supp.2d 198, 210 (S.D.N.Y. 2002).

There are three independent doctrines that U.S. bankruptcy courts have invoked to defer to foreign courts and tribunals for adjudication of disputes that are otherwise within the jurisdiction of the bankruptcy court: (i) international comity, (ii) concurrent jurisdiction, and (iii) the doctrine of forum non conveniens. Grace's request to determine the enforceability under Canadian law of the Canadian PD Claims in the CCAA Proceeding is appropriate under each of these doctrines.

### A.    The Doctrine of International Comity

The doctrine of international comity provides this Court with the ability to defer to the Canadian Court's decisions with respect to the substantive merits of the Canadian PD Claims. *In re Maxwell Comm. Corp.,* 93 F.3d 1036 (2d Cir. 1996); *In re Regus Bus. Centre Corp.,* 301 B.R. 122, (Bankr. S.D.N.Y. 2003). International comity has been defined as voluntary "recognition" of foreign "legislative, executive or judicial acts." *Hilton v. Guyot,* 159 U.S. 113, 164 (1895).

Courts have noted that international comity is particularly important in the context of the Bankruptcy Code. This deference to foreign insolvency proceedings will, in many cases, facilitate "equitable, orderly, and systematic" distribution of the debtor's assets. *Cunard,* 773 F.2d 458 (2d Cir. 1985) ("American courts have consistently recognized the interests of foreign courts in liquidating or winding up the affairs of their own domestic business entities."); *Victrix S.S. Co., S.A. v. Salen Dry Cargo A.B.,* 825 F.2d 709, 713 (2d Cir. 1987) ("American courts have long recognized the particular need to extend comity to foreign bankruptcy proceedings.").

Moreover, Congress explicitly recognized the importance of the principles of international comity in transnational insolvency situations when it revised the bankruptcy laws in 2005. Thus in the recently enacted Bankruptcy Abuse Prevention and Consumer Protection Act

12

of 2005, Pub.L. No. 109-8, 119 Stat. 23 (2005) (the "BAPCPA"), Congress added a new chapter

to the Bankruptcy Code designed "to provide effective mechanisms for dealing with cases of

cross-border insolvency." 11 U.S.C. § 1501(a). The new Chapter 15, "is intended to encourage

cooperation between the United States and foreign countries with respect to transnational

insolvency cases," and, "to provide for the fair and efficient administration of cross-border

insolvencies." H.R. Rep. No. 109-31 at 105 (2005). Among other things, Chapter 15 applies to

situations, such as the one currently before this Court, in which a foreign proceeding and a case

under this title with respect to the same debtor are pending concurrently. 11 U.S.C. §

1501(b)(3).

While chapter 15 is only applicable to cases filed on or after October 17, 2005[13] and,

therefore, not to this case, this Court may examine relevant provisions of chapter 15 in

determining whether to allow the Canadian Court in the CCAA Proceeding to address the

substantive merits of the Canadian PD Claims. *See In re Artimm, S.r.l.*, 335 B.R. 149, 157

(Bankr. C.D. Cal. 2005) ("While § 304 is the applicable law for this case, the court's decision is

informed also by the provisions of chapter 15.").

This Court's authority to allow the Canadian Court to adjudicate the allowance of the

Canadian PD Claims is made clear by chapter 15, as chapter 15 elevates comity as the primary

consideration in exercising concurrent jurisdiction with a foreign proceeding. 11 U.S.C. §

1507(b). As the House Judiciary Committee noted in its report, "comity is raised to the

introductory language to make clear that it is the central concept to be addressed." H. Rep. at

109-31.

---

[13]  *See* BAPCPA, Pub. L. No. 109-8, § 1501, 119 Stat. At 216.

Congress clearly intended for chapter 15 to codify and further promote the general

principles of cooperation and comity that authorize this Court to seek the cooperation of the

Canadian Court in the CCAA Proceeding with respect to determining the enforceability of the

Canadian PD Claims under Canadian law. For instance, the House Judiciary Committee states

that the provisions of Chapter 15 are "intended to permit the further development of international

cooperation begun under" the Bankruptcy Code prior to Chapter 15's adoption, and "United

States bankruptcy courts already engage in most of the forms of cooperating described here, but

they now have explicit statutory authorization for acts like the approval of protocols of the sort

used in cases." H. Rep. at 109-31 and 117.

International comity can be applied retrospectively or prospectively. When applied

prospectively - as the Debtors are asking the Court to do with respect to determining the

enforceability of the Canadian PD Claims under Canadian law - the Court considers whether to

address issues that may be raised before the United States court and the foreign court based on

the comparative interests of the United States government, the relevant foreign government, and

the international community. *See Bi v. Union Carbide Chems. & Plastics Co.*, 984 F.2d 582 (2d

Cir. 1993) (dismissing the claims of Indian nationals injured by a chemical plant explosion in

Bhopal based on Indian legislation granting the Indian government exclusive standing to

represent all victims); *see also Jota v. Texaco Inc.*, 157 F.3d 153 (2d Cir. 1998) (considering

whether to dismiss proceedings related to environmental damage in Equador based on Equador's

interest in foreign or domestic resolution and holding dismissal on grounds of *forum non

conveniens* and comity erroneous); *Pravin Banker Assocs. Ltd. v. Banco Popular Del Peru*, 109

F.3d 850 (2d Cir. 1997) (considering whether to stay proceedings brought by an American holder

of Peruvian debt while Peru attempted to renegotiate its commercial debt under the Brady Plan).

14

Applying these principles, United States courts in bankruptcy cases regularly defer to international proceedings in the interest of comity.[14] In *Philadelphia Gear Corp. v. Philadelphia Gear De Mexico*, 44 F.3d at 193 (3d Cir. 1994), the Court of Appeals for the Third Circuit (the "Third Circuit") found that the district court abused its discretion by dismissing a motion asking the court to abstain from deciding a matter because one of the parties to the case had filed for bankruptcy under Mexican law. In reaching this decision, the Third Circuit found that allowing the matter to proceed in the Mexican Court was appropriate where (i) that court shares the United State's policy of equal distribution of assets and (ii) abstaining from United States litigation was consistent with the stay of litigation provided for in the Mexican bankruptcy case. *Id.* Similarly, in *Cunard*, the Court of Appeals for the Second Circuit (the "Second Circuit") held that a district court properly exercised its discretion by granting comity to a Swedish business entity's bankruptcy including staying United States actions against the Swedish debtor.

In *In re Maxwell Comm. Corp.,* three European banks engaged in transactions with a chapter 11 debtor during the debtor's preference period. English claimants brought preference actions against the chapter 11 debtor in the debtor's U.S. bankruptcy case. The European banks (with whom the debtors were alleged to have made preferential transfers) moved for dismissal under, among other grounds, the doctrine of international comity. The United States bankruptcy court ruled in favor of the banks, stating that "considerations of comity dictate" the dismissal because "England has the greater interest in applying its law." *Maxwell Comm. Corp. plc v. Nat'l Westminster Bank plc*, 170 B.R. 800, 818 (Bankr. S.D.N.Y. 1994). The District Court

---

14    Indeed, the Court has already acknowledged that the issues relating to the Canadian clams can be resolved by the CCAA Court. During the January 26, 2006 hearing, where certain of the Debtors' 15th Omnibus Objections were heard, the Court stated, "[t]o the extent the Canadian litigation is going to take place somewhere, *that's not a large number of claims and it can be done here, it can be done in Canada,* it'll be done somewhere, and that's the bulk of the claims that are left." 1/26/2006 Hearing Transcript, p. 75, lns. 18-22 (emphasis added).

affirmed; the Second Circuit also affirmed, holding that where there is a case "involving cooperative parallel bankruptcy proceedings seeking to harmonize two nations' insolvency laws for the common benefit of creditors, the doctrine of international comity precludes application of the American avoidance law to transfers in which England's interest has primacy." *Maxwell*, 93 F.3d at 1054-1055.

In *In re Regus Business Centre Corp.*, 301 B.R. 122, (Bankr. S.D.N.Y. 2003), the unsecured creditors committee in the jointly-administered Chapter 11 cases of an English corporation and its United States subsidiaries objected to legal fees that were set-off by an English bank against accounts maintained by the debtor in England. The bankruptcy court held that the validity of the set-off should be resolved in the English courts:

> In this case, however, no compelling reason appears for this Court to retain jurisdiction over a dispute between English parties with respect to property situated in England which must be resolved under English law and can be resolved promptly and fully by an English court which specializes in the resolution of such disputes. Therefore, the Court will exercise its inherent and discretionary power to abstain from resolving the issue at hand out of concerns of international comity, respect for the capacities of foreign and transnational tribunals, and sensitivity to the need of the international commercial system for predictability in the resolution of disputes.

*Id.* at 129 (internal citations and quotations omitted).

As discussed below, applying the doctrine of international comity, this Court should permit Grace to adjudicate the enforceability under Canadian law of the Canadian PD Claims before the Canadian Court in the CCAA Proceeding.

**B.    Concurrent Jurisdiction**

Under a doctrine similar to international comity, United States Courts have regularly held that where, as here, two courts have concurrent jurisdiction over a matter, the court sitting in country with the strongest interests in the matter should resolve the dispute. *See In re Int'l*

16

*Admin. Servs., Inc.*, 211 B.R. 88 (Bankr. M.D. Fla. 1997); *Maxwell Comm. Corp. plc v.. National Westminster Bank plc,* 170 B. R. 8000, 818 (Bankr. S.D.N.Y. 1994).

In *In re Int'l Admin. Servs.*, 211 B.R. 88 (Bankr. M.D. Fla. 1997), a chapter 11 debtor's shareholder moved to vacate or modify an order of the bankruptcy court that authorized the creditors' committee to pursue claims against the shareholder and other defendants before a court in Guernsey,[15] where such claims were based upon a transfer of monies to Guernsey. In denying the motion, the bankruptcy court held that (i) the bankruptcy court and the court sitting in the foreign country to which debtor's property had allegedly been fraudulently transferred each had concurrent jurisdiction over the property, and (ii) the foreign court was the appropriate forum to address the issue, because the foreign court had a greater interest in addressing the matter. In reaching this decision, the bankruptcy court explained the proper analysis as follows:

> When concurrent jurisdiction exists, both courts should evaluate the interests of the competing parties applying a standard of reasonableness. The reasonableness inquiry turns on a number of factors that include:
>
> (a) the extent to which the activity takes place within the territory or has substantial, direct and foreseeable effect upon or in the territory;
> (b) the connections between the regulating nation and the person principally responsible for the activity to be regulated, or between the nation and those whom the regulation is designed to protect;
> (c) the character of the activity to be regulated, the importance of the regulation to the regulating nation, the extent to which other nations regulate such activities, and the degree to which the desirability of such regulation is generally accepted;
> (d) the existence of justified expectations that might be protected or hurt by the regulation;
> (e) the importance of the regulation to the international, political, legal or economic system;
> (f) the extent to which the regulation is consistent with the traditions of the international system;
> (g) the extent to which another nation may have an interest in regulating the

---

[15] Guernsey is part of the Channel Islands, located near the north coast of France. Once part of England, Guernsey is currently ndependent in all matters with the exception of international representation and defense, for which the United Kingdom is responsible. *See* The Official Guernsey Government Website, available at: http://www.gov.gg/ccm/navigation/about-guernsey/history/.

activity;                                                                and
(h) the likelihood of conflict with another nation.

*Id.* at 94, *citing Maxwell*, 170 B.R. at 815, Restatement of Foreign Relations § 403. The court

noted that under this analysis, "[i]f the interest of one country is greater, the second country

should consider deferring jurisdiction to the other." *Id.*, citing Restatement of Foreign Relations

§ 403.

Applying these principles, the court determined that the Guernsey court was the better

forum to resolve the dispute, because the "money [at issue] was located in Guernsey," and the

Guernsey court was the "most efficient and economical court to resolve the [ ] claims." *Id.* at 95.

Similarly, as discussed below, Canada has a stronger interest in resolving the enforceability of

the Canadian PD Claims, and the Court may defer to the Canadian Court's concurrent

jurisdiction over those claims

### C.    Forum Non Conveniens

The Court may also ask the Canadian Court in the CCAA Proceeding to adjudicate the

merits under Canadian law of the Canadian PD Claims under the doctrine of forum non

conveniens.  Forum non conveniens contemplates that where another forum has concurrent

jurisdiction, and the court determines that private and public interest factors point towards trial in

that other forum the court may permit the trial to proceed in that forum. *Gulf Oil Corp. v.

Gilbert*, 330 U.S. 501, 508-09 (1947); *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 255 (1981).

The private and public interest factors that guide the court's decision when determining

whether to apply forum non conveniens are: (i) the ease of access to sources of proof; (ii) the

availability of compulsory process for attendance of unwilling witnesses; (iii) the cost of

obtaining attendance of willing witnesses; (iv) practical problems involving the efficiency and

expense of a trial; (v) enforceability of judgments; (vi) administrative difficulties flowing from

18

court congestion; (vii) imposing jury duty on citizens of the forum; (viii) the local interest in

having controversies decided at home; and (ix) the avoidance of unnecessary problems in the

application of foreign law. *Gilbert*, 330 U.S. at 508-09.

There is no requirement that every factor be present for a court to dismiss a matter based

on forum non conveniens. Instead, the court uses the aforementioned factors as guiding factors

to determine whether the balance of private and public interests favors dismissal. For example,

in *Allstate Life Ins. Co. v. Linter Group Ltd.*, 994 F.2d 996 (2d Cir. 1993), the Second Circuit

affirmed a district court's order dismissing a U.S. case in favor of an Australian proceeding,

because "most witnesses and other sources of proof [were] located in Australia." *Id.* at 1001.

Similarly, as is discussed more-full below, because the interests of judicial economy and the

convenience of interested parties would be better-served if the enforceability of the Canadian PD

Claims were adjudicated by the Canadian Court in the CCAA Proceeding, the doctrine of forum

non conveniens bestows the Court with the ability to authorize Grace to litigate that matter

before the Canadian Court.

**D.      Nothing in Bankruptcy Law Militates Against Grace's Motion to Litigate
          Grace's Canadian Law Objections to the Canadian PD Claims in the CCAA
          Proceedings.**

The Bankruptcy Code's jurisdictional provisions do not deprive a bankruptcy court from

its inherent powers to permit a foreign tribunal to address claims objections involving issues of

law and/or fact. *See, e.g., Baumgart v. Fairchild Aircraft Corp.*, 981 F.2d 824 (5th Cir. 1993);

*Robert v. Bell Helicopter Textron, Inc.*, No. Civ. A 3:01-CV-1576-L, 2002 WL 1268030 (N.D.

Tex. 2002).

In *Baumgart*, 981 F.2d 827 (5th Cir. 1993), nineteen German citizens filed suit in Texas

state courts following the crash of an aircraft in Germany. Thereafter, the defendant-

manufacturer filed a Chapter 11 bankruptcy and removed these cases to the district court where

its bankruptcy was pending. *Id.* at 827-28. Following removal, the district court dismissed the

cases based on the doctrine of forum non conveniens and ordered the plaintiffs to file suit in

Germany. The Fifth Circuit affirmed this decision, concluding that consolidation of actions in

the district where the bankruptcy is pending is *"permissible, but not mandatory." Id.* at 831. In

reaching its decision, the court stated as follows:

> Congress's express conference [sic] of power on the district court in which the
> bankruptcy is pending to fix venue in the jurisdiction in which a plaintiff's cause
> of action arises, plainly indicates Congress's recognition (1) that that jurisdiction,
> as the site of the wrongful death, may have an actual interest in litigating the
> matter, and (2) that most eyewitnesses to the incident and at least some evidence
> may be located there. In light of such a provision, [the court] cannot fairly impute
> to Congress an intention implicitly to remove from the courts their inherent power
> also to effect the transfer of an appropriate wrongful death claim to a foreign
> forum where the cause of action arose. (*Id.* at 831-32.)

**E.    Under the Doctrines of International Comity, Concurrent Jurisdiction and
Forum Non Conveniens Grace Should be Authorized to Litigate the
Enforceability of the Canadian PD Claims in the CCAA Proceeding**

The Court should authorize Grace to litigate the enforceability of the Canadian PD

Claims in the CCAA proceeding because (i) the Canadian Court has the strongest interest in

resolving these claims; (ii) Speights filed the Canadian PD Claims with the specific intent of

bypassing the application of Canadian law; and (iii) adjudication of Grace's objections in Canada

would best serve the interests of judicial economy and the convenience of the parties.

**1.    The Canadian Court Has the Strongest Interest in Resolving the
Canadian PD Claims**

The Canadian PD Claims were filed on account of buildings located in Canada.

Accordingly, the alleged injury occurred in Canada and Canadian substantive law governs.

Memorandum Opinion [Dkt. No. 12888] dated July 31, 2006 at 4 ("If Minnesota law does not

recognize such a claim, than there is no basis upon which this court can allow the Minneapolis

20

Stigma Claims."); *Butner v. United States*, 440 U.S. 48, 55 (1979); *In re Federal-Mogul Global, Inc.*, 330 B.R. 133 (D. Del. 2005) (applying U.K. law for purposes of estimating the UK asbestos liabilities of the Chapter 11 debtor's UK subsidiary). As such, Canada has the greatest interest in the outcome of the litigation. *Id.* ("The interpretation of United Kingdom law for purposes of the United Kingdom administration is a matter for the United Kingdom courts."). *Id.* at 153; *see also In re Int'l Admin. Servs., Inc.*, 211 B.R. 88 (Bankr. M.D. Fla. 1997) (authorizing litigation before a foreign tribunal because the money at issue was located in the foreign country).

Further, the Canadian claimants are all located in Canada. This is important, because "in cases involving foreign creditors, the courts generally defer to foreign proceedings." *Victrix*, 825 F.2d at 715 (2d Cir. 1987).

Finally, as the Debtors' noted in the 15th Omnibus Objection, and as Speights specifically noted in its solicitation letter to potential Canadian claimants, Canadian law differs from U.S. law in several material respects. As discussed previously Speights' solicitation letter provides the following description of the salient differences between U.S. and Canadian law:

> Firstly there are significant differences in the liability laws between Canada and the U.S. Such theories as "strict liability" for a defective product and suits for pure economic loss are viable in the U.S. Courts but much less likely to succeed in Canada. The U.S. cases have historically taken many, many years to settle or come to court and the costs have been so great that that the only effective way for building owners to succeed was by engaging specialty lawyers on contingency -- a much less common practice in Canada. The only case tried in Canada (commonly referred to as the Privest case) also brought into question the Statute of Limitations for such suits in Canada.

> For all these reasons, particularly the doubtful outcome and costs involved, the extensive time such litigation takes and Canadians' historic reluctance to use the courts, Canadian Property Damage cases have never been widely considered.

*See* Exhibit 2.  Given the ties to Canada and these legal difference, the Canadian Court in the

CCAA Proceeding has the strongest interest in ensuring that its law is properly applied to the

Canadian PD Claims.

> **2.    Speights is Attempting to Use the U.S. Courts to Manufacture US Jurisdiction over the Canadian PD Claims**

The Canadian Court's interest in adjudicating the Canadian PD Claims is particularly

important in the present situation, where the Canadian PD Claims were filed by Speights in

Grace's Chapter 11 with the primary goal of evading the application of Canadian law.

The *Privest* decision helps to explain the absence of Canadian traditional asbestos

property damage litigation.  *Privest Properties Ltd. v. Foundation Co. of Canada* (1995), 11

B.C.L.R. (3d) 1 (S.C.), *aff'd* (1997), 31 B.C.L.R. (3d) 114 (C.A.), *leave to appeal to the Supreme*

*Court of Canada refused*, [1997] S.C.C.A. No. 216.  In the mid-1990s, under Canada's "loser

pays" system, Grace litigated the merits of a Monokote-3 fireproofing claim in British Columbia.

The Canadian trial court heard 182 days of evidence in a bench trial and issued a 309-page

decision on point.  Justice Drost acknowledged that certain courts in the U.S. had found MK-3 to

be dangerous, but "after consideration of the testimonial and documentary evidence presented in

this case, [the court] do[es] not agree with those American courts that have found Monokote

MK-3 to be a dangerous product and thus awarded judgment against Grace-Conn." *Privest*, 11

B.C.L.R. at ¶716.  Specifically, the court stated as follows:

> I have no hesitation in concluding that the asbestos fibres contained in the MK-3 did not "contaminate" the Building, nor did they expose its occupants and workers to an increased risk of contracting any of the asbestos-related diseases. Nor did any asbestos fibres that were released into the atmosphere of the Building by that product cause any damage to property.
>
> From these conclusions, it follows that there has been no negligence, no breach of duty of care or duty to warn, and no misrepresentation.  (*Id.* at ¶ 712-13)

The *Privest* court went further, awarding Grace costs against the plaintiff at the highest

tariff level. In doing so, the trial judge expressly acknowledged *Privest's* precedential power:

> Appendix B of the [British Columbian] Rules states that, in order to attract scale 5 costs, the matter must be of "unusual difficulty or importance." The import of the action must apply to the public at large, or at least to other litigation of a similar nature. *As noted, this was the first asbestos case in Canada and many other interested parties were following its progress. Had the plaintiffs' action been successful, it is likely that many others would have pressed similar claims, mirroring the plethora of litigation in the United States concerning the use of asbestos and asbestos-containing products.* . . It is true that the Grace Defendants defended this case with a view to avoiding a precedent-setting decision which, had they lost, would have probably cost them many more millions of dollars in similar law suits.

*Privest Properties Ltd. v. Foundation Co. of Canada Ltd. et al* (1998), 37 C.P.C. (4th) 126

(B.C.S.C.), at paras. 46 and 48 (emphasis added).

Acknowledging the lack of successful traditional asbestos property damage litigation in

Canada, Speights nonetheless actively solicited Canadian claimants for the Grace Chapter 11

Case in advance of the March 2003 Bar Date by promising them that a lower standard of proof

could be applied in the U.S. bankruptcy, forcing Grace to settle these claims. *See* Exhibit 2.

Noted in the solicitation letter:

> *[o]f particular importance at this time is Mr. Speights' role in the current bankruptcies.* He is co-chair of the PD Committee in the Grace bankruptcy, he is one of two PD representatives in the joint asbestos committee in U.S. Mineral Bankruptcy and he is one of only two lawyers active in Federal Mogul. As a result of this daily involvement in the bankruptcies our clients will have a representative who is present at the negotiating table at all times. *This, in our opinion, is the best and possibly the only way, for a Canadian property owner to be successful.*

*Id.* at p. 3 (emphasis added).

The Speights Solicitation Letter further explained, "it is likely that *the standard of proof*

*and even the applicable jurisdiction may have changed as a result of these companies now being*

*in bankruptcy negotiation,*" going on to note that "these companies (at least Federal Mogul and

W.R. Grace) are not bankrupt and in fact are quite solvent and will continue operating. The

bankruptcy is, however, their method of avoiding the increasing number of frivolous claims from unimpaired plaintiffs (plaintiffs with no bodily injury) who are suing based on any exposure to their product whatsoever." *Id.* at pps. 1-2 (emphasis added).

While Grace certainly agrees with Speights that it is solvent, the letter's premise regarding burden of proof is blatantly false. It is well established that Canadian law applies to the Canadian PD claims. *See Butner*, 440 U.S. 48, 55 (1979) (in addressing claims, United States bankruptcy courts apply the substantive law of the jurisdiction governing the subject property right); *In re Federal-Mogul Global, Inc.*, 330 B.R. 133 (D. Del. 2005) (applying U.K. law for purposes of estimating the UK asbestos liabilities of the Chapter 11 debtor's UK subsidiary). As Grace argued in the 15th Omnibus Objection and Speights states in the Speights Solicitation Letter (attached as Exhibit 2), Canadian law differs from U.S. law with respect to several aspects. Despite Speights suggestion to the contrary, these standards are not changed or lowered simply because Daniel Speights sits on the Grace PD committee. It is now time to apply *Canadian* law to the *Canadian* PD claims and the court currently presiding over Grace's CCAA Proceeding in Canada is best suited to do so.

> **3.    Adjudication of Grace's Objections to the Enforceability of the Canadian PD Claims Would Serve the Interests of Judicial Efficiency and the Convenience of Affected Parties**

The convenience of interested parties would be served by adjudicating in Canada whether the Canadian PD Claims are enforceable against Grace in Canada. The Canadian PD Claims involve, at least in part, facts involving the history of the alleged use of Grace's products in the claimants' buildings, and the principal witnesses, documentation and other evidence are located in Canada. Also, prosecution of Grace's objections in Canada would presumably be more convenient for Canadian claimants, who would not have to travel to the United States to prosecute their claims.

Further, Grace's proposal would not result in any delay. As outlined above, the Canadian Court in the CCAA Proceeding has significant experience in multi-jurisdictional matters, and is already very familiar with this matter through its order making the PD Claim bar date effective in Canada. Just as in *Maxwell*, using the CCAA Proceeding to address the Canadian PD Claims offers a unique opportunity to "involv[e] cooperative parallel bankruptcy proceedings" for the common benefit of creditors. *In re Maxwell Comm. Corp.*, 93 F.3d at 1054-55 (2d Cir. 1996).

In sum, the Canadian Court in the CCAA Proceeding has the greatest interest in applying Canadian law to claims that were filed by Canadian parties on account of alleged damage to buildings located in Canada, and prosecution of Grace's objections to the enforceability of those claims in Canada would best serve the interests of judicial economy and the convenience of affected parties. Therefore, the doctrines of international comity, concurrent jurisdiction, and forum non conveniens are each appropriate in the present situation, and the Court should permit Grace to litigate whether the Canadian PD Claims are enforceable in the CCAA Proceeding. *In re Int'l Admin. Servs., Inc.*, 211 B.R. 88, 94 (Bankr. M.D. Fla. 1997) ("If the interest of one country is greater, the second country should consider deferring jurisdiction to the other.").

## CONCLUSION

For the foregoing reasons, the Court should authorize Grace to (i) request the Canadian Court in the CCAA Proceeding to adopt Grace's Proposed Protocol whereby Canadian law objections to the Canadian PD Claims will be prosecuted before that Canadian Court; and (ii) proceed to litigate its objections under Canadian Law to the Canadian Claims in the CCAA Proceeding.

Wilmington, Delaware
Dated:  August 4, 2006

Respectfully submitted,

KIRKLAND & ELLIS LLP
David M. Bernick, P.C.
Theodore L. Freedman
Janet S. Baer
Samuel L. Blatnick
200 East Randolph Drive
Chicago, Illinois 60601
(312) 861-2000

*And*

PACHULSKI STANG ZIEHL YOUNG JONES
& WEINTRAUB LLP

Laura Davis Jones (Bar No. 2436)
James E. O'Neill (Bar No. 4042)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899-8705
(302) 652-4100