[Indexed as: **United Air Lines Inc., Re**]

In the Matter of the Companies' Creditors Arrangement Act, R.S.C. 1985, c. C. 36, as amended

In the Matter of United Air Lines, Inc. of the State of Delaware, in the United States of America and the other entities listed on Schedule "A"

Ontario Superior Court of Justice [Commercial List]

Farley J.

Heard: February 10, 2005

Judgment: February 26, 2005

Docket: 03-CL-5003

Scott A. Bomhof, Marc Lavigne for United Air Lines Inc.

Hugh M.B. O'Reilly for International Association of Machinists and Aerospace Workers ("IAMAW")

Barry Wadsworth for CAW-Canada

Ian Dick for Attorney General of Canada representing the Office of the Superintendent of Financial Institutions ("OSFI")

**Bankruptcy and insolvency —— Proposal — Companies' Creditors Arrangement Act — Miscellaneous issues ——** Airline filed for protection under Companies' Creditors Arrangement Act — Airline was in intensive discussions/negotiations in US with its American workforce unions and it was continuing to deal with its Chapter 11 proceedings filed in December 2002 — Airline had, in all countries except for US and Canada, kept up its pension-funding commitments because, under pension and legal structures of those other countries, it had no choice but to do so — Airline moved for order authorizing it to cease making contributions to its Canadian-funded pension plans — Motion dismissed — No evidence either that airline did not have sufficient funds to make pension-funding payments or that its arrangements were such that it could not make such payments — Canadian unions had not had opportunity to negotiate cessation of pension funding with airline — Payment of Canadian pension-funding obligations would not cause any particular stress or strain on US restructuring — Airline was ordered to make good on its pension contribution arrears unless otherwise agreed between its unions.

**Pensions —— Payment of pension — Bankruptcy or insolvency of employer — General ——** Airline filed for protection under Companies' Creditors Arrangement Act — Airline was in intensive discussions/negotiations in US with its American workforce unions and it was continuing to deal with its Chapter 11 proceedings filed in December 2002 — Airline had, in all countries except for US and Canada, kept up its pension-funding commitments because, under pension and legal structures of those other countries, it had no choice but to do so — Airline moved for order authorizing it to cease making contributions to its Canadian-funded pension plans — Motion dismissed — No evidence either that airline did not have sufficient funds to make pension funding payments or that its arrangements were such that it could not make such payments — Canadian unions had

not had opportunity to negotiate cessation of pension funding with airline — Payment of Canadian pension-funding obligations would not cause any particular stress or strain on US restructuring — Airline was ordered to make good on its pension contribution arrears unless otherwise agreed between its unions.

**Statutes considered:**

*Pension Benefits Standards Act, 1985*, R.S.C. 1985, c. 32 (2nd Supp.)
    s. 8(1) — considered
    s. 8(2) — considered

MOTION by airline under *Companies' Creditors Arrangement Act* protection for order authorizing it to cease making contributions to its Canadian-funded pension plans.

*Farley J.:*

1    United Air Lines, Inc. (UAL) moved for an order authorizing it to cease making contributions to its Canadian funded pension plans. It had originally brought on its motion on September 16, 2004 as to which there had been some advance preliminary discussion as to the "necessity" for it having to obtain some relief. The somewhat chaotic circumstances surrounding UAL and its insolvency proceedings in the U.S.A. and elsewhere in all probability contributed to its haste in bringing on the September motion and most certainly with respect to its method of giving notice to its two Canadian unions, the CAW and IAMAW, as well as OSFI. Given the exigencies of the circumstances, while unfortunate that there was not an appropriate length of and "proper" notice, one cannot be too critical of UAL as to providing something better. The CAW and OSFI attended at the September hearing; IAMAW did not in the relative confusion. There was then negotiated among UAL, CAW and OSFI a form of interim order granted by Pepall J. on September 16, 2004. This consent order, as is not uncommon with courtroom-drafted orders, is a little "awkward". It provided that pending the return of the motion, UAL could cease making pension plan funding payments notwithstanding the terms of any previous order or any direction of OSFI. I am of the view that, given that this motion was not brought back on until February 10, 2005, this shows that OSFI and the unions (IAMAW being cognizant of the September 16, 2004 order shortly thereafter) are quite understanding of the financial predicament in which UAL finds itself - and continues to find itself given a number of setbacks especially in its U.S. proceedings situation.

2    UAL as an airline has fallen on hard times. In this regard it is like a number of airlines worldwide both in recent times and at various stages in the past. The unions recognize that they have both long-term and short-term objectives in dealing with an employer - essentially they want a long term stable employer who is able to employ their workers at a fair wage and for this the company must remain in business and be competitive, but also in the short run, they do not wish to see a situation where commitments related to the employment arrangement are neglected. In the latter case, if matters take a turn for the worse,

in this subject case, there would be relatively significant pension deficiencies (relative to the size of the Canadian workforce) which would be unsecured claims. In this regard "cash in the bank" is always better than an IOU. At the present time, UAL is no golden goose; indeed it is a rather bald bird (keeping in mind the taxation principle of plucking the squawking taxpayer) - but it is a bird which the unions have no interest in killing.

3    Allow me to observe a number of practical elements in this situation. UAL is in very intensive discussions/negotiations in the U.S.A. with its American workforce unions and it is continuing to deal with the morass its insolvency proceedings have become over the time since it commenced its Chapter 11 proceedings in December 2002. It has an international workforce, including that in Canada, of significantly less magnitude. It has in all countries except for the U.S.A. and Canada kept up its pension funding commitments because under the pension and legal structures of those other countries, it had no choice but to do so. UAL has it would seem devoted most of its time and energy to attempting to solve its U.S. based problems. It seems that it has taken the approach as to Canada, both in terms of the pension arrangements - but also with respect to discussions/negotiations as to concessions with its Canadian workforce (e.g. wage cuts or productivity improvement commitments), that this will and must await the outcome of the U.S. situation. On a functional basis, I do not criticize UAL for that approach. Indeed it may be the only practical one available to it. However, the unfortunate outcome of such an approach is that in essence Canada is ignored in the interim. This is contrary to the philosophy of our insolvency proceedings approach which encompasses and balances the many elements including labour relations and balances the competing aspects of those elements - the key to which as to the labour relations element is that the company and the unions actively engage in a dialogue to see if the particular difficulty(ies) may be worked out and the aims of each side be accommodated with some give and take on a rational basis.

4    UAL has not run out of money nor of liquidity, albeit that it must husband its available funds and liquidity in a very prudent manner. However, there is no evidence before me that UAL either (i) does not have sufficient funds to make the pension funding payments or (ii) that its DIP arrangements are such that it cannot make such payments (in this latter (ii) situation, neither is there any evidence that even if it were up against the ceiling of its DIP requirements, that an application was made to the DIP lenders for consent to make such payments).

5    In other situations where a company has been in dire circumstances, it is not uncommon for a union to consent to a deferral of pension funding in order to facilitate the *bona fide* restructuring efforts of an employer (eg. the USWA in Ivaco). However, this is achieved on a consensual basis after negotiation; it is not a "given right" of the company. In the present case, the CAW and IAMAW have attempted to engage UAL in such discussions, but while UAL attended a

meeting, it said it could not make any commitment. As UAL put it in its factum when speaking *generally* of its situation in Canada vis-à-vis the U.S.A.:

> 36. United has also commenced discussions with representatives of its unionized workforce in Canada and OSFI with respect to United's Canadian labour issues and pension obligations. However, United has not been in a position to determine its course of action in Canada at this time given that its Chapter 11 emergence business plan, and any further cost cutting measures required thereunder, cannot be finalized until its substantial U.S. labour and pension issues are resolved.

As discussed above, fair enough, the tail cannot be expected to wag to dog. But the dog must appreciate that it has a tail.

6    Allow me to make a further observation as to the difference between Canada and the U.S.A. In the U.S.A., the parties are dealing under an umbrella which most significantly includes the Pension Benefits Guarantee Corp. which generally protects the workforce/pensioner side in an insolvency where there is a pension deficit. In Canada, in this federally regulated situation, there is no such backstop; the workforce/pensioners are naked. While I appreciate that as UAL points out, the pensioners in Canada continue to receive their pension cheques, that is as it should be. However, the result of that equation is that with all outflow from the fund and no inflow, it is not realistic to think that the investment income side will radically improve so that the pension deficit does not become larger with every pension cheque mailed, thereby weakening the pension fund to the detriment of future calls on it by existing pensioners and new pensioners upon retirement from the active workforce.

7    As discussed above, the relative size of the Canadian problems vis-à-vis the U.S.A. problems is rather insignificant. It would not seem on the evidence before me that payment of funding obligations would in any way cause any particular stress or strain on the U.S. restructuring - given their relatively insignificant amounts in question. UAL had no qualms about making such payments in the other countries internationally. Additionally there is the issue of the U.S. situation having the benefit of the Pension Benefits Guarantee Corp. (as to which UAL would have paid premiums) but there being no such safety net in Canada on the federal level (and thus no previous premium obligation on UAL).

8    In the end result on the basis of fairness and equity, I find no reason to excuse UAL from its obligation to fund its pension funding commitments in Canada and I therefore direct it to resume such funding.

9    I would also note that OSFI is at liberty to, if it feels it necessary, request a lift of stay so that it may issue a direction if it thinks that warranted (as opposed to the mere demand of September 3, 2004; the direction having a legal consequence).

10   I recognize that with the effluxion of time, the pension funding arrears have mounted up and therefore are greater than the interim payments at any one time which you would have in a pay as you go situation. It may therefore be desirable

for UAL and its unions (with or without the assistance of OSFI) to have discussions about the mechanics of such payment regarding funding of arrears; including a schedule if necessary or desirable and the question of future obligation payments. However, recognizing the dog and its tail problem, it is conceivable that UAL would continue to conclude that it would not be practicably feasible to do so. Thus if no such arrangement is put in place by March 31, 2005, all arrears are to be paid up by April 1, 2005. I would note the definite difference between "suspend" and "cease".

11    What then of the s. 8(2) *Pension Benefits Standards Act*, R.S.C. 1985, c.32 (2nd Supp)? It provides as follows:

> 8(2) In the event of any liquidation, assignment or bankruptcy of an employer, an amount equal to the amount that by subsection (1) is deemed to be held in trust shall be deemed to be separate from and form no part of the estate in liquidation, assignment or bankruptcy, whether or not that amount has in fact been kept separate and apart from the employer's own moneys or from the assets of the estate.

I agree with the submissions of UAL as set out in its factum at para. 85:

> 85. Also, United submits that there are a number of issues which raise doubts about the application of the deemed trust set out in subsection 8(2) of the PBSA to the current situation. In particular, subsection 8(2) states that a deemed trust arises where there is a "liquidation, assignment or bankruptcy" of an employer. None of the parties to this motion have provided any evidence that United (the employer) is in liquidation, has made an assignment or is in bankruptcy.

However, UAL should also keep in mind the provisions of s.8(1):

> 8(1) An employer shall ensure, with respect to its pension plan, that
> 
> (a)    the moneys in the pension fund,
> 
> (b)    an amount equal to the aggregate of the prescribed payments that have accrued to date, and
> 
> (c)    all
> 
> > (i)    amounts deducted by the employer from members' remuneration, and
> > 
> > (ii)   other amounts due to the pension fund from the employer that have not been remitted to the pension fund
> 
> are kept separate and apart from the employer's own moneys, and shall be deemed to hold the amounts referred to in paragraphs (a) to (c) in trust for members of the pension plan, former members, and any other persons entitled to pension benefits or refunds under the plan.

This of course may have fall out for officers and directors as to whom no stay protection is available.

12    In the end result, I dismiss the UAL motion to cease making contributions to its pension plans involving its Canadian workforce but rather to make good on its arrears unless otherwise agreed between its unions (who will have to keep in

mind that UAL at some stage will come calling for concessions if it gets its U.S.A. house in order) and OSFI.

13   OSFI itself did not request a lift of stay vis-a-vis itself and so I do not find it appropriate to deal with the unions' request that I do so. OSFI is well able to speak for itself in this regard. It made no such motion; nor did it refer to same in its factum.

14   Orders accordingly (this endorsement also deals with the motions of the CAW and IAMAW).

15   All parties to this motion - UAL, the unions and OSFI - are labouring under the difficulties of fulfilling their valid legitimate mandates at a time where functionally there are pressing financial problems, compounded by UAL's being functionally distracted from Canada (and elsewhere) by the necessity of having to deal with its U.S.A. problems on a prioritized basis. I appreciate their difficulties. I would also wish to express my appreciation for the thorough and helpful submissions I received from counsel as they attempted to deal with their own clients' difficulties in dealing effectively with this situation on both a legal and functional basis.

*Motion dismissed.*