# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| ) | |
| IN RE: ) | Chapter 11 |
| ) | |
| W.R. GRACE & CO., *et al.*, ) | Case No. 01-01139 (JKF) |
| ) | Jointly Administered |
| ) | |
| Debtors. ) | Related to Docket No. 12823 |
| ) | Hrg. Date: September 11, 2006 |
| ) | Objection Deadline: August 14, 2006 |
| ) | |

JOINT RESPONSE OF VARIOUS LAW FIRMS REPRESENTING ASBESTOS PERSONAL INJURY CLAIMANTS IN OPPOSITION TO DEBTOR'S MOTION TO COMPEL ASBESTOS PERSONAL INJURY CLAIMANTS TO RESPOND TO THE W.R. GRACE ASBESTOS PERSONAL INJURY QUESTIONNAIRE (D.I. 12823)

## Table of Contents

I. Introduction .................................................................................................. 1

II. Summary of Argument ................................................................................ 3

III. Explanation of Attachments ...................................................................... 5

IV. Argument .................................................................................................... 6

  A.  This Court Has Acknowledged Its Own Lack of Jurisdiction over the Claimants from Whom Discovery Is Sought by Way of the Questionnaire. ............ 6

  B.  Any Discovery from Claimants is Premature if the Court Intends to Impose an Asbestos Claims Bar Date as Previously Indicated................................ 9

  C.  Each of the Three Stated Grounds Underlying the Motion to Compel Lacks Merit. ................................................................................................. 11

    1.  Provision of attached documents responsive to questions posed by Grace is proper and represents an efficient, effective, and reasonable way of responding to Grace's discovery. .................................................... 11

    2.  Grace's erroneous claim that the questionnaire must be signed by Claimants' respective counsel is without merit, as the questionnaire, by its terms, requires no such thing. ................................................................. 20

    3.  A proper response to the questionnaire does not oblige Claimants to refrain from lodging appropriate objections.  This Court did not and cannot rule prospectively, in the abstract, on issues only justiciable in context and susceptible to being raised only by counsel representing actual Claimants............................................................................... 24

      a.  Grace's wishful notion that the Court reviewed and approved each line of the questionnaire is at odds with the record. ...................................... 25

      b.  Although this Court approved the questionnaire at Grace's urging, it had misgivings from the outset, and has since come to question whether the whole process is a mistake.......................................................... 27

      c.  This Court, from the outset, planned for appropriately individualized resolution of discovery objections, and never contemplated that objections be summarily disregarded wholesale. ............. 29

      d.  Certain objections cannot be appropriately considered in the abstract.  To take one example, issues of burden are wholly dependent upon context and require anchoring in an evidentiary record presented to the court. ................................................................................ 31

e.    Only counsel representing actual Claimants have the requisite ability, standing and authority to make objections to the questionnaire on behalf of Claimants they represent. .......................................................... 34

**V.  Grace's Suggested 60-Day Cure Period Is Unreasonable.** ................................... 36

**VI.  Conclusion & Prayer for Relief** .......................................................................... 38

# Table of Authorities

## CASES

*Aikens v. Deluxe Fin. Servs., Inc.*, 217 F.R.D. 533 (D. Kan., 2003).......................... 33

*Aktiebolaget Vargos v. Clark*, 8 F.R.D. 635 (D.D.C. 1949) ........................................ 17

*Armament Sys. & Procedures, Inc. v. IQ Hong Kong Ltd.*, 2006 WL 1277917,
    Case No. 00-C-1257 (E.D. Wis., May 4, 2006)......................................................... 31

*Cobell v. Norton*, 212 F.R.D. 24 (D. D.C. 2002) .......................................................... 31

*Farber & Partners, Inc. v. Garber*, 234 F.R.D. 186 (C.D. Cal., 2006)....................... 33

*Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33 .......................................................... 7

*Hickman v. Taylor*, 329 U.S. 495 (1947) .................................................................... 17

*In re Allegheny Int'l, Inc.*, 954 F.2d 167 (3d Cir. 1992) .............................................. 10

*In re Dow Corning Corp.*, 287 B.R. 396 (E.D. Mich. 2002) ......................................... 6

*In re Holm,* 931 F.2d 620 (9th Cir. 1991)................................................................... 10

*In re Unimet Corp.*, 74 B.R. 156 (Bankr. N.D. Ohio 1987) ........................................ 10

*Katchen v. Landy*, 382 U.S. 323 (1966) ...................................................................... 7

*Langenkamp v. Culp*, 498 U.S. 42 (1990) ................................................................... 7

*Phillips v. City of New York*, 230 F.R.D. 369 (S.D.N.Y. 2005)................................... 17

*St. Paul Reinsurance Co., Ltd. v. Commercial Fin. Corp.*, 198 F.R.D. 508
    (N.D. Iowa, 2000) ................................................................................................... 33

*Triangle Mfg. Co. v. Paramount Bag Mfg. Co.*, 35 F.R.D. 540 (E.D.N.Y. 1964)........ 18

*United Cigar-Whelan Stores Corp. v. Phillip Morris, Inc.*, 21 F.R.D. 107
    (S.D.N.Y. 1957)........................................................................................................ 17

*Whitelock v. Leatherman*, 460 F.2d 502 (10th Cir. 1972)........................................... 8

## Statutes

11 U.S.C. § 502(a) ................................................................................................ 14

## Other Authorities

Black's Law Dictionary 923 (5th ed. 1979) ............................................................ 16

## Rules

Fed. R. Bankr. P.  9011 ........................................................................................... 28

Fed. R. Bankr. P. 3001(f) ........................................................................................ 14

Fed. R. Civ. P. 26(g)(2) ........................................................................................... 28

Fed. R. Civ. P. 33(b)(1) ........................................................................................... 24

Various Law Firms Representing Asbestos Personal Injury Claimants (collectively, "Respondents" with each being a "Respondent"),[1] by and through their undersigned attorneys, hereby file their Joint Response in Opposition to Debtor's Motion to Compel Asbestos Personal Injury Claimants to Respond to the W.R. Grace Asbestos Personal Injury Questionnaire (the "Response" and the "Motion to Compel," respectively).[2] Respondents would respectfully show the Court as follows:

## I. Introduction

Despite acknowledgement by W.R. Grace & Co. and its affiliated companies (collectively, "Grace" or "Debtors") that they had received tens of thousands of questionnaire responses from asbestos personal injury claimants ("Claimants," each being a "Claimant"), Grace complains that many Claimants have not responded in the precise manner that Grace wishes, and have not – at their own considerable expense – spared Grace from all the work that attends the interpretation and processing of its own ambitious discovery.[3]

---

[1]   Each of the following law firms is a Respondent and, together, the following firms comprise the Respondents:  Baron & Budd, P.C.; Brayton Purcell; Foster & Sear, L.L.P.; Hissey, Kientz & Herron, P.L.L.C.; The Law Offices of Peter G. Angelos, A Professional Corporation; LeBlanc & Waddell, P.C.; David Lipman, P.A.; Chris Parks & Associates; Robert Pierce & Associates; Provost & Umphrey, L.L.P.; Reaud, Morgan & Quinn, L.L.P.; Sieben, Polk, LaVerdiere & Dusich, PA; Silber Pearlman LLP; SimmonsCooper, L.L.C.; Weitz & Luxenberg P.C.; Wilentz, Goldman & Spitzer, P.A.; and Williams Bailey Law Firm L.L.P.

[2]   Supplemental Responses to the Motion Compel on behalf of each individual Respondent are attached hereto as Exhibits.  See Part III, *infra.*

[3]   A Respondent estimates that it would incur approximately $2 million in costs to respond to the questionnaire on behalf of the 6,442 Claimants it represents in the oppressive

The Motion to Compel is just the latest volley in Grace's longstanding effort to run off creditors and exclude legitimate claims from its chapter 11 case. No one can credibly dispute that completing the questionnaire with the pinpoint precision Grace demands is extremely complicated and highly burdensome. It is hardly surprising that individual Claimants and the myriad law firms that represent them, attempting in good faith to respond to the questionnaire, have approached it differently. The breadth and complexity of the questionnaire has required some law firms to dedicate multiple staff members to working on client responses eight-hours-a-day, seven-days-a-week, for months at substantial cost to the Claimants and their counsel. One Respondent reports that several of its experienced staff members have actually quit, citing the burden and frustration associated with Grace's questionnaire.[4] The exertion and expense that Claimants and their counsel have devoted to Grace's questionnaire are all the more striking because, as elaborated upon below, the Court's jurisdictional hold on Claimants is, at best, tenuous.[5]

---

manner that Grace demands. *See* Declaration of Alan B. Rich at ¶ 7, included within Exhibit 1 attached hereto.

[4] *See* Declaration of Lynne M. Kizis at ¶ 6, included within Exhibit 16 attached hereto.

[5] One Respondent, which submitted questionnaire reponses on behalf of 949 Claimants, had approximately 2-3 people working on the questionnaire responses, 8 hours a day, for approximately 5-6 months. *See* Declaration of Julie Burnham at ¶¶ 3-4, included within Exhibit 4 attached hereto. Another respondent submitted questionnaire responses on behalf of 583 Claimants and had a crew of 7 people working on the questionnaire project for 6 months full-time and for another 4 months half-time. The associated cost in staff salaries and wages alone exceeded $160,000. *See* Declaration of Scott Wert at ¶¶ 3-4, 7-8 included within Exhibit 3 attached hereto.

Yet Grace now comes to Court for the purpose of visiting this titanic burden on Claimants all over again. Grace would require the great majority of responding Claimants who, it must be remembered, are involved in this process at all only because they are Grace's tort victims, to start from scratch on their questionnaire responses. Grace urges the Court not to even consider responses that have already been submitted and suggests the imposition of an oppressive deadline for the submission of "cured" responses.

## II. Summary of Argument

Grace's three stated grounds for its draconian request should be rejected:

- *Claimants' objections to the questionnaire cannot be summarily overruled.*

Incredibly, Grace posits that most discovery objections cannot be made – regardless of a Claimant's (or counsel's) specific circumstances – and that the Court should, in advance of considering any Claimant's personal circumstance, summarily overrule most individual objections in a single global order. This would turn due process on its head, would mock the rules that govern discovery, and would go far beyond anything ever countenanced by the Court.

- *Claimants may permissibly include with their questionnaire responses documents (or offer to produce) documents pertinent to the questionnaire's inquiries.*

Grace would prohibit any reference in questionnaire responses to extraneous documents. Yet, the space provided on the questionnaire form itself for responses to certain queries is slight – blanks that are only three or four inches long in some

cases.  Two things are going on here.  First, Grace wants to limit responses

deserving of appropriate elaboration to just a few words.  Medical diagnoses and

doctors' reports do not generally lend themselves to six-word narrative

encapsulations.  Does Grace intend to argue the paucity of evidence that will

actually fit in some of the blanks on its questionnaire when, in truth, Claimants

have tried hard to provide ample evidence?  Second, Grace expects data entry clerks

with virtually no discretion or interpretative capability to convert raw questionnaire

responses into a navigable database.  To facilitate that, Grace demands over-the-top

exertions from Claimants and their personal injury counsel so that questionnaire

responses can be neatly digested by data entry clerks employed by Grace's claims

processing agent, Rust Consulting, Inc. ("Rust"), and possessed of no interpretive

discretion whatsoever.

- *Claimants' counsel need not sign questionnaire responses.*

Grace also complains that some Claimants' counsel have not signed their

clients' questionnaire responses.  This is another red herring.  A fair reading of

Grace's questionnaire form suggests that counsel need not sign, and the procedural

rules governing discovery do not require counsel to attest to a clients' discovery

responses.

Underlying all of this is a jurisdictional problem.  ***Virtually all Claimants

have not submitted to the Court's jurisdiction.***  Grace persists in ignoring this.

Experience has shown that the questionnaire process was flawed from its inception.

Now, with an asbestos claims bar date about to be established, the questionnaire's

utility becomes even more doubtful and the motives of its proponents even more suspect.  Grace should not be permitted to run its creditors out of this bankruptcy by continually and unreasonably throwing up roadblocks and erecting hurdles. Grace's motion should be denied in its entirety.

## III.  EXPLANATION OF ATTACHMENTS

As noted, for the Court's convenience, and in lieu of cluttering the docket with numerous additional entries, attached hereto are supplemental responses to the Motion to Compel on behalf of each individual Respondent.  Included with each supplemental response under the same exhibit number is a declaration submitted to the Court on behalf of the particular Respondent.  Attached hereto as Exhibits are the supplemental responses on behalf of each individual Respondent, as noted:

| | |
|---|---|
| Exhibit 1 | Baron & Budd, P.C. |
| Exhibit 2 | Brayton Purcell |
| Exhibit 3 | Foster & Sear, L.L.P. |
| Exhibit 4 | Hissey, Kientz & Herron, P.L.L.C. |
| Exhibit 5 | The Law Offices of Peter G. Angelos, P.C. |
| Exhibit 6 | LeBlanc & Waddell, P.C. |
| Exhibit 7 | David Lipman, P.A. |
| Exhibit 8 | Chris Parks & Associates |
| Exhibit 9 | Robert Pierce & Associates |
| Exhibit 10 | Provost & Umphrey, L.L.P. |
| Exhibit 11 | Reaud, Morgan & Quinn, L.L.P. |
| Exhibit 12 | Sieben, Polk, LaVerdiere & Dusich, PA |
| Exhibit 13 | Silber Pearlman LLP |
| Exhibit 14 | SimmonsCooper, L.L.C. |

Exhibit 15        Weitz & Luxenberg P.C.

Exhibit 16        Wilentz, Goldman & Spitzer, P.A.

Exhibit 17        Williams Bailey Law Firm L.L.P.

Unless expressly noted in a Respondent's supplemental response, no Respondent joins in or adopts the assertions set forth in any other Respondent's supplemental response.[6]  The supplemental responses of each Respondent are provided for the limited purpose of apprising the Court of facts and circumstances attending the questionnaire process that are specific to each Respondent.

## IV. ARGUMENT

### A. This Court Has Acknowledged Its Own Lack of Jurisdiction over the Claimants from Whom Discovery Is Sought by Way of the Questionnaire.

From the beginning of the arguments and deliberations attending the conception and formulation of Grace's questionnaire, a figurative "elephant" – a substantial jurisdictional infirmity – has been lurking in the courtroom.  The persons to whom the questionnaire has been promulgated, the Claimants, have not submitted to the Court's jurisdiction and are not currently before the Court.  The Claimants have not filed proofs of claim.[7]  The Court has not imposed a bar date

---

[6]    Each Respondent hereby adopts and incorporates by reference any and all responses to the Motion to Compel filed by other parties in interest who are not Respondents to the extent such responses are applicable to, and not inconsistent with, a Respondent's particularized circumstances.

[7]    *See, e.g., In re Dow Corning Corp.*, 287 B.R. 396, 412 (E.D. Mich. 2002) ("When a creditor submits to bankruptcy court jurisdiction by filing a proof of claim in order to collect its debt, the creditor is subject to the court's orders ...").  The United States Supreme Court has explained that "by filing a claim against a bankruptcy estate the creditor triggers the process of 'allowance and disallowance of claims,' thereby

with respect to asbestos personal injury claims, although it has recently indicated a willingness to do so.  *See* Trans. of Omnibus Hrg., July 24, 2005, at 26 (Dkt. No. 12919).  For the most part, the Claimants' respective personal injury counsel have not even appeared before the Court in Grace's reorganization case; those that have, virtually without exception, have reserved the right to contest any exercise of jurisdiction by the Court over their respective clients.[8]

Grace has not purported to invoke the Court's subpoena power in connection with the dissemination of its questionnaire, perhaps in tacit recognition of the Court's doubtful jurisdiction over Claimants.  Nor has Grace sought information from each Claimant pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure.  In short, the Court's jurisdiction over individual holders of asbestos personal injury claims against Grace is, at this juncture, highly doubtful.

The Court itself has raised the specter of a jurisdictional problem with Grace's counsel:

> [T]he issue you argued to me primarily … is that you want an assertion of this Court's jurisdiction over the claimant and the reason you want the bar date is so that the Court can exercise jurisdiction.  I'm not going to exercise it in part.  I'm either going to do it or I'm not

---

subjecting himself to the bankruptcy court's equitable power." *Langenkamp v. Culp*, 498 U.S. 42, 44 (1990), *citing Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 58-59, and n.14 (1989) and *Katchen v. Landy*, 382 U.S. 323, 336 (1966).

[8]  By filing this response, Respondents, for themselves and any Claimants they represent, do not submit to the jurisdiction of this Court for any purpose and hereby deny that the Court has personal jurisdiction over Respondents (and any Claimants they may represent) with regard to the questionnaire or any issue arising with respect to the questionnaire, such jurisdiction being specifically reserved and objected to at this time.

going to do it.   That's my prerogative with respect to jurisdiction and that's how I deem my obligation.  If you have me invoke it, then you're going to have to live with the outcome.    And  that  means  potentially  litigating 100,000 or I don't know how many … claims.  Now, that isn't what you want to do and that's not the reason you want the bar date.   ***You want the bar date, I believe, without – and I'm not casting aspersions, to put some teeth behind the questionnaire.  Well, maybe there are no teeth behind the questionnaire.***

Trans. of Omnibus Hrg., Nov. 14, 2005, at 148 (emphasis added) (Dkt. No. 11563).

In the Motion to Compel, Grace simply disregards the jurisdictional landscape.  Closing its eyes tightly to the fact that the Claimants are not "parties" to Grace's chapter 11 case in the sense that properly served defendants would be parties to an ordinary civil lawsuit, Grace perfunctorily declares that "the [questionnaire] process will only work if all ***parties*** are committed to ensuring that the Questionnaires contain complete and accurate information."  Motion to Compel at 27-28 (emphasis added).  Finding most Claimants' "commitment" to its onerous questionnaire process wanting, Grace has moved to compel a heightened level of commitment.

The Motion to Compel mandates a reexamination of the Court's jurisdiction over Claimants.  *See, e.g., Whitelock v. Leatherman*, 460 F.2d 502, 514 (10th Cir. 1972) ("[I]t is the duty of a court, having only limited trial or appellate jurisdiction, to assure itself that any subsequent proceedings are pursued within jurisdictional limitations which must be strictly construed and applied.") (footnote omitted). While bankruptcy courts routinely craft estimation procedures suited to the cases

over which they preside, discovery cannot be imposed in the absence of jurisdictional underpinnings or outside the scope of the Bankruptcy Code and applicable rules.  If the efficacy of Grace's questionnaire process is dependent upon such coercion, in derogation of the due process rights of Claimants, the process must be suspended and ultimately abandoned in favor of a different approach to estimation.

In the absence of a jurisdictional predicate for compelling the Claimants to respond to the questionnaire with the precision that Grace insists is required – teeth, in other words – the claimant questionnaire is *de facto* a voluntary exercise. Grace, in effect, has appealed to personal injury counsel representing Claimants to urge their clients' participation in the questionnaire process.  If a voluntary process is not sufficient for Grace's purposes, then, as noted, reexamination of the questionnaire's jurisdictional moorings must be undertaken with the expectation that the questionnaire process, lacking "teeth," will have to be discarded.

### B.    Any Discovery from Claimants is Premature if the Court Intends to Impose an Asbestos Claims Bar Date as Previously Indicated.

As noted, the Court recently indicated that it will set a bar date for the filing of asbestos claims in this case.  *See* Trans. of Omnibus Hrg., July 24, 2005, at 26 (Dkt. No. 12919).  The prospect of a bar date casts the utility of Grace's questionnaire (and its propriety as a discovery tool with regard to the underlying asbestos claims to which the questionnaire is directed) in a new and dubious light. Imposition of a bar date for asbestos claims would essentially moot the

questionnaire process, because claims-related discovery prior to the filing of proofs of claim would be premature.

The filing of a proof of claim constitutes "prima facie evidence of the validity and amount of the claim" and the claim "is deemed allowed" unless it is objected to by a party in interest. 11 U.S.C. § 502(a); FED. R. BANKR. P. 3001(f). Consequently, once a bar date is established, only Claimants who file proofs of claim will hold claims against Grace's estate, and those claims will be allowed in their full amount unless and until an objection is made. Any such objection must be made on evidence sufficient to rebut the presumption of validity, and such evidence must be of sufficient probative force to demonstrate a true dispute. *See In re Allegheny Int'l, Inc.*, 954 F.2d 167, 173 (3d Cir. 1992); *In re Holm,* 931 F.2d 620 (9th Cir. 1991); *In re Unimet Corp.*, 74 B.R. 156 (Bankr. N.D. Ohio 1987).

There would obviously be no point in Grace taking discovery of Claimants who do not file proofs of claim. Similarly, there would be no point in Grace taking discovery of claims that are allowed (or deemed allowed) that Grace chooses not to contest as to validity or amount. Discovery would be appropriate only with regard to claims that Grace has disputed by filing proper objections. With the specter of a bar date, the questionnaire is reduced to a cumbersome anachronism.[9] To require thousands of persons to re-answer questionnaires before they have even filed a

---

[9]     Respondents do not suggest that the questionnaire, in its current form, would be an appropriate discovery device in any claims objection litigation. In fact, in all likelihood there would be no need for Grace to take such over-inclusive discovery on every aspect of a claim. Because a proof of claim is prima facie evidence of its validity and requires probative evidence for the claim to be rebutted, only those parts of claims as to which

proof of claim is putting the cart way before the horse.  The Motion to Compel

should be denied as moot.

### C.    Each of the Three Stated Grounds Underlying the Motion to Compel Lacks Merit.

>    1.    *Provision of attached documents responsive to questions posed by Grace is proper and represents an efficient, effective, and reasonable way of responding to Grace's discovery.*

While acknowledging that many tens of thousands of Claimants have

submitted information pursuant to the questionnaires, Grace is anything but

gracious about the care, attention, and exertion that these Claimants and their

counsel have devoted to the questionnaire.  Citing "deficiencies" that are allegedly

"pervasive," Grace insists that it is entitled to "a narrative answer to all questions,

fully and completely, on the Questionnaire form unless there is a particularized

privilege objection."  Motion to Compel at 1-2.

There are two related problems with this.  The first is that Grace's

expectations are unreasonable.  Most Claimants are infirm, quite often elderly, and

have limited sophistication in legal matters.  The notion that these people can be

required, in the absence of having submitted themselves to the Court's jurisdiction,

to provide Grace's claims processor with mechanically precise "narrative" responses

to all of more than 180 questions – even with substantial and time-consuming

assistance from their respective  personal injury counsel – is a stretch.  But Grace

also professes to expect that mere data entry clerks – as opposed to lawyers or

---

Grace may object and provide sufficient rebuttal evidence would be the proper subject
for discovery.

others capable of bringing a degree of discernment to the questionnaire review process – are capable of building the "navigable database" that Grace covets, ostensibly for claims estimation purposes, from raw questionnaire responses.[10]

In sum, Grace's expectations are so unrealistic as to be virtually utopian. It is doubtful that Grace privately holds to the view that the Claimants and their respective personal injury counsel categorically can respond, without undue burden, to the questionnaire in the manner that Grace demands.[11] Grace's haughty insistence that review of the raw questionnaire responses and the attendant creation of Grace's vaunted database should be easily delegable to data processors lacking *any* discretion – and thus no more taxing to Grace than, say, microwaving popcorn – likewise seems contrived.

And what of Grace's conviction that these data processors can construct a "navigable database" from *narrative* responses embodied in the raw questionnaires?[12] Rust's Senior Project Administrator has conceded under oath that her data entry clerks have no interpretive discretion in their review of the raw questionnaire responses:

---

[10] Respondents intend no disparagement of Rust's data entry clerks, but merely suggest that the task of reviewing raw questionnaire responses should appropriately be delegated to individuals possessed of discernment and an appropriate degree of interpretive discretion.

[11] As noted, the questionnaire consists of approximately 180 distinct questions. If a particular Claimant has an extensive work history, however, he or she might be confronted with upward of 300 questions.

> A data entry clerk who keys information from the [questionnaire] does not determine what information contained in an attachment answers a specific question of section of the [questionnaire]. The effect of attaching documents in lieu of completing the answer results in an absence of any data being entered into the database.

Declaration of Gina G. Washburn ("Washburn Decl.") at ¶ 4.

If a data entry clerk has no wherewithal or discretion to examine and interpret attached documents – even documents that the questionnaire instructs to be attached – they must necessarily lack the capacity to examine and interpret narrative responses to questions within the body of the questionnaire.[13] Unlike responses consisting of a simple "yes" or "no," narrative responses to questions seldom lend themselves to neat rendition as "data." How, in light of Ms. Washburn's candid acknowledgement of her data entry clerks' limitations, can Grace expect these same clerks to interpret a narrative response to *any* query for purposes of constructing a database?

Grace declares in the Motion to Compel that "the most significant deficiency observed in the Questionnaire responses is Claimants' decisions not to respond to questions at all – but instead write 'see attachment,' 'see exhibit" or some variation thereof." Motion to Compel at 20. Grace's characterization of some Claimants'

---

[12] "Narrative evidence" is defined as "[t]estimony from a witness which he is permitted to give without the customary questions and answers; e.g. when witness explains in detail what happened without interruption." BLACK'S LAW DICTIONARY 923 (5th ed. 1979).

[13] Ms. Washburn's testimony is remarkable in its implications. Essentially, she avers that her data entry clerks would be stuck in the mud even if pertinent information was contained within extraneous documents that the questionnaire, by its literal terms, requires be attached.

provision of pertinent documentation (or access thereto) as a "decision not to respond" is both self-serving and misleading.  Provision of documents in the form of attachments or exhibits in response to a question (or offering to permit inspection and copying) cannot fairly be described as a "decision not to respond."  Nor is it an "obstructionist tact" (*Id.* at 20) or a "document dump" (*Id.* at 24).[14]

Indeed, Grace acknowledges that its questionnaire "is a hybrid form of discovery, part contention interrogatory, ***part document request***, and part deposition by written questions.  *Id.* at 13 (emphasis added).  Putting aside Grace's odd frustration that some Claimants responded to discovery that is "part document request" by producing or agreeing to produce documents, there are two related strains of mischief at work here.

The first is Grace's hyperbole, particularly as to the extent of this so-called problem.  Grace broadly laments the "cross-referencing [of] undifferentiated and substantial collections of documents."[15]  *Id.* at 2.  But according to Ms. Washburn, an average of 38.43 pages of attachments was included with the first 56,659 questionnaires received by Rust.  This limited volume of attachments, on average,

---

[14]  Indeed, in another case pending before this Court, this Court has actively *encouraged* claimants to respond to a questionnaire type supplemental ballot form by attaching documents and inviting the recipient of the questionnaire to "see attached."  *See* Trans. of Omnibus Hrg. in *In re Global Industrial Technologies*, Case No. 02-21626  (Bankr. W.D. Pa., July 21, 2006) at 37 (Dkt. No. 6468) ("if you want to attach a copy of your file, and I'm using that in a generic term … you can say see attached.").

[15]  On page 14 of the Motion to Compel, it is the "cross-referencing [of] undifferentiated and substantial mass of documents" that Grace deplores.

hardly lends itself to the sweeping contention that an onerous amount of additional paper has been "dumped" on Grace.[16]

It would appear that Grace's problem is not so much that Claimants are, on average, submitting a modest amount of documentation with their returned questionnaires. Grace's real dilemma is its insistence on delegating the supposedly critical task of transforming raw questionnaire responses into a database to Rust's data entry clerks. Why, one might ask, is each questionnaire not being reviewed in the first instance by one of Grace's attorneys? The Kirkland & Ellis firm has over a thousand of them. Even while playing up the notion that Claimants' counsel plays "a critical role … in ensuring that the information presented [in the questionnaires] … is true, accurate, and complete" (Motion to Compel at 28), Grace is indifferent to the critical role that its own counsel should be playing in examining the raw questionnaire responses with a measure of scrutiny at the outset. Apparently, Grace is wedded to the idea that a comparatively low-cost review of the questionnaires by clerks whose job it is simply to input data already neatly spelled out for them is all that should be required of Grace to bring about its much-hyped database.[17]

---

[16]  Thirty-eight letter-size sheets of 20 lb. bond paper, weighing approximately 6.1 ounces, is not much of a "mass" either.

[17]  A Respondent candidly notes that "clerical staff does not have the legal experience or training to review the depositions, interrogatories, settlements, etc., to compile exposure charts and the like," which had to be performed by an attorney or paralegal. *See* Declaration of Robert Phillips at ¶ 6, included within Exhibit 14 attached hereto.

The Court may have shrewdly pinpointed the root of Grace's complacency in such regard.  The Court commented on Grace's ambivalence to whether asbestos personal injury creditors should be required to submit proofs of claim:

> You [Grace] don't want the burdens that go along with what you're asking the Creditors [Claimants] to do.  The Creditors have a significant burden in filing a Proof of Claim and they have the right to know that if they submit to the Court's jurisdiction, and file that Proof of Claim … then their claim's going to be allowed, unless a valid objection to [it] is formed, argued, and sustained.  So you can't have it both ways.  I'm not going to permit half a loaf.

Trans. of Omnibus Hrg., Nov. 14, 2005, at 154 (Dkt. No. 11563).  Responding to the questionnaire in the precise and uniform manner that Grace deems acceptable would subject many Claimants and their personal injury counsel to very substantial and unreasonable burdens, in all likelihood even more onerous than formulating and submitting a proof of claim.[18]  And that may be precisely the point; Grace proposes, in essence, to sub-contract *gratis* the construction of its database to the Claimants and their counsel (apart an incidental data input role reserved for Rust) without incurring substantial expense to its own professionals who, apparently, are to have no real role in the exercise.

---

[18]  Two things bear noting.  First, the proof of claim form for Claimants that the Court has approved in principal is substantially less onerous than the questionnaire.  Second, Grace plainly wants "half a loaf" in the questionnaire process.  As the Court noted, if a debtor does not want to examine and test a proof of claim by objecting, the claim is deemed allowed.  Here, Grace does not want to undertake any detailed analysis of the raw questionnaire responses, yet Grace insists that Claimants put themselves to the considerable exertion of responding to the questionnaire with a very high degree of precision.  Half a loaf, indeed.

It is long settled, however, that "[a] litigant may not compel his adversary to go to work for him."[19] *Phillips v. City of New York*, 230 F.R.D. 369, 370 (S.D.N.Y. 2005), *quoting Aktiebolaget Vargos v. Clark*, 8 F.R.D. 635 (D.D.C. 1949).  The latter decision includes the following cogent and topical pronouncement:

> An adverse party should not be required to perform burdensome labors or to execute difficult and expensive tasks, in searching for facts and classifying and compiling data.

8 F.R.D. at 636; *see also United Cigar-Whelan Stores Corp. v. Phillip Morris, Inc.*, 21 F.R.D. 107, 109 (S.D.N.Y. 1957) ("[D]iscovery proceedings should [not] be utilized to cast upon a defendant the burden of establishing the plaintiff's case when the plaintiff can at least as readily establish the requested facts.").  Indeed, where information must be extracted from documents, production of the documents in question is preferable to interrogatories that would shift the burden of document review to the responding party:

> Each of the interrogatories propounded ... can be answered only an extensive compilation of data contained in Triangle's records. ...  Under these circumstances, and since an order pursuant to Rule 34 would properly lie for the production of these records, it seems only fair that the party seeking such information be required to bear the burden of extracting and collating it.

---

[19]  *See also Hickman v. Taylor*, 329 U.S. 495, 516 (1947) (Jackson, J., concurring) ("Discovery was hardly intended to enable a learned profession to perform its functions ... on wits borrowed," or, one might infer, exertions exacted from, "the adversary.").

*Triangle Mfg. Co. v. Paramount Bag Mfg. Co.*, 35 F.R.D. 540, 543 (E.D.N.Y. 1964). In the present case, Grace is aggressively seeking to shift that burden to the Claimants and their counsel.

And what of the "critical role" of Claimants' counsel?  Again, Grace wants to have it both ways.  On the one hand, Grace expects each Claimant's counsel to be actively engaged in assisting his or her clients to respond to the questionnaire: Claimants' counsel plays "a critical role ... in ensuring that the information presented [in the questionnaires] ... is true, accurate, and complete."  Motion to Compel at 28.  Irreconcilably, Grace insists that "Claimants' counsel should not be permitted to aggregate their clients' burden, and use that as an excuse to fail to properly respond to the Questionnaire."  *Id.* at 26.  It bears reiterating that most Claimants are not able-bodied, legally sophisticated, and in the prime of their lives. Owing to the long latency periods associated with various asbestos diseases, most are elderly and/or infirm and others are survivors of persons who have died from their asbestos-related illnesses.

It bears noting that, in the normal course of litigating mass tort cases and in claims objection litigation in bankruptcy generally, law firms do not have to respond to thousands of discovery requests all at once.  That is what is ostensibly required here, however.  The burden to which many lawyers and their firms have been put must be recognized.  Some firms have had to dedicate multiple employees to work on questionnaire responses full-time for months.  The burden and cost already incurred has been enormous.  To suggest that counsels' substantial burden in

assisting these vulnerable and disadvantaged Claimants to respond to the questionnaire is not a pertinent consideration even as Grace acknowledges counsels' "critical role," is simply disingenuous.

The second strand of mischief at work here, already noted, is Grace's brazen attempt to shift the labor intensive component of the formulation of *its* database for *its* claims estimation to the Claimants and their counsel.  Grace concedes as much:

> [T]o ask data entry personnel, who have no specialized legal or medical training, to search through scores of attached documents and to try to glean which information may be responsive is an impossible task.

Motion to Compel at 24 (*citing* Washburn Decl. at ¶ 4).[20]  In Grace's view, the task of searching through and examining "scores" of documents, attached to questionnaire responses or otherwise, should be borne by others.  Any suggestion that this burden should appropriately be carried by Grace is denounced as a "subversion [which], if condoned, could derail the estimation process."  Motion to Compel at 15.  It apparently does not occur to Grace that the estimation process might be derailed – to the extent it has not been already – by Grace's laxity and poorly staffed review of the raw questionnaire responses.  Despite its repeated protestations to the Court that the questionnaire is central to the estimation process, Grace is utterly unwilling to commit more than token resources to transforming returned questionnaires into a workable database.

---

[20]  The reference to "scores of documents" is belied by Grace's concession that less than 39 pages of documents were being submitted with each questionnaire, on average.

Ms. Washburn has effectively conceded that Grace's team of data processors is not up to the task of initially screening the raw questionnaire responses to the extent they deviate at all from Grace's view of what is a perfect (and therefore acceptable) questionnaire response. Washburn Decl., ¶ 4. If construction of Grace's database grinds to a halt whenever a questionnaire references an attached document, one obvious solution would be for Grace to entrust the task of constructing its database to people with the necessary skill and discretion to examine attachments.

> 2.  *Grace's erroneous claim that the questionnaire must be signed by Claimants' respective counsel is without merit, as the questionnaire, by its terms, requires no such thing.*

Grace asserts the puzzling contention that submission of questionnaire responses not countersigned by Claimants' respective personal injury counsel is somehow improper. Looking at Grace's questionnaire in the best possible light, it is not at all clear who, if anyone other than the Claimant, may (or must) sign it.[21] The most commonsensical interpretation of Grace's questionnaire is that living Claimants and deceased Claimants' legal representatives are expected to sign.

---

[21] In itself, the purported requirement that Claimants sign their questionnaire responses under penalty of perjury is troubling. Save and except for the requirement that interrogatories be answered "in writing under oath, unless … objected to", the applicable rules impose no such requirement on any recognized form of written discovery response. FED. R. CIV. P. 33(b)(1). Especially in the absence of a jurisdictional hold over Claimants – recall Grace has availed itself of neither subpoenas nor Rule 2004 in furtherance of the questionnaire process – the legitimacy of a purported requirement that Claimants sign their questionnaire responses under oath is, at best, doubtful.

Part X of the questionnaire contains two signature blocks.  The first block is designated as "To Be Completed By The Injured Person" and reads:

> I swear under penalty of perjury that, to the best of my knowledge, all of the foregoing information contained in this Questionnaire is true, accurate and complete.

The second block is designated "To Be Completed By the Legal Representative Of The Injured Person and reads:

> I swear that, to the best of my knowledge, all of the information contained in this Questionnaire is true, accurate and complete.

Grace, in the Motion to Compel, cavalierly insists that the Court "ordered that the Questionnaire include a signature line for Claimants' legal representative (i.e. their counsel)."  Motion to Compel at 28.  The Court ordered no such thing.  Indeed, the transcript reference cited by Grace shows that the Court was puzzled by Grace's signature blocks:

> **Actually, I don't see in part nine a place where the lawyer is [to sign]** – oh, it says, "To be completed by the legal representative.  I swear that the information is true and accurate."

Trans. of Omnibus Hrg., July 19, 2005 at 243 (emphasis added) (Dkt. No. 9105).  In legal parlance, "legal representative" is a term of art commonly used to describe a representative of a person who is deceased or incapacitated.  As these questionnaires were directed to Claimants, it is entirely understandable for Grace to want to have questionnaires submitted on behalf of deceased Claimants signed by a formal legal representative of the deceased's estate.  On the other hand, had Grace wanted counsel's signature, it was perfectly capable of drafting the signature

block to make that plain.  The instructions state, at page 3, that "by signing Part X,

you the injured person, are attesting and swearing, under penalty of perjury, that to

the best of your knowledge, all of the information in this Questionnaire is true,

accurate and complete.  If the injured person is deceased, then the executor of the

person's will (or similar estate representative) must complete and sign Part X on

behalf of the injured person."  Where the questionnaire or instructions refer to

claimant's legal counsel, they employ the terms "counsel," "attorney" or "lawyer."

*See*, *e.g.*, Part I, seeking "Lawyer's Name and Firm," Part  II.2, asking the Claimant

"Did you retain counsel in order to receive any of the services performed by the

diagnosing doctor" and "[a]re you aware of any relationship between the diagnosing

doctor and your legal counsel," and in the "Important Reminders" section "[i]f you

have any questions concerning the Questionnaire, you should contact your

attorney."  Not once in Grace's questionnaire is a Claimant's counsel referred to as a

"legal representative."  The second signature box of the attestation uses the term

"legal representative," and is appropriately understood as referencing the

representative of a deceased Claimant's estate who is asked to sign in lieu of the

deceased Claimant.

Grace's notion that the Court was particularly exercised by some perceived

need for attorney signatures is also undercut by the Court's own words "what

difference if the claimants sign, what do you need the attorney to sign for?"  Trans.

of Omnibus Hrg., Mar. 27, 2006, at 25 (emphasis added) (Dkt. No. 11249).  As the

Court's query suggests, there is no such need and, in any event, Grace did not

actually request counsel's signature based on a plain reading of the questionnaire. Counsel who did not sign their clients' questionnaires assuredly cannot be penalized for their failure to sign, or be required to "cure" where the only "error" lies in Grace's inattentive drafting.

Grace compounds its own error by contriving to turn some counsel's failure to surmise that "Legal Representative" was intended by Grace to mean *legal counsel* into a sinister act of subterfuge. Grace recklessly alleges that attorneys who did not sign must have something to hide. Motion to Compel at 29. This is patently offensive nonsense. No improper motive can be imputed from a failure to do that which is not clearly requested and, in any event, counsel are officers of the court, and Grace should be not be so quick to cast aspersions upon their professional integrity. Such tactics and Grace's steadfast refusal to acknowledge its own careless drafting cast a revealing light on an argument that ought not ever been raised.

Additionally, the suggestion that counsel should be required to sign questionnaire responses runs afoul of the Federal Rules of Civil Procedure. The signature block requires the "legal representative" to swear that the information provided is true, accurate and complete, a burden not imposed by any portion of the rules. Rule 26(g)(2), made effective in contested matters by Federal Rules of Bankruptcy Procedure 9014 and 7026, imposes a much more limited certification upon an attorney lending his signature to discovery requests, responses or objections. It provides that:

> The signature of the attorney or party constitutes a certification that to the best of the signer's knowledge, information, and belief, formed after reasonable inquiry, the request, response or objection is: (A)consistent with these rules and warranted by existing law or a good faith argument for the extension, modification or reversal of existing law; (B) not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation; and (C) not unreasonable or unduly burdensome or expensive, given the needs of the case, the discovery already had in the case, the amount in controversy, and the importance of the issues at stake in the litigation.

FED. R. CIV. P. 26(g)(2).[22]  There is clearly a vast divergence between this permissible attorney certification and the skewed requirement urged by Grace.[23]

> 3.    *A proper response to the questionnaire does not oblige Claimants to refrain from lodging appropriate objections.  This Court did not and cannot rule prospectively, in the abstract, on issues only justiciable in context and susceptible to being raised only by counsel representing actual Claimants.*

In the main, discovery objections raised by Claimants' counsel to the questionnaire are legitimate and proper.  Even Grace acknowledges that "[d]uring the course of discovery in normal litigation, such objections [as those certain on behalf of a number of Claimants] might be proper grounds for withholding otherwise discoverable information."  Motion to Compel at 16.  Grace, however, cannot disregard Claimants' due process rights simply because the questionnaire

---

[22]  FED. R. BANKR. P.  9011 is couched in similar terms, but discovery materials are expressly excluded from its coverage.

[23]  It is interesting that Grace's counsel did not sign the questionnaire – it is, after all, Grace's discovery request – as required by Rule 26(g)(2).  Indeed, it likely could not, as it would have been required to swear, *inter alia*, that the discovery sought was not "unreasonable or unduly burdensome."

elicits information in the context of an estimation proceeding in a chapter 11 case.[24]

If any rules of discovery apply to Grace's questionnaire (*i.e.*, assuming, arguendo, that Claimants have submitted to the Court's jurisdiction), Grace seems to suggest that only the rules for compelling discovery are operative.  Real Claimants cannot lodge objections, in Grace's skewed worldview, based on the fiction that this Court has pre-emptively ruled upon the validity of all questions posed by Grace in the questionnaire and foreclosed Claimants' prerogative to do so.  The Court did not do that; indeed, it could not properly have done so.

> a.  Grace's wishful notion that the Court reviewed and approved each line of the questionnaire is at odds with the record.

Grace makes the astounding claim that "the form and substance of each and every question contained in the Questionnaire was approved by this Court."  Motion to Compel at 15.  Grace goes on to assert that the Court conducted a "line-by-line review" of the questionnaire.  *Id.* at 17.  Grace mischaracterizes the record.

---

[24]  Grace's one-sided invocation of the rules should not be entertained.  The Court has made it crystal clear that it considers the questionnaire to be nothing more than Grace's attempt to elicit information from Claimants, noting that "I agree with the Debtor that some limit – some appropriate discovery ***to the extent that people want to submit to discovery and agree to provide the information*** is appropriate and that – that's it.  I think the Debtor is entitled to take some discovery.  It's entitled to know, for example, what its assets and what its liabilities are.  It could use 2004 depositions with respect to that, if it chose.  That's all this questionnaire is."  Trans. of Omnibus Hrg., Nov. 14, 2005, at 142 (Dkt. No. 11563) (emphasis added).  If formal rules governing discovery are to be applied to the questionnaire, the jurisdictional problem notwithstanding, Claimants must be permitted to avail themselves of the protections under the rules for parties responding to discovery – most conspicuously the right to lodge and be heard with respect to objections.  Grace wants "half a loaf" on the rules, too, and would run roughshod over Claimants' rights to due process.

This Court *did* examine certain aspects of Grace's questionnaire before it was propounded. This alleged "line-by-line" review, however, was nowhere near as comprehensive as Grace suggests. A transcript review of the two hearings during which the substance of the questionnaire was considered is instructive. At the July 2005 Omnibus hearing, substantive consideration of the questionnaire spanned a mere 84 pages of a 295-page transcript. *See* Trans. of Omnibus Hrg., Jul. 19, 2005, at 207-290 (Dkt. No. 9105). The discussion at the August 2005 Omnibus hearing was even more cursory, filling a mere 28 pages of a 175-page transcript. *See* Trans. of Omnibus Hrg., Aug. 29, 2005, at 128-155 (Dkt. No. 9349). The process that actually occurred took about two hours of the Court's time. Mr. Lockwood, counsel for the Asbestos Claimants' Committee (the "Committee"), raised concerns about particularly objectionable aspects of the questionnaire, and the Court made certain rulings in an attempt to refine the questionnaire. Indeed, this Court implicitly acknowledged, during the alleged "line-by-line" consideration, that it could not resolve all questionnaire issues in advance. The Court, considering the possibility that Claimants may not fully respond to a given question, noted that "they'll supply what they know, and they'll explain their reasons for why they don't. That I can't deal with at this stage." Trans. of Omnibus Hrg., Jul. 19, 2005, at 180 (Dkt. No. 9105).

> b. Although this Court approved the questionnaire at Grace's urging, it had misgivings from the outset, and has since come to question whether the whole process is a mistake.

Although Grace's questionnaire was approved as a means of seeking discovery, the Court has openly doubted the questionnaire's efficacy as a tool for the collection of evidence pertinent to the estimation hearing.  The questionnaire was disseminated in September 2005.  By November, the Court voiced some serious reservations:

> I think the whole questionnaire process is probably woefully inefficient, but its what the Debtor wants to do and the Debtor controls its discovery.  I don't.  So it's fine with me.  If that's the way they want to go, it's the way they want to go.

Trans. of Omnibus Hrg., Nov. 14, 2005 at 142 (Dkt. No. 11563).[25]  At the same hearing, Grace aired early concerns about the potential inadequacy of forthcoming questionnaire responses (putting aside any explanation of the origin of these concerns, given that no questionnaire responses had yet been submitted).  The Court ventured that Grace may wish to scrap the entire questionnaire project:

> if this is that much of an issue, then I suggest that the Debtor go about formal discovery and forget the questionnaire. I mean, this was intended to help the process, not impede the process. And now you're arguing backwards to me that instead of the questionnaire

---

[25] The Court, at least, was never under any illusion that responses to the questionnaire would be uniformly consistent with Grace's oppressively unreasonable expectations: "The reason I permitted the questionnaires was to try to get … what the Debtor said the Debtor needed for its experts to evaluate in terms of the current mass of claims and it was only ever supposed to be a sample.  Nobody ever expected that every claimant was going to answer that questionnaire, at least I certainly didn't …."  Trans. of Omnibus Hrg., Nov. 14, 2005 at 140 (Dkt. No. 11563).

> advocating -- or advancing the cause, it's impeding the
> cause because there's no hook to it. Well, if there's no
> hook to it, then withdraw it and let's move on.

Trans. of Omnibus Hrg., Nov. 14, 2005, at 165 (Dkt. No. 11563).  As recently as

June 2006, this Court expressed the view, at a hearing in another case, that the

*Grace* questionnaire had been a "mistake."  *See In re Global Industrial Techs., Inc.*

Case No. 02-21626 (W.D. Pa. June 29, 2006), at 142 (Dkt. No. 6320) ("I think I made

a mistake by not requiring it to be a proof of claim form, and then I would have

eliminated three and a half years of the arguments.").  And at the June 2006

omnibus hearing in this case, when asked by the Grace about the mediation of

objections raised to the questionnaire, the Court responded:

> Frankly, if you're going to set a bar date, I don't think
> that's going to be necessary, because at some point in
> time, I'm going to treat the questionnaires as an
> appropriate interrogatory, and if there are legitimate
> objections, we're going to take the objections, and if not,
> then I'll do an order that compels people to answer.  I
> think that's what needs to happen but it needs to happen
> in a fashion that gives everyone the due process notice
> that they are entitled to have to raise whatever issues are
> there.

Trans. of Omnibus Hrg., Jun. 27, 2005 at 55 (Dkt. No. 12717).  The questionnaire

began life as a device that nobody but the Debtor wanted,[26] and has reached the

point where it is about to be superseded by events and rendered effectively moot by

the establishment of a bar date.

---

[26]  Referring to the questionnaire, the Court reminded Grace's counsel "but that's what
everybody argued against and you want to do it anyway."  Trans. of Omnibus Hrg., Nov.
14, 2005 at 148 (Dkt. No. 11563).

c.  This Court, from the outset, planned for appropriately individualized resolution of discovery objections, and never contemplated that objections be summarily disregarded wholesale.

From the very beginning of the questionnaire process, the Court has been well aware that objections were going to be raised to the questionnaire and would need to be dealt with in conventional fashion (*i.e.,* by objections and litigation over Grace's inevitable motions to compel).  When Grace sought approval of its chosen discovery vehicle, the Court (i) provided constructive comments on certain questions; (ii) provided guidance in the face of some objections raised, in the abstract, by counsel for the Committee; and (iii) deleted questions that were, on their face, objectionable.  This Court also recognized the inevitability of legitimate objections not susceptible to being dealt with in pre-emptive manner and ordered the appointment of a discovery mediator.[27]  Discussing discovery disputes between Claimants and Grace, and the Committee's reluctance to be caught up in such disputes, the Court commented that:

> I think an independent person ought to be appointed for that purpose … I think there should be a discovery focus that should not come to the Court first, and there should be someone who can attempt to fix that problem if it's fixable, and if it isn't, then you can come to the Court, and I've got somebody in mind, and I think that's an appropriate way.

---

[27]  *See* Order Appointing Mediator and Requiring Certain Action, entered Sep. 9, 2005 (Dkt. No. 9401).

Trans. of Omnibus Hrg., Jul. 19, 2005 at 187 (Dkt. No. 9105).[28]  With this much

advance warning that there would be issues between the Claimants and Grace

concerning the appropriateness of some of the discovery sought – and a mechanism

in place for the orderly resolution of such disputes – it is disingenuous for Grace to

feign disbelief once objections are made in questionnaire responses and then seek to

bypass the orderly process of dispute resolution instituted by the Court.  Indeed,

when Grace first began to make assertions about the need for early, global

resolutions of objections in the abstract, this Court vigorously rebuffed such

attempts to prejudge such issues, stating that:

> especially to the extent that it's a dispute over
> questionnaires, it's not something that I can give opinions
> about without looking at each one of the things that you
> say is objected to and finding out why there is an
> objection.  And I appointed a mediator for that purpose,
> and I do think you should go to the mediator first, because
> to the extent that there is an issue with respect to the
> scope of response for the questionnaires, that was the
> whole point for trying to a mediator in place who could
> address those issues with you promptly.

Trans. of Omnibus Hrg., Mar. 27, 2006 at 39 (Dkt. No. 11249).  When Grace initially

filed its Motion to Compel, it sought to bypass the mediation procedure instituted by

this Court and seek resolution of the three allegedly threshold issues by this Court

without first resorting to mediation.  Grace still does not deign to address, in

mediation, the merits of the objections raised.  Grace has reluctantly consented to

---

[28]  And later, this Court noted that "I've said I'm going to appoint a mediator for that
purpose [assisting in the resolution of discovery disputes]."  Trans. of Omnibus Hrg.,
July 19, 2005 at 240 (Dkt. No. 9105).

go to mediation first, but will continue to press only the broad grounds set forth in
its Motion to Compel.

> d.     Certain objections cannot be appropriately considered in the
> abstract. To take one example, issues of burden are wholly
> dependent upon context and require anchoring in an evidentiary
> record presented to the court.

Courts have acknowledged that discovery rulings may not conclusively
determine the future permissibility of discovery requests. *See Armament Sys. &*
*Procedures, Inc. v. IQ Hong Kong Ltd.*, 2006 WL 1277917, Case No. 00-C-1257 (E.D.
Wis., May 4, 2006) ("when a discovery ruling anticipates future events, it must be
narrowly proscribed and specific so as not to lend itself to overbreadth or uses to
which it was not intended").[29]  In the context of objections founded on the work
product exemption, the United States District Court for the District of Columbia
noted that it could not

> analyze, in a vacuum, whether communications or
> documents to which defendants might wish to assert a
> work product privilege warrant protection. The Court has
> before it only a blanket recitation that material prepared
> by defendants' lawyers … constitutes work product.
> Lacking concrete facts, any ruling that this Court might
> render with respect to defendants' assertion of work
> product privilege would necessarily be an advisory
> opinion without binding effect.

*Cobell v. Norton*, 212 F.R.D. 24, 32 (D. D.C. 2002).  This Court has acknowledged
that the individualized context of objections is all-important, and that objections
raised may not be disposed in a manner removed from context, stating that

---

[29]  A true copy of this unpublished decision is attached hereto as Exhibit 18 for the Court's
convenient reference.

> Okay, that's fine, in terms of, as you put it, the abstract. The difficulty I have is, I don't know that any specific person can take a look at the questionnaire, start working through the answers and know until they start working through the answers that they have an objection to a specific question. It may not be the structure of the questionnaire that's involved. It may be whether or not – for example – I'll just pick something hypothetical. Okay. A particular person may say, I'm not going to answer that question because it's privileged. Okay, I can't deal with the fact that they're going to have privilege issues in a vacuum.

Trans. of Omnibus Hrg., Apr. 17, 2005, at 40 (Dkt. No. 12299). Grace appropriately has not sought to dispose of privilege objections in a peremptory manner, but does insist that Claimants are foreclosed from raising burdensomeness and other "form and content" objections. Motion to Compel at 16. This assertion flies in the face of the case law and basic fairness alike.

To take burdensomeness objections for example, Grace asserts that all such objections are barred on the grounds of either having been raised and considered or waived by the inactivity of counsel for the Committee. Grace refers to this Court's ruling that requiring a Claimant to complete a separate Part III for each site of alleged exposure is not overly burdensome as justification for its stance. Motion to Compel at 15. This conclusorily facile interpretation of the Court's ruling misstates the actual issue that was then under consideration. In the absence of an evidentiary context, all the Court could decide preliminarily was that a particular question was or was not burdensome on its face. It could not, and did not, decide that such a requirement could never be considered burdensome when ultimately

viewed in a yet to be substantiated evidentiary context.  Whether a query is unduly

burdensome is peculiarly dependent on a properly developed factual record, which

was simply unavailable before Claimants' attorneys had ever sat down with the

questionnaires and attempted to answer them on behalf of their respective clients.[30]

Courts require a specific factual context before they will sustain a

burdensomeness objection.  *See Farber & Partners, Inc. v. Garber*, 234 F.R.D. 186,

188 (C.D. Cal., 2006) (specificity and evidence are necessary for consideration of an

objection based on excessive burdensomeness), *Aikens v. Deluxe Fin. Servs., Inc.*,

217 F.R.D. 533, 536-7 (D. Kan., 2003) (objections on burden require a "particular

and specific demonstration of fact")  and *St. Paul Reinsurance Co., Ltd. v.*

*Commercial Fin. Corp.*, 198 F.R.D. 508, 545 (N.D. Iowa, 2000) ("the objecting party

must show specifically how each discovery request is burdensome or oppressive").

In the absence of such a factual context, courts will only grant burdensomeness

objections "when a discovery request is unduly burdensome on its face."  *Aikens*,

217 F.R.D. at 538.

At the time the objections raised by counsel for the Committee were

considered by this Court, the only objections as to burden that could be legitimately

decided were those susceptible to a determination that they were excessively

---

[30] This principle is not confined to burden objections.  One of the Respondents notes that, under Illinois law, which provides the foundation for the claims of the Claimants it represents, questions related to other asbestos exposure are improper as evidence of other asbestos exposure is per se irrelevant and unreasonable due to the jurisdiction's joint and several liability rules.  *See* Declaration of Robert Phillips at ¶8, included within Exhibit 14 attached hereto.  The permissibility of the questions at issue, therefore, were innappropriate for a ruling in the abstract and stripped of context.

burdensome on their face (*i.e.*. that under any given circumstance, they were unduly burdensome).  No Claimant had been served with a questionnaire at that point in time.  No Claimant or Claimant's law firm had attempted to complete the questionnaire.  Grace's attempt to peremptorily dismiss all allegedly "generic" objections should be rejected, and Grace should be required to address the substance of the objections raised that were raised.

      e.    Only counsel representing actual Claimants have the requisite ability, standing and authority to make objections to the questionnaire on behalf of Claimants they represent.

Grace persists in the specious assertion that the Committee was empowered to not only represent each and every individual Claimant in all potential objections that might arise, but bind those Claimants to an abstract, prospective resolution of the entire range of potential objections.  *See* Motion to Compel at 17-18.  This represents a gross misunderstanding of the nature and scope of the role of creditors' committees.  While the Bankruptcy Code charges a committee with the fiduciary responsibility to represent the collective interests of creditors as a whole, a committee lacks both the authority and the necessary grasp of the unique and salient facts to speak for – let alone bind – individual creditors and the lawyers representing their interests.[31]  Nowhere is this more evident than in the realm of

---

[31]    Grace cites a case – *Loop Corp. v. U.S. Trustee* – for the proposition that "the role of the creditors' committee would be obliterated if … the bankruptcy court is required to solicit the views of the entire body of creditors each time an issue comes before the court that might affect the individual creditors."  Motion to Compel at 18.  Valid objections of individual claimants to discovery propounded to the claimants and not to the committee is not merely an issue that "might affect the individual creditors" it is an issue that, by definition, *only* affects the individual creditors.  Grace further argues that, where issues

discovery propounded to individual Claimants.  To take the example of

burdensomeness objections, which Grace grossly mischaracterizes as "generic," the

Committee could not know in advance the extent of the burden that a given query

may place upon a given Claimant and his or her counsel.  The calculus of burden is

unshakably tied to specific facts and circumstances.  Only the individual firms know

how many Claimants they represent, what records are kept for each Claimant, in

what manner files are maintained, and the myriad other calculations that underlie

an objection based on excessive burdensomeness.  Only individual firms and their

clients are in a position to know the specific burdens that will be required of them to

respond to the questionnaires and when that burden rises to a threshold that is

objectionable.

     Moreover, the Committee lacks the authority and the standing to make

certain objections on behalf of the individual claimants.  It represents the asbestos

personal injury constituency as a whole – not individual Claimants who have their

own counsel.  Indeed, this Court denied certain objections to the questionnaire

raised by Committee counsel on the grounds that the Committee lacked standing

because it did not represent any actual Claimants:

> Your objection is overruled.  This is not an allowance
> process.  It's an estimation process.  ***You have no standing***

---

have been "fully and fairly litigated by a committee in an estimation, such issues should
not be revisited."  *Id.*  The propriety of the discovery served upon individual Claimants
has not been litigated at all, except in the most general and threshold of senses.  The
couple of hours spent by committee counsel attempting to mitigate a few of the Grace's
worst transgressions does not obviate the need to fully consider legitimate objections
raised by the real targets of the discovery, the Claimants themselves.

> *to raise that objection, because, as you've told me*
> *repetitiously today, you don't represent the individual*
> *plaintiffs.*

Trans. of Omnibus Hrg., July 19, 2005 at 240 (Dkt. No. 9105). (emphasis added).

Indeed, while the Committee lacks standing, Claimants over whom the Court has

personal jurisdiction would have standing.  Grace's attempt to sidestep substantive

consideration of the valid objections raised should be summarily rejected.

## V.  GRACE'S SUGGESTED 60-DAY CURE PERIOD IS UNREASONABLE.

The supplemental responses appended hereto attest to the Herculean effort

already undertaken by and on behalf of Claimants who have submitted responses to

Grace's questionnaire.  Thousands of man-hours, representing tens of thousands of

dollars in lost opportunity costs, have been devoted to Grace's questionnaire.

Postage and copying expenses so vast as to beggar the imagination have been

incurred.  Grace's suggestion of a 60-day cure period (Motion to Compel at 29)

bespeaks a whimsy strikingly indifferent to the practical realities of the

questionnaire process and the substantial exertions Claimants and their personal

injury counsel have already undertaken in furtherance of Grace's questionnaire.

Should this Court deem it appropriate to afford Grace any relief pursuant to

its Motion to Compel, any permitted cure period must be realistic.  Respondents'

supplemental responses and accompanying declarations attest to the oppressive

burdensomeness that fully and literally responding to the questionnaire in the

manner Grace demands would entail.  One Respondent, for example, had an

experienced legal assistant complete questionnaire responses on behalf of a sample of Claimants with the degree of meticulousness that Grace seeks to compel. Each one took approximately 7 hours to complete – nearly a full work day.[32]

A 60-day cure period is both unrealistic and terribly oppressive. There would be a widespread inability to comply.[33] It bears reiterating that Grace has sought – for purposes of estimation only and not even for claims allowance – information that far outstrips what has been required in any other asbestos-related bankruptcy case. Grace insists that it be provided this information in a particularized format that imposes almost the entire burden of document review and associated interpretation upon counsel for the respective Claimants.

By far the better course would be for this Court to reject Grace's contentions and overrule the Motion to Compel in its entirety. If, on the other hand, the Court were to grant some or all of the relief requested in the Motion to Compel, a realistic cure period substantially longer that that sought by the Debtors should be permitted.

---

[32]  *See* Declaration of Mike Hanners at ¶¶ 3 & 7, included within Exhibit 13 attached hereto.

[33]  A Respondent estimates that responding to the questionnaire as Grace demands on behalf of the 1060 Claimants it represents would take 10 legal assistants working full-time on nothing else over 6 months to complete. This same Respondent employs just 4 legal assistants, so it would be necessary to more than double the firm's paralegal ranks to meet Grace's onerous demands in 6 months time. *See* Declaration of Chris Parks at ¶¶ 5-6, included within Exhibit 8 attached hereto.

## VI. CONCLUSION & PRAYER FOR RELIEF

WHEREFORE, for the foregoing reasons and the particularized reasons set forth in the Respondent-specific supplemental responses attached hereto, Respondents pray that the faulty questionnaire process be suspended without delay and ultimately discarded in light of the Court's doubtful jurisdiction over Claimants. Alternatively, Respondents pray that the Motion to Compel be denied as moot in light of the Court's impending imposition of an asbestos claims bar date. Finally, Respondents pray that their respective objections to the questionnaire on behalf of any Claimants they represent be sustained, that Grace's Motion to Compel be denied in its entirety, and that Respondents be afforded such other relief, individually and/or jointly, as to which they may be entitled.

Dated: August 14, 2006

Sander L. Esserman

Van J. Hooker
David A. Klingler
David J. Parsons
**STUTZMAN, BROMBERG,
ESSERMAN & PLIFKA,
A Professional Corporation**
2323 Bryan Street, Suite 2200
Dallas, Texas 75201
Telephone:  (214) 969-4900
Facsimile:  (214) 969-4999

**COUNSEL FOR RESPONDENTS,
VARIOUS LAW FIRMS REPRESENTING
PERSONAL INJURY CLAIMANTS**

/s/ Kathleen M. Miller
Kathleen M. Miller (ID no. 2898)
**SMITH, KATZENSTEIN &
FURLOW, LLP**
800 Delaware Avenue, 7th Floor
Wilmington, Delaware 19899
Telephone:  (302) 652-8400
Facsimile:  (302) 654-8405
E-mail:  KMM@skfdelaware.com

**LOCAL COUNSEL FOR RESPONDENTS
REAUD, MORGAN & QUINN, INC. &
ENVIRONMENTAL LITIGATION GROUP,
P.C.**

/s/ Daniel K. Hogan
Daniel K. Hogan (ID no. 2814)
**THE HOGAN FIRM**
1311 Delaware Avenue
Wilmington, Delaware 19806
Telephone:  (302) 656-7540
Facsimile:  (302) 656-7599
E-mail:  dan@dkhogan.com

**LOCAL COUNSEL FOR ALL OTHER
RESPONDENTS**

## List of Exhibits

Exhibit 1       Supplement and Declaration of Baron & Budd, P.C.

Exhibit 2       Supplement and Declaration of Brayton Purcell

Exhibit 3       Supplement and Declaration of Foster & Sear, L.L.P.

Exhibit 4       Supplement and Declaration of Hissey, Kientz & Herron, P.L.L.C.

Exhibit 5       Supplement and Declaration of The Law Offices of Peter G. Angelos, P.C.

Exhibit 6       Supplement and Declaration of LeBlanc & Waddell, P.C.

Exhibit 7       Supplement and Declaration of David Lipman, P.A.

Exhibit 8       Supplement and Declaration of Chris Parks & Associates

Exhibit 9       Supplement and Declaration of Robert Pierce & Associates

Exhibit 10      Supplement and Declaration of Provost & Umphrey, L.L.P.

Exhibit 11      Supplement and Declaration of Reaud, Morgan & Quinn, L.L.P.

Exhibit 12      Supplement and Declaration of Sieben, Polk, LaVerdiere & Dusich, PA

Exhibit 13      Supplement and Declaration of Silber Pearlman LLP

Exhibit 14      Supplement and Declaration of SimmonsCooper, L.L.C.

Exhibit 15      Supplement and Declaration of Weitz & Luxenberg P.C.

Exhibit 16      Supplement and Declaration of Wilentz, Goldman & Spitzer, P.A.

Exhibit 17      Supplement and Declaration of Williams Bailey Law Firm L.L.P.

Exhibit 18      Unpublished Opinion - *Armament Sys. & Procedures, Inc.*