UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE


IN RE:                          .    Chapter 11
                                .
W.R. GRACE & CO., *et al.,*     .    Case No. 01-01139(JKF)
                                .    Jointly Administered
            Debtors.            .
                                .    Aug. 21, 2006 (1:55 p.m.)
                                .    (Wilmington)


TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE JUDITH K. FITZGERALD
UNITED STATES BANKRUPTCY COURT JUDGE


Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

1          THE COURT: These are all Mondays: January 22nd,

2   February 26th, April 2 - Now, my calendar says that Passover

3   begins on April 3, so, does April 2 cause a problem?

4          UNIDENTIFIED SPEAKER: It may.

5          UNIDENTIFIED SPEAKER: Some calendars publish it the

6   night before and some have it the first day.

7          MR. BAENA:  My guess is that's the first day,

8   Judge, not the first night.

9          UNIDENTIFIED SPEAKER: So, the result of that would

10  be -

11         THE COURT: Well, I don't - I think it's the first

12  day because it's in the, you know, the Christian Holy Week,

13  and Good Friday is that Friday, Passover is listed on

14  Tuesday, so my guess is that that's the first day.

15         MR. BAENA: Which means we would observe the night

16  before.

17         THE COURT: The night before.  What time do you need

18  to be out of -

19         MR. BAENA: We have to be there by sundown.

20         THE COURT: So, could you participate by phone, if

21  necessary, for that one?

22         MR. BAENA: Sure.

23         THE COURT:  Or do you want me to put it on -

24  because you couldn't be here on the 3rd, either; correct?

25         MR. BAENA: That is correct.  We could, assuming

1   nothing will be scheduled in respect of our clients that

2   needs to be argued first.

3        THE COURT: I couldn't hear you, Mr. Baena, assuming

4   that what?

5        MR. BAENA: Assuming that nothing is scheduled in

6   respect of our clients that we would have to argue in person.

7   If we could avoid that, that's fine.

8        THE COURT: The 2nd, April 2nd, Monday.  Okay, that's

9   fine.  Why don't we plan it for April 2nd.  If it turns out to

10  be a problem, then we'll figure it out, I guess, closer to

11  then.  Okay, so let me repeat what I've got so far, and then

12  I'll keep going.  January 22nd, February 26th, April 2, April

13  30, May 21, June 25th you already know about, that's the one

14  that will be in Pittsburgh because we're going to be in the

15  middle of the many trial days in this case.  July 23 - I

16  don't have an August date yet.  I will give you that next

17  month.  September 24, October 22, November 26th, and December

18  17, and I may do December 17 in Pittsburgh, I'll figure that

19  out closer to then and see how active the cases still are at

20  that point in time.  Any problems that anybody's aware of

21  with any of those dates except for the April 2nd date?  Okay.

22  Well, if need be, we'll either do that by phone or change

23  that date as the time approaches.  Okay, then Monday at 1:30

24  starting in January will be the Grace dates.  Are they

25  connected, Jason?  Can I call the case?  Okay.  This is the

1   matter of W.R. Grace, Bankruptcy No. 01-1139.  The parties I

2   have listed by phone are: Paul Sadler, Christina Kang,

3   Richard Rescho, Paul Norris, Mark Shelnitz, David Siegel,

4   Natalie Ramsey, Brian Kasprzak, Mark Plevin, Leslie Epley,

5   Elizabeth DeChristofaro, Andrew Chan, Stephen Vogel, Kathleen

6   Farinas, Eric Manchin, Tiffany Cobb, Robert Guttman, Michael

7   Davis, Jeramy Kleinman, Joseph Radecki, Jonathan Brownstein,

8   Edward Westbrook, Curtis Plaza, Matthew Kramer, Darrell

9   Scott, Sean Walsh, Elizabeth Cabrasor, Richard Park, Carl

10  Pernicone, Stephanie Kwong, Arlene Krieger, Guy Baron, Sander

11  Esserman, David Parsons, Lori Sinanyan, Ted Freedman - but I

12  see him in court, John O'Connell, Barbara Harding, Sam

13  Blatnick, Barbara Seniawski, Andrew Craig, Lynne Nissen,

14  Daniel Glosband, Marti Murray, David Liebman, Jacob Cohn,

15  Craig Gilbert, Peter Shawn, Daniel Cohn, Debra Felder, David

16  Austern.  I'll take entries in court, please.

17          MR. BERNICK: Good afternoon, Your Honor.  David

18  Bernick for Grace.

19          MS. BAER: Janet Baer on behalf of Grace.

20          MR. O'NEILL: James O'Neill for Grace.

21          MR. BECKER: Gary Becker on behalf of the Equity

22  Committee.

23          MR. PASQUALE: Ken Pasquale from Stroock for the

24  Unsecured Creditors Committee.

25          MR. KRUGER: Lewis Kruger also from Stroock for the

1    Unsecured Creditors Committee.

2            MR. RESTIVO: James Restivo, Reed Smith for Grace.

3            MR. BAENA: Scott Baena on behalf of the Property

4    Damage Committee.

5            MR. SAKELO: Jay Sakelo on behalf . . . (microphone

6    not recording).

7            MR. LOCKWOOD: Peter Lockwood on behalf of the

8    Asbestos Claimants Committee.

9            THE COURT: Excuse me one second.  Okay, thank you.

10   After Mr. Lockwood?

11           MR. HORKOVITCH (phonetical): Thank you, Your Honor.

12   Bob Horkovitch, insurance counsel for the Personal Injury

13   Claimants Committee.

14           MR. WYRON: Richard Wyron for the Future Claimants

15   Representative.

16           MR. SPEIGHTS: Dan Speights on behalf of S&R

17   Claimants.

18           MR. DIES: Martin Dies, Your Honor, on behalf of my

19   claimants and also as Special Counsel for the PD Committee.

20           MR. WISLER: Your Honor, I'd like to enter my

21   appearance.  Jeffrey Wisler -

22           THE COURT: Sir, I can't hear you, I'm sorry.

23           MR. WISLER: Jeffrey Wisler appearing on behalf of

24   the Asbestos Claimants Committee.

25           MR. HURDFORD: Mark Hurdford of Campbell & Levine on

1  behalf of the Claimants Committee.

2         MS. McGONIGLE: Patricia McGonigle, the

3  SimmonsCooper Claimants, Your Honor.

4         THE COURT: I'm sorry, who are you representing?

5         MS. McGONIGLE: The SimmonsCooper PI plaintiffs.

6         MR. PHILLIPS: Robert Phillips, SimmonsCooper

7  Claimants, Your Honor.

8         MS. PULLECK: Laure Pulleck, Prudential.

9         MR. BURNHAM: Noel Burnham for Grace Certain Cancer

10  Claimants.

11         MR. HOGAN: Good afternoon, Your Honor.  Daniel

12  Hogan on behalf of the Canadian Zonalite Claimants as well as

13  Brayton Purcell Ford & Noms (phonetical) and various other

14  law firms, Your Honor.

15         MR. MONACO: Your Honor, good afternoon.  I'm Frank

16  Monaco for the Crown.

17         THE COURT: I like it when you do the whole thing,

18  Mr. Monaco.

19         MR. MONACO: I'm here in short, Your Honor.

20         THE COURT: Okay, Mr. Bernick.

21         MR. BERNICK: Good afternoon, Your Honor.  We're

22  going to try to get through the - well, I think essentially

23  ministerial matters which will be items 1, 2, 3, and 5.

24  We're going to propose deferring argument on item 4, which

25  relates to the approval of a settlement because it only

1    involves - I think there are limited numbers of people who I

2    think will be focused on that because we'd like to get to the

3    meat of where we are with the property damage and personal

4    injury litigation tracks, and therefore, Ms. Baer is going to

5    handle the items that I've indicated, but then our goal would

6    be to start up with item 6 on the agenda which relates to the

7    Canadian claims.  So, Ms. Baer will handle the first four -

8    actually 1, 2, 3, and 5, we seek to defer 4, and then

9    starting with 6.

10            THE COURT: All right.

11            MS. BAER: Your Honor, with respect to item number

12    1, that's just the debtor's fifth omnibus objection.  We have

13    one claim left, and we are continuing it.  Items 2 and 3 are

14    the New Jersey injunction and adversary proceeding.  By

15    agreement with the State of New Jersey, we're continuing

16    those.  So I have orders to hand up on both.

17            THE COURT: All right.  Thank you.  Okay, they're

18    continued.

19            MS. BAER: Your Honor, that takes care of 1, 2, and

20    3.  Item 4 is the Lloyd's Underwriters settlement which we'll

21    defer to the end of the hearing.  Item number 5, Your Honor,

22    was the debtor's objection to the claim of David Slaughter.

23    Your Honor, David Slaughter's counsel for the first time did

24    now submit some evidence in support of his claim.  We've

25    agreed that we will send this claim to mediation.  I've

1   spoken with Mr. Slaughter's counsel.  He's agreeable to that.

2   So, if Your Honor would like, we can present an order.

3   Effectively the claims objection stands but the merits will

4   be addressed in mediation, and we'll come back and put it on

5   the agenda once that's concluded.

6          THE COURT: All right, that's fine.

7          MS. BAER: Do you need an order for that, Your

8   Honor?

9          THE COURT: Probably because otherwise it's just

10  going to stand out there unless I just give you a general

11  continuance so that you can put this back on the agenda when

12  it's ready.  That's fine with me.

13         MS. BAER: That would be fine.

14         THE COURT: Okay.  Let me just make a note then.

15  Item 5 is continued, and debtor to put back on the agenda

16  when appropriate.

17         MS. BAER: Your Honor, that takes us to item 6,

18  which Mr. Bernick will address.

19         THE COURT: Okay.

20         MR. BERNICK: Your Honor, at the conclusion of the

21  discussion during the last hearing it concerns our request to

22  have the objections with respect to the Canadian claims heard

23  in the first instance in Canada, posed two very specific and

24  related questions that pertained, I think essentially, to

25  jurisdictional matters, and I want to go over the answers to

1    those this afternoon a little bit.  The two related questions

2    were, number one, what is the jurisdiction of the Canadian

3    Court to do what it is that we would ask them to do, and the

4    second related question is, how does the deployment of that

5    jurisdictional grant, if we can demonstrate that it exists,

6    square with U.S. law principles relating to whether Your

7    Honor should exercise what is clearly Your Honor's power to

8    adjudicate the same matters.  So they're two tied together,

9    they both focus on jurisdiction.  Taking a look at the briefs

10   that have been filed since that time, and I think that with

11   the benefit of hindsight Your Honor was very accurate in

12   seeing that the issues were not completely fleshed out in the

13   first round of briefing, but looking at the briefs that have

14   been filed since, it is apparent that part of the problem

15   here is that the property damage constituency, it really is

16   Mr. Speights, it is his claims that are issue in Canada or

17   claims of his clients, it analyzed the jurisdiction of the

18   Canadian proceeding in the Canadian Court as if they were

19   looking at a typical jurisdictional question arising

20   concerning an Article 3 or Bankruptcy Court here in the

21   United States.  That is, they sought to apply an analytical

22   framework or template that's driven by questions that are -

23   sound very familiar under U.S. jurisdictional principles, but

24   have almost no relationship to the jurisdictional grant that

25   was explicitly made by the Canadian statute - Canadian law

1   that we're talking about, when we're talking about the

2   jurisdiction of the Canadian court, we're not talking about

3   U.S. jurisdictional principles, we're talking about Canadian

4   law jurisdictional principles, and the only source of the

5   Canadian law relating to those jurisdictional principles is

6   (a) the statute itself that confers power upon the CCAA

7   proceeding and secondly, decisions of the Canadian Courts

8   interpreting that statute and applying that statute in the

9   context of actually pending CCAA cases.  If Your Honor take a

10  look at the language of the statute and takes a look at the

11  language of the cases, it's very apparent that the

12  jurisdiction that was conferred and has been exercised by the

13  CCAA courts in this particular area is a very distinctive

14  kind of jurisdiction.  It is not a standalone jurisdiction.

15  It is an ancillary or assistive jurisdiction.  That is to

16  say, the Canadian law grants to the Canadian courts the

17  power, the jurisdiction to stand in assistance of a

18  proceeding that's underway elsewhere, in this case, in the

19  United States.  So, there are really four key properties that

20  relate to this jurisdictional grant that have to be

21  specifically articulated.  One is the jurisdiction is an

22  ancillary jurisdiction.  It's in an assistive jurisdiction.

23  That comes right out of the language of the CCAA itself where

24  it talks in Section 18.6(4).  Nothing in this section

25  prevents the Court on application of a foreign representative

1    or any other interested person from applying such legal and

2    equitable rules governing the recognition of foreign solvency

3    orders and assistance to foreign representatives that are not

4    inconsistent with the provisions of this Act.  If you look at

5    Section 18.6(2), which talks about the powers of the court,

6    again very much similar language.  The purpose is to

7    facilitate, approve, or implement arrangements that will

8    result in coordination of proceedings under this Act with any

9    foreign proceeding.  So, the jurisdiction is not the

10   jurisdiction of the court that's acting on its own and

11   necessarily even with respect to its own debtor.  It is

12   acting in service of the jurisdiction of a foreign proceeding

13   properly before a foreign court.  That's principle number

14   one.  Number two, it need not be a bankruptcy case.  CCAA

15   proceedings can involve bankruptcy but they need not involve

16   bankruptcy.  There doesn't have to be a separate debtor in a

17   separate proceeding.  And what we've seen in the cases is

18   that is exactly so.  The CCAA proceedings have been used

19   with respect to companies or entities that are not debtors

20   and certainly do not have to be debtors, the same debtor that

21   is the subject of a U.S. or other foreign proceeding.  The PD

22   Claimants or I guess Mr. Baena's firm on behalf of Mr.

23   Speights suggests that the only way that the CCAA proceeding

24   can be used is if Grace U.S., the debtor in this case, were

25   to file a, quote, "parallel proceeding in Canada".  That's not

1    so, and the case law is clear that there does not have to be

2    a debtor.  In fact a judge in the <u>Babcock & Wilcox</u> decision,

3    which we have quoted to the Court, <u>Babcock & Wilcox Canada</u>

4    <u>Limited</u>, decided by Judge Farley on February 25 of 2000, says

5    that, Unlike 18.6(2), 18.6(4) does not contemplate a full

6    filing under the CCAA.  Rather, 18.6(4) may be utilized to

7    deal with situations where notwithstanding that a full filing

8    is not being made under the CCAA, ancillary relief is

9    required in connection with a foreign proceeding.  So you

10   don't have to have Grace, or for that matter any other debtor

11   actually filing in Canada.  Again, a principle that the PD

12   claimants do not come to grips with.  Third property, the

13   power that's conferred by this statute is broad and it is

14   flexible.  The language itself is broad and to serve the

15   purposes of the grant, the power must be broad because it is

16   essentially an ancillary or an assistive power with respect

17   to what may be a whole range of very diverse proceedings

18   taking place elsewhere.  It's not so constrained.  And

19   finally, in order to invoke or to trigger the CCAA process,

20   it is not necessary for a debtor to act.  It could be any

21   interested person.  That's exactly what the language of

22   18.6(4) says, and that's exactly what was done in this case.

23   The PD claimants make it seem as if the CCAA proceeding,

24   actually a proceeding initiated by Grace Canada, is somehow a

25   debtor entity.  It could have been any interested party.  The

1    point is not who initiates it.  The point is that once it is

2    initiated, the touchstone for what the Court is empowered to

3    do is the broad language of the Canadian statute that then

4    says, You can do whatever it is that we'll assist the

5    proceedings taking place abroad.  So in this case, Grace

6    Canada made the request that could have been made by others,

7    and the touchstone is not Grace Canada.  The Canadian case is

8    not the Grace Canada case.  The Canadian case is a case filed

9    or petitioned and prompted in Canada that is ancillary to

10   this Court's proceedings.

11          THE COURT: Wait, I'm sorry.  What is the Canadian

12   case again?

13          MR. BERNICK: The Canadian case is not - it was

14   initiated at the request of Grace Canada, but it's not a case

15   that is confined to Grace Canada.

16          THE COURT: Oh, so you're not asking to have these

17   claims adjudicated within the Grace Canada case.  You're

18   going to file an ancillary claim asking the Canadian Court to

19   adjudicate the case, the claims in this case.

20          MR. BERNICK: The proceeding has already been

21   initiated by Grace Canada.  In other words, that proceeding

22   is an ongoing proceeding today in Canada.  We're going to ask

23   that that Court take up the issue at the request of Grace

24   U.S. pursuant to its ancillary powers and resolve the

25   objection, that is, decide the objection subject then to Your

1    Honor's determinating what to do with it.  In other words,

2    let's be very clear, the proceeding was initiated as it could

3    be by any interested party, in this case it was Grace Canada,

4    but because it's not a bankruptcy proceeding, the case is not

5    defined by Grace Canada.

6          THE COURT: But why is Grace Canada the interested

7    party.  I'm sorry for interrupting, but I'm a little -

8          MR. BERNICK: Sure.

9          THE COURT:  - confused about the status of these

10   cases.  Why is Grace Canada the interested party moving to

11   have the Canadian Court exercise ancillary jurisdiction over

12   claims filed in the Grace U.S. cases?

13         MR. BERNICK: In this particular instance, I want to

14   distinguish between the request that gave rise to the fact of

15   there being a proceeding in Canada.  That was an earlier

16   request made back, I think, in 2001, 2002 by Grace Canada.

17         THE COURT: Yes.

18         MR. BERNICK: And I think matters have already been

19   taken up by that Court in connection with this case, but they

20   had not required Your Honor's attention, and they haven't

21   related to the merits of claims made against Grace U.S.  What

22   we are now doing is asking that Your Honor allow us to make a

23   request of the same Court sitting in that proceeding to take

24   up now a new issue.  And that issue, the Court in Canada will

25   have the jurisdiction to pass on because of the statute that

1   confers ancillary jurisdiction or assistive jurisdiction on

2   the Canadian Court.  In other words, that Court stands there

3   in service of the U.S. proceeding.  In this and in many other

4   cases, the proceedings have been initiated and then issues or

5   requests are made to the Canadian Court as the U.S. case

6   progresses.  It is an ancillary proceeding, and the Court - I

7   want to get to the question that Your Honor asked is, what is

8   the power of the Canadian Court?  The Canadian Court's power

9   is spelled out in the statute, is a broad assistive ancillary

10  power.  All you do is go to the language of 18.6, and I can

11  read to you again or point it out on the screen, the language

12  says that the proceeding itself in Canada can be initiated on

13  application when a foreign representative or any other

14  interested person -

15          THE COURT: Right.  I don't dispute the language of

16  the statute.  I think what I'm not clear about is why these

17  claims would be adjudicated within the context of the Grace

18  Canada case as opposed to being adjudicated within the

19  context of the Grace U.S. case but in a Canadian court that's

20  exercising ancillary jurisdiction.  I don't understand the

21  relationship between taking -

22          MR. BERNICK: (Microphone not recording.)

23          THE CLERK: Mr. Bernick, we can't hear you without a

24  microphone.  Do you want to take this, sir?

25          MR. BERNICK: Oh.  Thanks.

1          THE COURT: I guess I'm asking, I don't understand

2     why the vehicle is the Grace Canada case.

3          MR. BERNICK: Because it's already there.  In other

4     words, the distinction that Your Honor has drawn, I think, is

5     a distinction without a difference under the statute.  The

6     proceeding has been initiated.  The question now is what is

7     it going to do?  And what it's going to do depends upon what

8     it is asked to do.  The Canadian statute gives power to the

9     court sitting in that case to do lots of different things.

10    Grace Canada already made a request that gave rise to that

11    proceeding in the first instance.  We are now making a

12    request -

13         THE COURT: Who's the "we"?

14         MR. BERNICK: The "we" is Grace U.S.

15         THE COURT: All right.

16         MR. BERNICK: So, Grace U.S. is now making a request

17    of this Court to approve our seeking to ask that Canadian

18    Court to exercise its ancillary jurisdictional power to

19    decide or to adjudicate in the first instance the claims that

20    we're talking about because they involve Canadian law.  And

21    I'm going to go over the order that we're proposing as a

22    consequence of this.  The Canadian Court, if Your Honor were

23    to approve this, we would make the request and the Canadian

24    Court would go about the process of addressing these claims.

25    The Court would then make a decision, but the decision under

1    this order and as we look at U.S. law would not be binding on

2    Your Honor with respect to the ultimate allowance or

3    disallowance of the claim.   If there were some defect in the

4    Canadian proceeding or something else that said it would be

5    inappropriate now if you take the result of that proceeding

6    and make it binding in the sense of allowing or disallowing

7    the claim, Your Honor would retain the jurisdiction precisely

8    for that purpose, and that's what our draft order would so

9    provide.  So, effectively, what are we really doing?  We're

10   saying there's a statutory grant of very flexible power in

11   the Canadian court to do all kinds of things that stand in

12   service of this case.  That proceeding already has been

13   initiated for other reasons.  We now want to use the same

14   proceeding to encompass the decision of the interpretation

15   and application of Canadian law to these claims, which is

16   clearly within the purview of the statutory grant - that's

17   the question that Your Honor asked - and then with respect to

18   the U.S. side of the equation, we are not asking Your Honor

19   to either give up your jurisdiction or to abstain.  We're

20   simply asking Your Honor to have the decision be rendered in

21   the first instance so that you can get, in a sense, the

22   advice of the Canadian court with respect to application of

23   Canadian law, and then with the benefit of that

24   determination, we would come back here and ask Your Honor to

25   give an enforcement.  So we're not asking Your Honor to give

1   up your jurisdiction.  We're not asking you to abstain.

2   We're simply asking you to use a facility which already is

3   there for purposes of applying Canadian law, and our order

4   would expressly so provide.  Our proposed order would read as

5   follows: "Ordered that the debtors are authorized, pursuant

6   to the Canadian litigation protocol attached as Exhibit 2, to

7   prosecute their objections to the Canadian claims based upon

8   Canadian laws and facts before the Court in the CCAA

9   proceeding.  Notwithstanding, the Court shall retain

10  jurisdiction over the Canadian claims for purposes of

11  estimation and/or determine the ultimate allowance or

12  disallowance of the Canadian claims.  Number two, this Court

13  shall retain jurisdiction to hear and determine all matters

14  arising from the implementation of this order which is

15  final."  So, Your Honor would basically be retaining control

16  and power over all of these claims but for purposes of

17  finding out how a Canadian court would construe and apply

18  Canadian law, you're allowing us to initiate a proceeding

19  over in Canada pursuant to the protocol that's attached here,

20  which is very simple and straightforward.  It's essentially a

21  summary judgment process and if summary judgment fails, then

22  the matter is tried, and then the result comes back here for

23  Your Honor's disposition.  I say that we believe that the

24  merit of this procedure is very obvious, and we've laid it

25  out in detail, and I'm not going to go through it in detail,

1    but you're talking about the application of Canadian law,

2    that's quite clear.  It's quite clear the Canadian court

3    already has more experience than this Court obviously would

4    in applying Canadian law, and Canadian law is different, and

5    there's actually a track record, a very important track

6    record going back to 1995 in the Privus (phonetical) case

7    where an extended proceeding took place resulting in an

8    opinion over 300 pages long which dealt with the application

9    of Canadian law to asbestos property damage claims, and the

10   Court decided that Canadian law is different from U.S. law,

11   and those claims couldn't be pursued, and the result is that

12   there never has been since that time any Canadian property

13   damage litigation as a result of asbestos.  It just hasn't

14   happened.  So, what's happened is, that this matter now has

15   been taken back to the United States to be put before Your

16   Honor whereas the Canadian courts at least should have the

17   opportunity to tell the Court whether or not what we say is

18   true, which is they've already addressed this issue.  Now,

19   Your Honor, we are more than content to have Your Honor take

20   up exactly the same matters.  We're content to do the briefs

21   and get it done, the Canadian claims part of this process,

22   but we really do believe that this is the right way in which

23   to proceed because the matter involves Canadian law and also

24   because we believe that Your Honor has access to a court both

25   with the power and the competence to take on an issue that

1    Your Honor then would not have to decide in the first

2    instance.

3        THE COURT: Well, I sort of understand the

4    application of Canadian law in the summary judgment context.

5    I'm sort of losing it in the trial context because I'm not

6    sure how, if the cases are actually tried, I can retain any

7    jurisdiction to somehow or other act like an appellate court

8    and decide to set aside those rulings.  If the Canadian court

9    gives me some final ruling on what the application of

10   Canadian law is, then I think I have to accept that

11   application of Canadian law; don't I?

12       MR. BERNICK: Well, part of me says, Yeah, sure, go

13   right ahead and say that's exactly right, but I really think

14   that this is part of why the Canadian procedure here and the

15   Canadian jurisdiction, the jurisdictional grant, is a little

16   bit different in a sense less aggressive than that because

17   you could do that.  You could say, Well, assume that the

18   Canadian Court could acquire power over Grace U.S.  That is

19   that Grace U.S. would accept the jurisdiction or submit

20   itself to the jurisdiction of the Canadian courts.  Your

21   Honor could ship the whole thing out there and say, Tell me

22   what the answer is and it's fully binding.  What we're saying

23   is that that is not necessary under the CCAA proceeding.

24   That is to say, under the CCAA proceeding Your Honor doesn't

25   have to give up power over these claims.  This is no

1    different than Your Honor deciding really with respect to any

2    foreign proceeding whether or not you believe it's

3    appropriate to accept the outcome of that proceeding as being

4    binding here.  The Canadian court under our order would only

5    be deploying an ancillary power that it enjoys under its

6    statute.  It would not be acting as a separate proceeding

7    with the power finally to bind either Grace U.S. or finally

8    bind the Canadian claimants against Grace U.S.  The

9    determination would not be binding in a sense on either side

10   until Your Honor says it's going to be binding on either

11   side.  And in that respect, the Canadian statute doesn't

12   require and we're not asking Your Honor to give up your

13   ultimate say so about what to do with these claims.  You're

14   essentially referring them out to the Canadian court, which

15   is willing to do this, to do the work of analyzing Canadian

16   law and applying it to the facts and saying, Here's what we

17   believe the Canadian law would say.  And if it turns out that

18   they haven't done it right and there's a due process issue

19   and that there's a fundamental problem with giving weight and

20   effect to that ruling, all rights are preserved.  They can

21   come back and ask Your Honor to say that it should have no

22   effect.  I will say, Your Honor, that the Privus case, which

23   involved exactly the same issues, most courts in the United

24   States would not have gone this far as the Court in the

25   Privus case did.  That was an unbelievably, exhaustively

1    litigated and detailed case.  It was designed to decide the

2    matter pretty much for all time, and an unbelievable amount

3    of effort went into it.  I don't think that there's really

4    anybody who's going to come in and say, Somehow the Canadian

5    courts aren't going to satisfy fundamental principles of due

6    process.  There's certainly no evidence of it in connection

7    with the Privus case, but be that as it may, Your Honor

8    doesn't have to rule on that now because Your Honor retains

9    the jurisdiction to decide what to do.  But again, let me

10   emphasize, we made this proposal because we thought it was

11   the right way to go.  We made this proposal awhile ago.  If

12   it's not going to work, Your Honor, it's not going to work,

13   and we're happy to make the Canadian cases part of the CMO

14   and take up these issues and have Your Honor interpret the

15   statute of limitations of Canada.  We're happy to do it.  We

16   just want to get it done and we want to get it done the right

17   way.  So, this is something that Your Honor actually

18   mentioned awhile ago, saying maybe we'll do it in Canada.  We

19   saw that, heard that, said, Gee, can we do it?  We got

20   advice from Mr. Tay who's sitting here in court who's

21   Canadian counsel and has been intimately involved in these

22   different kinds of proceedings.  So we think it can work.  We

23   think this is the right way to go.  So we've made the

24   proposal, Your Honor, but whatever Your Honor wants to do,

25   whether it's this or keeping the matters here and deciding

1  what the <u>Privus</u> decision meant, et cetera, et cetera, we're

2  happy to do it either way, but we wanted to at least present

3  an option to Your Honor so Your Honor could decide what to

4  do.

5        THE COURT: Well, I too would like to get the claims

6  adjudicated wherever they can be done the quickest.  The

7  problem that I find with the process is that if it's going to

8  be a non-binding process, I'm concerned that I may end up

9  having to do it over again.  I may not, but I'm uncomfortable

10  in the role of an appellate court.  I don't see myself as a

11  court that's supposed to be taking a look at what the

12  Canadian court does and saying, Oh, I don't like that much,

13  therefore I'll set it aside.  Or, gee, I think that's really

14  great, therefore I'll affirm it.  I don't think that's my

15  role.

16        MR. BERNICK: Well, from Grace's point of view, we

17  represented before and we'll represent again, we're also

18  prepared to have the Canadian court's determination be

19  dispositive, that is, it would have the same force as Your

20  Honor's determination.  That's not a problem from our point

21  of view.

22        THE COURT: Okay.  Mr. Sakelo?

23        MR. SAKELO: Good afternoon, Your Honor.  Jay Sakelo

24  on behalf of the Property Damage Committee.

25        MR. BERNICK: I'm sorry.  Could I - I don't mean to

1    interrupt, Mr. Sakelo -

2            MR. SAKELO: No, that's okay.

3            MR. BERNICK: Mr. Sakelo's speaking for the Property

4    Damage Committee.  The only claims at issue here are the

5    claims of Mr. Speights' clients.  I can see how the Property

6    Damage Committee may want to give voice to its views, but we

7    really should be hearing from whoever it is that's

8    representing Mr. Speights' claimants.  We've been told again

9    and again that when it comes down to individual claim

10   adjudication, we have to be dealing with counsel for the

11   claimants themselves.

12           THE COURT: Okay.

13           MR. SAKELO: Your Honor, when they filed their

14   original motion for a CMO on this new scheduling order, the

15   Committee filed a response and included in that response was

16   a simple response to the Canadian process they're trying to

17   employ which was, quite simply, you can't abstain.  At the

18   last hearing you asked for additional briefing on that.  We

19   undertook the briefing in the first instance and it made

20   sense to undertake the briefing in the argument in this

21   instance.  So, with that, if I may proceed?

22           THE COURT: Well, I'm going to hear you because

23   frankly I can use any help on this issue I can get, but I

24   think Mr. Bernick does make a good point.  The Property

25   Damage Committee has from the outset been telling me that you

1    don't represent individual claimants, and I take it you would

2    not be the entity that would be defending any objection to

3    these claims whether they're in Canada or in the United

4    States since they're objections to individual claims.

5         MR. SAKELO: That's correct, Your Honor.  We're here

6    objecting to the process.  All along we've been objecting to

7    the process that the debtors have been trying to employ in

8    respect to property damage claims generally.

9         THE COURT: All right.

10        MR. SAKELO: And this instance it just happens to be

11   Mr. Speights is the only one that filed those claims.  Your

12   Honor, I find it interesting - I want to start on the Privus

13   decision because Mr. Bernick makes a lot of weight about the

14   fact that the Canadian courts already know what the law is up

15   there and it will be easy for them to apply that.  What he

16   fails to tell you is that the Privus decision was decided in

17   British Columbia.  The court that is presiding over the Grace

18   Canada proceeding is in Ontario.  It's no different, Your

19   Honor, than if a court in California made a decision and

20   somebody came in and told you, Your Honor, well, they've

21   already decided it in the United States, Your Honor, so you

22   should know what that law is.  It's apples to oranges.  We

23   have a court in British Columbia that's applied the law in

24   British Columbia and in Grace Canada we have a court in

25   Ontario that we need to apply Ontario law.  So we're starting

1    on different levels to begin with.  I want to go through a

2    couple of facts that have been skipped over because I think

3    it's important and it goes to the questions you've asked

4    about how this process works.  As Mr. Bernick said, Grace

5    Canada is the only debtor in the Canadian proceeding and I'm

6    probably using that debtor term improperly but under the CCAA

7    it does define them as a debtor.  It is not a debtor in this

8    proceeding and none of the U.S. debtors have subjected

9    themselves to the jurisdiction of Canada in the Grace Canada

10   CCAA proceeding.  In early 2002, the debtors filed a motion

11   for a bar date in this Court that included U.S. and Canadian

12   claims, and you know, Your Honor, we were here in front of

13   you for many months arguing over what that bar date would

14   look like and who it would extend to, and the debtor

15   specifically included all claims from Canadian buildings

16   against U.S. debtors.  As a result of that bar date, claims

17   were filed by Canadian claimants against the U.S. debtors

18   thereby subjecting themselves to the jurisdiction of your

19   court.  They did not subject themselves to the jurisdiction

20   of any Canadian proceeding.  And I might note, Your Honor,

21   until the debtors filed their disclosure statement in

22   November of 2004, nobody on the property damage side of this

23   case was even aware that they had initiated a proceeding in

24   Canada in respect of Grace Canada.  It wasn't part of the

25   notice program.  They spent $4 million plus dollars and

1    didn't even mention Grace Canada anywhere in that notice

2    program.  So now we have claims that are from Canadian

3    buildings that have subjected themselves to jurisdiction in

4    this Court, and the debtors would have you gloss over the

5    fact that those claims arise from different provinces within

6    Canada.  It's a big country. There are a lot of provinces.  I

7    believe there are eight different provinces currently that

8    claims are pending against the U.S. debtors, primarily Grace

9    Con.  They're ignoring all of that.  Just send everything to

10   Grace Canada, to what we would consider a state court in

11   Ontario.  This is not a federal court.  It's a state court

12   that is presiding over Grace Canada.  They want that court to

13   adjudicate claims across the country of which those claimants

14   have not subjected themselves to the jurisdiction of an

15   Ontario Superior Court.  No different than if a claimant

16   living in Texas files a claim here.  You can't send them to

17   California, Florida, pick another jurisdiction.  They have

18   their own territorial grounds and nowhere in the debtor's

19   brief do they address the fact that just because a claimant

20   is residing somewhere in Canada, whether or not the Ontario

21   Superior Court has jurisdiction over that particular claim

22   that they haven't subjected themselves to that jurisdiction.

23   You asked two straightforward questions, and I think we

24   answered them in the brief that unequivocally the answer to

25   both of those are, no.  You do not - The Canadian court does

1  not have jurisdiction over the claims of Canadian claimants

2  filed against U.S. debtors, and you don't have the authority

3  to send those claims up to that court for adjudication.  Now,

4  Mr. Bernick has modified that today.  Showed us an order that

5  we've seen for the first time that says he's not asking for

6  adjudication.  He's asking for essentially an advisory

7  opinion for you to come back down here and asked for you to

8  either approve or disapprove of that opinion, and I think he

9  was careful to say that the reason he's not asking for a

10  ruling is that would be abstention.  If he was asking for a

11  final ruling in Canada he would be asking you to abstain, and

12  it's clear you have no authority to abstain because there is

13  no proceeding pending in another jurisdiction in respect of

14  Grace Con, the debtor against whom the claims were filed.

15  Their reference to B&W, Your Honor, is interesting because

16  that was a decision entered by Judge Farley, who by the way

17  is no longer sitting on the bench and would not be the judge

18  who would be presiding over these.  He left the bench about

19  three months ago, went into private practice.  A new judge

20  who has absolutely no involvement in Grace Canada with no

21  history in the Grace Canada proceeding that's been pending

22  for five years would now be the judge who's asked to hear

23  this.  So that when we were here the last time Mr. Bernick

24  called this kind of a rent-a-judge.  Mr. Bernick mocked that,

25  but that's really what we're looking at here, Judge.  This is

 1  somebody who has no experience in the Grace Canada

 2  proceeding, no experience in the Privus decision, which was

 3  in a different province, and Mr. Bernick says, Just ship it

 4  up there because it's a lot easier.  It's a lot more

 5  convenient.  Your Honor, convenience doesn't carry the day

 6  here. There's no basis to sending the claims up there, and as

 7  it relates to the B&W Canada claims, in B&W, and we were not

 8  involved in that case, Your Honor, but I have relied upon

 9  others who were involved to find out information and upon our

10  own research, the B&W Canada proceeding that Justice Farley

11  extended to B&W Canada only was to extend the third-party

12  injunction that the Bankruptcy Court in New Orleans entered

13  in respect of the B&W U.S. debtors to apply to the B&W

14  Canadian debtor.  It was one single debtor, same as what we

15  have here.  In the beginning of this case, that Judge entered

16  the same injunction against Grace Canada, extended that

17  proceeding.  Through all the research that Kirkland & Ellis

18  can come up with, all the research that our firm can come up

19  with, nobody has pointed to one case where a Canadian court

20  has adjudicated the claims against a U.S. debtor by Canadian

21  claimants, not one.  All they did was extend the third-party

22  injunction.  I must say, in an ex parte proceeding no less.

23  That decision, by the way, by Justice Farley has been heavily

24  criticized by every academic involved in those types of

25  proceedings in Canada, including the draftsperson of the CCAA

1    who said that he's just gone way too far.  One additional

2    point, Your Honor, Mr. Bernick referred to 18.6 sub (4) of

3    the CCAA, and where he referred to, on the application of a

4    foreign representative or any other interested person that

5    can seek ancillary relief from that court, the only other

6    interested person in that section does not refer to the

7    debtor.  He's saying it's referring to the debtor Grace

8    Canada asking for that relief.  Any other interested person

9    would be somebody wholly unrelated to that proceeding.  He's

10   asking for Grace Canada to have that relief as an other

11   interested person to bring their claims against the U.S.

12   debtors up to Canada.

13        THE COURT: Well, I'm still confused, and I

14   apologize.  I guess I'm missing something that is just not

15   getting through my thick skull, but I am missing the

16   connection between the Grace Canada case and the Grace U.S.

17   case and the fact that some entities who are Canadian

18   entities have filed claims against the Grace U.S. case and

19   what that has to do with the Grace Canada case?

20        MR. SAKELO: It has nothing to do with it.  That's

21   why you're having confusion.  I'm having the same confusion.

22   I think others are as well.  It has nothing to do with the

23   claims.  It just happens to be by Canadian claimants.  They

24   are against U.S. debtors.  They filed - Grace Canada, for the

25   protection as the disclosure statement lays out because it

1   was recently named before the bankruptcy in a number of

2   asbestos personal injury lawsuits.  So they sought protection

3   in Grace - in Canada, for Grace Canada to prevent claims for

4   personal injury being made against Grace Canada.  That's why

5   at the beginning of the Grace Canada proceeding, they sought

6   the extension of a third-party injunction the same one that

7   you or Judge Farnan had entered back in 2001, it was extended

8   to Grace Canada.  That's why that case was implemented.  Now,

9   because you made a comment early on in tune to what the

10  debtors had said in their disclosure statement, they would

11  like to ship the claims up to Canada under their plan, you

12  said, Well, if they can be tried in Canada.  They've gone on

13  to that and have tried to expand the jurisdiction that just

14  doesn't exist.  There is absolutely no relationship other

15  than at some level there are affiliated entities that maybe

16  filed the same tax returns.

17          THE COURT: Okay, so the Grace Canada cases were

18  essentially filed to get a personal injury injunction -

19          MR. SAKELO: It was an extension of the third-party

20  injunction, Your Honor.  It's black and white in their

21  disclosure statement as to why they filed that case.

22          THE COURT: For Canadian Grace entities.

23          MR. SAKELO: Correct.  For individuals - To protect

24  Grace Canada against individuals in Canada filing personal

25  injury claims against Grace Canada.  No relationship to Grace

1     Con.  The entity by the way, Your Honor, as we attached to

2     Exhibit A to our supplemental brief, was formed in 1998.

3             THE COURT: Yeah.

4             MR. SAKELO: So, if that's the case, Your Honor, and

5     they're saying that these are new claims that they're trying

6     to protect Grace Canada against, property damage claims, it

7     doesn't add up.

8             THE COURT: Okay, but, I'm glad you're saying that

9     you've got the same confusion that I have.  Maybe that's the

10    answer to the question, but, just because the Grace Canada

11    case may not be the appropriate vehicle for asking a Canadian

12    court to assume ancillary or supplemental or ancillary

13    jurisdiction to assist in the Grace U.S. cases doesn't mean

14    that that process can't be undertaken.

15            MR. SAKELO: Your Honor, this isn't the case where a

16    claimant filed a claim against the debtor and is asking for

17    relief from the stay to go back and prosecute its claim.

18            THE COURT: Yeah.

19            MR. SAKELO: This is a debtor who came to Delaware

20    and asked for a bar date for all claims, from U.S. claimants

21    and Canadian claimants, and said, If you have a claim, you

22    have to come to Delaware and file the claim.  Now the debtor

23    is essentially asking to leave the jurisdiction of this Court

24    and go somewhere else to have it heard, to a court that has

25    no jurisdiction to begin with over those claims.  Grace Con

1    did not file a proceeding in Canada, just Grace Canada.

2           THE COURT: Well, I understand that Grace Con is a

3    U.S. debtor, but I think this Canadian statute seems to be

4    broad enough that Grace Con or claimants in Grace Con, some

5    interested party in the Grace Con case could go to the

6    Canadian Court and ask that Court to assume some form of

7    ancillary jurisdiction to assist in whatever the United

8    States court needed help with, and I'm not sure that that

9    means that claims adjudication can't be part of it.

10           MR. SAKELO: Again, they're not asking for

11    adjudication.  They're asking for advisory opinions to come

12    back down here and then have you either agree with it or

13    disagree with it, and the reason they're not asking for

14    adjudication, again, is because that would be abstention, and

15    there are no grounds for you to abstain to because there is

16    no other pending proceeding.  They go through this rigamarole

17    citing to Maxwell, citing to Regis Business Systems.  Those

18    would apply if they had submitted themselves to the

19    jurisdiction of the Canadian proceeding, perhaps, but they

20    haven't gone that far.  We don't know why they haven't.  They

21    haven't told us why they haven't.  They haven't told you why

22    they haven't, but they have not done that so they can't avail

23    themselves of the jurisdiction of that court, and in

24    addition, as I said at the beginning, they've skipped over

25    whether that court has jurisdiction over those particular

1    claimants.  Just because they're Canadian, doesn't mean we

2    can go to Ontario because it was a Grace Canada proceeding.

3    Claimants are in Saskatchewan, Alberta, British Columbia.

4    They're in many different provinces, Your Honor.

5            THE COURT: Okay.

6            MR. SAKELO: Thank you.

7            THE COURT: Mr. Bernick, before you start, I see Mr.

8    Speights here.  I think I'd like to hear from Mr. Speights.

9    I don't know that he's filed anything but with respect to his

10   position on behalf of his clients.

11           MR. SPEIGHTS: Thank you, Your Honor.  Dan Speights

12   representing S&R claimants.  I did file a joinder on the

13   initial pleadings and was here at the last hearing -

14           THE COURT: Yes.

15           MR. SPEIGHTS:  - when this matter came up and was

16   prepared to address the Court on the question of should you

17   do this, and Your Honor asked the question in effect can I do

18   this - jurisdictional question, and on that question and I

19   understood you wanted to consider that question first, can

20   you do it.  I have a whole lot to say on whether you should

21   do it on behalf of my clients, I have arguments to make that

22   you should not do it, but I would defer to counsel for the PD

23   Committee on the process question, the jurisdictional

24   question on whether you could do it or not.

25           THE COURT: All right.

1          MR. SPEIGHTS: Thank you, Your Honor.

2          THE COURT: Thank you.  Mr. Bernick, I'm sorry, I

3     think there are other people who may still - Do you want to

4     be heard before Mr. Bernick?  Okay.

5          MR. HOGAN: If I could, please, Your Honor.  Good

6     afternoon, Your Honor.  Daniel Hogan on behalf of the

7     Canadian ZAI claimants.  I apologize, Your Honor.  I

8     understand that you're probably not all that thrilled to hear

9     from me at this juncture, however, the issues that you're

10    discussing, obviously, have great impact on how the process

11    is going to proceed as it relates to these Canadian Zonalite

12    Claimants.  I've only recently been retained by the Canadian

13    Zonalite attic insulation parties in Canada, and as you are

14    well aware, and I assure Your Honor, they were not party to

15    the science trial that has already occurred, nor do I

16    believe, after reviewing the docket, were they contemplated

17    by the science trial that you undertook back in I believe

18    2004.  The reason I'm here today -

19         THE COURT: For which I am working my way through a

20    very technical opinion for about the fourth time to make sure

21    I understand it, so, if they're not part of it, then when are

22    they going to get to be part of it?

23         MR. HOGAN: Well, yes, Your Honor, and really the

24    point of it is, is that there needs to be a Canadian process,

25    a claims process for the Canadian Zonalite claimants, and

1   heretofore, one hasn't been contemplated, I don't believe, by

2   the debtors.  I haven't seen anything evidencing the fact

3   that they have to integrate that into the process. The point

4   being that if the debtors proceed with the U.S. entities to

5   wrap up all of the issues relative to this case, which are

6   huge, but the Canadian Zonalite claims are still out there

7   and haven't been adjudicated.  The claims process hasn't been

8   put in place.  Well, that's going to bring everything on the

9   state side to a screeching halt until those issues - or at

10  least contemplated and resolved at least in terms of putting

11  some sort of framework in place, and to heretofore, we

12  haven't seen anything relative to that.  The other issue, of

13  course, is the whole issue of the binding nature of any

14  determination, and obviously, the Canadian claimants, at

15  least as it relates to the Zonalite claimants, have great

16  concern about how such a process would be implemented.  And

17  so, I apologize.  I don't mean to muddy your waters, Your

18  Honor, anymore than they already are, but there's a 800 pound

19  gorilla standing over in the corner over here named Canadian

20  Zonalite Claimants and if what the debtor's arguing is in

21  fact going to happen with regard to the PD claimants, well I

22  think now is the time for us to stand up and say, We need to

23  be dealt with too, and we need to know the process that's

24  going to be implemented to deal with the Canadian Zonalite

25  claimants.

1           THE COURT: Well, give me all of the bad news.  How

2     many of them are there?

3           MR. HOGAN: Your Honor, I believe it's in excess of

4     20,000 claimants.

5           THE COURT: Oh, that's just a drop in the bucket,

6     Mr. Hogan.

7           MR. BERNICK: There are no actual claims.

8           MR. HOGAN: Well, there hasn't been a bar date yet.

9           MR. BERNICK: There hasn't been a bar - We don't

10    know if there are any.

11          MR. HOGAN: I'm here to say there are, Your Honor,

12    and I'm standing up to be heard.

13          THE COURT: Okay.

14          MR. HOGAN: I believe the Crown may want to have

15    something to say relative to this issue as well.  Thank you,

16    Your Honor.

17          THE COURT: Okay.  Mr. Monaco?

18          MR. MONACO: Good afternoon, again, Your Honor.

19    Thank you for letting me be heard today on this matter

20    because, again, as Mr. Hogan said, we're not trying to muddy

21    the water, but we do need to take this into consideration

22    because whatever Your Honor decides today with respect to

23    this issue is going to affect the Canadian ZA claimants as

24    well as the Crown.  Just to give Your Honor some brief

25    background on this matter.  We have contribution

1    identification claims arising from ten separate class actions

2    which were filed against the U.S. debtors and Grace Canada in

3    Canada asserting claims against the Crown.  These are similar

4    to the ones Your Honor has seen against the State of Montana,

5    basically a failure to warn type of theory.  So, we deny any

6    liability, but to the extent there is anything to be found,

7    it is clearly derivative of Grace's.  And, just to give Your

8    Honor some background about what's going on in the Canadian

9    insolvency proceeding, and I see Mr. Tay is here who

10   represents Grace Canada, he can certainly correct me if I'm

11   wrong, but Justice Farley issued an injunction which I

12   believe also covered certain PD claimants involving these

13   class actions in September of '05.  This injunction issue is

14   similar to the one that the debtor asked in connection with

15   the Libby claimants.  The other developments Your Honor

16   should be aware of in the Canadian solvency proceeding, the

17   court there has a designated representative for these ZAA

18   claimants, and also the Canadian Department of Health, which

19   is the equivalent of the EPA here, has issued a few reports

20   with respect to the ZAI problem in Canada.  There's one that

21   deals with the estimation of a number of homes and also there

22   is also a report on the expert reports that were submitted in

23   connection with the science trial here.  And it's also, my

24   understanding, that Grace was asked - invited to comment on

25   these reports but has not done so.  Your Honor, we have in

1    the past attempted to initiate a dialogue with Grace to try

2    to come to some kind of understanding and agreement with

3    respect to the handling of these claims, including the

4    Crown's claims as well as the underlying ZAI claims.  We've

5    been told that it's either premature or there have been

6    circumstances in connection with -

7        MR. BERNICK: Your Honor, at this point, I would

8    object to counsel characterizing the content of discussions

9    that I know I personally was involved in that were part of

10    the mediation process.  If he wants to get into them, I

11    suppose I might be agreeable to that, but then Your Honor's

12    going to hear all about exactly what Grace told these with

13    respect to their claims, and I don't think that that's what

14    we're here for today.

15        MR. MONACO: That's not what I was going to say -

16        THE COURT: Okay.

17        MR. MONACO:  - to Your Honor.  I was just simply -

18    This is outside of mediation.  We have tried to engage

19    dialogue for whatever reason.  I understand debtor's

20    frustration.  There's a lot of issues floating around in this

21    case, and maybe this is one on their radar screen that's not,

22    you know, at the top of the list, but nevertheless, they do

23    need to address these issues.  I'm actually, despite Mr.

24    Bernick's sense or objection, I'm here actually to support

25    their request to have a Canadian process because right now

1    there is no process, and I think we need to have something

2    that will encompass Canadian experts, Canadian evidence,

3    Canadian law, and right now there isn't anything, and I would

4    seek a commitment from the debtor to work with the Canadian

5    ZA claimants and the Crown to come up with something that the

6    CCAA court would be able to implement so that we can get this

7    underway. The problem is we are behind in terms of the curve

8    with respect to getting these claims processed, and again, we

9    do not have to have a timetable, but it can run parallel to

10   what's going on in the Court here.

11          THE COURT: But the circumstance, the underlying

12   circumstance of the claims is the same, that is that the ZAI

13   claims - Well, let me break them down. The ZAI Canadian

14   claims are claims filed against the U.S. debtors.

15          MR. MONACO: And Grace Canada.

16          THE COURT: And Grace Canada debtors.

17          MR. MONACO: Yes, Your Honor.

18          THE COURT: And the indemnity claims are also filed

19   against Grace Canada but not the U.S. debtors.

20          MR. MONACO: Your Honor, we did file contribution

21   indemnification and proofs of claim against U.S. debtors

22   because the claims were joint against both the U.S. debtors

23   and Grace Canada.

24          THE COURT: Okay, so the ZAI claims and the

25   indemnity claims are against both the U.S. and the Canadian

1    debtors.

2         MR. MONACO: That is my understanding, Your Honor.

3         THE COURT: But the personal injury S&R claims are

4    only filed against the U.S. debtors.

5         MR. SAKELO: Those are property damage claims.

6         THE COURT: Oh, the Speights claims, I'm sorry.

7    They're only filed against -

8         MR. SAKELO: Speights & Runyan.  Traditional

9    property damages claims only against U.S. Grace debtors.

10         THE COURT: I apologize.  I knew they were property.

11    If I said personal injury, I'm sorry.

12         MR. MONACO: Right, and, Your Honor, and the point

13    being that, you know, we understand there's some differences

14    but what Your Honor decides today could influence how this is

15    handled going forward.  We do believe that there should be a

16    Canadian process.  Now, whether it's binding or not, that's

17    something I think the debtor needs to have input from the ZAI

18    claimants as well as the Crown and the Canadian court.

19    Again, it's the detail, but a very, very important one that

20    needs to be discussed, and, Your Honor, I would just sum up,

21    I really don't have much more to say.  I did want to bring

22    this to the Court's attention along with Mr. Hogan's clients

23    that this needs to be addressed, and we would like to get

24    some kind of process underway, get the discussions going, and

25    with that, I'll wrap up.  Your Honor, the only other thing I

1    would add is I filed an objection to exclusivity, which

2    essentially, based on what I've just stated to the Court, I

3    would not want to burden the record any further on September

4    11th, or have my client incur the costs of having to fly out

5    to Pittsburgh, so I would request I could just participate by

6    telephone, because I would have nothing much more to add.

7         THE COURT: You can participate by phone.

8         MR. MONACO: Okay, thank you, Your Honor.

9         THE COURT: Anyone else before Mr. Bernick?  Okay.

10        MR. BERNICK: Maybe we'll find out something new

11   from Canada.  I'd like us to focus for half a moment on this

12   and then Mr. Tay who has been sitting back there busting at

13   the gills, will, I'm sure, have something further to offer.

14   I don't see any - This will do.  The whole issue here, and

15   Your Honor has asked a couple of questions that relate to

16   this, there's first of all the question of what is the power

17   or jurisdiction of the Canadian proceeding?  What is it?  And

18   thus far, again, I cited two sources of information to answer

19   that question.  One is the statute and two are the decisions,

20   and Your Honor has seen no other decision, has seen no other

21   interpretation of the statute.  The only thing that we've

22   heard is kind of a ride-by shooting of Justice Farley because

23   (a) he's no longer on the bench, and (b) academics have been

24   very critical.  I understand that there is a professor who

25   has had some commentary on Justice Farley but thus far his

1    decisions have been cited and approved and followed by the

2    Canadian court.  So that's what we're talking about.  We're

3    not talking about whether Justice Farley still practices law

4    or not.  We have a U.S. proceeding here, and the question is,

5    what then is the jurisdictional ambit of the CCAA proceeding?

6    And as we've indicated, it is an ancillary proceeding.  The

7    Canadian legislature granted the power to this Court to

8    conduct the proceeding that is ancillary to a foreign

9    proceeding, and that's the language of the statute.  It is a

10   foreign proceeding.  Now, in the Babcock & Wilcox case, in

11   the decisions that we've cited to the Court in the briefs,

12   the Court specifically found that the Babcock & Wilcox U.S.

13   proceeding was a foreign proceeding within the meaning of the

14   Canadian statute and thus that there was power under the CCAA

15   to enter various orders at the request of Babcock & Wilcox of

16   Canada, which was not a debtor.  So there was no parallel

17   bankruptcy proceeding.  There was no bankruptcy proceeding in

18   which Babcock & Wilcox came over to Canada.  There was a

19   proceeding that was initiated by B&W of Canada, not a debtor,

20   but a petitioning party saying, Commence this ancillary

21   proceeding, ancillary to a foreign proceeding.  So it's kind

22   of like In Re the Babcock & Wilcox debtor's case in the

23   United States.  Here is what we're going to do.  And Justice

24   Farley said, Okay, B&W Canada is here making a request.

25   They're solvent.  That doesn't make a difference.  They can

1    just be an interested party under the foreign statute.  There

2    is a U.S. bankruptcy proceeding.  I find that the U.S.

3    bankruptcy proceeding is a foreign proceeding within the

4    meaning of the CCAA and as a consequence the CCAA can proceed

5    at the request of B&W and grant relief.  Now, they say, Well,

6    you haven't told a case where they decided the merits of a

7    claim, but, but, but - Sure.  We have a whole - We've got

8    about a thousand different things that could take place in

9    Canada, and we don't have a case where exactly the same thing

10   happened as we have presented here, but all of those cases

11   that we have are cases in which rights of claimants are being

12   affected.  For example, the rights of claimants against

13   Babcock & Wilcox in the United States were being affected

14   because the channeling injunction of the U.S. proceeding was

15   extended to include the plaintiffs in the Canadian cases of

16   Babcock & Wilcox.  So, it's not deciding the merits of in a

17   narrow sense, but it's certainly affecting and limiting and

18   interpreting their rights.  Same thing has now happened in

19   the Grace case.  In the Grace case, the Grace case was

20   initiated by Canadian Grace.  Not a debtor.  Not insolvent,

21   but an interested party, and it was initiated and a finding

22   was made that this case here before Your Honor, is a foreign

23   proceeding with respect to the CCAA, therefore, the Canadian

24   court has power to act in connection with the foreign

25   proceeding at the request of Grace Canada.  So the case that

1    exists, the proceeding that's been filed and exists in Canada

2    today is an ongoing proceeding where the petitioner was Grace

3    Canada, but this is not like a U.S. bankruptcy case where the

4    debtor's estate defines the scope of the case, this is an

5    ancillary case where it is there to assist, in a sense, the

6    race or the proceeding in the U.S.  So the key finding is

7    that this is the foreign proceeding.  This then becomes the

8    ancillary proceeding.  It can be initiated by any interested

9    party, and it can act.  So all that we're saying is, Your

10   Honor, we believe it's appropriate here in the U.S. to have

11   the CCAA proceeding act with respect to this issue.  It's

12   within the power of the CCAA court.  It's within the power of

13   this Court based on comity principles to allow this Court to

14   proceed in whatever fashion suits both the Canadian statutory

15   purposes and your purposes.  Now, they say a couple of

16   different things, and I want to - let's see, here are my

17   notes.  They say, Gee, we can't avail ourselves of this

18   proceeding, suggesting that somehow we have got to be there.

19   That's just flat wrong. The statute says any interested

20   party.  We are here.  This proceeding is designed to serve

21   your process. It doesn't have to be at our request.  The

22   statute says it can be any interested parties, and we see

23   that Grace, that B&W of Canada went through exactly the same

24   kind of process, and we quoted others to you as well.  They

25   say, There's no jurisdiction in Canada over Mr. Speights'

1   claimants who are Canadian.  That's not the issue.  The issue

2   is Your Honor's jurisdiction.  Your Honor has jurisdiction

3   because those folks came into the U.S. court and submitted to

4   the jurisdiction of the U.S. Court, and if Your Honor then

5   says, I want their rights adjudicated to the point of telling

6   me what Canadian law says by the Canadian proceeding, this

7   court in Canada doesn't have to have independent personal

8   jurisdiction over Mr. Speights' clients at all.  That's a -

9   completely misses the point.  The point is that they

10  submitted to this proceeding, it is Your Honor's proceeding

11  that creates the touchstone for whether the CCAA has the

12  power, the court has the power to proceed.

13       THE COURT: I truly can't send claims to a court

14  that doesn't have jurisdiction over those claims.

15       MR. BERNICK: No, the court does have jurisdiction

16  in the sense that they have ancillary jurisdiction - They

17  have ancillary jurisdiction to assist Your Honor in deciding

18  what to do with those claims.  You don't - Your Honor, again,

19  Mr. Becker suggested I use this analogy and maybe he's right.

20  It's the same kind of thing as if the Court of Appeals for

21  the Third Circuit refers an issue of the interpretation of

22  Pennsylvania law to the Pennsylvania Supreme Court on

23  certification.

24       THE COURT: Well - that's what I was trying to get

25  to earlier in my thought process as to whether it is the same

1    thing or not, but the difference is that when the

2    Pennsylvania Supreme Court then gives the Third Circuit its

3    view as to what Pennsylvania law is, that's what the Circuit

4    then treats Pennsylvania law to be.

5         MR. BERNICK: That's correct.  However, it is then

6    up to the Circuit, depending upon the question that was

7    certified to decide what impact is going to be given to that

8    in the case.  We're not saying that Your Honor should

9    reinterpret Canadian law.  Once the Court in Canada

10   interprets Canadian law it seems to us that that would be

11   pretty much dispositive of what the Canadian law requires.

12   But if Your Honor believes that there's something about the

13   process in Canada that was a failed process or some other

14   aspect of their rights that have been impaired, Your Honor

15   would still have the ability to address those kinds of

16   issues.  You wouldn't have to decide Canadian law over again

17   because Canadian law has already been decided.  But -

18        THE COURT: That's where I - To the extent that it

19   were done on some papers, you know, a summary judgment

20   process, I can follow your logic, but if it gets to the point

21   that you get to the next step, which you said in the event

22   that there was a failure of the summary process would involve

23   a trial, I don't see how I retry cases.

24        MR. BERNICK: No, no, it would be a trial - Well, I

25   did say that in the sense that - Let's assume, for example,

1    that on summary judgment there is an issue of fact that

2    relates to whether the statute of limitations was triggered

3    or not or something like that.  We're not going in the same

4    fashion that we went before in connection with the U.S.

5    claims.  We're not going to sit there and litigate the

6    Canadian claims one by one.  I didn't want to be in a

7    position such that the Court was powerless to conduct an

8    evidentiary hearing in order to decide a fact.  There might

9    be facts that are of key importance in terms of applying the

10    law, and I think that if the Canadian Court were confined to

11    summary judgment, although we really think summary judgment

12    is in fact going to be where we're going.  We are clearly

13    going to file for summary judgment based upon <u>Privus</u>.  We're

14    clearly going to file for summary judgment based upon the

15    legal issues articulated in <u>Privus</u>.  We're going to file for

16    summary judgment based upon the statute in repose in Canada,

17    which is a very distinctive statute of repose.  So we think

18    that that's going to weed out the claims very effectively,

19    but we don't know, it's hard to foresee, that there might be

20    some factual issue that arises in that process and if so, we

21    don't want to leave the Court in Canada hamstrung to at least

22    make a record of what the facts are that then are critical

23    from a legal point of view.  If Your Honor believes that that

24    wasn't appropriate or believes that the record somehow is an

25    improper record, Your Honor would retain the jurisdiction to

1  say so, but to give the Canadian Court proper running room to

2  decide the application of Canadian law we didn't want to just

3  limit it to summary judgment, and that's why we extended it

4  beyond that.  I don't really - Again, you take the appellate

5  situation.  The appellate court can frame a very narrow issue

6  for the state court to decide and then reserve to itself the

7  jurisdiction to resolve all other matters, and I think that

8  that same kind of flexibility should be here.  I just want to

9  add a couple more things in response to some statements that

10  were made by counsel and then I'm going to give Mr. Tay an

11  opportunity to stand up here for a moment if there's anything

12  further that needs to be covered.  First, with respect to the

13  idea that we omitted to tell Your Honor that <u>Privus</u> was in

14  British Columbia.  Yeah, it was in British Columbia.  That

15  doesn't mean that the other provinces would have different

16  law.  It was British Columbia.  Now what does that mean?

17  Does that mean that we have to then initiate CCAA proceedings

18  in all of the different provinces so we can get provincial

19  judges from each province to articulate whether there are

20  nuances or differences between the provinces?  I don't think

21  so.  The CCAA proceeding can address whether there are

22  nuances.  If they want to say - if Mr. Speights wants to say

23  up there, <u>Privus</u> is really confined to British Columbia law,

24  that's something that the Court in Ontario has the perfect

25  competence to address and take a look at variations.  The

1   alternative is that - we then say to Your Honor, we want you

2   to decide whether British Columbia law, which was <u>Privus</u>

3   really should be binding with respect to Ontario claimants or

4   Quebec claimants or Saskatchewan claimant.  Is that what

5   they're really saying?  Is it Your Honor can be better able

6   to decide whether the variations in provincial law are

7   material than a Court sitting in Ontario?  I don't really

8   think so.  He said, Well, this is not a federal court

9   proceeding, doesn't understand the jurisdictional setup in

10  Canada.  The state courts do have the power to apply and

11  execute and implement grants of jurisdiction and authority

12  under the federal statutes in Canada.  So it is a state court

13  essentially acting as a federally empowered court.  That was

14  a misstatement.  And then Your Honor was told, Well, they

15  don't really have any prior experience in this, and that

16  again, is a real irony because certainly the Canadian courts

17  will have much greater experience with respect to the

18  application of Canadian law than anybody we here have in the

19  United States.  Last point is the ZAI.  We always welcome

20  support.  It was hard for me to figure out what it was

21  actually support for.  Let me say this with respect to ZAI.

22  First, we had an all in very, very expensive, very extended

23  ZAI proceeding here in the United States focused on the

24  science of ZAI.  Remember, we went through the process of

25  crafting the question.  The ZAI science trial has taken

1    place, and we appreciate that Your Honor is going back over

2    the opinion, but that science trial is not a question of is

3    the science different in Canada than it is in the United

4    States?  That's a science trial.  Counsel was specially

5    picked and paid to represent the interests of all ZAI

6    claimants with respect to that science issue.  Now, it may be

7    that after the science trial is done there are legal -

8    Canadian legal issues that have to be resolved with respect

9    to Canadian ZAI claimants.  I can certainly entertain that

10   possibility and we're certainly open, if we're proceeding in

11   Canada, to talk about getting Canadian law interpreted with

12   respect to Canadian ZAI claims.  But, we do have a science

13   trial.  That science trial was designed to be all in, and

14   therefore, I don't know how the position that was just

15   articulated really is very different from where we're already

16   at with ZAI, which is, let's see what happens with the

17   science trial, and then after that we can then determine what

18   happens with respect to other issues concerning ZAI if there

19   are any other issues with respect to ZAI.  And having now

20   said that, I'd like to give Mr. Tay just a moment, if he

21   could, to stand up and tell me what I - tell the Court what

22   I've gotten wrong.

23            MR. TAY: Good afternoon, Your Honor.

24            THE COURT: Good afternoon.

25            MR. TAY: Derrick Tay.  I'm Canadian counsel for

1   Grace.  I also happen to be or I was Canadian counsel in the

2   Babcock & Wilcox case as well, and so I'd like to sort of

3   help Your Honor to understand this issue because I can see

4   it's troubling you, and I think the first point of confusion

5   is thinking of the filing in Canada as the Grace Canada

6   filing because really, 18.6 doesn't even come into play at

7   all unless you have a foreign proceeding.  That's what it's

8   all about.  So, someone has to come to a court in Canada and

9   say, I have a foreign proceeding going on somewhere outside

10   of Canada, and I need help with that foreign proceeding.  Who

11   that someone is, is almost irrelevant.  The statute allows

12   any interested party to do it.  In this case it happened to

13   be Grace Canada, Inc.  Now, to put it - to flip it over, I'm

14   involved, for example, in a Chapter 15 case right now where

15   the monitor in a Canadian case, which is the principal

16   jurisdiction, goes to Judge Raygoff (phonetical), in New York

17   and says, I need help.  We need an ancillary proceeding under

18   Chapter 15 in the U.S. in respect of this Canadian case.  No

19   one thinks of it as the monitor's filing.  It's exactly the

20   same.  The filing is in respect of the U.S. cases not in

21   respect of Grace Canada itself.  It's in respect of the U.S.

22   cases, the foreign proceeding.  It was the case in B&W

23   Canada.  It is the case in Grace.  In B&W Canada, for

24   example, there was no Canadian issue at all.  There were no,

25   you know, at the end of the day, every order that the

1  Canadian court implemented was an order made in respect of

2  the U.S. case to give effect to it in Canada because

3  notwithstanding the jurisdiction that the Court takes in the

4  U.S., that order, unless recognized by a Canadian court will

5  not have effect in Canada.  And so, the purpose of the

6  Canadian court's involvement was to do exactly that, to help

7  and assist and to give effect to those orders as they're made

8  by the U.S. Court and to give effect to then in Canada.

9  Happened in B&W, happened in Grace.  Solvent company which

10 caused a little bit of an issue because generally the CCA's

11 an insolvency statute, but going under 18.6 sub (4) which

12 says, Any interested party can bring this motion, the court

13 in Canada found that that interested party doesn't have to be

14 insolvent because it's not a proceeding in respect to that

15 company.  It's a proceeding in respect of a foreign

16 proceeding which this Court has decided - which the Canadian

17 court has decided to help.

18        THE COURT: So, the filing of Grace Canada in Canada

19 is not an insolvency proceeding.

20        MR. TAY: No, no.  It happens to be under an

21 insolvency statute, which is why it was so unique.  Babcock &

22 Wilcox was the first time it was done, and it became the

23 precedent and has been followed every since.  So it's not an

24 insolvency filing.  Babcock & Wilcox Canada was not

25 insolvent, neither was Grace Canada insolvent, but it brought

1   the proceeding under Section 18.6(4) as an interested party

2   saying to the Canadian court, please recognize the U.S.

3   proceeding as a foreign proceeding.  And it is that finding

4   in each of the cases - the first thing that the court finds

5   is, Yes, I find the U.S. Chapter 11 case to be a foreign

6   proceeding, and from that point, it derives its authority.

7   From that point it then looks at 18.6 and says, now that I've

8   found a foreign proceeding, I now have the power to do

9   whatever is necessary to assist the foreign proceeding to

10  help to implement and all the rest of it that Mr. Bernick's

11  read to you.  So that's how that particular statute works.

12  It's like a Chapter 15 and the applicant is like a foreign

13  representative.  The case is not in respect of that

14  applicant.  It's in respect of the foreign proceeding.

15          THE COURT: All right, I understand that point, but

16  I'm still a little fuzzy on how the Canadian court can

17  exercise jurisdiction over United States claims.

18          MR. TAY: The court can do that because it is

19  replying to your seeking their assistance to do that.  So,

20  you have jurisdiction over the U.S. claims, there's no

21  question about that.  They were filed in the U.S. but you

22  look at it and you say, Well, the facts are Canadian, this

23  all happened in Canada, the claimants themselves are

24  Canadian.  I have an ancillary proceeding in Canada. I have a

25  court that's better equipped to deal with these issues, so

1    I'm going to seek their assistance.  So, really, they're

2    doing it at your request.

3        THE COURT: So the Canadian long-arm statute is

4    broad enough that it will exercise jurisdiction over claims

5    filed in a foreign proceeding, simply because the U.S. Court

6    that does have jurisdiction asks it to exercise -

7        MR. TAY: It's not a long-arm statute.  It's a clear

8    - you know, it's a - Parliament has decided that this is a

9    good thing to do and the statute clearly says, clearly says,

10    that they can do - the court can do whatever it thinks is

11    appropriate to assist you, and -

12        THE COURT: How do we get one of those bills passed

13    in Congress in the United States.

14        MR. TAY: Well, that's why we get things done a lot

15    faster.

16        UNIDENTIFIED SPEAKER:  This is why we have the

17    United States.

18        MR. BERNICK: That actually has been discussed in

19    the Rules Committee, because it gives them much more

20    flexibility to give relief without having a full-blown

21    Chapter 11 proceeding.

22        THE COURT: Okay.

23        MR. TAY: Can I help you with any other questions?

24        THE COURT: Probably, but at the moment, I'm sort of

25    overwhelmed, so I'm not sure what to ask.  Thank you.  If I

1    think of it, I'll get back to you.

2          MR. TAY: All right.

3          MR. SAKELO: Your Honor, I want to make this quick.

4    A couple of observations.  Under Mr. Bernick's premise here,

5    he says, Any interested party or any interested person can

6    take advantage of that proceeding.  Tomorrow, you're going to

7    have Federal-Mogul walk in here, Armstrong, every other

8    debtor and say, There's a Grace Canada proceeding that I wish

9    to avail myself of.  Under his construct, they can do that.

10   That court there can take jurisdiction over any of your cases

11   because those are foreign proceedings.  There has to be no

12   connection to the U.S. debtors under his construct.  Your

13   Honor, it can't go that far?

14         THE COURT: Well, no, that - Mr. Bernick, I don't

15   think is arguing that, and if I understand Mr. Tay correctly

16   there has to be a foreign proceeding in the United States

17   that the Canadian court recognizes.  The Canadian Grace

18   Canada case is not, I think, going to recognize the Federal-

19   Mogul case as somehow ancillary to the Grace Canada case.

20         MR. SAKELO: They keep harping on any other

21   interested person.

22         THE COURT: Yes, but, how does Federal-Mogul have an

23   interest in Grace Canada?

24         MR. SAKELO: No more so than the Grace debtors do,

25   Your Honor.

1              THE COURT: Well, the Grace -

2              MR. SAKELO: They're saying that Grace Canada has -

3    the Grace Canada proceeding has no relationship to this

4    proceeding.  It's there solely to recognize this proceeding

5    as a foreign proceeding.  That's it.  They just told you

6    that.  Mr. Tay just told you that.

7              THE COURT: But isn't there a corporate affiliation

8    between the Grace U.S. debtors and Grace Canada?

9              MR. SAKELO: Yes.

10             THE COURT: Okay.

11             MR. SAKELO: At some level there is.

12             THE COURT: Well, that makes all the difference, I

13   would think.

14             MR. BERNICK: Maybe I could save some time, Your

15   Honor.  What we said was, Any interested person, that means

16   the only people that can make the request are interested

17   parties, and there are interests that Grace Canada has.  But

18   that's only the first prong.  You then go to, well, what is

19   the foreign proceeding with respect to which you then define

20   what the CCAA can do by way of ancillary activities?  Here

21   the foreign proceeding is the Grace cases, not the Federal-

22   Mogul case, it's not the whatever case, so that becomes the

23   touchstone then for what can be taken up in the CCAA.  We

24   never said there was no relationship at all.  That's

25   completely false.  The whole idea is, it is ancillary.

1    They're totally tied together.  Your Honor becomes the

2    touchstone for what it is that the CCAA proceeding can take

3    up.

4            THE COURT: Okay.

5            MR. SAKELO: Your Honor, I submit that there - they

6    keep waffling back and forth whether it has to be a

7    connection, there isn't a connection. Grace Canada is there

8    for convenience -

9            THE COURT: Let me take care of that one.  I think

10   there has to be a connection.  So to the extent their

11   argument can somehow be interpreted otherwise I don't agree

12   with it, but -

13           MR. SAKELO: Your Honor, with respect to the issue

14   of whether you can assume jurisdiction over the claims here

15   because Canadian claimants filed claims in this Court and now

16   transferred them to another court that has jurisdiction, we

17   just keep following the bouncing ball.  Remember, none of

18   those claimants had any notice whatsoever of the Grace Canada

19   proceeding.  So now they've submitted themselves to the

20   jurisdiction of this Court pursuant to your bar date order.

21   They knew what they were doing by making that choice.  Now -

22           THE COURT: But they wouldn't have claims against

23   the Grace Canada proceeding if it's not a bankruptcy

24   proceeding anyway.

25           MR. SAKELO: They may have had independent claims

1    against Grace Canada.  Just because -

2            THE COURT: But it's not an - but that's where I

3    have been - somehow I've mislead myself.  I thought that the

4    Grace Canada case was an insolvency case for Grace Canada.

5    That's apparently not the circumstance.  It's been filed only

6    as an ancillary.  We can call it a miscellaneous case.  Like

7    an adversary proceeding before Chapter 15 took place here,

8    that's what it would have been here.  It would have had the

9    name of Grace Canada with an adversary number, and in that

10   case there would have been proceedings that went on with

11   respect to the main case as to which it was ancillary, but it

12   is not a bankruptcy proceeding of its own.  So, if that's the

13   case and Grace Canada is not an insolvency proceeding in

14   Canada, then there are no claims that can be filed in that

15   specific case because it's not a bankruptcy case.

16           MR. SAKELO: Well -

17           THE COURT: There may be claims against that debtor

18   -

19           MR. SAKELO: That's correct, but let's not forget,

20   Your Honor, that they have sought injunctions in that

21   proceeding -

22           THE COURT: Yes.

23           MR. SAKELO:  - to protect that debtor - As I said

24   at the beginning, I might be using the wrong word - that

25   debtor from having claims asserted against it.  They have an

1    injunction against that.  So it may not be an insolvency

2    proceeding as we think of it, but they have the benefit of

3    injunctions entered to prevent claims being filed against

4    that entity.

5         MR. BERNICK: And the basis - Correct.  And the

6    whole basis for that was that the court in Canada made the

7    determination that that relief was appropriately ancillary to

8    serving the needs of the U.S. case, and there are

9    relationships between Grace Canada and Grace U.S., if there

10   were absolutely no relationship that relief would not have

11   been necessary, but the court made a finding that it was an

12   appropriate foreign - it was a foreign proceeding and that

13   relief was appropriate as being ancillary to the foreign

14   proceeding.

15        THE COURT: Well, just because there is an

16   injunction though does not mean that it's an insolvency case.

17        MR. SAKELO: That's correct, Your Honor, and I'm not

18   suggesting that it is an insolvency case.

19        THE COURT: Okay.

20        MR. SAKELO: It's also important to note that what

21   we've heard today is the Canadian court has only implemented

22   orders, and Mr. Bernick just repeated that, to protect

23   matters or to continue matters that are taking place here.

24   So, in essence what we're hearing is that court is there just

25   to benefit this proceeding.  Judge, they're renting the court

1    again.  It goes back to Mr. Baena's comments at the last

2    hearing.  There's no tie to that court.  They're asking for

3    you to lift the stay to allow the defendant to go back up

4    there and prosecute the objections.  That's what they're

5    asking you to do, with no basis.  That's an abstention, Your

6    Honor.  There's no proceeding.  They make reference in their

7    supplemental brief on Chapter 15 and how that's so important

8    and that we have to look at the legislative intent.  Chapter

9    15 on its face, Your Honor, says it has to be the same debtor

10   in both proceedings.  So if they're trying to indicate that

11   Congress here is telling you what to do by their new

12   legislation.  It's not the same debtor, Your Honor.  We

13   submit there's no basis for that court to assume jurisdiction

14   over the Canadian claims against U.S. debtors and that you

15   have no authority to transfer those claims to Canada.

16          THE COURT: Okay.  Mr. Bernick, I would love to send

17   these claims to Canada and have either the advice or the

18   final rulings or the whatever it would take of the Canadian

19   court, but frankly, I think I'm going to be creating an

20   appellate issue in doing that which is going to further delay

21   the outcome of this case when the debtor is saying that you

22   don't really care much whether it's litigated here or there.

23          MR. BERNICK: We care very much otherwise we

24   wouldn't have done this in the sense that we really think

25   that it - given the very unique circumstances that are

1    present in Canada and the track record of they're being used

2    in other cases, it just seems like, you know, you've got an

3    opportunity to get a Canadian court to take a pass on this,

4    and it's totally not only legitimate, Canada wants to do it,

5    and they won't charge you rent.  And so, why not?  But, if

6    Your Honor - That's why I said a little while ago, if Your

7    Honor would feel more comfortable in taking these issues up,

8    we're happy to do it.  We just - We want to get the process

9    done because we think that it's going to be pretty

10   straightforward.

11          THE COURT: It seems to me that I have the ability

12   to require the parties to retain an expert for the Court's

13   use, and if I need one, then I guess that's the way I can do

14   it in this case.

15          MR. BERNICK: That's fine.

16          THE COURT: So, if I need expert help, and I may,

17   then maybe the better rationale, rather than having yet -

18   because I believe this would be in the final order because

19   otherwise jurisdiction - I don't know what would happen in

20   jurisdiction, so, I think it would be creating an appellate

21   issue that would really further delay things.

22          MR. BERNICK: Then what we would do, Your Honor, and

23   maybe we'll get to it in connection with the property damage

24   CMO is I don't think it really would - We would simply create

25   a track in the CMO for Mr. Speights' Canadian claims and seek

1    to have them litigated, in fact, I think the language that we

2    already have in the proposed CMO would be very amenable to

3    this, and we'll get Mr. Tay involved and they can retain

4    Canadian counsel if they want, and we'll tee it up for Your

5    Honor.  We're happy to do it.  We just thought this would be,

6    you know, a better way to go, but that's fine.

7              THE COURT: Well, it may be a better way to go in

8    terms of the initial rulings, but I don't know in terms of

9    the delay that the debtor contends it doesn't want to have in

10   the case whether it would be.  So, I think on balance, it

11   would probably be better simply to do it here and to figure

12   out a method by which I can get whatever expert help I need,

13   and if Justice Farley is no longer on the bench and is in

14   practice and he's out there and serving as expert and maybe

15   he's somebody –

16             MR. BERNICK: I'm not sure I want to subject Justice

17   Farley to all these scathing criticisms, but I'm sure that we

18   will have no problem whatsoever, Your Honor, I think in

19   finding people in Canada to weigh in on this given the effort

20   that was dedicated to the Privus case.

21             THE COURT: Okay.

22             MR. BERNICK: I know we've been going for awhile and

23   probably longer than anyone thought that we would on this

24   issue.  Let me just preview what's coming up and Your Honor

25   then can decide whether you want to take a break or whatever

1    is most appropriate.  The next area is we have the last of

2    the thirteenth omnibus issues with respect to Mr. Speights'

3    claims, and this relates to the question of whether a

4    purported grant of authority to Mr. Speights to present the

5    claim on behalf of the claimants after the fact satisfies the

6    rules. That would be next.  Then we have the Anderson

7    Memorial matter where Your Honor has asked us to report on

8    the notice program.  Your Honor will recall that you asked us

9    to do the notice program that was actually used with respect

10   to the property damage claims, and then the CMO is the last

11   real issue for property.  On personal injury we then have the

12   bar date and the CMO on personal injury and then a status

13   report on the questionnaire.  I don't think the personal

14   injury will go on as long as this property.  It might be

15   better if we tried to maybe get through the - at least the

16   next item before we took a break.  I think we can do that,

17   but obviously we stand at the Court's pleasure.

18           THE COURT: That's fine.

19           MR. BERNICK: Okay.

20           MR. BAENA: Your Honor, wouldn't it make more sense

21   since we've already alluded to it, to talk about the CMO now

22   before we go into claims.

23           MR. BERNICK: Well -

24           THE COURT: To talk abut what, Mr. Baena?

25           MR. BAENA: The PDCMO.

1          MR. BERNICK: I'm happy to do that too.

2          THE COURT: That's fine.

3          MR. BERNICK: Yeah, I'm happy to do that.

4          MR. BAENA: Is that okay with Mr. Speights?

5          MR. SPEIGHTS: That's fine with me.

6          THE COURT: All right, so you want to talk about the

7   scheduling order with respect to the rest of the fifteenth

8   omnibus, which is number 6 or simply to go into the PDCMO

9   process altogether?

10          MR. BERNICK: It's the PDCMO process.  The number -

11          THE COURT: Nine.

12          MR. BERNICK: Number 9, yeah, and I think that this

13   will be another interesting discussion.

14          THE COURT: Okay, before we get there, I want to

15   wrap up the prior discussion.  You're going to get together

16   with folks and submit an order that will set up a process to

17   adjudicate the Canadian claims here?

18          MR. BERNICK: I'm going to work that into actually

19   the PDCMO discussion.

20          THE COURT: All right.

21          MR. BERNICK: And then, depending upon how Your

22   Honor reacts to it, that will at least make us more focused

23   in what we would then draft up by way of an order that is

24   specific to the Canadian claims.

25          THE COURT: So, I'll take an order from the debtor

1    then that denies the debtor's motion -

2           MR. BERNICK: That will be fine.

3           THE COURT:  - with the understanding that the

4    process will be incorporated into the PDCMO.

5           MR. BERNICK: That's fine.

6           THE COURT: All right.

7           MR. BERNICK: Let me just - we had a long discussion

8    last time, as Your Honor will well recall, on the history of

9    what's happened in our efforts to get a litigation track

10   going with respect to the PD claims, and I'm not going to

11   revisit the details of that, but I'll create what I hope to

12   be an accurate hook to that and where we are today and where

13   we've gone in the last 30 days.  I think it's probably fair

14   to say that most of the discussion that we had with respect

15   to PD claims last time focused on what is Phase II as it was

16   then known.  I think there was an effort to change the label

17   at the end, but I don't know that that really is all that

18   germane.  I think Your Honor came to the view that what you

19   always had anticipated would be done in the Phase II hearings

20   or the April hearings, I'll just refer to it that way, is

21   that there would be litigation over gateway objections that

22   pertained to the PD claims, and that those gateway objections

23   would in fact be lodged as to individual claims and what that

24   then gave rise to was the issue of notice, and I think that

25   that's where we ended up last time. In the course of that

1    discussion, we did point out the fact that the fifteenth

2    omnibus objections that have been lodged in September of 2005

3    provided detailed notice to each and every claimant about

4    each and every objection that was to be made with respect to

5    their claims, and further, the dates when those objections

6    would be heard.  Remember, I displayed, Your Honor, the

7    tables that set out, you know, objections E-1, E-2, E-3 and

8    then the dates when they would be heard, and then with

9    respect to each claimant or each claim, we indicated which of

10   the objections - we believe that there was complete and

11   adequate notice and Your Honor said, I hear you but I want to

12   have a different notice anyway.  So, we went ahead and Your

13   Honor actually focused on it in this language.  This is at

14   page 170 from the last hearing.  You said, I will make it

15   clear, I think, I think we need to give a different notice.

16   Mr. Speights is here.  Mr. Dies is here.  Counsel for

17   Prudential is here.  I don't know, Mr. Speights, whether you

18   need additional time to supplement whatever you have

19   submitted.  Gentlemen, the same question for you.  If you

20   need some additional time to supplement because you're going

21   to participate on behalf of your clients in Phase II, I'd

22   like to work out a schedule to get it in.  Meanwhile, the

23   other sixty-five other claimants - and you were there making

24   reference to claimants who were not represented by Mr.

25   Speights, Mr. Dies, or Prudential, are to get a different

1    notice, a new notice, I should say, that reminds them that if

2    they choose to participate in the process whatever rulings

3    come out will be binding and not re-litigated, et cetera, et

4    cetera.  It is an estimation process.  It is an allowance

5    process but it isn't an estimation process.  And I then had

6    some further discussion and then Your Honor says, Well, I

7    think we'll give them a specific notice that says, you know,

8    this is your chance.  Discovery is starting.  Lay it all out

9    and if you do not participate in discovery and do not come to

10   the trial, then you may have your claim disallowed for all

11   purposes, et cetera.  So, those were the directions that Your

12   Honor gave.  Now, at that point I then say that I think this

13   is really a matter of scheduling at the end of the day.

14   Those were - that was my next statement because I thought

15   that that's really a question of scheduling at the end of the

16   day.  We're talking about Phase II.  So, we thought that what

17   would be appropriate was to essentially solicit the views of

18   Mr. Dies and Mr. Speights and Prudential on how much more

19   time they needed, and then further to provide a notice to

20   everybody else so that they could be brought up to speed.  So

21   - and to stay within the scheduling parameters that Your

22   Honor set up.  So that's what we did.  We submitted a draft

23   along those lines, and that prompted Mr. Baena and his

24   constituency, albeit again the position was taken that the

25   claimants would have to speak for themselves through their

1   own counsel, but they came back with the position that says,

2   No, you haven't followed what Judge Fitzgerald said you

3   should do.  What you should do is give notice to everybody

4   that they should come - they had the opportunity to come in

5   and basically express their views on whether there should be

6   a CMO, what the CMO should say, whether there should be a

7   hearing that dealt with this, that, or the other, that

8   essentially everybody else should have the opportunity to

9   come in, in the sense revisit everything that we've been

10  discussing in the last year.  They should have their own

11  crack at it, and it wasn't simply a notice of the fact that

12  there was going to be a hearing in April and they'd better

13  get involved because it's going to be binding on them.  So,

14  at this point, Your Honor, it was not a happy discussion and

15  we could argue about what the motives or strategic interests

16  might be for this approach.  We could argue about whether

17  these people already had had notice.  We could argue about a

18  whole bunch of different things, but Grace stepped back and

19  said, Look, it's not worth it to create another omnibus

20  hearing or taking up now with a whole new bunch of people who

21  come in with whatever motives, whether they like the idea of

22  an April hearing or not.  It's just not - we don't need this

23  kind of further proceedings.  It will be a delay.  And there

24  are some reasons why that delay might be appropriate for

25  exclusivity arguments, but we wanted to avoid the whole

1    thing.  So we essentially went back to Your Honor's remarks

2    and we crafted a different path and I think a simpler path,

3    and the path is laid out in the proposed notice and case

4    management order that we provided to Your Honor and the

5    concept that drives it is relatively simple.  We have summary

6    judgment motions to file.  There are a small number of those

7    motions that we intend to file, and those motions will go to

8    some of the central issues that we've been talking about:

9    product identification, hazard, statute of limitations, and

10   we have one that relates to a bunch of claims in Libby,

11   Montana where the homes, they say, are contaminated but the

12   same homes are going to be remediated or have been remediated

13   or would be remediated by the federal government with out

14   money.  So, with respect to those, there's not going to be a

15   notice issue because we're going to move for summary judgment

16   and we're going to provide actual notice to all those

17   claimants, and they can come in and respond to those motions

18   in due course.  So there's no notice issue.  There's no

19   procedural issue.  It's Rule 56, and we intend to file those

20   motions within the next few weeks.  So, our case - our

21   proposed notice - I'm going to be showing our proposed

22   notice, says in the first instance, Debtors intend to file

23   motions for summary judgment on groups of certain claims

24   principally based upon lack of hazard, product identification

25   and limitations period and the Libby issue as defined below.

 1    These motions may be filed and heard at any time prior to

 2    April 23, which is when the hearing takes place.  The motions

 3    will be heard on available dates in Pittsburgh.  All parties

 4    reserve the right to file additional summary judgment motions

 5    after April 23.  So, no notice issue.  No procedural issue.

 6    We can move for summary judgment anytime we want.  When you

 7    have a disputed claim, you can do so under the rules.  So

 8    that is the first chunk, and it's not confined to any

 9    particular group.  We don't say to include the sixty-five or

10    don't include the sixty-five.  In some cases they do and some

11    cases they don't, but there's no notice issue, and there's no

12    mystery because of summary judgment.  Number two, there will

13    be a Dalbert hearing on March 26, 27, 28 in Pittsburgh

14    regarding the methodology issue.  No other issues previously

15    described as Phase I issues will be heard at this hearing,

16    and we previously defined what the methodology issue is.  So

17    that again, status quo, it's there, it's now in a formal

18    notice.  The trickier part then came to what to do with

19    respect to the Phase II estimation hearing as outlined

20    previously in the CMO.  What we say is that there will be no

21    hearing with respect to Phase II estimation as previously

22    outlined in the estimation CMO and other related orders.

23    Rather, consistent with what was discussed last time,

24    substantive objections previously lodged in the fifteenth

25    omnibus objection to certain claims will be tried on April

1    23, 24, 25 commencing in Pittsburgh.  Okay, so we go back to

2    the notice that was given there in the rubric that was given

3    there, but we're now going to limit the objections that will

4    actually be heard to certain claimants and certain

5    objections.  Which claimants?  It's claimants represented by

6    Mr. Speights, claimants represented by Mr. Dies, and that one

7    group of Libby claimants who are represented by one person, a

8    Mr. Lewis in Missoula, Montana.  So, we have taken off the

9    table the idea of having an adjudication of objections lodged

10   to claims where the lawyers have not been actively involved

11   in this process.  Why?  We'd like to do them, but we don't

12   want to get held up with a whole discussion about, well, you

13   know, what about this?  What about that?  We never realized

14   this or that.  We'll just focus on the very people that Your

15   Honor singled out last time.  So, Exhibit A are the claims of

16   those people.  Now they fall into a couple of categories.

17   Mr. Speights - They're all just represented by Mr. Speights.

18   Mr. Dies has filed a 2019 form on behalf of a whole series of

19   claimants, and then with respect to an additional group of

20   claimants he has appeared as special counsel to those

21   claimants.  So, he's clearly been involved in those kinds of

22   claims so we've included those as well.  We spell out in the

23   notice the issues that we intend to address, and they're the

24   same ones: lack of hazard, we cross-reference the objections

25   that were made; product identification, the same thing;

1    limitations period, same thing.  Additionally, to the extent

2    not previously resolved through summary judgment or other

3    proceedings because we do intend to move on summary judgment,

4    objections with respect to the category II claims related to

5    residences in the Libby, Montana area unless the property has

6    been or already will be remediated by the EPA shall be

7    adjudicated.  So, the issue of the effect of the EPA

8    remediation on those claims will also tee up as a single

9    issue.  We think it's going to be dispositive.  So we're

10   going to tee up on the summary judgment.  If there's

11   something that has to be tried, that trial will take place.

12   Following the adjudication of these claims, the debtors will

13   have the opportunity to file motions to extend the Court's

14   rulings to additional claims.  If the debtors seek to extend

15   the Court's rulings to additional claims, the debtor will

16   provide additional notice to the affected claimants.  The

17   Phase I and Phase II estimation previously addressed in the

18   CMO will not go forward.  Estimation of the aggregate value

19   of PAD claims will take place a future date to be set by the

20   Court.  So effectively, what we've done is to stay on track

21   for the hearings in February - excuse me, in March and in

22   April.  We are doing summary judgments so there's no notice

23   issue.  We're doing the methodology issue which has already

24   been adequately described, and solve the problem to the

25   extent that there is a problem and notice we're simply not

1    going to seek to bind any of the people who are represented

2    by - or not represented in whole or in part by Mr. Speights,

3    Mr. Dies, and Mr. Lewis.  So that is the carve-out.  That's

4    the concept that we've got going forward in order to stay on

5    track and consistent with that, we have then tendered as an

6    attachment to the CMO a series of dates that would lead up to

7    the hearing in April.  Now, in terms of how much this would

8    pick up, it would pick up a lot, and we will furnish copies

9    of all these to counsel.  As of today, as of actually August

10   the 8th, there were a total of 653 PD claims that were still

11   outstanding.  These are traditional claims except the 55, and

12   you'll see that includes 55 non-traditional of which Lewis

13   represents 53, the 97 Canadian claims, and then you have the

14   501 U.S. traditional PD claims, which are divided up and you

15   can see that Speights has part of them.  What we would now

16   have in the hearing in April, here we have the 52 non-

17   traditional claims, that's Lewis.  I'm sorry, it's 53.

18   Speights' Canadian claims, we hope to have those back from

19   Canada but now all that we'll do is we'll file the summary

20   judgment motions with respect to those claims before Your

21   Honor and on the same timetable and if there's a factual

22   issue that has to be resolved, we can tee that up in April so

23   it dovetails right in.  We then have 177 Speights claims,

24   which would include Louisiana.  We then have 160 Dies claims,

25   including Louisiana, and then you can see that there are 99

1    additional Louisiana claims where Mr. Dies has appeared as

2    special counsel, the principal firms are Baggett, McCall,

3    Grant & Berl Hannas and Sills and Beard and Sutherland

4    (phonetical), and so we're really picking up out of the total

5    of 653, 585 of the claims, and given where we are in the

6    case, we think that it may not even be necessary to deal with

7    the other individually (a) because the issue has already been

8    teed up and (b) because in the context of estimation, we're

9    going to take whatever result comes out of the gateway

10   process and simply extrapolate it to the other claims if we

11   have a basis for that extrapolation.  So, we don't think that

12   we really have an issue here.  I will know that on the

13   summary judgment motions, one of the summary judgment motions

14   is going to be the Louisiana statute of limitations, very,

15   very clear, very clean.  We'll file that.  It doesn't address

16   the nolin tempest defense, but that's not a defense in many

17   of these cases, and there are other motions that we think

18   we'll be able to file with respect, for example, to

19   California on the statute of limitations.  So we already have

20   those motions in mind.  They're already being worked up and

21   it may be that a lot of this stuff doesn't even get to the

22   hearing, but if it does, that's what we intended the hearing

23   will cover.  So, we ask Your Honor to continue on the path

24   that Your Honor took at the last time.  We've sought again to

25   be flexible in order to avoid detours that will take us away

1  from our schedule, and we think that this is the only really

2  way that we can get to a hearing that would really have an

3  impact on this case.

4          THE COURT: Okay, Mr. Baena.

5          MR. BAENA: May it please the Court, Scott Baena on

6  behalf of the Property Damage Committee.  Judge, I won't

7  forget the last hearing for at least three reasons for a long

8  time.  The first reason is that the hearing ended so late,

9  that Mr. Sakelo and I missed our last flight out.  We then

10 found out there were no hotels between here and Philadelphia.

11 We were then ejected from the DuPont for vagrancy.  We went

12 then to the Marriott in Philadelphia, and at 4:30 in the

13 morning we were thrown out of there for loitering.  So I will

14 not forget that hearing.  The other two things that occurred

15 at that hearing that are likewise memorable and more

16 substantively connected to this case, is that firstly, you

17 jet us in for time being what was formerly referred to as

18 Phase II of the estimation proceeding in which we were

19 intending to put a value on all the extant PD claims then

20 remaining, and instead you decided we're going to proceed

21 with three objections which had been variously described as

22 the gateway objections that were asserted by the debtors in

23 their fifteenth omnibus objection to PD claims.  I only want

24 to parenthetically say that the biggest problem for anybody

25 watching this case is the terminology that we employ and

1    often abuse in this case, just like I've begged that we not

2    talk about Phase II, we're now referring to these three

3    objections as gateway objections, but they're not - not all

4    of them are the gateway objections that you entered a

5    separate order in respect of a long time ago.  One of them is

6    not one of those gateway objections, but you did that.  That

7    was the first thing you did, and that was a very, very

8    important thing that you did, and secondly, you said to give

9    effect to all of the foregoing we were directed to undertake

10   to fashion a notice to those individual claimants who claimed

11   PD claims were implicated by those three objections that were

12   now going to be heard.  It seemed pretty simple.

13   Unfortunately, the notice that was served up to us in

14   virtually non-negotiable format, was the one that you just

15   had Mr. Bernick walk you through, and rather than attempting

16   to fashion what we thought would be an easy, clear, and full

17   notice, we got this thing, and when you take the little

18   snippets out of it, as Mr. Bernick did, and ignore all of the

19   turgid commentary in there, all of the traps for the unwary,

20   it sounds pretty good.  But, unfortunately, all of those

21   problems exist with this notice.  For example, this notice

22   contains two lists that just start with the basics.  Two

23   lists.  List number one, is every claimant who had any

24   objection asserted in respect of their claim by the fifteenth

25   omnibus objection, that's the whole universe of objections,

1    and then list number two are those claims which are going to

2    be implicated in this process, and the claimants are going to

3    get a pile like this of lists which are redundant only in

4    some respects, very confusing.  The notice likewise goes on

5    to say in one of the paragraph that Mr. Bernick alluded to

6    that in respect of that Phase I process that we presently

7    have on the table for methodology, it says there will be a

8    Dalbert hearing on March 26, 27th, and 28th, in Pittsburgh,

9    Pennsylvania regarding the methodology issue, and it goes on

10   to say in 6 Romanet ii, no other issues previously described

11   as Phase I issues would be heard at this hearing.  Yet it

12   goes on to say at page 5 in Romanet v the Phase I and Phase

13   II estimate previously addressed in this estimation CMO will

14   not go forward.  Suddenly there's been a new transformation

15   in respect to Phase I.  I'm not sure that those our 65

16   claimants have any idea what any of this could possibly mean

17   since I don't even understand why the transformation

18   occurred.  The proposed order and the motion are traps for

19   the unwary for the following reason: Having told Mr. Bernick

20   and the debtors to tee up everything for hearing in those

21   three groups, you just heard they decided, they decided,

22   despite what you said, that that's cumbersome.  We're not

23   going to do that.  We're going to take Mr. Speights, we're

24   going to take Mr. Dies, and we're going to just do their

25   claims, and the objections that we've asserted in the

1    fifteenth omnibus objection in respect of their claims alone

2    and what we have in store for those other people is we're

3    going to try at the end of the day, if we're successful,

4    maybe if we're even unsuccessful, to revisit those claims

5    with similar objections depending upon the outcome that we

6    obtain in respect to Speights and Dies' claims.  And so, by

7    that, these people who - by the way, never got any notice of

8    any of this.  They were not served with this.  They didn't

9    know the transformation that was going on, and that's why we

10   were telling them, Why haven't you served them?  Why aren't

11   they on this conversation?  The retort being, Well, we're

12   just going to take you now, to Mr. Dies.  Those claimants

13   will not participate in the adjudication of these gateway

14   overarching - we've heard all that terminology - objections

15   until after the fact, and in essence, they'll be served up

16   with a result in a proceeding respecting other claimants and

17   then be told how the debtor wishes to employ that result in

18   respect of their claims.  Why?  Just so that they don't have

19   to be given notice?  This is an MO that this debtor typically

20   uses in this case particularly in respect to property damage.

21   They try to get relief in pieces and then promise to use it

22   later against others who did not participate in the process.

23   When we complained about all of this, as I said, the reaction

24   was to whittle down the list further of who was going to be a

25   participant in this process that you thought, everybody whose

1  claims was implicated by these objections would be a

2  participant in.  As the Court well knows, and you even

3  remarked about this at the last hearing, the PD Committee

4  does not and cannot represent individual claimants, and so,

5  when Mr. Bernick proposes this notice and includes with the

6  notice a CMO which is date specific as to when things are

7  going to occur in respect of the fifteenth omnibus

8  objections, he's doing so without any contestant on the other

9  side.  That's why we thought it was very important for PD

10  claimants whose claims were being objected to, to be

11  participants in this process.  If we want to be faithful to

12  what you directed, they all had to be participants.  Not only

13  weren't they participants, they weren't even given a copy of

14  what was being discussed so that they could possibly try to

15  weigh into this process if they wanted.  Judge, I have never

16  - I view a CMO as a process.  It's not a motion.  It's

17  something to assist the parties and the Court in scheduling a

18  proceeding.  I have never seen a CMO, in 32 years, I haven't

19  seen a CMO negotiated by one side to the litigation,

20  presented to the Court, and entered without the other party

21  participating in the process.  Those litigants are entitled

22  to come forward.  We even told them.  Look, we're not even

23  talking about the date of the trial.  Tell them there's going

24  to be a trial in April and then tell them we need to sit down

25  and talk about a CMO.  No.  This debtor wants to hand-

1    handedly shove this schedule down the throat of people who

2    haven't even been given an opportunity to appear.  That's why

3    we objected, Your Honor, because we think that this process,

4    this process even giving them the benefit of good intentions

5    in rethinking failed firstly in adhering to the Court's

6    admonitions and secondly, failed miserably in giving people

7    minimal due process via notice and an opportunity to

8    participate.  It failed altogether under traditional motions

9    of fair play, and we don't think that this CMO can be entered

10   with the content that the debtor has put forward.  Now, the

11   CMO has another piece to it, of course, which I don't believe

12   Mr. Bernick actually addressed and that's in regard to Phase

13   I, which was the methodology issue.  In regard to Phase I,

14   with the benefit of the last month, and certainly the meet-

15   and-confer that we had with the debtor to reflect on all of

16   this, I must say that I'm beginning to lose track of any

17   sense of urgency or any sense of a legal platform for Phase

18   I, as it is presently being constructed.  As a procedural

19   matter, I can't conceive any longer of how - just as a matter

20   of context, Judge, how we're having a Dalbert hearing in

21   respect of an estimation proceeding that's been put on ice.

22   More substantively -

23          THE COURT: Well, pardon me, Mr. Baena, the

24   estimation hearing was put on ice because I'm now viewing it

25   as an allowance/disallowance process.

1           MR. BAENA: It's not an estimation hearing.

2           THE COURT: No, it's not and estimation -

3           MR. BAENA: That's correct.

4           THE COURT: So you can't have expert testimony with

5    respect to the allowance and disallowance of claims.

6           MR. BAENA: Judge, the issue of dust is a specific

7    objection under the fifteenth amended - I keep saying

8    amended, I apologize, the fifteenth omnibus objection to

9    property damage claims.  It's E-2, I think.   That was their

10   complaint against a number of claims based upon the use of

11   dust sampling, and there were different shades of that, you

12   know, that didn't show a sufficient difference between the

13   ambient there and the interior of the building or, you know,

14   it didn't show anything or whatever it was, there were

15   various grades, but those were all teed up by the fifteenth

16   omnibus objection just like product ID, the three gateway

17   objections that we're dealing with, statute of limitations,

18   and the third one which was lack of hazard.  Indeed,

19   methodology may even be related to lack of hazard, but it's

20   not related at this point in time to an estimation hearing,

21   and the reason I raise this is to make sure that as long as

22   Mr. Bernick is re-engineering, that we take into account what

23   happens with this determination you make in respect of the

24   methodology issue.  In the present context, it has no purpose

25   until we get to a Phase II hearing, at best, or its only

1    purpose is in essence an adjudication of the E-2 objections

2    under the fifteenth omnibus objection.  Which is it at this

3    point in time?  And if it's the latter, if it's just the

4    fifteenth omnibus objection, E-2, then why aren't claimants

5    directly involved in that process?  Not allowed to be

6    involved as you have said so far, you know, they may be

7    involved, why aren't they involved?  Why aren't the claimants

8    whose claims are challenged by them in E-2 the parties to

9    that process.  There's no answer to that at this point in

10   time -

11            THE COURT: Well, I -

12            MR. BAENA:  - with Phase II on ice.

13            THE COURT: Well, I thought with respect to

14   methodology that the notice was pretty clear that if people

15   wanted to participate they could.  That was the whole purpose

16   to determine how a hazard, to put it in those terms, could be

17   determined.  What was the appropriate scientific test to

18   determine whether or not there was a hazard or whether, I

19   guess, under the E-2 claims, those claims that relied on a

20   particular methodology passed muster.  So, yes, they have to

21   get notice, but I can't force somebody to appear.  If I give

22   them notice and tell them this is their opportunity to show

23   up and they don't, they can sustain a default judgment.

24            MR. BAENA: But this is an adjudication in reality

25   of the E-2 objections against specific claims, and it's not

1  being advertised that way.  It's being advertised as Phase I

2  of an estimation proceeding. Now, Judge, if you go back to

3  January '05 when we first discussed this concept, you'll

4  recall that the methodology issue was being teed up so that,

5  you know, the Court would come to a conclusion about dust

6  sampling and then the estimators would say, Well, I can't put

7  a value on this or I'm going to put a value like that on this

8  by virtue of your decisions, as opposed to this stealth-like

9  attempt now with no estimation going on to adjudicate E-2

10  objections to property damage claims when the parties whose

11  claims are being implicated by that objection haven't been

12  given any more than a precatory invitation to participate.

13  And, Judge, the point is -

14        THE COURT: I don't think the order -

15        MR. BAENA:  - they don't understand it.

16        THE COURT: Well, I don't think the order was

17  precatory or an invitation.  I think it was an order that

18  says, We're going to trial on this date on this issue, and if

19  you intend to participate then do whatever discovery you need

20  and show up, and if you don't, be prepared to lose.

21        MR. BAENA: Yes, Judge, and we told them it was part

22  of an estimation of claims, and we did tell them that it may

23  be even binding on them although in the last hearing you

24  thought that we were talking about Phase II in that regard.

25        THE COURT: I did.

1          MR. BAENA: So, I mean, what are the claimants

2     thinking?  And to top that all off, they haven't even been

3     served up with the opportunity to comment on all of this.

4          THE COURT: Frankly, folks, I've had enough of this

5     notice issue.  You folks are either going to get a notice

6     that you are satisfied with on these issues on the property

7     damage claim and submit it by the end of the week or I'm

8     doing my own, that's it, because I know what I'm expecting,

9     and apparently I can't seem to communicate it on the record.

10    I guess maybe I'm going to have to try in writing.  Some of

11    the things that currently appear in the debtor's proposed

12    estimation - not estimation, pardon me, case management order

13    - wait till I find the correct one here, just a minute,

14    please.

15         MR. BAENA: Are you looking for the notice, Judge,

16    or the order?

17         THE COURT: I was actually looking for the notice

18    that had the proposed order attached to - Oh, wait - No,

19    that's not it, and I know I have it here because I just

20    looked at it a few minutes ago, but somehow in shuffling

21    pages -

22         MR. BAENA: There was an amendment too, Judge, that

23    was made Friday.

24         THE COURT: Friday.

25         MS. BAER: Your Honor, I have the certificate of

1    counsel with an order and the notice.

2         THE COURT: Okay, may I have a copy because it may

3    be easier rather than my wasting your time to look at this.

4         MS. BAER: (Microphone not recording.)

5         THE COURT: That's okay.  I have some concerns about

6    some of the language that is contained in this.  With respect

7    to - Let me try to deal with things in some order.  First of

8    all, with respect to what the debtor wants to try in April, I

9    want to deal with the April hearings for the moment.  If the

10   debtor wants to go forward with claims adjudication as to

11   people who have been represented by Mr. Speights, Mr. Dies,

12   and the Prudential claims, those attorneys were here, I did

13   not think they needed additional notice with respect to that

14   information because they have been here and basically,

15   consistently throughout the case.  So I thought that the

16   discussion on the record, as to them, was adequate as to what

17   would be tried in April.   I did expect that the debtor was

18   going to prosecute all of the other objections that are the

19   same as objections to the Speights claims or to the Dies'

20   claims at one time.  I do not know that the debtor has the

21   ability to essentially *nunc pro tunc* something into a Rule 42

22   common issues trial, I don't know that you can do that.  So,

23   to the extent that someone doesn't have notice that the

24   issues that may affect them are going to trial on a certain

25   day, I don't know that you can simply pick up that ruling and

1    say, Now we're going to try to apply it to your case because

2    there may be different facts.

3         MR. BERNICK: Our goal, Your Honor, is to get the

4    April trial to accomplish what it needs to accomplish, and we

5    thought that this is a way of avoiding a controversy about

6    notice and more delay.  If Your Honor is prepared to craft a

7    notice that will hold to that date and include those people,

8    we'd love to have everyone there at the same time.

9         THE COURT: I think that's what the discussion was

10   all about at the last hearing.

11        MR. BERNICK: That's what I thought as well.

12        THE COURT: So, the only issue is getting the notice

13   out to those folks to say this is when the trial is going to

14   occur.  Now, Mr. Baena, normally I would expect that anybody

15   who wants to have some input into a scheduling order is going

16   to have that input into a scheduling order.  The difficulty

17   at this point is it's getting so late.  I think the Court has

18   the right on its own to determine the control of the calendar

19   before it and to set reasonable dates, and if that's what I

20   have to do, that's what I'm going to do, and if somebody has

21   an objection to it, they can certainly raise it, and I'll

22   hear it, and if that objection has merit, then I'll change

23   the dates as need be, but I think at this point I expect to

24   go forward with an order that says, This is the order, and

25   you've got so many days to raise an objection as to why it

1   won't work for you as to one specific case or however many

2   specific cases, and I'll hear it at the next omnibus, if

3   that's necessary, but I think it's time to get the discovery

4   open and going.  So, I want to get an order out that will

5   start the discovery, and then if people have some concern

6   about the specific dates, I'm happy to hear it at the next

7   omnibus, but I intend to issue an order that says, these are

8   the dates.  If you have an objection, you know, file it and

9   come to the next hearing, and I'll address it as to specific

10  claims, not to change the whole schedule for entities that

11  don't object.  Am I being clear?

12          MR. BAENA: Yes, Your Honor.

13          THE COURT: Okay.  I'm not sure if I'm making myself

14  understood or not.

15          MR. BAENA: I understand.  I would just ask that

16  they have a sufficient amount of time to complain. I'm not

17  sure that giving them till the September omnibus - by the

18  time this gets served on people -

19          THE COURT: The September omnibus hearing is on

20  September 25th and I would suspect that this order ought to be

21  able to be served at least by next week. That will give them

22  a month.  That's surely enough to figure out whether a

23  discovery plan is sufficient.  Mr .Dies.

24          MR. DIES: Your Honor, Martin Dies appearing for the

25  Dies & Hall claims and apparently the last appearance as

1    special counsel for Phase I to the Committee.  On the

2    procedural issue, the concern I have is for some period of

3    time now, most of the year, I have been acting as special

4    counsel for Phase I, and with the current proposal, I'm out.

5    That's fine -

6              THE COURT: Well, Mr. Dies, I'm not to Phase I yet.

7    I'm only addressing the April hearings.  I haven't backed

8    into the March hearings yet.

9              MR. DIES: I know, but I'm talking about Phase I,

10    the April hearing.

11              THE COURT: But I'm talking about Phase - It's not

12    Phase II anymore, I'm talking about the April hearings.  I

13    don't want to talk about the Phase I hearing yet.  I want to

14    set up and tee up the trials that are going forward unless

15    there is something in the methodology that's going to impact

16    the April hearings that you're trying to tell me about.  If

17    that's the case, I'll hear whatever concerns you have.

18              MR. DIES: Well, my concern about the methodology

19    issue is by pulling down the special counsel there are a lot

20    of claimants out there that may proceed if there were being

21    represented and now they're not and I don't know if there's

22    enough notice there for those claimants to come and

23    participate in Phase I because if they're trying to apply

24    that later to Phase II that's a real problem.

25              THE COURT: Well, that's what I'm asking.  What in

1    Phase I is going to be applied to the April trials?

2         MR. DIES: Well, that's anybody's guess when you

3    read all these iterations, but it looks to me like Mr.

4    Bernick now is trying to apply whatever ruling comes out of

5    the Dalbert hearing, use dust sampling, can't use dust

6    sampling to Phase II which begins a month later.  So, you -

7         THE COURT: The issues on the statute of limitations

8    I don't think will be affected by dust - whatever ruling

9    there is on dust sampling.

10        MR. DIES: It's certainly going to go to hazard, and

11   I want to talk about hazard.

12        THE COURT: May go to hazard.

13        MR. DIES: Yes, it goes to Series E objections to

14   hazard and under the schedule the claimants would have a

15   month or less to know whether they're supposed to or they can

16   use dust sampling or not, and it's simply impossible to get

17   that done.  I want to -

18        THE COURT: But they've already either got it done.

19   I mean at this point, in order to have filed a claim, they

20   have to know what the basis for their claim is.  So, they

21   should already have that done.  I'm not looking at giving

22   them time to get the dust sampling done.  It's either done or

23   it's not done or else if they've got claims filed and they

24   want to rely on it, they'd better go get it done.  I'm not

25   going to hold up the rest of the world for people to go get

1  dust sampling or some other asbestos testing.  They filed

2  claims.  It's their burden to prove their claim.

3          MR. DIES: Your Honor, I want to come back to that

4  and I want to back up for just a minute because I don't think

5  anybody has talked about this, sort of take a deep breath and

6  say, Where are we and what have we accomplished?  What I'm

7  going to say are purely my thoughts.  They're not anybody

8  else's, and I haven't shared this with anybody else, but

9  there is perhaps the implication here somewhere that we

10  haven't accomplished a lot in terms of the agreements that we

11  have, and I want to talk about that.

12          THE COURT: In terms of what, sir?

13          MR. DIES: The agreements that have been

14  accomplished by property damage and bodily injury.

15          THE COURT: Well, I don't know what they are.  I

16  don't know whether there's anything that's been accomplished

17  or not.

18          MR. DIES: I just want to talk about that -

19          THE COURT: Okay.

20          MR. DIES:  - for a minute, Your Honor.

21          MR. BERNICK: (Microphone not recording.)

22          MR. DIES:  And may I not be interrupted, please.

23          MR. BERNICK: I'm sorry.  I'm addressing the Court

24  and I want to raise a point of order here.

25          THE COURT: Can you use the microphone, I can't hear

1    you, Mr. Bernick, I'm sorry.

2          MR. BERNICK: Yes.  We have a lot of stuff to do

3    today, and it sounds like what we're going to get are some

4    reflections by Mr. Dies on the significance of the agreement

5    that was reached between bodily injury and the property

6    damage people.  We would have a lot to say about that

7    agreement.  In fact, we've been trying to learn the details

8    of the agreement, and we've been unable to do so.  We have

9    some documents, but we don't know a key aspect of it which is

10   what preclusionary effect does it have on any further

11   negotiations in the case.  I wasn't going to raise any of

12   this.  These are all fair game at the exclusivity hearing,

13   but we're going down a road that takes up the time of

14   everybody in this court when the top priority for today, I

15   think, should be to get a CMO and a notice, because we've

16   been working on it for the better part of 15 months.  You

17   told us a year ago last spring to go get it done.  So on the

18   verge of getting it, Your Honor has said, it's just a

19   question of giving people notice.  If Mr. Dies has got

20   something to say with respect to notice, that's fair and

21   appropriate.  After all, he represents claimants, but I don't

22   think this should be an opportunity now to get us in

23   discussion at 4:15 in the afternoon about where this case is

24   going.

25          THE COURT: Well, okay.  Mr. Dies, I have not heard

1    any of the parameters of the agreement, and as I understand

2    it, since it's still for some settlement purposes I probably

3    can't hear any of those parameters.  So, as far as I can tell

4    from where the Court sits, there is no agreement, because

5    nothing's been filed of record, and these claims need to be

6    adjudicated one way or another.

7         MR. DIES: Your Honor, it's certainly true that the

8    terms haven't been told to you and I don't intend to do that.

9    That was not my purpose.  We have produced the terms to the

10   constituencies, but the reason that I wanted to just stop and

11   take a moment is that my understanding is, listening to the

12   last hearing and Mr. Frankel said this in reference to Your

13   Honor is that the litigation ought to be designed to reach a

14   consensual plan and be necessary for a consensual plan and to

15   see whether we're on those tracks, and we've accomplished a

16   great deal in this bankruptcy so far.  We've spent an

17   enormous amount of time getting the agreements.  I'm not

18   going to go into the substance of the agreements, but we've

19   spent a year working on these agreements.  So, I think that

20   at least we should say, Is the litigation Mr. Bernick is

21   proposing, is that designed to reach a consensual plan and is

22   it necessary?  And I don't believe it is.

23        THE COURT: There may not be a consensual plan, Mr.

24   Dies.  I mean, from what I've been hearing from the folks all

25   plan negotiations have essentially stopped.  So, even if

1    exclusivity were to be terminated, that's not going to get

2    you a consensual plan.  The debtor's going to go down one

3    track and other entities may go down another.  So to the

4    extent that the debtor wants to prove that certain claims are

5    not properly to be calculated in either the estimation

6    process or are disallowed, I think the debtor has the right

7    to do it.

8          MR. DIES: Your Honor, I understand that that is

9    your view, and I will not persist in talking about this

10   except to say that - and maybe I am the optimist, but I do

11   not believe that all work has stopped on a consensual plan,

12   and I still believe it's possible if the proper framework is

13   there for discussions.  So, I'll leave it at that, Your

14   Honor, and I want to go now to this proposal, and you asked

15   me to address Phase II.  Your Honor, the Phase II proposal

16   with the deadlines set out that have been proposed, in my

17   judgment, I've already talked about my belief it doesn't go

18   toward a  consensual plan.  I understand you believe they've

19   got a right to do it, but it's unmanageable, Your Honor.  It

20   is not manageable.  And there are a lot of reasons for it.

21   I'll be brief about this, but in the debtor's motion they

22   said that the gateway objections, limitation, hazard, prior

23   settlements implicate more complex evidentiary issues which

24   involve liability and damage concepts.  True.  However this

25   proposal is not faithful to that statement.  The shortened

1    discovery period here does not allow me or Mr. Speights or

2    any of our claimants to present the evidence on these issues,

3    and the problem I see with it is, it basically dampens down

4    our ability to present the evidence that is necessary for you

5    to understand the background of these cases and why

6    evidentiary issues are important.

7         THE COURT: I understand why the evidentiary issues

8    are important, it's because I have to adjudicate them because

9    the parties haven't come to a consensus.  So, we rule it.

10        MR. DIES: Yes, Your Honor.  Yes, Your Honor, but

11   the - Let me just take hazard, lack of hazard as it's been

12   discussed by Mr. Bernick.  It really is a misnomer, in my

13   judgment.  In the August 29th, '05 CMO it listed the five

14   gateway objections which had to do with no product ID,

15   insufficient supporting documentation, incomplete claim form,

16   barred by limitations, latches, or settlement.  There was no

17   mention of hazard.  There was no mention of that whatsoever.

18   That order, Your Honor, was the order that was served on all

19   the claimants, as I can tell.  Then in the fifteenth omnibus

20   objection, hazard comes along.  Well, hazard by any

21   definition, Your Honor, is not really some gateway objection,

22   and let me explain why, Your Honor.  The debtors have

23   constructed this so-called requirement that you must have air

24   sampling, you must have certain levels of air sampling in

25   order to have a hazard.  There is no such requirement.   That

1    really is not a gateway objection.  That's just part of their

2    evidentiary case.  That's part of their affirmative defense.

3    That's all that is.  The proof of claim form, Your Honor, had

4    nothing in it that said, If you don't file all your liability

5    evidence, you're out.  In fact, we've been allowed to

6    supplement the claim form.  Your Honor has said from the

7    beginning we could, and many claimants, many of my claimants

8    have done so, and the problem is that they're treating this

9    as if it's some requirement.  Now, what the Court doesn't

10   know, and I'm not going to waste a lot of time going into

11   this, but you really need to know this is, building owners

12   don't normally perform air sampling, and they certainly don't

13   do it outside of abatement or primary assessment, and the

14   reason they don't is EPA has continually said since the late

15   1980s that air sampling is not to be used as a primary

16   assessment methodology.  Visual method is a licensed asbestos

17   abatement inspector determining the condition of the

18   material, the location, accessibility, and all these things.

19   So, the building owners don't as a matter of fact do that

20   type of air sampling because the regulatory authorities have

21   always said don't use it as a primary assessment methodology,

22   in fact, EPA says, it is inaccurate for that purpose and they

23   say - if you give me one second here, they say that, In

24   essence, if you rely only on air sampling, it will endanger

25   the health of the occupants of the building because of the

1   limitations of air sampling and because it simply cannot tell

2   you when the levels are going to be reached because of fiber

3   release.  Now, what Mr. Bernick is using as a gateway

4   objection is the same argument that Grace made in its appeal

5   way back in the late 1980s, early '90s in the Safe Building

6   Alliance case versus EPA.  Grace took the position and

7   appealed EPA's promulgation of regulations under the AHERA,

8   Asbestos Hazard Emergency Response Act of 1987 and said EPA

9   was wrong because EPA did not determine a safe level of

10  exposure to asbestos to be applied in buildings and, two, EPA

11  did not say that air sampling was the primary assessment

12  methodology or sole assessment methodology.  They made this

13  argument on appeal to the DC Court of Appeals, and the Court

14  of Appeals soundly rejected that argument.  So, what happened

15  with the litigation was the argument they use about meeting

16  some undisclosed level of air sampling became part of their

17  evidence in their affirming defenses, in every single case in

18  the litigation there is no state that I'm aware of either by

19  statute or by court law has ever adopted the idea that air

20  sampling is a primary assessment tool.  In fact, all the

21  states that I represent, Arizona, Connecticut, Texas,

22  Arkansas, Oklahoma, and all the states adopted various

23  portions of AHERA, AHERA is applicable, most of the states

24  made the AHERA statutes more stringent than the federal

25  statute, and the methodology that has been adopted by the

1    states and used by the building owners is in fact as a

2    primary assessment methodology is the EPA visual assessment

3    method.  So, when you say if building owners didn't have dust

4    sampling or air sampling at the time of the proof of claim,

5    they couldn't file it.  They could not file that at the time

6    the proof of claim, they came along because they don't do

7    that.

8            THE COURT: Okay.  Then, let me back off that

9    statement and say it this way: If they don't have some

10   evidence of what the hazard is, they don't have a proof of

11   claim they can file.  So whatever evidence they're going to

12   rely on, I expect at this point they have.  If it's not air

13   sampling, okay.  If it's not dust sampling, okay, but it must

14   be some evidence.  It's their burden of proof and at this

15   point in time this case is five years old -

16           MR. DIES: Yes, Your Honor.

17           THE COURT: - and the bar date for property damage

18   went by a long time ago.  So, at this point, I don't find it

19   to be a credible objection to scheduling the matter for trial

20   that the parties need to go out and get their proof together.

21   They've had five years to get their proof together.

22           MR. DIES: But, Your Honor, there was never any

23   requirement that said what they had to have.

24           THE COURT: Well, that's why you wanted to do the

25   methodology trial.

1           MR. DIES: Yes, and there's been no decision on

2      that.

3           THE COURT: That's because we haven't done the

4      trial.

5           MR. DIES: And dust sampling is extremely expensive.

6      Usually it's the type of thing when they hire counsel in a

7      cost-recovery case, like Mr. Speights and myself, that's what

8      we go out and hire experts to do.  Occasionally some of them

9      have that, but because EPA always says use the visual method,

10     that's what they have.

11          THE COURT: But the visual method only tells them

12     whether or not there is some asbestos product in place.  It

13     may, in the best of all possible worlds, say, you know,

14     monokote on it so you know which debtor that you actually

15     have a claim against for the product itself, maybe, in the

16     best of all possible worlds.  You still have to prove your

17     claim.  You have to prove that this debtor did something that

18     led to a damage that's compensable against this estate for

19     that claimant.  Now, if they don't have it, they can't file a

20     proof of claim.

21          MR. DIES: First of all, Your Honor, the visual

22     assessment method requires that a EPA certified inspector

23     come in and assess the condition and material -

24          THE COURT: Okay.

25          MR. DIES:  - assess-ability and propensity -

1          THE COURT: Then they have to have something.

2          MR. DIES:  - and some claimants will have that.

3          THE COURT: Okay.

4          MR. DIES: And other claimants might or may choose

5     to use dust sampling but because the Court has not determined

6     that that methodology's available, did not want to spend the

7     money to do that -

8          THE COURT: But that's what the Phase I trial is

9     supposed to be about, to determine whether dust sampling is

10    an appropriate methodology.

11         MR. DIES: Yes, Your Honor, and if it's disallowed,

12    then they would have spent a lot of money for methodologies

13    that were not admissible in this Court.

14         THE COURT: Okay, so, your view, if I understand it,

15    is, we should continue down the road of doing the dust

16    sampling trial, not necessarily for estimation purposes but

17    because we need a ruling as to what level of proof, I guess

18    I'll use those words in a global sense, I'm not using them as

19    terms of art -

20         MR. DIES: Yes, Your Honor.

21         THE COURT: - the debt, the claimants have to

22    produce in order to show that Grace may be liable to them for

23    some product-based damage.  So, we should go forward on the

24    dust sampling, whether it's for estimation or for each

25    individual claimant's use, we need a ruling on the dust

1    sampling.  So that's what currently is set for the March

2    phase.  Then your issue is, that if in fact there's a

3    determination that you can't use dust sampling, those people

4    who already have dust sampling and only that, need some

5    additional time to get additional evidence to meet their case

6    and if there's a ruling that says dust sampling is

7    appropriate those claimants that don't have it may want to go

8    get it.  So a month between then and the hazard trial isn't

9    enough time.

10          MR. DIES: Yes, Your Honor, I believe that is

11    correct, and excuse me for not being able to talk very well,

12    I'm taking medication that causes that, but I believe that we

13    have told the claimants since day one, the Court is going to

14    determine the methodology, and until it's determined, a lot

15    of claimants did not do it, would not do it simply because

16    that's not what's done in the real world in terms of what

17    they already had when they filed the proof of claim.  Now,

18    some do have it.  Some of my claimants do have it, and I

19    think that you will find that many claimants have assessed

20    the buildings under the EPA method, they'll be able to show

21    that in fact there are conditions that constitute a hazard,

22    but I think the problem is more than notice here.  Until the

23    Court decides, I just don't think most claimants are in a

24    position to know what that is.

25          THE COURT: Okay.  I was going to get back to the

1    Phase I issues later and I still will.  I think we need to go

2    forward on the Phase I issue.  At the recess, which I'm going

3    to take before I make any rulings on this, I think you folks

4    should talk, Mr. Bernick, Mr. Dies, and Mr. Baena, about

5    whether the hazard part of the April case should be postponed

6    until there's a ruling on the dust sampling.

7              MR. BERNICK: I think, Your Honor -

8              MR. DIES: Excuse me, Your Honor, may I finish

9    because I'm not quite finished -

10             THE COURT: Well, folks, you've got five minutes,

11   Mr. Dies, and then we're taking a recess.

12             MR. BERNICK:  May I be heard before the recess?

13             THE COURT: All right, you've got five minutes too,

14   but I'm counting.  This is on the clock, so go.

15             MR. DIES: This is a very important issue. They've

16   also listed the Louisiana claimants, I assume those for which

17   I have some responsibility, but I am not counsel of record.

18   These people, most of them, as Your Honor knows, went through

19   the Katrina issue and so on and so forth, and they are today

20   under the impression that we're going to determine, as you

21   said, Phase I.  Now, as of today, if the Court accepted the

22   proposal in October, they're going to be on a plan to

23   adjudication schedule.  I don't think that is fair.  I don't

24   think they're in a position to do that.  So I do think, I do

25   think the first thing we need to do is to have a

1   determination of what methodologies are in fact acceptable to

2   the Court.

3       THE COURT: All right.  With respect to the

4   methodology issue we're going to have some information on it,

5   some trial, some proceeding on methodology.  So, that will

6   happen.

7       MR. BERNICK: Excuse me, can I have the - I would

8   like to address the Court before the recess.  I think that

9   counsel for various property people have now gone on for

10  about 50 minutes.  I think I took about 10 minutes to lay

11  this issue out.  There are many, many things that have to be

12  heard, and frankly, Your Honor, I think there's a fundamental

13  issue that we have here about whether in fact we're going to

14  have an orderly proceeding, and all I'll say for my arguments

15  is this:  Your Honor, they had to submit in response to the

16  claim forms at the beginning a lot of information.  And to

17  justify having to do that, we talked about all of the

18  different kinds of issues that applied, and we specifically

19  put them on notice that we wanted to know the basis of their

20  claim so that we could determine whether the claim was

21  meritorious or not.  We had to litigate all of that.  It was

22  done in the answer to the claim forms.  Now, that was in

23  2002.  We then got to the question of the CMO. That question

24  now is almost 18 months old, and we proposed - CMOs, we

25  proposed all these different things, so we have now spent the

1    better part of 18 months dealing with this issue.

2         THE COURT: Well, we're not going to deal with it

3    any longer than today, so, let's get through it.

4         MR. BERNICK: That's fine.  Now here is, I think,

5    the way that it works very simply.  They have known since

6    September on a claim by claim basis of all of these different

7    issues, and they've had the opportunity since then to make

8    whatever preparations they want.  When we laid out the CMO in

9    the process, it is summary judgment, and I haven't heard

10   anybody quarrel with the idea of having summary judgment, we

11   also have got the benefit of all the claims objections and

12   responses and that's not just a notice pleading deal. That

13   is, what is the basis for your claim?  So we have the claim

14   form.  We then have the objection process.  They've had all

15   kinds of time in which to determine what they want to proffer

16   in support of their claims.  What they're essentially saying

17   now is, Gee, Judge, decide this on an issue-by-issue sequence

18   basis so that we can learn in advance of trial what it's

19   going to take to prove up our claim, and that's not the way

20   that it works.  This is very mature litigation.  Sometimes

21   people rely upon dust.  Sometimes the rely upon air.

22   Sometimes they rely upon observation.  They make that choice,

23   and we've got a bunch of people who relied upon dust. We want

24   to litigate whether that evidence can come in as a straight

25   Dalbert issue, is the evidence admissible or not.  We did

1    this in the Armstrong case.  Judge Newsome took up the issue

2    as a Dalbert issue.  You hear all this discussion about what

3    happened in the prior litigation at the state court level.

4    In federal court, in bankruptcy, it is state substantive law,

5    and the Federal Rules of Evidence that govern, including

6    Dalbert.  So we should be talking about Dalbert as a gate-

7    keeping function with respect to whatever they produced on

8    hazard.  So, we would have the dust sampling hearing as a

9    straight Dalbert hearing, just like it would happen in

10   Armstrong.  This is a toxic tort case.  This is routine in a

11   toxic tort case, is to take up these kinds of issues.  Your

12   Honor then rules.  That defines the evidence that will be

13   admissible in April.  Now we sought to have all that be moved

14   to January, that is dust in January, and we were told that

15   they didn't want to do this.  So we agreed to their schedule.

16   They said April - March and April.  They insisted upon March

17   and April, so we used March and April.  Now they're coming

18   and saying, Oh, it's March but then it can't be April, it's

19   got to be May.  They have taken the position, I can't tell

20   you the calls that took place insisting that it be March and

21   then April.  Whatever Your Honor determines on dust, we then

22   go forward to have the hearing essentially on the merits, and

23   the hearing on the merits on hazard is not some esoteric,

24   Gees, I never heard - this is a products liability case.  Is

25   there an unreasonable risk of harm or not?  Just like what we

1    had with ZAI.  So that's a science issue.  We know the

2    scientific methodologies that they seek to rely upon.  We

3    deal with one of them in March, which is dust.  Whatever

4    happens happens, and then we have the issue, the science

5    issue gets posed in April.  Have they demonstrated not what

6    the EPA recommends to be able to remove asbestos - have they

7    proven up an actionable tort based upon an unreasonable

8    hazard, which is a science issue, and they come in with their

9    science experts.  They've got them all lined up.  Mr. Dies

10   has already identified them last fall.  They go on for pages

11   and pages and pages.  This is a massive effort, Your Honor,

12   to whittle away at these gateway issues and defer, defer,

13   defer.  This is not new litigation.  It's old litigation.

14   They've got the experts.  They've got the notice, and for

15   them to stand up and say, This schedule is too short.  It's a

16   schedule they insisted upon not three or four weeks ago and

17   that we acceded to.  Your Honor, we have got to get these

18   issues litigated, and for these folks to say that somehow

19   they're not ready yet, they've been litigating these issues

20   for 20/25 years, and if all that Mr. Dies says is true, and

21   they're not really gateway issues, and really the evidence is

22   far too complex, he can show Your Honor then and Your Honor

23   can decide, I don't think this is a gateway issue.

24              THE COURT: Okay.  I don't have a gong.  Your five

25   minutes are up.  Mr. Speights, five minutes and then we're

1    taking a recess.

2          MR. SPEIGHTS: Well, Your Honor, I would,

3    respectfully, urge that we take a recess and give me ten

4    minutes, because I have never spoken on this issue, and I was

5    just invited to the party when we did away with estimation

6    and we made this a claims objection procedure.  I promise you

7    I don't want to talk theology.  I don't want to talk

8    constitutionality and notice.  I don't want to talk about the

9    history of the CMO and the history of this or that.  I want

10   to be constructive with you as the guy for better or worse,

11   who has tried more of these cases than anybody else, and go

12   through the CMO and tell you what it is that I think needs to

13   be clarified in order that we can go through this process.

14         THE COURT: Fine, talk to the parties during the

15   ten-minute recess, and see if you can come to some agreement

16   about that, Mr Speights, and if not, I'll hear you because by

17   the end of the day today, we're going to have an order in

18   process.  We're going to have the trial dates already set,

19   and hopefully kept, those dates kept, but nonetheless the

20   process is going to be fixed today.

21         MR. SPEIGHTS: I understand that, Your Honor, and as

22   soon as I leave the rest room I'll talk to anybody who'll

23   talk to me.

24         THE COURT: All right.  We'll be in recess for ten

25   minutes.

1          (Whereupon at 4:35 p.m. a recess was taken in the

2    hearing in this matter.)

3          (Whereupon at 4:53 p.m. the hearing in this matter

4    reconvened and the following proceedings were had:)

5          THE COURT: Mr. Speights.

6          MR. BERNICK: Your Honor, I'm sorry.  Before we go

7    forward, I . . . (microphone not recording) discussions about

8    CMO and in the interest of time I thought it might be

9    worthwhile for us to report on whether there's any agreement

10   regarding scheduling and then perhaps -

11         THE COURT: Of course.

12         MR. BERNICK:  - get each sides different views on

13   the schedule so that maybe we can have Your Honor then be

14   able to reflect on that and then proceed to other matters on

15   the agenda.  We've already heard argument for close to an

16   hour from the other side.  I got five minutes to respond on

17   other aspects, there have been discussions of notice, you

18   know, this kind of litigation, and, you know, a lot of things

19   have been said that I'd like to respond to but to hear now

20   Mr. Speights' version of the same thing, I just don't think

21   is fair, and I don't think that it's appropriate in light of

22   the time.

23         THE COURT: Well, Mr. Bernick, we're going to be

24   here, and we're going to get through the agenda.  So any of

25   you who need to make phone calls for hotels or rides home go

1    do it, because we're going to be here.  Mr. Speights, go

2    ahead.

3           MR. SPEIGHTS: Thank you, Your Honor, and I will be

4    brief because I think I probably have the longest trip except

5    for Mr. Baena and Mr. Sakelo facing me, but it is important

6    because now we're involved with objections and not

7    estimation, and I do have apparently the most claims in this

8    bankruptcy, and I want to be constructive.  Here are my

9    problems with the papers that have been - I'm referring to

10   the papers that were sent to me by e-mail last Friday.  I'm

11   not sure because I was a claimant on the Committee, but I

12   certainly got them and I certainly have read them.  The first

13   problem I have is, I don't know the meaning of methodology.

14   There's a long history before you.  I could go through all

15   the ways that could be interpreted based upon the litigation.

16   Is it the methodology for taking or measuring dust?  Is it

17   the methodology for measuring debris?  Is it the methodology

18   for air sampling?  Et cetera, et cetera, et cetera.  My

19   problem would be solved by a simple motion or a simple

20   stipulation or maybe even a letter from debtor's counsel

21   saying, This is what we want to try, methodology.  In 25

22   years in the tort system, that is always done by motion in

23   limine to keep out dust sampling or whatever it is, and we

24   have briefed it and argued it and fortunately prevailed on it

25   in courts around the country, but I really want to know what

1    it is that I'm litigating.  Problem number two is, Your

2    Honor, that the problem that Mr. Dies alluded to and that is

3    the chicken and egg, the problem of when you do the

4    methodology trial.  I'm not standing here resisting a

5    methodology Dalbert hearing.  The real world is like this,

6    Your Honor, the real world is, and I have a number of

7    clients, they find out they've got fry-able asbestos, which

8    means it can be crumbled like Grace's monokote product.  They

9    hire an expert.  The expert informs them of what needs to be

10   done about it, manage it in place upon renovation or

11   demolition perhaps, remove the material, and the building

12   owner is then required to do certain things by OSHA

13   regulations.  The OSHA regulations themselves directed to

14   asbestos in buildings would fill up boxes and boxes of

15   materials, by EPA regulations, by EPA guidance documents, and

16   largely because of state health departments which have

17   extensive regulations in many cases on what to do about the

18   asbestos.  That's what the building owner does.  When you

19   send out a bar order, yes, I have monokote and yes, I have a

20   claim, and yes, here are the documents that I have, but the

21   building owners that I represent, rightly or wrongly at that

22   point in time, did not think that, well they should prove

23   their case on liability by what the debtor knew or to out and

24   hire experts, et cetera, et cetera.  If Your Honor wants to

25   try the building owners' individual cases to try the

 1   objections, we understand that.  I'm not here to argue

 2   against that today, and if that's what Your Honor wants to do

 3   in March or April or whatever, I understand it.  But, Your

 4   Honor, the chicken and egg is, that if we're going to have a

 5   trial on the merits of the claims, we need to know what it is

 6   that we use, what tools to convince you that the product is,

 7   and I'll use the term defective or whatever the standard

 8   might be, and so there must be a reasonable spacing between

 9   the methodology trial and the so-called hazard issue.  I

10   would suggest 90 days, but I'll come back to that in a minute

11   because I want to get to the next problem, Your Honor, which

12   is sort of related as I read this CMO the debtors have

13   proposed.  The debtors have proposed, I think, to try gateway

14   objections in April, and I don't believe hazard is a gateway

15   objection.  We can go back and forth on it, but to the extent

16   they want to try gateway objections as you first articulated

17   that in the hearing a year or two ago, I wasn't there, but

18   I've seen the transcript, that's fine.  We can try gateway

19   objections in April with respect to my clients.  I don't have

20   a problem with that, but I don't think hazard is a gateway

21   objection for several reasons.  First of all, Your Honor, I

22   don't think that it's a part of a proof of claim form which

23   required us to produce a lot of documents, which I thought

24   primarily because they wanted to raise the statute of

25   limitations issue, that we had to prove our case.  But

1    leaving that aside, I don't now what hazard means, and I say

2    that to you honestly.  I mean as somebody's whose been out

3    here since '82 involved in this litigation, I don't know what

4    hazard means, and I'm quite sure that Mr. Bernick's

5    definition of hazard and my definition of hazard are quite

6    different. The way we refer to it in the tort world is, is

7    there injury?  Is there injury?  And in some states, and this

8    varies greatly from state to state, in some states, as Mr.

9    Bernick said, you have products liability law governing these

10   and the test would be unreasonable risk of harm.  Is that

11   what he means by hazard?  I'm not sure, but in some states,

12   if that's the standard, the debtor would go forward and show

13   there's an unreasonable risk of harm.  To whom?  States vary

14   on who the unreasonable risk of harm must be to.  Some states

15   might suggest there must be an unreasonable risk of harm to

16   human beings.  Other states would say in context of product

17   liability acts, or in some instances product liability common

18   law that the patient here, the real plaintiff is the

19   building.  It's a property damage case, and the question is

20   whether the contamination of a building causes property

21   damage, is the contamination of a building with a known

22   carcinogenic material an unreasonable risk of harm.  But

23   that's not all just on that one standard, unreasonable risk

24   of harm.  There's also the question of what test because in

25   many states you have the consumer expectation test.  In some

1    states it is a question of whether the consumer would think,

2    would have bought that product if it had known of its

3    characteristics, that is, it contains a carcinogen, and that

4    is a valid argument I made in cases against Grace in some

5    states.  I wish I could make it in all of them, but frankly,

6    I can't because the law varies from state to state and then

7    you've got the question just on products liability law, the

8    question not only of unreasonable risk on the consumer

9    expectation, when do you measure that?  Do you measure it

10    when the consumer bought the material in '68 or '70?  Or do

11    you measure it in terms of what we think today in 2006?  But,

12    Your Honor, that's not all because we're not limited to

13    products liability.  We have the problem here, not a problem,

14    we've got the real world out there, that some states don't

15    require unreasonable risk of harm.  For example, the Chief

16    Judge of the South Carolina Federal District Court ruled,

17    consistent with many cases, that under South Carolina

18    warranty law, which goes back to the 1700s, you don't have to

19    show unreasonable risk of harm.  You can show the product is

20    defective in other ways besides unreasonable risk of harm.

21    So that Anderson Memorial Hospital itself, a claimant in this

22    bankruptcy, with monokote in its building wouldn't even have

23    to show.  Would it have to show hazard?  I don't know what

24    Mr. Bernick would say to that, but South Carolina warranty

25    law would not require that.  Then we have the Wisconsin

1    Supreme Court, which in a case tried against W.R. Grace and

2    appealed to the Supreme Court ruled that nuisance applies to

3    these causes of action.  You don't have to prove hazard.  You

4    don't have to prove unreasonable risk of harm.  So, Your

5    Honor, when I look down there at hazard, I see all sorts of

6    problems.  Now, if we're trying the case itself, and we're

7    trying to show that to resist the objection, we'll have to

8    prove what the injury is, and if it's a state that requires

9    unreasonable risk of harm to humans, we'll have to do that,

10   and if it's another situation, we'll have to do that, and if

11   we have that time between, that time between the Dalbert

12   hearing and the actual trial, we'll be able to know what

13   methodologies are available to show that if in fact we need

14   any methodologies, but, Your Honor, the problem on this, the

15   fly in the ointment here, is the debtors - and I'm not trying

16   to be anything but positive here, but it's the debtor's

17   desire to try hazard as a part of the gateway objections when

18   it always involves a central part of the trial of these

19   cases.  I put in dust samples.  I put in experiments dealing

20   with the dust which creates air samples.  I call experts to

21   say what all this means, et cetera, et cetera, and if that's

22   now allowed, I'll go a different way to show their product is

23   bad.  I'm confident we can show it's bad under any

24   methodology, but we need that, Your Honor.  So, my suggestion

25   would be to try to keep with the CMO as opposed to the

1   Dalbert hearing, make them tell me what the issue is, my

2   clients.  Don't say back in June of 2005, I said something or

3   I sent a letter as a part of this proceeding now that I've

4   been put on notice at least as last Friday, tell me what the

5   issue is to be tried.  If March is the date, sobeit.  Let's

6   try the traditional or what I think are the real gateway

7   objections in April, as scheduled.  We also could get through

8   those, I believe, in April, and let's have a period after

9   that, a reasonable period, to tee up what I would call the

10  injury issue, which is not a gateway, but we'll have a trial

11  on the injury issue, if that's the way we should go on this.

12  Thank you, Your Honor, and I believe I met my ten minutes.

13          THE COURT: Close.  Mr. Bernick.

14          MR. BERNICK: Both Mr. Dies and Mr. Speights spent a

15  good deal of time giving their views on what the evidence is

16  comprised of in these cases and what the merits actually turn

17  on, and I think that what's critical is that it's very, very

18  late in the day to be talking about some significantly

19  different structure because an awful lot of time has passed

20  in this case, and we have a record, and we're prepared to

21  proceed, and we have a date to proceed.  Your Honor, we

22  reviewed before the break - I think I can actually go back to

23  a brief that we filed at the very beginning of the case, the

24  informational brief, that set out this defense, one of the

25  principal defenses that we have, and it's a defense that

1   deals with their burden of proof, not our burden of proof,

2   they're burden of proof.  And what again is missing is the

3   appreciation that we underscored at that time of the fact

4   that this is a federal proceeding subject to the rules of

5   Dalbert.  So when you get issues that pertain to risk,

6   hazard, however you want to characterize it, un-safety, cost

7   benefit, whatever, that deals with toxicity, you're talking

8   about Dalbert and you're talking about science and there's a

9   core of sciences that's common to all of these different

10  cases.  That's what we flagged at the outset of this case.

11  We then asked for the claim forms.  Mr. Speights says, Well,

12  I thought that was statute of limitations.  The claim form

13  asks for all kinds of information relating to any sampling

14  that you have, anything that would bear upon the claim, and

15  that was a claims process that ran to completion.  They made

16  the claim.  We made the objection.  They made the response.

17  We're prepared now to litigate.  What they apparently want to

18  do is to kind of say, Well, none of that really counts or

19  none of it really counted.  It's as if Mr. Speights said,

20  We're staring last Friday and it's up to us to kind of define

21  an issue, and then we'll frame a pretrial process.  It's as

22  if none of that counted, that none of the objections, none of

23  the records counted.  But it does count, and the record is

24  closed with respect to the objections and responses to those

25  objections, and we are prepared to proceed on motion practice

1    and we are prepared to meet the hearing, and what I think

2    that we really have to do is get back to, in a sense, what

3    concretely we're talking about.  We have teed up the issue of

4    can they prove hazard, and if they want to come in later on

5    and say the standard is different in different jurisdictions,

6    they can go ahead and do that.  That's an issue of law that

7    Your Honor can take up.  What we're going to have presented

8    is the core science that relates to the question of not

9    injury but whether there is liability in the sense that

10   there's a problem with this product at these locations, and

11   they well know, and Mr. Speights just got done talking to you

12   about the fact that they know how to litigate the issue.

13   They can have dust, they can have air, they can have water,

14   whatever it is that they want, they should have presented

15   this.  Well we're now going to have a hearing on that in

16   April, and the only real question that they've raised is,

17   should Your Honor go through a process of giving them the

18   benefit of a hearing before trial on admissibility and on

19   methodology, and then should Your Honor give them the benefit

20   of having then a period of time to pass before the trial on

21   the merits?  I think that's what this already comes down to.

22   Everybody knows what the underlying science is.  They've been

23   through it a ga-zillion times.  The question is whether they

24   are entitled to have Your Honor tell them in advance what's

25   going to count in the trial, and, Your Honor, I believe it's

1    very, very late in the day for them to be negotiating on that

2    because that's effectively what they're doing, is they're

3    negotiating, because the fact of the matter is, that we

4    originally proposed having the dust methodology issue ala

5    Armstrong, no issues about what that was, heard in January,

6    and then were going to have - We wanted, actually, to have

7    the hearing in April - excuse me, in March on what was then

8    Phase II, the remaining issues, that we have identified,

9    that's not called estimation anymore, it's called allowance

10   or disallowance, but it's the same issues.  They insisted,

11   they insisted, that they were prepared to proceed in March

12   with the dust methodology and in April with the other method

13   - with the other issues that were identified.  They insisted

14   upon that.  Now, they'll say, Oh, well, that's when it was an

15   estimation.  But it's the same evidence.  We're all talking

16   about the same things. It's the same objections in the

17   omnibus, in the fifteenth omnibus objection.  So, now they

18   all say, Well, we would like to have the methodology heard

19   first and then have a reasonable period of time.  They

20   wouldn't be entitled to that in federal court.

21   Methodological issues, Dalbert issues are sometimes heard on

22   the eve of trial, indeed, in a bench trial, Dalbert issues

23   are heard during trial.  We just got done with this enormous

24   tobacco case in Washington, D.C.  Judge Kessler - there must

25   have been forty different Dalbert motions, and none of them

1   were resolved in advance of trial.  They were all held over

2   for trial because it was a bench trial.  So, effectively what

3   they want is to say, they don't really want the Dalbert

4   determination.  They simply want to have the only thing that

5   they have to do be dust and then to argue that, Well, we'll

6   never have to get to the ultimate hazard issue.  We're going

7   to hear the same arguments all over again.  So, effectively,

8   Your Honor, this is a request in essence to simply put over

9   the hazard litigation, and this is a central issue.  We have

10  got scores of properties where they have no dust sampling.

11  They have no air sampling.  They have nothing to demonstrate

12  that there was actually an ambient level of asbestos

13  sufficient to cause any kind of hazard, risk benefit, however

14  you want to name it, there at all.  So, they want Your Honor

15  to say, Oh, we're not prepared to go to trial and have that

16  be adjudicated.  Well, that's what the record is.  Let's go

17  forward and do the adjudication.   So if the April date is to

18  hold, it most definitely should include the so-called hazard

19  issues. These are clear issues.  They've been teed up and

20  they can be teed up scientifically.  This is no different

21  than what happened with respect to ZAI.  Remember how we had

22  to go through framing the core issue for ZAI.  We have all

23  the same arguments made about how there are variations in

24  law, and yet there was a core issue of science that somehow

25  the parties actually managed to litigate before Your Honor.

1    This is the same thing with respect to monokote III.  So the

2    date in April should hold.  Now, we suggested, early on, that

3    we use one of the early dates that is in January or in

4    February for the dust method trial.  We're still prepared to

5    go forward on that basis, so, we're prepared to agree, and

6    this is, I said this during the break, we're prepared to go

7    forward first with the dust methodology in January or in

8    February.  It's an issue that we can take up at that time,

9    and then go forward in April as scheduled with all of the

10   remaining issues.  I even expressed some flexibility that

11   says, We'll even give them another 30 days if Your Honor has

12   time in May so that the issues that were going to be heard in

13   April get heard in May, and if you combine those two things,

14   you've got 90 days, I think, between, you know, February -

15   let's see, February, March, April, May - 90 days between.

16   Now if that's not satisfactory, it's for only one reason,

17   which is that they never want to have the second, the

18   downstroke, they never want to have the actual adjudication

19   of the gateway issues, and then they're going to say to Your

20   Honor, don't go forward in May.  But Your Honor's going to

21   hold to the schedule, we can build in some time, although,

22   God knows, I don't know where in the rules this comes out,

23   Dalbert is typically determined shortly before or during

24   trial.

25            THE COURT: Well, I think - The Court has the

1    discretion to determine whether the Dalbert issues will be

2    done pretrial or at the trial or during the trial.

3          MR. BERNICK: Right.

4          THE COURT: So, I don't think that's really a

5    concern.  It makes sense to me to bifurcate it in this case

6    because it will probably involve a core of different

7    witnesses than the rest of the issues.  So, I don't see any

8    problem with doing it on a different date than the actual

9    trial.  What about - and I don't know the answers to the

10   question about May dates, Mr. Bernick, so I can't tell you

11   that now, but what about this: What about holding the April

12   dates for everything but the hazard issues.  Those dates are

13   scheduled.  It's difficult for me to get three days at a

14   time.  I've already given you most of my life in the month of

15   June and early part of July, so I probably am not going to be

16   able to give that much time in May.  What about doing the

17   non-hazard issues in April and on the statute of limitations

18   and - I've forgotten what the other one was.

19         MR. BERNICK: Product ID.

20         THE COURT: I'm sorry, product ID in April and

21   moving hazard to May.

22         MR. BERNICK: I don't have a - We don't have a

23   problem with that.  What we're concerned about is that hazard

24   - we picked the three issues because we picked issues that

25   were - if there's a difference it really makes a difference.

1   What we don't want to see is it slip because we have bodily

2   injury in June, we then have a petition that says, Oh, we're

3   not really ready in May, and it's going to be August and

4   September or -

5          THE COURT: No, I want to get, for my own benefit, I

6   want to get the property damage issues done before we start

7   the personal injury side.

8          MR. BERNICK: Then we're totally satisfied, Your

9   Honor, with slipping the hazard portion of the April issues

10  to May provided that Your Honor has that space in the

11  schedule.

12         THE COURT: How much of the April time frame were

13  you allotting to do the hazard portion?

14         MR. BERNICK: You know, I don't think we actually

15  kind of divided it up.  It probably would be fair to say

16  though, that it would have been, you know, I think you'd

17  probably roughly say, half, that is to say - maybe Jim can

18  address the Court on that.

19         MR. RESTIVO: Your Honor, we did not allocate time

20  among the issues.  I think we would like to keep the three

21  days you have given us for April, not give up one of those

22  days because we're taking out hazard, and I think the

23  challenge would be if the Court has, I would think, two days

24  in May for hazard, I think the challenge would be to find

25  those two days and let us still have the three in April.

1          THE COURT: Well, I think you should keep the three

2    in April, because if nothing else, we may need a status

3    conference on the personal injury side at some point as

4    you're getting closer to actually starting that, and one of

5    those April dates might be useful for that purpose too.  I

6    know we haven't scheduled anything along those lines.  I just

7    offer it as a suggestion that sometimes issues may come up

8    and that may be an available day.

9          MR. RESTIVO: I indicate, Your Honor, two days in

10   May.  My recollection is the ZAI science proceeding, I think

11   we did two days, or maybe two days and a morning, and it was

12   really all the same type of issues, and we did get that done

13   in two days.

14         THE COURT: You did.  I think it was about maybe two

15   or two and a half, but most of the evidence came in by way of

16   declarations and exhibits.  You know, your witness testimony

17   was somewhat limited, but I've got shelves of exhibits with

18   respect to that too.  So, is that going to be the same

19   process that you'll tee up?

20         MR. RESTIVO: Again, I don't know that we've talked

21   about the process.  I think the parties will have to get the

22   evidence in, dependent upon what the Court's schedule is in

23   May.

24         THE COURT: Okay, well, I think I'm not going to be

25   able to give you those dates until I get back to Pittsburgh

1    because we can't get into my calendar, and I don't have any

2    staff in at this hour to be able to call. So, Mr. Speights?

3          MR. SPEIGHTS: Number one - thank you, Your Honor,

4    for working with us on that.  Number two, I will be calling

5    live witnesses at the Dalbert hearing.  I assure of that,

6    Your Honor.

7          THE COURT: Well, that will be - The Dalbert hearing

8    is in March.

9          MR. SPEIGHTS: Right, and I'm not sure about the

10   next one until we sort of define it.  Number three, as I

11   understood what you said, you would move the Dalbert hearing

12   back to February?

13         THE COURT: Well, I think -

14         MR. SPEIGHTS: To give us 90 days?

15         THE COURT: I think -

16         MR. BERNICK: We're prepared to do that, but I don't

17   know - I know Your Honor has reserved days in February.  I

18   don't know whether that's something the other side is

19   agreeable to.

20         MR. SPEIGHTS: I was going to say, if that's the

21   case, can we caucus for one minutes, because that would give

22   us more time.

23         THE COURT: Well, here - I may have a personal

24   reason why I may not be able to do the hearings at the end of

25   March, but the problem is, this event may happen at anytime

1    in March, and I don't know as a result when I'm going to have

2    an issue in March, and I'm not free to say anymore until

3    after next Tuesday.  So -

4              MR. SPEIGHTS: Well, Your Honor, I was going - I

5    think we're going to suggest February?

6              THE COURT: So, March, if we can avoid March maybe -

7              MR. DIES: Your Honor, we were ready to do it in

8    January at one point, it was an estimation.

9              THE COURT: I'm sorry, Mr. Dies, I can't hear you.

10             MR. DIES: February, Your Honor, would most likely

11   be the most appropriate time for the claimants.

12             THE COURT: Okay, you have dates, Mr. Restivo

13   already in February?

14             MR. RESTIVO: Your Honor, I believe your staff was

15   saving dates in February, I don't know what they were, but I

16   know at the last hearing you did not give them up.  You kept

17   them for this case.

18             MR. BAENA: I've got them on my blackberry in the

19   locker if you want me to go get them.

20             THE COURT: Yeah, please.  If the guard needs to -

21             MR. BERNICK: Well, Your Honor, if we can - I'm sure

22   that we can, with all the resources here figure that out, but

23   the idea is we would then do - February would be the

24   methodology - dust methodology.

25             THE COURT: Right.

1          MR. BERNICK: And then April would be the two

2    gateway issues, the statute of limitations and product ID,

3    and then May we would do hazard.

4          THE COURT: That's right.  That's the scheme that I

5    will try to implement, but I need to go back to Pittsburgh to

6    be able to be able to implement, see what I can work out.

7          MR. BERNICK: That's fine, and then I guess that

8    with respect to the text of the notice, the text of the CMO,

9    would those matters that are basically now under submission

10   to the Court, and Your Honor intends to go through that?  I

11   mean, what would you prefer - how would you prefer that that

12   be handled?

13         THE COURT: All right.  Well, I started to get into

14   that issue several hours ago, and then I got sidetracked, so,

15   let me take one look at this for a minute.

16         MR. BERNICK: To be clear, there was some reference

17   made to the fact that we weren't giving people notice.  The

18   reason there were two lists, Your Honor, is very clear in the

19   notice.  The first list is a list of all claimants, and the

20   idea is that all claimants would get the notice.

21         THE COURT: Well, I think what you can do rather

22   than attaching a list of all claimants to the notice is serve

23   them all and attach it to the certificate of service.  Make a

24   representation that all claimants are being served, but, you

25   know, if your name appears on the list that's attached, which

1    I guess at that point would be Exhibit A, then your case is

2    going to trial on these dates.

3            MR. BERNICK: Right.

4            THE COURT: And I think that would make it more

5    clear.  With respect to the methodology, I think we still

6    need this trial, Mr. Baena, whether it's for purposes of

7    allowance, disallowance, or whether it's for purposes of

8    estimation, and because I'm not clear at this point what's

9    going to be estimated, frankly, but I think we still do need

10   to know acceptable methods of proof, and whether dust

11   sampling for the objections the debtor has raised will be

12   one.  I agree, however, that seems to be - on the Dalbert

13   issue seems to be an issue as to whether or not it's the only

14   evidence that a claimant has is dust sampling, you're going

15   to be able to come forward with evidence.  So, maybe we need

16   to make it clear that the methodology will determine whether

17   dust sampling - that the methodology trial is intended to

18   determine whether the dust sampling will or will not be an

19   allowed method of proof.

20           MR. BERNICK: Yes, well, I mean, this is not any

21   kind of mystery.  First of all, this is all going to lawyers.

22   Secondly, I mean, most lawyers now know that the effect of

23   Dalbert is that if your evidence is stricken, you're then

24   subject to a motion for summary judgment or you're subject to

25   the disallowance of the claim, but we can certainly spell

1    that out.

2         THE COURT: I think it should be spelled out because

3    I agree with you that the lawyers will understand it, but to

4    the extent - and I'm not sure that there are any claimants

5    left who have not filed claims through lawyers in this

6    process, but nonetheless, I think it may be better spelled

7    out.  So -

8         MR. BERNICK: We'll be happy to do that.

9         THE COURT:  - let me make the following rulings,

10   and then, please, let's see if we can just memorialize this

11   with no more changes.  Number one, the notice is to go to all

12   entities that the debtor intends to prosecute a claim

13   against, an objection to claim against, on any of the trial

14   dates that we have just discussed, which for purposes of this

15   record right now are either the March or April dates.  Those

16   dates may change, but those are the body of objections to

17   claims I'm talking about.  Is anybody unclear about that?

18   Okay.  With respect to that body of claims, the Dalbert

19   hearing will take place first, whatever those dates are,

20   hopefully in February.  The April hearing will be limited to

21   product ID and statute of limitations, and the May hearing

22   will constitute hazard.  To the extent, Mr. Speights, that

23   your clients are not clear as to specifically what - how the

24   debtor is going to frame those issues, file a motion if the

25   debtors - or take discovery, if you need some assistance

1    along those lines, then it will be opened up, but I think the

2    appropriate way to do it is from contention interrogatories

3    or however else you choose to get that information, so

4    discovery is open.  Mr. Baena, you raised the issue of the

5    inconsistency in this order in terms of the fact that

6    paragraph (5), I think, I'm not sure what the modified

7    paragraph is, says that Phase I estimation - or Phase I

8    estimations previously addressed are not going forward.  I

9    think the paragraph needs to be restated to say that the

10   Phase I trial is going to deal with the debtor's objections

11   to dust sampling, and the hearings in April will cover

12   product ID and statute of limitations issues and the May

13   hearings will cover whatever other hazard issues.

14          MR. BERNICK: The second paragraph that he referred

15   to was the negative paragraph and the reason it reads that

16   way is Phase I, Phase II estimations, and that was the reason

17   why we thought that they would want that, and frankly, we

18   don't care.

19          THE COURT: Well, why don't we simply vacate any

20   other orders that were out there with respect to the

21   scheduling so that it's clear that to the extent that words

22   were used and as other orders, they don't have any meaning

23   anymore, this is the schedule and the way we're going forward

24   with it.

25          MR. BERNICK: That's fine.

1          THE COURT: Okay, now, Mr. Baena, you raised the

2     issue about giving other people an opportunity to

3     participate.  I think the way I have to do that at this point

4     is to say, This is the schedule the Court's setting up.  If

5     someone has an objection to it, you have to file it I guess

6     in time to be heard in the September hearing.  Now, I don't

7     know what that objection date is.  That may have passed

8     already.

9          MS. BAER: The motion date is today, Your Honor.

10    So, the objection would be about 14 days.

11         THE COURT: Okay.  Well that should - I think the

12    objection period - Can I assume that you folks are going to

13    work out an order for this this time.  Since I'm giving you

14    specific rulings, are you going to be able to work out an

15    order and get it filed by, let's say, Wednesday?  If not,

16    then I want your different versions all filed by Wednesday,

17    from all of you, and I'll piece them together.

18         MR. BAENA: Could you make it . . . (microphone not

19    recording), please we're going to be traveling tomorrow.

20         THE COURT: Sure, Thursday's fine.  August 24th -

21    Okay, I will get you an order by not later than Monday the

22    28th, but hopefully on the 25th, so I want everything filed by

23    August the 24th at 2 p.m. so that I have an opportunity to

24    work on it and hopefully get it back to the debtors.  So the

25    debtor is to make service by August the 29th.  I will extend

1  the objection period to September the 14th.  Your preliminary

2  binders are due the 15th; correct?  Two Fridays before the

3  hearing.

4          MR. O'NEILL: Yes, Your Honor.

5          THE COURT: Okay.  So, the preliminary binders are

6  still due the 15th.  The objection period can be September 14th

7  at 4 p.m., and if there are objections, they will be heard,

8  those specific objections will be heard on the September

9  omnibus hearing date.  If there are no objections, that order

10  is final as to all parties, and the order will stay final as

11  to anyone who doesn't object.  Now, the gentlemen who are

12  here, Mr. Speights and Mr. Dies, I expect that as your

13  clients there isn't going to be an issue about these dates,

14  that these dates are now going to be worked out in sufficient

15  time that you folks, for the largest body of claims, are not

16  going to have an issue.  If you've got a problem with that,

17  tell me now.

18          MR. SPEIGHTS: I understand, Your Honor.  I'm

19  prepared to go forward like you've said.

20          THE COURT: All right, Mr. Speights indicated he's

21  prepared to go forward.  Mr. Dies?

22          MR. DIES: Your Honor, I understand, and I'm

23  prepared and I'll be advising our clients.  I'm not attorney

24  of record for the Louisiana claims.  I'm a little concerned

25  about some of that because some of those attorneys you can't

1   even really communicate with because they've relocated.  So,

2   those claims, I just want to tell the Court, that I need to

3   really try to talk to those folks because I'm not the

4   attorney of record.

5           THE COURT: All right.  I'm only speaking at this

6   point for your own individual clients, not for people you

7   don't represent.

8           MR. DIES: Yes, right.

9           THE COURT: Okay.

10          MR. BERNICK: Your Honor, I'm a little bit concerned

11  because the whole idea that we had of limiting the folks that

12  we're dealing with, if what we're going to have is a bunch of

13  people now come in and have the same processes saying all or

14  none of this is workable, and, you know, I don't understand

15  what this means, et cetera, et cetera -

16          THE COURT: Just because I'm giving somebody an

17  opportunity to object doesn't mean I'm going to buy it and by

18  the same token they may very well have a reason why it's

19  legitimate, Mr. Bernick, and they're not here.

20          MR. BERNICK: No, I understand, and with respect to

21  the Louisiana folks, I guess we'll pursue and try to find

22  out, but I do know that in the objections, the responses to

23  the objections that we made with respect to those Louisiana

24  folks, I believe that Mr. Dies name is on the pleadings as

25  being special counsel, every single one.  So, if they're

1    going to come in and say that they didn't know what was going

2    on, I mean, it's going to raise a real issue of consequence.

3    Those 99 Louisiana claimants, Your Honor, they have a

4    significant chunk of claims, and we think that they are very

5    amenable to being dismissed in this process, and to learn now

6    that Mr. Dies, in fact, does not represent them, I think

7    we're going to want to make inquiry about what it is that

8    they've known about this proceeding.  To have them come in

9    and say, Oh, gee, it's a surprise to me.  We would have to

10   take that at face value, and I think this is a sufficiently

11   important matter, that there ought to be something more said.

12          THE COURT: If you're special counsel, Mr. Dies,

13   don't you represent them?

14          MR. DIES: Well, I'm co-counsel, national counsel.

15   I didn't file the claims, they did.  I assisted them in

16   filing responses to the objections, but I think that the

17   answer to that is, the way the contract reads, it goes back

18   almost 20 years, I don't have any responsibility for issues

19   of Louisiana law and issues related to filing of the claims.

20   So, what I'm saying is, that I will make every effort to make

21   sure they know about this, but in terms of whether they may

22   come up and say, Well, we have a special reason here.  I'm

23   just saying that I didn't file the claims, and I've never

24   seen some of the claims.  The objections, the responses to

25   the objections we assisted with and that's all we did.

1          THE COURT: All right, well, I'll take a look and

2     see what happens when they come in.  I want to make it very

3     clear, I expect that this is going to be sufficient due

4     process for people to get ready to go for these hearings, and

5     it's going to take a very special reason to convince me

6     otherwise, but there may be special reasons, and I'm giving

7     people an opportunity, but it's not going to be because they

8     didn't now about this until August 24th.  That will not be a

9     sufficient reason.

10          MR. DIES: Your Honor, let me just say also, I don't

11    think there will be a problem.

12          THE COURT: Okay.

13          MR. DIES: But, a lot of these people had their

14    lives misplaced and their buildings ruined and their homes

15    gone, and for them, communication issues have been very

16    difficult.  For example, I don't have a lot of claims they

17    filed, Your Honor.  We did the best we could, but, so, I'm

18    just saying there are special circumstances with these folks

19    -

20          THE COURT: And I appreciate that -

21          MR. DIES: They may come forward, but I'll do my

22    best, and I don't think there's a problem.

23          THE COURT: Okay.

24          MR. BERNICK: That's fine, we'll accept that.  You

25    know, these are basically parish school boards, these are

1    basically school districts and boards, so they're talking

2    about school buildings.  They are not people's personal

3    residence.

4              THE COURT: Well, I know, but the schools may have

5    disappeared or their residences may have disappeared.

6              MR. BERNICK: If the schools have disappeared then I

7    think that would be very important to know because it may be

8    that there's, you know, what's the claim that's left in the

9    case.

10             THE COURT: That's exactly right, so you may want to

11   know that fact, but in any event, the schedule is, the orders

12   are to be by me - the order proposed or pleural orders,

13   August 24th at 2, by September 14th at noon, objections are to

14   be filed, they're to be in my preliminary binder on the 15th,

15   and if there are any objections I'll hear them September 25th

16   at the omnibus hearing.  If there are no objections, everyone

17   is going to be bound by that order.  Mr. Speights?

18             MR. SPEIGHTS:   Two things, Your Honor, two new

19   things.  In the proposed notice of deadlines that is

20   currently in place or had been offered, it says, All parties

21   reserve the right - this is paragraph (6) - All parties

22   reserve the right to file additional summary judgment motions

23   after April 23.  The paragraph itself talks about the

24   debtor's intention to file motions for summary judgment.  I

25   want to make sure that that provision does not preclude

1    claimants from filing motions for summary judgment whenever

2    they feel appropriate.

3            THE COURT: All parties are all parties?

4            MR. SPEIGHTS: Right, well, that, no, this is after

5    April 23.  I don't want to have to wait till after April 23

6    to file motions for summary judgment.

7            MR. BERNICK: It reserves the right to.  All they're

8    saying -

9            MR. SPEIGHTS: All parties reserve the right to file

10   additional summary judgment motions after April 23.  Fine, if

11   we agree, we don't need to argue about it.

12           MR. BERNICK: We can have a conversation over the

13   telephone for these things.

14           MR. SPEIGHTS: Maybe.

15           THE COURT: I think it would be a good idea to set

16   dates by which summary judgment motions have to be filed near

17   the end of the discovery period for purposes of the issues

18   that are set.  With respect to reserving something on some

19   other issue after the April hearings, fine, but with respect

20   to, you know, whatever the discovery has produced that you

21   think does not require an evidentiary hearing, I would like

22   to know about those summary judgment motions, if they're

23   going to be any, in advance.  So, fix the dates.  Put the

24   dates into the order.  Make it a reasonable time in advance

25   of the March hearing dates so that if they're on the Dalbert

1    issues and in advance of the -

2            MR. SPEIGHTS: Advance of the February if you get

3    February.

4            THE COURT: Right, or in advance of the April date

5    if they're a product ID or statute of limitations and in

6    advance of May if they're hazard issues.  So you can key the

7    summary judgment dates to, you know - I'm not ruling, just

8    suggesting, 30 days before the trial so that everything can

9    get filed if need be.

10           MR. SPEIGHTS: Thank you, Your Honor.

11           THE COURT: Okay.

12           MR. SPEIGHTS: The only other thing, and frankly I

13   don't know the answer to it, there is an exhibit with all the

14   discovery deadlines, and I don't know what the change in

15   dates does to that exhibit.  I'm happy to speak with Mr.

16   Bernick about it and see if they need to be adjusted.  I

17   don't know whether they need to be adjusted.

18           MR. BERNICK: Well, I took Your Honor's direction to

19   us to mean that we have to work on the order and basically

20   come up, if we can, with an agreement, and if we can't to

21   make a submission to the Court by the dates that were

22   indicated.  I hope an expectation is that we wouldn't have to

23   trouble the Court with some of those scheduling issues.

24           THE COURT: Okay. Let's - You folks ought to be -

25   Let me put it this way.  I am going to look very suspect at

1    any fees that anybody submits with respect to trying to deal

2    with this issue if you don't give me a consensual order.

3    Now, I know, Mr. Speights, I don't rule on your fees, but I

4    hope as a gentleman and an officer of the Court, that you

5    will take that to heart and do your best as well.

6              MR. SPEIGHTS: Do I get a bonus if we could get you

7    something, Your Honor?

8              THE COURT: Yes, sir.

9              MR. O'NEILL: Just one point on dates.  For the

10   September 25th hearing, our final agenda and binders would be

11   due to you on the 18th, and our preliminary would be due on

12   the 11th.

13             THE COURT: I'll take this in the final binder then.

14             MR. O'NEILL: Okay, final.

15             THE COURT: These objections only.

16             MR. O'NEILL: Great, thank you.

17             MR. BAENA: If I may.  Your Honor, could we reserve

18   the right to include a letter from the Committee in the

19   service of this order?

20             THE COURT: To do what?

21             MR. BAENA: Prepare a letter from the Committee to

22   claimants in, you know, a less formal way describing what's

23   happened here?

24             THE COURT: Sure.

25             MR. BERNICK: Your Honor, if they want to send a

1    letter to all of the claimants, they can do that.  If it's

2    attached to or accompanies any orders of the Court the

3    suggestion, of course, will be that somehow it has been

4    approved by the Court, and all we're going to do when we go

5    down this road is introduce another element that we're going

6    to be arguing about and then thinking about what the order

7    should say in order to balance or clarify anything they want

8    to get sent.  If they want to communicate with their

9    constituency, they should be doing that.  Nothing stops them

10    from doing it.  Let them write their own letter.  I really

11    don't care what they letter says.  It's up to them.

12            MR. BAENA: I was trying to save some money, Judge,

13    that's all.

14            THE COURT: Apparently the debtor doesn't want to

15    save it, and since there are 593 letters that would have to

16    go out at most, 593 times 37 cents isn't going to break this

17    case.  So, send the letters on your own.

18            MR. BAENA: Okay.

19            MR. BERNICK: Your Honor, our proposal for how to

20    proceed next, remember, there was the late claims issue or

21    I'll just say the authority issue with respect to Mr.

22    Speights.  There was the Anderson Memorial report on the

23    notice.  There was then the bar date for PI, and the PI CMO,

24    which are pretty much tied together.  What I would propose is

25    that although it's an arduous process always, it would

1  probably be most useful if we turn now to the bar date and

2  the CMO for personal injury and then I think that we can

3  resolve - that will resolve the principal element to the

4  personal injury.  We have to make a report on the

5  questionnaires, that won't take long, and then everybody else

6  can leave if they want and we would just - I think you have

7  matters only relating to Mr. Speights left at the end of the

8  calendar, so, if it's -

9           THE COURT: That's fine.

10          MR. BERNICK: Okay.  Let me talk about - What?  The

11  bar date.

12          THE COURT: So this is agenda -

13          MR. BERNICK: This is agenda item number -

14          THE COURT: Ten?

15          MR. BERNICK: Ten, 8, 9 - 10.

16          THE COURT: Okay.  This is actually the one I

17  thought it was in the other one.  I apologize.  This is

18  actually the proposed order that I have some concern about

19  the language that I don't think was taken out in the

20  amendments that were submitted last week.  There is very

21  bolded and in capital letters this sentence: The fact that

22  you've received this notices does not mean that you have a

23  non-settled pre-petition asbestos PI claim or a settled pre-

24  petition asbestos PI claim or that the debtors or the Court

25  believe you have either of such claims.  Frankly, I don't

1   think that's appropriate in a bar date notice.  I mean,

2   you're telling people to file their claims.  Of course it's

3   not a given that they have one, but they think they do, and

4   if the debtor doesn't the debtor will object, but the Court

5   doesn't have any opinion about whether they do or don't.

6          MR. BERNICK: I'm sorry, where does that -

7          THE COURT: It's on - The version I'm looking at is

8   the one that was filed on August the 18th at Docket No. 13012.

9   It's on page 4 of the notice.

10          MR. BERNICK: Yeah, I just - the notice.  Yeah - If

11   Your Honor doesn't like it, out it goes.

12          THE COURT: Okay.  Then let's look on page 6 at

13   Roman Numeral IX, the effect of not properly filing an

14   asbestos PI proof of claim -

15          MR. BERNICK: The effect, yeah.  I'm with you.

16          THE COURT: Okay.  That's fine.  I thought there was

17   something about the form as opposed to the proof of claim in

18   here.  Apparently, that's not the case.  There's another one,

19   though.  Oh, okay, it's on page 3 under Roman Numeral III,

20   procedure for non-settled pre-petition asbestos PI claims.

21          MR. BERNICK: Yeah.

22          THE COURT: The bolded paragraph says, If you're

23   asserting a non-settled pre-petition asbestos PI claim and

24   you previously returned the questionnaire, you still must

25   file an asbestos PI proof of claim.  Also, filing an asbestos

1   PI proof of claim does not excuse you from completing and

2   returning the questionnaire.  If you file an asbestos PI

3   proof of claim but did not return the questionnaire, I'm not

4   sure whether you meant the file there to be past tense, if

5   you filed an asbestos claim but did not return -

6           MR. BERNICK: Yes, yes, that's correct.

7           THE COURT:  - the questionnaire, then the debtors

8   reserve these rights.

9           MR. BERNICK: Right.

10          THE COURT: Okay, then, what if I already filed a

11  proof of claim in Roman Numeral IV.  You must file an

12  asbestos PI proof of claim even if you previously filed a

13  proof of claim regarding your non-settled pre-petition

14  asbestos PI claim or your settled pre-petition asbestos -

15  Why?  Why do they need to file it again?

16          MR. BERNICK: Let's see.  You must file an asbestos

17  PI proof of claim even if you previously filed a proof of

18  claim regarding your non-settled pre-petition claim or your

19  settled pre-petition asbestos - Yeah, well, certainly as to

20  the latter, that is a settled pre-petition PI asbestos claim

21  on Form 10, that's not sufficient because Form 10 has much

22  less, requires much less than this one does.  If somebody has

23  a settled claim, even though they filed a Form 10 before,

24  they still have to file this form because Your Honor

25  indicated you wanted information sufficient for us to be able

1   to assess whether their claim was settled or not.

2        THE COURT: Okay, well, if that's the case then, can

3   you make this say something like, you must file an asbestos

4   PI proof of claim on the form attached.

5        MR. BERNICK: Yes, that's fine.

6        THE COURT: Or something so that - This language is

7   not, I think, very clear.

8        MR. BERNICK: So you must file a proof of claim on

9   this form, using this form, even if you've previously filed a

10  proof of claim -

11       THE COURT: That complied with official Form 10.

12       MR. BERNICK: Form 10, yeah, and I think that's

13  really the simplest way to put it.  So when we're speaking to

14  the people who filed previously on Form 10, and we're saying,

15  you've got to file your claim using this form.

16       THE COURT: Right.

17       MR. BERNICK: Period.  Without regard to what their

18  status might be.

19       THE COURT: Right.

20       MR. BERNICK: Yeah, that's fine.

21       THE COURT: Okay.  What other objections or issues

22  are not resolved between the parties?

23       MR. BERNICK: I suppose that's a question that could

24  fairly be addressed to Mr. Lockwood first, but let me try to

25  put - I think there are basically three - two or three

1    issues, and then I want to make sure that we talk through the

2    process so that Your Honor understands where we've come since

3    the last discussion we had on this.  The form, as you know,

4    from having looked at it distinguishes between non-settled

5    and settled claims, and the reason for that is the reason

6    that we talked about last time, which is that with respect to

7    the settled claims, they enjoy different status.  So you then

8    get to the question of, Well, how do you define settled

9    claims?  And settled claims are defined at page 2 of the

10   order and at page 2 of the order it says, For purposes of

11   this order and bar date, the term settled pre-petition

12   asbestos claims shall be defined, and then it goes on - and

13   then gives the requirements.  And such claim against one or

14   more debtors, one, was filed in the Court as its lawsuit

15   prior to April 2.  Two is the subject to a settlement

16   agreement that - and we then have A through D.  So the

17   definition of what a settlement constitutes really is

18   comprised by A through D.  I think that most of them are not

19   at issue.  Three of them are  not at issue.  That is that it

20   is entered into and memorialized in writing between the

21   holder and one or more of the debtors prior to April 2.  B is

22   unenforceable under applicable non-bankruptcy law, and then D

23   has not been fully paid or satisfied by any of the debtors.

24   It is C, provides for a release that apparently is at issue,

25   that is, whether there has to be an actual release for there

1    to be a binding settlement.  Now, we went through all this in

2    connection with the Babcock & Wilcox case, and the outcome

3    there was that there did have to be a release -

4              THE COURT: Did?

5              MR. BERNICK: Did.

6              THE COURT: Did.

7              MR. BERNICK: But in order not to seek to litigate

8    the issue up front here, we deliberately used the words

9    "provides for".  That is to say, all we're really saying is

10   that unless the settlement provides, saying that there is

11   going to be a release, it's not a settlement.  If the claim

12   is not released you can't say it's a settlement.  When that

13   release is given or received, is not addressed here.  It

14   simply says that the writing has to provide for a settlement,

15   that the writing or release.  If the writing doesn't provide

16   for the release, that's not a settlement.  So, we tried to

17   avoid the Court coming to grips with, you know, when is the

18   piece of paper actually received.  We might litigate that

19   later on, but all we're saying here is that it's not a

20   settlement if it doesn't provide for a release.  So we tried

21   to loosen the language there to capture the concept of there

22   must be a release but avoid timing issues for receipt of

23   release issues which may be what animates the concerns of the

24   Committee.  So that's one issue that we have.  The second two

25   issues relate to the process, and they're not insignificant.

1    The first part of the process is, who fills out this claim

2    form, and we believe it was clear from what Your Honor said

3    last time, that everybody that's got a claim has got to fill

4    one out.  You want everybody who's going to have a claim to

5    fill one out, and I think that's been resolved, and these

6    papers are drafted to contemplate that everybody will have to

7    fill one out as indicated, in fact, by the language that Your

8    Honor referred to.  The second issue is a very important one,

9    and Your Honor's going to have to resolve which is the

10   linkage between people who assert that their claim is settled

11   on the one hand, and the obligation to fill out the

12   questionnaire on the other, and we had some discussion about

13   this before, but clearly, from our point of view, people who

14   assert that they have a settlement and our records do not

15   reflect that they do have a settlement, the other side would

16   have them not have to fill out the questionnaire until Your

17   Honor determines that they fall into the category of being a

18   settled claim.  In fact, what they're actually suggesting is

19   that it first be mediated, then Your Honor determines whether

20   they fall into the category of settled claims.  And, Your

21   Honor, from our point of view, that just is going to tank

22   this process.  There's no question but that we have to know

23   who has a settled claim, because if people merely assert that

24   they have a settled claim when they don't, it will blow the

25   same data hole in our claim's spectrum that we would have had

1    if we didn't have a bar date.

2         THE COURT: But if you think - If someone asserts

3    that there is settled claim, and you don't have a record of

4    it, aren't you going to file an objection to it saying we

5    don't have a record that you settled?

6         MR. BERNICK: Yes, that's currently the case.  In

7    other words - Let me just put it up here very quickly to see

8    what the - there's a sequence point.  We contemplate that

9    people who have settled - who believe they have settled

10   claims actually have an earlier bar date.   I think it's

11   October 15 or something like that.  That is, if the claimant

12   says it's a settled claim, it's asserted to be settled, they

13   have to give us their form then, together with the

14   documentation.  We then have a period of time, I think it's a

15   couple of weeks - I'm sorry, what?  Twenty-one days, so it's

16   sometime in November?  Whatever it is, we then say, yes or

17   no, and there was a concern that was raised about whether we

18   would have to say yes if it was yes, and we're agreeable that

19   if we think it was a settled claim, we will affirm that at

20   the same time that we would have been obliged to tell them if

21   we didn't think it was settled.

22        THE COURT: All right.

23        MR. BERNICK: So the same date, we'll give them the

24   answer.  So, we'll say, no, and fill out the questionnaire.

25   We would then put it back to them, they could satisfy that.

1   They could satisfy our concern within some period of time,

2   but the next step would be that there would be, you know, an

3   objection process and then some kind of hearing.  So, once we

4   know that their claim doesn't meet our records of being a

5   settlement, yes, we can go forward and make an objection and

6   have an adjudication of whether their settlement satisfies

7   the standards or not, and we're proposing that that be done.

8   And that could actually be in like December and in January.

9   Now, I will tell you, Your Honor, we went through this in

10  Babcock.  We started out with 48,000 people who said their

11  claims were settled, and by the time I think before the

12  process was terminated because a consensual plan was reached,

13  I think upwards of 30,000 of them had been disallowed, and we

14  were probably on the way to about 40,000 of them ultimately

15  being disallowed.

16          THE COURT: Disallowed as settled claims.

17          MR. BERNICK: Disallowed as settled claims; correct.

18  And what we found is that very quickly, as the Court

19  announced the criteria for all that settled, all kinds of

20  claims were withdrawn.  It dissolved very, very quickly.  It

21  actually took very little court time.  So we think that as

22  soon as in this process Your Honor articulates what the real

23  criteria for settlement are, all this is going to become

24  pretty simple. The key thing is this: that while we're happy

25  to go forward and have that issue resolved as triggered by

1   our saying yes or no on whether we believe it's settled, we

2   do have to get the questionnaires filled out, and we can't

3   have filling out the questionnaires await Your Honor's

4   ultimate determination about whether the claim is settled or

5   not.  Why?  Because if we don't get this information, we're

6   left with exactly that same big data hole.  People don't want

7   to fill out the questionnaire.  So of course they're going to

8   say, Oh, well, the claim is a settled claim.

9       THE COURT: Well, why don't we define the criteria

10  for settled claims in advance.  I mean if the issue is a

11  release, what does the debtor's settlement agreement with the

12  parties say?  You have to have had a full payment and release

13  before you have a settled claim?

14      MR. BERNICK: We didn't pay claims until we had a

15  release, and it was also Babcock's practice is that they

16  didn't pay until they had a release.   But, Your Honor -

17      THE COURT: So, if you have a release and they

18  didn't get paid then they're settled but unpaid.

19      MR. BERNICK: They're settled but unpaid.  We're

20  happy to deal with those claims.  What we have a problem with

21  is, if they say, Well, here's the settlement, it's in

22  writing, and it's kind of - they deal in principal but there

23  hasn't been any kind of release received.  There's no checks

24  that's been cut, and there may be other things that are built

25  into it that make it essentially not quite yet a settled

1    claim.  If they can come forward and say, Here's a document

2    that says, John Doe's claim is settled for $10,000 and upon

3    receipt of a check - upon receipt of the attached release,

4    the check will be cut.  I'd have to go back to my people to

5    find out whether they would regard that as a settled claim

6    for purposes of their database, but that is an agreement that

7    provides for the release.  That's why we use the language

8    that we did.

9            THE COURT: Well, if there was a release that has

10   been given to the debtor, why don't you just ask for a copy

11   of the release.  Would providing a copy of the release be a

12   problem?

13           MR. LOCKWOOD: Your Honor -

14           MR. BERNICK: What that - Well -

15           MR. LOCKWOOD: Your Honor.  My compatriot, Mr.

16   Liesmer is going to present the argument on this, but I was

17   involved in the B&W case, and he wasn't so I feel compelled

18   to say certain things.  First, there was a lot of litigation

19   in the B&W case over what was a settled and not a settled

20   claim because the issue, as a matter of bankruptcy law, is,

21   number one, to determine if you have a settled claim you look

22   to state law, and state law may or may not require a writing.

23   For example, if Mr. Bernick and I in a tort case get up in

24   front of the judge on the first day of trial and say, Judge,

25   we've agreed to settle the case for $10,000 and the Judge

1    says, Are you authorized by your clients to do that, and we

2    say, yes, and we're not lying, that's a settled claim under

3    the law of a lot of states even though it doesn't have a

4    writing signed by the plaintiffs to evidence it, and it

5    doesn't - and the statement of the settlement didn't say

6    anything about a release.  It may well be that the effect of

7    that is to give a release.  It may well be that there's - you

8    pay for it later on and you get a release, but the question -

9         THE COURT: I think -

10        MR. LOCKWOOD:  - is whether, excuse me - the

11   question -

12        THE COURT: If that's the issue, Mr. Lockwood,

13   that's an easy one.  There is actually a writing.  It happens

14   to be a transcript.  So attach a copy of the transcript and

15   then you've got a writing and that's the end of it.

16        MR. LOCKWOOD: My point simply is, Your Honor, that

17   a settlement is a form of contract, and Your Honor, as a

18   bankruptcy judge, has undoubtedly seen much litigation over

19   the years among parties as to whether they did or did not

20   enter into a binding contract.  It is not at all clear, as

21   Mr. Bernick so glibly asserts that you cannot have an oral

22   contract to settle a case, and the only point I'm trying to

23   make here is that we have not disputed in our papers the

24   requirement that the finding - that the settlement be binding

25   and enforceable, and that will be a matter of binding and

1    enforceable under whatever state law applies, but what Mr.

2    Bernick is attempting to do, and Your Honor has been

3    exhibiting some sympathy for, is for Your Honor to decide

4    today in the absence of any claimant who says his claim is

5    settled and where there's a dispute from the debtor, what the

6    requirements would be under the laws of 50 states to

7    determine whether or not a claimant had or had not entered

8    into a binding settlement.

9          THE COURT: No, Mr. Lockwood, I don't want to go

10   there.  I'm going to make this real easy.  If there is a

11   writing, even if it's a court order or a transcript or

12   whatever, that shows that there's been a settlement, it's to

13   be attached.  If it's an oral -

14         MR. LOCKWOOD: But there's no -

15         THE COURT: If it's an oral agreement of some sort,

16   that's what the claimant relies on, the claimant can say I

17   had an oral agreement, and here's who is was with, and

18   whatever facts they have but they're to fill out the

19   questionnaire, and that's a good compromise.  That way, if

20   it's in writing it should be beyond dispute.  If it's an oral

21   issue then the parties can argue whether or not it is settled

22   later, but at least for purposes of getting through this

23   process, the debtor will have what it contends it needs and

24   there is no great prejudice to the parties in having to fill

25   out that form if they allege that they've got an oral

1  contract to settle.  So, that's my ruling, that's it.  That's

2  my ruling.

3           MR. LOCKWOOD: Let me turn the lectern over to Mr.

4  Liesmer who will respond on some of the other points.

5           THE COURT: All right.

6           MR. LOCKWOOD: Maybe he'll do better than I did.

7           THE COURT: Mr. Liesmer.

8           MR. LIESMER: Jeffrey Liesmer appearing on behalf of

9  the Asbestos Claimants Committee.  Your Honor, in light of

10  your comments just now, may I suggest, because part of the

11  dispute that we're having with the debtors, and we were able

12  to narrow a lot of issues down over the past couple of weeks,

13  but one of the issues we're having with the debtor is

14  defining a settled claim as being memorialized in writing,

15  and I had a concern with the word "memorialized" because it

16  suggests that there has to be this, you know, beautiful

17  document with the boilerplate that says Settlement Agreement

18  at the top of it.

19           THE COURT: Fine, say if it's in writing, period.

20           MR. LIESMER: Evidenced, in writing - I was going to

21  suggest evidenced in writing.

22           MR. BERNICK: Or if it's contemporaneous.

23           THE COURT: No, if there is evidence in writing,

24  they can attach it, but it has to be attached.  If it's a

25  transcript, fine.  If it's a court order, fine.  If it's a

1  settlement agreement, fine.  If it's in writing, they're to

2  attach it, and that will be sufficient at this point in time

3  to avoid filling out the questionnaire until the debtor has a

4  chance to verify that the records are what they are, but if

5  it's an oral agreement, the questionnaires are to be

6  submitted.

7       MR. BERNICK: Your Honor, that's fine.  I thought

8  that the ruling was a good compromise, I'm not sure what just

9  happened in the following way.  Sometimes a problem that you

10 have is that these claims get resolved in groups.  People do

11 so-called inventory deals.  It just the way the world works.

12      THE COURT: Yes.

13      MR. BERNICK:  And you can have things that are in

14 writing that will be represented to be settlements on an

15 inventory basis, like, we will settle 10,000 claims for X

16 dollars.

17      THE COURT: That's not a settlement if you don't

18 have a release; is it?  I mean if the money -

19      MR. BERNICK: So that's why, when we go back to our

20 order, what we said was very specific because it has to be an

21 agreement between the debtor and the plaintiff.  That is, it

22 has to be specific to the claimant in the case.

23      THE COURT: Well, sometimes the mass agreements also

24 say we have 10,000 claimants and then the list is submitted

25 at a certain point that show the 10,000 claimants.

1          MR. BERNICK: Well, see, that's -

2          THE COURT: In most instances the debtor has the

3    right to take a look at those claims before they are paid and

4    doesn't have to pay till the release is in, which is one

5    reason why it's a good idea to have a release.

6          MR. BERNICK: That's why we've included release, but

7    the key thing is, you have to have an agreement that is

8    reduced to a dollar number for a plaintiff that is the

9    settlement, the price element of their settlement, and it has

10   to be acknowledge by them.  It can't just be the law firm

11   saying, Here's what I would like to do and there has to be

12   the release.  So, that's what is in our definition, and I,

13   you know, the idea that - the bright line between verbal and

14   non-verbal is pretty clear, but when you get to writings, we

15   don't want to have to go through the process of then coming

16   back to Your Honor and saying, Well, they've given us a

17   correspondence from their correspondence files about a course

18   of conduct that gave rise to an expectation -

19         THE COURT: No.  Look, this is getting way too far

20   afield.  It is a contract, an expectation that you will come

21   to an agreement is not a contract that indicates a

22   settlement.  It's either a settlement or it isn't, and folks,

23   these are going to be real bright lined standards that this

24   Court employs if it's something in writing, it's something

25   that either was or wasn't settled, but it does not mean that

1    it's not settled just because the specific claimant did not

2    agree or did not - pardon me, sign off on a settlement

3    document if the debtor has a letter - Mr. Lockwood, I'm going

4    to pick on you since you don't have a dog in this fight.

5    Let's say Mr. Lockwood has 500 plaintiffs and the debtor has

6    a letter that goes to Mr. Lockwood that says we've agreed

7    that we'll settle your 500 claims for $500,000, and what Mr.

8    Lockwood has to do is submit the documents based on his 500

9    people along with the releases in order for the debtor to

10   issue the check, and that's evidence in writing that there

11   was in fact a settlement.  Whether or not the releases are

12   there, you know, I don't know at this point.

13          MR. BERNICK: But the releases become key.  Unless

14   the releases are there, the clients haven't signed on.

15          THE COURT: That's fine.

16          MR. BERNICK: That would be a contract with a

17   client.

18          THE COURT: And I just ordered that if the releases

19   exist they should be attached.   So, you'll have everything

20   you need to file any objection that you need to file.

21          MR. SAKELO: Your Honor, our approach has always

22   been - I think the Court is starting to appreciate the

23   complications of trying to articulate in advance without any

24   contracts before it and without any facts and basically

25   trying to process a lot of state law to define what a valid

1    settlement is.  Our approach in order to reduce the

2    complication was to say, if the contract is enforceable under

3    applicable non-bankruptcy law, then it is enforceable because

4    it is what it is, and if it requires a release then it

5    requires a release.  The release is simply a condition

6    subsequent to the contract and it is what it is.  It depends

7    on state law and that's why - It's not because we didn't want

8    releases to be a material factor.  It's only a material

9    factor if state law provides for releases, and that's why we

10   thought just leaving the definition as enforceable under

11   applicable non-bankruptcy law captures the essence of

12   everything.

13          THE COURT: That's fine.  If you want everybody to

14   fill out questionnaires, that's fine, you pick, because

15   otherwise, I have no basis on which to know what it's going

16   to come in as a settled or not-settled claim, and I am not

17   going to litigate till the cows come home who is and who

18   isn't filling out the questionnaires.  I've given you a

19   bright line test.  If you don't like it then I'll reverse

20   what I said before and everybody will fill out the

21   questionnaires.  You pick.

22          MR. SAKELO: Well, Your Honor, I guess we're going

23   with the release provision as articulated by the debtors.

24   Let me invite Your Honor's attention to the second issue that

25   was raised in our submission that we filed this morning, and

1    that's the issue with respect to - Mr. Bernick articulated

2    the process, and the process that we're envisioning is that a

3    settlement proof of claim is submitted and then the debtors

4    check their records, they have 21 days to send out a notice

5    as to whether they agree that this is a valid settlement in

6    existence or whether they don't agree, and the question is,

7    what happens is if they don't agree with the fact that a

8    settlement is in place?  What we have proposed is that, first

9    of all, in order to narrow the issues so the Court doesn't

10   have to listen to all of these claims, that it would be

11   referred to the mediator in the first instance so the parties

12   can exchange information and see if they can resolve it

13   without involving the Court.  The second step to this too is

14   not to require the claimants to fill out questionnaires while

15   the whole idea of the notion of their settlement is in

16   dispute, because that's the entire reason.  It's no good for

17   a claimant to fill out a questionnaire -

18            THE COURT: I don't think this should be an issue

19   that much, because if you've got something in writing and

20   you've got the documents attached, then whether the debtor

21   has it in the debtor's records or not unless the debtor has

22   some reason to think there's a fraud going on, that's going

23   to be pretty good evidence that there was a settlement, and

24   if it's an oral agreement the clients have to fill out the

25   questionnaire.  So frankly, from my point of view, that

1   should have eliminated at least 99 percent of the objections

2   right there.

3          MR. SAKELO: Perhaps, but it's tough to predict

4   going forward whether the bright line is going to be enough.

5   There might be factors of interpretation as to how these

6   documents that evidence the settlement in the record are

7   interpreted, and for those sorts of situations, while it gets

8   processed through the mediation -

9          THE COURT: It's going to be a real easy matter of

10  interpretation if it's up to me, and I'm going to look at the

11  four corners of the documents, and it's either going to

12  provide that somebody has in fact settled a claim for a

13  specific number, that there will be or has been a release

14  given, that the debtor will pay or has paid a certain amount

15  of money, and pretty much, that's going to be it. And if it

16  doesn't have those magic components to it, it's not going to

17  be a settlement.  So, I don't think it's going to be all that

18  tough.

19         MR. SAKELO: We've suggested that the dispute be

20  referred first to the mediator.

21         THE COURT: There is no reason for that that I can

22  see right now.  I reserve the right to change my mind about

23  that depending on how many objections come in and what the

24  nature is, but I don't see any need for it right now.

25         MR. SAKELO: Your Honor, the fourth issue that was

1  raised in our submission was putting a deadline on the

2  debtors to notify the claimants who have settlements that

3  they agree are valid and it sounded from Mr. Bernick's

4  comments that the debtors will accept that suggestion.  We

5  also suggested as a more minor technical detail on our proof

6  of claim form, there's a Part I on the proof of claim form

7  that the debtor suggested, and it has a box that claimants

8  are supposed to check and just so everybody's clear when

9  they're filling this out, we suggested that there be

10  capitalized letters added at the end of the check box which

11  says that, you know, since you're - When you check the box,

12  you're basically electing to have the questionnaire

13  considered as part of your proof of claim, and the

14  capitalized letters that we're suggesting to add basically

15  say that you still have to file the proof of claim in

16  addition to filing the questionnaire.

17          THE COURT: Okay.  I'm sorry, maybe I missed this

18  one.  Let me take a look at the form for a minute.  You're

19  looking at Exhibit A?

20          MR. SAKELO: It's - Did Your Honor receive a copy of

21  our submission?

22          THE COURT: No, I did not.

23          MR. SAKELO: All right.

24          MR. BERNICK: Your Honor, we'll accept that last

25  suggestion that counsel made.

1           THE COURT: All right.

2           MR. BERNICK: So the last two issues that were

3   raised, (a) when we have to make a commitment that we agreed

4   that it's settled, and (b) his capital letters point we are

5   agreeable to and will work with him to include them.

6           THE COURT: Okay, that's fine.

7           MR. SAKELO: Finally, there's various points in the

8   notice in particular, and I think there's one point in the

9   order in which the debtors are requiring the claimants to

10  complete the questionnaire as opposed to answer the

11  questionnaire.  The degree of which somebody completes the

12  questionnaire is really subject to the motion to compel.

13          THE COURT: That's fair.

14          MR. SAKELO: That's for September 11, so we would

15  prefer the more neutral answer.

16          MR. BERNICK: Your Honor . . . (microphone not

17  recording) by September the 11th we are going to have, I

18  believe - the mediation is set for August the 29th.  The

19  matter is to be heard on September 11th.  This is all before

20  these folks have to do anything.  So, really, I mean, I

21  suppose in kind of an unfortunate way it is amusing, but the

22  whole idea of a questionnaire was not that people not answer

23  them, it was that they answer them.  So, if what they're

24  doing is preserving their right to make objections, it

25  doesn't seem to me that we ought to bless the idea that

1    people are going to be objecting to these things even more

2    than they already have.

3         THE COURT: I think it's very unlikely, having gone

4    through the process that this Court went through for days

5    about the questionnaire, that a whole lot of objections are

6    going to be sustained to the information requested on the

7    questionnaire.  So, folks get it filled out and get it

8    returned.  It's now no longer just the debtor's mechanism for

9    asking for something for estimation.  It's now a formal

10   discovery.  So, you can file an objection if you've got one,

11   but we went through this at length.  The language was vetted

12   by everybody who was present in court.  The courtroom was

13   filled on all of those days, so frankly, I don't think you're

14   going to have too many objections that will be sustained.

15   There may be some.  I'm not ruling in advance, but the

16   presumption that I'm going to make is that this questionnaire

17   was essentially what everybody agreed on could make sense for

18   the parties who had to fill it out and could be returned in

19   some completed fashion.  So that's the presumption I'm

20   starting with.

21        MR. SAKELO: That's a fair point, Your Honor.  I

22   understand where the Court is coming from.  The reason why we

23   made this particular suggestion was that number one, we are

24   hoping and at least we've been working with the debtor under

25   the assumption that these materials would go out by September

1    1.

2            THE COURT: Okay.

3            MR. SAKELO: So that the settled claimants would

4    have 45 days up until the October 16th deadline to get their

5    materials together and send the proofs of claim in. So the

6    issues on the motion to compel will hopefully happen after

7    the bar date materials go out, and the second point is, is

8    that we feel that by requiring claimants to answer the

9    questionnaire, they're going to answer it according to how

10   this Court rules on September 11, so we feel that our

11   suggestion captures the essence of the direction the Court is

12   going.

13           THE COURT: So you want it basically to say, Check

14   here if you returned the questionnaire to Grace and want it

15   to be part of your proof of claim form; is that -

16           MR. SAKELO: No, Your Honor, let me see if I can

17   find an example in my submission.

18           MR. BERNICK: Yeah, I think I can make it simpler.

19   First, whoever is going to have objections to the face of the

20   questionnaire, they're all going to get resolved because if

21   they haven't participated in the process, they've been

22   invited to and they've declined to participate, so, in a

23   sense filling out the questionnaires will no longer be the

24   subject of objections.  The objections will have been

25   resolved.  If counsel would feel more comfortable with our

1    saying they must answer the questionnaires as opposed to

2    complete, we would agree with that provided that we're not

3    going to then hear some kind of argument by people coming

4    into court saying, Oh, well, we were very careful.  All we

5    did was answer.  We didn't have to complete.  In other words,

6    I don't want this to be used as a sword to somehow argue that

7    because we've agreed to it, that somehow that means that

8    people don't have to do what they're supposed to do.

9         THE COURT: Well, the problem is that the Committee

10   is here and could make that agreement, but they can't speak

11   for everybody who's going to get this form, and so there

12   isn't any way, I think, that I can make a ruling that says,

13   Answer means complete, which is pretty much what you're

14   suggesting.

15        MR. BERNICK: No, no, to the - It seems to me it's

16   the contrary.  It's the same thing that you have in a case of

17   what we went through with the property damage people.  The

18   property damage people ultimately were involved in litigation

19   over the form of claim that would be submitted, and that

20   required effectively the same kind of thing that we're now

21   doing through the questionnaire.  All that we're doing is to

22   say, If you are a non-settled claimant, you are then going to

23   have to complete the questionnaire.  Your Honor has the power

24   to do that, the Committee is representing all claimants in

25   connection with the bar date.  There's no reason why they

1   don't represent these folks with respect to the very issues

2   that are spelled out in the bar date.

3          THE COURT: What about just simply say, Fill out.

4   Not answer, not complete, fill out and return.

5          MR. BERNICK: Fill out.  We're -

6          MR. SAKELO: Very well, Your Honor.

7          THE COURT: Fill out and return the questionnaire.

8          MR. SAKELO: Okay.

9          MR. BERNICK: Are we done with -

10          THE COURT: Does anybody have an objection to "fill

11   out"?

12          MR. PHILLIPS: Not on that point, Your Honor, but I

13   wanted to make one point.  Going back a little bit to the

14   issue with regard to the requirement that asserted settled

15   claims, completed questionnaire upon, I guess, an objection

16   by the notification by the debtor that they don't believe

17   their books show that a claim is settled.  My only concern if

18   someone again in the trenches is actually dealing with this

19   is that we get different answers at different times from the

20   debtor as to whether a claim is settled or not.  Earlier in

21   the case we get a letter from some random person at K&E

22   saying we have these claims of yours as settled, and then

23   just last week we get a different list of claims that are

24   settled, they believe their settled, and they are trying to

25   work with us, but my point is, I don't think the Court should

1    operate from this assumption that the debtor's books and

2    records are the be all/end all of the fount of knowledge.

3         THE COURT: I don't.  I'm not.  I think I said

4    earlier today that in the event that the documents, that

5    there are written documents and they are attached to the

6    proof of claim form, then whether the debtor's records show

7    them as settled or not, if in fact they're in writing, I

8    don't expect to see objections by the debtor saying that

9    their books and records don't contain the forms because now

10   they do.  You've just submitted them.

11        MR. PHILLIPS: Right.

12        MR. BERNICK: I'm a little perplexed because in

13   light of counsel's appearance at the last hearing and the

14   complaints that somehow we were suggesting that by their

15   failure to submit the questionnaires they had failed to do

16   something that they were doing, we specifically had reached

17   out to - is it the Simmons firm?

18        UNIDENTIFIED SPEAKER: SimmonsCooper.

19        MR. BERNICK: SimmonsCooper firm to find out what

20   they believe is settled and what they believe is not settled.

21   We have no desire to have any uncertainty with respect to

22   what our books and records say.

23        MR. PHILLIPS: Well, Your Honor, that's my point is,

24   they reach out and we get a completely different list - well

25   prior list, and the import of this is that these are the

1   people -

2          MR. BERNICK: Excuse me, if I can -

3          THE COURT: Mr. Bernick, let him finish, please.

4          MR. PHILLIPS: These are the people - The issue is

5   not - There's two issues.  One, the global issue, are they

6   settled or not, but the real live impact of this is if the

7   debtor comes back and says, We don't think you're settled

8   based on our books and records, which I'm saying here aren't

9   reliable and seem to change based on the pace of the case,

10  that claimant is being forced to go forward with answering a

11  questionnaire based on the debtor's current books and records

12  -

13         THE COURT: Apparently I'm not being clear.  If the

14  claimant's settlement is in writing and the documents are

15  attached, a settlement agreement, something that has to do

16  with the release one way or another and an indication whether

17  or not the claim has or hasn't been paid, whether the

18  debtor's records show that there is a corresponding entry or

19  not, if all the documents are attached, a letter from the

20  debtor, a letter from the law firm and a release, whether the

21  debtor's records show it or not you've substantiated that

22  there is some reason to believe it's a settled claim, and I

23  don't expect to get an objection from the debtor based on the

24  fact that there is nothing in their books that supports it

25  because you now will have shown prima facie evidence that the

1  claim was settled, and the debtor can't simply say, we don't

2  have any evidence in our books to attack that prima facie

3  claim.

4          MR. PHILLIPS: I'll let the point go, Your Honor.  I

5  just wanted -

6          MR. BERNICK: Please do because, Your Honor, there's

7  all this - our lists have changed.  I don't know where this

8  is coming from.

9          MR. PHILLIPS: It's because we have new information.

10         MR. BERNICK: Excuse me.

11         THE COURT: Gentlemen.

12         MR. BERNICK:  Excuse me.  We specifically reached

13  out to his firm to resolve these matters so we wouldn't have

14  to take up court time.  The debtor is not - We set out what

15  the criteria were, and we're going to stand by them.  If it's

16  not in our books and records that they got the goods, we're

17  not going to be sitting there pestering the Court.  So I

18  don't understand what the beef is here.

19         THE COURT: I don't either at this point.  I don't

20  expect to see spurious objections.  I do not expect to see

21  it.  People will not be paid for filing spurious objections.

22  In case I need to make it anymore clear, they will not be

23  paid, and I'm going to make sure Mr. Smith knows this.  So, I

24  will be getting objections in the event that there's an

25  issue.  Now, having dealt with the written, if there's an

1    oral - alleged oral settlement and the debtor doesn't have

2    any evidence in the books and records that in fact there is

3    no settlement, I do expect - actually, I don't think it's

4    going to be an issue, because if it's an oral agreement the

5    claimant has to fill out the questionnaire and return it

6    anyway without the debtor worrying about books and records.

7    So, I don't see how this books and records issue is going to

8    come up very often.

9          MR. PHILLIPS: I just wanted to make a point, Your

10   Honor, thank you.

11         THE COURT: Okay.

12         THE CLERK: Sir, please enter your appearance.

13         MR. PHILLIPS: Sorry, Robert Phillips,

14   SimmonsCooper.

15         MR. LOCKWOOD: One other item that is more of a

16   scheduling item that relates to the order that was submitted,

17   Your Honor.  The debtor's order, and you'll see we objected

18   to this in the certification we filed, provides that the

19   Court will hear and decide whether a claim is a settled pre-

20   petition asbestos claim or non-settled pre-petition asbestos

21   claim at the December 18, 2006 omnibus hearing.  That assumes

22   that it's going to be - Well, let me back up a second.  Your

23   Honor has been focusing on this discussion so far in terms of

24   the obligation to fill out a questionnaire, and obviously if

25   the only consequence of taking the debtor's view of things is

1    to fill out a questionnaire, one can understand how Your

2    Honor would arrive at that, but the fact is that what they're

3    doing is filing an objection to a formal proof of claim that

4    says, I have a settled claim.  That initiates, under the

5    Bankruptcy Rules a contested matter, and while Your Honor may

6    well ultimately conclude as you have preliminarily concluded

7    today that certain prerequisites apply in all the 50 states -

8         THE COURT: No, Mr. Lockwood, I haven't concluded

9    that.  I'm addressing who has to fill out a questionnaire and

10   under what circumstances.

11        MR. LOCKWOOD: Okay.

12        MR. BERNICK: I have a proposal to make that might

13   expedite this.  Our goal in creating the process that Mr.

14   Lockwood has made reference to and the - in pegging December

15   the 18th, is that in the event that we come up with situations

16   that involve significant numbers of claims -

17        THE COURT: Mona, hit that button, please.  I'm

18   sorry, Mr. Bernick.

19        MR. BERNICK: Yeah.

20        THE COURT: Thank you.

21        MR. BERNICK: The whole purpose of that date was to

22   be able to have a backstop such that if we've got a big

23   problem that we've run into where people have not attached

24   documentation that we believe reflects a settlement and

25   involves a significant number of claims, we want to have the

1   opportunity to have the matter placed before Your Honor

2   pursuant to a set procedure so that Your Honor can look at

3   the issue that has arisen and say, Yeah, maybe I won't decide

4   forever that the claim wasn't settled.  But on the basis of

5   what I've seen, I want you to fill out the questionnaires

6   because otherwise we take all - we don't even take the

7   pressure, they'll simply will be a disagreement.  We'll say,

8   You haven't met it.  They'll say, Oh, yes, we have.  And they

9   won't fill out the questionnaires.

10          THE COURT: Maybe the notice needs to be changed to

11   say that if you claim that you have - If the contention is

12   that you have a settled claim and the debtor disputes it,

13   then the Court will decide on December 18th whether for

14   purposes of filling out the questionnaire you have a settled

15   claim or not.

16          MR. BERNICK: Fair enough.  That's -

17          MR. LOCKWOOD: Okay, Your Honor, that's actually in

18   the order -

19          THE COURT: Okay.

20          MR. LOCKWOOD:  - where they set the omnibus

21   hearing.  So it's the sentence and their version of it is

22   page 5, it's the second full order paragraph at the bottom of

23   page 5 and the second to last sentence there that needs to be

24   revised in the manner that Your Honor just described.

25          THE COURT: Okay.

1           MR. BERNICK: We will - What I was going to suggest

2     is that we will, with the benefit of this discussion here, go

3     back and submit within - let's say, what, by when - Before

4     the end of the week, we'll circulate a revised set of

5     documents and then we have the same thing that says if we

6     can't reach agreement then by next Wednesday we'll submit it

7     to the Court or Thursday, we'll submit it to the Court.

8           THE COURT: Okay, does that solve that problem, Mr.

9     Lockwood?

10          MR. LOCKWOOD: It does, Your Honor.

11          THE COURT: All right.

12          MR. BERNICK: Okay.  I think that the only thing

13    really of consequence left on PI is just a little bit of the

14    status report and, Your Honor, we'll get - furnish copies of

15    these for everybody, but essentially, here's where we stand

16    now on the questionnaires.  It turns out that 116,000 of them

17    were mailed out.  This number does not include the settled

18    claims.  You're seeing apples and apples, and of the ones

19    that were sent out under the understanding that they were not

20    settled claims, there were 116,000 of them total, 55,000 or

21    about 46.7 percent have been returned, and this is now

22    current as of a more recent date, but essentially that

23    percentage hasn't changed.  We reviewed the last time the

24    responses from the top 20 firms, and you can see that in many

25    cases some of the numbers have shifted around, and that

1  again, not including settled claims, got 6,800 claim forms,

2  have submitted 1,100, Barron Budd 63 versus 3,800; Siber

3  Pearlman is much closer, 3,151 versus 3,127.  We're talking

4  about a very substantial delta between the number of claims

5  that we had on file as being - our records reflected were

6  pending not settled and the ones that had been returned.  Of

7  the ones that had been returned -

8       MR. LOCKWOOD: Your Honor, I'm sorry.  I object to

9  this.  We're having a hearing in three weeks on the motion to

10  compel.  I don't for the life of me understand why at 6:30 at

11  night we have to listen to a self-serving explanation from

12  Mr. Bernick about somehow or another his complaints.  Why do

13  we need a status conference on a subject that we're going to

14  have evidentiary hearing and objections.  Everyone of these

15  firms that has - well, I shouldn't say everyone, but lots of

16  them, there are multiple objections on file with the Court.

17  Many of the firms have attempted to explain the discrepancies

18  between the number of questionnaires they got and the number

19  returned.

20       MR. BERNICK: Your Honor, I'm sorry, I -

21       THE COURT: Mr. Bernick, I can't - Really, please, I

22  really wish you would not interrupt.  I cannot concentrate on

23  two people talking at the same time especially with this

24  noise that's coming from this air conditioning system.  I

25  can't hear you.

1          MR. BERNICK: With all due respect, Your Honor, I

2     think I was the one who was interrupted.  I have listened to

3     hours of self-serving statements.  All we were doing is we

4     doing exactly what we did at the last hearing which is to

5     provide the data.

6          MR. LOCKWOOD: And I objected to it -

7          MR. BERNICK: And Mr. Lockwood may not like it, but

8     it's what's actually going on.

9          THE COURT: Well, I think at this -

10         MR. LOCKWOOD: Why do we need this.  I'm objecting

11    to it, Your Honor, as -

12         THE COURT: I sustain your objection.

13         MR. LOCKWOOD: Thank you.

14         THE COURT: I don't need it today.  I will be

15    hearing it in connection with the evidentiary hearing in

16    three weeks, and it is late so I don't need it today.

17         MR. BERNICK: I think that that then means that

18    we're left with two matters.

19         THE COURT: Mr. Monaco had something he wanted to

20    put on the record first, Mr. Bernick.

21         MR. MONACO: Thank you, Your Honor.  As Your Honor

22    is aware, I represent the State of Montana which also is

23    contribution indemnification.  I just wanted some

24    clarification from the Court.  I was reviewing the form, the

25    proof of claim form, and looking at the definition of non-

1    settled pre-petition asbestos PI claims.  It could arguably

2    apply to some of the contribution indemnification claims we

3    have because there was a few lawsuits that were filed prior

4    to the petition date against both Canada - I'm sorry, against

5    the debtor and Montana where we may have cross-claimed.

6    Given what the debtor is trying to accomplish here and the

7    fact that Your Honor exempted Canada and Montana from filling

8    out the questionnaires, I just wanted to make sure and hear

9    it on the record whether or not this would apply to

10   contribution indemnification claims.

11        THE COURT: I didn't understand that that's what the

12   debtor wanted, but let me ask the debtor.

13        MR. BERNICK: I don't think that - No, it doesn't.

14        MR. MONACO: Okay.  Thank you, Your Honor.  I just

15   wanted to get that on the record.  Thank you.

16        THE COURT: Okay.

17        MR. BERNICK: I think that means, Your Honor, that

18   we have two matters that are left over that relate to Mr.

19   Speights.  One is the late authority issue and the other is

20   the Anderson Memorial case, and with that I think -

21        MR. PHILLIPS: Your Honor, I hate to interrupt.  My

22   motion was actually number 11 on the docket.  I don't know if

23   the debtor wishes to push it, and that's why we're being

24   moved aside for Mr. Speights.  I'll go with the debtor's

25   agenda, but we were on - they put us on the docket.  I had

1    offered to move us to September 11th, to put everything

2    together, but, I'm prepared to go forward today, but I'll

3    defer to the debtor.

4          MR. BERNICK: (Microphone not recording.)

5          THE COURT: What's your motion, I'm sorry.  What's

6    number 11?

7          MR. PHILLIPS: Your Honor, SimmonsCooper - we filed

8    a motion on behalf of our claimants who responded to the

9    questionnaire, which we defined as the claimants, to allow us

10   to move forward with discovery against the debtor and third

11   parties, and that motion has been joined by a couple other

12   law firms, none of whom I believe are in the courtroom today,

13   but, again, I'm not sure - the debtor put the agenda together

14   and they apparently moved passed it, so -

15         MR. BERNICK: No, we're happy to address it right

16   now.  It's a pretty simple issue.

17         THE COURT: Go ahead.

18         MR. PHILLIPS: All right.  Your Honor, basically,

19   you know, I came to this a little bit late.  There's two

20   issues here, I think, Your Honor.  One is, it seems a

21   principle of fundamental fairness and due process that if

22   someone is being asked to respond to discovery by one side to

23   a litigation and that's certainly what the questionnaire is.

24   Today we've also heard the questionnaire's being adopted and

25   bootstrapped into the proof of claim process so as to be made

1  a discovery vehicle for all, which I have another point upon,

2  but fundamentally it was originated as the debtor's

3  discovery, and the Court allowed this to go forward on the

4  basis of, well, "It's the debtor's discovery", quote/unquote.

5  That being the case, Your Honor, I think it's only fair that

6  the other parties to the litigation, namely the claimants, be

7  allowed to prove up their own cases.  Now the debtor makes a

8  lot of points about, well, it's not necessary.  It's not

9  needed.  It's burdensome and so forth, and, Your Honor, I

10  would say as to claim forms that limit themselves to what's

11  your name?  Do you allege an injury?  What is your medical

12  condition so that we can put you properly and categorize you

13  as to what kind of claim you're bringing?  I would agree.

14  However the debtor's questionnaire goes far beyond that.  The

15  debtor's questionnaire asks about exposure to their products.

16  It asks about exposure to other companies' products.  It asks

17  about settlements with other parties.  It asks about

18  practically everything that touches upon in any conceivable

19  way the merits of the claim the person is bringing.  And

20  given that, I think the Court needs to look at the fact that

21  the issue is not just whether the claimant has a claim

22  against Grace.  Your Honor's made a lot of points about how,

23  well, they had to know something for them to have filed a

24  proof of claim or to have brought suit, and that is true,

25  Your Honor.   The claimant maybe had to know something, but

1   the debtor's asking far more than that and is going to use

2   the information for far more than that.  The claimant may

3   know, Well, I think I was exposed to Grace because of X, Y,

4   and Z, but they don't know about A through W, which they

5   would have learned through discovery in the litigation, and

6   if this material is actually going to be used in any

7   meaningful manner in this estimation process or claims

8   objection process or so forth, it's important to know, well,

9   how good is the claim.  I mean if the claimant comes forward

10  saying, Well, I worked for a year as a plasterer, and I think

11  I used monokote during that one year.  That's great.  Maybe

12  that's prima facie enough in the debtor's view to bring a

13  claim.  However, if through discovery, as often is the case,

14  they can prove that they were exposed to Grace products for

15  15 other years at 6 other job sites working for 10 other

16  employers, the nature of that claim is substantially

17  different than what is going to be shown by just the

18  questionnaire answered by the claimant himself using the

19  claimant's attorney without any benefit of discovery from the

20  debtor, and if this information is truly going to be useful

21  in any kind of meaningful estimation process, that

22  information needs to come out. Otherwise, all we have is the

23  bare bones minimum under the state equivalent of Rule 11 to

24  bring a complaint and that information being used by the

25  debtor and its experts to say, Well, even if these group of

1    claimants have this claim, they only have this level of

2    claim.  Their evidence only rises to this level or because

3    they're in the wrong category of occupation, their claims

4    aren't worth much, therefore, the experts will hypothesize

5    that the aggregate claims will be much less.  However, if

6    these claimants were able to develop their cases and say,

7    Well, yeah, that's true, but through discovery I could have

8    learned that I had 15 other years of exposure to the debtor's

9    products, and therefore, that claim and all the claims like

10   it, get elevated in value as certainly they would be.  Well,

11   that's certainly meaningful evidence that the Court would

12   like to know and the experts would like to know to be able to

13   pronounce to the Court what these claims are worth.

14        THE COURT: You have the right to take discovery

15   against the debtor.  I'm not going to opine as to the

16   reasonableness of what that discovery is now, but this is an

17   objection process.  The debtor has raised some discovery

18   issues.  If you think your clients are not able to

19   appropriately, you know, assert what their claims are without

20   some discovery, you can take some limited discovery, but it

21   is going to be limited, because, frankly, your clients ought

22   to know where they worked for the past 20 years and whether

23   the debtor had some product.

24        MR. PHILLIPS: Well, I would agree, Your Honor,

25   universal interrogatories of the nature of where are all the

1    juice-applied products in the North American market, I would

2    agree would be inappropriate.  On that point, Your Honor,

3    just to follow up, I mean, I wasn't really certain because

4    (1) the motion to compel in our view, the motion to compel

5    the debtors have brought saying that the current answers we

6    have out there or the current completion or fill out, however

7    the terminology we're using today, that that is an objection,

8    and by the very nature of bringing their objection and motion

9    to compel in all of our claims, they've created contested

10   matters, and I note that paragraph (9) of the amended CMO

11   says all written fact discovery and all throughout the order

12   it talks about all parties, any parties, and so forth without

13   any limitation to certain denominated entities.  You know,

14   and therefore, if Your Honor's ruling is today we can go

15   forward with discovery, of course subject to the debtor's

16   objections, then I will stand down and beam accordingly.

17          THE COURT: I think you've got the right to take

18   some discovery.

19          MR. BERNICK: Well, Your Honor, I think I'd like to

20   visit on that for a moment.  In connection with the property

21   damage claims, we are told it really can't be estimation.

22   It's got to be adjudication of objections.  In the case of

23   personal injury, we're doing estimation not the adjudication

24   of objections, and they want to take discovery as if there

25   are objections.  There are not objections to their claims.

1    You have a bar date that's being filed.  They will file their

2    claims by the bar date.  We have not set out a process at

3    all, for objecting to any of their claims.  Therefore, as to

4    their individual claims, there is no contested matter.

5    There's no right to discovery.  There's nothing.

6            THE COURT: Well, if there isn't a claim, yes.

7            MR. BERNICK: There's not even a claim yet.

8            THE COURT: So, when there are proofs of claims

9    filed, if the debtor has some objection to the proof of

10   claim, they have the right to take some discovery.

11           MR. BERNICK: If the debtor has and lodges an

12   objection to the proof of claim, I would agree.  At that

13   point we would have a process whereby they would have to

14   answer and demonstrate what they had to support their claim,

15   and if we then contested their claim, we could be talking

16   about individual claim discovery.  That's a different CMO.

17   This CMO deals with an estimation, and the estimation is not

18   the adjudication of individual claims.  In contrast to

19   property damage, we had specifically said that we're not

20   seeking to disallow, allow or disallow, any of the individual

21   claims.  We do have a contested proceeding.  It's a contested

22   proceeding that I don't even know whether this gentleman here

23   or his clients has standing to participate in because it

24   doesn't really involve their claims.  This is an estimation

25   where the Personal Injury Committee will be representing the

1    interests of the claimants as to estimation in the aggregate.

2    Now, that is a contested proceeding.  That is a contested

3    proceeding, as a result, we have discovery that relates to

4    it.  We are taking discovery in the form of the

5    questionnaires.  We know that the Personal Injury Committee

6    has been very diligent in showing up at the Cambridge

7    document depository taking boxes and boxes and boxes of files

8    out of the document depository for purposes of preparing

9    their estimation case.  So, this case management order deals

10   with the estimation.  It doesn't deal with anything else.  It

11   contemplates there will be discovery that's relevant to the

12   estimation.  You then say, Well, what is relevant to the

13   estimation?  The answer is, the claims are relevant to the

14   estimation insofar as they inform the expert testimony of

15   people who will be testifying on both sides -

16        THE COURT: Yes -

17        MR. BERNICK:  - which then brings me to -

18        THE COURT:  - but the point is that the information

19   may not be sufficient because the claimant doesn't know all

20   of the places or products of the debtor.

21        MR. BERNICK: It may not, and that will go to the

22   weight of the evidence that's offered by whatever party seeks

23   to proffer the questionnaires as being evidence about what

24   the value of the claim is.  That's something that we're going

25   to have.  That's an issue that we're going to have to

1    address.  I'm very, very comfortable addressing that issue in

2    part because we're talking about claims now that are five

3    years old and have been through the entire litigation process

4    with respect to all kinds of other defendants.  These aren't

5    people who are walking out saying, Gee, I've got a claim.

6    I've got to go figure out what's going on.  These are people

7    who have had claims for years that have been pending, that

8    have had massive discovery against Grace.  They've had

9    discovery against the other companies.  They've had doctors

10   come and look at them presumable to prosecute their claims.

11        THE COURT: Well, some of them may, but surely not

12   everyone's in that position.

13        MR. BERNICK: Every - Your Honor, talk about being

14   in the trenches.  Every single claimant who is a part of this

15   list, almost without exception, is represented by counsel.

16   The number of lawyers who are involved in the asbestos

17   litigation process is actually relatively limited.  They've

18   got it down to a machinery.  Every single one of their claims

19   is prepared however they're going to get prepared in order to

20   maximize -

21        MR. PHILLIPS: Your Honor, I object to Mr. Bernick's

22   representation as to how we file our claims.

23        MR. BERNICK: Excuse me.  Excuse me.

24        MR. PHILLIPS: (Microphone not recording) . . . but

25   that's going a little far afield.

1          MR. BERNICK: Your Honor -

2          THE COURT: I don't think the issue is the claim.

3    The issue is whether or not this is mature litigation.  Mr.

4    Bernick's position is that it is mature litigation, and that

5    everyone out in the tort system has had the benefit of the

6    knowledge that's out there in the tort system for years.

7    Your point is that specific claimants in filling out the

8    questionnaire may not have it.  It seems to me that the best

9    way to go about solving this dilemma is to take some

10   information from the disclosure statement, post it on the

11   debtor's website, and refer any claimant who has a question

12   about what entities Grace operates or what product Grace used

13   to the website, and then they can find out in advance whether

14   or not there's some product claim or plant location.

15          MR. BERNICK: Well, Your Honor - I'm sorry, Your

16   Honor.  We're not - to get involved in disclosing to the

17   claimants where we operated and where our products are so

18   they can figure out whether when they filed a claim against

19   us in 2000 they had the basis for doing it.  Your Honor, the

20   touchstone here is a contested estimation process.

21          THE COURT: The touchstone for this Court is to

22   figure out what the best estimate of the amount of a trust

23   that has to be funded based on what legitimate claims,

24   because that's the point you've been raising since the outset

25   of this case -

1           MR. BERNICK: Correct.

2           THE COURT:  - you want to look at the legitimate

3   claims, so I want to get in the universe of legitimate

4   claims.  It doesn't cost the debtor virtually anything to

5   publish on its website the list of the debtor-affiliated

6   entities, the product that the debtor has used that contains

7   asbestos that the debtor recognizes, and probably the plants

8   where that was either manufactured or represented from.

9   Other debtors have done it, I see no reason why it can't be

10  done.

11          MR. BERNICK: Your Honor, no, I'm sorry.  I'm sorry.

12  This is something that's completely divorced from the reality

13  -

14          THE COURT: Fine, then I'll just let him take

15  discovery -

16          MR. BERNICK: No, but, Your Honor -

17          THE COURT:  - Mr. Bernick, pick, choose.

18          MR. BERNICK: That's fine.  We can go ahead and

19  we'll take discovery and we'll take discovery of all the

20  doctors and their relationships with the lawyers.  The point

21  is this.  None of their experts, none of the Personal Injury

22  Committee's experts are asking for discovery that's relevant

23  to the individual claimants.  Not a one of them.

24          THE COURT: Well, how do you know that?

25          MR. BERNICK: Because we know.  They haven't served

1   us with any such discovery.  In all the other cases that they

2   litigate they don't want to know about that stuff.  What they

3   want to know about is the claims that we've settled -

4           THE COURT: All right.

5           MR. BERNICK:  - not the current claims.  Number

6   two, we are not in the situation of having a bar date for

7   purposes of finding out other claimants who are out there.

8   This bar date is specific to people who already had claims

9   pending against Grace as of the time of the filing.

10          THE COURT: Yes, I understand that.

11          MR. BERNICK: So they've already made their claims.

12  We don't have to go tell them how to go make a claim, they've

13  already made their claims.  All we're doing in the

14  questionnaires is finding out what they know to be the basis

15  for their claims so that the experts then can have a data set

16  that says, Well, for whatever value it has, this is what was

17  known to support the claims as of the time the questionnaires

18  are filed.  If they - there's an individual claimant wants to

19  come in who hasn't even filed a claim and doesn't even have

20  an objection to the claim, and on a participatory basis

21  participate in the estimation process so that this gentleman

22  here is going to go file discovery so that he can participate

23  in the estimation process, we can talk about that, but then,

24  the next thing that's going to happen is we're going to be in

25  here asking for individual claimant discovery and the lawyers

1  and the doctors and how the claims were put together.  It's

2  got to be one or the other.  We can't have the Committee say,

3  No, you can't do that, which is what they've said, and then

4  have an individual law firm come in here and say, I want to

5  do it.

6        THE COURT: Look, this is my point.  I want the best

7  information that's available for the use of any expert who's

8  going to make use of it. That's all. That's the point.  I

9  don't see how the debtor is harmed by listing on its website

10 who the affiliate debtors are who were in bankruptcy and the

11 products that it listed.  You're going to have to do that in

12 the disclosure statement and plan for purposes of figuring

13 out who has claims against varieties of insurance policies

14 and things anyway.  I mean, all the other debtors have done

15 it, Mr. Bernick.  What's the issue?

16       MR. BERNICK: What's the point?  I mean, you're

17 going to have a bunch of people then come and say, Oh, I got

18 exposed to the - you've got a laundry list.  They'll all list

19 all the products and say, Well, I was exposed to them all.

20       THE COURT: Maybe you will.

21       MR. BERNICK: But what's the point of that?

22       THE COURT: The point of it is that if they know

23 what product they're exposed to, they'll fill out a proof of

24 claim which your experts, hopefully, will evaluate, and if

25 they list that they were exposed to all of the products, in

1    all probability your expert's going to throw out that

2    information with good reason.

3          MR. BERNICK: Your Honor, they are all represented

4    by counsel.  Counsel has had access to this information and

5    more information for years, and indeed, has enough

6    information to be able to make sure that the questionnaire is

7    filled out properly.

8          THE COURT: Mr. Bernick, what is the issue about

9    putting the stuff on the website?

10         MR. BERNICK: Because I don't understand how it's

11    even appropriate.  We are -

12         THE COURT: List the debtors for public information

13    purposes what debtors in bankruptcy -

14         MR. BERNICK: That's not - Obviously, putting

15    something on the website is not a big deal.  That's not what

16    my point is.  My point is this: We have gone through an

17    extended process with the Bodily Injury Committee, and we

18    have litigated and litigated and litigated exactly what's

19    going to take place, and we've been shut down from a lot of

20    things that we wanted and the questionnaire and otherwise.

21         THE COURT: And if somebody opens it up, you'll be

22    opened up.

23         MR. BERNICK: No, I know what's going to happen

24    which is this gentleman comes in and says for some reason he

25    wants this, and we say, Okay.  Well, if you're going to get

1    that, we now want to go back and ask more questions of all of

2    the claimants so that we can explore what this gentleman has

3    opened the door to, and Mr. Lockwood is then going to say,

4    Well, that was just this gentleman here.  He's not the

5    Committee.  He doesn't speak for the Committee.  There's got

6    to be -

7         THE COURT: All right.  Individual claimants, in the

8    event that a proof of claim is filed and some objection is

9    filed, will have the right to do some limited discovery.

10   That's what I started this process with.

11        MR. BERNICK: That's fine.

12        THE COURT: For purposes of filling out the

13   questionnaires, if the people want to know who the debtors

14   are, what the debtor's products are, and where the debtor's

15   major operations were, the debtor has an obligation to

16   provide that information to the claimants, and I'm ordering

17   the debtor to do it.  You can do it one of two ways.  You can

18   attach it to the notice that goes out so everybody has it or

19   you could put it on the website and you can refer the

20   plaintiffs to the web - the clients, not the debtor can refer

21   the claimants to the website in the event that there's an

22   issue that they want to discuss with their clients.  You

23   pick.

24        MR. BERNICK: Well, Your Honor, I will - we'll pick

25   the website -

1           THE COURT: Fine.

2           MR. BERNICK:  - or we'll pick the other one.  The

3    real question is what this now means to the Personal Injury

4    Committee is going to pick by way of drawing the lines

5    because we will now serve discovery -

6           MR. LOCKWOOD: Can I speak to that, Your Honor?

7           THE COURT: Yes.

8           MR. LOCKWOOD: Mr. Bernick has just explained his

9    view of what the Committee's been up to for the last several

10   years in the context of announcing that this is a contested

11   proceeding involving estimation in the aggregate not an

12   allowance.  What Mr. Bernick conveniently is ignoring here,

13   which will undoubtedly come up on September 11th, is that as

14   the Court noted when Mr Bernick said I'm concerned that in

15   this aggregate estimation proceeding, many of these claimants

16   may not answer the questions, so I need to obtain

17   jurisdiction in this Court over each and every one of these

18   claimants, and therefore, I want a bar date.  Your Honor

19   pointed out to Mr. Bernick at that time, which only happened

20   a couple of months ago, not years ago, that once he got

21   people to file claims the bankruptcy rules intervene and he

22   is now blithely saying, Well, I'm not going to object to

23   these claims.  Well, under the bankruptcy rules, what happens

24   when you don't object to a claim.  It's deemed allowed.  Now,

25   Mr Bernick is, Oh, no, we're not having anything to do with

1    allowance of claims here, but he was the one who decided that

2    he wanted a bar date so that he could force people who he

3    otherwise didn't have jurisdiction to give you discovery.

4    So, he's now got 118,000 or 160,000, or whatever it is,

5    contested matters once these people file claims or he can

6    live with the consequences of having the claims deemed

7    allowed for purposes of his experts and whatever that means.

8    Secondly, with respect to these constant iterations that

9    these claims have been out there for five years and there's

10   massive discovery against Grace.  That's what he said.

11   Massive discovery against Grace, there hasn't been any

12   discovery of Grace for five years because of the automatic

13   stay.  And he says, Oh, well, the lawyers know.  The lawyers

14   may know what clients who they settled or they litigated with

15   Grace before the bar date that came to trial that went

16   through discovery.  I haven't the vaguest idea nor does Mr.

17   Bernick have the vaguest idea how many of these people with

18   the pre-petition litigation claims against Grace actually got

19   discovery from Grace about their claims, and this business

20   about, Well, if you know what product Grace manufactured and

21   you know where they manufactured it, as Mr. Phillips will

22   tell you, that's not the critical thing.  The critical thing

23   is, Where was the product used, the job site, because that's

24   where you get exposed for most of these people not in the

25   factory.  I mean to some extent Mr. Bernick is correct in his

1  comments about the website.  The website will only give you

2  the sort of most generalized level of information that a

3  client and his lawyer would need to know for the client's

4  particular claim how many times, as Mr. Phillips explained,

5  the client was at job sites where monokote was used, and Mr.

6  Bernick says, Well, the Committee hasn't been seeking that

7  information.  That's because up until October - November the

8  15th of 2006, there will never have been any asbestos personal

9  injury claims filed in this case, and the Committee has been

10 the one that has all along proceeded on the assumption that

11 we weren't going to have any kind of allowance process, and

12 that we were going to have an estimation that was going to be

13 dealt with in the aggregate.  What Mr. Bernick has done is by

14 trying to create an aggregate estimation process that as he

15 constantly asserts is going to involve his experts testifying

16 about the validity of individual claims in order to get what

17 he thought was the tactical advantage of getting discovery

18 orders out of this Court, forcing the individual claimants to

19 give him information, he's the one that chose to go down the

20 bar date route.  If he wants to go down the bar date route

21 and take all the discovery from each of the 118,000

22 claimants, he can start I guess doing that.  I would suggest

23 to the Court, however, that if he does that, we're going to

24 be here for another five or ten years, and I'm not sure that

25 the Court, when it comes time to consider the exclusivity

1    issue, is going to find that a terribly attractive process.

2         MR. PHILLIPS: One minutes, Your Honor, I'd like to

3    rebut Mr. Bernick's -

4         MR. BERNICK: What is one point?

5         MR. PHILLIPS: You rebutted me, I get to rebut you.

6    Our firm was - just one point.  There are certain firms out

7    there, you see their names, who may very well have binders of

8    documents on certain job sites that are superior to what

9    Grace itself knows.  My firm was founded in 1999, middle of

10   1999, not even two years before Grace filed bankruptcy, by a

11   pair of lawyers less than five years out of law school.  To

12   say that we have this vast information library at our

13   disposal for Grace for all the claims we have across

14   Illinois, Missouri, and now, you know, no one's talking about

15   the tens and hundreds of thousands of claims filed since

16   petition date, but we have them all over the country now.  We

17   haven't been doing discovery against Grace.   We hadn't done

18   hardly any discovery against Grace prior to Grace filing

19   bankruptcy.  There are some firms, like I said, who may be

20   able to produce volumes of information, but there are a lot

21   who aren't, and I just think it comes down to fundamental

22   fairness. If Grace can propound 30-page questionnaires with

23   boxes and sub-parts and sub-parts of sub-parts upon our

24   clients, asking particulars about our claims, about their

25   exposures, their other exposures, their doctors, who employed

1    their doctors, whether their doctors smoked, whether their

2    doctor smoked cigarettes recommended by the lawyer.  If they

3    can do that, why can't we at least ask questions about where

4    their products were sold or as Your Honor has pointed out,

5    what those products were.  I, myself, am at a loss to

6    understand Mr. Bernick's reluctance to simply post a product

7    list and a list of entities.  I mean, there's a long list of

8    entities, the footnote at the first page of every pleading.

9    I don't quite understand the reluctance to go down that

10   route.

11        THE COURT: Well, I'm going to have the debtor post

12   a list of the debtors, a list of the products, and a list of

13   the, I guess, major either manufacturing plants, job sites,

14   whatever it is that's appropriate that the debtor had.

15        MR. BERNICK: Your Honor, before you say that, the

16   major job sites, what does that mean?

17        THE COURT: Well, I don't know.

18        MR. BERNICK: That's the whole point is that we're

19   dipping out toe in  - the whole purpose of this exercise is

20   to take a snapshot of the tort claims as they were as of the

21   date - I'm sorry, Your Honor, this is just the reality of

22   what it involves.  I know it's late, but what we have now is

23   -

24        THE COURT: But the reality is, though, Mr. Bernick,

25   that in the tort system, before this case was filed, everyone

1   of these claimants who had sued the debtor at some point

2   would get discovery from the debtor about the products, what

3   entity from the debtor's point of view it had a claim against

4   and possibly other discovery that may be necessary with

5   respect to where that product was either acquired or used, it

6   would happen.  Otherwise, they wouldn't be able to prove the

7   case in the tort system.

8           MR. BERNICK: Yeah, but that's not what we have

9   here.

10          THE COURT: But it is what we have here.  You're

11  asking for a bar date, and I want truthful claims.

12          MR. BERNICK: Okay, Your Honor, I want to go back

13  over this because we're once again getting a little bit off

14  the track, I think.

15          THE COURT: I'm not off the track.  This is

16  discovery with respect to making sure that somebody has a

17  legitimate proof of claim filed, and if the debtor disagrees

18  with it, the debtor will file some objection, and at that

19  point a different form of discovery will be opened, but the

20  client has the right to know from the debtor what the

21  products are, who the debtor was, and where the likely

22  exposure was.

23          MR. BERNICK: I will say, Your Honor, that the same

24  issue arose - I'm going to get back to why I think Your Honor

25  is being taken down a path that is very understandable, but

1   is fundamentally at odds with what we're about here.  Judge

2   Vance got the same request or when there was a bar date set

3   down in New Orleans in the Babcock & Wilcox case, and the

4   same request was made.  Your Honor, we'd like to have a list

5   of all the Board recites of Babcock & Wilcox.  If she turned

6   to Elihue (phonetical) Inselbuch, who was - I don't know

7   whether Peter was there then, said, Wait a minute.  You are

8   the ones that have the claims.  The purpose of this discovery

9   is not to tell you whether you've got a claim or not.  You're

10  not going to get the list, and the list was never produced

11  during the entire history of the Babcock & Wilcox case, but

12  for -

13          THE COURT: How do you know you have valid claims?

14          MR. BERNICK: That's the whole point, Your Honor, is

15  that you have a valid claim - You should know you have a

16  valid claim before you lodge the claim to begin.

17          MR. LOCKWOOD: It was never produced because we

18  never got to the point where -

19          MR. BERNICK: Your Honor, Your Honor - that's not

20  true.

21          MR. LOCKWOOD:  - there was a claims disallowance.

22          THE COURT: Gentlemen, stop, please.

23          MR. BERNICK: Could I have the courtesy of not being

24  interrupted so I can make a point?

25          MR. LOCKWOOD: Your Honor, he just gets up and

1    misrepresents what happened in a courtroom that I was

2    present.

3              THE COURT: That's all right, Mr. Lockwood -

4              MR. LOCKWOOD: Yeah, she said to -

5              THE COURT: Mr. Lockwood, you may rebut his argument

6    when he's finished.  Go ahead, Mr. Bernick.

7              MR. BERNICK: Your Honor, we could take a snapshot

8    in April of '01 of the claims that were pending at that time,

9    and we could follow those claims forward and say, Let's

10   pretend that there was never a bankruptcy but only to the

11   extent that the claims are now here, let's go forward and

12   litigate the claims.  That is the approach that I advocated

13   at the beginning of this case with respect to personal injury

14   was to have common issue, actual litigation of these claims.

15   That is to tee up these key issues about the reliability of

16   evidence and the impact of Dalbert and move under Rule 42.  I

17   was systematically shut down that there was no way that that

18   could possible ever be achieved.  It was useless to talk

19   about the adjudication of these claims.  The only thing that

20   could happen was to have an estimation.  What does the

21   estimation mean?  The estimation means that we're trying to

22   determine what the value of the claims would be like in the

23   future, but it's a different future.  State substantive law,

24   that's true, but it's not the state tort system.  It is

25   federal court, federal determination about the estimated

1   value of the claims, therefore Dalbert applies.   So, we

2   could in the context of this estimation now, say, oh, well,

3   now it's an estimation. Let's go forward and find out what

4   these claims really would have been worth under that

5   scenario, and allow new discovery to people like the fellow

6   from SimmonsCooper so that his law firm can learn what

7   everybody else has known for awhile, and they could come up

8   to speed.  That position, that is that estimation should

9   hinge on the best possible information about these claims,

10  that position was rejected by Your Honor last time in

11  connection with the property damage claims, because that is

12  estimation as I was proposing then.  I said, the way to do

13  the estimate is actually to gather evidence in the same kind

14  of way; remember?  I said, Bring the evidence in.  We'll have

15  it there in April, and we'll have an estimation, use

16  estimation as another way of determining the merits of the

17  claim.

18           THE COURT: No, it's a different standard.

19           MR. BERNICK: It is the same -

20           THE COURT: No, it is not, Mr. Bernick.  There is

21  not a future damage issue with respect to property damage.

22  The properties are either -

23           MR. BERNICK: I'm not talking about property -

24           THE COURT:  - well, that's the purpose for the

25  estimation.

1          MR. BERNICK: But the only way to get the futures is

2    by estimating the merits of the current.

3          THE COURT: Exactly.

4          MR. BERNICK: So, we're talking about the current.

5          THE COURT: Which is why you don't need to estimate

6    for property damage because there are no futures.

7          MR. BERNICK: Well, that may or may not be.  You

8    can't estimate with respect to - You can only estimate with

9    respect to futures from the PI point of view, but that's not

10   the issue.  The issue is what evidence are we talking about

11   being relevant to the estimate, and if we're going to go

12   forward and have them gather new evidence out of Grace's

13   files to support their claims, what we're really saying is,

14   we're going to pretend as if we are now litigating all of the

15   claims that never got litigated as of April 1.

16         THE COURT: Wait.  Why is who the debtors are, what

17   products they had that contained asbestos, and where those

18   products were either manufactured or distributed new

19   evidence?  It should be old evidence.

20         MR. BERNICK: Well, it's apparently new evidence in

21   support of these people's claims because they don't have it

22   yet, but, Your Honor, there will always be -

23         THE COURT: This is a fairness process, Mr. Bernick.

24   The debtor can't hide evidence and decide that somehow or

25   other you're then going to convince -

1          MR. BERNICK: And I believe that we're now going to

2     - this will require - Maybe we should have a separate hearing

3     on this, but we're going down the same kind of revisiting

4     that we did last time in connection with -

5          THE COURT: We do it every month.

6          MR. BERNICK: What?

7          THE COURT: We revisit every month.

8          MR. BERNICK: That's unfortunately the case, but

9     back in - what you're really doing in estimation is that

10    you're not taking all the claims as they were pending in

11    April and now gathering evidence about whether they were good

12    or bad based upon new discovery that's taking place.

13         THE COURT: I understand that.  Your experts want to

14    take a look at these claim forms with a view to seeing into -

15    I'll call them buckets, what bucket they want to put the

16    particular -

17         MR. BERNICK: No.

18         THE COURT:  - claim that's filed -

19         MR. BERNICK: I'm sorry.  It's a little bit

20    different from that.  They're saying here's the world as it

21    was in April 2001.  It's a snapshot.

22         THE COURT: Yes.

23         MR. BERNICK: As of any point in time in this

24    history, because you've got to get to the history or trend in

25    order to do any of these projections, as of this point in

1    time there will be claims that were very mature, lots of

2    information.  There will be claims that even were settled.

3    There will be a lot of claims that were immature.  There will

4    be claims that have never even been investigated.  That's

5    just the way that it is, and the estimators will have to deal

6    with each of those claims differently.  You don't take all

7    the claims that were pending as of April 1 and then attempt

8    to make them all the same by saying, We're now going to give

9    everybody the opportunity to come forward and try to conduct

10   the discovery that maybe they would have liked to conduct to

11   find out whether their claim was good, bad, or indifferent.

12   All you have is a snapshot and you take it as it is.  All the

13   questionnaire did was to ask people what evidence they had to

14   support their claims, and it deliberately froze them here.

15   We recognize that there will be people from the SimmonsCooper

16   firm, perhaps, and perhaps other firms that don't have the

17   same information as people from like the Real, Morgan & Quinn

18   (phonetical) firm.  And the estimators will have to

19   characterize this spectrum of claims and say, Yes.  Some of

20   the claims were well supported, some of the claims were not

21   well supported, and they will stratify this population by how

22   much were the claims worth and whether there was the evidence

23   to support them, and the reason that you have to do that,

24   Your Honor, is if you do anything else, you'll destroy the

25   ability of projecting that snapshot forward and talk about

1   future experience.  If you went into the process now and say,

2   Oh, we're going to now open up discovery for all the

3   individual claims, you will turn claims that were really not

4   being brought by very sophisticated firms when it came to

5   Grace, into the equivalent of claims that were being brought

6   by firms that were totally versed in Grace's history and were

7   able to demonstrate, and there were dramatic differences

8   between the values the different firms would be able to get

9   from Grace depending upon exactly the kind of variations that

10  have been brought.  So, there is a reason why you take a

11  snapshot, and there's a reason why you don't say that

12  estimation means that we're not going to pretend like we're

13  litigating these claims with the benefit of hindsight.  There

14  is another problem, and it's an even more central problem.  I

15  can deal with Mr. Lockwood on a good day.  I can deal with

16  Mr. Lockwood and debate how much discovery we get and how

17  much discovery he gets in order to support the experts who

18  will testify.  I think I know what his experts are going to

19  say.  I've had the pleasure of dealing with them in court on

20  other cases.  I know how their models work.  I know what

21  they're going to do, and God bless them, Peter knows the same

22  thing with respect to ours.  So, we craft in our minds what

23  discovery is it that we need in order to have our experts

24  testify and we carve out in this contested matter the arena

25  of necessary discovery.  Okay.  Now, in order to get that

1   discovery, it's true, as Peter says, we were only getting a

2   piece of the spectrum.  Not everybody was returning their

3   questionnaires.  So we said, Yeah, get a bar date going so

4   that people can make up the information deficit.  I have to

5   tell you, Your Honor, this was in a service of trying to get

6   as much information as we could from people -

7        THE COURT: I understand that, that you want as much

8   information as you can.

9        MR. BERNICK: But - I'm sorry, Your Honor, as much

10  information as we can that's necessary to get to this point.

11  And we can do without the bar date.  We don't need the bar

12  date.  What will happen to their claims?  There will be this

13  enormous hole in their claims.  They want - the futures want

14  this information to come in, but here's the thing, if we have

15  the bar date and Mr. Lockwood's right and filed the claim, we

16  have to make an objection.  I'm prepared to deal with the

17  consequence of what happens and that we do have to make an

18  objection.  That's fine.  I can take on that kind of burden,

19  but what I can't take on is people then injecting into the

20  estimation process the litigation of their individual claims.

21       THE COURT: It's not going to be a matter of

22  litigation of the claims.  I think we're talking over each

23  other's heads.

24       MR. BERNICK: That's exactly what this gentleman

25  here is talking about.

1          THE COURT: No, he's not.  He's - If I - I believe

2    what Mr. Phillips is saying, he may have a cadre of clients

3    some of whom have filed or intend to file proofs of claim

4    against Grace.  They believe that they were exposed to a

5    particular product at a particular time, and as a result they

6    will fill out the proof of claim form with that information.

7          MR. BERNICK: Right.

8          THE COURT: But the reality is that they may also

9    have worked at another site where Grace had a different

10   product at a different time.

11         MR. BERNICK: Could be, could be, Your Honor.

12         THE COURT: And as a result, their proof of claim

13   may not be totally or as accurate as it can be.

14         MR. BERNICK: That's true in any case. That's what a

15   proof of claim is about.  That's what taking a snapshot is

16   absolutely all about, but for him to come in and say, I want

17   to make sure that my proof of claim is as complete as

18   possible, that is, that I really do have a claim against

19   Grace.  I want to go conduct the discovery maybe of his

20   interests because he thinks that in some fashion his claims

21   are being compromised -

22         THE COURT: But they're not.

23         MR. BERNICK: This has nothing to do with the

24   adjudication of his claims.  Now, if Mr. Lockwood wants to

25   come in, on the other hand, and he wants to take the position

1    that his experts need that kind of information on a global

2    basis with respect to all of Grace's claims, that is, he

3    wants to say, not just Mr. Phillips who comes in for

4    SimmonsCooper but Mr. Lockwood who comes in for the PI

5    Committee and says, In this estimation, my experts require

6    information regarding individual current claims or they can't

7    do the estimate, I haven't heard that, and the reason that I

8    haven't heard it is that the last thing that they want is to

9    have individual claim discovery that's going to go right back

10   to the doctors and right back to the lawyers.  They haven't

11   even asked for it.

12              MR. LOCKWOOD: Your Honor -

13              THE COURT: Okay, my turn.  My turn.  Mr. Phillips -

14              MR. PHILLIPS: Yes.

15              THE COURT: Your clients should complete the proof

16   of claim form based on whatever information they currently

17   have.  I will still require the debtors on the website to

18   list the debtors, the products that contain asbestos that the

19   debtor manufactured, distributed, sold or whatever is some

20   contention for liability, and if the debtor had either

21   plants, mining facilities, or some major distribution points,

22   those locations are to be listed.  I am not going to require

23   the debtor to list major job sites because, frankly, I don't

24   think that's going to be of any value in this process.  If

25   you choose to look at that website, you may.  If you don't,

1    that's fine.  If your clients think that they were similarly

2    exposed elsewhere and have no evidence of it, they can add

3    that to the proof of claim that there may be additional

4    locations, but they have no evidence to support it.

5         MR. PHILLIPS: Your Honor, part - Mr. Bernick asked

6    in a sense, what's my dog in this fight and why am I here and

7    other people who may follow in my train, the debtors have

8    asked for all this information.  They've asserted in big bold

9    type all throughout the questionnaire how it's supposed to be

10   complete.  There's none of this provisional language we're

11   hearing today about how this is supposed to be a snapshot or

12   an expert's supposed to tell the difference between a claim

13   that's one month old and a claim that's, you know, twelve

14   months old at the time - for the life of me, I don't

15   understand that distinction, but they've also asked we, as

16   the attorneys, to sign under penalty of perjury that

17   everything is accurate.  Well, I'm telling Your Honor here

18   today, it's not going to be accurate for purposes of being

19   incomplete.  If my client spent one year at a major place,

20   like at Granite City Steel, one of the major steel foundries

21   in southern Illinois, and we know maybe that there was W.R.

22   Grace monokote there, but that person worked at six other job

23   sites, and in that case, we would have gotten discovery from

24   Grace that would have said yes or no whether - or from, the

25   other point here is for third parties -

1          THE COURT: Mr. Phillips, for purposes of having an

2   accurate proof of claim form, you can set out the locations

3   that you know and add a sentence that says there may be

4   others that we are not identifying because we don't have

5   sufficient information.  I think that will satisfy your

6   obligation and your clients under penalty of perjury.  It

7   will satisfy Mr. Bernick's with respect to the fact that his

8   experts who look at this will know that there is one

9   location, that there may be others, if that's relevant, and

10  then if there's an objection, I will deal with individual

11  discovery.  I want the debtor to post on the website the

12  information that I just listed so that people who have some

13  knowledge that they worked at a particular place can at least

14  go back and make as accurate a proof of claim as possible.

15  Okay, Mr. Lockwood.

16          MR. LOCKWOOD: Mr. Bernick keeps talking about this

17  snapshot, and he said, we don't want to have any information

18  about what people would learn through discovery after the

19  snapshot. What's the questionnaire?  It didn't exist at the

20  snapshot.  If he's entitled -

21          THE COURT: Well, no.  The questionnaire, as I

22  understand it, for purposes of laying out what information

23  the claimant had as of the snapshot.

24          MR. LOCKWOOD: It doesn't ask that question.  It

25  asks the question how much on November - I don't remember.

1    It asks what information the plaintiff and his lawyer have as

2    of mid-2006 about his claim. That's what it asks.  It doesn't

3    say anything about what information did you have at the

4    petition date about your claim, much less give the

5    plaintiffs, as Mr. Phillips just pointed out, and their

6    lawyers an opportunity to say, Well, gee, I didn't have much

7    information because I haven't been able to get any discovery

8    from Grace yet.

9            MR. BERNICK: This is the same exact -

10           MR. LOCKWOOD: Would you please, Mr. Bernick -

11           THE COURT: Gentlemen, I know it's late, but please.

12           MR. LOCKWOOD: Your Honor, I'm sorry, but you

13   instructed me not to -

14           THE COURT: And I will instruct Mr. Bernick, please

15   let me do that.  Mr. Bernick, don't interrupt.

16           MR. BERNICK: Sorry, Your Honor.  Sorry, Mr.

17   Lockwood.

18           MR. LOCKWOOD: Mr. Bernick has - he says we do not -

19   my Committee has not asked for this information.  He's right,

20   we haven't, yet.  But I want to make perfectly clear . . .

21   (microphone not recording).  We didn't take the position, as

22   Your Honor is fully familiar with, that this snapshot

23   methodology is ridiculous.

24           THE COURT: Right.

25           MR. LOCKWOOD:  Because the plaintiffs won't know

1   how much evidence they have because not only are the not

2   being asked for it as of 2001 and given the opportunity to

3   explain why . . . (microphone not recording) but they're also

4   being asked for it now in 2006 and these experts, who we've

5   never to this day heard anything other than the most general

6   description from Mr. Bernick about how these experts are

7   going to testify.  He says he knows how my experts are going

8   to testify.  That's true, he does, and Your Honor does too,

9   but I haven't the vaguest idea how his experts - I can't even

10  begin to imagine how the experts are going to stratify

11  118,000 claims where some of the claimants might have had the

12  claims on file four years before the petition date and have

13  gotten a lot of discovery from Grace about product ID and

14  stuff like that.  Some of the claims might have been filed a

15  week before -

16        THE COURT: Mr. Bernick was correct about that.

17  That's all going to go to the weight of what they're doing.

18        MR. LOCKWOOD: I understand it's going to go to the

19  weight, but he says, I know - I've already figured out that I

20  don't need discovery to figure out how his experts are going

21  testify.  I haven't a clue how his experts are going to

22  testify.

23        THE COURT: Well, then you'll take the discovery, if

24  you need it, when his experts are identified.

25        MR. LOCKWOOD: I will, and we'll be taking

1     discovery, if necessary, of what sorts of information would

2     be available -

3           THE COURT: All right.

4           MR. LOCKWOOD:  - to people five years ago with

5     claims of this sort.

6           THE COURT: Okay.

7           MR. BERNICK: Fine.

8           MR. LOCKWOOD: But the point is that he's not - He

9     wants to limit us and the claimants to what we knew or

10    without any discovery from Grace while getting from Your

11    Honor an order that says 118,000 or 180,000, however many of

12    those people have to be given this stuff, and now his experts

13    are going to give that discovery in this undisclosed fashion

14    and the idea that somehow or another the plaintiffs turn

15    around and say, Well, we would like some discovery back so we

16    could fill out the form better, fill out the questionnaires

17    better.  Oh, no, no, no we can't - that would pollute the

18    questionnaire process because it would take the information

19    to a later date.  That's just wholly one-sided.

20          THE COURT: Well, it is somewhat one-sided, but I

21    believe I've taken care of a large part if not all of the

22    one-sided aspect by requiring the debtor to post on the

23    website, which will be available to anybody who wants to look

24    at it, who the debtors are, where their major places of

25    business were, and the products that they manufactured that

1    contained asbestos over what periods of time.  Now, if

2    somebody needs more than that, Mr. Lockwood, if it's an

3    individual claimant, I'm going to wait until there's an

4    objection to claim and see if there's something relevant.  If

5    it's the Committee's experts, I'll hear from you.

6          MR. LOCKWOOD: One final point about that . . .

7    (microphone not recording).

8          THE COURT: Well, then, they'll all be allowed and I

9    won't need to worry about an estimation.

10         MR. LOCKWOOD: Well, Mr. Bernick -

11         MR. BERNICK: We'll deal - We'll - I just want to

12    know who my master - I just want to know who my master is and

13    for what purpose.  If we make objections, as I'm sure we

14    will, and he was fair to point that out, we will then take up

15    the issue of what kind of discovery is really necessary and

16    that issue will be crossed at that time.  What I'm trying to

17    get done is the estimation process, and my colleague, in

18    estimation, is Mr. Lockwood and his Committee, and I need to

19    have certainty about with whom I'm negotiating and arguing

20    against about what is relevant to the estimation process.  I

21    can't contend with 75 or 50 or 25 law firms who are all busy

22    telling their story about what they knew and what they didn't

23    know.

24         THE COURT: No, I believe the estimation process is

25    within the control of the Committee.  That would seem to be

1    something that is a Committee function in terms of defending

2    against or prosecuting whatever is going to be the

3    estimation.

4            MR. BERNICK: Now, if I could -

5            MR. LOCKWOOD: Just to finish, let me return here to

6    the debate about which methodology is the right one -

7            THE COURT: For?

8            MR. LOCKWOOD: For estimating claims whether based

9    on settlement history or on this snapshot process -

10           THE COURT: Oh, okay.

11           MR. LOCKWOOD: Remember what Mr. Bernick said to Mr.

12   Phillips a little bit ago about his firm being new and

13   inexperienced.  He said, The best evidence - the reason we

14   need the snapshot is to figure out what the values different

15   firms were getting back then.  And the values he's talking

16   about were not some estimate value of the claim at the time.

17   The values were the settlement values and the judgments that

18   Grace was experiencing in the tort system, and nobody in the

19   history of the universe has ever attempted to do this so-

20   called snapshot exercise in the manner that the debtors are

21   using here.

22           MR. BERNICK: Well, let me, Your Honor, because that

23   was as a kind of parting -

24           THE COURT: Okay, but literally two minutes each.

25   We need to get through this agenda, and I've already ruled,

1   and I'm not going to change my mind.  So, Mr. Bernick, you

2   may have two minutes.  Mr. Phillips, you may have two, and

3   then that's it.  We're moving on.  Go ahead.

4            MR. BERNICK: I'm sorry, Your Honor.  I only rose to

5   respond to what was - Mr. Lockwood is obviously very

6   satisfied with that little parting shot, but to be clear, I

7   want to be able to deal with Mr. Lockwood and his Committee

8   on what's relevant to the estimation that's coming forward.

9   Mr. Lockwood says, The snapshot approach, oh my God, when has

10  this ever been done.  His own experts take the snapshot,

11  exactly at the time of filing, and they calibrate their

12  period of time in reference to that snapshot and then they

13  take it going forward.  The only issue is, what do you put

14  into that snapshot.  All he wants to put in is the fact that

15  money has been paid out in settlement.  We, ultimately, will

16  say that when it comes to the valuation of claims that have

17  merit, yes, the marketplace is some evidence of that, but the

18  claim has to be a meritorious claim because we are no longer

19  in the tort system in state court, never will be there.  So,

20  the only difference that we're imposing is to say, You have

21  to take a look at that spectrum of claims and make a

22  threshold determination about which ones of them ultimately

23  are going to be provable, and this is actually done by the

24  experts themselves because they know about the whole problem

25  of what are called unknowns.

1          THE COURT: I understand -

2          MR. BERNICK: So, it's there.

3          THE COURT: I also understand what the various

4    District Courts recently have been writing with respect to

5    how the personal injury estimations are to be conducted.  I

6    would advise all parties to take a look at it because some of

7    it seems to be a pretty darn good process for trial to me.

8          MR. BERNICK: Your Honor, that, I understand, and I

9    also would then - we'll be talking about those cases and the

10   approaches that are actually taken.  What's happened in all

11   those cases is that nobody has fought the battle.

12         THE COURT: Well, that's okay.  Mr. Bernick, I've

13   given you free range to produce your case the way you want to

14   produce your case.

15         MR. BERNICK: Well, I understand that.  But I'm just

16   reacting a little bit, Your Honor, to the notion that somehow

17   those cases are the same as this.  There's no other case

18   where somebody has taken on to fight the battle to get this

19   information.  This information is information that's in the

20   newspapers.  Everybody knows it's there.  No court has ever

21   been pressed enough to say, Yes, let's get the information.

22         THE COURT: Well, this one has, and you're getting

23   the information largely the way you wanted it, not totally.

24   You've been given free reign to produce your estimation

25   witnesses and testimony however you choose, and so have the

1  other parties, and if I have a total disconnect between your

2  method and theirs, I'll have to decide what's appropriate.

3       MR. BERNICK: Fair enough.  Last point, and then

4  I'll sit down.  This period of time after the bar date, this

5  period of time after the bar date, Mr. Lockwood wants to go

6  down that road and talk about developments after April of

7  '01.  That's a fair point and with respect to the estimation

8  models, there may be information after April 1 that will be

9  very relevant to determining the validity of their models.

10  We may want to seek discovery of it.  So we're not adverse to

11  the idea of looking beyond the snapshot and saying, What else

12  has happened over time, but the touchstone is expert

13  estimation and sauce for the goose, sauce for the gander.

14  So, if Mr. Lockwood wants to sit down and talk about

15  discovery post-April '01, we're more than happy to do it, but

16  we can't.

17       THE COURT: Frankly, I don't want to talk about it

18  any more.  I've made my ruling.  I don't see that I have an

19  issue before me at this point.  Mr. Phillips.

20       MR. PHILLIPS: Just real quick, Your Honor.  We've

21  gone back and forth about if once we do file all our proofs

22  of claim whether they'll be, you know, not objected to in

23  which case it would be allowed, in which case, I guess, it

24  would be meaningless to go forward with discovery on either

25  side.  But if, as Mr Bernick just stated, they are going to

1   object, and I would submit that probably sometime around July

2   1st, 2007, after the June hearings, I just want Your Honor to

3   think about the point, when does it make more sense to flush

4   out these claims and determine how good they are.  After

5   you've had the estimation hearing and you realize, Whoa, we

6   would have had a lot better evidence, or now when we're still

7   almost a year away.

8          THE COURT: I think that issue was going to be for

9   the experts to tell me.  They will take a look at the proofs

10  of claims, they will decide whether they need additional

11  information, if they do, I'll hear from them.  If they think

12  it's adequate for whatever purposes they choose to use the

13  information, I'll hear from them along that line, and it will

14  all go eventually to whether or not the methodology satisfies

15  the Dalbert standards and/or whether or not the expert's

16  report and methodology turns out to be reliable from a

17  credibility/weight, I guess, purpose as opposed to a Dalbert

18  type of standard but the weight to be accorded it after that.

19  So, those issues can all come up in the context of the

20  litigation if and when it happens.  My understanding from

21  early on in this case, which may have changed, but my

22  understanding was that to the extent the debtors file

23  objections to the proofs of claim, the intent is going to be,

24  essentially, to compel the Court into an estimation process.

25  That was the whole purpose, and that is the reason why the

1    debtor may be filing objections to 118,000 or however many

2    proofs of claim were filed because the Court at that point

3    cannot possibly liquidate and determine the allow-ability of

4    each of those claims in the plan confirmation process in

5    sufficient time to get the plan confirmed, and that is the

6    appropriate way to get into an estimation hearing.  So,

7    whether or not I will ever need discovery after the debtor

8    has some objection, whether or not I will ever face an issue

9    with respect to discovery after the debtor files those

10   objections, isn't known to me.  If the debtor is going to do

11   some sort of merit spaced objection, your clients will have

12   the right to do discovery.  So, I'm going to take it as it

13   comes, but for right now, file the proofs of claim with the

14   information you have.  You could check the website - When

15   will the website be up and running?

16        MR. PHILLIPS: Thank you, Your Honor.

17        THE COURT: Wait.

18        MR. BERNICK: I'll tell you what, we will make a

19   report to the parties on that.  We'll promptly inquire of our

20   client and determine what -

21        THE COURT: Thirty days?

22        MR. BERNICK: Yeah, I'm sure.

23        THE COURT: Okay.  The website will be up and

24   running before your proofs of claim are due so that you and

25   your clients can take a look at the information that's there.

1    If it is not sufficient for you in your viewpoint to know

2    that your client has in fact dotted all of the i's and

3    crossed all of the t's as to where it may have been exposed

4    to a debtor's product, then you can add something to the

5    proof of claim that says, This is what we're relying on.

6    There may be additional evidence that we simply don't have

7    information to support.  And the experts will take it from

8    there.  I will not take from the debtor an objection based on

9    the fact that someone adds to the bottom of a proof of claim

10   the fact that there may be some additional exposure that the

11   claimant cannot prove based on lack of discovery from the

12   debtor.  I'm not going to accept that at this stage as an

13   invalid proof of claim, because I'm telling counsel they can

14   do it and satisfy their obligation -

15            MR. BERNICK: As long as they fill out the rest of

16   the questionnaire, if there's more information they say they

17   would like to add, we can't stop them from taking that

18   position.  We just want to get all the questions answered

19   with the information that they have.

20            THE COURT: All right.  So, I will do - Can I get an

21   order from one of you that will memorialize this so that the

22   process is in place?

23            MR. BERNICK: The process for - the website process?

24            THE COURT: No, the overruling or I guess the

25   granting of the motion - I'm sorry, I've forgotten on item

1    11.

2            MR. PHILLIPS: I was going to say, we want a

3    transcript first, Your Honor.

4            MR. BERNICK: No, no.  The motion to set a bar date

5    -

6            THE COURT:   No.

7            MR. PHILLIPS: Mine was the motion to amend -

8            MR. BERNICK: Oh, that.  Well, I think that that

9    motion is denied at this time -

10           THE COURT: All right, this is SimmonsCooper's

11   motion.

12           MR. BERNICK: Yeah, I got confused.

13           THE COURT: I forgot.  In the process I lost track

14   of who filed the motion.  All right, denying SimmonsCooper's

15   request for discovery at this time, but requiring the debtor

16   to set up the website with this basic information for access

17   to anybody and for anybody without prejudice to re-file a

18   request for discovery, you know, at an appropriate time.

19           MR. PHILLIPS: Thank you, Your Honor.

20           MR. BERNICK: Thank you, Your Honor.

21           THE COURT: Now, who's going to prepare that,

22   please.

23           MR. BERNICK: We will -

24           MR. PHILLIPS: I don't know if they want me riding

25   their point about putting the website first.

1          THE COURT: All right, I want them to run it by you,

2     Mr. Phillips.

3          MR. BERNICK: There's no magic.  I mean, what Your

4     Honor said about the website we'll stick in the order.

5          THE COURT: All right.  That's fine.  I'll sign it

6     when I get it.  They're to run it by you, Mr. Phillips, to

7     make sure you agree that it memorializes my ruling.

8          MR. PHILLIPS: Thank you, Your Honor.

9          MR. BERNICK: There are two more matters that are

10     left on the agenda.  One is the lateness of authority and the

11     other is the Anderson Memorial, and if Your Honor has got the

12     patience and stamina, maybe we should just do them or

13     whatever -

14          THE COURT: Do them.

15          MR. BERNICK: Okay.  With respect to -

16          THE COURT: Which agenda number, Mr. Bernick,

17     please?

18          MR. BERNICK: I'm sorry?

19          THE COURT: Which agenda number?

20          MR. BERNICK: This is agenda item 7-A and then you

21     also asked to remind you that you wanted it brought up to

22     touch on 7-B, Romanet iii, which was the withdrawal and

23     expungement of 194 Canadian asbestos property damage claims.

24          THE COURT: All right.

25          MR. BERNICK: It's those two, and then item 8 on the

1    agenda.  So, 7-A and 8.

2              THE COURT: All right, thank you.

3              MR. LOCKWOOD: What about agenda item 4?

4              MR. BERNICK: Which is?

5              MR. LOCKWOOD: Are we going to -

6              MR. BERNICK: Can we defer that one.

7              MR. LOCKWOOD: Except - I mean - Do you want to

8    defer that?

9              THE COURT: Folks, I'm sorry, but, please.  Do you

10   want to recess for a few minutes or can we proceed, because -

11             MR. BERNICK: Yeah, I would like to - Let's proceed

12   and then if we have to do that, we have to do that.

13             THE COURT: We are going to go through the agenda.

14   So, however long it takes, that's what we're going to do

15   today.  I'm not deferring any more of these matters.  Mr.

16   Speights.

17             MR. SPEIGHTS: That's fine, Your Honor, and I'm

18   happy to stay as long as you want.  I did want to tell you

19   that especially one of the items will be a somewhat lengthy

20   legal argument citing a number of cases, but if that's Your

21   Honor's pleasure, I'm here for the duration.

22             THE COURT: On which agenda, Mr. Speights?

23             MR. SPEIGHTS: On those authority - on the authority

24   question of people we represent with written authority

25   executed after the bar date.

1              THE COURT: All right.

2              MR. SPEIGHTS: And that involves a number of cases,

3    but I understand if you want to stay, I'm happy to stay, Your

4    Honor.

5              MR. BERNICK: I think it's doable.  It's been

6    briefed, and I'm prepared to go through that right now.  I

7    think it falls into some pretty easy categories.  First, what

8    claims are we talking about?  There were a total of six

9    remaining claims where there were factual matters that

10   remained to be tied down, and I think that we now have got

11   documentation on all six.  Three of them, it turns out,

12   relate to one building.  I'm just going to put them into the

13   record.  They are claims 10952, 10960, and 11010.  And those

14   purport to recite the authority that Mr. Speights had to file

15   the claim and further recite that the authority existed prior

16   to the time the claim was filed.  So, those are no longer at

17   issue.

18             THE COURT: All right.

19             MR. BERNICK: We then have three additional, I  mean

20   these are other issues that relate to them but not the

21   authority issue.  We then have three of the six where we also

22   have obtained documentation from Mr. Speights and, therefore,

23   the question of documentation is not there, and they are

24   11125, St. Anthony's Hospital; 10749, which is the Glen Oaks

25   Club; and 11207, which is Lafayette Medical Center.  And

1    we've got now the documentation of the authority, but they

2    now fall into the category of this late authorization because

3    the authorization took place after the fact of the claim

4    being filed.  So we now have a list, and we'll furnish a copy

5    to Mr. Speights as well, and we'll furnish it up to the

6    Court.  These are 61 claims that now present the remaining

7    legal issue, which has to do with what I'll call just the

8    post-fact authority.  So, I don't think we have any factual

9    matters any longer to take up.  It's purely a question of

10   law, and to illustrate the question of law, I'll just refer,

11   as an example, to these three last claims that we now have

12   received documentation . . . (microphone not recording)

13   authorizations for Speights & Runyan to file claims in the

14   Bankruptcy Court.  I hereby authorize Speights & Runyan to

15   file a proof of claim.  Same thing with respect to Glen

16   Oakes, same thing with respect to Lafayette, and we know from

17   the date - the received date stamp for Glen Oaks, it was

18   received May 18, of 2004.  With respect to the St. Anthony's,

19   we have the fax date, which is July 27 of 2004.  So, the

20   legal issue that's presented is whether authority given after

21   the fact constitutes appropriate authority to establish that

22   a claim that was earlier filed on behalf of the client was

23   timely filed.  Now, I think if we boil down the briefs, and

24   it's the reason why I don't think this should take too long

25   and I'll await with interest what I know will be Mr.

1    Speights' explication of the law.  What I tried to do in

2    order to crystalize it, was to talk about three major points

3    of authority that the debtor has and then three points that

4    Mr. Speights makes on behalf of his clients.  The three

5    points that the debtor has are fairly straightforward.  One

6    is the language of Rule 3001(b) which deals with proof of

7    claims, and says specifically, A proof of claim shall be

8    executed by the creditor or the creditor's authorized agent,

9    except as provided in Rules 3004-5, and authorized is not

10   only - it's past tense.  That is, there has to be the

11   authority for the creditor at the time that the action is

12   taken.  Essentially, 3004 is important because it's triggered

13   by and requires the action of the creditors, the action of

14   the creditor that's key and the creditor can act through an

15   agent, but it has to be the creditor that is taking the

16   action, and therefore, the agent must be an agent who is

17   authorized.  Our second point in support of the same basic

18   argument is that this essentially was incorporated in the

19   proof of claim form - I'm sorry, the claim form that we have

20   in this case.  This specifically said that all claims must be

21   signed by the claiming party.  Now, certainly we would

22   entertain the possibility that the claimant could have

23   already have authorized an agent, but it is the claiming

24   party whose conduct was required in this particular case.

25   And our third point of authority is agency law, and agency

1    law construed in connection with Rule 3002 basically says

2    that an act is only the act of the principal if it in fact is

3    authorized and read in connection with 3001(b) that means

4    that the authorization must take place before the fact.  This

5    is the first plus decision out of the Northern District of

6    Dallas in the context of talking about class certification.

7    It says, The concept of agency is so fundamental that it

8    barely requires articulation.  An agency relationship, quote,

9    "Exists only if there's been a manifestation by the principal

10   to the agent that the agent may act on his own account in

11   consent by the agent to so act." Close quote.  Or to put it

12   another way, quote, "Rule 3000(b) allows a creditor to decide

13   to file a proof of claim and to instruct an agent to do so.

14   It does not allow an agent to decide to file the proof of

15   claim and then inform a creditor after the fact."  These all

16   converge on the same point which is 3001(b) requires the

17   action of a creditor and in this case, at the time the claims

18   were filed, there was no action of the creditor, and by the

19   plain terms of 3001(b), as a consequence, these claims were

20   not properly filed at the time and the claim form confirms

21   that by itself making clear that what's called for is the

22   action of the creditor, the action of the principal.  So

23   those are three major points, Your Honor, and then Mr.

24   Speights raises three points in response.  His three points

25   and the emerges in his final brief are these: He first of all

1   has two cases that he cites, the SEI case, and a 1959

2   decision out of New Jersey, and the name of that case - I'll

3   get it here in a moment.  SEI vs. Norton, which is Eastern

4   District of Pennsylvania, 1986, and then you have City of

5   Trenton vs. Flower Thorn Company, 1959 Superior Court of New

6   Jersey Appellate Division.  The SEI case does not really have

7   much to do with anything.  This was not a situation in which

8   the rights of the principal were expanded by allowing

9   ratification after the fact.  This is a case where

10  ratification after the fact by estoppel was used to limit the

11  rights of the principal, that is the principal was bound by

12  action taken by authorized counsel.  So, estoppel or after

13  the fact ratification by estoppel was not a principal of

14  according authority to an agent and thereby binding -

15  allowing the principal to do what the principal had not

16  decided to do.  It was the other way around.  It was a way of

17  saying, you the principal cannot have a greater set of rights

18  than exist given the fact that you after the fact ratified

19  what your authorized counsel had done.  So it does not inform

20  this case at all.  The New Jersey case, the Trenton case, is

21  different from this case in principal part because it

22  predated the decision of the Supreme Court in the FEC case,

23  the Federal Election Commission case I think is the name of

24  the case.  I'll get this in front of me in half a moment.  It

25  is Federal Election Commission vs. NRA Political Victory

1    <u>Fund</u>, decided by the Supreme Court in 1994, and this case

2    then brings me to the third source of authority that Mr.

3    Speights had, which are the relation-back cases, and these

4    are really, in a sense, the most important point that Mr.

5    Speights makes and the most instructive on why the principal

6    that we have articulated in fact holds here.  The relation-

7    back cases where basically a petition, for example, for

8    voluntary bankruptcy is filed and is later then ratified by

9    the principal, they do not apply if the filing that's at

10   issue must meet a deadline and the deadline applies to a lot

11   of different people. The filing is made before the deadline

12   and the authority is given after.  The relation-back doctrine

13   does not apply where there is a deadline and a deadline

14   applicable to a number of people for the very specific reason

15   that relation-back cannot be used where there are other

16   intervening third-party rights that are affected by allowing

17   an after-the-fact ratification.  So, if you have got a

18   filing, for example, filing of a petition for bankruptcy or

19   the filing of - I'll just use that as an example, the

20   petition is filed.  If it's ratified after the fact, it

21   doesn't really make a difference to anybody else because

22   there is no deadline and nobody else is seeking to comply

23   with the deadline, and therefore, nobody else's rights, that

24   is the people who have filed timely with authority, are

25   compromised by the relation-back doctrine.  We don't have

1   that here.  Here we had a bar date.  There was a definite

2   deadline, and everybody else had to follow the same deadline

3   and allowing relationship-back would allow Mr. Speights'

4   clients, who were given the benefit of relationship-back to

5   effect - in a sense to get an unequal position because nobody

6   else was given the benefit of that kind of flexibility and

7   their rights are affected.  In the dispositive decision on

8   the relationship-back cases, is the Supreme Court's decision

9   in the <u>Federal Election Commission</u> case, and the case is

10  absolutely clear, and it's absolutely right on point, and it

11  says that where you have a specific deadline, you must have

12  authority that was granted before the deadline passed, and

13  the relevant language the Supreme Court used . . .

14  (microphone not recording).  I'll just read it from over

15  here.  We must determine whether this after-the-fact

16  authorization relates back to the date of the FEC's

17  unauthorized filing so as to make it timely.  There the FEC

18  made an unauthorized filing that was later authorized by the

19  Solicitor General's Office, and so we conclude that it does

20  not.  The question is at least presumably governed by

21  principles of agency law, and in particular the doctrine of

22  ratification.  Quote, "If an act to be effective in creating

23  a right against another or to deprive him of a right must be

24  performed before a specific time as a deadline case, and

25  affirmance is not effected as against the other unless made

1    before such time."   And it goes on to say, there's a

2    citation to the Restatement 2nd of Agency.   Though in a

3    different context we have recognized the rationale behind

4    this rule.   Quote, "The intervening rights of third persons

5    cannot be defeated by the ratification.   In other words, it

6    is essential that the party ratifying should be able not

7    merely to do the act ratified at the time the act was done,

8    but also at the time the ratification was made."  So, the

9    principle that was very clearly articulated by the Supreme

10   Court going back to fundamental agency principles, and it's a

11   decision after the City of Trenton case in New Jersey at the

12   New Jersey appellate system is that where you have a specific

13   deadline and the rights of others are affected, the

14   ratification must take place or the conferring of agency must

15   take place before the deadline.   So, Your Honor, I think, in

16   fact, when Mr. Speights cites these cases, these

17   relationship-back cases, it takes us back to exactly the same

18   point which is the same agency law that was the basis for the

19   ruling made and the analysis done in the <u>First Plus</u> case, and

20   back to the same principle that we articulated at the

21   beginning of our argument here, and that is 3001(b) requires

22   the act of a creditor, and that in a sense is as far as you

23   have to go, but the reason it requires an act of the creditor

24   is that you're talking about a deadline, and under principles

25   of agency law, where you have a deadline, it is the creditor

1    who must act before that deadline, the creditor cannot wait

2    or be solicited after the deadline to provide the authority.

3    The authority must be there beforehand.   So Mr. Speights in

4    arguing on behalf of his clients that he has the ability - or

5    they have the ability to provide the authorization of 2004

6    (a) is inconsistent with Rule 3001, and (b) is totally

7    inconsistent with the principles of agency law that have now

8    been adopted by the U.S. Supreme Court.

9            THE COURT: Mr. Speights?

10           MR. SPEIGHTS: Thank you, Your Honor.  You'll recall

11   that we actually argued this months before.  Ms. Browdy and I

12   argued it, I believe, in either December of January in

13   Pittsburgh, and Your Honor at that time focused on one issue

14   and requested supplemental memoranda, and both the parties

15   submitted supplemental memoranda, and I don't know - then we

16   had the stay and months have gone by, but I would urge Your

17   Honor to review our supplemental memoranda because I think we

18   refute everything that Mr. Bernick said, and if I in my tired

19   state don't do so, I would certainly refer back to that

20   memoranda.  Let me go back to this: We argued before Your

21   Honor sometime ago the question of authority for people who

22   we had no contact with under the Anderson putative class

23   action, and Your Honor ruled on that, and while I don't like

24   to lose any ruling, and while respectfully, I think I was

25   right on that, the consequence of that was sort of

1    hypothetical because we still have the Anderson motion to

2    certify pending and if while I thought I had the right to do

3    it under the putative, if we win the Anderson class action

4    certification, I think we will be back at your door saying,

5    Let my people back in, and if we lose the Anderson

6    certification, and I hope that doesn't happen, it doesn't

7    matter what Your Honor did to begin with because at that

8    point I wouldn't have had authority either way on those

9    claimants.  These claimants are altogether different.  These

10   are clients who have retained Speights & Runyan, giving us

11   authority to act, and the only issue here is with respect to

12   some of them, is whether that actual authority had to be

13   prior to the bar date.  They have given authority now, and

14   I'm going to argue ratification in a few minutes, and I just

15   point out that it's reflected, I think in the previous

16   transcript, there are some of those we claim we have old

17   authority from and ratified later, and there's some which I

18   would concede that we didn't have any authority from until

19   after the bar date, other than the putative class action and

20   then they gave us authority.  And at the last hearing, as I

21   recall, you said, Well, we can work that issue out once we

22   deal with the gist of the issue we're dealing with now.  But

23   I make the distinction between the first bucket of don't know

24   those people, and this bucket where they're actual clients

25   but the written document is later.  They point out that, you

1   know, these are real people that if Your Honor rules against

2   them on this, obviously, there will be an appeal, and I'm not

3   a lawyer that says, We'll appeal.  Your Honor knows,

4   everybody appeals everything.  I mean, that's not why, but

5   this will - this issue will just not die today unlike the

6   other one which I didn't appeal, which is academic.  This is

7   a matter that has extreme importance to some number of

8   claimants who want to participate in this bankruptcy, and

9   indeed, some might argue that if the ruling was against them,

10  might come along and file late filed claims and try to do

11  discovery, et cetera, et cetera, et cetera.  And I say that

12  at the outset, I'll try to get to the point, that I still

13  believe that it is more appropriate to rule on this issue,

14  even more so than the last time after Your Honor decides the

15  class certification issue because if Your Honor certifies

16  Anderson as a class, then I believe that we will be in a far

17  different position of arguing authority here.  We won't have

18  to discuss the hundreds, literally hundreds of cases of

19  dealing with ratification.  And while I understand that the

20  debtor wants to press for it and get its ruling, et cetera, I

21  really see no downside in that because at the end of the day,

22  these are the easiest issues to decide legally.  You know,

23  there's no time loss, and we should have the full record and

24  the full argument on the Anderson certification.  However,

25  Your Honor, if you want to, and I assume you do at least for

1   the moment, want to proceed, then I will go to the merits of

2   the argument.  I'm aware of Mr. Bernick's cases as he's aware

3   of my case.  As the case he currently has on the board is a

4   case in which Your Honor said did not trouble you during the

5   December or January hearing.  It was a question of whether

6   the solicitor general by statute is the only one who can file

7   a certain thing, and it is a situation where there's a

8   jurisdictional right to appeal.  On the other hand, the First

9   Plus case, which I don't recall Your Honor commenting on, has

10  a very interesting . . . (microphone not recording).  The

11  First Plus case, the simple point of it was that it did not

12  go along with the American Reserve, the Court of Appeals case

13  which Mr. Bernick has cited and which I have cited in the

14  past, and it wouldn't follow American Reserve, since then all

15  of the circuit that have dealt with the problem have followed

16  American Reserve, but the Bankruptcy Court here was

17  dissenting from the American Reserve view and in justifying

18  what it did, it said, The creditors whom the putative class

19  representative reports to represent are the principals, as

20  opposed to the class representative, in whom the power to

21  ratify such an act vests.  Even in First Plus we have a . . .

22  (microphone not recording).  Now, he's got the restatement of

23  the cases, and I've got the restatement of ratification.

24  He's got a few cases, I think I've got a lot more cases.  My

25  supplemental brief goes into in some detail.  And I believe

1    that the greater weight of the cases says that basic law of

2    ratification is that these people who have a claim against

3    Grace who had their product, these are product ID clients,

4    they can ratify my act, and I don't know how to argue that

5    other than saying, My cases are right and his are wrong on

6    the greater weight.  But then I read his cases a little more

7    on that 14 hour train ride up here, and I began to see that

8    his cases really fall into ratification as a general rule,

9    but his cases basically are one of two types.  The first type

10   is that there was no connection between the person who filed

11   the claim and, in this, instance the creditor.  There was

12   just no connection whatsoever.  That's a minority view, but

13   even if that were the correct view, I don't think that's the

14   situation here, and I don't think it's the situation because

15   it's not like we have no connection.  Now, I'm not citing

16   American Reserve to Your Honor again to argue against what

17   you did before.  The fact that you don't believe American

18   Reserve gave us authority to file the claims to begin with is

19   not the issue now.  The issue is, does American Reserve give

20   us some connection to these claimants which justifies the

21   later ratification, and the American Reserve case . . .

22   (microphone not recording).  Of course the leading Federal

23   Court of Appeals case and dealing with class action in

24   bankruptcy is now . . .   At the top of the right column, it

25   says that - I'm trying to keep my microphone and read at the

1    same time.

2            TELEPHONE OPERATOR: Excuse me, Your Honor, this is

3    the Court Co. operator.

4            THE COURT: Yes.

5            TELEPHONE OPERATOR: It seems that the last couple

6    of attorneys in the courtroom that are speaking are cutting

7    out for about ten seconds.

8            THE COURT: Okay.  I think the batteries may be dead

9    in that, Mr. Speights, which is part of the problem, so - Is

10   there anyone left on the phone?

11           TELEPHONE OPERATOR: Yes, Your Honor, I have several

12   attorneys.  Some are just listening and some do have a live

13   line.

14           THE COURT: Okay, that's fine.  Well I'll try to

15   keep the parties' voices up.  They're using portable

16   microphones, and I think the batteries have died after

17   today's rather marathon proceeding.

18           TELEPHONE OPERATOR: Yes, Your Honor.

19           MR. SPEIGHTS: Your Honor, I think I can see it from

20   here now.  American Reserves says the representative in a

21   class action is an agent for the missing and after the

22   citations it goes on to say, Not every effort to represent a

23   class will succeed.  A representative is an agent only if the

24   class is certified.  Putative agents keep the case alive

25   pending the decision on certification.  So that we start off

1   with the proposition that when I filed these, whether that

2   gave me authority then as I argued before, I was doing so

3   with knowledge of the law, the law that Mr. Bernick has cited

4   in the past before Your Honor, that I had this obligation,

5   that I was an agent for the missing, and so, that provides me

6   some connection with the claimants in question.  More

7   importantly, Your Honor, I would now like to provide Your

8   Honor with what I have often referred to since last summer,

9   the affidavit of John Freeman.  That's the affidavit in which

10  I told you last year that prior to taking my actions in these

11  bankruptcy cases, Professor Freeman, professor of ethics, not

12  only said that I had the right to file claims on behalf of

13  putative class members in the Anderson case, but told me, as

14  reflected in this affidavit, that I had a fiduciary duty to

15  file claims on behalf of these absent class members that I

16  knew about.  May I approach, Your Honor?

17          THE COURT: Yes. Thank you.

18          MR. SPEIGHTS: Your Honor, I believe that provides

19  the connection that deals with one or two of the cases.  The

20  other cases, I believe, are easily distinguishable on the

21  grounds that they provided some absolute right by statute

22  that the debtor - well not a debtor, a party would be losing,

23  and I think the basic disconnect is between, on those again

24  minority cases, the basis disconnect between what a bar order

25  is and what, for example, a statute of limitations or a

1  jurisdictional problem would be, and those minority of cases

2  in some courts, several courts, cited by Ms. Browdy in her

3  brief, would have a problem allowing ratification. However,

4  in other cases, many that we cited including the Fourth

5  Circuit and the Eighth Circuit cases have allowed

6  ratification in such circumstances, the Huber case and the

7  Boyds case.  In this instance, though, a bar date order, and

8  I'm not the bankruptcy lawyer, but a bar date order is not of

9  the same type that a statute of limitations is.  You can

10  allow a late filed claim.  It is sort of an equitable

11  principle that, yes, you impose a bar date order.  You can

12  extend the bar date order.  You can allow a late-filed claim

13  and under the Huber case, especially, that would allow

14  ratification.  So I don't think either one of Mr. Bernick's

15  cases or either one of his line of cases is applicable in

16  this instance.  Your Honor, the other thing I would say to

17  you, and maybe this is just a practical problem I want to say

18  to you is that, this issue has now been before you but not

19  decided in all of the other - at least several of the other

20  bankruptcies.  It was an issue that U.S. Gypsum filed a

21  motion on, and we were going to argue, and we settled the

22  case.  I can't recall if it was a case in the situation in

23  U.S. Mineral, but we settled that case as well.  It's also an

24  issue that was brought up by Mogul, same issue.  I have

25  authority is a question of whether it relates back or not,

1    and that matter is scheduled now for next Friday in

2    Pittsburgh - excuse me, next Monday in Pittsburgh on the

3    Mogul hearing.  I'd also tell you that I am this close to

4    resolving all of our claims in the Mogul bankruptcy so it

5    would still go away.  I would urge you to read the briefs

6    carefully.  I would urge you to wait until after

7    certification, and hopefully we can resolve it in one of

8    those ways.  If Your Honor wants to address it, I'll tell you

9    that the ratification law to me is just overwhelming that we

10   cited to you already.

11        THE COURT: Well, isn't there a practical solution.

12   Can't these three entities simply move to file a late claim

13   and to the extent that their basis - I don't know what their

14   basis would be, but if they have some basis that, you know,

15   they didn't get the notice, that they thought you were

16   representing them but they hadn't given you the authority.  I

17   mean, I don't know what it could be, but if they have a basis

18   for filing a late claim, isn't that the solution?

19        MR. SPEIGHTS: Well, that's an alternative, Your

20   Honor.  I'm not sure what Mr. Bernick would say if they file

21   a late-filed claim as to what arguments he would make and

22   what different standards might apply, but certainly if Your

23   Honor ruled against me, I would do that.  If Your Honor ruled

24   against on class certification, I would do that, and I have

25   no problem doing that now and having both issues decided at

1   the same time and allowing the full factual development

2   dealing with these claimants, because I don't think the - I

3   think I'm right on ratification, but my concern is that these

4   people who want to proceed, not be precluded from proceeding.

5   They are W.R. Grace product ID buildings who have retained me

6   to represent them.

7           THE COURT: Okay, thank you.

8           MR. SPEIGHTS: Thank you.

9           MR. BERNICK: (Microphone not recording) . . . there

10  are two matters that Mr Speights talked about -

11          THE COURT: Mr. Bernick, I can't even hear you let

12  alone the people on the phone, so - If you pull the mike from

13  the witness stand.

14          MR. BERNICK: Oh, oh, oh, here's one here.  How's

15  that?

16          THE COURT: That's fine.

17          MR. BERNICK: Good.  We have ratification, and I

18  want to distinguish that from the effect given to

19  ratification.  Was there a ratification in fact?  What effect

20  should be given to that ratification, given the fact that we

21  had a deadline that a lot of people relied upon?  Mr.

22  Speights spent a lot of time talking about ratification.  He

23  said, Well, there was ratification.  I think my cases are

24  right, and he talked a lot about there being a connection

25  that he had with the clients, with the principals.  And he

1    even cited this affidavit from Mr. Freeman saying that there

2    was an obligation, so strong was it.  This whole argument

3    that deals with ratification doesn't really address the

4    problem that the Court faces.  The problem the Court faces

5    is, sure there's a ratification.  We know that they have

6    given authorization in writing.  The question is, what effect

7    does it have given Rule 3001 and given the agency principles

8    as articulated by the Supreme Court, in the Supreme Court's

9    mindfulness about ratification in cases where there is a

10   definite deadline and other people's rights are affected.

11   So, I'm going to come back to that.  That's really the issue.

12   But even on ratification, he said that, Oh, there was an

13   obligation.  Well, did Mr. Freeman say there was an

14   obligation because there was a connection where the class was

15   not certified as to Grace?  Is the Anderson Memorial class

16   was not certified as to Grace?  Did he have - Did Mr. Freeman

17   say, Even though the class was not specifically carved out

18   Grace, did Mr. Speights still have the obligation to lodge

19   claims on behalf of Grace claimants?  Anderson Memorial was a

20   South Carolina class.  The Court had decided not to certify a

21   class that went beyond South Carolina.  Are any of the claims

22   that we're talking about here in the 61 claims, are any of

23   them South Carolina claims?  I don't see a one on even that

24   first page.  I'm not sure if there are any South Carolina

25   claims.  Is Mr. Freeman saying that Mr. Speights had an

1    obligation to people who didn't live in South Carolina under

2    a South Carolina class to file a claim on their behalf?

3    Obligation?  And then what about this Court's order.  This

4    Court, Your Honor, ordered counsel to seek permission before

5    filing any kind of class claim, any kind of class claim

6    whatsoever.  Does the obligation that Mr. Freeman identified

7    trump this Court's order?  So I think the whole idea that

8    somehow Mr. Speights can wrap himself in a cloak of

9    authority, given the Anderson class, to prosecuting claims

10   against Grace who is not a certified class defendant or

11   claimants who were not South Carolina claimants, and where

12   this Court had specifically ordered that any effort to

13   proceed on behalf of South Carolina claimants, that is

14   through a class proof of claim, had to be approved by the

15   Court.   So, I think that even on ratification, all that Mr.

16   Speights has done is to highlight by bringing into this issue

17   the Anderson Memorial issue, which we didn't do and he did,

18   to simply highlight all the problems that he has with

19   Anderson Memorial to which we're going to turn in a few

20   minutes.  But none of this, even if you were to grant that he

21   had ratification, none of that gives rise to the question or

22   answers the question, Well, what effect did it have?  Should

23   there be relationship-back, and he says, Well, this is a

24   question.  There are cases on both sides.  There are no cases

25   on both sides of that question.  The only cases that address

1    the question of whether there can be relationship-back where

2    you have the deadline that the Supreme Court described and

3    the rights of other intervening parties affected, the only

4    precedence are the precedence that we've cited, and

5    particularly the Supreme Court's case which Mr. Speights did

6    nothing to distinguish.  That was a case where there was an

7    effort after the fact ratification against the deadline and

8    the Court said, No.  And then we go back to 3001, and the

9    fact that 3001 in the claim form itself here required the

10   action of a principal.  No answer to that.  So we got a lot

11   of generalized discussion about ratification, but no specific

12   response to what counts here, which is the effect of

13   ratification and the application of Rule 3001(b) and the

14   Supreme Court's decision in <u>Federal Election Commission</u>.  I

15   was given a note that I really have to share.  If Mr.

16   Speights is correct about what he is able to do, there would

17   be a good business.  You'd get a Schedule F from the debtors

18   and file a proof of claim for each creditor, timely, proof of

19   claim.  Then you could wait for the bar date, and for anyone

20   who misses the bar date you would then contact them to say,

21   I've got an answer to your problems, I've already filed a

22   claim on your behalf and now all you have to do is authorize

23   me and I'm your attorney.  I don't think that's really what's

24   contemplated.  With respect, Your Honor, to the question that

25   you raise, which is late claims, Mr. Speights can always come

1    in on behalf of his clients and make a request for treatment

2    as a late claimant.  That's something that's presumably

3    available to everybody, but if that's going to happen, this

4    motion should be granted to strike the claims that were

5    filed, because they should be stricken.  If he then has the

6    authority from his clients to prosecute a late claim, we will

7    take up those late claim requests just like any other late

8    claim request and determine whether there's a ground for it,

9    and if they meet the ground, fine.  If they don't meet the

10   ground, they don't meet the ground.  But right now, that's

11   not before the Court and it's not really appropriate, we

12   think, in responding to the motion that is before the Court

13   to try to negotiate the point where somehow this matter is

14   held on ice until they can go ahead and file the late claims

15   or request for late claims, and then ask that both things be

16   adjudicated at once.  If these claims were not properly

17   filed, they should be stricken.  If his clients then want to

18   come in with late claims, we'll deal with that on another

19   day.

20          THE COURT: Mr. Speights?

21          MR. SPEIGHTS: I wish I had the vim and vigor of Mr.

22   Lockwood to respond to some of those things.  Number one, I

23   handed Mr. Bernick the Freeman affidavit, and he said, I

24   don't need to read it.  And then he proceeded to tell you,

25   Did Professor Freeman say this?  Did Professor Freeman say

1    that?  I don't think so.  Professor Freeman has said exactly

2    what Mr. Bernick said in his imagination that Mr. Freeman did

3    not state.  Mr. Freeman said, first of all, that we had the

4    obligation for the Anderson putative class, the nationwide

5    class to file these proofs of claim.  So, I urge Your Honor

6    to read the Freeman affidavit.  I didn't mis-characterize it.

7    It says that we had the obligation to do exactly what we did,

8    a fiduciary duty obligation.  Secondly, Your Honor, Mr.

9    Bernick said, Several times the Court has specifically ruled

10   that you had to get permission.  That is not the case, Your

11   Honor.  What happened was, Mr. Bernick found - I don't even

12   think in his initial brief a discussion with the Court in a

13   transcript, not a ruling, not an order, not something served

14   on people, not in the bar date order, he found a reference in

15   a transcript in which Your Honor suggested that you might

16   need permission and then later on in the same transcript, I

17   didn't know it was coming up today, I don't have it with me,

18   the Court turned and said something else, and in the

19   meantime, Mr. Bernick disagreed with that, and that is the

20   very transcript in which, if you have the whole transcript, I

21   think it was February of some year, Mr. Bernick said we

22   should be governed by the American Reserve case which is the

23   case I relied on after that transcript, filed claims pursuant

24   to American Reserve and pursuant to Professor Freeman's

25   strong and unambiguous advice to me that I should do so.

1    Lastly, Your Honor.  Maybe I was too cavalier in dealing with

2    all the cases because the cases are in our supplemental

3    brief. I would urge Your Honor to read the cases.  The Third

4    Circuit's case in <u>In Re; Eastern Supply Company</u>, the Fourth

5    Circuit's case in <u>Hager</u>, the Eighth Circuit's case in <u>Boyds</u>

6    all support what we have done here, support ratification.

7    The Third Circuit, the appellant sought dismissal of a

8    bankruptcy petition because the attorney who signed the

9    petition did not have authority.  The Third Circuit found

10   that ratification applied.  The Fourth Circuit held that the

11   unauthorized filing of a voluntary petition in bankruptcy on

12   behalf of a corporation might be ratified in appropriate

13   circumstances.  The <u>Boyds</u> case held.  The Eighth Circuit held

14   that the filing of a bankruptcy petition on behalf of a

15   corporation could be ratified.  I mean the cases go on and on

16   and on.  Your Honor, I didn't spend time on the Supreme Court

17   case because the record will reflect in the transcript that

18   Your Honor saw the distinction between that and our present

19   case, and this is not a situation in which the minority view

20   that's like a statute of limitations, then that might present

21   some problems to some courts but many other.  Lastly, Your

22   Honor, I did not see Mr. Bernick try to refute his own case,

23   his own case, <u>First Plus</u> case, which says that you can ratify

24   such an act.  It is the claimant itself that can ratify such

25   an act.  Your Honor, again I would go back.  All of this

1    would go away, potentially, when Your Honor rules on the

2    Anderson matter, and hopefully we're going down that road to

3    have the hearing on the Anderson matter, and there's no

4    prejudice by waiting until that ruling to deal with this

5    issue.

6         THE COURT: Okay.  I am going to take this one under

7    advisement because I did read the briefs, but I'm going to go

8    back and take a look at them again, so, I will give you a

9    ruling promptly.

10        MR. BERNICK: I think that brings us to what may be

11   the second to the last issue, which is the Anderson Memorial

12   case, and - Oh, before we reach Anderson, Your Honor wanted

13   us to, I guess, bring up and remind the Court under agenda

14   item 7-B, Romanet iii, there was a stipulation of withdrawal

15   and expungement of 194 Canadian property damage claims.

16        THE COURT: Oh, yes, I am confused as to what I

17   spent most of this morning or I guess earlier this afternoon

18   on based on the withdrawal of the Canadian property damage

19   claims.  Are there still some left?

20        MR. BERNICK: Yes, there were something like 200 or

21   thereabouts, 250, and then a whole bunch of them were

22   withdrawn leaving, I believe, 97 claims that were not

23   withdrawn and expunged, and it's those 97 claims that still

24   presented the issue of the Canadian adjudication and that

25   we'll now wrap into the property damage CMO, and Jen, if you

1   could just make sure to mark that down that we need to pick

2   that up in the CMO.

3       THE COURT: What agenda number is the stipulation.

4       MR. BERNICK: The stipulation was 7-B, Romanet iii,

5   and that related to the expungement of the ones that were

6   withdrawn, and there's no action the Court has to take on

7   that.  It's simply a report to the Court.  Just needs to sign

8   the order, I guess.

9       MR. SPEIGHTS: Your Honor, since neither Mr. Bernick

10  nor Ms. Baer were in Pittsburgh when that matter was heard,

11  that was when Ms. Browdy and I were before you, and it was a

12  product ID objection to all of those claims, and I suggested

13  a compromise, and everybody agreed.  Give me 60 days new

14  product ID and I'll withdraw those without product ID, and

15  Your Honor did that, and that's what that stipulation is all

16  about.

17      THE COURT: Okay.

18      MR. SPEIGHTS: And then 97 of the product ID

19  Canadian claims.

20      THE COURT: All right, one second.  I will enter

21  that order.  I don't have it here.

22      UNIDENTIFIED SPEAKER: Your Honor, I have it.

23      THE COURT: All right, I'll take it then.  Thank

24  you.  Okay, I did see the stipulation.  I was just confused

25  as to why I was going through the Canadian issue when the

1  claims were withdrawn.  I didn't appreciate the fact that

2  there was still some left.  So all I need is the order, thank

3  you.  Okay, I've signed the order that approves the

4  stipulation.

5          MR. BERNICK: Okay.  With respect to Anderson

6  Memorial, I think it probably gets divided into two parts at

7  most.  Maybe there's only one part, and I suppose it depends

8  upon whether we get back into the reasons why Your Honor

9  asked the questions that you did at the end of the last

10  hearing.

11          THE COURT: What agenda are we on again?

12          MR. BERNICK: This is item number 8 on the agenda.

13          THE COURT: Eight.

14          MR. BERNICK: And Your Honor will recall that - or

15  maybe you won't recall, but we're now going all the way back

16  to a hearing that was held in January of this year.  That was

17  the class certification hearing, and there were arguments at

18  that hearing about whether or not the class should be

19  certified thereby permitting the actual prosecution of the

20  class-wide proof of claim.  Your Honor made a series of

21  comments about the class certification motion at that time,

22  but then posed a question to be answered, and the question

23  was what had Grace actually done by way of giving notice, and

24  you asked for a report on that.  So, we are prepared to make

25  a report on that factual issue.  If that takes us back into

1    the matters that were then being heard and what the

2    implications of that report are, then I'm prepared to address

3    that.  That is all the events leading up to the hearing and

4    what happened in the hearing and kind of where we are on

5    class, but I don't know that that is something that we need

6    to take up today.  I'm happy to do it.  Happy to talk about

7    class cert and what Your Honor said at that time about your

8    own observations about class cert, so, we'll do it either

9    way.  We can either address the narrow issue and then the

10   broader issue.

11            THE COURT: Let's start with the narrow issue.

12            MR. BERNICK: That's fine, then Ms. Baer is going to

13   address the narrower issue.

14            MS. BAER: Your Honor, given the late hour, I will

15   try to be brief.  I do have a binder of all of the filed

16   materials that relate to this.  Pretty much everything is of

17   record, but what I'll do is just summarize what occurred.

18   Your Honor, as you might recall, when you entered the bar

19   date order on April 22nd of '02, there were various sections

20   as to what the debtor needed to do and who the debtor needed

21   to give notice to.  With respect to asbestos property damage

22   claims, the order provided specifically that good and

23   adequate and sufficient notice of the bar date and all the

24   procedures and requirements was if the debtor served the bar

25   date notice package upon all counsel of record for known

1    holders of asbestos property damage claims.  Your Honor, if

2    you also recall that order originally had some provisions

3    that because Grace had indicated they did not have the

4    address of asbestos property damage claimants, we'd be happy

5    to serve the bar date packages on the claimants but we don't

6    have the information.  We'll serve their counsel and their

7    counsel has a choice.  They can either give us the addresses

8    and then we'll serve their claimants, which in a couple of

9    cases happened, or they can serve their own clients and

10   certify to us that they did so.  Later on, the Property

11   Damage Committee came in and had you remove the requirement

12   that they certify that they had given their clients notice.

13   We did not give individual property damage claimants notice.

14   We gave their counsel notice.  Your Honor, when we filed our

15   certification of counsel of who we gave notice to, in June of

16   2002, we filed 199,816 actual notice bar date packages that

17   are certified in that notice.  Your Honor, where did the

18   information come from?  When Grace filed Chapter 11 it had a

19   database, and the database contained all of the names of

20   various types of creditors listed on its schedules.  The

21   database was around 400,000 names.  The service was only on

22   200,000 because we excepted from the database asbestos

23   personal injury claimants and lawyers, mostly lawyers.  Your

24   Honor, the database that Grace used had just about everything

25   on it you could think of: vendors, creditors, litigants, and

1   other lawsuits, co-defendants, environmental claimants and

2   the like.  When you look at the certification of counsel as

3   to the 199,000 that were served, it breaks down as follows:

4   112,116 parties were served with just the non-asbestos

5   property damage proof of claim.  They were equity holders

6   that may have an interest in the case.  In addition, 177,911

7   parties were given actual notice.  This was an actual notice,

8   the listing of which is just over 53,000 pages.  They were

9   given the bar date notice materials and the non-asbestos

10  proof of claim form.  They were not given the asbestos

11  property damage proof of claim form because these were

12  vendors, customers, employees, environmental claimants,

13  parties to non-asbestos litigation.  The 9,709 parties listed

14  on Exhibit 7 to the certification of counsel, which is 265

15  pages long, served the bar date notice package including the

16  asbestos property damage proof of claim form.  Your Honor,

17  among those 9,700 people who received the property damage

18  proof of claim form and notice package, were the 2002 list in

19  this case, members of the various committees, all residents

20  of Libby, Montana, which, Judge, you had ordered us to do,

21  and all known personal injury and property damage lawyers.

22  We did include, Your Honor, a lot of the, what we call the

23  major personal injury lawyers in that service because we

24  figured that they actually may have some clients who might

25  also be interested in filing property damage claims.  If you

1   examine the attachments to the certification, you will see

2   that many of the usual suspects were served, most

3   importantly, Mr. Speights was served.  Mr. Dies was served.

4   Ed Westbrook was served.  Darrell Scott was served, Ness

5   Notley, Perry Whites, Siber Pearlman, and I could go on.  We

6   served lawyers, Your Honor.  The lawyers had the

7   responsibility to serve their clients.  We do not have their

8   clients' names, we do not have their clients' addresses.

9   Your Honor, subsequently, in March of 2003, Mr. Speights

10  filed, as you know, over 3,000 property damage claims.  Among

11  those were 1,010 individual proofs of claim for the purported

12  members of the Anderson Memorial class.  He also at that time

13  then filed the two class proofs of claim.  When that

14  authority was challenged with our thirteenth omnibus

15  objection, Mr. Speights himself in his response indicated

16  that of the 1,010 Anderson Memorial purported claimants, 62

17  of the individual claims he filed were for known people in

18  the defined class.  Two hundred and eighty-five of them were

19  for putative class members where he had express authority

20  either in this case or another case, it wasn't necessarily

21  just the Grace case.  Most importantly for the notice issue,

22  Your Honor, 657 of the claims that he filed for putative

23  class members did not respond to his request for express

24  authorization and 396 were for buildings, not claimants, when

25  he was unable to locate any person or entity who owned the

1    building.  Your Honor, my point is that we served the

2    lawyers.  The lawyers had the responsibility to serve their

3    clients.  Mr. Speights filed these proofs of claim.  He

4    apparently made the attempts to contact his clients, and he

5    himself had great difficulty with the information he had

6    contacting over the majority of the people that he indicated

7    were the Anderson Memorial putative claimants now I guess he

8    thought we should have served.  Your Honor, that is

9    essentially what we did in the bar date notice program.  Your

10   Honor, the point and the whole debate with respect to serving

11   counsel, they had the responsibility to serve their clients.

12   It was they who insisted on it.

13        THE COURT: Yeah, they did insist on it, and the

14   only reason I removed the requirement for the certification

15   was because of the argument that they're officers of the

16   court and they said they were going to do it, and they should

17   do it, but at this point in time, maybe I need to go back and

18   have them file the certifications because if in fact there is

19   some in quote, "known creditor" out there and the attorney

20   should have made service and didn't, I don't know that that's

21   the debtor's problem but perhaps the attorneys may need to do

22   something about it.  So, Mr. Speights?

23        MR. SPEIGHTS: I'll come back to this point, but

24   just so I won't forget it, Your Honor, it strikes me as the

25   last two arguments have been contradictory about the debtor,

1    far be it for a lawyer to make a contradictory argument, but

2    five minutes ago, Mr. Bernick was arguing that I had no

3    authority to representing any of these people, and one minute

4    a go Ms. Baer was arguing that these were my clients, and

5    therefore, it was my obligation.  I want to come back to that

6    point, but there is a contradiction there which seems to me

7    to be pretty obvious.

8            THE COURT: Then if you didn't represent them, then

9    you had an obligation to get back to the debtor to say you've

10   sent me a package for this number of people, and I don't

11   represent them so, here are their addresses and go serve

12   them.

13           MR. SPEIGHTS: They didn't do that, Your Honor.

14   They didn't send me packages for all of these people, and

15   therein lies the problem.  Let me go back.  For all of these

16   putative class members, I don't believe they sent me

17   packages.  Let's go back to how we got started on this.

18   First of all, I want to say up front, because I didn't make

19   it clear before, that this is not an issue that somebody has

20   filed a motion attacking the bar date order.  This is not a

21   matter in the context of class certification we have raised

22   the issue that you have to do your publication notice again.

23   This is an issue about whether a select group of PD claimants

24   should have gotten and should now get direct notice or that

25   select group of PD claimants who did not get direct notice

1   should be taken care of by the Anderson class.  It all came

2   up because Grace in its brief in opposition to the motion to

3   certify acknowledged and correctly so acknowledged that one

4   reason to certify a class action in Bankruptcy Court would

5   assist the Bankruptcy Court in the development of a plan of

6   reorganization.  And there are many ways you can do that, but

7   one of the ways would be that if there's some question about

8   whether everybody got adequate notice, and if there was that

9   legitimate question, then there would be the argument that if

10  you certify Anderson and the resolution of Anderson will take

11  care of that potential problem of a group of people who did

12  not.

13          THE COURT: There shouldn't be a potential problem.

14  If you have an obligation on behalf of the Anderson putative

15  class to file proofs of claim on their behalf because of this

16  ethics opinion, why don't you at least have the same

17  obligation to notify them of the fact that there's a bar date

18  and to make sure that they get the information concerning the

19  bar date and the actual notice.  I mean, the contradiction, I

20  think, is you can't on the one hand tell me you have a

21  fiduciary duty to go part way but not the whole way with

22  respect to the notice issue.

23          MR. SPEIGHTS: Your Honor, maybe our disconnect is

24  that even if we have a duty and even if we attempt to find

25  these people, I don't think our duty to do that as putative

1    representative to file a class action and represent them in

2    that way, eliminates their obligation to give notice to these

3    people.  They didn't want to give notice.  Their position is,

4    they didn't know who these people were. They were not

5    reflected in their records, and they had to -

6            THE COURT: Right.

7            MR. SPEIGHTS:  - and they would not have given

8    notice.

9            THE COURT: Right.

10           MR. SPEIGHTS: Right, and I say, and I believe I can

11   prove to Your Honor at the appropriate time, I believe that

12   they did have records.  I believe that there is a strong

13   suggestion that they had the ability to directly notify these

14   people, number one, much more so than I did, but even if it

15   was the same, it would be directly from them to the people as

16   a debtor.  These are people I don't know.  I hadn't met.

17   Somebody should give them notice, and it could be both of us.

18           THE COURT: But you - Well, look, I don't know how

19   the debtor, unless all of the individuals who are in this

20   putative class have been identified somewhere, then I don't

21   know how the debtor could know who the putative class is.

22   Generally speaking, one reason that you may get certification

23   of a class is because you don't know all of the members at

24   the time that the class is certified, and this class wasn't

25   even certified yet.  So, how could the debtor possibly know

1   who all of the potential claimants in a class action that

2   wasn't certified could be?  The best person or people likely

3   to know who those claimants are, are the lawyers who profess

4   that they want to represent them in the event that there has

5   been some action in which they too can give notice.  If you

6   don't know who they are, Mr. Speights, and the debtor doesn't

7   know who they are, they're obviously not known creditors.

8           MR. SPEIGHTS: But, Your Honor, that's the point.

9   I'm not conceding that the debtor does not know.  I have -

10          THE COURT: Well, do you want to do discovery to see

11  what the debtor -

12          MR. SPEIGHTS: That's the issue I'm heading for.

13          THE COURT: Okay.

14          MR. SPEIGHTS: I noticed a deposition a year ago,

15  just a 30(b)(6) deposition to find out what they knew, and

16  see whether they gave notice to these people, and we'll come

17  back here, and you know, I've been here for four years and

18  haven't taken a deposition.

19          THE COURT: The debtor is admitting that it did not

20  give notice.  It gave notice to the attorneys.

21          MR. SPEIGHTS: But what it didn't - what it has not

22  told you is is what records they have.  We now have the

23  benefit of the opinion that came out the other day by Judge

24  Buckwalder (phonetical) which rejects what Grace said was a

25  limit of its obligation, which was to essentially just look

1  at my records.

2        THE COURT: No, I think it affirms that obligation.

3        MR. SPEIGHTS: I think that it has that obligation

4  to do so, but it also - I mean the opinion speaks for itself.

5  I like the language of that opinion, I can live with

6  certainly for this matter.  I think Grace - my deposition is

7  simply this, Your Honor, that, and again, it's the only

8  deposition I tried to take in this case since it was filed,

9  is to get the 30(b)(6) of the person most knowledgeable about

10  what records Grace had which would enable it to give direct

11  notice to property damage building owners who have Grace's

12  product in their buildings, and I believe Grace has a wealth

13  of information more so than I do.

14        THE COURT: Well, they apparently got a

15  certification that indicates that they had a database, that

16  they went through the database, that they took out the

17  entities with respect to the personal injury claims, and they

18  pretty much served everybody else.  Now, I mean, there's a

19  certification.  If I can accept the certification of counsel

20  that they served their clients, I ought to be able to accept

21  the certification of Grace's counsel that that's who they

22  notified.

23        MR. SPEIGHTS: Your Honor, I'm not challenging Ms.

24  Baer's certification as to what she believes; okay?  She has

25  a client.  They know what documents they have.  I don't know

1    that Ms. Baer knows.  She's not the deponent.  She's not the

2    person with first-hand knowledge, but she certainly knows who

3    she notified.

4             THE COURT: Well, I know but I think -

5             MR. SPEIGHTS: But for example -

6             THE COURT:  - the bigger problem, Mr. Speights, I

7    don't know how on the one hand you tell me you've got an

8    ethical obligation to file a proof of claim on behalf of

9    somebody and at the same time, don't have an obligation to

10   notify them that there's a bar date that means that they have

11   to file a proof of claim.

12            MR. SPEIGHTS: Your Honor, even if you say that's

13   the case; okay?  Even if you conclude that that's the case

14   that I had - when I filed the proof of claim, they say

15   they're not my client, and I didn't have to have

16   authorization.  So, I mean, it's a circular argument.

17            THE COURT: But that's because at the time that they

18   made this service, you are of record as representing certain

19   clients.  When you filed the proof of claim without the

20   authority, it then becomes clear that maybe you didn't have

21   the authority to represent them, but the apparent authority

22   was certainly there.  That's the issue.  So, if you didn't

23   make service and didn't tell the debtor that you didn't make

24   service, then how's the debtor to know who the people are who

25   weren't served when the order told counsel to serve their

1    clients?

2            MR. SPEIGHTS: When the debtor served me with the

3    order saying, you serve your own clients, I don't believe the

4    debtor had any knowledge, based upon what they've said in

5    court, that I was going to attempt to file claims on behalf

6    of or contact members of this putative class.  They were back

7    on this song and dance at that time. There were only seven

8    cases in America; okay?  And therefore, they sent me a claim

9    form for Anderson Memorial Hospital and they wanted to do the

10    same for my California building.  They didn't even know I

11    represented the University of California and Cal State.  That

12    was not on their radar screen.  But they knew -

13            THE COURT: But that's not the point.  Go ahead.

14        MR. SPEIGHTS: What they though, when they made this

15    decision not to serve building owners, not to serve people

16    with their product -

17            THE COURT: They didn't make a decision not to serve

18    building owners.  They made a decision to serve building

19    owners but in some instances they didn't have the

20    identification of who the building owners were. They served

21    people that they knew to be counsel for certain building

22    owners, asked counsel either to make the service or to return

23    the package to the debtor with the information as to who

24    should be served and the debtor would do it.  I mean, I don't

25    know what more debtor can do.

1        MR. SPEIGHTS: That's what I'm trying to explain,

2   Your Honor.

3        THE COURT: Okay.

4        MR. SPEIGHTS: Here are records of the debtor.  This

5   is an invoice of the debtor's, from their files.

6        THE COURT: The debtor doesn't have to go through 25

7   years worth of invoices, or I'm not sure how long Grace has

8   been in existence.  I'm sure for at least or close to a

9   hundred years, probably not that far.  They don't have to go

10  back through a hundred years' worth of invoices to see what's

11  been paid or not paid.

12        MR. SPEIGHTS: But, Your Honor, this is a - it's not

13  a question of paid or not paid.  This is an invoice showing

14  that the monokote product is in the Dodge County Hospital in

15  Eastman, Georgia.  That's a building.  That's where its

16  product is.  They have direct knowledge of that.   It's in

17  their files.  It may be, I don't know until I take my

18  deposition, it may be part of some data that's been

19  computerized.  There may be somebody, and it's hard for me to

20  imagine that somebody doesn't know, where that product is

21  placed.  Not just for the property damage litigation in the

22  world, but I would like to know if people are suing me for

23  mesothelioma where my product was placed.  We've got tons -

24  not tons, we've got a lot Grace invoices with specific

25  buildings where their product was placed.

1        THE COURT: Didn't we address this when I did the

2   notice issue.  I think this is something that I've heard

3   argued a couple of years ago.

4        MR. BERNICK: If I just can be heard for a moment on

5   some of what Mr. Speights has said . . . (microphone not

6   recording).

7        MR. SPEIGHTS: May I finish this, Your Honor.

8   There's not a moment with Mr. Bernick.

9        THE COURT: Yeah, finish, because, frankly, folks, I

10  would like to get through the agenda, but I'm getting to the

11  point where I'm getting tired too, and I'm sure all of you

12  are, so I want this one wrapped up in ten minutes so we can

13  get to number 4 and get finished tonight, by nine o'clock.

14  We're out of here by nine o'clock.  So, let's go, folks.

15       MR. SPEIGHTS: Your Honor, I have additional types

16  of records.  I've got letters from building owners with the

17  monokote product directly to Grace identifying their

18  buildings.  I've got in addition to the - and I can have all

19  these marked, but I'm not sure that you take evidence at this

20  type of hearing, but -

21       THE COURT: Well, I'll take them if you want to

22  submit them, but, frankly, I'm not sure that this is the time

23  for an evidentiary hearing.  If I need one, I probably need

24  to schedule it, but I'm sure I addressed all of this in

25  setting the bar date notice.  This is old news.  I've heard

1    this before.

2            MR. SPEIGHTS: Well, I don't know, Your Honor,

3    because I didn't argue the bar date notice, but in addition

4    to the invoices and the letters they have computer readouts

5    with a great deal of information about where their product

6    was sold, and then they go to -

7            THE COURT: But the placement of their product does

8    not a claimant make.   The building isn't a claimant in the

9    case.  So, who owns the building or whether the product was

10   remediated or anything that may have happened since the date

11   of sale does not mean that the debtor knows who the creditors

12   in the case are.

13           MR. SPEIGHTS: I believe, Your Honor, that they have

14   an obligation.  If they know where their product is - Let's

15   take the easiest example.  I know that monokote fireproofing

16   is in the DuPont Hotel.  I don't think it is and I hope it's

17   not because I stay there sometime, but if they know that

18   monokote fireproofing is in the DuPont Hotel, I think they

19   have an obligation to send the notice to the DuPont Hotel and

20   that might be the crux of the problem.  And in addition, Your

21   Honor -

22           THE COURT: But if they do that, under most rules of

23   service, the thing is either going to get bounced back or

24   it's going to be rejected as improper service because it's

25   not directed to the appropriate custodian or officer.  Now,

1    you know, Mr. Speights, they can only do what's reasonable.

2            MR. SPEIGHTS: But they didn't do any of this, Your

3    Honor.

4            THE COURT: But they did.

5            MR. SPEIGHTS: They gave it to a few lawyers.  They

6    were only seven cases filed at the time.  They didn't go

7    through any of that data, again without the discovery, I

8    don't know how they made these decisions, but they tell me in

9    their brief on the certification, Mr .Speights has no record.

10   He can't show where we failed in any way.  They go on and on

11   and on about how I can't show.  Well, I just want to

12   establish a factual record at this point.  Maybe the factual

13   record will be such that I'll have to come to Your Honor and

14   say, Frankly, Your Honor, this is what they did and I can't

15   refute it.  But I believe that and I believe in good faith

16   that W.R. Grace has a record of where its product went and at

17   least, even if Your Honor disagrees with me, let me make my

18   factual record so that, you know, if we end up before Judge

19   Burkholder, like the last people did, I can show this is what

20   they should have done, Your Honor, and they didn't even

21   attempt to do it, because to my knowledge of all these

22   invoices and all these computer readouts, and all of these

23   advertisements, which I didn't even discuss where their

24   product is shown in buildings.  To my knowledge they didn't

25   attempt any way to give direct notice to these people, and I

1    think they should have, but in order to determine that, I'd

2    like to know what records they actually had.  If they've got

3    a computer database, if they've got, you know, Mr. Fink is

4    down in the first row, I wake up there, because he's been a

5    Grace man for years.  He might be a deponent, but he has that

6    knowledge.  I don't have that knowledge.

7            THE COURT: Well, I think there's still a disconnect

8    between buildings, sending product to a place, and knowing

9    who the creditors are.

10           MR. SPEIGHTS: But in some instances, Your Honor -

11   you may draw that line, but in some instances they know who

12   the building owner is or was.  Some of the letters go into

13   the 70s and 80s of who the building owners are, writing them.

14   Dear Grace, I've got this asbestos in my building, what

15   should I do about it, and Grace responds and they don't give

16   notice to that creditor, and therein lies, I think, the

17   crucial issue of which one deposition one day and we can come

18   back before you, and we'll have a record and you can decide

19   it, Your Honor.  That's the only discovery I've sought other

20   than asking, now here's a motion, I've asked you to lift the

21   stay to get some South Carolina documents, but other than

22   that, you know, we want to argue the certification issue.

23           THE COURT: Mr. Bernick.

24           MR. BERNICK: This is a - I've got three minutes,

25   but I think that's all it will take.  This is a frivolous

1    issue, Your Honor.  We went through a process and the process

2    was driven by legal rules.  The process was to establish a

3    bar date, and in connection with the bar date process, we had

4    a notice program that was fully disclosed to the Court and to

5    all parties, and the notice program was driven by actual

6    notice and constructive notice by publication, and all we

7    were required to do was to follow the rules that specified

8    when you have to give actual notice and when you have to give

9    constructive notice by publication.  As Your Honor properly

10   has observed, it is not required to give actual notice based

11   upon invoices and analyses.  You give actual notice when you

12   actually have notice of the claim being made or the claim

13   existing and being ripened and being assertable.  Whatever

14   the standard is, we briefed it before.  So we segregated out

15   the people who were going to get actual notice and the

16   remainder were going to get constructive notice through

17   publication.  And we even went one step further, which is to

18   say, We'll ask the lawyers to make inquiry, and that would

19   really kind of come out of this population, that is people

20   who would otherwise only get constructive notice.  This

21   matter was fully litigated.  All the facts that Ms. Baer

22   recited were all out there.  The notice program was

23   transparent.  Ultimately the notice program was approved, it

24   was approved as complying with the actual requirements of the

25   law.  The bar date was appealed, but the adequacy of the

1   notice program was not appealed.  It's been decided in this

2   case.  It's final.  That's it.  There was no appeal.  There

3   was no issue with regard to the adequacy of the program. So,

4   we now have - the lawyers had an obligation going forward

5   under our program to make inquiry in order to supplement

6   publication.  They came in and said, No, they didn't want to

7   have that obligation.  Maybe they were going to go do it on

8   their own, but they didn't want to have the obligation and in

9   the face of that Your Honor said fine, we said fine.  So what

10  happened?  The lawyers went forward and they made their

11  contacts and they pounded the pavement and they went out and

12  solicited after-the-fact authority.  They went after everyone

13  they could possible think of.  They have yet to come forward

14  to say that they actually found somebody who should have

15  gotten actual notice.  They have yet to say, Gee, you know,

16  even after the fact we now know that there's somebody that

17  Grace had notice of and should have given actual notice to.

18  That's not even been demonstrated, and in fact, even if they

19  could it would be 20/20 hindsight.  It wouldn't even go to

20  the adequacy of the program because the adequacy of the

21  program is determined at the time.  It's not determined with

22  20/20 hindsight.  So, even today they don't have some huge

23  population of people that they say should have gotten actual

24  notice and didn't.  They want to simply argue that way back

25  then when the bar date program was established, we were

1    obliged to give actual notice to a bunch of people who are

2    reflected on invoices or sites.  That's just a revisiting of

3    the argument that they could have made then.  That day has

4    passed.  So, the reason I say it's frivolous is that they

5    could have argued this at the time.  He could have come in

6    here with the invoices and the collections and made exactly

7    the same argument.  He would have been wrong but he could

8    have made the argument.  He didn't.  So we went and did the

9    program.  So, now, about how the program should have been

10   done differently and I want to conduct discovery, I just

11   don't know what planet we're on.  This is *res judicata*.  It's

12   been decided in this case, and the only reason he's coming in

13   and doing that is he wants to sit there and bootstrap to his

14   class.  That's the only reason that we're here is that he now

15   thinks that the only function that the class can serve is to

16   cure inadequacies in a notice program that he never

17   challenged for its adequacy.  Your Honor, we would ask that -

18   we made the report in the status report to the Court, but we

19   think that the class certification motion was argued in

20   January, was before the Court then.  Your Honor actually went

21   through an analysis of the - there's now a continuing

22   distortion, kind of like, it's a ripple effect because they

23   still want to pursue or he still wants to pursue the class

24   certification, and all this is, is a back door consequence of

25   the fact he still wants the class certified.  It's not really

1   a bona fide argument that goes to the adequacy of the

2   program.

3          THE COURT: Well -

4          MR. BERNICK: I'll also observe - I'm sorry, one

5   last thing.  In January you asked that you be furnished all

6   of the orders and transcripts relating to Anderson Memorial.

7   I don't know that that's actually been done, but we have now

8   looked at the files and we can tender to the Court and it's

9   very plain, it's plain as day, a letter was written from the

10  Anderson Memorial judge to Mr. Speights and it specifically

11  told him to draft the final class certification order, the

12  one after Grace was already in bankruptcy, told him to draft

13  it because, he said, You can file your briefs because I think

14  your briefs are correct.  So, essentially, the order that was

15  entered in the Anderson Memorial case certifying the class

16  after the fact apparently at least as we can see from the

17  letters was actually drafted or at least proposed draft for

18  the Court in response to a letter from the Judge by Mr.

19  Speights and then tendered to the Court.  We don't know if

20  there were any edits made or how that worked, all we know is

21  that there's the letter there.

22         THE COURT: Well, I know, but I mean if the Court

23  orders you to draft an order, Mr . Bernick, are you not going

24  to do it?

25         MR. BERNICK: Well, it's a whole opinion.  It's not

1    just the order, it's a whole opinion.  And here's the

2    significant part of it, is that the letter from the Judge

3    specifically specified they'll be certified as to the

4    remaining three defendants not including Grace.

5            THE COURT: Right.

6            MR. BERNICK: So Grace was out of the picture, and

7    then when you go to the final opinion that was issued, you

8    can glean that Grace was not supposed to be there, you can

9    glean it from the opinion, but somehow the clarity that

10   specifically excluded Grace is not quite as clear in the

11   final opinion as it was in the letter that the Court sent to

12   Mr. Speights.  Now, I'm not making any accusations. I think

13   we're in for a whole bunch of reasons, but the fact is that

14   the clear intent of that Court was to exclude Grace from the

15   Anderson Memorial case and that that was known, it was known

16   to counsel in 2001, and yet, we're now sitting here still

17   dealing with the consequences and argument that says that

18   somehow the Anderson Memorial case is alive and well with

19   respect to W.R. Grace.  We don't think that's accurate.  We

20   will furnish the orders to the Court that we have gleaned and

21   anything that Mr. Speights has in his files, I think, would

22   be important also to furnish to the Court so the Court's

23   record is complete on what actually happened in connection

24   with the Anderson Memorial case.

25           THE COURT: All right, well, why don't all of you

1    put together all of your documents and submit them in a

2    binder.  I did get some documents from Mr. Speights awhile

3    back.  I don't recall now how long, but that I believe had

4    the Judge's letter and the opinion attached to it.  I have

5    seen that, so I'm aware that the Judge indicated that Grace

6    should be excluded, but my recollection is that it was

7    excluded because the debtor filed bankruptcy not because

8    there was some ruling on the merits that indicated that Grace

9    should not be included in that class certification.

10           MR. BERNICK: The two were tied together, that is to

11   say, clearly the Court could not include Grace, but remember

12   the pre-bankruptcy order was ex parte and done on the heels

13   of the press release.  The only order finally certifying a

14   class in the Anderson case was the order that was issued in

15   July, and pursuant to a letter that said, it should exclude

16   Grace.  So, the representation that there was a certified

17   class as to Grace in the Anderson Memorial case is not

18   correct.

19           THE COURT: I agree.  There is no certified class as

20   to Grace in the Anderson case.  I agree.

21           MR. SPEIGHTS: Your Honor, that's just simply not

22   correct.  I mean, Your Honor - I mean, we went over this a

23   year ago.  The case was certified as to Grace.  He challenges

24   the circumstances of the order.  It was not - after the order

25   was signed there was a hearing where now federal judge, Kevin

1  Castelle (phonetical) attended and he kept his order in place

2  as to Grace.  He excluded it.  This idea of -

3          THE COURT: Well, I don't have those documents, but

4  if it was entered post-petition -

5          MR. SPEIGHTS: It was not.  It was not entered post-

6  petition, Your Honor.  There's an order as to Grace

7  certifying the class -

8          THE COURT: All right, somebody has to get me the

9  documents -

10          MR. SPEIGHTS: And I have sent them to you and I'll

11  resend them to you, but, Your Honor, I know it's ten minutes

12  to nine, but gracious, we have to be as lawyers somewhat

13  accurate in what we tell Your Honor.  I mean, the order - the

14  letter from Judge Hayes was discussed last August when I came

15  here, thoroughly went over.  The fact that Grace was

16  certified before was discussed then.  More importantly, Your

17  Honor, Mr. Bernick has set up here and said, They never

18  appealed the order.  They never appealed the order.

19          MR. BERNICK: The notice program.

20          MR. SPEIGHTS: They never appealed the bar date

21  order.

22          THE COURT: No, he said they did appeal the bar date

23  order.

24          MR. SPEIGHTS: And you know what happened to that,

25  Your Honor.  Judge Wolin would not consider that and that's a

1    matter of a question of whether it was premature to consider

2    that, so the Committee did try to do that, but I really stood

3    up to say one thing, until Mr. Bernick started mis-citing

4    what happened in South Carolina which I obviously know what

5    happened down there.  What he said was, and I wrote it down,

6    Mr. Speights did not demonstrate - that's what he said, did

7    not demonstrate that we did not give notice to somebody we

8    should and therein is the only issue that I think needs to be

9    decided today, whether I can have the most basic discovery,

10   the deposition to demonstrate what they did and what they

11   didn't do.  Judge Burkholder in his opinion says, Further

12   this Court is guided by - is it <u>Chematron</u> <u>Kematron</u> one court

13   statement that the reasonably ascertainable standard requires

14   an analysis of the specific facts of each case, and I just

15   want to get the basic facts on that narrow point, and I

16   noticed a deposition a year ago.

17          THE COURT: But it should have been done in

18   connection with the bar date notice and the notice program.

19   I mean the time to raise an issue as to whether the bar date

20   notice and the notice program was adequate was at the time

21   that I was considering it, not now.

22          MR. SPEIGHTS: But, Your Honor, of course the

23   Committee was on that position, and I know I'm on the

24   Committee, and I know it's difficult to see that I have two

25   hats on my own out here, and the Committee takes positions

1  for everybody, and the Committee tried to appeal the bar date

2  notice, but forgetting all that, if that is a problem with

3  the bar date notice whether somebody raised it then or not,

4  if somebody did not get adequate notice and comes in here and

5  tries to file a late claim -

6      THE COURT: Yes, and if somebody raises that they

7  didn't get actual notice and tries to file a late claim, then

8  I'll probably have to find out why they didn't get notice and

9  whether they're really creditors at the time, but I don't

10  need to do it in a vacuum.  I don't have anybody here asking

11  me to file a late claim.

12      MR. SPEIGHTS: But, Your Honor, what you do have is

13  a debtor saying, Mr. Speights can't prove that it should have

14  given notice to one claimant, and hypothetically, I might be

15  right, Your Honor, suppose you find out -

16      THE COURT: You should have raised it at the time.

17  This bar date program was what?  Three years ago?  I mean, I

18  can't reopen issues that have been adjudicated for three

19  years after a notice program and millions of dollars have

20  gone out.

21      MR. SPEIGHTS: Your Honor -

22      THE COURT: The time to determine whether the debtor

23  did what the debtor was supposed to do was when the debtor

24  came in and said, Look, this is how we propose to go forward

25  with this.  We're going to search these records.  We're going

1    to give this notice.  Is that enough?  And I said, Yes,

2    that's enough.  I didn't have any contrary evidence.  The

3    Committee didn't raise any contrary evidence that indicated

4    that the debtor was missing actual creditors.

5         MR. SPEIGHTS: Well, Your Honor, all I need to do is

6    to come in here with one late filed claim -

7         THE COURT: Fine, come in.

8         MR. SPEIGHTS: And I get all this discovery even

9    though all that happened then.

10        THE COURT: You get discovery as to that claimant,

11   that's correct.  So come in with a late filed claim, and

12   we'll see whether somebody exists that didn't get it, didn't

13   get actual notice.

14        MR. SPEIGHTS: And the difference is - and we'll get

15   it and we'll get the truth of what happened then on my late-

16   filed claims, but the issue now is they're taking the

17   position vis-a-vis the Anderson certification that they did a

18   perfect job, and Mr. Speights can't refute it, and I want to

19   refute it.

20        THE COURT: Okay, with respect to the Anderson

21   certification, whether it was pre- or post-petition, was

22   there ever a list of who was included within that class

23   action?

24        MR. SPEIGHTS: The certification at the time was as

25   to South Carolina buildings.  The putative class action is

1    for non-South Carolina buildings.  There was not a list of

2    who was in except by definition.

3          THE COURT: Well, then it doesn't make anymore of an

4    actual notice for the debtor.  The debtor certainly doesn't

5    have to notify every single building in South Carolina and go

6    to, I don't know, every post office, every yellow book, every

7    internet site and find out where every building in South

8    Carolina is to give notice.  That's certainly not required.

9          MR. SPEIGHTS: But, Your Honor, I'm not talking

10   about South Carolina.  I'm talking about here, the putative

11   class action outside of South Carolina -

12         THE COURT: Fine, multiply that by 49.

13         MR. SPEIGHTS: But, Your Honor -

14         THE COURT: The debtor doesn't have to do that.

15         MR. SPEIGHTS:  - it's not a question of going out

16   and finding A, B, and C.  Suppose the discovery points out -

17   I'm looking at the clock, and I haven't got an answer,

18   suppose the discovery points out they hit button and all of a

19   sudden they've got the addresses of building owners with

20   monokote fireproofing in it.

21         THE COURT: Mr. Speights, there are so many what ifs

22   under that scenario.  When was the last time that monokote

23   was put into a building?

24         MR. SPEIGHTS: In this country, July 4, 1973.

25         THE COURT: Okay.  So the last building owner that

1    the debtor's records could possibly show who had some

2    knowledge of the monokote is back it 1973.  If the debtor

3    doesn't have an ownership interest in those buildings, how

4    would the debtor have any indication whether the building was

5    sold, transferred, remediated, knocked down, remodeled,

6    whatever.  The debtor doesn't have to go through an

7    unreasonable search to figure out -

8            MR. SPEIGHTS: We're not even at the -

9            THE COURT:  - claims that were 25 years old at the

10   time that the case was filed, if the existed at all?

11           MR. SPEIGHTS: Let me answer that question, Your

12   Honor.  First of all, you're assuming it doesn't have.  I

13   don't assume that.  I want the discovery to show that.  Just

14   the fact that it was supplied there doesn't mean it doesn't

15   have continuing knowledge through letters and advertisements

16   and knowledge, but in addition, Your Honor, something I

17   haven't even mentioned yet, the debtor knows that it's been

18   sued in this 100,000 personal injury lawsuits, and people

19   have testified about their exposure to product in various

20   buildings and various sites, maintenance workers at buildings

21   maybe as late as 1999.

22           THE COURT: And personal injury people are all going

23   to get a bar date notice and the people who were notified as

24   plaintiff's lawyers got the property damage notice.

25   Certainly you're not expecting the debtor to give notice to

1    personal injury claimants of a property damage bar date?

2             MR. SPEIGHTS: No, I'm saying that they may have a

3    computer readout right now to show where their product is

4    based upon a number of sources including the lawsuits filed

5    against it.

6             THE COURT: Where their product is, is irrelevant.

7    Just because their product is somewhere doesn't mean that

8    somebody's going to file a claim or that they have actual

9    notice of who owns the building in which the product is.

10   There are too many steps missing, Mr Speights.  That's an

11   unreasonable burden for a debtor to go through.

12            MR. SPEIGHTS: Your Honor, we don't know what the

13   burden is -

14            MR. BERNICK: Your Honor -

15            MR. SPEIGHTS: Excuse me, Mr. Bernick.  We don't

16   know what the burden is until we take the discovery of what

17   they actually know.

18            THE COURT: We do know what the burden is.  We know

19   that you're arguing that excluding South Carolina, that as to

20   the other 49 states, there was a putative class action out

21   there that would encompass every building in every one of

22   those states.  That's what you're arguing to me.

23            MR. SPEIGHTS: Actually, that's not correct.  I'm

24   not saying it does every building in every state.  Your

25   Honor, my point is and it's a narrow point.  I keep repeating

1    myself.  Let's get the factual record by one deposition of

2    what they actually had and their ability to do it.  You may

3    disagree with my assertion that they should have given notice

4    to this group of building owners or sub-group.  You may agree

5    that, well, maybe for these 25 buildings they should go out

6    with the right notice or should have.  I don't know.  We're

7    arguing in a vacuum.

8         THE COURT: What I'm suggesting is it's too late.

9    The time to do this was at the time that the debtor filed a

10   motion to approve the bar date program or at the time that

11   the certification with respect to the actual notice came in.

12   It is not time to reopen an issue that this Court adjudicated

13   and has been a final order for three years.  That's my

14   concern.  I just think it's too late.

15        MR. BERNICK: Your Honor, with respect to the

16   Anderson Memorial . . .  (microphone not recording) think

17   there's been so much time extended on . . . about what

18   actually occurred there . . . representations that are still

19   being made today about what the certification was that are

20   made by officers before the Court.  We have got for the sake

21   of a record here to come to terms with what those orders were

22   Now, maybe Mr. Speights submitted something.  He keeps on

23   talking about a putative class.  In 1994, the Judge in the

24   case struck the allegations for class determination for non-

25   residents for the claims that don't arise in South Carolina

1    or where the property is not situated in South Carolina.  He

2    just struck it because of the door closing schedule.  So,

3    there's no putative class. There's nothing.  It's a South

4    Carolina case.  Then we have a conditional certification.  I

5    have that document.  It was ex parte February 2001.  I got

6    that one.  That includes Grace but it's conditional.  I have

7    a letter in May that reads as follows: It says, Please draw

8    an order for my review granting plaintiff's motion for class

9    certification as requested.  The order should specifically

10   state that the order affects only the three remaining

11   defendants due to the stay as to W.R. Grace.  Please tailor

12   the order in conformity with plaintiff's brief and reply

13   brief.  I believe the pertinent issues are dealt with fully

14   and appropriately therein.  So, we have the conditional

15   certification.  We then have the final certification.  The

16   final certification at least as the letter reads was to

17   exclude Grace and if you go to the opinion and order, you can

18   see that it basically does, although it's not as plain as the

19   letter is.  Under any set of circumstances, I see nothing in

20   the record to indicate that there was a final order of

21   certification for Grace in any respect.

22         THE COURT: I cannot see a final order of

23   certification as to Grace.  Had it been entered pursuant to

24   the letter that was sent from the Judge to Mr. Speights, it

25   would have been post-petition and void, and to the extent

1    that it was not made final, the interim certification goes

2    away when it's not made final.  It doesn't exist anymore.

3            MR. BERNICK: Right.

4            THE COURT: Now, it may be reinstated at some point

5    if the bankruptcy's over.  I mean, there's a possibility that

6    people could go back and reinstate it, but it doesn't exist

7    anymore.  It's not a certification.

8            MR. BERNICK: Okay, and all I'm saying - and that's

9    how I look at these documents, but Mr. Speights got up and

10   made a representation yet again today that it was certified

11   pre-petition as to W.R. Grace and that there is some other -

12   we just ought to get past this so we don't keep on having

13   this debate.

14           THE COURT: I do not - Mr. Speights did send me

15   these documents.  I apologize again, I don't recall when, but

16   I have seen these documents.  I have looked at these orders.

17   There is no final certification as to Grace, and the

18   conditional one at this point in time is irrelevant because

19   it was not finally certified.  So - And as to the putative

20   class, I agree that the Judge struck all of the non-South

21   Carolina entities from the class that the Judge did certify,

22   so even if there were conditional certification as to Grace,

23   it's only as to South Carolina defendants at this point in

24   time.

25           MR. BERNICK: Thank you.

1          THE COURT: Okay.  I do not see a need for a class

2     proof of claim, Mr. Speights, because it appears to me at

3     this point the notice program was appropriate, the bar date

4     order has passed, the claimants who received the notice

5     either actual or constructed had an obligation to timely file

6     proofs of claim.  They are filed of record.  The debtor has

7     been filing objections to them, and we're getting through

8     that process.  I don't see how a class proof of claim is

9     going to assist anything at this point in time because all of

10    the entities should have received notice either actual or

11    constructive in sufficient time to file a claim.  If I am

12    incorrect, and there are entities out there who would have

13    filed a proof of claim had they had actual notice and there

14    is some evidence that the debtor knew about those creditors

15    and should have given actual notice, all of which is

16    hypothetical at this point because no one has filed a late

17    claim, then I'll consider it as to each of those individual

18    claimants whether some additional notice and/or late claim is

19    appropriate, but I don't see a need for class certification.

20    The bar date is passed, and we're down to, I don't know, 600

21    and some claims and based on where we started that's a

22    manageable number in this case.

23          MR. SPEIGHTS: Your Honor, I know it's 9 o'clock,

24    and I know we're all tired.  That matter wasn't even on the

25    agenda.  I mean I came here to argue - I didn't even bring my

1   class certification stuff.  Your Honor, when we came up with

2   class certification before, and I could point out some errors

3   in what Mr. Bernick said down in South Carolina, but I wasn't

4   going to stand up and say that will go for another day.  Your

5   Honor said, you know, in a class certification, before I get

6   to that, I had this narrow issue, I want you guys to address.

7          THE COURT: Well, I thought they were encompassed in

8   the same place, Mr. Speights.  If there's some other issue, I

9   am basing this on the notice program.

10         MR. SPEIGHTS: That's just one argument on behalf of

11  class certification and everybody held back, and I served my

12  notice of deposition, and Ms. Baer filed her stuff about what

13  a great notice program it was, et cetera, et cetera, and I

14  just want my day in court to argue the class certification

15  because that's not on the agenda.

16         THE COURT: Fine, I will give you your day in court

17  for any issues other than those related to this notice

18  program -

19         MR. SPEIGHTS: I understand that.

20         THE COURT:  - with respect to the class

21  certification.  I will not enter a final order with respect

22  to this now because to the extent that you want to do an

23  appeal, frankly, I think you ought to just have one

24  opportunity for it all, but you'll know in advance that even

25  if I certify a class it will not be based on inadequate

1    notice.

2          MR. SPEIGHTS: I understand that and that's what you

3    said that you wanted to look at this issues as a discrete

4    issue, and I understand I lost on that issue tonight, and I

5    understand the Court's ruling.

6          THE COURT: All right.

7          MR. SPEIGHTS: But I do want to be heard on the

8    other.  Thank you, Your Honor.

9          THE COURT: All right, that's fair enough.

10          MR. BERNICK: Your Honor, I know that - I know

11    better than to argue against Your Honor's flexibility and

12    willingness to hear argument and to consider all sides.  I'm

13    familiar with that from years of being here, but Your Honor

14    seemed a little bit uncertain about what the history was.  We

15    have briefed class certification.

16          THE COURT: I know, Mr. Bernick.

17          MR. BERNICK: We have argued - I have got the

18    transcripts from January where you said at that time, you

19    didn't see a basis for there being class - and only to carry

20    on, this was a tail carry-on clean-up issue, and now we're

21    going to have a new round - But, Your Honor -

22          THE COURT: If there are additional issues, Mr.

23    Bernick, I'm going to give Mr. Speights his day to argue

24    whatever the additional issues are.  So, folks get a

25    scheduling order and tee it up and put it on an appropriate

1    agenda, but what I am not going to revisit, please do not re-

2    include anything about the notice program.  I've made my

3    ruling, and I will incorporate it into a final order when I

4    hear the rest of your arguments.

5         MR. BERNICK: But, Your Honor, at this point at

6    least go back and take a look and see - there were briefs

7    that were filed.  It's one thing if we have another argument.

8    It's another thing if we have another round of briefs, I

9    mean, I don't -

10        THE COURT: Tell me when and where the briefs were

11   filed.

12        MR. BERNICK: There were briefs that were filed in

13   connection with the argument in January.  We'll supply the

14   information to the Court by letter, and we'll send a letter

15   to Mr. Speights as well, that this was -

16        THE COURT: I think it would be preferable if it's

17   not too much of a burden for you to put it together in a

18   binder.  Undoubtedly I do not have binders left from January

19   hearings.

20        MR. BERNICK: We will put it together in a binder

21   and then if Your Honor will set argument, we'll argue at any

22   time that the Court feels is appropriate.

23        THE COURT: Okay.  I think you folks can pick a

24   schedule, put it together in a binder, pick a schedule, put

25   it in whichever binder you want to argue the issues, but this

1   is it, folks, I'm not hearing any more about class

2   certification after the next issue.

3            MR. BERNICK: Can we put it down for the - September

4   11th?

5            THE COURT: You and Mr. Speights can agree -

6            MR. BERNICK: We'll talk about that.

7            THE COURT: - on it, and whenever you want to put it

8   in, I will hear it.

9            MR. BERNICK: Does Your Honor want to turn to the

10  famous number 4?

11           THE COURT: Yes, I do because counsel have been here

12  and I want to get this finished.

13           MR. BERNICK: If you'll excuse me, Your Honor, I

14  need to go use the facilities here, I'm sorry.

15           THE COURT: Maybe everyone needs that opportunity.

16           MS. BAER: Your Honor, that would be appreciated.

17           THE COURT: Yeah, a five-minute break, but that's it

18  so we can get this finished at least.

19           (Whereupon at 9:03 p.m. a recess was taken in the

20  hearing in this matter.)

21           (Whereupon at 9:09 p.m. the hearing in this matter

22  reconvened and the following proceedings were had:)

23           THE COURT: . . . eat, and I know my staff and I

24  haven't, and I want to be out of here at 9:30, so let's go.

25  Ms. Baer.

1          MS. BAER: I will try to talk fast.  Your Honor,

2     this is the debtor's 9019 motion to approve the settlement

3     agreement with Lloyd's Underwriters.  There are several

4     objections that were filed to the settlement agreement.   We

5     have spent a great deal of time and provided a tremendous

6     amount of information to the objectors, namely the Future

7     Claimants Representative, the Personal Injury Committee, and

8     the representatives of the Libby claimants to try to resolve

9     the objections.  Unfortunately, we have not resolved all of

10    the objections, but I will try to quickly summarize where we

11    are at.  Your Honor, there are essentially three issues that

12    are outstanding with respect to the settlement agreement.

13    Number one is the issue of whether the $90 million is

14    adequate consideration for what is being done here.  What we

15    are doing is, we are getting full payment from Lloyd's of all

16    of their obligations under certain asbestos-related insurance

17    policies.  These were originally resolved in terms of

18    mechanism in a 1995 London agreement that included a lot of

19    insurers.  This settlement would buy out, if you will,

20    Lloyd's obligations under the London agreement.  The

21    settlement agreement does not apply to any other parties to

22    the London agreement.  Your Honor, the debtors believe that

23    the $90 million is adequate consideration, and the analysis

24    is really as follows: The $90 million was structured based on

25    looking at the total obligations and then deducting from

1    there.  Your Honor, with respect to the $90 million, the

2    debtors did an analysis.  The analysis begins with the fact

3    that the total amount of Lloyd's coverage was $200 million.

4    Prior to the petition date, $63.5 million was paid leaving

5    $137.7 million of potential remaining coverage.  Grace ran

6    calculations at various levels to determine how much they

7    could collect based on how many asbestos claims there were,

8    and then they discounted to present value.  Your Honor,

9    Grace's calculations, which is shared with all the

10   Committees, showed that there would have to be an extremely

11   high level of liabilities, several multiples of what Grace

12   believes would be the allowed amount of asbestos liabilities

13   to fully exhaust the $137.7 million in coverage.  Here, Your

14   Honor, the settlement agreement is for $90 million, which is

15   a discounted present value number, and also, Your Honor, will

16   include interest.

17           THE COURT: At what rate is the discount?

18           MS. BAER: Your Honor, the discount was 4 percent if

19   I recall correctly.  But, Your Honor, again, the 137 million

20   is only if we reach this extremely high level of asbestos

21   claims.  The $90 million is based on a discount of that, on

22   what we think the claims may or could achieve.

23           THE COURT: But shouldn't I wait to see what the -

24   I'm going to be doing an estimation hearing.  Shouldn't I

25   wait to see whether the claims really do come in at that

1    level?

2           MS. BAER: Your Honor, the problem is, Lloyd's is

3    willing to pay this amount now to cash out and be done.  If

4    this goes on and the estimation goes on, several things could

5    happen.  Number one, they could decide not to give us even

6    the $90 million, which again, we believe is a very fair

7    settlement amount, and litigate the issue of how much they

8    should ultimate pay.  Number two, the London - the various

9    London carriers have been falling rather quickly.  We've had

10   a lot of insurance insolvencies.  This is a very fair number

11   for what is being settled here, and in fact, I think the

12   objectors don't really disagree with the $90 million, but for

13   one thing that I haven't gotten to yet, and that is not only

14   does this cover the regular asbestos claims, it also covers

15   this premises liability.

16          THE COURT: Right.

17          MS. BAER: But, Your Honor, the objectors indicate

18   that the premises liability is some $200 million theoretical

19   availability.  The fact of the matter, Your Honor, is the

20   premises coverage is a misnomer.  It will render zero to the

21   estate, and this is the reason why.  Under prevailing law,

22   Your Honor, it's impossible to recover under premises

23   liability because under prevailing law the layers are at such

24   high levels and it would be spread out over time in such a

25   way that the per occurrence for each claimant we covered is

1    multiple, multiple excesses of what anybody ever thinks a

2    claim  would be covered at.  The only way to access the

3    premises liability coverage, would be contrary to the law

4    that applies here, namely New York law, because the law in

5    New York is essentially that these claims are taken by each

6    occurrence, however, in order to prevail on the premises

7    liability coverage we would have to prove that it's one

8    occurrence, and that, Your Honor, would be shooting Grace's

9    foot - shooting itself in the foot.  The one occurrence

10   argument would preclude Grace from then collecting insurance

11   from other insurers at much higher levels.  The amount

12   available from other insurers to pay these claims if it is

13   not one occurrence but per occurrence, is much more

14   significant.  Therefore, Your Honor, it would make no sense

15   whatsoever to even try to convince a New York court to go a

16   different way besides the fact that it's not very likely

17   because the law is quite well settled.

18         THE COURT: But the policies are not broken down so

19   that x-dollars apply to premises and x-dollars apply to

20   personal injury; right?  It's just another 137 million of

21   coverage that's maximally available.

22         MS. BAER: That's correct, Your Honor.

23         THE COURT: Okay, then, that's a pretty steep

24   discount when at this point I'm going to be going through all

25   the property damage claims, so they should get resolved in

1   one fashion or another, and I'm going to be doing a personal

2   injury estimation.  I mean the entities that will stand to

3   benefit from this are the creditors in the case, and they're

4   pretty much unanimously opposed to this settlement.

5          MS. BAER: Well, again, Your Honor, first of all

6   this does not affect property damage claims in any way,

7   shape, or form.

8          THE COURT: Right.

9          MS. BAER: It only affects personal injury claims,

10  but, Your Honor, if you would leave it out, 137.7 discounted

11  to present value I think is around 107 million.  This is a

12  $90 million settlement, and -

13         THE COURT: Well, that's still a lot of money.

14         MS. BAER:  - but again, Your Honor -

15         THE COURT: People live on the difference between

16  $90 and a $107 million.

17         MS. BAER: But you only get to the 107, if you will,

18  if you prove the liabilities are at a multiple of where we

19  believe the liabilities are.  In fact a range higher than the

20  ranges that the experts for the PI Committees have cited so

21  far. So, that the bottom line is, we don't think we'd ever

22  get there.  Under the circumstances, the belief is that the

23  $90 million is fair and adequate coverage.  Your Honor, there

24  are two other issues.  The two other issues are really

25  interrelated.  One of them is you're asking the trust, the

1    524(g) trust that ultimately will be formed here, to give

2    documents, to have obligations to indemnify Lloyd's in

3    circumstances where you're not giving the trust the money.

4    And a related issue is even if we can get over that issue, we

5    don't want to give an indemnity to Lloyd's of any kind, "we"

6    meaning the trust.  Your Honor, the way this document is

7    structured, this settlement will only become final, the

8    trigger date will only occur if a 524(g) trust is confirmed

9    in a plan and that 524(g) trust calls for a channeling

10   injunction and that 524(g) trust channels these claims to the

11   trust.  In other words, the trust will be paying these

12   claims.  Your Honor, it doesn't matter if it's this money

13   that's funding the trust or other money, money is fungible.

14   The point is, in order to get to this trigger date and get

15   this money to the benefit of whoever it's going to get, Your

16   Honor's going to have to confirm a plan, and it's going to

17   have to go effective, that has this channeling injunction,

18   which means, you're going to have to have determined that the

19   trust that's being set up will be adequately funded.  Again,

20   doesn't matter where the money comes from, whether it's this

21   money or other money or Grace stock or whatever, the fact of

22   the matter is, the trigger vote will never occur unless a

23   plan is confirmed and that plan has a trust in it that fully

24   takes care of these claims.  As a result, the idea of we have

25   to now decide who gets the money, is not necessary.  You will

1  decide who gets the money in the context of what kind of a

2  plan is confirmed and what the funding is for the trust.  In

3  the meantime, this $90 million will sit in an escrow account

4  earning interest.  By the time you confirm the plan, it won't

5  be 90 million, it will be 90 million plus interest, and then

6  the 90 million will be available for whoever gets the money.

7  It could be the trust or the money may go to reorganized

8  Grace because reorganized Grace is funding the trust in a

9  different manner other than with things like this cash

10  account.  Under those circumstances, Your Honor, we do not

11  believe there's any problem with the way the order is drafted

12  now, that essentially reserves the issue of who gets the

13  money.  The third issue, indemnity.  Under the settlement

14  agreement the indemnity that is in there for Lloyd's is

15  rather all-encompassing.

16        THE COURT: Yes, it is.  It doesn't even exclude

17  fraudulent activity and criminal activity.

18        MS. BAER: Understood, Your Honor.

19        THE COURT: That is not going to be approved.

20        MS. BAER: Reorganized Grace agreed to an all-

21  encompassing indemnity, which is rather consistent with other

22  settlements, it's done with other insurance carriers.

23        THE COURT: If I have approved one that doesn't

24  include - where there has been an indemnity required, that it

25  does not include one for fraudulent conduct and criminal

1    conduct, I'm not aware of it, but point them out to me,   I'm

2    going to strike the orders and do it again.

3         MS. BAER: Your Honor, it raises two issues.  Number

4    one, will you approve that kind of an indemnity being given

5    by reorganized Grace?  And number two, will you make that

6    kind of an indemnity effective as to the trust?  We have had

7    discussions with the trust about carving back on that

8    indemnity.  In fact, Mr. Wyron and I were having some

9    discussions at one of the breaks to try to figure out what we

10   can do.  The trust has indicated that they are willing - the

11   trust - I should say the claimants who - Committee members

12   ultimately would be likely to be involved in the trust have

13   agreed that they -

14        MR. WYRON: Your Honor, I object.  We're talking

15   about settlement discussions here.

16        MS. BAER: Your Honor -

17        MR. WYRON: (Microphone not recording.)

18        THE COURT: Okay, fine.

19        MS. BAER: I'm sorry, Your Honor. I didn't mean to

20   do that, and I apologize.  The point I wanted to make is the

21   indemnity is being given by reorganized Grace, it becomes

22   effective as to the trust when the trust becomes a party to

23   the agreement.  We had notes all-encompassing.  There are

24   ranges in terms of what we could do with the indemnity.

25   We've talked about that. We have not resolved it.  Given what

1      Your Honor has said, we would frankly appreciate your

2      direction as to what you will permit and what you will not

3      permit.

4               THE COURT: Well, I will not permit that broad an

5      indemnity that is going to provide an indemnity regardless of

6      whether or not the conduct is based on some malfeasance,

7      misfeasance, gross malfeasance and gross misfeasance on

8      behalf of the - I'm not sure.  I guess in this instance the

9      insurance company.  I am not going to approve that.  That's

10     way too broad.

11              MS. BAER: And, Your Honor, the issue I think will

12     be as whether or not the indemnity that you will approve will

13     apply to the trust or not.

14              THE COURT: All right.  I think if the settlement is

15     approved, then I think all parties are going to be bound by

16     it, and that would include the indemnity, but at this point

17     in time, I'm just not so sure that the settlement approval

18     right now is in the best interest of the estate based on -

19     number one, I'm not really sure anybody is objecting to the

20     90 million or the discount rate per se.  I think there was an

21     objection with respect to the property issue.  Maybe that's

22     something that can get resolved, I'm not sure.  But with

23     respect to the overall process right now, if the property

24     issue is resolved, and no one is objecting to the 90 million,

25     then maybe it is in the best interest of the estate, but if

1   those two issues are not resolved, and it's the creditors

2   regardless of who ends up with this specific pot of money,

3   specific pot of money, it's still the creditors who at some

4   point are gong to be paid their claims through some funds of

5   the debtor.  So, just to make it simple, let's assume it's

6   these funds, it's their interest that's at stake.  So, if

7   they're unhappy and they want to take the risk litigating

8   with Lloyd's, I guess maybe they can take the risk litigating

9   with Lloyd's.

10          MS. BAER: Your Honor, there's one problem with that

11  though.  The debtors are effectively now able to get $90

12  million from Lloyd's, and one way or another, when we are

13  factoring in what the trust has to be funded with, we can now

14  factor in that we would have $90 million to compensate for

15  these claims.  We don't know if at the end of the day that

16  $90 million will still be available.  The debtor can get that

17  for the basic wholeness, the basic everybody's interested now

18  at 90 million.  If we take the chance of not doing the

19  settlement now, and later on Lloyd's is only willing to pay

20  70 million, the debtors may end up being the ones paying the

21  difference, Your Honor, because we've got to fund the trust.

22          THE COURT: Well, I understand that.

23          MS. BAER: We don't want to take that risk at - if

24  they want to take a risk with our money, that's

25  inappropriate.

1        THE COURT: Well, okay.  Why is there a reduction

2   from 170 million if that's the appropriate present value rate

3   down to 90?  I really don't understand how I get that $17

4   million -

5        MS. BAER: Because, Your Honor, that 107 million

6   which is the discounted present value of the total amount

7   that could possibly be paid, we don't believe we'll ever get

8   there because of the large number of claims that would have

9   to be allowed in order to ever get to the maximum coverage.

10       THE COURT: Yes, but -

11       MS. BAER: What you're saying is that you can only

12   settle if Lloyd's pays the entire amount of the outstanding

13   insurance discounted to present value.

14       THE COURT: That would be preferable, yes.

15       MS. BAER: We can't agree - we can't disagree with

16   you on that, but that's not what they're willing to pay, and

17   the risk is they'll be willing to pay even less later on.

18   The estimation will come in even lower later on, and they

19   won't pay that much.

20       THE COURT: But they're not - Their liability isn't

21   going to be determined by the estimation.  It's going to be

22   determined by - assuming that there isn't a settlement of

23   their policy rights, it's going to be determined by whatever

24   they can either lose or approve, however it turns out in the

25   tort system when claims are filed against it.  Their exposure

1  is 137 million, and they're getting one heck of a deal to try

2  to discount it down to 90 million even thought it's a payment

3  in advance through this policy.

4           MS. BAER: No, Your Honor.  They'll never - This is

5  a high-level policy.  You have to get through other policies

6  first.  They'll never get to the 137 million -

7           THE COURT: Well, that's -

8           MS. BAER:  - unless the claims go at some wild

9  amount.

10           THE COURT: Well, I mean, what's a wild amount?  In

11  other cases with similar claims, they've been estimated in

12  the billions of dollars.  Does the debtor have billions of

13  dollars worth of insurance before it gets to Lloyd's?

14           MS. BAER: Your Honor, the point is, this is a

15  compromise.  That's what settlements are.  This is a

16  compromise because the claims could be higher, the claims

17  could be lower.  It was the debtor's belief that this was

18  frankly an excellent deal based on where we would be in the

19  coverages and what the possible claims could be.  It is a

20  compromise.  Lloyd's is not offering to pay the full amount

21  of their policy.  No insurance carrier ever does in order to

22  resolve something when you don't know what the full amount of

23  the liability will be.

24           THE COURT: Obviously, that's the case in the

25  settlement, but there is - you know, if you tell me that

1  present value is X, and then you're going to discount it

2  below present value, I sort of need to know why.  You're

3  telling me that it's because this is very high level policy,

4  and the debtor has lots of insurance below it, but the lots

5  of insurance below it is dependent on whether or not the

6  claims estimation comes out at a number that the debtor can

7  fund with applicable insurance below this, and I don't have

8  any way of evaluating that right now.

9          MS. BAER: Your Honor, it can come out the other way

10  too.

11          THE COURT: Yes.

12          MS. BAER: You keep assuming that we will always get

13  to the full amount of this coverage.

14          THE COURT: No, I don't.

15          MS. BAER: That is -

16          THE COURT: If you don't get to the full amount of

17  the coverage, then you don't need it because the claims will

18  have come in much lower and you won't have access to the

19  insurance policies and they won't have any obligation to pay

20  it.

21          MS. BAER: But that's the whole point.  We can get

22  $90 million right now.  It's a tremendous amount of money.

23          THE COURT: It is a tremendous amount of money.

24          MS. BAER: And, Your Honor, from the debtor's

25  perspective, we have run the numbers.  Our business people

1    believe that it is an excellent result, and we are very much

2    supportive of the settlement agreements.  We can bring this

3    cash in and have the cash to fight over not a possibility.

4            THE COURT: All right.

5            MR. PASQUALE: Your Honor, if I may, while they're

6    chatting.  Ken Pasquale for the Creditors Committee.  Just to

7    address the Court's concerns, our professionals did - our

8    advisors did look at this very carefully and did get

9    comfortable with the amount and the discount rate and all of

10   those factors that are of concern to the Court.

11           THE COURT: All right, thank you.

12           MR. HORKOVITCH:  Good evening, Your Honor.  Bob

13   Horkovitch (phonetical) insurance counsel to the Asbestos

14   Personal Injury Claimants Committee.  This has been objected

15   to by the Personal Injury Committee, the Property Damage

16   Committee, which does have an interest in this, which I'll go

17   into in a moment, the Libby claimants, and the Futures

18   Representative.  One of the concerns, Your Honor's identified

19   is the indemnity and there are problems with this agreement,

20   which I understand has now been signed, beyond the

21   malfeasance.  Now, if I can look at the indemnity provision

22   for a moment on the Elmo.

23           THE COURT: Could we move it up, because truly

24   folks, we are going to be out of here in 15 minutes.  If I

25   need to start this tomorrow morning, we'll continue it until

1    tomorrow morning, but we've got 15 minutes, not one second

2    further.

3              MR. HORKOVITCH: I appreciate Your Honor's case

4    management . . . (microphone not recording).

5              THE COURT: Let's just go, please, with this.

6              MR. HORKOVITCH: This is the actual indemnity

7    provision that they want Your Honor to approve, and there's

8    an indemnity for all claims, and that's a term I'm going to

9    go into in just a moment, and it's indemnity even going

10   beyond the injunction.  Your Honor, our position is is that

11   even if Your Honor wanted to approve this agreement, you

12   couldn't because this has by its definition, has the trust

13   providing an indemnity beyond 524(g) . . . (microphone not

14   recording).

15             THE CLERK: You have to use the microphone or it

16   won't be on the record.

17             MR. HORKOVITCH: Some examples, Your Honor, of the

18   indemnity go to putative damage, putative or other injury or

19   damage including noise induced hearing loss, government

20   claims and actions, other assertions of liability of any

21   kind, environmental claims.  They're having the trust, a

22   524(g)'s trust whose purpose is to pay asbestos claims become

23   the subject of an - will pay an indemnity for environmental

24   claims, governmental actions, noise induced claims -

25             THE COURT: And I agree, let me cut it off.  That's

1    inappropriate to the extent that the trust has to be somebody

2    that's going to indemnify the claims it's going to have to be

3    for claims that are presented to the trust, although, if the

4    debtor wants to try a 105 injunction, for example, if there

5    are noise-induced hearing loss claims that are going to be

6    filed against the debtor and the debtor wants to do something

7    else, I think that's appropriate, but this trust is not in a

8    position to be able to indemnify an insurance company for

9    something other than the claims that will go through the

10   trust.  I agree, and I won't approve that.

11        MR. HORKOVITCH: Thank you, Your Honor.  The

12   indemnity also goes beyond Grace to any entity even that

13   Grace does not have control of including former subsidiaries,

14   predecessors in interest, sellers, purchasers of assets.  For

15   example, the Scott Company that made pesticides and

16   vermiculite and all the claims against Scott Company for

17   vermiculite would be sucked up in here.  There are claims

18   against Iquitos (phonetical) would be indemnified by the

19   trust.  Companies that Grace does not have control over would

20   be indemnified by the trust, any equitized liability for that

21   -

22        THE COURT: Same ruling.

23        MR. HORKOVITCH: Thank you, Your Honor.

24        THE COURT: Okay.  With respect to the trust, the

25   ruling is, the trust is not - I think cannot, probably, as a

1   matter of law based on what its function is supposed to do,

2   create an indemnity for something that's not part of its

3   liability at the outset.

4           MR. HORKOVITCH: One very quick point on the

5   disconnect between the next point on the payments and

6   reporting requirements.  I understand Grace would like the

7   $90 million, and I understand that $90 million is a lot of

8   money, and I understand that we would like Iquitos to rid

9   itself of $90 million.  We'd also like to have it in an

10  escrow account.  We'd like to have - the agreement right now

11  doesn't specify escrow account, but simply says a - it says a

12  bank - I'll get the exact language - It should be put in a

13  bank trust agreement or in an escrow agreement acceptable to

14  Grace and Lloyd's, no one else, and it refers, Your Honor, to

15  the last page of the agreement which they ask Your Honor to

16  approve of the actual agreement for the settlement account

17  agreement, and it's blank.   We don't know what they're doing

18  with the money, Your Honor.

19          THE COURT: Well, I'm not sure that it makes a

20  difference if it's in a bank trust agreement or in an escrow

21  agreement provided that the beneficiaries are identified;

22  does it?

23          MR. HORKOVITCH: Well, what we'd like is the

24  beneficiary to be the trust.  What we'd like is we would like

25  it to be specified as other than just money going to Grace.

1          THE COURT: I can't make the beneficiary the trust.

2     There is no trust.

3          MR. HORKOVITCH: An escrow account for the benefit

4     of the trust.

5          THE COURT: I cannot make the trust the beneficiary

6     if there is no trust.  There won't be a trust unless and

7     until there is a confirmed plan.

8          MR. HORKOVITCH: Or at least an escrow account for

9     dedication for payment for asbestos claims.

10         THE COURT: Well -

11         MR. HORKOVITCH: As opposed to noise-induced claims,

12    environmental claims, governmental claims -

13         THE COURT: I don't know what's covered by the

14    policy.  If those claims are covered by the policy and they

15    have a right to access it, then they ought to be part of the

16    escrow.

17         MR. HORKOVITCH: An escrow dedicated to claims

18    covered by the policy.

19         THE COURT: Fine.

20         MR. HORKOVITCH: Okay.  Would be better than just

21    being able to use it for Grace's operating.

22         THE COURT: Well, it shouldn't be used for Grace's

23    operating expenses.  I mean, to the extent that Grace

24    actually funds the trust and other claims through some other

25    sources, I think at that point there should be a reversionary

1   right back to the debtor, but the initial beneficiaries ought

2   to be the creditors of the estate, I agree.

3       MR. HORKOVITCH: Thank you, Your Honor.

4       THE COURT: Creditors entitled to a distribution

5   through the policy, let me make it specific.

6       MR. HORKOVITCH: Your Honor, the - our only point on

7   the reporting requirements objection is that the trust was

8   without any dedication of the funds for the trust or even for

9   use under the policies, the trust was being required to

10  provide reports to Iquitos regarding these asbestos claims,

11  expressly as part of the agreement so that Iquitos could make

12  reinsurance claims based on asbestos liabilities, and if the

13  money isn't being used for asbestos liabilities, it is

14  improper to use this Court's approval of this settlement so

15  that Iquitos can say, I'm entitled to reinsurance proceeds

16  for an asbestos liability.  Now, if it's a covered liability

17  under the policy, that would ease the requirement, that would

18  ease our concern about reporting requirements.  But if Grace

19  is using it for purposes other than covered by the policy it

20  makes this Court's blessing and the use of this Court's

21  blessing improper when Iquitos is going to be using this

22  Court's blessing for using it for reinsurance purposes to

23  assert a the reinsurance claim when it may not have anything

24  to do with the policy.  So, Your Honor's instruction is very

25  -

1          THE COURT: If this is a buyout of the policy, how

2   does Iquitos have a reinsurance claim?

3          MR. HORKOVITCH: Iquitos is going to tell its

4   reinsurers that it is paying this money for asbestos claims

5   or other claims under the policy.

6          THE COURT: Oh, for its own reinsurance not related

7   to the debtor's claims.

8          MR. HORKOVITCH: For it's own reinsurance, that's

9   correct.

10         THE COURT: Oh, okay.

11         MR. HORKOVITCH: Yes, Your Honor.  Just a couple of

12   quick points that were in error.  Property damage claims are

13   impacted here.  Property damage claims are covered by CGL

14   policies, just like bodily injury claims are, and people who

15   have property damage because of asbestos are able to make

16   claims against the policies.  So the PD's objection is well

17   stated.

18         THE COURT: Well, I think on that one, Ms. Baer's

19   made a very logical construction that it may be cutting off

20   your nose to spite your face if you take the position on one

21   policy that this is a single event whereas for the other

22   policies you have to take an opposite position.

23         MR. HORKOVITCH: Here's our point.  We agree that

24   there is a primary layer underneath Iquitos.  Iquitos then

25   comes in a first-layer umbrella form and also in the middle

1    and up on top.  Lloyd's is all over the map in Grace's

2    coverage program.  Mr. Posner (phonetical) has said if you

3    take a one-occurrence position which he disagrees with, we

4    disagree with, Grace disagrees with.  We think that a one-

5    occurrence position is wrong, but if it's taken then a whole

6    separate line of coverage for premises liability, not the -

7    there's a separate line of coverage for premises liability

8    and a separate line of coverage for products completed

9    operations coverage.  The separate line of coverage is

10   impacted by $12.7 million if you have $500 million in

11   premises claims.  That's $12.7 million in coverage that would

12   be given up.  Twelve million dollars of receipts that will be

13   given up if you have $500 million in premises liability.

14           THE COURT: But the sole coverage, the total

15   coverage is 137 million.

16           MR. HORKOVITCH: No.

17           THE COURT: No.

18           MR. HORKOVITCH: No. There's a $137 million of

19   coverage for products in completed operations coverage.

20           THE COURT: All right.

21           MR. HORKOVITCH: And Lloyd's has $200 million of

22   separate premises coverage.  All of that's being given away

23   for $90 million.

24           THE COURT: Well, look -

25           MR. HORKOVITCH: Okay.

1          THE COURT: I go back to what I said before.  If you

2     folks aren't happy with the economic terms of this, it seems

3     to me that this policy stands for the benefit of the

4     creditors who can access it.  Do you want to take your

5     chances and, you know, Lloyd's may go under or that they'll

6     not sweeten the deal or that you're going to litigate with

7     Lloyd's till the cows come home, far be it for me to stop

8     you.  I'm not sure in this instance that given the

9     indemnities and given the very deep discount that this is in

10    the best interests of the estate.  I understand the Equity

11    Committee and that the debtors think it is, but I'm not sure

12    that the Equity Committee will get a dime out of this policy

13    at this point in time anyway.  It doesn't stand for their

14    benefit.  It stands for the benefit of the creditors.  So, if

15    you're unhappy -

16         MR. HORKOVITCH: I think we probably would like to

17    talk with Grace further - talk with the other Committee

18    members and talk with Grace further about that specific point

19    and see where we are with regard to the dedication of these

20    funds for covered claims.

21         THE COURT: Well, I think you probably should talk

22    because I think this is a good deal from Lloyd's perspective

23    and it's probably not going to be open for very long.

24         MR. HORKOVITCH: Okay.  Mr. Wyron for the Futures

25    Rep also wanted to address certain issues with regard to the

1    indemnity.

2         THE COURT: More issues on the indemnity?

3         MR. WYRON: No, Your Honor. Richard Wyron for the

4    Futures Rep.  You understood our point perfectly.  I don't

5    need to address it, with one caveat, that is, I take it Your

6    Honor's is going not deny approval of this motion as it's

7    been presented.

8         THE COURT: I am going to continue this motion to

9    let you folks see if you can go work out some sort of deal

10   because 90 million birds in the hand seems to me to be a

11   whole lot of worth something.

12        MR. WYRON: As long as there's no liability on the

13   trust, we may well agree with you, and we'll try to work it

14   out.

15        THE COURT: Well, there may be some liability for

16   the trust.  I mean, I'm not saying that the trust can skate

17   totally free because you will have some indemnity obligations

18   with respect to claims that can be presented against it.

19        MR. WYRON: I think that's a matter of discussion.

20   I reserve my rights to address that when we figure out what

21   this deal really should look like.

22        THE COURT: All right.  Do you want -

23        MR. WYRON: Thank you, Your Honor.

24        THE COURT:  - this continued to my next hearing in

25   Pittsburgh so it's sooner than the next omnibus?

1          MS. BAER: Your Honor, you have a rather full agenda

2    for 9/11.

3          THE COURT: All right.

4          MS. BAER: Because you have exclusivity and because

5    you have the motion to compel.  I think it probably makes

6    sense unless Iquitos disagrees since they're the ones who

7    have been anxious to give us this money and be done, that

8    maybe it would be better to put it on the September 25th

9    hearing.  We have a lot to do in the next two weeks, and I'm

10   afraid this is not going to get pulled off by 9/11.

11         THE COURT: All right, that's fine.  If Iquitos

12   agrees to continue it to September 25th, it seems fine to me.

13         UNIDENTIFIED SPEAKER: Your Honor, that's fine from

14   Lloyd's Underwriters' perspective.

15         THE COURT: All right.

16         MS. BAER: Your Honor, just a couple of points.  We

17   are not that far off.  We have done a tremendous amount of

18   talking here.  Frankly, the indemnity issue is one of the

19   biggest issues and your guidance is very helpful, and I think

20   it will aid the discussions tremendously.

21         THE COURT: Okay.  Is there anything else we need to

22   address tonight?

23         MS. BAER: Your Honor, I have one order we need you

24   to enter.  There was a withdrawal of the claim and a

25   stipulation and the order never got entered.

1          THE COURT: I'll take it.  Thank you.

2          MR. BAENA: We've got five more minutes, Judge.

3    Could we do exclusivity?

4          THE COURT: Sure.  Talk fast Mr. Baena.  Preferably,

5    let's adjourn to the bar and we'll all talk there, but not

6    about exclusivity.   Okay, that order is entered and I'll see

7    you in Pittsburgh.

8          MS. BAER: Thank you, Your Honor.

9          MR. BERNICK: Your Honor, this is probably not a

10   great record to set, but we've probably set the record and

11   speaking I'm sure for all constituencies, we very much

12   appreciate Your Honor's stamina and patience in going through

13   the agenda.

14         THE COURT: Well, likewise, and I'm sorry it's so

15   long.  I hope we don't have to do another one of these

16   marathons, but I thought if we didn't get through this, we'd

17   just continue to be continuing things, and at some point we

18   have to get it caught up, so.  I hope you all have a safe

19   journey home.

20         (Remainder of page intentionally left blank.)

21

22

23

24

25

1           ALL: Thank you, Your Honor.

2           THE COURT: Good night.

3           (Whereupon at 9:41 p.m. the hearing in this matter

4   was concluded for this date.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19           I, Elaine M. Ryan, approved transcriber for the

20   United States Courts, certify that the foregoing is a correct

21   transcript from the electronic sound recording of the

22   proceedings in the above-entitled matter.

23

24   /s/ Elaine M. Ryan                        August 27, 2006
     Elaine M. Ryan
     2801 Faulkland Road
     Wilmington, DE 19808
     (302) 683-0221