UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

| | |
|---|---|
| IN RE: | . Case No. 01-1139(JKF) |
| | . Adv. No. 02-1657(JKF) |
| | . |
| W.R. GRACE & CO., | . 5414 USX Tower Building |
| | . Pittsburgh, PA  15222 |
| | . |
| Debtor. | . |
| | . August 25, 2006 |
| . . . . . . . . . . . . . . . | . 3:31 p.m. |

TRANSCRIPT OF HEARING
BEFORE HONORABLE JUDITH K. FITZGERALD
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

| | |
|---|---|
| For the Debtor: | Kirkland & Ellis, LLP |
| | By:  JANET S. BAER, ESQ. |
| | Aon Center |
| | 200 East Randolph Drive |
| | Chicago, IL  60601 |
| | |
| For Reaud, Morgan & Quinn and ELG: | Stutzman, Bromberg, Esserman, & Plifka, PC |
| | By:  SANDER L. ESSERMAN, ESQ. |
| | 2323 Bryan Street |
| | Suite 2200 |
| | Dallas, TX  75201 |
| | |
| Audio Operator: | Janet Kozloski |

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

---

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@optonline.net**

**(609) 586-2311  Fax No.  (609) 587-3599**

APPEARANCES (Cont'd.):

| | |
|---|---|
| For National Union Fire<br>Company: | Zeichner Ellman & Krause LLP<br>By:  MICHAEL S. DAVIS, ESQ.<br>575 Lexington Avenue<br>New York, NY  10022 |
| For Committee of Asbestos<br>Personal Injury Claimants: | Campbell & Levine, LLC<br>By:  MARK T. HURFORD, ESQ.<br>     (telephonically)<br>800 N. King Street<br>Suite 300<br>Wilmington, DE  19801 |
| | Caplin & Drysdale, Chartered<br>By:  PETER VAN N. LOCKWOOD, ESQ.<br>     (telephonically)<br>One Thomas Circle, N.W.<br>Washington, DC  20005 |
| For David T. Austern,<br>Future Claimants Rep: | Phillips, Goldman & Spence, P.A.<br>By:  JOHN C. PHILLIPS, JR., ESQ.<br>     (telephonically)<br>1200 North Broom Street<br>Wilmington, DE  19806 |
| For Official Committee of<br>Property Damage Claimants: | Bilzin Sumberg Baena Price<br> & Axelrod LLP<br>By:  JAY M. SAKALO, ESQ.<br>     (telephonically)<br>Wachovia Financial Center<br>200 South Biscayne Boulevard<br>Suite 2500<br>Miami, FL  33131 |
| For Official Committee of<br>Asbestos Property Damage<br>Claimants: | Ferry, Joseph & Pearce, P.A.<br>By:  Theodore J. TACCONELLI, ESQ.<br>     (telephonically)<br>824 Market Street<br>Suite 904<br>P.O. Box 1351<br>Wilmington, DE  19899 |

1          THE COURT:  Please be seated.  This is the matter of

2   W.R. Grace, bankruptcy number 01-1139.  This is the time set

3   for an argument on a motion for an entry of judgment at

4   adversary 02-01657.  The participants I have listed by phone,

5   Jay Hughes, Ted Tacconelli, Jay Sakalo, Mark Hurford, Peter

6   Lockwood, Marti Murray, and John Phillips.  I'll take entries

7   in court, please.

8          MR. ESSERMAN:  Your Honor, Sandy Esserman on behalf

9   of the Reaud, Morgan, and Quinn firm, and the ELG firm, movant.

10          MS. BAER:  Good afternoon, Your Honor.  Janet Baer on

11   behalf of W.R. Grace.

12          MR. DAVIS:  Good afternoon.  It's Michael Davis on

13   behalf of National Union Fire Insurance Company in Pittsburgh,

14   PA.

15          THE COURT:  Mr. Esserman.

16          MR. ESSERMAN:  First, on behalf of all the

17   participants I'd like to thank you for this setting.  We could

18   have been on the Grace omnibus docket, and --

19          THE COURT:  Actually, that's falling apart for this

20   one it looks like, so --

21          MR. ESSERMAN:  So this was a special setting for just

22   this matter, so I think with Grace in the state that it's in,

23   it's best not to be on the omnibus docket, so we're literally

24   glad to be here even though it's Friday afternoon.  We're here

25   on our motion, Reaud, Morgan, and Quinn and Environmental

4

1 Litigation Group's motion.  It's set forth in the papers, but a
2 few things to highlight.

3      This was a settlement that was entered into pre-
4 petition by Grace in 2000.  It involved two groups of
5 plaintiffs, the Texas plaintiffs and the Alabama plaintiffs,
6 subject to two separate but very similar settlement agreements.
7 The settlement was originally entered into in August 25, 2000.
8 The Texas portion settled 1,907 claimants for approximately $21
9 million.  The Alabama settlement settled 8,249 claimants for
10 approximately $59 million.  As part of the settlement, Reaud,
11 Morgan, and Quinn and Environmental Litigation Group required
12 security for those settlements in the form of a bond or payment
13 bond or payment guarantee.  Those were issued by National
14 Union.

15      Pursuant to the settlement agreements a processing of
16 claims was supposed to take place.  It's all set forth in the
17 documents.  It's set forth in the settlement agreement.  We've
18 actually argued this once before in March, and I know Your
19 Honor is aware of that, and I'm not going to revisit that
20 argument.  I'm just going to give you some of what I think are
21 significant highlights.

22      THE COURT:  Yes, I never entered an order.  I though
23 I had been told by the parties that this whole thing had been
24 settled, and now, frankly, I'm not sure that maybe I didn't
25 misunderstand.  Maybe what you had agreed to was some discovery

1  process, but I thought that the whole dispute was resolved,

2  so --

3          MR. ESSERMAN:  Not resolved, but I think there's

4  confusion by all parties, and that's frankly what the papers

5  sort of indicate.  No one takes either blame or credit for

6  anything.  We think an agreed order was worked out, and I don't

7  think anyone should whether or not an order was, in fact,

8  submitted to Your Honor.

9          THE COURT:  It was not.  I'm sure it was not.

10          MR. ESSERMAN:  Okay, but we certainly know that we're

11  here now, and we're trying to get this moving one way or

12  another.  Pursuant to the settlement agreement it was a

13  processing agreement whereby claims were to be submitted with

14  certain medical evidence and exposure evidence.  Grace was to

15  review it.  If they had a deficiency or problem with it, they

16  sent it back or gave a deficiency notice or approved it.  Those

17  claims were all set forth -- the dollar amounts were all set

18  forth in the agreement itself.

19          Grace was given four payment dates to make.  It was

20  divided by each settlement, payments due 11/1, 2000, 1/15,

21  2001, then 1/15, 2002, 1/15, 2003.  There's one payment that

22  has been made post-petition on the bond by AIG or National

23  Union pursuant to an order entered in the adversary.  As part

24  of their review process, Grace has approved and paid 1,466

25  claims and paid approximately $14 million from the Texas

1  settlement.  Currently outstanding on that settlement are two

2  thousand -- I'm sorry -- dollar wise due is $2,557,797.  On the

3  Alabama settlement 8,249 claimants were originally settled for

4  $59 million, and 8,249 claims had been approved in the amount

5  of 11 million -- and what is owed is $11,051,900.

6          THE COURT:  Eleven million what is it?

7          MR. ESSERMAN:  Eleven million zero five one commas

8  nine hundred.

9          THE COURT:  Okay.  Thank you.

10          MR. ESSERMAN:  When we were here before, there were

11  various arguments made by Grace and National Union, and I think

12  the papers are clear as to what was decided.  In fact, a

13  transcript was attached.  But one of the things the Court

14  wanted to do was give National Union and the debtor I think, if

15  they wanted, 60 days to review claims -- to review claims, and

16  not that there was -- there was not any decision of what

17  happens if they found anything or what they found, but there

18  was -- you felt that they ought to be given a chance to review

19  some claims.  Specifically, you were focused in on claims that

20  were unpaid and claims that were still outstanding, if you

21  will.  I think Your Honor's transcript is well -- frankly, in

22  all your cases have been consistent, and where a claimant has

23  been paid or given a release or dismissed a lawsuit, that's a

24  different deal.  That's sort of an end of story type of thing.

25  I think you were focused in on at that point in time who didn't

1 fall into that type of category, and we argued it was

2 irrelevant regardless, but this is where Your Honor was

3 focused.

4          Of course, at that point in time we didn't know who

5 was -- who had been paid, who had not been paid, who received

6 what, who had gotten approval from Grace fully, but we now know

7 really the main issue that was open was who had been -- who's

8 still had outstanding amounts to be paid.  AIG National Union

9 did issue some discovery along those lines, and what Reaud,

10 Morgan, and Quinn and Environmental Litigation Group did is for

11 all approved claimants, that is claimants who had given a

12 release, have agreed to dismiss their lawsuits, and have been

13 approved medically, and exposure evidence, also, sort of like a

14 several-part test here.  So basically it's exposure evidence

15 and medical and release.  Those people had been partially paid.

16 Eighty-four percent was the Texas group of 14 hundred and 66

17 claimants, 82 percent of the Alabama group of 8,249 claimants.

18          This agreement was not an agreement whereby a claim

19 was paid -- a claim was approved, then here's the money to pay

20 that claim.  This was an agreement whereby Grace approved

21 claims and was given four payments to pay the claimants.

22 There's nothing in any of the agreements that provides that a

23 claimant is to be paid in full when he's approved.  In fact,

24 it's impossible, because Grace didn't pay all at once.  They

25 wanted to stagger their payments.  So the document itself would

1 mandate some sort of spreading, and one issue that could come

2 up, and I think, in fact, was raised by Mr. Davis with me

3 before this hearing is was everybody approved that got

4 payments.  I'll let him speak to that and respond.  From our

5 records, everybody that was approved got paid at approximately

6 those percentages, and no one who was not approved got paid.

7 He may have something to say about that.  We'll see, and we'll

8 address it -- address it before.

9          There are a handful of claimants that our records

10 show have not been paid.

11          THE COURT:  Wait.  Let me understand that a second.

12 From your records, there was no one who was paid prior to

13 approval.

14          MR. ESSERMAN:  That's correct.

15          THE COURT:  And everyone who was approved was paid

16 something in part.  So there are still some people who are in

17 the --

18          MR. ESSERMAN:  Everyone except four out of the 14

19 hundred and 66 claimants in Texas, and one out of the 8,249

20 claimants were paid those percentages.

21          THE COURT:  Something.

22          MR. ESSERMAN:  Yes.

23          THE COURT:  Okay.

24          MR. ESSERMAN:  And have given their release.

25          THE COURT:  And have given a release?

1           MR. ESSERMAN:  Yes.

2           THE COURT:  Okay.

3           MR. ESSERMAN:  That is their files from Grace's

4 perspective are complete.  They've got releases in.  They've

5 got exposure evidence.  They've got medical.

6           THE COURT:  Okay.

7           MR. ESSERMAN:  There were those three things.  So

8 there are basically -- virtually all the claimants, except for

9 a handful, have been accepted, approved, and paid either 82 or

10 approximately 84 percent of their payment.  There's a question

11 in our mind as to really what is left to do here.  We're not

12 going to be -- we know from the last hearing we're not going to

13 be rearguing the settlement agreement.  That's clear what needs

14 to be done.  Grace has approved.

15          We've heard several responses from our -- from the

16 defendant from National Union that the claims -- that we've had

17 this delay, because the claims being presented would be paid in

18 full under the proposed -- under Grace's proposed plan.  That's

19 true, but that's not why there's a delay.  I think the delay

20 was -- I think it just seemed to fall through the crack for

21 whatever reasons.  But under Grace's current plan and under all

22 the plans they've ever filed, these claims would be paid in

23 full.

24          Now, the question is these parties did not agree to

25 wait until a plan of reorganization was approved.  They got a

1 payment bond to pay them.  The issue of Judge Jacks' decision

2 has been raised.  That under Judge Jacks' decision several

3 claimants that have been approved might not qualify.

4         THE COURT:  Well, that -- I don't know.  I mean that

5 may or may not have been the case, but the reality is that if

6 the debtor got the releases, the debtor owes the money, and if

7 there's a bond out there to secure it, then the debtor's

8 obligations, and National Union's obligation, and but for five

9 people, I'm not sure I'm seeing why this is even here.

10         MR. ESSERMAN:  Well, we agree, Your Honor.  In sum,

11 that's frankly -- that's frankly what we've got here.  Now, Mr.

12 Davis was kind enough -- and I will let him develop his

13 argument, but he was kind enough to mention to me that one of

14 the things that he was going to raise was he came across in

15 some their inspections and some of their reviews, which they've

16 conducted this last summer, they came across some claims that

17 were approved by Dr. Sigora (phonetic) prior to the time he was

18 a B reader, and --

19         THE COURT:  But they've given a release, so the

20 debtor --

21         MR. ESSERMAN:  They've given --

22         THE COURT:  The debtor has apparently gone through

23 the approval process.  National Union's issued the bond to

24 secure it.  I mean I don't know what else you can do.  Go sue

25 them for fraud in the State Court if you want.

1          MR. ESSERMAN:  In closing, Your Honor, I just want to

2     point out on the Dr. Sigora issue the agreements themselves

3     don't require a B read.  The only they require is competent

4     medical evidence, and competent medical evidence includes the

5     fact that you can -- you have evidence by a B reader.  And the

6     submissions that I saw were two months prior to Dr. Sigora's

7     certification that he was a B reader, and the -- and the

8     document I saw did not represent by Dr. Sigora -- did not

9     represent that he was a B reader.  And Dr. Sigora -- and we're

10    all sick of Judge Jacks, especially on my side of the table,

11    but Dr. Sigora was referenced by Judge Jacks as the gold

12    standard of doctors in this area, and he is a board certified

13    -- he's board certified in internal medicine and pulmonol --

14    he's a pulmonologist and board certified in that, also.

15          So whether or not he was a B read, a clear look at

16    the contract doesn't require a B read.  It requires competent

17    medical evidence.  It's clearly competent medical evidence.

18    This was accepted by Grace.  Releases were given.  And not only

19    that, but partial payments were made.  Thank you.

20          THE COURT:  Okay.  Mr. Davis, I don't see much wiggle

21    room here.

22          MR. DAVIS:  Your Honor, there's a great deal of

23    wiggle room including what caused you last time to realize that

24    this review was necessary.

25          THE COURT:  Well, what caused me last time is the

1  fact that I didn't know what the status of the claims paid and

2  unpaid and who had the releases and so forth but --

3          MR. DAVIS:  No, that isn't it, Your Honor.  Not at

4  all.  I've got to refresh your recollection.  To start off

5  with, remember my client is a surety.

6          THE COURT:  Yes.

7          MR. DAVIS:  And the surety, to quote the Texas

8  Supreme Court, "Guarantors are favored of the law and are bound

9  by the precise terms of the contract they have secured -- the

10 precise terms of the contract they have secured and are not

11 obligated to watch over the contracting parties."  If the

12 contracting parties do something that doesn't follow the

13 precise terms of the contract, I'm released.

14         THE COURT:  Okay.

15         MR. DAVIS:  That's suretyship law.  So just, for

16 instance, take Dr. Sigora as an example.  It is now evident to

17 us that there are many, and we have 67 that we've noticed in

18 the last two weeks -- 67 instances where Dr. Sigora gave a read

19 on an x-ray, which he's perfectly -- perfectly proper for him

20 to do, and submitted it to counsel, and counsel in turn

21 submitted it for part of this settlement.  The settlement

22 specifically requires a B reader for non-malignant claimants.

23 It says at the bottom of page 4 in the Alabama agreement, "For

24 settling plaintiffs alleging non-malignant asbestos-related

25 disease, either there exists a diagnosis of such condition by a

1 pathologist or a B reader."

2          THE COURT:  Okay.

3          MR. DAVIS:  There was no pathologist's report

4 submitted, and a B reader is a particularly high level of

5 certification.  Dr. Sigora was not -- and no one contends he is

6 -- was at the time of these 67 reports that we found so far.

7 And by the way, I learned the number 67 after I spoke to you,

8 Sandy.

9          MR. ESSERMAN:  That's okay.

10          MR. DAVIS:  Sixty-seven reports submitted that we've

11 reviewed so far that were in the process.  He was not a B

12 reader.  That is a failure to meet this contract, which W.R.

13 Grace is free to --

14          MR. ESSERMAN:  Your Honor, I know it's extremely

15 rude, and I apologize in advance, because I never do this.  But

16 if you're going to quote the contract, I would like the whole

17 sentence read, because the whole sentence clearly shows a B

18 read is not required.  It's just competent medical is required,

19 and competent medical -- it says, "Medical evidence will be

20 sufficient if it demonstrates that for settling plaintiffs

21 alleging non-malignant disease there existed diagnosis of such

22 condition by a pathologist or a B reader confirming such."  It

23 does not require a B read.

24          THE COURT:  Well, I think what Mr. Davis said was you

25 either have to have a pulmonology report, or you have to have a

1  B read.

2          MR. ESSERMAN:  It doesn't even say that.

3          THE COURT:  Okay.  Read it to me again, please.  I'm

4  sorry.

5          MR. ESSERMAN:  It says, "Qualifying materials consist

6  of the following, (i) competent medical evidence that the

7  settling plaintiff has had -- has or had an asbestos-related

8  disease."  Then it says, "Medical evidence will be sufficient

9  if it demonstrates that --"

10          THE COURT:  Keep going.

11          MR. ESSERMAN:  -- for settling plaintiffs alleging

12  non-malignant asbestos-related disease.  Either there exists a

13  diagnosis of such condition by a pathologist or a B read or

14  confirming such condition."

15          THE COURT:  Well, yes, it sounds like you have to

16  have one or the other.

17          MR. ESSERMAN:  Well, medical evidence will be

18  sufficient if it demonstrates that, but the only thing that's

19  required is competent medical evidence.

20          THE COURT:  Okay.

21          MR. DAVIS:  If I may continue.

22          THE COURT:  All right.

23          MR. ESSERMAN:  I apologize.

24          MR. DAVIS:  And I don't mind the interruption for one

25  reason.  If you remember, yesterday I did the same, and I was

1  very --

2          THE COURT:  Turnabout's fair play?

3          MR. DAVIS:  That's fair play.

4          MR. ESSERMAN:  I apologize.

5          MR. DAVIS:  It was a different case, and you weren't

6  here, but -- the fact is that there are genuine reasons to

7  doubt the qualification of the qualifying material.  When we

8  were here last time, Your Honor read from -- we read to the

9  Court, and Your Honor read further.  In fact, you sat up on a

10 bench and read several pages -- I don't know which pages -- of

11 Jay Hughes' deposition in which the testimony was very

12 specific.  It was that Mr. Hughes -- that would be W.R. Grace

13 -- decided to accept qualifying material that did not qualify

14 and to let payments be made to the claimants here even though

15 the material did not qualify.

16          Your Honor looked at that and said, well, that's

17 fine.  That means that they had made a deal, however, that's

18 not the deal that my client, a surety, guaranteed.

19          THE COURT:  Okay.

20          MR. DAVIS:  The deal that my client, a surety,

21 guaranteed was the deal that's written up in this document, and

22 it can't be varied from one sentence and hold the surety

23 liable.  So 82 percent of the dollars got paid -- actually,

24 it's less than -- a significant number of dollars got paid -- I

25 don't want to give a percentage -- well in excess of half based

1  on the agreement that they made that was different than the

2  written agreement that my client, a surety, provided.  So we

3  showed this last time without knowing about Dr. Sigora, which

4  is just a concrete specific example.

5          Last time, all we had was Dr. -- was Jay Hughes, an

6  attorney -- was Jay Hughes' testimony that he intentionally

7  agreed to allow claims to be paid even though the qualifying

8  material didn't qualify.  And when cross examined about that,

9  he said I did that, because it made business sense.  It made

10 business sense, because these are tough and mean hombres over

11 here.  That is the plaintiffs' lawyers.  They will come back

12 and sue us anyway on these same people.  So even if they don't

13 qualify under this settlement agreement, I'm going to make a

14 business decision, and I'm going to pay them.  And that's

15 perfectly proper.  There isn't anything wrong with that.  Grace

16 agreed to it.  They did it.  It's fine, but we didn't guarantee

17 that.

18          So since -- it was abundantly clear at the last

19 hearing that there were claims paid that didn't qualify under

20 the agreement, and the fact that releases were given doesn't

21 change the fact that they didn't qualify under the agreement.

22 We have now started to burrow in to see how and why they don't

23 qualify, and we're finding a lot of interesting things.  This

24 Dr. Sigora thing is just a -- the reason I wanted to mention

25 Dr. Sigora is very simple.  It's objective.  There's no

1  subjective component to it whatsoever.  There's a date that he

2  became a qualified B reader, and he gave 67 or more reports

3  prior to that date.  Nothing wrong with him doing that.

4  Nothing wrong with Grace accepting that.  Nothing wrong with

5  the plaintiff accepting it.  It's simply not the deal we

6  guaranteed.  So we're not obligated, because that's different

7  than the deal that we guaranteed.

8         Now, in addition to Dr. Sigora's 67 or more, because

9  we're doing this -- we're doing it.  It's a process.  We have

10  no idea what the final number will be.  In addition to the ones

11  that don't qualify for that objective reason, we are finding

12  that there are a number of instances where documents that are

13  submitted that purport to be a diagnosis are not.

14         THE COURT:  That purport to --

15         MR. DAVIS:  Documents that are submitted that purport

16  to be a diagnosis are not.  Now, I will allow to you that there

17  maybe a lot -- there be an opportunity to look at any

18  particular one of these and talk about them.  It's less

19  objective than the date thing with Dr. Sigora.  But, for

20  example, if the document says these -- this person demonstrates

21  these symptoms, and these symptoms are consistent with this

22  condition, consistent with is not a diagnosis.  I think that's

23  pretty well established, but certainly it's not as clear cut as

24  simply a date, and we're finding that there are many of these

25  submissions and qualifying material which do not meet the

1 standard of a diagnosis, because they are not -- because they

2 merely use the words consistent with.  And the more we dig into

3 it, the more we find that there -- that the qualifying material

4 is exactly what was told to this Court at the prior hearing,

5 exactly.  There was non-qualifying -- qualifying material that

6 W.R. Grace accepted, because it has every right to accept it,

7 and that the plaintiffs submitted it, because they had every

8 right to submit it.

9        THE COURT:  So you're going to be on Grace's side

10 when we get to an evidentiary hearing on estimation as to

11 whether or not the settlements are valuable.  Huh, Mr. Davis?

12        MR. DAVIS:  My client is a settled carrier in the

13 W.R. Grace case, so I don't know that we'll be participating in

14 that then.  And indeed that's marginally relevant to this

15 situation.  We're a settled carrier who owes W.R. Grace a great

16 deal of money pursuant to those settlements, and that's

17 essentially our security for this obligation.  It'll offset one

18 against the other if it ever comes to that, which is why the

19 real party in interest here is W.R. Grace.  But nonetheless, we

20 have an obligation that's defined by our surety bond, and our

21 surety bond is defined by the Law of Strictissimi Juris, and it

22 is, as the Texas Supreme Court said, "Well-settled in Texas

23 that a guarantor may rely on and insist upon the terms and

24 conditions of the guarantee being strictly -- strictly

25 followed."

1            THE COURT:  Well, okay.  All of that's fine.

2            MR. DAVIS:  That's why -- that's where we were when

3   we ended the hearing last time.

4            THE COURT:  And that's the problem, because that was

5   two years ago almost.

6            MR. DAVIS:  Right.

7            THE COURT:  So, you know, why isn't this done?  I

8   said 60 days.  You agreed to 60 days.  It's two years later.

9            MR. DAVIS:  Actually, Your Honor didn't say 60 days.

10  There's no actual amount of time stated in that transcript I'm

11  pretty sure.  And what you said is go talk to the parties and

12  come up with a proposal to do this, and we did.  And on May --

13  in May -- we had -- the first hearing was in March, and we

14  exchanged drafts, and in May I sent a draft of a schedule order

15  to Mr. Esserman, which is attached to our papers, including the

16  e-mail that forwarded it.  And it said in order for us to do

17  this, because Your Honor had articulated the view that paid

18  claimants would not be reviewed, only unpaid claims, so in

19  order to do this I had to know who was paid and who wasn't.

20            Now, that information is in the plaintiffs' hands,

21  and information, if they have a copy, in Grace's hands.  We've

22  actually come to understand it's strictly in the plaintiffs'

23  hands.  And so I said in order to get started, just, you know,

24  first step -- step one, tell me who I'm looking at.  Give me a

25  list of the people who are paid, and the people who are not

1  paid.  And that was written into the draft agreement, and that

2  draft agreement on January -- July 18th we got an e-mail back

3  from Mr. Esserman that said that's fine.  Do it.  And I

4  forwarded that e-mail to the debtor apparently without the

5  attachment, and it got lost, and the debtor was -- it was our

6  understanding the debtor would submit that order, and we would

7  proceed.  It got lost.  I don't know quite why that order never

8  got entered, but Mr. Esserman and his clients certainly

9  understood that from that point forward if the process was to

10  start, they were to give me a list.  They didn't need an order

11  to give me a list, but I couldn't start without a list.

12          So what happens next?  Well, what happens next is --

13  actually, I ran into -- I ran in -- I run into Mr. Esserman

14  from time to time in these asbestos cases, and I ran into him

15  in Trenton, New Jersey on a the Congoleum case, and we had a

16  conversation that we both looked at each other and wondered

17  what was going on, and as I remember it, we -- neither one of

18  us knew.  And but shortly after that the debtor filed a plan

19  that purported to pay this in full -- these obligations in

20  full, and I considered the dynamic of the situation.  If

21  they're going to go forward under the surety bond, they have to

22  go through this review process.  They have to give me the list,

23  and they have to allow me to do the review, and then I have the

24  right to kick out people who won't get paid, and I will

25  identify people who won't get paid or not, and that review

1 process will be at least an inconvenience to them or worse.  Or

2 they could just sit back and wait for the plan to take hold, if

3 it will, and under the plan get paid in full.  That was the

4 choice that they had, and I sat back, and I looked at this, and

5 I said, gee, I assume they're going to do nothing.  And I sat

6 and waited, and nothing happened, and nothing happened.  The

7 list, which was the trigger for the process, never came

8 forward.  The phone never rang, and Sandy never said to me,

9 Mike, we want to do something about this.  And, in fact, during

10 a mediation of the W.R. Grace plan, you and I met at Kirkland's

11 office in New York, and I raised this with you.  Do you recall?

12          MR. ESSERMAN:  No.

13          MR. DAVIS:  I did, and again the list never came.

14 The process never got started.  But it made no sense for the

15 process to start if the plan --

16          MR. ESSERMAN:  The mediation that happened six months

17 ago?

18          MR. DAVIS:  Yea.

19          MR. ESSERMAN:  Yea, that's right.

20          MR. DAVIS:  It made no sense for the process to start

21 if the plan was going to resolve it without this review

22 happening.  The review was going to be expensive, and, more

23 important than expensive, risky, because it presented the risk

24 that claims would be rejected, whereas, W.R. Grace's obligation

25 to pay was for the most part but not entirely -- for the most

1  part fixed simply by the passage of time.  W.R. Grace's

2  obligation was that they had 60 days to reject material, and

3  that 60 days, of course, froze when the petition was filed in

4  this bankruptcy case.  And so you count back 60 days prior --

5  pre-petition, and you come up with -- I think the number is 297

6  claimants whose materials were submitted after the freezing of

7  that 60-day review period, and those 297 people have never been

8  accepted or rejected, because the automatic stay prevents them

9  from being accepted or rejected.

10         And yet Mr. Esserman has stood here today and told

11  Your Honor that the only paid accepted people -- and Ms. Baer

12  will confirm, because she's done the check personally.  Those

13  297 people who were neither accepted nor rejected, because the

14  automatic stay prevented them from being accepted or rejected,

15  were paid.  They're on the list.  They're in that interrogatory

16  answer.  So that suggests yet something else.  This list that I

17  requested and that Mr. Esserman agreed to provide couldn't have

18  been provided, because the premise of the list was false.  The

19  premise of the list was something that we all talked about in

20  this very courtroom a year and a half ago or two -- in March,

21  2004.  At the prior argument it was well understood by everyone

22  in this courtroom -- and I can quote Your Honor on this --

23  where you were expressing the understanding that this was a

24  sequential submission.  The materials were submitted.  The

25  claimant was not rejected and then paid.

1          THE COURT:  Right.

2          MR. DAVIS:  And, therefore, there would be paid

3   individuals and unpaid individuals, and now we find out by an

4   interrogatory answer just given after our briefs were submitted

5   on this.  We just got the interrogatory answers, and the

6   interrogatory answers -- they list people who were paid after

7   -- whose materials were submitted after the petition date.

8   They list people whose certainly materials were submitted

9   during that 60-day window.  And in short, this hypothesis that

10  there was a body of people that we could have reviewed the

11  unpaid made our judgment about whether it was valid or not, and

12  then had an issue about that.  That hypothesis is not true.

13  And if the hypothesis isn't true, then we need a different way

14  to protect our rights.  We didn't know that the hypothesis

15  wasn't true.  We didn't know a different way to protect our

16  rights.

17          And here's where we have to review what the law is on

18  suretyship.  The Doctrine of Strictissimi Juris is an ancient

19  doctrine that is absolutely without challenge.  I mean there's

20  a split in the circuits on this.  It is our obligation to pay

21  only -- only exactly what was agreed to.  And when I was here

22  before, we were arguing Strictissimi Juris for two reasons, one

23  of which you rejected outright, and we're not going to reargue

24  it, just remind you of it.  There was an argument made that

25  there was an aggregate submission requirement.  You interpreted

1  the contract as not including that requirement, and we went on.

2          We also argued that Strictissimi Juris was not met

3  because of Mr. Hughes' testimony that there was a private

4  agreement to which we weren't a party.  And Your Honor's

5  response to that was, well, Mr. Davis, if there was a private

6  agreement to which you were not a party, you won't pay those

7  claims.  We don't actually agree that that's the right result,

8  but that's what Your Honor's ruling was, and we were prepared

9  to go forward with this review once we got the list that told

10  us who it was we needed to review, and we would, in fact, look

11  at the ones that hadn't been paid yet, and if they fell within

12  this private agreement that we weren't obligated to pay, then

13  at least as to those, we would have a defense.

14          Since then we've learned more.  We've learned that

15  they adopted this pro rata payment methodology, which we take

16  to be yet another alteration of the agreement, and we've

17  learned that there really are improper payments.  Mr. Hughes'

18  testimony has been borne out.  And we think that the

19  Strictissimi Juris doctrine is valid, we think that we have no

20  obligation, and we think that's the correct result, and what we

21  would like to do is finish the review, come back to this court

22  and show you the evidence -- the evidence, the proof that

23  Strictissimi Juris is, in fact, a defense to this bond.

24          In any event, even if that's not where Your Honor is

25  inclined to go, at a minimum we should stay with where we were

1  last time, and where we were last time is conduct a review,

2  identify the individuals for which we're not responsible, and

3  at least as to those individuals for whom my client is not

4  responsible as surety, those dollars we are obligated to pay.

5      THE COURT:  Yes, it seems to me that if you can show

6  that there is something that violates this specific guarantee,

7  obviously, you're not obligated to guarantee -- to pay

8  something that you didn't guarantee.  So it -- with respect to

9  the theory, I don't disagree with your recitation of the

10  theory.  How that theory gets impacted in this case I think is

11  going to depend on some evidence, and if there are specific

12  claimants who were paid and for whatever reason that payment

13  didn't follow the contract terms that you guaranteed, I think

14  as to those individuals, you have a defense, but I don't know

15  that that is an -- that's a defense to whole bond.

16      MR. DAVIS:  Your Honor, what I would propose to do is

17  to gather that evidence, do precisely the procedure that was

18  proposed last time, come back here, present that evidence

19  either because -- in an agreed form, which it may very well be

20  agreed as to what the components of the evidence are.  We may

21  not need to put witnesses on the witness stand, but either way,

22  make the record, put up the evidence, and then Your Honor will

23  decide whether we have a defense as to individuals or defense

24  to the bond as a whole.  But the evidence needs to be gathered.

25      THE COURT:  All right.  And maybe some briefing, too,

1  if that's going to be an issue that has to be looked at that

2  time, but I think the evidence is probably the first key.  Ms.

3  Baer.

4          MS. BAER:  Your Honor, I'll try to be brief.  Just a

5  couple points that are especially key to W.R. Grace.  When we

6  left the hearing in March of'04, we were given the opportunity

7  to finish the job that we need to do under the contract, and

8  that is to review claims where materials had come in, and we

9  had not yet had the opportunity to do so.

10         Your Honor, in paragraph 7 of the contract -- both of

11  them -- they say that installment payments shall be made only

12  if qualified materials are submitted within 60 days of the

13  payment.

14         THE COURT:  Oh, that's the 60 days.  Okay.

15         MS. BAER:  That's the 60 days.  Grace then had 60

16  days to notify Reaud, Morgan, and Quinn and ELG if there are

17  not qualified materials submitted.  In other words, to reject

18  claims.  Grace did this.  In the course of these agreements

19  Grace did this several times.  Mr. Esserman started at the

20  beginning to tell you that, you know, the maximum -- the amount

21  of the settlement was 59.9 million for Alabama, 21.6 million

22  for Texas.  That's the maximum amount, Your Honor.  This isn't

23  a settlement agreement.  It's a protocol.  It's a protocol by

24  which claims can get paid.  It was based on a maximum amount

25  that was in the system, but Grace had the opportunity to reject

1  claims but did not qualify, and those numbers went down.  And

2  so the payments were staggered, and the way the agreement read

3  is the very last payment, the payment that was not made here,

4  the one post-petition in '03, was to be reduced by whatever had

5  been kicked out.  There is a possibility nothing would be paid

6  on the last payment, or there was the possibility that a lot

7  would be paid depending upon how many materials were qualified.

8           When we filed bankruptcy, Your Honor, there were

9  approximately 300 claims in the system, things that had come in

10 in that 60 days prior to filing or after the filing that we

11 never finished or viewed.  We never finished and told RMQ or

12 ELG whether or not they qualified or not.  We filed bankruptcy.

13 The process didn't get completed.  Those are the ones you told

14 Grace had the opportunity to review.

15          When Mr. Esserman filed his motion, we immediately

16 started looking at those.  You've heard all the history about

17 what happened and why it didn't get done earlier.  The fact of

18 the matter was it didn't.  We looked at what we got in the 60

19 days prior and what we got in post-petition.  We couldn't look

20 at what was paid and not paid, because, frankly, we didn't

21 know, and we were frankly flabbergasted two weeks ago when we

22 got the discovery responses.  We had heard that there might

23 have been some pro rata distributions, because the parties had

24 been talking about other matters, but we had no idea.  Until we

25 got those answers two weeks ago, we didn't know that all of

1  these people -- these 300 who we had never finished reviewing

2  actually got partial payments on their claims.  In other words,

3  the plaintiffs treated them as if the qualifying materials had,

4  in fact, been approved, when they had not been.

5          And, Your Honor, yes, we have the releases.  That's

6  specifically provided for in the contracts.  The contracts at

7  paragraph 11 provide that if we have releases for people who

8  have not submitted appropriate qualifying materials, and they

9  are rejected, we give those releases back.

10         THE COURT:  Yes.

11         MS. BAER:  Those people then have the right to go to

12  the tort system and file cases.  In this case those people have

13  the right to file proofs of claim, but those people don't have

14  the right to get paid under the settlement agreement.

15  Apparently, they have gotten partial payment, but that is not

16  the contract between Grace and the plaintiffs.

17         THE COURT:  Yes, I think we're going to have to get

18  some accounting to straighten this out, because I don't see a

19  basis to make a partial payment to somebody who hasn't been

20  approved.  And to the extent that there has to be a pro rata

21  payment only because Grace is funding these payments on a

22  quarterly basis, and for a practical matter from the

23  plaintiffs' point of view, you choose to pay your clients on a

24  pro rata basis rather than on a payment claim-by-claim basis, I

25  don't think that's either Grace's or National Union's concern.

1  That's the plaintiffs'.  If that's how you want to do it, and

2  the protocol doesn't require anything other than that, that's

3  fine.  But I don't think that's going to effect the maximums

4  that Grace has to pay.  I don't think it's going to effect the

5  liability of the surety.  It's simply going to be a

6  distribution mechanism that, you know, outside the bankruptcy

7  it doesn't really matter.  You can set it up how you choose.

8  But I think to the extent that people were paid who were not

9  entitled to be paid, those funds have to be reimbursed.  And to

10 the extent that there are unqualified claims in the 60-day

11 window or post-petition who were paid, they need to be rejected

12 and not paid at all.  And then if there is a proof of claim

13 entitlement, then obviously, they can file that proof of claim.

14         So I think you need some discovery to make sure that

15 this gets done correctly, and we can see -- I imagine you're

16 going to be able to agree to the facts, frankly, when you

17 finally get through the discovery.  I doubt that the facts are

18 going to be materially different from your points of view.  The

19 spin to be put on those facts may differ substantially, but I

20 doubt that the underlying facts are going to be.

21         With respect to the request for an entry of judgment,

22 we need to get there, but I don't think we're there today, and

23 I don't know what the mixup was.  All I know is I was waiting

24 for an order.  I misunderstood.  I thought that the whole thing

25 had been settled, which is the reason you didn't get an opinion

1  from me in the first place.  And so I think at this point we

2  probably should just go back to the drawing board, set a

3  reasonable period for discovery.  Let's get the facts in order,

4  then have a status conference and see where you stand.  I think

5  if -- if you can come to some resolution -- and I don't know

6  that you can -- where claims that are absolutely not qualified

7  are not going to be paid by the debtor and also aren't going to

8  be paid by National Union, because the debtor doesn't have any

9  obligation to pay them, and if there were claims that the

10 debtor agreed to permit to have payments made that didn't have

11 qualifying materials, it might still be the debtor's -- it is I

12 guess still the debtor's obligation to pay them now, because

13 they didn't object within that 60 days.  But if that's not

14 guaranteed by National Union, then I don't know that those are

15 secured claims, because the security seems to be only to the

16 entities that meet the protocol, and if they don't meet the

17 protocol, I don't know that the surety stands.  So maybe if we

18 can get that far and see who's in which batch of -- you know,

19 how big the different batches are and which claims fall where,

20 maybe that would be a good start.  Mr. Esserman.

21         MR. ESSERMAN:  Your Honor, may I?  Just a couple

22 points here.  Let me just address some things that have been

23 said, and I'm not attempting to revisit what Your Honor said by

24 any means.  But just to make it clear it's our position -- and

25 I understand it's not Grace's position now -- that there's --

1 everyone has been approved.  That 1466 out of 1907 Texas

2 claimants have been approved, and all 8249 claimants for

3 Alabama have been approved by Grace, and what you heard Grace

4 say is there's 297 claims that they got post-petition that

5 equates to approximately $550,000 I think is what we're going

6 to find out of the 13.5 million.

7 　　　　　It's going to be our position that Grace approve

8 those claims notwithstanding the fact of the bankruptcy.  That

9 Grace continue to process those claims.  That Grace responded

10 to RMQ with a request for additional information on those

11 claims, and that post-petition a payment had been made of

12 approximately $9 million by agreed order under this settlement,

13 which paid a lot of outstanding percentage of claims, also.  So

14 just to make it clear, it's going to be our position that, and

15 one thing that you will have to address, is that those 297

16 claims, which constitutes a relatively small percentage of the

17 outstanding dollar amount, were properly approved by Grace.

18 　　　　　It's also our position that what National Union is

19 here is when and if Grace approved a claim and Grace did not

20 pay the claim, that National Union is bound to pay the claim

21 and is obligated to pay the claim.  And it's strictly a payment

22 bond in which that's all we have to do is show that our claim

23 has been approved and not paid.

24 　　　　　THE COURT:  It's not a performance bond of any sort.

25 It's just a payment bond.

1             MR. ESSERMAN:  It's a payment bond.

2             THE COURT:  Well, okay.  Now, I -- I am --

3             MR. ESSERMAN:  Which is totally --

4             THE COURT:  -- familiar with performance and payment

5   bonds in construction industries and other things but not in

6   this context to the level that we're discussing it today, so

7   I'm going to need some law on how this applies from you folks.

8   And probably the specific language of the bond that you rely

9   on, Mr. Davis, and whatever you're position is, Mr. Esserman,

10  so I can, you know, get this in a context.  But maybe the first

11  thing to do is finish the discovery and see if you're not

12  getting closer on the facts.  It may turn out not to be as big

13  an issue.  I don't know at this point.

14            MR. ESSERMAN:  So those are some of the -- these are

15  some of the -- we will do the discovery that Your Honor wants,

16  but I just want to make it clear that it will be our position

17  that the numbers that we listed today had been approved, and

18  basically what we're talking about is a handful of claimants

19  that have not received any money under this settlement, and

20  that everyone else has, in fact, been approved and has received

21  between 82 and 84 percent of their payment.

22            THE COURT:  Okay.

23            MR. ESSERMAN:  So, you know, from our perspective,

24  frankly, there's nothing -- and I understand Your Honor's

25  ruling, and I abide by it, as I always do, but from our

1  perspective this is basically a done deal.  There was payment

2  that wasn't made.  Payment was supposed to be made.  The bonds

3  actually were attached to our papers in '04, and I think

4  perhaps they were attached to National Union's papers, also.

5  Where you've got a situation where Grace has approved payment,

6  payment has not been made.  National Union needs to pay.  I

7  understand we've got the situation with these post-petition

8  folks.  I think we can -- I think the evidence will show that

9  they processed those claims.  I understand Your Honor wants

10 evidence for that.

11          THE COURT:  I do.  Well, what I have left from the

12 binder in '04 was this draft opinion, which I stopped working

13 on when I thought the whole thing was settled.  So I then -- I

14 no longer have the binders from 2004.  I'm sorry.  So I can

15 agree that the bonds were something that I looked at once upon

16 a time, but truthfully, I have no recollection.  Unless -- do

17 you still have --

18          UNIDENTIFIED SPEAKER:  I have them.

19          THE COURT:  Oh, you do have those binders from '04.

20 I take that back.  My law clerk still has them.  I don't.

21          MR. ESSERMAN:  Okay.

22          THE COURT:  All right, so maybe we don't need the

23 bonds submitted, but I would still like you to point out for me

24 specifically what language in those bonds you're looking at and

25 to attach it.  I think that would be helpful, so I have it in a

1  fashion that's worth looking at, and it makes it easier to look

2  at.  But, okay, let's start from the beginning.

3          MR. ESSERMAN:  And one thing I want to do before we

4  leave is I want to be specific as to what we're going to do,

5  when, who, how --

6          THE COURT:  Right.

7          MR. ESSERMAN:  -- and what.

8          THE COURT:  That's what I want to get to, too --

9          MR. ESSERMAN:  Okay.

10          THE COURT:  -- Mr. Esserman.

11          MR. ESSERMAN:  Okay.  Because I think we can -- you

12  know, one issue we can address is the language of the bonds and

13  whether they were a payment bond and what rights National Union

14  has in those bonds.  I know another issue that Your Honor said

15  she wanted is there's 297 people.

16          MS. BAER:  Your Honor, this is Janet Baer.  With

17  respect to the 297 people, there's a little bit I think of a

18  misunderstanding here.  We have post-petition people, and we

19  have people who submitted their materials 60 days before the

20  petition date.  The $500,000 figure he gave is only for the

21  post-petition people.  It's my understanding that the total --

22  if you look at the 60 days and the post-petition -- is closer

23  to the $2 million figure in terms of the dollars outstanding.

24          THE COURT:  All right.  Well, that, too, I think --

25          MS. BAER:  It'll come out.

1          THE COURT:  Yes, I think you'll be able to determine

2    that, but as to any payments that were still in the process

3    unapproved as of the date that the debtor filed the bankruptcy,

4    so that the payment processing was stayed, and as to any claims

5    submitted post-petition for which the payment processing was

6    then stayed, I think you need to take a look at those issues.

7    Now, if the debtor did, in fact, go forward, despite, you know,

8    the automatic stay and approved payments, the automatic stay

9    doesn't bind the debtor from going forward.  It binds the

10   creditors from going forward.  So if the debtor went forward

11   and, you know, the debtor agrees that there were some that were

12   paid and possibly some -- oh, I'm sorry -- some that were

13   approved and maybe some that weren't, whatever the outcome is,

14   that's okay.  I don't think that violates anything.

15         The only question really is what you need by way of

16   discovery.  I think between the debtor and the plaintiff's

17   counsel it seems that you need an indication of what claims

18   were actually approved, what claims were not approved, what

19   claims might still be hanging out there for some reason.  Like,

20   for example, the debtor may have asked for additional

21   information that either was submitted, and the debtor just

22   never got around to looking at it, or additional information

23   wasn't submitted for whatever reason.  So maybe you need to

24   take a look at those three bundles and see what the debtor

25   processed for payment.

**J&J COURT TRANSCRIBERS, INC.**

1          As to National Union, I don't know.  This may be a

2  legal issue, because if it's a performance bond, I don't know

3  in this context, Mr. Davis, what the obligations are.  I'm

4  sorry.  If it's a payment bond, then typically what I see in

5  the construction industry it pretty much doesn't matter whether

6  the debtor did anything bad or not.  You've got to pay when the

7  payment's due, and the debtor doesn't pay.  In the performance

8  bond situation, that's a different issue.  So maybe it's a

9  matter of what this document really is, and I don't have any

10  opinion about that right now, because I don't remember what it

11  says.

12          MR. DAVIS:  We'll look at that, Your Honor.

13          THE COURT:  All right, so --

14          MR. DAVIS:  I have a specific request about

15  discovery, and that is the interrogatories that I referred to

16  that we got answers to, there was one specific request that was

17  objected to, and that was the date upon which payment was made

18  to each claimant.  That's pertinent I think, because it has to

19  do with this sequence of events.  So I would ask that the

20  interrogatory answers that we did get be amended to not only

21  show the name of the person, the amount the person received,

22  but the date on which the person was paid.  That's the only

23  specific request I have at the moment.

24          THE COURT:  What difference will it make to the --

25  unless you're able to show that somehow or other the debtor did

1 not do whatever you think the debtor was supposed to have done,

2 and as a result your client's claiming that it doesn't have an

3 obligation to pay those claims.  I mean unless you can

4 substantiate that there was something wrong in the process,

5 when they got paid and how much is irrelevant.  Isn't it?

6          MR. DAVIS:  I believe the pertinence would be this.

7 First of all, the debtor cannot, in fact, approve anything

8 post-petition, and this process doesn't call for an affirmative

9 approval.  It's a 60-day period within which to reject, and

10 certainly, the debtor could not have approved or rejected --

11 let me put it differently.  The passage of -- once the petition

12 was filed, the passage of time would no long be an automatic

13 acceptance.  Where the debtor could affirmatively accept by

14 some conduct, that's another matter.

15          THE COURT:  Right.

16          MR. DAVIS:  But the passage of time certainly could

17 -- we would like to know whether payments were made to

18 individuals whose material was not approved yet, ad so the date

19 of payment would be part of that analysis.

20          THE COURT:  Then I think the more relevant focus and

21 narrower focus might be to get a list of payments who were --

22 that were made and entities who were paid --

23          MR. DAVIS:  We have that.

24          THE COURT:  -- within the 60 -- from and after the

25 60-day period that you're talking about pre-petition, because

1  the only -- the only thing that I think you're arguing is that

2  payments within that 60 days pre-petition and payments post-

3  petition for entities that weren't approved in that time would

4  be improper somehow because of the bankruptcy filing.

5  　　　　MR. DAVIS:  Well, actually, I could narrow it more

6  than that.  I would just like to know the dates of payment to

7  the individuals whose material fall into that category.

8  　　　　THE COURT:  Okay.  That's what I was trying to say.

9  You did it much better than I did.  Thank you.

10  　　　　MR. DAVIS:  I don't care about the date of payment

11  for the people whose materials were submitted prior to that.

12  　　　　MR. ESSERMAN:  Okay.  Just so I'm clear, you want the

13  dates of payments for those people who were submitted post-

14  petition?

15  　　　　MR. DAVIS:  Who were submitted within 60 days of the

16  petition.  To be very precise, the date is February -- I think

17  it's February 2, but why don't we call it February 1, because

18  it's a 28-day month.  I would ask for -- if somebody was paid

19  -- if somebody's material was submitted after February 1 of

20  2001, I would like to know the date of that.

21  　　　　MR. ESSERMAN:  I still think it's irrelevant.  We're

22  standing on that, but let me check.

23  　　　　　　　　　　　　　　(Pause)

24  　　　　MR. ESSERMAN:  Let's back up a little for a second.

25  Once again, there is a question in my mind as to -- I

**J&J COURT TRANSCRIBERS, INC.**

1 understand the issue as to the post-petition period.  Okay?

2 And I think those are the 297 people there.  Then you're also

3 talking about a pre-petition period of 60 days prior to those -

4 - prior to the petition date.

5          THE COURT:  Well, there's an assumption in there that

6 the claims submitted within that 60 days were not either

7 approved or rejected as of the date of the filing.  That may

8 turn out not to be the case.

9          MR. ESSERMAN:  I was just going to say that.

10          THE COURT:  But I think their request is to see what

11 claims were submitted in that time frame and then what payments

12 were made.  Those that had been approved pre-petition fall into

13 the pre-petition approval category.  Those that didn't though

14 fall probably in the post-petition category.

15          MR. ESSERMAN:  Well, for those claims that were

16 submitted pre-petition within the 60-day period, it would seem

17 to me that we ought to get from Grace which claims they

18 consider to be not approved.  In other words, if there's a --

19 if Grace is contending they had a 60-day window to file an

20 objection and not approve claims, I would -- I think it is

21 incumbent on Grace to show what claims during that 60-day

22 period they contend were not approved, because I think that --

23          THE COURT:  Well, I think -- the problem is I think

24 we've got a bucket of apples and a bucket of oranges.  Between

25 your clients and Grace, if Grace is contending that something

1  wasn't approved, yea, Grace ought to say, look, we think we

2  didn't approve this when you shouldn't have paid it.

3         MR. ESSERMAN:  Right.

4         THE COURT:  But there's a different issue between

5  National Union and everybody else, and that is National Union

6  is concerned that some claims were paid that didn't have

7  literal compliance with the settlement agreement.  And it is,

8  in its view, sort of a third party beneficiary in that sense,

9  because it didn't guarantee payment of claims that didn't meet

10  the settlement agreement.

11         Now, as a matter of law, I don't know if that's

12  correct or not correct.  I don't know what the bond that it

13  issued says.  Taking Mr. Davis' view for the moment, and let's

14  just hypothetically say I can reach the conclusion that he's

15  correct, then I think he has the right to take a look at claims

16  that were improperly paid from his client's perspective,

17  because, for example, the appropriate medical documentation

18  wasn't there.  That the debtor said we're not going to object.

19  Go ahead and pay him.  As to the debtor, I think the claimant

20  should -- you know, has a claim that should be paid.  The

21  debtor agreed to pay it and had a document out there that

22  secured the payment, so the debtor should pay it.  But if Mr.

23  Davis' construction of his client's bond is correct, just

24  because the debtor owes it, doesn't mean his client does.

25  However, if your construction is correct, Mr. Esserman, which

1 is that if the debtor owes it, National Union owes it, then his

2 client does owe it.  But sitting here where I am right now, I

3 don't know until I know what the law is with respect -- and the

4 facts are with respect to the bond.  Unless there's one, you

5 know, gazillion claims that were submitted in that 60 days,

6 it's probably better just to do the discovery for the 297 post-

7 petition and for the claims submitted in that 60 days, so you

8 don't have to go back and do it later.  But, you know, I don't

9 know if you're talking a thousand of the claims or 20 of the

10 claims.

11        MR. ESSERMAN:  I don't know if we know how many were

12 submitted within 60 days of the filing.

13        UNIDENTIFIED ATTORNEY:  I have no idea, Your Honor,

14 how many claims were submitted within 60 days of filing.

15        THE COURT:  So why don't you find that out and see --

16 and let's see what the universe of work is, because if it's

17 almost all of the claims, which I doubt, because there were

18 payments made many years before, so I doubt that that's the

19 case.  But if it's the majority of claims, it may be worth it

20 to get the legal issue decided first.  If it's only a few

21 claims, it's going to be worth it just to do the discovery and

22 worry about the legal issue down the road.

23        MR. DAVIS:  I just don't know.  I --

24        UNIDENTIFIED ATTORNEY:  We do believe that it's

25 actually 297 claims.

1          THE COURT:  That's the post-petition.

2          UNIDENTIFIED ATTORNEY:  That's the post-petition and

3  the 60 days prior.

4          THE COURT:  Oh, you think it's -- you think the 297

5  is that universe.  Okay, so you're looking at 297 claims.  If

6  that's the case, I think it would be better to do --

7          MR. DAVIS:  And that 297 claims is of five hundred --

8          UNIDENTIFIED ATTORNEY:  Two million.

9          MS. BAER:  No, only the post-petition amount --

10          MR. DAVIS:  Okay.

11          MS. BAER:  -- was 500.  It's over two million.

12          MR. DAVIS:  Okay, so it's two million out of the 13.5

13  million.

14          THE COURT:  Right.  Okay, so I think you've narrowed

15  the scope just by that discussion somewhat, but I think it's

16  not unreasonable to take a look at the 297 claims for that

17  information.  I don't think that should be overly burdensome.

18          MR. DAVIS:  Okay.

19          THE COURT:  All right.  So on the fact side, the

20  discovery with respect to the interrogatories that were not

21  answered and were objected to will be approved for those 297

22  claims and not for anybody else at this time.  Okay, then how

23  -- I guess the question then, Mr. Esserman, is maybe the

24  obligation should be on the plaintiffs to submit that first, so

25  we can see what has to happen next.

1          MR. ESSERMAN:  Of when the 297 claims were paid?

2          THE COURT:  Right.  How long will it take to get that

3 information?  And you want the amounts, too?

4          MR. DAVIS:  I have the amounts.

5          THE COURT:  The amounts and --

6          MR. DAVIS:  They gave the amount in the interrogatory

7 answer.

8          MR. ESSERMAN:  We gave the amounts.

9          THE COURT:  Oh, you have the amounts.

10          MR. DAVIS:  They declined to give the date.

11          THE COURT:  You just need the dates.  Okay.

12          MR. ESSERMAN:  My guess, we can have that within a

13 week.  Two hundred ninety-seven claims.  Hold on for a second,

14 Your Honor.

15                    (Pause)

16          MR. ESSERMAN:  Ms. Baer, are these 297 claims Alabama

17 or Texas claims or both?

18          MS. BAER:  They're about half and half.  That's my

19 understanding from an e-mail from my client, Your Honor.

20          MR. ESSERMAN:  Okay.  We'll get that information two

21 weeks.

22          THE COURT:  You ought to be able to run a search by

23 payment date that's within that 60 days.  Right?

24          MR. ESSERMAN:  For two law firms.  We've got one law

25 firm here.

1            THE COURT:  Okay.  I see.

2            MR. ESSERMAN:  I don't have the other law firm.

3            THE COURT:  Okay.  I see.  All right.  Well, two

4  weeks is fine.  It's waited two years.  Two more weeks won't

5  hurt.  Okay, so then what else -- Mr. Davis, right now by way

6  of discovery, what else are you looking for, so I can get some

7  kind of game plan together?

8            MR. DAVIS:  We are, in fact, reviewing the files in

9  Boca Raton, Florida right now.  We've got people there.  They

10 are very busy.  There are thousands of files to look at.  We

11 would like 90 days after we get this response to finish that

12 process, and then probably we'd like to set 45 days or so for

13 each side who wants to take depositions, and then I think that

14 would do it.

15           MR. ESSERMAN:  I think that's way too much time.

16 Here's why.  This process -- well, from our perspective, once

17 again, I think they've had a lot of time, and at a minimum when

18 they got our motion, they said in their response paper when

19 they got our motion, they started this process.  So I think

20 they're going back and looking at all claims from day one not

21 claims in a gap period or whatever.  So they've been at this

22 for several months, and 90 days I think is just --

23           MR. DAVIS:  Let me tell you what we've been doing

24 with complete candor.  We assumed -- because that's what we

25 thought was the case, that this was a rolling payment

1  situation, that there were paid claims, and there were non-paid

2  claims.  So we simply went forward on that assumption, since I

3  never got my list, of what was paid and unpaid.  And based on

4  that assumption we made a set of FIFO lists.  We identified

5  first in/first out or more the point last in/last out names of

6  individuals, and we have simply been looking at these files in

7  reverse chronological order.

8          What it appears -- because they adopted a pro rata

9  payment, I am intending to argue to Your Honor at the time of

10 this hearing that we have a right -- perhaps on a pro rata

11 basis, but we have a right to re-examine each and every

12 claimant who hasn't been paid in full to the extent they

13 haven't been paid in full.  That the dollars that are unpaid as

14 opposed to the individuals who are unpaid serve as a basis for

15 us to seek to make an argument.

16         The problem with that from a discovery standpoint is

17 that instead of having 3,000 claims, which was the number we

18 were counting backwards towards on a FIFO basis, I now

19 understand I've got 8,000 files to open up and look at, and

20 it's just a huge project.  That's all there is -- and, in fact,

21 90 -- I said 90 days with a fair amount of trepidation, because

22 that's 8,000 files to review, but we're working hard.

23         MR. ESSERMAN:  I mean it's our position that if we

24 want to look at these 297 claims --

25         MR. DAVIS:  I'm told it's 10,000.

1          THE COURT:  Yes, eight in Alabama and two in Texas.

2          MR. ESSERMAN:  Yes, 8249 and 1466.  But those claims

3  are stone cold.  I mean that -- those claims, releases have

4  been given approvals.  There's no issue on any of that.

5          THE COURT:  But again --

6          MR. DAVIS:  But only --

7          THE COURT:  -- see, that's the -- there is an issue

8  for National Union if, and only if, Mr. Davis' construction of

9  his client's payment obligation is correct.  There isn't an

10 issue as to the debtor.  The debtor's accepted the releases.

11 The debtor has to pay it.  That's the end of that story.  But

12 with respect to National Union, if the bond does have this sort

13 of caveat that says that you could -- that it's only obligated

14 to pay that, I'll call them in quotes, legitimately approved

15 claims, i.e., those that meet all the settlement criteria, then

16 his client probably has the right to go back and make sure that

17 the payment bond that was drawn on by the debtor or is to be

18 drawn on by the debtor is appropriately being drawn on.  So

19 that's the difference.  I think the debtor at this point,

20 except for probably these 297, doesn't have much dog in this

21 fight, but National Union does if his construction in the

22 obligation is correct.

23         MR. ESSERMAN:  I was just going to say I mean it'd be

24 a first that a payment bond would -- his client wasn't there

25 reviewing.  His client -- the only thing his client was

1  concerned about was whether or not it was paid but --

2          THE COURT:  That's what I -- I mean in -- certainly,

3  in a construction contract that's the case.  There is a big

4  difference between the obligations on a payment of performance

5  bond, and if, in fact, this is nothing more than a typical

6  payment bond, then I tend to think you're going to win this

7  argument, Mr. Esserman, but I don't know.  I don't know what it

8  is, and I don't know whether even if it's a payment bond in

9  this context it meets what I'm used to seeing as opposed to --

10          MR. ESSERMAN:  He says he wants 90 days.  He's had

11  more than enough time.  I don't want a due process argument.

12  Ninety days.

13          THE COURT:  Okay, then discovery is 90 days -- excuse

14  me -- 90 days to finish document discovery.  I'm not extending

15  this time.  And then you need another -- you think you're going

16  to need depositions after this?

17          MR. DAVIS:  I don't know.  I'm more inclined to think

18  that Mr. Esserman will want it than me, frankly, but --

19          MR. ESSERMAN:  Well, I --

20          THE COURT:  Well, why don't I say 30 days after that

21  to finish any depositions?  If you discover that you want a

22  deposition in the meantime, do it.  You know, I don't know that

23  you need to wait until the end of the document production.  At

24  some point you ought to have sufficient evidence to take your

25  deposition for discovery purposes without necessarily having to

48

1 finish every review I would suspect.

2        MR. ESSERMAN:  I'm going to want to see what he's

3 got.  I'm going to want to see what he has found in his -- in

4 his review and analysis what his contentions are.

5        THE COURT:  Oh, well, then after the document

6 discovery, do you want to come back in for a status conference

7 before I --

8        MR. ESSERMAN:  I was going to suggest that.

9        THE COURT:  -- give you a deposition date?

10        MR. ESSERMAN:  I was going to suggest that within a

11 week -- well, why don't we just get out the calendar and just

12 start setting dates?  It seems to me basically what we're

13 talking about is the first week of December.  He will have

14 finished his document discovery.  Isn't that right?

15        THE COURT:  September, October, November.  Right, the

16 last -- why don't I just say discovery closes November --

17 December 1st?  That's a little more than 90 days.

18        MR. ESSERMAN:  Okay.

19        THE COURT:  That's a Friday.  So --

20        MR. ESSERMAN:  How about a status conference the end

21 of the next week, 7th or 8th?

22        THE COURT:  All right.  Just a minute.  Let me see

23 what I can find here.

24                    (Pause)

25        MS. BAER:  The Grace omnibus that month is the 18th,

1 if that's relevant in any way.

2         THE COURT:  Yes.

3         MR. ESSERMAN:  I do not want it anywhere near the

4 Grace omnibus.  We won't be reached.  We won't, you know --

5 it'll be 9:00 at night.

6         THE COURT:  What about -- I have some time on

7 December the 12th.  There's a -- Federal Mogul is scheduled

8 that day, and it's going to take up quite a bit of the chunk of

9 time, but I think I could put you in on the afternoon on

10 December 12th.  That's a Tuesday.

11         MR. ESSERMAN:  That's fine.  What time, Your Honor?

12         THE COURT:  Well, Mogul's supposed to end at noon,

13 and then I have Virgin Island cases that are supposed to go

14 until 2:30.  What about 3:00 on December 12th?

15         MR. ESSERMAN:  That's fine.

16         THE COURT:  I don't care if we do this by phone.  If

17 it's just going to be a status conference and what you're going

18 to tell me is where you need to go next, by phone is fine with

19 me.

20         MR. ESSERMAN:  Why don't we see where that is and

21 decide?  Why don't we book it in a courtroom session for that

22 and agree that if we can use the phone, if necessary?

23         THE COURT:  That's fine.  I'll just ask you to let

24 the debtor know promptly enough that they can -- let's say a

25 week before the status conference, so that the call can be set

1  up.  Is that sufficient time, Ms. Baer?

2          MS. BAER:  Yes, Your Honor.

3          THE COURT:  So if the parties agree, not later than

4  December 5th, and if so, the debtor can set the call up.  And

5  if you want to be here, fine.  I'll be here one way or the

6  other.

7          MR. ESSERMAN:  You know, the other thing I'm thinking

8  about is what could be done in the interim, and it seems to me

9  that we can tee up the issue of whether or not this is a --

10  whether or not this is just a payment bond.  And one of the

11  issues that Your Honor's raised that you'd like briefing on is

12  the issue of the bond and what the obligations are of National

13  Union under this, because that may cut this whole thing short.

14  And, if, in fact, this is a payment bond and they don't have

15  any rights, which is going to be our contention under that

16  contract, and we're talking about -- and we can isolate this at

17  worst to a couple million bucks with dollars involved, there is

18  13 and a half million in play here, I'd like to get 11 -- 11

19  and a half.  We can argue about the other two.

20          THE COURT:  Okay.  Let me take a look at the draft

21  opinion I was working on for a minute and see.  I know I went

22  into this issue a little bit, but let me see if I -- I'm not

23  sure this was really raised in that context.  I don't know that

24  I addressed it then.

25          MR. DAVIS:  I don't believe it's been raised before

1  today.

2          THE COURT:  Well, at the April 28th hearing -- this

3  is a quote from what you had said at that hearing, Mr. Davis.

4  "National Union is a surety.  What National Union did is

5  provide its guarantee with respect to these transactions.

6  We're not denying their obligation under the bond.  The issue

7  the debtor raised is does the debtor owe the money that is

8  covered by our bond, and if the answer to that is no, then the

9  bond doesn't pay.  If the answer is yes, then the bond does

10 pay.  We haven't put up any issues concerning National Union,

11 its bond, its transactions, its events, its circumstances."

12         MR. DAVIS:  That was at the discovery hearing.

13         THE COURT:  That was the April 28th hearing.

14         MR. DAVIS:  I think it was a year earlier actually.

15         THE COURT:  Two thousand three.  That's right.

16         MR. DAVIS:  Oh.  And we learned in discovery since

17 then that Mr. Hughes agreed to alter the underlying

18 transaction.

19         THE COURT:  Okay, so that happened after the fact.

20 Let's see.

21         MR. ESSERMAN:  That sounds like a payment bond to me.

22 That sounds like a concession of a payment bond.

23                          (Pause)

24         THE COURT:  Well, the issue really that you were

25 arguing primarily at the argument, not in the April hearing but

**J&J COURT TRANSCRIBERS, INC.**

1 later, was more to do with the installment -- the effect of the

2 installments that were set out under the settlement agreement

3 than anything and --

4          MR. ESSERMAN:  We've covered that one.

5          THE COURT:  My concern there -- I mean I thought then

6 and I think I expressed this on the record at the time was that

7 the language of that contract with respect to the balance due

8 payment I thought was pretty --

9          MR. DAVIS:  That's what we called the aggregate

10 submission argument.  You made it very clear when we had

11 argument in March of '04 that you weren't buying that argument.

12          THE COURT:  Okay.

13          MR. DAVIS:  And we're not pushing that argument in

14 this court, although I still have, of course, the possibility

15 of raising it again elsewhere.

16          THE COURT:  Okay, then let me finish.  I'm almost

17 through this draft.  I don't think the draft is going to get us

18 where you need to go today, but just in case it would eliminate

19 any additional briefing, I want to double check.

20                    (Pause)

21          THE COURT:  Okay.  National Union did raise that some

22 of the qualifying materials didn't have sufficient medical

23 documentation and, therefore, should be rejected.  But at least

24 as to Grace, Grace had that 60 days after receipt of the

25 materials to notify the settling plaintiffs, whether it would

1  or wouldn't be accepted.  I didn't see anything in looking at

2  the surety bonds at that time that had any provision that

3  granted National Union re-verification rights.  That's a --

4  that was something that I had noted to myself in going over

5  this draft.  So I don't know that National Union had the

6  ability to either insert that it has a review right, or that it

7  has an obligation not to pay even improperly paid claims under

8  the bond.

9          MR. DAVIS:  But the bond only guaranteed that which

10  the agreement was.

11          THE COURT:  Well, you're going to have to show me

12  that language.

13          MR. DAVIS:  Yes, I mean it's -- but that's -- the

14  bond can only guarantee the agreement that exists.  The

15  argument made then and the argument made now is that if the

16  parties enter into a subsequent or different agreement, the

17  bond didn't guarantee --

18          THE COURT:  No, I don't --

19          MR. DAVIS:  -- the subsequent or different agreement.

20          THE COURT:  I don't think that's the case.  The bond

21  can guarantee the payment without looking at all as to what the

22  payment's for.  I mean it -- bonds can be written I think in

23  different ways.  I am --

24          MR. DAVIS:  I understand that.

25          THE COURT:  Yes, I need you --

1          MR. DAVIS:  There's such a thing as possible.

2          THE COURT:  Right.

3          MR. DAVIS:  I don't believe that's the case here.

4          THE COURT:  I need you to point out the specific

5  language, because I know there were no re-verification rights,

6  so I'm not sure how you're ever going to find out without a re-

7  verification right that, in fact, a claim was improperly paid,

8  because how would you know?  I mean if the debtor rejects a

9  claim, you obviously don't have an obligation to pay it when

10  the debtor rejected it.  But if a debtor agrees to it, and you

11  don't have a re-verification right, how do you then turn around

12  and say this was not provided for under the agreement?  So I

13  think that's the trouble.  That was the difficulty I was having

14  the last time with respect to National Union's position.

15          MR. DAVIS:  Our view would be that it wasn't paid

16  pursuant to the agreement but pursuant to a different

17  agreement.

18          THE COURT:  But there isn't a different agreement

19  that we know of.

20          MR. DAVIS:  Yes, there was.  There was an agreement

21  reached to pay that particular claim notwithstanding its

22  failure to qualify.

23          THE COURT:  No, I think what happened was Mr. Hughes

24  decided that he would simply pay the claims as submitted.  I

25  don't know that there was any -- again, if I'm incorrect, point

1  me to Mr. Hughes' deposition --

2          MR. DAVIS:  Yes.

3          THE COURT:  -- because I read it a long time ago.

4  But I don't recall that he said anywhere that he made a

5  separate agreement with claimants to pay unqualified claims.  I

6  thought he said what you'd said earlier, that he made a

7  business decision to process them through pursuant to this

8  agreement.  That doesn't represent a different agreement by

9  anybody.  That's just his interpretation.

10         MR. DAVIS:  We think it -- we would contend that a

11 non-qualified material that was submitted and an acceptance of

12 that material is an offer and an acceptance that falls outside

13 the four corners of the prior agreement.

14         THE COURT:  But if you don't have re-verification

15 rights, how are you ever going to find out about that fact?  I

16 mean I'm letting you take a look at this issue now as to the

17 unpaid bonds or unpaid claims, because to the extent that they

18 aren't yet paid, I agree.  You shouldn't have to pay something

19 that the debtor doesn't have to pay.  But as to those claims

20 that the debtor already processed, if you don't have the right

21 to go back and challenge the debtor's action, how do you get

22 out from under the obligation to pay on the surety?  So I think

23 there's a -- I think there's a disconnect, Mr. Davis, that

24 you're client's going to have some trouble getting out of, but

25 again I haven't looked at the bond for a long time.

1           MR. DAVIS:  Yes, that issue has not been briefed for

2  today.

3           THE COURT:  All right.  I agree with that, so I think

4  you need a chance to take a look at that.

5           MR. ESSERMAN:  And the bonds are basically one page.

6           THE COURT:  Yes, they're not very long.

7           MR. ESSERMAN:  No.

8           THE COURT:  The bonds are not long documents but --

9           MR. ESSERMAN:  No.

10          THE COURT:  Okay, so having said all that, what do

11  you need to brief?  I guess how much time do you need to do

12  this brief and to submit the bonds?

13          MR. ESSERMAN:  To me, the issue is is whether under

14  these bonds National Union has any other obligation other than

15  just pure payment for a default by W.R. Grace of -- under the

16  settlement agreement -- the failure to pay.

17          THE COURT:  Well, I think it's the other way, whether

18  National Union has a defense to an obligation to pay.  Right?

19          MR. ESSERMAN:  Well --

20          THE COURT:  Because the bonds provide an obligation

21  to pay.  The only question is what --

22          MR. ESSERMAN:  Correct.

23          THE COURT:   -- defense does National Union have to

24  that obligation.  Correct?

25          MR. ESSERMAN:  What defense, if any, National Union

1  has to a non-payment by Grace of amounts due under the

2  settlement agreement.

3          THE COURT:  No.

4          MR. ESSERMAN:  Okay.  Let's try it again.

5          THE COURT:  Grace already paid.  I think the issue

6  Mr. Davis is raising is the extent of the surety bond --

7  exactly what the surety bond covers.  I think there is a

8  concession that to the extent that Grace paid a claim that met

9  all of the criteria under the settlement and/or failed to pay,

10 so that they had to access the bond, that National Union would

11 be liable for those claims.  Now, Mr. Davis I think is maybe

12 contending that if even one improper claim was paid, that

13 National Union's entire obligation may go away.  So you can

14 raise that, if that's your contention.

15         But let me get to the harder question, which is

16 assuming that that's not the case, and that National Union has

17 to pay if the debtor fails to pay for the claims that met the

18 settlement agreement.  Fine.  Then we've got this gray area,

19 which is what happens when the debtor agrees to pay the claims

20 that don't meet the settlement agreement criteria, and,

21 therefore, you're claiming that the surety has to pay?  Mr.

22 Davis is saying the surety doesn't have to pay, because Grace

23 should never have agreed to pay, because the settlement

24 agreement terms weren't met.  Now, I don't know how to put that

25 I mean offhand into one simple sentence, but I think that's

1  what you're getting at, Mr. Davis.  Correct?

2          MR. DAVIS:  I think so.

3          THE COURT:  So however you want to phrase that,

4  folks, I understand what the issue is.

5          MR. ESSERMAN:  Yes, the debtor agreed to pay a claim

6  that Mr. Davis contends doesn't meet the settlement criteria.

7          THE COURT:  Right.  The debtor --

8          MR. ESSERMAN:  What are his obligations?

9          THE COURT:  Right.  That's right.  So -- oh, I guess

10 the way you said it before was correct.  The debtor agreed to

11 pay but didn't pay, and now you're looking to National Union

12 for payment.

13         MR. ESSERMAN:  That's right.

14         THE COURT:  Okay.  So I guess the first issue I think

15 should come from Mr. Davis.  I think this is your contention

16 that you're not obligated to pay, and I'd like to know from

17 your perspective where in the bonds that is stated.  So how

18 much time do you need to brief the issue, Mr. Davis?  And if

19 it's all right with you, why don't you just attach the factual

20 materials as exhibits to the brief -- briefs, plural?

21         MR. DAVIS:  Sure.  And it's the usual question of not

22 how much time do I need to do it, but how much time do I need

23 before I can get -- turn to it.  I would like -- actually, I

24 wonder if it wouldn't be more effective if Mr. Esserman filed a

25 motion to strike my argument -- strike my contention.  That,

1 first of all, would give me more time to respond, and I know

2 exactly what I'm responding to and --

3          MR. ESSERMAN:  I'm sorry.  What?

4          MR. DAVIS:  I was suggesting that -- Sandy, that you

5 put up a motion to -- for a ruling, and you file first.

6          THE COURT:  Well, he's got a motion for judgment that

7 you're defending.

8          MR. ESSERMAN:  I've got a motion for judgment.  I

9 would say that you should open as to why you think, and I'll

10 respond -- why you think you're not obligated, and I'll

11 respond.

12          MR. DAVIS:  Well, six of one, half --

13          MR. ESSERMAN:  You want 30 days?

14          MR. DAVIS:  At least.  If you want me to go first, I

15 would appreciate not having to do it until Friday, September

16 29th.

17          THE COURT:  Okay, so your brief is due by September

18 29th?

19          MR. DAVIS:  Yes.

20          THE COURT:  All right, and, Ms. Baer, are you going

21 to be briefing on this issue, too?

22          MS. BAER:  I'm not sure that the debtor really has a

23 stake in this particular fight, although it will have a stake

24 in the outcome of this particular fight, because we have issues

25 with National Union about what collateral they can use to

1  reimburse themselves, significant issues.  But I think that's

2  the next round, if you will.

3          THE COURT:  All right, so if you choose to brief,

4  whose side of this are you coming down on?

5          MS. BAER:  Likely National Union.

6          THE COURT:  All right, then your brief will be due by

7  September 29th as well, if you choose to do one.  Okay, and

8  your brief then, Mr. Esserman?

9          MR. ESSERMAN:  I mean I want the same amount of time

10 that he's taking.  How about October 30th?

11         THE COURT:  All right.

12         MR. ESSERMAN:  A response.

13         THE COURT:  Okay, then are you -- do you want simply

14 another like very brief argument date in case there's something

15 new that's come up?

16         MR. ESSERMAN:  Why don't we do this?  Why don't we

17 submit it on briefs?  If you feel you want oral argument, we'll

18 be happy to do that.

19         THE COURT:  I probably will want it, simply because

20 I'm going to want you to highlight for me --

21         MR. ESSERMAN:  Okay.

22         THE COURT:  -- anything additional.  But again we can

23 do it by phone.  I don't think it should take more than

24 probably 20 minutes, my guess is, unless something, you know,

25 new pops out of the woodwork that you folks haven't alerted me

1  to today.

2          MR. ESSERMAN:  Okay.

3          THE COURT:  So --

4          MR. DAVIS:  I would like the opportunity to reply.

5          THE COURT:  Oh, all right.  By when?

6          MR. DAVIS:  That I'll do in ten days.

7          THE COURT:  All right.  The date -- Mr. Davis and the

8  debtor, if the debtor chooses, to reply by November -- calendar

9  here --

10          MR. DAVIS:  November 10th.

11          THE COURT:  -- 10th.  Actually, there may be a

12  holiday.  I think that's when Veterans Day is celebrated.  Will

13  that make a difference?  I mean you can file --

14          MR. DAVIS:  No.

15          THE COURT:  Okay.

16          MS. BAER:  That's a Friday.  I'm sorry.

17          THE COURT:  Yes, I know.  I think it's the holiday

18  though, because Veterans Day is the 11th.

19          MR. DAVIS:  Why don't we just make it the 13th, the

20  next business day?

21          THE COURT:  All right.  Argument by phone.

22          MR. ESSERMAN:  Okay.

23          THE COURT:  Unless you just want to do it on that

24  December 12th date, which is I know a month later, but there's

25  time that day.

62

1          MR. ESSERMAN:  Why don't we get it out of the way

2 before the December 12th status conference?

3          MR. DAVIS:  Well, if the NARCO/GIT cases are still

4 going on, I'll be -- I could be in town on the 17th of

5 November.  Does Your Honor have time?

6          THE COURT:  That's okay.  I won't need that much time

7 for a reply brief that's limited to whatever, five or ten

8 pages, whatever the rule says.  So I -- that shouldn't be an

9 issue for me.  The time is the bigger concern.

10          MR. ESSERMAN:  I think you were anticipating 20

11 minutes, and to expand that by 50 percent, maybe 15 minutes

12 aside.  Maybe 30 minutes.

13          THE COURT:  How about at noon?  Pittsburgh Corning

14 starts at one, so how about at noon?

15          MR. ESSERMAN:   Perfect.

16          THE COURT:  So that's November 17 at noon.  And are

17 you going to be here, too, Mr. Esserman, or is this by phone?

18 That's Corning, NARCO, and GIT day.

19          MR. ESSERMAN:  I'll probably be here.

20          THE COURT:  All right.  It can be by phone if you

21 choose, but again why don't you decide that?

22          MR. ESSERMAN:  I will coordinate it with Mr. Davis.

23          THE COURT:  All right, and I'll just say maybe by

24 noon.

25          MR. ESSERMAN:  Because I'm here, he's going to be

1  here.  That's the only reason he's going to be here.  Perhaps

2  he can do it by phone, and I'll do it by phone.

3          MR. DAVIS:  We'll talk about it.

4          THE COURT:  All right.  It can be by phone at the

5  parties' choice, but you have to notify my office, because

6  we're going to have to set -- make the arrangements or -- I

7  don't know, Ms. Baer, you'd participate in that anyway I guess.

8          MS. BAER:  Yes, I probably would not come out for

9  that in person.  I'd listen in by phone.

10          THE COURT:  All right, then why don't I say it will

11  be by phone, because --

12          MR. ESSERMAN:  Okay.

13          THE COURT:  -- that way you can set it up.

14          MR. ESSERMAN:  Okay.  We'll be by phone.

15          THE COURT:  And you can be in court if you choose.

16          MR. ESSERMAN:  Okay.

17          THE COURT:  And the debtor to set up the call.

18          MS. BAER:  Okay.

19          THE COURT:  Okay, so let me review this and make sure

20  I've got everything the same.  With respect to the document

21  discovery, it's to be finalized by December 1.  We're going to

22  do a status conference December 12th at 3:00 p.m.  It can be by

23  phone if you folks so decide by December 5, and if it's by

24  phone, the debtor will set up the call, and we'll see whether

25  depositions need to go forward and whatever should happen next

1 at that time.

2          With respect to the briefs, the primary issue is what

3 the payment bond is going to cover -- what National Union's

4 obligations are under that bond.  Mr. Davis' and the debtor's

5 briefs are due September 29.  Mr. Esserman's October 30.  The

6 debtor and Mr. Davis to reply, if they choose, by November 13,

7 limited to ten pages.  And argument November 17 at noon.  All

8 right.  What else today?

9          MR. ESSERMAN:  The last thing is looking at down the

10 road if National Union is going to be successful in their

11 argument that the debtor change the deal and accepted some

12 claims that they didn't accept based on Jay Hughes' testimony,

13 and, therefore, they're not obligated to pay those claims.  I

14 think the -- there is an open discovery issue as to what Grace

15 contends the claims that Jay Hughes contends were not accepted

16 or were accepted.

17          THE COURT:  Without the documentation.

18          MR. ESSERMAN:  Or without the --

19          THE COURT:  Because you would know that.  All you --

20          MR. ESSERMAN:  -- without compliance of the contract.

21          THE COURT:  Right.

22          MR. ESSERMAN:  Because thinking about it narrow --

23 you know, narrowing the issues, right now we've got on the pre-

24 petition/post-petition, that's about a $2 million number out of

25 the 13 and a half, and I'm trying to find out if Mr. Davis wins

1 the second issue what is -- what are the claims, and I

2 understand he's got his arguments that vitiates the whole

3 thing.  But what are the dollar amounts of claims that he

4 contends were not in compliance with the settlement agreement

5 that he approved that were at variance with the settlement

6 agreement?  And his contentions, I asked him about it at

7 deposition.  He didn't know the answer.

8           THE COURT:  Well --

9           MR. ESSERMAN:  It seemed to me we need to know that.

10 We need to know --

11           MS. BAER:  Well, that's what the review is.

12           MR. DAVIS:  That's precisely what we're compiling.

13           MR. ESSERMAN:  Well, that's what National Union is

14 compiling.

15           THE COURT:  Right.

16           MS. BAER:  The review is being done by the debtor and

17 National Union.

18           MR. ESSERMAN:  Okay.

19           MS. BAER:  They're sharing employees --

20           MR. ESSERMAN:  Okay.

21           MS. BAER:  -- and they're being done in Boca's

22 offices.

23           MR. ESSERMAN:  Okay.

24           THE COURT:  Okay.

25           MR. ESSERMAN:  Well, then that's -- then I think then

1  we'll find that out.

2          THE COURT:  That's probably what we should try to do

3  the status conference about, one issue at the status

4  conference --

5          MS. BAER:  Right.

6          THE COURT:  -- in December I think.

7          MR. ESSERMAN:  Well, for instance, the reason I was

8  raising it the way I raised it is I understand that's what Mr.

9  Davis is doing, but it may be that the debtor, Grace, agrees or

10  disagrees --

11          THE COURT:  Right.

12          MR. ESSERMAN:  -- with the view of National Union on

13  this.

14          THE COURT:  Yes.

15          MR. ESSERMAN:  I don't know.

16          MS. BAER:  Right.

17          MR. ESSERMAN:  But I want to know the answer to that

18  question is why I asked that.

19          MS. BAER:  I think we'll know that in December.

20          MR. ESSERMAN:  Okay.

21          THE COURT:  Okay, so that will be an issue for the

22  status conference then and -- all right.  What else?

23          MR. ESSERMAN:  I think that's it.

24          MR. DAVIS:  National Union has nothing further.

25          MS. BAER:  Nor does the debtor.

                    **J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  Okay.  Well, thank you, folks.  I guess

2   I'll see you for this proceeding in November.

3          MR. ESSERMAN:  Thank you for the special setting once

4   again.  It's -- could you imagine doing this on a Grace day?

5          THE COURT:  No, actually.

6          MS. BAER:  Not at 10:00 at night.

7          THE COURT:  But then I've gotten to the point where I

8   can't imagine doing much on a Grace day except going out to the

9   local bar after its over and consoling myself.

10          MR. ESSERMAN:  I understand.

11          MS. BAER:  We have to live with it every day.

12          THE COURT:  Yea, I don't know.  You folks really have

13   your work cut out for you in that case.  I know I see only the

14   tip of the iceberg, so I apologize for the frustration that I'm

15   sure comes through from time to time in court on that, but I

16   really do admire the fact that you're keeping all the oars in

17   the water in that case.

18          MS. BAER:  So to the extent that my frustration leads

19   you to conclude otherwise, it's -- there's no animus here.

20   It's just pure frustration.

21          MR. ESSERMAN:  The other thing that I owed you is a

22   report today at 5:00 on where we were on the RMQ PPG matter.

23          THE COURT:  Oh, yes.

24          MS. BAER:  Your Honor, before you move off of Grace,

25   I wanted to just alert you as you might recall, the other day

1 we filed the property damage CMO and schedule and the Property

2 Damage Committee filed a dueling one.

3          THE COURT:  Yes.

4          MS. BAER:  The parties are actually still talking.

5 They have a conference call today at 5:00 --

6          THE COURT:  Oh.

7          MS. BAER:  -- in the hopes that we'll narrow the

8 issues.  I don't think they'll all be resolved, but on Monday,

9 if Your Honor would like, we could report to you on what, if

10 anything, we have resolved.

11          THE COURT:  Why don't you submit revised orders, so

12 that, you know, what -- what is agreed and then what isn't

13 agreed.  And if you need until, you know, Tuesday or Wednesday

14 or something, I don't know how long -- how soon the debtor

15 wants to get those issues out.

16          MS. BAER:  You know, I would say give us a deadline

17 at the end of the day Monday, because at some point in time

18 it's just time to let you decide.

19          THE COURT:  Fine.  Then how about by Monday?  Could

20 you put together what you agree on, and then your separate

21 submissions as to what you don't agree on?  Bcause there's no

22 point in my redoing the order with respect to what you do agree

23 on.  You know I'm going to approve it, because it's -- there's

24 no point in my not approving what you agree upon.

25          MS. BAER:  Right.  Yes, that's why I wanted you to

1  know they're still talking.

2          THE COURT:  Okay.  Thank you.  I appreciate that.

3  Yes, and --

4          MR. ESSERMAN:  It's very simple, and I've been

5  authorized by PPG to make this presentation.  The parties have

6  resolved the case, but they're working on that documentation.

7          THE COURT:  Oh, good.

8          MR. ESSERMAN:  Exactly consistent with what was

9  represented to you at the hearing yesterday so --

10          THE COURT:  Okay.  For the record, this is an

11  indication of what happened in the record in the Pittsburgh

12  Corning case yesterday, so I appreciate the representation.  I

13  don't really need a transcript of that, because it's just going

14  to go back on the next agenda so --

15          MR. ESSERMAN:  Exactly.

16          THE COURT:  Okay.

17          MR. ESSERMAN:  It's been reset to September 18th or

18  12th or something like that.  I can't remember what it is, and

19  we'll just -- by then we will have the documentation I'm

20  sure --

21          THE COURT:  Okay.

22          MR. ESSERMAN:  -- signed, sealed, and delivered.

23          THE COURT:  All right.  Thank you.

24          MR. ESSERMAN:  Thank you.

25          THE COURT:  We're adjourned.  Have safe trip home,

1 everybody.

2          MR. ESSERMAN:  Thank you.

3          MS. BAER:  Thank you, Your Honor.

4                    *  *  *  *  *

### CERTIFICATION

          I, PATRICIA C. REPKO, court approved transcriber,

certify that the foregoing is a correct transcript from the

official electronic sound recording of the proceedings in the

above-entitled matter to the best of my ability.


/s/ Patricia C. Repko          Date:  September 5, 2006
PATRICIA C. REPKO
J&J COURT TRANSCRIBERS, INC.