IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W. R. GRACE & CO., *et al.*,[1] | ) | Case No. 01-01139 (JKF) Jointly Administered |
| Debtors. | ) | |
| | ) | **Related Docket Nos. 10014, 11245** |

**APPENDIX TO IN FURTHER SUPPORT OF DEBTORS' OPPOSITION TO ANDERSON MEMORIAL'S MOTION FOR CLASS CERTIFICATION**

KIRKLAND & ELLIS LLP
David M. Bernick P.C.
Janet S. Baer
200 East Randolph Drive
Chicago, IL 60601
Telephone: (312) 861-2000
Facsimile: (312) 861-2200

PACHULSKI STANG ZIEHL YOUNG JONES & WEINTRAUB LLP
Laura Davis Jones (Bar No. 2436)
James E. O'Neill, III (Bar No. 4042)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899-8705 (Courier 19801)
Telephone: (302) 652-4100
Facsimile: (302) 652-4400

Co-Counsel for Debtors and Debtors in Possession

Dated: September 8, 2006

[1] The Debtors consist of the following 62 entities: W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.), W. R. Grace & Co.-Conn., A-1 Bit & Tool Co., Inc., Alewife Boston Ltd., Alewife Land Corporation, Amicon, Inc., CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace II, Inc., Creative Food 'N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC (f/k/a Dewey and Almy Company), Ecarg, Inc., Five Alewife Boston Ltd., G C Limited Partners I, Inc. (f/k/a Grace Cocoa Limited Partners I, Inc.), G C Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC Management Corporation, GN Holdings, Inc., GPC Thomasville Corp., Gloucester New Communities Company, Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical Company of Cuba, Grace Culinary Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe, Inc., Grace H-G Inc., Grace H-G II Inc., Grace Hotel Services Corporation, Grace International Holdings, Inc. (f/k/a Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W. R. Grace Capital Corporation, W. R. Grace Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-Caribe Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai Development Company, L B Realty, Inc., Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH, Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Inc., MRA Holdings Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (f/k/a Nestor-BNA, Inc.), MRA Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental Liability Management, Inc., E&C Liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin & Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country Staffing), Hayden-Gulch West Coal Company, H-G Coal Company.

# W.R. Grace
# Case No. 01-01139
# Materials re Anderson Memorial Class Certification Matter

| Tab No. | Filing Date | Docket No. | Docket Text/Description |
|---|---|---|---|
| 1 | 1/26/2006 | N/A | Relevant Pages [23-91] Discussing *Anderson Memorial* Class Certification From Transcript of Hearing on Debtors' Fifteenth Omnibus Objection Before Honorable Judith K. Fitzgerald; January 26, 2006 9:15 a.m. |
| 2 | 8/21/2006 | N/A | Relevant Pages [246-268] Discussing Status of *Anderson Memorial* Case From Transcript of Hearing on Debtors' Fifteenth Omnibus Objection Before Honorable Judith K. Fitzgerald; August 21, 2006 1:55 p.m. |
| 3 | 2/9/2001 | N/A | *Anderson Memorial*, Conditional Order Certifying a State-Wide Class |
| 4 | 3/5/2001 | N/A | *Anderson Memorial,* Anderson Memorial's Reply to the February 9, 2001 Conditional Order |
| 5 | 5/7/2001 | N/A | *Anderson Memorial*, Letter from South Carolina Court to Dan Speights, Directing Dan Speights to Draft a Final Order that (i) Certifies a State-Wide Class and (ii) Expressly Excludes W. R. Grace |
| 6 | 6/29/2001 | N/A | *Anderson Memorial*, Order Certifying a State-Wide Class to Defendants Other than Grace |

# TAB 1

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

| | |
|---|---|
| IN RE: | . Case No. 01-1139 |
| | . |
| W. R. GRACE, | . |
| | . 5414 USX Tower Building |
| Debtor | . Pittsburgh, PA 15222 |
| | . January 26, 2006 |
| . . . . . . . . . . . . . . . . . . | . 9:15 a.m. |

TRANSCRIPT OF HEARING ON DEBTORS' FIFTEENTH OMNIBUS OBJECTION
BEFORE HONORABLE JUDITH K. FITZGERALD
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

| | |
|---|---|
| For the Debtor: | Kirkland & Ellis LLP<br>By: MICHAEL T. DIERKES, ESQ.<br>SALVATORE BIANCA, ES.<br>MICHELLE H. BROWDY, ESQ.<br>200 East Randolph Drive<br>Chicago, IL 60601 |
| | W. R. Grace Legal Department<br>By: RICHARD C. FINKE, ESQ.<br>7500 Grace Drive<br>Columbia, MADE 21066 |
| For the FAI Claimants: | The Scott Law Group<br>By: DARRELL SCOTT, ESQ.<br>2712 Middleburg Dr.<br>P. O. Box 2665<br>Columbia, SC 29206 |
| Audio Operator: | Janet Kozloski |

Proceedings recorded by electronic sound recording, transcript produced by transcription service.

---

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-Mail: jjcourt@optonline.net**

**(609) 586-2311 Fax No. (609) 587-3599**

MS. BROWDY: Thank you, Your Honor. That would bring us to the Anderson motion for class certification.

MR. BAENA: Your Honor.

THE COURT: Yes, sir.

MR. BAENA: May I say something before you move onto the next subject.

THE COURT: Yes.

MR. BAENA: Judge, I only rise because of the implication of something you said in respect of the estimation which we are principally responsible for. A moment ago you alluded to the burden of proof that claimants have in respect of when contamination -- when contamination occurred.

THE COURT: No, that wasn't the question. The question is when did they know that there was a Grace product that had asbestos in the building?

MR. BAENA: You referred to it as their burden of proof. And respectfully, Judge, I reserve the right to disagree with that interpretation of the law at another time because that's not our view.

THE COURT: The claimant doesn't have to prove when they had a claim accrue?

MR. BAENA: No. The claimant has to prove that they have a claim.

THE COURT: Right.

MR. BAENA: They have -- in many states, most states,

the fact of contamination is what triggers the accrual of the claim. A claimant doesn't have to prove though when that occurred in those states. If the defendant wishes to assert by way of affirmative defense that the claim is time barred because the claim accrued and the time ran under the statute to bring that claim, it's the defendant's burden of proof in those jurisdictions, especially in California under the Samsung decision. It's the defendant's burden of proof to show when the release occurred. And so --

MS. BROWDY: Your Honor --

MR. BAENA: And so I'm not here to argue about it, Judge. I just want to sort of put like an asterisk next to your comment to reserve our right to suggest otherwise in other contexts.

THE COURT: Well that's fine except that I don't think I was going where you've just gone. My comment wasn't intended to go where you just went. So to the extent that it was interpreted that way, that was not the information.

MR. BAENA: Okay.

THE COURT: I'm talking about a proof of claim form that has a question on it that I've ordered people to answer. It's their burden to fill out that proof of claim form and assert the proper and truthful information on that claim form. The debtor can't fill out the claim form for the clients. The clients have to fill it out. That's their burden. That's what

I was attempting to say.

MR. BAENA: Okay. Yeah, I apologize, Judge. I thought I heard you say burden of proof.

THE COURT: Well I probably did. I apologize because sometimes I say burden of proof and I mean burden. To the extent that I said burden of proof, I retract the "of proof".

MR. BAENA: Thank you, Judge.

THE COURT: All right. Thanks. Ms. Browdy?

MS. BROWDY: And again, Your Honor, that takes us to the Anderson motion for class certification.

THE COURT: All right.

(Pause)

THE COURT: Mr. Speights?

MR. SPEIGHTS: I'm sorry, Your Honor. I'd like to say it's because I'm still under the weather, but I was thinking through a situation and thought that counsel might be going first and I realize it's my motion, albeit there's some branches of the tree out there that have to be dealt with in addition to the main part of the tree.

Your Honor, we are here on Anderson's motion to certify and I want to give you a little bit of background, less than three minutes, and then go to where I think we need to go today and where I understood you wanted us to go today as a threshold matter before getting to the merits or the few merits of this motion. And I say that because at the last hearing and

at this hearing I continue to be of the view that evidence needs to be presented, especially in light of the assertions made by the debtors in their various briefs and that we cannot agree to any assertion of factual on that as made by the debtors because we sharply disagree with many of their assertions and because we think there is evidence available to us that will greatly buttress our motion for class certification.

But let me stand back just a minute. I really was thinking last night about what we've been doing the last few months and I realize that I thought I had retired from this and I thought I had retired from this in 1992. And this is not a long war story, but it's a quick story to illustrate the importance of the class. In 1986, 20 years ago this week, I tried the Greenville City Hall case and got the first verdict in the country against Grace in any kind of asbestos case, personal injury or property damage, and it was the first asbestos property damage case tried to a successful verdict in the country. And from '86 until '92 I settled with W. R. Grace claims on behalf of in excess of 200 buildings in approximately 30 states.

In 1992 I tried to semi-retire. I'd had enough of this frankly going across the country and litigating case-by-case-by-case. And so I came back from a 12-week trial in North Dakota and filed the Anderson Memorial Hospital case as a class

action. And I did so for several reasons, personal reasons being one of them, I did so because frankly nobody can try hundreds of these cases and certainly not in our law firm. We have four lawyers. I'm not some mega firm that starts trials in 10 states at a time. And frankly because by then I thought the litigation was pretty clear with an additional certification of the colleges class that the courts had recognized in asbestos property damage cases that they are particularly good for treatment by class action, Rule 23, which would regard the multiplicity of lawsuits. That's the purpose of the class action, to efficiently deal with it.

And so I thought I had gotten out of what we've been doing here since July of dealing with hundreds of claims because if Grace had not declared bankruptcy, one of those what if games, I would have either tried or settled or had dismissed, won at trial, lost at trial, a case brought on behalf of Anderson for the entire class. I would have tried one claim. It would have been Anderson's. If it would have been a national class action it would have been Anderson; if it was a state certified class action it would have been Anderson. It would have been the Anderson claim as a representative of a class. Whether the statute of limitations had run or not would be a question of whether Anderson's statute of limitation had run. Whether there was liability for Grace and negligence or nuisance or strict liability of what would have been tried with

respect to Grace's product in Anderson. Whether there was a conspiracy or not would have been tried with respect to what evidence Anderson produced. In that case in the case of South Carolina would have been tried in South Carolina.

So I've listened now for months about Speights filing all these claims. The fact of the matter is I was trying to file a class. I did file it. Part of it was certified to create a pot of money. If we'd have won by settlement or by verdict, a pot of money would have been created, liability would have been created like other class actions, other class actions that, you know, that are handled in my state and others and there would have been a claims facility and people would have made claims against the facility and we wouldn't be trying 500 cases. We'd be having a claims facility. And that was the purpose of it.

We weren't -- when we filed later claims in this case, it wasn't that we were trying to, quote, gain the system, it was to try to protect, as I've said repeatedly, upon the advice of an ethics professor, protect the class for whom I filed the case.

Interestingly from '92 until 2000, not only did class actions proceed in asbestos and not only were class actions concluded such as the colleges class against Grace also filed in South Carolina, but in essence we did the same thing in other bankruptcies. Class claims were permitted, for example,

in the Celetex and National Gypsum bankruptcies. In Celetex a facility was set up, class claims were put forward made by the class representative. Nobody tried a case on behalf of hundreds of colleges in America. There was PE trust that was a facility and people either win or lose before the facility. I think the authority person who deals with claims in Celetex is roughly 50 percent, 50 percent of claims allowed, 50 percent are disallowed. Excuse me a moment, Your Honor.

(Pause)

MR. SPEIGHTS: But that's what we started and that's what we intended and now we are -- and I'm not here complaining about the process. I understand what's happened now because we have a bankruptcy and we're down the objection road rather than the trust road which I plea for constantly.

Your Honor, the other thing that I've said is that I wish the Court would be mindful of the effort that was made on behalf of Anderson from a period of 1992 to 2000. When we get to the point of making a factual record, which I do not believe is today. Your Honor said recently you wanted to start with legal issues. But I believe that we will show that we not only spent, you know, eight years of work, numerous motions. We conducted discovery throughout this country against Grace. The most discovery I've ever done against a defendant in any case I've ever handled was done against Grace in the Anderson class action case. I spent probably close to a million dollars in

expenses, that's not the hundreds and hundreds of hours, all to protect the class.

Now of course Grace filed bankruptcy and has filed -- we filed our brief. I'm not going to deal with the timeliness issue now because I don't think that's what before you again on the merits other than to say I think we filed our motion to certify as soon as we could under the Charter case. I do think in Grace's brief on the merits, however, they properly identified the issues ultimately for you to decide in whether to certify a Rule 23 class. They say, Grace says to warrant a class certification the Court must determine whether a class action makes sense and will advance the interests of the bankruptcy and second, even if claimants can demonstrate that a class must be acceptable, the claimants must also satisfy the elements of Rule 23 and in particularly they talk it being a superior method.

And I think that at least for purposes of today's argument we can at least start with that framework. And right away everybody has focused on the first element of that. Indeed some of the cases suggest that that is the primary focus, will this assist the bankruptcy. And we've got several arguments on that, Your Honor, but what was presented to Your Honor in our initial motion was that it would greatly assist the bankruptcy. It was assist the estate in making sure that they are not claims out here that still can be made and it

would assist of course property damage claimants who may not have gotten notice. It would greatly assist the bankruptcy because we believe, we asserted we think we have shown at least from a prima facie standpoint and certainly we'd be prepared to do so that despite all the work and all the effort that went into the bar date order which I appreciate and I'm not here today to criticize the bar date order, I'm here to criticize W. R. Grace for not providing certain information and for not doing certain things. But despite everything the Court did and despite the 4 million dollars or whatever that was spent on there, there's a gap there. There is a gap because Grace did not notify people that it had knowledge of that had its asbestos containing products in their buildings.

The law -- I've read -- as you know we've been briefing this week while I've been -- I'm going through the best I could in my condition trying to get ready for the objections as well. But to the extent that I've been able to concentrate on the law, I don't think we're that far apart on the law. The cases clearly suggest that if you can give actual notice it's preferred, actual notice to constructive notice. So that in addition to the construction notice program which Your Honor approved, the actual notice should be given to those and Grace says to those people who are reasonably ascertainable from their own records.

Well again we get to the final argument on this. I

may question some semi-colons and about some of their standards, but I'll live with that standard for today for the purpose of my saying we need to develop that record. Because, Your Honor, I think Grace simply saying that they did certain things or had no records, or Grace simply saying that we gave notices in their brief to 200,000 claimants suggesting they gave all this actual notice, number one saying it's so doesn't make it so and number two, I don't believe it is so. I do not believe that Grace gave actual notice to a large number of claimants where it had records that Grace's product went in their buildings.

And I assert the minute they took this position, I don't say the minute, within a short time after they took their position in response to our brief, I served discovery on Grace. I served it on several issues, but this is the issue Your Honor focused on at the last hearing concerning I want to question a 30(b)(6) the person who knows all about that. I've seen invoices. I have copies with me. If Your Honor wants to see them which have specific street addresses on them, specific post office boxes on them, where their product was shipped to specific buildings. I have seen advertisements of Grace, internal documents -- by the way both the invoices and these were supplied to me by Grace over the years in Anderson discovery and in other cases. They're Grace's documents. I have seen other data compilations by Grace salesmen back during

the time that identify where material was shipped including identifying salesmen and sales houses were material was shipped. And that alone to me suggest at least we ought to have a factual record of what they did with respect to these.

In addition, I'm going to have to be convinced by solid testimony that Grace does not have a data bank which contains a lot of this info. I think Grace was first sued, if I'm not mistaken, by Mr. Dies in 1982 in the Evendale case. And it was involved in a number of property damage cases from 1982 until the bankruptcy including a number of class actions. It obviously wants to know when somebody brings a personal injury lawsuit against them and says I have mesothelioma and I remember working in the First National Bank building in Little Rock, Arkansas. Well it just seems self evident to me in managing a major company and managing the asbestos liabilities that somebody within the W. R. Grace framework would be able to look up on a spreadsheet or something and say was monocoat used in the First National Bank building in Little Rock, Arkansas, else we've got a defense here and there was no exposure to Grace's product.

So the combination of the PD litigation and the personal injury litigation which came a little later than '82 I think, that that combination leads me to believe that they have a lot of information about where their product went. And if they had that information, the question is, did they do

something to give actual notice to these people and if not, why not. Well we've got to have testimony on that. We've got to know, you know, what would have been required.

I do know this. This is the smallest of all examples I could give to you and I just thought about it and I had somebody send it to me electronically today. I have in my hands and invoice for Buyers Machine Company, Post Office Box 464 in Lauren, South Carolina, 30 bags of monocoat, March 23, 1973, after the announcement that the product was going to be banned but within the 90-day period before it was actually banned or the spray application was banned. Now Buyers is one of those claims which you struck subject to their being a class action protecting them. It's a South Carolina building. I had not contact with Buyers before the bankruptcy or until midway during this war with Kirkland and Ellis. I believe honestly that I had authority to file a claim on behalf of Buyers because the judge in South Carolina said I was the class representative, certified class on behalf of South Carolina building owners.

Now to my knowledge W. R. Grace did not give notice to Buyers. If it did, it'll make me wrong and I'll be embarrassed and I'll ask them about 3,000 more. But I do know this. I do know that Buyers is readily ascertainable because when Kirkland and Ellis decided to proceed against Speights and Runyon in June of last year, they served Buyers with a subpoena

to question their form, to question the authority. They knew exactly how to find them. They had not problem whatsoever in serving Buyers with a subpoena. I spoke with the lawyer who represents Buyers. I didn't know him beforehand but he and I we went to the same school.

THE COURT: Well there was a claim filed.

MR. SPEIGHTS: Pardon me?

THE COURT: I mean there's a -- they contacted Buyers after the claim was filed to find out whether there was authority to file the claim and the proof of claim has the address on it.

MR. SPEIGHTS: The proof of claim had the same address.

THE COURT: Right, that's what I mean. They got it from the proof of claim.

MR. SPEIGHTS: Right. But my point, Your Honor, is this is their document. This is -- the proof of claim attached a Grace document, the invoice with the address. And the question is whether there was --

THE COURT: But this is an address from 1983. Number one, the building may not be there. Number two, the owner may not be the same. The building itself is clearly not a claimant. Now Buyers Machine Company may be. But the fact that the debtor has a record that's 23 years old doesn't mean, I think, that the person who owned the building 23 years ago is

still a creditor in the case. That's the whole purpose of constructive notice and a widespread dissemination of constructive notice so that current claimants that the debtor doesn't know about get notice and can come forward.

MR. SPEIGHTS: But Your Honor, my point is this. I don't suggest to you that if they sent a notice to everyone of these people where they have the names and addresses that every one of them will get the notice. What I suggest to you they've got a large number, and I haven't moved beyond invoices yet, they have a large number of addresses where material is that they never attempted to give notice to. It would not have done -- it would have cost them 32 cents --

THE COURT: Material in 1983 --

MR. SPEIGHTS: Pardon me, Your Honor.

THE COURT: Where material was in 1983, not where it is. I mean how would that -- how would the debtor know whether -- even if it -- let me just do a hypothetical. Let me assume for the moment that the debtor knew that there was in 1983 asbestos not just delivered to but installed in that building. Okay. There's no way that the debtor would know currently whether that asbestos -- whether the building is still there, who owns it, whether the asbestos was ever put into the building at all or whether it's still there. That's -- that's the whole purpose of a constructive notice program.

MR. SPEIGHTS: Your Honor, I believe the constructive

notice is to -- is to do the best we can where we don't -- where we can't give actual notice.

THE COURT: Well I agree with that. But I'm not sure that you can give actual notice to a current building owner just because you knew that a certain set of facts existed 23 years ago.

MR. SPEIGHTS: What you're saying, Your Honor, is without any discovery yet about what all was available to it. My point is we need a factual record because I believe we will show that Grace has -- I started out with the easiest example, an invoice, Grace has information within its records about where its product was placed. It's got -- it's got material -- it's got photographs where the material was applied in its depository. It's got advertisements where its product was applied. It's got correspondence with building owners about what to do about the product in its buildings. It's got certainly information from the BI litigation about where people were exposed and when and may well have that somehow reduced to some data format which is quickly available.

I think we owe it for the purposes of fair consideration of this issue to have a factual record to see what is there and what isn't there so that at the end of the day Your Honor may say, well I don't think the invoice is enough but I think that might be enough, et cetera, et cetera. Otherwise you're saying even if Grace -- theoretically even if

Grace knows that two blocks from its headquarters in Columbia there's monocoat in that building and it walks through that building to go to meetings. It knows it as certain as anything in life. Okay. It has no obligation to give actual notice to that building owner. And I just don't think that complies with any of the cases, theirs or ours, that we've cited to it.

At some point Grace has an obligation to inform people of its right to file a claim in this bankruptcy where it knows its product is there and they have a claim. And you might disagree with where that point is, but if it's any point I'm entitled to discovery to develop the factual record.

THE COURT: I think that even if there is constructive notice to the filing of a bankruptcy, the law in this Circuit is very clear, that that puts the burden on the claimant to file a proof of claim. So whether Grace gave them actual notice of the proof of claim form or not, the issue is did the claimant know that there was reason to know that Grace had a bankruptcy and to file a claim. So I really don't think this issue's going to go too far because that trial of that issue, the actual notice versus constructive notice really is based on whether or not the building owner knew that Grace was in bankruptcy and therefore had an obligation to file a claim whether Grace gave it actual notice or not.

MR. SPEIGHTS: And I understand that, Your Honor. But I think Your Honor would agree not all of the people with

Grace's product got actual notice of the bar date.

THE COURT: I don't know who has Grace's product or if any building has Grace's product in it.

MR. SPEIGHTS: So the best --

THE COURT: I don't know that --

MR. SPEIGHTS: But the best constructive notice devised by human kind has never gotten it disseminated to every single person who would be affected.

THE COURT: Of course not, neither has actual notice as far as I know.

MR. SPEIGHTS: Right. So there is a gap here. I happen to think it's a large gap. I think that, for instance, you talk to Buyers, I personally live in South Carolina and personally interested in this subject and I personally do not recall reading anything about the bar notice in South Carolina. Obviously I knew about it because I'm actively involved in this case and I filed a number of claims and everything else. I don't know -- and I'm not being critical, I'm not sure what South Carolina newspapers carried a Wall Street --

THE COURT: Well look, with respect to the notice program, that was vetted ad nauseam in this Court before an order was finally signed. The order that was originally signed required some additional information to come in from counsel whose claim holders would be filing claims. At the request of the Committee and with notice to not just the Committee members

but everybody else, I entered an order that said that counsel of record for those claimants did not have to produce information as to whether they had personally served their own clients with that information.

Now you're saying in this instance that you just gave me that you hadn't talked to Buyers before the proof of claim bar date. So I don't know whether Buyers had counsel of record or didn't have counsel of record. And at the request of the Committee with knowledge of the Committee members and everybody else because the service list is quite extensive on this order which was not appealed that counsel for those claimants have prevented the debtor from knowing whether there was actual notice served by attorneys who were ordered to make that service or not. Now you can't have it both ways, Mr. Speights.

MR. SPEIGHTS: Your Honor, respectfully, I think it's Grace trying to have it both ways. Your Honor has ruled that I had no authority to file these claims.

THE COURT: Some of the claims, that's right.

MR. SPEIGHTS: Right. And that's the group I'm talking about such as Buyers.

THE COURT: Well --

MR. SPEIGHTS: Grace had said, made the motion, you agreed I had no authority to file them, that I don't represent them.

THE COURT: All right.

MR. SPEIGHTS: So there's this large group that in this case it's been determined I couldn't file individual claims for.

THE COURT: But their claims were stricken. They didn't appeal. They didn't ask for reconsideration. They didn't have an attorney file a claim. They have all sorts of legal options available to them and they definitely got notice of the fact that an order went out that said that their claims are disallowed or stricken, whatever the -- or modified, whatever the appropriate order was, you know, given the particular facts in the case. They're not here.

MR. SPEIGHTS: Your Honor, I'm here because I filed the class action in 1992 and I'm here trying to convince Your Honor, and I realize that you're skeptical of my position to put it politely, I'm trying to convince Your Honor that Grace had some duty to give actual notice to some people.

THE COURT: I don't disagree with that.

MR. SPEIGHTS: And then the question is, can we just simply develop the facts of who they gave actual notice to, who they could have given actual notice to and who they did not give actual notice to.

THE COURT: Well I believe there is an affidavit of record that was filed by the noticing agent as to who was served. Now that's my recollection and again I apologize if I have this case confused with the others. But Ms. Browdy?

MS. BROWDY: I would have to chase that down. If my partner, Ms. Baer, is still on the line she might be able to address it. I think Mr. Speights' entire argument is wrong as a matter of law. But --

THE COURT: Well I'm not going there, Ms. Browdy.

MS. BROWDY: Okay.

THE COURT: You'll have a chance. All I want to know is the simple thing, is there an affidavit of record with respect to who was given actual notice by the noticing agent?

MS. BROWDY: And again I'd ask Ms. Baer.

MS. BAER: Your Honor, Janet Baer on behalf of the debtor. Yes, there is a certification of counsel in the record done by BMC who was our notice agent. It is, I believe, several hundred pages long.

THE COURT: So there is an affidavit -- thank you, Ms. Baer -- as to who was actually served.

MR. SPEIGHTS: And that's one of three things I said and I appreciate that and I would appreciate Ms. Baer sending me a copy of that and --

THE COURT: It's on the record. You can print it off of the CMECF system.

MR. SPEIGHTS: I understand it. But -- and again I think it's an issue of fact and I think that's a factual thing that we'll need -- excuse me -- be made part of the record by Grace.

THE COURT: It is part of the record. It's filed of record.

MR. SPEIGHTS: Well Your Honor, I'm not -- I need to go down this path, but I'm not sure that it's part of the record on the motion now that anything that's ever happened in the bankruptcy is part of the factual record for the motion being argued before you.

THE COURT: Well I can certainly take judicial notice of the fact that the certification is of record and it says what it says. If you want to put at issue that a particular person or entity on that service list wasn't served, you may do so. But otherwise there's a certification that indicates that they were served and as far as I'm concerned that's filed by counsel of record. I don't have any more reason to assume that it's false then I have reason to assume that you're filing false things, Mr. Speights.

MR. SPEIGHTS: And I'm not suggesting in the least. I'm just suggesting, Your Honor, that given that that's part of the record all I was saying is now my next question is, we have a record of what Grace has filed of who they served. Good. That's one of the things I said I wanted. We now have it. I'm not challenging counsel's credibility or integrity. I don't go there.

But my next question is, who could they have served that they didn't? What records did they have available, what

data did they have available, how easily could they have served other people with Grace's product? And that's the missing ingredient from this factual record. When we get that, you may say to me, Mr. Speights, I've looked at that, I think Grace's constructive notice is sufficient. They didn't have to write Buyers and they didn't have to write Jones Bank and they didn't have to do this and that. But I'm dealing now with a vacuum. I don't know what all they have. I've just got a great deal of suspicions and I want my facts so I can build my record. And Your Honor can agree or disagree with it, but this is a contested proceeding and I want to be able to show that.

THE COURT: But this proceeding is asking for class certification. If you're correct on the class certification motion, the class is going to get notice of the class certification. So what difference does it make? And if you're wrong on the class certification issues or I don't mean wrong, but if I decide not to certify a class, then in that sense the people who have had notice have the right to come in and file a claim based on the bar date. Those who say that they didn't get notice but find out about the bankruptcy later have an excusable neglect standard that they have to show under the Pioneer line of cases. The normal processes for filing proofs of claim apply. So I don't know where we're going with all this. Why am I going to have an evidentiary hearing to do -- to do something that seems to me to be -- well I'm not clear

what the point is.

MR. SPEIGHTS: Your Honor, we may or may not need an evidentiary hearing in the broad sense of calling people. But I do believe we need evidence. If you'll just take, Your Honor -- the best case they could find which is the Sacred Heart case, of all the cases in the world this is the best they could find. It's actually helpful to me in a number of ways especially it says that the South Carolina class should be recognized. But leaving that aside, this case and all the other cases suggest that one of the considerations is, "While we agree with movants that a class be proclaimed as an appropriate device in certain circumstances, we find that such circumstances are narrowly defined," and it goes on to say one of the issues is, why they would not certify here is, "There is no evidence that the debtor excluded or failed to provide proper notice to the putative class members." That's one of the issues. Did the debtor provide proper notice to the putative class members?

And I believe in deciding the certification issue under their first prong which says will it assist the bankruptcy that we need to find did they properly serve putative class members and not challenging the constructive notice program but challenging what they did not do which I say they should have done once I get the information from them. I'm not seeking 50 depositions or 10 tons of documents. I'm

seeking a 30(b)(6) deposition and documents in connection with who they could have given notice to, actual notice to, about their asbestos containing products being in buildings. And if I can come back before you in 30 days and say we now have the deposition of somebody, Mr. X, who says here's this readout and they could have for the cost of a stamp per building owner given actual notice to these people, I'm going to strongly argue that they should have done that. You might disagree, but at least that's the offer that I want to mk.

THE COURT: Okay. I understand what you want to do. I'm not sure it's going to be helpful, but I'll consider it in light of the rest of the arguments. So what else would you like me to focus on today?

MR. SPEIGHTS: Well, Your Honor, my understanding is that that was going to be the focus today, that's what you wanted to T up as a threshold matter as to whether -- what our basis was in going forward with discovery. Now before we also argue the merits of the motion, there are a couple of things that we have pending. First of all, they have attacked the South Carolina certification on the grounds that somehow it was a put-up job down South Carolina. I believe under the Sacred Heart case which says it may well be res judicata and if this class is certified beforehand you should normally recognize it plus your other comments about the South Carolina case. I would like to think that we could just accept the finding of

the South Carolina Court and be done with it. However --

THE COURT: The class -- I'm sorry. Would you just refresh my recollection? What class, the South Carolina state class was certified when?

MR. SPEIGHTS: It was certified several weeks before the bankruptcy, Your Honor.

THE COURT: All right.

MR. SPEIGHTS: And it was certified after years of contentious litigation. It was certified after an evidentiary hearing in September, the year before the bankruptcy. There was an extension -- in which live testimony was taken of a number of witnesses, number of distinguished witnesses on both sides. Grace got an extension to file one more brief until after the transcript was prepared. The transcript took months to prepare. Once the transcript was prepared, the Judge entered an order as to Grace certifying it. They somehow claim that it was -- and this is a judge who'd heard everything, okay, that somehow there was something wrong about it.

Well if Your Honor's inclined to go down that path to second guess the South Carolina judge of what went on, we have a motion to unseal the record. The Court in South Carolina -- actually it's to allow us to go South Carolina to ask the judge to unseal the record because after those contentious proceedings the South Carolina Court put the record under seal.

THE COURT: Excuse me. Mr. Speights, pardon me. I

have -- there are two very brief calls that I have to take today, but this is one of them. I shouldn't be more than five minutes.

MR. SPEIGHTS: Thank you, Your Honor.

(Recess)

THE COURT: Be seated. I'm sorry. I did call my husband while we were gone, and apparently I cannot handle the Coca-Cola matters, so I will have to transfer them to somebody else. And I will get a Judge for you promptly, but right now I don't know who that will be.

MS. BROWDY: Thank you, Your Honor.

THE COURT: So I think what I -- it would make it easier if I -- if the debtor could simply break out the Coca-Cola into a separate objection, and I don't care if you call it 15A or whatever, and then, Mr. -- and perhaps give me a list of all of the documents that refer to that objection, including Mr. Speights's response so that we don't have to have you refile anything except that -- the new objection and link all of the old documents to it so that whoever the new Judge is will just have a package.

MS. BROWDY: Thank you, Your Honor. We'll do that.

THE COURT: Okay. Thank you.

MR. SPEIGHTS: And, Your Honor, would it be appropriate to strike from the transcript of the record, at least put it in the seal or something, your comments about

those claims? That allows us (indiscernible) around the asbestos (indiscernible) and I don't know.

THE COURT: Well, I think I've already ordered that you can't use it for any purpose with respect to this -- whoever's going to sit on the case, so I don't know how to go about sealing a part of the transcript. I guess what I have to do, Mr. Speights, is have somebody order the transcript and then ask that the portions that refer specifically to Coca-Cola be put into a separate document that can then be sealed, I guess.

MS. BROWDY: But, Your Honor, the problem is, I mean, there are other things in the transcript from yesterday. The parties have already agreed not to use the Coca-Cola statements with respect to the Coca-Cola argument. We agreed on the record yesterday. There are other provisions in that transcript from yesterday that'll -- that we're going to need to look into, when are deadlines, what are page limitations, et cetera.

THE COURT: No, I said to have the transcript prepared in such a way that every -- all the references to the Coca-Cola things are excised into a separate document.

MS. BROWDY: Right, but our main concern would just be that that not slow down the process of getting the transcripts.

THE COURT: Well, I don't -- I don't know what

(indiscernible) slow down the process. I think, Mr. Speights, this would be the best. Perhaps let's get the transcript. Then if you can file something with me that delineates the pages that you would like excised from anything that's going to go to some other Court, although I don't think any other Court's going to look at this transcript anyway because why would they care, but --

MR. SPEIGHTS: I'm sort of our of my element. Maybe I'm -- maybe (indiscernible) has (indiscernible) idea how to do these things in bankruptcy --

MS. BROWDY: -- and --

MR. SCOTT: All you have to do is say on the record now (indiscernible) comments (indiscernible) --

THE COURT: Okay. All those -- I think I said that yesterday, to the extent that I have that conflict, that all of my comments are of no moment on this -- in this case because I'm not ruling. So, yes, my comments are, with respect to Coca-Cola, I guess are vacated. How's that? They're all vacated, and therefore they're of -- to be of no use. The parties have already agreed not to use them for any purpose. I don't -- I really don't know what more can be done at this point.

MR. SPEIGHTS: Well --

MS. BROWDY: Again, Your Honor, I think there's nothing else to be done on the transcript. Mr. Speights has

these claims. He's admitted that he doesn't have product identification. He knows it's a requirement. What he could just do is withdraw the claims, and that wastes everybody's time and money to go before another Court --

THE COURT: Well, look --

MS. BROWDY: -- if he's now willing to do it, we'll do it.

THE COURT: -- it doesn't matter -- Ms. Browdy, there's no point getting into this. I can't rule on it no matter what he does. So it seems to me that that issue will be addressed by some other Judge. My comments with respect to Coca-Cola, the questions I asked and the argument that took place, are all stricken. It's to be started over again. But I don't know how to excise it from the transcript and still have a transcript that will be meaningful for anybody's use, including yours in the future, because of the integration of the Coca-Cola arguments in various sections of the transcript. So they're stricken. They're to be of no use. Anybody who does attempt to use them for purposes of arguing with respect to this Coca-Cola issue in front of another Judge will be subject to contempt sanctions by this Court. That's the best I think I can do.

Okay. Mr. Speights, I apologize for the interruption. You were at -- you were going to file a motion, or you had filed a motion, to ask the South Carolina Court to

unseal the record?

MR. SPEIGHTS: Yes, Your Honor. You had asked me what is it I wanted to do because (indiscernible) my situation today is not here at the final hearing but trying to get a record so I can argue with a final record. And I did think of one thing over the break, if I can retrace about three steps, and that is the fact that I believe Grace served a number of Libby claimants by post office box address, so it's certainly -- and I think that's in our brief -- knows how to do that. And that was an appropriate way in that circumstance. I'm sure they will try to distinguish the situation.

Here's where I am today. And there's so many things I could argue and so many things I feel fervently about with respect to class action. But I'm really at this point with respect to the South Carolina class, a certified class prior to the bankruptcy, which Your Honor has commented on in the past, has been quite distinct from my wanting to get the rest of the world certified. Grace has the burden of proof to come in here and tell you why you should not honor that class action. In fact, I think it's entitled to full faith and credit. In fact, I think it's entitled to res judicata. In fact, I don't think they can go behind it. But if there is going to be argument on that in which they continue to make factual assertions, okay, or challenge me in any way on that I need to have the record that was made in South Carolina over days unsealed so I can

bring it and put it as part of this record. What happened there was the Court became concerned about certain statements which were made which turned out to be, according to the Court, not accurate, and it sealed the record. The Court sealed the record. And then Grace declared bankruptcy. And I think the Court will, presented with a short motion, quickly unseal the record. I'll be glad to serve breaks down there, however you do it, and not violate any stay if you want to lift the stay, and so I can at least say, Your Honor, everything they're saying about South Carolina is patently wrong and here's the record that proves it. And so South Carolina at least my certified class action lives when I struggle for it down there for almost ten years.

Now we have the rest of the world, and it -- and it -- Your Honor's going to recognize it. We don't need to go there with that discovery. With the rest of the world, Your Honor, we think we're entitled to certification regardless of whether or not they gave this notice. But I told you two hearings ago, I think, that I recognize that if I could not convince you of this I would have a more uphill fight to convince you to certify a class, and I did so because I think the cases recognize this is a strong factor in your favor if you show that people who are entitled to actual notice did not get served. And so we have a choice.

They make statements in their -- this is a statement

in their brief. It's before you now. This is the record I'm facing. There is absolutely no evidence that any creditors were not provided notice of the bar date in some form. Now maybe they mean constructive notice and maybe they mean actual notice. That's another one of those ambiguous sentences. They make the statement, this included mailing individualized notice packages to over 200,000 potential claimants or their counsel. Are they saying they gave 200,000 packages to asbestos property damage claimants? I don't know. I need -- first choice is I just need to pin this down with the record so we can come to grips with this one way or the other with a factual record and don't go arguing on an incomplete record and don't go to some Appellate Court with an incomplete record, whoever decides to go to the Appellate Court.

Of course, Your Honor, what I'm arguing for, however, is not only for my benefit. You know, we have two different issues here. Their interest is to give the minimum notice required for due process. That's what -- I mean, they want their bar date to survive. They want it to meet all due process so it can't be challenged and so the estate is protected. And that's a laudable goal. All right? And I'm a claimant in this estate -- my clients are, and we want the estate protected. So I join in that goal that we don't want this estate attacked down the road -- people who have claims who claim they did not give notice, and we believe this makes

the debtor vulnerable. So in that regard we're on the same page. I believe there is a threat to the estate if there's a large number of claimants who did not get notice.

But the other difference is that we're fiduciaries for people in or putative class, Anderson is. So in addition to providing whatever minimum due process might be required to give notice Anderson in addition wants to make sure that it fulfills its fiduciary duty by seeing that all people within its putative class who could have gotten actual notice did in fact get actual notice. And maybe I'm going in circles.

The bottom line is for the putative class at this point -- and I'm going to sit down because I'm not arguing merits yet, if we get to the merits I've got a lot to argue about, unless Your Honor wants me to address it -- at this point we either want a recognition that a class action would serve in the best interests of this estate because it would take care of (indiscernible) my view it a probability that people did not get actual notice or, which I don't think I'm going to get the first, simply to be able to show you in a factual record what I'm talking about, have it blown up, put it right down here, and for about 30 minutes show you, this is what they had, this is what they had, et cetera, et cetera, and do that. And once we have that we can argue the merits of this. And I might have other evidence as well (indiscernible) evidentiary hearing as well as that. That is fundamental

according to the cases in this area which have considered the question.

THE COURT: Ms. Browdy?

MS. BROWDY: thank you, Your Honor.

THE COURT: I'm sorry. Mr. Baena, is the Committee taking any position with respect to this?

MR. BAENA: -- no.

THE COURT: All right.

MS. BROWDY: Your Honor, I'm going to -- my I hand out one chart?

(Pause)

MS. BROWDY: Your Honor, may it please the Court, when Mr. Speights surfaced with his motion for class certification in October we were here for a hearing. And the debtors told the Court then that this motion was absolutely frivolous, that it was designed solely to delay the process of resolving Grace's Chapter 11, and it was thrown in as a stumbling block exactly as we were finally making progress on the property damage claims. And we argued, Your Honor, that Mr. Speights shouldn't even be permitted to file the motion for class certification. The Court disagreed and thought that there were a couple of legal issues to be addressed. There are legal issues. The parties have fully briefed those and I'm here prepared to address them, and we believe, again, based on the law this motion for class certification should be denied

and it should be denied today.

In order to understand these issues, though, first I want to talk just in terms of the time line of how we got here because I don't really think it's possible to understand the class certification motion in a vacuum without seeing how it fits into the big picture. And then after we walk through that I want to address three legal issues. One is the requirements of notice in the Third Circuit. Second is the issue of judicial estoppel in the Third Circuit. And last is how Bankruptcy Courts treat class actions. It's certainly not entitled to full faith and credit as Mr. Speights suggests. But let's start by walking through historically how we got here.

As the Court is well aware in 2001 and 2002 there was extensive briefing and hearings on the notice and bar date issues. And I note that Mr. Speights made a big point of saying, you know, the Anderson case started in 1992 and there's all this work was done up till 2000 and the like. So he was well aware of these issues as a member of the Property Damage Committee. This is not some surprise that just happened in 2005. Speights knew in 2001 and 2002 that there was full and detailed briefing and hearings on the issue of a notice and the bar date.

At one of the arguments on this issue, Your Honor, the Court stated -- and we cited this in or papers -- that

there will be no class proof of claims without this Court's permission in advance. I think it was actually stated twice on the record. It was during Mr. Baena's argument and Mr. Speights was present in the courtroom when that took place.

In April of 2002 the Court approved a four million dollar actual and constructive notice program. The Court expressly made the finding as required that the notice was adequate. Again, it was ordered after full briefing on this, after hearings. Two hundred thousand individual notices were provided and publication was given in dozens of journals. In fact, the question came up whether more notice should be given, for example, on television spots, and the Court said, no, there's plenty of notice here. There was the finding -- again, the April, 2002 order said notice was adequate.

As one of the provisions of the notice program the debtors asked for a requirement that the counsel for property damage claimants either certify to the Court that they had notified their clients or potential clients of claims or -- of te -- of the bar date, or that they give the debtors the address information. They didn't want to spend the time and money, give us the addresses and we'll notify them. And the Property Damage Committee came into court. Mr Baena argued it. Mr. Speights is part of that Committee, and this -- the Committee came in and asked the Court to abate that requirement. And again we cited that portions of that June

transcript in the brief that we filed on January 13th, and they said, don't make us do it. And again, we had asked that they either certify that they had notice -- notified their clients, potential clients, or give us the addresses. And they said, don't make us do it. They represented to the Court that it was unnecessary, and the Court in September of 2002 adapted the abatement request that the Property Damage Committee had made.

In March, 2003, Your Honor, at the bar date Speights did a number of things. He filed class proof of claims 9911 and 9914 for Anderson, South Carolina in state buildings or out of state buildings that -- one was for South Carolina, one for -- was for the others, in direct violation of the Court's admonition that there will be no proof of claims for a class without permission. He also then filed thousands of individual proofs of claims for individuals we later learned he didn't even represent, but he filed individual proof of claim forms. That meant he had the address information. Byers Machinery is an example. He had that address information. It's the exact kind of information the debtors had asked for to give notice, and the Property Damage Committee came in and said, don't make us give us that information, they don't need to give them actual notice. Again, this is what they got the Court to abate that requirement.

And in March of 2003 in addition to filing, again, nearly 3,000 proofs of claim, including these two class proofs

of claims, Mr. Speights never moved for class certification. It took us a while, Your Honor, to dig through the thousands of claims that we received in this bankruptcy. Remember, at the time Grace went into Chapter 11 there were only about seven property damage claims pending, and lo and behold 4,000 were filed. It turns out 3,000 of those, again, had been filed by Mr. Speights. And it took us, again, months of discovery, briefing and the like to find out that these 3,000 claims that Speights had filed he didn't have authority, they had false information --

THE COURT: Ms. Browdy, I am so tired of hearing this, for Pete's sake. The fact that you've repeated it for 18 times doesn't make it any more true than it was the first time. Please --

MS. BROWDY: Okay.

THE COURT: -- let's get to the merits of this.

MS. BROWDY: Okay. And then here's the merits. By October of 2005 2,300 hundred of his claims are gone. So he's no longer the big fish in this pond with 3,000 claims overwhelming everybody else. Twenty-three hundred claims of his are gone. The dynamic of the settlement process and the like is changing. He's again getting boxed out because so many of his claims are gone. And what does he then do? Two years after the bar date, four years after the notice issues, that's when he moves for class certification. It was prompted not by

any concern for these Anderson and Royal claimants, it's because, again, he wants to get leverage. That's the only reason this class proof of claim has been filed. And what's interesting is his motion for class certification -- and this is stunning -- he attaches as his Exhibit A, here's a thousand claimants that we think were not properly noticed. That's the root of his argument here. They're the exact list of claimants that he already filed proof of claims for and they're the exact people who are listed on his claim forms 9911 and 9914. These are not new names. This is what he had in his pocket. He had that since 2003. And I can hand this up to Your Honor.

(Pause)

MS. BROWDY: Your Honor, this is what Speights is complaining about. We went through everyone on his list attached as Exhibit A. They're contained on this -- on this handout. And we list the Anderson -- the claim number that was used for the individual filing in this case and we show you where it appears in 9911 or 9914. He hasn't found new stuff. He was sitting on this. This is the information he had back in 2003. He's now sought to get additional discovery with the Sam Anderson Memorial. He's tried to push over this hearing. And again, we think that as a matter of law this motion should be denied. And now I want to get into the legal issues.

First on the question of notice, which is what this Court had us brief most recently, this is -- the argument is

sketched out in our supplemental brief filed on January 13th, docket 11547. The Third Circuit recognizes there are two types of creditors, known and unknown. Known creditors get actual notice. Unknown creditors get constructive notice, publication notice. That's the Chemetron case, 72 F3d 341, the Third Circuit, 1995. So the question then becomes for these claimants on Exhibit A of Speights' motion are they known or are they unknown creditors?

Mr. Speights said, gee (indiscernible) could they have served but they didn't, how easily could it have done? I suspect that there are more people out there. I think they have a database. That's not the question. This is a question as a matter of law. And again, the cases are cited in our briefs. As a matter of law unknown creditors, unknown creditors, only get publication notice. And that shows, again, that -- the cases show we have no duty to go through all of our books and records and invoices and materials going back decades to give notice to every customer, supplier, vendor, et cetera, that we had 30 years ago. We only have to give it to known creditors. That's people with a claim and people who have given us notice of their intention to file a claim. And none of those people have done it. And Speights has had years and he comes up here, I suspect, I think, I think they have more. Where's his scrap of evidence that any of these people had a claim at the time or had notified Grace of a claim at the time?

That's the standard.

And again, it's a question of law. It's the issue this Court already addressed as part of this notice program briefing back in 2001 and 2002. We have to go back to known creditors, not to every customer we ever had, not to every invoice we ever had, not to every billing slip we ever had. That would be ridiculous. No Chapter 11 could ever move past the step one if every debtor had to go back and find every single slip of paper going back decades. And it's even more egregious, Your Honor, this contention of Mr. Speights, when you consider that property damage litigation went back to 1985. By 2001 there were seven claims pending. Again, we had never gotten intention from any of those individual claimants, any of these individual building owners listed on Exhibit A to say, I have a claim against you, I'm filing suit. Why didn't they file suit? Again, we had no obligation to do it. Speights's contention, gee, I think there's more, they could have done more, is completely frivolous. Where is the basis for his discovery? He can't get it because it's a legal issue. The Court doesn't need briefing on that. Again, the Court addressed the issue in 2001 and 2002.

Which then turn -- takes us again to the judicial estoppel argument. The Third Circuit reads judicial estoppel broadly, in fact more broadly than a lot of other places that I've had to litigate it. The Motley case, it's 196 F3d 160,

the Third Circuit, 1999, notes that judicial estoppel is there to preserve the integrity of the judicial system. It's to prevent parties from playing fast and loose with the Courts. They cannot take inconsistent positions, and the Courts should take a look and decide each case on its own individual facts.

Again, Your Honor, you go back to the abatement request. He had this list of addresses. This is exactly what we said. You want to give us additional information, people you think should have notice, we'll serve them. The PD Committee, of which Speights is a member, came and said, don't do it. He's judicially estopped now from turning around and saying our notice program wasn't adequate because it didn't give notice to people we said don't give notice to. We're not going to give you the information to give notice to. And the Court again doesn't even have to reach the issue because as a matter of law we had no obligation to give these people notice because they're not known creditors. They were -- received notice by the constructive notice program. But again, the Court has a second ground for denying the motion, which is judicial estoppel under Third Circuit law.

Now, Mr. Speights says, gee, I wasn't a party to that, it was the PD Committee. The Ryan case, which is cited in our opinion, shows you don't even need privity in the Third Circuit. The Ryan case is 81 F3rd 355, the Third Circuit, 1996. But he certainly can't stand up here as a member of that

Committee when the Committee proffered this position and then tried to come and turn it 180 degrees around. That's exactly what judicial estoppel is designed to prevent. He should no be permitted to go forward with this motion.

This gets us to the third and final legal argument, which is what does a Bankruptcy Court do when it gets a class proof of claim? The first thing, Your Honor, is it's obvious that it doesn't apply full faith and credit. If it was a full faith and credit analysis, Your Honor, you never would have the history leading up to the American Reserve decision. There wasn't -- there were -- there were questions for months if not years as to whether a Bankruptcy Court even could permit a class action to go forward. And if State Court class actions were entitled to full faith and credit you would never have had that line of cases leading up and following American Reserve because the question comes up again, can a Bankruptcy Court even permit class actions to go forward?

But as the American Reserve and other cases developed a couple of basic principles became clear, or I think that they were clear. They were spelled out in our brief. One thing is the Bankruptcy Court has discretion to figure out whether or not to permit a class action. And one of the key factors to consider is the effect on the progress of the bankruptcy. That's the American Reserve case and the In Re Zenith case. And it says, for example, these cases point out even if you had

a class certified outside of the bankruptcy it may not make sense for it to go forward in the context of the bankruptcy. The Court has discretion. You look at what is the effect on the bankruptcy process. And here I submit, Your Honor, where we had notice and bar date issues briefed four years ago. A four million dollar notice program has taken place. Thousands of claims were filed by March of 2003. We've now taken all these steps to get it down to a matter of hundreds of claims. We're in the midst of estimation. We're in the midst of our objection process. To go and now to open the door to change the issues, to change the notice that the Court has already addressed years ago, would impede. It would not advance the progress of the bankruptcy at this point, and that's again a key factor for this Court to consider.

A second issue that again becomes clear in the case law is the timeliness of the filing of the motion is a factor for the Court to consider. And again, we submit, Your Honor, when this was briefed and addressed in 2001 and 2002 and the Court said, you're going to have to get permission to file a class claim, that Speights went ahead and filed it without permission and then waited two years, actually more than two years, to try to bring the class claim. That's an important factor for this Court to consider. It's just not timely.

But the third point -- and again, this is spelled out in the opening brief that we filed on December 2nd -- is that

Courts have repeatedly rejected class actions in a bankruptcy where notice and the bar date had passed and the individuals have already been given an opportunity to file the claim. That's the Bicoastal decision, 133 BR at 255. That's the First Plus decision, 248 BR at 73. It would be inequitable to allow a class proof of claim to stand by giving a second bite at the apple to those who chose not to file. It's the In Re GAC case, 681 F2d 1295. And it's the Sacred Heart case that Mr. Speights cited to you, 177 BR 16 at 22, where the putative class had received actual or constructive notice denial of the class proof of claim device was deemed advisable. So repeatedly, case after case, where Bankruptcy Courts are given the opportunity to consider certifying a class after notice and a bar date have passed they turn it down.

And the last case I'd point out to Your Honor is one of the cases cited by the plaintiffs. It's In Re Charter, 826 F2d 866. It's an 11th Circuit case from 1989. And what's interesting in that Charter case, again, cited by Mr. Speights, that Charter distinguished the circumstances of that case from GAC because they noted that in GAC the bar date order entered by the Bankruptcy Court rejected class proof of claims and required individual proofs of claims and said that was within the Bankruptcy Court's discretion. The Bankruptcy Court has discretion not even to permit class proof claims. And, Your Honor, I submit that that's what this Court did in February of

2002 when they said, you're going to need permission before filing. So again, we think as a matter of law it's time to deny this motion. There's no basis for it.

And again, the question isn't, can we get discovery, who may have gotten notice, what other things were in your files, it's a legal standard. The legal standard has been set out by the Third Circuit, was there a known creditor? That was discussed at length in 2001 and 2002. It was briefed. It was argued. Speights hasn't come up with a single shred of evidence saying, here's a known creditor, someone who meets the standard under the Third Circuit, who didn't get notice.

This discovery request is a fishing expedition. The attempt to open up the Anderson Memorial case down in South Carolina is a fishing expedition. It's all designed to delay at the same time that Speights' claims are being thrown out by the hundreds and thousands.

THE COURT: All right. When was the class certified in South Carolina? Was it -- do you agree it was pre-petition?

MS. BROWDY: Your Honor, we briefed this as part of the Anderson Memorial issue. First of all, the out of state claimants in South Carolina, that class was never certified.

THE COURT: Right. I understand.

MS. BROWDY: Okay. For the South Carolina claimants Speights ran in in February and got an ex parte conditional class certification order. Again, it would have February,

2001. To the extent that there was a class certification decision it came out in July of 2001. It violated the bar date -- or the automatic stay as to Grace. So there was no cognizable class certified as to Grace ever in the Anderson Memorial class action. But to the -- to the extent that any class would be recognized in that case, again, it was certified in July of 2001. Again, we think that order was ultra vires as to Grace. And I believe that Mr. Speights has even conceded that it did not apply to Grace because we pointed out that by a letter that Mr. Speights introduced to this Court Speights drafted the order for the South Carolina Court, and he could not have done that in the Grace case. That would violate the automatic stay. He would be subject to sanctions if he had written that order to bar Grace -- to apply to Grace at the same time the automatic stay applied. We brief that issue, again, back in October. I can get those cases again if you need it.

THE COURT: No, I just am -- I want to make sure I understand the facts because Mr. Speights argued that it was certified pre-petition but my recollection was that the issue came up as to whether drafting an order for another Court to sign was in fact a violation of the stay. I don't think I ever had to get to that issue. But I thought that the order that came down specifically excluded Grace from the certification because the Court was concerned in -- the South Carolina Court

 was concerned that if it included Grace it would be in violation of the stay.

MS. BROWDY: Right. And again, there was a one-paragraph conditional ex parte class certification order entered in February. But the actual final class certification order, again, was entered in July of 2001, after the automatic stay. It had to carve out Grace, and again, if it didn't we would suggest that Mr. Speights is subject to sanctions for having drafted it in violation of the stay.

THE COURT: All right. Well, I don't know what the -- I don't recall if I saw it. I probably did. I just don't remember what this conditional order in February was. So can somebody get me a copy of that order, I want to see that, and then again, the July order?

MS. BROWDY: We can get that to Your Honor.

THE COURT: Mr. Speights?

MR. SPEIGHTS: Just on that one point, Your Honor, here's what happened. There was a conditional order ex parte when Grace announced it was thinking about bankruptcy. Before it filed bankruptcy there was a hearing in which Grace was represented by its national and local counsel. And after hearing fully with the parties the Court decided to continue that order. So it's not like I ran up to see the Judge, who's 200 miles from where I live, hand him a piece of paper and, what do you want, Mr. Speights? There's nothing to impugn the

integrity of this Judge, one of the best Judges that I

THE COURT: Well, an ex parte order getting a class certification after a trial's a pretty difficult thing to swallow, the other side, Mr. Speights.

MR. SPEIGHTS: I understand, and that's why I want to unseal that record, Your Honor, because it will show you that the Court had this extensive record already. Okay? And when we -- and it will show you that there was a basis for going to the Court ex parte with -- it's like a TRO in a child custody case, what am I going to do with the child pending a hearing? There was a hearing, before the bankruptcy, and the Court decided that it should certify the class, continue the certification as to Grace after being heard by everybody. And then a few weeks later the final order is entered as for everybody but Grace.

The word, conditional, I might say, Your Honor, has -- it's not -- it's not a term that I should be hesitant to use, or anybody else. All class actions are conditional. It's typically -- I think it's in the National Schools class action, which was upheld by the Third Circuit Court of Appeals. So that means nothing that it was conditional. I imagine the last order was conditional. My (indiscernible) was conditional.

So a Judge hears -- and again, that's another reason why we can unseal the record, and I think you will see what the Court had before it. And this thing about I draft the order,

 Grace drafts orders in the same sense. The Judge writes a lengthy letter, says, you got to type this, you have them type up, this is my order, and circulate it and everybody comment on it, and when everybody comments on it I'll put it in final form.

THE COURT: Yes, I'm not concerned about the fact that you drafted an order when a Court directs you to draft an order. It's still the Court's order, it's not your order, Mr. Speights. And whether you're the scrivener of it, you know, as it gets to the Judge or not, so that's not my concern. I want to understand the process and what happened pre-petition. So I would like to seethe orders that the Court entered, all of them, with respect to the class certification with respect to Grace. I don't care who drafted them. I do care that the Judge signed them. So I want --

MR. SPEIGHTS: And I'll be happy to supply those to Your Honor.

THE COURT: All right.

MR. SPEIGHTS: And I have them, and I will do so. Let me fall back to the -- to the sum of the rest of the argument. If I talk as fast as Ms. Browdy I couldn't go every point she made before two o'clock but I want to get to the essence of what I think we're here about today.

While on the one hand Grace talks about there are no factual disputes, we should rule today, Ms. Browdy makes

numerous factual assertions, including at one point there's not one scrap of evidence to show such and such. That's her language. Well, I just want to get this record straight. I'm like a broken record. I want to put some scraps of evidence into the record because throughout their brief, throughout their argument, they constantly say things that I sharply disagree with, including just a moment ago about the state of this record in South Carolina, suggesting that there was an ex parte order and then there was a bankruptcy, leaving out the critical middle step that there was a hearing in between the ex parte order in which Grace had a chance to argue the case in full. So again --

THE COURT: Is that the record that's sealed?

MR. SPEIGHTS: The -- I don't believe that portion is sealed. I can give you the orders. What's sealed is what the Judge had before him when he entered all those orders.

THE COURT: Okay. Well, at this point in time, frankly, I don't know that I need that. If there -- if there is a transcript that's not sealed of the hearing that took place after the ex parte order was entered and before the conditional continuation order, whatever that order was, I would like to see that transcript. If not then I'll take the orders. If it's under seal -- if the transcript's under seal I'll take the orders.

MR. SPEIGHTS: And I will get that to you, Your

Honor. And in addition, one more thing on facts. Somewhere throughout here they say this was done late, they waited three or four years, we didn't do anything about it, we were shocked to discover it, et cetera, et cetera. We have also served, I forgot to mention a moment ago, discovery which will show that Grace has been acutely aware of Anderson's claim throughout this bankruptcy from the very first when we believe we can show through this discovery that Grace successfully kept Anderson off the Committee by violating the South Carolina Court order, by violating the seal order and giving Mr. Perch, the U.S. Trustee, information that was under that seal order, and we got the record corrected before Mr. Perch and will add it to the Committee. So this is not contrary to the briefs and these naked assertions, this is not, we had no idea, Mr. Speights comes along four years later and files Anderson, we were shocked, et cetera, et cetera.

THE COURT: No, I don't think that's the point. I don't think there can be any dispute about the fact that Grace knows what Anderson's claims are as they were litigated in the South Carolina proceeding because it was there. The issue is whether or not the class proof of claim violates my order that said that before you file a class proof of claim you get authority. Whether it does violate that order or not at this point, frankly, is irrelevant. Whether it meets the standards for class certification is what I'm concerned about. And

here's the problem that I'm facing. There was a bar date, and for purposes of this discussion I'm just going to make an assumption, I'm not making findings, that the notice was appropriate because I made a finding earlier that the notice program was appropriate. So for purposes, again, as I'm saying, all I'm doing is making a hypothetical right now, assuming that the notice was appropriate for creditors then I have the whole panoply of property damage claims filed before me with the exception, of course, of the zonolite issues, which we haven't addressed yet. But but for the zonolite property damage issues we have all of the property damage claims that are ever going to be able to be filed because there was a bar date and it's gone. And frankly, at this point there just aren't enough of them that I can see that it requires a class. So that's where I'm coming from.

I don't see how a class is going to advance the cause of the bankruptcy at this point in time. The objection process is ongoing. To the extent that the Canadian litigation is going to take place somewhere, that's not a large number of claims and it can be done here, it can be done in Canada, it'll be done somewhere, and that's the bulk of the claims that are left. There are not that many claims left. I really just don't see the need for class certification in that sense.

To the extent that there are real live creditors, current creditors, who should have gotten actual notice but

didn't somehow get actual notice I think the answer to that is to give them actual notice and see if they file claims. I don't see why I need a class action for that purpose at this point.

To the extent that the creditors on claims 9911 and 9914 are the same creditors that you say are current claimants who didn't get notice, that was the whole purpose why the debtor wanted to get counsel to say who you had notified or to get -- when I say, you, I mean that in the plural sense -- who were notified or to get addresses so that the debtor could give actual notice. And the fact that the debtor's stymied in that effort because the Committee got an order that applies to all counsel and nobody appealed, so it's a final order, that says that that information doesn't have to be given to the debtor means, I think, that the debtor's done everything it could do. It came into court and argued against this order, and it lost because the Committee was persuasive and it applies to all counsel. And service list includes you, Mr. Speights, personally, not as a member of the Committee, and you didn't appeal it. So at this point in time I think, you know, you make your bed you lie in it.

Now, with respect to the actual notice issue I think we need to take a look at the certification that was filed by the claims agents -- oh, I'm sorry, the noticing agents to see who was served. Again, I apologize. This is going back too

many years and I wasn't the Judge originally assigned to this case so I'm not sure I even know this piece of information. The debtor's schedules, do the schedules list the current property damage claimants?

MS. BROWDY: I would ask if my partner, Ms. Baer, is still on the phone, because it was before I was involved as well.

MS. BAER: This is Janet Baer on behalf of the debtor. The debtor's schedules would have listed all of the pending property damage litigation, which is of course all of the people who would have been served, or their counsel, with the bar date material.

THE COURT: Okay. Do you know, Ms. Baer, whether they included the people who were putative class plaintiffs in the Anderson case, the South Carolina Anderson case?

MS. BAER: I can't say specifically. It's been too many years.

THE COURT: Okay. Can somebody check? Because if they in fact were served with actual notice, I don't know that the debtor even knew who all those plaintiffs were. I don't know the status of the South Carolina litigation. Were all of the putative class members identified in South Carolina?

MS. BAER: One thing -- one thing I can say, Your Honor, is we notified their counsel, Mr. Speights. That's what

our requirement would be.

THE COURT: Okay, yes, as the putative class counsel for the Anderson claims.

MR. SPEIGHTS: Actually it's certified class counsel for South Carolina.

THE COURT: Yes, for South Carolina. All right. So in fact they do have notice because you had notice and you represented them.

MR. SPEIGHTS: And I filed a class proof of claim.

THE COURT: Right, which I said you couldn't do, they needed to file -- until you got a motion approved.

MR. SPEIGHTS: Well, I'm ready to (indiscernible) there's a lot I need to address, Your Honor. I'm not sure where we are, but --

THE COURT: Well, I was trying to get to the question of whether or not I need some discovery with respect to the notice program. And at this point, frankly, I'm not convinced that I do. I think that issue maybe we should take a look at for February. You need to look at the certification, Mr. Speights, and see this list of 200,000 claimants and find out whether in fact these claimants were notified, and if they weren't why not when you were their counsel and could have notified them, I think is the issue. So --

MR. SPEIGHTS: Well, if we're going to deal with that in February I'm not going to prolong -- I understand where you

are -- I'm not going to prolong things now by hopefully effectively refuting everything Ms. Browdy said and by hopefully convincing you about a couple of things, especially about what Your Honor said at that previous hearing. I understand what your focus is. The focus is, it seems to me now, are we entitled to discovery or not? And just in fairness to me every now and then I like to fair to myself, Your Honor, when Ms. Browdy comes up and said, delay, delay, delay, I served this discovery in December. We'd already be finished with it. It's not something that's going to take a long time. They filed a motion for protective order, which they have every right to, and that's the way the game is played. And under the local rules I haven't been able to take that discovery. And I believe with the discovery already served, you know, provided they respond to it adequately, we would be in a position to argue the merits of every aspect of this, which is sort of like punching a balloon, when you punch one side of it another side pops out. But I want to get my arms around it and have it resolved.

THE COURT: Well, I agree with Ms. Browdy's statement with respect to the standard. The debtor is not required to go through every piece of paper in its possession to determine whether 30 years ago it shipped product to a place and therefore the entity who got it 30 years ago may still be the owner of a building who received the product and used it and

had some knowledge that there was a hazard. I think they do have an obligation to make a reasonable inquiry as to who the creditors of the estate are. And so to the extent that the issue, if this is the issue, is the list of creditors that were on the 9911 and 9914 proofs of claim, and whether or not they got actual notice, I think there can be a comparison between what the noticing agent did and what the creditors are. To the extent that you were served on their behalf, that's sufficient notice. You have an obligation to notify your clients that they have an obligation to do something as their counsel, and that's sufficient notice. That should have happened. So hopefully that's not going to become an issue as to whether counsel did or didn't notify their clients because otherwise I'm going to vacate this order that I entered several years ago and get those certifications filed. I don't know how else to address the issue as to whether actual notice was provided by the attorneys to their clients. So that's where I am.

MR. SPEIGHTS: And --

THE COURT: Either this order has to be vacated and we find out who was served. And if there wasn't service then I'll make the attorneys make the service.

MR. SPEIGHTS: And, Your Honor, as we sit here today I tell you that there's nothing in the record to suggest that Grace could not get on the computer and hit a button and print a list of addresses (indiscernible).

THE COURT: And there's nothing on the record at this moment to say that Grace didn't do that.

MR. SPEIGHTS: I know, and that's --

THE COURT: There were --

MR. SPEIGHTS: -- why I need the discovery.

THE COURT: -- there were representations, I believe by Mr. Bernick, before the notice program was put in place as to what effort the debtor was going to make to identify creditors, but I don't have a recollection specifically of what that was now. I do recall one of his charts, talking about some things like that, but I don't recall --

MR. SPEIGHTS: And that's what I want to challenge, and --

THE COURT: So go back and we'll --

MR. SPEIGHTS: -- in the most respectful way I want to challenge it in discovery. I just got -- this is an amazing world we live in where you can be up here arguing in Pittsburgh and get an e-mail from somebody out of state by your Blackberry, and -- but since we don't have the record, somebody has reported who has looked at the list Ms. Baer identified us for earlier, I think that's the list, of the 265 pages of PD names about 9,700 on the attachment, at least 200 pages of names are Libby or other Montana addresses sent to current occupant or current resident. The actual names are very small.

THE COURT: Well, with respect to Libby we addressed

that issue way back when, too. And I believe that -- I think I ordered the debtor to send notice to everybody who lived in Libby because I want to make sure that there was some universe of people. But, Mr. Speights, Libby is a whole different circumstance from having, you know, an isolated building somewhere outside Libby, Montana that has a Grace product in it or some other asbestos product in it. It's just not -- it's simply not the same kind of circumstance.

MR. SPEIGHTS: But whether it's apples and oranges or orange and tangerines, first of all, this long list is consumed by Libby -- I said, you know, we talk about now being a part of this record -- it's consumed by Libby. Secondly, it shows that when you want to give actual notice or the Court directs you to you can send it to a post office box (indiscernible) address --

THE COURT: I'm not sure that's actual notice. That may be constructive notice, too.

MR. SPEIGHTS: Well, and the other thing is buildings don't move. And we don't need to get it --

THE COURT: Buildings aren't claimants. Buildings are not claimants. They have no standing to raise a claim in a bankruptcy case. Sending a notice to a building is irrelevant. If they send a notice to, for example, I'll just pick a place, the U.S. Steel Building that has 60 some floors and 5,000 tenants in it, what kind of notice is that giving to anybody? It's not. It's not notice. It's better to put an ad in a

newspaper that's likely to be seen by at least half if not all of those 5,000 tenants in the building. The buildings are not claimants. And the fact that the debtor has some indication that it's product was shipped to a specific building is totally irrelevant with respect to giving notice to claimants.

MR. SPEIGHTS: Sell, Your Honor, let me just shut up since we're not going to finish today and say that hopefully you'll give -- allow us the discovery. I will send you the papers you requested dealing with the South Carolina certification. And whether you allow discovery or don't allow discovery when we appear before I will address all of those assertions that Ms. Browdy has made and try to convince you (indiscernible) timeliness on which Your Honor ruled in February of 2002, et cetera, et cetera, which, as I understand it, I don't need to address at this point.

THE COURT: All right. You may send me the -- I know somewhere I the docket, Mr. Speights, I've already seen those orders. It's just that at this point in time I really couldn't put my finger on them. If you could send them to me in paper copy and send Ms. Browdy a copy of what you send me, that would be sufficient. You don't have to -- unless electronically filing them is easier, I don't really care. But I just want an opportunity to take a look at those orders and --

MR. SPEIGHTS: And regardless --

THE COURT: -- if it's not sealed.

MR. SPEIGHTS: -- and regardless of the discovery issues relating to notice unsealing that file is a separate issue so that you would set -- I would ask you to think about -- consider the context in which those short orders were entered.

THE COURT: I'm sorry, would you say that again?

MR. SPEIGHTS: In addition to our discovery that we want about notice I would also urge you to consider unsealing the record in South Carolina so that when you consider the orders I'm going to send you, unless you say, oh, those are dispositive, okay, that at least you would have before you what Judge Hayes had before him when he signed these very short orders.

THE COURT: Okay. Well, I don't think I'm in a position to order some other Court to unseal a record.

MR. SPEIGHTS: Oh, we just want you to lift the stay so we can go ask the Judge to unseal the record.

THE COURT: Well, let me see the orders and the transcript of the one hearing that I think at this point is -- may be a bit more crucial to this issue than the whole trial at this point, just the transcript of the hearing between the ex parte and the second order that the Court issued, if it's not under seal. That's what I would like, those three orders and that transcript --

MR. SPEIGHTS: Thank you, Your Honor.

THE COURT: -- at this point.

MS. BROWDY: Your Honor, I mean, we were here today to argue the merits of the class certification. I understand you've heard argument, you want to look at these two additional orders and potentially a transcript from the Anderson. But Mr. Speights has made no basis for getting discovery. I mean, that was the whole point, and we -- when we started to flag this issue in October the Court wanted to examine the legal issues.

THE COURT: Well, the legal issue is whether, as I understand what Mr. Speights is arguing, is the fact that the case -- some of the cases indicate that to the extent that the debtor has done an appropriate notification program and the bar date has passed that there is very little basis for a class proof of claim. There may be in some circumstances other reasons to go into it, but for reasons such as face us on this record where the universe of claims is not that large and the known claimants are known, because everybody had notice, if the debtor did not give appropriate notice then the cases tend to say that a class proof of claim may be appropriate even though it may be a second bit at the apple. There are those cases that say you shouldn't get a second bit at the apple, but there seems to be a little bit of a disparity, depending on the facts and how the law is applies to the facts. He wants to get to the facts. His argument's going to be that the debtor didn't give appropriate notice.

MS. BROWDY: Your Honor, the Court's already made a finding that notice was adequate --

THE COURT: I gave -- I made a finding that the notice program was appropriate, that's right. The question is I think a very limited one, and that is, what did the debtor do to get that notice program approved, you know, what kind of investigation was made to get some indication of who the actual claimants are and to notify those actual claimants? I'm not convinced at this point that the debtor needed to do anything more than was done but the question is I don't really know what the debtor did to notify the actual claimants or to identify the actual claimants. I do recall some assertion by Mr. Bernick as to what was going to be done. I don't remember the details. It was just too long ago.

MS. BROWDY: That's why we're digging up that -- the list of notice from the earlier -- from the record that was referred to.

THE COURT: Well, the record that -- that notification -- I'm sorry, that certification of the notice that was provided should list everybody who got from the notice agent the package that the debtor sent out. So you're going to know the list of entities, either known claimants or their counsel, who got that package. The debtor's request way back when was to say, if we send the notice to the counsel we want an indication that in fact they sent it to their clients so

that we can say they got actual notice. They convinced me that they shouldn't have to do that because as a matter of ethics they have an obligation to notify their clients, and so I shouldn't have to make them file that certification. And I agree. They're officers of the court. If there's an order that says, you know, make sure that your clients are notified, they have to do it. Now they -- I agree with you, they can't come in and say, gee, there's no evidence of record because they asked me not to have the evidence put of record because they're officers of the court and I accepted that proposition, and now they want to say, well, the debtor didn't make notice.

You know, you can't have it both ways. So either I vacate this order that I entered back in September of 2002 and require the counsel who didn't want to certify to certify so that there is this record. That's going to be the first step before we go into any discovery with respect to the debtor. That will be step one because the debtor did make notice on several counsel, and to the extent that they had clients they had an obligation to notify them. The disparity may still be that there may be actual known creditors who weren't represented by counsel who were missed. But, you know, unless there are hundreds of them it's not going to make a difference. They got constructive notice. That's the whole purpose for constructive notice. So I'm not really sure where we're going, but the first step is to look at that certification. I may

request some information as to what the debtor did to find out who actual claimants were. And the next step before we go any further, if it's necessary, is going to be to vacate this order or to amend this order, whatever, and require the certification, because the counsel were notified, and to the extent they now want to say that there were creditors who were not notified then I want to find out whose fault it was.

MS. BROWDY: Thank you, Your Honor. Then the only question I -- we have for the Court, we have the omnibus hearing set for Monday. Two of the items on the agenda, one is our motion for protective order as to Mr. Speights' request for discovery, and the other is Speights' request to lift the stay in Anderson, to which we've objected. It strikes me that those should both come off of the agenda for Monday.

THE COURT: I think they should go on to the February calendar, Mr. Speights, to give you an opportunity to look at what I've already directed be done.

MR. SPEIGHTS: Thank you, Your Honor.

THE COURT: Okay. Put them on the February.

MS. BROWDY: Thank you, Your Honor.

THE COURT: Okay. Have -- is the argument for today finished with respect to this issue, class --

MS. BROWDY: As far as I know -- as far as I know --

MR. SPEIGHTS: I believe so, Your Honor.

THE COURT: Okay. Then I will take up again at the

February hearing whether some if any discovery is necessary, but as I indicated first I want everybody to look at the notice, the certification of the notice that was filed. I would like some recitation from the debtor. For February I will accept it from counsel as a proffer but I do want some representation as to what the debtor did to find out who the actual claimants were.

MR. SPEIGHTS: When is that due, Your Honor?

THE COURT: I'm just going to accept it by way of an oral representation at the February hearing.

MR. SPEIGHTS: At the hearing (indiscernible) get it in advance. I understand. I'm just making it clear.

THE COURT: Because I'm looking to see whether some additional discovery is going to be needed. And then if some additional discovery is needed before we do anything from the debtor we're going to revisit this order, because at that point in time I don't think you can have it both ways, so we'll find out who was served -- or who was notified from their own counsel so we do have a record as to not just the attorneys but the actual clients who were notified. So we'll address anything further than that at the February hearing.

Okay. I've given sort of my preliminary view with respect to the numerosity issue. I really am not convinced that this is that numerous a class but that may be dependent on this actual notice issue, so I'm reserving ruling on that.

With respect to advancing the bankruptcy, unless there is a numerosity issue I don't think it's going to advance the bankruptcy. And even if there is a notice problem I may rather refile -- or have the debtor reserve a bar date for those limited people who didn't get the notice and figure it out from there at this point, but again, that's an issue I'll hear from you on in February. Okay? Anything else for today? Okay. We're adjourned.

MS. BROWDY: Thank you, Your Honor.

THE COURT: Ms. Browdy, I didn't ask you how long it will take you to file that Coca-Cola line of things so that we can -- I can work to get that reassigned.

MS. BROWDY: We can surely get that on file next week, Your Honor, if that's okay.

THE COURT: Okay. That's fine. Sure. By like Friday of next week?

MS. BROWDY: That would be sure.

THE COURT: Okay.

MS. BROWDY: Thank you, Your Honor.

THE COURT: If you would, Ms. Browdy, when that's filed would you call Ms. Baker in Pittsburgh and let her know? Because I would like to take care -- since I have a conflict I would like to transfer that as soon as possible.

MS. BROWDY: Yes, Your Honor.

THE COURT: All right. Thank you.

(Hearing adjourned)

* * * * *

**CERTIFICATION**

I, BEATRICE A. CREAMER, court approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter.

/s/ Beatrice A. Creamer  
BEATRICE A. CREAMER  
J&J COURT TRANSCRIBERS, INC.

February 2, 2006  
Date

# TAB 2

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: | . | Chapter 11 |
| | . | |
| W.R. GRACE & CO., *et al.*, | . | Case No. 01-01139(JKF) |
| | . | Jointly Administered |
| Debtors. | . | |
| | . | Aug. 21, 2006 (1:55 p.m.) |
| | . | (Wilmington) |

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE JUDITH K. FITZGERALD
UNITED STATES BANKRUPTCY COURT JUDGE

Proceedings recorded by electronic sound recording; transcript produced by transcription service.

would go away, potentially, when Your Honor rules on the Anderson matter, and hopefully we're going down that road to have the hearing on the Anderson matter, and there's no prejudice by waiting until that ruling to deal with this issue.

THE COURT: Okay. I am going to take this one under advisement because I did read the briefs, but I'm going to go back and take a look at them again, so, I will give you a ruling promptly.

MR. BERNICK: I think that brings us to what may be the second to the last issue, which is the Anderson Memorial case, and - Oh, before we reach Anderson, Your Honor wanted us to, I guess, bring up and remind the Court under agenda item 7-B, Romanet iii, there was a stipulation of withdrawal and expungement of 194 Canadian property damage claims.

. THE COURT: Oh, yes, I am confused as to what I spent most of this morning or I guess earlier this afternoon on based on the withdrawal of the Canadian property damage claims. Are there still some left?

MR. BERNICK: Yes, there were something like 200 or thereabouts, 250, and then a whole bunch of them were withdrawn leaving, I believe, 97 claims that were not withdrawn and expunged, and it's those 97 claims that still presented the issue of the Canadian adjudication and that we'll now wrap into the property damage CMO, and Jen, if you

could just make sure to mark that down that we need to pick that up in the CMO.

THE COURT: What agenda number is the stipulation.

MR. BERNICK: The stipulation was 7-B, Romanet iii, and that related to the expungement of the ones that were withdrawn, and there's no action the Court has to take on that. It's simply a report to the Court. Just needs to sign the order, I guess.

MR. SPEIGHTS: Your Honor, since neither Mr. Bernick nor Ms. Baer were in Pittsburgh when that matter was heard, that was when Ms. Browdy and I were before you, and it was a product ID objection to all of those claims, and I suggested a compromise, and everybody agreed. Give me 60 days new product ID and I'll withdraw those without product ID, and Your Honor did that, and that's what that stipulation is all about.

THE COURT: Okay.

MR. SPEIGHTS: And then 97 of the product ID Canadian claims.

THE COURT: All right, one second. I will enter that order. I don't have it here.

UNIDENTIFIED SPEAKER: Your Honor, I have it.

THE COURT: All right, I'll take it then. Thank you. Okay, I did see the stipulation. I was just confused as to why I was going through the Canadian issue when the

claims were withdrawn. I didn't appreciate the fact that there was still some left. So all I need is the order, thank you. Okay, I've signed the order that approves the stipulation.

MR. BERNICK: Okay. With respect to Anderson Memorial, I think it probably gets divided into two parts at most. Maybe there's only one part, and I suppose it depends upon whether we get back into the reasons why Your Honor asked the questions that you did at the end of the last hearing.

THE COURT: What agenda are we on again?

MR. BERNICK: This is item number 8 on the agenda.

THE COURT: Eight.

MR. BERNICK: And Your Honor will recall that - or maybe you won't recall, but we're now going all the way back to a hearing that was held in January of this year. That was the class certification hearing, and there were arguments at that hearing about whether or not the class should be certified thereby permitting the actual prosecution of the class-wide proof of claim. Your Honor made a series of comments about the class certification motion at that time, but then posed a question to be answered, and the question was what had Grace actually done by way of giving notice, and you asked for a report on that. So, we are prepared to make a report on that factual issue. If that takes us back into

the matters that were then being heard and what the implications of that report are, then I'm prepared to address that. That is all the events leading up to the hearing and what happened in the hearing and kind of where we are on class, but I don't know that that is something that we need to take up today. I'm happy to do it. Happy to talk about class cert and what Your Honor said at that time about your own observations about class cert, so, we'll do it either way. We can either address the narrow issue and then the broader issue.

THE COURT: Let's start with the narrow issue.

MR. BERNICK: That's fine, then Ms. Baer is going to address the narrower issue.

MS. BAER: Your Honor, given the late hour, I will try to be brief. I do have a binder of all of the filed materials that relate to this. Pretty much everything is of record, but what I'll do is just summarize what occurred. Your Honor, as you might recall, when you entered the bar date order on April 22nd of '02, there were various sections as to what the debtor needed to do and who the debtor needed to give notice to. With respect to asbestos property damage claims, the order provided specifically that good and adequate and sufficient notice of the bar date and all the procedures and requirements was if the debtor served the bar date notice package upon all counsel of record for known

holders of asbestos property damage claims. Your Honor, if you also recall that order originally had some provisions that because Grace had indicated they did not have the address of asbestos property damage claimants, we'd be happy to serve the bar date packages on the claimants but we don't have the information. We'll serve their counsel and their counsel has a choice. They can either give us the addresses and then we'll serve their claimants, which in a couple of cases happened, or they can serve their own clients and certify to us that they did so. Later on, the Property Damage Committee came in and had you remove the requirement that they certify that they had given their clients notice. We did not give individual property damage claimants notice. We gave their counsel notice. Your Honor, when we filed our certification of counsel of who we gave notice to, in June of 2002, we filed 199,816 actual notice bar date packages that are certified in that notice. Your Honor, where did the information come from? When Grace filed Chapter 11 it had a database, and the database contained all of the names of various types of creditors listed on its schedules. The database was around 400,000 names. The service was only on 200,000 because we excepted from the database asbestos personal injury claimants and lawyers, mostly lawyers. Your Honor, the database that Grace used had just about everything on it you could think of: vendors, creditors, litigants, and

other lawsuits, co-defendants, environmental claimants and the like. When you look at the certification of counsel as to the 199,000 that were served, it breaks down as follows: 112,116 parties were served with just the non-asbestos property damage proof of claim. They were equity holders that may have an interest in the case. In addition, 177,911 parties were given actual notice. This was an actual notice, the listing of which is just over 53,000 pages. They were given the bar date notice materials and the non-asbestos proof of claim form. They were not given the asbestos property damage proof of claim form because these were vendors, customers, employees, environmental claimants, parties to non-asbestos litigation. The 9,709 parties listed on Exhibit 7 to the certification of counsel, which is 265 pages long, served the bar date notice package including the asbestos property damage proof of claim form. Your Honor, among those 9,700 people who received the property damage proof of claim form and notice package, were the 2002 list in this case, members of the various committees, all residents of Libby, Montana, which, Judge, you had ordered us to do, and all known personal injury and property damage lawyers. We did include, Your Honor, a lot of the, what we call the major personal injury lawyers in that service because we figured that they actually may have some clients who might also be interested in filing property damage claims. If you

examine the attachments to the certification, you will see that many of the usual suspects were served, most importantly, Mr. Speights was served. Mr. Dies was served. Ed Westbrook was served. Darrell Scott was served, Ness Notley, Perry Whites, Siber Pearlman, and I could go on. We served lawyers, Your Honor. The lawyers had the responsibility to serve their clients. We do not have their clients' names, we do not have their clients' addresses. Your Honor, subsequently, in March of 2003, Mr. Speights filed, as you know, over 3,000 property damage claims. Among those were 1,010 individual proofs of claim for the purported members of the Anderson Memorial class. He also at that time then filed the two class proofs of claim. When that authority was challenged with our thirteenth omnibus objection, Mr. Speights himself in his response indicated that of the 1,010 Anderson Memorial purported claimants, 62 of the individual claims he filed were for known people in the defined class. Two hundred and eighty-five of them were for putative class members where he had express authority either in this case or another case, it wasn't necessarily just the Grace case. Most importantly for the notice issue, Your Honor, 657 of the claims that he filed for putative class members did not respond to his request for express authorization and 396 were for buildings, not claimants, when he was unable to locate any person or entity who owned the

building. Your Honor, my point is that we served the lawyers. The lawyers had the responsibility to serve their clients. Mr. Speights filed these proofs of claim. He apparently made the attempts to contact his clients, and he himself had great difficulty with the information he had contacting over the majority of the people that he indicated were the Anderson Memorial putative claimants now I guess he thought we should have served. Your Honor, that is essentially what we did in the bar date notice program. Your Honor, the point and the whole debate with respect to serving counsel, they had the responsibility to serve their clients. It was they who insisted on it.

THE COURT: Yeah, they did insist on it, and the only reason I removed the requirement for the certification was because of the argument that they're officers of the court and they said they were going to do it, and they should do it, but at this point in time, maybe I need to go back and have them file the certifications because if in fact there is some in quote, "known creditor" out there and the attorney should have made service and didn't, I don't know that that's the debtor's problem but perhaps the attorneys may need to do something about it. So, Mr. Speights?

MR. SPEIGHTS: I'll come back to this point, but just so I won't forget it, Your Honor, it strikes me as the last two arguments have been contradictory about the debtor,

far be it for a lawyer to make a contradictory argument, but five minutes ago, Mr. Bernick was arguing that I had no authority to representing any of these people, and one minute a go Ms. Baer was arguing that these were my clients, and therefore, it was my obligation. I want to come back to that point, but there is a contradiction there which seems to me to be pretty obvious.

THE COURT: Then if you didn't represent them, then you had an obligation to get back to the debtor to say you've sent me a package for this number of people, and I don't represent them so, here are their addresses and go serve them.

MR. SPEIGHTS: They didn't do that, Your Honor. They didn't send me packages for all of these people, and therein lies the problem. Let me go back. For all of these putative class members, I don't believe they sent me packages. Let's go back to how we got started on this. First of all, I want to say up front, because I didn't make it clear before, that this is not an issue that somebody has filed a motion attacking the bar date order. This is not a matter in the context of class certification we have raised the issue that you have to do your publication notice again. This is an issue about whether a select group of PD claimants should have gotten and should now get direct notice or that select group of PD claimants who did not get direct notice

should be taken care of by the Anderson class. It all came up because Grace in its brief in opposition to the motion to certify acknowledged and correctly so acknowledged that one reason to certify a class action in Bankruptcy Court would assist the Bankruptcy Court in the development of a plan of reorganization. And there are many ways you can do that, but one of the ways would be that if there's some question about whether everybody got adequate notice, and if there was that legitimate question, then there would be the argument that if you certify Anderson and the resolution of Anderson will take care of that potential problem of a group of people who did not.

THE COURT: There shouldn't be a potential problem. If you have an obligation on behalf of the Anderson putative class to file proofs of claim on their behalf because of this ethics opinion, why don't you at least have the same obligation to notify them of the fact that there's a bar date and to make sure that they get the information concerning the bar date and the actual notice. I mean, the contradiction, I think, is you can't on the one hand tell me you have a fiduciary duty to go part way but not the whole way with respect to the notice issue.

MR. SPEIGHTS: Your Honor, maybe our disconnect is that even if we have a duty and even if we attempt to find these people, I don't think our duty to do that as putative

representative to file a class action and represent them in that way, eliminates their obligation to give notice to these people. They didn't want to give notice. Their position is, they didn't know who these people were. They were not reflected in their records, and they had to -

THE COURT: Right.

MR. SPEIGHTS: - and they would not have given notice.

THE COURT: Right.

MR. SPEIGHTS: Right, and I say, and I believe I can prove to Your Honor at the appropriate time, I believe that they did have records. I believe that there is a strong suggestion that they had the ability to directly notify these people, number one, much more so than I did, but even if it was the same, it would be directly from them to the people as a debtor. These are people I don't know. I hadn't met. Somebody should give them notice, and it could be both of us.

THE COURT: But you - Well, look, I don't know how the debtor, unless all of the individuals who are in this putative class have been identified somewhere, then I don't know how the debtor could know who the putative class is. Generally speaking, one reason that you may get certification of a class is because you don't know all of the members at the time that the class is certified, and this class wasn't even certified yet. So, how could the debtor possibly know

who all of the potential claimants in a class action that wasn't certified could be? The best person or people likely to know who those claimants are, are the lawyers who profess that they want to represent them in the event that there has been some action in which they too can give notice. If you don't know who they are, Mr. Speights, and the debtor doesn't know who they are, they're obviously not known creditors.

MR. SPEIGHTS: But, Your Honor, that's the point. I'm not conceding that the debtor does not know. I have -

THE COURT: Well, do you want to do discovery to see what the debtor -

MR. SPEIGHTS: That's the issue I'm heading for.

THE COURT: Okay.

MR. SPEIGHTS: I noticed a deposition a year ago, just a 30(b)(6) deposition to find out what they knew, and see whether they gave notice to these people, and we'll come back here, and you know, I've been here for four years and haven't taken a deposition.

THE COURT: The debtor is admitting that it did not give notice. It gave notice to the attorneys.

MR. SPEIGHTS: But what it didn't - what it has not told you is is what records they have. We now have the benefit of the opinion that came out the other day by Judge Buckwalder (phonetical) which rejects what Grace said was a limit of its obligation, which was to essentially just look

at my records.

THE COURT: No, I think it affirms that obligation.

MR. SPEIGHTS: I think that it has that obligation to do so, but it also - I mean the opinion speaks for itself. I like the language of that opinion, I can live with certainly for this matter. I think Grace - my deposition is simply this, Your Honor, that, and again, it's the only deposition I tried to take in this case since it was filed, is to get the 30(b)(6) of the person most knowledgeable about what records Grace had which would enable it to give direct notice to property damage building owners who have Grace's product in their buildings, and I believe Grace has a wealth of information more so than I do.

THE COURT: Well, they apparently got a certification that indicates that they had a database, that they went through the database, that they took out the entities with respect to the personal injury claims, and they pretty much served everybody else. Now, I mean, there's a certification. If I can accept the certification of counsel that they served their clients, I ought to be able to accept the certification of Grace's counsel that that's who they notified.

MR. SPEIGHTS: Your Honor, I'm not challenging Ms. Baer's certification as to what she believes; okay? She has a client. They know what documents they have. I don't know

that Ms. Baer knows. She's not the deponent. She's not the person with first-hand knowledge, but she certainly knows who she notified.

THE COURT: Well, I know but I think -

MR. SPEIGHTS: But for example -

THE COURT: - the bigger problem, Mr. Speights, I don't know how on the one hand you tell me you've got an ethical obligation to file a proof of claim on behalf of somebody and at the same time, don't have an obligation to notify them that there's a bar date that means that they have to file a proof of claim.

MR. SPEIGHTS: Your Honor, even if you say that's the case; okay? Even if you conclude that that's the case that I had - when I filed the proof of claim, they say they're not my client, and I didn't have to have authorization. So, I mean, it's a circular argument.

THE COURT: But that's because at the time that they made this service, you are of record as representing certain clients. When you filed the proof of claim without the authority, it then becomes clear that maybe you didn't have the authority to represent them, but the apparent authority was certainly there. That's the issue. So, if you didn't make service and didn't tell the debtor that you didn't make service, then how's the debtor to know who the people are who weren't served when the order told counsel to serve their

clients?

MR. SPEIGHTS: When the debtor served me with the order saying, you serve your own clients, I don't believe the debtor had any knowledge, based upon what they've said in court, that I was going to attempt to file claims on behalf of or contact members of this putative class. They were back on this song and dance at that time. There were only seven cases in America; okay? And therefore, they sent me a claim form for Anderson Memorial Hospital and they wanted to do the same for my California building. They didn't even know I represented the University of California and Cal State. That was not on their radar screen. But they knew -

THE COURT: But that's not the point. Go ahead.

MR. SPEIGHTS: What they though, when they made this decision not to serve building owners, not to serve people with their product -

THE COURT: They didn't make a decision not to serve building owners. They made a decision to serve building owners but in some instances they didn't have the identification of who the building owners were. They served people that they knew to be counsel for certain building owners, asked counsel either to make the service or to return the package to the debtor with the information as to who should be served and the debtor would do it. I mean, I don't know what more debtor can do.

MR. SPEIGHTS: That's what I'm trying to explain, Your Honor.

THE COURT: Okay.

MR. SPEIGHTS: Here are records of the debtor. This is an invoice of the debtor's, from their files.

THE COURT: The debtor doesn't have to go through 25 years worth of invoices, or I'm not sure how long Grace has been in existence. I'm sure for at least or close to a hundred years, probably not that far. They don't have to go back through a hundred years' worth of invoices to see what's been paid or not paid.

MR. SPEIGHTS: But, Your Honor, this is a - it's not a question of paid or not paid. This is an invoice showing that the monokote product is in the Dodge County Hospital in Eastman, Georgia. That's a building. That's where its product is. They have direct knowledge of that. It's in their files. It may be, I don't know until I take my deposition, it may be part of some data that's been computerized. There may be somebody, and it's hard for me to imagine that somebody doesn't know, where that product is placed. Not just for the property damage litigation in the world, but I would like to know if people are suing me for mesothelioma where my product was placed. We've got tons - not tons, we've got a lot Grace invoices with specific buildings where their product was placed.

THE COURT: Didn't we address this when I did the notice issue. I think this is something that I've heard argued a couple of years ago.

MR. BERNICK: If I just can be heard for a moment on some of what Mr. Speights has said . . . (microphone not recording).

MR. SPEIGHTS: May I finish this, Your Honor. There's not a moment with Mr. Bernick.

THE COURT: Yeah, finish, because, frankly, folks, I would like to get through the agenda, but I'm getting to the point where I'm getting tired too, and I'm sure all of you are, so I want this one wrapped up in ten minutes so we can get to number 4 and get finished tonight, by nine o'clock. We're out of here by nine o'clock. So, let's go, folks.

MR. SPEIGHTS: Your Honor, I have additional types of records. I've got letters from building owners with the monokote product directly to Grace identifying their buildings. I've got in addition to the - and I can have all these marked, but I'm not sure that you take evidence at this type of hearing, but -

THE COURT: Well, I'll take them if you want to submit them, but, frankly, I'm not sure that this is the time for an evidentiary hearing. If I need one, I probably need to schedule it, but I'm sure I addressed all of this in setting the bar date notice. This is old news. I've heard

this before.

MR. SPEIGHTS: Well, I don't know, Your Honor, because I didn't argue the bar date notice, but in addition to the invoices and the letters they have computer readouts with a great deal of information about where their product was sold, and then they go to -

THE COURT: But the placement of their product does not a claimant make. The building isn't a claimant in the case. So, who owns the building or whether the product was remediated or anything that may have happened since the date of sale does not mean that the debtor knows who the creditors in the case are.

MR. SPEIGHTS: I believe, Your Honor, that they have an obligation. If they know where their product is - Let's take the easiest example. I know that monokote fireproofing is in the DuPont Hotel. I don't think it is and I hope it's not because I stay there sometime, but if they know that monokote fireproofing is in the DuPont Hotel, I think they have an obligation to send the notice to the DuPont Hotel and that might be the crux of the problem. And in addition, Your Honor -

THE COURT: But if they do that, under most rules of service, the thing is either going to get bounced back or it's going to be rejected as improper service because it's not directed to the appropriate custodian or officer. Now,

you know, Mr. Speights, they can only do what's reasonable.

MR. SPEIGHTS: But they didn't do any of this, Your Honor.

THE COURT: But they did.

MR. SPEIGHTS: They gave it to a few lawyers. They were only seven cases filed at the time. They didn't go through any of that data, again without the discovery, I don't know how they made these decisions, but they tell me in their brief on the certification, Mr .Speights has no record. He can't show where we failed in any way. They go on and on and on about how I can't show. Well, I just want to establish a factual record at this point. Maybe the factual record will be such that I'll have to come to Your Honor and say, Frankly, Your Honor, this is what they did and I can't refute it. But I believe that and I believe in good faith that W.R. Grace has a record of where its product went and at least, even if Your Honor disagrees with me, let me make my factual record so that, you know, if we end up before Judge Burkholder, like the last people did, I can show this is what they should have done, Your Honor, and they didn't even attempt to do it, because to my knowledge of all these invoices and all these computer readouts, and all of these advertisements, which I didn't even discuss where their product is shown in buildings. To my knowledge they didn't attempt any way to give direct notice to these people, and I

think they should have, but in order to determine that, I'd like to know what records they actually had. If they've got a computer database, if they've got, you know, Mr. Fink is down in the first row, I wake up there, because he's been a Grace man for years. He might be a deponent, but he has that knowledge. I don't have that knowledge.

THE COURT: Well, I think there's still a disconnect between buildings, sending product to a place, and knowing who the creditors are.

MR. SPEIGHTS: But in some instances, Your Honor - you may draw that line, but in some instances they know who the building owner is or was. Some of the letters go into the 70s and 80s of who the building owners are, writing them. Dear Grace, I've got this asbestos in my building, what should I do about it, and Grace responds and they don't give notice to that creditor, and therein lies, I think, the crucial issue of which one deposition one day and we can come back before you, and we'll have a record and you can decide it, Your Honor. That's the only discovery I've sought other than asking, now here's a motion, I've asked you to lift the stay to get some South Carolina documents, but other than that, you know, we want to argue the certification issue.

THE COURT: Mr. Bernick.

MR. BERNICK: This is a - I've got three minutes, but I think that's all it will take. This is a frivolous

issue, Your Honor. We went through a process and the process was driven by legal rules. The process was to establish a bar date, and in connection with the bar date process, we had a notice program that was fully disclosed to the Court and to all parties, and the notice program was driven by actual notice and constructive notice by publication, and all we were required to do was to follow the rules that specified when you have to give actual notice and when you have to give constructive notice by publication. As Your Honor properly has observed, it is not required to give actual notice based upon invoices and analyses. You give actual notice when you actually have notice of the claim being made or the claim existing and being ripened and being assertable. Whatever the standard is, we briefed it before. So we segregated out the people who were going to get actual notice and the remainder were going to get constructive notice through publication. And we even went one step further, which is to say, We'll ask the lawyers to make inquiry, and that would really kind of come out of this population, that is people who would otherwise only get constructive notice. This matter was fully litigated. All the facts that Ms. Baer recited were all out there. The notice program was transparent. Ultimately the notice program was approved, it was approved as complying with the actual requirements of the law. The bar date was appealed, but the adequacy of the

notice program was not appealed. It's been decided in this case. It's final. That's it. There was no appeal. There was no issue with regard to the adequacy of the program. So, we now have - the lawyers had an obligation going forward under our program to make inquiry in order to supplement publication. They came in and said, No, they didn't want to have that obligation. Maybe they were going to go do it on their own, but they didn't want to have the obligation and in the face of that Your Honor said fine, we said fine. So what happened? The lawyers went forward and they made their contacts and they pounded the pavement and they went out and solicited after-the-fact authority. They went after everyone they could possible think of. They have yet to come forward to say that they actually found somebody who should have gotten actual notice. They have yet to say, Gee, you know, even after the fact we now know that there's somebody that Grace had notice of and should have given actual notice to. That's not even been demonstrated, and in fact, even if they could it would be 20/20 hindsight. It wouldn't even go to the adequacy of the program because the adequacy of the program is determined at the time. It's not determined with 20/20 hindsight. So, even today they don't have some huge population of people that they say should have gotten actual notice and didn't. They want to simply argue that way back then when the bar date program was established, we were

obliged to give actual notice to a bunch of people who are reflected on invoices or sites. That's just a revisiting of the argument that they could have made then. That day has passed. So, the reason I say it's frivolous is that they could have argued this at the time. He could have come in here with the invoices and the collections and made exactly the same argument. He would have been wrong but he could have made the argument. He didn't. So we went and did the program. So, now, about how the program should have been done differently and I want to conduct discovery, I just don't know what planet we're on. This is *res judicata*. It's been decided in this case, and the only reason he's coming in and doing that is he wants to sit there and bootstrap to his class. That's the only reason that we're here is that he now thinks that the only function that the class can serve is to cure inadequacies in a notice program that he never challenged for its adequacy. Your Honor, we would ask that - we made the report in the status report to the Court, but we think that the class certification motion was argued in January, was before the Court then. Your Honor actually went through an analysis of the - there's now a continuing distortion, kind of like, it's a ripple effect because they still want to pursue or he still wants to pursue the class certification, and all this is, is a back door consequence of the fact he still wants the class certified. It's not really

# TAB 3

STATE OF SOUTH CAROLINA )
COUNTY OF HAMPTON ) IN THE COURT OF COMMON PLEAS

Anderson Memorial Hospital, on behalf of itself and others similarly situated

Plaintiffs,

v.

W. R. Grace & Company; W.R. Grace & Company-Connecticut; United States Mineral Products Company; T&N, plc., formally Turner & Newall, PLC and Turner & Newall, LTD; United States Gypsum Company; Asbestos Products Manufacturing Corporation; Asbestospray Corporation; H&A Construction Company,

Defendants.

Civil Action No.92-CP-25-279

ORDER

FILED
FEB - 9 2001
CLERK OF COURT
HAMPTON COUNTY

Anderson Memorial Hospital has petitioned this Court for emergency relief which is based on the verified petition of counsel. I find under the circumstances such ex parte request is appropriate and not violative of the prohibition against ex parte communications. Based on the evidence and law presented to me at this time, I conditionally certify against W. R. Grace & Company and W.R. Grace & Company-Connecticut the class action requested in the Plaintiff's class certification motion. I further issue a Rule to Show Cause, returnable within three days from the date this order is served, for W. R. Grace & Company and W.R. Grace & Company-Connecticut to show cause why this conditional class certification should not remain in effect pending the Court's final order on Plaintiff's motion to certify.

**IT IS SO ORDERED.**

York, South Carolina
February 9, 2001

The Honorable John C. Hayes, III
Presiding Judge

FEB 2001
Received



# TAB 4

STATE OF SOUTH CAROLINA
COUNTY OF HAMPTON

IN THE COURT OF COMMON PLEAS

Anderson Memorial Hospital, on behalf of itself and all those similarly situated,

Plaintiff,

v.

W. R. Grace & Company, et al.

Defendants.

Case No. 92-CP-25-279

**ANDERSON MEMORIAL HOSPITAL'S REPLY TO GRACE'S RESPONSE TO FEBRUARY 9, 2000 CONDITIONAL ORDER**

\ shld be 2/9/01

**FILED UNDER SEAL**

Daniel A. Speights
C. Alan Runyan
Marion C. Fairey, Jr.
Robert N. Hill
SPEIGHTS & RUNYAN
200 Jackson Avenue East
Post Office Box 685
Hampton, SC 29924
(803) 943-4444

Hampton, South Carolina
March 5, 2001

STATE OF SOUTH CAROLINA )
) IN THE COURT OF COMMON PLEAS
COUNTY OF HAMPTON )

Anderson Memorial Hospital, on behalf of itself and all those similarly situated, ) Case No. 92-CP-25-279

Plaintiff,

v.

W. R. Grace & Company, et al.

Defendants.

**ANDERSON MEMORIAL HOSPITAL'S REPLY TO GRACE'S RESPONSE TO FEBRUARY 9, 2000 CONDITIONAL ORDER**

Grace professes that it wants class certification resolved on the merits, yet offers the Court no assurances that it will await a decision on the merits before arguably stripping the Court of jurisdiction under the automatic § 362 bankruptcy stay. These circumstances amply support the entry and maintenance of this Court's February 9, 2000 Order ("Conditional Order").

**I. Grace's Admissions and Undisputed Facts**

- Grace admits that *ex parte* orders are proper "where exigent circumstances clearly require that action be taken before there is time for a full hearing" [Grace Response at 8, citing Herring v. Retail Credit Co., 266 S.C. 455, 224 S.E.2d 663, 666 (1976)].
- It is undisputed that Grace announced on January 30, 2001 that it "may [be] force[d] to file for bankruptcy;" that it was "seriously consider[ing] bankruptcy; and that "[o]bviously, we would rather conclude this sooner rather than later . . ." [Verification at ¶ 6 and Exs. 1-3].
- It is undisputed that merely filing for bankruptcy arguably deprives this Court of jurisdiction over Grace - either to certify a class against Grace on the merits or even to determine if

exigent circumstances support an *ex parte* conditional order [Petition at 1-2, citing Ex parte Reichlyn, 310 S.C. 495, 427 S.E.2d 661, 663-664 (1993); Verification at ¶¶ 4, 6, citing Professor Ayer, Grace's bankruptcy expert].

- Grace does not claim that it lacked a full and fair opportunity to object to the Conditional Order or, given the hearing scheduled for March 9, 2001, that Grace will lack a full and fair opportunity to object to the Conditional Order [Grace Response].
- It is undisputed that Grace and its co-defendants enjoyed a two day evidentiary hearing to oppose class certification in which they presented expert witnesses; enjoyed additional time to file another round of opposition memoranda; and filed the last of it and its co-defendants' seven memoranda the day the Conditional Order was entered [Verification at ¶¶ 2-4, 7].
- It is undisputed that the Conditional Order will end by its own terms the moment the Court resolves Plaintiff's motion to certify on its merits [Conditional Order; Petition at 3]. With the filing of Plaintiff's final omnibus reply, certification on the merits is now decisional.
- Grace even now offers the Court no suggestion that Grace will await this Court's decision on the merits before triggering the § 362 bankruptcy stay.
- It is undisputed that the Petition was designed "to protect the rights of class members should Grace declare bankruptcy before the Court issues a final order" [Petition at 3].

## II. The *Ex Parte* Order is Perfectly Proper

This Court found unequivocally that, "under the circumstances such ex parte request is appropriate and not violative of the prohibition against ex parte communications" [Conditional Order]. While Grace boldly asserts that there is "no authority, procedurally or substantively," for this finding [Response at 1-2], Grace is plainly wrong. The finding is supported by Rule 23(d)(2), SCRCP, as well as exigent circumstances.

Rule 23(d)(2), SCRCP, grants this Court broad discretion to enter what it considers "appropriate" orders that impose "such terms and conditions as shall fairly and adequately protect the interest of the persons on whose behalf the action is brought or defended." Such orders, the rule continues, may be entered "at any time." Id. Grace barely mentions this provision, perhaps because it is an apparently unique grant of judicial authority to take broad measures designed to protect the class alleged.[1] Other rules, moreover, expressly provide for *ex parte* motions and orders. Rule 5, SCRCP (". . . every written motion, other than one which may be heard ex parte . . .."); Rule 77, SCRCP (". . . no hearing, other than one ex parte . . .shall be conducted outside the circuit . . ."). These rules combine to grant the Court authority to issue *ex parte* orders designed to "fairly and adequately protect" the class alleged.

Grace's "no authority" assertion also cannot be squared with Grace's later admission that *ex parte* orders are indeed proper "where exigent circumstances clearly require that action be taken before there is time for a full hearing." [Response at 8, citing Herring v. Retail Credit Co., 266 S.C. 455, 224 S.E.2d 663, 666 (1976)]. Herring is just one of many cases Grace could have cited. The courts have repeatedly held that exigent circumstances support *ex parte* orders. See Herring v. Credit Bureau of Columbia, 272 S.C. 368, 252 S.E.2d 123 (1979)("We have stated repeatedly that *ex parte* orders are reserved for those rare occasions where no adverse interest exists or where exigent circumstances dictated that action be taken prematurely."); McSwain v. Holmes, 269 S.C. 293, 237 S.E.2d 363, 366 (1977)(Justice Rhodes reiterated the Court's view that exigent circumstances support *ex parte* orders); Charest v.Charest, 329 S.C. 511, 495 S.E.2d 784, 787 (Ct.App. 1997)("*Ex*

[1]Neither the federal nor the Alabama courts that Grace cites has a provision as broad as Rule 23(d)(2), SCRCP. The Supreme Court has held that it is reversible error to apply federal restrictions unsupported by the plain terms of the South Carolina Rule. Littlefield v. South Carolina Forestry Commission, 37 S.C. 348, 523 S.E.2d 781 (1999).

*parte* orders are condemned by this Court **except** when justified by exigent circumstances"(emphasis added; citations omitted). Where exigent circumstances exist, post-order proceedings satisfy any due process notice concerns. See Herring, 224 S.E.2d at 666 ("In the latter instance [where exigent circumstances exist] a full hearing shall take place as soon as possible."); Myers v. Real Property at 1518 Holmes Street, 306 S.C. 232, 411 S.E.2d 209, 212 (1991)(post- seizure proceedings satisfy due process for *ex parte* asset seizures).

The exigent circumstances present are substantial and undisputed. Grace does not dispute its January 30, 2001 announcements, the adverse impact a prior bankruptcy filing will have on this Court's ability to certify a class against Grace on the merits, or even the adverse impact a prior bankruptcy filing would have had on this Court's ability to determine that exigent circumstances warranted an *ex parte* order to protect the class. Grace even now offers the Court no assurance that it will not immediately trigger the automatic § 362 bankruptcy stay if this Court vacates the Conditional Order "forthwith" before resolving the certification motion on the merits.

Grace instead dismisses as "absurd" Anderson's view that a noticed motion may itself have prompted a bankruptcy filing prior to the Court's consideration of these exigent circumstances. [Response at 6]. The idea is "absurd," Grace claims, because it made $1.62 billion in revenues last year. Id. But Grace offers no support for this figure, and the undisputed record Anderson presented in its verified petition reflects that Grace actually had a **$14.7 million net loss** last year [Verification at Ex. 1]; that Grace's stock price dropped from over $10.00 a share at the beginning of 2000 down to less than $2.00 a share today [Verification at Ex. 4]; that Grace's line of credit may run out this May [Verification at Exs. 1-3]; and that the Grace Chairman and CEO's bankruptcy pronouncements on January 30, 2001 followed what Grace wants the Court to believe was a banner year [Verification at Exs. 1-3]. While hindsight is always 20/20, this record evidence shows that a noticed motion may

indeed have tipped the scales in favor of bankruptcy - and that Grace may still trigger the automatic § 362 bankruptcy stay at any moment [Petition at 2, citing Ex parte Reichlyn, 310 S.C. 495, 427 S.E.2d 661, 663-664 (1993); Verification at ¶ 4, 6, citing Professor Ayer, Grace's bankruptcy expert].[2]

Grace's bankruptcy pronouncements, moreover, take this case far outside the realm of what Grace calls an "alleged" threat of bankruptcy which is a "possibility" for any company [Response at 15-17]. The threat of a Grace bankruptcy is not "alleged" but documented. The threat of a Grace bankruptcy is not a "possibility" but a likelihood. Again, the plummet in Grace's stock price and credit woes culminated in Grace's own announcement that it "may [be] force[d] to file for bankruptcy," was "seriously consider[ing]" bankruptcy, and would "[o]bviously" like to "conclude this sooner rather than later . . ." [Verification at Exs 1-3]. It is this unusual, if not unprecedented, advance warning that prompted Anderson to try "to protect the rights of class members should Grace declare bankruptcy before the Court issues its final order" [Petition at 3].

**III. The Temporary Order Should be Maintained**

*Ex parte* orders will be affirmed absent some showing of prejudice (or judicial partiality). Burgess v.Stern, 311 S.C. 326, 428 S.E.2d 880, 884 (1993); Stewart v.Floyd, 247 S.C. 437, 265 S.E.2d 254, 256 (1980)(Rhodes, J.). Despite two attempts, Grace has made no such showing.

Grace first tries to claim prejudice with the charge that the "intangible process of inertia" will prevent the Court from holding Anderson to its burden of proof on the merits [Response at 12]. There is no warrant for this charge. Anderson never attempted to shift the burden of proof on the

[2]The fact that this lawsuit is clearly on Grace's radar screen is shown by the fact that its former Executive Vice President and General Counsel, Robert Beber, who remains in charge of its asbestos litigation, not only has repeatedly tried to settle the case, but attended the two day evidentiary hearing. [Dies Affidavit (Speights Affidavit Tab II) at 11-12; Transcript (September 5-6, 2000)].

merits. Anderson was instead trying to "protect the rights of class members should Grace declare bankruptcy before the Court issues a final order[]" on the merits and, even more on point, the order expires once the Court . determines if Anderson has met its burden on the merits [Petition at 3; Conditional Order]. There is also no warrant for this charge against the Court. The Court's February 15, 2001 letter to Anderson and Grace clearly states that Anderson carries the burden of supporting the Conditional Order, much like the Court's April 10, 2000 order placed the burden on Anderson on the merits of certification.

Grace's last claim of prejudice is that the Court improperly granted Anderson a more favorable position in a bankruptcy proceeding [Response at 1-2, 4,7, 17]. This cannot be prejudicial, of course, unless and until Grace files for bankruptcy before the Conditional Order expires with the entry of the order on the merits. Grace holds the key to that lock and, if it waits, Anderson's position in any bankruptcy proceedings will be determined by this Court on the merits.

But Grace offers no assurances that it will await a decision on the merits. This is precisely why the Conditional Order is necessary. Absent such an order, Grace could file for bankruptcy and then try to pick the South Carolina building owners' individual proof of claims off one-by-one, or try to force Anderson to begin the entire certification process anew in a bankruptcy forum of Grace's choosing,[3] even if this Court later certifies a class against Grace's co-defendants on the merits (and would have certified a class against Grace on the merits absent the automatic § 362 bankruptcy stay). The order only grants the South Carolina building owners "the preferential class treatment **this Court** may determine they deserve" after entertaining the extensive class certification briefing and a two day evidentiary hearing [Verification, ¶¶ 2-4, 7-8].

---

[3]In bankruptcy, venue is generally determined by a corporation's principal place of business or where its principal assets are located 180 days prior to the bankruptcy filing. 28 U.S.C. § 1408.

Grace's charge of improper treatment is also belied by Grace's mutually exclusive charge that a bankruptcy court will not give this Court's Conditional Order any weight [Response at 5-6].[4] The Conditional Order expires once this Court resolves the merits. If the Conditional Order is ineffective in a bankruptcy filed before then, as Grace claims, Anderson fails to see how Grace can possibly be harmed.

Finally, Grace proffers no less restrictive means to protect the class or this Court's ability to grant these South Carolina building owners class treatment on the merits. Grace simply stands on its right to file for bankruptcy and thus strip the class of any protection this Court may determine its members deserve. As shown below, that is not, and cannot be, the law.

**IV. Grace's Case Citations Are Inapposite.**

Grace relies on foreign authority to threaten mandamus [Response at 11-15]. This authority is so off the mark that it is helpful for its distinctiveness.

First, Grace's threat of mandamus is legally flawed. The Alabama authority Grace relies on, for example, reflects that Alabama uses mandamus simply as a tool to review class certification orders that are not immediately appealable as a matter of right. See In Re: Citicorp Acceptance Co., 715 So.2d 199, 202 (Ala. 1997)("A petition for a writ of mandamus is the proper method for obtaining review of the certification of a class action."). While class certification orders are also not immediately appealable in this state, see Schein v. Lamar, 274 S.C. 329, 263 S.E.2d 383 (1980), the two states' mandamus practice differ dramatically. In this state, mandamus is designed to command

---

[4]Although Anderson will not be so bold as to predict an outcome, it believes that the Conditional Order is entitled to full faith and credit, and will vigorously defend the order in the bankruptcy court if need be. Unlike the situation presented in its single citation [Response at 6 n. 2], Grace has never claimed that it lacked anything other than a full and fair opportunity to contest the Conditional Order and has been granted a hearing to continue its opposition. As noted above, post-order hearings satisfy due process. See Herring, 224 S.E.2d at 666.

the performance of a ministerial act; it does not lie to either inquire into facts or adjudicate rights. Charleston School District v. Charleston Election Commission, 336 S.C. 174, 519 S.E.2d 567, 572-573 (1999). Grace is well aware of these unmentioned limits on mandamus from the Supreme Court's earlier denial of Grace's petition for an extraordinary writ. See Supreme Court Order, dated December 30, 1997 ("Petition for Extraordinary Writ is denied.").[5]

More importantly, all Grace's cases involve *ex parte* findings of fact and conclusions of law entered on the merits before discovery on certification was complete or, in some instances, before the complaint was even served. These "drive-by" certifications were apparently driven by the possibility that similar class actions subsequently filed in other courts would be certified first, and thus abate the pending action before the court could reach the merits. Basing a certification order on what it described as a "race to the courthouse" and "claim-jumping," the Alabama Supreme Court held, is insufficient to justify an *ex parte* certification. In Re: First National Bank of Jasper, 717 So.2d 342, 346-351(Ala. 1997). More significantly, the Alabama Supreme Court made a point to further hold that it was not laying down any per se rule and that other "compelling reasons" could justify a conditional *ex parte* certification. Id. at 347.

This Court's Conditional Order stands in sharp factual contrast to Grace's citations and is based on a compelling reason. The Conditional Order makes no findings of fact or conclusions of law on the merits, and actually expires once the Court does so in its "final order on the Plaintiff's motion to certify" [Conditional Order]. The Conditional Order also follows extensive briefing, a two-day evidentiary hearing in which Grace presented expert testimony, and yet another round of

[5] On a similar point, Grace claims that the record is insufficient for appellate review [Response at 13]. After seven opposition briefs and a two day evidentiary hearing, Grace cannot seriously claim that the record on the merits is deficient, and the record developed on the Conditional Order is based almost wholly on Grace's announcements and admissions.

opposition briefs [Verification at ¶¶ 2-4, 7]. Lastly, the Conditional Order is designed to protect the class should Grace trigger the automatic § 362 bankruptcy stay before the Court can reach the merits [Petition at 2-3; Verification at ¶ 8]. Again, Grace does not dispute that this Court may lose all jurisdiction over Grace the moment Grace files for bankruptcy and does not even pretend that it will await a decision on the merits before filing for bankruptcy [Petition at 1-2; Verification at ¶ 4].

## V. Conclusion

This Court has the power to issue an *ex parte* order to protect the class and properly protected the class pending resolution of class certification on the merits. Grace's only possible claim of prejudice from this protection is that Grace may now lack the ability to separately pick off the individual South Carolina property damage claims, or try to force Anderson to undergo the certification process all over again, should Grace unilaterally decide to file for bankruptcy before this Court resolves certification on the merits. That is not prejudice to Grace. That is prejudice to the class. The Conditional Order should remain in effect until it expires on its own terms.

Respectfully submitted,

Daniel A. Speights
C. Alan Runyan
Marion C. Fairey, Jr.
Robert N. Hill
SPEIGHTS & RUNYAN
200 Jackson Avenue East
Post Office Box 685
Hampton, SC 29924
(803) 943-4444

By: [signature]
ATTORNEYS FOR THE PLAINTIFF

Hampton, South Carolina
March 5, 2001

STATE OF SOUTH CAROLINA )
 )
COUNTY OF HAMPTON )

AFFIDAVIT OF SERVICE BY MAIL

Re: Anderson Memorial Hospital, etc. v. W.R. Grace & Company, et al. (Case No. 92-CP-25-279)

---

PERSONALLY APPEARED before me Rhonda L. Bowers, who being duly sworn, deposes and says: that she is employed in the office of Speights & Runyan, attorney for the Plaintiff in the above-referenced action; that she served the foregoing, under seal, **ANDERSON MEMORIAL HOSPITAL'S REPLY TO GRACE'S RESPONSE TO FEBRUARY 9, 2000 CONDITIONAL ORDER** this 5th day of March, 2001, by personally sending a copy of the same, Via UPS Next Day Air, addressed to the attorney(s) as indicated on the attached service list.

Rhonda L. Bowers
RHONDA L. BOWERS

SWORN TO before me this

5th day of March, 2001

Susan J. Murdaugh (L.S.)
Notary Public for South Carolina
My Commission Expires: June 6, 2005

SERVICE LIST

Re: Anderson Memorial Hospital, etc. v. W.R. Grace & Company, et al. (Case No. 92-CP-25-279)

T&N, plc, formerly Turner & Newall, PLC and Turner & Newall, Ltd.

Timothy W. Bouch, Esquire
LEE BOUCH AND CRAWFORD
134 Meeting Street, 4th Floor
Post Office Box 59
Charleston, SC 29401
843-937-8811
843-937-0606 (fax)

Charles Boulbol, Esquire
COBLENCE & WARNER
415 Madison Avenue, 17th Floor
New York, NY 10017
212-593-9058 (fax)

United States Gypsum Company

Steven W. Ouzts, Esquire
Timothy D. St. Clair, Esquire
TURNER PADGET GRAHAM & LANEY
1901 Main Street, 17th Floor
Post Office Box 1473
Columbia, SC 29202
803-254-2200
803-799-3957 (fax)

Raymond T. Cullen., Esquire
Joseph B.G. Fay, Esquire
MORGAN, LEWIS & BOCKIUS
1701 Market Street
Philadelphia, PA 19103
215-963-5000
215-963-5299 (fax)

U.S. Mineral Products Company

Bruce E. Miller, Esquire
MOORE & VAN ALLEN, PLLC
40 Calhoun Street, Suite 300 (29401-3535)
Post Office Box 22828
Charleston, SC 29413-2828
843-579-7033
803-579-7099 (fax)

Paul F. Slater, Esquire
DANAHAR TEDFORD LAGNESE & NEAL, P.C.
20 Exchange Place, 31st Floor
New York, NY 10005
212-269-7100
212-269-2976 (fax)

W.R. Grace & Company and W.R. Grace & Company-Connecticut

Donald A. Cockrill, Esquire
L. Gray Geddie, Jr., Esquire
Phillip A. Kilgore, Esquire
OGLETREE, DEAKINS, NASH, SMOAK STEWART
The Ogletree Building
300 North Main St., PO Box 2757
Greenville, SC 29602
864-271-1300
864-235-4754 (fax)

Allen S. Joslyn, Esquire
CAHILL GORDON & REINDEL
Eighty Pine Street
New York, NY 10005
212-701-3340
212-269-5420 (fax)

Asbestos Products Manufacturing Corporation
H&A Construction Corporation, formerly Spraycraft
Asbestospray Corporation

Linda Martin Barber, Esquire
Envision Claims Management
305 Madison Avenue
Morristown, NJ 07960
973-490-6000
973-490-6122 (fax)

# TAB 5



252

# State of South Carolina
# The Circuit Court of the Sixteenth Judicial Circuit

JOHN C. HAYES, III
JUDGE

MOSS JUSTICE CENTER, 2ND FLOOR
1675-1 N. YORK HIGHWAY
YORK, SOUTH CAROLINA 29745-7434
(803) 628-3047
FAX: (803) 628-3055

May 7, 2001

Mr. Daniel Speights, Esquire
SPEIGHTS & RUNYAN, P.A.
Post Office Box 685
Hampton, SC 29924

RE: Anderson Memorial Hospital
vs.
W. R. Grace & Company, et al.
C.A. #92-CP-25-279

Dear Dan:

Please draw an Order for my review granting Plaintiff's motion for class certification as requested. The Order should specifically state that the Order affects only the three remaining Defendants, due to the stay as to W. R. Grace. Please tailor the Order in conformity with Plaintiff's brief and reply brief. I believe the pertinent issues are dealt with fully and appropriately therein.

Since the remaining Defendants have withdrawn their arguments as to SPEIGHTS & RUNYAN's adequacy as class counsel, I prefer not to address the specific allegations raised. I do want to address the issue generally, since it was raised; lengthy testimony and briefs have addressed it, and I want it to be clear that I find absolutely no merit to the argument that SPEIGHTS & RUNYAN would not be adequate class counsel for the plaintiff class in this action. I could easily address and with specificity dismiss the grounds raised on this issue, as I had reached my conclusion on this issue prior to the Grace stay. My concerns in elaborating on this issue at this time are, one, it is moot as to the remaining defendants; second, since it would solely be an issue viable as to Grace, it, but for the stay, I am not sure but that my Order may run afoul of the stay if I make a finding and ruling pertaining solely to a Grace-raised issue. However, I do feel that I need to find affirmatively on the adequacy issue, since this is arguably a necessary prerequisite to a class action pursuant to Rule 23(a)(4), SCRCP.

First, I find the class is so numerous that joinder of all parties is impractical. Rule 23(a)(1), SCRCP. I base this finding on the potential number of class members. I do not find that the class members could not be individually identified and joined nor that the class may fluctuate to the extent that it would be impossible to individually join all class members (See Section I, Plaintiff's Omnibus Reply).
Second, I find there are questions of law and fact common to the class (Rule 23(a)(2), SCRCP (and is underlined to emphasize I find both even though the rule only requires a commonality of questions of law or fact). Plaintiff's arguments present an appropriate basis for inclusion in the Order in support of this finding. My review of the parties briefs and cited cases lead me to conclude that, as Plaintiff observed, "Typicality and commonality... tend to merge." I find that Plaintiff's arguments support both commonality under 23(a)(2) and typicality under 23(a)(3).

Third, as touched on above, I find Anderson's claim typical of the class claims (Rule 23(a)(3). Again, I like Plaintiff's treatment of this issue and the Order should be tailored on this issue to the Plaintiff's argument. I think the quote from Valentino in the Reply, citing Schools, at page 13 of the Reply is a ringing note on this issue. The effect of asbestos in different buildings would appear to the Court to be typically the same, while the effect on different people is rather diverse.

Fourth, skipping to Rule 23(a)(5), the amount in controversy as to each member of the class being in excess of one hundred dollars appears not to be in dispute. Common knowledge, let alone knowledge the undersigned has gained as a legislator, school boards attorney, city attorney, attorney and judge, is that asbestos removal and repair occasioned thereby require enormous expenditures by owners of affected buildings.

Fifth, Anderson's and its counsel's ability and commitment to fairly and adequately protect the class is clear. Anderson, throughout these proceedings has recognized its position in this matter and its duty as a class representative. Plaintiff's argument is an appropriate disposition of this issue as to Anderson.

As to SPEIGHTS & RUNYAN, the Order is to reflect that the Court is fully convinced of the firm's adequacy to prosecute Anderson's and the class's claims against the Defendants herein. As noted above, the Court is reluctant to in detail address the specific issues raised and pursued prior to Grace's bankruptcy. In brief, I find the overwhelming testimony of imminent members of the South Carolina Bar alone persuasive. Judge Sanders, Attorney Pope, and Professor Freeman are each personally known by the Court. Each's reputation and credibility are impeccable. Each's opinion is highly valued by the undersigned, and unlike the opinions presented by the witnesses for the defense, each opinion has a sound bottom. Each fully considered the allegations lodged against SPEIGHTS & RUNYAN. Each reviewed pertinent documentation issued and concerns in the context in which they arose. The witnesses testifying in opposition to counsel's adequacy did so with their guns not fully loaded and only half-cocked. The Court puts no credence on the assessments and

opinions of the Defense adequacy witnesses and finds them ill-equipped to help the Court to any degree on any issue they addressed. The record controverts all of these witnesses' attacks on SPEIGHTS & RUNYAN. The Order should, as to counsel's adequacy, follow in general its language addressing this issue as set forth herein and at pages 87-88 of Anderson's Reply.

Yours very truly,

John C. Hayes, III

JCH/pkb

cc: Timothy W. Bouch, Esquire
Steven W. Ouzts, Esquire
Bruce E. Miller, Esquire
Donald A. Cockrill, Esquire
Linda Martin Barber, Esquire

# TAB 6

STATE OF SOUTH CAROLINA )
) IN THE COURT OF COMMON PLEAS
COUNTY OF HAMPTON )

ANDERSON MEMORIAL HOSPITAL, on behalf of itself and others similarly situated,

Plaintiff,

v.

UNITED STATES GYPSUM COMPANY; UNITED STATES MINERAL PRODUCTS COMPANY; ASBESTOS PRODUCT MANUFACTURING CORPORATION; ASBESTOSPRAY CORPORATION; H&A CONSTRUCTION CORPORATION, formerly SPRAYCRAFT; T&N, plc, formerly TURNER & NEWALL, PLC and TURNER & NEWALL, LTD;

Defendants.

FILED
10:30am
JUL 05 2001
CLERK OF COURT
HAMPTON COUNTY

**ORDER**

Case No. 92-CP-25-279

This matter is before the Court on Plaintiff's Motion to Certify a class action. For the reasons set forth below, the motion is GRANTED.

## I. Procedural History

Plaintiff filed this asbestos property damage lawsuit on December 22, 1992, against the former manufacturers of asbestos-containing surfacing material ("ACSTM").[1] Although Plaintiff did not limit its putative class with geographic boundaries, the class was restricted to South Carolina buildings by Order of Judge William L. Howard, Sr., this Court's predecessor, interpreting South

[1]ACSTM is defined for the purpose of the certification of this class action as material that is sprayed, troweled-on or otherwise applied to surfaces, such as acoustical plaster, ceiling texture, fireproofing materials, attic insulation, and masonry fill.

Carolina's door closing statute to prohibit multi-state class actions. While reserving its right to appeal Judge Howard's ruling, Plaintiff moved this Court on January 2, 1998 to certify a South Carolina class action against essentially five Defendants then remaining in the case: W. R. Grace & Co. and W. R. Grace & Co.-Conn. ("Grace"); United States Gypsum Company ("USG"); United States Mineral Products Corporation ("USM"); T&N, plc, formerly Turner & Newall, PLC and Turner & Newall, LTD ("T&N"); and Asbestos Product Manufacturing Corporation, Asbestospray Corporation, and H & A construction Corporation ("Asbestospray").[2]

All Defendants except Asbestospray filed their March 3, 1998 consolidated response in which they objected to class certification on three grounds: (1) lack of numerosity; (2) lack of typicality; and (3) lack of adequate representation by Anderson Memorial Hospital ("Anderson") and its counsel, Speights & Runyan ("S&R"), particularly Daniel A. Speights.[3] Defendants based their numerosity and typicality objections on documents and affidavits of counsel, and their adequacy challenge on depositions, filings in other lawsuits, and an affidavit of Professor Geoffrey C. Hazard. Defendants requested an evidentiary hearing on the adequacy issues.

Plaintiff filed its reply on April 17, 1998, and also requested an evidentiary hearing. USG withdrew its support for all adequacy objections on September 19, 1998. Litigation of the adequacy challenge was then pursued by Grace, USM, and T&N, none of whom requested a meeting with

---

[2]By the time Plaintiff filed its Motion to Certify, three Defendants originally named were no longer in the case: Keene Corporation filed for bankruptcy in 1993; Judge Howard granted Dana Corporation's Motion for Summary Judgment in 1996 because Plaintiff had not proven that Dana was responsible in tort for ACSTM manufactured by Smith & Kanzler Company, and Plaintiff had not made a claim against Dana for contractual indemnification; and Plaintiff voluntarily dismissed USG Corporation (USG'S parent corporation) without prejudice in 1996.

[3]Although Asbestospray has never been dismissed from this action, its remaining insurers filed an interpleader action, and its counsel was relieved by Order of this Court on the condition that it would provide an agent upon whom notice of these proceedings could be served. The insurers chose not to participate in the certification battle.



Plaintiff's counsel, although one of them repeatedly tried to settle the case in the midst of its inadequacy attack. Anderson and S&R refused to discuss settlement until the attack on their adequacy was resolved.

On April 3, 2000 this Court conducted a pre-hearing conference. Plaintiff urged that Defendants should be required to proceed first at the evidentiary hearing so that it would have specific notice of their inadequacy objections, but the Court ruled that Plaintiff must proceed first because it had the burden of establishing the right to class certification. However, the Court directed the parties to exchange witness lists and submit pre-hearing memoranda outlining their respective positions. Grace, USM, and T&N filed their memorandum on May 3, 2000, which leveled ten inadequacy charges for the Court to decide.

On September 5-6, 2000, this Court conducted a two day evidentiary hearing on Grace, USM, and T&N's adequacy objections. Plaintiff introduced documents; depositions taken in this case; factual testimony of Mr. Speights, Professor John P. Freeman, and Thomas E. McCutchen; and factual affidavits of five lawyers and a newly appointed Federal Judge.[4] All of these witnesses had first hand knowledge of the events in question and, in the undersigned's opinion, refuted Grace, USM, and T&N's factual allegations against S&R. Plaintiff also presented expert testimony of Professor Freeman, Thomas H. Pope, III, and the former Chief Judge of the South Carolina Court of Appeals, Alex M. Sanders, all of whom testified unequivocally that S&R and Mr. Speights are

[4]In addition to an extensive affidavit of Mr. Speights, Plaintiff submitted the affidavits of now Judge Paul C. Huck of Miami, Florida; Martin W. Dies of Orange, Texas; Martin Greitzer of Philadelphia, Pennsylvania; Edward J. Westbrook of Charleston, South Carolina; and E. Robert Wright of Fresno, California.

adequate class counsel.[5]

Grace and USM presented their evidence during the second day of the hearing. T&N relied solely on its pleadings and attachments. As to their attack on S&R, although they did not present *any evidence* to refute Plaintiff's factual presentation, these Defendants called Professor Hazard and Professor John Ayer as expert witnesses,[6] both of whom expressed opinions based upon a number of factual *assumptions* which the undisputed record by then showed were simply wrong. Grace, USM, and T&N also called several of Plaintiff's present and former officers as adverse fact witnesses in support of their contention that Anderson somehow had abdicated its responsibilities as a class representative.

Although all the evidence had been presented by the close of the evidentiary hearing, and this Court was prepared to rule on the adequacy issues at that time, the Court granted Grace, USM, and T&N's request for one more opportunity to brief the issues after the transcription of the record. Thereafter, on February 8, 2001, these Defendants submitted their third and final comprehensive

---

[5]A number of the factual witnesses also attested to Mr. Speights adequacy. For example, Mr. Pope pointed to the affidavit of Mr. Wright, who is currently Assistant United States Attorney for the Eastern District of California, and, while serving in the Justice Department, was the principal author of the seminal report giving rise to the asbestos property damage litigation. Mr. Wright served for a number of years with asbestos lawyers from throughout the nation as a member of Plaintiff's executive committee in the certified class action on behalf of the nations's schools. In Re Asbestos School Litigation, 104 F.R.D. 422 (E.D. Pa. 1984), aff'd in part and vacated in part, 789 F.2d 996 (3d Cir. 1986), cert. denied, 479 U.S. 852, 915 ("Schools Class"). According to Mr. Wright, "If I owned a building that contained asbestos, my first choice among all the attorneys I dealt with in the Schools Class case to represent me, whether it were an individual building case, or a class action, would be Mr. Speights."

[6]Plaintiff objected to Professor Ayer's testimony on the ground that, despite the Court's April 14, 2000 pre-hearing scheduling Order, Grace, USM, and T&N first identified Professor Ayer as a possible witness only several days before the evidentiary hearing. Although Grace, USM, and T&N offered no explanation for this tardy disclosure, the Court took the testimony and reserved ruling on its admissibility. During his cross-examination, Professor Ayer revealed that he actually had been retained in this matter some three months earlier. Nevertheless, having found below that Professor Ayer's opinion in no way supports any finding of inadequacy, it is unnecessary for the Court to reach the question of whether his testimony should be stricken.

brief in which they continued to "strongly press" all but one of their adequacy charges.

The following day, Plaintiff filed an Emergency Rule to Show Cause why conditional class certification should not be granted as to Grace in light of evidence that Grace was about to file for bankruptcy. After carefully considering the Petition, this Court issued an Order granting conditional class certification as to Grace pending a show cause hearing. At the show cause hearing, the Court took the matter under advisement, but kept the conditional certification Order in place.

On March 30, 2001, Grace filed for bankruptcy which automatically stayed all further proceedings in this case against Grace. 11 U.S.C. § 362. Shortly after the Grace bankruptcy filing, USM and T&N withdrew their charges regarding S&R's adequacy to serve as class counsel, leaving only three objections to Anderson's adequacy as a class representative.[7] This abandonment occurred more than three years after USM and T&N first challenged S&R's adequacy and followed an enormous investment of time and energy on this issue by the parties and the Court, which substantially delayed resolution of the certification question.

## II. Class Certification

---

[7]While it is no longer necessary to specifically address in detail and reject each of the charges made against counsel, which the Court was prepared to do before USM and T&N's withdrawals, as discussed below, the Court finds that S&R and Mr. Speights are adequate class counsel under Rule 23(a)(5), SCRP. After having the issues exhaustively litigated before it, however, the Court does feel constrained to make several very brief observations. All of the charges arose out of Mr. Speights' involvement in four matters: the Schools Class; the Concordia-Central Wesleyan lawsuits; the Celotex bankruptcy; and the Ohio contempt proceeding. As to the Schools Class, the undisputed record is that the Court presiding over that action in which these Defendants were parties rejected Defendants' allegations in two Court Orders entered years ago. As to the Concordia-Central Wesleyan lawsuits, Defendants assertions were not only barren of any factual support, but were directly contradicted by Judge Blatt's statement of what was before him and the testimony of Professor Freeman, Mr. McCutchen, Mr. Westbrook, and Mr. Speights. As to the Celotex Bankruptcy, as discussed below, after the evidentiary hearing, the United States Court of Appeals for the Eleventh Circuit granted S&R a substantial contribution award in language which leaves no question about Mr. Speights' adequacy in that proceeding. In re: Celotex Corp., 227 F.3d 1336, 1340 (11th Cir.2000). As to the Ohio contempt proceeding, despite the repeated assertions by these Defendants and Professor Hazard, Defendants finally conceded five months after the evidentiary hearing what was plain in the contempt order: the Ohio Court did not find that Mr. Speights or any other S&R lawyer violated the preliminary injunction.



Plaintiff seeks to certify an opt-out class action on behalf of itself and a class of other South Carolina property owners whose buildings contain or previously contained ACSTM.[8] The class would include private residences, commercial buildings, county and municipal government buildings, and all other buildings in this state except for

> a) any public and private elementary and secondary school within the class action In re: Asbestos School Litigation, 104 F.R.D. 422 (E.D.Pa.1984), aff'd in part and vacated in part, 789 F.2d 996 (3d Cir.), cert. den'd, 479 U.S. 852 (1986); b) any public and private college and university within the class action Central Wesleyan College v. W. R. Grace & Co., et al., 143 F.R.D. 628 (D.S.C.1992), aff'd, 6 F.3d 177 (4th Cir.1993); c) any commercial building leased in any part to the United States government on or after May 30, 1986, within the class action Prince George Center, Inc. v. United States Gypsum Co., et al., CA No. 5388 (Philadelphia Common Pleas Court); d) any building owned by the State of South Carolina within the action The State of South Carolina v. W. R. Grace & Co., et al., CA No. 3:87-2879-0 (D.S.C.); or any building owned by the federal government. Second Amended Complaint ¶ 4.

As the proponent of class certification, it is Plaintiff's burden to make a *prima facie* showing that the five requirements of Rule 23(a), SCRCP have been met. Waller v. Seabrook Island Property Owners Asso., 300 S.C. 465, 388 S.E.2d 799, 801 (1990); Littlefield v. S. C. Forestry Commission, 370 S.C. 348, 523 S.E.2d 781 (1999). The Court finds that Plaintiff has met its burden as to each of these requirements.

**A. Impracticability of Joinder**

The Rule 23(a) requirement that "the class be so numerous that joinder of all members is impracticable" can be satisfied by the sheer number of potential class members. Stemmermann v. Lilienthal, 54 S.C. 440, 32 S.E. 535 (1899). Plaintiff need not show the exact number in the class, Evans v. U. S. Pipe and Foundry Co., 696 F.2d 925 (11th Cir.1983), or even that all members of the

[8] Opt-out means that class members will have a reasonable opportunity to exclude themselves from the class after Court-approved notice has been provided.

class can be readily identified. McGann v. Mungo, 287 S.C. 561, 340 S.E.2d 154 (Ct.App.1986); see also, Phillips v. Joint Legislative Comm., 637 F.2d 1014 (5th Cir.), cert. den'd, 456 U.S. 971 (1982).

Plaintiff has submitted records showing 1652 shipments of ACSTM into South Carolina. These shipments represent hundreds of thousands of bags of ACSTM sold within South Carolina.

Defendants argue that this Court should ignore the vast majority of Plaintiff's evidence and only consider those documents which conclusively establish that ACSTM manufactured by USG, USM, or T&N was actually installed in a specific, identifiable building within the definition of the class which has not been subject to a prior verdict or settlement. Subject to this scrutiny, these Defendants argue that Plaintiff's evidence only identified 14 potential class members. The Court finds no merit in this argument for a number of reasons.

First, the law is clear that where the exact size of the class is unknown, but general knowledge or common sense suggest it is large, the Court may take judicial notice of this fact and assume that joinder is impracticable. See, *Newberg, H.*, Newberg on Class Actions, p. 46 (2d Ed. 1985); citing, Evans v. United States Pipe & Foundry Co., 696 F.2d 925 (11th Cir.1983); Robert E. v. Lane, 530 F.Supp. 930 (N.D.Ill.1981); Bartleson v. Dean Witter & Co., 86 F.R.D. 657 (E.D.Pa.1980).

Second, Defendants proposition puts the cart before the horse. Defendants opposed Plaintiff contacting absent class members prior to certification. With this certification Order, Plaintiff may contact members of the class whom they now represent to obtain more specific information to connect the 1652 plus shipments (already shown by Defendants' sales to this state) to specific



buildings in the class.

Third, the restrictive approach advocated by Defendants defies common sense. Were it necessary to prove each element so exactly at the class certification stage, then these Defendants could easily escape class-wide liability simply by not keeping their old sales records.

Finally, Plaintiff has submitted evidence suggesting that it was consistent with industry practice for these Defendants to "not necessarily know" in which buildings its products were being installed. This is borne out by the additional records submitted by Plaintiff which reflect the sale of thousands of bags of ACSTM in South Carolina through distributors or supply houses where the ultimate purchaser is not identified. The standard of numerosity advocated by Defendants would ignore this probative evidence.

USM also argues (1) that Plaintiff must satisfy the "impracticability of joinder" requirement independently as to each Defendant and (2) that Plaintiff lacks standing to sue USM. USM's first argument is inconsistent with the plain language of Rule 23(a), SCRCP, ("the class must be so numerous that joinder of *all* members is impracticable")(emphasis supplied), which has no such defendant specific requirement. Cf., Central Wesleyan College v. W. R. Grace & Co., et al., 143 F.R.D. 628 (D.S.C.1992), aff'd, 6 F.3d 177 (4th Cir.1993) (J. Sol Blatt, Jr.)(certifying a nationwide class where the named plaintiff only identified one manufacturer's product in its buildings). As to the second argument, this Court already has ruled on two occasions that Plaintiff has standing to assert its claims against USM.[9] Given the extensive history leading up to these two Orders and

[9] In a November 22, 1996 Order, this Court held that:

> U. S. Mineral is a proper party-defendant at this time. Discovery of information requested by Anderson is appropriate because of Anderson's status as the representative of a putative class and because of Anderson's allegations of conspiracy and concert of action. Order at 4.

USM's failure to provide anything new on this issue, the Court declines to disturb its prior rulings.

In summary, the Court finds that the evidence submitted by Plaintiff establishes that there are large numbers of potential class members in this case. Based upon the sheer number of potential class members, joinder of all class members would be impracticable. South Carolina Public Service Authority v. C & S Bank, 300 S.C. 42, 386 S.E.2d 775 (1989); Stemmermann v. Lilienthal, 54 S.C. 440, 32 S.E. 535 (1899).

**B. Common Questions of Law or Fact**

Rule 23(a)(2), SCRCP requires that there be "questions of law or fact common to the class." No Defendant has objected on this ground, and every Court to address this issue in an asbestos property damage class action has agreed that common questions of both law and fact exist. See, Central Wesleyan, supra; Schools Class supra; National Gypsum Co. v. Kirbyville Independent School Dist., 770 S.W.2d 624 (Tex.App.1989). Accordingly, I find that Plaintiff has gone beyond its burden and established that there are questions of law *and* fact common to the class.

**C. Plaintiff's Claims are Typical of the Class Claims**

Rule 23(a)(3), SCRCP requires that "the claims of the representative parties are typical of the claims or defenses of the class." As Judge Blatt recognized in Central Wesleyan, "A claim is typical if it arises from the same course of conduct that give rise to the claims of the class members and if the claims are based on the same legal theories." 143 F.R.D. at 637. "This test 'does not require that the representatives have identical claims which other class members might present. The

---

On January 23, 1997, this Court further held that:

> Plaintiff has alleged a cause of action against U. S. Mineral on the basis of conspiracy. The material before the court is a sufficient showing in regard to this cause of action to establish the relevancy of the information sought. Order at 2.

question of typicality [instead] focuses on the similarity of the legal and remedial *theories of claims* of the named and unnamed plaintiffs." Bates v. Tenco Services, Inc., 132 F.R.D. 160, 163 (D.S.C.1990)(emphasis supplied). See also, Flanagan, *South Carolina Civil Procedure* (2d Ed. 1996) at p. 180 ("the use of the word 'typical' suggests that the claims or defenses do not need to be co-extensive, but rather similar to, or shared by most members of the class").

Moreover, the typicality and commonality requirements "tend to merge," General Telephone Co. of Southwest v. Falcon, 457 U.S. 147, 157 (1982), and "[t]ypicality is generally presumed when common questions exist." *Newberg H.*, Newberg on Class Actions, p. 165 (2d Ed. 1985). In addition, as with the "commonality" issue, courts have unanimously found the typicality requirement satisfied for asbestos property damage class actions that were much broader in breadth and scope than here. Central Wesleyan, supra (class action on behalf of the nation's colleges and universities); Schools Class, supra (class action on behalf of the nation's schools); National Gypsum Co. v. Kirbyville Independent School Dist., 770 S.W.2d 621, 624 (Tex.App.1989)(state class action); Detroit Board of Education v. Celotex Corp., Case No. 84-429634 (Cir. Ct., Wayne County, MI, Sept. 6, 1985)(state class action). In all of these class actions, there were many more Defendants, sometimes in excess of 70, and typically hundreds of products at issue.

Nevertheless, Defendants argue that Plaintiff's claims are not typical of the claims of other class members because Plaintiff has only shown that it has two types of products from two Defendants in its buildings. This argument was rejected by Judge Blatt in Central Wesleyan, where the named representative only identified a single bankrupt manufacturer's materials in its buildings. Id at 635. Judge Blatt nevertheless held that the claims were typical, in part, because the conspiracy allegations tied Defendants together. Id at 637-8. The Fourth Circuit agreed and affirmed. Central

Wesleyan, 6 F.3d at 188.

Plaintiff has submitted a substantial body of unrebutted evidence on the issue of the conspiratorial conduct by these Defendants.[10] Much of this conspiracy evidence is also probative of the general liability of these Defendants. Accordingly, in advancing its own claims, including its own conspiracy claims,[11] Plaintiff will be establishing the general liability of all Defendants. Charles v. Texas Co., 199 S.C. 156, 18 S.E.2d 719, 726 (1942) ("each conspirator is liable for all damages naturally resulting from any wrongful act of a co-conspirator in exercising the joint enterprise.") Therefore, Plaintiff's claims are typical of any class member who has a property damage claim, no matter which present or former manufacturer is at issue.

USG, USM, and T&N also suggest that differences in types of asbestos-containing products make Plaintiff's claims atypical. In rejecting this very argument, Judge Blatt in Central Wesleyan, found that the federal NESHAP regulations unite the claims of all class members "regardless of the exact product involved." Central Wesleyan, 143 F.R.D. at 637. These federal regulations (and the corresponding state regulations) require the removal of all "friable" asbestos in buildings during

---

[10]Defendants tried to dismiss conspiracy as a "red herring." However, the certification orders in Central Wesleyan and the Schools Class, clearly demonstrate the significance of Plaintiff's conspiracy claims in the context of certifying an asbestos property damage class action.

[11]Defendants have suggested that with the exception of the two products in its building, Plaintiff will have little need or incentive to advance conspiracy claims against other manufacturers. Such suggestion has no teeth and tilts back toward the adequacy issue disposed of herein. First, as class representative, Plaintiff has a duty to advance its conspiracy claims on behalf of the class, and in so doing, will be required to prove the underlying tort liability of each conspirator. Stiles v. Onorato, 318 S.C. 297, 457 S.E.2d 601 (1995) (party is liable for conspiracy if actively involved in the wrongful conduct). More importantly, Plaintiff has every incentive to establish the liability of every party who could be jointly and severally liable for Plaintiff's injuries, because Plaintiff can then recover its damages from any one or combination of those Defendants. Cabe v. Ligon, 115 S.C. 376, 105 S.E. 739 (1921) (conspiracy or concurring negligence subjects tortfeasor to joint liability); Webber v. Town of Jonesville, 94 S.C. 189, 77 S.E. 857 (1913) (one injured by the acts of several may elect to bring one action against the whole, or may bring separate actions against one or more of the torfeasors); Fernanders v. Marks Construction of South Carolina, Inc., 330 S.C. 470, 499 S.E.2d 509 (Ct.App.1998).

certain renovations or, at the latest, before demolition of the building. See also, City of Greenville v. W. R. Grace & Co., 640 F.Supp. 559, 573 (D.S.C.1986), aff'd, 827 F.2d 975, 982 (4th Cir.1987) (SC law); Kershaw County Board of Education v. U. S. Gypsum Co., 302 S.C. 390, 396 S.E.2d 369, 373 (1990). Moreover, these regulations simply codify sound public health policy. City of Greenville, 640 F.Supp. 573. Therefore, no matter what type of material may be in a class member's building, what percentage of asbestos is contained therein, or when that product was installed, the NESHAP regulations and accepted public health practices uniformly establish both the inevitability of damages and uniform guidelines for addressing these injuries that are typical across the class.

Defendants also rely on a number of federal personal injury class actions which have denied class certification, largely because those courts found that in cases of personal injuries, the facts and issues that were typical among class members did not "predominate" over individual differences between the claims of class members. The short answer to this proposition is that the federal "predominance" inquiry that forms the basis of each of these federal decisions is not a proper consideration under South Carolina law. Kennedy v. S. C. Retirement System, Op. No. 25133 (S.C.Sup.Ct., May 22, 2000)(Shearhouse Ad. Sh. No. 20 at p. 18); Littlefield v. S. C. Forestry Commission, 370 S.C. 348, 523 S.E.2d 781 (1999). Even if South Carolina adopted the predominance requirement, a number of these cases distinguish asbestos property damage actions as presenting *vastly fewer* individual questions than do personal injury actions. For instance, the court in Valentino v. Carter-Wallace, Inc., 97 F.3d 1227, 1232 (9th Cir.1996) distinguished the School Asbestos Litigation class "as much more manageable than a personal injury case would have been because, *in essence, the effect of asbestos in different buildings is the same and the effect of* [asbe]*stos on different people is not.*" (emphasis supplied). Similarly, the court in Castano v.

American Tobacco Co., 84 F.3d 734, 742 (5th Cir.1996), cited the School Class decision to note that property damage cases involved fewer individualized questions than personal injury classes. Likewise, the court in Georgine v. Amchem Products, Inc., 83 F.3d 610, 627 and n. 13 (3d Cir.), aff'd sub nom. Amchem Products, Inc. v. Windsor, 521 U.S. 591 (1997) held that asbestos property damage classes involve "vastly fewer individualized questions" than the personal injury classes.

Given the unanimous asbestos property damage class action decisions, all of which found typicality to exist in cases that were much broader in scope and in the number of defendants involved, coupled with the showing Plaintiff has made on the conspiratorial conduct of Defendants, the Court finds that Plaintiff has satisfied the "typicality" requirement of Rule 23(a)(3), SCRCP.

**D. Amount in Controversy**

Rule 23(a)(5), SCRCP requires that each member of the class have at least one hundred dollars in controversy. There is no dispute that the amount in controversy is met by each potential class member. Moreover, common knowledge and experience, as well as knowledge this Court has personally acquired through past service in the South Carolina Legislature, as a School Board Attorney, City Attorney, Attorney and Circuit Court Judge, make it clear that asbestos removal and repair occasioned thereby require enormous expenditures by owners of affected buildings. Accordingly, the Court finds that this requirement of Rule 23, SCRCP is satisfied.

**E. Adequacy of Representation**

Rule 23(a)(4), SCRCP requires that the representative party "will fairly and adequately protect the interests of the class." This analysis focuses not only on the adequacy of Anderson as a representative party, but also on Anderson's choice of counsel.

1. Anderson's Adequacy as a Class Representative

Plaintiff must demonstrate that it is a proper class representative. The applicable standard on this point is whether Anderson "has common interests with the unnamed members of the class" and will "vigorously prosecute the interests of the class." Waller v. Seabrook Island Property Owners Association, 300 S.C. 465, 388 S.E.2d 799, 801 (1990).

USM and T&N (but not USG) argue that Anderson will not vigorously prosecute this case because it has "lost interest" in the litigation and "abdicated" its responsibility to counsel. According to these Defendants, Plaintiff is unfit to serve as class representative because of the "near total lack of meaningful communication between class counsel and the class representative" which is "underscored" by Anderson's senior management not "having any awareness whatsoever of the significant developments in this litigation." The Court finds no merit in any of these assertions.

At the two day evidentiary hearing held on September 5-6, 2000, Anderson's current President, former President, and Vice-President of Support Services all testified. This Court was impressed at their commitment to this class action and why it will adequately serve as a class representative. After hearing these witnesses and fully reviewing the record, the Court finds that throughout these proceedings, Anderson has recognized its position as a class representative in this matter and has fulfilled its duties to the class, even at times when it may have been in Plaintiff's best interest to do otherwise. The record clearly demonstrates Anderson's understanding, willingness and qualifications to act as a class representative.[12]

---

[12]Although it did not address the issue at the evidentiary hearing, even during its examination of Anderson's officials, USM and T&N also suggest in their post-hearing submission that Anderson is an inadequate representative because it "abandoned its claims in the Eagle-Picher Bankruptcy because it lost interest in asbestos issues." The documents submitted by these Defendants indicate that an Illinois lawyer representing the American Hospital Association ("AHA") filed a claim in the Eagle-Picher Bankruptcy on behalf of several hundred hospitals across the nation. For reasons that are unexplained, but irrelevant to this proceeding, AHA apparently chose not to perfect its claim in that bankruptcy. There is no evidence that Anderson participated in that decision about a non-class claim

In Surowitz v. Hilton Hotels Corp., 383 U.S. 363, 366 (1966), the United States Supreme Court rejected a similar attack on a named Plaintiff even though she did not even understand her complaint at all, could not explain the statements in it, had little knowledge of what the lawsuit was about, did not know Defendants by name, nor even the nature of the misconduct alleged. The extent of the named class representative's knowledge of the substantive law and the legal niceties of its claims is not relevant to determining whether Plaintiff can adequately represent the class. South Carolina National Bank v. Stone, 139 F.R.D. 325, 329 (D.S.C. 1991).

USM and T&N also argue that Anderson is inadequate because an Ohio Court found in a March 11, 1997 Order that Anderson violated a 1987 preliminary injunction in an action involving the interpretation of a contractual indemnification which Dana provided to Celotex's predecessor when Dana sold an ACSTM manufacturer named Smith & Kanzler Company. The preliminary injunction prohibited Celotex from instituting "new actions or claims in any courts" against Dana based upon the indemnity. The sole basis of the Ohio Court's violation finding was that Anderson's former counsel (not S&R) made a prohibited claim in a letter to Judge Howard opposing Dana's Motion for Summary Judgment in this case. The finding is not yet ripe for an appeal.

With due respect for the Ohio Court, and without in anyway trespassing on its proceeding, nothing in its opinion affects this Court's view of Anderson as a class representative for several independent reasons. First, this Court is bound by Judge Howard's finding, entered upon Dana's urging, that Anderson did not make an indemnity claim in South Carolina. Second, Dana specifically told Judge Howard and Plaintiff that the preliminary injunction would not come into

involving a product type not in this case and probably not in its buildings (Eagle Picher made asbestos cement pipe). The Court fails to see how that matter has any relevance to the issue before the Court.

play unless and until Plaintiff obtained a judgment against Celotex and Celotex suffered a loss, neither of which ever occurred; this Court is not prepared to find that Anderson is inadequate for doing what Dana said it could do when obtaining its summary judgment in this Court. Third, it is undisputed that Anderson itself did not take any action which the Ohio Court criticized. Fourth, the Court finds it somewhat disingenuous for USM and T&N to pursue this ground against Anderson when at one time they contended that S&R was at the core of the events leading to the Ohio Order and now have conceded S&R's adequacy. Finally, after entertaining extensive arguments about this matter, the Court is of the view that regardless of the ultimate outcome of that proceeding, Anderson's tenacious defense of the class in that distant court for over five years further demonstrates that Anderson will "vigorously prosecute the interests of the class." Waller, 388 S.E.2d at 801.

Finally, this Court finds that Anderson's refusal to settle this action until the resolution of the adequacy challenge is strong evidence of its allegiance to the class. While it may have been easy to take the money and end this obviously unpleasant attack on its credibility, Anderson would not compromise the interest of the class by negotiating with a baseless cloud over its head.

In summary, there is no question in this Court's mind regarding Anderson's allegiance to the class or willingness to "vigorously prosecute" this action. Runion v. U.S. Shelter, 98 F.R.D. 313, 317 (D.S.C. 1983); Waller, 388 S.E.2d at 801. Accordingly, the Court finds that this requirement of Rule 23(a)(4), SCRCP as it relates to Anderson as a class representative is satisfied.

2. Class Counsel's Adequacy

The standard for determining the adequacy of class counsel is whether counsel is "qualified,

experienced and generally able to conduct the proposed litigation." South Carolina National Bank v. Stone, 139 F.R.D. 325, 329 (D.S.C. 1991). This Court was provided with a wealth of evidence and testimony regarding the qualifications, experience and capabilities of S&R, particularly Mr. Speights, both in asbestos property damage litigation and class actions. A capsule of this extensive record reveals that Mr. Speights was the first attorney in the nation to: successfully try an asbestos property damage case; successfully try an asbestos property damage case for a school district; successfully try an asbestos property damage case for a public building owner; successfully try an asbestos property damage case for an eleemosynary building owner; successfully try an asbestos property damage case for a commercial building owner; successfully try an asbestos property damage case against USG and USM (as well as Grace); and successfully settle an asbestos property damage case. Over the past twenty years, Mr. Speights and later S&R have pursued discovery and litigated cases all over the nation against all Defendants in this action.

Mr. Speights also has served as class counsel in three certified nationwide asbestos property damage class actions involving Defendants in this action, as well as counsel in another South Carolina environmental class action. Judge Blatt found (with no objection from any Defendant) that Mr. Speights was adequate to serve as co-lead counsel in the certified class action on behalf of the nation's colleges and universities. Mr. Speights' law partner, C. Alan Runyan, and other lawyers in their firm also have significant experience in individual and class action asbestos property damage litigation, including a certified class asbestos property damage action against USG for buildings in Puerto Rico and a certified South Carolina environmental class action against Exxon Corporation.

Additionally, Mr. Speights has had significant involvement on behalf of asbestos property damage claimants in every major asbestos bankruptcy involving ACSTM. In the Johns-Manville

bankruptcy, Mr. Speights was selected by all building owners in the country to serve as trial counsel for all asbestos property damage claims, which resulted in excess of $400 million dollars for property damage claimants. In the National Gypsum bankruptcy, Mr. Speights was a member of the joint asbestos committee and the property damage negotiating committee, and was chosen as one of three members of the property damage technical advisory committee. In the Celotex bankruptcy, Mr. Speights was recently recognized by the United States Court of Appeals for the Eleventh Circuit for his instrumental role in negotiating a consensual plan of reorganization:

> In sum, the evidence accepted as true by the bankruptcy judge was that [Speights & Runyan], and Speights in particular, played a significant role in the successful negotiation of a consensual plan, and that *a large portion of the credit for achievement of the plan was attributable to Speights because of his credibility and the experience in asbestos related bankruptcy that he brought to the process.*

In re: Celotex Corp., 227 F.3d 1336, 1340 (11th Cir.2000) (emphasis supplied). Finally, after Grace apparently pursued its attack in its bankruptcy, this Court received notice that the United States Trustee has appointed "Anderson Memorial Hospital, c/o Daniel A. Speights" to the Official Committee of Asbestos Property Damage Claimants in the Grace bankruptcy and that Mr. Speights has been selected by his peers from all over the nation to serve as Co-Chair of that committee.

None of this evidence was disputed by Defendants. Moreover, all Defendants conceded that Mr. Speights and S&R were qualified, experienced and generally able to conduct this litigation. South Carolina National Bank v. Stone, 139 F.R.D. 325, 329 (D.S.C.1991).

Despite this concession, however, some Defendants opposed class certification based upon allegations that Mr. Speights had been "seriously delinquent" in his prior representation of both private clients and class actions. Because Grace is now protected by the bankruptcy stay, and the

remaining Defendants have withdrawn their arguments regarding the adequacy of S&R, this Court will not address each specific allegation as requested by Plaintiff.[13] However, after considering the entire record devoted to this issue, this Court unequivocally finds ***absolutely no merit*** in any of the arguments that S&R and Mr. Speights are inadequate class counsel for Plaintiff's class in this action. Moreover, but for the bankruptcy stay protecting Grace, this Court would without hesitation address and with specificity reject each and every one of Defendants' inadequacy charges.[14]

This Court is fully convinced of S&R's adequacy to prosecute Plaintiff's claims and the class claims against these Defendants. The overwhelming testimony of imminent members of the South Carolina Bar *alone* is persuasive. Judge Sanders, Professor Freeman and Attorney Pope are each personally known to the Court. Each's reputation and credibility are impeccable. Each's opinion is highly valued by this Court, and unlike the opinions expressed by Professors Hazard and Ayer, each opinion has a sound basis. Each fully considered the allegations lodged against S&R, reviewed pertinent documentation, and fully supported their opinions of S&R's adequacy. Moreover, the testimony offered by Plaintiff's witnesses was fully supported by the substantial body of evidence produced to this Court.

In stark contrast, I find that the defense experts, Professor Hazard and Professor Ayer, testified with their guns not fully loaded and only half-cocked. This Court puts no credence in their

---

[13] In its final brief, Plaintiff states, "because of the scurrilous and meritless charges which Certain Defendants have publically filed against Mr. Speights in his own hometown, Plaintiffs respectfully urge this Court to address these charges on the record." [Plaintiff's Omnibus Reply at 31]. This is a reasonable and justified request.

[14] Although this Order was not issued until after the bankruptcy stay, this Court had reached its conclusions on the merits of the adequacy of S&R prior to March 30, 2001. Had this Court not reached its conclusions by that date, it would not have issued and allowed to stand its February 9, 2001 Order conditionally certifying a class action as to Grace.

assessments and opinions and finds that they were ill-equipped to help the Court to any degree on any issue they addressed. It was clear from their cross-examinations that both Professor Hazard and Professor Ayer had not reviewed pertinent evidence controverting all of their attacks on S&R -- evidence that is not only in the record before this Court but also much of which was publically available. Indeed, there were several instances in which Professor Hazard's averments and testimony in particular were flatly contradicted by the very documents on which he claimed to rely.

In summary, the Court is fully convinced of S&R's adequacy to serve as class counsel in this case. Anderson has shown that both it and its counsel are committed, qualified and in allegiance with the class they purport to represent. Contrary to the picture that Defendants tried to paint of S&R, the evidence and testimony before this Court show that S&R's lawyers are esteemed and respected and have shown nothing but prudence, loyalty and allegiance to the class and to Plaintiff – doing so even though their own interests might have been better served by an alternate course of conduct. None of the charges raised by Defendants or their experts during the course of these proceedings, when held up to the light of day, establish any detriment or prejudice or otherwise negatively reflect upon the best interest of the class. Accordingly, I find that the requirements of Rule 23(a)(4), SCRCP are satisfied.

## III. Conclusion

I find that each of the of the five criteria enumerated in Rule 23(a), SCRCP are satisfied and that this case is appropriate for class treatment. Therefore, Plaintiff's Motion to Certify a Class Action is granted as to the remaining Defendants.

Pursuant to Rule 23(d)(2), SCRCP, within thirty (30) days of the entry of this Order the Parties shall submit their proposals regarding the timing and content of class notice.

JK #20

**IT IS SO ORDERED.**

The Honorable John C. Hayes, III
Circuit Court Judge
Sixteenth Judicial Circuit

#2

Spartanburg, South Carolina
Entered this 29 day of June, 2001