IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: | ) | CHAPTER 11 |
| | ) | |
| W.R. GRACE & CO., ET AL.,[1] | ) | CASE NO. 01-01139 (JKF) |
| | ) | |
| DEBTORS. | ) | Jointly Administered |
| | ) | |
| | ) | **Objection Deadline: October 6, 2006** |
| | ) | **Hearing Date: October 23, 2006 At 2:00 P.M.** |

## DEBTORS' MOTION FOR AN ORDER AUTHORIZING THE SETTLEMENT AND PAYMENT OF CERTAIN TAX CLAIMS

The Debtors respectfully move this Court (the "Motion") for entry of an order

authorizing the Debtors to (1) enter into a settlement (the "Settlement") with the Department of

Justice ("DOJ") and Internal Revenue Service ("IRS") (collectively, the "Government"), with

respect to alleged liability for Federal Insurance Contribution Act taxes, federal income tax

withholding taxes (collectively, "Employment Taxes") and related claims, (2) make prompt

---

[1] The Debtors consist of the following 62 entities: W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.), W. R. Grace & Co.-Conn., A-1 Bit & Tool Co., Inc., Alewife Boston Ltd., Alewife Land Corporation, Amicon, Inc., CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace II, Inc., Creative Food 'N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC (f/k/a Dewey and Almy Company), Ecarg, Inc., Five Alewife Boston Ltd., G C Limited Partners I, Inc. (f/k/a Grace Cocoa Limited Partners I, Inc.), G C Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC Management Corporation, GN Holdings, Inc., GPC Thomasville Corp., Gloucester New Communities Company, Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical Company of Cuba, Grace Culinary Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe, Inc., Grace H-G Inc., Grace H-G II Inc., Grace Hotel Services Corporation, Grace International Holdings, Inc. (f/k/a Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W. R. Grace Capital Corporation, W. R. Grace Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-Caribe Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai Development Company, L B Realty, Inc., Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH, Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Inc., MRA Holdings Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (f/k/a Nestor-BNA, Inc.), MRA Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental Liability Management, Inc., E&C Liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin & Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country Staffing), Hayden-Gulch West Coal Company, H-G Coal Company.

payment of $13 million in settlement of such liability, and (3) take such further action as is necessary to complete the Settlement.

In support of this Motion, the Debtors respectfully state as follows:

## Jurisdiction

1.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue of this Motion is proper under 28 U.S.C. § 1408.

2.      The statutory predicates for this Motion are sections 105 and 363 of the Bankruptcy Code and Rule 9019 of the Federal Rules of Bankruptcy Procedure.

## Background

3.      On April 2, 2001 (the "Petition Date"), the Debtors filed their voluntary petitions for relief under chapter 11 of the Bankruptcy Code (collectively, the "Chapter 11 Cases"). These Chapter 11 Cases have been consolidated for administrative purposes only, and, pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, the Debtors continue to operate their businesses and manage their properties as debtors in possession.

## CCHP, Inc. And Cross Country Staffing

4.      From 1991 through July 1996, CCHP, Inc. ("CCHP") operated a nationwide, temporary staffing healthcare business (the "Healthcare Staffing Business") supplying nurses and other healthcare professionals. In February 1996, CCHP became a wholly owned, indirect subsidiary of W. R. Grace & Co.-Conn. ("Grace-Conn."). In July 1996, CCHP and MRA Staffing Systems, Inc. ("MRA Staffing") formed Cross Country Staffing ("CCS," and together with CCHP, the "Healthcare Companies"), a Delaware general partnership. CCHP

2

contributed its temporary staffing business to CCS in exchange for a 64% partnership interest

and MRA Staffing contributed its similar business in exchange for a 36% partnership interest.

At the time, MRA Staffing was owned indirectly by a UK corporation, Nestor Healthcare Group

plc ("Nestor"), through a series of U.S. holding corporations. CCHP, CCS, MRA Staffing, and

Grace-Conn are all debtors in these cases.

5.      In conducting the Healthcare Staffing Business, the Healthcare Companies

maintained a database of over 200,000 healthcare professionals interested in temporary

placement assignments at client hospitals located throughout the U.S. and the Virgin Islands. The

Healthcare Companies typically placed over 2,000 professionals in temporary assignments per

day; with temporary assignments generally lasting a period of approximately 3 months. For the

1993-1998 tax periods that are the subject of the tax dispute in question, there were in excess of

38,000 temporary assignments.

6.      In 1998, Nestor and Grace decided to sell the Healthcare Staffing

Business. On July 28, 1999, in order to facilitate a third party sale, Grace International Holdings,

Inc., a Grace-Conn. subsidiary, acquired Nestor's interest in the business for approximately $56

million. Under the terms of the sale, Nestor agreed to indemnify certain Grace-Conn. affiliates

for 36% of any CCS tax liabilities incurred up to the closing date of the sale.

7.      On July 29, 1999, CCS sold the Healthcare Staffing Business in an asset

sale to Charterhouse Inc. ("Charterhouse") for a purchase price of approximately $190 million

(including stock of the buyer). Following the sale to Charterhouse, the Healthcare Companies

ceased to conduct any form of healthcare staffing business.

## The Per Diem And Lodging Plans

8.      In 1992, CCHP instituted a meal and incidental expense allowance plan

for its employees placed in temporary assignments, providing such employees per diem

reimbursement in an amount prescribed by federal regulations.  CCHP also provided lodging

benefits, either in kind or in the form of an allowance.   CCHP and then CCS continued these

reimbursement plans until the sale of the Healthcare Staffing Business in 1999.

9.      In order to be eligible for the per diem and the lodging benefit, at the

beginning of each temporary assignment, an employee was required to submit to the Healthcare

Companies a completed Residence Information Questionnaire ("RIQ").  The RIQ was designed,

with the assistance of outside counsel, to provide the Healthcare Companies with sufficient

information to determine the location of an employee's "tax home," as defined by law.

10.     If, based upon its review of an employee's RIQ, the Healthcare

Companies determined that the temporary assignment required that the employee travel away

from his or her "tax home" overnight, the expense reimbursement was excluded from the

employee's taxable compensation.  If the temporary assignment did not involve such an

overnight stay, the expense reimbursement was included in the employee's taxable

compensation, subject to Employment Taxes.[2]

---

[2] The Healthcare Companies were permitted to fully deduct as "compensation expense" on their income tax returns those expense reimbursements treated as taxable compensation to the employee in the year paid.  However, they were not permitted a full deduction for expense reimbursements that were excluded from the employee's taxable compensation because meal and incidental expense payments were only partially deductible under the law.

4

**Irs Assessments**

11.    The IRS has challenged the Healthcare Companies' tax treatment of the per diem and lodging payments, arguing that all payments should have been subject to Employment Taxes. The assessments for the 1993-1998 tax periods aggregate approximately $61.9 million plus interest. The Government contends that the Healthcare Companies were required to treat all of the per diem and lodging payments as compensation subject to Employment Taxes, based on several different legal and factual theories.

12.    With respect to the 1993-1995 tax periods, the dispute has been in litigation for more than seven years in the U.S. Court of Federal Claims, CCHP, Inc. v. United States, No. 99-158T, where the DOJ is litigating the case on behalf of the Government. The amount of Employment Taxes assessed and in dispute for the 1993-1995 tax periods is approximately $21.8 million plus interest. The DOJ notified CCHP of its intent to move for summary judgment on the matter, and in connection therewith, the parties filed a Joint Stipulation of Facts on July 19, 2002. Settlement discussions commenced shortly thereafter and continued until terms of an acceptable settlement were agreed to in August 2006, a period of approximately four years.

13.    With respect to the 1996-1998 tax periods, in May 2003 the IRS issued assessments against the Healthcare Companies in the amount of approximately $40.1 million plus interest. The assessments were issued in order to provide the IRS with jurisdiction to settle the tax controversy during those years.

14.    The parties have agreed that the applicable statute of limitations for the 1999 tax period has expired. As previously stated, the Healthcare Staffing Business was sold in

5

July 1999. Therefore, the aggregate $61.9 million in assessments represents the Healthcare

Companies' total exposure for Employment Taxes, not including possible interest and penalties.

15.     The IRS has filed proofs of claim for Employment Taxes and accrued

interest during the tax periods in the aggregate amount of approximately $79.2 million,

substantially all of which are priority claims.[3]  More specifically, the following proofs of claim

filed by the IRS remain outstanding and relate to this matter: #15361 (filed on or about

December 12, 2003 against CC Partners (formerly CCS)), and #835 (filed on or about June 13,

2002 against CCHP) (collectively, the "Proofs of Claim").

### Settlement

16.     The Settlement requires that the Debtors (i) make a lump sum payment of

$13 million to the Government in settlement of all Employment Taxes and related claims

(including interest and penalties), which payment would not be deductible and (ii) forgo any

claim to deductions that arguably arise from treating previously nondeductible meal and

incidental expense payments as additional compensation expense (see footnote 2 herein).  If the

$13 million payment is not paid by the 181st day after the date the Settlement was accepted by

the DOJ (i.e., by February 6, 2007), the $13 million payment will bear interest at the statutory

rate under Sections 6621(a)(2), 6621(c) and 6622 of the Internal Revenue Code.

17.     The Settlement resolves all tax exposure with respect to this matter for the

tax periods 1993-1998. As previously stated, the applicable statute of limitations for the 1999

tax period has expired and, therefore, there is no tax dispute with respect to that year.  Pursuant

---

[3] The IRS did not file proofs of claim for Employment Taxes for the 1999 tax period.  Proofs of claim for Employment Taxes were filed for the 2000 and 2001 tax periods but were withdrawn because the Debtors no longer owned or conducted a healthcare staffing business in those years.

to the Settlement, upon payment by the Debtors to the Government of the amounts required by

the Settlement, (i) Proof of Claim 15361 shall be deemed fully satisfied and expunged, and (ii)

all amounts stated in Proof of Claim 835 for Employment Taxes shall be deemed fully satisfied

and expunged and such Proof of Claim shall be reduced to the amount of $129,000,000 (relating

to alleged liability for corporate income tax). The Debtors preserve their rights, however, to

object to the remaining amount stated in Proof of Claim 835 on whatever grounds are

appropriate.

18.    The Settlement is evidenced by a series of agreements, necessitated by the

fact that there are a number of different parties involved during different tax periods in issue and

the fact that certain of those tax periods are not included in the litigated court case.  The

Settlement documentation consists of (i) a settlement offer letter from CCHP and a

corresponding acceptance letter from the DOJ on behalf of the United States of America for the

tax case currently pending in the U.S. Court of Federal Claims (the "DOJ Settlement

Documents," attached as Exhibit 1 hereto) and (ii) four closing agreements between the IRS and

various parties, as follows:

- Closing agreement between the IRS and CCHP with respect to the tax periods beginning January 1, 1996 and ending June 30, 1996 (attached as Exhibit 2 hereto);

- Closing agreement between the IRS and MRA Holdings Corporation with respect to the tax periods beginning July 1, 1996 and ending July 28, 1999 (attached as Exhibit 3 hereto);

- Closing agreement between the IRS and CC Partners (formerly CCS) with respect to the tax periods beginning July 1, 1996 and ending July 28, 1999 (attached as Exhibit 4 hereto); and

7

■ Multiparty closing agreement among the IRS, GN Holdings, Inc., Fresenius Medical Care Holdings, Inc., Sealed Air Corporation, and Grace with respect to the tax periods beginning January 1, 1994 and ending July 28, 1999 (attached as Exhibit 5 hereto).

19.     The DOJ Settlement Documents and the first three closing agreements listed above have been fully executed and are contingent solely on the approval of this Court and execution of the multiparty closing agreement. With respect to the multiparty closing agreement, Fresenius Medical Care Holdings, Inc. and Sealed Air Corporation have agreed to execute the agreement after this Court approves the Settlement. Once these parties execute the multiparty closing agreement, the IRS will execute such agreement. Accordingly, the multiparty closing agreement has been executed only by the debtor entities that are parties to the agreement.

20.     Acceptance of the Settlement would resolve this controversy at a cost of approximately 21% of the aggregate $61.9 million of actual and proposed assessments for all tax periods 1993-1998 and would release the Healthcare Companies from any related claims (including interest and penalties).

21.     Nestor, which as discussed in paragraph 6 above is liable for 36% of any CCS tax liabilities, has confirmed in writing by e-mail to the Debtors that it is agreeable to the Settlement and has agreed to pay its proportionate share (approximately $2.7 million). After Nestor's payment of its share of the Settlement, the Debtors' net cost for the Settlement would be reduced to approximately $10.3 million.

22.     The Debtors are confident of their position on the merits of the tax assessment and acknowledge that the amount of the Settlement is not insignificant. However,

8

there are several considerations that justify acceptance of the Settlement under the terms described above.

23.    First, the Government has raised complex fact-intensive issues that may require substantial time-consuming (and expensive) discovery. For example, for the 1993-1995 tax periods alone, the Government's allegations cover over 5,200 nurses and over 13,000 temporary assignments that generated over 13,000 RIQs. During the 1993-1998 tax periods that are the subject of the Settlement, there were in excess of 38,000 temporary assignments generating a correlative number of RIQs. The DOJ has reviewed a statistical sampling of the RIQs and claims that there are sufficient grounds to support its case. In addition, the successful defense of the RIQ review process would, in part, be dependent upon testimony from persons who are no longer associated with the Healthcare Companies or the Debtors.

24.    Second, the Government's legal assertions cannot be summarily dismissed as untenable because the applicable law in this area is susceptible to multiple interpretations. Thus, even if the Healthcare Companies are permitted to rely on the RIQs, they nonetheless may be found liable for Employment Taxes with respect to all, or a substantial portion, of the assessments.

25.    Third, in the event that the Government successfully prosecutes its claims, substantially all of those claims would be accorded priority status in these Bankruptcy cases and would be paid in advance of any distribution being made on general creditors' claims.

26.    Based upon the foregoing, if the Settlement is not approved and the Debtors are forced to litigate this matter, the proceedings likely will be protracted, the cost of defending the Debtors' position will be expensive, and a favorable outcome cannot be assured.

9

**Relief Requested**

27.    By this Motion, the Debtors seek an order authorizing the Debtors to (i)
accept the Settlement, (ii) pay $13 million promptly to the Government and (iii) perform any and
all other acts that are necessary or useful to implement the Settlement.

**Statutory Authority**

28.    The Settlement is in the best interests of the Debtors and their creditors
and should be approved by the Bankruptcy Court pursuant to Fed. R. Bankr. P. 9019, which
authorizes this Court to approve a compromise settlement entered into by a debtor.  The decision
whether to accept or reject a compromise lies within the sound business judgment of the Debtors.
In re Neshaminy Office Bldg. Assocs., 62 B.R. 798, 803 (E.D. Pa. 1986).  Approval of a
compromise settlement is appropriate if it is in the "best interests of the estate."  Id.

29.    The settlement need not be the best that the debtor could have achieved,
but only must fall "within the reasonable range of litigation possibilities."  In re Penn Central
Transp. Co., 596 F.2d 1102, 1114 (3d Cir. 1979).  In making its determination, a court should not
substitute its own judgment for that of the debtor.  Neshaminy Office, 62 B.R. at 803.  Moreover,
it is not necessary to conduct  a "mini trial" of the facts or the merits underlying the dispute.  In
re Grant Broadcasting, 71 B.R. 390, 396 (E.D. Pa. 1987); see also In re A & C Properties, 784
F.2d 1377, 1384 (9th Cir.).  Rather, the court need only consider those facts that are necessary to
enable it to evaluate the settlement and to make an informed and independent judgment about the
settlement.  Penn Central, 596 F.2d at 1114; see also In re Energy Cooperative, Inc., 886 F.2d
921, 924-25 (7th Cir. 1989).

10

30.    The Debtors submit that the Settlement is in the best interests of the Debtors' estates and their creditors because it is the best settlement attainable given all the facts and circumstances. The Debtors and the Government have been negotiating the terms of the Settlement for approximately four years, and the case has been pending in the U.S. Court of Federal Claims since 1999. As previously stated, there are hazards of litigation and, therefore, a favorable outcome cannot be assured. In addition, in the absence of a resolution by settlement, the Debtors will likely incur substantial legal fees and expenses litigating this case to final judgment. In light of the foregoing, it is in the best interests of the Debtors' estate to accept the Settlement, thereby avoiding a lengthy and costly litigation whose outcome is uncertain.

### Notice

31.    Notice of this Motion has been given to (i) the Office of the United States Trustee, (ii) the Department of Justice; (iii) the Internal Revenue Service; (iv) counsel to the debtor in possession lenders, (v) counsel to each official committee appointed by the United States Trustee and the Future Claimant's Representative, and (vi) those parties that requested papers under Fed. R. Bankr. P. 2002. In light of the nature of the relief requested, the Debtors submit that no further notice is required.

*[Remainder of Page Intentionally Left Blank]*

11

WHEREFORE, the Debtors respectfully request that the Court enter an order

(i) authorizing the Debtors to (a) accept the Settlement, (b) pay $13 million promptly to the

Government and (c) perform any and all other acts that are necessary or useful to implement the

Settlement, and (ii) granting such other and further relief as the Court deems just and proper.


Dated:  September 18, 2006

                              KIRKLAND & ELLIS LLP
                              David M. Bernick, P.C.
                              Janet S. Baer
                              Todd F. Maynes, P.C.
                              200 East Randolph Drive
                              Chicago, Illinois 60601
                              Telephone: (312) 861-2000
                              Facsimile:  (312) 861-2200

                              and

                              PACHULSKI, STANG, ZIEHL, YOUNG, JONES
                              & WEINTRAUB LLP

                              Laura Davis Jones (Bar No. 2436)
                              James E. O'Neill, III (Bar No. 4042)
                              919 North Market Street, 17th Floor
                              P.O. Box 8705
                              Wilmington, DE 19899-8705 (Courier 19801)
                              Telephone: (302) 652-4100
                              Facsimile:  (302) 652-4400

                              Co-Counsel for the Debtors and Debtors in
                              Possession

12