UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE


IN RE:                          . Case No. 01-1139(JKF)
                                . Adv. No. 02-1657(JKF)
                                .
W.R. GRACE & CO.,               . 5414 USX Tower Building
                                . Pittsburgh, PA  15222
                                .
                Debtor.   .
                                . September 11, 2006
. . . . . . . . . . . . . . . . 9:57 a.m.


TRANSCRIPT OF HEARING
ARGUMENT ON MOTION TO EXTEND EXCLUSIVITY AND
ARGUMENT ON QUESTIONNAIRE ISSUES
BEFORE HONORABLE JUDITH K. FITZGERALD
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtor:             Kirkland & Ellis, LLP
                            By:  DAVID M. BERNICK, P.C., ESQ.
                                 BARBARA HARDING, ESQ.
                                 AMANDA BASTA, ESQ.
                                 SALVATORE BIANCA, ESQ.
                            Aon Center
                            200 East Randolph Drive
                            Chicago, IL  60601

Unsecured Creditors'        Stroock & Stroock & Lavan, LLP
Committee:                  By:  LEWIS KRUGER, ESQ.
                                 KENNETH PASQUALE, ESQ.
                            180 Maiden Lane
                            New York, NY  10048-4982


Audio Operator:             Janet Kozloski

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

_____

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@optonline.net**

**(609) 586-2311  Fax No.  (609) 587-3599**

APPEARANCES (Cont'd.):

| | |
|---|---|
| For Equity Committee: | Cramer, Levin<br>PHIL BENTLEY, ESQ.<br>(No Address Provided) |
| For David T. Austern,<br>Future Claimants Rep: | Phillips, Goldman & Spence, P.A.<br>By: DEBRA FELDER, ESQ.<br>1200 North Broom Street<br>Wilmington, DE  19806 |
| For Asbestos Creditors' | Caplin & Drysdale, Chartered<br>By:  ELIHU INSELBUCH, ESQ.<br>399 Park Avenue, 27th Floor<br>New York, NY  10022 |
| | Caplin & Drysdale, Chartered<br>By:  NATHAN D. FINCH, ESQ.<br>One Thomas Circle, NW<br>Washington, DC  20005 |
| For Official Committee of<br>Property Damage Claimants: | Bilzin Sumberg Baena Price<br> & Axelrod LLP<br>By:  SCOTT L. BAENA, ESQ.<br>     JAY M. SAKALO, ESQ.<br>Wachovia Financial Center<br>200 South Biscayne Boulevard<br>Suite 2500<br>Miami, FL  33131 |
| For Reaud, Morgan & Quinn<br>and ELG: | Stutzman, Bromberg, Esserman,<br> & Plifka, PC<br>By:  SANDER L. ESSERMAN, ESQ.<br>     VAN J. HOOKER, ESQ.<br>2323 Bryan Street, Suite 2200<br>Dallas, TX  75201 |
| For Ad Hoc Committee<br>of Equity Security-Holders: | Weil, Gotshal & Manges, LLP<br>By:  JUDY G. Z. LIU, ESQ.<br>     M. JARRAD WRIGHT, ESQ.<br>1300 Eye Street, NW, Suite 900<br>Washington, DC 20005 |

TELEPHONICALLY:

| | |
|---|---|
| For the FAI Claimants: | The Scott Law Group<br>By:  DARRELL SCOTT, ESQ.<br>2712 Middleburg Dr.<br>P. O. Box 2665<br>Columbia, SC 29206 |

APPEARANCES: (Cont'd)

| | |
|---|---|
| For National Union Fire Company: | Zeichner Ellman & Krause LLP<br>By:  MICHAEL S. DAVIS, ESQ.<br>        ROBERT GUTTMAN, ESQ.<br>575 Lexington Avenue<br>New York, NY  10022 |
| For Official Committee of Asbestos Property Damage Claimants: | Ferry, Joseph & Pearce, P.A.<br>By:  THEODORE J. TACCONELLI, ESQ.<br>824 Market Street<br>Suite 904<br>P.O. Box 1351<br>Wilmington, DE  19899 |
| For Ad Hoc Committee of Equity Security Holders: | The Bayard Firm<br>By:  NEIL B. GLASSMAN, ESQ.<br>        STEVEN M. YODER, ESQ.<br>222 Delaware Avenue, Suite 900<br>P.O. Box 25130<br>Wilmington, DE  19899 |
| For David T. Austern, Future Claimants Rep: | Phillips, Goldman & Spence, P.A.<br>By:  RICHARD Y. WYRON, JR., ESQ.<br>        ALEX VENEGAS, ESQ.<br>1200 North Broom Street<br>Wilmington, DE  19806 |
| For Libby Claimants: | Landis, Rath & Cobb, LLP<br>By:  KERRI K. MUMFORD, ESQ. |
| For Fireman's Fund Insurance Company: | Stevens & Lee, P.C.<br>By:  THOMAS WHALEN, ESQ.<br>1107 North Market St., 7th Floor<br>Wilmington, DE  19801 |
| For the Debtor: | Kirkland & Ellis, LLP<br>By:  DAVID MENDELSON, ESQ.<br>Aon Center<br>200 East Randolph Drive<br>Chicago, IL  60601 |
| For William Assire, et al.: | Cooney & Conway<br>By:  KATHY BYRNE, ESQ. |
| For Thornton, et al.: | Hogan Firm Attorneys at Law<br>By:  DANIEL HOGAN |

APPEARANCES (Cont'd)

| | |
|---|---|
| For Asbestos Personal Injury Claimants: | Shannon Law Firm, LLC<br>By:  KELLEY M. BERRY, ESQ. |
| For Hartley & O'Brien, Luckey & Millins: | Heiman, Gouge & Kaufman, LLP<br>By:  SUSAN E. KAUFMAN, ESQ. |
| For Latigo Partners: | Latigo Partners<br>By:  STEPHEN BLAUNER, ESQ. |
| For Royal Insurance: | Wilson, Elser, Moskowitz Edelman & Dicker, LLP<br>By:  SARAH J. EDWARDS, ESQ.<br>150 E. 42nd Street<br>New York, NY  10017-5639 |
| For Property Damage Claimants: | Speights & Runyan<br>By:  DANIEL A. SPEIGHTS, ESQ.<br>200 Jackson Avenue East<br>Hampton, SC  29924 |
| Roman Catholic Church Archdiocese of New Orleans: | Dies, Henderson & Carona<br>By:  MARTIN DIES, ESQ.<br>1009 Green Avenue<br>Orange, TX  77630 |
| For Tennenbaum Capital: | Tennenbaum Capital Partners, LLC<br>By:  STEPHEN MOYER, ESQ. |
| For Federal Insurance Co.: | Cozen O'Connor<br>By:  DAVID J. LIEBMAN, ESQ.<br>     JACOB C. COHN, ESQ.<br>1900 Market Street<br>Philadelphia, PA  19103 |
| For Linden Advisors, LP: | Linden Advisors, LP<br>By:  CRAIG GILBERG |
| For Future Claimants: | Phillips, Goldman & Spence, P.A.<br>By:  JOHN C. PHILLIPS, JR., ESQ.<br>1200 North Broom Street<br>Wilmington, DE  19806 |
| For Everest Reinsurance Co. & McKinley Ins. Co.: | Crowell & Moring, LLP<br>By:  MARK D. PLVEIN, ESQ.<br>     LESLIE A. EPLEY, ESQ.<br>1001 Pennsylvania Avenue, NW<br>Washington, DC  20004 |

APPEARANCES: (Cont'd):

| | |
|---|---|
| For Everest Reinsurance<br>Co. & McKinley Ins. Co.: | Marks, O'Neill, O'Brien &<br>  Courtney, P.C.<br>By:  BRIAN KASPRZAK, ESQ.<br>913 North Market St., Suite 800<br>Wilmington, DE  19801 |
| For Halcyon Asset<br>Management, LLC: | Halcyon Asset Management, LLC<br>By:  OSCAR MOCKRIDGE, ESQ. |
| Co-Counsel to Libby<br>Claimants: | Cohn, Whitesell & Goldberg, LLP<br>By:  DANIEL C. COHN, ESQ.<br>101 Arch Street<br>Boston, MA  02110 |
| For the State of Montana: | Monzack and Monaco, P.A.<br>By:  FRANCIS MONACO, ESQ.<br>1201 North Orange St., Suite 400<br>P.O. Box 2031<br>Wilmington, DE  19899 |
| For Grace Certain Cancer<br>Claimants: | Montgomery, McCracken, Walker<br>  & Rhoads, LLP<br>By:  NOEL C. BURNHAM, ESQ.<br>    LEONARD BUSBY, ESQ.<br>300 Delaware Avenue, Suite 750<br>Wilmington, DE  19801-1607 |
| For Asbestos Plaintiffs: | Wallace & Graham, PA<br>By:  WILLIAM MARC GRAHAM, ESQ.<br>North Carolina |
| For ACE Insurance Co.: | White & Williams, LLP<br>By:  MARC S. CASARINO, ESQ.<br>824 N. Market Street, Suite 902<br>P.O. Box 709<br>Wilmington, DE  19899-0709 |
| For Continental Casualty: | Ford, Marrin, Esposito,<br>  Witmeyer & Gleser, LLP<br>By:  ELIZABETH DeCRISTOFARO, ESQ.<br>Wall Street Plaza, 23rd Floor<br>New York, NY  10005-1875 |
| U.S. Trustee: | U.S. Trustee Department<br>By:  DAVID KLAUDER |
| For Claimants: | Goldberg, Perksy & White<br>By:  MARK MEYER, ESQ. |

<u>APPEARANCES</u>: (Cont'd)

For PD Claimants:                    Richardson Patrick Westbrook
                                       & Brickman, LLC
                                     By:  EDWARD WESTBROOK, ESQ.
                                     1037 Chuck Dawley Blvd., Bldg. A
                                     Mount Pleasant, SC  29464

For George & Sipes:                  George & Sipes
                                     By:  KATHLEEN FARINAS, ESQ.
                                     156 East Market Street, Suite 600
                                     Indianapolis, IN  46204

Official Committee of                Duane Morris, LLP
Unsecured Creditors:                 By:  MICHAEL R. LASTOWSKI, ESQ.
                                     1100 North Market St., Suite 1200
                                     Wilmington, DE  19801-1246

For London Market Companies:         Mendes & Mount, LLP
                                     By:  ALEXANDER MUELLER, ESQ.
                                     750 Seventh Avenue
                                     New York, NY  10019-6829

For Reaud, Morgan & Quinn            Stutzman, Bromberg, Esserman,
and ELG:                               & Plifka, PC
                                     By:  DAVID J. PARSONS, ESQ.
                                     2323 Bryan Street, Suite 2200
                                     Dallas, TX  75201

For Asbestos Claimants               Wellborn*Houston, LLP
& Wellborn Houston, LLP:             By:  PAUL L. SADLER, ESQ.
                                     300 West Main
                                     P.O. Box 1109
                                     Henderson, TX  75653-1109

For Campbell, Cherry,                Frank/Gecker, LLP
Harrison, Davis, Dove:               JOSEPH D. FRANK, ESQ.
                                     325 N. LaSalle, Suite 625
                                     Chicago, IL  60610

For Christopher Grell:               Law Office of Christopher Grell
                                     By:  RICHARD F. RESCHO, ESQ.
                                     360 22nd Street, Suite 320
                                     Oakland, CA  94612

For Asbestos Property Damage         The Brandi Law Firm
                                     By:  TERENCE D. EDWARDS, ESQ.
                                     44 Montgomery Street, Ste. 1050
                                     San Francisco, CA  94104

APPEARANCES:   (Cont'd)

For Asbestos Property Damage     Bilzin Sumberg Baena Price
Claimants:                           & Axelrod LLP
                                 By:  MATTHEW I. KRAMER, ESQ.
                                 Wachovia Financial Center
                                 200 South Biscayne Boulevard
                                 Suite 2500
                                 Miami, FL  33131

Also Appearing by Telephone:     JANET WORDBLACK, ESQ.

1          THE CLERK:  All rise.

2          THE COURT:  Please be seated.  This is the matter of

3  W.R. Grace, bankruptcy number 01-1139.  Participants I have

4  listed by phone are Robert Guttman, Kerri Mumford, Michael

5  Davis, David Mendelson, Kathy Byrne, Daniel Hogan, Kelley

6  Berry, Susan Kaufman, Janet Wordblack, Thomas Whalen, Martin

7  Dies, Darrell Scott, Stephen Moyer, Theodore Tacconelli, David

8  Liebman, Jacob Cohn, Craig Gilbert, Van Hooker, John Phillips,

9  Mark Plevin, Leslie Epley, Brian Kasprzak, Oscar Mockridge,

10  Stephanie Kwong, Paul Norris, Mark Shelnitz, David Siegel,

11  Daniel Cohn, Neil Glassman, Steven Yoder, Daniel Speights,

12  Richard Wyron, Alex Venegas, Jonathan Brownstein, William

13  Graham, Marti Murray, William Sparks, Marc Casarino, Elizabeth

14  DeCristofaro, David Klauder, Edward Westbrook, Kathleen

15  Farinas, Michael Lastowski, Arlene Krieger, Peg Brickley, Alex

16  Mueller, David Parsons, Stephen Vogel, Paul Sadler, Stephen

17  Blauner, Sarah Edwards, Noel Burnham, Simon Porter, Joseph

18  Frank, Peter Shawn, Richard Rescho, Alan Madian, Terence

19  Edwards, Matthew Kramer, Guy Baron, Sara Gooch, John O'Connell

20  and Francis Monaco.

21          Good morning.  I'll take entries in court, please.

22          MR. BERNICK:  Thank you, Your Honor.  David Bernick,

23  for Grace.

24          MS. HARDING:  Barbara Harding, for Grace, Your Honor.

25          MS. BASTA:  Amanda Basta, for Grace, Your Honor.

1          THE COURT:  Spell your last name.

2          MS. BASTA:  B-a-s-t-a.

3          MR. BIANCA:  Salvatore Bianca, for Grace.

4          MR. KRUGER:  Lewis Kruger and Ken Pasquale, for the

5   unsecured creditors' committee.

6          MR. PASQUALE:  Good morning, Your Honor.

7          THE COURT:  Good morning.

8          MR. BENTLEY:  Phil Bentley, for the equity committee.

9          MR. FRANKEL:  Good morning, Your Honor.

10         THE COURT:  Wait.  Excuse me one second.  I need to

11  make this bigger or I'm not going to be able to read what I'm

12  doing, so.  Okay.  I'm sorry.

13         MR. FRANKEL:  Good morning, Your Honor.  Roger

14  Frankel, for David Austern and the future claims

15  representative.  And also with me is Debra Felder, from my

16  firm.

17         THE COURT:  Thank you.

18         MR. INSELBUCH:  Elihu Inselbuch and Nathan Finch, for

19  the asbestos creditors' committee.

20         MR. BAENA:  Good morning, Your Honor.  Scott Baena,

21  for the property damage committee.

22         MR. SAKALO:  Good morning, Your Honor.  Jay Sakalo,

23  for the property damage committee.

24         MR. ESSERMAN:  Good morning, Your Honor.  Sander

25  Esserman, on behalf of the various law firms.

1          MS. LIU:  Good morning, Your Honor.  Judy Liu, from

2  Weil, Gotshal and Manges, for the ad hoc committee of equity

3  security holders, and with me is Jarrad Wright.

4          THE COURT:  Anyone else?  Okay.  Mr. Bernick.

5          MR. BERNICK:  Your Honor, today we have two matters

6  that are on the agenda, one, the request for an additional

7  extension of exclusivity, and the second is our motion practice

8  with regard to the questionnaires, that is, the motion to

9  compel.

10          Again, unless there is some preference that the Court

11  has, I'll just start out with the motion for extension of

12  exclusivity.

13          THE COURT:  That's fine.

14          MR. BERNICK:  And we can proceed from there.  I want

15  to take us back to the beginning of the case and provide a

16  brief overview.  I know Your Honor's very familiar with all

17  these matters, and in fact, I'm sure Your Honor probably

18  already has strong leanings about what you want to do in this

19  area, because the issue has been on the agenda a couple

20  different times, and the substantive matters that are at stake

21  are ones that have been discussed I think fairly carefully

22  before.

23          But it probably is appropriate at this point in time

24  as we're now at a very critical stage in the case to at least

25  do a short review.  I've got a very simple chart here.  We were

1  reviewing some of the other pages here and I would say that, on

2  a hopeful note, most of these pages relate to the CD case,

3  which was, after all, a consensual plan.

4          So maybe eventually we can get there in this case,

5  although thus far it has been obviously controversial.  The --

6  I put down scope of liability here as a key term, because we

7  now know that at the outset of this case, the very first brief

8  that was filed in this case, Grace in it's informational brief

9  set out the principal challenge that had to be met in this

10  case, which was, as they defined as the central path, to

11  determine the true scope of Grace's liability in this mess is

12  plaintiff's.

13          We said, as Your Honor knows very well, definitively,

14  that absent further definition of that scope of liability,

15  resolution of this case on a consensual basis and beyond any

16  kind of basis will prove to be elusive.  Five years later the

17  asbestos claimants in their supplemental objection have used a

18  somewhat different term, but it obviously converges on the same

19  facts, which is solvency.

20          The recent mediation efforts make it abundantly

21  clear, now sayeth the asbestos claimants themselves.  But the

22  real stumbling block for a consensual resolution of these cases

23  is the markedly different views of the debtor's solvency.

24  There has been a discussion and then a final concluding

25  sentence here that, again, we would agree with:  "Accordingly,

1  absent consent, the plan cannot be confirmed without a

2  determination of the debtor's solvency."

3         Put differently really one has the same concept,

4  whether we're talking about a consensual resolution or a

5  nonconsensual resolution there must be some determination in a

6  binding fashion with regard to what is the debtor's actual

7  liability.  There are then two paths that have been set out for

8  trying to bring this case to resolution in light of that

9  central issue and central path.

10        One path is the path that the debtor has pursued, and

11 we've pursued it at all points, and I believe consistently and

12 transparently, and that is a path that seeks to define

13 liability in the only way that our jurisprudence knows, which

14 is through a litigation and estimation process with the

15 ultimate hope and expectation that once the scope of Grace's

16 liability is determined, at least in part in that fashion, it

17 will then be possible to draft a plan for resolution, hopefully

18 a consensual plan.

19        And I'm going to talk a little bit about the progress

20 that's been made, because although it's been an arduous path

21 and an arduous process, progress now has been very substantial.

22 The second path is also very clear, although some of the

23 details of it have been not made apparent to the Court, and

24 indeed, not been made apparent to the parties in a binding

25 fashion.

1           And that is the path that's now been outlined to the

2    Court, and I'll call it the asbestos claimants' deal, which is

3    the agreement in principle that's been announced between the

4    different asbestos creditor or claimant constituencies in the

5    case.  And after I talk about the path that Grace has pursued

6    I'm going to spend some time talking about the alternative path

7    the asbestos creditors laid out to the Court and what it

8    promises to bring to this case.

9           So beginning with the liability, the litigation and

10   estimation path.  And again, I'm not going to pursue this in

11   all of its detail, but to bring us back to the beginning, at

12   the beginning of this case we were set -- set out or we were

13   facing three basic questions, three basic puzzles that, if I

14   could use the term, wish I could use the focus better, three

15   basic puzzles relating to three basic areas of liability of the

16   Grace case as of the time of the petition.

17          The first was the personal injury liability, and this

18   really was the driver for the filing.  And Your Honor will well

19   recall that throughout this case we have featured the almost

20   irrational exuberance of the plaintiff's personal injury bar in

21   prosecuting claims against Grace in 2001, which seemed to defy

22   all notions of a scientific trend and really were the reason

23   why Grace filed for Chapter 11.

24          There was then a different picture for the property

25   damage litigation.  Traditional property damage litigation had

1 been the principal litigation that Grace faced over the years.

2 And as we know, because it was during mature litigation, by the

3 time that Grace filed for Chapter 11 the number of new case

4 filings had been -- had vanished essentially to nothing, and

5 the number of pending cases had been reduced to a total of

6 seven.

7        The question then was -- the very different question

8 from personal injury, which is, what could there possibly be

9 else out there.  This was really a question of resolving a

10 handful of cases.  And then the brave new world that was being

11 -- was thought to be used to replaced traditional property

12 damage cases were ZAI property damage claims.

13        And here, there had been no verdicts, no settlements,

14 indeed, a preliminary injunction request that had been made

15 with regard to ZAI had been denied, but prior to the Chapter

16 11.  So essentially, after the Chapter 11 -- shortly before and

17 certainly after -- this whole question arose, as well as their

18 whole new area of liability where there has been no liability

19 determined in any way, shape or form before, is there now this

20 huge thing Mr. Lockwood, who is not here today, Mr. Lockwood

21 talked about the potential elephant or gorilla in the room,

22 even though there was no track record to say that it was, that

23 it created the question.

24        And these were the fundamental questions that we

25 faced at the very outset of the case.  Indeed, I'll tell the

1 Court, as almost a curiosity, these charts actually were the

2 charts that I had prepared to present --

3          MR. SPEAKER (TELEPHONE):  Prior to Friday.

4          MR. BERNICK:  -- to present to Judge Farnham the day

5 the case was transferred from Judge Farnham to Judge Woollen,

6 and we never ultimately had the hearing on the case management

7 orders that was originally scheduled to take place in the fall

8 of 2001.

9          So what progress has now been made.  Well, it has

10 been slow and it's been slow principally because different

11 judges in charge of the case have determined to proceed in the

12 different fashion with regard to pressing forward in these

13 different areas.

14          We began with Judge Farnham in the very beginning of

15 the case.  He wanted case management orders on all of the

16 different liability tracks, and ultimately in trying to end a

17 -- focus this a little bit better.

18          THE COURT:  Is it something with the -- is it our

19 screen or is it the --

20          COURT RECORDER:  No.  That's the other one.

21          MR. SPEAKER:  Clarity would be hard to --

22          MR. BERNICK:  Thank you.

23          THE COURT:  There you go.

24          MR. BERNICK:  He's just jealous, is all he is.  I

25 won't talk about your handwriting; I'll let you.  In any event,

1    let's -- yeah, that's about as good as it's going to get.

2    Judge Farnham wanted to have all of the different case

3    management tracks laid out all at once, to proceed all at once.

4    That's where we were headed literally on the morning of the

5    hearing that was scheduled for that day.

6         The case was reassigned.  Judge Woollen decided

7    otherwise.  He wanted to proceed with the Sealed Air fraudulent

8    conveyance litigation.  He then said the property damage can

9    take place before Your Honor as well as ZAI, but he very

10   carefully and very deliberately deferred any consideration of

11   the personal injury track.

12        So there literally was no progress with regard to the

13   personal injury under the administration of Judge Woollen.  the

14   Sealed Air case was eventually resolved.  The property damage

15   claims proceeded to -- under Your Honor's supervision through

16   the claims form process and ZAI went through the science

17   summary judgment adjudicative process following a very

18   interesting and unresolved question of whether to proceed by

19   way of class action.

20        So the case was active but the huge issue of personal

21   injury was deferred.  When Judge Woollen was recused Your Honor

22   then, I'm sure with very mixed feelings about it, or maybe

23   unmixed feelings, also inherited the personal injury side of

24   the case.

25        And at that point actually if we take a look at the

1 progress that's been made on the personal injury side of the

2 case, since Your Honor took over there has been steady progress

3 to deal with those issues in the case.  So as we sit here today

4 we actually have had very substantial progress in answering the

5 central question of the case in all respects.

6         And in fact, we would submit for Grace that the end

7 is not only in sight, it is literally only months away.  P.D.

8 is furthest along.  Your Honor has seen these versions of these

9 charts, but I think it would be important to provide a little

10 bit of an update.

11         We started out with upwards of 4,000 property damage

12 -- official property damage claims.  Your Honor is well

13 familiar with the fact that as a result of Grace's threshold

14 questions about whether there was even the authority to file

15 the claims and whether a good faith basis even existed to a

16 product ID, that the total came down very, very quickly from

17 4,000, and today we have 656 traditional property damage claims

18 that remain in the case.

19         Your Honor also is familiar that we now have a case

20 management order which contemplates both the summary judgment

21 process, an then also a gateway objection process before we

22 then go through estimation.  And to give Your Honor a flavor

23 for what -- how -- what the impact of this could be I've got a

24 couple more charts.

25         If you isolated the 55 non-traditional claims at the

**J&J COURT TRANSCRIBERS, INC.**

1   top of the bar, that is essentially 52 claims that arise out of

2   people saying they have property damage as a result of their

3   homes being contaminated and Libby.  We will be filing a

4   summary judgment motion that says the EPA either, a, has

5   cleaned them up, or b, has plans to clean them up, is committed

6   to clean them up, and Grace is funding that cleanup effort.

7          So whatever issue there is concerning that property,

8   we're already paying to have it resolved.  That will be a

9   motion that's filed before Your Honor.  We have 97 property

10  damage claims in Canada, and Your Honor already knows that we

11  have a major issue concerning whether tort law in Canada even

12  permits the prosecution of those claims, given the decision in

13  the Privest (phonetic) case.

14         There are also statute of limitations issues, as

15  well.  We'll be raising that by motion practice.  That then

16  leaves a total of 504 traditional property damage claims in the

17  United States.  Of those, we have motions -- we are -- the

18  motion that we are going to file for statute of limitations in

19  Louisiana, very, very strong, clear law in Louisiana, that will

20  affect the claim -- 99 claims other than those of Mr. Speights

21  and Mr. Dies in Louisiana; that is, the 99 other Louisiana

22  claims.

23         We then have Mr. Dies' claims, including the

24  Louisiana, he has filed largely in Louisiana on behalf of

25  clients that can make the annulum tentés argument.  So we're --

1  there's a different situation with respect to those claims.

2  With Mr. Speights we have 180 remaining claims, including

3  Louisiana.

4          Mr. Speights' claims are on the next page.  We have

5  California University, 92.  There is fairly clear law in

6  California, but an overwhelmingly clear fact, which is -- and

7  it's been admitted now in the claim forms in this case,

8  California University's actually filed a lawsuit in 1990

9  seeking the original jurisdiction of the Supreme Court of the

10 United States.

11         It involves the same claim that's being made here.

12 So we have a clear sketch with regard to that claim.  We then

13 have with respect to the others the issues that have been

14 raised before Your Honor of whether there was authority at the

15 time that the claim was filed.

16         Those are already under submission to Your Honor.

17 Those account, by my eye, for 59 out of the remaining 88

18 claims.  So we think that the balance of Mr. Speights' claims

19 are also going to be subject to a successful motion practice,

20 which then leads us back, as a birds' eye view, given the print

21 here it's hard, but there will be motions affecting these

22 claims, these claims.

23         With respect to the Speights' claims motions already

24 have been made or will be made with respect to California

25 covering virtually all of the claims.  And then of the

1 remaining claims, even before we get to other motions, which I

2 haven't yet described, we're talking about out of the

3 remaining, let's see, 160, 270, approximately 330 claims, 100

4 of those would be subject -- these are all claims that are

5 subject to summary judgment motions, even before we get to the

6 gateway objections that are scheduled to be heard in the next

7 year.

8          So we expect that Your Honor will have before you on

9 paper motion practice that goes to the bulk of the remaining

10 traditional property damage claims.  With respect to ZAI, that

11 matter has been fully briefed and it's under submission to Your

12 Honor.  I know Your Honor --

13          THE COURT:  And I'm hoping by next week you might

14 actually get an opinion.

15          MR. BERNICK:  Okay.  Well, that would be very, very

16 useful.  That causes me to reflect a little bit on where the

17 criminal case stands, and I know that that's been a matter

18 that's been brought to Your Honor's attention before.  And I'm

19 not going to go through the details of all the different

20 rulings that have taken place.

21          Enough said that Judge Malloy has issued a series of

22 rulings on in limine motions, as well as on motions that have

23 gone to the indictment.  And the result of that, for example,

24 of interest in the case of Libby is of the ATSDR study, which

25 is a study that purported to survey effects within the

1 population, has now been excluded as not being relevant to the

2 issue of causation because it wasn't designed for that purpose.

3    There are new studies that have now come out and been

4 produced under a motion by the government.  The government has

5 now taken an appeal from the Court's recent rulings with

6 respect to one of the accounts.  The trial that was scheduled

7 to go forward literally today or this week has now been stayed,

8 and the prosecution by the government in their appeal to the

9 Ninth Circuit.

10    So that case currently is on hold, but there's a lot

11 of -- there's a lot that's emerged in connection with that case

12 that is of consequence.  So progress, a lot of progress has

13 been made on ED, on ZAI.  We then come to personal injury,

14 which is after all, the major event we have.

15    We already know that the claim's history that

16 prompted the filing of the case has little, if any,

17 relationship to actual legal liability -- and I'm talking again

18 about our basic Speights here -- that has now been established

19 really by the admission of the asbestos claimants' own expert

20 in this case, Dr. Peterson.

21    Dr. Peterson was clear, we had the opportunity to

22 examine him in the Babcock and Wilcox case, that this trend

23 that you see is not a trend that represents the actual disease

24 caused by any company's asbestos.  It doesn't even purport to

25 measure that.  No epidemiological model determines the number

1 of claims or the number of cases of disease associated with

2 Babcock and Wilcox's product or Grace's product.

3        It's just not what the story is about.  So if the

4 question is, what is the actual liability, even in the sense of

5 who actually was injured by Grace's product, there is no

6 analysis that we're going to see from Dr. Peterson or from the

7 asbestos claimants' committee that's going to answer that

8 question.

9        Instead, what we will see is what we've already seen

10 in these cases.  We will see an effort by the claimants to take

11 an overall, nationwide trend of malignancies not specific to

12 Grace, and then seek to relate that to Grace's settlement

13 history -- this is a settlement history -- in order to

14 establish a relationship, and on the basis of Grace's

15 settlement history to say, well, here's what Grace settled in

16 the past, so we're now going to tell you what Grace would

17 settle in the future.

18        Our approach is very different.  Our approach says,

19 well, tell us of the claims that actually were pending against

20 the company as of the time it went 11; doesn't even focus on

21 who was hurt by our product in fact.  We know that the number

22 is going to be very, very different, and we know that already.

23        We know that it's going to be way, way down on that

24 graph.  How do we know that?  We know that, really, as a result

25 of two things.  One is the questionnaires that have been

1 returned already to date, and we'll talk a little bit about --

2 more about those in detail.

3         But I wanted to acquaint the Court with the basic

4 historical fact that now has come to dominate this case, and it

5 actually goes back, indeed, to Mr. Austern, who's the futures

6 claimant representative in this case; goes back to the Manville

7 case.

8         In the Manville case the deal that was originally

9 done essentially returned the Manville Trust -- in place of

10 Manville, the Manville Trust back into the Tort system.  It

11 says that claimants had to file their claims against the

12 Manville Trust; can't do it against Manville, but they can do

13 so after an effort to settle the claims.  They can do so in the

14 tort system.

15         Very quickly the money began to run out because

16 Weinstein and his -- as only Judge Weinstein has a tendency to

17 do, took over the situation, stopped the bleeding, stopped the

18 flow of money out and acquired control over the assets so that

19 they wouldn't be depleted.

20         And the reason this is of consequence to this case is

21 that it was the bell weather of what turned into the problem

22 that we now see with all these claims being filed, because in

23 order to essentially redo that plan there had to be a

24 settlement, and a class settlement was superimposed on the

25 plan.

1        And to produce that settlement the company or the

2  other -- the company, essentially, or all those who were

3  interested in keeping the plan together, had to reach a deal.

4  And the deal had to take the trust out of the tort system.  So

5  the claimants had to agree that the trust was no longer going

6  to be in the tort system.  All was the give-up.

7        The give-up was that the TDP was changed.  There was

8  a TDP actually that was put in place and the TDP called out who

9  could get paid what amounts of money without any litigation,

10 and critically, that TDP created an enormous opening for people

11 to prosecute as "asbestosis" claims, claims that would never

12 have passed muster for asbestosis before.

13       The trust recognized this at the time and indeed

14 shortly after doors opened for business again the asbestosis

15 claims against the Manville Trust skyrocketed.  Why?  Because

16 it was easier to get a claim from asbestosis proved up under

17 the new criteria, and the money available to pay lung cancer

18 claims was discounted to the extent that there was a history of

19 smoking.

20       So in the Manville Trust a very interesting dynamic

21 arose, which is of amazing and direct relevance here.  And that

22 is that the Manville Trust itself decided to audit the doctors

23 who were putting in the claims.  So there was an audit done by

24 the University of Pennsylvania, and I call it the Penn State

25 Manville audit.

1            And under this audit they basically took a look at

2    doctors who had the highest volume of screenings or readings

3    that were being processed and said, can we replicate this

4    independently.  And they found out that the answer was no, that

5    10 doctors responsible for 46 percent of all claims had a 63

6    percent failure rate, and over a third of the claims showed no

7    disease whatsoever, just those 10 doctors.

8            The most active doctor, you can see what happened to

9    the percentage of claims that he handled.  It jumped from 1983

10   less than one percent, to 1996, 31.8 percent.  And 49 percent

11   of the most active doctor claims came from him at all.  Forty-

12   nine percent showed no disease, evidence of disease whatsoever.

13   We now know who that doctor is.

14           Well, in the face of this audit experience the trust

15   basically stopped paying his claims, and there was litigation

16   that unfolded before Judge Weinstein about whether the trust

17   still had to pay them because a deal's a deal.  Judge Weinstein

18   ultimately decided, a deal's a deal; you can't come back and

19   refuse to pay these claims just because you've done an audit.

20   And so the claims continued to be paid.

21           Well, we now know what happened.  What happened was

22   that most of these claims came the swamp the Manville Trust and

23   prorated payouts of the Manville Trust dropped, and ultimately,

24   Judge Weinstein himself issued an order saying that something

25   has got to be done here.  That took place I think in 2002-2003,

**J&J COURT TRANSCRIBERS, INC.**

1  and from thereafter we've now seen a snowball effect where

2  attention has been focused on these doctors, focused on these

3  doctors by Judge Jack on the silica cases.  There are now

4  investigations that are going on of these doctors; were taking

5  discovery of these doctors.

6          What impact does that have in this case?  In the <u>BMW</u>

7  case, Babcock and Wilcox, we analyzed returned claim forms and

8  'lo and behold, those same 10 doctors, the same 10 doctors

9  accounted for 46 percent of the asbestosis claims that were

10  being made.  What about in this case?

11          Well, we now have analyzed where we can determine

12  where the claimants named are diagnosing via reading or

13  interpreting documents, we just focus on the ones who are part

14  of that same audit.  We now know from the questionnaires that

15  their names appear in 41.2 percent of the occasions in which

16  the claimants name who their doctors are, amazingly close to

17  the 46 percent that we saw with Babcock and Wilcox.

18          So the problem of these doctors, these doctors whose

19  results cannot be replicated, the results have now been called

20  into wide question.  Clearly, we have a <u>Daubert</u> situation here,

21  and I can go on and on but I won't.  We even -- there's

22  actually one case that's now just emerged called the <u>CSX</u> case

23  it turns out, at least it's alleged, that the law firm had or

24  made a -- a runner for a law firm made a request that somebody

25  else stand in for the x-rays, somebody who had asbestosis stand

1  in for the x-rays.

2          So we have got a clear problem situation.  And the

3  reason this is important is that this Court is not -- in the

4  sense we're not finding out new facts.  We're finding out facts

5  that are basically part of this sequence, the history.  It's

6  just the reality of what occurred, and all we're doing is

7  saying, gee, it happens that -- it happened in the Grace case,

8  too; big surprise.

9          Now, we've seen some reaction to this.  I said last

10 time that I was here that a number of questionnaires had been

11 returned, but actually, many have not been returned.  Of the

12 116,000 mail questionnaires, and this does not include

13 questionnaires that relate to people with potentially settled

14 claims, with respect to the -- what we believe to be non-

15 settled claims there are 116,000 mailed questionnaires.

16          Fifty-one percent of them have been returned.  So

17 half of them have not even been returned.  And it may be that

18 some of these terms are not pressing the claims that have been

19 supported by these factors.  We think that there are some firms

20 where that is clearly the case.  It was dramatically scaled

21 back on the number of claims that they're pressing.

22          However, we don't know that to be the case because of

23 the issue that I raised before about the settled claims.  And

24 we know that there are other firms that haven't done any such

25 thing.  And in fact, those are the firms where they still -- 41

1 percent of the cases still use medical data that was generated

2 by these 10 doctors that go back out -- in the years to the

3 Manville days.

4        The problem is not just a problem, and

5 notwithstanding, you know, what the heck we keep on talking

6 about, diagnostic data and diagnostic standards and

7 methodologies.  The problem is also a problem of exposure, as

8 who really was significantly exposed to our product.

9        And in the case of Grace, before 1995 a lot of claims

10 were dismissed because we had the ability, as this chart

11 indicates, to quite carefully scrutinize the exposure evidence.

12 After the claims started to skyrocket this process no longer

13 was feasible, not because we believe that there was exposure.

14        It's that we did not have the realistic opportunity,

15 given the way the claims were being administered, not state

16 substantive law, state administrative procedure.  We didn't

17 have the opportunity to exact the same requirement for

18 scrutinizing exposure.

19        And even then, even before 1995, we were necessarily

20 hampered in that effect.  So we can see that very few, much --

21 many fewer claims were dismissed post-1995.  And we now know

22 this is a chart that's been shown to the Court previously, but

23 a huge number of claims that had been pressed against Grace as

24 of the time of the filing come from people who worked in

25 industries that were not serviced, that were not sold to with

1  the principal Grace products, which were principally used in

2  the construction business.

3      This chart indicates that only 12 percent of the

4  sample that was taken involved claims of people who worked in

5  the construction field.  When you combine these two things,

6  that is, looking for real disease, real exposure, without

7  getting into any other issues, we believe that we are

8  substantially along the path already of being able to

9  demonstrate to the Court that when it comes just to figuring

10 out who really got hurt by a Grace product, nothing else, who

11 really got hurt by a Grace product based upon reliable data,

12 data that would satisfy a <u>Daubert</u> standard, then we're talking

13 about a huge, huge number of claims pending against Grace as of

14 the time of the filing that don't -- that are not based on that

15 kind of data, and only a fraction of cases that are.

16     This is what has been reported widely in the press

17 and it's true here that the money that had been paid out went

18 mostly to people who just didn't have claims, even by the basic

19 standards and requirements that apply in this Court under the

20 Federal Rules, before you get to a jury issue.

21     These figure very, very prominently, obviously, in

22 our belief that the claims largely are not going to pass

23 muster.  The implications of this are clear.  The law says, the

24 law says that no matter what the plan is, only -- the claims

25 can neither be overpaid nor underpaid.

1          That is to say, the claimants can't get -- they may

2 have to get less than they deserve in the sense that there's

3 not enough money to pay them, but they can't get more money

4 than they deserve, absolutely a fundamental predicate; that we

5 can't -- we don't have a situation where the law permits --

6 where the constituencies, where it is to their interest to band

7 together and decide, here's how we're going to divide up the

8 pot, even though the division of the pot doesn't match the

9 merit of the claims.

10          Obviously, if nobody objects whatsoever, I guess it

11 will escape the scrutiny of the Court.  But where there is an

12 objection or where there is scrutiny by the Court, the claims

13 can neither be overpaid nor be underpaid.  They have to be paid

14 according to their merit.

15          So we have now a huge disconnect based upon the

16 litigation, just as we sit here today, between what it is that

17 people said was the liability at the time the case was filed to

18 what now has emerged as being the liability.  It's a disconnect

19 even from the plan that Grace currently has on file with the

20 Court.

21          The plan that Grace currently has on file, because as

22 we explained before was designed to continue on a mediated or

23 consensual resolution process is out of sync.  There's way too

24 much money in that plan for property damages.  There's way too

25 much money in that plan from any personal injury plan.

1        So time has already moved us beyond even the

2   provisions of that plan.  So what is our path?  Our path is

3   straightforward.  It says we litigate and estimate, and based

4   upon that we, as the law requires us to do, develop a plan that

5   is tailored to the liabilities as who really got hurt from our

6   product.

7        It's a tailored plan.  You can't put the cart before

8   the horse.  We've already see what the consequences of that

9   are.  What, then, is the alternative?  What's the alternative

10  that the asbestos claimants have proposed?  And here, there's

11  been still the absence of complete communication.

12       There was an announcement by Mr. Lockwood to the

13  Court.  Mr. Lockwood said -- and this is April 17, 2006 --

14  Following a mediation period that was supposed to produce a

15  consensual plan, it produced a plan that was consensual only

16  among those who agreed with one another that they would like to

17  leave nothing there for the company and for its sole

18  shareholders.

19       Mr. Lockwood says:  "I'm please to report that Judge

20  Pointer's report to you is accurate.  We do believe that we

21  have an agreement in principle between the PI and PD committee

22  with respect to our respective claims, how we envisage those

23  going forward.

24       So this was the big fanfare; this was the big

25  announcement.  And Your Honor properly recognized, although it

1  was not the whole ball of wax to the extent that it was a

2  partial resolution among significant constituencies, it could

3  be very important.

4        But what was the agreement?  What was the agreement?

5  Now, certain parts of that have been very clear.  One, it's an

6  agreement that gives equity nothing, zero.  We were not even

7  invited to the table that we set, and that's fine.  That's

8  their prerogative to make that proposal, but that means it's

9  going to be a cram-down plan.

10       That's one thing that's very clear.  It is a -- it

11 purports to be the outline of a cram-down plan.  But it has

12 significance that goes beyond that.  It is not only a plan that

13 in order to be confirmed it would require the Court to go

14 through an estimation process designed to determine whether

15 that plan was fair and equitable.

16       It has a more pervasive effect on the process that

17 we're now going through, and this has not been fully shared

18 with the Court and it's still not even been fully shared with

19 the other constituencies.  Under this plan an allocation has

20 been agreed to between the property damage claimants and the

21 personal injury claimants, and it involves filters of who gets

22 what insurance and then what's ahead of insurance, et cetera,

23 et cetera.

24       But essentially, what's left over at the end of the

25 day after administrative expenses and considering the pot of

1  insurance that's dedicated to one set of claims or another is

2  that the personal injury and property damage constituencies

3  agreed to divide the pot 85/15; 85 percent to the personal

4  injury claimants, 15 percent to the property damage.

5       Well, I guess, you know, anybody can make that kind

6  of deal.  That's appropriate.  But the key thing is that that

7  allocation applies, regardless of whether as a result of the

8  process that we have underway here that is the actual

9  proportion of value that is allocable to those constituencies.

10      They have essentially reached an agreement amongst

11 themselves that simply says, here's how we're going to allocate

12 it, regardless of whether that represents the value the Court

13 has now determined to apply to those claims.  Okay.  Well,

14 that's an interesting kind of concept.

15      Can they really do that?  Can they not do that if

16 there's an objection to plan?  We'll have to take that up.  But

17 this goes way beyond the question of being a cram-down.  This

18 is an effort to say, we're deciding on the allocation, such

19 like -- it's a Mary Carter agreement, because they -- you know

20 -- geez, whatever happens, here's how we're going to divide it

21 up; that's respectively what it is.

22      But it has a third component that's also equally

23 important, and that is that as we understand it, no party to

24 that agreement can enter into any deal with the debtor or any

25 deal with the unsecured creditors, absent the approval of the

1  other parties to the agreement.

2        Now, we've gone through -- I've -- and outside of

3  bankruptcy I faced these questions because we had a joint

4  defense agreement in San Juan, Puerto Rico, in the San Juan

5  DuPont Plaza, a hotel fire case.  And the Court found that it

6  was unlawful, that it violated public policy and judicial

7  policy, because our joint defense agreement has the effect of

8  stymying or getting in the way of settlement.

9        Here we are in the bankruptcy process where the whole

10 purpose of the process essentially at the end of the day is to

11 produce a consensus.  Yet we have an agreement that, at least

12 as it's been recited to me, says nobody can do a deal unless

13 the other parties to this deal that's already been made agree

14 to that effect.

15       It's a lock-up.  It's not a Mary Carter.  It's a

16 lock-up.  It says, what's being locked up -- what's being

17 locked up is support.  Support has been locked up.  Now, maybe

18 that'll change.  That is at least what we believe.  We've asked

19 now for them to basically acknowledge this in writing.

20       Your Honor will hear that out on September the 25th

21 because they've declined to do that.  Under any set of

22 circumstances this path here is a path that doesn't get to and

23 presumes in fact, indeed, discounts and seeks to set aside the

24 only process that is available in our jurisprudence to actually

25 answer the question that everybody agrees is the central

1 question.

2           You can't -- unless there's agreement you cannot

3 bypass those rules, and yet, the only alternative that they

4 have set out to the Court here is to do precisely that because

5 they have reached what they characterize to be a deal that's

6 favorable to them.

7           In our view, Your Honor, there's only one path, only

8 one path that was there to begin with, only one path that's

9 there today, which is to continue this litigation estimation

10 process and get the thing done.  If there's one answer to the

11 question of how to resolve the case in our judicial system,

12 it's to set the thing for trial.  And effectively, it's now

13 been set for trial.

14           If at the end of the day they're correct and the

15 liabilities exceed the assets, well, then, we'll all know where

16 to go.  But prior to that time to terminate exclusivity so that

17 we can have them pursue yet another track of litigation now

18 dedicated to something that has all of the earmarks as being

19 contrary to the interests of case resolution, rather than

20 facilitative of that resolution, that is the wrong way to go.

21           There's only one thing that I'll add and then I'll

22 sit down, and that is a further proposal has been made, and

23 that proposal by the other side -- I suppose they'll touch on

24 it today -- say, well, in determining scope of liability or

25 solvency, let's take it a step at a time, and let's just go

**J&J COURT TRANSCRIBERS, INC.**

1  with the malignant claims first.

2          Let's estimate the malignant claims first, because if

3  it turns out that Grace is insolvent giving the malignant

4  claims, then we don't have to proceed and do anything else.

5  Your Honor, that path has not been taken in the other

6  estimations, and would be counterproductive here.

7          While we believe that the nonmalignant claims have

8  very few of them any merit, nonetheless that should be

9  determined.  Why?  Well, talk about the elephant in the room.

10 Of the 55,000 questionnaires processed to date approximately 88

11 percent have been submitted on behalf of claimants who

12 purportedly have a non-malignant asbestos-related disease.

13         We're going to have to get there, and we're going to

14 have to get there not only because it's a central issue given

15 the number of claims that have been made, but for two

16 additional reasons.  Reason one, if they are successful in

17 showing, as we believe they will not be, that Grace is

18 insolvent for malignant claims, that may tell equity that

19 they've got nothing left in this case.

20         But it leaves open the question of what value should

21 be available to the other unsecured creditors, and that value

22 requires not only a determination of solvency, but it requires

23 the determination of what the scope of the asbestos claimants'

24 claims is, what the liability is, so a -- all the claimants can

25 be treated pari passu.

1          That issue does not go away if you have a

2  determination of insolvency by reason of malignant claims.  But

3  secondly, and this is now problematic even with respect to

4  litigation against the Court to the position of the equity-

5  holders.  They have created what is really an illusory

6  distinction.

7          They make out as if you can determine the malignancy

8  liability and the non-malignancy liability.  Well, they don't

9  have anything to do with one another.  They're different kinds

10  of diseases.  And what they have failed to appreciate and have

11  failed to tell the Court is that there are always two prongs to

12  causation.

13          One prong is the diagnosis of the disease and the

14  other prong is exposure to a product in causation from that

15  exposure.  And where you have malignant claims, it may be that

16  the diagnosis of the malignant claim is easy, mesothelioma is

17  mesothelioma; lung cancer is lung cancer.

18          But when it gets to the question particularly with

19  respect to lung cancer, which arises in the general population

20  pervasively as a result of smoking, to determine whether a lung

21  cancer's attributable to asbestos exposure, guess what you get

22  back to?  You get back to the x-rays, which are used to

23  demonstrate there is in fact evidence of asbestos exposure and

24  asbestos-related pathology and provides a tie of lung cancer

25  claims to asbestos.

1        We're going to go back into the whole world of

2  reading the x-rays and all the rest of that, no matter which

3  way this gets cut.  And for all those reasons we're already

4  well down the path of an overall estimate.  They can be handled

5  at the same time.  They are currently scheduled to take place

6  at the same time.

7        To take a step backwards now and say, oh, we've now

8  decided that liability is important, but we only want to talk

9  about part of the liability would be a step backwards in this

10 case.  So -- and for all those reasons, Your Honor, the debtor

11 seeks an extension of exclusivity up through a decision on the

12 estimation motions that are now pending before the Court.

13       THE COURT:  Anyone wish to speak in support of the

14 debtor's motion?

15       MR. BENTLEY:  Your Honor, would you prefer that I --

16       THE COURT:  Your name again, please?

17       MR. BENTLEY:  Yes.  Phillip Bentley, of Cramer,

18 Levin, for the equity committee.

19       THE COURT:  Whichever place you're comfortable, just

20 so the court reporter can hear you, is fine.

21       MR. BENTLEY:  I'll stay here, then, if that's all

22 right with the Court.

23       THE COURT:  That's fine.

24       MR. BENTLEY:  Your Honor, I -- we certainly support

25 everything that Mr. Bernick has said, and I'd like to add a few

1 points on one issue that he touched on, specifically the last

2 issue he touched on, namely, the proposal by the plaintiffs

3 that Your Honor bifurcate the estimation process to a cancer-

4 only estimation first and turn to malignant later.

5        Mr. Bernick has explained several reasons why that

6 makes no sense.  I'd like to add two reasons to the litany, and

7 they both relate to the fact that the proposal that the

8 plaintiffs had made on this issue is predicated on the

9 assumption that there's no serious dispute about the value of

10 the debtor's assets here.

11        Your Honor will recall in their papers they say that

12 in order to push the debtor into -- to establish insolvency,

13 they would simply need to establish an aggregate asbestos

14 liability of $2.9 billion.  There are several fallacies in this

15 argument, Your Honor.

16        The first fallacy is simply in the number they've

17 picked.  We think it's very clear that the $2.9 billion figure

18 they've picked is very, very, very much lower than the real

19 number.  I'll just mention one or two obvious errors that

20 they've --

21        THE COURT:  Wait.  Say that again, please?

22        MR. BENTLEY:  The plaintiffs have said in support of

23 their proposal that the Court bifurcate the estimation

24 proceeding that we should proceed first with a cancer-only

25 estimation because we'll show that cancer-only claims by

1  themselves exceed $2.9 billion of liability.

2         And they then attach a computation which purports to

3  show that so long as asbestos claims exceed 2.9 billion the

4  debtor will be insolvent, because the debtor's assets less its

5  non-asbestos liabilities are $2.9 billion.

6         We think that number is flat-out wrong, Your Honor,

7  and just to make the (indiscernible) the Court clear of error

8  in the analysis that's been presented to you in their papers,

9  they -- the 2.9 figure is based on a -- they rattle off a list

10 of their assets, including the forseeneous (phonetic) on Sealed

11 Air contributions, the debtor's enterprise value, they simply

12 omit, they provide a zero, for the debtor's insurance.

13         And as the Court may recall, the debtor's have

14 estimated that if the asbestos claims were high enough to

15 approach an insolvency situation, the insurance would be

16 somewhere in the vicinity of $800 million.  That figure is

17 simply omitted from the computation of the 2.9.

18         So if you added that in we're already up to 3.7.  And

19 then there's additional reasons why then the true number, the

20 insolvency number, the aggregate asbestos liability needed to

21 push the debtor into insolvency, would be much higher than $3.7

22 billion.  For one thing, this computation includes an

23 enterprise value that's based necessarily on EBITDA numbers to

24 date; in fact, sometime prior to today, clearly.

25         Obviously, any valuation of the debtor that's done

1  would be done using values as of confirmation.  The debtor is

2  projecting of EBITDA growth of something on the order of $40

3  million over the next year.  If you use multiples of the sort

4  that the plaintiffs themselves are using, that would add

5  another three of $400 million to the insolvency number,

6  bringing us up now to $4 billion.

7          And finally, the plaintiffs are using multiples, and

8  they're -- they ignore the fact that the multiples at which

9  companies that are comparable to Grace have been selling have

10 been growing substantially.  They ignore the more recent

11 multiples, which are substantially higher than prior multiples.

12         And in our view, Your Honor, if you use the

13 appropriate multiples it could push the insolvency number up to

14 as high as $5 billion.  So we have this enormous swing between

15 the 2.9 billion that they say is the true number and the up to

16 $5 billion that we think Your Honor will ultimately determine

17 is the true number.  You would need to have vastly more

18 asbestos liability in that number, obviously, to hit a $2.9

19 billion number.

20         Final point, Your Honor, conceptually there --

21 there's a final reason why you can't possibly put the cart

22 before the horse the way they're proposing to do.  They say,

23 Your Honor, determine the value of cancer-only first, and it

24 will establish insolvency.  But that assumes that everybody

25 agrees that we know what the insolvency number is.

1            And as I've just discussed, clearly, there's a big

2    range.  Your Honor will need to hold a contested valuation

3    hearing.  There will be experts opining.  As always happens in

4    valuation hearings, there will be a significant range in values

5    that are presented to Your Honor.

6            And until Your Honor has had that hearing you can't

7    possibly say, Aha, the asbestos claims have been proved to

8    exceed the solvency number.  So it's a recipe for Your Honor

9    simply having to do everything twice.  It's a recipe for delay,

10   not for expediting the case.  And for that reason, as well,

11   Your Honor, we think it makes no sense to seriously consider

12   this bifurcation proposal --

13           THE COURT:  Well, I like the idea of getting to a

14   valuation hearing.  Those I understand.

15           (Laughter)

16           THE COURT:  We do those a lot in bankruptcy.  Okay.

17   Thank you.

18           MR. BENTLEY:  Thank you, Your Honor.

19           MR. KRUGER:  Your Honor, Lewis Kruger, of Stroock and

20   Stroock and Lavan, the unsecured creditors' committee.  I'd

21   just like to say that we would agree with Mr. Bernick's

22   presentation and also point out to Your Honor that just the

23   finding of insolvency does not by any means stop the process.

24           The estimation would still need to go forward in

25   order to determine the ultimate distribution, both to asbestos

1  claimants, as well as unsecured creditors in these proceedings.

2  Beyond that I'd like to reserve whatever comments we may have

3  until after we hear from our colleagues across the room.

4          THE COURT:  All right.  Mr. Frankel.

5          MR. FRANKEL:  Good morning, Your Honor.

6          THE COURT:  Good morning.

7          MR. FRANKEL:  Roger Frankel, on behalf of the future

8  claimants' representative.  First of all, Your Honor, I might

9  say that if Mr. Bentley's numbers are right, some 300 billion

10  -- 3 billion have been put on the table we might not be here at

11  this moment.  But I'll walk through the solvency numbers as we

12  see them.

13          MR. BERNICK:  I would object to that statement.  That

14  implicates the negotiations actually have taken place, and that

15  is misleading.

16          THE COURT:  Okay.  It's stricken.  Go ahead, Mr.

17  Frankel.

18          MR. FRANKEL:  Thank you, Your Honor.  Your Honor, I

19  think that what we heard very little of from Mr. Bernick is

20  about cause and about why exclusivity should be extended.  And

21  what I want to focus on and what I want the Court to focus on

22  is the time line that we have had in this case, and the time

23  line that we are likely to have in this case if exclusivity is

24  not lifted.

25          I'm going to go through a series of slides, and

1  because they are not particularly readable on the screen, we're

2  also going to hand them out to those that are involved or that

3  enter their appearance in the exclusivity hearing.  And if --

4          THE COURT:  Me, too.

5          MR. FRANKEL:  -- and I have a set for Your Honor.

6          THE COURT:  Thank you.  They're just a little

7  difficult to see on the screen.  I'm not sure whether it's the

8  -- that machine or the screen that's causing the problems

9  today, but they're hard to read.  Thank you.

10         MR. FRANKEL:  First of all, the first slide is a

11  slide that the Court is certainly familiar with, and it takes

12  us from the beginning of the case, essentially, to where we are

13  now.  And there's a few points that I just want to point out;

14  the petition date, obviously, April of '01.

15         In November of '02, there was a significant event,

16  which was the Sealed Air settlement.  And the Sealed Air

17  settlement was significant in the sense that one of the

18  elements of that litigation was the solvency of Grace.  Sealed

19  Air paid $1 billion to settle that case, as we now know,

20  contingent on 524(g) protection ultimately being obtained.

21         We move on in 2004.  The FCR was appointed, Mr.

22  Austern.  2005 in February Grace was indicted.  And then we get

23  each one of these deals with different exclusivity extensions,

24  and the third page of slide one, the Court was concerned back

25  in June of '05 about whether there would be some business

1 reason why perhaps exclusivity should not be terminated.

2          There were briefs.  There were affidavits.  The

3 bottom line is, there's never been any real concern.  Grace has

4 never expressed any real concern that its business would be

5 affected if exclusivity would be terminated.  Perhaps the stock

6 price would go down, but that's a different issue than the

7 business being affected.

8          Some of the critical factors and those that are

9 relevant in this case, Your Honor, that the Court must take

10 into account in determining whether the debtor has met its

11 burden for another extension is the time in Chapter 11.  It's

12 been over five years; whether a confirmable plan is on file and

13 its status, and I'll get to that; and then the balancing of the

14 benefits of a further extension against the harm of

15 termination.

16          So how does estimation, which is essentially all the

17 debtors talk about in their brief, and in fact, all they talked

18 about today, play into all of this?  I think everyone agrees

19 that estimation of asbestos liability is necessary without a

20 fully consensual plan.

21          The question is, would an estimation in the context

22 of competing asbestos constituent plans meet the goal of

23 exiting Chapter 11 on a quicker time line.  We're now going to

24 go to slide two.  Your Honor, on slide two if we start with

25 estimation hearing, which is in June of '07, essentially what

46

1  we have here is that two things can happen.

2          Under the current plan, the only plan that's on file,

3  if the Court estimates that the asbestos liabilities -- and

4  don't forget, we're including because it's the way their plan

5  is set up -- ZAI claims, as well as property damage claims, as

6  well as present and future personal injury claims, if those are

7  all estimated below $1.6 billion then the debtor goes forward

8  to a disclosure statement hearing.

9          As Your Honor well knows, we have significant

10 confirmation issues that would be raised at the disclosure

11 statement, in particular, whether or not those that are

12 personal injury claimants, for instance, are entitled to vote

13 under Section 524(g).

14         Assuming that they get past the disclosure statement

15 hearing, then we go to a confirmation hearing.  We are in --

16 under the most favorable circumstances to the debtor, we are in

17 early '08 for confirmation.  Now, if we look at the other side

18 of the chart and we assume, as we do, that the asbestos

19 liabilities will be estimated above $1.6 billion, then what

20 happens?

21         Under the debtor's plan there is no possible

22 confirmation.  They don't go to a disclosure statement.  They

23 go to an amended plan.  Presumably, they amend their plan to

24 conform with the rulings of the Court in the estimation

25 hearing.  We then go forward to a disclosure statement hearing.

1         Well, if the debtors continue to believe that the

2    asbestos claimants don't have the right to vote, we have

3    objection confirmation hearings in connection with the

4    disclosure, whether the disclosure should even go forward or

5    not.  If the Court rules that the disclosure should go forward,

6    we are basically into a confirmation hearing in the second

7    quarter of 2008.

8         If the Court rules that the disclosure statement

9    should not go out for solicitation because asbestos claimants

10   are entitled to vote, we're at the earliest in the middle of

11   '08.  The company may be solvent, may be insolvent.  I agree we

12   need to have a separate hearing during this process on that

13   issue.

14        But the fact is, is that under the debtor's approach

15   and under the debtor's plan that's on file we're going to be

16   here a long, long time before we get to a confirmation hearing

17   of a confirmable plan.  The asbestos constituents now seek a

18   process to get this case confirmed more quickly.

19        And while the debtors don't want to hear that, we

20   think the Court would want to hear that and we think that

21   that's essentially the cause that has not been shown by the

22   debtors.  This slide three shows essentially what the asbestos

23   constituents have in mind.

24        Well, I'm not working this too well, but what we

25   would say, Your Honor, is that the estimation takes place, but

1 in the meantime we would have a plan that would be on file.

2 And I'll get to that time line in a moment.  But our plan would

3 say that the administrative creditors would be paid in full.

4 We think that number's 560 million.

5          And by the way, almost all of these numbers are

6 numbers that our financial advisor have discussed with the

7 debtor's financial advisor.  So I don't believe there are any

8 surprises here; that the potential for nonasbestos pre-petition

9 creditors to be paid in full is there.

10          It would depend on what the asbestos constituents'

11 plan says, but the point that I'm making here is that if the

12 estimation comes out to be higher than 2.9 million -- 2.9

13 billion, assuming that that's the insolvency number, or

14 whatever the insolvency number is, then our plan would say the

15 commercial creditors get paid whether it's at par, whether it's

16 at 90 percent, but it would have a number.

17          And just like in Armstrong World Industries the

18 Court, once it got to an estimation that exceeded a certain

19 number, it's done.  The case goes forward with our plan because

20 we've fixed a number for the commercial creditors and we've

21 basically said the remaining assets go into a trust for the

22 benefit of the asbestos creditors, and the asbestos creditors,

23 as Mr. Bernick had said, have already agreed on how they're

24 going to split up the remaining assets.  There's a second page

25 to this plan --

1          THE COURT:  Well, I'm a little confused about the

2   agreement to split up the assets because, frankly, of something

3   that Mr. Bernick raised in his argument, and that is this.  I

4   do expect that within a week or so the ZAI opinion is coming

5   out, and I do expect that at some point we're going to be

6   looking at other property damage claims.

7          Now, just hypothetically, what happens if those

8   decisions aren't in conformity with the value of the trust that

9   has been devoted to property damage claims?  Either higher or

10  lower, it doesn't matter, just what if it doesn't reflect those

11  claims?  I don't think you can agree your way around a court

12  decision.

13         MR. FRANKEL:  Your Honor, I think the way the

14  agreement works is this:  if we just take an extreme

15  hypothetical that property damage is valued at zero, but the

16  personal injury claims are valued at $4 billion, okay, and what

17  ends up coming in is $3 billion of assets, we would have a vote

18  by the asbestos claimants, both property damage and personal

19  injury claimants, that of that $3 billion 85 percent is going

20  to go to the personal injury claimants, even though their

21  claims have been estimated at $4 billion.

22         THE COURT:  Okay.  But that's not the problem.  The

23  problem is that if the Court has actually made a determination

24  that there are no allowable property damage claims, that's the

25  end.  I don't think I can confirm a plan that says you're going

1  to pay value when I've determined that there's no value that's

2  owed.  I don't think that plan's confirmable.

3        MR. FRANKEL:  Well, Your Honor, if the plan is not

4  confirmable on that basis then, obviously, the agreement would

5  fall apart.

6        THE COURT:  Well, there's the problem, because right

7  now what I -- now, assuming that Mr. Bernick has correctly

8  articulated that there is a form of lockup agreement to divide

9  up those assets, regardless of what the Court's valuations are,

10  then you can't propose a confirmable plan at this point,

11  either.

12        MR. FRANKEL:  But Your Honor, I think that our plan

13  would be subject to what the Court orders.  If the Court says

14  that you cannot split the assets the way you've agreed, then we

15  can't do it and we won't do it.  I mean, the agreement right

16  now is an agreement among us.  It is a way to try to move this

17  forward.

18        We frankly don't think property damage is valued at

19  zero.  We may not be exactly right at 15 percent, but if we

20  wait for every last claim to be litigated, this case will go on

21  way too long.  And our goal was to try to reach some agreement

22  that we felt reasonably represented the allocation of resources

23  of the parties.

24        And by the way, it is not dependent on there being no

25  equity.  It is the split as between the asbestos constituents.

1 If the Court determines that there is equity, our split is

2 still 85 to 15.  And our plan -- I don't want to get into the

3 details of what our plan would say because, frankly, we haven't

4 drafted our plan.

5          What we're seeking here is the right to file the

6 plan, but we would file a plan that would certainly take into

7 account the fact that if the Court determines that this

8 arrangement is not confirmable, then that plan can still go

9 forward without that arrangement.

10          Your Honor, I think the point about our plan is it

11 would require a vote.  It would require all of the traditional

12 1129 requirements and 524(g) requirements.  We would expect it

13 to have a vote of all the asbestos constituents in each of

14 their respective classes, and we would expect it to be accepted

15 by the requisite majorities.

16          We don't believe that, notwithstanding that the Court

17 might estimate an amount, that that means you can channel them,

18 pay them in full based on the estimated amount and that's the

19 end of it and they don't have a right to vote.

20          THE COURT:  But conversely, just to satisfy that

21 objection, the debtor and the plan proponents could also modify

22 the existing plan to cure that issue to say that in the event

23 that there's a determination that the claims have to vote, that

24 they can then vote.

25          So I mean, if the only issue is to fix a plan so that

1  one way or other, whatever the Court's rulings are, the plan

2  can go forward, that's a pretty easy amendment to make.

3        MR. FRANKEL:  Your Honor, I will get to what the

4  debtor's plan could say and what in fact they said it would say

5  if we couldn't reach agreement.  And if the right plan were on

6  file I don't think we'd be here arguing over exclusivity.  I

7  think the problem is we have a plan that's absolutely not

8  confirmable that's on file.

9        Your Honor, this is what we see as the time line in

10 connection with the asbestos constituents' plan if exclusivity

11 was lifted.  And the point of this graph is simply that when we

12 got to the estimation hearing we would already have gone

13 through a disclosure statement hearing and a solicitation.

14       And if we were right that the liabilities are over

15 1.6 billion or over 2.9 billion or over 4 billion, then in that

16 event we would be prepared to go right forward to confirmation.

17 And we think in that situation we could have a confirmation in

18 the third quarter of 2007, and we think it's the only way that

19 there's going to be a confirmation in that kind of time period.

20       THE COURT:  You're keeping it in this -- this is

21 assuming that the estimation hearing is still in June of '07?

22       MR. FRANKEL:  Yes, Your Honor.

23       THE COURT:  And that you're going to get to

24 confirmation even if everything else is done in the third

25 quarter, when June's the end of the second quarter,

**J&J COURT TRANSCRIBERS, INC.**

1 Mr. Frankel?  I think that's a bit ambitious.

2         MR. FRANKEL:  Well, Your Honor, it -- maybe it is,

3 but the -- but again, our plan would already have been

4 solicited.  The disclosure statement would have been approved,

5 obviously, and the only thing that would be left would be the

6 estimation hearing.  So the way the pot is split up would be

7 dependent on the estimation hearing and evaluation of the

8 company.  Those --

9         THE COURT:  Right.  But you're telling me it's also

10 going to be a contested valuation.  And frankly, you're taking

11 up virtually all of the days that -- in that time frame, not

12 until June, but starting in that June time frame to get these

13 other things done.  So somewhere in there we need a valuation

14 hearing process, too.

15         MR. FRANKEL:  I think -- I absolutely agree, and I

16 think we're going to probably need a valuation hearing no

17 matter what.  I will say this, and I'm going to get to the

18 solvency numbers in a moment, but -- so actually, I'll save the

19 discussion on valuation for a moment, if I can.

20         The one idea that we had floated in our papers

21 earlier, which we actually thought the debtors had indicated at

22 one point had merit, was the idea of doing a staged estimation

23 where we would do the cancers only first.  It appears today

24 that the debtors don't think that's a good idea.

25         We're still not sure why, because certainly, if it

1 turned out that the cancers only, including those with meso,

2 with lung cancer, exceeded the solvency number then we would be

3 done and it would be a shorter process and the whole issue of

4 the so-called bad doctors and all of those kinds of things we

5 could avoid.  We --

6          THE COURT:  Well, how would it be done, because you'd

7 still have to figure out what the value would be, or you're

8 suggesting that you're somehow going to come up with a consent

9 by the creditors' committee, the commercial committees, to

10 figure out what their distribution should be if the debtor is

11 determined to be insolvent based on the cancer assessment,

12 because at that point even though the debtor may be insolvent

13 from that kind of a sense, you're not going to pay all the

14 money over to the cancers --

15          MR. FRANKEL:  Right.

16          THE COURT:  -- when there are other creditors in an

17 equal class.

18          MR. FRANKEL:  Your Honor, what we're suggesting is

19 that under our plan we would fix a number.  As we're sitting

20 here today I don't know whether it would be par for the

21 commercial creditors, 90 percent, but it would be a fixed

22 number.

23          And then if the estimation of the cancer claimants

24 was above the solvency number, or if we went to 90 percent it

25 would be higher than the solvency number, then the Court

1  wouldn't have to go any further.  In other words, the asbestos

2  claimants would be agreeing, again, as was done in <u>Armstrong</u>,

3  that if you're above a certain number then you don't have to go

4  any further than that.

5        THE COURT:  Okay.  I appreciate the -- I appreciate

6  that at a certain stage in the case that may make sense.

7  Frankly, five years into this case I think we're probably

8  looking at an extra day, possibly two days of trial to get the

9  entire estimation done, and I don't really see at this point a

10 reason to bifurcate that process.

11       If you want to put all the testimony in, in a case if

12 it makes sense in the case itself to structure it so that the

13 evidence with respect to the cancers and the mesos goes in

14 first, that may be one thing, but I really just don't see at

15 this point any reason to take the entire estimation process and

16 put it into two parts, because if for example I determine that

17 the cancers and the mesos are less than that 2.9 billion, then

18 I'm stuck with doing it anyway.

19       And frankly, in analyzing this sort of technical

20 evidence I would really just prefer to do it once and get it

21 done.

22       MR. FRANKEL:  Your Honor, it is -- no more said on

23 it, then.  We were floating it as an idea that we thought might

24 -- maybe the debtors and the Court would want.  We're obviously

25 prepared to go forward with the CMO as it is, and we do

1  recognize, I think as everybody now does, that without a

2  consensual plan we do have to do that.

3        I want to get back to the debtor's plan for a moment,

4  and I want to get back to the fact that the only way that the

5  debtors can achieve confirmation is if three things happen: the

6  estimation of all the present asbestos claims, present, future,

7  ZAI, et cetera, is 1.6 billion or less, two, the Court

8  determines that the asbestos claims are not impaired, and

9  therefore have no right to vote, and third, that the 524(g)

10  does not require the vote of PI claims that are channeled.  All

11  three of those would have to go in the debtor's favor for their

12  plan to go forward with confirmation.

13        Your Honor, I don't want to spend a lot of time on

14  the solvency analysis, but I do want to just show and

15  illustrate how we got to the number that we got to, because

16  most of these numbers are not really in dispute.  The $2.7

17  billion number, which is the enterprise value, is actually a

18  number that's been discussed among the financial advisors.

19        Could it be wrong?  Could Grace become more valuable?

20  Of course.  Could Grace become less valuable?  Of course.  Mr.

21  Bentley is right, the insurance is footnoted in this slide.  It

22  is not given a value because of several reasons.  Number one,

23  it is generally very disputed.

24        Number two, it is very much dependent on the total

25  amount of claims.  So if in fact there are $3 billion of

1  asbestos claims or $4 billion of asbestos claims, then there's

2  more insurance, but in that event the company is even more

3  insolvent, because the insurance is greater, based on the

4  greater number of asbestos claims.

5          The other point, though, is that there are three line

6  items on here for which we have attributed zero liability, but

7  which could have significant liability.  There's the federal

8  criminal case, where there are fines at stake.  There's the

9  Libby Montana Mine cleanup and there's the New Jersey

10 environmental case.

11         We just don't know what kind of valuation or

12 liability to put on that, and frankly, I don't think the

13 company does at this point either.  So the $2.9 billion

14 insolvency number is our good faith attempt to show where we

15 are today.  We'll need a valuation hearing on some of these

16 issues, but we don't think that number is very far off.

17         And if it's off because the insurance is more

18 valuable, that only means there's been a lot more asbestos

19 claims than the debtor at least believes is the case.

20         THE COURT:  Well, okay.  I'm not sure I understand

21 that.  If -- let's just assume for a moment that the asbestos

22 liability turns out to be 1.6 billion just hypothetically, but

23 the insurance assets are not valued at any more than 800

24 million no matter what.  Then the 800 million isn't going to go

25 up because the claims go up.

**J&J COURT TRANSCRIBERS, INC.**

1           MR. FRANKEL:  No, Your Honor.  I think everybody

2  would agree if the asbestos liability is 1.6 or less there's

3  not 800 million of insurance.  It's much less than that.

4           THE COURT:  Okay.  All right.

5           MR. FRANKEL:  The 800 million example was based on, I

6  believe, 3 billion.  I think that 800 is not 800 at 3 billion,

7  but the way it works it's a sliding scale.  The higher the

8  asbestos number, the higher the insurance.  But in terms of

9  round numbers the 800 million was pegged at about $3 billion of

10 asbestos liability.

11          THE COURT:  Okay.

12          MR. FRANKEL:  At 1.8 it's a much, much lower number.

13          THE COURT:  All right.

14          MR. FRANKEL:  Your Honor, I want to get to the --

15 this is my final item on my argument here.  The -- I want to

16 talk about the debtor's status report.  It was filed February

17 13 of 2006, Docket No. 11756.  Clearly, the debtors were

18 concerned then about losing exclusivity.

19          They were just as concerned with this Court's remarks

20 that the debtor's plan has problems.  So let's look at what the

21 debtor said back in February in section 3 of the status report

22 titled, "Grace's work on plan amendment," at page 6.  The

23 report state, one, "Grace also has been at work, both to

24 address the Court's concerns with the plan on file and also to

25 draft a plan to be used if agreement is reached."

1           Two at page 7, "Given the Court's concern with the

2  hard cap, Grace is ready to file if necessary an amended plan

3  that removes the cap on personal injury claims and puts equity

4  at risk.  The actual plan revisions are in process and will be

5  completed by the March omnibus hearing.  Filing such a plan,

6  however, should await the outcome of the current negotiations."

7           Obviously, the current negotiations ended a long time

8  ago.  They attached a Exhibit B to the status report showing

9  what the nonconsensual plan would look like.  And this gets to

10 Your Honor's comments of a few moments ago that Grace could

11 file a plan that would have a much better chance of

12 confirmation.

13          The PI claims will be channeled -- I'm actually going

14 to pick this up because I can't read it otherwise, but

15 everybody has it.  "The PI claims will be channeled to a post-

16 confirmation trust and paid in full the amount of their allowed

17 claim."  Again, this is from their exhibit to their status

18 report.

19          "The plan would say that there would be no limitation

20 or cap on the funds available to the post-confirmation trust to

21 pay PI claims.  The reorganized debtor will be ultimately

22 responsible for any shortfall if the initial funding of the

23 trust proves inadequate to pay PI claims in full"; nothing like

24 the current plan that's on file.

25          And then finally in this section, "Treatment of PI

1  claims," it says that, "PI claims shall be unimpaired and

2  deemed to have accepted the plan for all purposes."  Again, we

3  don't think you can do that under 524(g), but under a plan like

4  this maybe they would even get the acceptance.  Who knows?

5       But there is nothing like this that's on file.  Your

6  Honor, we believe the time has come to try a different

7  approach, because the debtor has simply not shown cause.  This

8  goes back to -- this is a bankruptcy case.  Asbestos cases

9  aren't non-bankruptcy cases.  They're bankruptcy cases.

10      Cause has to be shown.  The only thing that the

11 debtor has shown is that there has to be estimation, and after

12 estimation they'll get around to filing a confirmable plan.

13 They chose to file a plan arm in arm with the commercial

14 creditors, and more importantly, with old equity.

15      That's their choice.  It's their right, but there are

16 consequences that come with that.  The debtor's plan refuses to

17 even recognize the possibility that the aggregate asbestos

18 liability makes this debtor insolvent and therefore, the equity

19 worthless.  Now, Your Honor, is the time to level the playing

20 field.  Thank you.

21      THE COURT:  Let me just whether anyone else is going

22 to speak in opposition to the debtor's motion for extension of

23 exclusivity.  Yes.  Why don't we take a five-minute recess,

24 then, and then we'll return.

25      (Recess at 11:25 a.m., until 11:45 a.m.)

1          THE CLERK:  All rise.

2          THE COURT:  Mr. Baena.

3          MR. BAENA:  May it please the Court.  Scott Baena, on

4   behalf of the property damage committee.  Judge, I, too, speak

5   in opposition to the debtor's motion to extend exclusivity for

6   yet another time in this case.  And I would reiterate that the

7   burden is on the debtor.

8          And we've heard much ado about where we've been,

9   which we all know hasn't brought us to anyplace in particular,

10  except where we are now, which isn't any closer to the end of

11  this case than we were before.  But there are a couple aspects

12  of Mr. Frankel's presentation and the underlying dispute that I

13  would like to focus on and I'll be very brief.

14         To his credit, Mr. Frankel analyzed for the Court in

15  the schematic that shows the decision tree, which I have up on

16  the screen, just what happens in the current state of play

17  where we just pursue the estimations or valuations, whatever

18  you might characterize them as, while we leave on the table

19  only the debtor's plan, which we all thing for some reason or

20  another is not confirmable.

21         And giving everybody the absolute best case scenario,

22  Mr. Frankel described how, whatever the result is if we could

23  reach it in the second quarter of '07, by the third quarter of

24  '07 somebody would be able to genuflect in response to that.

25  Either the debtor, if it's wrong about the extent of asbestos

1  liabilities, it'll just amend its plan.

2        Or the asbestos claimants, if they're wrong about it

3  they'll do something else, too.  But we all know, Judge, that

4  the prospect of all that happening in that short period of time

5  is but a wish, and may be just wishful thinking.  In fact, the

6  delays could be inordinate and all the appeals that are also

7  alluded to in Mr. Frankel's exposition on the subject may well

8  indeed be accelerated, and we may be sitting there like the

9  atheist at his own funeral, with just no place to go at the

10 determination of the Court as to the extent of asbestos

11 liabilities.

12       And on the extent of the asbestos liabilities, not to

13 suggest too strongly which of those branches we're likely to be

14 on, you know, we ought to reflect a little in this context, as

15 well, about the fact that we know what's happened in other

16 cases, asbestos cases that have preceded us with regard to the

17 estimation of liabilities, and we know that in certain of those

18 cases those debtors were likewise selling the same kind of

19 product as Grace.

20       And we know the difference between the extent of the

21 market shares between those debtors and Grace in respect of

22 their principal products and we can only wonder how it is that

23 the debtor would ever expect to get in under the wire of $1.6

24 billion.  But that of course is a matter for another day.

25       The reality is, though, Judge, someone's going to be

63

1  very sorely disappointed by the result, and that disappointment

2  is going to engender a much longer process, and that's the

3  delay that we've all been trying to avert on this side of the

4  table.

5        Now, even Mr. Bernick along the way when we've

6  described this litigation strategy that Grace has had, when

7  we've talked about defining the types of estimation processes

8  that we were going to undertake, even Mr. Bernick admitted

9  along the way that one of the principal purposes and benefits

10  to be derived from all of that litigation would be to create

11  the delta for a settlement between the parties.

12        And indeed, I'm sure the Court's harbored that hope

13  all along.  You sent us out to conduct a mediation, and 'lo and

14  behold, what happened?  Actually, a sociological extreme

15  occurred where asbestos creditors of both the property damage

16  and the personal injury variety, came to a conclusion, a

17  consensual conclusion amongst themselves without any litigation

18  amongst themselves about one means by which they could resolve

19  their respect interest.

20        But we did not come to an agreement with any other

21  constituency and in the context of this exclusivity argument

22  it's a little bit important to understand how that falls into

23  the equation.  When the Court hoped for a consensual

24  arrangement I don't imagine that your hopes were as high of

25  everybody coming to an agreement with the debtor as it might

1  have been in respect of all the creditor constituencies perhaps

2  being able to unify.

3       And the reason is simple, because the issue in

4  respect of reaching a consensual arrangement with the debtor is

5  part and parcel tied inextricably with the issue of whether

6  there's any equity in this case for equity-holders.  And the

7  debtor will continue, as we would expect most debtors to

8  continue, to promote the interest of equity-holders, even when

9  all creditors have unified.

10       And in fact, that's why the asbestos constituencies

11  became more focused on trying to reach an agreement with the

12  non-asbestos creditor constituencies.  And I wish to remind the

13  Court that the reason that an agreement couldn't be reached

14  with the noncreditor asbestos constituency was, although

15  Mr. Kruger characterizes it as just part of the process, it was

16  the most important part of the process at that juncture, and

17  that is a supreme, absolute, abject difference of opinion as to

18  whether or not this debtor was insolvent.

19       And indeed, it was based upon that difference of

20  opinion that unsecureds say, we can't give up an entitlement to

21  being paid in full; we can't give up an entitlement to post-

22  petition interest because if the debtor is solvent that's

23  exactly what we're entitled to.

24       And there's no legal question about that.  And so the

25  issue that was forged by virtue of that mediation, by virtue of

1 the several attempts to reach a consensus was solvent or

2 insolvent.  Whatever the number is that we measure solvency by,

3 we've got to broach that issue and we've got to broach it as

4 quickly as we can in a most efficiently way possible if we ever

5 want to emerge, despite how jaded we're becoming, if we ever

6 want to emerge in a reasonable period of time.

7 　　　　　And so that's why we didn't author or propose a

8 unique solution.  We borrowed.  We borrowed somebody else's

9 solution to this puzzle of how we can move this along, how we

10 can create a new settlement dynamic, one that might well work

11 against us, we understand; we don't think so, but it might, but

12 one which creates that playing field on which creditor

13 constituencies at least can unify.

14 　　　　　And we reflected on the fact that in U.S. Gypsum, as

15 you're well aware, Judge Rolland was confronted with the very

16 same issue and he was confronted with the very same concerns

17 about attenuated and extensive litigation, much like that which

18 is being proposed by Grace, some of which wasn't even as

19 ambitious as what's been proposed by Grace.

20 　　　　　And he said, no, why don't we just take a look at

21 cancers.  Let's determine the extent of cancers, and then we'll

22 know who's in the money and who's out of the money, and we'll

23 create the dynamic that everybody needs in order to go forward

24 with settlement discussions, and that's the simple elegance, if

25 you will, of the proposal that was put forward, Judge.

1          We understand that in some contexts the decisions

2  that you come to in respect of the extent of malignancies

3  precipitates issues in other aspects of the case.  We

4  understand that.  That's the problem with fitting these tort

5  cases into the context of a bankruptcy.

6          They don't exactly dovetail -- the prosecution of a

7  tort case doesn't exactly dovetail with the processes that we

8  employ in bankruptcy, and that's why the Code in many, many

9  respects say, you know, determinations in one respect aren't

10  necessarily binding in others.

11          But at the bottom, the Code insists upon one thing

12  and that is that that fresh start that everybody's entitled to

13  occurs within somebody's lifetime that's associated with the

14  case.  And we're not near that.  And so with its frailty, the

15  biggest being that maybe that calculus doesn't work in some

16  other context, if I'm going to bet against the process at the

17  outside -- outset, maybe that's a real concern, but I don't bet

18  against that process at the outset.

19          We think that the calculus for settlement is

20  immediately put into place when you adhere to this malignancy

21  only concept.  And we certainly think that it is absolutely

22  irrefutable just by virtue of the scope of the litigation to

23  conclude anything other than the fact that if we go forward on

24  that basis we will be in the thick of it quicker, and we will

25  be out of that thicket faster than the process that we've been

1  employing to date.

2        And we think that that's what this case demands,

3  Judge, in all due respect, or we'll just be feeding at this

4  trough forever.  And there is no peaceful conclusion ahead of

5  it; it's just the litigated type.  And the litigated type never

6  ends, because in that environment everybody has an incentive to

7  continue to appeal until the cows come home.

8        We don't think that's the advisable way of

9  proceeding, Judge, and respectfully, we do think that we've

10 offered an attractive, workable, efficient alternative to what

11 we've been engaged in, or not engaged in as the case may be,

12 for the last five years.

13        We urge you to deny exclusivity.  We urge you to grab

14 this case by its neck, Judge, and we urge you to install a

15 process that we think brings it closer to end than we are

16 presently scheduled for.  Thank you.

17        THE COURT:  Mr. Inselbuch.

18        MR. INSELBUCH:  I don't have any charts.

19        THE COURT:  Thank you.

20        MR. INSELBUCH:  I would ask the Court's --

21        MR. BENTLEY:  I'll lend you some.

22        MR. INSELBUCH:  -- I would ask the Court to kind of

23 work backwards with me.  What's clear is the Court has to

24 estimate the asbestos liability.  I disagree with the Court in

25 -- only insofar as I believe we could get there a lot quicker

1  if we just did the cancers first, because we wouldn't have this

2  sideshow war over the broken tort system and all of this other

3  kind of stuff.

4         But the Court -- if that's how the Court wants to

5  proceed, fine.  We need to estimate the asbestos liabilities,

6  and we need to value the assets here.  Now, I've been through a

7  couple of these asbestos bankruptcies recently where we did

8  just that.  These are not great mysteries.

9         But what we need to do is start at the point where we

10 -- the Court has done that.  The Court has estimated the

11 asbestos liabilities and has valued the company.  What do we

12 need then?  If we had a plan on file right then that said,

13 pari passu now, done, it's just arithmetic after that, we would

14 have a confirmation hearing the next day.

15        And in effect, what we're suggesting is that's the

16 road we should follow.  Now, we might -- if you give us the

17 authority to file a plan we might file a plan that's a little

18 different from that, because as you're well aware, creditors

19 will often file plans that offer incentives to other creditor

20 constituencies to prevent the next stage of the war, which

21 would be an appeal from this Court's ruling on confirmation, on

22 this Court's rulings on the estimation of the asbestos

23 liabilities.

24        We had those kinds of circuses in the other

25 bankruptcies where the courts, in very short order, estimated

1  the asbestos liabilities; a few days of hearings, that's all it

2  took.  But appeals can take us through a District Court in this

3  case and then to the Court of Appeals.  That's two years.  Even

4  if everything is affirmed, it's two years.

5           What I would like to see happen is when this Court is

6  finished estimating the asbestos liabilities and valuing the

7  company that there's a plan that can be confirmed, that the

8  plan is on file, that it's been voted approval already, and

9  that it's a plan and a confirmation order that will -- that is

10  less likely to be appealed and is not to be appealed by someone

11  whose appeal will stay the effective date of the plan's coming

12  forward.

13           And that's what we're trying to design for the Court,

14  because if you follow the debtor's logic and we go to the

15  estimation and we go to the valuation, they will then appeal.

16  Someone will appeal that and there will still be no plan in

17  place.  There will still be no deal in place.  There'll be no

18  framework, no matrix around which the constituencies can

19  coalesce.

20           THE COURT:  Well, I have a little bit of trouble with

21  the concept that I'm not doing estimation and valuation in the

22  construct of a plan, and I don't intend to be entering final

23  orders with respect to estimation and valuation except in the

24  context of a plan, so that if there is an appeal --

25           MR. INSELBUCH:  Then there better be a plan.

**J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  -- then there better be a plan.

2          MR. INSELBUCH:  They why shouldn't there be a plan on

3  file now that can get voted on, that will be in front of the

4  Court when the estimation is being done and when the valuation

5  is being done?

6          THE COURT:  Well, that's all a good question and I'm

7  not sure I know the answer to why shouldn't there be, because

8  at the moment I do have a plan.  I understand there are some

9  significant concerns by the -- some of the creditor

10 constituents with it, but nonetheless, there is a plan on file.

11         My intention is not to create appealable orders until

12 we get to plan confirmation, because it seems to me that this

13 is all done in the context of a plan, and I don't see any

14 benefit to piecemealing these issues one at a time.

15         MR. INSELBUCH:  I couldn't agree with the Court more.

16 But then there should be some plan or plans on file that,

17 depending on what Your Honor finally decides, will -- you will

18 confirm.

19         THE COURT:  Well, on file is one thing.  Out for

20 votes is quite another, because there are so many issues at the

21 moment with respect to the liability and the valuation and the

22 possibility of cram-down under a number of scenarios, I don't

23 know how it can -- I don't know how any plan can necessarily

24 get out to vote until those determinations are made.

25         MR. INSELBUCH:  Just if there were a plan that said

1 nothing that all than pari passu determinations after this

2 Court's done the calculation, a plan that is just simply

3 arithmetic.

4 　　　　　THE COURT:  Well, that plan probably doesn't even

5 need to go out to vote, I mean.

6 　　　　　MR. INSELBUCH:  Well, I think it does need to go out

7 to vote.  Particularly, you need to know -- you will need to

8 rule -- if the debtor is correct in its views of estimation you

9 will need to know whether or not the asbestos claimants need to

10 vote.  The simplest thing to do, of course, is let them vote.

11 Then you can decide -- if they voted against his plan, you

12 could decide it doesn't matter.

13 　　　　　THE COURT:  I think that's a very wise discussion to

14 have with the debtor.

15 　　　　　MR. INSELBUCH:  Now, I don't understand how going

16 forward with simply the debtor's plan, which can only be

17 confirmed if your rulings are of a certain kind, is a useful

18 exercise.  And to leave us at the end of the day -- suppose you

19 came in with an estimation at 1.7.

20 　　　　　That still wouldn't make our constituency very happy,

21 but his plan wouldn't be confirmed, because his plan doesn't

22 provide for that.  Now, what we are suggesting, and we haven't

23 formulated the plan yet because Your Honor hasn't authorized us

24 to do so, is that we would have before the Court and out for

25 vote, hopefully, a plan that irrespective of how Your Honor

1  rules can be confirmed with the numbers plugged in and we can

2  be, at least at that point, past the level of the Bankruptcy

3  Court, recognizing that everything after this Court is still

4  subject to appeals.

5         But we are hopeful that that process is much more

6  likely to lead to fewer appeals, because we might provide in

7  such a plan an alternative course for other creditors, where if

8  they supported the plan it would be to their advantage,

9  depending upon what the estimation showed.

10        Now, I -- what we can't understand is how that

11  approach is not going to expedite the process.  We believe it

12  has to expedite the process because whether or not we get this

13  estimation done in June or July, I suspect if Your Honor keeps

14  it on the calendar it will get done as scheduled.

15        That's been the experience in every one -- every

16  other one of these cases.  If the Court just stays with the

17  schedule the lawyers will have to adjust to that.

18        THE COURT:  I think I've said pretty clearly, I don't

19  see any reason right now why that schedule's going to change.

20        MR. INSELBUCH:  Nor do I.

21        THE COURT:  Again.

22        MR. INSELBUCH:  Nor do I; nor would I ask that it

23  change.  It's time to get done.  It's time to have a plan that

24  can be confirmed.  It's time to find out what people are

25  willing to do by their votes on a plan and on a proposal on an

1 arrangement that is subject to what the unknowns are here, what

2 your rulings will be.

3       And I urge the Court to let us go forward to put that

4 on the table so that we can get moving forward.  And if the

5 debtor wants to take its plan forward, as well, we would

6 support that also.  And we can have a big package that goes out

7 and people can vote A or B or both A or not A and not B,

8 however they choose.

9       But we would really advance the ball during this

10 period while we're working on estimation and we're working on

11 valuation.  We could really advance the ball so that when Your

12 Honor rules, we're ready to go.  Thank you.

13       THE COURT:  Mr. Esserman.

14       MR. ESSERMAN:  Your Honor, Sandy Esserman.  We've

15 filed papers on behalf of Barron and Budd, Environmental

16 Litigation Group, Law Offices of Peter Angelos, Real, Morgan,

17 Silver Perlman, and Simmons Cooper on this matter.  I obviously

18 will not repeat anything you've already heard, but a couple

19 things we haven't heard.

20       April 2, 2001, that's when this debtor filed

21 bankruptcy.  So what Your Honor has to ask yourself is how much

22 time is enough.  How long should exclusivity go on?  Under the

23 debtor's proposal they're really talking about exclusivity,

24 really, through 2008, or at least until 2008.  Even today,

25 April 2, 2001, is a significant period of time.

1          The next question I suspect Your Honor is going to

2    ask herself is, what is the more likely path for resolution of

3    this case?  No one's really talked about that either.  Well,

4    we've tried mediation and it partially worked.  There were some

5    deals that came out.

6          Is this the path that's going to most likely resolve

7    this case?  It seems to me that if you've got an evening of the

8    playing field, if you've got two plans, that's going to force a

9    lot of things to happen.  It's going to force a lot of the

10   creditors to take a sharp look and see an alternative to

11   confirmation.

12         If Your Honor lifts exclusivity the sky is not

13   falling.  Your Honor controls the process.  You control when

14   disclosure statement hearings occur.  You control when plans

15   get voted on, when they get submitted to the creditors, when

16   confirmation hearings are set.

17         It is not the end of the world for the debtor by any

18   means.  But what it does do, it puts an alternative proposal on

19   the table that people can at least discuss.  It seems to me now

20   is the time to do that.  If we don't do it now I think we're

21   really looking at 2008 before anything really happens to even

22   the playing field.  Thank you.

23         THE COURT:  Anyone else?  Mr. Bernick.

24         MR. BERNICK:  Is it all right if I sit here, Your

25   Honor?  The labels that are used are somewhat different.  We

1  say scope of liability.  They talk about solvency.  Solvency

2  obviously involves an asset valuation, one that can't be done

3  without looking at the liability.

4           Everybody agrees with fervor that we've got to get to

5  the core of what the liabilities are.  I think that -- I know

6  that we appreciate Mr. Frankel's candor and for that matter,

7  Mr. Inselbuch's candor in saying that the way to determine that

8  liability is not to do it piecemeal in the Court's mind; fine,

9  we'll do it all together.  I think that that is both candid and

10 sound.

11          So there is I think a common core of central

12 agreement.  Number two, beyond the fact that we have to go and

13 turn to that matter, there's the question of, well, is there

14 any plan really that at the end of the day is immune from that

15 determination; that is, can go forward without regard to the

16 outcome of that process?

17          It's been demonstrated here graphically -- it's not

18 really a demonstration; it's an illustration.  This is the

19 chart that Mr. Frankel used -- but certainly, when it comes to

20 the debtor's plan the outcome of the estimation will have an

21 impact on the plan.

22          Now, the plan was designed to have that occur.  So we

23 know that the debtor's plan is not immune to the outcome of the

24 litigation, of the estimation.  That was transparent from the

25 very beginning, but at the same, as Your Honor has recognized,

1  how much modification really would be necessary, depending upon

2  the outcome?

3          What's very revealing is that -- a small modification

4  to Mr. Frankel's chart illustrates this point -- is that the

5  estimation hearing would have an impact not only on the

6  debtor's plan on file, but also upon any asbestos plans,

7  certainly any asbestos plan that purports to follow through on

8  the deal that's now been reached.

9          And what Mr. -- both Mr. Frankel and Mr. Inselbuch

10  have now acknowledged is that any plan that they develop has

11  got to be subject to court order.  That is to say, once the

12  estimation takes place it may well have an impact on the plan,

13  and as Your Honor has recognized, certainly with respect to a

14  plan that purports already to allocate value.

15          And interestingly, when I described what the plan

16  did, their plan or the outline of their plan did I said, it's a

17  cram-down plan, number one.  Number two, it purports to

18  allocate value without regard to whether the value matches up

19  to Your Honor's values, and number three, it's a lockup on

20  negotiations.

21          Not one person stood up here this morning to say that

22  that was wrong, not one.  I'm sure that now that I've said it

23  I'll probably get a chorus.

24          MR. INSELBUCH:  It's wrong.

25          MR. BERNICK:  A chorus, it's wrong.  But that's

1 exactly what we've asked them to confirm in writing.  That's

2 what we believe -- that's what I was told -- that's what we

3 believe the deal is.  And as they now recognize, that if that's

4 the deal the plan will fall apart if Your Honor's

5 determinations don't support that allocation.

6       So they made -- they have to make their plan subject

7 to court order, so that effectively, all plans, all plans that

8 are under consideration have to deal with the scope of Grace's

9 liabilities.  That's why we're here.  And depending upon what

10 the scope of Grace's liabilities are, call it a solvency

11 proceeding, call it an estimation proceeding, that is going to

12 inform any plan in this process.

13       In a way, they say -- well, I'll -- let me stay to

14 the other point.  What does that mean?  That means that we have

15 to have an estimation hearing before any plan can be finally

16 structured to be in accordance with the Court's resolution of

17 the central issue in the case.

18       Now, what have we done?  We have said, give us an

19 extension of exclusivity up through the determination on

20 estimation.  That doesn't give us an advantage.  That simply

21 recites the fact that nobody really can develop a plan here

22 without knowing more about what the Court's going to determine

23 here.

24       So our proposal regarding exclusivity does not give

25 us the upper hand.  It preserves the status quo so that we can

**J&J COURT TRANSCRIBERS, INC.**

1  get business done that is necessary to be done for any plan to

2  be finally formulated.  That is what we're proposing.  We're

3  proposing nothing more than that.

4          So now, the question becomes well, if that's what the

5  story is, that is, if at the end of the day any plan is going

6  to be subject in some fashion to the Court's order, the Court's

7  order is going to come out of the estimation hearing, is there

8  anything that can or should take place during the interim by

9  way of proposing an alternative plan, and should it take place?

10         And I think that the answer to that is that -- as

11  follows.  First, does it make sense to have -- I've now marked

12  this up here -- an alternative plan go out which is subject to

13  court order for solicitation during this period of time?  It

14  makes absolutely no sense.

15         It makes no sense first of all because there'd be a

16  competing solicitation.  So what happens?  All these

17  proceedings, I don't know when they're going to occur because

18  Your Honor doesn't have time on the schedule to deal with this

19  whole plan, disclosure statement process, solicitations process

20  and contest all before the estimation takes place?  Come on;

21  not going to happen.

22         Number two is, what are you soliciting?  If you got a

23  plan that all it says is, well, here's how we're going to lock

24  everything up, but it's all subject to court order, what are

25  you really asking for people to sign off on?  So the idea of

1 having a solicitation is, a, going to be incredibly time-

2 consuming, and b, legally, how is it the solicitation that you

3 can really say at the end of the day provides adequate

4 information to people whose votes you're soliciting?

5          You don't know what the final picture is going to be.

6 So then the question becomes, well, what if we just have a

7 plan?  We don't solicit it.  We'll just send the plan out there

8 so it'll be there at the time that Your Honor rules; there at

9 the time Your Honor rules.

10          Well, first, I don't think that they're actually

11 contented yet.  They want something more.  They want to

12 solicit.  They want to send it out so it's ready.  If they

13 can't solicit and send it out then what's the point of having

14 the thing on file to begin with?

15          It just kind of sits there, unless their real purpose

16 is that they really want to have some kind of impact on how the

17 stock market and the securities market looks at this case, and

18 that's not a legitimate consideration for proposing --

19          THE COURT:  Maybe they just wanted to get a plan on

20 file that they think is confirmable, because they don't think

21 the debtor's plan's confirmable and the debtor has offered --

22          MR. BERNICK:  But that --

23          THE COURT:  -- to amend the plan, but hasn't done it.

24          MR. BERNICK:  Well, I'm going to get to the offer to

25 amend and what's happened with respect to that in just a

1  moment.  But let's assume that they say, well, we don't like

2  the debtor's plan.  So let's -- we want our plan on there.

3  What's the -- what purpose is accomplished by that?

4         It can't have content to it until the Court provides

5  the estimation.  Let's kind of take a huge step back from these

6  plans.  There's a certain part of the plans that has to deal

7  with 524(g) and solicitation of votes, and that becomes very

8  complicated.

9         It becomes complicated for the debtor to deal with

10 leaving the claimants unimpaired in the event that there's not

11 a consensual plan.  We recognize that that's an issue and we

12 recognize it -- we had a whole hearing on that subject about a

13 year ago.

14         Their problem is, as Your Honor has suggested -- as I

15 suggested and Your Honor has at least said that's important to

16 think about, they can't overpay claims.  They have no license

17 to overpay claims, and they can't prove -- they have not proved

18 so far what the claims are worth.

19         So they've got a problem.  Everybody's got the same

20 problem.  With all this elaborate thing here or there, 524(g),

21 the central problem is the plan is going to have one principal

22 purpose, which is to allocate value to claimants.  Whether it's

23 our plan or it's their plan, the common skeleton, the common

24 structure will be the allocation of value to certain claimants.

25         That's the core.  When claimants vote they're going

1  to want to know what they are voting for, how much value they

2  are going to get out of the plan.  So Mr. Baena's folks and

3  property, they're going to want to know, well, are we going to

4  get paid at all or is the Court's -- is the disallowance that4

5  the Court just issued in connection with our claim, is that

6  going to prevent us from getting paid, or our claim is going to

7  be disallowed?  Are they going to be paid at all?

8         How can they possibly exercise their voting rights in

9  an informed fashion if they don't know what their value is

10  going to be?  To simply say, oh, well, the creditors get

11  treated equally and equity gets money if there's money left

12  over to them, that's not much to vote on.

13         We all know that, basically, the constituencies will

14  vote depending upon how they think that's going to sort out,

15  but they won't have information that tells them how it's going

16  to sort out.  We'd have to go ahead and resolicit all these

17  things once you actually knew what the dollars are.

18         All plans have to deal with this problem.  All plans

19  have to have an allocation of funds to pay claims.  That is

20  what the claimants are going to vote on.  Their plan that says,

21  equity gets nothing unless the Court orders otherwise.  Our

22  plan says, equity gets something unless the Court orders

23  otherwise.

24         We're all wrestling with the same problem, which is

25  that we don't know what the Court is going to determine, and no

1  plan that's put on trial, our plan, their plan is going to

2  definitively answer that question until Your Honor rules.

3  That's just the basic fact.

4          And you say, well, but under those circumstances,

5  that is, where no plan can really make that specification

6  today, do you terminate exclusivity so that we can have their

7  plan come on trial?  And that raises an interesting question.

8  It's the question that Mr. Frankel raised.  It's the question

9  Mr. Baena raised.

10         It is, what is the standard for the extension of

11  exclusivity?  What is it that cause means?  And they indicate

12  that, well, for the -- for Grace to be able to demonstrate, and

13  as Mr. Baena states, the burden is ours, that exclusivity

14  should be extended.  We have to say our plan on file today is

15  confirmable.

16         I don't believe that that's what the standard is.

17  It's certainly not how the standards read out.  That's to say

18  that given the progress of the case there is a prospect, a

19  reasonable prospect that ultimately a viable plan will be

20  proposed by the debtor.

21         That's how it reads, and that is exactly -- so that

22  then takes you back to the question not of whether the plan on

23  file today is confirmable, but whether the debtor has engaged

24  in the process, a process that points to ultimate success in

25  filing a confirmable plan.

1          And we've already talked about how we and we alone

2  throughout this case, all the years that Mr. Esserman refers

3  to, we and we alone have sought to supply the key element

4  that's going to be part of any plan, which is the element of

5  ascertaining value, who gets what.

6          That's what we have done.  That's what nobody else

7  has done in the case.  But there's also another story, a story

8  that relates directly to plan formulation, and that is historic

9  and has been described previously, but not today.  And it's

10  extremely germane, and that is, what has happened with the --

11  with respect to proposing plans that ultimately are designed to

12  be consensual plans?

13          And Your Honor, remember, we -- at your direction we

14  filed our plan.  We were given a deadline for filing a plan.

15  And recall that prior to that plan deadline being reached we

16  asked that it be put off for 30 days.  And the reason was that

17  there were active negotiations on a plan at that time.

18          And why were there active negotiations?  Because

19  there already had been settlement negotiations before within a

20  certain range.  I'll just indicate it roughly like that, and we

21  were proposing filing a plan that we thought would pick up on

22  those settlement discussions and put us in a range where we

23  thought we could reach a settlement.

24          And so close was everybody that everybody agreed that

25  the deadline should be extended.  We filed the plan and we then

1 had a big problem, which was the walkaway problem.  All of a

2 sudden things started to deteriorate.  I'm not going to go into

3 who, why, what.  It just didn't work out.

4        It didn't stop, however.  There were then efforts to

5 revive the settlement discussions, again, within a range that

6 was a workable range, and Your Honor has heard by that -- about

7 that.  And that continued on for some period of time, and

8 ultimately, when it came time to then say, well, what should

9 happen, there's a proposal for mediation.

10        And the quote that was made from our statement that

11 we were working on a nonconsensual plan, that quote was taken

12 for what we told the Court just as that mediation started,

13 because we were optimistic that if the mediation went, as all

14 of the other discussions had taken place, that there would be a

15 way to reach out and create a common ground for resolving this

16 case.

17        That plan, our statement expressly considered the

18 prospect that there would be a meaningful mediation following

19 in with the settlement discussion history and including the

20 debtor.  It never happened; it never happened.  The mediation

21 process never included us.

22        There was a walkaway, a walkaway from this entire

23 history.  So you say, has the debtor demonstrated a process and

24 a willingness and activity not only to resolve the core issue

25 in the case, that is, who gets what, but to pursue and produce

1  a plan that is a consensual plan.

2        The answers on both scores, we've done absolutely

3  everything that we possibly could.  And what's now being said

4  is that we can have a mediation process that excludes the

5  debtor, a plan that they want to file that they can't even yet

6  formulate, that excludes equity, that doesn't treat the

7  unsecureds as they believe they're entitled to be treated.

8        And somehow because they've now set that table,

9  unless we can come and say to Your Honor, oh, we'll persuade

10  even them to terminate exclusivity.  It can't be right.

11  Exclusivity is out there to foster a two-way street, not a one-

12  way street, not a street of lockups, not a street of, we don't

13  want to estimate, which is what they've said for five years,

14  not a street of, you're not invited to the mediation table that

15  you're responsible for setting.

16        That's not what termination of exclusivity is about.

17  We're on a good path.  We should continue back on that path.  I

18  just want to cover a couple miscellaneous points and then I'll

19  sit down.  It's been suggested here that we all know where the

20  estimation is going to go.

21        Take a look at Owens Corning Fiberboard, take a look

22  at Armstrong, and I guess I've got one answer to that.  If

23  they're so confident that the estimation is going to turn out

24  their way then what's the big deal.  Let's just get it done,

25  because if they're right, they're right.

1          That's what -- that's the bet that we're making.

2  It's a bet the company bet, which says, all the cards are on

3  the table.  Let the liabilities be whatever they are.  When

4  Grace filed for Chapter 11 that is the bet that it made, that

5  it did not believe that the liabilities were what the -- what

6  was being told to it.  And the only way to get that rationally

7  decided was before this Court.

8          We made that bet long ago and it's time for them to

9  be also parties to that bet.  I would point out just

10  parenthetically, a lot of discussion took place regarding the

11  Armstrong case and the fact that it was somehow not necessary

12  for the Court to focus on a particular number.

13          Armstrong has been misconstrued.  The Armstrong case

14  was a consensual plan.  It was an agreed-to plan.  There was

15  only one dissent that came from the unsecured creditors'

16  committee who didn't believe -- who believed that it was a

17  discriminatory plan.

18          And the only issue, therefore, that remained to be

19  resolved of all the other issues was, was the total value

20  placed on the asbestos liabilities reasonable.  That's all that

21  it was.  It was a very carefully constrained case, and even

22  then the Court had to engage in an estimation of all of the

23  asbestos liabilities.

24          Another point.  They say, well -- Mr. Baena says, we

25  know how this is going to come out; we know what the market

1  shares are and it's been done this before, that before.  Your

2  Honor, when you take a look at the cases that have come up for

3  estimation, they are -- it's no accident that the cases have

4  come out that way.

5         You have OCF.  You have Federal Mobile and you have

6  Armstrong.  If you went back, the big picture at the time that

7  the cases were consolidated under Judge Woollen, there were

8  some companies that wanted to test liability because they

9  believed that there was equity there.  There were some

10 companies that did not.

11        Owens Corning Fiberboard never believed that there

12 was money there for equity.  It was always a question of which

13 of the creditors was going to get what.  And that case was

14 litigated.  It was not litigated by the debtor.  It was

15 litigated by other creditor constituencies, and Owens Corning

16 Fiberglass was an amazingly -- Fiberboard -- was an amazingly

17 important player in the asbestos liability picture.

18        Its personal injury history was very, very different

19 from that of Grace and that of USG.  Armstrong was another

20 situation where the company decided day one that for whatever

21 reason, they did not want to pursue an issue of what the scope

22 of their liability was.

23        They, day one, sought to develop a plan that provided

24 nothing for equity.  The only exception was warrants for

25 management and we see that that evolved also in a different

1  kind of way.  What case is most similar to our case?  It is

2  <u>USG</u>.  <u>USG</u>'s history was largely a history of property damage

3  like Grace's.

4         <u>USG</u> was a late-comer to the personal injury table,

5  and yet, with respect to <u>USG</u>, the same people made exactly the

6  same arguments.  They said, oh, hopelessly insolvent, how often

7  I've heard, hopelessly insolvent, billions and billions and

8  billions, but then what happened?  A deal got done?

9         And a deal left billions of dollars of equity on the

10 table.  Now, why did that deal get done?  I'm not quite sure.

11 But when this is all made to be inevitable that everybody knows

12 what the liability is, it's a foregone conclusion, that is not

13 what history says.

14        Mr. Baena says -- characterizes the agreement that

15 was reached with the personal injury constituency as being a

16 sociological extreme.  I guess that means you guys get along so

17 well ordinarily.  It was not a sociological extreme.  That deal

18 stands -- the lockup deal stands for a sociological mainstream

19 event which is that when it comes to allocating who gets what

20 of other people's money, often it's easier to reach agreement

21 among yourselves rather than with the people who actually have

22 the money.

23        Should there be a malignant only estimation first,

24 Mr. Frankel acknowledges, Your Honor, if you want to have it

25 all at once, that's fine.  Mr. Inselbuch, the same thing.  Only

1  Mr. Baena seems to have a stake and say, no, we really should

2  have malignant only.  Why?  Because a subtext here is that the

3  property damage constituency would like to get out from the

4  litigation of property damage claims, and this is a way that

5  that strategic objective can be achieved.

6          Mr. Esserman says, how long must this take.  And the

7  answer is relatively simple.  It's been simple from the outset

8  of the case.  Only so long as the parties believe that there is

9  room to wiggle on the ultimate answer to the ultimate question,

10 which is, what are the claims worth.

11         We have to live with that answer.  They have to live

12 with that answer.  The faster we get to the answer, that's how

13 fast the case will be resolved.  What is the best path to

14 consent?  Well, if the answer is that the only path to consent

15 is one where all the equity is gone because their theory of the

16 case is bought, there will not be a consensual plan unless Your

17 Honor agrees with that position.

18         That's our way of saying, you must be like Owens

19 Corning Fiberboard.  You must be like Armstrong.  You must

20 capitulate.  Ironically, actually in the Manville case, the

21 first case, 20 percent of the equity of the reorganized

22 Manville did not go to the asbestos claimants.  It went to

23 management and other key players going forward with respect to

24 the case.

25         So I don't know what ultimately is the best path.

**J&J COURT TRANSCRIBERS, INC.**

1  The only path is one that resolves the central issue of the

2  case.  And then what really is the purpose of terminating

3  exclusivity?  An argument has been made in the past, and this

4  is Mr. Baena that says, gee, you got to terminate exclusivity

5  because the marketplace is reacting to what's happening in

6  court.

7          And we filed this plan and as a result we've kind of

8  misled or framed how the marketplace reacts, and in some

9  fashion exclusivity has to be terminated for marketplace

10 reasons.  We've actually taken a look at that and we will

11 provide the Court -- this is the trend of what happened to

12 stock prices.

13         And what we see is that the stock price for Grace

14 actually rose fairly significantly long before our plan of

15 reorganization was filed.  It was beginning in June of '04 and

16 we all know why it rose.  It rose as a result of the

17 legislation.

18         If you take a look at what happened to Grace's stock

19 price immediately after the plan of reorganization was filed,

20 it didn't jump up.  It declined.  It declined.  Whether you

21 take a look at one week, whether you take a look at two or

22 three weeks, it declined.

23         If you take a look at what happened after the amended

24 plan of reorganization was filed in January of 2005, it

25 declined again.  So the whole idea that somehow the marketplace

1 is reacting to the undue optimism associated with the Grace

2 plan, it is just not right.

3          The fact of the matter is -- and we can supply this

4 chart -- take a look at literally all the major developments

5 that have taken place in the stock market over time.  They're

6 overwhelmingly driven, first of all, by the Sealed Air

7 negotiation and then by developments concerning legislation.

8          One last footnote on Sealed Air, they've somehow

9 suggested that the Sealed Air settlement was a concession that

10 at least Sealed Air believed that Grace was insolvent in 1998

11 at the time of that transaction.  And what's interesting about

12 that is that it shows the danger of inferring anything from

13 settlements.

14          Your Honor may or may not recall, one of the first

15 players that came into the Grace case was Sealed Air.  They

16 came in, in connection with the preliminary injunction process

17 at the beginning.  What was their big problem?  Their big

18 problem was that once sealed -- once Grace went into Chapter 11

19 all the folks who were suing Grace turned around and they

20 started to sue Sealed Air.

21          We had 6,000 claims in 60 days.  Sealed Air,

22 supported by the debtor, was able to get an expansion or an

23 extension of the stay and preliminary injunction to include it,

24 but then it faced a big problem.  If they didn't make a deal at

25 the end of this case they would be back exactly where they

1 began.

2         So you say, the money that they paid, which is

3 contingent upon getting a 524(g) injunction, did that represent

4 an admission that Grace was insolvent in 1998?  I don't think

5 so.  I think what that represented was Sealed Air's

6 determination to get what a lot of other companies that are

7 solvent companies would love to get and have not been able to

8 get, which is a 524(g) channeling injunction without having to

9 go into bankruptcy themselves.  And did they pay money for it?

10 Yes, they did.

11         MR. INSELBUCH:  Can I just have a minute or two to

12 respond to some of this?  Mr. Bernick has the ability to read

13 men's minds and tell you what was going on in cases where he

14 wasn't even present.  He also has the ability to tell you

15 what's going on in the court system and I think what you're

16 going to start to hear today in the next motion that's before

17 you is a story that's very different from what you heard from

18 the debtor.  But I would like to just point to his chart over

19 here and write one word on it.  We've had five years --

20         THE COURT:  Sir, you're going to have to use a mike.

21         MR. INSELBUCH:  I'll just write the word and then

22 I'll talk.  The word is "failure."  We've been doing it their

23 way for five years and we've had a failure.  We've gotten

24 nowhere.  He had negotiations, he says now, where he thought he

25 was close to a deal.  That was based upon the possibility that

1  there'd be a Fair Act.

2        The reason why people bought equity in this company

3  was because they thought there was the possibility of the Fair

4  Act.  Now, there's not such a good possibility for the Fair

5  Act.  Maybe next congress there'll be another Fair Act.  Who

6  knows?  We've got to get this done.

7        We can propose a plan.  In every one of these other

8  cases estimation was done after the plans were voted on.

9  That's just silly.  We can propose a plan that the Court will

10 -- that will have a disclosure statement that this Court will

11 approve that will give sufficient information for people to

12 vote.

13       We've done it in every other case.  We can propose --

14 and we could propose a plan that provides for the commercial

15 creditors, something that they might like and they might even

16 vote for.  But we're going to get nowhere on his track for

17 another five years if what he gets to do is do estimation,

18 which we all agree we're going to get done in June.

19       But then we're going to have no plan on file, nothing

20 to confirm, no deal in place and we're going to wind up

21 appealing all the rest of these pieces.  That's what he wants.

22 That's how he keeps control of this case.  This Court must take

23 control of this case and this Court must see to it that when

24 this Court rules there'll be something to rule on.

25       MR. KRUGER:  Yes.  Good afternoon, Your Honor.  Lewis

1 Kruger, for the unsecured creditors' committee.  First, let me

2 say, to the best of my knowledge I think Your Honor does have

3 control of this case.  I've never thought otherwise, and I

4 still think that that's true.

5       But what I've heard from my friends at the asbestos

6 side today is -- in a sense I would almost laugh, but I really

7 -- it's too serious to laugh at.  First, what they say to us

8 is, for the unsecured creditors and looking solely from their

9 perspective, they will file a plan that has the potential if

10 there is insolvency, potential for claims to be paid in full;

11 not a certainty, but a potential.

12       Then they go on to say that we're going to have a

13 plan filed and we're going to have a disclosure statement

14 filed, and a disclosure statement hearing.  And at that hearing

15 this is what will not be known, right.  We will not know the

16 estimation of the asbestos liability, the property damage

17 claim.

18       We may know something more about Zone-A-Life

19 (phonetic) by then, perhaps.  We won't know the total

20 enterprise value or the total distributable value.  In addition

21 to that, what else won't we know?  We will also not know the

22 results of the federal criminal case, the would-be Montana

23 cleanup, the New Jersey environmental suit.

24       We won't know any of those things, but we're supposed

25 to vote on that reorganization plan in which all of the key

1 elements of a plan are missing.  What they're really in a sense

2 suggesting, Your Honor, is that somehow or other the Chapter 7

3 ought to be brought into this process, because what we're

4 really saying is, it doesn't matter how you vote.

5        There's going to be a determination about the

6 enterprise value, the amount of the liabilities and it will

7 come out however it comes out.  That's not what Chapter 11 is

8 supposed to be about.  If we're going to have a disclosure

9 statement it needs to disclose relevant information so that

10 ordinary human beings can indeed cast a vote based upon some

11 reasonable level of knowledge about the outcome to them

12 economically of what which they are voting upon.

13        May not be perfect, but there ought to be at least

14 some measure that gives them some comfort that there is

15 something that they can look forward to receiving.  This

16 proposed plan would do none of those things.  You would not

17 know whether or not you were voting for something that gets you

18 any recovery, some recovery, a handsome recovery, all of that

19 would be unknown and it wouldn't be a known until after there

20 has been indeed the estimation hearing that they seek really to

21 avoid.

22        What they really seek to do is to have a microscopic

23 estimation hearing in the context of the confirmation of the

24 plan on the assumption that that will be quicker and better and

25 easier.  But the reality of it is that the Court does indeed

1  put forth an estimation program and a time frame and a process.

2          We've also been at this case for the same years that

3  everybody else has been at this case, but at this point in this

4  case I think it's far more important to get it right than to

5  try to get it fast and wrong.  And it's wrong to think that

6  creditors should be put in the position of having to vote,

7  really, on a best guess by what I assume that their plan would

8  provide, is their best guess as to how outcomes might come.

9          Well, we're very close to having the actual answer to

10  many of these questions.  I think we ought to see the answer to

11  those questions.  In addition to that, I think in terms of

12  exclusivity I think the debtor has done everything it possibly

13  can do to try to move this case along.

14          It has certainly not dragged its feet.  It has

15  certainly not been unresponsive, either to its -- all of its

16  constituencies.  In light of that I think the debtor's

17  suggestion that exclusivity should be continued until the

18  conclusion of at least the estimation hearing is a proper one

19  and should be granted by the Court.

20          MR. BENTLEY:  Phillip Bentley for the equity

21  committee; very briefly, Your Honor.  I entirely agree with

22  everything Mr. Bernick and Mr. Kruger have said about how any

23  plan that the plaintiffs were to file now would be premature.

24  It would need to be based on a prejudging of rulings that the

25  Court has not yet made.

1           And any plan that they would file we've seen, they've

2  announced would be based on a pre-judging of whether the debtor

3  would be solvent or insolvent, which as Your Honor has

4  recognized, will hinge not only on Your Honor's estimation

5  rulings, but also on valuation rulings, which may be -- are

6  disputed.

7           Let me just add two brief points to what's been said

8  in this regard about how it would be inappropriate to pre-judge

9  solvency or insolvency.  First, I entirely agree with

10 Mr. Bernick that USG is the analogous case to look at, and as

11 Your Honor knows very well, that was a case where, as

12 Mr. Bernick pointed out, we heard choruses from the other side

13 about USG was deeply insolvent.

14          It turned out that at confirmation pre-petition

15 equity was given consideration that at confirmation had a value

16 of more than $3 billion.  So that's a number that's worth

17 keeping in mind.

18          THE COURT:  Well, I got into USG late, but frankly, I

19 never heard that USG, who had this chorus of people or entities

20 claiming that it was insolvent.  In fact, I kept hearing that

21 pretty much from the outset of my taking over the case that

22 there was relative agreement as to the value and that it would

23 not be insolvent.  So that may have occurred before me, but I

24 have to say on the record, that was not my exposure in USG.

25          MR. BENTLEY:  Okay.  Your Honor may recall that the -

1  -

2           MR. BERNICK:  I think that actually --

3           MR. BENTLEY:  Okay.

4           MR. BERNICK:  -- that statement was made even in this

5  case about <u>USG</u> in August of last year, but we'll provide the

6  citation for it.

7           THE COURT:  Well, it doesn't matter.  <u>USG</u> is done,

8  gone.  It's not this case.  I'm concerned about this case.

9           MR. BENTLEY:  Fair enough, Your Honor.  It simply

10 underscores the point that I think we all agree on, which is we

11 cannot pre-judge issues like this.  One final point, Your

12 Honor, and that is, how is it that the plaintiffs have gotten

13 to this pre-judgment of theirs that there is no solvency here?

14          And I think what we've seen today is that in

15 significant part they've gotten there based on an analysis

16 which they have now essentially conceded was flawed, and that's

17 the analysis that goes into the $2.9 billion solvency number

18 that you've heard them speak about today.

19          And as everybody has conceded that $2.9 billion

20 figure contains zero for insurance.  We heard Mr. Frankel

21 acknowledge today that in fact if the asbestos liabilities are

22 in the range of 2.9 or 3 billion, which is the number that

23 would be necessary to achieve insolvency, then in that instance

24 insurance is in the vicinity of $800 million.

25          THE COURT:  Yes.  I understand.  But frankly, I want

1  to hear from the financial advisors what the company's worth

2  and how to value whether or not there's going to be a criminal

3  find in the New Jersey environmental problem and all the other

4  matters, because I -- you know -- I appreciate the fact that

5  there are a lot of unknowns and as a result, some of these

6  things are very difficult to value.

7          But if we're going to get into a solvency hearing

8  we're going to get into the whole nine yards and figure out

9  what all of the liability, potential liabilities and assets are

10 worth from a financial advisor perspective.  So that's for

11 another day.

12         MR. BENTLEY:  And we completely agree with Your Honor

13 on that there.  My point is simply to underscore that there are

14 very serious issues here that one would need to get past before

15 you could even contemplate the conclusion that the debtor is

16 insolvent.  It's premature to do that today.  Thank you, Your

17 Honor.

18         MR. BAENA:  I'll be brief, Your Honor.  May it please

19 the Court, Scott Baena.  Since Mr. Bernick thinks that it's

20 appropriate to talk about agendas I do wish to suggest that we

21 need to take what Mr. Kruger says with a grain of salt, and

22 it's for a very fundamental reason.

23         If Mr. Kruger is absolutely right about everything he

24 maintains in this case, Mr. Kruger is indifferent to how long

25 this takes, because his clients will get post-petition

1  interest.  And so this estate will continue to pay the price

2  for its allegiance from Mr. Kruger's clients.

3          THE COURT:  But if his clients get post-petition

4  interest, your clients will get post-petition interest.

5          MR. BAENA:  It -- well --

6          THE COURT:  Because it's -- you know -- it's --

7          MR. BAENA:  -- it will not happen that way, Judge.

8          THE COURT:  Well, I don't think it'll happen that way

9  either, Mr. Baena, but you know, to the extent that one

10 unsecured creditor class is going to get post-petition

11 interest, I don't know how the rest of them aren't.  And you

12 can agree not to, but --

13         MR. BAENA:  And well, Judge, as you well know, that

14 calculus, despite all the efforts of all the brain trusts that

15 have, you know, come into being as a result of these asbestos

16 cases, nobody can figure out really how to implement that level

17 of equity and fairness because of the extreme that's present in

18 these cases that claims, you know, emerge later.

19         THE COURT:  Right.  So let's get onto something

20 realistic.

21         MR. BAENA:  I just want to make the point, though.

22 And I do think, as well, Judge, it's a bit ironic that we've

23 spent more time today critiquing a plan which hasn't even been

24 put forward by the asbestos contingency -- constituencies than

25 we've had an opportunity to critique their plan, which happens

1  to be on the table.

2          And the test for whether or not they should have

3  continued exclusivity is not how good a plan is that has not

4  yet been filed as a counterweight to their plan, but whether

5  there is a dynamic here that warrants the continued exclusivity

6  in favor of the debtor.

7          And that's an important point, that we can take some

8  direction from a higher power from -- in respect of.  While the

9  new Bankruptcy Code amendments are not applicable to this case,

10  the disparity --

11          THE COURT:  Yes, and I'm --

12          MR. BAENA:  -- the disparity, Judge, between --

13          THE COURT:  -- it's irrelevant, Mr. Baena.

14          MR. BAENA:  It's not irrelevant from the perspective,

15  Judge, that they have divined that 18 months is all that you

16  can give.  And --

17          THE COURT:  Yes.  And how many asbestos cases that

18  aren't pre-packs are going to be filed as a result?

19          MR. BAENA:  But the point, Judge, of the --

20          THE COURT:  None, Mr. Baena.  Let's put the cards on

21  the table, none, because you can't do this kind of a case in 18

22  months and we all know it.  Now, five years, that may be a

23  little long, but 18 months, as a not pre-pack, Mr. Baena, you

24  have to agree --

25          MR. BAENA:  Here's --

1        THE COURT:  -- it won't happen.

2        MR. BAENA:  Oh.  Oh, I'm sure; I'm sure.  I'm sure it

3  won't happen because by setting an 18-month immutable

4  limitation congress told you something about how it views

5  exclusivity.  It told you that it is not some elastic concept

6  that has all this flexibility to accommodate every single,

7  well-intentioned program that a debtor wants to accomplish in

8  the course of its bankruptcy.

9        THE COURT:  Whatever congress wants me to do for

10  cases filed on and after October 17th of 2005, my sworn duty is

11  to do it and I will do it.  This case wasn't then.  Don't

12  bother me with that right now.  I have enough other --

13        MR. BAENA:  I'm not trying --

14        THE COURT:  -- issues to deal with in this case.

15        MR. BAENA:  -- I'm not trying to bother you.  I'm not

16  trying to give you another test that should be applied.  I'm

17  just trying to suggest, Judge, that we've really got to step

18  back and think about these rules of engagement.  Now,

19  Mr. Bernick brings up what's happening in the marketplace in

20  response to something I said earlier.

21        What Mr. Bernick said in his soliloquy about what's

22  happening in the marketplace is so far from the truth that I

23  feel constrained to have to respond.  Mr. Bernick suggests that

24  the ramping up of the value of the stock of Grace was

25  principally -- in fact, the way he described it, it sounded

1  like solely -- due to the fact of impending legislation.

2          Judge, that's not the case at all.  If we look at the

3  facts of what was occurring in the period June '04 through as

4  late as January of '05, what was happening was that Grace was

5  announcing to this Court, publicly, at any opportunity it had,

6  that there were ongoing conversations with creditor

7  constituencies.

8          An article appeared in business publications in

9  September talking about the meetings that were going on between

10  the asbestos constituencies and Grace.  In October Grace comes

11  to the Court and said, don't make us file this plan of

12  reorganization that you want us to put on the table, because

13  we're still talking to those asbestos constituencies.

14          That is all driving up the price of that stock.

15  That's exactly what was happening.  And the market was reacting

16  more favorably to the prospect of a settlement with asbestos

17  than it was getting bogged down in adjusting the value too much

18  of the stock when indictments were being issued in respect of

19  employees and what -- and former employees.

20          THE COURT:  Mr. Baena, I want to stop you only for

21  this reason.  Whatever the debtor announced may or may not have

22  had an effect on the market.  What more likely had an affect on

23  the market is what debtor's products were being sold and for

24  what purpose out in the marketplace at the time.

25          The economic statistics at the time indicated that --

1  that, for example, housing starts were much higher in that

2  certain period than they were in other places.  And to the

3  extent the debtor's products, both here and internationally,

4  may have been sold, there are lots of reasons that affect the

5  stock price.

6        MR. BAENA:  Oh, absolutely.

7        THE COURT:  So --

8        MR. BAENA:  Absolutely.  But Judge, you know, the

9  reason that he points to, what I told the Court at a prior

10 hearing, and the reason -- what he left out was why I was

11 bringing this to the Court's attention.  And it goes back to

12 the same exact point I argued in my response to Mr. Bernick's

13 argument, which was that the unsecureds were unable to embrace

14 the notion of an agreement with asbestos unless and until they

15 got 100 percent of their claims, plus post-petition interest.

16       And because they were telling you at that hearing,

17 the marketplace was playing par plus, or valuing their claims

18 at par plus.  And our position was, don't listen to the

19 marketplace; it could be manipulated; there are lots of

20 external forces and dynamics that move that price, and that's

21 the only point.

22       THE COURT:  Well, and I agree with that point.

23       MR. BAENA:  Thank you, Judge.

24       THE COURT:  Anyone else?  Mr. Bernick, I'll give you

25 two minutes if you have anything you want to say.

**J&J COURT TRANSCRIBERS, INC.**

1      MR. BERNICK:  Nope, I'm ready to go onto the next

2  one.

3      THE COURT:  All right.  Do you -- shall we take a

4  recess?  I need to give you a chance to get lunch, get a change

5  in court staff reports.  I also need to be finished and out of

6  here, literally out of here by quarter till 6:00.  So --

7      MR. BERNICK:  Well, I guess maybe it would be good to

8  find out -- and it's my suggestion -- I know that I'll take

9  probably a half an hour.  I don't know if anybody else from our

10 side intends to speak to this issue.

11     THE COURT:  Does anyone?  No?

12     MR. BENTLEY:  Not at the moment, Your Honor.

13     MR. KRUGER:  Not at the moment.

14     THE COURT:  All right.

15     MR. BERNICK:  So then it might be worthwhile to find

16 out if specifically -- I would actually -- I think a lot of us

17 would like to get out here even before 10:00.  Who else really

18 intends to speak to this issue besides the creditor --

19     MR. SANDERS:  I'll probably take 15 minutes or so.

20     THE COURT:  All right.

21     MR. KRAUSE:  Your Honor, Peter Krause for the Waters

22 and Krause plaintiffs in the case of Pacific --

23     THE COURT:  I'm sorry.  I can't pick you up, sir.

24     COURT RECORDER:  You have to use the mike.

25     THE COURT:  You need to use --

1          MR. KRAUSE:  Probably 20 to 30 minutes, Your Honor.

2          THE COURT:  All right.  Mr. Krause is indicating

3 probably 20 to 30 minutes.

4          MR. KRAUSE:  PD has no role in this argument, Judge.

5 In fact, we'll ask for permission to leave table so that

6 counsel can use it.

7          THE COURT:  All right.

8          MR. MEYER:  Your Honor, Mark Meyer, maybe 10 minutes.

9          THE COURT:  All right.  So we're up to an hour.

10          MR. MEYER:  Meyer.

11          MR. HERRICK:  Your Honor, John Herrick, probably 10

12 minutes.

13          MR. BUSEY:  Your Honor, Byron Busey (phonetic), for

14 the Grace certain cancer claimants, 10 to 15 minutes.

15          MR. BRADLEY:  Your Honor, Ron Garrett Bradley

16 (phonetic), probably 10 minutes.

17          MR. BERNICK:  If we find out -- I know brother Krause

18 from the Babcock and Wilcox case.  I don't even know who the

19 rest of these folks are from.

20          THE COURT:  Well, you can do that later, Mr. Bernick.

21 Most of them have filed responses.  So I appreciate that you're

22 representing creditors in the case.

23          MR. SPEAKER:  We're the people litigating you.

24          MR. BERNICK:  Oh.

25          (Laughter)

1            MR. SPEAKER2:  Your Honor, I may have five or 10

2  minutes at the end.  It depends on what issues come up.

3            MR. BERNICK:  If I total all that up it sounds like a

4  couple hours.

5            THE COURT:  Right.  We're up to at lest two hours,

6  plus some rebuttal plus whatever questions.

7            MR. BERNICK:  Well, that --

8            THE COURT:  So let's say three hours.

9            MR. BERNICK:  So if we were back -- I think that

10 makes it tight.

11           THE COURT:  So do you want a half an hour so you can

12 get a sandwich downstairs --

13           MR. BENTLEY:  Yes.

14           THE COURT:  -- or do you want to keep going?

15           MR. BENTLEY:  Half-hour for a sandwich.

16           THE COURT:  Half an hour?  Okay.  We'll take a recess

17 until 20 after 1:00.

18           MR. BERNICK:  Can I make a proposal?

19           THE COURT:  Yes.

20           MR. BERNICK:  IN order to expedite it.  Why don't we

21 just let them all go first?  I -- you know -- it'd just save a

22 lot of time.

23           THE COURT:  Well, some people may have --

24           MR. FINCH:  No, Your Honor.  It's their motion.

25           MR. SPEAKER2:  It's his motion.

1          MR. BERNICK:  Well, I --

2          THE COURT:  Well, it's not for that.  Some people

3  have health concerns, Mr. Bernick.  So I think I need to allow

4  some people to get food.

5          MR. BERNICK:  Oh, I'm not -- I'm not -- I'm just

6  saying after we come back.

7          THE COURT:  Oh.  Oh.  Yeah, I think we'll be fine.

8  If you limit your opening remarks to half an hour we should be

9  fine.  You should -- what times are your flights?

10         MR. BERNICK:  My flight is at 5:00.  I'm frankly

11  coming back from -- I got here at 3:00 a.m. this morning, so.

12         THE COURT:  I'll --

13         MR. SPEAKER:  Yes, please.

14         THE COURT:  -- try to get you out by 3:30.  That's

15  two hours.  So folks, all of you from the plaintiff's far side,

16  go consolidate your remarks over this next half-hour so that

17  you're not repeating anything.  Many of your papers duplicate.

18  I have read every single word and all six of these volumes.

19         So I am familiar with your arguments.  You don't need

20  to restate that.  You can just illuminate the highlights or

21  give me some new points.

22         MR. FINCH:  Your Honor, before we start the motion to

23  compel there is one two-minute housekeeping matter relating to

24  the bar date order that Grace and the asbestos claimants have

25  reached an agreement on.  I'd just like to put that on the

1 record, or we can do it right when we come back from lunch or

2 we can do it now, at the Court's convenience.

3        THE COURT:  Everybody's ready to go.  Why don't we do

4 it as soon as you come back.

5        MR. FINCH:  Okay.  Thank you, Your Honor.

6        THE COURT:  All right.

7        MR. BAENA:  Judge, just for those who have no

8 interest in this or have an interest but not to stay, are you

9 going to rule on exclusivity today or --

10        THE COURT:  I'm hoping to after lunch, but it depends

11 on how much of the little bit of research I want to do, I get

12 done over this half-hour.  So I'm -- I intend to, but I'm not

13 totally sure.

14        MR. BAENA:  Thank you, Judge.

15        THE COURT:  All right.  We'll be in recess until

16 1:20.

17        MR. BERNICK:  Your Honor, here's research on the

18 exclusivity standards.

19        THE COURT:  Well, you can give me those.  I know the

20 standards.

21        MR. BAENA:  Yeah.  Yeah.  Yeah.  Yeah.

22        MR. BERNICK:  Well, I guess I said that we ought

23 to --

24        THE COURT:  Okay.  I'll take whatever you want to

25 give me, but that wasn't it.  Thank you.

1          (Recess at 12:54 p.m. until 1:44 p.m.)

2          MR. FINCH:  Your Honor, before we proceed with the --

3          THE COURT:  Your name, please.

4          MR. FINCH:  Nathan Finch, for the asbestos claimants'

5 committee.  Unless Your Honor has a ruling --

6          THE COURT:  I do.

7          MR. FINCH:  Okay.

8          THE COURT:  All right.  Why don't we deal with your

9 issue and then I'll wait till -- make sure everyone is here

10 first.  Go ahead.

11          MR. FINCH:  Oh, well, okay.  Is Barbara Harding in

12 the courtroom?

13          MR. BERNICK:  No, she's --

14          THE COURT:  Oh, you want to wait for Ms. Harding.

15          MR. FINCH:  Ms. Harding, yes.

16          THE COURT:  Oh.  I'm sorry.  I'll give you the ruling

17 on the exclusivity, then.

18          MR. FINCH:  Okay.

19          THE COURT:  Okay.  This is really not an easy

20 decision for this Court because this case has been on slow burn

21 from time to time, and I agree that the debtor has the burden

22 of substantiating cause to extend exclusivity.  This case was

23 filed in April of 2001, and some of the delay between then and

24 now is really not related to the debtor, the debtor's actions

25 or the debtor's inactions, but was caused by some things, such

1 as the assignment and reassignment of judges.

2          That all led to some delays in hearings, by the stay

3 that this Court imposed to allow the mediation to take place

4 with the hope that some or all issues between the various

5 parties could be settled.  In addition, the debtor has

6 requested the ability to try certain issues since the outset of

7 the filing of the case, but has not been permitted to start

8 that process until recently.

9          Now, the debtor is moving ahead with the issues that

10 it raised.  The parties argue that the case is old, and I

11 suppose a five-year-old case is old, but it is not the oldest

12 or the longest running case ever seen or in this Court.  And

13 the age, in and of itself, is not the only factor that this

14 Court has to consider, especially given the complexities of the

15 case, the very different ideas of how to resolve the case that

16 have been articulated on the record of various hearings by

17 different parties, the uncertainties that have arisen post-

18 petition, such as the criminal indictment, the New Jersey

19 environmental claim that is a decade old or longer, and the

20 other matters that have added layers of complexity beyond those

21 that have existed in some of the other asbestos bankruptcies,

22 even.

23          In addition, several major rulings by this Court and

24 others have affected and will continue to affect the claims

25 that the estate will have to deal with.  For example, some

1  stigma damage claims, the Speights issues, some of the

2  insurance issues concerning the preliminary injunction and so

3  forth.

4           Nevertheless, the question before this Court now is

5  what's the current lay of the land.  Does it appear from the

6  debtor's showing that the debtor can propose a plan that is

7  feasible and within a reasonable time?  And at this time the

8  Court must answer that question with a yes.

9           As all parties have articulated and agreed, the major

10 issues of estimation and valuation must be considered by all

11 parties prior to any plan being confirmed by the Court.  At

12 this point in this case it is more important for all parties to

13 focus their efforts on resolving the outstanding issues, than

14 in creating additional fees and expenses for the estate by

15 requiring the filing or redoing or doing of competing plans.

16          The parties have articulated outlines for their views

17 of confirmation, and this Court expects that having heard those

18 articulated views all parties will now meet and continue to

19 meet and confer on a regular basis in an effort to try to

20 resolve those differences of opinion and put together a

21 confirmable and consensual plan.

22          And Mr. Bernick, I said this to you once before.  I

23 say it again.  I'm holding you responsible for taking the

24 laboring oar to make sure it gets done this time.  The Court

25 will consider anew the issue of exclusivity at the July 2007

1  omnibus hearing if the debtor renews its motion, or earlier if,

2  for cause shown, another party moves to terminate exclusivity

3  prior to that time.

4        However, the Court cautions that this order is

5  entered to permit all parties to continue to negotiate so that

6  the estimation and valuation decisions can be incorporated into

7  a plan that is to be filed within 30 days after the issues of

8  estimation and solvency are resolved, either consensually or by

9  court order.

10        So whether or not exclusivity is terminated by some

11  subsequent order, plans will be due within 30 days.  I expect

12  all parties to get together and attempt to resolve the various

13  issues.  I will take an order from the debtor on a

14  certification of counsel that extends exclusivity through the

15  conclusion of the July 2007 omnibus hearing, however, require

16  the debtor to set any new motion for a hearing at that July

17  2007 hearing, and this order is without prejudice to any other

18  party moving to terminate exclusivity for cause.  Okay.

19        MR. BERNICK:  Thank you, Your Honor.  Maybe so that

20  Mr. Finch -- why don't you to try out the stipulation and if I

21  remember it correctly, I might be able to confirm it, as well.

22        MR. FINCH:  Okay.  Your Honor, there is a small

23  amount of good news in that Grace and the asbestos

24  constituencies I believe agree on who does not have to file a

25  proof of claim form in response to the Court's asbestos

1 personal injury bar date order.

2       First, claimants who were exposed to Grace asbestos

3 prior to petition date or who were not diagnosed with any kind

4 of asbestos-related disease until after the petition date would

5 not be required to file a proof of claim or be subject to the

6 bar date order.

7       Second, claimants who were both exposed to Grace

8 asbestos and diagnosed with an asbestos-related disease prior

9 to the petition date but who did not file a lawsuit against

10 Grace prior to the petition date would also not be subject to

11 the Court's bar date or -- and would not have to file a proof

12 of claim form.

13       Finally, there's a category of persons who filed a

14 lawsuit naming Grace or other defendants prior to the petition

15 date, but never served Grace with the lawsuit, complaint or

16 otherwise made the lawsuit, complaint known to Grace prior to

17 the petition date, that category of claimants would not be

18 required to file a proof of claim form or respond to the

19 Court's bar date order.

20       MR. BERNICK:  I believe that that is correct, but I

21 would want to confirm that with Ms. Harding when she gets back

22 to Court here in a minute.

23       THE COURT:  Okay.  And what's the rationale for

24 having some but not everyone file proofs of claim?

25       MR. BERNICK:  Because again, remember, going back to

1  that curve, in order to have, you know, apples and apples all

2  the way along we have to always be measuring the same thing.

3  What are you measuring?  You're measuring the claims that were

4  pending against Grace at each point in time.

5        That's how you produce a trend.  So we're taking a

6  snapshot of the claims actually pending against Grace using our

7  records of what was pending against Grace.  We sent out all the

8  questionnaires.  Those claimants take that snapshot.  That will

9  mean that there are people who, if they were exposed but didn't

10  have a disease, they didn't have a claim anyhow at that time.

11        If they were exposed and had a disease they may have

12  got a claim, but they hadn't put it to Grace, presumably, they

13  would later have put it against Grace and they'd be later on in

14  the trend.  But if you mix them into the snapshot as of the

15  date of the filing, you're back to apples and oranges.

16        THE COURT:  You're looking for filing of claims

17  against Grace trends?

18        MR. FINCH:  No.  Filings of claims against Grace

19  prior to the petition date that were made known to Grace.

20  There are going to be people who got a disease prior to the

21  petition date, but didn't get around to suing Grace, and

22  they're precluded from the bankruptcy stay afterward.

23        There are also going to be people who filed a lawsuit

24  against Grace, say, on March 20th, 2001, never served Grace

25  with a copy of that complaint.  Grace doesn't have records of

1 those people.  Grace never sent the questionnaire to those

2 people.  Grace never even sent the proof of claim forms to

3 those people because they're not in their records.

4        And when Grace created -- there are two databases

5 that Grace has created.  One is sort of it's regular, ordinary

6 course of business claims database that it produced to

7 everybody's experts in about 2002 that had the listing of cases

8 that were -- had been filed and cases resolved and cases

9 pending.

10        That would only include, obviously, people who made

11 their claims known to Grace prior to the petition date.  Now,

12 Grace has sent out this questionnaire to 116,000 people.

13 They've gotten responses back.  Again, Grace only sent that to

14 people who had pending claims within Grace's definition as of

15 the petition date.

16        And whatever else we disagree about, I think we do

17 agree that the only people who should be required to respond to

18 the bar date are people who Grace knew they were claimants

19 prior to the April 2nd, 2001, petition date for purposes of the

20 aggregate estimation.

21        THE COURT:  Isn't the --

22        MR. BERNICK:  Or --

23        THE COURT:  -- isn't the standard whether the

24 claimant knew that it had a claim pre-petition?

25        MR. BERNICK:  No.  No.  You're not -- for this bar

1  date, for this bar date.  We want to create a bar date that

2  says that a certain group of people must now come forward or

3  their claims will be barred, and we want them to fill out the

4  questionnaire.

5      Your Honor, all this is really being driven by the

6  desire to have as much data as we can in response to these

7  questionnaires.  The questionnaires are designed to ascertain

8  with respect to all of those people who had claims and had made

9  them known to Grace that they've taken all the steps necessary

10  to lodge the claim.

11      We want information from them, because that is a

12  number that's measurable over time and you can see, then, well,

13  if you take that as your denominator and your numerator turns

14  out to be, from our point of view, let's say 50 percent of

15  those people, in fact, did have good claims.

16      We have a 50 percent -- 50 versus 100, or the good

17  claims versus total asserted against Grace that we can then

18  take into the future and say, well, if the number of people who

19  proceeded against Grace in the future was x, of those we would

20  expect to have had to settle 50 percent of them.

21      All this is driven by the need to get apples and

22  apples data point so that you can work with an estimate of

23  future claims.

24      THE COURT:  Okay.  That's fine.  If that's the way

25  you want to do the bar date, that's fine.  I think it may be

1  difficult to figure out whose claims are barred at some point

2  in time and who -- but -- as a result, but I guess you can deal

3  with that later.

4        MR. FINCH:  As long as it's -- what we will do is we

5  will submit an order -- a so stipulated order for the Court to

6  sign that lays this out in more -- maybe not in more detail,,

7  but at least so that Your Honor can sign something, as opposed

8  to just this discussion on the record.

9        But the point is that we only want the bar date to

10  apply to people who had filed a lawsuit and made it known to

11  Grace prior to the petition date.

12        MR. BERNICK:  Right.  Again, typically, you have a

13  bar date and you want to be able to say with respect to

14  everybody who had, basically, a present claim as of the bar

15  date to either show it for their bar, and that's -- you then

16  end up with certainty about the totality of the current

17  claimant population.  We could do that, but it would be an

18  event that would be a one-shot -- it would give us certainty on

19  who the current claimants are, but --

20        MR. FINCH:  But it would also give them certainty on

21  who -- anybody who potentially -- basically, a lawyer would be

22  subject to malpractice if he didn't file that claim.  So if a

23  guy walked in his door with mesothelioma the day before the bar

24  date he would have to file that claim.

25        And both Mr. Bernick and I had a bar date that was

1  kind of like that in the <u>Babcock and Wilcox</u> case --

2           MR. BERNICK:  Right.

3           MR. FINCH:  -- and there were 250,000 proof of claim

4  forms filed in response to that bar date, and many of them, you

5  know, form people who -- they didn't file the proof of claim

6  form, they were protecting their client's rights, you know,

7  they had to do it.

8           And that -- any expert would say that skews what

9  you're trying to estimate when you're doing an aggregate

10 estimation, and it doesn't really give you a reliable basis

11 from which to do it.

12          MR. BERNICK:  Right.  It produces a data point that's

13 not really usable for any other purpose.  So then we have to

14 figure out, you know, what it means.  So our role here was not

15 to create that skewing problem.  We realize it then limits the

16 value of the bar date with respect to defining the total

17 population of current claimants, but we're not -- our primary

18 concern here is the estimate of claims.

19          THE COURT:  All right.

20          MR. BERNICK:  That's why we're going down this road.

21          THE COURT:  Okay.  I --

22          MR. BERNICK:  But I'll confirm this with Ms. Harding.

23          MR. FINCH:  Thank you, Your Honor.

24          THE COURT:  All right.  So the -- who is going to be

25 submitting this order and what are you linking it to?

1          MR. FINCH:  I was just going to do a so stipulated

2 agreement between Grace and the asbestos claimants' committee

3 for Your Honor's signature.

4          THE COURT:  All right.  It will never show up on the

5 docket, then, in any fashion that anybody will understand that

6 way.  Wasn't there a motion last month?

7          MR. FINCH:  There was.  And this -- the Court's

8 current order we believe is clear.  It's just that there have

9 been questions that have come up that we wanted to further

10 clarify it.

11          MR. BERNICK:  We'll figure out a way.

12          THE COURT:  To link it to that order.

13          MR. BERNICK:  To link it to that order and to do it

14 in writing so that there's no ambiguity.

15          THE COURT:  All right.

16          MR. FINCH:  Yes.

17          THE COURT:  Okay.  When I get it I'll sign it, but

18 you're going to have to make sure you send it to my Delaware

19 staff and it gets to Ms. Baker, because I --

20          MR. FINCH:  And it links back --

21          THE COURT:  -- with this not having been on the

22 agenda --

23          MR. FINCH:  -- and it links back to the other docket

24 numbers.

25          THE COURT:  Right.

1             MR. FINCH:  Okay.  Somebody who's a bankruptcy --

2     more of a bankruptcy lawyer than I can figure that out.

3             THE COURT:  All right.

4             MR. BERNICK:  You're unduly modest.

5             MR. FINCH:  What?

6             MR. BERNICK:  At this point in time you're unduly

7     modest.

8             THE COURT:  Okay.  Are we ready for item two, then?

9             MR. BERNICK:  Yes, Your Honor.  Let me just get my --

10    could you find me -- I think they have part of this, but I'm

11    not sure.

12            (Pause)

13            MR. BERNICK:  This is Grace's motion to compel for

14    responses to questionnaire, and I know that Your Honor, again,

15    is very familiar with the background for this because it's been

16    discussed on many occasions.  Indeed, it's precisely because it

17    has been discussed, and indeed, litigated so extensively that

18    we think that much of what the Court is being asked to decide

19    today in fact need not be decided, because it already has been

20    decided.

21            But let me just very quickly go through what I think,

22    again, are some fundamental propositions that are parallel in a

23    sense to some of the initial propositions we began with in

24    connection with structuring the discussion about exclusivity.

25    And these are propositions that have to do with the whole

1 purpose of why we are doing these questionnaires.

2          I think that that purpose really is not disputed, but

3 the legal consequences of that purpose are not adequately

4 appreciated by those who have been diligent and have come

5 forward this afternoon to object.  The whole purpose of the

6 questionnaire process is to produce an estimation in the

7 aggregate of the personal injury asbestos liability of Grace.

8          It is not, it is not for purposes of allowing or

9 disallowing any individual claim.  And that distinction has

10 been critical.  It's been pointed out since when we started to

11 go down the estimation process.  We began with a different

12 approach in this case, which was a Rule 42 consolidated

13 litigation proposal, because we thought that would accomplish

14 everything all at once.

15          For a variety of reasons, most of them having to do

16 with concern that was expressed by Judge Woollen, we were

17 flexible and said, we'll go with, in all, an estimation, but it

18 has to be a merits-driven estimation.  But literally, for year

19 the sole purpose of inquiring of the claimants has not been to

20 determine whether their claims would be allowed or disallowed,

21 but instead, to produce an overall estimate.

22          That purpose falls squarely within the power and the

23 authority of the asbestos claimants' committee to represent

24 those individual claimants.  The committee's power is not

25 simply that to be, well, we're here and we can help out.  The

1  entire bankruptcy process depends upon the empowerment, with

2  the approval of the Court and the appointment of the U.S.

3  Trustee, of these committees in giving them powers to act.

4          And the REVCO court, which we've quoted in our

5  papers, said it best.  It basically -- if we could get the ELMO

6  on.  Is that my switch to flip?  While it comes on, it says:

7  "An official committee of creditors plays a pivotal role in the

8  bankruptcy process.  The function of an official creditors'

9  committee is to aid, assist and monitor the debtor to insured

10 that the unsecured creditors' views are heard, and their

11 interest promoted and protected"; not just to be, well, we're

12 here if we need you.

13         They have a fiduciary, proactive role to play.  The

14 creditors' committee is not merely a conduit to whom the debtor

15 speaks to negotiate with -- negotiates with creditors

16 generally.  On the contrary, it is purposely intended to

17 represent -- that's a legal term -- represent the necessarily

18 different interests and concerns of the creditors that it

19 represents.

20         Put simply, on common matters the creditors'

21 committee has authority to speak on matters that pertain to the

22 individuals, particularly where the matters may involved

23 conflicts intersay or differences of perspectives, individuals

24 claimants ought to be separately represented.

25         The question of the overall value or scope of the

1 personal injury liability in the aggregate therefore falls

2 squarely within the authority and purview of the asbestos

3 creditors' [sic] committee.  That's point two.  Point three,

4 not only is that true as a matter of fundamental bankruptcy law

5 and process, but that very proposition was affirmatively

6 asserted by the asbestos claimants' committee in this case and

7 in connection with estimation.

8        We're not having this discussion about a principle of

9 law for the first time or in the abstract.  The asbestos

10 claimants' committee, through their counsel, affirmatively

11 represented that they would act on behalf of their constituency

12 insofar as the estimation was concerned.

13        And this is the transcript at page 240, where the

14 following colloquy took place.  Are we getting warm?  Well,

15 then we'll -- let's see.  It says, power, select, lights, zoom.

16 I don't know if there's anything more that I can do.  I'll just

17 read it again, Your Honor.

18        COURT RECORDER:  I'll exit and I'll go back.

19        MR. BERNICK:  Mr. Lockwood said, and this is when the

20 questionnaires are being formulated, and an initial objection

21 is made.  He says:  "Let me then just state for the record, I

22 object to a questionnaire that is going to be used by the

23 debtor under the guise of estimation for having experts

24 disallow claims based on the plaintiff's inadequate evidence

25 when the plaintiffs are not being offered any rules the

1  opportunity" -- and Your Honor then interrupted and said,

2  "Nobody is disallowing claims."

3          And you go on to say:  "Your objection is overruled.

4  This is not an allowance process.  It's an estimation process.

5  You have no standing to raise that objection because, as you've

6  told me repeatedly today, you don't represent the individual

7  plaintiffs."

8          Mr. Lockwood then goes on to say, "No" -- and I would

9  underline if it made a difference, but you can see it -- "No,

10  but I do represent them in the estimation, Your Honor."  And

11  that's what I'm concerned about, is we're going to wind up with

12  a very one-sided record here.

13          We're going to have a lot of information the debtors

14  are going to have to have gotten from the plaintiffs via the

15  questionnaire.  An affirmative representation that Mr. Lockwood

16  as counsel to the committee would represent the interests of

17  those claimants in connection with this questionnaire and with

18  this estimation process.

19          That representation was made to this Court.  At the

20  time that representation was made to this Court Mr. Esserman,

21  diligent as always in all matters, was in attendance and said

22  nothing to the contrary.  He was in attendance during this

23  hearing.  He was in attendance during the following hearing

24  where, again, the questionnaire was taken up.

25          I don't mean to pick on Mr. Esserman like in some

1  fashion he did something wrong.  All he did was to accede that

2  what Mr. Lockwood was asserting would be the role of the

3  committee.  It is in fact with Mr. Lockwood and with his firm

4  that we then went on and had extensive negotiations over the

5  content of the questionnaire, and then had extensive hearings.

6       We had line by line review, as Your Honor will

7  recall, of each and every feature of that questionnaire.  And I

8  have a whole bunch of slides, but I won't get into it.  In

9  connection with that process, it was a back and forth.  It was

10  a negotiation.

11       I remember repeatedly acceding to requests that Your

12  Honor made, that Mr. Lockwood made, in order to eliminate

13  issues, because as always, Your Honor was very solicitous of

14  the other side's views and attempted to reach a questionnaire

15  that basically would address the issues that had been raised.

16       So in numerous cases we revised, and indeed, we

17  revised huge portions of the questionnaire.  The questionnaire

18  at the ending -- at the end had in a sense a lot of the same

19  basic structure, but the verbiage of that questionnaire was

20  probably 80-90 percent of it changes.

21       At that point the order was entered approving the

22  questionnaire, and there was no appeal taken, none.  There was

23  no statement made by anybody that there was some fundamental

24  problem that now had to be relitigated at the behest of

25  individual claimants or their counsel.

1           Now, who is it that knew about all of this?  Well,

2   obviously, Mr. Esserman was active in this process.  The

3   asbestos claimants' counsel is knowledgeable.  But the asbestos

4   claimants' committee clearly would be knowledgeable about that.

5   Who was present from the asbestos claimants' committee?

6           Who was on that committee?  Barron and Budd, Mr. Rich

7   is present here today.  He's from Barron and Budd.  The

8   McGarvey Headreling (phonetic) firm from Libby from -- involved

9   in the Libby litigation was there.  We -- Your Honor is well

10  familiar with the certain answer claimants, that kind of ad hoc

11  group, with Mr. Kazan.

12          Mr. Kazan is a member -- represents a member of the

13  personal injury asbestos claimants' committee in this case.

14  Mr. Kazan and his clients are here representing -- represented

15  by one of the partners, Natalie Ramsey, who you'll recall from

16  the Montgomery McCracken firm.

17          They were -- Mr. Kazan was on the committee.  Certain

18  cancer claimants also included people who are working with

19  Mr. Kazan, such as Waters and Krause.  You're going to hear

20  from Mr. Krause here a little bit later on this afternoon;

21  Silver Perlman, also counsel to members of the committee and

22  very closely affiliated with the Barron and Budd firm.

23          So we not only had the representation being made to

24  the Court, Mr. Esserman being present, but all the people --

25  most of the people that you're going to hear from today were

                    J&J COURT TRANSCRIBERS, INC.

1 actually on the committee and knowledgeable about all of these

2 facts as they unfolded and knowledgeable when the appeal was

3 not taken.

4        Under these circumstances, Your Honor, there cannot

5 be a clearer case where a properly authorized organization or

6 committee holds itself out to the Court as having the authority

7 to speak for a constituency, for which the fact it has the

8 legal authority to speak, the Court and all parties relying

9 upon it, and then in addition the silence, the knowing silence

10 of all the people who are on the committee, who above all folks

11 have, again, a fiduciary obligation, being members of that

12 committee, to speak up if they have a problem.

13        None of them did so.  We went forward and one of the

14 implications of what now I just recited, very simple facts.

15 Number one, the questionnaire in all the matters that it

16 encompassed in litigation is a done deal in terms of the issues

17 having been decided.

18        It is basically law of this case, and I think that in

19 any other circumstance if we were here in any ordinary

20 litigation, and actually before a court, that was even slightly

21 less flexible than Your Honor is wont to be, we wouldn't be

22 talking about this.

23        And if it were a company that came in and then sat by

24 as all this occurred, and then came in with a whole bunch of

25 lawyers to say otherwise, these people -- these folks here

1 would be talking about sanctions, because we all sat silent

2 while all this went down.

3        The deal is a done deal with respect to the issues

4 litigated, and this Court has repeatedly said this.  I remember

5 back at the time in July 2005 -- is this working now?  It's

6 okay.  I raised a question of why go through it before the

7 questionnaires were sent out.  Why not wait?

8        And Your Honor says, well, what they'll say,

9 Mr. Bernick, in answer to the question is, I object, it's not

10 relevant and it's burdensome, and then I'm going to be right

11 here making rulings on it anyway.  So why don't we just do it

12 and get it done.

13        That was Your Honor in July of 2005.  August 2006,

14 did Your Honor expect that these questionnaires in fact would

15 be filled out and would be done in accordance with Your Honor's

16 order?  Yes.  You said, so folks, get it filled out and get it

17 returned.  What about objections?

18        April 2006, to the extent -- Your Honor says:  "To

19 the extent that an objection is to the question that's being

20 asked, I don't expect either a mediator or the Court to have to

21 go through that.  I've already decided that's an appropriate

22 question to be asked."

23        Again the same day:  "I'm not going to hear

24 objections to the question.  I have already said that if the

25 debtor wants to ask those questions, the debtor can ask those

1 questions."  So Your Honor again has repeatedly instructed all

2 the constituencies that what happened back at the time that we

3 litigated these issues was real and it was binding and wasn't

4 to be relitigated.

5        A separate question has been raised about whether in

6 fact in going forward and implementing your ruling you can make

7 the different claimants, in fact, come forward and answer the

8 questionnaires.  And the answer to that is Your Honor has

9 applied two answers to it.

10       One, Your Honor has recited that the people who we're

11 talking about here are ultimately going to make claims against

12 the trust.  They are in fact going to be creditors and

13 claimants against the trust.  And to the extent that they

14 expect to derive benefits from participating in this case in

15 making those claims, they are in fact before Your Honor.  They

16 are not simply third-party witnesses.

17       June 19 of 2006, Your Honor said:  "There's an

18 allegation that the claimants are 'third-party witnesses.'  I

19 don't see them as third-party witnesses.  These are people who

20 are going to be pursuing claims against the trust that the

21 debtor has to fund."  So one way or another they are going to

22 be recognized as creditors, even if they have not yet filed a

23 claim.

24       But there's more.  We now have all kinds of folks who

25 have appeared through the different law firms that are now

1  involved.  We have the law firms of Barron and Budd, Campbell

2  Cherry, Foster Sear, Kelley Ferraro, Peter Angelos, Motley

3  Rice, Rio, Morgan and Quinn, Silver Perlman, the Ease firm, the

4  Ferraro firm.

5      They've all come in and appeared for purposes of

6  dealing either with the questionnaire, or in fact to deal with

7  exclusivity.  They're now participating actively in this

8  process.  So now, not only do we have a committee that's gone

9  forward to and led to the law of the case that says that these

10  objections have been resolved and the questionnaires are to be

11  answered, but Your Honor clearly has the power to implement

12  Your Honor's order and require that people in fact fill out the

13  questionnaire.

14      So where has all of this led us at the end of the

15  day?  A great deal of time has passed.  We now are sitting

16  here, and I have a nice little time line which will have to

17  await our machinery.  We first requested the questionnaire in

18  November of 2004.

19      August of 2005 the questionnaire was approved.

20  September 12, 2005, the questionnaires were served.  And we're

21  now sitting here, September 12th, 2005.  We're now in September

22  of 2006.  We have essentially a year.  During this period of

23  time there was a deadline of January 12th, 2006.

24      That was the first deadline.  So the claimants had a

25  total of September through January under the first deadline.

1  And of course, this is with respect to a matter where it's been

2  out in the open for months of time before then that ultimately

3  they were going to have to answer these questions, but that was

4  still not the deadline.

5           There was one extension.  There were two extensions.

6  There were three separate extensions.  So all these firms have

7  now had the better part of more than a year to figure out how

8  to answer all of these questions and to get the work done.

9  What's now very apparent is that they didn't spend that year

10  filling out these claims, or filling out these questionnaires.

11          Throughout this whole period of time being on notice

12  of exactly what Your Honor had determined and what your

13  expectations were, they didn't fill them out.  Instead, what

14  they spent their time doing was orchestrating what we're now

15  going to hear about today.

16          They spent their time orchestrating a script, and

17  under this script they would all come in, all these different

18  firms, and tell Your Honor about the reality of what the

19  litigation is and how burdensome this is and how this kind of

20  stuff is not relevant where they come from in State Court, or

21  how some change has now taken place in the tort system or

22  whatever else occurs to them as being germane to their

23  obligations to comply with the Court's order.

24          So we get all the different firms all in, of one

25  chorus, saying the same thing.  And it's not just in court.  In

1 their objections, literally, they all came out of -- for

2 certain of the firms, they all came out of the same word

3 processor; down to the letter it is scripted.

4        Now, how does it happen that throughout this whole

5 period of time where they're supposed to be filling out the

6 questionnaires and where Your Honor has ruled finally that

7 they're now going to sit here and come in and say, gee, we're

8 not going to really fill them out at all; we're going to wait

9 for another order from this Court to fill them out.

10        We're going to wait to be told again.  And they have

11 our separate objections, separate from the committees'

12 objections heard.  That's what we're talking about in this

13 case.  Nothing could be clearer from the objections that have

14 been made.  We now have -- is -- are we getting close to an

15 image here, maybe?  It doesn't seem like it.  Okay.

16        So Your Honor probably has a sense of these numbers

17 because I previewed them a little bit last time.  There are

18 three essential issues that have been raised.  There's no --

19        THE COURT:  This isn't hooked up to Mr. Krause's

20 computer or anything now is it?

21        COURT RECORDER:  It was, but it should be able --

22        MR. KRAUSE:  It's totally independent.

23        MR. BERNICK:  Well, now, if Mr. Krause -- sorry?

24        (Colloquy regarding equipment problems)

25        MR. BERNICK:  Is it now hooked up to one of your

134

1  all's computers?

2          MR. KRAUSE:  My computer's hooked up but --

3          MR. BERNICK:  Well, then we ought to --

4          THE COURT:  I'm just wondering if there's a problem

5  with the switch.

6          (Pause)

7          MR. BERNICK:  How did it work before lunch and then

8  it doesn't work anymore?

9          MR. KRAUSE:  I'm happy to disconnect my computer.

10          THE COURT:  I just don't know whether there's a

11  problem with the toggle switch, but Kevin will see what he

12  needs.  Just give him a minute.  But Mr. Bernick, you're three

13  essential issues are all through your papers and the responses.

14  So it can --

15          MR. BERNICK:  Yeah.  The only thing here is, Your

16  Honor, that we have updated data.

17          THE COURT:  Okay.

18          MR. BERNICK:  And it -- oh, there we go.

19          (Laughter)

20          MR. BERNICK:  Yeah, but which button did you push?

21          MR. KRAUSE:  Input.

22          THE COURT:  Okay.

23          MR. BERNICK:  Okay.  I guess something did happen

24  over the lunch hour.

25          MR. SPEAKER:  Well, I could have done that.

1          MR. KRAUSE:  Don't say I never did anything for you.

2          MR. BERNICK:  I don't want to go back over this.

3 There is one thing, though, that I do want to make sure that

4 the Court got, down apart from all of the quotes.  No, really

5 two things.  One is Mr. Lockwood's undertaking, and this is at

6 page 240 of the -- "I do represent them in the estimation, Your

7 Honor, and that's what I'm concerned about, is that we're going

8 to wind up with a very one-sided record here.  We're going to

9 have a lot of information the debtors are going to have gotten

10 from plaintiffs by the questionnaire."

11          This statement was never objected to, never

12 retracted, still is there today.  And in fact, the asbestos

13 claimants' committee has been visiting our document

14 depositories and asking for literally tens of thousands --

15 boxes of -- hundreds of boxes of material to pursue.

16          They've asked us for stipulations on thousands of

17 documents coming out of the Sealed Air litigation.  They're

18 very actively engaged.  Remember, this is the personal injury

19 committee membership.  Barron and Budd, remember, they're

20 actually directly affiliated with Silver Perlman.

21          Case and McClain is part of the certain cancer

22 claimants, which includes Mr. Krause, and also includes --

23 they're represented by the McGovern -- or the Montgomery,

24 McCracken firm.  And then we've got the McGarvey firm.  Then

25 we've got Mr. Esserman.  I think Mr. Esserman will tell us that

1  he represents only the law firms.

2         Of course, law firms are not proper parties.  And

3  that's a convenience.  In fact, those law firms represent over

4  50 percent of the people who have actually presented claims and

5  questionnaires in this case.  And it's that group, these people

6  who have now pursued what I was going to show the Court as

7  being the three major strategies.

8         Objections rather than answering.  When it comes to

9  direct exposure to non-Grace products, 63 percent of the

10 questionnaires have not been answered have been objected to.

11 There's a settlement reached.  Thirty-nine percent have

12 objected and not indicated any answer.

13        "Are you aware of any relationship between the

14 diagnosing doctor and your legal counsel?"  Remember the

15 discussion that we had about that, because it is our view that

16 it goes directly to the reliability of the medical information

17 that's being provided.

18        And Your Honor will recall that we wanted direct

19 discovery and answers to the doctors, and it was in lieu of

20 that at the present time that Your Honor then said, ask this

21 question.  This was crafted after it must have been two or

22 three hours of debate before the Court and Your Honor's

23 suggestion.

24        Thirty-three percent are still taking it on

25 themselves, still not to answer but to in fact say that they're

1 just not going to answer it at all. There's a guy going --

2 does a doctor get paid for the services he performed? That is,

3 are these people who were paid for their services by the

4 lawyers? Are we talking about independent treating physicians?

5          There's the claim asserted against asbestos or silica

6 just settled, again, 27 percent. So we have enormous

7 percentages of the people who are participating in this process

8 simply leaving questionnaires blank. Then you have the folks

9 who have presented attachments rather than providing

10 information.

11          The first two are relatively ministerial, so I won't

12 focus on those. "Has the claimant received treatment for the

13 alleged condition?" Twenty-seven percent simply attached.

14 "Direct exposure to a non-Grace asbestos product," 17 percent

15 simply attached.

16          We're not talking simply about attachment of discrete

17 individual documents. As we'll see, we're dealing with

18 references in some cases to unidentified or collections of

19 documents housed at some location. In all, there are -- the

20 folks that are now present here and have submitted papers of

21 opposing our motion to compel represent claimants who returned

22 approximately 44,000 questionnaires, or 75 percent of the total

23 questionnaires that are returned.

24          So they're controlling this process. And we've seen

25 that the firms have either an identical script or a

1  substantially equivalent script.  The identicals include Silver

2  Perlman, Barron and Budd, Simmons Cooper, Angelos, Lightson

3  Luxemburg (phonetic), Cooney Conway; Cooney Conway, as in the

4  past and part of the certain cancer claimants.

5           Barron and Budd, counsel on the PI committee; Silver

6  Perlman, counsel on the PI committee; Simmons Cooper, there's a

7  gentleman who has been very active in the process recently from

8  Simmons Cooper.  We then get types two, which are not identical

9  but substantially similar.

10          Motley Rice.  Motley Rice is not on the personal

11  injury committee, but they're on the property damage committee,

12  because Mr. Rice and his colleagues have interest in the

13  property damage claims.  So we have a script and the script

14  basically says, we're going to ask that all these issues be

15  revisited.

16          Is there anything new that they've brought to the

17  table in the context of re-raising these issues?  We first of

18  all have on the objections, which is the first problem, that

19  is, objections based upon arguments of relevance or burden, and

20  then they leave the things blank.

21          And what's interesting here -- this is exactly what

22  Your Honor said that you were not going to entertain, is that

23  with respect to some of the claimants' counsel, they don't have

24  any problem answering these questions.  I'm showing you an

25  excerpt from a questionnaire pulled up by the Cherry --

1 Campbell Cherry firm.

2          This just deals with exposure to non-Grace

3 containing -- non-Grace asbestos-containing products.  Campbell

4 Cherry has no problem on behalf of their clients actually going

5 in and filling in the detailed history of other products to

6 which their clients were exposed.

7          And we can find this in other questionnaires, as

8 well.  Likewise, in connection with the Wellborn Houston firm.

9 Whereas we get some law firms that give no information on the

10 diagnoses and claim -- and basically make an objection, we can

11 see that this one is -- these forms are filled out and are

12 filled out in detail.

13          So the firms that actually used this time not to

14 orchestrate their objection process but actually to fill out

15 the questionnaires did not have a real problem in doing so.

16 And the -- actually, the time that was taken in connection with

17 the process was far more modest than what's been represented

18 and claimed historically.

19          All kinds of estimates have been made about how much

20 time this would take and how burdensome it would be.  We've got

21 some of the estimates that have been made out here.  Barron

22 Budd said it would take 12.5 hours for each one; Chris Parks

23 and Associates, nine hours; Simmons Cooper, eight hours.

24          But when it comes to the actual time that was spent,

25 including by the Campbell Cherry firm, actually filled out the

1  questionnaires, about three hours.  But the Barron and Budd

2  firm says it's cost $2 million.  Well, what's $2 million if you

3  split it over thousands of claims.  It's about $300 a claim.

4       So I mean, having the questionnaires filled out, it

5  takes a few hours per claimant.  It takes a few dollars per

6  claimant.  In exchange, we avoid untold hours of burdensome

7  discovery, time-consuming discovery and we actually get the job

8  done, a job that would be complete now if people had abided by

9  the rulings that Your Honor made that were never appealed from.

10       What about attachments?  Attachments, it's quite

11  clear that the question is there's a debate here about whether

12  people can in answering interrogatories, as an example, attach

13  documents or point to documents in lieu of an answer.  And if

14  this were a case where we were going and propounding

15  interrogatories I suppose in the first instance that would be

16  an option available to them.

17       It would not permit them under any circumstances to

18  do what they've done, which is in many cases instead of even

19  attaching the documents, is to say things like this.  Provost

20  Umphrey:  "To the extent provided please refer to interrogatory

21  responses, medical reports, specifically pulmonary function

22  tests, death certificate and/or claimant deposition."

23       They're not even saying that it's provided.  They're

24  saying, where it is provided, look through it.  Goldberg Persky

25  says:  "Here are some attachments, but in addition, go look at

**J&J COURT TRANSCRIBERS, INC.**

1  three boxes and two CD ROMs containing 36,000 pages of

2  documents."

3         Waters and Krause leaves blank all questions in parts

4  two through nine of the questionnaire and attaches various

5  types of documents to the questionnaires.  Barron and Budd

6  says, "Documents will be made available for inspection."

7  Silver Pearlman, "Documents will be made available."

8         Peter Angelos says, "See attached medical record

9  documentation, if applicable."  This wouldn't even pass muster

10 under the Federal Rules, insofar as interrogatories are

11 concerned.  But whether it would or would not satisfy the

12 interrogatory requirements, it clearly does not satisfy the

13 questionnaire.

14        The questionnaire was specific.  It says, "You are --

15 if you are asserting a claim you must complete the entire

16 questionnaire, providing all information and documentation."

17 This was not a question of, well, give us the documents and

18 then we'll figure out how to fill out the questionnaire

19 ourselves.

20        This was, fill out the questionnaire and then tell us

21 what the support is, because it's a claim.  There has to be

22 then supporting evidence.  This is clear repeatedly, and this

23 is at Romanet iv, Romanet ii again.  It's in the conjunctive.

24 The Romanet ii also, in talking about diagnoses, supporting

25 documents, "This questionnaire must be accompanied by

1 documents, copies."

2       Their questionnaire had blanks that require

3 explanation.  So -- and then Your Honor really made it quite

4 clear that in this particular context of bankruptcy this

5 questionnaire has to be filled out, whether or not information

6 concerning the contentions of these claimants has been provided

7 in other litigation.

8       Your Honor said -- this was just a few weeks ago --

9 "They're to fill out the questionnaire.  This is a bankruptcy

10 case.  I don't care what they said in the court system.  I want

11 to know for proof of claim purposes what they're alleging here,

12 and that's what the questionnaire does.  So I will not go

13 there."

14       Your Honor was saying and has said consistently

15 throughout, I want to know what the claim is; I want to know

16 what the support is.  That's the bread and butter of the

17 bankruptcy process.  Now, we can't sit there and try to divine

18 from the documents what a contention might be.

19       It is the obligation of the claimants, it's the whole

20 purpose of these questionnaires to find out what their

21 contention is, number one, and number two, what their support

22 is.  The third issue, there's a question raised about who has

23 to sign.

24       The questionnaire says:  "Part 10.  There has to be

25 an attestation that the information is true and accurate to be

1  completed by the injured person, then also to be completed by

2  the legal representative of the injured person."  Now, there --

3  some suggestion that somehow legal representative means like

4  the decedent's estate or a surviving spouse or other formal

5  designee.

6         And again, if Your Honor will take a look at the July

7  19th, 2005, transcript, pages 242-243, you'll be refreshed on

8  another two-hour discussion that took place about who actually

9  had to provide the attestation and why.  Both the claimant and

10 the law firm, because the law firm might be in possession of

11 more information the claimant -- than the claimant had with

12 regard to support for a claim.

13        So this language, the legal representative, again,

14 was specifically litigated, specifically dealt with,

15 specifically resolved, all at the time the questionnaire was

16 put together.  So Your Honor, I think that we're now at a point

17 -- I know that Your Honor will carefully listen to everybody

18 who now stands up and says what their particular concerns are

19 that we'll hear about.

20        We'll get all kind of instruction about how the

21 litigation process really works here and what's really

22 happening here.  The bottom line answer is, whatever their

23 contentions might be in that regard, whether they are entitled

24 to discovery, whether they can pursue something, I'll respond

25 to all of this.

1      But all these people, if they had a case the should

2  have put the case in through the person who Mr. Krause is now

3  taking the seat of, through Peter Lockwood or through Elihu

4  Inselbuch.  They should have been here saying all these things.

5  They had an agent who was fully authorized, said he was

6  speaking for the group, did speak for the group.  Your Honor

7  has ruled and we ought to get the questionnaires filled out.

8           THE COURT:  Mr. Esserman.

9           MR. ESSERMAN:  Your Honor, Sandy Esserman, for

10  various law firms.  I think Mr. Bernick had several parts to

11  his presentation, one of the -- one of which was a little bit

12  of revisionist history.  But in my opinion, I'd like to get --

13  I'd like to spend two minutes to go over that and then go right

14  to the merits -- the guts of why we're here.

15      Before I start, I do think that there are some

16  jurisdictional issues.  I think that the jurisdictional issues

17  have been raised by this Court and others.  And particularly in

18  regard to this questionnaire this Court has raised

19  jurisdictional issues.

20      I don't propose to discuss that.  I don't propose to

21  argue it.  I don't propose to get into it, but those

22  jurisdictional issues I think are preserved.  First, I'd like

23  to talk a little bit about the questionnaires and what the

24  response has been, because one of the things I think Your Honor

25  has wanted done here is the questionnaires to be filled out.

1           The debtors wanted the questionnaires to be filled

2   out, and I think my clients have spent a tremendous amount of

3   money and effort to fill out those questionnaires.  I really

4   think what we're here to talk about are some of the details of

5   how those questionnaires are filled out as much as anything.

6           Those are the big issues.  But to give you some

7   examples, and we put these in our papers.  As to how much time

8   has been spent filling these questionnaires out, I think

9   they're in affidavits attached to our papers.  Your Honor

10  indicated that you've reviewed them, but I think it's important

11  to highlight the effort that has been put into this process.

12          The Barron and Budd firm, 1159 hours; Foster and

13  Sears, 8,960 hours; Issy Kent's (phonetic) five to six months,

14  two to three persons working full-time; Lightson Luxemburg,

15  2295 hours; Wollentz Goldman, 1800 hours.  Clearly, a lot of

16  time and effort has been put into response to these

17  questionnaires.

18          Dollars expended, costs incurred:  Foster and Sear

19  (phonetic), 160,000; Peter Angelos, 90,000; Lightson Luxemburg,

20  57,000; Wollentz, $198,000; once again, all supported by

21  affidavits and cost analysis.  One of the big issues that we're

22  going to talk about is the "see attached," "see Exhibit A,"

23  "documents attached," "documents provided."

24          Those -- to my clients that constitutes a major,

25  major issue that we're talking about here.  Filling out the

1  questionnaire with those particulars as Grace wants them,

2  besides being impossible in the questionnaire, since in many

3  cases, for example, work history.  A lot of these people worked

4  at 100 different jobs or 50 different jobs.

5       Some of them had work histories that are 20 pages, 30

6  pages.  "See attached," is a perfectly legitimate response.

7  You cannot squeeze that information into the questionnaire.  It

8  would be impossible, and if you tried to fill out the

9  questionnaire like Grace wants, we asked our various clients

10 what it would -- what they think it would cost time-wise.

11      We got this response.  Barron and Budd, 70,000 more

12 hours [sic];  Peter Angelos' firm, 15,000 more hours [sic];

13 Steven Pope, 800 more hours; Silver Pearlman, 22,567 more hours

14 [sic]; Brayton Purcell, 3,258 to 4,344 more hours.  In sum,

15 what we think we're looking for here is a streamlined process.

16      In fact, Grace itself wants a streamlined process.

17 I'm going to read from their motion at page 12:  "Both Grace

18 and the Court recognize that because estimation is a more

19 streamlined and focused proceeding designed to address issues

20 common in significant numbers of claims, the discovery should

21 be equally focused and streamlined."

22      Of course, even under the streamlined procedure Grace

23 talks about that.  "The very purpose of the questionnaire is a

24 streamlined discovery vehicle.  The questionnaire is a

25 streamlined discovery tool," at page 24.  Grace itself concedes

1  that this questionnaire is a hybrid form of discovery, which

2  they said at their motion on page 13.

3          "It is in fact" -- and I'm quoting from their motion

4  -- "the questionnaire is a hybrid form of discovery, part fact

5  interrogatory, part contention interrogatory, part document

6  request and part deposition by written question."  Grace then

7  goes on again in their motion and says:  "The most significant

8  deficiency observed in the questionnaire responses is

9  claimants' decision not to respond to questions at all but

10  write, 'See attachment,' 'See exhibit,' or some variation

11  thereof."

12          But Grace does concede that this is a part document

13  request.  That is a very significant part of why we're here and

14  why you've sort of seen the uproar I think that you've seen in

15  response to the motion to compel, because "See attached," "See

16  Exhibit A," is and should be sufficient.

17          The plaintiffs should not be required to fill out

18  this questionnaire if the space cannot contain the answer.  If

19  they've already responded and they can say, "Refer to this

20  document or that document," that should be sufficient.  That is

21  sufficient under the Federal Rules.

22          That's sufficient under interrogatories of parties.

23  Specifically, interrogatory for parties, Rule 33 of the Federal

24  Rules of Civil Procedure, subpart (d), "Option to produce

25  business records.  When the answer to an interrogatory may be

1 derived or ascertained from the business records of the party

2 upon whom the interrogatory's been served, or from an

3 examination audit inspection of such business records,

4 including a compilation abstract or summary thereof, and the

5 burden of deriving or ascertaining the answer is substantially

6 the same for the party serving the interrogatory as for the

7 party served, it is a sufficient answer to such interrogatory

8 to specify the records from which the answer may be derived or

9 ascertained, or to afford the party" -- excuse me -- "serving

10 the interrogatory reasonable opportunity to examine, audit or

11 inspect such records and to make copies, compilations,

12 abstracts or summaries."

13        That's what we're talking about here.  That's

14 compliance with the Federal Rules.  I think the firms want to

15 comply with the questionnaire.  I think they recognize that

16 it's questionable jurisdictional basis, but nevertheless,

17 there's a purpose to it.

18        They're trying to comply.  They want to comply, but

19 they want to comply within the Federal Rules that preserves

20 their rights.  What I think when you drill down to really

21 what's going on here is Grace wants the firms to put together

22 his database.  Grace wants the firms who represent the

23 plaintiffs to use this process so they can put together their

24 searchable database.

25        That is what they have been after from day one.

1  That's not the obligations of the plaintiffs.  We think it's

2  black letter law that the litigant may not compel his adversary

3  to go to work for him.  We think that's what's going on.  We

4  think we've demonstrated that by affidavit, that the burdensome

5  requirements that Grace is asking the plaintiffs' firms to

6  undertake in compiling this data and classifying this data are

7  way beyond the pale.

8        In Grace's affidavit -- this is from the declaration

9  of Gina Washburn:  "A data entry clerk to keys information from

10  the questionnaire does not determine what information contained

11  in an attachment answers a specific question or section of the

12  questionnaire."  Excuse me.

13        "The effect of attaching documents in lieu of

14  completing the answer results in an absence of any data being

15  entered into the database."  All this could very easily be

16  solved if Grace supervised the reviewing of these

17  questionnaires in a way that, "See attached," they'd go to the

18  attached and they'd look at the answer.

19        They don't want to do that.  They want their clerks

20  to be able to take that questionnaire, and in a rote process

21  answer the question.  They don't want to have to look to

22  Exhibit A.  They don't want to have to look to Exhibit B.  They

23  don't want to have to look to the attached interrogatory

24  answers that the plaintiff has submitted or attached work

25  history sheets, which show exposure.

1          That's precisely what we think we're talking about

2   here.  The party seeking this information is Grace.  We think

3   it's fair that if that information is provided and in a form

4   that is ascertainable from the questionnaire, that they have to

5   accept that response.

6          We also think Grace is a little two-faced on the

7   issue of whether or not this is a claims disallowance process.

8   You heard Mr. Bernick say to day that the estimation is not and

9   is no way intended to be a claims disallowance process.

10  They've said it at their motion.  They've said it today.

11  They've said it many times.

12         Nevertheless, in their SEC filings they say exactly

13  the opposite.  In their 10Q filed March 18th, 2006, they say:

14  "Through the estimation process Grace will seek to demonstrate

15  that most claims should not be allowed, because they fail to

16  establish any material, and health impairment or significant

17  exposure to asbestos from Grace operations or products."

18         In summary, Your Honor, we think the "See attached,"

19  "See Exhibit A," "See Exhibit B," "See attached work history

20  sheets," are a sufficient answer when in fact they answer the

21  question.

22         THE COURT:  Did you say -- I'm sorry -- the 10Q was

23  March 18th?  So that was before --

24         MR. ESSERMAN:  March 13th, 2006.

25         THE COURT:  Six.  So that was before the hearing last

1  month in which the phasing issues were clarified and it was

2  made clear that this is not an allowance or disallowance

3  process.

4          MR. ESSERMAN:  That is possible.

5          THE COURT:  Okay.

6          MR. ESSERMAN:  It was March 18th -- March 13th, 2006,

7  page F21.

8          THE COURT:  All right.  Thank you.

9          MR. ESSERMAN:  Let's talk a little bit about the

10  signature, whether it's the attorney or a legal representative.

11  I'm not sure -- it's accept on its face what it says.  It says,

12  legal representative.  Well, what does a legal representative

13  mean?

14          We looked at Black's Law Dictionary and a legal

15  representative means, it says, "(c), personal representative,"

16  under representative, and a personal representative is defined

17  as a "person who manages the legal affairs of another because

18  of incapacity or death, such as an -- such as the executor of

19  the estate.  Technically, while an executor is a personal

20  representative named in a will, an administrator is also a

21  personal representative not named in a will.  The lawful

22  representative is a legal heir, an executor, administrator or

23  other legal representative."

24          So what's really going on here?  Why does Grace seek

25  to have the attorneys sign where it says, legal representative,

1 which I think it's clear that it's not -- that legal

2 representative is not the attorney, because I think they want

3 them to put down that they swear to the best of their knowledge

4 all the information contained in this questionnaire is true,

5 accurate and complete.  That's what I think they're seeking.

6      I think they're seeking some sort of "gotcha"

7 provision here on the lawyers.  They're not after the

8 information, because if the questionnaire is signed by either

9 the claimant themselves or the lawyer, what you're looking for

10 is reliable information, information that can give a clue as to

11 the questionnaire and from which information can be sought.

12      So you're looking for some signature here.  Is it

13 necessary to have both?  The answer is no, although frankly, we

14 have a little bit of a split going on because some of the firms

15 have filed papers saying they would like to sign it at a

16 lawyer, but they don't want to have their clients sign it

17 because they think their clients really are not capable of

18 knowing what this information is.

19      It seems to me that the fair compromise is to have

20 one or the other sign, because after all, what we're looking

21 for is information.  What's being solicited here is

22 information.  You've got your -- you've got much of the

23 information on the questionnaire or the attachments.

24      THE COURT:  Well, frankly, I thought the purpose of

25 having both of those on was to make sure that whoever's

1  completing the -- whoever is completing the questionnaire and

2  has the information signs it.  Somebody should be signing it,

3  but I don't know why the legal representative, assuming there

4  is one for a particular person, has to sign it if the claimant

5  does.  It's the claimant's information.

6        Conversely, if the attorney has the authority from

7  the client to sign and things that that's appropriate, the

8  attorney ought to sign.  I don't -- I just don't see that this

9  one's a big deal.

10        MR. ESSERMAN:  I agree with you, and that is

11  precisely my argument.

12        THE COURT:  But somebody should sign it.

13        MR. ESSERMAN:  And I'm not disputing that, nor

14  arguing that.

15        THE COURT:  Okay.

16        MR. ESSERMAN:  I'm saying there should be some

17  signature on there.  It cannot be both.  It does not have to be

18  both.

19        THE COURT:  It doesn't have to be both.  In fact, in

20  some instances I don't know whether claimants -- in this case I

21  suppose most of them, maybe all of them, have attorneys, since

22  that's how the questionnaire was distributed.  But as long as

23  it's the claimant or the attorney with the authority signing, I

24  just don't see the issue.

25        The issue is to get the reliable information.

1 There's an oath that you're taking when you sign it.  It seems

2 to me that that's the purpose that the experts want to get to.

3 They want to make sure that the information that's in the

4 questionnaires is reliable, and having somebody attest to it is

5 the way to get that.  So I agree.  On that point I agree.  One

6 -- but they do have to be signed by one or the other person.

7         MR. ESSERMAN:  No issue there, Your Honor.  It was

8 just a question of whether both have to be.

9         THE COURT:  All right.  Anybody else who wants to

10 argue that point, you do not need to.  One person has to sign.

11 That's my ruling.  It has to either be the claimant or a legal

12 representative.  Mr. Bernick.

13         MR. BERNICK:  Would you like me to speak to that?

14         THE COURT:  No.  You can wait.  Oh.

15         MR. BERNICK:  Okay.

16         THE COURT:  Until Mr. Esserman's done, and then I'll

17 hear everything.  I'm just telling people now, you can get to

18 rebut that, but I don't want to hear that argument from anybody

19 else.  Okay.

20         MR. ESSERMAN:  The next issue, and this one's going

21 to -- we're here on Grace's motion to compel.  There's an issue

22 here on cure period, on if Your Honor does require certain

23 answers to be answered certain ways.  Grace has proposed a 60-

24 day cure period.  We put in our papers by affidavit that that

25 just will not work.

1        Sixty days is just unreasonable.  It's got to be a

2   substantially longer period than that to send some of these

3   questionnaires back.  Frankly, the signature issue helps that,

4   although that was not -- that is something could probably have

5   been done within 60 days.

6        But if there's going to have to be any kind of

7   revisions, 60 days is inadequate.  Let me speak a little bit to

8   the individual objection.  I think Your Honor was clear that --

9   on the questionnaire that if Grace wanted to ask the questions,

10  they could ask the questions.

11       And if someone wanted to come before the Court with

12  an objection as to why they shouldn't answer it, Your Honor

13  would consider it in that context.  Your Honor -- your --

14       MR. BERNICK:  I'm sorry to interrupt.  At this point,

15  if Mr. Esserman particularly is going to object to answer that

16  and address that issue, on whose behalf Mr. Esserman's speaking

17  today, the claimants' themselves or the law firms or some

18  committee?

19       THE COURT:  Wait.  Mr. Bernick, I would normally hear

20  that, but the problem I'm having with this whole process is, I

21  don't have specific objections from the debtor to any specific

22  answer.  I have lumps of things.  So if lumps of objections

23  will do, like generically there's an issue as to signature, and

24  generically there's an issue with respect to whether or not

25  documents will satisfy a question, assuming that the documents

1  really are attached and that the documents do have the

2  information that the question asks for, then I can give those

3  kind of overarching rulings.

4          But with respect to looking at a specific objection

5  to a specific claim, I don't have those.  In these whole six

6  volumes of documents --

7          MR. BERNICK:  That's the -- that's the --

8          THE COURT:  -- I don't have them.

9          MR. BERNICK:  They weren't made.  That's the problem

10 that we're dealing with here, is that these are all the generic

11 points.  Now --

12         THE COURT:  But no.  There were objections to

13 specific questions.

14         MR. BERNICK:  They weren't -- they were not -- they

15 -- those are not matters that are even at issue.

16         THE COURT:  Well, then, if that's the case --

17         MR. ESSERMAN:  Because Grace didn't file a motion to

18 compel.

19         MR. BERNICK:  Well, no.  No.  I'm sorry.  No.  We

20 filed a motion to compel on matters that related to the face of

21 the questionnaire.

22         THE COURT:  Well, then, if it's related to the face,

23 Mr. Esserman represents the law firms that are trying to

24 complete these documents for their clients.

25         MR. BERNICK:  They don't -- then I would object,

1  because I don't believe that they have standing.

2          THE COURT:  Okay.

3          MR. BERNICK:  There's no legal right that they have.

4  If he's representing the individual claimants who are involved

5  in having to submit to this process, that's fine, too.  But

6  we've now -- we're now going through a second round of this

7  because Mr. Esserman, who sat through the first round, now says

8  he represents different people.

9          THE COURT:  No.  You're incorrect, Mr. Bernick.

10  We're going through a second round because I think I said at

11  the very outset that the debtor could control its own

12  discovery.  And if you wanted to ask certain questions I was

13  going to go through -- I don't know that we hit every one line

14  by line, but we sure did look at an awful lot of issues and

15  address every objection that anyone raised.

16          And it was pretty much a line by line, if not an

17  identical -- a line by line analysis, that I would go through

18  the format of those questions and determine whether or not the

19  questions were appropriately asked.  And I determined that they

20  were.  And to the extent that there is a question or an

21  objection with respect to the fact that the question has been

22  asked, I've already determined it was appropriate, and I'm not

23  getting into that.

24          But with respect to how somebody's going to answer

25  it, I never made rulings with respect to how any individual can

1  answer that objection, because --

2          MR. BERNICK:  Not in the individual; not in the

3  individual.  That's absolutely correct.  But whether the

4  question is relevant and whether it is problematic because of

5  burden, those have all been resolved.

6          THE COURT:  Well, I --

7          MR. BERNICK:  And that's all the --

8          THE COURT:  -- I never got into the issue of burden.

9  Relevance, I agree.

10          MR. BERNICK:  Well, I don't want to belabor this,

11  Your Honor, but that is exactly one of the things that we -- we

12  actually had an extensive discussion about.

13          THE COURT:  The burden in terms of the issues as they

14  were raised by Mr. Lockwood, but not the burden on the

15  individual claimants --

16          MR. BERNICK:  Okay.

17          THE COURT:  Yes.

18          MR. BERNICK:  That's fine.  That's fine, but now the

19  objections that are being made on the grounds of burden are the

20  same objections that Mr. Lockwood made.

21          THE COURT:  But well, look.  Let me cut through this,

22  because regardless of who's making the objections, this is my

23  spin.  The Federal Rules permit documents to be attached in

24  answer to a question.  The debtor has propounded this as

25  discovery.  You could do it in my view.

1          You could regard this as something in the nature of a

2    2004 deposition, because it's looking for the debtor's assets

3    and liabilities from the people who have that direct knowledge.

4    You can look at it as interrogatories.  You can look at it as

5    document discovery.

6          You can look at it as questions in the nature of

7    deposition questions, written questions in the nature of

8    deposition questions, however you want to look at it.  The

9    documents, as long as they do answer the question, are

10   appropriate attachments, and the burden is on the debtor to

11   sift through it.  If it turns out that the debtor can't find in

12   the documents --

13          MR. BERNICK:  Then, Your Honor, I would -- if that is

14   Your Honor's determination --

15          THE COURT:  It's my determination.

16          MR. BERNICK:  -- that's fine.  Then we may as well

17   not have the rest of the hearing today, in all candor, Your

18   Honor.  They have sent us down into rabbit holes and they are

19   plain; go look at our files and our law firm's.

20          THE COURT:  No.  Mr. Bernick --

21          MR. BERNICK:  I'm just saying, Your Honor, I can only

22   deal in the --

23          THE COURT:  I'm sorry.  I can't agree with you.

24          MR. BERNICK:  -- I can only deal in the real world.

25          THE COURT:  The real world --

1                MR. BERNICK:  And the real world --

2                THE COURT:  Mr. Bernick, the real world is that the

3    Federal Rules provide different methods --

4                MR. BERNICK:  They don't.

5                THE COURT:  -- for answering interrogatories.

6                MR. BERNICK:  They don't.  There's a business rule, a

7    business rule --

8                THE COURT:  Oh, you're going to argue these aren't

9    business records?

10               MR. BERNICK:  They're absolutely not business -- in

11   their hands they're not business records, and they've never

12   demonstrated they were.  That's number one.

13               THE COURT:  Well.

14               MR. BERNICK:  Number two, Your Honor, these are

15   contention interrogatories.  When have you ever heard in

16   response to a contention interrogatory, tell me what your

17   position is, and the answer is, a position.  What are you

18   claiming?

19               THE COURT:  To the --

20               MR. BERNICK:  The answer is --

21               THE COURT:  -- to the extent that they're contention

22   interrogatories, I agree.  There should be a state of the --

23               MR. BERNICK:  Well, they are.

24               THE COURT:  They're not all that, Mr. Bernick.

25               MR. BERNICK:  They are absolutely, every single one

1 of them.

2          THE COURT:  Some of them say --

3          MR. ESSERMAN:  Where have you worked.  Where --

4          THE COURT:  -- were you exposed to a Grace --

5          MR. ESSERMAN:  -- what is your exposure.

6          MR. BERNICK:  Where have you worked.  Do you claim

7 that you were exposed --

8          THE COURT:  Those are not contention interrogatories.

9          MR. BERNICK:  Of course they are.

10          THE COURT:  Those are fact interrogatories.  Where

11 did you work?

12          MR. BERNICK:  Well, what --

13          THE COURT:  What contention is there in where you

14 worked?

15          MR. BERNICK:  Do you contend you were exposed to

16 Grace asbestos?  If so, where?  Do you contend --

17          THE COURT:  That one -- if that's the way it's

18 stated, that may be one.

19          MR. BERNICK:  That is exactly --

20          THE COURT:  But the other questions say, were you

21 exposed --

22          MR. BERNICK:  Your Honor, all I can say to you --

23          THE COURT:  -- to non-Grace products?

24          MR. BERNICK:  -- all I can say to you is, I sat here,

25 Your Honor sat here.

1          THE COURT:  We did.

2          MR. BERNICK:  We went through every single one of

3  these things.

4          THE COURT:  And I still agree that answers are

5  required.

6          MR. BERNICK:  And if I'm -- I'm sorry.  I know I'm

7  upset about this because I believe that they've now succeeded.

8          THE COURT:  In what?

9          MR. BERNICK:  They've now succeeded in coming in here

10  18 months after this situation started, when we went through

11  the whole thing, and effectively, what you're now say -- if

12  what you're saying is true, they can point to these documents.

13  We can be sent the Barron and Budd's files.  We can be sent the

14  depositories, and then it's our burden to go through all of

15  that, try to ferret it out and they'll say --

16          THE COURT:  Well, that's the --

17          MR. BERNICK:  -- they'll say -- no.  No.  No.

18  They'll say, no, that's not what we meant.  You forgot to look

19  at this.

20          THE COURT:  -- that's the issue, Mr. Bernick.

21          MR. BERNICK:  So you go to tell Judge Pointer --

22          THE COURT:  Because I think under these

23  circumstances, attaching thousands of documents is not an

24  appropriate response.

25          MR. BERNICK:  Well, what do you -- what do I have to

1  do --

2         THE COURT:  And therefore --

3         MR. BERNICK:  -- Your Honor, what do I have --

4         THE COURT:  Let me finish, Mr. Bernick.

5         MR. BERNICK:  Sorry.  Go ahead.

6         THE COURT:  To the extent that there are documents

7  that are attached, the firms that are attaching documents will

8  point to the page of a document.  They will be either Bates

9  stamp numbered or numbered in some appropriate fashion.  You

10 will point to the page of the document that you are referring

11 to in answer to the interrogatory.

12        MR. BERNICK:  Well, what you're going to have --

13        THE COURT:  Because I am concerned that in fact

14 Mr. Bernick is correct.  These may or may not be business

15 records.  They may be to the extent that you -- they are a part

16 of your litigation files that you are submitting to the debtor

17 in response to an interrogatory.

18        And in that sense they may be part of the law firm's

19 business records, but they are not business records in the

20 traditional sense of how the Federal Rules of Evidence would

21 define a business record.  So I will accept the documents, but

22 you must attach a more specific identification so that the

23 debtor knows that in fact the document does address the

24 question.

25        MR. BERNICK:  Okay.  Can I ask --

1          THE COURT:  Because that's the problem with these

2 documents that are being attached.  They're -- I looked at some

3 example that was here and it -- I don't remember what -- and I

4 spent over an hour trying to find the answer to the question

5 and couldn't, so.

6          MR. BERNICK:  Yeah.  There are 116,000

7 questionnaires.

8          THE COURT:  I understand.

9          MR. BERNICK:  But each questionnaire is 10 pages

10 long.  If we --

11          THE COURT:  Mr. Bernick, you asked for it, you're

12 getting the information.

13          MR. BERNICK:  No.  I asked for it -- not only did I

14 ask for it, Your Honor.  I got it.  I got it.  We fought tooth

15 and nail to get it, and Mr. Esserman was here and his whole

16 committee was here, and they knew exactly what was going on and

17 they sat there and waited in the weeds until all the

18 questionnaires -- and they say how much time they spent

19 answering these and all the hours.  They spent all kinds of

20 time not answering them.

21          THE COURT:  Well --

22          MR. BERNICK:  And simply objecting to all of them.

23          THE COURT:  -- that's their burden.

24          MR. BERNICK:  They're telling Your Honor --

25          THE COURT:  Look, if this is life insurance for

1 attorneys so that, you know, firms have to hire attorneys for

2 quite some time I don't think any young attorney will be upset

3 about being hired to answer a legal questionnaire.

4       MR. BERNICK:  No.  It's very interesting because,

5 Your Honor, you know, I guess it was probably 12 years ago in

6 litigation that involved probably half the number of

7 questionnaires that Your Honor is dealing with.  It's called

8 the Dresden Plant litigation, and Judge Pointer ran it.  And

9 Judge Pointer did the same thing --

10      THE COURT:  You're covering your mike, sir.

11      MR. BERNICK:  -- did the same thing that Your Honor

12 did.  He had a questionnaire.  The questionnaire was

13 specifically designed to be answered by everybody precisely so

14 that it could become a database.  And all of those

15 questionnaires were answered, and the result of it was that we

16 were able to deal with massive numbers of claims and organize

17 them in some fashion, right?  Okay?

18      So if Your Honor wants to say it's not available

19 because the rules don't require it, that's fine.  Your Honor

20 ordered 18 months ago that it was available, and presumably,

21 all counsel had the opportunity to and did in fact make the

22 argument that the attachments would be sufficient, and the

23 questionnaire went down a different path.

24      It reads the way that it did, Your Honor.  There's a

25 prior order that says, you must fill out the questionnaire and

1  supply the documentation.  So I would respectfully say, Your

2  Honor, that if it is your determination, but notwithstanding

3  all of the work that's been done, that we're now going to have

4  negotiations with all the law firms about how they're going to

5  fill out the questionnaires, you will not have a single data

6  point.  They will have succeeded.  You won't have a single

7  data --

8            THE COURT:  I don't think I mentioned the word

9  "negotiation."

10            MR. BERNICK:  Well, sure.

11            THE COURT:  I think I mentioned the word "order."

12            MR. BERNICK:  Well --

13            THE COURT:  They may attach documents, but refer you

14  to the specific page.  Mr. Bernick, that's more probably than

15  the Federal Rules require.

16            MR. BERNICK:  To the --

17            THE COURT:  But --

18            MR. BERNICK:  -- to the contrary.  The Court -- the

19  Federal Rules require that people set out what their

20  contentions are, and the support for it, and they don't simply

21  say, you can go attach documents.  They have to be --

22            THE COURT:  Let me make it clear.  With respect to

23  anything that is stated as a contention interrogatory, that

24  question must be answered.

25            MR. BERNICK:  So we're now --

1          THE COURT:  And not by reference to a document.

2          MR. BERNICK:  -- we're now -- we're now --

3          THE COURT:  But if it says -- if it is asking for a

4  fact, where all did you work, and there's a 20-page document

5  that is attached that tells where they worked, that is

6  information that somebody could attach by way of a summary.

7          MR. BERNICK:  Whose burden is it to bring it to Your

8  Honor's attention that they're in default of that obligation?

9          MR. ESSERMAN:  It's a motion to compel.

10          MR. BERNICK:  It's now another motion to compel,

11  which will then go to the mediator again.

12          THE COURT:  No, we're not going to the mediator.

13  We're just coming here.

14          MR. BERNICK:  Well, what --

15          MR. ESSERMAN:  No.  We'll come back to the Court.

16          MR. BERNICK:  Well, no, and --

17          MR. ESSERMAN:  It's a motion to compel.

18          MR. BERNICK:  This -- hearing this from Mr. Esserman,

19  with due respect, is absolutely the best demonstration of how

20  this process has been perverted.  We sat here, he sat here.  We

21  went through the entire process.  There was not --

22          MR. ESSERMAN:  I'm going to object to this.  I'm

23  going to object to this whole thing.

24          MR. BERNICK:  -- there was not a word.  Now, I --

25          MR. ESSERMAN:  I'm going to object to this --

1          MR. BERNICK:  Well --

2          THE COURT:  All of you, please.  We'll take a five-

3 minute recess so tempers can cool down, and if you miss your

4 planes that will be the result.  Five minutes.

5          MR. BERNICK:  That -- I think that's what I --

6          THE COURT:  We're in recess.

7          (Recess at 3:02 p.m., until 3:13 p.m.)

8          THE COURT:  Mr. Esserman.

9          MR. ESSERMAN:  Your Honor, I'd like to wrap up

10 without interruption, if possible.  What I think it would be

11 helpful to do on the document attachment issue is to hear from

12 a couple law firms specifically who are sort of in the field

13 and working on this issue.

14          I think that that would highlight some of the issues

15 we've got with a "See page 1 of 200" versus, "See Exhibit B,"

16 which I think is on --

17          THE COURT:  Well, I understand.  But I think

18 Mr. Bernick has a point, that these are probably not business

19 records.  And if they're not business records, then the

20 document production isn't satisfactory.  So if you want a nice

21 compromise, which is, "see a certain page," fine.  If you want

22 to have to answer questions, okay.

23          MR. BERNICK:  Well, except sometimes it's not so easy

24 to just say, "See Exhibit 1, page 1," because sometimes it is

25 page 1 through 100 if they're talking about Grace exposure, for

J&J COURT TRANSCRIBERS, INC.

1 instance, or medical records, for example, which I think would

2 be very easy to say, "See medical records attached."

3          They're asking for information about the medical

4 condition of the plaintiff; be very easy to see -- to say, "See

5 the medical record attached as Exhibit A," and that's what I'm

6 talking about.

7          THE COURT:  Okay.

8          MR. ESSERMAN:  At this point I'd like the

9 representative of the Angelos firm to talk about some of the

10 issues in connection with that.

11          THE COURT:  All right.  Before you leave, Mr.

12 Esserman --

13          MR. ESSERMAN:  Yes.

14          THE COURT:  -- I want to make sure collectively that

15 we have no problem identifying what are contention

16 interrogatories, because those have to be answered.

17          MR. ESSERMAN:  Your Honor, I have not gone through

18 and done a line by line itemization of what's a contention

19 interrogatory and what is not, so.

20          MR. FINCH:  For example:  "Please complete the charts

21 below for each site in which you allege exposure to Grace

22 asbestos-containing products."  That to me is not a contention

23 interrogatory.  That's a fact interrogatory.  And as an

24 example, this is a claimant who basically -- who said in

25 response to his exposure to Grace and his exposure to non-

1  Grace, "See my interrogatory answers that I filed in Minnesota

2  -- in Michigan State Court."

3          And he goes on for 102 pages listing all the various

4  places he worked, all the products that he worked in.  And

5  so -- and that is the type of "See attached" I think the

6  Federal Rules of Civil Procedure expressly provide for.

7          THE COURT:  How is that the claimant's business

8  record?

9          MR. BERNICK:  It's the claimant's responses to sworn

10  interrogatories that is a -- all 102 pages are responsive to

11  the question, Your Honor.  Rule 33(d) says:  "When the answer

12  to an interrogatory may be derived or ascertained from the

13  business records of the party," and here, the claimants have no

14  business records, "upon whom the interrogatory has been served

15  or from an examination, audit or inspection of such business

16  records and the burden of deriving or ascertaining the answer

17  is substantially the same for the party serving the

18  interrogatories to the party served, is a sufficient answer to

19  such interrogatory to specify the records from which the answer

20  may be derived or ascertained," and I have an ellipsis, "and

21  the specification shall be in sufficient detail to permit the

22  interrogatory -- interrogating party to locate and to identify

23  as readily as can the party served the records from which the

24  answer may be ascertained."

25          MR. FINCH:  Your Honor, with all due respect,

1 interrogatory answers are records of the party.  They are the

2 -- they're not business records in the sense that an individual

3 doesn't have a business, but they are records that the

4 individual creates that are responsive to the question.

5         You can -- if you're asked a question in deposition,

6 for example, please tell me every purchase you've made through

7 Visa for the past two years, the honest answer to that is, I

8 don't know; here are my Visa bills; please look at them.  No

9 court is going to say that you cannot respond to a question

10 like that when you -- when it may be not my business records,

11 but it's Visa's business records.

12         And so this guy has interrogatory responses that are

13 directly responsive to every single question Grace answered

14 [sic], and they fill over 100 pages that each of the 100 pages

15 is relevant to the questions about other exposure and Grace

16 exposure.  That to me is what the rules of -- rule 33 was

17 designed to allow, is that the burden on Grace is the same as

18 the burden on the claimant, to type the 102 pages into the

19 questionnaire --

20         MR. BERNICK:  That's -- I'm sorry.

21         MR. ESSERMAN:  Wait a minute.

22         MR. BERNICK:  I got a lot of lawyers who are talking

23 at the same time.

24         MR. ESSERMAN:  Now, wait a minute.

25         THE COURT:  Let --

1          MR. ESSERMAN:  I thought this was my time.

2          MR. BERNICK:  Excuse -- well --

3          THE COURT:  It was, but just one second.  Let me

4   address this issue with Mr. Bernick and then I'll let you

5   finish uninterrupted, Mr. Esserman.  Go ahead, Mr. Bernick.

6          MR. BERNICK:  There is no general rule in the

7   discovery rules that says the -- that the burden is the same on

8   both sides.  The side who's answering the discovery has the

9   opportunity to provide the answers the way that are no more

10  burdensome to the interrogating party.  There's no such rule.

11          And in fact, in Mr. Finch's example of a deposition,

12  if the deponent says, that's in my records, sure, the parties

13  have the opportunity if they want to agree to supplement the

14  record with the documents.  But at the same time, particularly

15  if the documents are not so amendable to a routine

16  interpretation, the parties have the opportunity, indeed, the

17  right to insist the deponent have the documents there and be

18  examined with respect to those documents.  That's a deposition.

19          We're not dealing with a deposition.  We're dealing

20  with something in place of a deposition, and we're dealing here

21  with an interrogatory rule that's being imposed.  The

22  interrogatory rule could not be clearer.  They are business

23  records.  They are business records of a party.

24          In this case there are no business records of a

25  party.  The rule does not apply and there is no general relief

**J&J COURT TRANSCRIBERS, INC.**

1 from the discovery rules.  Again, all this was gone over --

2        THE COURT:  There is general relief, Mr. Bernick, to

3 the extent that something is overly burdensome.  And frankly,

4 if there is already a document like -- just to use the example

5 Mr. Finch stated -- a deposition that already -- transcript

6 that already answers the question, I don't see any reason why

7 that person has to in the space of three lines on a

8 questionnaire attempt to retype information that's in 102

9 pages.

10        MR. BERNICK:  I would agree with that, Your Honor.  I

11 would agree with that.  But the practical -- let's see how that

12 cuts.  We certainly created the opportunity, if people wanted

13 to, to fill in the blank.  If they wanted to fill in the blank

14 by referring to something else where it was absolutely lucid on

15 the face of it what the answer is, I could see a case could be

16 made for that.

17        But where you're talking particularly about medical

18 records that go on for hundreds of pages or work histories or

19 depositions, that's the example that actually defeats their

20 position, because then I've got to go or somebody else has got

21 to go through all the medical records or all 100 pages of a

22 deposition and ferret out the information.

23        And under those circumstances it's neither provided

24 for in the interrogatory rule, nor is it permissible in a

25 deposition, nor is it permissible under this questionnaire.

1  Now, if we can get closure -- and we're not going to have this

2  whole thing get argued nine times -- I could advance a position

3  that I think would accommodate the Court's concern and would

4  move us off the mark.

5         But I don't want to negotiate against five different,

6  six different law firms against -- well, but this is the way --

7  I've done it once already for several hours.

8         THE COURT:  If you have a position you think will

9  resolve the issue go ahead and state it.

10        MR. BERNICK:  Yes.  I have a position.  The position

11  is that first of all let's forget about talking about Rule

12  33(d), because if the basis of the Court's ruling is 33(d) it's

13  clearly erroneous because it's not business records of a party

14  and we'll just take the appeal.  That doesn't really get us

15  anywhere.

16        We do want the information.  So if they believe that

17  the information, the exact answer to the question, the exact

18  answer to the question is actually set out, you know, in so

19  many words in some document, then certainly, they've satisfied

20  their obligation, both to answer the question and to provide

21  the supporting documentation by attaching that document, that

22  page of that document, and Bates stamp numbering or whatever

23  and then cross-referencing that Bates number.

24        So for example, the occupational history, if it

25  really is set out, you say, well, I worked at x facility,

1  particularly, he says, at hundreds of jobs, that's a person for

2  whom the fact that he had hundreds of jobs is particularly

3  germane to what their claim is against Grace.

4          So you can't refer me to a deposition that's got 300

5  pages, say here's my work history.  They ought to fill it out.

6  They ought to say, I worked here, here, here and here, and they

7  ought to make a cross-reference to that page that they're

8  supplying the Court; same thing with medical records.

9          Saying that medical records can be cross-referenced

10 is a joke.  Everybody interprets medical records.  We have to

11 know what they say from the claimant's point of view or the

12 lawyer's point of view as the answer.

13         So if in fact they want to attach documents that

14 provide the identifying information or answering information we

15 would agree that they can do so if they are providing those

16 pages of the document, if they're Bates numbered, and that the

17 Bates number is put in the blank so that there is no issue

18 about what document we're talking about, and there is no issue

19 about what information on that page answers the question,

20 because if we get down to that debate we may as well start all

21 over from scratch.

22         This thing is going absolutely nowhere.  That applies

23 to x-rays.  It applies to other things that we're talking about

24 here where if they want to take the position that the

25 document's the answer, we want to see the document and we want

1  it attached.  There's no reason why it should not be attached.

2        And that's a compromise under the rule.  We think

3  that unquestionably, the interrogatory answer rule does not

4  apply, that this is really in lieu of depositions and

5  documents.  If we had a deposition there's no question that

6  we'd be entitled to ask those questions with the witness

7  sitting there and looking at the document.

8        MR. ESSERMAN:  Your Honor, Grace themselves says that

9  this questionnaire's a hybrid form of discovery.  I'm reading

10 from their motion, "Part fact interrogatory, part contention

11 interrogatory, part document request and part deposition by

12 written question."

13       We think it's clear that you can attach these things

14 as part of this hybrid process.  I don't know whether the

15 compromise, if it is such a compromise, would work or not.  I

16 can't say here that it would, but it seems to me that if they

17 want to see where the work history is and we can attach the

18 work history and say, see work history, that should be

19 sufficient.

20       Medical records, see attached medical records.  That

21 should be sufficient.  This business about going to the exact

22 line and -- of a particular deposition or whatever seems to me

23 to be over the pale.  If they want the information they should

24 be the one spending the money to extract it, as long as we

25 provide it in a form that is somewhat reasonable.

1           And I'd like to talk to maybe some of the

2  representatives here before I can say anything else about that

3  issue.

4           THE COURT:  All right.  That's fine.  Do you want a

5  recess or do you want me to continue with the arguments?

6           MR. ESSERMAN:  What?

7           (Several attorneys speaking at once away from mike)

8           MR. ESSERMAN:  Okay.

9           MR. BERNICK:  Your Honor, I -- we can hear a bunch of

10 recitations from people on why they want to do something or

11 other.  I'm trying to make progress.  I think the Court's

12 trying to make progress with this thing.  I'm also prepared to

13 respond on the signature so that we can get these things

14 resolved.  If all we're going to have is a chorus that stands

15 up and talks, it's just not productive.

16          THE COURT:  I didn't say, Mr. Bernick, that I'd let

17 you respond with respect to the signatures.  So why don't you

18 do that now before I hear from the next --

19          MR. ESSERMAN:  I would really like to close on

20 arguments that we've got teed up.  The issue of attachments is

21 a major issue.  Why don't we -- I think --

22          MR. PHILLIPS:  I was going to suggest -- I mean,

23 Mr. Bernick has a --

24          THE COURT:  Your name, please.

25          MR. PHILLIPS:  Sorry.  Robert Phillips, of Simmons

1 Cooper, for the claimants who received questionnaires from the

2 debtor with regard to their claims against Grace.  I think Mr.

3 Esserman may be right, maybe -- or we need to have some of us

4 tell you what is going on.

5         We've listened to Mr. Bernick tell us how we fill out

6 the questionnaires, tell us how these things are done and so

7 forth --

8              MR. BERNICK:  If this is --

9              MR. PHILLIPS:  -- without any reference -- let me

10 finish, please.

11             MR. BERNICK:  -- if this is an argument do we --

12             THE COURT:  Gentlemen, please.

13             MR. PHILLIPS:  No.  But I agree that it doesn't do

14 the Court any good to have every single lawyer who represents

15 personal injury claimants get up here and give largely perhaps

16 redundant descriptions.  So maybe at some point a quick five

17 minutes for us to decide which of us should say something.

18        But I do think, because there's been a lot of -- I

19 wouldn't call it proffered evidence, but there's been a lot of

20 talk about what the facts are without any introduction of

21 actual evidence on those points or discussion or testimony

22 offered to you about what is actually going on with regard to

23 the filling out of these questionnaires and what burden we

24 really think we have and so forth, and I think it would be

25 useful for Your Honor to hear that.

1          But like I said, I do agree that you don't need to

2    hear it from 12 of us, you know, in succession, because we

3    won't finish today.  So perhaps maybe moving on to the legal

4    signature, get that finalized, though I thought we had it

5    finalized before the break, based on what Your Honor was

6    saying.

7          But if there is some final point that Mr. Bernick

8    wishes to make, we can let him make it.  Give us five minutes

9    to go and then we can put maybe two or three of us up here,

10   limited amount of time each.  Mr. Bernick can respond.  But I

11   do think that you do need to hear from us and not just rely on

12   what Grace says we are doing and alleges we are doing in our

13   secret cabals down in Texas or Madison County or wherever.

14          THE COURT:  All right.

15          MR. BERNICK:  Your Honor, I don't really care what

16   they're doing down in their secret cabals.  All I'm just

17   looking at the piece of paper we've got.  They speak for

18   themselves loud and clear that they're not giving the

19   information.  They want to talk about reality down in Texas,

20   that's fine.

21          We're here in a Federal Court in Pittsburgh.  That's

22   where I've been hanging out for quite some time and this is

23   where this case is going to be decided.

24          MR. PHILLIPS:  Your Honor, this is the kind of

25   testimony and criticism masquerading --

1          THE COURT:  You have to use a mike, Mr. Phillips.

2   It's all right.  Let me just hear from Mr. Bernick with respect

3   to the signatures.  Gentlemen, the next one of you who says

4   anything of an incendiary nature against another attorney in

5   this courtroom is going to jail.  Period.  End of story.  You

6   will not be going home tonight.  So that's it.  I don't want

7   anymore of it, please.  Mr. Bernick, if you would please

8   address the signature.

9          MR. BERNICK:  Yes.  There's a very specific reason

10  why we asked for the signatures, both by the claimants and by

11  the legal representative, and it's a question of getting what I

12  think Your Honor acknowledges and understands we want and are

13  entitled to, which is a verification that all the information

14  that's on the questionnaire is accurate and correct.

15         And the problem is that unless you get both

16  signatures you're then open to a problem.  The claimant then

17  says, well, the best of my knowledge, and then it turns out

18  that they don't really know an awful lot of what's there

19  because they're not personally involved with it.  It's what

20  their lawyer has got or their doctor has got and that they may

21  never have seen.

22         The lawyer will say, well, gee, I can't -- you know

23  -- I don't have to answer it, the claimant's answer it, that's

24  as good as I got.  So --

25         THE COURT:  Well, isn't it?  I mean, Mr. Bernick --

**J&J COURT TRANSCRIBERS, INC.**

1          MR. BERNICK:  Well, no.  No.

2          THE COURT:  -- look, you're a debtor's lawyer.

3          MR. BERNICK:  No.  No.

4          THE COURT:  How often do you really want to put your

5  name on a piece of paper that verifies all the information that

6  your client gives you?

7          MR. BERNICK:  I have clients, in-house lawyers,

8  clients, with every single -- I'm sorry.

9          THE COURT:  No.  I'm not talking about in-house

10  lawyers, clients who have in-house lawyers.  I'm talking about

11  people who come in and talk to you and say, Mr. Bernick, I have

12  a house that's worth $300,000 and meanwhile they -- you know --

13  they live in an area of the town where the --

14          MR. BERNICK:  I mean, I don't know -- I don't find

15  that at all that painful.

16          THE COURT:  Well.

17          MR. BERNICK:  And the reason I don't find it painful

18  is that my clients who've got lawyers that work with them, the

19  lawyers are required to verify interrogatory answers on -- and

20  they do not have personal knowledge.  They have knowledge that

21  they've obtained as counsel -- and they're no different from

22  anybody else -- they are counsel to the company.

23          So when I'm asked to sign something, I sign

24  affidavits.  I make sure that they're true and correct and

25  accurate.  In this case we've got claimants who know something

1 and lawyers who know an awful lot more.  And this questionnaire

2 goes for not just what the claimants know, but also for what

3 the lawyers know, because the claimants may not know a lot of

4 the information that's there.

5         We want to get all of the information verified so

6 that it's -- Your Honor, this is exactly the discussion that we

7 went through.  That's why we ended up with the questionnaire

8 that was done.  This is -- we even had a dialogue on this very

9 subject at pages 242 and 243.

10         THE COURT:  Yes.  The question at that time was,

11 where is it that you were contending that an attorney had to

12 sign.  And the answer was, it says, "Legal representative."  So

13 that, I thought, was your contention that that's where an

14 attorney has to sign.

15         MR. BERNICK:  That's correct.  It says -- actually, I

16 don't see a place where the lawyers -- all it says --

17         THE COURT:  Legal representative.

18         MR. BERNICK:  -- to will be completed by the legal --

19         THE COURT:  Right.

20         MR. BERNICK:  -- "I swear that the information is

21 true and accurate."  Okay.  It seems to me that it can simply

22 be directed to the legal representative, you must sign part 10.

23 Part 10 should be amended.  That's exactly what it is that we

24 did.  So if it comes from the lawyer, if the claimant has

25 personal knowledge of everything, that's fine.

1           If the lawyer is needed, that should be there.

2   Otherwise, I know to a mortal certainty what we're going to

3   get, which is, well, the claimant knows this.  The lawyer may

4   know an awful lot more; we're not going to get any of that

5   information.  No company could do that and get away with it in

6   a zillion years.

7           I know representing clients for 25-30 years I

8   couldn't get away with that; wouldn't even try.  Here, it's the

9   claimants themselves who have got the claim.  And all we're

10  wanting to know is, what do you have to support the claim.  The

11  questionnaire's designed to ferret it out.  If the

12  questionnaire is filled out, we want somebody to verify that

13  the entire thing is correct.

14          THE COURT:  Right.

15          MR. BERNICK:  And if it's limited by the language of

16  the claimant's knowledge then he's going to say, well, nine out

17  of 10 pages I don't know anything about, but I knew about the

18  one and that was okay.  So I'm okay.  That's just not the way

19  it should work.  We should not be hiding the ball.

20          If the law firms have got the information they should

21  be attesting to the fact that the information is true and

22  correct, as they are informed or to the best of their

23  knowledge, which is the way that verifications and

24  interrogatory answers that lawyers give --

25          THE COURT:  And that's what it says.

1          MR. BERNICK:  What?

2          THE COURT:  That's what the verification says.

3          MR. BERNICK:  And they should be doing that.  The

4  lawyers should be doing that.

5          THE COURT:  If the claimant verifies his own

6  information.

7          MR. BERNICK:  He does so completely.  But Your Honor,

8  we're not -- I'm still not getting it across.  If the claimant

9  does it the claimant is not saying, I'm verifying all the

10  information in the questionnaire.  That's the problem.

11          THE COURT:  Why not?  It says that, "The information

12  in this questionnaire is true and correct to the best of my

13  knowledge."

14          MR. BERNICK:  To the best of his knowledge.

15          THE COURT:  Right.

16          MR. BERNICK:  All the foregoing is true and accurate,

17  to the best of his knowledge, but if he doesn't know, then that

18  doesn't mean anything.

19          THE COURT:  Well, then, how is he answering a

20  question if he doesn't know?

21          MR. BERNICK:  Well, then we can rephrase this and say

22  that, "All of the foregoing questions contained in the

23  questionnaire is true, accurate and complete," because they're

24  then saying it's true, accurate and complete.  But if it's to

25  the best of --

1          MR. PHILLIPS:  That's what it says.

2          MR. BERNICK:  No.  It says, to the best of the -- I'm

3  sorry.

4          THE COURT:  His concern is that it says, "To the best

5  of my knowledge," and that that somehow wiffle-waffles.

6          MR. BERNICK:  That's exactly what it's going to turn

7  out to be, because we have been told -- we've been -- well,

8  they're laughing --

9          THE COURT:  That's a T-ball term.

10          MR. BERNICK:  -- but they're the ones that do this

11  all the time.  This is no secret.  This is the way that it

12  works.

13          THE COURT:  Okay.  Look, I think what I need to do

14  with respect to this is the following.  Whoever fills out this

15  questionnaire has to sign it under one of these.  It's either

16  the claimant if the claimant fills it out, or it's the attorney

17  if the attorney fills it out, or it's some other legal

18  representative.

19          If some other legal representative fills it out,

20  whoever it is who's completing this questionnaire is the person

21  who's responsible for making sure that the information's true

22  and correct.  Isn't that what you're after?

23          MR. BERNICK:  Yes, but I want to make sure that

24  attestation relates to all of the information.

25          THE COURT:  It says that, "all of the foregoing

1 information."

2          MR. BERNICK:  Yeah, but I -- that, Your Honor, as I

3 said, because of the personal knowledge of a claimant, we're

4 going to find the personal knowledge of the claimant only

5 extended so far, and therefore, the verification only extends

6 so far.

7          THE COURT:  All right.

8          MR. BERNICK:  The law firms can't do that because

9 they are -- have all the information within their possession.

10          THE COURT:  If --

11          MR. BERNICK:  That's why we want --

12          THE COURT:  Look, if counsel were signing it -- their

13 officers of this Court -- I certainly hope never to hear that

14 an officer of this Court has signed something and then it turns

15 out that they didn't sign it understanding that when it says,

16 "All of the foregoing information contained in this

17 questionnaire," that it means --

18          MR. BERNICK:  And we would be content --

19          THE COURT:  -- all.

20          MR. BERNICK:  -- we would be content if the lawyers,

21 as legal representatives, signed all of these things.  We would

22 be content with that.  We don't have to have both, but we want

23 to avoid a situation where the verification is later construed

24 not to apply to the whole thing because the claimant doesn't

25 really know.  So if it's the lawyers who are going to sign it I

1  have no quarrel with the lawyers signing it.

2         THE COURT:  All right.  This is my instruction.  To

3  the extent that the claimant is the entity or the person who is

4  signing this form, you'd better make sure that they understand

5  that the information and the attestation is to all of the

6  foregoing information, which is what the attestation says.

7         Otherwise, then have somebody who does have the

8  knowledge also sign it.  If it takes two people to sign it to

9  have that information be verified, then have two people sign

10 it.  If one person's enough, have one person sign it.  But I am

11 not going to hear from anybody after today.

12        If these things need to be amended I'll give you time

13 to do it, but after that amended period comes in that somebody

14 signed the attestation without understanding that it applied to

15 all of the foregoing information.  So if it's a claimant and

16 the claimant only knows the answers to questions one, two and

17 three, then say, I swear that the information contained in

18 questions one, two and three is correct, and have somebody else

19 who has the rest of the knowledge sign it.  Okay.

20        MR. BERNICK:  Thank you.  Yes, Your Honor.

21        THE COURT:  Okay.  Now, you'd like a recess, Mr.

22 Phillips?  Yes, sir.

23        MR. PHILLIPS:  I just think given the time five

24 minutes would be appropriate.

25        THE COURT:  We'll take a five-minute recess.

1           (Recess at 3:35 p.m., until 3:45 p.m.)

2           THE COURT:  Mr. Phillips.

3           MR. PHILLIPS:  I believe we've definitely conferred.

4 Mr. Krause, of the Waters and Krause law firm, would like to

5 speak, Your Honor.

6           MR. KRAUSE:  Your Honor, good afternoon.  For the

7 record, Peter Krause, of Waters and Krause, appearing on behalf

8 of the Waters and Krause clients.  Your Honor, there's been

9 some contention by Mr. Bernick that I'm somehow affiliated with

10 Mr. Kazan and with Montgomery McCracken.

11           I want the record to be clear, I'm appearing here for

12 the Waters and Krause clients for the first time with respect

13 to this issue.  We were not heard before through the ACC.  I

14 know they have a very important role in this proceeding, and

15 bankruptcy in general, but my clients don't have the right to

16 hire and fire Mr. Elihu -- Mr. Inselbuch or Mr. Lockwood, and

17 are not bound by what they have done or said in the past.

18           Your Honor, when we received this questionnaire, and

19 it was a rather unusual and detailed pleading to receive, on

20 behalf of my mesothelioma clients I looked at it and I looked

21 at the Federal Rules and I said, well, what is this and what is

22 our obligation, read the Court's orders and we undertook,

23 pursuant to the Court's orders and the Federal Rules, to

24 respond in a way that is lawful under the Federal Rules.

25           And what we determined, Your Honor, was that this

1 questionnaire, which Mr. Bernick created and his clients

2 created for their own purposes, sought information that had

3 been provided by these clients in the course of their lawsuit.

4 All of this exposure information and medical information had

5 already been requested and provided in their lawsuit.

6          THE COURT:  Against the debtors?

7          MR. KRAUSE:  Against in some instances the debtors,

8 Your Honor, and in other instances against other joint tort

9 feasors after the debtor filed for bankruptcy, Your Honor.  But

10 the questions that were asked, what medical condition do you

11 allege was caused by asbestos; what is your supporting

12 documentation for that allegation; state all products that you

13 were exposed to which you believe you contain asbestos; give us

14 your work history; give us the duration of exposure; give us

15 the trades in which you were involved, all of that was

16 requested in the underlying lawsuits that all of these people

17 had against Grace and/or joint tort feasors.

18          And so we determined pursuant to Rule 33(d) that in

19 fact it was appropriate to refer Grace to those materials and

20 allow Grace to do, just as easily as we could do, read those

21 materials to determine what the answers were, because the

22 information was set forth therein.

23          Your Honor, I do believe that those records are the

24 records of my clients.  We're not talking about the records of

25 regularly-conducted business activities by institutions as

1  defined in the hearsay rules.  These are the business records

2  of my clients.

3          Just as their tax records, their lawsuit records,

4  their employment records, their medical records, they are their

5  business records that are maintained in their files.  In this

6  case they're maintained in the files of their agent, Waters and

7  Krause.

8          Your Honor, the burden associated with regurgitating

9  all of that information in these little boxes in this little

10  form, 180 plus questions with many, many, many, many subparts

11  is enormous.  And Your Honor, it's an unfair and it's an

12  unreasonable burden to require of mesothelioma clients.

13          And I'm here, Your Honor, to speak particular to the

14  burdens associated with this, this process for the mesothelioma

15  clients, because Your Honor, at its heart this whole estimation

16  process, and the information that Mr. Bernick says is so

17  necessary to determine whether or not these claims are valid,

18  the pages and pages of medical information about PFTs and

19  x-rays and ILO readings, none of that has any relevance to the

20  mesothelioma clients.  It's an unfair burden.

21          Your Honor has been involved in this long enough to

22  know that mesothelioma is a signature disease for asbestos

23  exposure, that if you have -- in fact, Your Honor, for adult

24  American males it's the only established cause.  There is no

25  stronger cause.

1      It's almost as strong for women, therapeutic

2  radiation from breast cancer 20-30 years ago has been

3  implicated in certain instances; that's it.  there is no other

4  established cause.  So there's a great burden there.  With

5  respect to the product ID, Your Honor, the burden is even

6  greater.  The information that Grace is requesting from each of

7  these claimants is enormously detailed.

8      And the information that has been generated in the

9  course of the lawsuits, that the claimants or their lawyers in

10  this case would have to review, to regurgitate it in the format

11  that Mr. Bernick requests is enormous, and it's unfair, Your

12  Honor, particularly for the mesothelioma plaintiffs.

13      Your Honor, I think it's important for the Court when

14  you are determining whether or not you can even rule on these

15  issues in some sort of global fashion of whether you need to

16  have specific responses of specific claimants before you, to

17  look at what the burden is on the claimants responding and look

18  at what the purpose of the information is and whether or not

19  it's legitimate to place the burden on the claimants and their

20  lawyers to provide that information in the format that

21  Mr. Bernick is requesting.

22      And Your Honor, make no mistake about it, the Court's

23  suggestion of a compromise position is an enormous burden.  The

24  materials that we have attached, the depositions that these

25  mesothelioma victims have been forced to undergo in the

192

1  litigation process are often 20-30 hours long.

2         They can go hundreds and sometimes more than 1,000

3  pages.  Interspersed throughout that hundreds of thousand pages

4  is examination about exactly the materials that Mr. Bernick

5  requests in his handy, dandy little chart.  Your Honor, it --

6  throughout those hundreds of pages they're asked about the

7  products.

8         They're asked about when they were exposed to the

9  products.  They're asked about what they were doing in and what

10  industry they were doing it.  They're asked about how they were

11  exposed, what was being done with the products at the time.

12  They're asked what the nature was.  I don't know exactly what

13  that means, but the intensity, the duration, how close, how

14  far, all those questions are the subject of depositions.

15         So Your Honor, if I'm going to read through those

16  hundreds of pages and divine the pages in which these topics

17  are identified the burden is going to be literally crushing

18  upon the claimants.  The alternative, Your Honor, is to refer

19  them to that deposition where Grace can hire whoever it wants

20  to determine and divine as much detail about my often now

21  deceased mesothelioma claim -- clients' exposures and put it

22  into whatever database they so choose.

23         But Your Honor, I think if you are determining that

24  it may be appropriate to place that burden on the victims, it's

25  also appropriate for you to determine to what end, to what use.

**J&J COURT TRANSCRIBERS, INC.**

1  What can and will be done with this that will help advance the

2  ball in estimation?

3           And with respect to mesothelioma, Your Honor, the

4  science of this disease is that very brief and very short

5  exposures can cause it, that each and every exposure that a

6  mesothelioma victim has to asbestos of any kind is a

7  contributing cause, that the law -- the tort law of the 50

8  stats so treat each such exposure, and that each exposure

9  shortens the duration of time until the onset of the disease.

10          Why is that important, Your Honor?  Because that

11 means that this enormous and crushing burden that Mr. Bernick

12 and Grace would place upon the victims is really to no end.  If

13 there is any exposure, if there is any exposure to a Grace

14 asbestos product, then that exposure would be sufficient to

15 defeat summary judgment in the tort system, and to have value

16 in the tort system, and thus would be a claim that has value

17 for estimation purposes.

18          And this enormous level of detail that's requested

19 here in a narrative form by Mr. Bernick, in addition to the

20 attachments that we have already given him is to no end in

21 estimating the value of those claims, Your Honor.  It's to no

22 end at all.

23          That's the consensus position of the scientific

24 bodies that slight exposures cause it, that these are dose-

25 response diseases, that as little as one day's exposure has

1  been reported to cause this disease.  And so when we're dealing

2  with those circumstances, Your Honor, to what end are you going

3  to place this burden on the claimants?

4           And Your Honor, I could -- I can't be clearer to the

5  Court that requiring us to read through hundreds of pages of

6  deposition testimony, tens of pages of interrogatory responses,

7  and cite chapter and verse where each of these little boxes is

8  addressed for each different product is an -- is nearly an

9  equally heavy and unfair and unreasonable burden on

10 mesothelioma clients as Mr. Bernick's original request.

11          Certainly, Your Honor, Mr. Bernick's proposed baby-

12 splitting solution is of no assistance whatsoever with respect

13 to that burden.  Your Honor, with respect to Grace's role in

14 this litigation, I'd like to show the Court briefly a few

15 slides of some Grace discovery materials that were generated in

16 the course of litigation, because what those slides

17 demonstrate, Your Honor, is that -- could you switch over to

18 the PowerPoint for me?

19          MR. BERNICK:  Your Honor, at this point apparently is

20 a presentation relating to vermiculite and Grace's history with

21 vermiculite.

22          MR. KRAUSE:  Your Honor, I --

23          MR. BERNICK:  I'm sorry.

24          MR. KRAUSE:  May I proceed, Your Honor?

25          THE COURT:  Yes.

1          MR. KRAUSE:  He doesn't know what my presentation is,

2 quite frankly.

3          MR. BERNICK:  No, but the problem basically is that I

4 made a proposal.  I think we should try to focus on the

5 proposal.  What happens inevitably, Your Honor, is we get to

6 the end of the day, we're now going to hear from a whole series

7 of people, and this may be very interesting, but my experience

8 here tells me that I get a whole bunch of people talking and

9 then at the end of the day I don't really have an opportunity

10 to respond.

11          And I at least want to respond to what Mr. Krause has

12 got to say with respect to his own clients, because the case is

13 unbelievably compelling, just focusing on his own firm.  If he

14 then wants to go ahead and give his presentation on his view of

15 Grace's history, that's terrific.

16          But the fact of the matter is that we're not here to

17 talk about Grace's history.  We're here to talk about what it

18 has to do with these different claim forms.

19          MR. KRAUSE:  Your Honor --

20          MR. BERNICK:  This was a special setting, the deal

21 with the questionnaires.  So it's not a special setting --

22          MR. KRAUSE:  This is --

23          MR. BERNICK:  -- to deal with his version of the

24 history to which we'd be happy to respond, but it's not here

25 today.

1          THE COURT:  Yeah.  This is to deal with the

2     questionnaire, not with publicized articles from somewhere

3     else.  I agree.

4          MR. KRAUSE:  Well, I understand that, Your Honor, and

5     my point simply goes with respect to the burden and whether or

6     not the burden is outweighed by the benefit to the process.

7     We've already -- I've already briefly mentioned and I haven't

8     gone through any of the prepared slides with respect to the

9     science of mesothelioma in terms of the burden, and whether or

10    not it's reasonable and legitimate for Mr. Bernick to require

11    mesothelioma clients to recreate in excruciating detail, either

12    through page references or through narrative responses, all of

13    the other exposures.

14          With respect to -- his response to that might be,

15    well, okay, well, let's see what they have as to Grace

16    exposures.  Now, leaving aside the issue, Your Honor, of the

17    fact that the plaintiffs have not been entitled to do any

18    discovery on Grace about all of the witnesses that they've

19    collected testimony from in the course --

20          THE COURT:  No one's asked for any.

21          MR. KRAUSE:  Well, I understand that, Your Honor.

22          THE COURT:  Okay.

23          MR. KRAUSE:  But in terms of what this estimation

24    process is going to accomplish with respect to Grace products,

25    Mr. Bernick has represented to the Court that Grace is a

1  narrow, narrow little peripheral player in this litigation,

2  that 12 percent of the people had the kind of construction

3  exposure which would give them any opportunity to have exposure

4  to Grace products, and that's simply revisionist history.

5  That's simply not Grace's experience in this litigation, that I

6  lived for many years with W.R. Grace until their bankruptcy.

7           And very simply, Your Honor, their own evidence

8  suggests that their products are all over the place.  Now, we

9  should have an opportunity at some point to look at what Grace

10 has with respect to that.  They had 40 asbestos plants.  They

11 exposed workers there in addition to Libby, their families, the

12 people who bought the products, the products that were made by

13 them and --

14           THE COURT:  But to what end?

15           MR. KRAUSE:  Well --

16           THE COURT:  I mean, what --

17           MR. KRAUSE:  -- the point is -- the point is --

18           THE COURT:  -- at this point in time I think I am not

19 going to take this process and encumber it with what might be

20 if the plaintiffs decide that they need some discovery.  The

21 question is, what are appropriate answers to these

22 questionnaires.  And frankly, to the extent that no one is

23 answering the contentions, i.e., do you contend that Grace made

24 you sick, and if so, how and where, those questions needs to be

25 answered.

1          MR. KRAUSE:  Well, and in fact, all of those

2 materials are provided in the answers to interrogatories that

3 we have attached to our questionnaires, Your Honor.  We have

4 attached all of the information about the -- that we have, that

5 we have through the discovery process that's taken place so far

6 about the products that we contend caused our clients'

7 mesothelioma, to the extent we have it.

8          And we don't have it all.  We don't have information

9 from Grace.  But Your Honor, there -- even if there is no

10 evidence presently, from this lengthy list of products, the

11 brochures where they advertise that they are, you know, all

12 over the place, that they are, you know, a vast network of 50

13 plants and their products are in thousands of homes, offices

14 and factories --

15          THE COURT:  What's the point?

16          MR. KRAUSE:  The point is that for estimation

17 purposes all of this is irrelevant.  There's a good faith

18 assumption I'm going to have to file for any client who worked

19 in any of these kinds of sites, whether I have the evidence now

20 or not, I'm going to have to file a proof of claim by the bar

21 date, believing it's there.

22          So Your Honor, I'm not -- I'm going to file it, I'm

23 going to file a questionnaire, and whether or not the

24 questionnaire demonstrates Grace exposure, I'm going to file a

25 proof of claim by the bar date, period, because they are all

1  over the place.  They are not the little, narrow, peripheral

2  player that Mr. Bernick would have you believe.

3         And the point of this, quite simply, Your Honor, is

4  that this enormous burden that Mr. Bernick and Grace would

5  visit on the mesothelioma clients, and quite frankly, would

6  still be visited upon us if we have to refer to page, line and

7  verse for every one of those response, is to no end in terms of

8  estimating what Grace has done.

9         Now, if we have complied with the Rules of Civil

10  Procedure by providing responsive materials to depositions, the

11  interrogatory answers and the lawsuit that have been provided

12  in the underlying case, which we have in every instance, Your

13  Honor, that should be sufficient, given the limited relevance

14  of these answers in terms of estimation, the great burden and

15  the fact that all of this is really not directed at the

16  mesothelioma clients and shouldn't be.

17         We're -- there's no fraud in terms of anyone

18  generating mesothelioma clients alleged by any defendant in

19  this litigation.  And so for us to have to suffer this burden

20  for this ubiquitous player in asbestos litigation is

21  unreasonable and unfair.

22         Your Honor, I reserve the right, if the Court

23  ultimately does order some additional responses, to move for

24  protection and to introduce evidence about that burden.  We

25  haven't had the opportunity to do that, and so at this point,

1  suffice to say I reserve the right to do so.

2         THE COURT:  All right.

3         MR. KRAUSE:  Thank you.

4         MR. BUSBY:  Your Honor, there are other people from

5  the plaintiff's side --

6         MR. BERNICK:  I'd like -- Your Honor, I would like to

7  be able to respond to Mr. Krause specifically before I then

8  deal with everybody else here, because otherwise, Your Honor,

9  frankly, it gets completely --

10        THE COURT:  Does --

11        MR. BERNICK:  -- utterly lost.

12        THE COURT:  Folks, I'm sorry.  You know, this is a

13 courtroom, not a barroom, and you folks will kindly conduct

14 yourselves that way.  I have never seen such a proceeding as

15 this in 20 years on the Bench, and I hope not to see another

16 one.  Now, please, be seated, all of you.  Everyone sit down.

17 Does anyone else wish to speak on behalf of the mesotheliomas?

18 Good afternoon.

19        MR. BUSBY:  Good afternoon, Your Honor.  Leonard

20 Busby, from Montgomery, McCracken, Walker and Rhoads, on behalf

21 of the Grace certain cancer claimants.  I'm here in place of my

22 partner, Natalie Ramsey, who unfortunately is attending to her

23 husband who's in the hospital with kidney stones.  So that's

24 why she cannot be here --

25        THE COURT:  Okay.  Hope he's better.  Thank you.

1          MR. BUSBY:  -- and -- yes -- and she expresses her

2  apologies to the Court for not being present.

3          MR. BERNICK:  We have a specification.  Does he

4  represent law firms?  Does he represent clients?  Which

5  clients?  We knew who the cancer claimants were in the CE case.

6  I don't believe there is any such group, ad hoc or otherwise,

7  that's ever appeared before this Court.

8          THE COURT:  Who are you representing, Mr. Busby?

9          MR. BUSBY:  Your Honor, we're representing individual

10  cancer claimants who have been identified, I believe, with a

11  2019 filing with the Court.

12          THE COURT:  All right.  Thank you.

13          MR. BUSBY:  And Your Honor, let's speak first -- I

14  mean, there are three issues that have been articulated here.

15  Your Honor's ruled on one of them.  That's the signature issue.

16  So obviously, I won't speak to that.  Then there's the issue of

17  attachment of documents, and we've heard a wealth of

18  information on that.

19          And as we explained in our brief, Your Honor, the law

20  is really quite clear on this that there is an absolute right

21  the courts have recognized to permit litigants to attach

22  documents by way of avoiding burden, and that's exactly what's

23  been done here.

24          An the 38 pages per claimant, there have been

25  relatively few pages for some claimants and large numbers of

1  pages for others.  But in each case it's been easy enough to

2  review and find out the essence of what the claim is and what

3  the support is for that claim, and that's what Mr. Bernick says

4  he wants and it's right there and it's easy to find.

5          Your Honor, for example, we attached three exhibits

6  to our motion papers and I take the liberty of handing up a

7  duplicate copy, because they're good examples, Your Honor, and

8  these are Exhibits A, B and C to our response to the motion to

9  compel.

10          Your Honor, I start with Exhibit A, which is three

11  pages of single-spaced typing, which was the list of prior --

12  of asbestos of employment by this particular individual

13  claimant.  Now, this is a subject specifically requested in the

14  questionnaire to which for this particular claimant the

15  questionnaire said, see attached.

16          And these pages were attached as part of the

17  interrogatory answers and they're easy to find.  They're

18  standard joint defense interrogatories, and here's a list.

19  There is no possible justification, I would respectfully

20  submit, to having this same information retyped and repeated --

21          THE COURT:  There isn't.  There isn't.  But the

22  problem was that it's not all that clear in some of the other

23  attachments that have been made by at least other firms.  I

24  can't speak to whose because I can't -- I just can't identify

25  from memory whose were attached to what.  It is not a nice,

1 typed list like this.

2          MR. BUSBY:  And Your Honor, we of course are at a

3 handicap because we don't know what all the other law firms

4 provided, but we're being thrown into the pot with all those

5 other people where a request that some potentially burdensome

6 order is going to apply to us when the responses and

7 attachments that we've provided are easy to find and are clear

8 and would be needlessly burdensome to repeat.

9          And Your Honor, on the debate as to business records,

10 Mr. Krause eloquently expressed why there is a legitimate basis

11 to treat the depositions and the interrogatory answers and the

12 information provided previously in litigation as the particular

13 plaintiff's own business records in the particular context

14 here.

15          THE COURT:  I'm sorry.  I can't agree.  They are

16 personal records, but they are not business records.

17          MR. BUSBY:  Well, there's certainly some courts, as

18 Mr. Bernick has cited in his brief, that stand for the

19 proposition that prior discovery responses are not business

20 records, and we acknowledge that, Your Honor.  However, there

21 are other courts that have specifically said that it is

22 permissible to attach prior discovery responses, including

23 interrogatory answers and depositions, as a way to avoid

24 burden.

25          And Mr. Bernick scrupulously avoids any

1 acknowledgment of that in his moving papers, and we've provided

2 those cases to the Court.  And certainly, some of the records

3 that were attached to the responses are fairly treated as

4 business records, Your Honor, because they're medical records

5 that preexisted any involvement in litigation or they're

6 generated by others, and death certificates, medical reports,

7 those -- that's a different issue than discovery responses.

8           THE COURT:  Yes, it is.

9           MR. BUSBY:  And as to that, Your Honor, as we

10 explained in our brief for the Grace certain cancer claimants,

11 there's a compelling argument that says those are business

12 records of the party.  And we submit, Your Honor, that whether

13 they are or are not, if the answer and the information is

14 available then that is sufficient.

15           And often in these cases the box is filled in with an

16 answer, with an x.  It says yes or it says no.  If it says yes,

17 it says see attached.  So they are getting both.  Your Honor,

18 the suggestion that's been made in the brief by Mr. Bernick

19 that this has been a document dump or a hide the ball exercise

20 is contradicted by what we've provided at Exhibit B.

21           And Exhibit B includes a summary of the page

22 separations that are included to various of the -- of the

23 various attachments.  And the page separations are labeled

24 "death certificate," "medical reports," "interrogatory

25 responses," "depositions," and all those are separately

1  collected and separately provided.  And the idea that that is a

2  hiding the ball exercise is certainly not true as to the

3  lawyers and parties who submitted it in that form.

4         THE COURT:  Yeah.  Mr. Busby, I agree.  That's what I

5  started the problem -- this process with, with respect to the

6  debtor; that if they want some global issues addressed I'll try

7  to address them.  But I agree that to the extent that your

8  Exhibit A is a list of places that this particular person

9  worked and the dates, that is responsive to the question.

10        You could not have filled all this information out in

11 the three or four lines that were available.  This is clearly

12 appropriate.  I doubt very much that the debtor is complaining

13 about this particular format.

14        MR. BUSBY:  And Your Honor --

15        MR. BERNICK:  Can I have an opportunity to respond

16 because --

17        THE COURT:  You will, Mr. Bernick.

18        MR. BUSBY:  And then further, Your Honor, though, as

19 Mr. Krause has explained as to the mesothelioma claimants,

20 there's a whole host of detail in certain parts of the

21 questionnaire regarding x-rays and pulmonary function tests and

22 various diagnoses where if there has been a diagnosis of

23 mesothelioma, none of that has any appropriateness, any

24 further.

25        THE COURT:  Well, let me find that out from

1 Mr. Bernick, because if in fact there is that diagnosis then

2 maybe what he needs is the exposure information.

3       MR. BUSBY:  And that's been in most cases, at least

4 to my knowledge for our clients, that's been provided, the

5 exposure information as to Grace.  Now, there's no basis for

6 exposure information as to anyone else, because of the precise

7 reasons that Mr. Krause articulated.

8       THE COURT:  Well, I don't know what the experts are

9 looking for information for, Mr. Busby.  I don't know whether

10 there is some contention that, you know, Grace should only be

11 20 percent liable and therefore, the trust only has to be

12 funded to 20 percent, because you're going to be making claims

13 against five other trusts.  And if that's the case then maybe

14 it is relevant.  The other --

15       MR. BUSBY:  Well, but only if that -- they may be

16 making that claim, Your Honor, but it's only relevant if that

17 claim has any merit.

18       THE COURT:  Well, but that's why they want to see the

19 other exposure information, and that seems to me to be

20 relevant.  So if you work -- if your client worked for Grace,

21 and I'll just make up cases, worked for Mid-Valley and worked

22 for Pittsburgh Corning and had different exposure to different

23 asbestos products and then had a diagnosis of mesothelioma and

24 is filing claims against all three of those trusts, then each

25 of the trusts is not going to be liable for the full amount of

1  whatever the claimant's damages are, number one.

2         And number two, this specific trust may be funded at

3  a different level based on the fact that some part of the claim

4  has been paid through another trust.  And that is appropriate

5  and relevant evidence.

6         MR. KRAUSE:  That's true as to every claimant, Your

7  Honor.

8         THE COURT:  Yes.

9         MR. KRAUSE:  In every one of these trusts --

10        MR. BUSBY:  Your Honor, again, I have --

11        MR. KRAUSE:  -- they all have multiple -- scores and

12  scores of claims against trusts and active tort --

13        MR. BUSBY:  It's still --

14        THE COURT:  Yes.  And gentlemen, you will sit,

15  please, until you're called upon.  Mr. Busby.

16        MR. BUSBY:  Well, I'm going to let Mr. Krause respond

17  to that because he's more learned about that, candidly, than I

18  am.

19        THE COURT:  I'm not turning to Mr. Krause, Mr. Busby.

20        MR. BUSBY:  All right.  Well, and I wasn't trying to

21  play a game with the Court.  The point is that unless there's a

22  determination that all this extra information has any relevance

23  to this proceeding, it is an incredible burden.

24        THE COURT:  Well, I think there -- I think it is

25  relevant for those reasons.

1        MR. BUSBY:  Well, we respectfully disagree on that

2 point as to the mesothelioma claimants, Your Honor.

3        THE COURT:  Okay.  Mr. Bernick, with respect to the

4 mesothelioma claimants, why do you need this whole level of

5 information?  It seems that if you got a diagnosis of

6 mesothelioma, that's a whole different ball of wax than some of

7 the other diagnoses.

8        MR. BERNICK:  It certainly is easier.  In fact, it

9 means that the burden is all the less because there's much less

10 to deal with.  We're not going to sit there, by and large,

11 there may be some exceptions, and say that there's some broad

12 principle that's at issue with respect to a mesothelioma

13 diagnosis.

14        In some cases, individual cases, there will be, but

15 there isn't the same kind of broad issue and therefore, the

16 burden is in fact less.  All they got to do is fill out the

17 damn -- excuse me -- fill out the form and attach the

18 diagnosis, which is exactly what they've asked, and it's kind

19 of the end of the issue.  That is, insofar as the diagnosis is

20 concerned.

21        What's happened is, mesothelioma claims, because

22 they're valuable, are now being put to every single company

23 that they can possibly think of putting them to, and the

24 question is, well, who really is a substantial contributing

25 factor to the onset of that mesothelioma.

1         Now, we heard the plaintiff's view of theory that

2    basically says, if you got within, you know, eyesight of a

3    product and you have mesothelioma, then there is a colorable

4    case of causation.  We completely disagree with that.  We don't

5    think that that's what the evidence supports.

6         We don't think that's what the science says.  It is a

7    dose response relationship.  And it's interesting that Mr.

8    Krause said it has been reported that very, very small

9    exposures are actually causative in and of themselves,

10   particularly where you have somebody who has a very substantial

11   occupational history of exposure to many, many different

12   products, and they have mesothelioma, and any one of those

13   exposures in many cases could be causative, to then get to what

14   may be a dubious or it may be even nonexistent exposure to a

15   Grace product that's simply asserted, that is going to weigh

16   very heavily in the estimation process.

17        So we would agree that in terms of the medical burden

18   of surveying the records it is different.  We've done nothing

19   that imposes a greater burden on mesothelioma claimants.  In

20   fact, we've done nothing to impose a mesothelioma -- a burden

21   on mesothelioma claimants at all.

22        We've done something to impose a burden on their

23   lawyers to read their depositions and figure out the answers to

24   the questions on the questionnaire.  But exposure's still a

25   very meaningful parameter.  That's why we're asking for it now.

1  That is all that I have to say in response to Your Honor's

2  question.

3          I have specific comments to respond to what Mr.

4  Krause had to say and what the fellow from Montgomery,

5  McCracken had to say abut what they've done in particular,

6  because I don't think they've been candid with this Court, and

7  I don't know whether Your Honor wants me to respond to that now

8  or whether you want to go on.

9          THE COURT:  I want you to respond to the meso issues.

10  Gentlemen, we are not at this rate going to get done tonight,

11  and we are leaving here at exactly -- in fact, 20 till 6:00,

12  because I have to be out of the building by quarter till 6:00.

13  Do you want to stay overnight and begin again tomorrow, because

14  we are not going to finish at this level.

15          MR. BERNICK:  Yeah.  We're prepared to go ahead and

16  do that.

17          THE COURT:  Okay.  Mr. Bernick, go ahead.  Answer

18  with respect to the meso issues that -- oh.  Did you want to

19  address meso --

20          MR. BERNICK:  Well, I'm done --

21          THE COURT:  -- I'm only on mesothelioma.

22          MR. PHILLIPS:  Well, Your Honor, just one quick

23  thing.  When we took our break one of the things we tried to

24  do, as I said to you, was we were going to try to limit

25  ourselves, and it may not look like we're accomplishing that,

1  but our intent was to limit the number of people who were going

2  to speak.

3          I said to them I wasn't going to speak.  Mr. Krause

4  went first.  Montgomery McCracken went second.  But we only

5  have say one or two more people who wish to speak.  The issues

6  -- it would be nice to now all of a sudden divide this into

7  meso and non-meso, but I agree with Your Honor.  We're going to

8  be here till 5:00 o'clock tomorrow.

9          I'm wondering, since issues about undue burden and

10  other issues to be raised by the next two speakers from our

11  side will substantially overlap, whether we shouldn't just go

12  ahead and let our last two people speak.  Mr. Bernick can then

13  respond to all of us and perhaps -- and then maybe there might

14  be some minor rebuttal, but we might get through this by 5:30

15  or so.

16          MR. BERNICK:  Yeah.  I'm happy to --

17          MR. PHILLIPS:  So whereas, if he rebuts every

18  person --

19          THE COURT:  All right.

20          MR. PHILLIPS:  -- I don't know when we're going to

21  get --

22          MR. BERNICK:  Well, I --

23          THE COURT:  Okay.  You win.  Okay.  You win.

24          MR. MEYER:  Your Honor, Mark Meyer, from Goldberg

25  Persky.  We have an issue unique to our law firm that I think

1 is pretty easy, and I'm willing to wait until everybody's done

2 to raise that.  It's whether we were even required to respond

3 to the questionnaires.  And so it's unique to our law firm.

4           I think it's fairly easy.  We've been trying to work

5 it out with them.  We have a partial agreement, but we haven't

6 worked it out.  I don't want to be subject to an order that I

7 don't think I need to be subject to.  So I'll -- we may have

8 three people to speak, then, Your Honor.

9           THE COURT:  All right.

10          MR. BERNICK:  Well, Your Honor, I'm happy to hear the

11 fellow from Goldberg Persky make his speech so we just get done

12 with it.

13          THE COURT:  We're going to go in the order in which

14 they agreed so we can finish.

15          MR. HERRICK:  Good afternoon, Your Honor.

16          THE COURT:  Good afternoon.

17          MR. HERRICK:  My name is John Herrick and I am with

18 Motley Rice.  And I am appearing here on behalf of clients who

19 are reserving their rights with respect to jurisdiction, having

20 not filed proof of claim forms, and also who have not received

21 any notification from W.R. Grace on an individual basis that

22 their questionnaires were deficient in any way.

23          In other words, we have not been notified of any

24 issues with regard to the motion to compel, other than those

25 globally mentioned.

1          THE COURT:  Have they -- are they included in the

2   2019 statement, these claimants?

3          MR. HERRICK:  I believe they are, Your Honor.

4          THE COURT:  Okay.

5          MR. HERRICK:  Now, I want to talk a little bit about

6   the burden and I'm going to focus on the burden related to

7   other exposures for purposes of this discussion.  I'll agree

8   with counsel that there is a doctrine called the law of the

9   case doctrine, but it doesn't apply to people who weren't

10  parties of the case at the time that those rulings were given,

11  which I think my clients fall into that category.

12          Your Honor, counsel talked about the real world.

13  Well, I'm head of asbestos litigation at Motley Rice and I

14  practice in the real world of litigation outside of the

15  Bankruptcy Court, for the most part.  And what is happening in

16  litigation outside of the Bankruptcy Court is that all of these

17  viable defendants in any particular case, or one of their

18  representatives, will subpoena the bankruptcy trusts for their

19  records related to any claims my clients made against them.

20          And they will then use those claims as statements of

21  my client against his interest.  And the Court might say, well,

22  Mr. Herrick, what does that matter, the truth shall set you

23  free.  But in fact, what you -- we have in litigation is the

24  adversarial process.

25          The truth comes out through cross-examination.  If I

1  have bankruptcy forms that are admitted in court against me, I

2  can't rebut those through cross-examination.  They are hearsay,

3  but they get in because they're an admission.  Now, how does

4  that affect what's going on here?

5          The level of detail required by the W.R. Grace

6  questionnaire is such that -- and believe it or not, Your

7  Honor, some of these cases that had been receiving

8  questionnaire and being required to respond to them are cases

9  that are still active in the litigation.

10         The level of detail required by those questionnaires

11 requires that not only do I search my files, not only do I talk

12 to my client, but that I canvass and talk to everybody,

13 including my brethren on the plaintiff's bar, to figure out

14 exactly what exposures could have occurred at any of the job

15 sites that my plaintiffs worked, because two years from now

16 down the road when my lawsuit is -- my client's lawsuit is

17 getting ready to come up to trial against one of the joint tort

18 feasors not in bankruptcy, they're going to come out with a

19 W.R. Grace form and say, well, mister plaintiff, when he filed

20 this form under oath, signed by both him and his attorney or

21 either one, doesn't matter for purposes of litigation, he

22 didn't mention this particular job site.

23         Now, it might be that I had mentioned it, that my

24 client was exposed to Owens, Illinois, at one job site, but

25 maybe I found another witness after I filed this questionnaire

1  who can provide more color to that exposure, who can provide a

2  longer exposure, which affects that case entirely.

3       Now, if I haven't provided that in that questionnaire

4  that W.R. Grace is requiring now it's going to be used against

5  me in trial.  Let's talk about the flip side of that.  The flip

6  side of that is a case where I have resolved it against all

7  other defendants and perhaps W.R. Grace is the only defendant

8  remaining in that case.

9       Well, what W -- and perhaps my client doesn't recall

10 W.R. Grace at all, which would not be unusual, but I have a

11 witness for that client, a co-worker, the only product he

12 remembers is W.R. Grace.  I may also have other witnesses who

13 would identify other products that I no longer have an interest

14 in pursuing.

15      What W.R. Grace is requiring in that instance for

16 this form is for me to provide my work product to W.R. Grace to

17 help them in their estimation process.  And Your Honor, that's

18 just something we're not willing to do, is to provide work

19 product, and that's why we objected in our questionnaires to

20 questions that we felt required that.

21      And you know, it seemed, as I thought about this

22 issue in the subpoenas from the other trust it would be a whole

23 lot easier and a whole lot less burden on everybody here if

24 W.R. Grace had simply subpoenaed the other trusts for all of

25 the information that they have requested, and for all of the

1  claimants, potential claimants that they sent these

2  questionnaires to.

3       The other trust can easily provide that information

4  electronically, and it's going to include all of the medical

5  that establishes a diagnosis.  So that's why the burden is

6  unfair, and Your Honor, you've got my response of my firm on

7  the time we've spent and the time we estimate spending, and I

8  won't take up the Court's time any further.  Thank you.

9       THE COURT:  All right.  Thank you.

10      MR. BRADLEY:  Good morning, Your Honor.  Thank you,

11  Your Honor.  Jarrad Bradley, with the law firm of Thornton and

12  Namez, representing plaintiffs, and we received 1,102

13  questionnaires.  Just briefly on that, Judge, on the

14  questionnaires we received it's important to note that the --

15  about 800 of them were mailed to an address that we weren't at

16  for about 10 years.

17      None of them had addresses or social security

18  numbers.  We received -- so it was a burden that was on us to

19  figure out if they were our clients, if -- and we represent

20  many individuals, working individuals, and I must have 50 John

21  Sullivans in my database, to use a random example.

22      So we had to go through and find out which John

23  Sullivan had the W.R. Grace exposure, and if multiple, how to

24  address that.  We also received double questionnaires from

25  Grace.  But we undertook the time and the burden to go through

1 and respond as best we could to these questionnaires, and then

2 sent them to our clients to have our clients sign the

3 questionnaire.  And I won't get into the signature issue,

4 Judge.

5 But the -- what we've undertaken resulted in a

6 response which had a very brief -- I have one in front of me

7 here -- which has a two-page narrative medical report on a

8 nonmalignant claim, a B reading, an affidavit from W.R. -- from

9 the individual saying, here's my specific Grace exposure, and

10 the cites and the years, and that under the claimant's -- the

11 debtor's motion is insufficient.

12 And I think a lot of this, Judge, especially on the

13 case caption -- I have 21 defendants that this individual sued.

14 There's no way I could squeeze them on that little line they

15 provide on page 9.  I couldn't do it.  So I really wanted to

16 get into the attachment issue.

17 I think it's really subjective and I think the larger

18 issue is that the debtors have chosen to use Russ Consulting,

19 who they say in their memorandum doesn't have legal or medical

20 training.  Well, quite frankly, Judge, that's not my claimants'

21 concern.  That's the debtor's concern.

22 I can't -- I could tic off now Cellotex -- how many

23 other claim-reviewing companies are out there right now that

24 look at this very information on every day and can go through

25 this information very quickly in an electronic format, submit

1 it to the debtors who could then respond to us individually,

2 because I reserved -- I made objection that reserved those

3 objections.

4          The debtor -- if those are issues that the debtor

5 wants to raise at a later date I'm happy to come back before

6 the Court.  But that issue can be easily addressed if they take

7 the time to go through the responses, contact the individual

8 law firms with an Excel spreadsheet attachment and a motion to

9 compel and says, here's what you're missing, and I'd be happy

10 to go through that, Judge.

11          But this really isn't an issue of having provided the

12 substance.  It's really the issue of in what form we provided

13 it.  And I don't think -- and I -- and if the Court can do it

14 -- I don't know if you can craft a cumulative cure for that

15 since every law firm is different and every claimant, quite

16 frankly, is different.

17          But evidently, according to debtor's counsel, the

18 costs would be low.  He estimates $300 a cost or a claimant.

19 Well, I'd point out that in -- depending on what the trust ends

20 up with, that could be more than a nonmalignant claim would

21 ever see under this particular trust.

22          So if the cost is so low and the time is so low to do

23 it, then debtor should either tell Russ Consulting to get on

24 the stick or find somebody who can actually go through this

25 material that we've turned over that we think goes to the

1 larger issue of the estimation.

2        And just quickly, Judge, on issues which, again,

3 aren't before the Court, but if an issue was raised relative to

4 prior settlements, whether it be from trusts or from trial, I'd

5 caution the Court, because I don't know a release that doesn't

6 have a confidentiality clause in it and a clause that says, if

7 this is revealed you have to give the money back, claimant.

8        So I think that in regards to objections which were

9 made, I have not only a right, but an obligation to make those

10 particular objections, but I'm happy, should the debtor have

11 issues relative to my objections or to the way I've attached

12 documents if they file a motion to compel.

13        And if they'd like to contact me in the beginning I'd

14 be happy to try to work with them on that, Judge, but I don't

15 think there's a way that you can do one -- a quick fix for

16 everybody involved.  Thank you, Judge.

17        MR. MEYER:  Your Honor, Mark Meyer again, from

18 Goldberg, Persky and White.  We fall under the truism that no

19 good deed goes unpunished.  When we received the questionnaires

20 we had the same problem.  We could not tell where the

21 questionnaires came from.

22        Whether they applied to settled -- unsettled claims,

23 we attempted to make that determination with W.R. Grace.  They

24 couldn't do it.  We could not reconcile our records with them.

25 We decided to go ahead and provide them information, even

1 though we believed at the time and we believe today we had no

2 requirement to do that.

3       Now, we believe we have no requirement to do that for

4 two reasons.  Your order says that only claimants with pre-

5 petition, and I quote, "litigation claims" have to file a

6 questionnaire.  We've had, since 1997, a tolling agreement and

7 a moratorium agreement with W.R. Grace.

8       So we did not sue W.R. Grace.  When we received the

9 latter from W.R. Grace with the questionnaire the letter said,

10 and I'm quoting, Your Honor:  "All parties who sued W.R. Grace"

11 -- "sued W.R. Grace," et cetera, et cetera, "have to file a

12 questionnaire."  We didn't sue them.

13       But we said, we'll file the questionnaires.  We'll go

14 ahead and do it and we'll just get it done.  And if somebody

15 then elects to collect under the TDP, that is under the

16 bankruptcy trust as opposed to a settled claim, maybe, maybe,

17 maybe some of this information will be used by the eventual

18 trust.

19       Well, so we don't believe that we have any duty,

20 because we didn't have a litigation claim.  Second, Your Honor,

21 we have, for all the questionnaires we filed and we filed 1800

22 questionnaires, we have an agreement in 2000 with W.R. Grace,

23 and I have a copy of the agreement for the Court.

24       The agreement, Your Honor, is specific as to amounts

25 for diseases.  It has a list of claimants.  It has a -- we sent

1  a computer diskette and a cover letter that's in there

2  identifying everybody subject to the agreement.  There were

3  approximately 3300 people as part of that agreement.

4         Grace had paid out about 1500 of the 1800 people

5  subject to that agreement for whom we submitted questionnaires.

6  We had submitted prior to bankruptcy releases and qualifying

7  information, that is, medical information, exposure

8  information, for 1500 of those people.

9         The other 300 or so were in varying processes of

10  being implemented.  Now, it seems like this ought to be easily

11  -- and Grace has now agreed, by the way, I got an email on

12  Friday, I think, indicating that they finally have verified

13  that at least 800 of those cases they agree we didn't have to

14  file any questionnaires.

15         We didn't have to do it, even though we did it, and

16  they're still examining the additional 1,000.  So I asked them,

17  well, why don't we just agree until you make your determination

18  or until the Court decides if we're -- actually we're subject

19  to the questionnaires that you carve us out of the order.

20         They wouldn't agree to that.  Why?  I don't know why

21  they wouldn't agree to that.  In fact, today even though we did

22  -- we weren't required to file the questionnaires, counsel for

23  the debtor cited our firm as one of the egregious examples of

24  not complying with the order.

25         Here's what we did, Your Honor, even though we didn't

1    have to do this.  We sent every single claimant, information

2    about their work history, asked them to verify if that was

3    correct, asked them to verify any products they remembered from

4    W.R. Grace.  We attached medical information for each claimant.

5              We then -- even though we didn't have to do it, we

6    instructed every paralegal in the office, go through every

7    single document that we'd ever collected from W.R. Grace.

8    These are the invoices.  Many we got from them, depositions,

9    and we gave it to them, even though we haven't -- because of

10   our moratorium agreement -- done any litigation against them

11   for almost 10 years.

12             And so Your Honor, I'm here today, I saw through this

13   entire hearing -- I don't think I couldn't be here today -- and

14   I'm simply asking the Court that whatever the Court decided,

15   that the Court not subject the clients of Goldberg, Persky and

16   White to any order compelling further discovery until either

17   W.R. Grace and our firm agree what cases are subject to the

18   order, or the Court if we can't agree, makes a determination.

19   Thank you.

20             MR. FINCH:  Your Honor, that I believe concludes the

21   presentation by the asbestos claimants.  I would like to

22   reserve a few minutes for rebuttal to Mr. -- surrebuttal to

23   Mr. Bernick.  I would emphasize one point, and that --

24             COURT RECORDER:  Can you turn that up, please?

25             MR. FINCH:  Sure.  I would like to reemphasize one

1  point and that -- you know -- with all due respect to Mr.

2  Lockwood, a statutorily formed creditors' committee cannot

3  represent individual claimants for purposes of prosecuting

4  their individual claims or responding to discovery.  And so

5  whatever positions that the counsel for the asbestos claimants'

6  committee took and arguments they made --

7        THE COURT:  They didn't take a position contrary to

8  that.  This has never been an allowance or disallowance

9  process.  It's been an estimation process.  And to the extent

10 that the record keeps getting confused and the committee keeps

11 arguing about a allowance and disallowance, I keep telling them

12 that this isn't what that's all about.

13        It's not an individual allowance.  And to the extent

14 that the individual claimants are telling me you want to be

15 involved in estimation I've said, fine, come.  But the

16 committee does have a role to play in estimation.

17        MR. FINCH:  I agree that we have a role to play in

18 estimation, but we don't have the power to raise burden and

19 privilege objection on behalf of individuals.  I don't think --

20 I think Your Honor recognizes that those type of objections are

21 tied to the specific facts of the specific questionnaire,

22 specific claimants, specific firm, that Caplan and Drysdale has

23 no information or knowledge.

24        And I think all of the evidence submitted by the

25 various law firms that filed responses to the motion to compel

1  as to the burden, as to why, for example, that if they had to

2  provide settlement information with other defendants they have

3  to give the money back, those are the discrete, specific issues

4  that a creditors' committee cannot act for its individual

5  constituents.  And I reserve the rest of my time to respond to

6  Mr. Bernick.

7           THE COURT:  Mr. Bernick.

8           MR. BERNICK:  Can you hear me, Your Honor?

9           THE COURT:  Yes.

10           MR. BERNICK:  I know there's a kind of a air-

11  conditioning thing, but I'll try to speak up.  And what I'm

12  going to try to do in order to get through this and the

13  inevitable round of surrebuttal and, you know, ended only by

14  Your Honor's wise decision, the necessary decision to cut

15  things off, is to focus on the concrete matters that are up for

16  decision today.

17           Let me first talk about -- we've already discussed

18  signature, and with respect to signature my feeling is that

19  we've got a motion for -- to compel, and we'll simply take Your

20  Honor's statements that were made from the Bench about what the

21  arrangement is and we'll incorporate them in an order.

22           And I guess we will circulate that order to all

23  counsel who are -- who have responded to the motion to compel

24  in order to see if we can get agreement.  We'll begin with Mr.

25  Finch, who's been good enough to stay here today, but that

1  would be our proposal for tying off that issue.

2          THE COURT:  That's fine.  My ruling, so it's clear,

3  because I don't expect to get draft proposals from 39 people

4  about this, I expect one order, is that however many people

5  have to sign the form to make sure that there is an attestation

6  with respect to every question, have to sign the form.

7          MR. BERNICK:  That should be clear.

8          THE COURT:  So if it's one, fine.  If it's two, fine.

9  If it's a half a dozen, fine.

10          MR. BERNICK:  I then want to take an easy issue,

11  which is the gentleman from Goldberg Persky.

12          MR. MEYER:  My name is Mark Meyer.

13          MR. BERNICK:  Mark what?

14          MR. MEYER:  Mary Meyer.

15          MR. BERNICK:  Mark Meyer.

16          MR. MEYER:  M-e-y-e-r.

17          MR. BERNICK:  Mark Meyer.  Mr. Meyer, we'll begin

18  with his questions, there's kind of a -- not meaning to make a

19  bad bun, but it's kind of a hybrid situation.  And there's an

20  issue with respect to claims of his clients where he says that

21  they are settled claims because there was a so-called inventory

22  deal.

23          And what an inventory deal means is that there will

24  be -- generally speaking what an inventory means -- deal means

25  is that there'll be a certain number of claims of a certain

1 type settled on an ongoing basis.  That is obviously a deal

2 that's subject to a future condition, which is the submission

3 of those claims meeting those criteria.

4        Those claims then become liquidated in an amount.

5 There has to be a release, et cetera, et cetera.  They may

6 assert that those are settled claims.  We don't believe that

7 they are.  The same issue was litigated in <u>Babcock and Wilcox</u>

8 and we're very familiar with it.

9        But that's a matter to be determined in connection

10 with this little, you know, spur track process to determine

11 who's going to have to fill out the questionnaire.  And that's

12 a matter, then, that's not up for decision today but will be

13 handled in the ordinary course.

14        There are other people who believe their claims are

15 settled, and if we're -- we can't reach agreement on that,

16 that'll be presented to Your Honor for -- at an appropriate

17 time.

18        THE COURT:  Well, it may be, but you've already

19 agreed with the committee and I take it now with Mr. Meyer that

20 settled claims don't have to fill out this questionnaire,

21 correct?

22        MR. BERNICK:  At this time.

23        THE COURT:  So --

24        MR. BERNICK:  Your Honor has issued, actually, I

25 believe a formal order to the effect -- actually, it's parsing

1  out who it is, the -- basically, the deal is they have to say

2  -- they have to fill out the proof of claim form.  They have to

3  indicate what their evidence is and who has settled.

4          We then take a look at it and so on, so on and so

5  forth.  All that Mr. Meyer's work has done is to refer to the

6  fact that his firm has got these kinds of issues for their

7  clients.  That's fine.  That's not really up for decision

8  today.

9          THE COURT:  Well, it is, because I'm not going to

10  compel them to submit any further answers until I know whether

11  they have to fill out the questionnaire in the first place.

12          MR. BERNICK:  Well, I understand that.

13          THE COURT:  They're contending they have settled

14  claims.  It's up to the debtor at this point to go through your

15  records and determine it.

16          MR. BERNICK:  Your Honor, we --

17          THE COURT:  To the extent that there is a

18  disagreement you'll bring it to me.  To the extent there is no

19  disagreement, if they're settled they won't fill out anything

20  more.  And if --

21          MR. BERNICK:  Your Honor, I am not -- we are not

22  going to be able to function in this Court.  There was an order

23  that Your Honor has issued --

24          THE COURT:  Yes.

25          MR. BERNICK:  -- that answers his question.

1          THE COURT:  And that's what the order says.

2          MR. BERNICK:  That's what the order says.

3          THE COURT:  Fine.

4          MR. BERNICK:  Now, the reason that we have in fact

5  served them with objections and brought -- asked them to -- if

6  they have problems to come here today and move to compel has

7  nothing to do with that.  It has to do with the fact that

8  according to our records they have 900 clients with pending

9  claims as of the petition date.

10          So those 900 clients were the reasons that we sent

11  out the questionnaires.  We got back approximately 180 out of

12  those 900.  It is with respect to the questionnaires

13  purportedly completed by those who already did have claims not

14  settled against the company, it's with respect to those

15  questionnaires that we moved to compel, because their answers

16  are woefully inadequate.

17          That's the only reason that they're here today and

18  there's nothing that they have said to distinguish themselves

19  in that regard.  They've raised issues about whether there are

20  additional questionnaires that should be submitted and whether

21  their claims are settled or not, but they've said nothing to do

22  with the motion to compel that relates to the 180.  That's the

23  Goldberg Persky people.

24          I then would like to turn to what I think are the

25  three -- four remaining issues that are substantive issues.

**J&J COURT TRANSCRIBERS, INC.**

1  First is attachment.  The second is whether questions have to

2  be answered, notwithstanding their objections on grounds of

3  relevance and burden.

4         The third is cure period.  And then the fourth is,

5  how are we going to proceed?  That is, are we going to be able

6  to continue to do anything on discovery and estimation with the

7  committee, or is it now the Court's determination that when it

8  comes to discovery that relates to estimation we have to deal

9  with each individual firm.

10        I'd like to address that just very briefly, but those

11 are the four issues.  First, with respect to attachment, I

12 think that we've now -- Your Honor has looked at the rule.

13 We've heard people who have now conceded that the case law is

14 our way -- we haven't heard a single case that says that in a

15 typical litigation a personal injury claimant can use medical

16 records as business records of a party.

17        I haven't seen one case to that effect.  We know that

18 there's actual case law that says that prior deposition

19 transcripts and prior transcripts and prior discovery responses

20 are not permissible answers, are not permissible reference

21 materials under 33(d).

22        There's nothing that says that somehow the language,

23 the literal language of the rule that says, business records of

24 a party transforms business records of a document who's a

25 nonparty into business records of a claimant who is a party.

1 And not only that, but we don't even have that here.

2      What we have is -- what we have are records that

3 really come from law firms that came in some point in some

4 fashion from doctors.  So this is not a situation where there

5 is compliance with the Rules of Civil Procedure.  This is a

6 situation where, again, we come back to Mr. Esserman's term

7 that we crafted the questionnaire carefully with the Court.

8      It was designed to avoid the need to take a whole

9 bunch of depositions.  It was further designed to facilitate an

10 aggregated estimation process that worked with common forms and

11 common data and followed a clear precedent in Mass. court

12 litigation outside of bankruptcy, no questions about it.

13      Medical screws, breast implants, Dalcon shields,

14 they've all used questionnaires.  So the question then becomes,

15 well, gee, what should the rule be for attachments.

16 Recognizing that Your Honor's not persuaded by the simple fact

17 that the questionnaire spells out how the attachments are to be

18 used, not used, is dispositive here.

19      And I think that the answer really comes from looking

20 at the track record of how the attachments have been used and

21 what you've heard in response to my proposal for how to solve

22 the attachments problem, which is pretty much silence or it's

23 too much burden; we shouldn't do it.

24      We propose that so that we actually get answers to

25 the question that we get if we're going to use documents, the

1  document attached and the page that answers the question.  And

2  if it's a three-page document which is totally responsive,

3  that's real simple.  You attach it and you say, see page 1,

4  page 2 and page 3; it's all responsive information; it's

5  directly on point; it's right there.

6           We have not seen a single example of that, that

7  complies with the questionnaire, including the example that was

8  proffered by counsel to which I'll turn in just a moment.  But

9  we could see how, rather than retype up the information, that's

10 -- that could be a sensible way to proceed.

11          But the real answer has to be there in black and

12 white in the attached page.  If we have problems of

13 interpretation we've defeated this whole process and we're back

14 to litigating, well, was this document really an answer to this

15 question.

16          And frankly, I think it would probably be easier if

17 and to a certain extent the questionnaires were simply answered

18 and then the documents were attached, but that's their

19 decision.

20          THE COURT:  Mr. Bernick, does the debtor want to pay

21 for some staff for all these counsel to put the questionnaire

22 in the format that the debtor wants?  If the debtor wants to

23 bear that administrative burden I'll order these folks to do

24 the questionnaire the way you want it done.

25          I am concerned about the estimates of the time and

1 expense involved in getting it done this way, and it seems to

2 me the debtor wants the information.  The parties are giving

3 you the attachments in that format.  If the debtor wants to

4 absorb that cost I will order that a line by line item and

5 every question on every attachment that is not somehow

6 privileged --

7          MR. BERNICK:  There is no precedent under the rules

8 for shifting --

9          THE COURT:  Mr. Bernick, there's no precedent for

10 this form of questionnaire.

11          MR. BERNICK:  Well, I -- I'd say there's just the

12 opposite.  Under the rules the party answering discovery bears

13 the burden and the cost of doing it.  That's true in every

14 Federal Court in this country.

15          THE COURT:  Then you're going to get documents.  And

16 you're --

17          MR. BERNICK:  I'm sorry?

18          THE COURT:  Then you're going to get documents

19 attached.

20          MR. BERNICK:  In response to a document request.  In

21 response to an interrogatory or in response to a deposition,

22 that is not the rule.

23          THE COURT:  Mr. Bernick, these -- with respect to

24 people who are -- well, I'll call them asymptomatic, since that

25 word is sometimes used in the other asbestos cases, the

1  likelihood that they're going to recover sufficient funds, if

2  anything, through a trust to absorb this burden is not high.

3  　　　　MR. BERNICK:  I did not --

4  　　　　THE COURT:  It's an unreasonable cost.

5  　　　　MR. BERNICK:  -- I did not decide, my client did not

6  decide that they should prosecute non-economic litigation.  If

7  they were --

8  　　　　THE COURT:  Well, yes, in fact your client has paid

9  non-economically feasible claims in the past, or the settlement

10 history wouldn't be something that everybody --

11 　　　　MR. BERNICK:  Well, when we know --

12 　　　　THE COURT:  -- keeps burdening me with.

13 　　　　MR. BERNICK:  -- we know why; we know why, because

14 they were all linked to the more valuable claims and we had no

15 choice but to do it.  In the system, if you didn't have that

16 linkage --

17 　　　　THE COURT:  I'm giving you a choice.  Your client

18 either pays the cost of getting it done your way or else I'm

19 going to have the documents attached, because it seems to me

20 that the information is there.  You've hired a consultant to go

21 through the documents and prepare the database the way you want

22 it done.

23 　　　　MR. BERNICK:  Your Honor, if -- with due respect, I

24 don't believe that that's a proper choice to put to a litigant,

25 which is that somehow, in order to get the discovery that we're

234

1 entitled to because there's a burden issue, that we have to

2 shoulder the cost.  I don't believe --

3           THE COURT:  All right.

4           MR. BERNICK:  -- I don't believe that --

5           THE COURT:  If that's the case, Mr. Bernick --

6           MR. BERNICK:  No, but if you hear --

7           THE COURT:  -- then I want specific objections by the

8 debtor to every one of these.  I can't address them en masse.

9           MR. BERNICK:  We may have to do that, but let me --

10           THE COURT:  That's fine.

11           MR. BERNICK:  -- let me --

12           THE COURT:  Then this proceeding will be adjourned

13 until you do.

14           MR. BERNICK:  Yeah.  Well, let me -- if I could be

15 heard --

16           THE COURT:  Except for the signatures.

17           MR. BERNICK:  -- if I could be heard, because a lot

18 of statements were made, and as I predicted, it's the end of

19 the day and now there's a presumption because people with

20 mesothelioma are sick and they're entitled to relief, that they

21 shouldn't have to bear a burden and their law firm shouldn't

22 have to bear a burden.

23           THE COURT:  Oh, no.  In fact, they probably can

24 afford to bear the burden more than the asymptomatics.  That's

25 not what I said.

1            MR. BERNICK:  Precisely.  So we're talking about a

2   rule that now preferentially allocates the transaction costs of

3   litigation to the people who have the most worthless claims.

4   That's what we're going to do here in this court.

5            THE COURT:  I'm sorry?

6            MR. BERNICK:  That if the -- for the people who have

7   the most worthless claims, those are the people whose

8   administrative cost we now bear?

9            THE COURT:  At this point, Mr. Bernick, I don't know

10  who has what kind of claims.

11           MR. BERNICK:  Well, Your Honor just said --

12           THE COURT:  That's what this whole process is devised

13  to do.

14           MR. BERNICK:  Your -- the rules already created the

15  allocation and they don't make a distinction between

16  meritorious and non-meritorious claims --

17           THE COURT:  That's fine.

18           MR. BERNICK:  -- sympathetic and non-sympathetic

19  claims.

20           THE COURT:  They do, however, give the court the

21  ability to control discovery.

22           MR. BERNICK:  If --

23           THE COURT:  To the extent that it is burdensome.

24           MR. BERNICK:  Yeah.  Discovery --

25           THE COURT:  And this discovery as illustrated by the

1  documents that have been attached in the binders --

2          MR. BERNICK:  No, they don't, Your Honor.

3          THE COURT:  -- and by the argument today --

4          MR. BERNICK:  Respectfully, they do not.

5          THE COURT:  -- I am finding as a fact --

6          MR. BERNICK:  Well, if you --

7          THE COURT:  -- that they are burdensome.

8          MR. BERNICK:  -- find this a fact, you find it

9  without having looked at the documents, because the documents -

10 -

11         THE COURT:  Mr. Bernick, I just stated on this record

12 earlier that I read all six binders word for word.

13         MR. BERNICK:  Okay.

14         THE COURT:  I have looked at these documents.

15         MR. BERNICK:  Well, then I will say -- I will just

16 point out a couple examples for the Court, because what I was

17 going to suggest is if you take a look at the types of

18 documents that we're talking about here, they don't make out

19 the proposition that's been argued.  Indeed, they make up

20 exactly the opposite proposition.

21         And if Your Honor has read these documents and

22 believes otherwise, that's fine, but I think that a lot of

23 representations were made to Your Honor that are just false.

24 Let's begin with Mr. Krause.

25         THE COURT:  Well, wait.  Mr. Bernick, the problem is

1  this.  I think in some instances you're quite correct.  I don't

2  think that the debtor has gotten the information in a format

3  that makes a lot of sense, and that that probably some

4  additional information should be and ought to be required.  the

5  trouble is that I then, in the same set of objections raised by

6  the debtor, have information, for example, as was handed up by

7  Mr. Busby, that completely complies --

8            MR. BERNICK:  No, it --

9            THE COURT:  -- even though it's an attachment, that

10 lists job descriptions.

11           MR. BERNICK:  Well, we'll get -- I'm going to get to

12 Mr. Busby and I'm going to get -- if Your Honor -- I'm sorry.

13           THE COURT:  Well, how am I going to get to it,

14 Mr. Bernick, when I don't know specifically what you're

15 objecting to on behalf of any of the 30 people who filed

16 responses?

17           MR. BERNICK:  We can go -- follow the invitation of

18 counsel and so this claimant by claimant, law firm by law firm,

19 and they will have succeeded in making your estimation, whether

20 the estimation is the central issue in this case, hostage to

21 whatever law firm wants to come in and make their beef.

22           Your Honor, I think it is so fundamentally wrong I

23 think it's an insult to the Court.  We be -- we may have to do

24 it, but please --

25           THE COURT:  Why isn't this all going to be moot with

1   respect to -- or at least pre -- somewhat maybe precipitous,

2   based on the fact that the proofs of claim will be coming in.

3   Why is this not an issue that should wait until you see what

4   you get on the --

5          MR. BERNICK:  Well, that's the part --

6          THE COURT:  -- proofs of claim?

7          MR. BERNICK:  -- that's exactly the opposite way to

8   run.  The only reason we did the proofs of claim was to get the

9   people to actually do their job in filling out the

10  questionnaires.

11         THE COURT:  That's right.

12         MR. BERNICK:  And we now then have another move which

13  is, oh, well, they don't have to do the proofs of claim if they

14  assert the claim has been settled.  The proofs of claim are not

15  going to solve this problem.  This problem is only going to be

16  resolved if Your Honor says, because we believe it's

17  appropriate, if you guys want for your clients to get money out

18  of this trust you're going to have to pay some transaction

19  costs, whether you've got mesothelioma claims or asymptomatic

20  claims.

21         And Your Honor, I made a proposal before the break

22  that was our way of going halfway.  We would like to have the

23  verbal responses.  That would save a lot of time.  If you're

24  going to have an attachment, it should be the appropriate

25  attachment, because somebody's got to go through and pick out

1  the piece of paper and make sure they're the right pieces of

2  paper.

3         That's still not good enough.  And the -- how is our

4  proposal not completely and utterly in compliance with the

5  rules?  Well, let me give you an example of how that would

6  work.  We have from Mr. Krause, he says, well, for my

7  mesothelioma people it's hard.

8         It's not hard for them.  It's hard for his firm

9  because of all of 250 claims that they've actually now

10 submitted through questionnaires.  This is one questionnaire.

11 This was -- you know -- that what's been attached, this is one

12 questionnaire from Michelle Norton.

13        THE COURT:  I don't think anything's on.

14        MR. BERNICK:  It's because I guess we have to have

15 input select.

16        (Pause)

17        THE COURT:  Mr. Krause, can you work your magic

18 again?

19        MR. BERNICK:  I'm using but we're wasting time.  If

20 there's something you can do that'd be terrific.

21        THE COURT:  There's an input button or something that

22 you push?

23        MR. BERNICK:  Yes.  It's that input select, and I

24 pressed it.  Maybe I shouldn't have pressed.  There we go.

25 I've acquired the touch.  Michelle Norton:  "For a mesothelioma

240

1  claim, which is so all fired valuable, we've got this

2  information, the lawyer's name and the firm and the address of

3  the firm."  Okay.  Is there anything else on this form that's

4  filled out at all?  Page after page after page after page after

5  -- nothing.  Not one word.

6          THE COURT:  So file an objection.  I mean, I truly --

7  I am trying to address it in global terms, Mr. Bernick.

8          MR. BERNICK:  Well, but -- well, but --

9          THE COURT:  You're not happy with my resolution.  My

10  resolution therefore --

11          MR. BERNICK:  What I'm -- what I --

12          THE COURT:  -- can't apply.

13          MR. BERNICK:  -- and there's a very simple --

14          THE COURT:  And as a result -- we can keep shouting

15  at each other or we can take turns.  You go ahead.

16          MR. BERNICK:  I'm sorry.  I'm trying to figure out a

17  way to maintain this Court's schedule and to keep this process

18  on track with information where you've got law firms that in

19  Mr. Krause's case have very valuable claims.  And they frankly

20  said to Your Honor's questionnaire and their process, I'm

21  sorry, we don't care to comply, because there's no other way to

22  read this.

23          There's not a single answer that's provided.  And

24  then you get to the attachment.  Okay.  Here's the attachment.

25  We've got a one, two, three-page letter from a doctor.  That's

1 all. There's almost nothing about work history, if anything

2 about work history. We've got a death certificate and we've

3 got objections. That's it.

4 There's no way you can take that and reconcile that

5 with a statement from Mr. Esserman that these people are

6 interested in complying with providing information. They're

7 not. Now, Mr. Krause gets up and says, I represent all these

8 people with mesothelioma. They shouldn't have to do any of

9 this.

10 We have -- they have submitted I think about 400

11 claims or something like that. We've processed 250. Of those

12 there is one mesothelioma, there are two lung cancers and

13 there's one asbestosis. With respect to all of the rest of the

14 250, we can't even determine the disease.

15 That's what we have from Mr. Krause. Mr. Krause's

16 says, gee, we'd really like to comply; gee, why pick on the

17 meso people. And you know, what we're talking about as the

18 burden is for his firm to go read the famous deposition, if

19 there was one, that went on for three days, and on the basis of

20 that deposition and the answers that were provided just to

21 complete the questionnaire.

22 Now, I don't know how I -- you know -- if Your Honor

23 says to Grace, we've got no choice, if we want it done we have

24 to pay, if Your Honor says we have to pay, we have to pay. And

25 I respect that, but this is nothing more than their basically

1 saying that they just don't want to do anything to prepare

2 their case for prosecuting.

3       This meso claim which they'll then later say is very

4 valuable, they're not willing to spend a dime on it.  All they

5 want to do is spend time having a lawyer come in and say the

6 process was all wrong, particularly with respect -- I was going

7 to job history.  Job history; we have this here.

8       This is a pretty good job history if all that you're

9 focused on are the jobs that were held.  But it doesn't tell

10 you anything about the product that they were exposed to.

11 Well, it --

12       THE COURT:  But that's not the answer to this

13 interrogatory question.

14       MR. BERNICK:  Well, no, but the interrogatory asks

15 for industry codes.  They should make a choice of the industry

16 code so that we can aggregate by industry code.  All they have

17 to do is for each one of these things say what the industry

18 code is, and they don't do it.  What's the big deal to have --

19 gee, it's so incredibly laborious, they have a law firm --

20       THE COURT:  If a claimant is filling this out,

21 Mr. Bernick, how would a claimant know industry codes?  I don't

22 know industry codes.

23       MR. BERNICK:  It's -- the industry codes are actually

24 right out there in black and white for anybody to read.

25       THE COURT:  Well, they may be, but on the

1  attachments --

2          MR. BERNICK:  On the questionnaire.

3          THE COURT:  Okay.

4          MR. BERNICK:  Okay.  So this is okay, but why not

5  just go on the claim form.  It's not sufficient.

6          THE COURT:  Well, then it's not sufficient.

7          MR. BERNICK:  It's not sufficient.

8          THE COURT:  And you should be objecting based on the

9  fact that this is what's missing.

10          MR. BERNICK:  Your Honor, that's what we have done.

11          THE COURT:  Mr. Bernick, I -- no, you haven't done.

12  What you have done is aggregated everybody's responses and

13  complained about three basic groups of things that are missing.

14          MR. BERNICK:  Yes.  We have said --

15          THE COURT:  But you have not tied those three basic

16  groups into specific questionnaires.  And as a result, all I

17  can do at this point is say, yes, I agree that signatures are

18  necessary; yes, I agree that in some instances documents can be

19  attached, but I can't give you specific rulings because I can't

20  tie it to anything.

21          MR. BERNICK:  Sure.  Sure.  All that I'm -- my point

22  in going through these documents is to say that they've made

23  some representations, none of which are actually borne out.  We

24  don't see a single case that they have at least pointed to this

25  document where the documents attached were identified and

1  actually provided the information.  If we go to -- here's a

2  perfect example of --

3          THE COURT:  Mr. Bernick, there's no point.  You

4  haven't given me specifics.  I'm not going to give you rulings

5  on something you raise in court today that somebody hasn't had

6  a chance to submit a supplemental response to.  I mean, that's

7  the way it works.  You're supposed to meet and confer with

8  respect to discovery.

9          MR. BERNICK:  We met and conferred --

10         THE COURT:  You went to mediation --

11         MR. BERNICK:  -- we met and conferred.

12         THE COURT:  Yes.

13         MR. BERNICK:  We met and conferred; we had a

14  mediation.

15         THE COURT:  Yes.

16         MR. BERNICK:  And it didn't work out.  That's why

17  we're here for Your Honor to rule.  What --

18         THE COURT:  But I don't have specific points.

19         MR. BERNICK:  Yes, I --

20         THE COURT:  You're asking me for advisory opinions

21  that I can't give.

22         MR. BERNICK:  I am asking you -- I'm asking you with

23  respect to the attachments to make a very simple determination.

24         THE COURT:  The attachments, to the extent that they

25  answer the questions, are appropriate.

1          MR. BERNICK:  Yes, that's fine, if the questions --

2    the answers are ascertainable.  I can go through chapter and

3    verse of others where you can't figure it out.  All that

4    we're --

5          THE COURT:  I just said that.  I tried with respect

6    to one and I couldn't figure it out.

7          MR. BERNICK:  Okay.

8          THE COURT:  But you didn't raise an objection to one

9    specific one.

10         MR. BERNICK:  Okay.  Well, Your Honor, we have -- we

11   -- it was a formal matter.  We objected to all of them.  Now,

12   did --

13         THE COURT:  They're not all deficient.

14         MR. BERNICK:  I'm sorry, Your Honor.  I'm -- I'm

15   trying --

16         THE COURT:  Mr. Bernick, you're a litigator.  You

17   know it works this way.  You've got to give me specifics.

18         MR. BERNICK:  No, Your Honor.  I'm a litigator --

19         THE COURT:  I'd have my head handed to me if I --

20         MR. BERNICK:  -- I -- oh, no.  I -- to the contrary.

21         THE COURT:  -- tried this in front of a District

22   Court judge.

23         MR. BERNICK:  I have litigated these issues

24   repeatedly and this is the first court, the first court where

25   I've faced people who remained silent during the whole period

1  of time who then come get -- come back in and litigate it

2  again.

3           THE COURT:  Mr. Bernick, have you served all these

4  people with those motions in advance?

5           MR. BERNICK:  Yes.  We served all those people with

6  those motions.

7           THE COURT:  Okay.  So they all had an opportunity to

8  appear and be heard.

9           MR. BERNICK:  They all had an opportunity.

10          THE COURT:  Except for those whose addresses went to

11  someplace that was 10 years old and they didn't get them.

12          MR. BERNICK:  No.  No.  No.  The motions to compel

13  went to all of these different people.

14          THE COURT:  No.  I don't mean the motions to compel.

15          MR. KRAUSE:  Your Honor.

16          THE COURT:  I mean the motions with --

17          MR. BERNICK:  Well, I don't want to get -- I don't --

18          THE COURT:  Gentlemen, please.  I really --

19          MR. BERNICK:  Your Honor, I --

20          THE COURT:  -- don't want to hold you in contempt,

21  but I will.

22          MR. BERNICK:  Your Honor, my --

23          THE COURT:  Mr. Bernick --

24          MR. BERNICK:  Yes.

25          THE COURT:  -- my turn, please.

1          MR. BERNICK:  Sure.

2          THE COURT:  I was talking about the original motions

3    to go over the questionnaires.

4          MR. BERNICK:  We were -- we relied upon Mr.

5    Lockwood's representat4ion.  The answer to your question is

6    that we did not separately serve all of the claimants and their

7    counsel.  We relied upon Mr. Lockwood's representation, for

8    purposes of the estimation he represented the plaintiff.

9          THE COURT:  Oh.

10         MR. BERNICK:  And nobody came forward at any point in

11   time and said that's not so.  No one took an appeal.  No one

12   objected to the order.  No one did anything.  The result is

13   that we spent 18 months and God knows how much money going down

14   a road at the expense of the estate, dealing with issue only

15   now to revisit it.  But --

16         THE COURT:  Yes.  And Mr. Bernick, frankly, I don't

17   ever want to hear another questionnaire again in my life as a

18   result of this process.

19         MR. BERNICK:  Well, I'm sorry, Your Honor.

20         THE COURT:  But we're here now for at least the

21   third, if not the fourth or fifth time, and I want to get it

22   done.  And this is my solution to getting it done.

23         MR. BERNICK:  Well --

24         THE COURT:  To the extent that the documents address

25   the question, they are appropriate.  If they don't and you want

248

1  to do something like file a motion for sanctions, I'll give you

2  sanctions.  To the extent that somebody wants to supplement an

3  answer so that they're not subject to sanctions, they may do

4  so.

5          To the extent that you just put this -- I'm sorry, I

6  don't remember the claimant's name -- person's form up and it

7  doesn't answer any of the questions, that is clearly

8  insufficient.  Now, if it is a settled claim then at this point

9  it doesn't have to be answered.

10          MR. BERNICK:  Already an order.

11          THE COURT:  I don't know whether it is a settled

12  claim.  I don't have a specific objection that tells me.  I am

13  not going to rule question by question, line by line, or

14  individual by individual until or unless you file those

15  objections.

16          MR. BERNICK:  I'm asking for two things today.

17  Number one, that if people choose to answer by attachment,

18  recognizing what Your Honor has said, that they specify in

19  their answer the page where the answer can be found.  To be

20  sent to medical records generally or exposure history in a

21  deposition generally, I don't think -- well, I know it doesn't

22  comply with the rules, and Your Honor, that would make a

23  mockery of this process.

24          If they believe that the answer is in a document,

25  they can tell us what page it is.  That is what I'm asking Your

249

1  Honor to determine, just like in a sense the verification.  It

2  says, here it is and you can go to that.  And that's what I

3  would ask the Court, number one.  Number two --

4          THE COURT:  Well, let me start with that.

5          MR. BERNICK:  Okay.

6          THE COURT:  On that point in some instances it may be

7  that it is the entire document that stands for something.  For

8  example, let's say that the question is, what is your

9  diagnosis, and the answer is -- just to pick something, you

10  know, lung cancer.

11         And then the next question is, attach the documents

12  that support it and there are a host of documents, that is

13  responsive to the question.

14         MR. BERNICK:  No problem; no problem.  However, if

15  the question is, tell us -- because remember, the questions, at

16  Your Honor's direction, we went and broke out all of the facts

17  that we were asking for.

18         THE COURT:  Yes.

19         MR. BERNICK:  It's the x-ray reports.  It's the

20  pulmonary function tests.  They shouldn't just say, see

21  documents.  They should point us in the document where the

22  information can be found so that there's no disagreement.

23         THE COURT:  Well, they should only attach the

24  documents that are responsive.

25         MR. BERNICK:  I agreement, but5 we didn't get that.

1  We got, go see our files at our law firm.  We got, go see the

2  following three boxes and two CD ROM.  So if they actually

3  attached the document and made reference to the documents, we

4  may not have a lot of these problems.  That's not what they

5  did.

6          So all I'm saying, Your Honor, is where a page can be

7  specified, where the answer is found, it should be specified.

8  That's all that we're asking.  That way, our burden is the same

9  as their burden to go pull out that page, which is the spirit

10 of Rule 33(d), even though Rule 33(d) does not really provide

11 them the avenue that they say that it does.  That's ruling one,

12 is that if they're going to rely upon a document, they attach

13 the document and identify it specifically by page, where

14 appropriate.

15         Number two, they answer the questions.  And we're

16 here, we've spent a lot of time talking about attachments, but

17 a lot of these people have simply -- you know, I think I gave

18 you the figures -- 60-65 percent that we've processed have just

19 not answered the questions on grounds of relevance or burden.

20         And particularly because you've now said they can

21 attach documents, we want Your Honor to reiterate, now, to

22 these people this time that, yes, they're supposed to answer

23 the questions.  Objecting in lieu of answer is no longer

24 acceptable.

25         THE COURT:  Objecting on the grounds of relevance,

1  from what I can tell at this point, is what I said I was not

2  going to revisit.  It seems to me that I determined relevance

3  early on in going through this questionnaire.  With respect to

4  the issue that the mesos have raised, that there may be some

5  parts of these questions that are not relevant as to them,

6  gentlemen, give me a specific, line by line, why you shouldn't

7  answer specific questions, and I will take a look at that,

8  because in term -- in looking at relevance I am looking at what

9  the experts may need, and it still seems to me that your -- the

10  exposure history may be relevant to an expert in terms of

11  figuring out what the funding for a trust may be.

12          And since I can't at this point opine what the

13  experts are going to want to know and discovery is reasonable,

14  if it is calculated to lead to relevant, admissible evidence,

15  and this may be relevant and admissible evidence, I have to

16  determine that it's relevant.

17          So I think you're going to have to answer the

18  questions, but if you've got a specific example of what you

19  think you ought not to have to answer, you need to put it down

20  for me.

21          MR. BERNICK:  And we ask that they provide that to

22  the Court and to the other constituencies within seven days.

23  And then we will submit an order to the Court in our motion to

24  compel that covers the signature.  And then subject to whatever

25  Your Honor's going to decide with respect to meso, says that

1 the objections -- the objections that have been made relevant

2 are overruled and the questions must be answered.

3         And then on the documents attachment, again, we would

4 use the language, and what I am proposing to Your Honor is the

5 documents can be attached if they contain the responsive

6 information.  But the document then must be identified and

7 attached in response to the questions so that we can figure out

8 which one it is.

9         If we then have to come back and say it doesn't have

10 the answer to it, then we will seek sanctions.  I don't know

11 what else to really -- I can take you through all kinds of them

12 right now where it is impossible from the record to determine

13 what the exposure history is, but I don't want to do that.  I

14 want to get this process done.

15         THE COURT:  If you're going to do it, file your

16 objections with respect to either the individual questionnaires

17 or the law firm, if the law firm has answered everything the

18 same way.  I cannot give you rulings that say that every single

19 objection is overruled.  I can't do that.

20         You haven't even pointed me to every objection that

21 people have made.  There may be -- relevance may be something

22 that I'm overruling, but I don't know whether there are

23 attorney/client privilege issues.  I don't know whether there

24 are other matters that --

25         MR. BERNICK:  Only --

1          THE COURT:  -- would prohibit a response from being

2  filed that are not before me right now.

3          MR. BERNICK:  No one's asking for attorney/client

4  privilege here.  There's been a work product objection made.

5          THE COURT:  All right, a work product.

6          MR. BERNICK:  Well, the work product objection that

7  was made was very simple, which is, we can't tell you our work

8  product of what other products our client was exposed to.

9  That's ridiculous.  It's actual information.

10         THE COURT:  Well, Mr. Bernick, then put it in a

11  properly stated objection, serve the relevant parties so that

12  they can state why they've taken that objection, and then I'll

13  make a ruling.  Otherwise, I can't.  You're not giving me

14  anything to base a ruling on.

15         MR. BERNICK:  I'm struggling, Your Honor, to try to

16  make progress today.

17         THE COURT:  We have made progress.  If documents are

18  attached and contain the answer, that's appropriate.  If

19  documents are attached that don't contain the answer and you

20  want to do something about it, go right ahead.  If people know

21  that the documents that they've attached don't contain the

22  answers and they want to supplement it, I think we should give

23  them a brief period of time to do that.

24         To the extent that there are voluminous documents and

25  only one or two pages of those documents address the question,

1 the parties have a choice.  They can either point you to those

2 one or two pages, or they can attach only the one or two pages

3 that contain the answer, so that you don't have to sort

4 through, you know, a myriad of records looking for a specific

5 point.  That is their burden if they want to attach answers.

6        With respect -- I'm sorry -- documents.  With respect

7 to answers, the contention interrogatories must be answered.

8 Those are not appropriately answered by reference to a

9 document.  They must be answered.  To the extent that there's a

10 question such as, what's your diagnosis, that should be stated

11 and then the relevant document should be attached so that there

12 is no misinterpretation by anybody as to what that diagnosis

13 is.

14        If there is more than one diagnosis, state it and

15 attach the relevant documents.  With respect to work history,

16 the format that has been shown by Mr. Busby is appropriate.  If

17 the question also says, tell me the industry code and it's

18 stated, then it should be supplemented to state the industry

19 code.

20        MR. BERNICK:  Yeah.  Well, the questionnaire's very

21 specific.  Work history is one thing.  Exposure history to

22 Grace product and to other products are all carefully spelled

23 out and if there is already existing documents they can attach,

24 clearly answered the question, we understand the Court's

25 ruling.

1          Can I propose that the language that Your Honor use

2  might be sharpened to the extent that where you get to

3  attaching documents, if it is reasonably ascertainable that, a,

4  the question asks for particular information, or b, the

5  document that answers the question is identifiable, it should

6  be identified.

7          We should not have to look through medical records or

8  work histories or anything else to ferret out a piece of

9  information, particularly when it's subject to interpretation.

10  If the question calls for voluminous documents, then that's

11  what the question does.

12          And we understand in some cases it does, but in terms

13  of questions that ask for particular information, they should

14  identify the document or attach it so that we can actually know

15  what it is.

16          THE COURT:  In global terms, yes, but with respect to

17  any specific objection by anyone I am not making any rulings

18  with respect to any specific objection.  You haven't given them

19  to me.  I don't have responses in that format.  So I'm giving

20  you the advisory opinion that you're asking for so that

21  everybody hopefully can get on the same page without the need

22  for additional litigation.

23          Folks, answer the questions, one form or another,

24  answer the questions.  If you have a privilege or you have some

25  objection other than relevance, state it.  Mr. Bernick, if you

1 still want information, then file an objection to that specific

2 thing so that I can make a ruling.

3          MR. BERNICK:  Okay.  Then what I would propose is

4 that we have a cure period, whatever we want, because we're not

5 getting, in a sense, wholly answered -- well, I'll put it this

6 way.  Because we may have to come back and move again it's

7 really critical that, as Your Honor indicates, the cure period

8 be a brief cure period.

9          I will tell Your Honor that based upon the schedule

10 that we have now, given the deadline for the submission of a

11 supplemental estimation report, a 60-day cure period is pretty

12 much all that's there in the current schedule.  But if we have

13 to come back on specific motion that eats into that 60 days,

14 what we would propose the -- anybody who wants to make an

15 additional submission, do so within, say, 30 days.

16          And then to the extent that there has to be a motion

17 practice, we will tee it up immediately for Your Honor's

18 consideration so we can get the information in place in time

19 for the supplemental expert report.

20          THE COURT:  Okay.  I know that based on the number of

21 questionnaires that are out there I don't know whether 30 days

22 is reasonable or not.  I just don't have a means of assessing

23 that.  It seems to me, however, that if I give you simply --

24 I'll call it a free -- 30-day supplemental response period so

25 that you can attach documents, try to -- I'll use the debtor's

1 word, cure any of the deficiencies that the debtor has

2 identified, that you can do that, hopefully to eliminate any

3 additional concerns.

4          With respect to settled claims, there is a separate

5 order out there that addressed settled claims.  So that order

6 will govern.  Mr. Finch.

7          MR. BERNICK:  Yeah.  There's one last point that I

8 wanted to raise before I sat down, and I know that Mr. Finch

9 can address it.  And I take it in light of that, Your Honor,

10 after 30 days we will then have no choice with whatever we've

11 got to move to compel individually with respect to these same

12 claims.

13          And once we do that, that is, after the end -- I

14 think this might be a little bit more -- if we -- we will take

15 the forms as they exist at that time and we will count on them

16 as being supplemented.  If we then have to move, and nobody's

17 telling us that they're going to be further supplemented, we

18 then have to move, we then will seek the costs of obtaining

19 compliance.

20          THE COURT:  In fact, that's an even better idea.

21 Within 10 days everyone is to tell you whether they will or

22 will not be submitting supplemental answers.  And if so, within

23 30 days they can do it so that we can get whatever answers can

24 be supplemented.  If that's not sufficient time, I'm sure you

25 can work something out with the parties.

**J&J COURT TRANSCRIBERS, INC.**

1          MR. BERNICK:  That's --

2          THE COURT:  Because to the extent that people have

3  1800 claims, Mr. Bernick, there is no way they're going to get

4  this done in 30 days.  It's just not likely to happen.

5          MR. BERNICK:  You know what, Your Honor?  If they --

6  these people -- these firms have massive support staffs.  They

7  have more support --

8          THE COURT:  Mr. Bernick --

9          MR. BERNICK:  -- they -- well, you know --

10          THE COURT:  Mr. --

11          MR. BERNICK:  -- all the anguish that I hear, but I

12  know that it's a fact because I've dealt with it.

13          THE COURT:  Look, the reason that I said that this --

14  we would go down this route in the first place is because at

15  some point people will have to prove their claims.  And a lot

16  of this information in the bankruptcy system is going to be

17  required, whether or not it's required in the tort system.

18          So to substantiate the proof of claim or a claim

19  against the trust, a lot of this information is going to have

20  to be submitted.  So regardless of that, I am making no rulings

21  compelling anybody at this point to do anything except within

22  10 days to tell the debtor whether you are or are not going to

23  submit supplemental information, and if you are, to attempt to

24  do it in 30 days.

25          If you can't, but you still want to submit

1  supplemental information, to work out a time frame with the

2  debtor.  That's the order so far, except for signatures.  The

3  signatures must be attached as I've indicated earlier, and I

4  will do an order with respect to the documents that I have put

5  on record when the debtor takes a stab at submitting it to

6  everyone.

7          Again, I do not expect to get 39 copies of an order.

8  Get the transcript and put the order that I've dictated

9  essentially on this record into writing.

10         MR. BERNICK:  In light of that, Your Honor, we will

11 not -- we will keep the schedule that we are currently on,

12 which is a tight one, for the estimation in June, but you know,

13 the schedule is what it is.  If at that time, 30 days from now,

14 we don't have the answers, we will then have to move very, very

15 promptly and ask Your Honor to order them to comply, and if

16 not, then -- I don't know how else to --

17         THE COURT:  Mr. Bernick, why aren't you doing what

18 somebody suggested, and that is subpoenaing some of this

19 information from the trust?

20         MR. BERNICK:  That is -- Your Honor, I can just

21 assume, as you involve a third party in this case, immediately

22 they have their own counsel.  We -- to execute on a subpoena

23 for trust records, we won't even have the lawyers in this court

24 for three months.

25         THE COURT:  You've got the futures rep who runs the

1 Manville Trust.

2          MR. BERNICK:  Well, in his capacity as the futures

3 rep that runs the Manville Trust, he's not here.  He's here as

4 the futures rep.

5          THE COURT:  He was here earlier.

6          MR. BERNICK:  But he's here as the futures rep in

7 this case.

8          THE COURT:  Yes.

9          MR. BERNICK:  It is extremely difficult to get

10 individual information in a reliable fashion.  And then you're

11 going to have to -- we have to sit here, this is all -- you

12 know -- we can spend two hours talking about this and we won't,

13 the claim forms in those trusts are different than the claim

14 forms here.

15          Supporting information is different.  The

16 requirements are different.  Now, the estimators have access to

17 a lot of that information.

18          THE COURT:  All right.  So they have it already.

19          MR. BERNICK:  But -- no.  It only gives you -- no.

20 No.  It only gives you where you have a trust.  So the Manville

21 Trust, we'll know if they have exposure to Manville product, in

22 some cases if they've submitted a claim.  We'll know if they've

23 got exposure to Eagle Picture Product in some cases if they

24 have a claim; what the exposure is, how much it was, when it

25 was.  We may know none of that.

1       So all you're doing -- and this has been a massive

2  problem for everybody dealing with asbestos forever -- is they

3  can never get with respect to any individual claimant what all

4  the exposures are, because there's only one organization that

5  knows it, and that's the law firm and the claimant themselves.

6  Nobody else has it, which is why we've got no choice but to ask

7  for it here.  Nobody is doing --

8       THE COURT:  Well, you're asking.  I've said you can

9  get it.  So fine.  I just was curious as to why that

10 information --

11      MR. BERNICK:  We would love --

12      THE COURT:  -- you can get it in an electronic format

13 wouldn't be better.

14      MR. BERNICK:  -- to have done this automatically.

15 There's no question about it.  Mr. Florence, as you've heard

16 from, Mr. Dunbar, who you've heard from, everybody would love

17 to get this information.  It's just not available.  Now, I then

18 get to the last question, which Mr. Finch can answer for us, I

19 hope, which is that, Your Honor, I can't -- we can't function

20 on the basis that we deal with the asbestos claimants'

21 committee, who is going in and asking for hundreds of boxes of

22 documents, who's making discovery requests, who's making

23 arguments, who's taking positions, and then deal with any

24 number of 20-25 law firms who all want to come in and say,

25 well, gee, I want to do this discovery or I want to take this

1  position.  We can't function that way.  We -- I've got a

2  certain number of people.  There's a limit to how many people

3  they can talk to.

4          THE COURT:  I don't have any requests for discovery

5  by anybody.

6          MR. BERNICK:  Well, I understand that, but Your

7  Honor, we -- no.  We've given them access --

8          THE COURT:  Okay.

9          MR. BERNICK:  -- that is the ACC access to our

10 depository by way of I think negotiating on discovery requests

11 that were made.  So we've been dealing with the ACC as the

12 organization that's going to be litigating the estimation on

13 behalf of these claimants.

14          And I just want to make sure that when it comes to

15 the estimation that we're not going to have a whole bunch of

16 other law firms who are going to come in and say, well, gee,

17 we'd like to participate in the estimation, too, because then

18 it's just not workable.  We ought to have --

19          THE COURT:  I believe that the estimation process, it

20 belongs to the creditors' committee.

21          MR. BERNICK:  Yes.

22          THE COURT:  They can get information from any other

23 individuals.  If this is not going to be an allowance-

24 disallowance process, that's a function of the committee.

25          MR. BERNICK:  Thank you.

1          THE COURT:  Mr. Busby.

2          MR. BUSBY:  Yes.  Thank you, Your Honor.  I just

3  wanted to speak one thing that was mentioned by Your Honor, and

4  that is about the industry classification codes.  I mean, you

5  saw the list.  I mean, it's equally burdensome to identify

6  which industry matches up with which code.

7          And it's true that the codes were provided on the

8  questionnaire, but why should the claimants have to do that?

9  If Grace wants that information and they have the industries,

10  they certainly -- as Your Honor pointed out, they know as much

11  about industry codes as these claimants do.

12          And the plaintiff's counsel, they don't know anymore

13  about industry codes than does Mr. Bernick and W.R. Grace.  so

14  we provide the names of the industries where these people

15  worked.

16          THE COURT:  Well --

17          MR. BUSBY:  They can make --

18          THE COURT:  -- here's one.  For example, I suppose

19  this would be something called maintenance worker, but it's not

20  listed that way.  It says, "Decedent cleaned bowling lanes.

21  Decedent attached buttons on pillows."  The debtor -- that is

22  not giving the debtor, I think, the type of information that

23  would necessarily fit into --

24          MR. BUSBY:  Well, that's all the information --

25          THE COURT:  -- an industry code.

1          MR. BUSBY:  I'm sorry, Your Honor.  That's what the

2   claimant knows and that's what the claimant's lawyer knows.

3          THE COURT:  Well, if that's all you know, that's all

4   you know.

5          MR. BUSBY:  Right.  And so what --

6          THE COURT:  But some of these sheet metal mechanic --

7          MR. BUSBY:  -- what code they want to --

8          THE COURT:  -- probably has an industry code.

9          MR. BUSBY:  Well, sure, and let them put the --

10  whatever industry code they want to put on that, they can put

11  on it, but it shouldn't be placed on the party.

12         MR. BERNICK:  Judge, it's just -- this is just

13  silliness.  This is basically a contention.  What job did you

14  have.  I could in a deposition --

15         THE COURT:  That is not a contention; that's a fact.

16         MR. BERNICK:  I could go through in a deposition and

17  say, were you this; were you this; were you this.  They want to

18  say at the end of it, I was none of those people and they want

19  to make that representation.

20         THE COURT:  Mr. Bernick, this information is

21  sufficient for your experts who will know the industry codes to

22  determine what it is.

23         MR. BUSBY:  Thank you, Your Honor.

24         MR. BERNICK:  No --

25         THE COURT:  People have to give you a job

1 description, but your experts can do it.

2         MR. BERNICK:  -- our -- Your Honor --

3         THE COURT:  That's my ruling.

4         MR. BERNICK:  -- it's not our experts' --

5         THE COURT:  Mr. Bernick, that's it.  That's my

6 ruling.

7         MR. BERNICK:  Okay.  Well, I'd like to make a record,

8 then.  It's not my experts that make this draw.  It is what

9 they believe their job was.

10         THE COURT:  It's -- and it's stated.

11         MR. BERNICK:  And as soon as my expert says -- what?

12         THE COURT:  It's stated.  What they -- what the

13 claimant believes the job is, is stated.

14         MR. BERNICK:  Yes.  Well, that -- I want them to fill

15 that out, just check it off.

16         THE COURT:  They have.  Laboratory technician.

17         MR. BERNICK:  Oh, no, I think --

18         THE COURT:  "Decedent worked at Scattergood Steam

19 Plant."

20         MR. BERNICK:  Okay.  Again, this falls into the

21 category that if the document actually answers it specifically,

22 Your Honor has ruled, I -- counsel was saying that they

23 shouldn't have to answer at all.

24         THE COURT:  No.  They do have to answer the question.

25         MR. BERNICK:  Okay.

1          THE COURT:  But to the extent that somebody doesn't

2    know an industry code, whether it's listed there or not,

3    they're not going to answer it.  This document provides

4    sufficient information that your experts, being familiar with

5    industry codes, can plunk it into something.

6          MR. BERNICK:  Okay.  But they are obliged to answer

7    in the first instance, if they can.

8          THE COURT:  Yes.  They have to answer, yes.

9          MR. BERNICK:  Okay.  Thank you.

10          THE COURT:  Sir, you need to use a microphone.

11          MR. WILSON:  For the record, Thomas Wilson, Kelley

12    and Ferraro, Cleveland, Ohio.  Your Honor, at this time I'd

13    just object to the 10-day time period on behalf of the 14,000

14    individuals that our law firm represents, so that the record is

15    clear.

16          THE COURT:  Well, at this point I think the question

17    is whether or not in 10 days you're going to tell the debtor

18    that you are or are not going to supplement any claim forms.

19          MR. WILSON:  I would have to look at --

20          THE COURT:  That's what the 10-day is for.

21          MR. WILSON:  -- 14,000 different questionnaires to

22    make that determination, Your Honor, and this 10 days is --

23    it's just not proper.  In light of the fact that we are a law

24    firm, we're litigating other matters and I can't shut my law

25    firm down to answer these questionnaires within the 10 days.  I

1 just wanted my --

2        THE COURT:  Okay.  But I think we're --

3        MR. BERNICK:  -- to give his answer within 10 days.

4        THE COURT:  -- we're still not -- I think -- I think

5 I am not communicating properly what I'm trying to get done

6 within 10 days.  I'm not asking that within 10 days you say to

7 Mr. Bernick, we're going to supplement, you know, claimant A,

8 B, C and D.  What I'm saying is, within 10 days can you let

9 Mr. Bernick know that you are or are not going to be submitting

10 any supplemental information.

11        If the answer's yes as to anybody, then tell him.

12 Obviously, within the 30 days that I'm asking you to try to get

13 this done, for 14,000 claimants you're not going to get it done

14 in 30 days.  I appreciate that, which is why I said to try to

15 work out something with Mr. Bernick that is a reasonable period

16 of time, if you intend to supplement.

17        But if you don't intend to supplement anything at

18 all, just tell him that so that life can move on.  That's all

19 I'm asking within --

20        MR. WILSON:  Understood, Your Honor.  But my

21 objections remain on the record.

22        THE COURT:  All right.

23        MR. BERNICK:  And just again, on the Kelley and

24 Ferraro law firm in particular, the Kelley and Ferraro law firm

25 is part of the problem that we have here.  We have the volume

1  shops.  And all the volume shops do is they submit the paper

2  because it's costless for them to submit the paper.  So Kelley

3  and Ferraro gave us zero information; objections to virtually

4  every question that was asked.  So they've got to make a

5  determination about whether they want to actually press the

6  claims in the case.

7         THE COURT:  All I'm asking within 10 days is that you

8  notify the debtor essentially up or down; yes, I'm going to be

9  submitting something, or no, I'm not going to submit anything

10  additional.  And then the debtor knows what position it wants

11  to take.  That's all.  Within 30 days I would like the effort

12  made to try to supplement, and if 30 days isn't sufficient, to

13  work out a time frame with the debtor.  That's it.  That's the

14  only requirement so far.

15         MR. WILSON:  Thank you, Your Honor.

16         MR. PHILLIPS:  Your Honor, I have one question and

17  this may fall under the rubric of places you shouldn't go, but

18  when we look at these deadlines and say 30 days out to respond,

19  we're starting to inch closer to parallel deadlines that are

20  going to impact how any disagreements that do arise are going

21  to be resolved.

22         For instance, in November we have the deadline for

23  the proof of claim forms for unsettled, pre-petition litigation

24  claims against Grace.  And I know Your Honor was admonishing

25  Grace counsel that, you know, if they wanted to file subsequent

1  objections, once we've had a chance to supplement they need to

2  do so.

3         But I kind of wanted to alert the Court to the issue

4  that we may have them filing motions to compel as to individual

5  claimants who end up, say, 20-30 days later before the Court

6  has had a chance to hear their objection, don't file a proof of

7  claim, because at the end of the day --

8         THE COURT:  Well, now, I'm sorry.  I missed that.

9         MR. PHILLIPS:  Well, Your Honor, at the end of the

10  day the only persons required to complete the questionnaire are

11  persons who end up filing proof of claim because they fall

12  under the category.

13         THE COURT:  Right.

14         MR. PHILLIPS:  So I just wanted to make it clear,

15  where we are perilously close on two tracks that don't quite

16  overlap and we could be in a position where the debtor is

17  objecting to nonresponsive questionnaires of people who end up

18  not even filing proofs of claim by the deadline.

19         THE COURT:  Oh, I see.  When's the proof of claim

20  deadline?

21         MR. PHILLIPS:  It's like November 16th, I think;

22  15th.

23         MR. BERNICK:  No.  No.  It does -- I understand the

24  kind of generalized concern, but if you just peel off a very

25  simple layer and get down to the specifics, there's no

1  conflict.  Everybody's got to submit a proof of claim.  Your

2  Honor said so.

3          With respect to their claims, if they were claims

4  that were pending against Grace as of the time the Chapter 11

5  case was filed.  Everybody.  Your Honor said that without

6  regard to anything else they've got to have a proof of claim.

7  That's what the order says.  I'm sorry.  It just --

8          MR. PHILLIPS:  No.  I just -- I wanted to clarify

9  that, though.

10          MR. BERNICK:  No.  No.  No.

11          MR. PHILLIPS:  I'm just curious because I'm --

12          MR. BERNICK:  It's my statement.

13          MR. PHILLIPS:  Okay.

14          MR. BERNICK:  It doesn't require clarification.  I'm

15  not even done with it.  Now, with respect to people who've got

16  claims that are -- they believe are settled claims, they too

17  have to file a proof of claim.  They will then indicate that

18  it's a settled claim.  If it is a settled claim they don't have

19  to file a questionnaire.

20          If it is not a settled claim we then go through the

21  process of determining whether in fact they have to submit the

22  questionnaire or not.  And that's all handled.  All the orders

23  already speak to it and there's no conflict at all.  With

24  respect to the people who do not assert that they have a

25  settled claim, they then, if they've got a claim that was

1  pending against Grace at the time, they have to submit their

2  proof of claim and they have to submit the questionnaire.

3          So there's nothing about that process that in any way

4  is inconsistent with the people who do have to submit a

5  questionnaire doing so in compliance with the Court's

6  determinations.  There's nothing at all.  The worst that can

7  happen is that the people who may not have to do it are people

8  who have settled claims, and that's going to be determined on

9  the track that Your Honor has indicated.

10          So there's no conflict at all.  I would further add,

11  Your Honor, that with respect to the -- who it is that falls

12  within the scope of the bar date, ambiguities there are

13  precisely the ambiguities that we were trying to resolve with

14  the asbestos claimants' committee.

15          That is, it only applies to people who had a claim

16  pending that had been asserted against the debtor as of the

17  time the Chapter 11 case been filed.  Nobody else has got to

18  submit a proof of claim, because they're not included within

19  the bar date.

20          MR. PHILLIPS:  Your Honor --

21          MR. BERNICK:  I don't think we have any conflict.

22          MR. PHILLIPS:  No, I don't think that's how the proof

23  of claim order actually reads, and I don't think that's --

24  that's certainly not how proof of claim bar dates operate

25  generally.  The proof of claim bar date says everyone who

1  matches this description, i.e., you sued Grace before the

2  petition date because you were diagnosed before the petition

3  date, must file a proof of claim.  If they're wanting to at any

4  point assert a claim against Grace and the trust or however,

5  just like any other proof of claim bar date.

6          It's not, as I read the bar date -- and maybe I'm

7  wrong.  This is why I had a clarification -- I don't read that

8  bar date, and I don't recall -- having been there, I don't

9  recall the discussions being of the nature that this is some

10  sort of mandatory order saying everyone who is out there who

11  sued Grace must file a proof of claim form, whether or not you

12  now believe you indeed have a claim against Grace.

13          I mean, it could be that they've decided they don't

14  want to prosecute.  It could be that the person has died and

15  there was an estate open and there's no one who properly can

16  bring a claim against Grace.  It may be that there was certain

17  information prior to the petition date where they brought a

18  claim, they subsequently realized, wait a minute, we were

19  wrong, that wasn't Grace who was responsible; it turns out

20  Grace was at that job site four years later.

21          I mean, there are people who are going to not file

22  proof of claim forms properly.  And I don't want Mr. Bernick's

23  explanation -- and I want to figure this out --

24          MR. BERNICK:  Go talk with Mr. Finch, because

25  Mr. Finch has been working on exactly --

1        THE COURT:  Mr. Bernick, it's his turn.

2        MR. BERNICK:  I'm sorry.

3        MR. PHILLIPS:  No.  I mean, I don't want somehow some

4  sort of motion for sanctions to come upon a person who has

5  dropped out for whatever reason.

6        MR. BERNICK:  Or --

7        MR. PHILLIPS:  Didn't file a proof of claim.  Maybe

8  they filed a questionnaire responsible for, but aren't going to

9  supplement it.

10        THE COURT:  I see.

11        MR. PHILLIPS:  Or didn't file one and now all of a

12  sudden they're coming back in.  I know it's a different issue,

13  but at the same time, we're --

14        MR. BERNICK:  Yeah.

15        MR. PHILLIPS:  -- what are we going to do and I'm

16  just alerting the Court, we are going to have a problem because

17  any motions to compel that they bring on this schedule we're

18  talking about today are going to --

19        THE COURT:  Well, I think what'll happen is that to

20  the extent that there's a motion to compel we'll have to set it

21  for hearing after the proof of claim bar date.

22        MR. PHILLIPS:  Right.

23        THE COURT:  So that to the extent that there is

24  actually not a proof of claim filed, it's going to be withdrawn

25  because there won't be any point to submitting a questionnaire

1 for somebody who hasn't filed a proof of claim.

2          MR. PHILLIPS:  Right.

3          MR. BERNICK:  We're only going to move with respect

4 to people that we believe are picked up by the bar date.  If

5 Mr. Phillips is saying that there are people who are not going

6 to be pursuing those claims, we have no desire to have them

7 pursue the claims.  We have no desire to have them go through

8 the process --

9          THE COURT:  Right.

10          MR. BERNICK:  -- of filling out the questionnaire.

11 And that is certainly something that I know we can work out,

12 because it seems to me that there's a shared interest in the

13 claimants and the law firms avoiding the burden and our

14 avoiding the burden.

15          THE COURT:  Well, his point is the timing.  If I'm

16 giving somebody 30 days and then you're going to file motions

17 to compel, those motions would be filed in October, but you

18 won't know whether the person filed a proof of claim until

19 November.

20          MR. BERNICK:  Only if they can't make up their minds

21 within 30 days about whether the claim is going to be pursued.

22          THE COURT:  Yeah.

23          MR. PHILLIPS:  Well, the bar date gave us to November

24 15th, Your Honor.  And again, I'm not seeking this early a

25 ruling, but I am alerting the point that the debtor may go off

1  on an exercise of objecting to thousands of claims, some of

2  which will end up not being claims that they needed to object

3  to, so.

4          MR. BERNICK:  And we'll --

5          THE COURT:  Well, look.  I think, Mr. Phillips, that

6  it's going to be a moot point, because to the extent the claim

7  -- the entities have 1800 and 14,000 and 800 claims and they're

8  trying to supplement information, the likelihood that it's

9  going to get done in 30 days and that I'm not going to be asked

10 to give at least some other additional period of time isn't too

11 high.  It's going to require more time.  I don't think it's

12 going to be a problem.

13         MR. PHILLIPS:  Okay.  Okay.  Thank you, Your Honor.

14         THE COURT:  Thank you.  All right.  Anybody else?

15 Okay, Mr. Bernick, take a stab at the order, circulate it to

16 everyone.  I'll take it on a certification of counsel.

17         MR. BERNICK:  Thank you.

18         THE COURT:  Thank you.

19         ALL COUNSEL:  Thank you, Your Honor.

20     (Whereupon, at 5:30 p.m., the hearing in the above-

21 entitled matter was adjourned.)

22                          --oOo--

23

24

25

276

<pre>
 1
 2
 3                          CERTIFICATE
 4          I, ELIZABETH REID-GRIGSBY, a certified electronic
 5  transcriber, certify that the foregoing is a correct
 6  transcript, to the best of the transcriber's ability, from the
 7  official electronic sound recording of the proceedings in the
 8  above-entitled matter.
 9
10  /s/ Elizabeth Reid-Grigsby           September 20, 2006
11  Elizabeth Reid-Grigsby
12  AAERT CET**00145
13
14
15
16
17
18
19
20
21
22
23
24
25
</pre>

J&J COURT TRANSCRIBERS, INC.