UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE


IN RE:                         .  Case No. 01-1139(JKF)
                               .  Chapter 11
W.R. GRACE, et al.,            .
                               .  Bankruptcy Courtroom No. 2
                               .  824 Market Street
               Debtors.        .  Wilmington, Delaware 19801
                               .
                               .
                               .  September 25, 2006
. . . . . . . . . . . . . . ..  2:03 P.M.


TRANSCRIPT OF OMNIBUS HEARING
BEFORE HONORABLE JUDITH K. FITZGERALD
UNITED STATES BANKRUPTCY JUDGE


APPEARANCES:

For Debtors:            Kirkland & Ellis
                        By:  DAVID M. BERNICK, ESQ.
                             JANET BAER, ESQ.
                             SAMUEL BLATNICK, ESQ.
                             LISA G. ESAYIAN, ESQ.
                        200 East Randolph Drive
                        Chicago, Illinois 60601

                        Pachulski Stang Ziehl Young & Jones
                        By:  DAVID CARICKHOFF, JR., ESQ.
                        919 North Market Street, 16th Floor
                        Post Office Box 8705
                        Wilmington, Delaware 19899-8705


Audio Operator:         Brandon McCarthy


Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

---

# TRANSCRIPTS PLUS
### 435 Riverview Circle, New Hope, Pennsylvania 18938
e-mail courttranscripts@aol.com

### 215-862-1115   (FAX) 215-862-6639

Appearances:
(Continued)

For the Property            Bilzin Sumberg Baena Price & Axelrod
Damage Committee:           By:  JAY SAKALO, ESQ.
                                 SCOTT BAENA, ESQ.
                            200 South Biscayne Boulevard
                            Suite 2500
                            Miami, Florida 33131-5340

                            Ferry & Joseph, PA
                            By:  THEODORE TACCONELLI, ESQ.
                            824 North Market Street, No. 904
                            Wilmington, Delaware 19899

                            Dies and Hilp
                            By:  MARTIN DIES, ESQ.

For Anderson:               Speights & Runyan
                            By:  DANIEL SPEIGHTS, ESQ.
                            200 Jackson Avenue, East
                            P.O. Box 685
                            Hampton, South Carolina 29924

For California State        Speights & Runyan
University, et al.:         By:  ALAN RUNYAN, ESQ.
                            200 Jackson Avenue, East
                            P.O. Box 685
                            Hampton, South Carolina 29924

For Ad Hac Committee of     Weil Gotshal & Manges, LLP
Equity Security Holders:    By:  JARRAD WRIGHT, ESQ.
                            Eye Street, NW, Suite 900
                            Washington, DC 20005

For Official Creditors'     Stroock & Stroock & Lavan LLP
Committee:                  By:  KENNETH PASQUALE, ESQ.
                            180 Maiden Lane
                            New York, New York 10038-4982

For Prudential             Riker Danzig Scherer Hyland & Perretti
Insurance Company of        By:  ROBERT GILSON, ESQ.
America:                    Headquarters Plaza
                            One Speedwell Avenue
                            Morristown, New Jersey 07962-1981

Appearances:
(Continued)


| For Asbestos P.I. Claimants: | Campbell & Levine<br>By:  MARK HURFORD, ESQ.<br>1201 Market Street, 15th Floor<br>Wilmington, Delaware 19801 |
|---|---|
| | Caplin & Drysdale<br>By:  PETER LOCKWOOD, ESQ.<br>     NATHAN FINCH, ESQ.<br>One Thomas Circle, N.W.<br>Washington, DC 20005 |
| For Grace Certain Cancer Claimants: | Montgomery McCracken<br>By:  NATALIE RAMSEY, ESQ.<br>123 South Broad Street<br>Philadelphia, Pennsylvania 19109-1029 |
| The U.S. Trustee: | Office of the U.S. Trustee<br>By:  DAVID KLAUDER, ESQ.<br>844 King Street<br>Wilmington, Delaware 19899 |
| For Canada/Montana: | Monzack & Monaco<br>By:  FRANCIS A. MONACO, JR., ESQ.<br>1201 N. Orange Street, Suite 400<br>Wilmington, Delaware 19801 |
| For FCR: | Orrick, Herrington & Sutcliffe LLP<br>By:  RICHARD WYRON, ESQ.<br>Washington Harbour, 3050 K Street N.W.<br>Washington, DC 20007 |
| | Phillips, Goldman & Spence, PA<br>By:  JOSEPH FERNAN, III, ESQ.<br>1200 North Broom Street<br>Wilmington, Delaware 19806 |
| For BNSF: | Burns, White & Hickton<br>By:  ANGELA ALLEN, ESQ.<br>Four Northshore Center<br>106 Isabella Street<br>Pittsburgh, Pennsylvania 15212-5805 |

4

Appearances:
(Continued)


For One Beacon/Seaton:          Drinker Biddle & Reath LLP
                                By:  MICHAEL BROWN, ESQ.
                                One Logan Square
                                18th & Cherry Streets
                                Philadelphia, Pennsylvania 19103-6996

For Prudential,                 Jaspan Schlesinger Hoffman
Motley Rice:                    By:  LAURIE S. POLLECK, ESQ.
                                1201 North Orange Street, Suite 1001
                                Wilmington, Delaware 19801

                                Motley Rice LLC
                                By:  JAMES HUGHES, ESQ.
                                28 Bridgeside Boulevard
                                P.O. Box 1792
                                Mount Pleasant, South Carolina 29465

For Various Firms:              Stutzman, Bromberg, Esserman & Plifka
                                By:  SANDER ESSERMAN, ESQ.
                                2323 Bryan Street, Suite 2200
                                Dallas, Texas 75201

For MCC:                        Connolly Bove Lodge & Hutz, LLP
                                By:  MARC PHILLIPS, ESQ.
                                1220 Market Street, 10th Floor
                                Post Office Box 2207
                                Wilmington, Delaware 19899

For Canadian ZAI                The Hogan Firm
Claimants:                      By:  DANIEL K. HOGAN, ESQ.
                                1311 Delaware Avenue
                                Wilmington, Delaware 19806

For Ad Hoc Committee            The Bayard Firm
of Equity Holders:              By:  KATHRYN SALLIE, ESQ.
                                222 Delaware Avenue, Suite 900
                                P.O. Box 25130
                                Wilmington, Delaware 19899-5130

For UCC:                        Duane Morris, LLP
                                By:  RICHARD W. RILEY, ESQ.
                                1100 North Market Street, Suite 1200
                                Wilmington, Delaware 19801

**Appearances:**
**(Continued)**


**Via Telephone:**        **Walter Slocombe**
                         **Elizabeth DeCristofaro**
                         **Roger Frankel**
                         **Debra Felder**
                         **Davis Oster**
                         **Jonathan Brownstein**
                         **Jacob Cohn**
                         **Joseph Radecki**
                         **William Sparks**
                         **Jay Hughes**
                         **William Wagner**
                         **Paul Norris**
                         **David Siegel**
                         **Mark Shelnitz**
                         **James Hughes**
                         **Elisa Alcabes**
                         **David Klinger**
                         **Oscar Mockridge**
                         **Matthew Kramer**
                         **Martin Dies**
                         **Robert Guttman**
                         **Michael Davis**
                         **Sean Walsh**
                         **Darrell Scott**
                         **Joseph Krigsfeld**
                         **Salvin Bianca**
                         **Christopher Candon**
                         **Arlene Krieger**
                         **Edward Westbrook**
                         **Craig Gilbert**
                         **Christina Kang**
                         **Sam Brian Kasprzak**
                         **Mark Plevin**
                         **Leslie Epley**
                         **Sarah Edwards**
                         **Stephen Vogel**
                         **Warren Smith**
                         **James Restivo**
                         **Marti Murray**
                         **Stephanie Kwong**
                         **David Liebman**
                         **Sara Gooch**
                         **Sam Blatnick**

**Appearances:**
**(Continued)**


**Via Telephone:**      **Theodore Freedman**
                          **Barbara Harding**
                          **John O'Connell**
                          **Tiffany Cobb**
                          **Kenneth Thomas**
                          **Andrew Craig**
                          **Alex Mueller**
                          **Andrew Chang**

1    THE COURT:   This is the matter of W.R. Grace, 01-

2  1139.   The participants I have listed by phone:   Walter

3  Slocombe, Elizabeth DeCristofaro, Roger Frankel, Debra Felder,

4  Davis Oster, Jonathan Brownstein, Jacob Cohn, Joseph Radecki,

5  William Sparks, Jay Hughes, William Wagner, Paul Norris, David

6  Siegel, Mark Shelnitz, James Hughes, Elisa Alcabes, David

7  Klinger, Oscar Mockridge, Matthew Kramer, Martin Dies, Robert

8  Guttman, Michael Davis, Sean Walsh, Darrell Scott, Joseph

9  Krigsfeld, Mr. Salvin Bianca, Christopher Candon, Arlene

10  Krieger, Edward Westbrook, Craig Gilbert, Christina Kang, Sam

11  Brian Kasprzak, Mark Plevin, Leslie Epley, Sarah Edwards,

12  Stephen Vogel, Warren Smith, James Restivo, Marti Murray,

13  Stephanie Kwong, David Liebman, Sara Gooch, Sam Blatnick,

14  Theodore Freedman, Barbara Harding, John O'Connell, Tiffany

15  Cobb, Kenneth Thomas, Andrew Craig Alex Mueller, and Andrew

16  Chang.

17    I'll take entries in court, please.

18    MR. BERNICK:  Good afternoon, Your Honor.  David

19  Bernick for Grace.

20    MS. BAER:  Good afternoon, Your Honor.  Janet Baer

21  for Grace.

22    MS. ESAYIAN:  Good afternoon, Your Honor.  Lisa

23  Esayian for Grace.

24    MS. HARTING:  Barbara Harting for Grace, Your Honor.

25    MR. O'NEILL:  Good afternoon, Your Honor.

1    THE COURT:  Wait -- excuse me, one second.

2                    (Pause)

3    THE COURT:  Okay.  Thanks.

4    MR. O'NEILL:  James O'Neill for Grace.

5    MR. PASQUALE:  Ken Pasquale from Stroock for the

6 Official Creditors' Committee.

7    MR. LOCKWOOD:  Peter Lockwood from Caplin and

8 Drysdale for the ACC, Your Honor.

9    MR. FINCH:  Nathan Finch, Caplin and Drysdale for the

10 ACC, Your Honor.

11    MR. ESSERMAN:  Sander Esserman on behalf of various

12 firms listed in our pleading, Your Honor.

13    MS. RAMSEY:  Natalie Ramsey for the Grace Certain

14 Cancer Claimants, Your Honor.

15    MR. WYRON:  Your Honor, Richard Wyron for the Futures

16 Rep.

17    MR. SAKALO:  Good afternoon, Your Honor.  Jay Sakalo

18 from

19    THE COURT:  One second.

20                    (Pause)

21    THE COURT:  Thank you.

22    MR. BAENA:  Good afternoon, Your Honor.  Scott Baena

23 on behalf of the Property Damage Committee.

24    THE COURT:  Thank you.  Mr. Bernick?

25    MR. BERNICK:  Ms. Baer will start out with some

1  uncontested matters, and then we'll take up --

2          THE COURT:  All right.  Ms. Baer?

3          MS. BAER:  Good afternoon, Your Honor.  Your Honor,

4  Items Agenda Number 1, 2 and 3 are all being continued.  And

5  I'd like to hand up orders.  The first one is one remaining

6  claim objection that's still outstanding and still being

7  discussed.

8          Items 2 and 3 relate to the New Jersey injunction

9  matter.  The parties are still talking.  Frankly we're waiting

10  for New Jersey to get the appropriate authority to make some

11  sort of an offer.  So, I'd like to hand up those continuance

12  orders.

13          THE COURT:  All right.  Thank you.

14                        (Pause)

15          THE COURT:  Thank you.

16                        (Pause)

17          THE COURT:  Okay.  Item 1 is continued.  Items 2 and

18  3 are continued.

19          MS. BAER:  And, Your Honor, I should note, Items 2

20  and 3 are going over to the November hearing, not the October

21  hearing.  And that is indicated on the order.

22          THE COURT:  Yes.  That's fine, thank you.

23          MS. BAER:  Your Honor, Item Number 4 is the quarterly

24  fee application for the twentieth quarterly interim period.  I

25  have a revised order to hand up, Your Honor.  There was one

1  change, the Capstone number was resolved and changed based on
2  an agreement with the United States Trustee's Office.
3            THE COURT:  All right.  Thank you.  Mr. Smith, have
4  you seen this order?
5            MR. SMITH:  Yes, Your Honor.  We have seen that
6  order.
7            THE COURT:  Any problems with it?
8            MR. SMITH:  No problem at all, Your Honor.
9            THE COURT:  All right.  It's entered.  Thank you.
10            MR. SMITH:  Your Honor, if I could be excused?
11            THE COURT:  Yes, sir.  Anyone who's interested only
12  in the fee applications are -- is excused.
13            MS. BAER:  Your Honor, Agenda Item Number 5, motion
14  of the Official Committee of Equity Security Holders to amend
15  the retention of Klett Rooney.
16            You ordered -- you entered an order on that last
17  week.
18            I'd like to skip Item Number 6 for a moment and get
19  on to 7 and 8 because they also are being continued.
20            Item Number 7, Your Honor, is the Lloyd settlement
21  agreement.  The parties are still in discussions on that matter
22  and we would ask that it be continued to the October 23rd
23  hearing.
24            THE COURT:  All right.
25            MS. BAER:  Your Honor, Item Number 8 is the motion of

1  Scotts Company to modify the automatic stay so that they can go

2  forward with their declaratory judgment matter.

3       Your Honor, I spoke with Scotts' counsel a couple of

4  times over the last month.  And unfortunately, she's been ill,

5  so we have not had an opportunity to talk among the various

6  people, including the insurers.

7       One Beacon was objecting to this motion and the

8  timing with respect to when it should go forward.

9       We've all agreed that the parties need to talk about

10 this, and we would continue the matter to the October 23rd

11 hearing so the parties have an opportunity to talk about

12 whether or not there's a way to resolve our differences of

13 opinion on how this should go forward.

14       THE COURT:  All right.  It's continued -- they're

15 both continued to October.

16       MS. BAER:  Thank you, Your Honor.

17       That takes us back to Agenda Item Number 6, and I'll

18 turn it over to Mr. Bernick.

19       THE COURT:  Thank you.

20                    (Pause)

21       MR. BERNICK:  Good afternoon, Your Honor.  Our

22 support people have discovered my Achilles heel, which is that

23 if I don't have an Elmo to use, things, you know, just don't go

24 the same.  So, I'll just have to muddle through here.  I've got

25 a number of things that I'd like to show the Court in

1  connection with the next matter, which is the Prudential

2  matter.  But I'll apologize to the Court if -- if we can't show

3  those things.  So, we'll just have to read them.  Maybe we can

4  cut some of them out.

5          I'd like to begin with Item 6, which relates to the

6  debtors' 2004 request.  And what I'm going to say at the end is

7  that maybe it is best pending other potential developments that

8  we hope will occur on the negotiation front to set this matter

9  to one side and to simply hold it in abeyance.

10          But before I get to that point, I just want to

11  explain to the Court what it is that we've done and that we do

12  want to hold it in abeyance and we may have to activate it if

13  developments don't take place and we think that it's a proper

14  request and ought to be complied with.

15          Your Honor will recall coming out of the mediation

16  process which -- to which the Court developed -- devoted very

17  substantial time as did the parties, took a few a months out of

18  our schedule.  That coming out of that process was an

19  announcement that was made to the Court that an important

20  agreement had been reached between two constituencies.  That is

21  the property damage constituency on the one hand and the

22  personal injury constituency on the other.

23          And the deal or the agreement was described in very

24  general terms to the Court.  The Court made sure that there

25  would be an opportunity for the debtor, and for that matter,

1   for anybody else to sit down with those who had made this deal

2   in order to learn more about it.  And very promptly after court

3   underscored the need for such a meeting to take place, in fact,

4   it did take place.  And I had a very cordial and informative

5   conversation with counsel for the futures claim representative,

6   counsel for the Property Damages Committee, as well as counsel

7   for the Personal Injury Committee.  And at the end of that

8   discussion, I felt fully apprized and I think my client later

9   agreed that we knew the essential economic terms of the deal,

10  so-called 85/15 split between personal injury and property

11  damage.  Nothing going to equity.  And then a haircut with

12  respect to the unsecureds.

13          What was less clear coming out of that discussion --

14  and this is not something that's confidential, it's been

15  already visited on with the Court here last time on the record,

16  was much less clear was what impact this agreement would have

17  on the ability to get a fully consensual plan by continuing the

18  negotiation process.  That is did the agreement foreclose

19  further negotiations or further agreements, or did it not?

20          And while there was some discussion about those

21  topics during our informal meeting, there was no definitive

22  answer that was supplied to either one of those questions.

23          And as a consequence, we made a formal request to get

24  a commitment by the people who had been involved in this

25  arrangement about what the answers to those questions were.

1          I raised the questions again at the hearing last

2   time.  And, again, there really was no statement that was made

3   in response to it other than if the Court later felt it was

4   appropriate, they would simply amend the deal.

5          So, I think that our 2004 request to get the finitude

6   on what exactly this deal entails insofar as further

7   negotiations are concerned involving the other constituencies,

8   or insofar as how that deal will be affected by further

9   determinations this Court makes, those requests, under 2004,

10  are fully appropriate.  We don't believe they breach any

11  confidentiality protections.  We think that the cases they cite

12  are inapposite, they deal with things like draft documents and

13  the like, which has nothing to do with our request.

14         All that said, I think our feeling is rather than

15  create or to continue an area where there's controversy between

16  the constituencies, we would be able to find out whether, in

17  fact, that agreement does prevent there being further

18  negotiations in this case or further agreements in this case,

19  that ultimately is the proof of the pudding.

20         So, we'd like to simply table our 2004 request and

21  our motion to compel.  If we feel that it becomes important at

22  some further stage, we would then put it back on the docket and

23  proceed to argue it before the Court.

24         THE COURT:  All right.  Does anyone have an objection

25  to a general continuance of the debtors' request for a 2004 --

 1  well, I guess it's production of documents as opposed to exam.

 2      MR. BERNICK:  Yeah, it really is request for

 3  information.

 4      MR. BAENA:  Judge, I would only ask that counsel be

 5  required to apprize us 30 days in advance of the next hearing

 6  that they wish to ramp this up again.

 7      MR. BERNICK:  No problem.

 8      MR. BAENA:  Thank you.

 9      THE COURT: All right.  One second then.   So, this

10  is continued until the debtor re-calendars it on not less than

11  30 days' notice to all opposing counsel.

12      MR. BERNICK:  That's --

13      THE COURT:  All right.

14      MR. BERNICK:  I'd like to then proceed to the next

15  item on the agenda, which relates to Prudential, and the motion

16  with regard to Prudential, which is Item 9 on the agenda.

17      And I guess this probably is styled as an objection

18  to certain of the claims, so we have the burden of going

19  forward, which I'm happy to take up here initially.

20      I had hoped, again, to have some way of displaying

21  this to the Court, but I think I can probably do without that.

22  Would I be audible if I'm standing over here?

23                         (Pause)

24      MR. BERNICK:  Your Honor, there was argument on these

25  matters, including the merits of the objection, back in

1    January.  And at that time, following the argument, you asked

2    for follow-up on two questions:

3         The first question is the doctrine of collateral

4    estoppel or issue preclusion, did that apply, in particular

5    reference to the decision that was rendered by Judge Ackerman

6    in the District of New Jersey in 1994.

7         The second question was assuming that there was no

8    collateral estoppel, this matter would then be addressed by the

9    Court here, did the Delaware Borrowing Statute apply.  And if

10   so, how did it apply?  I think those were the two matters that

11   were leftover.

12        There has been a welter of paper, I think the brief

13   that was filed by Prudential runs for 34 pages on these two

14   issues.

15        But I think that the dispositive facts are

16   essentially procedural facts, and I'd like to lay them out.

17   There's one set of facts with respect to the collateral

18   estoppel issue, and the second set of facts with respect to the

19   Borrowing Statute.

20        The key date on the first question, and that is

21   collateral estoppel, is not the 1994 decision at all.  The key

22   date with respect to collateral estoppel, and this was the

23   first decision back in 1994 by Judge Ackerman, the key fact is

24   the second decision, which was rendered in June of '01.  This

25   was 6 of '01.

1          Judge Ackerman issued a second decision.  And the way

2  that this came about was that in 1994, there was a -- there was

3  a motion for summary judgment.  Judge Ackerman denied the

4  motion for summary judgment with respect to the New Jersey

5  State law claims on the Statute of Limitations.

6          Appeals were then taken.  Efforts to appeal were then

7  undertaken by Grace, among other defendants in the company.

8  So, other defendants in the case.  So, we have these appeals.

9          I believe that the record further reflects that in or

10  about 1996, there was a second motion for summary judgment --

11  there was a motion for summary judgment that was filed, again,

12  before Judge Ackerman, now restyling the question of whether

13  there was a triable issue of fact on when the trigger from the

14  Statute of Limitations occurred.  This matter remained pending

15  and was pending at the time that Grace filed for Chapter 11,

16  which was in April of '01.

17          Shortly after Grace filed for Chapter 11 in April of

18  '01, Judge Ackerman issued a second decision in the same case.

19  Now pending against the same defendants, except stayed as to

20  Grace.

21          And the key aspect of this second decision is that

22  Judge Ackerman himself went back on what he said in the 1994

23  opinion.  And specifically, he said reviewing the state of

24  affairs, in talking about his prior decision in 1994, he says,

25  "The Court now finds, however, that in its 1994 opinion, it

1    should not have reserved the issue of what Prudential should

2    have known for trial."  And the opinion then goes on to explain

3    why it was that essentially he had addressed the wrong question

4    because the issue framed by the second motion for summary

5    judgment was a different issue and more accurately went after

6    the question of whether there really was anything to be tried.

7          So, the second decision in 19 -- a few years later in

8    June of '01 is an actual reversal by the District Judge himself

9    of the decision that Prudential seeks to argue is dispositive

10   and precludes any reexamination by this Court.

11         So, effectively, what we have in this case are three

12   basic procedural facts that bear upon the collateral estoppel

13   issue:

14         One, this decision -- a 1994 decision that they seek

15   to hold as being preclusive was found to be not final for

16   appellate purposes back in 1994 to 1996 time frame, and there's

17   not even an issue about that.  That's fact number one.

18         Fact number two is that even as of the time that

19   Grace went into Chapter 11, the District Court itself was being

20   asked to reconsider its determination in the context of a new

21   motion.

22         So, as of the time that Grace files for Chapter 11 --

23   and there's no question that's been raised that somehow, as in

24   the Brown decision out of the 3rd Circuit, Grace filed the

25   Chapter 11 case precisely in order to foreclose the usual

1  course of appellate review, instead to cause review by the

2  Bankruptcy Court, there's no suggestion of that.

3         This is a situation where the Appellate Court

4  wouldn't take jurisdiction and Grace tried to get it.  Not that

5  Grace didn't seek to get the jurisdiction, but instead filed

6  for bankruptcy.

7         So, we not only have a situation where the appellate

8  process was exhausted by Grace itself to the extent that it

9  could, but the District Court itself is reconsidering the

10 matter, at least it's being requested to do it, as of the time

11 the file -- Grace filed for Chapter 11.

12        So, neither for appellate purposes was it final, that

13 is the '94 opinion, and potentially as of the time that Grace

14 filed, even at that District Court, was not fairly considered

15 to be a final decision.

16        And then finally the cudegra to any notion of

17 collateral estoppel is that the District Court itself reversed

18 its decision.  I don't know if there's a technical vacation.  I

19 don't even know whether the first decision even stands or it

20 has any juridical consequence whatsoever.

21        So, what they're saying is notwithstanding all of the

22 subsequent history, six years of subsequent history to say

23 nothing than of the 3rd Circuit's affirmance of the reversal,

24 after all this period of time and all this litigation, only of

25 this Court, only in this Court, nowhere else is Prudential

1  asserting that we should simply take a look at the 1994

2  decision as if nothing had happened.  And it's dispositive.

3  That is a proposition so extreme that there is no case, no case

4  whatsoever that they cite that involves all three of these

5  elements.  They cite <u>Brown</u>.  In the <u>Brown</u> case it was a naked

6  attempt of the State Court decision that could have gone on

7  appeal.  And instead of allowing that to happen, the losing

8  party in that case filed a Chapter 11 case and sought to use

9  the Chapter 11 process as a way of obtaining appellate review.

10  The 3rd Circuit says, no.

11        Then you have the <u>Burlington</u> case.  The <u>Burlington</u>

12  case also is very uninstructive.  That's a case that deals with

13  the unmixed legal question exception to the issue of preclusion

14  of rule, a matter that's not even before this Court.  Although

15  I believe we can persuasive argue that even if the 1994

16  decision were flat out final for all purposes, given what

17  happened subsequently in the law as recognized by the Court

18  itself, you could argue that it falls squarely within the

19  unmixed legal question exception and issue preclusion shouldn't

20  apply.

21        But we don't get there.  This is a situation where

22  this decision in 1994 turned out to be not final for any

23  purposes whatsoever.  And the fact -- the fact that that was so

24  -- was, itself, well known, as of the time that Grace filed,

25  how in the world can a reverse District Court decision, never

1   subject to review by an Appellate Court, nonetheless be found

2   to be collateral estoppel, even when the same court reversed

3   and said it was wrong?  You've got to blink away reality.

4           The second issue that's been raised is what law

5   should apply.  And the question of what law should apply really

6   has two basic components to it.  I'm going to go back now and

7   kind of move our time line or procedural time line forward a

8   little bit.

9           We have the June, '01 decision by Judge Ackerman.

10  And we're now sitting here in '06.  And the first question that

11  gets raised by Prudential is the question of whether you are

12  the Delaware Court.  Because what they suggest in their papers

13  is that in determining what law should apply, you should

14  pretend as if you are a New Jersey court sitting on the

15  question of whether the case was timely filed in New Jersey and

16  ignoring Delaware conflict principles, and how Delaware would

17  look at this whole matter.

18          Again, all that this really is is the re-invocation,

19  the re-clothing of effectively the same argument, which is

20  let's just rely on the 1994 decision, don't trouble yourself

21  with Delaware law, don't trouble yourself with Delaware

22  Borrowing Statute, don't trouble yourself with being a Delaware

23  Court, just pretend that you're the New Jersey court, even

24  though the New Jersey court will later change its mind.

25          So, the first question is, well, you have to pretend

1 that you're not a Delaware court, but you're a New Jersey

2 court.   And the answer to that clearly is no.   That's what they

3 say in their brief.   They say really the question is as if you

4 were a New Jersey or if the first question was in the New

5 Jersey proceeding.

6 　　　　And what is the key -- the key fact that disposes of

7 this contention?   Whatever its jurisprudential underpinnings

8 might otherwise purport to be, the facts aren't there for this

9 position, and why?

10 　　　　Because there was a further procedural development

11 between the time of Judge Ackerman's June, '01 decision and the

12 times that we're now focused on these matters in 2006.   And

13 that further fact is what happened in March of '03.   In March

14 of '03, they filed a claim -- Prudential filed a claim in this

15 Court.

16 　　　　Now, they say, ooh, we simply transferred the New

17 Jersey claim.   Kind of just moved it over here.   So, really

18 this is just the New Jersey case, now pending in Delaware.

19 　　　　Well, Your Honor saw that pretty quickly last time.

20 I got the transcript, and I know that Your Honor will recall

21 very distinctly.   They said, well, no, you didn't transfer that

22 lawsuit.   If you really wanted to pursue that lawsuit that is

23 the New Jersey lawsuit, you should simply have made an

24 application to lift the stay and allow that case to proceed.

25 And then it would be the New Jersey case.   But you decided not

1    to do that.  You made an election to be in Delaware.  That's

2    what happened.

3              It was not as if -- we don't have to worry about as

4    if they decided to be here.  Now, could they have been

5    successful and moved to lift the stay and transferred?  We

6    don't know, but we don't have to go down the path and resolve

7    that issue because they did make an election.  And what's very

8    interesting and also relevant is not only did they make the

9    election, but why they made the election.

10             Why would it be that they thought things were so

11   great in New Jersey that they didn't simply move to lift the

12   stay and proceed in New Jersey?  And the answer is that things

13   were not necessarily so hot in New Jersey.  And what do I mean

14   by that?

15             In the District Court -- the District Court's opinion

16   in New Jersey in 2001, not only did the Court revisit where it

17   had been -- the decision that had taken -- had been taken in

18   1994, but it explained why it was changing its mind.  And it

19   said specifically that when we look at this record, we believe

20   that the trigger for the Statute, the trigger for the Statute

21   may have been as early -- it was certainly before 1983, but it

22   had been brought to the attention -- the matter had been

23   brought to the attention of Prudential as early as 1981.

24             Now, the complaint that was filed in New Jersey was

25   filed in November of 1987.  So, depending upon when in 1981 the

1    Statute was triggered, the Prudential folks would be out of

2    luck even under the New Jersey six-year Statute.

3            And there was a lot in the opinion at the District

4    Court level that gave rise to that prospect.  This is at Page

5    643.  The EPA had issued the regulations requiring asbestos

6    encapsulation during demolition a decade earlier.  And one of

7    Prudential's engineers had brought to -- the regulations to

8    Prudential's attention by at least -- by at least -- at least

9    as early as 1981.  Ooh.  Okay, well, when in 1981?  Well, if

10   you'd take a look a little bit later on, in the opinion, this

11   is at 667, it turns out that that correspondence took place in

12   May of 1981.

13           And then there is further correspondence also in May

14   of 1981.

15           So, what was going on with this decision in June of

16   '01 is not only did it wipe out the 1994 decision, but it put

17   the triggering events as early as May of 1981.

18           So, it's early -- and, you know, there's no question

19   about the Prudential if they had wanted.  The case was

20   dismissed for lack of federal jurisdiction in 2001.  There's

21   nothing to stop them from pursuing the State Court case.

22           Well, but did they really want to sit there and argue

23   for continuation of a State Court case?  Or would they rather

24   come in here and say, well, forget about the June, '01

25   decision, and forget all about the May, 1981 evidence, and

1  let's just argue that the 1994 decision is the way to go.  So,

2  maybe -- maybe what the story was and why the election was made

3  in March of 2003 is they didn't trust themselves in the New

4  Jersey Court.  They would rather come here and make their 35-

5  page arguments about why it is that the Court didn't have to

6  bother its head with what the story really was under Delaware

7  law.  Or, for that matter, under New Jersey law because the

8  1994 decision was controlling.

9         The matter gets even worse when Your Honor would take

10  a look at the 3rd Circuit's decision, the 3rd Circuit's

11  decision affirming Judge Ackerman's decision in June of '01.

12  The 3rd Circuit -- and this is at Page 235 of the decision, not

13  -- it doesn't go back simply to 1981.  The 3rd Circuit decision

14  goes back to events in 1976, in 1979, in 1978, in 1980, citing

15  all kinds of evidence supporting the determination by Judge

16  Ackerman that, in fact, the trigger had taken place long before

17  the 1983 date.

18         If you take a look at all of that record, what does

19  that record say?  It says that the 1994 decision was of no

20  consequence, that the matter should be decided by the Court in

21  the first instance.  That the idea that this -- this Court

22  should somehow pretend it's a New Jersey Court is not only

23  without any jurisprudential base, they should have taken a

24  different step, but it also flies in the fact of the fact that

25  these folks are here because they want to be here.  They don't

1  want to be in the New Jersey Court that they're asking that

2  Your Honor pretend that you are.

3        So, we then come to the Delaware law and the Delaware

4  Borrowing Statute.  And the Delaware Borrowing Statute applies.

5  And they say, well, wait a minute, it's Grace who chose to be

6  in Delaware and, therefore, Grace, who shouldn't be able to

7  invoke the protective aspects of the Delaware Borrowing

8  Statute.

9        Well, we know now -- now know that that's just false.

10  It's not just Grace that chose to be in Delaware, these folks

11  chose to be in Delaware.  So, whatever the effect of the

12  Borrowing Statute is, it is.

13        That Delaware Borrowing Statute ends up being fairly

14  easy to apply in accordance with its terms.  There are two

15  parts of the Statute that are of relevance.  There's the first

16  sentence, and there's the second sentence.

17        The first sentence deals effectively with non-

18  residence.  That is people who are coming and bringing the

19  claim who don't reside in Delaware.  And it says, "Where a

20  cause of action arises outside" -- "arises outside, the Court

21  should apply the shorter Statute of Limitations as between the

22  Delaware Statute and whatever statute would otherwise be

23  applicable to the claim."

24        The second sentence that deals with residents.  And

25  it says, well, but if you're a resident of Delaware, then you

1  should be able to invoke the Delaware Statute of Limitations.

2         Now, the Court in PAC (phonetic) -- New Jersey

3  Supreme Court from PAC said this second sentence cannot be read

4  literally.  And this is actually the line of cases that

5  Prudential cites.  "To the extent that a resident seeks to file

6  a lawsuit in Delaware in order to get a longer Statute of

7  Limitations."  In other words, the resident is forum shopping.

8  And the answer to that is, no, that can't be.

9         So, effectively, whether or not you are a resident,

10  the question is going to come -- these are people who, even if

11  they were a resident, they were a resident, they're the ones

12  who decided to be here under PAC, they would not be able to

13  invoke the first sentence of the Statute.  So, whether they're

14  really a resident or not does not make an ultimate difference

15  to the outcome here.  All we believe -- although we believe

16  that the proposition that Prudential's a resident because they

17  simply appointed an agent for service of process purposes is

18  ludicrous.

19         But at the end of the day, we're going to come out to

20  the same place, which is the shorter Statute of Limitations is

21  -- is the Statute of Limitations that applies under the first

22  sentence of the Delaware Borrowing Statute because the cause of

23  action arises outside of Delaware.  And, in fact, arises in

24  Georgia.

25         And how do we know that?  We know that because the

1  case law is absolutely and completely clear.  We've got it in

2  our briefs.  The Court can simply take a look at the cases in

3  our brief, but also specifically at the Paoletto (phonetic)

4  decision.  The Paoletto decision was rendered by the 3rd

5  Circuit in 1972, and dealt with what law applies where you had

6  a plane crash that took place in one jurisdiction and conduct

7  -- that is tortious conduct take place in another jurisdiction.

8          And what the Court clearly said there was that

9  consequently, Appellee (phonetic/sic) suggestion that in

10 Delaware lex loci delicti -- lex loci delicti permits reference

11 to the law of the place of negligence rather than to the law

12 of the place of injury must be rejected.  So, wherever the

13 conduct took place, the question is where did the injury take

14 place?

15         Now, Prudential advances the argument that

16 ultimately, ultimately the injury is visited upon them in the

17 friendly confines of New Jersey because -- and time -- memory

18 runneth not to the contrary, Prudential, that esteemed

19 organization has been in New Jersey since the 19th century.

20 And as a consequence, you know, their heart and soul and their

21 pocketbook is in New Jersey, so ultimately they must have

22 sustained a loss in New Jersey.

23         Well, if that were true, then the lex loci delicti,

24 that is the place where the injury is sustained for any

25 defendant is always going to be where they say their corporate

1  headquarters or their bank account is.  And choice of law

2  wouldn't make any sense in the tort context.

3        That's not the law.  It's certainly not the law as

4  recognized by the 3rd Circuit because immediately following the

5  sentence that I just read, which rejected that proposition,

6  there's a Footnote 7.  And in Footnote 7 says, "Indeed such a

7  construction of the lex loci delicti rule has been consistently

8  rejected by other courts."  And then goes on to cite the

9  original restatement of law.  Applies and says -- and defines,

10 quote, "The place of wrong," closed quote, as, quote, "the

11 state or the last event necessary to make an actor liable" --

12 "make an actor liable for an alleged tort that takes place."

13       Which means take a look at the elements of the tort,

14 and where the last element comes into place, that's where the

15 tort arises.  What's the last element that has to come into

16 place for the tort to arise?  It is not simply that Prudential

17 experiences a financial ripple effect in New Jersey.  That's

18 not necessarily required for the tort.

19       It is injury was sustained to their property.  That

20 event took place in Georgia.  And, therefore, the Georgia

21 Statute applies.

22       So, the Borrowing Statute applies, even if the

23 Borrowing Statute did not apply.  If you looked at the

24 traditional choice of law requirements in Delaware, indeed,

25 those that the plaintiff says apply here, which is lex loci

1  delicti, the case law is very, very clear and this Court, I'm

2  sure, is very familiar with it.  That the cause of action

3  arises in tort where the injury occurs, which then means that

4  Georgia law applies.  And under Georgia law, this claim is long

5  since barred.

6           Thank you, Your Honor.

7           THE COURT:  Good afternoon.

8           MR. GILSON:  Good afternoon, Your Honor.  My name is

9  Robert Gilson, I'm with the law firm of Riker Danzig Scherer

10 Hyland and Perretti, and I appear on behalf of the Prudential

11 Insurance Company of America.

12          Your Honor, the issue that this motion is based on

13 turns on a choice of law question of what Statute of

14 Limitations gets applied to two of Prudential's claims that

15 have been filed in this bankruptcy?  It's a choice of law

16 question.

17          When we argued this back in front of you in January,

18 you realized that the record needed to be focused on that

19 question and the related question, and they are very related,

20 of whether collateral estoppel applies.

21          Now, if you look at the choice of law question for a

22 Bankruptcy Court, and Your Honor focused on this back in your

23 2005 decision in In Re: Global Industries because you've

24 recognized there that in -- there's a split in the District --

25 in the Circuits on the question of when a Bankruptcy Court

1  sits, does it look to its forum State's choice of law, or can

2  it look to a Federal common law question?

3            And in that case, Your Honor, you said it really

4  doesn't matter because the analysis will bring you out the same

5  place.

6            THE COURT:  Well, it did in that case.

7            MR. GILSON:  It does.  And in this case --

8            THE COURT:  In that case, it did.

9            MR. GILSON:  I know.  And in this case, I'd like to

10  show you why the analysis will bring you out to the same place

11  both times.

12            I respectfully submit that the proper decision should

13  be that you apply a Federal common law, and that equity comes

14  into place.  And this case is a perfect illustration of why it

15  does.  And an overlap with the second question of why does

16  collateral estoppel get applied here?

17            The question that Grace is asking you to decide is do

18  two of Prudential's claims based on buildings in Georgia get

19  controlled by a Georgia Statute of Limitations or does New

20  Jersey's Statute of Limitations apply to that?

21            THE COURT:  What about Delaware?

22            MR. GILSON:  Or possibly Delaware.  Those are among

23  your three choices.  But --

24            THE COURT:  Well, of -- of the three, the only one I

25  can't see applying is New Jersey.

1            MR. GILSON:  Well, let me address that issue, Your

2   Honor.  Because they want to wipe that slate clean.  And

3   remember, one of the things that troubled me back in January

4   of 2005 when you were before me -- when we were before you is

5   no one can dispute that Judge Ackerman took a lot of time,

6   having had over -- with all due respect, 34 pages of briefing

7   here, is minimal to what he had back there filed by Grace.

8            THE COURT:  Yes, but he also dismissed the Federal

9   causes of action which, by the way, everyone has ignored the

10  fact that these were RICO causes of actions with slightly

11  different premises underlying -- I don't mean building

12  premises, I mean legal constructs.

13           MR. GILSON:  I don't ignore that at all.  I think

14  that is the point that makes counsel's point go down in flames

15  on collateral estoppel because he's an actor in a description

16  of the record.

17           The decision in 1994 had two separate motions in it.

18  The first was -- well, actually it had three.  But the first

19  part of it was a Statute of Limitations motion based on

20  Prudential's common law causes of action, which were State-

21  based.

22           The second was a Statute of Limitations based on RICO

23  Statute of Limitations.  Totally separate issues, controlled by

24  different law.

25           In 1994, Judge Ackerman denied both of those.  The

1  significant thing that he did in 1994 was in order to determine

2  the question of what Statute of Limitations applies to the

3  common law state-based claims, he had to determine whose choice

4  of law controls on that, and who has Statute of Limitations.

5  And indisputably, if you look at his decision, at Page 10, he

6  addresses that issue.

7          THE COURT:  He does.  But the cases have been

8  dismissed.  His rulings along those lines are clearly not issue

9  precluded because they've never been subject to appeal.  The

10 courts denied the debtors' request to have mandamus address

11 those issues, and the cases are dismissed.

12          So, there's never going to be a challenge on that

13 ground.  There never can be a challenge on that ground.  The

14 case doesn't exist anymore.  And if you were comfortable with

15 going back to State Court because his 2001 opinion ends with

16 the proposition that this does nothing to jeopardize

17 Prudential's ability to go to -- go back into the State Court

18 with your causes of action, that's where you would have gone.

19 You haven't transferred the claims here -- transferred the

20 causes of action here.  There's been no removal.  There's been

21 no automatic stay.  There's been no appeal.  I can't see issue

22 preclusion at all in this circumstance.

23          MR. GILSON:  With due respect, Your Honor, I think if

24 you look at Judge Ackerman's decision in 2001, this is found at

25 Federal Supplement and at Page 4 -- I mean 647 specifically.

1   He addresses Grace's status at that point.  And there he says,

2   "Grace, however, filed a voluntary petition for relief pursuant

3   to Chapter 11."  Goes on to cite it.  "Prior to the oral

4   argument of this motion.  As a result of the provisions, their

5   matter is automatically stayed against Grace."

6          THE COURT:  Yeah, but he's dismissed the case as to

7   everybody else.

8          MR. GILSON:  He --

9          THE COURT:  Why is he going to do anything different

10  as to Grace?

11         MR. GILSON:  He may not.  But the fact of the matter

12  is, once that automatic stay, of this moment, Prudential's

13  claims against Grace are pending in the District Court of New

14  Jersey stayed, and that's the status.

15         THE COURT:  That --

16         MR. GILSON:  They have not been dismissed.

17         THE COURT:  And based --

18         MR. GILSON:  They could not be dismissed.

19         THE COURT:  Based on the fact that the proofs of

20  claim are now filed here outside any applicable Statute of

21  Limitations, they're going to probably be dismissed in New

22  Jersey because there isn't going to be a cause of action left

23  in New Jersey when they're dismissed here.

24         MR. GILSON:  Your Honor, with due respect to that,

25  Prudential filed this claim in 1987 and litigated that.  It was

1   fully pre-tried and ready for trial in 1996.

2           The Statute of Limitations issues were addressed by

3   Judge Ackerman and he denied them based on the fact that they

4   would involve fact questions.  That still remains the law of

5   the case --

6           THE COURT:  But it doesn't --

7           MR. GILSON:   -- in that case.

8           THE COURT:  It does not.  The Circuit's opinion goes

9   to great length -- in fact, Judge Ackerman's 2001 opinion goes

10  to great length to substantiate the facts on which Prudential

11  had actual -- not even constructive, but actual knowledge of

12  the presence asbestos containing materials referred to as ACMs

13  in some of the opinions throughout its buildings, throughout

14  the United States, and probably throughout the world.

15          MR. GILSON:  Uh --

16          THE COURT:  There is no basis on which Prudential,

17  after looking at those two records, can stand here and argue

18  that they had no knowledge of the fact that there were asbestos

19  containing materials and that they had to do something to

20  ameliorate the problem.  And the District Court that says

21  before October 20th, I believe, of 1983, is adopted by the

22  Circuit, but then Judge Sloviter (phonetic) goes on to say, and

23  probably back to 1973, or earlier, when the EPA started issuing

24  its ruling.

25          MR. GILSON:  With all due respect, Your Honor, I

1  don't believe that Court said that.

2          THE COURT:  Well, I have the opinion here, if you'll

3  give me a minute.

4          MR. GILSON:  And I don't believe you can read that

5  into it.

6          THE COURT:  If you will give me a minute, I will find

7  it for you --

8          MR. GILSON:  I'd like to show you -- I have read it.

9          THE COURT:  -- because I have the opinion here and I

10  just finished reading it.

11          MR. GILSON:  I read it.  I studied it.  I argued it

12  in the 3rd Circuit myself, Your Honor.  I'm very familiar with

13  the facts of that case.  And that part of the case dealt with a

14  RICO claim --

15          THE COURT:  It did.

16          MR. GILSON:  -- which has a different notice

17  provision and inquiry.  And it is controlled by a different set

18  of law.

19          THE COURT:  Yes, it is.

20          MR. GILSON:  And --

21          THE COURT:  And, in fact, the Circuit addresses that

22  and says that it would have been an earlier statute in all

23  probability had it been a different cause of action than the

24  RICO claim.  You're correct, it was a RICO case.

25          MR. GILSON:  To the extent that the 3rd Circuit said

1 that, and I don't recall that, Your Honor, that would clearly

2 be dicta.  They -- in front of them was a RICO claim.  And my

3 point is that counsel for Grace wants you to ignore the

4 decision that was made in 1994.

5        The decision in 1994 concerning Prudential's common

6 law causes of action were that --

7        CLERK:  Sir, you're going to have to use a

8 microphone.

9        MR. GILSON:  Sure.  They're controlled by New Jersey

10 Statute of Limitations and as to that issue, there are fact

11 issues precluding summary judgment and that matter goes to

12 trial.

13        What was appeal -- what was later challenged, and the

14 only thing that was at issue in 2001, was the RICO Statute of

15 Limitations.  And if you read the District Court's case, what

16 he says is -- there was there was a change of law.

17        THE COURT:  Yes.

18        MR. GILSON:  On RICO.

19        THE COURT:  Well, he says that the Supreme Court

20 clarified when the inception of the Statute of Limitations

21 would apply.

22        MR. GILSON:  What -- what triggers the accrual rule

23 for a --

24        THE COURT:  Exactly.

25        MR. GILSON:  -- RICO cause of action.

 1              THE COURT:  Yes.

 2              MR. GILSON:  And it's an inquiry notice, which is a

 3  different issue than the State law question.  Because in that

 4  question, back in 1994, what defendants want to ignore is that

 5  Judge Ackerman also, in a related case, the year before --

 6              THE COURT:  You need to use the microphone.

 7              MR. GILSON:  I apologize, Your Honor.  In 1993, what

 8  Judge Ackerman held is that there were questions of fact as to

 9  defendants' fraudulent concealment of that cause of action when

10  you get to the question of what Prudential should have known.

11  It's not --

12              THE COURT:  In 2001, he says you've produced no

13  evidence of fraudulent concealment.  I mean --

14              MR. GILSON:  As to a RICO claim.

15              THE COURT:  Yes, as to the RICO claim.

16              MR. GILSON:  And -- and the RICO claim has a

17  different inquiry than --

18              THE COURT:  But it's irrelevant.  He dismissed the

19  Federal claims.  He said you could go back to State Court, and

20  you didn't.

21              MR. GILSON:  Well --

22              THE COURT:  Now, clearly --

23              MR. GILSON:  No, no, as to that --

24              THE COURT:  -- having not gone back to State Court

25  and having had Judge Ackerman say that at least as of October

1  20th of 1983, your clients were aware of asbestos containing

2  materials, and the Circuit picking up on that and indicating

3  that the accrual rule would be perhaps a different Statute of

4  Limitations period and shorter if it were something other than

5  RICO and as a former prosecutor, I realize that it could be

6  because the RICO Statute of Limitations was ten years, not the

7  six, four or three, depending on which of the State laws you're

8  trying to ask me to apply here.

9       So, it would be a shorter cause -- Statute of

10  Limitations, regardless of when the accrual period would begin.

11       MR. GILSON:  Well --

12       THE COURT:  Even if I take -- set aside the accrual

13  methodology, at this point, there is no State Court action that

14  I know of that's been pending, rather you chose to file the

15  proof of claim here, Bankruptcy Courts sit to enact the

16  substantive law of a particular state as informed by the choice

17  of law provisions of the jurisdiction of which they sit.

18       I am, therefore, I believe, honor-bounded to take a

19  look first at Delaware's Borrowing Statute and determine how

20  that would be applied.

21       In Delaware's Borrowing Statute, if you're a

22  nonresident, then I look to the shorter of the statutes.  I

23  agree with you, it doesn't look to me like the Delaware's six

24  year statute would apply.  It looks to me like the Delaware

25  three year statute would apply, and that's shorter than the New

1    Orleans' four-year statute.  But even if -- not New Orleans.

2    Georgia.

3              MR. GILSON:  Georgia.

4              THE COURT:  Pardon me.  Four-year statute.  So, even

5    if I apply the Georgia four-year statute, you're out of luck.

6    Under Delaware of Georgia law, I don't see how this claim can

7    survive.

8              MR. GILSON:  Well, under --

9              THE COURT:  There is no pending New Jersey State

10   Court action.

11             MR. GILSON:  Your Honor, let's take it piece by piece

12   on the questions you've raised.  As to the pending State claim,

13   what there is is there's a pending claim in Federal Court that

14   has been stayed under the automatic provision.  And that

15   remains the fact.

16             If Your Honor lifts that, what Prudential would do is

17   then refile it.  But they cannot file that until it's lifted.

18             And --

19             THE COURT:  You can sue Grace in State Court until

20   you have relief from stay, is that what you mean?

21             MR. GILSON:  Exactly.

22             THE COURT:  Okay, that's fine.

23             MR. GILSON:  So -- so, there is a pending --

24             THE COURT:  And I'm not going to lift it because

25   you've got to proof of claim here and this Court can clearly

1  adjudicate those claims.

2          MR. GILSON:  And that's the point is that we

3  recognize that you would probably make that decision that Grace

4  would vigorously oppose a lifting of the stay.

5          THE COURT:  Probably.

6          MR. GILSON:  So, we're here.  So, then the question

7  says as to the question that they now want to put in front of

8  you, which relates to two of our claims, and they say simply

9  apply the Delaware borrowing, therefore, it goes to Georgia

10  law, and Georgia has a four-year Statute of Limitations with no

11  discovery rule.

12          Well, there's a couple of flaws with that.  I

13  understand -- and I won't spend more time on the collateral

14  estoppel issue -- but I raise it for this proposition, Your

15  Honor.  It's --

16          THE COURT:  I'm not sure Georgia does apply.

17          MR. GILSON:  And I --

18          THE COURT:  I'm not sure that Delaware law doesn't

19  apply because --

20          MR. GILSON:  And I'm going to --

21          THE COURT:  -- it's the shorter of the --

22          MR. GILSON:  Well --

23          THE COURT:  -- the statutes.

24          MR. GILSON:  I believe, Your Honor, and I looked at

25  this issue, the way that I read the Delaware Borrowing Statute,

1  I may be incorrect in this because I'm not an expert in

2  Delaware law, but it says the period.  And I believe that you

3  would then look at Georgia law.  And because they don't have a

4  discovery rule, that the four years would have expired.  And,

5  therefore, the four years is actually technically shorter than

6  the three-year Delaware because Delaware has a --

7          THE COURT:  Discovery rule.

8          MR. GILSON:  -- discovery rule.

9          THE COURT:  Okay.

10          MR. GILSON:  But I think you -- before you get there,

11 you raise -- you come back to an issue that I think should be

12 what resolves this issue.  We can't ignore that Judge Ackerman

13 did what he did in 1994.  And whether it has -- you look at it

14 as collateral estoppel.  It was clearly the issue, and he

15 clearly applied New Jersey law to it.

16          So, the question becomes then what is a Bankruptcy

17 Court sitting in Delaware where the -- Grace elected to come

18 here.  Now, no one would dispute that had they not filed this

19 matter in Delaware, that they would deal with this in New

20 Jersey where there was a pending action that had been litigated

21 since 1987.

22          And despite everything they've said here, they had

23 not ever prevailed on the Statute of Limitations on the common

24 law claim.

25          We're ready and we'll fight that in New Jersey.  So,

1  the question then becomes, what should you apply?  They want

2  you to leap immediately to applying Georgia law.  I submit to

3  you that there's a first stop in that, Your Honor.  That if you

4  look at Delaware Supreme Court, and in particular the <u>Savvy</u>

5  <u>Basic Industries Corporation</u> case, which is a Delaware Supreme

6  Court, the Court there said, before you applying our Borrowing

7  Statute, look at the purpose of the Borrowing Statute.  The

8  purpose of the Borrowing Statute is to prevent forum shopping.

9  Okay?  You know you're out of time, you come to a court in

10  order to get a better time frame.

11           Well, here, Prudential was in time.  It was litigated

12  in New Jersey.  The Court there had not dismissed its claims

13  and they were going forward.  And now Grace comes to Delaware

14  and says, give us the benefit of the Borrowing Statute and give

15  us a different result than what we got in New Jersey.  That's

16  contrary to Delaware law.

17           And Delaware law says at that point, you don't apply

18  the Borrowing Statute.

19           THE COURT:  No, I don't agree.  Delaware law would

20  only say I don't apply the Borrowing Statute if this were a

21  matter for issue preclusion, but it is not a matter for issue

22  preclusion because Judge Ackerman has dismissed the Federal

23  claims.  Apparently hasn't dismissed them as to Grace because

24  of the stay.  I'm not sure how that would be considered to be

25  an action against Grace.  But nonetheless, that's his choice,

1 he's elected not to do it.

2      I have very little doubt, but that based on his very

3 comprehensive 2001 opinion that was affirmed by the 3rd Circuit

4 that when he's presented with the opportunity, he will be

5 dismissing the Federal claims against Grace.  And that means

6 that you're then left to your State law claim.  And all --

7      MR. GILSON:  Right.

8      THE COURT:  At best, all he has done is issued an

9 advisory opinion attempting to predict what a New Jersey State

10 Court would do.  It has nothing to do with the --

11      MR. GILSON:  No, --

12      THE COURT:  -- Delaware choice of law provision.

13      MR. GILSON:  -- if I could, Your Honor.

14      THE COURT:  I am not bound by it, and I am not going

15 to follow it.

16      MR. GILSON:  That -- Your Honor, that I respectfully

17 submit you should rethink that.  Because I -- I believe you're

18 not correct in --

19      THE COURT:  Okay.

20      MR. GILSON:  -- your law.  If a District Court faced

21 with a diversity action, as he did, makes a decision like that,

22 that is the law of the case that governs that case.  If he

23 dismissed that action, had there been no stay, and he -- and

24 Grace had been in part of the lawsuit, and the RICO claims had

25 gone out, Prudential would have filed in New Jersey State

1 Court, and those rulings as to the Statute of Limitations would

2 have governed the Court on the go forward basis.

3          THE COURT:  Well, frankly, it's also hypothetical.

4 That at this point in time, I don't think I need to get there.

5          My question is I'm sitting as a bankruptcy judge

6 applying Delaware law.  Where do I look?

7          MR. GILSON:  And --

8          THE COURT:  And my answer is I look to Delaware's

9 Borrowing Statute.  And no matter how I use Delaware's

10 Borrowing Statute, it doesn't get me to New Jersey.

11          The fact that you have an economic consequence felt

12 in New Jersey, which, I mean, is the basis for Judge Ackerman's

13 decision --

14          MR. GILSON:  No, it wasn't, with all due respect.

15          THE COURT:  -- that New Jersey Statute of Limitations

16 is there to protect New Jersey residents.  He's very clear in

17 his 1994 opinion.

18          MR. GILSON:  He is.

19          THE COURT:  That that's the reason he's applying New

20 Jersey law.

21          MR. GILSON:  But not because --

22          THE COURT:  That he does not --

23          MR. GILSON:  -- it's a vestment decision.  He does it

24 because it's -- the question under New Jersey law is what state

25 has a greater substantial interest.

1          THE COURT:  Exactly.  That's what he's -- he states

2     the question to be.  But the reality is that the tort analysis

3     that Mr. Bernick just supplied is accurate.  You have to look

4     under the Delaware provisions to where the last act that gave

5     rise to the injury was, and under 3rd Circuit tort law, too.

6     And that, in this instance, was in Georgia.  If Prudential

7     didn't own this building and some entity from California owned

8     this building, the last act that would have happened to cause

9     the injury was still in Georgia.

10          And, therefore, Prudential's fortuitous decisions to

11    be in New Jersey for 100 years or California for two years

12    cannot be the decision by which, or the factor by which, a

13    Court would determine where the loss and the harm has occurred.

14          You may have an economic injury at some point in

15    time, but that's a secondary problem to where the damage

16    occurred.  We are looking for this analysis as to where the

17    injury occurred, not where the damage is felt.

18          MR. GILSON:  Well --

19          THE COURT:  And the injury occurred in Georgia.

20    Georgia's law.  And Georgia -- Georgia's substantive law is

21    clearly the law that is most impacted by a parcel of real

22    estate within its jurisdictional boundaries.  Real property

23    law, aside from tort law, would clearly point you to Georgia.

24          Tort law points you to Georgia.  Delaware's choice of

25    laws point you to Georgia.

1          There is no way that Prudential, under these

2 circumstances, can rely on New Jersey law.

3          MR. GILSON:  I would respectfully submit, Your Honor,

4 that that's not the law under Delaware under the <u>Savvy Basic</u>

5 case.  I believe that the Court is only -- can only reach your

6 analysis if you want to pretend that there was never a New

7 Jersey action.  You basically expunge that away.  And if you

8 accept that proposition, you will invite defendants to do what

9 Grace has done here.  When they're losing in State Court, they

10 come to Bankruptcy Court and they start to start all over again

11 because that's the result that would come out of this.

12          THE COURT:  That is not the result, and I'm not

13 opening floodgates.  I am looking at a peculiar circumstance,

14 which is this:  That action in the District Court, but for the

15 stay, has been dismissed as to all other defendants on exactly

16 the same causes of action that you sued Grace on in that --

17          MR. GILSON:  It's -- but for --

18          THE COURT:  It's not a but for.

19          MR. GILSON:  It -- well, that's the point.  Is if it

20 wasn't for the but for, then I'd be up in New Jersey, I would

21 have tried this case against Grace --

22          THE COURT:  You wouldn't.  You would have been

23 dismissed out.

24          MR. GILSON:  What --

25          THE COURT:  Just like you were against the other

1  defendants.

2          MR. GILSON:  No, Your Honor.  In order for you to do

3  that, you'd have to have a record that, with all due respect,

4  stacked up about five feet high with disputed issues of fact.

5          THE COURT:  I don't think so.  I need Judge

6  Ackerman's opinion and the --

7          MR. GILSON:  And -- and --

8          THE COURT:  -- 3rd Circuit's affirmance.

9          MR. GILSON:  And look at his opinion from 1994, which

10  is the opinion that's at issue and has never been reversed on

11  the question before you.

12          THE COURT:  It hasn't been reversed because it hasn't

13  been subject to appeal.  I don't know whether it would be

14  reversed if it were subject to appeal.  That's never going to

15  happen because the action's been dismissed.

16          MR. GILSON:  Under Brown and the cases cited there,

17  the question is:  Was it fairly litigated?  Was it fully

18  litigated?  And is it final enough to be considered --

19          THE COURT:  Obviously it's not.

20          MR. GILSON:  -- collateral estoppel?

21          THE COURT:  Or Judge Ackerman could not have reversed

22  himself and decided to dismiss the case.  Obviously he

23  determined that based on the Supreme Court's analysis, that he

24  had applied the wrong determination.

25          MR. GILSON:  As to RICO.

1    THE COURT:  But that was the whole basis for his

2  case.

3    MR. GILSON:  No.  The RICO question is a separate

4  question from the State causes of action.  If he had believed

5  that, he would have dismissed all claims.

6    THE COURT:  He wasn't -- he -- he did dismiss all

7  claims.

8    MR. GILSON:  Without --

9    THE COURT:  He said go back to State --

10    MR. GILSON:  Without prejudice.

11    THE COURT:  Well, yes, but they're dismissed.

12    MR. GILSON:  As to RICO, he dismissed them based on

13  the Statute of Limitations.  He granted summary judgment on

14  that issue.

15    THE COURT:  That's right.

16    MR. GILSON:  He left in place all of the State law

17  claims.

18    THE COURT:  No, he dismissed them.

19    MR. GILSON:  Well, no, only as to the parties that --

20    THE COURT:  He dismissed them and sent you back to

21  State Court.

22    MR. GILSON:  -- were active.

23    THE COURT:  Well, yes, I agree.

24    MR. GILSON:  But that's a Federal --

25    THE COURT:  So, the conundrum --

1          MR. GILSON:  That's a Federal jurisdiction question,

2    Your Honor.

3          THE COURT:  The conundrum simply is that the District

4    Court action against Grace has not been dismissed because of

5    the stay.  And I, predicting in a position of trying to predict

6    what Judge Ackerman would do, faced with the stay being lifted

7    for that purpose, have to conclude that when he's dismissed

8    every other defendant out on the same identical causes of

9    action, he's going to dismiss Grace out, too.  It doesn't make

10   any sense that he'd do anything else.

11         MR. GILSON:  Well --

12         THE COURT:  So, I have to assume that given the

13   opportunity, he's going to dismiss the RICO claims against

14   Grace and tell you the same thing.  Go pursue your State law

15   causes of action.

16         On that basis, his ruling with respect to what New

17   Jersey law would do, which, after all, he's only predicting,

18   he's not holding in that sense because the action hasn't been

19   tried to conclusion.  It's not been subject to appellate

20   review.  The Circuit denied mandamus.  It's essentially at this

21   point writing on a clean slate.

22         I would agree with your position, if there were a

23   different set of facts, that -- i.e., that if -- that under

24   certain circumstances, collateral estoppel, at least until the

25   case is reviewed on appeal, would apply.

1          But I don't have that circumstance.  This case has

2    been reviewed on appeal.  And it's been dismissed.

3          So, I have no choice but to look to Delaware law.  I

4    cannot look to New Jersey law.  Delaware law simply doesn't

5    point me there.  No matter where else I may go under this set

6    of facts, it's not going to point me to New Jersey.

7          MR. GILSON:  Well, I -- I still respectfully

8    disagree, Your Honor, because I think if you look at Delaware

9    law, Delaware law does recognize that a Borrowing Statute only

10   gets applied when you've got forum shopping involved.  And

11   there's no forum shopping.

12         In fact, the opposite is being visited on Prudential.

13   It had claims that were timely.  And that motion had been

14   denied.

15         If Your Honor applies the -- grants the objection

16   that Grace puts forward, you would dismiss them as if nothing

17   ever happened in New Jersey, and that should not be the law of

18   Delaware or any other state.

19         THE COURT:  Well, I think that's -- in essence, I'm

20   not as sure I agree with your recitation.  I prefer my own.

21         MR. GILSON:  Obviously, Your Honor.

22         THE COURT:  But with respect to looking to Delaware

23   law, I believe that Delaware law, at worst, would put me into

24   New Jersey's three-year Statute of Limitations.  At best, would

25   put me -- I keep saying -- I apologize.  I mean Georgia.  I

1  don't know why I can't say Georgia today.  Georgia's four-year

2  Statute of Limitations.  At worst, would put you into

3  Delaware's three-year.

4           Although I confess, I have not paid much attention to

5  the discovery rule that may lengthen Delaware's statute.  But

6  if it did, you'd still be back to Georgia's statute, no matter

7  what.  You would not be under New Jersey's law under these

8  circumstances.

9           So, for those reasons, I believe that the debtors'

10  position is correct and I will take an order from the debtor

11  that will memorialize that ruling.

12           MR. GILSON:  Thank you for your patience, Your Honor.

13           THE COURT:  You need to submit it on a certification

14  of counsel.  So, you'll need to make sure that you agree that

15  it memorializes my ruling.

16           MR. GILSON:  Yes, thank you.

17           THE COURT:  Okay.

18           MR. BERNICK:  One thing, Your Honor, just to complete

19  the record by way of a factual matter to address the last

20  question with Your Honor raises.

21           Even if you were to assume that Delaware has a

22  discovery rule for trigger purposes, Judge -- Judge Ackerman's

23  decision in June of '01 specifically found while addressing a

24  RICO standard found as a matter of fact that there was

25  knowledge that Prudential knew or should have known, and then

1  specifically also addressed the contamination issue and said,

2  on the complaint that was filed by Prudential in New Jersey,

3  contamination wasn't required to bring the cause of action.

4          So, I only raise it just to make sure the record is

5  complete.  Your Honor shouldn't be operating on the assumption

6  that somehow the discovery issue was an issue that's not

7  addressed on the facts of this record.  It's our view that it

8  is.

9          THE COURT:  I think I pointed out Judge Ackerman's

10 very lengthy decision in which he building-by-building goes

11 through what Prudential knew --

12         MR. BERNICK:  Yes.

13         THE COURT:  -- and when, and how its employees made

14 Prudential aware of what was going on and the Circuit's

15 affirmance.  So, to that extent, I think the opinions speak for

16 themselves.

17         MR. BERNICK:  Thank you.

18         THE COURT:  This Court's interpretation is that Judge

19 Ackerman did find that Prudential had not constructive, but

20 actual knowledge of facts and circumstances that given its --

21 I've forgotten what words he used.  But significant expertise

22 in the real estate world with millions of dollars of properties

23 under its bailiwick, in essence, would have led it, as a

24 sophisticated building owner, to be on inquiry notice that far

25 back.

1          MR. GILSON:  Your Honor, with your --

2          THE COURT:  In 1983 or earlier.  I don't think that

3  changes any of my rulings.

4          MR. GILSON:  I do need to, just for the record, and I

5  apologize, but I feel like I'm being set up here because I can

6  see the next motion coming.

7          That wasn't the issue before you.  You haven't had

8  the issue of what Grace is now trying to expand to two narrow

9  buildings where they took their little shot, they're now going

10  to come back on all of Prudential's claims arguing that somehow

11  that decision from Judge Ackerman binds this Court on some

12  kind of finding of fact.  And that is not in the record before

13  you.

14          THE COURT:  I'm not --

15          MR. GILSON:  I did not argue it --

16          MR. BERNICK:  I'm not asking for that.

17          THE COURT:  I'm not making any finding.

18          MR. GILSON:  Well, I'm -- I'm being clear on the

19  record that I -- I don't doubt that I will face that motion

20  coming down the road.  And I don't think that counsel to

21  suggest that he was clarifying the record -- I don't believe

22  that I should be in a position of trying to argue that now when

23  Your Honor doesn't have all the facts of that underlying

24  decision.

25          THE COURT:  I am not making any decisions, but for --

1    or except, I guess I should say, for the two buildings that are

2    involved in this particular motion, and nothing more.  That's

3    all.

4              MR. GILSON:  That's all I wanted to preserve.

5              MR. BERNICK:   That is all that we are asking for

6    today.  And we will make whatever motions in the future are

7    appropriate.

8              THE COURT:  All right.

9              MR. GILSON:  Thank you, Your Honor.

10              MR. BERNICK:  I think that the next item on the

11    agenda, Your Honor, is Item 10.  And Item 10 really relates to,

12    I think, what is -- should be largely an administrative matter.

13    Your Honor will recall -- probably will not recall because

14    there are so many things flying around in this case these days.

15    But Your Honor heard in January argument on the question of

16    whether claimants for certain of the folks that were

17    represented by Mr. Speights, whether his clients should sign

18    the answers to question 18 on the proof of claim form which

19    dealt with when they learned of the presence of the Grace

20    asbestos that gave rise to the claim.

21              Your Honor ordered that the claimants sign on that

22    question, did so in January.

23              In Your Honor's March 27 order, you extended the

24    period for compliance to -- I believe it was May.  That is you

25    extended it for a period of time.

1           And then in July, you, again, extended it to August

2    26th.   So, it's been extended on numerous occasions.

3           On August the 26th, we did get some, but not all of

4    those claimant signatures.  And what we have now done is to ask

5    for expungement of the 17 claims with respect to which no

6    signature was provided.  And the particular claims with

7    duplication removed are listed in the -- the status report that

8    we filed before the Court.

9           So, we would ask for an order striking and expunging

10   the 17 claims that are listed in our status report.

11          The second thing that we're asking for --

12          THE COURT:  Wait.  Before we go on --

13          MR. BERNICK:  Sure.

14          THE COURT:  -- is that objected to?

15          MR. BERNICK:  I don't know.  We've not gotten any

16   kind of response.

17          MR. SPEIGHTS:  Yes, Your Honor.

18          THE COURT:  Okay.  I'll hear you, Mr. Speights,

19   after.  I just am not aware that there's been anything filed

20   that objected to that expungement.

21          MR. SPEIGHTS:  Your Honor, what he filed was a status

22   report, and I'm prepared --

23          THE COURT:  I see.

24          MR. SPEIGHTS:  -- to respond to the status report.

25          THE COURT:  All right.  Okay.

1          MR. BERNICK:    Well, fine.    I think Your Honor, that

2  -- Your Honor has issued an order.    And this is simply a

3  question of compliance with Your Honor's order, it's not an

4  occasion to reargue the merits of the claim.

5          The second matter relates to Canada.    We put the

6  Canadian claims to one side because, as we all remember,

7  there's been rather extensive discussion on where those claims

8  would come to rest.    Now that those claims have come to rest

9  where they began, which is back here before, Your Honor, we

10  would ask that Your Honor set a 30-day deadline by which time

11  Canadian claimants must comply with the same requirement and

12  signature with regard to Question 18.

13          THE COURT:    All right.    Mr. Speights, you walked the

14  whole way back there, and now I'm ready for you.    I'm sorry.

15          MR. SPEIGHTS:    Good afternoon, Your Honor.

16          THE COURT:    Good afternoon.

17          MR. SPEIGHTS:    I think I have five buckets to talk

18  about among these 17 claims.    Bucket number one should be very

19  easy.    In their status report, they listed several Andersons,

20  specifically which were not subject to the hearing back in

21  January.    I can document that.    I'm sure because Ms. Brody is

22  now gone, and she was the only Kirkland and Ellis lawyer who

23  was both there and she -- she wasn't the only one there, but I

24  don't believe anybody else here was there.    If Grace will check

25  its records, it will realize that the Anderson claims were not

1  at issue with respect to the 2003 issue at the January hearing.

2           THE COURT:  And how many of those are there?

3           MR. SPEIGHTS:  Three.

4           THE COURT:  All right.

5           MR. SPEIGHTS:  And, in fact, Your Honor, they had

6  known since we sued them in 1992 that we claim it's the Grace

7  product in those buildings, and the other things that say about

8  it, but that's the easy -- that's the first bucket.

9           The second bucket is they have one mistake with

10  respect to a claim -- excuse me, Your Honor, I've got a lot of

11  issues here today, so -- with respect to one building, Your

12  Honor, we did supplement with an accurate date and apparently

13  either Grace or somewhere with their people who administered

14  these, they didn't pick it up.  But that is the Orange County,

15  Inc. d/b/a Kendred Hospital, San Francisco Bay.  We

16  supplemented, along with everything else, when we did these.

17  So, I think that's a mistake.  I'd be happy to talk to Ms. Baer

18  about that and see --

19           THE COURT:  All right.

20           MR. SPEIGHTS:  Then we get --

21           MR. BERNICK:  I'm sorry.  Which claim number is that?

22  We don't have any Orange County thing here.

23           MR. SPEIGHTS:  I believe that's Claim Number 6 --

24  excuse me.  That is Claim Number 10805.

25           MR. BERNICK:  Sam Liandro (phonetic), Memorial

1  Hospital?

2          MR. SPEIGHTS:  Yes, that's another name for it.  And

3  that's just a question of -- I think they're clearly -- we

4  filed that at the same time.

5          That leaves me to the third bucket, Your Honor, and

6  this bucket only has one claim in it.  But it's sort of

7  illustrative of the situation, and that is the Hyatt and

8  Barcadero (phonetic) in San Francisco.  The Hyatt and

9  Barcadero, San Francisco was filed upon the Hyatt Group out of

10 Chicago on behalf of that building, and as an agent for that

11 building.  And the Hyatt Hotel would say to Your Honor that it

12 doesn't know the answer to the question, but I have a solution

13 to that I hope Your Honor will find satisfactory.  It doesn't

14 know because that building has -- first of all, it's undergone

15 many corporate changes over the years with many people long

16 gone.  It simply does not know when somebody with us knew that

17 there was Grace asbestos in this hotel.

18          And I would say to Your Honor that in light of the

19 San Francisco decision, which is an appellate case against

20 Grace in California, which deals with the Statute of

21 Limitations specifically for there, it was handled by Grace.

22 Mr. Spark, who, right on the front row there, was a Grace in-

23 house lawyer who had responsibility for that case.  We know

24 what the Statute of Limitations is.  I would say, and this is

25 an argument for another day, it doesn't matter.  But for

1    purposes of this hearing, for purposes of their objection, I

2    have my client's authority to say to Your Honor that you can

3    assume -- I don't think it's accurate, but we will assume that

4    they knew that they had Grace asbestos in the building when it

5    was constructed back in the early 1970's.

6          It seems to me that gives Mr. Bernick not only what

7    he wants, it gives him far more than what he wants.  We don't

8    think that triggers the Statute of Limitations.

9          But otherwise, Hyatt simply cannot answer the

10   question under oath honestly because it doesn't know.

11         There's another bucket, Your Honor.  Several of them

12   -- I don't know if it will be done by your striking the claims,

13   but several of them would withdraw their claims in light of

14   this -- one or more in light of this question.

15         And then finally, Your Honor, I get to the last

16   bucket.  I have some building owners -- and I think we've gone

17   from 17 less three, to 14 less one, to 13 less the Hyatt, to

18   12, a couple may withdraw.  But I have eight or ten clients who

19   are in this position, and this is a practical position they are

20   in, Your Honor.

21         The practical position is they are very reluctant to

22   respond to a question -- and please, this is with greatest

23   respect to the Court by my clients and, as well as me -- to

24   respond to a question of when they knew they had Grace asbestos

25   containing products in their buildings.  And they do so, not

1  out of any disrespect to the Court, and not even being critical

2  of what the Court is trying to do here, not even being critical

3  of Grace.  But some of my clients are scared to death of the

4  asbestos personal injury bar, which I have great fondness for,

5  Now that we've made a deal, I have a special fondness for,

6  coming along and suing them in an asbestos personal injury

7  case.  Because the reality is, as more and more manufacturers

8  go along the wayside, building owners are getting sued more and

9  more.  And while you can try to distinguish the situation

10 between what is contamination and when you knew that we had

11 Grace asbestos containing products, the reality is many of them

12 represented by private counsel said, you don't want to file

13 something saying that because two years, five years, ten years

14 on a maintenance worker or somebody else explains he's got

15 mesothelioma from that, this will be Exhibit 1 to the jury,

16 whether it was in 2003 or 1975 or 1985 or whatever.  And --

17         THE COURT:  But if they go to litigation, isn't that

18 going to be the first question out of counsel's mouth?

19         MR. SPEIGHTS:  Well, Your Honor, it will be -- it

20 will probably be a matter of discovery and what they knew and

21 when they knew it going through the whole business, okay?  I

22 didn't recommend this, Your Honor.  I mean I'm not getting an

23 attorney/client privilege, but I've had clients for many years

24 -- and this is a big concern.

25         But my solution is, Your Honor, the same as I said to

1  the Hyatt building.  I would ask Your Honor respectfully they

2  get more than what they bought, if this last bucket wants to

3  just -- for purposes of whatever objection they're going to

4  make, consider the statute started when the building was built,

5  we'll go from there.  And Mr. Bernick will make a motion for

6  summary judgment saying they knew when the building was built

7  in 1969, 1972, and I'll be back in here saying it doesn't

8  matter when they knew.  And under this jurisdiction, it's when

9  their property was contaminated with asbestos, or some other

10  defense to the Statute of Limitations.

11         We don't need the answer, I guess, is my question,

12  Your Honor, and I realize technically you told my clients to

13  answer, and most of them have answered.  But for these

14  approximately ten, I would urge Your Honor, as matter of

15  fairness, to allow them to proceed without having to sign this

16  statement under oath before you when it may not matter.

17         Do you want me to address Canada now, as well Your

18  Honor?

19         THE COURT:  Yes, sir.

20         MR. SPEIGHTS:  The first thing I would say, Your

21  Honor, you get, I believe, 97 claims, and there are

22  improvidences all over Canada.  And Canada was not part of the

23  Anderson group that we have learned to love so much and argued

24  about so much.  All of the Canadian claimants are signed

25  contracts, I believe without exception, retainer agreements

before the cases were ever filed.  We have -- they essentially are clients of a leading industrial hygienist and expert on asbestos billing cases in Canada.  And -- and we certainly can work with them if you think that data's necessary.  If you want a personal signatory from the building owners.

Before respond to that question, we did a good faith inquiry working through the expert who has dealt with these building owners over the years, and believe that's the correct date as to when the building owner knew it was Grace asbestos, as you have interpreted.  It will be some chore to go to all these clients and make them sign that individual thing, I'm not sure that what they have done in this situation in Canada deserve to have to go through that.  But if Your Honor requires it, we will.

I will say, Your Honor, you -- you thought 60 days was reasonable before, and I don't know what's changed because they haven't started on this project.  Sixty days is sort of the magic date -- number of days that it takes.  And as you know, Your Honor, I think we took about 57 or 58 of those days.

Thank you, Your Honor.

THE COURT:  Do you want a stipulation for purposes of this -- whatever you're going to be filing that the building owners knew as of the date of construction?

MR. BERNICK:  Well, I -- a stipulation that is a stipulation that his clients aren't going to sign onto.  It's a

stipulation where basically counsel are being asked to make the
representation.

As I take it his concern is his clients don't want to
come forward and make the personal attestation.  So, the
stipulation presumably is one that his clients aren't going to
attest to, and I don't think that that's right.  I don't think
that lawyers can come in and say, well, gee, don't make my
client say something.  I'll just accept it as true,
representing them in court, much as I would be inclined to
figure out some way to short circuit.  But I particularly don't
think it's appropriate here, and here's why:  It's not a
technicality.  The reason that we're here is that he
affirmatively represented on behalf of his clients -- he
affirmatively represented that it wasn't until 2003 that they
thought that there was Grace asbestos on their property.  That
was wrong.  We know it was wrong.  Indeed, the best evidence is
wrong as Anderson Memorial itself -- Anderson Memorial was
prosecuting claims against Grace years and years before that.

So, we have a misrepresentation in the proof of claim
that brought us here.

Your Honor then took the matter up on the merits and
ruled in January, saying, no, I want this signatures.  So, we
now have what we believe was an improper representations,
followed by proper relief issued by the Court in the form of an
order.  No effort to get reconsideration.  No effort to say

1    that it was wrong.  No effort to make any of these arguments.

2    The only effort was not to have to answer the questions

3    notwithstanding Your Honor's order.

4         And today, all of this is a technicality.  And we

5    then get arguments now to say, well, gee, let my clients off

6    the hook.  They don't want to be exposed to personal injury

7    litigation, whatever.  You know, I -- I don't know what to do

8    with any of those things.  They're all a bunch of statements

9    that counsel is making on behalf of his clients, and I'm sure

10   we won't get to probe whether they're accurate or not or what

11   the client's view of that is.  But whatever they are, they have

12   to do with the obligation that they had, that these claimants

13   had originally in order to participate in proceedings with this

14   Court.

15        They had to comply with the claim form.  Your Honor

16   issued that order, they appealed it, the appeal was rejected.

17   His clients, if they wanted to play in this process, had to

18   play by those rules.  They didn't do it, and Your Honor then

19   ordered them again to do it.  So, why we're here talking about

20   accommodating people with stipulations and, you know, -- he

21   says, I'll withdraw some claims.  Well, why were the claims

22   filed to begin with?  It's kind of late to withdraw them when

23   we have a motion, is effectively a sanction saying you failed

24   to comply with the order, dismiss the claim.

25        So, the order Your Honor issued is the order.  There

1   should be compliance.  I heard only one claim, only one claim

2   where they said, in fact, they did comply, which is Claim

3   10805, and we will exclude that from our request to the Court

4   because maybe we made a mistake.

5         With respect to Anderson Memorial, and there are two

6   Anderson Memorial claims, they are the most tangible evidence

7   that the representation -- that they only had awareness of 2003

8   was false.  They're the best illustration of that because we

9   know they prosecuted the litigation.  They should have to sign

10  on when it is that they came to learn, just like everybody

11  else.

12        The Hyatt people, if they don't know, I suppose if

13  they can make that representation and counsel believes that

14  it's unknowable, then they can say, nobody knows.  But I don't

15  think that that's accurate.  I don't think that's what's going

16  on.  I think that they do know and they don't want to have to

17  be in the position again where they're making another

18  misrepresentation.

19        If they're claims that are being withdrawn, then Your

20  Honor's order expunging them will have no detrimental

21  consequence.  They're gone, they're gone.  We shouldn't have to

22  wait for them now to tell us after all this time, and after

23  doing nothing, to respond to the status report, who it is

24  that's now, quote, "withdrawing their claims."

25        So, we would, again, reiterate.  Your Honor, we

1 believe that an order expunging the claim set forth in our

2 motion is appropriate, excluding only 10805.

3          THE COURT:  Well --

4          MR. BERNICK:  With regard to the Canadian --  I'm

5 sorry.

6          THE COURT:  Before you move that -- off of that

7 subject, I think someone has to check the record, unless you've

8 already done it, for the January of 2005 or '06, I've forgotten

9 which year it was, when we discussed this issue about Anderson.

10 Because I don't have perfect recall of what happened, but I do

11 seem to remember some discussion about whether or not the

12 Anderson group of claims was included in that order.  So --

13          MR. BERNICK:  But whatever -- that's fine.  But even

14 if they weren't, we know that the representation of their claim

15 of 2003 --

16          THE COURT:  Yeah, it has to be fixed.

17          MR. BERNICK:  -- is wrong.  It has to be fixed.  So,

18 they should then -- they should then have fixed it.  They

19 should not be waiting from January, or whenever it was that

20 their counsel was on notice, they shouldn't be waiting for the

21 better part of a year to go fix the situation.  Why didn't they

22 fix it?  There's no answer that's given.

23          THE COURT:  I don't know.  I -- I don't have an

24 answer.  But nonetheless, it seems to me that if it's

25 inaccurate, it should be fixed --

1          MR. BERNICK:  Okay.  Well, then I --

2          THE COURT:  -- to make it accurate.

3          MR. BERNICK:  I'll accommodate to go along with the

4    flow of what Your Honor is suggesting.  We'll put them 15 days

5    out.  Fifteen days, Anderson Memorial, which is 9914, and

6    Anderson Memorial Hospital, which is 1008, should provide the

7    signature.  And, again, we would exclude San Liandro, and ask

8    for the order with regard to the balance.

9          THE COURT:  Mr. -- I'll --

10          MR. BERNICK:  And I'll talk about the --

11          THE COURT:  All right.

12          MR. SPEIGHTS:  Anderson, Your Honor.  When I saw that

13   piece of paper come in that had Anderson listed, we looked at

14   Anderson.  I didn't sign the Anderson claim, somebody made a

15   mistake.  It wasn't up for hearing in January, so nobody looked

16   at it then.

17          When I saw this paper came in, I sent in an amended

18   complaint to the facility fixing Anderson.  And I apologize,

19   somebody made a mistake.  But it's fixed.

20          MR. BERNICK:  What --

21          MR. SPEIGHTS:  Okay, but --

22          MR. BERNICK:  I'm sorry.  You sent an amended

23   complaint into what -- what amended complaint?

24          MR. SPEIGHTS:  I mean an amended -- an amended claim.

25   Okay?

1          MR. BERNICK:  Can we have the date of that, please?

2          MR. SPEIGHTS:  It was sent the end of last week.  I

3 read it last week, I sent it in, it probably arrived there this

4 morning.

5          MR. BERNICK:  Okay.

6          MR. SPEIGHTS:  I'm just saying I don't need 15 days,

7 it's done.  I was just addressing the 15-day issue.

8          THE COURT:  I'm sorry.  You sent -- you sent it into

9 the -- to the claims agent?

10          MR. SPEIGHTS:  Yes.

11          THE COURT:  Or to your client?  To the claims agent.

12          MR. SPEIGHTS:  To the claims agent.

13          THE COURT:  So, it may not be recorded on the claim

14 agent system yet, but should be soon.

15          MR. SPEIGHTS:  Probably today.

16          THE COURT:  All right.  So, Anderson -- I will

17 exclude Anderson, I will exclude the hospital claim from any

18 order that's issued today so that you can take a look, Mr.

19 Bernick, to make sure that, in fact, those two issues are done

20 away with.  Okay.

21          MR. BERNICK:  Thank you.

22          MR. SPEIGHTS:  And that brings us back -- let me just

23 make one correction of counsel.  The P.D. Committee did appeal

24 the bar date order.  Judge Wolin decided that was an

25 interlocutory appeal.  I don't know why that's an issue on this

1  issue.   But I did want to correct that for the record.

2          That leaves us with Hyatt and those who want, in

3  effect, to stipulate.  And I think they're a little different

4  because Hyatt is in the business of not really knowing.  And I

5  think it's a very generous proposal on their part that I've

6  specifically told them to, and I would hope that Your Honor

7  would allow them to do that.

8          And that brings us to the so-called eight or nine or

9  ten, and we can get an accounting very quickly with Ms. Baer.

10  And I reiterate Your Honor, I don't see the harm in that.   I

11  understand what Your Honor said, but I represent these people,

12  and I ask you, again, just to let them be bound by when the

13  building was there, and I will never take a position in the

14  brief  that says otherwise as we proceed to -- as to -- we

15  proceed to deal with the objections on those.

16          MR. BERNICK:  Your Honor, I'd like to address that,

17  and then I'd -- maybe I'll just finish up on Canada, and then

18  I'll be done.

19          THE COURT:  All right.

20          MR. BERNICK:  This is a negotiation.  Your Honor,

21  gee, Hyatt really is, you know, big Hyatt, and we probably

22  represent Hyatt someplace, so I will show no disrespect for the

23  Hyatt Corporation.  But Hyatt -- Hyatt is a company that may

24  not know the answer, so we get the request, et cetera, et

25  cetera.

1          With respect to the others, well, gee, we'll never

2    say this again is a very generous proposal.  It's just too

3    late.  If Your Honor issues an order back in January and then

4    reiterates that order and provides multiple extensions of time,

5    then why are we even having this discussion?  There should just

6    be compliance with Your Honor's orders, that's all that we're

7    asking for is compliance with Your Honor's orders.

8          And nobody told any of these people, including Mr.

9    Speights's firm, nobody say, gee, we should have lawyers or

10   whoever it was, fill out these forms and make these false

11   statements that 2003 was the year.  That's why we're here.

12   We're here to rectify the problem that they created.

13         With respect to Canada, again, a whole bunch of

14   statements have been made by, you know, these Canadians are all

15   good people, and it's all done by contract, and really this is

16   quite a chore, et cetera, et cetera, et cetera, it's the same

17   problem.  These claimants all just said 2003.  That's why we're

18   here.

19         So, this is not a situation where the fact that it's

20   a burden or chore has any relevance whatsoever.

21         THE COURT:  No, I think what Mr. Speights is saying

22   is that it's going to take him 60 days to get that information

23   because the Canadian claims were not originally part of the

24   order.

25         MR. BERNICK:  Well, but it doesn't really -- it

1    doesn't really -- again, that kind of speaks to the tail end of

2    it.

3           Their original obligation was to fill out the claim

4    form appropriately.  Mr. Speights has been on notice, and

5    presumably he informs his clients, for months and months and

6    months, probably better than part of a year, that the 2003

7    representation was wrong.  In fact, it was probably known to be

8    wrong at the time.  It's just a plug.

9           So, this has been out there for a very, very long

10   time.  The fact that it might be a chore and take time is

11   something that is not our problem and it's not the Court's

12   problem --

13           THE COURT:  No, it's not.

14           MR. BERNICK:  -- it's --

15           THE COURT:  I still want to get the information

16   corrected.  And to the extent that the Canadian claims, if they

17   weren't part of the other order, need to have a contact back to

18   the clients to get the correct date, I think it's appropriate

19   to the correct date.

20           I am very unhappy about having false information in

21   claims.  Now, it can be false for a number of reasons, and not

22   all of them -- I'm not putting a pejorative spin on that.  But

23   I am unhappy -- uncomfortable and unhappy with false

24   information in claims.  And they need to be corrected.

25           So, I think if Mr. Speights needs some time to get

the Canadian claims corrected, I'll provide that opportunity but I want the client's signatures on the dates.

MR. BERNICK:  Thank you.  Then I would submit that if it's -- I suppose that if it's just a question of that information in Canada, I suppose we can live with 60 days.  I don't have any --

THE COURT:  Well, is there anything else in the -- about the Canadian claims?  Because if we're going to get into piecemealing the Canadian claims and the information the debtor needs, frankly, I want to do it once, and that's all.

MR. BERNICK:  Please, I would suggest, let's not open any -- we -- this is the last -- one -- maybe one of the last issues that remains with respect to the claims.  And I don't think that there is any reason why, in this process, there should be any tolerance for people now coming in and saying, oh, well, what we said didn't really -- we didn't really mean it.  We --

THE COURT:  No, I'm not talking about from the claimants' point of view.  I'm asking whether the debtor is going to be filing a motion saying I didn't get the answers, just to pick something to Question 10 or to Question 25.

MR. BERNICK:  We have -- we have, I believe, in the process of the omnibus objections tried to deal with all of the kind of blank answer issues.

THE COURT:  Even on the Canadian claim?

1          MR. BERNICK:  I believe on the Canadian claims,

2    that's true.

3          THE COURT:  Fine.  Then if it's only an issue with

4    respect to the signatures, with respect to the answer to

5    Question 18, Mr. Speights wants 60 days, you've got 60 days,

6    Mr. Speights.

7          MR. SPEIGHTS:  Thank you.

8          MR. BERNICK:  We then have -- we would then ask that

9    Your Honor -- that we submit an order to Your Honor dealing

10   with the expungement of the remaining claims.  That is the

11   claims that are in our status report less San Liandro and the

12   two Anderson Memorial claims.

13         MR. SPEIGHTS:  Three Anderson.

14         THE COURT:  All right, well --

15         MR. BERNICK:  Two.  There are two.

16         MR. SPEIGHTS:  I think he's right, there were two.

17   We filed three, but he only put two in this.

18         THE COURT:  All right.  So, they're -- the debtor at

19   this point in time is not going to pursue any type of relief

20   against the two Anderson and the one hospital claim that you

21   indicate have been corrected.

22         So, with respect to the Hyatt, I think if, in fact,

23   the Hyatt's assertion through, you know, whatever testimony is

24   going to come up, and all of their officers wherever is that

25   they can't answer the question, then I think they have to say

1  they can't answer the question.  But the year 2003 isn't an

2  appropriate make believe answer if, in fact, they don't know.

3         So, I guess I'll give you an opportunity with respect

4  to Hyatt to have somebody by way of affidavit, explain what

5  effort was made to find out and why they don't know.

6         As to the others, Mr. Speights, I think -- my order

7  is my order.  You know, claimants have to be bound by court

8  orders.  They just have to.  That's the only basis upon which

9  we have a system by which the -- any court order has meaning

10  within our jurisprudence.  And they've ignored that court

11  order, or chosen perhaps -- maybe not ignored.  But chosen not

12  to comply.

13         And if they don't comply, then I think they can't

14  prove the claim at this point in time, and I view this an

15  element of the claim.  So, if you want one opportunity to go

16  back and get that information before I expunge the claims, I'll

17  give you a brief period of time to do it.

18         But I -- if Mr. Bernick does not wish to accept the

19  stipulation, I don't I'm in a position of forcing somebody to

20  accept a stipulation.  So, they need to -- they need to answer

21  the question.

22         MR. SPEIGHTS:  I would request then, Your Honor, you

23  give me a short period of time to say -- I guess -- I'm not

24  trying to be funny about it, but she really means it.

25         THE COURT:  I really mean it.

1          MR. SPEIGHTS:  Then I will go back and tell them

2  that.

3          Let me just say two things for the record.  I'm not

4  arguing with your ruling, Your Honor, I understand you've

5  ruled, and I don't want to retrace that.

6          I would say that with respect to Hyatt, I believe the

7  question was very honestly answered.  2003 is when that group

8  which filed it knew, but they're not saying that other people

9  down the chain didn't know earlier, that's just for the record.

10          And I will say -- and it's not on this record, and

11  it's --

12          THE COURT:  It's not individual claimants, though.

13  This is a corporation, is it not, that's filing --

14          MR. SPEIGHTS:  Well --

15          THE COURT:  -- the claims?  So, they have an

16  obligation to find out through whatever their chain is who knew

17  what.

18          MR. SPEIGHTS:  I understand.  And we'll be filing an

19  affidavit, and get into some of the nuances of that.

20          THE COURT:  All right.

21          MR. SPEIGHTS:  But I do want to say -- I know Your

22  Honor remembers this, and I certainly remember it, and

23  hopefully Ms. Brody shared it with her colleagues.  But since

24  this transcript -- I've been in the business now of going

25  through all these transcripts and try to put it together to

1  make it clear for the record that how this came up was, not

2  these allegations they were false statements in a 2003 non-

3  pejorative statements, but that Grace interpreted the question

4  differently than we did.  Grace interpreted the question as to

5  when you knew you had asbestos.  And we said Grace asbestos.

6  And Your Honor ruled with us on that, that we were answering it

7  correctly, although some of the answers may not be corrected,

8  as it turned out, as we get more information.  And the

9  overwhelming majority of our clients did not know it was a

10 Grace product until 2003.

11         But in any event, that ruling is contained in the

12 January hearing, and I appreciate Your Honor's patience.

13         THE COURT:  All right.  How much time do you need,

14 Mr. Speights, with respect to one really last effort?  Because

15 I will expunge claims that do not contain this information

16 after this deadline goes by.

17         MR. SPEIGHTS:  I would ask for 30 days, Your Honor.

18         MR. BERNICK:  Is --

19         THE COURT:  Is that going to jeopardize anything?

20         MR. BERNICK:  Is this Hyatt now or is this all of

21 them?  I mean he said he was going to withdraw things, and now

22 he wants 30 days.

23         THE COURT:  Well, if they're withdrawn, they're

24 withdrawn.  But I -- I -- I think at this point, I'm going to

25 give him one last chance to get these orders.  Because I will

1    be imposing severe sanctions in the form of expunging the

2    claims if this question is not answered.

3            And I think as a Court of equity, to the extent that

4    people need to understand that I do mean business, I do mean

5    business.  And the claims will be expunged.

6            So, I'm going to give Mr. Speights a brief

7    opportunity to get these issues addressed.  But do you really

8    need 30 days, Mr. Speights?

9            MR. SPEIGHTS: Well, Your Honor, maybe -- let me back

10   up for that.  Can we just have it for the next omnibus hearing,

11   which is less than 30 days?  I'll have to respond before 30

12   days.

13           THE COURT:  Yes, that's fine.

14           MR. SPEIGHTS:  I mean you won't do anything before

15   the next omnibus anyway.  I'm happy to have it finally disposed

16   of at the next omnibus.

17           MR. BERNICK:  Well, I just want to know what the

18   deadline is for his compliance?

19           THE COURT:  Well, when is the next motions day for

20   filing?  Mr. O'Neill?

21           MR. O'NEILL:  Your Honor, we already passed the

22   filing deadline.

23           MS. BAER:  It -- it was last Monday, Your Honor.

24           THE COURT:  All right.  And what's the response date

25   then?

1          MR. O'NEILL:  October 6th is the objection deadline,

2   Your Honor.  The preliminary agenda will be on the 9th, and the

3   final agenda will be on the 16th, for a hearing on the 23rd.

4          MR. SPEIGHTS:  How about before the 16th, Your Honor?

5   Before the final agenda.  That's 20 days, I think, or something

6   like that.

7          THE COURT:  Okay.  I think -- you're -- I'm sorry.

8   Mr. O'Neill, you're going to file the final agenda on the 16th?

9          MR. O'NEILL:  On the 16th.

10          THE COURT:  Okay.  So, you need to do them by at

11   least -- say 4 P.M. eastern time on the 13th, Mr. Speights, so

12   that Mr. O'Neill can include whatever is left on this agenda on

13   the 16th.

14          MR. SPEIGHTS:  Yes, Your Honor.

15          THE COURT:  So, October 13th at 4 P.M.  All

16   signatures are to be corrected, except the Canadian claims.

17   I'm giving you 60 days for that so you can put that back on the

18   -- whatever the appropriate agenda is after that December,

19   January, whatever that works out to be.

20          And that will give you time, Mr. Bernick, to look at

21   the three that Mr. Speights says were cured, and to make sure

22   that, in fact, they have been.

23          MR. SPEIGHTS:  Right.  Right.

24          MR. BERNICK:  And I'm not going to respond, there are

25   a bunch of statements that Mr. Speights made about, you know,

1  was this purposeful, was it not purposeful, and whether Your

2  Honor agreed with him sometime back in January.  And I'm not

3  going to respond to that, Your Honor, on the theory that the

4  record is whatever it is.  But I don't want my silence to be

5  construed as acquiescence --

6  THE COURT:  I did agree with Mr. Speights that the

7  date was to be the date that the people knew that Grace's

8  product was in the premises.  I did agree with him.

9  MR. BERNICK:  Well, that -- yeah, but that doesn't --

10  with Anderson Memorial, where they have filed a lawsuit against

11  Grace back, God knows when --

12  THE COURT:  I don't think I made any adjudications

13  about any individual claim, only with respect to what should

14  the information be that was being answered in Question 18.  And

15  my ruling was it should relate to when Grace's product was

16  known to be in the building.

17  MR. BERNICK:  That's what the question said on its

18  face.

19  THE COURT:  Okay.  Well, that's what I ruled.

20  MR. BERNICK:  With respect to Item 11, Your Honor,

21  and what I would propose is that we try to get through Item 11,

22  and then --

23  THE COURT:  Well, let me -- let me -- before we leave

24  this one --

25  MR. BERNICK:  Sure.

1          THE COURT:   -- are you going to submit an order that

2     lays out these dates?

3          MR. BERNICK:  Yes, we'll submit an order.

4          THE COURT:  Okay.

5          MR. BERNICK:  Yes.

6          THE COURT:  Give me one second then.

7                         (Pause)

8          THE COURT:  Okay.  All right.  Item 11?

9          MR. BERNICK:  Item 11 -- what I would suggest is we

10    do this item, and then the class certification issue with

11    respect to Anderson Memorial, and then maybe take a break and

12    do the last two items, and I think that we would be done.

13         THE COURT:  All right.

14         MR. BERNICK:  If that's all right, Your Honor.  Item

15    11 deals with the Statute of Limitations briefing on claims

16    where Mr. Speights represents the claimant, claims in Georgia

17    and Tennessee.  These matters also were argued in January.  You

18    asked for briefs, Your Honor, on the conflict of law issues.

19    The briefs -- briefing was suspended during the mediation

20    process.  And all we now want to do is to get the briefing done

21    so we can get the matter heard.

22         We made contact with Mr. Speights to propose 30 days,

23    that was turned down.  We then -- for the brief.

24         We then wrote him on July 28th, again asking for the

25    schedule.  We have not received any answer to that.

1          So, we would ask that the -- that the briefs be due

2   in 30 days so that the Court can take this matter up promptly.

3          So, we would ask that their brief be due 30 days with

4   our response 15 days later, and then the matter can be heard.

5          THE COURT:  Mr. Speights, do you have a concern about

6   the briefing schedule?

7          MR. SPEIGHTS:  I have a couple of concerns, Your

8   Honor:

9          First of all, my understanding is that in your last

10  order, which I believe was supposed to be next on the agenda,

11  the CMO order, that you vacated all deadlines and that we had a

12  new schedule for disposing of these matters.  That might seem

13  supertechnical, but it's not just being technical.  We're going

14  to have Statute of Limitations arguments on a lot of buildings.

15  I believe it's in March, maybe April, as a part of the gateway

16  objection process.  And I'm not sure why we're going forward on

17  just these two buildings.

18          Now, I understand why we did it before.  We were in a

19  different world back then, but you've vacated those orders now.

20  And why should we just single out two claims to go forward with

21  arguments now as opposed to being with all the other claims I

22  have, and I'm sure Mr. Bernick has a plethora of objections to

23  the Statute of Limitations on all of my claims.

24          So, my first position is, Your Honor, we shouldn't be

25  briefing this now.  It may even be I won't even be on an

1  omnibus track here for a few months while we're out litigating

2  these other issues.

3          If we do have to brief it, or whenever we do have to

4  brief it, it's -- it's Grace's burden, Statute of Limitations,

5  and it should go first.  And whenever we have to brief it, now

6  or March, we'd like 30 days to do our brief.  But they are the

7  moving party on this.

8          MR. BERNICK:  Your Honor, we were the moving party.

9  We did brief it.  It was argued.

10          To now say, well, because the deadlines that are set

11  forth with respect to other claims, and perhaps with respect to

12  these claims, if they survive, are now set out in the CMO,

13  that's terrific.

14          But that doesn't mean that the prior deadlines are

15  altered or that somehow all the briefing that was done before

16  goes out the window.

17          THE COURT:  Well, okay, I apologize, but I truly have

18  lost track of this one.  It was argued when?  And why did I

19  order supplemental briefing?

20          MR. BERNICK:  You -- it was argued in January.

21          THE COURT:  Because I just don't remember.

22          MR. BERNICK:  And you ordered supplemental briefing

23  to deal specifically with the choice of law.

24          THE COURT:  I remember discussing the issue about a

25  choice of law, but I don't remember an argument on this --

1          MR. SPEIGHTS:  We have argued this, Your Honor.

2          MR. BERNICK:  Well, if that representation is going

3   to be made, then we'll go back and take a look at the

4   transcript.

5          MR. SPEIGHTS:  I'll tell you what happened, I was

6   there.

7          THE COURT:  All right, yeah.

8          MR. SPEIGHTS:  I'm not trying to hide the ball, Your

9   Honor.  Prudential had gone the day before and you said maybe

10  we want some more briefing because you just heard Prudential

11  about choice of law issues.  We never argued it, but that's

12  what Your Honor said at the January hearing.

13         MR. BERNICK:  If that's the representation, then I

14  would like to go back to the transcript and determine that.

15  Because I'm -- that's not my impression.  We now have, you

16  know, more slippage.

17         The point is that Your Honor asked to have briefing

18  on the conflict of law issues.  And it was suspended during the

19  mediation process.  And it now should be revived.

20         Now, if they want us to go first on the choice of

21  law, I've got no problem with our going first on the choice of

22  law.  We'll go first on the choice of law.  We'll submit our

23  brief on choice of law in 21 days.  And then they can have 21

24  days to respond to it.  May as well get the thing resolved and

25  heard.

1          I think these choice of law issues are going to

2    become shorter and shorter to resolve the more time the people

3    ask you to decide the same issue again and again and again.

4          THE COURT:  All right.  If the debtor wants 21 days,

5    that's fine.

6          Mr. Speights has asked for 30, I'm going to give him

7    30.

8          MR. BERNICK:  Fine.

9          THE COURT:  If you want 30 days, you may have 30

10   days.

11          MR. BERNICK:  That's fine.  We'll do it in 21 days,

12   and then he can have 30.  And then, Your Honor, if there is

13   going to be a reply not to exceed five pages, can we have seven

14   days for that?

15          THE COURT:  Yes.

16          MR. BERNICK:  Thank you.

17          THE COURT:  All right.  So, 21 for the debtor, 30

18   days for Mr. Speights, and seven days for a reply.  And then

19   whatever the next omnibus agenda is that it comes up on, we can

20   deal with that argument.

21          MR. BERNICK:  Thank you.  That then brings us to

22   Class --

23          THE COURT:  Just a second.

24          MR. BERNICK:  I'm sorry.

25                          (Pause)

1              THE COURT:  All right.  So, you're going to give me

2    this -- in a scheduling order, correct?

3              MR. BERNICK:  Yes, we will.

4              THE COURT:  All right.  And this is Item 11.

5              MR. BERNICK:  Right.

6              THE COURT:  All right.  Yes, sir?

7              MR. BERNICK:  So, now we're just clicking along here

8    to Item 12.  And Item 12 is the Anderson Memorial class issue

9    again.

10              Your Honor will recall, just briefing reciting the

11   history, that this was fully briefed and it was argued in

12   January.  And I have here the transcript page.  Your Honor

13   basically indicated where your leanings were and what your

14   thinking was at Page 75.  And Your Honor recounted there that

15   there had been a bar date for the P.D. claims.  That we know --

16   we knew what claims had come forward.  And at this point, there

17   aren't enough claims, Your Honor said at Line 13, "Frankly, at

18   this point, there's just not enough of them, that is the

19   claims, that I can see that it requires a class.  So, that's

20   where I'm coming from.  I don't see how a class is going to

21   advance the cause of the bankruptcy at this point in time."

22              That observation was fully consistent with the cases

23   that have allowed motion -- class motion practice in Chapter

24   11, the decision by the 7th Circuit in <u>American Reserve</u>, Judge

25   Easterbrook's opinion that basically said that the rules allow

1    for or would tolerate class action procedure, nonetheless

2    caution that in bankruptcy, there has to be a discretionary

3    overlay which asks the question whether class certification,

4    even if the requirements are met, whether class certification

5    would serve the cause of advancing the bankruptcy case.  In the

6    last page of the opinion goes on to say, for example, "The

7    judge might consider directing the trustee to send to all

8    persons who purchase the insurance policies," et cetera, et

9    cetera, "a notice informing of the bankruptcy, and that they

10   have to file a claim and a proof of claim form.  People could

11   then be invited to file claims, and that might achieve the

12   benefit of class certification without the need for class

13   certification."

14            MR. SPEIGHTS:  Your Honor --

15            MR. BERNICK:  Similar -- similar approach --

16            MR. SPEIGHTS:  I never -- I don't think I've ever

17   interrupted Mr. Bernick.

18            MR. BERNICK:  Well, then I don't see any reason why

19   we should establish a precedent.

20            MR. SPEIGHTS:  Then I would ask Mr. Bernick if he is

21   accepting the burden of proof because this is my motion.  And I

22   go first on my motion, and I don't get to go first very often.

23   But this is my motion and I don't think it's correct for Mr.

24   Bernick to be able to preview all the reasons you should reject

25   everything I'm about to say.

1          THE COURT:  All right.  Mr. Speights, it's your

2   motion.   So, go right ahead.

3          MR. BERNICK:  I won't interrupt either.  How about

4   that?

5          MR. SPEIGHTS:  Your Honor, Item 12 is a discreet

6   issue.  It's not a motion for certification.  It's a motion to

7   lift the bar order -- excuse me.  Lift the stay in order that I

8   can go to South Carolina and have the record taken out from the

9   seal order so that I can present the record of the South

10  Carolina proceeds to you.

11          The motion to certify -- the motion to certify is on

12  the agenda today.  Over my objection, it's on the agenda today.

13  And we will get to that probably after the break.

14          But this is a very important motion here, and I'd

15  like to take my time when I get out of the 2003 issue and the

16  notes and tell you where we are.

17          In September 1 -- on September 1, 2005, Grace

18  objected to the class proofs of claim of Anderson.  That was,

19  of course, two and a half years after we filed those claims.

20  Grace could have objected any time before then.  I do not

21  criticize Grace for not objecting.

22          In fact, the case law, including the progeny of

23  American Reserve, which Mr. Bernick was talking about, suggests

24  that a debtor should wait, should wait for objecting to class

25  proofs of claims on many occasions because they would -- that

1  would, in many situations, facilitate resolution, consensual

2  plan, settlements, and all those things we love but can't seem

3  to get to in this case.

4           But when Mr. Bernick filed his objection to the

5  Anderson proofs of claim under the In Re: Charter case, unlike

6  Mr. Bernick, had my blow-ups, but I can't use them today.  But

7  under the In Re: Charter case, that triggered --

8           THE COURT:  That's an 8th Circuit case?

9           MR. SPEIGHTS:  I think that's the 11th Circuit case.

10          THE COURT:  The 11th, okay.

11          MR. SPEIGHTS:  And I have it here.  But it clearly,

12  at that point, under some interpretations, triggered our

13  obligation to file a motion to certify.  The In Re: Charter

14  case is 876 Fed. 2d 866.  It is the 11th Circuit, it's a 1989

15  case.  And it says, "Therefore, absent an adversary proceeding,

16  the first opportunity a claimant has to move under Bankruptcy

17  Rule 9014 to request application of Bankruptcy Rule 7023 occurs

18  when an objection is made to a proof of claim.  Prior to that

19  time, indication of Rule 23 Procedures would not be ripe

20  because there is neither an adversary proceeding nor a

21  contested matter."

22          And on the next page the In Re: Charter case, and

23  this case and others are cited in our various briefs, they drop

24  a footnote when the opposing party in that case objected about

25  it being too late.  Not only was the situated not ripe for a

1    motion under Bankruptcy Rule 9014 until <u>Charter</u> objected to the

2    claim, but before that time, the claimants could reasonably

3    believe that Charter might accept the class proof of claim.

4            Class proof of claim -- well, it cites a case.

5    "Because in general, the debtor may decide not to litigate a

6    claim or may seek to compromise, there often will be no need

7    for contested proceedings relating to a claim."

8            Now, I'm going to really take a detour here about 30

9    seconds.  But the lessons of <u>In Re: Charter</u>, while they have --

10   my point is not directly related to this unsealing the record,

11   it's certainly relevant to the broader picture as we deal with

12   Anderson on several matters today.

13           The lessons of <u>In Re: Charter</u> have been followed in

14   every bankruptcy except this one.  Your Honor, in <u>U.S. Mineral</u>,

15   Your Honor approved a plan of reorganization which recognizes

16   the Anderson State class action as a certified class action,

17   and which recognizes the Anderson putative class action for

18   such special procedures on how those claims will be.

19           The debtor did not object in <u>U.S. Mineral</u> to the

20   class proofs of claim.  But as a part of a consensual plan of

21   reorganization, Anderson afforded an opportunity to deal with a

22   large number of claims.

23           THE COURT:  But there was a difference.  I think

24   there because the class was finally certified as to <u>U.S.</u>

25   <u>Minerals</u> pre-petition.  And that's not the case here.

1          MR. SPEIGHTS:  Well, Your Honor, I'm going to address

2   that during the motion to certify, but I can't resist at this

3   moment pointing out Mr. Bernick's chart over here that he had

4   against Prudential.  It was amazing to me, remarkable to me to

5   look at all those dates on that chart and how Mr. Bernick kept

6   returning to six zero one, the order -- I'm not sure if it's

7   3rd Circuit order or District Court order that Your Honor and

8   Mr. Bernick and counsel for Prudential discussed.  Well, I

9   recognize the -- what we will call the final order came out

10  after Grace declared bankruptcy.  Certainly I want to get a

11  transcript of this record to make -- to adopt all those

12  incorporation arguments that Mr. Bernick has made on the 2001

13  order that came there.

14          Because we all know in this case -- we all know in

15  this case that the record was finished before Grace ever

16  declared bankruptcy.  Testimony had been taken.  Documents had

17  been presented.  Briefs.  Rebriefs.  Rebriefs had been made.

18  There was nothing else submitted to Judge Hayes in South

19  Carolina after Judge -- that I'm aware of, in terms of

20  evidence, to Judge Hayes in South Carolina so that I would

21  believe there's a much stronger argument to look to that so-

22  called final order than there was to look at that six-o-one

23  order.

24          But Your Honor is correct.  There is this attack on

25  the first order, that is the South Carolina order.  And the

1  attack is made in several ways:

2        The first way is Mr. Bernick has said, well, it was a

3  conditional order.

4        Well, Your Honor, all class action orders, all class

5  action certification orders are conditional.

6        When we get into the motion to certify later, if we

7  have to go there, I don't think it should be today --

8        THE COURT:  Well, it was the conditional ex parte

9  order entered apparently because the judge wanted to do

10 something before Grace filed bankruptcy.  You know --

11       MR. SPEIGHTS:  I don't -- I don't --

12       THE COURT:  I don't know how that's an exigent

13 circumstance that the debtor exercises a statutory entitlement

14 to relief that that causes a -- somehow an emergency where a

15 District Court has -- or a State Court decides that it has to

16 exercise jurisdiction to enter a conditional ex parte order

17 because it's going to lose that jurisdiction.

18       But nonetheless, that's what the Court did.  So,

19 there is a conditional order, but it's never been finalized as

20 to Grace.

21       MR. SPEIGHTS:  Your Honor, and this goes directly to

22 why we want this record --

23       THE COURT:  All right.

24       MR. SPEIGHTS:  -- taken out of seal.  It was a

25 conditional order, as all orders are conditional.  It was a ex

1   parte order only a few days.  Then there was a hearing after

2   the order, and the Court allowed, permitted, ruled the order to

3   remain in place after hearing in full from Grace.

4           More to the point, Your Honor, --

5           MR. BERNICK:  I'm sorry.  I misheard -- I don't know

6   if I heard -- the Court allowed what?

7           MR. SPEIGHTS:  The ex parte order to stand after

8   having a hearing in which it entertained arguments from W.R.

9   Grace.

10          MR. BERNICK:  So --

11          MR. SPEIGHTS:  Is that the no interruption --

12          MR. BERNICK:  Well, I just -- just a -- but go ahead.

13          MR. SPEIGHTS:  So, Your Honor, let me back up.  They

14  filed the objection in 2005.  We filed the motion to certify.

15  We cite In Re: Charter.  We wanted Your Honor to recognize that

16  South Carolina order.

17          Grace files its brief in early December.  They argue

18  several things.  First of all, they would not accept that South

19  Carolina certification.  Rightly or wrongly, they will not do

20  that.

21          The second thing they argued is that the -- the

22  certification would not assist the bankruptcy.  And that's how

23  we got off on this branch of this big old oak tree here and

24  started talking about the bar date order.  And we dealt with

25  that at the last hearing when we tried to get that discovery.

1          But in addition, Your Honor, Grace made a number of

2    statements attacking the South Carolina order.

3          For example, the certification that was granted to

4    South Carolina plaintiffs and Anderson Memorial was awarded

5    under circumstances and procedures that are so suspect and

6    improper that they should not be credited by this Court.

7          And then they make numerous factual statements in

8    their brief, in their response.  There is absolutely no

9    evidence, you know, for example, et cetera, et cetera.

10          So, we immediately, in December -- December the 19th,

11    last year, asked Your Honor, filed a motion to lift the stay

12    for the limited purpose of going to the South Carolina judge

13    and saying, please lift this order from the stay so we can use

14    the proceedings in South Carolina, and Grace objected.   Which

15    is a rather extraordinary thing for two reasons:

16          First of all, it's extraordinary because we were the

17    ones who wanted the seal order in South Carolina.  And the

18    judge agreed with us, although Grace argued a lot about it,

19    agreed with us until he had entered the so-called final order,

20    which has now been entered.  But, of course, Grace was in

21    bankruptcy by that time.

22          So, it was rather extraordinary that now that Grace

23    is trying to keep that record from you.

24          But the second reason is, Your Honor, you know, it's

25    been eight or nine months, this is most simple, administrative

1   issue.  It means you're signing a two-line order and -- and my

2   mailing it with a copy to Mr. Bernick to the South Carolina

3   judge with a proposed order also two to three sentences.  Well,

4   why do we need it?  Well, Your Honor, we need it for several

5   reasons:

6          First of all, we need it to refute what Grace has

7   said about those South Carolina proceedings.  I think Your

8   Honor -- and Your Honor has made statements again today, and I

9   understand Mr. Bernick has said a whole lot about South

10  Carolina, and South Carolina justice.  But I think Your Honor

11  needs the record of what Judge Hayes had before him when he

12  issued that ex parte order which became, you know, a non-ex

13  parte order a few days later.

14         Judge Hayes had a two-day evidentiary hearing in this

15  matter.  He heard the testimony of a number of prominent

16  experts, not only from South Carolina, but from around the

17  country.  He had a large number of affidavits.  He had, in

18  addition to that, Your Honor, a lot of documents.  Documents

19  which goes to -- which go to commonality and typicality.  And

20  all of the issues involved, you know, Grace sales, how many

21  sales were there in South Carolina, where were those sales, et

22  cetera, et cetera, et cetera.

23         Now, Your Honor, I hope and trust that you have not

24  prejudged the South Carolina proceeding.  But even if you had,

25  and I beg that -- I hope -- I sincerely hope that you had not.

1  Even if you had, I would still need this to build my record in
2  this case, Your Honor.

3  THE COURT:  I haven't prejudged the proceeding.  I
4  was attempting to explain that I thought the difference between
5  the other cases in which the Anderson Memorial claims were
6  adjudicated in the plan and were not objected to, was the fact
7  that those debtors conceded that there had been full class
8  certification pre-petition, and they adopted that class claim
9  essentially based on that class certification.  And I just
10  think this case is in a different posture.

11  My understanding of the record is that there has not
12  been a final certification.  And, Mr. Speights, if you need the
13  full record here, and the South Carolina judge is willing to
14  let me have it, I don't have any reason not to read the full
15  record.

16  So, I'm happy to give you relief from stay, to let --
17  to get the full record here.  But I don't know that that's
18  going to help with respect to class certification for this
19  reason.  I now have a bar date.  And in my view, that should
20  have ferreted out all of the claims.  This was a very ambitious
21  notice program on behalf of this estate.  It was very costly,
22  it was very wide spread, and I'm not sure how, at this stage,
23  it's going to make a difference.

24  I think the intervention of circumstances since Judge
25  Hayes ruled whatever he ruled, and for whatever reasons he

1    ruled it, may have changed.    But I'm willing to take a look at

2    the record.    I'm willing to see what information Judge Hayes

3    had.    And to the extent that it either does or doesn't advance

4    the ball with respect to the class certification motion, I'm

5    happy to address that at the appropriate time.

6           MR. SPEIGHTS:    Thank you, Your Honor.    And that's the

7    only matter on Item 12.    I've got a lot of other things to say

8    about, you know, Anderson at the appropriate time, including

9    some issues you just raised, but that's what Item 12 is.

10          THE COURT:    All right.    Mr. Bernick, I really don't

11    see a reason not to permit this.

12          MR. BERNICK:    Can I -- if you would hear me out, Your

13    Honor?

14          THE COURT:    I'll hear you.    But I don't think you're

15    going to win this one, but I will listen.    I've been known to

16    change my mind sometimes.

17                              (Pause)

18          THE COURT:    Gentlemen, are you having a problem over

19    there?

20          MR. BERNICK:    Mr. Speights has taken the position in

21    this case for the better part of God knows how many years that

22    somehow he got a class certified as to Grace in South Carolina.

23          He has further taken the position that given the

24    pendency of that class, he has had no obligation -- no choice

25    but to proceed on the basis of that purported class.

1          What Your Honor said to Mr. Speights, and had I know

2    that we were going to go back into the record on the back and

3    forth with respect to Anderson Memorial on the merits today, I

4    would have -- I would have Your Honor's actual language -- was

5    that no class proof of claim should be filed in this case

6    without the Court's approval.

7          THE COURT:  That's right, I did say that.

8          MR. BERNICK:  Yes.

9          THE COURT:  But there should be a motion filed

10   because it seemed to me that with the -- particularly with the

11   bar date, that I should have a motion so that I can address

12   what Rule 23 requires me to address in the proper context.

13         MR. BERNICK:  No such motion was made.  Once again,

14   failure to comply with the Court's orders.  Once again, from

15   the same source.

16         Instead, the class proof of claim was simply filed.

17   That is as if there -- there already had been permission given

18   that Your Honor said had to be given explicitly.

19         That violated Your Honor's orders.  It violated the

20   applicable procedures.  Mr. Speights says, well, I had no

21   choice.  He has no choice but to follow the orders that are

22   issued in this Court.

23         So, I'm --

24         THE COURT:  Well, as I understand it, Mr. Bernick,

25   there really isn't any 3rd Circuit precedent that deals

1  specifically with how these claims ought to be adjudicated.

2  There are cases within the 3rd Circuit that deal with when you

3  can file them -- when you should file the motions, as opposed

4  to when you must file the motion.  But I don't think there's

5  any 3rd Circuit law.

6          And, frankly, I am not convinced on the basis of the

7  record of the various proceedings before me so far that there

8  is any need in this case for a class proof of claim.

9          MR. BERNICK:  Well --

10          THE COURT:  I'm just not sure that there is.  In

11  fact, I should probably state it more affirmatively.  I'm

12  relatively sure that there isn't.

13          MR. BERNICK:  Well, I understand that.

14          THE COURT:  But nonetheless --

15          MR. BERNICK:  That --

16          THE COURT:  -- Mr. Bernick, I don't choose to make

17  that kind of an error.  And if Mr. Speights wants me to look at

18  a record that somehow or other may get me to change my mind and

19  see what the South Carolina judge actually did, I'm happy to

20  look at that record.  I don't see any reason not to.

21          MR. BERNICK:  Well, at -- for the following reason,

22  Your Honor:  This is, again, what I wanted to get to.  When

23  Your Honor issues orders in this case, the debtor has no choice

24  but to comply.  We would comply under any circumstance, but we

25  comply.

1               When Your Honor issues orders in this case that are

2      directed at the property damage claimants, what we get

3      consistently -- and we've seen even today -- even the space of

4      the same hearing, we're dealing with two exact situations where

5      Your Honor could not have been clearer from the bench, and when

6      Your Honor's directions were not followed.

7               THE COURT:  You are correct.

8               MR. BERNICK:  Yet, at a certain point in time, the

9      end has got to come.

10              THE COURT:  And the end is here.

11              MR. BERNICK:  And what happened -- and -- well, the

12     end was actually here months ago.  Because on this precise

13     issue, on this precise issue, Your Honor instructed Mr.

14     Speights --

15              THE COURT:  Yes, I did.

16              MR. BERNICK:  -- to come into court and to provide

17     the actual orders out of the South Carolina court so that we

18     could test whether --

19              THE COURT:  Which he did --

20              MR. BERNICK:  No, which he did not do.

21              THE COURT:  No --

22              MR. BERNICK:  Which we did.

23              THE COURT:  Oh, I'm sorry.

24              MR. BERNICK:  We provided those materials because Mr.

25     Speights did not.

1          So, we came into the court and demonstrated clearly

2    that whatever the record was in South Carolina, it could have

3    been the most robust record, it could have been the Prudential

4    Company's record that goes this high or this high or this high,

5    that's terrific.

6              THE COURT:  Mr. Bernick --

7              MR. BERNICK:  But the --

8              THE COURT:  -- in this instance --

9              MR. BERNICK:   But the -- I'm sorry, but the --

10             THE COURT:  In this instance, it's the Court that's

11   going to be -- to have to suffer through reading a transcript

12   of a proceeding that's not before me.  It's not counsel.  You

13   know, I get paid the same salary whether I -- you know, in your

14   view, waste, I suppose, not in mine, in your view waste four or

15   five or 20 hours reading a record or don't.

16             MR. BERNICK:  Well --

17             THE COURT:  So, if it doesn't --

18             MR. BERNICK:  -- but it has --

19             THE COURT:  -- make any difference --

20             MR. BERNICK:  It does make a difference, Your Honor.

21             THE COURT:  Well, what is the difference?

22             MR. BERNICK:  The difference it makes is whether Your

23   Honor's orders when they're issued are regarded by the people

24   in this courtroom as being -- it's not this is the end of the

25   day and she really means it.  It means that you just go ahead

1   and comply with them.

2            And what happened in this particular case, Your

3   Honor --

4            THE COURT:  I don't have a motion for contempt in

5   front of me, Mr. Bernick.  You want to file a motion for

6   contempt --

7            MR. BERNICK:  Well, Your Honor asked why this request

8   should be denied.

9            THE COURT:  -- against Mr. Speights --

10           MR. BERNICK:  And the reason why this request should

11  be denied is that not only did Your Honor ask that these

12  materials be submitted to the Court, and the debtor had to

13  submit them.  But once they were submitted, they told a

14  totally clear and pellucid story, and we went through this

15  story, Your Honor, last time in detail because notwithstanding

16  the fact that we had been through it before, representations

17  continued to be made to Your Honor about what happened in South

18  Carolina --

19           THE COURT:  That's right.

20           MR. BERNICK:  -- which Your Honor said last time was

21  --

22           THE COURT:  And I want to put it to bed, Mr. Bernick.

23  Frankly, I am really tired of hearing this same issue.  I want

24  to get it adjudicated.  I really want to get it adjudicated.

25           MR. BERNICK:  You would --

1          THE COURT:  And if it means that I need to read a

2    transcript and find out who is telling me that -- from my view,

3    the correct version of the facts, I just want to do it and get

4    it done.

5          MR. BERNICK:  Well, but --

6          THE COURT:  And I really don't understand why the

7    debtor is objecting.

8          MR. BERNICK:  The debtor is objecting, again, for

9    precisely the same reason that I stated, which is that the

10   orders were supplied.  Your Honor looked at the orders of the

11   Court itself and those orders said, A, that the whole idea of a

12   non-South Carolina class was dead on arrival long before Grace

13   filed for Chapter 11.

14         THE COURT:  That's right.

15         MR. BERNICK:  But the only issue that was left was

16   the South Carolina class.  And with respect to Grace, there was

17   no South Carolina class.  Indeed, the judge specifically told

18   Mr. Speights not to include Grace.

19         THE COURT:  And nothing --

20         MR. BERNICK:  And then he represents today that Grace

21   was there and argued the matter after the Chapter 11?  That's

22   what he just said.  I stood up and I said, I can't believe

23   that.

24         THE COURT:  Mr. Bernick, I would just like to get the

25   facts done.  I don't need to hear it from you or from Mr.

1  Speights.

2           MR. BERNICK:  Well, then what facts --

3           THE COURT:  There's a transcript.

4           MR. BERNICK:  What transcripts?

5           THE COURT:  Why can't I just see the transcript?  I

6  don't know.

7           MR. BERNICK:  What --

8           THE COURT:  Whatever he's going to supply.

9           MR. BERNICK:  That's point, what specifically is Mr.

10  Speights saying?

11           THE COURT:  I want a certified copy of the entire

12  record that's before the South Carolina court.  Everything.

13  Everything that was under seal or not under seal.  And if you

14  folks need another argument because of it, fine, we'll do it.

15           Frankly, I'm not going to set aside any of the State

16  Court findings.  I'm not in the position of an Appellate Court.

17           If it, however, clarifies who said what to whom and

18  when, I would like to see it on the basis of the transcript.

19  Because, Mr. Bernick, you tell me one thing, Mr. Speights tells

20  me something else.  There's a ruling out there.  I have orders

21  that --

22           MR. BERNICK:  I'm sorry, Your Honor.

23           THE COURT:  Mr. Bernick, please --

24           MR. BERNICK:  I really would take exception to the --

25           THE COURT:  Let me speak.  There is a record there.

1   There are orders which I have read.  I do not, from having read

2   those orders, see any basis upon which the debtor was subject

3   to a final class certification order.  There was an interim

4   order.  I don't know the circumstances that led to it or how or

5   whether there was, in fact, anything that happened after that

6   class, after that interim order was entered.

7          I believe I had a supplemental order at one point

8   that the debtor submitted, it was at least a year ago.  I don't

9   recall the details of it now.  I don't see what difference it's

10  going to make.  You are incurring more legal fees by continuing

11  this argument when I've made a ruling --

12          MR. BERNICK:  Well, I --

13          THE COURT:  -- than this estate justifies.

14          MR. BERNICK:  I understand that, Your Honor.  But

15  you're now saying -- and I -- I understand the way Your Honor

16  feels about this, but it does take a toll on this case.  It

17  takes a broad toll.  It sends a message, and I'll say this and

18  I'll sit down.  It takes --

19          THE COURT:  Well, then let me make the message clear.

20  I will not back off another order on behalf of the Property

21  Damage Committee, period.  I will not grant additional

22  extensions of time to comply with an order, not ever in this

23  case for the Property Damage entities represented by Mr.

24  Speights again.

25          MR. BERNICK:  Okay.

1            THE COURT:  Now, Mr. Speights, you're here.  Have you

2    understood what I've said?  I'm not granting additional

3    compliance periods unless before one period expires, I have a

4    motion and an order that I've entered that extends the time.

5            Otherwise, if there is not literal compliance with my

6    orders, then, you know, everybody will take their chances.  But

7    I am not going to back off.  I'm not going to give the

8    claimants additional time.  I'm not going to give you

9    additional time.  My orders will be my orders.

10            MR. BERNICK:  Your Honor, I --

11            THE COURT:  Because I am sympathetic to Mr. Bernick's

12    point of view.  Frankly, I think my orders are being ignored,

13    too.

14            MR. BERNICK:  Your Honor, the last thing is that now

15    that Your Honor has said this, and I'm assuming that Mr.

16    Speights will go about the process of getting the certified

17    transcript and submitting it.  And if we could have a period of

18    time before we take our break, that would be good.  But I would

19    suggest then that the motion for class certification, which was

20    the next item on the agenda, and which I construed to be part

21    and parcel of the item that we were just talking about, we may

22    as well, rather than having that argued, and for me to point

23    out how Your Honor now for in two different hearings has said

24    this should not proceed as a class, why we shouldn't just put

25    that one over and then Your Honor can take it up whenever you

1 believe that the transcript has been, you know, submitted and

2 Your Honor has had an opportunity to review it.

3       THE COURT:  I have -- I am prepared to hear

4 everybody's arguments to the extent the record is there.  If

5 there is something supplemental that is submitted in the South

6 Carolina transcript, I'm happy to hear it.

7       If, on the other hand, you want to push this off a

8 month, that's fine.  I have read these papers at least five

9 times now.  One more time next month probably will make very

10 little difference.  I can probably by then have them memorized.

11       MR. BERNICK:  Well, I would really go with Your

12 Honor's preference.  I have no desire.  I mean, frankly, on the

13 motion for class certification, there is nothing that's new.

14 There's nothing new to be said.

15       Your Honor said last time that the only thing that

16 you would entertain are additional matters, not the same

17 matters all over again.

18       There is only one further fact I would put before the

19 Court, which is we now know -- Your Honor says we now have how

20 many claims we really have to deal with here.  Again, the South

21 Carolina class that was certified with respect to non-Grace

22 defendants because the -- put more accurately, the U.S. class

23 was dropped.  So, the only thing that was left was the South

24 Carolina class.

25       If Your Honor followed through the rationale saying,

1    well, how many people have now actually shown up?  The last

2    time Your Honor said, well, we now know we have 600 claims, and

3    that's not unhandleable.

4            If you focus on South Carolina, it's not even that.

5    There are a total now of approximately three South Carolina

6    claims that are left in this case.

7            THE COURT:  All right.  I don't think three is going

8    to meet the numerosity requirements either.  But nonetheless,

9    Mr. Speights is telling me he needs this documentation for his

10   record.  I am not sure what the documentation is.  I am going

11   to take a look at it.

12           If, once we get it, Mr. Bernick, you or some other

13   party have an objection to it, you can certainly raise those

14   objections.  But I don't see any basis not to get it before the

15   Court at this point.

16           So, Mr. Speights, I'll take an order from you that

17   grants relief from stay for you to go back to the South

18   Carolina court to ask whether the judge wants to unseal the

19   record for purposes of my review.  And if he does, fine.  And

20   if he doesn't, that's the end of the matter.

21           MR. SPEIGHTS:  Thank you, Your Honor.  Just a couple

22   of housecleaning matters.

23           MR. BERNICK:  Well, before we do that, can we find

24   out a time frame, Your Honor?

25               THE COURT:  Oh.

1          MR. SPEIGHTS:  Well, that's part of my --

2          THE COURT:  Okay.

3          MR. SPEIGHTS:  Do you mean the time frame for hearing

4   the motion to assert or for getting the record?

5          MR. SPEIGHTS:  Well, I want first of all a time frame

6   by which a request will be made and Mr. Speights will -- maybe

7   Mr. Speights can report to the Court.  The South Carolina judge

8   can write a letter or do whatever that basically says whether

9   the matter will be unsealed or not.

10         THE COURT:  All right.  I want this calendared for

11  not later than November, preferably for next month.  So, I want

12  the record in time either for the next omnibus or the November,

13  whichever.  But really, this -- this issue has to go away one

14  way or another.  You folks need a ruling.

15         MR. BERNICK:  Yeah, I -- I then have a question about

16  the process because I guess I'm wondering if there is -- if

17  there is a request that's being made out of this Court --

18         THE COURT:  I'm not making a request.  I'm granting

19  Mr. Speights's relief from stay to go back to the South

20  Carolina court, as he asked, to see whether that judge will

21  unseal the record for his purposes in presenting it to me.  I'm

22  not asking for the record.  I'm not demanding the record.  I'm

23  not ordering the record.  I am giving Mr. Speights permission

24  to see whether the South Carolina judge will unseal the record.

25         MR. BERNICK:  So, then Mr. Speights, on behalf of his

1  client, would file a motion before the South Carolina judge to

2  unseal the record in the entire case?

3         THE COURT:  Whatever -- if the part of the transcript

4  is going to come, I want the whole thing so that I have the

5  entire record before me so I can then put into context

6  everything you folks are going to argue.

7         So, I don't want -- my only caveat is I don't want a

8  part of it.  I either want it all, or I don't want any of it.

9         MR. BERNICK:  So, we will hear -- we will then see a

10 formal motion by Mr. Speights --

11        THE COURT:  I don't know what you're going to see,

12 Mr. Bernick, that's not before me.

13        MR. BERNICK:  Well, --

14        THE COURT:  My motion is this:  I have granted his --

15 I am granting his request to be able to go back to the South

16 Carolina court and ask that the record be unsealed to present

17 here.

18        Mr. Speights, I want you to take that action within,

19 I guess, 20 days from today.

20        MR. SPEIGHTS:  Thank you, Your Honor.

21        MR. BERNICK:  The concern that I have, Your Honor, is

22 that we now see from the record that there have been ex parte

23 contacts between Mr. Speights and the South Carolina judge.

24 Now, I'm not expressing an opinion about whether that's proper

25 or improper under South Carolina practice, I don't have a view

1  on that because I don't know.

2          But I do know that with respect to some matter that's

3  ancillary to this Court, if there's to be any request made at

4  the South Carolina court, it ought to be in the form of a

5  formal motion, there should be no ex parte contacts, and then

6  the Court can do whatever it's going to do by way of granting

7  or not granting that motion.  But there shouldn't be any

8  contacts whatsoever between Mr. Speights or any people acting

9  on behalf of Mr. Speights and any court personnel at all that's

10  on an ex parte basis.  This should all be done basically on the

11  record, whatever the --

12          THE COURT:  I trust that Mr. Speights is not going to

13  have an ex parte contact and will file a formal motion and will

14  serve you so that the judge can appreciate it in the context of

15  the litigated posture.  Whatever the judge sends, if anything,

16  that is what I will review.  But if I don't have the whole

17  record, I'm not going to review portions of it because it seems

18  to me the whole issue is what he had before him.  That's what

19  Mr. Speights keeps telling me.  So, having part of it will not

20  be helpful.

21          MR. SPEIGHTS:  Thank you, Your Honor.

22          THE COURT:  All right.  Mr. Speights, sorry, go

23  ahead.

24          MR. SPEIGHTS:  I am not going to respond to all of

25  his statements.  I understand and appreciate Your Honor's

1  ruling and will move quickly in accordance with that ruling.

2          I did want to deal with two housecleaning matters:

3          First, the historical housecleaning matter.  When we

4  were before you in August, and Your Honor ruled on what I call

5  the bar date issue, Your Honor said, Mr. Bernick and Mr.

6  Speights, you get together to get a date so we can argue this.

7  And I contacted Kirkland and Ellis, and I have the e-mails

8  right there in my briefcase, and said, would you just please

9  consent to lifting the stay so I can get this record, and then

10  we can agree on a hearing date, and I would like an evidentiary

11  hearing.  More or less, depending upon whether I get the file

12  down in South Carolina.  So, I tried.

13          And Kirkland and Ellis said they wanted to hear the

14  matter today, that's fine.  It's -- they prepared the agenda

15  and had the motion to certify.

16          I don't -- I say that historically because I'm trying

17  to avoid déjà vu all over again.  Not déjà vu about not getting

18  this process, but déjà vu about having all the attacks come.  I

19  can hear it now if I don't bring this up, Mr. Bernick is going

20  to say Mr. Speights was before you in September and he never

21  mentioned it.  But what -- there is something else that needs

22  to be addressed.  Back in December in 2005, we not only filed

23  the motion to lift the stay, but we also filed six deposition

24  notices.

25          One of those deposition notices was to get behind

1  their bar date, and the other five -- I believe it's six and

2  not five, but the others were information we wanted from Grace

3  in connection with the motion to certify, December of last

4  year.  Grace filed a motion for protective order on that -- on

5  those.

6          That matter came up in January, I believe, and Your

7  Honor said put those back on the February calendar for the

8  omnibus hearing because you wanted to direct your attention to

9  this bar date issue.  And you directed additional briefing on a

10 discreet concern you had about the bar date issue.  And Ms.

11 Brody and I, Mr. Ferry, briefed that.  And we came along in

12 February and, of course, February is the time Your Honor stayed

13 the case -- the activities in the case because we were going to

14 mediate and present you a grand consensual plan of

15 reorganization.  And I might say, we tried.  Property Damage

16 tried and Personal Injury tried.

17         However, for reasons that are totally unimportant to

18 me, okay, the motions for protective order are not on the

19 agenda today.  And I'm happy to argue them today, okay?  I'm

20 happy to argue them next week or next month, but I don't want

21 to be accused by Kirkland and Ellis that Mr. Speights was

22 sandbagging Your Honor because I also, in addition to wanting

23 the record from South Carolina, want this discovery which we

24 propounded back in December.

25         So, I don't know which way Your Honor wants to go.  I

1  don't know which way they want to go.  And I know everybody

2  else in the courtroom wants to go to a break, but -- and maybe

3  we could have a break and discuss this.  But I don't want to be

4  blamed again for derailing this matter.

5          THE COURT:  All right.  Why don't you discuss with

6  counsel what you wish to do with respect to those motions.  We

7  will take a recess.  I'll hear that -- whether -- if you want

8  it today, okay.  I'm not prepared -- I have not reread any of

9  the information since then, Mr. Speights, but I'm sure I can

10 get up to speed.  But I'm not sure counsel on the other side is

11 ready to do that today.

12          MR. BERNICK:  Your Honor, this is now the third issue

13 where Your Honor already has ruled.

14          THE COURT:  On the protective order?

15          MR. BERNICK:  Absolutely.  This was the whole notice

16 issue.  Notice --

17          MR. SPEIGHTS:  I'm not arguing -- rearguing that,

18 Your Honor.

19          MR. BERNICK:  Well, but that is exactly what it is

20 that we're -- this all went to the question of, well, where are

21 all your products, where are they located, all by way of saying

22 that we didn't give adequate notice to people who were out

23 there who might have potential claims.  We made a full report

24 to the Court last time about the notice, and we further pointed

25 out to the Court that any issues concerning the notice would

1  timely have been raised only at the time that the notice was

2  crafted.

3            THE COURT:  The deposition --

4            MR. BERNICK:  I have Your Honor's --

5            THE COURT:  -- requests are for notice issues?

6            MR. BERNICK:  Yes, the whole purpose is to say that

7  we didn't take the steps that were necessary to give notice to

8  people, who we believe have reason -- had reason to believe

9  would have had claims against -- would have had claims against

10 the debtor.

11           MR. SPEIGHTS:  That is absolutely wrong, Your Honor.

12           THE COURT:  All right, you know --

13           MR. BERNICK:  It's absolutely what we're talking

14 about.

15           MR. SPEIGHTS:  That's not what we're asking for.

16           THE COURT:  All right --

17           MR. SPEIGHTS:  You ruled on that last time and said,

18 Mr. Speights, I don't want to hear from you again on this, and

19 I wouldn't have the --

20           MR. BERNICK:  Well, then what are we doing here?

21           THE COURT:  I --

22           MR. BERNICK:  Well, I'll give you a suggestion --

23           MR. SPEIGHTS:  There are five other deposition

24 notices that he has not addressed, and probably never read.

25           MR. BERNICK:  Well, Your Honor, I would suggest --

1  they're not on the agenda.  I would suggest that if he wants to

2  have them heard, he wants to file some kind of motion, he can

3  have it heard the next time.

4          THE COURT:  Well --

5          MR. BERNICK:  We shouldn't -- we -- I mean I --

6          THE COURT:  You've apparently got an a protective

7  order pending that hasn't been adjudicated.

8          MR. BERNICK:  Well, it's not necessary because the --

9  the depositions aren't necessary, in light of what Your Honor

10 already has determined about the notice program.

11         THE COURT:  Okay.  I'm -- I'm sorry --

12         MR. BERNICK:  So, why are we -- why are we --

13         THE COURT:  -- but this is really one that I really

14 do not recall.  I don't know what the purpose of the deposition

15 notices was.  I don't remember having a hearing with respect to

16 this issue, I just don't recall.

17         So, if there is a protective order that remains

18 pending, put it on next month's agenda.  If there is reason to

19 move to terminate or to withdraw that motion, then withdraw it.

20 I don't know what the purpose --

21         MR. BERNICK:  Thank you, Your Honor.

22         THE COURT:  -- of the deposition subpoenas is.

23         MR. SPEIGHTS:  Thank you, Your Honor.

24         THE COURT:  All right.  Let's take a ten-minute

25 recess and we'll reconvene with whatever is left.

1                  (Recess 4:23 P.M./Reconvene 4:36 P.M.)

2                  THE COURT:  Are you ready?  Okay.  We're back on the

3    record in W.R. Grace.

4                  I want to make sure I have the resolution to the

5    class certification issues that I understand what this is.  The

6    motion for relief from stay is going to be granted to let Mr.

7    Speights file a motion before the South Carolina court to see

8    whether or not it will unseal the transcript or the record.

9    And if so, to get me a copy of the record.

10                 The Anderson Memorial class certification motion and

11   the protective orders are being continued until next month, was

12   that the resolution.

13                 MR. BERNICK:  Yes.

14                 THE COURT:  Mr. Speights?

15                 MR. SPEIGHTS:  That was not my understanding, Your

16   Honor.  But it's certainly my understanding of the motion for

17   protective order on my discovery was continued to next month.

18                 THE COURT:  All right.

19                 MR. SPEIGHTS:  But obviously we want the discovery

20   and the record to make an argument on the certification motion.

21   And, Your Honor, if we don't hear the discovery until next

22   month, that's unrealistic.  I'd be happy to do the

23   certification motion or the special setting before you, but we

24   -- you know, this record, I can't remember how long you gave me

25   on the record, Mr. Ferry is taking notes on all that behind me.

1  But I'm not sure -- I've got -- will the record be here, out of

2  storage, et cetera, in order to hear a motion to certify next

3  month?

4          I think we ought to clearly hear any discovery items,

5  motions for protective orders or any other precursors to the

6  Anderson certification hearing at next month's omnibus.  I just

7  don't think the certification motion itself will be ripe at

8  that omnibus hearing.

9          THE COURT:  Okay.  I --

10         MR. BERNICK:  Your --

11         THE COURT:  I'm a little unclear, Mr. Speights, what

12  discovery you will need with respect to the class certification

13  motion.

14         MR. SPEIGHTS:  Well, I've got the notices back there,

15  and I can -- and -- and I can tell you the notices that I

16  served back in December.  But it was to get information -- for

17  example, one of the issues -- and I think it's addressed in the

18  2001 order, which I now understand we can refer to, even though

19  it wasn't binding on Grace.  One of the issues was Grace's

20  attempt to -- it's in the order, I'm not violating anything to

21  say this, it's in the final order.  Grace's attempt to settle

22  the case -- the Anderson case prior to the certification, and

23  our refusal to enter into settlement discussions with them

24  because of their attack on our adequacy.

25         Well, the law in this case is that -- I mean the law

1  in the country is that after <u>Georgine</u>, the settlement class

2  must meet all the prerequisites of a litigation class.  And

3  Grace, I believe, we will show during that discovery made the

4  representations to us that it was willing to stipulate to a

5  certified class action in South Carolina if we would settle

6  with them.

7       So, that's -- that's one discreet issue which I think

8  is an admission by them that I want to establish for the

9  record.  I can get the other notices and bring them up here,

10  but I don't think we have a lengthy discovery process we're

11  trying to do when I served them in December, I hadn't served

12  anything since then.

13       THE COURT:  But that's not going to make a difference

14  as to whether the class was actually certified.  What they do

15  by way of settlement discussions and what they do by way of a

16  legal position, as well all know who settle cases, are not

17  always the same.  I mean --

18       MR. SPEIGHTS:  But, Your Honor, I'm glad you said

19  that because I sensed that was a concern of yours a while ago.

20  There are several issues floating around here at once.  One is

21  is whether you must or should accept the certification order

22  against Grace like you did against U.S. Mineral.

23       But putting that aside for a minute, even if Your

24  Honor must not do so, there's a separate issue of whether you

25  should certify a class.

1          THE COURT:  Right.

2          MR. SPEIGHTS:  And I want the information both from

3    discovery and the record to show you that we have a lot of

4    arguments, and a lot of forceful documents to present to you of

5    why you should certify a class.  And that I also will say to

6    you, just like Mr. Bernick wants to look to that order in

7    Prudential of June of 2001, I will also argue to you that you

8    should look to Judge Hayes' final order in which he deals with

9    all these issues, as you would look to schools' litigation, or

10   colleges' litigation or everything else.  So, we will also look

11   to all that when you should certify, we think, a class.

12         If Judge Hayes had never signed that March --

13   February or March order, I would be here making the exact same

14   arguments.  I just wouldn't have the argument that you should

15   file it because he's already ruled.  I should say they've had

16   their day in court and maybe collateral estoppel, but in any

17   event, there's a full record and, in addition, Your Honor,

18   here's all this information.  And I need to put the information

19   in a form to present to you, that's why I want the discovery.

20         I mean you may rule with them on the protective

21   order.  You may rule with me.  You may rule some yes, some no.

22         THE COURT:  All right.  I want the protective orders,

23   and any other issues that are preparatory to this, any other

24   issues, set for hearing in October.  If the judge is going to

25   issue an order that unseals the record, surely I ought to be

1  able to have that by the October hearing.  I don't see why it

2  should be that lengthy a process if, in fact, there's going to

3  be an order that will unseal it.  And we'll put the Anderson

4  Memorial class certification probably on the November hearing.

5  I'll hear from you about it next month.  I'll ask that we do a

6  status conference to see where all these discreet pieces are

7  going, but I really want it on.  And the next time it's on, I'm

8  not taking it off, not for anything.  We're going to get a

9  ruling on it, or at least get the argument done so that I can

10 make a ruling on it the next time it's on.

11            MR. SPEIGHTS:  Thank you.

12            THE COURT:  So, I'm aiming for November.  We'll see

13 whether all the pieces are in, and I'll expect you to tell me

14 that at the next omnibus in October.

15            MR. SPEIGHTS:  Thank you, Your Honor.

16            MR. BERNICK:  If you'll give me a moment, Your Honor,

17 I'm just --

18                         (Pause)

19            MR. BERNICK:  I understand the request that Mr.

20 Speights is going to be making by motion of the court in South

21 Carolina.  And I guess our hope from what you're saying, Your

22 Honor, is that we will hear by next time?

23            THE COURT:  Hear by next time?

24            MR. BERNICK:  Whether -- what -- what the status of

25 that is.

1        THE COURT:  Yes, I'm expecting that by the October

2  omnibus, I'm going to know that the record is or isn't coming

3  to me.  And if it's coming to me, when.  Now, if it has to be

4  ordered back from storage, you know, if it's a paper copy

5  record, is electronic, then I don't know what issues there may

6  be.  I guess we're going to have to find out.  So, I want to

7  know in October what that prospective game plan for getting

8  that piece of information to me is.

9        There are protective order motions.  If they need to

10  be adjudicated, I want them on the October calendar so that I

11  can adjudicate them.  If there's going to be discovery, it's

12  going to be very limited in terms of time frame.

13        And so I want everything ready so that the next time

14  this is on the calendar for a ruling on the merits, I actually

15  get to the argument.  I really don't want to read these

16  pleadings one -- more than one more time.  So -- these

17  arguments and briefs.

18        So, the next time it's on the calendar, that's it.  I

19  want it argued and then I'm going to give you a ruling.

20        MR. BERNICK:  Okay.  But at this point, there is no

21  setting on the calendar for the class certification itself.

22        THE COURT:  Right.  That's what we're going to have a

23  status --

24        MR. BERNICK:  From the debtors' --

25        THE COURT:  -- conference about.

1          MR. BERNICK:  From the debtors' point of view, this

2   thing has been gone over so many times.

3          THE COURT:  Yes, sir.

4          MR. BERNICK:  And -- I mean it is -- it is -- it is,

5   frankly, Your Honor, a joke that at this point in time we're

6   going to be certifying a class.  I say that -- I don't think

7   I've made that representation before to the Court.

8          Literally we don't want to spend any more time on

9   briefs.  So, I'm -- I'm not sure what purpose there is even to

10  be served by setting another hearing on classification.

11          THE COURT:  If you want to argue the merits today and

12  simply see whether there's anything supplemental to be done by

13  way of the protective order decision and the brief -- I'm

14  sorry, the record from South Carolina --

15          MR. BERNICK:  Well, I --

16          THE COURT:  -- fine.  Let's do it.

17          MR. BERNICK:  I think that that's probably evident

18  because no matter what happens, we're going to have the matter

19  heard yet again as long as there's any pretext for doing it

20  seeking discovery or otherwise.

21          So, I think that Your Honor says next time we'll get

22  a report and see what's going to go on with South Carolina.

23  Next time we'll deal with what has been in the past a request

24  for discovery, and that's all that's really being set today.

25          THE COURT:  That's all that's being set for hearing

1  next month.  But next month, I want the case and a process

2  where we can pick a date for hearing the class certification

3  motion on the merits.  I want to set that date during next

4  month's omnibus hearing.

5          MR. BERNICK:  But just so that -- and I don't want to

6  belabor this any more than it has to be.  But the concern that

7  I have, Your Honor, is that we already briefed class

8  certification again for today.

9          THE COURT:  You don't have to supplement anything.

10          MR. BERNICK:  Well --

11          THE COURT:  I'll keep the binders.  You don't even

12  have to submit the binders if that's what you want.  Or else

13  argue it now, Mr. Bernick.  I'm prepared to hear it.

14          MR. BERNICK:  No, I'm not --

15          THE COURT:  I'm tired of reading it, too.

16          MR. BERNICK:  It's not my --

17          THE COURT:  You're tired of writing it.  I'm tired of

18  reading it.

19          MR. BERNICK:  It's not my -- it's not really my

20  issue.  I mean if they -- if they get information out of South

21  Carolina, I can see their trying to convince the Court that

22  it's something new and important.  So be it.

23          But I don't know that that's a reason why we should

24  have a special setting yet again to argue class certification

25  and have a round of briefs on class certification.

1           What Your Honor said last time --

2           THE COURT:  I didn't ask for any briefs.

3           MR. BERNICK:  Well, but, see, if Your Honor says

4  we're going to set it on for motion -- set it on for an omnibus

5  down the road, we're going to hear class certification again,

6  it's suggested to my ear that Your Honor was entertaining the

7  idea that we're going to argue class certification all over

8  again sometime down the road.  I think we've already argued it

9  at least two or three different times.

10          I think that the only thing that really has to take

11 place is that if they get the information that they say that

12 they need, they can report to the Court and talk about what the

13 information is and we can respond to it, and I don't think

14 there's really anything else to be said on the subject.

15          THE COURT:  I am going in October -- I don't know how

16 to make myself any more clear, Mr. Bernick.  I apologize, but I

17 will take one stab at it.  In October, I want any discovery

18 matters that are opened that need addressed related to class

19 certification on the agenda, including the motion for

20 protective order if they are not withdrawn.

21          So, that anything that is preparatory toward getting

22 a decision of the class certification motion on the merits is

23 done in October.  I want to know from Mr. Speights when the

24 record is going to get to me if it hasn't already been

25 submitted to me, assuming that Judge Hayes approves it.

1          And if Judge Hayes does not decide to unseal it, I

2   want to know that so we can get a date set for one final round

3   of this issue of the class certification so that I can address

4   it on the merits.  I have not yet done an order with respect to

5   class certification.  If there's going to be one, it's time to

6   do it.

7          If there isn't going to be done, it's time to know

8   that there won't be done.

9          MR. SPEIGHTS:  Okay.

10          THE COURT:  Okay.  What else is there?

11          MR. BERNICK:  There is -- there are two more matters

12   that are on for this afternoon.

13          THE COURT:  All right.

14          MR. BERNICK:  One is visiting yet, again, the case

15   management order for the property damage claims.  We had had

16   some discussions with the view of trying to resolve this, but I

17   don't think that they have yielded a final resolution at this

18   point in time.

19          (Attorneys conferring off-the-record)

20          MR. BERNICK:  I guess there's been more developments.

21   Maybe we have a deal.  And, therefore, I will truncate all

22   discussion about the history leading up to this round of

23   discussions on the case management order, and just get to where

24   I think we finally come out.

25          I will tender to Your Honor here a copy which

1  reflects some hand notations.  I don't have copies for

2  everybody, will you take one for --

3                    (Pause)

4          MR. BERNICK:  Your Honor, I'll just describe this

5  orally, and then I'll tender it to the Court if it's

6  appropriate.

7          We have an order, and it was signed by Your Honor on

8  August the 31st.  There were a series of objections made.  And

9  I think that Mr. Dies will want to make a statement on the harm

10  portion of this adjudication.  But I believe it's a statement,

11  as opposed to re-litigating the issue.

12          And then we have an agreement, in order to resolve

13  another concern that Mr. Dies raised on behalf of his clients,

14  that deals with the briefing.  And I think we do have agreement

15  on that.  And effectively, what we're doing is with regard to

16  the paragraphs, if Your Honor will recall, we have three

17  different hearings:  We have methodology, we have Statute of

18  Limitations and product ID, and then we have the harm hearing.

19          And with respect to those three matters, we also have

20  the option for parties to file summary judgment motions in

21  connection with each of those three issues.

22          And because the hearings are on different tracks, the

23  time tables for the motions for summary judgment are on

24  somewhat different tracks.  And a concern was raised that if

25  the debtor waits until the very end, or anybody waits until the

1  very end to file a motion for summary judgment, there's a

2  squeeze in terms of numbers of days.

3        So, we clarified by changing -- we're going to move

4  up in each instance the last date by which a motion for summary

5  judgment can be filed.  So, that no one's squeezed at the end.

6        And then in each case following the filing of the

7  motion for summary judgment, basically the responding party

8  will have 30 days and then there will be seven days for a reply

9  not to exceed five pages.

10       So, in each case, we're basically going to have a

11 period of time lasting for varying periods of time, depending

12 on the issue.  And if motions -- motions for summary judgment

13 can be filed during these periods of time.  And as they're

14 filed, a response will be due in 30 days, reply seven days

15 thereafter, and then they can be teed up for a hearing when the

16 time is available before Your Honor.

17       I think effectively, this is already kind of taking

18 place now, as you've seen, so it's not all postponed and put to

19 the end.

20       So, I'll now tender to the Court an amended -- what

21 would be an amended order.  It's the copy of Your Honor's order

22 of August 31, but now with the amended dates.  And they are --

23 the dates would, I think, reflect this arrangement.

24           THE COURT:  All right.

25           MR. BAENA:  Judge, before that's signed --

1          THE COURT:  Okay.

2          MR. BAENA:  -- could we have one word?

3          THE COURT:  Yes.

4          MR. SPEIGHTS:  Your Honor, I've never seen that, I --

5     maybe Mr. Lockwood would loan me his copy.

6          MR. BERNICK:  Well, this was specifically discussed

7     with counsel.  I guess maybe there wasn't a deal.

8               (Pause/Attorneys conferring off-the-record)

9          MR. BERNICK:  I guess there's no deal, Your Honor.

10    We would then ask -- and I'll now lengthen my speech just a

11    little bit.  We had the marathon proceeding in July -- I'm

12    sorry, Your Honor.

13         THE COURT:  Well, I guess I'd like to hear from the

14    other side what's wrong with this proposal.  It appears to do

15    what they ask, which is to bump back the motion for a summary

16    judgment deadline date by roughly 30 days.  Give them 30 days

17    to answer, and then have the reply date.

18         MR. BERNICK:  I don't have the slightest idea what

19    the concern is, but our -- our request would then be on behalf

20    of the debtor to modify these dates so that we get more time at

21    the end.  And so that the process can take place on a

22    continuous basis, that's our request.  And I believe that is

23    already actually, in a sense, being executed now as we speak.

24         THE COURT:  All right.  Mr. Baena?

25         MR. BAENA:  Judge, I -- I -- you know, the -- there

1  is nothing to be critical about here when we suggest that this

2  order doesn't memorialize what the claimants were asking for.

3  It's very simple.

4          Your Honor will recall that when you entered an

5  order, it was after the parties couldn't agree.   And on this

6  very point, you found a compromise.

7          We were saying, consistent with what you've said

8  previously, Judge, motions for summary judgment shouldn't be

9  allowed to be made until discovery is closed.

10          You came back with an order that said, no, people

11  could file a motion for summary judgment at any time up to a

12  date certain.  And then people will have until another date

13  certain in March to file their responses.  And then you will

14  rule before another date certain.

15          Well, they left in the part anybody can file the

16  summary judgment motion starting now up to a date certain.

17          Then they say everybody has 30 days to respond.

18  Which means if somebody filed a motion for summary judgment

19  today, they'd have to respond within 30 days.  That just

20  eviscerates --

21              THE COURT:  I see.

22          MR. BAENA:  -- what we were trying to accomplish.

23          MR. BERNICK:  Your Honor, I -- that is -- this is

24  just -- this stretches the bounds of credibility.  Anybody can

25  file a motion for summary judgment at any time and take the

1  position that the record is clear and that there's no need for

2  a trial.  That happens every day of the week.

3          There is a provision under the Rule that's called

4  54(e), I believe it is, which says that if a motion for summary

5  judgment is filed, and the responding party believes that the

6  record is not complete and there's a need for further

7  discovery, then the Court can take up that matter and say the

8  motion for summary judgment is not ripe, and I'm convinced that

9  there's a need for further discovery.

10          But you don't automatically say, well, of course, no

11  motion for summary judgment can be filed until after discovery

12  is over.  Because at that point, all of those motions --

13          THE COURT:  The issue --

14          MR. BERNICK:  -- get jammed up until the very end.

15          THE COURT:  Yeah, the issue isn't the motions being

16  filed.  The issue is the response date having to be filed

17  before the discovery is closed.

18          MR. BERNICK:  Absolutely.

19          THE COURT:  That's the problem.

20          MR. BERNICK:  Well, but it's not a problem --

21          MR. BAENA:  That's correct.  Your Honor --

22          MR. BERNICK:  Excuse me.

23          MR. BAENA: Your Honor --

24          MR. BERNICK:  Excuse me, Counsel.  Excuse me.  I

25  think that we have a non-interruption policy here, at least we

1  did.

2                          (Laughter)

3          MR. BERNICK:  The Rules -- this limits the Rules.

4  The Rules make specific provision.  The Federal Rules of Civil

5  Procedure which govern in this process say you don't -- in a

6  motion for summary judgment that automatically you don't have

7  to respond until discovery is over.  You have to make a showing

8  that there is some further discovery that's necessary in order

9  to determine whether --

10          THE COURT:  Yes.

11          MR. BERNICK:  -- it's a triable issue of fact or not.

12          THE COURT:  The Rules also say that the Court can

13  vary the Rules when it's appropriate.  And here's the problem,

14  Mr. Bernick, if I don't do it now, I'm just going to get a

15  plethora of those motions.  You know it, I know it, I don't

16  want to deal with it.

17          MR. BERNICK:  Well --

18          THE COURT:  I would prefer to get the responses in

19  when the discovery period is finished, let you file a reply

20  within that time and get everything into one proceeding.  I am

21  really distressed about the fact that in this case, nothing

22  ever ends.  It just keeps going on and on.

23          MR. BERNICK:  Well --

24          THE COURT:  It's the same comment you've been making,

25  I have --

1          MR. BERNICK:  Absolutely.

2          THE COURT:  Yes, I know.  It's -- and -- and the

3 criticism, I agree, rests on me because I've allowed it to

4 happen.  I assured you earlier today I'm not going to allow it

5 to happen anymore.  This is my first step in making sure that

6 it doesn't happen in the future.

7          MR. BERNICK:  I appreciate that.  And far be it from

8 me to then say, well, gee, that's not enough.

9          Here's my concern, and it's relatively -- it's

10 relatively simple.  The whole idea of having these motions get

11 teed up -- and maybe here's a compromise.  Is that we would

12 file the motions.  If the other side believes that there is a

13 reason why they shouldn't be heard for 30 days or whatever it

14 is, it should be deferred, then they could come up and say so.

15          The difficulty is that a lot of these motions really

16 raise in the sense a lot of the same issues.  Take, for example

17 --

18          THE COURT:  That's why I want to hear them at one

19 time.

20          MR. BERNICK:  Well, but here's what happens.  Your

21 Honor -- Your Honor rules on choice of law.  Here's what choice

22 of law means in Delaware.  Everybody knows what the ruling is.

23 It's now been announced.

24          On the basis of that, it seems to me that you then

25 build from the decision that's been reached and then try to

1  sort out what's going to happen with related matters.

2        If Your Honor doesn't rule on any of the motions for

3  summary judgment until the end of the day, then effectively we

4  lose the benefit of finding out what Your Honor's determination

5  is going to be made -- going to be with respect to what is

6  effectively exactly the same issue.  And instead of being more

7  efficient, it's less efficient.

8        The Statute of Limitations -- how you decide what law

9  applies to the Statute of Limitations is a perfect example.  We

10 had in mind to tee up Statute of Limitations motions that

11 basically worked with different types of laws and says, well,

12 here under the choice of law, it's this kind of law.  Under

13 this law, here are the claims that are involved.  And we

14 proceed sequentially so that we winnow out and get down at the

15 end to issues that are more difficult issues.

16        This way we can't do that.  Now, if Your Honor says,

17 fine, we're just going to do it once and we're going to do it

18 all at the end, then we'll accept that ruling of the Court.

19 But I think that that really hampers, rather than facilitates

20 the process of sorting out all of these different issues on a

21 sensible basis, particularly on the Statute of Limitations.

22        THE COURT:  Well --

23        MR. BAENA:  Your Honor --

24        THE COURT:  -- on the Statute of Limitations, if it's

25 a legal argument, why do you need discovery at all?

1          MR. BERNICK:  Well, I -- I -- that's my -- that is

2     exactly my point.  In other words, it is really our burden --

3     for example, let's assume that we have a Statute of Limitations

4     of reposed state where the only question is when was the

5     building built and when was the asbestos installed.

6          We file a motion that says with respect to this

7     building, this is the state law that applies.  It's a statute

8     of repose.  The building was built X date, see the claim form.

9     It's over.

10          So, Your Honor then has the opportunity to say, yeah,

11     here's how this choice of law works.  It is the law of this

12     State.  This state's law is statute of repose.  And, therefore,

13     that claim is gone.  We don't have to worry about it for any

14     other purpose.

15          If I make the motion and they're able to say, well,

16     yeah, it's a statute of repose state, but the building was --

17     the asbestos wasn't really installed until Y, notwithstanding

18     that that's what the claim form says.  See, all this is driven

19     by what's just in the claim forms themselves, then why defer

20     that to the end and have that building survive for all of the

21     other issues in the case?  Why not just get rid of it?

22          MR. BAENA:  Can I be recognized, Judge?  There is no

23     motion to reconsider your order that was filed by Grace before

24     the Court.

25          What you have before you today is an objection which

1  you allowed claimants to make to the order that you entered.

2  Grace didn't ask you to revisit this order.  We're not here to

3  revisit your order on a motion by Grace.

4          This is why this case is not going anywhere.  Because

5  Mr. Bernick knows how to deflect blame for his shenanigans to

6  everybody else in this case.

7          THE COURT:  All right.  Gentlemen, I threatened you

8  last time.  If these kinds of comments keep going on that

9  you're going to be visiting the Marshal, and I mean it.

10         MR. BAENA:  Judge, the only thing before you --

11         THE COURT:  I mean it, Mr. Baena.

12         MR. BAENA:  -- is whether or not the ten days that

13  you provided, the difference between March 9th and March 19th,

14  was enough.

15         THE COURT:  And it isn't.

16         MR. BAENA:  And it isn't.

17         THE COURT:  Fine.

18         MR. BAENA:   And they just wish to extend that period

19  for another 20 days.

20         THE COURT:  That's fine.

21         MR. BAENA:  That's all that's before you.

22         THE COURT:  Okay.

23         MR. BAENA:  Thank you, Your Honor.

24         THE COURT:  Why doesn't this order do that?  Because

25  it says in 30 days, rather than putting a date in.

1          MR. BAENA:  That is correct.  Because it's from the

2  date that they filed the motion, as it's drafted.

3          THE COURT:  So, what you want is -- let me look, for

4  example --

5          MR. BAENA:  A date specific.

6          THE COURT:  -- at Paragraph 4, which right now has

7  inserted the date February 16, rather than March 9.  You want

8  the next sentence to say responses must be filed no later than

9  March 19th at 4 P.M.  So, that you're outside the discovery

10  period.  You want 30 days rather than --

11          MR. BAENA:  Correct.

12          THE COURT:  All right.  Responses must be filed by 4

13  P.M. eastern time on March 19.

14          So, the only --

15          MR. BAENA:  And then there is --

16          THE COURT:  -- date that needs to be changed is March

17  9 needs to be changed to February 16 in Paragraph 4.

18          MR. BAENA:  Correct.

19          THE COURT:  All right.  And in Paragraph 5, the only

20  date that needs to be changed is April 10 to March 20.

21          MR. BAENA:  That's correct.

22          THE COURT:  And that's the only change -- those are

23  the only two changes.

24          MR. BAENA:  That's it.  That's all they --

25          THE COURT:  Fine.  I am willing to make those

1    changes.

2            MR. BAENA:  Thank you.

3            THE COURT:  Mr. Bernick, can you submit an order that

4    will simply make those two changes?

5            MR. BERNICK:  That -- that's fine.  And what that

6    means, Your Honor, just so we're clear, is that there will be

7    no summary judgment motion practice until those dates take

8    place.

9            THE COURT:  Well, there may or may not.  I mean you

10   folks may decide that there are some issues that you want to

11   get adjudicated earlier, Mr. Bernick.

12           MR. BERNICK:  I am a thousand percent convinced that

13   they will not want to have -- these are our issues, right?

14   They're our issues that we teed up.  We go back to the claim

15   form and the work that was done on that claim form to get these

16   folks to commit on these basic predicate facts.  Every single

17   one of our motions is based upon essential predicate facts that

18   come right out of the claim forms.

19           If they want to say that discovery is necessary

20   before they can respond, what they're really saying is the

21   claim forms are -- they're not held to the claim forms.  And if

22   Your Honor is going to permit that, that's fine.  We'll just

23   then have all of the summary judgment motions, be up against

24   the back end of these dates.

25           THE COURT:  But it's not --

1      MR. BERNICK:  Which, you know, makes --

2      THE COURT:  It's not changing anything, Mr. Bernick,

3  except shortening the back end date.  That's what it's doing.

4  You had the back end issues before.  This order isn't amending

5  anything except the --

6      MR. BERNICK:  Well, I understand that.

7      THE COURT:  -- initiation date.

8      MR. BERNICK:  Maybe we should have been clear in the

9  order as it was originally submitted to say --

10     THE COURT:  No --

11     MR. BERNICK:  -- as we are --

12     THE COURT:  -- it was clear.  It was what I ordered.

13  They asked me to have the responses at the end of the discovery

14  period, and I agreed that that was appropriate.

15      I don't want to deal with discovery issues that are

16  unnecessary.  And it will just further prolong matters if I

17  have discovery disputes because of the fact that responses are

18  due when discovery isn't over.  Even in small cases, I find

19  that with one party, let alone all of these parties, Mr.

20  Bernick.

21     MR. BERNICK:  Okay.  Well, that's fine.

22     THE COURT:  It's not expeditious.  So, I think this

23  is a better way to proceed.  If it means that we have to tee up

24  a whole lot of arguments, then we'll all suffer for it, bring

25  your toothbrushes, we'll be here for late nights again.

1           MR. BERNICK:  Fine, Your Honor.

2           THE COURT:  All right.  I will take a new order when

3      it's submitted on a certification of counsel.

4           MR. BERNICK:  Okay.  I think that that then brings us

5      to the last matter, which is the questionnaires.

6           MR. BAENA:  Your Honor, may Property Damage be

7      excused?

8           THE COURT:  I suppose.  I don't know what's coming

9      up, Mr. Baena.  These hearings have a way of being free

10     flowing, so you leave at your peril.  If I issue rulings, I'm

11     going to issue rulings.  If I issue orders, I'm ordering them.

12     I'm going to issue orders.  So, it's up to you.

13          Mr. Bernick?

14          MR. BERNICK:  We have another process that deals with

15     orders.  You'll recall last time in dealing with the question

16     of the questionnaires for the personal injury claims that we

17     urged that the Court stand full square behind the process that

18     was followed with such care when the questionnaires originally

19     were approved by the Court and no appeal was taken.

20          And we also underscored the importance to Your

21     Honor's schedule, which I have told all that I converse with is

22     important to Your Honor because it represents potentially the

23     light at the end of the tunnel.

24          Well, it's a -- at least psychologically, it's what

25     enables me, at least, to believe that we're headed towards an

1  event of some consequence that might have impact on the case.

2  At least I think we all hope that that's true.

3        And we explained how it was important in order to

4  stay on track for that schedule and to respect the process that

5  had been followed in getting to the questionnaires that Your

6  Honor approved that we not allow the questionnaires then to be

7  re-litigated again by whatever lawyers decided to come in and

8  say, oh, well, it was all different and what was said by Mr.

9  Lockwood that the Committee would represent its constituency

10 for purposes of the process was not so.

11        Your Honor was clear last time in saying, well, it

12 may be, but I'm not going to cut off this discussion, I want to

13 hear from the folks that have come in.  So be it.

14        So, we had -- we had discussion last time at some

15 length on a variety of issues.  And I also -- only want to talk

16 about two or three of them because it brings me to where we go

17 from here because I think we're facing exactly the same issue

18 here, which is whether this case is going to proceed.

19        With respect to attachments, we had a long discussion

20 with attachments and, Your Honor, I think started out with the

21 reaction that, well, gee, why can't people use attachments as

22 they do under Rule 33(d).

23        But we, I think, pointed out, and rightly so, Rule

24 33(d) had no application here because we're not talking about

25 business records being maintained -- business records being

1  maintained by a responding party or a defendant -- corporate

2  defendant, which is what Rule 33(d) was designed to deal with.

3      Your Honor, nonetheless, did decide or indicated that

4  attachments could be appropriate, even if Rule 33(d) didn't

5  apply.  So, we made a proposal right there on the spot that

6  would allow attachments, but would assure that the attachments

7  truly are responsive to the questions and that we don't have to

8  fiddle around to figure out which documents are being used as

9  attachments.  We, actually after the break, came back in open

10  court and we made that proposal.  And in all of the different

11  lawyers who are here, nobody actually stood up to say, well,

12  gee, we accept that proposal or here's an idea of how to modify

13  that proposal, it didn't happen.

14      Your Honor, however, went through and gave at Pages

15  253 and 254 Your Honor's own reactions to what ought to be done

16  by way of attachment in a fair degree of detail.

17      Number 2 is burden.  An extensive pitch was made by

18  counsel for -- I think this was Mr. Krause, who represents meso

19  claimants, that filling out the questionnaire would be a

20  tremendous burden to mesothelioma claimants.

21      Of course, it then turns out that mesothelioma

22  claimants probably have fewer questions to fill out.  In any

23  event, it's their lawyers who are filling them out.

24      In any event, it turns out that the 400 people that

25  Mr. Krause purports to be representing here and does represent,

our processing of 260 of those records, determined only one

case where there actually had been a specification of

mesothelioma.

And, therefore, there really was a question about

whether there is a burden argument at all to be made, and

whether it's really relevant.  Obviously if this were

litigated, plaintiffs would have the burden of coming forward

and demonstrating what it is that supports their claim.

So, at the end of the day, I think I observed to Your

Honor that I was trying to get optimistic that we were making

some progress because it seemed to me that there was a lot of

controversy.

And Your Honor did say, oh, no, we have made some

progress.  And I think in fairness, there had been some

progress:

Number one, Your Honor resolved the signature issue.

Indeed, in your own language, specified how the -- how many

signatures had to be there and exactly why.

Number two, made clear that with respect to questions

that were essentially contention questions, that they did have

to be answered on the blanks provided.  It wasn't sufficient to

do an attachment.

Number three, Your Honor determined that the

questions were relevant.  That you didn't see that there was a

basis to say that they were not relevant.

1        You had, after all, found that they were relevant

2   when they were originally proposed in connection with the

3   formulation of the questionnaire.  And, in fact, we even have

4   one claimant -- one law firm which has written us a letter

5   saying they acknowledge that the questions now have to be

6   answered because of Your Honor's comments with respect to

7   relevance.

8        And finally there was the attachment issue where Your

9   Honor at least gave what you said -- you words were, "I have

10  given you an advisory opinion on what it is that should

11  happen."

12       And you then said, "Folks, answer the questions in

13  one form or another.  Answer the questions."

14       Following that process, we undertook to try to craft

15  an order that would reflect what Your Honor had decided.  And

16  in so doing, we realized that there was a major potential

17  problem.  And it had to do with the schedule that Your Honor

18  set.  And we didn't know whether Your Honor really appreciated,

19  this kind of took a little bit for it to sink in with us.

20       Your Honor set a schedule that basically said people

21  had to let us know within ten days whether they were going to

22  supplement or not.  And then they had to supplement -- any

23  supplementation had to take place within 30 days.

24       Well, our concern was that if people were still going

25  to be fighting the battle on attachment, that, more than

1 anything else.  But also to a certain extent, if they were

2 going to be fighting a battle on the other issues, that

3 effectively if the schedule were taken to be just that, just as

4 Your Honor said, folks would say, well, we are going to

5 supplement.  They would then do all the work that they thought

6 was appropriate to supplement, including whatever they were

7 going to do with the attachments.

8         And then we would find out what the result was 30,

9 35, 40 days later.  And if we gave them more time to do it,

10 however long it was by agreement, going to take them, maybe it

11 would be another 60 days.

12         And that they would then have gone through all the

13 work of mustering these materials pursuant to whatever they

14 felt was an appropriate attachment protocol or methodology.

15 And then if we only then came back and said, well, it's not

16 sufficient, it's not what the judge said, as we construed what

17 she had to say, they'd say, oh, well, that's ridiculous, and

18 not only that, but if you want us to do it all over again, it's

19 going to cost even more money and it's going to take even more

20 time.

21         And I won't re -- you could see also a strategic

22 element to that strategy if you're thinking about it for not

23 too terribly long.

24         And in this, even beyond the relevance objections,

25 was a huge problem because since there's no point in our

1    saying, okay, well, take as much time as you need or take 60

2    days, and then have no agreement on what the attachment scheme

3    is, then have them basically not answer the questions all over

4    again, supply a bunch of materials as our attachments and say,

5    go look, and we're not going to tell you exactly which one it

6    is or what part of which one it is.

7              So, at that point, we decided that we would try to

8    craft a solution.  And in the process of crafting the solution,

9    also give people at least a little bit more time and subject to

10   further negotiations or discussions on yet further time for

11   certain firms if it really was necessary.

12             So, we came up with the idea of simply taking what

13   Your Honor had said about attachment in the developing of

14   protocol that was a pretty thorough protocol.  And the result

15   was -- and then asking that it be sent out in connection with

16   the order, not that the orders say this is final, but that it

17   be sent out in connection with the order so the people then, if

18   they wanted to come in and object, could come in and object,

19   and then have a special setting where any such objections could

20   be heard.

21             So, that by the time people invested in more energy

22   with respect to the documentation, that it be crystal, crystal

23   clear what was going to be acceptable and what was not going to

24   be acceptable, and we'd get it done once and we'd get it done

25   right.  And that is essentially --

1                              **(Pause)**

2              **MR. BERNICK:    -- what this protocol seeks to do.    And**

3    **we can walk through -- and, in fact, this marks up the pages**

4    **that it came from.**

5              **But the essence of what it says, although it says**

6    **with great specificity, is this:**

7              **That first, where you have contention**

8    **interrogatories, you've got to answer the questions anyhow, and**

9    **we talk about which ones those are.**

10              **Second, that where documents are sought to be used as**

11   **an attachment, it must, first of all, be true that the document**

12   **itself on its face provides the answer.    Because we can't be in**

13   **a situation where the document requires interpretation.**

14   **Because then people may have different interpretations.    You've**

15   **got to be able to find the answer in the document.    That is if**

16   **the question were filled out as an answer in the blank, it**

17   **could be filled out by actually taking a look at the document**

18   **and see the answer there.**

19              **Second is that the document that provided that answer**

20   **should be identified specifically with a bates number or**

21   **something else.    It should be attached and then identified.**

22   **So, there's no question about where it is.    There's no question**

23   **about which one it is.    It's this.    It's Document 100003.**

24              **And that finally, there's a principal of limitation,**

25   **which is that the only documents that can be referred to are**

1    the ones that really do answer the question.  But then the

2    principal of limitation is you can -- you should provide the

3    identification of all those documents that do provide that

4    answer, but no more documents can provide that answer.  So, we

5    don't get a bates range that goes on for 50 pages, which isn't

6    really necessary.  The answer's on Page 47 or on Page 3.  That

7    way, people -- if the answer's in a document, like you were

8    given the example of the work history.  It wasn't really --

9    this is the employment history, it didn't have any information

10   with regard to product exposures.  If you've got that kind of

11   document where we can go see the -- see the words, just cross

12   reference that document and it's attached.

13          Whereas if you have medical records, we don't have to

14   go ferreting through a hundred or 300 files that are attached

15   or incorporated by reference or produced with the

16   questionnaire.  The result, the diagnosis that's being

17   identified or the test result that's being identified, is

18   attached, and it's identified by page number, that's

19   essentially what this does.  Which really means that, yes, you

20   can use documents, but there's not going to be any question of

21   our having to interpret the document.  This is the same as if

22   the claimant were a deponent or the doctor were a dependent and

23   the documents are all there and they're asked, well, which one

24   does it, and they would have to answer.

25          There's also no question but that this is obviously

1  much cheaper.  Maybe a burden, but it's much cheaper -- it's

2  the cheapest way to go out and find responsive information.

3          So, we propose that this go out with the order.  And

4  that people then have the opportunity if they want to come in

5  and say, no, we want to fine-tune this or fine-tune that.  That

6  instead of having this process take place without the guidance

7  from the Court, that we'd have that special setting, I think

8  it's on October the 13th, with a view to getting this matter

9  resolved.

10          The only other development that we have is that it

11  now turns out that, well, there are relevance objections.  For

12  example, the one they come up with is why should a meso

13  claimant have to fill out PFTs -- PFT tests.  And the answer

14  is, it's real simple, if it's a meso claim, they can just put

15  in N/A, it doesn't apply to the claim.

16          We're not putting -- if that's -- if that's the most,

17  you know, probing and important relevance objection, there's a

18  very simple solution to that.

19          We're concerned, though, that people are going to use

20  this now as an opportunity because Your Honor didn't rule on

21  specific objections to then say, well, we still have our

22  relevance objections, and we've now heard that from -- we -- we

23  still have this relevance objection or we've got a work product

24  objection, we're not going to tell you what it is, but we've

25  got a big work product objection that -- there are still some

1    important threshold matters that we think can and should be

2    teed up, so we get this done the right way.  And the way we've

3    thought of handling that is to take a couple of the law firms,

4    beginning with those who have said already they're not going to

5    supplement -- there are a couple of firms that have said

6    they're not going to supplement.  And moving to compel answers

7    to certain questions that we think are out there as being still

8    kind of -- there's no closure on them, and have those heard on

9    the 13th, as well, which would require that we have an

10   expedited schedule, which we're prepared to agree to.  We're

11   prepared to put these matters to you, you know, say within

12   seven to ten days and have them respond, and then have it

13   heard.

14          But we would file motions to compel with respect to

15   probably about three or four firms, teeing up some of these

16   issues so that they can then be heard.

17          But then other folks who want to speak to the issue

18   also can show up on the 13th and speak to the issue.  We want

19   to have the 13th be a date where Your Honor can provide with

20   specificity closure on the attachment issue so that it gets

21   done right.

22          And then if there is a few other major issues, for

23   example, can you say that the identification of other non-Grace

24   products that people were exposed to cannot be identified

25   because it impinges on the work product?  Therefore, work

1  product prevents people from saying whether there are other

2  products they were exposed to.

3       We think it's a totally frivolous objection, we

4  believe, it is in fact, going to be made.  In fact, by the

5  Motley Rice firm.  So, we want to get that out into the open

6  and get it resolved, it will be a couple of things like that.

7       But that really, I suppose, in a way, the October

8  13th hearing would be an extension from the hearing that we

9  already had where I think some things were resolves.

10      So, that's why we have submitted the proposed order

11 that we have.  It calls for the circulation of this protocol,

12 together with the order, so that people can come in and object.

13 And then we would be filing motions to compel with respect to

14 some of the other relevance objections.

15      THE COURT:  Now, I have not seen an order.  All I

16 have is a status conference.  I have not seen this document or

17 an order.

18      MR. BERNICK:  This is a certification regarding order

19 -- counsel regarding order granting, in part.  This was, I

20 believe -- I believe both of these were -- I believe the other

21 side submitted one, and we submitted one.

22      THE COURT:  At Item Number 15, is that what we're

23 relating this to?  I have not seen anybody's orders.

24      MR. O'NEILL:  Both were filed late in the day

25 yesterday -- on Friday, Your Honor.

1           THE COURT:  I haven't seen them.

2           MR. BERNICK:  Okay.  Well, um --

3                      (Pause)

4           MR. BERNICK:  I don't know what -- I don't really

5    know what to say other than we would ask that Your Honor take a

6    look at these orders.  They have their order.  We have ours.

7    And that Your Honor decide as promptly as possible which one

8    you want to enter.  I'm prepared to go through it, if that's

9    appropriate now.

10          THE COURT:  Well, did -- do people who filed these

11   have paper copies that I can look at now?

12          MR. BERNICK:  Yeah, we can -- we can just give Your

13   Honor --

14                      (Pause)

15          THE COURT:  Okay.  Thanks.  So, this is the debtor

16   and the Property Damage Committee?

17          UNIDENTIFIED ATTORNEY:  P.I.

18          THE COURT:  The P.I. Committee's, I'm sorry.

19          MR. FINCH:  Your Honor, actual -- Your Honor, it's

20   not -- the P.I. Committee -- the clients represented by Mr.

21   Esserman and the Certain Cancer Claimants, a lot of the firms

22   who were at the September 11th hearing were served with this on

23   Friday afternoon and haven't filed any kind of responsive order

24   or anything else.

25               I mean you'll hear from Mr. Esserman and myself later

1  on.  We think this is totally an attempt to reargue a lot of

2  stuff that was argued at the September 11th hearing that is not

3  appropriate, and this is effectively a motion for

4  reconsideration, teeing up an order, very different from what

5  Grace asked for in advance of the September 11th hearing.  I

6  think that's inappropriate and, frankly, denies people the

7  right to be heard on this.  So, really we would take that up if

8  Your Honor wants to deal with it today.

9        THE COURT:  I want to deal with it today.  But could

10  I just have a couple of minutes to read these two documents

11  first?

12        MR. BERNICK:  That's fine.

13        THE COURT:  And then I'll hear from you.

14        MR. BERNICK:  I just want to point out, it's October

15  the 11th, not October the 13th.

16        THE COURT:  Okay.  I think she's not correct about

17  that.  I'm supposed to have a medical procedure on the 10th,

18  and I don't know if I'm going to be in on the 11th.

19        MR. BERNICK:  I understand.

20        THE COURT:  Okay.  Is the 13th available?

21        MS. BAER:  We'll take whatever you want, Your Honor.

22        THE COURT:  Well, I'm asking you.  I wasn't aware of

23  any of this.

24        MR. BERNICK:  I -- I --

25        THE COURT:  So --

1           MR. BERNICK:  I don't know.  I don't know.

2           MR. LOCKWOOD:  Your Honor, before we -- excuse me.

3  While you're considering that, another point -- a process point

4  is that as I heard Mr. Bernick, he wants to tee up as yet

5  unfiled motion to compel against unnamed firms on the same

6  date.  And un -- he hasn't filed a motion to -- he hasn't filed

7  the motion to compel.  He hasn't filed the motion to shorten

8  time.  He hasn't given notice to anybody prior to the statement

9  that he just made here about this.  And I believe that on

10 behalf of the constituency, and I'm sure Mr. Esserman can speak

11 to this, but we don't know who we're talking about here, that

12 there's a process problem.  I -- if we're going to -- a motion

13 -- if you're going to make motions, you're supposed to file

14 them and you're supposed to set them in accordance with this

15 Court's procedures for how much time you get to respond and

16 when they get set for a hearing.

17          THE COURT:  Well, with respect to those, I'm --

18 frankly, I have my doubts that there are going to be any dates

19 between October the 10th and the hearing date.  So, I have a

20 feeling it's going to have to get calendared on -- do it on the

21 omnibus.  I mean Mona just went to look, but I -- from what I

22 know of my schedule in the next -- those two-week periods, I

23 think that's likely.

24          And to the extent that motions were just due a day or

25 so ago, frankly, I don't have a problem if the debtor files

1  them within a day or so to get them.  That will still be

2  sufficient time. I can advance the time frame so that -- for --

3  I mean postpone the time frame for responses to give you

4  sufficient time to get them on that calendar.

5         I'm not sure I'll -- I'm -- I am sure October 11th is

6  not going to be a good day.  If I have the 13th, I'm happy to

7  make myself available for you that day.  I just don't know

8  offhand, that's normally my motions day.

9         MR. ESSERMAN:  Your Honor, may I speak from here?

10         THE COURT:  Yes.

11         MR. ESSERMAN:  The first time I heard of this

12  suggestion by the debtor formally was with their papers.  And I

13  think the best thing to do is to set this on the omnibus date.

14  I personally cannot be here on the 13th.  I would accommodate

15  the debtor -- well, I would object, if I would be here, but I

16  cannot be here on the 13th.  And I think there's a lot -- there

17  are a lot of other people here in the courtroom and we're

18  talking about motions that aren't filed, yet I think -- and I

19  would not have a problem with an acceleration so they could be

20  heard on the 23rd, I think is the next omnibus.  And that would

21  be fine with me.

22         But the 13th, I think, is just accelerating it too

23  far, too fast.  I personally can't be here.

24         MR. BERNICK:  Whatever Your Honor has in the schedule

25  Your Honor has in the schedule.  The protocol was already -- I

1  mean these issues were already gone over at the last hearing

2  with the benefit of all of the clan.  So, this is not as if

3  we're asking for a new relief.  This is specifically focused on

4  the attachment issue.

5          With respect to the motions to compel on the other

6  items, I -- I would agree that we should probably have a little

7  bit more time, and the next omnibus may be fine.  But I am very

8  worried about the passage of time and this issue just kind of

9  sitting out there while people are going to then come later on

10 and say, oh, well, we already started immediately and we're

11 doing it a different way kind of thing.  So, I don't think that

12 this is a situation where we have to have some further special

13 notice of some hearing that's going to take place.

14         Your Honor basically is saying here is what I think

15 the protocol should be or what the debtor thinks the protocol

16 should be based upon the last hearing where Your Honor spoke to

17 all of these issues, let me know your objections and, yes, it's

18 going to be tight, whatever the date is, but it's got to

19 happen.  This is a real priority.

20         THE COURT:  All right.  Let's just close the record

21 for a few minutes.  If you folks want to take a recess for five

22 minutes while I take a look at these, you may.  I'm just going

23 to sit here so I can take a look at these orders.  And as soon

24 as I'm done, we'll get back on the record.

25              (Recess 5:28 P.M./Reconvene 5:37 P.M.)

1          THE COURT:  Okay.  Let me restate what I was saying.

2   With respect to, for example, Part 2, the question that relates

3   to asbestos related lung cancer, the question is:  "If alleging

4   asbestos related lung cancer, were you diagnosed with primary

5   lung cancer based on the following."  Then it says, "Check all

6   that apply."

7          And there are one, two, three, four, five, six,

8   seven, eight, nine boxes, including the other box.  The debtor

9   is suggesting that the appropriate boxes should be checked and

10  then whatever documents or exhibits are -- exist that the

11  plaintiff has that support that assertion should be attached.

12          MR. FINCH:  And, Your Honor, it's our view that what

13  disease you have is a contention by the complaint.  I have a --

14  I have mesothelioma.  I have an asbestos related disease.  But

15  what documents they have, or what evidence they have that

16  supports that disease is not a contention at all.  And it also

17  is -- it's subject to interpretation by lay people.

18          I mean they -- they -- they have medical records.

19  And a set of medical records may fit into the debtors' little

20  boxes in terms of what are the various types of types of

21  medical records, and they may not.

22          THE COURT:  Well, and if they don't, they're going to

23  check other and say, I don't know, here are the documents, look

24  at Pages 62 to 65.

25          MR. FINCH:  So, people can check other, see attached,

1   and that's fine.

2           THE COURT:  They can check other, see attached at

3   pages such and such and so and so.

4           MR. BERNICK:  Well, but, Your Honor, this is --

5   excuse me.

6           MR. FINCH:  And that's fine.

7           MR. BERNICK:  Well, I know, of course, it's fine

8   because that then gives them the loophole that they need to get

9   out of the whole thing.

10          THE COURT:  No, they need to assert that they don't

11  know.  See the attachment.  Otherwise they're to check off this

12  box.

13          MR. BERNICK:  Well, but --

14          THE COURT:  The problem is that, you know, if a

15  person has been to a doctor repetitiously for some sort of

16  pulmonary dysfunction, they're going to know that they have a

17  pulmonary dysfunction and they're going to check off an

18  appropriate box.

19          Now, I find it very hard to believe that people are

20  not going to know something about their own medical history.

21  If they don't, they'll check other and say, I don't know, here

22  are the documents, see pages such and such of the attached.

23          MR. BERNICK:  This is why -- this is exactly --

24  that's -- this is what they want to do, Your Honor.  They want

25  to negotiate -- Mr. Esserman was here before in connection with

1  the original questionnaire -- excuse me, if I can just get to

2  the podium --

3         THE COURT:  I'm not negotiating, Mr. Bernick.  You're

4  asking me --

5         MR. BERNICK:  Well, what you -- it is --

6         THE COURT:  You're asking me to -- to explain what

7  may understanding of this is.  If they know that, in fact,

8  their disease, for example, in this case was based on findings

9  by a pathologist certified by the American Board of Pathology,

10  they should check that box.

11         MR. BERNICK:  Well, explain it like this because this

12  goes back to the time -- you know, this is -- under the Rules,

13  if we're going to deal with contention interrogatories,

14  contention interrogatories are served every day of the week.

15  And they say, do you contend X.  Say yes or no.  If no, say

16  why.  If yes, tell me the basis for it.

17         THE COURT:  Right.

18         MR. BERNICK:  And I've answered those things, and

19  they go on -- sometimes they go on forever.  And you can't, as

20  a lawyer, sit there and say, well, gee, my client or this

21  corporate officer or this person or that person doesn't really

22  know and then turn around at trial and say -- have the doctor

23  come in and testify and say, well, they really had asbestos

24  related lung cancer for the following nine reasons.  That's

25  called hiding the ball, you're not answering the contention

1 interrogatory.  So, --

2           THE COURT:  And that's grounds for you to move to

3 strike the answer as either not responsive or to the testimony

4 based --

5           MR. BERNICK:  But this is where they want --

6           THE COURT:  -- on the fact that the person doesn't

7 know what their disease is.

8           MR. BERNICK:  This is where they want you -- this is

9 where they want you to go down the road, Your Honor.

10           UNIDENTIFIED ATTORNEY:  Your Honor --

11           MR. BERNICK:  Excuse me.

12           UNIDENTIFIED ATTORNEY:  If you don't allow it,

13 nobody's --

14           MR. BERNICK:  Excuse me.

15           UNIDENTIFIED ATTORNEY:  -- going to have a trial --

16           THE COURT:  Gentlemen --

17           MR. BERNICK:  Excuse me.

18           UNIDENTIFIED ATTORNEY:  -- of individual asbestos --

19           THE COURT:  Gentlemen, truly.  The toothbrushes are

20 coming out and you're going to visit the Marshal if you do this

21 again.  I am really fed up with it.  Now, that's it.  Please.

22 Everybody sit down.  One person at a time at the podium.

23           MR. BERNICK:  Okay.

24           THE COURT:  Mr. Bernick, finish your presentation.

25 Then I will hear from the other side.

1          MR. BERNICK:   Okay.

2          THE COURT:   And while they're talking, do not

3    interrupt them.

4          MR. BERNICK:   Okay.

5          THE COURT:   Now, do not interrupt Mr. Bernick.

6    That's an order, not a request.

7          MR. BERNICK:   This is why they were crafted to begin

8    with in exactly this fashion.   And this is why, as Your Honor

9    now has order in connection with the attestation, the

10   attestation has to be by whomever it is --

11         THE COURT:   That's right.

12         MR. BERNICK:   -- that -- so, you can't simply hide --

13   the claimant can't simply say, well, gee, it's doctor stuff, I

14   don't really know, or this is all I know, go see the medical

15   records.

16         It is -- if it takes -- if it takes the lawyers to

17   fill it out, if it takes the doctors to fill it out.   Whoever

18   it is that's supplying information on the basis of the best

19   knowledge based on the documents has to do it and has to so

20   attest.

21         So, all that we're saying -- and the only issue that

22   we're visiting here is this a contention interrogatory such

23   that they have to check off the boxes as opposed to being able

24   to answer with attachments.

25         Your Honor said with respect to contention

1  interrogatories, they have to answer the question.

2          THE COURT:  Right, they do.

3          MR. BERNICK:  So --

4          THE COURT:  I just said they have to check the box

5  and attach a document.  The problem is this, what if they don't

6  know whether, for example, the pathologist has been board

7  certified?

8          MR. BERNICK:  Who knows?

9          THE COURT:  They may not know.

10          MR. BERNICK:  Who knows?  If the lawyer doesn't know

11  and the experts are going to hire --

12          THE COURT:  Whoever signs this doesn't know.

13          MR. BERNICK:  That's not whoever signs.  You have to

14  have a signature by a person who has the ability to sign off on

15  the boxes.  So, if the lawyer knows because the medical records

16  say it because they have looked at the medical records --

17          THE COURT:  Then he should check the box.

18          MR. BERNICK:  He should check the box off, that's

19  exactly right.  So, to say, well, if the claimant doesn't know,

20  they can say, I don't know and say, see the medical records

21  that my lawyer already knows.

22          THE COURT:  What are you arguing about, Mr. Bernick?

23  I"ve said, they should check the box and they should attach the

24  documents.  The other box is there in the event that someone

25  really doesn't know which box up above this falls into, or if

1   there is some other basis for diagnosis.  And if they check the

2   other box, they have to say either see a -- see attached at

3   pages such and such, if there is a document.  Or if they just

4   say they don't know, I suppose --

5           MR. BERNICK:  Maybe I overreacted.

6           THE COURT:  -- that the debtor will be able to do

7   something about it.

8           MR. BERNICK:  Maybe I over -- so, when you say

9   someone, it's not simply their option to pick who someone is.

10  That is they have to supply the information that the claimant

11  or counsel acting on behalf of the claimant has.

12          THE COURT:  Of course.

13          MR. BERNICK:  Okay.

14          THE COURT:  I'm not retracting what we've done

15  already --

16          MR. BERNICK:  That's fine.

17          THE COURT:  -- Mr. Bernick.

18          MR. BERNICK:  Fine.

19          THE COURT:  Okay.  Your turn.

20          MR. FINCH:  Your Honor, Mr. Esserman will address the

21  procedural issues.

22          One point -- and then I will speak at the end.  But

23  one point on the -- just to respond to Mr. Bernick's point

24  about the contention on the medical records, this is not an

25  individual claims allowance proceeding.  There is no deadline

1 in this Court's case management order for the claimants to

2 identify the experts that they would put on at trial for

3 purposes of proving up what asbestos related disease they have

4 and what -- and whether it's asbestos related or not.

5         So, it very well may be the case that the guy has

6 lung cancer and he's been diagnosed with lung cancer and he's

7 been exposed to asbestos.  But he has never -- his -- he and

8 his counsel haven't selected the expert who would testify as to

9 whether or not it's asbestos related or not.  And they don't

10 know whether or not the guy who would ultimately testify for

11 that is board certified.

12         THE COURT:  That's possible.  That's right.

13         MR. FINCH:  So, it could very well be that the --

14 that a truly responsive answer is other, and see the

15 attachment.  That's what they have in their file now, but they

16 haven't made any decisions at all as about who their testifying

17 experts --

18         THE COURT:  This isn't --

19         MR. FINCH:  -- would be in a trial.

20         THE COURT:  This is not asking for expert

21 identification.  It's saying if you contend that you have lung

22 cancer, tell me why you think you have lung cancer, and there

23 are all these boxes that give you a pretty easy choice if you

24 have a reason to know why you have lung cancer.  And if you

25 don't, there's the other box.  I don't know what we're arguing

 1  about.

 2          MR. FINCH:  What --

 3          THE COURT:  These questions need to be answered.

 4          MR. FINCH:  What I am -- what I am concerned about,

 5  Your Honor, is that -- at the time when it comes time to make

 6  motions for summary judgment in the estimation case, 80,000

 7  people, 50,000 people will be getting motions for summary

 8  judgment from the debtor saying you don't have a board

 9  certified physician who will certify that you lung cancer.

10          THE COURT:  These are --

11          MR. FINCH:  And that's totally --

12          THE COURT:  This is an estimation process.  It's not

13  -- it's not a summary judgment saying that you don't have a

14  board certified --

15          MR. FINCH:  That's my -- my view of it is estimation

16  for purposes of plan confirmation, and not for purposes of

17  allowance.

18          But if they will stipulate on the record that there

19  won't be any summary judgment motions directed to individual

20  claimants or groups of claimants based on whether or not those

21  types of claims have particular expert testimony, then I'm not

22  concerned.

23          THE COURT:  Well --

24          MR. FINCH:  But I think they're trying to mousetrap

25  the claimants and this Court into doing something that they

1  haven't --

2          THE COURT:  This process is to help anybody's expert

3  that the information that they need to try to convince me of

4  what the existing and future asbestos personal injury claims

5  will be, and how much it's going to cost to resolve them.

6  That's what this is for.  And nothing else.

7          I can't say, and I'm sure the debtor can't at this

8  point in time, who and what they're going to file motions for

9  summary judgment about.  That's not a proper request at this

10  point in time.

11          But the issue is if somebody checks other, yes, I

12  have lung cancer, but I don't know why and I don't have a

13  diagnosis, there is going to be a serious question as to

14  whether it's related to asbestos, isn't there?

15          MR. FINCH:  No, not if --

16          THE COURT:  Yes.

17          MR. FINCH:  If they've been exposed --

18          THE COURT:  Yes, there is.

19          MR. FINCH:  If they have been exposed to asbestos and

20  they have lung cancer --

21          THE COURT:  And they don't check anything that

22  indicates that they have exposed -- been exposed to asbestos

23  and they don't know why they have it, that claim is going to be

24  challenged by experts.  How can they put it into a package

25  related to asbestos if there isn't any information related to

1  asbestos?

2        MR. FINCH:  They have a diagnosis of lung cancer --

3        THE COURT:  Then they should --

4        MR. FINCH:  -- and they've been exposed to asbestos.

5        THE COURT:  Then they should fill out the appropriate

6  questions that say I was exposed at such and such a place at

7  such and such a time, and I have this diagnosis.  And then

8  they'll have some evidence as to why they have lung cancer.

9        This form is not all that difficult to do for people

10  who have to process personal injury claims.

11        Now, I recognize it's bumping up the process over

12  what personal injury plaintiffs may have expected in the tort

13  system, and may expect in certain trust distribution

14  procedures.  But it's approved, it's allowed, and they need to

15  answer the questions.

16        I'm not backing off of what I ruled last month.  I'm

17  not expanding what I ruled last month.  But I am explaining.

18  These are contention interrogatories.  They need to be checked

19  off -- a box or more boxes need to be checked off, and answers

20  need to be supplied.  That's why ruling.

21        MR. FINCH:  Okay, Your Honor.  With respect to what

22  happened at -- what was on -- at issue at the September 11th

23  hearing, I'll turn the podium over to Mr. Esserman, who has

24  some comments for the Court.

25        THE COURT:  All right.

1              MR. FINCH:  And I will follow-up with a brief

2    summary.

3              MR. BERNICK:  Your Honor, we'd like to hear from Mr.

4    Esserman.  But maybe if Your Honor now has those matters, has

5    the materials before you, maybe we can just go through --

6              MR. FINCH:  Your Honor, can we invoke the no

7    interruption rule and allow Mr. Esserman to be heard --

8              THE COURT:  Yes, we can.

9              MR. FINCH:  -- before Your Honor makes any comments?

10             THE COURT:  Mr. Esserman --

11             MR. FINCH:  Thank you.

12             THE COURT:  Everybody else sit down.  Thank you.  Mr.

13   Esserman?

14             MR. ESSERMAN:  Everyone needs to take a deep breath

15   here.  I look forward to the uninterrupted time at the podium,

16   and I'll try and make it brief.

17             I don't know if Your Honor has ever seen this movie

18   called Jerry Maguire, but there's a great scene in Jerry

19   Maguire where Jerry is talking to his client and they're -- his

20   client's in the shower and he says, let me help -- help me help

21   you.  And that's sort of what I feel like telling Mr. Bernick

22   here today.

23             We're trying to push this across the goal line.  The

24   questionnaire needs to be answered, we understand that.  We

25   want to do it, we want to do it right.

1          You're presented with two orders here.  And we've got

2   to sort of go back to what brought us here in the first place.

3   It was a motion by Grace that concerned three things:

4          Number one, Grace said you couldn't attach any

5   documents.

6          Number two, Grace said we had to have all lawyers and

7   all clients sign.

8          And number three, Grace said all objections to

9   everything were overruled.

10          That's the pleading that we're here before.  And

11   we're trying to get an order done out to lots of people and

12   lots of firms to get these questionnaires answered.  And what

13   Grace has come back to you with is a protocol, which they've

14   attached to their order, which was completely new and an

15   expedited hearing request for October 13th, which I just think

16   is out of bounds.  But personally I can't do it on the 13th

17   anyway, but maybe we can accommodate them at the next omnibus

18   to the extent they properly bring things on and we agree to

19   shorten time frames to get all that done.  No one's looking to

20   stall here.

21          So, I think you have to sort of look at what we were

22   here on on September 11th.  What the orders are trying to

23   address, and get the questionnaires answered.  Okay, we

24   understand that.

25          And -- and we think Grace's order is -- and the

protocol has sort of gone way out of bounds and in a fashion
that only Grace can do, it is overly restrictive and not really
trying to get the questionnaires answered, but to get the
questionnaires answered in the way they want them answered, how
they want them answered.  It's sort of -- we're back to the
debacle of September 11th again, which we don't think we need
to go to.

We've prepared an order that we think is reflective
of Your Honor's ruling.  We've tied it into the transcript.
Although, frankly, I think there's a little bit there for
everybody.  And I think that was, frankly, Your Honor's
intention.

But there's certain things in Grace's order that are
just, you know, so out of bounds.  Clearly 30 days is not going
to be enough for some firms.  You heard the basis, anyone that
has a lot of claims that are going to need to be supplemented.
And Your Honor said something very reasonable.  You said, well,
they need to do it in 30 days, and if they can't, they need to
talk to the debtor, get a date, and they'll get it done.  And
that's sort of what our -- what our order says.

The ten-day supplementation -- there's been a lot of
confusion out among the bar about when the ten days runs to.  A
lot of them have lots of questionnaires to look at, they're not
-- they're not sure.  I think the clearest thing is the ten
days needs to run from an order that gets served on them.

1          THE COURT:  Clearly it should run from the day an

2    order gets served on people.

3          MR. ESSERMAN:  I think so, too.  And that's what I

4    put in my order.

5          That's not what's in Grace's order.  And it's sort of

6    these type of things that I think are sort of --

7          THE COURT:  The only exception to that, Mr. Esserman,

8    is there were a lot of people here.  And I think I made it

9    clear at that hearing that they were to start serving things

10   within ten days.

11         MR. ESSERMAN:  And you know what?  A lot of people

12   did.  And I saw lots of e-mail traffic, and I saw some letters

13   saying ten days, you know, we just wanted to let you know, you

14   know, I saw a Baron and Budd letter, I saw a couple others.

15   But some people are still confused by that.

16         But the bottom line is we've got to get the

17   questionnaires answered.  We've got to get them in a reasonable

18   format so they can be used for the purposes that they're

19   intended to be used, not for, once again, for the plaintiffs to

20   construct the database for proprietary use by Grace.  We want

21   to get the information that can be used and is in a usable

22   form.  If that means check the box, it means check the box.  If

23   you have to check other and do an attachment, you know, you

24   have to be flexible on this because not everything's going to

25   fit into a box.

1          THE COURT:  That's right.

2          MR. ESSERMAN:  And that's what the purpose of my

3    order is.

4          THE COURT:  But some things will.

5          MR. ESSERMAN:  If a box can be checked, it should be

6    checked.  You know.  But -- but -- but that's not always the

7    case.  And when it's not the case, you need to -- you need to

8    attach documents.

9          So, those are the fundamental differences between

10   what I think we tried to do and what Grace tried to do with the

11   additional -- of the protocol.   We want to get this done, we

12   want to get it done timely.   You know, we could be here for

13   eight hours arguing about whose order is better than whose

14   order.  I thought about how this should be handled and how it

15   should even be argued, if at all, frankly, I almost thought of

16   just saying, you know, here are the orders, sign one, both or

17   neither, take this from that and mix and match and do your own

18   order.

19         But I thought -- I thought Your Honor ought to have -

20   - and maybe that's the way it should go because I don't think

21   we should be here rearguing the case.

22         But those are the fundamental differences that I saw

23   in the orders.

24          THE COURT:  Okay.

25          MR. ESSERMAN:  Thank you.

1        THE COURT:  What -- Ms. Ramsey?

2        MS. RAMSEY:  Thank you, Your Honor.  I just wanted to

3 add a few things to what Mr. Esserman said.  To go through the

4 form of order provided by the debtor, with respect to their

5 first word clause, they're ordering that claimants provide

6 answers to all questions objected to on relevance grounds

7 within 30 days of the date of this order.  And at Page 258 of

8 the transcript, the Court was very clear in saying, "I am

9 making no rulings compelling anybody at this point to do

10 anything except within ten days to tell the debtor whether you

11 are or are not going to submit supplemental information.  And

12 if you are, to attempt to do it in 30 days."

13        And so that is the basis of our concern with

14 Paragraph Number 1.

15        With respect to Paragraph Number 2, the attestation

16 contained in the questionnaire, and I apologize I don't have it

17 in front of me because my copy is with the Court, but the

18 attestation refers to the best of the executing party's belief

19 and knowledge.  That is taken out of the requirement that is

20 contained in the debtors' order at Paragraph 2 where they're

21 asking simply that they be true, accurate and complete.

22        Again, we think that changes it.  What the Court

23 ordered was that such people, as were required to respond to

24 this in compliance with the attestation contained on the

25 questionnaire, complete the questionnaire.

1          With respect to Item Number 3, Mr. Esserman covered

2     that.   Our proposal would be that the Court provide,

3     particularly those claimants that were not represented at the

4     hearing on September 11th with notice of the ten-day period in

5     which to advise the debtor to supplement.

6          With respect to Item -- Paragraph Number 4 of the

7     debtors' proposed order, the Court provided a procedure whereby

8     claimants could attempt to supplement, that they could engage

9     in a dialogue with the debtor, and where the debtor -- the

10    burden was on the debtor to come back to the Court in the event

11    that the questionnaire was not completed in a satisfactory

12    manner.   And the Court even provided the debtor with the

13    opportunity to identify general categories of information, such

14    as it had done in its first motion to compel, or to file

15    motions with respect to certain law firms if there were issues

16    that were consistent with all of the claimants that were

17    represented by a certain law firm.

18         Here the debtor is attempting to reverse that burden.

19    If you to the protocol, there are all kinds of new requirements

20    in here.   For example, Paragraph Number 3, all documents

21    referenced in response to questions must be bates numbered.

22    Well, a lot of people have already responded and provided

23    responsive documents, such as those handed up by my partner,

24    Mr. Busby at the last hearing.   But the Court determined were

25    satisfactory in responding to the questions, does that --

1           THE COURT:  Ms. Ramsey, pardon me, that bates number

2    was from me.   I think what I indicated was that some

3    appropriate numbering system should be employed, and I used

4    bates as an example of an appropriate numbering system.   That's

5    where it came from.

6              To the extent that there are supplements that come

7    in, I think the documents should be numbered.   And I think the

8    individuals should say, look at Page 65 of, you know, 205

9    pages.

10           MS. RAMSEY:  Your Honor, you're -- you're correct in

11   your recollection.   What you said, though, was not every

12   document has to be bate number -- bates numbered.

13             What you said, I believe, on the transcript at the

14   hearing was a more, in my view, practical solution, which is it

15   has to be bates numbered, or you have to identify the pages, or

16   it has to be somehow behind an exhibit page that says that it's

17   responsive to --

18           THE COURT:  Right.

19           MS. RAMSEY:  -- this particular question.  You gave a

20   number of options.  And your point was it has to be responsive.

21   Don't play games.  Don't document them.  It has to be

22   responsive to the question.  But the additional requirement

23   that everybody go and bates number all of their documents is

24   not something that the Court specifically ordered.

25             THE COURT:  No, I didn't specifically order a bates

1 stamping, and I wouldn't because I'm not sure that everybody

2 has access to that particular type of stamping.  But numbering,

3 yes.

4         MS. RAMSEY:  And we -- and we recognize that.  And I

5 think that is -- that is what -- our -- our problem, though,

6 goes across the board.  Paragraph 8, as the protocol, gives

7 another example.  What the Court said is, the documents have to

8 be legible.  Well, to this, they've added, if a medical report

9 does not contain the physician's name printed on the report,

10 that the physician's signature must be legible.

11         That's something that wasn't discussed.  That -- you

12 know -- what does that mean?  Legibility?  You know, who's

13 going to make those determinations?  It seems to me that those

14 things can be dialogued.

15         What the Court was looking for was a practical

16 solution.  I think you were very clear that you expected people

17 to comply in good faith with responding to the questionnaire to

18 the best of their ability.  But what the debtor is attempting

19 to do is to go back to the -- check the little box in your own

20 format and put the burden on the claimants that is just

21 unreasonable.

22         I think that Item Number 5 -- Paragraph Number 5 of

23 their proposed order is also related to Paragraph Number 3.  I

24 think that actually is not so objectionable.

25         With respect to what we submitted, Your Honor, we did

1  try to follow what the Court had said.  And we -- I know that

2  Mr. Esserman has handed up an annotated page.  But we attempted

3  to follow what we thought was both the letter and the spirit of

4  what the Court said.

5          For example, in Paragraph 2, any response by way of

6  attachment must allow the reader reasonably to determine the

7  answer.  The attestation must be signed by the person or

8  persons whose signature is sufficient to satisfy the

9  attestation required.

10          I know that the Court has addressed what is

11  contention interrogatories.  I understand that decision, and as

12  it has been stated on the record, we would be content with

13  that.

14          Paragraph 5 reflects the -- again, the concept, the

15  proposal that we had that claimants should have ten days after

16  the notice.

17          Paragraph 6 provides the 30-day period.  And

18  specifically provides that it's subject to extension upon

19  agreement with the debtors or the Court.

20          Mr. Bernick had indicated before when he was at the

21  podium that you could run into a problem where this could

22  create undue delay if the debtor was cooperative and gave

23  extensions of time, that they could only, sometime in the

24  future, determine whether or not the answers were responsive.

25          To me, that seems unrealistic in the real world where

1  presumably if someone's contacting the debtor and asking for an

2  extension of time, there's going to be some agreement as to

3  what's going to be satisfactory, or the parties are going to

4  tee it up before that with the Court.

5          We did attempt, Your Honor, to follow what the Court

6  has done.  And it may be that there are some modifications the

7  Court will want to make to our order, but we believe that it is

8  consistent with what the Court ordered.

9          And further, the protocol, in particular, we think is

10  an effort to either re-litigate or to file a second motion to

11  compel on an expedited time frame that we think is just

12  inappropriate.

13          THE COURT:  Okay.  Well, --

14          MS. RAMSEY:  Thank you.

15          THE COURT:  -- I don't think that the protocol is an

16  effort to try to re-litigate.  I think it's an effort to try to

17  put my rulings into a format that people who are not

18  necessarily lawyers -- are not necessarily lawyers may

19  understand.  But I don't think it's necessary to go that far

20  because I think my rulings on the record, frankly, were

21  sufficient.  And I believe my rulings were these, and this is

22  without reference to the record, so if I'm incorrect, then

23  somebody can point this out to me:

24          Number one, the contention interrogatories must be

25  answered.  And to the extent that they include all of Part 2

1  with the -- you know, what you contend your disease is, you

2  check off the box that says, yes, I contend this is my disease.

3  Then what's the basis for it?  Those are to be answered.

4         And to the extent that the person doesn't know,

5  there's an other box that you can check and supplement an

6  answer.

7         Documents may be responsive to the question as

8  supporting evidence in some instances if a person really

9  doesn't know.  The document may, in fact, have the answer to

10  the question.

11         If that's the case, if the document is being

12  submitted, it is to be attached in some recognizable legible

13  format and numbered so that the debtor understands what page of

14  that document is responsive to the question.

15         With respect to the relevance rulings, I tried to

16  explain that in general terms, I think these questions are all

17  relevant.  There may be, as to any individual, a specific

18  question that may not be relevant.  I don't have objections

19  based -- before me based on a specific question not being

20  answered by a specific individual.  So, I can't make rulings on

21  those issues with respect to relevance.

22         In global terms, these questions are addressed to

23  what debtor is attempting to do.  They are designed to elicit

24  admissible evidence that can be used by an expert in attempting

25  to estimate the asbestos liabilities of this estate and how

1    much it's going to cost to pay for them.

2          That's what it's intended to do.  I think they are

3    relevant to that issue.  There may be a specific question.

4    I'll go back to the mesothelioma example, that isn't relevant

5    within the context of a particular disease.  And if that's the

6    case, there is a process by which somebody can say this isn't

7    relevant to me because, and state why it's not.  And I think

8    that should handle it.

9          The mesothelioma situation is probably a good one to

10   address.  You don't need certain types of functions if, in

11   fact, you've got a higher level, more serious disease.

12         Okay.  With respect to -- I've lost track.

13         MR. BERNICK:  Attestation.

14         THE COURT:  The attestation, I believe what I said

15   was that any number of people -- however number of people it

16   takes to get the questions answered should answer and sign the

17   attestation.

18         MR. LOCKWOOD:  Just out of clarity, Your Honor, you

19   mean the people who the debtors have put on the attestation,

20   which is the lawyer and the client.  You're not expanding that

21   to mean the doctors have to start filling these out?

22         THE COURT:  No, this is not directed to the doctors.

23         MR. LOCKWOOD:  Right.

24         THE COURT:  I think what I indicated was to the

25   extent that there's a question, these questions are directed to

the claimant.  If a claimant's attorney is answering, then the attorney should indicate that he's answering, you know.

And if he's only answering with -- and I'm just picking up numbers, respect to Questions 1, 3 and 5, he should say so.  And if the claimant is answering with respect to everything else, they should say so so that we know the basis for the information that is attached to the questionnaire. That's what I was attempting to get to.

MR. BERNICK:  And I think that actually your language there was -- would -- picked up that, but it was specifically designed to address the question that I had raised which is, you know, kind of the -- I won't call it a shell game, but the different people would say that they're answering different things in order not to have an attestation to what was actually in the documents that are being attached and are known to the attorneys.  That is if the claimant knows something, they can certainly attest to it.

If the claimant doesn't know something, but the attorney does, then the attorney ought to be the one that's answering the question and attesting to the question so that we get a complete -- that's why it says true, accurate and complete.  And the language that Your Honor used, I think, is just right, which is it has to have an attestation by whomever it is that it takes to make sure that the answers are true and complete so that we don't get, well, I didn't know this, but

1  somebody else did, but they weren't attesting to it.  That was

2  the problem that engendered this whole thing to begin with.

3          THE COURT:  Okay.  My ruling is as follows:

4          The questionnaires are to be completed.  Whoever it

5  takes, in terms of the claimant, the attorney, the claimant's

6  other representative who is filling -- there may be a deceased

7  claimant who has an estate representative.  Whoever it is who

8  was filling out the questionnaire is to attest to the accuracy,

9  as required, in the attestation.

10          If it takes more than one person, it should be more

11  than one person.  If it only takes one person, it should be one

12  person.  Whatever it takes to get complete and truthful

13  information onto this questionnaire should be attested to.  Is

14  -- I'm not sure, is that unclear?

15          MS. RAMSEY:  Your Honor, I think that's very clear.

16  And that's exactly how we understood it.

17          THE COURT:  All right.  So, with respect to the

18  attestation -- okay, if -- I -- and I apologize.  I did not

19  look at the specific motion again this month.  So, if the

20  motion was seeking a ruling that said all claimants and all

21  attorneys have to sign, I denied that request.

22          What I said was, whoever it takes to get the

23  information accurately onto the form has to sign, whoever that

24  is.  And if it takes both the attorney and the claimant, then

25  both are to sign.

1              MR. BERNICK:  Accurate and complete.

2              THE COURT:  Well, to be -- the questionnaire is to be

3    complete.  That's the whole purpose for doing this was to get

4    the questionnaires complete.  So -- all right.

5              MR. BERNICK:  I think Your Honor -- well, I don't

6    mean to interrupt.  You had the relevance.  You just talked

7    about attestation.  You've talked about -- you talked about the

8    attachment, which then means that I think what we're left with

9    is the dates for the supplementation and the dates -- the dates

10   to state intent and the dates to actually supplement.

11             THE COURT:  Well, let me ask whether you even need at

12   this point --

13             MR. BERNICK:  Well, I -- I -- I --

14             THE COURT:  No, Mr. Bernick, I just don't want to

15   complicate something.  Do you still want the ten-day period for

16   people to notify you that they are, in fact, going to

17   supplement?  Or do you just want the supplements?

18             MR. BERNICK:  Well, I think -- I think it's probably

19   useful to know who is not going to supplement.  Because if

20   they're not going to be supplementing, then it may be -- I'm

21   still kind of worried --

22             THE COURT:  Okay.

23             MR. BERNICK:  -- about -- like the work product

24   thing, and that I'm going to learn that there's whole other

25   idea out there that really undercuts getting --

1          THE COURT:  All right.

2          MR. BERNICK:  -- the supplementation done.  So, I

3 think it still is important.  And we would probably like to tee

4 up some motions to compel so that if there's anything else out

5 there -- see, this is why -- I'll tell you what.  I think that

6 to the extent the ten-day requirement was there, we probably

7 already have gotten the letters from pretty much everybody and

8 we can probably have a couple candidates right there.

9          I think, therefore, that there is no further language

10 that's probably required beyond what people already have done

11 in their letters.

12          THE COURT:  Okay.

13          MR. BERNICK:  I would say --

14          THE COURT:  So, we can strike the ten days and --

15          MR. BERNICK:  I'd say strike the ten days.

16          THE COURT:  -- just give people 30 days to answer.

17          MR. BERNICK:  Right.  And then I'd say on the

18 supplementation, which would be 30 days, I think, from --

19          THE COURT:  From the day this order gets entered, but

20 I think I'm probably going to --

21          MR. BERNICK:  Okay, well, let's -- from the day the

22 order gets entered, that's fine.  If they want to say that if

23 you want more time, you can contact the debtor --

24          THE COURT:  Yes.

25          MR. BERNICK:  -- I have no quarrel with that

1  whatsoever.  We've gotten different proposals from different

2  people and we're happy to take them up.  It's far more

3  important from our point of view that we -- when we ultimately

4  get the answers, they are really the answers to the questions

5  than just about anything else.

6          THE COURT:  Well, I think there is an obligation, I

7  believe, for all people to attempt to comply within 30 days.

8  But, as I recognized last month, there are going to be firms

9  that, based on how many clients they represent, may simply not

10 have an opportunity to get it all done in 30 days, and it may

11 take longer.

12         MR. BERNICK:  Yes.

13         THE COURT:  And I think the debtor can work with

14 those --

15         MR. BERNICK:  Absolutely.

16         THE COURT:  -- claimants.  But I believe that

17 everybody should make a good faith effort to get it all done in

18 30 days.  And if you need an extension, contact the debtor and

19 try to work it out.  That was my intent.

20         MR. BERNICK:  Yeah, now I still -- let me just raise

21 something because this is the other thing that's left.  I think

22 that with what Your Honor has now articulated, it surely ought

23 to be possible for us to get together and do an order by the

24 end of the week.  And if we can't, to let the Court know.

25 Because you've now --

1          THE COURT:  If you can't, I'm locking you folks up in

2  my conference room and throwing away the key.

3          MR. BERNICK:  Because -- because the language -- I

4  think we all have heard the language.  I'm sure the people have

5  taken good notes.  I don't -- I know it sometimes -- it takes a

6  while to get the transcript, so I'm not sure --

7          THE COURT:  You can order a tape or a CD for, what,

8  $15?

9          CLERK:  Twenty-six.

10          THE COURT:  Six dollars?

11          CLERK:  Twenty-six.

12          THE COURT:  Twenty-six.

13          MR. BERNICK:  Maybe -- maybe -- that's real fast?

14          THE COURT:  That's --

15          UNIDENTIFIED ATTORNEY:  Get the order and have a

16  protocol attached to it?

17          THE COURT:  No.

18          MR. BERNICK:  No.

19          THE COURT:  There will not be a protocol.  It's just

20  going to be an order.

21          MR. BERNICK:  No, I -- I think what the Court said

22  about with respect to the attachment -- the attachments is

23  fine.  It's just has to make its way to that language in the

24  order.  So -- and that would also eliminate there need to be

25  any objection.  There's not going to be objection to it because

1  it's what Your Honor has ordered.

2          THE COURT:  It's what I've ordered and -- and -- is

3  there any reason why the claimants at this point need another

4  ten days?  I think the ten-day period was really to try to

5  address the people who were here in court to get the process

6  moving.

7          MR. ESSERMAN:  I also think Mr. Bernick addressed the

8  issue.  There was a reason they wanted to know who was going to

9  supplement, who wasn't.  I think they've now got their critical

10 mass.  And really people just need to supplement and not give a

11 notice --

12          THE COURT:  All right.  Then I will retract --

13          MR. BERNICK:  I said that.  I said that they didn't

14 have to --

15          THE COURT:  Yes, he --

16          MR. ESSERMAN:  Yeah, that -- and I said you said it.

17          MR. BERNICK:  Yeah, okay.

18          THE COURT:  I will retract the ten-day requirement

19 for notice at this point and simply order that within 30 days

20 from the day the order is entered, that's when the

21 supplementation is to be done.  Because I think at this point,

22 the ten days is moot.

23          MR. BERNICK:  Yeah, I agree with that.

24          THE COURT:  The -- the -- what I wanted to get to was

25 in the same spirit that we have now, I think, pinned down some

1  things better, and we're responsible for that, obviously not --

2  it is not the fault or failure of Your Honor to be clear.  But

3  I think that it's now -- that's now been done.

4          I'm still worried about there being, you know, kind

5  of the other big things that are out there waiting to happen

6  now after we've been all cooperative and, oh, yeah, supplement,

7  you got 60 days or 75 days, we still get the answers and they

8  say, oh, we're not going to tell you anything about this.  And

9  then the monkey is on my back -- on the debtors' back to come

10 back to Your Honor, set the thing up for a motion, go through

11 the process.  Then, of course, they'll want to say, well, we

12 need 60 days or whatever, or even more, to go ahead and get

13 this information.  I want to avoid that.

14         And meso was kind of easy.  I'm concerned about this

15 work product objection where people say I'm not going to tell

16 you anything about other products because it's work product.

17         And I'm also concerned that there may be something

18 else out there that is going to be used as a reason why a lot

19 of questions should not be answered.  And I think Your Honor

20 has been clear about relevance, but that still leaves the

21 privilege out there.

22         So, what I would ask is that either Mr. Finch or Mr.

23 Esserman or Mr. Lockwood, they're all such nice smiling people,

24 or Ms. Ramsey, I want to make sure we don't leave her out of

25 the process, of one or more than one of them want to be the --

1  in the sense purely a liaison for purpose of identifying, if

2  there are other -- if there is a work product objection that's

3  going to lead to not answering a series of questions, or there

4  is some other impediment that the Court has not ruled on,

5  taking Your Honor's ruling on relevance at face value, if

6  there's some extraordinary burden that is somehow unique and

7  unprecedent, or something, I don't know what it is, that we

8  learn of it in the next week or so.  Such that if it's really

9  going to effect this process, we can figure out some way to tee

10 it up before Your Honor and get the matter heard.  So that once

11 we commit to allowing people to say -- or negotiating on times

12 for a response, we really are negotiating for when they're

13 going to be really answering everything and giving it to us.

14         THE COURT:  Well, I think the easy answer to that is

15 this:  If you're raising an objection to answering any

16 question, it has to be raised within the 30-day period.  There

17 will be no extension for raising objections.

18         MR. BERNICK:  That's fine.

19         THE COURT:  And that way, you'll know at the end of

20 the 30-day period.

21         Otherwise, if it's an issue that somebody can't get

22 the documents together or has too many clients, or whatever,

23 then --

24         MR. BERNICK:  That's fine.

25         THE COURT:  -- that's a different issue.

1           MR. BERNICK:  That's fine.

2           THE COURT:  All right.  So, we will build in any

3   objections to the answer -- answering the questions must be

4   raised within that 30-day period.

5           MR. FINCH:  Your Honor, I would just note that a lot

6   of people already -- to the extent have made objections, there

7   are objections on the questionnaire.  If the debtor can move to

8   compel, I would -- I would suggest that they do that in an

9   orderly fashion and set it for a special hearing, rather than

10  trying to take --

11          MR. BERNICK:  No, I --

12          THE COURT:  Well, the debtor can do that now if it

13  chooses, but these folks --

14          MR. FINCH:  Yeah, that's -- that was the point.

15          THE COURT:  These folks are being given 30 days to

16  supplement.  My hope is that they will supplement with whatever

17  non-privileged information that they can divulge, rather than

18  going down this objection path.  Because at some point in time,

19  there are going to be rulings.  And in all probability, when

20  it's an issue for estimation, it's going to be pretty hard to

21  show why the information shouldn't be supplied.  It's not going

22  to be a merits objection to any specific person's claim.

23          This is an issue directed to the debtor to attempt to

24  let everybody figure out what the debtors' abilities are in

25  mass.

1          MR. LOCKWOOD:  Just --

2          MR. BERNICK:  Your Honor, I would say --

3          MR. LOCKWOOD:  Just before we --

4          MR. BERNICK:  Excuse --

5          MR. LOCKWOOD:  One point.  That last statement you

6  made it's not going to be a merits based objection.  The

7  debtors' experts are going to tell you that these claims are

8  meritless based on these questionnaires.

9          THE COURT:  Oh, sure.

10          MR. LOCKWOOD:  Let's not kid ourselves.

11          THE COURT:  Well --

12          MR. LOCKWOOD:  And so --

13          THE COURT:  Mr. Lockwood, you know that's not what I

14  meant.  It has nothing to do with the experts opining about the

15  value of these claims.  That's what the experts should be

16  doing, opining about the value of the claims and what the

17  claims are.

18          What I meant by merits based is this isn't going to

19  be a disallowance of a specific person's claim based on the

20  fact that they refused to answer a question.  That's not what

21  this process is intended to be.  That's what I mean by merits

22  based.

23          I'm not adjudicating the personal injury of a

24  specific claimant.

25          MR. BERNICK:  Yes.  But I'm -- I would say on behalf

1    of the debtor that this is not an allowance or disallowance of

2    process.   The merits are being pursued because it does bear

3    upon the question of value, but it's only value that, Your

4    Honor, at the end of the day must determine for purposes of

5    estimation.

6              THE COURT:  Yes.

7              MR. BERNICK:  We're going to --

8              THE COURT:  And --

9              MR. BERNICK:  We're going to say that a lot of these

10   claims would drop out if, in fact, they were properly analyzed

11   on the merits.   These folks are going to say, that's all

12   totally irrelevant because the historical values in the tort

13   system govern.   That's the big disconnect that we have in the

14   case.

15             THE COURT:  And --

16             MR. BERNICK:  And Your Honor's going to rule on that.

17             THE COURT:  And with --

18             MR. LOCKWOOD:  Your Honor, that's -- with all due

19   respect, that's -- as long as we're projecting what's going to

20   happen, we're not going to -- we have our own estimation

21   methodology, that's true.   But we're not going to just sit here

22   -- and the individual plaintiff's firms are not just going to

23   sit here and allow Mr. Bernick's experts who are going to be

24   acting as mini judges to tell the Court, let me run through a

25   list of 18,000 questionnaire answers and tell you that each one

1  of these claims that's responding to this questionnaire is

2  worth zero dollars.

3          THE COURT:  Let --

4          MR. LOCKWOOD:  I mean --

5          THE COURT:  Mr. Lockwood, for my purposes, we can put

6  letters on and avoid the names.  It doesn't matter in this

7  estimation process whose claim it is.

8          MR. LOCKWOOD:  I understand that's true.  But it does

9  matter whether -- when they test -- when their expert is going

10 to testify a claim is worth zero because it doesn't meet

11 certain criteria --

12         THE COURT:  Yes.

13         MR. LOCKWOOD:  -- what they're telling you is that in

14 the tort system, that claim, whether it's labeled by the

15 plaintiff's name or by a letter, would not be able to get to a

16 jury and get a verdict.

17         And the -- the committee, with the assistance of the

18 law firms whose claims are being scrutinized by these alleged

19 experts on validity and merits, are going to have to put up

20 their own defenses.  That's all I'm saying.

21         I'm not saying what they're going to be.  But the

22 idea that we're going to have two trains passing in the night

23 here is not going to be --

24         MR. BERNICK:  No, they'll --

25         MR. LOCKWOOD:  -- the way this is going to work.

1          THE COURT:  Well, it --

2          MR. BERNICK:  I'll stipulate they'll collide.

3          THE COURT:  All right, we're off this -- we are off

4    the subject.  And I apologize.  I don't know how I led us down

5    that path.  We're off the subject.

6          The point was that this is for estimation purposes,

7    not for allowance and disallowance purposes.  So, I don't

8    expect to see something like I'm not going to tell you that my

9    client also worked for U.S.G. because it's work product.  Un-

10   un't.  If your client worked for U.S.G., that's a fact.  So,

11   put it in there.

12         MR. BERNICK:  Your Honor, on the objections, counsel

13   pointed out -- just to get us back on track.  Your Honor said

14   you want to know the objections within the 30-day

15   supplementation period.

16         Counsel then responded, well, a lot of those -- a lot

17   of objections have already been made.  And it is true that when

18   people submitted responses to our motion to compel, the kind of

19   global motion to compel, they stated a bunch of objections to

20   the questionnaire.  And some of them, as like lawyers do, maybe

21   are obliged to do, is I object to this, this, and this and

22   this.

23         Your Honor now has provided additional elucidation,

24   particularly with regard to the issue of relevance.  And I

25   think that it's only fair if there are objections that Your

1  Honor has not heard and has not ruled on, they ought to be set

2  forth within this period of time.

3          We shouldn't have --

4          THE COURT:  That's what I said.

5          MR. BERNICK:  Well, but -- I think what was being

6  suggested was to the extent that people previously have lodged

7  objections, a lot of them are very kind of general, that that

8  might suffice.

9          And all that I'm saying is now that Your Honor

10 already has taken a cut of this, we ought to -- I know there

11 are going to be lots of groans.  But we ought to get some

12 process for people to identify any matter as to which there's

13 going to be an objection that Your Honor has not ruled on.

14         THE COURT:  I --

15         MR. BERNICK:  It's not the purpose of --

16         THE COURT:  I haven't ruled on any individual

17 claimant's objections.  None.  They haven't been teed up before

18 me.

19         If they've been stated in a previous document, and

20 there's some supplement, I -- perhaps this order should say

21 that prior objections go away.  And if you're going to file a

22 supplement, restate it.  Because --

23         MR. BERNICK:  But --

24         THE COURT:  Because otherwise there is no way to know

25 what the supplementary information is intended to do.  So, it

1  seems to me if you file a supplement and you want to raise an

2  objection to a specific question, rather than supplementing, it

3  should be raised.

4         I don't know how else we're ever going to get to the

5  end of this.

6         MR. FINCH:  Your Honor, unless it's been previously

7  raised.  I mean this is discovery aimed at people.  When you

8  get a -- whether it's a questionnaire or a set of document

9  requests, or interrogatories, you state on the -- you can

10  answer it, you can object to part of it, you can object to all

11  of it.  But they -- they have the questionnaire responses.

12  Some people in their questionnaire responses have objections to

13  various things.  If they --

14         THE COURT:  And if they've objected to a specific

15  question, and they don't supplement that question, then that

16  objection that's already on the record will suffice.

17         But if there is a supplement submitted, the debtor

18  can't possibly know whether the objection is withdrawn or not

19  withdrawn.  So, they have to restate the objection.  You have

20  to.  Otherwise --

21         MR. FINCH:  I -- I --

22         THE COURT:  -- the process can't work.

23         MR. FINCH:  I misunderstood Your Honor.  I thought

24  that Your Honor was saying that all objections were --

25         THE COURT:  No.

1          MR. FINCH:  -- as if they had never been made.

2          THE COURT:  No.

3          MR. FINCH:  And as long as objections already

4    previously made are preserved, as long as people don't

5    supplement --

6          THE COURT:  Right.

7          MR. FINCH:  -- or if they do supplement, they restate

8    the objections --

9          THE COURT:  Yes.

10         MR. FINCH:  -- then I -- then I don't have a problem

11   with that.

12         MR. BERNICK:  Yeah, well -- let's just --

13         THE COURT:  Mr. Bernick, that's my ruling.

14         MR. BERNICK:  Well, I understand --

15         THE COURT:  I'm not going to hear any more argument

16   on it, not from anybody.

17         MR. BERNICK:  Your --

18         THE COURT:  I've had this questionnaire until the

19   cows come home and, frankly, that's enough.

20         MR. BERNICK:  I don't even understand, Your Honor,

21   what was just said.

22         THE COURT:  What was just said is this:  Let's assume

23   that person A completed a questionnaire.

24         MR. BERNICK:  Right.

25         THE COURT:  And filed an objection on the

1  questionnaire to Question 3.

2          MR. BERNICK:  Right.

3          THE COURT:  All right.  If the person supplements and

4  doesn't submit a supplement to Question 3, they don't need to

5  restate the objection.  The objection stands.

6          If they file a supplement to Question 3, then -- if

7  they intend to have a new objection, they have to raise it.

8  Because otherwise, the debtor can't possibly know whether the

9  objection's been done away with because of the supplement or

10  whether there is still some objection.

11          So, if someone files a supplement, they have to

12  restate their objections.

13          If they don't file a supplement, their objections

14  stand.

15          MR. BERNICK:  What you will then get, Your Honor --

16  because that basically says that what you've just said about

17  relevance doesn't matter, they don't have to file it, it wasn't

18  -- it wasn't specific to a question, we will -- we will find

19  out --

20          THE COURT:  I didn't understand?

21          MR. BERNICK:  Very simple.  Your Honor, we believe,

22  has ruled that these questions are relevant.

23          THE COURT:  In the global sense, yes.

24          MR. BERNICK:  In the global sense.

25          THE COURT:  Yes.

1          MR. BERNICK:  If you allow them, that is the

2   claimants, to basically stand on prior objections on the

3   grounds that they are now specific objections and they haven't

4   been ruled on, and there is then no indication to us that they

5   are so doing, then the first time we will find out that they're

6   standing on those objections and basically saying we don't

7   think that your global determination is dispositive with

8   respect to us is when we finally get the supplementation.  That

9   will be our first notice that they really haven't done anything

10  new at all, that Your Honor's determination with respect to

11  relevance, the guidance, hasn't caused them to change a thing

12  and we're now -- however far we are down the process, and we

13  haven't made any progress whatsoever.

14          THE COURT:  You --

15          MR. BERNICK:  The -- the --

16          THE COURT:  You can't be more than 30 days down the

17  process because they have to raise all objections in 30 days.

18          MR. BERNICK:  No.  No, no.  What they're saying --

19  what they just told you was that if they are not supplementing

20  --

21          THE COURT:  Right.

22          MR. BERNICK:  -- then they don't have to do anything

23  new.  So, they will take all the objections that they made

24  previously --

25          THE COURT:  Okay.

1          MR. BERNICK:  -- before Your Honor gave guidance.

2   They will stand on those objections.

3          THE COURT:  All right.

4          MR. BERNICK:  They will not supplement.  They will

5   not tell us whether or not they're going to supplement as to

6   those individual questions.  And we will find out when they

7   finally give their submission at the end of the day for the

8   first time that, in fact, they're standing on their old

9   objections and they haven't changed anything.  And for that

10  matter, they haven't even supplemented anything.

11         THE COURT:  Well --

12         MR. BERNICK:  But -- but I think that there's a much

13  simpler --

14         THE COURT:  I will never do this again.

15         MR. BERNICK:  Yes.

16         THE COURT:  This was such a nightmare.  I will never

17  do this again.

18         MR. BERNICK:  Well, but, Your Honor, there's only --

19  just think what the alternative was.

20         THE COURT:  The alternative would have been a whole

21  lot easier.  We put everybody in a room and throw the key away

22  until you come out with one side either alive or dead.

23         MR. BERNICK:  You have -- well, they're older than I

24  am, so we may have killed them in the process.  But --

25         MR. LOCKWOOD:  Your Honor -- Your Honor said you've

1  ruled.

2          MR. BERNICK:  But -- look, there's the no

3  interruption rule.

4          MR. LOCKWOOD:  Your Honor said you've ruled.

5          MR. BERNICK:  The no interruption rule.

6          MR. LOCKWOOD:  You've told Mr. Bernick --

7          MR. BERNICK:  No, no --

8          THE COURT:  Gentlemen -- Mr. Lockwood, you're out of

9  order.

10          Mr. Bernick?

11          MR. BERNICK:  Yeah.  No, I think that as a practical

12  matter, we're trying to get to the point where this whole thing

13  was introduced by me.  I said that we want to make sure Your

14  Honor has ruled on certain things, relevance, dah, dah, dah.

15  We want to make sure that we get complete answers.  It ought to

16  be very, very simple to find out if there are objections that

17  people are standing on, such that they are simply not going to

18  answer the question.  Your Honor said -- you've said

19  repeatedly, to the extent -- I want you to answer these

20  questions, as said again, this stuff is relevant.  If there are

21  people who are still not going to do it, why can't we find out

22  who they are and what they're going to say within this 30 days

23  and have them tell us?  We're not going to answer this

24  question.  We're not going to supplement.  We're not going to

25  supplement.  We're not going to answer this question because we

1  don't buy it still.

2          Let them come forward and identify themselves so we

3  can get this thing resolved.

4          THE COURT:  Mr. Bernick, they've already raised

5  objections, and it's up to the debtor now if you want more

6  information to compel.

7          MR. BERNICK:  So we can move to compel?

8          THE COURT:  You can move to compel.

9          MR. BERNICK:  We can move to compel on the basis of

10  the prior objections.

11          THE COURT:  You can move to compel on the basis of

12  the prior objections.

13          MR. BERNICK:  Fine.

14          THE COURT:  I think you're not going to want to do

15  that until after you find out that what the supplements are

16  because some of these objections will not be re-raised.  But,

17  you know, they're out there.  And if somebody has told you

18  they're not going to supplement, those questionnaires are fair

19  game.  If you have motions to compel, file them.

20          MR. BERNICK:  Okay.  So, we'll go back through the

21  objections and we'll pick some out and we'll move to compel and

22  we'll proceed.

23          THE COURT:  Okay.  Mr. Lockwood?

24          MR. LOCKWOOD:  Now we say, Your Honor, God bless.

25                      (Laughter)

1          MR. BERNICK:  Now, with respect to your 30-day -- so,

2     with respect to the 30-day point --

3          THE COURT:  Yes.

4          MR. BERNICK:  -- we can take what they said before to

5     be a basis for a motion to compel.  So, they still don't have

6     to come forward and identify new objections within the next 30

7     days.

8          THE COURT:  If -- if you have received information

9     from someone that they are not going to supplement, and there

10    are objections raised to questions, you can take that as their

11    objection to the questions and move to compel, yes.

12         MR. BERNICK:  Thank you.

13         THE COURT:  Mr. Lockwood, did you have something you

14    wanted to say?

15         MR. LOCKWOOD:  No, Your Honor, that's fine.  My only

16    prior comment then that you had told Mr. Bernick that you ruled

17    and you didn't want to hear anything more from him, he

18    proceeded to get up and argue with you for ten minutes, and I

19    thought that was objectionable.  But you overruled me, so --

20         THE COURT:  All right.  Thank you for protecting my

21    honor.

22                          (Laughter)

23         THE COURT:  All right.

24         MR. FINCH:  Does that conclude the questionnaires?

25    Because there is one order which we did agree to relating to

1 the bar date clarification, which I believe Mr. O'Neill has a

2 copy that he could hand up to the Court.

3          MR. BERNICK:  Can we -- before you go on with that.

4 Can we be clear that the parties will meet and confer to get an

5 agreed order by the end of the week?

6          THE COURT:  Yes.

7          MR. FINCH:  Yes.

8          THE COURT:  All right.

9          MR. FINCH:  Pick up the phone.

10          MR. BERNICK:  Yeah, well, that's something.  It's

11 been pointed out to me that one of the issues we're going to --

12 we are going to be making a request, as the questionnaire does,

13 and Your Honor has approved, for x-rays.  And we will be

14 submitting -- we actually, I think, have raised this with the

15 other side.  But we have a -- we'll be submitting a particular

16 protocol with respect to the x-rays so that -- as was done, I

17 believe, in one of the other cases and as we specifically

18 talked about before.  But I wanted to make sure that we alerted

19 the Court to that and we'll meet and confer with respect to the

20 other side on how to proceed along those lines.

21          THE COURT:  You folks are going to file what you want

22 to file.  And at some point, I'm actually going to adjudicate

23 this and get rulings.  And this case is really going to end at

24 some point.  So, -- okay.

25          Mr. Finch, now what were you raising?

1           MR. FINCH:  The -- the bar date discussion Mr.

2    Bernick and I had before Your Honor on September 11th we have

3    reduced to writing in an order that I understand linked back to

4    the motion that originally --

5           THE COURT:  All right.

6           MR. FINCH:  -- teed up the bar date.  And Mr. O'Neill

7    has that to present to the Court.

8           THE COURT:  Okay.

9           MR. FINCH:  So, that's ready for the Court's

10   signature.

11          THE COURT:  All right, I'll take it, Mr. O'Neill.

12   This is related to the September 11th proceeding?

13          MR. FINCH:  It's related to the -- it's related to

14   the bar date motion and who has to respond to the bar date.

15   There was a stipulation on the record between Mr. Bernick and

16   myself --

17          THE COURT:  Yeah.

18          MR. FINCH:  -- where we tried to reduce that to words

19   on a transcript, but now we've reduced it to typewritten order

20   for you to sign.

21          THE COURT:  All right.

22                          (Pause)

23          THE COURT:  Okay.  This is basically excepting,

24   that's E-X-C-E-P-T-I-N-G, from the bar date claimants who were

25   exposed to Grace products pre-petition but weren't diagnosed

1  until after the petition date, claimants who were exposed pre-

2  petition and were diagnosed pre-petition but didn't file a suit

3  against Grace prior to the petition date, and claimants who did

4  file a suit against Grace or other defendants pre-petition but

5  didn't serve Grace pre-petition.  Those are the three

6  categories that are excepted from the bar date.

7          MR. FINCH:  That's correct, Your Honor.

8          THE COURT:  And everybody agrees with this.  I'm not

9  going to get any next month asking to have this changed.

10          MR. FINCH:  Not from -- not from me, Your Honor.

11          THE COURT:  That -- Mr. Bernick?

12          MR. BERNICK:  If you can give me a moment.

13                      (Pause)

14          MR. BERNICK:  Yes, that's satisfactory, Your Honor.

15          THE COURT:  All right.  That order is entered.

16          MR. BERNICK:  Your Honor, there -- there were two --

17  I know the gentlemen here have got an issue to raise.  There

18  was only one other thing from the debtors' point of view.  Did

19  you need something added?

20          MS. RAMSEY:  I'm sorry.   Yes, excuse me, Your Honor.

21  On the bar date notice, I was just asking counsel for the

22  Committee, and they suggested that I present it to the Court,

23  to clarify that if someone checks the box on the bar date -- on

24  the proof of claim that indicates that they have submitted a

25  questionnaire, that that questionnaire is found deficient by

1  the Court.  The question is, is their claim still

2  satisfactorily before the Court, or is that a basis for their

3  claim to be dismissed?

4              MR. BERNICK:  No, I --

5              MS. RAMSEY:  I'm sorry.

6              THE COURT:  I think I don't understand the question.

7  They have to file a proof of claim --

8              MR. BERNICK:  I think what --

9              THE COURT:  -- but they've already submitted the

10  questionnaire.

11              MR. BERNICK:  I think there's a place on the proof of

12  claim that says if you have filed a questionnaire, then that

13  constitutes the proof of claim.  And -- but I think you still

14  have to file -- do you not still have to file the proof of

15  claim itself?

16              MR. FINCH:  Yes.

17              MR. BERNICK:  Yes.

18              MR. FINCH:  You do.

19              MR. BERNICK:  So, the question then, I guess, the

20  narrow question is is if you -- if submitted less than a

21  satisfactory questionnaire, does that then put you at risk of

22  losing your place as having a claim that's not barred by the

23  bar date.

24              MS. RAMSEY:  That's correct.

25              THE COURT:  That --

1          MR. BERNICK:  And at least from our point of view,

2   while we want people to fill out the questionnaires completely,

3   I don't think that people ought to -- I don't think that people

4   ought to be in a position where somehow their ability to have a

5   timely claim made should hinge upon whether the questionnaire

6   is filled out completely.  So, I -- I guess I would be in

7   agreement that says that if the questionnaire is later not

8   proven to be completely done, that doesn't somehow date

9   retroactively mean that they haven't filed a proof of claim.

10          THE COURT:  Oh, I see the question.  No.  The proof

11   of claim filing date is going to be the date that the proof of

12   claim is submitted to the debtor --

13          MR. BERNICK:  Right.

14          THE COURT:  -- under the proof of claim rules.  But

15   if the -- if the questionnaire is incomplete, and the debtor

16   files a motion to compel or a motion to strike or whatever, it

17   will be grounds for some court order.  But the -- but it won't

18   be grounds to be dismissed as having been untimely filed.

19          MS. RAMSEY:  Thank you, Your Honor.  That's what I

20   was asking.

21          THE COURT:  Okay.

22          MR. BERNICK:  And that -- that's fine.

23          THE COURT:  All right.

24          MR. BERNICK:  With respect to outstanding matters, I

25   know that -- I -- we're not intending to pest Your Honor, but

1    we're kind of curious about when we might get the ZAI opinion.

2            THE COURT:  I am still working on it.  I have a law

3    clerk pretty much full time devoted to it.  We have had some

4    intense discussions over the last couple of days and it's being

5    reworked.

6            MR. BERNICK:  Okay.

7            THE COURT:  So, soon.

8            MR. BERNICK:  Okay.  And then --

9            THE COURT:  After the Owens confirmation order.

10           MR. BERNICK:  After the what?

11           THE COURT:  After the Owens confirmation order.

12           MR. BERNICK:  The -- the other thing is --

13           UNIDENTIFIED ATTORNEY:  There's $30 million riding on

14   that one on extension fees, Your Honor.

15           THE COURT:  I understand.  I hope to have that order

16   done shortly.

17           MR. BERNICK:  The other -- the other question, Your

18   Honor, is on the -- I think with respect to Mr. Speights, there

19   was a -- the issue of whether there could be after-the-fact

20   authorization.  That is where the -- the authority letter is

21   clear that it was after the bar date and after the claim forms

22   had been submitted.  And that matter was briefed, argued, and

23   is under submission to Your Honor.  And I think that those are

24   the only two things -- oh, and then there's a stay motion with

25   respect to claims brought against the State of Montana.

1          THE COURT:  I also have that case in the works.  An

2  opinion is in the works, but it's not -- it's not as far along

3  as ZAI, I can tell you that --

4          MR. BERNICK:  Okay.

5          THE COURT:  -- because I pulled my clerk off to work

6  on ZAI, which I thought needed to get done first.

7          MR. BERNICK:  Okay, that's fine.

8          THE COURT:  But there is an outline of an opinion on

9  that.  There is not yet -- I haven't even looked at the timely

10  signature issue, and probably won't for a while.

11          MR. BERNICK: Okay.

12          THE COURT:  Mr. Monaco?

13          MR. MONACO:  Thank you, Your Honor.  Good evening,

14  unfortunately.  Your Honor, for the record, I represent her

15  Majesty, the Queen in Right of Canada, I'll just refer to it as

16  the Crown.

17          Your Honor, if you will recall at the last omnibus

18  hearing, you gave me permission to appear telephonically with

19  respect to the exclusivity hearing.

20          Unfortunately due to a logistical mix-up, I was -- I

21  literally could not be heard on my objection.  I was put on a

22  listen only mode.

23          And I'm -- I beg the Court's indulgence, I'm not here

24  to argue my objection.  Your Honor has already made a ruling.

25  But I did want to follow up on Your Honor's ruling with respect

1  to how it affects my client and Mr. Hogan, who represents -- is

2  the representatives of the Canadian ZAI claimants, who's also

3  here in the courtroom, and can address some of these points.

4  And I promise I'll be brief, Your Honor, I know that it's late.

5          Your Honor, there were two positive developments:

6          One, you just touched on.  The fact that the ZAI

7  decision is going to be rendered hopefully very soon.

8          And also the fact that Your Honor directed the

9  parties to continue to negotiate with respect to outstanding

10  issues.

11          As you are aware, Your Honor, the Crown and the

12  Canadian ZAI claimants have advocated a separate Canadian

13  process to handle those claims.  And I do not think that Grace

14  disagrees with that standpoint.  They advocated a Canadian

15  process for other types of Canadian claims.

16          The problem is they've been reluctant to discuss a

17  process unless and until Your Honor renders a decision on the

18  ZAI.

19          Mr. Hogan and I spoke with debtors' counsel last

20  week.  And -- to discuss this issue with the debtor.  And we

21  spoke with Ms. Baer and she indicated that Grace would be

22  willing to enter into good faith negotiations with respect to a

23  separate Canadian process for the ZAI Canadian claims, but they

24  wouldn't do so until Your Honor rendered the decision.  There

25  certainly is merit to that.

1        Your Honor, I realize you are very, very busy, you're

2   involved in a lot of other complex cases.  This case has a lot

3   of moving parts.  And I, with some trepidation, I always have a

4   problem asking a judge to issue an opinion.  But I think in

5   this specific matter, it would help to advance the ball, at

6   least as to this aspect of the case.

7        Before I --

8        THE COURT:  Mr. Monaco, I'm not holding up the

9   decision for anything other than the fact that it is factually

10  very complex.

11       MR. MONACO:  And I understand, Your Honor.

12       THE COURT:  And even checking the record cites has

13  been a nightmare in some instances, for no -- for technical

14  reasons in my office.  We lost a draft of the opinion, it just

15  disappeared, and I couldn't get it back on the computer.

16       MR. MONACO:  Um.

17       THE COURT:  I mean there have been nightmares related

18  to this.  And as a result, it's just taken me longer than I

19  might otherwise have wanted.

20       MR. MONACO:  And I understand, Your Honor.  I --

21  there's -- aside from that, there's a lot of other things going

22  on in this case and other cases Your Honor has.

23       But I don't know if Mr. Hogan has anything to add

24  before I would request that debtors' counsel just confirm this

25  agreement that we've reached last week on the record.

1          THE COURT:  To -- to try to work on a separate

2 process after the ZAI opinion is issued?

3          MR. MONACO:  Yeah.

4          THE COURT:  Okay.  Mr. Hogan?

5          MR. HOGAN:  Good evening, Your Honor.  Daniel Hogan

6 on behalf of the Canadian ZAI claimants.

7          I'm -- I really have nothing else to add to that,

8 Your Honor, except to say that as you're well aware, there is

9 an ancillary or related administration going on up in Canada

10 that you've heard about before the CCAA.  And that there is a

11 stay involved in that proceeding, and that my clients, and the

12 attorneys that I work for, were appointed as representative

13 counsel for all of the various claimants in the various class

14 action suits that are -- that were pending out there before the

15 stay was put in place.

16          And so I need to report to them that there's -- as to

17 what the conditions are going on down here.  And that was the

18 reason we reached out to the debtors' counsel, and I just

19 wanted the Court to be aware of that.

20          THE COURT:  Okay.  Well, I -- I know it doesn't look

21 like it, but I'm honestly doing the best I can with respect to

22 that opinion.

23          MR. HOGAN:  Thank you, Your Honor.

24          MR. BERNICK:  Let me -- just -- for -- just speaking

25 for Grace.  Let me be totally clear.  The -- counsel have

1  gotten up and stated their views.  This was not something that

2  Grace -- we understand the burden that Your Honor is under, and

3  this is not -- nothing to do with some agreement with Grace

4  that they would stand up and say, oh, you've got to issue the

5  opinion.  We -- we know that you're working on it, and whatever

6  it issues, it's fine.

7        And our position with respect -- there's a

8  characterization that was made about the settlement process

9  again before the Court.  And I really take issue with that

10  because it has lots of different potential suggestions and

11  perceptions that it creates, and we've been through this

12  before.  Your Honor told me that I was responsible for

13  advancing the cause on settlement.  I already have undertaken

14  steps to try to begin that process in a sensible way.

15        With respect to the Canadian ZAI folks, our -- our

16  position with regard to them I'm sure would be informed by any

17  decision Your Honor reaches with respect to ZAI.  But it's not

18  as if -- that is -- that is the ZAI opinion, whatever it might

19  be, is the factor that is or is not driving talks with the

20  Canadian ZAI claimants.

21        So, the suggestion that somehow we believe that Your

22  Honor has to rule before there can or cannot be productive

23  discussions, that's simply one feature of it.  There's a whole

24  feature of they're in Canada and they're subject to different

25  law in Canada.  And Your Honor well understands that we have

1  views about that law.

2       So, we will be responsible with respect to the

3  Canadian ZAI claimants, but they have to understand that they

4  are one of many constituencies.  And while we're wrestling with

5  the whole problem of how to fit P.I., P.D., equity and

6  unsecureds in the global picture together, you know, that is

7  the big issue.  And Canadian ZAI will be part of the process.

8       But I really wanted to rise to say that we disagree

9  with the idea that counsel should be making representations to

10 the Court on what it is that's driving the settlement

11 discussions, particular when it seeks to create a nexus between

12 the settlement discussions and Your Honor's issuing some kind

13 of opinion.  That's not our doing.  That may be their

14 perception, that's our not doing.

15      THE COURT:  Well, it may be.  And, frankly, it's

16 irrelevant because it will be coming out shortly anyway.  So,

17 to the extent that you can, you know, start your discussions,

18 start your discussions.  If they turn out to be irrelevant for

19 whatever reason based on my opinion and you think they won't be

20 productive, then you'll stop.  If you think it will advance the

21 ball, you'll expedite.

22      I don't think you need to wait for an opinion to talk

23 to each other.

24      MR. HOGAN:  Your Honor, thank you.  And that was our

25 belief, and that's why both Mr. Monaco and myself reached out

1  to Ms. Baer to initiate a dialogue.

2          And although Mr. Bernick wasn't present on the phone

3  call that we had, it is my opinion, as well as Mr. Monaco's

4  understanding that, in fact, they weren't going to talk to us

5  until the opinion was rendered.

6          THE COURT:  Well --

7          MR. HOGAN:  But we'd be glad to start the dialogue

8  now.

9          THE COURT:  Okay.  It --

10          MR. HOGAN:  Be happy to.

11          THE COURT:  You know what, this is really not

12  something that the Court needs to get involved in.  This is

13  really an issue that you folks ought to be addressing on your

14  own.

15          And to the extent --

16          MR. HOGAN:  Understood, Your Honor.

17          THE COURT:  -- that the Property Damage and the

18  Personal Injury people have reached some settlement, you ought

19  to talk to them to see whether or not you can get included in

20  that settlement, and it will be perhaps irrelevant to anything

21  more.

22          MR. HOGAN:  Thank you, Your Honor.

23          THE COURT:  So -- okay.  Mr. Bernick?

24          MR. BERNICK:  I'm sorry that it's taken so long

25  today.  But the debtor has nothing further to raise.

1          THE COURT:  Anyone else?  Housekeeping matters?

2                  (No audible response heard)

3          THE COURT:  Okay.  We're adjourned.

4          MULTIPLE SPEAKERS:  Thank you, Your Honor.

5               (Proceedings Adjourn at 6:45 P.M.)

6

7

8                  C E R T I F I C A T I O N

9

10         I, Karen Hartmann, certify that the foregoing is a

11   correct transcript to the best of my ability, from the

12   electronic sound recording of the proceedings in the above-

13   entitled matter.

14

15    /s/  Karen Hartmann                  Date:  September 29, 2006

16   TRANSCRIPTS PLUS

17

18

19

20

21

22

23

24

25