## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| IN RE: | Chapter 11 |
| W.R. Grace & Co., *et al.*, | Case No. 01-01139 (JKF) |
| Debtors. | Jointly Administered |

### EXPERT REPORT OF DR. ARTHUR L. FRANK

PLEASE TAKE NOTICE that the attached expert report of Dr. Arthur L. Frank, dated September 26, 2006, is filed on behalf of the claimants injured by exposure to asbestos from the Debtors' operations near Libby, Montana (the "Libby Claimants"),[1] in anticipation of the asbestos personal injury estimation proceedings scheduled to commence on June 13, 2007.

Dated:  October 3, 2006

LANDIS RATH & COBB LLP

Adam G. Landis (No. 3407)
Kerri Mumford (No. 4186)
919 Market Street, Suite 600
P.O. Box 2087
Wilmington, DE 19801
Telephone:  (302) 467-4400
Facsimile:  (302) 467-4450

-and-

Daniel C. Cohn, Esq.
Christopher M. Candon, Esq.
COHN WHITESELL & GOLDBERG LLP
101 Arch Street
Boston, MA 02110
Telephone:  (617) 951-2505
Facsimile:  (617) 951-0679

Counsel for Libby Claimants

---

[1] As identified in the Amended and Restated Verified Statement of Cohn Whitesell & Goldberg LLP and Landis Rath & Cobb LLP Pursuant to Fed. R. Bankr. P. 2019 [Docket No. 12645], as it may be amended and restated from time to time.

393.001-14060.doc

## EXPERT REPORT OF DR. ARTHUR FRANK

**A.    Qualifications.**

1.    I am Dr. Arthur L. Frank. My work address is Drexel University School of Public Health, 1505 Race Street, 13th Floor, Philadelphia, PA 19102.

2.    I am a physician currently licensed in Pennsylvania and Texas. I practice occupational Medicine, in which I am board certified, as well as being certified in internal medicine.

3.    My curriculum vitae is attached as Exhibit A.

4.    My Ph.D. degree is in Biomedical Sciences, and the original research carried out to be awarded this degree had to do with the effects of asbestos on organ cultures. I have also published on the effects of asbestos on cell cultures as well as populations exposed to asbestos.

5.    I studied at the Mount Sinai School of Medicine with Dr. Irving Selikoff and have been involved with asbestos-related activities since 1968.

6.    I have been an invited speaker on the subject of asbestos-related disease on numerous occasions and have lectured throughout the United States as well as internationally. I have spoken on the subject of asbestos in such countries as Austria, England, Brazil, Italy, Israel, India, Thailand, China and elsewhere. I have given the keynote address on the subject of asbestos before the American College of Occupational and Environmental Medicine and the comparable group in Canada.

7.    I have examined thousands of asbestos exposed workers either in person or

by x-ray evaluation.

8.    My current professional activities include biomedical research, teaching, departmental administration, service activities to my school, university, state, national and international organizations, and time spent doing medical-legal work, which I have been doing on a regular basis since the latter part of the 1970s. Most of my medical-legal work has had to do with asbestos although I have also been engaged in assessment of persons exposed to silica, coal, gasoline, benzene and several other exposures. I have, over these decades, been deposed many times and testified in court frequently.

9.    My curriculum vitae list the dozens of publications I have authored or co-authored on the subject of asbestos. Most articles have appeared in the peer reviewed literature.

10.    I have worked in the area of occupational medicine for a number of companies, governmental agencies, and have collaborated with unions on a variety of occupational health issues.

11.    I have served as an advisor or consultant on the subject of asbestos to a variety of federal and state agencies including the EPA, NIOSH, OSHA and have worked with the National Academy Institute of Medicine on the subject of asbestos. I have advised international governmental agencies on the hazards of asbestos.

**B.    The Nature of Asbestos.**

12.    There are six fiber types regulated as asbestos, five amphiboles (crocidolite, amosite, tremolite, anthophyllite, and actinolite), and one serpentine form (chrysotile).

There are numerous other fibrous materials that are considered asbestiform, and other fibers that have been studied for their ability to produce malignancy, specifically mesothelioma.

13.    In addition to asbestos, which is the primary cause of mesothelioma in North America, and much of the rest of the world, studies have shown mesothelioma developing after exposure to fibrous zeolites in Turkey and to fluoro-edenite in Sicily. A variety of fibers, including man-made fibers, have produced mesotheliomas in animal studies.

14.    It has been generally agreed that all mineralogic forms of asbestos produce a wide range of diseases, and there is a considerable body of data that there may well be differences in the biological effects of different fiber types.

15.    Asbestos fibers are both inhaled and ingested and can cause disease. Asbestos fibers that are ingested are distributed elsewhere into other parts of the body as well as being removed from the lungs. There is scientific literature that reviews the rate of clearance from lung tissue which documents removal of chrysotile to occur more quickly than amphiboles. I am not aware of any studies that look at asbestiform or other fibrous materials as to the rate of clearance from the lung except for some man-made fibers that have been looked at for their biopersistence.

C.    **Asbestos-Related Diseases.**

16.    There are two types of disease caused by asbestos, non-malignant (benign) and malignant (cancerous). As noted above, all the fiber types are known to produce all

of these diseases, although there is literature about differences in response based upon different fiber types.

17.    The non-malignant diseases include asbestos skin warts (of which nothing further will be discussed), benign asbestotic pleural effusion, and asbestosis. Benign asbestotic pleural effusion is generally an uncommon finding, often thought of as the first manifestation of an asbestos disease, often seen within ten years of first exposure. It is characterized by a bloody pleural effusion, without an underlying malignancy. In Libby, Montana, the rate of benign pleural effusions appears to be more frequent than is generally seen in other populations, this view coming from clinical impressions.

18.    Asbestosis is one of the pneumoconioses, or dust diseases of the lung, first described by Dr. Zenker, a pathologist, in 1867. There are numerous pneumoconioses in addition to asbestosis, including silicosis, coal workers pneumoconiosis, talcosis, and others. Asbestosis can be further divided into two types, parenchymal asbestosis and pleural asbestosis. Not all agree to this distinction, but it can be justified by various scientific facts. Parenchymal asbestosis is characterized by fibrotic changes in the lung tissue itself, caused by exposure to asbestos. These changes generally are not seen earlier than ten years after first exposure. Progression after cessation of exposure is dependent on the ILO category at that time; more progression occurs with higher levels. There are reports of disease occurring in less than ten years, but generally with heavy levels of exposure. Pleural asbestosis, a term not accepted by all, develops when fibrotic changes occur in the pleura. Simply calling it pleural plaquing or pleural fibrosis makes no

difference with regard to what is noted.  These changes generally do not occur prior to ten years either, and in many populations are often clinically inapparent.  Low level exposures that produce pleural asbestosis are rarely clinically significant by themselves, and rarely progress.  Here we have a significant difference in that among the people of Libby, both those occupationally exposed and those only environmentally exposed, there appears to be much more progression, and has also been found to be the cause of death in a much larger percentage of cases than noted elsewhere.  The one exception to this is the significant diseases seen in the Anatolian Plain of Turkey where there is environmental evidence of significant pleural disease as well as mesothelioma.

19.    There are numerous malignant changes caused by asbestos.  Many carcinogens appear to cause only one or a few different forms of malignant disease, although asbestos seems to cause many more malignant diseases than most carcinogens. The cancers caused by asbestos include:  (1) lung cancers of several cell types,  (2) mesothelioma in several sites (pleural, peritoneal, pericardial and testicular), (3) a variety of gastrointestinal tract cancers (esophageal, stomach, colon, etc.) (4) laryngeal cancer and (5) kidney cancer.  There is a significant synergistic effect between smoking and asbestos with the development of lung cancers.  In general, cancers do not begin to appear before 10-15 years from first exposure; the risk of asbestos-related cancers will last throughout a person's lifetime.  There appears to be a dose response relationship with the development of all cancers, without evidence of a threshold, as there is for the development of asbestosis.  There appears to be no "safe" level of exposure to asbestos.

Data exists that very short periods of exposure give rise to excess cases of cancer; in animals this can be as short as one day and human data shows less than a month of exposure will double the risk of lung cancer.

**D.    Methods of Diagnosis.**

20.    The diagnosis of asbestos-related disease is based upon standard medical practice. First, one needs to obtain a history of exposure to asbestos. This is the most critical documentation of exposure to asbestos, more important than any tissue evaluation. One problem with obtaining a history is that individuals may not always know that they have been exposed to asbestos, especially with environmental exposure rather than in occupational settings. Physical exam findings related to asbestos exposure occur in a minority of individuals with asbestos-related disease. For non-malignant disease this would include rales, dusky lips and/or nailbeds, changes in fingernails or other findings of chronic lung disease. Radiologic evidence is what is usually available in individual cases and may be either in the form of chest X-rays, often of several views, or from CT scans. There are characteristic changes that can be found, related either to fibrosis in the lungs or the pleura. Pulmonary function testing may or may not be abnormal, and may show restrictive changes, obstructive change, or both. Advanced testing such as diffusing capacity may also be abnormal. Rarely available, but often helpful if available, is tissue which allows for pathologic evaluation. Cancers, on occasion, are diagnosed only on a clinical basis, but the best data comes from pathologic evaluation of tissue. Such tissue can make the diagnosis of both non-malignant and

malignant disease.

### E.    The Libby Experience.

21.    The method of evaluation of individuals exposed to Libby vermiculite and its contaminants is no different from the evaluation of any other asbestos exposed group. Numerous studies making use of standard medical and scientific evaluation techniques have been carried out on the Libby cohort. What makes the Libby experience strikingly different from many other situations are the findings that are available. While the diseases found in the Libby cohort have been the same, their time to onset, clinical pattern, and impact on those environmentally exposed is different than in pleural cohorts elsewhere.

22.    The Libby cohort is characterized by predominately pleural disease. In the Peipins (2003) summary of ATSDR screenings in 2000 and 2001, of the 6,668 participants, 18% had pleural abnormalities and under 1% had interstitial abnormalities. Similarly, Whitehouse (2004) found in 123 patients with two or more sets of pulmonary function tests, 55% had pleural disease with no interstitial fibrosis and 45% had pleural disease with only minimal interstitial fibrosis. No patient in the study had advanced interstitial disease.

Few asbestos disease cohorts are reported as predominately pleural disease. Cohorts which may be considered predominately pleural include those in Turkey, Corsica and those living near the Finnish anthophyllite mining activities. None of these are reported as being progressive, severe or leading to pleural death. Mesothelioma cases are

reported. Most asbestos disease cohorts show predominately interstitial, with a lesser pleural disease component, which is rarely progressive and rarely severe. This is in sharp contrast to the Libby cohort, which is predominately pleural, and the pleural disease is generally progressive and often severe.

In the Libby community, pleural disease is widespread. Peipins (2003) uses "central Lincoln County" with a relatively stable population of 9,521 for the past 30 years as a definition of the affected area in and about Libby, Montana. The expert report of Dr. Whitehouse informs as to total numbers diagnosed and numbers with positive screenings, amounting to a very significant percentage of the local community population. Similar numbers for proper comparison are not generally available from other pleural cohorts, but it may be observed that the Libby cohort appears to present more widespread disease in the community, more environmental exposure cases, and perhaps a greater percentage of the community total population than is the case in other pleural cohorts. The only other area with a somewhat similar pattern of disease from environmental exposures is in parts of Turkey.

24.    The Libby cohort is characterized by rapid progression of pleural disease and a pleural disease severity not reported elsewhere. The expert report of Dr. Whitehouse presents observations on rapidity of progression and disease severity. No similar observations have been reported from other pleural disease cohorts, or for that matter for pleural disease in any setting.

Particularly striking is the observed number of cases in the Libby cohort of pleural

disease leading to death, with little or no interstitial disease present. Dr. Whitehouse includes chest x-ray series on a number of patients with diffuse pleural disease, accompanied by increasingly severe restrictive disease leading to death. Nothing of this kind has been reported elsewhere. There are few reports of pleural disease resulting in death in the medical literature. ATS (2004), p.707, cites five. I believe I have heard of a few others in my career of 30 years. Death by pleural disease is generally accepted as a rare occurrence. Not so in Libby. In this aspect, the Libby experience is strikingly different from that reported elsewhere.

The Libby cohort has produced 23 apparently verified cases of mesothelioma, including 15 Grace mine workers and 8 persons environmentally exposed. This is indeed striking in a population under 10,000 in the Libby area. Of course, there is turnover in the population and undoubtedly more have been significantly exposed to Libby vermiculite. This rate would rival that of many regularly exposed occupational groups.

There also appears to be more clinical pain associated with the Libby experience than is generally found with pleural disease elsewhere.

25.    It is also significant that Libby asbestos disease may appear early after intense exposure. As reported in the expert report of Dr. Whitehouse, W.R. Grace chest x-ray series on workers in 1969, 1975 and 1976 showed 17%, 6% and 5% abnormals. With the caveat that these workers likely had community exposures prior to work for W.R. Grace, to be sure these are significant numbers of abnormalities in the first five years after intense occupational exposure. This phenomenon is rarely seen elsewhere,

other than in benign asbestotic pleural effusion. Early presentation also speaks to the high toxicity of the Libby asbestos, in addition to high exposure levels.

26.    The question is presented as to why Libby is so different from other pleural disease cohorts, in intensity, mortality, and impact on those environmentally exposed. The answer to this question is not definitively established as yet.

One explanation is that the Libby materials, the "Libby asbestos," is particularly toxic. The Libby material has been variously referred to as "tremolite," "tremolite-actinolite," and now "winchite." Meeker (2003) appears to be the definitive work on the mineralogy. Meeker refers to the material as the "Vermiculite Mountain amphiboles." The materials meet the chemical definition for amphiboles (p. 1958). The materials are "fibrous" as well as "asbestiform." Most samples met the definition of "true" asbestos (p.1968). In the samples collected, there was a wide range of material, 40% of which was asbestos (p.1963). Meeker (Figure 6) shows that the material is largely winchite, chemically close to tremolite. The difference between winchite and tremolite is minute, but it may be significant in terms of toxicity to humans. It may be that winchite is more toxic than other amphiboles. Or, it may be that the richterite or the tremolite in the mix of fibers is the problem. The combination of fibers may also be responsible. The matter will require further investigation.

All the fibers in question are amphiboles. It is the majority view that amphiboles are more toxic than serpentine asbestos. My own view is that the issue is not settled, as there is evidence going both ways. It may be that the Libby amphibole is a particularly

toxic form of amphibole asbestos.

A second factor which may explain why the Libby experience is so different is that virtually all patients had a 24 hour exposure in Libby, whereas in most cohorts workers went home to an area of respite from asbestos exposure. The Grace workers had eight hour exposures at the mine, but generally went home with asbestos dust on their clothing, to homes in areas of perhaps significant ambient asbestos exposure. Accordingly, their exposure, like that of community members, was generally a 24 hour exposure. The 24 hour exposure without respite for the lungs to clear much of the asbestos might be a factor in the intensity, severity, and the extent of asbestos disease in Libby.

**F.      Prevention of Disease.**

27.      The modern era of the appreciation of disease caused by asbestos goes back to the end of the 19th century. The term asbestosis was first used in the mid 1920s. In the 1930s, when there was a growing literature on this subject, both parenchymal and pleural disease were considered to be part of the disease asbestosis. Also, as early as 1930 preventive measures were written about as important to the prevention of asbestos-related disease. The first suggestions that asbestos could cause malignancy were made, in the 1930s, and written about definitively as early as 1942. The lay press was aware of the malignant hazards of asbestos by the end of that decade.

**G.      Occupational Medicine History of the Grace Mining Operations in and Near Libby, Montana and Their Effect Upon Workers, Family Members and Community Members.**

Asbestos/Expert Report of Dr. Frank                    11                                        9/22/06

28.    Vermiculite Mountain is located about seven miles northeast of Libby, Montana. The mineral vermiculite was first discovered there in the 1920s. The presence of naturally occurring asbestos as an impurity in the vermiculite was known in the 1920s. Exh. 90.4. Exhibit citations are to the Common Exhibits to the Grace trials in Libby in 1997 - 2000. There were attempts to market the asbestos in the 1920s and in about 1962. Exh. 41-44.

29.    Mining of vermiculite began in the 1930s. The old dry mill was constructed part way down the mountain from the mining operations in about 1937. In this open cut mining operation, blasting loosened materials. Shovels loaded materials into trucks. Roughly half of the materials loaded were dumped over the side of the mountain as waste. Trucks moved the ore down to the transfer point, where the material was roughly sorted in a grizzly. The ore then traveled on a conveyor down to bins next to the dry mill. The ore was then introduced into the top of the dry mill and passed through a series of hammer mills, screens, and chutes through six levels in the dry mill to the lowest level. There the product (vermiculite concentrate) was loaded into small railroad cars called "skip cars," and was transported down to the lower ore bins. From there the concentrate was trucked down to river storage, to large bins identified by grade. As necessary, the concentrate was released into tunnels below the river storage bins onto a conveyor belt and was moved across the Kootenai River. At the loading dock on the other side of the Kootenai River, the vermiculite concentrate was loaded into railroad cars. The cars were pushed into the Libby railroad yard near the downtown area of

Libby. There the railroad cars were joined to eastbound or westbound trains. About 10-16 car loads of vermiculite concentrate per day left Libby.

30.    The mining operations were extremely dusty. Virtually every time the ore or the vermiculite concentrate was moved clouds of dust were created, except in wet weather. There was no area in the mining operation which was not dusty. Workers recounted that all flat surfaces were dusty. There was often visible dust in the air, as can be seen from photos of the dry mill and blasting operations.

31.    The community of Libby lies in a mountain valley. The valley airshed functions somewhat like a bowl. Pollutants when disturbed by wind or human activity tend to be recycled into the bowl.

32.    W.R. Grace & Co. and its predecessors introduced raw ore and vermiculite concentrate into the community of Libby in a number of ways. Next to the railroad tracks near the downtown area, Grace had a bagging plant where a limited quantity of vermiculite concentrate was trucked to town, dumped, kept in open storage bins and then placed in bags and loaded onto railroad cars. Again, virtually every time the vermiculite concentrate was moved, dust was created. Next to the bagging plant was an expansion plant, where vermiculite concentrate was exfoliated or "popped" into products which could be used for insulation and other purposes. When the expansion plant was operating, considerable dust was generated. This is shown in the film "Dust to Dust," with boys playing baseball with the expansion plant in the background.

33.    Grace had no fences around the storage bins and piles of vermiculite

concentrate. Children often played on the piles. Community members were allowed to take the waste from piles for use in gardens, lawns, or insulation.

In the 1950s and 1960s, the railroad cars hauling vermiculite concentrate were generally open cars which emitted dust when moved. In the 1970s, hopper cars were used, but they often leaked concentrate into the railroad yard. Recently BNSF Railway has cleaned the Libby railroad yard by removing several inches of top soil.

34.    The result of the above, and other pathways, was "widespread contamination of the Libby, Montana area." Peipins (2003), abstract. Of 7,307 participants in the ATSDR screenings in 2000 and 2001, only 307 had worked for W.R. Grace, but 1,103 had had vermiculite exposure at non-Grace jobs, 3,017 had vermiculite insulation in Lincoln County homes, 3,702 had used vermiculite for gardening, 4,722 had played at the baseball field near the expansion plant, and 2,442 had played on vermiculite piles.

35.    Various tests on the dust showed 27%-40% asbestos. Exh. 21, p.1; Exh. 35, Exh. 45.

36.    The occupational medicine literature shows that asbestos exposure was well understood as a hazard by the 1930s. The connection between asbestos exposure and lung cancer was established in the 1940s. The danger of asbestos exposure to workers' families and the community was recognized in the 1940s. The connection between asbestos exposure and mesothelioma was well established by 1960. The above was clear in the occupational medicine and industrial hygiene literature, and W.R. Grace and its

predecessor Zonolite Company should have been well aware of it.

37.    The central principles of occupational medicine are to study, to warn and to

protect. These principles extend not only to the Grace workers in Libby, but also to

family members of workers, and to the community. W.R. Grace and its predecessor

Zonolite Company did not adequately study, warn or protect the workers, their family

members, or the community of Libby.

38.    Let us examine what Grace knew by 1964. The company knew of the

presence of asbestos from the 1920s forward. Exh. 90.4. The company knew asbestos

was toxic by 1955 (Exh. 14). Under occupational medicine standards the company

should have known this through the literature in the 1940s or earlier. In 1956, the State

of Montana, Board of Health, Division of Disease Control performed an inspection at the

mine. The State found high concentrations of asbestos, violations of industrial hygiene

standards, and warned of the "considerable toxicity of asbestos." Exh. 17. The company

recognized at that time that asbestos was a serious health hazard. Lovick Depo, 87:10. In

1959 a company chest x-ray series showed 36% of the workers with abnormal chest x-

rays. Exh. 26. Annual chest x-rays 1964-1980 showed 25-30% abnormals. Exh. 193.17,

p.36. The company knew in 1959 that worker Glenn Taylor was diagnosed with

asbestosis. He died of asbestos disease in 1961. Lovick Depo, 98:9, Exh. 22, Exh. 67.

Three workers died of asbestos disease in 1961. Exh. 225. The trial testimony of Earl

Lovick, Assistant Manager for Grace in Libby, states:

> Q:  And you knew at least by 1962 that this - you had a serious health
> problem and in fact that your men were being diseased, correct?

A:  Yes sir.

Q:  It wasn't at risk of disease, they were in fact being diseased, correct?

A:  Some of them yes sir.

Q:  And they were in fact dying correct?

A:  Some of them yes sir.

*Schnetter v. W.R. Grace* Transcript 4/30/97, p.381:4.

Q:  You had absolute proof that these men had been diseased up there at the mill by 1966 at the latest?  Is that true?

A:  Yes sir, that would be true.

Q:  And you have told us that none of the records you had on that were shared with men.  Is that true?  That is what you told us correct?

A:  Yes sir.

Q:  And so at this point it wasn't just a matter of men being exposed to something that might injure or kill them, these men were already injured and dying, and they were continuing to be exposed every day, is that true?

A:  Yes sir."

*Schnetter v. W.R. Grace* Transcript 4/29/97, p.155:4.

Grace continued to send men into the dry mill for eight more years after 1966.

39.    Grace knew of the connection between asbestos exposure and lung cancer through the 1964 State Report, and was therein informed of "possible widespread carcinogenic air pollution."  Exh. 53.  Risks of asbestos exposure to community members were quite clearly spelled out to Grace executives in 1968.  Exh. 119.

40.    In 1967 a test was done on the large "600 fan" on the dry mill.  Exh. 117.

The estimate was 24,000 pounds per day in dust emitted by the large stack on the dry mill. At 25-30% asbestos, this was about 8,000 pounds of asbestos emitted into the air from a single source, the large stack on the dry mill.

41. Residents have reported that Libby in 1950-1990 was a dusty place. The manager of Grace operations estimated in 1965 that "you could get a five count in downtown Libby on many dry days." Exh. 79. This would have been 5 mppcf, or about 20 fibers per cubic centimeter. See Amandus (1987a), p.5, Libby Studies. In 1975, Grace performed measurements of ambient air at three locations in Libby and obtained 0.67, 1.1, and 1.5 f./cc, indicating a serious hazard from breathing the air in Libby.

42. Grace and Zonolite Company did not adequately study the asbestos hazard. Even though the rate of abnormal chest x-rays was extremely high from 1959 forward, and even though full physical examinations were first suggested to the company in 1959 (Exh. 26), Grace never did have the workers examined by a physician who could collect the chest x-rays, lung function tests, the physical examination and history of asbestos exposure, then report and advise the patient. This was true all the way through until Grace closed operations in 1990. Accordingly, Grace's medical surveillance program was inadequate at all times up to 1990.

43. The occupational medicine standard is that the company study the hazard, consult appropriate physicians and scientists, inform those at risk, and ideally publish the results in the literature. W.R. Grace did not do this.

44. In fact, Grace declined and obstructed medical studies, and misrepresented

facts to local Libby doctors. The history provides a clear record of obstruction. In 1959, on receipt of the Glenn Taylor diagnosis of asbestosis, Dr. Knight of the Montana State Tuberculosis Sanitarium inquired about asbestos in the dust from the ore. Exh. 23. The company replied that "the dust in our mill has never been analyzed as such." Exh. 24. This statement was false. The 1956 State Report shows "the concentration of asbestos found in the dust, which varies from eight percent to twenty-one percent" Exh. 17, p.3. Also the 1959 State Report found that airborne asbestos was in an average concentration of 27%. Exh. 21, p.1.

45.    In 1959 Dr. Cairns a local doctor in Libby, proposed a study on the workers with abnormal chest x-rays. Exh. 26. The company declined. In 1964, Dr. Nelson of Libby performed lung function tests, and proposed further study on workers with abnormal chest x-rays, and offered to do the work on his own time. Exh. 54, 56. Grace declined. Exh. 72.

46.    In 1965, Dr. Spicer, a pulmonologist and consultant to Maryland Casualty, Grace's Workers' Compensation carrier, reviewed Dr. Nelson's records and estimated a "20% incidence of asbestosis in the workers studied." Exh. 73. Dr. Spicer suggested a thorough study. Exh. 73. Grace declined. Exh. 85, p.5.

47.    In 1967, the first asbestosis occupational disease case came to hearing. Grace's attorney reviewed the existing State Board of Health reports, and consulted with Dr. Little, the radiologist then reading the chest x-rays on Libby workers. The attorney's letter (Exh. 92a) notes:

> Dr. Little stated that we did indeed have a severe problem, and that we
> might expect a good many claims involving asbestosis. . . . apparently the
> only persons aware of the studies are the insured's officials and Dr. Little.
> Again, as you may well realize, I would much like to avoid having evidence
> presented by the opposing party which would reveal the extent and severity
> of the problem with which we are concerned. p.3

In that same document, the attorney informed the company:

> Nevertheless, as I informed you, I would hesitate to allow the evidence of
> the State Board reports if it is possible to keep them out of the hands of the
> Industrial Accident Board, and through it, the general public. p.2

Grace settled the case.

48.     In 1968, the U.S. Public Health Service requested a study on the Libby

workers. Exh. 104. Grace declined. Exh. 108. In 1969, Grace performed an in-house

study on the 1969 chest x-ray series, finding 92% abnormals in workers with over 21

years service, and 17% abnormals in workers with under six years of service. Exh. 130.4.

This study was not disclosed. In 1976, Grace performed a review of death certificates,

finding a lung cancer rate five times the expected. Exh. 183.12. This study was not

disclosed. In 1977, Dr. McMahon of Harvard proposed a study. Exh. 182.30. Grace

declined. Exh. 183.

49.     In 1977, Grace performed an in-house study in which hamsters were

injected with Libby tremolite asbestos. The study found a high association of

mesothelioma with Libby tremolite. Exh. 184b1. Later, H. Eschenbach, Director of

Toxicology and Industrial Hygiene for Grace, represented to Dr. Irons of Libby that

Libby tremolite had not been associated with mesothelioma. This statement was false. In

1978, Dr. Irons of Libby, having found asbestos disease in his patients, requested data

and requested that a major study be undertaken, including effects on workers "their families and the community." Exh. 184b. Grace declined. See Exh. 188z (H. Eschenbach, Grace Director of Toxicology and Industrial Hygiene, stated "I think it best that we just let Irons sit and meditate a while.")

50.    In 1980 NIOSH proposed a study on the Libby workers. Grace's response was to consider alternatives, including to "obstruct and block" the study. Exh. 192.4.

51.    The above constitutes a long series of violations of occupational medicine standards and common decency, and no doubt was a contributing factor in the continuing pattern of disease and death in the Libby workers, their families and community members until the present time.

52.    A second central principle of occupational medicine is that the company must warn workers, their families and the community of known hazards in all settings. In 1979, new federal regulations required a miner education program. Before that Grace did not discuss the hazards of asbestos exposure with workers, or even with lower level supervisors. Lovick Depo, 763:8. Workers will take precautions, especially if they know they may bring toxic dust home on their clothes or in their vehicles, which may then affect their wives and children. Grace workers had no such opportunity in the 1950s, 1960s or 1970s up to June 1979. In fact, the Chief Engineer in Libby was reprimanded for discussing the asbestos with an outsider. Exh. 159. The memo states, "The point I am trying to get across is that our present policy is to tell no one anything, no visitors or discussion of our operations period." After 1979, Grace told some workers that the

material was not asbestos, it was tremolite. In terms of occupational medicine standards, a physician examination, chest x-ray and pulmonary function tests, along with worker education by the physician is the minimum required. This was not done. Grace also did nothing to warn family members or the community of the hazards of asbestos exposure, all in breach of the standards of occupational medicine.

53.    A third central principle of occupational medicine is that workers, their families and the communities must be protected. The hazard must be controlled. Asbestos disease in Libby was largely preventable. A review of the trial transcripts shows there was no adequate housekeeping and maintenance at the Grace operations, whereas this was accomplished elsewhere. Bag houses and vacuum technology were feasible, and in place elsewhere. Wet methods were feasible. The dry mill was finally replaced in 1974, with a wet mill. However, the rest of the Grace mining operations remained dusty. There was not a proper respiratory protection program. Protection from the hazards of asbestos had been written about by Merewether and Price in 1930.

54.    Grace never supplied showers and lockers for the employees. As a result, workers brought home asbestos dust on their clothing. In 1983, Grace declined to spend $200,000 on a change house for workers. Exh. 193.77. In this memo the Grace Plant Manager discusses the opinion of Dr. Gill, the radiologist reading Libby worker x-rays, that he was also seeing a pattern of abnormality in the chest x-rays of Libby community members.

55.    Grace allowed community members to take vermiculite waste from piles on

company property, thus spreading asbestos contamination into the community. Grace allowed children to play on piles of vermiculite waste on company property.

56.     Grace knowingly endangered the health of workers, family members of workers and community members in Libby for decades. This constituted gross violations of applicable occupational medicine standards.

57.     The data and other information considered in forming the above opinions and observations includes:

    a.    The Expert Report of Dr. A.C. Whitehouse, which I rely upon and generally concur in.

    b.    A visit to Libby, conferences with Dr. Whitehouse and Dr. Black, and substantial work done for the U.S. Government in the *U.S. v. Grace* criminal case.

    c.    The common exhibits for the Grace trials in Libby 1997-2000 attached on CD.

    d.    Consultation with Dr. Terry Spear, Professor of Industrial Hygiene, at Montana Tech of the University of Montana, School of Mines, Butte, Montana, and review of his reports.

    e.    Transcripts of the trials in *Skramstad v. W.R. Grace* (1997), *Benefield v. W.R. Grace* (1998) and *Finstad v. W.R. Grace* (1999), on CD.

    f.    Depositions upon Earl Lovick, Assistant Manager of the W.R. Grace operations of Libby, Montana, on CD.

    g.    Occupational medicine and cell biology literature on asbestos and disease.

58.     I am being compensated at the rate of $350 per hour.

59.     A listing of other cases with trial or deposition testimony is attached as Exhibit B.

Asbestos/Expert Report of Dr. Frank                                    22                                    9/22/06

DATED this 26ᵗʰ day of ~~October~~ September, 2006.

Arthur L. Frank, MD, PhD