```
            UNITED STATES BANKRUPTCY COURT
                 DISTRICT OF DELAWARE

                             .
IN RE:                       .     Chapter 11
                             .
W.R. Grace & Co., et al.,    .
                             .
        Debtor(s).           .     Bankruptcy #01-01139 (JKF)
...........................................................
```

```
                     Wilmington, DE
                    October 23, 2006
                       2:00 p.m.

              TRANSCRIPT OF OMNIBUS HEARING
        BEFORE THE HONORABLE JUDITH K. FITZGERALD
              UNITED STATES BANKRUPTCY JUDGE
```

APPEARANCES:

For The Debtor(s):              David M. Bernick, Esq.
                                Kirkland & Ellis, LLP
                                200 E. Randolph Drive
                                Chicago, IL 60601

                                Janet S. Baer, Esq.
                                Kirkland & Ellis, LLP
                                655 Fifteenth Street, N.W.
                                Washington, DC 20005

                                Barbara H. Harding, Esq.
                                Kirkland & Ellis, LLP
                                655 Fifteenth Street, N.W.
                                Washington, DC 20005

                                James O'Neill, Esq.
                                Pachulski, Stang, Ziehl,
                                Young, Jones & Weintraub
                                919 North Market Street
                                Wilmington, DE 19801

For Official Committee of:      Kenneth Pasquale, Esq.
Unsecured Creditors             Stroock Stroock & Lavan, LLP
                                180 Maiden Lane
                                New York, NY 10038

2

| | |
|---|---|
| For Equity Security Holders:<br>Committee | Gregory A. Horowitz, Esq.<br>Kramer Levin Naftalis<br>& Frankel, LLP<br>919 Third Ave.<br>New York, NY 10022 |
| | Jessica J. Glass, Esq.<br>Kramer Levin Naftalis<br>& Frankel, LLP<br>919 Third Ave.<br>New York, NY 10022 |
| | Peter Friedman, Esq.<br>Weil Gotshal & Manges<br>1300 Eye Street, NW-Ste. 900<br>Washington, DC 20005 |
| | M. Jarrad Wright, Esq.<br>Weil Gotshal & Manges<br>1300 Eye Street, NW-Ste. 900<br>Washington, DC 20005 |
| For Asbestos Claimants:<br>Committee | Nathan D. Finch, Esq.<br>Caplin & Drysdale, Chartered<br>One Thomas Circle, N.W.<br>Washington, DC 20005 |
| | Mark Hurford, Esq.<br>Campbell & Levine, LLC<br>1201 North Market St.-Ste. 1501<br>Wilmington, DE 19801 |
| For Future Claimants: | Raymond G. Mullady, Jr., Esq.<br>Orrick Herrington<br>& Sutcliffe, LLP<br>Washington Harbour<br>3050 K. Street, N.W.<br>Washington, DC 20007 |
| | Debra L. Felder, Esq.<br>Orrick Herrington<br>& Sutcliffe, LLP<br>Washington Harbour<br>3050 K. Street, N.W.<br>Washington, DC 20007 |

| | |
|---|---|
| For Official Committee of:<br>Asbestos Property Damage<br>Claimants | Theodore J. Tacconelli, Esq.<br>Ferry, Joseph & Pearce, PA<br>824 Market Street<br>Wilmington, DE 19899 |
| For Anderson and California:<br>Claimants | Daniel Speights, Esq.<br>Speights & Runyan<br>200 Jackson Ave. East<br>Hampton, SC 29924 |
| For Fireman's Fund:<br>Insurance | Thomas G. Whalen, Jr., Esq.<br>Stevens & Lee, PC<br>1105 N. Market Street-7th Fl.<br>Wilmington, DE 19801 |
| For Canadian ZAI: | Daniel K. Hogan, Esq.<br>The Hogan Firm<br>1311 Delaware Ave.<br>Wilmington, DE 19806 |
| For One Beacon/Seton: | David P. Primack, Esq.<br>Drinker Biddle & Reath<br>1100 N. Market St.-Ste. 1000<br>Wilmington, DE 19801 |
| For Acting U.S. Trustee:<br>(Roberta A. DeAngelis) | David Klauder, Esq.<br>U.S. Trustee's Office<br>844 King Street-Ste. 2313<br>Lock Box 35<br>Wilmington, DE 19801 |

(Via telephone)

| | |
|---|---|
| For The Debtor(s): | Lori Sinanyan, Esq.<br>Kirkland & Ellis<br>777 S. Figueroa Street<br>Los Angeles, CA 90017 |
| | Sal Bianca, Esq.<br>Kirkland & Ellis, LLP<br>200 E. Randolph Drive<br>Chicago, IL 60601 |
| | Sam Blatnick, Esq.<br>Kirkland & Ellis, LLP<br>200 E. Randolph Drive<br>Chicago, IL 60601 |

Lisa Esayian, Esq.
Kirkland & Ellis, LLP
200 E. Randolph Drive
Chicago, IL 60601

Theodore Freedman, Esq.
Kirkland & Ellis, LLP
Citigroup Center
153 E.  53rd. St.
New York, NY 10022

David Siegel, Esq.
In-House counsel
W.R. Grace & Company

Paul J. Norris, Esq.
In-House Counsel
W.R. Grace & Company

For Asbestos Claimants:          Walter Slocombe, Esq.
Committee                        Caplin & Drysdale, Chartered
                                 One Thomas Circle, N.W.
                                 Washington, DC 20005

                                 Robert M. Horkovich, Esq.
                                 Anderson Kill & Olick, PC
                                 1251 Avenue of the Americas
                                 New York, NY 10020

For Baron & Budd, Reaud:         Sander L. Esserman, Esq.
Morgan & Quinn                   Stutzman Bromberg Esserman
                                 & Pfilka, PC
                                 2323 Bryan St.-Ste. 2200
                                 Dallas, TX 75201

                                 David J. Parsons, Esq.
                                 Stutzman Bromberg Esserman
                                 & Pfilka, PC
                                 2323 Bryan St.-Ste. 2200
                                 Dallas, TX 75201

For Special Counsel to:          Martin Dies, Esq.
PD Committee                     Dies Henderson & Carona
                                 1009 West Green
                                 Orange, TX 77630

For C.N.A. Insurance:            Daniel M. Glosband, Esq.
                                 Goodwin Procter, LLP
                                 Exchange Place
                                 Boston, MA 02109

For The Futures:                 Richard Wyron, Esq.
Representative                   Orrick Herrington
                                 & Sutcliffe, LLP
                                 Washington Harbour
                                 3050 K. Street, N.W.
                                 Washington, DC 20007

For Federal Insurance:           David Liebman, Esq.
                                 Cozen O'Connor
                                 1900 Market St.
                                 Philadelphia, PA 19103

For PD Claimants:                Matthew I. Kramer, Esq.
                                 Bilzin Sumberg Baena Price
                                 & Axelrod, LLP
                                 200 S. Biscayne Blvd. -Ste. 2500
                                 Miami, FL 33131

                                 Edward J. Westbrook, Esq.
                                 Richardson, Patrick, Westbrook
                                 & Brickman, LLC
                                 174 E. Bay Street
                                 Charleston, SC 29401

                                 Darrell Scott, Esq.
                                 Scott Law Group
                                 926 West Sprague Ave.
                                 Spokane, WA 99201

For AIG Member Companies:        Michael S. Davis, Esq.
                                 Zeichner Ellman & Krause, LLP
                                 575 Lexington Ave.
                                 New York, NY 10022

                                 Robert Guttman, Esq.
                                 Zeichner Ellman & Krause, LLP
                                 575 Lexington Ave.
                                 New York, NY 10022

For Royal Insurance:             Sarah Edwards, Esq.
                                 Wilson Elser Moskowitz
                                 Edelman & Dicker, LLP
                                 3 Gannett Drive
                                 White Plains, NY 10604

For Continental Casualty:     Elizabeth M. DiCristofaro, Esq.
Ins.                          Ford Marrin Esposito Witmeyer
                              & Gleser, LLP
                              Wall Street Plaza
                              New York, NY 10005


For Libby Claimants:          Christopher M. Candon, Esq.
                              Cohn Whitesell & Goldberg, LLP
                              101 Arch Street
                              Boston, MA 02110


For Scotts Company:           Tiffany S. Cobb, Esq.
                              Vorys Sater Seymour
                              & Pease, LLP
                              52 East Gay Street
                              Columbus, OH 43216


For Federal Insurance:        Jacob C. Cohn, Esq.
Company                       Cozen O'Connor
                              1900 Market Street
                              Philadelphia, Pa 19103


For Travelers Insurance:      Barbara Seniawski, Esq.
Company                       Simpson Thatcher & Bartlett, LLP
                              425 Lexington Ave.
                              New York, NY 10017


For State of California,:     Christina J. Kang, Esq.
Department of General         Hahn & Hessen, LLP
Services                      488 Madison Ave.-14th Fl.
                              New York, NY 10022


For Everest Reinsurance:      Brian L. Kasprzak, Esq.
Company                       Marks O'Neill O'Brien
                              & Courtney, PC
                              1880 JFK Pkwy.-Ste. 1200
                              Philadelphia, PA 19103


For Everest Reinsurance Co.:  Leslie A. Epley, Esq.
McKinley Insurance            Crowell & Moring, LLP
                              1001 Pennsylvania Ave., NW
                              Washington, DC 20004

                              Mark Plevin, Esq.
                              Crowell & Moring, LLP
                              1001 Pennsylvania Ave., NW
                              Washington, DC 20004

| | |
|---|---|
| For Tort Claimants: | Robert W. Phillips, Esq. |
| | SimmonsCooper, LLC |
| | 707 Birkshire |
| | East Alton, IL 62024 |
| | |
| For London Market Companies: | Alexander Mueller, Esq. |
| | Mendes & Mount, LLP |
| | 750 Seventh Ave. |
| | New York, NY 10019 |
| | |
| Audio Operator: | Todd Kirk |
| | |
| Transcribing Firm: | Writer's Cramp, Inc. |
| | 6 Norton Rd. |
| | Monmouth Jct., NJ 08852 |
| | 732-329-0191 |

Proceedings recorded by electronic sound recording, transcript produced by transcription service.

1        THE COURT:  Good afternoon.  Please be seated.  This

2   is the matter of W.R. Grace, Bankruptcy #01-1139.  Participants

3   by phone area, Mark Plevin, Leslie Epley, Guy Baron, Haley

4   Pendergrass, Christina Kang, Stephanie Kwong, Lisa Esayian,

5   Robert Phillips, Andrew Chan, Simon Porter, Tiffany Cobb, Peter

6   Shawn, Steven Eisman, Barbara Seniawski, Elizabeth

7   DeCristofaro, Robert Guttman, Michael Davis, Brian Kasprzak,

8   Walter, Walter Slocombe, Alex Mueller, Sal Bianca, Lori

9   Sinanyan, Barbara Harding, Theodore Freedman, Sam Blatnick,

10  Drrell Scott, Edward Westbrook, David Liebman, Jacob Cohn,

11  Sander Esserman, David Parsons, Sara Edwards, Beau Harbour,

12  William Wagner, Richard Wyron, Ritwik Chatterjee, Paul Norris,

13  Christopher Candon, David Siegel, Robert Horkovich, Daniel

14  Glosband, Marti Murray, John O'Connell, Graig Gilbert, Sara

15  Gooch, Joseph Krigsfeld, Martin Dies, I'm sorry, Terence

16  Edwards, Matther Kramer, Sean Walsh.  Take entries in Court

17  please.  Good afternoon.

18        MR. BERNICK:  Good afternoon, David Bernick for Grace.

19        MS. BAER:  Good afternoon, Your Honor, Janet Baer for

20  Grace.

21        MS. HARDING:  Good afternoon, Your Honor, Barbara

22  Harding for Grace.

23        MR. O'NEILL:  Good afternoon, Your Honor, James

24  O'Neill for Grace.

25        MR. PASQUALE:  Good afternoon, Your Honor, Ken

1    Pasquale from Stroock for the Unsecured Creditor's Committee.

2         MR. FRIEDMAN:  Peter Friedman on behalf of the Ad Hoc

3    Committee of Equitey Security Holders.

4         MR. HOROWITZ:  Gregory Horowitz from Kramer Levin on

5    behalf of the Official Equity Committee.

6         THE COURT:  Wait one second.  Thank you.

7         MR. FINCH:  Nate Finch from Caplin & Drysdle on behalf

8    of the Asoestos Claimants Committee, Your Honor.

9         MR. MULLADY:  Good afternoon, Your Honor, Ray Mullady

10   Orrick Herrington & Sutcliff for the Future Claimants

11   Representative.

12        MR. TACCONELLI:  Theodore Tacconelli for Property

13   Damage Committee, Your Honor.

14        THE COURT:  Mr. Bernick.

15        MR. BERNICK:  Thank you, Your Honor.  Ms. Baer is

16   gonna handle, I think, the first five, if I'm not mistaken, of

17   the agenda items.

18        THE COURT:  All right.

19        MS. BAER:  Good afternoon, Your Honor.  Your Honor,

20   the first matter on the call this afternoon is the Debtor's

21   Fifth Omnibus objections to claims.  There remains one set of

22   claims outstanding involving environmental contingent clean up

23   costs.  We are still -- I should say the Pachulski firm is

24   still working on negotiating stipulations so that we can get

25   those claims withdrawn in some appropriate manner.

1  Unfortunately, they have not yet reached that conclusion.  So I

2  have another Continuance Order.

3          THE COURT:  All right.  Thank you.  Okay, this is

4  continued until the November hearing.  That's item 1.

5          MS. BAER:  Thank you, Your Honor.  Item 2, Your

6  Honor, is the Debtor's Motion for an Order Authorizing

7  Settlement of certain tax claims.  We filed a Certificate of No

8  Objection, Your Honor, but I did not see that the Order had

9  been entered.

10          THE COURT:  I didn't have a chance to get my staff to

11  enter those orders yet.  I instructed them to do it this

12  morning.  So that -- it should be hitting the docket today or

13  tomorrow.  But it will be entered.

14          MS. BAER:  Thank you, Your Honor.  I do have a

15  duplicate copy.  Would that help or hinder the process?

16          THE COURT:  It would probably hinder at this point.

17          MS. BAER:  Okay.  Then we will not submit that.  Your

18  Honor, agenda item #3 is the Debtor's Seventeenth Objection --

19  Omnibus Objections to claims.  On this, Your Honor, we have

20  received one response from CSX, and we're continuing the matter

21  with respect to CSX while we review the invoices they've

22  submitted.  We've received one call from the Cummings firm with

23  respect to their claims.  And we are continuing those until

24  November.  Four of the Claimants the mail was returned as

25  nondeliverable.  We have new addresses.  We've resent those out

1  and those will be continued until November.  On all of the

2  rest, Your Honor, we're asking for you to enter the Order,

3  which pursuant to Exhibit-A expunges certain claims, and

4  pursuant to Exhibit-B reduces and/or reclassifies certain

5  claims.  And I have an Order to present, Your Honor.

6        THE COURT:  All right, I'll take it.  Thank you.

7  Okay, that Order is entered.

8        MS. BAER:  Thank you, Your Honor.  That takes us to

9  agenda item #4, which is the Debtor's Motion for Approval of

10 the Lloyds settlement agreement.  Your Honor, the parties are

11 working very, very hard to try to resolve this matter.  Even

12 this morning another draft was exchanged.  We are very, very

13 close.  In fact it looks as though everybody's on board, but

14 now a slightly new issue has come up between the Debtors and

15 Lloyds.  Under the circumstances, Your Honor, we are hoping we

16 may be able to submit a Certification of Counsel with an agreed

17 settlement agreement shortly.  If not, what we would ask is

18 this matter be continued to the November hearing so that we can

19 hopefully finalize this one issue and decide if we're going to

20 proceed or not.

21       THE COURT:  That's fine.  And if it's continued to

22 November that will simply be as a status conference to let me

23 know what's going on to set further proceedings?

24       MS. BAER:  Your Honor, if we could I'd like to have

25 it continued for potential argument.  I -- again, I don't

1  anticipate there will be argument.  I think we will either

2  resolve this issue or we won't.  But that is the only issue

3  outstanding.

4         THE COURT:  All right.  So if an Order is not

5  submitted on a Certification of Counsel then it will be

6  argued --

7         MS. BAER:  Yes, Your Honor.

8         THE COURT:  -- in November?  Okay.

9         MS. BAER:  Correct.

10         THE COURT:  And if a COC is submitted then I'll

11  obviously take a look at it and see if that Order can be

12  entered.

13         MS. BAER:  Thank you, Your Honor.  And I would expect

14  that if you have questions it would then come up for on the

15  November agenda --

16         THE COURT:  November.

17         THE COURT:  -- for that.

18         THE COURT:  Okay.

19         MS. BAER:  Your Honor, that takes us to agenda item

20  #5, which is the motion of the Scotts Company to lift the

21  automatic stay to proceed with some litigation on insurance

22  related issues.  This matter has come up many times, Your

23  Honor, and there's currently a stay in proceedings with respect

24  to the adversary.  It's the Debtor's position that the stay of

25  proceedings should remain as is.  It's an issue of shared

1  insurance.  To the best of our knowledge, Your Honor, there are

2  no current judgments that have made this contingent potential

3  claim into something more than that.  It has a lot of

4  dependency on what's going to happen under the Chapter 11 plan,

5  who's going to ultimately get insurance proceeds.  Who would be

6  responsible in the event that there were a liability that arose

7  because of this issue.  The only objector, Your Honor, to the

8  continuation of the stay has been One Beacon Insurance Company.

9  And Your Honor, although they've objected to the continuation

10  of the stay it's really -- they seem to indicate that the real

11  issue is how is their claim gonna be treated under the Debtor's

12  Chapter 11 plan?

13      Your Honor, once again, we believe that these issues are

14  slightly premature and a little bit off topic from where we're

15  currently going.  We would ask that the stay of proceedings be

16  continued again for a period of several months so we can see

17  where everything else goes and where this ultimately will fit

18  into the process.

19          THE COURT:  Good afternoon.

20          MR. PRIMACK:  Good afternoon, Your Honor.  David

21  Primack, Drinker Biddle & Reath for One Beacon American

22  Insurance Company and once again I come before you to put on

23  the record that we'd like this matter to go forward.  This has

24  been continued many times, but essentially we understand how

25  this -- the reasons for the continuance, but again, we'd like

1  to go on the record saying that this should go forward.

2            THE COURT:  Yes, I appreciate the fact that at some

3  point I'm going to have to address these issues, but really

4  while these plan negotiations are still in progress I don't

5  think this is the time to do it.  So I really do think it has

6  to stay continued for a while longer, and I can't define what

7  while means yet, but for a while.  So if you want the Debtor to

8  put this back on the calendar several months in the future I'll

9  do that.  Otherwise I'll just deny it without prejudice to

10 reraising the issue at the later time.  You're choice.  Which

11 do you prefer?

12           MR. PRIMACK:  We'll contact the Debtor and try to get

13 it put back on the calendar.

14           THE COURT:  Okay, if you tell me when I'll just tell

15 them when to put it back on.  Maybe March?

16           MS. BAER:  That's fine, Your Honor.

17           THE COURT:  March, okay.

18           MR. PRIMACK:  Thank you, Your Honor.

19           THE COURT:  So I'll continue it to March, the March

20 agenda and we'll see where that goes.  Oh, I apologize for

21 taking this out of order, but I'm afraid I'm going to forget.

22 With respect to your cases going forward starting the 2007, I'd

23 like to keep them where they are now, on Mondays at 2 o'clock

24 if that's okay with the Debtors.

25           MS. BAER:  That's fine.

1         THE COURT:  All right.  And I have the August date

2    now too.  But it's a Wednesday.  It's August 29th in

3    Pittsburgh.  I only have one day that week for motions.  And so

4    if at all possible could you try to keep this one to a

5    reasonable period in August of 2006 because I'm doing --

6         UNIDENTIFIED SPEAKER:  We'll start working at that

7    right now.

8         (Laughter)

9         THE COURT:  -- all motions that day.  Okay, thank

10   you.

11        MR. BERNICK:  Your Honor, I think that brings us to

12   item #6, which I think Your Honor has entered an Order on that

13   that relates to the requirement that certain of Mr. Speights'

14   Claimants provide signatures regarding the Proof of Claim.  I

15   think Your Honor has entered an Order on that, right?  I

16   believe that some of the claims were withdrawn and some of the

17   signatures were provided.

18        THE COURT:  I think that's correct.  Let me see if --

19   I don't remember even making a note about that for this

20   hearing, frankly.  I remember getting the Order.

21        MS. BAER:  Your Honor, it showed up on the docket --

22        THE COURT:  I'm pretty sure it was -- oh,

23   Mr. Speights has it.

24        MR. SPEIGHTS:  I have a copy of the Order.

25        THE COURT:  All right, thank you.  I thought I had it

1  entered.  I just couldn't remember.  I've gone through a lot of

2  Orders in the last couple of days and I was off for a couple

3  days as well.  So it's -- it is entered, thank you.

4         MR. BERNICK:  There's a deadline that's come up a

5  little bit later on in November for the same issue, that is

6  signatures, now with respect to the '96 Canadian Claimant, so

7  -- but that deadline has yet to come.  And I don't know whether

8  -- what will happen at that time.  I don't know if Mr. Speights

9  has anything else that he wants to add with regard to item 6.

10  Mr. Speights, do you have anything to add?

11         MR. SPEIGHTS:  Nothing, Your Honor.

12         THE COURT:  All right.  Thank you.

13         MR. BERNICK:  Items 7 through 9 are all related in

14  that they all pertain to the Motion for Class Certification by

15  Anderson Memorial, which Your Honor I know will appreciate has

16  been the subject of many rounds of briefing, many rounds of

17  argument, and many preliminary rulings by Your Honor.  I think

18  that basically today there's only one substantive matter.

19     Item 9 is basically asking for a date for the final final

20  hearing.  If Your Honor still wants to have that final final

21  hearing.  Item 8 relates to the -- for the lift stay in order

22  that the record in the Anderson Memorial case be forwarded to

23  Your Honor.  I believe that where we stand on that essentially

24  is that the request has been made by Mr. Speights to have that

25  record released to Your Honor.  We have expressed our agreement

1   to that request so the matter's now in the hands of the South

2   Carolina Judge.  And presumably at some time that will be

3   forwarded to Your Honor.

4       My understanding is that the transcript of that proceeding

5   -- that proceeding took about two days, so it may not be that

6   the record is quite so overwhelming as at least what I had

7   thought, but in any event I guess we'll just have to await the

8   Judge's determination about what to do.  We still believe that

9   it might be appropriate for Your Honor to look on the calendar

10  to set a date for the hearing on the theory that that will be

11  forthcoming at some point relatively soon.  I know it's very

12  hard to get time on Your Honor's calendar, but we'd just like

13  to get that matter resolved once and for all fairly soon so

14  that it doesn't -- it's just not out there any more.

15          THE COURT:  Well, Mr. Speights, is that -- the

16  transcript something that you've been I think asserting that I

17  should read in connection with making this decision on the

18  merits.  And so can I proceed until I get it or can we do the

19  argument and then when I get the hearing we can -- I can

20  address whatever I need or do you need to rely on that

21  transcript in order to make your arguments?

22          MR. SPEIGHTS:  Two things, Your Honor.  Number one, I

23  do think you need to have that as part of the record when we

24  make the arguments.  However, as circumstances would have it,

25  after I got to Wilmington today I got an e-mail from our office

1  saying Judge Hayes' law clerk called and wanted me to call him

2  concerning the order that we sent him, and Mr. Bernick's now

3  agreed to a petition and an order.  And said that Judge Hayes

4  was on the bench in Union County South Carolina and to leave a

5  -- call a certain number and leave a message.  I have not done

6  so because we had this discussion about ex parte calls, even

7  returning a law clerk's call.  I assume I could return the law

8  clerk's call.  But I want to make sure I can to see the status.

9  I'm not even sure that he has Mr. Bernick's response.  I think

10  it went in Thursday or Friday.  But I probably could find out.

11  I would think that this would be, you know -- I don't think

12  this will delay us getting the record here.  Because you had

13  talked in terms of at least carrying it over to November.  Not

14  being heard today.

15       But my second point is I would prefer your hearing the

16  discovery matters, which are impacted by item 7, before we get

17  to item 9, the scheduling of the hearing.  And if we could do

18  that then I could tell you more concretely when I think the

19  matter would be ready for the hearing.

20            THE COURT:  All right.

21            MR. BERNICK:  I don't have -- I'm happy to accede to

22  that request.  It's appropriate from Your Honor's point of

23  view.  Although it seems to me that what we're talking about is

24  the transcript.  With respect to the call that's been received

25  by the Court, I think it would be relatively easy for

1   Mr. Speights to simply set up a conference call and we can find

2   out what the nature of the inquiry is.

3           THE COURT:  That's fine.  I think if that's the case

4   I think you folks can work that out.

5           MR. BERNICK:  Yeah.

6           THE COURT:  If it's just a matter of word smithing an

7   order then I don't think it's gonna be a problem.  If he wants

8   to know what's going on then you can all tell him.

9           MR. BERNICK:  Right.

10          THE COURT:  So, okay.

11          MR. BERNICK:  On the Motion for Protective Order,

12  happen to take that up, Your Honor will -- may or may not

13  recall that the class certification was set for hearing -- the

14  motion was set for hearing originally in December.  In fact

15  there was a hearing that took place in December, and on the eve

16  of the hearing there were deposition notices served on Grace

17  for 30(b)(6) depositions on a variety of topics.  We moved

18  promptly for Protective Order against those depositions.  And

19  we submitted a brief in support of that motion.  There was a

20  pretty short response that was filed by Mr. Speights, and then

21  essentially the matter was held in abeyance after the hearing.

22  And while Your Honor had asked for the briefing on notice and

23  the issue of notice.

24      The only other development that's taken place since that

25  time is that at the last hearing Mr. Speights I think was

1  pretty clear in indicating that a portion of the notice that

2  related to the issue of class notice was no longer being

3  pursued because Your Honor already had ruled on that.  Which to

4  our reckoning then means that there are three different subject

5  matters that remain at issue as concerns the 30(b)(6) notice.

6  In fact -- that's attached to our brief.  The first is Debtor's

7  knowledge of in prepetition efforts to settle the Anderson

8  Memorial class action.  The second is the Debtor's knowledge of

9  efforts in 2001 to exclude Anderson Memorial, Speights &

10 Runyan, or Daniel Speights from the Official Committee of

11 Property Damage Creditors.  And then final, Debtor's

12 communications with the Cellotechs Asbestos Settlement Trust

13 regarding property damage claims filed by Speights & Runyan or

14 through Anderson Memorial.

15      Your Honor, these are no more relevant to the issue of

16 class certification than they were before.  They are patently

17 irrelevant.  The first one relating to prepetition settlement

18 efforts, don't know that that would even be appropriate for

19 discussion before the Court.  I don't know if there were any.

20 I personally don't know if there were any.  But whatever they

21 are they're not appropriate for discussion here.  And they

22 can't bear on class certification because as Mr. Speights and

23 Your Honor I know well know you can't certify a class for

24 settlement purposes using a standard that's different for

25 settling it -- certifying it for litigation purposes.  So

1   whether or not that the suggestion here is that somehow

2   Anderson Memorial might be, even after we've gone through the

3   whole process of ferreting down the Anderson Memorial -- the

4   claims that would have been Anderson Memorial class -- claims,

5   that is would have been encompassed in the class and I think

6   there are now a total of only three claims left that would have

7   even been in that class.  But the whole idea that somehow this

8   class should now be certified because in some fashion it might

9   facilitate a settlement effort is contrary to the rules under

10  -- the Rule 23 law, and moreover would not be appropriate

11  subject matter for discussion on the record in this proceeding

12  before the Court.

13      With respect to the second item, which is the efforts to

14  exclude Anderson Memorial from the Official Committee of

15  Property Damage Claimants, again, totally and completely

16  irrelevant to any matter that's posed by class certification.

17  Again, I'm not assuming that there were any such matters, but

18  under any set of circumstances they are irrelevant.

19      And then finally, the Debtor's communication with the

20  Cellotechs Asbestos Settlement Trust.  Again, I don't know what

21  it is that Mr. Speights has in mind, but whatever it is it is

22  completely and utterly irrelevant to the issue of class

23  certification.

24      And so we really have three efforts that I think pretty

25  much on their face read out as #1, being a suggestion that Your

1  Honor should certify because it will facilitate settlement,

2  that being an improper suggestion.  And that #2, somehow

3  there's been action to the detriment of Mr. Speights that I

4  think in connection with other litigation or in connection with

5  his service on the Property Damage Committee, and that again is

6  entirely irrelevant to any of the factors that are germane to

7  certification under Rule 23.

8       So for all those reasons we believe that our Motion for

9  Protective Order is well taken, that the discovery should not

10 proceed, and that there's no reason why in any way, shape or

11 form this should cause the delay in our schedule of finally

12 moving to a resolution of this issue that's been kind of

13 hanging out there for a while.  So we would ask that this

14 motion be granted, that the 30(b)(6) notices be an nullity and

15 quashed, and we further would ask that time be set for class

16 certification -- the class certification hearing.  We're

17 prepared to proceed on that at Your Honor's convenience.

18      THE COURT:  Mr. Speights?

19      MR. SPEIGHTS:  May it please the Court.  In the

20 papers that Grace filed in opposition to this discovery it said

21 that -- suggested that the -- Anderson filed these notices for

22 purposes of delay.  I filed the notices last December.  And I

23 certainly haven't interposed them for purposes of delay.  I

24 believe that we are entitled to this discovery to get

25 information which may lead to the finding of admissible

1   evidence on the certification issue.

2       I think that we can take these depositions very quickly.

3   Could have taken them back in January.  I filed the notices

4   within a week or two after they filed their opposition to the

5   certification, which raised certain factual issues.

6       Now specifically -- somebody turned off the chart.  I'd be

7   happy to have it up there.

8       (Pause in proceedings)

9       Specifically, although we're not far apart on one thing,

10  he says there are three notices, I think, we're down to.  We're

11  down to three notices because Your Honor ruled on the other

12  notices about -- that Your Honor thought were in conflict with

13  the Bar Date Order.  Although there are three orders there are

14  four subjects.  And I'll be happy to start with where Mr.

15  Bernick started, and that is with the so-called settlement

16  issue.

17      We have asked to depose a person and asked Grace to

18  produce the documents at that deposition of the person

19  knowledgeable about Grace's attempts to settle the Anderson

20  class action prebankruptcy.  Now why is that important?  It's

21  important for the reason Mr. Bernick just articulated.  That

22  under law you cannot have a settlement class that does not meet

23  the criteria for a litigation class.  That was decided in the

24  Georgine decision, which is famous among asbestos lawyers.  And

25  the reason that is important, Your Honor, is that we expect to

1  be able to show Your Honor at the certification hearing that

2  Grace made attempts to settle Anderson and told Anderson that

3  if Anderson --

4          MR. BERNICK:  Your Honor, I'm sorry.  It would be

5  inappropriate at this point for Counsel to get into any aspect

6  of settlement discussions.  I don't know what he is going to

7  say.  I don't know the content of it.  I've not been informed

8  of it, but it's not appropriate for discussion before the

9  Court.  There's been an awful lot of that.  And I think that

10 that is not appropriate here.

11         MR. SPEIGHTS:  Your Honor, there are rules and there

12 are exceptions to rules.  What I am trying to show, and I can

13 deal with it a little bit hypothetically, not conceding

14 Mr. Bernick is right, but I believe I can circle the wagons a

15 little differently on the argument.

16      What we are trying to show is an admission by Grace which

17 is inconsistent with the position it has taken and presumably

18 will take before you in connection with the certification

19 hearing.  We want to know whether Grace -- we can show Grace

20 through its own documents has taken a position that it would be

21 willing to settle the Anderson class --

22         MR. BERNICK:  Your Honor, again --

23         MR. SPEIGHTS:  We want to know whether --

24         MR. BERNICK:  -- this is --

25         MR. SPEIGHTS:  -- it's taken that position.

1            MR. BERNICK:  Now, this is not a game of how we can

2   tease being close to being the edge here.  We all know where

3   this is going.  It's improper and it's not germane.  For Mr.

4   Speights to be commenting on the settlement proceeding is

5   improper, it's incorrect under the rules --

6            THE COURT:  I --

7            MR. BERNICK:  -- the 6th Circuit has decided this

8   issue.

9            THE COURT:  I don't think that's the -- what he's

10  attempting to do.  What he's trying to show at this point is

11  that if you can't have a class for settlement purposes that's

12  different from litigation class and the Debtor agreed to have a

13  settlement class that the Debtor must recognize that there is

14  therefore some appropriate basis to have a litigation class.

15       Now, you can't get into the settlement discussion, so how

16  exactly that's going to arise I don't know.  But it seems to me

17  to be calculated to lead to reasonable and discoverable and

18  admissible evidence.  Whether or not it turns out to be that is

19  a different issues --

20           MR. BERNICK:  Well --

21           THE COURT:  -- but the standard for now is only

22  whether it's calculated, reasonably calculated to get there.

23           MR. BERNICK:  But that's precisely the problem, is

24  that in explaining how it is reasonably calculated he has told

25  us what it is that he is going to attempt to find.  And what he

1  is going to attempt to find is improper.  It is not calculated

2  to leave to discovery of relevant evidence because it itself is

3  not admissible.  Settlement discussions including the content

4  of settlement discussions are not admissible for --

5          THE COURT:  That's right.  But the fact of settlement

6  discussions is admissible.

7          MR. BERNICK:  I have no problem with the fact of

8  settlement discussions.  I don't think it's relevant.  It's not

9  precluded by 408.  But he's telling you the content of the

10  settlement discussions.

11          THE COURT:  Well, okay.  For this purpose I'm not

12  paying any attention to the content of settlement discussions.

13  You know, to the extent that you think there was some

14  information that led to that, I don't really recall it or see

15  it that way, but in any event that's stricken.  But I don't

16  think that's at this point what Mr. Speights is attempting to

17  get to.

18          MR. BERNICK:  Well, just -- I --

19          THE COURT:  He's attempting to establish the fact

20  that there was a settlement under way.  Without regard to what

21  the terms of that settlement were.

22          MR. BERNICK:  If that's what he wants to say he can

23  say that.  He doesn't have to describe the content.  And that

24  in and of itself would be inadmissible and improper to consider

25  as part of a Rule 23 litigation class.  Whether or not the

1  class could be certified for settlement is completely and

2  utterly irrelevant.  You've got to meet the requirements of

3  Rule 23 for litigation purposes.  Not a single one of those

4  requirements relates to settlement.

5      So what is the element of Rule 23 as to which this

6  discovery would make the -- as to which this discovery would be

7  relevant?  That is would go to their ability --

8          MR. SPEIGHTS:  Your Honor --

9          MR. BERNICK:  -- to establish that an element of Rule

10  23 has been met.

11          THE COURT:  All right.

12          MR. SPEIGHTS:  Your Honor, I understand it.

13  Mr. Bernick had an objection.  And he stood up and made it and

14  we headed down another track.  But I hope the noninterruption

15  rule is in affect because I haven't even begun to go down the

16  track.  I understand -- I agree with Your Honor about what we

17  want, you know, to show, Your Honor, but --

18          THE COURT:  I think his point is that you need to

19  show me how it's relevant to a specific element of Rule 23, and

20  I agree with that.  So tell me how it's relevant.

21          MR. SPEIGHTS:  Well, I'm going to, but before I get

22  to that let me just correct what has now be said.  The

23  objection that somehow we can't discuss it.  As the record will

24  show when it is provided to you we will be able to address this

25  more fully, but Judge Hayes' Final Order --

1          MR. BERNICK:  Your Honor, I'm sorry --

2          MR. SPEIGHTS:  -- which you have the Order --

3          MR. BERNICK:  I'm sorry.

4          THE COURT:  I have the Order.

5          MR. BERNICK:  He's got an Order that doesn't have

6    anything to do with the content of the discussions.  And if it

7    does it shouldn't be gone into.  It's not a game here.

8          MR. SPEIGHTS:  The Order -- Your Honor, I invite you

9    to read the Order about what it says about the old settlement

10   issue with Grace.  It's addressed in Judge Hayes' Order.  Now

11   I'm trying to expedite this matter.  We can wait until we get

12   to whole record and I can come back before Your Honor and say

13   it's all out on the table, and therefore I want to see what

14   Grace has said in its internal documents, what its most

15   knowledgeable witness has to say about this subject matter,

16   okay?  That's why I want to do it right now.  I'm trying to

17   expedite this as quickly as I can.  Why is it admissible?  Why

18   is it relevant?  Because hypothetically if Grace agreed to

19   stipulate to a settlement class then as Your Honor pointed

20   out --

21         MR. BERNICK:  Your Honor, I object and ask for an

22   instruction to Mr. Speights to abide by the rules here.  It is

23   improper to get into this material.  He's yet to establish the

24   predicate that Your Honor asked for, which is what element of

25   Rule 23 does this go to?  He hasn't told us that.

1           THE COURT:  Okay.  Well I do want to know what

2  element of Rule 23 it goes to, but I don't see that he's in

3  violation of anything.  He said if Grace agreed to stipulate to

4  a settlement class, and then I didn't hear the rest.  So I

5  don't know what the end result of the if is.  But what element

6  of Rule 23 are we talking about first, Mr. Speights?

7           MR. SPEIGHTS:  All elements, Your Honor.  If Grace

8  was agreeing -- if Grace agreed that there should be a

9  settlement class, ipso facto Grace agreed that all the criteria

10  for a litigation class were present.  Period.  End of story.

11  And that's why I want to establish that through Grace's own

12  witness and whatever documents it has.  It shouldn't be a long

13  deposition.  I've wanted it since December.  It may or may not

14  lead to admissible -- to the production of evidence which will

15  be admissible before Your Honor, but let me just go take the

16  deposition and we'll get to the bottom of it.

17           THE COURT:  All right.  The fact that someone agrees

18  to settle an issue does not necessarily mean that on the merits

19  they're going to have the same position.  So although I think

20  some of this may lead to relevant -- I think it's calculated to

21  lead to relevant admissible evidence, I'm not sure that even if

22  you find that Grace did make that agreement that it is going to

23  be relevant and admissible evidence because the fact that

24  parties will do something to settle does not mean that they

25  have the same position with respect to ongoing litigation.  If

1    it did we'd never settle anything.

2            MR. SPEIGHTS:  But Your Honor, when it comes to Rule

3    23 in Georgine I think it's probably best that we wait until

4    after the deposition because what exactly they agreed to

5    Mr. Bernick doesn't want me to discuss and what they agreed to

6    will be established on the record at a deposition and any

7    contrary evidence we might have, and I believe I'll be in a

8    position at the certification hearing to present to you

9    admissible evidence on that point.

10           THE COURT:  Well, it still seems to me that it's

11   calculated to lead to that evidence so I'm going to permit the

12   deposition to go forward on that score.  But it's subject to

13   all objections and claims of privilege and everything else.

14   And it's not a ruling that says that you're going to get any

15   admissible evidence.  It's simply an agreement that the

16   deposition can go forward because it's calculated to get

17   irrelevant evidence.

18           MR. SPEIGHTS:  Now Your Honor --

19           MR. BERNICK:  Your Honor, I would have to say -- Your

20   Honor I'd like to have -- make a record on one point and then

21   advise the Court on what I think the impact of this is.

22   Counsel's asked specifically for what is totally and completely

23   precluded by Rule 408.  The whole purpose of Rule 408 says that

24   even if it is -- even if it's completely material, even if it

25   might be dispositive were it to come into evidence statements

1  made during the course of a settlement discussion, be they

2  admissions or otherwise usable under the rules, are not usable.

3  Are not admissible.

4          THE COURT:  Well --

5          MR. BERNICK:  And so if he gets what he wants, which

6  is let's presume that some representative of Grace completely

7  authorized says, you know Mr. Speights, I really think for

8  purposes of our settlement discussion here we will be able to

9  agree with you that Rule 23(a) is satisfied, that Rule 23(b)(3)

10  is satisfied, all of those as plain admissions would otherwise

11  be admissible under the Rules of Federal Evidence in so far as

12  they're relevant or material, but are exactly what is barred by

13  Rule 408.  And not only are they barred by Rule 408, but we

14  believe that the law in this country is that they're not even

15  discoverable because of the chilling affect that this would

16  have.  This is the Goodyear decision out of the 6th Circuit,

17  and if Your Honor enters this Order I'm highly confident that

18  we will instruct our witnesses not to answer these questions,

19  and then we certainly shouldn't schedule the class

20  certification hearing that turns on this because we will take

21  an appeal.  We cannot be sitting here having our settlement

22  discussions in an unconsummated settlement be considered as

23  judicial admissions for purposes of class certification.

24          THE COURT:  Well, I don't know.  Because I don't know

25  what those discussions are at the moment.  And if in fact Grace

1  made, I don't know, a decision that all of the elements for

2  class certification of a settlement class could be met then I

3  think Mr. Speights is correct that means that you've agreed

4  that there can be a litigation class settle.

5          MR. BERNICK:  That's again --

6          THE COURT:  A litigation class, pardon me.

7          MR. BERNICK:  With due respect, that's the whole

8  purpose of Rule 408.  If the settlement had been consummated

9  Grace had written that down in writing and submitted it in

10 saying this is a settlement that we have now agreed to and for

11 some reason it didn't go forward, even if it were consummated

12 it would not be admissible to prove the elements of a

13 litigation class because it would be barred under Rule 408.  It

14 is a settlement.  It's not usable for litigation purposes.

15 That's the entire purpose for the rule.  This one wasn't even

16 consummated.  So you have a nonconsummated settlement

17 discussion where the very fact that Grace entered into those

18 discussions, if in fact it did, is then used to certify a

19 litigation class over its objection.  That's just absurd.  And

20 for a deposition to take place would violate Grace's rights.

21 That's the whole reason that's not discoverable and would have

22 that chilling affect and that's exactly what the 6th Circuit

23 decided in Goodyear.

24     Now Your Honor, we have been through in fact this very

25 issue in connection with other matters.  And if Your Honor

1   wants to have the briefing on this we will do the briefing.  If

2   Your Honor orders this to take place I don't think that I would

3   have any choice but to advise my client that they --

4            THE COURT:  The only --

5            MR. BERNICK:  -- should not proceed with this

6   deposition.

7            THE COURT:  The only objection that I can see at the

8   moment is, if -- the chart's not back up, that the Debtor is

9   basically contending that the elements that Mr. Speights is

10  attempting to find essentially are not relevant.  Now I don't

11  know whether --

12           MR. BERNICK:  No --

13           THE COURT:  I'm sorry.

14           MR. BERNICK:  I'm sorry.  They are not relevant

15  because they cannot be considered as part of a class

16  certification hearing, and they cannot be considered as part of

17  a class certification hearing because they're barred by the

18  Rules of Evidence, Rule 408.  So if Rule 408 weren't there

19  would they be admissions?  Sure, they might be admissions.

20  Would they be admissions that would be relevant to the

21  proceeding?  If they're specific enough and they relate to

22  matters of fact, yes, they might be considered to be admissions

23  that are relevant to the matters of fact that are implicated by

24  Rule 23.  But there's something called Rule 408.  And Rule 408

25  says that they're not admissible for that purpose.  And because

1  they're not admissible for that purpose they are irrelevant to

2  class certification.

3         THE COURT:  Okay, just a minute.

4     (Pause in proceedings)

5         THE COURT:  All right.  Well, Rule 408

6  says, "Evidence of 1) furnishing or offering or promising to

7  furnish or 2) accepting or offering or promising to accept a

8  valuable consideration in compromising or attempting to

9  compromise a claim which was disputed as toeither validity or

10  amount is not admissible to prove liability for or invalidity

11  of the claim or its amount."  That does not appear to be what

12  Mr. Speights is attempting to get to.

13     The second sentence says, "Evidence of conduct or

14  statements made in compromise negotiations is likewise not

15  admissible.  This rule does not require the exclusion of any

16  evidence otherwise discoverable merely because it is presented

17  in the course of compromise negotiations.  This rule also does

18  not require exclusion when the evidence is offered for another

19  purpose such as proving bias or prejudice or a witness,

20  negativing a contention of undue delay, or proving an effort to

21  obstruct a criminal investigation or prosecution."  So where

22  within that rule does this fit, Mr. Speights?

23         MR. BERNICK:  The second prong.

24         MR. SPEIGHTS:  I don't think it fits at all, Your

25  Honor.

1          MR. BERNICK:  It absolutely -- exactly the second

2   prong.

3          THE COURT:  Well, it's in settlement -- if it's in

4   settlement discussions it -- I mean --

5          MR. SPEIGHTS:  It's not offered to establish

6   liability.  It is an issue on certification for the Court, not

7   for the jury of course, and the rule recognizes for such things

8   as -- I don't -- I can read the rule as Your Honor just read

9   it, for other purposes we can use it.

10          THE COURT:  Some things.

11          MR. SPEIGHTS:  For some things.

12          THE COURT:  Yes.

13          MR. SPEIGHTS:  But it doesn't purport to list

14   everything you can use it.  We're not in the face of the rule

15   trying to say Grace should pay X dollars because of any

16   discussion that was held in South Carolina.  We're on the issue

17   of whether there's an admission by Grace -- and Mr. Bernick has

18   acknowledged that if there was an admission it might be used

19   and whether it can get around that admission by claiming that

20   it was in the context of settlement discussions.  Well, there

21   are all sorts of issues that might arise about that, but it's

22   an admission, it may be a start.  Your Honor has ultimate

23   authority on whether there's a certified class or not a

24   certified class.  But I don't believe the rule holds it out.

25   And I've got another argument that I can't use until I get that

1    record before Your Honor as well that I think obviates the

2    necessity of all of this.  But I don't have the record yet

3    until we call Judge Hayes.

4         THE COURT:  Well --

5         MR. BERNICK:  That's tantalizing.

6    (Laughter)

7         MR. BERNICK:  Your Honor, I only -- evidence of

8    conduct or statements made in compromise negotiations is

9    likewise not admissible.

10        THE COURT:  That's right.

11        MR. BERNICK:  That plainly implies.  The exclusion

12   that they then offer, and that's independently of whether

13   there's an offer for a given amount.  Really the two sentences

14   work together.  Because one deals with an offer of compromise,

15   the other goes beyond that and deals with statements made

16   during the course of discussions relating to a potential offer

17   to compromise.

18        Now the third sentence is the only way that Mr. Speights

19   could argue that somehow there's an exception.  It says, "This

20   rule does not require the exclusion of any evidence otherwise

21   discoverable merely because it is presented during the course

22   of compromise negotiations."  Now this rule does not require

23   exclusion where the evidence is offered for another purpose.

24   There are no other purposes that would apply here, and this is

25   not a situation where evidence is otherwise discoverable but

1  merely was presented during the course of compromise

2  negotiations.  And how do we know that?  Because the admissions

3  that he's seeking are specifically statements that would only

4  be made in the context of a class settlement negotiation.  That

5  they are admissions that go the whole idea of class

6  certifications.  So this is not admissible evidence that would

7  otherwise be discoverable and simply happen to come up during

8  the course of settlement discussions.  These were made

9  precisely because there was settlement discussions underway, if

10  in fact they're under way.

11      And the affect of this is really dramatic.  You have a

12  discussion between Mr. Speights and I about settlement.  That

13  might be hard to conceive of at this time.

14      (Laughter)

15      MR. BERNICK:  But let's assume that there were

16  discussion about settlement between Mr. Speights and I.  And he

17  said -- he says, "Bernick, even though we never get along I'll

18  give you a class settlement and all you have to agree is the

19  requirements of Rule 23, and then we'll talk about money.  Will

20  you agree that if the money is right we'll have a discussion

21  about class settlement?"  I said, "Absolutely, Dan, if the

22  money is right, fine with me.  We'll have a discussion and we

23  may well agree Rule 23(a), (b), (3) they all apply."  He

24  says, "Terrific."  I say, "Now how much money do you want?"  He

25  says, "$9 billion."  And I say, "You know what, that's just not

1  right.  I've got a dollar in mind.  I guess we don't have a

2  deal" --

3          MR. SPEIGHTS:  I'll meet you half way.

4      (Laughter)

5          THE COURT:  Sold.

6          MR. BERNICK:  There's a little bit too much of that

7  in this case.  That's the problem, Your Honor.  So he then

8  turns around and files a Motion for Class Certification,

9  says, "Oh, we don't have -- all these briefs, Your Honor, we

10  don't need all of that stuff.  We can go proceed.  And the fact

11  of the matter is that Mr. Bernick has now admitted a way the

12  certifiability of this class under Rule 23 during the course of

13  the settlement discussions."  That's the whole reason -- if

14  that were the case you would never have any settlement

15  discussions because people would never be able to have a

16  discussion without there coming back on them.

17          THE COURT:  Well, I think that is the purpose for the

18  second sentence, that the evidence of conduct or statements

19  made in compromise negotiations is not admissible.  So unless

20  there is another way to get to this, Mr. Speights --

21          MR. SPEIGHTS:  Well, Your Honor --

22          THE COURT:  -- I think you're -- I think

23  Mr. Bernick's correct that it can't be calculated to lead to

24  admissible evidence because it's not admissible.

25          MR. SPEIGHTS:  Your Honor, let me respond three ways.

1  First of all, I could give you a hypothetical like Mr. Bernick.

2         THE COURT:  Well, I don't need another hypothetical.

3         MR. SPEIGHTS:  Okay.

4         THE COURT:  Because that's not the basis for my

5  ruling.

6         MR. SPEIGHTS:  It would be quite different, but I'm

7  not going to that.  I was just gonna say that, okay.  Quite

8  different than the one he said.  Number two, Your Honor, as

9  Your Honor pointed out Mr. Bernick did not raise 408 in his

10  papers.  I don't mind -- I mean, I understand he can raise it

11  today, I'm raising things today, but if Your Honor is concerned

12  about Rule 408, which I haven't looked at because we don't have

13  settlement discussions in this case, so I haven't seen 408 in a

14  long time.

15        THE COURT:  I am concerned about it.  If you want to

16  brief it that's fine.

17        MR. SPEIGHTS:  And tee this aspect of it up by

18  November, and by then I will have the record in South Carolina

19  which may add further light on this issue.

20        THE COURT:  All right, that's fine.

21        MR. SPEIGHTS:  But there are three other issues in

22  the deposition notices beside the so called settlement issue.

23        THE COURT:  Okay.  Let me make a note to this one

24  though.  How much time do you folks -- can you brief it in time

25  for the November hearings now?

1          MR. BERNICK:  Sure.

2          MR. SPEIGHTS:  Yes, Your Honor.  I think it --

3          THE COURT:  All right.

4          MR. SPEIGHTS:  I think he is objecting on that ground

5   and just give me a reasonable time.  Give me the same amount of

6   time he takes to object.

7          MR. BERNICK:  So that we would have the class -- we'd

8   have -- just this issue for the November hearing?

9          THE COURT:  Well, I don't know what else.  But for

10  now this issue.  I have to take them one at a time.  By the

11  time we get through these I probably won't remember what's

12  going to be on the November hearing list.  So let's just knock

13  them down one at a time.  For now the 408 issue.  I need a

14  brief.  Can it be briefed in time for the November hearings?

15         MR. BERNICK:  I suppose so.  Yes -- the answer's yes,

16  Your Honor.

17         THE COURT:  All right.  Then you two work out a

18  schedule.  Can you do that?  The Debtor -- it's the Debtor's

19  objection on Rule 408.  The Debtor should go first.  Mr.

20  Speights, you can go second.  Hopefully I don't need any

21  replies.  Because this issue should, I think, be articulated

22  well enough in the papers.  All right, so the Debtor first and

23  then Mr. Speights.  And then it will be argued in November.

24         MR. SPEIGHTS:  Your Honor, the second thing we ask in

25  connection with Anderson, and it may be on that board, but I

41

1  don't think it is, is that we ask for the person most

2  knowledgeable about the property damage claims and class action

3  proceedings brought by Anderson through the law firm of

4  Speights and Runyan.  It was not just limited to the settlement

5  issue.  In affect what we ask for is what Grace knew, the

6  person most knowledgeable about what Grace knew about Anderson

7  historically.  And the reason -- and for documents relating to

8  that.  And --

9         MR. BERNICK:  What are -- which notice is that?

10        MR. SPEIGHTS:  Mr. Bernick, I'll be glad to go get my

11 notebook and pull out the notice if you like.  You don't

12 believe you have it?

13        MR. BERNICK:  I have them all.  I just -- there are

14 like five of them.

15        MR. SPEIGHTS:  My -- the Committee's local Counsel

16 says it's Committee-C.

17        MR. BERNICK:  C?

18        MR. SPEIGHTS:  Committee -- Exhibit-C to your Motion

19 for Protective Order.

20        THE COURT:  I'm sorry, so you're doing something

21 that's not on this chart?

22        MR. SPEIGHTS:  Yes, it's not on Mr. Bernick's chart.

23 This was the one -- I said there were four actually, and he put

24 up three.

25        THE COURT:  All right.

1          MR. SPEIGHTS:  But there's a fourth one.  His

2   Exhibit-C to the Motion for Protective Order.  My copy of the

3   notice.  And essentially, Your Honor, what it says is we want

4   to depose the person at Grace most knowledgeable about

5   Anderson, and the documents relating to that.  And why do we

6   want that?  Again, Your Honor, it's a question of admissions.

7   Grace has now for, at least starting in the summer of 2005,

8   made a large number of statements about the history of the

9   Anderson certification process, about Anderson itself,

10  suggesting that it's some fly-by-night certification down in

11  South Carolina, et cetera, et cetera.

12       So first of all, I want to see what Grace said not through

13  their lawyers and this Courtroom, but what it says back home in

14  Boca Raton or Columbia, Maryland about Anderson.  They may have

15  said nothing.  I believe they've said a lot because Anderson

16  was filed in December 1992 and was a very actively litigated

17  case over those years.  So we want to show that, what Grace

18  said internally is at odds with the position Grace has taken

19  before Your Honor about the status of Anderson and the

20  seriousness of Anderson, et cetera, et cetera.

21          THE COURT:  I'm sorry --

22          MR. SPEIGHTS:  The other thing --

23          THE COURT:  You said it was filed when?  The

24  Anderson --

25          MR. SPEIGHTS:  December 1992.

1          THE COURT:  Okay.  That's what I thought.  All right,

2    sorry, go ahead.

3          MR. SPEIGHTS:  The second thing, Your Honor, is along

4    the same line, same argument, admissions by a party opponent.

5    What has Grace said about the certification issues behind the

6    scenes?  As if, for example, taken positions in its internal

7    documents about commonality, and typicality, and numerosity and

8    all these issues.  I want to ask the person most knowledgeable

9    at Grace about these issues.  Maybe he didn't say anything.

10   That will be a very quick deposition.  Maybe there are no

11   documents.  That will be even quicker.

12        But it may be that Grace has taken positions not in terms

13   of settlement as we dealt with on the first issue, but in

14   affect the same substantive question here, has Grace made

15   admissions internally that are consistent with our getting a

16   certified class?  I'm not suggesting to Your Honor today that

17   because Grace is somewhere in its company said Anderson should

18   be certified or will be certified Your Honor has to follow

19   that.  But I do think it's evidence on that.  So we are asking,

20   as #2, your Honor, the person most knowledgeable about Anderson

21   and the history of Anderson down below.

22        The third thing, Your Honor, is -- and it's one of those

23   up there, Grace's efforts to keep Anderson Memorial Hospital

24   off the PD Committee in Grace.  Anderson was kept off the PD

25   Committee in Grace for a period of weeks, and the U.S. Trustee

1   allowed us back on after we clarified the history of Anderson,

2   et cetera, et cetera.  Your Honor, the same question arises

3   with respect to that.  What did Grace tell the U.S. Trustee?

4   What communications did it make to the U.S. Trustee about the

5   status of Anderson Memorial Hospital when it -- when and if,

6   and I believe it's when, Grace convinced the U.S. Trustee to

7   keep Anderson Memorial Hospital off the PD Committee.  As Grace

8   always says, there are only seven cases out there.  Only four

9   or five of which was active, and Anderson had been the most

10  active, maybe the most active or second longest case against

11  Grace at this time.  There were communications, we believe, and

12  we want to establish what those communications were, and we

13  believe that we may establish in that some information that is

14  either totally at odds with what Grace has been telling Your

15  Honor about the history of Anderson, or that there may have

16  been some misleading statements made to the U.S. Trustee about

17  the history at Anderson, which where at odds with the facts in

18  this case.

19       The fourth thing, Your Honor, is the communications with

20  the Cellotechs Asbestos Settlement Trust or other persons

21  involved with Cellotechs.  While it's been a few months since

22  this issue has been before Your Honor at various times on both

23  Mr. Bernick and Ms. Browdy referred to what was happening with

24  Anderson's claims in the Cellotechs Bankruptcy.  As Your Honor

25  knows from previous presentations, the Cellotechs claims

45

1   administrator allowed Anderson's claims for several hundred

2   millions of dollars of which they were allowed at 12 cents on

3   the dollars, which is the pay out percentage in the Cellotechs

4   bankruptcy.

5       Now Mr. Bernick has attempted to attack what happened in

6   Cellotechs in some way.  Frankly, I'm not sure exactly what he

7   said last summer and at other hearings, or Ms. Browdy exactly

8   what they said, but we want to establish what communications

9   Grace has had from that record or any basis of their attack on

10  Anderson's claims because we think it's important, not

11  dispositive but important if we can tell you that in another

12  Court in Florida, Tampa, Florida, a Court issued a Plan of

13  Reorganization under which Anderson has been allowed claims,

14  albeit litigations ensued between all the PD Claimants down

15  there, or most of the PD Claimants down there, and Cellotechs,

16  which is Cellotechs Trust, which is now pending in the 11th

17  Circuit Court of Appeals, but we think that decision may well

18  be entered -- it was argued in April -- by the time we get to

19  the certification hearing before Your Honor.

20      But in any event, we want to know the basis of what Grace

21  knows about Cellotechs so that when they again continue to use

22  it against us in the certification battle we'll be prepared.

23  Bottom line, Your Honor, is I believe from an issue of this

24  magnitude these notices served in December are just clearly

25  meant to show admissions by Grace inconsistent with their

1  positions taken before Your Honor.  I can't imagine the

2  depositions lasting more than two days.  And I'll be happy to

3  take them next week.

4          THE COURT:  Okay.  I'm a little confused about the

5  purpose for trying to get into what Grace knows about the

6  Cellotechs case.  Because what difference does it make whether

7  Anderson had allowed claims there or not?  The issue is whether

8  Anderson has allowed claims here that should subject the

9  Claimants to a class action.  Not whether they where or weren't

10 subject to a class action in Cellotechs, which is a different

11 Debtor with is different structure and different issues, isn't

12 it?

13         MR. SPEIGHTS:  Well, all of that's certainly true,

14 Your Honor.  I think, again, what we would say is that the

15 Debtor has been communicating to you about Anderson and

16 Cellotechs, trying to cast aspersions on the allowance of

17 Anderson's claims in Cellotechs.  And we believe that if the

18 Debtor's gonna be allowed to [quote}, "talk trash" about

19 Anderson's claims in Cellotechs we ought to know the basis of

20 their communications.  We need to have their communications

21 with somebody, and I don't know who they've been talking to.  I

22 don't even know for sure they've been talking to somebody --

23         THE COURT:  But why --

24         MR. SPEIGHTS:  -- as to what the basis to say

25 Mr. Bernick knows that when he says there's -- that the

1  Cellotechs Asbestos Trust Mr. Z has taken the position that

2  XYZ.

3          THE COURT:  But why do I care?  I mean, as a matter

4  of evidence when we get actually to litigate this issue why do

5  I care what somebody did in the Cellotechs case with respect to

6  this?  And how's it going to be relevant?  I'm missing the

7  connection between what difference it's going to make in this

8  case, what happens --

9          MR. SPEIGHTS:  Because it might be from my

10 standpoint.  If you're asking why should you care about what

11 Mr. Bernick says and I don't think you should, but if you're

12 asking about what I say, I say it's relevant because it's a

13 precedent.  It's simply a precedent.  There is another

14 bankruptcy out there with another Bankruptcy Court had before

15 him claims filed on behalf of Anderson Hospital for itself and

16 behalf of a number of other Claimants.  And it's a precedent of

17 how those claims were handled there.  Is it binding on you?

18 No.  Is a central west end class binding on you?  No, but it's

19 a precedent to show that this is the way that other Courts have

20 dealt with class certification issues.  So --

21         THE COURT:  So what you're telling me is in the

22 Cellotechs case Anderson is a class -- nominal class Plaintiff

23 for a class --

24         MR. SPEIGHTS:  No, Your Honor.  I'm not telling you

25 that.  Let me be crystal clear about this.  Anderson filed a

1   class claim on the alternative, a group claim in the Cellotechs

2   bankruptcy.  At that time Anderson had not been certified, and

3   moreover, Cellotechs was already in bankruptcy before 1992 when

4   Anderson filed its lawsuit.  So again, Anderson files --

5   Cellotechs files bankruptcy in '90, Anderson files bankruptcy

6   in '92.  We filed a claim on behalf of Anderson Memorial as a

7   class claim, or on the alternative as a group claim.  The Court

8   enters a Plan of Reorganization.  Under that Plan of

9   Reorganization, as interpreted by the claims administrator

10  Anderson was a group Claimant entitled to recover for these 50

11  or 60 building owners around the country.  And that's the

12  status of the matter.  Although it's now being challenged by

13  the Asbestos Settlement Trust and some of my good friends in

14  this very room today, and that matter will be decided by the

15  11th Circuit, in the New York litigation, because that was

16  another one they challenged, any time now.

17          THE COURT:  Okay.  But the issue before me isn't that

18  there is a group claim in the alternative.  This is a motion

19  for class certification.  So if there isn't a class

20  certification in the Cellotechs bankruptcy what relevance does

21  it have?  Because I don't see how I'm going to hear the

22  Debtor's arguments or yours, frankly, with respect to what

23  happened in Cellotechs if there isn't a class certification I

24  don't see what the relevance is.

25          MR. SPEIGHTS:  Because one of the issues Your Honor

1    will face in class certification is whether you should handle

2    these claims en masse or not.

3        THE COURT:  Yes.

4        MR. SPEIGHTS:  And in Cellotechs, while it was a

5    group claim ultimately down there, they were handled with one

6    proof of claim on behalf of building owners within the

7    definition of the Anderson class.  And they were handled en

8    masse that way, although they had have to particularized claim

9    information before the claims administrator, which was, I

10   think, a sensible way to handle a large number of claims, and I

11   will be making the same arguments with you in the certification

12   hearing in this case.  Is it the best piece of ammunition we

13   have?  No, Your Honor.  Is it as -- a piece of the puzzle we'll

14   argue before you?  Yes, Your Honor.  And I just want to make

15   sure that I understand what information Grace has about

16   Cellotechs.  They may no nothing.  But if it has something I

17   want to be able to show that even Grace knows this.

18       THE COURT:  Okay.  I am having really some difficulty

19   understanding what relevance that has at all to the facts

20   before me.  I don't see how either party's assertions are going

21   to be relevant.  If the Debtor intends to make some argument

22   about what's happening in Cellotechs and you want to find out

23   what that's going to be because you want to make an argument

24   about what's happening in Cellotechs, then maybe I need a

25   Motion in Limine to see whether or not any argument should be

1  made about what's happening in Cellotechs, because I don't see

2  what relevance it has here.  It may be the same Plaintiff,

3  Asbestos Property Damage Plaintiff, but it's different product.

4  Different Debtor.  Different set of circumstances as to how the

5  Court now sits with respect to the proof of claims that have

6  been filed.  I'm really having some trouble seeing how that

7  would even be admissible, by either of you, Mr. Speights.

8          MR. SPEIGHTS:  Well, Your Honor, let me be perfectly

9  candid with the Court, as I hope I always am.  Number four --

10 in the pecking order it's #4 is the reason I addressed it as

11 #4, and I appreciate that it might appear to be somewhat

12 attenuated from the issues before Your Honor.  I'm not sure how

13 exactly that will play out at the certification hearing.  And I

14 thought it appropriate to try to find out the basis of

15 Mr. Bernick's and Ms. Browdy's statements about Cellotechs

16 before going to that certification hearing.  But I understand

17 if Your Honor's reluctant to do that.  I would say the other

18 three go directly to this Grace bankruptcy, both the settlement

19 issue, both the U.S. Trustee issue and the issue of what Grace

20 has been saying about Anderson since 1992.  And I would say if

21 we weighted them the other three certainly weigh heavier than

22 the Cellotechs issue.

23         THE COURT:  Okay.  Well, I'll hear from the Debtor,

24 but I'm having some difficulty understanding how any of the

25 Cellotechs matters are relevant.  So if you're arguing that

1  they are and the Debtor argues that they are I don't know.  I

2  guess I'll have to hear how they are, but I'm not seeing it too

3  easily.

4        MR. BERNICK:  I won't prolong that agony, Your Honor.

5  On Cellotechs the only argument that's really been made is that

6  it's relevant to value.  That's a matter for estimation.  We

7  don't know that it really is relevant for that purpose, but

8  it's not relevant to Rule 23.  There's not been any explication

9  of how Cellotechs proceeding goes to a specific element of Rule

10  23.  None of it's been articulated here.  Rule 23 is not simply

11  -- it's not even specifically a rule that says, gee, if you

12  want to have aggregate treatment you ought to have

13  certification under Rule 23.  You can have aggregate treatment

14  in many ways under the rules, including by consolidation of

15  individual cases, rule 42.  Otherwise that is not a specific

16  element of Rule 23, and therefore right now there's been no

17  articulated nexus between that discovery and satisfying the

18  requirements of Rule 23.

19        With respect to --

20        THE COURT:  Wait, wait.  Before you bypass that, so

21  the Debtor is not going to attempt to argue what the process

22  was, class certification process in Cellotechs in this case by

23  way of its challenge to a Rule 23 certification motion here?

24        MR. BERNICK:  I don't -- I'm not aware of any motion

25  practice with respect to certifying a class or that there was a

1  certified class, or certified -- certification was denied in

2  Cellotechs, there may be a case out there.  But I don't know of

3  anything that relates to that.  Certainly I had no intention of

4  talking about how Mr. Speights's claims were handled at all in

5  the context of Cellotechs.

6          THE COURT:  All right.  If that's the case then I'm

7  going to deny the request with respect to the Cellotechs

8  certification if -- but I'm telling you now neither said is

9  going to argue to me what happened with respect to class

10  certification in Cellotechs.

11          MR. BERNICK:  Okay.

12          THE COURT:  Down the road if we need an issue about

13  value I'll determine that in a different context as to whether

14  it's relevant to that.  But that's not where we are now.

15          MR. BERNICK:  I don't know maybe -- I say, it may be

16  that there is a published decision with respect to

17  certification of a class in Cellotechs before the bankruptcy.

18          THE COURT:  Well, that's different.  If there's an

19  opinion that's a different issue.  But I'm talking about the

20  process.

21          MR. BERNICK:  I'm not -- I will stipulate, Your

22  Honor, we'll only be focused on there's an opinion.  This

23  really is a matter of law in the decisions.  Debtor's knowledge

24  of the efforts to exclude Anderson from the official property

25  -- Committee of Property Damage Creditors, again, nothing, zero

1  articulated by way of a nexus between those facts that are

2  sought in the requirements of Rule 23.  It looks like that's

3  kind of an effort to say, well, gee, Grace didn't like my

4  participating on the Official Committee.  Don't know that

5  that's so.  But I also know, at least my understanding from all

6  the times that I've dealt with the U.S. Trustee's office with

7  respect to the appointment of committees, I have always

8  understood that it's all confidential.  Now Your Honor's

9  smiling.  It may be that it's --

10       THE COURT:  It's confidential from the Court.  I can

11  tell you that.

12       MR. BERNICK:  Yeah.  I think at least so far as my

13  experience goes is that one-way street.  That is, you don't

14  find out really what anybody else is saying.  U.S. Trustee asks

15  you questions and you respond to the questions.  And if it were

16  otherwise, that is if we could conduct discovery into those

17  matters, I would imagine that the process of people

18  communicating with U.S. Trustee's office would be significantly

19  affected.  And therefore not only is no articulation been made

20  of relevance, I think it's contrary to the policies, if not the

21  explicit rules of the U.S. Trustee in connection with the

22  appointment of committees.

23       The last one was the one that was mentioned here, it's a

24  very broad one, and I apologize for omitting it from our brief.

25  But it really is kind of a broader version of the request that

1  was made in item 1.  The request in item 1 is kind of, this is

2  what we really want.  That is, the communications regarding

3  prepetition efforts.  Number two is kind of, well, give me

4  everything.  And you know, maybe if I lose on that I'll get

5  item 1.

6      The give me everything is -- would again make a mockery

7  out of class action practice.  What that says is that as soon

8  as I file a case for -- file a motion for class certification

9  I'm permitted as part of that process to say, well, I like to

10 have the company sit down through a knowledgeable

11 representative and tell us all of what they think about my

12 class action case.  Because whatever it is that they're

13 discussing internally by all admissions so have all those

14 admissions.  Well, class action practice has got no

15 relationship, no resemblance to that at all.

16     And what this is really a way of saying is, I want to get

17 into Grace's legal files and its legal personnel because

18 they're the only ones who are gonna know about the Anderson

19 class action with any degree of detail.  It's gonna be in the

20 legal department.  So let me go talk to the lawyers about what

21 the lawyers think of my class action request.  That's not

22 proper class discovery.  It's clearly -- I mean, to say that it

23 would violate all kinds of privileges in all kinds of discovery

24 rules that say the last thing you do is conduct discovery of

25 lawyers is to miss the huge problem that's the threshold

1  problem, which is this is improper discovery practice in

2  connection with any piece of practice unless it's for sanctions

3  or for something else that requires that you get into the

4  internal legal workings of a company.  And to say that somehow

5  it's relevant to class certification is, I'm gonna prove my

6  class certification case by taking depositions of the company

7  lawyers and cross examining them with respect to whether the

8  elements of Rule 23 are satisfied, that, Your Honor, is just --

9  it is a laughable proposition.  I'm pretty familiar with all

10  the revisions that have been done to Rule 23 over the last six

11  years, and the considerations thereof.  I don't think I've ever

12  come across this kind of proposition.  And this is certainly

13  not the case for it.

14      And that brings me to what I think is a point that we

15  really would have to make at this time.  Your Honor has already

16  decided that the notice was adequate.  If the notice was

17  adequate, that is the bar date notice was adequate, then all

18  people who could have comprised this class have come forward.

19  If that class notice were as Your Honor determined adequate all

20  the people who have comprised this class would have come

21  forward.  So we now know who all the people are who would have

22  been participants in the class.  Because they've come forward.

23  And those people with their claims have now been gone over, and

24  we know today.  Even before we'd gotten to the substantive

25  issues.  When we just talk about the preliminary issues of is

1  there a signature?  Is there a building?  Is the claim form

2  properly -- was there authority to file it?  We now know that

3  there are only three Claimants left in this August purported

4  class.  That's it.

5      And therefore the idea -- two things flow from it.  One,

6  is that even if all of the other requirements of Rule 23 could

7  be in some fashion met, which they can't because there's no

8  longer numerosity just to begin with, we know that under

9  American reserve and the cases that have recognized class

10  certification as being possible in the bankruptcy context, the

11  medium requirements of Rule 23 are -- is only the beginning.

12  The Court then has to determine whether certifying a class

13  serves the purposes of the bankruptcy case.  And Your Honor has

14  we know preliminarily but consistently over and over again said

15  why are we certifying a class when we know who these people are

16  and -- however many there are but we can handle it.  So that's

17  really where we are.

18      So to go through all of this discovery motion practice,

19  more briefs, to prolong the agony for another day really kind

20  of ignores what's happened.  Which is we had a proper notice,

21  we know who the Claimants are.  Your Honor has already said

22  that it's not enough.  We only have in fact three.  And I would

23  venture to say that we have probably spent more time and money

24  litigating this purported class than probably all three of

25  those claims are worth in their totality.  Because those three

1  claims have massive problems.  Each and every one of them.  And

2  even if they didn't, even if one was good or maybe two was good

3  or three is good, we're probably coming up to what those claims

4  are worth just in terms of this briefing.

5      Your Honor was very flexible and gave Mr. Speights the

6  opportunity to find out about the transcript in South Carolina.

7  That transcript will now come through.  To somehow say that the

8  transcript of what happened in South Carolina really is only

9  part of it, we ought to find out what the lawyers at Grace were

10 thinking about South Carolina, Your Honor, I just think it is a

11 waste of the assets of the Estate.  It does not further the

12 goals of this proceeding.  Enough is enough.  We just ought to

13 get on with that final hearing.

14      THE COURT:  Okay.  Part of this process has been the

15 fact that you've been winnowing down the property damage

16 claims.  But I don't have, except for your assertion today, any

17 way of knowing whether the claims that are filed do -- are or

18 are not encompassed within this Anderson Memorial --

19      MR. BERNICK:  We can certainly give Your Honor a very

20 short piece of paper that tells Your Honor exactly what claims

21 would have fallen within that class and how many of them are

22 left.  I think our count was originally 26 and then it came

23 down to -- I think there's three left.

24      UNIDENTIFIED SPEAKER:  In South Carolina.

25      MR. BERNICK:  In South Carolina.  Three claims.

1          THE COURT:  Okay.  Mr. Speights, if there are three

2     claims I'm not sure what we're doing here.

3          MR. SPEIGHTS:  Well, two things on that, Your Honor.

4     I want to say, Mr. Bernick, there you go again.  The Motion to

5     Certify is not limited to South Carolina to beginning with.

6     The Motion to Certify is a motion to recognize the South

7     Carolina class and to certify the entire class, which is far

8     more than three buildings.

9          Secondly, Your Honor, while you have come up to the edge

10    on frequent occasions as you just did, I am not sure what we're

11    doing Mr. Speights that there are only such and such claims,

12    and numerosity, you've been very careful going back to hearings

13    with Ms. Browdy in January and other hearings to say that you

14    have not ruled on that yet because that will come at

15    certification.  And we want to argue that on certification, and

16    respectfully, Mr. Bernick's trying to jump into certification

17    now on an issue whether we can take several depositions.  I

18    understand where he's going and I greatly understand and

19    appreciate Your Honor's concern on it.  And at certification

20    I'm going to try to address that.

21         But I believe that -- I know that there are far more than

22    three claims in the universe of Anderson.  And I believe that

23    when I argue to you on Anderson itself that you will listen

24    carefully to me on why there should be a certified class in

25    South Carolina, or the recognition of a class, which they have

1    characterized quite differently than the way I believe it

2    happened.  And the record will show.  So the short answer is on

3    the numerosity, which Your Honor has gone to since day one on

4    this matter, and that's why these deposition notices of last

5    December are being heard today.  We went down there and Your

6    Honor said I couldn't have discovery behind the bar date.  And

7    I understand that ruling, and I'm trying to just finish up the

8    rest of the issues.  But bottom line is there's more than that.

9         Secondly, Your Honor, the issue is that Mr. Bernick raised

10   this time, not relevancy is in his papers, and not delay is in

11   his papers, but he raised attorney/client privilege.  And now

12   that this notice where we simply want to ask the person most

13   knowledgeable about -- at Grace -- and actually, he didn't put

14   the notice up there.  He put the request for production up

15   there.  The notice is #1.  The person most knowledgeable about

16   the Debtor's knowledge regarding the property damage claims and

17   class action proceedings brought the Anderson Memorial Hospital

18   through Speights & Runyan.

19        Now I would not be at all surprised, Your Honor, if the

20   documents relating to that, some of those documents -- in fact,

21   I would not be at all surprised if Grace claims all of those

22   documents, but certainly not surprised if it claims that some

23   of those documents are privileged.  File a privilege log before

24   the deposition.  That's the way it's done under the rules.  I

25   just -- to make it a blanket assertion before the Court,

1  everything would be lawyers and everything would be privileged

2  is not sufficient in response to my request for deposition of

3  the person most knowledgeable.

4     I realize when I take the deposition that there may be

5  objections.  I don't know if they're gonna produce a lawyer or

6  nonlawyer.  And if it's in-house counsel there's all sorts of

7  arguments about privilege and in-house counsel.  And who was

8  given is copy of the document?  Did it just go to lawyers or

9  did it go to others?  Et cetera, et cetera.  Bottom line, Your

10  Honor, is you recognize when we're talking about the history of

11  Anderson, which we're now briefing on a separate rule, as Your

12  Honor recognized where Grace makes admissions against its

13  interest related to what we have to show to get class

14  certification we're entitled to discovery on that to be able to

15  show that it may lead to relevant evidence on that.

16     THE COURT:  Well, you -- I think you're entitled to

17  do that.  But that's why I want the 408 brief, because you're

18  only entitled to do it, I think, under 408 if it's somehow

19  discoverable other than through the settlement negotiations.

20  And if in fact the conduct has only come up because it's part

21  of the settlement discussions I don't think you are entitled to

22  it.  But that's what I need a brief about.

23     MR. SPEIGHTS:  But this is separate -- I understand

24  that some of what I want here, okay, which was separate and

25  apart from the other, some of what I want covered by here could

1  be construed as settlement discussion subject to that other

2  brief.  But this goes far beyond that.  This goes to -- from

3  December 1992 when the case was filed, certainly up an through

4  the certification hearing down below in September 2000.  So

5  there's a whole history of Anderson separate and apart from any

6  settlement discussions.  And I suspect, Your Honor, that

7  anything about settlement discussions is a minority interest in

8  those pieces of paper and of those discussions.  So I would

9  like to go forward.  Again, I'm ready next week to go forward

10  on the person most knowledgeable about Anderson and the

11  Anderson documents.  I would request, Your Honor, that Grace be

12  required to furnish is privilege log before the deposition and

13  not after the deposition.  I also will want to, you know, go

14  back again.  And I'm not trying to delay the matters.  I'm

15  trying to move it along.

16          THE COURT:  Well, okay.  I do agree that with respect

17  to an assertion of privilege that that is not something that

18  the Court can address in blank, that you do have to do a

19  privilege log.  Mr. Bernick, if there's an assertion of

20  privilege it will have to be done by privilege log.  The cases

21  are really clear.

22          MR. BERNICK:  I would understand that, Your Honor.

23  But that -- I -- this is -- this issue here, this #1, by filing

24  -- the only difference between this and the part that would be

25  covered by Rule 408, the part that would be covered by Rule 408

1  deals with class.  And as he has said that there are admissions

2  with respect to class as part of the discussion of class

3  settlement.  The only issue before Your Honor is class.  So the

4  two are -- the request -- the issue before Your Honor and 408

5  are all of one piece.  All that 1 says is give me everything

6  else that you have with respect to Anderson Memorial.  It's

7  like filing a case and saying, gee, why don't you produce the

8  30(b)(6) witness who can testify and give admissions about the

9  entire case?  Now maybe that's the way it works in some Courts

10  by way of the first request, but by and large in a case you

11  have to make a specific discovery request.  This says, give me

12  everything.  Well, what does that encompass beyond what is

13  picked up by item 2?  It's something that's not related to

14  classes.  Give me everything you know about Anderson Memorial

15  that doesn't have to do with class certification.  Well, it's

16  class certification that is the reason why we're here today.

17  We're --

18       THE COURT:  So your contention is that the deposition

19  notice isn't specific enough to let -- to advise you what it is

20  that Mr. Speights is attempting to do.

21       MR. BERNICK:  I am saying that by virtue of its lack

22  of specificity, but more importantly the only thing that it can

23  encompass that is different from 2, which is settlement

24  discussions about class, the only thing it can encompass are

25  matters that don't relate to class.  That's the whole point is

1  that we're here at class certification.  This is not all about

2  conducting discovery against the merits of the case that was

3  never certified.  We're here to talk about class certification.

4      These class certification discussions are discussions that

5  if they took place took place in the context of settlement.  So

6  they're not admissible.  It wouldn't be admissible even if they

7  weren't in the context of settlement discussions.  Let's be

8  concrete about this.  Anderson Memorial case is filed.  It

9  never gets certified as to Grace.  These are facts we all know.

10 And they've now pursued the idea of class certification here.

11 The class that was on the table for consideration at the time

12 we filed was a South Carolina class.  Okay.  Now who is gonna

13 know about the Anderson Memorial case in so far as class

14 certification is concerned?  Which is the only thing we're here

15 to talk about.  It's lawyers.  Nobody else at the company is

16 gonna have personal knowledge or be in a position the give

17 binding admissions with respect to the company on class

18 certification other than lawyers.

19     So effectively what #2 says is give me what the lawyers

20 discussed in the context of class certification for settlement

21 purposes, and presumably if #1 is relevant at all it says, give

22 me what the lawyers discussed about class certification not in

23 the context of settlement.  Well of course, all of that coming

24 from a lawyer is going to be privileged.  So --

25         THE COURT:  Well, not everything that comes from a

1  lawyer is privileged.  I mean --

2        MR. BERNICK:  With regard to class certification?

3        THE COURT:  Well, I don't know.  It may depend, as

4  Mr. Speights said, on who all is involved in the discussions

5  and who has dissemination of the materials.  Not everything --

6  just because you're lawyer doesn't mean that because you say

7  hello to someone that that fact is privileged.

8        MR. BERNICK:  I understand that.  But Your Honor, the

9  idea is that somehow only the person who can make an admission

10  that's a binding admission is somebody with knowledge.

11        THE COURT:  Is an officer of the company.

12        MR. BERNICK:  If you get to have an officer of the

13  company who has independent knowledge of class -- independent.

14  We got through the lawyer, it's a no go.  So you have to have

15  independent knowledge and be able to --

16        THE COURT:  So if there is no such person then you'll

17  have to put that in writing and say there is no such person.

18        MR. BERNICK:  Okay, well we're happy to do that.

19  That is, we're happy to tell him if there's any person with

20  knowledge and authority regarding class certification other

21  than a lawyer.

22        THE COURT:  Well, I don't -- that -- I don't think

23  that's what the deposition says.  The deposition notice says he

24  wants a person most knowledgeable about the property damage

25  claims and the class action proceedings.  Now the class action

1  proceedings portion of that you may be correct about -- to the

2  extent that that is a legal determination then you can file a

3  privilege log that says we claim the privilege and here's why.

4  To the extent that it's knowledge about property damage claims,

5  that may very well be a real estate person, not a lawyer.

6         MR. BERNICK:  Sure.  But it's not class

7  certification.  That's the point.  We're not here to talk about

8  the merits of the Anderson Memorial claim.

9         THE COURT:  But it may be class certification because

10 it may affect the numerosity issue specifically.

11        THE COURT:  But we've already been through

12 numerosity.

13        THE COURT:  No, we've been through your version of

14 numerosity, which is that there are three claims.  We haven't

15 been through Mr. Speights', which is that there are numerous --

16        MR. BERNICK:  But Your Honor has already determined

17 -- Your Honor ruled last time and I believe the time before

18 that the purpose of this discovery is not to find out how many

19 more buildings there are out there.

20        THE COURT:  That's right.  There's no need.

21        MR. BERNICK:  So numerosity --

22        THE COURT:  There's a bar date.

23        MR. BERNICK:  So numerosity -- if Your Honor's asking

24 for numerosity in so far as it relates to how many claims are

25 there, how many claims are there today?  We can furnish that to

1  Your Honor -- to the Court, or we can do it by way of affidavit

2  and Your Honor can decide whether it's necessary to have the

3  deposition of a person to find out how many claims there are

4  with respect to the purported South Carolina class that remain

5  to date.  I think there are three.  But whatever they are we

6  can furnish that to Your Honor.

7         THE COURT:  But that's -- for purposes of this

8  discussion I accept the proposition that as to the South

9  Carolina class there are three claims.

10        MR. BERNICK:  Well, it's -- okay.

11        THE COURT:  But Mr. Speights is not contending that

12  this class should be limited to the South Carolina certified --

13  certification process.

14        MR. BERNICK:  I just -- I guess -- I won't get

15  frustrated.  There was no other class that was pending as of

16  the time this case was filed.

17        THE COURT:  That's right.

18        MR. BERNICK:  So we're now saying we want to have a

19  certified class that was not prepetition, because that was

20  withdrawn, it was stricken prepetition.  We want to have a

21  broader precertification class.  I'm not aware of a single case

22  in our jurist prudence that says you for the first time have a

23  class proposed during a bankruptcy proceeding.  Especially

24  against the backdrop where one was proposed and was much more

25  limited.

1      But even if you did, this is what's left.  I mean, these

2   are all of the claims that remain pending.  And again, we can

3   give you a certification from this chart here.  This says that

4   there are a total of 180 Speights claims left in the United

5   States, and this would include Anderson Memorial.  All of the

6   other folks are represented, are put forth, represented by

7   their lawyers so they don't need to be represented by Mr.

8   Speights or Anderson Memorial.  So we have now a whopping 180

9   claims as to which you don't need class certification anyhow

10  because a) it's not numerous, and b) Mr. Speights is here and

11  see all the Claimants have come before the Court to participate

12  in these proceedings.  So we're talking about an after-the-fact

13  class that now is gonna say, oh, we're going to ignore the fact

14  of all the people who are here and certify a class for a bunch

15  of people who never showed up.  Your Honor's already rejected

16  that proposition in the context of dealing with the class

17  notice, which was adequate.

18          THE COURT:  Right.  I do not believe at this point

19  it's appropriate to look outside the proof of claims that were

20  filed -- proofs of claim that were filed because we had a bar

21  date that I found to be appropriate.  So the universe of claims

22  is going to be the proofs of claim filed in the Court.

23          MR. BERNICK:  Your Honor --

24          THE COURT:  Okay.

25          MR. BERNICK:  Your Honor, if you want attestation

1   about how many there are we'll give you that attestation.  And

2   I think that we probably will not have a disagreement with Mr.

3   Speights on how many there are because we've been going through

4   it ad nauseam.

5       If we want -- if the purpose is to get class discovery you

6   have two parts of it.  You have part 1 for settlement.  And

7   part 2 is nonsettlement.  That is if the purpose is to get

8   discovery out of the mouths of Grace witnesses that will be

9   relevant to Rule 23 elements because they are admissions.

10  That's the touch stone for discoverability, class discovery.

11  We have a place allegedly in connection with settlement, Your

12  Honor recognizes it's a 408 issue.  So we then have, well, are

13  there people who can testify with knowledge and the authority

14  of the company and give admission with regard to Rule 23

15  elements not in a nonsettlement context.  And I have observed

16  people who are gonna know about class, whether in settlement or

17  not in settlement, are gonna be the chief legal officer are the

18  people who are gonna be most knowledgeable.

19      Now if there's somebody who has independent knowledge,

20  independent knowledge and can give authoritative

21  representations with respect to the elements of Rule 23 beyond

22  numerosity, which we've just taken care of, who is not a legal

23  officer, I guess I try to think about who that is, but I don't

24  know of any such person.  If Your Honor wants us to pin that

25  down, well we can pin that down.  But thus far Mr. Speights has

1  not articulated any theory, any fact it would be known to a

2  nonlegal officer as to which that person would have the ability

3  to give binding admissions that would be relevant to Rule 23.

4  Which is what his burden is, particularly when we're dealing

5  with a threshold problem about numerosity.

6      So what is the fact?  You can't find it anywhere.  What is

7  the fact not subject to a claim of privilege, not subject to

8  Rule 408 that is relevant to class discovery?

9          MR. SPEIGHTS:  I never argued so hard two depositions

10  or three depositions, Your Honor, but --

11          THE COURT:  Well, you know, I think the point still

12  is, Mr. Speights, and you're right, I have been concerned about

13  the numerosity issue from the beginning, and I am still

14  concerned about the numerosity issue.  But I had been under the

15  assumption that the issue was going to be whether or not there

16  should be recognition of the South Carolina class as the first

17  step, and then secondly I suppose whether since this is a

18  Bankruptcy Court as opposed to a South Carolina Court that

19  class can be broadened somehow to include other Claimants that

20  Anderson might be representative of in a class proof of claim,

21  as opposed to just looking at the South Carolina issues.

22      But if we're down to, seriously, 180 claims, if in fact

23  that's the case, I'm not sure where we're going, because I just

24  can't see where the numerosity issue is going to be satisfied,

25  even if all of the other elements of Rule 23 are met.  I can't

1   see how that's going to provide a benefit to this Estate to

2   attempt to do that in a class method.  And I guess -- I

3   understand I'm kind of leapfrogging past the certification

4   hearing, but that's what I am concerned about.

5          MR. SPEIGHTS:  Well, Your Honor, I understand that.

6   I've understood that's been your concern since we were before

7   you in December and January.  But respectfully, that's not

8   where we are today.  I mean, I didn't come here to argue class

9   certification --

10          THE COURT:  I understand that.

11          MR. SPEIGHTS:  I have, I don't know how many boxes of

12  documents last time when Mr. Bernick put it on the calendar to

13  argue a number of points about all of the issues, including

14  that issue.  But I do want to go back, and I understand you

15  always are gonna come back to that concern.  But the

16  certification hearing, as I understand it, will be you will

17  probably turn to me, certainly Mr. Bernick will take the

18  position that I have the burden of proof in convincing you to

19  have class certification.  And at that point I understand all

20  issues are on the table.  Commonality, typicality, numerosity,

21  the affect on bankruptcy, everything.  Your Honor has ruled --

22  all Your Honor has ruled at this point, while you've given me

23  some strong caution lights, is that we can't go behind your Bar

24  Date Order when we try to get discovery on that.

25          THE COURT:  Right.

1          MR. SPEIGHTS:  And I understand that.  And so I'm

2     trying to wrap up my record presuming that Mr. Bernick is gonna

3     say I have the burden of proof.  It's almost like I'm trying to

4     do some clean-up issues here that I think are important

5     because, #1, what Grace may have recognized behind the scenes

6     that it doesn't recognize in this -- in its pleadings on

7     certification, and to be able to use those at least as being

8     contrary to what Grace says.

9          And #2 is to correct the misstatements of the record.  For

10    example, it has been less than 10 minutes when Mr. Bernick

11    said, and I wrote it down, [quote}, "It never gets certified as

12    to Grace."  And I think that's wrong.  And I want to show it

13    not only by the record but by what Grace has said in its own

14    documents.  And advised their own people.  So we get to the

15    question of a person.  It's great slight of hand to go up here

16    and say, "This is about certification, #2.  And this is about

17    everything else."  That's not what I'm saying.  This is about

18    settlement.  And this is about everything else.  Settlement you

19    have decided you want additional briefing on.  This is -- and

20    it is broad.  They didn't object that it was overly broad.  But

21    it is broad about everything Grace has about Anderson.  So

22    somewhere in Boca Raton or somewhere, and perhaps in local

23    Counsel's office, they have two or three file drawers dealing

24    with Anderson.  And that's the Anderson record that they have.

25    And they're going to claim a lot of that is privileged.

1  They'll file a privilege log.  Okay.  Then they've got to

2  produce a witness if Your Honor allows a deposition.  You can't

3  keep somebody from testifying just because he's a lawyer or

4  she's a lawyer.  You might not allow that person to answer

5  questions that are privileged.  But if the person most

6  knowledgeable is a lawyer so be it.  And I can't think of

7  anybody who would be more active in protecting privilege than

8  Kirkland & Ellis.  So, you know, I'm gonna be right there, and

9  I'm gonna get about 1 out of 10 questions answered probably.  I

10 understand that.

11      But it's important to me to go through that and see the

12 privilege log and see the documents they will produce to see

13 whether there are statements in there that could lead to the

14 discovery of admissible evidence or for documents which can be

15 used in my presentation on class certification.  And I really

16 don't think that the issue of numerosity, while it's a big,

17 large issue floating around the Courtroom, should be dealt with

18 today on terms of discovery when Your Honor has, and I

19 appreciate it, said that that will be dealt with at the

20 certification hearing.

21      THE COURT:  Yes, I said that repeatedly, so I guess

22 we're just going to have to go through the certification

23 hearing, because I'm not -- frankly at this point I'm just not

24 sure, maybe 180 claims is enough.  Certainly there have been

25 classes certified with fewer so I -- if they can all be lumped

1  into Anderson -- and I don't know that they can by any means,

2  but if they can then maybe that's enough.  Three, I have

3  significant doubts about.  I'm not sure that there are any

4  cases that certify a class with three claims.

5      And if we're limited to that, I think that issue alone or

6  that fact alone will defeat class certification.  However, I

7  don't know, you're correct.  And I think you're entitled to

8  some discovery.  I have been pushing this off.  So I think you

9  need a date for the final proceeding so that we can get this

10  done once and for all in one context where all the issues come

11  up for adjudication.

12      Now, having said that, with respect to item #2, to the

13  extent that the request is for a person who has made some

14  statements during the settlement or compromise, I want the

15  brief on the 408 issue.  I think Mr. Speights, you're going to

16  lose on this one because I don't think under the second

17  sentence in 408 that this will be relevant and admissible but I

18  don't know.  I'll give you a chance to show me otherwise.  With

19  respect to item 1, the request for a person who is most

20  knowledgeable regarding property damage claims in class action

21  proceedings, I'm still not sure what element it is that the

22  Debtor's knowledge of your claim is going to get you.

23      You're looking for some admission.  That means it has to

24  be by a person with the authority to make an admission.  All

25  right?  This is a deposition notice, this isn't a document

1  production request, correct?

2      MR. SPEIGHTS:  Well, it's both, Your Honor.  And I'm

3  glad you asked that.  I meant to make that point.  It's a

4  deposition person of the most knowledgeable person and a

5  document production of documents relating to Anderson.  We may

6  argue about whether the deponent -- the person produced makes

7  statements that are admissible or not admissible but he will

8  first of all lead us to documents.  We'll have the documents

9  there.  And the documents themselves may be admissions.  Or for

10 a host of other reasons we may argue that something is

11 admissible out of that proceeding.

12     I don't -- I mean, right now, I'm trying to get the facts,

13 and the facts are -- I'm trying to get are what did Grace know

14 about Anderson or say about Anderson prior to our being here

15 and I mean, I'm -- I just think we don't need to cross the

16 bridge whether it's admissible or not.  The documents

17 themselves we'll be offering and we'll deal with the admission

18 issue itself probably more likely than the person most

19 knowledgeable.

20     THE COURT:  Okay.  I -- this is why I'm having some

21 difficulty with this construct.  Grace wouldn't know about a

22 class action proceeding, I would assume, until the class action

23 proceeding is filed.

24     MR. SPEIGHTS:  Well --

25     THE COURT:  You're asking back to December of 1992

1  when the action's filed.

2      MR. SPEIGHTS:  It was filed as a class action

3  complaint.

4      THE COURT:  Okay.  Then as of December of 1992,

5  everything after that, isn't it going to be either subject to

6  some litigation privilege or some settlement privilege and

7  therefore covered by Rule 408?

8      MR. SPEIGHTS:  Your Honor, I suggest to you

9  respectfully, there's no way to know that.  I mean, they can

10 file the privilege log if you think that, but I can't imagine

11 everything even in their lawyer's file is privileged.  I mean,

12 the lawyer, I mean -- I have my own files.  You know, I can't

13 imagine everything that I put in there is privileged.  But

14 we'll see.

15     But there may be things other than what's in the lawyer's

16 files.  There may be an analysis by, you know, an accountant on

17 something.  There may be an analysis by another type of expert.

18 There may be statements from one employee to the next, which

19 are not privileged.  And that -- you know, privilege is really

20 seeking legal advice from a lawyer.  That's a much narrower

21 subject than both Mr. Bernick and I representing other clients

22 sometimes try to make it to be.

23     THE COURT:  All right.  Well, I think that request,

24 to the extent it's a document request, is too broad.  Asking

25 somebody to give them -- to give you everything they have

1   related to a topic, I think, is simply a fishing expedition.

2   And even the rules of discovery don't give you that much.  I

3   think you need to narrow this topic.

4       With respect to a deposition of a person knowledgeable,

5   I'll ask the Debtor to identify a person.  You can take your

6   deposition.  And to the extent that you get a discovery request

7   in that is more limited in scope and the documents are claimed

8   to be privileged by the Debtor, then they'll have to produce a

9   privilege log in advance of the deposition if in fact that's

10  what they intend to do.

11      But that request, Mr. Speights, I think, is just overly

12  broad.  It would require the Debtor to go through every

13  document in the Debtor -- in every file that the Debtor ever

14  had since 1992.  And I don't think the discovery rules are --

15  require --

16      MR. SPEIGHTS:  All right --

17      THE COURT:  -- the Debtor to do that.

18      MR. SPEIGHTS:  Your Honor, I understand that and

19  I'll do what Your Honor says but in fairness to myself --

20  sometimes I give myself a little fairness -- Grace never made

21  that objection from last December about over broad.  It was on

22  relevancy grounds and on the grounds that it was intended for

23  delay.  I'll be glad to do it.  I just want to make it clear

24  that had Grace written me a letter saying overly broad in your

25  request and all, I would have worked in that behalf.  I just

1  don't want to be the one -- we're about to go to scheduling --

2  to say well, Mr. Speights, you caused a delay because your

3  request is overly broad.  I'll do that as quickly as I can and

4  get him a revised request.

5      THE COURT:  None of this -- is this point is about

6  delaying, Mr. Speights.  I've been holding this off because I

7  want to see what the resolution -- what the universe of

8  resolution is with respect to the property damage claims.  The

9  Debtors just put up this chart that essentially shows that

10  there about 180 claims left that may fall into this universe.

11  I think if -- I mean, you may have some disagreement, I don't

12  know.

13      But I'll just assume for the moment that that's what the

14  documents will show with respect to the number of claims that

15  you have filed on behalf of your clients and Anderson that

16  would be included in the broadest scope of this request.  And

17  if that is the case, then we know that number.  So the number

18  isn't going to be the issue.  Whether it meets the numerocity

19  is a different question.  But at least we know the finite

20  number.  And then there are some other claims there apparently

21  from other entities that were not represented by you but have

22  other Counsel involved.

23      So I think with respect to the discovery to the extent

24  that the request is as broad as it is, I can't even see how

25  it's calculated to lead to relevant admissible evidence because

1    it's too broad.  So I think you need to narrow the scope,

2    whether the Debtor raised that issue or not.  So how much time

3    do you want to recraft the document notice and the deposition

4    notice with respect to what was Point 1 on the board before?

5         MR. SPEIGHTS:  One week, Your Honor.

6         MR. BERNICK:  One week?  Just so we're clear, Your

7    Honor, the issue is class discovery.  He says I want to know

8    what Grace knew and said about Anderson.  There is no

9    connection between these two that's apparent.  It is our view

10   that the former question, that is what did Grace know, say

11   about Anderson is explicitly violative of Rule 23 and the

12   provisions for discovery associated with Rule 23.  Has been

13   squarely rejected by the Supreme Court, which says you do not

14   litigate the merits -- class -- of the case before deciding --

15        THE COURT:  But I --

16        MR. BERNICK:  -- class certification.

17        THE COURT:  -- don't think that's what the request

18   said.  It said, knew about property damage claims and the

19   Anderson Memorial --

20        MR. BERNICK:  What --

21        THE COURT:  -- class action.  But regardless, I've

22   said that it's too broad and it has to be recast.

23        MR. BERNICK:  Well, but that's the point, Your

24   Honor, is that even today we have no articulation about

25   discovery that is specific to the elements of Rule 23.  Like --

1      THE COURT:  Well, he'll -- it'll have to be done in

2  the new deposition notice.  Not the document production

3  request, but in the deposition notice.

4      MR. BERNICK:  Maybe I just -- I think just the other

5  way around.  I think it actually should be both, that is to

6  say, the documents are only discoverable to the extent that

7  they pertain to the elements of Rule 23 and we can only produce

8  a witness who is most knowledgeable concerning something about

9  which they are most knowledgeable.  We need to know what it is.

10     THE COURT:  Right.  I agree with that.

11     MR. BERNICK:  And so in both respects, we need to

12 know what specific element of Rule 23 we need to provide

13 documents about at -- person most knowledgeable.  And I'm

14 fairly confident, Your Honor, that it will all be -- even if

15 it's non-settlement, it'll all be protectable by a privilege

16 because these are all matters handled within the legal

17 department.

18     The only reason I'm raising that, Your Honor, is it's kind

19 of -- it is damned if you do and damned if you don't.  If it

20 goes beyond class discovery we will take the position and it'll

21 be all the way up position that we are not going to agree in

22 the context of class certification -- discovery.  If, however,

23 it is class, we believe it's clearly going to be covered by a

24 privilege.  So I don't want to mislead Your Honor into somehow

25 there is some room that we see to craft some narrow kind of

1   discovery.

2       We think that this is basically just an effort to go into

3   the lawyers' files in order to make up a claim for class

4   certification.  And I am not aware of a single case in which

5   it's ever been done.  And we would -- we'd probably spend the

6   time -- we've spent so much money on this already.  We'll spend

7   the time looking to see whether this whole idea of looking to

8   the Defendant to supply the predicates for a class

9   certification through the lawyers' files has ever been done.

10      THE COURT:  Well, okay.  There are an awful lot of

11  assumptions that are being made that I'm not sure are valid or

12  invalid at this point in time.  Mr. Speights, I want you to

13  recast the deposition notice and the discovery request, tying

14  the class of documents -- or the nature of the deposition

15  testimony you're looking to an element of Rule 23, so that when

16  I get an objection -- and Mr. Bernick, I want you to raise

17  every objection you intend to argue.  I am not going to have

18  another proceeding like this where I hear objections to

19  relevance and delay but when I get here, I've got Rule 408 and

20  settlement issues and over breadth argued.

21      MR. BERNICK:  Well, in fairness, Your Honor, we

22  objected to this.  We objected to it in a timely fashion.

23      THE COURT:  Yes.

24      MR. BERNICK:  And we objected to the entirety of the

25  thing.  And the whole -- our position fundamentally is not

1   changed, which is that all of this has got nothing to do with

2   class discovery.  It's got everything to do with a bunch of

3   other issues that are not germane and we most certainly laid

4   opposition.  Your Honor has now said you want to parse it

5   finer.  That's fine, but we objected to what this is in

6   essence, which is an effort -- somehow that we're going to

7   prove up his class cert claim.

8       THE COURT:  Well, I don't know what documents or

9   people are going to prove the certification claim, but

10  certainly he's entitled to find witnesses even if they're

11  witnesses who work for the Debtor if in fact he needs them to

12  prove that claim.  And there is not as I know it a privilege

13  just because there's an employee of an opposite person who

14  prevents them from testifying as to an element of the case if

15  somebody can identify it.  So, Mr. Speights, a week.  Recast

16  it.

17      Mr. Bernick, whatever objections you're going to raise,

18  make them specific.  I'm only going to hear arguments as to the

19  specific objections that are raised.  And I want the 408

20  briefing on the same schedule.  If this can come up at the

21  November Omnibus, that's fine.

22      Is there enough time to put it on the November Omnibus or

23  should I at this point simply give you a date for all class

24  certification issues including this?  Do we need to get through

25  this discovery matter -- I guess we do -- need to get through

1  the discovery matter first?

2      MR. SPEIGHTS:  Your Honor, first of all, I

3  understand your ruling.  Secondly, as quickly -- I said a week,

4  I'll do it -- as quickly as we need to tee up the discovery

5  issues, let's do it.  I want the record closed so we can argue

6  certification.  I'm not trying to delay that.  I have informed

7  Grace before that I want to present evidence, which I do not

8  think would be appropriate at the Omnibus hearing.

9      I'm ready to go as soon as Your Honor has some time to do

10  that after you rule on this.  I would suggest, Your Honor,

11  between the November Omnibus and December whatever -- in

12  Pittsburgh when you have time to argue class certification

13  assuming we don't have any discovery blowups which I have to

14  come and -- I pray we don't -- come and say, Your Honor, we

15  have this thing and they won't give me the documents or

16  something of that nature.  We can get this out of the way in

17  early December.

18      MR. BERNICK:  Your Honor, I want to be realistic

19  here.  I don't think that first of all, that Your Honor should

20  set a date for the class certification hearing because I don't

21  think this is going to be resolved.  I think that we're going

22  to -- every time we go down this road we get the same thing

23  again and again, which is more and more discovery.  I need this

24  that or the other -- I can predict to a 100% certainty that

25  when the requests come in they will fail as they've failed to

1  date to identify something in Rule 23 or if the -- at least

2  there will be an issue about that we'll have to get Your Honor

3  to resolve.  So if Your Honor wants to go down this road, I

4  think that I -- we have got no choice.  It's their motion.

5  Your Honor has allowed them discovery.  We're going to have

6  litigation, I think, over the scope of this discovery what it's

7  going to be and we'll just take it in the ordinary course.

8       THE COURT:  Okay.

9       MR. BERNICK:  To hurry it up and set a date, I just

10  think is unrealistic at this point.

11       THE COURT:  All right.  The -- let's get it on to

12  November for the discovery issues.  So that hopefully I can

13  give you rulings about this.  Because truly, we need to get

14  this decision.  And I have some serious concerns as to whether

15  or not the elements can be met as I've expressed on the record.

16  And I'm not in a position to make rulings about it at this

17  point in time.  But I am concerned about it.

18       So I would like to get those concerns addressed one way or

19  the other, either to find that the elements have failed or to

20  find that they've been established, just so we can get past

21  this and get on with the claims litigation in this case.  So

22  put it on for November -- whatever your briefing schedule is

23  that you need to do it.  Get it on for the November hearing.

24       MR. SPEIGHTS:  Thank you, Your Honor.

25       THE COURT:  Now, I've said that -- isn't the

1   November -- I should point this out, maybe, just to be sure you

2   can meet this deadline.  Okay, the November hearings are on the

3   20th.  So that's a month.  Is that still sufficient time?

4        MR. BERNICK:  For this matter?

5        THE COURT:  Yes.

6        MR. BERNICK:  I -- it ought to be, but that's not to

7   say that it will be.  I think it all depends on when we can get

8   from Mr. Speights the answers to the questions that Your Honor

9   has posed.  And if he will tell us that, then I suppose we'll

10  find out when we should be responding to those requests, which

11  I assume will be by way of objection.  And then I guess he

12  needs time to -- so we will move to -- for protective order to

13  quash again and then he'll have an answer to that.

14       So you got to have three things really between now and

15  November.  There is the new discovery request, there is our

16  objection in motion and then I guess there is his response.  I

17  mean, I think that's what the sequence should be.

18       MR. SPEIGHTS:  Plus the 408 --

19       MR. BERNICK:  Well, then the 408 -- well, let's get

20  this one done first because I'm sure that may end up driving

21  the date.

22       THE COURT:  Well, why don't you do the 408 briefs at

23  the same time?  Because I think --

24       MR. BERNICK:  I understand --

25       THE COURT:  -- that's still -- yes.

1        MR. BERNICK:  -- that, but I'm saying -- yeah.  The

2    408, but in terms of the schedule, I think the slow part of

3    it's going to be the objection part of it.

4        MR. SPEIGHTS:  One week, one week, one week.

5        THE COURT:  Okay.  If -- I'm happy to do it in

6    November if you can.  If you folks want it in December, I don't

7    care at this point in time.  I think this case has got other

8    problems that are probably going to tie people up for a while

9    that you're working on anyway, but I would prefer to get it in

10   November simply so that hopefully we can get it done and I can

11   get you some rulings if you need an evidentiary hearing I'd try

12   to -- like to do that by the end of the year, but you know, the

13   longer we get into these dates and the more my calendar fills

14   up, the less likely that's going to be.  So --

15       MR. BERNICK:  I'll tell you what, Your Honor.  If we

16   get the discovery questions in one week, we will file

17   objections within one week and Mr. Speights can then have one

18   brief in response in one week.  And I suppose that we ought to

19   have an exchange briefs but -- or it may be at -- on the second

20   date, which is the date for our responding to their discovery

21   we will also submit a Rule 408 brief and they then can have

22   that last date to get their briefs.  Got three dates.  One week

23   for the discovery requests, new discovery requests.  Now, I'm

24   assuming, Your Honor, that we're not talking about new

25   discovery requests on new matters.  They are simply --

1      THE COURT:  No.

2      MR. BERNICK:  -- a refinement --

3      THE COURT:  Refining.  Only refining.

4      MR. BERNICK:  Yeah.

5      THE COURT:  This item.  Yes.

6      MR. BERNICK:  Okay.  And that's a week.  Then the

7  following week we will submit our 408 brief and a Motion to

8  Quash any new discovery that we believe is inappropriate.  And

9  then the third week -- I don't know what these dates are --

10      THE COURT:  I'll give you the dates.

11      MR. BERNICK:  Yeah, I guess it's the 30th.  The 6th

12  would be for our responsive brief and our 408 brief and then on

13  the 13th, which would be the last week, Mr. Speights on behalf

14  of his clients can file a response to our motion for protection

15  and response to our 408 brief.

16      MR. SPEIGHTS:  I don't want to be picky, Your Honor,

17  but I probably won't be the one who's doing the 408 brief.  No

18  problem on the depositions, one week, one week, one week.

19  Seems to be on 408, they've got a brief, I've got a brief.

20  Just split the time in half for that, otherwise they're going

21  to have two weeks to do a 408 brief and I'm going to have one

22  week to do a response.

23      THE COURT:  Okay.  It's all going to come to me at

24  the same time, so I don't --

25      MR. SPEIGHTS:  I understand, Your Honor, but I mean,

1  it's -- the 408's the big issue and there's no reason they

2  can't be working on that now and I -- all I said when we argued

3  it a while ago was, just give me the same amount of time.

4      THE COURT:  All right.  The Debtor -- your -- the --

5  why do I need reply briefs on the 408?  Why can't you both

6  submit them at the same time?

7      MR. BERNICK:  We could do that too.

8      MR. SPEIGHTS:  That's fine, Your Honor.

9      THE COURT:  I mean, the law's going to be the law on

10 408, isn't it?

11     MR. SPEIGHTS:  Yes, Your Honor.

12     THE COURT:  So, fine.  Everybody's 408 brief can be

13 submitted by November 13th.  That's not going to make my final

14 binders and give me the weekend to review these.  Well, okay.

15 I'll have the following weekend.  No, I won't.  I need

16 everyone's 408 briefs in the final binders, and since you've --

17 both going to submit them together -- I'm sorry, Mr. O'Neill,

18 when are the binders?  The 10th?

19     MR. O'NEILL:  The final agenda, Your Honor, is due

20 on the 13th.

21     THE COURT:  Okay.  So you need the briefs by at

22 least the 10th so that I can get them -- actually, is there any

23 possibility of getting the binders on the 10th instead of the

24 13th?

25     MR. O'NEILL:  Sure.  Well, the preliminary binder

1  will have already gone out --

2        THE COURT:  Oh, that's right.

3        MR. O'NEILL:  So that none of these things would be

4  included.

5        THE COURT:  That's right.  That's right.  So --

6        MR. O'NEILL:  And so we can email the briefs with

7  the -- we can email the briefs to -- on the 13th or on the

8  10th --

9        THE COURT:  10th -- that would --

10        MR. O'NEILL:  -- if that works better.

11        THE COURT:  -- be fine.  Yes.  You're correct.  The

12  preliminaries will be there.  I'd forgotten.  All right.  So

13  all the 408 briefs are due on November 10th.  So let me correct

14  this.  All right, so the dates.  Mr. Speights, your new

15  discovery documents due -- or notice is due October 30.  The

16  Debtor's responses, objections, whatever -- November 6th.  Your

17  response if they file an objection by November 13 and the

18  argument on November 20.  With respect to the 408 briefs,

19  everybody's are due November 10th and they'll be argued on

20  November 20.  Okay.  All right, that's item 7.

21        MR. BERNICK:  That is which one, I'm sorry, Your

22  Honor?

23        THE COURT:  7, I think.  For the Motion for

24  Protective Order?

25        MR. BERNICK:  Yes, that's item 7.  8 was the

1  transcript matter, and that's, I think, already been reported

2  to the Court.  And then the 9th -- item 9 was a date for class

3  certification, which sounds to me like we ought to simply hold

4  in abeyance until Your Honor can determine where we're at next

5  time.

6      THE COURT:  Yes, I'm not sure I can do much on item

7  9 until we get past the discovery and hopefully the transcript

8  issue, if I'm going to get it, will be addressed by then.  Mr.

9  Speights, can we just take that issue up for a scheduling order

10  at the next hearing?

11     MR. SPEIGHTS:  Yes, Your Honor.

12     THE COURT:  All right.

13     MR. BERNICK:  I think that just leaves us, Your

14  Honor, with item 10.  Finally give Mr. Finch here something to

15  do.  This is just a status report with respect to the personal

16  injury claims.  And I think that there are probably three

17  matters, if Your Honor will give me just a moment here.

18     Okay.  There are three matters.  One is the status of the

19  questionnaires.  The second is to make a report concerning X-

20  rays and then the third is to let Your Honor know where things

21  stand with respect to the settled claims.

22     So on the questionnaires, as Your Honor probably doesn't

23  recall at this point, we do have a due date for any

24  supplementation to the questionnaires of November the 12th.

25  We, as pursuant to discussions we've had with Your Honor before

1  in Court, have both written and discussed over the telephone

2  the question of what the extent of the supplementation is going

3  to be, and more specifically, whether people are going to

4  continue to not only object, but on the basis of those

5  objections, not answer questions.

6      And then the related issue of how much time they need in

7  order to complete their responses.  And the two are very

8  closely tied together, because if we are simply going to get

9  the questionnaires, but without really any substantial

10  supplementation with a lot of gaps, then it doesn't make too

11  much sense to have an awful lot more time for that process

12  because we're not going to get a complete answer anyhow.

13      Whereas if people would give us a complete answer then

14  we'd be much more -- it'd be much more livable to have an

15  extension of time because we know that once the answers come

16  in, they're going to be complete and the data can be put into

17  the system.  Thus far we've -- I think -- contacted absolutely

18  everybody and I won't go into the gory details of the scope of

19  that effort.  Nobody has said that -- has committed that they

20  will answer all the questions.  And nobody has given us a

21  definitive list of what they're still going to be objecting to.

22      They all pretty much say, you have to wait for our

23  supplementation, but by the way we want a very -- you know, a

24  significant supplementation.  Usually between 30 and 60 days or

25  additional time -- usually between 30 and 60 days more time

1  beyond the time that Your Honor already has given.  So

2  effectively what we're approaching on November the 12th is that

3  we will find only then what people are not going to answer and

4  at that time, Your Honor's going to have to address those

5  matters.

6     Our approach right now is that -- remains the same, that

7  unless people really are going to give us complete answers,

8  that is they're going to answer the questions -- they may

9  object, but they'll answer the questions, we don't see a

10 purpose to prolonging the time period for their supplying

11 answers.  That dialog still continues, we are still totally

12 open to people.

13    And there's one law firm in fact who has made very

14 substantial progress in deciding that they're going to give us

15 answers.  And there are very few questions that they're not

16 answering.  And with respect to them, we're very flexible on

17 time.  So I think I really can't say much more than this is

18 still in process.  I can tell Your Honor what the objections

19 are that I think we're headed for.

20    MR. FINCH:  Your Honor, I don't really understand

21 the purpose of this.  I mean, if Mr. Bernick has Motions to

22 Compel, he can file his Motions to Compel, giving the Court

23 preview about what Motions to Compel he might file later on

24 down the road.  I think it's inappropriate, particularly since

25 the law firms who are responding to these questionnaires don't

1   have Counsel.

2       MR. BERNICK:  Yeah, I'm not going to -- with due

3   respect, Your Honor, we're giving you a status report on the

4   matters that affect the schedule.  And the problem with

5   bringing the Motion to Compel is that -- and I'm happy that Mr.

6   Finch raised it -- the problem with bringing the Motion to

7   Compel is that there has been -- and I won't say an intentional

8   -- but a very consistent pattern whereby people don't want to

9   commit to what their positions are as a result -- with the

10  result that we can't tee them up for decision by Your Honor.

11  And it's cost us an incredible amount of time.

12      But we have read through the questionnaires.  And on the

13  basis of our discussions, it appears that the objections that

14  will remain are the ones that I've listed here -- attorney-

15  client privilege, work product confidentiality burden and then

16  I guess it's a privacy issue.

17      Our current intention is to try to file some Motions to

18  Compel right away, anticipating that these issues will in fact

19  survive at least with respect to certain firms and that we'll

20  know that by November the 12th.  So what we'd like to do is

21  file the motions, then perhaps get a special hearing set if

22  that's at all possible just to deal with these issues on a

23  Motion to Compel at some time before the December Omnibus

24  because we really do need Your Honor's determinations on these

25  matters.

1     And I think that the issues have been very significantly

2   refined at this point as a result of all that Your Honor has

3   said.  So effectively, the time frame that we're working with

4   is November the 12th for supplementation.  We will have a

5   Motion to Compel pending by that time.  If people -- we hope to

6   be able to report also by November 12 our efforts to reach

7   agreement with folks.  And maybe they'll have more definitude

8   on what they're objecting to by that time, on what they really

9   need by way of more time if any.

10    But I think our basic approach is going to be that 30

11   days, 45 days is pretty much all that the schedule at this

12   point will tolerate.  I will add that by this time also the

13   Proof of Claim date is November 15th.  So by that time folks

14   will have had to make the decision about whether in fact

15   they're going to pursue a claim in this case.

16    Now, it may be that as Mr. Innselbuck explained at one

17   point, people will have no choice because they feel that as a

18   matter of making sure that they don't breach an obligation to

19   their client -- no choice but to file a Proof of Claim.  It may

20   be not.  But certainly anybody who does file a Proof of Claim

21   at that point then there -- I mean, there's no reason why the

22   questionnaires can't be completed for those people who are in

23   fact going to be preserving their rights in this case.

24    So that's where we are in the questionnaires.  It's -- you

25   know, we're making progress but it's difficult to say how much

1  because nobody's really told us whether there's going to be any

2  significant change over where we were before.  Whereas Your

3  Honor knows there were huge numbers of questionnaires that were

4  really not filled out at all and these objections that were

5  being made to thousands and thousands of claims.  And maybe

6  that nothing's changed.  I just don't know.

7       THE COURT:  Okay.

8       MR. BERNICK:  With respect to the X-rays, the

9  questionnaire does call for people to turn over X-rays.  We

10  know that that's a process that requires some work and

11  therefore we have started by only asking for X-rays for people

12  who are making claims for lung cancer or other cancers.

13       We're not asking for X-rays at this time with respect to

14  people who have mesothelioma claims.  We're not asking for X-

15  rays at this time with respect to people who have non-malignant

16  claims, although that time will come.  We may well go for a

17  sampling kind of approach there.  We're just not quite sure.

18       But we have asked for the X-rays for people who have --

19  who actually have lung cancer or other cancers -- it's driven

20  by the question of whether those cancers are asbestos-related

21  or not.  And I think we've told Your Honor before that based

22  upon the data that we have from the questionnaires, the

23  statistics are pretty significant.  Based on the questionnaire

24  information, 30% of the doctors who have performed the B

25  reading in connection with lung cancer are either known or

1  suspected of using non-standard diagnostic practices.  And Your

2  Honor's familiar with those doctors and that whole issue.

3      But we could be talking about 30% and more of the

4  questionnaires that have been submitted so far.  With respect

5  to other cancers, the number gets up to 51%.  Our approach is

6  going to be to ask that the X-rays be turned over within 30

7  days.  We will then submit them to three independent B readers

8  -- that is, the same X-ray will be read three different times

9  by an independent B reader, which we believe is necessary in

10  order to gather data that's replicable data.  And we'll see

11  what comes out of that.  But that's our process.  That's what

12  we're going for there.

13     With respect to the settled claims, there's actually a

14  partially good news story there.  Your Honor will recall the

15  concern that we had about the settled claims, which is the

16  people -- there was a significant number or a significant

17  number of claimants who did not submit questionnaires at all.

18  And we were concerned that the reason that they weren't

19  submitting the questionnaires is that there was some position

20  that the claim had been settled whereas in fact it had not been

21  settled.  And we didn't know how much that accounted for.

22     We do have records of our own, indicating that there are a

23  significant number of settlements that we recognize as being

24  settlements.  I will tell Your Honor that our database reflects

25  approximately 21,000 claims that we believe in fact have been

1    settled.  The estimate -- the deadline for people to submit

2    their Proof of Claim forms if they have a -- if they assert a

3    settled claim -- that deadline was October the 16th.

4        And our current estimate is that there are maybe as many

5    as 35,000 Proof of Claims for settled claims that have been

6    submitted which would -- assuming that all 21,000 of the ones

7    that we think are settled submitted a Proof of Claim, which

8    means that you have a delta of approximately 15,000 claims.

9    Now that's not great but it could be much worse.  Two major

10   problems that we think are going to be amenable to a very

11   prompt resolution in December -- 1 is that we have people who

12   assert that they have a settled claim and there is no

13   documentation at all that's attached.  And #2 is that there are

14   a number of settlements where -- ledge settlements where a

15   release has been produced but we have no indication of whether

16   that release actually was given to Grace as of the time that

17   the case had been -- the Chapter 11 had been filed.

18       Now, I'll tell Your Honor that that very issue was

19   addressed in connection with the Babcock and Wilcox bankruptcy

20   case.  And the standard that was articulated there was that

21   there had to be evidence that the release in fact was sent,

22   that it had left the control of the claimant as of the time the

23   case was filed.  Otherwise there could not be mutuality -- that

24   is, if the claimant still had the ability not to send it

25   through then the claimant's not bound and therefore there can't

1   be a contract.  And that was the test that was adopted there.

2        But we need to do further homework to understand what the

3   source of this disagreement is in those cases.  But in any

4   event, I think that that matter is pretty much on track, as

5   we'll be able to tee up these issues.  We have to send out

6   letters within two weeks, which is going to be a push.  But we

7   think we can do it.  Telling basically people whether we agreed

8   that their claims are settled or not.  And then the outstanding

9   matters can be taken up and we can roll the people who don't

10  have settled claims into the questionnaire process.

11        THE COURT:  Mr. Finch?

12        MR. FINCH:  Nathan Finch for the Asbestos Claimants

13  Committee, Your Honor.  Before I respond to the points Mr.

14  Bernick raised, there is an issue that the Asbestos Claimants

15  and the Future Claimants representative would like to tee up by

16  a Motion to Compel -- probably along the same time frame as the

17  Debtors on their Motion to Compel with the claimants.

18        I'm not suggesting that we do it on necessarily the same

19  day, but there's an impasse between us on the question of

20  whether Grace has waived the attorney-client privilege with

21  respect to settlement communications with asbestos personal

22  injury claimants pre-petition.  We think that they have, based

23  on statements they made in Court, based on briefs that they've

24  filed.

25        The Debtor respectfully disagrees with that position.  I

1    think it's fair to say that neither one of us would have our

2    minds changed by going through a mediation session with the

3    mediator -- the discovery mediator --

4         THE COURT:  Wait.  I missed the point.  The --

5    whether the Debtor waived the attorney-client privilege as to

6    what?

7         MR. FINCH:  As to the reasons that it settled pre-

8    petition asbestos personal injury claims.  And --

9         MR. BERNICK:  Oh.

10        THE COURT:  As to the reasons why it settled.

11        MR. FINCH:  Correct.

12        MR. BERNICK:  You're talking about -- just to be

13   clear, there's been some discussion on certain Sealed Air

14   documents.  As I understand it, these are requests that ask for

15   Grace to disclose -- presumably from its lawyers' files,

16   because that's where it would be -- the reasons why Grace

17   settled individual claims prior to the Chapter 11.

18        MR. FINCH:  Yes, we think they've waived the

19   attorney-client privilege with respect to those types of

20   discussions, for several reasons.  I can argue the motion now.

21   I prefer -- I don't think Mr. --

22        THE COURT:  But why do you care?  I'm sorry, why do

23   you care?

24        MR. FINCH:  Because Grace has come into this Court

25   and said that you should disregard our past settlement history

1  as not reflective of our liability because we settled tens of

2  thousands of cases that had absolutely no merit at all that

3  were -- and they're going to ask you to heavily discount their

4  past history because they're asserting that those claims are

5  {quote} "meritless" or lack merit.

6      Leaving aside the question of whether -- how you can

7  determine whether a claim is meritless without taking it all

8  the way to a jury or not, the point is that we believe there

9  are documents that their lawyers have that show that they knew

10  very well they were settling claims to basically buy off the

11  risk of liability.  And that the cost -- the estimate of the

12  cost it would -- Grace would incur to settle the pending and

13  future claims, resolve the future and pending claims -- best

14  evidence of that is the dollars they paid in the past.

15      And so it's their contention that you should ignore all

16  the past settlement history and that it's irrelevant.  And we

17  think there are very damaging admissions in their files from

18  what their lawyers were really telling them about the claims.

19  And therefore we think that they have waived the attorney-

20  client privilege by coming into Court and saying we settled

21  cases for X reason and that therefore by saying the reason that

22  they settled the case is we're entitled to discovery of that.

23  They said they settled cases for -- you know, for reasons that

24  -- well, we had too many cases to deal with.  Our lawyers

25  weren't competent and couldn't defend us.  We had too -- far

1   too many cases on our docket to evaluate them all.   And

2   there --

3       THE COURT:  Where have they made these statements?

4       MR. FINCH:  In the informational brief, among other

5   places.

6       THE COURT:  Oh.

7       MR. FINCH:  In presentations that Mr. Bernick has

8   made in Court where he's quoted the testimony of Jay Hughes,

9   whose deposition I took in the Sealed Air case.  Some of these

10  types of documents were produced in the Sealed Air case --

11  they're -- they have been turned over to the United States

12  Government pursuant to a subpoena.  They're no longer

13  privileged as against the world.

14      So we have a variety of arguments why this type of

15  discovery is a, both necessary, and b, not barred by the

16  attorney-client privilege or the work product doctrine.  What I

17  would like to do is to file the Motion to Compel, have Grace

18  respond to it, have a hearing -- have an argument on that.

19      If the Court rules in Grace's favor, then we'll decide

20  whether we appeal that or not.  But there won't be anything for

21  the discovery mediator to do.  If on the other hand the Court

22  rules in my favor, then it may well be that there would be

23  burden issues and timing issues related to the production of

24  that material and that's when the mediator could be of some

25  assistance.  But what I'm suggesting is that we tee up the --

1        THE COURT:  But --

2        MR. FINCH:  -- legal issue first.

3        THE COURT:  Okay.  But isn't the legal issue that

4    I'm going to face whether or not to give credence to Grace's

5    assertion that I should ignore the pre-petition settlement

6    history and Grace's expert, I -- I'm assuming that Grace's

7    expert's going to adopt that position.  I don't know that for a

8    fact.  But on the assumption that Grace's expert's going to

9    take that position, first it's the experts from the other sides

10   who are going to say, this is relevant because it's the best

11   evidence of what Grace's actual -- felt it's actual liability

12   for the cases was.  What difference does the reason make?

13   Isn't it the fact that Grace settled --

14        MR. FINCH:  It's an admission by Grace.  It's --

15   Grace is --

16        THE COURT:  But they settled.

17        MR. FINCH:  -- coming -- but Grace --

18        THE COURT:  I mean, of course --

19        MR. FINCH:  Grace is coming into Court saying these

20   cases have -- we settled these cases because they -- because of

21   specific reasons.  We're entitled to attest those assertions in

22   discovery.  We're entitled to put on our own evidence where

23   their lawyers and their General Counsel said we settled these

24   cases for the same reason you would settle an accident case.

25   There was a potential liability there.  We settled cases where

1  we thought they could get past Motions for Summary Judgment and

2  we took the cases to trial where we thought we had a good

3  chance of winning.

4      That's their strategy.  They've come in and said things --

5  that that's the strategy that their lawyers pre-petition wrote

6  in documents to their auditors.  They're coming in here saying,

7  no, no, no, Your Honor.  You've got to ignore all that.  We

8  settled cases because there were 100,000 of them.  We couldn't

9  defend them all.  Once they say the reasons why they did what

10  they did, they put into issue whatever advice they got from

11  their lawyers about the reasons why they did what they did.

12      THE COURT:  Okay, but so far I haven't had an

13  evidentiary hearing and you're making the assumption that I'm

14  going to let them tell me why they settled cases.  And I think

15  Rule 408 that we just spent a lot of time going through isn't

16  going to let them tell me why they settled the cases.

17      MR. FINCH:  Well, one of their arguments is that the

18  settlement had -- the Rule 408 issue has been teed up in the

19  exact same context in an asbestos case and Grace lost.  It was

20  in the Babcock and Wilcox case, Your Honor.  And one of the

21  arguments they make is that prior settlement history is

22  inadmissible for the purposes of proving up the -- please sit

23  down, Mr. -- Your Honor -- Mr. Bernick.

24      THE COURT:  Pardon me.

25      MR. FINCH:  May I --

1       THE COURT:  You will address me, not Mr. Bernick.

2       MR. FINCH:  Your Honor --

3       THE COURT:  I've told you folks and I mean it.  The

4  next time, bring your toothbrushes.  We're not going to do this

5  in this case anymore, folks.

6       MR. FINCH:  May I continue until I'm finished and

7  then I'd like to cede the podium to Mr. Mullady.

8       THE COURT:  You may finish.  You may finish.  And

9  then I'll determine who goes next.  Go ahead.

10      MR. FINCH:  The point, Your Honor, is that the -- we

11  believe the settlement history is admissible to prove what is

12  Grace's liability for pending and future asbestos personal

13  injury claims.

14      THE COURT:  The settlement history may be, but you

15  know the settlement history.  What difference do the reasons

16  make and how are you going to get them into evidence?  How is

17  the Debtor going to get them into evidence

18      MR. FINCH:  The Debtor has said that you should

19  ignore the settlement history.  They're going to put on

20  evidence -- they -- this is discovery, remember?

21      THE COURT:  Wait, wait.  No.  Discovery has to be

22  calculated to lead to relevant and admissible evidence.  What

23  the Debtor has said in its discussions arguing against whether

24  or not there should be the type of evidentiary hearing that it

25  wants versus what the Creditors Committee wants isn't evidence.

1 It's just their argument about why I should hear a particular

2 line of strategy.

3     MR. FINCH:  But they're --

4     THE COURT:  I've already said that Grace is going to

5 try its case Grace's way.  And you're going to try your case

6 your way.  And if the two don't meet, the job that the Court

7 has is to try to reconcile the evidence where I can.  And where

8 I can't, to determine who I believe and credit and to give the

9 weight to those appropriate entities.  If you can't get -- if

10 the Debtor can't get into the reasons for the settlement, and I

11 don't think the Debtor can get into the reasons for the pre-

12 petition settlements, because they were settlements, what

13 difference does it make to the committee?  It's the fact that

14 the Debtor settled X number of cases for X dollars that you

15 care about, isn't it?

16     MR. FINCH:  Because they have said what they're

17 going to put on evidence from both fact witnesses and experts

18 that will say that you should ignore the past settlement

19 history because they say that they settled cases -- various

20 categories of cases they now say are valueless.  They say you

21 should give no value to these types of cases.  We are entitled

22 to show that the -- that they settled those cases because they

23 did think they had some value.  They thought --

24     THE COURT:  Well, obviously --

25     MR. FINCH:  -- they had some exposure.

1      THE COURT:  -- they thought they had some value, at

2  least nuisance value if nothing else, because they settled the

3  case.  Otherwise if they thought there was absolutely no

4  possible exposure, they'd take it to the mats unless in their

5  business judgment they decide that it costs them less to

6  settle.  What difference does it make why they settled?  The

7  fact is they settled.

8      MR. FINCH:  Your Honor --

9      THE COURT:  People settle for reasons --

10      MR. FINCH:  I --

11      THE COURT:  -- that are wholly different from their

12  litigation modes.

13      MR. FINCH:  But the -- if what we're estimating is

14  the cost to resolve the pending and future claims --

15      THE COURT:  Yes.

16      MR. FINCH:  Our argument is that the best evidence

17  of that is based on what they paid in the past.  They're saying

18  they're going to put on evidence to ask you to disregard that.

19      THE COURT:  Well, I don't know how I'm going to

20  disregard it.  It's a fact that happened in the past.  That's

21  what they paid to settle cases.

22      MR. FINCH:  They've asked you to either disregard

23  and/or heavily discount that.  They're going to put on fact and

24  expert testimony that they say will prove that their method of

25  estimation is better.  I think they can't get even any kind of

1  admissible evidence before the Court as to how they're going to

2  do this, but I got to be able to cross examine their General

3  Counsel if he gets on the stand and their -- Jay Hughes, the

4  director of asbestos personal injury litigation.  I think I

5  know what he's likely to say.  He's likely to say what he said

6  in the Sealed Air case, which is, we had too many cases to deal

7  with.

8      I think that's undercut by a lot of other documents in

9  Grace's files, some of which I've seen.  Some of which I

10  haven't gotten access to yet.  I'm entitled to do that

11  discovery.  And to the extent that Grace in its responses to my

12  outstanding document requests, has raised the attorney-client

13  privilege and the work product doctrine as a reason to withhold

14  that discovery, I'm entitled to file a Motion to Compel,

15  because I think this is --  it is evidence that is relevant to

16  a claim or defense of a party.  It's their defense, in effect.

17  They're saying you should ignore all this fact that we paid $1

18  billion in the past to resolve asbestos cases --

19      THE COURT:  Okay.

20      MR. FINCH:  -- because we have all these reasons why

21  we did it.

22      THE COURT:  Well, you could --

23      MR. FINCH:  Well, but once they start getting into

24  the reasons why they did it, I got to be able to --

25      THE COURT:  You can certainly file a Motion to

1  Compel.  And the Debtor can certainly respond to it.  If what

2  the Debtor's response is going to be is that they're going to

3  produce evidence that says that I should value the claims that

4  they settled at 0, then I agree.  You're entitled to find out

5  why they're valuing those claims at 0.  Because they clearly

6  have a settlement value, if nothing else.  They settled.

7      MR. FINCH:  Well, they're clearly going to be

8  valuing lots of cases that they think are {quote} "meritless"

9  at 0 in the estimation process, or at some diminimous value

10  that's far lower than what the historical values are.

11      THE COURT:  Well --

12      MR. FINCH:  I mean, they've already said that.

13      THE COURT:  But what I understood --

14      MR. FINCH:  I don't know for sure that they're going

15  to say it until I get their expert reports in December or

16  January.

17      THE COURT:  I understand.  But what I understood

18  their -- the Debtor's position to be is that the reason we're

19  going through the questionnaire process and looking for the X-

20  rays and the B readers and the other evidence of what the

21  current claims are is so that the Debtor's expert can take a

22  look at the current claims that are before the Court and say,

23  based on this evidence, these claims are valued at 0.  Not that

24  the Debtor's settled claims in the past were valued at 0.

25      MR. FINCH:  But who is -- the point is, though, Your

1   Honor --

2        THE COURT:  Or some number.  I'm using 0.

3        MR. FINCH:  It's part of rebutting their expert,

4   saying these claims are worthless.  Their expert will say lung

5   cancer without an underlying radiologic diagnosis of asbestosis

6   is not asbestos-related lung cancer.  There's a --

7        THE COURT:  And your expert will say otherwise.

8        MR. FINCH:  Yes, but in the -- and -- but Grace paid

9   those cases in the past and their expert is saying, oh, those

10  cases have no value now.  I'm entitled to put on evidence that

11  Grace thought those cases -- not only that they paid them in

12  the past but they thought that they had value because if they

13  took them to juries, they could get hammered for $1 million or

14  $2 million or $10 million.

15       THE COURT:  I don't know how you're going to get

16  into the scope of settlement discussions and why Grace settled.

17  I don't know how the Debtor's going to get into it.

18       MR. FINCH:  Because, Your Honor, the -- Rule 408

19  would only preclude discovery into settlement negotiations

20  between me and Mr. Bernick as to whether Grace's asbestos PI

21  liability is $1« billion or $2« billion or $5 billion.  That's

22  the claim at issue in this case.  The discussions they had with

23  other people on the merits of individual personal injury cases

24  is not the claim that we're trying in this Courtroom.

25       THE COURT:  That doesn't matter.  It's still

1   settled.  This -- the Rule 408 doesn't apply to just the

2   settlement that you want to undertake.  It applies to all

3   settlements.  You cannot admit evidence of the conduct or the

4   negotiations of a settlement discussion and the -- and I think

5   there's good reason for it.  We've all settled cases.  We all

6   know why we settle cases.  We settle cases because we don't

7   want to go to trial.

8       MR. FINCH:  Your Honor --

9       THE COURT:  And if we have to go to trial, our

10  litigation posture and position is much different than our

11  settlement strategy.

12      MR. FINCH:  Your Honor, with all due respect there's

13  a case directly on point on this exact issue.  The Babcock and

14  Wilcox case.  It's 274-Bankruptcy Reporter --

15      THE COURT:  Cite it in your motion.  I'm not -- I

16  don't have a motion before me.  What I'm trying to find out is

17  why you care.  Because in your motion -- and I'll deal with it

18  in the Motion to Compel and the response.  Because unless you

19  can show me how getting into Grace's settlement discussions is

20  going to lead to evidence that you can admit in this case,

21  which is what I'm having the difficulty understanding, I don't

22  think you're entitled to it.  Having said that, the Debtor is

23  not eligible to use it either.  The Debtor can't introduce the

24  reasons why it settled a case any more than you can introduce

25  the reasons why the Debtor settled a case.

1      MR. FINCH:  Your Honor, in every asbestos,

2  fraudulent transfer or estimation case that I've tried -- and

3  I've tried six of them -- there have been testimony from

4  defense lawyers or claims adjusters who would come in and say,

5  we would settle these cases because they reflected real

6  liability.  I --

7      THE COURT:  These aren't fraudulent transfers.

8      MR. FINCH:  No, in asbestos -- the Armstrong case.

9  We've put on the testimony -- the defense Counsel for Armstrong

10  and the claims settlement for Armstrong.

11      THE COURT:  This is not a fraudulent transfer case.

12      MR. FINCH:  It's not a fraudulent --

13      THE COURT:  It's an asbestos personal injury case.

14  And I don't care what reasons at this point in time you did in

15  some other case and why some Judge let it in --

16      MR. FINCH:  It was -- it wasn't --

17      THE COURT:  -- including me.

18      MR. FINCH:  It wasn't the -- it was the Armstrong

19  confirmation hearing.  It wasn't a fraudulent transfer case.

20      THE COURT:  Okay.

21      MR. FINCH:  It was the exact issue we're trying

22  here, which is what was the overall magnitude of Armstrong's

23  asbestos liability.  The same issue was in Owens-Corning.  The

24  same issue in Federal Mobil.  All those cases say you can get

25  into the settlement history and the settlement history is

1  relevant and admissible for proving the liability of the

2  Debtor.

3      THE COURT:  They've all gone into the settlement --

4  the fact that there have been settlements and what those claims

5  where that were settled at what amount.  As far as I know, they

6  did not reopen up the settlement negotiations.  I've read some

7  of those transcripts, including the Armstrong estimation

8  transcript, and I don't recall a single word there where the

9  parties went into the reasons for pre-petition settlements that

10  someone was objecting to as the basis of the fact that you

11  can't bring it into evidence because it reflected a prior

12  settlement.

13      MR. FINCH:  Your Honor, we will address this --

14      MR. BERNICK:  Your Honor, can I make a request as a

15  matter of process?  Which is that I think this is a great

16  discussion and I'm happy that Mr. Finch raises it.  I'm

17  familiar with it.  I could respond to all the different

18  elements of it and talk about Babcock.  But I think that Your

19  Honor has given a preview of a concern that you have.  He's

20  given us a preview of the position they're going to take, which

21  we appreciate.  If the question is, will we agree with their

22  view that this doesn't have to be submitted to the mediator

23  first --

24      MR. FINCH:  Yes.

25      MR. BERNICK:  I would agree with that.  I think that

1  this is important enough that it should come before Your Honor

2  in the first instance --

3      THE COURT:  Okay, that's fine.

4      MR. BERNICK:  -- and therefore they should go file

5  their motion and we'll respond to their motion.  I do want to

6  make clear though, because I'm now sitting here listening to

7  the statement again and I hear characterizations of what we've

8  said in Court being characterized as waiver.  We have waived

9  nothing.  They've raised an issue which is the intent to rely

10  upon the settlements and they said this is why we think it's so

11  important.

12      I've made a bunch of observations about why those

13  settlements don't stand for what they say they stand for but

14  it's their contention that those settlements are relevant.

15  What we say by way of a response to it doesn't mean that we've

16  waived anything.  So I -- but to be clear, it is our position

17  we are not waiving our rights under Rule 408 and we will

18  respond to their motion in due course.  I'm happy to have it

19  teed up at an early date to get resolved.  I think that that's

20  also appropriate.

21      THE COURT:  Okay.

22      MR. BERNICK:  I'd also say it's also appropriate to

23  take it up perhaps in connection with our Motions to Compel at

24  an early date because if they're going to seek discovery of why

25  we have settled, we're going to seek discovery for why they

1   have settled and why their claims were worth only $200 for a

2   lung cancer -- why that is so.  I mean, it -- the -- there's

3   all these things are connected.  And I think that rather than

4   spend more time on it today, I think Mr. Finch has given us a

5   heads up.  We're agreeable not to mediate it.  We're agreeable

6   to a more expedited schedule.  Let's just file the papers and

7   proceed.

8        THE COURT:  What I expect to hear from the Debtor is

9   an assertion as to whether or not the Debtor intends to get

10  into the reasons why cases were settled.  If you do, I'm going

11  to let them do discovery, because they're entitled to challenge

12  it.  If your position is going to be that as a legal matter,

13  the settlements are irrelevant somehow, or shouldn't be

14  considered for whatever reason you raise -- without getting

15  into the merits, then I don't know that there is an entitlement

16  to --

17       MR. BERNICK:  Fair enough.

18       THE COURT:  -- discovery because neither side can --

19  as I understand it -- do this.  So I think --

20       MR. BERNICK:  Well, Your Honor, if they --

21       THE COURT:  -- you folks should discuss the matter

22  and --

23       MR. BERNICK:  Yes.

24       THE COURT:  -- see whether or not you can come to an

25  agreement as to what you are and are not going to raise by way

1  of an evidentiary matter with respect to these pre-petition

2  settlements.  I agree with you, Mr. Finch.  Every other Court

3  that I know of that's looked at this has considered the pre-

4  petition settlements.  So the Debtor is going to have to show

5  me if they don't want me to consider them, why they shouldn't.

6      But that is not my understanding of what the Debtor's

7  contention has been.  My understanding is we're going through

8  this questionnaire process as to claims that have not yet been

9  paid so that somebody can say the existing universe of claims

10 are valued at these dollars for these reasons.  And among them

11 for example, hypothetically, maybe this universe of claims is

12 valued at 0 because there is no evidence of any impairment.

13 You know, that might be something that they allege with the

14 existing, unpaid, unsettled claims.

15     MR. FINCH:  But I'm --

16     MR. BERNICK:  Again, my point, Your Honor, was a

17 process point which is that we -- and I would dearly love to

18 respond to what Your Honor has said about the other cases.  I

19 won't do that.  We've spent a lot of time on this today and I

20 think that this is far too important a discussion that is kind

21 of contours of where things are going to be spending time on it

22 now as opposed to in the very systematic fashion --

23     THE COURT:  All right.

24     MR. BERNICK:  -- when we get to it.  And therefore I

25 would respectfully ask the Court to suggest to all the parties

1  that we move onto something else in the status report and maybe

2  conclude so that folks can pursue their other travel

3  arrangements.

4      MR. FINCH:  Well, may I suggest that the Court just

5  give us a briefing schedule for this?  I mean --

6      MR. BERNICK:  Well --

7      THE COURT:  Sure, why -- well --

8      MR. BERNICK:  -- it really ought to be tied to when

9  we're going to have the brief -- maybe we can do it this way.

10  We would like to ask the Court to have maybe a special setting

11  that would be the same time when we take up the Motion to

12  Compel on the questionnaires, in -- you know, late November,

13  early December.  And if they want to file a motion with respect

14  to the discovery of our claim files, we will respond on a basis

15  that we have them both teed up on the same day.

16      THE COURT:  Wait.  I -- do we have December dates?

17      THE CLERK:  Omnibus dates?  Or --

18      MR. FINCH:  Special -- a special setting date --

19      THE COURT:  Special setting.

20      MR. FINCH:  -- for the first week of December,

21  possibly.

22      THE CLERK:  Well --

23      THE COURT:  December 5th?

24      THE CLERK:  Do you have that --

25      THE COURT:  I don't -- I must have left it in --

1    THE CLERK:  December 5th, I think we have --

2    MR. BERNICK:  Maybe while she's --

3    THE COURT:  Go ahead.

4    MR. BERNICK:  I was going to suggest that maybe if

5  there's something else that you all wanted to address as

6  concerns the status report?

7    MR. FINCH:  Sure.  The -- yeah.

8    MR. BERNICK:  Yeah.

9    MR. FINCH:  The second item you raised on the status

10  report was about the request for X-rays.  I didn't regard the

11  questionnaire as asking people to submit original X-rays.  I'm

12  not aware of any law firms being contacted by Grace asking them

13  to submit their original X-rays.

14    As I recall the questionnaire, it said send in your B

15  reader report or your X-ray report or your narrative diagnosis,

16  and then Grace reserves the right to come back and seek the

17  original X-rays.  Once you get into trying to obtain original

18  X-rays, there's all kinds of custody problems and you know,

19  people have these X-rays out in a hospital, they maybe need the

20  X-rays to use in a case that they're going to trial in.  They

21  can't just turn them over to Grace willy-nilly for you know,

22  however long Grace decides to --

23    MR. BERNICK:  We had this specific discussion, Your

24  Honor in connection with the questionnaire because we were

25  concerned about getting discovery from the law firms.  Your

1  Honor said, "No, you can get medical material from the doctors

2  and please attach all X-ray readings and reports you may -- but

3  are not required to attach."  The Court however has ruled that

4  Grace may seek access to chest X-rays upon request.  So that

5  was specifically preserved for us.  Not that the issue was

6  preserved.

7      MR. FINCH:  I understand.

8      MR. BERNICK:  But that we are going to be able to

9  get access, we have now made the requests by letter --

10     MR. FINCH:  Okay.

11     MR. BERNICK:  -- to all --

12     MR. FINCH:  That explains why I haven't seen it.

13     MR. BERNICK:  -- firms -- yes.

14     MR. FINCH:  Could you please copy me with the

15  letters?

16     MS. HARDING:  He will copy me.  It just went out

17  over the weekend I think.

18     MR. FINCH:  Okay.  Then, suffice it to say, Your

19  Honor, the law firms and/or the Asbestos Claimants Committee

20  may well have issues with the -- what Grace wants to do with

21  the X-rays.  And you know, you may have to resolve that through

22  either a --

23     THE COURT:  Well, obviously if somebody needs them

24  in a hospital and can't give it up, and a copy can't be made,

25  then the Debtor is going to have to, you know, be given access

1  to them where they can be located.  But can't X-rays be copied?

2      MR. FINCH:  They're relatively expensive to copy an

3  X-ray.  I mean, it's $100, $200 process that --

4      THE COURT:  Well, if the Debtor wants them and wants

5  them badly enough, then we'll have to figure out working out

6  some kind of cost if that's the case.

7      MR. BERNICK:  Well, we -- it is the only way that we

8  have to go back through this process and establish to the Court

9  what the standard read would have been.  So it's --

10      THE COURT:  You're only asking for this for the

11  doctors -- in {quotes} "Judge Jack doctors," is that the case?

12      MR. BERNICK:  Let me defer to Ms. Harding, who is

13  much more familiar with this than I, to specify.

14      THE COURT:  All right.

15      MS. HARDING:  Your Honor, in the letter, we've

16  requested for diagnosing doctors or treating doctors, copies of

17  X-rays.  Obviously they -- we don't want to take their original

18  X-rays.  For B reading doctors or doctors that are not their

19  treating or diagnosing doctors, we've asked for originals.

20      MR. FINCH:  All I can say is, Your Honor, the -- you

21  may well be getting objections to such requests and/or, you

22  know, Motions for Protective Order from people to -- relating

23  to the handling and care and treatment of those X-rays.  I

24  just --

25      THE COURT:  Yes, I --

1      MR. FINCH:  -- flag it as an issue.

2      THE COURT:  I think that is going to be a problem

3  that we'll have -- we may have to address.  But hopefully if

4  the Debtor is going to send them to, you know, people who are

5  familiar with reading X-rays and that's the point of having the

6  X-rays, those people will be aware of the need to handle the X-

7  rays appropriately and not cause damage.  And I assume that

8  they can be given back at a certain point in time.

9      MR. BERNICK:  Absolutely, and remember, we focused

10  on a narrow population to begin with.  And with respect to --

11      THE COURT:  Well, okay.  With respect to that narrow

12  population, to the extent that you're getting information from

13  actual diagnosing doctors, not the Judge Jack doctors, do you

14  really need the X-rays?

15      MR. BERNICK:  Yes, because the X-rays are what the B

16  readers for the lawyers will rely upon to say -- you know, lot

17  of people smoke, lot of people get lung cancer.  Is this lung

18  cancer a result of asbestos exposure?

19      THE COURT:  Oh, I see.

20      MR. BERNICK:  So the X-ray is not for purposes of

21  questioning the diagnosis of lung cancer.  It is to determine

22  whether the lung cancer is asbestos-related.  So it has to be

23  read for that purpose.  And remember, these again, are all

24  claims for people who had claims pending against Grace as of

25  now five years ago.

1     So you know, these are -- this is not necessarily

2   something that is in immediate use right now.  We've also

3   focused it on lung cancer and other cancers -- not mesothelioma

4   and not at this point the non-malignants, although we will get

5   to that perhaps on a sampling basis.  So we've tried to be very

6   conservative about it.

7     If it has to be litigated like everything else here, I

8   suppose it has to be litigated but this again, Your Honor, is

9   something that we did litigate and specifically addressed the

10  question --

11    THE COURT:  No, and I think you're entitled to see

12  them to the extent that I really was focused in that paragraph

13  more I think on the B reader types of problems as opposed to

14  the diagnosing physicians.  But to the extent that you're

15  looking for something that's five years old, if you're -- if

16  that's what you're looking for, the initial X-ray reads, I

17  suppose there may not be quite so much of a problem.  But if

18  somebody was diagnosed five years ago with lung cancer and is -

19  - there may be so many --

20    MR. BERNICK:  We are happy to do -- make the -- to

21  be cooperative in the arrangements that are necessary to get

22  access and obviously somebody who was diagnosed five years ago

23  could well still have current records.  So we're prepared to do

24  -- that's why we --

25    THE COURT:  Or may be deceased and there may be no

1  need for current records.

2      MR. BERNICK:  Or there may be no need for current

3  records.  So the point is, we got the request out there.  If

4  people come in and say, Your Honor, it shouldn't have happened

5  at all, then we're really not making much progress.  If people

6  want to come in to us and say how can we make arrangements so

7  that this is as -- you know, as convenient or less inconvenient

8  as possible, that's a dialogue we can make a lot of progress

9  on.

10      What I'm worried about is that we're going to now spend

11  another 30 days litigating the question of whether this process

12  should take place at all.  And Your Honor, our view is and our

13  consistent position has been this has been gone over, Your

14  Honor has made this determination and people ought now to be

15  talking to us about how to get it done.

16      THE COURT:  Well, the Debtor can reach out to people

17  too, to try to get it done.

18      MR. BERNICK:  We're trying to.

19      THE COURT:  Okay.  Well, I think I've already

20  determined that you can make this request to the extent that

21  your B readers or doctors -- whoever -- excuse me -- you're

22  going to use need access to the X-rays, that's one thing.  To

23  the extent that the X-rays are five years old, I have some

24  doubts except for the fact that people may need them to compare

25  changes.  But if they're for lung cancers, the likelihood is --

1      MR. FINCH:  Yeah, well --

2      THE COURT:  -- that --

3      MR. FINCH:  -- Your Honor, most of the lung cancer

4   claimants who were diagnosed more than five years ago are dead.

5      THE COURT:  That's --

6      MR. FINCH:  Or 95% of them.  But it doesn't mean

7   they've been able to get their -- that the Estate has been able

8   to get their case to a trial yet.  The docket in some places

9   may well be five years long or more.  So there will -- there

10  could possibly be some situations where people have X-rays who

11  they need to go, you know, use in a trial somewhere even though

12  the person whose X-ray it is, is dead.

13     THE COURT:  Well --

14     MR. FINCH:  But all I'm saying is I'm flagging the

15  issue that there may well be --

16     THE COURT:  Okay.

17     MR. FINCH:  Either motions practice or an issue

18  related to this.

19     THE COURT:  That's fine.  I mean, to the extent that

20  they're alleging that Grace's asbestos caused the problem, they

21  have to prove the claim in this case, so they're going to have

22  to produce the X-rays in this case.  This is the Federal Court,

23  unless it's a District Court where they're trying a case and

24  therefore, I don't get the supremacy clause in my favor --

25     MR. FINCH:  Your --

1      THE COURT:  They produce them here first and we

2  worry about the State Courts later.

3      MR. FINCH:  Your --

4      THE COURT:  That's my ruling, Mr. Finch.

5      MR. FINCH:  Your Honor, though, but the -- nobody's

6  claim is getting allowed or disallowed, I thought, in this

7  case?

8      THE COURT:  Mr. Finch, it's for estimation purposes.

9  They need to produce that proof.  Let's just get past it.

10  Okay.  But, yes, you need to work with the Debtor.

11      MR. ESSERMAN:  Your Honor, this is Sandy Esserman.

12  Can I make a couple quick statements?

13      THE COURT:  Yes, sir.

14      MR. ESSERMAN:  As to the X-rays, hopefully those

15  will get worked out.  I'm not familiar and have not heard from

16  any of the firms that I represent as to whether or not X-rays

17  have been requested but it would seem to me it would certainly

18  go a long way, since the reproduction of an X-ray can be

19  expensive, if Grace would offer to pay for any copies that

20  would be made because I suspect that people would be very

21  reluctant to let loose the only X-ray they have, especially

22  when the client may be either ill, inform or deceased and that

23  could be a problem.  Just sort of previewing that issue.

24      The next thing I just wanted to preview was on the

25  extension.  I have heard from many law firms and to a certain

1  extent but very limited, I do agree with Mr. Bernick in this

2  sense -- that is, it makes no sense to give, say, a 60-day

3  objection, only to get to the end of the 60 days and say, oh,

4  by the way, I object to everything that you're seeking and I'm

5  not going to give you any additional information.  That -- Mr.

6  Bernick is correct in that, that doesn't make any sense.

7      What I'm hearing from the firms that I represent that have

8  large numbers of clients is that it -- they will need an

9  additional 60 days to provide information.  There may be some

10  additional objections -- or not additional.  There may be some

11  objections that need to be addressed before that time, but for

12  the information that they are providing in the questionnaires

13  that is going back and giving information in the

14  questionnaires, when that time is requested, it's my

15  understanding -- and it would only come from me that that would

16  -- that time would be necessary to complete the questionnaires,

17  objections aside.

18      And it may be that we have to address objections sometime

19  during the next 30, 45 days or so.  But the parties will still

20  need that additional time to complete the supplementation of

21  their questionnaires.

22      THE COURT:  Okay.

23      MR. ESSERMAN:  Just wanted to make sure that was

24  clear.

25      THE COURT:  All right, Mr. Esserman.  Well, the only

1  day I have -- in fact, I have a half a day between now and the

2  December Omnibus that would fit in with the Debtor filing

3  objections after November 12th is Tuesday, December the 12th at

4  -- I -- we could start at -- was that Virgin Islands early?

5      THE CLERK:  In November the 12th?

6      THE COURT:  No, you've got December 5th.  I'm sorry.

7  Did I say December 12th?  I apologize.  December 5th.  I'm

8  looking at the wrong day in the calendar.  Tuesday, December

9  5th.  That was the Virgin Island hearing date?

10      THE CLERK:  Something was on --

11      THE COURT:  Morning.  I think we could start at 1

12  o'clock.  So I could give you --

13      MR. FINCH:  So this would be --

14      THE COURT:  -- the afternoon.

15      MR. FINCH:  -- a hearing both on the Motions to

16  Compel and the questionnaire and then on the Committee FCR

17  Motion to Compel the production of Grace's lawyers' files?

18      MR. BERNICK:  Wait a minute.  I'm sorry, lawyers'

19  files?

20      MR. FINCH:  Well, the -- specifically it's the

21  Motion to Compel response to document request 47 and 66, which

22  are related to Grace's settled claims.  Reasons for settlement.

23      MR. BERNICK:  Is that right?  Yeah, we don't have a

24  problem with that.

25      MR. FINCH:  No, we don't have a problem with --

1      MR. BERNICK:  But if that's going to be the case, it

2   -- well, first of all, I guess the question is whether Your

3   Honor, that would be all right to schedule those two matters on

4   that day?

5      THE COURT:  Yes, that's fine.  You'll have from 1

6   o'clock until we --

7      MR. FINCH:  Finish.

8      THE COURT:  -- we finish.

9      MR. BERNICK:  Then I would go back to Mr. Esserman

10  and Mr. Finch as well and say if those matters are going to be

11  heard on the 5th of December, we're going to file -- we would

12  like to file a motion that tees up the issues on the

13  questionnaires and if we're going to do it on that timetable

14  basis, and it's going to be, both sides get what they want in

15  terms of timing, we need to be able to have people who are

16  prepared to tell us that they're actually going to be objecting

17  and we don't have to wait to go sift through thousands of

18  questionnaires on November the 12th.  That's just not fair.

19  So, you know, Mr. Esserman represents -- I don't know how many

20  -- 10 firms?

21      MR. ESSERMAN:  Yes.

22      MR. BERNICK:  Yeah.  So, let's have -- let us have

23  then -- your clients be prepared within the next week to tell

24  us what objections they're going to be standing on, so we can

25  file a motion.  You all can respond and will be heard on the

1  5th of December.

2      MR. ESSERMAN:  We can certainly try to get as much

3  of that information --

4      MR. BERNICK:  Well, but --

5      MR. ESSERMAN:  -- as to what objections that these

6  firms are still insisting to you during this time frame.

7      MR. BERNICK:  I appreciate that.  I mean, Your

8  Honor, our point obviously is that we're prepared to be

9  cooperative.  Mr. Finch has got a matter that he would like to

10  raise on a timely basis.  We've got a matter that we would like

11  to raise on a timely basis.  We're prepared to do the

12  scheduling but we need -- we do need folks like Mr. Esserman

13  and his clients not to simply be waiting 'til the 12th of

14  November to tell us what it is that they're going be objecting

15  to.

16      If they would give us, you know, what their big objections

17  are within a week, we will move to compel and we can proceed.

18  We don't want to sit here and then up on December the 5th with

19  a bunch of people saying oh, well, gee, you know, it's not

20  timely and it's got to shift over to December -- to January --

21  only then to go forward on the motions that they haven't even

22  filed that relate to us.  It's just not appropriate.

23      THE COURT:  Well, you obviously need to know what

24  some of the objections are going to be or you can't very well

25  file a Motion to Compel.  So --

1     MR. BERNICK:  Right.

2     THE COURT:  -- you know --

3     MR. BERNICK:  We can file the Motion to Compel

4  tomorrow and then wait 'til the 12th and then kind of go

5  sifting through and finding out who it's going to apply to and

6  try to deal with it.  It's just kind of silly.  We just ought

7  to have, with respect to some of these major firms who have

8  thousands of claims, what their position is.  It's just not

9  that hard.

10     MR. ESSERMAN:  Yeah, I think we will endeavor to try

11  and get that information to Mr. Bernick, Your Honor, as to what

12  issues may be outstanding so we can try and tee things up on

13  December 5th.  Once again, notwithstanding that, the major

14  firms will need -- I've been informed, 60 days to complete the

15  questionnaires regardless.  If -- I think maybe at that day we

16  can perhaps tee up some of the issues that Mr. Finch raised

17  about X-rays also.  Although this is the first I've heard of

18  that.

19     MR. BERNICK:  I'd like to propose we take this one

20  step at a time.  If we're in agreement that we're going to have

21  December the 5th as Motions to Compel with respect to document

22  request 47 and 60 --

23     MR. FINCH:  66.

24     MR. BERNICK:  -- 60 -- I'm sorry?

25     MR. FINCH:  6 -- I think.  I'm doing this off of

1  memory.

2      MR. BERNICK:  Well, whatever it is --

3      MR. FINCH:  But I think it's 47 and 66.

4      MR. BERNICK:  -- that you mentioned before is fine.

5  But we're going to have Motion to Compel and the

6  questionnaires, I think that we can probably work out a

7  schedule -- Mr. Finch, Mr. Esserman and I -- or Ms. Harding,

8  that deals with the briefing on that so that you get those

9  briefs in a timely fashion.   With respect to the -- Mr.

10  Esserman's request that his clients be given by the Court at

11  this time a 60-day extension even on the matters that are not

12  subject to the objection, we would very vociferously disagree

13  with that.  There has been eons of time to do that and I think

14  it's not appropriate, Your Honor said last time it ought to be

15  done in 30 days.  30 days is coming up.  This is the very

16  reason why there should be a dialogue.  We're prepared to reach

17  agreements with these people and --

18      THE COURT:  Well, that's what I think I ordered.

19      MR. BERNICK:  Yeah.

20      THE COURT:  What I said is it should be done in 30

21  days but I recognized at the same time that there were firms

22  who had a huge client base that it would probably take more

23  than 30 days to answer these questionnaires and I --

24      MR. ESSERMAN:  And that's what I'm referring to.

25      MR. BERNICK:  Well, that is what we ought to be

1  talking about instead of asking the Court to grant a two-month

2  extension that will just --

3      MR. ESSERMAN:  I'm not asking the Court to grant a

4  two-month extension right now to anything.  I'm informing the

5  Court as part of the status conference as to where things are

6  so people can understand that the law firms are out there

7  working on these questionnaires.  Initial feedback is that

8  they're -- that the major firms with lots of questionnaires to

9  respond to are going to need 60 days to complete those

10 questionnaires.  It's a status conference.

11     THE COURT:  Mr. Esserman, can -- are -- as the firms

12 get the questionnaires done, are they submitting them to the

13 Debtor piecemeal rather than holding them all at one -- to one

14 time?

15     MR. ESSERMAN:  I have no idea, Your Honor.

16     THE COURT:  Okay.  Is there a way that we can get

17 that done so that as the questionnaires come in, that it can be

18 a sliding scale?  Because I think part of the --

19     MR. ESSERMAN:  I think that's a good idea.

20     THE COURT:  I think part of the problem is the fact

21 that the Debtor isn't getting batches of information at a time.

22 And when you get everything at one time, it's too hard to

23 process.  So if we can get the questionnaires submitted to the

24 Debtor as they're completed, then I think at least the Debtor

25 will be able to start amassing whatever information it wants to

1   get from those questionnaires and the time frame may not be so

2   onerous, you know, if the Debtor is waiting for 15% of the

3   questionnaires for 60 days rather than 100%, that may be

4   workable.  But if you're waiting for 100% it's not workable,

5   so --

6        MR. BERNICK:  They usually --

7        MR. ESSERMAN:  No, I agree, Your Honor.

8        MR. BERNICK:  -- come in at the last day.

9        MR. ESSERMAN:  That makes perfectly logical sense.

10        THE COURT:  Okay.  So how do I communicate an order

11   then to get the questionnaires to the Debtor as they're

12   completed -- including the objections.  I mean, if what the --

13   if what they're -- if what the entities are going to say is

14   that they object and they're not going to complete questions X,

15   Y and Z, and everything else is finished, then that ought to be

16   submitted to the Debtor now.  There's no need to wait.

17        MR. BERNICK:  Yeah.  It seems to me that maybe if we

18   can call upon recognizing that as has been said repeatedly,

19   that the Asbestos Claimants Committee does not actually

20   represent the claimants individually, certainly we could ask

21   that Counsel for the Committee simply circulate a letter

22   reflecting what Your Honor has said to the different law firms.

23   That's the best way to get it done and get it done soon.

24        MR. FINCH:  What, that the -- that questionnaires be

25   sent in -- I'm not sure what I mean by --

1     MR. BERNICK:  That we don't wait -- that all the

2  questionnaires don't come in on the date that they're due.

3  Instead we get the questionnaires on a steady basis --

4     THE COURT:  You -- I --

5     MR. FINCH:  I don't have any --

6     MR. ESSERMAN:  If the firms --

7     MR. FINCH:  -- ability to know how -- I mean --

8     MR. BERNICK:  Well, you don't have to --

9     MR. FINCH:  All I could do is send a letter saying

10  we would suggest to you that you send the questionnaires in

11  when you complete batches of them as opposed to waiting and

12  holding all of them at the -- when it's the same time.

13     THE COURT:  No, I think the thing to do is to say

14  that, you know, at the end of every business day, every

15  questionnaire that's completed should be mailed to the Debtor

16  that day, including if, you know, if they're going to be

17  objected to, then that fact -- the fact that they're not going

18  to answer and that they're objected to should be sent to the

19  Debtor.

20     Everybody's going to want to make use of this information

21  at some point.  So let's just get it in and get the information

22  done.  If the firms can't complete the questionnaire, then they

23  won't be sent in at that time.  But if they're finished, they

24  ought to be sent in.  There's no point to hiding this

25  information at this point.  It's going to become -- come into

1   the Debtor anyway.  Let's get it done.  So --

2      MR. BERNICK:  With respect to the -- I mean, seems

3   to me another solution is simply I could suggest that -- may

4   want to write a letter that just says what -- attach the

5   transcript, here's what the Court said.

6      THE COURT:  Why don't you give me an order and I'll

7   sign an order that tells people as they get the questionnaires

8   done at the end of every business day they're to mail them to

9   the Debtor.  If it takes an order, honestly, I can't imagine

10  that -- I've just never seen a process like this.  I can't

11  imagine that it takes a Court Order to have somebody send in a

12  questionnaire that they're going to answer anyway earlier

13  rather than later when it's done.

14     MR. ESSERMAN:  I don't think it does take a Court

15  Order, Your Honor.  I think a communication from the Committee

16  and -- would be sufficient as to what the Court wants -- that

17  is as the questionnaires are done, they're to be turned in on a

18  rolling basis.

19     THE COURT:  Yes, that's really all it takes.  I

20  don't understand why the Committee can't prepare that type of

21  letter and reflect this Court's ruling.  But if you can't

22  then --

23     MR. FINCH:  No, I can prepare that letter, Your

24  Honor.  Unless you're just saying I can't prepare that letter.

25  I just can't guarantee that every single day people will be

1   stuffing envelopes.  All I can do is tell people to comply with

2   the Court's Orders and send the materials in on a rolling

3   basis.  I don't --

4        THE COURT:  That's fine.

5        MR. FINCH:  -- know whether some firms might hold --

6   you know, wait until they get enough to put in a box and --

7        MR. ESSERMAN:  I think that'll be -- that should be

8   sufficient.

9        THE COURT:  That's fine.

10       MR. BERNICK:  With respect to the X-rays, if I can

11  suggest to Mr. Esserman, who is effective in this area as in

12  all things, that again on behalf of his clients if we could

13  have a dialogue -- we're prepared to do it as soon as possible

14  -- about the best way to get access to these X-rays without

15  causing inconvenience.  I'm sure whatever it is that we could

16  reach agreement on with Mr. Esserman would be eminently

17  satisfactory to all others concerned.  But we're prepared to

18  have that discussion right away so that we don't wait for, you

19  know, a special setting or special hearing to hash it out.

20       THE COURT:  All right, did --

21       MR. ESSERMAN:  And that's fine, David.  I would like

22  to know who have you requested X-rays and how many X-rays --

23       MR. BERNICK:  Yeah.

24       MR. ESSERMAN:  -- per law firm.

25       MR. BERNICK:  We'll get you --

1      MR. ESSERMAN:  That would be helpful.

2      MR. BERNICK:  We will get that information to you.

3      MR. ESSERMAN:  Okay, thank you.

4      MR. FINCH:  I mean, it may be that what ends up

5  happening is you put up -- have like an X-ray repository where

6  you gather the X-rays in some place and then they can send

7  their B readers there and look at the X-rays and --

8      MR. BERNICK:  And we're not -- no, no, no --

9      THE COURT:  That probably -- that may make sense.

10      MR. FINCH:  That is all --

11      MR. BERNICK:  Well, if the B readers have got to be

12  -- the way that the B readers do their reading is they have

13  other jobs and they have other activities and they need to have

14  access to them so they're not camping out in some facility

15  waiting for the X-rays to show up.

16      THE COURT:  That may make some sense, Mr. Finch.

17  You can talk to Mr. Esserman about how to get this done.

18      MR. FINCH:  I mean, I have been involved in personal

19  injury litigation before where you -- there's been a central

20  medical record repository for multiple claimants.  And rather

21  than shipping, you know --

22      MR. BERNICK:  We've got a central shipping point.  I

23  guess the point is not where they're shipped to.

24      THE COURT:  Well, I think the handling --

25      MR. BERNICK:  It's where they're reviewed.

1      MR. FINCH:  No, it's the handling.

2      THE COURT:  Yes, the handling.

3      MR. FINCH:  It's the handling and the review --

4      THE COURT:  The handling and the -- yes.

5      MR. FINCH:  -- and the doctors come to where the

6  records are.

7      THE COURT:  The handling and the review's the issue.

8  I'm certain that you'll be able to work this out.  If a central

9  repository makes sense, do it that way.  If you have to send

10  your B readers there, then tell them to take three days off and

11  go read X-rays for three days.

12      MR. BERNICK:  Yeah, well, and then the question will

13  be -- and we're prepared to talk about this on any kind of

14  basis that makes sense -- we need the date when the X-rays are

15  going to be there.  And it's got to be fairly soon for this

16  process to work.  We can't have it coming in dribs and drabs

17  and we can't --

18      THE COURT:  Well, when does your letter ask?

19      MR. BERNICK:  -- have it be all -- what?  30 days.

20      UNIDENTIFIED SPEAKER:  Within 30 days.

21      THE COURT:  Okay, so talk to Mr. Esserman about how

22  to do it, and Mr. Finch too.

23      MR. BERNICK:  Your Honor, I don't know -- did you

24  have anything else that you wanted to raise?

25      MR. FINCH:  I don't have anything else.  I believe

1  Counsel for the Futures rep has brief comments and remarks.

2  And I'm --

3      THE COURT:  All right.

4      MR. FINCH:  -- on the same train that you are, so --

5      MR. BERNICK:  Okay.  We're all on the 5:15 train.

6      THE COURT:  I wouldn't plan on that if I were you

7  folks.  Go ahead.

8      MR. MULLADY:  Good afternoon, Your Honor.

9      THE COURT:  Good afternoon.

10     MR. MULLADY:  Ray Mullady for the Future Claimants

11 Representative.  This is my first occasion to address the Court

12 and I appreciate the opportunity, even if it comes at 4:45 and

13 people are trying to make trains.  I will be brief.

14     But I do want to briefly address the FCR's view of the

15 status of things.  And where we think this questionnaire

16 process and indeed the entire estimation methodology that's

17 being advanced by the Debtors is taking us, because it's our

18 view, and I believe Mr. Finch shares this view as well, that

19 it's taking us to a place where ultimately this is not going to

20 be a very helpful process for the Court.

21     And I want to just point out a few of the things that we

22 are seeing.  It's appropriate, I think to point these things

23 out to the Court as early indications of where we think we're

24 going.

25     MR. BERNICK:  Your Honor, as a process point again.

1  The agenda calls for a status report with respect to the

2  personal injury claims -- the asbestos PI claims.  It does not

3  call for a report on the current observations of current

4  Counsel for the FCR and where the --

5      THE COURT:  Mr. Bernick, I have given the Debtor

6  every leeway.  Please sit down and let me get through this.

7  You want to make your train, I'd like to get off the Bench.

8  Mr. Mullady, please proceed.

9      MR. MULLADY:  Thank you, Your Honor.  All right,

10  Your Honor, I think we've seen at this point that the Debtor's

11  approach is as I said taking us to a place where estimation for

12  plan confirmation purposes is not going to be very helpful.

13  And why is this so?

14      Well, there are two principal problems as we see them.

15  Mr. Bernick -- and I've read the prior transcripts -- he likes

16  to talk about elephants in the room.  There are two mastodons

17  that are staring us down in terms of this questionnaire process

18  and what the Debtors have advanced here.

19      The first is a -- is just the cumbersome nature and the

20  glacial pace of this process.  I don't need to belabor this

21  point.  The Court made the observation at the last hearing that

22  this has been a tortuous path, one that the Court may not

23  repeat again.

24      But let's just look at the time line here briefly.  It is

25  October the 23rd.  Estimation reports are due on December the

1    1st, a little over a month from now.  Your October 12th Order

2    on Grace's Motion to Compel requires that supplementation of

3    the questionnaires be provided by November the 12th.  Three

4    days later we're going to have -- we have the bar date.  And

5    we're going to have Proof of Claim forms streaming in on those.

6    Presumably within a week or two after that, Grace will once

7    again update the Russ database.  Several law firms have

8    indicated that they're going to be doing supplementations.  Mr.

9    Bernick said that he has no idea what those supplementations

10   are going to be.  A lot of uncertainty there.

11        Ultimately this is going to be worked in, we assume, to

12   yet another draft of the Russ database.  Our experts have

13   already been provided several of these draft iterations of the

14   Russ database.  We wonder if we will ever get a final version.

15   And how much time should our experts have to play around with

16   draft versions of this database before we get the final one?

17        THE COURT:  Well, you can't get it until the Debtor

18   has it.

19        MR. MULLADY:  I understand that, Your Honor.

20        THE COURT:  So --

21        MR. MULLADY:  It's -- again, it's just our

22   observation that the way this process is working is we are

23   going to be in the position of having to provide estimation

24   reports, having not received even a remotely close to a final

25   version of the Russ database until almost the eve of when our

1  reports are due and that's a tremendous concern for us.

2      The second problem, Your Honor, and certainly not second

3  in terms of its seriousness or priority, is just the inherent

4  limitation of this questionnaire process in its ability to be

5  predictive about what would happen to Grace and its claims and

6  ability to resolve claims outside the bankruptcy.  That is,

7  after all, the purpose of this estimation proceeding.  But what

8  are we seeing?

9      Let's just look at a couple examples of where this process

10  does or does not provide complete information.  Mr. Bernick

11  said in Court on September 11 and then again on September the

12  26th that Waters and Kraus, which filed questionnaires on

13  behalf of about 400 people, identified only one mesothelioma

14  claimant.  And the rest did not have any recognized disease, is

15  what he said.  Well, Russ database shows the same thing -- one

16  mesothelioma.

17      In fact, though, of the Waters and Kraus claimants, our

18  information is 116 have had -- have or have had mesothelioma

19  and another 150 are lung cancer claimants.  Now, anyone could

20  have told this or made this determination within about five

21  minutes by looking at the attachments to the questionnaires.

22  But under Russ protocol, if the box isn't checked, the disease

23  diagnosis isn't made and it's as if the disease isn't there.

24      Now, we don't think this is a defensible position for

25  Grace to take.  And we suspect that sooner or later, Russ is

1  going to figure out that the Waters and Kraus claimants have

2  mesothelioma or lung cancers.  But it's an indication, at least

3  at this point, that the iterations of the Russ database that we

4  are getting are worthless.

5       There's another issue and I can just point to the Court as

6  just another example.  There's a firm, Whites & Luxembourg, had

7  a processing deal with Grace.  There are some 12 to 15,000

8  Whites & Luxembourg clients that are not subject to the Bar

9  Order, because they don't have settled claims under the Bar

10  Order.  And they don't have non-settled claims under the Bar

11  Order.  Now, for the FCR's purposes, we know these claims are

12  there.  We know they're future claims.  And they'll have to be

13  evaluated and certainly our experts will take those into

14  account.

15       But it's again another piece of information -- and not an

16  insubstantial one that is not captured within the information

17  that this questionnaire is purporting to provide.

18       THE COURT:  I thought the only group of claimants

19  excused from the Bar Date Order were the settled claims?

20       MR. BERNICK:  That's correct.  Or -- from the Bar

21  Date Order --

22       MR. MULLADY:  Well --

23       MR. BERNICK:  -- the settled claims --

24       THE COURT:  Yes.

25       MR. BERNICK:  -- have to submit a Proof of Claim --

1        THE COURT:  Different claim.

2        MR. BERNICK:  -- for settled claim --

3        THE COURT:  Yes.

4        MR. BERNICK:  -- by the bar date.  So they already

5    had to proceed.

6        THE COURT:  So why aren't the Whites & Luxembourg

7    claims in?

8        MR. BERNICK:  They should be.

9        MR. MULLADY:  No, Your Honor --

10        MR. ESSERMAN:  They're not.

11        MR. FINCH:  These are people who haven't -- who

12    never presented a claim to Grace pre-petition.  They didn't sue

13    Grace pre-petition --

14        THE COURT:  Oh.

15        MR. MULLADY:  -- because they had a processing deal.

16        MR. FINCH:  -- they had a processing deal.

17        THE COURT:  Oh, so they're future claims.

18        MR. FINCH:  They had -- they're future claims.

19        MR. MULLADY:  They're futures.

20        MR. FINCH:  But they're future claims that --

21        MR. BERNICK:  Well, that's fine.

22        MR. FINCH:  -- you know they exist.

23        THE COURT:  All right.

24        MR. FINCH:  It's 12 to 15,000 claimants.  It's just

25    that the questionnaire's not going to pick them up.

1      THE COURT:  Well, they're not going to be in the

2 Russ database, if they're future claims and the Russ database

3 is supposed to cover present claims.

4      MR. FINCH:  No, they won't be in the Russ.

5      THE COURT:  Right.

6      MR. ESSERMAN:  Your Honor -- just to clarify this.

7 Basically the only people that submitted Proofs of Claim are

8 those people who'd sued Grace in the tort system.

9      THE COURT:  Right, that's --

10      MR. ESSERMAN:  -- pre-petition.  If you didn't sue

11 Grace pre-petition but had a claim, you had to file a Proof of

12 Claim.

13      THE COURT:  Right.  That's what the bar date --

14 that's what the Debtor asked for for the bar date --

15      MR. ESSERMAN:  Correct.

16      THE COURT:  -- so that it had a finite date as to

17 which to determine for its estimation purposes the universe.

18      MR. ESSERMAN:  Yes.

19      THE COURT:  Yes.  So those claims won't be in the

20 Russ database.

21      MR. MULLADY:  It's a minor point, Your Honor.

22 They're future claimants.  We know about them.  Again, just

23 another example of what's not captured in the questionnaire.

24 And another point, Your Honor, is that, you know, the

25 perception is coming through pretty clearly to us that the

1    Debtor's view is that these questionnaire responses, when fully

2    provided and vetted by their experts, that that response is

3    really the trial-ready claim of that individual claimant.  And

4    this is the case that we would be defending in Court.

5        These are the data points on which we would have defenses.

6    We'd be able to respond to this.  They're nothing but --

7    nothing of the sort, Your Honor.  These are not trial-ready

8    claims.  We -- I'm putting up for the Court to -- see if we can

9    get this focused in.

10    THE COURT:  I'm not going to be able to read that

11    because of the highlighting.  So you'll have to read it to me.

12    MR. MULLADY:  I'd be happy to, Your Honor.  We are

13    serving -- we have served some requests for admissions to Grace

14    to have them concede what we think are some fairly unassailable

15    propositions about what these personal injury questionnaires

16    cover and what they don't.

17        And we've asked, in responding to the Grace asbestos

18    personal injury questionnaire, have asked them to admit that an

19    individual asbestos personal injury claimant was not required

20    to identify all factual testimony, expert witness testimony or

21    other evidence that he or she might seek to introduce into

22    evidence in a trial against Grace involving his or her

23    individual personal injury claim.

24        Obviously, the questionnaire doesn't go there.  Nor does

25    it ask the claimant or require him to gather information that

1   was not yet available, obviously.  Nor does the questionnaire

2   require a claimant to identify all expert witnesses who may be

3   called to testify on his or her behalf in a trial against

4   Grace.  And finally, it doesn't -- the questionnaire doesn't

5   require any claimant to identify all fact witnesses who may be

6   called upon to testify on his or her behalf in a trial against

7   Grace.

8       So at the end of the day, you know, we're going through

9   this process.  It's very cumbersome.  It's very time-consuming.

10  It has pushed the dates out quite far.  And what we're going to

11  have in our view -- the sum total of this is a microscopically

12  small glimpse at a very small number of claims that Grace will

13  take and extrapolate into a sum total of what it believes its

14  exposure is -- it's artificial.  We will have a lot more to say

15  about this in terms of Daubert motions practice and otherwise

16  but these are the concerns that the FCR has at this time.

17      THE COURT:  Well, I think the FCR hasn't exactly

18  expressed those concerns in that format, but the -- I mean,

19  that is, I think what the positions of the parties on the other

20  side -- from Grace -- have been contending all along -- that

21  Grace wants to do this trial one way and they want to do it

22  another.  And I finally couldn't get anybody to agree, so I

23  said, fine, Grace'll do it its way.  You do it your way.  And

24  I'll decide who wins and who loses.  So okay?

25      MR. MULLADY:  And there we are.

1      THE COURT:  Okay.

2      MR. MULLADY:  Thank you, Your Honor.

3      THE COURT:  There we are.

4      MR. BERNICK:  Just as a factual matter, Your Honor,

5  the Waters and Kraus citation was interesting because our point

6  about Waters and Kraus is you took a look at the questionnaire,

7  you couldn't tell anything -- he hasn't filled anything out.

8  Now apparently they went back or somebody went back and did

9  what Waters and Kraus should have done, which is go back to

10  their own medical records and tell us in the box what the

11  disease being claimed was.

12      They hadn't done it.  Waters and Kraus hadn't done it.

13  And Your Honor then ordered them in that hearing that Counsel's

14  talking about to check the box.  And when he talks about the

15  fact that the box wasn't checked that was the very problem

16  that's now been cured because Your Honor has ordered them to

17  check the box and then I'm sure Russ will pick it up.  So I

18  don't know what the point of that was.

19      With respect to Mr. -- the Whites and Luxembourg's

20  processing deal, we're very familiar with that deal.  That's

21  been alleged in other cases.  It's not been found to be upheld

22  in other cases.  In any event it's an irrelevance because the

23  sample is what the sample is.  Presumably, if there's a history

24  of some kind of processing deal, that'll be something that can

25  be incorporated into the analysis.  All the requests for

1  admission about trial-ready claims, I think Your Honor --

2  actually these are overstatements about what the facts actually

3  are.

4      But I think Your Honor has well recognized that this is

5  something that will be litigated as the case proceeds.  I

6  really believe that if the Futures Representative in this case

7  could provide a process here or assistance to help us get the

8  data that we need -- Your Honor has said we're going to get the

9  data.  So if the Futures Representative could figure out ways

10  to help us get the data so that we can make the process less

11  cumbersome, that'd be terrific.

12     But I understand that their position is that they're going

13  to stand by the current claimants in the case.  And we'll have

14  to then also pursue -- whether that's what this futures

15  representative has done in all cases, because there's an

16  inconsistency with respect how Mr. Austern has regarded non-

17  malignant kinds in particular, depending upon what case he's

18  in.  But that's for another day.

19     THE COURT:  Okay.  That part is so far off the

20  beaten path for this subject and I'm just striking the last

21  comment from the record.  I don't want any responses to it.

22  I'm just striking it.  Now, with respect to the Futures Claims

23  Representative position, I don't think you're asking me for

24  anything.  I'm just simply hearing your report.  Okay.  Does

25  anybody else have any reports that you wish to make?  Is that

1  the end of the agenda?  Okay.  So we're on for December the 5th

2  at 1 o'clock in Pittsburgh?

3       MS. HARDING:  Yes, Your Honor.

4       MR. BERNICK:  Thank you, Your Honor.

5       THE COURT:  All right, and then the Omnibus is

6  November 20.  Okay.  Thank you.  We're adjourned.

7       ALL:  Thank you, Your Honor.

8       (Court adjourned)

9

10                     CERTIFICATION
11  I certify that the foregoing is a correct transcript from the
12  electronic sound recording of the proceedings in the above-
13  entitled matter.
14
15  *Lewis Parham*                        11/2/06
16  _____      _____
17  Signature of Transcriber                  Date