*BLACKLINE*

## SETTLEMENT AGREEMENT AND MUTUAL RELEASE

This Settlement Agreement and Mutual Release is made by and between W. R. Grace & Co., on its own behalf and on behalf of ~~all Entities within~~ the ~~definition of~~ Grace **Parties**, and Lloyd's Underwriters, each as defined herein (collectively, the "Parties").

### WITNESSED THAT:

WHEREAS, Lloyd's Underwriters **severally** subscribed to certain policies of insurance that provide, or are alleged to provide, insurance coverage to **certain** Grace **Parties**; and

WHEREAS, Grace and Lloyd's Underwriters entered into an agreement dated November 17, 1995 (the "1995 London Agreement") concerning the application to Asbestos Claims of certain policies of insurance severally subscribed by Lloyd's Underwriters and London Market Companies in favor of Grace; and

WHEREAS, **the** Grace **Parties** and Lloyd's Underwriters agree that the London Market Companies and any other insurance company that may have severally subscribed to or participated on any Subject Polic~~y~~**ies** are not parties to this agreement and any rights that **the** Grace ~~has~~**Parties have** against the London Market Companies or any other insurance company with respect to the Subject Polices, the 1995 London Agreement or otherwise are not being released, compromised or affected by this agreement in any way.  It is acknowledged by Lloyd's Underwriters and **the** Grace **Parties** that the London Market Companies and other insurance companies are not parties to this Agreement~~.~~**; and**

WHEREAS, the 1995 London Agreement resolved disputes concerning policies that were severally subscribed by Lloyd's Underwriters and London Market Companies and that had inception dates prior to June 30, 1985. This Agreement is, effective on the Trigger Date, terminating Lloyd's Underwriters' obligations under the 1995 London Agreement and also is resolving obligations that Lloyd's Underwriters may have to **the** Grace **Parties** with respect to

1

policies issued to Grace that have inception dates of June 30, 1985 or later as more fully described in the definition of Subject Policies in this Agreement. However, with respect to policies that have inception dates of June 30, 1985 or later, this Agreement shall also not apply to London Market Companies or other insurance companies that participated on those policies, whether such companies are parties to the 1995 London Agreement or not—**; and**

WHEREAS, **the** Grace has**Parties have** incurred and may incur in the future certain liabilities, expenses, and losses arising out of Asbestos Claims and other Claims; and

WHEREAS, Lloyd's Underwriters are obligated under the 1995 London Agreement to make certain payments in connection with Asbestos Claims under the Subject Policies identified in the 1995 London Agreement; and

WHEREAS, **the** Grace contends**Parties contend** that Lloyd's Underwriters may also be obligated to make payments under the Subject Policies for Claims other than Asbestos Claims; and

WHEREAS, there are or may in the future be disputes between the Parties regarding their respective rights and obligations with respect to insurance coverage under the Subject Policies with respect to Claims and regarding their respective rights and obligations with respect to the 1995 London Agreement; and

WHEREAS, on or about April 2, 2001, W. R. Grace & Co., W. R. Grace & Co-Conn., and certain other debtors filed reorganization cases pursuant to Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware, jointly administered as Bankruptcy Petition No. 01-01139 (JKF), et seq. (the "Chapter 11 Reorganization Cases"), and Grace and such other debtors continue to operate their businesses as debtors and debtors-in-possession **(collectively, the "Debtors")**; and

2

WHEREAS, the Grace anticipatesParties anticipate that a plan of reorganization (the "Plan," as hereinafter defined) will be confirmed by the Bankruptcy Court in the Chapter 11 Reorganization Cases that the Grace anticipatesParties anticipate will provide for the establishment of a trust (the "Trust") as hereinafter defined) pursuant to section 524(g) of the Bankruptcy Code to process and pay Asbestos Claims involving Grace; andWHEREAS, Grace and Lloyd's Underwriters desire that, upon the creation of the Trust, the Trust shall become a Party to this Agreement; and

WHEREAS, in consideration of certain monetary payments and other consideration as more fully set forth herein, the Parties intend to adopt, by way of compromise, and without (i) prejudice to or waiver of their respective positions in other matters, (ii) trial or adjudication of any issues of fact or law, or (iii) Lloyd's Underwriters' admission of liability or responsibility under the Subject Policies or the 1995 London Agreement, a full and final settlement that: (a) releases and terminates all rights, obligations and liabilities (if any) that the Parties may owe one another with respect to the Subject Policies and the 1995 London Agreement; and (b) fully and finally settles all claims that the Parties asserted or could have asserted against one another pursuant to the Subject Policies and the 1995 London Agreement.

## AGREEMENTS:

NOW, THEREFORE, in full consideration of the foregoing and of the mutual promises and covenants herein contained, and intending to be legally bound hereby, subject to the entry of the Approval Order and subject to the terms and conditions set forth herein, the Parties hereby agree as follows:

K&E 11302110.1
Final Agreed Version of Equitas Settlement Agreeme.DOC

**I.**       ~~I.       Definitions~~**Definitions**

The following definitions apply to the capitalized terms wherever those terms appear throughout the Agreement or in any attachments hereto. Capitalized terms in the prefatory paragraph, recitals, this Definitions section, and in the sections below have the meanings ascribed to them therein to the extent they are not otherwise defined in this Definitions section. ~~Capitalized terms not otherwise defined herein~~**The terms "Asbestos Insurance Entity Injunction", "Asbestos Channeling Injunction," "Released Matters Injunction," "Plan Supplement" and "Settled Asbestos Insurance Company,"** shall have the meanings set forth in the *Amended Joint Plan of Reorganization* filed by ~~Grace~~**the Plan Proponents** on or about January 13, 2005. Each defined term stated in a singular form includes the plural form, each defined term stated in plural form includes the singular form, and each defined term stated in the masculine, feminine, or neuter form includes each of the masculine, feminine and neuter forms. The word "including" means "including but not limited to."

4

A.    <u>Affiliate</u>:  An "Affiliate" of an Entity shall mean another Entity that is directly or indirectly (through one or more intermediaries) controlled by the first Entity.

B.    <u>Agreement</u>:  The term "Agreement" means this Settlement Agreement and Mutual Release, as the same may be amended or modified from time to time in accordance with its provisions.

C.    <u>Approval Order</u>:  The term "Approval Order" means an order of the Bankruptcy Court, in form and substance satisfactory to the Parties, approving this Agreement and the compromise and settlement memorialized herein between and among the Parties (the "Approval Order").

D.    <u>Asbestos Claims</u>: "Asbestos Claims" means any and all Claims, asserted by any person or Entity, whether in litigation or not, that arise out of, relate to, involve, result from or are attributable to asbestos in any form (including products containing asbestos) and from any source, including Claims that seek to impose legal liability for damages, or which seek any other relief, because or on account of or arising in any way from the manufacture, sale, installation, presence, removal, replacement, encapsulation or other remediation or abatement of, or testing or monitoring or inspection for, asbestos-containing products or materials including without limitation (a) alleged property damage or other harm, or (b) alleged bodily injury, sickness, disease, mental anguish and injury, increased risk of harm, and/or death or other harm, allegedly caused by or on account of asbestos or asbestos fibers.

E.    <u>Asbestos Legislation</u>:  The term "Asbestos Legislation" means any legislation enacted into law by the United States Congress that (i) regulates, limits or controls

5

the prosecution of Asbestos Claims in the state or federal courts, and (ii) creates or purports to create an obligation on Lloyd's Underwriters to pay money pursuant to the legislation for the benefit of asbestos claimants.    The term "Asbestos Legislation" does not mean legislation that concerns general tort reform, class action reform, malpractice reform, or tax reform, or any other legislation that would regulate, limit or control Claims not arising from or attributable to exposure to asbestos or asbestos-containing products.    For the avoidance of doubt, the fact that legislation alters or modifies the requirements or standards for establishing liability against the **Reorganized** Debtors **and/or the Trust** (including legislation that imposes medical and/or exposure criteria, imposes strict liability on the **Reorganized** Debtors **and/or the Trust**, or regulates or limits the jurisdiction or forum in which an Asbestos  Claim may be brought) does not make such legislation "Asbestos Legislation" under this Section $I_x(E)$.

F.    Bankruptcy Court:    The term "Bankruptcy Court" means the United States Bankruptcy Court for the District of Delaware.

G.    Business Day:  The term "Business Day" means any day that is not a Saturday, a Sunday, a federal holiday in the United States of America or a national holiday in the United Kingdom.

H.    Claim:  The term "Claim" means:

**1.**    ————1.——"Claim" as that term is defined in the United States Bankruptcy Code, 11 U.S.C. Sec. 101(5);

6

**2.**        2.        "Demand" as that term is defined in the United States Bankruptcy Code, 11 U.S.C. Sec. 524(g)(5); and

**3.**        3.        any claim (whether past, present or future, known or unknown, asserted or unasserted, foreseen or unforeseen, fixed or contingent, direct or indirect, matured or unmatured, liquidated or unliquidated, direct or consequential, and whether in law, equity, admiralty or otherwise), assertion of right, complaint, cross-complaint, counterclaim, affirmative defense, writ, demand, inquiry, request, directive, obligation, suit, lawsuit, action, cause of action, administrative proceeding, governmental claim or action, order, judgment, settlement, mediation, arbitration, lien, and any other assertion of liability of any kind. For the avoidance of doubt, "Claim" includes any claim:

**a.**        a.        arising out of, related to, involving, resulting from or attributable to asbestos in any form and from any source, including products containing such substances, or to any other substance, product, matter or material in any form or state;

**b.**        b.        any cumulative or other injury or damage, including noise induced hearing loss, arising from any activity, operation, or exposure;

**c.**        c.        any alleged bad faith, conspiracy, unfair claim practice, unfair trade practice, fraud or misrepresentation, or extra-

7

contractual or tort liability, under any theory of liability whatsoever;

**d.** d.——for damages (including any damage or injury of any kind whatsoever caused by or allegedly caused by asbestos), including damages as a result of death, bodily injury, sickness, disease, emotional injury, damage to property, diminution in value or loss of use, economic loss, and punitive, exemplary, statutory damages or penalties, indemnity or defense obligations, insurance premiums (whether retrospectively rated or otherwise), deductibles, self-insured retentions, costs, expenses, contribution or subrogation; and

**e.** e.——pursuant to or under a contract, other agreement, promise, representation or warranty or pursuant to any direct action or statutory or regulatory right of action or based on tort liability.

I.    <u>Confirmation Order</u>: The term "Confirmation Order" means an order entered by the Bankruptcy Court in the Chapter 11 Reorganization Cases confirming the Plan, together with any order of the District Court issued pursuant to section 524(g)(3)(A) of the Bankruptcy Code confirming or affirming such order.

J.    <u>District Court</u>: The term "District Court" means the United States District Court for the District of Delaware.

K.    <u>Entity</u>: The term "Entity" means any individual, corporation, limited liability company, partnership, association, joint stock company, joint venture, estate,

8

trust, **including the Trust as defined in Section I.(FF) herein,** unincorporated organization, federal, state, local or foreign government or any political subdivision thereof, or other person or entity.

L. Equitas: The term "Equitas" means:

**1.** ———1.——Equitas Limited, Equitas Reinsurance Limited, Equitas Holdings Limited, Equitas Management Services Limited, and Equitas Policyholders Trustee Limited;

**2.** ———2.——each of the respective parents, Subsidiaries, Affiliates, divisions, holding companies, merged companies, acquired companies, predecessors-in-interest, successors-in-interest, estates, scheme administrators and assigns of the foregoing, solely in their capacities as such; and

**3.** ———3.——each of the present and former directors, members, officers, shareholders, trustees, receivers, estates (including bankruptcy and insolvency estates), employees, agents, representatives, attorneys, heirs, executors, administrators, and reinsurers of the foregoing, solely in their capacities as such.

**For avoidance of doubt, Equitas is not an insurance company as that term is used in this Agreement.**

M.    Execution Date:  The term "Execution Date" means the earliest date on which this Agreement has been signed by all of the Parties.

N.    Final Order:  "Final Order" means an order or judgment of the Bankruptcy Court, the District Court or other court of competent jurisdiction, as entered on the docket in any Chapter 11 Reorganization Case or the docket of any other court of competent jurisdiction, that has not been reversed, stayed, modified or amended, and as to which the time to appeal or seek certiorari or move for a new trial, reargument or rehearing has expired, and no appeal or petition for certiorari or other proceedings for a new trial, reargument or rehearing has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been timely filed has been withdrawn or resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought or the new trial, reargument or rehearing has been denied or has resulted in no modification of such order.

O.    Grace:  The term "Grace" means:  _W. R. Grace & Co., a Delaware corporation._

**P.    Grace Parties:  The term "Grace Parties" means:**

    **1.    Grace;**

    **2.    _W.R. Grace & Co-Conn., a Connecticut corporation;_**

    **3.**    ~~1.    _W. R. Grace & Co., a Delaware corporation, W. R. Grace & Co-Conn., a Connecticut corporation,_~~ all other debtors and debtors in possession in the Chapter 11 Reorganization Cases~~, and all of~~

the foregoing (the "Reorganized Debtors) after entry of the Confirmation Order (collectively, the "Debtors");

**4.** ——————2.——All subsidiaries, divisions, and Affiliates of the ~~Debtors~~**foregoing**, including any Entity in which any of the Debtors has an ownership interest of fifty percent (50%) or more;

**5.** ——————3.——Any predecessor, successor or assign of any of the foregoing Entities;

**6.** ——————4.——Any Entity that has been acquired by, merged into or combined with any of the Entities described in this Section I.(~~O~~**P**);

**7.** ——————5.——Any Entity on whose behalf W. R. Grace & Co. or W. R. Grace & Co-Conn. has the power to release claims under the Subject Policies or the 1995 London Agreement; and

**8.** ——————6.——The directors, officers, agents, and employees of the foregoing Entities, in their respective capacities as such.

**For avoidance of doubt, "Grace Parties" includes the Reorganized Debtors.**

11

**Q.** ~~P.~~ Grace Committees:    The term "Grace Committees" means the Official Committee of Asbestos Personal Injury Claimants, the Official Committee of Asbestos Property Damage Claimants, the Official Committee of ~~General~~ Unsecured Creditors, the Official Committee of Equity Security Holders, and the Future Claimants Representative in the Chapter 11 Reorganization Cases.

**R.** ~~Q.~~ Injunctions:The term "Injunctions" shall mean the injunctions described in Section I.~~T~~U.(3-5) below.

**S.** ~~R.~~ Lloyd's Underwriters:    The term "Lloyd's Underwriters" means (i) all the underwriters, members or Names, at Lloyd's, London who, through their participation in syndicates (including without limitation, those identified on Attachment B hereto), severally subscribed, each in his own proportionate share, to one or more of the Subject Policies, as well as all underwriters, members or names at Lloyd's, London (whether or not they participated in the syndicates identified in Attachment B hereto) who, through their participation in syndicates (including without limitation, those identified on Attachment B hereto) severally subscribed to any Subject Policies the existence of which (a) has not presently been established; or (b) has been established but as to which the identities of the Names, members or syndicates are not presently known; (ii) all the present and former employees (if any), representatives, attorneys and agents of the Entities and persons set forth in clause (i) of this Section I.~~R~~S), and their respective predecessors and successors, if any, solely in such capacity; and (iii) the respective heirs, executors, administrators, successors, assigns and reinsurers (as

12

such) of any of the foregoing. For avoidance of doubt, the term "Lloyd's Underwriters" does not include Equitas.

**T.**     S. London Market Companies:     The term "London Market Companies" means those insurance companies doing business in the London Insurance Market that severally subscribed policies of insurance in favor of Grace and that are parties to the 1995 London Agreement.

**U.**     T. Plan: The term "Plan" means a plan of reorganization filed in the Chapter 11 Reorganization Cases , provided that such plan and modifications thereto:

**1.**          1.         are not inconsistent with the terms of this Agreement;

**2.**          2.         do not materially and adversely affect the interests of Lloyd's Underwriters, Equitas or **the** Grace **Parties** under this Agreement;

**3.**          3.         provide for a channeling injunction pursuant to Section 524(g) of the Bankruptcy Code that is at least as broad as the Asbestos Channeling Injunction provided in the *Amended Joint Plan of Reorganization* filed by Grace **the Plan Proponents** on or about January 13, 2005, **(the "524(g) Injunction")** and that applies to Lloyd's Underwriters and Equitas;

**4.**          4.         provide for an injunction pursuant to Section 105(a) of the Bankruptcy Code that is at least as broad and inclusive as the Released Matters Injunction provided in the *Amended Joint Plan of Reorganization* filed by Grace **the Plan Proponents** on or about January 13, 2005, and that applies to Lloyd's Underwriters and Equitas;

13

**5.**    ———5.———provide for an injunction that is at least as broad and inclusive as the Asbestos Insurance Entity   Injunction provided in the *Amended Joint Plan of Reorganization* filed by ~~Grace~~**the Plan Proponents** on or about January 13, 2005, and that applies to Lloyd's Underwriters and Equitas;__ and__

**6.**    ———6.———provide for an indemnification of Lloyd's Underwriters and Equitas by the Reorganized Debtors**, but not the Trust,** in accordance with Section ~~VI~~**V.** hereof or, if it does not contain such indemnification, there must be a written waiver by Lloyd's Underwriters of the requirement that the Plan provide for such indemnification; ~~and  7.       provide   that the Reorganized Debtors and the Trust shall be bound to the provisions of this *Agreement  with  the  same  force  and  effect  as  if* the Reorganized Debtors and the Trust were a party to this Agreement from the Execution Date.~~

14

**V.**    ~~U.~~ Plan Effective Date:  The term "Plan Effective Date" means the first Business Day after the date on which all conditions precedent to the effectiveness of the Plan (as specified therein) are satisfied or waived or, if a stay of the Confirmation Order is in effect on such date, the first Business Day after the expiration, dissolution, or lifting of such stay.

**W.**    **Plan Proponents:  The term "Plan Proponents" includes the Debtors, the Official Committee of Unsecured Creditors, and the Official Committee of Equity Security Holders.**

**X.**    **Reorganized Debtor:   The term "Reorganized Debtor" "Reorganized Debtors" or "Reorganized Grace" shall mean the Debtors on and after the Plan Effective Date.**

**Y.**    ~~V.~~ Settlement Account:  The term "Settlement Account" means the bank trust or escrow account created pursuant to the Settlement Account Agreement.

**Z.**    ~~W.~~ Settlement Account Agent:  The term "Settlement Account Agent" means the bank or financial institution which serves as trustee or escrow agent of the Settlement Account that shall be appointed pursuant to this Agreement and the Settlement Account Agreement with the prior written consent of the Parties, which shall not be unreasonably or unseasonably withheld.  Without appointing the same, the Parties hereby consent to the appointment of ~~Wachovia National~~**J.P. Morgan Chase** Bank, N.A., as Settlement Account Agent.

**AA.**    ~~X.~~ Settlement Account Agreement:    The term "Settlement Account Agreement" means the agreement creating the Settlement Account, **for the**

15

**purpose of establishing an insurance escrow account to hold payments made by Lloyd's Underwriters pursuant to this Agreement,** which shall be **substantially** in the form of ~~a bank trust agreement or escrow agreement as is acceptable to Grace and Lloyd's Underwriters~~**the Escrow Agreement attached as Attachment C hereto**.

**BB.** ~~Y.~~——Settlement Amount:  The term "Settlement Amount" means the sum of Ninety Million Dollars U.S. ($90,000,000).

**CC.** ~~Z.~~——Subject Policies:  The term "Subject Policies" means:

**1.** ~~1.~~——all insurance policies listed on Attachment A hereto; and

**2.** ——~~2.~~——all known and unknown policies of insurance (whether or not listed in Attachments A hereto) severally subscribed to by Lloyd's Underwriters and providing coverage to **any** Grace **Party** that were originally allocated by the Lloyd's Policy Signing Office or otherwise to the 1992 year of account or any earlier year of account, including any liabilities under such contracts reinsured to close into the 1993 or any later year of account, but excluding any liabilities re-signed or reallocated pursuant to a premium transfer into the 1993 or later year.

Notwithstanding the foregoing, Subject Policies shall not, in any event, include policies of insurance incepting on or after January 1, 1998.

16

**DD.**    ~~AA.~~ Subsidiary:  A "Subsidiary" of an Entity shall mean a corporation as to which the Entity possesses shares of common stock and exercises control through the voting power of such stock.

**EE.**    ~~BB.~~ Trigger Date:  The term "Trigger Date" means the day that the last of the following has occurred, provided that this Agreement has not previously become null and void pursuant to its terms:

1.    The Approval Order becomes a Final Order;

2.    The ~~Trust becomes a party to this Agreement;~~**time during which Lloyd's Underwriters have the right to terminate this Agreement pursuant to Section VIII.A.5 shall have passed without Lloyd's Underwriters providing written notice of termination;**

**3.**    ~~3.~~ The Confirmation Order becomes a Final Order; and

**4.**    ~~4.~~ The occurrence of the Plan Effective Date with respect to a plan that satisfies the definition of Plan set forth in Section I~~(T)~~**.U**.

17

**FF.**    ~~CC.~~ Trust:  The term "Trust" shall mean the trust to be established under the Plan pursuant to section 524(g) of the Bankruptcy Code to process and pay Asbestos Claims ~~involving Grace~~**as authorized by the Plan**.

**GG.**    ~~DD.~~ Trust Agreement~~:~~**.**  The term "Trust Agreement" shall mean the agreement ~~establishing~~**in connection with the formation and establishment of** the Trust.

**II.**    ~~II.~~    **Payment of the Settlement Amount**

**A.**    ————**A.**————No later than ten (10) Business Days after ~~(i) the Grace Committees execute a written approval of this Agreement (the "Grace Committees' Approval"), or (ii) Lloyd's Underwriters execute a written waiver (the "Approval Waiver") of the Grace Committees' Approval~~**the entry of the Approval Order**, Lloyd's Underwriters shall pay the full Settlement Amount to the Settlement Account Agent by wire transfer for payment into the Settlement Account.  Time is of the essence with respect to the payment of the Settlement Amount.

**B.    The Settlement Amount, together with investment earnings thereon (collectively "Settlement Funds"), shall be held in escrow in the Settlement Account for the benefit of the holders of the types of Claims for which the Grace Parties were provided coverage under the Subject Policies, until the respective interests of such claimants, if any, with respect to the Settlement Funds, shall have been determined or otherwise agreed to and the Settlement Account Agent has distributed the Settlement Funds to a particular Entity or Entities pursuant to the confirmed Plan or as ordered by the Bankruptcy Court as set forth in the following section (C) below.**

**C.**    ————**B.**————On the Trigger Date, the Parties shall direct the Settlement Account Agent to release the Settlement ~~Amount in full to Grace or as otherwise provided in the~~

~~Plan~~**Funds to the Entity or Entities designated under the confirmed Plan or as ordered by the Bankruptcy Court to receive the Settlement Funds on behalf of types of Claims, including Asbestos Claims, for which the Grace Parties were provided coverage under the Subject Policies**, provided that this Settlement Agreement has not earlier been terminated in accordance with its terms, along with any and all interest or investment income accrued (less (i) any expenses that the Settlement Account Agent incurs pursuant to the Settlement Account Agreement; (ii) any reserves required under the Settlement Account Agreement to be held for the payment of taxes, indemnities, or otherwise; and (iii) any losses incurred under any investment of the Settlement Amount permissible under the Settlement Account Agreement). Upon the release of the Settlement ~~Amount~~**Funds** as provided in the preceding sentence, legal and equitable title to the Settlement ~~Amount~~**Funds** shall pass irrevocably to ~~Grace~~**the Entity** or the ~~party~~**Entities** designated under the ~~Plan~~**confirmed Plan or as ordered by the Bankruptcy Court** to receive the same to be distributed pursuant to this Agreement and the **confirmed** Plan.

**D.**      **In the event that the types of Claims, including Asbestos Claims, for which the Grace Parties were provided coverage under the Subject Policies, are paid in full pursuant to the confirmed Plan from sources other than the Settlement Funds, then the Settlement Funds shall revert back to the Reorganized Debtors subject to the confirmed Plan or an order of the Bankruptcy Court.**

**E.**      **In the event that the confirmed Plan or order of the Bankruptcy Court designates that the Settlement Funds are to be disbursed to an Entity or Entities other than the Reorganized Debtors, that Entity or Entities shall be bound to the provisions of this Agreement and the Settlement Account** *Agreement with the same force and effect as if* **said Entity(s) was a party to this Agreement and the Settlement Account Agreement except that**

19

the Indemnity obligations outlined in Section V. herein shall not apply to the Trust.  If all of the Settlement Funds are disbursed to the Trust, the Trust shall have a duty to defend the application of the 524(g) Injunction as to any Claims asserted against Lloyd's Underwriters and/or Equitas that are subject to the 524(g) Injunction.  If the Plan provides that the Trust is to provide claim reporting to insurers other than Lloyd's Underwriters, the Trust shall provide Lloyd's Underwriters with copies of all reports it provides to other insurers that include some or all of the information set forth in Section IX.I below, at the sole expense of Lloyd's Underwriters with respect to out-of-pocket costs incurred by the Trust, regardless of whether the Settlement Funds are disbursed to the Trust.  Nothing whatsoever in this Agreement shall require the Trust to do anything other than copy Lloyd's Underwriters or Equitas on reports already created and provided to other insurance companies on a periodic basis, to provide Lloyd's Underwriters or Equitas with any rights to audit or inspect the Trust's documents, files or databases, or to provide Lloyd's Underwriters or Equitas with any cooperation whatsoever other than copying them on periodic reports otherwise provided to other insurance companies, unless the Trust receives the Settlement Funds.  Lloyd's Underwriters shall, however, have the right to terminate this Agreement as provided in Section VIII.A below if a confirmation order is issued for a plan of reorganization that does not meet the definition of Plan provided in Section I.U or does not contain the provisions described in Section VIII.A.5(ii)-(v).

   **F.** ~~C.~~——Except as otherwise expressly provided in Section VIII, with respect to the Settlement Amount, the Settlement Amount and any and all past payments by Lloyd's Underwriters under, arising out of, or related to, or involving the Subject Policies and the 1995 London Agreement are deemed final and irrevocable payments.  Lloyd's Underwriters' payment

20

of the Settlement Amount is in addition to any and all payments made by Lloyd's Underwriters to or for the benefit of **the** Grace **Parties** prior to the Execution Date.

### III.    ~~III.~~    Several Liability

**The** Grace **Parties** and Lloyd's Underwriters acknowledge that (i) the obligations of Lloyd's Underwriters hereunder are several, and not joint, (ii) no Lloyd's Underwriter shall be liable for any portion of the Settlement Amount allocated to any other Lloyd's Underwriter, and (iii) no Lloyd's Underwriter shall be liable for any share of the Subject Policies subscribed by other Entities.

21

**IV.**   ~~IV.~~ **Releases**

**A.**   ~~A.~~ Release By **the** Grace **Parties:**

Except for the obligations created by this Agreement,

**1.**   ~~1.~~ Effective on the Trigger Date, ~~Grace hereby releases, remises, covenants~~ **the Grace Parties (on behalf of themselves and their successors and assigns, in their capacities as such) hereby release, remise, covenant** not to sue and forever ~~discharges~~ Lloyd's Underwriters from and against:

    **a.**   ~~a.~~ any and all Claims that **the** Grace **Parties** ever had, now has, or hereafter may have; and/or

    **b.**   ~~b.~~ liabilities to **any** Grace **Party** of any Lloyd's Underwriters or Equitas,

**in either the case of (a) or (b) above,**

        **i.**   ~~i.~~ for, arising out of, or in connection with insurance coverage (including both defense costs and indemnification claims) under the Subject Policies and the 1995 London Agreement with respect to Lloyd's Underwriters' participation in the Subject Policies, the 1995 London Agreement or any other agreement between the Parties relating to the Subject Policies; or

        **ii.**   ~~ii.~~ arising out of or in connection with any act, omission, representation, or conduct of any sort in

22

connection with any of the Subject Policies, the 1995 London Agreement or any other agreement between the Parties relating to the Subject Policies, with respect to Lloyd's Underwriters' participation in the Subject Policies, the 1995 London Agreement or such other agreement.; or

**iii.**  ~~iii.~~ otherwise arising from or relating to the Subject Policies, the 1995 **London** Agreement or any other agreement between the Parties relating to the Subject Policies, with respect to Lloyd's Underwriters' participation in the Subject Policies, the 1995 London Agreement or such other agreement.

**2.**  ~~2.~~ Effective on the Trigger Date, **the** Grace ~~intends~~**Parties intend** to reserve no rights or benefits whatsoever under or in connection with the Subject Policies and the 1995 London Agreement, but only to the extent subscribed by or participated in by Lloyd's Underwriters, with respect to any past, present or future Claims, **the** Grace **Parties** expressly reserving all other rights and benefits under the Subject Policies **and the 1995 London Agreement** to the extent subscribed by or participated in by Entities other than Lloyd's Underwriters.

**3.**  ~~3.~~ Effective on the Trigger Date, (i) any and all rights, duties, responsibilities and obligations of Lloyd's Underwriters created by or in connection with the Subject Policies and the 1995 London Agreement are

23

hereby terminated, and (ii) **the** Grace ~~has~~**Parties have** no insurance coverage from Lloyd's Underwriters under the Subject Policies or rights against Lloyd's Underwriters under the 1995 London Agreement. The releases contained in this Agreement as between **the** Grace **Parties,** and Lloyd's Underwriters are intended to operate with respect to Lloyd's Underwriters as though Lloyd's Underwriters had never subscribed to the Subject Policies.

**4.**         ———4.——All releases contained in this Section IV, also extend to Equitas, which is an intended third-party beneficiary of the terms of the releases, to the same extent as they extend to Lloyds Underwriters.

**5.**     ~~5.~~ **THE** GRACE ~~ACKNOWLEDGES~~**PARTIES ACKNOWLEDGE** THAT ~~IT~~**THEY** HA~~S~~**VE** BEEN ADVISED BY ~~ITS~~**THEIR** ATTORNEYS CONCERNING, AND ~~IS~~**ARE** FAMILIAR WITH, THE CALIFORNIA CIVIL CODE SECTION 1542 AND EXPRESSLY WAIVE~~S~~ ANY AND ALL RIGHTS UNDER CALIFORNIA CIVIL CODE SECTION 1542, WHICH PROVIDES THAT "A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR," AND UNDER ANY OTHER FEDERAL OR STATE STATUTE OR LAW OF SIMILAR EFFECT.

24

**6.**      6. **The** Grace **Parties** expressly assumes the risk that acts, omissions, matters, causes or things may have occurred that it does**they do** not know or does**do** not suspect to exist.

**B.**    B.      Releases By Lloyd's Underwriters**:**

Except for the obligations created by this Agreement,

**1.**          1.      Effective on the Trigger Date, Lloyd's Underwriters hereby release, remise, covenant not to sue and forever discharge **the** Grace **Parties** from and against;

    **a.**      a.      any and all Claims that Lloyd's Underwriters ever had, now have, or hereafter may have; and/or

    **b.**      b.      liabilities to Lloyd's Underwriters of **any** Grace, **Party,**

**in either case of (a) or (b) above**

        **i.**      i.      for, arising out of, or in connection with insurance coverage, including both defense costs and indemnification claims, under the Subject Policies, the 1995 London Agreement or any other agreement between the parties relating to the Subject Policies, with respect to Lloyd's Underwriters' participation in the Subject Policies, the 1995 London Agreement or any other such agreement; or

        **ii.**      ii.      arising out of or in connection with any act, omission, representation, or conduct of any sort in

connection with any of the Subject Policies, the 1995 London Agreement or any other agreement between the Parties with respect to the Subject Policies, with respect to Lloyd's Underwriters' participation in the Subject Policies, the 1995 London Agreement or any other such agreement.; **or**

**iii.**    ~~iii.~~ otherwise arising from or relating to the Subject Policies, the 1995 Agreement or any other agreement between the Parties relating to the Subject Policies, with respect to Lloyd's Underwriters' participation in the Subject Policies, the 1995 London Agreement or such other agreement.

**2.**    ~~2.~~ Effective on the Trigger Date, Lloyd's Underwriters intend to reserve no rights or benefits whatsoever under or in connection with the Subject Policies and the 1995 London Agreement, but only to the extent subscribed by or participated in by Lloyd's Underwriters, with respect to any past, present or future Claims.

**3.**    ~~3.~~ Effective upon the Trigger Date, any and all rights, duties, responsibilities and obligations of **the** Grace **Parties** created by or in connection with the Subject Policies and the 1995 London Agreement are hereby terminated. As of the Trigger Date, Lloyd's Underwriters and Equitas have no rights with respect to **the** Grace **Parties** under the Subject

26

Policies and the 1995 London Agreement. The releases contained in this Agreement are intended to operate as though Lloyd's Underwriters had never subscribed to the Subject Policies. Nothing in this Section IV$_A$(B)(3) shall affect Lloyd's Underwriters' or Equitas' right to seek reimbursement from their reinsurers or retrocessionaires in their capacities as such (but not including **any** Grace **Party**).

**4.** ————4.————LLOYD'S UNDERWRITERS ACKNOWLEDGE THAT THEY HAVE BEEN ADVISED BY THEIR ATTORNEYS CONCERNING, AND ARE FAMILIAR WITH, THE CALIFORNIA CIVIL CODE SECTION 1542 AND EXPRESSLY WAIVE ANY AND ALL RIGHTS UNDER CALIFORNIA CIVIL CODE SECTION 1542, WHICH PROVIDES THAT "A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR," AND UNDER ANY OTHER FEDERAL OR STATE STATUTE OR LAW OF SIMILAR EFFECT.

**5.** ————5.————Lloyd's Underwriters expressly assume the risk that acts, omissions, matters, causes or things may have occurred that they do not know or do not suspect to exist.

V.    ~~Assignment of Subrogation, Contribution and Reimbursement Rights Against other Insurers~~

27

A.    Payments Made Under this Agreement

Lloyd's Underwriters shall not seek reimbursement of any payments Lloyd's Underwriters are obligated to make under this Agreement, or any other payments they have made to or for the benefit of Grace under the Subject Policies and the 1995 London Agreement, whether by way of a Claim for contribution, subrogation, indemnification or otherwise, from anyone other than Lloyd's Underwriters' reinsurers or retrocessionaires in their capacity as such. Notwithstanding the foregoing, if a third party pursues a contribution, subrogation, indemnification or similar Claim against Lloyd's Underwriters relating to any of the Subject Policies or the 1995 London Agreement, then Lloyd's Underwriters shall be free to assert such a Claim against such third party. To the extent Lloyd's Underwriters recover any amount from such third party, the net proceeds of such recovery (after any payment made by Lloyd's Underwriters to such third party on its Claim and after Lloyd's Underwriters are reimbursed from such proceeds for their fees, costs, and expenses incurred in prosecuting or defending such Claims) shall be paid by Lloyd's Underwriters promptly to the Settlement Account Agent for deposit in the Settlement Account. For the avoidance of doubt, any payment to the Settlement Account Agent made by Lloyd's Underwriters pursuant to this Section V(A) shall not reduce or count towards Lloyd's Underwriters' obligation to pay the Settlement Amount pursuant to this Agreement. Grace shall use reasonable best efforts to obtain from all insurers with which they settle agreements similar to those contained in this Section V(A).

B.    Payments Received from Other Insurers

In the event that the Trigger Date occurs and:

1.    Grace and/or the Reorganized Debtors become entitled to receive a payment from one or more of their insurers other than Lloyd's

28

Underwriters for any Claims that have been remised, released, acquitted and forever discharged as against Lloyd's Underwriters pursuant to this Agreement, and

2.    as a result of such other insurer's obligation to pay described in Section V(B)(1) above, such insurer either:

a.    enters into a settlement with Lloyd's Underwriters, which settlement has been consented to by Grace and the Reorganized Debtors (as applicable), requiring Lloyd's Underwriters to reimburse some or all of the payment made or to be made by such insurer; or

b.    obtains a final, non-appealable judicial or quasi-judicial determination or award entitling such insurer to obtain a sum certain from Lloyd's Underwriters for contribution, subrogation or indemnification, or other similar Claim, against Lloyd's Underwriters for their alleged share or equitable share, or to enforce subrogation rights, if any, relating to such payment referenced in Section V(B)(1) above,

Grace and/or the Reorganized Debtors shall voluntarily reduce the amount of payment to be received by them (referenced in Section V(B)(1) above) by such amount to the extent necessary to reduce or eliminate such settlement, determination or award against Lloyd's Underwriters (referenced in Section V(B)(2) above). To ensure that such a reduction is accomplished, Lloyd's Underwriters shall be entitled to assert this Section V as a defense to any action against them for any such portion of the determination or award against Lloyd's Underwriters (referenced in

29

~~Section V(B)(2) above) and shall be entitled to have the court or appropriate tribunal issue such orders as are necessary to effectuate the reduction to protect Lloyd's Underwriters from any liability for the determination or award.  Grace~~ and/or the Reorganized ~~Debtors~~ ~~(as appropriate) agree that in any proceeding against other insurers in which Grace~~ and/or the ~~Reorganized Debtors~~ ~~makes a claim for insurance rights or benefits for any Claim that may give rise to the events referenced in Section V(B)(1) above, they will provide notice to Lloyd's Underwriters of such Claim within thirty (30) days of the time Grace and/or~~ The ~~Reorganized Debtors first~~ ~~becomes~~ aware that ~~such Claim is reasonably likely to result in a claim against Lloyd's Underwriters and shall consent to Lloyd's Underwriters' intervention in any such proceeding to the extent that Lloyd's Underwriters seek to intervene to effectuate the intent of this Section V.~~

### <u>V.</u>    ~~VI.~~ <u>Indemnification</u>

A.    <u>Obligation **of the Reorganized Debtors** to Indemnify</u>

Reorganized Debtors shall:~~(1)~~ defend, indemnify and hold harmless Lloyd's Underwriters, including defense costs, in respect of any and all Claims against Lloyd's Underwriters relating to the Subject Policies, the 1995 London Agreement or any other agreement between the Parties relating to the Subject Policies that are not subject to the Injunctions; and ~~(2)~~**shall** defend application of the Injunctions to all Claims against Lloyd's Underwriters **and Equitas** subject to the Injunctions **(except to the extent that the Trust has the duty under the Plan to defend application to Lloyd's Underwriters and Equitas of the 524(g) channeling injunction described in Section I.U(3))** (collectively, the "Indemnified Claims").  The Indemnified Claims include all Claims~~,~~ whether by way of direct action or otherwise, made by:  (i) other insurers of Grace; (ii) any person or Entity claiming to be insured under the Subject Policies; (iii) any person or Entity who has made or will or can make a claim

under the Subject Policies or the 1995 London Agreement; (iv) any person or Entity who has acquired or been assigned the right to make a claim under the Subject Policies or the 1995 London Agreement; or (v) any federal, state or local government or any political subdivision, agency, department, board or instrumentality thereof. **In the event that the Reorganized Debtors defend Lloyd's Underwriters against Claims alleging fraudulent conduct, criminal conduct, gross malfeasance or misfeasance or intentional wrongdoing, the Reorganized Debtors shall be entitled to recoup the costs of such defense if Lloyd's Underwriters are in fact determined to have engaged in such conduct.** The Parties acknowledge that this indemnification includes Claims made by any person or Entity over whom Grace does not have control, including former subsidiaries, predecessors in interest, and sellers or purchasers of assets.

**For the avoidance of doubt, the obligations set forth in this Article V are not obligations of the Trust.**

B.    Notice of Indemnified Claims

Lloyd's Underwriters shall forward promptly to Reorganized Debtors any demand, notice, summons or other process (an "Indemnified Claim Notice") received by them in connection with any Indemnified Claim. Reorganized Debtors shall promptly, and in any event within ten (10) Business Days of receipt of an Indemnified Claim Notice, acknowledge in writing their obligations under this Agreement in connection with the Indemnified Claim and shall in fact assume responsibility for the defense of the Indemnified Claim as hereinafter set forth. To the extent that Reorganized Debtors do not agree that the claim so submitted is an Indemnified Claim pursuant to this Agreement, Reorganized Debtors shall so inform Lloyd's Underwriters, in writing, within ten (10) Business Days of receipt of such Indemnified Claim

31

Notice. Reorganized Debtors shall solicit and consider the views and obtain the consent of Lloyd's Underwriters in choosing counsel to defend an Indemnified Claim, which consent shall not be unreasonably withheld. Following solicitation and consideration of the views of Lloyd's Underwriters, Reorganized Debtors shall have the right and the obligation to direct the defense of the Indemnified Claim; provided, however, that:

1.    Reorganized Debtors shall take no position on behalf of Lloyd's Underwriters with respect to an Indemnified Claim, substantive or procedural, without their consent;

2.    In any filing with a Court, Reorganized Debtors shall state in the caption of the filing that it is filed by them "as indemnitor of Lloyd's Underwriters." Unless waived in writing, every representation and filing made by counsel retained by Reorganized Debtors shall contain the following disclaimer: "Lloyd's Underwriters have settled the claims that are the subject of this action concerning policies.[22] Accordingly, Lloyd's Underwriters now take no position with respect to these policies. All statements and positions are solely those of Reorganized Debtors and shall not constitute any representation or admission by Lloyd's Underwriters";

3.    Reorganized Debtors shall provide Lloyd's Underwriters with draft copies of all pleadings, briefs, discovery requests and responses, and other court papers and correspondence sufficiently in advance of filing, service or mailing to permit a reasonable opportunity to review and comment on same; and

32

4.      Reorganized Debtors shall resist production of documents, information and witnesses of Lloyd's Underwriters if Lloyd's Underwriters determines and so advises Reorganized Debtors that they are not properly discoverable. Any production of documents, information or witnesses of Lloyd's Underwriters shall be made only as expressly authorized by Lloyd's Underwriters and only pursuant to applicable rules, including subpoena rules.

C.      Authority to Settle Indemnity Claims

Provided that Reorganized Debtors have timely accepted the tender of any Indemnified Claim and are fully complying with their obligations regarding the defense of such Indemnified Claim, Reorganized Debtors shall have the sole right to settle any tendered Indemnified Claim for which they take responsibility and Lloyd's Underwriters shall not settle any Indemnified Claim without the prior written consent of Reorganized Debtors.

D.      Failure to Defend Indemnity Claims

Should Reorganized Debtors fail to timely respond to the tender of any Indemnified Claim or fail to fully comply with its obligations regarding such Indemnified Claim, Lloyd's Underwriters shall be free to defend such Indemnified Claim as they, in their sole discretion, deem appropriate and to settle any such claim as they see fit. Reorganized Debtors shall not be permitted to object to, contest or otherwise challenge Lloyd's Underwriters' actions in defending any such claim and the reasonableness of any such settlement absent fraud or bad faith on the part of Lloyd's Underwriters, and Reorganized Debtors shall fully reimburse Lloyd's Underwriters for all expenses they incur in the legal defense and settlement of such Indemnified Claim.

33

E.    No Waiver of Attorney-Client Privilege

Nothing in this Agreement shall be construed or asserted to be a waiver of Lloyd's Underwriters' or Grace's or Reorganized Debtors' attorney-client privilege, or any other privilege or immunity, in connection with any Indemnified Claim, nor shall anything contained herein be construed as evidence that any Indemnified Claim is well founded in fact or law.

F.    Equitas as Third-Party Beneficiary

The indemnification and hold harmless undertaking set forth in this Section shall also extend to the benefit of Equitas, which is an intended third-party beneficiary of the terms of this indemnification and hold harmless undertaking.

## VI.    Assignment of Subrogation, Contribution and Reimbursement Rights Against other Insurers

### A.    Payments Made Under this Agreement

*Lloyd's Underwriters shall not seek reimbursement of any payments Lloyd's Underwriters are obligated to make under this Agreement, or any other payments they have made to or for the benefit of* **any Grace Party** *under the Subject Policies and the 1995 London Agreement, whether by way of a Claim for contribution, subrogation, indemnification or otherwise, from anyone other than Lloyd's Underwriters' reinsurers or retrocessionaires in their capacity as such.   Notwithstanding the foregoing, if a third party pursues a contribution, subrogation, indemnification or similar Claim against Lloyd's Underwriters relating to any of the Subject Policies or the 1995 London Agreement, then Lloyd's Underwriters shall be free to assert such a Claim against such third party.   To the extent Lloyd's Underwriters recover any amount from such third party, the net proceeds of such recovery (after any payment made by Lloyd's Underwriters to such third party on its Claim and after Lloyd's Underwriters are*

34

reimbursed from such proceeds for their fees, costs, and expenses incurred in prosecuting or defending such Claims) shall be paid by Lloyd's Underwriters promptly to the Settlement Account Agent for deposit in the Settlement Account. For the avoidance of doubt, any payment to the Settlement Account Agent made by Lloyd's Underwriters pursuant to this Section **VI.**(A) shall not reduce or count towards Lloyd's Underwriters' obligation to pay the Settlement Amount pursuant to this Agreement. **The Grace Parties** shall use reasonable best efforts to obtain from all insurers with which they settle agreements similar to those contained in this Section **VI.(A).**

**B.**    *Payments Received from Other Insurers*

*In the event that the Trigger Date occurs and:*

**1.**    **Grace, the Reorganized Debtors and/or any other Entity** *become entitled to receive a payment from one or more of* **the** *insurers other than Lloyd's Underwriters for any Claims that have been remised, released, acquitted and forever discharged as against Lloyd's Underwriters pursuant to this Agreement, and*

**2.**    *as a result of such other insurer's obligation to pay described in Section* **VI.***(B)(1) above, such insurer either:*

**a.**    *enters into a settlement with Lloyd's Underwriters, which settlement has been consented to by Grace,* **the Reorganized Debtors and any other Entity** *(as applicable), requiring Lloyd's Underwriters to reimburse some or all of the payment made or to be made by such insurer; or*

35

**b.** *obtains a final, non-appealable judicial or quasi-judicial determination or award entitling such insurer to obtain a sum certain from Lloyd's Underwriters for contribution, subrogation or indemnification, or other similar Claim, against Lloyd's Underwriters for their alleged share or equitable share, or to enforce subrogation rights, if any, relating to such payment referenced in Section* **VI.(B)(1) above,**

**the Entity entitled to receive such payment** *shall voluntarily reduce the amount of payment to be received by them (referenced in Section* **VI.***(B)(1) above) by such amount to the extent necessary to reduce or eliminate such settlement, determination or award against Lloyd's Underwriters (referenced in Section* **VI.***(B)(2) above). To ensure that such a reduction is accomplished, Lloyd's Underwriters shall be entitled to assert this Section* **VI.** *as a defense to any action against them for any such portion of the determination or award against Lloyd's Underwriters (referenced in Section* **VI.***(B)(2) above) and shall be entitled to have the court or appropriate tribunal issue such orders as are necessary to effectuate the reduction to protect Lloyd's Underwriters from any liability for the determination or award. Grace***, the Reorganized Debtors and/or any other Entity** *(as appropriate) agree that in any proceeding against other insurers in which Grace***, the Reorganized Debtors and/or any other Entity** *makes a claim for insurance rights or benefits for any Claim that may give rise to the events referenced in Section* **VI.***(B)(1) above, they will provide notice to Lloyd's Underwriters of such Claim within thirty (30) days of the time Grace and/or* **the** *Reorganized Debtors first* **become aware that** *such Claim is reasonably likely to result in a claim against Lloyd's Underwriters*

*and shall consent to Lloyd's Underwriters' intervention in any such proceeding to the extent that Lloyd's Underwriters seek to intervene to effectuate the intent of this Section* **VI.**

    **VII.**  ~~VII.~~  **Bankruptcy Obligations**

    **A.**  ~~A.~~  Designation of Lloyd's Underwriters and Equitas as Settl~~ing~~**ed** Asbestos Insurance ~~Entities~~ **Companies**

~~Grace~~**The Debtors** shall designate Lloyd's Underwriters and Equitas (solely in its capacity as Lloyd's Underwriters' re-insurer and run-off agent) as Settl~~ing~~**ed** Asbestos Insurance ~~Entities~~**Companies** in the ~~schedule~~**list** of Settl~~ing~~**ed** Asbestos Insurance ~~Entities~~**Companies** to be **included in the Plan Supplement and** filed by Grace prior to the ~~Confirmation Date pursuant to the Plan by no later than sixty (60) days after entry of the Approval Order~~**commencement of confirmation hearings on a plan of reorganization**. The Parties agree that the designation: "Lloyd's Underwriters and Equitas, all as defined in the Settlement Agreement and Mutual Release with Lloyd's Underwriters, if said Agreement is not terminated and rendered null and void pursuant to its terms" is an acceptable designation for the ~~schedule.~~ **list of Settled Asbestos Insurance Companies. Such list shall also set forth the Subject Policies identified on Attachment A hereto and shall describe the presently unknown Subject Policies in substantially the same terms set forth in Section I.CC(2).**

K&E 11302110.1
Final Agreed Version of Equitas Settlement Agreeme.DOC

**B.**    ~~B.~~ Obligations of the Parties

Promptly following the execution of a written approval of this Agreement by the Grace Committees or the Lloyd's Underwriters' execution of a written waiver of the Grace Committees**'** Approval, ~~Grace~~**the Debtors** will prepare and file a Motion to Approve this Settlement Agreement with the Bankruptcy Court, which Motion shall be in form and substance reasonably satisfactory to Lloyd's Underwriters. After the Approval Order becomes a Final Order, Lloyd's Underwriters shall not object to or oppose confirmation of a plan of reorganization for ~~Grace~~**the Debtors** so long as it meets the definition of Plan set forth in Section I**.**~~(T) hereof~~**U) hereof and so long as such Plan contains the provisions relating to the Trust described in Section VIII.A.5(ii)-(v)**, or Lloyd's Underwriters waive the requirement that the Plan contain such provisions or any of them, and shall not appeal the Confirmation Order, unless this Agreement becomes null and void pursuant to its terms.

**C.**    ~~C.~~ Grace Committees' Approval

After the Execution Date, ~~Grace~~**the Debtors** shall use ~~its~~**their** reasonable best efforts to obtain the Grace Committees' approval of this Agreement. If ~~Grace is~~**the Debtors are** unable to obtain the Grace Committees' Approval, ~~it~~**they** shall so notify Lloyd's Underwriters, and Lloyd's Underwriters may, at their sole option, issue the Approval Waiver in which event ~~Grace~~**the Debtors** shall use ~~its~~**their** best efforts to obtain entry of the Approval Order over the objections of the Grace Committees.

~~D.    Trust as a Party~~
~~As a condition to the occurrence of the Trigger Date and without limiting the obligations of Grace under this Agreement, the Trust must execute this Agreement and become a Party to this Agreement and be bound by all of the obligations of Grace under this Agreement to~~

~~the maximum extent possible. The Trust Agreement shall provide that the Trust shall be subject to and bound by this Agreement and the Approval Order to the maximum extent possible. Notwithstanding anything else in this Agreement to the contrary, this Agreement shall be fully effective and binding upon Grace and Lloyd's Underwriters, subject to its terms, from and after the Effective Date (subject in the case of Grace to the approval of the Bankruptcy Court), notwithstanding that the Agreement has not been executed by the Trust or the Trust is not otherwise a Party to the Agreement, unless this Agreement terminates pursuant to its own terms.~~

**D.** ~~E.~~ No Prejudice of Lloyd's Underwriters' Rights under Agreement

After the Trigger Date, ~~neither~~**the** Grace ~~nor the Trust~~**Parties** shall **not** seek to terminate, reduce, or limit the scope of the Injunctions with respect to Lloyd's Underwriters and/or Equitas, and shall oppose any such efforts by other ~~Persons~~**Entities** to do so. In addition, ~~neither~~**the** Grace ~~nor the Trust~~**Parties** shall **not** take any other action that would prejudice the rights of Lloyd's Underwriters and/or Equitas under this Agreement and they shall oppose any such efforts by other ~~Persons~~**Entities** to do so.

**E.** ~~F.~~ No Impairment of this Agreement

No ruling, proceeding, or other matter in connection with the **confirmed** Plan or the Chapter 11 Reorganization Cases will impair, affect or modify the Parties' rights or obligations under this Agreement, and **the** Grace **Parties** shall exercise reasonable best efforts to ensure that the Confirmation Order expressly will so affirm. For the avoidance of doubt, this Section VII.(~~F~~**E**) is not intended to impair, affect or modify the Parties' rights or obligations under this Agreement, including the Parties' rights under Section ~~VIII~~**VII.** of this Agreement.

39

## VIII. ~~VIII.~~ Termination of Agreement

**A.**    A.——Conditions for Termination by Lloyd's Underwriters

*Lloyd's Underwriters, at their sole option, may terminate this Agreement and render this Agreement null and void (as described in this Section VIII,) by providing written notice of termination* **to the Grace Parties and all of the Grace Committees** *within one-hundred twenty (120) days of the occurrence of any of the* **below** *described conditions of termination*:

~~If (i)~~**1.** any Asbestos Legislation is enacted into law within one hundred twenty (120) days after the Execution Date~~, (ii)~~**;**

**2.** the Chapter 11 Reorganization Cases of W. R Grace & Co. or W.R. Grace & Co.-Conn. are dismissed or converted into Chapter 7 cases~~,~~**;**

**3.** ~~(iii)~~ the Approval Order has not been entered by the Bankruptcy Court by close of business on December 31, ~~2006, (iv)~~ **2006 or such later date to which the Parties agree;**

**4.** the Confirmation Order has not been entered by the Bankruptcy Court by close of business on December 31, 2008, or such later date to which the Parties agree~~, or (v) a Confirmation Order~~**; or**

**5. a confirmation order** is issued and the plan of reorganization **confirmed**

**(i)** does not meet the definition of Plan set forth in ~~include Section I(T), then~~ *Lloyd's Underwriters, at their sole option, may terminate this Agreement and render this Agreement null and void (as described in this Section VIII) by providing written notice of termination* ~~to Grace and all of the other Parties~~ *within one-hundred twenty (120) days of the occurrence of any of the* ~~above~~ *described conditions of termination.* ~~If timely written notice is not received, the Lloyd's Underwriters will be deemed to have waived the right to terminate the Agreement as to that condition of termination.~~**Section I.(U);**

**(ii) does not provide that the Trust shall have a duty to defend the application of the 524(g) Injunction as to any Claims asserted against Lloyd's Underwriters and/or Equitas that are subject to the 524(g) Injunction;**

**(iii) does not provide that the Trust shall release Lloyd's Underwriters and Equitas to the same extent as the Grace Parties release Lloyd's Underwriters and Equitas as set forth in Section IV.(A) herein;**

**(iv) does not provide that Lloyd's Underwriters shall release the Trust to the same extent they release the Grace Parties as set forth in Section IV. (B) herein; or**

**(v) does not require the Trust to provide Lloyd's Underwriters the same cooperation and claim reporting and the same files, information, documents and reports that the Reorganized Debtors are required to provide under Sections IX.(B), IX.(C), IX.(D) and IX.(I) herein.**

**Failure by Lloyd's Underwriters to give timely written notice of termination following the occurrence of a condition of termination shall be deemed a permanent waiver of such condition by Lloyd's Underwriters.**

**B.**    ~~B.~~——Reimbursement of Settlement Amount Following Termination

If this Agreement is terminated and rendered null and void pursuant to this Section VIII, Lloyd's Underwriters shall be immediately entitled to reimbursement of the Settlement Amount plus any interest or investment income accrued on the Settlement Amount (minus (i) any reasonable and proper costs incurred by the Settlement Account Agent; (ii) any reserves required under the Settlement Account Agreement to be held for the payment of taxes, indemnities, or otherwise; or (iii) losses incurred under any investment of the Settlement Amount

41

permissible under the Settlement Account Agreement), and the Parties shall so direct the Settlement Account Agent. The Settlement Account Agent shall disburse the funds as provided in Section 2.6 of the Settlement Account Agreement. Any dispute among the Parties arising out of or relating to the right to terminate under this Section shall be finally resolved by binding arbitration in accordance with the International Institute for Conflict Resolution & Resolution's Rules for Non-Administered Arbitration then currently in effect by a sole arbitrator. Such arbitration must be held in New York or Washington D.C. and resolved on an expedited basis, and must be completed with an award by the arbitrator entered no more than ninety (90) days from the date any Party demands arbitration. The arbitration shall be governed by the Federal Arbitration Act, 9 U.S.C. §§1-16, and judgment upon the award rendered by the arbitrator(s) may be entered by any court having jurisdiction thereof. Each Party shall bear its own fees and costs incurred in connection with such arbitration.

    **C.**    <s>C.</s> Provisions Surviving Termination

Notwithstanding anything in this Agreement to the contrary, in the event this Agreement terminates, is ineffective, and/or is null and void pursuant to this Section VIII:

    **1.**      <s>1.</s> this Agreement, other than Sections I, VIII, XI(A-B) and XII through XIX (which Sections shall remain in full force and effect), shall be vitiated and shall be a nullity and shall be void <u>ab initio;</u>

    **2.**      <s>2.</s> the Parties shall promptly direct the Settlement Account Agent to return, with thirty (30) days prior written notice to Lloyd's Underwriters and **the** Grace **Parties**, the Settlement Amount plus any interest or investment income accrued on the Settlement Amount (minus (i) any reasonable and proper costs incurred by the Settlement Account

42

Agent; (ii) any reserves required under the Settlement Account Agreement to be held for the payment of taxes, indemnities, or otherwise; or (iii) losses incurred under any investment of the Settlement Amount permissible under the Settlement Account Agreement) to or at the direction of Lloyd's Underwriters or their run-off agent, Equitas. While all Parties are required to provide the direction set forth above in the event of termination of this Agreement, the Settlement Account Agent shall disburse the funds to or at the direction of Lloyd's Underwriters or their run-off agent, Equitas, upon the notices, certifications, orders or arbitration decisions provided for in Section 2.6 of the Settlement Account Agreement whether all Parties provide the direction set forth above or not;

**3.**    3.——none of the Parties shall be bound by the terms of any Approval Order;

**4.**    ——4.——Lloyd's Underwriters and Equitas shall not be designated as ~~Settling~~**Settled Asbestos** Insurance Companies, and Lloyd's Underwriters shall neither seek nor receive any benefit or protection of a ~~Settling~~**Settled Asbestos** Insurance Company under the Plan;

**5.**    ——5.——the Parties shall have the rights, defenses and obligations under or with respect to the Subject Policies**, the 1995 London Agreement or any other agreement between the Parties relating to the Subject Policies** that they would have had absent this Agreement,

43

**6.**    6.——the releases provided in Section IV, shall become null and void <u>ab initio;</u>

**7.**    ————7.——Lloyd's Underwriters shall be free to pursue their objections to the Pplan and to appeal from the Cconfirmation Oorder; and

**8.**    ————8.——any otherwise applicable statutes of limitations or repose, or other time-related limitations, shall be deemed to have been tolled for the period from the Execution Date through the date that the Agreement becomes null and void, and no Party shall assert, plead, raise or otherwise rely on or take advantage, whether actively or passively, of any time-related defense to any Claim by any other Party related to such period and if any Party breaches this obligation, it shall be deemed to have created a new cause of action against it at the time of such breach for which it shall be liable in damages equal to the amount of damages it avoided by reason of the breach. This covenant shall be deemed to last for the maximum time period allowed by applicable law as provided in Section XV.

K&E 11302110.1
Final Agreed Version of Equitas Settlement Agreeme.DOC

**D.**    ~~D.~~    Termination for Wrongful Acts

In the event that a Party asserts that any action or refusal to take action that is required by this Agreement is wrongfully taken or not taken by a Party, the Party so asserting may not claim that the Agreement is terminated, but must pursue such rights as it has to enforce the Agreement against the Party asserted to have been in breach; provided, however, that **the** Grace ~~is~~**Parties are** entitled to terminate this Agreement and declare it null and void or seek to enforce it , at ~~its~~**their** option, if the full Settlement Amount is not deposited into the Settlement Account as required in Section II**.**(A), provided that **the** Grace **Parties** must provide written notice to Lloyd's Underwriters of ~~its~~**their** intent to terminate this Agreement within fifteen ~~business days~~**(15) Business Days** of the date the Settlement Amount was required to be deposited into the Settlement Account or forever waive ~~its~~**their** right to terminate this Agreement on this ground.

**IX.**    ~~IX.~~    **Cooperation on Document and Information Sharing**

**A.**    ~~A.~~    Allocation of Settlement Amount to Subject Policies

Lloyd's Underwriters may prepare an allocation of the Settlement Amount (or a grossed up amount where appropriate) to the Subject Policies from which the shares allocated to insolvent insurers that subscribed to one or more of the Subject Policies can be derived.  If Lloyd's Underwriters prepare such an allocation, ~~at Grace's request~~ Lloyd's Underwriters shall cooperate (beginning as of the Execution Date) with ~~Reorganized Debtors~~**the Grace Parties** by directing London Market Claims Service ("LMCS") or other similar Entity, as to any such Entity identified by ~~Reorganized Debtors~~**the Grace Parties**, to provide (upon reasonable notice, at the requesting Party's expense (provided that the requesting Party shall have no obligation to pay any internal costs of Lloyd's Underwriters, including costs associated with time and expenses of

45

any of Lloyd's Underwriters' employees), and in a manner convenient to Lloyd's Underwriters) to the administrator/liquidator of any insolvent company or solvent company in a solvent scheme that company's share, if any, allocated on a per policy and per year basis. Such allocation will be provided directly to the administrator/liquidator of such insolvent company or solvent company in a solvent scheme, and will not be provided **directly** to the ~~Reorganized Debtors~~**Grace Parties,** or any broker.  Lloyd's Underwriters shall notify ~~Reorganized Debtors~~**the Grace Parties** within thirty (30) days after such companies have been provided with the information set forth above, of the names and addresses of the persons to whom such information was provided and the date(s) on which such information was provided. Any such allocation shall not bind ~~Reorganized Debtors~~**the Grace Parties**, and shall not affect Lloyd's Underwriters' payment obligations under this Agreement. This Section IX.**(A)** is solely for the benefit of the ~~Reorganized Debtors~~**Grace Parties** to enable them to pursue claims against insolvent companies or solvent companies in solvent schemes.

  **B.**  ~~B.~~  Reorganized Debtors' Obligation to Provide Information

   After the Trigger Date, Lloyd's Underwriters shall have the right (upon reasonable notice and in a manner convenient to the Reorganized Debtors ~~and, upon its creation, the Trust~~), to review and obtain from the Reorganized Debtors ~~and the Trust~~ relevant files, information and documents **in the possession of Reorganized Debtors or to which they have the right to obtain access from the Trust**:

     **1.**  ~~1.~~  concerning Asbestos Claims subject to payment or potential payment with the proceeds of this Agreement, and

**2.**        2.——required of or necessary to Lloyd's Underwriters in connection

with any Claims, arbitrations, or litigation for reinsurance for the

Settlement Amount or in connection with this Agreement.

**C.**        C.——Specific Information to be Provided

For the avoidance of doubt, the relevant files, information and documents

referenced to in Section IX.(B) above shall include:

**1.**        1.——information from any database maintained by Reorganized Debtors
or **to which they have the right to obtain access from** the Trust, any
information that Reorganized Debtors or**collect or to which they have the
right to obtain access from** the Trust-collects in connection with its**the**
payment of Asbestos Claims; and

**2.**        2.——for each Asbestos Claim resolved:

**a.**        a.——the Claimant's name;

**b.**        b.——a claim number;

**c.**        c.——jurisdiction;

**d.**        d.——status (open or closed);

**e.**        e.——date of first exposure as set forth in the complaint or as
reflected by information reasonably available to Reorganized
Debtors-or the Trust;

**f.**        f.——alleged disease and, to the extent reasonably available to
Reorganized Debtors-or the Trust, the date of diagnosis; and

**g.**        g.——the amount of indemnity paid.

**D.**        D.——Duty of Cooperation

As of the Trigger Date, Reorganized Debtors and, upon its creation, the Trust,

shall reasonably cooperate in obtaining and providing the files, information and documents

referred to in Section IX.(B) above at Lloyd's Underwriters' reasonable request and expense

(provided that Lloyd's Underwriters shall have no obligation to pay any internal costs of

47

Reorganized Debtors~~or the Trust~~, including costs associated with time or expenses of Reorganized Debtors's~~or the Trust's~~ employees).  For the avoidance of doubt and without limitation of the foregoing, Reorganized Debtors ~~and the Trust~~ shall undertake all reasonable actions to cooperate with Lloyd's Underwriters in connection with their reinsurers, including (upon reasonable notice, at Lloyd's Underwriters' expense other than internal costs of Reorganized Debtors~~and the Trust~~, and in a manner convenient to Reorganized Debtors~~and the Trust~~) responding to reasonable requests for information and meeting with representatives of reinsurers.  Such cooperation shall include providing Lloyd's Underwriters' representative access to all claim files related to Asbestos Claims **maintained by Reorganized Debtors or to which they have the right to obtain access from the Trust**, including all product exposure, medical, claim status, and payment records contained in such files.

**E.**    **Information Subject to Disclosure**

**For avoidance of doubt, the files, information and documents subject to this Section IX are limited to those in the possession of Reorganized Debtors, including their counsel and consultants, and those files, information and documents to which the Reorganized Debtors have the right to obtain access from the Trust.**

**F.**    ~~E.~~    No Effect on Liability

For the avoidance of doubt, this Section IX**,** and any results of such a review:

**1.**    ~~1.~~    shall not affect Lloyd's Underwriters' payment obligations under this Agreement;

**2.**   ~~2.~~——shall not obligate Reorganized Debtors ~~or the Trust~~ to collect any information from any ~~C~~claimant that they are not otherwise obligated to collect; and

**3.**   ~~3.~~——shall not give Lloyd's Underwriters and/or Equitas any right to challenge the allowance or payment of any Claim by Reorganized Debtors ~~or the Trust~~.

**G.**   ~~F.~~——Use of Confidential Materials

Lloyd's Underwriters shall not provide any Report (as defined in Section IX.(**HI**) hereto), results, files, information, or documents obtained by Lloyd's Underwriters pursuant to this Section IX. (the "Materials") to any other Entity and shall keep the Materials confidential, except that Lloyd's Underwriters may:

**1.**   ~~1.~~——provide the Materials to Entities identified in Section ~~XII~~**IX.**(D), and

**2.**   ~~2.~~——use the Materials in any proceeding to obtain reinsurance with respect to the Settlement Amount or this Agreement or in connection with its compliance with applicable laws or regulations.

**H.**   ~~G.~~——Disclosure of Confidential Materials

Lloyd's Underwriters shall exercise their reasonable best efforts to maintain the confidentiality of the Materials, including seeking a confidentiality pledge from any Entity with which they share the Materials and seeking a protective order in any proceeding in which they use the Materials, but Lloyd's Underwriters' right to disclose any portion of the Materials to any of the Entities identified in Section ~~XII~~**IX.**(D) shall not be affected if their reasonable best efforts

49

do not result in a confidentiality pledge being given or a confidentiality order being entered. Nothing in this Section IX shall prevent Lloyd's Underwriters or Equitas from using the Materials for their own internal purposes.

**I.**     ~~H.~~     Furnishing Reports

At the sole discretion of Reorganized Debtors ~~and the Trust~~, they may satisfy their obligations under Section IX,(B-C) above by providing Lloyd's Underwriters (or their representatives) on a quarterly and annual basis with a report (each, a "Report") concerning asbestos-related bodily injury claims activity with respect to the time period that is the subject of Lloyd's Underwriters' request for relevant files, information and documents. Notwithstanding anything to the contrary in this Section IX, Reorganized Debtors ~~and the Trust~~ shall not be required to include in any Report any information that ~~Reorganized Debtors or the Trust are~~is not required to ~~collect~~**be collected** under the **confirmed** Plan unless ~~Reorganized Debtors or the Trust in fact collects~~ such information. ~~If Reorganized Debtors or the Trust~~ **is in fact collected.** **If** *the following information* is required to ~~collect~~**be collected** under the **confirmed** Plan (or ~~in fact collects~~) *the following information***is in fact collected)**, such Reports shall include:

**1.**     ~~1.~~     the number of total e**C**laims filed, pending, settled, dismissed or that went to judgment, the total indemnity paid, and total expense paid; and

**2.**     ~~2.~~     with respect to each e**C**laim resolved during the relevant period:

    **a.**     ~~a.~~     the claimant's name;

    **b.**     ~~b.~~     the claim number;

    **c.**     ~~c.~~     jurisdiction;

    **d.**     ~~d.~~     status (open or closed);

50

**e.**   e.——the date of first exposure as set forth in the complaint or as reflected by information reasonably available to Reorganized Debtors;

**f.**   f.——the asbestos product(s) or premises for which Reorganized Debtors is responsible to which the claimant alleges exposure;

**g.**   g.——the Entity(ies) within Reorganized Debtors that the claimant alleges caused his injury;

**h.**   h.——the alleged disease and the date of diagnosis;

**i.**   i.——whether there is a medical diagnosis of the alleged disease;

**j.**   j.——date of death if applicable; and

**k.**   k.——the amount of indemnity paid.

If Reorganized Debtors or the Trust exercise their discretion to provide Reports to Lloyd's Underwriters pursuant to this Section IX.(HI), Reorganized Debtors and the Trust shall still be obligated, at the request of Lloyd's Underwriters (upon reasonable notice, at Lloyd's Underwriters' sole expense, and in a manner convenient to Reorganized Debtors and the Trust) to make available to Lloyd's Underwriters files, information and documents described in this Section IX, that relate to the asbestos bodily injury claims that are the subject of the Report.

**J.**   **Trust not bound**

**For avoidance of doubt, nothing whatsoever in this Section IX shall require the Trust to provide directly to Lloyd's Underwriters or Equitas any files, information, documents, audit or inspection rights or cooperation, except as set forth in Section II.E, unless the Trust receives all of the Settlement Funds.  In addition, the Trust shall not bear any additional out-of-pocket expenses as a result of the operation of this Section IX.**

**X.**   X.——**Reasonably Equivalent Value**

The Parties acknowledge and agree that:

**A.**    A.——This Agreement was bargained for and entered into in good faith and as the result of arm's length negotiations.

**B.**    B.——Based on their respective independent assessments, with the assistance and advice of counsel, of the Chapter 11 Reorganization Cases, and other matters, the consideration exchanged by the Parties pursuant to this Agreement (including the payments from Lloyd's Underwriters, the mutual releases, the designations of Lloyd's Underwriters and Equitas as ~~Settling~~**Settled Asbestos** Insurance Companies, and the other benefits exchanged by the Parties) constitute a fair and reasonable settlement of the Parties' disputes and of their respective rights and obligations relating to the Subject Policies and the 1995 London Agreement and constitute reasonably equivalent value.

## **XI.**    ~~XI.~~——**Confidentiality and Press Release**

### **A.**    A.——Settlement Negotiations

Settlement negotiations leading up to this Agreement, all information exchanged between the Parties in connection with such negotiations, and all related discussions, are confidential and shall be deemed to fall within the protection afforded to compromises and to offers to compromise by Rule 408 of the Federal Rules of Evidence and any parallel state law provisions and shall not be disclosed by either Party except as permitted in this Section XI.

### **B.**    B.——Protection of Confidential Information

In the event that a private litigant (other than a Party to this Agreement, the Reorganized Debtors, or the Trust), by way of document request, interrogatory, subpoena, or questioning at deposition or trial, attempts to compel disclosure of anything protected by this Section XI, the Party from whom disclosure is sought shall decline to provide the requested information on the ground that this Agreement prevents such disclosure. In the event that such

52

private litigant seeks an order from any court or governmental body to compel such disclosure, or in the event that a court, government official, or governmental body (other than the Inland Revenue, Internal Revenue Service, Securities and Exchange Commission or Financial Services Authority) requests or requires disclosure of anything protected by this Section XI, the Party from whom disclosure is sought promptly shall give written notice by facsimile or hand-delivery to the other Party, and promptly shall provide copies of all notice papers, orders, requests or other documents in order to allow each Party to take such protective steps as may be appropriate. All costs incurred by a Party in accordance with this provision shall be the sole responsibility of the Party incurring such costs.

**C.**    ~~C.~~    Press Releases

Any Party issuing a press release concerning this Agreement within thirty (30) days after the Execution Date shall provide the other Parties with a draft copy for comment (but not approval) no later than twenty-four (24) hours before issuance.

**D.**    ~~D.~~    Permitted Disclosures

Notwithstanding anything in this Section XI, nothing in this Agreement shall prevent any Party from disclosing or releasing information relating to the negotiation of this Agreement in any form and at any time after the Execution Date to:

> **1.**    ~~1.~~    reinsurers or retrocessionaires of any Lloyd's Underwriter directly or through intermediaries;
>
> **2.**    ~~2.~~    outside auditors, attorneys or accountants of any Party;
>
> **3.**    ~~3.~~    to the extent required by law, including, to the extent applicable, to the Inland Revenue, the Internal Revenue Service, the

53

Securities and Exchange Commission, the Financial Services Authority or other U.S., U.K., or other governmental authority that properly requires disclosure by a Party hereto;

**4.**      ———4.———to the extent and in any form that such information is required to be disclosed or released to satisfy reporting requirements imposed by law, including any Federal securities laws; and

**5.**      ———5.———in connection with the approval of this Agreement by the Bankruptcy Court.

**XII.**    ~~XII.~~——**Non-Prejudice and Construction of Agreement**

**A.**    ~~A.~~———Character of this Agreement

This Agreement is not a contract of insurance. This Agreement is not subject to rules or construction governing contracts of insurance, including the doctrine of contra proferentum. This Agreement is a compromise between the Parties and shall not be construed as an admission of coverage under the Subject Policies, nor shall this Agreement or any provision hereof be construed as a waiver, modification or retraction of the positions of the Parties with respect to the interpretation and application of the Subject Policies.

**B.**    ~~B.~~———Scope of this Agreement

This Agreement is the product of informed negotiations and involves compromises of the Parties' previously stated legal positions. Accordingly, this Agreement does not reflect upon the Parties' views as to rights and obligations with respect to matters or Entities outside the scope of this Agreement. This Agreement is without prejudice to positions taken by Lloyd's Underwriters with regard to other insureds, and without prejudice to positions taken by

54

**Debtors and/or the** Reorganized Debtors with regard to other insurers. Except for the express references to unidentified Lloyd's Underwriters and Equitas, the Parties specifically disavow any intention to create rights in third parties under or in relation to this Agreement.

**C.**    ~~C.~~——Construction of this Agreement

This Agreement is the jointly drafted product of arm's length negotiations between the Parties with the benefit of advice from counsel, and the Parties agree that it shall be so construed. As such, no Party will claim that any ambiguity in this a**A**greement shall, as a matter of law, be construed against the other Party.

**XIII.**    ~~XIII.~~—**Modification**

Except as expressly provided herein, no change or modification of this Agreement shall be valid unless it is made in writing and signed by the Parties. In the event that any Party is dissolved or otherwise ceases to exist, the remaining Parties may modify this Agreement without that Party's consent.

**XIV.**    ~~XIV.~~—**Integration**

**A.**    ~~A.~~——Entire Agreement

This Agreement, including its Attachments, constitutes the entire agreement and understanding among the Parties with respect to the subject matter hereof, and supersedes all discussions, agreements and understandings, both written and oral, among the Parties with respect hereto. Except as expressly set forth in this Agreement, there are no representations, warranties, promises or inducements, whether oral, written, expressed or implied, that in any way affect or condition the validity of this Agreement or alter its terms. If the facts or law related to the subject matter of this Agreement are found hereafter to be other than is now believed by any of the Parties, the Parties expressly accept and assume the risk of such possible difference of fact

55

or law and agree that this Agreement nonetheless shall be and remain effective according to its terms. This Agreement shall have perpetual existence except as provided herein. This Agreement shall, upon the Trigger Date, also supercede all prior agreements between the Parties relating to the subject matter of this Agreement, including the 1995 London Agreement, and other agreements that have been entered into by the Parties that relate to the Subject Policies and such other agreements shall become null and void.

### **B.** B.——Titles and Captions

Titles and captions contained in this Agreement are inserted only as a matter of convenience and are for reference purposes only. Such titles and captions are intended in no way to define, limit, expand, or describe the scope of this Agreement or the intent of any provision hereof.

### **XV.** XV.——Governing Law

This Agreement shall be governed by, and shall be construed in accordance with, the laws of the State of Delaware without regard to its choice of law rules. Nothing in this Section XV₂ shall affect what law would govern the interpretation or application of the Subject Policies.

### **XVI.** XVI.——Representations

Each Party represents and warrants that it has authority to execute this Agreement as its binding and legal obligation, and the Debtors represent and warrant that they have the authority to execute this Agreement as the binding and legal obligation of all Parties within the definition of **the** Grace **Parties** (subject, however, in the case of the Debtors, to the requirement that the Approval Orders be entered). Each Party represents and warrants that the persons signing this Agreement on its or their behalf is authorized to execute this Agreement (subject, however, in the case of the Debtors to the requirement that the Approval Orders be entered).

## XVII. ~~XVII.~~ Execution and Authority

### A. ~~A.~~ Originals and Counterparts

There will be two (2) signed originals of this Agreement, which may be executed in duplicate counterparts, each of which shall be deemed an original and all of which shall constitute one and the same instrument. Each counterpart may be delivered by facsimile transmission or by e-mailing a scanned version, and a faxed or scanned signature shall have the same force and effect as an original signature.

### B. ~~B.~~ Authority of Equitas and Designation of Attorney-in-Fact

Lloyd's Underwriters agree and acknowledge that Equitas acts as run-off agent for Lloyd's Underwriters, and that, in its capacity as run-off agent, Equitas has authority to act and to designate and authorize signatories for Lloyd's Underwriters with respect to any and all of Lloyd's Underwriters' obligations under this Agreement. Lloyd's Underwriters have designated James Sottile, Esquire, as their attorney-in-fact for the limited purpose of executing this Agreement on their behalf with express authority to do so.

## XVIII. ~~XVIII.~~ Notices, Consent to Jurisdiction, and Service of Suit

Unless another person is designated, in writing, for receipt of notices hereunder, any and all statements, communications, or notices to be provided pursuant to this Agreement shall be in writing and sent by next-Business-Day courier service, with receipt or tracking number requested, postage prepaid (except as otherwise specified in this Agreement). ~~Such notices~~**In addition, Grace shall provide to the Grace Committees copies of all notices, instructions and other notifications which Grace sends or receives under the Settlement Account Agreement, such copies to be provided at the time Grace sends such notice, instruction or**

K&E 11302110.1
Final Agreed Version of Equitas Settlement Agreeme.DOC

**other notification, or within one Business Day after Grace receives such notice, instruction**

**or other notification.  Such notices to the Parties** shall be sent to the following:

If to Grace:

W. R. Grace & Company
7500 Grace Drive
Columbia, Maryland  21044
Attn:  Secretary

Fax:  (410) 531-4367

**--and--**

**Janet S. Baer**
**Kirkland & Ellis LLP**
**200 East Randolph Drive**
**Chicago, Illinois  60601**

**Fax:  (312) 861-2200**

If to Lloyd's Underwriters or Equitas:

Equitas Limited
Claims Division
33 St. Mary Axe
London  EC3A 8LL  ENGLAND
Attn:  Head of Direct Claims

Fax:  011+44+020+7342-2100

--and--

James Sottile
Zuckerman Spaeder LLP
1800 M Street, NW, Suite 1000
Washington, DC  20036-5802

Fax:  (202-)822-8106

**Notices to the Grace Committees shall be sent to the following:**

| | |
|---|---|
| **If to the Official Committee of Asbestos** | **Peter Van N. Lockwood** |
| **Personal Injury Claimants:** | **Caplin & Drysdale** |

K&E 11302110.1
Final Agreed Version of Equitas Settlement Agreeme.DOC

One Thomas Circle, NW
Washington, DC 20005

Fax: (202) 429-3301

| If to the Official Committee of Unsecured Creditors: | Lewis Kruger<br>Kenneth Pasquale<br>Stroock & Stroock & Lavan LLP<br>180 Maiden Lane<br>New York, New York 10038 |

Fax No.: (212) 806-6006

| If to the Official Committee of Asbestos Property Damage Claimants | Scott L. Baena, Esq.<br>Bilzin Sumberg Baena Price & Axelrod LLP<br>200 South Biscayne Boulevard<br>Suite 2500<br>Miami, FL 33131 |

Fax No.: (305) 351-2203

| If to the Official Committee of Equity Security Holders: | Gary M. Becker, Esq.<br>Kramer Levin Naftalis & Frankel LLP<br>919 Third Avenue<br>New York, NY 10022 |

Fax No.: (212) 715-8000

| If to the Future Claimants Representative: | David T. Austern, Esq.<br>Future Claimants Representative<br>c/o Claims Resolution Management Corporation<br>3110 Fairview Park Drive, Suite 200<br>Falls Church, VA 22042-0683 |

Fax No.: (703) 205-6249

with a copy (which shall not constitute notice) to :

Orrick, Herrington & Sutcliffe LLP
3050 K Street, N.W., Suite 200
Washington, DC 20007-5135
Attention: Richard H. Wyron, Esq

Fax No.: (202) 339-8500

59

### XIX. ~~XIX.~~ Binding Effect

This Agreement shall be binding on and inure to the benefit of the successors and assigns of the Parties.

### XX. ~~XX.~~ Continuing Court Jurisdiction

The Parties shall not object to the Bankruptcy Court's exercising jurisdiction to resolve disputes under or concerning this Agreement, its terms and performance, including disputes concerning the Settlement Account Agreement, whether this Agreement has or should terminate, whether modifications to the Plan disqualify it as a "Plan" as defined in Section I.(~~T~~U), or whether the Trigger Date has occurred. Any Party that is concerned whether an action it or another Party takes or proposes to take under or with respect to this Agreement is consistent with or violative of its terms, may request from the Bankruptcy Court an order or instructions so determining. Any Party may seek specific performance from the Bankruptcy Court of the terms of this Agreement by another Party that refuses or fails to take actions or refrain from taking actions required by this Agreement.

IN WITNESS WHEREOF, the Parties have executed this Agreement by their duly authorized representatives.

**W. R. GRACE & CO.** ~~AND W. R. GRACE &~~
~~CO. CONN. ON THEIR~~ON ITS **OWN**
**BEHALF** _____ **AND**
**ON BEHALF OF ALL PERSONS INCLUDED**
_____ **IN THE DEFINITION OF**
**GRACE** PARTIES

_____
_____
_____By:
Name: _____
Title: _____
Date: _____

**FOR LLOYD'S UNDERWRITERS**

60

By:_____

Name: _____      James Sottile

Title: _____      Attorney-in-Fact

Date: _____

61

# ATTACHMENT A

## Known Subject Policies

## ATTACHMENT B

### Known Lloyd's, London, Syndicate Numbers

## ATTACHMENT C

### Settlement Account Agreement