# EXHIBIT A

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W. R. GRACE & CO., et al.[1] | ) | Case No. 01-01139 (JKF) |
| | ) | (Jointly Administered) |
| Debtors. | ) | Re: Docket No. 12432 |
| | ) | 11/20/06 Agenda Item No. 4 |
| | ) | |

## ORDER APPROVING THE DEBTORS' SETTLEMENT AGREEMENT
## AND MUTUAL RELEASE WITH LLOYD'S UNDERWRITERS

This matter coming before the Court on the Motion of Debtors for Entry of an Order

Approving Settlement Agreement with Lloyd's Underwriters (the "Motion")[2]; the Court having

reviewed the Motion; the Court finding that (a) the Court has jurisdiction over this matter

pursuant to 28 U.S.C. §§ 157 and 1334, (b) this is a core proceeding pursuant to 28 U.S.C.

§ 157(b)(2), and (c) notice of the Motion was adequate under the circumstances; and the Court

having determined that the legal and factual bases set forth in the Motion establish just cause for

the relief granted herein;

---

[1] The Debtors consist of the following 62 entities: W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.), W. R. Grace & Co.-Conn., A-1 Bit & Tool Co., Inc., Alewife Boston Ltd., Alewife Land Corporation, Amicon, Inc., CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace II, Inc., Creative Food 'N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC (f/k/a Dewey and Almy Company), Ecarg, Inc., Five Alewife Boston Ltd., G C Limited Partners I, Inc. (f/k/a Grace Cocoa Limited Partners I, Inc.), G C Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC Management Corporation, GN Holdings, Inc., GPC Thomasville Corp., Gloucester New Communities Company, Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical Company of Cuba, Grace Culinary Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe, Inc., Grace H-G Inc., Grace H-G II Inc., Grace Hotel Services Corporation, Grace International Holdings, Inc. (f/k/a Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W. R. Grace Capital Corporation, W. R. Grace Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-Caribe Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai Development Company, L B Realty, Inc., Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH, Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Inc., MRA Holdings Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (f/k/a Nestor-BNA, Inc.), MRA Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental Liability Management, Inc., E&C Liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin & Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country Staffing), Hayden-Gulch West Coal Company, H-G Coal Company.

[2] Capitalized terms used herein have the meanings ascribed to them in the Motion.

NOW, THEREFORE, IT IS HEREBY ORDERED THAT:

1. The Motion is GRANTED.

2. The Settlement Agreement, as amended, is approved. A copy of the amended Settlement Agreement is attached hereto as Exhibit A.

3. The Debtors shall be, and hereby are, authorized to enter into the Settlement Agreement, and are authorized to execute, deliver, implement and fully perform any and all obligations, instruments, documents and papers and to take any and all actions reasonably necessary or appropriate to consummate the Settlement Agreement and perform any and all obligations contemplated therein.

4. This Court shall retain jurisdiction to interpret, implement, and enforce the provisions of this Order subject to the provisions of the Settlement Agreement.

Dated: _____, 2006

_____
The Honorable Judith K. Fitzgerald
United States Bankruptcy Judge

K&E 11301953.1

# EXHIBIT A

## SETTLEMENT AGREEMENT AND MUTUAL RELEASE

This Settlement Agreement and Mutual Release is made by and between W. R. Grace & Co., on its own behalf and on behalf of the Grace Parties, and Lloyd's Underwriters, each as defined herein (collectively, the "Parties").

### WITNESSED THAT:

WHEREAS, Lloyd's Underwriters severally subscribed to certain policies of insurance that provide, or are alleged to provide, insurance coverage to certain Grace Parties; and

WHEREAS, Grace and Lloyd's Underwriters entered into an agreement dated November 17, 1995 (the "1995 London Agreement") concerning the application to Asbestos Claims of certain policies of insurance severally subscribed by Lloyd's Underwriters and London Market Companies in favor of Grace; and

WHEREAS, the Grace Parties and Lloyd's Underwriters agree that the London Market Companies and any other insurance company that may have severally subscribed to or participated on any Subject Policies are not parties to this agreement and any rights that the Grace Parties have against the London Market Companies or any other insurance company with respect to the Subject Polices, the 1995 London Agreement or otherwise are not being released, compromised or affected by this agreement in any way. It is acknowledged by Lloyd's Underwriters and the Grace Parties that the London Market Companies and other insurance companies are not parties to this Agreement; and

WHEREAS, the 1995 London Agreement resolved disputes concerning policies that were severally subscribed by Lloyd's Underwriters and London Market Companies and that had inception dates prior to June 30, 1985. This Agreement is, effective on the Trigger Date, terminating Lloyd's Underwriters' obligations under the 1995 London Agreement and also is resolving obligations that Lloyd's Underwriters may have to the Grace Parties with respect to

1

policies issued to Grace that have inception dates of June 30, 1985 or later as more fully described in the definition of Subject Policies in this Agreement. However, with respect to policies that have inception dates of June 30, 1985 or later, this Agreement shall also not apply to London Market Companies or other insurance companies that participated on those policies, whether such companies are parties to the 1995 London Agreement or not; and

WHEREAS, the Grace Parties have incurred and may incur in the future certain liabilities, expenses, and losses arising out of Asbestos Claims and other Claims; and

WHEREAS, Lloyd's Underwriters are obligated under the 1995 London Agreement to make certain payments in connection with Asbestos Claims under the Subject Policies identified in the 1995 London Agreement; and

WHEREAS, the Grace Parties contend that Lloyd's Underwriters may also be obligated to make payments under the Subject Policies for Claims other than Asbestos Claims; and

WHEREAS, there are or may in the future be disputes between the Parties regarding their respective rights and obligations with respect to insurance coverage under the Subject Policies with respect to Claims and regarding their respective rights and obligations with respect to the 1995 London Agreement; and

WHEREAS, on or about April 2, 2001, W. R. Grace & Co., W. R. Grace & Co-Conn., and certain other debtors filed reorganization cases pursuant to Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware, jointly administered as Bankruptcy Petition No. 01-01139 (JKF), et seq. (the "Chapter 11 Reorganization Cases"), and Grace and such other debtors continue to operate their businesses as debtors and debtors-in-possession (collectively, the "Debtors"); and

WHEREAS, the Grace Parties anticipate that a plan of reorganization will be confirmed by the Bankruptcy Court in the Chapter 11 Reorganization Cases that the Grace Parties anticipate will provide for the establishment of a trust pursuant to section 524(g) of the Bankruptcy Code to process and pay Asbestos Claims involving Grace; and

WHEREAS, in consideration of certain monetary payments and other consideration as more fully set forth herein, the Parties intend to adopt, by way of compromise, and without (i) prejudice to or waiver of their respective positions in other matters, (ii) trial or adjudication of any issues of fact or law, or (iii) Lloyd's Underwriters' admission of liability or responsibility under the Subject Policies or the 1995 London Agreement, a full and final settlement that: (a) releases and terminates all rights, obligations and liabilities (if any) that the Parties may owe one another with respect to the Subject Policies and the 1995 London Agreement; and (b) fully and finally settles all claims that the Parties asserted or could have asserted against one another pursuant to the Subject Policies and the 1995 London Agreement.

**AGREEMENTS:**

NOW, THEREFORE, in full consideration of the foregoing and of the mutual promises and covenants herein contained, and intending to be legally bound hereby, subject to the entry of the Approval Order and subject to the terms and conditions set forth herein, the Parties hereby agree as follows:

**I.     Definitions**

The following definitions apply to the capitalized terms wherever those terms appear throughout the Agreement or in any attachments hereto. Capitalized terms in the prefatory paragraph, recitals, this Definitions section, and in the sections below have the meanings ascribed to them therein to the extent they are not otherwise defined in this Definitions section. The terms "Asbestos Insurance Entity Injunction", "Asbestos Channeling Injunction," "Released

3

Matters Injunction," "Plan Supplement" and "Settled Asbestos Insurance Company," shall have the meanings set forth in the *Amended Joint Plan of Reorganization* filed by the Plan Proponents on or about January 13, 2005. Each defined term stated in a singular form includes the plural form, each defined term stated in plural form includes the singular form, and each defined term stated in the masculine, feminine, or neuter form includes each of the masculine, feminine and neuter forms. The word "including" means "including but not limited to."

A.   Affiliate: An "Affiliate" of an Entity shall mean another Entity that is directly or indirectly (through one or more intermediaries) controlled by the first Entity.

B.   Agreement: The term "Agreement" means this Settlement Agreement and Mutual Release, as the same may be amended or modified from time to time in accordance with its provisions.

C.   Approval Order: The term "Approval Order" means an order of the Bankruptcy Court, in form and substance satisfactory to the Parties, approving this Agreement and the compromise and settlement memorialized herein between and among the Parties (the "Approval Order").

D.   Asbestos Claims: "Asbestos Claims" means any and all Claims, asserted by any person or Entity, whether in litigation or not, that arise out of, relate to, involve, result from or are attributable to asbestos in any form (including products containing asbestos) and from any source, including Claims that seek to impose legal liability for damages, or which seek any other relief, because or on account of or arising in any way from the manufacture, sale, installation, presence, removal, replacement, encapsulation or other remediation or abatement of, or testing or monitoring or inspection for, asbestos-containing products or materials

4

including (a) alleged property damage or other harm, or (b) alleged bodily injury, sickness, disease, mental anguish and injury, increased risk of harm, and/or death or other harm, allegedly caused by or on account of asbestos or asbestos fibers.

E. <u>Asbestos Legislation</u>: The term "Asbestos Legislation" means any legislation enacted into law by the United States Congress that (i) regulates, limits or controls the prosecution of Asbestos Claims in the state or federal courts, and (ii) creates or purports to create an obligation on Lloyd's Underwriters to pay money pursuant to the legislation for the benefit of asbestos claimants. The term "Asbestos Legislation" does not mean legislation that concerns general tort reform, class action reform, malpractice reform, or tax reform, or any other legislation that would regulate, limit or control Claims not arising from or attributable to exposure to asbestos or asbestos-containing products. For the avoidance of doubt, the fact that legislation alters or modifies the requirements or standards for establishing liability against the Reorganized Debtors and/or the Trust (including legislation that imposes medical and/or exposure criteria, imposes strict liability on the Reorganized Debtors and/or the Trust, or regulates or limits the jurisdiction or forum in which an Asbestos Claim may be brought) does not make such legislation "Asbestos Legislation" under this Section I.(E).

F. <u>Bankruptcy Court</u>: The term "Bankruptcy Court" means the United States Bankruptcy Court for the District of Delaware.

G. <u>Business Day</u>: The term "Business Day" means any day that is not a Saturday, a Sunday, a federal holiday in the United States of America or a national holiday in the United Kingdom.

5

H.    Claim:  The term "Claim" means:

1.    "Claim" as that term is defined in the United States Bankruptcy Code, 11 U.S.C. Sec. 101(5);

2.    "Demand" as that term is defined in the United States Bankruptcy Code, 11 U.S.C. Sec. 524(g)(5); and

3.    any claim (whether past, present or future, known or unknown, asserted or unasserted, foreseen or unforeseen, fixed or contingent, direct or indirect, matured or unmatured, liquidated or unliquidated, direct or consequential, and whether in law, equity, admiralty or otherwise), assertion of right, complaint, cross-complaint, counterclaim, affirmative defense, writ, demand, inquiry, request, directive, obligation, suit, lawsuit, action, cause of action, administrative proceeding, governmental claim or action, order, judgment, settlement, mediation, arbitration, lien, and any other assertion of liability of any kind.  For the avoidance of doubt, "Claim" includes any claim:

a.    arising out of, related to, involving, resulting from or attributable to asbestos in any form and from any source, including products containing such substances, or to any other substance, product, matter or material in any form or state;

b.    any cumulative or other injury or damage, including noise induced hearing loss, arising from any activity, operation, or exposure;

Final Agreed Version of Equitas Settlement Agreement_(11466573_3).DOC

c.      any alleged bad faith, conspiracy, unfair claim practice, unfair trade practice, fraud or misrepresentation, or extra-contractual or tort liability, under any theory of liability whatsoever;

d.      for damages (including any damage or injury of any kind whatsoever caused by or allegedly caused by asbestos), including damages as a result of death, bodily injury, sickness, disease, emotional injury, damage to property, diminution in value or loss of use, economic loss, and punitive, exemplary, statutory damages or penalties, indemnity or defense obligations, insurance premiums (whether retrospectively rated or otherwise), deductibles, self-insured retentions, costs, expenses, contribution or subrogation; and

e.      pursuant to or under a contract, other agreement, promise, representation or warranty or pursuant to any direct action or statutory or regulatory right of action or based on tort liability.

I.      Confirmation Order:  The term "Confirmation Order" means an order entered by the Bankruptcy Court in the Chapter 11 Reorganization Cases confirming the Plan, together with any order of the District Court issued pursuant to section 524(g)(3)(A) of the Bankruptcy Code confirming or affirming such order.

J.      District Court:  The term "District Court" means the United States District Court for the District of Delaware.

K.      Entity:  The term "Entity" means any individual, corporation, limited liability company, partnership, association, joint stock company, joint venture, estate, trust, including the Trust as defined in Section I.(FF) herein, unincorporated organization, federal, state, local or foreign government or any political subdivision thereof, or other person or entity.

L.      Equitas:  The term "Equitas" means:

1.      Equitas Limited, Equitas Reinsurance Limited, Equitas Holdings Limited, Equitas Management Services Limited, and Equitas Policyholders Trustee Limited;

2.      each of the respective parents, Subsidiaries, Affiliates, divisions, holding companies, merged companies, acquired companies, predecessors-in-interest, successors-in-interest, estates, scheme administrators and assigns of the foregoing, solely in their capacities as such; and

3.      each of the present and former directors, members, officers, shareholders, trustees, receivers, estates (including bankruptcy and insolvency estates), employees,        agents,        representatives,        attorneys,        heirs,        executors,

8

administrators, and reinsurers of the foregoing, solely in their capacities as such.

For avoidance of doubt, Equitas is not an insurance company as that term is used in this Agreement.

M.    <u>Execution Date</u>:  The term "Execution Date" means the earliest date on which this Agreement has been signed by all of the Parties.

N.    <u>Final Order</u>:  "Final Order" means an order or judgment of the Bankruptcy Court, the District Court or other court of competent jurisdiction, as entered on the docket in any Chapter 11 Reorganization Case or the docket of any other court of competent jurisdiction, that has not been reversed, stayed, modified or amended, and as to which the time to appeal or seek certiorari or move for a new trial, reargument or rehearing has expired, and no appeal or petition for certiorari or other proceedings for a new trial, reargument or rehearing has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been timely filed has been withdrawn or resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought or the new trial, reargument or rehearing has been denied or has resulted in no modification of such order.

O.    <u>Grace</u>:  The term "Grace" means:  W. R. Grace & Co., a Delaware corporation.

P.    <u>Grace Parties</u>:  The term "Grace Parties" means:

1.    Grace;

9

2.        W.R. Grace & Co-Conn., a Connecticut corporation;

3.        all other debtors and debtors in possession in the Chapter 11 Reorganization Cases;

4.        All subsidiaries, divisions, and Affiliates of the foregoing, including any Entity in which any of the Debtors has an ownership interest of fifty percent (50%) or more;

5.        Any predecessor, successor or assign of any of the foregoing Entities;

6.        Any Entity that has been acquired by, merged into or combined with any of the Entities described in this Section I.(P);

7.        Any Entity on whose behalf W. R. Grace & Co. or W. R. Grace & Co-Conn. has the power to release claims under the Subject Policies or the 1995 London Agreement; and

8.        The directors, officers, agents, and employees of the foregoing Entities, in their respective capacities as such.

For avoidance of doubt, "Grace Parties" includes the Reorganized Debtors.

Q.    Grace Committees:  The term "Grace Committees" means the Official Committee of Asbestos Personal Injury Claimants, the Official Committee of Asbestos Property Damage Claimants, the Official Committee of Unsecured Creditors, the Official Committee of Equity Security Holders, and the Future Claimants Representative in the Chapter 11 Reorganization Cases.

R.    Injunctions:   The term "Injunctions" shall mean the injunctions described in Section I.U (3-5) below.

S.    Lloyd's Underwriters:   The term "Lloyd's Underwriters" means (i) all the underwriters, members or Names, at Lloyd's, London who, through their participation in syndicates (including without limitation, those identified on Attachment B hereto), severally subscribed, each in his own proportionate share, to one or more of the Subject Policies, as well as all underwriters, members or names at Lloyd's, London (whether or not they participated in the syndicates identified in Attachment B hereto) who, through their participation in syndicates (including without limitation, those identified on Attachment B hereto) severally subscribed to any Subject Policies the existence of which (a) has not presently been established; or (b) has been established but as to which the identities of the Names, members or syndicates are not presently known; (ii) all the present and former employees (if any), representatives, attorneys and agents of the Entities and persons set forth in clause (i) of this Section I.(S), and their respective predecessors and successors, if any, solely in such capacity; and (iii) the respective heirs, executors, administrators, successors, assigns and reinsurers (as

11

such) of any of the foregoing.   For avoidance of doubt, the term "Lloyd's Underwriters" does not include Equitas.

T.    London Market Companies:   The term "London Market Companies" means those insurance companies doing business in the London Insurance Market that severally subscribed policies of insurance in favor of Grace and that are parties to the 1995 London Agreement.

U.    Plan:   The term "Plan" means a plan of reorganization filed in the Chapter 11 Reorganization Cases, provided that such plan and modifications thereto:

1.    are not inconsistent with the terms of this Agreement;

2.    do not materially and adversely affect the interests of Lloyd's Underwriters, Equitas or the Grace Parties under this Agreement;

3.    provide for a channeling injunction pursuant to Section 524(g) of the Bankruptcy Code that is at least as broad as the Asbestos Channeling Injunction provided in the *Amended Joint Plan of Reorganization* filed by the Plan Proponents on or about January 13, 2005, (the "524(g) Injunction") and that applies to Lloyd's Underwriters and Equitas;

4.    provide for an injunction pursuant to Section 105(a) of the Bankruptcy Code that is at least as broad and inclusive as the Released Matters Injunction provided in the *Amended Joint Plan of Reorganization* filed by the Plan Proponents on or about January 13, 2005, and that applies to Lloyd's Underwriters and Equitas;

12

5.    provide for an injunction that is at least as broad and inclusive as the Asbestos Insurance Entity Injunction provided in the *Amended Joint Plan of Reorganization* filed by the Plan Proponents on or about January 13, 2005, and that applies to Lloyd's Underwriters and Equitas; and

6.    provide for an indemnification of Lloyd's Underwriters and Equitas by the Reorganized Debtors, but not the Trust, in accordance with Section V. hereof or, if it does not contain such indemnification, there must be a written waiver by Lloyd's Underwriters of the requirement that the Plan provide for such indemnification.

V.    Plan Effective Date:  The term "Plan Effective Date" means the first Business Day after the date on which all conditions precedent to the effectiveness of the Plan (as specified therein) are satisfied or waived or, if a stay of the Confirmation Order is in effect on such date, the first Business Day after the expiration, dissolution, or lifting of such stay.

W.    Plan Proponents:  The term "Plan Proponents" includes the Debtors, the Official Committee of Unsecured Creditors, and the Official Committee of Equity Security Holders.

X.    Reorganized Debtor:  The term "Reorganized Debtor" "Reorganized Debtors" or "Reorganized Grace" shall mean the Debtors on and after the Plan Effective Date.

Y.    Settlement Account:  The term "Settlement Account" means the bank trust or escrow account created pursuant to the Settlement Account Agreement.

Z.    Settlement Account Agent:  The term "Settlement Account Agent" means the bank or financial institution which serves as trustee or escrow agent of the Settlement Account that shall be appointed pursuant to this Agreement and the Settlement Account Agreement with the prior written consent of the Parties, which shall not be unreasonably or unseasonably withheld.  Without appointing the same, the Parties hereby consent to the appointment of J.P. Morgan Chase Bank, N.A., as Settlement Account Agent.

AA.   Settlement Account Agreement:  The term "Settlement Account Agreement" means the agreement creating the Settlement Account, for the purpose of establishing an insurance escrow account to hold payments made by Lloyd's

14

Underwriters pursuant to this Agreement, which shall be substantially in the form of the Escrow Agreement attached as Attachment C hereto.

BB.   Settlement Amount:  The term "Settlement Amount" means the sum of Ninety Million Dollars U.S. ($90,000,000).

CC.   Subject Policies:  The term "Subject Policies" means:

    1.   all insurance policies listed on Attachment A hereto; and

    2.   all known and unknown policies of insurance (whether or not listed in Attachment A hereto) severally subscribed to by Lloyd's Underwriters and providing coverage to any Grace Party  that were originally allocated by the Lloyd's Policy Signing Office or otherwise to the 1992 year of account or any earlier year of account, including any liabilities under such contracts reinsured to close into the 1993 or any later year of account, but excluding any liabilities re-signed or reallocated pursuant to a premium transfer into the 1993 or later year.

Notwithstanding the foregoing, Subject Policies shall not, in any event, include policies of insurance incepting on or after January 1, 1998.

DD.   <u>Subsidiary</u>: A "Subsidiary" of an Entity shall mean a corporation as to which the Entity possesses shares of common stock and exercises control through the voting power of such stock.

EE.   <u>Trigger Date</u>: The term "Trigger Date" means the day that the last of the following has occurred, provided that this Agreement has not previously become null and void pursuant to its terms:

     1.   The Approval Order becomes a Final Order;

     2.   The time during which Lloyd's Underwriters have the right to terminate this Agreement pursuant to Section VIII.A.5 shall have passed without Lloyd's Underwriters providing written notice of termination;

     3.   The Confirmation Order becomes a Final Order; and

     4.   The occurrence of the Plan Effective Date with respect to a plan that satisfies the definition of Plan set forth in Section I.U.

FF.   <u>Trust</u>: The term "Trust" shall mean the trust to be established under the Plan pursuant to section 524(g) of the Bankruptcy Code to process and pay Asbestos Claims as authorized by the Plan.

GG.   <u>Trust Agreement</u>. The term "Trust Agreement" shall mean the agreement in connection with the formation and establishment of the Trust.

## II.   <u>Payment of the Settlement Amount</u>

A.   No later than ten (10) Business Days after the entry of the Approval Order, Lloyd's Underwriters shall pay the full Settlement Amount to the Settlement Account Agent by

wire transfer for payment into the Settlement Account. Time is of the essence with respect to the payment of the Settlement Amount.

B.      The Settlement Amount, together with investment earnings thereon (collectively "Settlement Funds"), shall be held in escrow in the Settlement Account for the benefit of the holders of the types of Claims for which the Grace Parties were provided coverage under the Subject Policies, until the respective interests of such claimants, if any, with respect to the Settlement Funds, shall have been determined or otherwise agreed to and the Settlement Account Agent has distributed the Settlement Funds to a particular Entity or Entities pursuant to the confirmed Plan or as ordered by the Bankruptcy Court as set forth in the following section (C) below.

C.      On the Trigger Date, the Parties shall direct the Settlement Account Agent to release the Settlement Funds to the Entity or Entities designated under the confirmed Plan or as ordered by the Bankruptcy Court to receive the Settlement Funds on behalf of types of Claims, including Asbestos Claims, for which the Grace Parties were provided coverage under the Subject Policies, provided that this Settlement Agreement has not earlier been terminated in accordance with its terms, along with any and all interest or investment income accrued (less (i) any expenses that the Settlement Account Agent incurs pursuant to the Settlement Account Agreement; (ii) any reserves required under the Settlement Account Agreement to be held for the payment of taxes, indemnities, or otherwise; and (iii) any losses incurred under any investment of the Settlement Amount permissible under the Settlement Account Agreement). Upon the release of the Settlement Funds as provided in the preceding sentence, legal and equitable title to the Settlement Funds shall pass irrevocably to the Entity or the Entities designated under the

confirmed Plan or as ordered by the Bankruptcy Court to receive the same to be distributed pursuant to this Agreement and the confirmed Plan.

      D.     In the event that the types of Claims, including Asbestos Claims, for which the Grace Parties were provided coverage under the Subject Policies, are paid in full pursuant to the confirmed Plan from sources other than the Settlement Funds, then the Settlement Funds shall revert back to the Reorganized Debtors subject to the confirmed Plan or an order of the Bankruptcy Court.

      E.     In the event that the confirmed Plan or order of the Bankruptcy Court designates that the Settlement Funds are to be disbursed to an Entity or Entities other than the Reorganized Debtors, that Entity or Entities shall be bound to the provisions of this Agreement and the Settlement Account Agreement with the same force and effect as if said Entity(s) was a party to this Agreement and the Settlement Account Agreement except that the Indemnity obligations outlined in Section V. herein shall not apply to the Trust. If all of the Settlement Funds are disbursed to the Trust, the Trust shall have a duty to defend the application of the 524(g) Injunction as to any Claims asserted against Lloyd's Underwriters and/or Equitas that are subject to the 524(g) Injunction. If the Plan provides that the Trust is to provide claim reporting to insurers other than Lloyd's Underwriters, the Trust shall provide Lloyd's Underwriters with copies of all reports it provides to other insurers that include some or all of the information set forth in Section IX.I below, at the sole expense of Lloyd's Underwriters with respect to out-of-pocket costs incurred by the Trust, regardless of whether the Settlement Funds are disbursed to the Trust. Nothing whatsoever in this Agreement shall require the Trust to do anything other than copy Lloyd's Underwriters or Equitas on reports already created and provided to other insurance companies on a periodic basis, to provide Lloyd's Underwriters or Equitas with any

18

rights to audit or inspect the Trust's documents, files or databases, or to provide Lloyd's Underwriters or Equitas with any cooperation whatsoever other than copying them on periodic reports otherwise provided to other insurance companies, unless the Trust receives the Settlement Funds. Lloyd's Underwriters shall, however, have the right to terminate this Agreement as provided in Section VIII.A below if a confirmation order is issued for a plan of reorganization that does not meet the definition of Plan provided in Section I.U or does not contain the provisions described in Section VIII.A.5(ii)-(v).

F.    Except as otherwise expressly provided in Section VIII. with respect to the Settlement Amount, the Settlement Amount and any and all past payments by Lloyd's Underwriters under, arising out of, or related to, or involving the Subject Policies and the 1995 London Agreement are deemed final and irrevocable payments. Lloyd's Underwriters' payment of the Settlement Amount is in addition to any and all payments made by Lloyd's Underwriters to or for the benefit of the Grace Parties prior to the Execution Date.

**III.    Several Liability**

The Grace Parties and Lloyd's Underwriters acknowledge that (i) the obligations of Lloyd's Underwriters hereunder are several, and not joint, (ii) no Lloyd's Underwriter shall be liable for any portion of the Settlement Amount allocated to any other Lloyd's Underwriter, and (iii) no Lloyd's Underwriter shall be liable for any share of the Subject Policies subscribed by other Entities.

**IV.    Releases**

A.    Release By the Grace Parties:

Except for the obligations created by this Agreement,

1.  Effective on the Trigger Date, the Grace Parties (on behalf of themselves and their successors and assigns, in their capacities as such) hereby release, remise, covenant not to sue and forever discharge Lloyd's Underwriters from and against:

    a.  any and all Claims that the Grace Parties ever had, now has, or hereafter may have; and/or

    b.  liabilities to any Grace Party of any Lloyd's Underwriters or Equitas,

    in either the case of (a) or (b) above,

        i.  for, arising out of, or in connection with insurance coverage (including both defense costs and indemnification claims) under the Subject Policies and the 1995 London Agreement with respect to Lloyd's Underwriters' participation in the Subject Policies, the 1995 London Agreement or any other agreement between the Parties relating to the Subject Policies; or

        ii. arising out of or in connection with any act, omission, representation, or conduct of any sort in connection with any of the Subject Policies, the 1995 London Agreement or any other agreement between the Parties relating to the Subject Policies, with respect to Lloyd's Underwriters'

20

participation in the Subject Policies, the 1995 London Agreement or such other agreement; or

iii.    otherwise arising from or relating to the Subject Policies, the 1995 London Agreement or any other agreement between the Parties relating to the Subject Policies, with respect to Lloyd's Underwriters' participation in the Subject Policies, the 1995 London Agreement or such other agreement.

2.    Effective on the Trigger Date, the Grace Parties intend to reserve no rights or benefits whatsoever under or in connection with the Subject Policies and the 1995 London Agreement, but only to the extent subscribed by or participated in by Lloyd's Underwriters, with respect to any past, present or future Claims, the Grace Parties expressly reserving all other rights and benefits under the Subject Policies and the 1995 London Agreement to the extent subscribed by or participated in by Entities other than Lloyd's Underwriters.

3.    Effective on the Trigger Date, (i) any and all rights, duties, responsibilities and obligations of Lloyd's Underwriters created by or in connection with the Subject Policies and the 1995 London Agreement are hereby terminated, and (ii) the Grace Parties have no insurance coverage from Lloyd's Underwriters under the Subject Policies or rights against Lloyd's Underwriters under the 1995 London Agreement. The releases contained

21

in this Agreement as between the Grace Parties, and Lloyd's Underwriters are intended to operate with respect to Lloyd's Underwriters as though Lloyd's Underwriters had never subscribed to the Subject Policies.

4.    All releases contained in this Section IV. also extend to Equitas, which is an intended third-party beneficiary of the terms of the releases, to the same extent as they extend to Lloyds Underwriters.

5.    THE GRACE PARTIES ACKNOWLEDGE THAT THEY HAVE BEEN ADVISED BY THEIR ATTORNEYS CONCERNING, AND ARE FAMILIAR WITH, THE CALIFORNIA CIVIL CODE SECTION 1542 AND EXPRESSLY WAIVE ANY AND ALL RIGHTS UNDER CALIFORNIA CIVIL CODE SECTION 1542, WHICH PROVIDES THAT "A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR," AND UNDER ANY OTHER FEDERAL OR STATE STATUTE OR LAW OF SIMILAR EFFECT.

6.    The Grace Parties expressly assume the risk that acts, omissions, matters, causes or things may have occurred that they do not know or do not suspect to exist.

B.    <u>Releases By Lloyd's Underwriters:</u>

Except for the obligations created by this Agreement,

1.    Effective on the Trigger Date, Lloyd's Underwriters hereby release, remise, covenant not to sue and forever discharge the Grace Parties from and against;

a.    any and all Claims that Lloyd's Underwriters ever had, now have, or hereafter may have; and/or

b.    liabilities to Lloyd's Underwriters of any Grace Party,

in either case of (a) or (b) above

i.    for, arising out of, or in connection with insurance coverage, including both defense costs and indemnification claims, under the Subject Policies, the 1995 London Agreement or any other agreement between the parties relating to the Subject Policies, with respect to Lloyd's Underwriters' participation in the Subject Policies, the 1995 London Agreement or any other such agreement; or

ii.    arising out of or in connection with any act, omission, representation, or conduct of any sort in connection with any of the Subject Policies, the 1995 London Agreement or any other agreement between the Parties with respect to the Subject Policies, with respect to Lloyd's Underwriters'

participation in the Subject Policies, the 1995 London Agreement or any other such agreement; or

iii.    otherwise arising from or relating to the Subject Policies, the 1995 Agreement or any other agreement between the Parties relating to the Subject Policies, with respect to Lloyd's Underwriters' participation in the Subject Policies, the 1995 London Agreement or such other agreement.

2.    Effective on the Trigger Date, Lloyd's Underwriters intend to reserve no rights or benefits whatsoever under or in connection with the Subject Policies and the 1995 London Agreement, but only to the extent subscribed by or participated in by Lloyd's Underwriters, with respect to any past, present or future Claims.

3.    Effective upon the Trigger Date, any and all rights, duties, responsibilities and obligations of the Grace Parties created by or in connection with the Subject Policies and the 1995 London Agreement are hereby terminated. As of the Trigger Date, Lloyd's Underwriters and Equitas have no rights with respect to the Grace Parties under the Subject Policies and the 1995 London Agreement.  The releases contained in this Agreement are intended to operate as though Lloyd's Underwriters had never subscribed to the Subject Policies.  Nothing in this Section IV.(B)(3) shall affect Lloyd's Underwriters' or Equitas' right to seek reimbursement from their

reinsurers or retrocessionaires in their capacities as such (but not including any Grace Party).

4.   LLOYD'S UNDERWRITERS ACKNOWLEDGE THAT THEY HAVE BEEN ADVISED BY THEIR ATTORNEYS CONCERNING, AND ARE FAMILIAR WITH, THE CALIFORNIA CIVIL CODE SECTION 1542 AND EXPRESSLY WAIVE ANY AND ALL RIGHTS UNDER CALIFORNIA CIVIL CODE SECTION 1542, WHICH PROVIDES THAT "A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR," AND UNDER ANY OTHER FEDERAL OR STATE STATUTE OR LAW OF SIMILAR EFFECT.

5.   Lloyd's Underwriters expressly assume the risk that acts, omissions, matters, causes or things may have occurred that they do not know or do not suspect to exist.

## V.   **Indemnification**

A.   Obligation of the Reorganized Debtors to Indemnify

Reorganized Debtors shall defend, indemnify and hold harmless Lloyd's Underwriters, including defense costs, in respect of any and all Claims against Lloyd's Underwriters relating to the Subject Policies, the 1995 London Agreement or any other agreement between the Parties

relating to the Subject Policies that are not subject to the Injunctions and shall defend application of the Injunctions to all Claims against Lloyd's Underwriters and Equitas subject to the Injunctions (except to the extent that the Trust has the duty under the Plan to defend application to Lloyd's Underwriters and Equitas of the 524(g) channeling injunction described in Section I.U(3)) (collectively, the "Indemnified Claims"). The Indemnified Claims include all Claims whether by way of direct action or otherwise, made by: (i) other insurers of Grace; (ii) any person or Entity claiming to be insured under the Subject Policies; (iii) any person or Entity who has made or will or can make a claim under the Subject Policies or the 1995 London Agreement; (iv) any person or Entity who has acquired or been assigned the right to make a claim under the Subject Policies or the 1995 London Agreement; or (v) any federal, state or local government or any political subdivision, agency, department, board or instrumentality thereof. In the event that the Reorganized Debtors defend Lloyd's Underwriters against Claims alleging fraudulent conduct, criminal conduct, gross malfeasance or misfeasance or intentional wrongdoing, the Reorganized Debtors shall be entitled to recoup the costs of such defense if Lloyd's Underwriters are in fact determined to have engaged in such conduct. The Parties acknowledge that this indemnification includes Claims made by any person or Entity over whom Grace does not have control, including former subsidiaries, predecessors in interest, and sellers or purchasers of assets.

For the avoidance of doubt, the obligations set forth in this Article V are not obligations of the Trust.

B.    Notice of Indemnified Claims

Lloyd's Underwriters shall forward promptly to Reorganized Debtors any demand, notice, summons or other process (an "Indemnified Claim Notice") received by them in connection with any Indemnified Claim. Reorganized Debtors shall promptly, and in any event

26

within ten (10) Business Days of receipt of an Indemnified Claim Notice, acknowledge in writing their obligations under this Agreement in connection with the Indemnified Claim and shall in fact assume responsibility for the defense of the Indemnified Claim as hereinafter set forth. To the extent that Reorganized Debtors do not agree that the claim so submitted is an Indemnified Claim pursuant to this Agreement, Reorganized Debtors shall so inform Lloyd's Underwriters, in writing, within ten (10) Business Days of receipt of such Indemnified Claim Notice. Reorganized Debtors shall solicit and consider the views and obtain the consent of Lloyd's Underwriters in choosing counsel to defend an Indemnified Claim, which consent shall not be unreasonably withheld. Following solicitation and consideration of the views of Lloyd's Underwriters, Reorganized Debtors shall have the right and the obligation to direct the defense of the Indemnified Claim; provided, however, that:

1.      Reorganized Debtors shall take no position on behalf of Lloyd's Underwriters with respect to an Indemnified Claim, substantive or procedural, without their consent;

2.      In any filing with a Court, Reorganized Debtors shall state in the caption of the filing that it is filed by them "as indemnitor of Lloyd's Underwriters." Unless waived in writing, every representation and filing made by counsel retained by Reorganized Debtors shall contain the following disclaimer: "Lloyd's Underwriters have settled the claims that are the subject of this action concerning policies. Accordingly, Lloyd's Underwriters now take no position with respect to these policies. All statements and positions are solely those of Reorganized Debtors and shall not constitute any representation or admission by Lloyd's Underwriters";

3.  Reorganized Debtors shall provide Lloyd's Underwriters with draft copies of all pleadings, briefs, discovery requests and responses, and other court papers and correspondence sufficiently in advance of filing, service or mailing to permit a reasonable opportunity to review and comment on same; and

4.  Reorganized Debtors shall resist production of documents, information and witnesses of Lloyd's Underwriters if Lloyd's Underwriters determines and so advises Reorganized Debtors that they are not properly discoverable. Any production of documents, information or witnesses of Lloyd's Underwriters shall be made only as expressly authorized by Lloyd's Underwriters and only pursuant to applicable rules, including subpoena rules.

C.  Authority to Settle Indemnity Claims

Provided that Reorganized Debtors have timely accepted the tender of any Indemnified Claim and are fully complying with their obligations regarding the defense of such Indemnified Claim, Reorganized Debtors shall have the sole right to settle any tendered Indemnified Claim for which they take responsibility and Lloyd's Underwriters shall not settle any Indemnified Claim without the prior written consent of Reorganized Debtors.

D.  Failure to Defend Indemnity Claims

Should Reorganized Debtors fail to timely respond to the tender of any Indemnified Claim or fail to fully comply with its obligations regarding such Indemnified Claim, Lloyd's Underwriters shall be free to defend such Indemnified Claim as they, in their sole discretion,

28

deem appropriate and to settle any such claim as they see fit. Reorganized Debtors shall not be permitted to object to, contest or otherwise challenge Lloyd's Underwriters' actions in defending any such claim and the reasonableness of any such settlement absent fraud or bad faith on the part of Lloyd's Underwriters, and Reorganized Debtors shall fully reimburse Lloyd's Underwriters for all expenses they incur in the legal defense and settlement of such Indemnified Claim.

E.    No Waiver of Attorney-Client Privilege

Nothing in this Agreement shall be construed or asserted to be a waiver of Lloyd's Underwriters' or Grace's or Reorganized Debtors' attorney-client privilege, or any other privilege or immunity, in connection with any Indemnified Claim, nor shall anything contained herein be construed as evidence that any Indemnified Claim is well founded in fact or law.

F.    Equitas as Third-Party Beneficiary

The indemnification and hold harmless undertaking set forth in this Section shall also extend to the benefit of Equitas, which is an intended third-party beneficiary of the terms of this indemnification and hold harmless undertaking.

**VI.    Assignment of Subrogation, Contribution and Reimbursement Rights Against other Insurers**

A.    Payments Made Under this Agreement

Lloyd's Underwriters shall not seek reimbursement of any payments Lloyd's Underwriters are obligated to make under this Agreement, or any other payments they have made to or for the benefit of any Grace Party under the Subject Policies and the 1995 London Agreement, whether by way of a Claim for contribution, subrogation, indemnification or otherwise, from anyone other than Lloyd's Underwriters' reinsurers or retrocessionaires in their

29

capacity as such. Notwithstanding the foregoing, if a third party pursues a contribution, subrogation, indemnification or similar Claim against Lloyd's Underwriters relating to any of the Subject Policies or the 1995 London Agreement, then Lloyd's Underwriters shall be free to assert such a Claim against such third party. To the extent Lloyd's Underwriters recover any amount from such third party, the net proceeds of such recovery (after any payment made by Lloyd's Underwriters to such third party on its Claim and after Lloyd's Underwriters are reimbursed from such proceeds for their fees, costs, and expenses incurred in prosecuting or defending such Claims) shall be paid by Lloyd's Underwriters promptly to the Settlement Account Agent for deposit in the Settlement Account. For the avoidance of doubt, any payment to the Settlement Account Agent made by Lloyd's Underwriters pursuant to this Section VI.(A) shall not reduce or count towards Lloyd's Underwriters' obligation to pay the Settlement Amount pursuant to this Agreement. The Grace Parties shall use reasonable best efforts to obtain from all insurers with which they settle agreements similar to those contained in this Section VI.(A).

B.    Payments Received from Other Insurers

In the event that the Trigger Date occurs and:

1.    Grace, the Reorganized Debtors and/or any other Entity become entitled to receive a payment from one or more of the insurers other than Lloyd's Underwriters for any Claims that have been remised, released, acquitted and forever discharged as against Lloyd's Underwriters pursuant to this Agreement, and

2.    as a result of such other insurer's obligation to pay described in Section VI.(B)(1) above, such insurer either:

a.       enters into a settlement with Lloyd's Underwriters, which settlement has been consented to by Grace, the Reorganized Debtors and any other Entity (as applicable), requiring Lloyd's Underwriters to reimburse some or all of the payment made or to be made by such insurer; or

b.       obtains a final, non-appealable judicial or quasi-judicial determination or award entitling such insurer to obtain a sum certain from Lloyd's Underwriters for contribution, subrogation or indemnification, or other similar Claim, against Lloyd's Underwriters for their alleged share or equitable share, or to enforce subrogation rights, if any, relating to such payment referenced in Section VI.(B)(1) above,

the Entity entitled to receive such payment shall voluntarily reduce the amount of payment to be received by them (referenced in Section VI.(B)(1) above) by such amount to the extent necessary to reduce or eliminate such settlement, determination or award against Lloyd's Underwriters (referenced in Section VI.(B)(2) above). To ensure that such a reduction is accomplished, Lloyd's Underwriters shall be entitled to assert this Section VI. as a defense to any action against them for any such portion of the determination or award against Lloyd's Underwriters (referenced in Section VI.(B)(2) above) and shall be entitled to have the court or appropriate tribunal issue such orders as are necessary to effectuate the reduction to protect Lloyd's Underwriters from any liability for the determination or award. Grace, the Reorganized Debtors and/or any other Entity (as appropriate) agree that in any proceeding against other insurers in which Grace, the Reorganized Debtors and/or any other Entity makes a claim for insurance

31

rights or benefits for any Claim that may give rise to the events referenced in Section VI.(B)(1) above, they will provide notice to Lloyd's Underwriters of such Claim within thirty (30) days of the time Grace and/or the Reorganized Debtors first become aware that such Claim is reasonably likely to result in a claim against Lloyd's Underwriters and shall consent to Lloyd's Underwriters' intervention in any such proceeding to the extent that Lloyd's Underwriters seek to intervene to effectuate the intent of this Section VI.

VII.    **Bankruptcy Obligations**

A.      Designation of Lloyd's Underwriters and Equitas as Settled Asbestos Insurance Companies

The Debtors shall designate Lloyd's Underwriters and Equitas (solely in its capacity as Lloyd's Underwriters' re-insurer and run-off agent) as Settled Asbestos Insurance Companies in the list of Settled Asbestos Insurance Companies to be included in the Plan Supplement and filed by Grace prior to the commencement of confirmation hearings on a plan of reorganization. The Parties agree that the designation: "Lloyd's Underwriters and Equitas, all as defined in the Settlement Agreement and Mutual Release with Lloyd's Underwriters, if said Agreement is not terminated and rendered null and void pursuant to its terms" is an acceptable designation for the list of Settled Asbestos Insurance Companies. Such list shall also set forth the Subject Policies identified on Attachment A hereto and shall describe the presently unknown Subject Policies in substantially the same terms set forth in Section I.CC(2).

B.      Obligations of the Parties

Promptly following the execution of a written approval of this Agreement by the Grace Committees or the Lloyd's Underwriters' execution of a written waiver of the Grace Committees' Approval, the Debtors will prepare and file a Motion to Approve this Settlement

32

Agreement with the Bankruptcy Court, which Motion shall be in form and substance reasonably satisfactory to Lloyd's Underwriters. After the Approval Order becomes a Final Order, Lloyd's Underwriters shall not object to or oppose confirmation of a plan of reorganization for the Debtors so long as it meets the definition of Plan set forth in Section I.(U) hereof and so long as such Plan contains the provisions relating to the Trust described in Section VIII.A.5(ii)-(v), or Lloyd's Underwriters waive the requirement that the Plan contain such provisions or any of them, and shall not appeal the Confirmation Order, unless this Agreement becomes null and void pursuant to its terms.

C.    Grace Committees' Approval

After the Execution Date, the Debtors shall use their reasonable best efforts to obtain the Grace Committees' approval of this Agreement. If the Debtors are unable to obtain the Grace Committees' Approval, they shall so notify Lloyd's Underwriters, and Lloyd's Underwriters may, at their sole option, issue the Approval Waiver in which event the Debtors shall use their best efforts to obtain entry of the Approval Order over the objections of the Grace Committees.

D.    No Prejudice of Lloyd's Underwriters' Rights under Agreement

After the Trigger Date, the Grace Parties shall not seek to terminate, reduce, or limit the scope of the Injunctions with respect to Lloyd's Underwriters and/or Equitas, and shall oppose any such efforts by other Entities to do so. In addition, the Grace Parties shall not take any other action that would prejudice the rights of Lloyd's Underwriters and/or Equitas under this Agreement and they shall oppose any such efforts by other Entities to do so.

E.    No Impairment of this Agreement

No ruling, proceeding, or other matter in connection with the confirmed Plan or the Chapter 11 Reorganization Cases will impair, affect or modify the Parties' rights or obligations

33

under this Agreement, and the Grace Parties shall exercise reasonable best efforts to ensure that the Confirmation Order expressly will so affirm. For the avoidance of doubt, this Section VII.(E) is not intended to impair, affect or modify the Parties' rights or obligations under this Agreement, including the Parties' rights under Section VII. of this Agreement.

## VIII.   Termination of Agreement

### A.   Conditions for Termination by Lloyd's Underwriters

Lloyd's Underwriters, at their sole option, may terminate this Agreement and render this Agreement null and void (as described in this Section VIII.) by providing written notice of termination to the Grace Parties and all of the Grace Committees within one-hundred twenty (120) days of the occurrence of any of the below described conditions of termination:

1. any Asbestos Legislation is enacted into law within one hundred twenty (120) days after the Execution Date;

2. the Chapter 11 Reorganization Cases of W. R Grace & Co. or W.R. Grace & Co.-Conn. are dismissed or converted into Chapter 7 cases;

3. the Approval Order has not been entered by the Bankruptcy Court by close of business on December 31, 2006 or such later date to which the Parties agree;

4. the Confirmation Order has not been entered by the Bankruptcy Court by close of business on December 31, 2008, or such later date to which the Parties agree; or

5. a confirmation order is issued and the plan of reorganization confirmed

(i) does not meet the definition of Plan set forth in Section I.(U);

(ii) does not provide that the Trust shall have a duty to defend the application of the 524(g) Injunction as to any Claims asserted against Lloyd's Underwriters and/or Equitas that are subject to the 524(g) Injunction;

(iii) does not provide that the Trust shall release Lloyd's Underwriters and Equitas to the same extent as the Grace Parties release Lloyd's Underwriters and Equitas as set forth in Section IV.(A) herein;

(iv) does not provide that Lloyd's Underwriters shall release the Trust to the same extent they release the Grace Parties as set forth in Section IV. (B) herein; or

(v) does not require the Trust to provide Lloyd's Underwriters the same cooperation and claim reporting and the same files, information, documents and reports that the Reorganized Debtors are required to provide under Sections IX.(B), IX.(C), IX.(D) and IX.(I) herein.

Failure by Lloyd's Underwriters to give timely written notice of termination following the occurrence of a condition of termination shall be deemed a permanent waiver of such condition by Lloyd's Underwriters.

B.    Reimbursement of Settlement Amount Following Termination

If this Agreement is terminated and rendered null and void pursuant to this Section VIII., Lloyd's Underwriters shall be immediately entitled to reimbursement of the Settlement Amount plus any interest or investment income accrued on the Settlement Amount (minus (i) any reasonable and proper costs incurred by the Settlement Account Agent; (ii) any reserves required under the Settlement Account Agreement to be held for the payment of taxes, indemnities, or otherwise; or (iii) losses incurred under any investment of the Settlement Amount permissible under the Settlement Account Agreement), and the Parties shall so direct the Settlement Account Agent. The Settlement Account Agent shall disburse the funds as provided in Section 2.6 of the Settlement Account Agreement. Any dispute among the Parties arising out of or relating to the right to terminate under this Section shall be finally resolved by binding arbitration in accordance

with the International Institute for Conflict Resolution & Resolution's Rules for Non-Administered Arbitration then currently in effect by a sole arbitrator. Such arbitration must be held in New York or Washington D.C. and resolved on an expedited basis, and must be completed with an award by the arbitrator entered no more than ninety (90) days from the date any Party demands arbitration. The arbitration shall be governed by the Federal Arbitration Act, 9 U.S.C. §§1-16, and judgment upon the award rendered by the arbitrator(s) may be entered by any court having jurisdiction thereof. Each Party shall bear its own fees and costs incurred in connection with such arbitration.

C.      Provisions Surviving Termination

Notwithstanding anything in this Agreement to the contrary, in the event this Agreement terminates, is ineffective, and/or is null and void pursuant to this Section VIII.:

1.      this Agreement, other than Sections I., VIII., XI.(A-B) and XII. through XIX. (which Sections shall remain in full force and effect), shall be vitiated and shall be a nullity and shall be void ab initio;

2.      the Parties shall promptly direct the Settlement Account Agent to return, with thirty (30) days prior written notice to Lloyd's Underwriters and the Grace Parties, the Settlement Amount plus any interest or investment income accrued on the Settlement Amount (minus (i) any reasonable and proper costs incurred by the Settlement Account Agent; (ii) any reserves required under the Settlement Account Agreement to be held for the payment of taxes, indemnities, or otherwise; or (iii) losses incurred under any investment of the Settlement Amount permissible under the Settlement Account Agreement) to or at the direction of Lloyd's

36

Underwriters or their run-off agent, Equitas. While all Parties are required to provide the direction set forth above in the event of termination of this Agreement, the Settlement Account Agent shall disburse the funds to or at the direction of Lloyd's Underwriters or their run-off agent, Equitas, upon the notices, certifications, orders or arbitration decisions provided for in Section 2.6 of the Settlement Account Agreement whether all Parties provide the direction set forth above or not;

3.      none of the Parties shall be bound by the terms of any Approval Order;

4.      Lloyd's Underwriters and Equitas shall not be designated as Settled Asbestos Insurance Companies, and Lloyd's Underwriters shall neither seek nor receive any benefit or protection of a Settled Asbestos Insurance Company under the Plan;

5.      the Parties shall have the rights, defenses and obligations under or with respect to the Subject Policies, the 1995 London Agreement or any other agreement between the Parties relating to the Subject Policies that they would have had absent this Agreement,

6.      the releases provided in Section IV. shall become null and void ab initio;

7.      Lloyd's Underwriters shall be free to pursue their objections to the plan and to appeal from the confirmation order; and

8.      any otherwise applicable statutes of limitations or repose, or other time-related limitations, shall be deemed to have been tolled for the period from

the Execution Date through the date that the Agreement becomes null and void, and no Party shall assert, plead, raise or otherwise rely on or take advantage, whether actively or passively, of any time-related defense to any Claim by any other Party related to such period and if any Party breaches this obligation, it shall be deemed to have created a new cause of action against it at the time of such breach for which it shall be liable in damages equal to the amount of damages it avoided by reason of the breach.  This covenant shall be deemed to last for the maximum time period allowed by applicable law as provided in Section XV.

D.    Termination for Wrongful Acts

In the event that a Party asserts that any action or refusal to take action that is required by this Agreement is wrongfully taken or not taken by a Party, the Party so asserting may not claim that the Agreement is terminated, but must pursue such rights as it has to enforce the Agreement against the Party asserted to have been in breach; provided, however, that the Grace Parties are entitled to terminate this Agreement and declare it null and void or seek to enforce it , at their option, if the full Settlement Amount is not deposited into the Settlement Account as required in Section II.(A), provided that the Grace Parties must provide written notice to Lloyd's Underwriters of their intent to terminate this Agreement within fifteen (15) Business Days of the date the Settlement Amount was required to be deposited into the Settlement Account or forever waive their right to terminate this Agreement on this ground.

## IX.    Cooperation on Document and Information Sharing

A.    Allocation of Settlement Amount to Subject Policies

Lloyd's Underwriters may prepare an allocation of the Settlement Amount (or a grossed up amount where appropriate) to the Subject Policies from which the shares allocated to insolvent insurers that subscribed to one or more of the Subject Policies can be derived.  If Lloyd's Underwriters prepare such an allocation, Lloyd's Underwriters shall cooperate (beginning as of the Execution Date) with the Grace Parties by directing London Market Claims Service ("LMCS") or other similar Entity, as to any such Entity identified by the Grace Parties, to provide (upon reasonable notice, at the requesting Party's expense (provided that the requesting Party shall have no obligation to pay any internal costs of Lloyd's Underwriters, including costs associated with time and expenses of any of Lloyd's Underwriters' employees), and in a manner convenient to Lloyd's Underwriters) to the administrator/liquidator of any insolvent company or solvent company in a solvent scheme that company's share, if any, allocated on a per policy and per year basis.  Such allocation will be provided directly to the administrator/liquidator of such insolvent company or solvent company in a solvent scheme, and will not be provided directly to the Grace Parties, or any broker.  Lloyd's Underwriters shall notify the Grace Parties within thirty (30) days after such companies have been provided with the information set forth above, of the names and addresses of the persons to whom such information was provided and the date(s) on which such information was provided.  Any such allocation shall not bind the Grace Parties, and shall not affect Lloyd's Underwriters' payment obligations under this Agreement.  This Section IX.(A) is solely for the benefit of the Grace Parties to enable them to pursue claims against insolvent companies or solvent companies in solvent schemes.

39

B.    Reorganized Debtors' Obligation to Provide Information

After the Trigger Date, Lloyd's Underwriters shall have the right (upon reasonable notice and in a manner convenient to the Reorganized Debtors), to review and obtain from the Reorganized Debtors relevant files, information and documents in the possession of Reorganized Debtors or to which they have the right to obtain access from the Trust:

      1.    concerning Asbestos Claims subject to payment or potential payment with the proceeds of this Agreement, and

      2.    required of or necessary to Lloyd's Underwriters in connection with any Claims, arbitrations, or litigation for reinsurance for the Settlement Amount or in connection with this Agreement.

C.    Specific Information to be Provided

For the avoidance of doubt, the relevant files, information and documents referenced to in Section IX.(B) above shall include:

      1.    information from any database maintained by Reorganized Debtors or to which they have the right to obtain access from the Trust, any information that Reorganized Debtors collect or to which they have the right to obtain access from the Trust in connection with the payment of Asbestos Claims; and

      2.    for each Asbestos Claim resolved:
          a.    the Claimant's name;
          b.    a claim number;
          c.    jurisdiction;
          d.    status (open or closed);
          e.    date of first exposure as set forth in the complaint or as reflected by information reasonably available to Reorganized Debtors;

        f.        alleged disease and, to the extent reasonably available to Reorganized Debtors, the date of diagnosis; and

        g.       the amount of indemnity paid.

D.      <u>Duty of Cooperation</u>

As of the Trigger Date, Reorganized Debtors shall reasonably cooperate in obtaining and providing the files, information and documents referred to in Section IX.(B) above at Lloyd's Underwriters' reasonable request and expense (provided that Lloyd's Underwriters shall have no obligation to pay any internal costs of Reorganized Debtors, including costs associated with time or expenses of Reorganized Debtors' employees). For the avoidance of doubt and without limitation of the foregoing, Reorganized Debtors shall undertake all reasonable actions to cooperate with Lloyd's Underwriters in connection with their reinsurers, including (upon reasonable notice, at Lloyd's Underwriters' expense other than internal costs of Reorganized Debtors, and in a manner convenient to Reorganized Debtors) responding to reasonable requests for information and meeting with representatives of reinsurers. Such cooperation shall include providing Lloyd's Underwriters' representative access to all claim files related to Asbestos Claims maintained by Reorganized Debtors or to which they have the right to obtain access from the Trust, including all product exposure, medical, claim status, and payment records contained in such files.

E.      Information Subject to Disclosure

For avoidance of doubt, the files, information and documents subject to this Section IX are limited to those in the possession of Reorganized Debtors, including their counsel and consultants, and those files, information and documents to which the Reorganized Debtors have the right to obtain access from the Trust.

F.    No Effect on Liability

For the avoidance of doubt, this Section IX., and any results of such a review:

      1.      shall not affect Lloyd's Underwriters' payment obligations under this Agreement;

      2.      shall not obligate Reorganized Debtors to collect any information from any claimant that they are not otherwise obligated to collect; and

      3.      shall not give Lloyd's Underwriters and/or Equitas any right to challenge the allowance or payment of any Claim by Reorganized Debtors.

G.    Use of Confidential Materials

Lloyd's Underwriters shall not provide any Report (as defined in Section IX.(I) hereto), results, files, information, or documents obtained by Lloyd's Underwriters pursuant to this Section IX. (the "Materials") to any other Entity and shall keep the Materials confidential, except that Lloyd's Underwriters may:

      1.      provide the Materials to Entities identified in Section IX.(D), and

      2.      use the Materials in any proceeding to obtain reinsurance with respect to the Settlement Amount or this Agreement or in connection with its compliance with applicable laws or regulations.

H.    Disclosure of Confidential Materials

Lloyd's Underwriters shall exercise their reasonable best efforts to maintain the confidentiality of the Materials, including seeking a confidentiality pledge from any Entity with which they share the Materials and seeking a protective order in any proceeding in which they

use the Materials, but Lloyd's Underwriters' right to disclose any portion of the Materials to any of the Entities identified in Section IX.(D) shall not be affected if their reasonable best efforts do not result in a confidentiality pledge being given or a confidentiality order being entered. Nothing in this Section IX shall prevent Lloyd's Underwriters or Equitas from using the Materials for their own internal purposes.

    I.    <u>Furnishing Reports</u>

    At the sole discretion of Reorganized Debtors, they may satisfy their obligations under Section IX.(B-C) above by providing Lloyd's Underwriters (or their representatives) on a quarterly and annual basis with a report (each, a "Report") concerning asbestos-related bodily injury claims activity with respect to the time period that is the subject of Lloyd's Underwriters' request for relevant files, information and documents. Notwithstanding anything to the contrary in this Section IX, Reorganized Debtors shall not be required to include in any Report any information that is not required to be collected under the confirmed Plan unless such information is in fact collected. If the following information is required to be collected under the confirmed Plan (or is in fact collected), such Reports shall include:

    1.    the number of total Claims filed, pending, settled, dismissed or that went to judgment, the total indemnity paid, and total expense paid; and

    2.    with respect to each Claim resolved during the relevant period:

        a.    the claimant's name;

        b.    the claim number;

        c.    jurisdiction;

        d.    status (open or closed);

e.    the date of first exposure as set forth in the complaint or as reflected by information reasonably available to Reorganized Debtors;

f.    the asbestos product(s) or premises for which Reorganized Debtors is responsible to which the claimant alleges exposure;

g.    the Entity(ies) within Reorganized Debtors that the claimant alleges caused his injury;

h.    the alleged disease and the date of diagnosis;

i.    whether there is a medical diagnosis of the alleged disease;

j.    date of death if applicable; and

k.    the amount of indemnity paid.

If Reorganized Debtors exercise their discretion to provide Reports to Lloyd's Underwriters pursuant to this Section IX.(I), Reorganized Debtors shall still be obligated, at the request of Lloyd's Underwriters (upon reasonable notice, at Lloyd's Underwriters' sole expense, and in a manner convenient to Reorganized Debtors) to make available to Lloyd's Underwriters files, information and documents described in this Section IX. that relate to the asbestos bodily injury claims that are the subject of the Report.

    J.    Trust not bound

For avoidance of doubt, nothing whatsoever in this Section IX shall require the Trust to provide directly to Lloyd's Underwriters or Equitas any files, information, documents, audit or inspection rights or cooperation, except as set forth in Section II.E, unless the Trust receives all of the Settlement Funds.  In addition, the Trust shall not bear any additional out-of-pocket expenses as a result of the operation of this Section IX.

    **X.**    **Reasonably Equivalent Value**

The Parties acknowledge and agree that:

44

A.    This Agreement was bargained for and entered into in good faith and as the result of arm's length negotiations.

B.    Based on their respective independent assessments, with the assistance and advice of counsel, of the Chapter 11 Reorganization Cases, and other matters, the consideration exchanged by the Parties pursuant to this Agreement (including the payments from Lloyd's Underwriters, the mutual releases, the designations of Lloyd's Underwriters and Equitas as Settled Asbestos Insurance Companies, and the other benefits exchanged by the Parties) constitute a fair and reasonable settlement of the Parties' disputes and of their respective rights and obligations relating to the Subject Policies and the 1995 London Agreement and constitute reasonably equivalent value.

## XI.    **Confidentiality and Press Release**

A.    Settlement Negotiations

Settlement negotiations leading up to this Agreement, all information exchanged between the Parties in connection with such negotiations, and all related discussions, are confidential and shall be deemed to fall within the protection afforded to compromises and to offers to compromise by Rule 408 of the Federal Rules of Evidence and any parallel state law provisions and shall not be disclosed by either Party except as permitted in this Section XI.

B.    Protection of Confidential Information

In the event that a private litigant (other than a Party to this Agreement, the Reorganized Debtors, or the Trust), by way of document request, interrogatory, subpoena, or questioning at deposition or trial, attempts to compel disclosure of anything protected by this Section XI., the Party from whom disclosure is sought shall decline to provide the requested information on the ground that this Agreement prevents such disclosure.  In the event that such private litigant seeks

45

an order from any court or governmental body to compel such disclosure, or in the event that a court, government official, or governmental body (other than the Inland Revenue, Internal Revenue Service, Securities and Exchange Commission or Financial Services Authority) requests or requires disclosure of anything protected by this Section XI., the Party from whom disclosure is sought promptly shall give written notice by facsimile or hand-delivery to the other Party, and promptly shall provide copies of all notice papers, orders, requests or other documents in order to allow each Party to take such protective steps as may be appropriate. All costs incurred by a Party in accordance with this provision shall be the sole responsibility of the Party incurring such costs.

C.    Press Releases

Any Party issuing a press release concerning this Agreement within thirty (30) days after the Execution Date shall provide the other Parties with a draft copy for comment (but not approval) no later than twenty-four (24) hours before issuance.

D.    Permitted Disclosures

Notwithstanding anything in this Section XI., nothing in this Agreement shall prevent any Party from disclosing or releasing information relating to the negotiation of this Agreement in any form and at any time after the Execution Date to:

1.    reinsurers or retrocessionaires of any Lloyd's Underwriter directly or through intermediaries;

2.    outside auditors, attorneys or accountants of any Party;

3.    to the extent required by law, including, to the extent applicable, to the Inland Revenue, the Internal Revenue Service, the Securities and

46

Exchange Commission, the Financial Services Authority or other U.S., U.K., or other governmental authority that properly requires disclosure by a Party hereto;

4.  to the extent and in any form that such information is required to be disclosed or released to satisfy reporting requirements imposed by law, including any Federal securities laws; and

5.  in connection with the approval of this Agreement by the Bankruptcy Court.

## XII.  Non-Prejudice and Construction of Agreement

### A.  Character of this Agreement

This Agreement is not a contract of insurance. This Agreement is not subject to rules or construction governing contracts of insurance, including the doctrine of contra proferentum. This Agreement is a compromise between the Parties and shall not be construed as an admission of coverage under the Subject Policies, nor shall this Agreement or any provision hereof be construed as a waiver, modification or retraction of the positions of the Parties with respect to the interpretation and application of the Subject Policies.

### B.  Scope of this Agreement

This Agreement is the product of informed negotiations and involves compromises of the Parties' previously stated legal positions. Accordingly, this Agreement does not reflect upon the Parties' views as to rights and obligations with respect to matters or Entities outside the scope of this Agreement. This Agreement is without prejudice to positions taken by Lloyd's Underwriters with regard to other insureds, and without prejudice to positions taken by Debtors and/or the

47

Reorganized Debtors with regard to other insurers. Except for the express references to unidentified Lloyd's Underwriters and Equitas, the Parties specifically disavow any intention to create rights in third parties under or in relation to this Agreement.

C.     Construction of this Agreement

This Agreement is the jointly drafted product of arm's length negotiations between the Parties with the benefit of advice from counsel, and the Parties agree that it shall be so construed. As such, no Party will claim that any ambiguity in this Agreement shall, as a matter of law, be construed against the other Party.

### XIII.  Modification

Except as expressly provided herein, no change or modification of this Agreement shall be valid unless it is made in writing and signed by the Parties. In the event that any Party is dissolved or otherwise ceases to exist, the remaining Parties may modify this Agreement without that Party's consent.

### XIV.  Integration

A.     Entire Agreement

This Agreement, including its Attachments, constitutes the entire agreement and understanding among the Parties with respect to the subject matter hereof, and supersedes all discussions, agreements and understandings, both written and oral, among the Parties with respect hereto. Except as expressly set forth in this Agreement, there are no representations, warranties, promises or inducements, whether oral, written, expressed or implied, that in any way affect or condition the validity of this Agreement or alter its terms. If the facts or law related to the subject matter of this Agreement are found hereafter to be other than is now believed by any of the Parties, the Parties expressly accept and assume the risk of such possible difference of fact

セグ

or law and agree that this Agreement nonetheless shall be and remain effective according to its terms. This Agreement shall have perpetual existence except as provided herein. This Agreement shall, upon the Trigger Date, also supercede all prior agreements between the Parties relating to the subject matter of this Agreement, including the 1995 London Agreement, and other agreements that have been entered into by the Parties that relate to the Subject Policies and such other agreements shall become null and void.

B.    <u>Titles and Captions</u>

Titles and captions contained in this Agreement are inserted only as a matter of convenience and are for reference purposes only. Such titles and captions are intended in no way to define, limit, expand, or describe the scope of this Agreement or the intent of any provision hereof.

XV.    <u>Governing Law</u>

This Agreement shall be governed by, and shall be construed in accordance with, the laws of the State of Delaware without regard to its choice of law rules. Nothing in this Section XV. shall affect what law would govern the interpretation or application of the Subject Policies.

XVI.    <u>Representations</u>

Each Party represents and warrants that it has authority to execute this Agreement as its binding and legal obligation, and the Debtors represent and warrant that they have the authority to execute this Agreement as the binding and legal obligation of all Parties within the definition of the Grace Parties (subject, however, in the case of the Debtors, to the requirement that the Approval Order be entered). Each Party represents and warrants that the persons signing this

Agreement on its or their behalf is authorized to execute this Agreement (subject, however, in the case of the Debtors to the requirement that the Approval Order be entered).

### XVII. Execution and Authority

A.    Originals and Counterparts

There will be two (2) signed originals of this Agreement, which may be executed in duplicate counterparts, each of which shall be deemed an original and all of which shall constitute one and the same instrument. Each counterpart may be delivered by facsimile transmission or by e-mailing a scanned version, and a faxed or scanned signature shall have the same force and effect as an original signature.

B.    Authority of Equitas and Designation of Attorney-in-Fact

Lloyd's Underwriters agree and acknowledge that Equitas acts as run-off agent for Lloyd's Underwriters, and that, in its capacity as run-off agent, Equitas has authority to act and to designate and authorize signatories for Lloyd's Underwriters with respect to any and all of Lloyd's Underwriters' obligations under this Agreement. Lloyd's Underwriters have designated James Sottile, Esquire, as their attorney-in-fact for the limited purpose of executing this Agreement on their behalf with express authority to do so.

### XVIII. Notices, Consent to Jurisdiction, and Service of Suit

Unless another person is designated, in writing, for receipt of notices hereunder, any and all statements, communications, or notices to be provided pursuant to this Agreement shall be in writing and sent by next-Business-Day courier service, with receipt or tracking number requested, postage prepaid (except as otherwise specified in this Agreement). In addition, Grace shall provide to the Grace Committees copies of all notices, instructions and other notifications which Grace sends or receives under the Settlement Account Agreement, such copies to be

provided at the time Grace sends such notice, instruction or other notification, or within one

Business Day after Grace receives such notice, instruction or other notification.  Such notices to

the Parties shall be sent to the following:

| | |
|---|---|
| If to Grace: | W. R. Grace & Company<br>7500 Grace Drive<br>Columbia, Maryland 21044<br>Attn: Secretary |
| | Fax: (410) 531-4367 |
| | --and-- |
| | Janet S. Baer<br>Kirkland & Ellis LLP<br>200 East Randolph Drive<br>Chicago, Illinois 60601 |
| If to Lloyd's Underwriters or Equitas: | Fax: (312) 861-2200<br>Equitas Limited<br>Claims Division<br>33 St. Mary Axe<br>London EC3A 8LL ENGLAND<br>Attn: Head of Direct Claims |
| | Fax: 011+44+020+7342-2100 |
| | --and-- |
| | James Sottile<br>Zuckerman Spaeder LLP<br>1800 M Street, NW, Suite 1000<br>Washington, DC 20036-5802 |
| | Fax: (202) 822-8106 |

Notices to the Grace Committees shall be sent to the following:

| | |
|---|---|
| If to the Official Committee of Asbestos Personal Injury Claimants: | Peter Van N. Lockwood<br>Caplin & Drysdale<br>One Thomas Circle, NW<br>Washington, DC 20005 |
| | Fax: (202) 429-3301 |

51

| | |
|---|---|
| If to the Official Committee of Unsecured Creditors: | Lewis Kruger<br>Kenneth Pasquale<br>Stroock & Stroock & Lavan LLP<br>180 Maiden Lane<br>New York, New York 10038<br><br>Fax No.: (212) 806-6006 |
| If to the Official Committee of Asbestos Property Damage Claimants | Scott L. Baena, Esq.<br>Bilzin Sumberg Baena Price & Axelrod LLP<br>200 South Biscayne Boulevard<br>Suite 2500<br>Miami, FL 33131<br><br>Fax No.: (305) 351-2203 |
| If to the Official Committee of Equity Security Holders: | Gary M. Becker, Esq.<br>Kramer Levin Naftalis & Frankel LLP<br>919 Third Avenue<br>New York, NY 10022<br><br>Fax No.: (212) 715-8000 |
| If to the Future Claimants Representative: | David T. Austern, Esq.<br>Future Claimants Representative<br>c/o Claims Resolution Management Corporation<br>3110 Fairview Park Drive, Suite 200<br>Falls Church, VA 22042-0683<br><br>Fax No.: (703) 205-6249<br><br>with a copy (which shall not constitute notice) to :<br><br>Orrick, Herrington & Sutcliffe LLP<br>3050 K Street, N.W., Suite 200<br>Washington, DC 20007-5135<br>Attention: Richard H. Wyron, Esq<br><br>Fax No.: (202) 339-8500 |

## XIX. **Binding Effect**

This Agreement shall be binding on and inure to the benefit of the successors and assigns

of the Parties.

## XX.    Continuing Court Jurisdiction

The Parties shall not object to the Bankruptcy Court's exercising jurisdiction to resolve disputes under or concerning this Agreement, its terms and performance, including disputes concerning the Settlement Account Agreement, whether this Agreement has or should terminate, whether modifications to the Plan disqualify it as a "Plan" as defined in Section I.(U), or whether the Trigger Date has occurred. Any Party that is concerned whether an action it or another Party takes or proposes to take under or with respect to this Agreement is consistent with or violative of its terms, may request from the Bankruptcy Court an order or instructions so determining. Any Party may seek specific performance from the Bankruptcy Court of the terms of this Agreement by another Party that refuses or fails to take actions or refrain from taking actions required by this Agreement.

IN WITNESS WHEREOF, the Parties have executed this Agreement by their duly authorized representatives.

> **W.R. GRACE & CO. ON ITS OWN BEHALF AND ON BEHALF OF ALL PERSONS INCLUDED IN THE DEFINITION OF GRACE PARTIES**
>
> By: _Robert M. Tarola_
> Name: _ROBERT M. TAROLA_
> Title: _SVP & CFO_
> Date: _9 NOVEMBER 2006_
>
> **FOR LLOYD'S UNDERWRITERS**
>
> By: _____
> Name: James Sottile
> Title: Attorney-in-Fact
> Date: _____

## XX.    Continuing Court Jurisdiction

The Parties shall not object to the Bankruptcy Court's exercising jurisdiction to resolve disputes under or concerning this Agreement, its terms and performance, including disputes concerning the Settlement Account Agreement, whether this Agreement has or should terminate, whether modifications to the Plan disqualify it as a "Plan" as defined in Section I.(U), or whether the Trigger Date has occurred. Any Party that is concerned whether an action it or another Party takes or proposes to take under or with respect to this Agreement is consistent with or violative of its terms, may request from the Bankruptcy Court an order or instructions so determining. Any Party may seek specific performance from the Bankruptcy Court of the terms of this Agreement by another Party that refuses or fails to take actions or refrain from taking actions required by this Agreement.

IN WITNESS WHEREOF, the Parties have executed this Agreement by their duly authorized representatives.

> **W.R. GRACE & CO. ON ITS OWN BEHALF AND ON BEHALF OF ALL PERSONS INCLUDED IN THE DEFINITION OF GRACE PARTIES**
>
> By:_____
> Name:_____
> Title:_____
> Date:_____
>
> **FOR LLOYD'S UNDERWRITERS**
>
> By:_____
> Name: James Sottile
> Title: Attorney-in-Fact
> Date: November 13, 2006

**ATTACHMENT A**

**Known Subject Policies**

**Attachment A**
**W R Grace Policies**

| Policy number | Inception | Termination |
|---|---|---|
| 59 / 2209 /2 (1ST YEAR) | 20-Oct-59 | 20-Oct-60 |
| 59 / 2209 / 3 (1ST YEAR) | 20-Oct-59 | 20-Oct-60 |
| 59 / 2209 / 4 (1ST YEAR) | 20-Oct-59 | 20-Oct-60 |
| 59 / 2209 / 5 (1ST YEAR) | 20-Oct-59 | 20-Oct-60 |
| 59 / 2209 / 2 (2ND YEAR) | 20-Oct-60 | 20-Oct-61 |
| 59 / 2209 / 3 (2ND YEAR) | 20-Oct-60 | 20-Oct-61 |
| 59 / 2209 / 4 (2ND YEAR) | 20-Oct-60 | 20-Oct-61 |
| 59 / 2209 / 5 (2ND YEAR) | 20-Oct-60 | 20-Oct-61 |
| 59 / 2209 / 2 (3RD YEAR) | 20-Oct-61 | 20-Oct-62 |
| 59 / 2209 / 3 (3RD YEAR) | 20-Oct-61 | 20-Oct-62 |
| 59 / 2209 / 4 (3RD YEAR) | 20-Oct-61 | 20-Oct-62 |
| 59 / 2209 / 5 (3RD YEAR) | 20-Oct-61 | 20-Oct-62 |
| 66 - 180390 (1ST YEAR) | 17-May-66 | 20-Oct-67 |
| 66- 180390 (2ND YEAR) | 20-Oct-66 | 20-Oct-67 |
| 66- 180390 (3RD YEAR) | 20-Oct-67 | 20-Oct-68 |
| 914 / 1/ 02502 (1ST YEAR) | 20-Oct-68 | 20-Oct-69 |
| 914 /1/ 0110 9 (A) | 14-Nov-69 | 19-Oct-70 |
| 914 / 1/ 4116 | 14-Nov-69 | 30-Jun-70 |
| 914 / 1/02502 (2ND YEAR) | 20-Oct-69 | 20-Oct-70 |
| 914 /1 / 0110 (B) | 20-Oct-70 | 29-Jun-71 |
| 914 / 1/ 4116 (A) | 30-Jun-70 | 30-Jun-71 |
| 914 / 1/02502 (3RD YEAR) | 20-Oct-70 | 29-Jun-71 |
| 914105953 (1ST YEAR) | 30-Jun-71 | 30-Jun-72 |
| 914105953 (2ND YEAR) | 30-Jun-72 | 30-Jun-73 |
| 914105953 (3RD YEAR) | 30-Jun-73 | 30-Jun-74 |
| 74DD662 (1ST YEAR) | 30-Jun-74 | 30-Jun-75 |
| 74DD663C (1ST YEAR) | 17-Jun-74 | 30-Jun-75 |
| 74DD662 (2ND YEAR) | 30-Jun-75 | 30-Jun-76 |
| 74DD663C (2ND YEAR) | 30-Jun-75 | 30-Jun-76 |
| 76DD1594C | 30-Jun-76 | 30-Jun-77 |
| 76DD1595C (PERIOD 1) | 30-Jun-76 | 30-Jun-77 |
| 74DD662 / CN32277 (YR3) | 30-Jun-76 | 30-Jun-77 |
| 74DD663C (3RD YEAR) | 30-Jun-76 | 30-Jun-77 |
| 76DD1594C (PERIOD 2) | 30-Jun-77 | 30-Jun-78 |
| 76DD1595C (PERIOD 2) | 30-Jun-77 | 30-Jun-78 |
| 77DD1631 | 30-Jun-77 | 30-Jun-78 |
| 77DD1632 | 30-Jun-77 | 30-Jun-78 |
| 77DD1826 | 30-Jun-77 | 30-Jun-78 |
| 76DD1594C (PERIOD 3) | 30-Jun-78 | 30-Jun-79 |
| 76DD1595C (PERIOD 3) | 30-Jun-78 | 30-Jun-79 |
| 78DD1417C | 30-Jun-78 | 30-Jun-79 |
| 78DD1418C | 30-Jun-78 | 30-Jun-79 |
| 78DD1419C | 30-Jun-78 | 30-Jun-79 |
| 78DD1420C | 30-Jun-78 | 30-Jun-79 |
| 79DD1633C/PY107779 (1ST YEAR) | 30-Jun-79 | 30-Jun-80 |

| Policy number | Inception | Termination |
|---|---|---|
| 79DD1634C/PY107879 | 30-Jun-79 | 30-Jun-80 |
| 79DD1635C/ PY107979 | 30-Jun-79 | 30-Jun-80 |
| 79DD1636C | 30-Jun-79 | 30-Jun-80 |
| PY0111779/79DD1637C | 30-Jun-79 | 30-Jun-80 |
| 79DD1638C | 30-Jun-79 | 30-Jun-80 |
| 79DD1633C/ PY107779 (2ND YEAR) | 30-Jun-80 | 30-Jun-81 |
| 80DD1643 / PY107880 (1ST YEAR) | 30-Jun-80 | 30-Jun-81 |
| 80DD1644 / PY107980 | 30-Jun-80 | 30-Jun-81 |
| 80DD1645 / PY108080 | 30-Jun-80 | 30-Jun-81 |
| 80DD1646C/ PY111780 | 30-Jun-80 | 30-Jun-81 |
| 80DD1647/ PY111880 | 30-Jun-80 | 30-Jun-81 |
| 79DD1633C/ PY107779 (3RD YEAR) | 30-Jun-81 | 30-Jun-82 |
| KY003382 | 1-Nov-81 | 30-Jun-82 |
| 80DD1643 / PY107880 (2ND YEAR) | 30-Jun-81 | 30-Jun-82 |
| PY030181 | 30-Jun-81 | 30-Jun-82 |
| PY030281 | 30-Jun-81 | 30-Jun-82 |
| PY030381 | 30-Jun-81 | 30-Jun-82 |
| 82-18826-5 | 30-Jun-82 | 30-Jun-83 |
| KY017582 (1ST YEAR) | 30-Jun-82 | 30-Jun-83 |
| KY017782 (1ST YEAR) | 30-Jun-82 | 30-Jun-83 |
| KY017882 | 30-Jun-82 | 30-Jun-83 |
| KY017982 | 30-Jun-82 | 30-Jun-83 |
| 83-18826-7 | 30-Jun-83 | 30-Jun-84 |
| KY017582 (2ND YEAR) | 30-Jun-83 | 30-Jun-84 |
| KY017782 (2ND YEAR) | 30-Jun-83 | 30-Jun-84 |
| KY048183 (1ST YEAR) | 30-Jun-83 | 30-Jun-84 |
| KY048283 (1ST YEAR) | 30-Jun-83 | 30-Jun-84 |
| KY017582 (3RD YEAR) | 30-Jun-84 | 30-Jun-85 |
| KY017782 (3RD YEAR) | 30-Jun-84 | 30-Jun-85 |
| KY048183 (2ND YEAR) | 30-Jun-84 | 30-Jun-85 |
| KY048283 (2ND YEAR) | 30-Jun-84 | 30-Jun-85 |
| PY278185 | 30-Jun-85 | 30-Jun-86 |
| PY284785 | 30-Jun-85 | 30-Jun-86 |
| PY284885 | 30-Jun-85 | 30-Jun-86 |

# ATTACHMENT B

## Known Lloyd's, London, Syndicate Numbers

**Attachment B**
**W R Grace Syndicates**

| | | | |
|---|---|---|---|
| 2 | 219 | 494 | 764 |
| 15 | 223 | 499 | 772 |
| 16 | 231 | 502 | 782 |
| 18 | 235 | 506 | 783 |
| 32 | 238 | 507 | 786 |
| 33 | 239 | 510 | 793 |
| 35 | 243 | 516 | 795 |
| 36 | 250 | 518 | 797 |
| 43 | 263 | 529 | 801 |
| 46 | 274 | 531 | 807 |
| 55 | 276 | 551 | 812 |
| 56 | 278 | 553 | 813 |
| 57 | 279 | 555 | 819 |
| 60 | 283 | 557 | 823 |
| 64 | 300 | 558 | 825 |
| 65 | 301 | 568 | 830 |
| 69 | 315 | 573 | 838 |
| 86 | 316 | 576 | 839 |
| 88 | 322 | 583 | 845 |
| 90 | 335 | 596 | 846 |
| 95 | 342 | 604 | 849 |
| 99 | 346 | 618 | 867 |
| 108 | 347 | 620 | 868 |
| 109 | 362 | 621 | 884 |
| 126 | 365 | 632 | 896 |
| 128 | 368 | 633 | 905 |
| 129 | 371 | 634 | 918 |
| 130 | 373 | 635 | 921 |
| 151 | 383 | 650 | 933 |
| 160 | 404 | 651 | 935 |
| 164 | 406 | 661 | 943 |
| 169 | 408 | 679 | 948 |
| 175 | 417 | 694 | 972 |
| 183 | 425 | 701 | 975 |
| 190 | 433 | 720 | 986 |
| 199 | 448 | 722 | 987 |
| 204 | 450 | 727 | 989 |
| 206 | 471 | 729 | 990 |
| 210 | 479 | 751 | 998 |
| 211 | 484 | 755 | 999 |
| 213 | 489 | 763 | |

# ATTACHMENT C

## Settlement Account Agreement

## SETTLEMENT ACCOUNT AGREEMENT

THIS SETTLEMENT ACCOUNT AGREEMENT, dated as of November __, 2006 (the "Escrow Agreement"), is made by, between and among W. R. Grace & Co. on its own behalf and on behalf of the Grace Parties, and Lloyd's Underwriters, each as defined in the Settlement Agreement and Mutual Release between the Grace Parties and Lloyd's Underwriters dated as of _____, 2006 (the "2006 Settlement Agreement"), and JPMorgan Chase Bank, N.A. as escrow agent (the "Escrow Agent") (the Grace Parties, the Lloyd's Underwriters and the Escrow Agent shall be referred to herein separately as an "Escrow Party" and collectively as the "Escrow Parties").

### WITNESSETH:

WHEREAS, all capitalized terms not otherwise defined in this Escrow Agreement shall have the meanings ascribed to them in the 2006 Settlement Agreement; and

WHEREAS, Grace and Lloyd's Underwriters entered into an agreement dated November 17, 1995 (the "1995 London Agreement") concerning the application to Asbestos Claims of certain policies of insurance severally subscribed by Lloyd's Underwriters and London Market Companies in favor of Grace ; and

WHEREAS, the Grace Parties have incurred and may incur in the future certain liabilities, expenses, and losses arising out of Asbestos Claims and other Claims; and

WHEREAS, Lloyd's Underwriters are obligated under the 1995 London Agreement to make certain payments in connection with Asbestos Claims under the Subject Policies identified in the 1995 London Agreement; and

WHEREAS, the Grace Parties contend that Lloyd's Underwriters may also be obligated to make payments under the Subject Policies for Claims other than Asbestos Claims; and

K&E 11467353.3

WHEREAS, there are or in the future may be disputes between the Grace Parties and Lloyd's Underwriters regarding their respective rights and obligations with respect to insurance coverage under the Subject Policies with respect to Claims and regarding their respective rights and obligations with respect to the 1995 London Agreement; and

WHEREAS, the Grace Parties and Lloyd's Underwriters have reached a settlement of all rights, obligations and liabilities (if any) that the Parties may owe one another with respect to the Subject Policies and the 1995 London Agreement that is embodied in the 2006 Settlement Agreement; and

WHEREAS, the Grace Parties and Lloyd's Underwriters wish to appoint an escrow agent to hold and disburse funds in accordance with the 2006 Settlement Agreement; and

WHEREAS, the escrow account hereby established is intended to qualify as a "qualified settlement fund" ("QSF") within the meaning of Section 1.468B-1 of the Treasury Regulations promulgated under Section 468B of the Internal Revenue Code of 1986, as amended from time to time.

NOW, THEREFORE, in consideration of the foregoing and the mutual covenants and agreements contained herein, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Escrow Parties hereto agree as follows:

## ARTICLE I

SECTION 1.1 <u>Appointment of Escrow Agent</u>.    The Grace Parties and Lloyd's Underwriters hereby appoint the Escrow Agent as the escrow agent under this Escrow Agreement, and the Escrow Agent hereby accepts such appointment.

2

## ARTICLE II
## The Escrow Account

SECTION 2.1 Deposit. Pursuant to the 2006 Settlement Agreement, Lloyd's Underwriters shall deliver the sum of Ninety Million United States dollars (US$90,000,000) (the "Settlement Amount") to the Escrow Agent to be deposited into an escrow account pending further distributions of the funds as provided in Section 2.2 below (hereafter the "Escrow Account"). Said amount, as it may increase or decrease as contemplated by this Escrow Agreement (hereafter the "Escrow Funds") shall be held, invested and disbursed by Escrow Agent in accordance with the terms hereof for the benefit of the holders of the types of Claims for which the Grace Parties were provided coverage under the Subject Policies, until the respective interests of such claimants, if any, with respect to the Settlement Funds, shall have been determined or otherwise agreed to. Subject to and in accordance with the terms and conditions hereof, Escrow Agent agrees that it shall receive, hold in escrow, invest and reinvest, and release or distribute the Escrow Funds. It is hereby expressly stipulated and agreed that all interest and other earnings on the Escrow Funds shall become a part of the Escrow Funds for all purposes, and that all losses resulting from the investment or reinvestment thereof from time to time and all amounts charged thereto to compensate or reimburse the Escrow Agent from time to time for amounts owing to it hereunder shall from the time of such loss or charge no longer constitute part of the Escrow Funds.

SECTION 2.2 Distribution of Escrow Funds. The Grace Parties and Lloyd's Underwriters agree that the Escrow Agent shall hold the Escrow Funds and shall disburse the Escrow Funds (other than to pay the expenses of the Escrow Agent as provided in Section 2.6 below) only upon the occurrence of any one or more of the following events (each, individually, a "Disbursement Event"):

3

(a)     Joint written instructions from the Grace Parties and Lloyd's Underwriters to the Escrow Agent in accordance with the terms of the 2006 Settlement Agreement, the confirmed Plan, or as ordered by the Bankruptcy Court directing the disbursement of Escrow Funds;

(b)     Notification by the Grace Parties and Lloyd's Underwriters that a tax payment or payments is due as provided in Section 3.8; or

(c)     Final Order of any court of competent jurisdiction directing the disbursement of Escrow Funds consistent with the 2006 Settlement Agreement or the confirmed Plan.

Upon the occurrence of any of the foregoing Disbursement Events, the Escrow Agent shall disburse all or part of the Escrow Funds in accordance with such written instruction, notification or Final Order. Disbursement to the Grace Parties shall be by wire transfer to: ABA No. _____; _____ Bank; Account No. _____; Account Name – W. R. Grace & Co.-Conn. Disbursement to Lloyd's Underwriters shall be wire transfer to: ABA No. _____, _____ Bank, Account No. _____, Account Name – Equitas Limited. Either the Grace Parties or Lloyd's Underwriters may change its disbursement account upon ten Business Days' prior written notice to the Escrow Agent.

SECTION 2.3 Investment of the Escrow Funds.

A.     Definitions for Section 2.3.

1.     "Initial Agreed Investments" shall mean particular Eligible Investments and amounts such that at least 80% of the Escrow Funds are invested in obligations described in (B)(i) of the definition of Eligible Investments, and no more than 20% of the Escrow Funds are invested in shares described in (B)(ii) of the definition of Eligible Investments. The Escrow

4

Parties agree that the Initial Agreed Investments were determined by agreement of the Escrow Parties, that neither the Grace Parties on the one hand, nor Lloyd's Underwriters and/or its run-off agent, Equitas Limited, on the other hand, provided any investment or other advice to any other party to this Escrow Agreement in connection with the Initial Agreed Investments and that the Grace Parties, Lloyd's Underwriters and Equitas Limited shall have no liability to one another or to any other Escrow Party should the market value of the Initial Agreed Investments decrease and/or should the Escrow Parties not achieve the investment return or any other financial benefit they expected to recover and/or earn.

2.    "Eligible Investments" shall mean:  (A) The Initial Agreed Investments provided that such investments continue to satisfy the criteria of sub-section (B) hereof; and (B)(i) obligations issued or guaranteed by the United States of America or any agency or instrumentality thereof (provided that the full faith and credit of the United States is pledged in support thereof) and provided that the maximum maturity limit for any individual security is 366 days, and (ii) shares of money market funds with a minimum credit rating of AAA by S&P or Moody's and minimum assets of at least $1 billion.

B.    <u>Eligible Investments</u>.  The Escrow Agent shall invest the Escrow Funds solely in Eligible Investments.  Initially, the Escrow Funds shall be invested in the Initial Agreed Investments.  If the Initial Agreed Investments or any Eligible Investments later made by the Escrow Agent cease to be Eligible Investments at any time, the Escrow Agent shall, as soon as practicable, liquidate such investments at the then fair market value and promptly reinvest such monies as are generated by a liquidation (or any series thereof) in Eligible Investments; provided, however, that after giving effect to any such reinvestment, at least 80% of the Escrow Funds shall be invested in obligations described in (B)(i) of the definition of Eligible

5

Investments, and no more than 20% of the Escrow Funds are invested in shares described in (B)(ii) of the definition of Eligible Investments.

      C.    <u>Limitations on Escrow Agent's liability with respect to Eligible Investments</u>. The Escrow Agent shall not be responsible for any loss due to interest rate fluctuation or early withdrawal penalty.  The Grace Parties and Lloyd's Underwriters understand that Eligible Investments are not necessarily insured by the United States Government or any agency or instrumentality thereof, or of any state or municipality, and that such deposits do not necessarily earn a fixed rate of return.  In no instance shall the Escrow Agent have any obligation to provide investment advice of any kind.  The Escrow Agent shall not be liable or responsible for any loss resulting from any investments made pursuant to this Section 2.3 other than as a result of Escrow Agent's gross negligence or willful misconduct or failure to comply with sufficient written instructions.  It is expressly agreed and understood by the Escrow Parties that the Escrow Agent shall not in any way whatsoever be liable for losses on any investments undertaken in accordance with the terms of this Escrow Agreement, including, but not limited to, losses from market risks due to premature liquidation or resulting from other actions taken pursuant to this Escrow Agreement.

      Receipt, investment and reinvestment of the Escrow Funds and payment of the Escrow Agent's fees and expenses from the Escrow Funds as provided in Section 2.6 shall be confirmed by the Escrow Agent as soon as practicable by account statement separately to the Grace Parties and to Lloyd's Underwriters, and any discrepancies in any such account statement shall be noted either by the Grace Parties or Lloyd's Underwriters, or both, to the Escrow Agent within thirty (30) calendar days after receipt thereof.  Failure to inform the Escrow Agent in writing of any discrepancies in any such account statement within said 30-day period shall conclusively be

6

deemed confirmation of such account statement in its entirety. For purposes of this paragraph, (a) each account statement shall be deemed to have been received by the party to whom directed on the earlier to occur of: (i) actual receipt thereof; or (ii) three (3) Business Days (hereinafter defined) after the deposit thereof in the United States Mail, postage prepaid; and (b) the term "Business Day" shall mean any day of the year, excluding Saturday, Sunday and any other day on which national banks are required or authorized to close in the United States of America

SECTION 2.4 <u>Resignation/Removal and Appointment of Successor Escrow Agent</u>. The Escrow Agent may resign hereunder upon thirty (30) days' prior written notice to the Grace Parties and Lloyd's Underwriters. The Grace Parties and Lloyd's Underwriters may remove the Escrow Agent at any time upon thirty (30) days prior written notice executed by both the Grace Parties and Lloyd's Underwriters. A successor escrow agent shall be appointed by agreement between the Grace Parties and Lloyd's Underwriters if (a) there is a resignation or removal, or (b) the Escrow Agent is dissolved, taken under the control of any public officer or officers or if a receiver appointed by a court, or otherwise becomes incapable of acting hereunder. Upon the acceptance by the successor escrow agent of such appointment, the Escrow Agent shall deliver the Escrow Funds to the successor agent and the Escrow Agent will be released from its obligations hereunder by written instrument, a copy of which shall be delivered to the Grace Parties , Lloyd's Underwriters, the resigning Escrow Agent and the successor escrow agent.

SECTION 2.5 <u>Term of Escrow Agreement</u>. This Escrow Agreement shall remain in full force and effect until such time as all the amounts in the Escrow Account have been distributed in accordance with Section 2.2 hereof; *provided, however,* that in the event all fees, expenses, costs and other amounts required to be paid to Escrow Agent hereunder are not fully and finally paid prior to termination, the provisions of Article III hereof shall survive the termination hereof.

7

SECTION 2.6 <u>Escrow Agent Fees and Expenses</u>.  The Escrow Agent shall be paid for its services hereunder in accordance with Escrow Agent's fee schedule as attached as Schedule I hereto as in effect from time to time, together with all reasonable expenses incurred by the Escrow Agent in connection with the performance of its duties and otherwise in connection with the preparation, operation, administration and enforcement of this Escrow Agreement, including, without limitation, attorneys' fees, brokerage costs and related expenses incurred by the Escrow Agent (the "Expenses").  The Escrow Agent's fees and Expenses shall be paid from the funds on deposit in the Escrow Account.  In the event that the Escrow Funds are insufficient to pay the Escrow Agent's fee, the Escrow Agent shall bill the annual administration fee to the Grace Parties.  The obligation to pay or reimburse the Escrow Agent for the Expenses shall survive the satisfaction and discharge of this Escrow Agreement or the earlier resignation or removal of the Escrow Agent.  The Escrow Agent agrees to advise the Grace Parties and Lloyd's Underwriters in writing of increases in fees before such fees take effect and of all new fees not agreed to prior to execution of this Escrow Agreement.

SECTION 2.7 <u>Lloyd's Underwriters' Agents and Representatives</u>.  Equitas Limited, as the run-off agent for Lloyd's Underwriters, shall have full power and authority to act on behalf of Lloyd's Underwriters with respect to all matters relating to this Escrow Agreement.  Equitas Limited has appointed James Sottile as Lloyd's Underwriters' Representative and attorney-in-fact in connection with this Escrow Agreement.  Equitas Limited may change the Lloyds' Underwriters' Representative and attorney-in-fact at any time and from time to time upon ten Business Days' prior written notice to the Escrow Agent and the Grace Parties.  The Escrow Agent may rely upon any decision, consent or instruction of Equitas Limited or the Lloyd's Underwriters' Representative received by the Escrow Agent in connection with this Escrow

8

Agreement, and is relieved from any liability to any person for any acts performed in accordance with any such decision, consent or instruction except for its own failure to comply with sufficient written instructions, willful misconduct or gross negligence. The Escrow Agent may rely, without inquiry, upon any written notice from Equitas Limited of any successor Lloyd's Underwriters' Representative, and may deal with such successor with respect to the escrow created by this Escrow Agreement.

### ARTICLE III
### The Escrow Agent

SECTION 3.1 Scope of Undertaking. The Escrow Agent's duties and responsibilities in connection with this Escrow Agreement shall be limited to those expressly set forth in this Escrow Agreement. The Escrow Agent is not a principal, participant or beneficiary in any transaction underlying this Escrow Agreement, including, but not limited to, the Subject Policies or the 2006 Settlement Agreement, and shall have no duty to inquire beyond the terms and provisions hereof. Except as otherwise provided in Section 2.3, the Escrow Agent shall have no responsibility or obligation of any kind in connection with this Escrow Agreement or the Escrow Funds other than to receive, hold, invest, reinvest and deliver the Escrow Funds and provide notices and statements as herein provided. Without limiting the generality of the foregoing, it is hereby expressly agreed and stipulated by the Grace Parties and Lloyd's Underwriters that the Escrow Agent shall not be required to exercise any investment discretion hereunder and shall have no investment or management responsibility and, accordingly, shall have no duty to, or liability for its failure to, provide investment recommendations or investment advice to the Grace Parties and Lloyd's Underwriters or either of them under this Escrow Agreement. The Escrow Agent shall not be liable for any error in judgment, any act or omission, any mistake of law or fact, or for anything it may do or refrain from doing in connection herewith, except for its own

9

failure to comply with sufficient written instructions, willful misconduct or gross negligence. It is the intention of the Grace Parties and Lloyd's Underwriters that the Escrow Agent shall never be required to use, advance or risk its own funds in the performance of any of its duties.

SECTION 3.2 <u>Reliance; Liability</u>.  The Escrow Agent may rely on, and shall not be liable for acting or refraining from acting in accordance with, any written notice, instruction or request or other document furnished to it hereunder or pursuant hereto and reasonably believed by it to have been signed or presented by the Grace Parties, Equitas Limited and/or Lloyd's Underwriters as appropriate.  The Escrow Agent shall be responsible for holding, investing, reinvesting and disbursing the Escrow Funds pursuant to this Escrow Agreement.  Except in circumstances involving the Escrow Agent's failure to comply with sufficient written instructions, willful misconduct or gross negligence, the Escrow Agent in no event shall be liable for special, indirect or consequential loss or damage of any kind whatsoever (including but not limited to lost profits), even if the Escrow Agent has been advised of the likelihood of such loss or damage and regardless of the form of action.  The Escrow Agent is not responsible or liable in any manner whatsoever for the sufficiency, correctness, genuineness or validity of the subject matter of this Escrow Agreement or any part hereof, or for the transaction or transactions requiring or underlying the execution of this Escrow Agreement, the form or execution hereof, or for the identity or authority of any person executing this Escrow Agreement or any part hereof, or depositing the Escrow Funds.

SECTION 3.3 <u>Escrow Agent's Own Funds</u>.  None of the provisions of this Escrow Agreement shall require the Escrow Agent to expend or risk its own funds in the performance of any of its duties hereunder, or in the exercise of any of its rights or powers.

10

SECTION 3.4 <u>No Duty of Investigation</u>.  The Escrow Agent shall not be bound to make any investigation into the facts or matters stated in any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, entitlement, order, approval or other paper or document presented to the Escrow Agent by the Grace Parties, Equitas Limited and Lloyd's Underwriters.

SECTION 3.5 <u>Acting Through an Agent</u>.  The Escrow Agent may execute any of its powers and perform any of its duties hereunder directly or through agents or attorneys (and shall be liable only for the careful selection of any such agent or attorney) and may consult with counsel, accountants and other skilled persons that may be selected and retained by it.  The Escrow Agent shall not be liable for anything done, suffered or omitted in good faith by it in accordance with the advice or opinion of any such counsel, accountants or other persons.  In the event that the Escrow Agent shall be uncertain as to its duties or rights hereunder or shall receive instructions, claims or demands from any party hereto which, in its opinion, conflict with any of the provisions of this Escrow Agreement, it shall be entitled to refrain from taking any action and its sole obligation shall be to notify the other Escrow Parties of its decision so to refrain, and to keep safely all property held in escrow until it shall be directed otherwise in writing by all of the other Escrow Parties hereto or by a final order or judgment of a court of competent jurisdiction.

SECTION 3.6 <u>Indemnification</u>.  The Grace Parties and Lloyd's Underwriters agree jointly and severally to indemnify and defend the Escrow Agent, its officers, directors, partners, employees and agents (each herein called an "Indemnified Party") against, and hold each Indemnified Party harmless from, any and all losses, liabilities and expenses, including, but not limited to, fees and expenses of outside counsel, court costs, costs damages and claims, costs of investigation, litigation and arbitration, tax liability (other than for income taxes on fees earned

11

hereunder) and loss on investments suffered or incurred by any Indemnified Party in connection with or arising from or out of (i) the execution, delivery or performance of this Escrow Agreement, or (ii) the compliance or attempted compliance by any Indemnified Party with any instruction or direction upon which the Escrow Agent is authorized to rely under this Escrow Agreement, except to the extent that any such loss, liability or expense may result from the willful misconduct or gross negligence or failure to comply with sufficient written instructions of such Indemnified Party. The Escrow Parties acknowledge that the foregoing indemnity shall survive the resignation or removal of the Escrow Agent or the termination of this Escrow Agreement.

SECTION 3.7 <u>Security Procedures</u>. In the event funds transfer instructions are given (other than in writing at the time of execution of this Escrow Agreement), as indicated in Schedule II attached hereto, whether in writing, by facsimile or otherwise, the Escrow Agent is authorized to seek confirmation of such instructions by telephone call-back to the person or persons designated on Schedule II hereto, and the Escrow Agent may rely upon the confirmation of anyone purporting to be the person or persons so designated. Schedule II may be changed only in a writing actually received and acknowledged by the Escrow Agent.

It is understood that, absent willful misconduct or gross negligence or failure to comply with sufficient written instructions, in any transfer of Escrow Funds, the Escrow Agent and the transferee's bank may rely solely upon any account numbers or similar identifying number provided by any of the Escrow Parties to identify: (i) the transferee, (ii) the transferee's bank, or (iii) an intermediary bank. The Escrow Agent may apply any of the Escrow Funds for any payment order it executes using any such account or similar identifying number, even where its

12

use may result in a person other than the transferee being paid, or the transfer of funds to a bank other than the transferee's bank or an intermediary bank.

SECTION 3.8 <u>Tax Obligations</u>. Upon execution of this Escrow Agreement, each of the Grace Parties and Lloyd's Underwriters shall provide the Escrow Agent with its applicable taxpayer identification number documented by an appropriate Form W-8 or Form W-9. The Grace Parties and Lloyd's Underwriters each represent that its correct Taxpayer Identification Number ("TIN") assigned by the Internal Revenue Service ("IRS") or any other taxing authority is set forth in Schedule III. The Escrow Agent shall report any income paid to Lloyd's Underwriters to Equitas Limited. Failure so to provide such information may prevent or delay disbursements from the Settlement Amount and may also result in the assessment of a penalty and the Escrow Agent's being required to withhold tax on any interest or other income earned on the Escrow Funds. Any payments of income shall be subject to applicable withholding regulations then in force in the United States and any other applicable jurisdiction. The Grace Parties and Lloyd's Underwriters agree that any applicable international, federal or other taxes relating to any interest or other income earned on the Escrow Funds shall be paid from the Escrow Funds. The Grace Parties and Lloyd's Underwriters shall retain the services of an appropriate third-party, whose services shall be paid from the Escrow Funds, to timely file all required and appropriate federal, state and local tax returns and make timely payment out of the Escrow Funds of any taxes due by or lawfully assessed against the Escrow Account.

The Escrow Agent shall have no duty to comply with the provisions of Treasury Reg. § 1.468B, cited above. Furthermore, the Escrow Agent shall not be deemed to have any knowledge or responsibility concerning the applicability of such regulation to the transactions contemplated by this Agreement.

13

## ARTICLE IV
### Miscellaneous

SECTION 4.1 <u>Waivers; Amendments; Benefit of Agreement</u>.

(a)     No failure or delay by any Escrow Party in exercising any power or right hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power. No waiver of any provision of this Escrow Agreement or consent to any departure there from shall in any event be effective unless the same shall be authorized as provided in paragraph (b) below, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given. No notice or demand on any Escrow Party in any case shall entitle such Escrow Party to any other or further notice or demand in similar or other circumstances. Except as otherwise expressly provided herein, all rights and remedies existing under this Escrow Agreement are cumulative with, and not exclusive of, any rights or remedies otherwise available.

(b)     No provision of this Escrow Agreement may be waived, amended supplemented, or modified except pursuant to an agreement in writing entered into by the Grace Parties, Lloyd's Underwriters and the Escrow Agent.

(c)     Nothing in this Escrow Agreement, expressed or implied, shall give or be construed to give to any person other than the Escrow Parties any legal or equitable right, remedy or claim under this Escrow Agreement, or under any covenants and provisions of this Escrow Agreement, each covenant and provision being for the benefit of the Grace Parties and Lloyd's Underwriters.

14

SECTION 4.2 <u>Legal Capacity</u>.  Each of the Grace Parties, Lloyd's Underwriters and the Escrow Agent represents and warrants that it has the legal capacity to enter into and perform its obligations under this Escrow Agreement.

SECTION 4.3 <u>Notices</u>.  All communications or notices provided for hereunder (including a notice of change of address) will be in writing, will be addressed in accordance with the information set forth below and will be deemed given (a) in the case of delivery by hand, when delivered by hand, (b) in the case of delivery by a standard overnight carrier, upon the date of delivery indicated in the records of such carrier, (c) in the case of a facsimile transmission, when received by recipient in legible form, or (d) in the case of delivery by certified mail with return receipt requested, upon delivery to the recipient:

If to the Grace Parties:

> 7500 Grace Drive
> Columbia, Maryland  21044
> Attn:  Secretary
> Fax:  (410) 531-4367
>
> and
>
> 7500 Grace Drive
> Columbia, Maryland  21044
> Attn:  Finance Manager, Corporate Treasury
> Fax:  (410) 531-4461

If to Lloyd's Underwriters or Equitas:

> Equitas Limited
> Claims Division
> 33 St. Mary Axe
> London  EC3A 8LL
> ENGLAND
> Attn:  Head of Direct Claims
> Phone:  011 44 207 342-2000
> Fax:  011 44 207 342-1000

K&E 11467353.3

With a copy to:

> Zuckerman Spaeder LLP
> 1800 M Street N.W., Suite 1000
> Washington, DC 20036
> Attn: James Sottile, IV, Esq.
> Phone: (202) 778-1800
> Fax: (202) 822-8106
> e-mail: jsottile@zuckerman.com

If to the Escrow Agent:

> JPMorgan Chase Bank, N.A.
> 4 New York Plaza
> Escrow Services
> 21st Floor
> New York, New York 10004
> Attention: James M. Foley
> Phone: (212) 623-5182
> Fax: (212) 623-6168
> Email: james.foley@jpmorgan.com

or at such other addresses as any Escrow Party may designate by notice to the other Escrow Parties in accordance with this Section 4.3.

SECTION 4.4 Governing Law; Waiver of Jury Trial; Jurisdiction.

(a)     This Escrow Agreement shall be governed by and construed in accordance with the laws of the State of New York including all matters of construction, validity and performance.

(b)     TO THE FULLEST EXTENT PERMITTED BY LAW, EACH ESCROW PARTY HERETO HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES ANY RIGHTS THEY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED HEREON, OR ARISING OUT OF, UNDER OR IN CONNECTION WITH, THIS ESCROW AGREEMENT OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER VERBAL OR WRITTEN) OR ACTIONS OF ANY

16

OF THE ESCROW PARTIES. THIS PROVISION IS A MATERIAL INDUCEMENT FOR EACH ESCROW PARTY TO ENTER INTO THIS ESCROW AGREEMENT.

SECTION 4.5 <u>Counterparts</u>. This Escrow Agreement may be executed in three or more counterparts, and by the different Escrow Parties hereto in separate counterparts, each of which when so executed and delivered, shall be an original, but all of which together shall constitute one and the same instrument. All signatures of the Escrow Parties may be transmitted by facsimile, and such facsimile will, for all purposes, be deemed to be the original signature of such Escrow Party whose signature it reproduces, and will be binding upon such Escrow Party.

SECTION 4.6 <u>Severability</u>. If any term or provision of this Escrow Agreement or the application thereof to any circumstance shall, in any jurisdiction and to any extent, be invalid or unenforceable, such term or such provision shall be ineffective as to such jurisdiction to the extent of such invalidity or unenforceability without invalidating or rendering unenforceable any remaining terms or provisions of this Escrow Agreement or the application of such term or provision to circumstances other than those as to which it is held invalid or unenforceable. To the extent permitted by applicable law, the Escrow Parties waive any provision of law that renders any term or provision of this Escrow Agreement invalid or unenforceable in any respect.

SECTION 4.7 <u>Rules of Interpretation</u>. This Escrow Agreement shall be construed without regard to any presumption or other rule requiring construction against the Escrow Party drafting this Escrow Agreement. The headings of the Sections and paragraphs of this Escrow Agreement have been inserted for convenience of reference only and shall in no way restrict or otherwise modify any of the terms or provisions hereof. All pronouns and any variations thereof refer to the masculine, feminine or neuter, singular or plural, as the context may require.

17

SECTION 4.8 <u>Entire Agreement</u>.    This Escrow Agreement supersedes all prior agreements, written or oral, between or among any of the Escrow Parties relating to the transaction contemplated hereby or thereby.

SECTION 4.9 <u>Further Cooperation</u>. Each of the Escrow Parties agrees to cooperate with the other Escrow Parties in effectuating this Escrow Agreement and to execute and deliver such further documents or instruments and to take such further actions as shall be reasonably requested in connection therewith.

SECTION 4.10 <u>Assignment Binding Effect</u>. No Escrow Party may assign this Escrow Agreement, or any of its rights or obligations hereunder, without the consent of the other Escrow Parties (which consent shall not be unreasonably withheld). All agreements, representations, warranties and indemnities in this Escrow Agreement and in any agreement, document or certificate delivered concurrently with the execution of this Escrow Agreement, or from time to time hereafter, shall bind the Escrow Party making the same and such Escrow Party's successors and assigns, and shall inure to the benefit of each Escrow Party for whom made and for such Escrow Party's permitted successors and assigns.

SECTION 4.11 <u>Specific Performance</u>.    The rights of the Escrow Parties under this Escrow Agreement are unique and each Escrow Party hereto acknowledges that the failure of an Escrow Party to perform its obligations hereunder would irreparably harm the other Escrow Parties hereto. Accordingly, the Escrow Parties shall, in addition to such other remedies as may be available at law or in equity, have the right to enforce their rights hereunder by actions for specific performance to the extent permitted by law.

18

SECTION 4.12 <u>Force Majeure</u>. No Escrow Party is liable to any other Escrow Party for losses due to, or if it is unable to perform its obligations under the terms of this Escrow Agreement because of, acts of God, fire, floods, strikes, equipment or transmission failure, or other causes reasonably beyond its control.

19

**IN WITNESS WHEREOF,** the Escrow Parties have executed this Escrow Agreement to

be effective as of the date first above written.

> **W.R. GRACE & CO. AND ON ITS OWN
> BEHALF AND ON BEHALF OF ALL
> PERSONS INCLUDED IN THE
> DEFINITION OF GRACE PARTIES**
>
> By:_____
> Name:_____
> Title:_____
>
>
> **LLOYD'S UNDERWRITERS**
>
> By:_____
> Name:  James Sottile, IV
> Title:  Attorney-in-Fact
>
>
> **JPMORGAN CHASE BANK, N.A., AS
> ESCROW AGENT**
>
> By:_____
> Name:_____
> Title:_____

20

**Schedule I**

**FEE SCHEDULE**
_____.

ESCROW AGENT SERVICES
FOR
W. R. GRACE & CO. ON ITS OWN BEHALF AND
ON BEHALF OF THE GRACE PARTIES
AND
UNDERWRITERS AT LLOYD'S, LONDON

| | | |
|---|---|---|
| I. | Acceptance Fee/Annual Administration Fee | **$2,500 per annum without pro-ration for partial years** |
| II. | Counsel Fees & Expenses | **Waived** |

S1-1

## Schedule II

### Telephone Number(s) for Call-backs and Person(s)

### Designated to Instruct or Confirm Funds Transfer Instructions

If to W. R. Grace & Co. on its own behalf and on behalf of the Grace Parties:

| Name | Telephone Number | Signature |
|------|------------------|-----------|
|      |                  |           |

If to Certain Underwriters at Lloyd's, London:

| Name | Telephone Number | Signature |
|------|------------------|-----------|
| James Sottile, IV, Esq. | (202) 778-1894 | |
| Glenn E. Brace | 011 44 207 342-2820 | |

In the event funds transfer instructions are given (other than in writing at the time of execution of this Escrow Agreement), whether in writing, by facsimile or otherwise, JPMorgan Chase Bank, N.A. is authorized to seek confirmation of such instructions by telephone call-back to the person or persons designated above, and JPMorgan Chase Bank, N.A. may rely upon the confirmation of anyone purporting to be the person or persons so designated. Schedule II may be changed only in a writing actually received and acknowledged by JPMorgan Chase Bank.

Pursuant to the above, the respective parties will issue payment orders to us to transfer funds by federal funds wire. JPMorgan Chase Bank, N.A. reviews the orders to determine compliance and to confirm the signature by the appropriate party, in accordance with this agreement. Bank policy requires that, where practicable, we undertake callbacks to a party other than the individual who signed the payment order to verify the authenticity of the payment order.

Inasmuch as the above noted parties are the only employee in your office to confirm wire transfers, we will call you to confirm any federal funds wire transfer payment orders purportedly issued by you. Your continued issuance of payment orders to us in accordance with this procedure will constitute your agreement (1) to the callback security procedure outlines herein and (2) that the security procedure outlined herein constitutes a commercially reasonable method of verifying the authenticity of payment orders.

S2-1

## Schedule III

**Effective Date:  November ___, 2006**
**W.R. Grace & Co.:**

Notice Address:

TIN:

Wiring Instructions:

ABA #
Bank Name:
Account No.
Account Name:

**Lloyd's Underwriters:**

Notice Address:

Seller TIN:

Wiring Instructions:

ABA #
Bank Name:
Account No.
Account Name:

S3-1