*EXHIBIT B*

RLF1-2671105-1

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| *In re* | ) | |
| | ) | |
| | ) | |
| ARMSTRONG WORLD INDUSTRIES | ) | Chapter 11 |
| INC., *et al.*, | ) | Case No. 00-4471 (RJN) |
| | ) | (Jointly Administered) |
| Debtors | ) | |
| | ) | |

**Exhibit 1.24**

FORM OF ARMSTRONG WORLD INDUSTRIES, INC.
ASBESTOS PERSONAL INJURY SETTLEMENT TRUST
DISTRIBUTION PROCEDURES

Exhibit 1.24-1

ARMSTRONG WORLD INDUSTRIES, INC.

ASBESTOS PERSONAL INJURY SETTLEMENT TRUST DISTRIBUTION PROCEDURES

The Armstrong World Industries, Inc. Asbestos Personal Injury Settlement Trust Distribution Procedures ("*TDP*") contained herein provide for resolving all Asbestos Personal Injury Claims (as that term is defined in the Armstrong World Industries, Inc. Plan of Reorganization ("*Plan*")) caused by exposure to asbestos-containing products for which Armstrong World Industries, Inc. ("*AWI*") and its predecessors, successors, and assigns have legal responsibility (hereinafter for all purposes of this TDP referred to as "*PI Trust Claims*"), as provided in and required by the Plan and by the Armstrong World Industries, Inc. Asbestos Personal Injury Settlement Trust Agreement ("*PI Trust Agreement*"). The Plan and PI Trust Agreement establish the Armstrong World Industries, Inc. Asbestos Personal Injury Settlement Trust ("*PI Trust*"). The Trustees of the PI Trust ("*Trustees*") shall implement and administer this TDP in accordance with the PI Trust Agreement.  Capitalized terms used herein and not otherwise defined shall have the meanings assigned to them in the Plan and the PI Trust Agreement.

SECTION I

Introduction

**1.1**     **Purpose.**  This TDP has been adopted pursuant to the PI Trust Agreement.  It is designed to provide fair, equitable and substantially similar treatment for all PI Trust Claims that may presently exist or may arise in the future in substantially the same manner.

**1.2**     **Interpretation.**  Nothing in this TDP shall be deemed to create a substantive right for any claimant.

SECTION II

Overview

**2.1**     **PI Trust Goals.**  The goal of the PI Trust is to treat all claimants equitably.  This TDP furthers that goal by setting forth procedures for processing and paying AWI's several share of the unpaid portion of the liquidated value of PI Trust Claims generally on an impartial, first-in-first-out ("*FIFO*") basis, with the intention of paying all claimants over time as equivalent a share as possible of the value of their claims based on historical values for substantially similar claims in the tort system.  To this end, the TDP establishes a schedule of eight asbestos-related diseases ("*Disease Levels*"), seven of which have presumptive medical and exposure requirements ("*Medical/Exposure Criteria*"), specific liquidated values ("*Scheduled Values*"), anticipated average values ("*Average Values*") and caps on their liquidated values ("*Maximum Values*").  The Disease Levels, Medical/Exposure Criteria, Scheduled Values, Average Values and Maximum Values, which are set forth in Sections 5.3 and 5.4 below, have all been selected and derived with the intention of achieving a fair allocation of the PI Trust funds as among claimants suffering from different disease processes in light of the best available information considering the settlement history of AWI and the rights claimants would have in the tort system absent the bankruptcy.

**2.2**     **Claims Liquidation Procedures.**  PI Trust Claims shall be processed based on their place in the FIFO Processing Queue to be established pursuant to Section 5.1(a) below.  The PI Trust shall take all reasonable steps to resolve PI Trust Claims as efficiently and expeditiously as possible at each stage of claims processing and arbitration.  To this end, the PI Trust, in its sole discretion, may conduct settlement discussions with claimants' representatives with respect to more than one claim at a time; provided that the claimants' respective positions in the FIFO Processing Queue are maintained and each claim is individually evaluated pursuant to the valuation factors set forth in Section 5.3(b)(2) below.  The PI Trust shall also make every effort to resolve each year at least that number of PI Trust Claims required to exhaust the Maximum Annual Payment and the Maximum Available Payment for Category A and Category B claims, as those terms are defined below.

The PI Trust shall liquidate all PI Trust Claims except foreign claims that meet the presumptive Medical/Exposure Criteria of Disease Levels I – V, VII and VIII under the Expedited Review Process described in Section 5.3(a) below.  Claims involving Disease Levels I – V, VII and VIII that do not meet the presumptive Medical/Exposure Criteria for the relevant Disease Level may undergo the PI Trust's Individual Review Process described in Section

Exhibit 1.24-2

5.3(b) below. In such a case, notwithstanding that the claim does not meet the presumptive Medical/Exposure Criteria for the relevant Disease Level, the PI Trust can offer the claimant an amount up to the Scheduled Value of that Disease Level if the PI Trust is satisfied that the claimant has presented a claim that would be cognizable and valid in the tort system.

PI Trust Claims involving Disease Levels II – VIII may in addition or alternatively seek to establish a liquidated value for the claim that is greater than its Scheduled Value by electing the PI Trust's Individual Review Process. However, the liquidated value of a PI Trust Claim that undergoes the Individual Review Process for valuation purposes may be determined to be less than its Scheduled Value, and in any event shall not exceed the Maximum Value for the relevant Disease Level set forth in Section 5.3(b)(4) below, unless the claim qualifies as an Extraordinary Claim as defined in Section 5.4(a) below, in which case its liquidated value cannot exceed the Maximum Value specified in that provision. Level VI (Lung Cancer 2) claims and all foreign claims may be liquidated only pursuant to the PI Trust's Individual Review Process.

Based upon AWI's claims settlement history in light of applicable tort law, and current projections of present and future unliquidated claims, the Scheduled Values and Maximum Values set forth in Section 5.3(b)(4) have been established for each of the Disease Levels that are eligible for Individual Review of their liquidated values, with the expectation that the combination of settlements at the Scheduled Values and those resulting from the Individual Review Process will result in the Average Values also set forth in that provision.

All unresolved disputes over a claimant's medical condition, exposure history and/or the liquidated value of the claim shall be subject to binding or non-binding arbitration as set forth in Section 5.10 below, at the election of the claimant, under procedures that are provided in Attachment A hereto. PI Trust Claims that are the subject of a dispute with the PI Trust that cannot be resolved by non-binding arbitration may enter the tort system as provided in Sections 5.11 and 7.6 below. However, if and when a claimant obtains a judgment in the tort system, the judgment will be payable (subject to the Payment Percentage, Maximum Available Payment, and Claims Payment Ratio provisions set forth below) as provided in Section 7.7 below.

2.3    **Application of the Payment Percentage.** After the liquidated value of a PI Trust Claim other than a claim involving Other Asbestos Disease (Disease Level I – Cash Discount Payment), as defined in Section 5.3(a)(3) below, is determined pursuant to the procedures set forth herein for Expedited Review, Individual Review, arbitration, or litigation in the tort system, the claimant will ultimately receive a pro-rata share of that value based on a Payment Percentage described in Section 4.2 below. The Payment Percentage shall also apply to all Pre-Petition Liquidated Claims as provided in Section 5.2 below. The Initial Payment Percentage has been set at twenty percent (20%), and shall apply to all PI Trust Voting Claims accepted as valid by the PI Trust, unless adjusted by the PI Trust pursuant to the consent of the PI Trust Advisory Committee ("*TAC*") and the Legal Representative for Future Asbestos Claimants ("*Future Claimants' Representative*") (who are described in Section 3.1 below) pursuant to Section 4.2 below. The term "*PI Voting Trust Claims*" includes (i) Pre-Petition Liquidated Claims as defined in Section 5.2(a) below; (ii) claims filed against AWI in the tort system or actually submitted to AWI pursuant to an administrative settlement agreement prior to the Petition Date of December 6, 2000; and (iii) all claims filed against another defendant in the tort system prior to the date the Plan was filed with the Bankruptcy Court (November 1, 2002 (the "*Plan Filing Date*")), provided, however, that the holder of a claim described in subsection (i), (ii) or (iii) above or his or her authorized agent, actually voted to accept or reject the Plan pursuant to the voting procedures established by the Bankruptcy Court, and provided further that the claim was subsequently filed with the PI Trust pursuant to Section 6.1 below by the Initial Claims Filing Date defined in Section 5.1(a) below. The Initial Payment Percentage has been calculated on the assumption that the Average Values set forth in Section 5.3(b)(4) below will be achieved with respect to existing present claims and projected future claims involving Disease Levels II – VIII.

The Payment Percentage may be adjusted upwards or downwards from time to time by the PI Trust with the consent of the TAC and the Future Claimants' Representative to reflect then-current estimates of the PI Trust's assets and its liabilities, as well as the then-estimated value of pending and future claims. However, any adjustment to the Initial Payment Percentage shall be made only pursuant to Section 4.2 below. If the Payment Percentage is increased over time, claimants whose claims were liquidated and paid in prior periods under the TDP will not receive additional payments, except as provided in Section 4.2 below relating to circumstances in which the PI Trust has received a substantial recovery of insurance proceeds. Because there is uncertainty in the prediction of both the number and severity of future claims, and the amount of the PI Trust's assets, no guarantee can be made of any Payment Percentage of a PI Trust Claim's liquidated value.

Exhibit 1.24-3

2.4     **PI Trust's Determination of the Maximum Annual Payment and Maximum Available Payment.** The PI Trust shall estimate or model the amount of cash flow anticipated to be necessary over its entire life to ensure that funds will be available to treat all present and future claimants as similarly as possible. In each year, the PI Trust will be empowered to pay out all of the interest earned during the year, together with a portion of its principal, calculated so that the application of PI Trust funds over its life shall correspond with the needs created by the anticipated flow of claims (the *"Maximum Annual Payment"*), taking into account the Payment Percentage provisions set forth in Sections 2.3 above and 4.2 below. The PI Trust's distributions to all claimants for that year shall not exceed the Maximum Annual Payment determined for that year.

In distributing the Maximum Annual Payment, the PI Trust shall first allocate the amount in question to outstanding Pre-Petition Liquidated Claims and to liquidated PI Trust Claims involving Disease Level I (Cash Discount Payment), in proportion to the aggregate value of each group of claims. The remaining portion of the Maximum Annual Payment (the *"Maximum Available Payment"*), if any, shall then be allocated and used to satisfy all other liquidated PI Trust Claims, subject to the Claims Payment Ratio set forth in Section 2.5 below. In the event there are insufficient funds in any year to pay the total number of outstanding Pre-Petition Liquidated Claims and/or previously liquidated Disease Level I Claims, the available funds allocated to that group of claims shall be paid to the maximum extent to claimants in the particular group based on their place in their respective FIFO Payment Queue. Claims in either group for which there are insufficient funds shall be carried over to the next year and placed at the head of their FIFO Payment Queue.

2.5     **Claims Payment Ratio.** Based upon AWI's claims settlement history and analysis of present and future claims, a Claims Payment Ratio has been determined which, as of the Effective Date, has been set at 65% for Category A claims, which consist of PI Trust Claims involving severe asbestosis and malignancies (Disease Levels IV – VIII) that were unliquidated as of the Petition Date, and at 35% for Category B claims, which are PI Trust Claims involving non-malignant Asbestosis or Pleural Disease (Disease Levels II and III) that were similarly unliquidated as of the Petition Date. The Claims Payment Ratio shall not apply to any Pre-Petition Liquidated Claims or to any claims for Other Asbestos Disease (Disease Level I - Cash Discount Payment). In each year, after the determination of the Maximum Available Payment described in Section 2.4 above, 65% of that amount will be available to pay Category A claims and 35% will be available to pay Category B claims that have been liquidated since the Petition Date.

In the event there are insufficient funds in any year to pay the liquidated claims within either or both of the Categories, the available funds allocated to the particular Category shall be paid to the maximum extent to claimants in that Category based on their place in the FIFO Payment Queue described in Section 5.1(c) below, which will be based upon the date of claim liquidation. Claims for which there are insufficient funds allocated to the relevant Category shall be carried over to the next year where they will be placed at the head of the FIFO Payment Queue. If there are excess funds in either or both Categories, because there is an insufficient amount of liquidated claims to exhaust the respective Maximum Available Payment amount for that Category, then the excess funds for either or both Categories will be rolled over and remain dedicated to the respective Category to which they were originally allocated.

The 65%/35% Claims Payment Ratio and its rollover provision shall apply to all PI Trust Voting Claims as defined in Section 2.3 above except Pre-Petition Liquidated Claims and Other Asbestos Disease claims (Disease Level I – Cash Discount Payment), and shall not be amended until the fifth anniversary of the Effective Date. Thereafter, both the Claims Payment Ratio and its rollover provision shall be continued absent circumstances, such as a significant change in law or medicine, necessitating amendment to avoid a manifest injustice. However, the accumulation, rollover and subsequent delay of claims resulting from the application of the Claims Payment Ratio, shall not, in and of itself, constitute such circumstances. Nor may an increase in the numbers of Category B claims beyond those predicted or expected be considered as a factor in deciding whether to reduce the percentage allocated to Category A claims.

In considering whether to make any amendments to the Claims Payment Ratio and/or its rollover provisions, the Trustees shall consider the reasons for which the Claims Payment Ratio and its rollover provisions were adopted, the settlement history that gave rise to its calculation, and the foreseeability or lack of foreseeability of the reasons why there would be any need to make an amendment. In that regard, the Trustees should keep in mind the interplay between the Payment Percentage and the Claims Payment Ratio as it affects the net cash actually paid to claimants.

Exhibit 1.24-4

In any event, no amendment to the Claims Payment Ratio may be made without the consent of the TAC and the Future Claimants' Representative pursuant to the consent process set forth in Sections 5.7(b) and 6.6(b) of the PI Trust Agreement. However, the Trustees, with the consent of the TAC and the Future Claimants' Representative, may offer the option of a reduced Payment Percentage to holders of claims in either Category A or Category B in return for prompter payment (the "*Reduced Payment Option*").

      **2.6**    **Indirect PI Trust Claims.** As set forth in Section 5.6 below, Indirect PI Trust Claims (as such term is defined in the Plan) ("*Indirect PI Trust Claims*"), if any, shall be subject to the same categorization, evaluation, and payment provisions of this TDP as all other PI Trust Claims.

SECTION III

<u>TDP Administration</u>

      **3.1**    **PI Trust Advisory Committee and Future Claimants' Representative.** Pursuant to the Plan and the PI Trust Agreement, the PI Trust and this TDP shall be administered by the Trustees in consultation with the TAC, which represents the interests of holders of present PI Trust Claims, and the Future Claimants' Representative, who represents the interests of holders of PI Trust Claims that will be asserted in the future. The Trustees shall obtain the consent of the TAC and the Future Claimants' Representative on any amendments to these Procedures pursuant to Section 8.1 below, and on such other matters as are otherwise required below and in Section 2.2(f) of the PI Trust Agreement. The Trustees shall also consult with the TAC and the Future Claimants' Representative on such matters as are provided below and in Section 2.2(e) of the PI Trust Agreement. The initial members of the TAC and the initial Future Claimants' Representative are identified in the PI Trust Agreement.

      **3.2**    **Consent and Consultation Procedures.** In those circumstances in which consultation or consent is required, the Trustees will provide written notice to the TAC and the Future Claimants' Representative of the specific amendment or other action that is proposed. The Trustees will not implement such amendment nor take such action unless and until the parties have engaged in the Consultation Process described in Sections 5.7(a) and 6.6(a), or the Consent Process described in Sections 5.7(b) and 6.6(b) of the PI Trust Agreement, respectively.

SECTION IV

<u>Payment Percentage; Periodic Estimates</u>

      **4.1**    **Uncertainty of AWI's Personal Injury Asbestos Liabilities.** As discussed above, there is inherent uncertainty regarding AWI's total asbestos-related tort liabilities, as well as the total value of the assets available to the PI Trust to pay PI Trust Claims. Consequently, there is inherent uncertainty regarding the amounts that holders of PI Trust Claims will receive. To seek to ensure substantially equivalent treatment of all present and future PI Trust Claims, the Trustees must determine from time to time the percentage of full liquidated value that holders of present and future PI Trust Claims will be likely to receive, i.e., the "Payment Percentage" described in Section 2.3 above and Section 4.2 below.

      **4.2**    **Computation of Payment Percentage.** As provided in Section 2.3 above, the Initial Payment Percentage shall be twenty percent (20%), and shall apply to all PI Trust Voting Claims as defined in Section 2.3 above, unless the Trustees, with the consent of the TAC and the Future Claimants' Representative, determine that the Initial Payment Percentage should be changed to assure that the PI Trust will be in a financial position to pay holders of unliquidated and/or unpaid PI Trust Voting Claims and present and future PI Trust Claims in substantially the same manner.

In making any such adjustment, the Trustees, the TAC and the Future Claimants' Representative shall take into account the fact that the holders of PI Trust Voting Claims voted on the Plan relying on the findings of experts that the Initial Payment Percentage represented a reasonably reliable estimate of the PI Trust's total assets and liabilities over its life based on the best information available at the time, and shall thus give due consideration to the expectations of PI Trust Voting Claimants that the Initial Payment Percentage would be applied to their PI Trust Claims.

Exhibit 1.24-5

Except with respect to PI Trust Voting Claims to which the Initial Payment Percentage applies, the Payment Percentage shall be subject to change pursuant to the terms of this TDP and the PI Trust Agreement if the Trustees determine that an adjustment is required. No less frequently than once every three years, commencing with the first day of January occurring after the Plan is consummated, the Trustees shall reconsider the then applicable Payment Percentage to assure that it is based on accurate, current information and may, after such reconsideration, change the Payment Percentage if necessary with the consent of the TAC and the Future Claimants' Representative. The Trustees shall also reconsider the then applicable Payment Percentage at shorter intervals if they deem such reconsideration to be appropriate or if requested to do so by the TAC or the Future Claimants' Representative.

The Trustees must base their determination of the Payment Percentage on current estimates of the number, types, and values of present and future PI Trust Claims, the value of the assets then available to the PI Trust for their payment, all anticipated administrative and legal expenses, and any other material matters that are reasonably likely to affect the sufficiency of funds to pay a comparable percentage of full value to all holders of PI Trust Claims. When making these determinations, the Trustees shall exercise common sense and flexibly evaluate all relevant factors. The Payment Percentage applicable to Category A or Category B claims may not be reduced to alleviate delays in payments of claims in the other Category; both Categories of claims shall receive the same Payment Percentage, but the payment may be deferred as needed, and a Reduced Payment Option may be instituted as described in Section 2.5 above.

The uncertainty surrounding the amount of the PI Trust's future assets is due in significant part to the fact that the estimates of those assets do not take into account the possibility that the PI Trust may receive substantial additional funds from successful recoveries of insurance proceeds that have been assigned to the PI Trust with respect to which the coverage is presently in dispute or the solvency of the carrier is in doubt. If the PI Trust successfully resolves an insurance coverage dispute or otherwise receives a substantial recovery of insurance proceeds, the PI Trust will use those proceeds first to maintain the Payment Percentage then in effect. If the insurance recovery exceeds the amount estimated to be reasonably necessary to maintain the Payment Percentage then in effect, the PI Trust, with the consent of the TAC and the Future Claimants' Representative, shall adjust the Payment Percentage upward to reflect the increase in available assets, and shall also make supplemental payments to claimants who previously liquidated their claims against the PI Trust and received payments based on a lower Payment Percentage. The amount of any such supplemental payment shall be the liquidated value of the claim in question times the newly adjusted Payment Percentage, less all amounts previously paid the claimant with respect to the claim.

    4.3      **Applicability of the Payment Percentage.** No holder of a PI Trust Voting Claim, other than a PI Trust Claim for Other Asbestos Disease (Disease Level I - Cash Discount Payment) as defined in Section 5.3(a)(3) below shall receive a payment that exceeds the Initial Payment Percentage times the liquidated value of the claim. Except as otherwise provided in Section 5.1(c) below for PI Trust Claims involving deceased or incompetent claimants for which approval of the PI Trust's offer by a court or through a probate process is required, no holder of any other PI Trust Claim, other than a PI Trust Claim for Other Asbestos Disease (Disease Level I - Cash Discount Payment), shall receive a payment that exceeds the liquidated value of the claim times the Payment Percentage in effect at the time of payment. PI Trust Claims involving Other Asbestos Disease (Disease Level I - Cash Discount Payment) shall not be subject to the Payment Percentage, but shall instead be paid the full amount of their Scheduled Value as set forth in Section 5.3(a)(3) below.

If a redetermination of the Payment Percentage has been proposed in writing by the Trustees to the TAC and the Future Claimants' Representative but has not yet been adopted, the claimant shall receive the lower of the current Payment Percentage or the proposed Payment Percentage. However, if the proposed Payment Percentage was the lower amount but was not subsequently adopted, the claimant shall thereafter receive the difference between the lower proposed amount and the higher current amount. Conversely, if the proposed Payment Percentage was the higher amount and was subsequently adopted, the claimant shall thereafter receive the difference between the lower current amount and the higher adopted amount.

## SECTION V

### Resolution of PI Trust Claims.

    5.1    Ordering, Processing and Payment of Claims.

        5.1(a)  Ordering of Claims.

Exhibit 1.24-6

**5.1(a)(1)   Establishment of the FIFO Processing Queue.**  The PI Trust will order claims that are sufficiently complete to be reviewed for processing purposes on a FIFO basis except as otherwise provided herein (the *"FIFO Processing Queue"*).  For all claims filed on or before the date six months after the Effective Date (the *"Initial Claims Filing Date"*), a claimant's position in the FIFO Processing Queue shall be determined as of the earlier of (i) the date prior to the Petition Date (if any) that the specific claim was either filed against AWI in the tort system or was actually submitted to AWI pursuant to an administrative settlement agreement; (ii) the date before the Petition Date that a claim was filed against another defendant in the tort system if at the time the claim was subject to a tolling agreement with AWI; (iii) the date after the Petition Date (if any) but before the Effective Date that the claim was filed against another defendant in the tort system; (iv) the date after the Petition Date (if any) but before the Effective Date that a proof of claim was filed against AWI in AWI's Chapter 11 case; (v) the date a ballot was submitted in AWI's Chapter 11 case for purposes of voting on the Plan in accordance with the voting procedures adopted by the Bankruptcy Court; or (vi) the date after the Effective Date but on or before the Initial Claims Filing Date that the claim was filed with the PI Trust.

Following the Initial Claims Filing Date, the claimant's position in the FIFO Processing Queue shall be determined by the date the claim was filed with the PI Trust.  If any claims are filed on the same date, the claimant's position in the FIFO Processing Queue shall be determined by the date of the diagnosis of the claimant's asbestos-related disease.  If any claims are filed and diagnosed on the same date, the claimant's position in the FIFO Processing Queue shall be determined by the date of the claimant's birth, with older claimants given priority over younger claimants.

**5.1(a)(2)   Effect of Statutes of Limitations and Repose.**  To be eligible for a place in the FIFO Processing Queue, a claim must meet either (i) for claims first filed in the tort system against AWI prior to the Petition Date, the applicable federal, state and foreign statute of limitation and repose that was in effect at the time of the filing of the claim in the tort system, or (ii) for claims that were not filed against AWI in the tort system prior to the Petition Date, the applicable statute of limitation ~~and repose~~ that was in effect at the time of the filing with the PI Trust.  However, the running of the relevant statute of limitation shall be tolled as of the earliest of (A) the actual filing of the claim against AWI prior to the Petition Date, whether in the tort system or by submission of the claim to AWI pursuant to an administrative settlement agreement; (B) the filing of the claim against another defendant in the tort system prior to the Petition Date if the claim was tolled against AWI at the time by an agreement or otherwise; (C) the filing of a claim after the Petition Date but prior to the Effective Date against another defendant in the tort system; (D) the date after the Petition Date (if any) but before the Effective Date that a proof of claim was filed against AWI in AWI's Chapter 11 case; (E) the date a ballot was submitted in AWI's Chapter 11 case for purposes of voting on the Plan in accordance with the voting procedures adopted by the Bankruptcy Court; or (F) the filing of a proof of claim with the requisite supporting documentation with the PI Trust after the Effective Date.

If a PI Trust Claim meets any of the tolling provisions described in the preceding sentence and the claim was not barred by the applicable statute of limitation at the time of the tolling event, it will be treated as timely filed if it is actually filed with the PI Trust within three (3) years after the Effective Date.  In addition, any claims that were first diagnosed after the Petition Date, irrespective of the application of any relevant statute of limitation or repose, may be filed with the PI Trust within three (3) years after the date of diagnosis or within three (3) years after the Effective Date, whichever occurs later.  However, the processing of any PI Trust Claim by the PI Trust may be deferred at the election of the claimant pursuant to Section 6.3 below.

**5.1(b)   Processing of Claims.**  As a general practice, the PI Trust will review its claims files on a regular basis and notify all claimants whose claims are likely to come up in the FIFO Processing Queue in the near future.  However, claims that were not filed (i) against AWI in the tort system or actually submitted to AWI pursuant to an administrative settlement agreement prior to the Petition Date, or (ii) against another defendant in the tort system prior to the Plan Filing Date, shall not be processed until after the Initial Claims Filing Date.

**5.1(c)   Payment of Claims.**  PI Trust Claims that have been liquidated by the Expedited Review Process as provided in Section 5.3(a) below, by the Individual Review Process as provided in Section 5.3(b) below, by arbitration as provided in Section 5.10 below, or by litigation in the tort system provided in Section 5.11 below, shall be paid in FIFO order based on the date their liquidation became final (the *"FIFO Payment Queue"*), all such payments being subject to the applicable Payment Percentage, the Maximum Available Payment, and the Claims Payment Ratio, except as otherwise provided herein.

Exhibit 1.24-7

Where the claimant is deceased or incompetent, and the settlement and payment of his or her claim must be approved by a court of competent jurisdiction or through a probate process prior to acceptance of the claim by the claimant's representative, an offer made by the PI Trust on the claim shall remain open so long as proceedings before that court or in that probate process remain pending, provided that the PI Trust has been furnished with evidence that the settlement offer has been submitted to such court or probate process for approval. If the offer is ultimately approved by the court or through the probate process and accepted by the claimant's representative, the PI Trust shall pay the claim in the amount so offered, multiplied by the Payment Percentage in effect at the time the offer was first made.

If any claims are liquidated on the same date, the claimant's position in the FIFO Payment Queue shall be determined by the date of the diagnosis of the claimant's asbestos-related disease. If any claims are liquidated on the same date and the respective claimants' asbestos-related diseases were diagnosed on the same date, the position of those claimants in the FIFO Payment Queue shall be determined by the PI Trust based on the dates of the claimants' birth, with older claimants given priority over younger claimants.

    5.2    **Resolution of Pre-Petition Liquidated PI Trust Claims.**

        5.2(a)    Processing and Payment. As soon as practicable after the Effective Date, the PI Trust shall pay, upon submission by the claimant of the applicable PI Trust proof of claim form (included in Attachment B) together with all documentation required thereunder, all PI Trust Claims that were liquidated by (i) a binding settlement agreement for the particular claim entered into prior to the Petition Date that is judicially enforceable by the claimant, (ii) a jury verdict or non-final judgment in the tort system obtained prior to the Petition Date, or (iii) by a judgment that became final and non-appealable prior to the Petition Date (collectively "*Pre-Petition Liquidated Claims*").

The liquidated value of a Pre-Petition Liquidated Claim shall be AWI's share of the unpaid portion of the amount agreed to in the binding settlement agreement, the unpaid portion of the amount awarded by the jury verdict or non-final judgment, or the unpaid portion of the amount of the final judgment, as the case may be, plus interest, if any, that has accrued on that amount in accordance with the terms of the agreement, if any, or under applicable state law for settlements or judgments as of the Petition Date; however, pursuant to Section 7.4 below, the liquidated value of a Pre-Petition Liquidated Claim shall not include any punitive or exemplary damages. In the absence of a final order of the Bankruptcy Court determining whether a settlement agreement is binding and judicially enforceable, a dispute between the claimant and the PI Trust over this issue shall be resolved pursuant to the same procedures in this TDP that are provided for resolving the validity and/or liquidated value of a PI Trust Claim (*i.e.*, arbitration and litigation in the tort system as set forth in Sections 5.10 and 5.11 below).

Pre-Petition Liquidated Claims shall be processed and paid in accordance with their order in a separate FIFO queue to be established by the PI Trust based on the date the PI Trust received a completed proof of claim form with all required documentation for the particular claim; *provided, however,* the amounts payable with respect to such claims shall not be subject to or taken into account in consideration of the Claims Payment Ratio, but shall be subject to the Maximum Annual Payment and Payment Percentage provisions set forth above. If any Pre-Petition Liquidated Claims were filed on the same date, the claimants' position in the FIFO queue for such claims shall be determined by the date on which the claim was liquidated. If any Pre-Petition Liquidated Claims were both filed and liquidated on the same dates, the position of those claimants in the FIFO queue shall be determined by the dates of the claimants' birth, with older claimants given priority over younger claimants.

        5.2(b)    Marshalling of Security. Holders of Pre-Petition Liquidated Claims that are secured by letters of credit, appeal bonds, or other security or sureties shall first exhaust their rights against any applicable security or surety before making a claim against the PI Trust. Only in the event that such security or surety is insufficient to pay the Pre-Petition Liquidated Claim in full shall the deficiency be processed and paid as a Pre-Petition Liquidated Claim.

    5.3    Resolution of Unliquidated PI Trust Claims. Within six months after the establishment of the PI Trust, the Trustees with the consent of the TAC and the Future Claimants' Representative shall adopt procedures for reviewing and liquidating all unliquidated PI Trust Claims, which shall include deadlines for processing such claims. Such procedures shall also require claimants seeking resolution of unliquidated PI Trust claims to first file a proof of claim form, together with the required supporting documentation, in accordance with the provisions of

Exhibit 1.24-8

Sections 6.1 and 6.2 below. It is anticipated that the PI Trust shall provide an initial response to the claimant within six months of receiving the proof of claim form.

The proof of claim form shall require the claimant to assert his or her claim for the highest Disease Level for which the claim qualifies at the time of filing. Irrespective of the Disease Level alleged on the proof of claim form, all claims shall be deemed to be a claim for the highest Disease Level for which the claim qualifies at the time of filing, and all lower Disease Levels for which the claim may also qualify at the time of filing or in the future shall be treated as subsumed into the higher Disease Level for both processing and payment purposes.

Upon filing of a valid proof of claim form with the required supporting documentation, the claimant shall be placed in the FIFO Processing Queue in accordance with the ordering criteria described in Section 5.1(a) above. The PI Trust shall provide the claimant with six-months notice of the date by which it expects to reach the claim in the FIFO Queue, following which the claimant shall promptly (i) advise the PI Trust whether the claim should be liquidated under the PI Trust's Expedited Review Process described in Section 5.3(a) below or, in certain circumstances, under the PI Trust's Individual Review Process described in Section 5.3(b) below; (ii) provide the PI Trust with any additional medical and/or exposure evidence that was not provided with the original claim submission; and (iii) advise the PI Trust of any change in the claimant's Disease Level. If a claimant fails to respond to the PI Trust's notice prior to the reaching of the claim in the FIFO Queue, the PI Trust will process and liquidate the claim under the Expedited Review Process based upon the medical/exposure evidence previously submitted by the claimant, although the claimant shall retain the right to request Individual Review as described in Section 5.3(b) below.

     5.3(a)    Expedited Review Process.

        5.3(a)(1)   In General. The PI Trust's Expedited Review Process is designed primarily to provide an expeditious, efficient and inexpensive method for liquidating all claims (except those involving Lung Cancer 2 - Disease Level VI and all foreign claims, which shall be liquidated pursuant to the PI Trust's Individual Review Process) where the claim can easily be verified by the PI Trust as meeting the presumptive Medical/Exposure Criteria for the relevant Disease Level. Expedited Review thus provides claimants with a substantially less burdensome process for pursuing PI Trust Claims than does the Individual Review Process described in Section 5.3(b) below. Expedited Review is also intended to provide qualifying claimants a fixed and certain claims payment.

Thus, claims that undergo Expedited Review and meet the presumptive Medical/Exposure Criteria for the relevant Disease Level shall be paid the Scheduled Value for such Disease Level set forth in Section 5.3(a)(3) below. However, except for claims involving Other Asbestos Disease (Disease Level I), all claims liquidated by Expedited Review shall be subject to the applicable Payment Percentage, the Maximum Available Payment, and the Claims Payment Ratio limitations set forth above. Claimants holding claims that cannot be liquidated by Expedited Review because they do not meet the presumptive Medical/Exposure Criteria for the relevant Disease Level may elect the PI Trust's Individual Review Process set forth in Section 5.3(b) below.

        5.3(a)(2)   Claims Processing under Expedited Review. All claimants seeking liquidation of their claims pursuant to Expedited Review shall file the PI Trust's proof of claim form provided in Attachment B hereto. As a proof of claim form is reached in the FIFO Processing Queue, the PI Trust shall determine whether the claim described therein meets the Medical/Exposure Criteria for one of the seven Disease Levels eligible for Expedited Review, and shall advise the claimant of its determination. If a Disease Level is determined, the PI Trust shall tender to the claimant an offer of payment of the Scheduled Value (as adjusted by the applicable Payment Percentage) for the relevant Disease Level multiplied by the applicable Payment Percentage, together with a form of release approved by the PI Trust. If the claimant accepts the Scheduled Value and returns the release properly executed, the claim shall be placed in the FIFO Payment Queue, following which the PI Trust shall disburse payment subject to the limitations of the Maximum Available Payment and Claims Payment Ratio, if any.

        5.3(a)(3)   Disease Levels, Scheduled Values and Medical/Exposure Criteria. The eight Disease Levels covered by this TDP, together with the Medical/Exposure Criteria for each and the Scheduled Values for the seven Disease Levels eligible for Expedited Review, are set forth below. These Disease Levels, Scheduled Values, and Medical/Exposure Criteria shall apply to all PI Trust Voting Claims filed with the PI Trust on or before the Initial Claims Filing Date provided in Section 5.1 above. Thereafter, with the consent of the TAC

Exhibit 1.24-9

and the Future Claimants' Representative, the Trustees may add to, change or eliminate Disease Levels, Scheduled Values, or Medical/Exposure Criteria; develop subcategories of Disease Levels, Scheduled Values or Medical/Exposure Criteria; or determine that a novel or exceptional asbestos personal injury claim is compensable even though it does not meet the Medical/Exposure Criteria for any of the then current Disease Levels.

In addition, the Trustees, with the consent of the TAC and the Future Claimants' Representative, shall establish separate Medical/Exposure Criteria and standards, as well as separate requirements for physician and other professional qualifications, which shall be applicable to foreign claims; provided, however, that such criteria, standards or requirements shall not effectuate substantive changes to the claims eligibility requirements under this TDP, but rather shall be made only for the purpose of adapting those requirements to the particular licensing provisions and/or medical customs or practices of the foreign country in question.

| Disease Level | Scheduled Value | Medical/Exposure Criteria |
|---|---|---|
| Mesothelioma (Level VIII) | $110,000 | (1) Diagnosis[1] of mesothelioma; and (2) credible evidence of AWI Exposure (as defined in Section 5.7(b)(3) below). |
| Lung Cancer 1 (Level VII) | $ 42,500 | (1) Diagnosis of a primary lung cancer plus evidence of an underlying Bilateral Asbestos-Related Nonmalignant Disease[2], (2) six months AWI Exposure prior to December 31, 1982, (3) Significant Occupational Exposure to asbestos (as defined in Section 5.7(b)(2) below), and (4) supporting medical documentation establishing asbestos exposure as a contributing factor in causing the lung cancer in question. |
| Lung Cancer 2 (Level VI) | None | (1) Diagnosis of a primary lung cancer; (2) AWI Exposure prior to December 31, 1982, and (3) supporting medical documentation establishing asbestos exposure as a contributing factor in causing the lung cancer in question. Lung Cancer 2 (Level VI) claims are claims that do not meet the more stringent medical and/or exposure |

---

[1]   The requirements for a diagnosis of an asbestos-related disease that may be compensated under the provisions of this TDP are set forth in Section 5.7 below.

[2]   Evidence of "Bilateral Asbestos-Related Nonmalignant Disease" for purposes of meeting the criteria for establishing Disease Levels I, II, III, V, and VII, means a report submitted by a qualified physician stating that the claimant has or had either (i) a chest X-ray read by a qualified B reader of 1/0 or higher on the ILO scale or, (ii) (x) a chest X-ray read by a qualified B reader, (y) a CT scan read by a qualified physician, or (z) pathology, in each case showing bilateral interstitial fibrosis, bilateral pleural plaques, bilateral pleural thickening, or bilateral pleural calcification. Solely for claims filed against AWI or another asbestos defendant in the tort system prior to the Petition Date, if an ILO reading is not available, either (i) a chest x-ray or a CT scan read by a qualified physician or, (ii) pathology, showing bilateral interstitial fibrosis, bilateral pleural plaques, bilateral pleural thickening, or bilateral pleural calcification consistent with, or compatible with, a diagnosis of asbestos-related disease shall be evidence of Bilateral Asbestos-Related Nonmalignant Disease for purposes of meeting the presumptive medical requirements of Disease Level I, II, III, V and VII. Pathological proof of asbestosis may be based on the pathological grading system for asbestosis described in the Special Issue of the Archives of Pathology and Laboratory Medicine, "Asbestos-associated Diseases," Vol. 106, No. 11, App. 3 (October 8, 1982).

Exhibit 1.24-10

requirements of Lung Cancer (Level VII) claims. All claims in this Disease Level will be individually evaluated. The estimated likely average of the individual evaluation awards for this category is $15,000, with such awards capped at $50,000, unless the claim qualifies for Extraordinary Claim treatment (as described in Section 5.4(a) below).

Level VI claims that show no evidence of either an underlying Bilateral Asbestos-Related Non-malignant Disease or Significant Occupational Exposure may be individually evaluated, although it is not expected that such claims will be treated as having any significant value, especially if the claimant is also a Smoker.[3] In any event, no presumption of validity will be available for any claims in this category.

| | | |
|---|---|---|
| Other Cancer (Level V) | $ 21,500 | (1) Diagnosis of a primary colo-rectal, laryngeal, esophageal, pharyngeal, or stomach cancer, plus evidence of an underlying Bilateral Asbestos-Related Nonmalignant Disease, (2) six months AWI Exposure prior to December 31, 1982, (3) Significant Occupational Exposure to asbestos, and (4) supporting medical documentation establishing asbestos exposure as a contributing factor in causing the other cancer in question. |
| Severe Asbestosis (Level IV) | $ 42,500 | (1) Diagnosis of asbestosis with ILO of 2/1 or greater, or asbestosis determined by pathological evidence of asbestos, plus (a)TLC less than 65%, or (b) FVC less than 65% and FEV1/FVC ratio greater than 65%, (2) six months AWI Exposure prior to December 31, 1982, (3) Significant Occupational Exposure to asbestos, and (4) supporting medical documentation establishing asbestos exposure as a contributing factor in causing the pulmonary disease in question. |
| Asbestosis/ Pleural Disease (Level III) | $ 9,700 | (1) Diagnosis of Bilateral Asbestos-Related Nonmalignant Disease, plus (a) TLC less than 80%, or (b) FVC less than 80% and FEV1/FVC ratio greater than or equal to 65%, and (2) six months AWI Exposure prior to December 31, 1982, (3) |

---

[3]    There is no distinction between Non-Smokers and Smokers for either Lung Cancer (Level VII) or Lung Cancer (Level VI), although a claimant who meets the more stringent requirements of Lung Cancer (Level VII) (evidence of an underlying Bilateral Asbestos-Related Nonmalignant Disease plus Significant Occupational Exposure), and who is also a Non-Smoker, may wish to have his or her claim individually evaluated by the PI Trust. In such a case, absent circumstances that would otherwise reduce the value of the claim, it is anticipated that the liquidated value of the claim might well exceed the $42,500 Scheduled Value for Lung Cancer 1 (Level VII) shown above. "Non-Smoker" means a claimant who either (a) never smoked or (b) has not smoked during any portion of the twelve (12) years immediately prior to the diagnosis of the lung cancer.

Exhibit 1.24-11

Significant Occupational Exposure to asbestos, and (4) supporting medical documentation establishing asbestos exposure as a contributing factor in causing the pulmonary disease in question.

| | | |
|---|---|---|
| Asbestosis/<br>Pleural Disease (Level II) | $ 3,700 | (1) Diagnosis of a Bilateral Asbestos-Related Nonmalignant Disease, and (2) six months AWI Exposure prior to December 31, 1982, and (3) five years cumulative occupational exposure to asbestos. |
| Other Asbestos Disease (Level I –<br>Cash Discount Payment) | $  400 | (1) Diagnosis of a Bilateral Asbestos-Related Nonmalignant Disease or an asbestos-related malignancy other than mesothelioma, and (2) AWI Exposure prior to December 31, 1982. |

### 5.3(b)    Individual Review Process

**5.3(b)(1) In General.** Subject to the provisions set forth below, an AWI claimant may elect to have his or her PI Trust Claim reviewed for purposes of determining whether the claim would be compensable in the tort system even though it does not meet the presumptive Medical/Exposure Criteria for any of the Disease Levels set forth in Section 5.3(a)(3) above. In addition or alternatively, an AWI claimant may elect to have a claim undergo the Individual Review Process for purposes of determining whether the liquidated value of the claim exceeds the Scheduled Value for the relevant Disease Level also set forth in said provision. However, until such time as the PI Trust has made an offer on a claim pursuant to Individual Review, the claimant may change his or her Individual Review election and have the claim liquidated pursuant to the PI Trust's Expedited Review Process. In the event of such a change in the processing election, the claimant shall nevertheless retain his or her place in the FIFO Processing Queue.

The liquidated value of foreign claims shall be established pursuant to the PI Trust's Individual Review process. In reviewing foreign claims, the PI Trust shall take into account all relevant procedural and substantive legal rules to which the claims would be subject in the Claimant's Jurisdiction as defined in Section 5.3(b)(2) below. The PI Trust shall determine the liquidated value of foreign claims based on historical settlements and verdicts in the Claimant's Jurisdiction as well as the other valuation factors set forth in Section 5.3(b)(2) below.

For purposes of the Individual Review process, the Trustees, with the consent of the TAC and the Future Claimants' Representative, may develop separate Medical/Exposure Criteria and standards, as well as separate requirements for physician and other professional qualifications, which shall be applicable to foreign claims; however, that such criteria, standards or requirements shall not effectuate substantive changes to the claims eligibility requirements under this TDP, but rather shall be made only for the purpose of adapting those requirements to the particular licensing provisions and/or medical customs or practices of the foreign country in question.

At such time as the PI Trust has a sufficient historical settlement, verdict and other valuation date for claims from a particular foreign jurisdiction, the Trustees, with the consent of the TAC and the Future Claimants' Representative, may also establish a separate valuation matrix for such claims based on that data.

**5.3(b)(1)(A)  Review of Medical/Exposure Criteria.**  The PI Trust's Individual Review Process provides a claimant with an opportunity for individual consideration and evaluation of a PI Trust Claim that fails to meet the presumptive Medical/Exposure Criteria for Disease Levels I – V, and VII-VIII. In such a case, the PI Trust shall either deny the claim, or, if the PI Trust is satisfied that the claimant has presented a claim that would be cognizable and valid in the tort system, the PI Trust can offer the claimant a liquidated value amount up to the Scheduled Value for that Disease Level, unless the claim qualifies as an Extraordinary Claim as defined in Section 5.4(a) below, in which case its liquidated value cannot exceed the Maximum Value for such a claim.

**5.3(b)(1)(B)  Review of Liquidated Value.**  Claimants holding claims involving Disease Levels II – VIII shall also be eligible to seek Individual Review of the liquidated value of their claims, as

Exhibit 1.24-12

well as of their medical/exposure evidence. The Individual Review Process is intended to result in payments equal to the full liquidated value for each claim multiplied by the Payment Percentage; however, the liquidated value of any PI Trust Claim that undergoes Individual Review may be determined to be less than the Scheduled Value the claimant would have received under Expedited Review. Moreover, the liquidated value for a claim involving Disease Levels II – VIII shall not exceed the Maximum Value for the relevant Disease Level set forth in Section 5.3(b)(4) below, unless the claim meets the requirements of an Extraordinary Claim described in Section 5.4(a) below, in which case its liquidated value cannot exceed the Maximum Value set forth in that provision for such claims. Because the detailed examination and valuation process pursuant to Individual Review requires substantial time and effort, claimants electing to undergo the Individual Review Process will necessarily be paid the liquidated value of their PI Trust Claims later than would have been the case had the claimant elected the Expedited Review Process.

       **5.3(b)(2)    Valuation Factors to be Considered in Individual Review.**  The PI Trust shall liquidate the value of each PI Trust Claim that undergoes Individual Review based on the historic liquidated values of other similarly situated claims in the tort system for the same Disease Level. The PI Trust will thus take into consideration all of the factors that affect the severity of damages and values within the tort system including, but not limited to (i) the degree to which the characteristics of a claim differ from the presumptive Medical/Exposure Criteria for the Disease Level in question; (ii) factors such as the claimant's age, disability, employment status, disruption of household, family or recreational activities, dependencies, special damages, and pain and suffering; (iii) evidence that the claimant's damages were (or were not) caused by asbestos exposure, including exposure to an asbestos-containing product for which AWI has legal responsibility prior to December 31, 1982 (for example, alternative causes, and the strength of documentation of injuries); (iv) the industry of exposure; and (v) settlements, verdicts, and the claimant's and other law firms' experience in the Claimant's Jurisdiction for similarly situated claims.

For these purposes, the *"Claimant's Jurisdiction"* is the jurisdiction in which the claim was filed (if at all) against AWI in the tort system prior to the Petition Date. If the claim was not filed against AWI in the tort system prior to the Petition Date, the claimant may elect as the Claimant's Jurisdiction either (i) the jurisdiction in which the claimant resides at the time of diagnosis or when the claim is filed with the PI Trust; or (ii) a jurisdiction in which the claimant experienced exposure to an asbestos-containing product for which AWI has legal responsibility.

       **5.3(b)(3)    Processing and Payment Limitations for Claims Involving Disease Levels III and II.**  The PI Trust shall administer Individual Review for Disease Levels III and II so that Individual Review does not reduce payments to claimants electing the Scheduled Value for such PI Trust Claims under Expedited Review. As one means of implementing this requirement, the following shall apply for Disease Levels III and II claims:

       **5.3(b)(3)(A)    Disease Level III Claims.**  No more than 8 percent of Disease Level III claims paid in any year shall be PI Trust Claims allowed under Individual Review, and the total payments to such Disease Level III claims allowed under Individual Review shall be no more than 12 percent of payments to all Disease Level III claimants during any year.

       **5.3(b)(3)(B)    Disease Level II Claims.**  No more than 15 percent of Disease Level II claims paid in any year shall be PI Trust Claims allowed under Individual Review, and the total payments to such Disease Level II claims allowed under Individual Review shall be no more than 25 percent of payments to all Disease Level II claimants during any year.

       **5.3(b)(4)    Scheduled, Average and Maximum Values.**  The Scheduled, Average and Maximum Values for the Disease Levels compensable under this TDP are the following:

Exhibit 1.24-13

| Scheduled Disease | Scheduled Value | Average Value | Maximum Value |
|---|---|---|---|
| Mesothelioma (Level VIII) | $110,000 | $130,500 | $400,000 |
| Lung Cancer1 (Level VII) | $ 42,500 | $ 43,800 | $150,000 |
| Lung Cancer 2 (Level VI) | None | $ 15,000 | $ 50,000 |
| Other Cancer (Level V) | $ 21,500 | $ 21,800 | $ 75,000 |
| Severe Asbestosis (Level IV) | $ 42,500 | $ 44,300 | $140,000 |
| Asbestosis/Pleural Disease (Level III) | $ 9,700 | $ 10,100 | $ 20,000 |
| Asbestosis/Pleural Disease (Level II) | $ 3,700 | $ 4,200 | $ 10,000 |
| Other Asbestos Disease Cash Discount Payment (Level I) | $ 400 | None | None |

These Scheduled Values, Average Values and Maximum Values shall apply to all PI Trust Voting Claims except Pre-Petition Liquidated Claims filed with the PI Trust on or before the Initial Claims Filing Date as provided in Section 5.1 above. Thereafter, the PI Trust, with the consent of the TAC and the Future Claimants' Representative pursuant to Sections 5.7(b) and 6.6(b) of the PI Trust Agreement, may change these valuation amounts for good cause and consistent with other restrictions on the amendment power.

5.4    Categorizing Claims as Extraordinary and/or Exigent Hardship

5.4(a)    Extraordinary Claims.  *"Extraordinary Claim"* means a PI Trust Claim that otherwise satisfies the Medical Criteria for Disease Levels II - VIII, and that is held by a claimant whose exposure to asbestos (i) occurred predominately as the result of working in a manufacturing facility of AWI during a period in which AWI was manufacturing asbestos-containing products at that facility, or (ii) was at least 75% the result of exposure to asbestos-containing product for which AWI has legal responsibility, and there is little likelihood of a substantial recovery elsewhere. All such Extraordinary Claims shall be presented for Individual Review and, if valid, shall be entitled to an award of up to a Maximum Value of five (5) times the Scheduled Value for claims qualifying for Disease Levels II – V, VII and VIII, and five (5) times the Average Value for claims in Disease Level VI, multiplied by the applicable Payment Percentage.

Any dispute as to Extraordinary Claim status shall be submitted to a special Extraordinary Claims Panel established by the PI Trust with the consent of the TAC and the Future Claimants' Representative. All decisions of the Extraordinary Claims Panel shall be final and not subject to any further administrative or judicial review. An Extraordinary Claim, following its liquidation, shall be placed in the PI Trust's FIFO Queue ahead of all other PI Trust Claims except Pre-Petition Liquidated Claims, Disease Level I Claims and Exigent Hardship Claims, which shall be paid first in that order in said Queue, based on its date of liquidation and shall be subject to the Maximum Available Payment and Claims Payment Ratio described above.

5.4(b)    Exigent Hardship Claims.  At any time the PI Trust may liquidate and pay PI Trust Claims that qualify as Exigent Hardship Claims as defined below. Such claims may be considered separately no matter what the order of processing otherwise would have been under this TDP. An Exigent Hardship Claim, following its liquidation, shall be placed first in the FIFO Payment Queue ahead of all other liquidated PI Trust Claims except Pre-Petition Liquidated Claims and Disease Level I Claims, and shall be subject to the Maximum Available Payment and Claims Payment Ratio described above. A PI Trust Claim qualifies for payment as an Exigent Hardship Claim if the claim meets the Medical/Exposure Criteria for Severe Asbestosis (Disease Level IV) or an asbestos-related malignancy (Disease Levels V-VIII), and the PI Trust, in its sole discretion, determines (i)

Exhibit 1.24-14

that the claimant needs financial assistance on an immediate basis based on the claimant's expenses and all sources of available income, and (ii) that there is a causal connection between the claimant's dire financial condition and the claimant's asbestos-related disease.

     5.5     **Secondary Exposure Claims.**  If a claimant alleges an asbestos-related disease resulting solely from exposure to an occupationally exposed person, such as a family member, the claimant may seek Individual Review of his or her claim pursuant to Section 5.3(b) above.  In such a case, the claimant must establish that the occupationally exposed person would have met the exposure requirements under this TDP that would have been applicable had that person filed a direct claim against the PI Trust.  In addition, the claimant with secondary exposure must establish that he or she is suffering from one of the eight Disease Levels described in Section 5.3(a)(3) above or an asbestos-related disease otherwise compensable under the TDP, that his or her own exposure to the occupationally exposed person occurred within the same time frame as the occupationally exposed person was exposed to asbestos products produced by AWI, and that such secondary exposure was a cause of the claimed disease.  The proof of claim form included in Attachment B hereto contains an additional section for Secondary Exposure Claims.  All other liquidation and payment rights and limitations under this TDP shall be applicable to such claims.

     5.6     **Indirect PI Trust Claims.**  Indirect PI Trust Claims asserted against the PI Trust based upon theories of contribution or indemnification under applicable law, shall be treated as presumptively valid and paid by the PI Trust subject to the applicable Payment Percentage if (a) such claim satisfied the requirements of the Bar Date for such claim established by the Bankruptcy Court, if applicable, and is not otherwise disallowed by Section 502(e) of the Code or subordinated under Section 509(c) of the Code, and (b) the holder of such claim (the "*Indirect Claimant*") establishes to the satisfaction of the Trustees that (i) the Indirect Claimant has paid in full the liability and obligation of the PI Trust to the individual claimant to whom the PI Trust would otherwise have had a liability or obligation under these Procedures (the "*Direct Claimant*"), (ii) the Direct Claimant and the Indirect Claimant have forever and fully released the PI Trust from all liability to the Direct Claimant, and (iii) the claim is not otherwise barred by a statute of limitation or repose or by other applicable law.  In no event shall any Indirect Claimant have any rights against the PI Trust superior to the rights of the related Direct Claimant against the PI Trust, including any rights with respect to the timing, amount or manner of payment.  In addition, no Indirect Claim may be liquidated and paid in an amount that exceeds what the Indirect Claimant has actually paid the related Direct Claimant.

     Further, the PI Trust shall not pay any Indirect Claimant unless and untilTo establish a presumptively valid Indirect PI Trust Claim, the Indirect Claimant's aggregate liability for the Direct Claimant's claim hasmust also have been fixed, liquidated and paid fully by the Indirect Claimant by settlement (with an appropriate full release in favor of the PI Trust) or a Final Order (as defined in the Plan) provided that such claim is valid under the applicable state law.  In any case where the Indirect Claimant has satisfied the claim of a Direct Claimant against the PI Trust under applicable law by way of a settlement, the Indirect Claimant shall obtain for the benefit of the PI Trust a release in form and substance satisfactory to the Trustees.

     If an Indirect Claimant cannot meet the presumptive requirements set forth above, including the requirement that the Indirect Claimant provide the PI Trust with a full release of the Direct Claimant's claim, the Indirect Claimant may request that the PI Trust review the Indirect PI Trust Claim individually to determine whether the Indirect Claimant can establish under applicable state law that the Indirect Claimant has paid all or a portion of a liability or obligation that the PI Trust had to the Direct Claim as of the effective date of the TDP.  If the Indirect Claimant can show that it has satisfiedpaid all or a portion of such a liability or obligation, the PI Trust shall reimburse the Indirect Claimant the amount of the liability or obligation so satisfiedpaid, times the then applicable Payment Percentage.  However, in no event shall such reimbursement to the Indirect Claimant be greater than the amount to which the Direct Claimant would have otherwise been entitled.  Further, the liquidated value of any Indirect PI Trust Claim paid by the PI Trust to an Indirect Claimant shall be treated as an offset to or reduction of the full liquidated value of any PI Trust Claim that might be subsequently asserted by the Direct Claimant against the PI Trust.

     Any dispute between the PI Trust and an Indirect Claimant over whether the Indirect Claimant has a right to reimbursement for any amount paid to a Direct Claimant shall be subject to the ADR procedures provided in Section 5.10 below and set forth in Attachment A hereto.  If such dispute is not resolved by said ADR procedures, the Indirect Claimant may litigate the dispute in the tort system pursuant to Sections 5.11 above and 7.6 below.

Exhibit 1.24-15

The Trustees may develop and approve a separate proof of claim form for such Indirect PI Trust Claims. Indirect PI Trust Claims that have not been disallowed, discharged, or otherwise resolved by prior order of the Bankruptcy Court shall be processed in accordance with procedures to be developed and implemented by the Trustees, consistent with the provisions of this Section 5.6, which procedures (a) shall determine the validity, allowability and enforceability of such claims; and (b) shall otherwise provide the same liquidation and payment procedures and rights to the holders of such claims as the PI Trust would have afforded the holders of the underlying valid PI Trust Claims. Nothing in this TDP is intended to preclude a trust to which asbestos-related liabilities are channeled from asserting an Indirect PI Trust Claim against the PI Trust subject to the requirements set forth herein.

### 5.7    Evidentiary Requirements

#### 5.7(a)    Medical Evidence.

5.7(a)(1)    In General.  All diagnoses of a Disease Level shall be accompanied by either (i) a statement by the physician providing the diagnosis that at least 10 years have elapsed between the date of first exposure to asbestos or asbestos-containing products and the diagnosis, or (ii) a history of the claimant's exposure sufficient to establish a 10-year latency period.  A finding by a physician after the Petition Date that a claimant's disease is "consistent with" or "compatible with" asbestos will not alone be treated by the PI Trust as a diagnosis.[4]

5.7(a)(1)(A).  Disease Levels I-IV.  Except for claims filed against AWI or any other asbestos defendant in the tort system prior to the Petition Date, all diagnoses of a non-malignant asbestos-related disease (Disease Levels I-IV) shall be based in the case of a claimant who was living at the time the claim was filed, upon a physical examination of the claimant by the physician providing the diagnosis of the asbestos-related disease.  In addition, all living claimants must provide (i) for Disease Levels I-III, evidence of Bilateral Asbestos-Related Nonmalignant Disease (as defined in Footnote 2 above); (ii) for Disease Level IV, an ILO reading of 2/1 or greater or pathological evidence of asbestosis, and (iii) for Disease Levels III and IV, pulmonary function testing.[45]

In the case of a claimant who was deceased at the time the claim was filed, all diagnoses of a non-malignant asbestos-related disease (Disease Levels I-IV) shall be based upon either (i) a physical examination of the claimant by the physician providing the diagnosis of the asbestos-related disease; or (ii) pathological evidence of the non-malignant asbestos-related disease; or (iii) in the case of Disease Levels I-III, evidence of Bilateral Asbestos-Related Nonmalignant Disease (as defined in Footnote 3 above), and for Disease Level IV, either an ILO reading of 2/1 or greater or pathological evidence of asbestosis; and (iv) for either Disease Level III or IV, pulmonary function testing.

5.7(a)(1)(B).  Disease Levels V-VIII.  All diagnoses of an asbestos-related malignancy (Disease Levels V – VIII) shall be based upon either (i) a physical examination of the claimant by the physician providing the diagnosis of the asbestos-related disease, or (ii) on a diagnosis of such a malignant Disease Level by a board-certified pathologist.

5.7(a)(1)(C).  ~~Treatment of~~Exception to the Exception for Certain Pre-Petition Claims.  If the holder of a PI Trust Claim that was filed against AWI or any other defendant in the tort system prior to the Petition Date has ~~available~~not provided the PI Trust with a ~~report~~diagnosis of the asbestos-related disease by a ~~diagnosing~~ physician who conducted a physical examination of the holder as described in ~~Sections~~Section 5.7(a)(1)(A), or if the holder has such a diagnosis by an examining physician engaged by holder, or if the holder filed such ~~medical~~a ~~evidence~~diagnosis with another asbestos-related personal injury settlement trust

---

[4] All diagnoses of Asbestosis/Pleural Disease (Disease Levels II and III) not based on pathology shall be presumed to be based on findings of bilateral asbestosis or pleural disease, and all diagnoses of Mesothelioma (Disease Level VIII) shall be presumed to be based on findings that the disease involves a malignancy.  However, the PI Trust may rebut such presumptions.

[45] "Pulmonary Function Testing" shall mean spirometry testing that is in material compliance with the quality criteria established by the American Thoracic Society ("ATS") and is performed on equipment which is in material compliance with ATS standards for technical quality and calibration.

Exhibit 1.24-16

that requires such evidence, the holder shall provide such ~~medical evidence~~diagnosis to the PI Trust notwithstanding the exception in ~~Sections~~Section 5.7(a)(1)(A).

5.7(a)(2)    Credibility of Medical Evidence.    Before making any payment to a claimant, the PI Trust must have reasonable confidence that the medical evidence provided in support of the claim is credible and consistent with recognized medical standards.  The PI Trust may require the submission of X-rays, CT scans, detailed results of pulmonary function tests, laboratory tests, tissue samples, results of medical examination or reviews of other medical evidence, and may require that medical evidence submitted comply with recognized medical standards regarding equipment, testing methods and procedures to assure that such evidence is reliable. Medical evidence (i) that is of a kind shown to have been received in evidence by a state or federal judge at trial, (ii) that is consistent with evidence submitted to AWI to settle for payment similar disease cases prior to AWI's bankruptcy, or (iii) a diagnosis by a physician shown to have previously qualified as a medical expert with respect to the asbestos-related disease in question before a state or federal judge, is presumptively reliable, although the PI Trust may seek to rebut the presumption.

In addition, claimants who otherwise meet the requirements of this TDP for payment of a PI Trust Claim shall be paid irrespective of the results in any litigation at anytime between the claimant and any other defendant in the tort system.  However, any relevant evidence submitted in a proceeding in the tort system involving another defendant, other than any findings of fact, a verdict, or a judgment, may be introduced by either the claimant or the PI Trust in any Individual Review proceeding conducted pursuant to Section 5.3(b) or any Extraordinary Claim proceeding conducted pursuant to Section 5.4(a).

5.7(b)    Exposure Evidence

5.7(b)(1)    In General.  As set forth in Section 5.3(a)(3) above, to qualify for any Disease Level, the claimant must demonstrate a minimum exposure to an asbestos-containing product manufactured or distributed by AWI.  Claims based on conspiracy theories that involve no exposure to an asbestos-containing product produced by AWI are not compensable under this TDP.  To meet the presumptive exposure requirements of Expedited Review set forth in Section 5.3(a)(3) above, the claimant must show (i) for all Disease Levels, AWI Exposure as defined in Section 5.7(b)(3) below prior to December 31, 1982; (ii) for Asbestos/Pleural Disease Level II, six months AWI Exposure prior to December 31, 1982, plus five years cumulative occupational asbestos exposure; and (iii) for Asbestosis/Pleural Disease (Disease Level III), Severe Asbestosis (Disease Level IV), Other Cancer (Disease Level V) or Lung Cancer 1 (Disease Level VII), the claimant must show six months AWI Exposure prior to December 31, 1982, plus Significant Occupational Exposure to asbestos as defined below.  If the claimant cannot meet the relevant presumptive exposure requirements for a Disease Level eligible for Expedited Review, the claimant may seek Individual Review of his or her claim based on exposure to an asbestos-containing product manufactured or distributed by AWI.

5.7(b)(2)    Significant Occupational Exposure.    *"Significant Occupational Exposure"* means employment for a cumulative period of at least five years, with a minimum of two years prior to December 31, 1982, in an industry and an occupation in which the claimant (a) handled raw asbestos fibers on a regular basis; (b) fabricated asbestos-containing products so that the claimant in the fabrication process was exposed on a regular basis to raw asbestos fibers; (c) altered, repaired or otherwise worked with an asbestos-containing product such that the claimant was exposed on a regular basis to asbestos fibers; or (d) was employed in an industry and occupation such that the claimant worked on a regular basis in close proximity to workers engaged in the activities described in (a), (b) and/or (c).

5.7(b)(3)    AWI Exposure.  The claimant must demonstrate meaningful and credible exposure prior to December 31, 1982, to asbestos or asbestos-containing products supplied, specified, manufactured, installed, maintained, or repaired by AWI and/or any entity, including an AWI contracting unit, for which AWI has legal responsibility.  That meaningful and credible exposure evidence may be established by an affidavit of the claimant, by an affidavit of a co-worker or the affidavit of a family member in the case of a deceased claimant (providing the PI Trust finds such evidence reasonably reliable), by invoices, employment, construction or similar records, or by other credible evidence.  The specific exposure information required by the PI Trust to process a claim under either Expedited or Individual Review is set forth on the proof of claim form to be used by the PI Trust, which is attached as Attachment B hereto.  The PI Trust can also require submission of other or additional evidence of exposure when it deems such to be necessary.

Exhibit 1.24-17

5.8    Claims Audit Program.    The PI Trust with the consent of the TAC and the Futures Claimants' Representative may develop methods for auditing the reliability of medical evidence, including additional reading of x-rays, CT scans and verification of pulmonary function tests, as well as the reliability of evidence of exposure to asbestos, including exposure to asbestos-containing products manufactured or distributed by AWI prior to December 31, 1982. In the event that the PI Trust reasonably determines that any individual or entity has engaged in a pattern or practice of providing unreliable medical evidence to the PI Trust, it may decline to accept additional evidence from such provider in the future.

Further, in the event that an audit reveals that fraudulent information has been provided to the PI Trust, the PI Trust may penalize any claimant or claimant's attorney by disallowing the PI Trust Claim or by other means including, but not limited to, requiring the source of the fraudulent information to pay the costs associated with the audit and any future audit or audits, reordering the priority of payment of all affected claimants' PI Trust Claims, raising the level of scrutiny of additional information submitted from the same source or sources, refusing to accept additional evidence from the same source or sources, seeking the prosecution of the claimant or claimant's attorney for presenting a fraudulent claim in violation of 18 U.S.C. § 152, and seeking sanctions from the Bankruptcy Court.

5.9    Second Disease (Malignancy) Claims.    The holder of a PI Trust Claim involving a non-malignant asbestos-related disease (Disease Levels I through IV) may assert a new PI Trust Claim against the PI Trust for a malignant disease (Disease Levels V – VIII) that is subsequently diagnosed. Any additional payments to which such claimant may be entitled with respect to such malignant asbestos-related disease shall not be reduced by the amount paid for the non-malignant asbestos-related disease, provided that the malignant disease had not been diagnosed by the time the claimant was paid with respect to his or her original claim involving the non-malignant disease.

5.10    Arbitration.

5.10(a)    Establishment of ADR Procedures.    The PI Trust, with the consent of the TAC and the Future Claimants' Representative, shall institute binding and non-binding arbitration procedures in accordance with the Alternative Dispute Resolution ("ADR") Procedures included in Attachment A hereto for resolving disputes concerning whether a Pre-Petition settlement agreement with AWI is binding and judicially enforceable in the absence of a final order of the Bankruptcy Court determining the issue, whether the PI Trust's outright rejection or denial of a claim was proper, or whether the claimant's medical condition or exposure history meets the requirements of this TDP for purposes of categorizing a claim involving Disease Levels I – VIII. Binding and non-binding arbitration shall also be available for resolving disputes over the liquidated value of a claim involving Disease Levels II – VIII as well as disputes over AWI's share of the unpaid portion of a Pre-Petition Liquidated Claim described in Section 5.2 above, and disputes over the validity of an Indirect PI Trust Claim.

In all arbitrations where relevant, the arbitrator shall consider the same medical and exposure evidentiary requirements that are set forth in Section 5.7 above. In the case of an arbitration involving the liquidated value of a claim involving Disease Levels II – VIII, the arbitrator shall consider the same valuation factors that are set forth in Section 5.3(b)(2) above. With respect to all claims eligible for arbitration, the claimant, but not the PI Trust, may elect either non-binding or binding arbitration. The Arbitration Rules set forth in Attachment A hereto may be modified by the PI Trust with the consent of the TAC and the Future Claimants' Representative. Such amendments may include adoption of mediation procedures as well as establishment of an Extraordinary Claims Panel to review such claims pursuant to Section 5.4(a) above.

5.10(b)    Claims Eligible for Arbitration.    In order to be eligible for arbitration, the claimant must first complete the Individual Review Process as well as either Pro Bono Evaluation or Mediation under the ADR Procedures with respect to the disputed issue. Individual Review will be treated as completed for these purposes when the claim has been individually reviewed by the PI Trust, the PI Trust has made an offer on the claim, the claimant has rejected the liquidated value resulting from the Individual Review, and the claimant has notified the PI Trust of the rejection in writing. Individual Review will also be treated as completed if the PI Trust has rejected the claim.

5.10(c)    Limitations on and Payment of Arbitration Awards.    In the case of a non-Extraordinary Claim involving Disease Levels II – VIII, the arbitrator shall not return an award in excess of the Maximum Value for the appropriate Disease Level as set forth in Section 5.3(a)(4) above, and for an Extraordinary Claim involving one of those Disease Levels, the arbitrator shall not return an award greater than the Maximum Extraordinary Value for such a claim as set forth in Section 5.4(a) above. A claimant who submits to arbitration and

Exhibit 1.24-18

who accepts the arbitral award will receive payments in the same manner as one who accepts the PI Trust's original valuation of the claim.

**5.11    Litigation.** Claimants who elect non-binding arbitration and then reject their arbitral awards retain the right to institute a lawsuit in the tort system against the PI Trust pursuant to Section 7.6 below. However, a claimant shall be eligible for payment of a judgment for monetary damages obtained in the tort system from the PI Trust's available cash only as provided in Section 7.7 below.

## SECTION VI

## Claims Materials

**6.1    Claims Materials.** The PI Trust shall prepare suitable and efficient claims materials ("*Claims Materials*") for all PI Trust Claims, and shall provide such Claims Materials upon a written request for such materials to the PI Trust. The proof of claim form to be submitted to the PI Trust shall require the claimant to assert the highest Disease Level for which the claim qualifies at the time of filing. The proof of claim form shall also include a certification by the claimant or his or her attorney sufficient to meet the requirements of Rule 11(b) of the Federal Rules of Civil Procedure. A copy of the proof of claim form to be used by the PI Trust for Pre-Petition Liquidated Claims and unliquidated PI Trust Claims is included in Attachment B hereto. The proof of claim form may be changed by the PI Trust with the consent of the TAC and the Future Claimants' Representative.

**6.2    Content of Claims Materials.** The Claims Materials shall include a copy of this TDP, such instructions as the Trustees shall approve, and a detailed proof of claim form. If feasible, the forms used by the PI Trust to obtain claims information shall be the same as or substantially similar to those used by other asbestos claims resolution organizations. Instead of collecting some or all of the claims information from a claimant or the claimant's attorney, the PI Trust may also obtain such information from electronic data bases maintained by any other asbestos claims resolution organization. However, the PI Trust shall inform the claimant that it plans to obtain information as available from such other organizations and may do so unless the claimant objects in writing or provides such information directly to the PI Trust. If requested by the claimant, the PI Trust shall accept information provided electronically. The claimant may, but will not be required to, provide the PI Trust with evidence of recovery from other asbestos defendants and claims resolution organizations.

**6.3    Withdrawal or Deferral of Claims.** A claimant can withdraw a PI Trust Claim at any time upon written notice to the PI Trust and file another such claim subsequently without affecting the status of the claim for statute of limitations purposes, but any such claim filed after withdrawal shall be given a place in the FIFO Processing Queue based on the date of such subsequent filing. A claimant can also request that the processing of his or her PI Trust Claim by the PI Trust be deferred for a period not to exceed three (3) years without affecting the status of the claim for statute of limitation purposes, in which case the claimant shall also retain his or her original place in the FIFO Processing Queue. Except for PI Trust Claims held by representatives of deceased or incompetent claimants for which court or probate approval of the PI Trust's offer is required, or a PI Trust Claim for which deferral status has been granted, a claim will be deemed to have been withdrawn if the claimant neither accepts, rejects, nor initiates arbitration within six months of the PI Trust's offer of payment or rejection of the claim. Upon written request and good cause, the PI Trust may extend either the deferral or withdrawal period for an additional six months.

**6.4    Filing Requirements and Fees.** The Trustees shall have the discretion to determine, with the consent of the TAC and the Futures Representative, (a) whether a claimant must have previously filed a PI Trust Claim in the tort system to be eligible to file the claim with the PI Trust and (b) whether a filing fee should be required for any PI Trust claims.

## SECTION VII

## General Guidelines for Liquidating and Paying Claims

**7.1    Showing Required.** To establish a valid PI Trust Claim, a claimant must meet the requirements set forth in this TDP. The PI Trust may require the submission of X-rays, CT scans, laboratory tests, medical examinations or reviews, other medical evidence, or any other evidence to support or verify the claim, and may

Exhibit 1.24-19

further require that medical evidence submitted comply with recognized medical standards regarding equipment, testing methods, and procedures to assure that such evidence is reliable.

7.2    Costs Considered.  Notwithstanding any provisions of this TDP to the contrary, the Trustees shall always give appropriate consideration to the cost of investigating and uncovering invalid PI Trust Claims so that the payment of valid PI Trust Claims is not further impaired by such processes with respect to issues related to the validity of the medical evidence supporting a PI Trust Claim.  The Trustees shall also have the latitude to make judgments regarding the amount of transaction costs to be expended by the PI Trust so that valid PI Trust Claims are not unduly further impaired by the costs of additional investigation.  Nothing herein shall prevent the Trustees, in appropriate circumstances, from contesting the validity of any claim against the PI Trust whatever the costs, or to decline to accept medical evidence from sources that the Trustees have determined to be unreliable pursuant to the Claims Audit Program described in Section 5.7 above.

7.3    Discretion to Vary the Order and Amounts of Payments in Event of Limited Liquidity.  Consistent with the provisions hereof and subject to the FIFO Processing and Liquidation Queues, the Maximum Annual Payment, the Maximum Available Payment and the Claims Payment Ratio requirements set forth above, the Trustees shall proceed as quickly as possible to liquidate valid PI Trust Claims, and shall make payments to holders of such claims in accordance with this TDP promptly as funds become available and as claims are liquidated, while maintaining sufficient resources to pay future valid claims in substantially the same manner.

Because the PI Trust's income over time remains uncertain, and decisions about payments must be based on estimates that cannot be done precisely, they may have to be revised in light of experiences over time, and there can be no guarantee of any specific level of payment to claimants.  However, the Trustees shall use their best efforts to treat similar claims in substantially the same manner, consistent with their duties as Trustees, the purposes of the PI Trust, the established allocation of funds to claims in Categories A and B, and the practical limitations imposed by the inability to predict the future with precision.  In the event that the PI Trust faces temporary periods of limited liquidity, the Trustees may, with the consent of the TAC and the Future Claimants' Representative, suspend the normal order of payment and may temporarily limit or suspend payments altogether, and may offer a Reduced Payment Option as described in Section 2.5 above.

7.4    Punitive Damages.  In determining the value of any liquidated or unliquidated PI Trust Claim, punitive or exemplary damages, i.e., damages other than compensatory damages, shall not be considered or allowed, notwithstanding their availability in the tort system.

7.5    Interest.

7.5(a)    In General.  Except for PI Trust Claim involving Other Asbestos Disease (Disease Level I – Cash Discount Payment) and subject to the limitations set forth below, interest shall be paid on all PI Trust Claims with respect to which the claimant has had to wait a year or more for payment, provided, however, that no claimant shall receive interest for a period in excess of seven (7) years.  The initial interest rate shall be six percent (6%) simple interest per annum for the first five (5) years after the Effective Date; thereafter, the PI Trust shall have the discretion to change the annual interest rate with the consent of the TAC and the Future Claimants' Representative.

7.5(b)    Unliquidated PI Trust Claims.  Interest shall be payable on the Scheduled Value of any unliquidated PI Trust Claim that meets the requirements of Disease Levels II – V, VII and VIII, whether the claim is liquidated under Expedited Review, Individual Review, or by arbitration.  No interest shall be paid on any claim liquidated in the tort system pursuant to section 5.11 above and 7.6 below.  Interest on an unliquidated PI Trust Claim that meets the requirements of Disease Level VI shall be based on the Average Value of such a claim.  Interest on all such unliquidated claims shall be measured from the date of payment back to the earliest of the date that is one year after the date on which (a) the claim was filed against AWI prior to the Petition Date; (b) the claim was filed against another defendant in the tort system on or after the Petition Date but before the Effective Date; or (c) the claim was filed with the PI Trust after the Effective Date..

7.5(c)    Liquidated Pre-Petition Claims.  Interest shall also be payable on the liquidated value of all Pre-Petition Liquidated Claims described in Section 5.2(a) above.  In the case of Pre-Petition Liquidated Claims liquidated by verdict or judgment, interest shall be measured from the date of payment back to the date that is one year after the date that the verdict or judgment was entered.  In the case of Pre-Petition Liquidated Claims

Exhibit 1.24-20

liquidated by a binding, judicially enforceable settlement, interest shall be measured from the date of payment back to the date that is one year after the Petition Date.

7.6 **Suits in the Tort System.** If the holder of a disputed claim disagrees with the PI Trust's determination regarding the Disease Level of the claim, the claimant's exposure history or the liquidated value of the claim, and if the holder has first submitted the claim to non-binding arbitration as provided in Section 5.10 above, the holder may file a lawsuit in the Claimant's Jurisdiction as defined in Section 5.3(b)(2) above. Any such lawsuit must be filed by the claimant in her or her own right and name and not as a member or representative of a class, and no such lawsuit may be consolidated with any other lawsuit. All defenses (including, with respect to the PI Trust, all defenses which could have been asserted by AWI) shall be available to both sides at trial; however, the PI Trust may waive any defense and/or concede any issue of fact or law. If the claimant was alive at the time the initial pre-petition complaint was filed or on the date the proof of claim was filed with the PI Trust, the case will be treated as a personal injury case with all personal injury damages to be considered even if the claimant has died during the pendency of the claim.

7.7 **Payment of Judgments for Money Damages.** If and when a claimant obtains a judgment in the tort system, the claim shall be placed in the FIFO Payment Queue based on the date on which the judgment became final. Thereafter, the claimant shall receive from the PI Trust an initial payment (subject to the applicable Payment Percentage, the Maximum Available Payment, and the Claims Payment Ratio provisions set forth above) of an amount equal to one-hundred percent (100%) of the greater of (i) the PI Trust's last offer to the claimant or (ii) the award that the claimant declined in non-binding arbitration. The claimant shall receive the balance of the judgment, if any, in five equal installments in years six (6) through ten (10) following the year of the initial payment (also subject to the applicable Payment Percentage, the Maximum Available Payment and the Claims Payment Ratio provisions set forth above).

In the case of non-Extraordinary claims involving Disease Levels II - VIII, the total amounts paid with respect to such claims shall not exceed the Maximum Values for such Disease Levels set forth in Section 5.3(b)(4). In the case of Extraordinary Claims, the total amounts paid with respect to such claims shall not exceed the Maximum Value for such claims set forth in Section 5.4(a) above. Under no circumstances shall interest be paid pursuant to Section 7.5 or under any statute on any judgments obtained in the tort system.

7.8 **Releases.** The Trustees shall have the discretion to determine the form and substance of the releases to be provided to the PI Trust in order to maximize recovery for claimants against other tortfeasors without increasing the risk or amount of claims for indemnification or contribution from the PI Trust. As a condition to making any payment to a claimant, the PI Trust shall obtain a general, partial, or limited release as appropriate in accordance with the applicable state or other law. If allowed by state law, the endorsing of a check or draft for payment by or on behalf of a claimant shall constitute such a release.

7.9 **Third-Party Services.** Nothing in this TDP shall preclude the PI Trust from contracting with another asbestos claims resolution organization to provide services to the PI Trust so long as decisions about the categorization and liquidated value of PI Trust Claims are based on the relevant provisions of this TDP, including the Disease Levels, Scheduled Values, Average Values, Maximum Values, and Medical/Exposure Criteria set forth above.

7.10 **PI Trust Disclosure of Information.** Periodically, but not less often than once a year, the PI Trust shall make available to claimants and other interested parties, the number of claims by disease levels that have been resolved both by the Individual Review Process and by arbitration as well as by litigation in the tort system indicating the amounts of the awards and the averages of the awards by jurisdiction.

## SECTION VIII

## Miscellaneous

8.1 **Amendments.** Except as otherwise provided herein, the Trustees may amend, modify, delete, or add to any provisions of this TDP (including, without limitation, amendments to conform this TDP to advances in scientific or medical knowledge or other changes in circumstances), provided they first obtain the consent of the TAC and the Future Claimants' Representative pursuant to the Consent Process set forth in Sections 5.7(b) and

Exhibit 1.24-21

6.6(b) of the PI Trust Agreement, except that the right to amend the Claims Payment Ratio is governed by the restrictions in Section 2.5 above, and the right to adjust the Payment Percentage is governed by Section 4.2 above.

      8.2      **Severability.**  Should any provision contained in this TDP be determined to be unenforceable, such determination shall in no way limit or affect the enforceability and operative effect of any and all other provisions of this TDP. Should any provision contained in this TDP be determined to be inconsistent with or contrary to AWI obligations to any insurance company providing insurance coverage to AWI in respect of claims for personal injury based on exposure to asbestos-containing products manufactured or produced by AWI, the PI Trust with the consent of the TAC and the Future Claimants' Representative, may amend this TDP and/or the PI Trust Agreement to make the provisions of either or both documents consistent with the duties and obligations of AWI to said insurance company.

      8.3    **Governing Law.**  Except for purposes of determining the liquidated value of any PI Trust Claim, administration of this TDP shall be governed by, and construed in accordance with, the laws of the State of Delaware. The law governing the liquidation of PI Trust Claims in the case of Individual Review, arbitration or litigation in the tort system shall be the law of the Claimant's Jurisdiction as described in Section 5.3(b)(2) above.

Exhibit 1 24-22

Document comparison done by DeltaView on Monday, November 10, 2003 14:38:47

| Input: | |
|---|---|
| Document 1 | pcdocs://ny2/1251056/7 |
| Document 2 | pcdocs://ny2/1251056/10 |
| Rendering set | Standard |

| Legend: | |
|---|---|
| Insertion | |
| Deletion | |
| Moved from | |
| Moved to | |
| Format change | |
| Moved deletion | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | Count |
|---|---|
| Insertions | 33 |
| Deletions | 20 |
| Moved from | 2 |
| Moved to | 2 |
| Format changed | 0 |
| Total changes | 57 |