# Exhibit H

1

```
 1                    IN THE UNITED STATES DISTRICT COURT
                        FOR THE DISTRICT OF DELAWARE
 2

 3      In re:                            Chapter 11

 4      USG CORPORATION,
        a Delaware corporation, et al.,   Jointly Administered
 5                                         Case No. 01-2094 (JKF)
                    Debtors.
 6

 7      USG CORPORATION, et al.,          Civil Action 04-1559(JFC)
                                           Civil Action 04-1560(JFC)
 8                    Movant,
             vs.
 9
        OFFICIAL COMMITTEE OF ASBESTOS
10      PERSONAL INJURY CLAIMANTS,
        OFFICIAL COMMITTEE OF UNSECURED
11      CREDITORS, OFFICIAL COMMITTEE
        OF ASBESTOS PROPERTY DAMAGE
12      CLAIMANTS AND LEGAL
        REPRESENTATIVE FOR FUTURE
13      CLAIMANTS,

14                    Respondents.

15

16
             Transcript of Motions Proceedings on Thursday, October 6,
17      2005, United States District Court, Pittsburgh, Pennsylvania,
        before Joy Flowers Conti, District Judge.
18

19

20
        Court Reporter:                    Juliann A. Kienzle, RMR, CRR
21                                          1021-A U.S. Courthouse
                                            Pittsburgh, PA 15219
22                                          (412) 261-6122

23
             Proceedings recorded by mechanical stenography; transcript
24      produced by computer-aided transcription.

25
```

2

```
 1   APPEARANCES:

 2   For the Debtor:              Stephen C. Neal, Esq.
                                  Scott D. Devereaux, Esq.
 3
                                  David Heiman, Esq.
 4
     For Equity Committee:        David Hickerson, Esq.
 5                                Peter Friedman, Esq.
                                  Andrew Sole, Esq.
 6
     Unsecured Creditors          Kenneth Pasquale, Esq.
 7   Committee:                   Mike Lastowski, Esq.

 8   Futures Representative:      Jane W. Parver, Esq.
                                  Andrew Kress, Esq.
 9                                Michael A. Lynn, Esq.

10   Asbestos Personal Injury     Nathan D. Finch, Esq.
     Claimants Committee:         Walter B. Slocombe, Esq.
11
     Asbestos Property Damage     Mitchell Widom, Esq.
12   Committee:

13   (Participating
     telephonically)
14
     Owens-Illinois:             Katharine Mayer, Esq.
15

16

17   For the Debtors:            Daniel J. DeFranceschi, Esq.

18   Asbestos Property Damage    Chris Ward, Esq.
     Committee:
19

20   Futures Representative:     Maribeth Minella, Esq.

21   Liske Trust:                Randy Videen, Esq.

22   USG Corporation:            Suzanne Torrey, Esq.
                                 Stan Ferguson, Esq.
23
     Chair of Equity Committee:  Thomas Walper
24
     USG'S Financial Advisor:    Matt Rosenberg
25
```

3

```
 1              (Proceedings held in open court; Thursday, October 6,
    2005.)
 2              THE COURT:  This is a hearing on a motion regarding

 3   the client questionnaire in the matter of the USG Corporation

 4   Jointly Administered at No. 01-2094 in the Bankruptcy Court and

 5   present before this court in Civil Action No. 04-1559 and

 6   04-1560.

 7              At this time, I'm going to ask that the clerk will

 8   call the role of all those here so we have your appearance

 9   entered on the record.

10              THE CLERK:  Scott Devereaux?

11              MR. DEVEREAUX:  Good morning, Your Honor.

12              THE CLERK:  Stephen Neal?

13              MR. NEAL:  Good morning, Your Honor.

14              THE CLERK:  David Heiman?

15              MR. HEIMAN:  Good morning, Your Honor.

16              THE CLERK:  Nathan Finch?

17              MR. FINCH:  Good morning, Your Honor.

18              THE CLERK:  Walter Slocombe?

19              MR. SLOCOMBE:  Good morning.

20              THE CLERK:  Mitchell Widom?

21              MR. WIDOM:  Good morning, Your Honor.

22              THE CLERK:  Ken Pasquale?

23              MR. PASQUALE:  Good morning, Your Honor.

24              THE CLERK:  Jane Parver?

25              MS. PARVER:  Good morning, Your Honor.
```

```
 1              THE CLERK:   Andrew Kress?

 2              MR. KRESS:   Good morning, Your Honor.

 3              THE CLERK:   Michael Lynn?

 4              MR. LYNN:   Good morning, Your Honor.

 5              THE CLERK:   Marla Eskin?

 6              MS. ESKIN:   Good morning.

 7              THE CLERK:   David Hickerson?

 8              MR. HICKERSON:   Good morning, Your Honor.

 9              THE CLERK:   Ralph Miller?

10              MR. MILLER:   Good morning, Your Honor.

11              THE CLERK:   Is there anyone else who is present and

12    would like to enter their appearance on the record in the

13    courtroom?

14              On the phone, if you could please identify yourself

15    when I call your name and at the end if there are any

16    additional parties joining us, please identify yourself.

17              Andrew Sole?

18              MR. SOLE:   Yes.

19              THE CLERK:   Mike Lastowski?

20              MR. LASTOWSKI:   Present.

21              THE CLERK:   Stephen Vogel?

22              Chris Ward?

23              MR. WARD:   Present.

24              THE CLERK:   Katherine Mayer?

25              MS. MAYER:   Yes, I'm here.
```

5

```
1           THE CLERK:  Mary Beth Minella?

2           MS. MINELLA:  Present.

3           THE CLERK:  Peter Friedman?

4           MR. FRIEDMAN:  Present.

5           THE CLERK:  Randy Videen?

6           MR. VIDEEN:  Yes.

7           THE CLERK:  Peg Brickley?

8           Thomas Walper?

9           MR. WALPER:  Good morning, Your Honor.

10          THE CLERK:  Matt Rosenberg?

11          MR. ROSENBERG:  Present.

12          THE CLERK:  Suzanne Torrey?

13          MS. TORREY:  Present.

14          THE CLERK:  Daniel DeFranceschi?

15          MR. DeFRANCESCHI:  Present.

16          THE CLERK:  Pat Evans?

17          Reid Snellenbarger?

18          Is there anyone who would like to enter an

19 appearance whose name I have not called?

20          THE COURT:  The Court notes that of those who are

21 scheduled to appear, that Mr. Vogel, Ms. Brickley, Pat Evans

22 and Mr. Snellenbarger are not on the line.

23          Before the Court today is the debtors' motion for

24 approval of the debtors' sample plan and questionnaire.

25          The parties have submitted a joint report which the
```

1    Court has reviewed.  In that report, each party goes through

2    their agreements and disagreements.  What I would like to do

3    is to address three issues today.  One, I want to go over what

4    we discussed at the last hearing and that was how the Court is

5    going to handle the motion with respect to the sampling plan.

6    I want to review the questionnaire.  And then we need to

7    examine the issues relating to the databases that have been

8    raised to see how that would affect the questionnaire and the

9    process going forward.  So those are really the three matters.

10   And then procedurally we're going to have to address at the

11   very end timing in terms of the process to conclude this

12   discovery phase and then how to proceed from that.

13            MR. DEVEREAUX:  Good morning, Your Honor.  Scott

14   Devereaux on behalf of the debtors.

15            As the joint report makes clear, we did make some

16   progress in areas that you laid out with the questionnaire and

17   sampling plan and timing, actually, for the overall discovery.

18   There are some issues that remain in dispute to be resolved

19   today.  There is one additional agreement that we were able to

20   reach relating to timing after the joint report is submitted

21   that I'd like to apprise the Court of that relates to the time

22   needed to analyze the questionnaire and supporting documents.

23            THE COURT:  You were a couple months off between

24   parties.

25            MR. DEVEREAUX:  We were between March and May --

1   March and June.  We settled around May.

2            THE COURT:  That's where I was coming at anyway.

3            MR. DEVEREAUX:  Glad we got there before you did,

4   Your Honor.  The way the agreement was reached is as the joint

5   report makes clear, if as a result of this hearing today we

6   are able to, the debtors are able to distribute the

7   questionnaire to their sample of claimants by October 20th,

8   then we've agreed that the personal injury claim superseding

9   it will respond and provide the detailed questionnaires back

10  by January 9th.  At that point, Rust Consulting, the document

11  processing group that is handling the questionnaires, will

12  scan the questionnaires themselves and any documentation

13  submitted with them, be they medical records or depositions

14  and such, and then distribute it to all the parties.  Rust

15  tells me that that will take -- they'll get it done by January

16  20th.

17           THE COURT:  How does the question on the database

18  affect this sampling plan?  How is that information going to

19  go out?  That was raised by --

20           MR. DEVEREAUX:  I don't think it does.  We've had

21  different versions of this database because the CCR, which is

22  the compiler of the database, updates it over time.

23  Initially, in 2001, when the case was filed, a copy of that

24  database was provided to the ACC.  Later, in 2002, the FCR was

25  appointed by Judge Wolin and a copy was provided to them, but

8

1   it was a subsequent copy as of that date, so they're

2   different.  We had endeavored following the June hearing to

3   try and get everybody on the phone with CCR, Navigant, their

4   data processing consultant, to get everybody what they wanted

5   or what they thought they needed.  We tried to do that.

6   Apparently, we didn't.  What we did was we got from Navigant

7   for the parties at the ACC and CCR's requested databases as of

8   January 2002 and May of 2002 because I think, and they can

9   speak to this, I think they wanted to compare them and see

10  what kind of changes are happening over time.

11          Those went out in the form that I think they were

12  asked for, sort of standard CCR format, but there was a period

13  at the end that Navigant didn't know or didn't understand to

14  be part of the request from the 2001 time period.  So we've

15  asked Navigant to get that stub period for the ACC and all the

16  parties in this case.

17          There's still concern that the data isn't matching

18  because we keep generating new databases and so what they have

19  asked for in a recent conference call, and we've agreed to,

20  we're just going to have our expert, Lexecon, make a copy of

21  their database and provide it --

22          THE COURT:  I think everybody has to have the same

23  database because, otherwise, you cannot -- it would be like

24  comparing apples and oranges.

25          MR. DEVEREAUX:  That's right.  It's such a

1  voluminous amount of data that absent doing it that way, it's

2  hard to really know whether it's really precise or not.  That

3  solves the problem as far as making sure everybody is on the

4  same page.  We're going to give them a copy of ours, if they

5  or any other parties want information from Navigant.

6          THE COURT:  That was raised from the future

7  claimants.

8          MS. PARVER:  Yes, Your Honor.

9          THE COURT:  Does this satisfy you?

10          MS. PARVER:  Well, Your Honor, what Mr. Devereaux

11  agreed to on Monday of this week was finally to produce, as he

12  said, the exact copy of what they're working from.  We have

13  not gotten a date as to when that will be supplied as well.

14  There is an outstanding request that we've not heard back from

15  the debtors with certainty because they have asked for another

16  meet and confer on a variety of discovery issues which they

17  have scheduled -- they couldn't do it this week, it's October

18  11th.  And there are outstanding requests for data

19  dictionaries and listings of fields in the database and codes

20  and things like that, so we're waiting to hear back with

21  respect to that, Your Honor, as well as when Navigant will

22  produce --

23          THE COURT:  To the extent the database is prepared,

24  anything like that to help assess the information, that should

25  also be provided.

1           MR. DEVEREAUX:  We are providing it.  We are in the

2    process of collecting over one million documents.  We have

3    produced half a million.  There are lots of discovery issues

4    we're discussing.  This is one of them and we're responding.

5           THE COURT:  We have to get through this phase with

6    the claimants because this database is such a critical issue

7    and their experts are going to need to look at it as well as

8    yours.

9           MR. DEVEREAUX:  We'll get it to them this coming

10   week.

11          MR. FINCH:  May I briefly be heard on the

12   clarification of the database point, and then the timing

13   agreements that were reached?

14          Our view, and as I think the Court recognizes, that

15   they send out the sample to 2,000 claimants, if it turns out

16   that the database they are using has errors in it, and if it

17   turns out for some reason their sample is nonrepresentative,

18   we will attack that with expert testimony at the estimation

19   hearing at the appropriate period of time.  I don't think

20   fixing on the final version of the database necessarily should

21   hold up sending out the questionnaire to the claimants.

22          On the timing of that, my understanding is Rust

23   will send out 2,000 questionnaires in whatever format the

24   Court finally orders and my agreement with them as to timing

25   is on behalf of ACC.  I don't represent the individual

1  claimants and their individual circumstances.  If somebody's

2  files were wiped out in Hurricane Katrina, I can't control

3  whether or not they can get stuff back in two months or not.

4  People may come in with their own timing issues.  But if Rust

5  gets the questionnaires out by October 20th, then two and a

6  half months to January 9th is our best estimate of the time

7  frame to complete the questionnaires.

8           I know from the W.R. Grace case, there are still

9  law firms who have claims on filings with Grace at the time

10  they went into bankruptcy who hadn't received questionnaires

11  from Rust yet.  That was a month after they were supposed to

12  go out, so all the timing deadlines are from the time the

13  questionnaires go out, and then the time to -- the time after

14  which to analyze whatever Rust gets, that has to be a

15  four-month clock that starts when Rust produces all that stuff

16  to the parties, not some fixed, arbitrary date which may or

17  may not be met by Rust.  That's what I wanted to be clear on

18  in terms of the agreements and the timing.

19           MR. DEVEREAUX:  Your Honor, there are lots of

20  reasons why we chose a sample of 2,000 rather than trying to

21  send out questionnaires to everybody, and to avoid those kinds

22  of problems, we're dealing with a much, much smaller sampling

23  than Grace.  But the agreement, as Mr. Finch says, once the

24  materials are received by Rust, they will scan it and get it

25  distributed, which they tell me they'll be able to do by

1  January 20th, and four months from that date, then by the

2  parties' agreement, is the time sufficient to analyze fully.

3          THE COURT:  My preference is to have a firm date.

4  If there's a problem with that date, then parties need to file

5  a request to extend the date because at that stage you,

6  hopefully, will have an assessment of how much additional time

7  might be necessary, or if there's additional sampling that

8  needs to be done, we'll have to address that at that time, if

9  it's necessary.  If we have a firm date to work against, then

10 there's a reason to come back to court and I have an

11 opportunity to monitor the progress of the discovery.

12         MR. DEVEREAUX:  Along that line, Your Honor, then I

13 would propose --

14         THE COURT:  You have to file something before the

15 close of the period so that I'm alerted to it, and then

16 everybody can be heard and then we can all get on the line.

17 We probably can do that by conference call, if it's just a

18 question of trying to determine what the appropriate date

19 would be.

20         MR. DEVEREAUX:  For today's scheduling order, then

21 I would propose that if those dates of October 20th and

22 January 9th -- which have been agreed to by the parties -- are

23 acceptable to the Court, then the date of January 20th would

24 be the date by which Rust and the debtor would make sure that

25 all information received with the questionnaire is distributed

1  to all parties.  And the period --

2            THE COURT:  Rust will be scanning it within that

3  period of time?

4            MR. DEVEREAUX:  Correct, Your Honor.  And

5  distributing it by the 20th, and that the parties will then

6  have up and to and including May 20th for the purpose of

7  analyzing that data.

8            MS. PARVER:  Your Honor, if I may, could we have

9  the order reflect they're going to be distributing it

10  electronically in the forms agreed to by the parties?  There

11  have been some disagreements -- I'm sure you'll be shocked to

12  hear -- on other production issues as to what form people can

13  use, et cetera, with all these different and technological --

14            THE COURT:  I'm going to ask the debtor to prepare

15  an order with respect to these dates, share it with the other

16  counsel and make sure that we've picked up the issues that

17  you've addressed with the electronic problems.  If there's a

18  problem with the form of the order, we can have a quick

19  conference call and resolve any issues, but, hopefully, that

20  you're working together and everyone has a mutual goal of

21  bringing this process to a conclusion, agree on appropriate

22  language, and then I'll have an order that everyone has agreed

23  to and I'll be able to sign it.

24            MR. DEVEREAUX:  We'll do that, Your Honor.

25            So, that's the timing issue.  Now, we don't have a

1  close of fact discovery deadline yet.

2          THE COURT:  I've dealt with the data issue and

3  that's something that is going to be handled by the debtor,

4  making sure that everybody has the same database so that when

5  you're doing a review or having the material reviewed, you'll

6  have that.

7          MR. FINCH:  Basically, what we want is whatever

8  database they use to draw their sample of 2,000, that's the

9  exact same thing they produce to us.

10          THE COURT:  That's what they said they would do.

11          MS. PARVER:  They said this week they were going

12  to.

13          MR. DEVEREAUX:  I said next week, this coming week,

14  but you'll have it soon.

15          THE COURT:  So the database will be produced.

16  We've agreed on the timing issues and that the debtor will

17  produce it with respect to the portion of the motion that

18  addresses the sampling plan.

19          At the last hearing, I told the parties that when

20  discovery hasn't been completed, it was very difficult for

21  this Court to try to assess in the absence of a complete

22  presentation the legitimacy of the sampling plan and approving

23  it, so at this point, the Court would not approve the sampling

24  plan.  That's a matter that the debtor has to review with the

25  experts that it's going to be relying on, then we'll have an

1  opportunity when everybody has the database, the analysis, the

2  expert reports, then we'll be able to have an appropriate and

3  full record before the Court in order to make an appropriate

4  determination with respect to that issue.  So that's clear on

5  the record.

6          Now, with respect to the questionnaire, I think the

7  best thing to do is to pull out the form of the questionnaire

8  and just go through those areas of the questionnaire one by

9  one that the parties dispute and I'll address each one as we

10 go through.

11         MR. DEVEREAUX:  One clarification on the sampling

12 plan before we move on because we have, as a result of some

13 comments or criticisms by the FCR, made some changes in the

14 sampling plan.  And I understand from the last hearing and

15 what Your Honor just said that you aren't blessing it as being

16 adequate to do what the debtors seek, but that you are,

17 instead, permitting us to take discovery of 2,000 people and

18 we choose them how we choose them.  Later on, it's subject to

19 criticism and debate.

20         THE COURT:  It's too difficult when you don't see

21 what the results are.  What comes back, if you need more

22 sampling because not enough have responded, that's a concern

23 as well.  So until it's concluded, I can't make the final

24 determination about the appropriateness or the weight to be

25 given to the sampling plan and the expert reports derived from

1  it, so that's clear on the record.

2          That's the last issue for today because what I'm

3  going to do is we'll set a status conference at the close of

4  this discovery period and by the close of the discovery

5  period, it will be closed for everybody, so if there are these

6  other discovery issues out there, I want to make sure

7  everything has been addressed and resolved.  Once we know that

8  this discovery is concluded, at that stage when I ask each

9  party to disclose who their experts are going to be, then

10  we'll set the time frame for the filing of the expert reports,

11  the responsive reports, replies and set up a Daubert hearing.

12          MR. DEVEREAUX:  At the end of the May 20 time

13  period we'll close discovery.

14          THE COURT:  We'll move toward closing discovery.

15          MS. PARVER:  I understand, Your Honor, but I

16  understand that Your Honor is going to give us an opportunity

17  today to speak to what we believe should be the --

18          THE COURT:  -- the appropriate cutoff for

19  discovery.  I understand.  Whatever that date is, it's going

20  to be -- we have a cutoff date for the sampling.

21          MR. FINCH:  There are lots of other discovery

22  issues.

23          THE COURT:  We'll address that, too.

24          MR. DEVEREAUX:  Your Honor, on the questionnaire,

25  we have made a lot of -- the debtor has made a lot of changes

1    to the questionnaires since the version that was submitted a

2    couple weeks ago in the meet and confer process.

3              THE COURT:  Is this different from the one that --

4    do I have the most recent one?

5              MR. DEVEREAUX:  You have the most recent one, Your

6    Honor.  But in that, as opposed to two weeks ago when we were

7    here taking the Court's admonitions to heart, we've eliminated

8    medical records for mesothelioma claimants, voluminous

9    records.  We have eliminated any requests for most medical

10   records for cancer claims, lung cancer or other cancer claims,

11   focusing instead simply on records related to the diagnosis

12   itself.  We have deleted any request for residences, even

13   though that can play a part.  We've deleted a request that the

14   claimants execute a HIPAA form so we could have access to

15   their medical records.  We've reduced the amount of

16   information we asked for as to the doctors who treat various

17   claimants.  We've deleted any requests that claimants identify

18   distributors of products that they claim to have been exposed

19   to, and we've removed any requests that the claimants identify

20   the debtors.  We've made a lot of changes, including some

21   small verbiage changes to try to make the form clearer at the

22   request of other parties.

23             THE COURT:  It's clear to this Court that an

24   average person is going to have to have counsel assist them in

25   this, and I'm assuming that all of the claimants who receive

1   this form are represented by counsel.  Does this go to their

2   counsel?

3           MR. DEVEREAUX:  It does, Your Honor.  Debtors have

4   compromised where they can, but we still have a methodology

5   that we intend to pursue and which we understand the Court is

6   going to allow us.  It involves presenting evidence on the

7   merits of these claims and that the debtor and the equity

8   committee and every other stakeholder in this case, but for

9   the ACC and the FCR, want to be sure that what is clearly

10  suspect and what some argue fraudulent claimant behavior in

11  the asbestos tort world does not get propagated in this

12  courtroom.  And in order to do that, Your Honor, we need to

13  try to develop or we're going to put down evidence before this

14  Court that identifies who it is that is actually sick, and in

15  order to do that, we need the medical records of those

16  individuals.  The ACC's response is to say, well, we'll just

17  give you the ILO x-ray reading form and not the x-ray itself

18  and that will be sufficient.  But it won't, Your Honor,

19  because that would require us to accept what we believe are

20  highly suspect diagnoses of doctors or mass screening

21  companies and turns the adversarial nature of the litigation

22  on its head.  So we actually need the medical records that

23  they claim to rely on as evidence of disease.  We also want to

24  identify those individuals and all stakeholders want to

25  identify those individuals that the debtors actually cause --

1          THE COURT:  I want to be clear here because I am

2   not adjudicating any individual claimant's claim in this

3   process because I'm not going to adversely affect anyone's

4   rights without their being present and able to be heard and

5   having a full trial as they would be entitled to.

6          MR. DEVEREAUX:  Nor are we asking you to, Your

7   Honor.  But what we are asking, we'll focus on a sample and

8   some information about the claimants that we learn from that

9   sample and extrapolate as a whole so the Court, as Your Honor

10  has indicated, it would be able to make some general

11  assessments about what types of cases have merit and what

12  types of cases in the aggregate don't, and that that's the

13  only way to yield an estimate of the debtors' liability.

14          So that's what our process is designed exactly to

15  do.  We haven't adjudicated anybody's rights and are not

16  proposing to in this courtroom, but we do need and propose

17  getting a body of information by which the Court can make some

18  assessments about what kind of claims the debtor generally

19  faces and will face.

20          Another piece of information that we ask for and

21  it's in dispute is -- we want to pay those individuals who

22  we've actually caused their injury, if they're actually

23  injured, but the second question is did the debtors cause it?

24  And so we need to know, though, the when and the where and the

25  how they claim they were exposed to US Gypsum

1   asbestos-containing products.  And that's the information that

2   the questionnaire designs to seek regarding where they worked,

3   what they were exposed to, for how long.  And they are all

4   represented by lawyers, and this is sort of bedrock basic

5   information for any tort claim and important for this

6   estimate.

7              Finally, there are really three areas in dispute in

8   the questionnaire.  The final area relates to other legal

9   actions or bankruptcy claims that have been made.  And it is

10  the debtors' view that we want to make sure that people are

11  fairly compensated in this bankruptcy, but that no one

12  receives a disproportionate share at the expense of all the

13  other stakeholders who are here as well making claims on the

14  estate.  So it is incumbent that the debtor be allowed to find

15  out what the tort settlement history was for these claimants.

16  And all of this information, Your Honor, is fundamental to

17  tort claims and all of it is clearly relevant and discoverable

18  and, in fact, Judge Fitzgerald in Grace has approved already

19  that this information be collected.

20             The January 9th date is the date the parties agreed

21  to to return the questionnaires in this matter and that date

22  was requested by the ACC and FCR, and we acceded to it.  It

23  wasn't requested by happenstance.  The Grace case management

24  order requires that all 118,000 of the claim forms going out

25  or questionnaires going out in that matter be returned on

1  January 12th.  And the information requested in the Grace

2  claim form is very similar to the information that the debtors

3  are seeking here, and they're already going to be collecting

4  that information and essentially asked for January 9th so they

5  can all do it at the same time.

6          So, Your Honor, there is no real claim that this is

7  relevant or likely to lead to discoverable, admissible

8  information.  I would submit, Your Honor, there's no other

9  objection regarding the questionnaire that's pending before

10 Your Honor today.  The questionnaire that the debtors propose

11 to circulate imposes no obligation on the FCR or any of the

12 individuals or interests that the FCR represents.  Nothing is

13 asked of them.  The ACC, obviously, as a representative of

14 present claimants has a role in this because the argument will

15 go to their people, but they say in the joint report at Pages

16 3 and 4, bottom of Page 3 and 4, that those claimants they're

17 talking about, the personal injury claimants -- I'm quoting

18 from the bottom of Page 3:  Those claimants and their

19 attorneys are not bound by the objections that counsel for the

20 ACC may make and have the right to advance their own

21 identical, different or additional objections.  It is

22 impossible at this juncture for counsel to the ACC to know

23 whether compliance with the questionnaire is unduly burdensome

24 in a particular case.  I close quote there.

25          This is reiterating something Mr. Finch said today.

1   We don't represent the individual claimants and, as a result,

2   they aren't claiming that this is burdensome.  If some lawyer

3   who does represent a claim wants to come in and say, despite

4   the fact that I have a claim against USG in this bankruptcy,

5   it's unfair to ask any information about what illness they

6   have, about some evidence showing it, how they're exposed to

7   USG and other asbestos-containing products and some

8   information regarding it and what their other experience is in

9   suing people who they claim have also injured them.  If they

10  want to come in and make that argument, they can, but I don't

11  understand the ACC today to be saying that the one and a half

12  percent sample with a questionnaire on this basic information

13  is burdensome.  But if they did, Your Honor, that objection

14  wouldn't be well taken.  The approach that the debtors have

15  taken in asking for a sample of 2,000 has rightly been

16  approved in other cases, like Grace, of sending out a

17  questionnaire to 118,000 people.  Obviously, this debtor is

18  very concerned about making this efficient, is not interested

19  in making it burdensome and hasn't.

20          We've pared down this questionnaire taking out

21  things that are, in fact, relevant to the determination, but

22  which, in the interest in compromise and an efficient

23  estimation hearing, we've decided to forego.  We have boiled

24  this down to:  Are you sick?  Did we cause it?  And what in

25  your other experience with others you've claimed caused your

1  injury?  That's what the set of objections that remain from

2  the ACC relate to, those three types of issues.

3            There's one issue that I would like to raise, Your

4  Honor, about the questionnaire.  One clarification that I

5  would propose today and that is on Page 3 of the questionnaire

6  in the instruction section.  It's something that for

7  clarification sake should be done.  I don't know whether there

8  will be a problem.  It's Instruction 10, which says that

9  instead of originals, you may submit photocopies.  And it goes

10 on, of any and all documents that the questionnaire requires.

11 Obviously, a photocopy of an x-ray is not helpful to us, you

12 can't read it.  We don't want anyone confused that photocopies

13 of x-rays are acceptable for x-rays.  We need the original

14 submitted for the purpose of reading them.  Judge Fitzgerald

15 in Grace gave the debtors access, upon request, to the

16 original x-rays.  We're obviously requesting a very small

17 amount.

18            So, for clarification, I would propose after the

19 word "requires," we insert "other than nondigital radiographic

20 evaluations, such as x-rays or CT scans."  Obviously, if

21 they're digital, then the copies are as good as the originals.

22 A lot of x-ray scans now are digital.

23            That one clarification of the questionnaire I think

24 is appropriate.  Otherwise, Your Honor, I believe that in

25 passing the test that the Court set out for us, is this

1  designed -- taking a broad view of it, is this designed to

2  discover admissible information?  I think the answer is

3  undeniably yes.  Is it burdensome, if there was even a

4  burdensome objection, and the answer is absolutely not.  It is

5  a very focused sample and a very streamlined questionnaire.

6            Now, I can, if you would like, Your Honor, start to

7  go through the items one at a time that are in the joint

8  report.

9            MR. FINCH:  May I be heard before we do that?

10           THE COURT:  Yes.

11           MR. FINCH:  The debtor has stated both just now and

12  in its papers that what it seeks to do here is estimate the

13  aggregate liability for plan purposes.  It's not either

14  adjudicating the merits of 2,000 individual claims, nor is it

15  estimating, asking this Court to estimate for any purposes of

16  allowance whether or not Claimant X has a valid claim or not.

17  And that's the context in which you have to view this

18  discovery.  Almost all of their discovery beyond what disease

19  do you have, were you exposed to USG products and some basic

20  information about the claim goes to the type of evidence that

21  you would put on by expert testimony to impeach or

22  cross-examine or use in a trial of that claim.  And think

23  about what you're asking.  These are people who don't have a

24  date by which they have to submit expert reports.  They're

25  prohibited by the automatic stay from just doing discovery

1    against USG.  They are prohibited from trying their cases

2    against USG unless they successfully lift the stay motion, and

3    they are claimants who have filed claims against USG prior to

4    going into bankruptcy.

5            Most of the information sought by this

6    questionnaire goes to the specific facts of each individual

7    claim.  For example, name the other defendants you were

8    exposed to.  Well, the law is pretty clear that you can

9    recover from more than one asbestos defendant.  The test is

10   cumulative exposure to asbestos and the test is significant --

11   is a particular exposure a significant contributing cause?

12   And there's expert testimony admitted every day in courtrooms

13   across the country that any identifiable exposure to asbestos

14   can be a significant contributing cause to the claimant's

15   injury.  So once you have some evidence of exposure to USG

16   products, how are they going to have admissible testimony from

17   somebody that says, okay, I've looked at this file and in my

18   view, I'm an expert doctor, I'm an expert industrial

19   hygienist, this guy doesn't have sufficient exposure to USG

20   products to have a valid claim.  Well, the plaintiff doesn't

21   have the opportunity to put on his own expert to counter that.

22   The plaintiff isn't able to do discovery from USG to say,

23   produce a list of every single place where your products were

24   sold that I worked, that I particularly worked at.  The

25   recoveries from other defendants aren't relevant to the claim

1    against USG.

2              It's very typical for a construction worker or for

3    any other type of claimant, for that matter, to be exposed to

4    the products of very many companies.  Think about it from your

5    own personal experience.  If law books were

6    asbestos-containing products and you were asked, identify

7    every different type of law book you were ever exposed to, you

8    can say, I know I worked with West Reporters, I know I worked

9    with Colliers, I know I worked with Lexis.  People filed

10   complaints based on a good faith belief that they were exposed

11   to joint compound if they were a construction worker, but they

12   may not have done the discovery that sort of links that up,

13   therefore, I don't see how individualized discovery into the

14   particulars of each of these 2,000 claims could possibly lead

15   to admissible evidence as to the merits of those claims.

16             Now, they have said in repeated submissions they

17   want to litigate sort of five big issues.  The first of those

18   issues is does chrysotile asbestos cause mesothelioma?  I

19   think that is an issue that does not need the particular type

20   of discovery.  They can put on an expert to say mesothelioma

21   cannot be caused by our type of chrysotile and ACC and FCR can

22   put on experts that say they do.  But once you get beyond that

23   and you start saying, well, was this particular claimant

24   exposed to enough USG asbestos versus this other USG other

25   different product, you're inextricably bound up in evaluating

1    the merits of that particular complaint.  I understand the

2    Court is not doing that.

3              The second issue they want to litigate is can you

4    have lung cancer attributed to asbestos exposure without an

5    underlying diagnosis of asbestosis?  There's medical debate

6    about that.  I think the greater weight of the medical

7    authority is on the side that you can have lung cancer without

8    underlying asbestosis, but the questionnaire says, do you have

9    lung cancer and is there a doctor that says your lung cancer

10   is caused by asbestos exposure?  Also, do you have asbestosis

11   is sufficient for them to make whatever arguments they choose

12   to make based on that fact.

13             The third issue they want to litigate is can any

14   type of other cancer, which is sort of shorthand to

15   gastrointestinal type cancers, be caused by asbestos exposure?

16   Again, that is an issue that can be litigated based solely on

17   the documents in the responses in the questionnaire.

18             The fourth issue is their contention that you need

19   certain levels of pulmonary function tests to have a valid

20   claim and their contention that there are certain doctors who

21   are unreliable.  The questionnaire that we have -- the

22   questionnaire, if the Court were to accept our main

23   objections, the questionnaire that would be left would

24   absolutely allow them to make whatever arguments they choose

25   to make about the credibility of certain doctors, and you

1   don't need to go out and review individually 1,000 x-rays to

2   make those assessments and determinations.  They can say that

3   20 percent of the claimants have an x-ray read by one of the

4   doctors involved in the silicone litigation.  Now, inquiry

5   about whether or not those claimants may go out and get

6   another doctor to read their x-ray, they certainly don't have

7   the opportunity -- they don't have any obligation to put on

8   who was your expert witness against USG right now, but they

9   can make whatever arguments they choose to make based solely

10  on who is the doctor that read your x-ray?  What does your

11  x-ray show?  What are your pulmonary function tests?  The rest

12  of it, I suggest to the Court, is cumulative, not likely to

13  lead to admissible evidence.  And in any sort of discovery

14  issue, it's a balancing test.  Will the additional information

15  be at all helpful or relevant or useful in a global asbestos

16  estimation trial.

17          And finally on the exposure information, Your

18  Honor, it's my view that once you get beyond, do you have

19  evidence of exposure to USG product and describe the type of

20  evidence that you have, you're inextricably caught up in

21  individualized, particularized determinations.  We want you to

22  estimate this claim is not a valid claim.  I don't see how any

23  expert can testify when there has been one side of discovery

24  for the plaintiffs aren't coming in with their own individual

25  experts or their own testimony or the testimony of evidence

1    that the plaintiffs' lawyers would choose to present at a

2    trial.  How could you have admissible testimony about whether

3    or not there's sufficient exposure in that particular case or

4    that group of cases?  That's sort of the basis for my

5    objections on the relevance of other defendant exposure

6    information.

7              And then finally, as to the recoveries from other

8    defendants, what we are estimating here is several share of

9    USG's liability.  The fact that somebody might have collected

10   $100,000 from Owens Corning or $3,000 from Manville and

11   $1 million from a total of 40 defendants says nothing about

12   what is the value of the claim worth against USG.  If we're

13   going to try these cases to judgment, every single one of

14   them, then USG might get a setoff for the amount that

15   plaintiffs have collected by settlement or judgment from other

16   defendants, but that's not what we are doing here.  There's no

17   sort of absolute value for an asbestos personal injury claim.

18   Unless the USG proposes to use some kind of judgment average

19   by taking a sample of cases to judgment, the ones that are

20   indisputable product ID and indisputable mesothelioma, then

21   evidence from other people is irrelevant because these cases,

22   90 percent of them settle, they settle historically,

23   regardless of whether USG is backing the tort system or

24   whether it is a trust that is defending them.  There is not

25   enough courtroom time in every court in the United States to

1  hear them all.  I submit that other settlement information is

2  totally irrelevant to the estimate of liability here.  Can't

3  possibly be.  It's oftentimes never discoverable, even if the

4  case goes to verdict.

5          THE COURT:  Your position would be that if a

6  company is going to settle a claim, that it would not have

7  inquired about if there's been other settlements in that claim

8  and then factor that in in terms of the value that they might

9  be offering, as well as the other party?

10         MR. FINCH:  It wouldn't have the right to get that

11 discovery.  At most, if there was a judgment, it would be

12 entitled to know what is the total aggregate amount of

13 settlements you have gotten from other defendants, then set

14 that off against the judgment.  But in settling the cases, it

15 is very, very rare that courts would permit one defendant to

16 learn in discovery all the settlements the plaintiff has

17 recovered from other defendants.  A typical settlement

18 agreement contains confidentiality agreements that prohibit

19 that.  Indeed, many USG agreements have provisions like that.

20 And in evaluating the liability, the Court has to remember

21 that each company is paying its own several share, they don't

22 get together and know with perfect knowledge what someone has

23 recovered from everybody -- everyone else.  I submit that has

24 no bearing at all on the estimation of USG's liability here.

25         If you want to go through sort of objection by

1  objection, I think now is the time to do it, but I wanted to

2  make sure you understood our basic position on why the

3  information we object to is not relevant.  What you're talking

4  about is a global estimation or estimation of the life size of

5  liability in the aggregate.  If it were going to estimate

6  2,000 cases one by one, then it's a totally different ball

7  game.  I think you have to allow the claimants to do

8  individual discovery against USG, you have to give them a much

9  longer time frame to do that discovery, and then you would sit

10  here and say, individually evaluate 2,000 cases.

11          THE COURT:  My understanding of this questionnaire,

12  the use that it's going to be put to is that the debtor has

13  experts, it has sampling, it's going to input this data and

14  based on the data that is received, it's going to come up with

15  an estimation that it's going to present to this Court.  And

16  then the debtor is then going to try to convince this Court

17  through expert testimony that the sampling was valid as to

18  whatever the range would be.  But it would not require this

19  Court to go through each of the 1,000 or 2,000 claims that are

20  going to be reviewed and make a determination on a

21  claim-by-claim basis.  It's going to be in the aggregate and

22  it's likely to be that there's going to be some range that

23  would be reflected.  But that's a decision I cannot make in

24  terms of whether it's going to be accepted by the Court, or if

25  it is accepted, whether it's going to be in full weight, less

1   weight, minimum weight.  You have a lot of arguments that

2   might go to the weight as opposed to whether the evidence

3   itself would be admissible.  And in discovery, my philosophy

4   of discovery is that relevancy is in the eye of the beholder,

5   to one side it's absolutely irrelevant and to the other side

6   it is relevant.  And in discovery, the one who wants it is the

7   one that I generally favor in terms of the relevancy argument.

8   So I have a very broad view of relevancy because if I

9   constrict relevancy, it may impede the ability of one party or

10  the other to have an opportunity, fair opportunity to present

11  their case to the Court.

12          So, with that in mind, I am going to permit the

13  questionnaire.  I am going to permit an inquiry and an

14  obtaining of documents that you feel would not be relevant.

15  But the relevancy here, I'm going to go in favor of the debtor

16  who is seeking the information.

17          That doesn't mean I'm going to permit everything.

18  We need to go through some of these things and look at each

19  one of them.

20          MR. FINCH:  There are my relevance objections, Your

21  Honor, but there's also a burden objection.  It's not a burden

22  on the individual claimant objection I'm raising, it is a

23  burden on the parties to the estimation proceeding which is

24  that proceeding -- it is one thing for them to do a sample of

25  2,000 claimants and get certain information, but once they

1  start asking for certain categories of additional documents,

2  like every potential co-worker deposition that might be

3  relevant to a particular claim, I mean plaintiff lawyers

4  haven't decided what evidence they would put on against USG in

5  a trial, they have no obligation to do so unless and until the

6  Court lifts the stay and says you have a trial date of such

7  and such a time and you have to go prove up your case.

8  Typically, they would decide what evidence they're going to

9  put on as to exposure when they have a discovery schedule that

10  says you have to produce that evidence.

11            THE COURT:  The problem that you have, if you look

12  at -- go back to the case, you have claimants who have filed

13  claims in this case, the bankruptcy case, they've put their

14  physical circumstances at issue.  If they were going to be

15  proceeding, this is the very type of information that the

16  debtor would be able to get in discovery.  It doesn't matter

17  that it's going to be admissible or not admissible.  It's a

18  question of getting information in discovery so that they can

19  make some assessments, whether it's ultimately admissible or

20  not admissible is not the question.

21            MR. FINCH:  But it's one side of discovery.  The

22  discovery, the debtors are taking discovery from the

23  plaintiffs and they're not allowing the plaintiffs to take the

24  reciprocal discovery from them where each plaintiff would

25  serve the debtor would document requests and interrogatories

1   that relate to that particular guy's work history, where he

2   might have been exposed to their products.  That, as I

3   understand, is not what the Court is allowing to go on here.

4   Because, otherwise, you're talking about --

5           THE COURT:  If you want to look at some of those

6   things, you're free to look at it.

7           MR. FINCH:  The committee and the FCR will look at

8   that type of thing --

9           THE COURT:  It's just looking at it in general.

10  What I want to say is this is not something where I'm going to

11  go and say for each claim -- estimate each particular claim.

12  What I'm going to do is look at the claims in general.  There

13  are going to be certain assessments that will be made by the

14  experts relative to that type of information that has been

15  obtained.  I'm going to look at that and then make a

16  determination whether it's valid; if it is valid, how much

17  weight should it be given.

18          MR. FINCH:  But the experts will have inevitably

19  been basing their opinion on judgments about what happened for

20  each individual claim, and I believe that can't possibly be

21  admissible unless the other side, i.e., the plaintiffs have

22  produced their expert reports and have produced to the spirit

23  what would be required -- what they would put on at trial, and

24  that's not permitted here, so, therefore, I don't see how this

25  can lead to admissible evidence.  I understand your views on

1    relevance and discovery.  We will make these --

2              THE COURT:  We need to move on because I've made my

3    decision.  I've heard your argument and we'll move on because

4    I think we're going back over the same issues.  I think what

5    we need to do is spend what time we have so that we can

6    finalize the form of the questionnaire.  The issues that you

7    raised I'll certainly entertain at the appropriate time

8    because it is either going to go to whether or not the process

9    is flawed and not permissible or go to the weight.  So I'm not

10   saying that I'm not going to hear your arguments, it's just I

11   think that issues you're raising we've already been over and

12   I've resolved, so we're going to move forward with the

13   questionnaire.

14             MR. FINCH:  A question by question analysis.

15             MR. DEVEREAUX:  The first one I have is question

16   No. 6 on the questionnaire on Page 2.

17             THE COURT:  What is the difference as to that

18   paragraph between the parties on Page 2?

19             MR. DEVEREAUX:  In Instruction 6, we're obviously

20   asking for medical records, and we've pared it down in a way

21   that I had identified earlier.  Almost nothing from meso

22   claims, but for a diagnosis for the cancer claims only those

23   physical exams, we'll take A.  As to the cancer claimants, we

24   ask for the lab results and diagnostic tests and medical

25   information related to their diagnosis.  And then for part C,

1  the nonmalignants, we ask for the records related to their

2  diagnosis.

3          I think what the ACC proposes is that we be given,

4  if anything, that what we be given is not the x-ray but simply

5  the reading of the x-ray where their mass screener or whomever

6  has filled out and say I saw an x-ray rated 1-0.  We don't get

7  the underlying information so that we can say, we don't think

8  that was a very good reading as a whole and sort of point out

9  the problems with the mass screening that goes on.  So, I

10  think that the primary differences --

11          THE COURT:  I'm going to permit the x-rays to be

12  produced.  There are a lot of other things that are being

13  requested there.  I guess we need to go through each one of

14  those.  I think the x-rays are something that need to be

15  produced.

16          MR. FINCH:  For the nonrelated claimants?

17          THE COURT:  Right.

18          MR. FINCH:  Let me start with the cancer claimants.

19  The way this is worded, it requires them to submit copies of

20  any and all physical exam results, pathology reports and

21  diagnostic tests or reports that support or conflict with

22  alleged diagnosis.

23          Any time I see the words "any and all" of anything,

24  I immediately think overbreadth and unlikely to lead to

25  admissible evidence.  What if what they're looking for is a

1  statement of diagnosis and pathology report that says that

2  this person has lung cancer and there's another diagnosis that

3  says that it's somehow inconsistent with that, then I think

4  that given the Court's parameters on the earlier ruling, I

5  think that's acceptable, but once you start saying any and all

6  pathology reports that support your diagnosis, I mean, or any

7  and all physical exam results that support your diagnosis, the

8  cancer claimant might go to the doctor 20 times on physical

9  exam in the course of a year.  Surely they're not asking for

10  every single physical exam the doctor has made because that

11  arguably supports their diagnosis every time they go back to

12  the doctor.  If what they're looking for is just documents

13  sufficient to show that you have a diagnosis of cancer and

14  what type of cancer it is, then I think that would be

15  permissible.  But for a typical cancer claim, you might have

16  boxes and boxes of medical records that are arguably in

17  support of your diagnosis.  I don't really think that's what

18  Mr. Devereaux is looking for here.  Perhaps it's just a

19  question of language choice.  So that's my position on part B.

20         I can get to part C after Mr. Devereaux responds.

21         MR. DEVEREAUX:  We don't say that aren't consistent

22  with the diagnosis.  By support what we mean is the things

23  that the doctor relied upon when he made the diagnosis.  Yes,

24  he takes an x-ray every six months for the next few years and

25  sees some remnants of the tumor, I guess that would or could

38

1    be consistent with his diagnosis, but it doesn't support the

2    additional diagnosis, and that's what we obviously are looking

3    for, the records that the doctor relied on and that support

4    the diagnosis of the cancer claimed.

5            MR. FINCH:  I would suggest the language say that,

6    that the records that the doctor relied upon in making the

7    diagnosis.

8            THE COURT:  I think that's a good suggestion.  That

9    will be a clarification.

10            MR. DEVEREAUX:  That's fine.

11            MR. FINCH:  I think the same sort of --

12            THE COURT:  "Conflict with" has to stay in, if

13    there's something in the record that has to conflict with that

14    diagnosis.

15            MR. FINCH:  If there's something -- if there was

16    another medical report in the file that this person suddenly

17    doesn't have cancer, then, yes, I agree that would be

18    relevant.  But I'm not sure what any and all records that

19    conflict with the alleged diagnosis would mean.  There has to

20    be some sort of principle to that.

21            MR. DEVEREAUX:  Regarding the potential cause of

22    the alleged diagnosis, obviously, our view is that lung

23    cancers, in the absence of asbestosis, are not asbestos

24    induced, and so we'll want chest x-ray and any indications

25    that spirometry or other sort of pulmonary function tests were

1    done which show or don't show --

2           THE COURT:  They may not think it conflicts with

3    their diagnosis, so you may not be getting what you want, if

4    that's the case.  Then what you should put in is what you're

5    looking for would be the chest x-rays.  You need to be

6    specific about what you want because if I'm the recipient of

7    this, and I believe that your theory is incorrect and that

8    that's not a conflict, then you're not going to get any of

9    that.

10          MR. FINCH:  Your Honor, there is a question that

11   asks about asbestosis.  The typical lung cancer claim might

12   have multiple x-rays, so the real issue is do they allege that

13   they also have asbestosis?  If the answer to that is no, then

14   I don't think you need x-rays from lung cancer.

15          MR. DEVEREAUX:  If the answer is no, I agree.

16          THE COURT:  How do we clarify that here then?

17          Let's move on.  We'll come back and let you work on

18   this when we take our break.  You can meet and confer and

19   we'll come up with language so you can get what you need

20   without creating confusion.

21          MR. FINCH:  On part C, I think, again, it should be

22   limited to records on which the doctor relied to make the

23   diagnosis, not anything that supports or otherwise relates to

24   the alleged diagnosis.

25          MR. DEVEREAUX:  Well, we've asked for a specific

1  set of records here.

2          THE COURT:  You say "including but not limited to."

3  You want to limit it to those?  I think you have to be

4  specific in a sense because if you say "otherwise relate to

5  the alleged diagnosis," you are going to get every treatment

6  note by any physician that may have seen this person.

7          MR. DEVEREAUX:  What if we say "support" or

8  "conflict with"?

9          THE COURT:  What would be relied upon?  The same

10  language you had before, and the "conflict with."  I think

11  what we said in Paragraph B, we're going to have some

12  specifics about what types of records you want, so I think if

13  you're specific and if your experts have looked at this and

14  say, if you see these, we'll be able to make the assessment

15  you need, that's what we should have for this purpose.

16          MR. DEVEREAUX:  That are relied upon or conflict

17  with the alleged diagnosis, including but not limited to --

18          THE COURT:  You're going to work with the "conflict

19  with."  I thought what we were going to do was not go with the

20  word conflict because that's something that is judgmental, but

21  you're going to have a specific report or statement from a

22  doctor that you want.

23          MR. FINCH:  Your Honor --

24          THE COURT:  Am I not understanding that correctly?

25          MR. FINCH:  I hate to agree with Mr. Devereaux on

1  lots of things, but on this one, I think if you start trying

2  to define it in too much detail, it sort of breaks down the

3  process.  Perhaps the best we can do is documents upon which

4  you relied for your diagnosis or which conflict with the

5  diagnosis, and leave it at that.

6            MR. DEVEREAUX:  Well, including but not limited to.

7            MR. FINCH:  Including but not limited to that sort

8  of material.

9            THE COURT:  All right.  Then we'll go on with that.

10           Are we done with Paragraph C?

11           MR. FINCH:  I believe it is likely that may be

12 subject to objections from people who are required to submit

13 x-rays on burden or viability grounds, but I won't know until

14 I know who gets the questionnaires, how easy it is for them to

15 access the x-rays.  If they are already in possession of

16 another defendant they're going to trial against in state

17 court in California, then it may not be available to USG, so

18 that's an individualized, particularized call that I'm not in

19 a position to make.

20           THE COURT:  They'll have to contact the debtors'

21 counsel and say what they can produce and what they can't

22 produce, and if there's a disagreement, then we'll have to

23 come here.  Hopefully, most of them will be worked out.  If

24 it's not something that is possible to produce, or if there's

25 a financial burden, you have to work out the financial

42

1    ramifications of getting that information.

2              Paragraph 7.

3              MR. DEVEREAUX:  We ask if the injured party or

4    personal representative of claimant has responded to

5    interrogatories or given a deposition, we ask that it be

6    produced.

7              THE COURT:  You're going to pay for this?

8              MR. DEVEREAUX:  Correct.

9              MR. FINCH:  We don't object.  Given the Court's

10   ruling on the documents, if they're interrogatories or

11   depositions, as long as the debtor is going to pay people to

12   copy that, we don't object.

13             THE COURT:  Is it clear where it says that they

14   will be paid for?

15             MR. DEVEREAUX:  In No. 10, which we talked about

16   earlier about making photocopies, Instruction 10.

17             THE COURT:  You may want to cross reference that

18   where you maybe highlight in bold some of the information in

19   No. 10.

20             MR. DEVEREAUX:  We'll do that.

21             Instruction No. 8 relates to situations where the

22   claimant says -- we ask specifically, do you rely upon

23   testimony of a co-worker in order to identify US Gypsum's

24   products as to ones which you were exposed.  If they answer

25   that question yes, and we ask for that co-worker's

1  deposition --

2         MR. FINCH:  Your Honor, this gets into an area I

3  was highlighting earlier.  The plaintiff's counsel may not

4  have decided what evidence he would put on as to USG exposure

5  and, therefore, there should be a box that says "have not

6  decided" or "don't know yet" on the questionnaire as to

7  whether or not they're going to rely -- if they say yes, I'm

8  going to rely on co-worker and it's John Smith.

9         THE COURT:  That's what I think this is asking for.

10         MR. FINCH:  There has to be an instruction or

11  provision that says, if you haven't made that determination,

12  so state.

13         MR. DEVEREAUX:  Well, they sued US Gypsum, so they

14  had some basis, and what we ask is, are you relying on

15  personal recollection, or are you relying on other bases?  And

16  then we ask specifically, because this was part of the meet

17  and confer, do you claim to rely on a co-worker?  If that's

18  the basis --

19         THE COURT:  They have to make a determination if

20  they're going to rely on a co-worker or not.  If they can't

21  make it, then they'll have to contact the debtors and they'll

22  have to resolve that on an individual basis.

23         MR. FINCH:  Your Honor, I guess --

24         THE COURT:  In any discovery in federal court, if

25  you are complying with Rule 26, you have to identify any

1  person that may have evidence relevant to your claim, which

2  would require you to identify a co-worker, if you believe that

3  co-worker had information that was going to support your

4  claim, so it's really no different than asking for that type

5  of thing.

6           MR. FINCH:  Discovery from USG or other sources,

7  you may not have that information.  The person may have come

8  in --

9           THE COURT:  If they don't have it, they don't have

10  it.  This is not a merits determination on their particular

11  claim, and if you believe that because of the time frame of

12  the relevant claim that that may have been produced, that they

13  won't have obtained that at that point in time, that will go

14  to whether the sampling is flawed and/or go to the weight.

15           MR. FINCH:  The weight of the admissibility; so

16  people can say, I have not made that determination yet?

17           THE COURT:  You can ask them that on your side and

18  then attack the same plan and the responses for that purpose.

19  But if they're relying on somebody, they have to disclose that

20  person.  And if that person has been deposed, they'll have to

21  produce the deposition, subject to the debtor paying the cost

22  of the copying.

23           I think that's it, with the one clarification that

24  you're going to make on Paragraph 10.

25           Now, there is a need for confidentiality of the

1    Social Security number and the courts have been very careful

2    about protecting those personal identifiers.  So I would like

3    on part one, I think it comes up again later in the

4    questionnaire, to put an asterisk by the Social Security

5    number and note on the form that this information will be held

6    in strict confidence by the debtor and any party to whom it is

7    disclosed.  And there's going to have to be a confidentiality

8    agreement that is acceptable to the parties and presented to

9    the Court.  But I do want the claimants to know if they're

10   filling this out, that information is going to be held

11   confidential.

12           MR. DEVEREAUX:  We'll do that, Your Honor.

13           THE COURT:  I don't know that any of the other

14   information rises to the level of needing that type of

15   protection.

16           MR. FINCH:  The Social Security work history would,

17   Your Honor.

18           THE COURT:  Yes, that would, too, you're correct.

19           MR. FINCH:  The confidentiality order has to

20   provide that to the extent that this type of information is

21   submitted to parties, the parties can only use it for purposes

22   of this bankruptcy case and can't use it for purposes of any

23   other case or for general purposes.  I mean some of the

24   parties to this bankruptcy case are large commercial

25   institutions which I'm sure would love to get lists of people

1  with Social Security numbers to send all kinds of junk mail

2  to, if for nothing else, so there has to be some kind of

3  limited order in place.

4          MR. DEVEREAUX:  During the meet and confer, we

5  discussed this and all parties agreed that they wanted an

6  onerous confidential provision.  It is something that would be

7  absolutely ironclad.

8          THE COURT:  I don't want this to go out until the

9  confidentiality is agreed to.  When will you have that?  Do

10  you want to send this out on October 20th?  I'm going to need

11  that confidentiality agreement here early next week.

12          MR. DEVEREAUX:  I can promise a draft early next

13  week.  I can't promise an agreement.  There have been four

14  months we have been working on one substantive consolidation

15  case before Judge Fitzgerald.

16          THE COURT:  It's going to come out one way or the

17  other very quickly, so you're going to have to have that draft

18  of the confidentiality agreement to the other parties by the

19  11th of October, which is next Tuesday.  It's after the

20  holiday.  You're going to have to meet and confer on that.  If

21  you can all agree on that, I need to have it filed with this

22  Court by October 14th.  And if you can't agree, we'll have to

23  have a conference on whatever the draft is at that stage and

24  if you have dual drafts, I'll pick one of them.

25          MR. FINCH:  May I suggest that we -- I think we'd