1  likely be able to agree on that, but it sort of shortened the

2  time frame.  If parties aren't able to agree by the 14th, that

3  we just submit each side's version of a draft confidentiality

4  agreement and the Court can either decide for itself or can

5  have a short telephonic hearing as to which one is preferable.

6           THE COURT:  I'm just going to make a decision.

7           MR. FINCH:  We would submit -- if we can't agree by

8  the 14th, then the ACC and FCR will submit their version.

9           THE COURT:  I'm going to pick one or the other.

10 Take your best shot at what you feel you need and if you're

11 wrong, I'll pick the other one, but it just gets too

12 cumbersome.  You can go on forever and deal with these issues.

13 I'll make a judgment.  I'll look at both sides.  Hopefully,

14 you'll agree.  Confidentiality is not something that is meant

15 to be overly onerous, and if a party is receiving confidential

16 information, clearly, you have to have a way to protect it.

17 And if it needs to be disclosed, you come back to court.  If

18 somebody wants to disclose it outside of the confidentiality

19 parameters, they come back to court.

20           MS. PARVER:  Your Honor, just a question for

21 clarification.  The draft orders or the proposed orders that

22 you are envisioning, are they an overall confidentiality order

23 which may or may not contain special provisions for Social

24 Security and earnings information, or are you just envisioning

25 before it goes out that the special --

1          THE COURT:  It's going to be specific to the

2    information being obtained to the questionnaire.  Ultimately,

3    there may be another confidentiality that may cover other

4    things, but I want this information protected before that

5    questionnaire goes out.

6          MS. PARVER:  Thank you, Your Honor.

7          THE COURT:  So it's just really whatever needs to

8    be confidential as to this document.  Hopefully, you can agree

9    on it.  It doesn't seem to me that it's something that should

10   be of great dispute between the parties.

11         MR. DEVEREAUX:  We'll certainly do that, Your

12   Honor.

13         THE COURT:  Okay.

14         I think we need to take a break now.  We're going

15   to come back.  I have part two, Paragraph 9, 10, 11, 12 --

16   what I would like you to do, you're going to be meeting and

17   conferring, just make sure on that other language that we've

18   talked about that everybody has.  And I understand people

19   still have objections, but having heard my ruling on what

20   would be permissible, preserve your objections to the

21   questionnaire, but if you can agree that the language reflects

22   what the Court has ordered, that's what I would be expecting

23   you to come back with.  So we're going to take a break for 45

24   minutes and then we'll be back and we'll have one hour left to

25   go through this.

1      (Whereupon, there was a brief recess in the proceedings.)

2          THE COURT:  I'm going to ask that each person when

3   you speak, slow down because I think as you start to talk, it

4   gets faster and it's makes it almost impossible for the court

5   reporter to make an accurate record.  So, please, go slowly.

6   If the court reporter has any difficulty, just make a signal

7   and then we'll know that you've got to slow down.

8          MR. DEVEREAUX:  I will, Your Honor.  I will ask her

9   to do that.  It will help me as well.

10          So, over the lunch hour, Your Honor, we did craft

11  during the meet and confer some language as to Instructions 6B

12  and 6C that I think will meet some of the concerns that the

13  ACC had expressed and that Your Honor expressed.  I can read

14  that into the record.

15          THE COURT:  Why don't you do that.

16          MR. DEVEREAUX:  6B will now read:  If in Part 2 you

17  state that the injured party has been diagnosed with lung

18  cancer or other cancer, submit originals of the most recent

19  radiographic evaluation, such as, x-ray or CT scan, taken

20  before the filing of your claim, and copies of any and all

21  medical records that were relied upon or conflict with the

22  alleged diagnosis, including but not limited to: -- and then

23  the same list Your Honor -- the bullet points that appear

24  under C.

25          6C in the instruction section will read:  If in

1  Part 2 you state that the injured party has been diagnosed

2  with pleural plaques, diffuse pleural thickening, asbestosis

3  or any other nonmalignant asbestos-related condition, submit

4  originals of the most recent radiographic evaluation, such as,

5  x-ray or CT scan taken before the filing of your claim, and

6  copies of any and all medical reports and records that were

7  relied upon or conflict with the alleged diagnosis, including

8  but not limited to:  -- and then the same list of subparts.

9          THE COURT:  Okay.

10          MR. DEVEREAUX:  That, I think returns us to Part

11  2.9A, Your Honor.

12          THE COURT:  Yes.

13          MR. DEVEREAUX:  2.9A certainly can't be argued to

14  be burdensome.  It's one box that asks if they were diagnosed

15  with any of the particular lung conditions that we list in

16  that section.

17          The ACC's argument is they have nothing to do with

18  asbestos diseases.  Experts that we talked to say, yes, they

19  do.  For example, congestive heart failure is fluid in the

20  lining of the lungs that on x-ray can mean staging for an

21  asbestotic condition.  That's what our experts say.  Another

22  expert's estimation says our experts are wrong, but as far as

23  potentially developing admissible evidence in a nonburdensome

24  way, I don't see the objection.

25

1          MR. FINCH:  Your Honor, the objection is not as to

2   burden.  It is as to except for idiopathic pulmonary fibrosis

3   and silicosis, none of the other diseases are inconsistent

4   with the diagnosis of asbestosis.  I agree with Mr. Devereaux

5   that in evaluating an individual particular claim, a doctor

6   might -- you might use the fact that someone has asthma or

7   pneumonia or COPD, chronic obstructive pulmonary disease, in

8   challenging the credibility of the plaintiff's doctor's

9   diagnosis, but it, again, is the type of individualized,

10  particularized inquiry that I don't think leads to admissible

11  evidence for the purpose of a global estimation.

12          MR. DEVEREAUX:  That's an argument.

13          THE COURT:  I've already determined that the party

14  that's requesting the information is going to get a fair

15  chance to get what they believe is relevant, unless it doesn't

16  bear any relationship whatsoever to the matter at hand.  And I

17  think, particularly, because part B asks to identify the lung

18  condition, if you're correct that several of these don't

19  apply, you'll be able to bring that to the Court's attention

20  if they're going to try to rely on a response to this question

21  in assessing the estimation.  So that would be permitted.

22          No. 10.

23          MR. FINCH:  I think 2.10 through 2.12 were subsumed

24  by the Court's prior ruling.  I think you understand my

25  objection, but I understand I have been overruled.

52

1          THE COURT:  What is the next one that the Court

2   would make a ruling on?

3          MR. DEVEREAUX:  Part 3, Smoking History of the

4   Injured Party found on Page 10 of the questionnaire.  This has

5   been approved in the Grace case, for obvious good reasoning.

6   Smoking is by far the largest cause of lung cancer in this

7   country.  If someone has been a smoker, it impacts both an

8   analysis of causation and the evaluation of the claim.

9          The smoking is also the largest cause of -- one of

10   the single largest causes of nonmalignant lung disease.  In

11   the ACC's objection, they say, quote, smoking is irrelevant to

12   causation for mesothelioma and nonmalignant asbestos diseases.

13   We agree on mesothelioma, and that's why the instruction to

14   the question says if you're a mesothelioma claimant, don't

15   fill this out.

16          For the nonmalignant asbestos diseases, nothing

17   could be further in the truth.  Smoking causes all sorts of

18   lung problems that aren't cancer in and of themselves.  So,

19   smoking is obviously a huge issue for us to know about, as are

20   the use of cigars, pipes and smokeless tobacco.  We will and

21   have in the past, Your Honor, had claims of laryngeal and

22   upper GI tract cancers that will be part of this estimation as

23   well.  Cigars, pipes, smokeless tobacco are also causes of

24   those.  It's information that clearly we can and would want to

25   develop for our expert estimation case.

1          MR. FINCH:  Your Honor, I continue to stand on my

2 objection, but believe it is likely been overruled.

3          THE COURT:  It has.  But it will be reflected on

4 the record that you did object.

5          The next thing is product exposed to, Page 11.

6          MR. DEVEREAUX:  I believe 4.3, Mr. Finch did talk

7 about issues that the Court's prior indications have

8 already -- prior rulings have already addressed.  I think 4.3

9 was one of them.

10          MR. FINCH:  That's correct.  I stand on the earlier

11 objection, but understood to have been overruled as to the

12 4.3.

13          THE COURT:  Thank you.

14          MR. DEVEREAUX:  So the next then, Your Honor, is

15 4.7A and B on Page 12.  This relates to a particular set of

16 questions regarding the exposure, the types of exposure and

17 frequency of exposure that a claimant would have or claims to

18 have experienced.

19          What it does, this entire questionnaire, we've

20 tried to make it, to the extent it can be, a box-checking

21 exercise so that it is easy both to input analyze and can't

22 lead to lots of debates as to what people did or didn't mean

23 when they wrote things.  And there are different levels of

24 exposure, who worked directly with a US Gypsum product as

25 opposed to people who never worked with the product but were

1    at a building site where the product was in use.  And that is

2    the disjunctive choice, A, B, C or D, that has made -- is made

3    in the exposure type.  And then we ask them to tell us the

4    range of dates for exposure and the frequency of exposure.

5    And Mr. Finch at the break showed me a Manville claim form

6    that I think he's going to propose at least part of as a

7    substitute for this.  I haven't had a chance to look at it and

8    don't have a copy up here with me, but the one thing I do note

9    is the Manville claim form uses the exact same approach of a

10    disjunctive description of are you the person who worked

11    directly with it, or were you next to somebody, and so it's

12    sort of something plaintiffs' lawyers are familiar with as a

13    way of gathering information.

14         MR. FINCH:  My only objection to this section, Your

15    Honor, is that the frequency of exposure during the date

16    ranges, days per month, hours per day, I would suggest there

17    should also be a box that says "unknown" because if you think

18    about the typical worker, he may well recall working with

19    Durabond, which is USG's most common asbestos joint compound,

20    he may say, well, I know I worked with this over the course of

21    my career, but to try to estimate how many hours per day and

22    days per month is impossible.  And one proper response in

23    interrogatory answers is I don't know, or I don't recall, but

24    I do know I'm certain I worked with Durabond, I worked with it

25    fairly frequently, I was in close proximity to it, but to

1   break it down to days per month and hours per day, I don't

2   think -- without having something that allows people to say I

3   don't know, it's a problem.

4           MR. DEVEREAUX:  Your Honor, I appreciate the issue.

5   I guess that I would propose then to insert an instruction,

6   like you would do in such a deposition where you would say

7   that the debtor is entitled to your best estimate, if you are

8   unable to provide an estimate, then you can check "don't

9   know."  I don't want to make it a situation where just because

10  it's easy, people check a box.

11          THE COURT:  I think what you could do is you could

12  have another box there that would say "other" and under it

13  say, estimate aggregate exposure.  I think you can either do

14  it by hours or days.

15          MR. DEVEREAUX:  We'll do that, Your Honor.

16          THE COURT:  Then they can just write in the number.

17          MR. DEVEREAUX:  I think that takes us on the same

18  page to 4.8:  Description of injured party's job duties.  It's

19  not asking for any lengthy recitation of what they did and I

20  think the objection is it's -- to use occupational codes, some

21  occupational codes do give you quite a precise idea of what

22  people did, some aren't so.  If someone was a laborer, you're

23  not exactly sure if they were laboring, loading and unloading

24  bags of asbestos, if they were laboring sweeping up after

25  construction crews, or in some other way, so it's not a

1   burdensome question.  It may, in fact, add and will add

2   additional information that will be helpful and for that

3   reason, we don't believe it is duplicative.

4           MR. FINCH:  Your Honor, with that explanation at

5   least I would withdraw the objection Section 4.8.

6           This sort of actually raises an issue as to the

7   questionnaire.  The box there is not particularly large.  One

8   of the things that I think should be required in the order is

9   that people can take this questionnaire and create it

10  electronically so if they need to type in more information or

11  they can cross reference the deposition or interrogatory, they

12  are going to have the space to do it.  I don't think

13  Mr. Devereaux is suggesting people can fill this out in pen

14  and ink.  So they can type it in so they can submit to Rust

15  something that is more user friendly.

16          THE COURT:  You can put an asterisk, or it should

17  go in the instructions to say, if there's insufficient space

18  to complete an answer, please attach an addendum page.

19          MR. FINCH:  What I'm getting at --

20          THE COURT:  I understand.  But if it's done

21  electronically, then you wouldn't need to do that because it

22  would just open it up.

23          MR. FINCH:  It will make it bigger.  Because I

24  think that in terms of obligations of a party responding to

25  discovery, there's no difference between sending it in hard

57

1   copy --

2           THE COURT:  I would assume they would want to send

3   it electronically.

4           MR. FINCH:  Yes, if that's possible.  If you think

5   about it, the average file might be a foot thick of paper,

6   it's interrogatory answers, depositions, some medical records

7   and the questionnaire, it will be less, I think, burdensome on

8   everyone if instead of having to copy a foot thick of stuff to

9   mail it to Rust, if people would submit the electronic

10  equivalent of that on a CD-Rom, the order needs to reflect

11  that.

12          THE COURT:  Can you put that in the instructions?

13          MR. DEVEREAUX:  We can, Your Honor.

14          MR. FINCH:  So people can take the questionnaire,

15  copy it electronically and then electronically attach whatever

16  documents they wish.

17          THE COURT:  You need something in the instructions

18  to say if you have received this electronically -- they can't

19  send it to somebody if they don't have the electronic address

20  to send it.

21          MR. FINCH:  They can send it into Rust in one of

22  two ways, Rust may or may not be capable --

23          THE COURT:  I'm talking about getting it to them.

24          MR. FINCH:  Getting it to the claimants; they can

25  send either a hard copy to claimants, or if the claimants got

58

1    something like this, they could scan it and create the

2    electronic version of the document, send back electronic

3    documents either to hard copy form, or I would suggest in

4    electronic form, if that's what they wanted to do as well.

5    The issue is making it so that whatever is the most user

6    friendly for both the plaintiff law firms and for Rust --

7            THE COURT:  I think coming in digitally,

8    electronically would be easier for everyone.

9            MR. DEVEREAUX:  That would be great.

10            THE COURT:  Why don't you create an instruction

11    that says, if you have the electronic means, you must submit

12    this form electronically, give the address where you want it

13    to go, except for I think it would be the x-rays you can't

14    send in that way, or maybe you can today, if they're

15    maintained --

16            MR. FINCH:  I don't know the answer to that.

17            MR. DEVEREAUX:  If they're digital, they can.

18            MR. FINCH:  The rest of it -- I think for quality

19    control purposes, Rust should send a hard copy, how many

20    questionnaires to each -- let's say a law firm has 20 of these

21    to fill out, Rust should send a hard copy, if the law firm

22    says, hey, can you send it to me electronically, Rust should

23    do that.

24            THE COURT:  I think what we should do is we should

25    have them send a disk with the questionnaire on it.

1          MR. DEVEREAUX:  What I was going to propose, Your

2     Honor, I have to talk to them, you can simply put in the

3     instruction a link, if you would like to access this

4     questionnaire electronically, log onto rust.com and there it

5     is on the USG, the questionnaire.  I'm not the most technical

6     person in the world, but I think something like that is

7     probably well within their means.

8          THE COURT:  That would be good.

9          MR. FINCH:  As long as it's clear to people if they

10     want to, they can send it back to Rust on a CD-Rom.

11          THE COURT:  Or electronically.  Talk with Rust and

12     see what is the best way to approach this and then put in an

13     instruction as to how they can file it electronically.

14          MR. DEVEREAUX:  I will, Your Honor.

15          MR. FINCH:  My fear if you say they only have to

16     submit it electronically, A, some plaintiff law firms may not

17     be as technologically --

18          THE COURT:  I didn't say that.  I said if they

19     wanted to, they could send it in electronically.

20          MR. FINCH:  Thank you, Your Honor.

21          MR. DEVEREAUX:  The next item that remains in

22     dispute is 4.10, again, on Page 12 of the questionnaire.

23          This asks for those individuals who worked in

24     construction, the percentage of time that they worked in

25     commercial --

1           THE COURT:  What would be the relevance of this?

2           MR. DEVEREAUX:  The expert will tell you that tasks

3   are sequenced in commercial and residential so the foundation,

4   the framing, they actually go in in different sequences and

5   the likelihood of percentage overlap -- so, for example, one

6   of our major asbestos-containing products is joint compound,

7   and there's a question of what trades could or would be in

8   proximity to those operations when they're going on.  It's a

9   slightly different answer if it's residential or commercial,

10  and that's why it's relevant.

11          THE COURT:  Is it only relevant for that one

12  product?

13          MR. DEVEREAUX:  No.  No.  Any construction product.

14  Any construction product.

15          MR. FINCH:  Your Honor, again, I think this is an

16  objection which may have been subsumed by the Court's earlier

17  ruling, but it is such a particularized inquiry.

18          THE COURT:  Why don't you say "estimate" the

19  percentage of time.

20          MR. DEVEREAUX:  Next is an objection related to I

21  guess Part 5 of the questionnaire and this is a request in

22  form or format asking the claimants to identify other

23  nondebtor asbestos-containing products that they were exposed

24  to.  And the need for this information, which has also been

25  approved in the Grace case, is being collected by the

1  claimants in any event and is part of standard discovery in

2  every personal injury asbestos case is -- I would say almost

3  obvious, that if to the extent claimants have spent a lifetime

4  exposed to other non-USG products and come in making a claim

5  in this bankruptcy, and do so reporting a history of exposure

6  to US Gypsum products that involves home remodeling that they

7  did in 1967, there are very good grounds both for

8  apportionment of damages and a termination of the aggregate

9  liabilities for those types of claims as to whether or not

10  US Gypsum under that kind of scenario, how many of those

11  scenarios do we find out of 2,000, whether or not they, in

12  fact, are substantial factors in a legal sense.  And so that

13  is the basis on which we request information.

14         MR. FINCH:  Your Honor, again, the fact that a

15  claimant may have been exposed to other defendants' products

16  or even primarily to other defendants' products is not a

17  defense for USG.  And I still think it's impossible for any

18  expert to offer admissible testimony that, well, this

19  particular plaintiff because he was exposed to Manville

20  products for 20 years and USG products for ten days doesn't

21  have a valid claim against USG and I don't --

22         THE COURT:  I think it goes to the validity of the

23  claim, maybe to the value of the claim.  I'm not here to say

24  claimant A has no valid claim.  It's a question of what value

25  you might assign to that claim.  This would be relevant to

1  that, at least for them to make an argument.

2          MR. DEVEREAUX:  Certainly would.

3          MR. FINCH:  Well, Your Honor, it would be relevant

4  to the value of the claim against USG if there were going to

5  be a jury to report damages.  If instead you're going to look

6  at some method of valuing the claim, whether it's the judgment

7  history or the USG's judgment history in USG's settlement

8  history, then the fact that --

9          THE COURT:  That would be relevant to looking at

10  for settlement purposes.

11          MR. FINCH:  It wouldn't be -- there are plenty of

12  cases where plaintiffs obtain judgments against defendants

13  even though they had significant exposure to lots of other

14  defendants' products who they settled out with earlier, and

15  that's not relevant to the validity or the amount of recovery

16  they obtained from the defendant they ultimately went to trial

17  with.  So, again, I stand on the relevance objection.

18          THE COURT:  Unless there's a jurisdiction that

19  would allow them to have some apportionment, or if you're

20  talking about settlement value --

21          MS. PARVER:  Your Honor, if I could just point out,

22  the debtors in reply papers say that they're asking you to

23  make determinations as to the validity or they're making

24  determinations based on the information presented in the

25  questionnaires and the records as to the validity of the

1  sample claims and that -- I'm referring to Page 7, the last

2  paragraph on that page of the debtors' reply papers, after

3  these determinations as to the validity of the sample claims

4  were made, debtors' expert statistician will predict taking

5  into account the appropriate margins of error, what percentage

6  of the total claimant population in each disease category has

7  and does not have the characteristics of a valid claim.  So

8  that I don't think, Your Honor, that they are asking you to do

9  this just in terms of what the value of a claim may be.  The

10  debtors' own papers seem to say that they are asking you --

11          MR. FINCH:  They're asking you to make

12  determination that because somebody was exposed predominantly

13  to lots of other products, they don't have a valid claim

14  against USG.

15          THE COURT:  I'm not going to make that finding on

16  any particular basis.  There may be a range and any time you

17  do an estimation, it's not an exact science, as I understand

18  it.  And what I'll be doing is looking at the various

19  positions the parties have and trying to create the range of

20  values that will be appropriate, and then to ultimately set

21  the value based on what I feel the appropriate range would be.

22  And in that you have to take in the weight of the arguments,

23  the terms of validity, nonvalidity, and try to come up with

24  what is an appropriate estimate, to the extent I have the

25  facts to do it, so it's not a claim-by-claim basis?

1      MR. DEVEREAUX:  We're not proposing and we won't

2  put on evidence on a claim by claim basis, we will talk about

3  characteristics and that's a broad or in the aggregate issues

4  that you'd look at and it's not individual claim information.

5      THE COURT:  The more compelling argument is going

6  to be whether or not there are any of these claims that will

7  fall within the fraudulent type category that is being seen

8  around the country.  That's a little easier to ascertain if

9  the facts support it.

10      MR. FINCH:  Your Honor, I still fail to see how the

11  relevance of other exposure information for an aggregate

12  information -- USG's settlement history is claims people filed

13  against it where they also filed claims against lots and lots

14  of other --

15      THE COURT:  I may totally discount what they have

16  to say, but they have a right to make a record of what their

17  position is because if it goes up on appeal, I can be second

18  guessed, perhaps I'm wrong.  I'll do my best to be right here.

19  But they have to have a right -- they have a right to make

20  their case and then I'll judge the facts and the opinions when

21  they come in and make a determination.  But if they don't get

22  an opportunity to pull the information together and make their

23  case, then their ability to appeal from my decision is gone,

24  and it will be gone forever.  I'm not going to -- I thought I

25  made that clear at the last hearing -- I am not going to cut

65

1   off a party's opportunity to make their case.  I'll consider

2   other issues, burdens, confidentiality, those types of things,

3   but this is the view that they have about the nature of the

4   discovery that they need, why they need it.  They have a

5   reason.  I may not give that reason any weight, they may be

6   unavailing in their arguments to this Court, but they're going

7   to get an opportunity to make their case.

8         MR. FINCH:  I will stand on my objection for Part 5

9   and I understand it to be overruled.

10        THE COURT:  Thank you.

11        MR. DEVEREAUX:  Part 6, Your Honor, I believe

12   remains in dispute.  It's a request by the debtors in the

13   questionnaire for the employment history of the claimants,

14   it's requested -- well, we ask them when and where and what

15   they were doing when they were exposed to asbestos-containing

16   products.  We also asked them their occupational history

17   because they may well not know that certain occupations, jobs

18   and industries in this country have been heavily exposed to

19   asbestos-containing products in the time frame that they were

20   working and, therefore, under the same point of being able to

21   get a full profile, their asbestos-containing history or

22   exposure history, we ask this question.  I don't think it's

23   burdensome, but that's the dispute.

24        MR. FINCH:  Your Honor, if the occupational history

25   were limited to occupations in industrial trades, I would

1  understand the relevance.  But, for -- this is broader than

2  that.  It can pick up any potential occupation that anybody

3  ever had.  Let's say somebody worked construction for one

4  summer and then they went and got a job as an engineer or

5  something, or an accountant or something not an industrial job

6  and changed jobs 20 times, I believe that is burdensome and

7  not relevant.  So if it's limited to industrial occupations, I

8  could see the relevance of that.  And I would suggest also

9  that if they're going to get the Social Security work history,

10  Part 6 is subsumed by that anyway.

11          MR. DEVEREAUX:  That might be acceptable.  I'm

12  concerned that by limiting it to industrial occupations, that

13  we --

14          THE COURT:  You have to define what you mean.

15          MR. DEVEREAUX:  I don't know what that even means

16  right now.  That doesn't mean that it couldn't be a

17  satisfactory definition, but I'm not sure what it is, or if

18  it's generally accepted.

19          THE COURT:  Do you have a definition you'd like to

20  proffer?

21          MR. FINCH:  In any of the occupations listed on the

22  attachment to their questionnaire.

23          MR. DEVEREAUX:  I don't think that's a fair

24  description of industrial.  The occupations have a big

25  category called "other" and it's there for a reason.  This

67

1   isn't an exhaustive list of every occupational or industrial

2   occupation that exists.  That's what the other category is

3   for.

4           MR. FINCH:  I will stand on my objection, but I do

5   think it is --

6           THE COURT:  If there's a way to refine it, but I

7   have to have some suggestion so everyone will understand what

8   it means.  If you have to list your entire work history, then

9   you have to list your entire work history, but if you want to

10  narrow it down, I need to have some definition that would be

11  really understood.

12          MR. DEVEREAUX:  And I've said this before, if there

13  are -- they asked at the break whether it is acceptable to

14  take a film original x-ray and turn it into a digital x-ray,

15  is that acceptable for submission?  I said, I'll ask an expert

16  and if is says we can make that change, we don't have to

17  involve the Court and the final questionnaire can reflect it.

18  Again, with this kind of proposal I'm not saying no, I'm just

19  saying I don't understand.

20          THE COURT:  We'll leave it the way it is now.  If

21  there's a definition -- the more material you have, the harder

22  it is to digest it.  So if there's a way to narrow it down,

23  I'm understanding that that debtors' counsel are willing to

24  consider it.  So if you have a phrase or a definition of a job

25  that you feel should be included in here that can limit it,

68

1    present that to the debtor.  If you can mutually agree, that's

2    fine, if you can't, then we'll leave it the way it is.

3          MR. FINCH:  I guess one way to reduce the burden

4    would be if you're submitting Social Security work history,

5    you don't need to complete this section.

6          THE COURT:  Does the Social Security history -- I

7    do Social Security appeals, I don't know that they show you

8    the job that you had.

9          MR. DEVEREAUX:  They don't.

10         THE COURT:  I think they show you that you were

11   working, but I don't know that they get specific to know what

12   exactly you were doing, so you wouldn't know whether you were

13   sitting in an office, or am I mistaken?

14         MR. DEVEREAUX:  No.  You're right.  That's why we

15   have requested both.  We want to know certain things and

16   that's the reason we asked for both of these.  You'll get

17   Social Security -- it will make up for instances where people

18   genuinely don't recollect, and that will happen, but what it

19   doesn't do, it doesn't tell you anything about what the --

20         THE COURT:  Sort of a check to see whether or not

21   if they didn't put anything down for the year 1970 and they

22   had $100,000 worth of income in that year, then you can say

23   there's something not right.  Is that the purpose?

24         MR. DEVEREAUX:  Yes, that's right.

25         MR. FINCH:  Given that, Your Honor, then we suggest

1   the Social Security work history is not relevant to this

2   inquiry.  It doesn't show anything about what they did, only

3   that they were employed.

4           MR. DEVEREAUX:  I think it will show where they

5   were employed.  It will be the best information that we have,

6   and for that reason, it is relevant.  It's not as good as

7   someone who can tell me what they were doing and when, but

8   it's what we will have, so it is clearly relevant.

9           MR. FINCH:  I think if they're going to fill out

10  Part 6, they shouldn't have to submit the Social Security

11  questionnaire -- Social Security work history that would at

12  least duplicate everything in Part 6.

13          THE COURT:  I think what it does, if they have to

14  get that, it will help them when they're preparing the form

15  double check and refresh their recollection about certain

16  jobs.  So I think it's going to be of help to the plaintiffs

17  as well as being a way to check their responses to see if

18  they're valid.

19          MR. DEVEREAUX:  Your Honor, I believe the next

20  objection 7.1A.  7.1A asks whether an individual was exposed

21  to asbestos outside of their occupation?  And there are a fair

22  number of claims that come in where individuals say, well, I

23  wasn't exposed occupationally, but I was exposed in a variety

24  of nonoccupational settings.  I was sort of home remodeler who

25  did my own work on my own home, not an occupation, or just on

1  weekends, or they were exposed to another individual who

2  worked in construction who came home with dust all over them

3  day after day after day.  7.1A is designed to get at the

4  people, nonoccupational, who were exposed, and all it asks is

5  check a box, yes, no.  And if you say yes, just tell us the

6  product.  Tell us how you remember it was the basis of your

7  claim, if it was a debtor's product.  And if you're relying on

8  another person for that basis, tell us about them.  It's

9  consistent with the other method of developing information on

10  exposure.  It's three questions, it's not burdensome and I

11  think it should be allowed.

12          MR. FINCH:  Your Honor, the objection goes to if

13  someone is occupationally exposed to USG products, additional

14  information about nonoccupational exposure seems to be

15  cumulative and not relevant.

16          THE COURT:  It may go to how you're going to value

17  the claim, just like it would be if you were exposed to other

18  companies' products on other job sites.

19          MR. FINCH:  I stand on my prior objection but

20  understand it to be overruled.

21          THE COURT:  Thank you.

22          MR. DEVEREAUX:  Your Honor, the next objection was

23  to Part 7 generally.

24          MR. FINCH:  I think that's an objection, basically,

25  whatever Section 4 looks like, Part 7 will conform to it.

1            MR. DEVEREAUX:  That's what I was going to say.

2            THE COURT:  Yes.  So that's where we're going to

3    put in that other box to put in estimate.

4            MR. DEVEREAUX:  Right.

5            Which brings us to Parts 8 and 9.  I think we

6    talked about these this morning at some length and this

7    relates to other litigation and bankruptcy claims that the

8    injured party or the source individual in Part 9 engaged in

9    and monies they received as a result, and so, I'll simply

10    refer to those comments.

11            MR. FINCH:  Your Honor, as to Part 8, I stand on

12    the earlier objection but understand the bulk of it to be

13    overruled.

14            Focusing in on Part 8, Question 11, again, the

15    relevance -- I object to the relevance of settlements with

16    other defendants, but even if that is overruled, the

17    settlements with other defendants broken out on a

18    defendant-by-defendant basis, I think, is equally irrelevant.

19    But also the other objection to it is that that kind of

20    information would not ordinarily be discoverable even in an

21    individual personal injury case.  You might be able to get

22    have you settled with anyone else and what is the aggregate

23    settlement you have received from everybody.  That would seem

24    to me, under their theory, that could possibly be relevant to

25    the value of the claim against USG if you're going to value

1   settlement and get a setoff.  What difference does it make if

2   they settle with Owens-Corning for $200,000 and Manville for

3   $6,000 and Union Carbide for a million and a half dollars and

4   they still have a claim against USG?  Why does USG need to

5   know the other defendants with whom they settled and the

6   settlement amount for each defendant?  That's going to lead to

7   lots and lots of confidentiality objections not only from the

8   claimants but probably from defendants out there in the tort

9   system as well and/or insurance companies.

10          THE COURT:  I think he has a point there about the

11  confidentiality agreements, without dragging all those people

12  into court so that they have an opportunity to be heard on it,

13  I don't know how I can --

14          MR. DEVEREAUX:  Your Honor, far from not being

15  discoverable in most states, the information when settling --

16  a co-defendant reached a settlement, they would have to

17  apprise the remaining defendants in order to get a

18  determination of a good faith settlement and extinguish any

19  right to contribution of cross claims and so those -- this

20  information is as a matter of course by law shared in most

21  states.  The confidentiality issues are handled two ways,

22  one -- Judge Fitzgerald has already heard and overruled this

23  objection as well, but that there be an application and a

24  confidentiality order about we have been asked to disclose the

25  following information, you can come and be heard and maybe we

1   should put in here that the disclosure will remain

2   confidential within the context of the confidential order

3   entered in the court.  So there are ways that confidential

4   information are handled and handled the most sensitive with

5   Social Security numbers, but one isn't to deprive litigants of

6   highly relevant information.

7           THE COURT:  Why do you need, given all the

8   complexities of this confidentiality, why do you need more

9   than the number of defendants that they have settled with and

10  the aggregate amount?

11          MR. DEVEREAUX:  One of the points that the Court

12  made this morning you want to know and one of the things that

13  may form the estimation is to know what similarly situated

14  individuals are in fact settling for, that the Court is going

15  to want to have some parameters of what is reasonable for

16  these types of claims.  This is evidence that can well help

17  the Court in making sure of that.  So, it's clearly relevant

18  in that setting.

19          MR. FINCH:  Your Honor, you get that information by

20  averages, even on their theory of the case.  I mean the fact

21  that somebody in one case settled, one claimant settled with

22  Owens-Corning for $500,000 or Owens Illinois for $500,000,

23  another for $200,000, and each have collected $2 million from

24  other -- if you're going to require people to provide

25  settlement information at all, I believe aggregate settlement

1    amounts are clearly sufficient, and once you start raising

2    individual settlements with individual defendants, the fact of

3    settlements may be disclosed in state court litigation, but

4    oftentimes the amount is only disclosed to the Court and not

5    to the other litigants.  Many times the defendants have no

6    idea what other defendants are paying to resolve a particular

7    case.  I think for all those reasons, in addition to the

8    confidentiality concerns that this question is objectionable

9    as framed.

10            MR. DEVEREAUX:  Your Honor, one last comment.

11   There is clearly extra utility and relevance in having

12   information broken down the way the debtors requested.  And

13   the confidentiality concern is a red herring, frankly, in

14   Judge Fitzgerald has ordered all the settlements for all

15   118,000 claimants, most of whom are going to be claimants in

16   this bankruptcy to already be produced, so if Owens-Corning or

17   any other debtor in the asbestos tort world has a problem with

18   their information being shared in the bankruptcy in a

19   confidential way, that objection is going to be heard and

20   raised already.  There's no -- there's no additional issue

21   here that's being created by this request.  So I think it

22   should be allowed.

23            MR. FINCH:  That issue has not been raised by

24   individual claimants who are bound by confidentiality

25   agreements between Judge Fitzgerald --

1          THE COURT:  What I'm going to do is I want you to

2   rephrase this question and make it so that to provide the

3   information, any of the information, if it's not subject to a

4   binding confidentiality agreement or not otherwise made a

5   matter of public record.  And if it is a matter of

6   confidentiality, then just to disclose the aggregate number of

7   defendants that have settled with the gross amount of the

8   settlement, the lowest amount paid in settlement, the highest

9   amount paid in settlement, and so then you'll get a sense of a

10  range, which is probably what you're looking for.

11          MR. DEVEREAUX:  I think that's a good solution,

12  Your Honor.

13          THE COURT:  I'm just troubled, people will be

14  running in and wanting to be protected with the

15  confidentiality agreement and having other concerns.  So, if

16  you can make that a two-part question --

17          MR. DEVEREAUX:  We will, Your Honor.  That's a good

18  suggestion.

19          10.2, regarding the Social Security work history, I

20  believe you've already addressed.

21          THE COURT:  Yes.  But I want you to make an

22  asterisk there to make it very clear that that information is

23  only being provided under the confidentiality agreement.

24          MR. DEVEREAUX:  I will, Your Honor.

25          THE COURT:  And Rust and whoever else is going to

1   touch the information has to be bound by this confidentiality

2   agreement.

3           MR. DEVEREAUX:  And every expert in the case.

4           THE COURT:  Absolutely.

5           MR. DEVEREAUX:  We have nothing further, Your

6   Honor.

7           THE COURT:  Is that it?

8           MR. FINCH:  That covers the contents of the

9   questionnaire.

10          THE COURT:  What I'm going to ask, there's only --

11  I'm going to ask that the debtor undertake to revise the form

12  consistent with what I've ordered on the record here today, to

13  share that with all the parties that are here, no later

14  than -- can we turn this around by the 11th?  I want that

15  filed here with the court with the proposed order, the order

16  where we're going to have the dates.  And make sure everybody

17  is comfortable with the language.  I want the order to also

18  reflect that there's a confidentiality agreement that's being

19  approved and that should also be attached.  So I envision that

20  there's going to be two exhibits attached to the order, one

21  exhibit will be the questionnaire, and the second exhibit will

22  be the confidentiality agreement.  And then when you submit

23  that order to me, assuming there are no objections, I can sign

24  it.  If there are going to be objections to it, we will have a

25  conference call the week of the 17th so that it can be

1  finalized.  If you're going to be sending it out on the 20th,

2  when does it have to be finalized so they can be making

3  copies?

4          MR. DEVEREAUX:  The 18th should be sufficient, Your

5  Honor.

6          THE COURT:  If there is going to be any objection,

7  those objections have to be filed by the 14th.  As I've told

8  you, if it's confidentiality problem, you're each going to

9  file your version of the confidentiality and I'll accept one

10  and attach it to the order, the one that I feel is best

11  suited.  I think to spend more time and energy dealing with

12  this -- I think if you act reasonably, you should agree.  And

13  if you can't agree, then you have to take your best shot at

14  what you think is the most reasonable approach and I'll pick

15  one of them.  If there's something where what I've ordered on

16  the record, if it's not clear in terms of what should be in

17  the questionnaire or what should be in the order, I will hear

18  some very brief argument on that and we'll have a conference

19  call, but it will be later in the day because I have trial the

20  week of the 17th.

21          We'll do it on the 17th, no later than the 17th.

22  So everything has to be circulated by the 11th from the

23  debtors' point of view.  Responses from the other parties have

24  to be back to the debtor in sufficient time so by the 14th

25  you'll know whether there's a problem.

1           If there is a problem, you'll have to advise the

2  Court and we'll have a quick conference by telephone on the

3  17th, probably around five o'clock.

4           MR. FINCH:  One other issue on the timing related

5  to the questionnaire.  I believe this is implicit to the

6  estimation.  In addition to Rust by January 20th sending to

7  the other parties whatever materials have been submitted to

8  Rust, there was also a requirement that Rust create a

9  database, a usable database of however they code that stuff.

10          THE COURT:  There was a date set.

11          MR. DEVEREAUX:  Forty-five days.

12          THE COURT:  That should be in the order as well.

13          MR. DEVEREAUX:  I indicated that was.

14          MR. KRESS:  The debtors will transmit on the 11th

15  will be the court order the questionnaire and the form of

16  confidentiality agreement?

17          THE COURT:  Yes.  If you can be talking then, so if

18  you can work out any problems that you think might exist, that

19  would be advisable.

20          MR. DEVEREAUX:  We will, Your Honor.

21          THE COURT:  That will be the latest date to

22  circulate that.

23          We need to talk about some timing.  We've talked

24  about the timing for this questionnaire.  So I think we have

25  that set and, again, it's with the understanding that if

1  there's a problem that comes up, the sooner I know about it,

2  the better it will be in terms of revising the calendar, if

3  that has to happen.  So now we need to talk about the other

4  discovery that's going on to get to the point where we can

5  actually have the estimation hearing.

6         MR. DEVEREAUX:  The other discovery that's going on

7  right now, there's been a broad document request to the

8  debtors and we have produced to date somewhere on the order of

9  half a million or more pages and are reviewing, analyzing and

10  producing on an every other week schedule the documents that

11  have been requested.  We spent four hours last week on a meet

12  and confer talking about a variety of issues.  My client has

13  been asked -- I have been asked to find out certain

14  information before types of documents that they would like to

15  know how much you have of it, from what time frames do you

16  have of it and I'm endeavoring to do that.  There are some

17  issues that we aren't in agreement on right now, and I suspect

18  there will probably be some issues about the burdensomeness of

19  what is being asked that we might not be able to agree to.  We

20  are scheduled to talk again, hoping to talk again next week on

21  Tuesday where I'm going to report back to all the parties,

22  letting them know what I've found out primarily about

23  documents that exist related to cases previously filed against

24  the debtors and in the tort system where settlements or trials

25  or other results were reached.

1           That's the primary issue we're grappling with is

2    what is the best way CFR would like to have a base of

3    information about the way the tort system claims were handled.

4    We want them to get that.  We understand our obligation to

5    make sure that they get that.  That I don't think requires --

6    just as we've chosen a sample of 2,000 people for the present

7    claimants, we don't think that it requires or makes sense for

8    the debtor to have to go try to identify hundreds of thousands

9    of case files for claims filed back in 1980 through 2001, and

10   so we're trying to find out what exists, what lawyers, outside

11   lawyers have it and hopefully be able to reach some

12   negotiation where they say, you know what we'd like, we'd like

13   a couple hundred cases from these time frames of these types,

14   and then work toward that.  So there's a meet and confer going

15   on about a variety of document issues and we're doing our

16   best, but the other side, obviously, can and should comment on

17   how they do that.

18           MS. PARVER:  Thank you, Your Honor.  Obviously, no

19   one wants this fact discovery to go on ad infinitum at all.

20   We have two very big problems here, Your Honor.  That is,

21   debtors won't tell us what they're going to produce and they

22   won't tell us even as to the things they agree to produce when

23   they are going to do it.  This Court -- we've spent much of

24   today, and I understand why, Your Honor, and we've spent much

25   of the last time we were here, all focused on the debtors'

1    professed need for this sample, this discovery, and we've had

2    a lot of papers filed about the standard of relevance, and how

3    important it is to --

4              THE COURT:  It's a two-way street.

5              MS. PARVER:  You said that.  What is happening,

6    Your Honor, as soon as we're not in front of the Court, we're

7    met with a big stop sign as soon as we try to go down the

8    debtors' street.  Now, we served a document request, Your

9    Honor, and what we got back from them initially on September

10   12th was, we couldn't possibly look at any outside counsel

11   files because that would put us to the burden of having to

12   figure out who our outside counsel were.  I said to them, that

13   doesn't meet the straight face test, that a legal department

14   of a big corporation, which also had outside national asbestos

15   counsel all those years, doesn't know the names and contact

16   information of the law firms who handled the cases.  They said

17   to us, yes, we have all these resolved personal injury claim

18   files, we shouldn't be put to the burden of looking at any of

19   them and we're not going to.  Remember, Your Honor, one of our

20   big points is, the future builds on the history and resolved

21   claim files are very, very important.  So, we teed up a lot of

22   these issues, Your Honor.

23              I haven't written these kind of discovery letters

24   in a long time, Your Honor, but I wrote a four- or five-page

25   letter to the debtors because Your Honor said very

82

1    specifically, meet and confer, Ms. Parver.  Don't tell me

2    there are problems now, meet and confer and try to work it

3    out.  The debtors asked to defer the meet and confer for

4    another day.  I sent the letter, very detailed and what we

5    tried to do, Your Honor, is take their objections and say,

6    okay, here's how we can deal with some of the objections, or

7    here's what we'll propose, or here's what we'll accept your

8    limitations on that.  And we had the meet and confer on

9    September 29th and at that point, we were told by the debtors,

10    oh, so now we find -- no, we can't give you answers today

11    because now we're sort of understanding what you want and

12    we're just starting to look for things and we'll give you a

13    progress report next week.  Well, that week is this week, and

14    focused as we were on the sampling things, whatever, the

15    debtor said, we can't give you answers this week, but we'll

16    have a meet and confer on the 11th.

17            And, Your Honor, during the course of the meet and

18    confer on the sampling motion, the debtors had proposed that,

19    gee, they would agree with us on the end of June as the end of

20    fact discovery and that would resolve all the issues on the

21    time and on the sampling motion, and I said to them, you know,

22    that's all very reasonable.  There's one problem.  I can't

23    commit, I don't want to agree -- if we agree now -- I said it

24    very directly -- if we agree on an end date today before we

25    have had this meet and confer, debtors are going to drag their

1    heels, Your Honor, on all of this stuff and we will not get
2    any relevant documents until three or four months from now.
3    They can talk all they want to about the 500 -- well, it's
4    440,000 pages that got dumped initially, and we got CDs this
5    morning of stuff.
6         What is interesting, Your Honor, is that on August
7    4th, Mr. Devereaux sent us a letter, and among other things --
8    August 4th, that's two months ago -- he said at that point, we
9    have collected approximately 60 to 70 boxes related to the
10   debtors' experience in the tort system generally and
11   participation in the CCR and ACC specifically, and he said
12   they were reviewing them currently and would produce them
13   shortly.  We haven't seen one box, Your Honor, of any
14   documents related to the debtors' experience in the tort
15   system, none of the depositions of their employees, nothing.
16   Because what is clear is the debtors are giving us the --
17   you'll excuse the expression, a truckload of nonconsequential
18   documents.  I think in the first, if we've gone through --
19   there are 440,000 or 109,000 documents I think we have gone
20   through, 70,000 of those in the first production, I think
21   there are 50 documents my associates have collected as semi,
22   lukewarm or hot documents.  So you can imagine the types of
23   stuff that we're getting.
24        We can't -- we need to know, Your Honor, when and
25   what the debtors are producing.  We do know that they have now

1    refused to produce any insurance coverage litigation files,

2    Your Honor.  These are files they first claimed burden because

3    there are 350,000 pages to review, and they said, well, a lot

4    is very confidential, very confidential.

5              THE COURT:  I don't want to cut you off,

6    Ms. Parver.  I do have another hearing at three.  Remember, I

7    told you I had some time constraints.

8              I think, Mr. Devereaux, it is a two-way street.

9    The debtor is going to have to accelerate, absolutely, the

10   pace.

11             And Ms. Parver, what I want you to do is, if you

12   feel that the debtor is dragging their feet, you file a

13   motion, ask for an expedited hearing and I will get it to them

14   and the debtor will have to come in and answer why they

15   haven't done what they're obligated to do.  It is a two-way

16   street.

17             They need to get the historical information to make

18   their case to this Court and just as I've given you the

19   opportunity to get the information you need, you have to come

20   up with that.  And it's not the debtor they're saying can only

21   have 100 files or 200 files, it's up to them to look through

22   it to assess the magnitude and make a determination about what

23   they feel is necessary for them.  And if you still feel that

24   that's a problem, you can come back here.

25             MR. DEVEREAUX:  And I will, Your Honor.

1          THE COURT:  I'll resolve it as quickly as possible.

2    But they're entitled to it.

3          MR. DEVEREAUX:  I agree with that.  I'm not going

4    to belabor a motion that's not before the Court, but let me

5    say --

6          THE COURT:  I can't address it here, but I do think

7    it has to come quickly because time is marching on.

8          MR. DEVEREAUX:  It is absolutely false to say that

9    the debtor doesn't recognize this is a two-way street or that

10   we're dragging our heels.  I'm available Tuesday to meet and

11   confer on documents they weren't --

12         THE COURT:  I'm not assessing blame on anyone.  I'm

13   not going to have this as a forum for that.  All I want to do

14   is everybody understands this Judge's view of what is

15   necessary.  You're going to get what you feel you need to have

16   to make your case.  You need to get together.  If it can't

17   happen, just as they filed their motion here to have the

18   questionnaire, you'll need to file a motion to compel the

19   discovery.

20         MS. PARVER:  Then, Your Honor, if the debtors won't

21   give us answers on October 11th, we will move to compel on all

22   those.  We have notified the debtors that we will file on or

23   before October 17th the motion on the insurance coverage

24   litigation files.  The debtors committed that when we gave

25   them a date -- it was in that letter that I gave you at the

86

1  beginning --

2           MR. DEVEREAUX:  At the break today.  I haven't read

3  it yet.

4           MS. PARVER:  Your Honor, we're --

5           THE COURT:  Everyone here is sensitive, I believe,

6  to the fact that this case has to come to a close.  And I am

7  going to pick June 30th as the date Friday, June 30 of 2006.

8  That will be close of discovery.  Everybody has to work toward

9  that date.  If you cannot meet the date, you need to drag them

10 in here so that we can make it happen.  Because if I can

11 facilitate the process and get the information so that it can

12 be completed, that is what is appropriate.  If for some reason

13 that date has to drag, then someone needs to file a motion

14 suggesting what the revised date should be and the reason why,

15 in good faith, the parties couldn't meet June 30th.

16          MS. PARVER:  Your Honor, you understand that the

17 motion to compel I guess will also have to set dates by which

18 the debtors are required to produce.

19          THE COURT:  Yes, I understand.

20          MS. PARVER:  We need time to read it.

21          THE COURT:  I understand.

22          MR. FINCH:  Your Honor, just so I'm clear, the end

23 of fact discovery --

24          THE COURT:  Look, before we move off of that,

25 Ms. Parver, what you need to do with the debtor is you need to

1  say, I need this information by X date, Y date and Z date so

2  that you've met and conferred before you file that paper.

3          MS. PARVER:  I've told them which information,

4  detailed in the letter today.  I'll just tell them the dates,

5  Your Honor.

6          THE COURT:  Then you meet and confer about that if

7  you can meet the date.  If you can't, have a good faith reason

8  why not, then you have to be in communication.

9          MR. DEVEREAUX:  We will, Your Honor.  I'll read the

10  letter first.

11          THE COURT:  It's best if everybody can work it out

12  amongst yourselves because you know what your calendars are,

13  you know what the pace of the work is.  If you can't work it

14  out, then bring it to me and I'll make a determination.

15          MS. PARVER:  Your Honor, there is a little

16  confusion about how we go about selecting a date because we

17  thought we understood from what Your Honor had said at the

18  last hearing what the procedure was, but when we called

19  chambers to select a date to have the motion -- this is the

20  motion on the insurance coverage litigation -- we were told

21  first we had to file the motion and then a date would be

22  selected.

23          THE COURT:  There's a procedure that -- the Court

24  has entered a special procedures motion in this case.  I think

25  you need to get a date.

88

1          MR. KRESS:  Your Honor, your CMO says you obtain a

2    date from the Court.

3          THE COURT:  If it's our fault --

4          MR. KRESS:  We tried that.  I called personally and

5    was told that no, first file your motion, the Judge will then

6    read the motion and decide when the hearing --

7          THE COURT:  There probably was confusion about not

8    understanding this was something that there's a special order

9    in.  You do need to call.  Ask for Ms. Gleason when you call.

10   She's assigned to this case and she'll be familiar with that

11   order.  That's the way to get the date.

12         What we will do then, we'll have a conference on

13   the 17th of July, that's a Monday.

14         What time is the best for you all?  This is the

15   meeting that we're going to come to after the close of the

16   discovery part, the fact discovery part, then we're going to

17   set the pace for the expert discovery, and by that time, you

18   should come on that date with the list of your experts so

19   we'll get a sense of the magnitude of the number of experts,

20   and then you should be prepared that the initial expert

21   reports are going to be due to be served on the other side by

22   probably August 4th.  It's usually about a month, 30 days

23   after.

24         MR. NEAL:  I'm sorry, Your Honor, can I ask one

25   question?  Is there any chance of doing it on a Tuesday?  It

1    takes us a whole day to fly in from the West Coast, so if we

2    do it on Monday, we give up a Sunday.

3              THE COURT:  No problem.  2:00 p.m. on the 18th.

4              We'll set the schedule for the experts on that date

5    and then we'll set the dates, because then by that time, we'll

6    know how many experts you have to deal with, how many

7    depositions you may have to take, and that will get us a good

8    sense of what time we need before any Daubert hearing.  I'm

9    assuming there will be a Daubert hearing in this case, so I

10   need to set this time aside.

11             MS. PARVER:  Motions on discovery, Your Honor, we

12   call your chambers to bring on expedited motions?

13             THE COURT:  Yes.  I don't do anything ex parte, so

14   if you can't work something out, let the other side know, you

15   try to call together and we'll pick a date and time that is

16   convenient for everyone.  If I'm there in the office and not

17   on the bench, I can take the call right away.  If there's a

18   discovery dispute, you need to get each other on the phone to

19   call.

20             MR. KRESS:  It may make sense to move the July 18th

21   hearing forward quickly, that there should be a date set for

22   disclosure of experts.

23             THE COURT:  Prior to that?

24             MR. KRESS:  Yes.

25             THE COURT:  How about the 7th of July?  If fact

 1   discovery is closing on the 30th of June, then July 7th would

 2   be the date for each side to exchange their list of experts.

 3   This would not be rebuttal experts, which would be your moving

 4   experts on your respective theories, so that would be -- that

 5   list should be exchanged on the 7th.

 6             MR. FINCH:  May I make one additional suggestion to

 7   the order for fact discovery is that a date be built in there

 8   by which parties identify fact witnesses they would likely

 9   call at the asbestos estimation hearing.  There are hundreds

10   of people with potential knowledge about various things.

11             THE COURT:  Let me tell you what my practice is so

12   you'll know what we'll be doing.  Once we get through the

13   expert Daubert hearing, then everybody will know what is going

14   to be admissible and what is not admissible from the experts.

15   Within two weeks after the Daubert hearing, the respective

16   parties have to file the equivalent of a pretrial statement

17   and in that pretrial statement, you will identify the

18   witnesses that you intend to call, which would include any

19   experts that you would intend to call, a brief summary of what

20   case you would be putting on, any documents that you would be

21   relying on.  Those would be filed with the Court and

22   exchanged.  Then you'll have an opportunity, the respective

23   parties, to respond to what has been filed.  That's usually

24   two weeks.  Then you should be in trial in about a month.

25             MR. FINCH:  What I was suggesting, Your Honor, I

1  understand the time at which you do disclosure, list of fact

2  witnesses.

3          THE COURT:  I see what you're saying if you want to

4  take some --

5          MR. FINCH:  If somebody shows up on a witness list

6  right before trial --

7          THE COURT:  I thought I had required you all to

8  comply with Rule 26.

9          MR. DEVEREAUX:  We have.

10          THE COURT:  That's where you disclose -- it's an

11  ongoing obligation.  That's where you'll find out who they

12  believe they have relevant information from.  And if it

13  doesn't show up on the Rule 26(f) disclosures as they roll on

14  through the case, you're not going to be able to put that

15  person on at the trial.  That's the way it works here.

16          MS. PARVER:  But, Your Honor, in the Rule 26

17  disclosures from the debtor, for example, they said, we plan

18  to put on a present or former employee to testify about X.

19  And we have asked them to identify it, rather than require

20  that person -- rather than require us to serve interrogatories

21  for persons with knowledge, they come back with 30 people's

22  names who might have knowledge about the subject, and

23  rather -- since we're in a fairly expedited situation, make us

24  take 30 depositions to find the one that they're going to put

25  on for trial, that they tell us who they intend --

1            THE COURT:  If you're willing to -- if you're

2    willing to whittle down the list just to the ones they want to

3    proffer as opposed to anybody that has relevant information,

4    which is generally -- generally, if they felt there were 30

5    people, they would give you 30 names and you could take

6    whoever you thought was appropriate, but if you want them to

7    narrow it down to who you would actually call at trial, to the

8    extent they know it, because they may not -- this is the same

9    problem you were raising with some of the discovery of the

10   claimants, if you know who it is or if you have a range, a

11   smaller number of the likely ones, then you have to disclose

12   it.  As soon as you know you're going to call somebody, then

13   you have to give them the opportunity to disclosure.

14           MR. DEVEREAUX:  We have actually given them the

15   names of every expert we're going to call because we know who

16   those people are.  I don't know the people who may be fact

17   witnesses, but I understand the continuing obligation.

18           THE COURT:  You need to find them and you should

19   have that to them let's say within 30 days.

20           MR. NEAL:  That's a two-way street, too.

21           THE COURT:  It's all a two-way street.

22           MR. FINCH:  If you know in discovery, if somebody

23   surfaces --

24           THE COURT:  If somebody surfaces, it's an ongoing

25   obligation.  This is people under Rule 26.  They want you to

1   whittle it down, they want those that are likely to be called.

2         MR. DEVEREAUX:   I'll do that, Your Honor, but it

3   also opens me up to criticism later on when I add somebody and

4   they'll say, you should have known people would have

5   information.

6         THE COURT:   You give them everybody's name and you

7   say these are the five that are the top five.

8         MR. FINCH:   These are for fact witnesses.   We'll do

9   the same.

10        THE COURT:   You can give 100 witnesses, but

11  identify your top five picks.

12        MS. PARVER:   Thank you, Your Honor.

13        THE COURT:   Anything else today?   Thank you.

14    (Court adjourned.)

15
                              C E R T I F I C A T E
16

17        I, Juliann A. Kienzle, certify that the
     foregoing is a correct transcript from the record of
proceedings
18   in the above-titled matter.

19   s/Juliann A. Kienzle

20   Juliann A. Kienzle, RMR, CRR

21

22

23

24

25