## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| IN RE: | ) | Chapter 11 |
|  | ) |  |
| W.R. GRACE & CO., *et al.*, | ) | Case No. 01-01139 (JKF) |
|  | ) | Jointly Administered |
|  | ) |  |
| Debtors. | ) | Related to Docket Nos. 13620, 13626 |
|  | ) | and 13628. |
|  | ) |  |
|  | ) | Hrg. Date: December 5, 2006 |

**COMBINED RESPONSE OF FOSTER & SEAR, LLP., WILLIAMS BAILEY LAW FIRM, LLP, LAW OFFICES OF PETER G. ANGELOS, P.C., PROVOST UMPHREY LAW FIRM, LLP, BARON & BUDD, P.C., SILBER PEARLMAN, LLP, AND LEBLANC & WADDELL, LLP TO THE DEBTORS' MOTIONS TO COMPEL ASBESTOS PERSONAL INJURY CLAIMANTS REPRESENTED BY (i) EDWARD O. MOODY, P.A., FOSTER & SEAR, LLP., MOTLEY RICE LLC AND WILLIAMS BAILEY LAW FIRM, LLP [DOCKET NO. 13626], (ii) HARTLEY & O'BRIEN, PLLC, PROVOST UMPHREY, LLP AND THE LAW OFFICES OF PETER G. ANGELOS, P.C. [DOCKET NO. 13620], AND (iii) BARON & BUDD, P.C., SILBER PEARLMAN, LLP, AND LEBLANC & WADDELL, P.C. [DOCKET NO. 13628] TO RESPOND TO THE W.R. GRACE ASBESTOS PERSONAL INJURY QUESTIONNAIRE**

Foster & Sear, LLP. ("Foster Sear"), Williams Bailey Law Firm, LLP ("Williams Bailey"), Provost Umphrey, LLP ("Provost Umphrey"), the Law Offices of Peter G. Angelos, PC ("Angelos"), Baron & Budd, P.C. ("Baron & Budd"), Silber Pearlman, LLP ("Silber Pearlman") and LeBlanc & Waddell, LLP ("LeBlanc & Waddell") (collectively, "Respondents" with each being a "Respondent"), counsel for and on behalf of certain personal injury claimants ("Claimants"),[1] by and through their undersigned attorneys, hereby file this combined response to three of the Debtor's Motions to Compel Asbestos Personal Injury Claimants to Respond to the

---

[1] The names of the individual Claimants from whom Grace seeks to compel discovery are listed in the exhibits to the Motion to Compel.

W.R. Grace Asbestos Personal Injury Questionnaire [Docket Nos. 13620, 13626 and 13628] (collectively, the "Motion to Compel") filed herein by W.R. Grace & Co., et al. ("Grace" or "Debtor").[2]  Respondents would respectfully show the Court as follows:

## INTRODUCTION

Not content to inflict upon Claimants a discovery burden unprecedented in any state court asbestos litigation or any other asbestos bankruptcy, Grace now improperly seeks to invade privileged and confidential communications and work product of Claimants and their counsel.  Like Grace's motion to disallow the use of any attachments in answering the questionnaire, the current Motion to Compel is completely unreasonable and is clearly violative of fundamental discovery rules.

Grace's position that consulting experts are entitled to no protection whatsoever in asbestos litigation is completely groundless.  The questions regarding communications with counsel are similarly inappropriate.  In fact, some of the questions to which Grace seeks to compel answers ask *on their face* whether the Claimant's counsel has made certain communications to his or her clients.  In addition, Grace's effort to discover confidential settlement agreements is utterly hypocritical, in that Grace itself has categorically pronounced to this court on multiple occasions that evidence of settlements has absolutely no relevance in this estimation proceeding.  If Grace contends that its own settlement history is not relevant, there is certainly no justification for causing the Claimants to violate

---

[2] Respondents file this combined response to Debtor's separate motions [Docket Nos. 13620, 13626 and 13628] because the motions raise identical issues and, in fact, contain identical briefing.  Rather than burden the Court with separate identical responses, Respondents have filed this combined response.

contractual confidentiality obligations in their settlement agreements with unrelated third parties.  The Motion to Compel is not well taken and should be in all things denied.

## RESPONSE TO DEBTOR'S SEPARATE MEMORANDUM OF POINTS AND AUTHORITIES

Grace attached to the Motion to Compel a separate memorandum entitled Notice and Memorandum of Points and Authorities Concerning Background of Questionnaire Approval Process and Objections Previously Addressed by the Court (the "Memorandum").  The Memorandum does not support or advance any point in the Motion to Compel itself, but instead recounts an incomplete and inaccurate history of the Debtor's litigation of the questionnaire before this Court.  The Memorandum is an attempt to improperly prejudice the Court with a one-sided tale of woe that omits any mention of the Court's many adverse rulings against Grace in this matter.  Contrary to its assertion, Grace's history of troubles with the questionnaire is chiefly of its own manufacture -- and as the Court itself warned in reluctantly allowing the Debtors to distribute and attempt to make use of the Questionnaire -- it is a process that was flawed from its inception and destined not to accomplish the Debtors' goals in preparing for the estimation proceedings in this case.

In a continuation of the highly adversarial posture it has taken with its tort creditors over the course of this case, Grace insisted that this Court approve its request for a discovery "questionnaire."  Grace underestimated, however, the

complexity of the information gathering and interpretative process, badly understaffing the agency to which it delegated responsibility for compiling the questionnaires into a "navigable database" and refusing to commit legally trained personnel under adequate attorney supervision to interpret and input the data. Even after its woefully inadequate global attempt to compel answers to all questionnaires in its preferred format and manner was summarily rejected by this Court, Grace stubbornly persists in the fiction that the Questionnaire is fine, but that it is the Claimants' law firms that are the problem.  This position is simply more evidence of Grace's tunnel-vision on this issue, and its mulish wasting of estate assets, instead of what it should do; abandon this ill-conceived process, a process that was fatally flawed from its inception.[3]

The Claimants and firms have provided answers to the questionnaire in terms above and beyond that required by applicable discovery rules.  Grace's insistence that counsel complete each and every question rather than answering by way of attachment is instructive.  Many firms, quite reasonably, responded to the burdensome discovery requests with the attachment of documents (as Grace itself conceded, the questionnaire was part document request).[4]  Grace, feigning

---

[3] As this Court noted in November of last year, "I think the whole questionnaire process is probably woefully inefficient, but it's what the Debtor wants to do and the Debtor controls its discovery.  I don't.  So it's fine with me.  If that's the way they want to go, it's the way they want to go."  Tr. Omnibus Hr'g 142, Nov. 14, 2005 (Dkt. No. 11563).  And again, this Court chided the Debtor that "if this is that much of an issue, then I suggest that the Debtor go about formal discovery and forget the questionnaire.  I mean, this was intended to help the process, not impede the process."  Tr. Omnibus Hr'g 165, Nov. 14, 2005 (Dkt. No. 11563).

[4] *See* Debtor's Motion to Compel Asbestos Personal Injury Claimants to Respond to the W.R. Grace Asbestos Personal Injury Questionnaire at 13.

astonishment at this practice, came to this Court seeking to compel answers in its chosen form, only to be soundly rebuffed by a clear ruling that attachments were acceptable.  Grace seems to have finally conceded the propriety of this means of answering its discovery.  Memorandum 15 ("the Court has ruled that Claimants are permitted to attach documents in lieu of providing narrative responses").  In the same vein, Grace insists now on total capitulation of firms to its overreaching requests for information despite *privilege* claims.  Unfortunately, it is again necessary for this Court to set Grace straight on the degree of discovery to which it is entitled.

Grace's questionnaire is uniquely complex and demanding, burdensome and intrusive, and unprecedented in the field of mass tort bankruptcy cases.  It is designed to intimidate, harass and suppress the tort claims asserted against Grace in this bankruptcy.  With the filing of the latest raft of Motions to Compel, Grace's true colors continue shining through, and its real motivation is even more starkly exposed.  Despite plentiful earlier assurances to the contrary,[5] Grace now makes a naked threat to the creditors upon whom its prepetition torts visited grievous injury:  Comply on our terms, or we will seek the disallowance of your claim. Memorandum 17.  Grace's tactics are clear – seek a hugely burdensome and intrusive discovery, ride roughshod over reasonable objections, claim widespread noncompliance, and then object to swathes of claims, since procedural defaults are

---

[5] For example, counsel for Grace, Mr. Bernick, declared unequivocally to this Court: "I'll state it here in black and white and red.  We are not seeking, in contrast to what we're doing with property damage, where the rules are different, we're not seeking to disallow claims when it comes to the estimation that applies to the personal injury claims."  Hrg. Tr. 145, July 19, 2005 (Dkt. No. 9105).

apparently the only means that Grace perceives available to it to preserve any interest for existing equity in the reorganized entity.  This self-serving scheme of harassment and obstructionism becomes more obvious with each successive motion from Grace, and the Court no doubt is, and it must be, mindful of Grace's strategy. By the January 12 supplementation deadline, Grace will have more information than it ever could have obtained if this were in fact a claims objection proceeding, and this Court should tolerate no further intransigence on its part.  Finally, perhaps, this case may then be allowed to proceed toward a successful reorganization.[6]

Claimants in this case have responded to the Questionnaire, and have complied with the vast majority of its onerous provisions – but, as they are entitled to do, have made objections where appropriate, spending tens of thousands of hours doing so, and incurring costs running, in the aggregate, in the many hundreds of thousands of dollars.  Now, with objections reduced down to a handful, Grace remains unsatisfied, demanding yet more information, and the complete abrogation of all privileges.  As will be set forth in detail below, the remaining objections based

---

[6] In the Memorandum, Grace boasts that it has been "diligent and dogged in its efforts to obtain the relevant information and in its refusal to surrender."  Memorandum 1.  So was Captain Ahab, in his relentless (and ultimately ill-advised and self-destructive) pursuit of Moby Dick.  Like the Debtor, Ahab was so consumed by his quest that he refused to listen to the counsel of others and headed single-mindedly down a path leading to failure.  Herman Melville, *Moby Dick* 166 (Hendricks House 1952) (1851) ("Over unsounded gorges, through the rifled hearts of mountains, under torrents' beds, unerringly I rush!  Naught's an obstacle, naught's an angle to the iron way.").  Not unlike Ahab's obsession with the legendary whale, Grace's relentless litigation with its creditors has been its own worst impediment to a quick and successful reorganization.

on privilege grounds and the core principle of settlement confidentiality are well

taken, and should be sustained by this Court.[7]


## ARGUMENT

### I.    GRACE CONTINUES TO IMPROPERLY SEEK RULINGS ON UNSPECIFIED OBJECTIONS.

Grace continues to improperly seek global rulings on some objections, without

specifying the actual objection complained of.  Memorandum 2 ("Grace comes to this

Court for a final order overruling the *remaining* objections.  … As these general

relevance and burden issues already have been addressed by the Court, Grace will

not reargue them in the current Motions to Compel.").  This tactic was condemned

by the Court in the hearing on Grace's last motion to compel,[8] and the Court

recognized in its October 12 order that Claimants and their law firms are entitled to

raise objections to specific questions, as to which Grace must make a specific

motion.[9]  Accordingly, Respondents argument below is addressed only to the specific

---

[7] Without conceding the merits of Grace's position, Foster Sear, Williams Bailey, Provost Umphrey, and Angelos have withdrawn all general relevance and burden objections previously asserted to questionnaire responses.  To the extent Grace might contend that prior correspondence is unclear on this point, these four Respondents hereby withdraw all such general objections.  Given Grace's refusal to comply with this Court's orders to make specific rather than global motions to compel, this is a step above and beyond that which is strictly required, and is undertaken in the interests of narrowing the remaining issues for this Court's consideration.  The Claimants represented by Baron & Budd, Silber Pearlman and LeBlanc & Waddell continue to maintain certain objections regarding relevance and burden because their situation is different from the other firms, and such objections are discussed separately in section V of this response.

[8] Hr'g Tr. 252, Sept. 11, 2006 (Dkt. No. 13823) (THE COURT: "I cannot give you rulings that say every single objection is overruled.  I can't do that.  You haven't even pointed me to every objection that people have made.")

[9] Order Concerning Debtors' Motion to Compel Asbestos Personal Injury Claimants to Respond to the W.R. Grace Asbestos Personal Injury Questionnaire, 1-2, Oct. 12, 2006 (Dkt. No. 13393) ("1.  … [T]here may be specific individual questions that for reasons particular to an individual's

objections raised by Grace in the Motion to Compel, and the Court's rulings should be limited to such specific objections.[10]

## II.    UNABLE TO SHOW THE REQUISITE "EXCEPTIONAL CIRCUMSTANCES", GRACE IS NOT ENTITLED TO DISCOVER FACTS AND OPINIONS OF CLAIMANTS' CONSULTING EXPERTS.

Discovery of "facts known or opinions held by" an adverse litigant's experts is governed by Rule 26(b)(4) of the Federal Rules of Civil Procedure. Subpart (A) permits broad discovery of experts whose opinions may be presented at trial. Fed. R. Civ. P. 26(b)(4)(A). Subpart (B), however, significantly constrains discovery concerning experts whose opinions will not be presented at trial, so-called consulting experts. Fed. R. Civ. P. 26(b)(4)(B). Specifically, subpart (B) provides:

> A party may, through interrogatories or by deposition, discover facts known or opinions held by an expert who has been retained or specially employed by another party in anticipation of litigation or preparation for trial and who is not expected to be called as a witness at trial, only as provided in Rule 35(b) or upon a showing of exceptional circumstances under which it is impracticable for the party seeking discovery to obtain facts or opinions on the same subject by other means.

Fed. R. Civ. P. 26(b)(4)(B). As a textual matter, it is thus clear that the rule provides only two avenues to discovering facts and opinions known to an adversary's consulting expert: pursuant to Rule 35(b) or upon a showing of exceptional circumstances.

---

circumstances or claim, a question in the Questionnaire is not relevant to his or her claim or is unduly burdensome or invades a privilege, and he or she may separately raise his or her specific objections… .").

[10] This comment applies with regard to any objection made by Respondents to any specific question in the Questionnaire that has not been specifically identified by Grace in the Motion to Compel.

A.   <u>No Onerous Showing Is Required to Establish the Existence of a Consulting Expert Relationship</u>.

Undoubtedly because Rule 35(b) is inapplicable and "exceptional circumstances" entails a very heavy burden, Grace leads off by contesting whether consulting expert relationships even exist between Claimants and the various medical professionals with whom they may have consulted.  Grace suggests that Claimants are obliged to present numerous facts to the Court before the existence of consulting expert relationships can even be established.  In going down that rabbit trail, however, Grace stretches its own case law authority past the breaking point.

Citing the Tenth Circuit's "*Ager*" decision – a very instructive case – Grace faults Claimants for not making showings with respect to the following laundry list of facts:

> (1) the manner in which the consultation was initiated; (2) the nature, type and extent of information or material provided to, or determined by, the expert in connection with his review; (3) the duration and intensity of the consultative relationship; and, (4) the terms of the consultation, if any (e.g. payment, confidentiality or test date or opinions, etc.).

*Ager v. Jane C. Stormont Hosp. & Training Sch. for Nurses*, 622 F.2d 496, 501 (10th Cir. 1980).[11]  The Tenth Circuit did not, however, enumerate these factors as bearing on the question of whether a consulting relationship existed in the first instance.  Instead, *Ager* identifies these factors as relevant to the very different question of whether an expert consultation was informal (such as casual

---

[11]   Grace is obviously indifferent to the extraordinary burden that detailing numerous facts regarding each and every expert consultation would entail for the Claimants and their respective counsel.

conversation with a doctor at a social occasion or on a golf course, typically with no consideration contemplated) or formal (a discussion or examination followed by the rendition of advice or an opinion for which a charge is made and paid). *Id.* at 501-502.  The Tenth Circuit held that "[i]f the expert is considered to have been only informally consulted in anticipation of litigation, discovery is barred." *Id.* at 502.

Rule 26(b)(4)(B) requires that only two things be shown to establish the existence of a consulting expert relationship.  The first, of course, is the involvement of an expert.  Expert status turns on "knowledge, skill, experience, or education …" – attributes presumptively common to all medical professionals.  Fed. R. Evid. 702. It must also be shown that the expert "has been retained or specially employed by another party in anticipation of litigation or preparation for trial and who is not expected to testify as a witness at trial … ."  Fed. R. Civ. P. 26(b)(4).   That an expert is a consulting expert can be (and has been) established in a straightforward manner by declaration.  Attached hereto as Exhibits "A", "B", "C", "D", "E", "F" and "G" are the Declarations of (a) Scott Wert of Foster & Sear, (b) Robert Shuttlesworth of Williams Bailey, (c) Colin Moore of Provost Umphrey, (d) Armand J. Volta, Jr. of Angelos, (e) Natalie Duncan of Baron & Budd, (f) Jeffrey A. O'Connell of Silber Pearlman and (f) Cameron Waddell of LeBlanc & Waddell. These declarations describe the manner in which the law firms use physicians and other medical professionals as consultants and how the firms maintain the confidentiality of the facts and opinions of such experts in cases where the witnesses

are not expected to be used at trial.[12]  To the extent that these declarations are even necessary, they establish conclusively the consulting expert relationships that exist between these physicians and the claimants and their law firms.

**B.**   **<u>"Exceptional Circumstances" is a Heavy Burden that Grace Cannot Carry</u>.**

Ultimately, Grace pursues the only course it can, urging an expansive view of what is subsumed within "exceptional circumstances."  Grace's argument, in effect, is that circumstances sufficient to intrude upon a consulting expert's work need not be exceptional at all, a position strikingly at odds with *Ager*.  There, the Tenth Circuit cautions that "[t]he party 'seeking disclosure under Rule 26(b)(4)(B) carries *a heavy burden*' in demonstrating the existence of exceptional circumstances." *Ager*, 622 F. 2d at 503 (*quoting Hoover v. U. S. Dept. of Interior*, 611 F.2d 1132, 1142 n.13 (5th Cir. 1980)) (emphasis added); *accord, Burkybile v. Mitsubishi Motors Corp.*, No. 04 C 4932, 2006 WL 2325506, at *2 (N.D. Ill. Aug. 6, 2006) ("The party seeking discovery from the non-testifying expert consulted in anticipation of litigation 'carries a heavy burden in demonstrating the existence of exceptional circumstances.'" (q*uoting  Spearman Indus., Inc. v. St. Paul Fire & Marine Ins. Co.*, 128 F. Supp. 2d 1148, 1151 (N.D. Ill. 2001))); *Hartford Fire Ins. Co. v. Pure Air on the Lake Ltd. P'ship*, 154 F.R.D. 202, 207-08 (N.D. Ind. 1993) (burden of party seeking discovery of facts known or opinions held by consulting experts characterized as "heavy").

---

[12]  See Declaration of Scott Wert ¶ 3-4; Declaration of Robert Shuttlesworth ¶ 3-4; Declaration of Colin Moore ¶ 3-4; Declaration of Armand J. Volta, Jr. ¶ 3-4; Declaration of Natalie Duncan ¶ 2-3, Declaration of Jeffrey A. O'Connell; ¶ 2-3; Declaration of Cameron Waddell ¶ 2-3.

It is instructive to note the divergent thresholds that a litigant must meet in order to discover the two species of work product – "fact" and "opinion" – of an adversary's lawyer.[13]

> Rule 26(b)(3) establishes two tiers of protections.  Fact work product is discoverable upon a showing of "***substantial need***" and by demonstrating that one cannot otherwise obtain the "substantial equivalent" of such materials without "undue hardship."  Fed. R. Civ P. 26(b)(3).  "Core" or "opinion" work product, which consists of "mental impressions, conclusions, opinions, or legal theories of an attorney," is afforded almost absolute protection.  *In re Cendant Corp. Sec. Litig.*, 343 F.3d 658, 663 (3d Cir. 2003) (citing Fed. R. Civ. P. 26(b)(3)).  … Opinion work product is discoverable "only upon a showing of rare and ***exceptional circumstances***."  *In re Cendant*, 343 F.3d at 663.

*In re Linerboard Antitrust Litig.*, 237 F.R.D. 373, 381-82 (E.D. Pa. 2006) (emphasis added).  The Third Circuit thus equates the very limited discoverability of opinion work product, tied to an "exceptional circumstances" standard, with "almost absolute protection."  This is a far cry from Grace's casual indifference to the import of the word "exceptional."

Grace argues that the circumstances attending all of the questionnaire's intrusions into Claimants' consulting expert relationships are exceptional, fastening onto the time specific nature of all medical testing.  Because all x-ray and diagnostic tests are conducted at a discrete moment in time, Grace maintains that the circumstances are always exceptional and that it is thus always impractical for a

---

[13]  "Fact" work product might include, for example, documents created as part of an internal investigation undertaken in anticipation of litigation.  *In re Linerboard Antitrust Litig.*, 237 F.R.D. 373, 381 (E.D. Pa. 2006).  "Opinion" work product consists of "mental impressions, conclusions, opinions, or legal theories of an attorney[.]"  *Id.*, citing *In re Cendant Corp. Sec. Litig.*, 343 F.3d 658, 663 (3d Cir. 2003)).

party like Grace to obtain the same information by other means.  "Even if Grace's

experts could re-perform the tests," Grace laments, "this would not be sufficient

because the tests may be many years old and a significant change of circumstances

likely has occurred during the intervening period of time."  Motion to Compel 9.

Grace peculiarly insists that "[a]ny test that tends to show that a Claimant

may have tested negative for the presence of asbestosis or another asbestos-related

disease or that the Claimants is not impaired as the result of any asbestos-related

disease is critically important to Grace's experts' evaluations of their pre-petition

litigation claims."  Motion to Compel 9-10.  Surely Grace is not suggesting that

someone cannot be sick from asbestos today unless they were already sick when

prior medical testing was conducted months or years ago, despite the notorious

latency problem associated with asbestos diseases.[14]  Moreover, the doubtful

relevance of dated medical testing pales in comparison to the pressing relevance of a

Claimant's medical condition now, to which testifying experts will offer their

opinions.  Claimants will ultimately be compensated based on the here-and-now,

not the there-and-then.

Even more troublesome for Grace is the fact that Rule 35(d), the avenue other

than exceptional circumstances for discovering consulting experts' facts and

opinions, invalidates Grace's notion that the circumstances attending the facts and

---

[14] "An individual [may] not become ill from an asbestos-related disease until [ ] forty years after
initial exposure", with the sad and problematic consequence that the identities of many asbestos
victims exposed decades ago remain unknown today.  *See Kane v. Johns-Manville Corp.*, 843 F.2d
636, 639 (2d Cir. 1988).  In addition, because asbestos diseases are progressive in nature, any
subsequent testing would most likely result in a showing that the disease has actually worsened.

opinions of consulting medical experts are always exceptional.  Entitled "Physical and Mental Examination of Persons," Rule 35 facilitates an adverse litigant's examination of a person whose mental or physical condition is in controversy.  An "order for examination" may issue upon motion for good cause shown, specifying "the time, place, manner, conditions, and scope of the examination and the person or persons by whom it is to be made."  Fed. R. Civ. P. 35(a).

A party against whom an order is made pursuant to Rule 35(a) may request a copy of the examiner's report of the examination, which "shall" be delivered if requested.  Fed. R. Civ. P. 35(b)(1).  That request, however, has consequences that Rule 35(b)(2) makes very clear:

> By requesting and obtaining a report of the examination so ordered or by taking the deposition of the examiner, the party examined waives any privilege the party may have in that action or any other involving the same controversy, regarding the testimony of every other person who has examined or may thereafter examine the party in respect of the same mental or physical condition.

Fed. R. Civ. P. 35(b)(2).  By requesting and obtaining a copy of the report of an adverse party's examiner, the party examined submits to discovery of its own consulting experts' facts and opinions.  Forbearance from requesting a copy of the examiner's report preserves the confidentiality of one's own consulting experts unless, according to Rule 26(b)(4), exceptional circumstances are present.  Rule 35(b)(2) would be reduced to surplusage if exceptional circumstances were always present with respect to opinions and facts known by medical consultants.

As noted, however, Grace seems insistent that some Claimants may have tested negative for the presence of asbestosis or another asbestos-related disease in past consultations with consulting experts. The plaintiff-insurer in *State Auto Insurance Cos. v. Briley*, 140 F.R.D. 394 (E.D. Mo. 1992), thought that the defendant-insured might "have retained experts immediately after [a] fire who possess[ed] knowledge of the physical evidence" that no longer existed when plaintiff arrived to investigate. *Id.* at 397. Plaintiffs maintained that "exceptional circumstances" existed because they did not investigate the scene until two weeks after the fire, though the defendants might have.

> ... The Court agrees that plaintiff's proffered "exceptional circumstances" is nothing more than complete conjecture.
>
> Defendants' notified plaintiff's agent ... of the loss the evening of the fire. ... Plaintiff's speculations regarding disturbance of the physical evidence at the scene of the fire does not meet the standard of "heavy burden" in demonstrating exceptional circumstance.

*Id.* Similarly here, Grace has offered nothing but conjecture, which even if true, would not meet the heavy burden standard.

*State Auto Insurance. Cos. v. Briley* exemplifies another important point. A litigant typically invokes "exceptional circumstances" in the context of preparing for a trial with the party asserting the privilege. Grace is not, however, preparing for a trial on these asbestos claims. The contested matter *sub judice* is an estimation proceeding between Grace and the Asbestos Claimants' Committee. Claimants are third-party witnesses to that proceeding. The heavy burden to show exceptional circumstances becomes much heavier when a party seeks to invade the privileges of

non-parties.  Grace's sought-after intrusions into the musings and conclusions of

Claimants' consulting experts have no discernible relevance to estimating Grace's

asbestos liability in the aggregate.

C.    **Grace Cannot Bootstrap Into "Exceptional Circumstances" by Speculating About Potential "Shopping of Experts."**

If a Claimant is afflicted with an asbestos-related disease now, the relevance

of prior consultations with experts in anticipation of litigation is doubtful at best.

Therefore, Grace's dual suggestions that (i) Claimants may have "shopped around"

for doctors, based on "substantial evidence" drawn from other cases, and (ii) this

alleged "shopping" is a circumstance sufficiently "exceptional" for Grace to intrude

on Claimants' consulting expert relationships, is odd.  Motion 12.  The standard,

after all, is "exceptional circumstances" – not exceptional conjecture.

The only authority Grace cites for this dubious proposition is *Coates v.*

*AC&S, Inc.,* 133 F.R.D. 109 (E.D. La. 1990).  There, the plaintiff had died, allegedly

of mesothelioma.  Post-mortem tissue samples were taken and sent to both

plaintiff's and defendant's experts.  The successor-plaintiff sought to depose some of

defendant's experts who had examined tissue samples, but who had been

designated as consulting experts.  The court concluded that there were exceptional

circumstances, but emphasized the significance of the samples being post-mortem.

*Id.* at 110.  In fact, the court found "that a pathologist's or other expert's

examination of tissue samples taken from the body of a person who is now deceased

is sufficiently analogous to an examination under Rule 35(b) so that all parties have

a right to the type of information set forth in that rule."  *Id.*

While the *Coates* court did express concern about its perception that litigants tend to "shop" among experts for a favorable opinion, it failed to consider other reasons why an expert might not be called upon to testify. *Id.* at 110-11. The Tenth Circuit did in *Ager*, noting "lack of qualifications, unattractive demeanor, excessive fees, or adverse opinions … ." *Ager*, 622 F.2d at 502. There is nothing untoward about a litigant's decision to relegate an expert to a consultancy role for any of these reasons.

**D.   Grace May Not Discover Names of Claimants' Consulting Experts Absent a Showing of "Exceptional Circumstances."**

Citing dated authority, Grace maintains that the names of Claimants' consulting experts "are not privileged or shielded from disclosure under any scenario." Motion to Compel 7. Grace's leading case is *Sea Colony, Inc. v. Continental Insurance. Co.*, 63 F.R.D. 113 (D. Del. 1974), a thirty-two-year-old case that did hold the identities of non-testifying experts to be discoverable without a showing of exceptional circumstances. *Id.* at 114. The *Sea Colony* court did concede, however, that "there is room for argument" on the issue. *Id.*

The holding of *Sea Colony* appears to have fallen into disfavor in the intervening years. "The view expressed in *Ager*," – yes, the ubiquitous Tenth Circuit decision cited by Grace – "has become the prevailing one in the years since *Ager* was decided." *Kuster v. Harner*, 109 F.R.D. 372, 374 (D. Minn. 1986). In 1999, a Delaware state court followed suit, observing in *Pfizer v. Advanced Monobloc Corp.*, No. 97C-04-037-WTQ, 1999 WL 743868, *2 (Del. Super. Ct., Sept.

20, 1999), that the approach taken in *Ager* "seems better [than the *Sea Colony* approach] for the policy reasons suggested by the *Ager* Court … ."[15]

In *Ager*, the court held "that the identity, and other collateral information concerning an expert who is retained or specially employed in anticipation of litigation, but not expected to be called as a witness at trial, is not discoverable except as 'provided in Rule 35(b) or upon a showing of exceptional circumstances … .'" 622 F.2d at 503.  The Tenth Circuit reasoned that "once the identities of retained or specially employed experts are disclosed, the protective provisions of [Rule 26(b)(4)] concerning facts known or opinions held by such expert are subverted." 622 F.2d at 503.  "The expert may be contacted or his records obtained"; in some instances, his participation in the trial may even be compelled.  *Id.*  "The possibility also exists … that a party may call his opponent to the stand and ask if certain experts were retained in anticipation of trial, but not called as a witness, thereby leaving with the jury and inference that the retaining party is attempting to suppress facts or opinions."  *Id.*

The Tenth Circuit was also concerned regarding the chilling effect that identity disclosure would have, specifically with respect to consulting medical experts:

---

[15] *Accord, In re Pizza Time Theatre Sec. Litig.*, 113 F.R.D. 94, 97-98 (N.D. Cal. 1986) (*citing Ager*) ("There is a division in the authorities about whether the 'exceptional circumstances' requirement applies to efforts to discover only the identities of non-testifying experts … .  Having studied carefully the leading cases in both camps, I am persuaded that the better reasoned view is that discovery of the identities of non-testifying experts should be subject to the same standard as discovery of their opinions, namely, the 'exceptional circumstances' standard.").

"(d)isclosure of the identities of (medical) consultative experts would inevitably lessen the number of candid opinions available as well as the number of consultants willing to even discuss a potential medical malpractice claim with counsel … (I)n medical malpractice actions (perhaps) more than any other type of litigation, the limited availability of consultative experts and the widespread aversion of many health care providers to assist plaintiff's counsel require that, absent special circumstances, discovery of the identity of evaluative consultants be denied.  If one assumes that access to informed opinions is desirable in both prosecuting valid claims and eliminating groundless ones, a discovery practice that would do harm to these objectives should not be condoned.  Brief of appellant at pp. 27-28, 29-30.

*Id.*    Accordingly, the identity of consulting experts, along with their opinions,

reports, materials or facts known, are not discoverable.

**E.    Has Not Offered to Reimburse Claimants for a Fair Portion of the Fees and Expenses of the Consulting Experts.**

The Motion to Compel should also be denied because Grace has not offered to

reimburse Respondents for the fees and expenses incurred by Respondents in

obtaining the facts and opinions of their consulting experts.  This is a mandatory

requirement under Rule 26(b)(4)(C) if Grace is able to prove the exceptional

circumstances necessary to obtain consulting expert information under Rule

26(b)(4)(B).  Federal Rule of Civil Procedure 26(b)(4)(C) provides:

Unless manifest injustice would result, … (ii) with respect to discovery obtained under subdivision (b)(4)(B) of this rule ***the court shall*** require the party seeking discovery to pay the other party a fair portion of the fees and expenses reasonably incurred by the latter party in obtaining facts and opinions from the expert.

Fed. R. Civ. P. 26(b)(4)(C) (emphasis added).  This is a very reasonable requirement.

The structure of Rule 26(b)(4) "was largely developed around the doctrine of

unfairness designed to prevent a party from building his own case by means of his opponent's financial resources, superior diligence and more aggressive preparation. *Ager*, 622 F.2d at 502. As the Tenth Circuit recognized, the drafters of the rule did not intend for a party to gain "a material advantage or benefit at the expense of the opposing party's preparation." *Id,* at 502-03. "The purpose of the rule is to avoid the unfairness of requiring one party to provide expensive discovery for another party's benefit without reimbursement." *U.S. v. City of Twin Falls, Idaho*, 806 F.2d 862, 879 (9th Cir. 1986) (citing 4 J. Moore, J. Lucas, & G. Grotheer, Jr., *Moore's Federal Practice,* ¶ 26.66[5] (2d ed. 1984)). "The language of the rule is mandatory ("shall"), unless manifest injustice would result." *Id.*

It is not surprising that Grace has not acknowledged its mandatory reimbursement obligation. One of Grace's goals in this litigation is to inflict continuing financial burden on the Claimants, in hopes that many will simply surrender the fight and withdraw their claims. To allow Grace to discover confidential work product of the Respondents' consulting experts – which by definition is not going to be used at trial against Grace – without paying for such expert information, would itself be manifestly unjust. Grace would be obtaining thousands of dollars, if not hundreds of thousands of dollars or more, of free expert information to use in its war against its asbestos creditors. This is information that Grace would not be entitled to receive in normal litigation between Grace and the Claimants. Accordingly, even in the unlikely event this Court finds exceptional circumstances require production of consulting expert information in this

proceeding, the Motion to Compel should be denied unless Grace agrees to pay an appropriately substantial portion of all consulting experts' fees and expenses incurred by Respondents. Because the experts are consulting-only experts, whose facts and opinions were not intended to be used at trial against Grace, fairness dictates that Grace reimburse the full amount of all fees and expenses incurred, and Grace should do so in advance of receiving the confidential information.

III.  GRACE SEEKS TO IMPROPERLY INVADE THE ATTORNEY-CLIENT AND WORK PRODUCT PRIVILEGES.

Debtors next seek to disregard the attorney-client and work product privileges with regard to communications between the Claimants and their counsel regarding the Claimants' diagnosing doctors. Grace moves to compel answers to three questions, without regard to whether or not the answers would cause disclosure of privileged communications. Claimants object to the questions, but only to the extent that the answers would invade the attorney-client and work product privileges.

The medical component of a personal injury claim is an integral part of the cause of action. When proof of an alleged medical condition is required, counsel necessarily must discuss such condition openly with clients. A lawyer must be able to recommend expert witnesses to his clients without concern that such recommendations may be investigated by their opposition. Moreover, individuals who believe that they have suffered an injury or developed a disease as a result of the wrongful actions of another must be able to consult confidentially with legal counsel – both before and after receiving a diagnosis of their condition – without

fear that such consultations will be subject to being discovered in later litigation. This is, of course, at once the very bedrock of the attorney-client and work product privileges and also the very information that Grace improperly seeks through the Motion to Compel.

The declarations submitted herewith establish that Foster Sear, Williams Bailey, Provost Umphrey and Angelos regularly communicate with their clients regarding various matters relating to their clients' claims, including the medical aspect of such claims.[16]   These communications relate to various issues regarding a client's medical condition, and sometimes include, but are not limited to, discussions relating to the physicians and medical professionals that treat the client or provide opinions with regard to the client's condition.  *Id.*  These communications are confidential and are made for the purpose of facilitating the rendition of legal services to the client.  *Id.*  In addition, these communications often include the mental impressions of legal counsel developed in anticipation of litigation or for trial, and thus constitute work product of Respondents.  *Id.*

The three questions at issue under the Motion to Compel are:

(1)    "Did you retain counsel in order to obtain any of the services performed by the diagnosing doctor?",[17]

(2)    "Was the diagnosing doctor referred to you by counsel?",[18] and

---

[16] See Declaration of Scott Wert ¶ 5-6; Declaration of Robert Shuttlesworth ¶ 5-6; Declaration of Colin Moore ¶ 5-6; Declaration of Armand J. Volta, Jr. ¶ 5-6; Declaration of Natalie Duncan ¶ 4-5, Declaration of Jeffrey A. O'Connell ¶ 4-5; Declaration of Cameron Waddell ¶ 4-5.

[17] Questionnaire, Part II, Questions 2, 4, 5, 6 and 7.

[18] Questionnaire, Part II, Questions 2, 4, 5 and 6.

(3) "Are you aware of any relationship between the diagnosing doctor and your legal counsel?"[19]

Notwithstanding the fact that all three questions on their face inquire about counsel's advice and relationships, Grace contends that the questions seek only facts and in no circumstance could the questions be construed to require the disclosure of communications with counsel. A simple reading of the questions, however, belies such assertion. Moreover, the content of the communication between counsel and client is not important. Attorney-client communications are privileged both when the communications relate to a matter of legal advice and when the parties are simply discussing factual matters. "[C]ommunications between the attorney and the client, even when the parties are discussing factual information, are protected by the attorney client privilege." *Sinclair Oil Corp. v. Texaco, Inc.*, 208 F.R.D. 329, 332 (N.D. Okla. 2002). "[The attorney-client] privilege attaches to the complete communication between attorney and client. The subject matter of the information communicated between attorney and client is irrelevant when determining whether the privilege applies. Privilege attaches to legal advice and factual information included in completed communications between attorney and client." *Marathon Oil Co. v. Moyé*, 893 S.W.2d 585, 589 (Tex. App.—Dallas 1994, original proceeding); *see also GAF Corp. v. Caldwell*, 839 S.W.2d 149, 151 (Tex. App.—Houston [14th Dist.] 1992, original proceeding) ("It is irrefutable that the privilege attaches not only to legal advice but also to the complete communication between client and counsel. The subject of the information

---

[19] Questionnaire, Part II, Questions 2, 4, 5 and 6.

communicated between the attorney and client is of no concern in determining whether the privilege is applicable… .").  Each of the three questions could require the disclosure of attorney client communications.

The first question (i.e., "did you retain your counsel to obtain the doctor's services") in essence asks the Claimant for a disclosure of whether he or she retained counsel to obtain a diagnosis of the Claimant's condition.  On first blush, the question seems silly and easily answered "no" in all instances.  But because the medical condition of a Claimant is an integral part of the Claimant's legal claim, and because such condition is proved through expert medical testimony, depending on the circumstances the question could require a disclosure of communications between the lawyer and client with regard to the medical proof necessary and the retention of medical experts in connection with such proof.  To the extent that it requires such disclosure, the Claimants' objection is entirely proper.

The second question (i.e., "was the doctor referred to you by counsel") clearly asks for the disclosure of a communication between counsel and client.  If an attorney recommends an expert witness to a client, that advice is privileged.  This question has nothing to do with facts, but instead asks for the disclosure of recommendations made from counsel to client.  It is protected under both the attorney-client and work product privileges and is objectionable on its face.

The third question (i.e., "are you aware of a relationship between the doctor and your legal counsel"), may also require disclosure of an attorney-client communication depending on the circumstances.  If the Claimant learned of a

relationship between the diagnosing doctor and legal counsel[20] through means other than a confidential communication with counsel, there is no privilege.  However, if the Claimant learned of a relationship solely through a conversation with his or her attorney, the communication and all facts discussed therein are privileged from disclosure.  *See Sinclair Oil Corp.,* 208 F.R.D. at 332;, *Marathon Oil Co.,* 893 S.W.2d at 589;, *and GAF Corp.,* 839 S.W.2d at 151.  Claimants' objections are lodged only to the extent that answering the questions would invade the attorney-client or work product privileges.  If so, Grace cannot discover such confidential communications under any circumstances.  Claimants' objections to the three questions raised by Grace are proper and should be sustained.


IV.   **THE CONFIDENTIALITY OF RESPONDENTS' SETTLEMENT AGREEMENTS SHOULD BE RESPECTED.**

Grace has moved to compel Claimants to provide information concerning the amount(s) of any settlements they may have made with other asbestos defendants.  This comes, of course, in the wake of numerous proclamations by Grace and its counsel that evidence of Grace's own settlements has absolutely no relevance to this estimation proceeding.  Mindful of the "presumption of validity and enforceability attaching to settlement agreements which include confidentiality provisions", Claimants have objected to providing this information as to settlements attended by

---

[20] The question does not specify the nature of the relationship, so it encompasses more than the law firm's prior use of the doctor as an expert witness.  The question arguably covers *any* relationship, such as personal professional relationships (legal or medical – i.e., the doctor is a client of the lawyer or the lawyer is a patient of the doctor), social relationships (members of the same church, golf club or PTA), etc.  The question is of limited, if any, relevance.

confidentiality undertakings. *Jordan v. Knafel*, 823 N.E.2d 1113, 1119 (Ill. App. Ct. 2005) (*citing Fidelity Fin. Servs., Inc. v. Hicks*, 642 N.E.2d 759, 762 (Ill. App. Ct. 1994) (noting that "confidentiality clauses are common attributes of settlement agreements")). "It is," after all, "a fundamental principle of contract law … that ... a deal is a deal." *Chambers Dev. Co. v. Passaic County Utils. Auth.*, 62 F.3d 582, 589 (3d Cir. 1995) (*citing Morta v. Korea Ins. Corp.*, 840 F.2d 1452, 1460 (9th Cir. 1988), (*quoting United Food & Commercial. Workers Union v. Lucky Stores, Inc.*, 806 F.2d 1385, 1386 (9th Cir. 1986))). The attached declarations establish that the Claimants' settlement agreements contain confidentiality provisions that contractually prohibit disclosure of the terms, conditions or amounts of the settlements.[21]  Moreover, the confidentiality provisions constitute a portion of the consideration for the settlements, and disclosure could constitute a breach of the agreement and subject both Claimants and their counsel to penalties for such breach.[22]

Grace relies principally on its parsed rendering of one unpublished court decision's quotation of another. According to Grace, *Cleveland Construction. Inc. v. Whitehouse Hotel Ltd. P'ship*, No. Civ. A. 01-2666, 2004 WL 385052, *1 (E.D. La., Feb. 25, 2004), quotes *ABF Capital Mgmt. v. Askin Capital*, No. 96 Civ. 2978 (RWS), 2000 WL 191698, *2 (S.D.N.Y., Feb. 10, 2000), for the proposition that "litigants cannot shield a settlement agreement from discovery merely because it contains a confidentiality provision." Motion to Compel 25 (Grace's emphasis omitted). Grace's

---

[21] Declaration of Scott Wert ¶ 7-8; Declaration of Robert Shuttlesworth ¶ 7-8 Declaration of Colin Moore ¶ 7-8; Declaration of Armand J. Volta, Jr. ¶ 7-8; Declaration of Natalie Duncan ¶ 6-7, Declaration of Jeffrey A. O'Connell ¶ 6-7; Declaration of Cameron Waddell ¶ 6-7.
[22] *Id.*

rendering strips the quotation from essential context, however. The sentence of the *ABF Capital* court's opinion, from which the quote is drawn, reads in full as follows:

> Although litigants cannot shield a settlement agreement from discovery merely because it contains a confidentiality provision, or was filed under seal, ***discovery of such an agreement is <u>only</u> appropriate if it is itself relevant to the subject matter of the action, or is likely to lead to relevant evidence***.

*ABF Capital Mgmt.,* 2000 WL 191698, at *2. (citations omitted & emphasis added).

The suggestion that Grace has been zealous in maintaining that its *own* prior settlement history with respect to asbestos claims is irrelevant to the forthcoming estimation proceeding verges on understatement. "***The Debtors' historical settlement of asbestos-related claims has no bearing on their actual legal liability.*** The settlements are not even permitted evidence of liability." Debtors' Reply in Support of Their Estimation Motion 3-4 (Dkt. No. 7502) (emphasis added).

In such regard, Grace points to Rule 408 of the Federal Rules of Evidence:

> Federal Rule of Evidence 408 expressly bars using evidence of a settlement to prove liability. See Fed. R. Evid. 408 ("Evidence of … furnishing or offering or promising to furnish … a valuable consideration in compromising or attempting to compromise a claim … is not admissible to prove liability for … the claim or its amount.")

*Id.* at 10. Mr. Bernick made the same point on Grace's behalf at the January 2005 omnibus hearing:

> And guess what? The Federal Rules of Evidence control all issues that are raised in a contested matter. … What does [sic] the Federal Rules of Evidence say about ***settlement evidence***? ***It doesn't come in. It's just not part of the equation***.

Dkt. No. 7680, p. 34 (emphasis added).

Grace evidently wants to have it both ways.  While categorically disclaiming the relevance and admissibility of its own settlement history, Grace has the gumption to seek to compel Claimants to provide it with confidential information concerning other asbestos defendants' settlement histories.  Grace's flip-flop on the issue raises issues of judicial estoppel and should not be countenanced by the Court.[23]  Grace conveniently forgets the language from the *ABF Capital* decision that conditions the discoverability of settlement information on its "relevan[ce] to the subject matter of the action" and the likelihood that it would lead to the discovery of relevant evidence.  2000 WL 191698, at *2.  Information about Claimants' other settlements is, in Mr. Bernick's turn of phrase, "just not part of the equation."

In the face of this, Grace demands disclosure of Respondents' confidential settlement terms, which could constitute a breach of the settlements agreements and could subject the law firms and their clients to penalties for such breach.  The rights of third parties (i.e., the other settling defendants), not currently before this Court, will be affected.  There is absolutely no reason to demand the disclosure of irrelevant evidence that may create liability or litigation for the Claimants and the law firms representing them.

---

[23] Judicial estoppel precludes a party from obtaining an advantage by arguing inconsistent positions. *See Montrose Med. Group Participating Sav. Plan v. Bennett*, 243 F.3d 773, 777 (3rd Cir. 2001) (judicial estoppel appropriate to prevent a party from taking inconsistent positions to gain unfair advantage); *see also Motley v. New Jersey State Police,* 196 F.3d 160, 163 (3rd Cir. 1999) (judicial estoppel may be invoked by a court at its discretion "to preserve the integrity of the judicial system by preventing parties from playing fast and loose with the courts in assuming inconsistent positions").

Finally, it is interesting that Grace itself raises the possibility of a protective order, while ignoring the plain incongruity of its position. Grace floats the idea by quoting the Third Circuit:

> The [C]ourt, in its discretion, is authorized by [Rule 26(c)] to fashion a set of limitations that allows as much relevant material to be discovered as possible, while preventing unnecessary intrusions into the legitimate interests—including privacy and other confidentiality interests—that might be harmed by the release of the material sought.

*Pearson v. Miller*, 211 F.3d 57, 65 (3d Cir. 2000); see Motion to Compel 25 (Grace's emphasis omitted). Inasmuch as Grace has categorically disclaimed the relevance of what it is seeking, the task for the Court is made simple. The Third Circuit's admonition that "unnecessary intrusions into the legitimate interests—including privacy and other confidentiality interests—that might be harmed by the release of the material sought" be prevented is best advanced by denying Grace's Motion to Compel. *Pearson*, 211 F.3d at 65. The contractual expectations of confidentiality attending Claimants' other settlements merit protection here. Grace, having indirectly but conclusively conceded the irrelevance of these settlements, is simply not entitled to intrude into such matters at all. The Motion to Compel should be denied in such regard and no protective order is indicated.

## V.   THE SPECIFIC BURDEN AND RELEVANCE OBJECTIONS OF THE BARON AND BUDD, SILBER PEARLMAN AND LEBLANC AND WADDELL CLAIMANTS SHOULD BE SUSTAINED.

In addition to the common legal issues discussed above, Grace has also moved to overrule several other specific objections raised by the Claimants represented by Baron & Budd, Silber Pearlman and LeBlanc & Waddell. Specifically, in footnote 3

of the motion to compel directed to these firms [Docket No. 13628], Grace asks the

Court to overrule certain relevance and burden objections lodged to questions

relating to these Claimants' dismissal of lawsuits and claims made against asbestos

trusts.[24]   These questions ask the Claimants, among other things, to provide the

"basis" for the dismissal of (i) any settled lawsuit, or (ii) any claim made against an

asbestos trust.   See Questionnaire, Part VII, Section A, Question 4, and Part VII,

Section B, Question 7 ("[P]rovide the basis for dismissal of the lawsuit against each

defendant."   "[P]rovide the basis for the dismissal of the claim.").   To obtain such

information, however, would impose an extreme and undue burden on these

Claimants and their law firms that far outweighs the relevance (if any even exists)

of the information requested.

The attached Declarations of Natalie Duncan, Jeffrey A. O'Connell and

Carmen Waddell (the "Declarations") establish that their law firms do not keep a

record of the basis or bases upon which a cause of action or case against a defendant

in the tort system was dismissed, other than whether the dismissal was with or

without prejudice.   It would therefore be a practical impossibility to respond to the

questions that ask for such information.   See Declarations, ¶ 7.   Even were every

lawyer involved in the claimants' cases, and every claimant, were personally

interviewed, it is not likely that significant additional information would be

discerned.   *Id.*   Furthermore, this process, which as stated would be unlikely to

provide significant additional information anyway, would take thousands of hours

---

[24] Footnote 3 of the Motion to Compel references the following questions:  Part VII, Section A, Questions 4-6, and Part VII, Section B, Questions 6-7.

to interview the clients, and thousands more hours for the lawyers involved in the files to review the files, at a cost of several million dollars in time and expenses. *Id.* The process would take at least one year, given the number of lawyers and clients involved who would need to be personally interviewed, and given the fact that many of the lawyers involved are no longer employees of the law firms. *Id.*

A court "has a duty, of special significance in lengthy and complex cases where the possibility of abuse is always present, to supervise and limit discovery to protect parties and witnesses from annoyance and excessive expense." *Dolgow v. Anderson,* 53 F.R.D. 661, 664 (E.D.N.Y. 1971). A party especially cannot impose burden on a witness if, in light of the issues in the case, the significance of the area of inquiry is questionable. *Stabilus v. Haynsworth, Baldwin, Johnson and Greaves,* 144 F.R.D. 258, 266 (E.D. Pa. 1992).

Grace has conceded that information about the amounts of claimants' settlements in lawsuits is irrelevant to the issues in this estimation proceeding. The *basis* for the dismissals of lawsuits (settled or otherwise) is of even less importance in estimating an aggregate total of Grace's current and future asbestos liability. When the cost to obtain such inconsequential information (if it is even possible) is so high, an objection based on grounds of burden and relevance is well taken. Consequently, the Claimants' burden and relevance objections to these questions should be in all things sustained.

## PRAYER FOR RELIEF

WHEREFORE, for the foregoing reasons, Respondents pray that the Motion to Compel be denied in its entirety, and that Respondents be afforded such other relief, individually and/or jointly, as to which they may be entitled.

Dated: _____, 2006

Sander L. Esserman
Van J. Hooker
David A. Klingler
David J. Parsons
**STUTZMAN, BROMBERG,
ESSERMAN & PLIFKA,
A Professional Corporation**
2323 Bryan Street, Suite 2200
Dallas, Texas 75201
Telephone:  (214) 969-4900
Facsimile:  (214) 969-4999

**COUNSEL FOR RESPONDENTS**

/s/ Daniel K. Hogan
Daniel K. Hogan (ID no. 2814)
**THE HOGAN FIRM**
1311 Delaware Avenue
Wilmington, Delaware 19806
Telephone:  (302) 656-7540
Facsimile:  (302) 656-7599
E-mail:  dan@dkhogan.com

**LOCAL COUNSEL FOR RESPONDENTS**