**EXHIBIT "G"**

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | ) | |
|---|---|---|
| IN RE: | ) | Chapter 11 |
| | ) | |
| W.R. GRACE & CO., *et al.*, | ) | Case No. 01-01139 (JKF) |
| Debtors. | ) | Jointly Administered |
| | ) | |
| | ) | |
| | ) | |

## DECLARATION OF CAMERON WADDELL

1. My name is Cameron Waddell. I am a lawyer and an employee of LeBlanc & Waddell, LLP. ("L&W"). L&W represents individuals who have claims against W.R. Grace, et al. ("Debtors") for personal injury or wrongful death caused by exposure to asbestos-containing products manufactured or distributed by the Debtors. I am familiar with and have for the purposes of this Declaration familiarized myself with (i) my firm's use of consulting expert medical witnesses, (ii) communications with our clients regarding their claims, including the medical aspect of their claims, (iii) the terms of typical settlements reached with defendants in asbestos litigation pending in the tort system, (iv) the manner in which L&W keeps records of the manner and circumstances surrounding dismissals of pending actions against defendants in the tort system.

2. In many if not all of our cases pending in the tort system, including cases currently pending (albeit stayed) against Debtors, as well as cases being prepared for filing, medical professionals have been retained or specially employed as experts in anticipation of litigation or preparation for trial, but who at this time are not expected to be called as testifying witnesses at trial (hereinafter a "Consulting Expert"). We do not voluntarily disclose the identity, opinion, reports or materials of a Consulting Expert to an adverse party in litigation, but instead hold such information in confidence.

3. The Questionnaire requests disclosure of confidential information about and from Consulting Experts in cases against the Debtors. Specifically, the following portions of the Questionnaire request the disclosure of confidential information, since the requests are absolute and do not provide any exceptions for information that originated with Consulting Experts:

-1-

(a) Section C of the Instructions requests the completion of Part II of the Discovery Questionnaire "if you received diagnoses and diagnostic tests relating to the same condition by multiple doctors."

(b) Section C of the Instructions requests the production of "any and all documents" that "support or conflict with your diagnosis."

(c) Section C of the Instructions requests the production of "all x-ray readings and reports."

(d) Section C of the Instructions requests the production of "all pulmonary function test results, including the raw data and all spirometric tracings, on which the results are based."

(e) Section J of the Instructions requests the production of "any and all documents" that "support or conflict with your diagnosis."

(f) Part II of the questionnaire requests disclosure of "diagnoses and diagnostic tests" by "multiple doctors" concerning "previous or subsequent diagnoses or diagnostic tests that change or conflict with the original diagnoses."

4. L&W lawyers and other professional staff also regularly communicate with clients regarding matters relating to L&W clients' claims, including the medical aspect of such claims. These communications sometimes include, but are not limited to, discussions relating to the physicians and medical professionals that treat the client or provide opinions with regard to the client's condition. These communications are confidential, are made for the purpose of facilitating the rendition of legal services to the client and are covered by the attorney-client and work product privileges. In addition, these communications often include the mental impressions of legal counsel developed in anticipation of litigation or for trial, and thus constitute work product of L&W.

5. The Questionnaire requests disclosure of such protected attorney-client communications and of L&W's work-product. Specifically, the following questions and instructions request the disclosure of attorney-client communications and work-product:

    (a)    Part II sections 2, 3, 4, 5, 6 and 7 of the Questionnaire to the extent that it asks if Claimant "retained counsel in order to receive any of the services performed by the diagnosing doctor."

    (b)    Part II sections 2, 3, 4, 5, 6 and 7 of the Questionnaire to the extent that it asks if "the diagnosing doctor was referred to you by counsel."

    (c)    Part II sections 2, 3, 4, 5, 6 and 7 of the y Questionnaire to the extent that it asks if Claimant is "aware of any relationship between the diagnosing doctor and your legal counsel".

6. When our clients reach settlements with defendants regarding asbestos claims, the settlements are usually memorialized in writing. In many cases, the settlements contain a requirement that the parties keep the terms, conditions or the amounts of the settlements confidential. Such confidentiality provisions do not have expiration dates. Accordingly, L&W and its clients are bound not to voluntarily disclose the terms, conditions or amounts of the settlements. Disclosure of the financial terms of the settlements by L&W and its clients to the Debtors could expose L&W and its clients to potential penalties for breach of the settlements.

7. L&W does not keep a record of the basis or bases upon which a cause of action or case against a defendant in the tort system was dismissed, other than whether the dismissal was with or without prejudice. It would therefore be a practical impossibility to respond to Part VII, Section A, Question 4 and Part VII, Section B, Question 7 of the Questionnaire. Even were every lawyer involved in the clients' case, and every client, personally interviewed, it is not likely that significant additional information would be discerned. Furthermore, this process, which as stated would be unlikely to provide significant additional information anyway, would take thousands of hours to interview the clients, and thousands more hours for the lawyers involved in the files to review the files, at a cost of over a million dollars in time and expenses. In my opinion this process would take at least one year, given the number of lawyers and clients involved who would need to be personally interviewed, and given the fact that a significant percentage of the lawyers involved are no longer employees of L&W.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: November 27, 2006.

_____