**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

_____

In Re:                                                    )

                                                              )

W.R. Grace & Co., *et al.,*                      )

                                                              )

            Debtors.                                   )

                                                              )

_____ )

In Proceedings for a Reorganization under Chapter 11

Case No. 01-01139-JKF
Re:  DI  13703

Objection Deadline:  November 28, 2006 at 4:00 p.m.
Hearing: December 5, 2006 at 8:30 a.m.

**MEMORANDUM OF THE MMWR FIRMS' ASBESTOS CLAIMANTS**
**IN OPPOSITION TO GRACE'S MOTION TO COMPEL DISCOVERY**

The MMWR Firms, [1] on behalf of their respective asbestos personal injury

claimants, and by and through their own counsel, MMWR, [2] hereby submit this

Memorandum in Opposition to the "Motion to Compel the MMWR Firms' Asbestos

Injury Claimants to Respond to the W.R. Grace Asbestos Personal Injury Questionnaire."

I.      **INTRODUCTION**

        The objections asserted by the MMWR Firms' Asbestos Claimants to three

limited and specific portions of the Grace Questionnaire should be sustained:

_____

[1] The "MMWR Firms" as defined by Grace in its Motion to Compel consist of the following firms:
(i) Kazan, McClain, Abrams, Fernandez, Lyons, Farrise & Greenwood, A Professional Law Corporation;
(ii) Waters & Krauss, LLP; (iii) Hobin, Shingler & Simon, LLP ("Hobin Shingler"); (iv) Paul, Hanley &
Harley, LLP; (v) Early Ludwick & Sweeney; (vi) Harowitz & Tigerman; and, (vii) the Wartnick Law Firm.
MMWR represents the Wartnick Law Firm in connection with this Response only as to those clients of the
Wartnick Law Firm that are members of the Grace Certain Cancer Claimants.  MMWR also represents
other law firms in connection with the questionnaire that are not identified as the MMWR Firms in Grace's
Motion to Compel.

[2] The law firm of Montgomery, McCracken, Walker & Rhoads, LLP ("MMWR") represents these other
noted law firms and, except for the individuals that comprise the Grace Certain Cancer Claimants, does not
directly represent any of the individual claimants who are directly represented by these other firms.  In
order to conform to the terminology used in Grace's Motion, reference will be made herein to "MMWR
Firms' Asbestos Claimants."

- 1 -

(i)      The MMWR Firms' Abestos Claimants who have been diagnosed with mesothelioma, and who are producing a pathology report in support of that diagnosis, have properly objected to Questions 2-5 of Part II of the Grace Questionnaire on the basis that there is no permissible justification for Grace to insist on the requested monumental amounts of mindless and needless additional data for purposes of an estimation hearing.

(ii)     The MMWR Firms' Asbestos Claimants have properly objected to Grace's unconscionably detailed requests in Part V of the Grace Questionnaire for information about exposures to non-Grace asbestos products.

(iii)    The MMWR Firms' Asbestos Claimants have properly objected to Grace's requests in Part VII of the Grace Questionnaire for the terms of confidential settlement agreements with other asbestos defendants, and for confidential settlements reached with other asbestos trusts.[3]

As also explained below, Grace seeks discovery sanctions that are impermissible in the context of an estimation proceeding and that are, in any event, procedurally improper under established Federal discovery practice.

Finally, Grace's claim that all relevance objections have already been denied is without merit.

---

[3] A copy of the letter objection provided by counsel for the MMWR Firms is attached hereto as Exhibit A.

## II.    LEGAL ARGUMENT

### A.    THE MMWR FIRMS' MESOTHELIOMA CLAIMANTS HAVE PROPERLY OBJECTED TO QUESTIONS 2 - 5 OF PART II OF THE GRACE QUESTIONNAIRE

Questions 2 through 5 of Part II of the Grace Questionnaire, excluding the 72 sub-part questions, are titled as follows:

2.    Information Regarding Diagnosis

3.    Information Regarding Chest X-Ray

4.    Information Regarding Chest X-Ray Readings

5.    Information Regarding Pulmonary Function Test

The MMWR Firms' Mesothelioma Claimants have either answered or agreed to answer Question 6 of Part II entitled "Information Regarding Pathology Reports." By providing pathology reports that represent the "best evidence" of disease diagnosis – pathology reports have been referred to under oath by medical experts as the "gold standard" in diagnosing mesothelioma[4] – there is no proper factual or legal basis on which Grace can impose the mindless and needless exercise of providing "all x-ray readings and reports" and "all pulmonary function test results, including the actual raw data and all spirometric tracings, on which the results are based." See, Instructions to Grace Questionnaire at p. ii; for Part II of Questionnaire, questions 3, 4, and 5.

---

[4] See, for example, Deposition Transcript of Victor L. Roggli, M.D., pp. 70-71, attached as Exhibit B. Dr. Roggli is a pathologist and mesothelioma expert witness who has testified in the attached excerpt that the pathological diagnosis of mesothelioma represents the "gold standard" and the "final word on the question."

Nor is there any basis to subject the MMWR Firms' Mesothelioma Claimants to the mindless and needless exercise of answering the painfully precise and detailed 72 sub-part questions that are included as a part of Questions 2-5 of Part II of the Questionnaire.

The smokescreen raised by Grace as to the supposed need for "clinical. . . data" (Grace Motion to Compel the MMWR Firm's Asbestos Claimants at p. 10) is cleared away by the attached Affidavit of Samuel P. Hammar, M.D., F.C.C.P. in which he explains that:

> A definitive diagnosis [of mesothelioma] is obtained in approximately ninety-nine percent (99%) of the cases, with a reasonable degree of medical probability, from receiving histopathology and immunostain results.  In a very small percentage of the cases (typically when there are insufficient pathologic materials), it may be helpful to review additional medical records and reports of chest radiographs or CT scans.  However, in the vast majority of the cases, the pathologic materials are sufficient to make a definitive diagnosis with reasonable medical probability.

Affidavit of Samuel P. Hammar, Exhibit C, at p. 2, emphasis added.[5]

In short, in the context of Grace's announced objective of compiling a "navigable database. . . [to be made] available to the Debtors' and various Official Committees' estimation experts, if any" (see, Grace Notice and Memorandum of Points and Authorities at p. 4; internal quotations omitted; emphasis added), there can be no principled justification for obtaining and then compiling data that is needless and irrelevant in "approximately 99%" of all mesothelioma cases where, as here, pathology reports are being supplied.  Where a claimant relies on a pathology report that provides a definitive diagnosis of mesothelioma, there is simply no legitimate need for "all x-ray

---

[5] See also, to the same effect, the Declaration of Dr. Jerrold Abraham attached as Exhibit D.

readings and reports" and "all pulmonary function tests, actual raw data, and all spirometric tracings, on which the results are based." Instructions to Grace Questionnaire at p. 2i.

In any mesothelioma case without a confirming pathology test, that claimant will, of course, have to produce sufficient other medical evidence to sustain the claimant's burden of proof.  And, to the extent that Grace has a demonstrated need to review other medical information in a particular case, Grace can itself subpoena such information in those *very* few cases where any such information may be needed.  However, the idea that an incredibly burdensome and expensive discovery protocol for an entire class of asbestos victims can be dictated by approximately 1% of the entire class is pure foolishness.

As noted, the magnitude and detail of the data called for in the Grace Questionnaire in Part II, Questions 3, 4, and 5 is extraordinary.  Grace often talks about the simplicity of checking a box on the Questionnaire so that untrained readers can enter the data into the database.  If this was all so simple, there would be little or no debate over Questions 2-5 of Part II of the Questionnaire.  But the assembly of all such medical records – to the extent that they are in the custody of claimant or claimant's counsel – is not at all simple, but rather a huge and irrelevant task for the reasons noted.

There is also the needless burden and expense to the Debtor's Estate in collecting all of this needless and mindless data, and then entering it into some database.  The fact that it is more likely than not that all of this expense will ultimately be born by the asbestos claimants victimized by Grace's own misconduct makes the present exercise all the more unconscionable.

**B.**    **THE MMWR FIRMS' ASBESTOS CLAIMANTS HAVE PROPERLY OBJECTED TO PART V OF THE QUESTIONNAIRE REGARDING "EXPOSURE TO NON-GRACE ASBESTOS-CONTAINING PRODUCTS"**

The Court needs to appreciate that the MMWR Firms' Asbestos Claimants have provided, or have agreed to provide by January 12, 2007, work or personal histories that include detailed references to known asbestos exposures, which provide the essential relevant information that Grace seeks.  See, e.g., Consensus Report, Asbestos, Asbestosis, and Cancer: the Helsinki Criteria for Diagnosis and Attribution, Scand. J. Work Environ. Health, vol. 23, no. 4, p. 311 ("In general, reliable work histories provide the most practical and useful measure of occupational asbestos exposure.").

The essential objection of the MMWR Firms' Asbestos Claimants to Part V of the Questionnaire is that it is needlessly detailed and duplicative of the relevant work history information to be provided pursuant to Part VI of the Grace Questionnaire ("Employment History").

Part V of the Questionnaire requires completion of eight columns of information for "each party against which you have filed a lawsuit or claim alleging exposure to asbestos-containing products other than Grace products."  (Emphasis in original.)  The headings for the eight columns are as follows:

1.    Site of Exposure

2.    Job Description

3.    Product(s)

4.    Date and Frequency of Exposure (hours/day, days/year)

5.       Occupation Code
If Code 59, specify

6.       Industry Code
If Code 118, specify

7.       Was exposure due to working in or around areas
where product was being installed, mixed, removed,
or cut?  If yes, please indicate your regular
proximity to such areas.

8.       Nature of Exposure

With respect to the eighth column, Grace demands specification as to "whether

you were any of the following during your exposure":

(a)       A worker who personally mixed Non-Grace
asbestos-containing products;

(b)       A worker who personally removed or cut Non-
Grace asbestos-containing products;

(c)       A worker who personally installed Non-Grace
asbestos-containing products;

(d)       A worker at a site where Non-Grace asbestos-
containing products were being installed, mixed,
removed or cut by others;

(e)       A worker in a space where Non-Grace asbestos-
containing products were being installed, mixed
removed or cut by others; and

(f)       If other, please specify.

Grace apparently views the distinctions between "mixing," "removing," "cutting,"

and "installing" as being sufficiently important to require a separate answer for each job

site, for each job description at that site, for each product, and for "each party against

which you have filed a lawsuit and/or claim alleging exposure to asbestos-containing

products other than Grace products."

The information sought in Part V is more information than what Claimants would typically be required to establish at trial as to any asbestos defendant.

<u>In other words, under the guise of one part of a supposedly "simple"</u> <u>Questionnaire, Grace presumes that every Claimant should have to assemble on or before</u> <u>January 12, 2007 his or her entire case as to every other asbestos defendant, even those</u> <u>defendants with which a Claimant has already settled</u>.

In terms of the level of detail demanded by Part V of the Grace Questionnaire there are more angels here dancing on a smaller pin than can ever be justified in the context of collecting data for an <u>estimation</u> hearing as to which it is Grace's share of liability for asbestos injury that is at issue.

Grace is, of course, within its rights to contest whether claimants have an asbestos disease, and whether they were exposed to any Grace asbestos products.  But for Grace to insist on such detailed discovery of specific other asbestos exposures is pointless as a matter of law.

In a transparent fishing expedition, Grace makes a specious argument that all of this additional discovery should be permitted for even mesothelioma claimants on the basis that "the established medical literature demonstrates that mesothelioma has other causes."  Grace Motion to Compel the MMWR Firms' Asbestos Claimants at p. 9.  Grace then proceeds to quote from the "Expert Report of Suresh Moolgavkar, Ph.D.,  M.D." to the effect that "there is a direct evidence that mesothelioma can occur without exposure to asbestos."  <u>Id.</u>

What Grace ignores in this utterly irrelevant factoid is that all of the mesothelioma victims claiming against Grace assert that they <u>have</u> been exposed to

asbestos, including in particular, to asbestos sold by Grace. <u>See</u> Declaration of Samuel P. Hammer, at ¶ 6 (internal citations omitted) ("[T]here is a preponderant scientific and medical consensus that a documented history of occupational, environmental or domestic exposure to asbestos is sufficient for attribution of a mesothelioma to asbestos exposure.")

Counsel for the MMWR Firms' Asbestos Claimants is unaware of any "established medical literature" anywhere that "demonstrates" that any mesothelioma victim with a proven history of asbestos exposure would ever be thought to have contracted mesothelioma from a source other than asbestos.

As noted, the MMWR Firms' Asbestos Claimants have already agreed to provide evidence of other asbestos exposure through their detailed employment histories. In addition, the MMWR Firms' Asbestos Claimants have provided or agreed to provide, to the extent available, interrogatory responses or transcripts of testimony in which such histories are detailed and where Claimants have been examined as to their recollection regarding products and employment.

Such other exposure might arguably have some relevance to a determination of Grace's several shares of liability and damages, but the requirement that asbestos claimants detail or develop responses in the mindless, needless, and cumulative detail demanded by Grace in Part V of the Questionnaire, particularly where such information is in many instances equally available to Grace, is objectionable.

Moreover, neither Grace nor this Court can ignore the controlling precedent of countless state courts to the effect that a minimal exposure to asbestos is, as a matter of law, recognized as a "substantial factor" in causing mesothelioma.

- 9 -

1.      **State Tort Law Governs a Claimant's Rights**

A fundamental principle of bankruptcy jurisprudence is that personal injury claims against a bankruptcy estate are defined by state tort law.  See, e.g., Raleigh v. Illinois Dep't of Revenue, 530 U.S. 15, 20, 120 S.Ct. 1951, 1955 (2000) ("The 'basic federal rule' in bankruptcy is that state law governs the substance of claims, Congress having 'generally left the determination of property rights in the assets of a bankrupt's estate to state law.'") (quoting Butner v. United States, 440 U.S. 48, 54, 57, 99 S.Ct. 914 (1979)); Cossu v. Jefferson Pilot Sec. Corp. (In re Cossu), 410 F.3d 591, 595 (9th Cir. 2005) ("The validity of a creditor's claim is determined by the rules of state law . . . ."); Litton Loan Servicing, LP, v. Garvida (In re Garvida), 347 B.R. 697, 705 (B.A.P. 9th Cir. 2006) ("Under the 'basic federal rule in bankruptcy,' nonbankruptcy (usually state) law governs the substance of claims"); Drown v. Hebert (In re Drown), 340 B.R. 428, 437 (Bankr. D. Mass. 2006) ("The allowance of the proof of claim is determined with reference to applicable state law."); Ford v. Skorich (In re Skorich), 337 B.R. 441, 445 (Bankr. D.N.H. 2006) ("State law determines the existence of a claim based on a cause of action . . . .").

2.      **Minimal Exposure is Sufficient to Satisfy Causation Standards Under State Law**

Here, controlling state tort law holds that with respect to mesothelioma claimants, evidence of exposure to non-Grace asbestos is irrelevant as a matter of law to the question of whether Grace asbestos products legally caused claimants' injuries.

- 10 -

In contrast to lung cancer and other asbestos-related diseases, one encounter with a small amount of asbestos has been deemed sufficient to cause mesothelioma. <u>See</u>, <u>e.g.</u>, <u>Hoeffer v. Rockwell Automation, Inc.</u>, Nos. A107353, A107964, 2006 WL 185479, at *6 (Cal. Ct. App. Jan. 26, 2006) ("[U]nlike in other asbestos-related cancer cases, the relationship between asbestos exposure and mesothelioma provides 'the strongest link between any exposure in any cancer that we know of.'"); <u>Lane v. Gasket Holdings, Inc.</u>, No. B153966, 2003 WL 21666623 at *2 (Cal. Ct. App. July 17, 2003) ("Mesothelioma can develop in one who has had very low exposure to asbestos. . . . there's no threshold below which any type of bystander or occupational exposure to asbestos cannot potentially cause mesothelioma."); <u>Wehmeier v. UNR Indus., Inc.</u>, 572 N.E. 2d 320, 337 (Ill. App. Ct. 1991) (stating that mesothelioma "is caused after only minor exposure to asbestos dust," but that "[a]sbestosis, on the other hand, develops after a more substantial exposure to asbestos."); <u>Horton v. Harwick Chem. Corp.</u>, 653 N.E.2d 1196, 684 (Ohio 1995) ("Medical science suggests that very limited exposure to asbestos can cause mesothelioma, perhaps the worst of asbestos-related diseases."); <u>Purcell v. Asbestos Corp., Ltd.</u>, 959 P.2d 89, 94 (Or. Ct. App. 1998) (stating that mesothelioma "can be caused by very minor exposures."); <u>Mesothelioma: Has Patient Had Contact With Even Small Amount of Asbestos?</u>, 257 JAMA 1569 (1987) ("Further studies showed that <u>one fiber</u> of a certain length can lodge in the pleura of the lung, and 40 years later, the patient will exhibit signs of dyspnea, chest pain, or both.  To date, there has been no threshold level defined for asbestos induced mesothelioma.") (emphasis added); <u>Consensus Report, Asbestos, Asbestosis, and Cancer: the Helsinki Criteria for Diagnosis and Attribution</u>, Scand. J. Work Environ. Health, vol. 23, no. 4, p. 311, 313 ("Mesothelioma can occur in

- 11 -

cases with low asbestos exposure. . . . An occupational history of brief or low-level

exposure should be considered sufficient for mesothelioma to be designated as

occupationally related.")

To prove "causation" in asbestos tort cases, established and controlling state law

provides that an asbestos plaintiff need not show that specific fibers from the defendant's

product caused the malignancy.  See, e.g., Rutherford v. Owens-Illinois, Inc., 16 Cal. 4th

953, 982 (1997) ("In an asbestos-related cancer case, the plaintiff need not prove that

fibers from the defendant's product were the ones, or among the ones, that actually began

the process of malignant cellular growth.").

The California Supreme Court described the "substantial factor standard" as

follows:

> The substantial factor standard is a relatively broad one, requiring only
> that the contribution of the individual cause be more than negligible or
> theoretical.  A standard instruction (BAJI No. 3.77) tells juries that each of
> several actors or forces acting concurrently to cause an injury is a legal
> cause of the injury 'regardless of the extent to which each contributes to
> the injury.'

Id. at 978.

Where a plaintiff has been exposed to different asbestos products made by

different defendants, a jury may find the "substantial factor" test satisfied with respect to

a particular defendant by showing exposure to that defendant's product.  See, e.g.,

Hoeffer, 2006 WL 185479, at *4 ("[A] particular asbestos-containing product is deemed

to be a substantial factor in bringing about the injury if its contribution to the plaintiff or

decedent's risk or probability of developing cancer was substantial."); Tragerz v. Keene

Corp., 980 F.2d 411, 424 (7th Cir. 1993) ("Illinois courts in applying the substantial

factor test do not seem concerned with which of the many contributing causes are *most*

- 12 -

substantial.  Rather, they seem concerned with whether each contributing cause, standing alone, is a substantial factor in causing the alleged injury.").

With respect to mesothelioma claimants, much of the information sought in Part V of the Questionnaire is plainly irrelevant.  As explained, a showing of exposure to Grace asbestos products is, as a matter of controlling state law, sufficient to prove that Grace's products "substantially contributed" to their mesothelioma.  No other evidence regarding causation would be relevant.  See, e.g., Tragarz, 980 F.2d at 425 ("In sum, under our interpretation of Illinois law, the plaintiff's exposure to each defendant's product should be independently evaluated when determining if such an exposure was a substantial factor in causing the plaintiff's injury – meaning that evidence of an exposure to other manufacturer's products is not relevant to such an inquiry.  As such, the district court properly excluded such evidence."); see also, ACandS, Inc. v. Asner, 686 A.2d 250 (Md. 1996) (to the same effect, applying Maryland law).

### 3.    Estimation of Grace's Liability

Importantly, the instant proceeding is solely for estimation purposes, and not for the allowance, disallowance, or calculation of any individual claims.  See, e.g., Bankr. Ct. Tr., 9/11/06 Hearing, p. 122: 5-10 (Grace's counsel stated, "The whole purpose of the questionnaire process is to produce an estimation in the aggregate of the personal injury asbestos liability of Grace.  It is not, it is not for the purpose of allowing of disallowing any individual claim.  And that distinction has been critical.").

A particular defendant's several share typically is calculated by a determination of that defendant's percentage of fault.  See, e.g., Restatement (Third) of Torts:

Apportionment of Liability § 11 (2000) ("When, under applicable law, a person is severally liable to an injured person for an indivisible injury, the injured person may recover only the severally liable person's comparative-responsibility share of the injured person's damages."); 5 Witkin Sum. Cal. Law Torts § 54 (stating that a severally liable defendant is liable for "damages allocated to that defendant in direct proportion to that defendant's percentage of fault").

Under controlling legal principles, the only evidence of "other exposure" relevant to the present estimation proceeding is general evidence sufficient to allow Grace to estimate all claimants' (present and future) <u>total asbestos exposure</u>, which is only one aspect of determining Grace's share of the overall fault and thus its share of liability. The identities of the individual products, the specific asbestos manufacturers to which claimants were exposed, and the other incredibly detailed aspects of Part V of the Grace Questionnaire are all irrelevant for this purpose. The provided or promised production by the MMWR Firms' Asbestos Claimants of their complete work history is sufficient. <u>See, e.g.</u>, <u>Consensus Report, Asbestos, Asbestosis, and Cancer: the Helsinki Criteria for Diagnosis and Attribution</u>, Scand. J. Work Environ. Health, vol. 23, no. 4, p. 311.

**C.      THE MMWR FIRMS' ASBESTOS CLAIMANTS HAVE PROPERLY OBJECTED TO PORTIONS OF PART VII REGARDING OTHER LAWSUITS AND CLAIMS[6]**

Part VII of the Grace Questionnaire is a colossal red herring to which the MMWR Firms' Asbestos Claimants have properly objected on multiple grounds:  relevance, confidentiality, privacy, and privilege.

**1.      The Basis of Dismissal of Suits is Either Available or Privileged**

Question 4 of Section (a) of Part VII and Question 7 of Section (b) of Part VII ask for the "basis for the dismissal of the lawsuit" and the "basis for the dismissal of the claim," respectively.  (Section (a) of Part VII relates to "lawsuits" and Section (b) of Part VII relates to "claims against an asbestos trust.")

To the extent that the word "basis" means the basis articulated as a matter of public record, then this is non-privileged information readily and equally available to Grace, notwithstanding its demonstrable irrelevance.  To the extent that the word "basis" means the reasons – factual and/or strategic – considered by claimant and counsel, this is so obviously privileged as to be self-proving.

**2.      The Requested Settlement Information is Irrelevant to a Determination of Grace's Several Share of Each Claimant's Liability**

---

[6] In their initial Responses to Grace's Questionnaire, the MMWR Firms specifically objected, *inter alia*, to questions VII(a)(6) and (b)(6) on the ground of irrelevance.  See, e.g., Claimant's Responses and Objections to W.R. Grace Asbestos Personal Injury Questionnaire, submitted by Kazan, McClain, Abrams, Fernandez, Lyons, Farrise & Greenwood, on behalf of asbestos creditor Lawrence Anetsky, which is attached as Exhibit E.

- 15 -

The remaining portions of Sections (a) and (b) of Part VII of the Questionnaire involve an objectionable attempt by Grace to get the dollar amounts of every recovery by a particular claimant from any other asbestos defendant or asbestos trust.

Grace quotes the following statement of the Court during the September 11, 2006 hearing in support of Grace's contention that such information is relevant:

> So. . . if your client worked for Grace, and. . . worked for Mid-Valley and worked for Pittsburgh Corning and had different exposure to different asbestos products and then had a diagnosis of mesothelioma and is filing claims against all three of those trusts, then each of the trusts is not going to be liable for the full amount of whatever the claimant's damages are, number one.  And number two, this specific trust may be funded at a different level based on the fact that some part of the claim has been paid through another trust.  And that is appropriate and relevant evidence.

Tr. of September 11, 2006 Hearing at pp. 206-207

The Court <u>is correct</u> in stating that "each of the trusts is not going to be liable for the full amount of whatever the Claimant's damages are."  The Court is <u>not correct</u> in stating that "this specific trust may be funded at a different level based on the fact that some part of the claim has been paid through another trust."

The Court would be <u>equally incorrect</u> in stating that the funding for the Grace trust could be "at a different level based on the fact that some part of the claim has been paid through [a settling asbestos defendant.]"

As explained below, the amounts paid from other asbestos trusts or other asbestos defendants are wholly irrelevant as to <u>future</u> claimants who will seek recovery from any Grace Asbestos Trust solely for Grace's several share of asbestos exposure to each future claimant.

- 16 -

As for present Claimants who have concurrently asserted claims against other asbestos trusts and other asbestos defendants, any amounts already recovered are equally irrelevant, as well as subject to confidentiality agreements and enforceable privacy rights.

For purposes of estimation, Grace's legal obligation to present claimants (just like Grace's obligation to future claimants) is only for its several share of liability for asbestos exposure to its own asbestos products.  If present claimants have been "underpaid" by other asbestos defendants/trusts relative to their respective several shares, then that underpayment is of no concern or relevance to Grace; if present claimants have been "overpaid" by other asbestos defendants/trusts relative to their respective several shares, then Grace would itself be liable to those overpaying parties to reimburse them for their overpayments.

The net net result is always that Grace must pay its several share and it is only the calculation of Grace's several share that has relevance to the current discovery exercise – discovery that is solely for purposes of estimation of Grace's several share for damages caused by its own conduct.

Grace certainly has the right to investigate whether current claimants against it truly have the asbestos disease that they claim – see Part II of the Grace Questionnaire, and whether or not Grace has the right to investigate whether current claimants against it have, in fact, been exposed to a Grace asbestos product – see Parts III and IV of the Grace Questionnaire.  Grace can proceed with any such investigation based on the information that has or will be provided as detailed above.  And, whether or not Grace has any right or need to compare the amount of exposure to its asbestos products with the amount of exposure to non-Grace asbestos products – see Part VI of the Grace

Questionnaire – Grace may do so based on the information that has or will be provided in response to Part VI.

Grace can use the answers to these portions of the Grace Questionnaire, and Grace can use its experts, to argue that the universe of present claimants should be smaller by some factor, that the levels of asbestos disease should be reduced by some factor, and that the amount of Grace's several share should be smaller by some factor.

But, as explained in detail below, what other asbestos defendants and other asbestos trusts have chosen to pay, or not pay, as part of negotiated settlements with present asbestos claimants against Grace has no relevance to anything at all in terms of a proper "estimation" of Grace's own asbestos liability.

Part VII of the Questionnaire requests information about settlements that claimants have reached in other asbestos lawsuits, including settlement amounts. Requests for information about the settlement amounts in other actions amounts cannot be considered as "reasonably calculated to lead to the discovery of admissible evidence" pursuant to Fed.R.Civ.P. 26(b).

 

     **3.**      **Prior Settlement Amounts Are Relevant Only For Purposes Of Potential Post-Verdict Set-Offs**

In personal injury litigation in most States, settlements with other defendants are relevant only to calculate a non-settling defendant's right to offset with regard to the amount of a verdict for which the non-settling defendant is jointly liable with the settling co-defendants.  See, e.g., ABF Capital Mgmt. v. Askin Capital Mgmt., No. 96-2978, 2000 WL 191698, (Feb. 10, 2000 S.D.N.Y.) ("Even after final judgment has been rendered, the settlement would not be evidence relevant to any issue in this case other

than the ministerial apportionment of damages.  Hence, the amount of the settlement is

not relevant to any issue in this case at this time.") (quoting <u>Bottaro v. Hatton Assocs.</u>, 96

F.R.D. 158, 160 (E.D.N.Y. 1982)) .

An asbestos trust by its very nature eliminates the relevance of any post-verdict

analysis.

Post verdict offsets are entirely irrelevant for purposes of the present estimation

exercise because the trust is intended only to pay based on Grace's collective several

share of its asbestos liability.  The "estimation" of Grace's several share bears no relation

to negotiated settlements with other asbestos suppliers.


**4.      Grace's Established Course of Dealing Demonstrates that Grace has Almost Never Taken Prior Settlement Amounts Into Consideration in Valuing Asbestos Claims**

In its entire history, Grace has taken less than 100 asbestos claims to verdict

before it filed for bankruptcy protection.  <u>See</u> Informational Brief, filed April 2, 2001 at

p. 29.  On the other hand, it is undisputed that Grace settled over 200,000 cases before

filing for bankruptcy.  In reaching all of these pre-bankruptcy settlements, Grace, of

course, never knew the prior settlement amounts with other asbestos defendants.

Nonetheless, Grace managed to value its own liability for purposes of reaching

settlements in over 200,000 pre-petition cases.  Moreover, Grace has itself consistently

insisted on settling its own pre-bankruptcy asbestos claim on a confidential basis to

prevent disclosure of settlement amounts to other asbestos defendants.  <u>See</u> the excerpted

and redacted copy of a confidential settlement agreement used by Grace itself, copy

attached at Exhibit F.

- 19 -

Grace now disavows its long-established prior course of dealing, and takes the factually unsupportable position that all asbestos claims must be treated as if they have been or will be taken to verdict – the only context where settlement amounts with other parties would arguably have any relevance whatsoever.

"The basic federal rule in bankruptcy is that state law governs the substance of claims . . . .  The same principle applies to estimation proceedings under § 502(c)".  See Owens Corning v. Credit Suisse First Boston, 322 B.R. 719, 721-22 (D. Del. 2005) ("This necessarily means that claims are to be appraised on the basis of what would have been a fair resolution of the claims in the absence of bankruptcy.").  Therefore, Grace may not use this bankruptcy to assert rights unavailable under state law and to construct an estimation system for claims that is unsupported by controlling state law principles.

More specifically, Grace, has no right to obtain discovery of settlement terms under controlling state law.  Grace's virtually universal practice in state court was to settle all claims, and in every such instance state law would have prevented Grace from discovering other parties' settlements.  Grace cannot bootstrap itself into obtaining a right to such discovery by pretending that present and future claims have gone, or will go, to trial.  And this is especially true in light of the fact that the premise of the trust proposed by Grace is in the nature of a settlement for an entire class of claimants.

**5.      The confidentiality and privacy rights of the MMWR Firms' Asbestos Claimants Preclude Grace from Obtaining Discovery of prior settlement amounts**

As Grace knows from its own past conduct, settlement details, including amounts, are typically subject to confidentiality agreements entered into with settling defendants.

2133777v2

Claimants are not permitted to disclose information as to settlement amounts, or any other information covered by their confidentiality agreements.  The attached Declaration of Steven Kazan[7] establishes that the settlement agreements at issue contain confidentiality provisions that prohibit disclosure of settlement terms, including the settlement amounts and that the claimants are subject to severe penalties for the breach of these confidentiality provisions.  Mr. Kazan states in his Declaration as follows:

> If any information covered by confidentiality provisions of settlement agreements, including settlement amounts, were to be provided to any third party in breach of the confidentiality provisions, then my client would have breached the terms of his or her settlement agreement, and would be subject to motions for sanctions, which could include severe consequences, including complete forfeiture of the settlement payment.

Declaration of Steven Kazan, Esq., attached as Exhibit H.[8]

Grace cites Cleveland Const. Inc. v. Whitehouse Hotel Ltd., No. 01-2666, 2004 WL 385052 (E.D. La. Feb. 25, 2004) for the proposition that "litigants cannot shield a settlement agreement from discovery merely because it contains a confidentiality provision."  Motion to Compel at p. 17.  The full sentence from which Grace quotes, though, reads, "Although litigants cannot shield a settlement agreement from discovery merely because it contains a confidentiality provision, or was filed under seal, discovery of such an agreement is only appropriate if it is relevant as defined by Fed. R. Civ. P.

---

[7] See also, Declaration of Peter Kraus attached hereto as Exhibit G.  Additional declarations are anticipated from other of the MMWR Firms in advance of the hearing on December 5, 2006.

[8] There is also the fact that the disclosure of confidential settlement would intrude on the strategic judgments and choices made by claimant's counsel.  As explained by Mr. Kazan:

> It would be severely prejudicial to the litigation of all the cases we have presently, and those that we will file in the future, to allow any defense attorney or insurance company who is involved in asbestos litigation to review our settlements with particular defendants.  It would not only be an invasion of privacy for our clients, but it would give the particular attorney or company a road map to our analyses of the values of different cases and the liabilities of different defendants.

- 21 -

26(b)."  Cleveland Const., 2004 WL 385052 at *1 (emphasis added).  Here, as described

above, claimants' settlement amounts are not relevant to the estimation of Grace's

aggregate liability, which must be considered to be the sum total of Grace's several share

of current and future claimants' damages.

Indeed, evidence of a party's settlements is irrelevant to determining liability

beyond simply calculating, post-verdict, an amount by which to offset any joint liability.

And even in this latter instance, only the aggregate amount would be discoverable, as

only such amount is relevant to calculating any offset.  See, e.g., ABF Captial Mgmt. v.

Askin Capital Mgmt., No. 96-2978, 2000 WL 191698, (Feb. 10, 2000 S.D.N.Y.) ("Even

after final judgment has been rendered, the settlement would not be evidence relevant to

any issue in this case other than the ministerial apportionment of damages.  Hence, the

amount of the settlement is not relevant to any issue in this case at this time.") (quoting

Bottaro v. Hatton Assocs., 96 F.R.D. 158, 160 (E.D.N.Y. 1982)); Ford Motor Co. v.

Leggat, 904 S.W.2d 643, 649 (Tex. 1995) (holding that evidence of defendant's prior

settlements was irrelevant and stating, "[R]evelation of confidential settlement amounts

might have a chilling effect on  parties' willingness to settle at all.").


**6.      The Volkswagen Case is Distinguishable**

Grace cites Volkswagen of America, Inc. v. The Superior Court of S.F. Co., 139

Cal. App. 4th 1481 (2006) for the proposition that "the Court found that privacy interests

did not protect the discovery of settlement amounts."  Motion to Compel, p. 19.  That

case is distinguishable.

In <u>Volkswagen</u>, an asbestos plaintiff who had previously settled with a number of bankruptcy trusts was proceeding against Volkswagen in state court.  Volkswagen sought discovery of all documents that the plaintiff had submitted to any bankruptcy trust. Among other things, the trial court ordered the plaintiff "to disclose the amounts, if any, he has received in settlement from each of the trusts . . . ."  <u>Volkswagen</u>, 139 Cal. App. 4th at 1494.

However, the present proceeding is an estimation proceeding and not a series of separate trials as to Grace.  Moreover, as explained above, prior settlement amounts have no relevance to the calculation of Grace's several share of collective asbestos liability. Grace's several share will not be altered by any claimant's previously received settlement amounts.  In <u>Volkswagen</u>, on the other hand, the court was actually adjudicating through a trial process the merits of the plaintiff's claim.

First, as this Court has stressed time and again, the present proceeding is an estimation proceeding, and <u>not an allowance proceeding</u>.  The Court is not now making conclusive findings regarding the merits of individual asbestos claims.  Rather, the Court needs to determine what, on average, will be Grace's several share of each claimants' liability.  As explained, prior settlement amounts are not relevant to the calculation of Grace's several share of each claimant's total liability.  A defendant's several share cannot be altered by a plaintiff's previously received settlement amounts.  In <u>Volkswagen</u>, on the other hand, the court was actually in the process of adjudicating the merits of the plaintiff's claim.

Further, Grace is asking the claimants here to violate their confidentiality agreements, in which the claimants made legally binding promises to keep their

settlement amounts secret.  In <u>Volkswagen</u>, the court made no mention of the plaintiff being bound by any confidentiality agreements.  The opinion, therefore, does not discuss the tension between binding confidentiality provisions and a party's need for discovery.

Finally, in <u>Volkswagen</u>, the plaintiff did not challenge the portion of the trial court's order requiring him to disclose his settlement amounts.  The specific question here – the discoverability of prior settlement amounts – was never in question in <u>Volkswagen</u>.  Contrary to Grace's assertions, <u>Volkswagen</u> provides no precedent, or even guidance, in the present case.

**7.  Individual States Recognize and Enforce the Confidentiality of Settlement Agreements**

In California, "given the private nature of a confidential settlement of a lawsuit, the burden rests on the proponents of discovery of this information . . . to justify compelling production of this material.  They must do more than show the possibility it may lead to relevant information.  Instead, they must show a compelling and opposing state interest." <u>Hinshaw, Winkler, Draa, Marsh & Still v. Superior Court of Santa Clara Co.</u>, 51 Cal. App. 4th 233, 239 (1996).

<u>Hinshaw</u>, which is the leading case on point, involved two plaintiffs who sought discovery of their former co-plaintiffs' settlement amounts, in order to help value their own claims against the common defendant.  The Court applied the above "compelling interest" test, and held that the discovery-seekers had not made a sufficient showing to overcome the settlement agreements' privacy protection.  The Court stated as follows:

> Private financial information is worthy of protection in discovery.  The need for such discovery is balanced against the need for privacy protection in resolving such

disputes. when seeking to discover such material, the proponent must make a higher showing of relevance and materiality than would be necessary for less sensitive material.

. . . .

The court in <u>Board of Trustees</u> outlined the weighing process governing discovery of private documents. Article I, section 1 [of California's state Constitution]'s inalienable right of privacy is a fundamental interest of our society, essential to those rights guaranteed by the First, Third, Fourth, fifth and Ninth Amendments to the U.S. Constitution. But another state interest lies in facilitating the ascertainment of truth in connection with legal proceedings. The constitutional right of privacy is not absolute; it may be abridged when, but <u>only when, there is a compelling and opposing state interest</u>. In an effort to reconcile these sometimes competing public values, it has been adjudged that inquiry into one's private affairs will *not* be constitutionally justified simply because inadmissible, and irrelevant, matter sought to be discovered *might* lead to other, and relevant, evidence. When compelled disclosure intrudes on constitutionally protected areas, it cannot be justified solely on the ground that it may lead to relevant information.

Thus, given the private nature of a confidential settlement of a lawsuit, the burden rests on the proponents of discovery of this information – the plaintiffs here – to justify compelling production of this material. They must do more than show the possibility it may lead to relevant information. Instead they must show a compelling and opposing state interest.

. . . .

The privacy of a settlement is generally understood and accepted in our legal system, which favors settlement and therefore supports attendant needs for confidentiality.

We find a private settlement agreement is entitled to at least as much privacy protection as a bank account or tax information, and analyze the situation on that basis.

. . . .

. . . [Plaintiffs] also argue that there is a low degree of privacy interest in a settlement agreement. They cite no authority for that proposition and we disagree. Finally, plaintiffs argue that if we hold the settlement is private and disclosure would be injurious, the proper remedy is not to deny discovery altogether but to mandate protective measures such as redacting identity. We do not believe redacting names would effectively protect the [co-plaintiffs'] privacy.

These confidential settlement agreements are entitled to privacy protection. Plaintiffs have not made a sufficient showing of compelling need for the information to be entitled to invade that protection. Our decision is influenced by the public policy favoring settlements, the parties' expressed desire for confidentiality, and the speculative nature of measuring plaintiffs' damages by these settlements.

Id. at 238-39, 241-42 (footnotes, quotations, and citations omitted) (underlined emphasis added). See also, Board of Trustees, 119 Cal. App. 3d at p. 524-526 ("And even when discovery of private information is found directly relevant to the issues of ongoing litigation, it will not be automatically allowed; there must then be a careful balancing of the compelling need for discovery against the fundamental right of privacy.") (citations omitted).[9]

Here, far from being able to show a compelling interest in discovery of claimants' settlements, Grace is not able to show that it will gain any utility whatsoever from such information. First, under Federal Rule of Evidence 408 the settlement amounts are inadmissible "to prove liability for or invalidity of [any] claim or its amount." Fed. R. Evid. 408.

---

[9] The MMWR Firms incorporate the responses of other respondents to Grace's other Motions to Compel with respect to the law in other states prohibiting or restricting the discovery of settlements.

Second, in addition to the prior settlements' inadmissibility, this evidence is completely irrelevant to the estimation process.  What Grace needs to be able to calculate is the aggregate amount of Grace's several shares of all present and future claims.  The several share is calculated by dividing Grace's share of a given claimant's exposure by that claimant's total exposure.  The resulting fraction is that portion of the total asbestos liability for which the trust will be responsible.  At no point in this calculation does the amount the claimant may have received in other settlements become relevant.

In sum, far from being able to demonstrate a compelling need for discovering claimants' settlement amounts, Grace cannot even demonstrate that such evidence will be admissible in, or even relevant to, the present estimation process.

### D.   GRACE SEEKS DISCOVERY SANCTIONS THAT ARE IMPERMISSIBLE IN THE CONTEXT OF AN ESTIMATION PROCEEDING

Grace now insists that the Questionnaire must be completed in form and fashion as demanded by Grace, or each non-complying Claimant should have his or her claim "disallowed" or be subject to an "adverse inference."  See, Grace Notice and Memorandum of Points and Authorities, at p. 17.

This is unconscionable and patently contrary to a claimant's Constitutional rights.

First, Grace's present insistence on this Sanction completely contradicts what Grace's own counsel expressly represented to this Court on September 11, 2006:

- 27 -

> The whole purpose of the questionnaire process is to produce an estimation in the aggregate of the personal injury asbestos liability of Grace. It is not, it is not for the purpose of allowing of disallowing any individual claim. And that distinction has been critical.

Bankr. Ct. Tr., 9/11/06 Hearing, p. 122: 5-10

Second, the legal impermissibility of Grace's request for claim disallowance or an adverse inference as a discovery sanction has been well-addressed in "The Official Committee of Asbestos Personal Injury Claimants' Response to the Debtors' Memorandum of Points and Authorities Concerning Background of Questionnaire Approval Process and Objections Previously Addressed by the Court" at pp. 7-10, which is incorporated herein as if fully set forth.

Third, Grace's announced intention to "seek to have an individual's claim disallowed or to seek an adverse inference where a claimant fails to provide the requested information by January 12, 2007" (Grace Notice and Memorandum of Points and Authorities at p. 17) turns the sequence of events under the applicable Federal discovery rules upside down. More specifically, Federal Rule of Civil Procedure 37(b) (2) provides in relevant part that the failure "to obey an order or [to] provide or permit discovery" means only that the Court "may make such orders in regard to the failure as are just."

A determination of what is "just" necessarily depends on facts and circumstances that can never be known in advance. Grace's request that the Court pre-determine sanctions without benefit of the Court knowing the relevant particular facts and circumstances is meritless and, as noted, turns the sequence of events provided for in the discovery rules upside down.

Personal injury/wrongful death claimants are entitled to a jury determination of their claims, and due process permits only a very limited exception in the context of

2133777v2

estimation.  The hearing sought by Grace is essentially summary judgment of its liability

– not estimation.  The individual inquiry sought here is improper and turns the entirety of

estimation procedure into a violation of the Claimants' Constitutional rights.

In a pre-technology era this would be referred to as putting the cart before the

horse.  In the present case, it is putting the punishment before the crime.

Finally, the draconian sanction of claims disallowance for failure to complete the

questionnaire in the form required by Grace is impermissible under 28 U.S.C. §157.


**E.     GRACE'S CLAIM THAT ALL RELEVANCE OBJECTIONS HAVE
        ALREADY BEEN DENIED IS WITHOUT MERIT**

Grace argues that the Court has already issued a blanket ruling that all questions

are relevant for all mesothelioma claimants.  See, Grace Motion to Compel at pp. 4-8.

Grace is not correct.  To the contrary, the Court has explicitly and repeatedly stated that

certain questions may be irrelevant to mesothelioma claimants.  For example, at the

September 25, 2006 hearing the Court stated as follows:

> There may be a specific question.  I'll go back to the
> mesothelioma example, that isn't relevant within the
> context of a particular disease.  And if that's the case, there
> is a process by which somebody can say this isn't relevant
> to me because, and state why its not.  And I think that
> should handle it.
>
> The mesothelioma situation is probably a good one
> to address.  You don't need certain types of functions if, in
> fact, you've got a higher level, more serious disease.

Bankr. Ct. Tr., 9/25/06 Hearing, p. 180: 3-11.  See also Bankr. Ct. Tr., 9/11/06 Hearing,

p. 208:5-7, where the Court said:

2133777v2

It seems that if you got a diagnosis of mesothelioma, that's a whole different ball of wax than some of the other diagnoses.

Further, as a matter of procedural due process, the Court could not, in a series of *ex parte* proceedings, have made rulings that would deprive individual claimants of their rights to object based on the specific facts and circumstances of their claims.  See, e.g. U.S. v. One Toshiba Color Television, 213 F.3d 147, 152 (3d Cir. 2000) ("An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections") (citing Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 314 (1950)); see also Fed. R. Civ. P. 33(b) and 34(b) (specifically providing for the ability of the responding party to object to interrogatories and document requests).

The Court has correctly and consistently recognized the fact that individual claimants retain the right to object to any of the questions based on their own unique circumstances, which include the characteristics of their particular disease:

- "I cannot give you rulings that say that every single objection is overruled. I can't do that."  Bankr. Ct. Tr., 9/11/06 Hearing, p. 252: 28-19

- "In global terms, yes, but with respect to any specific objection by anyone I am not making any rulings with respect to any specific objection."  Id. at p. 255:16-18

- "There may be, as to any individual, a specific question that may not be relevant.  I don't have objections based – before me based on a specific question not being answered by a specific individual.  So, I can't make rulings on those issues with respect to relevant."  Bank. Ct. Tr., 9/25/06 Hearing, p. 179: 17-21

Moreover, while Grace has endeavored to paint this Court's rulings as definitive rulings on relevance as binding on all Claimants (contrary to the Court's express rulings),

- 30 -

Grace has utterly failed to sustain its burden of demonstrating why the information demanded is relevant.

Accordingly, the MMWR Firms' Claimants have retained the right to have this Court now consider the merits of their specific objections, including their relevance objections.

III.    **CONCLUSION**

For the foregoing reasons, the MMWR Firms' Asbestos Claimants respectfully

request that Grace's Motion to Compel directed to them be denied.


Dated:  November 28, 2006                MONTGOMERY, MCCRACKEN, WALKER &
                                         RHOADS, LLP


                                         By:    _____/s/ Noel C. Burnham_____
                                                Noel C. Burnham, Esquire (DE 3483)
                                                Natalie D. Ramsey, Esquire (PA only)
                                                Leonard A. Busby, Esquire (PA only)
                                                300 Delaware Avenue, Suite 750
                                                Wilmington, DE 19801
                                                (302) 504-7800
                                                (302) 504-7820 (facsimile)

                                                and

                                                123 South Broad Street
                                                Philadelphia, PA 19109
                                                (215) 772-1500
                                                (215) 772-7620 (facsimile)

                                                Attorneys for the "MMWR Firms"

2133777v2