**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W. R. GRACE & CO., *et al.* | ) | Case No. 01-01139 (JKF) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | |
| | ) | |

**STATUS REPORT ON NON-PARTY DISCOVERY**

The Court is well-aware of the factual predicate that originally animated Grace's efforts to get discovery of the screening process. It is now virtually indisputable that the medical evidence submitted in support of large numbers of asbestos claims does not comport with standard medical practices and is perhaps, in some cases, fraudulent. Events in the last three years have brought to the forefront that the asbestos claims process is fraught with massive problems. For example:

- The September 2002 confessions of Steven Kazen and his experts before the Senate Committee on the Judiciary have revealed extensive systemic flaws, questionable methods and unreliable practices employed in litigation-related screening processes for both silica and asbestos injuries.[1]
- In February 2005, in the *In re Silica Products Liability Litigation*, federal District Court Judge Janice Graham Jack held *Daubert* hearings and investigated the foundation for 10,000 silicosis diagnoses and found "great red flags of fraud" perpetrated by the lawyers, doctors and screening companies who generated those diagnoses, as well as related asbestosis diagnoses.[2]
- The Spring 2006 hearings before the United States House of Representatives' Subcommittee on Oversight and Investigations further demonstrated the excesses of

[1] *See* September 25, 2002 Testimony of Steven Kazen before the Senate Judiciary Committee at http://judiciary.senate.gov

[2] *See* Debtors' Status Report Regarding Motion to Approve PI Estimation CMO and Questionnaire at 2-4, 16, 18-21 (Docket No. 8994) (Jul. 13, 2005).

the litigation screening industry, which focuses on high-volume, financially driven results.[3]

We now know that the problems that Grace foretold in filing its bankruptcy petition[4] are real and they infect the claims process that is before the Court in this case. A large portion of the asbestos claims brought against Grace, the very claims that will form the basis for this Court's estimation, are founded upon the same unreliable medical and exposure data as revealed in the *Silica* litigation and the Congressional hearings.[5] Indeed, the same doctors that supported the baseless silica claims are the same doctors who now support thousands of Grace claims. And the same lawyers who filed the bogus silica claims are the same lawyers who have filed asbestos claims against Grace.

As Grace has argued from the start, front and center in this controversy is the relationship among the lawyers that file the claims, the screening companies and doctors who provide

---

[3] *See The Silicosis Story: Mass Tort Screening and the Public Health: Hearing Before the Subcomm. on Oversight and Investigations*, 109th Cong. (Mar. 8, 2006); http://energycommerce.house.gov

[4] The pertinent facts surrounding the asbestos claims debacle have been established in prior briefs by Grace. *See* W.R. Grace & Company's Informational Brief at 19, 20 (Docket No. 6) (Apr. 2, 2001); Debtors' Memorandum in Support of Motion for Entry of Case Management Order, Motion to Establish Bar Date, Motion to Approve Claim Forms, and Motion to Approve Notice Program at 13-15 (Docket No. 537) (Jun. 27, 2001); Debtors' Consolidated Reply in Support of Their Motion For Entry of Case Management Order, Establishment of a Bar Date, Approval of the Claim Forms and Approval of the Notice Program at 7-10 (Docket No. 1106) (Nov. 9, 2001); Debtors' Consolidated Reply in Support of Their Motion for Entry of Case Management Order, Establishment of a Bar Date, Approval of the Claim Forms with Respect to Asbestos Personal Injury Claims and Approval of Debtors' Combined Notice Program at 8, 12 (Docket No. 1666) (Feb. 12, 2002); Debtors' Motion for Entry of an Order Seeking the Estimation of Asbestos Claims and Certain Related Relief at 15-17 (Docket No. 6899) (Nov. 13, 2004); Memorandum of Points and Authorities in Support of W.R. Grace & Co.'s Motion to Approve PI CMO and Questionnaire at 9-10, 13-15, 17-18, 32, 37-39 (Docket No. 8395) (May 10, 2005)

[5] *See* Debtors' Consolidated Reply in Support of Their Motion For Entry of Case Management Order, Establishment of a Bar Date, Approval of the Claim Forms and Approval of the Notice Program at 41-54 (Docket No. 1106) (Nov. 9, 2001); Debtors' Consolidated Reply in Support of Their Motion for Entry of Case Management Order, Establishment of a Bar Date, Approval of the Claim Forms with Respect to Asbestos Personal Injury Claims and Approval of Debtors' Combined Notice Program at 25-41 (Docket No. 1666) (Feb. 12, 2002); Debtors' Motion for Entry of A Case Management Order Establishing the Protocols for Litigating Asbestos-Related Claims Following Plan Confirmation at 5, 18-25, 26-29 (Docket No. 6898) (Nov. 13, 2004); Debtors' Motion for Entry of an Order Seeking the Estimation of Asbestos Claims and Certain Related Relief at 21-24 (Docket No. 6899) (Nov. 13, 2004); Memorandum of Points and Authorities in Support of W.R. Grace & Co.'s Motion to Approve PI CMO and Questionnaire at 2, 38-43 (Docket No. 8395) (May 10, 2005).

"medical" evidence in support of those claims. The issues raised in the instant motions to compel, including the purported consulting expert privilege assertion, place these relationships squarely in the forefront.

## I. Grace's Preliminary Investigation and Non-Party Discovery to Date Underscores the Unreliable (and Likely Fraudulent) Nature of the Process that Generated the Claimants' Medical Evidence.

At the Court's suggestion, Grace focused its discovery efforts not on the law firms in the first instance, but on the doctors and screening companies that helped to generate the "evidence" that supports the pending claims against Grace. Grace has undertaken preliminary discovery of doctors and screening companies, generating testimony and document production. While these efforts have been impaired in part by objections (including unfounded privilege assertions) and the invocation of the Fifth Amendment against self incrimination, some basic facts about this process have come to light:

- Grace asbestos claimants have undisclosed subsequent or intervening negative x-ray reports indicating that their diagnoses of asbestos-related disease may be unreliable.
- Claimants or their attorneys have shopped negative x-rays, searching for doctors who will provide positive findings in order to support claims.
- Numerous Grace claimants have brought claims for both asbestosis and silicosis, often based on the same x-ray, despite the fact that the dual occurrence in a single individual of both silicosis and asbestosis is believed to be a clinical rarity.
- The testimony of doctors who have been deposed in this bankruptcy case has revealed that doctors who have participated in medical-legal screening processes do not follow accepted medical practices in rendering diagnoses.
- Doctors with litigation-based screening practices often do not perform differential diagnoses to rule out other, non-asbestos causes of disease, do not take their own occupational and exposure histories from claimants, and do not conduct physical examinations before diagnosing disease.
- Screening doctors and litigation-based B-readers frequently rely on clerical staff to translate their notes, generate their reports, and stamp their names to the reports, and just as frequently fail to review their reports themselves.

- Screening companies and law firms gave doctors instructions and/or criteria for their diagnoses and reports that the doctors duly followed.
- Doctors with litigation-based practices frequently fail to retain any claimant materials, leaving the only source for crucial medical records to be the law firms themselves.
- Lawyers and claimants are selectively omitting or concealing evidence that does not support their claims or that would raise questions about the reliability of the underlying medical diagnoses.

Grace's investigation is on-going and no doubt other such evidence will continue to be revealed through the discovery process in this case. Grace's initial investigation only underscores why the data sought by Grace is imperative to any assessment of the claims' validity and the reliability of the underlying scientific and medical data.

### A. Evidence of Suspicious and Potentially Criminal Practices Continues to Emerge Through Deposition Testimony.

#### 1. Doctor Testimony Demonstrates That The Doctors Act in Concert With The Screeners and The Lawyers and Fail to Follow Accepted Medical Criteria in Rendering Diagnoses.

Evidence continues to mount, revealing the unreliable diagnostic methods employed by the doctors and screening companies in asbestos cases such as this one. Grace has subpoenaed and deposed a number of the doctors who have contributed to the so-called medical evidence underlying the pending Grace claims. These questionable (or at least controversial) doctors are among the ones that the claimants' lawyers have used to generate their claims here. So far, amongst the depositions to go forward, two key doctors -- Drs. Raymond A. Harron and Andrew N. Harron -- have elected to invoke their Fifth Amendment privilege against self incrimination rather than answer even the most basic deposition questions. (*See* R. Harron 12/15/05 Deposition excerpts, Exhibit. 1; *see also* A. Harron 1/12/06 Deposition excerpts, Exhibit 2.) At least one additional doctor, Dr. Ballard, has also expressed an intention to invoke his Fifth Amendment privilege as well. Tellingly, these doctors refuse to answer any questions involving

the screening process, their diagnosis practices, or their relationships with any of the claimants' law firms.

### A. Doctor Testimony From Previous Cases

Some background on these doctors based on previous depositions helps to underscore the significance of their decisions to invoke the Fifth Amendment here. Dr. Ray Harron is a radiologist from West Virginia. Dr. Harron began working for N&M, Inc. -- a prolific screening company responsible for screening numerous Grace claimants -- in 1995 or 1996. Dr. Harron was involved in the diagnosis of over 6,300 plaintiffs in the federal Silica Multi-District Litigation, MDL 1553. *In Re Silica Prod. Liab. Litig.*, 398 F.Supp.2d 563, 604-06 (S.D. Tex. 2005). Before working for N&M, Dr. Harron also worked for Jerry Pitts and Pulmonary Testing Services ("PTS") -- another asbestos screening company, now defunct) -- where his positive rates were staggering. (Exhibit 3 at 240 (Excerpt from Deposition of Ray A. Harron, M.D., Jan. 17, 1997, *Owens Corning v. Glenn E. Pitts*, Case No. 96-2095, E.D. La.).) Dr. Harron stopped seeing patients in normal clinical settings in 1995. *In re Silica Prod. Liab. Litig.*, 398 F.Supp.2d at 603-04 ("In 1995, at the age of 63, Dr. Harron 'kind -of gave up real medicine and [he has] just been doing this pneumoconiosis work.' From 1995 to present, Dr. Harron has worked exclusively for plaintiffs' lawyers . . . ." Dr. Harron testified that, by 1999, he had reviewed x-rays in hundreds of thousands of cases. (Exhibit 4 at 42 (Excerpt from Deposition of Dr. Ray Harron, March 3, 1999, *Ashton v. AC and S, Inc.*, No. 323-879, Ct. Com. Pls., Cuyahoga Co., Ohio).)

Dr. Harron screened for silica and asbestos both. Sometimes Dr. Ray Harron would even write two separate reports: one stating that an individual has asbestosis and the other report stating the same individual has silicosis. *In re Silica Prod. Liab. Litig.*, 398 F.Supp.2d at 605-

607. Dr. Harron would rely on the same x-rays and pulmonary function tests for these reports. The screening company simply paid him an extra $50 to write the second diagnostic report. (Exhibit 5 at 149-155); *In re Silica Prod. Liab. Litig.*, 398 F. Supp. 2d at 603. Dr. Ray Harron did not review exposure histories with plaintiffs. (Exhibit 5 at 174); *In re Silica Prod. Liab. Litig.*, 398 F. Supp. 2d at 604.

Dr. Harron's methodology and motivations came under scrutiny during the *Daubert* hearings in the federal Silica Multi-District Litigation proceedings. *In re Silica Prod. Liab. Litig.*, 398 F. Supp. 2d at 603-08, 629-30, 636-40. Based on Dr. Harron's testimony there, the court found numerous instances of questionable methodology. In the *Silica* lawsuit, the court found that one screening company had in its possession blank ILO forms that were pre-signed by Dr. Harron; that Dr. Harron did not take occupational and medical histories himself; that he "did not agree with the language in his reports about him relying upon the results of a physical examination in making his diagnosis" but "capitulated" when a screening company asked him to place that language in his reports; that he rejected the notion that it is necessary to exclude other possible causes before diagnosing occupational lung disease; and that he relied on secretarial staff to translate the ILO forms. *Id.* at 600, 604-06, 630, 638. The court further concluded that Dr. Harron's "technique" of trusting "his secretaries, a typing company, N&M, Inc., and perhaps others to prepare his reports, stamp [his] name on them and send the reports out without [him] editing or reviewing them" was not generally accepted in the scientific community and was "utterly lacking in any 'standards for the technique's operation.'" *Id.* at 638. While on the witness stand in the *Silica* hearings, Dr. Harron "asked for [legal] representation" and thereby effectively terminated his testimony. *Id.* at 607, 608.

On March 8, 2006, Dr. Harron was called before the United States House of Representatives' Subcommittee on Oversight and Investigations to testify concerning his role in litigation screenings and his diagnoses in MDL 1553. *See The Silicosis Story: Mass Tort Screening and the Public Health: Hearing Before the Subcomm. on Oversight and Investigations,* 109th Cong. (Mar. 8, 2006); http://energycommerce.house.gov. His testimony was short:

> **Chair:** Dr. Harron in my opening statement I made some references to diagnoses that you made in the silica multidistrict litigation for people that you had previously diagnosed with asbestosis. . . . I would ask you today will you certify that each of these diagnoses and all others that you made in this litigation are accurate and made pursuant to all medical practices, standards and ethics?
>
> **Ray Harron:** Mr. Chairman, with all due respect on the advice of counsel I invoke my constitutional privilege under the Fifth Amendment and decline to answer the questions sir.
>
> **Chair:** Now you're refusing to answer all of your questions based on the right against self incrimination afforded to you under the Fifth Amendment of the U.S. Constitution?
>
> **Ray Harron:** Yes sir.
>
> **Chair:** And, is it your intention to assert this right in response to all questions that may be asked you today?
>
> **Ray Harron:** Yes, Mr. Chairman.

Since first asserting his privilege under the Fifth Amendment before the House Subcommittee, Dr. Harron has consistently refused to testify when questioned about his methodology and diagnoses, including the deposition in this case. (*See, e.g.,* Exhibit 1) As a result of Dr. Harron's continued assertion of his Fifth Amendment rights, at least one court overseeing asbestos litigation has stricken Dr. Harron's diagnoses and reports. (Exhibit 6, Order of the Court Regarding Defense Motions for Evidentiary Hearings, *In re Cuyahoga County Asbestos Cases*, Special Docket No. 73958 (Ct. Com. Pls., Cuyahoga Cty., Ohio, March 22, 2006).)

Dr. Andrew Harron, an osteopath and B-reader from Wisconsin who is Dr. Ray Harron's son, also participated in mass screenings, performing B-readings and physicals and issuing diagnoses. In the *Silica* case *Daubert* hearings, Dr. Andrew Harron testified that he engaged in the same diagnosing process for litigation screenings as his father. *In re Silica Prod. Liab. Litig.*, 398 F. Supp. 2d at 608-09. Following his *Silica* testimony, Dr. Andrew Harron has -- like his father -- refused to answer questions regarding his screening work in relation to asbestosis and silicosis diagnoses, asserting his privilege against self-incrimination under the Fifth Amendment. *See* Testimony of Dr. Andrew Harron before the United States House of Representatives, *The Silicosis Story: Mass Tort Screening and the Public Health: Hearing Before the Subcomm. on Oversight and Investigations*, 109th Cong. (Mar. 8, 2006); (*see also* Exhibit 2).

**B. Doctor Testimony in This Case**

The testimony of other doctors who have been deposed in this bankruptcy case has been similar. Doctors do not follow accepted medical practices in rendering diagnoses. (*See, e.g.*, Exhibit 7, Dominic Gaziano 10/18/06 Deposition excerpts at 148 (no differential diagnosis), 217-18, 223 (doesn't review reports, relies on clerical staff), 271-72 (physical exam not necessary); Exhibit 8, Walter Allen Oaks 3/9/06 Deposition excerpts at 191 (physical exam not necessary), 107 (no differential diagnosis).) The screening companies and law firms gave doctors instructions and/or criteria for their diagnoses and reports. (*See, e.g.*, Gaziano 10/18/06 Dep. at 133, Exhibit 7) For example, Respiratory Testing Services, a screener, and its owner, Charles Foster, had a purported goal and business plan of achieving a forty percent positive rate at RTS screenings; Dr. Jay Segarra's positive rate for a three-day screening for RTS "coincidentally" ended up being exactly that -- forty percent. (*See* Exhibit 9, Jay Segarra 11/20/06 Deposition Excerpts at 276-287.) What is more, doctors frequently fail to retain claimant materials; the only

source likely to have these crucial records are the law firms themselves. (*See, e.g.*, Gaziano 10/18/06 Dep. 199-200 (Q: Doctor, for materials that are more than five years old, for materials that are outside the time period that corresponds to your record-retention policy here, what would be potential sources for us to be able to locate any such materials? A: I gave you the list of 15 law firms. You call them and tell them to send anything that has my name on it, and they will give it to you, I am sure.), Exhibit 7; *see also* Oaks 3/9/06 Dep. at 68, 165-66, Exhibit 8.)

While Grace's efforts to obtain non-party discovery related to doctors' litigation-based asbestos screening practices is on-going, the testimony to date, at the very least, supports the conclusion that the doctors' methodology and work is neither medically-sound nor reliable, and suggest that, in some cases may, the practices in fact be fraudulent.

**2. Screening Company Testimony Only Serves To Confirm The Failings Revealed By the Doctors' Testimony.**

Like the doctors with longstanding and prolific medical-legal practices, Grace has also sought discovery of the respiratory lung disease screening companies who helped to generate the Grace claims. Respiratory Testing Services ("RTS") is a full-service asbestos and silica litigation screening entity responsible for screening numerous Grace claimants. (*See* Exhibit 10 (RTS's Marketing Brochure).) The company demonstrates the excesses of the litigation screening industry, which focuses on high-volume, financially driven results. RTS is one of the most prolific screening companies, and its objectionable practices exemplify the litigation screening industry as a whole. On October 27, 2006, Grace deposed Charles Foster, the owner of RTS. Like Dr. Ray Harron, Foster refused to answer a single question, instead invoking his Fifth Amendment right against self incrimination. (Charles Foster, 10/27/06 Deposition Excerpts, Exhibit 11.)

RTS's screening process has been described by Charles Foster in past depositions and in-court testimony. RTS takes x-rays of potential claimants throughout the country using a mobile screening trailor, which is frequently set up in motel parking lots. When a potential claimant attends a screening, he first speaks with RTS's testing manager, who determines whether the individual meets the sponsoring attorney's criteria for that screening. (Exhibit 12 at 143-144 (Excerpt from Dep. of Charles Foster, Sept. 27, 2004, in *Master Consolidated Case Silica (and Mixed Dust)/Asbestos Docket*, Ct. Com. Pl., Cuyahoga County, Ohio).) The potential claimant then speaks with a "sign-in girl," who obtains the work history that is supposed to be used in reaching a diagnosis -- even though she lacks any medical training. (*Id.* at 148; Exhibit 13 at 179-182 (Excerpt from Testimony of Charles Foster, Feb. 18, 2005, at *Daubert* Hrg., *In re Silica Products Litigation*, MDL 1553, U.S. Dist. Ct., S.D. Tex.).) The potential claimant also signs a form requesting an x-ray and/or a pulmonary function test. (Exhibit 12 at 150.) He does not see a physician before having a chest x-ray. (*Id.*)

If a screening doctor finds that a potential claimant's x-ray is consistent with silicosis or an asbestos-related condition, the potential claimant will proceed further through the screening process. The RTS testing manager or another RTS employee will obtain the potential claimant's medical history, using a medical-history form. Then, an RTS technician administers pulmonary function tests to the potential claimant. Finally, a physical examination of the potential claimant will be performed. After this examination, the individual either goes home or, if positive, speaks with a lawyer present at the screening. (Exhibit 12 at 155-56.) Foster's prior testimony also establishes that RTS is paid more if a potential plaintiff tests "positive" for an asbestos-related or silica-related disease rather than negative. (Exhibit 12 at 170.)

The results of RTS screenings are now widely rejected. RTS is now broadly discredited. Judge Janice Jack rejected diagnoses from RTS screenings in *In re Silica Products Liability Litigation*, 398 F.Supp.2d 563 (S.D. Tex. 2005). Likewise, several of the court-supervised trusts established to compensate asbestos claimants have announced that they will no longer accept medical reports generated through RTS screenings. (*See, e.g.,* Exhibit 14 (announcement from the Claims Resolution Management Corporation, which handles asbestos claims submitted to the Manville Personal Injury Trust, that it will not accept the results of RTS screenings).) In addition, the methods of RTS and other litigation screening companies are now the subject of federal grand jury and congressional investigations. (*See* Exhibit 15.)[6]

Grace continues to seek additional testimony related to screening companies There is currently a motion to compel pending with regard to the corporate representative deposition of N&M, Inc., another prolific screening company, as well as subpoenas to other screeners and their current or former employees. This testimony, once it is obtained, will no doubt add to the already mounting body of evidence indicating improper and objectionable practices underlying claimants' evidence.

**B. The Doctors' And Screeners' Documents Produced in This Case Tell A Similar Tale.**

Non-party document discovery also demonstrates the incomplete, misleading and unreliable nature of the materials that have been submitted in connection with the Personal Injury Questionnaires. Grace has also sought document production from medical-litigation doctors and screeners, and has begun the process of comparing the results of these productions to the materials that have been submitted in conjunction with the Personal Injury Questionnaires. In

---

[6] *See also* Debtor's Emergency Motion for Leave To Take Discovery of Claimants' Attorneys at 4-6 (Docket No. 9382) (Sept. 9, 2005).

this review process, Grace has found widespread evidence of undisclosed subsequent or intervening negative medical reports, diagnosis and doctor shopping, silica/asbestos retread claims, and inadequate occupational and exposure histories for claimants.[7] While the following examples are but a sample of the issues discovered through this on-going review process, they suggest that the documents, medical records and x-ray reports that have been withheld from production are pivotal to any fair and truthful understanding of the claimants' complete medical condition.

**1. Undisclosed Subsequent or Intervening Negative X-ray Reports**

Claimant WRR at WR GRACE PIQ 31602 (submitted by Kelley & Ferraro) brings asbestos-related claims against Grace and submits a Personal Injury Questionnaire in this case based on a July 1999 report of Dr. Alvin Schonfeld: "Impression: . . . consistent with pulmonary asbestosis." Claimant further submits a March 2001 report, also by Dr. Schonfeld noting a "diagnosis of bilateral asbestosis." (*See* Exhibit 16.) However, documents obtained through non-party discovery -- but undisclosed in the Questionnaire response -- reveal that, in March 2000, another doctor, Dr. Dominic Gaziano, reviewed WRR's chest x-rays and found them "insufficient to diagnose pneumoconiosis"; rather, his impression was that WRR's "chest x-ray was normal with no evidence of asbestosis or asbestos related pleural disease." (*See* Exhibit 17.)

Even more egregious is Claimant RH at W.R. GRACE PIQ 52595 (submitted by Motley Rice). This claimant brings asbestos-related claims against Grace and submits a Personal Injury

[7] *See further* Debtor's Emergency Motion for Leave To Take Discovery of Claimants' Attorneys at 6-13 (Docket No. 9382) (Sept. 9, 2005). A "retread" is a case where a single claimant has brought claims both for asbestosis and silicosis, often based on the same x-ray. Such claims were at the heart of the controversy before Judge Jack in the *Silica* litigation. As has previously been explained to this Court, the dual occurrence in a single individual of both silicosis and asbestosis is believed to be a clinical rarity. In contrast, the frequency with which such claims occur in asbestos-related litigation is not scientifically plausible. (*See id.* at 7.) It calls into question the reliability of the diagnoses and the diagnostic method. That the existence of such dual asbestos/silica diagnoses would remain hidden but for the aggressive non-party discovery undertaken by Grace demonstrates that claimants and their counsel have concealed relevant information in their incomplete and inadequate questionnaire responses.

Questionnaire in this case referencing a November 17, 1998 report of asbestos by Dr. Thomas L. Brown based on an x-ray of the same date. (*See* Exhibit 18.) However, non-party document discovery revealed an undisclosed May 2000 report of Dr. Robert Altmeyer asserting that the same November 17, 1998 x-ray film "shows no evidence of asbestosis or asbestos related pleural disease. There were no interstitial infiltrates. The pleural surfaces are normal." (*See* Exhibit 19.)

**2. Shopping Negative X-rays for Positive Findings**

Claimant GAA at WR GRACE PIQ 53028 (submitted by Goldberg Persky & White) brings asbestos-related claims against Grace and submits a Personal Injury Questionnaire in this case based on an August 2003 diagnosis letter by Dr. Gordon Gress referencing a June 6, 1998 chest x-ray and ILO characterization by Dr. Gaziano. (*See* Exhibit 20.) However, documents obtained through a non-party subpoena to Dr. Gaziano revealed that, according to a July 16, 2003 report, Dr. Gaziano was "unable to make a diagnosis of an occupational lung disease . . . based on the normal chest x-ray." Dr. Gaziano's July 2003 report was based on a July 7, 2003 x-ray and ILO characterization. (*See* Exhibit 21.) Apparently unsatisfied with the negative x-ray and report from Dr. Gaziano in July 2003, this claimant's records (omitting the recent negative film and report, but including a different older ILO worksheet) were shopped by counsel to a different doctor a month later in order to obtain the positive diagnosis material submitted with the Questionnaire. The intervening negative x-ray and report were withheld or concealed from the Questionnaire response.

Likewise, further evidence of diagnosis shopping is seen in Claimant HLM at WR GRACE PIQ 52575 (submitted by Motley Rice) based on documents discovered through non-party subpoenas. This claimant brings asbestos-related claims against Grace and submits a Personal Injury Questionnaire referencing an April 1, 1999 report of asbestos by Dr. Jay Segarra

based on a March 19, 1999 x-ray. (*See* Exhibit 22.) However, a March 19, 1999 report by Dr. Altmeyer of that same March 19, 1999 x-ray was produced as part of non-party discovery. The March 19, 1999 Dr. Altmeyer report finds "[t]his film is negative for pulmonary asbestosis and asbestos-related pleural disease. . . " (*See* Exhibit 23.) Less than two weeks after Dr. Altmeyer found the film negative, the very same x-ray was shopped to Dr. Segarra who read it as positive.

**3. Silica Diagnoses/Retreads**

Claimant CCM at WR GRACE PIQ 52518 (submitted by Motley Rice) brings asbestos-related claims against Grace and submits a Personal Injury Questionnaire in this case based on what is referenced as a March 19, 1999 x-ray and diagnosis of Dr. Robert Altmeyer of bilateral pleural thickening. (*See* Exhibit 24.) However, non-party discovery reveals a March 19, 1999 narrative report by Dr. Altmeyer that says, instead, that "it is my opinion that this man does have silicosis. . . . The pleural thickening along the right lateral chest wall is likely post surgical in nature. There were no irregular opacities to suggest asbestosis." (*See* Exhibit 25.) While Dr. Altmeyer's finding of pleural thickening was disclosed in the Questionnaire response, the actual narrative report was withheld, thereby concealing the fact that Dr. Altmeyer declined to attribute the condition to asbestos.

Claimant MLC at WR GRACE PIQ 013763 (submitted by Morris Sakalarios & Blackwell) brings asbestos-related claims against Grace and submits a Personal Injury Questionnaire in this case based on an August 2000 report of Dr. James Ballard concluding that the patient's "parenchymal changes are consistent with asbestosis." This claimant also submits additional October 2000 and December 2002 reports by other doctors finding she has pulmonary asbestosis. (*See* Exhibit 26.) Nevertheless, according to documents discovered in through a non-party subpoena, on October 14, 2002, Dr. Andrew Harron diagnoses this claimant with silicosis, and makes no mention of asbestosis whatsoever. (*See* Exhibit 27.)

Claimant HS at WR GRACE PIQ 010611 (submitted by Morris Sakalarios & Blackwell) brings asbestos-related claims against Grace and submits a Personal Injury Questionnaire in this case based on an November 21, 2000 report of Dr. James Ballard concluding that the patient's "parenchymal changes are consistent with asbestosis." This claimant also submits an additional December 2002 report by Dr. William Pinkston saying he has asbestos-related pleural disease and a February 2003 report by Dr. Ballard finding he has asbestosis. (*See* Exhibit 28.) However, according to documents discovered through a non-party subpoena, on October 14, 2002, Dr. Andrew Harron diagnoses this claimant with silicosis, and fails to mention asbestosis or any asbestos-related condition or exposure. (*See* Exhibit 29.)

Claimant EA, Sr. is on record as having open asbestos-related claims against Grace at the time Grace filed for bankruptcy in 2001. However, documents obtained by subpoena from a non-party doctor's files reveal that the claimant (represented by Provost & Umphrey) was subsequently x-rayed and evaluated for silicosis. Dr. Gaziano's December 2001 evaluation of a September 2001 x-ray finds silicosis only, and not asbestosis. This conclusion is again demonstrated in Dr. Gaziano's January 2002 report which states that "the x-ray changes are due to silicosis that he acquired through his occupational exposure." On January 9, 2004, at the request of Provost & Umphrey, this claimant was again evaluated and found to have silica-related disease (and only silica related disease) by Dr. Gaziano with no reference to any asbestos-related condition. (Exhibit 30.)

### 4. Miscellaneous Suspicious Documents

Claimant DLB at WR GRACE PIQ 14015 (submitted by Morris Sakalarios & Blackwell) brings asbestos-related claims against Grace and submits a Personal Injury Questionnaire in this case. (*See* Exhibit 31.) Non-party discovery revealed an obscure note in this claimant's file

suggesting that lawyers were concealing medical records contra-indicting asbestosis in this claimant in order to enhance his recovery in litigation. The note reads:

> Tony says to send pft without having the med evaluation. The reason is cause not only does the patient live in another state, but the doctor who did the pft put on there that the lack of restrictive change would be unusual in asbestosis; therefore, it probably isn't worth the costs for the client to go back to doctor to get a medical evaluation if the doctor is going to put stuff like that in his report.

(*See* Exhibit 32.) Thus, it is without question that lawyers are selectively omitting or concealing evidence that does not support their claims or that would raise questions about the reliability of the underlying medical diagnoses.

## CONCLUSION

Grace's non-party discovery is on-going. The discovery process continues to reveal that the interrelated nature of the lawyers, doctors and screeners in the process of generating underlying medical evidence for asbestos claims has created an inherently flawed, unreliable and potentially fraudulent system. What is more, the depositions and documentary discovery continue to demonstrate that claimants and their attorneys have concealed information relevant to the validity of their asbestos claims against Grace via unfounded assertions of privilege. As argued above, and in the motions to compel also before the Court, the information sought by Grace through the Questionnaires and the discovery process is directly relevant to any assessment of the accuracy of the medical screenings, diagnoses, reports and x-rays readings that form the underlying basis of the claims, and to the reliability of the data generated through these processes. Claimants and their counsel should not be permitted to put forward positive medical findings generated through these flawed and unreliable practices while at the same time selectively concealing or omitting other materials developed through the same methods under a purported consulting expert privilege.

Dated: December 1, 2006

KIRKLAND & ELLIS LLP
David M. Bernick, P.C.
Ellen Therese Ahern
200 East Randolph Drive
Chicago, Illinois 60601
Telephone: (312) 861-2000
Facsimile: (312) 861-2200

KIRKLAND & ELLIS LLP
Barbara M. Harding
David Mendelson
Brian T. Stansbury
Amanda C. Basta
655 Fifteenth Street, NW
Washington, D.C. 20005
Telephone: (202) 879-5000
Facsimile: (202) 879-5200

*and*

PACHULSKI STANG ZIEHL YOUNG JONES
& WEINTRAUB LLP

James E. O'Neill

Laura Davis Jones (Bar No. 2436)
James E. O'Neill (Bar No. 4042)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899-8705
(302) 652-4100

Co-Counsel for the Debtors and Debtors in Possession