# EXHIBIT 1

Dr. Raymond A. Harron                    December 15, 2005
New York, NY

1

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

CHAPTER 11

CASE NO. 01-1139 (JKF)


------------------------------------------------- x

     In Re:



     W.R. GRACE & CO., et al,

          Debtors.

------------------------------------------------- x

     DEPOSITION OF:  DR. RAYMOND A. HARRON

          December 15, 2005, 10:06 a.m.



     Videotaped deposition of Dr. Raymond A.

Harron, taken by Debtors, pursuant to

Subpoena, at the Law Offices of Lawrence S.

Goldman, 500 Fifth Avenue, 29th Floor, New

York, New York, before Linda J. Greenberg, a

Certified Shorthand Reporter and Notary

Public of the State of New York.

Dr. Raymond A. Harron                                December 15, 2005
New York, NY

**Page 2**

1  APPEARANCES:
2
3     KIRKLAND & ELLIS, LLP
4     655 Fifteenth Street, N.W.
5     Washington, D.C. 20005
6     BY: BARBARA M. HARDING, ESQ.
7      - AND -
8       AMANDA C. BASTA, ESQ.
9     (202) 879-5081
10    Attorneys for Debtors
11
12
13    FORMAN PERRY WATKINS KRUTZ & TARDY, LLP
14    City Centre
15    200 South Lamar Street - Suite 100
16    Jackson, Mississippi 39201
17    BY: MARCY BRYAN CROFT, ESQ.
18     - AND -
19      AARON VICK, ESQ.
20    (601) 960-8630
21    Attorneys for W.R. Grace
22

**Page 4**

1  APPEARANCES:
2
3     LAW OFFICES OF LAWRENCE S. GOLDMAN
4     500 Fifth Avenue - 29th Floor
5     New York, New York 10110
6     BY: LAWRENCE S. GOLDMAN, ESQ.
7      - AND -
8       HOWARD S. WEINER, ESQ.
9     (212) 997-7499
10    Attorneys for Dr. Raymond A. Harron, Witness
11
12
13  Also Present:
14
15    Scott Mitchell, Videographer
16
17
18
19
20
21
22                    INDEX

**Page 3**

1  APPEARANCES:
2
3     CAPLIN & DRYSDALE
4     One Thomas Circle, N.W.
5     Suite 1100
6     Washington, D.C. 20005
7     BY: DANIELLE K. GRAHAM, ESQ.
8     (202) 862-5000
9     Attorneys for Asbestos
10    Claimants Committee
11
12
13    STROOCK & STROOCK & LAVAN, LLP
14    180 Maiden Lane
15    New York, New York 10038
16    BY: RYAN PAPIR, ESQ.
17    (212) 806-5400
18    Attorneys for Unsecured
19    Creditors Committee
20
21
22

**Page 5**

1
2  WITNESS        EXAMINED BY           PAGE
3  DR. RAYMOND A. HARRON
4        Ms. Harding            14
5
6            EXHIBITS
7
8  NO.        DESCRIPTION            PAGE
9  Harron Exhibit 1 for identification, Notice
10 of deposition and subpoena.................... 21
11 Harron Exhibit 2 for identification, CD-ROM.... 24
12 Harron Exhibit 3 for identification, Multi-page
13 document titled, "The Manville Personal Injury
14 Settlement Trust X-Ray Audit," production
15 numbers CRMC 0116759 through 0116831......... 48
16 Harron Exhibit 4 for identification, Letter
17 from Mark E. Lederer to Elihu Inselbunch dated
18 4/24/98 production numbers CRMC 0168905 through
19 0168913.......................... 53
20 Harron Exhibit 5 for identification, Multi-page
21 document titled, "American Thoracic Society
22 Documents."...................... 71

Dr. Raymond A. Harron

December 15, 2005

New York, NY

---

**6**

```
1   Harron Exhibit 6 for identification, Two-page
2   document, Report by Dr. Harron re Donald R.
3   Hubbard................................... 85
4   Harron Exhibit 7 for identification, Multi-page
5   document re Jerry Mike Houston.............. 105
6   Harron Exhibit 8 for identification, Multi-page
7   document re William W. Bratton............. 119
8   Harron Exhibit 9 for identification, Three-page
9   document titled, N&M, Inc. Transaction List by
10  Vendor.".................................. 134
11  Harron Exhibit 10 for identification, One-page
12  document titled, "N&M, Inc."............... 136
13  Harron Exhibit 11 for identification, One-page
14  document titled, "N&M, Inc."............... 136
15  Harron Exhibit 12 for identification,
16  One-page document titled, "N&M, Inc."...... 139
17  Harron Exhibit 13 for identification, Multi-page
18  document................................... 142
19
20
21
22
```

**7**

```
1         THE VIDEOGRAPHER: This is the    09:47:45
2   videotaped deposition of Dr. Raymond Harron 10:06:56
3   in the matter of In Re W.R. Grace & Company, 10:06:59
4   et al, in the United States Bankruptcy Court 10:07:03
5   for the District of Delaware, Chapter 11,    10:07:05
6   Case Number 01-1139.                10:07:08
7         This deposition is being held at 10:07:11
8   the office of Lawrence Goldman at 500 Fifth 10:07:12
9   Avenue, New York, New York on December 15, 10:07:15
10  2005.                      10:07:18
11        My name is Scott Mitchel from the 10:07:18
12  firm of Henderson Legal Services with   10:07:20
13  offices in Washington, D.C., and I am the 10:07:22
14  video specialist. The reporter is Linda  10:07:24
15  Greenberg from the same firm. We are going 10:07:27
16  on the record at 10:06 a.m.          10:07:29
17        Counsel will now state their    10:07:32
18  appearances for the record.           10:07:32
19        MS. HARDING: Barbara Harding on 10:07:34
20  behalf of W.R. Grace with the law firm of 10:07:35
21  Kirkland & Ellis.                10:07:39
22        MS. BASTA: Amanda Basta,      10:07:39
```

**8**

```
1   Kirkland & Ellis, for W.R. Grace.        10:07:41
2         MS. CROFT: Marcy Croft and Aaron 10:07:41
3   Vick with Forman, Perry, Watkins, Krutz &   10:07:46
4   Tardy for W.R. Grace.               10:07:46
5         MS. GRAHAM: Danielle Graham with 10:07:51
6   Caplin & Drysdale for the ACC.         10:07:52
7         MR. PAPIR: Ryan Papir at Stroock 10:07:55
8   & Stroock & Lavan for the Unsecured    10:07:55
9   Creditors Committee.               10:07:57
10        MR. WEINER: Howard Weiner for   10:08:00
11  Ray Harron.                    10:08:02
12        MR. GOLDMAN: Lawrence S. Goldman 10:08:03
13  also for Dr. Harron.              10:08:05
14        THE VIDEOGRAPHER: Will the court 10:08:06
15  reporter please swear in the witness.     10:08:07
16        DR. RAYMOND A. HARRON,        10:08:07
17  having been first duly sworn, was examined 10:08:07
18  and testified as follows:            10:08:23
19        MS. HARDING: Good morning, Dr.  10:08:23
20  Harron. My name is Barbara Harding and I'm 10:08:25
21  from the law firm of Kirkland & Ellis and I 10:08:27
22  represent W.R. Grace.              10:08:27
```

**9**

```
1         Before we start the deposition   10:08:28
2   today, your counsel and I have reached a    10:08:29
3   couple of agreements that I think we'd like  10:08:32
4   to place on the record.             10:08:33
5         The first relates to an issue    10:08:35
6   with respect to your compensation for your  10:08:39
7   appearance here today, and it's our     10:08:42
8   understanding that it is your position that 10:08:43
9   -- your counsel's position and your position 10:08:46
10  that you should be compensated for your time 10:08:49
11  spent answering questions as an expert    10:08:52
12  witness pursuant to Federal Rule of Civil  10:08:54
13  Procedure 26(b)(4)(b).              10:08:59
14        It is the Debtors' position that  10:08:59
15  Dr. Harron is not entitled to compensation 10:09:02
16  as an expert witness, nor is such       10:09:03
17  compensation proper. Rule 26(b)(4)(b)    10:09:06
18  neither authorizes payment for the time of 10:09:10
19  witnesses, such as Dr. Harron, nor does it 10:09:12
20  designate the sort of knowledge for which  10:09:14
21  Dr. Harron is being deposed as expert    10:09:16
22  opinion.                      10:09:17
```

Dr. Raymond A. Harron                              December 15, 2005
New York, NY

**10**

1  Dr. Harron has not been retained 10:09:17
2  or designated as an expert by any party as  10:09:19
3  part of the Bankruptcy Estimation proceeding 10:09:21
4  that this deposition is a part of.        10:09:23
5  Moreover, it is our intention to 10:09:27
6  depose Dr. Harron on subjects within his    10:09:28
7  personal knowledge as a fact witness.   10:09:32
8  However, Debtors, in order to    10:09:32
9  move this litigation forward, do not wish to 10:09:34
10  waste the assets of the State by moving to  10:09:36
11  compel Dr. Harron to answer deposition    10:09:38
12  questions or for sanctions for failure to   10:09:40
13  comply with the subpoena.          10:09:43
14  Instead, Debtors are willing to  10:09:45
15  compensate Dr. Harron to the extent      10:09:47
16  permissible under the Federal Rules of Civil 10:09:48
17  Procedure and suggest the following     10:09:50
18  procedure:          10:09:51
19  Without waiving any objections to 10:09:52
20  compensation of Dr. Harron, the parties will 10:09:54
21  put their respective positions before the   10:09:56
22  court ordered mediator, Roger Whelan, by    10:09:58

**11**

1  letter by a date certain that your counsel  10:10:01
2  and I will agree to after the deposition.   10:10:03
3  Dr. Harron and your counsel may  10:10:06
4  submit with that letter a bill for their     10:10:07
5  compensation to which you think you're     10:10:09
6  entitled.          10:10:11
7  The parties agree to abide by    10:10:13
8  whatever the mediator recommends and the   10:10:15
9  Debtors and Dr. Harron's counsel agree to  10:10:20
10  not seek to litigate the matter of Dr.       10:10:20
11  Harron's compensation further. W.R. Grace   10:10:25
12  will also pay all of the mediator's costs     10:10:28
13  with respect to this issue.          10:10:31
14  Does that fully represent the    10:10:35
15  agreement we've reached?          10:10:37
16  MR. GOLDMAN: Yes. I guess I    10:10:38
17  should add, because you went somewhat beyond 10:10:39
18  the agreement. You put in your -- at least  10:10:42
19  your position.          10:10:45
20  Our position quite simply is that 10:10:47
21  Dr. Harron acted as an expert. He is called 10:10:49
22  to testify, as I understand it, and required 10:10:55

**12**

1  to appear pursuant to subpoena pursuant to  10:10:58
2  what he did as an expert, what he learned as 10:11:01
3  an expert within the guise of his being --  10:11:04
4  within the purview of what he was called to  10:11:11
5  do as an expert; and, therefore, both the   10:11:14
6  clear spirit of Rule 26(4)(b), as well as  10:11:18
7  common law requires that he be compensated  10:11:25
8  for his time, for his expenses, which     10:11:29
9  include both the travel expenses, hotel     10:11:34
10  expenses, those expenses, since he has     10:11:35
11  traveled from West Virginia to New York.    10:11:42
12  I should add that although he is 10:11:44
13  submitting to a deposition and appearing, it 10:11:47
14  is our belief that this could have been     10:11:49
15  obviated with no harm to anyone by a      10:11:53
16  stipulation, since it is clear that based    10:11:58
17  upon newspaper articles, other information  10:12:19
18  and the like, that Dr. Harron has a        10:12:21
19  legitimate basis for invoking his Fifth     10:12:26
20  Amendment and intends to do so with respect 10:12:30
21  to questions that, to the extent I'm        10:12:32
22  knowledgeable about this deposition or the  10:12:40

**13**

1  subject matter of this deposition, believe  10:12:50
2  this deposition will cover.          10:12:50
3  Accordingly, not only does he    10:12:50
4  believe that his appearance is unnecessary, 10:12:50
5  but it is, indeed, burdensome.        10:12:52
6  Nonetheless, he has appeared and 10:12:57
7  will respond to questions undoubtedly      10:12:58
8  invoking his Fifth Amendment privilege to   10:13:03
9  many, if not most, if not almost all of the 10:13:07
10  questions.          10:13:12
11  MS. HARDING: Pursuant to our    10:13:14
12  agreement, we will agree to abide by      10:13:15
13  whatever order the mediator issues with     10:13:18
14  respect to the appropriate compensation.    10:13:20
15  MR. GOLDMAN: We will so agree.  10:13:22
16  MS. HARDING: Secondly, with     10:13:28
17  respect to the issue of Dr. Harron's        10:13:29
18  appearance today, pursuant to the Federal   10:13:31
19  Rules of Evidence and the Federal Rules of  10:13:33
20  Civil Procedure, the Debtors were not able  10:13:35
21  to reach such a stipulation and required Dr. 10:13:37
22  Harron to appear today to make the proper   10:13:42

Dr. Raymond A. Harron

December 15, 2005

New York, NY

**14**

1 record pursuant to those rules for the   10:13:45
2 Estimation proceeding, and we made our   10:13:47
3 position clear to counsel.   10:13:51
4     MR. GOLDMAN: Just so we're   10:13:53
5 clear, that was a disagreement apparently   10:13:54
6 among the Debtors themselves. I don't think 10:13:57
7 you ever got to the point where you and I   10:14:00
8 discussed the specifics, or anyone on your   10:14:02
9 behalf, of any stipulation, but we have   10:14:04
10 always said, by that or otherwise, that we   10:14:06
11 would be glad to enter into any reasonable   10:14:10
12 stipulation.   10:14:13
13     MS. HARDING: I understand, and   10:14:14
14 we've also made our position clear that   10:14:15
15 pursuant to the Federal Rules of Evidence   10:14:18
16 and the Federal Rules of Civil Procedure, in 10:14:19
17 order to be able to properly use the   10:14:22
18 deposition in the Estimation proceeding, we   10:14:25
19 believe under the law and the rules that   10:14:28
20 it's necessary for us to ask our questions   10:14:30
21 on the record and for Dr. Harron to fully   10:14:35
22 consider the questions before invoking his   10:14:39

**15**

1 Fifth Amendment privilege.   10:14:42
2     MR. GOLDMAN: One other thing — 10:14:52
3 stipulation, I think, or at least the   10:14:54
4 agreement we received was with respect to   10:14:57
5 the videotaping, is that correct?   10:14:59
6     What I would ask is all counsel   10:15:03
7 agree that the videotape, although counsel   10:15:05
8 will have every right to use it for purposes 10:15:07
9 of the litigation and will not be limited in 10:15:09
10 any way in their use of litigation, it would 10:15:19
11 not be disclosed to the media other than if   10:15:22
12 the media receives it as an exhibit in   10:15:25
13 litigation or similarly.   10:15:28
14     MS. HARDING: What I believe that 10:15:29
15 the Debtors have agreed to, since we do not 10:15:30
16 have control over the transcript or the   10:15:33
17 videotape, but the Debtors have agreed that 10:15:35
18 the Debtors and their counsel will not   10:15:40
19 distribute the videotape to any media ·   10:15:42
20 outlet, and I think other counsel have   10:15:47
21 agreed.   10:15:49
22     MS. CROFT: That's agreed.   10:15:50

**16**

1     MR. GOLDMAN: All counsel so   10:15:51
2 agree?   10:15:52
3     MS. HARDING: Counsel for the ACC 10:15:54
4 agree?   10:15:55
5     MS. GRAHAM: Of course.   10:15:55
6     MS. HARDING: And for the UCC?   10:15:57
7     MR. PAPIR: Yes.   10:16:00
8 EXAMINATION BY   10:16:01
9 MS. HARDING:   10:16:02
10   Q.  Dr. Harron --   10:16:03
11     MR. GOLDMAN: Let me just make   10:16:25
12 something clear. This is Raymond "A" -- as   10:16:28
13 in Alpha -- Harron. There is another doctor 10:16:31
14 in this nation who has the same name as Ray   10:16:35
15 Harron.   10:16:40
16     So this is Raymond A. Harron; is   10:16:41
17 that correct, sir?   10:16:43
18     THE WITNESS: Correct.   10:16:43
19   Q.  I was about to ask you, Dr.   10:16:46
20 Harron, could you state your name for the   10:16:46
21 record, please.   10:16:49
22   A.  Well, the name I use is Ray,   10:16:49

**17**

1 middle initial "A," as in Alpha. Ray A.   10:16:50
2 Harron, H-A-R-R-O-N.   10:16:56
3   Q.  Do you have a medical degree?   10:16:57
4   A.  On advice of counsel, I   10:17:15
5 respectfully invoke my Fifth Amendment   10:17:15
6 privilege against self-incrimination and   10:17:15
7 decline to answer.   10:17:15
8   Q.  In what states have you been   10:17:15
9 licensed to practice medicine?   10:17:19
10   A.  On advice of counsel, I   10:17:15
11 respectfully invoke my Fifth Amendment   10:17:15
12 privilege against self-incrimination and   10:17:15
13 decline to answer.   10:17:21
14     MR. GOLDMAN: I also object to   10:17:21
15 form.   10:17:21
16   Q.  Doctor, are you licensed to   10:17:23
17 practice in eleven states?   10:17:24
18   A.  On advice of counsel, I   10:17:26
19 respectfully invoke my Fifth Amendment   10:17:29
20 privilege against self-incrimination and   10:17:32
21 decline to answer.   10:17:34
22     MR. GOLDMAN: Ms. Harding, would 10:17:35

Dr. Raymond A. Harron

December 15, 2005

New York, NY

**18**

1  anyone mind if, to save time, Dr. Harron, in 10:17:36
2  the future, if he is invoking his Fifth · 10:17:40
3  Amendment privilege, merely says "Fifth    10:17:43
4  Amendment," and it will be understood that   10:17:45
5  that is a shorthand for what he has just    10:17:46
6  read before?                10:17:50
7      MS. HARDING: I do not have any 10:17:51·
8  opposition to that.            10:17:52
9        MR. GOLDMAN: Is everyone okay on 10:17:53
10  that? So agreed.            10:17:56
11  Q.   Doctor, are you aware of the    10:17:59
12  ethical rules related to the practice of    10:18:00
13  medicine in the eleven states in which      10:18:04
14  you're licensed to practice medicine?      10:18:06
15  A.    Fifth Amendment.          10:18:08
16  Q.    And do you abide by the ethical  10:18:09
17  rules related to the practice of medicine in 10:18:11
18  the eleven states in which you're licensed  10:18:14
19  to practice medicine?          10:18:16
20  A.    Fifth Amendment.          10:18:17
21  Q.    What is your medical specialty? 10:18:18
22  A.    Fifth Amendment.          10:18:20

**19**

1  Q.    Dr. Harron, I'm going to ask you 10:18:22
2  several questions today concerning your role 10:18:25
3  in supporting claims for asbestos-related   10:18:27
4  disease in the U.S. litigation system, and, 10:18:31
5  in particular, your role in supporting     10:18:33
6  asbestos personal injury claims against W.R. 10:18:35
7  Grace.                  10:18:38
8      In connection with that, did you  10:18:40
9  receive a subpoena, a notice of deposition 10:18:41
10  and a subpoena in In Re W.R. Grace &      10:18:45
11  Company, et al?            10:18:49
12      MR. GOLDMAN: We're not sure    10:19:04
13  whether Dr. Harron or his representative   10:19:06
14  have --                10:19:08
15  Q.   To your knowledge, did your    10:19:12
16  counsel agree to accept service on your    10:19:13
17  behalf of the notice of deposition and    10:19:15
18  subpoena in In Re W.R. Grace & Company, et 10:19:17
19  al?                  10:19:33
20  A.   I don't really know.        10:19:33
21  A.   I'm sorry, I couldn't hear you.  10:19:36
22  A.   I don't really know.        10:19:38

**20**

1      MS. HARDING: Counsel, will you 10:19:42
2  stipulate --            ·10:19:43
3      MR. GOLDMAN: I will stipulate -- 10:19:44
4  and I don't know, maybe someone could tell 10:19:44
5  me -- but Dr. Harron or counsel have      10:19:46
6  received, and we stipulate that he has     10:19:49
7  either been personally served or that     10:19:52
8  counsel has agreed to accept service on his 10:19:54
9  behalf.                10:19:57
10      MS. HARDING: I'm sorry, you're  10:19:58
11  not agreeing to that?          10:19:59
12      MR. GOLDMAN: No. We are.      10:20:00
13      MS. HARDING: I'm sorry, I       10:20:01
14  misunderstood you.            10:20:03
15      MR. GOLDMAN: I think I got that 10:20:03
16  right. In any case, we are.        10:20:04
17      (Harron Exhibit 1 for        10:20:04
18  identification, Notice of deposition and   10:20:39
19  subpoena.)               10:20:40
20  Q.    Dr. Harron, I'm presenting to you 10:20:37
21  the notice of deposition and subpoena to you 10:20:38
22  in this matter, and it's been marked as   . 10:20:41

**21**

1  Harron Exhibit 1. I direct your attention  10:20:47
2  to Attachment A of this document, which is a 10:20:50
3  subpoena. Do you recognize this document?  ·10:20:52
4  A.    No, I don't.            10:20:59
5      MR. GOLDMAN: Again, I will     10:21:02
6  stipulate that that is an attachment to the 10:21:03
7  subpoena that was served either by direct  10:21:07
8  service or by agreement to Dr. Harron.    10:21:11
9  Q.    Dr. Harron, Attachment A directs 10:21:16
10  you to produce certain documents in      10:21:19
11  connection with this deposition.       10:21:21
12      Have you brought with you any   10:21:22
13  documents today?            10:21:24
14  A.    Fifth Amendment.          10:21:34
15      MS. HARDING: Doctor, because you 10:21:35
16  have not produced any documents in      10:21:36
17  connection with the subpoena, W.R. Grace is 10:21:38
18  reserving its right to reconvene this     10:21:42
19  deposition in the event W.R. Grace receives 10:21:44
20  documents later relevant to the inquiry   10:21:47
21  today.                10:21:49
22      I understand that from your    10:21:51

# EXHIBIT 2

Dr. Andrew Harron                    January 12, 2006
                  Waukegan, IL

Page 1

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

CHAPTER 11

CASE NO. 01-1139 (JKF)


--------------------------------------------- x

In Re:

W.R. GRACE & CO., et al,

Debtors.

--------------------------------------------- x


DEPOSITION OF: DR. ANDREW HARRON

January 12, 2006, 12:00 p.m.

Videotaped deposition of Dr. Andrew

Harron, taken by Debtors, pursuant to

Subpoena, at the Law Offices of Stone &

Associates, L.L.C, 415 W. Washington Street,

Suite 107, Waukegan, Illinois, before Joan M.

Burke, a Certified Shorthand Reporter of the

State of Illinois.

Dr. Andrew Harron                          January 12, 2006
                      Waukegan, IL

---

**Page 2**

1  APPEARANCES:
2     MS. AMANDA C. BASTA
3     Kirkland & Ellis, LLP
4     655 Fifteenth Street, N.W.
5     Washington, D.C. 20005
6        appeared on behalf of the Debtor,
7        W.R. Grace Co.;
8     MS. MARY MARGARET RATLIFF and
9     MR. AARON VICK
10    Forman, Perry, Watkins, Krutz & Tardy, LLP
11    200 South Lamar Street, Suite 100
12    Jackson, Mississippi 39201,
13       appeared on behalf of the Debtor,
14       W.R. Grace Co.
15    MR. JED STONE
16    Stone & Associates, LLC
17    415 West Washington Street, Suite 107
18    Waukegan, Illinois 60085
19       appeared on behalf of the deponent.
20  ALSO PRESENT:
21    MR. BRUCE WITTY, Videographer
22    Legal Video Services, Inc.

---

**Page 3**

1                  INDEX
2  WITNESS:                    PAGE
3  Dr. Andrew Harron, D.O.
4     Examination by Ms. Basta.................... 007
5
6                EXHIBITS
7  NUMBER:        DESCRIPTION        PAGE
8  Exhibit 1, Subpoena to Appear for Deposition.. 010
9  Exhibit 2, Notice of Rescheduled Deposition... 010
10 Exhibit 3, N&M Inc. Transaction List-Andy
11    Harron, M.D........................ 035
12 Exhibit 4, N&M Inc. Transaction List-Andrew
13    Harron............................ 035
14 Exhibit 5, American Thoracic Society Documents-
15    Diagnosis and Initial Management of
16    Nonmalignant Diseases Related to
17    Asbestos.......................... 039
18 Exhibit 6, Guidelines for the Use of the ILO
19    Classification of Radiographs of
20    Pneumoconioses.................... 041
21 Exhibit 7, Memo Re: Walter G. Crawford
22    Radiographs, dated 2/19/99......... 052

---

**Page 4**

1         EXHIBITS (CONTINUED)
2  NUMBER:        DESCRIPTION        PAGE
3  Exhibit 8, The Manville Personal Injury
4     Settlement Trust X-Ray Audit....... 090
5  Exhibit 9, CRMC Memo Dated 9/12/05 Re:
6     Suspension of Acceptance of Medical
7     Records........................... 097
8  Exhibit 10, CD-ROM Labeled W.R. Grace - ASBBI
9     Open Claims As Of April 4, 2001.... 099
10 Exhibit 11, Patient Record #1513, 9/14/00...... 105
11 Exhibit 12, MDL-1553-NandM-552648.............. 112
12 Exhibit 13, MDL-1553-NandM-552649.............. 118
13 Exhibit 14, MDL-1553-NandM-496866.............. 122

---

**Page 5**

1        THE VIDEOGRAPHER: This is Bruce Witty
2  of Legal Video Services, Incorporated, 205 West
3  Randolph Street, Chicago, Illinois. I am the
4  operator of this camera in this videotaped
5  deposition of Dr. Andrew Harron, D.O. as being
6  taken pursuant to Federal Rules of Civil
7  Procedure on behalf of the debtor.
8        We are on the record on January
9  12, 2006. The time is 12:04 p.m. as indicated on
10 the video screen. We are at 415 West Washington,
11 Waukegan, Illinois. Case is captioned W.R. Grace
12 and Company et. al., Chapter 11, Case No. 01-1139
13 parenthesis JFK.
14        Will the attorneys please
15 identify themselves for the video record.
16        MS. BASTA: Amanda Basta, Kirkland and
17 Ellis for the debtor, W.R. Grace.
18        MS. RATLIFF: Mary Margaret Ratliff with
19 Forman, Perry, Watkins, Krutz and Tardy. Aaron
20 Vick is also here with Forman, Perry, Jackson,
21 Mississippi, with W.R. Grace as well.
22        MR. STONE: Jed Stone on behalf of Dr.

---

2 (Pages 2 to 5)

1eb07cc6-8a03-4ba6-aae2-40ee9b5dce20

Dr. Andrew Harron                    January 12, 2006
                 Waukegan, IL

---

**Page 6**

1  Harron.
2       MS. BASTA: My understanding is that
3  there is counsel for the other parties to the
4  examination who wish to appear by phone and we
5  have arranged a conference call-in number for
6  those parties and we will now attempt to make
7  that phone call.
8       MR. STONE: I am objecting to any person
9  or persons not present in this room participating
10 in any way in this deposition.
11      MS. BASTA: I'm going to state for the
12 record that on Monday afternoon I called the
13 office and spoke with Mr. Stone's assistant
14 informing her that people intended to appear by
15 phone and asking whether or not a phone would be
16 made available for that purpose. I received a
17 telephone call back saying that there was -- a
18 phone would be available with speaker capability,
19 but not conference capability and I explained to
20 her that I would arrange a conference call-in
21 number for that purpose.
22      I understand that this is Mr.

---

**Page 7**

1  Stone's position and if he will -- we disagree
2  with it. We believe it's contrary to our prior
3  agreement with this office and the
4  representations that were made on his behalf by
5  his secretary. However, in the interest of
6  moving the deposition forward we are willing to
7  go forward, but we do object.
8       Dr. Harron, good afternoon.
9       THE VIDEOGRAPHER: Hold on. We've got
10 to swear him in yet. Will the court reporter
11 please identify herself and swear in the witness.
12      COURT REPORTER: Joan Burke, Eastwood-
13 Stein Deposition Management. Would you raise
14 your right hand, please.
15          (Witness sworn.)
16      THE VIDEOGRAPHER: Please proceed.
17      ANDREW HARRON, D.O., called as a
18 witness herein, having been duly sworn, was
19 examined and testified as follows:
20      EXAMINATION
21 BY MS. BASTA:
22      Q. Dr. Harron, my name is Amanda Basta. I'm

---

**Page 8**

1  an attorney with the law firm of Kirkland and
2  Ellis in Washington, D.C. and we're representing
3  the debtor, W.R. Grace, in this matter. Would
4  you please state your name for the record.
5       A. Andrew Harron.
6       Q. And Dr. Harron, do you have a medical
7  degree?
8       A. I respectfully decline to answer your
9  question on Constitutional grounds based on the
10 Fifth Amendment. To each subsequent question
11 that you ask and that I exercise Constitutional
12 privilege, in the interest of time --
13 (inaudible.)
14      COURT REPORTER: I'm sorry, I couldn't
15 hear the last part of your answer.
16      THE WITNESS: I respectfully decline to
17 answer your question on Constitutional grounds
18 based on the Fifth Amendment. To each subsequent
19 question that you ask and that I exercise
20 Constitutional privilege, in the interest of time
21 I will merely say "Fifth Amendment".
22 BY MS. BASTA:

---

**Page 9**

1       Q. Dr. Harron, in what states have you been
2  licensed to practice medicine?
3       A. Fifth Amendment.
4       Q. Are you -- do you have an M.D.?
5       A. Fifth Amendment.
6       Q. Do you have a D.O.?
7       A. Fifth Amendment.
8       Q. Are you presently licensed by any state
9  to practice medicine?
10      A. Fifth Amendment.
11      Q. Are you currently practicing medicine?
12      A. Fifth Amendment.
13      Q. Doctor, do you follow the ethical rules
14 related to the practice of medicine in the states
15 in which you're licensed to practice medicine?
16      MR. STONE: I'm going to object to that
17 question. Doctor, you may answer as you've
18 indicated.
19      THE WITNESS: Fifth Amendment.
20 BY MS. BASTA:
21      Q. And do you have a medical specialty?
22      A. Fifth Amendment.

3 (Pages 6 to 9)

1eb07cc6-8a03-4ba6-aae2-40ee9b5dce20

Dr. Andrew Harron

January 12, 2006

Waukegan, IL

Page 10

1      THE VIDEOGRAPHER: Excuse me. Would it
2  be okay if we went off the record for just a
3  second?
4      MS. BASTA: Sure.
5      (Discussion held off the record.)
6      THE VIDEOGRAPHER: Going back on the
7  record at 12:09 p.m. Please proceed.
8  BY MS. BASTA:
9      Q. Dr. Harron, as we just discussed off the
10  record, because this is a deposition we need
11  everybody in the room to be able to hear you so
12  if you could please keep your voice up.
13      All right. Dr. Harron, I'm going
14  to hand to you what has been previously marked as
15  A. Harron Exhibit 1 and A. Harron Exhibit 2.
16      MR. STONE: Do you have copies of those?
17      MS. BASTA: Yes, I do.
18  BY MS. BASTA:
19      Q. Do you recognize these documents?
20      MR. STONE: We would acknowledge receipt
21  of these documents as notice of deposition and
22  notice of rescheduled deposition.

Page 11

1  BY MS. BASTA:
2      Q. Are you testifying here today pursuant
3  to the subpoena and revised notice of deposition?
4      MR. STONE: Dr. Harron is not testifying
5  here today. He's exercising Constitutional
6  privilege under the United States Constitution
7  and the Fifth Amendment thereof.
8  BY MS. BASTA:
9      Q. Are you appearing here today pursuant to
10  the subpoena and revised notice of deposition?
11      MR. STONE: Dr. Harron is here because
12  he's been subpoenaed to be here.
13  BY MS. BASTA:
14      Q. Dr. Harron, I'm going to direct your
15  attention to Attachment A to the subpoena and ask
16  you to look at that for a moment. Attachment A is
17  the document request that was attached to the
18  subpoena duces tecum.
19      MR. STONE: Ms. Basta, as you know, we
20  have written to you with respect to that subpoena
21  duces tecum, indicated in a letter that we would
22  be exercising Constitutional privilege with

Page 12

1  respect to the production of documents, and
2  explained to you our legal basis for our
3  objection.
4      MS. BASTA: I understand. I'm just
5  going to ask Dr. Harron a few questions regarding
6  the subpoena.
7  BY MS. BASTA:
8      Q. Did you bring the requested documents
9  with you?
10      A. Fifth Amendment.
11      Q. Do you intend to assert the Fifth
12  Amendment privilege for each document that is
13  responsive to the subpoena?
14      A. Fifth Amendment.
15      MS. BASTA: The debtors are reserving
16  their right — We understand Dr. Harron's
17  position, but we are reserving our right to move
18  to compel the documents at an appropriate stage.
19      MR. STONE: And if you do, we'll go to
20  court and discuss with the judge our position and
21  the judge will rule. But in the meantime, the
22  doctor could not have been clearer that he was

Page 13

1  going to exercise Fifth Amendment privilege, that
2  he's resisting the production of documents on the
3  grounds of the Fifth Amendment, that he's
4  exercising a Constitutional right, and I don't
5  even — I mean those questions are clearly an
6  abuse of this process because you knew the
7  answers before you walked in the room.
8      MS. BASTA: Mr. Stone, those answers
9  were not on the record and I believe that we are
10  entitled to get them on the record and therefore
11  I will ask the questions to which I believe we
12  are entitled answers and Dr. Harron may choose to
13  answer or not answer as he sees fit and as you
14  see fit to advise him.
15  BY MS. BASTA:
16      Q. Dr. Harron, have you performed B-
17  readings in connection with potential lit —
18  potential asbestos litigation?
19      A. Fifth Amendment.
20      Q. Have you diagnosed individuals with
21  asbestos-related disease in connection with
22  potential litigation?

4  (Pages 10 to 13)

1eb07cc6-8a03-4ba6-aae2-40ee9b5dce20

# EXHIBIT 3

1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

```
* * * * * * * * * * *  *
OWENS CORNING          *  CIVIL ACTION
                       *
VERSUS                 *  NUMBER 96-2095 "S" (3)
                       *
GLENN E. PITTS, ET AL  *
                       *
* * * * * * * * * * *  *
```

# ORIGINAL

Deposition of RAY A. HARRON, M.D.,
taken on Friday, January 17, 1997, commencing at
10:10 a.m., in the offices of ADAMS AND REESE,
Attorneys-at-Law, 4500 One Shell Square, New
Orleans, Louisiana 70139.

1  predecessor publications to Exhibits 12 and 13?

2    A.   No.

3    Q.   I would like to ask you a couple of

4  questions about the different diagnoses you made

5  while you were doing work for Pulmonary Testing

6  Services.   I mean, I take it you could make a

7  finding that there was no asbestosis.   Is that

8  correct?

9    A.   I don't think we ever said that, because

10  nobody would get to me without a work

11  history.   So I think we would say possible

12  asbestosis.

13    Q.   And what did you mean by that?

14    A.   Just what it said, this guy possibly

15  could have asbestosis, and my judgment on that

16  was made on his work history.

17    Q.   And what did you need to have for you to

18  make that diagnosis?

19    A.   A history of exposure and the latency

20  period.

21    Q.   And what other diagnoses did you make?

22    A.   Asbestosis within a reasonable degree of

23  medical certainty.

24    Q.   What did you need to have in order to

25  make that diagnosis?

# EXHIBIT 4

CondenseIt

**Page 1**

```
 1         IN THE COURT OF COMMON PLEAS
 2            CUYAHOGA COUNTY, OHIO
 3          CASE NOS. 323-879-323909
 4                  - - -
 5
 6   RAY EDWIN ASHTON,    -vs-    ACandS, Inc.,
     et al.,                     et al.,
 7
 8   Plaintiffs,               Defendants.
 9
10                  - - -
11
12         Deposition of DR. RAY A. HARRON, a witness
13   herein, taken by the Defendants as upon cross
14   examination pursuant to the Ohio Rules of Civil
15   Procedure and Notice as to time and place and
16   stipulations hereinafter set forth, at the Hilton
17   Hotel, 8191 Airport Boulevard, Houston, Texas, at
18   2:40 p.m., on Wednesday, March 3, 1999, before
19   Gregory D. Crase, a notary public within and for the
20   State of Florida.
21                  - - -
22
23
24
25
```

**Page 2**

```
                        I N D E X
 2   Witness:
     DR. RAY A. HARRON
 3
     EXAMINATION:      DIRECT  CROSS  REDIRECT  RECROSS
 4   by Mr. Johnson              5                91
     by Mr. Taber                      53
 5   by Ms. Bozorth       86
 6
 7
 8
 9
10
11
12
13                    E X H I B I T S
14                                            Page:
15   Defense Exhibit 1  Notebook of Information on
16                      Cuyahoga Group Clients        93
17
18
19
20
21
22
23
24
25
```

*** Notes ***

**Page 3**

```
 1   APPEARANCES:
 2        For the Plaintiffs:
 3             Susan Bozorth, Esq.
                  Of
 4             Baron & Budd
               43-B New Carver Road
 5             Monroe, Ohio  45050
 6
          For the Defendant, ICF/Kaiser Engineers,
 7        Inc., and The Flibrico Company:
 8             Edward E. Taber, Esq.
                  Of
 9             Bonezzi, Switzer, Murphy & Polito Co.,
               L.P.A.
10             Leader Building, Suite 1400
               526 Superior Avenue
11             Cleveland, Ohio  44114-1491
12        For the Defendant, IMC:
13             John Bruni, Esq.
               (Via telephone)
14                  Of
               Pietragallo, Bosick & Gordon
15             The 38th Floor
               One Oxford Centre
16             Pittsburgh, Pennsylvania  15219
17
          For the Defendant Pittsburgh Corning Corp.
18
               Steven T. Johnson, Esq.
19                  Of
               Pepple, Johnson, Cantu & Schmidt
20             1900 Seattle Tower Building
               118 Third Avenue
21             Seattle, Washington  98101
22                  - - -
23
24
25
```

**Page 4**

```
 1              S T I P U L A T I O N S
 2         It is stipulated by and between counsel for
 3   the respective parties that the deposition of DR.
 4   RAY A. HARRON, a witness herein, called as upon cross
 5   examination by the Defendants, may be taken at this
 6   time and place pursuant to the Ohio Rules of Civil
 7   Procedure and Notice as to time and place of taking
 8   said deposition; that the state qualifications of the
 9   Notary Public were waived; that the deposition was
10   recorded in stenotypy by the court reporter, Gregory D.
11   Crase, and transcribed out of the presence of the
12   witness; and that signature to the said deposition is
13   expressly waived.
14                  - - -
15
16
17
18
19
20
21
22
23
24
25
```

*** Notes ***

COPY

Condensit™



# EXHIBIT 5

Mason Heath 7-8-03.txt

1

```
1                   IN THE CIRCUIT COURT
                 OF COPIAH COUNTY, MISSISSIPPI
2

3    CURTIS JOHNSON, et al.,
             Plaintiffs,
4
     VERSUS              CIVIL ACTION NO. 2002-0030
5
     AMERICAN OPTICAL CORPORATION,
6    et al.,
             Defendants.
7                             AND

8    JAMES UNDERWOOD, et al.,
             Plaintiffs,
9
     VERSUS              CIVIL ACTION NO. 2002-0027
10
     AMERICAN OPTICAL CORPORATION,
11   et al.,

12           Defendants.

13

14       VIDEOTAPE 30(b)(6) DEPOSITION OF N&M, INC.
            REPRESENTATIVE:  CHARLIE HEATH MASON
15
         Taken at the LaFont Inn, 2703 Denny Avenue,
16       Pascagoula, Mississippi, on Tuesday,
         July 8, 2003, beginning at 9:08 a.m.
17

18   REPORTED BY:

19       SANDI SUAREZ MYERS, RPR, CSR #1301
         State-Wide Reporters
20       Post Office Box 14113
         Jackson, Mississippi  39235
21       Telephone:  (601) 366-9676
         Fax:  (601) 366-9756
22
         Biloxi Office:
23       764 Water Street
         Post Office Box 389
24       Biloxi, Mississippi  39533
         Telephone:  (228) 432-0770
25       Fax:  (228) 432-0690
          STATE-WIDE REPORTERS - (228) 432-0770
```

2

```
1    APPEARANCES:

2

3        MARK SLEDGE, ESQUIRE
         Grenfell, Sledge & Stevens, PLLC
         1659 Lelia Drive
4        Jackson, Mississippi 39211
         Telephone:  (601) 366-1900
                    Page 1
```

Mason Heath 7-8-03.txt

148

1    next document that's in Deposition Exhibit No. 2.
2    If you'll just tell me what that is, please?
3        A.    This is where O'Quinn law firm called me
4    and said that the defense lawyers had lost a set of
5    chest x-rays on some plaintiffs that they needed
6    redone.  So we shot.  We charged them $3,000 to come
7    and do those plaintiffs because we had to charge
8    them a minimum.  They called us and said they had to
9    have them for whatever you all were doing, so.
10       Q.    How many pages is that document?
11       A.    Just two.  It shows the plaintiffs, and it
12   shows the check that they sent to us with our...
13       Q.    You charged $600 for an x-ray for each of
14   these individuals?
15       A.    That's what they allocated to the clients.
16   We charged our norm- -- we charged the straight
17   minimum with no travel or anything to come back and
18   do those chest x-rays.
19       Q.    I guess the point is that $600 for each of
20   these individuals is what you charged?
21       A.    That's not what we charged.  We charged
22   the straight amount.  Whatever they charged back to
23   the client is up to them.
24       Q.    So you charged an amount of $3,000 for
25   these six individuals?

149

1        A.    I didn't know how many there were going to
2    be.  They just told us to be there.

Page 127

Mason Heath 7-8-03.txt
3      Q.   All right.  What is the next document?

4      A.   This is a semipulmonary function manual

5   that we use, basically just showing the

6   calibrations, how we calibrate the machines, what we

7   go through for calibrations.

8      Q.   All right.

9      A.   And it shows a little bit of procedures on

10   how.  We go through a pulmonary function.  I mean,

11   it -- it's pretty self-explanatory.

12      Q.   What is next?

13      A.   You've got the 118 people from Jackson,

14   Mississippi that we generated silica reports for.

15   This particular charge is $150.  What they did was,

16   you had two -- you were there in Jackson,

17   Mississippi.  People had mixed reports.  They had a

18   mixed B read, basically, meaning that they had

19   asbestos and silicosis.  So we generated two

20   separate reports, one being for silica, and one

21   being for asbestos.  Not we, but Dr. Harron did.

22   And then what we did was pay Dr. Harron for

23   regenerating the reports.

24      Q.   May I see that please?

25      A.   (Witness complies).


150

1      Q.   So this is an invoice No. 203 dated April

2   12th, 2002, and this is for 118 silica reports for

3   clients in Jackson, Mississippi, correct?

4      A.   Yes, sir.

5      Q.   And those are Dr. Harron's charges for his

6   reports?

7      A.   No.  His fee is on the back.  What we did
Page 128

Mason Heath 7-8-03.txt

8   was, instead of having charged them $300 all over

9   again for another pulmonary function, we basically

10  gave them a copy of the same pulmonary function we

11  did the same day for the asbestos claim, and then we

12  just charged them for just giving them the pulmonary

13  function that went -- because they already had it,

14  basically.  So it was just two separate law firms

15  that were doing the asbestos versus silica.  Instead

16  of having to charge the client $300 again, there was

17  no need.  So we just charged them half of whatever

18  it was.

19       Q.   Okay.  And what I don't understand, what

20  doesn't track on this, is Ray Harron is paid for 118

21  individuals, $5,900.

22       A.   Right.

23       Q.   But the invoice was for 17,700.

24       A.   Because we made the rest.

25       Q.   The rest is for -- for the PFTs?

151

1        A.   Yes, sir.

2        Q.   Okay.

3        A.   This is -- like I was telling you, this --

4   these are the silica reports that we generated in

5   this invoice.  These people were also seen for part

6   of their asbestos claim.  I don't know which of the

7   plaintiffs exactly because I don't have their B

8   reads, so I don't know who has a mixed report and

9   who don't.  But this shows the asbestos people that

10  we did on this day.  I don't know who also were

11  silica or not.

Page 129

Mason Heath 7-8-03.txt
12            I just generated this because it had

13    something to do with the plaintiffs for this day.

14    This shows the days that we were there and the

15    charge that we had and the checks there with them

16    and the check that we paid Dr. Harron to match the

17    amounts.

18        Q.    May I see that, please?

19        A.    (Witness complies).

20        Q.    And this is invoice No. 202; is that

21    correct?

22        A.    Yeah.  Yes, sir, I can't see it, but.

23        Q.    With attached check?

24        A.    Yes, sir.  What you see as a credit up

25    there is apparently they sent some people or some


                                                    152

1    people came in that were not their clients that got

2    through the system basically, and we couldn't charge

3    them for those people, so.  The back check is

4    Dr. Harron's check, and you'll see that he's paid

5    per client for everyone who came in and that was his

6    fee.

7        Q.    And that fee was $100,125 for 444

8    individuals at Jackson, Mississippi, and 357

9    individuals for Hattiesburg, correct?

10        A.    Yes, sir.

11        Q.    Now, I -- I'm a little confused,

12    Mr. Mason.  Please help me out here.  Are you

13    charging individuals for being tested for both

14    asbestos and silicosis?  Is that one charge, or are

15    there two different charges for -- for asbestos

16    testing and then another charge for silica testing?
                        Page 130

Mason Heath 7-8-03.txt

17      A.   No.   What we did was to generate a silica
18   report.   To have another silica report done, we
19   would charge them for the silica report.   But we
20   didn't charge them the full amount because they'd
21   already been in for their pulmonary function.
22      Q.   Okay.   And I guess what I don't understand
23   is, they came initially for an asbestosis
24   evaluation?
25      A.   They came for the -- both -- they had


                                            153
1   lawyers there for both the same day.   They had a
2   silica group of lawyers, and they had an asbestos
3   group of lawyers.
4      Q.   So they had two different sets of lawyers
5   to represent them for -- one for silica and one for
6   asbestos?
7      A.   Yes, sir.
8      Q.   So what you were doing is divvying up your
9   charges as to who got what?
10      A.   I divvied up my charges from what they
11   wanted from me.
12      Q.   All right.   So the silica and asbestos
13   lawyers said charge the silica guys this amount,
14   charge the asbestos guys this amount?
15      A.   No.   I mean, I basically told them.   They
16   don't tell me.
17      Q.   Okay.   But I didn't understand the
18   difference that was being charged.   Would you go
19   through that for me again?
20      A.   Someone came in for asbestos.   They
                       Page 131

Mason Heath 7-8-03.txt

21  initially were there for their asbestos claim.  They

22  had a mixed disease case, which was silica as well.

23  So what we would do is, instead of having them,

24  No. 1, either just do a pulmonary function all over

25  again, which was not necessary at all, and charge

                                                        154

1   them for it, we had no need in that.

2           So what we would do is, is we would take

3   the pulmonary function that they had done for their

4   asbestos claim, and then we would take that and

5   attach it to their silica work history so that they

6   did not have to go through that again, No. 1; and,

7   No. 2, we didn't have to charge them the full price

8   for it again.

9       Q.    Okay.  Understood.  So they didn't get

10  charged twice for the pulmonary function --

11      A.    Right.

12      Q.    -- test?

13      A.    No, sir.

14      Q.    And they didn't get charged twice for

15  Dr. Harron's exam?

16      A.    No, sir.

17      Q.    They didn't get charged twice for the

18  x-ray read?

19      A.    No, sir.  All they got charged -- see,

20  Dr. Harron charged them $50 to generate the silica

21  report for them, and that's what's -- it's all in

22  the Exhibit 2 here.

23      Q.    Okay.  Did Dr. Harron generate two

24  different reports, one for silica, one for

25  asbestosis?

                    Page 132

Mason Heath 7-8-03.txt

155

1       A.    As far as I know, yes, sir.

2       Q.    Or -- or did he generate one report for

3   both?

4       A.    As far as I know, he didn't -- I -- he did

5   two separate ones, but that's -- you know, that's

6   Dr. Harron's, so.

7       Q.    And that's apparently what he was

8   charge -- charging them?

9       A.    Yes, sir.

10      Q.    The two different amounts?

11            Do you know if the silica report mentioned

12  asbestosis?

13      A.    I have no idea.

14      Q.    How about the other way around, did the

15  asbestos report from Dr. Harron mention as- --

16  silica?

17      A.    I have no idea.

18      Q.    All right.  What is next in this pile of

19  Deposition Exhibit No. 2?

20      A.    This is our x-ray tube and facility

21  inspections and registrations with the state for

22  unit No. 1 and unit No. 2 which were used in the

23  screens.

24      Q.    Where did you get x-ray units No. 1 and

25  2?

156

1       A.    No. 1, Molly Netherland already had.  She

2   had it built at whatever time she had it built.  I

Page 133

Mason Heath 7-8-03.txt

17       Q.    For any plaintiffs, for anyone?

18       A.    I don't do -- for anyone, I would think

19    that it's been a business practice of, not N&M, but

20    maybe of the lawyers that if they have a database of

21    people that they may test those people for silica.

22       Q.    would it be part of the marketing

23    practices -- and we'll -- we'll break jointly --

24    shortly for lunch here -- part of the marketing

25    pra- -- marketing practices of N&M to take your

174

1    sign-in list of individuals who were tested for

2    asbestosis and then, for lack of better terms,

3    market those individuals to come back and be

4    retested for silica?

5       A.    what we may do is in- -- investigate

6    someone who came in for an asbestos claim to see if

7    they were ever a sandblaster or had exposure to

8    silica at any point.  If they did have some type of

9    exposure to silica at some point, we may make the

10   recommendation to them to be screened for silica.

11   And that was up to the plaintiff whether they wanted

12   to do that or not.

13      Q.    All right.  So that would require some

14   research of your patient files, that's particularly

15   the exposure history information that was completed

16   as part of the screening that was done for

17   asbestosis?

18      A.    Yeah, but most of the time I didn't do

19   that.  I didn't really have any -- if the lawyers

20   were interested in testing a group of people that

Page 149

Mason Heath 7-8-03.txt
21  they had in their database already, they did it
22  themselves.  They just called me and said, hey, I'd
23  like to screen these people.  And we did.
24      Q.   What I'm asking is, Mr. Mason:  Did you
25  independently go through your records without a

                                                    175

1   lawyer request and identify individuals who you
2   thought may have had silica exposure, such as people
3   that indicated that they were sandblasters or
4   otherwise, and then contacted the lawyers or the
5   individuals and asked them if they wanted to come
6   back and be retested for silica?
7       A.   No, because basically I tested for one set
8   of lawyers in my early days for asbestos.  They had
9   all the people.  So what they did is they mailed out
10  to every single person in their database and said if
11  they were interested in being screened for silica,
12  that they should call this number.
13          That's when we reviewed what we had on
14  them in our database to make sure what we had -- we
15  had something to do with their silica exposure
16  because you didn't ask about their silica exposure
17  in the earlier years of asbestos.  We didn't.
18      Q.   All right.  One last area, and then we'll
19  break.  On the PFT test that you did for these 27
20  individuals and others that you do in the normal
21  course of practices at N&M, do you maintain an
22  electronic file for those PFT tests?
23      A.   Yes, sir, a -- a lot of the ones we keep
24  on -- we have electrically on backup disk.
25  Sometimes -- pretty much we have just about
                    Page 150

# EXHIBIT 6

# In the Court of Common Pleas
# Cuyahoga County, Ohio

Special Docket 73958
Cuyahoga County Asbestos Cases

## ORDER OF THE COURT REGARDING DEFENSE MOTIONS FOR EVIDENTIARY HEARINGS

The Court has received extensive briefing and heard argument with respect to the Motion for Evidentiary Hearings with respect to Plaintiffs' doctors. (See F&S Transaction # 7668460, 7749451, 7763333, 7764614, 7770620, 7771937, 7779442, 7785431, 10437400, 10439149, 10440443, 10443247, 10443926, 1044034, 10495981, 10499440);

NOW THEREFORE, it is ORDERED as follows:

1. Except as provided in paragraph 2, below, Defendants' Motions for Evidentiary Hearings (F&S Transaction # 7668460, 7749451) are denied without prejudice to defendants renewing such motions at a later time.

2. Based upon the arguments and statements presented by the parties, it appears to the Court that Dr. Ray Harron and Dr. James Ballard are currently unlikely to testify at any hearing or trial in these matters. Accordingly, the Court hereby orders that all cases in which Dr. Ray Harron or Dr. James Ballard provided the only B-read relied upon for the diagnosis shall be administratively dismissed against all non-bankrupt defendants. Any case administratively dismissed shall have the right to petition the Court for good cause shown for placement on the Court's regular, active docket. No new or additional filing fee shall be required in the event of re-entry onto the regular, active docket. All claims and defenses existing under the statute of limitations in connection with the refiled lawsuit shall be determined as of the date of the filing of the original lawsuit with respect to any defendant that had been named and served in connection with the original lawsuit.

Administrative dismissal as set forth in this Order shall not be counted as a dismissal under Ohio Revised code Section 2305.19.

Administrative dismissal as set forth in this Order shall not affect in any way workers' compensation claims, bankruptcy claims, claims filed against Trusts or similar entities established to pay asbestos claims, or any other type of claim submitted outside of the tort system. Such claims shall be governed by the terms of the Trust, applicable workers' compensation law, or other applicable law, rule or regulation without regard to the administrative dismissal.

It is so ordered.

Judge Harry A. Hanna
Judge Leo M. Spellacy
Justice Francis A. Sweeney

March 22, 2006

# EXHIBIT 7

1

```
 1            IN THE UNITED STATES BANKRUPTCY COURT
              FOR THE DISTRICT OF DELAWARE
 2

 3
      In re:
 4
                              Chapter 11
 5
      W.R. GRACE & CO., et al.,
 6
                              Case No. 01-113 (JKF)
 7                            (Jointly Administered)
                    Debtors   Related Docket No. 11958
 8

 9

10

11         The deposition of DOMINIC GAZIANO, taken upon
      oral examination, pursuant to notice and pursuant
12    to the Federal Rules of Civil Procedure, before
      Johnny J. Jackson, Registered Diplomate Reporter
13    and Notary Public in and for the State of West
      Virginia, Wednesday, October 18, 2006, at the
14    Offices of Ciccarello, Del Giudice & LaFon, 1219
      Virginia Street, East, Charleston, West Virginia.
15

16

17

18

19

20

21

22            JOHNNY JACKSON & ASSOCIATES, INC.
                  606 Virginia Street, East
23                  Charleston, WV  25301
                      (304) 346-8340
24
```

1          So I can't know in this specific case

2     whether that was just some letters or all letters.

3     It could have gone either way.  So I don't know.

4          Q.   Would whether or not you wrote letters

5     following the review of a negative film depend on

6     what direction you received from the law firm who

7     was requesting the review?

8          A.   Law firms have certain needs.  I don't do

9     things related to what law firms want to do, except

10    there are certain needs in terms of — that I don't

11    have privy to.  They say, We need letters, positive

12    letters and negative letters, or we just need

13    letters of those in which you find evidence of

14    asbestos disease.  So that's the way it occurs.

15         Q.   I'm not asking you to speculate about what

16    the law firm might or might not have as

17    motivation.

18          I'm simply trying to determine whether you

19    had a standard course of practice about whether or

20    not you wrote negative letters —

21         A.   My standard —

22         Q.   Let me finish my question.

23          — or if your choice of whether you wrote

24    negative letters or not depended on what the

1   criteria required for diagnosing asbestosis.

2           And a number of individuals, a number of

3   doctors -- and I do have cases in which even

4   Frazier of Frazier and Paré, the dean of the

5   textbook of pulmonary x-ray, did that himself on

6   occasion with written letters, and so did others.

7           So the medical literature is good and that

8   that is what should do -- to do otherwise would be

9   to diminish the rights of these individuals who

10  were exposed to asbestos and weren't given proper

11  consideration in the diagnosis.

12          So, yes, I believed that way.

13          And secondly, so did a great deal of the

14  country.

15          And, thirdly, I think it was the right

16  thing to do, based upon the number of cases of

17  individuals exposed to asbestos at that time.

18      Q.   If I understand you, Doctor, are you

19  saying that you do not consider a differential

20  diagnosis to be a important criteria in diagnosing

21  nonmalignant asbestos disease?

22      A.   I think that if -- it's not essential and

23  it's not important in the wide range of things.

24          Certainly information that you get is

1      A.   That some other process, either an

2    asbestos plaque or a plaque due to some other

3    condition.

4      Q.   Speaking in terms of lung zones, in

5    diagnosing silicosis, where would you expect to

6    find your opacities?

7      A.   Most of the opacities for silicosis is in

8    the upper lung zones, the mid lung zones.  Again,

9    with silicosis you can have a — at one stage it

10   generally involves all the lungs, upper, middle and

11   lower, as it progresses.

12     Q.   How would that contrast with what you

13   would expect to see in terms of asbestosis?

14     A.   Well, asbestosis is almost always

15   irregular and predominantly lower zone, lower to

16   mid zone.

17     Q.   How about coal workers' pneumoconiosis?

18     A.   It is similar to silicosis in its

19   distribution and size and appearance.

20     Q.   In coal worker pneumoconiosis would you

21   expect to see a greater propensity of opacities

22   that are p's?

23     A.   p's, q and R.  p's, yes, ma'am.  But p is

24   relatively uncommon, but it occurs, maybe, and I'm

1   estimating now, around 10 to 15 percent p.  Most of

2   them are q and a few r in coal workers'

3   pneumoconiosis.  Those are all rounded opacities.

4           THE DEPONENT:  I have one little problem.

5   It's that water right there.

6           MS. AHERN:  We can take a short break if

7   you need to.

8           THE DEPONENT:  I just need 90 seconds.

9           VIDEOGRAPHER:  We are off the record.  The

10   time 2:51 p.m.

11                   (Break.)

12           VIDEOGRAPHER:  We are back on the record.

13   The time is 3:06 p.m.  This is tape four.

14   BY MS. AHERN:

15       Q.   Dr. Gaziano, I just want to wrap up the

16   things we have been talking so we can move on.

17       A.   All right.

18       Q.   With regard to coal worker pneumoconiosis,

19   what would you expect to see as the primary

20   opacities?

21       A    "q."

22       Q.   And secondary?

23       A.   "p" and "r," probably "r."

24       Q.   How about asbestosis, what would you

199

1   after you have prepared your diagnostic letters,

2   how do you send those materials back to a lawyer?

3       A.   What do you mean how?

4       Q.   Do you spend them in the mail?

5       A.   Yes.

6       Q.   Or do you overnight them?

7       A.   No, unless somebody specifically wants

8   some, we send it in the usual mail.

9       Q.   Hand-deliver?

10      A.   We don't hand-deliver it.  Unless someone

11  needs something for a deposition tomorrow morning,

12  we just put it in the mail.

13      Q.   Put it all back in an envelope and pop it

14  in the mail?

15      A.   Yes, ma'am.

16      Q.   Fair enough.

17          Typically, do you provide the records of

18  your diagnosis to the individual claimants, in

19  addition to the lawyers who requested that you

20  conduct the exam?

21      A.   No.

22      Q.   Doctor, for materials that are more than

23  five years old, for materials that are outside the

24  time period that corresponds to your record-

1  retention policy here, what would be potential

2  sources for us to be able to locate any such

3  materials?

4      A.   I gave you the list of 15 law firms.  You

5  call them and tell them to send anything that has

6  my name on it, and they will give it to you, I'm

7  sure.

8      Q.   So outside the window of time that you

9  retain your own records, it's your understanding

10  that the only other place that we might be able to

11  seek those materials might potentially be in the

12  hands of the law firms?

13      A.   That's where we send them.  Now, what they

14  do with them I have no idea.

15          MR. DEL GUIDICE:  Some defense data bank.

16      Q.   That's fair enough.

17          MR. DEL GUIDICE:  Probably JJ's office.

18      Q.   Doctor, is it fair to say that you do not

19  believe you must exclude other causes of

20  abnormality when diagnosing a person with

21  asbestosis?

22          MS. GRAHAM:  Objection.

23          MR. DEL GUIDICE:  Asked and answered.

24  BY MS. AHERN:

217

1      Q.   So it's your impression after a hard copy

2   is printed out Ms. Loudermilk does not store that

3   report?

4      A.   She may keep it a while.  I don't know

5   when she discards it.

6          MR. DEL GUIDICE:  Again these are

7   questions that Ms. —

8      A.   Loudermilk can answer that if you want to

9   submit it to her.

10     Q.   Dr. Gaziano, have you provided a signature

11  stamp to your staff or anyone else for use in

12  connection with preparing your reports?

13     A.   In some instances.  Very rare.  I am going

14  out of town or something, I like to sign mine.  But

15  most of time — but there is a signature stamp.

16     Q.   Under what circumstancings would you

17  authorize your staff to employ your signature

18  stamp?

19     A.   Well, I authorize it if I'm away or out of

20  office, or it's just a routine letter.

21          I sign all my B-readings, without

22  question.  I never allow that to be — all my x-ray

23  reports, B-readings, that is.

24     Q.   So it is your practice to always sign your

218

1    ILO forms?

2        A.    Yes, ma'am.

3            You will come up with one somewhere, and

4    you will say, ah-hah.  Well, there may be one, but

5    I don't think — you may not find it.  But anyway.

6        Q.    Doctor, do you have any ability to

7    estimate the frequency with which your staff would

8    stamp your signature on a narrative report or a

9    diagnostic letter compared to how often you would

10   sign it?  I'm looking for what your impression is

11   of how often the stamp gets used.

12       A.    For recently it's none at all.  At one

13   time maybe five percent, and that's a guess, and

14   that's a rough guess.

15       Q.    Who in your office specifically has the

16   authority to use your name stamp?

17       A.    Well, my office staff.  I don't have any

18   one specific designation.

19       Q.    That's fair enough.

20            Does anyone outside your office have a

21   copy of your name stamp?

22       A.    I hope not.

23       Q.    To your knowledge —

24       A.    To my knowledge, no, I don't know.

1   review the report before it was mailed out?

2       A.   Yes, ma'am.

3       Q.   Doctor, is it your practice to review and

4   edit diagnostic reports before they get sent out,

5   as a general matter of course?

6       A.   I generally don't read the whole report,

7   no, I don't.

8       Q.   Even when you sign?

9       A.   Yes, ma'am.

10      Q.   Doctor, do you perform any kind of quality

11  control review with regard to your B-reader reports

12  or your diagnostic reports before they get sent

13  out?

14      A.   I don't know what you mean by that.

15      Q.   Do you do anything more than essentially

16  having a secretary or a clerical staff person read

17  through it before you sign?

18      A.   I think over 36 years of doing this I have

19  not come across an instance where a grievous error

20  has been performed by me not doing some sort of

21  quality reread of every report.  So I haven't felt

22  it's necessary to do anything like that.

23      Q.   Fair enough.  Just trying to get an

24  understanding of what your normal practice is.

# EXHIBIT 8

1

```
 1            IN THE UNITED STATES DISTRICT COURT
           FOR THE SOUTHERN DISTRICT OF ALABAMA
 2                    SOUTHERN DIVISION

 3

 4                          *
     In re:                 *
 5                          *
     W. R. GRACE & CO.,     *
 6   et al.,                *    CASE NO.  01-1139
                            *    United States Bankruptcy Court
 7        Debtors.          *    District of Delaware
                            *    (Wilmington)
 8                          *
                            *
 9   ****************************************************

10

11

12

13

14

15

16

17            The videotaped deposition of DR. WALTER ALLEN

18   OAKS, taken at the law offices of Carr, Allison, Pugh,

19   Howard, Oliver & Sisson, 7101 Highway 90, Suite 402, Daphne,

20   Alabama, on the 9th day of March, 2006, commencing at

21   approximately 9:10 a.m.

22                                        COPY

23
```

1    tapes.  Yes.

2        Q.   And would she then send you a copy of what she

3    transcribed?

4        A.   Yes.

5        Q.   And would you keep that copy of what you

6    transcribed?

7        A.   No.  She sent me the document that I transcribed.

8    Then I checked it and signed it and then referred it on to

9    the testing company or the attorneys or whatever, whoever

10   had asked me to do the reading.

11       Q.   But you never kept any copies?

12       A.   No.

13       Q.   So the attorneys and the testing companies,

14   they're the ones who have all the reports that you did?

15       A.   That's correct.

16       Q.   What about Ann Burk?  Would she keep copies of the

17   transcriptions?

18       A.   I don't know that she keeps copies.  I mean, she

19   may have -- I don't know what she has.

20       Q.   You don't require her to keep any records for you?

21       A.   No.

22       Q.   Would she invoice you?

23       A.   No.  She usually -- Well, every time she sent me a

1    potential causes of that radiographic image?

2        A.   It depends on the type of interstitial lung

3    disease that you see.

4        Q.   So when looking at -- But in some cases then, when

5    looking at interstitial lung disease, before diagnosing that

6    person as asbestotic, would you consider other potential

7    causes of that appearance?

8        A.   You're speaking about when I'm reading a film for

9    asbestosis, or in my medical practice?

10       Q.   Your medical practice.

11       A.   In your medical practice, you're not looking for

12   asbestosis unless there are findings other than interstitial

13   disease, and the -- you look for everything that may be

14   causing some harm or some disease in the patient.

15       Q.   That's a differential diagnosis, correct?

16       A.   That is a differential diagnosis.

17       Q.   And that's an important component of making a

18   diagnosis in a clinical context, correct?

19       A.   Sometimes.

20       Q.   So there are instances in which you don't think

21   it's important to conduct a differential diagnosis?

22       A.   When it's like this, you don't need a differential

23   diagnosis.

1    7/25/02.

2        Q.    So that document predates the first entry in this

3    sales and receivable journal from January 1st, 2000 to June

4    1st, 2005, correct?

5        A.    Yes.

6        Q.    Do you have any other records which reflect the

7    B-reads that you've performed?

8        A.    You mean to reflect these --

9        Q.    Any B-reads you performed.  I believe you said

10   earlier this was your complete log.

11       A.    This is -- Yeah.  This is when I -- I don't

12   remember the date that I started using this particular

13   program to keep up with my affairs, but this is -- with my

14   B-reading; but I assume that that's when it was, was

15   December '02.

16       Q.    So sitting here today, you're not aware of any

17   other productions you've made reflecting B-reads performed

18   prior to December 9th of 2002?

19       A.    I'm sorry.  I don't understand the question.

20       Q.    Sure.  Sitting here today, do you recall -- are

21   there any other documents that you've produced in response

22   to any subpoena that reflect B-reads you performed prior to

23   December 9th, 2002?

1      A.   I may very well have produced something somewhere

2   else, but I just -- I don't recall whether I did or not.

3      Q.   Do you have any of those records in your

4   possession at this time?

5      A.   The only thing I have is my income tax records.

6      Q.   From 2000?

7      A.   From forever, you know.

8      Q.   So your income tax records would reflect --

9      A.   But they generally don't reflect anything other

10  than a total amount, as I recall.  They may represent --

11  Some of them may have allocated to different law firms or

12  something, but there would not be any specific dates or that

13  sort of thing.

14     Q.   But there would be an itemization on your 1099

15  form, correct?

16     A.   They don't always send 1099's.  About half of the

17  firms that I worked for never sent a 1099.

18     Q.   But you do recall getting some 1099's?

19     A.   Yes.

20     Q.   And you would still have those, correct?

21     A.   As a matter of fact, I do not still have those.  I

22  gave them to my accountant, and he told me later that he was

23  not required to keep those.

1      A.    No.

2      Q.    Is that the last conversation you've had with

3    Mr. Gresham?

4      A.    Yes, as I recall.

5      Q.    I just want to confirm a few more things.  You've

6    never performed a physical examination in connection with

7    litigation work, correct?

8      A.    Correct.

9      Q.    But you do believe a physical examination is

10   important in the diagnosis of asbestos-related diseases,

11   correct?

12     A.    A physical examination, in my opinion, is not

13   important in the diagnosis of asbestosis.  There is no

14   finding on physical examination that is diagnostic of

15   asbestosis, and there is no finding on physical examination

16   that would exclude the diagnosis of asbestosis.  I think

17   it's important only in the manner that you may find

18   something -- some other disease that may contribute to the

19   asbestosis or silicosis.

20     Q.    You don't think it's important to listen to an

21   individual's breathing?

22     A.    I think that the legal system has established some

23   precedent that if a person has rales in their lung bases,

# EXHIBIT 9

**11/20/2006 Segarra, Jay Thomas**

```
1                    IN THE UNITED STATES DISTRICT COURT
               FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
2                          SOUTHERN DIVISION
3
4           In re:                    ) Chapter 11
                                      )
5           W.R. GRACE & CO., et al.  ) Case No. 01-1139 (JFK),
                                      ) pending U.S. Bankruptcy
6                                     ) Court, District of
                                      ) Delaware (Wilmington)
7                                     ) (Jointly Administered)
                         Debtors.     )
8
9
10
11

                         VIDEOTAPED DEPOSITION OF
12              JAY THOMAS SEGARRA, M.D., FACP
13              Taken at the Beau Rivage Hotel,
                875 Beach Boulevard, Azalea Room,
14              Biloxi, Mississippi on Monday,
                November 20, 2006, beginning at
15              9:17 a.m.
16
17
18
19          REPORTED BY:
20              JANNA WHITE, CSR #1312
                State-Wide Reporters,
21              A LegaLink Company
                Post Office Box 14113 (39236)
22              4400 Old Canton Road, Suite 160
                Jackson, Mississippi 39211
23              Telephone:  (601) 366-9676
                Fax:  (601) 366-9756
24
                1(800)372-DEPO
25              www.legalink.com
```

**11/20/2006 Segarra, Jay Thomas**

1      A.    I think so.  But I don't know for sure.

2      Q.    Do you know about -- have you -- have

3   you read Charlie Foster's testimony in the silica

4   MDL 1553?

5      A.    No.

6      Q.    He said the following.  Question:  Is

7   that a goal -- is that a goal that is 40 percent

8   positives?  Is that a goal of Respiratory Testing

9   Services to get somewhere around 40 percent?

10  Answer:  Not a goal, no, sir.  Question:  Is it a

11  business practice?  Answer:  It's a common

12  practice with the numbers around 40 percent.

13  Question:  And one of your business practices is

14  to basically screen 50 people a day, correct?

15  Answer:  Yes, sir.  Question:  As a minimum, 50 a

16  day, and give the lawyers about 20 folks out of

17  50; is that correct?  A, Answer:  Thereabouts,

18  yes, sir.

19           Did he ever -- when you were working

20  with RTS, did Charlie Foster ever tell you that

21  his business practice was to basically screen at a

22  minimum 50 people a day and give the lawyers about

23  40 percent of those people to file lawsuits?

24  MR. MESTAYER:

25           Object to the form of the question.

1       A.    No.

2    MR. KRUTZ:

3       Q.    He never discussed that business

4    practice with you?

5       A.    Never, no.  Also just out of

6    curiosity -- the answer is never either way.  But

7    was he referring to silicosis screening or

8    asbestos screening or both or either or what?  You

9    gave me the quote out of context.  And I didn't

10   read his testimony.  So I don't really know.

11      Q.    You weren't -- you weren't screening

12   for silica back in 1999, were you?

13      A.    Well, the individuals I saw did not

14   have any -- except for the sandblasters didn't

15   have any particular reason to have silica

16   exposure.  Except maybe the sandblasters and the

17   foundry workers.

18      Q.    And you weren't screening for silicosis

19   with RTS the whole time you did it?

20      A.    Never.  Right.

21      Q.    And so you didn't send any bills to RTS

22   for screening for silicosis?

23      A.    That's right.

24   MR. MESTAYER:

25           Fred, if we get to a stopping point, I

1       need to call my office before 5:00.

2              (Exhibit 35 was marked.)

3       Q.    Let me hand you a document that's

4       marked as Exhibit 35.  It is a December 14th,

5       1998, letter from J. Michael Fitzgerald to Charles

6       Foster at RTS.  And in that letter, he is talking

7       about a big concern that he at least has about the

8       asbestos litigation changing rapidly.

9              And he says there is a big concern

10      about a bill pending in the house and the senate

11      that would remove asbestos claims from tort system

12      and set up an arbitration panel to review them.

13      He goes on to say that those of us who represent

14      asbestos victims are taking the threat of

15      seriously.

16             He also says until the threat of

17      adverse legislation has been lifted, we need to

18      conduct screenings in a different way.  Instead of

19      a B-reader and a full pulmonary function test and

20      medical exam, we need to revert to just a

21      B-reading.  We would like to have the B-reader

22      present at the screening so that we can give the

23      participants an immediate decision on whether or

24      not they test positive.  We would then schedule

25      the medical exam and the pulmonary function test

**11/20/2006 Segarra, Jay Thomas**

1     at a later time.  Do you see that language?

2          A.    I do, yes.

3          Q.    He then goes on to say, Jay told me it

4     would make economic sense for him to do that if we

5     scheduled 60 to 80 claimants per day for x-ray.

6     Did you tell J. Michael Fitzgerald as he reported

7     to Charlie Foster that you would be willing to

8     change the way you had been doing it from a one

9     day to a two day if -- it would make economic

10    sense for you to do that if you could do 60 to 80

11    claimants a day for x-ray?

12    MR. MESTAYER:

13               Objection to form.

14         A.    I don't remember saying that but such a

15    thing would be a reasonable statement based on the

16    idea that if I'm going to sit around all day out

17    of town that based on my charges just to read an

18    x-ray, it would make sense that I would need to

19    have about that number of x-rays to read to make

20    it worthwhile, yes.

21         Q.    And during this period of time, there

22    was no discussions between you and Charlie Foster

23    or J. Michael Fitzgerald about a business plan to

24    get 40 percent diagnoses?

25         A.    I don't even recall the discussion

**11/20/2006 Segarra, Jay Thomas**

1    mentioned in this letter let alone the discussion

2    you alluded to.  And be that as it may, I never

3    did do any trips for Michael Fitzgerald where I

4    just sat and read x-rays all day.

5              (Exhibit 36 was marked.)

6        Q.    Let me hand you a document marked as

7    Exhibit 36.  It is an October 14th, 1999, letter

8    that you sent to Charlie Foster.  This came from

9    RTS's documents.

10       A.    Okay.

11       Q.    And there are some handwritten changes

12   to your letter that we believe -- although I

13   cannot tell you for sure -- are Charlie Foster --

14   is Charlie Foster's handwriting.

15       A.    Okay.

16   MR. MESTAYER:

17             Objection.

18   MR. KRUTZ:

19       Q.    Is this a letter that you sent to

20   Charlie Foster on or about October 14th, 1999?

21       A.    Yes.

22       Q.    Do you recall -- do you know whether

23   this is Charlie Foster's handwriting?

24   MR. MESTAYER:

25             Objection.

1      A.     I don't know at all.  I have no idea.

2      Q.     Did you at that time negotiate with

3    Charlie Foster about what you would be paid for

4    screenings?

5      A.     Well, I don't remember exactly.  The

6    only thing I recall is that the amount we agreed

7    upon would be $60 if I read the film in the

8    office and 180 -- I mean, read the film on site

9    and 180 if the patient went through a complete

10   evaluation that I performed myself.

11     Q.     You see on the left-hand margin under

12   2C.

13     A.     Okay.

14     Q.     It looks like misspelled but guarantee

15   50 people a day or $4,000?

16     A.     Yes.

17     Q.     Did he ever talk to you about doing 50

18   people a day?

19     A.     No.

20            (Exhibit 37 was marked.)

21     Q.     Let me hand you a document we've marked

22   as Exhibit 37, and it is an invoice from you to

23   Charlie Foster dated September 8th, 2000.

24     A.     Okay.

25     Q.     Is that a letter that you would have

**11/20/2006 Segarra, Jay Thomas**

1    sent to Mr. Foster on or about that date?

2        A.    It looks like a bill.

3        Q.    Now, the reference line is medicals

4    from Warren, Boardman and Steubenville, Ohio.

5    August 14, 15, 16 and 17, 2000.  Do you see that?

6        A.    I do.

7        Q.    And that's screening days in Ohio that

8    you did back in August 2000?

9        A.    Yes.

10        Q.    Now, on August 14th, 2000, you screened

11    52 people, did 32 x-ray interpretations and 22

12    full meal deals with diagnoses, correct?

13        A.    Yes.

14        Q.    And so your positive rate for diagnoses

15    on August 14th, 2000, was 22 out of 54, correct?

16        A.    Well, it's actually a little bit less

17    than that.  Because some of the people that

18    presented for a complete evaluation, the request

19    was to see them regardless of whether their x-ray

20    was positive or not.  Do you understand what I'm

21    saying?  In other words, they weren't -- they were

22    just -- they were scheduled for an appointment

23    regardless of whether they had had an x-ray with a

24    decision to do the entire evaluation or not

25    decided by the result of the x-ray.

1       Q.      You can remember that from six years

2    ago?

3       A.      Well, it happened almost every time.

4       Q.      Well, if you add the 32 x-ray

5    interpretations and the 22 occupational exposure

6    evaluations with diagnoses, that just happens to

7    be 40.7 percent.  You're saying that that

8    wouldn't -- that's not right?

9       A.      Well, it's the -- it's an upper limit,

10   yeah.  But there -- there are, it's a little less

11   than that.  I mean, it's not 20 percent, but it's

12   a little less than because as I just told you

13   there will -- there will be some number of

14   individuals who would have gone through the entire

15   test regardless of whether they had a positive

16   x-ray or not.

17      Q.      And Mr. Foster would have to pay you

18   $180 if the people got a negative x-ray but went

19   through the full test?

20      A.      Well, they didn't have an x-ray first.

21   They just went through the whole test including

22   the x-ray, but, yes, he would have to do that.

23   That's right.

24      Q.      Mr. Foster wouldn't want to pay you

25   $180 unless someone had a positive x-ray, would

11/20/2006 Segarra, Jay Thomas

1    he?

2    MR. MESTAYER:

3            Object to the form.

4        A.    Well, for purely screening purposes,

5    no.  But this group, this subgroup I'm talking

6    about likely had been scheduled by the attorneys

7    to see me regardless -- outside of the screening

8    process, you see.

9        Q.    Okay.  Well, let's look at day two in

10   Ohio.  8/15/2000.

11       A.    Okay.

12       Q.    He paid you for 33 x-ray

13   interpretations and 22 diagnoses, correct?

14       A.    Yes.

15       Q.    That's 22 out of 33.  Excuse me.

16   That's 22 out of 55 or exactly 40 percent positive

17   diagnosis rate, correct?

18       A.    Okay.

19       Q.    So so far, Mr. Foster is hitting his

20   business plan, correct?

21   MR. MESTAYER:

22           Object to the form of the question.

23       A.    I don't know what his business plan is.

24   MR. KRUTZ:

25       Q.    I just read it to you about 15 minutes

1    ago.

2        A.    Okay.  But that's got nothing to do

3    with me.

4        Q.    All right.  Third day, August 16th,

5    2000, 34 x-ray interpretations, 22 occupational

6    exposure evaluations or diagnoses which would be

7    22 out of 56 is 39 percent.  For a total on those

8    three days of 66 out of 165 or 40 percent.  Is

9    that just a coincidence?

10       A.    Yes.

11   MR. MESTAYER:

12             Objection to form.

13       A.    It's mostly a coincidence.  But to the

14   degree that it's not a coincidence, Mr. Foster

15   from long experience, just basically has an

16   empirical understanding of what percentage of

17   people will generally have some kind of positive

18   finding when they go through the testing.  That's

19   all.

20   MR. MESTAYER:

21             Fred, I may have to remind you just

22   whenever you get a chance --

23   MR. KRUTZ:

24             Okay.  Thank you.  And I'm sorry.  I

25   forgot about it.  Thanks for reminding me.

**11/20/2006 Segarra, Jay Thomas**

1    MR. MESTAYER:

2            All right.

3    MR. KRUTZ:

4        Q.    Now, we have --

5    MR. KRUTZ:

6            Why don't we take five minutes for you

7    to call your office while I'm still remembering.

8    MR. MESTAYER:

9            Thank you.

10   VIDEO SPECIALIST:

11           Off the record at 4:12 p.m.

12           (Off the record.)

13   VIDEO SPECIALIST:

14           On the record at 4:23 p.m.

15           (Exhibit 38 was marked.)

16       Q.    Let me hand you a document that's

17   marked as Exhibit 38.

18       A.    Thank you.

19       Q.    I don't have any questions about it.  I

20   just want to put it into the record.  That is --

21   what that is is our Dr. Segarra RTS letters and

22   narratives reflecting a positive negative rate of

23   42 percent.  If you add all of the asbestos

24   plueral; silicosis; mixed dust, asbestosis and

25   silicosis together, and then give that as a

**11/20/2006 Segarra, Jay Thomas**

1    percent of the total number of the diagnoses.  And

2    it comes to 42 percent.

3    MR. MESTAYER:

4            Objection.

5        A.    I don't --

6    MR. MESTAYER:

7            He didn't ask a question.

8        A.    You didn't ask any question, so I will

9    just shut up.

10   MR. KRUTZ:

11       Q.    Okay.  Well, we're going to just have

12   to -- we will just have to argue about what's a

13   diagnosis and what's not.  We have already

14   discussed all of that.  So that's why I'm not

15   asking you any questions.

16       A.    Okay.

17       Q.    Now, when you -- I noticed in some of

18   your reports you put, quote, no earlier films are

19   available for evaluation, unquote.

20       A.    That's right.

21       Q.    Does that mean no earlier x-rays

22   themselves or no earlier x-rays and no earlier

23   x-ray evaluation by you?

24       A.    It means no earlier x-rays.

25       Q.    Okay.  What steps do you take to