# EXHIBIT 10

# R.T.S., Inc.

## Asbestos and Silica Disease Screening Throughout the United States

Facilities with 100% mobile capabilities



## SELF SUPPORT

R.T.S. mobile clinics are completely self contained and supportive. The units are powered by a 50 kw generator to ensure ample electrical power in all situations.

The mobile units are not only fully equipped but very appealing to the eye. Your clients will be impressed not only with the service, but also the comforts such as central air and fast and modern design of our clinics.

## RESPONSIVENESS



R.T.S. is dedicated to the quickest possible service to both our clients and our patients. We maintain 3 complete mobile medical facilities complete with Pulmonary Physician machines with gas diffusion, Radiological equipment, and density equipment, to mention a few, as well as a complete, licensed, certified and NIOSH (National Institute for Occupational Safety and Health) approved Physicians and medical staff.

You might have been exposed to asbestos if you worked at one of the following plants or in the trade with at least 3 years employment prior to 1973:

1. Aluminum Plant
2. Auto Mechanic Shop (Asbestos Brakes & Clutches)
3. Boilermakers
4. Carpet Mills Wholand
5. Carpenters
6. Chemical Plant
7. Electrician
8. Fertilizer Plant, Hydrochemical Plant
9. Glass Foundries
10. Insulators
11. Ironworkers
12. Laborers
13. Machinists/Millwrights
14. Mine Workers
15. Navy/Ships in boiler room
16. Oil Refinery
17. Painters
18. Papermill
19. Pipefitters
20. Power Houses
21. Power Plant
22. Railroad
23. Rubber Plants
24. Shipyard
25. Steel Foundry
26. Steel Mill



RESPIRATORY TESTING SERVICES, INC.
TESTING FOR ASBESTOS
DONE QUICKER
CALL FOR APPOINTMENT
1-800-997-8378

1-800-997-8378

## EXPERIENCE AND PERFORMANCE

Respiratory Testing Services, Inc. was formed in 1994 to fill a void in the South East United States.

R.T.S. official service in our facility at 3163 Midtown Drive, in Mobile, AL, as well as being actively mobile with all of our diagnostic testing services.

We retain on-our-staff, full time, the following board certified and NIOSH (National Institute for Occupational Safety and Health) approved physicians:

- Pulmonologist
  - Internal Medicine
  - Pulmonary Disease
  - Critical Care Medicine
  - NIOSH-approved B-Reader

- Internal Medicine Specialist
  - Emergency Medicine
  - Hyperbaric Medicine
  - Radiology
  - Diving Medicine

We also maintain board certified and NIOSH approved RRTs, RTs, radiologists as well as other technical staff with a combined 100+ years of medical experience and expertise.

## PROFESSIONAL SUPPORT

R.T.S. works with state and federal agencies to control asthma, R.T.S. not only meets, but exceeds those standards set forth by government agencies.

## BACKED BY TECHNOLOGY

R.T.S. has turned no-expense in equipping the mobile units with state-of-the-art-equipment. This all-testing/diagnostic-equipment is x-rays or blood test results. All equipment is maintained and calibrated according to NIOSH (National Institute for Occupational Safety and Health) and ATS (American Thoracic Society) standards.



YMAX 2401 SCRUBS

RESPIRATORY TESTING SERVICES, INC.
TESTING FOR ASBESTOSIS
DONE LOCALLY
CALL FOR APPOINTMENT
1-800-997-8378

# EXHIBIT 11

**10/27/2006 Foster, Charles**

1              IN THE UNITED STATES DISTRICT COURT

              FOR THE SOUTHERN DISTRICT OF ALABAMA

2                    SOUTHERN DIVISION

3

4

5

                                        )

6                                       )

                                        )

7                                       ) CIVIL ACTION

        In re:                          ) NO. 01-1139

8                                       ) United States

        W. R. GRACE & CO., et al.,      ) Bankruptcy

9                                       ) Court District

        Debtors.                        ) of Delaware

10                                      ) (Wilmington)

                                        )

11                                      )

12

13

14

15

16                 DEPOSITION OF CHARLES FOSTER

17

18

19

20

           The videotaped deposition of CHARLES FOSTER was

21      taken before Tessa L. Travis as Commissioner, on

        October 27th, 2006, commencing at 9:20 a.m., in the law

22      offices of Carr, Allison, Pugh, Howard, Oliver &

        Sisson, in Daphne, Alabama, pursuant to the

23      stipulations set forth herein.

```
 1                              APPEARANCES
 2              FOR THE W. R. GRACE & CO.:
 3                      Kirkland & Ellis
                        200 East Randolph Drive
 4                      Chicago, Illinois 60601
                        BY:  Ellen Therese Ahern, Esquire
 5
                        Carr, Allison, Pugh, Howard, Oliver & Sisson
 6                      6251 Monroe Street
                        Daphne, Alabama 36526
 7                      BY:  Adam Overstreet, Esquire
 8                      Forman, Perry, Watkins, Krutz & Tardy
                        City Centre
 9                      200 South Lamar Street
                        Suite 100
10                      Jackson, Mississippi 39201
                        BY:  Marcy Bryan Croft, Esquire
11
                FOR CHARLES FOSTER:
12
                        Fleming & Chavers
13                      169 Dauphin Street
                        Suite 204
14                      Mobile, Alabama 36602
                        BY:  Charles J. Fleming, Esquire
15
                FOR THE ASBESTOS CLAIMANTS COMMITTEE:
16
                        Campbell & Levine
17                      800 N. King Street
                        Wilmington, Delaware 19801
18                      BY:  Marla Eskin, Esquire
                             (Via Telephone)
19
                FOR THE OFFICIAL COMMITTEE OF PROPERTY DAMAGE
20              CLAIMANTS:
21                      Bilzin, Sumberg, Dunn, Baena, Price & Axelrod,
                        LLP
22                      First Union Financial Center
                        200 South Biscayne Boulevard, Suite 2500
23                      Miami, Florida 33131
                        BY:  Kathy Marlin, Esquire
```

**10/27/2006 Foster, Charles**

```
 1                    (Via Telephone)
 2          FOR THE OFFICIAL EQUITY COMMITTEE:
 3                    Kramer, Levin, Naftalis & Frankel
                      1177 Avenue of the Americas
 4                    New York, New York 10036
                      BY:  Peggy Farber, Esquire
 5                       (Via Telephone)
 6
            ALSO PRESENT:
 7
                    Chris Mclean- Videographer
 8
 9
                    Tessa L. Travis
10                    Court Reporter
11                           --oOo--
12
13
14
15
16
17
18
19
20
21
22
23
```

**10/27/2006  Foster, Charles**

1                                        INDEX

                                                            PAGE

2              Examination by Ms. Ahern:                      5

3

4

5

6

7                                      EXHIBITS

               Exhibit Number 1                              10

8              Exhibit Number 2                              35

               Exhibit Number 3                              43

9              Exhibit Number 4                              67

               Exhibit Number 5                              76

10             Exhibit Number 6                              78

               Exhibit Number 7                              91

11             Exhibit Number 8                              93

               Exhibit Number 9                              97

12             Exhibit Number 10                            101

13

14

15

16

17

18                                    --oOo--

19

20

21

22

23

1                          STIPULATIONS

2          It is hereby stipulated by and between counsel

3     that the videotaped deposition of CHARLES FOSTER may be

4     taken on the date and time specified and in the action

5     denominated herein before Tessa L. Travis as

6     Commissioner.

7          It is further stipulated that all objections and

8     assignment of grounds are reserved to the time of

9     trial.

10         It is further stipulated that the signature to and

11    reading of the deposition by the witness are waived,

12    the deposition to have the same force and effect as

13    though full compliance is had with all laws and rules

14    of court relating to taking depositions.

15         It is further stipulated that notice of filing

16    this deposition is hereby waived.

17                          --oOo--

18

19

20

21

22

23

```
1                    CHARLES FOSTER,
2          the witness, after having been duly sworn to tell
3     the truth, the whole truth, and nothing but the truth,
4              was examined and testified as follows:
5     THE COURT REPORTER:
6          Usual stipulations?
7     MS. AHERN:
8          Let's not.  Let's just put all the stipulations on
9     the record if we're gonna.
10                    EXAMINATION
11    BY MS. AHERN:
12    Q    Good morning.
13    A    Good morning.
14    Q    Could you state your full name for the record?
15    A    Charles E. Foster.
16    Q    Mr. Foster, my name is Ellen Ahern, and I'm at the
17    law firm of Kirkland & Ellis.  I represent W. R. Grace
18    in this matter.  We've never met before, have we?
19    A    No.
20    Q    Have you been deposed before?
21    A    Yes.
22    Q    And so you understand a little bit about how we're
23    going to proceed this morning?  For a few hours, I'm
```

**10/27/2006 Foster, Charles**

1    going to ask you some questions, and the court reporter

2    here is going to take down the questions and your

3    answers, but she needs to have you answer audibly

4    because she can't take down the nod of a head or the

5    wave of an arm.  All right?

6    A    Okay.  Yes.

7    Q    And I'm going to ask you a series of questions,

8    but if for any reason you don't understand my question,

9    whether I speak too quickly or for any reason at all

10   that you don't understand, I'd like you to stop me, and

11   say, Ms. Ahern, I don't understand the question.  All

12   right?

13   A    Yes.

14   Q    So if I ask a question and you answer it, I'm

15   going to assume you understood the question.  All

16   right?

17   A    Yes.

18   Q    Fair enough?

19   A    Fair enough.

20   Q    If you need to take a break at any time, you

21   should let me know.  Okay?

22   A    Okay.

23   Q    Mr. Foster, when did RTS first start as a

**10/27/2006 Foster, Charles**

1    business?

2    MR. FLEMING:

3        Mr. Foster, I would like for you to decline to

4    answer that question.

5    A    On the advice of my counsel, I invoke my right

6    under the forty-fifth -- or Fifth Amendment -- I'm

7    sorry -- to the United States Constitution to answer

8    that question.

9    MS. AHERN:

10       Before we go any further, I would like to have the

11   people who are participating in this deposition by

12   phone just let us know who they are and put themselves

13   on the record.

14   MS. ESKIN:

15       Marla Eskin, E-S-K-I-N.   Campbell & Levin for the

16   Asbestos Claimants Committee.

17   MS. MARLIN:

18       Good morning.   Kathy N. Marlin, M-A-R-L-I-N, from

19   Bilzin, Sumberg on behalf of the Official Committee of

20   Property Damage Claimants.

21   MS. FARBER:

22       Hi, I'm Peggy Farber from Kramer & Levin, and I'm

23   representing the Official Equity Committee.   And it's

**10/27/2006 Foster, Charles**

1    F, like Frank, A-R-B-E-R.

2    MS. AHERN:

3         Anybody else?  All right.  Now, I would like to go

4    back to where we are.

5    Q    Mr. Foster, is RTS still in business today?

6    A    On the advice of counsel, I invoke my right under

7    the Fifth Amendment to the United States Constitution

8    to decline to answer that question.

9    Q    What is your position with RTS?

10   A    On the --

11   MR. FLEMING:

12        If I may, it may speed things up if you would

13   allow him to say same answer or something like that

14   instead of reading that answer every time.

15   MS. AHERN:

16        He can say Fifth Amendment, he can say anything he

17   likes, but I'd prefer that he say something that

18   suggests he's invoking the Fifth Amendment if that's

19   the case, even if it's a short form.

20   MR. FLEMING:

21        Well, you just say same answer as above which

22   invokes the Fifth Amendment.  Fair enough?

23   MS. AHERN:

**10/27/2006 Foster, Charles**

1        Fair enough.

2    Q    I think my question was:  Is RTS still in business

3    today?

4    A    Same answer as above.  I invoke the Fifth

5    Amendment.

6    Q    What is your position with RTS?

7    A    Same answer as above.  I invoke the Fifth

8    Amendment.

9    Q    You're the sole owner of RTS; isn't that right?

10   A    Same answer above.  I invoke the Fifth Amendment.

11   Q    Since RTS first began as a business, have you

12   always been the sole owner of RTS?

13   A    Same answer as above --

14   MR. FLEMING:

15        Just say same answer.

16   THE WITNESS:

17        Okay.

18   A    Same answer.

19   MS. AHERN:

20   Q    Mr. Foster, do you have a medical degree?

21   A    Same answer.

22   Q    Do you have any medical training whatsoever?

23   A    Same answer.

# EXHIBIT 12

Foster, Charles 9-27-04.txt
0001
1                IN THE COURT OF COMMON PLEAS
2                     CUYAHOGA COUNTY, OHIO
3
4                MASTER CONSOLIDATED CASE
                    SILICA (AND MIXED DUST)/
5                ASBESTOS DOCKET
                 Judge Harry A. Hanna/Leo M. Spellacy
6
7
8    Couts v.American Optical Corp.,et al.)
                               Case No.466469
9
     Diley,et al. v. American Optical Corp., et al.)
10                            Case Nos. 469011-469030
11   Dettmer, et al. v. American Optical Corp.,et al.)
                              Case Nos.468985-469010
12
     Harrison, et al. v. American Optical Corp., et al.)
13                            Case Nos. 469126-469169
14   Whitlow, et al., v. American Optical Corp., et al.)
                              Case Nos. 469166-469169
15
     Bellito, et al. v. American Optical Corp., et al.)
16                            Case Nos. 469152-469165
17   Damico, et al. v. American Optical Corp. et al.)
                              Case Nos. 469099-469125
18
     Fansler v. American Optical Corp., et al.)
19                            Case No. 469429
20   Ross v. Allied Mineral Prods., et al)
                              Case No. 474018
21
     Seward, et al. v. Allied Mineral Prods., et al.)
22                            Case Nos. 475702-475704
23   Wolfe, et al. v. Allied Mineral Prods., et al.)
0002
1
2    Young, et al. v. Allied Mineral Prods.,et al.)
                              Case Nos. 475631-475668
3
     Agalianos, et al. v. Best Sand Corp.)
4                             Case Nos. 478997-479034
5    Ash, et al. v. Best Sand Corp.)
                              Case Nos. 499450-499460
6
     Beach, et al. v. Best Sand Corp.)
7                             Case Nos. 482220-482251
8    Applegarth, etc. v. Air Liquide America)
                              Case Nos. 515434-515483
9
     Jenkins v. Foseco, Inc.)   Case No. 519507
10
     Cash, et al. v. Air Liquide America)
11                            Case Nos. 516415-516438
12   Brown, et al. v. Air Liquide America)
                              Case Nos. 524514-524557
13
     Allen, et al. v. Air Liquide America)
14                            Case Nos. 524558-524607
15   Burkeen, et al. v. Air Liquide America)
                              Case Nos. 522891-522925
16
                             Page 1

                                Foster, Charles 9-27-04.txt
 5        A.    Yes, we have been up there once or twice.
 6    I am not sure.
 7        Q.    Where did those occur?
 8        A.    Warren.  And Akron and Canton.
 9        Q.    Do you recall approximately when RTS was
10    in Warren?
11        A.    I don't recall the dates.  I know it's
12    been a couple of three months ago.
13        Q.    That would have been what, early summer?
14    June or July?
15        A.    Like I said, I don't remember the dates.
16    I know it's been this year.
17        Q.    How about Akron/Canton?
18        A.    The same time.
19        Q.    Was that all done in, say, one week of the
20    screenings?
21        A.    Yes.
22        Q.    Do you recall who the physician was?
23        A.    Dr. -- he is out of Miami.  I can't think
0141
 1    of his name.  Cranson (phonetically)  or -- not
 2    Cranson.  But it is his partner.  Mezey, Dr. Mezey.
 3        Q.    Mezey?
 4        A.    M-E-Z-E-Y.
 5        Q.    Where is Dr. Mezey out of?
 6        A.    Miami.
 7        Q.    Do you know if Dr. Mezey is licensed to
 8    practice medicine in the state of Ohio?
 9        A.    Yes.
10        Q.    Do you know what his first name is?
11        A.    No.
12        Q.    Any other physicians you were using in
13    Ohio in 2004?
14        A.    No.
15        Q.    Any recollection of testing in Ohio, other
16    than the week that you indicated may have been
17    earlier this summer in Warren and Akron/Canton
18    area?
19        A.    No.
20        Q.    And you are going to look for your day
21    planner for 2004 and provide that to your counsel?
22    Yes?
23              THE WITNESS:  Have you got that?
0142
 1              MR. FLEMING:  I am sure Barbara will send
 2              us a letter, like she usually does.
 3              MS. MACHIN:  Yeah.
 4              MR. FLEMING:  I'm not bothering to write
 5              it down.
 6    BY MS. MACHIN:
 7        Q.    And the underwriting law firm for the week
 8    in Warren, Akron/Canton area, was that Brent Coon &
 9    Associates or Ratiner --
10        A.    Do what now?
11        Q.    Brent Coon & Associates or Ratiner, Reyes
12    & O'Shea?
13        A.    Reyes & O'Shea.
14        Q.    The RRO?
15        A.    Yes.
16        Q.    Do you know how many screenings RTS has
17    scheduled for the remainder of 2004 in Ohio?
18        A.    None.
19        Q.    Are you in the process -- is RTS in the
                                Page 56

Foster, Charles 9-27-04.txt
20  process of trying to set up some screenings in Ohio
21  for the remainder of 2004?
22      A.   No.   Not unless somebody calls me, but I
23  haven't -- I am not in the process, no.
0143
1                    MS. MACHIN:  That's all the questions I
2                    have right now.  I am going to defer to
3                    other counsel, who I know have some.  I
4                    may have some later in follow-up.  Do you
5                    want to take a three-minute break and --
6                    MR. FLEMING:  How about ten?
7                    (WHEREUPON, THERE WAS A BRIEF BREAK.)
8
9                            EXAMINATION
10  BY MR. SETTER:
11      Q.    Mr. Foster, my name is Dave Setter.  We
12  have met before.  I would like to go back on a
13  couple of things that you covered today with
14  Ms. Machin, as well as in your prior deposition
15  back in March.
16          First, I would like to go back to the
17  screening process, if you don't mind.  If I
18  understood correctly, the first person that an
19  individual, a patient of yours -- if I can use that
20  term, or a client sees when they go to the
21  screening is the testing manager?
22      A.    Yes.
23      Q.    Is that correct?
0144
1       A.    Yes.
2       Q.    And the testing manager verifies for that
3   person whether that individual meets the attorney's
4   criteria for that screening?
5       A.    Yes.
6       Q.    Does the testing manager also meet with
7   that person when they first come in and establish
8   whether or not the individual is willing to take on
9   a lawyer, whoever the lawyer may be that is
10  sponsoring the screening?
11      A.    If the question comes up.
12      Q.    Is that discussed by the testing manager
13  at that point in the process?
14      A.    Not anything to do with the attorney firm,
15  no.
16      Q.    Does the question come up from either the
17  testing manager or the patients as to who is going
18  to be paying for the screening?
19      A.    It has, but not every time.
20      Q.    If it does come up, what does the testing
21  manager usually tell these individuals?
22      A.    That the law firm that's doing the
23  screening is -- will represent them on a 60/40
0145
1   contingency basis and if they want to use them,
2   they are there to pay for the screening.
3       Q.    And if the individual refuses to use the
4   screening attorneys at that instance, what happens
5   to that person?
6       A.    We can't -- I don't refuse them.  But I
7   have never had an attorney firm refuse to pay for
8   anybody.
9       Q.    What if the individual finds out that they
10  don't want to use that individual?  At that point
                                                    Page 57

Foster, Charles 9-27-04.txt

11   in the process can they turn down the process?
12        A.   No -- yeah, they can.  But I've had them
13   call and have their attorneys pay us for the
14   screening.
15        Q.   Would you consider the client for RTS is
16   really the lawyers that sponsor the screenings?
17        A.   Say that again, now.
18        Q.   RTS' real client is the lawyers who
19   sponsor the screenings?
20        A.   The lawyers are the clients?
21        Q.   Yes, for RTS?
22        A.   They are the ones that pay us for the job.
23        Q.   Right.  You work for the lawyers?
0146
1         A.   In essence.
2         Q.   And, in essence, in working for the
3    lawyers, it's your job to go get the lawyers their
4    clients?
5         A.   Not necessarily, no.
6         Q.   Well, don't you send out union mailers or
7    mailings to the unions to go get clients?
8         A.   I mean, you read the thing a while ago
9    that they send me to talk to these people.
10        Q.   And the lawyers do that?
11        A.   Yes.
12        Q.   And the lawyers pay you to send mailings
13   out to the union members to get them to the
14   screenings?
15        A.   Yes.
16        Q.   The lawyers pay you to go have meetings
17   with union officials at meetings where you make a
18   presentation about the testing process?
19        A.   In some cases, but not in all.
20        Q.   And the lawyers pay you for the tests?
21        A.   Yes.
22        Q.   Would you consider or do you know whether
23   or not RTS has a physician/patient relationship
0147
1    with these individuals that you test?
2         A.   Ask that again.
3         Q.   Do you consider whether or not RTS has a
4    physician/patient relationship with the folks that
5    you test?
6         A.   For the positive, they do.
7         Q.   For the positive you do?  For the
8    negatives you don't consider there is a
9    physician/patient relationship?
10        A.   No.
11        Q.   Why do you consider --
12        A.   Unless there is an abnormality.
13        Q.   Unless there is an abnormality, in terms
14   of a cancer?
15        A.   Well, you know, we are not going to call
16   it cancer.  A nodule or whatever.  Then the doctor
17   talks to them and tells them they have an
18   abnormality.
19        Q.   If a doctor finds a positive and a full
20   medical procedure is done, then you believe that
21   RTS has a physician/patient relationship with that
22   individual?
23        A.   The doctor has a -- state that again, now.
0148
1         Q.   The question is, you, RTS, considers there
                        Page 58

Foster, Charles 9-27-04.txt
```
 2   to be a physician/patient relationship if the
 3   individual is tested positive?
 4       A.   With the doctor.
 5       Q.   With the doctor?
 6       A.   With the physician, yeah.
 7       Q.   Now, after the individual sees the testing
 8   manager, if I am correct, the next person that they
 9   see is the sign-in person; is that right?
10       A.   No.
11       Q.   What happens after they first see the
12   testing manager?  Who --
13       A.   Oh, the testing manager, yes.
14       Q.   Then after the testing manager, they go
15   see who?  The sign-in person?
16       A.   There would be a sign -- a person to sign
17   them in.  In most cases, they'll be sitting -- you
18   know, this area that we talked about charging for,
19   different areas, sit here and someone will get you.
20   And they come in and get their name and write it
21   down.  And then they call them and then they get
22   all that.
23       Q.   All right.  What does the sign-in person
0149
 1   do with this individual?  What do they make them
 2   sign in?  A sign-in sheet?
 3       A.   Yeah, they sign in.  They go over the
 4   history with them and they get them to sign it,
 5   saying that that is true to the best of their
 6   knowledge.
 7       Q.   Okay.  So they sign in probably a sign-in
 8   sheet as well as the work history sheet?
 9       A.   Well, a work history sheet is what they
10   sign.
11       Q.   After they finish signing in the work
12   history sheet, then do they go get an X-ray shot?
13       A.   They get X-rayed after they have signed
14   that they have no abnormality to keep them from
15   X-ray.
16       Q.   Okay.  And if they've signed those sheets,
17   if I am clear, they have now signed a sign-in
18   sheet, an exposure history sheet and a form saying
19   that they have no abnormality or no reason that
20   they can't be X-rayed?
21       A.   Well, the exposure history and the sign-in
22   sheet is the same thing.
23       Q.   Okay.  So let's go back.  They sign in the
0150
 1   exposure history; right?
 2       A.   Yes.
 3       Q.   And then another form that says they can
 4   be X-rayed?
 5       A.   X-rayed or PFT.
 6       Q.   And after they do that, then they are
 7   X-rayed by one of your technicians?
 8       A.   Yes.
 9       Q.   In one of the X-ray trailers?
10       A.   Yeah.
11       Q.   Or by Dr. Netherland, Chiropractor
12   Netherland out of Mississippi?
13       A.   No.
14       Q.   Did you use Chiropractor Netherland ever
15   up in Ohio?
16       A.   No.
```
Page 59

Foster, Charles 9-27-04.txt
```
17      Q.    Before they are actually X-rayed, are they
18   seen by a physician at any point?
19      A.    No.
20      Q.    Is there anything in writing from a
21   physician requesting that they go forward with the
22   X-ray, other than what we have looked at, for
23   example, on Exhibit 20 with Dr. Gaziano?
0151
1      A.    Is there any what now?
2      Q.    Is there anything in writing from a
3   physician before they get an X-ray that the
4   individual should go forward with an X-ray?
5      A.    The only thing is the way I said mark
6   those forms.  I mean, they might -- whatever they
7   mark it, PFT or X-ray eval or whatever.
8      Q.    Something like Exhibit 19, if I can show
9   that to you?
10      A.    That is an abnormality form there.  They
11   wouldn't go any further by signing that.
12      Q.    Do you have Exhibit 20 over there by
13   chance?  Here it is.  Never mind.
14           I'll show you Exhibit No. 20, which has
15   previously been identified.  That is the form that
16   the doctor would go ahead and order an X-ray?
17      A.    On their work history more so than that.
18      Q.    And after an X-ray is shot, then what
19   happens to that individual?  The X-ray is then
20   taken on-site; correct?  To a B-reader?
21      A.    Yes.
22      Q.    Is that right?
23      A.    By a B-reader.  Well, the X-ray is taken
0152
1   by an X-ray technician.
2      Q.    Okay.  And then after the X-ray is shot,
3   it is then given to a B-reader?
4      A.    Right.
5      Q.    And the B-reader is on-site; is that
6   correct?
7      A.    Yes.
8      Q.    And on-site, the B-reader evaluates that
9   film?
10      A.    Yes.
11      Q.    As positive or negative?
12      A.    Yes.
13      Q.    Does the B-reader, in your opinion, have a
14   physician/patient relationship with that individual
15   or not?
16      A.    Not if he doesn't see anything on his
17   X-ray.
18      Q.    What if he sees anything on his X-ray?
19      A.    If he sees an abnormality, yes, he does.
20   He brings him in and talks to him and tells him he
21   is referring him to his own personal physician.
22   And he could be negative as far as asbestos or
23   silicosis go.
0153
1      Q.    If the individual is found negative by the
2   B-reader, is a B-read form filled out for the
3   negative individual?
4      A.    Yeah.  The B-read form is filled out with
5   a narrative report.
6      Q.    And the ILO form is filled out as well?
7      A.    Yeah.
```
Page 60

Foster, Charles 9-27-04.txt

8    Q.   Plus a narrative report?
9    A.   Yes.
10   Q.   So for a negative --
11   A.   When you're saying a B-reader form,
12 B-reader form and ILO is the same thing.
13   Q.   I understand.  There is also a narrative
14 as well?
15   A.   Well, there is a narrative.  But you said
16 three forms.  And there is not three forms.  It's
17 two.
18   Q.   All right.  Two forms are a narrative and
19 an ILO form; is that right?
20   A.   Yes.
21   Q.   So if someone is found negative by RTS we
22 would have for that individual a work history form;
23 correct?
0154
1    A.   Right.
2    Q.   A form or a piece of paper from the doctor
3 indicating the individual should take an X-ray,
4 which could be on the work history form; right?
5    A.   Right.
6    Q.   A B-read/ILO form; correct?
7    A.   All right.
8    Q.   And a narrative?
9    A.   Right.
10   Q.   Is there any other paperwork that is
11 completed on a negative?
12   A.   Yes, they sign one more form, saying that
13 they are capable of doing a PFT or an X-ray.
14   Q.   Is there anything else done on that
15 negative person?
16   A.   No.
17   Q.   What happens to that paperwork and the
18 film for a negative?
19   A.   It's shipped to the law firm.
20   Q.   All of it is shipped?
21   A.   All of it is shipped.
22   Q.   Does RTS maintain any paperwork for
23 negatives?
0155
1    A.   We have copies of -- we maintain copies of
2 positives or negatives.  No, we don't maintain any
3 of the originals.
4    Q.   Do you maintain copies of the file
5 materials for a negative?
6    A.   Yes.
7    Q.   The only thing you don't keep on a
8 negative, that the attorneys may have that you
9 don't have, would be the actual x-rays?
10   A.   The X-ray and the original forms, the
11 original stuff -- documentation.
12   Q.   You have copies of everything?
13   A.   Yes.
14   Q.   If the individual is determined positive
15 by the B-reader, then if I understood the process
16 correctly, that individual goes forward and does a
17 medical history form?
18   A.   Yes.
19   Q.   And the medical history form is either
20 filled out by a girl by the name of Debbie --
21   A.   Now.
22   Q.   Now, or your testing manager?
                              Page 61

Foster, Charles 9-27-04.txt
```
23        A.    Charlie Brooks.
0156
 1        Q.    Is that right?
 2        A.    Yes.
 3        Q.    Or in the past, your testing managers?
 4        A.    Yes.
 5        Q.    After you fill out this medical history
 6  form, then the individual is sent in for a
 7  pulmonary function test?
 8        A.    Yes.
 9        Q.    And after the pulmonary function test is
10  completed, the individual is then routed over to
11  the physician?
12        A.    Yes.
13        Q.    And at that point, the physician does his
14  examination?
15        A.    And interpretation of the PFT.
16        Q.    And after the PFT interpretation, physical
17  examination is done, then the individual is taken
18  to some type of last process, for lack of a better
19  term?
20        A.    Well, he can go to a lawyer.  If he has
21  already talked to a lawyer, he will go home.  He or
22  she will go home.
23        Q.    For the screenings in Ohio in 2000, with
0157
 1  the Jackson, Taylor firm, did the lawyers meet with
 2  the individual at the beginning of the screening or
 3  at the end?
 4        A.    I don't know.  I don't remember that.
 5        Q.    Do the B-readers ever take the films with
 6  them, away from the screening, back to their
 7  offices?
 8        A.    I answered that a while ago.  I said some
 9  do and some don't.
10        Q.    Does Dr. Oaks do that?
11        A.    I don't recall.
12        Q.    When you have had screenings with Dr. Oaks
13  doing the B-reads, is there a pulmonologist or
14  another physician there doing the physical
15  examinations?
16        A.    I don't recall.
17        Q.    Do you recall whether Dr. Oaks usually
18  works in tandem with Dr. Jose Roman?
19        A.    In the South he did.  But he didn't in the
20  North.  He did in Mississippi and Alabama.
21        Q.    How about in Ohio?  Who did Dr. Oaks work
22  with?
23        A.    I don't know.  I don't know that he did.
0158
 1  I don't remember.
 2        Q.    Do you recall whether Dr. Ballard ever
 3  worked with you in Ohio?
 4        A.    No, I don't.
 5        Q.    The answer is no or you don't recall?
 6        A.    I don't recall.
 7        Q.    Do you know if Dr. Ballard has worked with
 8  Dr. Roman in conjunction with RTS in terms of a
 9  screening?
10        A.    In Ohio?
11        Q.    Yes.  Anywhere.
12        A.    Yeah, they have worked in conjunction
13  anywhere.
```

Foster, Charles 9-27-04.txt
2      Q.   And he charges $180 for a full medical
3   procedure?
4      A.   Again, if you'll take -- if you had bills
5   from Washington or Kentucky, it's going to vary,
6   different prices.
7      Q.   I'm saying for the ohio --
8      A.   I don't remember for ohio.  Right there
9   it's showing $60.
10          MR. FLEMING:  You are not arguing with him
11          if he says $60, are you?
12          THE WITNESS:  No.
13   BY MR. SETTER:
14      Q.   And if he says $180 on these invoices that
15   we've seen today --
16      A.   No, I'm not arguing with you on that.
17      Q.   Okay.
18      A.   He is a lot higher than that now.  Go
19   ahead.
20      Q.   But it is $180 for a positive?
21      A.   Yes.
22      Q.   Isn't it in the interest of Dr. Segarra to
23   find more positives, because he gets paid more for
0170
1   a positive than a negative?
2      A.   No.
3      Q.   It's not in his interest to do that?
4      A.   I don't see where it would be.
5      Q.   Isn't it also in RTS' interest for RTS to
6   have the doctors find more of these folks positive
7   than negative?
8      A.   We're going to get paid for them whether
9   they are positive or negative.
10      Q.   But don't you get paid more for a positive
11   than you do a negative?
12      A.   Yes, we do.
13      Q.   And doesn't the doctor get paid more for a
14   positive than he does for a negative?
15      A.   Yes.
16      Q.   So doesn't it make more sense to find more
17   positives because you get paid more?
18      A.   You do more work.
19      Q.   All right.  Fair enough.  Do the PFT
20   technicians get paid per test?
21      A.   Yes.
22      Q.   And how much do they --
23      A.   Wait a minute.  Let me re-answer that.
0171
1   They get paid a salary and they get paid for PFTs.
2      Q.   So they do get paid per PFT test on top of
3   a base salary?
4      A.   Yes.
5      Q.   How much do they get paid on top of their
6   base salary, per test?
7      A.   Different prices.  From $16 to 20, $24 a
8   test.
9      Q.   So if you are a PFT technician, you make
10   more money in a day if you do more PFTs in a day?
11      A.   If you travel, yeah.  But if you're
12   sitting at home, you don't.
13      Q.   So it's in their interest to do more PFTs
14   in a day as well?
15      A.   I would think so.
16      Q.   All right.  And when you set up a
                        Page 67

# EXHIBIT 13

1

1       THE UNITED STATES DISTRICT COURT
        SOUTHERN DISTRICT OF TEXAS
2          CORPUS CHRISTI DIVISION

3
   IN RE:              *   MDL DOCKET NO. 1553
4                *
   SILICA PRODUCTS   -   *   ALL CASES
5   LIABILITY LITIGATION    *
                  *   CORPUS CHRISTI, TEXAS
6                 *   FEBRUARY 18, 2005
                  *   8:30 A.M.
7  * * * * * * * * * * * * * * *

8
          TRANSCRIPT OF DAUBERT HEARING
9
        BEFORE THE HONORABLE JANIS GRAHAM JACK
10          UNITED STATES DISTRICT JUDGE

11
   APPEARANCES:
12
   PLAINTIFF'S LEAD      MR. JOE GIBSON
13  COUNSEL:         O'QUINN, LAMINACK & PIRTLE
                440 LOUISIANA, SUITE 2300
14              HOUSTON, TEXAS 77002

15  PLAINTIFFS' EXECUTIVE    MR. BILLY H. DAVIS
   COMMITTEE:        CAMPBELL, CHERRY, HARRISON, DAVIS &
16              DOVE, P.C.
                P.O. DRAWER 21387
17              WACO, TEXAS 76702-01387

18              MR. SCOTT HOOPER
                SCOTT HOOPER & ASSOCIATES
19              1414 WEST CLAY STREET
                HOUSTON, TEXAS 77019-4943
20

17 an x-ray?

18 A.  This was a form that one of my employees would fill out,

19 and the patient would sign it.

20 Q.  But on the basis of this form alone, Respiratory Testing

21 Services would shoot an x-ray?

22 A.  Yes, sir.

23 Q.  And for this same individual, if you'll take a look at

24 this, is this a form that Respiratory Testing Services does as

25 part of its screening practices?

179

1 A.  Yes, sir.

2 Q.  Do you have a name for this form?

3 A.  A work history.

4 Q.  Now, who completes this form for Respiratory Testing

5 Services?

6 A.  One of our sign-in people.

7 Q.  And is this completed by the individual that's being

8 tested, like Melvin Young, or an employee of Respiratory --

9 A.  No, an employee.  And Mr. Young signs it.

10 Q.  Now, are the employees at Respiratory Testing Services

11 that fill out these forms, are they medically trained?

12  A.  In some cases, some are, and some are not.

13        THE COURT:  What kind of medical training?

14        THE WITNESS:  Well, I've had nurses that worked for

15  us, but in most cases, not so.  It's people that we train to --

16        THE COURT:  Well, you mean registered nurses or

17  vocational nurses or --

18        THE WITNESS:  Either and both, at different times.  I

19  don't say it's the particular case here.

20        THE COURT:  Well, who would have filled out these?

21        THE WITNESS:  I would say one of my sign-in girls

22  filled that out.

23        THE COURT:  And that's a girl with or without medical

24  training?

25        THE WITNESS:  I don't know who did this one here, but

180

1  probably without medical training.

2  BY MR. SETTER:

3  Q.  And do they have any type of training by any physician

4  about how to complete an occupational exposure history?

5  A.  Repeat that.

6  Q.  Would the sign-in girl, if they didn't have --

7       THE COURT: Don't do it. Let's you and I do that.

8       MR. SETTER: All right.

9       THE COURT: Thank you. You can ask — don't call

10  them girls any more.

11      MR. SETTER: Oh, I'm sorry, Your Honor.

12      THE COURT: The third day is just the killer, I

13  think, on this. Do you mind if I call you a boy?

14      THE WITNESS: Ma'am?

15      THE COURT: Do you mind if I call you boy?

16      THE WITNESS: No, no.

17      THE COURT: Okay.

18      THE WITNESS: I love it.

19      THE COURT: What did he say? He's too old? Okay.

20  Well, how old does it take to be a girl before she becomes a

21  woman? I mean, I'm just curious.

22      THE WITNESS: I'm not going to answer that.

23      THE COURT: Over 18?

24      THE WITNESS: I would —

25      THE COURT: Do you have little girls working for you,

181

1   like 12 and 13 or — or how old are the women working for you?

2      THE WITNESS: Oh, I'm sorry. Most -- all of them are

3   married and over 21.

4      THE COURT: They're grown up?

5      THE WITNESS: Yes. Yes, ma'am.

6      THE COURT: So why are you calling them girls?

7      THE WITNESS: Because I'm so old, I guess.

8      THE COURT: Okay. Just curious.

9   BY MR. SETTER:

10  Q.  Back with respect to this exposure history form that's

11  filled out by the sign-in people, would this form be sent with

12  the x-ray to Dr. Ballard or Dr. Oaks?

13  A.  Yes, a folder would. It would be in a folder and sent to

14  them.

15  Q.  Okay. And I note at the top, it says S-I-L, where the pen

16  is -- I'm sorry, I don't have a pointer. What does that mean?

17  A.  Silicosis.

18  Q.  And would Dr. Ballard in this instance be told by RTS, by

19  this form, that they're looking at the issue of silicosis in

20  terms of his x-ray evaluation?

21  A.  The work history itself would say that they qualified for

22  silicosis and not asbestosis.

23      THE COURT: How do you know that?

24        THE WITNESS:  Because of the years of exposure and

25   what their job was.


                              182

1         THE COURT:  What is your training on this, on

2   silicosis?  What is your training?

3         THE WITNESS:  Whatever the criteria the law firm sets

4   for whatever --

5         THE COURT:  Okay.  Okay.  Got it.  I don't know why

6   they use doctors or -- at all.

7         MR. BARGER:  To say reasonable medical certainty.

8         MR. SETTER:  All right.  I'll be real quick.

9         THE COURT:  Okay.

10  BY MR. SETTER:

11  Q.  Then after the form was sent with the x-ray, Dr. Ballard

12  would then complete his ILO evaluation, as well as his

13  narrative report?

14  A.  He would dictate it and have his transcriptionist to

15  finish his report, to do the report, from what I understand.

16  Q.  All right.  Did that transcriptionist work for RTS?

17  A.  No.

18  Q.  Is there a reason, or do you know why he would put on

file:///C|/Documents%20and%20Settings/mrhicks/Desktop/Feb%20Daubert%20Hearings/SilicaMDL050218SC-DH.txt

19  there RTS on his form?

20  A.  No.

21  Q.  Do you know who his transcriptionist is?

22  A.  No, I can't — I don't really know her.  I never met her.

23  I can't even think of her name.

24      THE COURT:  Would you fix it, Ms. Scotch?

25      MR. SETTER:  I think it's there.


183

1      THE COURT:  There we go.

2  BY MR. SETTER:

3  Q.  Now, in this instance for Mr. Young, Dr. Ballard found on

4  September 21st, 2002, the individual was a 0/1.  And I noticed

5  on the page before, at the top of this page, it looks like

6  there's a mark.  Is that a negative mark on this?

7  A.  Yes, sir.

8  Q.  And if I went through this file and got the rest of it, it

9  looks like there's a positive mark for another day.  Let me

10  just show you what I'm talking about.  Apparently Mr. Young

11  came back in March 13th of 2003 after he had been there

12  September 21st, 2002, and was reevaluated by Respiratory

13  Testing Services.  Would that be a fair statement, if that's

# EXHIBIT 14



**FROM:**   David Austern
            President, CRMC

**DATE:**   September 12, 2005

**RE:**     <u>Suspension of Acceptance of Medical Reports</u>

The reliability of reports prepared by the doctors and screening facilities listed below has been challenged and is the subject of federal grand jury and congressional investigations into alleged fraud. Based upon evidence presented in the silica Multidistrict Litigation (MDL), the challenge is credible and compels suspension of acceptance of these reports. In the two months since Judge Janis Jack issued her June 30, 2005 Order in the silica MDL, CRMC has received no information or evidence to support continued acceptance of reports prepared by these doctors and facilities. Pending completion of the grand jury and congressional investigations and the litigation in which the reports were challenged, CRMC will no longer accept reports prepared by these doctors and facilities.

In addition, CRMC has determined that medical reports prepared by Healthscreen, Inc., a pulmonary function testing (PFT) facility formerly located in Jackson, Mississippi (now closed), are not reliable and will no longer be accepted.

Effective immediately, CRMC will not accept reports from the following doctors and screening facilities. Their names have been removed from the e-Claims™ tables of acceptable doctors and facilities.

| | |
|---|---|
| Dr. James Ballard | N&M, Inc. |
| Dr. Kevin Cooper | RTS, Inc. (Mobile, Alabama) |
| Dr. Todd Coulter | Healthscreen, Inc. (Jackson, Mississippi) |
| Dr. Andrew Harron | |
| Dr. Ray Harron | |
| Dr. Glynn Hilbun | |
| Dr. Barry Levy | |
| Dr. George Martindale | |
| Dr. W. Allen Oaks | |

CRMC will not withdraw outstanding offers for claims based upon the reports of these doctors and facilities. However, claimants' only option will be to accept those offers, unless they submit new medical reports from acceptable doctors and facilities.

- 2 -

While Manville Trust claimants usually may elect to accept their last offer, claimants whose *deactivated* claims were based on reports from these doctors or facilities will no longer have that option. Deactivated claims must be re-filed on the basis of new medical reports.

Claims awaiting document submission, Quality Control (QC) document submission or individual evaluation must be recategorized on the basis of new medical reports. For e-filers, claim status has been reset to awaiting categorization decision tree (CDT). For paper filers, CRMC will send claim denial letters.

Inquiries related to the suspension of these doctors and facilities should be directed to CRMC's Customer Relations Analysts at (800) 536-2722 or customeroperations @claimsres.com.

## Charlotte Neuberger

**From:**    Patricia Cuniff
**Sent:**    Friday, December 01, 2006 3:44 PM
**To:**      Michele Santore; Charlotte Neuberger
**Subject:** FW: Exhibits re Appendix: Status Report On Non-Party Discovery

Please print and save in folders for a filing to come.
-----Original Message-----
**From:** James O'Neill
**Sent:** Friday, December 01, 2006 3:39 PM
**To:** Patricia Cuniff
**Subject:** FW: Exhibits re Appendix: Status Report On Non-Party Discovery

Exhibits for appendix

-----Original Message-----
**From:** Laura Mellis [mailto:lmellis@kirkland.com]
**Sent:** Friday, December 01, 2006 3:30 PM
**To:** James O'Neill
**Cc:** Daniel Rooney; Maxwell Shaffer; Amanda Basta
**Subject:** Fw: Exhibits re Appendix: Status Report On Non-Party Discovery


Hi Jamie,

Attached please find the exhibits to the Status Report to be filed today.

Laura

Laura E. Mellis  |  Legal Assistant I  |  Kirkland & Ellis LLP
655 Fifteenth Street, N.W.  |  Washington, DC 20005
(202) 220-2559 Direct  |  (202) 879-5200 Fax  |  lmellis@kirkland.com

----- Forwarded by Laura Mellis/Washington DC/Kirkland-Ellis on 12/01/2006 03:29 PM -----

| Maxwell Shaffer/Chicago/Kirkland-Ellis | | |
|---|---|---|
| 12/01/2006 02:13 PM | To | Barbara Harding/Washington DC/Kirkland-Ellis@K&E, David Mendelson/Washington DC/Kirkland-Ellis@K&E, Amanda Basta/Washington DC/Kirkland-Ellis@K&E, Laura Mellis/Washington DC/Kirkland-Ellis@K&E |
| | cc | Ellen Ahern/Chicago/Kirkland-Ellis@K&E, Daniel Rooney/Chicago/Kirkland-Ellis@K&E, Courtney Biggins/Chicago/Kirkland-Ellis@K&E, Karla Sanchez/Chicago/Kirkland-Ellis@K&E |
| | Subject | Exhibits re Appendix: Status Report On Non-Party Discovery |

Please find attached the exhibits to Appendix: Status Report On Non-Party Discovery. Should you have any problems with the attachments, please let me know.

Thanks,

Max Shaffer

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
The information contained in this communication is
confidential, may be attorney-client privileged, may
constitute inside information, and is intended only for
the use of the addressee. It is the property of
Kirkland & Ellis LLP or Kirkland & Ellis International LLP.
Unauthorized use, disclosure or copying of this
communication or any part thereof is strictly prohibited
and may be unlawful. If you have received this
communication in error, please notify us immediately by
return e-mail or by e-mail to postmaster@kirkland.com, and
destroy this communication and all copies thereof,
including all attachments.
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

# EXHIBIT 15



EXHIBIT

15



# J O I N T   C E N T E R
#### AEI-BROOKINGS JOINT CENTER FOR REGULATORY STUDIES

## Regulating Attorney-Funded Mass Medical Screenings:
## A Public Health Imperative?

### Judyth Pendell[*]

### Related Publication 05-22
### September 2005

[*]Senior Fellow, AEI-Brookings Joint Center for Regulatory Studies. The author wishes to thank Leah Lorber, Dr. Kenneth Prager, and Jeffrey Blumenthal for their assistance.

## Executive Summary

Attorney-funded mass medical screenings for asbestos and silica litigation have been shown to have a high rate of false positive diagnoses. It is likely that hundreds of thousands of asbestos and silica lawsuits have been based on unreliable medical evidence. Several analysts have discussed the financial and legal consequences for defendants and the courts. This paper adds to the discussion by focusing on the effects on the workers who are screened. I find that there are numerous breaches in acceptable medical procedures. Harms to workers include: unnecessary anxiety caused by false positive diagnoses, unwarranted x-ray exposures that increase the risk of cancer, and invasive procedures that may have resulted from false positive diagnoses.

The most effective prevention of further abuses by attorney-funded litigation screenings would target the point at which the lawsuits are allowed to move forward in the courts. I recommend that judges carefully scrutinize asbestos and silica claims and dismiss any that are not based on reliable medical evidence; legislatures should establish medical standards for these suits; and medical authorities should investigate attorney-funded screening activities.

1

## Regulating Attorney-Funded Mass Medical Screenings:
## A Public Health Imperative?

Judyth Pendell

## 1. Introduction

Asbestos litigation has been in the courts for decades, yet most of the costs lie in the future. Although $74 billion had been spent on the litigation through 2002 RAND predicts an additional $130 to $195 billion will be spent going forward.[1] This growth and its timing were not predicted – a 1983 RAND report projected total costs of less than $40 billion.[2]

Similarly, silica litigation is experiencing dramatic and unexpected increases. Only 342 silica claims were filed in Mississippi over the three-year time period of 1999-2001.[3] Approximately 20,000 silica claims were filed in that state from 2002-2004.

The litigation growth in both asbestos and silica is not supported by medical or epidemiologic evidence showing comparable increases in asbestosis and silicosis. Federal government data show that silicosis deaths are declining.[4] Although the same data source shows small increases in asbestosis deaths, asbestosis is generally not fatal[5], and other sources conclude that the incidence of asbestosis should have been declining around the mid 1990s.[6]

---

[1] Stephen Carroll et al., *Asbestos Litigation* (RAND Inst. for Civil Justice, May 2005).

[2] James Kakalik et.al., *Costs of Asbestos Litigation* (RAND Inst. for Civil Justice, 1983).

[3] *See* David M. Setter and Andrew L. Kalish, *Recent Screening Developments: The MDL Silica 1553 Daubert Hearing*, MEALEY'S LITIG. REP.: SILICA (2005).

[4] See DEP'T OF HEALTH & HUMAN SERVS., CENTERS FOR DISEASE CONTROL & PREVENTION, NAT'L INST. FOR OCCUPATIONAL SAFETY & HEALTH,; THE WORK-RELATED LUNG DISEASE SURVEILLANCE REPORT, 2002 54 tbl 3-1 )Pub. No. 2003-111, 2003); DEP'T OF HEALTH & HUMAN SERVS., CENTER FOR DISEASE CONTROL & PREVENTION, NAT'L INST. FOR OCCUPATIONAL SAFETY & HEALTH, WORKER HEALTH CHARTBOOK, 2000; FATAL ILLNESS 3 (Pub. No. 2003-111, 2002), available at http://www.cdc.gov/niosh/00-127pd.html (last visited Apr. 29, 2005.)

[5] *See* Carroll et al. *supra* note 2 at 137 (stating that "Data on asbestosis cases or deaths are limited and unreliable because asbestosis generally is not fatal." The report also cites an unpublished 1884 study prepared for the Congressional Research Service predicting that 2,774 excess deaths due to asbestosis would occur in 1982, decreasing to 734 in 2007.)

[6] See Lester Brickman, On the Theory Class's Theories of Asbestos Litigation: The Disconnect Between Scholarship and Reality, 31 PEPP. L. REV. 33 (2003) 36. ("It has been almost thirty years since large numbers of industrial plant and constsruction workers have been exposed to high levels of friable asbestos fibers in the courts of their employment. Based on the latency periods associated with asbestos related

2

Recent developments link these sharp increases in claiming for both asbestos and silica disease to attorney-funded mass screening operations. Several small medical screening companies are providing testing services to plaintiff attorneys who use mass marketing techniques to attract workers to testing sites.

Audits of asbestos and silica claims reveal that large numbers of claims are based on unreliable medical evidence. An American Bar Association Commission formed to craft a legal standard for asbestos-related impairment reported that the rate of "positive" findings, those consistent with prior asbestos exposure, generated by litigation screening companies often exceeds 50% and sometimes reaches 90%.[7] Since 1986, however, there have been at least four impartial panels of scientists who have evaluated the accuracy of litigation-related asbestos diagnoses, and they have found the rate of false positives from the screening companies to range from 66% to 97%.[8]

The consequences of having so many inaccurate diagnoses serve as the bases for lawsuits are both financial and human. The financial costs to defendant companies have been substantial. RAND estimates that 73 companies have declared bankruptcy as a result of asbestos litigation.[9] At least two companies have been driven into bankruptcy, in part, by silica litigation.[10] The hidden victims of asbestos and silica litigation are the employees of the bankrupt companies.

The human costs imposed on the workers who have been the objects of these screenings have been largely overlooked. It has been estimated that over 750,000 workers have been screened by attorney-funded mass screening companies.[11] Assuming this is

disease, rates of disease manifestation and claims based on such manifestations should have begun to significantly decline by no later then the mid 90s.")

[7] See AM. BAR ASS'N COMM'N ON ASBESTOS LITIG., ABA REPORT TO THE HOUSE OF DELEGATES, RECOMMENDATION & RESOLUTION, 12 (2003).

[8] See R.B. Reger et. al. Cases of Alleged Asbestos-Related Disease: A Radiologic Re-Evaluation, 32:11 J. OCCUPATIONAL MED. 1088 (1990); Hon. Carl Rubin & Laura Ringenbach, The Use of Court Experts, 137 F.R.D. 35 (1991); A.R.. LOCLIO ET AL., BIOSTATISTICS SECTION, DEP'T OF HEALTH EVALUATION SCIENCES, PA. STATE UNIV. COLLEGE OF MEDICINE & CEN TER FOR CLINICAL EPIDEMIOLOGY AND BIOSTATISTICS, THE MANVILLE PERSONAL INJURY SETTLEMENT TRUST X-RAY AUDIT: AN ASSESSMENT OF THE IDENTIFICATION OF THE UNDERLYING DISEASE PROCESS FOR MEDICAL REVIEW BY CERTIFIED B-READERS (1998); Joseph N. Gitlin et al., Comparison of "B" Readers' Interpretations of Chest Radiographs for Asbestos Related Changes, 11 ACAD. RADIOLOGY 843 (2004).

[9] See Carroll supra note 2 at xxvii.

[10] Clemtex (2003) and Swan Transportation (2003).

[11] See Lester Brickman, Ethical Issues in Asbestos Litigation, 33. HOFLR. 833. (2005) at 836.

3

accurate, somewhere between 250,000 and 650,000[12] workers have been told they have asbestos-related disease when in all probability they do not. Further, these workers have been deprived of many of the protections that accompany appropriate medical testing and as a result may have been harmed.

This paper will: 1) provide background on asbestos and silica litigation and on the significance of attorney-funded mass screenings in the litigation; 2) describe the operations and management of attorney-funded mass screenings; 3) discuss the financial impact of asbestos litigation on workers of now-bankrupt defendants' ; 4) raise concerns relative to the effect these screenings may be having on the workers who have been and are being screened; and 5) offer policy options and make recommendations.

## 2. Background on Asbestos and Silica Litigation and the Role of Attorney-Funded Mass Screenings

Asbestos diseases are dose-related diseases: the higher the level of exposure, the more likely and more severe the disease. Even mesothelioma, a lethal type of cancer alleged to occur in the absence of intensive or longstanding exposure to asbestos, generally requires more than minimal exposure. Most of the people who filed claims in the first few decades of the asbestos litigation worked in environments where large amounts of asbestos fibers were airborne. Since the mid-1980s, plaintiffs have had less and less exposure, and the severity of their diseases has lessened correspondingly. Now, ninety percent of current claimants have non-cancerous claims and the majority of them are unimpaired.[13] To maintain their claims, these claimants often just produce a doctor's statement that their x-rays are "consistent with" asbestos-related disease, a standard that is at odds with medical diagnostic protocols and subverts traditional legal standards of proof.[14] To satisfy this requirement, claimants often provide reports generated by doctors

---

[12] This range is the product of multiplying 750,000 by the percentage of positive diagnoses as estimated by the ABA, then by the percentage of false positive diagnoses estimated by the audits discussed in this paper.
[13] *See* Stephen Carroll et al., *Asbestos Litigation Costs and Compensation* xv (RAND Inst. for Civil Justice, 2005); Jennifer Biggs et al., *Overview of Asbestos Issues and Trends* 3 (Dec. 2001), *available at* http://www.actuary.org/mono.htm (last visited Apr. 29, 2005); *see also* Roger Parloff, *Asbestos*, FORTUNE, Sept. 6, 2004, at 186 ("According to estimates accepted by the most experienced federal judges in this area, two-thirds to ninety percent of the nonmalignants are 'unimpaireds'").
[14] *See* Brickman, *supra* n.8, at 61 (stating that the "consistent with" standard "is not simply tolerant of specious claiming but an active inducement thereto.").

4

hired by their law firms or screening companies, not by their own treating physicians. These reports are based on x-rays and sometimes on pulmonary function tests (PFTs) generated at mass medical screenings sponsored by lawyers.[15]

Attorney-sponsored medical screenings began in the early 1980s. They evolved from programs that tested injured union workers who worked with asbestos, to the for-profit entities that actively recruit anyone who might have been exposed to asbestos. The tactics of mass tort litigation encouraged their use.[16] In order to handle asbestos cases efficiently, courts weakened legal standards for recovery on asbestos claims. For example, courts dispensed with evidentiary requirements and the need for proof of a causal relationship between a specific company's product and a specific individual's asbestos-related disease. In other words, minimal exposure to a defendant's product, however tenuous, was generally sufficient in most states to get the case to a jury. They also allowed thousands of dissimilar claims to be aggregated in a single lawsuit.[17] When individual claims are consolidated, defendants face great pressure to settle all the claims, because it lowers overall costs to the company to settle the cases *en masse* than to litigate the merits of each individual claim.[18] Hence, attorney-sponsored mass medical screenings became a primary tool for the recruitment of new claimants, particularly clients with little or no impairment. As the judge presiding over the federal asbestos multidistrict litigation has explained: "Only a very small percentage of the cases filed have serious asbestos-related afflictions," but they "are prone to be lost in the shuffle with pleural and other non-malignant cases."[19]

---

[15] *In re* Joint E. & S. Dists. Asbestos Litig., 237 F. Supp. 2d 297, 309 (E.D.N.Y. & S.D.N.Y. 2002) (asbestos claimants "are diagnosed largely through plaintiff-lawyer arranged mass screenings programs targeting possible exposed asbestos-workers and attraction of potential claimants through the mass media."); Eagle-Picher Indus., Inc. v. Am. Employers' Ins. Co., 718 F. Supp. 1053, 1057 (D. Mass. 1989) ("[M]any of these cases result from mass X-ray screenings at occupational locations conducted by unions and/or plaintiffs' attorneys, and many claimants are functionally asymptomatic when suit is filed.").

[16] *See* Victor E. Schwartz et al., *Addressing the "Elephantine Mass" of Asbestos Cases: Consolidation Versus Unimpaired Dockets (Pleural Registries) and Case Management Plans that Defer Claims Filed By the Non-Sick*, 31 PEPP. L. REV. 271 (2004).

[17] *See, e.g.*, Victor E. Schwartz & Leah Lorber, *A Letter to the Trial Judges of America: How The Focus on Efficiency is Hurting You and Innocent Victims In Asbestos Litigation*, 24 AM. J. OF TRIAL ADVOC. 247 (2000).

[18] *See* Victor E. Schwartz & Rochelle M. Tedesco, *The Law of Unintended Consequences in Asbestos Litigation: How Efforts to Streamline The Litigation Have Fueled More Claims*, 71 MISS. L.J. 531 (2001).

[19] *In re* Asbestos Prods. Liab. Litig. (No. VI), 1996 WL 539589, *1 (E.D. Pa. Sept. 12, 1996); *see also* Brickman, *supra* n.8, at 54-62 (discussing the development and use of mass medical screenings in asbestos litigation and settlement procedures).

5

With as many as 73 companies in bankruptcy protection as a result of asbestos litigation, the amounts plaintiffs are able to recover against these companies is limited. One of the responses of some asbestos plaintiff attorneys has been to take the model for developing a client base of asbestos claims and adapt it to another pulmonary occupational disease: silicosis. As a result, silica litigation, which had been stable for many years, with a relatively low number of cases filed annually, suddenly experienced a dramatic increase in filings in 2002.[20]

This increase in case filings has occurred despite federal government data showing that silica-related deaths are decreasing. According to the National Institute for Occupational Safety and Health (NIOSH), the annual number of silica-related deaths has dropped nearly eighty-four percent, from 1,157 in 1968, to 187 in 1999.[21] The CDC reported a 70 percent decline in silicosis mortality comparing 1968-1981 to 1982-2000.[22]

If over 750,000 workers have undergone attorney-sponsored asbestos and silica screenings during the past two decades,[23] it does not take a very high error rate in diagnoses to generate a substantial number of claims that should not be in the system. There is considerable evidence that the error rate is, in fact, quite high.

An American Bar Association Commission formed to create a legal standard for asbestos-related impairment[24] reported that the rate of positive findings (i.e. findings consistent with prior asbestos exposure) generated by litigation screening companies is "startlingly high," often exceeding 50% and sometimes reaching 90%.[25] Several major audits of the diagnostic accuracy of asbestos and silica claims have provided independent, compelling evidence of a high rate of false positives.

---

[20] See Roy T. Atwood et al., Commentary, *In Silica Litigation, The Numbers Alone Dictate Careful Scrutiny of Injury and Causation*, 26:2 ANDREWS ASBESTOS LITIG. RPTR. 12 (Dec. 4, 2003); *see also Asbestos: The Mixed Dust and FELA Issues: Hearing Before the Senate Committee on the Judiciary*, 109th Cong., at 9 (Feb. 2, 2005) (statement of Lester Brickman, Professor, Benjamin N. Cardozo School of Law of Yeshiva University); Susan Warren, *Silicosis Suits Rise Like Dust: Lawyers in Asbestos Cases Target Many of the Same Companies*, WALL ST. J., Sept. 4, 2003, at B5; Gilbert S. Keteltas, *Learning the Lessons of Asbestos: Courts and Defendants Can Do Better in The Case of Silica*, 26:6 ANDREWS ASBESTOS LITIG. RPTR. 9 (Jan. 15, 2004).

[21] See DEP'T OF HEALTH & HUMAN SERVICES *Supra* Note 6.

[22] Id.

[23] See *supra* note 11.

[24] The ABA Commission proposed the enactment of federal medical criteria standards for nonmalignant asbestos claims. The ABA's House of Delegates adopted the Commission's proposal in February 2003.

[25] See Am. Bar Ass'n Report, *supra* note 7 at 8.

 6

### The National Tire Workers Litigation Project

The first major discovery of inaccurate x-ray readings involved a project in which two attorneys and three physicians formed the National Tire Workers Litigation Project (NTWLP) in 1986 to sign up tire workers and to file claims for lung injury from asbestos. According to a handout distributed to tire workers, 64 percent of the workers first examined by chest radiography for asbestosis were positive and in a second group 95 percent had the disease. Scientists subsequently conducted a radiologic re-evaluation of 439 tire workers' claims previously designated by the NTWLP as having x-ray changes consistent with asbestos exposure.[26] The re-evaluation was conducted by a panel of three board-certified radiologists who were NIOSH certified B-readers. The readings were performed independently, according to the International Labour Office Guidelines for Pneumoconioses Classification. Of the 439 films re-interpreted by the three independent radiologists the percentage of positive films was 3.7%, 3.0% and 2.7%. A consensus evaluation indicated that approximately 3.6% of the subjects evaluated had a condition consistent with asbestos exposure — a figure that markedly differs from the 64% and 95% findings of the NTWLP.

### Review of cases by Judge Carl Rubin

A review undertaken by a federal court overseeing asbestos cases found similar problems. Of the sixty-five asbestos claims studied by court-appointed medical experts, almost two-thirds had no asbestos-related conditions at all.[27]

### The Manville Audit

In 1982, Johns Manville, a principal defendant in asbestos litigation, declared bankruptcy, and a trust fund was established thereafter to provide compensation to Manville claimants. By 1994, asbestosis claims exceeded anticipated filing rates by 94 percent, and by the end of 1995 by almost 250 percent. Patricia Houser, President of the Claims Resolution Management Company, which provides claims resolution services to the Trust, offered the following testimony in an affidavit to the court in 1999:

---

[26] *See* R.G. Reger et al.*supra* note 8.
[27] *See* Hon. Carl Rubin & Laura Ringenbach, supa note 8.  See also supra text p 43.

 7

*Asbestos claims were failing medical audit at high rates. In contrast, increases in asbestos-related cancer and pleural disease filings, which did not have a troubling failure rate in medical audit, had far less alarming rates of variance from predicted levels. We thus had reason to believe, on a statistical basis alone, that a portion of the asbestosis claims might not be based on reliable medical evidence. At the same time, we also observed that the nature of the claims being submitted had fundamentally shifted—it became widely known that the vast majority of new claims were being submitted through mass litigation screenings.*

These developments caused the Trust to implement a medical audit program in which neutral experts analyzed and evaluated five percent of the claims submitted by each law firm during each payment cycle. The process was designed to be biased in favor of confirming the diagnosis presented by claimants, giving them the benefit of the doubt. Still, the audit showed there was a very high medical audit failure rate. For example, analysis of the 1996 submission showed that about 41 percent of claimants either had no disease at all or had a less severe condition than they alleged.[28] Moreover, the ten physicians used most often by plaintiffs' law firms had an average failure rate of 63 percent.[29] Based on these numbers, one researcher calculated that the Trust alone might have paid $190 million for inauthentic or inflated claims between 1995 and 2001.[30] When all asbestos claims during that time period are considered, the value of the inauthentic and inflated claims approaches $28.5 billion.[31]

**The Gitlin Study**

Similar discrepancies were recently reported in a 2004 study by researchers at Johns Hopkins University who re-evaluated 551 films interpreted by B-readers and 491

---

[28] *See* A.R. LOCALIO et al., *supra* note 8.
[29] *See* Roger Parloff, *Mass Tort Medicine Men,* AM. LAW., Jan. 3, 2003, at 98.
[30] *See id.*
[31] *See* id.at 98.

 8

matching interpretative reports used as a basis for asbestos claims.[32] In the initial readings, 91.7% of the 551 films were interpreted as positive for abnormalities. The films were re-interpreted by six B-readers in an independent manner with a finding of *only* 4.5% having those same abnormalities. The data showed statistically significant differences between the interpretations of the initial B-readers – that were used as a basis for the lawsuit -- and the independent B-reader panel. Members of the radiologic community subsequently called for further investigation into questionable B-reader practices.[33]

**The Silica MDL**

Federal District Court Judge Janis Graham Jack, who is presiding over the federal multidistrict silica litigation in Texas, took an unusual position in response to a discovery request from defendants last year. She allowed the defendants to depose the screening doctors who diagnosed the plaintiffs, even though it was not necessarily the plaintiff lawyers' plan to use them as witnesses in trial. The defense lawyers used this as an opportunity to compare asbestos claimants with silicosis claimants, using social security numbers. Looking at one particular screening company, they found 3,691 plaintiffs had been told, prior to December 31, 2000, that their x-rays showed shadows consistent with asbestosis but not silicosis. Yet when those plaintiffs were examined again after December 31, 2000, 3715 had x-rays supposedly showing silicosis related shadows as well. For those workers examined for the first time after December 31,2000, screening doctors regularly saw both types of shadows: asbestosis and silicosis. One doctor issued 331 separate asbestosis and silicosis diagnoses based on one reading of each worker's x-ray, with neither report referring to the other.[34]

---

[32] *See* Joseph N. Gitlin et al. *supra* note 8.

[33] *See* Murray L. Janower & Leonard Berlin, *Editorial, "B" Readers' Radiographic Interpretations in Asbestos Litigation: Is Something Rotten in the Courtroom?* 11 ACAD. RADIOLOGY 842 (2004) (stating that "the radiological community itself clearly has an obligation to conduct further investigations to determine whether the integrity of the B-reader radiologists has indeed been breached and if so, to repair the breach, implement measures to prevent it from happening again, and restore integrity to our noble and proud profession.")

[34] *See* Roger Parloff, *Diagnosing for Dollars*, Fortune, June 13, 2005.

9

During court hearings on the reliability of the medical evidence supporting the plaintiffs' silicosis claims Judge Jack said that she saw "great red flags of fraud" in the way these screenings were used to recruit thousands of plaintiffs to file their lawsuits.[35]

In May 2005, a federal grand jury was convened in Manhattan to consider possible criminal charges arising out of the silica related claims that emerged in federal court proceedings in Corpus Christi, Texas." According to *The New York Times*, "Evidence was entered in the Texas court that some doctors had little training in how to interpret X-rays to find signs of silica-related illness and that they reached their conclusions after spending just minutes looking at an X-ray – or worse, just a prepared report based on an X-ray. Some doctors backed away from their conclusions; one cut short his own testimony to ask for a lawyer."[36] According to the *Times* the grand jury has subpoenaed documents from at least one of the companies involved in the case before Judge Jack. Further, last month Judge Jack revealed that on June 30, 2005 her court had received a communication from an Assistant United States Attorney for the Southern District of Texas, on behalf of the U.S. Attorneys Office in the Southern District of New York, requesting access to items in the MDL document depository/x-ray repository for use in grand jury proceedings in New York.[37]

---

[35] *See* Transcript, *Daubert* Hearings Before the Honorable Janis Graham Jack, U.S. District Court Judge, *In re* Silica Prods. Liab. Litig., MDL No. 1553, 23 (S.D. Tex. Feb. 17, 2005); *see also* Jonathan D. Glater, *Companies Get Weapon in Injury Suits; Many Silica-Damaged Plaintiffs Also Filed Claims Over Asbestos*, N.Y. TIMES, Feb. 2, 2005, *available at* 2005 WLNR 1415209; Jerry Mitchell, *Silicosis Screening Process Irks Judge*, CLARION-LEDGER, Mar. 6, 2005, at A1, *available at* 2005 WLNR 3546204 (explaining that U.S. District Judge Janis Graham Jack used the word "fraudulent" to describe the process that led to the diagnosis of many of the MDL plaintiffs); Mary Alice Robbins, *Judge in Silicosis Suits Critical of Plaintiffs Counsel*, 21:3 TEX.LAW. 1 (Mar. 21,2005); Asbestos personal injury lawyer Steve Kazan of Oakland, California, has said "[t]he whole thing is somewhere between shameless and shameful." Justin Scheck, *Critics Sandblast Local Silicosis Suits*, THE RECORDER, Apr. 1, 2005 at 7.

[36] Jonathan D. Glater, *Civil Suits Over Silica in Texas Become a Criminal Matter in New York*, NY TIMES, May 18, 2005, B1.

[37] *In re* Silica Prods. Liab. Lit., MDL 1553, Admin. Order No. 31 (S.D. Tex. Aug. 22, 2005). (Judge Jack further reported that on August 1, 2005 Attorney Scott Hooper had removed in excess of 1,000 x-rays from the repository , despite the fact that she had previously denied Hooper's request to take the x-rays, and despite the fact that she had informed counsel to the litigation that the documents and x-rays were under federal scrutiny. At the time the x-rays were removed, Hooper signed a document indicating he was removing 1,342 x-rays. As of 5:00 p.m. August 22, 2005 he had returned only 1,219. Her reaction: "In the future the Court would like Mr. Hooper to form a closer relationship with the law.").

 10

### 3. The Operations and Management of Attorney-Funded Mass Screenings

Within the field of preventive medicine there are standards that determine when and under what circumstances medical screenings of asymptomatic patients are appropriate, including the relative risks and benefits to the individuals from the screenings, which may be intrusive, painful or potentially harmful.[38] Whether health-related medical screenings are performed individually or on a broad scale, they should be conducted by qualified medical personnel and follow medically accepted protocols.[39] Attorney-sponsored screenings, on the other hand, are driven by plaintiffs' lawyers' efforts to generate a substantial number of asbestos and silica claims to facilitate mass settlements. As former U.S. Attorney Griffin Bell stated: "These screenings often do not comply with federal or state health and safety law. There often is no medical purpose for these screenings and claimants receive no medical follow-up."[40]

This section contains a description of mass screening practices that deviate from accepted medical procedures based on a review, by the author, of 35 depositions of owners, managers, doctors, and technicians affiliated with attorney-funded mass screening companies.[41] The depositions are not of people who were randomly selected from all participants in the screenings companies. The deponents were not all asked the same questions. The interviews were not repeated over time. So, it is not possible to generalize from the practices described below to the practices of all screening companies across all points in time. Three important points should be made, however, relative to the utility of the anecdotes below. First, taken as a whole, the depositions created the impression, for the author, that deviations from standard medical practice were more the norm than the exception for the companies that were deposed. Second, the specific deviations cited are sufficiently prevalent, and in some cases sufficiently serious, to suggest that an investigation of the practices of these companies should be conducted by

---

[38] *See* Victor E. Schwartz et al., *Medical Monitoring: The Right Way and the Wrong Way*, Mo. L. REV. (forthcoming 2005.)

[39] *See, e.g.*, Johns Hopkins Bloomberg School of Public Health Medical Exam Program for Former Workers at Los Alamos National Laboratory (LANL), *Frequently Asked Questions, at* http://www.jhsph.edu/LANLFW/faqs.html (last visited Apr. 29, 2005) [hereinafter Johns Hopkins FAQs] (describing medical screening program for former LANL workers occupationally exposed to asbestos and other potentially hazardous substances).

[40] Hon. Griffin B. Bell, *Asbestos & The Sleeping Constitution*, 31 PEPP. L. REV. 1, 5 (2003); *see also* Brickman, *supra* note 8 at 65.

[41] The depositions are supplemented by testimony from *In re* Silica Prods., *Daubert* Hearing, *supra* note 15.

the proper medical authorities (this is discussed at greater length in section 5.) Finally, the medical audits described in the prior section beg the question: What occurs in these mass screening companies to produce the diagnostic results found by the Johns Hopkins scientists, the Johns-Manville auditors, and others? Although anecdotal, these depositions provide a partial answer.

**Recruitment and Intake Interviews of Potential Mass Tort Claimants**

Litigation screenings are often conducted in vans or trailers that have been outfitted with X-ray machines. These mobile x-ray units can travel to union halls, motels or even restaurant parking lots to perform screenings.[42] Financial incentives produce a screening environment in which large numbers of people are moved through the testing process in short periods of time.[43] Rather than being referred by their treating physicians, workers in targeted industries are solicited for litigation-driven screenings through labor unions,[44] direct mail,[45] and advertising.[46] One company's goal is to screen a minimum of 50 people in one day,[47] and several companies reported performing 100 or more screenings a day.[48]

---

[42] *See In re* Silica Prods. Liab, Litig., *supra* note 34, Feb. 17, 2005, at 54-55 (testimony of plaintiffs' diagnosing expert Dr. Harold Coulter) (testifying he was present for litigation screenings performed in a trailer in the parking lot of a Sizzler restaurant in Lewisville, Mississippi).

[43] "[F]rom a business standpoint of mine, you had to do large numbers." *In re* Silica Prods., *Daubert* Hearing, *supra* note 34, Feb. 17, 2005, at 281-82 (testimony of Heath Mason, owner of for-profit screening company N&M, Inc.).

[44] *See* Dep. of. Kenneth Werner, Oct. 3, 2000, at 199.

[45] In some cases, direct marketing companies are hired to blanket communities with direct mail solicitations with such solicitations as "Find out if you have Million Dollar Lungs." Pamela Sherrid, *Looking for Some Million Dollar Lungs*, U.S. NEWS & WORLD REP., Dec. 17, 2001, at 36, *available at* LEXIS, News Library, U.S. News & World Rep. File.

[46] Newspaper or television advertisements typically give an 800 number to call to arrange for a free screening. *See In re* Silica Prods., *Daubert* Hearing, *supra* n. 34, Feb. 17, 2005, at 366-67 (testimony of Heath Mason) (describing television advertising in Mississippi and Alabama).

[47] *See* Dep. of Charles Foster, Aug. 6, 2002, at 141, *in* Morehouse v. N. Am. Refractories Co. (Ala. Cir. Ct. 2002) (testimony of founder of Respiratory Testing Services, Inc.); *see also* Dep. of Gregory A. Nayden, M.D., Mar. 28, 2002, at 89, *In* Bentley v. Crane Co., Civ. Action No. 92-7655 (Miss. Cir. Ct. 2002) (testifying he saw 50 to 65 workers a day for asbestos screening, spending about ten minutes on each person for both the physical exam and the medical history).

[48] *See* Dep. of Glenn Pitts, Dec. 4, 1995, at 49, 147, 197, *in* Adams v. Metro. Ins. Co., No. 433-992 (La. Dist. Ct. 1995) (testimony from witness who ran Pulmonary Advisory Services, Inc. indicating doctors saw 67 workers a day, performing a five-to-ten minute on-site physical exam); Dep. of K. Werner, *supra* n 41, at 145; *In re* Silica Prods. Liab. Litig., *supra* note 34, Feb. 17, 2005, at 97 (testimony of plaintiffs' diagnosing expert Dr. Harold Coulter) (physical exam of worker at screening program "probably tops 15 minutes").

12

When workers appear at the screening site they usually are required to sign a retainer agreement with the law firm sponsoring the testing. The retainer fee can be anywhere from 33 to 40 percent of the recovery.[49] (According to RAND claimants' total legal expenses, including lawyers' fees and other expenses averaged 39 % of gross compensation in 1984, and that continues to be the average through 2002. RAND notes that "although plaintiff lawyers may have recognized savings from routinization of the litigation (e.g. the widespread use of administrative payment schedules)...none of those we interviewed suggested that any of these savings have been passed on to claimants."[50])

In any medical screening program, good intake procedures are important to assure that the physician has the appropriate information to accurately diagnose a health condition and its likely cause.[51] "[T]he recording of patient information such as medications, age, race, medical history and exposure history are crucial to prevent errors in interpretation."[52] There is no standard intake protocol among litigation screening companies. Intake procedures seem to be erratic. In at least one for-profit screening company there were no education or training requirements for the employees who took worker histories.[53] The owner of another screening company testified that he had "never

---

[49] See, e.g., Brickman, supra note 8, at 64 & n.91 (plaintiffs' attorneys fees in asbestos litigation typically range from 33 to 40 percent, even when settling or filing mass claims in what is essentially an administrative process.); Shrader & Williamson, L.L.P. Attorney-Fee Contract and Power of Attorney, 1 (Section V. provides for attorneys' fees of 40 percent of any gross recovery).

[50] See Carroll et al. supra note 2 at 103.

[51] For example, an accurate diagnosis of an asbestos-related condition:

requires assessment of a number of factors, including the review of chest X-rays, pulmonary function tests, latency, and the taking of a complete occupational, exposure, medical and smoking history. Because many symptoms and findings are not specific to asbestos-related disease, this approach is necessary to enable a physician to exclude other more probably causes for various findings. This then enables the physician to support a conclusion that the patient's medical condition is the result of asbestos exposures. AM. BAR ASS'N COMM'N ON ASBESTOS LITIG., ABA REPORT TO THE HOUSE OF DELEGATES, RECOMMENDATION & RESOLUTION, 12 (2003) (reporting consensus on proper practices among all doctors interviewed by ABA Commission on Asbestos Litigation).

[52] Dep. of Dr. Jose E. Roman-Candelaria, at 38, in Koontz v. AC&S, Inc., Cause No. 49D02-9601-MI-0001-668 (Ind. Super. Ct. 2002). In the Johns Hopkins' screening program for former Los Alamos National Laboratory (LANL) workers, for example, the intake interviewers are former LANL workers. See Johns Hopkins Bloomberg School of Public Health Medical Exam Program for Former Workers at Los Alamos National Laboratory, The Program Team, at http://www.jhsph.edu/LANLFW/faqs.html (last visited Apr. 29, 2005).

[53] Dep. of C. Foster, supra note 47, at 168-80, 168-71 (testimony of owner of RTS, Inc., describing how work histories and a medical form are filled out by part-time personnel who who were "[m]ostly high school graduates" without any training"). When questioned about how the interviewer knew what to ask during intake, Charles Foster testified: "Listen, I can take a six-year-old kid and put them at the desk and say fill this out."). Guy Foster, owner of American Medical Testing, testified simply that medical intake employees "must have good handwriting and good hearing." Dep. of Am. Med. Testing, Inc., Guy Wayne

13

heard of' anyone being medically trained to take worker histories.[54] In some cases the intake was done by someone from the law firm paying for the screening.[55]

Some screening companies do not take workers' medical histories, job histories and/or smoking histories.[56] All of these are relevant to a diagnosis of an asbestos or silica-related health condition, as well as a determination of what may have caused or contributed to that condition.[57] In at least one company, intake personnel have discretion over what questions to ask, but they do not need to put their names on the intake form, making follow up on the intake interview difficult to impossible.[58]

---

Foster, Designee, Dec. 12, 2001, at 261, *in* Bentley v. Crane Co., Civ. Action No. 11-0064 (Miss. Cir. Ct. 2001). *See also In re* Silica Prods. Liab.Lit., MDL 1553, Admin.Order No. 29 (S.D. Tex. June 30, 2005), (Judge Jack found that "there is no evidence that anyone answering the phones, whether employed by a screening company or a law firm, had any medical training or had been instructed by any medical professional what questions would be appropriate in taking an occupation history." at 68. She rejected the notion that this task was too routine to require the doctor's involvement: "[E]xperts in the field of occupational medicine do not consider taking an occupational history to be beneath a physician." at 123. After noting that a "thorough, physician-guided work/exposure history is the kind of history that experts in the field of occupational medicine insist upon when diagnosing silicosis" she stated that the plaintiffs' experts "relied upon a history taken by lawyers and clerks with no medical training or supervision. The questions asked were not drafted by physicians, testifying or otherwise; indeed, the challenged physicians were not even aware of what questions were asked." at 125 and 126).

[54] *See In re* Silica Prods., *Daubert* Hearing, *supra* note 34, Feb. 17, 2005, at 293 & 291-93 (testimony of Heath Mason) ("I've never heard of someone being medically trained to take exposure history.").

[55] *See id.* at 284-85 (identifying several law firms that took their own exposure histories at silica litigation screenings and stating: "Basically we would show up with just our X-ray equipment and they [the law firm workers] would do a brief work history with them [the persons being screened] before they allowed them to get an X-ray. If they thought they had adequate exposure, then they would say, "Hey, we'll take your X-ray.""); Dep. of K. Werner., *supra* note 45, at 209.

[56] *See* Dep. of Charles Kemeny, M.D., May 14, 1997, *In re* Asbestos Prods. Liab. Litg., MDL No.875 (E. D. Pa.) at 277-280 and 321.

[57] *See* Dr. Harold Coulter, who diagnosed a relatively small number of plaintiffs in the silica litigation, testified as follows: *[O]ne of the things that sometimes is missing when you're not directly there with the patient is asking about the character of their complaints, you know. Exactly, where was it located? What exactly is going on? You've got to be very, very specific. The who, the what, the why, the when, the where, the how. Were they wearing a mask? Were they not wearing a mask? Exactly what were they doing? Was there some additional exposures that they may not have had, such as, I know patients that I've had the opportunity of interacting with and talking to have said to me, "Yes, I did some sandblasting" or "Yes, I did some welding," or "I cut some sheetrock. But you know my big job, Doctor, is I pressure wash on the weekends." "Well, what are you pressure washing?" "Oh, all of these old buildings. There's a lot of good money to be made. Well, sometimes the stuff flies off on me." "Well, how do you know?" "Well because I got a piece of rock once in my eye and I had to go to the emergency clinic for it." So there's more to this than meets the eye. The history has to be expansive but it also has to be guided, if you will, by what the patient tells you.*

*In re* Silica Prods., *Daubert* Hearing, *supra* note 34, Feb. 17, 2005, at 44, 68 (testimony of plaintiffs' diagnosing expert Dr. Harold Coulter) (also testifying he believed he diagnosed 140 to 150 patients; defense counsel stated he estimated the number of diagnoses at between 250 and 300).

[58] *See* Dep. of G. Foster, *supra* note 50. at 241 (testifying that the only way to know, after the fact, who filled out the form is to "recognize the handwriting.").

 14

Some screening companies require workers to sign a form verifying they had been exposed to the substance at issue.[59] Sometimes, the assumption is made that if the person worked around asbestos or silica at any time in a job, he worked around it the entire time he was in that job.[60] A doctor working for a screening company testified as follows:

> Q: But, under your definition the existence of a pipe, in a
>     workplace, without more, is ["]asbestos exposure["]?
>
> A: Yes.[61]

In the federal silica MDL litigation, some plaintiffs who claimed they were "exposed" to silica included a homemaker who performed light housework and errands, a butcher at Sunstar Foods, and a manager for Wal-Mart.[62]

**X-rays and Their Interpretations**

Once the litigation screening intake process is completed, workers receive a chest x-ray. They are typically not examined by a doctor prior to the x-ray and no treating physician concludes that an x-ray is necessary or medically appropriate for an individual

---

[59]*See In re* Silica Prods., *Daubert* Hearing, *supra* note 34, Feb. 17, 2005, at 306-07 (testimony of Heath Mason) ("They would have to circle yes or no whether they were exposed to silica and they would have to initial it themselves. And then they would sign their name to the bottom verifying that the information they gave us is to the best of their knowledge that it's true.").

[60] *See* Dep. of G. Foster, *supra* n. 50, at 212. Heath Mason, the owner of N&M Inc., testified in court hearings for the silica litigation:

> THE WITNESS: *We didn't put exactly how long they were at each job title; we*
>               *just put how long that they were at this work site.*
>
> THE COURT:    *Okay. But you don't know what they were doing in these*
>               *various times?*
>
> THE WITNESS: *No, ma'am.*
>
> THE COURT:    *Okay. Or the time they were exactly exposed to silica*
>               *during this work time?*
>
> THE WITNESS: *Right.*

*In re* Silica Prods., *Daubert* Hearing, *supra* note 34, Feb. 17, 2005, at 292-93 (testimony of Heath Mason).
[61] Dep. of G. Nayden, *supra* note 44, at 277-80, 321.
[62] *See* Fact Sheets, Tab 11, *Motion to Strike Plaintiffs' Diagnoses, and for Judgment, In re* Silica Prods. Liab. Litig., MDL No. 1553 (S.D. Tex. 2004).

15

person.[63] In most states, with few exceptions, a physician must issue a prescription for an x-ray or the company must obtain approval from a state's department of health to administer x-rays without a physician's order. To get around these regulatory requirements, mass screening companies often use "blanket prescriptions."[64] In most cases, medical doctors do not supervise the x-ray procedure. Sometimes the x-rays are not performed properly. One chiropractor who took x-rays for a screening company testified that he had the men he x-rayed remove their shirts only about half the time and he had women position themselves at the x-ray machine.[65] These methods deviate from acceptable medical practice.

States also have registration, quality control and inspection requirements for the x-ray equipment and mobile vans. Some companies do not maintain their equipment.[66] One company was unaware of state calibration requirements,[67] and a number of mass screening companies have fallen short of meeting state requirements for the use of x-ray equipment.

State health departments have sanctioned chiropractors (South Carolina) and a screening company (Ohio and Texas) for violations of laws that regulate the use of x-ray equipment, including but not limited to: failure to annually renew a radiation protection program; inadequate shielding devices; occupational exposure limits not documented; cassettes and screens not inspected, cleaned or replaced; frequency and QC tests not performed or documented; records not maintained; equipment not registered; quality assurance records not available; calibration records not maintained; written operating procedures nonexistent; and radiation areas not posted with "Caution—Radiation Area" signs.[68]

---

[63] See Dep. of C. Kemeny, *supra* note 53, at 256.

[64] See Dep. of Roman-Candelaria, *supra* note 49.

[65] See Dep. of Dr. David T. Netherland, D.C., Feb. 14, 2002, at 171-172, *in* Bentley v. Crane Co., Civ. Action No. 92-7655 (Miss. Cir. Ct. 2002).

[66] See *supra* note 64. See also Dep. of K. Werner, *supra* note 41, at 387.

[67] See *id.* at 262; Dep. of D. Netherland, *supra* note 62, at 70.

[68] See *In re* David Netherland, D.C., Consent Order RXCO-07-2001, State of South Carolina Department of Health and Environmental Control, March 2001. *See also* letter to James Corbitt, U.S. X-Ray, Inc., from J. Nick Baird, Director of Health, Ohio Department of Health, Re: Notice of Violations-Public Health and Safety Risk Notice, Notice of Right to Evidentiary Hearing, Nov. 1, 2001; *See also* Emergency Cease and Desist Order No. 01062CO In the Matter of U.S. X-Ray, Inc. Before the Texas Department of Health, Aug. 21,2001. Extensive documentation is available from the Ohio, Texas, and South Carolina Departments of Health.

 16

After the x-rays are taken they are given to a B-reader – a medical doctor certified by NIOSH to interpret x-rays in accordance with standards established by the International Labour Office (ILO).[69] The B-readers interpret the x-rays and fill out standard ILO forms documenting their findings.[70] Although ILO guidelines require that the B reader read the x-ray blind to information about the individuals other than the radiographs themselves, including information about the individual's purported occupational exposure, this guideline appears to be disregarded. [71]The B-readings are often performed off-site and the physician performing the B-readings rarely meets, personally examines or communicates with the worker, There appears to be a consistent tendency for for-profit screening services to identify whatever disease is the subject of litigation.[72] As one B-reader testified:

> *Q. Doctor . . . the lawyers tell you the work history is exposure*
> *history that's consistent with asbestosis, or they want you to*
> *look for asbestosis, is that what the lawyers tell you?*
>
> *A. Yes.* [73]
>
> *              *              *
>
> *THE WITNESS: I'm making the reading according to what*
> *                    information I have.*
>
> *THE COURT:    From the lawyer.*
>
> *THE WITNESS: What's on the film, plus what I'm given.*

---

[69] *See* Robert Glenn, *The NIOSH B Reader Program: Recalling Its True Purpose*, 16:1 PRODS. LIAB. 1 (ABA, Sec. of Litig., Comm. on Prods. Liab. Litig. 2005).

[70] *See Brickman, supra* note 8, at 47 (explaining the use of ILO standards and how questionable diagnoses of asbestosis and silicosis can be generated from x-rays).

[71] *See In re* Silica Prods. Liab. Lit., *supra note* 57 at 131("In the settling of a mass screening and/or mass B-reading for litigation, the B-reader is acutely aware of the precise disease he is supposed to be finding on the x-rays. In these cases, the doctors repeatedly testified that they were told to look for silicosis, and the doctors did as they were told.).

[72] As one physician has explained, in asbestos litigation, "the chest x-rays are not read blindly, but always with the knowledge of some asbestos exposure and that the lawyer wants to file litigation on the worker's behalf." David E. Bernstein, *Keeping Junk Science Out of Asbestos Litigation*, 31 PEPP. L. REV. 11, 13 (2003) (quoting Lawrence Martin, M.D.).

[73] *See In re* Silica Prods., *Daubert* Hearing, *supra* note 34, Feb. 18, 2005, at 55-56 (testimony of plaintiffs' expert Dr. James W. Ballard).

 17

THE COURT:    *From the lawyer.*

THE WITNESS: *Yes.*[74]


## Pulmonary Function Tests and Their Interpretations

If the x-ray findings are "positive" for conditions consistent with asbestos- or silica-related disease, sometimes the worker then undergoes a pulmonary function test (PFT), and, sometimes, a physical exam.[75] PFTs are a variety of breathing tests that, "when properly administered, provide objective, quantifiable measures of lung function to determine whether an individual is impaired and, if so, to what degree."[76]

As with chest x-rays, written guidelines for PFT procedures sometimes are not provided to technicians,[77] and the PFTs sometimes are not administered according to medical standards.[78] One screening enterprise, N&M, Inc. advertised to law firm clients that its PFTs were performed to meet standards set by NIOSH or the American Thoracic Society (ATS) but, according to the owner's deposition testimony, "a lot" of the time the company fell short of those standards:

> Q:    *And you would advertise to these law firms that your company*
> *was offering PFT tests that performed in NIOSH and ATF*
> *[ATS] standards, correct?*
>
> A:    *Right. . . . Now there's a difference now. You can only -- to*
> *say everybody applied . . . ATF [ATS] standards is definitely*

---

[74] *See id.* at 57-58.

[75] *See id.,* Feb. 17, 2005, at 283-84 (testimony of Heath Mason). The worker will undergo the PFT at the screening program if the chest x-rays are read on site; in most cases, because these B-reads are performed off-site, workers must return for additional testing.

[76] Brickman, *supra* note 8, at 111 (also stating that PFTs are the "primary means of evaluating non-malignant asbestos-related personal injury claims and are widely used by both plaintiffs and defendants to determine the settlement values of claims and as evidence in trials.").

[77] Pitts, who ran Pulmonary Advisory Services, testified that the company had no documents relating to testing procedures or evaluation criteria. Dep. of G. Pitts, *supra* note 45 at 31. A physician for another company confirmed that the guidelines given x-ray or pulmonary function test technicians in asbestos litigation screenings "are verbal. I don't provide them with anything written." Dep. of Jay Segarra, M.D., Oct. 14, 2002, at 17-18, *in* Moorehouse v. N. Am. Refractories Co., No. CI-2002-00253(2) (D. Miss. 2002).

[78] *See* Dep. of William McNeese, taken on Apr. 22, 1996, Abernathy v. AC & S, Inc.-A-920,967-C (Tx. Dist Ct. 1996). 155; Dep. of William Spence, Aug. 27, 1996, at 135, *in* Abernathy v. AC&S, Inc., A-920, 967-C (Tex. Dist. Ct. 1996); Dep. Of G. Foster, *supra* note 50, at 192;

18

> not the case. A lot of people can't match the ATF [ATS]
> standards. You'll see a lot of people where we attempted to
> make ATF [ATS] standards, but due to the client not
> following directions, they did not.
>
> Q: Right. But they are performed to meet the ATF [ATS]
> standards?
>
> A: Yeah. *They're performed to try to meet.* That's right.[79]

Indeed, it is possible to alter PFTs in the plaintiff's favor in a number of ways.[80] These include: failing to have the individual exhale for a long enough period of time; instructing the individual not to inhale forcibly, as required; failing to administer the correct number of reproducible tests; and failing to re-test when there is too great a variability between the two highest test results.[81] Failing to spend the proper amount of time on PFTs also may skew results.[82] Properly performed, a complete PFT battery can take approximately one to one and a half hours, depending on a number of variables.[83] Charles Foster, who set up the PFT program for one screening company, Pulmonary Testing Services, before going into business for himself, testified that while he was at PTS, the average PFT took three to eight minutes to complete.[84]

---

[79] *In re* Silica Prods., *Daubert* Hearing, *supra* note 34, Feb. 17, 2005, at 370 (testimony of Heath Mason) (emphasis added).

[80] *See* Brickman, *supra* note 8, at 111-128 (describing standards for performance of PFTs and the potential for elevating impairment results by failing to achieve those standards).

[81] *See id.*; Dep. of J. Segarra, *supra* note 71, at 291-92 (doctor for Respiratory Testing Services who diagnosed workers for asbestos litigation acknowledged that one way testing results could be skewed was not to breathe in fully to start).

[82] *See* Brickman, *supra* note 8, at 126 ("PFTs administered at the rate of fifteen to twenty minutes each, let alone three to eight minutes each, are not intended to generate reliable medical evidence; rather they are intended to generate printouts of graphs to be added to a 'litigant's' file so that it can be sold to a lawyer.").

[83] *See id.* at 111 (also stating that PFTs are the "primary means of evaluating non-malignant asbestos-related personal injury claims and are widely used by both plaintiffs and defendants to determine the settlement values of claims and as evidence in trials").

[84] Dep. of Charles Foster, June 4, 1996, at 160, *in In Re* Consol. of Maples & Lomax, P.A., Asbestos Pers. Injury Cases, Flight I (Miss. Cir. Ct. 1996).

19

### Diagnosis of Asbestos and Silica-Related Disease

After the chest x-rays and pulmonary function tests are complete, a physician conducts a physical exam and issues a diagnostic report. In light of the lack of reliable information developed during intake and testing at the medical screenings, it is not surprising that a large number of diagnoses of asbestos- or silica-related disease are questionable. For example, a medically sound diagnosis of silicosis requires, at minimum, the following: x-ray findings consistent with silicosis; an exposure history that connotes a substantial risk of silicosis; the absence of any good reason to believe that the radiographic findings are the result of some other condition; and, for simple silicosis, an appropriate latency period, usually ten to fifteen years.[85]

Many times, medical experts' written diagnoses in the federal silica MDL did not incorporate much, if any, exposure history.[86] Financial pressures require quick returns from the diagnosing doctors. In the federal silica MDL, plaintiffs' diagnoses were produced at rates of more than 50 to more than 200 a day.[87] Further, some screening physicians have positive rates near 100%.[88]

Sometimes the diagnostic reports are dictated by the doctor and transcribed; other times non-medical personnel prepare a report straight from the ILO form. One plaintiffs' expert physician in asbestos litigation reported that he did not dictate medical reports after examining patients but gave the file to his secretary and she wrote the report. He did not give her any instructions, written or otherwise. "She's done so many of them she

---

[85] *See In re* Silica Prods., *Daubert* Hearing, *supra* note 34, Feb. 17, 2005, at 42-44 (testimony of plaintiffs' diagnosing expert Dr. Harold Coulter) (testifying that diagnosis of silica-related disease requires radiographs consistent with finding of silicosis, reasonable history of occupational or other history of silica exposure, including length of exposure, and information ruling out alternative causes); *Transcript of Hearing, In re* Silica Litig., MDL No. 1553 (S.D. Tex. May 17, 2004) (testimony of defense expert Dr. Gary Friedman); *Guidelines for the Use of the ILO International Classification of Radiographs of Pneumoconioses*, s 2 (Rev. Ed. 2000) "[n]o radiographic features are pathognomic of dust exposure" and "[s]ome radiographic features that are unrelated to inhaled dust may mimic those caused by dust); *Transcript of Hearing, In re* Silica Prods. Liab. Litig., MDL No. 1553 (S.D. Tex. Feb. 5, 2004) (statement of plaintiffs' counsel Scott Hooper in court) ("Judge, first off, the B-read is not a diagnosis.").

[86] *See* Fact Sheets, Tab 11, *Motion to Strike Plaintiffs' Diagnoses, and for Judgment, In re* Silica Prods. Liab. Litig., MDL No. 1553, 4 (S.D. Tex. 2004).

[87] *See id.* at 2. Dr. George Martindale, who subsequently repudiated a number of his diagnosing expert reports, issued 3,617 diagnoses on 48 days in the first half of 2002, at the average rate of 75 diagnoses per day. He allegedly rendered many diagnoses without x-rays, *id.* at 5-6, as Dr. Allen Oaks supposedly did. *See id.* at 7.

[88] Dr. Greg Nayden testified that he had 100% diagnostic rate. *See* Dep. of G. Nayden, *supra* note 44.

knows."[89] A plaintiffs' expert physician in silica litigation testified that the secretary at his father's (also a plaintiffs' diagnosing expert) office wrote the reports using "boilerplate" language and referring to the ILO form, and used a stamp of his signature to "sign" the reports.[90] The doctor did not review the reports on individual patients before they were sent:

> THE COURT:      So you never read through the letters that were
>                 sent out with the stamped signatures?
>
> THE WITNESS: The individual letters, I did not.
>
> THE COURT:      Pardon?
>
> THE WITNESS: Not the individual letters. I had read through the
>                 boilerplate, you know, blank copies, if you will,
>                 to know what they said, and –
>
> *              *              *
>
> THE COURT:      The formal diagnosing reports were written
>                 entirely by secretaries.
>
> MR. DAVIS:      Yes. Yes.[91]
>
> THE COURT:      Is that right?
>
> MR. DAVIS:      That's correct. But there was nothing interpretive
>                 by any secretarial staff as to what was on the
>                 ILO.
>
> THE COURT:      Somebody has to read the marks and say what
>                 they mean.
>
> *              *              *

---

[89] Id at 299.

[90] See In re Silica Prods., Daubert Hearing, supra note 34, Feb. 18, 2005, at 156-57 (testimony of Dr. Andrew Harron). The use of boilerplate language appeared to be fairly common, as the substance of the litigation letters prepared by some physicians was essentially identical except for plaintiff-specific information. See Fact Sheets, Tab 11, Motion to Strike Plaintiffs' Diagnoses, and for Judgment, In re Silica Prods. Liab. Litig., MDL No. 1553, 9-12 (S.D. Tex. 2004).

[91]      Billy Davis is counsel for certain plaintiffs in the federal silica MDL.

21

| THE COURT: | Just listen to the question really carefully. This is not a difficult question. The first time the word silicosis shows up is in a letter that you never dictated, written by your secretary, that you never saw. Is that true or not true? |
|---|---|
| THE WITNESS: | I don't believe so. It was on the A sheet that the claimant had -- |
| THE COURT: | I'm sorry. Does the word silicosis show up on the A sheet? |
| THE WITNESS: | There's are -- |
| THE COURT: | Is there a word silicosis on the A sheet? |
| THE WITNESS: | There's the word silica. |
| THE COURT: | Is the word silicosis on the A sheet? This is not difficult. |
| THE WITNESS: | I don't believe so. I don't recall. |
| THE COURT: | Okay. |
| THE WITNESS: | I don't have the A sheet in front of me. |
| THE COURT: | So my point is the first time the word silicosis shows up was in a letter written by your secretary that you never saw. Is that correct?[92] |

Quality control of the diagnosing reports is often performed by the doctors' secretarial staff, or by the non-medical personnel at the screening companies themselves.

---

[92] *In re* Silica Prods., *Daubert* Hearing, *supra* note 34, Feb. 18, 2005, at 154-58 (testimony of Dr. Andrew Harron).

 22

### Follow-Up With Workers

Diagnostic reports and other screening records are usually sent *only* to the plaintiffs' lawyers, not to the workers or their personal physicians.[93] Dr. Werner of a screening company called Most Health Services (MHS) testified in the asbestos litigation that his company does not ask the identity of the worker's primary care physician and that MHS has no follow-up system to assure that the law firm has informed workers of any positive test findings.[94] The owner of another screening company, American Medical Testing, testified that if a patient asks any questions after the exam they are told to call their lawyer: "Any further contact will be through the attorney."[95] Screening company owners testified in the silica litigation that they believed that the law firms notified all screened workers of their results.[96] Some doctors have testified that they relayed their findings to workers at the screening,[97] but at least one doctor testified that he tells workers their diagnoses at screenings without telling them that it is only a preliminary diagnosis.[98]

### The Role of the Law Firms

Plaintiffs' law firms pay for the screenings. Sometimes they select and contract directly with physicians who provide the technicians, perform the tests, interpret the reports, and render the diagnoses. The law firms that pay for the screenings determine the criteria for the screenings and who fits the criteria for the screenings,[99] and law firm personnel often are present during the mass screening programs.[100]

The law firms often determine <u>what</u> tests will be done:

---

[93] *See, e.g.,* Shrader & Williamson, L.L.P., *Attorney-Fee Contract and Power of Attorney,* 1 (Section V. states: *"All experts employed shall report only to Attorney."*).
[94] *See* Dep. of K. Werner, *supra* note 41, at 193.
[95] Dep. of G. Foster, *supra* note 47, at A1.
[96] *See* Dep. of K. Werner, *supra* note 41, at 193 (stating his understanding, based on assurances from plaintiffs' counsel, that "[t]he law firm, of course, contacts the people that are positive for asbestosis, positive diagnosis, and the ones that are negative.").
[97] See *In re* Silica Prods. Liab, Litig., *Daubert* Hearing, *supra* note 34, at 48 (testimony of plaintiffs' expert Harold Coulter) ("[N] o one leaves without at least a tentative diagnosis.").
[98] *See Id.,* Feb. 18, 2005, at 158-59 (testimony of Dr. Andrew Harron) (stating that he told all 50 workers he screened that they had silicosis before they left and did not explain it was a preliminary diagnosis).
[99] *See Id.,* Feb. 17, 2005, at 286 (testimony of Heath Mason).
[100] *See id.* at 284-85 (identifying several law firms that took workers' exposure histories themselves prior to allowing an X-ray).

23

> *A:    [The] [o]nly tests provided are those ordered by the law firm.*
> *If the worker wanted to order, and pay for, additional tests he*
> *could not do so.* [101]

The law firms often determine how the tests will be done:

> *Q: Correct me if I'm wrong, if . . . the law firm determines it wants*
> *a two-view X-Ray, then during the screening what is done is a*
> *two view X-Ray?*
>
> *A: That is correct.*
>
> *Q: In terms of your process, that is a law firm decision?*
>
> *A: Yes.* [102]

The lawyers determine what language is to be used in the expert
physician reports:

> *THE COURT:    [Some of the] doctors that have been testifying . .*
> *. use the terminology, "It's my opinion, to a*
> *reasonable degree of medical certainty." Those*
> *are not usually medical terminologies. I mean,*
> *when you send a diagnosis to another doctor, you*
> *say, "This x-ray and this history is consistent*
> *with a finding of silicosis." Right?*
>
> *THE WITNESS: Usually, yes.*

---

[101] Dep. of K. Werner, *supra* n. 41, at 216.
[102] Dep. of C. Kemeny, *supra* note 53, at 139.

24

> THE COURT:   *Okay. Where did you come up with this language*
> *to use in these legal deals? Is this legal*
> *language?*
>
> THE WITNESS:  *If I'm provided with the individual's exposure*
> *history, then I would say that it's a diagnosis with*
> *a reasonable degree of medical certainty that*
> *there is --*
>
> THE COURT:   *I just asked where you came up with that kind of*
> *language? Did the lawyers tell you to use that?*
>
> THE WITNESS: *I think so, yes.* [103]

The law firms collect the test results and screening records. Generally, copies are not provided to the workers or their treating physicians.[104]

Several physicians have testified that they did not keep worker files or copies of the screening results that went to the law firms.[105] The medical screening companies rarely keep copies of the screening records and test results[106] or records regarding their procedures.[107] Nor do they keep copies of their billing records or contracts with the

---

[103] *In re* Silica Prods., *Daubert* Hearing, *supra* note 34, Feb. 18, 2005, at 61 (plaintiffs' expert Dr. James W. Ballard); *see also id.*, Feb. 17, 2005, at 383-84, 387-89 (testimony of Heath Mason) (discussing identical language on a number of different physicians' reports).

[104] Contrast this practice with medical screenings performed on potentially exposed workers at Los Alamos National Laboratories, where the screening program physicians explain the test results and health implications to the worker, tell the worker if there is a need for any treatment or follow up, and refer the worker to an appropriate medical provider as necessary. *See* Johns Hopkins FAQs, *supra* n. 49. Also, all test and examination results generated during the LANL screening program are to remain on file and copies of records are made available to the patient and his or her primary physician. *See id.; cf. infra* notes 49.

[105] *See In re* Silica Prods., *Daubert* Hearing, *supra* note 34, Feb. 17, 2005, at 98 (testimony of plaintiff's expert Dr. Harold Coulter) ("I had a small note card that I would keep some information on, yes [during the screening]. ... After we were complete, after we completed the reports or something like that, I tossed them. I didn't hold onto them.").

[106] *See In re* Silica Prods., *Daubert* Hearing, *supra* note 34, Feb. 17, 2005, at 296-99 (testimony of Heath Mason) (stating that medical records were all forwarded to lawyers in most cases; N&M kept records for clients of one law firm, Campbell Cherry, because the lawyers kept losing theirs).

[107] Dep. of C. Kemeny, *supra* note 53, at 263-266; Dep. of Helen Robinson, Case, Case No., Dec. 13, 2002, at 54; Dep. of G. Nayden, *supra* note 44, at 200; Dep. of K. Werner, *supra* note 41, at 224; Dep. of G. Pitts, *supra* note 45, at 192.

25

sponsoring law firms or the physicians and technicians they use.[108] Some companies do not even keep a copy of their books or corporate minutes.[109] The owner of American Medical Testing captured his company's record-keeping as follows:

> *Q: Are you telling me there are no written documents anywhere that indicate that your company is in the business of screening asbestos plaintiffs for litigation purposes?*
>
> *A: That's correct.*
>
> *Q: But you know that's what you do?*
>
> *A: That's correct.[110]*

Fees

Most mass screening companies are paid on a per screening basis by the law firms.[111] A number of screening company witnesses (but not all) have testified to being paid a higher fee for those potential plaintiffs they find positive for asbestos- or silica-related disease than for those potential plaintiffs that they find negative. The owner of N&M testified that his company charged one law firm $750 for a positive screening and nothing for a negative screening, generating up to 95 percent positive screenings a day:

[108] *See In re* Silica Prods., *Daubert* Hearing, *supra* note 34, Feb. 17, 2005, at 296-99 (testimony of Heath Mason) (stating that medical records were all forwarded to lawyers in most cases; N&M kept records for clients of one law firm).

[109] One company owner testified that she did not keep books. At one point she did a cost breakdown but she "threw it away." Dep. of Molly Netherland, Apr. 22, 1996, at 180, in *In re* Consol. of Maples & Lomax, P.A., Asbestos Pers. Injury Cases, Flight 1 (Miss. Cir. Ct. 1996).

[110] Dep. of G. Foster, *supra* note 50, at 230-31. Another screening company owner testified that he had no written contract with the law firms to pay for the screenings, but if a worker's attorney "had told us that he would pay for the client, we would accept his word for it." Dep. of G. Pitts, *supra* note 45, at 170.

[111] *See* Dep. of K. Werner, *supra* note 41, at 400; Dep. of G. Foster, *supra* note 47, at 219 & 229; Dep. of Ray A. Herron, Jan. 18, 2002, at 15, in *In Re* Asbestos Pers. Injury Litig.,Civ. Action No. 01-C-9002 (W. Va. Cir. Ct. 2002); (testifying that he initially charged $1.99 for each x-ray he interpreted as a B-reader in asbestos litigation and that he reads at least 10,000 plus x-rays a year, plus additional x-rays sent to him by plaintiffs' lawyers); Dep. of G. Pitts Depo., *supra* note 45, at 175 & 241; *see In re* Silica Prods., *Daubert* Hearing, *supra* note 34, Feb. 17, 2005, at 281 (testimony of Heath Mason); *id.* at 79 (testimony of plaintiffs' expert Dr. Harold Coulter) (testifying he was paid $40 per person he saw at silica screenings, the same he charged private patients at his medical clinic). Although Medicare and most private health insurance plans cover diagnostic testing for asbestos disease, some of these mass screening companies report they have not been paid by these sources. Dep. of C. Foster, *supra* note 78, at 51; Dep. of G. Pitts, *supra* note 45, at 309.

> *I prided myself in not testing negative because — I mean what you*
> *wanted to do was you had no reason to continue to X-ray a bunch*
> *of people who had no exposure. ... In the [one plaintiffs' law firm]*
> *situation you didn't charge for a negative, so that was definitely*
> *another motivating factor in what you did as far as when you took*
> *their [clients'] exposure.[112]*

One doctor who read a high volume of x-rays in a short period of time in the silica litigation testified that he charged more for positives ($70) than negatives ($35), because he felt it was unnecessary to write a narrative for the negative cases. (Not all deponents testified that they charged differential fees for positive and negative results.)  N&M charged another firm $35 for the chest x-ray and $300 for a physical and pulmonary testing — with gross receipts of about $3 million from the two firms in the silica MDL.[113] The bottom line: The more positive screenings, the more money to be made.

### Management, Employee and Program Qualifications

In bona fide medical screening programs, the technicians and administrative personnel as well as the physicians involved in the program are well-trained. In contrast, the owners and managers of the litigation screening companies typically do not have any medical education, and few have any training aside from that picked up on the job at other litigation screening companies.[114] Two screening company owners, who set up

---

[112] *In re* Silica Prods., *Daubert* Hearing, *supra* note 34, Feb. 17, 2005, at 302-03 (testimony of Heath Mason).  In the asbestos litigation, one screening firm was paid $775 per patient if the report was positive and $175 if the report was negative. *See* Dep. of C. Foster, *supra* note 78, at 272. Another screening company, Pulmonary Testing Service, Inc., billed the law firms $400 if the tests were negative, but $700 if the tests were positive. *See* Dep. of Pulmonary Testing Servs., Inc., Jewel "Jerry" Pitts, Designee, Mar. 14, 1996, at 128, 152-53, 284-394, *in* Adams v. Metro Life Ins. Co., No. 433-992 (La. Dist. Ct. 1996).

[113] *See In re* Silica Prods., *Daubert* Hearing, *supra* note 34, Feb. 17, 2005, at 302-03 (testimony of Heath Mason).

[114] Guy Foster, the owner of American Medical Testing (AMT) testified in 2001 that he is a high school graduate and has no medical training. *See* Dep. of G. Foster, *supra* note 50, at 55. Charles Foster, the owner of Respiratory Testing Services (RTS), left high school in the tenth grade and worked as a department store clerk, a pipefitter, and a tire store manager before entering the medical screening business. Dep. of C. Foster, *supra* note 78, at 113. He said his preparation for this business came from: "[j]ust being in the public, PR, no kind of schooling." *Id.* After starting his own service, RTS, he took a several-day training course when he purchased pulmonary function testing equipment. Although he was awarded a certificate at

27

operations for different screening companies, acknowledged in deposition testimony that they had little understanding of the standards for administering PFTs.[115] One man testified he saw his company as "just an investment, really."[116] The owner and operator of a third screening company actively managed a home repair business and a new home construction business at the same time as well.[117]

The employees and contractors who take the chest x-rays or perform the pulmonary function tests similarly may have no medical education, little training, and receive minimal, if any, medical supervision. For example, N&M's PFT technicians were not certified respiratory therapists; they simply took three-day courses to get NIOSH certification to perform these tests.[118]

Several doctors involved in the asbestos or silica screening programs testified that they interpreted x-rays, issued diagnoses, or conducted physical exams of workers in states where they were not licensed to practice medicine.[119] For example, Dr. Dominic Gaziano testified that he conducted evaluations in states such as Arkansas, Florida, Illinois, Ohio, Tennessee and Virginia without being licensed in those states to practice

that time, he said: "I couldn't tell you two words that was [sic] said in there. ... I didn't really go to the classes. I was out on the beach." *Id.* at 115. Heath Mason, the owner of N&M Testing Services (N&M) in Grand Bay, Alabama, which screened at least 6,500 plaintiffs in the federal silica MDL, left junior college after a year to work for his step-grandfather's medical screening service. He testified that after he was fired from that company, he opened his own screening service at age 21. Neither he nor his partner, Molly Netherland, has any medical background, he said. *See In re* Silica Prods., *Daubert* Hearing, *supra* note 34, Feb. 17, 2005, at 271-72 (testimony of Heath Mason).

[115] *See* Dep. of G. Pitts, *supra* note 45, at 296; Dep. of J. Pitts, *supra* note 107, at 125-26, 118-19.

[116] Owens-Illinois Motion for Case Management Order, MDL 875,Oct. 11, 2001, at 236 (quoting testimony of Glenn Pitts).

[117] Dep. of G. Foster, *supra* note 50, at 80.

[118] *See In re* Silica Prods., *Daubert* Hearing, *supra* note 34, Feb. 17, 2005, at 300-01 (testimony of Heath Mason). In contrast, PFT technicians for government preventative health screening programs are registered nurses or have advanced degrees, in additional to NIOSH certification. *See* Johns Hopkins Program Team FAQ, *supra* note 49.

[119] *See, e.g.,* Dep. of G. Nayden, *supra* n. 44, at 57 (testifying in asbestos litigation that he conducted a number of physical examinations in Mississippi without being licensed to practice there); Dep. of Roman-Candelaria, *supra* note 49, and exhibits thereto (doctor is licensed only in Puerto Rico but he has acknowledged doing tests and diagnoses of workers in Mississippi, Indiana, Alabama, Louisiana, Florida, Texas, and Georgia); Dep. of G. Foster, *supra* note 50, at (a doctor licensed only in Alabama has done physical exams in Georgia, Louisiana, Arkansas, and Florida.); Dep. of J. Segarra., *supra* note 71, at 251, 254, 19 (testifying that he conducted screenings in Oregon, Washington, Indiana, Florida, North Carolina, Ohio, Georgia, Oklahoma, Missouri, and Illinois where he is not licensed); *In re* Silica Prods., *Daubert* Hearing, *supra* note 34, Feb. 18, 2005, at 37-38 (testimony of plaintiffs' expert Dr. James W. Ballard) (stating that he traveled to Mississippi to perform screenings in asbestos litigation, although he was not licensed to practice medicine there, and that his work there involved performing B-reads but not meeting with workers or performing physical examinations).

28

medicine. The screening company Respiratory Testing Services paid him approximately $70,000 for 15 days of work.[120] Similarly, Dr. Jay Segarra evaluated over 600 people in Ohio on 12 days in 2000 when working for Respiratory Testing Services when he was not licensed to practice in Ohio.[121] In Washington, Dr. Segarra's practice of medicine without license during screenings went before the Court. The Court ruled that:

> Dr. Segarra has the requisite skill, training, and experience to
> render expert diagnoses concerning lung disease. However, when
> he participated in union screenings of certain plaintiffs, he
> performed examinations, rendered diagnoses, and recommended
> treatment without being licensed in Washington, a criminal
> offense. He also relied for his diagnoses on radiology reports from
> unregistered and uncertified technicians or radiologists using
> unregistered and uncertified equipment. The court concludes it
> would contravene public policy to accept such evidence.[122]

### 4. The Financial Impact on Workers Employed by Bankrupt Companies

Workers exposed to asbestos and injured as a result are not the only workers who have suffered harm. Many who were employees of asbestos defendants at the time they were driven into bankruptcy are hidden victims. Their plight is made particularly poignant by the role that claims based on unreliable medical evidence may have played in the bankruptcies.

As was explained earlier, RAND estimates that the $74 billion dollars that has been spent on asbestos litigation through 2002 has produced at least 73 bankruptcies.[123]

---

[120] Id. At 194.
[121] See records produced at Deposition of Respiratory Testing Services, Inc., Representative: Charles Foster in Master Cons. Case Silica (and Mixed Dust)/Asbestos Docket; (Ct. of Common Please, Cuyahoga County,                                                                                                          Ohio).

[122] Order by the Honorable Glenn K. Iwasaki, In re: Asbestos Cases of Brayton & Purcell, District Court of Salt Lake County, Utah (Salt Lake County Dist. Ct. Utah Jan. 28, 2005), pending reconsideration.
[123] Id.

29

When companies are sued, the costs they incur are usually passed on in the form of lower wages for employees or layoffs, reductions in assets for investors, and increased costs for consumers. Two research teams have examined the effects of asbestos litigation on the employees of the companies that were bankrupt as of 2002. There does not appear to be any comparable research on silica bankruptcies.

One team of economists headed by Nobel Prize winner Joseph Stiglitz assessed the effects that 60 asbestos bankruptcies had on workers in those firms. Their study drew the following conclusions:

- Bankruptcies led to a loss of an estimated 52,000 to 60,000 jobs;
- Each displaced worker at the bankrupt firms faced a future loss, on average, of approximately $25,000 to $50,000 in wages over his or her career because of periods of unemployment and the likelihood of having to take a new job paying a lower salary; and
- The average worker at an asbestos-related bankrupt firm with a 401(k) plan suffered roughly $8,300 in pension losses, which represented, on average, a roughly 25 percent reduction in the value of the 401(k) account.[124]

A team of economists at National Economic Research Associates, in the same timeframe, added to the understanding of the downstream effects of asbestos bankruptcies. They made the following estimates of the losses experienced by workers laid off by asbestos-related bankruptcies:

- After 2-3 years 11% remained unemployed and 14% dropped out of the labor force.
- Wages for re-employed workers are between 3-17% lower at new jobs even 2-3 years after the plant closure or layoff.
- Unemployment insurance typically accounts for less than 50% of the average wages for a displaced worker.

---

[124] Joseph E. Stiglitz, Jonathan M. Orszag, Peter R. Orszag, *The Impact of Asbestos Liabilities on Workers in Bankrupt Firms*, Sebago Associates, December 2002.

30

- Forty percent of displaced workers undertake retraining, with costs ranging from $2,000 to $3,000 per worker, and aggregate costs of $44-$76 million.

- Laid off workers face higher health insurance costs, averaging $300 per month. For the 72% of the estimated 52,000-60,000 laid off workers who participated in employer-sponsored health insurance before being laid off, this translated into an overall loss of $26-$30 million over the transition period of employment.[125]

## 5. The Impact on the Workers Tested: A Public Health Concern?[126]

Workers who were exposed to asbestos and subsequently became ill or died from an asbestos disease, have understandably evoked strong public sympathies. There also has been widespread public antipathy towards asbestos defendants in response to allegations of corporate cover-up over the dangers of asbestos, even though the allegations have been largely targeted at one company, Johns-Manville. [127]

When Paul Brodeur's book *Outrageous Misconduct: The Asbestos Industry on Trial* was released in the mid 1980s it was reviewed in the Harvard Law Review by Harvard professor David Rosenberg. He had this to say:

> *Conspiracy theories like Brodeur's are in vogue today, especially where corporate activity is concerned. Conspiracy theorists usually claim that the victims of this or that unfortunate fate were*

---

[125] National Economic Research Associates, *Secondary Impacts of Asbestos Liabilities on Workers, Taxpayers, and Local Communities*, February 2003.

[126] The workers who have been screened by attorney-funded mass screening companies may have also been harmed financially. Unimpaired workers who were recruited by these companies and filed claims may not be able to file suit if later they become seriously ill. According to the recent RAND report: "Under traditional tort doctrine, only a single claim can be filed for any tort, even if that tort causes multiple injuries to a person. Therefore, in jurisdictions that follow this traditional rule, a worker who files a claim for pleural plaques or non-disabling asbestosis cannot file another claim if he or she develops more serious disease, such as cancer, in the future." Many states have adopted a "two-disease" rule that allows asbestos plaintiffs who have filed claims for nonmalignant diseases to bring a second lawsuit if and when a malignancy is diagnosed. However, workers who cannot file suit in the states with a "two-disease" rule, or who develop disabling asbestos, as opposed to cancer, after receiving a small recovery in an unimpaired claim may be barred from recovering for the serious injury. In addition, workers with an asbestos exposure who are not injured now and have not file a claim, but who become sick in the future, may find that the funds have been depleted.

[127] Most defendants are "peripheral defendants," companies that have had limited, sometimes highly attenuated, links to asbestos. RAND estimates that at least 8400 companies have been named as defendants through 2002, covering at least 75 of the 83 different industries listed at the 2-digit level in the SIC system. *See supra* note 2 at xxv.

31

> *duped by the wealthy and the powerful. The subjectivity of*
> *individual risk preferences, respect for people's capacity to make*
> *basic choices, and common sense suggest that those advancing*
> *conspiracy claims should bear a fairly heavy burden of proof.* [128]

Rosenberg believes that Brodeur meets the burden. Despite acknowledging the book's flaws, most notably Brodeur's tendency to become swept up in sympathy for the workers and his "unremitting hostility to capitalism," Rosenberg believes the evidence paints an ugly and convincing picture. He is persuaded that "manufacturers had not only known of the risk to insulation workers since the 1930s; they had also planned and executed a cover-up — a policy of silence designed to avoid tort liability by concealing information about the risks of asbestos exposure."[129]

Others, no doubt, disagree and dispute some or all of the evidence presented in the book. Yet it is against this backdrop, with which *so* many are *so* familiar, that asbestos litigation proceeds today, with the result that there has been a great reluctance in the courts, in the media, and in legal academe to scrutinize workers and their attorneys who are attempting to wrest money for them from the defendants. In the area of attorney-funded screening activities, this lack of scrutiny has not only contributed to substantial economic damage to some defendants and at least some workers, it has also resulted in workers not benefiting from protections in the course of the delivery of health care testing services that others receive as a matter of course.

It has taken more than two decades for a critical examination of these mass screening companies to develop. Ironically, this prior absence of scrutiny may in fact be harmful to the very people one would expect to be the beneficiaries.

There is almost nothing in the press or legal or medical literature, other than scant anecdotes, that describes how workers are experiencing and reacting to these mass screenings. One recent publication contains an anecdote told to Andrew Schneider of the *St. Louis Post Dispatch* in 2002 that paints an unflattering picture of the attitudes with which two workers approached the screening process:

---

[128] David Rosenberg, *The Dusting of America: A Story of Asbestos—Carnage, Cover-Up, and Litigation,* 99 Harv. L. Rev. 1693.
[129] Id.

*"I saw the notice in the union news letter and said, 'Why not?'"*
*said an automotive worker from Ford. Sitting on the tailgate of his*
*shiny, new Chevy pickup and lighting a fresh cigarette off the one*
*he had just finished, he added: "It's better than the lottery. If they*
*find something, I get a few thousand dollars I didn't have. If they*
*don't find anything, I've just lost an afternoon."*
*Standing nearby, a Boeing worker 10 days from retirement*
*volunteered, "The lawyers said I could get $10,000 or $12,000 if*
*the shadow is big enough, and I know just the fishing boat I'd buy*
*with that." [130]*

One gets a very different view of how workers have experienced these screenings
from The National Tire Workers Litigation Project (NTWLP), one of the first attorney-
funded mass screening operations. NTWLP was sued by Raymark, an asbestos
manufacturer, claiming they were defrauded. United States District Court Judge Patrick
F. Kelly, who presided over that litigation, described the worker solicitation process:

*The defendants' [NTWLP] deceptive and coercive solicitation*
*process is evidenced by, among other things, the following:*
*herding large numbers of tire workers and former tire workers into*
*the meeting halls and rooms; showing them graphic slides*
*depicting the effects of asbestos on human lungs; showing them*
*local television news coverage concerning the NTWLP; providing*
*the tire workers with frightening notices which informed the tire*
*workers of a "serious health risk within our industry;" stating that*
*some union members will need medical examinations; informing*

---

[130] American Insurance Association, *Diagnosing for Dollars: Mass Screening and Asbestos Litigation*, AIA
Advocate, May 6, 2005.

 33

> *them of the possibility of lawsuits; and offering to represent them.[131]*

So, although some workers may have seen their testing process as a disingenuous effort to screen for asbestos-related disease. others may have seen it as a legitimate medical exercise. For those in the latter category the screenings in which they participated may have produced much more anguish than benefit. It was estimated earlier that 250,000 to 650,000 workers may have received false positive diagnoses of asbestosis. How many believed the diagnosis? Those who believed the diagnosis was accurate may have been quite troubled by the news; asbestosis is a progressive and disabling disease that can be fatal. At a recent judicial conference one judge commented: "I don't know if any of you has ever known someone who died of asbestosis but I have and it isn't pretty." Many workers who have been exposed to asbestos have known and observed coworkers who suffered with and died from asbestos-related disease.[132]

Based on available information , the worker's diagnosis is almost always communicated by the lawyers through a letter[133] with no provision made for proper communication of the diagnosis or counseling. This is in sharp contrast to accepted medical standards. An article published in the *American Journal of Industrial Medicine* cautioned that attorney-directed screenings are dangerous when they fail to provide adequate medical counseling or treatment for workers.[134] The article told about a maintenance worker at a vinyl chloride facility who participated in a lawyer-generated asbestos screening program and received a letter from the screening company informing him he had "markings consistent with asbestos related disease." According to family members, the worker became upset and worried by this diagnosis, and preoccupied with

---

[131] *See* Brickman *supra* note 8, at 99.

[132] *See In re* Silica Prods. Liab. Litig. *supra note* 57 at 152. (The court notes that those who received a false diagnosis of silicosis "can be expected to take their diagnosis seriously." Since the person screened "never had the opportunity to ask the diagnosing doctor questions about the diagnosis and what it means...[A] misdiagnosis potentially imposes an emotional cost on the plaintiff and the plaintiff's family that no court can calculate.")

[133] The American College of Radiology has a "Practice Guideline for Communication" for diagnostic radiology, in which it asserts that communication is a critical component of the art and science of medicine. It can be found at:
www.acr.org/s_acr/bind.asp?TrackID=&SID=1&DID=12196&CID=541&VID=2&DOC=File.PDF

[134] David Egilman & Susanna Ranking Bohme, *Attorney-Directed Screenings Can be Hazardous*, Am. J. IND. MED. 45:305 (2004).

the letter. His son recalled that he was "real worried about the fact that he would wind up like several of his friends, dying a slow death....he did not want to be an invalid and wind up on a breathing machine and feeders." The worker subsequently shot and killed himself, after writing a suicide note on the back of the form that accompanied his notification letter from the mass screening company.

Two psychiatrists who evaluated the case concluded that the diagnosis of asbestos-related disease and the fear he experienced of dying from the disease was a significant contributing factor in his suicide. Ironically and tragically, two independent B-readers re-evaluated his x-rays and neither of them found "evidence of interstitial fibrosis or asbestosis." The op-ed's authors concluded that the man had many medical problems, including serious lung disease, most likely from smoking, but there was *no evidence of asbestos disease* from x-rays or pulmonary function tests.[135]

Another worker, who had his chest scanned in the parking lot of a Red Lion Inn, was told he tested positive for asbestos-related disease. His reaction: "It's like living with a suicide bomb inside of you. You don't know when it could go off."[136]

According to the American Thoracic Society, people diagnosed with asbestos-related disease should be counseled at the time of diagnosis and given certain information. Specifically, they should be informed of the "risk of progression of the disease, the risk of malignancy, and especially the interaction between smoking and asbestos exposure in enhancing the risk of lung cancer."[137]

In addition to counseling relative to the diagnosis, some workers may require additional medical follow up. For example, patients with asbestosis may require immunization against pneumonococcal pneumonia and influenza.[138] People with silicosis are at high risk for developing tuberculosis (TB). Silica is believed to interfere with the body's immune response to the bacteria that causes TB. Yearly skin tests to check for TB are recommended by the National Institute for Health, with anti-TB drugs recommended for those that show a positive skin test.[139]

---

[135] Id.
[136] Id.
[137] *See* American Thoracic Society, *Diagnosis and Initial Management of Nonmalignant Diseases Related to Asbestos,* American Journal of Respiratory and Critical Care Medicine, Vol. 170, p.33.
[138] Id. at 34.
[139] *See* Medline Plus *available at* http://www.nlm.nih.gov/medlineplus/ency/article/000134.htm

35

When attorney-funded screening companies screen for asbestosis, they also unavoidably screen for lung cancer. A number of medical associations, including the National Cancer Institute[140] and the American College of Chest Physicians,[141] recommend against using chest x-rays to screen for lung cancer. Randomized controlled trials have not demonstrated a reduction in lung cancer mortality resulting from screening with chest x-ray.

There are two harms that can result from screening for lung cancer with chest radiography. First, a false-positive result can lead to an unnecessary invasive procedure, such as needle biopsy.[142] The second harm is overdiagnosis, the diagnosis of a small or slowly growing tumor that would not have become clinically significant had it not been detected by screening.[143]

Another troubling result of the tests administered by the attorney-funded screening companies relates to the likelihood that the tests themselves have increased the workers' risk of cancer. In June of this year the National Academy of Sciences released a report on the increased cancer risk from medical x-rays. The report concluded that a preponderance of scientific evidence shows that even low dose radiation, such as that found in medical x-rays, poses a health risk. The study revealed that the risk of cancer "proceeds in a linear fashion at lower doses without a threshold and that the smallest dose has the potential to cause a small increase in risk [of cancer] to humans."[144] Last year the federal government added x-rays to its list of "known carcinogens," noting that "epidemiological studies of radiation exposure provide a consistent body of evidence for the carcinogenicity of x-radiation and gamma radiation in humans."[145] According to a recent article in *The Lancet*, a highly respected medical journal, diagnostic x-rays are the

---

[140] *See* National Cancer Institute, *Screening for Lung Cancer*, 8/20/2003 *available at* www.bcbswny.com/kbase/nci/cdr0000062832.htm.

[141] See American College of Chest Physicians, *Screening for Lung Cancer*, CHEST, 2003: 123:83S-88S *available at* www.chestjournal.org/cgi/content/abstract/123/1.

[142] *See* National Cancer Institute *supra* note 138.

[143] Id. *See also* Sharon Begley, *Early Cancer Detection Doesn't Always Give Patient an Advantage*, WALL ST. J, Aug. 26, 2005 at B1. (Quoting Dr. Barnett Kramer of the National Cancer Institute on the subject of the problem of overdiagnosis for screenings in general : "Overdiagnosis of cancer as a result of screening is the rule rather than the exception.)

[144] National Research Council, *BEIR VII: Health Risks from Exposure to Low Levels of Ionizing Radiation*, The National Academies, June 2005.

[145] National Toxicology Program, *X-Radiation and Gamma Radiation*, Report on Carcinogens, Eleventh Edition, 2004.

36

largest man-made source of radiation exposure to the general population, contributing about 14% of the total annual exposure worldwide from all sources. The report estimates that 5,695 radiation-induced cancers occur in the U.S. each year.[146] These recent reports raise particular concerns in those instances where mass screening companies have not properly maintained and submitted for inspection the x-ray equipment they use. Further, the reports by several screening companies and doctors that they neither forward the x-rays to workers' personal physicians, nor retain them on file, suggests the likelihood that workers could be subject to repeat x-ray examination by their own doctors.

A failure to retain medical records when those records might be of some value to the patient is just one of several practices that appear to deviate from the American Medical Association's Policy Statements, which constitute part of the AMA's code of ethics.[147] Several other policy statements have possible bearing on the activities of attorney-funded mass screening companies: physicians should not charge contingency fees,[148] physicians should be above the influence of laypersons,[149] and physicians who have only a limited patient-physician relationship still have the duties of remaining objective, disclosing conflicts of interest, and properly informing and counseling patients regarding diagnoses.[150] Of course, the code requires that physicians never place their own financial interests above the well being of patients[151] and that they never permit financial incentives to compromise their clinical objectivity.[152] The physicians practicing with

---

[146] Amy Berrington de Gonzalez and Sarah Darby, *Risk of Cancer from Diagnostic X-Rays: Estimate for the UK and 14 Other Countries,* THE LANCET, VOL. 363, at 345 and 349.

[147] AMA CODE OF MEDICAL ETHICS, Opinion E-7.05 Retention of Medical Records, June 1994. Physicians have an obligation to retain records which may reasonably be of value to a patient. Medical considerations are the primary basis for deciding how long to retain records....In deciding whether to keep certain parts of the record, an appropriate criterion is whether a physician would want the information if he or she were seeing the patient for the first time. (#1).

[148] Id. Opinion E-6.01, Contingent Physician Fees, Issued prior to April 1977, updated June 1994...a physician's fee for medical services should be based on the value of the service provided by the physician to the patient and not on the uncertain outcome of a contingency that does not in any way relate to the value of the medical service.

[149] Id. Opinion E-8.05 Contractual Relationships, issued prior to April 199777, updated June 1994 and June 1996. "...physicians should not be subjected to lay interference in professional medical matters and their primary responsibility should be to the patients they serve."

[150] Id. Opinion E-10.03, Patient Physician Relationship in Context of Work-"Related and Independent Medical Examinations, issued December 1999, adopted June 1999.

[151] Id. Opinion E-8.03, Conflicts of Interest: Guidelines, issued July 1986, updated June 1994.

[152] Id. Opinion E-8.054, Financial Incentives and the Practice of Medicine, issued July 1986, adopted December 1997, updated June 2002.

attorney-funded mass screening operations should be sensitive to and in compliance with the provisions of this code.

Finally, it should be mentioned that the harms from attorney-funded mass screenings extend beyond asbestos and silica workers to plaintiffs in fen-phen litigation. In late 2002 the judge presiding over the fen-phen trust became concerned that something was "seriously amiss" based on an unexpectedly high volume of claims against the diet drug trust, and ordered an audit of all claims for payment. By March 2004 the auditors had reviewed 4,500 claims and disqualified almost two-thirds of them. Further investigation revealed that lawyers were holding mass echocardiograph sessions in law offices and hotel rooms, using mobile echocardiograph machines and teams of traveling sonographers, and engaging in what the judge called "a mass production operation that would have been the envy of Henry Ford." In the words of one physician-auditor: "We found serious, repeated, and verifiable alterations of systems controls to consistently exaggerate [the seriousness of disease.]" In one instance a patient whose condition was overstated ended up having unnecessary heart valve replacement surgery. Fifty other patients who had received diagnoses of <u>mitral</u> heart damage had actually suffered moderate or severe <u>aortic</u> valve damage, which had gone undiagnosed. [153]

## 6. Policy Options and Recommendations

There are numerous interventions under existing laws and rules that might have a positive influence on some of the abuses mentioned in this paper: sanctioning of unethical activities by lawyers through state bar associations, sanctioning of unethical or unlawful activities of physicians by medical boards, or sanctioning by state health departments of testing companies that fail to comply with state laws.   These corrections all rely on the capability and the will of existing institutions to enforce the rules. The abuses mentioned in this paper have a long history. It seems unlikely that change will occur if it must come from these groups under existing laws and rules.

Attorney-funded mass screenings operate as they do because there are such strong financial incentives behind the high volume, assembly line business model approach to attracting plaintiffs and generating the medical evidence needed to file suit. The

---

[153] Alison Frankel, *Still Ticking,* The American Lawyer, March 2005.

38

interventions most likely to succeed are those directed squarely at these financial incentives; e.g., those that target the point at which suits filed with inadequate medical evidence are permitted to go forward. This can be done most effectively by judges who are willing to be aggressive gatekeepers, helped along by legislated medical standards tailored to address the relatively unique issues raised by attorney-funded mass screenings.

### Judges as Gatekeepers

All federal judges and state judges have procedural tools available to them to test the reliability of the medical evidence in cases that have been assigned to them.[154] Two good examples of the uses of these tools follow:

In 1988, Judge Thomas Lambros in the Northern District of Ohio decided to test the viability of x-ray reports supporting asbestos claims on that district's mass tort docket. He conducted an <u>in camera</u> inspection of 1700 B-reader reports and concluded: "...my concerns in giving priority to the medical questions have been vindicated because a review of these reports demonstrate that only 75 of the 1700 seamen have lung x-rays that show radiological changes related to an asbestos exposure." Based on that review he divided the plaintiffs into four groups with the first group having no evidence of injury, the second group having some injury but no showing that it is asbestos-related, the third group having clear evidence of asbestos injury, and the last group having serious injury that could be asbestos related. He dealt with each of these groups in ways consistent with the nature and strength of the medical evidence they had presented.[155]

Judge Janis Graham Jack, who oversees the federal silica MDL in Texas, chose to require the production of strong evidence bearing on mass litigation screenings. She required plaintiffs to disclose the names of their diagnosing doctor or other health care provider, their diagnoses, dates of diagnoses or treatments, and what medical screenings or tests resulted in their diagnoses.[156] Such disclosures should highlight cases that stem only from screenings and which cases are backed up by the diagnoses of legitimate medical professionals. In the silica MDL, this information led to increasingly detailed

---

[154] *See*, for example, David E. Bernstein, *Keeping Junk Science Out of Asbestos Litigation*, 31 PEPP. L. REV. 33 (2003).
[155] *See In re* Asbestos Litig., MARDOC Order No. 32 (N.D. Ohio Aug. 23, 1988) (Findings and Conclusions From In Camera Inspection of 1,666 X-Ray Reports)..
[156] *In re* Silica Prods. Liab. Litig., MDL 1553, Admin. Order No. 6, at Ex. B (S.D. Tex. Feb. 5, 2004).

investigation into the legitimacy of the plaintiffs' claims.[157] As discussed *supra*, during this investigation, one diagnosing doctor expressly disclaimed his diagnoses of silica-related disease that supported a number of plaintiffs' claims, and other physicians testified that their office staff generated and signed their reports. Judge Jack is currently considering how to address the questionable claims generated through mass screening.

Courts also could help assure that claims are legitimate by establishing an independent panel of expert physicians with recognized experience in the ILO classification system to determine the medical consensus as to what changes, if any, are actually reflected on an X-ray.[158] In scientific studies, certain protocols are generally followed to minimize bias and variability in the classification of individual radiographs made by physicians.[159] Expert panels established by the courts could institute similar criteria in the legal setting as used in scientific interpretations of chest films for pneumoconiotic changes.

These criteria could include: (1) those interpreting the x-rays should not have any information about the individuals or potential occupational exposures; (2) identifying information on films should be masked and personal identifiers assigned; (3) classifications of films should be made in an independent manner without conferences between physicians; (4) to reach a final determination on an individual film, an odd number of readers should be employed with procedures put in place so as not to give undue weight to an unusually high or low interpretation; and (5) for certain findings, a consensus of agreement of the readers should be required (e.g., three out of five).[160] At least five readers should be used for these court-appointed panels.[161] The criteria for selecting those readers should include board certification in radiology or pulmonology, NIOSH B-reader certification, detailed knowledge of the ILO radiographic classification system and recognized experience in reviewing large numbers of films for the dust-induced diseases.[162]

---

[157] *See, e.g., In re* Silica Prods., *Daubert* Hearings, *supra* note 34.
[158] *See* Glenn, *supra* note 65 at 5.
[159] *See id.*
[160] *See id.*
[161] *See id.*
[162] *See id.*

40

**State Legislation that Facilitates the Active Gatekeeper Role**

Several states have enacted or are considering legislation that would significantly curtail abusive mass medical screenings while still allowing the appropriate development of medical evidence for claimants who have actual injuries.

In 2004, the Ohio Legislature enacted landmark legislation establishing minimum medical requirements for asbestos[163] and silica litigation.[164] The Georgia Legislature followed suit in 2005.[165] These laws serve as good models for legislators in states experiencing problems with mass screenings. Here is how the new Ohio and Georgia laws work.

Both the Ohio and Georgia laws require that at the very beginning of an asbestos or silica lawsuit, except for claims based on mesothelioma or cancer,[166] the plaintiff must make a prima facie showing of physical impairment resulting from a medical condition for which exposure to asbestos or silica was a substantial contributing factor.[167] This prima facie showing is an essential element of an asbestos or silica claim.[168] Further, for purposes of making this showing, the legislation bars the use of so-called "litigation doctors," those who generate more than a minor amount of their professional income as expert witnesses in developing such evidence, or who are affiliated with a medical group that does.[169]

At the time of filing the complaint (Georgia) or within 30 days thereafter (Ohio), a plaintiff must submit a diagnosis and medical report by a licensed medical doctor who meets the qualifications set forth in the statute.[170] In Georgia, these reports are not

---

[163] *See* OHIO REV. CODE §§ 2307.91 et seq. (Anderson 2005).

[164] OHIO REV. CODE §§ 2307.84 et seq.(Anderson 2005).

[165] *See* GA. CODE ANN. §§ 51-14-1 to 51-14-10. On Apr. 27, 2005, the Texas Senate overwhelmingly passed SB 15, which would provide medical criteria for asbestos and silica claims and curb mass litigation screening practices, among other provisions. As of this writing, the bill was headed toward the Texas House of Representatives and quick action was expected. *See Texas Civil Justice League News Release,* (Apr. 27, 2005), *available at* http://www.texasbestos.com/news.php.

[166] In Ohio, no prima-facie showing is required for an asbestos mesothelioma claim, *see* OHIO REV. CODE § 2307.92(E), or a claim based upon a malignant condition. *See* OHIO REV. CODE §§ 2307.85(B), 2307.86(B), 2307.92(B) A smoker who brings a claim based upon lung cancer, however, must make a prima facie showing. *See* OHIO REV. CODE §§ 2307.85(C), 2307.86(C), 2307.92(C).

[167] *See* GA. CODE ANN. § 51-14-3; OHIO REV. CODE §§ 2307.85(B), 2307.86(B), 2307.92(B).

[168] *See* GA. CODE ANN. § 51-14-3; OHIO REV. CODE §§ 2307.85(B), 2307.86(B), 2307.92(B).

[169] *See* GA. CODE ANN. § 51-14-2(17); OHIO REV. CODE §§ 2307.84(I), 2307.91(Z).

[170] *See* GA. CODE ANN. § 51-14-5(b)(1), 51-14-6; at OHIO REV. CODE §§ 2307.85(B), 2307.86(B), 2307.87(A), 2307.92(B), 2307.93(A).

41

admissible at trial unless the parties agree otherwise.[171] In Ohio, the court's findings and decision as to whether these documents constitute a prima facie showing of impairment are not admissible at trial.[172] If plaintiffs fail to file these materials, or fail to file materials that comply with the standards set forth in the legislation, their complaints must be dismissed without prejudice.[173] The plaintiffs may seek to reinstate their cases when they can make the required showing.[174]

The laws set forth the contents and requirements for the medical reports and other materials supporting the effort to make a prima facie showing. For example, for an asbestos claim, there must be a detailed narrative medical report and diagnosis of the asbestos-related physical impairment, accompanied by copies of the B-reading, pulmonary function tests, other documents required to show compliance with equipment, quality, interpretation and reporting standards in the legislation.[175] All reports and other evidence used to establish prima facie evidence of physical impairment must meet objective medical criteria related to exposure to asbestos.[176] This evidence must not be obtained through testing or examinations that violate any applicable law, regulation, licensing requirement, or medical code of practice.[177]

---

[171] *See* GA. CODE ANN. § 51-14-7(c)

[172] *See* OHIO REV. CODE §§ 2307.85(F)(3), 2307.86(F)(3), 2307.92(G)(3).

[173] *See* GA. CODE ANN. § 51-14-5(b)(5); OHIO REV. CODE §§ 2307.87(C), 2307.93(C).

[174] *See* OHIO REV. CODE §§ 2307.87(C), 2307.93(C); GA. CODE ANN. § 51-14-5(b)(5) (stating that the court should dismiss claims *without prejudice* that do not establish prima facie evidence of physical impairment).

[175] *See* GA. CODE ANN. § 51-14-5(b)(1), 15-14-2(15); OHIO REV. CODE § 2307.92(B). In Georgia, for claims of asbestos-related cancer or mesothelioma, a board-certified pathologist must provide a medical report showing the diagnosis as a primary cancer or pleural or peritoneal mesothelioma and certify "to a reasonable degree of medical certainty that exposure to asbestos was a substantial contributing factor to the diagnosed cancer and that it was not more probably the result of causes other than the asbestos exposure." GA. CODE ANN. § 51-14-2(15)(A). For claims of nonmalignant asbestos-related disease, a board-certified internist, pulmonologist, or pathologist must provide a detailed medical report and diagnosis that the exposed person has a nonmalignant asbestos-related disease. *See* GA. CODE ANN. § 51-14-2(15)(B). This report also must verify compliance with the intake requirements for the person's occupational and exposure history and medical and smoking history; provide details of these histories and verify that at least 15 years have passed since the person's first exposure to asbestos and the time of diagnosis. *See id.* at § 51-14-2(15)(B)(i), (ii). The report also must verify that the exposed person meets specific medical criteria set forth in the legislation. *See id.* at § 51-14-2(15)(B)(iii), 51-14-2(15)(B)(iv). Finally, the report must verify that the doctor signing the detailed narrative medical report and diagnosis has concluded that exposure to asbestos was a substantial contributing factor to the exposed person's medical condition and physical impairment and that the medical condition was not more probably the result of other causes revealed by the exposed person's employment and medical histories. *See id.* at § 51-14-2(15)(B)(v). The requirements for the prima facie evidence to support silica claims are similarly rigorous. *See id.* at § 51-14-2(16).

[176] *See* GA. CODE ANN. § 51-14-2(15); OHIO REV. CODE § 2307.92(F).

[177] *See* GA. CODE ANN. § 51-14-2(15); OHIO REV. CODE § 2307.91(Z)(3)(a).

（此处略）

42

The Ohio and Georgia laws bar the use of materials generated by so-called litigation doctors to fulfill the prima facie evidence requirement.[178] The Ohio statute specifically states that the doctor who provides the diagnosis and medical report must have a doctor-patient relationship with the claimant.[179] The legislation in both states prevents doctors from basing their findings on tests, reports and other information from doctors who spend more than a minor amount of their professional practice time providing consulting or expert services for actual or potential civil actions, and whose medical group, clinic, professional corporation or other affiliated group earns more than a minor amount of its revenues from providing such services.[180] Both also exclude such information that is provided by chiropractors, podiatrists and others who are not medical doctors.[181]

Provisions in the legislation also *de facto* bar the use of lawyer-funded screening results.[182] In Georgia, reports, tests and other documents submitted for the prima facie evidence requirement are to be accepted only from medical doctors who are or were paid for the treatment of the exposed person by that person, or by that person's health maintenance organization, or other medical provider.[183] Also, in both Ohio and Georgia, the doctors cannot require that the exposed person (or anyone with a claim based on the exposed person's asbestos or silica exposure) retain legal services as a condition of diagnosing, examining, testing, screening or treating the exposed person.[184]

The physicians must be licensed to practice medicine and be currently board-certified as an internist, pulmonologist or pathologist.[185] Moreover, the internist or

---

[178] *See* GA. CODE ANN. § 51-14-2(17); OHIO REV. CODE §§ 2307.84(I), 2307.91(Z).

[179] *See* OHIO REV. CODE §§ 2307.84(I)(2), 2307.91(Z)(2).

[180] The Ohio legislation provides that the doctor providing the diagnosis and medical report for the prima facie showing cannot spend more than 25 percent of his professional practice time in consulting or serving as an expert witness in actual or potential litigation. *See* OHIO REV. CODE §§ 2307.84(I)(4), 2307.91(Z)(4). It also provides that the doctor's medical group, professional corporation, clinic, or other affiliated group cannot obtain more than 20 percent of its revenues from providing such services. *See* OHIO REV. CODE §§ 2307.84(I)(4), 2307.91(Z)(4). The Georgia legislation sets those figures at 10 percent of the doctor's practice time, and 20 percent of the revenues of the doctor's medical group or other affiliated group. *See* GA. CODE ANN. § 51-14-2(17)(A).

[181] *See* OHIO REV. CODE §§ 2307.84(I)(1), 2307.91(Z)(1); *see* GA. CODE ANN. §§ 51-14-2(15), (16).

[182] *See* GA. CODE ANN. § 51-14-2(17); OHIO REV. CODE §§ 2307.84(I), 2307.91(Z).

[183] *See* GA. CODE ANN. § 51-14-2(17)(B).

[184] *See* GA. CODE ANN. § 51-14-2(17)(C); OHIO REV. CODE §§ 2307.84(I)(3)(c), 2307.91(Z)(3)(c).

[185] To be a "diagnosing physician" for purposes of completing the prima facie evidence report, the physician must be an internist currently certified by the American Board of Internal Medicine (ABIM), or a pulmonologist currently certified by the ABIM in the subspecialty of pulmonary medicine, or a pathologist

pulmonologist must be either treating (or have treated) the exposed person or have had a doctor-patient relationship with the exposed person.[186] The legislation sets out requirements for the "intake" portion of the tests.[187] First, information must be gathered from the exposed person by either the diagnosing doctor or a medical professional employed by and under the doctor's direct supervision and control.[188] This provision would bar the practices in litigation screenings of having law firm employees or undereducated workers from the screening companies performing intake.

Second, the information taken must include a detailed occupational history and the person most knowledgeable about the exposures at issue in the action.[189] The history must include all of the exposed person's principal employments and exposures to airborne contaminants that can cause pulmonary impairment, including, but not limited to asbestos, silica and other disease-causing dusts.[190] The history also must include the nature, duration and level of any such exposure.[191]

This provision would help prevent "double-dipping" by asbestos-silica plaintiffs, as complete information about the person's occupational exposure to both substances would be available to the doctor rendering the diagnosis.[192] This provision also would prevent litigation screening companies and their doctors from assuming that if a person worked for a company where asbestos or silica was present somewhere, at some time, the person was exposed to the substance for their entire employment. This should

---

who holds primary certification in anatomic pathology or combined anatomic or clinical pathology from the American Board of Pathology.

[186] The pathologist must be engaged in professional practice that is principally in the field of pathology and involves regular evaluation of pathology materials obtained from surgical or post-mortem specimens.

[187] *See* GA. CODE ANN. § 51-14-2(15)(B), 51-14-2(16)(C); OHIO REV. CODE §§ 2307.85(B), 2307.86(B), 2307.92(B).

[188] *See* GA. CODE ANN. § 51-14-2(15)(B)(i), 51-14-2(16)(C)(i); Ohio Am. Sub. H.B. 292 § 1, *codified at* OHIO REV. CODE §§ 2307.85(B)(1), 2307.86(B)(1), 2307.92(B)(1).

[189] *See* GA. CODE ANN. § 51-14-2(15)(B)(i)(I), 51-14-2(16)(C)(i); OHIO REV. CODE §§ 2307.85(B)(1), 2307.86(B)(1), 2307.92(B)(1).

[190] *See* GA. CODE ANN. § 51-14-2(15)(B)(i)(I), 51-14-2(16)(C)(i); OHIO REV. CODE §§ 2307.85(B)(1), 2307.86(B)(1), 2307.92(B)(1).

[191] *See* GA. CODE ANN. § 51-14-2(15)(B)(i)(I), 51-14-2(16)(C)(i); OHIO REV. CODE §§ 2307.85(B)(1), 2307.86(B)(1), 2307.92(B)(1).

[192] *See* Jonathan D. Glater, *Asbestos Claims Decline, but Questions Rise*, N.Y. TIMES, Apr. 6, 2005, at C1, *available at* 2005 WLNR 5343368 (stating with respect to the federal silica multidistrict litigation: "The details of the diagnoses underlying some silica claimants are striking. Some of the same doctors who diagnosed silicosis in claimants had previously found asbestosis – another disease, which doctors said was typically characterized by different scaring of a different part of the lungs in the people they examined.").

significantly reduce questionable claims by workers who spent little time, if any, close enough to asbestos or silica to constitute dangerous legitimate exposures.

The information taken also must include a detailed medical and smoking history that includes a thorough review of the exposed person's past and present medical problems and their most likely cause.[193] This provision helps assure that information relevant to alternative causes of the plaintiff's alleged asbestos or silica-related health problems is available to the diagnosing physician.

In addition, asbestos or silica claims filed in Georgia after the enacting date of the legislation must include a sworn information form containing specific information about such things as the location or duration of each exposure, the specific products and employers involved for each exposure, and the like.[194] Chest x-rays and pulmonary function tests are to be performed and interpreted in accordance with specified medical criteria.[195]

In Georgia, discovery is not to take place on the claim until the trial court enters an order determining that the plaintiff has established prima facie evidence of physical impairment, except discovery related to establishing or challenging the prima facie evidence of impairment, or by court order.[196]

It should be mentioned that at the time this paper is being written a trust fund bill is pending in the Congress, which if passed, might resolve the mass screening issue, depending on the provisions actually enacted.

Finally, it should be acknowledged that the organized bar has addressed the issue of attorney-funded mass screenings through several positions it has adopted. The most recent and most relevant was introduced by the Tort and Insurance Practice Section and adopted by the American Bar Association in February of 2005. This position statement recommends that the states develop standards for the operations of screening vans or

---

[193] See GA. CODE ANN. § 51-14-2(15)(B)(i)(II), 51-14-2(16)(C)(i); OHIO REV. CODE §§2307.85(B)(2), 2307.86(B)(2), 2307.92(B)(2).
[194] See GA. CODE ANN. § 51-14-6(a).
[195] See GA. CODE ANN. § 51-14-2(15, § 51-14-2(16); OHIO REV. CODE §§ 2307.85(E), 2307.86(E), 2307.92(F).
[196] See GA. CODE ANN. § 51-14-7.

45

other forms of mass screening for asbestos-related conditions, and that the standards should be enforced. [197]

Organized medicine, on the other hand, has largely neither investigated nor developed position statements on attorney-funded mass screening programs. In fact, last year the AMA published a report on commercial screenings that addressed only coronary artery calcium screening, CT screening for lung cancer, CT scanning for colon cancer, and whole body scans. It did not mention screenings conducted for litigation purposes.[198] The AMA and the relevant specialty organizations need to address this issue. The depositions reviewed suggest that the conduct of the professionals and technicians involved in the screenings is clearly inconsistent with what might be called the penumbra of expectations derived from the statutory provisions, codes of ethics, and policy statements intended by the medical community to protect patients. We see lawyers instead of physicians determining what tests will be conducted, physicians using blanket prescriptions to authorize x-ray testing, inadequate communications with the workers before and after the tests (little or no intake history and no physician follow-up regarding test results), physicians who are not licensed where the tests are conducted, and apparent failure to maintain x-ray equipment to required standards. It is time for organized medicine to weigh in on this issue. Their views would help to motivate and inform judges and legislators.

---

[197] American Bar Association, The position statement calls for compliance with: FDA laws and regulations relative to the use of medical equipment and testing devices; local, state , and federal laws; and professional standards such as those promulgated by the AMA. It also recommends that the reading, evaluation and reporting of tests should be performed by a physician or other qualified medical professional; the physician or other qualified medical professional rendering the diagnosis should have personally examined the screened individual; a complete medical and exposure history should be taken and all relevant tests and information should be considered by the physician or medical professional rendering the diagnosis. Finally, all PFT tests should conform to standards; and diagnoses should should be made in accordance with the applicable standard of diagnostic care and communicated within a reasonable amount of time by the physician or other qualified medical professional rendering the diagnosis.
[198] See American Medical Association, *Commercialized Medical Screening*, available at http://www.ama-assn.org/ama/pub/category/13628.html

46

## 7. Conclusion

This paper provides detailed descriptions of attorney-funded mass screenings for asbestosis and silicosis, citing numerous examples of how they can deviate from acceptable medical practice. The principal point of the paper is that these deviations are likely to result in harm to the workers who are being screened.

The harms to workers fall largely into three categories:

First, hundreds of thousands of workers have been told they have asbestos- related or silica-related disease when in all likelihood they do not. Audits conducted by independent, qualified medical teams have revealed an astonishingly high rate of false positive diagnoses coming from attorney-funded screenings. Since asbestosis and silicosis can advance to stages where there is considerable suffering, receiving such a diagnosis could cause alarm and anguish for workers and their families.

Second, those workers who do have asbestosis and silicosis are likely to have been deprived of counseling and follow up care that the medical literature describes as critical for the management of these diseases. Attorney-funded mass screenings appear not to provide any counseling or follow up medical care. Nor do they assure that workers receive the proper medical care from some other source.

Third, the chest x-rays that are integral to every screening expose the workers to a carcinogen, one that is of growing concern in the medical community. A recent study by the National Academy of Sciences concludes that even low dose radiation such as that found in medical x-rays poses a health risk. According to an article in the prestigious medical journal *The Lancet*, diagnostic x-rays are the largest man-made source of radiation exposure to the general population. The report estimates that 5,695 radiation-induced cancers occur in the U.S. each year. In addition, chest x-rays can produce false positives for lung cancer, resulting in unnecessary and invasive procedures.

Prior analyses of attorney-funded screenings have focused on the adverse impact they have had on defendants and the courts, perhaps implicitly assuming that workers only benefit from these activities. A survey of workers who have participated in these screenings would be a useful supplement to this paper. It would be helpful to the courts, and to those who regulate the delivery of medical care, to get first-hand information on issues such as whether workers: thought this was a legitimate medical service, believed

47

the diagnosis, obtained any independent medical evaluation from their own physician, provided informed consent to the procedures, were told they might have lung cancer (and if so what testing or treatment followed), and believed the process delivered more benefits than harms.

Attorney-funded mass screenings operate as they do because there are strong financial incentives behind the high volume, assembly line business model approach to attracting plaintiffs and generating the medical evidence needed to file a lawsuit. The most cost-effective reforms are likely to be those that are directed at the point of entry for the lawsuit. Judges should become active gatekeepers, assuring that only claims with proper medical evidence are allowed to go forward. One federal judge in Texas, presiding over a silica MDL, has provided a blueprint for effective gatekeeping of these claims. A few legislatures such as Georgia and Texas have acted to facilitate effective gatekeeping. Their statutes should be emulated.

Last, organized medicine should break its long silence on this topic. The American Medical Association, the relevant specialty organizations, and state medical boards should investigate and act. The unorthodox medical practices of attorney-funded mass screenings, and the size of the worker population that has been screened, make this a public health problem that requires attention.