UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: | . | Case No.  01-1139 (JKF) |
| | . | Motion No. |
| | . | |
| W.R. GRACE & CO., | . | |
| et al., | . | 824 Market Street |
| | . | Wilmington, Delaware  19801 |
| Debtors. | . | |
| | . | November 20, 2006 |
| . . . . . . . . . . . . .. | | 1:58 p.m. |

TRANSCRIPT OF HEARING
BEFORE HONORABLE JUDITH K. FITZGERALD
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the U.S. Trustee:        Office of the U.S. Trustee
                             By:  DAVID KLAUDER, ESQ.
                             84 King Street, Suite 2207
                             Lock Box 35
                             Wilmington, DE  19801

For the Ad Hoc              Weil, Gotshal & Manges LLP
Committee of Equity         By:  JUDY G.Z. LIU, ESQ.
Security Holders:           767 Fifth Avenue
                            New York, NY  10153

Audio Operator:             Brandon McCarthy

Proceedings recorded by electronic sound recording, transcript
             produced by transcription service.

---

**DIANA DOMAN TRANSCRIBING**

**P.O. Box 129**
**Gibbsboro, New Jersey  08026-0129**
**Office:  (856) 435-7172**
**Fax:  856) 435-7124**
**E-Mail:  dianadoman@comcast.net**

APPEARANCES (CONT'D):

For the Equity Committee:        Kramer Levin Naftalis & Frankel,
                                    LLP
                                 By:  GARY M. BECKER, ESQ.
                                 919 Third Avenue
                                 New York, NY  10022

For FCR:                         Orrick, Herrington, & Sutcliffe,
                                    LLP
                                 By:  RAY MULLADY, ESQ.
                                 Washington Harbour
                                 3050 K Street, N.W.
                                 Washington, D.C.  20007

For the ACC:                     Caplin & Drysdale, Chartered
                                 By:  NATHAN D. FINCH, ESQ.
                                 One Thomas Circle, N.W.
                                 Washington, D.C.  20005

For the ACC:                     Campbell & Levine, LLC
                                 By:  MARK T. HURFORD, ESQ.
                                 800 N. King Street, Suite 300
                                 Wilmington, DE  19801

For Fireman's Fund               Stevens & Lee, P.C.
Insurance Co.:                   By:  THOMAS WHALEN, ESQ.
                                 1105 North Market Street, 7th Fl.
                                 Wilmington, DE  19801

For Anderson Hospital:           Speights & Runyan
                                 By:  DANIEL SPEIGHTS, ESQ.
                                 200 Jackson Avenue, East
                                 Hampton, SC  29924

For PD Committee:                Bilzin Sumberg Baena Price &
                                    Axelrod LLP
                                 By:  SCOTT L. BAENA, ESQ.
                                 200 South Biscayne Boulevard
                                 Suite 2500
                                 Miami, FL  33131

For PD Committee:                Ferry, Joseph & Pearce, P.A.
                                 By:  THEODORE J. TACCONELLI, ESQ.
                                 824 Market Street, Suite 904
                                 Wilmington, DE  19899

For Prudential:                  Jaspan, Schlesinger Hoffman LLP
                                 By:  LAURIE SCHENKER POLLECK,
                                        ESQ.
                                 300 Garden City Plaza
                                 Garden City, NY  11530

APPEARANCES (CONT'D):

For Grace CCC:              Montgomery, McCracken, Walker &
                             Rhoads, LLP
                           By:  NOEL C. BURNHAM, ESQ.
                           300 Delaware Avenue, Suite 750
                           Wilmington, DE  19801

For the Debtors:           Pachulski, Stang, Zeihl, Young, Jones
                             & Weintraub
                           By: JAMES O'NEILL, ESQ.
                           919 North Market Street, 17th Floor
                           Wilmington, DE  19899-8705

For the Debtors:           Kirkland & Ellis LLP
                           By:  JANET S. BAER, ESQ.
                                DAVID BERNICK, ESQ.
                           200 East Randolph Drive
                           Chicago, IL  60601

For the Official           Stroock & Stroock & Lavan
Unsecured Creditors'       By:  LEWIS KRUGER, ESQ.
Committee:                 1809 Maiden Lane
                           New York, NY  10038-4982

For the Ad Hoc Equity      The Bayard Firm
Committee:                 By:  KATHRYN D. SALLIE, ESQ.
                           222 Delaware Avenue, Suite 900
                           Wilmington, DE  19899

TELEPHONIC APPEARANCES:

For the Official           Stroock & Stroock & Lavan
Unsecured Creditors'       By:  ARLENE KREIGER, ESQ.
Committee:                      KENNETH PASQUALE, ESQ.
                           1809 Maiden Lane
                           New York, NY  10038-4982

Roman Catholic Church      Dies, Handerson & Cafona
Archdiocese of New         By:  MARTIN DIES, ESQ.
Orleans:                   1009 Green Avenue
                           Orange, TX  77630

For the FCR:               Swidler Berlin LLP
                           By:  RICHARD WYRON, ESQ.
                           The Washington Harbour
                           3000 K Street, N.W., Suite 300
                           Washington, D.C.  20007-5116

                           Orrick, Herrington, & Sutcliffe,
                             LLP
                           By:  DEBRA FELDER, ESQ.
                           Washington Harbour
                           3050 K Street, N.W.
                           Washington, D.C.  20007

TELEPHONIC APPEARANCES (CONT'D):

For Halcyon Asset          Halcyon Asset Management, LLC
Management, LLC:           By:  OSCAR MOCKRIDGE, ESQ.


For W.R. Grace:            W.R. Grace
                           By:  MARK SHELNITZ, ESQ.
                           7500 Grace Drive
                           Columbia, MD  21044

For Reaud Morgan &         Stutzman, Bromberg, Esserman &
Quinn:                       Plifka, P.C.
                           By:  DAVID PARSONS, ESQ.
                                SANDER L. ESSERMAN, ESQ.
                           2323 Bryan Street, Suite 2200
                           Dallas, TX  75201

For London Market          Mendes & Mount, LLP
Companies:                 By:  ALEXANDER MUELLER, ESQ.
                           750 Seventh Avenue
                           New York, NY  10019-6829

For DK Acquisition         Willkie Farr & Gallagher
Partners:                  By:  STEPHEN VOGEL, ESQ.
                           787 Seventh Avenue
                           New York, NY  10019


                           Ford Marrin Esposito Witmeyer &
                             Gleser, L.L.P.
                           By:  ELIZABETH DeCRISTOFARO, ESQ.
                           Wall Street Plaza
                           New York, NY  10005-1875

For the Official           Anderson, Kill & Olick, P.C.
Committee of Asbestos      By:  ROBERT HORKOVICH, ESQ.
Claimants:                 1251 Avenue of the Americas
                           New York, NY  10020-1182

For Off Date Insurance     Cuyler Burk LLP
Co.:                       By:  ANDREW CRAIG, ESQ.
                           Parsippany Corporate Center
                           Four Century Drive
                           Parsippany, NJ  07054

For CNA Insurance:         Goodwin Procter LLP
                           By:  DANIEL GLOSBAND, ESQ.
                           Exchange Place
                           Boston, MA  02109


                           Bilzin Sumberg Baena Price & Axelrod
                             LLP
                           By:  MATTHEW KRAMER, ESQ.
                           200 South Biscayne Boulevard
                           Suite 2500
                           Miami, FL  33131

TELEPHONIC APPEARANCES (CONT'D):

| | |
|---|---|
| For Everest<br>Reinsurance Co. and<br>McKinley Insurance: | Marks, O'Neill, O'Brien & Courtney,<br>  P.C.<br>By:  BRIAN KASPRZAK, ESQ.<br>913 North Market Street, Suite 800<br>Wilmington, DE  19801 |
| For the FAI Claimants: | The Scott Law Group<br>By:  DARRYL SCOTT, ESQ.<br>2712 Middleburg Drive<br>P.O. Box 2665<br>Columbia, SC  29206 |
| | Crowell & Moring LLP<br>By:  MARK PLEVIN, ESQ.<br>     LESLIE EPLEY, ESQ.<br>1001 Pennsylvania Avenue, N.W.<br>Washington, D.C.  20004-2595 |
| For the Trade<br>Committee: | Duane Morris<br>By:  MICHAEL LASTOWSKI, ESQ.<br>1100 North Market Street, Suite 1200<br>Wilmington, DE  19801-1241 |
| | Cohn, Whitesell & Goldberg, LLP<br>By:  CHRISTOPHER CANDON, ESQ.<br>101 Arch Street<br>Boston, MA  02110 |
| For ZAI Claimants: | Richardson, Patrick, Westbrook &<br>  Brickman, LLC<br>By:  EDWARD WESTBROOK, ESQ.<br>174 East Bay Street<br>Charleston, SC  29401 |
| For W.R. Grace: | Kirkland & Ellis LLP<br>By:  THEODORE FREEDMAN, ESQ.<br>153 East 53rd Street<br>New York, NY  10022 |
| | Kirkland & Ellis LLP<br>By:  BARBARA HARDING, ESQ.<br>655 Fifteenth Street, N.W.<br>Washington, D.C.  20005 |
| | Kirkland & Ellis LLP<br>By:  SAM BLATNICK, ESQ.<br>200 East Randolph Drive<br>Chicago, IL  60601 |
| For the Scotts Co.: | Vorys, Sater, Seymour and Pease, LLP<br>By:  TIFFANY COBB, ESQ.<br>52 East gay Street<br>Columbus, OH  43216 |

```
TELEPHONIC APPEARANCES (CONT'D):

For National Union        Zeichner Ellman & Krause LLP
Fire Company:             By:  ROBERT GUTTMAN, ESQ.
                               MICHAEL L. DAVIS, ESQ
                          575 Lexington Avenue
                          New York, NY  10022


                          By:  RICK CHICHERI, ESQ.

                          By:  PAUL NORRIS, ESQ.

                          By:  DAVID SIEGEL, ESQ.

                          By:  JOHN O'CONNELL, ESQ.

                          By:  GUY BARRON, ESQ.

                          By:  ANDREW CHAN, ESQ.

                          By:  STEVEN EISMAN, ESQ.

                          By:  MARTI MURRAY

                          By:  NURAGAN BECHER, ESQ.

                          By:  JAY HUGHES, ESQ.

                          By:  PETER SHAWN, ESQ.

                          By:  EMILIA WONG, ESQ.

                          By:  JONATHAN BARRON, ESQ.

                          By:  SHAWN WALSH, ESQ.

                          By:  KENNETH THOMAS, ESQ.

                          By:  WALTER SLOCUM, ESQ.

                          By:  STEPHANIE QUONG, ESQ.

                          By:  ROBERT RYAN, ESQ.

                          By:   JEFF CARLISLE, ESQ.

                          By:  CRAIG GILBERT, ESQ.

                          By:  LAURIE SINAIAN, ESQ.

                          By:  BARBARA SENIOWKI, ESQ.

                          By:  SAL BIANCA, ESQ.
```

1          THE COURT:  Good afternoon.  Please be seated.

2          UNIDENTIFIED ATTORNEY:  Good afternoon, Your Honor.

3          THE COURT:  Folks, please turn off your Blackberrys.

4  We're getting feedback even outside the courtroom.  Please make

5  sure they're off.  Does this computer shut down?  I did.  And I

6  hit these.

7                         (Pause)

8          THE COURT:  Well, I'm sorry.  We're not going to

9  start the hearing yet.  I need the computer.

10          UNIDENTIFIED ATTORNEY:  Should we exchange a couple

11  of jokes?

12          THE COURT:  Sure.  Well, maybe I can do the telephone

13  hearing list while that's going on.  Okay.  The parties

14  participating by phone are Arlene Krieger, Ken Pasquale, Martin

15  Dies, Richard Wyron, Debra Felder, Rick Chicheri, Paul Norris,

16  David Siegel, Mark Shelnitz, John O'Connell, Guy Barron, Oscar

17  Mockridge, Andrew Chan, Steven Eisman, David Parsons, Sandy

18  Esserman, Marti Murray, Nuragan Becher, Alex Mueller, Jay

19  Hughes, Stephen Vogel, Elizabeth DeCristofaro, Robert

20  Horkovich, Andrew Craig, Daniel Glosband, Peter Shaun, Emilia

21  Wong, Jonathan Barron, Matthew Kramer, Darryl Scott, Shawn

22  Walsh, Brian Kasprzak, Mark Plevin, Leslie Epley, Kenneth

23  Thomas, Walter Slocum, Christopher Candon, Edward Westbrook,

24  Stephanie Quong, Robert Ryan, Michael Lastowski, Jeff Carlisle,

25  Craig Gilbert, Laurie Sinaian, Barbara Harding, Barbara

1 Seniowski, Theodore Freedman, Sal Bianca, Sam Blatnick, Tiffany

2 Cobb, Robert Guttman, and Michael Davis.

3                          (Pause)

4          THE COURT:  All right.  This is the matter of W.R.

5 Grace, 01-1139.  I have announced the parties appearing by

6 phone.  I'll take entries in Court, please.

7          MR. BERNICK:  Good afternoon, Your Honor.  David

8 Bernick for Grace.

9          MS. BAER:  Good afternoon, Your Honor.  Janet Baer

10 for Grace.

11          MR. O'NEILL:  Good afternoon, Your Honor.  James

12 O'Neill, Pachulski, Stang, for Grace.

13          MR. BECKER:  Good afternoon, Your Honor.  Gary

14 Becker, Kramer, Levin, Naftalis & Frankel for the equity

15 committee.

16          MS. LIU:  Judy Liu, Weil, Gotshal & Manges, for the

17 ad hoc committee of equity security holders.

18          MR. MULLADY:  Good afternoon, Your Honor.  Raymond

19 Mullady, representing the future claimants' representative from

20 Orrick, Herrington & Sutcliffe.

21          MR. FINCH:  Good afternoon, Your Honor.  Nathan Finch

22 for the asbestos claimants' committee.

23          MR. BAENA:  Good afternoon, Your Honor.  Scott Baena

24 on behalf of the property damage committee.

25          THE COURT:  Anyone else?  Mr. Speights?

1          MR. SPEIGHTS:  Your Honor, Dan Speights representing

2   Anderson Memorial Hospital.

3          MS. POLLECK:  Good afternoon.  I'm Laurie --

4          THE COURT:  I can't hear a word.  Sorry.

5          MS. POLLECK:  Good afternoon.  Laurie Schenker

6   Polleck, from Jaspan Schlesinger Hoffman, for Prudential.

7          THE COURT:  Okay.  Mr. Bernick?

8          MR. BERNICK:  Thank you, Your Honor.  Ms. Baer is

9   going to be handling the first part of the agenda.

10          MS. BAER:  Good afternoon, Your Honor.

11          THE COURT:  Good afternoon.

12          MS. BAER:  Agenda Item Number 1, Your Honor, is the

13   debtors' fifth omnibus objections to claims.  There are four

14   environmental claims left on this omnibus objection, and this

15   has come to you many, many times.  We would expect between now

16   and the December hearing we are actually going to end up

17   withdrawing these objections and reserving our rights.  These

18   are uncontingent, unliquidated environmental claims, of which

19   we have many, and we're going to be taking a different approach

20   to those going forward.  So, hopefully by next time -- for this

21   time we'd ask that you enter another continuing order

22   continuing it to the December hearing.

23          THE COURT:  All right.  Okay.  Thank you.

24          MS. BAER:  Your Honor, Agenda Item Number 2 and 3

25   relate to the debtors' request for an injunction relative to

1    some matters in the state of New Jersey.  The parties continue

2    to discuss these matters and have agreed to continue this,

3    again, to the December hearing.

4              THE COURT:  Okay.

5                        (Pause)

6              THE COURT:  All right.

7              MS. BAER:  Your Honor, Agenda Item Number 4 is the

8    debtors' 17th omnibus objection to claims.  This is the second

9    time it's come up.  According to the order which I will be

10   handing up we have three more claims that are being expunged as

11   outlined on Exhibit A.  On Exhibit B, the claim is being

12   reduced and allowed.  We are withdrawing as outstanding on

13   Exhibit C two claims.  That leaves us, Your Honor, with two

14   claims that are being continued on Exhibit D to the December

15   hearing.  We are checking our records on those and hope, by

16   December, to have those claims resolved, which will resolve the

17   entire omnibus objection.

18             THE COURT:  All right.

19             MS. BAER:  Thank you.

20

21             THE COURT:  That order is entered.

22             MS. BAER:  Thank you, Your Honor.

23                        (Pause)

24             MS. BAER:  Agenda Item Number 5 is the debtors' 18th

25   omnibus objections to claims.  This was actually filed by

1 Delaware counsel.  Your Honor, we have an order to hand up

2 which grants relief with respect to some claims and continues

3 some with respect to others to the December 18th hearing.

4          THE COURT:  All right.  Okay.

5          MS. BAER:  Your Honor, that takes us to Agenda Item

6 Number 6, which is the debtors' motion to approve the

7 settlement with Lloyd's Underwriters and Equitas.  Your Honor,

8 this first came before you in May of this year.  The parties

9 have been negotiating almost constantly to resolve this matter.

10 In August we came before you, had not yet resolved all issues.

11 The Court was very helpful at some.  We went back to the

12 drawing table and negotiated with others.  And I'm happy to

13 report that all of the objections have been resolved.  All of

14 the committees support entry of the order.  And unless Your

15 Honor has questions, we would ask that the order be entered

16 today approving the settlement agreement with Lloyd's

17 Underwriters.

18          THE COURT:  I do have a question, and that is, I

19 really did not want to have to go through it.  I did not get a

20 black line version, and I did not decide to go through the

21 entire settlement agreement all over again without one, so I

22 want to know what's different about this one, and how the

23 objections are resolved.

24          MS. BAER:  I'd be happy to do that, Your Honor.  In

25 fact, we did file a black line, so I apologize to the extent

1 that somehow it did not get to you.

2              THE COURT:  Okay.

3              MS. BAER:  Your Honor, the significant changes

4 between the version we filed in August and the version today,

5 number one, the trust -- the 524(g) trust, the asbestos trust,

6 is not a party to the agreement.  Instead, Your Honor, the

7 agreement essentially provides that the 524(g) trust will only

8 have obligations if they get the money that is being provided

9 by this trust, or alternatively, if a Chapter 11 plan is

10 confirmed which provides that they have obligations.  And, Your

11 Honor, if, in fact, the trust does not get the money, the only

12 way the debtor would ultimately get the money is if all claims

13 were paid by other funds, and therefore this money could go

14 back to the reorganized debtor.

15              Second, Your Honor, there is no indemnity being given

16 from the trust with respect to Lloyd's Underwriters.  The

17 indemnity is being given by the reorganized debtors, and, Your

18 Honor, the indemnity excepts out fraud, gross malfeasance, and

19 criminal conduct, which were concerns that the Court had at the

20 last hearing.

21              Third, Your Honor, the duty to defend the 524(g)

22 injunction.  Again, Your Honor, the trust only has that duty if

23 the trust gets the money from the settlement, or, Your Honor,

24 again, if the confirmed Chapter 11 plan indicates that the

25 trust will have the duty to defend the 524(g) injunction.

1        Next, Your Honor, information, records, and the like,

2   that are being supplied.  Again, the trust is not a party.  The

3   trust does not have any separate obligations.  But to the

4   extent that the trust is providing information to other

5   insurers, that same information would be available to Lloyd's

6   and Equitas  In addition, Your Honor, to the extent that the

7   debtor has information or the debtor is going to be getting

8   information from the trust with respect to asbestos claims, the

9   debtor would provide that information to LLoyd's Underwriters

10  so they can make claim against their other insurers and the

11  like.

12       Your Honor, the most key and significant thing is

13  under the document, under the escrow agreement, as well as the

14  settlement agreement, the money is being set aside into an

15  escrow account for the benefit of all claimants who hold the

16  types of claims that would be covered by this insurance.  And,

17  Your Honor, to the extent that, again, as I indicated before,

18  only to the extent that all of those claims would be paid by

19  other funds in full, then and only then would the reorganized

20  debtor get the monies back.

21       With respect to the amount of the settlement, Your

22  Honor, all parties are now in agreement that this settlement

23  agreement in the amount provided, which is the $90 million, is

24  acceptable.  And the other objections, Your Honor, with respect

25  to reporting and the like, have all been resolved as I

1  indicated.  The one objection with respect to premises

2  liability we discussed at length at the last hearing, and

3  again, it is my understanding that all parties have withdrawn

4  their objections to the settlement in the amount provided, and

5  support the entry of the order.

6           THE COURT:  All right.  Does anyone wish to be heard

7  with respect to Agenda Number 6?  All right.  I will -- do you

8  have an order with you, Ms. Baer?

9           MS. BAER:  I do, Your Honor.

10          THE COURT:  I'll take it, then.  Thank you.

11                    (Pause)

12          THE COURT:  Okay.  That order is entered.

13          MS. BAER:  Your Honor, with respect to the

14 settlement, the funds are to be paid ten days after entry of

15 the order.  And if I could ask that you sign a duplicate copy

16 --

17          THE COURT:  All right.

18          MS. BAER:  -- so we can make sure we have it.

19          THE COURT:  Okay.

20                    (Pause)

21          MS. BAER:  Thank you, Your Honor.  That takes us to

22 Agenda Item Number 7, which Mr. Bernick will address.

23          THE COURT:  All right.

24          MR. BERNICK:  Your Honor, last time -- this relates

25 to notice of 30(b)(6) depositions, and requests for documents

1  that had been propounded by Mr. Speights on behalf of certain

2  of his clients.  Last time I think we spent the better part of

3  two-and-a-half hours going through that.  Your Honor, at the

4  end of that process, instructed counsel to revise the notice,

5  and revise the document requests and resubmit them.  Your Honor

6  also was clear in articulating the touchstone that was to be

7  applied in this process and was to be specifically addressed in

8  the new discovery, and that touchstone is relevance to Rule 23.

9  Your Honor, I'll refresh Your Honor's recollection to the

10 extent that it needs to be refreshed, Page 78 and 79.  I said,

11 "But that's the point, Your Honor, is that even today we have

12 no articulation about discovery that is specific to the

13 elements of Rule 23."  And Your Honor then says, "Well, he'll

14 have to have it done in the new deposition notice, not the

15 document production request, but in the deposition notice."  I

16 then pick up and say, "Maybe I just -- I think that it's just

17 the other way around.  I think actually it should be both.

18 That is to say the documents are only discoverable to the

19 extent that they pertain to the elements of Rule 23, and we can

20 only produce a witness who is most knowledgeable concerning

21 something about which they are most knowledgeable.  We need to

22 know what it is."  Your Honor then responded, "Right.  I agree

23 with that."  Your Honor, at other points, reiterated that the

24 touchstone was Rule 23.  At Page 27 Your Honor said, "I think

25 his point is that you need to show me," this is speaking with

1  Mr. Speights, "how it's relevant to a specific element of Rule

2  23, and I agree with that, so tell me how it's relevant."

3         Well, we've now received the new requests from Mr.

4  Speights, and I'm prepared to go through them, specifically

5  because I suspect that that's what it will ultimately come down

6  to today is going through the specific requests.  But the

7  bottom line is that they are even more detailed, even more

8  expansive than they were before.  And I think before we do that

9  it's important to revisit, and I'm going to step over to the

10  chart here if I can -- it's important to revisit --

11                           (Pause)

12         MR. BERNICK:  Pick that up?  There's a threshold

13  problem with the entire exercise, and the threshold problem is

14  the discover has to be material.  You have to hold out some

15  prospect of being material to the class certification motion as

16  that motion now stands.  And there are certain facts about that

17  motion that are undisputed, for that matter undisputable.  And

18  what we're going to suggest now -- yes, well -- I'll try one

19  more time, and I'll go back.  Is that better?  Okay.

20         THE COURT:  Maybe a chair, Mr. -- oh, you can't write

21  and --

22         MR. BERNICK:  Well, if I have the chair, then I'll

23  need a telephone -- let me just write a couple things down and

24  then I'll talk about them.

25                           (Pause)

1           MR. BERNICK:  As a result of the very long process

2   that's been consumed in connection with the class certification

3   efforts, there are certain facts that have emerged that are not

4   disputed, not disputable, and are dispositive.  First, it took

5   a long time, but we finally established that there was, in

6   fact, no certification in South Carolina in the Anderson, South

7   Carolina case, as to Grace.  And, Your Honor, we went through

8   this, I think, for the last time on August the 21st.  And I

9   then, because we kept on going back and forth, I asked Your

10  Honor to announce Your Honor's feelings about what the

11  documents that actually had been submitted to the Court showed.

12  And Your Honor said at Page 280, "I cannot see a final order of

13  certification as to Grace.  Had it been entered pursuant to the

14  letter that was sent from the Judge to Mr. Speights it would

15  have been post-petition and void.  And to the extent that it

16  was not made final, the interim certification goes away when

17  it's not made final.  It doesn't exist anymore."  It goes on --

18  you go on, later on, at Page 281, "Mr. Speights did send me

19  these documents.  I apologize, again, I don't recall when, but

20  I have seen these documents.  I have looked at these orders.

21  There is no final certification as to Grace, and the

22  conditional one at this point in time is irrelevant because it

23  was not finally certified.  And so, as to the punitive class I

24  agree that the Judge struck all of the non-South Carolina

25  entities from the class that the Judge did certify, so even if

1 there were a conditional certification as to Grace, it's only

2 as to South Carolina defendants at this point in time."  So, we

3 have no certification in South Carolina as to Grace that really

4 exists as of today.  Second, we have had a notice and bar date

5 process, a very extensive one of this case.  Third, Your Honor,

6 has found that process to be adequate.  There was an issue

7 raised concerning it.  We've litigated that.  Your Honor

8 specifically found that the notice and bar date were adequate.

9 And coming out of that notice and bar date process there are

10 now a total of 180, thereabouts, Speights claims throughout the

11 country and only three of those claims arise in South Carolina,

12 which was the geographical scope of the class certification

13 litigation as it was pending at the time that Grace entered

14 into Chapter 11.

15        Now, Your Honor asked last time if there was any

16 issue concerning those numbers.  That is, 180 claims

17 countrywide, and three in South Carolina, and all the briefs

18 that have been filed, and the arguments that have been had,

19 nobody has taken issue with those figures and those facts, and

20 again, if Your Honor wishes, we can submit an attestation to

21 that effect, but it basically comes out of the review of the

22 claims that's taken place over the last year and a half.

23        Now, Your Honor knows that under the rules, now that

24 we're in bankruptcy, there are two sets of considerations that

25 have to be addressed in connection with class certification.

1   One is compliance with Rule 23, and the other, per the American

2   Reserve Analysis, says that even if Rule 23 is satisfied, there

3   must be a further demonstration that certification pursuant to

4   Rule 23 serves some useful, productive purpose in this

5   bankruptcy.  But we're only talking about three claims, or at

6   the most, 180 claims.  The numerosity requirement is not met,

7   and therefore we don't even get to the Prudential

8   considerations that were recognized in American Reserve.  And

9   certainly, those considerations cut further against the idea of

10  any kind of class certification.  This case is at an advanced

11  stage.  If Your Honor were to certify a class it would be

12  appealable on an interlocutory basis.  It would simply

13  introduce another area of ambiguity and uncertainty where none

14  is necessary.  There is no sense to be served by this that has

15  been articulated to the Court other than an effort to somehow

16  cast doubt on the certainty of the number of claims that we're

17  dealing with here per the notice and bar date, the very issue

18  which Your Honor has repeatedly says said is not going to be

19  addressed.  None of the discovery that's been propounded, and

20  none of the new discovery that's been propounded can change

21  those basic facts.  They are there.  That's it.  So, as we go

22  through all of these different detailed requests, and I know

23  that we're going to do it, and I've got a little chart to help

24  in the process, the fact of the matter is that they don't move

25  the needle of where we are in class cert.  We can have the

1 hearing if Your Honor wishes, at any time.  At the same time if

2 we have to continue on with the process of discovery and

3 litigation over discovery, I guess we won't have it for a

4 while.

5          But having said all of that, I want to go through the

6 specific requests, and I have a chart that I think may help in

7 the process.

8                          (Pause)

9          MR. BERNICK:  There are a total --

10          MR. SPEIGHTS:  Excuse me, Your Honor.  Does counsel

11 have a copy of that for opposing counsel?

12          THE COURT:  Actually, I'd like one, too, if that's

13 possible.

14          MR. BERNICK:  Okay.

15          MR. SPEIGHTS:  I'd asked if counsel had a copy -- a

16 photocopy?

17          MR. BERNICK:  In point of fact, there are no less

18 than 11 topics that are now identified in the 30(b)(6) notice,

19 and the requests for production go on to 16 different requests.

20 I don't know if Your Honor has had an opportunity to look at

21 the -- what I've tried to do is very simply group them without

22 trying to leave anything out, and if I have, I know that Mr.

23 Speights will point this out.  But I grouped them into three

24 basic categories, and I've indicated the fundamental problems

25 that attach to each in the second column.  The first basic

1  category are those requests that at least purport to have some

2  connection to the subject of class certification.  Now, in

3  point of fact, not a single one of these requests does what

4  Your Honor asked for, which is to have a specification in the

5  request of something that purports to address an element of

6  Rule 23.  All they do is talk about certification.  So, for

7  example, we get the request that seeks out testimony concerning

8  the -- Anderson's motion to certify in South Carolina, that's

9  Item 4 of the 30(b)(6).  In Item 5 the certification hearing in

10 South Carolina.  Six, any efforts to delay the South Carolina

11 certification.  Item 7, circumstances surrounding the South

12 Carolina Circuit Court's certification of a statewide class as

13 to W.R. Grace.  So, these are all, on their face, they use the

14 word and they describe a subject, but there's no articulation,

15 and there's no specificity that asks what particular element of

16 Rule 23 is being sought out, and it's certainly not tailored to

17 any particular element of Rule 23.  The only effort in the

18 course -- and, likewise, expert witnesses, one of the document

19 requests asks for -- let's see -- class certification.  This is

20 Item 8 in the document requests.  All documents which reflect

21 or refer to any communication made with any lay or expert

22 witnesses involving any issues, and Anderson's efforts to

23 obtain class certification.  Well, what element of Rule 23 does

24 that talk to?  It's not specific to any element of Rule 23.

25 You would then get a request that's as broad as the entire

1  lawsuit itself, the first subject in the 30(b)(6) is, number

2  one, Anderson's South Carolina lawsuit.  That's the entire

3  lawsuit.  It's not even class cert.  The request for

4  production, number one, number three, and number four, all deal

5  with the Anderson lawsuit or Anderson lawsuit proceedings

6  during a certain period of time.  So, as we go down each of the

7  different items that are picked up in the discovery request

8  that on their face at least use the word class cert, or

9  encompass it, none of them do what Your Honor has said, which

10 is to be focused on a particular element of Rule 23, certainly

11 none that are transparent.  Now, there are two that are worthy

12 of at least a little bit more discussion.  One is class

13 membership.  This is the only one, this is the only discovery

14 request that is geared towards an actual element of Rule 23.

15 So, for example, we get the 30(b)(6) request saying number two,

16 members or potential members of the punitive statewide and

17 worldwide classes whom Anderson purports to represent.  So,

18 that is tied to an element of Rule 23, it's just the very

19 element that Your Honor has said is no longer at issue because

20 Your Honor has determined that whoever it is that submitted

21 proofs of claim in response to the class notice, that is who

22 are the potential class members.  So, that is tied to Rule 23,

23 and a specific element, but Your Honor has already ruled that

24 we know the answer to that from the proofs of claim.  Now, if

25 it's necessary to, again, bear out the 180 and the three, we

1  can go ahead and do that, but it's not necessary to -- there's

2  not a 30(b)(6) person at W.R. Grace who is going to know that.

3  That comes from the claims processing, and, frankly, from the

4  lawyers taking a look at the property damage proofs of claim

5  that have survived the omnibus objection process to date.

6      So, if we go through the first four of the topics,

7  not a single one of them relates specifically to an element of

8  Rule 23 that is still properly at issue.

9      We then get to settlement, which is Rule 408.  And I

10 want to come back to that because that involves a special

11 principle of law.  Let me turn, though, briefly to the other

12 requests that all appear below that first line.  We have a

13 whole bunch of requests that go essentially to the merits of

14 the claims.  That is to say, tell us what you know, for

15 example, about Grace surface treatment product in the Anderson

16 case.  That is, the Anderson claims, the Anderson buildings.

17 Tell us what you know, give us all that you have relating to

18 individual or class claims.  For example, all documents.  This

19 is request for production number five, all documents generated

20 prior to September 1, 2005, which refer or relate to Anderson's

21 individual and class claims in this bankruptcy.  Well, that's,

22 first of all, totally over broad.  It's not specified to any

23 particular subject.  And, B, it goes, presumably, to some

24 aspect of the merits of the case.  That's not what we're here

25 to talk about.  Eisen v. Carlisle could not be clearer.  You

1  don't litigate the merits of the case when you're litigating

2  class certification.  The touchstone in class certification

3  discovery are the requirements of Rule 23.  To the extent that

4  they got discovery requests that go to the merits, they're not

5  relevant to certification unless they're tied to some aspect of

6  Rule 23, and in no case have they done that.

7        We also have other problems.  First, the breadth.

8  Your Honor specifically told counsel last time that the

9  discovery rules do not permit the request that says give me

10  everything that you've got relating to "X."  That's not

11  properly discoverable.  There's been no effort to solve that

12  problem.  All of these requests are all documents relating to,

13  all documents relating to, all documents relating to the South

14  Carolina case, all documents relating to individual and class

15  claims.  So, all documents which refer -- all document which

16  refer or relate to the debtors' knowledge concerning the facts

17  or factual assertions relating to Anderson's punitive class

18  action.  Well, the punitive class action is a nationwide class

19  action.  That's what it sought to be.  And the whole thing is,

20  of course, you've got all the general allegations relating to

21  Grace's asbestos product and its conduct.  That request

22  basically says give me all you've got relating to property

23  damage liability.  Well, that's not proper discovery.  So, as

24  you go through them, all of them share the same defect in that

25  they're not tied to certification.  They're tied to some other

1    aspect of the case.  Many of them are still problematic for

2    breadth.  And then many of them specifically and explicitly get

3    into matters that are privileged.  Why certain reserves were

4    taken.  Insurance that might be available.  Communications with

5    insurance.  Companies regarding the claims.  Evaluations of the

6    claims.  Damage estimates.  These are all things that will

7    clearly implicate privilege.  Life is too short to go about the

8    process of trying to deal with this kind of thing now when

9    we're just talking about class certification.  If there's other

10   discovery that's appropriate in connection with estimation, it

11   can be taken up at an appropriate time.  Now is not the time.

12        We then have the last category, which are very

13   interesting requests.  We, of course, still have the request to

14   find out what communications we had regarding the membership of

15   the asbestos claimants' committee.  That's no more permissible

16   a subject for inquiry in this Court than it was last time.  And

17   it has obviously no tie to class certification.

18        There's also the request that I was going to say is

19   somewhat novel.  This one says Item 15 of the document

20   requests, all documents which refer or relate to any

21   communications with any building owners regarding any proofs of

22   claim filed by Anderson's counsel.  Remember, we had to go

23   through literally thousands of claims where ultimately Mr.

24   Speights acknowledged that he did not have the authority of the

25   client to file the claim.  A lot of -- we did receive contacts

1  from various people, who basically got the communications

2  because claims had been filed on their behalf.  They called us

3  to say that Mr. Speights did not represent them.  But whatever

4  communications have taken place with regard to building owners

5  regarding proofs of claim, again, has no relationship, at least

6  one that's demonstrable here, of a connection to the elements

7  of Rule 23.

8          Now, if you go to the brief that was filed, because

9  all I can do is judge on the basis of these various requests,

10  if you go to the brief that's been filed and you ask, well --

11          THE COURT:  Which brief?

12          MR. BERNICK:  The briefs that were filed by Anderson

13  Memorial, by Mr. Speights on behalf of the Anderson Memorial --

14  or, Anderson Memorial class, A, on Rule 408, and B, in

15  opposition to our motion for protective order regarding these

16  discovery requests.  There were two briefs that were filed.  If

17  you go to the brief that was filed with respect to basically

18  the issues other than Rule 408, we have all of two paragraphs,

19  or three paragraphs that essentially say, oh, well, the Court

20  has already ruled that this discovery is going forward, as if

21  Your Honor gave no instructions and that this discovery clearly

22  is going to take place, and there's nothing more to talk about.

23  And then there's another paragraph that basically says, well,

24  this stuff is clearly relevant to the proceedings that we have

25  here.  We should be able to get the facts that relate to class

1    certification.  So, we've now gone through the better part of a

2    year of discussion, and certainly within the last three or four

3    months specific discussion, about what is the articulated

4    basis, and nexus for seeking discovery regarding Rule 23

5    certification?  And as we sit here today, we still do not have

6    that articulation save what appears in the class membership

7    request, which is moot because Your Honor has already

8    determined how class membership would be determined, or

9    defined.  And then, C -- then secondly, with respect to

10   settlement, Rule 408, all of the other requests, there has been

11   no articulation of a basis for discovery given the test that

12   Your Honor has proposed.

13          With respect to Rule 408, we did get an articulation

14   there.  Mr. Speights specifically said why it was that he

15   wanted to conduct discovery regarding settlement discussions

16   that had taken place, and this is at Page 43.  It's also at

17   Page 24.  At the last hearing Mr. Speights came right out and

18   said, well, here's what I think is needed here, why we're

19   seeking this.  He says he wants admissions by a party opponent.

20   What has Grace said about the certification issues behind the

21   scenes?  As if, for example, taken positions in these internal

22   documents about commonality, and typicality, and numerosity,

23   and all these issues.  I want to ask the person most

24   knowledgeable at Grace about those issues.  Maybe he didn't say

25   anything.  That will be a very quick deposition.  But maybe

1   there are -- and maybe there are no documents.  That will be

2   even quicker.  So, if the claim of what's being sought, and

3   does discovery of the lawyers to say, well, gee, maybe in the

4   settlement discussions we can find what happened, that Grace

5   has taken an inconsistent position.  This is Mr. Speights' Page

6   24.  What we are trying to show is an admission by Grace which

7   is inconsistent with the position it has taken and presumably

8   will take before you in connection with the certification

9   hearing.  We want to know whether Grace can show -- we can show

10  Grace, through its own documents, that it has taken a position,

11  they will be willing to settle the Anderson class that's taken

12  that position.

13          So, it's very plain that what is sought here is to

14  say, well, let's go, now that the class certification motion

15  has been filed in this Court, let's go back and take a look at

16  a prior settlement discussion in order to find evidence that

17  the lawyers who were pursuing that discussion made alleged

18  admissions about the certifiability of the class for settlement

19  purposes, so that we can then say it doesn't make any

20  difference what the facts show now, we have Grace making these

21  admissions in settlement discussions.  Well, Your Honor, that

22  is plainly contrary to Rule 408, plainly contrary to the

23  intentment of the rules allowing for discovery in connection

24  with class certification.  And Your Honor specifically

25  recognized this at the last hearing, said that no, this seems

1  to be covered, and you can't do it, that, in fact, Your Honor

2  set out another test.  You said you can't look for admissions

3  in the context of settlement discussions.  The only thing that

4  you can look for in settlement discussions is information that

5  would have been otherwise discoverable if there had been no

6  settlement discussions whatsoever.  Well, that obviously does

7  not include statements made about compliance with Rule 23.

8  Those wouldn't have been made in any context other than a

9  context of settlement discussion concerning a class

10  certification.  That's exactly what's being sought here.

11         So then the question becomes, well, even if they

12  haven't specifically articulated a nexus with Rule 23, that

13  they at least identified underlying facts that would be

14  discoverable that would be relevant to Rule 23.  And again,

15  there's nothing.  There's no particular specification anywhere

16  of an underlying fact that did emerge during the settlement

17  discussions that would have been independently discoverable

18  that's somehow germane to Rule 23.  So, where we are today is

19  exactly where it was that we were before, for, like, the fourth

20  time now we have said what is the nexus for Rule 23?  And there

21  is no nexus.  And, Your Honor, given the status of class

22  certification, where it's been briefed, it's argued, Your Honor

23  already has expressed your inclinations regarding it, and based

24  upon some very, very simple facts that are not going to be

25  implicated by any of this, why are we spending yet more time

1  now going through, and I know we're going to end up going

2  through them one by one, each of these discovery requests.

3  This is improper.  It's a waste of our time.  It's a waste of

4  the Court's time.  If there has to be a hearing on class

5  certification again, we will do that, but we believe that this

6  is not an appropriate use of our time in this bankruptcy.

7           THE COURT:  Good afternoon.

8           MR. SPEIGHTS:  Good afternoon, Your Honor.

9  Respectfully, Your Honor, Mr. Bernick wants to and has, in

10  fact, reargued the same issue he always reargues at every

11  hearing about whether there is any basis for the certification

12  of why we're doing this.  And Your Honor ruled at the last

13  hearing, in the face of those almost identical arguments, that

14  I could go forward with some discovery.  There were two words

15  that came out of that hearing, over broad.  Your Honor thought

16  that my discovery was over broad, which I am here to address

17  today.  You directed me to re-serve the discovery.  And the

18  issue of 408  came up, although it hadn't been briefed.  I

19  really wasn't prepared to discuss 408, didn't even have a copy

20  with me, but Mr. Sawyer handed me a copy so I could read it as

21  Mr. Bernick was arguing.  And those are the two issues that we

22  were supposed to argue today.  And that's what I intend to

23  argue, and I am not going to respond to maybe 80 percent of

24  what Mr. Bernick said, other than to say I disagree with him,

25  and I disagree with him including some of his so-called

1  undisputed facts.  I don't think the facts are undisputed on

2  that.  So, let me tell you what we did.

3          Let me back up a minute and try to place this in

4  context, and hopefully provide a simple solution that's used

5  every day in American jurisprudence of how to get out of

6  arguing every sentence, every word, ad nauseam, ad nauseam.

7  And I'd like to go back, Your Honor, to what precipitated all

8  of this discovery.  Two-and-a-half years after we filed a class

9  proof of claim, or actually two class proofs of claim on behalf

10 of Anderson, not just for the state but for a much broader

11 class that this Federal Court has jurisdiction to deal with,

12 W.R. Grace filed an objection to those claims two-and-a-half

13 years after they were filed.  In light of that objection we

14 filed a motion to certify triggered by the <u>In Re Charter</u> case

15 out of the 11th Circuit.  After we filed that motion to

16 certify, Grace filed an opposition.  And it's instructive to

17 look at the opposition to understand why we are doing what we

18 are doing.

19          In light of the opposition, the opposition, first of

20 all, it was filed, I think, in December 2005, the opposition

21 made many, many factual assertions.  It raised the question of

22 delay.  It said after extensive investigation, debtors

23 discovered that earlier Anderson class Memorial class action

24 was a purported basis.  You know, I don't know what extensive

25 investigation they did.  There are many statements in there

1  that have been presented to Your Honor that I disagree with,

2  including the representation of what happened in South

3  Carolina.  But more importantly, Your Honor, the precise issues

4  that Grace raised in defense of our motion to certify --

5                    (Pause)

6           MR. BERNICK:  What page is this?  Is this a brief, or

7  is this your extract?

8           MR. SPEIGHTS:  This is your brief, citation of your

9  brief.

10          MR. BERNICK:  Your Honor, I would object.  We bring

11 copies of these all the time, so they've gone through a brief

12 and plucked out excerpts of certain pages.  I don't have the

13 brief here.  We didn't come here to argue class certification.

14 This is effectively a demonstrative.

15          THE COURT:  What are you putting up on the board, Mr.

16 Speights, so I have a context for what this is?  Is this a page

17 out of a brief, or excerpts from a brief?

18          MR. SPEIGHTS:  This is excerpts from Grace's brief

19 opposing class certification.  I could pull it right in front

20 of me here, Your Honor, and make the same argument of what they

21 said.

22          THE COURT:  That's fine.  I just want to know what

23 it's from.  Do you know the docket number so that they can

24 check your cites?  Or the date it was filed?  Or something like

25 that?

1              MR. SPEIGHTS:  I actually have the brief here.  I'll

2 let them have a copy of the full brief.

3              THE COURT:  I'd like to know that information, too,

4 though, so I can make a note so I can check it later.

5              MR. SPEIGHTS:  I don't have the docket number of the

6 brief itself.  It's entitled Debtors' Brief in Opposition to

7 Motion of Anderson Memorial Hospital for Class Certification."

8              THE COURT:  All right.  Is there a date anywhere on

9 it?

10             MR. SPEIGHTS:  On the front it says, "Re: Docket

11 Numbers 9302 10014, responses due December 2, 2005, Hearing

12 Date, December 19, 2005."

13             THE COURT:  All right.

14             MR. SPEIGHTS:  Your Honor, and this merely sets forth

15 what Grace argued in opposition.  And this is not every ground,

16 but these are some of the grounds to illustrate why I thought

17 it necessary to go out with discovery.  The first one, the

18 class certification was granted to South Carolina plaintiffs

19 and Anderson Memorial was awarded under circumstances and

20 procedures that are so suspect and improper that they should

21 not be credited by this Court.  They attack what happened in

22 South Carolina.

23             Secondly they said, and very importantly, the burden

24 is on the claimant seeking class certification to establish

25 each element of Rule 23, that I have the burden, therefore I

1  need discovery to help me meet that burden.

2          Next they said the Speights proposed class action

3  cannot claim to be superior in any way to the case management

4  plans that the Court has already enunciated for estimation of

5  claims in these cases.  Well, that raises the bar date notice

6  issue.  That's why I went out with discovery.  Your Honor has

7  ruled on that, and I'm not rearguing that today, but it

8  explains why I went out with discovery on that.

9          Next it says, even if 23(b) were satisfied, however,

10  the criteria under Rule 23(a), numerosity, commonality,

11  typicality, and adequacy of representation cannot be met, so

12  they put up before Your Honor for this certification dispute

13  both the adequacy of Anderson Memorial Hospital as a class

14  representative, which, in fact, is why we asked some questions

15  about the material and Anderson -- because its adequacy is

16  being challenged, as well as the adequacy of Speights & Runyan

17  as class counsel.

18          They next said certifying a class will create a group

19  of creditors that is unknown and largely unknowable in its size

20  and complexity.  And then it said, with respect to adequate

21  representation and adequate protection of the proposed class,

22  there is no showing that Anderson Memorial Hospital and its

23  counsel will adequately represent other members of the proposed

24  class.  Quite the opposite is true.  That's certainly an attack

25  on Speights & Runyan as class counsel.  And I am very

1 interested in what they say about Speights & Runyan when

2 they're not preparing a brief.

3       And lastly, they said in the <u>Celotex</u> bankruptcy where

4 Speights also represented Anderson Memorial Hospital, Speights

5 purported to finally and fully compromise the claims and rights

6 of a class of South Carolina building owners without notice to

7 the class and an opportunity to be heard as required by both

8 South Carolina and Federal Rule 23.  Your Honor will recall at

9 the last hearing one of my discovery requests dealt with

10 Celotex, and we went back and forth of why I had asked

11 something about Celotex, and Mr. Bernick made his strenuous

12 argument that that was irrelevant, etcetera, etcetera, and he

13 wasn't going to rely on Celotex.  Okay.  I understand that, but

14 they're not going to raise that issue that they raised in their

15 motion in opposition to my motion to certify when we get to the

16 certification hearing.  But I'm glad I asked that question that

17 Your Honor has now said we don't need to go forward on, because

18 at least it got that concession out of Grace.  I say all that,

19 Your Honor, because while Your Honor has dealt with the one

20 issue about going behind the bar date order, and while Grace

21 wants to say, well, that's it, time's up, that's not all they

22 argued.  They argued a great deal more than that issue, and

23 much of my discovery, in fact, hopefully all of my discovery

24 that's left goes to issues raised by Grace, very broad issues

25 when you deal with adequacy of class representative, adequacy

1  of counsel, typicality, commonality, etcetera.

2       Now, Your Honor, that brings me to the present, what

3  I did with respect to the instant -- excuse me one minute.  I

4  lost a piece of paper.  Excuse me one minute.

5                    (Pause)

6       MR. SPEIGHTS:  Now, Your Honor --

7       UNIDENTIFIED ATTORNEY:  Can you hear me now?

8       MR. SPEIGHTS:  After we filed, of course, our

9  discovery, they filed their motion for protective order.  After

10 various delays for reasons we all understand and have

11 discussed, etcetera, etcetera, Your Honor heard this matter a

12 the last hearing.  And this is what Your Honor said.  "Well, I

13 think that request, to the extent it's a document request, is

14 too broad.  Asking somebody to give them -- to give you

15 everything they have related to a topic, I think, is simply a

16 fishing expedition, an even the Rules of Discovery don't give

17 you that much.  I think you need to narrow this topic.  With

18 respect to a deposition of a person knowledgeable, I'll ask the

19 debtor to identify a person.  You can take your deposition.

20 And to the extent that you get a discovery request in that is

21 more limited in scope, and the documents are claimed to be

22 privileged by the debtor, then they'll have to produce a

23 privilege log."  And then, later, the issue of 408 came up, and

24 we dealt with that issue.  So, when I left the courtroom, I

25 knew I had to deal with providing new discovery that met your

1 concerns, and, Your Honor, dealing with the 408 issue, which I

2 had never researched before the last hearing.  So, what did we

3 do?  We served three pleadings on Grace, three discovery

4 pleadings on Grace, within the week that Your Honor provided.

5 First of all, Your Honor, we served Grace with a notice of

6 deposition, not a 30(b)(6) notice of deposition, but a notice

7 of deposition of the custodian of documents relating to

8 Anderson Memorial Hospital that existed prior to the

9 bankruptcy.  That deposition is set for tomorrow.  I don't

10 believe, and I don't construct the debtors' brief to say that

11 it has objected to that deposition.  There's no document

12 request in connection with it.  It's just try to get a hold of

13 what these documents are, or might exist.  And I do that, Your

14 Honor, because to place it in context -- I think that the

15 illusion has been created here by the debtors that we are

16 asking for tons and tons of documents.  And I'm going to deal

17 with that when I get to the over broad concerns.  And I don't

18 believe, and I have been dealing with W.R. Grace since I think

19 I was 36 years old, 24 years ago was when I first started

20 taking discovery against W.R. Grace.  I don't believe that we

21 are dealing with any mammoth amount of documents.  First of

22 all, I believe that when we restrict the documents to Anderson,

23 and we take out all of the pleadings, which I've excluded from

24 all of my requests.  I don't need to see anything that I

25 already have in my very large file cabinet dealing with

1  Anderson, I believe that we are dealing with documents that, in
2  all likelihood are in one of -- one, two, or three places.
3  Either in Boca Raton, Florida, where Grace's in-house counsel
4  have managed the litigation for many years, unless they've been
5  moved to some other cite in light of the bankruptcy, and I
6  suspect that the Anderson documents are in one file cabinet.  I
7  suspect that -- also that local counsel in South Carolina, and
8  Grace's national counsel, Cahill Gordon, in New York City,
9  probably have Anderson files, unless Grace asked them to be
10 returned to them.  And excluding the pleadings from New York
11 and South Carolina, and down in Boca Raton, I'll bet -- I may
12 be wrong, but I would be willing to bet more than a nickel that
13 we're talking about one or two banker's boxes, at most, of
14 documents.  I mean, there's not that -- there could not be
15 imaginable, could not be that many documents with respect to
16 the Anderson case.  But leaving that aside, Your Honor, I
17 understand your concern, and I went back, and first of all, did
18 the notice of deposition to try to define what documents we are
19 talking about.  And secondly, Your Honor, I severed the
20 original 30(b)(6) notice of deposition and request to produce.
21 I severed it because it was getting, I think, a little
22 confusing, and it would enable us to really examine the
23 purported discovery with respect to documents on the one hand,
24 a deposition on the other.  And finally, Your Honor, it said
25 that I could go forward with a deposition, although I

1  understand, Your Honor, they have some thoughts on how broad or
2  how limited it might be.

3        So, I sent, also within the week, amended requests
4  for production to the debtors.  And those are -- that pleading
5  has 16 requests for production to the debtor which excludes
6  pleadings and attempts to get to the basic documents that I am
7  searching with respect to class certification.  And I am
8  prepared, if we have to go that route, to go over those
9  individually.  That request to produce is returnable in 30
10 days.

11       And lastly, Your Honor, I did a 30(b)(6) notice of
12 deposition in which I asked for the persons most knowledgeable
13 about 11 categories.  That's the discovery before Your Honor
14 today.  Now, Grace originally, Your Honor, back in December of
15 2005, early 2006, chose to file a protective order on the first
16 round of discovery.  And I understand that, and really a
17 protective order is probably the most appropriate way to tee up
18 the issue of whether you are entitled to take the discovery at
19 all.  Should we have to do any of this?  And we argued that, of
20 course, last month, and Your Honor said we're entitled to some.
21 But I suggest that Your Honor really and truly, especially with
22 respect to the request for production of documents, the
23 sensible thing to do is what's done every day in discovery
24 around the country, is let them file a specific response to the
25 discovery requests, and produce those documents they can

1 produce reasonably, and object in that document to what they

2 object to producing.  And if I'm not satisfied, I'll make the

3 motion to compel.  It is a much simpler exercise.  But if we

4 have to go down this road --

5          THE COURT:  Does somebody have a Blackberry on?

6 Please turn it off.

7          MR. SPEIGHTS:  If we have to go down this road, Your

8 Honor, then I think we start with the basics, and the most

9 basic thing is Rule 26 on protective orders.  And the first

10 thing about protective orders is it is the burden on the

11 debtors to show good cause for a protective order.  It's their

12 burden.  It's not my burden.  Secondly, Your Honor, it is a

13 mechanism, a rule to protect a party or a person from

14 annoyance, embarrassment, oppression, or undue burden or

15 expense.  That's what a protective order is.

16          And that leads me to your first concern about over

17 broad.  Respectfully, Your Honor, I hadn't really thought about

18 this until you raised it at the last hearing.  Respectfully,

19 certainly discovery can be overly broad, but it's overly broad

20 because of something.  It's overly broad because it requires

21 the party to have to spend hundreds of hours of looking for

22 something.  Or it places an impossible burden on somebody.  Or,

23 it's some other -- it's a cause and effect situation.  The fact

24 that we use the word all in the debtors' brief, you would think

25 all is a four letter word.  The fact that we say all documents

1 does not make the discovery overly broad, and therefore

2 something that the Court should squash.

3      THE COURT:  And I agree with that, and I don't think

4 that's what I was intending to say.  What I was intending to

5 say is you can't make a document request that says give me

6 everything in your file, you know, not connected to something.

7 You can say give me all documents related to "X," and if they

8 object, they object.

9      MR. SPEIGHTS:  Absolutely, Your Honor, and I

10 understand that.  And, in fact, I'm not the only one who

11 understands that.  W.R. Grace understands that.  And I'm not

12 going to put that up here now in light of what Your Honor just

13 said, but over the weekend I thought, hey, I'll go back and see

14 the questions, and the request to produce that Grace served on

15 Anderson in the underlying litigation.  And I have it here.

16 And it's now in Pittsburgh somewhere, in the file that was

17 forwarded to Your Honor.

18      THE COURT:  Well, I want to get to that at the end of

19 this hearing.

20      MR. SPEIGHTS:  All right.  But in any event, Your

21 Honor, I would tell you that this document, which is filed down

22 there, over, and over, and over again, as for all documents to

23 be identified, all documents relate to the construction of the

24 building, all documents which supports plaintiff's causes of

25 action for civil conspiracy, all documents, all documents, all

1  documents, and we responded.  And I haven't closely looked at

2  the response, but I imagine we objected to some, and probably

3  said subject to that objection, here are the documents related

4  to that, and some of them we may have said, you're going to

5  have to go and make a motion to compel on this one.  That's the

6  way it's done.  And so, Your Honor, I thought by sending a

7  30(b) -- by taking the document request out of the 30(b)(6),

8  that we had provided a mechanism to deal with these issues.

9  The response to the request to produce is due November 30.

10 I'll be glad to do them paragraph by paragraph now, but it

11 seems to me to be a great waste of the Court's time when it

12 could be very easy for Grace to take its burden of proof and

13 show why, that it's unreasonable.  It's not unreasonable

14 because it's broad, as Your Honor recognizes.  It's not

15 unreasonable for other reasons.  It's got to be because it is

16 oppressive, or embarrassing, or a burden, etcetera, etcetera.

17 And I'm sure Mr. Bernick will come up with some other reasons

18 why they're unreasonable.  But that's what I would propose,

19 Your Honor.  Again, I'm prepared to go by paragraph by

20 paragraph.  The 30(b)(6) notice of deposition was also noticed

21 on November 30th -- custodian -- November 30, and I'm not

22 wedded to that date.  I wanted to get my documents first and

23 then go forward.  And maybe see -- may see the documents, or at

24 least what they are going to produce.  But when you raise all

25 of the defenses that they have to the motion to certify,

1  including the adequacy of Anderson, whether it's a good

2  representative, does it have Grace's product, you know, has it

3  taken care of the product, etcetera, etcetera, and when you

4  raise questions concerning my adequacy, I think there's a lot

5  of discovery that's very relevant to the certification issue in

6  light of the issues they've put in dispute.

7         Then, Your Honor, we get to the 208, and hopefully

8  I'm a little --

9         THE COURT:  408?

10        MR. SPEIGHTS:  408.  Hopefully I'm a little more

11 prepared to deal with that today than I was last time, although

12 I didn't start out that way by mis-citing the rule.  Your

13 Honor, there are about five answers to your concern about 408

14 in light of Mr. Bernick's argument.  The first, and simplest

15 argument, is this.  408 protects, with some exceptions,

16 communications in the negotiations, and the Sixth Circuit case

17 which Mr. Bernick relied on was actually a settlement

18 conference conducted by the District Court, and a third party

19 wanted to know what the parties said during the settlement

20 negotiations.  That's not what I'm seeking.  And that should be

21 the end of the story.  I know what was said.  I was there.  I

22 have testified to it, and I'll get to that in a minute.  But I

23 know what was said by Grace.  And if Grace does not want to say

24 what it recalls saying, and wants to claim that that's

25 protected by the rule, fine.  That's not what I'm seeking.

1   What I'm seeking are facts, and those facts will be, I believe,

2   reflected in documents dealing with the settlement issue

3   internally, within Grace.  What is Grace saying within its own

4   structure about whether we need to settle this case?  What are

5   the merits of this case?  Does it meet the requirements?  Can

6   we concede all these issues?  Because as Your Honor knows, and

7   we discussed last time if they were willing to concede a class

8   action for settlement purposes, they have acknowledged that it

9   was certifiable as a litigation class under the <u>Georgine</u> case.

10  I don't know what other facts were discussed in those

11  memoranda, if, in fact, those memoranda exist.  And, indeed,

12  Your Honor, some of them may be privileged.  And if they are,

13  again, request to produce, you file a privilege log if there

14  are such documents.  And when we come back here, if I have to

15  file a motion to compel, we may be dealing with four documents

16  rather than this imaginative huge number of documents which

17  deal with the issue.  I don't know, but I am entitled to get

18  the facts as they relate to certification, and those facts

19  would be very important, if Grace internally, in discussing the

20  possibility of settlement, did that.  So, number one is, I

21  don't think I'm seeking anything that the rule prohibits.  But

22  if Your Honor disagrees with me, as I'm sure Mr. Bernick will,

23  there are other reasons for the inapplicability of this rule,

24  as well.  For example, Your Honor, the rule itself says that

25  there may be other reasons to get that information, and the

1   cases have -- which we cite in our brief, for example, have

2   said where there is -- where the information is sought for

3   impeachment purposes, you're entitled to that information.  A

4   party cannot say one thing in a settlement discussion and take

5   a diametrically different position without impunity in a

6   litigation matter.

7          Now, I know there's a limit to that, and I know that

8   raises all sorts of questions.  But we can't decide that in a

9   vacuum.  We need to have the documents identified.  If they are

10  identified, if they are produced, we can deal with it.  And,

11  Your Honor, basic point, the rule doesn't even apply to

12  discovery.  The rule is an admissibility rule.  It doesn't

13  apply to discovery.  So, I think they ought to produce them

14  anyway.  But even if you list them on some sort of privilege

15  log, we can deal with them in particular rather than in the

16  abstract.

17         THE COURT:  Well, it deals with discovery in that

18  discovery has to be calculated to lead to relevant and

19  admissible evidence.  And if the evidence is not admissible

20  because Rule 408 prohibits it from being used in Evidence, then

21  it can't be calculated to lead to relevant and admissible

22  evidence.  So, although it, itself, is an evidentiary rule,

23  nonetheless there are implications for discovery purposes.

24         MR. SPEIGHTS:  I agree with that 100 percent, Your

25  Honor.  And I suggest to Your Honor, until, number one, we find

1  out if there are any such documents, and number two, then if we

2  proceed to get those documents, either voluntarily or through a

3  motion, Your Honor will decide, based upon the documents, or

4  the objection, rather than a vacuum.  But you just can't throw

5  a blanket over everything that occurred and say, you know, the

6  rule prohibits any discovery of this.  And I say let's go

7  forward.

8         The other reason, Your Honor, that I mentioned last

9  time, and now I can cover is, that it's clear to me that W.R.

10 Grace has waived this.  They have waived any objection to going

11 into settlement.  In the proceeding below, Your Honor --

12         MR. BERNICK:  This is a document, Your Honor, that

13 was, as it indicates from what he's holding in his -- Mr.

14 Speights is holding in his hand, filed under seal.  It should

15 not be displayed, and it should not be discussed before the

16 Court, without the Court's permission.  Again, this is not a

17 proceeding below.  It was a proceeding across.  It's in a

18 different Court.  It's a State Court.  And it's not appropriate

19 here.  And I do know that Mr. Speights chose to file settlement

20 discussion documents under seal without prior permission in

21 South Carolina.  He simply put it in one of his briefs.  And

22 that is something we'll have to take up a little bit later on

23 today, because presumably Your Honor has now received those

24 materials.  But it was inappropriate that those materials were

25 filed.  It's now inappropriate to consider them, even though

1  they were filed under seal.  That was inappropriate to do --

2  that's inappropriate to consider them.  And, therefore, we

3  would object to any use of those materials in this Court.

4        THE COURT:  Well, let me state the status of the

5  documents.  I received four boxes, Xerox boxes, essentially

6  that size, banker boxes of documents.  I had my secretary look

7  through them to see whether they might be duplicates, because

8  what I thought I was getting was a docket sheet and a

9  transcript.  But that appears not to be what I got.  It appears

10 that what I got is a complete copy of the entire file in South

11 Carolina.  I'm not sure what I'm supposed to do with that.  I

12 thought what I was getting was the transcript of the hearing

13 that would justify the Judge's orders that were entered.  So,

14 exactly what I have and why I have it, I'm not sure.  And to

15 the extent that something has been filed under seal, I haven't

16 read those documents either, because, frankly, I thought with

17 all of this information having been filed on November 14th,

18 that this whole thing was going onto the December omnibus.  I

19 haven't seen any of it.  So far, nothing that you've talked

20 about is something I've seen.

21       MR. SPEIGHTS:  Let me address the documents, Your

22 Honor, and then I'll come back to Mr. Bernick's objection.  My

23 recollection, and my reading of the transcript, and my reading

24 of that transcript upon --

25       THE COURT:  Which transcript?

1    MR. SPEIGHTS:  When you said to send it, whatever, to

2  you.

3         THE COURT:  Okay.

4         MR. SPEIGHTS:  My reading of it --

5         MR. BERNICK:  Your Honor, again, it's not

6  appropriate.  I don't know what Mr. Speights is going to say.

7  This is the same game that we played last time.  It's not

8  appropriate for counsel to make any reference to the materials

9  that were filed under seal --

10         MR. SPEIGHTS:  I'm not going down that --

11         THE COURT:  You're referring to something I said on a

12  transcript that led you to conclude that --

13         MR. SPEIGHTS:  I'm trying to explain why you got what

14  you got.

15         THE COURT:  -- you should send me -- okay.

16         MR. SPEIGHTS:  I'm trying to answer the Court's --

17  when I was there, and listen carefully, when I read the

18  transcript, and when I conferred with other lawyers, both

19  within and without my firm, it was clear to me, rightfully or

20  wrongfully, that upon the urging, I believe, of Mr. Bernick,

21  you wanted the entire file, and that's what the motion that I

22  made to the South Carolina Court asked for.  I served it on Mr.

23  Bernick's firm, and Mr. Bernick's firm agreed to the motion,

24  and the entry of the order, and that's what the Clerk of Court

25  did.  Rightfully or wrongfully.  I was a little surprised,

1 frankly, that you wanted the entire file.

2        THE COURT:  I think when I was talking about file, I

3 think -- I thought that we were talking about the transcript of

4 the hearings that justified -- or that explained, not

5 justified, explained what the certification process was all

6 about.  In any event, I now have four boxes of documents, and

7 somebody is going to have to sort of summarize what it is that

8 you want me to read, because, frankly, I don't see any benefit

9 to my going through whole boxes of documents.  I'm not re-doing

10 whatever the South Carolina Court did.  I thought you were

11 giving me the transcript so that I could in a frame of

12 reference, some things that you haven't yet been able to argue,

13 because I didn't have the transcript, and it was sealed.

14        MR. SPEIGHTS:  And had I -- I believe what I wanted

15 when I made the motion, was to give you the transcript and the

16 exhibits from that hearing on class certification.  That's what

17 I wanted to do.  I didn't want to have a document download on

18 you of four boxes of documents.  But that's the way we read

19 what you ruled in light of Mr. Bernick's arguments, and maybe

20 the easiest thing to do would be to tell you what the

21 transcripts are and what the exhibits are that we will be

22 relying on in the certification.

23        However, Your Honor, without putting anything on the

24 board, I will address Mr. Bernick's objection.  The first thing

25 I would like to say is, I will agree now, and I believe

1  everybody on this side of the isle would agree, that people

2  shouldn't be putting stuff on the board that they haven't

3  shared with other people.  I think that's a good rule from

4  hereafter, and I will join that, and not be surprised, and not

5  ask for copies, etcetera, etcetera, etcetera.  I think that's a

6  great rule, if we're going to do that.

7      THE COURT:  Frankly, I think it's a pretty good rule,

8  too, so at least -- at least one full business day before the

9  hearing you're to share all exhibits that you intend to put up

10  on the board, and you can bring a copy to Court, obviously.

11  I'm not going to be preparing -- be doing that.  But I think it

12  is a good rule, too, Mr. Speights.  That applies to everyone.

13      MR. SPEIGHTS:  Secondly, Your Honor, with respect to

14  the specific objections, I was dealing with the waiver issue.

15  And what I'm telling Your Honor is that now the order that we

16  requested to lift the stay and excuse us from the seal order,

17  so that we could send everything to you, in my opinion relieves

18  us of the restrictions of the seal order for use in the

19  proceeding before you.

20      THE COURT:  Well, okay.  That I don't know about

21  because I don't know what it is that people want.  It seems to

22  me that what you need to do with respect to that -- the

23  transcript and the exhibits is highlight for me in some

24  proceeding what -- I will read the entire transcript and look

25  at the exhibits, but I am still not certain, because no one has

1  really articulated yet to what end I have these documents, I

2  want you to put together in some fashion, you can file it under

3  seal, what it is specifically that you want me to look at, and

4  why I am looking at that information.  Mr. Bernick can

5  certainly file a response.  By the way, I want to back up.

6  When I say one full day, I mean, one full business day.  If

7  these hearings are on Monday, I expect these documents to be

8  shared on Friday, not on Sunday, just to make it clear.

9           MR. SPEIGHTS:  Would that be before five p.m. on

10 Friday, Your Honor?

11          THE COURT:  Before five p.m. on Friday for everyone

12 -- or, before five p.m. the next -- a full business day before

13 the hearing, to be clear.  Okay.  Five p.m. Eastern Time.

14 We're sitting in the east.  Eastern Time.

15          MR. SPEIGHTS:  Thank you, Your Honor.

16          THE COURT:  Okay.

17          MR. SPEIGHTS:  And all I will say on that point is

18 that I believe the record now before you will show that there

19 has been a complete waiver of this 408 argument by W.R. Grace,

20 and to the extent we need to argue it, I'm prepared to argue it

21 with just Grace here, if there's any concern about a protective

22 order.  But I want to go back to where I was on square one,

23 Your Honor.  And I believe the sensible thing to do is, if we

24 go forward with the notice of deposition, the documents

25 custodian to define what documents there are relating to

1    Anderson, I wouldn't think that's a long deposition.  And then

2    we can come back and say, listen, we're talking about two file

3    cabinets in Boca Raton, or something like that.  Or perhaps

4    we're talking about a universe of millions of documents.  I

5    don't believe it.  And to let Grace respond to my request to

6    produce specifically, it's not a lengthy request to produce.

7    They can make all its objections and produce what it will

8    voluntarily.  And that's due on the 30th.  And then if we have

9    to come argue specific responses, we'll do that.  And the

10   30(b)(6) deposition I would like to -- I don't have a problem

11   carrying that over until I get my documents, because I need my

12   documents to take that deposition.  But to the extent that you

13   want to go by paragraph by paragraph, Your Honor, I want to get

14   back up here if Mr. Bernick is not agreeable to that, or if

15   Your Honor doesn't like that approach, and argue these specific

16   paragraphs and why they are related to the subject matter of

17   class certification.

18            THE COURT:  Well, I thought that the reason that I

19   issued the ruling that I did at the last hearing, which was

20   that some indication should be put into the document request

21   itself as to what element you're looking for, was so that we

22   didn't have to have an argument today, that it would be clear

23   specifically what you are looking for, Mr. Speights.  And I

24   recognize that that's a different type of limitation on

25   discovery than sometimes applies.  But the reality is that this

1  case is very old.  You folks have been litigating over this

2  issue for years.  And I'm finding it a little difficult at this

3  point to understand why a broad scope of discovery has to

4  apply.  It seems to me that I have articulated some concerns on

5  the record, particularly withe the numerosity issue.  I'm

6  concerned as to whether there is numerosity.  If some of your

7  discovery is going to numerosity, then I don't think at this

8  stage it's inappropriate to say -- you don't need to, you know,

9  dot every I and cross every T, but that this request is related

10  to numerosity.  If it's related to, as you've argued today, the

11  commonality, typicality matters, say, you know, primarily

12  that's what I'm getting at.  I'm having a little trouble

13  understanding why we can't get past that issue in these

14  requests.

15          MR. SPEIGHTS:  Well --

16          THE COURT:  I agree with you -- pardon me -- I agree

17  with you that as to a specific objection the debtor is going to

18  have to lodge specific objections.  I can't address these

19  things in a vacuum.  I mean, number one, the rules require that

20  you two get together and have a discovery colloquy before

21  anybody files any motions.  So, that's the first thing that's

22  going to happen.  You are going to get together and see if you

23  can resolve discovery issues, or you're not getting before the

24  Court, neither of you, on any of these matters, because that's

25  what the rule requires.  There's a good reason for it.  It's

1  because you can generally work out a lot of issues when you

2  talk.  And the lack of talking is not going to be helpful.  But

3  on the general point as to what element you're attempting to

4  get to, it seems to me that it's not inappropriate to get some

5  direction, especially since some of this information is

6  apparently under seal, or the debtor is going to claim its

7  privileged.  I don't know what defenses may be raised, if any.

8  I do agree that they will have to raise the defenses in the

9  context of the discovery that you have propounded.  But I do

10  think it's appropriate, based on the last hearing, for you to

11  articulate what it is that you're trying to do with each of

12  these requests.

13          MR. SPEIGHTS:  Your Honor, I understand that.  I

14  accept that.  And I'll do that.  I did not understand from the

15  last hearing that you wanted us to put it in the document

16  itself.  I have no problem.  I hope it won't --

17          THE COURT:  Let's just do it now.  If you know now,

18  let's do it now.

19          MR. SPEIGHTS:  Right.  I can go through and say

20  typicality, whatever.  However, let me just make this general

21  statement.  I don't think it will limit it.  What a lawyer is

22  always concerned about is letting his opponent filter his

23  question in a certain way.

24          THE COURT:  Sure.  I understand that.

25          MR. SPEIGHTS:  And I don't mind broadly putting down

1 typicality, commonality, adequacy, whatever it is that I think

2 it relates to.

3          THE COURT:  My concern, Mr. Speights, is I want to

4 make sure that what we're doing is discovery related to

5 certification, not to something else.  Not to merits.  Not to

6 something else.  But to certification.  So, if you tie it to an

7 element, then at least it's tied to an element.  That was the

8 basis on which I went forward at the last hearing and what I

9 thought was going to happen with your amended discovery

10 request.

11          MR. SPEIGHTS:  I appreciate that, Your Honor, and I

12 really believe that if we find out in the deposition of the

13 custodian that we're talking about, you know, documents that

14 are 18 inches thick, we'd all save us a lot of time --

15          THE COURT:  Well, that may be.

16          MR. SPEIGHTS:  But we'll just have to see how that

17 goes.  Thank you very much, Your Honor.

18          THE COURT:  All right.  So, you're going to send

19 counsel a letter, or something, that indicates what the general

20 scope is?  Is that --

21          MR. SPEIGHTS:  I'm happy to do it by letter if that's

22 acceptable to counsel.  And I'm happy to do it --

23          THE COURT:  Now?  Which do you prefer, Mr. Bernick?

24          MR. SPEIGHTS:  I'd like to send him a letter within a

25 week and tell him exactly.  If that's too much time -- and it

1 is Thanksgiving, that's the only reason why I said a week.

2         MR. BERNICK:  Yes.  I don't think -- as I said

3 before, predicted last time that we'd be here again this time

4 with no progress is exactly what's happened.  These requests

5 are no different from the last ones.  Indeed, they're more

6 expansive.  I have no confidence that meeting with Mr. Speights

7 or receiving a letter is going to advance this cause because I

8 think fundamentally what he wants to accomplish is not in

9 accordance with the rules, and is designed to serve a different

10 purpose.  And that's exactly why we moved for a protective

11 order.

12         THE COURT:  Well --

13         MR. BERNICK:  We think the whole enterprise -- I'm

14 sorry, Your Honor.  I'm going to get to a suggestion, but the

15 fact of the matter is that we've now spent fabulous amounts of

16 time.  Unfortunately it's all on -- pretty much on our nickel.

17 The estate has to bear the burden of all of this.  And it's not

18 appropriate, and that's why we moved for protection.

19         But I think that if we go back to the base line here,

20 I want to take up maybe a couple ways of trying to get to this.

21 First, there's no question that Your Honor specifically

22 directed that this take place last time.  There was no ruling

23 last time that somehow this discovery is okay.  So -- and to

24 the extent, Your Honor, that we have -- we have a threshold

25 problem with the enterprise that seeks to go back to the

1  Anderson Memorial case, and litigate class certification in the

2  context of conducting discovery into the Anderson Memorial

3  case.  If there are facts that are discoverable facts that

4  relate to class certification of this case, they can identify

5  them.  I think Your Honor has suggested that they do that

6  repeatedly.  I suppose they still can do it.  To the extent,

7  Your Honor, that you're opening up the door to inquiry into

8  what happened in the Anderson Memorial case, that is at core

9  the reason that we moved for the protective order, and we want

10 to stand on that position.  If Your Honor is stating today that

11 there is going to be discovery allowed into what happened in

12 the Anderson Memorial case --

13          THE COURT:  I haven't stated anything.

14          MR. BERNICK:  Well, I understand, but --

15          THE COURT:   All I have stated is that I want

16 reasonable discovery requests, and we're going to do it the way

17 discovery follows.  If you've got an objection to the request,

18 put a line item objection, produce what you don't -- what you

19 agree is produceable, or deposeable without the objection.  If

20 Mr. Speights has some need for it, he'll file a motion to

21 compel.  With respect to the protective order, if I grant your

22 protective order today and say that this discovery doesn't

23 comply with what I ruled last week because -- or last month,

24 pardon me -- because it don't contain an indication of what

25 element of Rule 23 certification this goes to, that's fine, Mr.

1  Speights will just do it again.  So --

2        MR. BERNICK:  But that, Your Honor, is something that

3  fundamentally we take issue with.  This is not just a process

4  of keeping on trying, and trying, and trying again.  There has

5  been huge resources -- look at all the people sitting around in

6  this room today clicking on what are -- what is largely the

7  debtors' meter.

8        THE COURT:  Well, I don't know why all these people

9  are here today.

10       MR. BERNICK:  Well, because we're all sitting here

11  waiting for this issue to be over so we can get to the other

12  issues.

13       THE COURT:  I would like the issue to be over, too,

14  so in the future, if there are other issues that people have to

15  be here for, and this is not one of them, then do those first

16  so that they can leave and the debtors' clock will not be

17  ticking at such a large expense.

18       MR. BERNICK:  Well, I'm just trying to be candid with

19  Your Honor.  We think that this process is fundamentally off

20  track, and will remain off track so long as we keep on talking

21  about the Anderson Memorial case.

22       THE COURT:  Well, I don't understand what we're

23  dealing with Anderson for either, except that Mr. Speights has

24  said that he is attempting to ascertain facts that he believes

25  are in Grace's records that will essentially be admissions

1  against interest, not by virtue of settlement discussions, but

2  because of facts.  Now, I don't know whether that is true or

3  not true.

4         MR. BERNICK:   But that is -- well, but Your Honor,

5  there is a threshold inquiry that has to be made, certainly

6  given the track record here, as to what those facts are.  We

7  have had the opportunity, four or five different times, to hear

8  that claim.  And all that seems to be going on is that the he

9  wants to.  And I will go over here, again, because -- let's

10  just draw a line --

11         THE COURT:  Well, if there are no such facts, I mean,

12  your answer is to say there aren't any such facts, or there

13  aren't any documents.

14         MR. BERNICK:  But that doesn't come to grips with the

15  issue, in fairness, Your Honor.  There are facts today that

16  bear upon the class certification process.  We can testify to

17  what they are.  Thus far, we know that numerosity is an

18  enormous problem, and there's nothing that he has done so far

19  to address that --

20         UNIDENTIFIED SPEAKER:  Mr. Bernick, if you could --

21         MR. BERNICK:  I'm sorry.  I don't really -- next time

22  we'll try to do a little bit better in turning it up to begin

23  with.  The facts are whatever they are today.  They could be

24  discoverable today or not discoverable today.  That's something

25  that can determine -- be determined by specifying what facts

1  are at issue.  To the extent that we go back to Anderson, we

2  know right now that Mr. Speights has said that when it comes to

3  communications in connection with the settlement process,

4  that's not -- he's not seeking that.  That's out.  Presumably,

5  when the lawyers met together to talk about what should be

6  communicated in the settlement process, this is now internal

7  communications about the settlement process, those are equally

8  undiscoverable under Rule 408.  So, let's now draw a line and

9  say he wants to go back to the Anderson case for purposes of

10 finding out not about anything that related to the settlement

11 process, but instead to the underlying facts, the so-called

12 facts that would be relevant to class certification.  Now,

13 there are two kinds of facts that would be relevant to class

14 certification.  There are the underlying facts themselves.

15 That is, how many people would have comprised the class.  Now,

16 one of the facts are evidence relating to typicality or

17 commonality.  And there are also obviously what the lawyers

18 talked about internally, what the attorneys said.

19         Now, what Mr. Speights has said repeatedly is that he

20 wants to know what it is, and we can go back and pull the

21 transcripts, that the attorneys for Bellcore thought about the

22 elements of Rule 23.  Seeking that discovery is, I said before

23 it's laughable, and it's still laughable.  The whole idea that

24 a motion for class certification can be filed and that the

25 plaintiff who was filing the motion for class certification

1  seek discovery from the defense attorney to find out what their

2  internal analyses say about whether the class could be

3  certified or not, even if there's been no settlement

4  discussion, it is a laughable proposition.  That's just

5  completely and utterly impermissible, and yet it is exactly

6  what Mr. Speights has told the Court that he wants to do.  He

7  says, well, what did they not tell us during the settlement

8  discussions?  I don't want to know about the settlement

9  discussions.  I want to know what their analysis show.  Well,

10 let's go find out what the Cahill Gordon people felt about

11 class certification.  That's proper discovery in connection

12 with a contested motion for class certification?  That's just

13 an outrage.  That's an argument that would be, in my view, I

14 think under -- there's no precedent for --

15        THE COURT:  So, Mr. Bernick, the way you handle that

16 is, when you get that request you say, it's privileged.  It's

17 attorney-client work product.  It's whatever you're going to

18 raise --

19        MR. BERNICK:  We have said that repeatedly.  We have

20 filed briefs repeatedly.  Your Honor, the reason we're moving

21 for protection is we feel that this is excessive, harassing.

22 It should not take place.  Oh -- it's so benign.  Let's go back

23 and do -- let's do all the privilege logs, because that's

24 what's going to be next.  Let's do all the privilege logs, all

25 these documents --

1          THE COURT:  That's what happens.

2          MR. BERNICK:  That -- Your Honor -- at a certain

3  point discovery is excessive.  It's too costly.  It's too time

4  consuming.  It is harassing.  It is harassing discovery to ask

5  from the other lawyers' files for their legal memos that deal

6  with the question of whether your class motion is well taken or

7  not.  That is harassing.

8          THE COURT:  You're not going to get legal memos, but

9  I don't -- I mean, I have not seen these documents, Mr.

10 Bernick, because you just filed this supplement on November

11 14th.

12         MR. BERNICK:  Your Honor, we -- we have --

13         THE COURT:  So --

14         MR. BERNICK:  -- we have not seen -- we have -- when

15 you talk about the documents --

16         THE COURT:  So, if there is a request for attorneys'

17 memos, and I haven't seen it, so if it's there, I'm not going

18 to let him get attorneys' memos.

19         MR. BERNICK:  Okay.  So, we have relief that we don't

20 have to log, as privileged documents, documents that were

21 written and received by attorneys?

22         THE COURT:  I don't know what the request is, Mr.

23 Bernick.  I haven't seen it.  This was just filed.  I -- you

24 know, I have a procedure set up so that I have a chance to

25 prepare for these hearings.  I haven't had any chance to

1  prepare.  I don't know what it is that you're arguing about.

2  You need to do an objection that tells me specifically what

3  item you're objecting to and why.  That's what the rules

4  require, and that's the reason for it.  You're asking for a

5  protective order that says I strike all discovery because you

6  don't want to do it.  Well, that's not the standard, either.

7  Well, no, that is exactly what this says.  That's the whole

8  purpose of moving for a protective order.  And the --

9          THE COURT:  You move for a protective order as to

10 items that may be excessive.  You don't move for a protective

11 order to say protect me from all discovery because I don't want

12 to do discovery.

13         MR. BERNICK:  We didn't say that.  What we said is

14 that we want to be protected from this discovery relating to

15 the Anderson case because it was, by counsel's own admission,

16 designed to get the admissions of lawyers internally.  That is

17 improper --

18         THE COURT:  That is --

19         MR. BERNICK:  -- and the estate should --

20         THE COURT:  That is improper --

21         MR. BERNICK:  -- should not be --

22         THE COURT:  -- and the estate shouldn't have to bear

23 the expense of getting lawyers --

24         MR. BERNICK:  That is exactly right.

25         THE COURT:  -- opinions that are given to their

1 clients in the course of legal advice.  I agree.

2          MR. BERNICK:  But, Your Honor, that's why we're here.

3 Now --

4          THE COURT:  But where is the request that asks for

5 that?

6          MR. BERNICK:  He just said all of these things.  He

7 got -- let me go back to my little cheat sheet here.

8                         (Pause)

9          MR. BERNICK:  His requests, and I can go list them

10 one by one, tell me about the -- what you've got relating to

11 the South Carolina certification motion.

12          THE COURT:  Addressed to Grace, not addressed to

13 Grace's lawyers.

14          MR. BERNICK:  But that's the point.  What other

15 individual other than a lawyer is going to have documents that

16 relate to the South Carolina class certification motion?

17          THE COURT:  I don't know.  And if there is no one,

18 then you answer the response saying there is no one except

19 legal counsel who has any information about this motion, Mr.

20 Bernick.  I mean --

21          MR. BERNICK:  Well, but -- because -- the reason that

22 we moved, and what I would suggest, Your Honor, is that we can

23 draw a line, because I -- you know -- well, we can draw a line,

24 and the line should be forget about Anderson litigation, just

25 forget about it.  If there are facts as to which he can show

1  that they have a nexus to one of the elements of Rule 23 --

2            THE COURT:  Wait --

3            MR. BERNICK:  -- that exist independently --

4            THE COURT:  He's asking Grace to identify what facts

5  it had that are independent.  He's entitled to get what

6  information --

7            MR. BERNICK:  No, that -- that is another --

8            THE COURT:  -- that Grace knows.

9            MR. BERNICK:  I'm sorry, Your Honor.  That's another

10 observation they make.  I think that that is wrong.

11           THE COURT:  He can't know what Grace knew?

12           MR. BERNICK:  Your Honor, this is a Rule 23 motion.

13           THE COURT:  Yes.

14           MR. BERNICK:  He bears the burden on the Rule 23

15 motion.  We have already briefed the Rule 23 motion.  Your

16 Honor has already heard argument, has already expressed

17 preliminary views.  For him now to come and say today I want

18 discovery from Grace to find out facts that I don't know yet in

19 order to bear my burden of proof under Rule 23, that's a way of

20 saying we've had this class notice out there, we've had class

21 claims pending for ten years, and now, after it's all done, and

22 after all the briefs are done, we now want to conduct discovery

23 of Grace to see if there's something else that we missed on the

24 underlying facts.  That is why we moved for a protective order.

25 That is why we would now object on grounds of relevance because

1  he has -- he can say Rule 23 says it's commonality, typicality,

2  numerosity, adequacy -- we all know what Rule 23 says.  He puts

3  on the piece of paper about what our briefs say.  We said it,

4  yes, you've got to meet Rule 23.  And Rule 23(a) has these

5  prongs.  That's great.  That's not a basis for his now coming

6  at this late date, late point in the day, and saying, oh, well,

7  Grace, give me everything that you've got about numerosity,

8  typicality, commonality, and adequacy of representation.  That

9  is abusive.  If there's something in particular that somehow he

10 has never had access to that is factual that bears upon one of

11 these elements, not just reciting I want this because it kind

12 of relates, but something in particular, he can always tell us

13 that.  He's never sought to tell us that.  And he talks about

14 superiority of class versus -- that's, again, a legal

15 requirement.  It's a legal requirement that is a general

16 requirement if there's some fact, again, that he hasn't had

17 access to that he needs from Grace, he can specify it.  We have

18 never said you can't get any discovery regarding class.  What

19 we have said is that it's their burden to specify particular

20 discovery of facts, not just an excuse to get back into

21 Anderson and -- give us some particular facts that are still at

22 issue, and we certainly will consider that.  It's never been

23 done.  So, the first burden ought to be on Mr. Speights to

24 identify those specific facts that are tied to Rule 23 as to

25 which he has not had an opportunity to conduct discovery, and

1  he can let us know what they are, and then maybe we can make

2  some progress.  But to the extent that we're sitting here

3  revisiting Anderson and going after the Anderson case, and

4  lawyers' files, that's what we move for protection on.  Now,

5  there's an alternative way to proceed, and let me hasten to get

6  to it.  All of this really evolved from where we were at the

7  beginning of this year.  At the beginning of this year Your

8  Honor was pretty much ready to rule, I believe, on class

9  certification.  I don't want to be presumptuous, but I think

10 that's where Your Honor was.  But you had an outstanding issue,

11 which was this issue of notice.  We then went forward and

12 somewhat exhaustively explored that issue and resolved that

13 issue.  This is not a situation where we haven't had any motion

14 practice on class, and there haven't been any briefs that have

15 been filed.  They've all been filed.  And what we would think,

16 if Your Honor wants to get to this issue with some prospect of

17 getting it resolved promptly, is a much better way to go.  It's

18 very simple.  Let's proceed with the argument on class

19 certification, the final argument.  If they have knowledge of

20 facts or they say that there are specific facts not protected

21 by privilege that they know are there and that are -- that

22 they've been deprived of the opportunity to get, they can go

23 point them out, because the fact of the matter will be, at the

24 end of the day, class certification is not going to turn on

25 adequacy of representation.  It's not.  Class certification is

1  going to turn on the fact that there's not numerosity, number

2  one, and that, number two, under <u>American Reserve</u>, even if they

3  can meet each and every element of Rule 23, it would be silly

4  to certify a class in this case at this point in time, given

5  the notice and bar date. Those are the things that are going

6  to drive the decision. And if he wants to have the Court draw

7  all kinds of inferences, well, I would be able to show that I

8  really was adequate counsel, he can go say that. If he's going

9  to be able to say, oh, well, I would be able to show that these

10 claims are typical, or there's commonality, let him go ahead

11 and say that. We all know what this litigation is about, left,

12 right, and center. We don't need to know what arguments can be

13 made about typicality or commonality. That's not really the

14 issue here. The issue is do you need a class after you know

15 all of the class members, do you need a class anymore? Or is

16 it really more problem than it's worth? And I would go back,

17 in that regard --

18        THE COURT: Well, then, why don't you stipulate, for

19 purposes of some summary proceeding, that, in fact, all of the

20 other elements would be met, and let's go to it on the issue of

21 numerosity? I mean, if that's what the position is going to

22 be, and the debtor is convinced that that's going to be the

23 means all and end all --

24        MR. BERNICK: I would have to talk to my client, but

25 I believe that we, for purposes of this discussion, all this

1  stuff about adequacy of counsel is kind of a so what.  It's not

2  -- I mean, the elephant in the room is that you don't -- I

3  mean, the case law is just -- is deep that you think long and

4  hard before you certify any kind of class in Chapter 11.  And

5  we've already been through such a mature and arduous process to

6  find out who the claimants are, we know who they are.  They're

7  all represented.  The only purpose for this is to introduce

8  ambiguity, uncertainty, and somehow develop negotiation with

9  them.  So, maybe we'll say, for purposes of this motion we're

10 not going to contest adequacy of counsel.  Maybe we'll say

11 that.  Now, typicality and commonality, we could well contest

12 on the basis not of any facts that are somehow unique to the

13 Anderson case, or unique to Grace, it's just so that everybody

14 knows about asbestos property damage litigation.  They've got a

15 problem there, as well.  But the real drivers that really

16 enable us to avoid all of that are numerosity and the fact that

17 it's unnecessary in Chapter 11 and because of the maturity of

18 this case.

19         I think that what would be sensible, Your Honor, is

20 for Your Honor to turn to the class certification issue and

21 decision, really with that focus, and decide, as a matter in

22 the first instance, why do we have to get into all this stuff?

23 Why do we have to keep on arguing about it and spending time

24 about it?  Because I really think that's -- I think that's

25 where this is, and that's what I was going to suggest after

1  hearing all this.  I was going to go through Mr. Speights's

2  list of all the things that were said in the brief.  He said we

3  attacked the South Carolina certification as being improper.

4  Well, that's no longer relevant because Your Honor already has

5  ruled what the South Carolina Court did and didn't -- no

6  discovery is necessary to that.  He says, we argue that the

7  burden is on the plaintiffs.  Well, of course the burden is on

8  the plaintiffs.  It's on them as a matter of law.  That doesn't

9  implicate that all of a sudden discovery of our files is

10 necessary.  He says we can't claim that -- he can't say that

11 it's superior.  And he said, well, I was there, interested in

12 the bar date, but he recognizes the bar date issue is a past

13 issue.  23(a), and, well, we know what 23(a) is.  So what?  He

14 says, well, they're going to attack my adequacy.  So, we took

15 that off -- we can take that off the table.  The number five

16 proposition was that the creditors will create a class of

17 unknown and unknowable creditors.  Well, that's obvious on the

18 face of it, that's why Your Honor has already said we're not

19 going down that road.  We don't need discovery of that.  Six

20 was adequacy of counsel.  Seven was <u>Celotex</u>.

21      So, if you take even his own demonstrative, of which

22 I do not have a copy, but that's okay, and go through that

23 demonstrative and say, well, what comes out of that that is

24 somehow a fact that he needs from us that he's never been able

25 to obtain before, there's nothing.  So, what are we doing all

1 this for?  And it is burdensome.  It's contentious.  It's

2 problematic, because it threatens all of these attorney work

3 product and settlement communications, which is not

4 appropriate.

5          Now, with respect to the trans -- my argument -- my

6 position would be, Your Honor, that we ought to go forward.  If

7 he wants to craft an identification of those facts which he has

8 not had access to that are specifically implicated by Rule 23,

9 we can pursue that on a parallel track.  I think that we ought

10 to set the motion for class certification for argument, and we

11 ought to do that at some point in January, and we ought to go

12 forward, and Your Honor ought to take a look at the question

13 about whether any of this really means anything at the end of

14 the day, because there are so many other more pressing, and

15 important, and solvable problems about Rule 23.

16          With respect to the transcript, Your Honor, we tried

17 to do as Mr. Speights indicated.  We thought that you wanted

18 the whole thing, as I think that Mr. Speights thought.  But

19 clearly we have never been interested in taking up the Court's

20 time with the Anderson Memorial South Carolina case.  So, we're

21 happy to go forward and help to limit the population of

22 documents that's at issue.  I don't think that they should be

23 all that voluminous.  Our only issue, though, would be we would

24 take issue with the idea that somehow there's an in camera

25 submission of anything to do with the settlement process.  This

1  is not a jury trial situation.  This is the documents that are

2  being used as evidence.  This is why the <u>Goodyear</u> Court said

3  what it said, the Sixth Circuit said what it says, you already

4  produced the chilling effect that Rule 408 was designed to

5  avoid when you allowed discovery.  And to the --

6         THE COURT:  I'm sorry.  The South Carolina documents,

7  these four boxes, are settlement discussions?  I thought --

8         MR. BERNICK:  No.  No.  I'm not suggesting that.

9  There is a small, probably a relatively -- there's a subset of

10  those documents that's related specifically to class

11  certification, and then presumably there are hearing

12  transcripts relating to class certification.  So, those can be

13  segregated.  Among those materials is a brief that was filed by

14  Mr. Speights's firm in support of the motion for class

15  certification.  And that brief attached as an exhibit a

16  description that apparently was crafted by Mr. Speights, or

17  people in his firm, describing these settlement discussions.

18  And it related to the issue of adequacy of counsel.  So, there

19  is a document that relates specifically to the discussions.

20  That document was filed under seal.  Okay?

21         THE COURT:  Okay.

22         MR. BERNICK:  Then there is a brief that was filed in

23  response to it.  But it was said in the responsive brief, and

24  it remains Grace's position today, was improper for Mr.

25  Speights to file those settlement materials under any set of

1  circumstances, whether they were under seal or not.  Those

2  documents we don't believe should be part of the record in this

3  case.  They are under seal documents.  They should not be

4  useable, admissible, discoverable for any purpose.  It would

5  violate the purpose of Rule 408.  And so, we have no quarrel

6  with Your Honor taking a look, obviously, at whatever it is

7  that you want to take a look at.  We do have a quarrel, though,

8  with respect to the settlement documents because -- and I don't

9  mean to suggest that somehow these are, you know, there's red

10 hot admissions anywhere.  It is that -- on principle we do not

11 want to get into settlement discussions that relate to a

12 purpose that's violative of Rule 408, in this case it is

13 impeachment materials with respect to the issues of Rule 23.

14 We don't think that that's appropriate.  So, to that extent,

15 that is what this is, being admitted for the purpose of showing

16 an inconsistent position, which the case law is clear in saying

17 is the language, the operative language under Rule 408.  So, we

18 don't think that those should be a matter of record in this

19 case, and they shouldn't be discoverable.

20      THE COURT:  Okay.  Well, I think because I haven't

21 seen them I'm really a little unclear as to what it is you're

22 talking about.  Are you suggesting that something in the briefs

23 dealing with Mr. Speights as adequate class counsel got into

24 settlement discussions on another issue?

25      MR. BERNICK:  There was an issue raised in the

1  Anderson Memorial case about the adequacy of Mr. Speights to

2  act as class counsel.  That was out there as an issue.  There

3  was discovery that was being proposed with respect to that

4  issue.  Because that issue was out there in connection with the

5  class certification motion that was filed, Mr. Speights

6  submitted as an exhibit to one of his briefs a sealed group of

7  materials that related to the settlement process -- to

8  settlement discussions.  And he proffered those in service of

9  the proposition that he was right about the adequacy of counsel

10 issue.  I don't want to get any further into the detail because

11 then we're opening the door to the substance of what occurred.

12 I'm just saying in terms of its subject matter, the subject

13 matter of the submission relating to settlement was the

14 adequacy of counsel issue.  That's, again, why, for our

15 purposes here, it's kind of a lot of discussion about something

16 that's not really very germane.

17          THE COURT:  Well, if you're taking the adequacy of

18 counsel issue off the table, I mean, if you are doing that, is

19 there any relevance to any of the documents that are under

20 seal?

21          MR. BERNICK:  I don't think that there's -- well, I

22 would say the answer to that, both generally -- without

23 reference to whether you take it off the table or not, is no.

24 And certainly, if you were to take it off the table, those

25 documents I don't believe are relevant at all.

1          THE COURT:  Okay.  I don't have a view.  I haven't

2     seen them, so I don't know what they are.

3          MR. BERNICK:  Okay.  So, again, our position would

4     be, Your Honor, that rather than having simply the re-

5     submission of a bunch of requests, and go through some kind of

6     meet and confer process, and, you know, talking about what's

7     privileged, what's not privileged, counsel should identify

8     specific facts in existence obtainable from discovery through

9     Grace that somehow had not been discoverable or able to be

10    discovered before.  There's been all kinds of discovery over --

11    for Grace for years, and years, and years.  They can identify

12    that.  We'll seek to work out if there are facts like that, a

13    way to give them discovery.  We don't really -- it doesn't

14    really -- we don't think it's really going to bear very much on

15    the ultimate issue.  But in order to get this thing off the

16    marks, we think that the matter should be set for a hearing,

17    because at the end of the day we think that none of this makes

18    a difference to the key facts that are the real obstacles to

19    certification.  And I will be able to get back to the Court

20    with a representation about whether adequacy of counsel is

21    going to be disputed for purposes of the motion.

22          THE COURT:  Okay.  Mr. Speights?

23          MR. SPEIGHTS:  Your Honor, I'd like to just sit back

24    and not say anything if you haven't changed your mind about

25    what your solution was.  But to the extent that you are

1  wavering in that because of Mr. Bernick's argument, I will

2  address it just briefly.  And, you know, I welcome any

3  stipulation saying I'm a great lawyer and an adequate counsel,

4  and if he wants to do that, that's fine.  I am the lawyer

5  that's for two years been attacked before Your Honor, before I

6  ever appeared before you and often since I've appeared before

7  you.  So, I want it to be an unequivocal stipulation.  And to

8  the extent that we can get that so that it's not -- I don't

9  want to sequence this certification hearing but to the extent

10 that they abandon certain positions that they took in that

11 pleading, I welcome to abandon them.  I mean, adequacy of my

12 client is another one, and then we get to all the other issues.

13          Secondly, the idea of the burdensome, I guess

14 Kirkland & Ellis never thinks about the burden on me.  I served

15 this discovery a year ago, not really a huge amount of

16 discovery in light of what they said about me, and my client,

17 and Judge Hayes, and about the fundamental issues involved in

18 this, and I've spent a year trying to get it, and I've been up

19 here at many hearings only because discovery being involved at

20 my own nickel, and two days every time to come up here to a

21 hearing.  So, I just sat back down and said if Mr. Bernick had

22 just filed a response to the discovery back in -- or the

23 document request back in December, we could have saved

24 ourselves a whole lot of time.  I'd have made a motion to

25 compel, etcetera, etcetera.  But the burden has been, I think,

1  more so on Anderson.

2        The other thing, Your Honor, is I must say that Mr.

3  Bernick keeps saying you ruled on certain issues about what

4  happened in Anderson.  I don't believe Your Honor has ruled.

5  You've opined a lot, and some of the concerns that you have

6  have been of great concern to me, but you've always said at the

7  end of the day that we'll have a certification hearing to do

8  it.

9        For example, Your Honor, the first thing up there he

10  says no certification in South Carolina as to Grace.  Mr.

11  Bernick has been saying that from the time he filed that

12  opposition until, you know, 30 minutes ago.  Well, I dispute

13  that.  That's not undisputed, and I think at the certification

14  hearing we will show you.  But one thing I'm interested in,

15  it's not just, you know, admissions about commonality, or

16  adequacy, or everything else.  What if, and this is not a

17  fishing expedition, what did Grace say internally when that

18  order was entered in South Carolina against Grace in February

19  or March of 2001?  What did it say?  Was there a discussion

20  about -- within Grace about that order?  And if there was a

21  discussion, okay, do they say, as they have said in this case,

22  that there was no certification, what did they say about it?

23  And if it's a lawyer saying something, let them file a

24  privilege log, because there may be an exception.  There may be

25  something about some of these documents, first of all, they may

1  have been shared with non-lawyers.  It may not have been

2  something seeking advice.  We've got the whole issue in-house

3  counsel and what is protected versus litigation counsel.  We've

4  got all sorts of privilege issues which Your Honor recognized

5  the last time.  That's why you file a privilege log.  And to

6  suggest that there may be hundreds of thousands and millions of

7  privileged documents, Your Honor, there's -- they have the

8  burden.  They haven't shown that.  They haven't shown that

9  they've got this huge number of documents.  And the privilege

10  log is a key here.  They should file a privilege log, and we

11  can get right to the heart of the matter.  And I know that

12  that's what they don't want to do.  They don't want to file a

13  privilege log and indicate just on the privilege log that they

14  have had discussions on these very issues that we're dealing

15  with.  And again, they have the burden.  So, Your Honor --

16         THE COURT:  But what would the relevance be, because

17  whether -- whether the class was certified in Anderson as a --

18  on a final basis as to Grace I don't think is undisputed.  It

19  was -- the order that you prepared at the Judge's request

20  specifically said that it wasn't being certified as to Grace

21  because Grace had filed bankruptcy, so there was no final

22  certification as to Grace.  I don't think that's disputed, is

23  it?

24         MR. SPEIGHTS:  Your Honor, but what the Court said in

25  South Carolina was that this was a conditional certification as

1 to Grace.

2          THE COURT:  The original order?

3          MR. SPEIGHTS:  The order, as to Grace, conditional

4 certification.

5          THE COURT:  Not the final?  The second order?  I'm

6 sorry, the first order was a conditional certification as to

7 Grace.  That's the one that was entered because Grace was going

8 to file bankruptcy, and Grace wasn't there initially to defend

9 itself, correct?

10          MR. SPEIGHTS:  And then it had a hearing, with Grace

11 there.

12          THE COURT:  Then there was a hearing.

13          MR. SPEIGHTS:  And the order was continued.  And it

14 was a conditional certification.

15          THE COURT:  And then --

16          MR. SPEIGHTS:  The record was closed.  He had heard

17 testimony for two days.  He had considered mountains of

18 exhibits, which Your Honor now has in Pittsburgh.  The record

19 was done.  He issued a conditional certification.  Then his so-

20 called final order was also a conditional certification.  And

21 this is just a point that gets lost in all these arguments.

22 All certifications are conditional.  That's the Rule, 23.

23 Every certification is conditional.  The Third Circuit has said

24 that.  You can always visit it.  And the fact that it was in

25 February or March, we will get into that at the final

1  certification hearing, and I'll take the position that it was

2  no different than any other conditional certification.

3           THE COURT:  Okay.  I think what --

4           MR. SPEIGHTS:  But what did Grace say about that?

5           THE COURT:  I think it's the timing issue that I'm

6  trying to get clear.  There was an order entered before Grace

7  filed bankruptcy.  That was a conditional certification.  By

8  the time the Judge got around to issuing the final order, Grace

9  was in bankruptcy and the final order, as I recollect, and I

10 haven't looked at it for quite some time, specifically excluded

11 Grace from any certification because to do so would have

12 potentially violated the automatic stay, and the Judge was very

13 clear that Grace was not being included in that order.  Is my

14 recollection in error?

15          MR. SPEIGHTS:  No, Your Honor.  And he was -- because

16 of the automatic stay, but he had already conditionally

17 certified as to Grace.

18          THE COURT:  Okay.

19          MR. SPEIGHTS:  They want to attack the circumstances

20 of that, and that's -- you know, from day one they have said,

21 you know, something was amiss in South Carolina.  They want to

22 attack it.  And just one simple -- I mean, there are many of

23 these -- one simple issue is does Grace have internal documents

24 about that certification in South Carolina, which might be

25 inconsistent with the positions they are taking with you today?

1  And that could be -- we could go through each one of these

2  issues, each one of these facts that they represent before you,

3  and find out whether they are accurate or not.  You know, it's

4  nice to say, well, we're down to numerosity.  But they have

5  spent two years talking about Anderson, I would say defaming

6  Anderson and its counsel, with all sorts of assertions and all

7  of these briefs, and the first thing, frankly, I've already

8  been working on is a sort of a list of assertions that Grace

9  has made about Anderson and its counsel, and a response with

10  the facts based upon -- partly from the record that's now in

11  Pittsburgh, and partly upon other documentary evidence.  But

12  the missing ingredient is what Grace itself knew.  And Mr.

13  Bernick wasn't involved in South Carolina during that fight,

14  but his client was, and I believe, again, there are a modest

15  number of documents which deal with the Anderson certification

16  issues.

17          THE COURT:  Okay.  But the relevance to whatever

18  Grace felt about the conditional order is what -- I'm just --

19  I'm trying to get a handle, Mr. Speights, on where this is

20  going.  I really don't quite grasp what it is that you're

21  looking for, so I'm not trying to make you reveal your

22  litigation strategy.

23          MR. SPEIGHTS:  I'll be glad to tell you, Your Honor.

24          THE COURT:  I'm just trying to figure out what it is

25  that's going on.

1          MR. SPEIGHTS:  Well, if the certification order --

2    and Your Honor has talked about it several times, some with Mr.

3    Bernick, some with Ms. Browdy at various times, and you've

4    recognized, well, the Anderson state class is a different -- a

5    different situation than a punitive class for everything else.

6    Your Honor has said that you don't want to revisit the findings

7    of the South Carolina Judge.  Your Honor has -- when you kicked

8    out a bunch of claims because you ruled I had no authority by

9    reason of the class, you expressly would not do that with

10   respect to the South Carolina claims because Anderson state was

11   a different breed of cat.  So, where we're headed on that is,

12   and I understand the numerosity questions out there, but I

13   believe that you are required to follow the Anderson -- a

14   certification already made unless, and we can argue about what

15   the unless is, but it carries weight.  It carries a presumption

16   in this Court that there was a class certified in South

17   Carolina, and it should be afforded respect and comity, and

18   follow that unless there is some reason not to.  And I know the

19   reason they're going to argue.  They're going to argue

20   numerosity.  But that doesn't underlie the fact that there was

21   a class, a conditional class.  Judge Hayes did it after years

22   of litigation, and a full record, and a lot of facts that are

23   known to Grace behind the walls of its offices, that would

24   support my theory on that.  And, Your Honor, having a state

25   certified class before you carries the ball on South Carolina a

1  long way, carries it a long way.  We may be down to numerosity

2  again, and I've been thinking about that one a lot, and we'll

3  deal with it.

4         But there's another point, Your Honor, the reason

5  that it's important.  It's not just the fact that there's a

6  certified class in South Carolina.  The South Carolina Judge,

7  after Grace had more than its day in Court, it had numerous

8  days in Court, and numerous briefs, okay, it wanted to have the

9  certification tee'd up.  It requested the hearing.  And it got

10 what it asked for.  It got a full hearing with expert witnesses

11 from around the country.  It lasted two days.  More briefs

12 after the hearing.  And it got an order from Judge Hayes

13 conditionally certifying it.  But we also know, not violating

14 the stay now, we also know that Judge Hayes found implicitly in

15 the conditional order, the first order, explicitly in the order

16 after Grace declared bankruptcy, found commonality and

17 typicality, etcetera, etcetera.  Grace wrote all those briefs.

18 Grace was a lawyer -- the Grace lawyer dominated the case in

19 South Carolina, not USG, not Federal Mogul, not U.S. Mineral.

20 It was Grace that did all the briefing, Grace which did all the

21 arguing.  So, Your Honor, I will show you that's why it's

22 important, because I want to show you the certification hearing

23 that Grace has had its day in Court on all issues in this case

24 except the issue now you've raised -- Grace raised in its

25 pleading about, well, will the certification assist the

1 Bankruptcy Court, which leads us to numerosity somewhat, and it

2 leads us to some other questions about how I believe the

3 certification will assist Your Honor in doing what it's doing

4 right now in this objection process.

5        So, it's very important.  And, you know, we have

6 spent a year on something that I -- you know, they just filed

7 their objections, so once I take this deposition of the guy who

8 knows about the existence of Anderson documents I believe we

9 can come up here and we've been arguing for a year about

10 something that could be resolved in a very short period of

11 time.

12        MR. BERNICK:  Your Honor, I'd like to begin with --

13 not begin, just end, this was very useful to inquire of Mr.

14 Speights, because I think that it goes back and it really

15 confirms that the issues that are really out there are not

16 issues as to which any discovery is really required at all.

17 They really have to do with the role of the Anderson class

18 action, and what relevance it has to this case.  If you go back

19 to Anderson versus this case, maybe I just sketched it out for

20 myself -- thank you.  I think that this is an issue of law pure

21 and simple.  We have the Anderson case, and we have the Chapter

22 11 case.  Now, in the Anderson case we know that there was a

23 conditional certification as to Grace.  We know that there was

24 never a final certification -- a final certification was as to

25 others.  And, indeed, the Judge in the South Carolina case mad

1    it explicit in his letter that Grace was to be excluded.

2           So, we then have this Chapter 11 case, and we have

3    the bar date, and as a result of the bar date we have a certain

4    number of claims that have been filed.  So, what is the

5    relevance of the Anderson case?  There is argument that says --

6    there were cases out there, indeed, the Third Circuit has not

7    yet addressed the question about whether you can have a class

8    in Chapter 11.  American Reserve, out of the Seventh Circuit,

9    says yes.  Other Circuits also say yes.

10          In connection with thinking about whether there

11   should be a class in Chapter 11, the Courts have looked to see,

12   well, was there a certification pre-Chapter 11, as kind of a

13   threshold inquiry.  If there already was a certified class that

14   is relevant but not dispositive of the issue of whether there

15   should be a class in Chapter 11.  So, what Mr. Speights has

16   just got done telling us is that the conditional certification

17   as to Grace says that he says it's the same thing as if it were

18   final.  That is to say there was a full record, Grace had an

19   adequate opportunity to be heard.  Now, it could be that he

20   would say that because this was a real certification, a real

21   certification, that becomes relevant to the Chapter 11

22   analysis, a la American Reserve.  That would be, in our view,

23   wrong, because there was no final certification.  The

24   conditional certification, Your Honor, already has found, and

25   properly so, was only that.  And because it doesn't become

1 final it's no longer of any force and consequence in this case.

2 This conditional certification is not an order of

3 certification.  It's not.  The very fact that it was made final

4 as to others is the best evidence that it was not.  But Mr.

5 Speights now doesn't -- isn't even content with arguing -- he

6 first says it was a certification when we know that it was not.

7 But he then goes further.  He not only says that this was a

8 certified class and therefore for purposes of the Chapter 11

9 analysis is relevant, he actually says that because the Judge

10 down there must have determined typicality, commonality,

11 adequacy of representation, it is binding on this Court.  It's

12 res judicata.  That is, Grace, and you heard his language,

13 Grace had a fair and adequate opportunity to be heard.  There

14 were experts, motions, that -- this, that, and the other, and

15 because the Court granted conditional certification, he says

16 that's the same thing.  Everything is all conditional, so that

17 is the determination that now is binding presumptively on this

18 Court.  Well, that transforms a conditional order into a final

19 order.  It further says that the -- that final order is binding

20 on this Court when there is no case in Chapter 11 that says a

21 pre-bankruptcy certification is dispositive of post-bankruptcy

22 -- or, of bankruptcy certification.  And he further, then, says

23 that it is not only binding in that sense, it's binding on Your

24 Honor's ultimate determination as to whether the requirements

25 of Rule 23 are met or not.  That's just -- that is just a wild

1  proposition.  There is no law -- I mean, where is the law

2  that's going to say that an order that's conditional really is

3  final?  Where is the law then going to say that conditional

4  order is binding on a Chapter 11 Court, who then has no

5  latitude to do the Court's own Chapter 11 analysis?  That law

6  just doesn't exist.  So, if we're going through this process to

7  argue about whether the result in Anderson should be binding or

8  not, that's an issue of law, but that's not what he wants.  he

9  wants to know, as you've just heard, what was Grace saying

10  internally about that conditional order?  He's not entitled to

11  that.  That's to say, give me your litigation files.  Let me

12  know what was in your heart about whether you thought that this

13  order was a problem, or that you thought you felt good or bad

14  about it.  That's where we draw the line.  If he wants to argue

15  about the effect of Anderson, we only got into it because he

16  was arguing about it.  If he wants to argue that effect, he's

17  always been free to do it.  But to the extent that discovery is

18  being sought about how Grace internally was looking at the

19  Anderson case, that is absolutely where we draw the line.

20  We're not prepared to believe that we should even go through

21  the process of -- oh, this will all be over so quick, we know

22  that that's not true.  So --

23        THE COURT:  Well, I don't quite understand what the

24  relevance of what Grace thought about the conditional order is

25  anyway.  The reality is there's a conditional order, and it was

1   that, it was a conditional order.  Grace was subject to it for

2   the time period in which it existed, that it was never made

3   final, the bankruptcy intervened.  It's never going to be made

4   final as a result of the bankruptcy, and I'm still back to -- I

5   feel like I'm unstuck, but I'm still back to the numerosity

6   issue.  If, in fact, there are three South Carolina claims, is

7   that -- and I understand there may be more than one building in

8   a claim.  But if, in fact, there are three South Carolina

9   proofs of claim at this point in time, I am -- and Anderson

10  only purported to certify South Carolina buildings, it did not

11  purport to do anything else, I just don't see how three claims

12  is going to be too many to try.  And so, I'm still back to that

13  same position.

14          MR. BERNICK:  Well, and that's why, Your Honor, what

15  we think should -- well, let's just go forward and argue the

16  class -- we already did once, but if he wants to come back and

17  argue it again, now, in the context of the broader information

18  that's been brought to the Court's attention, and Your Honor is

19  able to then read the files of the Anderson case, again,  if

20  it's a conditional order, it can't possibly be res judicata.

21  It can't possibly satisfy the standards that had been applied

22  to Chapter 11 classes.  But he can argue that all he wants.  We

23  can have that argument at a hearing on class certification.

24  But why do we have to go through discovery and deal with

25  privilege issues in order to get there?

1           THE COURT:  Well, I guess while we're talking about
2  this I have two concerns, so let me put the both on the table
3  and see where we go.  One is the numerosity issue, and the
4  second is that the request is for an opt out class.  And
5  frankly, with the proof of claims bar date having been passed,
6  I don't know how I do an opt out class in a bankruptcy.  It
7  seems to me you don't have that choice. If we're going to
8  certify a class, it has to be a class that the bankruptcy can
9  deal with.  At this point in time we've had a proof of claim
10 bar date.  So, I don't think the class can be expanded beyond
11 the proofs of claim that have been filed, and those are the
12 problems I'm facing, Mr. Speights.  I don't know whether
13 discovery is necessary on those two particular points, or not,
14 but those are really the issues that I have.  With respect to
15 typicality and commonality, you know, there are cases that
16 define those concepts, and basically make it a pretty easy
17 threshold to show typicality and commonality, and then subject
18 to the defendants in that action to raise defenses to show why,
19 in a particular case, maybe something isn't typical or isn't
20 common, or even if it is that the defense can satisfy the
21 defendant's burden, and -- or else show that the plaintiff has
22 met its own burden with respect to a particular treatment of,
23 and indeed within that class.  So, the way I see the pleadings
24 coming down and the briefing that's been done so far, my two
25 major concerns are what I've just articulated.  I'm not so

1  concerned about the typicality and commonality.  I don't know

2  if you need to do discovery on those.  I'm a little confused

3  about what the relevance would be as to what Grace thought

4  about the Court's order.  I mean, as a matter of curiosity, I

5  might like to be a little mouse in the corner and find out what

6  Grace thought about some of my orders, too, but I'm not sure

7  that's relevant either.  So, I just don't know what the

8  relevance of that is.

9        MR. SPEIGHTS:  By the way, Your Honor, I have

10  absolutely no objection if you want to move Anderson matters to

11  the end of every hearing.  I can appreciate the --

12        THE COURT:  No, actually, I want to get past them so

13  I don't have to deal with them anymore, and neither do any of

14  the other parties.  That's really what I'd like.  I would like

15  to get the certification motion done.  And, Mr. Speights, if

16  you need some discovery I'd like you to get it so that we can

17  get it -- get the whole process completed, but I'm not sure to

18  what end.

19        MR. SPEIGHTS:  Well, I have several comments.  First,

20  I understand your two issues, and I believe I can deal with

21  both of those issues when we argue certification.  And to the

22  extent that you want to curtail the discovery efforts because

23  you are focused on those two issues, I would beg Your Honor to

24  at least make Mr. Bernick do what he suggested he might do, and

25  that is to stipulate that those issues are off the table so I

1  don't come here and convince you on those two issues, and all
2  of a sudden arising over here on my right side is all the other
3  issues.  I'm not saying that I won't want any discovery if we
4  are limited to those two issues of how they impact things, for
5  instance, the slander of the Anderson class and what really
6  happened is something that cuts a -- as to a lot of issues.
7  But I acknowledge that if they would take off the table what
8  they put on the table a year ago, it would simplify matters.
9         Now, having said that, Your Honor, you know, you've
10 said a while ago you don't want my litigation strategy, or
11 wouldn't require me to do it, but there's a whole lot that
12 happened in South Carolina, and I probably know more than Mr.
13 Bernick, although he is catching up as he gets more and more
14 involved in this, but there are a lot of circumstances and a
15 lot of facts down there, and I want to know what Grace was
16 saying as an admission against an interest, are they
17 inconsistent with what they are representing to you today?  You
18 know, and I could give you examples of that, but if all we are
19 talking about -- all we are talking about is one request to
20 produce, one 30(b)(6) notice, which they will produce one
21 person to talk about Anderson, and I probably could guess who
22 it would be, and one custodian's deposition.  That's it.
23 That's all the discovery that's outstanding now.  And I have
24 said to Your Honor I will mark by the request to produce what,
25 you know, what Rule 23 issue it pertains to.  But if we get

1  that so that we can get the record straight, at least when we

2  are here before you to argue certification -- you know, Your

3  Honor, last time I was the one that said we ought to get the

4  certification tee'd up.  Okay?  If we can just get this basic

5  discovery out of the way, and they're going to object, I

6  understand that, but surely there's one piece of paper at W.R.

7  Grace that I'm entitled to look at.  One piece of paper

8  pertaining to Anderson.

9          THE COURT:  Well, haven't you already seen it in the

10  Anderson discovery?

11          MR. SPEIGHTS:  No.  This pertains to Anderson's

12  certification.  I've got the whole Grace documents repository.

13  I copied, in Boston, 100,000 documents or more, dealing with

14  liability.  But that's what you knew, and when you knew it

15  about asbestos, going back to 1932, when it had an asbestos

16  plant.  I don't have -- you know, I don't have what was going

17  on during the Anderson certification proceeding when they were

18  actively litigating.  I don't know whether, for instance, on

19  the 408 issue -- one of the exceptions to 408 is delay.  You

20  know -- somebody up to delay.  I don't know if this was a big

21  game Grace was playing down there to delay the certification by

22  getting more briefs, etcetera, etcetera, because they knew they

23  were filing bankruptcy.  I mean, there are all sorts of things

24  going on down there --

25          THE COURT:  But what difference would it make here?

1  Because --

2          MR. SPEIGHTS:  Because I'm going to tell you, Your

3  Honor, that you should give more weight to that conditional

4  certification than Mr. Bernick is.  I never used the word

5  binding.  Mr. Bernick talked about binding for five minutes.  I

6  never said the word binding.  But I'm going to argue that you

7  should give great deference to Judge Hayes, who heard all these

8  issues.  And the more we know about what Grace's position was,

9  and if, and I say if, it was up to shenanigans to delay that so

10 it could get into bankruptcy so it wouldn't be part of the same

11 order of everybody else, that would be good for me, I think.  I

12 could show you that.  I could show everybody that.  But the

13 bottom line is, the final order was a conditional order.  That

14 was a conditional order.  And I want to bolster that order in

15 your eyes so that you will see exactly what was going on, not

16 that -- I showed it up there at the beginning, where something

17 was amiss in South Carolina attacking Judge Hayes, who is one

18 of the most ethical and honorable Judges I've ever been before,

19 and I want to be able to show that.  If I just read the

20 statements in their brief on certification to you attacking

21 everybody down in South Carolina, me, and the Judge, and

22 everybody else, and making all of these assertions, I want to

23 get to the bottom of it.  Lawyers ought to be held accountable

24 to what they write in briefs before Your Honor on the issue

25 that's pending before Your Honor.

1           THE COURT:  Okay.  Well, the issue that is pending
2    before me is not whether Judge Hayes is an honorable Judge.  I
3    have no reason to suspect that he is anything but an honorable
4    Judge, and I have no assertion on this record to the contrary,
5    nor would I credit one.  And even if I credited it, it would be
6    irrelevant.  He's issued an order.  His order, to the extent
7    that it was issued, is an order that is entitled to full faith
8    and credit, and I will give it such, but I don't know that it's
9    entitled to res judicata effect because it is, in fact, a
10   conditional order, not a final order.  So, when I talk about
11   faith and credit what I mean is I will consider it as an order
12   of the Court.  He had a hearing.  He issued an order.  I
13   understand the process.  I understand what he went through to
14   get to that.  And I respect the order that he entered.  So, if
15   you want to argue that I should have some -- give some weight
16   to that order, I think you can do that without the need for
17   discovery.  I don't see how you're going to get into at least
18   counsel for Grace's thought processes, nor do I think, unless
19   there's a factual statement that says something like, and I'm
20   making this up, Grace says something like, you know, the fact
21   of the matter is, and then makes a statement which is contrary
22   to a fact that was asserted in the trial on that record, and
23   you've got that evidence to use, I don't see what it's relevant
24   -- what Grace thought about the order.  I can probably opine
25   what Grace thought about the order, it probably didn't like it

1 too much.

2        MR. SPEIGHTS:  And maybe it said it was a brilliant

3 order.

4        THE COURT:  Well, okay, then I'm wrong.  It may have

5 liked it very much.  But, so what?

6        MR. SPEIGHTS:  Well, we're dealing with -- first of

7 all, Mr. Bernick is a master of the what if.  And, what if,

8 Judge, in effect he's saying, we have all these attorney-client

9 documents, and Mr. Speights can never get through the attorney-

10 client privilege.  Your Honor, don't take us down this track.

11 We're going to have to spend all this money making all these

12 lists of privileged documents.  I don't know that.  They've got

13 the burden.  Let them convince you of that.  But the point is,

14 Your Honor, they have non-privilege documents, too.  He hasn't

15 asserted that he has no documents at all.  We don't know what

16 documents he has.  And I want to find out what documents he has

17 discussing the Anderson class certification issues, or dealing

18 with facts related to the Anderson class certification issues

19 back in the files somewhere, and he can file his privilege log,

20 and we can do that, and be back here in December, and we'll

21 have it all complete, and then we can deal with that issue.

22 Otherwise, Your Honor has -- we've now, on several areas you've

23 said I'm entitled to discovery.  In effect you're saying I

24 can't get any discovery on these issues which they raise.

25        THE COURT:  Well -- okay.  I think we need to go back

1   to, I guess, the drawing board, and find out what the issues

2   are.  If the debtor is going to continue to assert that there

3   is no commonality, there is no typicality, that you are not

4   adequate class counsel, that Anderson isn't an adequate

5   representative, I think you're entitled to the factual

6   discovery that backs up those assertions.  I agree.  I don't

7   think you're entitled to opinions -- lay witness opinions with

8   respect to what a Judge's decision was all about.  That is not

9   a fact that will be evidence in the case.  So, to the extent

10  that you're looking for facts, I think you're entitled to them.

11  To the extent that there are documents that lay out facts that

12  you haven't had access to, I think you're entitled to it.  But

13  I don't think you're entitled to attorney work product.  I

14  don't think you're entitled to privileged documents.  I do

15  agree that to the extent there is a specific request they have

16  to do a privilege log, they have to tell you what's privileged.

17  They have to assert the privilege.  And if you have something

18  else that you want, you have to come before the Court on a

19  motion to compel.  I agree with that.  It's discovery.  We're

20  going to follow that order, and that sequence.  But I think

21  there is -- not I don't think, I know, it is your burden in

22  making a discovery request, to show me how it is calculated to

23  lead to relevant and admissible evidence, and I don't see how -

24  - what Grace thought about a Court's opinion is calculated to

25  do that.  If there are facts of record, that's a different

1 issue.

2      MR. SPEIGHTS:  We have gotten bogged down in what

3 Grace thought about a Court's opinion, but -- and I don't want

4 to belabor it, but it's also what Grace thought about the

5 issues down there, typicality, commonality, as Your Honor said.

6 But I understand where Your Honor is.  That's all I want.  I'll

7 give them the clarification in a week as to what Rule 23 issue

8 it goes on, and we'll see you in December.

9      MR. BERNICK:  Your Honor, I just think this is --

10 we're now at the end of the end of the day, we're not making

11 progress here.

12      THE COURT:  Well, we are making progress.  You are

13 going to decide with your client whether or not you are going

14 to pursue all of the issues, and I think you should notify Mr.

15 Speights of that fact within a week.  Then Mr. Speights, at the

16 same time, within that same week, should tell you with regard

17 to the pending discovery, what elements of Rule 23 it relates

18 to.  To the extent that there are documents that contain

19 privileged information, you need to do a privilege log.  I

20 don't -- I have a bare record before me.  I don't know, at this

21 stage, why -- what appear at this point to have been cut down

22 numbers of interrogatories and requests, is harassing and

23 burdensome.  I haven't seen them.

24      MR. BERNICK:  It's not cut down.  They were probably

25 tripled.

1          THE COURT:  Well, okay, if that's the case, I haven't

2     seen them, as I've explained earlier.  I still --

3          MR. BERNICK:  Well, what mechanism do we have, Your

4     Honor?  You know, I've said it repeatedly.  Your Honor has now

5     repeated it, as well, that they're not entitled -- it is

6     facially improper in every Court that I've ever practiced in,

7     to seek discovery of lawyers unless it's with respect to facts

8     which are not obtainable through any other means, and just

9     facts.  We now have a Chapter 11 case and a motion to certify.

10    If there are facts in existence that bear upon the elements of

11    that certification we can talk about those.  As soon as we talk

12    about Anderson we're into a world of money being spent.  And

13    what I'm looking for is, sure, we'll go ahead and do it.  We've

14    got the people to go ahead and do it.  It is facially wrong,

15    and now he's said there's got to be at least one page out

16    there.  He hasn't identified even one page that's out there

17    that is responsive without coming from some lawyer's files.

18    So, what is our mechanism?  Can we have some recourse here such

19    that if the requests are all pretty much the same as before,

20    and they get into Anderson, we have to do these privilege logs

21    at the cost of compiling these privilege logs, and of looking

22    through all these materials, is going to be borne by Mr.

23    Speights?  I mean, there's just no -- there's no down side that

24    Mr. Speights has for prolonging this process and taking up all

25    of this time, all to no purpose.

1          THE COURT:  Here's the difficulty.  I don't have a

2     line by line objection that tells me what's wrong with Mr.

3     Speights' request.  I don't have the debtor saying, just for

4     example, here are ten pages worth of documents that we don't

5     contest, and we're not giving you X, Y, Z, because.  I don't

6     have that.

7          MR. BERNICK:  That's not -- that presumes that we now

8     -- and I'm just telling you very concretely, we now, on the

9     basis of this record, at this point in this case, are now going

10    to have the burden of going and doing a complete canvas for all

11    of the documents that fall within the scope of what he's asking

12    for, because, Your Honor, at this point has said we've got to

13    go and somehow, you know, divide up what's responsive and not

14    -- that's another way of saying he gets his request, we've got

15    to go look through all of our files, pull all of those

16    documents --

17         THE COURT:  I think what I've said is I haven't seen

18    the requests yet.  I haven't even seen the -- the objection.

19    Nor do I know if Mr. Speights has filed a response, since the

20    objection was just filed.

21         MR. BERNICK:  We did.  It's all on the record.  It

22    was part of -- it's all part of the agenda.

23         THE COURT:  That was filed on November 14th that I

24    haven't seen.

25         MR. BERNICK:  Well, I understand that, but what I'm

1  suggesting, Your Honor, is that in light of this discussion,

2  maybe it would be appropriate to go back and at least take a

3  look at what's there, rather than directing -- rather than

4  having --

5          THE COURT:  And maybe it would.  Maybe it's -- you

6  know, maybe it's just coming up too soon.  I thought these

7  issues would be coming up in December.  I really don't have a

8  clue at this point.  Your chart, Mr. Bernick, this chart, I

9  don't even know what it relates to.  I don't know specifically

10 what document request -- you mentioned some on record, but I

11 don't know.  I have not seen what it relates to.

12         MR. BERNICK:  Okay.  Well, we're happy to do a cross

13 reference on that chart and show what it relates to.

14         THE COURT:  Has Mr. Speights filed a response to your

15 objection?

16         MR. BERNICK:  Yes.

17         THE COURT:  Okay.  I haven't seen that, either.  I

18 need to go back --

19         MR. BERNICK:  We filed a series of objections.  And I

20 can't say that we went through each and every request and said

21 here are our objections to each one, because they fell into

22 categories, but we made all of our objections, relevance, over

23 breadth, burden, seeks privileged information.

24         THE COURT:  Okay.  I think --

25         MR. BERNICK:  That's -- I really -- maybe we should

1  just --

2        THE COURT:  I think what I need to do is get the

3  completed set of documents and go through them.  That's what I

4  need to do, because I have not seen what you're talking about.

5  So, you folks have a better understanding of what's going on on

6  this record than I have.  I haven't seen them.  I don't -- I

7  have an understanding, but I don't think it's informed enough

8  in the context of looking at the production requests and the

9  documents.  So, I think I need to go through them.  If -- were

10 binders submitted here to Delaware, too?  Is there a set here?

11 Are all these documents in the binders in Delaware?  All right.

12 Tomorrow I will go through these documents and take a look.  I

13 think what I am going to do is give you a continued hearing

14 date on this issue and this issue alone.  No one who is not

15 interested in the course of this discovery has to appear.

16 We'll do it by telephone, if need be.  What I can't do today,

17 though, because my calendar in Pittsburgh apparently has some

18 problem with it, and I can't access it, so I can't give you

19 that date today.  I just don't know when it will be.

20        MR. BERNICK:  I'm just wondering, I think it might be

21 -- Your Honor has made a series of statements from the bench,

22 as we kind of get a little bit further into this dialogue, that

23 I think are pretty helpful and instructive about what's -- you

24 know, what really is going to be a fruitful area and what is

25 not.  And I'll go back to my client and find out about adequacy

1 of representation.  I'm pretty confident that when it comes to

2 typicality and commonality, we know that those are not as

3 stringent as the requirement that is very much parallel to it

4 under 23(b)(3), which is predominance.  And predominance is a

5 fundamental issue.  There's been a lot of talk about, you know,

6 in connection with the common issues, matters that will be

7 taken up next year on the P.D. claims.  Well, Grace said this

8 in connection with the class certification of this case or that

9 case.  Our position will be that there is not sufficient

10 predominance of common issues to warrant certification.  And

11 I'm very confident of that.  We're not going to concede

12 commonality or typicality, but they really are subsumed at the

13 end of the day under the question under (b)(3), about whether

14 there's predominance.  In other words, if you had a (b)(2)

15 case, commonality and typicality would be much more important

16 because they really speak to a question about whether there's

17 cohesiveness, which is not necessarily addressed by (b)(2)(B).

18 At the same time -- or, (b)(2).  If you're in (b)(3), you get

19 to the same matters by way of predominance, but predominance is

20 the ultimate test.  So, I don't really know, A, I don't think

21 we're going to stipulate on typicality and commonality, and B,

22 even if we did, we would still have predominance to deal with,

23 and we are certainly not going to stipulate on predominance.

24 So, I think that the net outcome of this will be we probably

25 won't contest adequacy of counsel just because it's not worth

1 it in light of all this history.  But if we're narrowing the

2 scope of what we're prepared to argue, I think it's really of

3 critical importance that Your Honor perhaps articulates some

4 ground rules based upon your review of the requests that have

5 been made, but also your understanding now of the potential

6 relevance or lack thereof of Anderson, about whether Anderson

7 really is where we should be going, because I would tend to

8 think that if we're not going down the road of trying to find

9 admissions in Anderson, and instead we're focused on facts that

10 are extant and are discoverable, this process might be an awful

11 lot faster.

12          THE COURT:  Okay.  I am not totally sure what the

13 relevance of going into all this discovery on Anderson is,

14 except Mr. Speights has said that somehow in that process he

15 will have an argument that I should pay more attention to the

16 order because of the method by which Grace did or didn't behave

17 in getting that order addressed.

18          MR. BERNICK:  But that is an issue of law.  I mean,

19 it clearly is not res judicata --

20          THE COURT:  Well --

21          MR. BERNICK:  If it's not res judicata and it's not a

22 final order, it is just plain hearsay.  That's all that it is.

23 It's another Court reflecting on a -- not the same issue, but a

24 similar issue.  It is not a decision.  It does not have

25 precedential value, precisely because it's conditional.  It's

1  just hearsay.  It's the Judge saying I want to conditionally

2  certify it, I don't know what I'm going to do.  And there's no

3  question but that the final order is not conditional.  If you

4  read the whole document, there's not a word in it that says

5  conditional.  It is the order on class certification, pure and

6  simple.

7        THE COURT:  Well, I think -- I thought what I heard

8  Mr. Speights say is that in his view even final orders are

9  conditional because -- I guess because they're subject to

10  decertification.  Is that the concern?

11        MR. BERNICK:  That's right.  I don't -- we know what

12  the argument is.  The question is whether, as a matter of law,

13  this Court, or any Court, can give any weight to an order that

14  is a conditional certification order.  There is case law,

15  significant case law, on the relevance of pre-bankruptcy

16  certifications, the certification in Chapter 11.  It speaks

17  only in terms of either an alleged class, or a class that has

18  been certified.  There's nothing that says that you give weight

19  to a non-final conditional certification order.  So, whatever

20  happened -- whatever happened in South Carolina doesn't make a

21  difference because the test of relevance under the case law for

22  pre-bankruptcy certifications is was there a certified class,

23  or not?  And even that is not dispositive.  It's simply a

24  factor.  So, if there is law out there that says that a non-

25  final conditional certification is entitled to any deference

1  under Chapter 11, we concede that case law.  It has not been

2  pointed out to the Court.  So, if there's not law that says

3  that, and the law that says deference is final orders, what are

4  we talking about here?

5          THE COURT:  Well, I have that same concern.  I think

6  that it would be advisable if we could focus on the issues that

7  I think will be the drivers in this -- in this issue, which

8  really are, as I see the pleadings right now, the numerosity

9  and the fact that this is requested to be an opt out class.  I

10 have some difficulty with how that can happen.  I have some

11 difficulty with the concept that we're going to expand the

12 proof of claim bar date, because I have found that the

13 provisions for notice were adequate.  And so, if the proof of

14 claim bar date isn't going to be reopened in a class

15 certification process, then at best I guess we're left with 180

16 claims.  That's still a lot of claims, concededly, but only

17 three of them are South Carolina claims, and that was the basis

18 for the Court's certification order, and frankly, I'm just not

19 seeing how that's going to fit the numerosity issue.  So, I

20 think -- I really go back to what I've been saying since the

21 beginning.  I though tit was important to get through this

22 process to see how the claims would be weeded out, if they

23 would, at all, and they have been, to a certain extent, as the

24 debtor has filed objections, and some have been withdrawn, and

25 some have been sustained, and so forth.  And now we're left

1  with the universe that I think is probably -- well, I don't

2  think, I know, it is more manageable than it was when the

3  claims were filed.  So, those still are my basic concerns, but

4  if the debtor is going to pursue the other objections, I think

5  Mr. Speights is still entitled to do discovery.  Whether you

6  agree with the discovery or not is the method by which people

7  file objections, don't file discovery, and motions to compel

8  come up.  That's how it has to happen.  Now, having said that,

9  as I indicated at least five times, I haven't seen this motion

10 in context.  I will look at it tomorrow, and I will get back in

11 touch with the parties.  If I need a further argument, I will

12 schedule it.  If I don't, I will do rulings.  That's all I can

13 tell you on the motion for protective order right now.

14            MR. BERNICK:  I don't think that there's anything

15 else with respect to property damage, other than to make a

16 report to the Court, and I know it relates to Prudential, and

17 the counsel for Prudential has been waiting very patiently.

18 There are two motions for summary judgment that we have now

19 filed on property, particular property damage claims.  There's

20 a motion for summary judgment relating to Prudential.  Your

21 Honor will recall that Your Honor disallowed two of, I think

22 it's the eight Prudential property damage claims on the grounds

23 that they are barred by the statute of limitations.  You

24 applied the borrowing statute to look at what the appropriate

25 statute of limitations was to look at, and you also gave -- you

1  found that Prudential was bound by the determination made in

2  prior litigation that the company was on notice of the claims

3  within the statutory period.  This motion simply takes exactly

4  the same ruling and issue and seeks to apply it to the other

5  six buildings.  Now, we're mindful of the fact that under the

6  basic order that was put in place, motions for summary judgment

7  are to be made at any time prior to February, and then

8  responses are due in March.  But Your Honor issued that order

9  against the backdrop of wanting to make sure that discovery was

10  done.  These are motions -- this motion requires no discovery.

11  The record is totally fixed in place, and it really is a

12  question of simply applying the ruling that Your Honor made

13  previously.  If it is the position of Prudential that this

14  motion cannot be resolved because there is discovery, they can

15  simply say that.  But we don't think that there's any way that

16  it is, and we just ought to get it resolved.

17          There's a second motion, which is a motion for

18  summary judgment directed to buildings that are located in the

19  state of New York.  New York has a statute that is triggered by

20  the date of installation.  So, if it's the date of

21  installation, that's pretty easy to find out.  It's right in

22  the proof of claim.  So, there is no further elaboration that's

23  necessary.  And again, given the analysis of the law that Your

24  Honor followed in connection with the Prudential claim, and for

25  that matter with respect to certain claims in Minnesota, we

1  think that Your Honor's analysis of the law is now fairly clear

2  in these cases of how you look to choice of law and what the

3  statute is.  And this motion, again, does not require any

4  discovery of any facts.  So, we have filed these two motions,

5  and we would like to get them tee'd up in the ordinary course

6  to be heard, so that we can, again, continue to try to narrow

7  the universe of claims that Your Honor is facing.

8          THE COURT:  Okay.  The New York buildings are also --

9  are against Prudential?

10         MR. BERNICK:  No.  No.  The New York buildings, I

11  think Mr. Speights represents most of them.  They are other

12  building owners.  The reason that we singled out New York, and

13  there may also be some with -- we may be able to do the same

14  thing with respect to Canada, is that we wanted to focus on the

15  summary judgment motions that we didn't think required any

16  discovery on any kind of theory, because New York works with

17  installation as the trigger.  You don't have to worry about

18  discovery.  You don't have to worry about contamination.  You

19  don't have to worry about anything.

20         Now, if we're wrong on that, and the statute is not

21  triggered by installation, that's also something that can be

22  pointed out, and under Rule 56 there's a provision that

23  specifically says that it's premature to move for summary

24  judgment because discovery is important and material to the

25  disposition of the motion.  So, that's something that can

1 certainly be said, in which case we can go do the discovery an

2 then come back.  But these are two motions that we believe can

3 be taken up at this point in time.

4          THE COURT:  All right.  Good afternoon.

5          MS. POLLECK:  Good afternoon, Your Honor.  Laurie

6 Schenker Polleck from Jaspan, Schlesinger, Hoffman, for

7 Prudential.  Prudential objects to the debtors' counsel

8 requesting a briefing and scheduling order that would deviate

9 from Your Honor's amended order dated October 13th, 2006.  The

10 two claims that the debtors' counsel mentioned are currently on

11 appeal, and we feel that those -- it would be wise to wait

12 until the U.S. District Court decided on appeal for Your Honor

13 to hear the remaining claims.  In addition, we object to the

14 late notice from counsel regarding requests for a briefing and

15 hearing schedule.  I'm not in a position now to honestly say on

16 the record whether we need discovery or not, because debtors'

17 counsel basically e-mailed my co-counsel on Friday evening,

18 November 17th, after business hours, at 5:42, saying he was

19 going to file this claim.  And I don't believe that the claims

20 against our client were filed until, like, 9:15 in the evening

21 on Friday.

22          THE COURT:  I'm sorry.  You're saying claims?

23          MS. POLLECK:  Oh.  The -- in other words, the motion

24 that he wants to expunge six Prudential claims.  That wasn't

25 filed until 9:15 on the evening, on Friday evening.  So, and it

1  never made the agenda.  It's not on the agenda for today.  And

2  my co-counsel, who is doing the substantive work for the case,

3  wasn't able to appear telephonically because there was no time

4  to appear telephonically.  And he -- there was nothing on the

5  agenda regarding Prudential today.

6          THE COURT:  Okay.

7          MS. POLLECK:  And, finally, my co-counsel would be

8  happy to agree to scheduling with the debtors' counsel, you

9  know, if that would be good with the Court.  Or, if the Court

10 has to schedule it today, we'd like to have it scheduled

11 according to the, you know, administrative order of October 13.

12         THE COURT:  Well, what's the status of the appeal?

13         MS. POLLECK:  The status of the appeal right now, I

14 guess, is just pending.  I mean --

15         THE COURT:  Well, is briefing finished?  The reason

16 I'm asking is because in the event that the appeal is still

17 active, it may be better to get this issue decided now and have

18 it joined with that issue on appeal so that you don't have some

19 later issue, if, in fact, my prior order can apply to these six

20 buildings.  I don't know that.  I haven't seen any pleadings

21 yet so I don't know, and I'm not presuming that you can.  But

22 if that were to be the ruling, I would think you'd want to sort

23 of consolidate all that and get -- you might want to

24 consolidate it anyway, because it may be an inconsistent ruling

25 that might help you on appeal.  I don't know.

1          MS. POLLECK:  Right.  Well, I don't believe any

2    briefing has been done, and -- at this point.  But, I mean, we

3    do object to the fact that the -- or, my co-counsel, who is

4    working on the case, isn't able to speak today.

5          THE COURT:  Well, that's fine.  And that's a fair

6    objection.  I think if you can work out a scheduling order with

7    the debtor, that's fine.  I'm happy to have you work out that

8    order and submit it.  I think it would come up for a status

9    conference in December anyway, so if you can submit a

10   scheduling order before then, I don't think I need another

11   status conference.  I just need to know when you're going to

12   file what, and whether you need an argument.  I don't know.

13   Maybe Prudential will agree that the same order applies at the

14   same buildings, and you can just take it all on appeal.  I

15   don't know.  I think you need an opportunity to talk to your

16   client and find out.

17         MS. POLLECK:  All right.  Thank you, Your Honor.

18         THE COURT:  All right.  So, I'll do an order, a

19   scheduling order, when I get a certification of counsel from

20   you with respect to that, from the debtor.

21         MS. POLLECK:  Thank you, Your Honor.

22         MR. BERNICK:  I think that leaves us with a personal

23   injury, and that's just up for a status report, but I think

24   that there probably are a couple things to talk about here.  We

25   do have copies of these.  Our -- we'll deal with these three.

1                    (Pause)

2              MR. BERNICK:  There's a lot of work that's being done

3    -- let me get a copy for Your Honor.  On the settled claims,

4    there were approximately 37,000 proof of claims filed.

5    Remember, Your Honor set a bar date for the settled claims that

6    was separate from the non-settled claims, so that people would

7    file a separate proof of claim indicating whether they believed

8    their claim had been settled or not.  And then under the

9    procedure they were also supposed to attach documents that

10   related to or reflected the settlement, and we then, within a

11   certain period of time, had to express a view about whether

12   that corresponded -- that is, those claims of settlement

13   corresponded with our own records and then let folks know.  So,

14   that process has now pretty much gone to the point where we've

15   told people which claims we don't -- claims of settlement we

16   think are not well founded.

17             If you take the 37,000 claims, there are

18   approximately 10,000 claims that we agree have been -- are

19   subject to a settlement agreement.  Those are the ones from the

20   environmental law group.  And with respect to those, there's an

21   -- there are some questions relating to the payment of those

22   claims.  But we would not dispute that there is an agreement to

23   settle those claims.

24             With respect to approximately 11,000, ten, 11,000

25   claims, we have received releases.  We don't know whether they

1  correspond to the releases that we have in our files.   But at

2  least we've received the releases.   There are some other issues

3  there, but that kind of gives you a rough order of magnitude.

4        Then we have approximately 15,600 claims where we

5  have not received any release, and where we don't believe the

6  claim has been settled.   So, this is a -- these are claims with

7  respect to which they have not provided releases, and with

8  respect to which we don't believe that they are settled claims.

9  You can see that a lot of them are in the hands of a relatively

10 small number of firms.   So, we're in correspondence with the

11 different firms that are involved to see if we can't reach some

12 kind of agreement.   Otherwise, these would be the matters that

13 Your Honor would be taking up on the 18th of December.   But you

14 can now kind of see where the swing is, and it's not good, but

15 you know, it could be worse.   And we think that the issues

16 there are going to be relatively straightforward in terms of

17 what Your Honor actually has to decide.

18        THE COURT:  Which will be what?

19        MR. BERNICK:  Which will be is there, in fact, a

20 settlement if we don't have a release from the claimant.

21 Again, what -- the same issue was handled -- or was raised in

22 the Babcock case before Judge Brown.   There was fairly

23 extensive briefing on these matters.   And the essence of the

24 line that Judge Brown drew in the Babcock case is that for

25 there to be a settlement there has to be a mutuality of

1 obligation.  That is, both the company and the claimant have to

2 have reached an agreement both with respect to the fact that

3 the claim is being settled, and the amount of the settlement.

4 Well, until you have a release that's back, there is -- the

5 claimant is not obliged to proceed, and therefore the absence

6 of a release becomes a pretty simple litmus test as to whether

7 there is mutuality of obligation, or whether there's a

8 settlement.  And that's the approach that was adopted in that

9 case.  We would suggest the same is appropriate here.  There

10 are many of these claims where there's not even something that

11 purports to be a written agreement of settlement.  So, we --

12 these are just matters that I think will have to be tee'd up as

13 we go forward.

14        This is -- not necessarily one that kind of jumps out

15 to you as being understandable, but let me explain it a little

16 bit.  It's designed to kind of move from left to right.  We

17 have questionnaires timely filed as questionnaires that were

18 filed by the deadline, which was some time in July, I believe.

19 Approximately 60,000 questionnaires.  Now, those would not

20 include people whose claims are asserted to be settled.  So,

21 we'd put those on top.  We have settled proof of claims of

22 37,000.

23        The green box over to the right indicates that of

24 those 37,000, we believe that some portion will be found not to

25 be settled, in which case the folks who have submitted those

1 claims found not to be settled have to submit questionnaires,

2 or they're supposed to submit questionnaires.  So, in addition

3 to the 60,000, we have to deal with the question of when those

4 people whose claims are found not to be settled have to submit

5 questionnaires.  And I want to come back to that, but we think

6 the number should be about 15,000.  So, we may get another

7 15,000 questionnaires.

8        If you move -- with respect to the people who have

9 already filed questionnaires, that is, the 60,000, further to

10 the right we know that they also had to file proofs of claim.

11 Now, we received approximately 87,000 proofs of claim.  Those

12 proofs of claim are problematic in some ways.  We can't

13 determine exactly what the overlap is with the questionnaires

14 at this time.  We believe that there will be very substantial

15 overlap, but there clearly are some proofs of claim that were

16 submitted where there is no questionnaire.  One problem we have

17 is the Kelly & Ferraro firm, and will be probably filing a

18 motion.  They have submitted proofs of claim for approximately

19 37,000 claims.  And yet they are in our records as only having

20 lodged, as of the time Chapter 11 was filed less than 10,000

21 claims.  So, there is, you know, multiples of proofs of claim

22 being submitted in excess of what our records show was even

23 pending at the time.  We suspect that they really haven't

24 filtered through their claim inventory to see which of the

25 claims actually were pending at the time.  They just put them

1  all in, which is unhelpful and confusing.  So, the bar date

2  said only those people who had claims that were asserted

3  against the company.  Mr. Finch was very diligent in making

4  sure that that was clear, and so, the Kelly and Ferraro people

5  need to tell us which of those claims were actually pending at

6  the time the Chapter 11 was filed.

7           If we go further to the right from that, we then get

8  into the whole question of supplementation, and the motion

9  practice with respect to objections.  And where we've gone on

10  that with Mr. Esserman's cooperation and help, is we, following

11  the last conference, got together to agree a schedule for any

12  supplementation that's going to be necessary.  And the basic

13  idea was we agreed to extend the deadline set forth in Your

14  Honor's order for supplementation, which has passed a while

15  ago.  We agreed to extend that supplementation deadline to

16  January 12, provided that all the people who get the benefit of

17  that extension agree to litigate any and all objections they

18  have on the same time line that produces a resolution at the

19  December 5 hearing.  So, let me go back over that one more

20  time.  We had people -- we had an agreement -- we agreed to

21  give, I think, people -- what is it, 30 days of additional time

22  for supplementation, originally.  Yes.  So, that period of time

23  was out there.  At the same time there were these objections

24  that were pending, and I think everybody wanted to get the

25  objections resolved by Your Honor on December the 5th.  So,

1   what we developed was a plan whereby if people agreed to submit

2   any and all objections they had to Your Honor so they could be

3   adjudicated by December 5, we would automatically extend their

4   date for supplementation to January 12, and that deadline would

5   then apply to any supplementation that was necessary in light

6   of Your Honor's rulings.  So that by the time January 12 rolled

7   around, we would have, with respect to anybody who was going to

8   make a supplementation, any supplementation that was driven

9   either by their own purposes, or by Your Honor's rulings.

10          THE COURT:  Okay.

11          MR. BERNICK:  We've gotten approximately 35 firms,

12  and they're most of the major firms, to agree to that.  So,

13  we're on track to have the objections heard on December the

14  5th.  And Your Honor will see that those motions are filed.

15  They basically boil down to a certain number of objections,

16  attorney-client privilege, settlement discussions,

17  confidentiality.  There are a certain number of issues that are

18  frequent issues.  In any event, that's the kind of part that's

19  on track.  So, with respect to some of the people -- the 60,000

20  people who have timely filed the questionnaires, we will go

21  forward on December the 5th, have a hearing, and then any

22  supplementation will be done by January the 12th, which then

23  means, as to those people, we have got their submissions

24  complete by January 12, which then drives our schedule.

25          Where are the questions?  Well, question one is what

1   about people who are found, on January -- December the 18th,

2   not to have claims that are settled and therefore have to

3   submit a questionnaire?  And it would be our position, Your

4   Honor, that they should complete their questionnaires -- they

5   are already on notice now that they are at issue.  They should

6   complete those questionnaires when everybody else does, which

7   is January 12th.

8           With respect to the people who are past the deadline

9   for supplementation, and who have not agreed to resolving their

10  objections, you know, on the 5th of December, we have extended

11  to them the opportunity, and it's good all the way through

12  December the 5th, that they can opt into the same schedule as

13  everybody else has agreed to.  So, with respect to anybody

14  other than those who are represented by the 35 firms, the idea

15  would be that they can opt into the same schedule, get the

16  benefit of the same extension for supplementation, and then

17  abide by whatever rulings Your Honor makes and do so by January

18  the 12th.  If people do not opt into this schedule, then our

19  position would be, and we believe it's very important, because

20  otherwise we'll just have this dribble out, that they are not -

21  - that any supplementation they offer will not be considered in

22  connection with the estimation process, because at that point

23  it's just coming in way, way, way too late.  Again, this

24  estimation is not for the specific purpose of allowing or

25  disallowing an individual's claim on the merits.  That's not

1 the outcome that we're seeking in connection with this

2 estimation.

3        At the same time, in the sense by reason of that, it

4 is important that if the people get any information that's

5 going to be used in the estimation in on a timely basis.  So,

6 if people aren't complying with the schedule and they're going

7 to continue to litigate objections after the 5th, our position

8 would be that they're held to the original deadline that Your

9 Honor set for supplementation, and if they haven't met it, they

10 haven't met it.

11        So, I don't think we're really asking for Your Honor

12 to so state now.  We think that that's a simple consequence of

13 the orders that have been entered.  But we're going to be -- we

14 just want to be clear we're going to be taking that position,

15 so that we don't then have more people dribbling out, more

16 objections at some point in the future, and then saying, well,

17 they should be able to supplement.  It's just too late.

18        We also need, though, Your Honor, I believe the

19 current orders do not state the date by which people whose

20 claims are found not to be settled must submit their

21 questionnaires, and we would ask that that date now be

22 established for January the 12th, because it's the same date

23 that everybody else is meeting.  That, then -- and the reason

24 that becomes important is my final slide, and I --

25        THE COURT:  Well, may I ask a question before you get

1 off that point?    Can you go back a slide?    Okay.    So, the

2 15,000 claims that are the ones that you believe are unsettled

3 are represented primarily by the five or six law firms that are

4 up there, and those are the people you're currently dealing

5 with to find out why they think they're settled and the debtor

6 doesn't think they're settled?

7          MR. BERNICK:    And there's no release -- now, what

8 Your Honor --

9          THE COURT:    But they also have claims from people

10 that are in other pools?

11          MR. BERNICK:    Yes.    We have -- with respect to those

12 same firms, they have, indeed, thousands of claims that they

13 say are not settled, where they have submitted questionnaires,

14 or submitted proofs of claim.    So, this is --

15          THE COURT:    Okay.

16          MR. BERNICK:    This is only the ones from those firms

17 who say that their claims were settled through a proof of

18 claim.

19          THE COURT:    And you can't find any evidence, or

20 haven't, at this point, found some evidence that matches up in

21 the debtors' records?

22          MR. BERNICK:    Well, not only that, but they haven't

23 given us a release at all.

24          THE COURT:    Oh.    You don't have a release?

25          MR. BERNICK:    So, it's not even a question of

1  whether it matches.

2           THE COURT:  Okay.

3           MR. BERNICK:  They just don't have the documentation

4  that we believe is necessary to show a settlement.

5           THE COURT:  All right.  I think it may be appropriate

6  to send them all notice that, in fact, if it's determined that

7  their claims are not settled claims, that they will have to do

8  the supplemental submissions by January 12th.  But I think you

9  should send that notice now.

10          MR. BERNICK:  That was the reason for raising it

11 today.

12          THE COURT:  All right.

13          MR. BERNICK:  Then, on the time line, and know that

14 Mr. Finch is going to have a comment --

15                    (Pause)

16          MR. BERNICK:  But where we are, essentially, is --

17 and I know this is probably a little bit difficult to read, we

18 have the extension for supplementation that's indicated here

19 that goes through the middle of January.  And written over that

20 is where we are in connection with the different due dates for

21 the expert reports that are -- I take that back.  What we have

22 are due dates set forth in the case management orders for

23 various pre-trial submissions.  So, you can one of the first

24 ones is estimation expert reports due.  This is the first due

25 date, is December 1 under the current order.  Supplemental non-

1  estimation expert reports are due on the -- whatever this is --

2  the 21st of December.  And then supplemental estimation reports

3  are due on the -- some time in February -- February 1st.  So,

4  those are the current due dates.  Now, you can see that

5  overlaid on that tan bar shows an extension for

6  supplementation.  And what that means, really, is designed to

7  show is that now that the supplementation has been extended,

8  first it was agreed to to begin with, and now it's been

9  extended to January, it's not going to be possible to have

10 information from the supplementation, much less a database,

11 probably until some time in mid February.  So, you see the PIQ

12 database completed is in February, so that effectively when it

13 comes to any matters that will require knowing what the

14 questionnaires say, we're not going to know those -- we're not

15 going to have that information until mid February.  I'm sorry.

16 We're not going to have it until March.

17        So, there's a disconnect between the old schedule

18 dates for an expert report on the one hand, and the new dates

19 now that we have -- for the questionnaires and the analysis of

20 the questionnaires on the other.  And we can all talk about who

21 is responsible for that, and the like, but there's no real

22 point to it.  I think that people are working hard to get this

23 stuff done.  It's just not feasible to accomplish it.

24        So, we're proposing -- we're not proposing to change

25 the trial date.  We know that that's the light at the end of

1  the tunnel.  What we are proposing is to basically maintain

2  where we're at with the supplemental deadline in January.  We

3  would then have the PIQ database completed in March.  And then,

4  in the middle of March, we would have the estimation reports

5  due, and supplemental non-estimation reports due.  Then, later

6  on in April we will have the supplemental estimation expert

7  reports due, and then continue on from that point.

8          What's the essence of this?  We have made a

9  distinction between experts who are estimation experts and

10  experts who are non-estimation experts.  Everybody recognizes

11  that the estimation expert work is on a slower track because it

12  is almost completely driven by the data from the

13  questionnaires.  But it is also true that with respect to the

14  non-estimation experts we need information from the

15  questionnaires.  For example, non-estimation experts will talk

16  about what the exposure conditions were for different trades.

17  To know what trades are really going to be mostly at issue we

18  need the data from the questionnaires.  So, for the non-

19  estimation experts to have to deliver a final, final

20  supplement, before we have the personal injury questionnaire

21  database is just fundamentally not doable.  We can't do that.

22  So, we're seeking to move the date for supplementing the non-

23  estimation expert reports until after the database is

24  completed.  And again, this is not something that is our fault,

25  or responsibility.  It's just the way that things have worked

1  out with the extension of time for people to supplement.

2  Likewise, with the estimation reports, there's no point in

3  having an estimation report where you don't even have the data.

4  So, there's no point in turning out the report to begin with.

5  Now, it may be that their expert doesn't feel that he needs the

6  data.  That's great.  If they want to submit their expert

7  report earlier on, that's fine.  We think we probably already

8  know pretty much what it's going to say anyhow.  But from our

9  point of view and this estimation, we depend upon this

10  questionnaire data.  So, our estimation experts are going to

11  need this data.  So, our schedule basically calls for shifting

12  back the due dates for supplementing the non-expert reports and

13  for the estimation reports, both original and supplemental, in

14  accordance with this schedule.

15          So, that's pretty much where we're at.  I mean, the

16  good news is that a lot of progress is being made in gathering

17  the data, and moving through the issues.  You know, God

18  willing, in January we will have all of the questionnaires

19  done.  We'll have those issues resolved.  We will have resolved

20  the issue of settled claims for purposes of the submission of

21  any additional questionnaires, and we'll be in a position then

22  to complete the database.  And all that's then left is for the

23  experts to slice and dice that data and be able to move forward

24  towards the trial that we have in June.

25          THE COURT:  Okay.  Is there some objection to this

1 new time line?

2          MR. MULLADY:   Yes, Your Honor.

3          THE COURT:  Okay.

4          MR.  MULLADY:  May I be heard?

5          THE COURT:  Yes.  Please.

6          MR. MULLADY:  Good afternoon, Your Honor.  Ray

7 Mullady for the future claimants' representative.  We do have

8 an objection to the proposed extension, and particularly,

9 insofar as the position of the futures' representative is

10 concerned.  Your Honor, the absence of complete questionnaire

11 responses is no reason to extend the production of the

12 estimation expert reports for Grace, particularly in light of

13 the fact that whatever the questionnaires may tell us, they are

14 not -- they are not telling you anything about how many claims

15 would have been filed between the petition date and today, nor

16 are these questionnaire responses going to tell us anything

17 about what -- how many asbestos claims are going to be filed in

18 the future against Grace.  So, insofar as Grace's ability to

19 estimate its -- the number of future claims, and the estimate

20 of its liability for such claims, there is no reason why they

21 can't tell us what now.  We're entitled to know it now.  This

22 is the schedule we've agreed to.  And again, the questionnaire

23 process, however it may relate to the existing claims, has

24 nothing to do with future claims.  It's not dependent on the

25 result of a questionnaire process.

1          Now, why do we need to know this?  Well, we need to

2    know now what Grace's methodology is.  We have received Grace's

3    non-estimation expert reports.  There are a passel of them.

4    They run the gamut from scientific reports, to actuarial

5    studies, and down the line.  Somehow this is going to be

6    connected up, we assume, to the estimation report that is due

7    on December the 1st.  We'd like to know how they link up,

8    because we have to file a rebuttal to those non-estimation

9    expert reports.  We have to begin to work with our experts to

10   see what rebuttal, if any, is needed.  We can't tell, on the

11   basis of what's in those reports now, the non-estimation

12   reports, whether rebuttal is going to be necessary, and if so,

13   the direction in which those rebuttal reports need to be

14   pointed.

15         So, we submit that irrespective of this questionnaire

16   process, which we regard as completely beside the point for

17   purposes of estimating future claims, we are entitled to know

18   now what the methodology is, how this is all going to connect

19   up, because it's important -- it's an important driver for us

20   in taking our discovery of Grace and ascertaining how Grace

21   believes, or how historically it has valued its -- the number

22   and exposure for its asbestos liability, and where they're

23   going with this whole process.  It's not something that can

24   wait until March.

25         The other practical effect of this proposed time line

1   is what it jams into that band in red on Mr. Bernick's chart at

2   the back end, where he has estimation expert depositions.

3   Well, that's not the only thing that's going to be happening in

4   that time period.  If one looks at the schedule, we have, after

5   -- and I'm just glancing at it here, after April 2nd, when we

6   have the fact and expert discovery deadline on the current

7   schedule, we have briefing on motions in limine, <u>Daubert</u>

8   motions, there's likely to be a <u>Daubert</u> motion filed on the

9   methodology that Grace is using in this case, summary judgment

10  motions.  All of that is to be done by May the 4th.  And then

11  there are exchanges of exhibits, and objections to exhibits,

12  and designations and things of that nature.  I would submit,

13  Your Honor, that the whole purpose of this is to take that last

14  point on the chart, the trial date, and move that to the right,

15  as well.  That's where this is going, make no mistake about

16  that, because it just can't be done on the basis of this

17  schedule.  We would not have an objection to moving some of

18  these dates after receipt of the estimation report on December

19  the 1st.  We understand that there may be a need to supplement

20  their report on the basis of what the PIQ results show, not

21  that we think that's relevant to us, but it may be relevant to

22  the estimation of the current claims.  That's fine.  They can

23  supplement.  We -- Mr. Finch can speak to what we would propose

24  in the way of extending some of those dates.  In the event the

25  Court agrees with us that the report should be delivered on

1  December the 1st, but that a supplement can be done.  We think

2  there's a way to work this through that won't back load

3  everything to the last 60 days before trial, and which won't

4  deprive us from understanding Grace's methodology in preparing

5  our case until March of 2007.

6         THE COURT:  Mr. Finch?

7         MR. FINCH:  There's also another scheduling issue

8  which Mr. -- I believe Mr. Mullady will argue relating to the

9  timing for tee'ing up some additional motions to compel, or

10  requiring Grace to file a motion for a protective order on

11  discovery that we had served on Grace.  But basically, my

12  proposal would be keep -- may I walk over to the chart?  I'll

13  just refer to the chart.  Keep the December 1st date for the

14  estimation experts, and then have the ability to supplement --

15  Grace says it needs to supplement that based on questionnaire

16  data for the current claimants.  Have the supplemental reports

17  due on March the 2nd, and then have the second supplemental

18  reports due on April the 2nd, and then extend the trial -- I

19  mean, extend the discovery cut off with enough time so you can

20  finish the estimation expert depositions by the middle of May,

21  so we could have an orderly process leading up to the trial.

22         In other words, keep the -- require Grace to file a

23  report on December 1st that says this is what our methodology

24  will be.  This is what our estimate -- this is how we will use

25  this information to estimate the liability.   And then the

1  experts that, you know, Grace has identified, and the
2  commercial creditors have identified, and the equity committee
3  have identified, all of these people have projected future
4  liabilities before, and we don't think there's any reason they
5  can't tell us how they're going to use this methodology now,
6  even if we don't have the complete data.  And like Mr. Mullady
7  said, there's nothing in the questionnaire process that will
8  tell you how many claims Grace would have had filed against it
9  in the year 2005, for example.  And it just doesn't -- and it
10 didn't ask the plaintiff lawyers how many claims are you going
11 to file against us in the year 2005.  And so, what I would
12 submit is that they've got to file a report on December the
13 1st, and then, you know, if they need to supplement it because
14 they get additional data from the questionnaire process, I'm
15 not sure what additional information that the -- the database
16 will contain, but, you know, say they do, they would have until
17 -- instead of March the 15th on Mr. Bernick's chart, I would
18 suggest March the 2nd with a supplemental response to that due
19 on April the 2nd, which, that extra 15 days, I think, gives us
20 a little bit more breathing room to get this done.
21      There's also the issue, I think, that we will have to
22 have discussions with Grace, and then that maybe at some point
23 bring to Your Honor's attention, there is some level of
24 cumulativeness of expert testimony.  There are a multitude of
25 experts on various topics.  You know, I think, you know, a rule

1    like two experts per topic per side, or something, might be

2    something useful to put into place.  But that's part of the

3    reason why Mr. Mullady and I have this great fear of pushing

4    everything off so close to the trial date.  I mean, just as a

5    matter of practicalities and scheduling expert depositions, and

6    trying to get things done, I mean, Grace has got 18 expert

7    witnesses.  I have seven.  The futures rep has a couple of

8    expert witnesses.  When you add all of that up, trying to do 25

9    expert depositions in the month before trial, I don't -- not so

10   much that the lawyers can't do it, but just in terms of

11   people's schedules, expert schedules, I just -- I would submit

12   that it's unlikely to happen.

13           Before we turn to the issue of the -- of setting a

14   schedule for additional briefs on our discovery, there are two

15   issues I wanted to take up.  One on the settled claims issue

16   that Mr. Bernick raised.  Obviously the claimants themselves

17   will be heard.  I will just caution the Court there are ways to

18   settle a lawsuit in addition to submitting a release.  It

19   depends on the facts and circumstances of each case.  One way

20   to settle a case is to accept money, for example, for your

21   claim.  I have been told that there are people who say they

22   have settled claims with Grace where they had an agreement that

23   Grace would pay them money over, you know, three years, and

24   that Grace made the first payment, and the second payments

25   hadn't been paid yet.  Grace's records don't show any kind of a

1  settlement, yet the people have already received a check, and

2  partially, you know, cashed in their claim, so to speak.

3  That's a settled claim in almost any jurisdiction I'm aware of.

4          THE COURT:  Grace made a payment without a release?

5          MR. BERNICK:  I think these are the ELG, the

6  environmental law --

7          MR. FINCH:  No.  They're claimants beyond the ELG who

8  are in that same circumstance.

9          THE COURT:  Okay.

10          MR. FINCH:  That's -- I just caution the Court that

11  that is an issue that will come up on December the 18th.

12          THE COURT:  Okay.  That's fine.  If they have some

13  proof that they settled, then they do.

14          MR. FINCH:  The second issue before turning to the

15  motions practice that I would like Mr. Mullady to address,

16  relates to the December the 5th hearing.  There are two sets of

17  motions to compel on schedule for hearing that date.  One is

18  Grace's motions to compel against 35 different law firms.  The

19  other is the motion to compel filed by the asbestos claimants'

20  committee joined in by the future claimants' representative

21  that is also scheduled to be heard on December the 5th.  And as

22  a matter of scheduling, we would like to request that the ACC

23  and FCR motion be heard first on the morning of the 5th so that

24  Mr. Mullady, among others, doesn't have to sit there and listen

25  to 28 or 35 motions to compel involving individual law firms.

1 That's the -- and --

2         THE COURT:   What's the basis for your motion?   I

3 haven't seen these yet, either.

4         MR. FINCH:   We filed ours on November the 7th.   This

5 is what we discussed at the last hearing, Your Honor,

6 concerning whether Grace has waived the attorney-client

7 privilege concerning the reasons why it settled asbestos

8 personal injury claims.   Their response is due, I think,

9 tomorrow -- no, Wednesday.   Our reply brief will be due on --

10 maybe yours is due Monday -- Wednesday.   I think it's

11 Wednesday.   Our reply brief will be due December the 1st.

12 We'll put all that in a binder to you so you'll get it on

13 Friday, the 1st.   What you had allowed us to brief it and argue

14 it along that schedule, and what I request is that we hear that

15 first on the morning of the 5th, so that Mr. Mullady, and if

16 Mr. Lockwood argues it for my firm, he can leave and the debtor

17 can then tee up the motions to compel for the other 15 firms.

18         THE COURT:   Well, maybe Mr. Mullady -- I don't know

19 about Mr. Lockwood, that could take the rest of the day --

20 you'll have to put some time restrictions in place.

21         MR. BERNICK:   Well, all I would say on that, and I

22 think that is pretty easy to resolve, we have no issue about

23 who goes first, but we do have an issue that both get completed

24 on that date.   That was the deal.   So, if they want to do an

25 allocation of time such that they -- both matters get done that

1  day, we don't have a problem with that.  But if they simply

2  want to start out with what is best for them, or more

3  interesting for them, I'll say, then we have 25 different law

4  firms standing up, but we only get through two law firms

5  because the basic strategy is not to get through all of them.

6  That is a huge consequence on this scheduling.

7        MR. FINCH:  No.  No.  That's not the intent at all.

8  With all due respect, Mr. Bernick, that's not the intent at

9  all.  I mean, I think we can argue my motion to compel, you

10 know, in an hour, an hour-and-a-half.  And then the rest of the

11 day could be for the --

12        MR. BERNICK:  I think as long as -- as long as in the

13 rest of the day we have an agreement that it all gets done, and

14 whoever is going to talk gets have the time of the rest of the

15 day, and then we get the other half.  I mean, there has to be

16 an allocation of time, otherwise I think what's going to happen

17 is we're going to have a lot of different law firms standing up

18 and making a lot of different arguments that are largely

19 duplicative --

20        THE COURT:  Well --

21        MR. BERNICK:  -- and we won't get done.

22        THE COURT:  -- I think the law firms are going to

23 have to designate who is going to make the arguments that are

24 duplicative.  I mean, if there are certain particular facts

25 that will vary, maybe  I need to have the specific facts

1  articulated.  But to the extent that the issues are going to be

2  identical, that division of responsibility is going to have to

3  be made.  I'm not going to hear duplicative arguments.  When I

4  hear it once I expect that if it applies to some other set of

5  requests for production or --

6        MR. FINCH:  Well, Your Honor, I guess one question I

7  have is does Your Honor have from nine until five that day to

8  resolve the --

9        THE COURT:  If I could get into my calendar, I could

10  tell you that; but I believe that when I set this hearing I had

11  the whole day, but I'm not -- Mr. O'Neill, do you know?

12        MR. O'NEILL:  Just for a point of clarification,

13  originally we had scheduled for one o'clock on December 5th,

14  and we received word from your chambers that that wasn't going

15  to work.  So, the hearing has been changed to nine a.m. on

16  December 5th, when we will start.  And the word that I got from

17  your chambers was we have from nine until 11:30, and then we

18  can come back at two.

19        THE COURT:  Oh.

20        MR. O'NEILL:  You had something in the middle of the

21  day.

22        THE COURT:  Okay.  That's a Board of Judges meeting

23  that I am supposed to participate in.  As of now I haven't

24  received an agenda for that meeting, so it's possible that

25  there won't be a meeting.  If there is a meeting I'm going to

1 have to take at least a small recess to go find out what the

2 issues are and what my colleagues are saying about them.  But I

3 doubt very much that it will take that much time.

4        MR. FINCH:  Your Honor, I think we could finish with

5 the ACC/FCR motion to compel, if we start right at nine, by

6 10:15.  And if -- you know, and then --

7        THE COURT:  Do you want to start at 8:30?

8        MR. BERNICK:  I have no -- I can start at 8:30.  We

9 have no problem with order, but we are very concerned about

10 getting it done.  And so, what I would suggest is that if you

11 have a preference on -- if counsels have preference on time,

12 the allocation of time, that -- just talk to the other folks

13 that are going to be arguing in response to our motion to

14 compel, and get an agreement about how much total time the

15 claimants or their counsel are going to take, and then we will

16 use no more than the same amount of time, and we'll get done.

17        THE COURT:  Well, I think I'll make it easy, rather

18 than expecting agreement.  I'll just give you an order.  I

19 think in this case the Court can control the schedule, and it

20 would make more sense if I just do it.  So, let's start at 8:30

21 rather than at nine o'clock.  You'll have the first hour.

22 Okay?  The first hour will be on the FCR/ACC's motion.  That's

23 it.  You can divide it up however you choose.  And I include in

24 that the debtors' response  You get a half an hour, the debtor

25 gets a half an hour.

1          MR. FINCH:  So, if we take 28 minutes, and he gets 30

2  minutes, we get two minutes in reply, and we stop?

3          THE COURT:  That's fine.  That's it.

4          MR. FINCH:  Okay.

5          THE COURT:  And you're done in an hour.

6          MR. FINCH:  I'll bring a chess clock, Your Honor.

7          THE COURT:  All right.  And then, well, we can go

8  into Judge McCullough's room and use his little lights, the

9  circuit lights.  We'll --

10          MR. FINCH:  Well, the case I tried in Armstrong, the

11  Judge literally had a stop watch on us, for the witness exams

12  --

13          THE COURT:  An hour glass.  I'll turn my hour glass

14  upside down.  Okay.

15          MR. FINCH:  And gave each side ten minutes for their

16  opening.

17          THE COURT:  And then I think what will happen is it's

18  the -- I'm not sure who is going to be the moving party next,

19  the debtor?

20          MR. BERNICK:  We -- it's our motion to compel.

21          THE COURT:  Okay.  So, do you want to divide it up by

22  issue?  Or do you want to divide it up by firm?

23          MR. BERNICK:  It doesn't make any difference to us,

24  as long as we get it all done.  I think that it probably makes

25  sense to divide it up by issue, but -- and there are

1 approximately five issues.  But I -- it's very difficult to

2 foresee what other folks are going to want to use their time

3 arguing about.

4          MR. FINCH:  I have no way of knowing that right --

5 standing here, Your Honor.  I mean, Mr. Esserman might have a

6 better view of that, if he's on the telephone, but, I mean,

7 counsel for the committee is not really going to be arguing as

8 much as observing all of this.

9          THE COURT:  Mr. Esserman, are you on the line?  I

10 think we may have lost him.  Is the -- is anybody on -- just on

11 listen only?  If so, can the operator unmute them, please?

12          MR. ESSERMAN:  Your Honor?

13          THE COURT:  Yes, sir.

14          MR. ESSERMAN:  This is Sandy Esserman.  I was on -- I

15 think that we can get it all done within a reasonable time

16 frame.  I'm unsure how many firms are going to want to argue

17 their own motion, but I strongly suspect that Ms. Ramsey and

18 myself will carry the vast burden of the argument, and to the

19 extent other firms are going to be there, I suspect it's going

20 to be more either filler, or their particular circumstances

21 which differ from the situations that Ms. Ramsey and I are --

22 our firms are going to take, the positions that our firms are

23 going to take.  So, I'm sort of confident that we can do it in

24 a reasonable amount of time, and I don't think we're going to

25 get 25 different law firms getting up there and arguing.  I

1  really think it's -- the burden is mostly going to fall on me

2  and Ms. Ramsey.

3        MR. BERNICK:  That's fine.  Maybe Mr. Esserman is in

4  a better position to be able to find out from others.  But

5  again, maybe, Sandy, if you can give us a call, we just want to

6  make -- we want to have a schedule that gets it done before the

7  end of the day so that the Court can give us the guidance that

8  we need in order to get the questionnaires completed by --

9        MR. ESSERMAN:  I don't see that as a problem,

10  especially if the other issues are going to be done by, say, 11

11  o'clock -- well, 8:30 to 9:30, say 10:00.  I suspect we'll get

12  done relatively -- either by lunch, or early afternoon.

13        THE COURT:  Did you hear Mr. Esserman?

14        MR. BERNICK:  Yes.

15        THE COURT:  He thinks you're going to be finished by

16  lunch or early afternoon.

17        MR. BERNICK:  Yes, I did.  I think that I -- I'm

18  encouraged by that, and I would suggest that if there's

19  anything further that we can do, Sandy, to talk about it in

20  advance, that's fine.  On the basis of that representation, we

21  don't have a problem with the first issue on their motion going

22  first.  So --

23        THE COURT:  All right.  Well --

24        MR. BERNICK:  -- but that has to be the objective.

25        THE COURT:  -- whether we're done at noon, or not,

1  we're going to stay until we're done, so -- you know, folks, I

2  -- this case has a way of taking a lot longer to do anything

3  than I think it will, so be prepared.

4           MR. ESSERMAN:  And those are the only things set on

5  that day, Your Honor?  Just the motions to compel and the

6  motions of the FCR and the committee?

7           THE COURT:  Yes.  That's the only things scheduled,

8  except for my Board of Judges meeting -- oh, wait.  Now I'm

9  being flagged.

10          MR. BERNICK:  And the x-rays.

11          THE COURT:  X-rays.

12          MR. BERNICK:  The x-ray protocol, we had circulated a

13  protocol on the x-rays, and that would have to be taken up at

14  the same time.

15          THE COURT:  You want to do that second?

16          MR. BERNICK:  We can do that second.  That, I think,

17  will -- it's a pretty distinct subject.

18          MR. ESSERMAN:  We just got that motion, Your Honor,

19  on the x-ray protocol, and we will endeavor to be ready on the

20  5th.  We're hopeful of filing a response on the 1st.  It is

21  being treated as an expedited matter, although no motion for

22  expedited matter was filed.

23          THE COURT:  I think I indicated earlier that we would

24  do it that day, Mr. Esserman.

25          MR. ESSERMAN:  Yes.  And I told Mr. Bernick that we

1 would seek to have that addressed on the 5th, also, so -- I

2 think that that's going to be a lot shorter than the other, but

3 I would probably allocate an hour to that, anyway.

4        THE COURT:  Okay.  I think you folks ought to talk

5 about this x-ray protocol.  I have some -- you know, generally,

6 when you actually speak to each other you can resolve this kind

7 of thing.  And I think -- I've indicated on the record I want

8 to try to protect the privacy of the individuals and the

9 integrity of the documents, but nonetheless the debtor does

10 need them.  I think within that broad parameter you folks will

11 probably be able to work something out.  So, we will put it

12 second on the hearing calendar for that day, but Mr. Bernick

13 and Mr. Esserman, I think you folks really should speak about

14 this issue.

15        MR. ESSERMAN:  And I don't think there's any basic

16 disagreement that Grace needs access to the x-rays, and Grace

17 should get access to the x-rays.  Grace should get access to

18 the originals of the x-rays to the extent they need them.  I

19 think the devil is sort of in the details, but the broad

20 strokes of the request, I think ultimately the firms will not

21 have a problem with, and don't have a problem with.  It's just

22 some of the details on the custody of the x-rays, things like

23 that.

24        THE COURT:  Okay.  All right.  So then, we'll divide

25 the rest of the time up 50-50, however that turns out to be,

1  but again, I can't tell you specifically.  I don't know whether

2  I will have a Judge's meeting, and if so, how long it will be.

3  In most instances it doesn't last more than about an hour, so

4  --

5          MR. FINCH:  And then, finally, Your Honor, there is

6  the issue that we'd like to get a schedule for having this

7  briefed and argued by the January omnibus hearing.  It's my

8  understanding that something argued -- argued in January, we'd

9  have to file it by the middle of December, and Mr. Mullady

10 would address the particular issue we want to tee up to Your

11 Honor and propose a schedule that relates to that.

12         THE COURT:  Well, on what issue?

13         MR. FINCH:  On issues relating to some additional

14 discovery that we have put forward that Grace has objected to,

15 or, in the case of 30(b)(6) notice, refused to provide

16 witnesses on.  We would like to tee that up for Your Honor's

17 consideration, so that you can hear it in the ordinary course

18 on the January 18th -- or January omnibus.

19         MR. BERNICK:  Maybe I can save time, and mindful of

20 the train schedule here, Your Honor, Your Honor's schedule, I

21 think I know what the issue is -- there's been -- extensive

22 discussion about a 30(b)(6) deposition notice on a variety of

23 subjects.  It's my understanding that agreement has been

24 reached, although I have not been involved directly in these

25 discussions on a number of areas, but apparently there's a

1  concern with one or more areas.  I don't know what -- exactly

2  what they're on.  If they're not content with where we stand,

3  they can go file a motion, and we will agree that it can be

4  heard in January.  I don't know that there's really -- what I

5  would like to try to do is rather than lose the skein of where

6  we were, to at least tie this down, and then if Mr. Mullady

7  wants to talk about scheduling something else, we can do that.

8  But --

9         THE COURT:  Well, there is a schedule for how you

10  need to get motions filed before me for January, so --

11         MR. FINCH:  Well, the issue, Your Honor, is not --

12  two of the motions we would like to tee up would be our

13  motions, but one is -- I think Grace has to file a protective

14  order -- a motion for protective order if it doesn't want to

15  produce a witness, and Mr. Mullady can speak to that.

16         MR. BERNICK:  Well, with due respect, Your Honor, we

17  -- is it all right if we just finish this, and then we can take

18  that up, and then we'll talk about whether we are told -- the

19  protective orders weren't necessarily the best idea.  So, but

20  we're prepared to do whatever is necessary to tee the issue up

21  for January, whether we have to file a motion, or you all have

22  to file a motion.  We're agreeable to having it heard in

23  January.  I don't know if that helps.

24         On the schedule, I think that there are really two

25  different issues that are being -- that are being kind of tied

1  together, and I don't think that they should be, Your Honor.

2  The first -- what we really heard from Mr. Finch is the

3  criticality of our submitting our first estimation report on

4  December 1, so as they put it, we need the methodology -- they

5  need the methodology that our experts follow in order to

6  predict the number of claims that will be filed in the future,

7  and they suggest that that issue is completely severable from

8  whatever it is that we want to do with the questionnaires.  We

9  don't -- our experts don't think that that's correct.  There is

10 no such thing as what claims would have been filed.  There will

11 never be the opportunity for people in the tort system to file

12 claims.  That's not what's going to happen.  So, we're making

13 projections of the future.  Our projections of the future are

14 very much driven, indeed, they are intimately tied with the

15 responses to the questionnaires.  Indeed, our whole approach

16 here is to tailor our methodology to the questionnaires.  Now,

17 it may be that their expert doesn't want to do that.  We also

18 know that in other cases our experts included have used models

19 that are some of the times similar to their models.  That's

20 mostly in the context of fraudulent conveyance actions which

21 have been driven by estimates that have been made in the past.

22       THE COURT:  But surely by now your experts know what

23 -- how they're going to approach this problem, even though they

24 may not know what the specifics are for producing an expert

25 report.

1          MR. BERNICK:  That's just -- I'm sorry, Your Honor.

2     This is the first case in which we're going to actually have

3     this data --

4          THE COURT:  But you have -- I mean, you have 60,000

5     of them now.

6          MR. BERNICK:  No, we don't have -- we -- no, we

7     don't.  We have 60,000 question -- this is --

8          THE COURT:  I thought you --

9          MR. BERNICK:  This is totally based -- the 60,000

10    questionnaires mostly are series of objections.  We have whole

11    -- Mr. -- we have whole firms that have supplied really nothing

12    but objections.  And they haven't withdrawn the objections.

13    So, we don't have anything that is remotely close to the data

14    on 60,000 questionnaires.  And they're being supplemented, and

15    they're being subject to motion practice, so even the broad

16    contours of what those questions are going to show will not be

17    known, won't even be knowable to us until January.  It's just a

18    fact.  And that's why we're involved in this situation.  And

19    our methodology is not an abstract methodology.  Sure we have

20    ideas on what we're going to be looking for in the

21    questionnaires, but they are saying they want the methodology

22    that we're going to follow in analyzing and then projecting

23    claims in the future.  Their expert assumes that that's all

24    indifferent to data in this case.  It's all driven by the

25    history of settlements.  Our approach is completely different.

1  So, yes, we have ideas about methodology, but we certainly

2  don't have anything that remotely resembles a fixed methodology

3  that we believe is going to actually be applicable in this

4  case.  More to the point, the original deal here calls for

5  sequencing, and this was very important.  When we negotiated

6  way back in 2005 what the schedule was going to be for the

7  estimation, and this was done with Mr. Finch and his firm, one

8  thing that everybody agreed on was that we were going to have

9  sequencing.  And the sequencing was going to make it possible

10 so that nobody was, in a sense, compromised by the absence of

11 data.  That sequencing has got to remain in place for us.  For

12 us to have to file reports before this data is even gathered,

13 much less analyzed, puts us at a fundamental disadvantage.  It

14 means that we submit a bunch of expert reports that will be

15 used inevitably for impeachment purposes, and improperly so.

16         THE COURT:  When did I schedule the Daubert hearings?

17         MR. BERNICK:  The Daubert hearings I think are at the

18 every end, but I'm not sure that I recall.

19         MR. MULLADY:  There is not a date set, Your Honor --

20         MR. BERNICK:  Okay.  Well, that -- at this pre-trial

21 conference I would have assumed that you had -- but it would be

22 towards the -- but the essence of my point, Your Honor, is

23 this.  Sequencing has to remain in place.  If they're getting

24 --

25         THE COURT:  Let me get to that, then.  When are --

1 you're saying the <u>Daubert</u> hearings were not scheduled?  When

2 are the motions due?

3          MR. MULLADY:  The paper is due May the 4th, and your

4 order provides replies shall be limited to five pages,

5 appearing on such motions will be at the Court's direction.

6          THE COURT:  When was the trial supposed to begin?

7          MR. BERNICK:  June the 16th.  Well, June the 13th is

8 here.  I don't know if that's right.

9          THE COURT:  June 13?

10          MR. BERNICK:  Yes.  I think that's right.

11          THE COURT:  All right.  Well, I have a suggestion.  I

12 think, based on what I'm hearing, that it's very likely that

13 there are going to be <u>Daubert</u> objections based on the fact

14 that, I guess, the experts have not used this type of process

15 in the past.  And that's what your basis for your objection is

16 going to be.  Why don't we schedule them for argument on that

17 June 13th date?  That will -- I don't know, push the schedule

18 back by how much, but I need time to hear those things anyway.

19 My contemplation was we would probably be doing that on the

20 first day of trial or so, anyhow, so perhaps what I can do is

21 just give you a couple of more days on the end of that schedule

22 to finish the trial, so that that may give you a little bit

23 more time to adjust the disclosure of the expert testimony,

24 knowing that trial won't start that week.  It will be probably

25 the next week, whenever I gave you dates.

1          MR. BERNICK:  And this will now -- Your Honor has

2     made the statement about, you know, whether it's been used

3     before.  Clearly, no one ever has had the questionnaire data

4     before, so the precise methodology is -- but we clearly, we're

5     talking about estimation principles --

6          THE COURT:  Well, I understand --

7          MR. BERNICK:  -- that are well established.

8          THE COURT:  But I was asking the -- opposing counsel

9     said they were contemplating filing the Daubert motions.  I

10    didn't know on what grounds.  From having your recitation, I'm

11    surmising that that may be one of the grounds.  I don't know

12    whether it's a legitimate ground or not, but if it is, I'm

13    going to need an argument.  So, I think it may make sense if we

14    just build into this process the argument on those motions, and

15    maybe that will give you an extra week or so to adjust the

16    schedule.

17         MR. BERNICK:  We will have Daubert motions, as well.

18    Your Honor heard them in connection with the C.E. case --

19         THE COURT:  Right.

20         MR. BERNICK:  -- on cross of whatever that guy's name

21    was, Timothy Wyant.

22         THE COURT:  But I understand what yours are likely to

23    be about.

24         MR. BERNICK:  Right.

25         THE COURT:  So, maybe that makes more sense, that we

1  can tee up the <u>Daubert</u> motions first, and then I can -- maybe

2  at the December -- is December 5th when we're together again

3  next?  Maybe December 5th I can give you adjusted dates for the

4  end period of the trial so that --

5          MR. BERNICK:  That's fine.

6          THE COURT:  -- maybe that would work.

7          MR. FINCH:  That still doesn't address the December

8  1st --

9          THE COURT:  I don't think, based on what the debtor

10  is telling me, that the December 1st date is going to do, but I

11  think all of these dates will have to be somewhat adjusted

12  because I do think the sequencing probably is important, and I

13  agree with you that you probably don't want to be taking 25

14  expert depositions in the last month if there's a way to avoid

15  it.  I'm not sure you need 25 experts, either.

16          MR. BERNICK:  I think that those are all fair points,

17  and we've done enough business across the isle in these cases,

18  I don't think it's going to be a problem to figure out how to

19  keep the discovery focused.  And I don't think that anybody is

20  arguing that somehow people should be jammed up and shouldn't

21  have an opportunity to prepare.  That's why, really, we're

22  suggesting to move back this date.  We would like to hold a

23  trial date really because we know that it's probably important

24  also for psychological reasons, but if there's some part of it

25  that has to slip some, you know the important thing is to get

1  it done right.

2       THE COURT:  Well, yes.  The problem is, from picking

3  this many days for trial, and I'm basically committing my life

4  to this case for three months.  And, you know, there is only so

5  long that I can do that.  I have other cases beside this one,

6  so it is an issue for me, as well.  And if we're going to do

7  this, I need to do it now in preparation for that trial period

8  then, so that I can make other adjustments to the schedule.

9  So, I will work on that, and come back with additional dates

10  for trial December 5th.  But I think you folks need to adjust

11  the schedule.  Having the debtors' expert reports -- I

12  apologize, my eyesight is not that good.  I think you said they

13  were -- the non-estimation supplements were going to be due

14  March 15.  I think you're going to have to move that forward a

15  bit in order to even accommodate the <u>Daubert</u> hearings on June

16  13th, if you're going to keep the sequencing.  So --

17       MR. BERNICK:  Well, we can talk about that.  I think

18  that the immediate reason for raising this is the imminence of

19  the December 1st date.

20       THE COURT:  Well, I don't see how you're going to

21  make the December 1st date, from what you're telling me.  I'm

22  not sure it's going to make much point to -- to do that.

23       MR. BERNICK:  So, maybe, in light of Your Honor's

24  guidance to us, maybe we can sit down and try to figure out a

25  schedule that works between now and the 5th, and if it doesn't,

1    it doesn't.  We'll be back here on the 5th.

2          THE COURT:  But you need -- I want adequate time for

3    what the other side need to do.  So, you know, it's not -- I

4    don't think it can be back loaded to the extent that this is,

5    it's too burdensome.

6          MR. BERNICK:  There's no -- we do not have an issue

7    with this, Your Honor.  We recognize that.

8          MR. FINCH:  Just briefly, Your Honor.  So, is it Your

9    Honor's ruling that the December 1st expert witness date is not

10   going to hold for the estimation experts?

11         THE COURT:  I don't see how it can hold for the --

12         MR. FINCH:  May I have one minute to try to change

13   Your Honor's mind?

14         THE COURT:  Sure.

15         MR. FINCH:  The issue that -- the experts that Grace

16   has identified are -- for their estimation experts are Thomas

17   Florence and Frederick Dunbar.  Both of those gentlemen

18   testified in the Armstrong case and the Owens-Corning case,

19   respectively.  To a methodology about projecting future claims.

20   The data about the present claims from the questionnaire

21   process may be different, but their basic methodology, I would

22   submit to Your Honor, is not dependent on the results of the

23   questionnaire process for predicting how many people are going

24   to get sick in the future, and of that percentage of people who

25   get sick who might file a claim against Grace.  And it seems to

1  me that they can tell us, at least put down on a piece of paper

2  how they're going to project that on December the 1st.

3        THE COURT:  The debtor just told me that they're

4  going to somehow or other craft a methodology based on the

5  responses to the questionnaires, and they won't have the

6  supplements until January.  Now, you can argue whether that's

7  an appropriate methodology, Mr. Finch, but I think I have tried

8  to make it clear I am going to let the debtor take its best

9  shot at proving its case its way, and I'm going to give

10 everybody else the same opportunity to prove the case your way.

11 So, I think we're going to be basically doing two trials that

12 aren't going to look much alike at the same time.  That's how

13 it seems to me that this is shaking down, but if that's how it

14 is, that's how it's going to be.

15       MR. FINCH:  I think that the trials may actually end

16 up looking somewhat similar.  But long story short, there's no

17 expert reports due on December the 1st.

18       THE COURT:  No.

19       MR. FINCH:  And then -- and then when -- and there's

20 no date right now for either the estimation experts or the non-

21 estimation supplemental experts that I'm supposed to sit down

22 and talk with Mr. Bernick --

23       THE COURT:  Yes.

24       MR. FINCH:  -- about those dates?

25       THE COURT:  Yes.

1          MR. FINCH:  Okay.

2          THE COURT:  And work out a schedule so that the

3    Daubert arguments can be -- whatever those -- that week of June

4    13th is.  The trial will start on the next week, whenever it

5    was scheduled.  And then I will add a week to the end somehow,

6    and I will give you those dates on December 5th.

7          MR. FINCH:  Okay.  Thank you.

8          THE COURT:  Now, that's only one week.  Is that going

9    to do it?  Because the debtor has to present its --

10          MR. BERNICK:  Let's us talk about this, because I

11    think that, again --

12          THE COURT:  You can work out --

13          MR. BERNICK:  -- we can probably work something -- I

14    mean, generally speaking, we've been able to work these things

15    out.

16          THE COURT:  All right.

17          MR. MULLADY:  And finally, Your Honor, in the

18    interest of time, just -- Mr. Finch alluded to two discovery

19    matters that we believe required Court intervention.  I won't

20    belabor the Court at this hour, but the first is the Rule

21    30(b)(6) deposition notice that we issued to W.R. Grace in

22    early October.  After over a month of meet and confer

23    negotiations, we are right where we started.  We have not been

24    given a witness.  We have not been given any usable documents

25    in lieu of a witness.  And so, we're constrained to reissue

1  that notice and require Grace to produce corporate designee

2  witnesses.  That, I assume, will prompt Grace filing a motion

3  for protective order.  We will not be filing a motion on this.

4  We don't believe it's our responsibility to file a motion on

5  discovery that we've issued that they're resisting.  We'll

6  proceed with our discovery.  If they choose not to have

7  witnesses appear, they'll have to do so having obtained a

8  protective order.

9       There is a companion issue which is or would be the

10  motion of the FCR and the ACC, and that's to compel answers to

11  interrogatories which parallel some of the information we have

12  put in our 30(b)(6) notice, and secondly, an actuarial study

13  that we know underlies the P.I. asbestos reserve set forth in

14  Grace's December 2005 10-K, and that is something we've tried

15  to obtain through Grace's counsel, unsuccessfully to date, and

16  we are constrained to have to move to compel on that.  So, our

17  suggestion would be that the Court take up these motions at the

18  January omnibus.  We'll obviously follow the Court's procedure

19  to get these on the calendar for that hearing.  But we submit

20  that they're closely enough aligned that we could do all of

21  this in one briefing schedule.  That is to say Grace would have

22  to submit its motion for protective order on a date certain.

23  We would file our motion to compel on a date certain on the

24  similar issue, and then we'd just have tracking of opposition

25  and reply briefs that lead up to that January omnibus.

1            THE COURT:  All right.  That's fine to do them in

2    January.  Everybody make plans to stay overnight.  We are not

3    going to leave that day until these issues are done.  And every

4    time you folks start talking about a discovery issue it takes

5    forever, so make plans to be here overnight, because I'm not

6    going to worry about train schedules, or plane schedules, or

7    anything else.  We're going to be here until we're done.

8    Please tell Mr. Baena, so that if he chooses to be here, he

9    can, and Mr. Lockwood, so that if he chooses to be here, he

10   can.

11           MR. BERNICK:  Your Honor, along those lines, you

12   know, when I generally stand to characterize an issue that's

13   going to be raised, I'm told, no, no, no, you can't get into

14   it, it's for the event itself.  And I think that what's a

15   little bit disconcerting here in order to expedite and

16   facilitate resolving this, we, in fact, work pretty hard to try

17   to resolve all the different topics in the 30(b)(6).  I think

18   we've reached agreement on a lot of them.  To then have a

19   motion that gets filed and then highlighted to suggest that

20   somehow it's been fruitless, that Grace has been a stick in the

21   mud, is not correct, and we don't believe it's fair,

22   particularly because we have even sought to have a mediator

23   involved in connection with this particular dispute, and

24   they're taken the position that there should not be a mediator.

25   That it doesn't need to go through mediation.  So, when I said,

1 and I stood up and said we're happy to have it on for January.

2 We're happy to have it on for January, but we certainly thought

3 that the process was being productive in narrowing the issue,

4 and we're prepared to continue to work on it.

5       THE COURT:  All right.  Let me make a statement.  I

6 am not attributing in this case any personal attacks any longer

7 by anybody.  I'm not attributing any inference of a personal

8 attack by anybody against anything.  If you want a personal

9 attack, put it in writing and file it with the Court, and then

10 I'll know it's going to be a personal attack.  So, you don't

11 need to do the apologies any further.  Any time on this record

12 I'm not attributing any bad conduct to anybody unless it's put

13 in a pleading, set for an evidentiary hearing, and I make

14 findings.  Is that clear?

15       UNIDENTIFIED ATTORNEY:  Yes, Your Honor.

16       THE COURT:  Okay.  In January plan to stay until

17 we're done.  All right?

18       UNIDENTIFIED ATTORNEY:  Thank you.

19       MR. SPEIGHTS:  Your Honor, I have one --

20       THE COURT:  Mr. Speights?

21       MR. SPEIGHTS:  It's a simple matter, Your Honor.  The

22 Canada deadline for the 2003 question, 60 days runs from Friday

23 after Thanksgiving.  I talked to Canada this morning, and

24 they're having a few problems because they moved their office

25 today.  They -- the expert that I'm using up there, and in

1 addition, I really don't want to work on Friday.  And then

2 several of the claimants were confused about -- more than

3 several, just had product i.d. done in the last few months that

4 they had to sign it, and I would respectfully respect a one

5 week extension to file that, and I have no objection to it

6 coming up on the December calendar if anything needs to be done

7 about it.

8             THE COURT:  Mr. Bernick?

9             MR. BERNICK:  I have no idea of exactly what's being

10 referred to.  If it's a one week extension, it's a one week

11 extension.  We're not going to quarrel over a one week

12 extension.

13             MR. SPEIGHTS:  Thank you.

14             THE COURT:  Okay.  I guess the question is will it

15 still get done on the December calendar?  That's the issue.

16             MR. SPEIGHTS:  It's due Friday.  It would only be a

17 report to the Court had we done it.  We --

18             THE COURT:  I'm sorry?

19             MR. BERNICK:  We're supposed to get signatures on

20 those --

21             THE COURT:  Right.  Oh.  And you want an extension of

22 a week.  And then you'll -- they'll either be withdrawn if

23 there are no signatures --

24             MR. SPEIGHTS:  Right.

25             THE COURT:  Okay.  I don't think that should be a

1  problem.

2       MR. SPEIGHTS:  Thank you, Your Honor.

3       THE COURT:  All right.

4       MR. BERNICK:  Thank you, Your Honor.

5       THE COURT:  Thank you.  We're adjourned.

6       MR. O'NEILL:  Your Honor, one clarification on

7  December 18th --

8       THE COURT:  Okay.  We're not adjourned.

9       MR. O'NEILL:  December 18 is in Pittsburgh?

10       THE COURT:  Yes, it is.

11                    *  *  *  *  *

### C E R T I F I C A T I O N

I, TAMMY DeRISI, court approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter.


_____  Date:  December 1, 2006

TAMMY DeRISI

DIANA DOMAN TRANSCRIBING