UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

IN RE:                      .     Case No. 01-01139
                            .     Adv. No. 02-1657
W.R. GRACE & CO.,           .
et al.,                     .     USX Tower - 54th Floor
                            .     600 Grant Street
                            .     Pittsburgh, PA 15219
          Debtors.          .
                            .     November 27, 2006
. . . . . . . . . . . . ..        1:03 p.m.


TRANSCRIPT OF HEARING
BEFORE HONORABLE JUDITH K. FITZGERALD
UNITED STATES BANKRUPTCY COURT JUDGE


APPEARANCES:

For Reaud, Morgan & Quinn        Stutzman, Bromberg, Esserman,
and ELG:                          & Plifka, PC
                                 By:  SANDER L. ESSERMAN, ESQ.
                                 2323 Bryan Street, Suite 2200
                                 Dallas, TX  75201

For National Union Fire          Zeichner Ellman & Krause LLP
Company:                         By:  MICHAEL S. DAVIS, ESQ.
                                      ROBERT GUTTMAN, ESQ.
                                 575 Lexington Avenue
                                 New York, NY  10022


Audio Operator:                  Cathy Younker


Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

_____

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@optonline.net**

**(609)586-2311      Fax No. (609) 587-3599**

APPEARANCES (continued):

TELEPHONIC APPEARANCES:

```
For the Debtors:              Kirkland & Ellis LLP
                             By:  JANET BAER, ESQ.
                             200 E. Randolph Drive
                             Chicago, IL  60601

For W.R. Grace:               Orrick, Herrington & Sutcliffe
                             By:  KATHERINE THOMAS, ESQ.

For PD Committee:             Bilzin Sumberg Baena Price
                                & Axelrod LLP
                             By:  SCOTT BAENA, ESQ.
                                  MATTHEW KRAMER, ESQ.
                             200 S. Biscayne Blvd., Suite 2500
                             Miami, FL  33131

For Royal Insurance:          Wilson, Elser, Moskowitz
                             Edelman & Dicker, LLP
                             By:  SARAH J. EDWARDS, ESQ.
                             150 E. 42nd Street
                             New York, NY  10017-5639


For Various Claimants:        Reaud, Morgan & Quinn, LLP
                             By:  CHRIS PORTNER, ESQ.
                             801 Laurel
                             Beaumont, TX 77701

For Committee of              Campbell & Levine
Asbestos Personal             By:  MARK HURFORD, ESQ.
Injury Claimants:             1700 Grant Building
                             Pittsburgh, PA 15219

For Official Committee        Stroock & Stroock & Lavan, LLP
of Unsecured Creditors:       By:  ARLENE KRIEGER, ESQ.
                             180 Maiden Lane
                             New York, NY  10038
```

1          THE COURT:  This is the matter of W.R. Grace,

2    Bankruptcy Number 01-01139.  Participants I have listed by

3    phone are Chris Portner, Janet Baer, Mark Hurford, Matthew

4    Kramer, Sarah Edwards, Marti Murray, Katherine Thomas, Arlene

5    Krieger, Amelia Wong, Robert Gutman -- it says, Sander

6    Esserman, but he's here in court -- and Van Hooker.  I'll take

7    entries in court, gentleman.

8          MR. DAVIS:  Michael Davis for National Union Fire

9    Insurance Company.

10          MR. ESSERMAN:  Good afternoon, Your Honor.  Sander L.

11    Esserman on behalf of Reaud, Morgan, and Quinn, and ELG, an

12    Environmental Litigation Group.

13          THE COURT:  Mr. Esserman, are you going first?

14          MR. ESSERMAN:  Sure.  I think this is an all time low

15    number of attorneys in the courtroom for W.R. Grace.

16          THE COURT:  I think it is.

17          MR. ESSERMAN:  I don't know whether it's a good thing

18    or a bad thing, but --

19          THE COURT:  But it's a nice day.  You brought nice

20    weather again, Mr. Esserman.  So --

21          MR. ESSERMAN:  It's beautiful.  I was just commenting

22    before Your Honor entered the courtroom that I'm not an

23    alarmist but I'm concerned about this nice weather.  It's

24    supposed to be winter.

25          We've got a matter on the docket today that arose out

**J&J COURT TRANSCRIBERS, INC.**

4

1  of a hearing we had a few months ago.  And the issue is whether

2  or not the bonds issued by National Union are payment bonds or

3  performance bonds.  If they're strictly a payment bond, then

4  once Grace is owed the  money, the only obligation of National

5  Union or the bonds is to pay under the bond.  What National

6  Union has been engaging as has to a certain extent W.R. Grace

7  is a review of certain claims within, I believe, 60 days of the

8  bankruptcy and any claim asserted after bankruptcy.  There was

9  a 60-day approval window, and therefore that's the window that

10  Your Honor gave the parties to review the claims.

11          I would note for the record that we do have -- it's

12  not before Your Honor today, but we believe that Grace has

13  approved claims post-bankruptcy -- post-petition date.  And

14  we've gotten written documentary evidence on that.  But that

15  may be for another day, possibly the 12th of December when we

16  have our status conference as to where we really take the case

17  from here.

18          Today, it really is just strictly an issue of payment

19  bond versus performance bond.  And Your Honor, the key issue

20  here is -- I think it has to be determined within the four

21  corners of the bond, itself.  And the four corners of the bond

22  itself we believe provides that it is a payment bond and not a

23  performance bond.  We think the -- we've briefed the matter as

24  has National Union, and to a certain extent, the debtor.  And I

25  don't purpose to necessarily go over every argument we've made.

1  I just want to highlight a few things for the Court.

2  Once again, out of the settlement agreement -- out of

3  the written settlement agreement, there are two agreements.

4  There's the Texas agreement and there's the Alabama agreement.

5  And approximately 84 percent of the monies that were due under

6  the Texas agreement have been paid.  And approximately 82

7  percent of the amount of monies due under the Alabama agreement

8  have been paid.  The total gross sums due on the Texas

9  agreement is 2.5 million approximately.  And on the Alabama

10 agreement, it's 11 million -- it's actually 11,051,900 for the

11 Alabama agreement, 2,557,797 for the Texas agreement.

12 Once again, we think looking at the bonds, the bonds

13 are relatively simple.  And if you look at the settlement

14 agreement, the settlement agreement is incorporated into the

15 bond or referred to in the bond.  And we think that that is

16 important.  One of the reasons it's important is because of the

17 settlement agreement itself provided for a letter of credit or

18 similar type of guarantee.

19 And under a letter of credit, we think that that's

20 more analogous to say a payment bond rather than a performance

21 bond.  And that is what we think Grace was obligated and did

22 provide and National Union provided also.

23 Once again, those -- that those words, letter of

24 credit, or other similar guarantee are from the settlement

25 agreement, itself.

1          We think once Grace was required to pay, that does

2   it.  That is, once Grace agreed to pay the claim to the extent

3   that they didn't pay the claim, National Union has to step up

4   and make the payment.

5          We understand that Your Honor has given -- to bend

6   the phrase -- grace or a grace period of the 60 days prior and

7   post-petition which perhaps we can address some other time, but

8   -- and how much of the bond that entails, I think we will know

9   shortly when Grace responds to their interrogatories.  We think

10  it could be similar -- it could be several million dollars.

11  But once again, we think approximately $13.5 million is due.

12         We don't think that National Union has these rights

13  to basically step into the shoes of Grace and perform the

14  contract as we think that they want to do.  There's been no

15  material alteration of the settlement agreement.  No one said

16  that Grace and Real Morgan have somehow gotten together and

17  changed this contract.

18         Real Morgan and ELG, the other law firm to the

19  settlement agreement submitted their claims.  They were

20  reviewed, some were rejected, some were approved, some were

21  sent back for further submissions -- further compliance.

22         THE COURT:  There's one footnote, Mr. Esserman, that

23  has me just a bit concerned because the settlement agreement

24  does define who the eligible plaintiffs are.

25         MR. ESSERMAN:  Yes.

1          THE COURT:  And there's one footnote in one of

2  National Union's replies -- and I apologize, I probably can't

3  put my finger on it right now -- but it says, that there was

4  some review that showed that 773 -- and I think they're

5  pre-petition -- of the pre-petition claims had actually not

6  been -- had not sued Grace in a lawsuit before the date, the

7  May 1, 2000 date or whatever that date was that's in the

8  settlement agreement as an eligibility factor.

9          MR. ESSERMAN:  Yes, and I think those -- I think that

10  had to do with Chumino (phonetic) claims which were part of the

11  class action, which I believe were excluded from the settlement

12  agreement and were not submitted for payment.

13          THE COURT:  Oh.

14          MR. DAVIS:  I can step in here --

15          MS. BAER:  Your Honor?  Your Honor, it's Janet Baer

16  on behalf of W.R. Grace.  I don't think we've given Mr.

17  Esserman the written interrogatory responses, but I think if

18  you look at the brief, National Union attached a letter that

19  outlines those claims that those are not the Chumino claims.

20  Those are separate claims where Grace had asked for

21  verification of that -- the loss of attendance had been filed,

22  and prior to filing our Chapter 11 case, we never got that

23  verification.  So, those are a question mark.

24          THE COURT:  Okay.  So, that -- those 773 were not

25  paid?

1           MS. BAER:  Um --

2           MR. ESSERMAN:  They were paid in part and I believe

3  they were approved by Grace.

4           THE COURT:  Well, how can they be if they're not

5  eligible?  And it seems to me that there has to be -- I don't

6  see how you can submit a non-eligible claim --

7           MR. ESSERMAN:  Well --

8           THE COURT:  -- and get the payment on those.  But I'm

9  not saying that that's the thousands of claims.

10          MR. ESSERMAN:  And I don't know whether or not those

11 -- that proof was subsequently submitted.

12          THE COURT:  Okay.  Well --

13          MR. ESSERMAN:  And that certainly could be an issue

14 that we could discuss on the 12th as to the 772 claims

15 -- whether lawsuits were filed and whether that information has

16 been properly submitted.

17          But certainly, I think one thing we can determine

18 today or not is whether or not this is a payment bond or

19 performance bond.  Thank you.

20          THE COURT:  Mr. Davis?

21          MR. DAVIS:  Thank you.  The first thing I'd like to

22 do is simply talk about 773 because Your Honor asked about it.

23 The 773 as I understand it -- we just learned about it in this

24 on-going process in the last few weeks.  And what we've learned

25 was that there was 773 claims that are not the Chumino claims

1  -- because the same letter addresses the Chumino claims also

2  -- that did not qualify.  W.R. Grace asked about them shortly

3  before its petition date.  And as of this standing before you,

4  we don't whether there was any reply or not.  We review those

5  simply as rejected or apparently rejected.  We don't -- we

6  don't have the full story yet on those 773.

7        But what I think I'd like to do is exactly what Mr.

8  Esserman suggested doing but then didn't do.  And that's read

9  the bond aloud with you, if you could turn to a copy of it.

10       And even before I do that, just in the way of going

11 back over some previous points, Your Honor will recall that

12 I've stood here before and I've cited Texas law that says

13 guarantors are favored under the law.  And the important part

14 of that is that when there's any uncertainty in the documents

15 that control the guarantor's obligations, you would construe

16 them in the favor of the guarantor.

17       THE COURT:  Well, I can agree that that may be the

18 case.  But I don't --

19       MR. DAVIS:  And we'll get there in a moment.

20       THE COURT:  -- see that there's any ambiguity in

21 these documents.

22       MR. DAVIS:  Well, bear with me a second.  And now

23 with that one comment, let's turn to the bond.  Let's actually

24 look at it.  It's attached to our answering -- well, no.  It's

25 attached to our --

1          THE COURT:  I have it.  The settlement agreement

2  bond?

3          MR. DAVIS:  You got it, okay.  Yes, the one I'm going

4  to open to is the Texas one, but the Alabama one is identical

5  in wording.  Only the numbers differ.

6          There are in fact seven paragraphs.  Not a big

7  document.  The first paragraph simply identifies the parties.

8  It doesn't even identify the agreement, it just identifies the

9  parties.  The second paragraph reads --

10          THE COURT:  Well, it -- are we looking at the same

11  document, it's called, "Settlement Agreement Bond"?

12          MR. DAVIS:  "Settlement Agreement Bond".

13          THE COURT:  Okay.

14          MR. DAVIS:  The one I'm looking at is the Texas one

15  which you can identify as Texas because the amount is 13

16  million.  The Alabama bond which is also provided is in

17  wording, identical.

18          THE COURT:  Okay.  That's fine.  I'm looking at the

19  Alabama one.

20          MR. DAVIS:  Well, then I'll --

21          THE COURT:  But that's all right.

22          MR. DAVIS:  Okay.  The first paragraph identifies the

23  parties.  It identifies the penal sum, it identifies what the

24  bond is.  But then we come to the terms.  And that's the first

25  whereas clause says, "Whereas the principals and the obligee"

1 -- the principal being Grace and the obligee being the RMQ and

2 plaintiffs together -- "have entered into a confidential

3 settlement agreement for the Texas cases" -- and the other one

4 says, Alabama cases -- "as amended in the form attached"

5 -- and I completely agree with Mr. Esserman that it's attached.

6 And it is very much a part of this bond -- "the form attached

7 which provides for certain" -- see the word certain --

8 "provides for certain payments to be made by the principal to

9 RMQ" -- and the other one says to the other law firm -- "in

10 trust to the settling plaintiffs for the purposes set forth

11 therein."

12          So, it's talking about certain payments for the

13 purposes of the agreement.

14          And then we come to the third paragraph.  "Whereas

15 the principal is required to provide the obligee with certain

16 collateral that said payments -- those certain payments -- be

17 made within the terms of the said agreement."

18          We now come to the paragraph I want to focus on.

19 "Now therefore, if during the term of this bond, the principal

20 shall make said payments" -- the payments under the agreement

21 -- "to the obligee as required" -- and these are the two most

22 important words as far as we're concerned in the entire bond

23 -- "as required, this bond shall be null and void, otherwise it

24 remains in force."

25          THE COURT:  Well, all that does --

1            MR. DAVIS:  So --

2            THE COURT:  -- I think is say that if the principal

3   pays, then they don't have a right to double recovery.

4            MR. DAVIS:  No, it says that if the payments that are

5   required are made --

6            THE COURT:  Right, that's what I mean.

7            MR. DAVIS:  Okay.  Now, we have to go back over this

8   settlement agreement.  This settlement agreement created in

9   effect a protocol for payment.  There were payments that were

10  required.  And there were other payments that were not

11  required.

12           THE COURT:  Under the settlement agreement?

13           MR. DAVIS:  Yes, absolutely.

14           THE COURT:  Okay.  Tell me how payments are not

15  required.

16           MR. DAVIS:  But first, let's tell you how they were

17  required.  There were a set of specific criteria that if met,

18  rendered them required.  Then there were payments that did not

19  meet the requirement but if a period of time lapsed, they would

20  then become required as against Grace.

21           And I submit to you that the word "required" cannot

22  be construed at any point in time other than the point in time

23  when the bond was issued.  That if Grace's subsequent conduct

24  made a payment required, that isn't what the word required

25  means in the bond.

1          THE COURT:  Oh, Mr. Davis --

2          MR. DAVIS:  No, I'm --

3          THE COURT:  There -- look, this protocol was set up

4    in the following -- in global terms in the following fashion.

5          MR. DAVIS:  Yes.

6          THE COURT:  Claimants submitted claims with

7    appropriate medical criteria, one piece of which included a B

8    Read for certain types of diseases.

9          MR. DAVIS:  Yes.

10         THE COURT:  That's what National City seems to be

11   arguing most vociferously about -- that the  B Readers were

12   some if not all of the Judge Jack doctors.  Nonetheless the

13   criteria included the need under those certain cases for the

14   B-reads.

15         MR. DAVIS:  Well, let --

16         THE COURT:  The debtor got information with medical

17   criteria.  If the debtor didn't think it was sufficient, the

18   debtor had a period of time within which to either ask for more

19   information or make a rejection of the claim.

20         MR. DAVIS:  Exactly.

21         THE COURT:  If -- I'm sorry?

22         MR. DAVIS:  Exactly.

23         THE COURT:  If the parties did not agree that the

24   claim should either be rejected or that the medical criteria

25   was sufficient, they had to go to arbitration.

1          MR. DAVIS:  That's right.

2          THE COURT:  And at some point there would then be a

3 ruling as if the parties couldn't agree as to what Grace owed.

4 In no place in that bond does it say that Grace doesn't have to

5 pay if the medical criteria is there, Grace doesn't challenge

6 it and/or Grace does challenge it and some arbitrator says they

7 have to pay.

8          MR. DAVIS:  Right.  That's not the circumstance that

9 we're talking about.

10          THE COURT:  Okay.

11          MR. DAVIS:  We're talking about the circumstance

12 where the medical -- we have testimony here.  We have Jay

13 Hughes, the responsible officer at Grace, testifying that he

14 received material that he knew did not qualify.  And he decided

15 to allow it to be paid anyway.  That's the testimony.

16          And when asked how much that was by Mr. Esserman, the

17 testimony was, he didn't know how much, but it could have been

18 very substantial.

19          THE COURT:  Well, the testimony was it could have

20 been hundreds of claims.

21          MR. DAVIS:  It could have been hundreds.  So, we have

22 a situation here where Grace permitted itself to become

23 obligated by its own business decision that was subsequent to

24 the settlement agreement and subsequent to the bond.

25          THE COURT:  But that doesn't mean that there's an

1 agreement by the plaintiffs to change the criteria or the terms

2 of the settlement agreement.

3          MR. DAVIS:  It doesn't matter.

4          THE COURT:  Number 1.  And Number 2, I don't see

5 anything in the bond that gives National Union the ability to

6 look behind these transactions.

7          MR. DAVIS:  No.  The bond is void by its terms once

8 the required amount is paid.  Once the payments as required are

9 made, the bond is void.

10          THE COURT:  Right.

11          MR. DAVIS:  Our factual contention is this, that the

12 -- we have now been through 3,000 of these claims.  We have

13 compiled data on 3,000 of these claims.  And we have come to

14 the conclusion -- and we're prepared to prove it with evidence

15 in this court -- that more than 15 percent of the claims

16 submitted do not qualify, did not qualify, and they were

17 allowed to become an obligation of Grace, but they were never

18 required to become an obligation of Grace.

19          The consequence of that is, that all the payments

20 that were -- since 85 percent has been paid, as Mr. Esserman

21 just pointed out -- since 85 percent of the dollars under this

22 agreement have been paid.  And 85 -- and less than 85 percent

23 of the payments were required to be paid, the bonds are void.

24 That's what it says.  That's the language right here.  And

25 that's the law of Texas.

1          And we think that any other interpretation is simply

2   disregarding a long string of Texas law that says that surety

3   is favored under the law, that you read the surety bond in our

4   favor, that you don't change requirements.  Its temporal

5   changes are vital to what these Texas cases are all about.

6          You look at the circumstance as and when it came

7   about.  We have one case in our brief that is specifically

8   addressed time in point, and it says, you look at it at the

9   time of the bond.  That case --

10         THE COURT:  Well, then you're not going to be able to

11  get to the Judge Jack doctor issue if you have to look at it at

12  the time the bond came about.

13         MR. DAVIS:  Well, that's a separate issue, actually.

14         THE COURT:  Well, I don't know.

15         MR. DAVIS:  It makes -- it makes -- it is a separate

16  issue.  Our Number 1 contention is that the quantity of

17  material that specifically didn't qualify on its face

18  -- facially failed to qualify -- is more than 15 percent.  And

19  if more than 15 percent on its face, facially qualified, then

20  all the requirements have been met, the bonds are void.

21         And the requirements are measured at the time the

22  bond -- the requirement is measured at the bond issued.  You

23  can't have subsequent events to which the surety -- the -- what

24  -- otherwise the principal and the obligee could get together

25  and enlarge the surety's obligations.

1          THE COURT:  Oh, sure.  I don't disagree that you have

2 to look at the circumstances at the time of the bond because

3 the bond guarantees performance as of a certain date or dates.

4          MR. DAVIS:  Right.

5          THE COURT:  In the case of the debtor, it wasn't the

6 future, certain payments that would be made.

7          MR. DAVIS:  So, posit with me a very simple

8 circumstance which we have direct testimony occurring.  Mr.

9 Hughes received a claim.  He looked at the claim, he said, this

10 doesn't qualify.  However, I know that these people will

11 litigate if I reject it.  I prefer not to litigate.  I'm going

12 to allow it and it shall be paid.  And it was paid.

13          That claim doesn't count against the surety.  It's

14 not what we guaranteed to pay.  And you have to knock those

15 out.  Figure out how much was required as opposed to the amount

16 that Mr. Hughes allowed as a business decision.

17          And by the way, I want to make one point clear,

18 there's no criticism here of W.R. Grace's decision.  They had

19 every right to pay people who didn't qualify under the

20 agreement if their business decision was they nonetheless made

21 perfectly good sense to settle with.

22          And they took their releases and they gave them their

23 money, and it's a perfectly good settlement.  But it's not a

24 settlement that we guaranteed.  We guaranteed what was

25 required, not what was permitted.

1        And so, what we have here -- and the testimony

2 couldn't be clearer -- that they were permitted settlements as

3 well required settlements.  The permitted settlements must be

4 subtracted.  That's what we're here to say.

5        THE COURT:  Okay.  But for Grace's bankruptcy --

6        MR. DAVIS:  Yes.

7        THE COURT:  If Grace had let these claims go

8 through --

9        MR. DAVIS:  Yes.

10        THE COURT:  National Union pre-petition didn't do a

11 single thing to look behind Grace's decision.

12        MR. DAVIS:  Right.

13        THE COURT:  So --

14        MR. DAVIS:  Right.  The Texas law is absolutely clear

15 on that.  The surety is not obliged to take any steps.  It's

16 all over our brief.  The surety is not obliged to take any

17 steps to check out the facts until the claim is presented.  In

18 fact, had there not been a bankruptcy, Grace would have paid.

19 And we wouldn't be here at all.  We wouldn't be in this court

20 or any other court.

21        THE COURT:  What about the Alabama law?

22        MR. DAVIS:  The Alabama agreement says it's governed

23 by Texas law.

24        THE COURT:  Okay.  All right.  Ms. Baer, does the

25 debtor have any thing you want to put on record before I go

1  back to Mr. Esserman?

2          MS. BAER:  No, Your Honor, we don't.

3          MR. DAVIS:  Your Honor, there's a subject we didn't

4  touch upon yet.

5          THE COURT:  Oh, sorry.

6          MR. DAVIS:  And I can defer it, postpone, it or not.

7  And this is the Judge Jack point.  My argument up to now today

8  has been the non-Judge Jack problem, separate and apart from

9  the fact that these documents -- about 15 or 20 percent of them

10 -- facially fail to qualify and thus was not what we

11 guaranteed.  Among the ones that do facially qualify, there is

12 large reasons to be concerned that those include fraudulent

13 reports.

14         What are the reasons?  And what is the significance

15 of that?  Well, the only significance is, if you don't agree

16 with our first argument, I'm now on to my second argument.  And

17 I will sit right -- sit down immediately if you tell me I don't

18 need to address my second argument.

19         But my second argument is, that Grace can't be bound

20 by fraudulent documents.  Grace would have the right to undo

21 -- until a statute of limitations runs -- Grace would have the

22 right to undo anything pertaining to them with fraudulent

23 documents.

24         And what is it that we have that suggests that there

25 are fraudulent documents here?  The one fact I can point to

1 -- and this is not grabbing Judge Jack from the air and simply

2 -- in fact, it doesn't rely on Judge Jack at all, although it

3 does draw its origin from Judge Jack's analysis -- in other

4 words, but for Judge Jack, we wouldn't have been so smart, if

5 we're smart.

6 But what we can look at is simply the number of

7 claims done by a single doctor in a single day.  And the one

8 -- the lead doctor in that hit parade is Dr. Jay Segarra

9 (phonetic) who on one particular day managed to issue 50

10 reports.

11 Now, my first draft of my brief -- you may have

12 noticed, it was a motion to amend my brief?  My first draft of

13 the brief said that Dr. Ballard (phonetic) had done 80.  And

14 when I had an allegation that Dr. Ballard had done 80, I was

15 prepared to bring in medical testimony and have a doctor sit in

16 that stand and say, 80 is impossible.  But we later learned we

17 misread the data.  And that's why we amended our brief.  It's

18 not 80, it's 50.  Fifty says my doctor is possible.  It's the

19 absolute limit of possibility, but it's possible.

20 So, I'm not standing up and telling you that 50 is a

21 convincing evidence of fraud.  But it's ample reason for

22 inquiry particularly when you add one more fact.  Jay Segarra,

23 Dr. Jay Segarra was deposed in the Grace case by Kirkland and

24 Ellis or its co-counsel last Monday.  And in the deposition

25 that was taken last Monday in this case, he was examined

1  extensively about something called positive rates, the

2  percentage of the claimants he reviewed that were positive for

3  illness.

4          And the range depending on the circumstance was ten

5  percent, 20 percent, 30 percent, 40 percent, up to 65 percent.

6  It was never 100 percent.  That 50 are 50 positives.  So, if

7  you go to the highest range that was addressed with Dr.

8  Segarra's deposition last week, that would be -- that 50

9  represents 65 percent, which would put you right back at the

10 80, which is just impossible.

11         THE COURT:  Oh, I see.  You're -- because they didn't

12 submit -- he admitted that he reviewed other claims and they

13 were some negatives in the same day?

14         MR. DAVIS:  He hasn't been asked a question because

15 we haven't been allowed discovery in that regard in this case.

16 But he testified that he always has some positives and some

17 negatives.  You never look at a set of films and they all come

18 out positive.  Otherwise, why bother.  And the highest rate he

19 ever identified was 65 percent.  Often it's 10 percent, 20

20 percent or somewhere in between.  The point is if he had 50

21 positives, then he had more than 50 people, whatever that

22 number is.

23         And that is a very difficult number to imagine being

24 possible.  And therefore, we say that it is appropriate for

25 this Court to allow W.R. Grace -- who supports on this request

**J&J COURT TRANSCRIBERS, INC.**

1  -- and National Union to see whether -- to take the discovery

2  necessary to see whether those were fraudulent.  That's my

3  second argument.  It's independent of the first.

4          THE COURT:  Okay.  Mr. Esserman?

5          MR. ESSERMAN:  Let me take the second argument first

6  because I think this is a complete red herring.  What's

7  complained about is a doctor reviewing 50 reports.  And their

8  own doctor says that that's certainly possible.  In this case,

9  I believe that to the extent we need to go down this -- that

10 path, which we do not, those 50 people that Mr. Segarra may

11 have looked at in one day were positives.  That is positives

12 were sent to Mr. Segarra in the first place.  These were not

13 initial screenings that were done.  These were people that were

14 already  -- had already had some indication of disease.  And

15 they were sent to Mr. Segarra for review.  This isn't looking

16 at 100 people and coming out with 50 positives.  It's looking

17 at 50 patients who had been sent -- they already had a

18 diagnosis that was in fact reconfirmed.  We think that's a

19 complete red herring.

20          And what Mr. Davis said on that issue is pure

21 conjecture.  And I would also like to point out that Jay

22 Segarra  -- Dr. Segarra in the Judge -- the famous Judge Jack

23 decision which everybody likes to talk about now, which I don't

24 think anyone really is sure what it means, other than it's

25 inflammatory -- was allowed by Judge Jack as the gold standard

1  of doctors.

2  THE COURT:  Well, I appreciate that, but if I take a

3  look at 50 reviews in the course of a day, even if I assume a

4  ten hour day, that's what?  Something like eight minutes per

5  review over a course of ten hours a day.  I mean, Mr. Esserman,

6  really.  That -- that --

7  MR. ESSERMAN:  Well, 50 reviews is not uncommon for

8  the doctor.  National Union's insurance -- own insurance

9  company says that certainly is within the realm of what can be

10  done.  And this -- that was a very heavy day.

11  But once again, I think we're sort of getting off

12  point here.  And what's on point are the bonds and what the

13  obligation of National Union was under the bonds and the

14  reading of the bonds, I think the English language is clear.  I

15  think if Grace was required to make a payment under the bond,

16  and they didn't make it, National Union is obligated to make

17  that payment.

18  Now, what that payment may be, we can argue about 60

19  days prior to the -- to the petition date.  And we can argue

20  about the post-petition submissions.  But the fact remains,

21  that if Grace didn't pay, National Union was obligated and

22  required to pay.

23  THE COURT:  Well, show me the language -- I was

24  looking at the bond, but not the settlement agreement.  So, let

25  me take a look at what the debtor's obligations are.  Let's

1  see --

2      MR. ESSERMAN:  I can sum them very quickly.  Your

3  Honor, I believe it's -- the debtor gets a submission from RMQ

4  or ELG.  And they have 60 days to review that submission and/or

5  contest the submission and/or ask for further data or

6  clarifying data.  And at the end of 60 days, if they haven't

7  done that, the submission is deemed approved for payment.

8      THE COURT:  Okay.  So, where is Mr. Davis' argument

9  that Grace has some wiggle room in there?  I mean, it seems to

10  me that's how I interpreted this agreement too.

11      MR. ESSERMAN:  It's very simple.  Grace can get a

12  submission.  They have a choice.  They can say this complies

13  with the settlement agreement or this complies with our

14  understanding of the settlement -- our review of the settlement

15  agreement.  Or it doesn't.

16      And if it doesn't, they have two choices.  One they

17  can -- well, they really have one choice under the settlement

18  agreement.  If they send RMQ ELG a letter of correspondence

19  saying, this is deficient, correct it.  At which time RMQ and

20  ELG comes back and corrects it.

21      And if they then disagree, it then goes to some sort

22  of arbitration or I believe, it's a mandatory/mediation

23  exercise at which time it's decided.  And all those -- all

24  those mediations, arbitrations were by contract supposed to

25  have been concluded in 2001.

1          THE COURT:  Yes, it says binding arbitration.

2   Paragraph 8 talks about the fact that the -- it's binding

3   arbitration that should have been concluded by 2001, but of

4   course, Grace filed bankruptcy within that period.  So, to the

5   extent that the 60 days or post-petition submissions haven't

6   gone through, I don't think that date would apply.

7          MR. ESSERMAN:  There is a subset -- there's a subset

8   of plaintiffs that -- that were submitted within 60 days and

9   were post-confirmation or post-petition date.  I think Grace

10  thinks that number is around $4 million out of the -- out of

11  the current amounts owed.

12          THE COURT:  Okay.  I just -- I want to take a run

13  through the settlement agreement while we're all here.

14          MR. ESSERMAN:  So, out of 13 and a half million, I

15  think they think somewhere around 4 million.  We think it's

16  less.

17          THE COURT:  Okay.  The settlement agreement -- this

18  one I'm looking at is the one dated August 25th of 2000 with

19  Reaud, Morgan, and Quinn.

20          MR. ESSERMAN:  Okay.

21          THE COURT:  So, the recital essentially just say why

22  the parties have gotten to the point where they've decided to

23  settle.  Then there's a definition that discuss section.  It

24  discusses Grace, who the law firms are, and then who qualifies

25  settling plaintiffs.

**J&J COURT TRANSCRIBERS, INC.**

1          And the settling plaintiffs are every client of the
2  firm who as of May 19th, 2000 is a plaintiff in a pending
3  lawsuit, state or federal, and so forth, who hasn't already
4  settled with Grace, and who's case wasn't tried a verdict as of
5  that date.

6          Then there's an agreement as to how much will be paid
7  to people who established that they have a variety of diseases.
8  There's an adjustment to the amounts that will be paid in the
9  event a settling plaintiff refuses to settle or to provide a
10 release.   That's in Paragraph 5.

11         In Paragraph 6 is what I was referring to earlier as
12 to the medical criteria that would have to be substantiated.
13 And as Sub-paragraph 1 talks about competent medical evidence
14 that the settling plaintiff, or for wrongful death claims to
15 settling plaintiff's decedent has or had an asbestos related
16 disease or injury of the type that was set forth in Paragraph 4
17 which listed the diseases and the amounts to be paid.

18         And Criteria 2 is that a release has to be executed
19 and returned.

20         Then there's some additional documentation.  A work
21 history sheet, a list of plans where Grace had agreed that its
22 products had been used or to an affidavit showing other
23 exposure.

24         And then it specifically talks about what medical
25 evidence will be sufficient.  "If it demonstrates that the

1  settling plaintiffs alleging non-malignant asbestos-related

2  disease, either there is a diagnosis of such condition by a

3  pathologist or B Reader confirming the condition."   And then

4  it is other medical criteria for other types of diseases.

5          Paragraph 7 doesn't really -- I think -- I don't

6  think anybody's arguing at the moment that Paragraph 7 is of

7  material -- materiality now.

8          Okay, Paragraph 8 is the paragraph that gives Grace

9  60 days to notify the law firm of the deficiency in any

10  materials.  States specifically that if they can't resolve that

11  deficiency, then the matter will go to binding arbitration.

12          Then the next paragraph talks about the fact that the

13  parties will attempt to do another agreement in the future, but

14  that's not relevant right now.

15          MR. ESSERMAN:  Not applicable.

16          THE COURT:  I'm sorry?

17          MR. ESSERMAN:  Yes, that's not applicable.

18          THE COURT:  And that the law firm would file a motion

19  to dismiss the lawsuits as to all settling plaintiffs.  Grace

20  agrees that if it rejects a settlement, it will give the

21  release back.

22          Paragraph 12 is the paragraph -- that whereby Grace

23  agrees to provide a letter of credit or similar guarantee.

24          Okay.  Paragraph 13 excludes a certain group of

25  participants.  That's not relevant right now, either.

1          Paragraph 14 is not relevant now.

2          Paragraph 15 just says that this is not an admission

3    of liability.

4          Paragraph 16 just imposes the confidentiality

5    agreement on the parties.

6          17 is where notices are to go, as is 18.

7          19 says where the qualifying materials are to be

8    sent.

9          20 says that this is the full agreement.

10          21, that it will be governed by the law of Texas.

11          And 22, that there won't be a contest of -- as to

12    venue or jurisdiction in a particular location in Texas.

13          I don't see anything in here, Mr. Davis, that says

14    that the debtor is not required to pay provided that the debtor

15    doesn't contest within 60 days and then is found not obligated

16    to pay.

17          MR. DAVIS:  I agree.  The debtor became obligated.

18    But the point is, Mr. Esserman said it very nicely a moment

19    ago.  He said -- he went up to say the debtor has two choices.

20    And then he back-tracked and he said, they really have only one

21    choice.  I wrote it down.  The debtor -- not -- even though the

22    debtor really only had one choice -- because it actually says

23    the debtor shall respond -- shall.

24          Even though the debtor really only had the one

25    choice, the debtor chose another path anyway.  And when the

1  debtor chose that other path, it went off the surety bond.

2  That path is not covered by the surety bond.  The debtor had

3  one choice to deal with this contract as written, to accept

4  qualifying material, or to push back against non-qualifying

5  material.

6         The debtor chose a different path.  The claimants

7  facilitated that other path by submitting non-qualifying

8  material.  And they just went away from the surety bond.

9         THE COURT:  Now, it think there's more than that.

10 The parties have to submit qualifying materials that the debtor

11 has a right to review.  And if the debtor determines that the

12 qualifying materials are insufficient, the debtor has to

13 affirmatively act to do something.

14        MR. DAVIS:  Right, but --

15        THE COURT:  Otherwise, these payments are deemed

16 owed.

17        MR. DAVIS:  That's exactly correct under the terms of

18 the agreement.

19        THE COURT:  Okay.

20        MR. DAVIS:  And that's precisely what did not occur.

21        THE COURT:  But it did occur.

22        MR. DAVIS:  And -- it did not occur.  That's Mr.

23 Hughes' testimony is precisely the opposite.

24        THE COURT:  So, you're -- what you're --

25        MR. DAVIS:  Mr. Hughes' testimony is that it didn't

1  qualify, but we ignored that paragraph.

2        THE COURT:  Okay.  Show me where in his deposition,

3  he says that?  There was a quote of part of his deposition, but

4  it did not say quite that.

5        MR. DAVIS:  Page 90 and 91, I believe.  I've got to

6  find -- it's quoted in my brief.  But if you want to see the

7  transcript in total, I've got to look for it.

8        MR. ESSERMAN:  Your Honor, while Mr. Davis is looking

9  for that quote, let me tell you what I think is going on here.

10 I think this is a simple agreement.  It's not complicated.  RMQ

11 submitted the materials.  Grace reviewed them.  They either

12 accepted them, or they didn't accept them, or they got back to

13 RMQ and was deficiencies -- which they did.  And RMQ either

14 cured them or not or withdrew the claim.  And Grace became

15 obligated to pay.

16       What's really coming down -- what you're really

17 hearing a lot of noise about is to a certain extent, Paragraph

18 6.  And that's RMQ is submitting to W.R. Grace qualifying

19 materials.

20       And what you're hearing Mr. Davis say based on

21 conjecture on this point is he didn't like the way that certain

22 of the qualifying materials were submitted.  That is, he didn't

23 like -- he doesn't think that this medical evidence that was

24 submitted under Paragraph 6 was competent medical evidence in

25 his opinion.  In his 20/20 hindsight, five years after the

1  fact, trying to get out of a bond, they don't like the way that

2  Grace graded these claims.

3         On the other hand, RMQ submitted -- complied with the

4  agreement.  There's no allegation that RMQ has somehow gotten

5  together with Grace to modify this agreement.  RMQ submitted

6  what it thought was competent medical evidence, a release, and

7  dismissed a lawsuit for which people have been paid in large

8  part.  They've been paid -- as I said before, 82 percent of the

9  Alabama monies have been paid.  84 percent of the Texas monies

10  have been paid.

11         And I'm holding aside once again the -- this subset

12  of claimants, the 60-day post-petition, which I think Grace

13  contends is about $4 million  out of the 13.5 million.

14         And that's really what's going on.  Is they're trying

15  to -- they're trying to interject their judgment in the

16  settlement process after Grace has already said, these are

17  qualifying payments and they didn't pay.

18         We think under the bond, they're obligated to pay.

19  We think the bond is pretty clear.  It's pretty straight

20  forward.  It's in plain English.  The settlement agreement

21  talks about a letter of credit or similar type of guarantee,

22  that's what was provided.

23         Under a letter of credit, I think there'd be no issue

24  that when the obligor doesn't pay, the letter of credit party

25  has to pay.  That -- that's what we're seeking here.  Thank

1  you.

2       THE COURT:  Okay.

3       MR. DAVIS:  I've been doing a letter of credit

4  litigation for a lot of years.  And the answer is it depends

5  what the letter of credit says.  And there are letters of

6  credit that say, we pay if the contract has been complied with.

7  There are letters of credit that say, we pay on sight.  And to

8  the letter of credit says -- a letter of credit is no better or

9  worse than a bond in terms of its ability to be flexible.  This

10 bond says precisely what it says.  It says, as required.

11       And Mr. Hughes' testimony is in his deposition at

12 Page 90 and 91, there's other testimony elsewhere, but this is

13 the place where it's most concise.  And his testimony is

14 attached to our answering brief, that is Docket Number 62.  And

15 filed on August 4th.  The entire transcript is there.  And

16 if --

17       THE COURT:  Yes, I had it.  Would you just read me

18 the pages that are relevant.  I did have -- I know the

19 transcript is in this binder.  I have looked at it.

20       MR. ESSERMAN:  Okay.  Page 90, Line 22.  I'm -- at

21 this point, I'm asking.  Because the issue -- if I can back up

22 a moment, the issue came as a total surprise.  I had no idea

23 that W.R. Grace had did anything other than what the agreement

24 required.  I had no idea they had chosen this other path.

25       And Mr. Esserman had been asking Mr. Hughes questions

1  for some time.  And it came out that they had chosen this

2  alternative path.  So, I came in with, "Do I correctly

3  interpret" -- Page 90, Line 22 -- "Do I correctly interpret

4  your prior testimony as stating that when a decision was made

5  not to object to a particular claim or a particular set of

6  qualifying material for a claim submitted under the settlement

7  agreements, that were marked as Exhibit 2 and Exhibit 3, that

8  the criteria for making that decision may have been practical

9  or business considerations apart from the actual requirements

10  of the contract?"

11          Answer, "Yes."

12          I had no further questions.  Mr. Esserman then

13  followed up immediately.  "I have a couple of follow up

14  questions.  Regarding the last question that Mr. Davis just

15  asked you, when a decision was made to not object to certain

16  cases submitted, you said as a practical or business decision,

17  do you know how many?"

18          And then he gives this answer, "Could be hundreds."

19          That's the testimony.  And there's earlier testimony

20  that's consistent with it.  And it all came down to this.  W.R.

21  Grace made a business decision to chose another path, a path

22  that wasn't required or even permitted by the agreement.  And

23  that's fine.  They can do that.  But I didn't guarantee that.

24          THE COURT:  Well, I think there's a problem.  Now, it

25  seems to me that -- I don't know that the words payment bond

1  and performance bond are literally applicable outside the

2  construction arena.  And I tried to express that earlier.  But

3  I didn't -- I thought that was a good shorthand way of trying

4  to get to what -- I was trying to find what National Union's

5  obligations and rights were under this contract.

6         And the difficulty I have is under the bond, it

7  doesn't seem National Union has any rights except to pay

8  provided that Grace doesn't pay.  I understand Mr. Davis'

9  argument that they only -- that National Union has only

10  guaranteed the payments that Grace is required to make.  But I

11  think under the settlement agreement, Grace is required to make

12  payments if it doesn't object or reject the claim within the

13  time frames that have been articulated in that agreement or

14  isn't somehow found liable not to pay pursuant to some

15  arbitration for example which is not really relevant to what

16  we're talking about right now.

17        So, the fact that Grace did not demand additional

18  information, I think kicks in the 60-day provision of the

19  agreement that says, Grace is obligated to pay.  And once Grace

20  is obligated, I think that's the same thing as "required".

21  That's what the settlement does.  It imposes on Grace an

22  obligation to pay certain claims when either the criteria is

23  submitted or Grace doesn't object to the criteria.

24        I think that the settlement bond then says that if

25  the debtor doesn't pay as required, i.e. when it has an

1 obligation to pay, then National Union will stand for those

2 payments instead.  And I think that's the typical, you know,

3 plain English construction of this type of an arrangement.  I

4 don't see anything unusual in the type of arrangement or this

5 bond from any other, you know, bonds.

6         I agree with you, Mr. Davis, they can be written

7 differently.  But this one's written the way it is.  And the

8 words in it govern.  I can't see how the "as required" gives

9 National Union rights that the debtor didn't have.  And the

10 debtor's rights were confined to a particular time period, i.e.

11 that 60 days.

12         Now, I do agree with you that to the extent that

13 Grace was defrauded somehow, that Grace would have the right to

14 set aside at least those payments under the settlement

15 agreement if not the entire agreement itself.  And to the

16 extent that Grace was defrauded that National Union also

17 wouldn't be responsible as to the surety.  I can't see how

18 you're required to guarantee a fraudulent payment when the

19 principal doesn't have to pay for a fraudulent claim.

20         But I don't have any evidence at the moment that

21 there were any such fraudulent claims.  To the extent that the

22 773 or whatever the number turns out to be were in fact not

23 eligible plaintiffs under this agreement -- whether or not

24 Grace objected, I don't think that those claims are entitled to

25 be paid because the document itself defines eligibility.  And

1 that is not an issue for medical criteria.  That is an issue as

2 to whether or not you were a plaintiff in a tort action that

3 was pending against Grace and hadn't been tried the verdict as

4 of a -- as of a particular date.

5          And if you didn't meet that criteria, the document,

6 itself says that the parties will attempt to negotiate a

7 different agreement for those non-qualifying plaintiffs; i.e.,

8 those who were not subject to a suit as of that date.

9          So, I don't see how -- if that turns out to be the

10 case that the debtor could even agree to pay those claims.

11 They weren't qualified under the terms of this agreement to

12 have even submitted claims.

13         So, to the extent that there is some evidence that,

14 you know, claims were submitted by parties who were not engaged

15 against Grace in the tort system as of the relevant date, I

16 think those claims have to be factored against the payment that

17 Grace has already made assuming that they've been paid.

18         But to the extent that it's a medical criteria issue,

19 that's really the only place that there is wiggle room.  The

20 debtor has to demand medical criteria or documentation if it

21 has not been submitted and the debtor is uncomfortable with the

22 level of documentation that was submitted.  And if the debtor

23 doesn't do it within 60 days, then the debtor basically is

24 deemed to have agreed that it's a legitimate claim that should

25 be paid.  And I think that kicks National Union's obligation

1 into play.

2          And I'm not necessarily given -- given what I have

3 read from Judge Jack's opinions as to some of the other

4 doctors, thrilled with that result.  But no one was aware of

5 that fact at the time that the bond was written.  And I do

6 agree with you, you have to look at it at the time the bond was

7 written.  I think to the extent that those doctors are subject

8 at least for the claims that were filed within the 60 days

9 pre-petition and the post-petition period, certainly Grace

10 should be demanding some additional evidence and there should

11 not be claims -- claims paid just on the basis of those B

12 Readers without some additional evidence.

13          But the debtor can demand the additional evidence.

14 And the parties have an opportunity under this agreement to

15 produce it.  If they withdraw the claim, they do.  If they

16 don't produce additional evidence, the debtor will deny it, and

17 you know, life will go on.  You'll either go to arbitration and

18 a ruling will be made or else, you know, something else will

19 happen.

20          So, that's a long way of saying I think National

21 Union is obligated provided that the claim is submitted by a

22 qualified individual, i.e. one who was subject to a tort suit

23 as of the date stated in the settlement agreement and meets the

24 four criteria in Paragraph 3 of the settlement agreement.

25          As to Paragraph 6, that says that the settling

1  plaintiffs, i.e. the qualified settling plaintiffs who choose

2  to participate in this process may do so.  But if they choose,

3  then they have to submit the competent medical criteria and the

4  release.  And that's where Grace's 60 days come in.  And that's

5  the obligation -- the payment that is obligation that National

6  Union has guaranteed.

7          So, I think the only issue at this point is the 60

8  days pre-petition, the post-petition period, and anybody who

9  submitted a claim who was actually not a settling plaintiff as

10 defined in Paragraph 3.

11         Are you going to need some additional time based on

12 the fact apparently you're still looking at the 60 days

13 pre-petition and those post-petition?

14         MR. ESSERMAN:  We've asked for discovery on that.

15 And we've given Grace an extension to -- I believe it's through

16 December 1st.  I suspect that in our status conference on the

17 12th, we will have all this information including the

18 information on the 773 number as to whether or not they were

19 subject to a suit against Grace at the time which I believe

20 they were of which I have been informed.  And will be able to

21 address that in the conference.

22         THE COURT:  Okay.  Why don't I just continue this

23 matter 'til then and see where you stand with discovery.  I'd

24 like to give you one final order that can address all the

25 issues, if I can, at one time.  Mr. Davis?

1        MR. DAVIS:  The only thing I was thinking about is

2  Your Honor remarked that W.R. Grace would and should correctly

3  have the ability to challenge fraudulent claims and that wasn't

4  listed in your final list of items that remain open.

5        I think the 12th of December is a perfectly good time

6  to reconvene.  We're scheduled to reconvene by telephone.  And

7  if there are -- if there's more work to be done or if we have a

8  disagreement about whether there's more work to be done, we'll

9  address it then.

10        THE COURT:  Okay.  Well, as I said, at the moment,

11  I'm sitting here without any information concerning fraudulent

12  claims.  But I do agree with you as a matter of contract law, I

13  don't think this settlement agreement addresses fraudulent

14  claims.  So, okay.  We can discuss that too if need be on

15  December 12th.  All right, thank you.

16        MR. ESSERMAN:  Thank  you, Your Honor.

17        MR. DAVIS:  Thank you, Your Honor.

18        THE COURT:  Any house-keeping matters?

19        MR. DAVIS:  I think we just kept house.

20        THE COURT:  All right.  We're adjourned.  Thanks.

21        MR. ESSERMAN:  I would point out that it is three

22  minutes to two o'clock.  And we came in within the hour that

23  we --

24        THE COURT:  You promised.  I know.  I have -- you

25  guys are good.  What can I say?

**J&J COURT TRANSCRIBERS, INC.**

1        MR. ESSERMAN:  Well, we're good when they're just the

2  two of us.

3        THE CLERK:  May I close the record?

4        THE COURT:  Yes, thank you.

5                        *  *  *  *  *

6

7

8


                  **C E R T I F I C A T I O N**

        I, Vidhya Veerappan, court approved transcriber,

certify that the foregoing is a correct transcript from the

official electronic sound recording of the proceedings in the

above-entitled matter, and to the best of my ability.


/s/ Vidhya Veerappan            DATE:  December 1, 2006

VIDHYA VEERAPPAN

J&J COURT TRANSCRIBERS, INC.