# Exhibit 1

S. Hrg. 107–993

# ASBESTOS LITIGATION

# HEARING

BEFORE THE

## COMMITTEE ON THE JUDICIARY UNITED STATES SENATE

ONE HUNDRED SEVENTH CONGRESS

SECOND SESSION

SEPTEMBER 25, 2002

**Serial No. J–107–105**

Printed for the use of the Committee on the Judiciary



U.S. GOVERNMENT PRINTING OFFICE
88–289 PDF                    WASHINGTON : 2003

For sale by the Superintendent of Documents, U.S. Government Printing Office
Internet: bookstore.gpo.gov   Phone: toll free (866) 512–1800; DC area (202) 512–1800
Fax: (202) 512–2250   Mail: Stop SSOP, Washington, DC 20402–0001

206

compensation. In my own state, California, defendants are not jointly liable for "non-economic" loss such as pain and suffering, even though these losses are enormous for elderly plaintiffs with devastating cancers. The more fundamental problem, however, is in finding a solvent defendant to sue. When all of the "usual suspects" have taken refuge in bankruptcy, it becomes much harder to find a viable defendant who can be held liable to pay compensation. Inevitably, and increasingly, some cancer victims find themselves without a claim against any significant solvent defendant.

### Congress Must Act To Make the System Work Again

In my view, what is wrong with asbestos litigation is due almost entirely to the huge number of claims filed each year by lawyers who have found people who are not sick. The problem is *not* the cancer cases or the serious asbestosis cases. There are only a few thousand cancer cases filed every year in the entire country and an even smaller number of asbestosis claims involving death or significant impairment. The courts and the defendants could deal with those cases, if they did not have to deal with many tens of thousands of claims brought by people who are not sick. Moreover, I do not believe that we need any new Federal bureaucracy to manage the cancer cases or the advanced asbestosis claims. Courts and juries are at their best in evaluating the claim of a genuinely injured plaintiff, and the number of such claims can easily be handled by our existing civil justice system.

As I show below, the non-malignant claims problem is driven by litigation screening. Traditionally toxic tort litigation follows a medical model: a plaintiff sees a

Page 19

207

doctor to treat his illness or injury and then is referred to, or otherwise finds, a lawyer. Litigation screening substitutes an entrepreneurial model: the lawyer recruits the plaintiff – who usually feels fine, has no symptoms or impairment, and is unaware of any "injury" – and sends him to a screening company for an x-ray. The question is, what features of asbestos litigation have contributed most to this shift to an entrepreneurial model? I focus on three: the failure of courts to enforce the principle that a person should not have a tort claim unless he is "injured"; interstate forum shopping, that allows these claims to flow to pro-plaintiff courthouses with no connection to the plaintiff or the case; and consolidations that are intended to force the settlement of cases whether or not they have merit under state law.

**Litigation Screening: The Driving Force**

The engine that drives the filing of non-malignant cases is litigation screening. The Manville Trust estimates that as many as 90% of non-cancer claims are generated through screenings.[55] People who are found, as a result of litigation screenings, to have what may seem to be some sign of a non-malignant condition, are often forced by the statute of limitations to file lawsuits before they are really sick. This can come back to haunt individuals who later develop cancer, because some states still maintain a "single disease" rule, which precludes a second lawsuit just when the individual is facing a serious injury and needs to provide for his family.

---

[55] Letter from David Austern, General Counsel of Manville Trust, to Joseph Rice (Aug. 8, 2002) and exhibits (Exhibit C hereto).

Page 20

208

Litigation screenings have absolutely nothing to do with medicine – they are a device for recruiting clients.[56] Internet advertisements invite readers to "Find out if YOU have MILLION DOLLAR LUNGS!" while newspaper ads warn readers not to delay, reporting that "[b]ased upon recent national information, it is our belief that workers have only a limited time remaining in which to file cases against the manufacturers."[57] When participants arrive for a screening, they often must sign a retainer agreement before receiving their "free x-ray."[58]

Participants at many screenings never even meet with a doctor: a technician takes the x-ray, which is then sent to a doctor, whose report is sent in turn to the lawyer who arranged for the screening.[59] Moreover, if the doctor does not give the lawyer the right answer, the lawyer can get a second opinion, or a third, or a fourth ... as many as it takes.[60] Dr. David Egilman of Brown University, who regularly testifies as an expert for

---

[56] As one plaintiffs' law firm admitted in 2000: [T]he sole purpose for . . . asbestos screening programs is in anticipation of future litigation against asbestos manufacturers . . . . [T]he entire screening process from the moment [the law firm] becomes involved is geared toward collecting evidence for future asbestos litigation." Brief of Appellants, *In re Asbestos Products Liability Litigation*, Nos. 98-1166 and 98-1165 (3d Cir. Mar. 21, 2000), at 19.

[57] See Newspaper Advertisement for the Law Office Wilson & Bailey and for Shinaberry, Meade & Venezia, L.C. These and other advertisements for litigation screenings are collected at exhibit H(2).

[58] See Deposition of Kenneth Werner, October 2, 2000, *In Re Asbestos Products Liability Litigation*, MDL 875 (E.D. Pa.), at 200; Deposition of Charles B. Kemeny, May 14, 1997, *In re Asbestos Products Liability Litigation*, MDL 875 (E.D. Pa.), at 225, 230. These depositions are attached hereto as Exhibit H(3).

[59] See Werner Dep., *supra* note 58, at 211-12, 225; see also *Adams v. Harron*, 191 F.3d 447, 1999 WL 710326 (4th Cir. 1999) (unpublished per curiam opinion) (noting that workers never even saw the doctors who reviewed their x-rays). This detached, impersonal arrangement means that no doctor-patient relationship is formed. And when doctors miss indications of possible lung cancer in their hurried reviews of x-rays, or fail to make sure that workers are informed of a serious diagnosis, workers have no recourse to malpractice. *Adams*, 1999 WL 710326.

[60] Not that it is usually hard to get a satisfactory opinion from the first doctor who reads an x-ray. One doctor who has evaluated about 14,000 individuals for two different screening companies admitted under oath that he has no experience in diagnosing asbestosis, and that he is not even practicing medicine. That doctor has concluded that every single person he has evaluated – all 14,000 – have asbestosis! Deposition of Dr. Gregory A. Nayden, March 28, 2002, *Bentley v. Crane Co.*, No. 92-7655 (Cir. Ct. Jasper County, Miss.), at 164-65.

Page 21

209

plaintiffs, including for my firm, said in a recent letter to the American Journal of Industrial Medicine, "I was amazed to discover, that in some of the screenings, the worker's X-ray had been 'shopped around' to as many as six radiologists until a slightly positive reading was reported by the last one of them."[61] A "slightly positive reading" usually does not even amount to a diagnosis of asbestosis – that requires a real physical examination and a great deal more information than is available from reading X-rays taken en masse in mobile vans.[62] Rather, the reader of the X-ray merely concludes that the x-ray is "consistent with" asbestosis.[63]

---

[61] David Egilman, Letter, *Asbestos Screenings*, 42 AM. J. INDUS. MED. 163 (2002) (Exhibit H(3) hereto).

[62] American Thoracic Society, *The Diagnosis of Nonmalignant Diseases Related to Asbestos*, 134 AM. REV. RESPIRATORY DISEASE 363, 363-68 (1986).

[63] Unfortunately, these x-ray readings were "consistent with" numerous other causes as well; many of these plaintiffs did not have any physiological change caused by asbestos, and most were not suffering from the symptoms of an asbestos injury. One study reviewed the chest x-rays of more than 700 workers who had undergone a medical screening in the 1980s. More than 60% of the workers (440 in total) had gone on to file lawsuits, claiming that they had x-ray results consistent with an asbestos-related condition. Upon closer scrutiny, however, the researchers concluded that only eleven or sixteen of the workers truly had conditions that were consistent with asbestos exposure. "The vast majority of the abnormalities found were nonoccupational in origin and consisted of conditions one might expect in an aged population. Prevalent nonoccupationally related conditions included healed tuberculosis, histoplasmosis, emphysema" and so on. R.B. Reger *et al.*, *Cases of Alleged Asbestos-Related Disease: a Radiologic Re-Evaluation*, 32 J. OCCUPATIONAL MED. 1088, 1089 (Nov. 1990).

The results of the Reger study were shocking, but a sizable portion of the population has lung conditions that could be diagnosed as asbestosis unless care is taken in the evaluation. There are more than 150 types or causes of interstitial lung disease, many of which present similarly on x-rays. Marvin I. Schwartz, *Approach to the Understanding, Diagnosis, Management of Interstitial Lung Disease*, in INTERSTITIAL LUNG DISEASE 1, 4-5 table 1-1 (Marvin I. Schwartz & Talmadge E. King, eds. 1998). One study found that 11% of the participants without occupational exposure to any sort of dust (let alone asbestos) had x-rays showing small opacities in the lungs of at least a 1/0 level on the standard International Labor Organization (ILO) classification regime. See, e.g., David M. Epstein, *et al.*, *Application of ILO Classification to a Population Without Industrial Exposure: Findings To Be Differentiated from Pneumoconiosis*, 142 AJR 53 (1984). Another study found that about a quarter (24.8%) of males between the ages of 55 and 64 in the general population have lung abnormalities that register at least 1/0 on the ILO scale, and the prevalence of such x-ray readings continues to increase with age. Anders J. Zitting, *Prevalence of Radiographic Small Lung Opacities and Pleural Abnormalities in a Representative Adult Population Sample*, 107 Chest 126, 127 (1995).

Page 22

210

The results of such screenings are totally unreliable. That is why the court that oversees all federal asbestos litigation now dismisses all claims that are based on a mass screening.[64/]

Lawyers and public health advocates debate whether some sort of screening might be appropriate for people exposed to asbestos, or at least to some subset of that population. Since early detection is not helpful in the treatment of asbestosis or pleural changes, screening for non-malignant diseases has no justification, at least for workers that are no longer exposed to asbestos. Moreover, given the current state of medicine, screening is not likely to improve outcomes for mesothelioma. The real debate therefore focuses on screening for lung cancer. I personally believe that a screening program for lung cancer involving the use of high-resolution spiral CT scans is promising, though there is controversy even about that.[65/] There is no legitimate scientific doubt, however, that litigation screenings are not calculated to provide real health benefits.

The U.S. Preventive Services Task Force has concluded that "[r]outine screening of asymptomatic persons for lung cancer with chest radiography or sputum cytology is not recommended."[66/] That conclusion matches the position of the American Cancer Society.[67/] Chest X-rays are simply too inaccurate to be useful in screening

---

[64/] *In re Asbestos Prods. Liability Litig.*, MDL 875, slip op. at 1-2 (E.D. Pa. Jan. 16, 2002) (Administrative Order No. 8)(attached hereto as exhibit H(1)) (Weiner, J.). The court understood the connection between mass screenings and the bringing of unimpaired claims. It stated: "Oftentimes these suits are brought on behalf of individuals who are asymptomatic as to an asbestos-related illness and may not suffer any symptoms in the future."

[65/] The use of spiral CT scans in monitoring regime to detect lung cancer is explored in a brief collection of leading articles in Exhibit I(2) hereto.

[66/] U.S. PREVENTIVE SERVICES TASK FORCE, DEPARTMENT OF HEALTH & HUMAN SERVICES, GUIDE TO CLINICAL PREVENTIVE SERVICES 135, 138 (2d ed. 1996) (attached hereto as Exhibit I(1)).

[67/] Medical associations' recommendations with regard to general screening for lung cancer are attached hereto as Exhibit I(1). These include: American Cancer Society, *Guidelines on Early Detection of Cancer*,

Page 23