# Exhibit 2

From dallasobserver.com
Originally published by *Dallas Observer* Aug 13, 1998
©2005 New Times, Inc. All rights reserved.

## Toxic Justice

**Lawyer Fred Baron says he's one of the good guys, fighting a war against evil asbestos manufacturers. But some former employees claim his firm is a factory that mass-produces lawsuits by implanting memories and inventing testimony.**
BY CHRISTINE BIEDERMAN, THOMAS KOROSEC, JULIE LYONS AND PATRICK WILLIAMS

To hear lawyers at the Dallas law firm of Baron & Budd tell it, they are frontline warriors in a battle against callous corporations whose product, asbestos, claimed the lives and health of thousands of working men.

But the first casualty of war is truth, and at Baron & Budd, one of the city's most successful law firms, the truth, if not killed outright, is sometimes missing in action.

Over the past four months, the Dallas Observer has reviewed hundreds of pages of leaked internal Baron & Budd documents and has interviewed clients, opposing lawyers, and current and former employees to reveal the inner workings of the firm created by Frederick Martin Baron. Some of those former employees claim--and the documents suggest--that Baron & Budd staff members invented testimony, encouraged witnesses to lie, and implanted memories in workers whose claims that they were harmed by asbestos are, in some cases, dubious.

A former lawyer, now critical of the ethics surrounding these practices, says that it's all done in the name of social justice, and that attorneys were encouraged to view their work as serving a higher cause. Today, Baron & Budd partners sometimes lapse into the language of a holy war and describe their opponents as "evil" and "not good people." In that jihad, say some former paralegals at the firm, just about anything goes.

The allegations concern one of the nation's most prominent plaintiffs' lawyers. Baron & Budd is a leader among a handful of firms filing the lion's share of asbestos lawsuits nationwide. According to one 4-year-old estimate, Baron & Budd has grossed more than $800 million from asbestos cases. Though Baron hotly disputes this figure, saying it is high by "hundreds and hundreds and hundreds of millions," clearly the lawsuits have made him a wealthy man.

Baron and his partners move in rarefied circles in the legal profession. In July, he was elected vice president of the American Trial Lawyers Association, the most influential group of plaintiffs' lawyers in the country. He's a past president of the Trial Lawyers for Public Justice and a member of several professional groups, among them the American Law Institute, a widely respected body of lawyers, judges, and legal scholars.

Baron's influence and ambitions are not limited to the law. In June, he was one of six co-hosts of a benefit for President Clinton that raised some $500,000, and late last month he played host to the president at his second home in Aspen, Colorado. In 1996 alone, his firm gave about $89,000 in so-called "soft money" to the Democratic Party; that figure does not include campaign contributions directly to candidates. He's been profiled in books, magazines, countless newspaper articles, and even

featured prominently in a four-part series in The New Yorker.

As the New Yorker series pointed out, asbestos litigation--which it describes as "the greatest avalanche of toxic tort litigation in history"--was the result of scandalous corporate behavior. Manufacturers' disregard for the health of asbestos workers caused thousands of American workers to die prematurely and in the most gruesome manner imaginable. Some died of asbestosis, gasping to fill their scarred lungs with air, others from mesothelioma, a horribly painful cancer caused only by exposure to asbestos.

Yet what began 25 years ago as a crusade for justice for injured workers has transformed over time. Asbestos is no longer used commonly in the workplace, and a host of workplace reforms have been enacted. Many of the largest asbestos manufacturers are bankrupted by lawsuits, and after a quarter century, many of the seriously ill workers have died or received settlements. Yet the flood of cases continues, fueled by workers with less obvious signs of injury and a huge, profit-fueled, settlement-driven litigation industry.

Baron's firm is an example of the latter, grinding out claims against former asbestos manufacturers by the thousands. Their clients are mostly elderly blue-collar workers whose cases hinge in part on their abilities to sift through their memories and identify specific asbestos-containing products to which they were exposed.

To build its cases, former Baron & Budd employees and documents suggest, firm members have:

* Provided workers with sample questions and the "right" answers for their depositions, with little regard for whether the answers were true;

* Coached workers to say they were exposed to products that the workers can't identify by themselves and implanted memories in the minds of the firm's clients;

* Exaggerated the threat to some workers' health from asbestos exposure, employing what one former Baron & Budd paralegal described as "whore docs" willing to blame virtually any lung ailment and a whole host of cancers on asbestos exposure.

Fred Baron says that the documents supplied to the Observer are taken out of context, that the matters they touch upon are not important to asbestos litigation, and that his associates observe strict ethical and legal standards and counsel their clients to tell the truth. Coaching clients to give set answers to critical questions in their lawsuits is "absolutely" permissible, he says, and attorneys who fail to do so are guilty of malpractice. Indeed, of 12 former clients the Observer interviewed, none said he believed he was improperly coached.

In response to the allegations by former Baron & Budd employees, Baron and his partners say that as long as the firm doesn't literally tell anyone to lie, its lawyers are permitted to:

* Coach asbestos-exposed workers on their symptoms (for example, tell them to say they suffered from "shortness of breath" as a result of asbestos exposure);

* Coach workers on how they were harmed by asbestos ("get plaintiff to say he is afraid of getting [cancer]");

* Tell clients the "facts" of their asbestos exposure and implant memories where there were none.

In the end, Baron's defense boils down to this: This is how "any lawyer in the country that is worth a damn" works.

The charges and defenses raise a question about which lawyers themselves disagree: Just how far can one go in helping his client come up with the facts? While there are many who would agree that the lawyer's latitude is as wide as Baron says it is, there are those who protest, and not all of them can be dismissed as asbestos-industry apologists.

The troubles at the house that asbestos built first came to light last fall, when a memo written by a Baron & Budd paralegal Lynell Terrell outlining techniques for coaching witnesses was handed to opposing lawyers. That memo ignited a controversy over the firm's methods and prompted a review by a Dallas County grand jury. The grand jury's term expired in late June without its acting, an apparent victory for Baron.

County prosecutors say the grand jury did not act because the U.S. Attorney's Office has taken over the investigation. Privately, local prosecutors familiar with the investigation say they doubt that the county had the resources to make a case or that they could prove the Terrell memo was used in Dallas County. Federal law-enforcement officials, however, say the district attorney's office abandoned the investigation because it feared Baron's money and political clout.

Whether for lack of resources or lack of gumption, the local investigation into the Terrell memo never gathered steam, and the federal probe is just getting under way.

In the meantime, the Observer has independently uncovered additional documents and located witnesses willing to speak about what they consider Baron & Budd's wrongdoing. The paper found that at least 24 of the firm's clients who were deposed in Dallas County might have received the Terrell memo. Reporters have interviewed former Baron & Budd employees who charge that the Terrell memo, far from being an isolated document, is in fact part of a pattern of witness coaching that buttresses a multimillion-dollar lawsuit machine.

Mr. Asbestos
Fred Baron's name is synonymous with the history of asbestos litigation and the story of how a band of courageous lawyers made corporations pay for covering up the hazards of asbestos.

A naturally occurring mineral, asbestos is pliable enough to be spun into cloth, but can withstand tremendous heat, traits that made it a useful insulator to industry in everything from kilns to power plants. Asbestos is also a potent carcinogen and a cause of deadly lung disease--problems manufacturers recognized early on, certainly by the 1920s and '30s, when asbestos miners and factory workers began choking to death from cancer and asbestosis. Yet for the sake of profits, some manufacturers conspired to conceal early evidence of asbestos mortality--exposing hundred of thousands of unprotected workers to potentially lethal products into the late '70s and early '80s.

Baron was among the lawyers who unearthed documents showing how asbestos manufacturers hid evidence of the dangers of asbestos. "He's one of the giants of asbestos litigation," says Frank Andrews, a former Dallas County district judge.

Yet this giant found himself the subject of an investigation this year by a Dallas County grand jury,

which examined Baron & Budd's conduct in asbestos cases.

Baron breezily dismisses the controversy surrounding his firm. "This whole thing is so stupid," he says. "I mean, it really is."

As he speaks, Baron sits at the head of a 20-foot conference table at the offices of Baron & Budd, P.C., which occupy nearly four floors of the Centrum office tower at the intersection of Oak Lawn and Cedar Springs. The firm employs 58 lawyers and a 324-person staff, and at least four outside law firms have counseled Baron & Budd because of the furor surrounding the Terrell memo.

"I've got tons of lawyers now," Baron says with a laugh.
It's an embarrassing situation for a man who hobnobs with Supreme Court justices, consults with famed legal minds, and has the president as a houseguest.

"I mean...I've never been accused of anything in my life. Ever. Ever," he says. "And this has been a horrible experience for me."

The trouble began last fall, after a first-year Baron & Budd lawyer handed over an internal firm document to opposing counsel during a deposition. The document, "Preparing for Your Deposition," appeared to be a preparation aid that told workers exposed to asbestos how to testify. It caused a minor sensation. Defense attorneys filed it in courts around the nation, and the press excerpted it in magazines and newspapers everywhere, from Harper's and Reason to the ABA Journal, The Washington Post, and the National Law Journal. The document has been cited as an example of everything from how sleazy lawyers are to how hard it is to prosecute for witness-tampering.

Baron says that he hired attorney Robert M. Greenberg and the Dallas powerhouse of Carrington Coleman Sloman & Blumenthal to "advise us on the ramifications" of Lynell Terrell's memo. "They both advised us that we needed a very comprehensive internal investigation to be certain that what Lynell told us was correct, and...it was a very comprehensive [investigation]."

Attorneys at Carrington Coleman say Greenberg, a longtime friend of Baron's, oversaw the investigation. As a result of the investigation and of his own knowledge of Baron & Budd's system, Baron says, he is certain that nothing else like the Terrell memo exists.

In courts around the state, Baron and his lawyers defended the memo, claiming it was a one-of-a-kind document produced solely by Terrell. "Did she do something that we don't approve of?" Baron says. "Yes, no doubt about it. Does that mean that there's an epidemic in this office? Absolutely, positively not. If there was an epidemic, we would have found evidence that other people were using this document, or...that other people were using documents at all or doing anything. No evidence at all. Period. None.

"It's been a nightmare," he adds. "But I know why it happened." According to Baron, the scrutiny has been whipped up by his enemies, especially Raymark, the successor to asbestos manufacturer Raybestos Manhattan, with whom Baron has been waging what he describes as a decade-long "nuclear war."

"You know, we have some very significant enemies who would like to destroy us," Baron says.

Heart and Soul

At 50, Baron still appears boyish; the only lines in his face are the two laugh lines that form at the edge of his brown eyes when he smiles. On a recent July evening, smiles were not frequent.

"I put my heart and soul into this," Baron says with some passion. "There are just very few law firms that have any quality to them that represent working people and have the resources to go up against these asshole defendants and call their bluff."

It is 7:15 p.m. in the offices of Baron & Budd, P.C., and name partner Fred Baron is livid. It isn't just the fact that the air-conditioning was shut off an hour ago, or that there are two reporters in his conference room seeking answers.

The truth is that anger isn't unusual for Baron. It's what has fueled his considerable success and helped make him one of the highest-profile lawyers in the country specializing in "toxic torts," or injuries caused by poisonous substances. His anger at how some asbestos manufacturers hid the dangers of their products for decades and his rage at corporate wantonness in poisoning the environment led him to establish what he says is the "largest firm in the country" specializing in toxic tort litigation.

"Most of the law firms that do asbestos take that case, send in the medical to the defendant, settle the case, and that's the end of it," he says. "We work every single one of them out. We have three times as many people for half the number of cases that the other firms do, and that's because I give a goddamn about my clients, and I want my clients to have absolutely first-class representation."

He has a point. Baron represents working-class people who, in contrast to the manufacturers he sues, cannot afford to pay lawyers by the hour. He takes his mission seriously; with Baron, it's personal.

Born in Iowa, Baron grew up in Rock Island, Illinois. When he was 15, his mother remarried and moved to Smithville, near Austin, where he finished high school. He attended the University of Texas and UT Law School, where he fell under the spell of the late W. Page Keeton, the Harvard-trained torts professor who co-authored one of the primary casebooks used to teach torts in American law schools. "The very first day, the very first class, I had Page Keeton for torts," Baron recalls. "And I just was spellbound...It was really an incredible enlightening about what the tort law can do.

"Almost a year later I was sitting in a lecture one evening that Ralph Nader gave, and I was just totally proselytized," Baron says.

"We worked it out [with the dean] so that 11 of us who were on the law review were able to move to Washington and spend about six months working for Ralph. I got to be very close friends with him, and I really understood what he was doing and why he was doing it."

After graduating, Baron moved to Dallas to work with the small labor firm of Mullinax, Wells, Mauzy & Collins, where, in August 1973, one of the partners handed Baron, the youngest lawyer in the firm, a case nobody else wanted. "The firm had kind of made up its mind that it didn't want to do the case, but it didn't want to piss off the client," recalls Baron. "And I was not terribly busy, so they asked me to go out and visit with the clients."

The case involved workers at a Pittsburgh, Corning asbestos plant in Tyler, where workers had turned raw asbestos into insulation. The Tyler plant had recently been dismantled after the National Institute for Occupational Safety and Health issued a report citing dangerous health conditions.

"OSHA went in there and said that it was the worst plant they'd seen in the United States," Baron recalls. "People were actually--it's hard to believe--just shoveling asbestos off the floor, without any respiratory protection." Although the plant had been in operation for less than two decades, at least one worker had already died from asbestosis.

The suit Baron filed, Yandle vs. PPG Industries, made headlines across the nation, in part because the second-year lawyer asked for $100 million in damages. But in 1975, Baron had to relinquish the case when he left Mullinax, Wells.

He started his own firm and quickly signed on other clients, including some additional Tyler plant workers who put him right back in the case, for which he eventually won a $2 million settlement. He started representing others exposed to radiation or toxic products, including a young woman named Karen Silkwood; in another case, he represented a number of low-income housing residents in West Dallas poisoned by lead emitted from nearby smelters.

In 1979, he hired his first associate, Russell Budd, who had just graduated from UT Law School.

Baron recalls the period as a sort of golden age for plaintiffs' lawyers. "The law started changing in the '70s. And there were liberal courts...the doctrines of products liability changed...and it became easy to win the cases. And the corporate conduct was, you know, awful."

In 1980, Baron added two more lawyers, and that same year, he married a young assistant district attorney named Lisa Blue, who would later join the firm. By 1986, he had eight lawyers, according to a lawyers' directory, and that year he changed the name of the firm to Baron & Budd.

"There were all sorts of exciting new theories of law," recalls Baron. "And by the mid-1980s, we were winning a lot of cases. A lot of cases."

By 1990, however, Baron had tired of the asbestos-litigation grind. "Between 1973 and 1990, I think I tried 62 individual asbestos cases," he recalls. "I tried three cases back-to-back in 1990 and lost all three of them, and said, That's enough for me."

This is not to say he had wearied of fighting the bad guys.
"Objective A is, obviously, you want to get the client compensation," Baron says. "But I'm a tinkerer, and I thought that the real reason to be filing these lawsuits is to stop these kinds of practices. Deterrence--I mean, that's what Page Keeton always said...he said the tort law is not a worker's compensation system."

Baron insists not only that the law can save lives, but that punishment is its true function.

"You know, my whole shtick in law school was that I thought everything ought to be regulated by the government. And I was one of these really left-wing guys that thought that every agency ought to control every piece of our lives, until I got out in practice and realized that...you send OSHA down here to investigate, they find the worst conditions they've ever seen, and they fine PPG Industries $710.

"And I thought to myself, it probably took $710 in administrative time to write a $710 check. This is not gonna do. The only way we will stop this is by really going after their pocketbooks, through economic litigation."

Whether the possibility of "economic litigation" has ever stopped a corporation from dumping toxins or burying incriminating scientific evidence is hard to measure. There is anecdotal evidence--some of it from Baron's foes--that Baron is right. "Companies are painfully aware of the possibility of liability [for their products]," says Robert Thackston, a shareholder at the law firm of Jenkens & Gilchrist who has frequently crossed swords with Baron. "Nobody's throwing a dirty product out on the market these days."

The prospect of lawsuits has occasionally led to dangerous products' being taken off the market. Yet even here, government action is frequently required.

Asbestos is a case in point. As scientific knowledge of the dangers of asbestos spread during the '60s and '70s, new federal agencies such as OSHA used these studies to promulgate safety standards that, in many cases, asbestos manufacturers could not meet. By the early '70s, asbestos began to be phased out of the workplace.

Yet, as in the case of PPG, government regulation itself just results in the possibility of criminal and civil penalties. Baron argues that without lawyers like him, these penalties would often be ignored.

"In fact, I wrote a book in 1979 or '80, and I started getting into all of these philosophies and theories about, What is the purpose of the tort law as it applies to occupational-disease cases, and how do you get these companies to really do things? And I'd come to the absolute conclusion that the government was not going to regulate them...Reagan came into office, the agencies were gutted, and it seemed to me that the private attorney general case or the individual tort case was the very best way to go after these folks...The harder you can hit them, and the more times you can hit them, the better off we were."

He hit them by setting up a law firm that Baron estimates is presently handling 9,500 to 10,000 asbestos cases.

"We've been doing this litigation for over 20 years," Baron says. "And we have evolved a system that we think works very well for the manner in which we decide to handle cases."

But a few monkey wrenches have the potential to wreak havoc with Baron & Budd's well-oiled machinery.

When the first asbestos cases were filed in the 1970s, the victims were horribly ill with cancer, asbestosis, or lung ailments. The original targets of most of those suits were the asbestos manufacturers who had held the largest share of the market. Now, 25 years after those original cases, some of the big manufacturers have been bankrupted by the legal claims, and many of the most seriously harmed workers are in their graves.

In 1982, Johns-Manville, the biggest single manufacturer of asbestos products and, at the time, number 181 on the Fortune 500, became the first to seek bankruptcy protection. Since then, more than 15 other manufacturers--many of whom were the biggest producers of asbestos, and thus among the first generation of asbestos defendants--have gone the way of Manville. When Manville sought bankruptcy protection, it estimated that a total of 68,500 claims would be filed; in 1986, at the time of its reorganization, it estimated there might be as many as 100,000; today, more than 381,000 claims have been submitted, and the trust estimates another 350,000 are on the way. The Manville trust, which today holds 80 percent of the company's stock and exists to pay the claims of victims,

has paid more than $1.8 billion since 1986. (The trust's average settlement is $5,000.)

Partly because lawyers like Baron helped get asbestos products taken off the market, the pool of victims with the most serious asbestos-related sicknesses is diminishing. At the same time, however, the claims and lawsuits are increasing rapidly. According to David Austern, general counsel for the Manville Trust, this has resulted from a gradual expansion of just what constitutes asbestos disease. "Part of the problem was sort of an amazing elasticity--which is about as calm a word as I can think of--on the part of claimants' lawyers to find doctors who will say that somebody suffers from minimal asbestos disease," he says.

"Looking at projections...over the past 10 years, the cancer claim numbers have not been our problem," he says. "They have remained constant at about what the experts said they would be...Disabling asbestosis claims have not terribly exceeded the predictions of the experts. Our problem is in non-disabling asbestosis claims, where a claimant is asymptomatic--that is to say, they may or may not be sick."

In many of these cases, Austern says, there is not scientifically measurable illness. "And there you have to rely on chest X-rays, and reading any soft-tissue injury is an art form as well as a science."

What is left these days to feed Baron & Budd's mill are thousands of workers who often weren't in trades that worked directly with loose, or friable, asbestos. The ranks of insulators and pipe fitters are giving way to house-builders and roofers, supervisors, even office workers and supply clerks.

Thanks to the bankrupting of the biggest asbestos companies, the targets of their lawsuits are a host of smaller manufacturers--among them brake manufacturers, turbine manufacturers, paint manufacturers, even the makers of the first generation of respiratory equipment intended to protect workers from asbestos.

Many of the remaining asbestos manufacturers complain that they couldn't possibly have sold enough product to expose even a fraction of the men who claim to remember seeing their goods.

"My client is a very small player," explains one defense lawyer, who asked that his name not be used because, as he puts it, "when you irritate [Baron & Budd], they have a tendency to retaliate."

From '54 through '70, this company's total sales of asbestos products were $5 million, he says.

"I'd be surprised if [my client] actually sold enough product to expose half the people who claimed to have been exposed. We know, for example, of locations where not only was our product not there, but [it] would have no function there. Yet in case after case, Baron & Budd sues us and gets product ID and comes up with at least three or four co-workers [who identify the products]."

The problems arise when the workers Baron & Budd represents--nearly all in their 50s, 60s, and 70s--are asked to identify products they worked with 20 to 30 years ago, as the law says they must in order to collect. Memories fade, and it is up to Baron & Budd to help revive them, a process that Baron himself admits can involve implanting memories.

Specifically selected memories, say some employees who helped revive them.

Spreading fear

"I saw a dozen men choke to death--slowly die," says Roger Freeman, 67, a Baron & Budd client from Tuscumbia, Alabama. "They'd spend years laying in bed, drying up like a bean."

Like Freeman, many Baron & Budd clients have known and worked with men who died of asbestos disease.

"One of them lived here close to me, that died from asbestosis," says Julian Avery Roberts, 61, of Hartselle, Alabama. "Another guy's son died when he was 22 years old. This guy was an insulator-- he'd come in, and he'd have it on his clothes, and his son was just a small child. He'd climb up in his lap and all. Got it through that."

Naturally enough, these men fear what asbestos can do. According to the U.S. Centers for Disease Control and Prevention, "[b]reathing very high levels of asbestos may result in a slow buildup of scar tissue in the lungs and in the membrane that surrounds the lungs. This disease is called asbestosis, and is usually found in asbestos workers and not in the general public."

In addition to asbestosis, the CDC says, there "are two types of cancer caused by exposure to high levels of asbestos: cancer of the lung tissue itself and mesothelioma, a cancer of the membrane that surrounds the lung and other internal organs. Both of these are usually fatal...Interactions between cigarette smoke and asbestos increase your chances of getting lung cancer." Some studies have also suggested that "breathing asbestos can increase the chances of getting cancer in other parts of the body (stomach, intestines, esophagus, pancreas, kidneys), but this is not certain."

Such clinical descriptions do not, however, convey the true horror of fatal asbestosis or mesothelioma. An internal Baron & Budd document provides a glimpse of the final days of one mesothelioma victim. "Willie [the client's son] starts his day at 6 a.m. each morning by giving his father his first pain medication...(90 milligrams morphine is given at 6 a.m., 2 p.m., and 10 p.m. His father's other medications are given at 8 a.m. and 4 p.m.

"The only food that his father gets is Carnation Instant Breakfast...mixed with milk...He sometimes eats eggs or grits, but only about twice per week.

"After medications and food, his father spends the day either laying in bed or getting up and walking around approximately three times/day...Willie said that because of the high dose of morphine his father usually just lays in bed staring at the ceiling or dozing off.

"His father can walk to the bathroom, but has limited control of his bowels. He does mess in his PJs and around the house. He can brush his teeth and shave himself, but doesn't do it well."

While horrific, such scenes take place in a distinct minority of the cases Baron's firm handles. According to Baron, 3 to 5 percent of his clients have mesothelioma. Another 10 to 12 percent, he says, are lung cancers, and from 2 to 3 percent are "other cancers." A number of epidemiologists' studies forecast a declining number of mesothelioma cases, though Baron says the severity of the cases is no different today than it was 20 years ago.

By Baron's own estimate the remaining cases--around 80 percent--are either asbestosis or "pleural disease," a term that describes a variety of changes in the lining of the lung that show up on X-rays.

In the absence of surgery or autopsy, lung specialists rely on X-rays and breathing tests to diagnose

an asbestos-related illness. As the CDC notes, "[c]hest X-rays cannot detect asbestos fibers, but can detect early signs of lung disease caused by asbestos."

As suggested by the Manville Trust's David Austern, increasingly, workers are suing based on X-rays showing they have pleural disease or nondisabling asbestosis. In many of these cases, the men have no scientifically measurable lung impairment; a suspicious X-ray is all the evidence of disease that is present. Baron concedes that in many of these cases the finding of an asbestosis-related disease "seems to be in the eye of the beholder."

Yet this doesn't stop the men from filing suit and winning. Baron & Budd regularly argues that these mild diseases will progress into far more serious ones. In fact, the fear that the workers' illness will progress, no matter how medically unlikely, is one of the main elements for which the workers can recover monetary damages.

Soon, even the tenuous requirement for evidence of physical injury--the suspicious X-ray--may go by the wayside. Some recent cases have held that workers can recover monetary damages for fear of cancer based on asbestos exposure alone.

At least one Texas appellate court has held that a person who was exposed to asbestos but has no "asbestos-related disease symptom, or impairment" can nevertheless recover damages for fear of cancer. That case is on appeal to the Texas Supreme Court. Even if it is overturned, it will not stem the so-called "pleurals," many of them now classified as asbestosis, which Baron admits are overwhelming the courts.

In 1982, when Johns-Manville sought bankruptcy protection, some 24,000 asbestos-related lawsuits had been filed. By 1990, as the number of cases grew exponentially, a special committee of the U.S. Office of Court Supervision was directed to study how to deal with the asbestos suits flooding the federal courts.

Refreshing memories
Asbestos workers often find their way to Baron & Budd after a health screening arranged by another law firm and a trade union.

Together, the union and the local law firm round up a group of the skilled laborers who constitute Baron & Budd's clientele, sending out notice of the free screening. The men, many of whom know someone who died from asbestos disease, come from miles around.

According to trial testimony from doctors, the union and the law firm pay for a lung doctor to examine up to 200 men a day using equipment rented from a local hospital or hauled in by the doctor in a tractor-trailer rig. The union men are X-rayed, and the films are usually developed on the spot. Frequently, an attorney is standing by to sign up anyone whose examinations show any evidence of asbestos exposure.

After the workers are X-rayed and referred to a lawyer, the local attorney typically sends the case to Baron & Budd. (According to Baron, the referring firm usually gets up to one-third of Baron & Budd's 40 percent contingency fee.)

Baron & Budd then sends out a "Client Questionnaire" packet to the workers. It contains forms asking about general background, the worker's past claims and lawsuits, and his employment history-

-all information that will be used to build the case.

The questionnaire asks for a detailed medical accounting. Many of Baron & Budd's clients were heavy smokers, and studies have shown that the combination of tobacco and asbestos exposure may increase the risk of lung cancer as much as a hundredfold, according to trial testimony from doctors. The problem when one of these men comes down with cancer is determining which factor was the primary cause.

Finally, there is a list of miscellaneous questions, including how and when the worker first learned asbestos could be harmful to his health--critical questions, as the answers could provide a defense against the workers' suits.

The case then goes to Baron & Budd's foot soldiers, the product-identification paralegals. These mostly young women make the initial face-to-face contact with the clients. They help the clients draft work histories and show them the "picture books" from which the clients, in theory, pick out the products they recall using.

The paralegals have the primary contact with the workers, helping them prepare their answers and readying them for deposition and possible trial. ("Depo prep," as it is called at the firm, is an essential part of the process. By Baron's own estimate, about 97 percent of the cases Baron & Budd files do not go to trial, so the answers the workers give during depositions can play an important role in determining whether they get a settlement.)

Memo author Lynell Terrell is one of those paralegals.
In courts around the state, Baron has argued that the Terrell memo is ethical, though he concedes it may not have been "proper." "It's like somebody files a lawsuit against you for having an affair with your neighbor, and they file it in federal court, and you know the federal court doesn't have any jurisdiction," he says. "You're gonna file a motion to dismiss based on lack of jurisdiction. And you're gonna win, and the case is gonna be dismissed. That doesn't vindicate you from whether or not you had an affair with your neighbor...

"I'm not sitting here saying that [court decisions in his favor] absolutely vindicate that the memo was proper. OK? I've never taken that position."

Nevertheless, he insists the document cannot be evaluated properly without "context," and points to Terrell's sworn statements that she always orally instructed clients to tell the truth and that she never gave the memo to clients without also handing them a copy of a second article that admonishes them to testify truthfully.

Yet Baron also insists that he does not condone the Terrell memo. "I would never sanction any of our people using a written document like that to give to a client, because it can be misinterpreted a million ways," he says. "That's number one. So, we don't use written material when we prepare clients. Number two, there are some statements that are in there, that, if taken out of context, are awful...I think that if you literally read some of the words in there, it sounds like she is telling a witness to say something that might not be true."

That is, in fact, what the Terrell memo seems to do. Sandwiched between detailed descriptions of the packaging, appearance, and use of asbestos products are explicit instructions to Baron & Budd clients:

* "You may be asked how you are able to recall so many product names. The best answer is to say that you recall seeing the names on the containers or on the product itself. The more you thought about it, the more you remembered!"

* "Remember to say you saw the NAMES on the BAGS."
* "The more often you were around it, the better for your case. You MUST prove that you breathed the fibers..."

* "Keep in mind that these [defense] attorneys are very young and WERE NOT PRESENT at the job sites you worked at. They have NO RECORDS to tell them what products were used on a particular job, even if they act like they do."

* "You will be asked when you FIRST LEARNED asbestos was dangerous and HOW you found out. Most people learned about the danger when their doctor told them asbestos WAS IN THEIR LUNGS. It is important to emphasize that you had NO IDEA ASBESTOS WAS DANGEROUS when you were working around it. The defense attorneys believe that if you KNEW asbestos was dangerous and you continued to expose yourself to it without protection, then you should share the blame for being harmed by it."

* "It is important to maintain that you NEVER saw any labels on asbestos products that said 'WARNING' or 'DANGER.'"

* "Do NOT mention product names that are not listed on your Work History Sheets. The defense attorneys will jump at a chance to blame your asbestos exposure on companies that were not sued in your case."

* "Be CONFIDENT that you saw just as much of one brand as all the others. All the manufacturers sued in your case should share the blame equally!"

* "[B]y the mid 1970s most insulating products being installed no longer contained asbestos. The public was just beginning to hear reports that asbestos was dangerous...You want to be PERFECTLY CLEAR ON THE RECORD that you did not expose yourself to asbestos once you learned it was dangerous!"

In affidavits submitted to authorities, Terrell and others in Baron & Budd's employ have stated that Terrell gave her memo to about 200 Baron & Budd clients. The Observer was able to locate and interview a dozen of these clients. Most were vague about whether they had actually seen the memo, and none admitted having a specific recollection of the document. "Tell you what, they give you so much stuff," says Julian Avery Roberts.

Courts and experts in legal ethics have differed wildly on the propriety of Terrell's memo. Some have said it's OK, given Terrell's claim that she orally instructed clients to tell the truth and always gave out the second document. A former Texas Supreme Court justice called it a "cancer on the legal system." Baron has denied that the memo contains "firm policy" and is clearly tired of the questions.

"This whole thing is so stupid," Baron says. "You have to know the context of how Lynell did this before you can draw a judgment." A few minutes later, he says, "You'll never know the context, because you've not interviewed Lynell, and Lynell's not going to tell you the way that she used it. But taken out of context and taken away from the staple that stapled the other piece of it together, it

sounds bad." (The Observer asked Baron to arrange an interview with Terrell, his employee. He declined.)

Yet a number of former Baron & Budd employees say that the information and techniques contained in the memo are widely used, even taught to employees. They say the Terrell memo was not truly an aberration, but a written example of how the product-identification staff works at Baron & Budd.

Cathy Eads-Tone says she laughed last fall when the Terrell memo surfaced and she read excerpts informing clients that, in the event of product-identification mistakes, they should say the "girl from Baron & Budd" wrote it down wrong.

From 1987 until late 1991, Eads-Tone was a Baron & Budd "girl," a paralegal handling the medical side of hundreds of asbestosis claims. "If there ever was a screw-up, 'the girl' did it. It was a joke," Eads-Tone says.

Eads-Tone, 38, who was laid off by the firm and now is employed in Dallas as an insurance claims adjuster, worked side by side with Cheryl Kuntze, who did product-identification paralegal work at Baron & Budd for five years, until she resigned in 1992. Now 39, Kuntze works in North Carolina as a loan officer.

At Baron & Budd, Kuntze's duties consisted mostly of helping clients identify which asbestos products they recalled seeing at their workplaces.

Eads-Tone, who remembers making one trip with Kuntze to upstate New York in the winter of 1991 to do "product ID" interviews, and Kuntze both say that a client-coaching system was in place at the firm. Workers were routinely encouraged to remember seeing asbestos products on their jobs that they didn't truly recall, the women say.

It worked like this, according to Kuntze: The firm would start with a printout from the Social Security Administration listing every job the workers ever held. She would set up a meeting with the clients, usually at their homes, and she would spend weeks on the road traveling from interview to interview.

Using past lawsuits and other information, Kuntze said, attorneys at the firm would already have provided her a list of asbestos products. "Depending on what area of the country, and based on prior asbestos litigation, they [Baron & Budd] already would know who they were going to sue. It was based on lawsuits that were filed previously in that area," she says.

Russell Budd says Baron & Budd has an internal database that shows what asbestos products were at a particular job location and who else may have worked there. Thus, in many or even most cases, Baron & Budd knows ahead of time what the "correct" product ID answers are. As Budd explains it, this knowledge is "one of the benefits that we bring to the table for these clients."

Paralegals say--and neither Baron nor Budd denies--that workers are selectively shown pictures of asbestos products they should identify. Kuntze says that in meetings with clients, she would bring a "3- or 4- or 5-inch binder with pictures of asbestos products, divided up according to manufacturer. I'd go through page by page and encourage the client to recall the products they used. It would be pretty strong encouragement. Most of the time when I left, I had ID for every manufacturer that we needed to get ID for."

She already had the answers, she says. Kuntze just needed the worker to agree she had the correct ones. Most would wise up pretty quickly, she says. "Clients understood that products needed to be ID'd for the manufacturers we sued," she says.

Budd says this is permissible. "If there were, you know, 20 products that were used at the shipyard that have been identified over and over and over and over again, by literally hundreds or maybe even thousands of witnesses--yeah, it would be our duty to say, 'These are the following products that have been used at that job site. Do you recall any of these?'

"If she is construing that to be encouragement, then that's entirely permissible and probably our job. [Not] probably--it is our job. If it's anything more than that, then I don't know what she's talking about."

Yet Kuntze says that in many cases, the client had no specific recollection of some products before she interviewed them. "My original caseload was a thousand, but I didn't interview that many people. It was in the hundreds. I'd say that probably in 75 percent of those cases I had people identify at least one product they couldn't recall originally."

Like Baron, Budd seems to believe that refreshing memories in these cases is not only ethical, but also mandated. "It certainly would be our job to show the plaintiff the evidence that products of this type were used at that job site and ask him if he remembered [any of them]," Budd says--even if there were no memories to start with.

But as Kuntze and Eads-Tone remember it, their job didn't stop with implanting memories; there were also the asbestos products they had to encourage clients not to recall.

In New York, Kuntze says, "everybody could remember something from Johns-Manville," which was the largest U.S. distributor of asbestos products.

But Kuntze claims that her supervisors, two lawyers, told her to discourage identification of Johns-Manville products because the Manville Trust was not paying claims rendered against it at the time.

This, Budd denies. "Absolutely not true," he responds. "I can show you in virtually every case, there will be, for example, Johns-Manville exposure [listed]. There will be UNARCO exposure [listed]. There will be Forty-Eight. Those are all companies that have been in bankruptcy."

Kuntze insists that, for certain periods of time when tactical reasons dictated it was better not to have exposure to a bankrupt company's products, identification of those products was discouraged. Thus, when a client would say he saw, for instance, a Johns-Manville pipe covering, Kuntze says, she would hand them a line. "You'd say, 'You know, we've talked to some other people, other witnesses, and they recall working with Owens Corning's Kaylo. Don't you think you saw that?' And they'd say, 'Yeah, maybe you're right.'"

Later, she says, Johns-Manville began paying settlements, and she was ordered to go out and "meet these guys again" and get them once again to name Johns-Manville products.

Kuntze says she learned some of these methods and techniques from "other paralegals I worked with." But she has no doubt that her supervisors and at least one of the firm's partners knew what was going on.

"I remember specifically there was a case in the Mobile, Alabama, area that was set for trial, and I was specifically sent down there to get product ID. I was basically told, 'Don't come back without the IDs.' Russell Budd or [former Baron & Budd attorney] Sarah Clark told me that." She says that occurred sometime in 1991 or 1992.

"That's not true," says Sarah J. Clark, who was a Baron & Budd lawyer for more than 10 years, ending in 1995.

Budd denies it as well: "That certainly doesn't sound like anything that I would have ever said."

Kuntze says she thought about the nature of her work and felt ethically conflicted, but she stayed on. "That was a choice I had to make for myself. I was making good money."

In her last year, she made about $43,000, she says.
Product-ID paralegals, who meet with clients regularly, hold considerable status at the firm, says another former paralegal who demanded that she not be identified. "They treat these paralegals very well. Pay them well. Bonus them well. They are treated like the upper echelon."

Says Kuntze: "There was at least one time, maybe more, that I went to Brian Weinstein [her supervisor and a Baron & Budd attorney] and said I didn't think a particular settlement was right. That I can't believe we're doing this. I was basically told to be quiet or leave."

Weinstein, who now owns his own firm in Seattle that also specializes in asbestos litigation, says that simply didn't happen. "I honestly don't remember telling anybody to do something that was improper. Nobody was ever told to lie or to say something was there if they didn't believe it was there.

"Coaching of clients? You have a duty to coach your clients," Weinstein continues. "...People were coached, but nobody did anything improper that I know of. It would be part of their job to say, 'Hey, Joe Schmoe said it was there. Does your memory jog because it was there?'

"You walk a fine line. I don't believe I ever walked over the line."
But Kuntze recalls it differently: "There were clients we were getting money for, and some people just didn't deserve a dime."

The paralegal who asked not to be identified confirms that Kuntze told her she routinely led clients to give specific testimony.

"She said, 'Oh God, yeah, I used to prep those guys all the time. You know half of them couldn't read or write.' And when they couldn't identify things, she'd say, 'Certainly you were exposed to this, don't you remember?' And steer them that way. Very, very suggestive."

The former paralegal recalls being asked to falsify product-ID information the very first week she was on the job.

"They were having me fill out the product IDs [forms that the paralegals had gathered from clients]...There was a man, he was some sort of contractor. He had absolutely no exposure to asbestos—none. There was nothing in his work history."

As she scanned the paperwork, Russell Budd walked by the office she was working in. "I got up and

walked out and said, 'I don't know what to do. This man has not had exposure at all.' He looked at me and said, 'Oh you're a smart lady. Be creative,' and he turned and he walked away."

She says she then went to her immediate supervisor, who she recalls also told her to "fill it in, make up stuff."

"I was shocked," she says.
When she refused to fill in product names, the supervisor simply took over the file, she says. "I don't know what happened to the case after that."

Says Budd: "I don't understand how a person that has never been exposed to asbestos would have an asbestos-related disease. It just doesn't make any sense."

The former paralegal, who left the firm in the mid-'90s, says that Baron & Budd's "girls" operate in a results-oriented pressure cooker: "If you don't produce, you don't win. You don't get money. You don't get bonuses and the [annual] trip to Colorado and all the perks."

Eads-Tone, who spoke from her home in the Casa Linda area, her husband and five Chinese pugs sitting nearby, says that around the firm, "lying" was not a word that was tossed around.

"When somebody's deposition was coming, you were never told to tell people to lie or anything," she says. "But you were told, 'Look, we have this product ID. Make sure they stick to it.'...It was sort of like 'Work with 'em. Work with 'em to identify this stuff, and don't leave until you get the ID.' OK, you can interpret that any way you want."

Eads-Tone spent most of her time at the firm dealing with medical records, but when work piled up, she also was enlisted in the effort to get clients to identify asbestos products.

Overall, she says, workers in asbestos plants and insulators "really did know the products...But when you got the electricians and the carpenters and the brick masons...They didn't work with the products that much."

These clients needed aggressive coaching, she says.
"When you were talking with the guy, you would say, 'We know this product was there.' This is where you'd get them to implant false memories. We knew in many cases from insulators that certain products were on the job site. So you would say, 'Joe Smith says that Celotex was all over the place when they'd saw that thing in half. They say, 'Oh yeah. I'd be under it.' You'd say, 'You know, it was Celotex they were cutting,' and they'd think, and they'd think, and they'd go, 'Yeah...Yeah, it was Celotex.'"

Eads-Tone says there was tremendous pressure in her section to get results. "There is a lot of pressure to get [clients] not to cave under at deposition or at trial. A lot, a lot of pressure."

Once the clients' work history sheets listing where and what products the clients worked with were done, she recalls, "That is the story. There were occasionally guys who would crash at their depositions, and if that happened, the paralegal would get beaten up for not doing her job. I heard them get chewed out for that."

Eads-Tone also says she clashed at times with her supervising attorney, Brian Weinstein, when she

defended an unbiased doctor and resisted employing "whore docs," doctors who would tie almost any lung abnormality to asbestos exposure. "There were a couple of pathologists that would say everything is asbestos-related," she says.

And she says she witnessed how, as the pool of very sick clients shrunk, the firm lowered the bar on which cases it would take.

"Initially [in the late '80s], if somebody just had pleural plaques [benign spots on the pleura, or lining of the lung] or something like that, they wouldn't take the case. Later on that's all they had...Later on they made these into cases. I could see the shift during my period [with the firm]."

Eads-Tone says her supervisor, an office manager, told her when she left the firm that she could not be trusted to "do whatever it takes" to make a case. She agrees. "I wasn't willing to do whatever it takes."

Though both Baron and Budd dispute it, internal Baron & Budd documents obtained by the Observer appear to track what these former paralegals say about how the firm's product-identification process works.

A document titled "P.I.D Study Sheet," which was written by Baron & Budd paralegal Judy Bruton, gives information that is similar to the Lynell Terrell "Preparing for Your Deposition" memo. Like the much longer Terrell memo, the "Study Sheet" contains detailed information on the different types of asbestos products that existed, their color, packaging, and common uses, and identifying information about specific products.

Also like Terrell, Judy Bruton apparently sent part or all of her product-identification memo to clients. In a handwritten memo dated August 26, 1993, and addressed to several Baron & Budd attorneys, Bruton writes that she gives the attached "study sheet" to "all my clients who can read [and] ask them to be familiar [with] the information for their deposition." The attached two-page "study sheet" gives essential information on different types of asbestos products, from pipe covering to gaskets, and, most important, when each product might have released dust that the worker could have inhaled.

Baron says he is not particularly concerned about the danger of implanting product memories in his clients, who often are elderly and infirm.

"You know, I used to do DES cases. And what you are asking your client to remember is the size and shape and color of a pill that they might have taken 10 years ago. That's a hard recollection. [Diethyl-stilbestrol was a drug given to pregnant women from 1938-1971 to prevent miscarriages and other pregnancy problems. It was found to cause cancer and other illnesses.]

"Do we implant memories? Yeah, probably we do. Is that something that is wrong? I don't believe it is."

Blurring lines

"The first thing they give you is this book on the history of asbestos litigation," explains a former Baron & Budd attorney who spoke on condition that she not be named. "It...includes the evil deeds of the asbestos companies...and Fred's mentioned in the book."

Another book has pictures of men dying. They look like Holocaust victims, the attorney says.

"You get all worked up," she says. "You feel like you're working for a higher purpose. The lines start to blur, because you believe. It makes you not want to question what the paralegals are doing."

As she speaks, the lawyer unconsciously draws her knees up in a lawn chair outside a local Starbucks and hugs her ankles. It is a morning in late April, and she is nervous. She knows that her former employers would not approve of her talking to the press.

But she is also angry. She blames Baron & Budd for souring her on the practice of law, for creating what she describes as an atmosphere where attorneys and paralegals were not only taught that manufacturing testimony was their duty, but disciplined if the "proper" testimony was not obtained.

She says she lasted a few years.
"Slowly, you begin to question whether the means you are using to achieve the ends are legitimate. And if not, what is your involvement in that?" she says. "And you either leave or you accept it."

She still recalls one of the first depositions she ever defended at Baron & Budd by herself. "I knew my guy wasn't prepared to tell the lie," she says. "This gentleman did not know Kaylo [a product manufactured by an important defendant], had never seen pipe covering and never worked with it.

"It was on his work-history sheet. And for me not to get the testimony that some paralegal got...I'd have caught shit for that if that group went to trial.

"I pulled him out [of the deposition]," she says. "And I said, 'Could you just read off your work-history sheet?'...He goes, 'I don't know why it's on there. It shouldn't be on there. I don't remember it.'

"...And I was in fear and feeling totally inadequate and knowing that in getting what I needed to get, I was crossing the line." She got the identification. "And this was a good man," she recalls--though he wasn't particularly sick. Afterward, she ran home in tears and told a family member that she couldn't continue.

She got over it, she says, and goes on to explain how.
"They die breathless," she says of the sickest clients. "Literally, their lungs get so scarred that their air is restricted. And they choke to death. It's a horrific disease, which they knew the dangers of. The manufacturers, they absolutely knew.

"You see these people wheeled in, attached to oxygen tanks--and so what if they can't remember which of the labels they saw 30 years ago? The defendants...made something. They should pay. That's where you get confused."

But not all the workers she saw were so ill. By her estimate, "at least 50 percent" had no outward symptoms of illness, and that disturbed her.

For those workers who weren't obviously ill being deposed by opposing lawyers, one Baron & Budd-produced document has this bit of advice:

"If client says he doesn't like thinking about [getting cancer], get him to say the reason is because he is afraid of getting it, and it upsets him to think about it, but nevertheless, he does think about it."

This suggestion goes to the notion that workers can recover for emotional distress caused by their asbestos exposure.

Baron dismisses questions about whether clients should be coached to say they fear cancer. "Every client that you'll ever see says he is afraid of developing cancer," he says. "We want that on the record."

But the former Baron & Budd lawyer recalls it differently. She says the firm's lawsuit process was designed to exaggerate the fear of cancer in many clients who had little increased risk of cancer, because a scared client is an effective witness.

She found this incredibly cruel.
"I would tell my clients after the deposition that they have a higher likelihood of being hit by a bus than being killed by asbestosis," she recalls. They would hug her and say thanks.

By the time her clients came in for their depositions, their cases had been on file for some time, and they were usually well-versed. "They sounded like recordings," she says. And a good thing it was, too, as she says she first saw them just an hour before their depositions began.

"You sit at that deposition and [most of the time] your client isn't sick and does not remember what he had for lunch, much less the particular brand name of asbestos--if he knows what it is--he worked with some 30 years ago. [And] you realize that this is not legitimate."

By the time she arrived, an explosion of cases was under way, fueled by a Texas law permitting asbestos cases from other states to be tried before Texas courts as long as the defendant manufacturers had some contact with the state of Texas. In 1990, the Texas Supreme Court declared that Texas courts could not dismiss suits simply because they were filed here by nonresidents. In response to the decision, in 1993 the Legislature introduced a bill designed to allow courts to toss the nonresidents' suits out once more. But Baron, who was one of six people on the commission that helped draft the new statute, managed to ensure that the law had an exception for claims related to asbestos, as well as several other categories of mass tort claims.

In other words, out-of-state residents could no longer file many lawsuits in Texas, but they could still file asbestos-related suits.

This small exception quickly became a gaping hole. Between 1990 and 1992, after the Texas Supreme Court made it more difficult to get rid of nonresidents' suits, the number of nonresidents filing asbestos lawsuits in Texas grew rapidly, according to numbers compiled by the Texas Civil Justice League. There were 580 claims filed by nonresidents in 1990, and 3,121 in 1992. After the 1993 bill, the numbers multiplied even more rapidly. Between 1993 and the end of 1995, more than 35,000 nonresidents filed asbestos-related claims in Texas, as lawyers in states with shorter limitations statutes than Texas referred their cases here. Though the loophole was closed last year, there are nearly 42,000 asbestos claims filed in Texas by out-of-state plaintiffs awaiting resolution.

To help prepare Baron & Budd attorneys for the caseload, senior lawyers educated new attorneys at internal lectures and seminars. At these lectures, the new recruits would learn how to handle every aspect of a case.

Among the documents the former Baron & Budd lawyer obtained from another employee were

photocopies of handwritten notes apparently taken by an attorney named Angelyn Schmid during an internal training session. The notes admonish lawyers to explain to workers that their claims for damages might be weakened if they had seen warnings from manufacturers that asbestos was hazardous. In essence, the law in some states says that if the workers knew that a product was very dangerous and continued to work around it, that fact can affect their ability to recover money from the manufacturers, according to Joe Sanders, a law professor at the University of Houston.

"Warn [plaintiff] not to say you were around it--even if you were--after you knew it was dangerous," the handwritten notes read.

The notes also suggest that workers should not say they were exposed to asbestos beyond the mid- to late '70s. By the '80s, the dangers of asbestos were widely known, so anyone who continued to work unprotected with the product by then could be presumed to have contributed to the risk--thus weakening any claims for damages.

Under a section titled "name that product," the outline covers the critical business of product identification:

"Show client filled out sheet showing what [client] picked out. Get him to agree he picked out...

"Products: explain in the context of who will be in depo[sition]--emphasize those products."

The manufacturers at the deposition, of course, would be those who hadn't settled yet and might end up going to trial.

"Did it originate at Baron & Budd? No doubt, it did," Baron says of this set of notes. "Was it taken completely out of context? Absolutely. Listen--it's authentic. It's her handwriting...but Angelyn would be delighted to tell you what she meant when she wrote it."

But Schmid was far from delighted when asked about the notes. In fact, she denied they were hers.

"This is not my writing," Schmid said when the Observer faxed her a copy of the notes. "I do not recognize this. I do not remember writing down anything like this." Yet Linda Collins, a certified forensic document examiner consulted by the Observer, says the handwriting is identical "in every way" to that contained in a handwritten change-of-address letter that Schmid sent to the Collin County voter registrar in 1996.

Though Baron insists that neither Terrell's nor Schmid's documents were authorized by the firm, similar instructions appear on other sets of notes apparently taken at internal Baron & Budd training sessions. One document, which Baron says appears to be a typewritten summary of notes taken at a training session given by deposition attorney Jennifer Calhoun on September 18, 1992, contains heavy-handed instructions to clients that echo those contained in the Terrell memo:

"If client is asked if any other doctors told him about his condition before the diagnosing doctor named in the [interrogatory], client should answer NO."

(An interrogatory is a set of written questions submitted by attorneys to the other side.)

This instruction goes to the heart of another problem bedeviling some of Baron & Budd's cases. The

statute of limitations for filing an asbestos claim, which varies from state to state, generally begins running from the date a worker "knew or should have known" he had an asbestos-related illness-- usually, when he is diagnosed. If a worker waits too long after a diagnosis to file a claim, he's out of luck.

In a telephone interview, Calhoun claimed that this document is fraudulent. "It looks like somebody is feeding you some false stuff," charges Calhoun. "This is just ridiculous. I'd be very careful in saying this is a document that came from Baron & Budd."

Baron, however, confirms that the notes are "authentic" and that they apparently came from a training session with Jennifer Calhoun. But he adds: "Jennifer just vigorously denies this...[but] what it appears to be is someone listening to Jennifer Calhoun doing a training session and then writing notes and typing them up...Jennifer has never seen that document...It was not authorized...Was the Lynell Terrell document a Baron & Budd document? I would say no. It's a Lynell Terrell document. Is this document a Baron & Budd document? I would say no. It belongs to the author, whoever that is, and it was authored without our consent."

Yet he stands by the instructions to young lawyers contained in the document that a client should answer no when asked whether he was diagnosed previously.

"If [the client's] case is going to survive, he sure as hell should answer no," Baron says.

But in the case of Larry Duane Smith, the Observer discovered how the "right" answer is not necessarily the most truthful answer.

Some helpful hints
Larry Duane Smith, a mechanical engineer technician with the Army Corps of Engineers in Oregon, filed suit against several asbestos-product manufacturers in Dallas County in 1994.

Thanks to another wayward memo from a Baron & Budd paralegal, his case would quickly hit a snag over the issue of when he was diagnosed--a question concerning the statute of limitations.

In early 1995, an internal Baron & Budd memo was accidentally handed to opposing lawyers. The memo, dated December 21, 1994, was written by then-Baron & Budd paralegal Debi La Barbera. "Mr. Smith informed me that Dr. Epsteine, in Portland, told him in 1986 that he had asbestos in his lungs. He said he spoke to Ann Worthington about this, in Portland, and she told him not to worry about it." (Ann Worthington was the attorney who referred the case to Baron & Budd.)

The statute of limitations for products liability cases in Texas is two years, so if Smith were diagnosed in 1986, his 1994 case would have been filed six years too late.

La Barbera continues: "Mr Smith has been involved in several depo's [sic] with his employer, the Army Corps of Engineers. He is a little concerned about this problem. I spoke to him concerning this. We may want to remove Dr. Epstein [sic] from the list of phys[icians]. He said he will need to be prepped well by the depo attorney. Which means he wants to spend more than an our [sic] with whomever sits his depo. I think he's okay with saying he wasn't diagnosed til dr. Craven read his CRX's." (CRX is an abbreviation for X-ray.)

"I did not circulate this memo...."

Did the earlier finding by Dr. Epsteine start the clock running too early for Smith to make his case, and was Smith being coached to lie? Baron says no; the memo shows no impropriety. "You can have asbestos in your lungs, and it doesn't start the statute of limitations running," he says. "There has to be a medical diagnosis of an asbestos-related disease." He denies that Epsteine's name was omitted from a list of all physicians Smith had seen; instead, he says, it was dropped from the expert witness list. As for the "I did not circulate this memo" bit, Baron says he has "no idea" what that's all about.

But in Dallas County, Epsteine's name appears nowhere in the answers to interrogatory questions asking a plaintiff to list all physicians he has seen, for "any reason during your lifetime." Moreover, on January 12, 1995, after the La Barbera memo was inadvertently given to the defense lawyers, Baron & Budd dismissed the case.

Two months later, on March 22, 1995, the firm filed it again in Cameron County, Texas, in the Rio Grande Valley, where most of the defendant manufacturers employed a different set of local lawyers--lawyers who were unfamiliar with the La Barbera memo's link to Smith's case.

As did his answers in the Dallas case, Smith's answers in the Cameron County suit say that Smith was "first told in 1994 by Dr. John Gotchall that Plaintiff's lung or breathing problems were related to asbestos-containing products." This time, however, Dr. Epsteine did make the list of 15 doctors whom Smith had consulted during his lifetime; the Cameron County answers say that Smith consulted Epsteine for "[g]eneral health care" in "1985-86." During his deposition last November, none of the lawyers representing asbestos manufacturers even questioned Smith about his visit with Epsteine.

Budd denies that they moved the case to hide Dr. Epsteine from a new set of defense lawyers unfamiliar with the problem in Dallas.

"There's about 25 different jurisdictions where these cases at that time could have been filed in Texas," he says. Where his firm chooses to file, he adds, "is pretty much random."

Random or not, none of the defense attorneys the Observer contacted in the Cameron County case was aware the case had been dismissed in Dallas County and refiled.

"They really knew what they were doing on that one," marvels one defense lawyer, who represented a manufacturer in the Smith case filed in Dallas, speaking on condition that he not be identified because he fears retribution from Baron & Budd. "They know that all of these defendants have different lawyers in Cameron County than in other counties. It's so far away, and they want to save on travel costs. And everyone just feels they must have local counsel there."

Several attempts to reach Smith and La Barbera for comment were unsuccessful. Smith's case was eventually settled for more than $100,000.

The notes from the Calhoun "depo prep" session contain specific guidance on how to avoid problems with the statute of limitations: First, you "explain S.O.L to the client," then you "quiz client on S.O.L. to see what their answers will be." In other words, tell them the law and how it could affect their case before they tell you the facts.

Baron himself is explicit. Not only is this approach permissible, but professional guidelines for lawyers make it mandatory.

"The lawyer," says Baron, "needs to sit [with the client] and say, 'Now, before I ask you whether you've been diagnosed by another doctor, you need to know that if you have been, your case will be barred by the statute of limitations. Now, have you been diagnosed by another doctor?'"

"Does that mean I've gotten the client to lie?" Baron asks. "You know, if you don't like that, then you don't like the way law is practiced.

"And do we suggest testimony? Of course we do," says Baron, who nevertheless insists his employees never suggest false testimony. How does he guarantee this? Baron says he has outside speakers come in periodically to lecture on ethics.

But while internal Baron & Budd memoranda contain plenty of suggested answers to questions, they have few cautions to ask whether any of them are actually true.

A December 1993 memo provides an example. At the time, Baron & Budd lawyers Peter Kraus and Andy Waters were trying a case against Owens Corning in a Dallas courtroom. Two of their clients, Willie Thompson and Lloyd Dodds, had worked for years at the Alabama Dry Dock Shipbuilding Co., near Mobile.

During the trial, an attorney representing Owens-Corning tried to introduce several issues of a company-produced newsletter called Fore and Aft, which was apparently distributed to employees of the Alabama Dry Dock Shipbuilding Co. while both Dodds and Thompson worked on the docks. The publication contained warnings that employees should wear masks to guard against hazards such as asbestos.

In other words, the newsletters constitute at least some evidence that Thompson and Dodds may have been warned to wear respirators, a fact that might provide a basis for reduction of their damages.

On December 8, 1993, Waters dashed off a memo warning fellow employees about the publication, suggesting testimony to be adopted by future Baron & Budd clients who worked at the state docks:

"Witnesses should be properly prepared concerning Fore and Aft, especially in terms of the fact that he probably never reviewed the specific issues presented and generally these were available to be picked up on the way out of the facility but were not read by the employees." As with most of the internal Baron & Budd memos in the Observer's possession, there's no warning to make sure the suggested stories are the truth.

"What I wanted to make sure didn't happen...was that the clients, that we hadn't discussed with them whether they'd ever seen this publication before," Andy Waters explains.

Two more memos—one of them authored by Russell Budd—go to the very heart of the notion that a plaintiff would not have continued to work with asbestos products if he had been properly warned of the risk.

In a memo dated July 25, 1994, Budd suggests both a proper question and answer to deal with this issue:

"Q: 'What would you have done if the container of Kaylo had a warning label advising you that asbestos could kill you?'

A: 'I would have stopped working with the product immediately.'"
Budd says he did not mean to suggest clients should testify thus if it isn't true.

Yet even Baron admits that it is doubtful a client would have quit his job if the asbestos bag
contained a warning. "Our position is that they did not know the magnitude of the risk. Did they
know that it was dangerous? Of course they did. We can't argue that they didn't."

Two out of 12 Baron & Budd clients interviewed by the Observer admitted they continued to work
around asbestos long after they knew it was dangerous. And public records from their lawsuits show
they testified otherwise.

One Baron & Budd client, who asked not to be identified because his case is still pending, says he
learned that asbestos was dangerous in 1978 or 1979, when OSHA came out to his workplace. Yet
his interrogatory answers, filed by Baron & Budd, contain the standard statement that "Plaintiff
learned that asbestos could be harmful to his health through the media."

Likewise, Willie Jean Armstrong of Pleasant Grove, Alabama, the widow of a Baron & Budd client,
told the Observer that her husband was warned of the dangers of asbestos at least 10 years before
he testified he did. At the time, his company forbade its workers to take their work clothes home to
be washed because of the danger from asbestos dust.

"When they first started doing this stuff--telling people there was asbestos at the plant and that it was
dangerous--they made them wear protective clothing and wouldn't let them bring their laundry
home," she says.

In a deposition taken in November 1995, the man testified he knew nothing of the danger of asbestos
until 1992, "[w]hen the doctor told me." A smoker from age 7, he nevertheless insisted that smoking
is not dangerous. Indeed, he was perfectly clear about what he believed was killing him:

"I'm mad at the people that produced asbestos-material disease. I'm mad at God. I'm mad at this
whole world because I'm not educated on what--on this stuff that's damaged my health."

To tell the truth
While former paralegals and the firm's documents paint one picture, many Baron & Budd clients
insist they were not coached to lie.

"They said if you ain't never seen nothing like that, don't tell it," says Roger Freeman of Alabama.

"Some people say, 'They'll put words in your mouth,'" says Julian Roberts of Alabama. "But they
never done me like that. It was always, 'Tell the truth, tell the truth.'"

Neither does the firm lack champions among former employees.
"In the time I was there, I don't believe I observed any preparation I would consider improper," says
Andy Waters, a former trial lawyer who now has his own asbestos plaintiffs' practice.

"I'd say I was very surprised when [news of the Terrell memo] came out," he says. "I was
flabbergasted by the thing. For one, I'd be surprised if more than a third of our clients could even read
that thing."

"I wasn't exposed at Baron & Budd to a policy where we told people what to say," says Al Stewart, a former Baron & Budd trial lawyer. "What I saw on TV [about the memo], I thought, 'There is no way anything like that could be going on.' As a matter of fact, my adage before I put them on the stand was, 'Your job is to tell the truth. If you don't remember, say that.'"

"To tell the truth. That is the culture," says Amy Blumenthal, a former deposition lawyer who, like other former Baron & Budd attorneys, still does asbestos plaintiffs' work at a Baron & Budd spin-off. "I was proud to be a part of that culture."

Others are more equivocal. "That [lying or shaping the truth] is something every attorney deals with on an individual basis," says Paul Donsbach, a former Baron & Budd lawyer who now practices in Hawaii and no longer does asbestos work. "I think that is something of a private matter, whether people are going to push the envelope or not."

Baron says that rules governing lawyers make it clear that informing clients about the consequences of their answers is ethical.

"Look," he says. "For instance, you're in an automobile accident. You come in here and say, 'You know what? I ran the red light.' I'm not going to then sit here and say, 'Well, you are going to have to tell them you didn't.'

"But if you come in here and say you were in an automobile accident at an intersection, I'm going to say, 'Now if you tell me you ran the red light, that means you are going to lose your case.' And then wait for your answer."

Baron says this hypothetical is "absolutely, positively" ethical. "And in fact if you read any of the deposition-preparation materials—in fact, if you read the American Law Institute [Restatement on the Law Governing Lawyers]—you have an obligation to do that. You gotta tell the guy, 'discussing the applicability of law to the events in issue.' Absolutely, positively, I have a duty to do that.

"You know, there are probably 350,000 of these [asbestos] cases that have been filed over the last 15 or 20 years. You're asking me to say what we do, which is what everyone else does, and which is the way these cases are handled—and it is the way every product-liability case is handled—is wrong."

Everbody does it
"Context counts, and a lot of ethical things are not bright lines," says Stephen L. Pepper, a University of Denver College of Law professor and a renowned ethics expert.

As Pepper and others point out, there are schools of legal thought that would bless the practices of Baron & Budd.

"You know, it's quite an elaborate conversation you have with a client, to get the facts without encouraging lying," he says. "Knowledge of the law is a two-edged sword. And this is a classic example of it. You can use that knowledge to try to remember truthfully, or, depending on the kind of person you are and your motivation, you can use that knowledge to lie.

"And I must say, in this context, I'm not even sure lying would be the worst thing to do, if in fact you were injured by these products and the only reason you can't recover is it's 20 years ago, the companies aren't willing to settle with you, and you can't even remember which one it was."

Of course, if that was the context 25 years ago, it no longer is.
"These folks have such volume, they may have drifted across the line because of the volume," Pepper
continues. "I'm sympathetic to that, until you tell me the volume involves people who aren't sick, and
then I'm less sympathetic to that."

Geoffrey C. Hazard, director of the American Law Institute in Philadelphia, also believes that the
"context" of Baron & Budd's practice is important, but he interprets it less charitably.

"If the [Terrell] memorandum simply provides a formal structure for what was even more intensive
coaching--if you accept that set of facts, then it was clearly unethical, because they're inducing
people to give statements that they couldn't have remembered themselves, and it's all focused on
setting up liability, and that's essentially telling the witnesses what to say, and that's wrong.

"Many plaintiffs' lawyers probably do something like that, and probably there's a lot of it in the
asbestos cases, and obviously it's very difficult to detect, and there are not many prosecutions for that
reason."

Indeed.
"By the way," says Baron on July 2, "I assume, number one, you know that the grand jury expired."

It's true. In late June, the held-over county grand jury looking into the matter of the Terrell memo
quietly disbanded without taking any action.

"The DA's office issued a statement that we were advised of," Baron continues. "It came from Cecil
Emerson [the assistant district attorney in charge of intake]. Cecil told us that the grand jury had
completed its investigation, as had the district attorney's office, and they had decided to take no
further action on any matter, period."

That's not exactly the story coming from the district attorney's office--or, for that matter, from the
U.S. Attorney's Office.

"I guess you know our investigation has been taken over federally," says Luke Madole, the assistant
Dallas County district attorney who advised the grand jury investigating Baron & Budd. "I'd better
not say too much more, because I wouldn't want to interfere with their investigation."

The criminal investigations are but the latest chapters in the drama prompted by the Terrell memo, a
drama that Baron casts as a Hatfield-and-McCoy-style blood feud between himself and Raymark
Corp.

Like Johns-Manville, Raymark is a bankrupt former asbestos manufacturer. Baron, who once sat on a
bankruptcy creditors committee overseeing Raymark, claims the company has stirred up the furor
over the Terrell memo in an effort to "kill Fred Baron." Raymark's attorney denies the claim.

Nevertheless, in mid-September, Raymark and two other manufacturers began filing the Terrell
memo in courts in three states, seeking to put Baron & Budd cases on hold.

Baron launched an aggressive counteroffensive, claiming that the document was privileged and
therefore that everyone had to give it back. The resulting rulings have taken Baron to two state courts
of appeals, with mixed results. And in the meantime, state District Judge John Marshall referred the

matter of the Terrell memo to a Dallas County grand jury.

Baron's response was swift and personal. "He's a fruitcake," Baron said of the judge--a comment that was made within earshot of several reporters. Though Baron later apologized to the judge, he also fired off a judicial-conduct complaint. (The complaint was later dismissed.) In a later interview, he alleged that the judge has a habit of referring trivial matters to the district attorney. "We were told that he routinely refers matters to the grand jury and that so far the grand jury has--the DA's office has never accepted any of Marshall's complaints," Baron says.

Meanwhile, Baron was busy at the district attorney's office, sending over brief after affidavit after personal emissary in an effort to squelch the grand jury inquiry. He argued that suborning perjury was not a crime in Texas, that the Terrell memo was a one-of-a-kind document by a rogue employee, and that it wasn't unethical under the code of professional responsibility, and therefore couldn't be a crime.

"I didn't really engage with him on any of those issues," says Luke Madole. "The decision to surrender the case was made while I was out of town. When I got back, I found out we'd received word that the federals were going to take the matter up."

The story from the DA's office makes a couple of assistant U.S. attorneys chuckle. "The spin from the DA's office is, ah, different than kinda how the case got up here," says one federal prosecutor. "Because of the politics of it, they wanted to drop it, and so it ended up here.

"The Man [U.S. Attorney Paul Coggins] definitely said go after it full-bore," the prosecutor adds. "He's definitely said if there's anything to be done there, he wants it done."

The Observer has learned that at least one former Baron & Budd employee has been subpoenaed by a federal grand jury. And a number of other potential witnesses or their attorneys told the Observer that the FBI or the U.S. Attorney's Office has contacted them about matters related to the Terrell memo.

Federal prosecutors appear to be in the early stages of their investigation, and records, as well as former employees of Baron & Budd interviewed by the Observer, have the potential to expand the probe well beyond the Terrell memo. But as demonstrated by the diversity of opinion legal ethicists have delivered on the propriety of the Terrell memo, the subject is inherently difficult. Yet if the end of punishing callous corporations once justified the means alleged by former Baron & Budd employees, those days have long since passed. The most culpable defendants are, by and large, bankrupt. The workplace is significantly safer.

Certainly no one disputes the need to compensate the remaining workers who are seriously ill. But as the decades passed and the reforms were adopted, the pool of obviously sick victims has greatly diminished. Baron himself estimates that a large percentage of his clients are the "pleurals" and asbestosis cases, in whom the long-term health impact of asbestos exposure is negligible, or even in Baron's own words, "in the eye of the beholder."

Baron & Budd's former employees make the case that if the asbestos industry was in need of reform, today, 25 years after Fred Baron launched his war, it is the settlement-mill approach to justice that needs to change.

Even Baron himself, when he isn't discussing his own firm, recognizes that his profession needs to

heal itself.

"The public does look down on us," Baron told the Dallas Bar Association this May in a speech inside the Belo Mansion. "The public thinks that we're on the take. The public thinks that we do bad things. There's a public perception that lawyers are involved in double-dealing.

"Unless and until we start really and truly playing by the rules, we're going to continue to have that perception," Baron says, his voice rising in indignation. "And I know it's difficult, because I know that there are client pressures on all of us...But we've got to do it the right way, for the sake of all of us and for the sake of the profession."

If not for the sake of the truth itself.

Additional reporting for this story was provided by Dallas Observer editorial intern Elisa Bock.