# Exhibit 10

```
                             Foster, Charles 9-27-04.txt
0001
 1             IN THE COURT OF COMMON PLEAS
 2                CUYAHOGA COUNTY, OHIO
 3
 4        MASTER CONSOLIDATED CASE
             SILICA (AND MIXED DUST)/
 5           ASBESTOS DOCKET
          Judge Harry A. Hanna/Leo M. Spellacy
 6
 7
 8     Couts v.American Optical Corp.,et al.)
                            Case No.466469
 9
       Diley,et al. v. American Optical Corp., et al.)
10                          Case Nos. 469011-469030
11     Dettmer, et al. v. American Optical Corp.,et al.)
                            Case Nos.468985-469010
12
       Harrison, et al. v. American Optical Corp., et al.)
13                          Case Nos. 469126-469169
14     Whitlow, et al., v. American Optical Corp., et al.)
                            Case Nos. 469166-469169
15
       Bellito, et al. v. American Optical Corp., et al.)
16                          Case Nos. 469152-469165
17     Damico, et al. v. American Optical Corp. et al.)
                            Case Nos. 469099-469125
18
       Fansler v. American Optical Corp., et al.)
19                          Case No. 469429
20     Ross v. Allied Mineral Prods., et al)
                            Case No. 474018
21
       Seward, et al. v. Allied Mineral Prods., et al.)
22                          Case Nos. 475702-475704
23     Wolfe, et al. v. Allied Mineral Prods., et al.)
0002
 1
 2     Young, et al. v. Allied Mineral Prods.,et al.)
                            Case Nos. 475631-475668
 3
       Agalianos, et al. v. Best Sand Corp.)
 4                          Case Nos. 478997-479034
 5     Ash, et al. v. Best Sand Corp.)
                            Case Nos. 499450-499460
 6
       Beach, et al. v. Best Sand Corp.)
 7                          Case Nos. 482220-482251
 8     Applegarth, etc. v. Air Liquide America)
                            Case Nos. 515434-515483
 9
       Jenkins v. Foseco, Inc.)   Case No. 519507
10
       Cash, et al. v. Air Liquide America)
11                          Case Nos. 516415-516438
12     Brown, et al. v. Air Liquide America)
                            Case Nos. 524514-524557
13
       Allen, et al. v. Air Liquide America)
14                          Case Nos. 524558-524607
15     Burkeen, et al. v. Air Liquide America)
                            Case Nos. 522891-522925
16
                                Page 1
```

```
                          Foster, Charles 9-27-04.txt
      Ellis, et al. v. Air Liquide America)
17                       Case Nos. 523610-523659
18    Arnold, et al. v. Air Liquide America)
                         Case Nos. 530935-530958
19
      Gailey, et al. v. Air Liquide America)
20                       Case Nos. 530905-530934
21    Hitchcock v. Air Liquide America)  Case No.532705

22
23
0003
 1         The resumption of the Rule 30(b)(5) discovery
      deposition of Respiratory Testing Services/Charles
 2    E. Foster taken at the Bienville Club, 107 St.
      Francis Street, 34th Floor, Mobile, Alabama, on the
 3    27th Day of September 2004 commencing at
      approximately 10:20 a.m.
 4
 5
 6
 7              A P P E A R A N C E S
 8
 9    For the Deponent:  Charles Foster
10    CHARLES FLEMING, ESQ.
      FLEMING & CHAVERS
11    169 Dauphin Street, Suite 204
      Mobile, Alabama  36602
12
      For the Defendant:
13    U.S. Silica
      BARBARA E. MACHIN, ESQ.
14    BUNDA, STUTZ & DEWITT, PLL
      One Seagate, Suite 650
15    Toledo, Ohio  43604
16    Gardner Denver
      DAVID M. SETTER, ESQ.
17    SOCHA, PERCZAK, SETTER & ANDERSON, PC
      Denver Financial Center Tower I
18    1775 Sherman Street, Suite 1925
      Denver, CO  80203
19
      (By Phone)
20    Black Decker (U.S.) Inc.
      DENA KOBASIC, ESQ.
21    THOMPSON HINE, LLP
      3900 Key Center
22    127 Public Square
      Cleveland, Ohio  44114-1291
23
0004
 1    Black & Decker, USA
      DOUGLAS B. PFEIFFER, ESQ.
 2    MILES & STOCKBRIDGE, PC
      10 Light Street
 3    Baltimore, MD  21202-1487
 4    American Optical
      SCOTT J. WILKOV, ESQ.
 5    TUCKER, ELLIS & WEST, LLP
      1150 Huntingdon Bldg.
 6    925 Euclid Avenue
      Cleveland, Ohio  44115-1475
 7
```

```
                                         Foster, Charles 9-27-04.txt
11   in the process can they turn down the process?
12        A.   No -- yeah, they can.  But I've had them
13   call and have their attorneys pay us for the
14   screening.
15        Q.   Would you consider the client for RTS is
16   really the lawyers that sponsor the screenings?
17        A.   Say that again, now.
18        Q.   RTS' real client is the lawyers who
19   sponsor the screenings?
20        A.   The lawyers are the clients?
21        Q.   Yes, for RTS?
22        A.   They are the ones that pay us for the job.
23        Q.   Right.  You work for the lawyers?
0146
 1        A.   In essence.
 2        Q.   And, in essence, in working for the
 3   lawyers, it's your job to go get the lawyers their
 4   clients?
 5        A.   Not necessarily, no.
 6        Q.   Well, don't you send out union mailers or
 7   mailings to the unions to go get clients?
 8        A.   I mean, you read the thing a while ago
 9   that they send me to talk to these people.
10        Q.   And the lawyers do that?
11        A.   Yes.
12        Q.   And the lawyers pay you to send mailings
13   out to the union members to get them to the
14   screenings?
15        A.   Yes.
16        Q.   The lawyers pay you to go have meetings
17   with union officials at meetings where you make a
18   presentation about the testing process?
19        A.   In some cases, but not in all.
20        Q.   And the lawyers pay you for the tests?
21        A.   Yes.
22        Q.   Would you consider or do you know whether
23   or not RTS has a physician/patient relationship
0147
 1   with these individuals that you test?
 2        A.   Ask that again.
 3        Q.   Do you consider whether or not RTS has a
 4   physician/patient relationship with the folks that
 5   you test?
 6        A.   For the positive, they do.
 7        Q.   For the positive you do?  For the
 8   negatives you don't consider there is a
 9   physician/patient relationship?
10        A.   No.
11        Q.   Why do you consider --
12        A.   Unless there is an abnormality.
13        Q.   Unless there is an abnormality, in terms
14   of a cancer?
15        A.   Well, you know, we are not going to call
16   it cancer.  A nodule or whatever.  Then the doctor
17   talks to them and tells them they have an
18   abnormality.
19        Q.   If a doctor finds a positive and a full
20   medical procedure is done, then you believe that
21   RTS has a physician/patient relationship with that
22   individual?
23        A.   The doctor has a -- state that again, now.
0148
 1        Q.   The question is, you, RTS, considers there
                                    Page 58
```

Foster, Charles 9-27-04.txt
```
 2   to be a physician/patient relationship if the
 3   individual is tested positive?
 4        A.   With the doctor.
 5        Q.   With the doctor?
 6        A.   With the physician, yeah.
 7        Q.   Now, after the individual sees the testing
 8   manager, if I am correct, the next person that they
 9   see is the sign-in person; is that right?
10        A.   No.
11        Q.   What happens after they first see the
12   testing manager?  Who --
13        A.   Oh, the testing manager, yes.
14        Q.   Then after the testing manager, they go
15   see who?  The sign-in person?
16        A.   There would be a sign -- a person to sign
17   them in.  In most cases, they'll be sitting -- you
18   know, this area that we talked about charging for,
19   different areas, sit here and someone will get you.
20   And they come in and get their name and write it
21   down.  And then they call them and then they get
22   all that.
23        Q.   All right.  What does the sign-in person
0149
 1   do with this individual?  What do they make them
 2   sign in?  A sign-in sheet?
 3        A.   Yeah, they sign in.  They go over the
 4   history with them and they get them to sign it,
 5   saying that that is true to the best of their
 6   knowledge.
 7        Q.   Okay.  So they sign in probably a sign-in
 8   sheet as well as the work history sheet?
 9        A.   Well, a work history sheet is what they
10   sign.
11        Q.   After they finish signing in the work
12   history sheet, then do they go get an X-ray shot?
13        A.   They get X-rayed after they have signed
14   that they have no abnormality to keep them from
15   X-ray.
16        Q.   Okay.  And if they've signed those sheets,
17   if I am clear, they have now signed a sign-in
18   sheet, an exposure history sheet and a form saying
19   that they have no abnormality or no reason that
20   they can't be X-rayed?
21        A.   Well, the exposure history and the sign-in
22   sheet is the same thing.
23        Q.   Okay.  So let's go back.  They sign in the
0150
 1   exposure history; right?
 2        A.   Yes.
 3        Q.   And then another form that says they can
 4   be X-rayed?
 5        A.   X-rayed or PFT.
 6        Q.   And after they do that, then they are
 7   X-rayed by one of your technicians?
 8        A.   Yes.
 9        Q.   In one of the X-ray trailers?
10        A.   Yeah.
11        Q.   Or by Dr. Netherland, Chiropractor
12   Netherland out of Mississippi?
13        A.   No.
14        Q.   Did you use Chiropractor Netherland ever
15   up in Ohio?
16        A.   No.
```
Page 59

Foster, Charles 9-27-04.txt

```
17      Q.   Before they are actually X-rayed, are they
18  seen by a physician at any point?
19      A.   No.
20      Q.   Is there anything in writing from a
21  physician requesting that they go forward with the
22  X-ray, other than what we have looked at, for
23  example, on Exhibit 20 with Dr. Gaziano?
0151
 1      A.   Is there any what now?
 2      Q.   Is there anything in writing from a
 3  physician before they get an X-ray that the
 4  individual should go forward with an X-ray?
 5      A.   The only thing is the way I said mark
 6  those forms.  I mean, they might -- whatever they
 7  mark it, PFT or X-ray eval or whatever.
 8      Q.   Something like Exhibit 19, if I can show
 9  that to you?
10      A.   That is an abnormality form there.  They
11  wouldn't go any further by signing that.
12      Q.   Do you have Exhibit 20 over there by
13  chance?  Here it is.  Never mind.
14           I'll show you Exhibit No. 20, which has
15  previously been identified.  That is the form that
16  the doctor would go ahead and order an X-ray?
17      A.   On their work history more so than that.
18      Q.   And after an X-ray is shot, then what
19  happens to that individual?  The X-ray is then
20  taken on-site; correct?  To a B-reader?
21      A.   Yes.
22      Q.   Is that right?
23      A.   By a B-reader.  Well, the X-ray is taken
0152
 1  by an X-ray technician.
 2      Q.   Okay.  And then after the X-ray is shot,
 3  it is then given to a B-reader?
 4      A.   Right.
 5      Q.   And the B-reader is on-site; is that
 6  correct?
 7      A.   Yes.
 8      Q.   And on-site, the B-reader evaluates that
 9  film?
10      A.   Yes.
11      Q.   As positive or negative?
12      A.   Yes.
13      Q.   Does the B-reader, in your opinion, have a
14  physician/patient relationship with that individual
15  or not?
16      A.   Not if he doesn't see anything on his
17  X-ray.
18      Q.   What if he sees anything on his X-ray?
19      A.   If he sees an abnormality, yes, he does.
20  He brings him in and talks to him and tells him he
21  is referring him to his own personal physician.
22  And he could be negative as far as asbestos or
23  silicosis go.
0153
 1      Q.   If the individual is found negative by the
 2  B-reader, is a B-read form filled out for the
 3  negative individual?
 4      A.   Yeah.  The B-read form is filled out with
 5  a narrative report.
 6      Q.   And the ILO form is filled out as well?
 7      A.   Yeah.
```

Page 60

Foster, Charles 9-27-04.txt

```
 8      Q.   Plus a narrative report?
 9      A.   Yes.
10      Q.   So for a negative --
11      A.   When you're saying a B-reader form,
12  B-reader form and ILO is the same thing.
13      Q.   I understand. There is also a narrative
14  as well?
15      A.   Well, there is a narrative. But you said
16  three forms. And there is not three forms. It's
17  two.
18      Q.   All right. Two forms are a narrative and
19  an ILO form; is that right?
20      A.   Yes.
21      Q.   So if someone is found negative by RTS we
22  would have for that individual a work history form;
23  correct?
0154
 1      A.   Right.
 2      Q.   A form or a piece of paper from the doctor
 3  indicating the individual should take an X-ray,
 4  which could be on the work history form; right?
 5      A.   Right.
 6      Q.   A B-read/ILO form; correct?
 7      A.   All right.
 8      Q.   And a narrative?
 9      A.   Right.
10      Q.   Is there any other paperwork that is
11  completed on a negative?
12      A.   Yes, they sign one more form, saying that
13  they are capable of doing a PFT or an X-ray.
14      Q.   Is there anything else done on that
15  negative person?
16      A.   No.
17      Q.   What happens to that paperwork and the
18  film for a negative?
19      A.   It's shipped to the law firm.
20      Q.   All of it is shipped?
21      A.   All of it is shipped.
22      Q.   Does RTS maintain any paperwork for
23  negatives?
0155
 1      A.   We have copies of -- we maintain copies of
 2  positives or negatives. No, we don't maintain any
 3  of the originals.
 4      Q.   Do you maintain copies of the file
 5  materials for a negative?
 6      A.   Yes.
 7      Q.   The only thing you don't keep on a
 8  negative, that the attorneys may have that you
 9  don't have, would be the actual x-rays?
10      A.   The X-ray and the original forms, the
11  original stuff -- documentation.
12      Q.   You have copies of everything?
13      A.   Yes.
14      Q.   If the individual is determined positive
15  by the B-reader, then if I understood the process
16  correctly, that individual goes forward and does a
17  medical history form?
18      A.   Yes.
19      Q.   And the medical history form is either
20  filled out by a girl by the name of Debbie --
21      A.   Now.
22      Q.   Now, or your testing manager?
```

Page 61

```
                                    Foster, Charles 9-27-04.txt
 8       Q.   Plus a narrative report?
 9       A.   Yes.
10       Q.   So for a negative --
11       A.   When you're saying a B-reader form,
12  B-reader form and ILO is the same thing.
13       Q.   I understand. There is also a narrative
14  as well?
15       A.   Well, there is a narrative. But you said
16  three forms. And there is not three forms. It's
17  two.
18       Q.   All right. Two forms are a narrative and
19  an ILO form; is that right?
20       A.   Yes.
21       Q.   So if someone is found negative by RTS we
22  would have for that individual a work history form;
23  correct?
0154
 1       A.   Right.
 2       Q.   A form or a piece of paper from the doctor
 3  indicating the individual should take an X-ray,
 4  which could be on the work history form; right?
 5       A.   Right.
 6       Q.   A B-read/ILO form; correct?
 7       A.   All right.
 8       Q.   And a narrative?
 9       A.   Right.
10       Q.   Is there any other paperwork that is
11  completed on a negative?
12       A.   Yes, they sign one more form, saying that
13  they are capable of doing a PFT or an X-ray.
14       Q.   Is there anything else done on that
15  negative person?
16       A.   No.
17       Q.   What happens to that paperwork and the
18  film for a negative?
19       A.   It's shipped to the law firm.
20       Q.   All of it is shipped?
21       A.   All of it is shipped.
22       Q.   Does RTS maintain any paperwork for
23  negatives?
0155
 1       A.   We have copies of -- we maintain copies of
 2  positives or negatives. No, we don't maintain any
 3  of the originals.
 4       Q.   Do you maintain copies of the file
 5  materials for a negative?
 6       A.   Yes.
 7       Q.   The only thing you don't keep on a
 8  negative, that the attorneys may have that you
 9  don't have, would be the actual x-rays?
10       A.   The X-ray and the original forms, the
11  original stuff -- documentation.
12       Q.   You have copies of everything?
13       A.   Yes.
14       Q.   If the individual is determined positive
15  by the B-reader, then if I understood the process
16  correctly, that individual goes forward and does a
17  medical history form?
18       A.   Yes.
19       Q.   And the medical history form is either
20  filled out by a girl by the name of Debbie --
21       A.   Now.
22       Q.   Now, or your testing manager?
                              Page 61
```

```
                                   Foster, Charles 9-27-04.txt
23        A.   Charlie Brooks.
0156
 1        Q.   Is that right?
 2        A.   Yes.
 3        Q.   Or in the past, your testing managers?
 4        A.   Yes.
 5        Q.   After you fill out this medical history
 6   form, then the individual is sent in for a
 7   pulmonary function test?
 8        A.   Yes.
 9        Q.   And after the pulmonary function test is
10   completed, the individual is then routed over to
11   the physician?
12        A.   Yes.
13        Q.   And at that point, the physician does his
14   examination?
15        A.   And interpretation of the PFT.
16        Q.   And after the PFT interpretation, physical
17   examination is done, then the individual is taken
18   to some type of last process, for lack of a better
19   term?
20        A.   Well, he can go to a lawyer.  If he has
21   already talked to a lawyer, he will go home.  He or
22   she will go home.
23        Q.   For the screenings in Ohio in 2000, with
0157
 1   the Jackson, Taylor firm, did the lawyers meet with
 2   the individual at the beginning of the screening or
 3   at the end?
 4        A.   I don't know.  I don't remember that.
 5        Q.   Do the B-readers ever take the films with
 6   them, away from the screening, back to their
 7   offices?
 8        A.   I answered that a while ago.  I said some
 9   do and some don't.
10        Q.   Does Dr. Oaks do that?
11        A.   I don't recall.
12        Q.   When you have had screenings with Dr. Oaks
13   doing the B-reads, is there a pulmonologist or
14   another physician there doing the physical
15   examinations?
16        A.   I don't recall.
17        Q.   Do you recall whether Dr. Oaks usually
18   works in tandem with Dr. Jose Roman?
19        A.   In the South he did.  But he didn't in the
20   North.  He did in Mississippi and Alabama.
21        Q.   How about in Ohio?  Who did Dr. Oaks work
22   with?
23        A.   I don't know.  I don't know that he did.
0158
 1   I don't remember.
 2        Q.   Do you recall whether Dr. Ballard ever
 3   worked with you in Ohio?
 4        A.   No, I don't.
 5        Q.   The answer is no or you don't recall?
 6        A.   I don't recall.
 7        Q.   Do you know if Dr. Ballard has worked with
 8   Dr. Roman in conjunction with RTS in terms of a
 9   screening?
10        A.   In Ohio?
11        Q.   Yes.  Anywhere.
12        A.   Yeah, they have worked in conjunction
13   anywhere.
```