IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W. R. GRACE & CO., et al. | ) | Case No. 01-01139 (JKF) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | Docket No. 13947 and 13999 |
| | ) | |

## (CORRECTED)[1] ADDITIONAL BRIEF IN SUPPORT OF W.R. GRACE & CO.'S MOTION TO COMPEL CLAIMANTS TO RESPOND TO THE W.R. GRACE ASBESTOS PERSONAL INJURY QUESTIONNAIRE

W.R. Grace & Co. ("Grace") files this brief to bring to the Court's attention the points from its Status Report on Non-Party Discovery relevant to the discovery of documents generated by so-called "consulting" experts. *See* Order Granting in Part and Denying in Part W. R. Grace & Co.'s Motion for Reconsideration (Dec. 7, 2006) (Docket No. 13947).

The evidence presented in the Status Report and highlighted for the Court here must be viewed in the context of the candid concessions made *outside of Court* by parties and representatives in this case that the alleged medical evidence being submitted in support of claims is, in fact, not what it purports to be:

- Steven Kazan (member of the Official Committee of Asbestos Personal Injury Claimants):

    ➢ "In my view, what is wrong with asbestos litigation is due almost entirely to the huge *number of claims* filed each year *by lawyers* who have found people *who are not sick* …."

    ➢ "[T]he non-malignant claims problem is driven by litigation screening …. Litigation screening substitutes an *entrepreneurial model* [for the model of traditional toxic tort litigation]: the lawyer recruits the plaintiff -- who usually feels fine, has no symptoms or impairment, and is unaware of any 'injury' -- and sends him to a screening company for an x-ray … Litigation screenings

---

[1] This corrected Brief was filed to correct nonsubstantive errors and ommissions.

have absolutely nothing to do with medicine -- they are a device for recruiting clients."

> "Moreover, if the doctor does not give the lawyer the right answer, the lawyer can get a second opinion, or a third, or a fourth ... *as many as it takes* ... The results of such screenings are totally unreliable."[2]

- David Austern (Future Claimants' Representative):

  > "Part of the problem was sort of an *amazing elasticity* -- which is about as calm a word as I can think of -- *on the part of claimants' lawyers* to find doctors who will say that somebody suffers from minimal asbestos disease."[3]

  > "The reliability of reports prepared by the doctors and screening facilities ... has been challenged and is the subject of federal grand jury and congressional investigations into alleged fraud. Based upon *evidence* ... the challenge is *credible* and compels suspension of acceptance of these reports."[4]

The two basic questions, then, that Grace has sought to answer through discovery of the screening companies and the doctors are: (1) whether the admissions by Mr. Kazan and Mr. Austern are true; and (2) what impact those facts have on this case. What Grace has confirmed is that these so-called consultants were merely vehicles for the selective presentation of purportedly positive results and the suppression of purportedly negative results. There was no consultancy relationship in any traditional sense, and none of the results were reliable or obtained as a result of any process that could be given legal effect under the Federal Rules of Evidence. Instead, the plaintiffs' bar's simple purpose for the process was to maximize claim volume, and that goal was achieved with signal success against Grace.

---

[2] Asbestos Litigation: Hearing Before the Senate Comm. on the Judiciary, 107th Cong. 206-08, 210 (2002) (testimony of Steven Kazan) (emphasis added) (attached as Exhibit 1).

[3] Christine Biederman, *et al.*, *Toxic Justice*, Dallas Observer, Aug. 13, 1998 (emphasis added) (attached as Exhibit 2).

[4] Memorandum from D. Austern re Suspension of Acceptance of Medicine Reports (Sept. 12, 2005) (attached as Exhibit 3).

And it is plainly insufficient to confine the disclosure obligation to claims supported by doctors presently implicated by the Debtors discovery efforts to date. This is so for four obvious reasons. *First,* the discovery process has been resisted extensively and the results are partial only. *Second,* it is not just specific doctors who are at issue. Rather, it is the mass screening procedure that the law firms have sponsored using a variety of doctors. That procedure is what is at issue. This is the focus at the *Daubert* stage: the gate-keeping function is focused on methodology. But Grace has no way to ascertain all of the doctors who have used the method for past B-reads or who now are being recruited to replace the old hands but still use the old "method." *Third,* the only way to determine the scope of claims affected IN THIS CASE is to look at the results for Claimants IN THIS CASE. Those results will be "diagnostic" of the problem: If they are inconsistent and are submitted by repeat doctors, they are affected by the problem. *Fourth,* limiting relief to claims sponsored by a limited number of doctors implicitly perpetuates a fraud on the Court. Here, the very assertion of the privilege is the vehicle for fraud and manipulation. If so far undetected manipulation through less notorious doctors escapes scrutiny, the improper assertion of privilege will remain effective and will continue to mislead the Court.

In order to assist the Court, Grace has organized the evidence according to the basic contentions that are being made about the consultancy privilege.

I.    A TRUE "CONSULTANCY" RELATIONSHIP DID NOT EXIST.

    A.    The Screening Doctors Disclaim A Consulting Relationship.

Far from confirming that they acted hand-in-hand with lawyers to get a Claimant's personal injury case ready for trial, the screening doctors have disclaimed the existence of any consulting relationship at all:

3

- Dr. Dominic Gaziano: "I'm not retained .... But I evaluate claims that are ... sent to me by law firms. But I don't have any *formal relationship* or *formal contract* or *formal agreement* or *formal anything* with any of these law firms over the years."[5]

- Dr. Walter Allen Oaks: "Q: Did you sign a contract with [N & M] to review [x-rays]? A: No.; Q: Did you sign a contract with RTS to review [x-rays]? A: No."[6]

- Dr. Ray Harron:  Asserted his Fifth Amendment privilege against self-incrimination rather than answer any questions regarding his relationships with law firms.[7]

- Dr. Andrew Harron:  Asserted his Fifth Amendment privilege against self-incrimination rather than answer any questions regarding his relationships with law firms.[8]

**B.     The Screening Process, On Its Face, Bears No Relationship To Litigation Consulting.**

The manner in which screenings were conducted demonstrates that no consulting relationship existed between the law firms and the screening doctors:

- Screening companies recruited Claimants for a screening through advertisements and lists obtained from union contacts, law firms or their existing inventory of persons previously screened for asbestos related injuries.[9]

- The potential claimant appeared at the screening, at which point he was given a variety of intake forms to complete, including an attorney selection sheet in which the Claimant *disclaimed* that he had a pre-existing relationship with a law firm.[10]

---

[5] Dominic Gaziano Dep. Tr. at 29 (Oct. 18, 2006) (emphasis added).  Cited portions of Dr. Gaziano's deposition transcript have been attached collectively as Exhibit 4.

[6] Walter Allen Oaks Dep. Tr. at 51 (Mar. 9, 2006).  Cited portions of Dr. Oaks's deposition transcript have been collectively attached as Exhibit 5.

[7] Ray Harron Dep. Tr. at 23-24 (Dec. 15, 2005).  Cited portions of Dr. R. Harron's deposition transcript have been collectively attached as Exhibit 6.

[8] Andrew Harron Dep. Tr. at 14 (Jan. 12, 2006).  Cited portions of Dr. A. Harron's deposition transcript have been collectively attached as Exhibit 7.

[9] *See In re Silica Prods. Liab. Litig.*, 398 F. Supp. 2d 563, 597 (S.D. Tex. 2005).

[10] *See* Charles Foster Dep. Tr. at 148-50, *Couts v. American Optical Corp.* ("Foster Am. Op. Dep.") (Sept. 27, 2004) (attached as Exhibit 10); *see also, e.g.*, N & M Attorney Selection Sheet of J. S. (attached as Exhibit 11); RTS Attorney Selection Sheet of W. T. (attached as Exhibit 12).

- If the Claimant received a positive B-read, the Claimant only then was examined and referred to a law firm, if one was associated with the screening.[11]

C. **There Was No "Anticipation" That The Doctors' Reports Were Confidential: Confidentiality Depended Not Upon Relationship But On Outcome.**

- There was *no difference in process or relationship* for B-reads that have been disclosed and used as compared to B-reads that are claimed to be privileged.[12]

- Negative x-rays were re-read until a positive reading could be obtained, and then the positive B-read was disclosed:

  ➢ Claimant H.L.M. was screened on March 19, 1999 and found to be "negative for pulmonary asbestosis and asbestos-related pleural disease ...."[13] The *same* March 19, 1999 x-ray was then sent to Dr. Jay Segarra, who found that the Claimant was, in fact, positive for asbestosis.[14]

- There is no contemporaneous evidence to differentiate disclosed versus "consultancy" B-reads, except the difference in outcome.

- The B-reads themselves have no indicia of confidentiality: The B-reads are not marked privileged or confidential.[15]

D. **The Screening Process Has Been Placed At Issue By the Claimants Themselves.**

As in the *Silica MDL,* it is the law firms and Claimants themselves who have thrust the screening practice into the center of this case by relying upon the screening results to file and support their claims.[16]

---

[11] Foster Am. Op. Dep. at 155-56.

[12] *See id.*

[13] Chest X-Ray Reading Interpretation of Robert Altmeyer (Mar. 19, 1999) (attached as Exhibit 13).

[14] WR GRACE PIQ 52575-0022 (submitted by Motley Rice) (attached as Exhibit 14).

[15] *Compare* Questionnaire of W.R.W. at WR GRACE PIQ 60226-0023 (submitted by James F. Humphreys) (attached as Exhibit 8) and Report of Dominic Gaziano for W.R. (Mar. 17, 2000) (attached as Exhibit 9).

[16] Such dual use of the same experts in the same litigation is not protected by Rule 26(b)(4)(B). *See In re Silica Prods. Liab. Litig.,* 398 F. Supp. 2d at 584 (noting that "the Court ruled that so long as Plaintiffs are proferring the doctors and their diagnoses, plaintiffs cannot claim the doctors are non-testifying") (citations omitted).

- In 52.3% of the Questionnaires,[17] the Claimants identify doctors who have either been directly excluded by the Manville Trust for engaging in fraudulent practices or have worked for the screening companies excluded by the Manville Trust.[18] Those doctors are:

    ➢ Ray Harron (excluded by the Manville Trust, worked for screening companies);

    ➢ Andrew Harron (excluded by the Manville Trust, worked for screening companies);

    ➢ James Ballard (excluded by the Manville Trust, worked for screening companies);

    ➢ Walter Oaks (excluded by the Manville Trust, worked for screening companies);

    ➢ Jay Segarra (worked for screening companies excluded by the Manville Trust);

    ➢ Alvin Schonfeld (worked for screening companies excluded by the Manville Trust);

    ➢ Richard Levine (worked for screening companies excluded by the Manville Trust);

    ➢ Philip Lucas (worked for screening companies excluded by the Manville Trust);

    ➢ Dominic Gaziano (worked for screening companies excluded by the Manville Trust);

    ➢ Larry Mitchell (excluded by Manville Trust);

---

[17] The 52.3% figure is based on the analysis of Questionnaires in which Claimants provided the name of the doctor in the Questionnaire itself (approximately 16,000 Questionnaires). It does not include Questionnaires in which the Claimant only provided information about the screening doctors in attached documents (approximately 44,000 Questionnaires).

[18] For example, the following firms have relied on one or more of the doctors who have been found to be unreliable or have been discredited: Hartley O'Brien (Ray Harron, Gaziano, Levine); Provost Umphrey (Lucas, Mitchell, Kuebler, Ray Harron); Law Offices of Peter G. Angelos (Gaziano); Goldberg Persky & White (Gaziano, Schonfeld); Cooney & Conway (Segarra, Schonfeld, Levine); Kelley & Ferraro (Lucas, Schonfeld, Segarra, Gaziano); Ferraro & Associates (Levine); James F. Humphreys (Ray Harron, Gaziano); Edward O. Moody, P.A. (Ray Harron); Foster & Sear (Lucas); Motley Rice (Ballard, Gaziano, Ray Harron, Mitchell, Kuebler, Lucas); Baron & Budd (Ray Harron, Ballard, Segarra, Levine, Lucas, Gaziano); Silber Pearlman (Ray Harron, Levine, Lucas, Segarra); Early, Ludwick, Sweeney & Strauss (Ray Harron, Levine).

6

> ➤ Richard Kuebler (excluded by the Manville Trust).[19]

- Many of these doctors, such as Dr. Dominic Gaziano and Dr. Walter Allen Oaks, have testified that they did not follow accepted medical practice in diagnosing Claimants with asbestos-related disease, while others, such as Dr. Ray Harron, Dr. Andrew Harron, and Dr. James Ballard, have invoked the Fifth Amendment and refused to answer questions regarding their diagnostic practices.[20]

The rules are clear that where the evidence is being used to challenge plaintiffs' claim, Rule 26(b)(4)(B) does not apply and will not preclude that discovery:

> The purpose of Rule 26(b)(4)(B) is to prevent a party from building its own case through its opponent's diligence. In this instance, Defendant does not seek to build its own case with [the expert's] work but rather seeks to tear down Plaintiffs' case. ***That is entirely proper.***

*Derrickson v. Circuit City Stores, Inc.*, 1999 WL 1456538 (D. Md. Mar. 19, 1999), *aff'd Johnson v. Circuit City Stores, Inc.*, 203 F.3d 821 (4th Cir. 2002) (emphasis added) (citations omitted). Having injected into this case the screening results they like, the Claimants and their law firms cannot withhold the evidence that shows those results to be unreliable and not the pristine medical assessments they purport to be.[21]

---

[19] This list represents only those doctors for whom we have evidence specific to them or to the screening companies with which they worked. Obviously, screening was a far broader practice; and it is the screening itself as a practice that must be examined and this is the only way to examine it. If limited to these doctors, the data set will be confined to the evidence uncovered to date and will not accurately capture the scope of the problem or the volume of claims affected by the flawed screening practice in this case. The only way to obtain full data as to the scope of the problem is from the Claimants themselves -- *i.e.*, by examining the B-reads.

[20] *See, e.g.*, Gaziano Dep. at 148 (no differential diagnosis), 217-18, 223 (doesn't review reports, relies on clerical staff), 271-72 (physical exam not necessary); Oaks Dep. at 191 (physical exam not necessary), 107 (no differential diagnosis).

[21] *See In re Silica Prods. Liab. Litig.*, 398 F. Supp. 2d at 584 (plaintiffs cannot proffer doctors in support of claims and at same time withhold evidence from those doctors based on an alleged consultancy privilege); *see also, e.g., Ferguson v. Michael Foods, Inc.*, 189 F.R.D. 408, 409 (D. Minn. 1999) (holding the defendant's designation of an expert expected to be called at trial takes the expert out of the exceptional circumstances category of Rule 26(b)(4)(B), even if the designation is subsequently withdrawn); *Agron v. Trustees of Columbia Univ.*, 176 F.R.D. 445, 448-50 (S.D.N.Y. 1997) (holding the plaintiff waived Rule 26(b)(4)(B)'s protections when the plaintiff voluntarily produced an expert report in discovery, even though the plaintiff subsequently withdrew the expert's designation).

### E. B-Readings Purport To Recite Medical Facts.

Of course, facts regarding the Claimants' medical conditions -- including the reviews and contents of x-rays and pulmonary function tests -- are discoverable, even if they are contained solely in documents prepared by so-called consultants. *See Aptargroup, Inc. v. Owens-Illinois, Inc.*, 2003 WL 21800083, at *2 (N.D. Ill. Jul. 25, 2003) ("Facts acquired by an expert may be discoverable even if they are contained in a non-discoverable document.").

The B-reads submitted by the Claimants purport to be just that, facts regarding Claimants' medical conditions. Specifically, the Claimants allege that the B-reads they rely on follow a standard method for classifying x-rays, using a standard form and comparisons to a set of standard films.[22]

## II. THE CLAIMANTS CANNOT USE THE CONSULTANT PRIVILEGE TO WITHHOLD EVIDENCE CRITICAL TO THIS CASE OR TO MISLEAD THE COURT.

### A. The Court Has A Gate-Keeping Function That Cannot Be Stymied By The Selective Use of Consultant Evidence.

Of course, cases often involve a battle of the experts. But the logically- and legally-prior issue is whether the Claimants' expert evidence is so rigged or so variable and unreliable that it cannot be used at all. The only way to determine these facts and their impact on the scope of claims in this case is to examine whether the "medical" method being proferred here -- B-read screening -- has produced skewed or inconsistent results. The only direct evidence of that is the results themselves. Access to those results is critical to determining both the integrity and the reliability of the screening method and to determining the impact of that method in this case. Of course, it is clear under the law that uniquely

---

[22] *See* International Labour Office, Guidelines for the Use of the ILO International Classification of Radiographs of Pneumoconioses, Geneva, 2000, at 4, 12.

DOCS_DE:123491.1

probative evidence cannot be withheld under the cloak of privilege.[23] Sections B and C below identify such unique evidence being withheld this case.

    **B.    Evidence Of Skewed And Manipulated Medical Data Goes To The Heart Of This Case And Is In The Unique Possession Of The Claimants and Their Doctors.**

Through discovery Grace has obtained clear and pervasive evidence that the screening process has been used to manipulate and skew the presentation of data, and that data, therefore, should be inadmissible. The Court must be given access to the results in order to determine the impact of this manipulation.

- **Targeting Positive Screening Rates:** Respiratory Testing Services, a screening company, and its owner, Charles Foster, had a purported goal and business plan of achieving a forty percent positive rate at RTS screenings; Dr. Jay Segarra's positive rate for a three-day screening for RTS "coincidentally" ended up being exactly that -- forty percent.[24]

- **Intentional Cover-Ups of Unfavorable Evidence:** Non-party discovery revealed an obscure note in the screening file of Claimant D.L.B. The note reads:

    > Tony says to *send pft without having the med evaluation*. The reason is cause not only does the patient live in another state, but the doctor who did the pft put on there that the lack of restrictive change would be unusual in asbestosis; therefore, it probably isn't worth the costs for the client to go back to doctor to get a medical evaluation if the doctor is going to put stuff like that in his report.[25]

- **"Double Dipping":** An Ohio Court has permitted discovery against two law firms involved in this litigation, Brayton Purcell and Early, Ludwick, Sweeney & Strauss to explore the claim that they have submitted claims in asbestos litigation and to various asbestos trusts based on inconsistent work histories:[26]

---

[23] Grace is not seeking to discover the development of the Claimants' litigation strategy but the factual evidence of medical conditions that has already been collected by the Claimants and is necessary to demonstrate the unreliability of the Claimants' diagnoses.

[24] *See* Segarra Dep. at 276-87.

[25] *See* PFT Note (Jan. 29, 2002) (Exhibit 22) (emphasis added).

[26] *See* Kimberley A. Strassel, Op-Ed., *Trusts Busted*, Wall St. J., Dec. 5, 2006.

> ➤ The Plaintiff in the Ohio case, Harry Kananian, *is also a Grace Claimant*.[27]

> ➤ Brayton Purcell has admitted to "overstat[ing] Mr. Kananian's exposure" and that "there is no way what our client sent [Early Ludwick] matches what they put in the [claim] forms."[28]

- **Silica Retreads:** Numerous Grace Claimants have brought claims for both asbestosis and silicosis, often based on the same x-ray, despite the fact that the dual occurrence in a single individual of both silicosis and asbestosis is believed to be a clinical rarity.[29]

- **Disavowing Diagnoses:** Doctors are walking away from reports that Claimants allege are positive diagnoses:

> ➤ Dr. Segarra: "Q: And ... under diagnosis/impression, it says, quote: The reported parenchymal findings on chest x-ray are consistent with a clinical diagnosis of mild asbestosis given the environmental exposure history and latent period. Do you see that? A: Yes. Q: And then on the back page, it says, quote: This report relates only to the *diagnosis of asbestos-related diseases* and is not intended to serve as a comprehensive evaluation of all health problems. Do you see that language? A: Yes. Q: And yet despite all of that language, you're saying this is not a diagnosis of asbestosis? A: In this particular case, *it's not* ... as I told you before, diagnosis and impression can refer to diagnosis or just an interpretive statement."[30]

> ➤ Dr. Levine: "None of my reports are intended to, and cannot be used as evidence of the presence or absence of an occupational dust disease."[31]

> ➤ Screening companies and law firms gave doctors instructions and/or criteria for their diagnoses and reports that the doctors duly followed.[32]

- **Claimants are Failing to Disclose Negative B-Reads:**

---

[27] WR GRACE PIQ 39046 (attached as Exhibit 23).

[28] *See* Kimberley A. Strassel, Op-Ed., *Trusts Busted*, Wall St. J., Dec. 5, 2006.

[29] *See, e.g.,* Claimant C.C.M. at WR GRACE PIQ 52518-0036 (submitted by Motley Rice) (attached as Exhibit 17); Chest X-Ray Reading of Robert Altmeyer (Mar. 19, 1999) (attached as Exhibit 26); Claimant M.L.C. at WR GRACE PIQ 013763-021-026 (submitted by Morris Sakalarios) (attached as Exhibit 18); Chest X-Ray of Andrew Harron (Oct. 14, 2002) (attached as Exhibit 19).

[30] Segarra Dep. Tr. at 190 (emphasis added).

[31] *See* Affidavit of Dr. Richard Levine at ¶ 6 (May 1, 2006) (attached as Exhibit 20).

[32] *See, e.g.,* Gaziano Dep. at 133; *see also* Segarra Dep. at 276-87.

> ➤ Claimant G.A. disclosed two positive readings, but failed to disclose a July 2003 B-reading in which a screening doctor found that he was "unable to make a diagnosis of an occupational lung disease . . . based on the *normal* chest x-ray."[33]

> ➤ Claimant W.R. disclosed two positive readings based on a July 16, 1999 x-ray but failed to disclose a negative B-reading performed in March 2000.[34]

C. **Variable And Inconsistent Results Go To The Heart Of This Case And Are In The Unique Possession Of The Claimants And Their Doctors.**

Where, of course, there is evidence of manipulation of results, that same evidence demonstrates variability and inconsistency which are key considerations in a *Daubert* analysis.

- **B-read Shopping:** Claimants or their attorneys have shopped negative x-rays, searching for doctors who will provide positive findings in order to support claims.

  > ➤ Claimant C.C.M. at WR GRACE PIQ 52518-0036 (Exhibit 17); Chest X-Ray Reading of Robert Altmeyer (Mar. 19, 1999) (Exhibit 26) (Hiding doctor's refusal to attribute condition to asbestos).

  > ➤ Claimant H.L.M. at WR GRACE PIQ 52575-022 (Exhibit 14); Chest X-Ray Reading of Dr. Robert Altmeyer (Mar. 19, 1999) (Exhibit 13) (Shopping x-ray to Dr. Jay Segarra within two weeks of initial negative reading).

- **Reliability of Screening Practices:** The testimony of doctors who have been deposed in this bankruptcy case has revealed that doctors who have participated in medical-legal screening processes do not follow accepted medical practices in rendering diagnoses.[35]

---

[33] *Compare* G.A., WR GRACE PIQ 53028-0038-0039, 0049 (Exhibit 15) *with* Report of Dominic Gaziano to Robert Jarsulic (Jul. 16, 2003) (emphasis added) (Exhibit 16).

[34] *Compare* WR GRACE PIQ 31602-0026-0028 (attached as Exhibit 24) *with* Report of Dominic Gaziano (Mar. 17, 2000) (Exhibit 9). The Court will recall that at the December 5, 2006 hearing on the motion to compel, Kelley & Ferraro, counsel for W. R., attempted to dismiss this inconsistency by suggesting that Grace was comparing documents concerning two separate Claimants. This is simply not true. Indeed, there can be no doubt that these reports refer to the same individual as the first name, middle initial, last name, and full nine digit social security numbers for W.R. are identical.

[35] *See, e.g.,* Gaziano Dep. at 148 (no differential diagnosis), 217-18, 223 (doesn't review reports, relies on clerical staff), 271-72 (physical exam not necessary); Oaks Dep. at 191 (physical exam not necessary), 107 (no differential diagnosis).

- **Necessity of Access to B-reads:** Without access to the negative B-reads, Grace cannot substantiate Mr. Austern's and Mr. Kazan's statements that the screening and diagnostic processes at issue generate highly variable and unreliable results, even among the Claimants' own doctors.

Even if the Court were to find that there is not outright fraud, the inconsistency and variability would be a basis for the Court to exclude the screening method on *Daubert* grounds. That is not to say that B-reading itself is inherently unreliable but rather that the method used in this case -- high volume mass-screening -- is unreliable and inadmissible.

### D.    The Consultant Privilege Cannot Be Used To Mislead The Court.

Where the privilege itself is being used in service of misleading the Court in the performance of a key function, the privilege must give way. What is important here is that the very purpose and effect of the selective invocation of the consultancy privilege is itself the very vehicle for misleading whatever authority is deciding the merits of claims -- in this case, the Court. Where that is so, privilege clearly must give way:

- "[R]elational privileges do not protect communications that further a crime or fraud."[36]

- "Since the policy of the privilege is that of promoting the administration of justice, it would be a perversion of the privilege to extend it to the client who seeks advice to aid him in carrying out an illegal or fraudulent scheme."[37]

- Claimants' lawyers have a "duty of candor" to the Court, which prohibits them from "offer[ing] evidence the lawyer knows to be false."[38]

### CONCLUSION

Grace, a member of the PI Committee, and the Future Claimants' Representative, all contend that thousands of personal injury asbestos claims were generated by unsound,

---

[36] *Making Sense of Rules of Privilege Under the Structural (IL) Logic of the Federal Rules of Evidence*, 105 Harv. L. Rev. 1339, 1349 (1992).

[37] McCormick on Evidence ¶ 95.

[38] *See* ABA Model Rules of Professional Conduct, Rule 3.3 (1984).

outcome-driven and fundamentally flawed medical screenings. Through the Questionnaire, Grace seeks to uncover the *facts* about the screening process and generation of baseless asbestos claims. Grace seeks access to negative medical reports and evidence generated by that process -- while the Claimants want to conceal that evidence, and provide the Court, the Debtors, and the Debtors' other creditors with only the "positive" evidence ***produced by that same process***. The Claimants and their counsel invoke the "consultancy privileges" to effectuate this transparent scheme. This Court should reject the Claimants' "consultancy privilege" claims because: (1) they have not been established and are not applicable; and (2) the privilege was not designed to protect the type of claims manufacturing process, and the evidence it generates, at issue in this litigation.

Wilmington, Delaware  
Dated: December 12, 2006

Respectfully submitted,

KIRKLAND & ELLIS LLP  
David M. Bernick, P.C.  
200 East Randolph Drive  
Chicago, Illinois 60601  
(312) 861-2000

KIRKLAND & ELLIS LLP  
Barbara M. Harding  
David Mendelson  
Brian T. Stansbury  
Amanda C. Basta  
655 Fifteenth Street, NW  
Washington, D.C. 20005  
Telephone:    (202) 879-5000  
Facsimile:     (202) 879-5200

*and*

13

PACHULSKI, STANG, ZIEHL, YOUNG, JONES
& WEINTRAUB, LLP

_____*/s/ James E. O'Neill*_____
Laura Davis Jones (Bar No. 2436)
James E. O'Neill (Bar No. 4042)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899-8705
(302) 652-4100

Co-Counsel for the Debtors and Debtors in Possession

14