UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: | . | Case No. 01-1139(JFK) |
| | . | |
| | . | |
| W. R. GRACE & CO., | . | |
| | . | 5414 USX Tower Building |
| | . | Pittsburgh, PA  15222 |
| | . | |
| Debtor. | . | |
| | . | December 5, 2006 |
| . . . . . . . . . . . . .. | | 8:21 a.m. |

TRANSCRIPT OF HEARING
ARGUMENT ON MOTION TO COMPEL
BEFORE HONORABLE JUDITH K. FITZGERALD
UNITED STATES BANKRUPTCY COURT JUDGE

<u>APPEARANCES</u>:

For the Debtor:                Kirkland & Ellis, LLP
                               By: DAVID. M. BERNICK, P.C., ESQ.
                                   AMANDA BASTA, ESQ.
                                   DAVID MENDELSON, ESQ.
                               Aon Center
                               200 East Randolph Drive
                               Chicago, IL  60601

Unsecured Creditors'           Strook & Strook & Lavan, LLP
Committee:                     By: KENNETH PASQUALE, ESQ.
                               180 Maiden Lane
                               New York, NY  10048-4982

For the FCR:                   Orrick
                               By: RAY MULLADY, ESQ.
                               Washington Harbour
                               3050 K Street, N.W.
                               Washington, D.C. 20007-5135


Audio Operator:                Janet Heller

Proceedings recorded by electronic sound recording, transcript
produced by transcription service
_____

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@optonline.net**

**(609) 586-2311    Fax No. (609) 587-3599**

<u>APPEARANCES</u>: (Cont'd)

For Equity Committee:          Kramer Levin
                               By: GREGORY HOROWITZ, ESQ.
                                   PEGGY FARBER, ESQ.
                               1177 Avenue of the Americas
                               New York, NY 10036

For Asbestos Creditors':       Caplin & Drysdale, Chartered
                               By: NATHAN D. FINCH, ESQ.
                                   PETER LOCKWOOD, ESQ.
                               One Thomas Circle, NW
                               Washington, DC  20005

For Official Committee of      Bilzin Sumberg Baena Price
Property Damage Claimants:       & Axelrod LLP
                               By: MATTHEW I. KRAMER, ESQ.
                               Wachovia Financial Center
                               200 South Biscayne Boulevard
                               Suite 2500
                               Miami, FL  33131

For Reaud, Morgan & Quinn      Stutzman, Bromberg, Esserman,
and ELG:                         & Plifka, PC
                               By: SANDER ESSERMAN, ESQ.
                               2323 Bryan Street, Suite 2200
                               Dallas, TX  75201

For Ad Hoc Committee           Weil, Gotshal & Manges, LLP
of Equity Security-Holders:    By: M. JARRAD WRIGHT, ESQ.
                                   DAVID HICKERSON, ESQ.
                               1300 Eye Street, NW, Suite 900
                               Washington, DC 20005

For Grace Certain Cancer       Montgomery, McCracken, Walker
Claimants:                       & Rhoads, LLP
                               By: NATALIE RAMSEY, ESQ.
                               300 Delaware Avenue, Suite 750
                               Wilmington, DE  19801-1607

For Waters & Kraus Claimants:  Waters & Kraus
                               By: PETER KRAUS, ESQ.
                               3219 McKinney Avenue
                               Dallas, Texas 75204

For Motley Rice Claimants:     Motley Rice
                               By: JOHN HERRICK, ESQ.
                               28 Bridgeside Blvd.
                               Mount Pleasant, SC 29464

For the Thornton &             Thornton & Naumes
Naumes Claimants:              By: GARRETT BRADLEY
                               100 Summer Street, 30th Floor
                               Boston, MA 02110

APPEARANCES: (Cont'd)

| | |
|---|---|
| For the Ferraro Law Firm Claimants: | Kelly & Ferraro<br>By: THOMAS WILSON<br>2200 Key Tower, 127 Public Square<br>Cleveland, Ohio 44114 |
| For Wilentz, Goldman & Spitzer: | Wilentz Goldman & Spitzer<br>BY: DEIRDRE PACHECO<br>90 Woodbridge Center Drive<br>Suite 900 Box 10<br>Woodbridge, NJ 07095-0958 |
| For Lock & Waddell Claimants: | Baron & Bud, PC<br>By: ALAN RICH<br>3102 Oak Lawn Avenue, Suite 1100<br>Dallas, TX 75219 |
| For unknown: | Law Office of Peter G. Angelos<br>By: PAUL M. MATHENY<br>100 N. Charles St.<br>Baltimore, MD 21201-3804 |

TELEPHONICALLY:

| | |
|---|---|
| For the Debtor: | Kirkland & Ellis, LLP<br>By: BARBARA HARDING, ESQ.<br>    SALVATORE BIANCA, ESQ.<br>    SAM BLATNICK, ESQ.<br>    JANET BAER, ESQ.<br>    THEODORE FREEDMAN, ESQ.<br>Aon Center<br>200 East Randolph Drive<br>Chicago, IL  60601 |
| For Official Committee of Asbestos Property Damage Claimants: | Ferry, Joseph & Pearce, P.A.<br>By: THEODORE J. TACCONELLI, ESQ.<br>824 Market Street  Suite 904<br>P.O. Box 1351<br>Wilmington, DE  19899 |
| For Official Committee of Property Damage Claimants: | Bilzin Sumberg Baena Price<br>  & Axelrod LLP<br>By:  JAY M. SAKALO<br>Wachovia Financial Center<br>200 South Biscayne Boulevard<br>     Suite 2500<br>Miami, FL  33131 |
| For Fireman's Fund Insurance Company: | Stevens & Lee, P.C.<br>By: THOMAS WHALEN, ESQ.<br>1107 North Market St., 7th Floor<br>Wilmington, DE  19801 |

**J&J COURT TRANSCRIBERS, INC.**

APPEARANCES: (Cont'd)

| | |
|---|---|
| For Reaud, Morgan & Quinn and ELG: | Stutzman, Bromberg, Esserman, & Plifka, PC<br>By: DAVID J. PARSONS, ESQ.<br>   VAN J. HOOKER, ESQ.<br>2323 Bryan Street, Suite 2200<br>Dallas, TX  75201 |
| For William Asire, et al.: | Cooney & Conway<br>By: KATHY BYRNE, ESQ.<br>120 North LaSalle Street<br>Chicago, IL  60602 |
| For Royal Insurance: | Wilson, Elser, Moskowitz, Edelman & Dicker, LLP<br>By: SARAH J. EDWARDS, ESQ.<br>150 E. 42nd Street<br>New York, NY  10017-5639 |
| For Federal Insurance Co.: | Cozen O'Connor<br>By: DAVID J. LIEBMAN, ESQ.<br>1900 Market Street<br>Philadelphia, PA  19103 |
| For David T. Austern Future Claimants Rep: | Phillips, Goldman & Spence, P.A.<br>By: DEBRA FELDER, ESQ.<br>   RICHARD Y. WYRON, JR. ESQ.<br>   ALEX VENEGAS, ESQ.<br>   JOHN C. PHILLIPS, JR., ESQ.<br>1200 North Broom Street<br>Wilmington, DE  19806 |
| For Everest Reinsurance Co. & McKinley Ins. Co.: | Crowell & Moring, LLP<br>By: MARK D. PLEVIN, ESQ.<br>   LESLIE A. EPLEY, ESQ.<br>1001 Pennsylvania Avenue, NW<br>Washington, DC  20004<br><br>Marks, O'Neill, O'Brien & Courtney, P.C.<br>By: BRIAN KASPRZAK, ESQ.<br>913 Market St., Suite 800<br>Wilmington, DE  19801 |
| For Grace Certain Cancer Claimants: | Montgomery, McCracken, Walker & Rhoads, LLP<br>By: NOEL C. BURNHAM, ESQ.<br>300 Delaware Avenue, Suite 750<br>Wilmington, DE  19801-1607 |

**J&J COURT TRANSCRIBERS, INC.**

APPEARANCES: (Cont'd)

| | |
|---|---|
| For ACE Insurance Co.: | White & Williams, LLP<br>By: MARC S. CASARINO, ESQ.<br>824 N. Market Street, Suite 902<br>P.O. Box 709<br>Wilmington, DE  19899-0709 |
| Official Committee of<br>Unsecured Creditors: | Duane Morris, LLP<br>By: MICHAEL R. LASTOWSKI, ESQ.<br>1100 North Market St., Wuite 1200<br>Wilmington, DE  19801-1246 |
| For London Market Companies: | Mendes & Mount, LLP<br>By: ALEXANDER MUELLER, ESQ.<br>750 Seventh Avenue<br>New York, NY  10019-6829 |
| For Campbell, Cherry,<br>Harrison, Davis, Dove: | Frank/Gecker, LLP<br>JOSEPH D. FRANK, ESQ.<br>325 N. LaSalle, Suite 625<br>Chicago, IL  60610 |
| For Christopher Grell: | Law Office of Christopher Grell<br>By: RICHARD F. RESCHO, ESQ.<br>360 22nd Street, Suite 320<br>Oakland, CA  94612 |
| For Personal Injury<br>Claimants of Michael B.<br>Serling: | Michael B. Serling, PC.<br>By: PHILLIP GOODMAN<br>280 North Old Woodward Avenue<br>Suite 406<br>Birmingham, MI  48009 |
| For Asbestos Plaintiff: | Hartley & O'Brien<br>By: LESLIE JAMES |
| For David G. Slaughter: | Jacobs & Crumplar<br>BY: ROBERT JACOBS<br>2 East 7th Street Suite 400<br>Wilmington, DE |
| For Libby Claimants: | Landis Rath & Cobb, LLP<br>By: KERRI K. MUMFORD<br>919 Market Street, Suite 600<br>P.O. Box 2087<br>Wilmington, DE 19899 |

**J&J COURT TRANSCRIBERS, INC.**

APPEARANCES: (Cont'd)

| | |
|---|---|
| For Libby Claimants: | Cohn Whitesell & Goldberg, LLP<br>By: CHRISTOPHER M. CANDON<br>101 Arch Street<br>Boston MA 02110 |
| For JP Morgan Chase Bank: | JP Morgan Chase Bank<br>By:  MITCHELL HUANG |
| For Seaton: | Drinker Biddle & Reath<br>By: ANDREA D'AMBRA<br>One Logan Square<br>18th and Cherry Streets<br>Philadelphia, PA 19103-6996 |
| For National Union Fire<br>Insurance: | Zeichner Ellman & Krause, LLP<br>By: ROBERT GUTTMANN<br>575 Lexington Avenue<br>New York, New York 10022 |
| For Asbestos Personal Injury<br>Claimants: | Luckey & Mullins, LLC<br>By: ALWYN H. LUCKEY<br>2016 Bienville Blvd.<br>Ocean Springs, MS 39564<br><br>Gibson Law Firm<br>By: CHARLES E. GIBSON, ESQ. |
| For Rockbay Capital<br>Management: | Rockbay Capital Management<br>By: AMELIA WONG |
| For Silverpoint Capital: | Silverpoint Capital<br>By: JOHN KU |
| For Ochziff Capital<br>Management: | Ochziff Capital Management<br>By: JOSEPH KRIGSFELD |
| For State of Montana<br>Department of<br>Environmental Quality: | Monzack & Monaco<br>By: FRANCIS MONACO<br>1201 North Orange Street<br>Suite 400 P.O. Box 2031<br>Wilmington, DE  19899-2031 |
| For Wartnick Law Firm: | Wendel Rosen Black & Dean<br>By: MARK BOSTICK, ESQ.<br>1500 J Street<br>Modesto, CA |

**J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  Good morning.  Please be seated.

2   Everybody here now?  Please be seated.  Did everyone get in?

3          MR. BERNICK:  Yes.  Thank you, Your Honor, for

4   indulging our problems getting ready this morning.

5          THE COURT:  This is the matter of W.R. Grace,

6   Bankruptcy Number 01-1139.  I don't have a list for court call.

7   Thank you.  Okay, the participants by phone are William Graham,

8   Phillip Goodman, Oscar Mockridge, Mina Faltas, Barbara

9   Seniawski, Leslie James, Robert Jacobs, Stephen Vogel, Kerri

10  Mumford, Mitchell Huang, Andrea D'Ambra, David Skatoff, Robert

11  Gutmann, Alwyn Luckey, Barbara Harding, Sam Blatnick, Sal

12  Bianca, Marc Casarino, Janet Baer, Theodore Freedman, Arlene

13  Krieger, Narayan Becher, Andrew Hain, William Wagner, Brian

14  Kasprzak, Mark Plevin, Leslie Epley, Alex Mueller, Amelia Wong,

15  Katharine Mayer, David Liebman, Charles Gibson, David Parsons,

16  Stephen Blauner, Theodore Tacconelli, Stephanie Kwong, David

17  Siegel, Jay Sakalo, Francine Rabinovitz, Paul Norris,

18  Christopher Candon, Peg Brickley, Kurt Hoffman, Guy Baron,

19  Craig Gilbert, John Ku, Joseph Krigsfeld, Noel Burnham, Marti

20  Murray, Steven Eisman, Kathy Byrne, Michael Lastowski, Johathan

21  Brownstein, Van Hooker, Andrew Chan, Andrew Craig, Francis

22  Monaco, Irwin Zandman, Peter Shawn, Joseph Frank, John

23  Phillips, Elizabeth DeCristofara, Mark Bostick, Richard Rescho,

24  Sara Gooch, Sarah  Edwards, Eric Manchin, Thomas Whalen,

25  Richard Wyron, Debra Felder, Alex Venegas, Ritwick Chatterjee.

 1          Excuse me one minute.  I'll take entries in court,

 2 please.

 3          MR. BERNICK:  Good morning, Your Honor.  David

 4 Bernick for Grace.

 5          MS. HARDING:  Barbara Harding on behalf of Grace,

 6 Your Honor.

 7          MS. BASTA:  Amanda Basta on behalf of Grace.

 8          MR. MENDELSON:  David Mendelson on behalf of Grace,

 9 Your Honor.

10          THE CLERK:  You're going to have to -- I didn't catch

11 the -- I'm sorry -- the last few.  You're going to have to

12 speak into the microphone.

13          MS. BASTA:  Amanda Basta for Grace.

14          MR. MENDELSON:  David Mendelson for Grace.

15          MR. PASQUALE:  Good morning, Your Honor.  Ken

16 Pasquale from Stroock for the Unsecured Creditors' Committee.

17          MR. HOROWITZ:  Good morning, Gregory Horowitz from

18 Kramer Levin for the Official Equity Committee.

19          MS. FARBER:  Good morning.  Peggy Farber --

20          THE COURT:  Excuse me.  Wait.  Excuse me.   I'm

21 sorry.  Go ahead.

22          MS. FARBER:  Peggy Farber, Kramer Levin, the Official

23 Equity Committee.

24          MR. LOCKWOOD:  Peter Lockwood from Caplin and

25 Drysdale for the Asbestos Person Injury Claimants' Committee,

1  Your Honor.

2          MR. FINCH:  Nathan Finch from Caplin and Drysdale for

3  the Asbestos Personal Injury Claimaints' Committee, Your Honor.

4          MR. ESSERMAN:  Good morning, Your Honor, Sander

5  Esserman for various law firms.

6          MR. MULLADY:  Good morning, Your Honor, Ray Mullady

7  from Orrick for the FCR.

8          MR. KRAMER:  Good morning, Your Honor, Matt Kramer,

9  Property Damage Committee.

10          MR. WRIGHT:  Good morning, Your Honor, Jarrad Wright

11  and David Hickerson from the Ad Hoc Group of Equity Security

12  Holders.

13          THE COURT:  I'm sorry, Wright?

14          MR. WRIGHT:  Jarrad Wright.

15          THE COURT:  Wright.  Okay.  And I'm sorry, who are

16  you representing?  The Ad Hoc --

17          MR. WRIGHT:  The Ad Hoc Group of Equity Security

18  Holders.

19          THE COURT:  -- equity.  Okay.  Thank you.

20          MS. RAMSEY:  Good morning, Your Honor, Natalie Ramsey

21  for the MMWR Firms and the Grace certain cancer claimants.

22          MR. KRAUS:  Good morning, Your Honor, Peter Kraus for

23  the Waters and Krause claimants.

24          MR. HERRICK:  John Herrick with Motley Rice on behalf

25  of the Motley Rice claimants and the Hartley O'Brien

**J&J COURT TRANSCRIBERS, INC.**

1 claimants.

2          MR. BRADLEY:  Good morning, Your Honor, Garrett

3 Bradley for Thornton and Naumes and claimants represented by

4 Thornton and Naumes.

5          THE COURT:  I can't -- that microphone is not

6 working.  I can't hear anybody from there.  I'm sorry, sir.

7 Would you --

8          MR. BRADLEY:  Sure.  Garrett Bradley -- now I can

9 hear you, Judge, how are you doing?

10          THE COURT:  That's better.

11          MR. BRADLEY:  Garrett Bradley, Thornton and

12 Naumes.

13          THE COURT:  Thank you.

14          MR. WILSON:  Good morning, Your Honor.  Thomas

15 Wilson, the Kelly Ferraro and the Ferraro law firm claims.

16          MS. PACHECO:  Good morning, Your Honor, Deirdre

17 Pacheco, Wilentz, Goldman and Spitzer.

18          THE COURT:  I can't hear you.  I'm sorry.

19          MS. PACHECO:  Deirdre Pacheco, Wilentz, Goldman and

20 Spitzer.

21          THE COURT:  You'll have to spell your last name too.

22 I apologize.

23          MS. PACHECO:  P as in Peter, a-c-h-e-c-o.

24          THE COURT:  And who are you representing?

25          MS. PACHECO:  Wilentz, Goldman and Spitzer.

1          THE COURT:  Thank you.

2          MR. RICH:  Good morning, Your Honor, Alan Rich,

3  R-i-c-h, representing Baron and Budd, Silver Pearlman and Lock

4  Waddell claimants.

5          MR. MATHENY:  Good morning, Your Honor, I'm Paul

6  Matheny from the Law Offices of Peter Angelos.

7          THE COURT:  Anyone else?  Okay, Mr. Bernick.

8          MR. BERNICK:  Good morning, Your Honor.  I think that

9  probably the best way we should proceed, and I think we

10  discussed this a little bit last time, is out of deference to

11  the patience of the people who are here for David Austern the

12  Future Claimants' representative, and I guess also out of

13  deference to Mr. Lockwood and Mr. Finch's schedule who are here

14  on behalf of the Asbestos' claimants, that we would begin with

15  the motion to compel that's been filed against Grace by those

16  parties and deal with that first.  We would then go to the

17  X-rays, and Ms. Harding from our office will speaking to the

18  X-rays.  And then in the third and final stage we would

19  proceed to the other matters that are encompassed by our motion

20  to compel with respect to the questionnaires.

21          In that regard, I think it's probably best if we

22  proceed kind of issue by issue and whoever wants to speak to

23  the issue can speak to it.  And we're of course, mindful of

24  your terse injunction last time that we've all brought our

25  toothbrushes, but we do hope that it won't be necessary to use

1 them.  So that is my proposal.  I don't know if anybody else

2 has a different plan, but I think that that's what we did agree

3 last time.

4          THE COURT:  That's fine.  That works.

5          MR. BERNICK:  So I guess I'll turn it over to those

6 who will present the motion to compel.

7          THE COURT:  Okay.  Mr. Lockwood.

8          MR. LOCKWOOD:  I'm going to take off -- try and put

9 my watch where I can keep an eye on it, Your Honor.  As I

10 recall, you told us we would only get an hour for this

11 argument, so I want to make sure I reserve a few minutes for

12 reply.

13          We're here today on the joint motion by the Committee

14 and the Future Claimants' representative to obtain document

15 discovery with respect to two enumerated document requests that

16 are referred to and quoted in our briefs.  And essentially what

17 those document requests involve or seek are documents

18 evidencing Grace's pre-petition litigation strategy with

19 respect to the claims that it resolved in the court system.

20          Briefly, the reason we need those documents is,

21 first, that our -- the methodology that our estimation experts

22 propose to use is based on that settlement history.  And

23 essentially, extrapolate with various adjustments to take into

24 account changes in the litigation environment from that

25 history.  And secondly and perhaps more directly, we need it to

1   rebut what we have all heard repeatedly here both in papers and

2   in oral arguments from Grace's counsel which is efforts to

3   effectively sort of negate or trash that settlement history by

4   asserting that it's the product of a broken court system, and

5   therefore it doesn't provide any reliable information.

6          With respect to this particular motion, Grace has

7   raised two separate legal basis for it's opposition to it.  One

8   is based on Rule 408, the proposition that this involves

9   settlement information which is not admissible under that rule,

10  therefore discovery into it would not lead to the discovery of

11  admissible evidence.  And secondly, arguments that it's subject

12  to the attorney client privilege.

13         I thought before we got into the actual nitty gritty

14  of that, one thing that might be useful for use and the Court

15  to focus on here is the context of this dispute.  I mean, why

16  are we here at this time on this issue?  We're here because

17  we're having an estimation.  Why are we having an estimation?

18  The answer at least in part is that Grace has filed a plan of

19  reorganization purporting to comply with Section 524(g) and

20  that plan provides that all of its creditors, including the

21  Asbestos Claimants, are going to get 100 percent pay including

22  post-petition interest where applicable and that as a result,

23  the Asbestos Claimants in particular are unimpaired, not

24  entitled to vote and the existing stockholders of Grace get to

25  retain their equity.

14

1          Under -- that means Grace has to satisfy Section 1124

2   of the code to show that there is no impairment.  The normal

3   way in which one shows no impairment of tort claims is that you

4   pass them through and let the reorganized debtor litigate them.

5   Another way of showing unimpairment is that you go through an

6   allowance process claim by claim and pay 100 cents on the

7   dollar of whatever that allowance process produces.

8          Here as again the parties have repeatedly stated,

9   we're not going to do either of those.  We're certainly not

10  passing the claims through and we're not having an individual

11  claims allowance process.  Why is that?  Well, it's because

12  Section 524(g) of the code has a sort of unique, within the

13  bankruptcy code, provision that allows you to -- a debtor to

14  effectively obtain the equivalent of a discharge, not only of

15  its present tort claims, but of future claims that under normal

16  circumstances it wouldn't even be able to address in the

17  bankruptcy case by creating a trust and instead of channeling

18  claims through to the reorganized debtor, channeling them sort

19  of laterally to the trust and letting the trust resolve the

20  claims post consummation.

21          In the normal case, and indeed in the Manville case

22  from which this was modeled, the trust procedures and the plan

23  itself are consensual and so you don't get into debates with --

24  between the debtor and the Asbestos' Claimants.  There may be

25  other creditors that have issues, but not between the debtors

1   of the Asbestos' Claimants over what is the appropriate amount.

2   And you do have votes because generally you don't have 100

3   percent.

4           Here that's not happening.  Instead, we're having

5   this -- we're having a contest.  If you -- what is that

6   contest?  Well, as we've said earlier, it's not about allowing

7   these claims.  In essence, what it is, is we're sort of --

8   we've bifurcated the confirmation process in a sense.  And we

9   are right now engaged in trying to ascertain and determine what

10  is the amount of funding that would be required for a trust

11  were it to be proposed in this plan and sent to confirmation

12  that would achieve the goals that I just recited earlier, 100

13  percent payment, non-impairment, no voting and retention of

14  equity.

15          THE COURT:  Let me interrupt you, Mr. Lockwood.

16  Somebody must be using a Blackberry, there is some buzzing.

17  Please turn them off or else I'll have everyone take them out

18  to the security guard so that we don't get the buzzing on the

19  record.  I'm sorry, Mr. Lockwood, go ahead.

20          MR. LOCKWOOD:  So how are we going about that

21  bifurcated confirmation process which the Court is ultimately

22  being asked to make this decision?  Well, there are effectively

23  two dueling methodologies being proposed here by the debtor on

24  the one hand and the claimants and the futures rep on the

25  other.  As the Court will hear at great length later in the

1  day, the debtor's proposal contemplates what they call a merits

2  based estimation, which involves sending out questionnaires to

3  tens of thousands of claimants, getting the answers back,

4  submitting those questionnaires to an expert review and then

5  having the Court have the experts in some manner or another

6  testify about the validity of the claims based on that review

7  and have the Court decide that contest.  And the Court has made

8  it clear that despite the strenuous objections of the asbestos

9  constituency to the validity and legitimacy and the feasibility

10  of that process that the debtor will be permitted to do that

11  and will be permitted to put on that evidence at trial and the

12  Court will decide after the trial whether that methodology

13  works.

14        On the other hand, the asbestos claimants and the

15  futures' representative have proposed what we consider to be

16  the conventional method of estimation using the pre-petition

17  resolution history as a starting point and then making, as I

18  mentioned earlier, adjustments for current and reasonably

19  likely future developments.  And the Court has also indicated

20  that we may present that estimation methodology as the other

21  train passing on the other track in the night and the Court

22  will determine which of those two methodologies or some hybrid

23  combination of the two or whatever will produce the amount that

24  the Court is being asked to determine here at the end of the

25  day.

1          In that connection, it's important to note a couple

2    of things.  When we talk about the resolution history here,

3    we're talking about both judgments and settlements.  But

4    judgments constitute a very small fraction of that resolution

5    history in terms of the number of cases.  And they have a much

6    higher rate of dismissal or defense wins than the settlement

7    process produced by way of dismissals.  But they also have a

8    much higher resulting set of outcomes when the plaintiffs win

9    them.  And as the Court will hear and we have referred to in

10   prior briefs, if you use the judgment history without regard to

11   settlements, you would comes up with a substantially larger

12   number if you extrapolated that information to the estimated

13   numbers of pending and future claims.

14          On the other hand, by definition, settlements don't

15   represent adjudications of the merits of claims.  Indeed,

16   they're deliberately intended to be in lieu of those.  And

17   Grace historically has settled the vast majority of its cases.

18   And we have as a result taken the sort of common sense notion

19   that because you're looking to see what would happen if Grace

20   either hadn't filed bankruptcy or alternatively in the case of

21   an un-impairment regime, what would happen if the cases were

22   passed through.  You look to see what the reality of the way in

23   which those cases would be resolved was.  And the assumption is

24   that Grace, like any other debtor, settled cases because they

25   thought it was cheaper and more economically beneficial for it

1  to do so rather than attempting to try them all, or try test

2  cases and use the summary judgment results as mechanisms for

3  dismissing on the merits by judges held up by appeals court,

4  large numbers of cases.

5         And so our experts have accepted the notion that the

6  vast bulk of the outcomes predicted in the future would be the

7  results of settlements rather than judgments.  And that's where

8  the need for the settlement history in this extrapolation

9  process has arisen.

10         Turning back to this discovery and focusing initially

11 on the Rule 408 piece of it, I go through this lead in in part

12 because the issue raised here by Grace is a lot broader

13 potentially than merely whether or not we get discovery of some

14 documents.  Grace urges that the Rule 408 bars the admission of

15 evidence of settlements or settlement negotiations.  If you

16 read the rule and you accept the proposition that it is

17 applicable here.  It doesn't -- it's not limited to, for

18 example, settlement negotiations which in fact, we're not even

19 particularly interested in negotiation discussions between

20 plaintiffs and defense counsel here.  It has -- you can't

21 introduce evidence of settlements, period.  And moreover, the

22 rule specifically talks about not only to prove liability, but

23 to prove the amount of the settlement.

24         And if that were -- if this Court were to hold that

25 the rule applied to Grace's settlement histories in the course

1  of ruling on this discovery motion, potentially at least that

2  would prohibit any evidence of the settlements for any purpose

3  relating to estimation being adduced in this case.    And not

4  only would that sort of in effect prejudge the inapplicability

5  or unuseability of our methodology which is based on those

6  settlements, but it also would prohibit Grace from doing

7  something which Grace has repeatedly said that it wants to do

8  here.

9          And in that connection, I'd particularly like to read

10 to the Court something that Grace said in its consolidated

11 reply of motions to compel asbestos personal injury claimants

12 to respond to the W.R. Grace Asbestos Personal Injury

13 questionnaire at Page 5 and it states, "In both its prosecution

14 and defense of this case, Grace has maintained a consistent and

15 legally principal position with regard to its prior

16 settlements.  The basic terms of final settlements, including

17 the parties thereto and the amounts thereof are discoverable

18 and potentially relevant to limited aspects of this estimation

19 proceedings (e.g. claim value).  But the other documents and

20 communications regarding the evaluation of claims, the basis

21 for deciding to settle a claim and the negotiations of such

22 settlements are wholly irrelevant to this proceeding, clearly

23 invade attorney client privilege communications and the

24 attorney work product, and have not been shown to have any

25 potential use other than those barred by Rule -- Federal

1  Evidence 408."

2        In effect, Your Honor, what Grace is attempting to do

3  is to cherry pick Rule 408 here.  The rule specifically says

4  you can't use settlements to prove amount and yet Grace

5  proposes to do precisely that.  And as a practical matter, the

6  distinction that it is attempting to draw in its cherry picking

7  is illusory because you -- what Grace would have us understand

8  or believe is that the first -- the liability part, which is

9  being distinguished from the amount part for the purposes of

10  the rule will be resolved by what it refers to as its liability

11  filter process, which is the questionnaires and the experts.

12  And only after the cases -- and only the cases that survive the

13  widowing will be then valued by relationship to the so called

14  settlement values or settlement histories.

15        Well, ask yourself this simple question.  How does

16  Grace propose to determine which pre-petition settlements apply

17  to cases that survive the liability filter?  Grace itself keeps

18  asserting there was no liability filter pre-petition.  So it's

19  got tens of thousands of potential cases here, all of which

20  have different amounts in them.  And how does Grace propose

21  that the Court should choose at Graces's behest, whether a

22  $500,000 settlement or a $3,000 settlement or a $30,000

23  settlement or a $1 million settlement, should apply to any

24  given case that survives the so called liability filter?  The

25  answer has to be that Grace is going to put on some kind of

1  evidence to show which claims are comparable.  Because that's

2  the only way in which anybody could do that.

3          Well, we believe and submit that the only way of

4  producing comparable cases would be to look at cases which have

5  the equivalent amount of evidence in the pre-petition context

6  as the cases that survived the liability.  But in order to make

7  that comparison you have to have somebody on Grace's side of

8  the table tell you which of those cases pre-petition had that

9  liability.  And the only -- that evidence of liability -- and

10 the only people that could possibly do that would be the Grace

11 lawyers, whether inside or outside, that handled those cases.

12 Because the Grace database that we've got doesn't say anything

13 at all about what criteria were used in determining to settle a

14 particular case for a particular amount.

15          And indeed, to jump ahead a little bit, if you look

16 at the Grace 10K, which we quote in our opening brief here at

17 Page 9, and look to what Grace itself was doing in setting

18 reserves both pre and post petition, you'll see that Grace

19 based its reserve, which is quite similar to an estimation --

20 that's what it is, it's an estimation, albeit not a court

21 determined one -- on the settlement history and in an earlier

22 stage of the proceeding, when Grace's general counsel from 1988

23 to 1998 was questioned about how this reserve was established

24 -- and this is set out at Footnote 5 on Page 9 of our brief --

25

1  and he said, among the list of criteria was Number 5, the

2  likelihood of taking a case to trial.  And how on -- who

3  decides what the likelihood of taking a case to trial is in

4  terms of valuing the case?  Lawyers.  Not businessmen that

5  don't know anything about litigating cases.

6         So what we've got here is that Grace itself proposes

7  to use this information and can't use it in ways that at the

8  end of the day won't involve lawyers in some manner or another.

9  But they're saying, we can't have discovery of what those

10 lawyers thought at the and are likely going to have to produce

11 some kind of evidence on it at the hearing.

12        Rule 408 itself says that settlement information is

13 useable quote, "For other purposes other than proving the

14 liability for the claim."  And the liability or amount of the

15 claim is the same claim for which the settlement information or

16 negotiations are proposed to be used.  It's as though we were

17 in this courtroom and we were trying a case in front of Your

18 Honor and the plaintiff attempted to say to the Court, well,

19 Your Honor, we had settlement negotiations and Grace offered me

20 to settle $10,000 for this case and that shows you that A,

21 they're liable for it and B, that's what it's worth.  And in

22 that context, you can't do that.  But that's not what we're

23 doing here.

24        The cases that were settled are history, they're

25 done, they're over.  We're talking about this undifferentiated

1 mass of present and future cases as to which there is no

2 settlement negotiations of those cases that are being proffered

3 here.  And if you read through Grace's brief and look at the

4 cases that it cites in support of its Rule 408 argument,

5 everyone of them in one way or another involved a single case

6 at issue.  None of them involved anything remotely like the

7 524(g) estimation process of tens of thousands of present and

8 future cases that we have here.

9        In contrast, the cases we cite, the Owens Corning,

10 Armstrong, Federal Mogul, the (indiscernible) and Babcock &

11 Wilcox cases where our methodology was used all involved those

12 kinds of estimations.  And in one of them, B & W, the precise

13 408 arguments that Mr. Bernick is making here now were made by

14 Mr. Bernick there and rejected by Judge Brown.

15        So the bottom line here, Your Honor, is that Rule 408

16 simply doesn't provide a basis for denying this discovery

17 request.  In addition it should be noted, as we do at Page 10

18 of our brief and which Grace has never responded to, that even

19 if we were wrong, which we're not, about Rule 408 evidence

20 coming in -- of settlements coming in directly into -- before

21 the Court, Rule 703 of the Federal Rules of Evidence permits

22 experts to rely on materials that are not admissible if they

23 are customarily relied on by experts in field.  And in this

24 case, every single one of the estimation experts that's been so

25 far identified by the parties, albeit their reports haven't yet

1  been filed, are on record as having used in other cases at

2  least, the very same approach to estimation which starts with

3  the settlement history as here.  Grace's experts include Tom

4  Florence, who has testified in some of the very cases we've

5  cited on this sort of estimation methodology.  Fred Dunbar and

6  Denise Martin of NERA wrote a book on the subject.  Latisha

7  Chambers and other folks from Navigant that have been

8  identified by the commercial creditors in the <u>Armstrong</u> case

9  and others used settlement history as part of her analysis.

10 And the Equity Committee represented by the Weil Gotshal firm

11 has identified Charles Bates who did an estimate of this sort

12 in the <u>Sealed Air</u> case using this sort of methodology.

13         The remaining issue that Grace has raised is the

14 attorney client privilege issue.  And they've stated that we

15 can't get into their lawyer's heads because they haven't waived

16 those discussions and they  haven't put at issue their

17 attorney's judgments on these things.  And the -- while they

18 say that on one side of the (indiscernible), they even

19 reiterate in their opposition at Page 8 and Page 19 among other

20 places, that the reason that our methodology's unacceptable is

21 because the court system was broken and therefor there

22 settlements don't represent some sort of legitimate basis for

23 reflecting a fair valuation of the prospects for success of

24 those claims.

25         While at one point they try and argue that well

1  quote, "We don't have to rely on our lawyers for this because
2  everybody knows this," and because they cited some case law
3  where judges have talked about elephantine morass of cases and
4  they cite some law review articles.  With all due respect, if
5  you're going to try to prove up that the court system is
6  broken, you've got to have evidence of that, and if you want to
7  prove that the broken court system has effected your claim's
8  history, you've go to have evidence of that, not statements of
9  counsel in brief or oral argument.  And the only source of any
10 evidence of that type would have to be the lawyers who were
11 operating in the allegedly broken court system who would
12 explain how it worked and how it effected their settlement
13 history and also would explain how the court system, if we
14 passed these cases through today, was either no longer broken
15 and therefore would produce a different set of outcomes or is
16 still broken.  And if it's still broken, then that's just too
17 bad for Grace.  Because as I said earlier in this thing, what
18 Grace is attempting to do is the equivalent of a pass through.
19 They have go to prove that these claims are unimpaired at a
20 funding level of whatever dollars they're asking this Court to
21 put on this cap funded trust.  And since all of the cases that
22 this subject of the broken tort system was handled by lawyers,
23 the Grace lawyers are the only possible source of this.
24         And again, with respect to this at issue waiver I
25 would harken back to the reading I gave you of the 10K in which

1  Grace itself has already used a settlement history

2  methodology's estimation and its counsel previously testified

3  that in part, that's based on lawyer's judgments about cases

4  status as trial ready or likely to go to trial.  So basically,

5  what -- this is another example of attorney client privilege

6  being sought to be used as both a sword and a shield.  On one

7  hand the sword part is that the attorney judgments underlying

8  the broken court system are being used to trash the settlement

9  history with respect to our methodology.  On the other hand,

10  when we try and find out exactly what they mean by that and

11  what they think they can show by that, we're told to ask their

12  lawyers how they evaluated these cases and why and how their

13  client and they concluded that the case should be resolved at

14  any particular stage for any particular amount, we're told we

15  can't find that out, that's privileged.  So we think this is

16  unfair and that they have in fact, either through waiver or at

17  issue waiver, put this on the table.

18          THE COURT:  Mr. Lockwood, let me interrupt.  Folks on

19  the phone, please turn your Blackberries off.  We're getting a

20  buzz.  I really don't want to have to disconnect the 100 of you

21  who are on the phone today, but I'm going to if this keeps up.

22  So please turn your Blackberries off and pick up a handset.  Go

23  ahead, Mr. Lockwood.

24          MR. LOCKWOOD:  At bottom, Your Honor, if Grace wants

25  to preserve its attorney client privileges and want to assert

1 Rule 408 and keep all of its settlement history out of the

2 thing, there's a very easy way they could do it.  They can just

3 pass through all the claims untouched, we can forget about this

4 confirmation and estimation process and their plans will be

5 confirmed, but they don't want to do that and they can't have

6 it both ways.  And I'd like to reserve the rest of my time,

7 Your Honor.  Thank you

8          THE COURT:  Okay.

9          MR. MULLADY:  Good morning, Your Honor.

10          THE COURT:  Good morning.

11          MR. MULLADY:  Ray Mullady representing the FCR.  As

12 Mr. Lockwood noted, the Court has affirmed that it will permit

13 each party to pursue the estimation methodology of its choosing

14 and will therefore allow each party to obtain discovery to that

15 end.  Where I would like to focus my remarks, Mr. Lockwood

16 having mad that -- established that proposition, is on how the

17 debtors in this matter have chosen to ignore this basic fact in

18 their present opposition to our motion to compel.  And they've

19 instead asked the Court to assume as fact that their

20 unprecedented estimation methodology, which focuses on the

21 merits of individual claims through the questionnaire and

22 liability filter process, is the exclusive method that the

23 Court will be employing here.  And only after the Court adopts

24 that proposition, can then Grace argue that Rule 408 bars the

25 disoverability and the admissibility of evidence of its

1  settlement history because, after all --

2          THE COURT:  I'm sorry.  Folks, please, if it's

3  someone in the courtroom, please -- anybody using a Blackberry?

4  No, you've all turned them off.  Okay, please, on the phone,

5  turn off the Blackberries, please.  This is my last request.

6  The next time it's an order and after that, I'm disconnecting

7  the phone.  I'm sorry, Mr. Mullady, go ahead.

8          MR. MULLADY:  Thank you, Your Honor.  So what I'd

9  like to talk about, first of all, the fact that the Court is

10 not here today to establish an estimation methodology.  I don't

11 think we have to say a lot about that, but I would point out

12 that we are in precisely the same posture as the court in

13 G.I. Holdings.  The G.I. Holdings case, one opinion from that

14 case has been prominently featured in the debtor's opposition.

15 In that case, the Court said that it was not its task at this

16 stage of the discovery process to decide upon an estimation

17 methodology.  It proceeded in the course of its opinion to

18 outline all of the discovery that had been requested, much of

19 which is exactly the same discovery --

20         THE COURT:  It certainly is.

21         MR. MULLADY:  -- that we are requesting here.  And

22 the implication or import from that opinion is that the Court

23 is going to permit that discovery to go forward, reserving

24 until the end which estimation methodology should control.  So

25 we would submit for the FCR that the debtors here, in

1  constructing their opposition to this motion to compel have

2  really placed the cart before the horse.  First assuming the

3  premise that their estimation method will not only survive the

4  Daubert challenge, but is also going to be employed as the

5  exclusive methodology.  And then they argue from that premise

6  as to why 408 and the attorney client privilege should deprive

7  us of this discovery.

8           So what I'd like to do just over a few minutes is

9  take a look and see how this construct that the debtors have

10  set up compares with controlling law.  Because after all, there

11  is law here and it needs to be followed.

12           Grace has said, in one of its responses to a set of

13  request for admissions that was directed to it by the PI

14  Claimants Committee said quote, "The purpose of the estimation

15  hearing is to have a merits based determination of the value of

16  the asbestos personal injury claims."  They've gone on to say

17  in their opposition that, "Grace's liability can only be

18  established by the evidence currently being adduced in the

19  questionnaire and (indiscernible) process which evidence goes

20  to the merits of actual claims being asserted against Grace,

21  not inferences from past settlement agreements and practices."

22  And that's at Page 4 of their opposition to the ACC's motion to

23  compel.

24           They then talk about pending and future claims having

25  to pass through a liability filter, and that's at pages 2 and 4

1  of their opposition.  They then assert that settlements quote,

2  "Cannot be used to infer liability."  And they say, "The

3  internal statements, mental impressions and motives of lawyers

4  will have no relevance to any stage of the estimation."  Again,

5  at pages 2 and 4 of their opposition.  They continue to assert

6  their position as follows, "Any effort to use Grace's

7  settlement negotiations and strategy documents to prove that it

8  is liable in any individual asbestos case would run afoul of

9  Rule 408."  And that's at Page 23 of their opposition.

10        So let's just stack up in a summary way what they're

11 saying here.  They're saying that estimation is based on proof

12 of Grace's liability for asbestos claims and that pending and

13 future claims must pass through this liability filter that

14 they've created.  They say that Grace's liability can only be

15 established by evidence adduced through a questionnaire and bar

16 date process.  No other way it can be done.  They say that

17 settlements cannot be used to infer liability, that the

18 internal statements, mental impressions and motives of lawyers

19 will have no relevance to any stage of this estimation and that

20 it's not -- and that 408 prescribes against the use of Grace's

21 settlement negotiations and strategy documents to prove that it

22 is liable in any individual asbestos case.

23        Now let me speak for a moment to the controlling law.

24 Case law says, sets this process up just a little bit

25 differently.  In <u>Federal Mogul</u>, <u>In re Federal Mogul v. Asbestos</u>

1  Property Damage Committee, which at 330 Bankruptcy Reporter

2  133, the court said that the focus is on the debtor's aggregate

3  personal injury liability for the creation of a trust, not the

4  merits of individual or class of individuals claims.

5          Also in Federal Mogul, the court said, "To focus on

6  the merits of individual claims would require that each

7  claimant be afforded the procedural protections of the due

8  process clause of the fifth amendment, thereby requiring cases

9  that presented disputed issues of fact, a trial by jury."

10  That's at page -- I don't have a page cite for that, but it's

11  also Federal Mogul.  And then in the Armstrong case, In re

12  Amrstrong World Industries at 348 Bankruptcy Reporter 111 and

13  123, the court said that, "Because asbestos claims arise under

14  state tort law, a court must therefore look at how a claim

15  would have been valued in the state court system had the debtor

16  never entered bankruptcy."  And also in Federal Mogul, the

17  court said, in the realm of future claims, the Eagle Picher

18  court had set forth seven considerations that should drive the

19  estimate.  One of those, consideration Number 4 was, valuation

20  of claims should be based upon settlement values for claimants

21  close to the date -- to the filing date of the bankruptcy case.

22          The law also has held that evidence of settlement

23  strategies used by the debtor is not only relevant, it's

24  crucial.  And I'd like to refer the Court at this point to the

25  Federal Mogul  case, and in particular, a passage from that

1  case where the court was discussing certain testimony that was

2  presented there by the primary outside defense counsel for the

3  debtor, which was Turner and Newell.  Quote, "Plaintiff's

4  presented Mr. Paul Hanley, the primary outside counsel --

5  defense counsel for T and N in the United States.  Hanley's

6  testimony was crucial because it shed light on the task of

7  placing appropriate weight on T and N's historical settlements

8  and provided insight into the perils that T and N faced in the

9  months before filing bankruptcy."  The court went on to say,

10  "This Court finds Hanley's testimony regarding the various

11  strategies used by T and N is credible and corroborated by Dr.

12  Mark Peterson, the plaintiff's estimation expert."

13         And last point on the controlling, Your Honor, on

14  Rule 408, contrary to the argument of the debtor here, in the

15  Babcock & Wilcox case, the Court said and I quote, "The

16  defendants submit that the plaintiffs rely on B & W's

17  settlement process as a substitute for proof of legal liability

18  is contrary to law and is in violation of Rule 408 of the

19  federal rules of evidence.  This argument is flawed."  And the

20  Court went on to say why.  And the reason the Court cited was

21  when plaintiff in a tort case against a particular defendant,

22  while it can't establish liability in that case by using

23  evidence of attempts to settle that case, when settlement

24  negotiations in terms explain and are part of another dispute,

25  they're often admitted to allow the trier of fact to understand

1  that case.

2          So why I've gone through all this is to really point

3  up that what we have here is the debtor sort of presumptiously,

4  with all due respect, saying to the Court, this is the way it's

5  going to go down.  We're going to have a claim by claim

6  examination of the individual liability of Grace as to each of

7  these claims.  We're going to pass them through a liability

8  filter.  The only purpose to use settlement strategies would be

9  to show whether we're liable in each case or not.  And because

10 the case law says you can't do that, 408 bars it, that

11 discovery should be denied.   And that just doesn't stack up to

12 the controlling law.

13         And let me just go through it again.  Grace's

14 position, liability can only be established by evidence adduced

15 through a questionnaire and bar date process.  Evidence of

16 settlement strategies has no relevance.  That's their position.

17 On the other side of the ledger, the controlling law says the

18 only requirement is that the value of the claim be determined

19 in accordance with the legal rules that will govern the final

20 amount of the claim.  That's the <u>Bittner v. Borne Chemical</u>

21 case, 691 F. 2d 134 out of the third circuit.  And that was

22 cited in the <u>Armstrong</u> opinion.

23         Again, Grace's position, use of Grace's settlement

24 negotiation and strategy documents to prove that it is liable

25 in any individual asbestos case would violate Rule 408.  The

1 law, evidence of settlement strategies is not only admissible,

2 it's crucial.  That's _Federal Mogul_.  Moreover, the argument

3 that reliance on settlement process as a substitute for proof

4 of legal liability is in violation of Rule 408 is flawed.

5 That's _Babcock & Wilcox_.

6          At bottom, Your Honor, we are not arguing for this

7 discovery because we are trying to prove Grace's liability for

8 any particular individual investor's case.  We recognize that

9 the proper methodology here ultimately to be decided by the

10 Court will involve a combination of the use of settlement

11 strategies, the use of settlement evidence and the methods that

12 Grace will present into evidence.  To restrict discovery to

13 only that evidence that Grace purports to support its

14 estimation process would be inappropriate and we submit,

15 unwarranted.  Thank you, Your Honor.

16          THE COURT:  Anyone else?  Mr. Bernick?

17          MR. BERNICK:  It might be better, actually, Your

18 Honor, if I could stand over here with the Court's permission.

19          THE COURT:  That's fine.

20              (Mr. Bernick away from microphone)

21          MR. BERNICK:  I want to start out by putting up on

22 the chart here some things that I think will look back to

23 during the course of the day, but I'm not going to address at

24 the present time.  But I think that now that we have them out

25 on the table, it's probably important to make sure that the

1 remaining consistentness today proceeds.

2      We heard from Mr. Lockwood who said it's not enough

3 for lawyers to stand up and say that the court system is broken

4 or to quote from Justice Souter that asbestos litigation is an

5 elephantine mass.  He says you've got -- Mr. Lockwood said he's

6 got to have evidence the court system is broken.  Number 2, he

7 says the only evidence, at least when it comes to Grace, which

8 really speaks to the issue of what was going on in the tort

9 system, the only evidence comes from the lawyers because

10 they're the ones who handled the cases.  And that's really the

11 third point.  They are the ones who settled.

12      We're going to come back to these propositions, but

13 I'm not going to talk about the tort system right now because I

14 think that the issue that we're really facing here in

15 connection with their motion to compel is a narrower question.

16 We're prepared, Your Honor, to give substantial ground on this

17 issue here this morning.  And I'll say that right at the

18 outset.  But I want to be precise about what it is that we're

19 giving up and why we're giving it up so that as we go forward

20 here and have some of this discovery take place they're so

21 anxious to pursue, it's very clear about what the limits are

22 and for what purpose it's being conducted.

23      So let me take a step back and talk about what we

24 are, where we are in terms of Rule 408 and discovery versus

25 trial (indiscernible) because that's what this thing's about,

1  (indiscernible) as a basis for saying, let's go ahead and have

2  some of this discovery proceed.

3           First, Rule 408, in our view, is completely and

4  clearly applicable.  And whether Rule 408 is applicable or not

5  from the debtor's point of view is not on the table for

6  negotiation.  Our position today, tomorrow, when we go through

7  the estimation process is that Rule 408 in fact, does apply to

8  the use it's being proposed here.  And to show how clear it is

9  that Rule 408 governs, I want to go back to a chart that we

10  showed actually the very date this case was filed.  I believe

11  we have some copies, I think, for other folks who are sitting

12  here in court.

13          This simply records, or reflects, it was in our first

14  brief, our informational brief we filed in the very beginning

15  of the case.  This reflects the filing rates against Grace in

16  the years leading up to 2001, which is when the case was filed.

17  As Your Honor will recall and I know that I've shown this

18  repeatedly, but it goes back to day one and is key, we have a

19  series of the areas in which (indiscernible) claims that were

20  filed and kind of went up in the mid 1990s.  And then it came

21  back down, it came back down in '97, '98 and even 1999 was

22  below the peak of the mid 1990s.  But then in 2000, it just

23  took off.  Absolutely (indiscernible) dramatic rise in the

24  claims that were being filed.

25          Now why did that happen?  This was the reason -- this

J&J COURT TRANSCRIBERS, INC.

1   spike is the reason why this case was filed.  And as we

2   articulated at the beginning of the case, our real goal was to

3   say -- in showing this case -- that but for this spike, but for

4   this anomaly, this company would in fact have been able to

5   proceed in the ordinary course and handle its asbestos

6   liability.  So our goal was to demonstrate that this spike was

7   false.  That it doesn't represent an actual liability and that

8   is the goal and has remained the goal in the case as we have

9   gone forward.

10          Now it would seem self evident that that spike does

11  not represent a newly arising medical event.  There's no way

12  that all of a sudden a number of people were exposed -- twice

13  as many people were exposed and got sick some time in the

14  distant past and all of a sudden they've become manifested.

15  More is it a situation where Grace was all of a sudden

16  discovered by the tort system.  This is a situation of which

17  all of a sudden in one year, people decided to go gunning for

18  Grace for whatever reason.  And it does not represent Grace's

19  liability.

20          So where do we go with that in this case?  And here's

21  where the fork in the road develops.  We're here and we've go

22  this big spike.  The day or the year before the petition in

23  2000.  And these are the claims (indiscernible) for

24  illustration purposes, that were pending as of the time that

25  Grace filed for Chapter 11, and these are the claims with

1  respect to which we've asked for information.  Our plan, our

2  goal is to say, do we have liability or not.  Let's focus on

3  two issues and two elements of liability.

4          One is, is there disease in fact, and two, is it

5  caused by Grace?  Two specific issues, both of them are

6  scientific (indiscernible) issues, both of them are subject to

7  (indiscernible), both of them are amenable to gathering

8  information on a consistent basis in order to answer the

9  question with respect to this large number of claims, fo they

10  or do they not satisfy the requirements for even making their

11  way into court given the principles of (indiscernible) holding

12  the space.  That's our approach.

13          Plaintiff said, what is the approach that the other

14  side is going to bring to bear?  Well, Your Honor has heard it

15  before, heard it again this morning (indiscernible).  Dr.

16  Peterson says, look, I don't need to worry about any of that,

17  I've got a better way.  I don't have to worry about disease, I

18  don't have to worry about causation, I don't have to worry

19  about any of the other elements of law that have to be

20  sustained, I don't even have to worry about evidence on the

21  merits.  I don't have to worry about these particular cases.  I

22  will go back and just show the Court the settlement history.

23  And on the basis of that settlement history, I will tell the

24  Court which of the claims are claims that would have been

25  settled as of the time the company filed for Chapter 11 and

1   then I'll carry it through indefinitely in the future using

2   various curves and epidemiological models.

3          Now Dr. Peterson has been deposed and we have

4   specifically gone into the question of what it is that he is

5   assuming as a fundamental principle when it comes to disease

6   and when it comes to causation.  And we have been able to

7   establish clearly and it is beyond debate.  It comes right from

8   his mouth, that he does not know how many people actually are

9   sick, that he does not know how many of the people that are

10  actually sick have an illness or a disease that is caused

11  by any particular company.  He just doesn't know.  It's not

12  something that he even worries about.  Why?  Because he infers

13  that that is so from settlements.  That is plain and simple.

14         And when we took his deposition, this is the

15  testimony that he offered in some briefs that he had filed.

16  This is the cross examination at trial in the Babcock & Wilcox

17  case which counsel have referred to repeatedly here this

18  morning.  This is a fraudulent advanced trial.

19         And I asked him, this was at Page 91, question, "If

20  you take all of the mesothelioma claims that have been made or

21  will be made, isn't it a fact that your report nowhere

22  quantifies what portion of those claims, if any, was actually

23  caused by actual -- was caused by actual exposure to Babcock &

24  Wilcox asbestos?"  His answer was, "No, I don't yet.  I have

25  not made that calculation, but I believe that B & W has made

1  such a calculation by its settlement practices."  As if the

2  settlement practice somehow is the same as an actual assessment

3  and admission of medical evidence related to the disease and

4  medical evidence related to causation as concerns resulting in

5  the (indiscernible).  His testimony was broader, this is Page

6  31 of the adversary proceedings on October 10, 2001.  This part

7  goes to all of the claims that he is dealing with.  This is

8  Page 31.  I asked him,

9  "Q    Any situation where Babcock and Wilcox agreed that it had

10 committed a wrong to a claimant and that as a result the

11 claimant has suffered injury?

12 "A    Yes.

13 "Q    Which one?

14 "A    By 287,000 claims they paid.

15 "Q    It's your statement as an expert, Dr. Peterson, that the

16 fact that they agreed to pay those claims was an agreement they

17 had committed a wrong to the claimant and that as a result the

18 claimant had suffered injury?

19 "A    I think it's an agreement, and the most important way to

20 make an agreement is you can pay money.  There wasn't explicit

21 reward statement, but they paid the money.

22 "Q    And from that, you inferred and they agreed that they were

23 liable?

24 "A    Well, it's been agreed that they paid money, yes."

25         And what's so stunning about this is that this is the

1  kind of thing that typically, you'll read in the newspapers,

2  well, they settled, they must have thought they were liable.

3  This comes from Dr. Peterson who's actually trained as a

4  lawyer.  He's a trained lawyer.  Yeah, I infer, I don't have to

5  worry about the actual evidence.  I infer from settlement that

6  there is liability and that it is an admission.  And I don't

7  have to worry about any of the evidence.  I don't have to worry

8  about (indiscernible), I don't have to worry about evidence

9  period.  That is a plain and simple violation of Rule 408.

10        Rule 408 could not be clearer that that is precisely

11  what is designed to be avoided.  It's plainly barred, there is

12  no other purpose for which the settlement testimony, the

13  settlement evidence is offered on the liability issue other

14  than as an admission of liability and is centrally in the

15  purview of Rule 408.

16        THE COURT:  But I think the settlement history has a

17  different purpose regardless of liability.  I don't take a

18  settlement to -- especially one that says, which most of the

19  ones I've seen in other cases, if not this case say that

20  there's no admission of liability, so I'm certainly not going

21  to deem it to be an admission of liability.  But I think it

22  does have some value with respect to whether or not the debtor

23  is willing to settle claims an if so, at what levels for

24  whatever purpose the debtor chooses to settle those claims.

25        MR. BERNICK:  But that is only -- that is not germane

1  in this proceeding.

2         THE COURT:  Well, sure it is.  From the asbestos

3  creditor's committee's side it is because the standard, I

4  think, is pretty clear that the Court has to look to what would

5  be the likely outcome of the claims in the tort system if no

6  bankruptcy had been filed.  Now, I'm not getting into the chain

7  of circumstances and the lay of the land, I understand all

8  that.  I just want to get to the legal principle at the moment.

9         MR. BERNICK:  Well, I'll respond.  It kind of gets

10  into the estimation itself.  But I would suggest to Your Honor

11  that that is incorrect in the following way.  There's no

12  question that that the state substantive law governs what

13  happens in the estimation process to the extent as your talking

14  about the substantive elements of liability.  So as of the time

15  that Grace filed for Chapter 11, prior to that time, state

16  substantive law controlled.

17         Now that we're into Chapter 11 we have an issue which

18  is what is the extent of the liability?  Because as everybody

19  agrees, Grace has got to account for the liability when it

20  comes to this plan and the question of impairment.   Liability

21  is not a question of what Grace was willing to do in the state

22  court system.

23         THE COURT:  I just said, I agree that liability has

24  nothing to do with this.  But claim valuation and the fact that

25  even if debtor paid claims that were invalid by whatever

J&J COURT TRANSCRIBERS, INC.

1  standard you want to say, they're invalid simply because it

2  shows pay claims rather than litigate.  It shows that nuisance

3  value is a value to be assessed to a claim.

4          MR. BERNICK:  A value in the tort system.

5          THE COURT:  Well, but it's a value here too.

6          MR. BERNICK:  They're not at the tort system, never

7  will be --

8          THE COURT:  But you're not adjudicating each

9  individual claim here, so you're not going to be establishing

10 liability for any specific claim.

11         MR. BERNICK:  Your Honor, establishing

12 (indiscernible), I'm glad we're having this discussion.  We're

13 establishing liability and the aggregate.  Liability and the

14 aggregate follows the same legal principals as -- the same

15 substantive procedural legal principle as it does on an

16 individual basis, it's just that you're not actually

17 determining, for purposes of distribution, each and every one

18 of those individual claims.

19         So the standard is, what is liability?  Legal

20 liability.  Willingness to pay nuisance values is not an

21 element of legal liability.

22         THE COURT:  I didn't say it was.  In fact, I think I

23 said it wasn't.

24         MR. BERNICK:  Right.  So if we're focused on what is

25 the aggregate legal liability, our willingness to pay prior

1  settlements and to draw the -- and the inference that Dr.

2  Peterson suggests should be drawn is irrelevant and it's barred

3  by Rule 408.

4        Now, once we go through the question of where there's

5  legal liability, do we come to the issue about the value of the

6  claim?  The answer to that is yes.  For purposes of the value

7  of the claim, how it trades -- how it traded in the past

8  marketplace is probably the only place to go.  But that's not

9  to say that you're going to go back to the past marketplace to

10 revive and give value to claims as to which legal liability has

11 not been demonstrated.  If you did that, what you'd essentially

12 be saying is the bankruptcy case to rules of legal liability as

13 a filter.  Anything that you are prepared to settle for in the

14 tort system whether there's liability or not, you now have to

15 take and settle again.  There's no purpose in bankruptcy,

16 that's not the bankruptcy rules.

17       So to be very clear, we believe that legal liability

18 must be applied in this case a threshold proposition.  We

19 believe the settlement history is not admissible for purposes

20 of proving our legal liability.  Once we establish with respect

21 to the pending claims as of the time of the bankruptcy what the

22 overall scope of the legal liability was -- how many claims?

23 We then clearly will with the benefit of that population then

24 say well, what are they worth.  And for that purpose, we will

25 clearly go back to the question of what Grace was prepared to

1  pay to settle the claim.

2        If that's what  Your Honor is getting at, we totally

3  agree that the past settlement history is relevant.  It's

4  relevant to prove value.  We have provided all of our claims'

5  history and our claims' database for purposes of that

6  valuation.  And it should be relatively simple.  If we want to

7  determine what the value of the claims was as to the claims

8  that passed the liability filter, we can go back to the same

9  database and on the basis of that database, determine what the

10 dollar values are.

11       Now Mr. Lockwood is asking, well how is that actually

12 going to take place.  And our answer is when our expert reports

13 are filed, we will tell him exactly how it's going to take

14 place.  But I can assure the Court that we do know enough now

15 to know that it is not going to be very difficult and figure

16 out what the dollar values in the claim are.

17       Our issue with respect to Rule 408 is the threshold

18 issue of whether settlement could be taken instead of, in place

19 of a determination of -- as to which -- with both claims in the

20 aggregate, there is legal liability.  That's our issue.  We are

21 not raising an issue about whether the settlement history will

22 have had some relevance in determining dollar value.

23       Now, we're going to come back to this dollar value

24 when we talk about joint and several liability a little bit

25 later on today.  So there's more to be said here.  But the

1  first step is liability, the second step is value.  And it's on

2  the first step that the settlements are sought to be offered as

3  evidence as exactly what Dr. Peterson says, is that they're

4  offered as evidence of the fact that the elements of liability

5  are satisfied even though he has done no review.  Nothing.

6        THE COURT:  But that's a report in a another case.

7  Hopefully he's not going to do that in this case.

8        MR. BERNICK:  I can assure Your Honor that's exactly

9  what he's going to do in this case.

10       THE COURT:  Well, I don't know what he's going to do

11  here.  But the question is whether the committee and the future

12  claims rep is entitled to look at the debtor's settlement

13  history for purposes of value claims.  And I think they are.

14       MR. BERNICK:  We have already given them the

15  settlement history.  Your Honor, I'm going to get to the good

16  news in a minute.

17       THE COURT:  Well then what are we fighting about?

18       MR. BERNICK:  Well, we're fighting about -- what

19  we're fighting about is, if you give me -- Your Honor, I ask

20  for your indulgence.  I'm going to get right in a moment here

21  to a proposal that I think will become more specific in terms

22  of discovery.  And the reason I'm going through this right now

23  is that it's really important that we make clear what it is

24  that we're prepared to give on and what it is that we're not

25  prepared to give on.

**J&J COURT TRANSCRIBERS, INC.**

1         And one thing that we're not prepared to give on is

2    the application of Rule 408 to bar the admission of evidence at

3    trial.  We believe that 408 is fully applicable.  We believe

4    that it bars the very use that Dr. Peterson has referred in

5    this other case.  And as I said, that is not on the table.

6    With respect to the law in that area, there is not one case,

7    not one, they talk about Federal Mogul, Armstrong, Owens

8    Corning, all these other estimations, not one of those

9    estimations looked at the Rule 408 issue.  Why?  Because given

10   where the parties were in those cases and what they had decided

11   or agreed to and not agreed to and sometimes what their

12   estimators were doing, given all of that, it was not an issue.

13   So there was no -- you go look for Rule 408 in Federal Mogul

14   which was cited, you go look for Rule 408 in Armstrong, Owens

15   Corning.  There's not a single mention of Rule 408.  There's

16   not a single court that has said that this use for estimation

17   purposes of prior settlements as an admission of legal

18   liability is permissible under Rule 408.  Not one.

19         THE COURT:  But I don't see how it's an admission of

20   legal liability.  I don't understand either the claims rep or

21   the ACC to be asking for the settlement history to prove

22   liability.  They're talking about valuation.

23         MR. BERNICK:  Let me assure Your Honor that's exactly

24   what they'll do.  But here's -- let me get to --

25         THE COURT:  Well, if they do, then it seems to me

1  you've got an objection at that stage as to admissibility.  But

2  this is a discovery colloquy.

3        MR. BERNICK:  That's exactly right, and that's where

4  we're going.  But again -- let me get to that proposal.  We are

5  here on discovery and we are flexible with respect to discovery

6  and for the following reason.  The Goodyear case finds that

7  this is not only not admissible for trial purposes, it's not

8  discoverable.  And we think that that analysis is correct.

9  That is, it is not discoverable because it can't lead to the

10  discovery of relevant evidence, that is, why we settled a given

11  case is not relevant, doesn't lead to the discovery of

12  admissible evidence with respect to what the settlement history

13  was.

14        To be clear, Your Honor, we have already turned over

15  the database that reflects all of the settlements that we have

16  ever reached.  That is not an issue at all.  What they want are

17  the underlying reasons why we settled the case.  Because they

18  want to be able to demonstrate that not only did we settle, but

19  that once more, the settlement was an admission of liability.

20        THE COURT:  What I heard them say is that they want

21  to rebut the debtor's proposition that the tort system's broken

22  and that that was the reason why the debtor is settling.  And

23  now I'm not sure anybody's going to be able to talk about why

24  the debtor settled including the debtor.  But in terms of the

25  valuation, it still seems to me that it's relevant.

1        MR. BERNICK:  Well, again Your Honor has to again put

2  this in context.  The first proposition that they made is,

3  they're the ones who want to get into the settlement history,

4  not only for valuation purposes, but as an admission of

5  liability.  That's plain and simple, it's from Dr. Peterson.

6  You'll hear it again on the stand when he testifies.  We, in

7  response to that, have said uh, uh, uh, those settlements do

8  not reflect actual legal liability because the tort system was

9  broken.  So the only reason that we even pursued the issue of

10 the settlement history is to respond to their contention which

11 we believe is barred under Rule 408.  Well, let us make a

12 sequence out of this in order to be totally --

13        THE COURT:  But you're advocating a reason which,

14 you know, if the debtor's going to advocate a reason for

15 settlements, they're entitled to challenge the debtor's

16 reason for settlements.  I don't see how the debtor or any

17 other party is going to get behind the basis for the

18 settlements.  But the fact of settlement is relevant and the

19 fact that there are values placed on settlements, I think is

20 relevant to determining the debtor's valuation matters going

21 forward.

22        MR. BERNICK:  Let's tease it out because there are

23 different layers, Your Honor.  The first layer is, was there a

24 settlement and what are the terms.  There's no issue about

25 that.  We have turned it over.  The settlements that have been

1  entered into are all in a database, it's been made available,

2  not an issue in discovery, not an issue for purposes of

3  admission.

4          THE COURT:  Okay.

5          MR. BERNICK:  Okay.  So that's on the table.  We then

6  get to the question of the reasons for settlement.  Now, they

7  want to get into the reasons for settlement because what they

8  do with these settlement terms is they do two things.  They say

9  it's value and they say it's liability.  We say it does

10 represent value, but it's not an admission of liability.  In

11 fact, what it is, is it's barred by Rule 408.  They won't

12 recognize this and they've told you again today.  But look at

13 all the other cases.  All the other cases, this is all fair

14 game.  If we were to prevail right now on Rule 408 with respect

15 to whether those settlement terms are admissible for purposes

16 of liability, if we're correct and we weren't prepared to be

17 flexible when somebody said, no, not discoverable under

18 Goodyear, we're not going to get into it, it's completely

19 inadmissible for that purpose, and they were not permitted to

20 offer the settlement terms as an admission of liability, we

21 would be over and done with.  There wouldn't be anything left

22 to talk about.

23         What's happened though is that because Rule 408 has

24 not been applied historically in these other cases for whatever

25 reasons and because it has not been decided here, we have

1  anticipated that they would make this argument, say that the

2  settlement terms are an admission of liability and we have said

3  no, not (indiscernible) by 408, but the tort system is broken.

4  The tort system can't possibly be evidence of an admission of

5  liability because it wasn't an admission of liability.  It is a

6  response to our anticipated attack on the tort system here.

7  They then say no, we need to know the reasons why you settled

8  in order to bolster the fact that it was an admission of true

9  liability, then the tort system really wasn't broken after all.

10 So you can see how confused it's become.

11        THE COURT:  Who cares whether the tort system's

12 broken or not broken?  The question is going to be, I think,

13 that the debtor has certain claims that it's going to have to

14 recognize and other claims that it's going to take the position

15 are not valid in this record and therefore have no basis in

16 fact on which to support the value.

17        MR. BERNICK:  Correct.

18        THE COURT:  Okay.  It's -- in valuing -- I've passed

19 the liability issue.  I'm only looking at value.  In valuing

20 claims, I think the law is clear that the Court has to look at

21 the pre-petition settlement value, litigation value, every

22 other value that can be thrown into this mix going forward to

23 determine what the likely outcome of the value of the claims

24 is.  So why is the debtor settlement history not relevant?

25        MR. BERNICK:  It is, to that.

**J&J COURT TRANSCRIBERS, INC.**

1            THE COURT:  Okay, then what -- I'm still --

2            MR. BERNICK:  I am going to do the job.  Let' try

3   another slice in a different way.  We've got a stack of claims.

4   The stack of claims are the claims that were pending as of the

5   time that the petition was filed.  We have to decide which ones

6   of those claims are claims as to which there is the prospect of

7   legal liability on an aggregated basis.  That's the first step.

8   So that we can't get past that right away, we have to look at

9   that first.

10           THE COURT:  Well, that's what the debtor wants to

11   look at first.  But this is their motion to compel.

12           MR. BERNICK:  I understand that.  But at some point,

13   they have to address that issue.

14           THE COURT:  Well, they are addressing the issue, at

15   least superficially by virtue of the fact that they're

16   submitting claims and filling out questionnaires and agreeing

17   that there are claims --

18           MR. BERNICK:  I understand that.

19           THE COURT:  Okay.

20           MR. BERNICK:  But in terms of their vision for how

21   they will pass this burden.  In their case, it is settlement.

22   You settle, therefore, you're legally liable.  And as a result,

23   they will take the portion of the total claims that they

24   believe would have been settled in the state system and say,

25   because they would have been settled in the state system, you

1  are legally liable, that is Dr. Peterson's inference, and

2  therefore you have to pay.  And then to get the dollars,

3  they'll take all of those same claims and say, okay, you want

4  to settle, here's what you would have settled for.   That's the

5  second step.

6        Now to do that, they're satisfied with having the

7  terms of the settlements and they'll say, the fact of

8  settlement, the fact of settlement, you don't need anything

9  more, says liability and the dollar value is also reflected in

10 the settlements.  That's their view of the world.  Our view of

11 the world is different.  Our view of the world says, the first

12 step is legal, we need the questionnaires to figure out which

13 ones of these claims has liability.  And then with respect to

14 the ones where there is liability, we agree --

15        THE COURT:  Mr. Bernick, the problem I'm having is, I

16 don't understand how the debtor's going to do this without

17 filing a specific objection to every claim if you're trying to

18 get to whether or not the debtor is legally liable for every

19 claim filed.  Because the reality is that if a claim is

20 submitted somewhere in a tort system, there may not be a legal

21 basis of liability.  You know, there may be a failure of proof

22 somewhere as to one of the elements.

23        MR. BERNICK:  Yes.  That's right.

24        THE COURT:  Okay.  But the reality is that people

25 settle cases, not because they're liable, but because they just

1 don't want to deal, for whatever reason, with the issues that

2 may come up in order to defend against a claim.  You know,

3 people have all sorts of reasons for settling.

4          MR. BERNICK:  Okay.  But the nuisance value is not a

5 standard of liability.

6          THE COURT:  But it is a -- it's not a standard of

7 liability, but it's an estimate of the value of claims.

8          MR. BERNICK:  Only as an estimate of the value of the

9 claims given the circumstances in which a claim is made --

10          THE COURT:  Exactly, but you know what --

11          MR. BERNICK:  -- which is no longer present here.

12          THE COURT:  But it is present here because you're not

13 challenging every specific claim.

14          MR. BERNICK:  Your Honor, with due respect to the

15 Court, the whole purpose of the questionnaires is to find out

16 the claims that won't pass Daubert standards, they're just junk

17 claims.

18          THE COURT:  Well I understand that that's your

19 theory.  I mean, I understand that that's what you want it for.

20          MR. BERNICK:  And we're here, if we're either right

21 or wrong about that, if Daubert doesn't apply, we're out.  If

22 Daubert does apply, that is a standard that has --

23          THE COURT:  But that's no relevant to what we're

24 talking now on the ACC's motion to compel.  The ACC has nothing

25 to do with your theory.  Your method of trying this case and

**J&J COURT TRANSCRIBERS, INC.**

1  their method of trying this case are going basically down two

2  separate paths as I understand it.   Maybe there will be

3  someplace where they join, but at the moment, it doesn't look

4  like it.

5            MR. BERNICK:  Fair enough.

6            THE COURT:  So regardless of what the debtor wants to

7  do with its case, this is the ACC's case that we're talking

8  about.

9            MR. BERNICK:  I understand that.

10           THE COURT:  And they want to say, we want to see the

11  settlement -- we want to see the settlement values --

12           MR. BERNICK:  We already gave them that.

13           THE COURT:  Okay.  Then I think I need to know what

14  more we're talking about.

15           MR. BERNICK:  I was trying to get into that.  The

16  settlements and the settlement terms are all there.  What they

17  want is to know, they want to take Mr. Hughes' deposition,

18  who's sitting back in court, and they want to say why did you

19  settle these claims?  What was going through your mind?  And

20  what they want to establish is it the reason why you settled

21  the claims is that you thought you were legally liable.  And by

22  doing --

23           THE COURT:  But that doesn't have anything to do with

24  the settlement terms.

25           MR. BERNICK:  That's why we're here, Your Honor.  Is

1  that, that is what the discovery is that they're seeking.  We

2  have already given them the settlement terms, we have given

3  them the database.  They can have as many settlement terms, as

4  many databases as they want to deal with the settlement terms.

5  But where we have drawn the line is they're not entitled to

6  pursue the reasons for the settlement in order to use that in

7  order to establish our legal liability.

8         THE COURT:  Don't the settlement documents by

9  themselves indicate that they're not an admission of liability?

10        MR. BERNICK:  They probably do.

11        THE COURT:  Okay.  So then you can't use the

12  settlement terms to show legal liability, the settlement

13  documents themselves say so.

14        MR. BERNICK:  Right.

15        THE COURT:  Okay.

16        MR. BERNICK:  Okay.  So, on that -- it is for that

17  basis that we said no to their discovery.  That is why we are

18  here.  We are not here to say that the settlement terms are

19  undiscoverable.  We are here to say that the reasons for the

20  settlement are inadmissable under Rule 408.

21        THE COURT:  But it depends -- whether that's the case

22  or not depends on whether the debtor opens the door to its

23  theories for settlement.  And --

24        MR. BERNICK:  And the answer to that -- the answer to

25  that is no.  (Indiscernible) and that's what our brief said.

1  Our brief says that it's not we who wanted to get into the

2  reasons for the settlement.  They are pursuing the reasons for

3  the settlement as part of their theory that they can use the

4  settlement as an admission of liability and thereby not satisfy

5  the legal standards.  And that's why -- would satisfy -- that

6  is why I say that if we are correct about Rule 408, if we're

7  correct about Rule 408, their whole deal here, the whole -- the

8  use of the settlements to establish liability and the need for

9  discovery into the reasons for the settlement, it's all out.

10       We're not the ones who are opening the door.  They

11  are the ones that want this history in order to satisfy their

12  -- to satisfy in a way that they believe is appropriate, a

13  requirement they establish some evidence of our liability.  If

14  they can't do that through the settlement process, as Your

15  Honor indicates, the settlement doesn't speak for liability,

16  we're not the ones who are going to be talking about it.  We're

17  not opening that door.

18       THE COURT:  We are if you're starting to talk about

19  the fact that you settled because the tort system's broken.

20       MR. BERNICK:  And we only do that by way of

21  responding to their contention that the settlements represented

22  an admission of liability.

23       THE COURT:  Okay.

24       MR. BERNICK:   In other words, what we're saying is,

25  let's assume that a claim settled for $10,000, an asbestos

**J&J COURT TRANSCRIBERS, INC.**

1  claim settled Grace $10,000, (indiscernible) asbestos is

2  $10,000.  Okay.  If that claim passes the standards for legal

3  liabilities as the Court would find legal liability, we would

4  take the $10,000 that is the value of the claim as it was

5  settled before.  We'd say okay, $10,000 for estimation

6  purposes.  It is they who want to say, no, no, no, we want to

7  go further.  We want that settlement to stand as evidence that

8  you were in fact legally liable.  And it's there we say no.

9  But if they're permitted to say that, if they're permitted to

10 have Dr. Peterson testify as he did before, than the settlement

11 equals legal liability, then we're of course going to say no,

12 this is not true.

13         THE COURT:  Maybe I'm confused about this estimation

14 process.  It seems to me that the estimation is to do two

15 things.  It's to try to figure out how many claims of a

16 particular type are currently pending and to use that and

17 whatever other information the experts will use to extrapolate

18 out what the demands against the debtor will be in the future.

19 So it's to look at, in absolute terms, a number of claims that

20 are likely to be filed.

21         MR. BERNICK:  That's correct.

22         THE COURT:  Okay.  Then it is to figure out what the

23 value of those claims is so that we know what the debtor has to

24 put into a fund in order to pay those claims.

25         MR. BERNICK:  Correct.


                    **J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  That's what I understand the estimation

2  purpose to be.  So it's to look at numbers.  Numbers of claims

3  and their worth.

4          MR. BERNICK:  But there's something that's in

5  between.  And that is which claims are actually have evidence

6  of being claims that properly can be pursued against the

7  debtor.

8          THE COURT:  Well, you're talking about that in terms

9  of pending claims --

10          MR. BERNICK:  Yes.

11          THE COURT:  -- not about claims that are already

12  settled.  They're gone.

13          MR. BERNICK:  Right.

14          THE COURT:  Okay.  So --

15          MR. BERNICK:  It is a confusing process.  Go back to

16  the first chart here.

17          THE COURT:  I don't think I'm confused about the

18  process.  I think I'm confused about what it is that is still

19  left open.  If you've given the settlement history, what are we

20  here for?

21          MR. BERNICK:  What we're here for is they want --

22  along with the settlement history, they want the reasons why we

23  settled in order to be able to say that the settlement was an

24  admission of liability.  That's why we're here.  We say it's

25  not an admission of liability and therefore, because it's not

1 an admission of liability, you're not entitled to get into what

2 Mr. Hughes' thought processes were in order to establish that

3 it was an admission of liability.

4      THE COURT: Okay. What I heard from Mr. Lockwood

5 wasn't that this is supposed to be used as an admission of

6 liability. That was to determine, I think the word was

7 strategy, the debtor's pre-petition strategy for determining

8 how to pay claims in the tort system. Not he reasons for it,

9 but essentially the fact that claims were being paid in the

10 tort system. The debtor didn't --

11      MR. BERNICK: They're both stipulating the fact --

12 they'll stipulate to the fact that the debtor paid claims in

13 the tort system. We'll stipulate to what claims they paid and

14 what they paid for it. That's not why we're here. He wants

15 the strategy involved in settlement for purposes of being -- we

16 went through this exact same situation in the Babcock and

17 Wilcox cases, it's not the first time this has happened. They

18 wanted to call Mr. Knight, bu they were succeeded and used

19 fraudulent conveyance. It was not estimation.

20      They called Mr. Knight to be able to establish that

21 (indiscernible) successfully, that the settlements were made

22 because Babcock and Wilcox thought they were liable. And by

23 doing that, they sought to establish now in the context of

24 fraudulent conveyance, liability. They said because you

25 settled and you settled on the basis of feeling that you had

1  exposure to the tort system, that equals liability, legal

2  liability for insolvency purposes.  And that's what they sought

3  to pursue.

4          THE COURT:  Of course you're settling because you

5  think you have some exposure in the tort system.  But that

6  doesn't mean that you were legally liable.

7          MR. BERNICK:  That's the whole point.  And Rule 408

8  prevents that second argument from being made.  That is the

9  argument, however, that they are making.  That's why they want

10  to say that Rule 408 does not apply, but it does.  We have to -

11  - we go down this road, not because of the settlement terms,

12  they're coming out, they're being used.  But because they want

13  to use the settlements to solve the problem of being able to

14  demonstrate legal liability.  There's not a question of value

15  in claims, it is which claims should be paid based upon the

16  legal grounds before you get to the question of how much to pay

17  for them?

18          We have to  have -- we only have to pay what we're

19  obligated to pay.  We don't have to pay anything more than what

20  we're obligated to pay.

21          THE COURT:  The legal liability aspects in the past

22  are sort of irrelevant, aren't they, to the current claims and

23  the pending future claims?

24          MR. BERNICK:  We would agree with that too.

25          THE COURT:  So the purpose of the settlements would

1  be to say, for example, I'll use your example.  A severe case

2  of asbestos is settled for $10,000.  Now Grace's expert is

3  going to testify -- again, hypothetically -- that severe

4  asbestos' claims are really only worth $500.

5          MR. BERNICK:  No, no, that's not it.

6          THE COURT:  Just a minute.  They want to say, but you

7  settled them for $10,000, so they have to be worth more than

8  500 regardless of the reason why you settled because here's

9  self evidence of what your settlement history is.

10          MR. BERNICK:  That's not an issue.

11          THE COURT:  It's relevant to that point.

12          MR. BERNICK:  That's not even an issue.

13          THE COURT:  Okay.

14          MR. BERNICK:  What we're saying is, if we -- if this

15  asbestos claim was for a worker, A, is a bonafide asbestos

16  claim supposed to one of their (indiscernible) as a

17  diagnostician.  We'll get to that a little bit later on in the

18  day.  B, the person had very substantial exposure to Grace

19  asbestos because again, asbestos, you have to have a lot of

20  exposure for it to be causal.  We would then say that claim

21  passes the filter and we will value it for estimation purposes

22  at its historical value of $10,000.  We're not going to say,

23  oh, it's only worth $5,000.  Now, there's a caveat with respect

24  to a point that we'll get into later about settlements and what

25  he tort system settlements were which is joint and several

1  liability as opposed to what we're talking about here which is

2  several liability.

3         THE COURT:  But that theory doesn't hold water

4  either.  Because you are now -- in your most recent construct,

5  you are taking a look at a current claim going -- putting it

6  through your filter saying yes, we think we will be liable.  If

7  faced in the tort system with litigating this claim, we in fact

8  will be liable.  Okay.  Your settlement value isn't relevant to

9  what the actual value of the claim will be.

10         MR. BERNICK:  There's no other benchmark that either

11  side will use other than settlement value.

12         THE COURT:  There are some judgments.

13         MR. BERNICK:  The judgments are joint and several

14  liability.  I'm not talking about judgments.

15         THE COURT:  It doesn't matter.  That doesn't matter.

16         MR. BERNICK:  What?

17         THE COURT:  That doesn't matter.  Every joint and

18  several liability entity is responsible for paying the full

19  claim and worrying about recouping and get a proportionate

20  share from somebody else.

21         MR. BERNICK:  Not when it comes to funding the trust.

22  The trust is funded under several bases.

23         THE COURT:  You're saying you're going to pay 100

24  percent of the claims.  The other people with which you may be

25  legally, jointly liable may already be insolvent and therefore,

64

1  not subject to pay, so it is totally relevant.

2          MR. BERNICK:  No, that's what we will determine is

3  what the share -- it doesn't really make a difference, Your

4  Honor.

5          THE COURT:  But it does make a difference.

6          MR. BERNICK:  It will make a difference in terms of

7  whether we get discovery of what others are paying, which we do

8  want, when we get to the other side of the --

9          THE COURT:  You can't get any more than you're

10  willing to give.  I mean, what's good for the goose is good for

11  the gander.

12          MR. BERNICK:  Your Honor, I would love to be able to

13  get to the proposal that I came here this morning to make.

14          THE COURT:  Well, let's do it then.  Because this is

15  not helpful.

16          MR. BERNICK:  I don't what else to say, Your Honor,

17  because in prior fact, what Your Honor's remarks do is to raise

18  a question about in a sense, what is the touchstone or

19  benchmark for what it is that we're doing here.  I want to be

20  very clear with Your Honor because all kinds of people are

21  standing up and saying, here's what the estimation's going to

22  do and what not to do and here's what's in dispute.

23          As I said, the settlement terms, not an issue, we

24  provided them.

25          THE COURT:  Okay.

**J&J COURT TRANSCRIBERS, INC.**

1          MR. BERNICK:  The history we've provided them.  The

2    only reason that we're here to talk about discovery is for the

3    discovery that they're proposing is for an improper purpose

4    which is to try to show that the settlements meant and were an

5    admission of liability.  That is barred by Rule 408 and if we

6    are successful on that at trial that's the end of the show.  So

7    the reason that we're here is not to settle the history.  The

8    reason that we're here is their effort to try to create an

9    admission of the settlement history in order to be able to show

10   yeah, there is legal liability as well as there being value

11   because they're concerned.

12          THE COURT:  Well, they may be able to show legal

13   liability somewhere, but not through the settlements from what

14   I can tell.

15          MR. BERNICK:  So now here's what our proposal was.

16   Our proposal was that for purposes of discovery we would say

17   that even though we believe that this is inadmissible at trial

18   for purposes of establishing liability and that's the only

19   purpose for which it's proper.  The reason for settlement

20   aren't relevant to value.  They're only relevant under their

21   theory to the assessment of legal liability.  That's

22   impermissible, and it shouldn't come out.  But for purposes of

23   discovery we're prepared to allow discovery into the reasons

24   for settlement even though I don't think, Your Honor, it's

25   appropriate under <u>Good Year</u>.  And the reason that we're

1 prepared to do that is simple.  Which is that in the <u>Sealed Air</u>

2 case there was testimony that was offered by Mr. Hughes and by

3 Mr. Beaber with respect to the reasons why Grace settled

4 claims.

5          So while we don't think it's permissible under Rule

6 408 we do believe it should be inadmissible at trial for the

7 purpose for which it's proffered.  And, Your Honor, it has

8 nothing to do with getting access to the terms of the

9 settlements.  We are prepared to allow discovery along the same

10 lines that took place in <u>Sealed Air</u>.

11          THE COURT:  Wait.  <u>Sealed Air</u> had testimony about why

12 Grace settled tort claims in looking at the fraudulent

13 conveyance issue in determining whether there was insolvency?

14 Is that what the --

15          MR. BERNICK:  Here's why.

16          THE COURT:  Is that what happened?

17          MR. BERNICK:  That is what happened.

18          THE COURT:  Okay.

19          MR. BERNICK:  What happened was, and this is like

20 <u>Babcock</u> and <u>Wilcox</u>.  Again, we have the bankruptcy here.  The

21 bankruptcy is filed, we are now talking about the estimation of

22 claims.  In 1998 there was a transaction, and in that

23 transaction there were various assets that were spun off of

24 Grace.  There's a fraudulent conveyance claim that was

25 prosecuted by the creditors of the estate.  And it attacked

1  that 1998 transaction.

2         In connection with that 1998 transaction Grace's

3  reserves were put at issue and it's estimated liability at that

4  time was -- let me just take a step back.  In connection with

5  this transaction there was a fairly extensive process whereby

6  an estimate of current and future liability was done.  It was

7  done by Mr. Florence.  And in doing that estimation he used a

8  history of settlements approach, et cetera, and it sought to

9  extrapolate what the future would bring.  So he went down the

10  road with Grace in 1998 of estimating what Grace's exposure was

11  in the tort system at that time and what its projected exposure

12  was going forward.  Because of that what Grace had done in 1998

13  in that transaction including the estimate was highly relevant

14  to the fraudulent containment case.

15         So discovery was allowed into all of the estimates

16  that Grace had done of its potential exposure including

17  discovery of Mr. Florence's estimate, including discovery of

18  in-house counsel for Grace with respect to what their view was

19  at the time of the expected liability.  And the Judge also

20  determined -- Judge Wollen also determined that at least up to

21  a certain point, that is the filing of the bankruptcy further

22  examination of the estimations was appropriate in the context

23  of discovery in that case.

24         So Judge Wollen allowed discovery of the past history

25  of settlements as of that time.  He allowed discovery going

68

1  forward at the transaction and he allowed discovery of in-house

2  counsel to determine what their views were at the time.  Now,

3  what's very critical is that that was not for purposes of

4  estimating liability, ultimate liability in the bankruptcy and

5  it was never questioned about that.

6        The same thing with <u>Babcock</u> and <u>Wilcox</u>.  The <u>Babcock</u>

7  and <u>Wilcox</u> fraudulent conveyance trial focused on a 1998

8  transaction, and Judge Brown allowed discovery into the reasons

9  why settlements took place and that's the cite that counsel has

10 provided to you, but counsel has not pointed out what Judge

11 Brown said.  And this is the final opinion which came out in

12 favor against the fraudulent conveyance claim and in our favor.

13       The Court made clear that all of the estimation

14 discussion that had taken place in connection with fraudulent

15 conveyance was not controlling on the estimation for bankruptcy

16 purposes of the value of the claims.  He says consequently the

17 Court in determining whether <u>Babcock</u> and <u>Wilcox</u>'s future

18 estimation of tort liabilities was reasonable in 1998 you can

19 consider both the settlements by <u>Babcock</u> and <u>Wilcox</u> under case

20 histories.  So he allowed the settlements to come in, he

21 allowed testimony to come in about why the settlements were

22 occurring the same connection the Judge won't allow that in

23 connection with the fraudulent conveyance case here.

24       But in his final decision Judge Brown was clear the

25 Court again emphasized, he said, the valuations and estimations

1 are done for different reasons.  As of different times it may

2 be used for different purposes.  If the Court is required to do

3 further estimates in this case for any purpose other than

4 determining whether B&W was insolvent in June of 1998 the

5 determination of this opinion of judgment will not be binding.

6          So what he is saying is I allowed all of this

7 discovery including why the settlements were entered into

8 because it bore a common question of what the company knew it

9 bought and did as of 1998 in the same fashion as Judge Wollen

10 allowed discovery into all of those different matters.  Neither

11 one of those cases was an estimation of the claims for any

12 bankruptcy purpose that is to be -- really any purpose in

13 connection with the bankruptcy case.  And there is no court

14 ever, ever, ever that has allowed settlement history as

15 evidence of liability for purposes of an estimate.

16          So Judge Wollen allowed this discovery to take place.

17 Judge Brown allowed parallel discovery to take place in

18 connection with the Babcock and Wilcox cases for the purpose of

19 the fraudulent conveyance actions in those cases.  Because

20 Judge Wollen did that, and because Mr. Hughes already has

21 testified we are prepared for discovery purposes to say go

22 ahead and find out why Grace thought -- what Grace was -- had

23 on its mind at the time that these cases were settled.  not

24 because we think it's admissible for any purpose -- indeed, we

25 think it's barred by Rule 408 -- but because it's discovery has

70

1  already been gone into to a certain extent and therefore we're

2  prepared to have it continue.

3          THE COURT:  Okay.  We've spent an hour and a half on

4  something the debtor is going to concede.  This isn't an

5  admissibility hearing, this is whether or not the evidence is

6  discoverable, and the debtors agree.  Why are we wasting time?

7          MR. BERNICK:  Because it's very critical, Your Honor,

8  in this case.  I understand that you'd like to get on to other

9  -- we'd very much like to get on to other things as well.  In

10 this case what we end up saying and doing is under a microscope

11 and we hear it again and again, while they've already done this

12 and they've already done that we want to be clear that the

13 question of whether Dr. Peterson's testimony or any use of the

14 reasons why we settle is inadmissible under Rule 408 and that

15 we expect that Dr. Peterson's fundamental methodology because

16 it relies upon these settlements as an admission of liability

17 is barred by Rule 408 and we are not waiving that in any way,

18 shape, or form.  That is an issue of admissibility for trial.

19         We are further prepared to agree to discovery beyond

20 the database of the reasons why settlements were entered into,

21 but only because it has already been the subject of some

22 testimony.  We are not waiving subject matter, we are not

23 waiving the discoverability of any matters because we do not

24 believe that they are discoverable.  We think that we're in a

25 sense opening the door as wide as we can possibly open it while

1  being consistent with our position under Rule 408 precisely to

2  allow discovery to take place and we're prepared to do that.

3        What are we not doing?  We are not waiving as to

4  anything to do with bankruptcy planning or any reserves or

5  estimates which were done in connection with the bankruptcy

6  case.  We don't believe that that's appropriate.  That

7  continues to be attorney work product and privileged

8  information.  It ought not be discoverable.  We're not waiving

9  with respect to discovery of outside counsel.  Their discovery

10 request on their fact threatened the possibility of their going

11 around and take depositions of ten different law firms that

12 were involved in Grace's litigation history over time.  We're

13 not agreeing to that.

14        They can find out from Grace what Grace thought at

15 the time that it entered into these settlement agreements.

16 We're not talking about Grace's relationships with insurance

17 companies or its assessments after the fact about why it may

18 have settled.  Those are all matters that are privileged,

19 confidential and we're not disclosing those.  We don't think

20 that they're properly discoverable.  But if they want to ask

21 Mr. Hughes or Mr. Beaber who is the former general counsel

22 questions about why personal injury cases were in fact settled

23 in the same fashion that they asked before in connection with

24 the prior proceedings before Judge Wollen we are agreeable for

25 discovery purposes that that's appropriate.

1          We would like however, two things.  One is that we're

2    going to revisit that this should be a sauce rule.  That is

3    what's sauce for the goose, sauce for the gander when we're

4    talking about settlements this afternoon.  But number two, much

5    more importantly we'd like the Court to recognize that the

6    undertaking that's being made here and if Your Honor then

7    orders it that Your Honor's address does not address the

8    question of admissibility at trial that that --

9          THE COURT:  It's not going to address admissibility.

10   This is not an admissibility issue at this point.  It's simply

11   a discovery colloquy, and I'm not making any determination with

12   respect to admissibility.  I am at least facially sympathetic

13   to the debtors, you, that the reasons for settlement are not

14   going to be relevant with respect to establishing liability.

15   At least facially I am sympathetic to that view and somebody's

16   going to have to give me a pretty good brief as to why I should

17   move off of that position to have a settlement history, a

18   settlement negotiation used to establish liability particularly

19   when I am willing to show that the documents in this case will

20   show that the documents themselves say that there is no

21   admission of liability.

22         MR. BERNICK:  So that's where we are.  That's a

23   proposal --

24         THE COURT:  If there is an admission of liability in

25   a settlement of course it can be used because then it's an

1  admission.  But I doubt that that's going to happen.

2       MR. BERNICK:  I appreciate Your Honor's patience, but

3  there's a lot of moving parts on how the estimates work and all

4  the other lawyers here have fortunately or unfortunately

5  somewhat burdened with the fact that we already know the

6  experts and what they do.  And that's a lot of why you hear

7  that Grace will say this or Grace will say that.  It's all in

8  the context of how we believe that the experts are going to

9  testify.  And as I said if Rule 408 applies and now of this

10 comes in we're not going to be sitting here talking how the

11 torn systems is necessarily broken because it really won't have

12 an awful lot of relevance.

13      The real question will be is there liability in these

14 claims and what is the value of the claims to pass the

15 liability barrier?  It is only because we anticipate that

16 they're going to go down that road notwithstanding Rule 408,

17 but you've heard the discussion about the broken tort system.

18      THE COURT:  All right, let's take a five minute

19 recess so you folks can see whether or not you can agree on the

20 form of an order.  If you can agree on a form of an order I

21 don't need any further discussion.  If you can't then I'll hear

22 it.  I'm taking a five minute recess.  Don't say a word.  We're

23 in recess.

24                    (Recess)

25      MR. BERNICK:  Yes, we have had the opportunity to

1 confer and we believe that we are in agreement with respect to

2 a scope of discovery going forward at this time and will

3 prepare a form of order and submit it to the Court.

4 Essentially as we've indicated, we're prepared to produce the

5 people at Grace who are actually responsible for the decision

6 to settle the cases historically testify as to from their point

7 of view what was the reason for the settlement and to produce

8 the documents that were associated with those decisions.  And

9 that would be Mr. Hughes, Mr. Gordon, Mr. Beaber and Mr.

10 Siegle.  To be clear, this pertains specifically and only to

11 personal injury liability.  It is not property damage

12 liability.

13         All other rights in connection with this matter in

14 putting subsequent motions that may be presented or including

15 waiver are preserved.  This is not a waiver, and we'll pursue

16 it -- we'll see where this discovery goes.  So that's where

17 this is headed, Your Honor.  And if I've misstated I know that

18 all counsel will rise uniformly to their feet and say that I've

19 misstated it.

20         MR. LOCKWOOD:  Your Honor, Mr. Bernick hasn't

21 misstated the agreement that we have made.  I do want to make

22 one observation about Mr. Bernick's presentation which was

23 addressed virtually entirely to what's going to happen at

24 trial, whose witnesses are going to say what, et cetera,

25 because --

1          THE COURT:  Mr. Lockwood, raise the microphone.

2  Thank you.

3          MR. LOCKWOOD:  Because I just can't leave the record

4  the way it is on this.  Mr. Bernick has picked out a statement

5  by Mr. Peterson in a deposition that was taken in connection

6  with the sealed air and is asserted that that's what we're

7  going to try and prove at trial.  All I can tell you is that's

8  not what we're going to try and prove.  We're not going to try

9  and prove that Grace has admitted liability for present and

10  future cases by settling past cases.

11          Mr. Bernick, in admitting that we would use the

12  settlement information that he would use it for purposes for

13  valuing cases used the phrase that they were going to do it

14  because this would show what the claims were trading in the

15  market.  All we're really -- I shouldn't say all, but one of

16  the main points that we're trying to establish here which I

17  really don't think there's frankly at the end of the day any

18  dispute about as a factual matter although we may be surprised,

19  is that what was going on in the tort system, broken or not,

20  and what will go on in the future if these claims were passed

21  through in the tort system broken or not is that when you look

22  at claims in terms of settling them one of the criteria -- you

23  use various criteria such as would this claim survive a motion

24  for summary judgment?

25          And if it would you placed a different value on that

1  claim and were a lot more eager to settle it than if you made

2  the decision no, I don't think this claim will pass summary

3  judgment.  But remember, getting past summary judgment is not

4  the same thing as proving liability for the claim or its

5  amount.  It's just a hurdle that you get through.  But that is

6  among various things, one of the tests for value.

7          The _Owens Corning_ decision itself, I believe it was

8  _Owens Corning_, I don't have it here, Judge Fullam specifically

9  said that a claim that could get past summary judgment has

10 value.  And as I said in my initial remarks, and this is where

11 we have the trains passing in the night metaphor that I used

12 and that Your Honor somewhat adopted here is, our view is that

13 what the confirmation estimation issue here is to put a value

14 on the claims that are going to the trust, that the trust is

15 going to resolve mostly through settlements, and that that

16 value should include real world numbers for what claims you

17 resolved short of determining liability.

18         I agree, Mr. Bernick has his view that we have to

19 prove Grace's liability.  That's his view.  We dispute that as

20 Your Honor knows.  We think frankly it's Grace's burden.  It's

21 Grace that wants to propose a plan.  It's Grace that wants to

22 get it confirmed.  And it's Grace that wants to tell Your Honor

23 to decide how much money they have to put in it.  And it's

24 their burden to show how much money it is that will meet all of

25 the bankruptcy issues.

1          And I don't want to argue this anymore today.  We're

2    going to have ample opportunity to brief and argue this in

3    connection with the run up to the trial, et cetera, but I felt

4    it just had to be said that there are certain things that we

5    are not trying to do here.  And one of them is to prove

6    liability through the notion that Grace admitted liability when

7    it settled claims.  Thank you.

8          THE COURT:  All right, let's move on to the next

9    issue.

10         MR. BERNICK:  I just want to make sure that there's

11   no other -- no one else is disagreeing with where we're at, is

12   that right, Mr. Mullady?

13         MR. MULLADY:  That's correct.

14         MR. BERNICK:  Okay.  I think that that brings us to

15   the x-rays.  And I think that that's probably our burden in the

16   first instance and Ms. Harding will address it.

17         THE COURT:  All right.  Thank you.  Good morning.

18         MS. HARDING:  Good morning, Your Honor, let me get

19   the microphone from Mr. Bernick.

20         MR. LOCKWOOD:  Your Honor, may I be excused?

21         THE COURT:  If you're done and have nothing else.

22         MR. LOCKWOOD:  I'm turning it over to my partner, Mr.

23   Finch.

24         THE COURT:  All right.

25         MR. LOCKWOOD:  Thank you.

1          MS. HARDING:  Your Honor, this matter concerns

2    Grace's submission of a proposed protocol for the submission of

3    x-ray evidence that the claimants allege support their

4    allegations that their cancers, their nonmesothelioma cancers

5    are attributable to asbestos.  Grace believes that the Court

6    has already ruled on this issue, that we're entitled to this

7    evidence, but I'm going to give a short presentation, Your

8    Honor, to address some of the issues that are raised by the

9    pleadings by the plaintiffs on this matter.

10          Your Honor, the first issue I want to raise is that

11    the plaintiffs' firms do not dispute the relevance and

12    necessity of the x-ray evidence.  I think that's an important

13    point.  If I may approach, Your Honor.

14          THE COURT:  Look, I think I can narrow this one down

15    a bit.  It seems that the only issue is whether or not the

16    debtor's protocol with respect to getting the original films

17    should somehow or other be changed so that the debtor gets

18    copies.  And I'm a little concerned as to why the debtor needs

19    original films as opposed to copies.

20          MS. HARDING:  Your Honor, I'm actually going to

21    address that.  But I think I've got a couple of points I think

22    are important to getting at that issue.  The first one I wanted

23    to make, if I could approach, there are approximately -- can

24    you hear me, Your Honor?

25          THE COURT:  Yes.

1          MS. HARDING:  -- 5600 nonmesothelioma cancer claims.

2     Of those 5600 about three-quarters of the claimants that have

3     returned questionnaires thus far for cancer claims allege some

4     place on the questionnaire that they have x-ray evidence that

5     supports their claim that their cancer is related to asbestos.

6          And the reason why that's important is because when

7     you look at the actual data that they provide in the

8     questionnaire where they've actually answered the question on

9     the questionnaire as opposed to attachments, they don't have

10    the information in the attachments yet, but where they've

11    answered the questionnaire with respect to the x-ray evidence

12    they have 50 percent -- it's actually over 50 percent -- but 50

13    percent of the evidence supported by doctors that are already

14    excluded under Manville or doctors who work for screening

15    companies that are excluded under Manville.

16          It's a remarkable finding and that is why the debtors

17    are seeking the evidence, Your Honor, and why they are seeking

18    the original x-ray evidence.  Because there's a B read from the

19    doctor that the x-ray is the evidence of the person's chest and

20    the evidence of whether or not they have asbestosis or not.

21    And that's why we're seeking the original.  I'll also get to

22    why the originals are not the same as copies which I think that

23    the Court is asking about as well.

24          There's no real dispute, even from the plaintiffs

25    that the debtors should have originals.  So there isn't a

80

1  single filing where the plaintiffs offer any medical evidence

2  or any support for the idea that the debtors don't need

3  originals to do this review.

4       THE COURT:  You can certainly go look at the

5  originals if that's the case.  It seems to me though that if

6  you want copies produced to put into a database that's going to

7  give up custody of those documents and the x-rays are also

8  needed by the plaintiffs for use in other litigation that the

9  debtor should not take custody of those x-rays.  They don't

10 belong to the client necessarily.  They belong to the doctor,

11 the hospital, somebody, and copies should be good enough.

12      If you want the opportunity to go see the originals I

13 wholly agree you're entitled to that opportunity to go see

14 them.  But if you absolutely want physically in debtor's

15 possession so that the quote, unquote, neutral people that you

16 want to take a look at these x-rays have access to them, in

17 fact, anybody does on a database type of basis then I think

18 copies ought to be the standard.  I don't see the need to get

19 into the originals for that purpose.

20      MS. HARDING:  Your Honor, well, a couple of issues

21 that you've raised.  But the first one is that if the Court --

22 if we're required to go to see the originals at the firms or at

23 their doctors' it effectively precludes us from doing the

24 review because it's simply not possible to do in this case

25 which is why courts in mass tort litigation that have dealt

1 with this issue have required the production of the originals.

2 We should probably get to that right now.  The USG Court was

3 faced with exactly this issue.

4          THE COURT:  But it didn't happen.

5          MS. HARDING:  It started to happen, Your Honor,

6 absolutely.  The case settled before it could be completed.

7          THE COURT:  Right.

8          MS. HARDING:  But the Court ordered it.  And I think

9 it's --

10          THE COURT:  And I think it wasn't contested.

11          MS. HARDING:  The questionnaire was absolutely

12 contested.

13          THE COURT:  No, the production of the original x-

14 rays.

15          MS. HARDING:  Well, they were certainly part of the

16 questionnaire that USG proposed.  And I have the pleadings,

17 Your Honor, where there were pleadings back and forth on the --

18 whether or not the questionnaire would be approved.  And the

19 production of original x-rays was absolutely part of that, it

20 was contemplated.

21          THE COURT:  I know it was.  It was contemplated in

22 that production report, but I wasn't directly involved, I did

23 see some of the pleadings because I had the case assigned and

24 sometimes things got misfiled and I would see them.  If it was

25 contested, that is the production of the originals, I don't

82

1  recall it.  I wouldn't have had direct knowledge because Judge

2  Conte was handling that matter, not me.  So maybe it was

3  contested and I just don't know it.  But it still seems to me

4  that you are entitled to the production of the originals, but I

5  don't think you're entitled to their custody.  And the

6  arguments that say that the debtor's assertion that entitlement

7  to access is entitled to custody, I think, is correct.  The

8  cases under Rule 36, 37 all seem to go that way.

9       So I believe if you want copies I will order the

10  copies be produced.  I'm not sure why.  If you get a certified

11  copy, and I think it could, you know, if you want an affidavit

12  that attests that it's a certified copy and somebody has given

13  a medical opinion to that effect you're entitled to that, too.

14  It has to be a real copy.  But nonetheless if you want to

15  actually have custody I think you're entitled to copies.  I

16  don't see why the originals have to be given up to the

17  possession of the debtor.

18       MS. HARDING:  Your Honor, if I may.  If I may briefly

19  address the issue of copies versus originals and maybe talk

20  about why it is so crucial to have the originals with respect

21  to an x-ray --

22       THE COURT:  All right.

23       MS. HARDING:  -- of the chest and with respect to an

24  x-ray that's purporting to determine whether somebody has

25  pneumochroniosis or not.  In the debtor's submission the debtor

1  submitted an affidavit from Dr. Daniel Henry.  Dr. Henry is the

2  chief of thoracic imaging at the department of radiology at the

3  Medical College of the School of Medicine in Virginia.  And

4  he's also, I think, importantly, Your Honor, he is the chairman

5  of the American College of Radiologies Committee where they

6  test for (indiscernible).  This is his explanation for why

7  copies are not sufficient for a review of this type.

8          "Based on experience as a radiologist my opinion any

9  court ordered x-ray evaluation program to require the

10  production of original chest x-rays as opposed to copies of

11  chest x-rays.  Chest x-rays are a critical component of the

12  medical data.  Coping conventional x-rays is not a simple

13  systematic process such as copying a piece of paper presenting

14  pulmonary function test or physician notes.  On the contrary,

15  copying x-rays is subjective and copied films can either

16  enhance or detract from the information in the original x-ray.

17  The chest x-ray is a unique anatomic image of the lung

18  architecture peculiar to each individual.  Chest x-rays is one

19  of the most difficult images to satisfactorily copy due to the

20  anatomic detail presented, and a significant variation in the

21  original exposure technique.  Using copies of the conventional

22  x-ray will compromise the evaluation process."

23          The most important part, I think, of what he has to

24  say is in the next page, Your Honor.  Talking about why a copy

25  wouldn't be accurate, even a well executed copy -- well, that

84

1  goes -- "This would undermine the purpose of chest x-ray

2  evaluation in individuals who have a demonstrative disease from

3  an imaging perspective," so that from the claimant's

4  perceptive, "we want to take steps to ensure that the chest x-

5  ray findings are identifiable and that the chest x-ray quality

6  does not have to be downgraded due to the copying process and

7  thus influencing interpretation.  Evaluation of the original

8  chest x-ray benefits the individual claimant.

9       THE COURT:  Yes, but you've already got the original

10  evaluations that are conducted by the claimant's doctors

11  whoever it is who's reading and interpreting these.  So the

12  purpose of the debtor getting the copies is to see whether or

13  not you agree with the report that was given by the entity who

14  looked at them.

15       MS. HARDING:  Your Honor, if our experts -- just be

16  clear -- if our experts review the copy and don't find evidence

17  of asbestosis the response from the plaintiff's firms who are

18  putting forth this evidence in support of their claims is going

19  to be that oh, it was a copy and you couldn't see it.

20       THE COURT:  that's why I think you're entitled to an

21  affidavit from somebody qualified in the field that they've

22  examined the two x-rays and that the x-rays in quality -- I

23  don't know the exact words, but in quality sufficiency of

24  detail and whatever are substantially similar so that there is

25  no loss of data.  Whatever it takes so that you get a copy that

1  shows the same thing that the original x-ray showed.  I think

2  you're entitled to that, but I really don't think you're

3  entitled to custody of the originals.  If you want to go look

4  at them or have somebody on your behalf go look at them where

5  they exist you're clearly entitled to do that.

6      MS. HARDING:  Your Honor, if the plaintiffs' firms

7  will submit with their copies affidavits that the copies fully

8  and completely represent and accurately represent the original

9  x-ray and that the evidence of asbestosis that they believe is

10  there appears on that x-ray --

11      THE COURT:  I think you're entitled to that.

12      MS. HARDING: -- then I think that we will be -- that

13  the copies will be adequate under those circumstances.

14      THE COURT:  You're entitled to know that somebody

15  with the appropriate criteria has looked at the copy and that

16  it is a duplicate of the original.  The whole reason why you

17  can substitute copies for originals is because they're

18  duplicates.  And I think you're entitled to that.

19      MS. HARDING:  Your Honor, Mr. Bernick suggests a

20  stipulation that the copies are complete and accurate and they

21  won't be challenged based on -- and that the --

22      THE COURT:  Fine.

23      MS. HARDING:  -- and that the readings of our experts

24  won't be challenged based on the view that they are copies and

25  therefore they don't fully demonstrate the evidence.

1          THE COURT:  Whichever way you folks want to do it.

2     It seems to me that you're entitled to some assertion that says

3     I'm giving you a copy in lieu of an original, but it's a

4     duplicate.  And duplicate means --

5          MS. HARDING:  Your Honor, that's sufficient for our

6     purposes.

7          THE COURT:  Okay.  Duplicate means in quality, kind,

8     whatever.  It means a duplicate.

9          MS. HARDING:  I do want to say in response to what

10    you said earlier the reason that we're seeking the evidence and

11    want the review is because of the pervasiveness of the doctors

12    that we're questioning from the beginning in the case.

13         THE COURT:  Well, I understand that.  I don't know

14    what the debtor intends to do with this.  If your objection is

15    going to be that no matter what they say with respect to an x-

16    ray that their opinion can't be varied -- can't be credited you

17    probably don't need the x-rays if you're really going to look

18    at them one on one and say okay, this one looks good, that one

19    doesn't, then you need all the x-rays.  But it's up to the

20    debtor to decide.  I am not strategizing your case.  I'm only

21    making rulings with respect to discovery.  You're entitled to

22    this.  If you want the copies you're entitled to them.  You're

23    entitled to some assertion that it's a duplicate either by

24    stipulation from counsel or by somebody who's made the copy,

25    whichever.

1          MS. HARDING:  Duplicates with the kinds of clauses

2 that we discussed here.  Not just a duplicate, but a duplicate

3 that represents the evidence that they say that the --

4          THE COURT:  Right.

5          MS. HARDING:  Okay.

6          THE COURT:  Well, that's the whole purpose for

7 getting the x-ray submitted in the first place.  So if, you

8 know, the copy doesn't show the evidence that they say is there

9 because the copy isn't as good as the original in quality then

10 you don't have a duplicate.  So by duplicate I mean something

11 that substitutes for the original in quality and kind.

12          MS. HARDING:  Thank you, Your Honor.

13          THE COURT:  Mr. Esserman.

14          MR. ESSERMAN:  Sandy Esserman for various law firms.

15 Let me go right to the heart of the issue.  We've put in our

16 papers -- that's exactly what we put in our papers, that we

17 would provide at Grace's expense copies of the original.  Under

18 the rules, if they want to come to our offices and look at the

19 x-rays that we have in our possession, we've offered that.

20          Now one thing you have to realize is that not all of

21 the x-rays are at the lawyers' offices.  Some of the x-rays and

22 a lot of the x-rays are at doctor facilities.  There are some

23 that are at court ordered depositories in which there are very

24 specific check-in and check-out procedures for the evidence.

25 And what I do think Grace is asking for is unprecedented, but

1 as I have done throughout this process although we vehemently

2 opposed the questionnaire we're trying to get Grace what they

3 feel they need.  And so if they want copies we can provide some

4 sort of certification or verification from the service that

5 says that this is an x-ray that is duplicate of the original.

6          I do think that it needs to be done at Grace's

7 expense.  If Grace wants to come out to a facility and look at

8 the original that's fine.  That's also done at their expense.

9 And although these things will be done as quickly as possible

10 you're talking about a lot of x-rays and not necessarily under

11 the control of the firms or necessarily the clients.  A lot of

12 them are doctors or hospitals and we will try and get those as

13 quickly as we can.  But --

14          THE COURT:  In terms of the expense, yes, I think

15 it's up to Grace.  Otherwise they have to go look at the

16 originals.  So the debtor will have to pay for the copy, but I

17 think that to the extent that counsel can obviously facilitate

18 getting the copies.

19          MR. ESSERMAN:  Absolutely.  And we intend to do that,

20 the firms that I represent, and I suspect the others will also.

21 So we think that this is an easy solution.  Thank you.

22          THE COURT:  Okay.  I think it's up to the debtors to

23 ask -- or to say whether you want copies of all of these or if

24 you want to pick and choose.  It could be -- I don't know in

25 terms of length, but it could be a while until you get all of

1 these copies in.

2        MS. HARDING:  Your Honor, could I address this issue,

3 please?  I've got to say that some of the claims that are being

4 made here are just simply not supported by the facts.  These

5 claimants are pursuing claims all over the place.  I have a

6 file full of letters from claimants who said I can't give you

7 my original x-ray because I've given it to another defense

8 counsel.

9        THE COURT:  Well, then they can't give it to you if

10 they don't have it.

11        MS. HARDING:  But the idea that they can't give us

12 even a copy and that that's going to take a long time, I mean,

13 they are alleging in our questionnaire that they have x-ray

14 evidence that supports their claim that they have -- that

15 they're --

16        THE COURT:  And you may go look at it.  Ms. Harding,

17 I'm done.  That's my ruling.  You either get copies if you want

18 them in your possession or go look at them at the site.  You're

19 entitled to see the originals, I'm not going to prohibit you

20 from seeing the originals, but I'm also not going to require

21 plaintiffs who may need these -- who in many cases do need

22 these x-rays for other purposes to turn them over to this

23 debtor when in fact they may need them for some other purpose.

24        MS. HARDING:  No, I'm not arguing about that issue,

25 Your Honor.  You've already ruled on the copies, you've already

1  stated what should go in the order.  Mr. Esserman didn't repeat

2  it, but I want to make sure that that's the Court's position.

3          THE COURT:  It is.

4          MS. HARDING:  All right.

5          MR. HERRICK:  Your Honor, John Herrick on behalf of

6  certain claimants.  I'd like to raise a couple of issues with

7  respect to this.  First of all, counsel for Grace stood up

8  before this Court and said of 5600 claimants that have been

9  filed other cancer claims or lung cancer claims three-quarters

10 of them say they have x-ray evidence of it.

11         THE COURT:  No, they said three-quarters of -- oh,

12 I'm sorry, I apologize.  Go ahead.

13         MR. HERRICK:  Three-quarters of them represented that

14 they had radiographic evidence of asbestosis.  Now what Grace

15 hasn't done is identified those three-quarters and specifically

16 requested their chest x-rays.  They haven't done that.  And in

17 particular, Your Honor, when it's a cancer case often times the

18 x-ray is done in the hospital facility.  We as plaintiff's

19 lawyers many times cannot get a hospital facility to give us an

20 original chest x-ray.

21         THE COURT:  Then you'll put down on the questionnaire

22 that the x-ray is at the hospital and you've tried to get it

23 from the hospital and they won't release it and the debtor will

24 then either subpoena it or do whatever.  I mean, look, it's

25 discovery.

1          MR. HERRICK:  Furthermore, Your Honor, with respect

2     to the certification of an original chest -- excuse me -- that

3     a copy is as good as an original chest x-ray, the plaintiffs

4     don't have the wherewithal to do that.  That would have to be

5     something that W. R. Grace --

6          THE COURT:  No.  Absolutely not.  If the plaintiffs

7     control the originals and are getting copies made the rule is

8     very clear, you can substitute a duplicate provided that it's

9     the same as the original.  That is the claimant's burden.  If

10    you're going to submit an x-ray as part of your proof you're

11    going to make sure it's a duplicate.

12         MR. HERRICK:  And then the rule also allows for

13    someone who is responding to discovery to allow somebody to

14    come to their offices and view the documents.

15         THE COURT:  Yes.

16         MR. HERRICK:  I assume that rule remains with respect

17    to the original chest x-ray.

18         THE COURT:  Yes.  If they want to go look at the

19    originals they can certainly go look at the originals.  They

20    have that right.  But nonetheless they're entitled to a

21    certification that indicates that this is a duplicate.  And if

22    it can't be a duplicate for some reason then they'll say I

23    can't get a duplicate, the image is faded or whatever.  I don't

24    know what the reasons will be, but then Grace will know they

25    have to go look at the original.

1          MR. HERRICK:  Thank you, Your Honor.

2          MR. ESSERMAN:  Your Honor, why don't we see if we

3    can't work out an agreeable --

4          THE COURT:  I think that would be helpful, Mr.

5    Esserman.

6          MR. ESSERMAN:  (Indiscernible)

7          THE COURT:  All right.  I think someone else wanted

8    to speak.

9          MR. BRADLEY:  Just briefly, Your Honor.  Judge,

10   Garritt Bradley for Thornton anonymous claimants.  We have

11   roughly 850 questionnaires.  We have a couple hundred that are

12   cancers.  I did get a letter from Ms. Harding.  I did respond

13   with a letter.  The facilities in Massachusetts have always

14   requested back the x-rays.  We just have the report which we

15   attached as part of our questionnaire.  I did look because

16   occasionally there is some overlap and I sent a letter

17   indicating of -- there are four individuals that we have the

18   original films on in our possession, in our custody.  I found a

19   place to make copies, sent a request for a check.  I don't

20   believe that's a big issue.

21         The bigger issue for me, Judge, is the other couple

22   hundred that I don't have custody and control and I'd like some

23   input from the Court because I think it would be a substantial

24   burden to the claimants, and I really think it's a fundamental

25   fairness issue, they know where they are, if there's a release

1 that they don't have --

2          THE COURT:  How are the claimant's going to prove

3 their claim without the x-rays?

4          MR. BRADLEY:  That's fine, Judge, but why should I

5 have to be the one that requests them from the facilities?

6 They have the information.

7          THE COURT:  Because how are they going to prove their

8 claim without --

9          MR. BRADLEY:  I'm happy to give a release from my

10 clients for them to get the information themselves.  This is a

11 fundamental fairness issue, Judge.

12          THE COURT:  It's the claimant's burden to prove a

13 claim.  This is not the tort system.  This is the federal rules

14 of evidence.

15          MR. BRADLEY:  I understand that, Judge, but I have

16 turned over --

17          THE COURT:  You've got to support the claim.

18          MR. BRADLEY:  I have.  I have turned over a report by

19 a reader who's read the x-ray and said this is what I find.

20 They now want to challenge that --

21          THE COURT:  Report is not evidence.  The x-ray is the

22 evidence.

23          MR. BRADLEY:  I understand that, Judge, but if it's

24 not --

25          THE COURT:  The report is only a summary of

1  somebody's testimony.  It's not admissible.  You've got to

2  support the claim.  It's your burden.  That's my ruling.

3          MR. BRADLEY:  Thank you, Judge.

4          MR. FINCH:  Your Honor, the evidence in support of

5  the claim is not the x-ray alone.  It's also testimony from a

6  doctor concerning the fact that the person has lung cancer and

7  it's asbestos related.

8          THE COURT:  If you want to produce the doctors for

9  depositions at your expense instead of the x-rays you can do

10  that.  Next issue.

11          MR. FINCH:  But the point, Your Honor, under the

12  Federal Rules of Civil Procedure you have the -- a claimant who

13  is responding to discovery has the option to do one of three

14  things.  They can provide a copy, they can tell the person

15  requesting discovery here is the original you can come and look

16  at it, or if I don't have custody of the original they can sign

17  a release that says you can go to the hospital where it's

18  located and look at it.  Any of those three examples are

19  permissible under Federal Rule of Civil Procedure 34 and they

20  should be permissible in this Court.

21          THE COURT:  And the Court is entitled to control the

22  process of discovery to determine what makes the most sense for

23  everybody in the case.  In this case yes, the debtors have the

24  right to get access to the originals.  But the copies also can

25  be produced.  That is a legitimate -- at the debtor's expense

1 that is a legitimate form of discovery in this case where the

2 debtors are arguing whether successfully or not, I don't know,

3 that the x-rays will not support the diagnosis that has been

4 received because the report is not evidence.  It's somebody's

5 opinion as to what the x-ray says.  You want to produce the

6 doctors then at your expense produce the doctors for

7 deposition.  Otherwise, get the copies.

8         MR. FINCH:  But the point is you can produce the copy

9 or you can provide access to the original where they're located

10 in site.  What you cannot do is order people to turn over their

11 x-rays to W. R. Grace, and that did not happen in the USG case.

12         THE COURT:  I'm not ordering them to turn them over.

13 I'm ordering them to get copies at the debtor's expense.

14         MR. FINCH:  Thank you, Your Honor.

15         MR. BERNICK:  In order to -- I want to address only

16 one part of this, because I'm more than happy to sit down with

17 Mr. Esserman and work out the details.  My understanding from

18 Ms. Harding is, I think, Mr. Esserman probably represents law

19 firms that probably have about 50 percent of the cancer

20 claimants that are involved so that's probably appropriate.

21         We're focused obviously on timing because we're on a

22 very tight time table in order to be able to create the

23 database and get out our expert reports.  Given what Your Honor

24 has said really the critical feature is getting the copies

25 together with a stipulation that I think will probably be, I

1  suppose, in the form of an order that I think would probably

2  have to be -- we'd have to get some acknowledgment.  But what

3  we're going to need to have is a stipulation that says that the

4  copies meet the standards that Your Honor has set.  And so

5  we'll incorporate that into the order.  But we need those

6  copies on a timely basis.

7        THE COURT:  Mr. Bernick, they're going to be what

8  they're going to be.  If you want them timely go to the site

9  and look at the x-rays.  I can't control the world, Mr.

10  Bernick.  It's going to be what it is.

11        MR. BERNICK:  Well, again to be --

12        THE COURT:  That's why I suggested that if the debtor

13  doesn't really need them all the debtor ought to limit the ones

14  that it really wants.

15        MR. BERNICK:  That's what we have tried to do is not

16  to begin with them all.  We're beginning with the subpopulation

17  that deals with the lung cancer claims.  But it seems to me

18  that if counsel is -- A) we're picking up the cost.  If counsel

19  is motivated to get these they are in a much better position

20  than we are to get the copies done on a timely basis.  And we

21  would ask the copies be furnished by the time that the

22  questionnaires are supposed to be completed which is January

23  12th.

24        THE COURT:  I don't know whether that's possible or

25  not.  If you want releases so that you can contact the doctors

1  and make sure that you can get them that's fine.

2          MR. BERNICK:  We're not going to be able to do it any

3  faster, Your Honor.  But all I'm saying is that we need some

4  type of time table because otherwise no one has got an

5  incentive to get it done.  It's part of our case it's not --

6          THE COURT:  They should be due with the

7  questionnaires.  But to the extent that they can't be for

8  whatever reason I'm going to be amenable to request for

9  extensions of time if the attorneys don't have the x-rays in

10 their possession.  If they've got them in their possession that

11 should be an easy thing.  If you want releases to pursue the

12 doctors and hospitals on your own, Mr. Bernick, you can get

13 those.  I'm sure that would make everybody else a lot happier.

14         MR. BERNICK:  Can we have the order then to read that

15 these will be furnished in connection with the questionnaires

16 which is January --

17         THE COURT:  I can't hear you, Mr. Bernick.

18         MR. BERNICK:  I'm sorry.  Can we have the order read

19 -- we'll work out the details of it, but have the order read

20 that the copies will be furnished together with the

21 stipulations and we'll have the form -- the language of the

22 stipulation in connection with the supplementation of the

23 questionnaires which is January 12th.  We will then further say

24 that on a showing of need for the Court the Court will

25 entertain reasonable request for extension after that time.

1 The reason that we want this and need it is that it affects our

2 side of the case uniquely and we have obligations under the

3 Court's pretrial schedule to furnish our expert reports.

4       THE COURT:  Then the best thing may be to get your

5 releases promptly, like tomorrow, and let you get the x-rays on

6 your own.  I mean, truly, that will make it much easier for

7 those that are not in possession of debtor's counsel.  Those

8 that are in the possession of debtor's counsel I think they

9 have to produce --

10       MR. BERNICK:  The difficulty with that is that we're

11 again working not with the originals, but with copies.  We want

12 them to be able to make the copies to their satisfaction so

13 that their stipulation gets us to where we have to be.

14       THE COURT:  Well, no, I think regardless of who makes

15 the copies you're still entitled to an assertion by the person

16 who makes it or by counsel that it's in fact a true and correct

17 copy of the original.  And you can work out those terms with

18 counsel for the opposing side.  It can be done by the person

19 who makes it, who looks at it, who verifies it by stipulation,

20 whatever you want.  I think you're entitled to that process.

21       MR. BERNICK:  Well, let's see if Mr. Esserman and we

22 can work it out.  It may be necessary to maybe have a

23 telephonic conversation.  We just don't want to get caught in

24 between on timing, Your Honor.  We think that the process that

25 you've outlined is a workable solution, we hope.  But if it

1 proves to be that we can't really get commitments on time then

2 we are going to need some kind of further relief from the

3 Court.  And rather than anticipate a stay which I'm always

4 loathed to do we'll try to work it out, but we may need to have

5 a conference with the Court to deal with this issue

6 specifically.  And we'll work with Mr. Esserman along those

7 lines.

8             THE COURT:  That's fine.

9             MR. FINCH:  Your Honor, may I respond briefly about

10 the timing point?  Grace has known who its current cancer

11 claimants are through its historical database for years.  If

12 they had wanted to get a selection of the x-rays of lung cancer

13 claimants they could have started asking people for the x-rays

14 in September of 2005 when they served out the questionnaires.

15             THE COURT:  Well, they could have, but they didn't,

16 Mr. Finch.

17             MR. FINCH:  But the point is it is my ultimate goal

18 in life to try the estimation proceeding of W. R. Grace

19 beginning June 13th of 2007 and that nothing on God's green

20 earth will stop the case from going forward for going to trial

21 on that date.  Because I think we get things dissolved by

22 trying the case.  And I've tried a lot of these cases, I'm very

23 happy to try this case to Your Honor.  However, what I'm

24 hearing from Mr. Bernick is oh, we need more time, oh, we need

25 more time if we don't get the x-rays in such and such a time.

1 Well, why didn't they ask for the x-rays a year ago, Your

2 Honor?

3          THE COURT:  I don't know, Mr. Finch, but --

4          MR. FINCH:  And it shouldn't be held against my

5 clients or the future claimants the fact that they haven't

6 started asking for the original x-rays.  They could have

7 reviewed them all if they started asking for them two years

8 ago.

9          THE COURT:  Mr. Finch, there's no point reviewing

10 ancient history.  We are where we are today.  I am trying to

11 set up a process that fits everybody's needs and provide due

12 process going forward.  They're entitled to the x-rays.  This

13 is the first time this motion to compel has come up.  You've

14 been aware for months that they were going to ask for the x-

15 rays because this issue has come up several times in court

16 before.  So this is the pot calling the kettle black.

17          People don't want to produce the discovery on either

18 side.  My view is everybody is going to produce virtually

19 everything on both sides.  So let's get to it.  Because so far

20 I have been very consistent with that ruling.  And I'm probably

21 going to keep on being pretty consistent with that ruling so

22 let's just go and get it done.  Mr. Esserman, I'll take your

23 offer to work with Mr. Bernick to get an order.

24          MR. ESSERMAN:  Yes.  Can you hear me?

25          THE COURT:  Yes.

1          MR. ESSERMAN:  May I speak from here, Your Honor?

2          THE COURT:  Yes.

3          MR. ESSERMAN:  Let me also say that we understand the

4    time constraints and the firms that I represent will do the

5    best they can under the circumstances that we're under and I

6    think that the big problem is one that Your Honor identified

7    where you're dealing with third party providers and hospitals

8    and doctors and you've got Christmas and New Year and all the

9    holidays in between.

10         THE COURT:  They work over holidays.

11         MR. ESSERMAN:  I understand.  And all I'm saying is

12   that we're going to do the best we can to accommodate the

13   debtor and get this done in a reasonable fashion.

14         THE COURT:  Okay.

15         MR. ESSERMAN:  And it would be helpful, I think, if

16   the debtor would provide to us sort of a list via law firm of

17   the names of the x-rays -- the names of the people that you

18   want the x-rays from sort of divided by law firm.

19         THE COURT:  I think that would be very helpful and

20   that's a good way to get this started.  But I think you can

21   work out those details.

22         MR. ESSERMAN:  Yes.  And that type of thing will be

23   very helpful.

24         MR. BERNICK:  We'll do that, but it's on the

25   questionnaires that were submitted.

1          THE COURT:  But lots of questionnaires are submitted.

2  I think it would be helpful if he can identify specifically

3  which ones you want so that they can start producing those

4  promptly.

5          MR. BERNICK:  Not a problem.

6          THE COURT:  You may not want them all.  There's a

7  possibility you may not need them all.  But whatever.

8          MR. BERNICK:  This is a subpopulation of x-rays.

9  There's a whole world of asbestotics.  We haven't even asked

10  for that yet.

11          THE COURT:  Well, I understand.  But you may not even

12  want all of these.  So you should go through and decide.  If

13  you do find you're entitled to them, but you know, put it in

14  OS.  I think that's a reasonable request.  All right, what's

15  next?

16          MR. BERNICK:  Next I think we go to the -- our

17  motions to compel with respect to the questionnaires and -- let

18  me fuddle here for just a moment.  I think that there are a

19  series of issues, and I'm going to take them up in the

20  following order.  First there is the issue with respect to the

21  -- what's called the consultant's information.  The medical

22  data relating to the reading principally of x-rays.  We'll

23  begin with that.  We then have the attorney/client privilege

24  that's being invoked with respect to three questions on the

25  questionnaire.  We then also have the question of exposure to

1  non-Grace product that's being raised -- questions are being

2  raised or objections are being raised by certain of the law

3  firms.  And then the last principal issue is our discovery

4  relating to the settlements.  That's my proposed order.  What I

5  would suggest is that we simply take them up each one at a time

6  and whoever wants to respond can.

7          THE COURT:  What was the last one, Mr. Bernick?

8          MR. BERNICK:  The settlements.

9          THE COURT:  Oh, the settlements.

10         MR. BERNICK:  The terms of settlements between these

11 same claimants and other defendants.  Now, I want to be clear

12 that we could probably spend a lot of time talking at the

13 outset on exactly what firms are maintaining on behalf of what

14 clients and what objections.  And I don't believe that that

15 would be a productive way to start off this process.

16         THE COURT:  It won't be.  Plus their objections are

17 of record at this point.

18         MR. BERNICK:  But I want to make sure that by the end

19 we get to what would be a close out ruling by Your Honor to the

20 effect that any other objections that have been raised are

21 either granted or denied so that we have certainty walking out

22 the door today that Your Honor has ruled on everything that's

23 before you.

24         THE COURT:  I brought my toothbrush, too, Mr.

25 Bernick.

1          MR. BERNICK:  But that's the goals.  It is not --

2 rather than talk up front about who's still saying what let's

3 go through the issues and then save till the end what I call

4 the clean up or the more general --

5          MR. HERRICK:  Excuse me, Your Honor.  With respect to

6 that proposal my firm received a motion to compel that wasn't

7 even specific to my firm.  Specific to three firms which

8 addressed three separate issues.  Those are the only issues

9 that my firm addressed.  Those are the only issues that I'm

10 here prepared today to talk about.  This catch all provision

11 counsel for W. R. Grace certainly could have picked out all of

12 the questions that they thought my clients didn't answer fully

13 and teed those up for the Court today.  They didn't do that.

14          THE COURT:  I am only here to rule on the objections

15 that are before me.  I am not going to be ruling on catch all

16 objections that are not raised.

17          MR. HERRICK:  Thank you, Your Honor.

18          MR. BERNICK:  -- the gentleman that represent Motley

19 Rice?

20          THE COURT:  I don't know who he represents.

21          MR. BERNICK:  I just need to know.  Motley Rice is

22 not even prepared to recognize Your Honor's jurisdiction to

23 make any decisions in this case.

24          THE COURT:  Well, whether they are or not I think I

25 have jurisdiction to make the decisions and it'll rise or fall

1 on that.  But I'm only ruling on objections that were raised,

2 not objections that weren't raised.

3         MR. BERNICK:  That's our goal.

4         MR. ESSERMAN:  Your Honor, just a quick comment.  I

5 think Mr. Bernick's general proposal is fine.  We should take

6 them topic by topic.  He can argue for five minutes and I'll

7 argue for five minutes on each of the topics and we'll come to

8 a decision.  There are a couple other ones that we've raised in

9 our papers that he didn't specifically address.  One is -- was

10 raised on behalf of Baron Budd, and McLaughlin & Wiedel on the

11 burden of obtaining the basis for the dismissal of the cases.

12 And the last one was some information regarding race that has

13 been submitted and is otherwise irrelevant as to the Wilentz

14 Goldman firm only.

15         THE COURT:  I actually need to hear from the debtor

16 with respect to what that relevance is because I'm really not

17 clear what that's about.  On that one, the race issue, it seems

18 to me that if the information is readily available from a file

19 that can be produced I don't think an attorney has to contact a

20 client when it's not in the file or on the document somewhere

21 to ask that question.  But I need to hear from the debtor as to

22 why that might not be right.

23         MR. ESSERMAN:  But those issues, I think, were also

24 on my list of issues that were raised by the papers concerning

25 our firm.

1           THE COURT:  Okay.

2           MS. BYRNE:  Good morning, Your Honor, I'm Kathy Byrne

3    from the Cooney, Conway firm in Chicago.  And we have responded

4    to the debtor's motion to compel.  There are some issues that

5    are rather unique to the Illinois jurisdiction.  I just wanted

6    to make sure that I have a chance to be heard today.

7           THE COURT:  All right.

8           MS. BYRNE:  Thank you.

9           MR. BERNICK:  We will be speaking to those and I

10   agree with Mr. Esserman on some of the matters that he raised.

11   Let me begin first of all, Your Honor, with the medical data.

12   And going back to where we began this is the focal point here

13   which is is there a real diagnosis of disease that would be

14   satisfactory under the evidentiary rules that apply in Federal

15   Court.  And as we've said in our brief that is the legal touch

16   stone because this is a contested proceeding.

17           We can only have evidence that satisfies the federal

18   standards which are Daubert standards.  And both the issue of

19   whether there is admissible scientific evidence or medical

20   evidence of disease and the second issue which is causation by

21   Grace they're all squarely within the mainstream purview of the

22   requirements of Daubert and as a consequence the rules of the

23   road here are really quite clear.

24           I want to take up the first one and supply again just

25   a little bit of perspective before getting to the five minute

1  conversation that I guess we're going to have with Mr.

2  Esserman.  Again, our focal point is the same which is that

3  we're concerned about.  We know that this fight was not

4  scientifically or medically driven, but we now have to prove

5  it.  That is something that we intend to do.  It's been

6  facilitated since we filed the case by some other developments.

7         This is the chart that we submitted in connection

8  with our estimation brief and this basically shows that

9  Manville, too -- these are proof of claim filings against the

10  Manville Trust, that the filings against Manville also took off

11  significantly in the 2000 and 2001 period of time.  And that's

12  significant because this development, not the development

13  against Grace, but the development against Manville was

14  ultimately the reason why certain facts came to light that we

15  are now pursuing through the questionnaire.

16         Basically as the claims arose against Grace they rose

17  against everybody.  And as they rose against everybody we had

18  literally scores of companies -- we had almost two score

19  companies file for Chapter 11 in a very short period of time.

20  And the fact that those filings were taking place created a

21  major economic problem for certain of the claimants and certain

22  of the claimants that were represented by certain of counsel.

23  But effectively it was their view that the filing of all these

24  cases threatened the situation where when the trusts were set

25  up they'd be set up on the basis that when able -- what were

essentially nonmeritorious claims not medically sound claims to get paid at the expense of claimants who really did have a disease.

So the rash of bankruptcy filings put enormous pressure on whether the way that these proof of claims were being submitted and the doctors that were supporting them really was valid. And ultimately Ms. Ramsey's clients Steve Cassan went on the hill and testified. And testified really in a very blunt fashion about what it was that was going on and now what it is we're pursuing. And we got very limited options for pursuing it, but effectively that is why we're here.

He said, "In my view what is wrong with asbestos litigation is fueled almost entirely to the huge number of claims filed each year by lawyers who have found people who are not sick." This comes from the plaintiff's lawyer. "The problem is not the cancer cases or even the serious asbestosis cases, there are only a few thousand cancer cases filed every year in the entire country and even small number of asbestosis claims involving death or significant impairment. Courts and the defendants could deal with those cases if they did not have to deal with many tens of thousands of claims brought by people who are not sick."

He went on to say, "As I show below the nonmalignant claims problem is driven by litigation screening. Traditionally toxic tort litigation follows a medical model

1  where plaintiff sees a doctor to treat his illness or injury

2  and then is referred to or otherwise finds a lawyer.

3  Litigation screening subsequent to the entrepreneurial model

4  the lawyer recruits the plaintiff who actually feels fine, has

5  no symptomatic impairment -- symptoms of impairment, and is

6  unaware of any injury and sends him to a screening company for

7  an x-ray."

8           The interim that drives the filing of nonmalignant

9  cases is litigation screening.  But Manville Trust estimates

10  that as many as 90 percent of noncancer claims are generated

11  through screenings.  Litigation screenings have absolutely

12  nothing to do with medicine.  They are a device for recruiting

13  clients.  Internet advertisements invite readers to find out if

14  you have million dollar lungs, while newspaper ads warned

15  readers not to delay reporting that based upon recent national

16  information it is our belief that workers have only a limited

17  time remaining in which to file cases against manufacturers.

18           He then describes the sequence of how this proceeds.

19  And this is (indiscernible) the discovery that we're seeking.

20  "Participants at many screenings never even meet with a doctor.

21  A technician takes the x-ray.  The x-ray which is then sent out

22  to a doctor whose report is sent in turn to the lawyer who has

23  arranged the screening.  Moreover, if the doctor does not give

24  the lawyer the right answer the lawyer can get a second opinion

25  or a third or a fourth, as many as it takes. "

He then cites Dr. Eagleman who has testified on behalf of the plaintiffs in asbestos cases for many, many years. He wrote a letter to the American Journal of Industrial Medicine, "I was amazed to discover that in some of the screenings the worker's x-ray had been shopped around to as many as six radiologists until a slightly positive reading was reported by the last one of them."

Now, Mr. Cassan called it as it was. And he called it as it was before congress in connection with the proposed legislation. That is, a fact, it is a fact that has been offered by counsel for a significant number of cancer claimants in this case, counsel who as you know has been very active in connection with other bankruptcy litigation. The question becomes what relevance does it have to the Grace case? And that is something that we have undertaken to determine. We have been aided in this process by the fact that we're not the only ones who are focused on this.

Mr. Mullady' client, Mr. Austern who is in charge of the CRCM which runs the claims processing for the Manville Trust, the Manville Trust has now issued a statement suspending the acceptance of medical reports that come from some of the doctors who have been most active in the screening process. Dr. Ballard, Dr. Cooper, Dr. Colter, Dr. Herron, Andrew Herron and Ray Herron, a father and son team, none of their reports are any longer accepted by the Manville Trust.

1          As you know Judge Jack also in connection with the

2   silica litigation basically directed as a result of the

3   concerns that she had that all of the x-ray reads for any

4   particular claimant be turned over and made available.  And as

5   Your Honor also is aware in the USG case a similar request made

6   as part of a similar questionnaire.  Actually it was a

7   questionnaire that was frankly modeled on our questionnaire was

8   also entered by the Court in that case.  So the ship is

9   beginning to turn around, but it is a slow process.  It's one

10  that is very difficult and that takes time.

11         We've tried to bring home to this case this very same

12  problem.  And we've tried to do so in a number of different

13  ways.  First, we asked in connection with the original

14  questionnaire process that we be able to get information from

15  the law firms themselves.  And Your Honor said no, in the first

16  instance you have to go to the doctors.  So we have now gone to

17  the doctors and we've tried to take discovery of many of the

18  same players who we have just referred to.  People who are

19  involved in this screening process.  It has been a very

20  difficult process to take that discovery because some of them

21  have taken the Fifth Amendment.

22         In other cases we actually have to go pursue process

23  locally to obtain depositions and documents by subpoena.  We

24  have people who are doing it, working very hard to do it, but

25  it is a very, very difficult proposition.  But we're pursuing

1  it.  But when it comes to the actual materials that are being

2  submitted and are available we also want to get them from the

3  claimants and from their counsel.  The medical information

4  itself.  Because we believe that the medical information itself

5  will show that many of these same doctors are doing the same

6  thing in this case that they've done in other cases.  And what

7  we've been able to determine is that that is exactly what is

8  happening here.  That is that the same doctors are now involved

9  in their materials and their reads are being referred to in the

10  questionnaires that are being submitted in this case to show

11  the evidence that there is to support these claims.

12          So what we have, and I'll go over this in just a

13  moment, is that we have a given doctor.  We'll call him Doctor

14  1, who sees a whole series of claimants, and finds -- and

15  there's actually testimony that some of them actually had bench

16  marks or quotas that they sought to reach.  All of this

17  information is in the status report.  The bench mark will say I

18  want to end up with 40 percent positives.  In fact, one of the

19  reasons for that was that the screening doctors got paid more

20  money for a positive than they got for a negative.  But that

21  still leaves the 60 percent who are negatives.

22          So we then have Doctor 2 who comes in and he may

23  actually read the same population and his 40 percent may

24  include people who were part of the 60 percent that were

25  originally negative.  So we get 40 percent positive from Doctor

1, we then get another 20 percent from Doctor 2.  And then

before you're done with it it turns out that virtually

everybody has a positive read.  Now, the claimants here

basically take the position that you don't look at the whole

picture, you just look at -- you picture --

MR. FINCH:  Your Honor, I feel constrained to object

to this to the extent that he's relying on stuff in the status

report that he filed with the Court.  A) the status report is

improper.  There's nothing in the Court's rules to provide for.

He is mischaracterizing, misdescribing deposition testimony

that's taken of some doctors in this case.  There's been no

opportunity for anybody to respond to it.  It's effectively a

pretrial brief.

We're here, I thought, on a motion to compel which

would first tee up the question of the consultant expert

privilege.  I haven't heard anything about the laws that relate

to the consulting expert privilege which is I would think would

be relevant to that information.  Instead, Mr. Bernick is going

through a litany of stuff in a effectively ex parte pleading

that he filed Friday night describing what he says discovery

has shown so far.  The ACC hasn't had an opportunity to respond

to that and we don't know the Court's procedures.

Secondly, I think it's just outrageous that he does

this time and time again, and I would ask that that -- A) that

pleading be stricken, and B) that he be ordered not to file

1 status reports.  We don't file status reports before every

2 hearing that says that we have discovered that Grace knew about

3 the hazards of asbestos for 50 years before they stopped

4 selling products and they were going around telling everybody

5 how safe their products were.  We don't file a status report

6 that says of the 60,000 questionnaires that are returned there

7 are 3000 mesothelioma cases in there with deadly serious

8 diseases.  The people are all pretty much dead now.  We don't

9 file status reports like that.

10        This is a discovery issue with a discrete set of

11 legal analysis whether or not a particular doctor's report is

12 subject to the consulting expert privilege or not.  What I hear

13 from Mr. Bernick is a series of grandiose statements about how

14 the tort system is broken and how Grace is going to do all this

15 discovery to fix it.  But I would very much like to have the

16 motion to compel resolved today and so we don't have to use our

17 toothbrushes and stay here all night.  And this kind of one-

18 sided presentation which doesn't really tie to the motions to

19 compel other than through the back door, I think it's

20 completely objectionable and I urge the Court to order Mr.

21 Bernick to stop filing status reports in advance of -- a day in

22 advance of the hearing that are respectively pretrial briefs.

23 And secondly, to focus on the issues that are teed up for the

24 motion to compel today.

25        THE COURT:  Okay.  With respect to the status report

1    I have been asking not for filing, but for status reports with

2    respect to the conduct of the case so that I have some

3    expectation of what's going forward in the future.  This status

4    report, I agree, is more akin to a brief than it is to a status

5    report.  And for purposes of this hearing I will not consider

6    it.  I'm not going to order that they not be filed.  To the

7    extent that somebody thinks I need to know something by way of

8    a status report I think that's an appropriate way to get some

9    information before the Court.

10         If it's a contested matter you clearly have the right

11   to file a response to it.  For purposes of today I will not

12   consider the status report.  It is stricken.  Nobody needs to

13   respond to it.  And let's move on.

14         However, having said that I think Mr. Bernick's

15   argument with respect to why he wants to get behind whether or

16   not there is more than one doctor who has looked at an x-ray

17   and have all of the reports, not just one, is appropriate.  I

18   think to the extent that there is some negative evidence as

19   opposed to positive evidence that shows that a claim is subject

20   to disallowance because, again, hypothetically five doctors

21   have said there is no evidence of disease and then the sixth

22   who looks at it finds some is clearly relevant.  So that is

23   going to be produced in some form or other.  I don't need any

24   more argument and I'm not hearing anybody in opposition.

25   That's my ruling.

1        The questionnaire asks for it, that is clearly

2   relevant and it is to be produced.  Whether it's admissible or

3   not that's a different issue.  I am not determining

4   admissibility.  I'm only ruling on discovery.  I'm not going to

5   say this again.  It applies to every ruling I'm making today.

6   What's next?

7        MR. BERNICK:  The next matter is attorney/client

8   privilege.  Attorney/client privilege is invoked with respect

9   to --

10       MR. FINCH:  Your Honor, I think that Mr. Esserman

11  would like to respond on the consulting expert privilege and so

12  would other firms.  I mean, he hasn't -- Mr. Bernick has not

13  addressed the merits of the arguments that people made about

14  whether or not there is a consulting expert privilege and the

15  extent --

16       THE COURT:  How do you have a privilege as to medical

17  evidence if you're coming forward with a claim in a bankruptcy

18  case based on personal injury?  I mean, I'm not asking for the

19  consultant expert's reports, but to the extent that there is in

20  fact some evidence that more than one report has been filed or

21  produced with respect to a claim that seems to me to be

22  relevant.  Admissible, I don't know, but relevant for discovery

23  purposed surely.

24       MR. ESSERMAN:  Your Honor, if a report has been

25  produced I would agree with you.  But if a consulting expert

1 has been hired the Rules of Evidence are very clear, we think.

2 The consulting expert has been hired by a law firm and that

3 consulting expert is not a testifying expert or that report is

4 not tendered to a court or otherwise made available it is not

5 discoverable.  We think the law is very clear on this.  We

6 don't even think this one is a close one --

7      THE COURT:  I'm asking for the medical reports to be

8 produced, not a consultant's report.  If in fact there has been

9 more than one B read or if in fact there has been more than one

10 medical assessment of a specific x-ray or other tests that's

11 been involved all of the reports are to be produced.  The

12 plaintiffs can't pick and choose which they're going to go

13 forward with.

14      MR. ESSERMAN:  But in many cases or in some cases

15 there might be a medical consulting expert.  And what Your

16 Honor is saying is that there's no such thing as a consulting

17 expert privilege for a medical consulting expert.

18      THE COURT:  No, I'm not saying that.

19      MR. ESSERMAN:  Well, because a firm can hire a

20 medical consulting expert.  That medical consulting expert can

21 not be a testifying expert, can be a consulting expert strictly

22 consulting with the law firm, prepare reports for the law firm,

23 not be disclosed to third parties, not be submitted to

24 defendants, not be submitted to a hospital, not be submitted to

25 anywhere, not used for treatment.  And that is not necessarily

1    -- well, the rules is clear that that's a consulting expert,

2    not discoverable.

3            THE COURT:  Okay.  I think maybe we're talking apples

4    and oranges and maybe I'm misunderstanding the issue.

5            MR. ESSERMAN:  Okay.

6            THE COURT:  I thought what the debtor was asking was

7    for copies of all of the medical reports.  That is, for

8    example, a treating physician that the tort plaintiff goes to

9    four doctors and sees four different doctors for whatever

10   reason with respect to the same x-ray and each of those four

11   doctors produces a report.  All of those reports are to be

12   produced, because those are prepared for the client, not for

13   the law firm in the course of treatment.  And I don't see how

14   when you're coming forward with a personal injury action you

15   cannot product the medical evidence that will allegedly support

16   your claim.

17           Now, if the law firm hired a consultant to say,

18   again, hypothetically something like here are 500 clients of my

19   firm I want you to take a look at them and advise me which

20   cases should we pursue first?  Which should we file claims in

21   this amount?  I agree, that is not discoverable nor is it

22   producible, nor is it admissible.  But with respect to the

23   medical consultation that a client went through whether it was

24   ordered by a law firm or not it is discoverable evidence, not

25   necessarily admissible evidence in this case because it isn't

1 for purposes of the attorney's consultation, it's for the

2 client's consultation.  Am I missing the point?

3         MR. BERNICK:  No, Your Honor, that opens the door to

4 exactly what the problem is here.

5         THE COURT:  Well, I was actually asking Mr. Esserman.

6 Am I missing your point?

7         MR. ESSERMAN:  Well, Your Honor, I think if in fact

8 -- I think you've got it partially right.  I think it's clear

9 where a law firm hires a doctor and the doctor goes to perform

10 an analysis strategy, whatever disease levels that they should

11 go for that's clear consulting expert.  That's clearly not

12 discoverable.  The position you're saying is if a client goes

13 to a doctor in say 1999 and then goes to another doctor and he

14 gets, say, a negative report and then he goes to another doctor

15 in 2000 or 2001 and gets a positive report that both of those

16 reports have to be produced.

17         THE COURT:  Right.

18         MR. ESSERMAN:  And I think that's what you're saying.

19         THE COURT:  Yes, it is.

20         MR. ESSERMAN:  And I would like a minute to consult

21 with my clients.

22         THE COURT:  All right.

23         MR. BERNICK:  Your Honor, if I could.  It does what

24 Your Honor has said goes back substantially and dramatically on

25 what we have asked for.  And I don't want to interrupt the

1 consultation with the client, but before people go back and

2 consult they're consulting with respect to something that has

3 very little to do with the facts of how this actually works

4 which we now have actually conducted discovery of and that's

5 why we did file the status report.  If Your Honor wants to hear

6 a little bit about that before --

7        UNIDENTIFIED ATTORNEY:  Excuse me, Your Honor, I

8 can't hear counsel.

9        MR. BERNICK:  Well, maybe you want --

10        THE COURT:  Can you use -- yes.

11        MR. BERNICK:  I've got a microphone on.  I tell you

12 what, you want to sit over here?

13        THE COURT:  Use the podium microphone, Mr. Bernick.

14 Jim, can you check the batteries in the portable mike.

15        MR. BERNICK:  They're fine.  Can you hear me, now?

16        UNIDENTIFIED ATTORNEY:  Thank you.

17        MR. BERNICK:  Treating physicians have almost -- they

18 have very little to do with many of these cases.  I want to be

19 candid with the Court that these are not people who, as Mr.

20 Cassan says, these are not people who are feeling ill and go to

21 a doctor for treatment of the condition.  Some of them, yes.

22 Obviously if somebody's got lung cancer or mesothelioma --

23        THE COURT:  Mr. Bernick, it doesn't matter in my view

24 whether the client went to the doctor because the lawyer set up

25 the arrangement or whether the client went on his own.  If a

1 client went to a doctor and/or a B reader, got an x-ray and got

2 a report those reports are to be produced.  What you're not

3 entitled to is the law firms legal strategy.  You're not

4 entitled to their own medical expert consultant reports that

5 say things to the lawyer like, you know, again, hypothetically,

6 I don't think this claim has any merit, but I think these five

7 claims do.  You're not entitled to that.

8       MR. BERNICK:  We're not seeking that.  The way that

9 this system works is -- and this is very difficult to get a

10 hold of.  Trust me, we've been trying for a long time.  But the

11 lawyers are over here and they find doctors who go around in

12 these mobile trailers.  And the law firms also have relations

13 with the unions.  And the unions encourage people who are --

14 become part -- are potential claimants, people that belong to

15 the union they encourage them to go, get checked out in the

16 van.  So all these people go into the van, the doctors are the

17 ones that have the financial relationships with the law firm.

18 The doctors are the ones who get paid more if they have a

19 positive finding and they do these screenings.  So the

20 screening gets done.  The law firm is involved to the extent

21 that they're providing the financing.  The doctors are doing

22 what purport to be medical assessments, but they're not

23 treating physicians.

24       THE COURT:  Well, I don't care whether they're

25 treating physicians.  If they are somebody who is doing a

1 procedure with respect to the debtor that's what I'm

2 classifying as a treating physician for purposes of this

3 record.  There's a difference between examining a tort

4 plaintiff and doing a medical task and issuing a report.

5 You're entitled to that.  And having a consultation that looks

6 at a different set of circumstances, for example, the entire

7 database that is available in a law firm and give an opinion as

8 to whether or not particular claims have value.  You're

9 entitled to the former, you're not entitled to the latter.

10         MR. BERNICK:  In other words, we want the B reads, we

11 want the sporometry readings, we want what purports to be the

12 medical data.

13         THE COURT:  You're entitled to that.  These claimants

14 are coming forward saying that based on that data they have a

15 claim against the estate.  You're entitled to see that

16 evidence.  Mr. Esserman.

17         MR. ESSERMAN:  Your Honor, I think there's two

18 different situations.  One, I think we're in agreement on and

19 hopefully we'll get agreement on the second.  The first is a

20 client goes to visit a doctor for treatment and he gets a

21 report.  He later goes to his lawyer.  That first report is

22 clearly discoverable.  The next situation is a client goes to a

23 lawyer and in consultation with a lawyer decides to seek advice

24 of a certain doctor as a consulting doctor.  The doctor issues

25 a report to the client and the law firm.  That report, if not

1  disclosed, if not used as the basis for a claim, it's not used

2  for testimony is clearly a consulting expert report which is

3  not subject --

4          THE COURT:  Why?  Who's the doctor consulting with?

5  The doctor's taking a look at a medical criteria for a

6  plaintiff and giving an opinion as to whether there is or there

7  isn't the disease.

8          MR. ESSERMAN:  But the doctor is an expert.  And the

9  doctor is a consulting --

10          THE COURT:  They're all experts.

11          MR. ESSERMAN:  Well, the doctor is a consulting

12  expert.  And under the rules for consulting expert --

13          THE COURT:  Wait.  Why are you --

14          MR. ESSERMAN:  You don't have to disclose any more so

15  than Grace.

16          THE COURT:  Wait a minute.  A consulting expert --

17          MR. ESSERMAN:  Let's take the reverse.

18          THE COURT:  No, let's go back to the definition

19  because I'm concerned -- I don't want to get past this point

20  and then find out that I'm again, misunderstanding.  Let's go

21  back to the consulting expert issue.  The lawyer has a client

22  come in, and in consultation with the lawyer the client goes to

23  a doctor.  That's not privileged.  That's an act on behalf of a

24  plaintiff, not the lawyer, going to get a medical opinion based

25  on the fact that there may or may not be a lawsuit that can or

124

1 can't be brought.  But the fact that the client went to visit a

2 doctor is certainly not privileged.  Not in a medical personal

3 injury lawsuit.

4         MR. ESSERMAN:  If the doctor was retained as a

5 consulting expert --

6         THE COURT:  Why is the law firm retaining a

7 consulting expert to give an opinion as to a particular client

8 as to whether the client has a claim?  The whole purpose is to

9 determine if a client has a claim, not if the law firm has a

10 client.

11         MR. ESSERMAN:  Let's take it in a reverse situation.

12 X-rays are provided to Grace.  Grace sends it to two or three

13 doctors to determine whether or not there's a claim here.  Are

14 those three doctors that Grace sends their x-rays to, is that

15 information discoverable?  Are those three doctor reports --

16         THE COURT:  I don't know the -- I think if they're

17 not testifying experts in that case the answer is probably not

18 because this is not the issue of a client of Grace going to get

19 a medical opinion that's going to be advocated in a court of

20 law as a legitimate claim.  This is the debtor taking a look at

21 the claims and going to a series of experts and saying in your

22 opinion is there or isn't there a claim.  So I think it's a

23 different issue.

24         MR. ESSERMAN:  I think we've got the same situation

25 in reverse.  I agree with your analysis.  I do not think that

125

1 would be discoverable.  And the only thing I'm talking about is

2 the mirror image on the other side.

3         THE COURT:  But it's not equivalent.  I don't think

4 you're arguing apples to apples.

5         MR. ESSERMAN:  Well, I think they are apples to

6 apples.  No different than if Grace had three doctors that they

7 were consulting with and decided not to use those three doctors

8 for testimony.

9         THE COURT:  No, I think it's different.  If Grace in

10 its own -- well, I can't come up with the same analysis because

11 Grace isn't advocating a claim before the Court.  I mean,

12 here's the problem that counsel has.  Number one, counsel's an

13 officer of the court.  And if you've got some reason to believe

14 that your client may be prosecuting a claim that is false you

15 have an obligation either to withdraw his counsel or to do

16 something that advises this court that there may be a false

17 claim.

18         Now, if you've got, hypothetically just to make this

19 really absurd so it's not key to anything in the case.  You've

20 got 100 reports.  Ninety-nine of them say no evidence of any

21 type of asbestos disease and the last one, all issued in the

22 same time frame looking at the same x-ray says evidence of

23 disease, how can you as an officer of the court produce that

24 one claim without also advocating the fact that there are 99

25 others that say no evidence of disease?

1          MR. ESSERMAN:  Well, in an egregious circumstance as

2    Your Honor points out it's one thing, and another circumstance

3    where things are not so black and white, things are not so

4    clear, x-rays are not absolutely totally easily readable.  It's

5    no different in many respect to what happened at the

6    intersection when this car hit that car.  Was the light yellow,

7    was the light green?  There are different opinions.  People

8    have different views of the situation and not all views are

9    consistent.  And that's what lawsuits are all about.  Different

10   views of the facts.  And because a law firm --

11         THE COURT:  But the difference, Mr. Esserman, is in

12   your second scenario the client has never visited a doctor

13   before.  And the fact that they go to a lawyer who sends them

14   to a particular doctor as opposed to the fact that they go to a

15   doctor of their own choosing without having gotten the name

16   from the lawyer is irrelevant.  The consultation that the

17   debtor is entitled to is between the doctor and the client, not

18   between the doctor and the lawyer.  So if there is some spin on

19   this analysis that is for legal purposes only that is not a

20   medical report you may be able to protect that.  But to the

21   extent that there is an x-ray that has been taken and a report

22   made between a doctor and a client who's coming forward with a

23   personal injury suit I don't see how there's any

24   attorney/client privilege or expert consultation.

25         MR. ESSERMAN:  It's consulting expert privilege under

1    the rules.

2          THE COURT:  Okay, tell me the rule.

3          MR. BERNICK:  Your Honor, maybe I do my -- in the

4    interest of producing parody in how this thing is examined,

5    first we are not dealing with general opinion test.  We're

6    talking about specific -- a specific what purports to be

7    medical procedure which is doing B reads or sporometry tests.

8    We are not arguing for the production of what the essentially

9    consulting expert work product in regard to assessing the

10   merits of the case.  We want the B reads.  And in the parallel

11   -- and because the client is the one that's bringing the

12   lawsuit in all observations with respect to that client that

13   are placed at issue by the prosecution of the lawsuit so the

14   client can't any more than the lawyers can, the client can't

15   say well, I like certain observations of me, but not other

16   observations.  It all comes in.

17         The parallel, the defense side is not the defendant

18   is defending the case, the defendant that's defending the case

19   doesn't have uniform access to the client to send them out to

20   90 people and then get them done all different ways.  He only

21   gets one shot which is the IME and everyone gets to be present

22   for an IME -- a representative during the course of an IME or

23   the defendant asks for it.

24         To be parallel on the defense side is let's say you

25   have a company that goes out and gets data about its product,

1  gather scientific data about its product and then in the

2  context of litigation and then it turns out that that data is

3  different from data that is gathered in the ordinary course of

4  its business also relating to its product.  Everybody here in

5  court would say that the company, even though it gathered the

6  information on the basis of a consulting relationship, if that

7  information is material to the safety of their product the

8  company is obliged to produce that information.

9           The same kind of thing.  You can't use a consulting

10 privilege to cloak information that is not available to the

11 other side.  In this case we don't have ongoing access to these

12 people historically, they did.  So there is total parody

13 between the two different situations.  The consulting privilege

14 though I don't think you even get to in this case.  Why?  And

15 the case law is very consistent with this.  You're talking

16 about a medical procedure.  You're not talking about a piece of

17 opinion testimony that kind of gives an overview of a client

18 and whether the client's got a good claim or a bad claim or

19 anything like that.  This is B reading.  There's a procedure

20 for B reading.  There's a procedure for sporometry just like

21 there is for a pathology report.  There's a procedure for that.

22 All these things are data that purport to be gathered following

23 well established medical procedure.  This is not somebody who's

24 going to testify to an ultimate question of does X product

25 cause Y disease?  It's not generic.  This is data.  It's like

1  going in and taking a test.  That's what's happening here.

2  That's why this does not even apply.

3        MR. ESSERMAN:  Your Honor, we think it not only

4  applies, but it's very clear under Rule 26B(4)(b) and we've got

5  supportive affidavits of every law firm that we've gotten.  Let

6  me just read you a paragraph from an affidavit.  In many of our

7  litigation cases including the cases currently pending against

8  debtors our client or my law firm on behalf of our client has

9  retained or specifically employed physicians or other medical

10  professionals as expert witnesses in anticipation of litigation

11  or preparation for trial and who are not expected to be called

12  as witnesses at trial a consulting expert.

13        In such cases we do not disclose their identity,

14  opinion, reports, or materials of the consulting expert to the

15  adverse party in such litigation, but instead hold such

16  information in confidence.  These are the types of reports that

17  we think are clearly covered by a consulting expert privilege

18  under Rule 26(B)(4)(b).  And that's what's been briefed by both

19  sides in this issue.

20        THE COURT:  To the extent that the consultation is

21  between the doctor and the client, involves some medical test

22  or procedure, and results in a report that is not a

23  consultation on behalf of an attorney.  That is determining

24  whether there are facts in evidence that will support a claim.

25  There's a difference.  I agree that a report may also, for

example, give you some strategy.  To the extent that it does

that it's not admissible.  But the test itself is clearly

admissible.  It's not a legal opinion that your firm is

devising on its own.  It's a test that a client has received

sometimes in preparation for litigation, sometimes not.

MR. ESSERMAN:  I think that turns the tort system

rules on its head.

THE COURT:  Well, maybe they need to be if that's the

case.  I don't know.

MR. ESSERMAN:  And whether they do or not they need

to be turned on its head is another issue.  But these reports

are not discoverable in the tort system, and there's no reason

they should be discoverable here.  There's no --

THE COURT:  Wait.  (B)(4)(b) talks about trial

preparation experts.  What you're telling me, if I understand

correctly, is that you are -- not you personally, but let me

just make a hypothetical.  A law firm has a client who comes in

without any medical data to support apparently what is not even

evidence of a medical problem.  Consults with the law firm.

The law firm says go to Dr. X and get a test.  So the client

does.  Goes to Dr. X to get a test.  As a result the law firm

decides that there's a claim that can be prosecuted.  Your

suggestion is that neither the expert, nor the report, nor any

testimony about that whole process can be used by either side.

So how do you prove the claim?

1          MR. ESSERMAN:  The answer is no.  That's not what I

2     mean.

3          THE COURT:  Okay.

4          MR. ESSERMAN:  When that situation exists, and he

5     decides he has a claim, that expert report would have to be

6     disclosed, because that -- he then loses his consulting expert

7     privilege and is a testifying expert.  Or that -- that's the

8     basis of a claim, or the basis of a proof of claim.

9          THE COURT:  But that's what we have here.

10         MR. ESSERMAN:  And whatever.

11         THE COURT:  We have all these tort plaintiffs --

12         MR. ESSERMAN:  Well then those types of reports are

13    disclosed, and have been disclosed.

14         THE COURT:  Okay, then what isn't disclosed?

15         MR. ESSERMAN:  It's where -- just like I described in

16    the declaration, it's actually the declaration of R. Montalta

17    Jr. Paragraph three, is situations where in many -- in some

18    litigation cases including cases against the debtor, their

19    client, or the client of the law firm, on behalf of their

20    client retains specialty -- physicians or other medical

21    professionals, as expert witnesses, in anticipation of

22    litigation preparation for trial, who are not expected to be

23    called as a witness at trial.  And those reports are in fact

24    not disclosed.  Now what Your Honor is talking about, is you go

25    to a doctor, you've got to prove your claim, obviously that has

1 to be -- that has to be disclosed I understand that.

2          The basis of your claim has to be disclosed, the

3 reports have to be disclosed.  But where there is a -- where

4 the firm has in fact hired a consulting expert, which is a

5 totally different situation, they're not anticipated to be

6 disclosed, those are experts of the law firm, those are

7 consulting experts that are privileged.  So --

8          THE COURT:  Well, I understand --

9          MR. ESSERMAN:  -- those are two different situations

10 I think.

11          THE COURT:  Well they're different situations, only

12 insofar as you have a consulting expert who is taking some

13 other data, not creating the data.  In the example that you

14 posited, a client comes in, has no medical data whatsoever to

15 support a claim, and is sent out to go get that data.  And in

16 fact, does get the data.  Now it either does or doesn't support

17 the claim.

18          MR. ESSERMAN:  It supports the claim it has to be

19 disclosed.  I agree with that.

20          THE COURT:  Okay.

21          MR. ESSERMAN:  I -- we don't have a disagreement.

22          THE COURT:  Well then why doesn't it have to be

23 disclosed if it doesn't support the claim?  If the claimant is

24 filing a claim, I mean obviously if the plaintiff says okay, I

25 don't have any evidence of disease, you don't have to reveal

1  that, but there is no lawsuit then.

2        MR. ESSERMAN:  There is two different things we're

3  talking about here.  One is what evidence did he have that he

4  has a claim, what kind of reports does he have, to support his

5  claim that he's relying on for that claim.  I agree, that has

6  to be disclosed.  But the second issue is if the law firm hires

7  a consulting expert, in connection with that claim that they do

8  not intend to disclose to anyone that they intend to keep in

9  confidence --

10        THE COURT:  Okay.

11        MR. ESSERMAN:  -- there's a consulting expert or a

12  trial expert --

13        THE COURT:  But wait.

14        MR. ESSERMAN:  -- that does not have to be disclosed.

15        THE COURT:  But what you're telling me is that the

16  law firm makes the decision as soon as somebody walks in the

17  door, to send that person to a consulting expert.  And oh gee,

18  we're going to make it a testifying expert if in fact we like

19  the results but we're going to keep it a consulting expert if

20  we don't.

21        MR. ESSERMAN:  Sometimes consulting experts turn into

22  testifying experts that is a correct statement.

23        THE COURT:  But the -- issue is whether a particular

24  plaintiff who has filed a claim in this case, in Grace.

25        MR. ESSERMAN:  Yes.  Yes.

1          THE COURT:  Okay, has seen more than one doctor, or a

2    doctor more than one time, whatever the circumstance may be,

3    has had numerous reads, of the same data, and gotten different

4    results.  That's the issue.

5          MR. ESSERMAN:  Well, that's a hypothetical, but --

6          THE COURT:  Yes, it's a hypothetical.

7          MR. ESSERMAN:  The -- if in fact regardless of the

8    read, positive, you can get -- let's just take two positive

9    reads, one is a consulting expert read, and one is the basis of

10   the lawsuit against Grace.

11         THE COURT:  By the same doctor?

12         MR. ESSERMAN:  No, different doctors.

13         THE COURT:  Okay.

14         MR. ESSERMAN:  Different doctors.  The fact that the

15   second doctor had a positive read, B-Read or whatever, he's

16   still  a consulting expert, he's number one, not disclosed, not

17   used for testimony, not the basis of the claim, strictly for

18   consulting with the law firm, in connection with their claim

19   against Grace, that is not discoverable, that is not

20   discoverable in the tort system, it's not discoverable under

21   the Federal Rules.

22         THE COURT:  I agree with that.  But the -- but what -

23   - but I -- I'm missing a disconnect, or I guess I'm not able to

24   articulate this very well.  The problem is as I understand --

25   let me go back to your second example.  A client, let's just

1  deal with one, a client comes into the law firm, I'm not even

2  going to posit why, just you know comes into the law firm,

3  after the discussion, the client goes to visit a doctor and

4  gets a medical report.  That's what happens.

5       There is now some data as to whether or not that

6  client has a disease that's caused by asbestos in -- you know

7  in this hypothetical.  Okay.  If the client never pursues a

8  claim against any entity, for whatever reason, there is no --

9  reason to have to worry about disclosing it.  But as soon as

10 that client takes that report, that B-Read, and says I now have

11 the basis for a lawsuit against X, based on this report, it's

12 discoverable.

13      MR. ESSERMAN:  I disagree with you and let's take it

14 out of this context, and let's put it in another context and

15 see if maybe we can all relate to it even better.

16      There is an accident, in an intersection, the injured

17 party comes to a lawyer's office and says I was in an accident

18 at the intersection, do I have a claim. The lawyer says, okay,

19 I'm going to hire expert X to see whether or not you've got a

20 claim.

21      Expert X goes out there, he looks at the

22 intersection, and he says -- he reports back to the lawyer,

23 this looked like a confusing situation, I don't know whether

24 they have a claim or not.  Okay.  The lawyer says, well let me

25 try Joe, and see what he says.  So expert number two Joe goes

1  out there and says I think he may well have a claim.   Lawyer

2  exercising his fiduciary duty says, well I've got an obligation

3  to my client to let him know that there is someone that says he

4  might have a claim.   So he discusses it with the client, the

5  client says okay let's sue.   They bring a lawsuit, the expert

6  number two is designated as their witness, he takes the stand.

7  Expert number one never disclosed, never -- never utilized in

8  any situation, his report was never dispersed, or -- in any way

9  utilized.

10         What you're saying is, that expert number one's

11 report would have to be disclosed?

12         THE COURT:   No.   I'm not saying that.   But there is a

13 big difference between somebody taking a look at -- or doing a

14 procedure you know a medical test, which is not otherwise

15 available -- anybody can go look at the accident scene, and get

16 their own opinion as to whether or not it's a dangerous

17 intersection, for example.   But the debtor -- I don't know how

18 to take it out of the context of this case off hand.   So, I'll

19 just say the debtor, the debtor doesn't have the opportunity to

20 find out whether or not the tort plaintiff in this case has had

21 a series of different diagnostic procedures, unless that fact

22 is disclosed.

23         Now, if you're arguing about the opinion, the gloss

24 on the fact of the data, you may be right.   That the opinion

25 may be different, but if there are different tests that are

137

1  involved, or different consultations that have involved a

2  direct contact between the doctor and the patient, not between

3  the doctor and the lawyer, but between the doctor and the

4  patient, I don't see how there is any privilege with respect to

5  that, to the extent that there is a consultant privilege surely

6  it has to be waived, because now there has been another person

7  who is brought in the client.  With respect to that.

8          The client's in, the doctor's in, and the lawyer gets

9  a -- you know gets some sort of a report that may incorporate

10  that data, that report may not be admissible, but surely the

11  spin on what the evidence will substantiate is.

12          MR. ESSERMAN:  But a B-Read in fact, is an opinion of

13  that reader, that yes there is a disease, or no there is not

14  disease, just like yes there is an intersection is dangerous,

15  or no there isn't.

16          THE COURT:  Of course, that's -- but that's the whole

17  basis for the claim.

18          MR. ESSERMAN:  Well, if it's the basis for the claim,

19  we're not arguing that it's not discoverable.  That's not the

20  issue.

21          The only issue is whether people that had been

22  specifically retained for not -- not to be experts for the

23  basis of the claim, but for consulting purposes only, and not

24  disclosing, not used.

25          THE COURT:  See I think the title -- I think the

title that the law firm puts on somebody is not determinative. You know it's like the Supreme Court says I can't define pornography, when I know it. But I know it when I see it, it's the same issue. You can't by virtue of putting a title on something, say that just because you put that title on it, that that's the fact of what took place. If somebody has seen a client, for "diagnostic purposes" figuring out whether or not there is a basis for a claim. Not to talk to the lawyer about how to strategize the case or whether the claim is worthwhile, but to advise the client as to whether there is a basis for a claim, I don't see how there is a consulting privilege.

MR. ESSERMAN:  That may be a little bit different, than what we're -- than what I was talking about.

THE COURT:  Okay.

MR. ESSERMAN:  I was talking about a situation where the doctor reports to the law firm, he's retained, and he says whatever he says to the law firm, is a privilege fact.

THE COURT:  I don't see --

MR. ESSERMAN:  It's a consulting expert.

THE COURT:  -- what his communication with the law firm -- I don't see how that as a non-testifying expert is discoverable, but his opinion on the factual evidence that supports the claim, to the client, is discoverable.  If he makes a report that indicates that there is -- you know, asbestosis in a case, that's -- why is that not discoverable?

1  If the plaintiff is suing to recover, based on the fact that he

2  has asbestosis?

3          MR. ESSERMAN:  If that's the basis of the claim, I

4  would agree with you.

5          THE COURT:  Okay.

6          MR. ESSERMAN:  If it's not the basis of the claim, I

7  think it's not discoverable.

8          MR. BERNICK:  Your Honor, I -- don't want to prolong

9  this --

10         MR. KRAUS:  I'm sorry, could I -- before Mr. Bernick

11 speaks, could I --

12         THE COURT:  Yes sir.

13         MR. KRAUS:  -- speak.  Your Honor, on behalf of the

14 Waters and Kraus clients I want to adopt part of what Mr.

15 Esserman said, but distinguish our position.  With respect to

16 the diagnostic tests mentioned by the Court.

17         THE CLERK:  Pardon, who is speaking.

18         MR. KRAUS:  Peter Kraus, I'm sorry for the Waters and

19 Kraus clients.  We do agree that subject to the Federal Rules

20 and the previous orders of the Court the actual diagnostic

21 tests that is, the chest X-rays themselves we do agree can be

22 produced.  However, Your Honor, to the extent that my firm has

23 had those chest X-rays reviewed by radiologists or B-Readers,

24 who have rendered reports to our firm, which we may or may not

25 have shared with out clients, if those have not -- if those

1  experts have not been identified as testifying experts, if we

2  have maintained all other indicia of the consulting expert

3  privilege, we do not agree to produce the opinions of those

4  radiologists or B-Readers, we do believe those are consulting

5  expert materials, Your Honor. However, we do agree to produce

6  whatever X-rays they reviewed, whatever pulmonary function

7  studies they may have reviewed, whatever pathology or CAT scans

8  they may have reviewed, the actual diagnostic testing we agree

9  with the Court, is not privileged, their readings of those

10  materials, and opinions rendered to the firm, whether shared

11  with my clients or not, if those experts have not been

12  identified, are consulting Your Honor and we do not believe

13  they are subject to production.  Only those opinions of experts

14  that we have identified as the basis for the claims that we

15  have asserted, should be required to be produced.  Not the

16  opinions of those that we  have maintained the consulting

17  experts did.

18          THE COURT:  I think I agree with your formulation of

19  --

20          MR. ESSERMAN:  I think that's what she said.

21          THE COURT:  -- the issue.

22          MR. ESSERMAN:  Yeah, I think that's what you said,

23  unless I'm mistaken, I think that what Mr. Kraus said is what

24  you said.

25          THE COURT:  I think it's what I'm trying to say.  But

1  I'm not sure I articulated it very well.

2          MR. KRAUS:  Okay, I just -- I just wanted to the

3  extent that Mr. Esserman's clients took the position that the

4  diagnostic tests were not subject to production themselves, the

5  X-rays, I wanted to be clear, we did agree, we do agree upon

6  behalf of our clients to produce the underlying X-rays.

7          THE COURT:  Okay.

8          MR. ESSERMAN:  I -- and that is a distinction that

9  Mr. Kraus pointed out, but I think that Your Honor was clear

10  that those reports etcetera, are privileged.  Or are --

11          THE COURT:  Are not.

12          MR. ESSERMAN:  Our consulting -- they're consulting

13  experts, but in fact the diagnostic -- the basis of it has to

14  be produced.  That is the --

15          THE COURT:  The actual tests I think --

16          MR. ESSERMAN:  The tests.

17          THE COURT:  The tests and the -- and the -- if there

18  is a -- if there is a report, that is issued by what I'm going

19  to call a treating physician, somebody who examined the client

20  and issued a report, and took the test, I think those are

21  discoverable.  I don't know how else to say -- articulate this.

22          If it's something that happened you know, after the

23  fact, the law firm is getting ready for trial, hires somebody

24  for purposes of whatever you're going to use them for, and

25  doesn't use that expert, I agree.   That part of the opinion is

1  not discoverable, but the underlying tests clearly are, and

2  somebody who is acting as a diagnosing physician is clearly

3  discoverable whether sent to the -- whether the client was sent

4  there by the attorney or not.

5      MR. BERNICK:  Your Honor this is a process where I

6  think it's in the sense, Your Honor clearly is learning a lot I

7  the process of trying to issue rulings and it's very difficult,

8  but I think that what's a little bit unfair perhaps, the Court

9  is that folks are trying to frame the issue this way or that

10 way, because they know much more than Your Honor does, about

11 what it's potential impact might be.

12     And I don't think that that's really appropriate and

13 I'm going to try to in a sense, put out that --

14     THE COURT:  I am not at this point concerned with the

15 potential impact, I'm concerned with whether or not something

16 is discoverable, or not.  I mean it's going to have whatever

17 impact it has in terms of admissibility down the road.

18     MR. BERNICK:  I understand that, and that is

19 something that I think that we really in a sense, just like we

20 went through in connection with our settlement information, it

21 really ought to be the same thing.  That is we're talking about

22 discovery at this point.  But yet an X-ray that's taken, in

23 1999 so they go to -- they get the X-ray.  We've talked about

24 that.  And we're going to -- we hope get access to the X-ray.

25 But there is then a procedure, there are different procedures,

1  just like if you went and had a tissue sample taken.  Got the

2  sample, the hard stuff, you got the X-ray, that's -- a fancy

3  camera, but then have a medical procedure, that purports to

4  satisfy standards that are applicable to the medical

5  profession.

6          Medical procedure here is pathology, you have a path

7  report, where you've got a certified pathologist who looks at

8  the tissue sample, and sees cells of a certain kind, and says

9  so.

10         With respect to the X-rays there is of course would

11 be a medical procedure, it's called out in a standard, they ILO

12 standard, and it has to do with B-Reading.  And there are

13 certified B-Readers and they're only purpose in life insofar as

14 this is concerned, is to look at the X-ray and say do I see

15 opacities, do I see evidence of fibrosis, and there is a scale,

16 and it's all culled out in a procedure.

17         We then have a question of -- and the date of this

18 being offered here purports to follow these procedures.  And

19 the reason it's a Daubert issue is that we're raising the

20 question of whether these medical procedures in fact do comply

21 -- once they're actually being -- do comply with the standards.

22 That's the whole purpose here.  Is that it's a question of

23 whether the data has been reliably gathered in conformance with

24 standards or not.

25         Now, we then have the question of a consulting

1 expert, who may say, this is a good, bad, or indifferent case.

2 This clearly is discoverable, the X-rays and the tissue

3 samples.  Our position is that what purport to be medical tests

4 or medical procedures are themselves discoverable, completely

5 without regard to expert privileges of any kind, because they

6 purport to be routine diagnostic procedures, that you go

7 through, every time you go through a hospital. You don't sit

8 there and say, oh well gee, that's a path report, so that's a

9 question of interpretation etcetera, etcetera, etcetera.  You

10 go send the tissue out for a path report, it comes back this

11 cell, or this cell, or this cell.  This is the same kind of

12 thing.  This -- number of opacities that number of opacities,

13 or not.  That's what it purports to be.

14          Now, with respect to a consultant, if you had a

15 consultant who comes and takes a look at the path reports, or

16 comes to take a look at the B-Readings, it's only for purposes

17 of advising the law firm, never to -- never going to testify.

18 It's only for the purposes of advising the law firm takes a

19 look at all of these different procedures, and says I think

20 that this is a good case, or a bad case, we're not here to

21 argue about that.  We're arguing about is the underlying

22 reading that purports to be done in accordance with a very

23 specific medical procedure, and whether that is discoverable or

24 not.

25          Now, as a result what -- I'm going to be a couple of

1 minutes -- so -- if you just bear with me.

2          MR. KRAUS:  Your Honor, it might be helpful to

3 address that exact point before Mr. Bernick moves on.

4          MR. BERNICK:  No, Your Honor I --

5          MR. KRAUS:  I'd like to Your Honor, I think it might

6 be helpful.

7          THE COURT:  I have tried in the past to make sure

8 that one counsel speaks at a time, I'm going to let Mr. Bernick

9 finish, just take good notes, I'll hear you when he's done.

10 Mr. Bernick.

11          MR. KRAUS:  That would be fine Your Honor.

12          MR. BERNICK:  Okay.  Now, the threshold issue

13 therefore, is really whether the so-called consultant privilege

14 has the affect of cloaking and preventing discovery of data

15 that purports to be gathered in accordance with a standard

16 procedure. That's the question.  Can you say, well I'm only

17 going to show this read, and not that read, because I like this

18 read, just like I'm only going to show one path report, versus

19 another path report.  And if that were so, then the affect

20 would be that people would basically be able to shop around and

21 look for exactly the right path report, and say oh, this is a

22 standard path report, and that process would never come to

23 light.

24          That's not the purpose of the consulting standard.

25 This case is unique for a different reason.  Actually there are

1  three reasons.  First, in this particular case the statement

2  was made that consulting experts have to be people who where

3  there is and I think Mr. Esserman's words -- not anticipated to

4  be disclosed.  That's what his words were.  That's not this

5  case.

6        These are cases where there is anticipation of

7  disclosure, depending upon whether the result is good or bad.

8  That's not the rule. You can't say, well I'm going to send this

9  X-ray out to this B-reader, if it's good, then I anticipated

10  disclosing it.  But if it's bad, I didn't anticipate disclosing

11  it.

12        That cannot be the rule.

13        THE COURT:  Well that's what I was trying to say by

14  virtue of the analogy, I don't think just because you put a

15  title of consultant onto something, that that drives the

16  outcome of whether in fact there really is a consultant report.

17        MR. BERNICK:  So, these are people where if it's

18  good, it's - true that supports my claim that's okay.  If it's

19  bad, I don't anticipate testifying -- that cannot be the rule

20  that's not what a consultant is.

21        If that were, well I -- Your Honor is -- has

22  acknowledged that, so I don't need to go further, but that's

23  the first distinctive feature.  Is that the consultant's

24  privilege not only does not apply because what we're talking

25  about are the underlying reads, but these are cases where you

1 don't have people who are true consultants, every single one --

2 every single one of the screeners that we're talking about are

3 in fact, looking at these people in these vans, for purposes of

4 ultimately supporting a claim.  That's why they're there.

5          They're there because the lawyers are paying for the

6 vans, because they expect that coming out of this process will

7 be people who may have good claims.  The claims they want to

8 actually pursue. So when these folks go to the vans, it is

9 totally and completely with the anticipation that if it's good,

10 it will be disclosed and used.  And if it's bad, it will not be

11 disclosed and used.

12          So, we're not talking about some pristine situation

13 where each case by case you know, the case is being developed,

14 and I've got to go figure out who I really want to use, this is

15 a routine process, where it's -- it is a given that if it's

16 good, it's going to be disclosed.

17          That is point number two.  Point number three, is the

18 elephant in the room here, and that is that there is an

19 enormous problem that we have been able to demonstrate with

20 respect to how these B-reads are being done.  That is that they

21 are in fact being shopped and the people who are still

22 sponsoring the claims in this case, are the very people who

23 have been at the core of this controversy about B-reading.

24          Ray Harron is -- his B-reads are referred to over --

25 these are just where they're disclosed in the questionnaire

1 answer to say nothing of where the reads are actually in the

2 attachments, Ray Harron who took the Fifth Amendment, is

3 actually cited 1,465 times in questionnaires. He's at issue,

4 his procedures are at issue in this case. You have Jay Sigara,

5 another doctor who is part of the screening process, 1,267

6 times. So, when it comes to particular doctors, who are doing

7 these ILO's like Harron, like the other screeners, you can't

8 look about whether there was a -- whether they were put at

9 issue in just one claim, they are at issue in this bankruptcy

10 case as a whole, their integrity is at issue, their methodology

11 is at issue, and it's an issue precisely because folks are

12 still relying upon their reads, they're representing, they're

13 being in the questionnaires submitted as people who have done

14 proper ILO readings in a reliable fashion. They have integrity,

15 they followed procedures. That representation is being made to

16 Your Honor in this case thousands and thousands of times. And

17 yet we can't go back and show how those same people, there are

18 -- reach inconsistent results, or are other people contradict

19 them. The representation that's at issue in this case is the

20 reliability of the screening process. This thing that we

21 talked about here, this is at issue in this case, with respect

22 to tens of thousands of claims. The integrity of this process

23 is at issue in this case, and they're not coming in and telling

24 Your Honor we're going to -- the whole thing in a privilege?

25 And you can't find out the bad news, that says that these

things are being shopped, you can't find out what Mr. Kazen

himself has talked about because it's all cloaked in the

privilege?  That's ridiculous.  Screening is the heart of a

huge number -- tens of thousands of claims, a huge amount of

money is going to be sought on the basis of these non-malignant

claims.

So, we should be able to test whether these non-

malignant claims are being supported by B-reads that reflect a

racket, or whether they reflect by B-reads that are truly in

compliance with standards, we have to be able to test them, and

they can't sit there and put it at issue by relying on it, and

then turn around and say oh, well, you can't get it from the

lawyers, we won't let you.  We can't get it from the clients,

because there's this privilege, that cannot be the law.

So, this is a situation where it might be a little

closer if you were talking about a single case, where it's

being worked up for trial, and where you're talking about

ultimate conclusions with respect with an intersection, is safe

or not safe, but this is a case where you're talking about

thousands of claims, where the screening procedure itself is

directly at issue and is placed in issue hundreds of thousands

of times in the questionnaires, and now we can't show that it's

a fraud.  We can't show that it's a scam, we can't show that it

doesn't meet Daubert, because somehow this was all not

anticipated to be disclosed.  Maybe it wasn't anticipated to be

1  disclosed, but that doesn't mean that that becomes a basis for

2  a privilege.

3       And I'll close with one a single example, become very

4  concrete about how this works.  This is a PIQ, involves the

5  Kelley and Ferraro firm, attorney Thomas Wilson, and this is

6  PIQ31802, and it pertains to an individual with the social

7  security number that ends 8747.  And the diagnostic letter that

8  is submitted in support of this claim, is by a Dr. Shoenfeld,

9  and this reflects incidentally that this diagnostic letter --

10  this report, this B-read actually was processed through the

11  Russ System, see July 23, 1999, signed by Dr. Shoenfeld, and it

12  says here's what it is lateral X-ray, dated a few days earlier,

13  film is quality two, etcetera, etcetera, and basically just

14  reads like a path report.  Irregular interstitial infiltrates

15  we've seen in both mid and lower lung zones, having a shape and

16  size, etcetera, etcetera, no plural changes noted, impression

17  interstitial fibrosis consistent with pulmonary asbestosis in a

18  patient with an appropriate work history and latency.

19       Incidentally, these folks never actually see the

20  patient, somebody else comes in, they come in the trailer, the

21  X-ray gets taken, and the X-ray is then shuttled over just like

22  a tissue sample, so we're not talking about people who actually

23  see the patient, they've got far too many X-rays -- thousands

24  of X-rays to do, to actually see a patient.

25       You then have another one, that is done, March 9th,

1  2001, this is two years later, by the same individual, also

2  part of the PIQ.  Chest X-ray, PA chest X-ray dated 1999 was

3  read by me according to the 1980 ILO classification, these guys

4  purport to be telling the Court we're following the ILO

5  standard, when we do this reading, that's the representation

6  that's being made.  And showed an ILO score on 1 / 2

7  bilaterally with no plural changes.

8          On the basis of my history review, which is inclusive

9  of the significant exposure to asbestosis dust the physical

10 examination and chest read graph the diagnosis is established

11 with a reasonable degree of medical certainty.  So that's

12 what's in the PIQ.  What's not on the PIQ is another read that

13 was done in the year -- in between, year 2000, and the year

14 2000 there was a separate B-read that was done by Dr. Graziano,

15 and this is the B-read that is the B-read deal -- the B-read

16 chart that gets filled out, and what does Dr. Graziano say, Dr.

17 Graziano in the middle says "between 1999 and 2001" and we have

18 deposed Dr. Graziano, says "there were -- irregular and rounded

19 opacities, lungs were otherwise clear, etcetera, etcetera,

20 apart from minimum interstitial changes of  a 0 / 1 profusion,

21 insufficient to diagnose pneumonoconiosis, the chest X-ray was

22 normal with no evidence of asbestosis or asbestosis --

23 disease."  We didn't get this in the questionnaire.  We got

24 this by taking discovery of Dr. Graziano's firm, which was an

25 arduous and laborious process in putting two and two together,

1  and hand matching it on our own.  This is the problem.

2      The firm made a representation through the proof of

3  claim, that -- well gee Mr. Shoenfeld had it right, he applied

4  the ILO standard, this person has asbestosis, that's it.  Looks

5  clean, looks authoritative, creates the impression that it's a

6  done deal.  It's just important that in the middle year between

7  the two forms that they submitted, it was sent out to another

8  person to read, who said, it's not here.  Now, Mr. Graziano --

9  Dr. Graziano of course, he is not being disclosed -- that part

10 of Dr. Graziano was not disclosed anywhere, but then it turns

11 out that Dr. Dominick Graziano has been cited, in 888 other

12 questionnaires, where he came out with a positive read.

13     So, it bears out exactly 100 percent of what we've

14 been telling the Court, which is that they present the picture

15 that says, in each case where they find a positive, well we'll

16 tell you about those, they're all Kosher, they're all standard,

17 but when it's the negative, they don't want to tell you about

18 that, and the result is that what is purporting to be

19 authoritative according to standard, and completely consistent

20 is actually not in accordance with standard, it's not reliable,

21 it doesn't meet Daubert and it's wildly inconsistent, and yet

22 they're saying that they want the Court as a matter of law, to

23 find, that we can't work into what we all know to be the truth

24 and instead, it just -- forget about all that stuff, just pay

25 attention to what it is that we want to hear.

1          The bottom line, Your Honor, is exactly what you

2     said, when this questionnaire was originally approved.  Which

3     is that we should have all the B-reads, we should have all the

4     sterometry (sic) -- all the standardized procedures, just like

5     we should get all path slides, and if we don't get that what

6     we're really saying is that it's kind of okay to play this

7     little shell game, and it just cannot be right the shell game,

8     gets sanctioned in a case of this magnitude, the integrity of

9     all these doctors, who they're using selectively is the central

10    issue in a huge part of the -- part of what is alleged to be a

11    liability in this case.  And we'd have to be able to get it --

12    the data that enables us to determine whether in fact these

13    people have medical integrity or whether they don't.

14          THE COURT:  Mr. Kraus.

15          MR. KRAUS:  May I respond Your Honor.  Again, Peter

16    Kraus for the Waters and Kraus clients.  I want to leave aside

17    somewhat point three that Mr. Bernick made this -- this notion

18    about the bad silica docks and the alleged pervasive fraud, and

19    by way of background for the Court, I should tell the Court

20    that I was sitting with Mr. Kazen, in Congress in 2002.  When

21    he offered his testimony about abusive screenings, but Your

22    Honor it's important for the Court to understand the fact that

23    there -- that regardless of whether there may have been abuses

24    at some point in asbestos or silica litigation it does not

25    vitiate for all purposes the consulting expert privilege in

1 asbestos litigation.

2        Your Honor, Mr. Bernick quite frankly if I may

3 approach this chart, I think attempted to confuse the Court

4 about what is a procedure and what is a protected opinion.

5        Let me give the Court an example.  A real live

6 example, because the Court said I don't know how these clients

7 get here, but in my case, I represent primarily cancer victims.

8 Mesothelioma victims now almost exclusively but in the past

9 lung cancer, and before that asbestos patients, and I have all

10 three kinds of claims in this bankruptcy, but let's take the

11 example of a lung cancer claimant, who comes in to my office,

12 says they were a boiler maker, that they had a substantial

13 history of exposure to asbestos products, with an appropriate

14 latency from the exposure to the onset of their lung cancer.

15        They've had a lung removed, and they -- come in with

16 a chest X-ray that was given to them during the course of their

17 treatment for their lung cancer, and tell me that they

18 understand that asbestos may be implicated in causing their

19 lung cancer, and can I help them.  And I look at the X-ray and

20 it's several years old, and I say well we'll be happy to do

21 that, but I'd like you to go over to Mercy Hospital, I'd like

22 you to get a new X-ray, they have a very good radiology

23 department over there, and I'd like you to bring it back and we

24 will evaluate the evidence and see what it shows.

25        And he does that.  And I send off the X-ray from his

1  treatment, and I send off the X-ray that I've had him obtain to

2  two B-readers, two radiologists who've been NIOSH certified, by

3  the ILO criteria, as B-readers, and those B-readers look at the

4  chest X-ray, and they prepare a report -- somewhat like the

5  Graziano report that Mr. Bernick showed you from the Kelley and

6  Ferraro case.

7       And it may also include filling out this ILO form,

8  where he checks certain boxes, let -- the narrative report that

9  Mr. Bernick showed you and the form that Mr. Bernick showed you

10  are the opinions, Your Honor, the opinions of the B-readers,

11  about what that chest X-ray shows.

12       Now I absolutely agree with the Court that whether or

13  not I caused this client to be X-rayed, or whether that X-ray

14  was obtained in the course of his treatment, in both instances

15  that diagnostic procedure the X-ray, and the irreplaceable

16  evidence of that procedure the chest film, are clearly subject

17  to production, and I can't hide the X-ray that I've had him get

18  done, and the film that was generated behind the consulting

19  expert privilege.  However, Your Honor, if I caused either of

20  those films to be sent to any B-reader who bills out a form

21  like this, and gives me his opinions, the B-reading is not the

22  procedure as Mr. Bernick would have you believe Your Honor, the

23  B-reading on that form and the attached narrative is the B-

24  readers opinion.

25       Now, until I disclose that form and that opinion in

1  litigation, it is in all respects protected by the consulting

2  expert privilege.  It doesn't matter Your Honor, if I shared

3  the results of that B-read report, or form with my client.  It

4  is still protected by the consulting expert privilege unless I

5  take the affirmative step of either listing that witness as a

6  treating -- as a testifying expert in the case, or otherwise

7  disclose the results of his reads in violation of the

8  consulting expert privilege.

9          If I send it to two different experts Your Honor, and

10  one of them reads that those chest X-rays and says I see

11  evidence of underlying asbestos disease, and the other B-reader

12  says I don't see evidence of underlying asbestos disease, or my

13  read is inconclusive and later on Your Honor, in the course of

14  the litigation, I determine to use the expert who found a

15  positive association with asbestos as a testifying expert that

16  does not Your Honor, make the results of the expert who found

17  the results of the reading inconclusive or negative to be

18  discoverable, either in an underlying tort suit, or in a claims

19  estimation proceeding in the W R Grace bankruptcy, it simply

20  does not.  And it also does not make the negative or

21  inconclusive B-reading discoverable that there have been some

22  abuses or that there have been some doctors who have taken the

23  Fifth Amendment, in some other procedure, that simply does not

24  vitiate, for all purposes the consulting expert privilege.

25          Now, Your Honor, I would agree with the Court that it

1 may be a different deal if the expert lays on hands, and

2 conducts tests, that are unique but the opinions that an expert

3 that I have retained, to advise me and my client about the

4 medical condition and whether or not the medical facts and

5 evidence that have been generated in the case show or don't

6 show an association with asbestos in a given case, until those

7 have been disclosed Your Honor, that the expert privilege is

8 otherwise maintained.  It is not producible. Those forms in the

9 circumstance that I describe, Mr. Bernick showed you, are not

10 producible.

11         Quite simply Your Honor, that's the law and I believe

12 that's where the Court is going, and I think it's simply a

13 matter of educating the Court about the kind and nature of

14 evidence that Mr. Bernick is discussing here.  But I wanted to

15 be absolutely clear.  Thank you.

16         MR. BERNICK:  Sorry go ahead.

17         MR. ESSERMAN:  The major difference I have with Mr.

18 Kraus is Mr. Kraus has conceded that the underlying medical

19 testing when Mr. Kraus sent his clients to Mercy Hospital is

20 otherwise discoverable, and not covered by a consulting expert

21 privilege.  Otherwise he's articulated I think exactly what our

22 position is, and I'm not so sure that Mr. Bernick has

23 necessarily disagreed with the fact that the opinion of a

24 doctor, that the lawyer sends the client to, is somehow

25 rendered discoverable if not otherwise designated as a

1  testifying expert.  But there is a difference between what Mr.

2  Kraus did articulate and what we've articulated and I just

3  wanted to make sure that -- and what I think the Court's

4  articulated and -- although I disagree with the Court what I

5  think you said is that the underlying medical tests are in fact

6  discoverable, we disagree with that, we think the rules provide

7  otherwise, and we've briefed it.  And there may be more to say

8  on that, but I don't think there's any disagreement on the fact

9  of the reports.

10      THE COURT:  Okay, well I think with respect to the

11  underlying data, whether or not the consultant looked at that

12  data, it seems to me that you haven't hired the hospital that

13  took the data, or did the tests as a consultant for that

14  purpose, and to the extent that there is some consultant

15  privilege because you have to get the data in the first place,

16  I don't think it extends to that level.

17      I mean a person goes to a hospital or to a -- to

18  where ever a van, and gets an X-ray it seems to me that the

19  fact of that X-ray is still discoverable, as is the film

20  itself, discoverable.  The spin that the consulting expert puts

21  on that, may very well be not subject to discovery to the

22  extent that it's done in consultation with a law firm,

23  particularly in preparation for trial by a non-testifying

24  expert.  But I can't see how the underlying data is in any way

25  subject to any privilege by a consultant, by an

1 attorney/client, or otherwise, when the basis for the personal

2 injury claimant coming forward is the fact that they allege

3 that they have an injury.  So, to the extent that they have had

4 tests taken to prove that injury I think those tests are

5 discloseable.

6         MR. BERNICK:  Your Honor, I hesitate to rise but

7 that last articulation coming on the heels of what Mr. Esserman

8 just said, will be construed by Mr. Esserman, and I believe by

9 everybody else sitting on that side of the room, to mean that

10 all we get are the X-rays themselves, or the tissue samples

11 themselves, we don't get the conflicting ILO reads.

12         THE COURT:  Well I have to think about that, I'm not

13 sure if you get the conflicting ILO reads.

14         MR. BERNICK:  Oh, well that -- but that is the whole

15 -- that's the whole shooting match.

16         THE COURT:  Well, it may be, except for this fact, I

17 mean you've now examined the B-readers who have taken the Fifth

18 Amendment, I mean surely if they're taking the Fifth Amendment

19 with respect to their procedures and their outcome, there is

20 going to be some negative inference that will be against the

21 entity who produces the doctor that the debtor can take

22 advantage of.  This is a civil case.  This is not a criminal

23 trial.  So.

24         MR. BERNICK:  That -- frankly Your Honor we're not

25 here just to talk about where Dr. Harron took the film.

1          THE COURT:  No.

2          MR. BERNICK:  We're here to say that the screening

3   process is an unreliable process that doesn't meet the ILO

4   standards.

5          THE COURT:  But you need to show that as to each

6   individual entity within that process.

7          MR. BERNICK:  Well then -- we may as well --

8          THE COURT:  Don't you?

9          MR. BERNICK:  I tell you candidly Your Honor, we may

10  as well not proceed.  Because the -- no -- the burden on the

11  debtor of having to show on an individualized basis, each and

12  every read we have to know where the inconsistencies are.

13          The question is very simple Your Honor.  Do I get to

14  find only exhibit 18 which is what they chose to submit as the

15  right B-reading or do I have with respect to exactly the same

16  patient, the ability to show the B-read by one of their other

17  favorite doctors, that said, negative, and in the case where

18  they comport to say that both B-readings, both B-readers are

19  accurate, reliable doctor -- Dr. Graziano didn't take the Fifth

20  Amendment, all I want to know is I want to be able to establish

21  the inconsistency of the B-reads to be able to say that this is

22  a procedure that with respect to at least this client, produced

23  inconsistent results, with the result that you do not have, a

24  repeatable, reproducible set of data, which is what Daubert

25  requires.

1          What they have succeeded in doing today Your Honor,

2  is -- that Mr. Kraus can sit next to Mr. Kazen in Congress and

3  say, yes it's all true, these people are not really sick, it's

4  all true they're not really sick, and yet standing up on behalf

5  of his clients, who may or may not use these screening

6  processes argues to the Court a principle that says that the

7  whole gambit of abuse here which we have now begun to uncover

8  is going to be cloaked at a privilege.

9          THE COURT:  Well.  I think I'm not understanding your

10 point, are you attempting to show that the entire standards, an

11 ILO standard and the ILO standards are unreliable.  Because

12 they can't -- they're not capable of repetition?

13         MR. BERNICK:  No.  What I --

14         THE COURT:  Well then what I think --

15         MR. BERNICK:  I'm not saying that.

16         THE COURT:  Then what you're saying is, that

17 particular doctors within that process.

18         MR. BERNICK:  No I'm not saying that either.

19         THE COURT:  Well -- okay then, what is it?

20         MR. BERNICK:  It's very -- again it's very simple --

21 relatively simple.  We have a patient, we have claimant one.

22 Maybe the individual 8747 last four social security numbers,

23 that person has an X-ray.  What we want to be able to show, and

24 again this is discovery, is a couple of things.  We have doctor

25 one and doctor two.  One says negative, the other says

1 positive.  Both doctors are doctors where the anticipation was

2 if positive, we disclose, if negative we don't disclose.

3        Both of them, so there is the anticipation of

4 disclosure if the result turns out to be right.  Under those

5 circumstances you can't have a consulting expert, they just

6 don't meet the standard period.

7        THE COURT:  Well, I tend to agree with that

8 formulation, I don't know whether it implies here, but I agree

9 with that standard.

10        MR. BERNICK:  Oh, oh, okay, that's fine.  We then

11 have -- we then have -- that's the point one. Which is what was

12 the anticipation.

13        We get the X-ray but then these -- both of these

14 individuals purport to show the -- A.  That the ILO -- the ILO

15 reading was done in accordance with standards.  That is

16 everything is hunky dory, the guy who is positive this is an

17 authoritative reliable deal.

18        THE COURT:  But they both may have been done by

19 standards, but -- because there is a subjective --

20        MR. BERNICK:  They could have -- they --

21        THE COURT:  -- spin to it, one person sees it a

22 result that's different from another.

23        MR. BERNICK:  Well, that is the third point.  Second

24 point, I'm not there yet.  First point is anticipation, and

25 it's anticipated to be disclosed. Second point is are they --

1 are they the kind of doctors who are following procedures that
2 are reasonably defined -- that can be said to comply with the
3 standards.  This is the -- what I'll call the bad doctor
4 problem.

5         Okay.  That's problem number -- that's problem B.  We
6 have the bad doctor problem here, in spades, and we -- only
7 know, only part of what the bad doctors have done.  We don't
8 know all of what the bad doctors have done because we still are
9 looking through the questionnaires and seeing what there in
10 fact is.

11         But nothing that Mr. Kraus can do can help with the
12 doctors as to who followed these procedures.  In other words
13 when we have vans that are run by lawyers and are paying people
14 more money for a positive diagnosis we believe it's important
15 to be able to conduct a discovery to show, who those doctors
16 are.

17         THE COURT:  You can do that.

18         MR. BERNICK:  Okay, well that's what we're doing
19 here.

20         THE COURT:  Well, that's -- but you don't need to
21 look at inconsistent B-reads for that purpose.  I mean the ILO
22 reports are not going to tell you whether or not a doctor
23 actually used the appropriate standard.  They may make a
24 representation that the standard was used but in all
25 probability it's not going to say something like, I haven't

1  looked at the -- at the patient, I haven't examined the

2  patient, I haven't considered whether there was other evidence

3  of asbestos, I haven't done this, they're not going to give you

4  the information that you're attempting to seek.

5       MR. BERNICK:  I don't want to spend too much time on

6  that, but the problem is Your Honor, is that one of the ways

7  that we can show the nature of the relationship between the

8  doctors and these different law firms, is to show how these law

9  firms on the basis of what's turned in on the questionnaires,

10 we hope that will be enforced here.  That these doctors were

11 incredibly active on behalf of -- they're literally doing tens

12 of thousands of reads for these firms.  So it definitely bears

13 on the nature of their interest in this controversy.

14      But --

15      THE COURT:  But Mr. Bernick if a particular firm

16 submits again, this is hypothetical, a thousand claims, and 500

17 of the B-reads that back up those claims came from one doctor

18 you already know there is a relationship between the doctor and

19 the firm.

20      MR. BERNICK:  We don't -- we don't -- Your Honor

21 you're making an assumption that this is not -- this is not

22 factually accurate.  All that we know now is what they've

23 chosen to show us on the questionnaires.  What those chose to

24 show us on the questionnaires, they reflected with respect to

25 for example, to some of the Manville precluded doctors, they're

1 only involved in one or two or three of the claimants.

2        And may be involved in a small number of cases that

3 are reviewed by a given firm.  The truth of the matter is,

4 those same doctors who are relied on for some purposes, have

5 relationships that extend to tens of thousands of B-reads

6 actually that are discoverable in connection with this case

7 because they relate to -- claimants.

8        Our ability to show that the doctors have -- these

9 doctors have substantial relationships with this firm, these

10 firms, and make up -- are getting the data, right now we can

11 only get the data when people don't take the Fifth or when they

12 turn over the documents in response to subpoenas that's a very

13 limited population of information that we're able to get.

14        That's -- the bad doctor problem is only one of the

15 problems. You're shaking your head.  If we've got a doctor who

16 is involved on a multi-million dollar basis, with these law

17 firms, and those doctors are turning in B-reads that are being

18 relied on for purposes of these questionnaires, we want to know

19 what the full scope of the -- their relationship is with those

20 law firms, we have to the limited ability to get access to that

21 information, because the doctors aren't cooperating with us.

22 You told us to go to the doctors, we've gone to the doctors.

23 The doctors are not cooperating in this exercise.

24        One of our other ways of getting data, and evidence

25 is through the questionnaire process where we make the

1 claimants and their law firms disclose the nature of how many

2 different B-reads that they've done with these doctors, so we

3 can tell Your Honor forget about the claims that these people

4 have sponsored, or supported historically, they're totally in

5 it up to their eyeballs with these very firms in connection

6 with this very case.

7           Of course, it's all relates to the nature of the

8 relationship between the doctor and the law firm.  Let me get

9 to point three.

10          THE COURT:  I'm not following point two.  If you have

11 Dr. Harron I'll just pick a name.  Okay.  Dr. Harron is Doctor

12 one, on your chart.  Okay.  So, he's given a negative read.

13          MR. BERNICK:  Okay.

14          THE COURT:  Which you never find out about.

15          MR. BERNICK:  Right.

16          THE COURT:  Okay, now Dr. -- just make up a name, Dr.

17 Fred.

18          MR. BERNICK:  Right.

19          THE COURT:  Is doctor two.

20          MR. BERNICK:  Right.

21          THE COURT:  And he's given a positive read, so you

22 find out about Dr. Fred in the case.

23          MR. BERNICK:  Right.

24          THE COURT:  Okay.  What difference does it make that

25 Dr. Harron who gave a negative and is one of the suspect

1  doctors, gave a negative?

2          MR. BERNICK:  Okay.  Dr. Harron has given 1856

3  positive readings that are actually disclosed in questionnaires

4  that have been submitted in support of the proofs of claim.

5          THE COURT:  Yes.

6          MR. BERNICK:  So, Dr. Harron and that's just the ones

7  that were actually described in the questionnaire.  Dr. Harron

8  for the intensity of his work is directly at issue in this

9  case.

10          That's point number one.  Point number two, the fact

11  that even just deliver the positive but didn't deliver the

12  negatives, and was only used for the positives bears upon the

13  credibility of the plaintiffs proffering any testimony from Dr.

14  Harron at all, because what they gave you is what suited their

15  purposes and it's not representative of what's taking place

16  with respect to the case as a whole.

17          THE COURT:  But you're not trying each individual

18  proof of claim.

19          MR. BERNICK:  We're not trying each individual, we

20  want to be able to show that Dr. Harron, they proposed positive

21  results for Dr. Harron, we want to be able to show that that is

22  a bias piece of data, that --

23          THE COURT:  So you're looking for impeachment

24  evidence with respect to doctors?  And the way you want to get

25  the impeachment evidence with respect to doctors is to show

1 that they have some different --

2       MR. BERNICK:  Show two things.  Show two things.  To

3 show they have strong financial ties to the plaintiff -- which

4 we can't get from them, because they take the Fifth or they're

5 unavailable, and we can't get from the law firm because the law

6 firms won't tell us about it.  So our only way of doing it is

7 to be able to show that they've got 5,000 other reads in

8 connection with this case, that albeit negative, gave them a

9 bunch of money and gave them a bunch of money from these very

10 plaintiffs firm.  The plaintiffs firms are sponsoring these

11 people to the tune of hundreds of thousands of dollars, doesn't

12 that seem to bear upon the question of whether it's independent

13 and whether it's reliable or whether it's junk and it's not

14 reliable.

15       We have to prove -- our part of the case is to prove

16 up that the screening process was biased, was biased only and

17 produced only positive results, that the positive results that

18 are here in Court are a biased selection of positive results.

19 That the whole system is gained to produce only the positive

20 results and not the negative results in Court?  And we can't

21 get access to the negative results?

22       The whole point is that there is a representation

23 being made -- that what they're doing has got integrity.  That

24 they're giving you reliable reads in an independent and

25 unbiased fashion.  And that that is exactly the opposite, it is

1  all writ, it is paid financed, it is blocked data.  We can't

2  prove that, without having the other side of the equation which

3  is all the money they get from negative reads, and the fact

4  that we're not seeing the negative reads in Court.

5       I can't imagine a clearer situation in which what --

6  the full nature of what it is that the doctor finds, both

7  positive and negative bears upon the integrity of the

8  representation that's being made about the positive results.

9  The positive results are being picked by lawyers who hired

10 their favorite doctors, to go read and read and read until they

11 get positive results, it's like -- if you were -- trying this

12 case to a jury, and you say oh, I'm Dr. Harron, I've got 1856

13 different results and boy they are in accordance with the ILO

14 classification process, and they're great, and then at cross

15 examination I'd say, well I don't really have any questions.

16 All I've got access to -- Dr. Harron, were you paid by the

17 plaintiff's firm in connection with these yes?  Yes, I was.

18      Were you -- was this a positive result, are you --

19 believe that's true?  Absolutely.  Yes, it was.

20      Well, who determined whether to use this result or

21 another result?  I don't know.  All I know is that this is a

22 positive result.

23      The jury would never get the picture of the depth of

24 the financial relationship between the guy on the stand and the

25 law firm that's prosecuting the case, which is directly

1 relevant to his integrity and whether he's biased and the jury

2 would get a false picture about how reliable is data is that's

3 being presented, because it's counter balanced by all kinds of

4 negative reads that have never seen the light of day and we've

5 never even seen them.  So, proposition one is anticipation.

6         Proposition two is that we are being foreclosed in

7 discovery from being able to uncover the element of bias that's

8 produced financially.  And the element of bias that's produced

9 because only part of the data is being furnished, to the Court.

10         Dr. Harron's integrity and his independence as a

11 proffered expert in support of 1856 claims, is directly at

12 issue because the -- those positive claims are hand picked.

13 There's a whole world of negative reads, by the same doctor and

14 he's in there without any ability to cross examine, say oh yeah

15 I stand by those.  Well weren't there a lot of negative reads?

16 Well sure there were some.  Well how many?  And were they

17 consistent or inconsistent with other doctors?  Well this then

18 brings me to proposition C.  And proposition C is not unique to

19 this case, but the facts are unique. On something like this.

20         If you had a test that you wanted to be able to say

21 was a reliable test, and say I want to know whether this

22 chemical, I want to know whether this chemical is present in a

23 solution, so I have a witness papered, and -- paper when I

24 stick them in the solution it turns color, I know it's got a

25 certain Ph or a certain chemical.  What if you had a piece of -

1  - paper that where if you stuck it in the solution would read

2  out that there was a chemical there half the time, and the

3  other half the time it wouldn't tell you if there was a

4  chemical there.

5          In other words it is an unreliable measure of whether

6  the condition even exists.  You would say, well gee that's

7  probably not a piece of litness paper, that's going to satisfy

8  scientific standards for telling me something about whether

9  the chemical is there.  As often as not it's wrong.

10         It would be pretty clear, and Daubert picks up these

11  requirements by asking for reliability and reproducibility of

12  results.  If it's not reliable, and it's not reproducible, it

13  doesn't work, it doesn't come in.

14         In fact the ILO standards themselves require multiple

15  B-reads in order to insure reliability.  So when these doctors

16  as they have done, represent them in their reports, is XYZ

17  according to the ILO -- that's not just well kind of my

18  judgment is this or that, they are saying that the standard has

19  been met.

20         In fact the standard has not been met.  There haven't

21  been multiple independent B-reads, we need to be able to show

22  that.  The ILO standard cannot be met where you have

23  inconsistent results.  So then we're back to our little diagram

24  here, the fact of there being inconsistency in looking at this

25  single X-ray in looking at that X-ray the fact that there being

1  inconsistency positive and negative, speaks to whether there is

2  compliance with the ILO standard, speaks to whether the result

3  is reproducible, or not.  Speaks to whether this meets Daubert

4  or not.

5          If for example, claimant 8747 sees six doctors, and

6  they all purport to do B-reads of a single X-ray, all we get is

7  the X-ray.  We got five that say yes, and one that -- one that

8  says yes and five that says no.  Or two and four, or three and

9  three.  The fact of there being variability among the reads as

10 to this particular claimant, is absolutely of the essence in

11 determining whether the one positive read that's being

12 proffered is one that is based upon a reliable reproducible

13 methodology.  So even if you forgot all about the financial

14 incentives, you're shaking your head.

15         THE COURT:  Yes, I'm shaking my head as to that one,

16 because it seems to me that if the ILO standard set out a

17 process by which the X-ray is taken and the read is made, the

18 fact that somebody may differ in opinion as to whether or not -

19 - you know the B-read is zero one, or a one two or whatever

20 it's going to come out.  Is the -- is not evidence necessarily

21 that the -- that the B-read the test is not reproducible.  It

22 just means that the subject of opinion of the person who is

23 doing the read differs from person to person, and the test

24 itself is still --

25         MR. BERNICK:  No, no, no, that's --

1          THE COURT:  -- reproducible.

2          MR. BERNICK:  That's the whole point of this doing

3 this in the aggregate, that I think is respectfully I would say

4 I think it's wrong.  That is to say there are procedures like

5 the ILO, if they're done the right way, they should lead to

6 reproducible results.

7          THE COURT:  Sure.

8          MR. BERNICK:  If they don't lead to reproducible

9 results, then they can't really be used in the Court of law to

10 begin with.  So you should have reproducible results, that's

11 the hallmark benchmark of Daubert is reproducible results.

12          THE COURT:  Well, I agree, but what Daubert also

13 says, is that it's not the opinion that has to be reliable,

14 it's the test, the methodology has to be reliable.

15          MR. BERNICK:  That's what we're testing out here, is

16 the --

17          THE COURT:  But the ILO is --

18          MR. BERNICK:  We're saying that with respect to

19 certain groups of claimants, i.e. people that are low enough on

20 the ILO -- we're not talking about people with two two, or even

21 one two or one ones, we're talking about people with one zeros

22 that when you get down to a group of patients, i.e. the group

23 of patients that Mr. Kazen talked about, who aren't sick, and

24 they go through this screen deals, they come in, and they come

25 out with highly variable results, what does that tell you?

1    It tells you that the process Your Honor, whoever is

2  involved, whatever they're doing, the process that's being

3  followed in connection with these screens, does not lead to

4  reliable reproducible results.  If for example, I have this

5  expert on the stand, and he's got a B-read and he says it's

6  positive, and he happens to know that there are seven other

7  people who read it, and they came out with negatives, that

8  wouldn't bear upon whether his results are reliable and

9  reproducible?

10    Certainly would. What we have here is a whole group

11  of people that we believe will be the subject of highly

12  conflicting results, when we get the negative results.

13    But we don't even have access to it for discovery, so

14  we can't even test out whether this is reliable, based upon

15  what we know now, we think that there is a lot of conflict, we

16  see evidence of it in a claims that we've been able to find.

17    But we won't be able to demonstrate in the aggregate

18  that when these come with this whole group of non-malignant

19  claims that went through the screening process, we will show

20  that the screening process leads to highly variable results,

21  positives and negatives.  Wide degree of variability, and that

22  is precisely why the ILO standard, when you get down to these

23  very, very minimal reported findings, is highly variable.

24    There is literature out there, that addresses the

25  same basic issue, so when you get to proposition three, which

1 is whether for Daubert purposes it's a reliable procedure

2 that's being proffered up in connection with these claims.

3 　　　　The unquestionable should be entitled to get

4 discovery regarding reliability and reproducibility.  That's

5 exactly why Judge Jack ordered it in the <u>Silica</u> case, which is

6 in the tort system, that there would be access to all of the

7 different reads positive and negative, whereas what we

8 presented to Your Honor is simply the positive side saying, oh

9 well this is an opinion by an expert who is prepared to --

10 summary judgment -- you know what, the answer to that is no.

11 It wouldn't satisfy summary judgment because if they can't

12 clear Daubert for their expert, and they can't clear Daubert

13 for their data, you don't get summary judgment -- they don't

14 clear summary judgment, they don't go anywhere.

15 　　　　THE COURT:  All right, I understand what you're

16 saying, I need to think about this one.

17 　　　　MR. WILSON:  Good afternoon Your Honor, for the

18 record, Thomas Wilson, Kelley and Ferraro, everybody's been

19 talking about my submissions and the X-rays and I thought

20 perhaps it would be a good idea for me to say something.  Mr.

21 Bernick has actually proven the problem, and all of the smoking

22 mirrors about --

23 　　　　THE COURT:  You need to use a microphone sir, I'm

24 sorry.

25 　　　　MR. WILSON:  I'm sorry.

1              THE COURT:  You can get it from Mr. Bernick.

2              MR. WILSON:  All of the smoking mirrors that we put -

3  - that was put up on the chart over there, involving the first

4  doctor one, the second doctor two, and then was somehow

5  buttressed by exhibit 16, and Dr. Graziano's B-read.  They

6  don't even relate.  And I have to tell you the reason why,

7  because the Court was correct early on -- in this particular

8  case we have Dr. Shoenfeld reading in 1999 this was this

9  exhibit 16, reading an X-ray and he's coming up with a positive

10 reading.  He says, I have a claim.  We've taken that claim and

11 then he went back and did a physical to buttress what he did

12 originally, and gets all the rest of the information and we

13 used that information -- we don't have people looking -- it's

14 not somebody looking at a different X-ray, Dr. Shoenfeld looked

15 -- goes back based upon his own X-ray, and produces a report.

16             In the meantime, Dr. Graziano we say to him Mr.

17 Consulting Expert, look at this for me, tell me what you think.

18 You tell me.  He comes back and he says something.  He doesn't

19 agree with Dr. Shoenfeld.  In the B-reading world that's

20 exactly what happens, and as a matter of fact every -- I

21 shouldn't say that.  Every defendant comes back with a negative

22 reading.  That's how this -- that's how it works.  But what

23 happens is this, I don't have someone who had a negative

24 reading and then I shopped it around, as Grace seems to think.

25 To show that I have a positive reading, and then only give them

1  the positive one.

2          I have the positive reading, that's the basis for my

3  claim.  I file the cause of action.  That's the basis for my

4  claim.  Then I have my own person, somebody else, who goes out

5  there and takes a look at it.  And you know what?  I didn't

6  give him my consulting expert report, because Rule 26 says I

7  don't have to.

8          He's the one I asked to do after I already have the

9  claim.  He's gone out now, and he's violated my privilege.

10 He's gone out and gotten information without telling me -- from

11 a doctor because the doctor gave it to him for whatever reason,

12 I don't know -- and he's using that information -- now he is

13 using my consulting doctor's diagnosis.  And it just so happens

14 to be different.

15         That's okay.  There's nothing wrong with a different

16 -- if there is a credibility issue, that's fine. But he doesn't

17 have the right to get that, and this isn't the opposite case

18 where Dr. Graziano said, okay it's a zero, and Dr. Shoenfeld

19 said it's a one.  It's just the opposite.

20         THE COURT:  Okay, I --

21         MR. WILSON:  And there are also -- just so -- there

22 are also probable separate X-rays.  People read different X-

23 rays.  I guess the point is this, if all of the consulting --

24 if I have a consulting expert, which is this is the case, why

25 is he entitled to get it, when Rule 26 says no?

1          THE COURT:  Well I agree that Rule 26 does not permit

2     the advice given by the consultant to the law firm for the

3     purpose of litigation, preparing a case, whatever.  Provided

4     that the expert isn't going to testify, I don't agree that Rule

5     26 prohibits the underlying data that is in this case, for

6     example the fact of an X-ray and the X-ray itself from being

7     produced.  I think that is producible.  And I need to figure

8     out, I guess, what the standard is, with respect to where you

9     draw the line, between consulting and non-consulting.  And I

10    think that's the problem that I'm having.  It's the line

11    drawing aspect of this.

12          I think that too easy from my point of view, I know

13    Mr. Esserman and some others disagree, but from my point of

14    view, it's an easy answer to say that the data have to be

15    given.  I.e. the X-ray, the ILO test, whatever it is that is

16    the physical test has to be produced.  It's also easy to say

17    that the consultant's report that deals only with the lawyer

18    for purposes of providing a lawyer with advice, concerning a

19    case, a group of cases, whatever is not producible.

20          The tough part comes in the middle, where it appears

21    that some of the consulting experts did more than just consult,

22    and that is that they actually did something to -- with the

23    tort plaintiff himself, herself, as opposed to just taking a

24    look at data for the law firm to prepare a case.  You know

25    where the -- the underlying data was produced by that so-called

1 consulting expert, I think that's different from retaining

2 somebody to take a look at the data, and give an opinion about

3 it.

4           And I don't -- I'm not sure exactly how to articulate

5 this problem but I see a distinction.

6           So I'll have to think about this one.

7           MR. BERNICK:  The thing here is the problem is we're

8 not talking about different people.  We're talking about the

9 same people, Dr. Graziano is on the stand, he has got 880

10 questionnaires that specifically mention him by name.

11           THE COURT:  Well I know Mr. Bernick, but there could

12 be a whole lot of reasons for it.  Just again, hypothetically,

13 Dr. Graziano might you know, have his principal place of

14 business in Tyler, Texas, and maybe that's where the debtor's

15 principal place of business is, and so hypothetically, and as a

16 result a lot of people go to Dr. Graziano, because he happens

17 to be available in  a locale in which they live.

18           MR. BERNICK:  I don't -- I'm not disputing that.

19           THE COURT:  Okay.

20           MR. BERNICK:  I think that's fine, whatever reasons

21 he's there, he's there. But he's there.  He's not a guy who is

22 undisclosed.

23           THE COURT:  I know but the -- fact that he has 800

24 reports -- is mentioned in 800 proofs of claim doesn't mean

25 that because of that fact that he is suspect as a --

180

1  diagnostician.

2        MR. BERNICK:  Well first of all, that is an issue

3  that should be developed on the record through discovery, you

4  know it's amazing at the beginning --

5        THE COURT:  Well it may be yes.

6        MR. BERNICK:  -- at the beginning of the day, I

7  started out by saying you know, we're prepared to allow

8  something to go forward in discovery, and then worry later

9  about its admissibility at trial.  And now all of a sudden,

10  it's -- we can't even get access to the information -- at the

11  beginning of the day we need this for our case, we need -- we

12  need -- we  need.  And Your Honor said yes, okay, you need, you

13  need, you need.

14        And now we --

15        THE COURT:  You do need the underlying data.  And you

16  will have your own --

17        MR. BERNICK:  NO, no the underlying data --

18        THE COURT:  You will have your own experts, if they

19  can't replicate --

20        MR. BERNICK:  No, a couple --

21        THE COURT:  -- the report you'll have your Daubert

22  issue.

23        MR. BERNICK:  No, that is not the same.  That's not

24  the same thing, anybody we hire they'll say is not independent,

25  he's your own expert.  When I have got --

1          THE COURT:  That's the same thing you're saying about

2 them?

3          MR. BERNICK:  No.  What I'm saying no is that their

4 own experts disagree with one another.  That's the whole point.

5          THE COURT:  I'll think about it Mr. Bernick.  We

6 might as well move on.

7          MR. BERNICK:  I'm not --

8          THE COURT:  I need -- I understand the point, I

9 understand their point, I need to think about this one, so we

10 might as well move on, but I think we should take a lunch

11 recess, and let my staff have a little break first.

12          MR. BERNICK:  I thank you.

13          THE COURT:  Half an hour long enough folks?  Okay.

14 We'll recess for half an hour.

15                    (Luncheon recess)

16          THE COURT:  Please be seated.  Mr. Wilson.

17          MR. WILSON:  Your Honor, over the lunch break I've

18 been racking my brain on something and I'm wondering if perhaps

19 the Court might help me clarify a point.  We were talking about

20 exhibit 16 and 17 prior to the break, I'm wondering if Mr.

21 Bernick might be able to help me and do you have a unredacted

22 version of exhibit 17?

23          MR. BERNICK:  I don't have any unredacted version of

24 anything other than what I showed the Court today.

25          MR. WILSON:  Which is the problem Your Honor, because

1  what I've been able to ascertain over the lunch break, and I

2  wasn't able to do it in the short period of time before, is

3  exhibit 16 and exhibit 17, they're different people.  They

4  happen to have the same last four social security numbers.  But

5  they're different people.  Which causes me a big issue in

6  regard to this whole issue regarding the questionnaires,

7  because if -- this very limited purpose they are showing us,

8  and accusing me of fraud, that's what they basically have done,

9  and it comes up where I have two individuals both happen to be

10 my client, this document exhibit 17, I've never seen, I don't

11 have it in my file, don't know anything about it, I don't know

12 where it came from.

13         But, it certainly doesn't match the questionnaire and

14 the individual on exhibit 16.  Unless somehow I -- I'm wrong,

15 but when someone accuses me of fraud, I guess that makes me a

16 little unhappy when you know, in 30 minutes of a questioning I

17 can come up with I believe, they're just different people.

18         THE COURT:  Well I don't think you were being accused

19 of fraud, I think the issue was whether or not all of the

20 information was being produced, and you know, to the extent

21 that your argument earlier was that you had retained Mr. -- Dr.

22 Graziano as a consulting expert, you know from your point of

23 view, that's I think reason not to have disclosed the

24 information any way.

25         So I don't think it's an issue of fraud, let's get

1 past that.

2        MR. WILSON:  Well I just need -- though so the Court

3 though will need to know that the questionnaire issue when it

4 comes down later on, has this type of error built into it.

5        THE COURT:  Yes, well maybe because of the fact that

6 there are four social -- only four social security -- last

7 digits being used.  You know there will be a duplication as a

8 result of that fact.  And so somewhere or other I guess the

9 debtor is going to have to take a look for those issues down

10 the road.  But we're not there yet.  I think it's still in the

11 process of discovery.

12        MR. WILSON:  I just needed the record to be clear,

13 thank you Your Honor for --

14        THE COURT:  All right.

15        MR. BERNICK:  I don't know that the record is clear,

16 representations now been made that they are in fact two

17 different individuals, I don't know if they are or not.  We'll

18 certainly check up on it, but it's all the more reason why we

19 wanted to gather this information -- basis the law firms are in

20 a much better position to enable us to determine which of these

21 claims, what is meant, the screening process has produced

22 variable results.

23        THE COURT:  Okay, I'm done with that argument, so Mr.

24 Esserman is there anything you want to put on the record.  I've

25 heard all I want.

1          MR. ESSERMAN:  Nothing -- nothing about this Your

2  Honor.

3          THE COURT:  On that one.

4          MR. ESSERMAN:  The only thing I wanted to say before

5  we moved on to the next topic, was that -- both Grace's

6  attorneys and our firm have briefed the issues that we were

7  discussing with the Court on consulting experts, rather

8  extensively and it may be something that you might consider, if

9  you desire to revisit those briefs in light of the discussion.

10          THE COURT: Yes, I will.  I -- I have gotten through

11  but that's what I've gotten, this matter.

12          MR. ESSERMAN:  Well, there's been so much --

13          THE COURT:  I have not been able to concentrate

14  specifically on a lot of it, so.

15          MR. ESSERMAN:  And there's been so much paper filed

16  that it's -- it would be very difficult to really focus on this

17  particular issue before the argument.

18          THE COURT:  Okay, in any event, my preliminary, well

19  no.  My rulings with respect to what I can determine without

20  the need to go back into those briefs is, the underlying

21  medical data are to be disclosed.  And to the extent that the

22  consulting expert is really a consulting expert for the law

23  firm, without anything to do with the client itself, himself,

24  herself, then that is not discoverable.  So if --

25  hypothetically, just so I can try to make this clear.  If the

1  law firm had 500 clients was going to trial, and hired an

2  absolute independent doctor who had no connection with the

3  plaintiffs whatsoever to review evidence for purposes of

4  helping and assisting with trial strategy.  That report would

5  not be discoverable.  So the distinctions I'm making right now

6  are simply reports that are purely and only for the purpose of

7  consultation without any connection to the underlying medical

8  data, except to review it, to give a report, and the medical da

9  ta itself, the medical data is to be disclosed, those high

10  level reports are not.

11         The issue that I am still troubled by, is what

12  happens if the alleged consulting expert is in fact someone who

13  did either did the test or did the initial review.  My

14  inclination is to think that Mr. Bernick's analysis of that is

15  correct, that that is not really consulting expert, it's almost

16  more like a factual investigation to determine whether there is

17  or isn't a claim at the outset.  And therefore is not really

18  for purposes of consultation, was never intended to be for

19  purposes of consultation but that's the issue that I'm

20  reserving.

21         I need to do some investigation still with respect to

22  that.  So.  Anybody have any better way to say this, than -- or

23  -- any concerns.

24         MR. BERNICK:  I think that Your Honor has heard a lot

25  of argument, and -- and whatever else would assist the Court in

1 coming to grips with these facts.

2          THE COURT:  I just need to read --

3          MR. BERNICK:  Would be helpful, but it -- you know,

4 it's just again the problem is that everybody here knows an

5 awful lot more about the details than the Court does.

6          THE COURT:  And always will.

7          MR. BERNICK:  And always will.  At the same time, and

8 so I would simply agree with Mr. Esserman that the most

9 important thing is for Your Honor to -- to reflect on it.  I

10 would say though, that there are rather than trying to frame

11 today what's definitely discoverable and what's definitely not

12 discoverable, I think that we probably -- more confusion than

13 would be worthwhile.  In the sense that the underlying data X-

14 rays, Your Honor already has determined are discoverable.  If

15 there is underlying spherometry tests I would assume that there

16 is no disagreement that they should be produced.

17          THE COURT:  They should be produced.

18          MR. BERNICK:  But to the extent that we get into --

19 on the other side of the equation people are retained solely by

20 the law firm, to review what somebody else has done with

21 respect to a case that's going to trial, kind of understand

22 what that is.  But I'm not sure that there's an awful lot

23 that's advanced by articulating that with greater precision

24 today, because I think that when Your Honor ultimately rules,

25 on that kind of middle area, that's when I think it's going to

1  be more important for Your Honor to be able to be precise,

2  knowing you know what the record has shown.

3         That we'll just have to deal with that.

4         THE COURT:  Well, I'm going to try to be more

5  precise, what I'm trying to get on the record right now is,

6  that what area I am leaving open for the decision.  The rest of

7  it those are the way I'm -- what I've announced with respect to

8  those two extremes, is how I am going to rule.  What's open is

9  what to me is in the middle.

10        MR. BERNICK:  Okay, now with respect to the X-rays --

11 is our --so I guess again to be clear, we're talking then about

12 all the X-rays.

13        THE COURT:  All X-rays, all tests.

14        MR. BERNICK:  Yes.  The other -- the only other thing

15 that I would say, is that I guess is a timing question, and

16 then of kind of where do we go from here question.  The timing

17 obviously is important.  Because people from all your other

18 duties, people got to do their supplemental questionnaires, and

19 then that also drives the database so we're obviously focused

20 on this thing.

21        At the same time, you know, I want to make sure that

22 Your Honor knows from our point of view, this is -- this

23 affects a major, major portion of the case.  There are

24 thousands and thousands of non-malignant claims, that are --

25 going to be at issue here, and then the lung cancer claims as

1 well.  So we're talking about an issue that if discovery does

2 not take place, as a material impact on our ability to proceed

3 with the case, and I just want to alert the Court I don't want

4 to assume the worst predicted because Your Honor has said,

5 preliminarily see our point of view, but we would have to think

6 about what our ability is to continue with the preparation of

7 the estimation on the non-mesothelioma claims if we can't even

8 get the discovery here, so I guess it's kind of an elaborate

9 way of saying that this could have a real impact on the ongoing

10 schedule, and I want to just let the Court know that, I know

11 that Your Honor will take whatever time is appropriate but it -

12 - this is a big deal for us, it's not just these particular

13 documents, this is one of the major discovery and evidentiary

14 issues that we've had.

15          THE COURT:  Okay.

16          MR. BERNICK:  I think beyond that, the next item to

17 take up is the attorney/client privilege issue and I would hope

18 that this is a more -- one that's easier to put to the Court,

19 and will take much less time.

20          We're talking about only three questions in the

21 questionnaire they are in part two of question two, three

22 questions for the Court's -- to refresh the Court's

23 recollection are -- Did you retain counsel in order to receive

24 any of the services performed by the diagnosing doctor?  Was

25 the diagnosing doctor referred to you by counsel?  Are you

1  aware of any relationship between the diagnosing doctor and

2  your legal counsel?

3          All of these go to the same basic question, which is

4  to what extent are the reads or the diagnoses that we're

5  talking about ones that are really being done at the behest or

6  sponsorship of the law firms, because it relates to this

7  fundamental question of independence which in turn is a Daubert

8  issue.

9          There's an objection that's been raised on grounds of

10  attorney/client privilege, we don't think that that really is a

11  -- an appropriate objection, and for a very simple reason,

12  which is the Supreme Court instructs us of the Upjohn case, the

13  attorney/client privilege --

14          THE COURT:  Mr. Bernick, I'm sorry, I can't hear you.

15          MR. BERNICK:  Okay, this -- I've got a little green

16  light here, I'm sorry.  The Supreme Court told us in the Upjohn

17  case that the attorney/client privilege does not apply to

18  facts, it applies to indications.  We clearly would be entitled

19  to get those three facts during the course of any ordinary

20  case, they would be facts that would be discoverable for

21  purposes of showing the financial interest that the people

22  involved in the diagnostic process have.  We have the ability

23  to gather that information now from the claimants and their

24  counsel, and we don't believe the attorney/client privilege is

25  an obstacle there, because the information would otherwise be

1 discoverable.

2       Attorney/client privilege covers communications, not

3 -- but does not cover the underlying facts.

4       THE COURT:  Mr. Esserman.

5       MR. ESSERMAN:  Your Honor, this issue is one that we

6 have briefed, it's a -- relatively close issue I think.  It's

7 the question of whether or not the discussions between a client

8 and an attorney regarding a diagnosing doctor or a referencing

9 the reference by counsel is in fact a discoverable fact.  We

10 think it's part of the attorney/client privilege, whether Mr.

11 Kraus tells his client to get a consult at Mercy Hospital, or

12 not.  And the discussion surrounding that with the client, we

13 think are attorney/client privilege and are not subject to --

14 to invasion or discovery.

15       The damage necessarily done by disclosure of that

16 communication may be little or nothing as to whether or not

17 that is -- that has to be disclosed.  Because frankly they only

18 ask a yes or no.

19       And they haven't asked the details.  We were

20 concerned and that several of our clients were concerned that

21 that did come close to the attorney/client privilege.  We felt

22 we had to raise that issue, and we did.  We think that there is

23 grounds for that, but I do point out for the Court these are

24 yes or no questions.  And I am aware they're frequently yes or

25 no answer -- answer a yes or no question is not necessarily an

1   invasion of the attorney/client privilege.

2        THE COURT:  Yes, and I think actually that's probably

3   the telling point here.  I don't have much difficulty excluding

4   from the attorney/client privilege the second two questions,

5   whether the client was referred to the doctor by the attorney,

6   and whether the client knows the relationship between the

7   client and the doctor.

8        The first one is a little closer I think because it's

9   asking the purpose for which the client consulted the lawyer

10  although it's not asking for an opinion.  It's asking the

11  client's point of view, not the lawyer's point of view, I think

12  that one's closer.  Nonetheless, to the extent that it's asking

13  for a yes or no conclusion I really do think it's not as

14  onerous as it might be, if the question were what did your

15  lawyer tell you about X.  And so I think on balance, I will

16  order that those questions be answered, I don't see that there

17  will be prejudice to anybody as the result of these -- of the

18  answer to these three questions.

19       And so, I agree, the first one is a closer question

20  but I think the other two are not even close. Okay. So they're

21  to be answered.

22       Well, Mr. Bernick, will we work out -- as I'm making

23  rulings, at the end of this, will the debtor work with counsel

24  to submit some for of order.

25       MR. BERNICK:  Yes.

1            THE COURT:  Okay.

2            MR. BERNICK:  Yes.  The next item are exposures to

3  products other than Grace products, and also exposure to I

4  guess is the details of the exposure history.  For Your Honor's

5  benefit -- this is the second prong of the inquiry I guess to

6  the question of whether the case of people who have been

7  diagnosed as having asbestos related illness, there is a causal

8  relationship between that illness and history of exposure to

9  Grace's product.  It is not simply as has been characterized in

10  some of the briefs, an issue of whether the disease that's

11  being alleged is asbestos related.  That is only  a part of it.

12  There's a question of whether exposure to, or working with the

13  product that is a Grace product, is a substantial contributing

14  factor.  Causation of injury is a classic medical and

15  scientific issue, therefore it is subject to all of the

16  strictures that are ordered by the Daubert doctrine, and we are

17  pursuing that.  Now, the chart that I have here, is a chart

18  that was attached to briefs really long ago, and is I think

19  part of the estimation briefing process here.  And what this

20  basically reflects is on the basis of the sample of claim files

21  that were pending when the claims were pending when the company

22  went into chapter 11, what kinds of trades are represented in

23  the claimant population.

24            And again we're trying to deal with the huge spike of

25  claims the huge spike of claims, to what extent do those claims

1  reflect trades, or people who have been exposed to a Grace

2  product.

3          And what animates the chart is the Grace produced

4  product that if there were exposure it would most likely be in

5  the construction trades, and yet the construction trades are

6  actually a relatively small portion of the population of

7  claimants that is suing Grace, at least as of the time of the

8  Chapter 11.

9          So you get Railroad workers, auto maintenance

10 workers, these are all people who are claimants against Grace,

11 and obviously the question is to what extent are the claims

12 that are being filed in this huge uptake, claims that don't

13 really have a sound scientific and medical basis and sufficient

14 exposure to Grace product to satisfy the substantial

15 contributing tri-factor requirement.

16         The same issue has been raised and identified in the

17 Rand Report, the same issue was raised in connection with the

18 US Chee case, all the questions that we're asking here in

19 connection with these questionnaires have parallel questions

20 that are put and are incorporated in the US Chee questionnaire.

21         The only objections that have been pursued here that

22 is briefed here, with respect to the questions that relate to

23 the exposure is to Grace product and to non-Grace product are

24 by the folks that are represented by Ms. Ramsey, and also by

25 the Cooney and Conway firm.

1          And to give a focus to the questions that we're

2    talking about, the question error has as Part 6 employment

3    history.  In the employment history it requires for each job

4    what the occupational code was, what the industry code was, the

5    employer, the beginning and end of employment and the cite or

6    the location.  That's the job history.  So, the basis of that,

7    we know what people's employment histories were.

8          Part 5 is the real operative part that is much more

9    detailed, and it focuses -- and it's difficult to read here, so

10   I'll just describe it to the Court.  It focuses on the left

11   column here of all of the different sites of exposure -- so

12   it's now working within the site -- and asks the claimant to

13   specify the different jobs that were held at that job site, and

14   then the nature of the kind of exposure that took place.

15         So, it's the products first -- it's the Grace

16   products and other products -- dates and frequency of exposure,

17   occupation code, industry code, what the exposure due to

18   working in or around areas where the product was being mixed,

19   installed, removed or cut and the nature of the exposure.

20   These are all much more specific facts in a toxic tort case, a

21   classic toxic tort case, that the exposure facts drive the

22   strength and credibility of the causation presentation.  These

23   are basic exposure facts that you would have in any toxic tort

24   case.  So, the questionnaire properly requires that people fill

25   out very detailed descriptions of what their jobs were and the

1  nature of their exposure to asbestos during those different

2  periods of time.

3        The objections that have been made are basically

4  three-fold.  First, there's an objection that says that, well,

5  under Illinois law or under California law, it's much easier to

6  satisfy the substantial contributing factor requirement.  The

7  plaintiff doesn't have to go through all of this stuff because

8  under the rules of evidence that are there applicable, it

9  becomes the plaintiff's burden to go only very slightly down

10  this road and then it shifts to the defense to basically rebut

11  it.  We can talk in detail I suppose on some day about what

12  Illinois law is and what California law is with respect to what

13  claimants the applicable law will be Illinois or California,

14  but it's irrelevant.  And the reason that it's irrelevant in

15  this case is that we're operating again under the federal rules

16  of evidence and the federal rules of procedures.  And the case

17  law is clear that <u>Daubert</u> trumps all conflicting and contrary

18  procedural and evidentiary rules when you're in court.  So, it

19  really is a point that misses the point.

20        Second, the point is made not as a matter of law but

21  as a matter of science.  The folks who represent mesothelioma

22  claimants say, well, gee, we know that any exposure to asbestos

23  even very, very small can cause certainly mesothelioma.  And,

24  therefore, all that we really need to demonstrate is that there

25  was any kind of exposure to Grace asbestos at all.  And they

1 give affidavits from their experts that are to the effect that

2 very small levels of exposure to asbestos can cause

3 mesothelioma.  Again, that's not the issue.

4      First of all, that's simply their scientists' view.

5 It is not the view of our scientists.  But, second, and more to

6 the point, the issue is not whether low levels of exposure can

7 cause mesothelioma.  The issue is whether exposure to Grace

8 product was a substantial contributing factor with respect to

9 the claimants' mesothelioma.  If a claimant has years and years

10 of exposure to somebody else's asbestos, and then at the tail

11 end of his career handles some Grace product or is at the same

12 job site as a Grace product, the fact that they're at a job

13 site doesn't mean that Grace exposure is a substantial

14 contributing factor given the long history of exposure to other

15 products.

16      And none of the affidavits submitted by their experts

17 in connection with this motion say that somehow Grace's

18 asbestos is from a scientific -- Grace exposure no matter how

19 minimal is from a scientific point of view automatically

20 substantially causative no mater what the exposures to other

21 products are.  It's not in the Hamara.  It's not in the other

22 affidavits that have been submitted.  So, this is again an area

23 of discovery that's clearly been set out.  This was negotiated

24 in detail in connection with the original questionnaire.

25 There's no scientific matter that's been brought to the Court's

1 attention that says as a scientific matter there is no other

2 position that's the correct position.  This is a matter of some

3 debate between the scientists.  And we are talking, after all,

4 about a discovery matter.

5       Is it burdensome with respect to these claimants to

6 fill this out?  Sure, there is some burden that's associated

7 with it.  But, in point of fact, if a case were actually

8 litigated before this Court, you know, next week God forbid,

9 all of this same data would clearly be discoverable.  It would

10 clearly be information that would have to be provided.  We

11 would have the option to parse out exactly what the exposures

12 were to Grace products and to other products.  So, it's clearly

13 relevant.  It's clearly discoverable.  State procedures and

14 state evidence is not to the contrary.  And the burden is

15 simply a burden that's associated with ordinary litigation.

16       And for those reasons, we don't believe that the MMWR

17 clients are somehow dramatically differently situated or the

18 Cooney and Conway clients are dramatically differently situated

19 from other clients that are in the process of filling out the

20 questionnaires and who have not pressed objections to filling

21 out the questionnaires.  Indeed, we have gotten some

22 questionnaires back, even in the first instance, that actually

23 went through and filled out in detail all of these different

24 charts.  So, it's certainly something that can be done and that

25 should be done in this case.

1          THE COURT:  Ms. Ramsey?

2          MS. RAMSEY:  Good afternoon, Your Honor.  Initially,

3   we have completed or have agreed to complete the work history

4   part, Part 6 of the questionnaire.  The part that we have

5   objected to completing is Part 5, the detailed chart regarding

6   non-Grace exposure.  And the reason is that we believe that the

7   debtor really has that information.  We have provided or will

8   provide the work histories.  Where they were available, we have

9   provided deposition testimony where a claimant was examined

10  regarding exposures and what types of jobs he had in what

11  industries.  We have provided court term and number for the

12  complaints.  So, they have that information.

13         What they have now asked in addition to that is for

14  us to regurgitate the information in a different format, and

15  it's an unnecessarily cumulative process given the nature of

16  this proceeding.  Mr. Bernick said if these cases were going to

17  be litigated in this Court next week, we would have to provide

18  the information.  Well, he's absolutely right.  If we were in

19  allowance or a trial procedure, that information would be fully

20  developed.  But, this is not a trial procedure.  This is an

21  estimation.  In an estimation, the question is -- you know,

22  there has to be a balance between the information that's

23  provided so that the estimation is reliable and the burden on

24  the claimants.  They shouldn't have to try their cases unless

25  they're going to get to try their cases.

1         And so, that's our primary objection, Your Honor.

2  And we've cited in our brief to the Helsinki report and -- for

3  the proposition that it is clear that work history is the most

4  reliable evidence of exposures.  We simply think that this is

5  unnecessarily burdensome to the claimants to have to fill this

6  out in addition to the information that they've already agreed

7  to provide.

8         One other point, Your Honor, is that in some

9  instances, the claimants have not fully developed their cases

10 against all of the defendants, either because they've settled

11 or because cases are in bankruptcy and there's been an

12 automatic stay.  And so, to that extent what completing this

13 part of the questionnaire would require is either providing

14 Grace with incomplete information, which of course is

15 inherently unreliable and therefore not reasonably likely to

16 lead to admissible or evidence, or it requires that claimants

17 go out and actually prepare their cases for trial, not just

18 against Grace but against all of the other potential defendants

19 against whom they might assert claims.  And that's not what

20 discovery is about.  It's not supposed to require claimants to

21 go out and do something that they don't -- they have not done

22 already.

23         THE COURT:  All right, thank you.

24         MR. RAMSEY:  Thank you.  I'm going to ask Mr. Kraus

25 to step up also, Your Honor, just to address the mesothelioma

1  issue.  And we've raised an objection with respect to

2  mesothelioma claimants with respect to this part of the

3  questionnaire, and also with respect to several questions in

4  Part 2 of the questionnaire.  And for simplicity, I thought it

5  might be best if the Court is willing to let us go ahead and

6  present the entire case now.

7            THE COURT:  Okay.

8            MR. KRAUS:  Your Honor, Peter Kraus again.  I don't

9  know, for the sake of clarity, when Mr. Bernick laid out his

10 outline, he did not indicate that he indicated to move forward

11 to compel our answers to Questions 2 through 5 in Part 2.  And

12 that was not part of his presentation.  If he's not seeking to

13 do that right now, I'll reserve my presentation.

14           MR. BERNICK:  No, I believe that those related to

15 providing the medical data, the D reads and the like, and that

16 most certainly was already encompassed in what we argued.  So

17 -- and I think that Mr. Kraus as you saw was very active in

18 connection with that argument.

19           MR. KRAUS:  Your Honor, we've raised additional not

20 privilege objections but relevance objections on behalf of the

21 mesothelioma claimants in opposition to answering approximately

22 75 separate questions containing information about PFT's,

23 medical conditions, x-rays and various other underlying

24 clinical data in mesothelioma cases on the basis of relevance

25 and burden.  When we were here in September, we discussed this

1  elliptically and Your Honor rhetorically noted, you know, I

2  don't know, I don't have any individual objections in front of

3  me, but I might entertain an objection that mesothelioma

4  claimants are different with respect to the relevance of some

5  of this medical information.

6          THE COURT:  Yes, unless there is some dispute about

7  the fact that the data shows that there is a meso claim.  I

8  mean, if a particular report or something is challenged, then I

9  think the underlying data maybe relevant.  But, if there is no

10 challenge but that the fact that there is mesothelioma, I think

11 you need the work related history.

12         MR. KRAUS:  That's our position, Your Honor, that in

13 -- according to our experts, Dr. Abraham, Dr. Hammer and Dr.

14 Rogley, whose deposition excerpt was attached, in 99 plus

15 percent of the cases the pathologic evidence alone definitively

16 diagnoses the disease.  And all of the other clinical

17 information, which is quite burdensome to gather, is really

18 irrelevant.  And that the burden should be on Grace to come

19 forward if they believe that a pathologic diagnosis is not

20 based upon an adequate methodology or adequate material to ask

21 the plaintiff to produce additional material.  But, otherwise,

22 we would ask that the Court sustain a relevance and burden

23 objection to that.

24         THE COURT:  This is only as to mesos, correct?

25         MR. KRAUS:  Yes, Your Honor, I'm here specifically as

1 to mesos.  And, you know, I would note for the Court Mr.

2 Bernick began the day by drawing his bar graph and saying, you

3 know, we're here to prove that this filing spike in 2000 is not

4 real and that there is no real disease here.  Well, certainly,

5 Grace is not contending that the mesothelioma victims are not

6 real disease cases, and that's what all of this medical proof

7 is directed towards obtaining.

8             THE COURT:  Okay.

9             MR. KRAUS:  So, we would ask the Court sustain for

10 mesothelioma victims our objections to providing material in

11 response to Questions 2 through -- I don't have the

12 questionnaire in front of me, Your Honor --

13             THE COURT:  I think it's five --

14             MR. KRAUS:  -- but I believe it's two through five in

15 Part 2.

16             THE COURT:  Part 2.

17             MR. KRAUS:  Yes.

18             THE COURT:  Well, yes, but on this issue though with

19 respect to the mesos, why is it that the -- I think it maybe

20 the flip side I guess.  With respect to the Part 5 issues, I

21 think maybe the information should be submitted by the mesos

22 because that probably is the place where the information and

23 the exposure to Grace's product and the frequency and the

24 timing and the dates maybe more relevant because of having to

25 show that it's, you know, somehow related -- that the cancer is

1  in fact related to Grace's product.

2           MR. KRAUS:  The Grace exposure.  Well, I certainly

3  agree, Your Honor, that the evidence we've submitted shows that

4  you must have a work history of exposure to the asbestos

5  product.  And these claimants wouldn't be before the Court in

6  the Grace bankruptcy if they were not alleging that a

7  contributing cause of their mesothelioma was exposure to a

8  Grace product.  And we have provided work history information.

9  We've had the argument about attachments and the Court has

10 ruled, and we've provided those attachments.  So, I think we

11 have done that, Your Honor.

12          THE COURT:  But, this is with respect to non-Grace

13 products I think, right?

14          MR. KRAUS:  Well, we have provided information in

15 response to Question 5 and 6.

16          THE COURT:  Oh, you've done both.

17          MR. KRAUS:  In the form of attaching work history

18 information, depositions of plaintiffs and depositions of

19 co-workers that demonstrate both the Grace and non-Grace

20 exposure, the work -- the occupation of the individual, the

21 years, the location and to the extent known the length of time,

22 the duration and intensity of that exposure to the extent that

23 that information is available.

24          THE COURT:  Okay.

25          MR. KRAUS:  So, I -- you know, Mr. Bernick hasn't

1  teed up the issue of whether or not a specific attachment to a

2  specific claim is inadequate as he believes it, but we have

3  provided that information.  My objection on relevance and

4  burden was to the Part 2 questions for mesothelioma claimants.

5         THE COURT:  Okay.  Well, as to the Part 2 questions,

6  I'll hear from Mr. Bernick.  But, I really -- I think with

7  respect to the mesothelioma unless there is some challenge to a

8  particular set of diagnostic materials, in which case if there

9  is, then I think the plaintiff may have to supplement that

10 material.  But, otherwise, I think that should be enough.

11        MR. KRAUS:  I think the plaintiff and defense experts

12 are in agreement on that if there is inadequate pathologic

13 evidence, Your Honor.

14        MR. BERNICK:  Well, that's the whole problem, so.  I

15 will admit counsel for Cooney and Conway to approach that.

16        MR. FINCH:  Just briefly before Ms. Byrne speaks, Mr.

17 Bernick made reference to Daubert.  Daubert is a red herring

18 here when it comes to mesothelioma causation.  The law that Ms.

19 Byrne is going to talk about in the California Rutherford case

20 is substantive state law, the law that governs the claims, not

21 evidence law.  It's not whether an expert can testify about

22 something.  It's not implicated in the federal rules of

23 evidence.  It's that under the law of these states, all you

24 have to show is a very minimal exposure to asbestos to prove

25 that it's a substantial contributing factor.  And I'll turn

1  that over to Ms. Byrne to talk about the law of Illinois where

2  lots of claimants happen for -- particularly for mesothelioma

3  happen to be from.

4         MS. BYRNE:  Good afternoon, Your Honor, Kathy Byrne

5  from Cooney and Conway in Chicago.  Judge, Illinois law is

6  different, and Illinois law is different in a couple of ways.

7  First, I was rather bewildered when I saw that our firm had

8  been named as one of the firms that Grace was bringing a motion

9  to compel against, because I thought that we had complied with

10 our attachments in which we gave answers to interrogatories, a

11 deposition, if there has been one given, fully listing an

12 extensive work history for all of our malignancy cases, listing

13 co-workers, listing job sites, listing years, listing Grace and

14 non-Grace products.  And those are what is filed in discovery

15 in Illinois in answers to interrogatories, depositions, as you

16 would see in many other cases.

17        Where we did not file was in our plural registry

18 cases.  Now, Cook County and the Northern District of Illinois

19 have had a deferred docket in effect since 1991.  Under the

20 deferred docket, people who have had a diagnosis that does not

21 meet certain standards to reach full blown asbestosis are

22 placed on hold.  Their statute is tolled.  Their claim is

23 recognized as being a claim.  But, nothing happens on that case

24 unless and until they develop progressive asbestosis or a

25 malignancy.

1        During that time, nothing is done on those cases.

2   They are not subject to discovery.  There is -- I have cited in

3   our briefs the order from the Northern District and Judge

4   Trafalad's order for Cook County.  And that has been truly

5   cited -- in almost every jurisdiction that I have been in, it

6   has been cited by defendants as being a gold standard thing.

7   Cook County doesn't have a plural problem.  And all of these

8   various sins that Mr. Bernick has talked about all day with the

9   plural cases, well, the solution in Cook County at least was to

10  create this deferred registry.

11        Under that, we are enjoined from conducting any

12  discovery.  I don't have answers to interrogatories.  I don't

13  have work histories.  And the claimants on the registry, if

14  they were to go and have medical examinations done in order to

15  fill out the Grace questionnaire so that they would have a

16  recent x-ray, I mean, no matter what -- I mean, the minimal

17  amount that Grace will probably eventually end up settling

18  these claims for, if any amount, would be more -- would be less

19  than what it's going to cost them to have their work history

20  done up and a new medical exam done.

21        For that reason, we provided a copy of the registry

22  form, a copy of their filing on the registry, and we informed

23  Grace, you know, these cases are from perhaps 1988, 1990.  They

24  went on the registry as soon as it was created.  You were part

25  of the group that formed the registry.  And I was shocked when

1  we got a motion to compel assumingly on these cases, which

2  consists of 146 out of the 191 that Grace is compelling.  The

3  remainder of the cases are either malignancies or full-blown

4  asbestosis.  About 50 percent of them are cases that have

5  during the course of Grace's bankruptcy come off the registry

6  and they have filed cases not against Grace because Grace was

7  in bankruptcy.  But, they have filed cases against the

8  non-bankrupt defendants.  We have provided the discovery from

9  those cases, the work history, the social security printout.

10       But, our objection is that this is not relevant under

11  Illinois law.  We have the Lipki-Tragars' doctrine -- Lipki

12  being the Illinois case and Tragars being the Seventh Circuit

13  case -- in which the specific statute in Illinois which goes to

14  all toxic torts but specifically names asbestos says, this is

15  joint and several liability that has been interpreted in the

16  Tragars case as meaning evidence of exposure to non-defendants'

17  products is not relevant in an asbestos case.  Therefore,

18  whenever any --

19       THE COURT:  I'm sorry, exposure to a non --

20       MS. BYRNE:  To a non-defendant's asbestos product is

21  not relevant.  It's not admissible in Illinois.  It does not

22  come in.  The jury doesn't hear about any other defendants',

23  former defendants' exposures.  They only hear about the

24  defendants who are at trial.  In making an estimation, Grace is

25  overlooking the fact that estimates typically include all of

1 the various and sundry things that can happen in different

2 states.  When values are placed on cases for individual

3 evaluation under the asbestos trusts, the venue is very

4 important.  And one of the things that gets looked at in

5 individual evaluation is, what is the case value in a certain

6 venue?

7          Where a venue is joint in several, it probably has a

8 higher case value than one where it's simply several, or where

9 there's a setoff prior to trial.  In Illinois, there is no

10 setoff until there is a verdict.  If a defendant chooses to buy

11 their piece ahead of a verdict, they don't get a setoff for

12 what other defendants have paid.  For those reasons, the

13 Illinois courts have held that the <u>Lipki</u> doctrine controls and

14 evidence of non-defendants' products is not relevant to an

15 asbestos claimant's case or an asbestos plaintiff's case.  For

16 that reason, we object to furnishing this information.

17          We have furnished and Grace did not give us any

18 specific cases in which they said they wanted something other

19 than what we had attached.  It was sort of a blanket motion to

20 compel.  And without the specificity, I don't know what they

21 consider to be non-compliant.  We -- as I say, I think the --

22 typically the answers to interrogatories are well over 80

23 pages.  In the portion of the questionnaire where they ask for

24 the work history, we direct them to that portion of our answers

25 to interrogatories where the products are listed, both Grace

1 and non-Grace.  However, we do maintain for this purpose and

2 also for what I think we're eventually going to get to, which

3 is the argument regarding other settlements, that this is not

4 relevant information for Grace to consider.

5       And I would ask that their motion to compel be denied

6 both for the registry claimants where there is nothing that we

7 can provide them with where we are enjoined from participating

8 in discovery on those cases.  And I would ask that the Court

9 consider that and not imperil our asbestos registry, which

10 really has worked extremely well.  And if by suddenly starting

11 to do discovery in deferred docket cases, that could really

12 imperil the balance of having that registry that has worked so

13 well in Cook County for 16 years.  And I would ask that their

14 motion to compel be denied.

15       THE COURT:  Okay, thank you.

16       MS. RAMSEY:  Your Honor, just to clarify the record,

17 with respect to the objection that we raised with respect to

18 mesos, Mr. Kraus indicated that his firm has provided

19 attachments that disclose a lot of the information requested by

20 Section 5 of the questionnaire, and I think that many of the

21 other firms have as well.  But, with respect to the meso issue,

22 Illinois law is not that different than what you find in other

23 jurisdictions.  We've cited the Rutherford v. Owens Illinois

24 case on Page 12 of our memo, and the AC&S, Inc. v. Ashner case

25 on Page 13.  The Rutherford case under California law, the

1 <u>Ashner</u> case under Maryland law.  They, as in Illinois, hold

2 that with respect to mesothelioma claims, other exposures are

3 irrelevant.  And for that reason as well, we have objected for

4 the meso claimants to Section 5 of the questionnaire.  I just

5 wanted to clarify the record on that point.

6          THE COURT:  Okay, thank you.

7          MR. BERNICK:  I think we've now been through this

8 questionnaire probably in excess of five or six times, and many

9 of the arguments that we've heard today have been heard before.

10 I go back to a benchmark that I think Your Honor announced

11 several hours ago when this day began that seems to have faded

12 a little bit with each passing hour.  And that was the

13 benchmark that was so forcefully articulated at the beginning

14 of the day by I think it was Mr. Mullady.  It may well have

15 been Mr. Lockwood, which is that we're talking about discovery,

16 that each side has got to be given the latitude to prepare

17 their case for estimation.

18          Consistent with that same spirit, we agreed to

19 discovery at the outset here that by no means, shape or form we

20 believe is going to be admissible at trial, in part because we

21 know that it's so central to their preparation of the case.

22 Your Honor reacted to the <u>G-1</u> case I think pretty much in the

23 same vein where the judge there said, I'm not going to decide

24 exactly what's going to be admissible.  I'm not going to decide

25 who is right or wrong about estimation.  I'm going to allow

1 both sides to be able to pursue the preparation of their case.

2        And now, in each and every area where we're going

3 through here, it's really proving out the other way.  That is,

4 all of these things are being objected to even though it is

5 only discovery.  And we've got a lot of arguments being made,

6 none of which really give credence to the idea that both sides

7 given the opportunity fairly to prepare their cases in the same

8 fashion that we try to do at the outset.  The meso claims have

9 now been gone over repeatedly today.  When it comes to

10 diagnosis, which is the top part, it is true that most of the

11 meso claims will not have an issue about diagnosis.  I don't

12 think there's any question but that's true generally.

13        But, we also know that the diagnosis of meso can be

14 controversial.  And what's really being said here is that,

15 well, it can be controversial but it's just not really worth

16 getting into.  You know, why doesn't Grace just kind of give on

17 the idea that whatever it is that Dr. Hamara is going to say

18 about these cases is probably good enough for us because he

19 seems to think he's accurate pretty much all of the time.

20 Well, that's great.  That's what Dr. Hamara thinks.  That's

21 what the other side thinks about their experts.

22        But, there are situations in which mesothelioma is a

23 disputed diagnosis.  We are not talking here today about tens

24 of thousands of meso cases.  We're talking about a relatively

25 small number of cases.  These are cases that get worked up

1  right away.  They have a very fast time in going through the

2  docket because the life span is very, very limited and it's

3  important to be able to have the case prosecuted in the time

4  they fashion.  We think they're probably -- all of them by this

5  stage, these are now cases that are five years old.  These are

6  all cases that have been very thoroughly prepared.

7          And all we're asking for is the information that is

8  probably in a file sitting in their offices right here today

9  that was prepared long ago in connection with the presentation

10 of these claims to a variety of defendants and a variety of

11 trusts.  Why can't we have it?  We're not talking about

12 something that's so particularly special here.  So, why should

13 the mesothelioma claimants who are the claimants who have the

14 greatest stake, the greatest value of their claims somehow be

15 uniquely here talking about the burden of producing scientific

16 medical data that is already at their fingertips?

17         This is not an issue of a sympathy factor for

18 mesothelioma claimants.  Nobody is going to doubt that or

19 dispute that.  This is an issue that --

20         THE COURT:  Well, I don't understand.  With respect

21 to Part 2 the questions 2 through 5 that have -- that are

22 basically the backup medical criteria, I'm not sure I

23 understand why they're relevant when you've got a meso

24 diagnosis.  I understand how --

25         MR. BERNICK:  Because not --

1          THE COURT:  I'm sorry.

2          MR. BERNICK:  Not all meso diagnoses are so

3   completely unequivocal.

4          THE COURT:  Well, I think what you should do then is

5   indicate that ones that you think are not so adequately stated,

6   and as to those I think the plaintiff should submit additional

7   evidence.  But, that can't be true for all of the mesos.

8          MR. BERNICK:  We'll take a look at it.  We'll take a

9   look and see if there is some way that we can limit the scope

10  of this request.  I don't know that there is, but we will

11  certainly undertake to do that.  If we can identify -- part of

12  it is if we actually had the path reports and we knew who the

13  examining pathologists were, that might be a helpful way of

14  determining if we're going to have an issue here.  But, we

15  don't have necessarily the backup for these questionnaires now.

16  So, we may not be in a position.

17         So, I guess maybe what I'm suggesting is this.  We

18  will do without certainly -- we will do with the path reports

19  for purposes of kind of making a cut.  And the faster the

20  people can get their path reports to us, we'll be able to make

21  a determination.  But, the only affected -- we have to wait

22  until January 12 to find out what the backup is.  Then, we're

23  going to be coming back here with respect to a certain number

24  of the cases.  And then again, we're under the gun to produce

25  expert reports on these things.  So, it's a little bit of a

1 chicken in an egg.  We think it's simple because the paperwork

2 is there right now to simply furnish it by January the 12th.

3 If people want to wait and say, okay, I'm not going to do it

4 until January the 12th, it is going to take us some time to be

5 able to make that follow-up request to the Court.

6          THE COURT:  Well, let me just ask Ms. Ramsey, Mr.

7 Kraus, can the path reports be submitted since that seems to be

8 an issue that will be backup documentation?

9          MR. KRAUS:  Your Honor, my -- I can't speak for all

10 the other Montgomery McCracken clients, but I can speak for the

11 Waters and Kraus clients.  And we provided the pathology

12 reports with the original response before the first motion to

13 compel.  He has them for all my mesothelioma clients.

14          THE COURT:  All right.

15          MS. RAMSEY:  Your Honor, my understanding is that

16 with respect to most of our firms -- I can't speak for all of

17 them -- that the pathology reports have been provided.

18          MR. BERNICK:  Okay, we'll take a look at them and

19 then --

20          MR. FINCH:  And, Your Honor, that's true.  This is

21 Nathan Finch for the asbestos claimants.  We have had

22 consulting experts go through all the mesothelioma

23 questionnaires that have been returned and the vast, vast

24 majority of them have pathology reports attached -- you know,

25 it's typical a file, a questionnaire, response,

1  interrogatories, deposition and pathology report.

2          THE COURT:  Okay.  Well, to the extent that there --

3          MR. FINCH:  -- tends to be in almost every case.

4          THE COURT:  To the extent there is no pathology

5  report, it seems that that's going to be a minor portion of

6  them.  You're entitled to pathology reports.  Let's make due

7  with those.

8          MR. FINCH:  Part of the problem is that a lot of

9  these things we got by way of attachments.  We didn't have the

10 attachment rule in place.  So, we had to go fiddle through all

11 of the backup to find out what's there.  But --

12         THE COURT:  All right.  As to the mesos, the path

13 reports, if they haven't already been produced, are to be

14 produced as soon as possible but absolutely not later than

15 January 12th.

16         MR. BERNICK:  Okay.  I didn't get to the -- I'm

17 sorry.  I didn't get to the causation issue.  And this is --

18 there's been a statement made that somehow, well, gee, this big

19 problem of the spike in 2000 doesn't have to do with people who

20 are really sick.  And that may or may not be true.  We know

21 that it's not true in the sense that the spike is a function of

22 two things.  It's first of all a function of screening, and

23 that's the disease.  And it's second of all a function of

24 people basically opting in favor of an approach that says, he

25 pretty much sue everybody or put a claim to them and then you

1 see who pays.  And that's the causation prong.

2       And it's with respect to the causation prong that all

3 of what we're now talking about with non-Grace exposure speaks

4 specifically and strongly.  We have to be able to fair it out

5 the science that's associated with the causation issue with

6 respect to these groups of claims.  And that's true with

7 respect to people who have mesothelioma.  It's true with

8 respect to people with lung cancer, with respect to people who

9 have nonmalignant disease even if they have nonmalignant

10 disease that's been diagnosed in the appropriate fashion.

11       So, the spike concern, the concern about claims that

12 shouldn't be filed is in fact there, and it's there in an

13 undiminished fashion notwithstanding the severity of the claims

14 that are being made.  And this is of -- again, you can't get --

15 the spike was not just a spike in nonmalignancy.  It was a

16 spike in malignancy.

17       THE COURT:  What are you asking for?  I've heard

18 about the spike.  I understand the debtor's position about the

19 spike.  Let's get to specifically what you're asking for so I

20 can make some rulings.  With respect to the --

21       MR. BERNICK:  I'm asking for what -- I didn't think

22 that that was an issue.  What I'm asking for is exactly what

23 the questionnaire calls for, and I'm asking for something

24 special.  The questionnaire says, you can provide a work

25 history.  They're supposed to provide a work history.  The work

1 history is for jobs listed in Parts 3 -- other than jobs listed

2 in Parts 3 or 5.  Five is jobs that involve exposure to

3 non-Grace asbestos.  So, somehow they're saying that job

4 history is all that they have to do in response to Part 6 and

5 they shouldn't have to fill out the response to Part 5.  If

6 Your Honor can bear with me, I'll --

7         THE COURT:  Well, I think what Ms. Ramsey said is

8 that the information is attached in the documents that were in

9 the attachments that were provided with respect to Part 5.

10        MR. BERNICK:  Well, the first -- the position that

11 was taken in their brief I believe was that they should only

12 have to fill out Part 6 not Part 5.  And Part 5 and Part 6

13 speak to different jobs, and that's all that I'm suggesting to

14 --

15        THE COURT:  Well, I understand that and I think

16 you're entitled to some information in Part 5, whether it's --

17 whether you get it by way of the attachments as long as the

18 pages are identified according to the ruling that I made I

19 don't know some months ago.  I think that's adequate.  But,

20 otherwise, yes, I think you're entitled to the information that

21 Part 5 requests.

22        MR. BERNICK:  Okay.  Well, then that's fine, Your

23 Honor.  The attachment that we have in Part 5 is important

24 because it requires that people actually make an assessment of

25 what it is that they are saying is their exposure of.  We

1  created this chart not for no good reason at all but to

2  actually have people make judgments according to which they

3  will be bound, judgments about what information really is

4  responsive.  If they fill out in each box as the attachment

5  instructions require, the references in their attached

6  materials by number with the particular pages that belong in

7  each box.

8          And so, it is exactly the information that is

9  responsive because that was the whole controversy about

10  attachment as opposed to, well, take a look at Pages 1 through

11  1000, 1 through 1,000, 1 through 1,000.  If it's rebroken out

12  and it's all there, then we don't have issue.  But, the

13  position that was being taken was different.  The reason that

14  there is an objection here is that they don't want to fill out

15  this charge.  And if they don't want to fill out the chart, I'm

16  assuming they're saying that they don't want to provide a

17  detailed specification in this chart of which attachment to

18  look to.

19          So, they should provide the information that is

20  sufficient to fill the chart out, and they should provide it in

21  a way that's consistent with the attachment instruction which

22  means to designate in each place exactly what pages belong

23  there, and then we will be happy to read through it.  But, the

24  reason that we're moving to compel is that they've taken a

25  different position.  They've taken the position that they

1  shouldn't' have to tell us about exposure to non-Grace

2  asbestos.  That is the essence of what they're saying.

3          And they're saying that scientifically they don't

4  believe it's germane.  We say it is totally germane

5  scientifically.  They say that legally they don't think it's

6  germane.  It is germane completely legally.  So, the issue is,

7  do they have to fill out Chart 5?  That's the issue.  Now, if I

8  can respond to the arguments that they've made or does Your

9  Honor would like to hear from them or -- what would you like to

10  do?  I don't want to --

11         THE COURT:  I think you're entitled to the

12  information in Part 5.  With respect to the Illinois issue that

13  under Illinois state law some minimal exposure is sufficient to

14  show a nexus between debtor causing the asbestos disease, I'm

15  sure under Illinois state law that's true.  But, the reality is

16  that in submitting the proof of claim process right now that

17  the Court is going through, I think they have to show some

18  likelihood that Grace caused the problem whatever the problem

19  is.  So, I think for purposes of this discovery -- whether it's

20  admissible or not later, for purposes of this discovery I think

21  you're entitled to the information in Part 5.  But, it can be

22  by attachment provided that the, you know, place to look to get

23  the information is articulated according to the ruling that I

24  made whenever I made it.

25         MR. BERNICK:  That's fine, Your Honor.  And the only

1  other thing that I would add is that there has been concern

2  expressed that somehow the information is not available or it

3  hasn't been gathered or it would be too expensive to gather.  I

4  think Your Honor has said repeatedly that if the information is

5  not -- hasn't been gathered, hasn't been done, people have the

6  latitude to say they don't know or they haven't done it.

7  Nobody is requiring -- because this is not an allowance or

8  disallowance procedure, nobody is requiring that information be

9  provided if they don't want to undergo the expense of doing it

10  because we're not -- at least our position has never been that

11  somehow claims will be forfeited as a result.  And Your Honor

12  has held out that possibility.

13          And we're not saying that at some point it may not be

14  appropriate.  But, the purpose of this is discovery.  If they

15  want to take the position that they don't have it, I can't make

16  them have the information.

17          THE COURT:  Well, to the extent that the information

18  is available, it should be produced.  I think what I said

19  earlier is I'm not going to make somebody go create information

20  for purposes of putting this together.  And, again,

21  hypothetically, you may have a meso plaintiff who died five

22  years ago, and maybe the only heirs who are left are daughters

23  and sons who really don't know where the meso person worked for

24  the last 50 years before he or she died.  I mean, there is the

25  possibility that that information can't be produced.  And if

1 that's the case, I don't see any reason why they -- whoever is

2 filling out the questionnaire can't say, I don't know all of

3 the places.

4          MR. BERNICK:  Thank you.

5          THE COURT:  So, but whatever is available should be

6 produced.  It can be produced in attachment form, but the

7 places in the attachments where the information is located

8 should be pointed out.

9          MS. RAMSEY:  Your Honor, I think that is consistent

10 with what we in fact have done, except that we may not have put

11 on the chart see exhibit blank or see pages X to Y, and we can

12 make that addition.

13          THE COURT:  All right.

14          MR. BERNICK:  I don't know if there's anything else

15 that's on that.  The last I guess couple issues left, one is

16 the settlements, and then there are some burden issues.  And I

17 then I want to get back to this last question that I raised at

18 the outset, which is the disposition of all other objections

19 that have been raised before the Court.  With respect to the

20 settlements, the shoe is now a little bit on the other foot.

21 We've asked for the prior settlements by these claimants.  That

22 is to say, we have asked for the terms of settlements that had

23 been reached by these claimants with respect to other parties,

24 other trusts and the like.

25          We have not asked -- although it is obviously germane

1 in exactly the same way as was articulated this morning, we

2 have not asked for the thought process at this point about why

3 those settlements were reached.  So, when you go back to the

4 issue that we talked about this morning, you'll recall this

5 morning the -- we told the Court that the settlement database

6 had been produced.  Therefore, the terms on the basis of which

7 the settlements had been reached was not the issue in

8 discovery.  Rather, the issue in discovery was the reasons why

9 those settlements had been reached.

10          When it comes now to talking about the settlements

11 that the claimants actually before the Court have made with

12 other parties and other persons, we don't even have number one.

13 That is to say, we don't know what settlements have been

14 reached between these same claimants and the variety of other

15 folks that they have proceeded against.

16          THE COURT:  Well, Mr. Bernick, I think you're

17 entitled to the settlement terms.  I think you're entitled to

18 know who settled against what other defendants for what disease

19 and maybe for the sum of money.  I don't know about the sum of

20 money.  But, in any event, for what disease and as to what

21 other company the entity settled.  If there is a

22 confidentiality agreement in place, there are ways by which

23 confidential information can be disclosed.  And I think it's up

24 to the individuals to attempt to get an appropriate waiver of

25 that confidentiality.

1          However, if the debtor is going to make use of that

2   information, the debtor has to sign a confidentiality agreement

3   and agree that this will be used for purposes of this

4   estimation and for no other purpose, not for claims allowance,

5   not for anything else, and that the database will at some point

6   in time be scrubbed of this information.  It seems to me you're

7   entitled to it for this reason.  Yes, I think the debtor in

8   looking at what its valuation of claims is going to be I think

9   does have the right to take a look at joint and several

10  liability issues.

11         To the extent that there is some allegation of joint

12  and several liability, whether the claimants have settled or

13  recovered something from another entity is going to factor into

14  that.  I think it goes to the valuation of claims.

15         MR. BERNICK:  Yes, and I think Your Honor recognized

16  that -- we have a prior transcript -- when unprompted you made

17  exactly the same statement at the time, is that it goes to the

18  question of how much each one of these other different sources

19  is paying.  No trust should have to pay.  And what's

20  interesting is the brief that was filed by Ms. Ramsey's firm

21  basically acknowledges in very, very explicit terms.  This is a

22  several liability situation.  Each trust is going to be paying

23  for its own way.  The question is whether that's really so

24  here.  That is, are we talking about values that effectively do

25  the work of other trusts.

1      They say that shouldn't happen or if it does we

2  should go pay somebody else back.  But, I think the Court

3  properly understands that at the end of the day because a trust

4  is setup and it will be setup under several bases, we ought to

5  be able to know what money is going to -- is coming in from

6  other sources or going out to these same people.

7      With respect to the settlement confidentiality, which

8  I think really is the only issue that is a little bit novel, we

9  looked to see if there was any settlement agreement where they

10  could redact everything and then show us what the agreement was

11  so we can see if there is a problem.  Very interestingly, I

12  don't believe that there's been a single settlement agreement

13  submitted to the Court which has been pointed to as precluding

14  the use of information at the direction of a court.  We would

15  obviously comport with what Your Honor has indicated is an

16  appropriate restriction.

17      But, in point of fact, the one settlement agreement

18  that was attached -- I think it was attached to maybe Ms.

19  Ramsey's affidavit or somebody's affidavit.  But, it was a

20  settlement agreement that was not signed.  It was for the Kazan

21  firm.  It says each party -- this release agrees not to make

22  public or otherwise reveal or disclose any third party except

23  as maybe required by law.  Nobody is saying that somehow a

24  court does not have the authority to compel the production of

25  information.  God knows, Grace entered into all kind of

1  settlement agreements itself before it went into Chapter 11.

2  All of its settlement agreements had been provided to the folks

3  who are on the other side of the room.

4       So, we don't believe that that's really inappropriate

5  or a real impediment.  And, as a consequence, we would suggest

6  the solution to that is simply to have a confidentiality

7  provision that we're prepared to enter into that says along the

8  lines as Your Honor suggested, only be used for purposes of

9  this case.

10       MR. ESSERMAN:  Your Honor, Sandy Esserman on behalf

11  of various law firms.  Confidentiality is an important issue.

12  We filed affidavits that basically provide that the settlements

13  that our clients have entered into are confidential.  I think

14  we're obligated to make this objection.  The Court can order

15  information disclosed.  I did bring several settlement

16  agreements which are sort of what I'll call typical.

17       One is, "It is further agreed" -- this quoting from

18  the settlement -- "that the fact and amount of this settlement

19  is confidential.  It is not to be disclosed by any part hereto

20  or any attorney representing such party to any third party

21  except as required by law."  That's sort of a typical -- that

22  provision is actually from Grace's agreement.  Others are more

23  complicated and more complex.  But, as a general rule, they

24  prohibit disclosure and -- to third parties.  In some

25  instances, settlement agreements provide for notice to the

1 settling parties and allow them to come in and object to

2 release of any information.

3       THE COURT:  Well, that's fine.  If notice is

4 required, I think notice can be given.  And if they have some

5 objection I'll hear it.  It seems to me that to the extent that

6 notice isn't required provided that Grace agrees to keep the

7 information confidential and for use only in this estimation

8 process.  That should go a long way to giving people some

9 comfort.

10      MR. ESSERMAN:  Let me make a suggestion as to -- in

11 addition to keeping the information confidential, I think we

12 could get around a lot of these confidentiality provisions

13 without having to give notice, without having to -- have a long

14 of hearings.  If the firms were to provide the amounts they

15 received in settlement, and so the number of defendants that

16 they have settled with.  That is, if they received for example

17 say $100,000 from eight defendants and that information was

18 given to grace, I think we could get around the confidentiality

19 provision for any particular agreement which it came from the

20 Court without having had any further hearings on the issues.

21      THE COURT:  Okay.  I'm not sure that -- I'm not sure

22 that Mr. Bernick was paying attention what you just offered.

23      MR. ESSERMAN:  Okay.  Well, then he must agree.  What

24 I suggest it was --

25      THE COURT:  It would be so easy.

1          MR. ESSERMAN:  I just wish I got paid by the word.

2          UNIDENTIFIED SPEAKER:  You've got a better deal than

3 I do.  Let me assure you, you and your clients do better than I

4 do.

5          MR. ESSERMAN:  Anyway, what I suggested is one way

6 around these confidentiality agreements that I think we could

7 go without any further hearings and without giving any notice

8 to any of the parties that are involved in the settlement is by

9 giving or each claimant the amount they received, the dollar

10 amount they received and the number of defendants that they

11 received the monies from.  That is, for example, $100,000 from

12 eight defendants.

13          MR. BERNICK:  I think if we got the aggregate amount

14 --

15          MR. ESSERMAN:  Aggregate amount.

16          MR. BERNICK:  -- the number of defendants that

17 contributed to it --

18          THE COURT:  Yes.

19          MR. BERNICK:  And the disease?

20          MR. ESSERMAN:  That should be part of the -- you

21 should have that.  That should be of the questionnaire.

22          MR. BERNICK:  The disease for which the claim was

23 settled.

24          THE COURT:  If it's different -- maybe if it's

25 different from what's on the questionnaire.

1          MR. ESSERMAN:  How about if it's different than the

2  questionnaire?

3          MR. BERNICK:  Well, because the questionnaire either

4  --

5          MR. ESSERMAN:  That's another burden.

6          MR. BERNICK:  We don't know what it is because the

7  questionnaire has every specific definitions and there are

8  different questions that relate to him.  So, we just want to

9  know how it reads --

10          MR. ESSERMAN:  In other words, $100,000, eight

11  defendants for mesothelioma or asbestosis or whatever you --

12          MR. BERNICK:  Whatever it is.  And if it's different

13  for different settlements, then we're talking about --

14          MR. ESSERMAN:  Which of course t could be because it

15  could have $50,000 for asbestos in one year and then they could

16  develop X-Games mesothelioma five years from now.

17          MR. BERNICK:  Who knows?

18          MR. ESSERMAN:  Or a more serious asbestosis or

19  something.  Why don't I consult with my client.  Well, those

20  that were here.  And maybe that's an easy way of getting around

21  it without have to have further proceedings.

22          MR. FINCH:  Your Honor, just on the confidentiality

23  point, I mean, as long as it's clear that the information can

24  only be used by Grace and whatever -- I mean, Grace has hired

25  in this bankruptcy case a firm called Forman, Perry and

1  Watkins, which is a firm that is actively defending other

2  asbestos defendants, solvent asbestos defendants in the tort

3  system.  And it would cause grave concern on the part of the

4  claimants if that firm got access to any of the aggregate

5  settlement data and started sharing it with the defendants that

6  are represented out in the tort system --

7          THE COURT:  I think I --

8          MR. FINCH:  -- because normally you do not get

9  discovery as to whether or not John Smith settled with five

10 other people before he settles with Grace.

11         THE COURT:  I think I just said it would only be

12 subject to a confidentiality agreement for use in this

13 estimation process and no other.  I mean, that's the condition

14 for ordering it in the first place.

15         MR. BERNICK:  Mr. Finch should know me well enough by

16 this point that we would be very responsive to that kind of

17 concern.  And I don't think the Forman, Perry people are

18 involved in this part of the case.  They're involved in a

19 different part of the case.  So, we would have no difficulty

20 working out those kinds of things with Mr. Finch or --

21         MR. FINCH:  Okay.  I just wanted to lay down a

22 marker, Your Honor, that's all.

23         THE COURT:  All right.

24         MR. BRADLEY:  Your Honor, Gary Bradley for Thornton

25 anonymous claimants.  We're not represented by Mr. Esserman in

1 this matter, but we would agree to that arrangement for the

2 purposes of the record.  I would also ask leave at least to

3 work with Mr. Bernick or Mr. Mendelson.  I've worked with them

4 on other issues.  We are computer based in regards to our

5 receipts and it would be much easier for us to provide an

6 Excel-based format rather than having to print it out and

7 attach it, just to provide all by one --

8             THE COURT:  They would probably love it.

9             MR. BRADLEY:  It would be easier for us but it would

10 also provide different dates that can coincide with the disease

11 diagnosis, so we would get all the information rather than

12 having to write in the little boxes on the form.

13             THE COURT:  Mr. Bernick, is that okay to work out?

14             MR. BERNICK:  Whatever we can do.  You know, it's

15 impossible for me to address these kinds of things right now.

16 Again, we have only an interest in getting the appropriate

17 (inaudible) information and I'm sure we can work with people to

18 get that.

19             THE COURT:  All right.

20             MR. ESSERMAN:  Your Honor, I think that that

21 suggestion by Mr. Bernick and the suggestion by myself melding

22 the two will be fine.

23             THE COURT:  All right.

24             MR. ESSERMAN:  I think that that's something that we

25 can live with.  So, it will be aggregate settlement amount,

1 number of defendants and disease.

2            MR. BERNICK:  Disease -- disease or diseases.

3            MR. ESSERMAN:  Exactly.

4            MR. BERNICK:  Yes, but I want to be able to --

5            UNIDENTIFIED SPEAKER:  We can settle.

6            MR. ESSERMAN:  Yes.

7            THE COURT:  Okay.

8            UNIDENTIFIED SPEAKER:  I don't want to get to the --

9            MR. BERNICK:  Do we have anything else to talk about

10 that concerns the --

11           THE COURT:  Wait, Mr. Bernick.  People are still

12 lined up I'm not sure for what here, so let me find out.  No?

13 Oh, they're not lined up, never mind.  Okay.

14           MR. BERNICK:  That was a bomb.

15           THE COURT:  Okay.  Yes, what's next now?

16           MR. BERNICK:  Yes, there were two other things.

17 There was a burden issue with respect to the reasons why cases

18 that were -- cases or claims that were pending against -- that

19 were brought against other defendants or other parties were

20 dismissed or dropped.  And a burden issue was raised with

21 respect to that by the different firms.  And that is, you know,

22 from our point of view, if they don't know why they don't know

23 why.  But, if they do know why, they ought to be able to tell

24 us yet --

25           THE COURT:  What's the relevance of claims that are

232

1  not going to go forward?

2      MR. BERNICK:  Well, for example, if you have claims

3  that are brought for exposure at a given job site to asbestos

4  or with respect to a given product.  If they fill out the

5  non-Grace asbestos chart and they have claims that involve or

6  years that involve significant exposure to other company's

7  products and then it turns out that the claims were dropped or

8  dismissed, that's going to be pretty relevant to the question

9  perhaps because they went into Chapter 11, I don't know.  But,

10  it becomes pretty relevant to the question of again whether we

11  are really being asked to pick up the responsibility of other

12  companies that were actually involved in the exposure.  And

13  that certainly is germane to our -- the question of whether we

14  are paying our several share or not.

15      I mean, the fact of the matter is it's just the same

16  kind of thing.  In all of Grace's litigation history, all that

17  claims that it settled and why it settled and which ones were

18  dropped, all of that has been gone over with a fine tooth comb

19  as being relevant to the question of what claims against Grace

20  are worth.  Well, it is a two-way street.  If in fact there

21  were claims that involved the same kinds of products that were

22  dismissed for whatever reason or not proof enough for whatever

23  reason, this becomes important as part of the history about how

24  these claims were pursued.

25      So, that was the reason why it was in the original

1 questionnaire.  It got approved.  I don't believe that there

2 was even an issue raised or any objection that was made when we

3 went through this process the first time of that information.

4 And, of course, everything was objected to, but I don't believe

5 that it even got to the point of being controversial before the

6 Court.  And now, a burden issue is raised.  Well, you know, the

7 burdens of litigation are there.  And if they've got a lot of

8 claims they've got a lot of claims, but the information should

9 be provided.

10      So, we believe that that burden objection is not well

11 taken.  Burden really ought to be extraordinary.  If the

12 information is not available, if the law firms just don't have

13 it anymore.  They can say they don't have it anymore.  But, if

14 the information is there, they ought to be providing it to us

15 in the same fashion that we've been providing all kinds of

16 information from our own side.

17      THE COURT:  Okay.  I'm having a little difficulty

18 understanding the reason why a claim is dropped as relevant.  I

19 mean, the fact that somebody sued five other defendants and the

20 cases were dismissed maybe.  But, what difference does it make

21 what the reason is?

22      MR. BERNICK:  Because in a case where there's a

23 fundamental issue of causation and nexus, if they've got cases

24 where they have made the same allegations that a same disease

25 involving other products and have dropped them because they

1 were not able to produce enough evidence that there was some

2 significant exposure, let's say you've got --

3          THE COURT:  But, what difference does that make as to

4 the debtor's liability for its own products?  I mean --

5          MR. BERNICK:  Because if the product is the same

6 product or the job site is the same job site.  See, we'll get a

7 lot of situations where somebody will say, I worked at a job

8 site.  I was there.  I saw a Grace product, therefore, I was

9 exposed.  We believe that that is a fundamentally defective

10 claim because you can't bring a toxic tort claim on the

11 strength of simply saying I was there.  You have to demonstrate

12 that you have affirmative exposure that's sufficient to satisfy

13 a causation requirement.

14          If the same worker present at the same job site

15 originally prosecuted claims against other companies that had

16 product on the site and then later it never pursued claims

17 against the other company but is now here to pursue the claim

18 against Grace, that tends to suggest that there is a problem

19 with their ability to prove that they had any significant

20 exposure at that site.

21          THE COURT:  Maybe or maybe they dropped it because

22 they intended to pursue the claim against Grace.

23          MR. BERNICK:  That would be also -- well, Your Honor,

24 that would be very, very instructive.  So, I mean, that is

25 exactly the kind of thing that we're getting into.  And, again,

235

1  fair is fair.  All of our history has been exposed.  We ought

2  to get it going the other way.

3       THE COURT:  All right.  Mr. Esserman?

4       MR. ESSERMAN:  First of all, Your Honor, we're not

5  talking about Grace claims.  We're talking about other claims.

6  So, when Mr. Bernick stands up and says, all our history is

7  exposed, well, what's at issue is the estimation of claims

8  against Grace not the estimation of claims against other third

9  parties.  So, that's a complete apples and oranges situation.

10 But, there is a relevance and burden issue, but let me just cut

11 to the chase here.  If what we can do is put in that the case

12 was dismissed because it was settled or it was dismissed

13 without prejudice and we can determine that from our computers,

14 I believe, or the claimant decided not to prosecute the claim,

15 if it can be determined from our computers and we can do

16 something like that which I think we can, we'll do it and give

17 them that information.

18       What we're not going to do is go through 15,000 files

19 and do a legal analysis which is what Mr. Bernick wants to do

20 to say, well, maybe this product was just like Grace and,

21 therefore, we dismiss somebody because they're just like a

22 Grace product.  They had insulation just like Grace or they had

23 some coating just like Grace, and maybe Grace should get the

24 benefit of that individual.  This is an estimation.  Once

25 again, we've got to bring this back to an estimation.  This is

1 not a claim by claim analysis.

2          THE COURT:  I have some trouble seeing the relevance.

3 To the extent that, you know, there is some information that

4 something was settled or that the claim was dismissed without

5 prejudice so you can get something when you file, I think

6 that's fine.  I don't see --

7          MR. ESSERMAN:  We can do that, Your Honor.

8          THE COURT:  -- a large amount of relevance to this.

9 So, I'm not going to make you go back through each thing --

10 each file to look for a specific reason that probably won't

11 exist in your file anyway, but --

12          MR. ESSERMAN:  And if it would it would probably be

13 work product, but anyway as to the analysis of why something

14 was done or why it wasn't don't.  So, we'll go ahead and do

15 that.  Thank you.

16          MR. BERNICK:  That sounds very reasonable and again

17 it's all nicely balanced.  This morning, there was none of

18 that.  They want to know why we settled all the claims that we

19 had.  And, you know --

20          THE COURT:  Well, you said that you would give them

21 that.

22          MR. BERNICK:  I said that we would give them --

23          THE COURT:  I never made the ruling.

24          MR. BERNICK:  I said that we would give them that.

25          THE COURT:  I didn't have to make a ruling.

1          MR. BERNICK:  Well, I, you know -- so, now when it

2  comes to our asking for the same kind of information, well, if

3  it's easy we'll do it for you.  And what we would like to have

4  is really kind of the same kind of thing to the extent that

5  they have.  With respect to these claimants -- nobody is asking

6  for all the claimants that they ever had.  But, with respect to

7  these claimants presumably they have got a file on each and

8  every one of these claimants.  Somebody there has got to know

9  about what happened to these claimants and which claims were

10 pursued and why.  I'm not --

11         THE COURT:  I don't see the basis of relevance for

12 all of that information, Mr. Bernick.  The fact that a case was

13 filed against someone else and resolved in some fashion and how

14 it was resolved, yes, I can see the relevance to that.  But,

15 the reasons for it, I mean, you know, number one, it could be

16 attorney client privilege.  Number two, it could be

17 confidential.  Number three, it could be based on some

18 settlement and --

19         MR. BERNICK:  Those were all things that were -- you

20 know, they were batting down the door --

21         THE COURT:  Yes, and I --

22         MR. BERNICK:  -- to pursue exactly the same things

23 with respect to Grace.

24         THE COURT:  -- didn't have to make any rulings on

25 that matter.

1          MR. BERNICK:  And you didn't have to make any

2    rulings.  Well, okay, that's fine.  What we would like to have

3    though at least as to -- I think the statement that was just

4    made by Mr. Esserman that -- in his usual fashion is very

5    moderate and effective and we appreciate that.  It was kind of

6    if it's reasonably convenient, we will tell you whether it was

7    settled or whether it was dropped or whether it was dismissed.

8          MR. ESSERMAN:  We'll search our database.  We'll

9    search the database.

10         MR. BERNICK:  We'll search the database.  But, at

11   least when it comes to just that information, settled, dropped

12   or dismissed, I mean, what are the databases?  How far back to

13   they go?  I mean, are we going to -- is that going to be a

14   reasonable way of --

15         MR. ESSERMAN:  It's going to be for those claimants

16   for which we submitted a questionnaire.  These are

17   questionnaire questions.  So, that's --

18         MR. BERNICK:  Well, you believe that with respect to

19   people who actually submitted questionnaires that we'll be able

20   to get this information?

21         MR. ESSERMAN:  Well, to the extent it exists, yes.  I

22   mean, to the extent that they dismissed somebody or settled

23   with somebody or dismissed somebody out, yes.

24         MR. BERNICK:  If it's respect to the people who

25   submitted questionnaires, that would be very appropriate and we

1  wouldn't have a problem with that.

2          MR. ESSERMAN:  Yes, that's fine.

3          MR. BERNICK:  Okay, then I think we've got it.

4          THE COURT:  All right.  So, you'll work out an order

5  for this one?

6          MR. BERNICK:  Yes.

7          THE COURT:  All right.

8          MR. BERNICK:  Now, I think that the only -- was there

9  another burden issue, Sandy?

10          MR. ESSERMAN:  There is one more.  It's the race

11 issue was the only other one.

12          MR. BERNICK:  Oh, isn't that -- that's relevant to

13 the PFT test.  There's a different input to the PFT test based

14 upon race.

15          MR. ESSERMAN:  That's the last one I've got.

16          MR. BERNICK:  Yes.

17          THE COURT:  I'm sorry?  I'm sorry, you were both

18 speaking and I couldn't hear you.

19          MR. ESSERMAN:  I'm sorry.  Mr. Bernick and I were

20 trying to decide what as next and how much was left.  And what

21 I suggested was that there was just one issue left to decide

22 this afternoon and that was the race issue on the PFT.

23          THE COURT:  Okay.  And what's the difference in the

24 PFT test?

25          MR. BERNICK:  There's a different input for the --

1  the PFT scores go through a different algorithm depending upon

2  race.  Ms. Harding will know the --

3           MS. HARDING:  Yes, Your Honor, when the PFT tests are

4  conducted, the result of the PFT test is compared against a

5  predicted value for somebody of a certain age, height, weight

6  and race.  Race is required.

7           THE COURT:  Oh, I see.

8           MS. HARDING:  So, that is why it's asked for, Your

9  Honor.

10          THE COURT:  Okay.  And it's only one firm that

11  doesn't have that information so far?

12          MR. ESSERMAN:  Your Honor, the Wilentz firm is the

13  firm that is involved in this information and issue.

14          THE COURT:  All right.  Good afternoon.

15          MS. PACHECO:  Good afternoon, Your Honor, Deirdre

16  Pacheco from Wilentz, Goldman and Spitzer.  Your Honor, for

17  those instances where we had PFT results in a file, the PFT

18  results were provided.  And our understanding is that where it

19  was indicated on the PFT form what the client's race was, we

20  also lifted that information from the PFT and inserted it in

21  the appropriate space on the questionnaire.  We will

22  double-check that.  But, for those instances where we do not

23  have a PFT or the PFT for whatever reason doesn't happen to

24  account for race, we do not independently have that

25  information.

1          THE COURT:  Well, I mean, if you don't have it you

2     don't have it.  I guess the question is if -- I'm not sure how

3     the PFT results will be used.  If it's a matter of ultimately

4     the claimant producing the PFT results to support a claim and

5     the comparisons go by race, I guess that's a relevant factor.

6     I think in most instances race just doesn't matter, but maybe

7     it does for some medical purpose.

8          MS. PACHECO:  And we understand that.  And we

9     understand why it's sought with respect to this particular set

10    of claims.  But, this motion to compel is not related to our

11    firm or our clients claiming against a trust that doesn't exist

12    yet.

13         THE COURT:  Okay.

14         MS. PACHECO:  Thank you.

15         MR. BERNICK:  Maybe if I can inquire -- if we don't

16    have PFT tests that are being submitted, this is a nonissue.

17    So, this is only with respect to people who submitted PFT

18    tests.  If the PFT test submitted has race indicated and

19    they've pulled the information off and filled out the

20    questionnaire, again, there's no issue.  If the PFT test does

21    not reflect Grace and there is some other source of information

22    that they have within their office about the race of the

23    individual, it seems to me that we ought to get that.

24         THE COURT:  Well, she said she would check her files

25    to see if they have it.  But, if they don't, they're not going

1  to go back to the clients to ask for it.

2          MR. BERNICK:  So, the only issue that we're really

3  facing is where there's no information about the race of their

4  own client --

5          THE COURT:  Right.

6          MR. BERNICK:  -- and there is a PFT test, they have

7  to pick up a telephone to find out what the race of the client

8  is.

9          THE COURT:  But, I -- I mean, I --

10          MR. BERNICK:  Is that the issue?

11          THE COURT:  I guess that's the issue.  They don't

12  want to do it and I'm not sure they have to do it.

13          MS. PACHECO:  Your Honor, it's just as easy for Grace

14  to send --

15          THE CLERK:  Please use the microphone.

16          MS. PACHECO:  I'm sorry.  If Grace wants to send our

17  clients postcards asking them this question, we don't have a

18  problem with that.

19          MR. BERNICK:  We can imagine that that would be well

20  received in the press.  It's just kind of a little bit -- well,

21  if the client will -- where there's a PFT test the firm will

22  represent -- we get a representation where there's a PFT test

23  and no race indicated that the firm just does not have the

24  information, we'll be satisfied with that.

25          THE COURT:  Okay, that's -- I think counsel said that

1  she would go back and look through their files and make that

2  representation if it hasn't already been provided.

3          MS. PACHECO:  Correct.

4          THE COURT:  Okay.

5          MR. BERNICK:  Now, there's -- I don't know if -- the

6  last substantive -- there's a little detail -- it turns out

7  that we do know the name now of the individual -- the famous

8  individual where there were two different B reads.  And based

9  upon the unredacted version of Dr. Graziano's report, we do

10 believe that it is in fact the same individual.  So, for the

11 record, that is what we presently -- happens to have the same

12 social security number and the same name, which again

13 underscores the need that we think we have to be able to avoid

14 having to go down this kind of rabbit hole several thousand

15 times.

16          The last matter really is I think the balance of any

17 and all objections that are outstanding.  There were different

18 firms.  They include the Motley Rice firm.  They -- I think

19 there was one other firm that could well have been Kelley and

20 Ferraro.  There were firms that took the position that for

21 whatever reason or at some point in time it was their view that

22 the Court did not have authority to issue rulings that were

23 binding upon them or their clients.  There are also I'm sure a

24 welter of different objections that have been stated at some

25 point in time or another in writing.

1          But, I think that unless there is some other

2    substantive issue that has to be taken up this afternoon, it

3    would be important for Your Honor to determine -- we can

4    reflect this in the order -- that all other objections that

5    actually have not been ruled upon and have been presented --

6    there are objections that have been made, not ruled upon

7    specifically, are overruled for purposes of the completion of

8    the questionnaire, and that the questionnaire should be

9    answered completely in conformance with Your Honor's rulings.

10          THE COURT:  I'm not understanding.  The only issue

11   that I know that I haven't made a ruling on is the one issue

12   that I've reserved with respect to the consulting reports.

13          MR. BERNICK:  Yes.

14          THE COURT:  I've made rulings on everything else.

15          MR. BERNICK:  I believe that that's correct, Your

16   Honor, but I don't -- in light of some of the ambiguity of who

17   is taking what positions on what, I want it to be clear that

18   from Your Honor's point of view, there are no other outstanding

19   rulings to be made.

20          THE COURT:  Well, let me inquire.  Those of you on

21   the phone, does anybody have an objection to raise that has not

22   previously been raised and that I have not ruled on?

23                    (No verbal response)

24          THE COURT:  All right.  There is no response.  In

25   court, does anybody have an objection to raise that I have not

1  already ruled on?

2      MR. ESSERMAN:  Your Honor, Sandy Esserman.  I think

3  we've got it a little backwards and let me try and straighten

4  this out.  I think the Court has been very clear that -- on the

5  questionnaire proceeding that if there has been some

6  noncompliance or objection or someone hasn't answered a portion

7  of the questionnaire, it was Grace's burden to bring a motion

8  to compel.  And Grace brought those motions to compel, and

9  Grace brought those motions to compel against various firms.  I

10 think we have ten or 15 firms that we filed responses to on the

11 various issues that Grace filed their motion to compel.

12     We believe on behalf of the firms that I represent

13 that we responded to the issues that Grace has raised.  What

14 Grace wants is sort of a blanket comfort letter, all other

15 relief not granted is denied.  And that is not the way the

16 Court had requested this process to go.

17     THE COURT:  No, I wasn't clear, Mr. Esserman.  I'm

18 sorry for interrupting you.

19     MR. ESSERMAN:  sure.

20     THE COURT:  There were a variety of objections raised

21 both by the ACC, the FCR and Grace.  There were joinders and

22 not joinders to some objections and to some responses.  There

23 were some I think objections -- I would have to say that there

24 were objections to production of documents raised and

25 responses, not by way of a motion to compel but by -- sometimes

1 by way of a response to the motion to compel.  I want to make

2 sure that every issue that everybody who has a position to take

3 on any of the matters that have been raised in the pleadings

4 that were set for hearing today has had an opportunity to be

5 heard because this is it.  I'm not revisiting these issues

6 again.

7          MR. ESSERMAN:  Right.

8          THE COURT:  And to the extent that somebody doesn't

9 speak on this record, I'm not hearing it later.  So, if you

10 have a position and you haven't advocated it, then I guess it

11 is overruled because I'm not hearing it later.

12          MR. ESSERMAN:  I think every issue that Grace has

13 raised in a motion to compel that affected firms that I

14 represent has been discussed by the Court and either taken

15 under advisement or ruled on.

16          THE COURT:  Okay, that's what I'm trying to get to,

17 not things that have not been raised before today.

18          MR. HERRICK:  Good afternoon, Your Honor, John

19 Herrick again.  And I understand that counsel for Grace has

20 been kicking this bankruptcy around for what is it five and a

21 half years now?  And the plaintiffs that I represent or the

22 claimants that I represent have not been involved in this

23 bankruptcy throughout that period of time.  As the Court

24 recognizes, they became involved when they filed their proof of

25 claim forms and that conferred jurisdiction upon them.

1         Now, one of the issues that I had raised in my

2  response to their motion to compel -- and I'll be brief about

3  this -- was that Grace failed to file as is required by Federal

4  Rule of Civil Procedure Number 30 a certificate of good faith.

5  That rule is couched in the imperative.  It's not a choice as

6  to whether or not they want to do that, it's a must situation.

7  That's particularly important I think in light of what counsel

8  has alluded to here today about how this might turn into

9  disallowance of claims, how this might require more time for

10 them to get the information from my claimants that they want to

11 use to lower the value or disallow their claims.

12        Now, after the last hearing, Your Honor, my office

13 sent Mr. Bernick a letter.  And what we basically said was, we

14 have filed our responses to your questionnaires.  Please let us

15 know which if any of our submissions you may feel to be

16 deficient at this time.  Please be specific.  Also, to the

17 extent any question wasn't answered, identify please the person

18 by name, social security number, state of filing or other

19 unique information which will allow us to determine which of

20 our similarly named clients will respond.  You may recall when

21 I was here at the last hearing on September 11th, I pointed out

22 to the Court that some of the questionnaires we got we were not

23 able to determine for what client -- to what client they

24 pertained because there was no identifying information.

25        Now, I did get a response from W.R. Grace -- or

1  excuse me, the debtor here.  And the response was basically,

2  I'm in receipt of your letter.  I'm enclosing for your review a

3  copy of the order that this Court entered on October 12th,

4  which of course I already have, Your Honor.  In other words,

5  that wasn't a response to my question.  Now, not -- despite

6  this, Your Honor, W.R. Grace filed a motion to compel.  Now,

7  the motion to compel wasn't directed specifically to any of my

8  claimants but directed not even specifically to my law firm but

9  my law firm and two other law firms.

10        And not until their response -- or excuse me, their

11  reply to my response to the motion to compel do I see this.

12  And what this talks about is it is clear some claimants have

13  not disclosed documents that their physicians relied on.  A

14  Motley Rice claimant submitted a questionnaire that attaches a

15  2003 diagnosis by Dr. Wayne Middendorf that relies on a check

16  x-ray by Dr. Ballard.  This is the first notice I received of

17  anything of this nature.  And he says -- he goes onto say,

18  "Such underlying information and documents must be produced."

19  Your Honor, I agree.  That's Dr. Ballard's report.  It was

20  inadvertently produced.

21        And the reason I point that out is that's why we have

22  certificates of good faith requirement.  That's why the Court

23  has rules about motions to compel.  We are wasting time going

24  through these sorts of issues when W.R. Grace is not looking at

25  the documents that have been provided and not looking at the

1  data and making real -- or asking real questions about the

2  further information they need to have.  Thank you.

3        MR. BERNICK:  Your Honor, if I could respond to that

4  briefly.  We looked through -- the Motley Rice firm has lodged

5  objections at different points in time in this process like

6  other firms have.  We have had some correspondence.  But, as

7  this situation evolved, Your Honor will recall that at the

8  outset we did move to compel on a generic or broad basis.  And

9  everybody was given notice of that and we tried to get

10 everybody in.  Coming out of that process ultimately was Your

11 Honor's October 12 order.

12       And Your Honor's October 12 order said specifically

13 that generalized objections to relevance and burden are not

14 going to be taken up again.  You wanted to hear specific

15 concerns with respect to specific claimants and specific

16 objections.  That is, if there was a firm or there were a group

17 of claimants that were particularly affected by this

18 questionnaire in some special fashion, that ought to be raised

19 before the Court.  The Motley Rice firm has done no such thing.

20 The Motley Rice firm has first taken the position as their

21 brief indicates -- continues to be their view that there was no

22 jurisdiction over them.  Because there was no jurisdiction,

23 they basically didn't have to do anything.

24       And the other maters that they raised are of a

25 general nature, not claimant specific, not law firm specific,

1  not claimant specific, not law firm specific, no class of

2  claimants that were part and parcel of the same objections that

3  were being negotiated with Mr. Esserman and with other people

4  who are more actively involved in the process.  So, no, we did

5  not -- we have got a staff of people that are working round the

6  clock to try to deal with the process of getting rulings with

7  respect to answers to tens of thousands of questionnaires.  We

8  do not have the ability to have detailed firm specific

9  negotiations with respect to each firm where we went through

10 each and every questionnaire and said, fill this one out

11 differently or fill this one out differently or fill this one

12 out differently.

13         What we sought to tee up were the objections that

14 were going to be relied upon going to the face of the

15 questionnaire as a reason for not filling out the

16 questionnaire.  We have worked very, very hard with the law

17 firms who have been voluntary and active participants in the

18 process to try to resolve our differences.  And if the Motley

19 Rice people had some specific issue that was specific to their

20 clients or specific to some other group of claimants that we

21 should have considered, the whole force of Your Honor's October

22 12 order was to have them come forward and then identify what

23 that specific issue was.

24         THE COURT:  No, I -- look, I think this is a

25 nonstarter.  So, I don't think I need to make rulings.  The

1  purpose of my October 12th order wasn't just to apply to the

2  claimants.  It is to apply to the debtor, too.  If you've got

3  specific questions, specific issues, I want them raised

4  specifically and not in gross.  I am done with the engross

5  objections.  At this point, we have been over this

6  questionnaire to the point where probably all of you have it

7  memorized and use it for your nighttime reading when you can't

8  fall asleep.  I mean, it's enough.  So, let's get the

9  questionnaires answered and move onto something else, folks.

10 We have enough issues in this case.  This questionnaire has

11 taken up enough time and expense.  Yes, sir?

12       MR. ROADES:  Your Honor, I'm David Roades and I'm

13 here for the claimants represented by Goldberg, Perskie and

14 White.  All or virtually all of my clients are parties to an

15 administrative settlement agreement with Grace.  My reading of

16 the order indicates that questionnaires are to be filled out by

17 people who filed suit against Grace.  We didn't file suit

18 against them.  This Court said at the last hearing that, I'm

19 not going to compel them, the Goldberg claimants, to submit any

20 further answers until I know whether they have to fill out the

21 questionnaire in the first place.  We don't believe that that

22 issue has been addressed yet.  And so, we would object to any

23 attempt to sweep us into an omnibus ruling that everything has

24 been resolved and --

25       THE COURT:  Well, I thought I setup a process by

1 which the debtor and the various firms would determine whether

2 or not there were settlements in place and whether the debtor

3 agreed that it had everything that it thinks it needs to

4 have -- to verify that there was a settlement.  And then, the

5 debtor was to notify the other side that they disagree if they

6 disagree.  So, if that time period has come and gone -- and I

7 don't remember the dates -- then you don't -- and you haven't

8 been notified, you don't have to answer.  If the time period

9 hasn't come and gone yet and they say, we think you settled

10 these 500 cases but not these 36, then you'll have to answer as

11 to the 36.

12        MR. ROADES:  Well, Your Honor, I believe we have a

13 disagreement as to some of them.  The parties are going through

14 that procedure and there are some claimants who have -- who are

15 subject to the agreement but have not submitted qualifying

16 materials because there was a staged process in which the

17 qualifying materials were to be submitted.  We believe that the

18 same principal would apply to those who have not submitted

19 qualifying materials but still are subject to the agreement and

20 have the right to get the stated amount, because the amount of

21 a given claimant's -- the value of a given claimant's claim

22 cannot be less than the amount he's contractually entitled to

23 receive upon performance of a ministerial act.

24        THE COURT:  Well, you know, the problem with this

25 theory from my limited exposure in I think it was another -- I

1  think it was in <u>Owens</u>, I'm not sure, is that this is an issue

2  that appears to be dependent on the underlying state law that

3  governs these agreements.  And so, whether or not there is a

4  completed settlement depends on that state law.  In most -- but

5  I don't profess to have examined all 50 states' laws.  I have

6  looked at a couple of them in connection with other litigation.

7  In most of them, the fact that there is a settlement in

8  progress but not completed is not going to be enough to get

9  your clients within that settlement term.  They're going to

10  have a claim in this state if it wasn't paid.  But, in some,

11  there are different rulings.  I don't know the underlying state

12  law.  You folks -- I don't even know what law applies in -- so,

13  you folks need to work this one out.

14          My ruling is this.  To the extent that you have --

15  you agree that there are settlements, you don't need to answer

16  this questionnaire because it wasn't directed to that.  To the

17  extent that there's a disagreement, if your clients don't do

18  what's necessary to file a proof of claim, even if they think

19  it's -- they have some different ruling in mind, for example,

20  they file it saying, we think we settled, I think you need to

21  get the claim filed and the questionnaire done or else when it

22  comes time to make substantive rulings, your clients may have

23  lost simply because they didn't do what they need to do to get

24  into the bankruptcy system.

25          MR. BERNICK:  We've had an extended dialogue with the

1 Goldberg Perskie firm.  The person involved in that is Lisa

2 Sand, who is not here, because the question of what claims are

3 settled is not up for discussion today.

4          THE COURT:  Okay, it's not.

5          MR. BERNICK:  And the Goldberg Perskie firm, we did

6 have this -- exactly the contemplate exchange with.  It turns

7 out that they did not have the documentation to support upwards

8 of 668 plus claims.  We notified them.  They filed no response

9 and no objection to our dispute.  So, we wrote them a letter

10 saying, you should fill out the questionnaires.  And all of

11 this is going to be put before Your Honor in time for I think a

12 hearing on December the 18th, at which time we will ask Your

13 Honor to enter an order directing that they fill out the

14 questionnaire.  So, this has all been taken care of.  It's part

15 of God bless another day.  And the issue that we've raised

16 today is not really germane to this particular point.

17          THE COURT:  Okay.

18          MR. BERNICK:  And if there is anything else I can

19 tell the Court I would be happy to, but I that's all I know.

20          THE COURT:  No, that's fine.  It's not up -- but I am

21 concerned that if your clients are wrong on their legal

22 perspective, they're going to suffer some severe consequences

23 and by operation of law.

24          MR. ROADES:  Your Honor, I think we've submitted some

25 materials.  We have some of the same objections that have been

1  addressed by other parties here today.  I have a very limited

2  purpose, which is just to make sure that I don't get foreclosed

3  from resolution of the issue about whether these settlements

4  are binding based on a generic catchall today.  And as I

5  understand it, it's set for another day and I won't be so

6  concluded.

7            THE COURT:  Right.

8            MR. ROADES:  So, I'm satisfied with that, Your Honor.

9            THE COURT:  Okay, that's fine.

10           MS. RAMSEY:  Your Honor, I have -- Natalie Ramsey for

11  the MMWR claimants.  I have three points with respect to the

12  request for a catchall ruling.  The first is that in the motion

13  as regarding the MMWR firms, there was a request by Grace for

14  discovery sanctions which included the potential for claims

15  disallowance.  And that issue has not been discussed today.  We

16  think that that request was grossly inappropriate in any event.

17  But, it hasn't been discussed today and we certainly wouldn't

18  want some ruling that because that hadn't been aired before the

19  Court that the motion was granted.

20           The other -- Part B of one is that there was an

21  argument made in Grace's memorandum as regards our clients that

22  all relevance objections had been overruled by the Court.  And

23  I understand that the Court has generally opined that the

24  questionnaire is relevant.  But, it's also my understanding

25  that individual objections for individual claimants have not

1 been ruled on.  And to the extent that an individual claimants

2 comes before the Court later on and has an objection that the

3 Court will rule on that objection at that point in time.  And

4 so, I wanted to clarify that.

5         Number two, although we have tried to keep up with

6 all of the pleadings that were -- other motions to compel filed

7 against the other firms and the responses, I can't claim to

8 have the same hold on that that I do on my own.  And so, while

9 certainly with respect to the issues that have been argued here

10 today, we are prepared to accept the Court's rulings.  But, if

11 there is something embedded in some of those pleadings that

12 we've missed, we wouldn't want an adverse inference against us

13 that was raised in some other pleading to which we weren't the

14 respondent and that for some reason didn't get aired today.

15         THE COURT:  Okay.  I don't think you have an

16 obligation to respond to a pleading in which you're not the

17 respondent.  That means that your client's discovery responses

18 were not being challenged on that basis.

19         MS. RAMSEY:  Okay, all right.  I just wanted to

20 clarify that.

21         MR. BERNICK:  I'm sorry, I didn't hear.  I'm sorry,

22 you --

23         THE COURT:  I'm saying if a particular firm, the

24 MMWR, was not listed as a respondent in one of Grace's motions

25 to compel, then Grace wasn't raising those issues as to MMWR.

1 So, they didn't have to file a response.  And the rulings that

2 I've made will govern everybody because I'm going to make the

3 same rulings.  So, they will govern everyone.  But, to the

4 extent that something hasn't been addressed by the Court in a

5 pleading that was not served as to MMWR but they would

6 challenge that action if it were served.  They're not waiving

7 the right to do it if Grace raises the issue as to them.  You

8 can only respond to what you've been served with and given an

9 opportunity to respond to.

10        MR. BERNICK:  Yes, I don't -- I'm now confused on

11 exactly -- I'm sorry.  Were you done?

12        MS. RAMSEY:  No, I have one more point but which way

13 would you like to take it, Your Honor?

14        THE COURT:  Finish, Ms. Ramsey, and then I'll --

15        MS. RAMSEY:  Okay.  And then, the third point was

16 sort of related to the first, which was simply that the way

17 that this procedure was teed up from my understanding today was

18 that we agreed to raise with Grace those objections upon which

19 we were relying to not answer at all certain aspects of the

20 questionnaire.  We have raised other objections.  The issues

21 that were teed up today were to those parts that the parties

22 sort of mutually identified and agreed to tee up.  But, I

23 wouldn't want the record to be unclear with respect to the fact

24 that we have raised other objections.

25        We have agreed to provide information despite those

1  objections.  But, there maybe a disagreement with respect to

2  how a particular claimant or a particular firm responds.  And

3  with respect to that, I just want to make sure that the record

4  is clear that with respect to the MMWR firms and the claimants

5  that they represent that all objections that are not ruled on

6  today are preserved.

7          THE COURT:  Any objection that I'm ruling on today,

8  those rulings are going to be the same as to everybody.  So,

9  whether you're specifically named or not named, when I've ruled

10  it's going to bind everybody.

11          MS. RAMSEY:  Your Honor, I'm not trying to play that

12  kind of game at all.

13          THE COURT:  Okay.

14          MS. RAMSEY:  It's just that to the extent, for

15  example, I can envision a circumstance where we can provide an

16  answer.  Grace could consider it unsatisfactory.  In our view,

17  it could be responsive.  I just wouldn't -- because we've

18  raised the objection, if the Court were to enter an order

19  saying everything that -- everything else is overruled --

20          THE COURT:  I'm not --

21          MS. RAMSEY:  Okay.

22          THE COURT:  -- doing an order that says everything

23  that hasn't been raised is forever barred --

24          MS. RAMSEY:  Thank you.

25          THE COURT:  -- because I don't even know what those

1  things are.

2           MS. RAMSEY:  Okay, thank you, Your Honor.

3           MR. BERNICK:  This is one of these things again where

4  Your Honor is being asked to make a statement without really we

5  don't know exactly what the factual context is.  I don't

6  understand what the Court said, and let me be specific.  There

7  were a series of objections that were made by way of not

8  answering questions or by answering them only in a certain way.

9  We moved to compel on all of them.  We've tried to tee up

10 rulings for the Court to make on all of them.  We moved with

11 respect to all of the firms so that the questionnaires that

12 we're expecting to be completed on January the 12th, we would

13 expect to be completed each and every one of them in accordance

14 with Your Honor's rulings.  That's what we want the record to

15 reflect now, is that people are going to answer each and every

16 question of the questionnaires in response to Your Honor's

17 rulings.

18          There maybe -- I mean, there obviously has been a

19 record made of objections.  So, it's not a question of making a

20 record that -- there have been objections made.  What we want

21 is the definitude to know that there are not outstanding issues

22 on the basis of which people are not going to fill out the

23 questionnaires or fill them out in whole or in part.  That's

24 the key.

25          THE COURT:  Well, I don't know what that -- I don't

1  know what people are going to do.  My rulings with respect to

2  what people have to answer and how and when are of record.

3  They apply to everyone.  If somebody has a specific objection

4  that hasn't been vetted before this Court and they raise it,

5  you know, I can't -- I don't know whether they do or they don't

6  and what's going to come up in light of a particular

7  individual's response.  I just don't know.  My expectation now

8  is that we've been through this questionnaire ad nauseam and,

9  at this point, virtually everything has been vetted before this

10  Court.  If there's been something that's missed, you know, I

11  guess you'll find out.  Okay.  Other than the one matter that I

12  have not ruled on, what else is left for today?  Mr. Esserman?

13         MR. ESSERMAN:  You need to wish me and Natalie Ramsey

14  happy birthday.

15         THE COURT:  Oh, happy birthday.  I'd sing but

16  everybody may leave even earlier, so.  Okay.  Anything else?

17         MR. ESSERMAN:  That's it.

18         THE COURT:  All right, we're adjourned.  Thank you.

19         UNIDENTIFIED SPEAKER:  Thank you, Your Honor.

20         UNIDENTIFIED SPEAKER:  Thank you, Your Honor

21                      *  *  *  *  *

22

23

24

25

## CERTIFICATION

We, RITA BERGEN, KIMBERLY UPSHUR, PATRICIA DUPRE and CARLA OAKLEY, certify that the foregoing is a correct transcript to the best of our ability, from the electronic sound recording of the proceedings in the above-entitled matter.


/s/ Rita Bergen

RITA BERGEN


/s/ Kimberly Upshur

KIMBERLY UPSHUR


/s/ Pat Dupre

PAT DUPRE


/s/ Carla Oakley                    Date:  December 10, 2006

CARLA OAKLEY

J&J COURT TRANSCRIBERS, INC.