IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>W.R. GRACE & CO., *et al.*,<br><br>Debtors. | Chapter 11<br><br>Case No. 01-1139 (JKF)<br>Jointly Administered<br>Rel. Doc. No. 13999 |

**RESPONSE OF THE OFFICIAL COMMITTEE OF ASBESTOS
PERSONAL INJURY CLAIMANTS TO DEBTORS' ADDITIONAL
BRIEF IN SUPPORT OF W.R. GRACE & CO.'S MOTION TO
COMPEL CLAIMANTS TO RESPOND TO THE W.R. GRACE
ASBESTOS PERSONAL INJURY QUESTIONNAIRE**

The Official Committee of Asbestos Personal Injury Claimants (the "ACC") hereby files this Response to Debtors W.R. Grace Company, et al. ("Grace")'s Additional Brief In Support of W.R. Grace's Motion to Compel Claimants to Respond to the W.R. Grace Asbestos Personal Injury Questionnaire ("Grace Additional Brief") [Docket # 13999]. The ACC does not address the particulars of the law relating to the consulting expert privilege in this Response; rather it files this Response to correct Grace's inaccurate and misleading descriptions of the nature of the Estimation Hearing and the bankruptcy claims and discovery process that have occurred in this bankruptcy case.

**ARGUMENT**

As the basis for many of the arguments in its Additional Brief, Grace posits a discovery and claims allowance process in this case that does not and never did exist. Grace asserts that "it is the law firms and Claimants themselves who have thrust the screening practice into the center of this case by relying upon the screening results to file ***and support*** their claims." Grace Additional Brief at 5 (emphasis added). Grace later asserts that "the screening process has been

1

used to manipulate and skew the presentation of data, and that data, therefore, should be inadmissible." Grace Additional Brief at 9. Grace also asserts that:

> Even if the Court were to find that there is not outright fraud, the inconsistency and variability would be a basis for the Court to exclude the screening method on <u>Daubert</u> grounds. That is not to say that B-reading itself is inherently unreliable but rather that the method used in this case – high volume mass-screening – is unreliable and inadmissible.

Grace Additional Brief at 12.

Taken together, these and similar statements in Grace's Additional Brief are premised upon three faulty and misleading assumptions: (1) that during the Estimation Hearing the asbestos personal injury claimants are required to "prove" the merits of their individual claims,[1] (2) that the Questionnaire/Bar Date process is intended to and could elicit all of the evidence (including expert testimony) from claimants that they would proffer as evidence at a trial involving their claim, and that in such a trial claimants would be limited to the medical and exposure information produced in response to the Questionnaire, and (3) that the Court can issue "Daubert" rulings against doctors or other experts who are identified in medical records produced pursuant to the Questionnaire discovery but who have not been (and may never be) proffered by a claimant as his or her testifying expert at trial.[2] None of these assumptions are true.

---

[1] Under Grace's proposed Plan of Reorganization, or any 11 U.S.C. § 524(g) Plan, no asbestos claimant is required to "prove" his or her claim during the pendency of the bankruptcy case – all such claims are channeled to a trust for post-confirmation evaluation and resolution.

[2] Grace is particularly misleading when it attempts to equate a B-reader's report that a plaintiff produces in response to Questionnaire discovery with the expert testimony that the plaintiff would rely upon if required to prove his claim at trial.

2

To illustrate the falsity of Grace's position, it is useful to review the asbestos litigation process that proceeded the bankruptcy filing and the events that have taken place in the bankruptcy case to date.

Prior to its bankruptcy petition, Grace was a defendant in tens of thousands of pending individual asbestos personal injury cases, and was receiving approximately 50,000 new claims each year. In asbestos litigation, like any civil litigation, the only time the plaintiff was able or required to "prove" Grace's "real liability," and the amount of his damages for which Grace was responsible, was following a trial by jury to judgment and the conclusion of any appeals. Such trials were conducted at the conclusion of a discovery process which included scheduling orders that required the plaintiff to identify his testifying experts for trial and produce "expert witness reports" for same, and to identify the witnesses and exhibits he would use in trial to support his claim.

In many jurisdictions however, neither the plaintiff nor the defendant can proceed with any discovery after an asbestos personal injury case is filed until the case is moved onto the "trial docket." This meant that as a practical matter usually only a small percentage of the claims pending against Grace or any other asbestos defendant were in the process of being actively discovered and prepared for trial at any one time.

Asbestos defendants and plaintiffs, like most parties in civil litigation, resolved the vast majority of the claims before trial by voluntary arm's length settlement, with each defendant requiring whatever evidence or proof it (or its insurers) deemed sufficient to justify paying money to resolve the claim and the plaintiff in turn agreeing to resolve the claim short of trial for an amount which was typically something less than what he or she could recover against that particular defendant if the case were tried. Some defendants, like Owens Corning in the mid-

1990s, adopted an approach where they tried as many cases as possible and settled others only if they reached the court house steps.[3]  Others, like Babcock & Wilcox, chose never to try a case and instead settled any claim which in its view had sufficient minimal evidence to survive a motion for summary judgment or dismissal.  See In re Babcock & Wilcox Company, 274 B.R. 230, 235-36 (E.D. La. 2002).

Grace, like most asbestos defendants, chose to try some of the cases against it but settled the vast majority of the claims provided the plaintiff could provide *some* evidence of: (a) exposure to a product formerly manufactured by the Company; and (b) the presence of an asbestos-related injury.  It is axiomatic that the evidence parties may agree upon to be required to settle a claim (i.e., affidavit of exposure, letter from a doctor) is in most instances far less detailed and voluminous than the evidence that the plaintiff would put forward in his case at trial (e.g., live testimony or prior deposition from co-workers concerning exposure, live testimony from medical and industrial hygiene experts etc.).  In essence a settlement is both parties' "hedging their bets" as to what might happen if the case where to proceed further in the discovery and trial process.

Grace's bankruptcy filing in April 2001 ended the normal litigation process, staying all claims prosecution and discovery efforts against it, as well as stopping the normal claims settlement process in its tracks.  After several years of dithering, Grace filed a Plan of Reorganization which contains an 11 U.S.C. § 524(g) channeling injunction which provides that all of its pending and future asbestos personal injury claims will be channeled to a trust and

---

[3]  This "scorched earth" approach was disastrous for Owens Corning.  As the Court will hear at the Estimation Hearing from the ACC's experts, within the space of 3 years Owens Corning's average settlement values rose dramatically and it suffered several hundred million dollars of judgments rendered against it.  See Owens Corning v. Credit Suisse First Boston, 322 B.R. 719, 722 (D. Del. 2005).

4

considered and resolved by the trust post-bankruptcy. Under Grace's Plan ***none*** of its asbestos personal injury claimants are required to "prove" their claims during the pendency of the bankruptcy case; claims review and resolution will occur only after plan confirmation and be conducted by the § 524(g) trust. Because Grace proposes a section 524(g) plan which is opposed by its asbestos creditors on the grounds that (1) the Plan allows shareholders to retain their ownership interest even if all present and future asbestos creditors are not paid in full which would be a violation of the "absolute priority rule" and (2) the Plan allocates too little value to the 524(g) trust and thus "unfairly discriminates" against the asbestos creditors within the meaning of 11 U.S.C. § 1129(b), an estimate of the aggregate asbestos liability is necessary to determine whether the Plan can survive these particular confirmation objections.[4]  See, e.g., In re Armstrong World Indus., Inc., 348 B.R. 111, 114-15 (D. Del. 2006) (Robreno, J.).

     This Court has repeatedly stated (and Grace has agreed) that the Estimation Hearing is for the purpose of determining Grace's aggregate liability for pending and future asbestos personal injury claims, and not for the purpose of evaluating or estimating the claims for purposes of individual allowance or disallowance. See, e.g., Hr'g Tr. of Sept. 25, 2006 at 166 ("This process is to help anybody's expert that the information that they need to try to convince me of what the existing and future asbestos personal injury claims will be, and how much it's going to cost to resolve them. That's what this is for. And nothing else."), 194 ("The point was that this is for estimation purposes, not for allowance and disallowance purposes.") (excerpt attached as Exhibit "A"). As part of the discovery for the Estimation Hearing, the Court allowed Grace to propound its Asbestos Personal Injury Questionnaires to all asbestos personal injury claimants with pending claims that were not settled as of the Petition Date. The Questionnaire on its face

---

[4] Grace's Plan is patently unconfirmable for other reasons, including its inclusion of a § 524(g) injunction without allowing asbestos personal injury claimants to vote on the Plan.

does not contain any questions which require the plaintiff to (1) identify any of the experts upon whose testimony he will rely at trial, (2) provide Fed. R. Civ. P. 26(a)(2) expert witness reports for any testifying expert, (3) identify all fact witnesses the plaintiff will call at trial to support his case, or (4) identify the documents on which he will rely as exhibits at trial.  See W.R. Grace Asbestos Personal Injury Questionnaire, attached as Exhibit "B".

Nor has the bar date process or any subsequent order entered by the Court required the individual claimants to identify their testifying experts or fact witnesses upon whom they will rely at trial.  As the Court is well aware, filing a proof of claim form in response to a Bar Date Order is merely the equivalent of filing a complaint and thus the start of a litigation process if the claim is objected to by the debtor.  If an individual contingent asbestos personal injury claim were going to be allowed or disallowed (or even estimated) for purposes of distribution during the bankruptcy case in a Federal District Court,[5] that Court would enter a scheduling order which would, among other things, allow the plaintiff to continue his discovery against Grace which has been precluded by the automatic stay and which would also require the plaintiff whose claim was being tried to identify the experts upon whose testimony he or she will rely at trial, and produce a report pursuant to Fed. R. Civ. P. 26(a)(2) for each such expert.

It is only after a plaintiff has identified his testifying experts for trial and the expert report and discovery process is complete that a Daubert motion or summary judgment hearing is appropriate.  Daubert and its progeny require a court to provide a "gate-keeping" function to preclude a jury from hearing inadmissible or unreliable expert testimony *at trial*; Daubert has

---

5   28 U.S.C. § 157(b)(1) precludes a bankruptcy court from liquidating or estimating contingent or unliquidated personal injury tort or wrongful death claims against the estate for purposes of distribution.  Indeed, the claims liquidation process would not even have to occur in a federal court at all.  One option available to the District Court would be to abstain from hearing the matter, lift the automatic stay, and allow the personal injury claim to proceed to trial and judgment in the state court in which it was pending prior to the bankruptcy petition.

absolutely no application to the methodology or testimony of screening companies, medical professionals, or anyone else who is not being proffered as a testifying expert at trial.

Thus, contrary to Grace's assertions, it is demonstrably ***not*** true that claimants will only be allowed to rely on the evidence and medical reports presently in their files as support for their claims at a trial or that any court could issue <u>Daubert</u> rulings or grant summary judgment against a claimant who has not yet been required to identify his testifying experts for trial purposes.

With this case history in mind, it is useful to analyze the consulting expert issue in light of its applicability to a typical (if hypothetical) asbestos claimant:

Assume a worker goes to a union hall screening in 1998 and undergoes an x-ray which a doctor at the screening facility opines as being "consistent with asbestosis." The union refers the worker to an attorney, who files a lawsuit on the worker's behalf in 1999 against W.R. Grace and other defendants because the worker works in an industry in which exposure to Grace's asbestos spray-on insulation was likely and has been notified that he has an asbestos related non-malignant disease, given the appropriate latency and work history. The case pends against Grace with little or no discovery conducted (and no testifying experts designated by any party) until Grace files for bankruptcy protection in 2001. In 2005, the attorney sends the worker's x-ray to a doctor other than the initial B-reader for a second opinion in anticipation of the case being moved onto a trial docket and progressing in litigation against other (non-bankrupt) defendants. At no point, either before the bankruptcy petition or subsequent to it, has the plaintiff been required to identify who his testifying experts would be at trial.

Given this set of facts and the events that have taken place thus far in the Grace bankruptcy, under the Federal Rules of Civil Procedure both doctors' opinions would normally be privileged and exempt from discovery unless the claimant's lawyer designates one or the

7

other of them as testifying experts for trial. See Fed. R. Civ. Pro. 26(b)(4)(B). In making its decisions on the consulting expert issues, the Court must not be mislead by Grace's attempt to equate the opinions of medical professionals in a screening context with the evidence that a claimant would rely upon in support of his or her claim at trial.

Date:  December 15, 2006

Respectfully submitted,

CAMPBELL & LEVINE, LLC

 /S/ Kathleen Campbell Davis
Marla Rosoff Eskin (No. 2989)
Mark T. Hurford (No. 3299)
Kathleen Campbell Davis (No. 4229)
800 North King Street, Suite 300
Wilmington, DE  19801
Telephone: (302) 426-1900
Telefax: (302) 426-9947

-and-

CAPLIN & DRYSDALE, CHARTERED
Elihu Inselbuch
375 Park Avenue
New York, NY  10152-3500
(212) 319-7125

Peter Van N. Lockwood
Nathan D. Finch
Walter B. Slocombe
Adam L. VanGrack
One Thomas Circle, N.W.
Washington, D.C.  20005
(202) 862-5000

*Counsel to the Official Committee of Asbestos Personal Injury Claimants*