**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W.R. GRACE & CO., *et al.*, | ) | Case No. 01-1139 (JFK) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |
| | ) | **Objection Date: January 5, 2007 @ 4:00 p.m.** |
| | ) | **Hearing Date: January 23, 2007 @ 8:30 a.m.**<br>**Before the Honorable Judith K. Fitzgerald, U.S.**<br>**Bankruptcy Court, 824 Market Street,**<br>**Wilmington, DE, 19801** |

**MOTION OF THE OFFICIAL COMMITTEE OF ASBESTOS PERSONAL-INJURY CLAIMANTS TO COMPEL DEBTORS' PRODUCTION OF CERTAIN ACTUARIAL STUDIES REFERENCED IN THEIR SECURITIES FILINGS**

The Official Committee of Asbestos Personal-Injury Claimants ("Committee" or "ACC"), by and through its undersigned counsel, hereby moves for entry of an order, pursuant to Fed. R. Bankr. P. 7037 and Fed. R. Civ. P. 37(a)(2)(B), compelling the debtors-in-possession (collectively, "Debtors" or "Grace") to produce or permit the inspection of all estimates of aggregate asbestos personal injury liability prepared by or for Grace between January 1, 1996 and the present, including but not limited to actuarially-based estimates of pending and future asbestos personal-injury claims that are referenced in the 2005 Form 10-K that Grace filed with the U.S. Securities & Exchange Commission ("SEC"). The grounds supporting this motion are as follows.

**PRELIMINARY STATEMENT**

In October of last year, the Committee served document requests upon Grace, seeking, *inter alia*, any estimates of Grace's own asbestos liability that were done pre-petition or post-petition. Grace responded with general objections, and later told the Committee that it would "search" for such estimates, while reserving the right to

{D0077626.1 }

withhold any estimates that it considered privileged or attorney work product. To date, Grace has not produced any estimates of its aggregate asbestos liability, nor has it identified any such estimate on a privilege log. Nevertheless, earlier this year Grace filed with the SEC a Form 10-K for the year ended December 31, 2005, which, *inter alia*, disclosed the existence of "actuarially-based estimates" of its future asbestos liability, which Grace had used to calculate the asbestos reserve or "Funding Amount" in its proposed plan of reorganization. See W. R. Grace & Co., SEC Form 10-K, December 31, 2005 (excerpt relevant to this motion attached as Exhibit 1) (hereinafter, "Form 10-K"). Grace has neither produced nor permitted the Committee access to the "actuarially-based estimates" referred to in its recent securities filings.[1] The Committee thus moves to compel the production of these and any other estimates responsive to the ACC's discovery requests.

These "actuarially-based estimates" are relevant to the issues before this Court because, among other reasons, Grace has strived to turn this estimation proceeding into a contest of methodologies. Here, the Committee and the Future Claimants' Representative ("FCR") are developing an estimate of Grace's liability that is tied to Grace's claims and settlement history, an approach that has been recognized and adopted by all the courts that have rendered estimation decisions in asbestos bankruptcy cases. On the other side is Grace, which is doing its utmost to escape its own claims history, and is attempting to develop an alternative estimate by utilizing data from claimant

---

[1] During the course of the *Sealed Air* litigation, Grace produced several documents relating to its internal estimates of its aggregate asbestos liability as of the time of the 1998 Sealed Air transaction. However, Grace has not produced any of its more recent aggregate liability estimates or the "actuarially based estimates" referred to in its December 2005 10-K.

{D0077626.1}                                    2

questionnaires – an unorthodox and defective approach that *no* court to date has recognized or adopted. Curiously, despite Grace's steadfast assertion that its questionnaire-based approach is correct (which it is not), Grace did not even bother to use that approach when it calculated the "Funding Amount" in its proposed plan of reorganization and made disclosures to the SEC. Instead, Grace relied on "actuarially-based estimates" – estimates that most likely were calculated using a far more conventional approach and which will likely mirror the type of methodology that the Committee is advocating here. Accordingly, the "actuarially-based estimates" are relevant to the issues at hand, and Grace must produce them in response to the Committee's document requests.

Grace has offered no basis or reason for withholding these estimates. Although it has made general objections based on privilege and attorney work product, it has not specifically identified its "actuarially-based estimates" as privileged or work product on a privilege log. In short, Grace has not carried its burden of establishing a proper legal basis for withholding the estimates. Accordingly, the Court should grant the Committee's motion, and should compel Grace to produce the estimates here.

## FACTUAL BACKGROUND

The Debtors petitioned this Court for relief under Chapter 11 of the Bankruptcy Code on April 1, 2001. Sometime thereafter, in late 2004, the Debtors proposed a plan of reorganization to deal with their substantial asbestos liability. Among other things, Grace's proposed plan assumes that the level of funding necessary to pay present and future asbestos-related claims "is not greater than $1,613 million" (or, stated another way, $1.613 billion).

Over the past several months, the Debtors, the Committee, and other parties have engaged in discovery in connection with the Court's anticipated estimation of pending and future asbestos personal-injury claims against Grace. On October 14, 2005, the Committee served its first round of discovery requests on the Debtors, which included requests for the production of documents. ACC's First Set of Requests for Production of Documents Directed to the Debtors, October 14, 2005 (excerpt relevant to this motion attached as Exhibit 2). Document Request #69 requested that Grace produce documents "setting forth any estimate of asbestos personal injury liability prepared by or for Grace between January 1, 1996 *and the present* which attempts to estimate the aggregate amount of Grace liability to present and future asbestos personal injury plaintiffs." Id. (emphasis added). Stated another way, Document Request #69 sought documents relating to any of Grace's pre-petition *and post-petition* estimates of its own asbestos liability.

On or about November 15, 2005, Grace served its responses and objections to the Committee's document requests. W.R. Grace & Co.'s Responses and Objections to Asbestos Claimants' Committee's First Set of Requests for Production of Documents, November 14, 2005 (excerpt relevant to this motion attached as Exhibit 3). In response to Document Request #69, Grace asserted, *inter alia*, that the request was "overly broad" and "unduly burdensome," as well as "irrelevant" and "immaterial." Id. Grace also objected to the request "to the extent" that it called for "documents protected from disclosure by the attorney-client privilege and/or the attorney work product doctrine." Id. Grace further suggested that it had, in effect, already responded to this request when it

"produced its Case Management System on disc in this case," and that it would be willing to produce its Case Management System again on request. Id.

Following this exchange of discovery requests and objections, Grace filed with the SEC its Form 10-K dated March 13, 2006, which covered the fiscal year ending December 31, 2005. See Exhibit 1. In its Form 10-K, Grace discusses, *inter alia*, its proposed plan of reorganization, and refers to its $1.613 billion asbestos liability reserve in its proposed chapter 11 plan as the so-called "Funding Amount." Id. at 22. On page 22 of the Form 10-K, Grace states: "It is a condition to confirmation of the plan of reorganization that the Bankruptcy Court shall conclude that the Funding Amount is not greater than $1,613 million." Id. Importantly, Grace further discloses in the Form 10-K that the "Funding Amount" of $1.613 billion "is based in part on Grace's evaluation of: existing but unresolved personal injury and property damage claims; [and] *actuarially-based estimates of future personal injury claims.*" Id. at 22-23 (emphasis added).[2]

The "actuarially-based estimates" underlying the "Funding Amount" are clearly relevant and responsive to Document Request #69. Even if these estimates had not existed at the time Grace initially responded to the Committee's document requests, Grace had a continuing duty to supplement its discovery responses and document production. See Fed. R. Civ. P. 26(e). Nevertheless, despite numerous exchanges of letters and meet-and-confer sessions among counsel, Grace has neither produced nor permitted the inspection of any documents responsive to Document Request #69, including the "actuarial-based estimates" mentioned in its Form 10-K. In a letter to

---

[2] The Committee does not know the exact date when Grace's actuarially-based estimates of future asbestos personal injury claims were prepared, but suspects they were created several years ago, either shortly before or shortly after Grace's bankruptcy filing.

{D0077626.1}    5

Committee counsel that followed a discovery meet-and-confer session on September 6, 2006, Grace's counsel asserted that Grace was "currently . . . searching for documents relating to estimates of aggregate asbestos liability that Grace conducted after its petition for bankruptcy . . . ." Letter from Barbara Mack Harding, to Nathan D. Finch, September 22, 2006, at 4 (attached as Exhibit 4)[3] Grace's counsel stated further that Grace would "produce responsive documents that are not privileged or otherwise confidential," or alternatively would "produce a privilege log for those documents that are privileged or otherwise confidential." Id. To date the Committee has not received any of Grace's aggregate estimates of asbestos liability such as the "actuarially-based estimate" of asbestos liability referenced in its 10-K. Nor has Grace identified such documents on a privilege log.[4]

### **RELIEF REQUESTED**

The Committee seeks entry of an order compelling Grace to produce or permit the inspection of all documents responsive to Document Request #69, including but not limited to the "actuarially-based estimates" that are referenced in its Form 10-K, and awarding to the Committee such other and further relief as this Court deems just and appropriate.

---

[3]  That Grace purports to be "searching" for estimates mentioned in its most recent Form 10-K and used in the formulation of its proposed chapter 11 plan raised considerable doubt as to whether Grace is responding to discovery in good faith.

[4]  Grace did produce a privilege log on November 16, 2006 which contains references to documents evidencing communications between various Grace employees or agents concerning its asbestos reserves. W.R. Grace Privilege Log, November 16, 2006 (attached as Exhibit 5). However, none of the documents referenced on the privilege log appear to be the "actuarially based" estimates described in Grace's 10-K. Id. The Committee maintains that responsive documents, even if otherwise privileged or entitled to work product immunity, must be produced here for the reasons described below. In so doing, the Committee reserves the right to challenge the privileged status of any particular document.

{D0077626.1 }                                    6

**ARGUMENT**

I. **Grace's Actuarial-Based Estimates of Its Asbestos Liability Are Relevant to this Court's Estimation of the Same**

In an estimation of a debtor's aggregate liability for asbestos personal-injury claims, the central question is how the claims "would have been valued in the state court system had the debtor never entered bankruptcy." In re Armstrong World Indus., Inc., 348 B.R. 111, 123 (D. Del. 2006) (Robreno, J.) (citing In re Owens Corning, 322 B.R. 719, 722 (D. Del. 2005) (Fullam, J.)). There are now four bankruptcy cases (three from this District) governing the estimation of pending and future asbestos personal-injury claims. Armstrong, 348 B.R. at 123-24; Owens Corning, 322 B.R at 721-22; In re Federal-Mogul Global, Inc., 330 B.R. 133, 155 (D. Del. 2005) (Rodriguez, J.), appeal pending on other grounds; In re Eagle-Picher Indus., Inc., 189 B.R. 681, 683 (Bankr. S.D. Ohio 1995). Like the matter before this Court, each of these four cases involved an estimate of a debtor's liability for purposes of formulating a plan, and in each case the estimation was based in large part on each debtor's past claims resolution and settlement history as well as actuarial-type estimates of the number of expected future claims. The courts have described the debtor's pre-petition record of disposal of asbestos claims as "a valuable experiential resource" for estimating the value of pending and future claims. Armstrong; 348 B.R. at 123-24, Owens Corning, 322 B.R at 723; Federal-Mogul, 330 B.R. at 157; Eagle-Picher, 189 B.R. at 686.

The Committee's method of estimating claims follows these established precedents since, *inter alia*, it relies on Grace's historical claims and settlement data as well as actuarial-type estimates of the number of future claims. Contrariwise, Grace seeks to shirk its claims and settlement history by embarking on a flawed and imprudent

process of sending questionnaires to claimants.[5] Given how estimation methodology is a central issue here, it is noteworthy that in its Form 10-K, Grace has calculated a "Funding Amount" of $1.613 billion that is based *not* on questionnaire data, but instead on "actuarially-based estimates" of its future asbestos liability. Since methodology is a central issue in this estimation proceeding, Grace's "actuarially-based estimates" are relevant to the issues at hand and responsive to the Committee's document requests, namely Document Request #69. The Committee is thus entitled to those estimates as well as the actuarial data and reports underlying them.

II. **Grace's Actuarial-Based Estimates Are Necessary to Rebut Grace's Erroneous Assertions That Its Settlement History Should Be Ignored and That the Questionnaire Process Is the Only Proper Method for Estimation**

The Committee believes that, when produced, these "actuarially-based estimates" will demonstrate that Grace is perfectly capable of estimating its aggregate asbestos liability without relying on questionnaire data. Indeed, Grace clearly viewed its "actuarially-based estimates" as reliable enough that it used them to calculate its "Funding Amount," and then disclosed that Amount in its Form 10-K and proposed plan of reorganization. Despite all of its arguments in favor of a "merits-based" estimation, Grace certainly seems content to have relied on actuarial data when it disclosed its "Funding Amount" to the SEC and to investors. That Grace used "actuarially-based estimates" to calculate its "Funding Amount" of $1.613 billion should surprise no one. Whatever the questionnaire data may reveal, such data cannot inform the Court about the number and types of claims that would have been filed against Grace in 2001, 2002, and subsequent years, had Grace remained in the tort system. It certainly cannot reveal

---

[5] *No* court that has conducted an asbestos estimation hearing and rendered a decision therefrom has accepted the misguided approach championed by Grace.

{D0077626.1}    8

anything about Grace's liability for future claims, for which no questionnaire data has been or could be collected.

The Committee also believes that, when produced, Grace's "actuarially-based estimates" will differ substantially from the questionnaire-based estimates that Grace will introduce at the estimation hearing.  Although the parties have not yet served their estimation expert reports on one another, it seems reasonably clear at this juncture that Grace will be asking its experts to utilize the questionnaire data to assign values to entire categories of what Grace considers to be "valid claims."  Thus, the "actuarially-based estimates" will put into sharp relief the inconsistent manner in which Grace has gone about estimating its asbestos liability.  At a minimum, these studies are an adverse admission by Grace as to the propriety of an actuarially-based method to estimate the aggregate amount of Grace's asbestos liability.  Accordingly, the "actuarially-based estimates" mentioned in the Form 10-K are not only relevant to the issues at hand, but will also serve as important, material evidence that will likely aid the Court's decisional process.

III.    **Grace Has Not Specifically Claimed the Actuarially-Based Estimates as Privileged or Attorney Work Product, Nor Has It Met Its Burden of Establishing the Applicability of Any Privilege or Work Product Immunity**

Grace thus far has not specifically identified the actuarially-based estimates as privileged or attorney work product on a privilege log.  Had it asserted privilege as the basis for withholding these estimates, Grace would still have to carry the burden of establishing its applicability.  See, e.g., In re American Metrocomm Corp., 274 B.R. 641, 654 (Bankr. D. Del. 2002) ("The party claiming the privilege has the burden of establishing its applicability, which is narrowly construed.").  Indeed, "claims of attorney-client privilege must be asserted document by document, rather than as a single,

{D0077626.1 }                                        9

blanket assertion." United States v. Rockwell Int'l, 897 F.2d 1255, 1265 (3d Cir. 1990); see also Vanguard Sav. & Loan Ass'n v. Banks, 1995 WL 555871, *2 (E.D. Pa. Sept. 18, 1995) (stating that "the burden is upon [the party asserting privilege] to show that precise facts exist to support the claim of privilege"). Grace has not produced any privilege log which identifies the actuarial estimates of future claims as privileged or sets forth the precise facts that would support a claim of privilege. Because Grace has failed to meet its burden on the privilege issue, this Court should compel Grace to produce the actuarial-based estimates to the Committee.

Similarly, Grace has neither specifically claimed that the estimates are attorney work product, nor met its burden of proving that they are such. The party claiming work product immunity carries the burden of proving that the document or tangible thing in question was prepared "in anticipation of litigation." See Holmes v. Pension Plan of Bethlehem Steel Corp., 213 F.3d 124, 138 (3d Cir. 2000) ("A party claiming work-product immunity bears the burden of showing that the materials in question 'were prepared in 'the course of preparation for possible litigation.'") (citations omitted); In re Tri State Outdoor Media Group, Inc., 283 B.R. 358, 363 (Bankr. M.D. Ga. 2002) ("The burden initially rests on the party asserting the work product doctrine to prove that the documents were prepared in anticipation of litigation."). As with any claim of privilege, Grace has not met its burden with respect to the work product doctrine. Grace has not identified its "actuarially-based estimates" on a privilege log, and has not put forward any facts that would lead this Court to conclude that these estimates were prepared in anticipation of litigation, and *not* for business or SEC reporting purposes. See Fed. R. Civ. P. 26(b)(3) advisory committee note (explaining that "[m]aterials assembled in the

ordinary course of business, or pursuant to public requirements unrelated to litigation, or for other nonlitigation purposes" are excluded from work product protection).

Nor should one expect Grace to satisfy its burden. In this respect, the Eighth Circuit's decision in <u>Simon v. G.D. Searle & Co.</u>, 816 F.2d 397 (8th Cir. 1987), a factually analogous case, is instructive. There, Searle was confronted with approximately 40 products liability suits, stemming from its manufacture of a birth-control device. <u>See id</u>. at 398. Searle's legal department determined reserve amounts for each of the product-liability cases, reserves that ostensibly were be used to pay product-liability claims in the event a claimant prevailed in court or Searle settled the claim. <u>See id</u>. at 399. Certain "nonlawyer corporate officials" in Searle's risk management department then prepared documents containing "aggregate information" compiled from those individual reserve figures "in an attempt to keep track of, control and anticipate costs of product liability litigation for business planning purposes." <u>See id</u>. at 398-400.

Searle claimed that the risk management documents were exempt from discovery because they contained information that was attorney work product. <u>See id</u>. at 400. The Eighth Circuit, however, disagreed with respect to the *aggregate* reserve information. The court of appeals found no basis for claiming work-product immunity because, *inter alia*, the "risk management department was not involved in giving legal advice or in mapping litigation strategy" and because the aggregate reserve information served "numerous business planning functions" and did not "enhance[] the defense of any particular lawsuit." <u>Id</u>. at 401. Searle argued that the aggregate reserve information was, in fact, related to litigation since it pertained to the pending lawsuits and not to its core health-care business. <u>Id</u>. The Eighth Circuit rejected such hair-splitting: "Searle's

business involves litigation, just as it involves accounting, marketing, advertising, sales, and many other things. *A business corporation may engage in business planning on many fronts, among them litigation*." Id. (emphasis added). On these grounds, the Eighth Circuit determined that the aggregate reserve information was not prepared in anticipation of litigation and thus did not qualify for work product protection.[6]

The "actuarially-based estimates" referenced in Grace's Form 10-K are essentially "aggregate reserve information" that Grace used to calculate the "Funding Amount" in its plan. As in Simon, Grace apparently commissioned these "actuarially-based estimates" as part of its business planning activities to formulate a proposed plan of reorganization. Grace also disclosed the "Funding Amount" as well as the "actuarially-based estimates" in compliance with the reporting requirements under the securities laws. Like Searle, Grace engages in business planning on many fronts, including "litigation." Grace enlisted actuaries to prepare the estimates in question as part of that planning process. Accordingly, in light of the Simon decision, Grace cannot be heard to argue that these estimates are entitled to work product protection.[7]

---

[6] Similarly, with respect to the attorney-client privilege, the Eighth Circuit upheld the lower court's determination that the aggregate reserve information was not privileged under Minnesota law, even after assuming that the that the individual case reserves were privileged. See id. at 402-04.

[7] Cf. also In re Royal Ahold N.V. Sec. & ERISA Litig., 230 F.R.D. 433 (D. Md. 2005). At issue in Royal Ahold were memos of witness interviews prepared by outside counsel in connection with an investigation into various accounting irregularities and alleged fraud. The court determined that the memos were not entitled to work product immunity, since they had been prepared for business reasons. See id. at 435-36. Additionally, the court concluded in the alternative that waiver of any applicable work-product immunity had occurred because, *inter alia*, the results of the investigation had been disclosed in SEC filings. See id. at 436.

**CONCLUSION**

For all the reasons set forth above, the Committee respectfully requests that the Court enter an order (a) granting this motion in its entirety, (b) compelling Grace to produce or permit the inspection of the actuarial-based estimates referenced in the Form 10-K, and (c) granting to the Committee such other and further relief as this Court deems just and appropriate.

Dated: December 18, 2006

Respectfully submitted,

CAMPBELL & LEVINE, LLC


/s/ Marla R. Eskin
Marla R. Eskin (No. 2989)
Mark T. Hurford (No. 3299)
800 North King Street, Suite 300
Wilmington, DE  19801
(302) 426-1900

-and-

CAPLIN & DRYSDALE, CHARTERED
Elihu Inselbuch
375 Park Avenue
New York, NY  10152
(212) 319-7125

-and-

CAPLIN & DRYSDALE, CHARTERED
Peter Van N. Lockwood
Nathan D. Finch
Jeffrey A. Liesemer
One Thomas Circle, N.W.
Washington, D.C.  20005
(202) 862-5000

*Counsel to the Official Committee of Asbestos Personal-Injury Claimants*

{D0077626.1}    13