# EXHIBIT E



**eers**
CANADIAN PAT. # 1047219

**energy efficient roof system**

9-21-06

Dear JaneT

I hope These documenTs will give you a beTTer or clearer picTure of my Claim and whaT has already happened daTing back many years. Please feel free To contacT me aT any Time

Hoping to be able To come To an aggreeeble SeTTlemenT and that we may always be friends

Sincerely

Anton Johousek
More CommenLy Known as
Tony

*[handwritten note at top:]* First Packet from W.R. Grace stating I am a Creditor not once but Twise on Last Two pages - (Sorry v.)

*[handwritten note in left margin, vertical:]* I must have 10,000 Packets from Law Firms all over the World WR Grace is Comprised of 25 entities but only entered 62 in the back of Group

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W. R. GRACE & CO., et al.,[1] | ) | Case No. 01-1139 (JJF) |
| | ) | Jointly Administered |
| Debtors. | ) | |

Objection Deadline: April 25, 2001, at 4:00 p.m. EDT
Hearing Date: May 3, 2001 at 8:00 a.m. EDT

## NOTICE OF FINAL HEARING AND ENTRY
## OF SECOND INTERIM ORDER AUTHORIZING
## SECURED POST-PETITION FINANCING ON A PRIORITY BASIS
## PURSUANT TO 11 U.S.C. § 364, GRANTING RELIEF
## FROM THE AUTOMATIC STAY PURSUANT TO
## 11 U.S.C. § 362 AND SCHEDULING A FINAL HEARING

TO:    Parties required to receive notice pursuant to Del. Bankr. L.R. 2002-1

PLEASE TAKE NOTICE that on April 2, 2001, the above-captioned debtors and

debtors in possession (the "Debtors") filed the Emergency Motion for Interim and Final Orders,

---

[1]  The Debtors consist of the following 62 entities: W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.), W. R. Grace & Co.-Conn., A-1 Bit & Tool Co., Inc., Alewife Boston Ltd., Alewife Land Corporation, Amicon, Inc., CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace II, Inc., Creative Food 'N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC (f/k/a Dewey and Almy Company), Ecarg, Inc., Five Alewife Boston Ltd., G C Limited Partners I, Inc. (f/k/a Grace Cocoa Limited Partners I, Inc.), G C Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC Management Corporation, GN Holdings, Inc., GPC Thomasville Corp., Gloucester New Communities Company, Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical Company of Cuba, Grace Culinary Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe, Inc., Grace H-G Inc., Grace H-G II Inc., Grace Hotel Services Corporation, Grace International Holdings, Inc. (f/k/a Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W. R. Grace Capital Corporation, W. R. Grace Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-Caribe Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai Development Company, L B Realty, Inc., Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH, Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Inc., MRA Holdings Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (f/k/a Nestor-BNA, Inc.), MRA Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental Liability Management, Inc., E&C Liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin & Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country Staffing), Hayden-Gulch West Coal Company, H-G Coal Company.

*[handwritten:]* 124

Page 5 of Exhibit B

secured creditors of the Debtor and holders of Prior Claims (defined below).[2]  Based upon all of

the foregoing, sufficient and adequate notice under the circumstances of the Motion, the Interim

Order, and this Order has been given pursuant to sections 102(l), 364(c), and 364(d) of the

Bankruptcy Code, and Bankruptcy Rules 2002 and 4001(c).

   F.  The Post-Petition Financing has been negotiated in good faith and at arms-

length among the Debtors and BofA (as Agent and as a Lender), and any credit extended and

loans made to the Debtors ("Loans") and letters of credit issued for the account of the Debtors

pursuant to the Loan Agreement ("Letters of Credit") shall be deemed to have been extended,

issued or made, as the case may be, in good faith as required by, and within the meaning of

section 364(e) of the Bankruptcy Code, and the Agent and Lenders are entitled to the protections

of section 364(e) of the Bankruptcy Code.

   G.  The terms of the Post-Petition Financing are fair and reasonable, reflect

the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and are

supported by reasonably equivalent value and fair consideration.  Pursuant to the Interim Order,

the Debtors were each authorized to execute and deliver to the Lenders the Loan Agreement, the

Notes (to the extent requested by the Lenders pursuant to the Loan Documents) and any other

document of any kind required to be executed and delivered in connection therewith.

   H.  This Court concludes that entry of this Order is in the best interests of the

Debtors' estates and creditors because its implementation, among other things, will allow for the

---

[2]  The Debtors have advised the Court that, in an effort to identify the parties with potential
Prior Claims or liens, the Debtors conducted a diligent review of their books and records
to identify all such parties.  Counsel for the Debtors also conducted extensive title
searches on all owned real property and extensive searches of state UCC filings to
identify such parties.

[ CH_DOCS\212364.13 [W97]]

Blacks encirclement and
underlines are mine — Peter Dolaveck

000018

**Federal Express**
PHH FleetAmerica Corporation/D.L.
Peterson Trust
307 International Circle
Hunt Valley, MD 21030-1337

**Federal Express**
Space Maker Systems of Md., Inc.
3310 Childs Street
Baltimore, MD 21226

**Federal Express**
Associates Leasing Inc.
1301 E. 9th St.
Cleveland, OH 44114

**Federal Express**
Nations Bank, N.A.
100 South Charles Street
Baltimore, MD 21201

**Federal Express**
Regal Savings Bank, F.S.B.
10123 Reisterstown Road
P.O. Box 426
Owings Mills, MD 21117

**Federal Express**
Signet Leasing & Financial Corp.
7 St. Paul Street, 3rd Floor
Baltimore, MD 21202

**Federal Express**
Associates Leasing Inc.
8001 Ridgepoint Drive
Irving, TX 75063

**Federal Express**
North East Trailer Services, Inc.
798 Woodlane Road
Mount Holly, NJ 08060

**Federal Express**
Financial Federal Credit Inc.
300 Frank W. Burr Blvd.
Teaneck, NJ 07666

**Federal Express**
Yale Industrial Trucks-Maryland, Inc.
2211 Sulphur Spring Road
Baltimore, MD 21227

**Federal Express**
Chesapeake Industrial Leasing Co., Inc.
9512 Hartford Road
Baltimore, MD 21234

**Federal Express**
Commercial & Farmers Bank
8593 Baltimore National Pike
Ellicott City, MD 21403

**Federal Express**
Ferguson Enterprises, Inc.
4001 E. Moument St.
Baltimore, MD 21205

**Federal Express**
Caterpillar Financial Services Corporation
4975 Preston Park Blvd.
Suite 280
Plano, TX 75093

**Federal Express**
FUL Incorporated
100 Corporate North
Bannockburn, IL 60015

**Federal Express**
Cypress Amax Minerals Company
9100 East Mineral Circle
Englewood, CO 80211

**Express Mail**
Anton Frank Volovsek
P.O. Box 723
Tekoa, WA 99033

*Express Mail*
CIS Corporation
P.O. Box 4785
Syracuse, NY 13221-4785

*Express Mail*
Colonial-Pacific Leasing
P.O. Box 1100
Tualatin, OR 97062

*Express Mail*
Anton Frank Volovsek
P.O. Box 723
Tekoa, WA 99033

*Express Mail*
Hyster Credit Company
P.O. Box 4366
Portland, OR 97208

*Express Mail*
Blanchard Machinery Company
P.O. Box 7517
Columbia, SC 29202

Anton Frank, Volovsek
c/o
System Solutions
P.O. Box 511
White Salmon, Washington
NDPZ [98672]


country of Washington          )
                               )    Ss
Klickitat county               )


### Affidavit of Anton Frank, Volovsek

I Anton Frank, Volovsek Do depose & state

1. In the fall of 1974, I began experimenting to try and improve the roofing system. I succeeded and I have patented it both in the United States (U.S. Patent #4,016,323) and Canada (Canada Patent # 1,047,219). *my a*

2. The main product required by my system is a "Bituthane" manufactured by W.R. Grace. To my knowledge Grace was the only company to manufacture this membrane that would work in my system. Hayden Clark of W.R. Grace flew out from Boston five times to watch me put the system together. Mr. Clark implied that it was quite a revolutionary system.
Hayden Clark was head of the water proofing divison of W.R. Grace

3. Don Cauglin, Grace's regional representative, implied that a large amount of sales of the membrane 'Heavy Duty Bituthane' would be forthcoming.

4. I wrote to Hayden Clark on 12/18/74 regarding warranting their product in a roofing system and on what types of decks this material would adhere to. I got no response.

5. Straightaway, Span Crete wanted my new system on 30,000 sq. ft. roofs of the type which this system originally designed and manufactured. I also was approached to put this system on a car wash building which always had conventional roof problems.

6. I quickly called Don Cauglin, the Graces' representative, and ordered the membrane. He returned my call to inform me that they (Grace) would not sell me the material.

7. I was already forming my own company with the architect and engineer that assisted me in the testing and final invention of this system, which we named EERS, Energy Efficient Roof System. I had already spent many days and dollars with my patent attorney with confirmation from the patent office that this system was patentable.

8. My attorney then sent a letter to Mr. Peter Grace on October 14, 1975 (See Exhibits Attached) requesting a reason for their refusal to sell us their heavy duty Bituthane, which was on the open market.

9.  A reply was received from Vice President Leonard Rosenblatt refusing to sell us any material, but offering us five rolls for further testing. In the meantime I lost my two contracts, had to close down my new company, and was without a job with four children to feed.

10. A second letter was sent to Mr. Rosenblatt on November 7, 1975 with the same negative response. I tried to find a distributor who might have some of that membrane in stock. I found Highway Pavers, but they told me that they could not sell me the membrane because W.R. Grace threatened to blacklist them if they did.

11. The same response came from Milwaukee Insulation. Both companies had enough material for the jobs I had, but neither company wanted to lose their source of supply of this good product.

12. I then contacted Don Cauglin again to see if we could find another company who might have a product we could use in my system. We both searched, but to no avail. Don Cauglin then quit working for W.R. Grace in disgust. *3 years Later Hayden Clark committed suicide*

13. I checked on a product from Protecto Wrap in Denver, Colorado. My attorney, Ed Snyder, sent them a letter describing my system and inquired if it might work as a substitute for Grace's product. After several trips to Denver we found that it would not work as a substitute for Grace's product.

14. Now, on the verge of bankruptcy and my health failing because of the stress generated from the deeds done to me and my company by W.R. Grace, I fought to keep what was left of my company, my marriage, and my family from diminishing any further. I failed.

15. In a last chance effort I made some phone calls, and everyone suggested that I go to see a chemical engineer in Phoenix, Arizona who was very knowledgeable in roofing and urethane foam insulation. I contacted him, and he agreed to hire me at a minim wage salary and help me promote my roofing system. My attorney supported this idea by lending me money to get there.

16. After a short time Mr. Coultrap, the chemical engineer, decided I would have to give him 90 percent of my system to remain with his company. I declined his offer, and I was promptly fired.

17. At this point I had a nervous breakdown. The soul person responsible for my recovery was a woman, Terry, that I was keeping company with who understood my situation and my system.

18. My attorney saw the opportunity to steal my patent, and proceeded to do so. He convinced Mr. Coultrap to joining forces to produce and market my system.

19. Terry helped me find a law firm to retrieve my patent. This lawyer also tried to steal the patent in the process of getting it back from my lawyer (Snyder). After a tough battle we were able to fire this lawyer (Ron Logan) and were informed by the judge that I had to file my suit back in Wisconsin.

20. Because of my financial situation I had no way to do that. Many months later I acquired enough money and plane fare to return to Wisconsin to find a law firm to get my patent back. Aul and Mawicke took the case and won after almost a year. Five years later Aul and Mawicke did

manage to get Snyder disbarred.

21.   In 1980 Terry quit her job at the newspaper in Phoenix and went to work for another newspaper in Alaska, and asked me to go along. After several years of recovery I began to search for investors interested in helping me get my system marketed.

22.   In the next year I put together about $100,000, but expenses were high and my knowledge of marketing low. I hired a marketing firm from Boston on a percent basis, but they fared as well as I had.

23.   I made contact with:
      a.   Oil companies, but they wanted no part of my system because it was to energy efficient and would cost them a few dollars in fuel. *Bi LLi ons of doLLars*
      b.   The U.S. Government, explaining some possible net-savings to taxpayers of more than one billion dollars' per-year, but they were not interested in saving the taxpayers any money.
      c.   W.R. Grace would have been an ideal company, but they too refused.

24.   I learned, regardless of how efficient this system was, architects would not specify it unless it was corporately endorsed. I then proceeded to contact 30 or more major companies who manufactured the products I had incorporated into my roofing system.

25.   By this time three other manufacturers made a membrane that was almost identical to Grace's. I contacted them all. They all liked my system but not one would market it. The coating companies loved my system, but none were big enough to market a system that had all the potential that my system had.

26.   Due to Physical and Financial problems Terry and I ended up back in Phoenix. At this time I learned that R. W. Grace was no longer manufacturing the quality of membrane that I needed for my system and that Phillips 66 was. So I promoted my system to Phillips. There was much interest, and I installed a job for them in Miami, Florida. The system was a success.

27.   In the meantime Phillips sold this product to the Henery Company in California. So off I went with a retired colonel from the U.S. Army Corps of Engineers to California to meet with the Henery Company. They liked it, but said they weren't big enough to market it. *As did all the major coating manufactuvers*

28.   In the meantime, the colonel gets my system approved by the U.S. Army Corps of Engineers and I was promised the first job that came up. Shortly thereafter, however, the Corps money was cut off and the Corps itself was cut in half. *5 miLLion Sq. ff. in Saudi Arabia Lost because of Army Corp of engineers*

29.   I next met with the ex-Governor of Arizona and Senator Don Rodgers of California to see if they might be able to get in touch with W.R. Grace and convince them to reconsider and market my system. Before they made contact with W.R. Grace, I contacted the Grace waterproofing representative myself. *His Name is Dan KubaL - ScoTTsdale Arizona*

30.   He was very interested, and asked me to write to his boss in Boston, Massachusetts to see if they would be interested at this time to market my system Since they were now making the

membrane again. Once again I got a negative reply. (See Letters Attached)   *Jim Adams*

31.  Without waiving any right to dispute, I, Anton Frank, Volovsek, I certify under penalty of perjury under the laws of the united states of America, that I have read the foregoing and know the contents thereof,  and that to the best of my knowledge and belief it is true, correct and materially complete, relevant and not misleading; the truth, the whole truth, and nothing but the truth, so help me God.

Dated this _____ day of _____, 1996.

_____
Anton Frank, Volovsek

STATE OF WASHINGTON        )
                           )    SS
COUNTY OF KLICKITAT        )

SIGNED and SWORN TO before me on _____ day of _____, 1996.

_____
Notary Public in and for
the State of Washington
My Commission Expires:_____



lief that the breed was in danger of declining, and he has raised and sold the dogs in each year since. The taxpayer recently began raising and racing thoroughbred horses. The losses from the taxpayer's dog and horse activities have increased in magnitude over the years, and he has not made a profit on these operations during any of the last 15 years. The taxpayer generally sells the dogs only to friends, does not advertise the dogs for sale, and shows the dogs only infrequently. The taxpayer races his horses only at the "prestige" tracks at which he combines his racing activities with social and recreational activities. The horse and dog operations are conducted at a large residential property on which the taxpayer also lives, which includes substantial living quarters and attractive recreational facilities for the taxpayer and his family. Since (i) the activity of raising dogs and horses and racing the horses is of a sporting and recreational nature, (ii) the taxpayer has substantial income from his business activities of retailing soft drinks, (iii) the horse and dog operations are not conducted in a businesslike manner, and (iv) such operations have a continuous record of losses, it could be determined that the horse and dog activities of the taxpayer are not engaged in for profit.

*Example 4.* The taxpayer inherited a farm of 65 acres from his parents when they died 6 years ago. The taxpayer moved to the farm from his house in a small nearby town, and he operates it in the same manner as his parents operated the farm before they died. The taxpayer is employed as a skilled machine operator in a nearby factory, for which he is paid approximately $8,500 per year. The farm has not been profitable for the past 15 years because of rising costs of operating farms in general, and because of the decline in the price of the produce of this farm in particular. The taxpayer consults the local agent of the State agricultural service from time to time, and the suggestions of the agent have generally been followed. The manner in which the farm is operated by the taxpayer is substantially similar to the manner in which farms of similar size, and which grow similar crops in the area, are operated. Many of these other farms do not make profits. The taxpayer does much of the required labor around the farm himself, such as fixing fences, planting crops, etc. The activity of farming could be found, based on all the facts and circumstances, to be engaged in by the taxpayer for profit.

*Example 5.* A, an independent oil and gas operator, frequently engages in the activity of searching for oil on undeveloped and unexplored land which is not near proven fields. He does so in a manner substantially similar to that of others who engage in the same activity. The chances, based on the experience of A and others who engaged in this activity, are strong that A will not find a commer-

cially profitable oil deposit when he drills on land not established geologically to be proven oil bearing land. However, on the rare occasions that these activities do result in discovering a well, the operator generally realizes a very large return from such activity. Thus, there is a small chance that A will make a large profit from his soil exploration activity. Under these circumstances, A is engaged in the activity of oil drilling for profit.

*Example 6.* C, a chemist, is employed by a large chemical company and is engaged in a wide variety of basic research projects for his employer. Although he does no work for his employer with respect. to the development of new plastics, he has always been interested in such development and has outfitted a workshop in his home at his own expense which he uses to experiment in the field. He has patented several developments at his own expense but as yet has realized no income from his inventions or from such patents. C conducts his research on a regular, systematic basis, incurs fees to secure consultation on his projects from time to time, and makes extensive efforts to "market" his developments. C has devoted substantial time and expense in an effort to develop a plastic sufficiently hard, durable, and malleable that it could be used in lieu of sheet steel in many major applications, such as automobile bodies. Although there may be only a small chance that C will invent new plastics, the return from any such development would be so large that it induces C to incur the costs of his experimental work. C is sufficiently qualified by his background that there is some reasonable basis for his experimental activities. C's experimental work does not involve substantial personal or recreational aspects and is conducted in an effort to find practical applications for his work. Under these circumstances, C may be found to be engaged in the experimental activities for profit.

[T.D. 7198, 37 FR 13683, July 13, 1972]

**§ 1.183-3 Election to postpone determination with respect to the presumption described in section 183(d). [Reserved]**

**§ 1.183-4 Taxable years affected.**

The provisions of section 183 and the regulations thereunder shall apply only with respect to taxable years beginning after December 31, 1969. For provisions applicable to prior taxable years, see section 270 and § 1.270-1.

[T.D. 7198, 37 FR 13685, July 13, 1972]

**§ 1.186-1 Recoveries of damages for antitrust violations, etc.**

(a) *Allowance of deduction.* Under section 186, when a compensatory amount which is included in gross income is received or accrued during a taxable year for a compensable injury, a deduction is allowed in an amount equal to the lesser of (1) such compensatory amount, or (2) the unrecovered losses sustained as a result of such compensable injury.

(b) *Compensable injury*—(1) *In general.* For purposes of this section, the term *compensable injury* means any of the injuries described in subparagraph (2), (3), or (4) of this paragraph.

(2) *Patent infringement.* An injury sustained as a result of an infringement of a patent issued by the United States (whether or not issued to the taxpayer or another person or persons) constitutes a compensable injury. The term *patent issued by the United States* means any patent issued or granted by the United States under the authority of the Commissioner of Patents pursuant to 35 U.S.C. 153.

(3) *Breach of contract or of fiduciary duty or relationship.* An injury sustained as a result of a breach of contract (including an injury sustained by a third party beneficiary) or a breach of fiduciary duty or relationship constitutes a compensable injury.

(4) *Injury suffered under certain antitrust law violations.* An injury sustained in business, or to property, by reason of any conduct forbidden in the antitrust laws for which a civil action may be brought under section 4 of the Act of October 15, 1914 (15 U.S.C. 15), commonly known as the Clayton Act, constitutes a compensable injury.

(c) *Compensatory amount*—(1) *In general.* For purposes of this section, the term, *compensatory amount* means any amount received or accrued during the taxable year as damages as a result of an award in, or in settlement of, a civil action for recovery for a compensable injury, reduced by any amounts paid or incurred in the taxable year in securing such award or settlement. The term *compensatory amount* includes only amounts compensating for actual economic injury. Thus, additional amounts representing punitive, exemplary, or treble damages are not in-

| UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT of Delaware | GRACE NON-ASBESTOS PROOF OF CLAIM FORM |
|---|---|

Name of Debtor:[1]  *W R. Grace + Co. et al*   Case Number *01-01139*

NOTE: This form should not be used to make a claim for an administrative expense, as defined on the attached instructions, arising after the commencement of the case. A "request" for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503. This form should also not be used to file an Asbestos Personal Injury Claim, Asbestos Property Damage Claim, Zonolite Attic Insulation Claim or Settled Asbestos Claim. A specialized proof of claim form for each of these claims should be filed.

Name of Creditor (The person or other entity to whom the Debtor owes money or property):

*Anton Frank Valovsek*

Name and address where notices should be sent:

*RT 2 - Box 200 H 92*
*Kemiah Idaho  83536*

☐ Check box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.

☐ Check box if you have never received any notices from the bankruptcy court in this case.

☐ Check box if the address differs from the address on the envelope sent to you by the court.

THIS SPACE IS FOR COURT USE ONLY

Account or other number by which creditor identifies Debtor:

*Case No. 01-01139 (JKF)*

Check here ☐ replaces
if this claim ☐ amends a previously filed claim, dated: _____

Corporate Name, Common Name, and/or d/b/a name of specific Debtor against whom the claim is asserted:

*ALL W.B.Grace property & interests*

1. Basis for Claim
   ☐ Goods sold
   ☐ Services performed
   ☐ Environmental liability
   ☐ Money loaned
   ☐ Non-asbestos personal injury/wrongful death
   ☐ Taxes
   ☐ Other *See 2 Liens -*
      *Commercial Construction Liens*

☐ Retiree benefits as defined in 11 U.S.C. § 1114(a)
☐ Wages, salaries, and compensation (fill out below)

Your SS #: _____
Unpaid compensation for services performed
from _____ to _____ (date)

2. Date debt was incurred: *1976 Continuing 1a day*   3. If court judgment, date obtained:

4. Total Amount of Claim at Time Case Filed:   $ *591,500, 463,500.00*

   If all or part of your claim is secured or entitled to priority, also complete Item 5 below.

   ☐ Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of all interest or additional charges.

5. Classification of Claim. Under the Bankruptcy Code all claims are classified as one or more of the following: (1) Unsecured Nonpriority, (2) Unsecured Priority, (3) Secured. It is possible for part of a claim to be in one category and part in another. CHECK THE APPROPRIATE BOX OR BOXES that best describe your claim and STATE THE AMOUNT OF CLAIM AT TIME CASE FILED.

☒ SECURED CLAIM

   Attach evidence of perfection of security interest

   Brief Description of Collateral:

   ☐ Real Estate        ☐ Other (Describe briefly)
                           *See all of documents*
   Amount of arrearage and other charges at time case filed included in secured claim above, if any: $ *591,500, 463,500.00*

   ☐ UNSECURED NONPRIORITY CLAIM

   A claim is unsecured if there is no collateral or lien on property of the debtor securing the claim or to the extent that the value of such property is less than the amount of the claim.

☐ UNSECURED PRIORITY CLAIM - Specify the priority of the claim.

   ☐ Wages, salaries, or commissions (up to $4650), earned not more than 90 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier - 11 U.S.C. § 507(a)(3).

   ☐ Contributions to an employee benefit plan - 11 U.S.C. § 507(a)(4).

   ☐ Taxes or penalties of governmental units - 11 U.S.C. § 507(a)(8).

   ☐ Other - Specify applicable paragraph of 11 U.S.C. § 507(a(___).

6. Credits and Setoffs: The amount of all payments on this claim has been credited and deducted for the purpose of making this proof of claim. In filing this claim, claimant has deducted all amounts that claimant owes to Debtor.

7. Supporting Documents: *Attach copies of supporting documents,* such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, court judgments, mortgages, security agreements and evidence of perfection of lien. DO NOT SEND ORIGINAL DOCUMENTS. If the documents are not available, explain. If the documents are voluminous, attach a summary.

8. Date-Stamped Copy: To receive an acknowledgment of the filing of your claim, enclose a stamped, self-addressed envelope and copy of this proof of claim.

This Space is for Court Only

| Date | Sign and print the name and title, if any, of the creditor or other person authorized to file this claim (attach copy of power of attorney, if any): |
|---|---|
|  | *Anton Frank Valovsek* |

C:\WINDOWS\Temporary Internet Files\OLK5002\PROOF002-Rvsd2-5-02.wpd

## SPECIFIC INSTRUCTIONS FOR COMPLETING
## GRACE NON-ASBESTOS PROOF OF CLAIM FORMS

*The instructions and definitions below are general explanations of the law. In particular types of cases or circumstances, there may be exceptions to these general rules.*

This Proof of Claim form is for Creditors who have Non-Asbestos Claims against any of the Debtors. Non-Asbestos Claims are any claims against the Debtors as of a time immediately preceding the commencement of the Chapter 11 cases on April 2, 2001 other than Asbestos Personal Injury Claims, Asbestos Property Damage Claims, Zonolite Attic Insulation Claims, Settled Asbestos Claims or Medical Monitoring Claims, as defined on the attached General Instructions. More specifically, Non-Asbestos Claims are those claims against one or more of the Debtors, whether in the nature of or sounding in tort, contract, warranty or any other theory of law, for equity for, relating to or arising by reason of, directly or indirectly, any injury, damage or economic loss caused or allegedly caused directly or indirectly by any of the Debtors or any products or materials manufactured, sold, supplied, produced, specified, selected, distributed or in any way marketed by one or more of the Debtors and/or arising on allegedly arising directly or indirectly, from acts or omissions of one or more of the Debtors, including, but not limited to, all claims, debts, obligations or liabilities for compensatory and punitive damages.

**Administrative Expenses:** Those claims for, among other things, the actual, necessary costs and expenses of preserving the estate as defined in Section 503 of the Bankruptcy Code that arose after the commencement of the case. A request for payment of an administrative expense may be filed pursuant to Section 503 of the Bankruptcy Code. This form should not be used to make a claim for an administrative expense.

**Secured Claim:** A claim is a secured claim to the extent that the creditor has a lien on property of the debtor (collateral) that gives the creditor the right to be paid from that property before creditors who do not have liens on the property. Examples of liens are a mortgage on real estate and a security interest in a car, truck, boat, television set, or other item of property. A lien may have been obtained through a court proceeding before the bankruptcy case began; in some states a court judgment is a lien. In addition, to the extent a creditor also owes money to the debtor (has a right to setoff), the creditor's claim may be a secured claim. (See also Unsecured Claim )

**Unsecured Claim:** If a claim is not a secured claim, it is an unsecured claim. Unsecured claims are those claims for which a creditor has no lien on the debtor's property or the property on which a creditor has a lien is not worth enough to pay the creditor in full.

**Unsecured Nonpriority Claim:** Certain types of unsecured claims are given priority, so they are to be paid in bankruptcy cases before most other unsecured claims (if there is sufficient money or property available to pay these claims). The most common types of priority claims are listed on the proof of claim form. Unsecured claims that are not specifically given priority status by the bankruptcy laws are classified as Unsecured Nonpriority Claims.

**Information about Creditor:** Complete this section giving the name, address, and telephone number of the creditor to whom the debtor owes money or property, and the debtor's account number, if any. If anyone else has already filed a proof of claim relating to this debt, if you never received notices from the court which sent notice, or if this proof of claim replaces or amends a proof of claim that was already filed, check the appropriate box on the form.

1. **Basis for Claim:** Check the type of debt for which the proof of claim is being filed. If the type of debt is not listed, check "Other" and briefly describe the type of debt. If you were an employee of the debtor, fill in your social security number and the dates of work for which you were not paid.

2. **Date Debt Incurred:** Fill in the date the debt was first owed by the debtor.

3. **Court Judgments:** If you have a court judgment for this debt, state the date the court entered the judgment.

4. **Amount of Claim:** Insert the amount of claim at the time the case was filed in the appropriate box based on your selected Classification of Claim in item 5. If interest or other charges in addition to the principal amount of the claim are included, check the appropriate place on the form and attach an itemization of the interest and charges.

5. **Classification of Claim:** Check either Secured, Unsecured Nonpriority or Unsecured Priority as appropriate. (See Definitions above.)

   **Unsecured Priority Claim:** Check the appropriate place if you have an unsecured priority claim, and state the amount entitled to priority. (See Definitions, above.) A claim may be partly priority and partly nonpriority if, for example, the claim is for more than the amount given priority by the law. Check the appropriate place to specify the type of priority claim.

6. **Credits:** By signing this proof of claim, you are stating under oath that in calculating the amount of your claim, you have given the debtor credit for all payments received from the debtor.

7. **Supporting Documents:** You must attach to this proof of claim form, copies of documents that show the debtor owes the debt claimed or, if the documents are too lengthy, a summary of those documents. If documents are not available, you must attach an explanation of why they are not available.

*Be sure to date the claim and place original signature of claimant or person making claim for creditor where indicated at the bottom of the claim form. Please type or print name of individual under the signature. Be sure all items are answered on the claim form. If not applicable, insert "Not Applicable".*

RETURN CLAIM FORM (WITH ATTACHMENTS, IF ANY) TO THE FOLLOWING CLAIMS AGENT FOR THE DEBTORS:

> Claims Processing Agent
> Re: W. R. Grace & Co. Bankruptcy
> P.O. Box 1619
> Faribault, MN 55021-1619

The Bar Date for filing all NON-ASBESTOS CLAIMS against the Debtors is _____, 2002 at 4:00 p.m. Eastern Time.

C:\WINDOWS\Temporary Internet Files\OLK5003\Specific Instructions for Non-Asbestos P of C Form4-11.doc

This **UCC-1 FINANCING STATEMENT** is presented for filing pursuant to the WASHINGTON UNIFORM COMMERCIAL CODE, chapter 62A.9 RCW, to perfect a security interest in the below named collateral.    **PLEASE TYPE FORM**     Filing fee: $12.00.

| 1. DEBTOR(S) *(see instruction #2)* | |
|---|---|
| ☐ PERSONAL *(last, first, middle name and address)* | Debtor 1  SSN: ___  FEIN: ___ |
| ☐ BUSINESS *(legal business name and address)* | Debtor 2  SSN: ___  FEIN: ___ |

2. FOR OFFICE USE ONLY — DO NOT WRITE IN THIS BOX

A.L. Costello, Chrman, Pres., CEO
W.R. Grace & Co., Inc.
One Town Ctr. Rd.
Boca Ratan, FL  33486

# COPY

TRADE NAME, DBA, AKA:

3. SECURED PARTY(IES) *(name and address)*

Anton Frank Volovsek
P.O. Box 723
TEkoa WA 99033

4. ASSIGNEE(S) of SECURED PARTY(IES) if applicable *(name and address)*

5. SECURED PARTY CONTACT PERSON: Anton Frank Volovsek     Phone: ___

6. CHECK ONLY IF APPLICABLE: *(For definitions of TRANSMITTING UTILITY AND PRODUCTS OF COLLATERAL, see instruction sheet.)*
☐ Debtor is a Transmitting Utility   ☒ Products of Collateral are also covered

7. THIS FINANCING STATEMENT covers the following collateral: *(Attach additional 8-1/2" x 11" sheet(s) if needed.)*

Please see Attachment

8. RETURN ACKNOWLEDGMENT COPY TO: *(name and address)*

Anton Frank Volovsek
P.O. Box 723
Tekoa WA 99033

9. FILE WITH:
UNIFORM COMMERCIAL CODE
DEPARTMENT OF LICENSING
P.O. BOX 9660
OLYMPIA, WA 98507-9660
(360) 753-2523

MAKE CHECKS PAYABLE TO THE
DEPARTMENT OF LICENSING

10. FOR OFFICE USE ONLY    IMAGES TO BE FILMED ☐

11. If collateral is described below, this statement may be signed by the Secured Party instead of the Debtor. Please check the appropriate box, complete the adjacent lines and box 13. If collateral is:
a. ☒ already subject to a security interest in another jurisdiction when it was brought into this state or when the debtor's location was changed to this state. *(complete adjacent lines 1 and 2)*
b. ☒ proceeds of the original collateral described above in which a security interest was perfected. *(complete adjacent lines 1 and 2)*
c. ☒ listed on a filing which has lapsed. *(complete adjacent lines 1 and 2)*
d. ☐ acquired after a change of name, identity, or corporate structure of the debtor(s). *(complete adjacent lines 1, 2 and 3)*

1. 255865, 257396
ORIGINAL FILING NUMBER
2. Klickitat County Auditor
FILING OFFICE WHERE FILED
3. Goldendale, WA
FORMER NAME OR DEBTOR(S)

12. DEBTOR NAME(S) AND SIGNATURE(S):

A.L. Costello, Chrman, Prs. CEO
TYPE NAME(S) OF DEBTOR(S) AS IT APPEARS IN BOX 1.
W.R. Grace & Co., Inc

SIGNATURE(S) OF DEBTOR(S)

SIGNATURE(S) OF DEBTOR(S)

13. SECURED PARTY NAME(S) AND SIGNATURE(S) ARE REQUIRED IF BOX 11 HAS BEEN COMPLETED.
Anton Frank Volovsek
TYPE NAME(S) OF SECURED PARTY(IES) AS IT APPEARS IN BOX 3 OR 4.

SIGNATURE(S) OF SECURED PARTY(IES)

SIGNATURE(S) OF SECURED PARTY(IES)

FORM APPROVED FOR USE IN THE STATE OF WASHINGTON (R/7/93)
WASHINGTON UCC-1

This **UCC-1** FINANCING STATEMENT is presented for filing pursuant to the WASHINGTON UNIFORM COMMERCIAL CODE, chapter 62A.9 RCW, to perfect a security interest in the below named collateral.       PLEASE TYPE FORM                                      Filing fee: $12.00.

| 1. DEBTOR(S) (see instruction #2) | Debtor 1 | 2. FOR OFFICE USE ONLY — DO NOT WRITE IN THIS BOX |
|---|---|---|

☐ PERSONAL (last, first, middle name and address)  SSN: ____  FEIN: ____
☐ BUSINESS (legal business name and address)  Debtor 2  SSN: ____  FEIN: ____

**COPY**

Grace, W.R. & Co. Inc.
A.L. Costello, Chrman, Pres., CEO
One Town Ctr Rd
Boca Ratan, FL  33486
TRADE NAME, DBA, AKA:

3. SECURED PARTY(IES) (name and address)

Anton Frank Volovsek
P.O. Box 723
Tekoa, WA 99033

4. ASSIGNEE(S) of SECURED PARTY(IES) if applicable (name and address)

5. SECURED PARTY CONTACT PERSON: Anton Frank Volovsek       Phone: ____

6. CHECK ONLY IF APPLICABLE: (For definitions of TRANSMITTING UTILITY AND PRODUCTS OF COLLATERAL, see instruction sheet.)
☐ Debtor is a Transmitting Utility    ☒ Products of Collateral are also covered

7. THIS FINANCING STATEMENT covers the following collateral: (Attach additional 8-1/2" x 11" sheet(s) if needed.)

Please see Attachment

8. RETURN ACKNOWLEDGMENT COPY TO: (name and address)

Anton Frank Volovsek
P.O. Box 723
Tekoa WA 99033

9. FILE WITH:
UNIFORM COMMERCIAL CODE
DEPARTMENT OF LICENSING
P.O. BOX 9660
OLYMPIA, WA 98507-9660
(360) 753-2523

MAKE CHECKS PAYABLE TO THE
DEPARTMENT OF LICENSING

10. FOR OFFICE USE ONLY    IMAGES TO BE FILMED

11. If collateral is described below, this statement may be signed by the Secured Party instead of the Debtor. Please check the appropriate box, complete the adjacent lines and box 13, if collateral is:
a. ☒ already subject to a security interest in another jurisdiction when it was brought into this state or when the debtor's location was changed to this state. (complete adjacent lines 1 and 2)
b. ☐ proceeds of the original collateral described above in which a security interest was perfected. (complete adjacent lines 1 and 2)
c. ☒ listed on a filing which has lapsed. (complete adjacent lines 1 and 2)
d. ☐ acquired after a change of name, identity, or corporate structure of the debtor(s). (complete adjacent lines 1, 2 and 3)

1. 255865, 257396
ORIGINAL FILING NUMBER
2. Klickitat Co. Auditor
Goldendale, WA
FILING OFFICE WHERE FILED
3. ____
FORMER NAME OR DEBTOR(S)

12. DEBTOR NAME(S) AND SIGNATURE(S):
Grace, W.R. & Co. Inc.
A.L. Costello, Chrman, Pres., CEO
TYPE NAME(S) OF DEBTOR(S) AS IT APPEARS IN BOX 1.

SIGNATURE(S) OF DEBTOR(S)

SIGNATURE(S) OF DEBTOR(S)

13. SECURED PARTY NAME(S) AND SIGNATURE(S) ARE REQUIRED IF BOX 11 HAS BEEN COMPLETED.
Anton Frank Volovsek
TYPE NAME(S) OF SECURED PARTY(IES) AS IT APPEARS IN BOX 3 OR 4.

SIGNATURE(S) OF SECURED PARTY(IES)

SIGNATURE(S) OF SECURED PARTY(IES)

FORM APPROVED FOR USE IN THE STATE OF WASHINGTON (R/7/93)
WASHINGTON UCC-1

WASHINGTON LEGAL BLANK, INC.

This UCC-1 FINANCING STATEMENT is presented for filing pursuant to the WASHINGTON UNIFORM COMMERCIAL CODE, chapter 62A.9 RCW, to perfect a security interest in the below named collateral.   PLEASE TYPE FORM   Filing fee: $12.00.

| 1. DEBTOR(S) (see instruction #2) | Debtor 1 | 2. FOR OFFICE USE ONLY — DO NOT WRITE IN THIS BOX |
|---|---|---|
| ☐ PERSONAL (last, first, middle name and address) | SSN: | |
| ☐ BUSINESS (legal business name and address) | FEIN: | |
| | Debtor 2 | |
| | SSN: | |
| | FEIN: | |

Robert J. Bettacchi, Pres.
Grace Construction Products
62 Whitmore Avenue
Combridge MA  02140

TRADE NAME, DBA, AKA:

**COPY**

| 3. SECURED PARTY(IES) (name and address) | 4. ASSIGNEE(S) of SECURED PARTY(IES) If applicable (name and address) |
|---|---|

Anton Frank Volovsek
P.O. Box 723
Tekoa WA 99033

5. SECURED PARTY CONTACT PERSON: __Anton Frank Volovsek__   Phone: _____

6. CHECK ONLY IF APPLICABLE: (For definitions of TRANSMITTING UTILITY AND PRODUCTS OF COLLATERAL, see instruction sheet.)
☐ Debtor is a Transmitting Utility   ☒ Products of Collateral are also covered

7. THIS FINANCING STATEMENT covers the following collateral: (Attach additional 8-1/2" x 11" sheet(s) if needed.)

Please see Attachment

| 8. RETURN ACKNOWLEDGMENT COPY TO: (name and address) | 9. FILE WITH: |
|---|---|

Anton Frank Volovsek
P.O. Box 723
Tekoa WA 99033

UNIFORM COMMERCIAL CODE
DEPARTMENT OF LICENSING
P.O. BOX 9660
OLYMPIA, WA 98507-9660
(360) 753-2523

MAKE CHECKS PAYABLE TO THE
DEPARTMENT OF LICENSING

| 10. FOR OFFICE USE ONLY | IMAGES TO BE FILMED |
|---|---|

11. If collateral is described below, this statement may be signed by the Secured Party instead of the Debtor. Please check the appropriate box, complete the adjacent lines and box 13, if collateral is:
a. ☒ already subject to a security interest in another jurisdiction when it was brought into this state or when the debtor's location was changed to this state. (complete adjacent lines 1 and 2)
b. ☒ proceeds of the original collateral described above in which a security interest was perfected. (complete adjacent lines 1 and 2)
c. ☒ listed on a filing which has lapsed. (complete adjacent lines 1 and 2)
d. ☐ acquired after a change of name, identity, or corporate structure of the debtor(s). (complete adjacent lines 1, 2 and 3)

1. __255865, 257396__
   ORIGINAL FILING NUMBER
2. __Klickitat County Auditor__
   FILING OFFICE WHERE FILED
3. __Goldendale WA__
   FORMER NAME OR DEBTOR(S)

| 12. DEBTOR NAME(S) AND SIGNATURE(S): | 13. SECURED PARTY NAME(S) AND SIGNATURE(S) ARE REQUIRED IF BOX 11 HAS BEEN COMPLETED. |
|---|---|
| Robert J. Bettacchi, Pres. Grace Construction Products | __Anton Frank Volovsek__ |
| TYPE NAME(S) OF DEBTOR(S) AS IT APPEARS IN BOX 1. | TYPE NAME(S) OF SECURED PARTY(IES) AS IT APPEARS IN BOX 3 OR 4. |
| SIGNATURE(S) OF DEBTOR(S) | SIGNATURE(S) OF SECURED PARTY(IES) |
| SIGNATURE(S) OF DEBTOR(S) | SIGNATURE(S) OF SECURED PARTY(IES) |

FORM APPROVED FOR USE IN THE STATE OF WASHINGTON (R/7/93)
WASHINGTON UCC-1

## ATTACHMENT FOR UCC-1 - BLOCK 7

All personal judgments, licenses, bonds, insurance's, private/public trusts, bank accounts, savings accounts, personal & private property (cars, trucks, vehicles, land/real estate, buildings, livestock, wells, mines, natural resources), assignments of all stocks, bonds, and certificates of deposits, personal and corporate signatures, all tangible and intangible property, and including but not limited to their partners assets, all inventory personal, corporate and company to include all chairman, CEO's, and Vice Presidents; also all mineral products and holdings, current development holdings, all retirement accounts (Federal, State, Foreign, and domestic) all payments while in public office, all private payments while relieved out of public office, all inheritance, all accounts receivable, etc., until full accord and satisfaction has been given to the secured parties (paid in full). Non/standard-Non/negotiable (Non-Federal form). A security-15 USC. This is a USSFC Tracer Flag, not a point of law. RCW 62A.9 207, -102, -103, -105, -106, -107, -109; RCW 62A.9 3-415.

FILED FOR RECORD
KLICKITAT COUNTY AUDITOR

97 JAN -7 PM 2: 51

99  2  00096  8

FILED BY *A. F. Volovsek)*
RETURN TO *same*

VOL *343*  PAGE *788-794*

RECORDER'S USE

RECORDING REQUESTED BY
AND WHEN RECORDED MAIL TO

257396

Anton Frank, Volovsek
c/o System Solutions
P.O. box 522
White Salmon, Washington
NDPZ              [98672]

## CAVEAT/NOTICE:

*Failure To Respond To This Affidavit As Herein Required Within Ten (10) Days, Will Invoke The Doctrine Of Acquiescence And/Or Admission And/Or Claims Made, By This Affiant And Further, Will Be A Tacit Admission Of Affiant's Right To Recover In Commerce For Damages Caused By Respondent, But Not Limited To Penalties And Costs.*

Anton Frank, Volovsek
        Affiant:
        vs.

A. L. Costelio Chrman, Pres., &. Ceo
W. R. Grace & Co, One Town Ctr Rd
Boca Raton, Fl. 33496,
 And,
A. L, Costello Chrman, Ceo,
And,
Robert J. Bettacchi Pres.,
Grace Construction Products
62 Whitemore Ave, Cambridge, Ma. 02140,
And,
A.l. Costello Chrman, Pres., & Ceo;
Grace W- R. & Co. Inc. (Ny)
One Town Ctr, Rd, Boca Raton, Fl. 33486,
        Respondents

**A SECURITY* (15 USC)**

* A SECURITY: "Any evidence of DEBT"

**COMMERCIAL AFFIDAVIT
OF DEFAULT,
NOTICE AND WARNING OF: 10 Day
COMMERCIAL GRACE;**
  and,
**NOTICE OF NON-JUDICIAL,**
  and
**PRE-JUDICIAL PROCEEDING**

The foregoing instrument has been compared and is a true and correct transcript of the original thereof on file in the records of my office.
Dated this *7th* day of *January* 19 *97*
 *E.* DIANA HOUSDEN, Auditor
 *Elizabeth Richardson*  DEPUTY
in and for the County of Klickitat, State of Washington.

FILED

MAY 1 9 1999

SHIRLEY BAFUS
WHITMAN COUNTY CLERK

VOL 343 PAGE 788

## TRUE BILL IN COMMERCE

6. RESPONDENTS, their agents, and principal corporation must follow public Antitrust Civil Process 15:131 1, §§1. 186-1, and federal Procedures and Process, applicability of Federal Civil Process, Wright and Miller, Civil 2451 and Wright, Criminal 109 and applicable Uniform Commercial Code while conducting business or be liable for the damages to injured party and are subject to penalties prescribed therein; and,

7. RESPONDENTS, their agents, and principal corporations refused to sell, this Affiant, their product, heavy duty Bituthene, which was on the open market. It was the only product on the market at that time which met specifications needed to utilize Affiant's patented roof systems, (See attached letters); and,

8. RESPONDENTS, their agents, and principal corporations also notified all membrane distributors that if they sold any membrane to this Affiant for the One Hundred Thirty Five Thousand ($135,000.00) Dollar contract, then in place, or if they sold Affiant any membrane for future contracts, they would be black-listed and never be able to handle the Grace Product lines, (See Exhibit B); and,

9. RESPONDENTS, are responsible and liable for all acts, non-acts, omissions, or commission of their agents, officers, or others, living or deceased, for the acts of the agents are the acts of the principals; and

10. RESPONDENTS, their agents, and principal corporations committed the above acts compromising the thirty thousand square foot, One Hundred Thirty Thousand ($135,000) Dollar contract and a Two Thousand Five Hundred ($2500.00) Dollar contract on or about 1975. (See Exhibit A); and,

11. SAID ACTS also compromised future contracts to apply my EER System because no other product would produce the same results in my roofing system, which was later tested, patented and approved by Underwriters Laboratories, and U.S. Army Corps of Engineers. Additional losses to business, due to Affiant's inability to develop and use patented system, resulted in financial losses amounting to approximately One Hundred Billion ($100,000,000,000) Dollars, (See exhibit A): and,

12. RESPONDENTS, their agents, and principal corporations, cost Affiant a marriage of 25 years and caused Affiant's four children to be alienated from him; and,

13. RESPONDENTS, their agents, and principal corporation caused Affiant, humiliation, trauma and left Affiant to be incapable of communication due to the server stress, abuse and financial losses. This resulted in Affiant having a severe nervous breakdown. The aggravated mental condition allowed for Affiant's attorney to steal his patent. The cost of litigation to retrieve his patent was approximately Two Hundred Twenty Five Thousands ($225,000.00) Dollars; and,

## CRIMINAL COMPLAINT

18. This Criminal Complaint and the Defendants herein are in violation of various Constitutional secured rights, these rights are listed below:

   a. Article 1, § 10 cl.1, impart; No state shall pass any law impairing the obligation of contracts; and,

   b. Amendment V , in part, nor be deprived of life, liberty or property without just compensation; and,

   c. The Defendants herein are in violation of 15 USCA. Sherman Anti Trust Act; as placed below:

   e. The Defendants herein are in violation of 15 USCA § 1; as placed below, Trust, Etc., In Restraint Of Trade Illegal; Penalty:

   Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal. Every person who shall make any contract or engage in any combination or conspiracy hereby declared to be illegal shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding $10,000,000 if a corporation, or, if any other person, $350,000, or by imprisonment not exceeding three years, or by both said punishments, in the discretion of the court.

   f. The Defendants herein are in violation of 18 USCA § 4; as placed below, Misprision of Felony:

   Whoever, having knowledge of the actual commission of a felony cognizable by a court of the United States, conceals and does not as soon as possible make known the same to some judge or other person in civil or military authority under the United States, shall be fined under this title or imprisoned not more than three years, or both.

   g. The Defendants herein and all that conspired to embezzle the patented system whether from the beginning or whether they joined the conspiracy after the fact are equally guilty as stated in 18 USCA § 3; as placed below, Accessory after the fact:

   Whoever, knowing that an offense against the United States has been committed, receives, relieves, comforts or assists the offender in order to hinder or prevent his apprehension, trial or punishment, is an accessory after the fact. Except as otherwise expressly provided by any Act of Congress, an accessory after the fact shall be imprisoned not more than one-half the maximum term of imprisonment or (notwithstanding section 3571) fined not more than one-half the maximum fine prescribed for the punishment of the principal, or both; or if the principal is punishable by life imprisonment or death, the accessory shall be imprisoned not more than 15 years.

   h. The Defendants herein are in violation of 18 USCA § 241; as placed below, Conspiracy Against Rights Of Citizens:

   If two or more persons conspire to injure, oppress, threaten, or intimidate any Citizen in the free exercise or enjoyment of any right or privilege secured to him by the Constitution or laws of the United States, or because of his having so exercised the same; or if two or more persons go in disguise on the highway, or on the premises of another, with intent to prevent of hinder his free exercise or

**NOTICE TO PRINCIPALS, IS NOTICE TO AGENTS.**
**NOTICE TO AGENTS, IS NOTICE TO PRINCIPALS.**

24.   SERVICE of this Notice and Demand upon the Chief Executive Officer of each of the W.R. Grace divisions named on page one of this instrument; each officer being a respondent.

25.   Further Affiant saith not.

*Frank*

*Anton Volovsek*

Anton Frank, Volovsek

STATE OF WASHINGTON  )
                      )   Ss
COUNTY OF KLICKITAT   )

Subscribed and sworn before me, *Robin R. Cameron*

This 7ᵗʰ day of *Jan*, 19 97.

*Robin R Cameron*

Notary Public, State Of *Wash*
My Commission Expires: 3-6-2000

WHEN RECORDED, RETURN To:
Anton Frank, Volovsek
c/o P.O. Box 522
White Salmon, Washington
NDPZ           [98673]





**CANADIAN PAT. # 1047219**

**energy efficient roof system**

To

Pachulski, Stang, Ziehl, Young + Jones

This is To notify you That I recieved
a Copy of The ChapTer 11 bankrupTcy hearing
of W.R. Grace + Co. eT al.

Paket recieved may 1, 2001 - 1:30 P.m.

This is also To notify you of my
Current address which is

RT 2 - Box 200 # 42
Kamiah, Idaho 83536
1-208-935-7979

Thank you

Anton Volovsek

Anton Volovsek
RR 2 Box 200-42
Kamiah, ID 83536-9229

To: Honorable Joseph J. Farnan Jr. (Judge)
United States Bankruptcy Court

District of Deleware
824 North Market Street
Wilmington, Delaware
19801

Case No. 01-1139 (JJF)
Jointly Administered

Re: Chapter 11

W.R. Grace & Co et al - Debtors

This is to notify you that I, Anton Frank Volovsek, have recieved a copy
of the Chapter 11 Bankruptcy, of W.R. Grace & Co et al., on May the 1st
at approximately 1:30 p.m.
This also is to advise you of my current address which is;

Anton Frank Volovsek
Rt 2 Box 200 #42
Kamiah, Idaho  83536
1-208-935-7979     _Anton Frank Volovsek_

If this be allowed I would like to propose a suggestion that will make
W.R. Grace & Co very healthy within the next 5 years.

Subject:       E.E.R.S.
Fact:          Amount of B.U.R. applied each year ( 15 billion sq. ft )
Fact:          W.R. Grace manufactures 3 of the 4 components of E.E.R.S.
Suggestion:    W.R. Grace Market E.E.R.S
               Since they already have a represenative in every State-
               No cost involved
Estimate:      If Grace markets E.E.R.S. under my direction and
               supervision, we should get 30 to 40% of the market in 5 years.
My Share:      $1.00 per square foot + profit
Grace's Share: $1.00 per square foot + product sales

     One Third of market (15 billion sq. feet) - 5 billion sq. feet per year
     5 Billion sq. feet x $1.00 per sq. foot x 5 years-
     25 Billion dollars + profit on their membrane---
     Primer & Coating

10 Year Estimate x 3 with 90% of the market and 20 Billion sq. ft. per yr.
     1960's- 5 Billion sq. feet per Year
     1970's- 8 "                        "
     1980's- 10 "                       "
     1990's- 12-13 "                    "
     2001-  15-16 "                     "

E.E.R.S. is now warranted by three major coating manufacturers for 10
years, with an additional 10 years if roof is recoated every 10-12 years,
and each additional 10-12 year period, as long as building stands.

C.C. Pachulski-Stang-Ziehl-Young & Jones
C.C. Richard Schepacater - Trustee

E. H. SNYDER

ATTORNEY AND COUNSELOR AT LAW
161 WEST WISCONSIN AVENUE
PLANKINTON BUILDING SUITE 7046
MILWAUKEE, WISCONSIN 53203

TELEPHONE 224-1011
AREA CODE 414

October 14, 1975

CERTIFIED MAIL
RETURN RECEIPT REQUESTED

Mr. Peter R. Grace
W. R. Grace & Co.
62 Whitmore Avenue
Cambridge, Massachusetts 02140

Re: BITUTHENE
        Ardco, Inc.   our file 75-125
        Eerrs, Inc.   our file 75-126

Dear Mr. Grace:

I am the attorney for Mr. Anthony Volovsek, Daniel C. Hanson, and
Ralph E. Bielefeld, who have formed the above Wisconsin corporations
for the purpose of installing a Roofing System invented and created
by Mr. Volovsek, and on which a patent is now pending.

This new roofing system has been thoroughly investigated and discussed
with Mr. Donald Couglen and Mr. Hayden Clark beginning in January,
1975 and on various dates from that time to the present.

Your material "BITUTHENE" is one of the elements that can be used in
this new roofing system, and on or about October 2, 1975, Mr. Hansen
was informed by Mr. Couglen that Mr. Hansen's request for 105 rolls
of Bituthene, C.O.D., could not be filled and would have to be referred
to Mr. Clark.

Mr. Hansen then left two messages for Mr. Clark to return his call,
and on October 10, 1975, Mr. Clark left a message with Mrs. Bielefeld
that he would furnish only 5 rolls for testing, although Mr. Hanson
had requested 105 rolls. Mr. Clark quoted no price and stated that
he could not sell larger amounts to my clients at this time.

Under the circumstances, I have informed my clients that their rights
and interests are being clearly infringed upon by Mr. Clark, that the
matter should be brought to not only your attention, but to the at-

E. H. SNYDER

ATTORNEY AND COUNSELOR AT LAW

Mr. Peter R. Grace                    -2-                    October 14, 1975

tention of Mr. Rosenblatt and Mr. Couglen with a request that I
receive an immediate explanation for the treatment given to my clients
by Mr. Clark, and if such is a fact, the reason or reasons that W.
R. Grace and Co. refuses to sell Bituthene to my clients on a C.O.D.
basis.

In the event that I do not receive a satisfactory reply from you
within the next five days, my instructions are to take whatever legal
action is necessary to enforce the rights and interests of my clients
against those responsible for this situation.

Very truly yours,

E. H. Snyder

EHS/mmi

cc: via Certified Mail return receipt requested to:
    Mr. Hayden Clark, W. R. Grace & Co., 62 Whitmore Ave.,
                     Cambridge, Mass. 02140

    Mr. Leonard Rosenblatt, W. R. Grace & Co., 62 Whitmore Ave.,
                     Cambridge, Mass. 02140

    Mr. Donald Couglen, W. R. Grace & Co., Construction Products Div.,
                     6051 W. 65th St., Chicago, Ill. 60638

cc: via regular mail to:
    Mr. Anton Volovsek
    Mr. Daniel C. Hanson
    Mr. Ralph E. Bielefeld

# CONSTRUCTION PRODUCTS DIVISION

W. R. GRACE & CO., 62 WHITTEMORE AVENUE, CAMBRIDGE, MASSACHUSETTS 02140   617-876-1400

October 24, 1975

E. H. Snyder, Esq.
161 West Wisconsin Avenue
Plankinton Building, Suite 7048
Milwaukee, Wisconsin  53203

Dear Mr. Snyder:

I am in receipt of a copy of your letter dated October 14, 1975 and have taken the liberty of looking into the matters raised by your letter.

W. R. Grace & Co. is a responsible company and desires that its products be used only in applications wherein there is sufficient basis to believe that they will perform satisfactorily. Your clients desire to use our product Bituthene as a critical component in a roofing system which your clients have designed. My people are of the opinion that there is not sufficient basis for us to believe that your clients' roof design utilizing our product will perform as intended.

Product liability exposure in the roofing industry can be substantial. Further, there is nothing which will so materially adversely affect our ability to make sales as bad field exposure with a product. Therefore, I must inform you that W. R. Grace & Co. is not willing to assume the legal and business risks that sales of our product Bituthene to your clients would entail.

As we have said previously, we are willing to work with your client to develop some field experience with the use of Bituthene in their system. We initially offered to provide Mr. Volovsek with five rolls of Bituthene, at no charge, for this purpose if he so desires. If they wish to proceed on this basis, please let me know.

Sincerely,

Leonard Rosenblatt
Vice President

LR/mj

cc: Mr. J. Peter Grace

COPY RECEIVED

JL 2 6 1975

GRACE

E. H. SNYDER

75-125

# E. H. SNYDER

ATTORNEY AND COUNSELOR AT LAW

161 WEST WISCONSIN AVENUE

PLANKINTON BUILDING SUITE 7046

MILWAUKEE, WISCONSIN 53203

TELEPHONE 224-1011
AREA CODE 414

November 7, 1975

Mr. Leonard Rosenblatt, Vice Pres.
Construction Products Division
W. R. Grace & Co.,
62 Whittemore Avenue
Cambridge, Mass. 02140

Re: Ardco, Inc. — our file 75-125

Dear Mr. Rosenblatt:

I have carefully reviewed your letter to me of October 24, 1975 with my clients.

On behalf of my clients and ARDCO, INC., I am authorized and do hereby offer to purchase from W. R. Grace & Co. 200 rolls of Heavy Duty Bituthene, C.O.D. at a total price which is the same as the total price currently being charged and paid for that amount by other direct purchasers of this material in the midwest.

It is expressly understood that any warranties, expressed or implied, of said Bituthene by W. R. Grace & Co. shall be limited to those warranties set forth in your standard written warranty relating to said material and in your advertising brochure, Form CMD 362B, entitled "Heavy Duty Bituthene".

In addition, since your letter appears to state a concern for products liability exposure if Heavy Duty Bituthene is used in the roofing industry, I request that you furnish me with a description of the product liability risks you allege may arise out of the use of Bituthene for roofing which risks do not or may not arise out of the established uses of Heavy Duty Bituthene.

Both you and the W. R. Grace & Co. are also hereby informed that ARDCO has had to breach its contracts for the installation of the patent pending roofing system solely because you have refused to sell to or deal with ARDCO or with any material supplier in Wisconsin by making Heavy Duty Bituthene unavailable to ARDCO or any other distributor of building materials in Wisconsin.

I would appreciate an early response in order that I may advise my clients whether the commencement of litigation to enforce their rights and interests is necessary. We would obviously prefer to resolve this matter immediately without

<div align="center">

### E. H. SNYDER
ATTORNEY AND COUNSELOR AT LAW

</div>

Mr. Leonard Rosenblatt         -2-             November 7, 1975

long·term litigation.  However, if that is the only way that we can be compensated for the destruction of the business of ARDCO as a result of your actions and those of the other representatives of W. R. Grace & Co., we shall certainly proceed with whatever litigation is necessary and justified under the circumstances.

Very truly yours,

*E. H. Snyder*

E. H. Snyder

EHS/mmi

cc: Mr. J. Peter Grace
     Mr. Anton Volovsek
     Mr. Daniel C. Hanson
     Mr. Ralph E. Bielefeld
     Mr. James A. Hauer

# CONSTRUCTION PRODUCTS DIVISION

W. R. GRACE & CO., 62 WHITTEMORE AVENUE, CAMBRIDGE, MASSACHUSETTS 02140    617-876-1400

November 26, 1975

E. H. Snyder, Esq.
161 West Wisconsin Avenue                   Your File No. 75-125
Milwaukee, Wisconsin 53203

                    Re:  Ardco, Inc.

Dear Mr. Snyder:

    I have reviewed your letter of November 7, 1975 with
our counsel who, I understand, has discussed our position
with you.

    This will confirm that W. R. Grace & Co. does not feel
it appropriate to knowingly sell Heavy Duty Bituthene for a
use wherein there is not sufficient basis for us to believe
that it will perform satisfactorily. Accordingly, our
position remains unchanged from that stated in my letter of
October 24, 1975.

                                    Sincerely,

                                    Leonard Rosenblatt
                                    Vice President

LR/ms

cc/ Mr. J. Peter Grace

*sent copy*
*to Valvoske, Antone*
*12/12/75*

COPY RECEIVED

        DEC 5 1975

        E. H. SNYDER

*75-125*

**GRACE**

<div align="center">

### E. H. SNYDER

ATTORNEY AND COUNSELOR AT LAW

161 WEST WISCONSIN AVENUE

PLANKINTON BUILDING  SUITE 7048

MILWAUKEE, WISCONSIN 53203

</div>

February 23, 1976

<div align="right">

TELEPHONE 224-1011

AREA CODE 414

</div>

Atty. Michael E. McIntosh
Sheridan, Ross & Fields
1201 First National Bank Bldg.
Denver, Colorado 80202

Re:  Our file 75-125
      Ardco, Inc.

Dear Mr. McIntosh:

I am the attorney for Anton Volovsek, who is the owner of the patent of the roofing system about which you were concerned, and your client Protecto-Wrap is interested.

Will you please direct any and all inquiries regarding this matter to me alone, since Mr. Hauer was retained solely for the purpose of filing the patent and does not in any way represent Mr. Volovsek beyond that capacity.

Mr. Volovsek is anxious to work out the details concerning some agreement with Protecto-Wrap and has in mind some way that we can specify your client's membrane product on all roofing systems provided that we do not run into any problems with the anti-trust laws.

I might inform you that W. R. Grace Co. is the only company that has a product which it has patented under the name of "BITUTHENE", and which it has refused to sell us because "it has not yet been tested on roofs".

There is no question but what we have the legal right to sue W. R. Grace, but would prefer to get on with our business, and believe that their refusal to sell to us or to permit us to use their product in roofing will at least for some period of time protect us in specifying the use of your client's basic membrane if the five year guarantee we anticipate giving is to be valid.

By the time you receive this letter, I will have spoken to you on the phone, and we are most anxious to conclude this matter as soon as possible.

<div align="right">

Very truly yours,

E. H. Snyder m.

</div>

EHS/mmi

cc:  Anton  Volovsek

Pechulske + Main Law frim Represonting W.R. Grace
Stange-Ziehl      Janet, Bear - Attorney for Grac
40

My Notes -

I have Copy

~ Tony

'is (Referred by Pechulski)
e to Sell me bitathana
l - & Liens + defaults uce
-ace lawyer I am Creditor
ley consist of 75 entities
intered into bancrupcy
Judgement.
- have disc To prove it
ace - black Listad (madows
unity to market my syster
, R. Betachi regarding
nt of D. Rockafellar as
e of my being barred
d Lien/of 650 Bichtion
es Possible

⑨ Bring Dan Kubal To meeting - + CPA- + maybe
Logods of Landon Legal reps. + R. Betachi
⑩ Ham only Credetor with Lien against Grac
makeing me The only secured Creditor
$ must be paid before any one else - see duenmos
⑦ Sugert returing money To Loyods - present
my progam To full attendence + The
Possible return of interest also To Loyods.

⑫    Regardless what has happened
over the past 30 yrs. Grace is Still
my first and only choice To market
my System - The best, and at no cost
what so ever To Them. Let me prove
it To Them. In 10years They will
make more Then They had in The past
30 yrs. maybe even 40 to 50 yrs.
Let Dan Kubal with be The judge.

⑩
⑪  } Combined = ⑬
⑨a make sure you mention Graces 75
entities - only 62 are in bankrupcy
I need some up front money To make
my progrom sucead. IT will Boggle every our
(over)

Schulski → Main Law frim Representing W.R. Grace
Tanger Ziehl
ing + Jones

Janet Bear - Attorney for Grace
Kirkland & ELLIS (Referred by Pechulski)
Chicago

① Anti Trust - refusing to sell me bitathane
② nothing was contested - 2 Liens + default + ucc
③ I was notified by Grace Lawyer I am Creditor
④ Grace Lawfirm said They consist of 75 entities
    but only 62 were entered into bankruptcy
⑤ default same as Judgement
⑥ numbers are correct have disc To prove it
⑦ I was barred by Grace - black Listed (in Dallas)
    deprived of opportunity To market my system
⑧ I wish To speak To R. Betochi regarding
explain possible involement of D. Rockafellar as
Rockafellar The possible cause of my being barred
⑨⑨ Possibility of Third lien at 650 Bilbury
⑩⑬ meet here soon as possible
⑪ Bring Dan Kubel To meeting - + CPA - + maybe
    Loyods of London Legal reps + R. Betochi
⑩ I am only Creditor with Lien against Grace
    making me The only secured Creditor
⑦ I must be paid before any one else - see document
    Sugest returing money To Loyods - present
    my program To full attendance + The
    possible return of interest also To Loyods

⑫      Regardless what has happened
    over The past 30 yrs. Grace is still
    my first and only choice To Market
    my system - The best, and at no cost
    what so ever To Them. Let me prove
    it to Them. In 10 years They will
    make more Then They had in The past
    30 yrs. maybe even 40 to 50 yrs.
Let Dan Kubal with be The Judge.

⑩ ⑪  Combined = ⑬
⑨a  make sure you mention Graces 75
    entities - only 62 are in bankruptcy
    I need some up front money To make
    my program succeed. It will Boggle every your
    everyone mind

Once you here or see whaT I am
abouT To do you may even cencider
Represon Ting me and my Program
Hope so !

Tony

Brende
 if you came I
WonT be Back TiLL
afTer noon

Tony

# *A DOUBLE ROOF SYSTEM  WITH  NO EQUAL!*



## **eers** inc.

**energy efficient roof system**



# • THE eers ADVANTAGE •

**TWO ROOF SYSTEMS:** The tough 60 mil (± 5 mil) reinforced single ply bitumen vapor barrier acts as the initial self-sealing waterproof membrane and as a temporary construction roof. The sprayed-in-place foam and elastomeric coating add both insulation and a seamless waterproofing membrane on top of the insulation.

**TOTALLY ADHERED:** There are no mechanical fasteners or stone ballast needed to hold the eers Roof System in place. Each roof component is totally and fully adhered to the next item. The roof components become one integrally solid "monolithic" roof system.

**SEAMLESS MEMBRANE:** The sprayed-in-place foam and elastomeric coating have no joints, or seams for water to travel in, under, or through. eers is truly a monolithic system. The roof is self-flashing around ducts, vents, stacks, and vertical and parapet walls.

**ENERGY EFFICIENT:** Polyurethane foam has the highest insulation value (R-value), for any commercially available insulation on the market today. One inch of foam insulation results in an R=7.1. Your roofing expense can be engineered to become an energy saving investment.

**LIGHTWEIGHT & STRONG:** The eers Roof System has a high strength to weight ratio. Weighing up to 6 times less than a conventional roof, the eers System can actually give building designers substantial cost saving in the structural steel components of both the roof and main structure.

**FULLY RATED SYSTEM:** The eers Roof System is fully rated to meet or exceed both Factory Mutual and U.L. guidelines for fire and wind uplift.



Top coat fluid applied protective coating membrane

Base coat fluid applied protective coating membrane

Spray applied rigid polyurethane foam insulation

Prime coat for the foam

Fully adhered 60 mil single ply water proofing membrane

Prime coat

Structural deck

**TWO** TOTALLY ADHERED, SEAMLESS ROOFS **COMBINED INTO ONE** MONOLITHIC ENERGY EFFICIENT ROOF SYSTEM

# Your **eers** Roof System In Detail

## Substrates:

The eers Roof System can be utilized for both new and re-roofing projects. Reroofing requires the removal of the existing membrane roof so that the bitumen can be adhered to the existing dry, clean substrate.

Approved substrates include but are not limited to: new or existing metal and/or steel decks, concrete decks, plywood and wood surfaces. All surfaces must be dry and clean and free of debris. The substrate must be primed prior to application of the bitumen membrane.

## Bitumen Membrane:

Comprised of both top grade flexible bitumen material and an integral polypropelyne reinforcing mesh, the tough 60 mil (± 5 mils) membrane is self adhering. The membrane comes with a plastic or paper release sheet that is removed during application. The substrate is primed prior to applying the membrane. Edges may be caulked with compatible bitumen caulk. Curbs, flashings and openings are flashed according to eers specifications. At parapet walls and other vertical surfaces; the membrane can be secured with metal pressure bar if needed. Roof sumps, vents and stacks are flashed using similar N.R.C.A., (National Roofing Contractors Association), roofing details. Upon completion the watertight membrane acts initially as a temporary construction roof and eventually becomes the bottom roof membrane/vapor barrier for the complete eers Roof System.

 

Release Film
Rubberized Asphalt Compound
Woven Glass Fiber Reinforcement
Rubberized Asphalt Compound
Woven Polypropylene Fabric

## Sprayed-In-Place Foam Insulation:

Polyurethane Foam is a rigid, closed cell (90%+), insulating plastic foam material which has the best insulation value of any insulation material now available. One inch (1") has a typical "R" factor value of "7". The higher the "R" value — the better the insulation.

Before spraying the foam, the bitumen membrane should be cleaned of dirt and debris and primed.

The rigid polyurethane foam is formed through the mixing of an "A" isocyanate component and a "B" resin component in a specially designed spray gun which dispenses the mixed, heated, liquid mixture directly on the substrate. This liquid immediately expands to about thirty (30) times its volume and bonds tenaciously to the surface to which it was applied.

Layers or "lifts" of foam are sprayed in place to achieve the desired thickness of insulation. As these layers are sprayed, they bond and become homogeneous with previous layers. This sprayed in place insulation has no joints, seams or cracks through which moisture, heat or cold can enter. This monolithic insulation will not allow any horizontal migration of water through the system, a major problem with conventional composite roofs. The foam flows into all cracks, around all profusions, into all cavities and completely seals all surfaces.

The polyurethane foam should be brought to the desired thickness the same day it is sprayed for best adhesion results.

### COMPARATIVE INSULATING EFFICIENCY OF VARIOUS COMMON ROOFING INSULATION

| Urethane | 0.14 | 7.14 |
|---|---|---|
| Glass Fiber | 0.25 | 4.00 |
| Exp. Polystyrene Bead Bd. | 0.28 | 3.57 |
| Foam Glass | 0.35 | 2.86 |
| Fiberboard | 0.38 | 2.77 |
| Expanded Perlite | 0.39 | 2.56 |

## Elastomeric Coating:

An elastomeric coating is a synthetic rubber-like fluid or liquid coating material which is spray applied in multiple coats to achieve a prescribed thickness. It cures to form a flexible weather protective cover over the foam.

The coating is tough allowing for normal maintenance traffic. Repairs are easy to find since the yellow foam insulation contrasts with the darker coating. Permanent repairs are made with the simple use of caulk and a caulk gun.

The coating is applied at a rate of approximately 3 gallons per 100 square feet of roof area. The coating is applied in two coats. First, a base coat; then a U.V. resistant top coat of a contrasting color. The base coat should be applied within 72 hours after the polyurethane foam has been sprayed.

## Testing and Ratings:

The eers system is rated as follows:

I.   UL Fire Resistance Rating:
     ASTM-E-108/U.L. 790 Class "A" and U.L. 1256.

II.  Factory Mutual Fire Resistance Rating Approval:
     System — Class 1 on non-combustible deck.

III. Wind-Lift:
     The complete eers Roof System is rated UL Class 90 for wind uplift. The system when tested exceeded a 174 m.p.h. wind uplift current.

## Availability, Warranties and Costs:

The eers Roof System has National availability. Licensed applicators are throughout the United States and Canada to provide both the eers Roof System and a manufacturer's warranty.

Warranties up to 10 years on the complete roof system are available. The warranties are provided by both the manufacturer and the applicator. (joint warranty).

The cost for the eers Roof System is competitive with systems of similar design. Licensed applicators can provide owners with budgetary and actual installation costs.

## Designer/Specifier — The eers Advantages:

Never before has a roof system given specifiers and designers so many advantages in roof construction and design. The eers bitumen membrane can be installed immediately after the metal deck has been installed allowing trades to start the interior finish of the building. The bitumen membrane acting as a temporary construction roof speeds construction while allowing the final roof to be installed after the majority of the construction trades are completed on or near the roof. The normal wear and tear of the trades and will not effect the eventual application and watertightness of the final application of the membrane insulation and elastomeric coating.

The eers Roof System weighs less than one-sixth of most conventional roof systems. This reduced dead load and the fact that the membrane and insulation adds structural rigidity to the roof deck allows the building designer substantial cost savings in the structural steel design of the building.

The bitumen membrane becomes a watertight vapor barrier after the foam and coating is installed. The eers vapor barrier is not broken by mechanical fasteners since it is fully adhered. The bitumen vapor barrier will continuously protect the insulation value of your new roof system.

The energy efficient seamless double roof system that will not allow the entrance and/or any horizontal migration of water through the system is the result of the fully adhered, monolithic seal of the eers components. These are many of the eers advantages!

# A DOUBLE ROOF SYSTEM WITH NO EQUAL!



1.   Metal deck and application of reinforced bitumen membrane.
2, 3. Spraying of polyurethane foam insulation on the primed bitumen membrane.
4.   3 phases of construction: 1 ) Primed bitumen membrane  2.) Sprayed-in-place urethane insulation  3.) Elastomeric coating.
5.   Monolithic seal of roof drain.
6.   Final coating application: Grey base coat and silver top coat.

208-935-7979

**eers**

**energy efficient roof systems**

[redacted]

Patent No. 4,016,323

ANTON VOLOVSEK
Technical Consultant
Sole Owner

Structural deck
Prime coat
Fully adhered 60 mil single ply water proofing membrane
Prime coat for the foam
Spray applied rigid polyurethane foam insulation
Base coat fluid applied protective coating membrane
Top coat fluid applied protective coating membrane

*TODAY'S INVESTMENT IN THE FUTURE*

| | |
|---|---|
| **WARRANTY** | 10 years against leaks. |
| **R. FACTOR** | 7.14 per inch |
| **WIND RESISTANCE** | U.L. Class 90 Wind-Uplift Rating. Exceeds 200 M.P.H. |
| **WEIGHT** | Less than One and One-Half Pounds per square foot. |
| **FIRE RATING** | U.L. 790 Class A Foam and Coating Meets or Exceeds any other roof system. |
| **ENERGY SAVING** | Exceeds cost of the System in less than 10 years. |

**A DOUBLE ROOF SYSTEM THAT HAS NO EQUAL**

# Chrysler develops new car treatment

By Lisa Olson
News Staff Writer

Chrysler Corp. unveiled a new anti-corrosion system Wednesday for its assembly plants of the future.

The "pro-coat technology" system, developed at Chrysler's Outer Drive Manufacturing Technical Center, is expected to reduce the cost and floor space required for an anti-corrosion system by up to 30 percent, according to Richard E. Dauch, executive vice-president of manufacturing at Chrysler.

Unlike conventional "drag-through" anti-corrosion systems used today, which drag vehicles through the various rinse, coating and curing

Dauch

processes, Chrysler's modular pro-coat technology system lowers a car body, or parts, into separate tanks for each step of the rinse, anti-corrosion and curing process, then oscillates the vehicle 180 degrees before repeating the treatment.

Each modular functions as a stand-alone system and is capable of handling 15 units per hour, the company said. A central computer "monitors, preprograms and gives a diagnostic opt-in-out of every process of the pro-coat system, including such functions as cycle time, temperature and vehicle oscillation, Dauch said.

Pro-coat technology, which was jointly developed with New Century Systems, Ltd., a Chrysler supplier, can adapt to vehicles of different shapes and sizes, Chrysler said.

The company has not assigned a production plant for the anti-corrosion system, but the company expects to put pro-coat technology into a plant this decade, Dauch said. Chrys-



NEWS PHOTO / MARK HOFFMAN

Under Chrysler's "pro-coat technology," a car body is lowered into separate tanks for each step of the anti-corrosion process.

ler's Jefferson Avenue plant is a candidate for the system, but not the Sterling Heights, Dodge City or Windsor plants, he said.

Dauch declined to say how much money Chrysler spent developing the

1984, the company has put $80 million into the Outer Drive Manufacturing Technical Center. Roughly 15 percent, or approximately $9 million, of that had gone to its paint operations, including pro-coat technology, he said.

---

The EERS Double Roof System was chosen for this new facility to satisfy the following specifications :

1. This "HIGH TECH" operation needed a guaranteed " no leak " roof.

2. A vapor barrier was needed on the warm side of the roof system to totally eliminate vapor drive or condensation buildup that could lead to moisture dripping into the open vats.

3. A totally sealed roof system with no mechanical fasteners to loosen and eventually create leaks.

4. A monolithic roof system with no seams,flashings or other accessories where leaks are known to develop.

5. An absolute 10 year warranty with an assured trouble free life of

OUTER DRIVE MANUFACTURING TECHNICAL CENTER

**CHRYSLER**
**CORPORATION**

January 26, 1987

E.E.R.S., Inc.
22226 W. Eight Mile
Southfield, MI.  48034

Gentlemen:

I would like to take this opportunity to express our complete satisfaction
with the E.E.R.S. Roof System, which was installed at our Pro-Coat Facility in
1985 at Outer Drive Mfg. Technical Center.

The 45,000 square foot plant roof is performing to our expectations.  Recent
inspection shows no sign of wear, design or installation problems.

We have been particularly impressed with the fact that the E.E.R.S. 60-mil,
single ply membrane is protected with a layer of energy efficient sprayed-in-
place polyurethane foam insulation and elastomeric coating.  This top
application of polyurethane foam and coating is providing the single ply
membrane with an effective barrier against all the harsh environmental
conditions which effect the roof membrane, i.e., freeze/thaw, U.V. and
mechanical wear and tear.  Important, also, is the fact that the E.E.R.S.
System required no mechanical fasteners or ballast to meet U.L. Class 90 wind
uplift.

We are sure that the E.E.R.S. Roof System will become an important part of
Chrysler's Roofing Program in the years to come.

Sincerely,

Tony Victor
Manufacturing Engineering Facilities



**CHRYSLER**
CORPORATION

*OUTER DRIVE MANUFACTURING TECHNICAL CENTER*

April 14, 1988

Mr. Carl Jacobs
Marketing Director
Energy Efficient Roof Systems
22226 West Eight Mile Road
Southfield, Michigan 48034

Dear Carl:

I'm sure that you and the staff at E.E.R.S. will be pleased to know the recent findings of a detailed roof system inspection. As you will recall, the pro-coat building roof was put in place in early 1985.

To date, now in our fourth year, this double roof system shows no heat/cold or weather wear whatsoever. There is also no breakdown or shrinkage in the foam portion of the system and the elastomeric coating maintains its gloss for the sealing and reflective qualities.

With little, if any wear at the surface level, the E.E.R.S. 10-year warranty should not be in jeopardy, and in fact with such quality, you should consider a 15 or 20 year warranty for your system.

Considering the trouble-free service supplied by the E.E.R.S. roof system, feel free to have prospective clients call with questions or to further discuss your product.

In closing, I must congratulate you and your staff on, in my opinion, the finest roofing product in the market place today.

Sincerely,

Tony Victor

*Tony Victor*

Manufacturing Engineering
Facilities

/rg

**FOR MORE INFORMATION:**

Mr. Victor's # is 313-369-7040 or
the facility Manager Mr. Keith
Asquith at 313-369-7915.

*P.O. BOX 1318*
*DETROIT, MICHIGAN*
*48288*

# 7 (3p)

**WATERPROOFING & RESTORATION COMPANY**
OF MICHIGAN, INC.

9436 Maltby Road • Brighton, Michigan 48116
Phone: (810) 220-2100 • Fax (810) 220-3549
*Masonry & Concrete Restoration Specialists*

December 19, 1995

Tony Volovsek
652 S. Ellsworth Road #167
Mesa, AZ 85208

Dear Tony,

This is a brief summary of the performance of the EERS Roof System at Chrsyler as
you requested.

The EERS Roof System was installed 10 years ago at the Technical Center owned by
the Chrysler Corporation. I personally toured the roof two years ago and found it in
sound working condition.

The environment found in the large auto plants is not conducive to the longevity of any
roof system. I was pleasantly surprised to see that the EERS System held up to the
abusive conditions it was subjected to.

There was no maintenance done on a regular basis to this roof. There were no leaks
at this time. There were blemishes and a few superficial cuts in the roof that would
typically have been repaired under normal maintenance conditions. The total cost for
putting this roof back into a like new condition would be less than a $1,000.00. Not
bad when considering a regular maintenance program alone would cost $250.00 per
year or over $2,000.00 for the last eight years.

The Engineer who originally specified the roof had told me when we were installing the
system that the EERS roof was the best Roof System he had ever seen in the last
thirty years. I would now have to agree with him; the EERS Systems is one of the
most cost effective Roof Systems on the market today.

We would without hesitation install an EERS System on any appropriate facility in the
near future.
If you would like further input on our experience with the EERS System, please feel
free to call my office.

Best Regards,

S. Scott Evett
General Manager



**CARPENTER**
**INSULATION & COATINGS CO.**

4670 MINT WAY
DALLAS, TEXAS 75236
TELEPHONE: (214) 330-0357

March 4, 1988

E. E. R. S. Inc.
Mr. Milton Myers
16561 Greenfield St.
Apt. 203
Detroit, Michigan 48235

REF: Warranty

Dear Melt,

This is to advise that the Carpenter Co. Will approve and issue our standard Limited Maintenance Warranty on any and all projects in which the E.E.R.S. System is used and applied in accordance and in conjunction with our Sprayed in Place Polyurethane Foam and Elastomeric "FR" System. This will be a total system warranty covering the E.E.R.S. System, Foam and Coating.

A sample of our Warranty is enclosed for your reference.

Best personal regards,
CARPENTER INSULATION & COATINGS CO.

Wayne P. Gray
President

WPG/nb

Enclosure

CC:  Tom Kinney
     AFC Roofing & Insulation

*The other companies are - G.E - 10year warrenty and Graco Western - 10yr. w. and Futura - 10yr. w. for that matter - All major coating manufctuers will issue a 10 year warrenty for and when their product is used with or without the botton membrane - which includes - Neoguard and Dow Corning and the Above*



**eers**
CANADIAN PAT. # 1047219

**energy efficient roof system**

## Memo ll

after 20 years IT was reported To me That There has yet To be a Leak or any repair work done on This roof
When Tony VicTor retired from Chrysler He approched me and said when he reTires He would Like To be a representitive of my roof SysTem

1-1-06



Recieved
5-1-01 — 1:30 P.M.



Pachulski, Stang, Ziehl, Young & Jones
A PROFESSIONAL CORPORATION
919 North Market Street, 16th Floor
P.O. Box 8705
Wilmington, DE 19899-8705

TO

Express Mail
Anton Frank Volovsek
P.O. Box 723
Tekoa, WA 99033

(9100.001)21111  bs+lv

EXPRESS
MAIL

UNITED STATES POSTAL SERVICE