UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

IN RE:                          . Case No. 01-1139(JKF)
                                .
                                .
W.R. GRACE & CO.,               . 5414 USX Tower Building
                                . Pittsburgh, PA  15222
                                .
              Debtor.    .
                                . December 18, 2006
. . . . . . . . . . . . . . . . . 2:04 p.m.


TRANSCRIPT OF HEARING
BEFORE HONORABLE JUDITH K. FITZGERALD
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtor:            Kirkland & Ellis, LLP
                           By:  JANET BAER, ESQ.
                                LISA ESAYIAN, ESQ.
                                DAVID M. BERNICK, P.C., ESQ.
                                BARBARA HARDING, ESQ.
                                DAVID MENDELSON, ESQ.
                           Aon Center
                           200 East Randolph Drive
                           Chicago, IL  60601

Unsecured Creditors'       Stroock & Stroock & Lavan, LLP
Committee:                 By:  LEWIS KRUGER, ESQ.
                                KENNETH PASQUALE, ESQ.
                           180 Maiden Lane
                           New York, NY  10048-4982

Audio Operator:            Janet Heller

Proceedings recorded by electronic sound recording, transcript
             produced by transcription service.

_____

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@optonline.net**

**(609) 586-2311  Fax No.  (609) 587-3599**

APPEARANCES (Cont'd.):

| | |
|---|---|
| For Equity Committee: | Kramer, Levin, Naftalis & Frankel<br>By: GARY BECKER, ESQ.<br>1177 Avenue of the Americas<br>New York, NY  10036 |
| For David T. Austern,<br>Future Claimants Rep: | Phillips, Goldman & Spence, P.A.<br>By: DEBRA FELDER, ESQ.<br>1200 North Broom Street<br>Wilmington, DE  19806 |
| For Asbestos Creditors' | Caplin & Drysdale, Chartered<br>By:  RITA TOBIN, ESQ.<br>399 Park Avenue, 27th Floor<br>New York, NY  10022 |
| | Caplin & Drysdale, Chartered<br>By:  NATHAN D. FINCH, ESQ.<br>One Thomas Circle, NW<br>Washington, DC  20005 |
| | Campbell & Levine, LLC<br>By:  MARK T. HURFORD, ESQ.<br>800 N. King Street<br>Suite 300<br>Wilmington, DE  19801 |
| For Official Committee of<br>Property Damage Claimants: | Bilzin Sumberg Baena Price<br> & Axelrod LLP<br>By:  SCOTT L. BAENA, ESQ.<br>   JAY M. SAKALO, ESQ.<br>Wachovia Financial Center<br>200 South Biscayne Boulevard<br>Suite 2500<br>Miami, FL  33131 |
| For Reaud, Morgan & Quinn<br>and ELG: | Stutzman, Bromberg, Esserman,<br> & Plifka, PC<br>By:  SANDER L. ESSERMAN, ESQ.<br>   VAN J. HOOKER, ESQ.<br>2323 Bryan Street, Suite 2200<br>Dallas, TX  75201 |

APPEARANCES (Cont'd):

```
For Ad Hoc Committee            Weil, Gotshal & Manges, LLP
of Equity Security-Holders:     By:  JUDY G. Z. LIU, ESQ.
                                     M. JARRAD WRIGHT, ESQ.
                                1300 Eye Street, NW, Suite 900
                                Washington, DC 20005


For the FAI Claimants:          The Scott Law Group
                                By:  DARRELL SCOTT, ESQ.
                                2712 Middleburg Dr.
                                P. O. Box 2665
                                Columbia, SC 29206


For National Union Fire         Zeichner Ellman & Krause LLP
Company:                        By:  MICHAEL S. DAVIS, ESQ.
                                     ROBERT GUTTMAN, ESQ.
                                575 Lexington Avenue
                                New York, NY  10022


For Official Committee of       Ferry, Joseph & Pearce, P.A.
Asbestos Property Damage         By:  THEODORE J. TACCONELLI, ESQ.
Claimants:                      824 Market Street
                                Suite 904
                                P.O. Box 1351
                                Wilmington, DE  19899


For Ad Hoc Committee of         The Bayard Firm
Equity Security Holders:        By:  NEIL B. GLASSMAN, ESQ.
                                     STEVEN M. YODER, ESQ.
                                222 Delaware Avenue, Suite 900
                                P.O. Box 25130
                                Wilmington, DE  19899


For David T. Austern,           Phillips, Goldman & Spence, P.A.
Future Claimants Rep:           By:  RICHARD Y. WYRON, JR., ESQ.
                                     ALEX VENEGAS, ESQ.
                                1200 North Broom Street
                                Wilmington, DE  19806


For Future Claimants Rep:       Orrick, Herrington & Sutcliffe
                                By:  RAYMOND G. MULLADY, JR. ESQ.
                                3050 K Street, NW
                                Washington, DC  20007


For Libby Claimants:            Landis, Rath & Cobb, LLP
                                By:  KERRI K. MUMFORD, ESQ.
```

APPEARANCES (Cont'd):

| | |
|---|---|
| For Fireman's Fund Insurance Company: | Stevens & Lee, P.C.<br>By:  THOMAS WHALEN, ESQ.<br>1107 North Market St., 7th Floor<br>Wilmington, DE  19801 |
| For Hartley & O'Brien, Luckey & Millins: | Heiman, Gouge & Kaufman, LLP<br>By:  SUSAN E. KAUFMAN, ESQ. |
| For Latigo Partners: | Latigo Partners<br>By:  STEPHEN BLAUNER, ESQ. |
| For Royal Insurance: | Wilson, Elser, Moskowitz Edelman & Dicker, LLP<br>By:  SARAH J. EDWARDS, ESQ.<br>150 E. 42nd Street<br>New York, NY  10017-5639 |
| For Property Damage Claimants: | Speights & Runyan<br>By:  DANIEL A. SPEIGHTS, ESQ.<br>200 Jackson Avenue East<br>Hampton, SC  29924 |
| Roman Catholic Church Archdiocese of New Orleans: | Dies, Henderson & Carona<br>By:  MARTIN DIES, ESQ.<br>1009 Green Avenue<br>Orange, TX  77630 |
| For Tennenbaum Capital: | Tennenbaum Capital Partners, LLC<br>By:  STEPHEN MOYER, ESQ. |
| For Federal Insurance Co.: | Cozen O'Connor<br>By:  DAVID J. LIEBMAN, ESQ.<br>     JACOB C. COHN, ESQ.<br>1900 Market Street<br>Philadelphia, PA  19103 |
| For Linden Advisors, LP: | Linden Advisors, LP<br>By:  CRAIG GILBERG |
| For Future Claimants: | Phillips, Goldman & Spence, P.A.<br>By:  JOHN C. PHILLIPS, JR., ESQ.<br>1200 North Broom Street<br>Wilmington, DE  19806 |

APPEARANCES (Cont'd):

| | |
|---|---|
| For Everest Reinsurance<br>Co. & McKinley Ins. Co.: | Crowell & Moring, LLP<br>By:  MARK D. PLVEIN, ESQ.<br>     LESLIE A. EPLEY, ESQ.<br>1001 Pennsylvania Avenue, NW<br>Washington, DC  20004 |
| For Everest Reinsurance<br>Co. & McKinley Ins. Co.: | Marks, O'Neill, O'Brien &<br>   Courtney, P.C.<br>By:  BRIAN KASPRZAK, ESQ.<br>913 North Market St., Suite 800<br>Wilmington, DE  19801 |
| For Halcyon Asset<br>Management, LLC: | Halcyon Asset Management, LLC<br>By:  OSCAR MOCKRIDGE, ESQ. |
| Co-Counsel to Libby<br>Claimants: | Cohn, Whitesell & Goldberg, LLP<br>By:  DANIEL C. COHN, ESQ.<br>101 Arch Street<br>Boston, MA  02110 |
| For the State of Montana: | Monzack and Monaco, P.A.<br>By:  FRANCIS MONACO, ESQ.<br>1201 North Orange St., Suite 400<br>P.O. Box 2031<br>Wilmington, DE  19899 |
| For Grace Certain Cancer<br>Claimants: | Montgomery, McCracken, Walker<br>   & Rhoads, LLP<br>By:  NOEL C. BURNHAM, ESQ.<br>     NATALIE RAMSEY, ESQ.<br>300 Delaware Avenue, Suite 750<br>Wilmington, DE  19801-1607 |
| For Asbestos Plaintiffs: | Wallace & Graham, PA<br>By:  WILLIAM MARC GRAHAM, ESQ.<br>North Carolina |
| For ACE Insurance Co.: | White & Williams, LLP<br>By:  MARC S. CASARINO, ESQ.<br>824 N. Market Street, Suite 902<br>P.O. Box 709<br>Wilmington, DE  19899-0709 |

APPEARANCES (Cont'd):

For Continental Casualty:          Ford, Marrin, Esposito,
                                     Witmeyer & Gleser, LLP
                                   By:  ELIZABETH DeCRISTOFARO, ESQ.
                                   Wall Street Plaza, 23rd Floor
                                   New York, NY  10005-1875

U.S. Trustee:                      U.S. Trustee Department
                                   By:  DAVID KLAUDER

For Claimants:                     Goldberg, Perksy & White PC
                                   By:  MARK MEYER, ESQ.
                                   1030 Fifth Avenue
                                   Pittsburgh, PA  15219

For PD Claimants:                  Richardson Patrick Westbrook
                                     & Brickman, LLC
                                   By:  EDWARD WESTBROOK, ESQ.
                                   1037 Chuck Dawley Blvd., Bldg. A
                                   Mount Pleasant, SC  29464

For George & Sipes:                George & Sipes
                                   By:  KATHLEEN FARINAS, ESQ.
                                   156 East Market Street, Suite 600
                                   Indianapolis, IN  46204

Official Committee of              Duane Morris, LLP
Unsecured Creditors:               By:  MICHAEL R. LASTOWSKI, ESQ.
                                   1100 North Market St., Suite 1200
                                   Wilmington, DE  19801-1246

For London Market Companies:       Mendes & Mount, LLP
                                   By:  ALEXANDER MUELLER, ESQ.
                                   750 Seventh Avenue
                                   New York, NY  10019-6829

For Asbestos Claimants             Wellborn Houston, LLP
& Wellborn Houston, LLP:           By:  PAUL L. SADLER, ESQ.
                                   300 West Main
                                   P.O. Box 1109
                                   Henderson, TX  75653-1109

For Campbell, Cherry,              Frank/Gecker, LLP
Harrison, Davis, Dove:             JOSEPH D. FRANK, ESQ.
                                   325 N. LaSalle, Suite 625
                                   Chicago, IL  60610

APPEARNCES (Cont'd):

```
For Christopher Grell:        Law Office of Christopher Grell
                             By:  RICHARD F. RESCHO, ESQ.
                             360 22nd Street, Suite 320
                             Oakland, CA  94612

For Asbestos Property Damage  The Brandi Law Firm
                             By:  TERENCE D. EDWARDS, ESQ.
                             44 Montgomery Street, Ste. 1050
                             San Francisco, CA  94104

For Asbestos Property Damage  Bilzin Sumberg Baena Price
Claimants:                       & Axelrod LLP
                             By:  MATTHEW I. KRAMER, ESQ.
                             Wachovia Financial Center
                             200 South Biscayne Boulevard
                             Suite 2500
                             Miami, FL  33131


For Prudential Ins. Co.       Riker, Danzig, Scherer, Hyland
                             & Perretti, LLP
                             By:  JOSEPH SCHWARTZ, ESQ.
                             One Speedwell Avenue
                             P.O. Box 1981
                             Morristown, NJ  07962
```

1            THE COURT:  This is the matter of W.R. Grace,

2   Bankruptcy Number 01-1139.  The participants I have by phone

3   are Jonathan Brownstein, Brian Kasprzak, Mark Plevin, Leslie

4   Epley, Steven Yoder, Elisa Alcabes, Jay Sakalo, Jarrad Wright,

5   David Hickerson, Robert Guttman, Michael Davis, Arlene Krieger,

6   Stephen Vogel, John Phillips, Natalie Ramsey, Joseph Frank,

7   David Liebman Jay Prascik, William Sullivan, Oscar Mockridge,

8   Richard Wyron, Lynne Nissen. Stephanie Kwong, Peter Shawn, Alex

9   Mueller, David Klauder, Edward Westbrook, Martin Dies, Roger

10  Frankel, Debra Felder, Ritwik Chatterjee, Marc Casarino,

11  Darrell Scott, Daniel Speights, Francis Monaco, Sarah Edwards,

12  Michael Lastowski, Warren Smith, Richard Candon, Marti Murray,

13  Noel Burnham, Paul Norris, David Siegel, Jay Hughes, Mark

14  Shelnitz, Andrew Chan, Sean Walsh, Amelia Wong, John O'Connell,

15  David Parson, Mark Heron, Theodore Tacconelli, Rita Tobin,

16  Andrew Craig, Sara Gooch, Tiffany Cobb, Joseph Schwartz, Andrew

17  Hain, William Kuzmin, Joy Monaghan, Barbara Harding, Lori

18  Sinanyan, Theodore Freedman, Sal Bianca, Sam Blatnick,

19  Elizabeth DeCristofaro, Beau Harbor and Daniel Glosband.

20            MR. BERNICK:  Your Honor, this is David Bernick, I'll

21  be taking Mr. Bianca's place on the phone.

22            THE COURT:  All right.

23            MR. ESSERMAN:  Your Honor, this is Sandy Esserman,

24  I'll be taking David Parsons place on the phone.

25            THE COURT:  All right.  Anyone else?  Okay.  I'll

1 take entries in court.  Good afternoon.

2          MS. BAER:  Good afternoon, Your Honor, Janet Baer on

3 behalf of W.R. Grace.

4          MS. ESAYIAN:  Good afternoon, Your Honor, Lisa

5 Esayian on behalf of W.R. Grace.

6          MR. O'NEILL:  Good afternoon, Your Honor, James

7 O'Neill, Pachulski Stang, on behalf of W.R. Grace.

8          MR. BECKER:  Good afternoon, Your Honor, Gary Becker,

9 Kramer, Levin, Naftalis & Frankel for the Equity Committee.

10          MR. BAENA:  May it please the Court, good afternoon,

11 Your Honor, Scott Baena on behalf of the Property Damage

12 Claimants.

13          MR. KRAMER:  Good afternoon, Your Honor, Matt Kramer

14 on behalf of the Property Damage Committee.

15          MR. HURFORD:  Good afternoon, Your Honor, Mark

16 Hurford for the Personal Injury Committee.

17          MR. FINCH: Good afternoon, Your Honor, Nathan Finch

18 for the Personal Injury Committee.

19          MR. MULLADY:  Good afternoon, Your Honor, Ray Mullady

20 representing Future Claims Representative.

21          MS. RAMSEY:  Good afternoon, Your Honor, Natalie

22 Ramsey for the Montgomery, McCracken, Walker and Rhoads firms

23 and the Certain Cancer Claimants for W.R. Grace.

24          MR. MEYER:  Good afternoon, Your Honor, Mark Meyer on

25 behalf of claimants represented by Goldberg, Persky & White.

1           THE COURT:  Ms. Baer.

2           MS. BAER:  Thank you, Your Honor.  Your Honor, agenda

3  item number one this afternoon is the Debtors fifth omnibus

4  objections to claims.  There is one set of claims left there,

5  environmental claims that the parties are still negotiating an

6  attempted settlement, so I would ask that this matter be

7  continued and I have an order.

8           THE COURT:  All right.  That order is signed.

9           MS. BAER:  Thank you, Your Honor.  Agenda item number

10 two is the Debtors 18th omnibus objections.  There is one set

11 of claims left involving NL Industries.  These, too, are

12 environmental related claims.  The parties are discussing

13 those.  All other claims have been resolved, and I have an

14 order continuing that matter to the January 23rd hearing.

15          THE COURT:  Okay.  All right, that's signed.

16          MS. BAER:  Your Honor, agenda items number three and

17 four relate to a matter pending in New Jersey and an injunction

18 that the Debtor has requested along with an adversary

19 proceeding.  The parties there are continuing to discuss

20 matters and I also have an order continuing that to the January

21 23rd hearing.

22          THE COURT:  All right.  Okay, that order is signed.

23          MS. BAER:  Thank you, Your Honor.  Agenda item number

24 five is the 21st quarterly interim fee application.

25          Your Honor, I understand that there is one issue

1  involving Caplin and Drysdale and counsel for Caplin, I

2  believe, is on the phone who wishes to address that matter.

3          THE COURT:  Okay.  Mr. Smith?

4          MR. SMITH:  Yes, Your Honor.  We have basically filed

5  final reports for all of the fee applications, Your Honor.

6  It's my understanding that an order is available, reflecting

7  our recommended reductions for all these applicants.  Again,

8  except with respect to Caplin.  But it's also my understanding

9  that we completely agree with the exhibit to the order

10 approving fees in the amounts because, Your Honor, we prepared

11 that exhibit ourselves.  So, there shouldn't be any

12 discrepancies.

13          With that, Your Honor, I'd like to, I guess, turn it

14 over to Caplin.  We had objected to time entries, Your Honor,

15 that appeared to us to be for clerical work that were performed

16 by paralegals.  We had recommended a reduction to $80 an hour

17 which, Your Honor, is consistent with what we have been

18 recommending in this case for all similar time entries.

19          THE COURT:  Okay.  Well, I read Caplin's response.  I

20 just got it a few minutes before the hearing, Mr. Smith.  I

21 don't know if you received it yet.

22          MR. SMITH:  Yes, I have, Your Honor.

23          THE COURT:  Okay.  It seems to indicate that there

24 was something a little more than clerical work going on, except

25 for in one entry the few minutes were somebody was feeding

1  something into the document copier.  Are you willing to accept

2  that representation?

3        MR. SMITH:  Well, Your Honor, I guess -- and quite

4  frankly, Your Honor, if the Court would rule on this, this

5  might clear it up.  It's never been our understanding that just

6  getting on Pacer, Your Honor, is anything more than a clerical

7  activity.  I mean, it's something that's not that hard to do.

8  I'm tempted to say, Your Honor, it's so easy that even I can do

9  it.  But in our office --

10        THE COURT:  I was going to say, Mr. Smith, some of us

11 are a little more technically challenged, technologically

12 challenged, but okay.

13        MS. TOBIN:  This is Rita Tobin from Caplin and

14 Drysdale, if I may speak to that.  As we --

15        MR. SMITH:  Well, Your Honor, I was going to say,

16 though, that -- if I could just finish.  And that is, we've

17 consistently made this recommendation regarding entries of that

18 type, that they be reduced to an hourly rate of $80 an hour and

19 that hourly rate of $80 an hour has over the life of these

20 cases been adjusted upward to the $80 an hour figure.

21        And, again, we've applied it consistently across the

22 board to activities of this type, including indexing documents,

23 which apparently a number of these time entries had to do with,

24 and retrieving documents from Pacer.

25        THE COURT:  Okay.  I appreciate that.  If that's the

1  amount that's been charged by or for everyone else in the case,

2  I don't think Caplin is entitled to any better charge than

3  anybody else is getting.

4         MS. TOBIN: Your Honor, if I can speak to that.  I

5  can't attest to what Mr. Smith has been doing in other cases,

6  but I know that we have been having these issues over our

7  paralegal time, probably for the past year and we've been

8  objecting pretty consistently.

9         Our paralegals have done, and as I tried to explain

10  and we've tried to explain or respond, our case files for the

11  attorney, they go in Pacer, they identify documents, they need

12  to understand the procedural posture of the cases in order to

13  identify the documents.  And they're putting together the

14  packages of cases and other materials that are --

15                  (Microphones cutting out)

16         THE COURT:  Hello.

17         MS. TOBIN:  I don't -- I think --

18         THE COURT:  Pardon me, pardon me, Ms. Tobin, just a

19  minute.  See that's what's happening.  You're not on a speaker

20  phone, are you?

21         MS. TOBIN:  I am.  Is that the problem?

22         THE COURT:  Yes, it is.

23         MS. TOBIN:  Your Honor, I'm now off the speaker

24  phone, I apologize.  I did not realize that would be a problem.

25  Basically, and as we've described in these entries, our

1 paralegals are performing what are classic paralegal functions,

2 which include preparing the case files that our attorneys use

3 in preparing witnesses and examining witnesses and preparing

4 for hearings.

5         I, again, don't know what Mr. Smith has done in all

6 other cases, but I know that we have been objecting to these

7 reductions because we feel that this kind of activity is what

8 we hire paralegals to do.  These aren't clerical chores and, in

9 fact, the secretary certainly could not do them.  And if we had

10 attorneys prepare case files, which we could do, and bill at

11 attorney rates, I don't think we would have -- incur these

12 challenges.

13         So, we do think that our paralegals should be paid at

14 full rates for doing this kind of work which, of course,

15 includes accessing the online databases, but doesn't end there.

16         THE COURT:  Well, I'm not sure that secretaries, in

17 fact, can't do this kind of work.  In fact, I have one who does

18 this kind of work.  So, I have to say that I think that's a

19 misnomer and the fact that somebody is doing paraprofessional

20 work and holds a secretarial title is, I think, perhaps a

21 misnomer.  If what you're talking about is document processing,

22 somebody simply doing word processing type functions, who is

23 not --

24         MS. TOBIN:  No, no, excuse me, I'm sorry, no.  We

25 would probably -- we would, for example, identify a case and

1  say that we needed certain pleadings.  That person would

2  actually have to go online or go into our files and identify

3  those pleadings.  I mean, it's not simply a question of writing

4  down an index number, but it is a question of, you know, using

5  their legal training and judgment to identify documents and to

6  create a file that an attorney is going to be able to use and I

7  --

8         THE COURT:  Well, I'm sorry, but I have some

9  difficulty with that philosophy.  The clerks office uses high

10 school students and college students to do that very function.

11 So, I can't see why just -- I tell somebody, go get me document

12 X, it takes a paralegal to do it, but if it does, that's fine,

13 I think, however, an $80 per hour rate is sufficient to

14 compensate that person for that kind of document retrieval.

15 There is no legal judgment that's being put on to preparing a

16 file, you know, it's doing an index, that's what

17 non-paraprofessional type people did before we had

18 paraprofessionals.  It's the same type of function.

19        To the extent there is no professional judgment

20 that's being employed, that's not to say that the person

21 shouldn't be compensated, clearly they serve a very valuable

22 function, but $80 an hour is, I think, a sufficient amount to

23 compensate that person for that function.

24        MR. FINCH:  Your Honor, may I be heard briefly?

25        THE COURT:  Mr. Finch.

1          MR. FINCH:  I think this goes a little bit beyond

2  pulling specific documents (indiscernible) since I'm one of the

3  persons who asks the paralegals to do some of this.

4          THE COURT:  All right.

5          MR. FINCH:  It could be everything from, please go

6  back and pull all the transcripts and all the references to a

7  transcript where Judge Fitzgerald discussed the questionnaire

8  issue.  And that requires more than just going and pulling, you

9  know --

10          THE COURT:  That's true.

11          MR. FINCH:  The specific transcript and I have no

12  idea, I don't have a calendar in my head that I can recall

13  exactly every time -- but a lot of times in preparing for a

14  hearing, I will want to review everything Your Honor said.

15          Another thing I might do is, say, please go pull all

16  of the orders or all of the pleadings leading up to an order

17  that related to some issue related to the questionnaire, some

18  issue relating to a motion to compel which requires a paralegal

19  to have a knowledge of the case and to sort of know how I like

20  to put together things and to look at the docket and figure out

21  what's relevant and pull that together for me.  I'll obviously

22  review that and check it, but it makes more sense to have a

23  paralegal do that and it's beyond the sort of the file clerk

24  type function.  So, I would just have Your Honor consider that

25  as part of making your ruling today.  It's not just -- maybe

1  they haven't done as good a job in describing their time on

2  their time entries as they should have, but the type of work

3  that we ask the paralegals to do is not a ministerial task.

4        THE COURT:  Okay.  Well, it may be, you know, just

5  the difference in the description.  With respect to going

6  through a transcript and picking out things that relate to a

7  subject yes, that probably does involve more judgment.  With

8  respect to getting into the Pacer docket, looking at a

9  particular document and printing everything that's linked to

10  it, that doesn't involve any professional judgment.  And the

11  document title tells you what the document is.  So, I really

12  don't see how that requires paraprofessional training.  If

13  you're going through your own files, I take it that those

14  paralegals set up those files because they're being compensated

15  through this case, for having set up those files.  So, it

16  shouldn't require them a long time to understand how the files

17  are put together when they're the ones who are putting the

18  files together.   I still think $80 an hour, whether there is,

19  you know, some portion of this that requires a professional

20  judgment and some portion which is purely clerical, which after

21  all is what paralegals do.  They sort of split the difference

22  between the pure professional and the pure clerical tasks that

23  have to be performed in many instances.   I think $80 an hour

24  for things like looking up the Pacer documents, copying the

25  Pacer charges, putting together the typical file.  I'm not

1 talking, necessarily about witness prep.  That can be a much

2 more intense process than putting together a file for lawyers,

3 but to say to somebody, you know, pull the pleadings that

4 relate to X and put them into a file, I think, does not require

5 more than $80 per hour and I think Mr. Smith's analysis that

6 those types of functions for everybody are compensated at $80

7 an hour is fair.  If there's more involved, then I think you

8 need to itemize it more specifically in your time entry because

9 some of the tasks that you mentioned, Mr. Finch, I agree, $80

10 an hour is probably not an adequate compensation for those

11 tasks.  But for the things that the fee auditor is objecting

12 to, I think it is sufficient.

13          I don't know whether that resolves this from Caplan's

14 point of view.  Is there something more that you can add, other

15 than pulling things from Pacer and putting --

16          MS. TOBIN:  Well, I would ask, Your Honor, that we

17 get an opportunity to do the kind of itemized breakdown that

18 Mr. Finch has described so that those elements of these tasks

19 that would be billable at a higher rate we would be able to

20 resubmit.

21          THE COURT:  Okay.  Why don't I -- I mean, this is the

22 year end, I don't think there is very much of your fee

23 application that is contested at this point.  So, I am prepared

24 because it is the year end, to approve the portion that's

25 uncontested and put over to January the portion that is

1 contested.

2        MS. TOBIN:  That would be very good, Your Honor.

3 Thank you.

4        MS. BAER:  Your Honor, I have a draft order that was

5 prepared in conjunction with Mr. Smith that allows the portion

6 that he agreed to and if I might present that to Your Honor,

7 and also if I could ask you to sign a duplicate copy, Grace is

8 prepared to pay by year end, but they need an actual signed

9 copy to do so.

10        THE COURT:  Okay.  Mr. Smith, I'm not sure what your

11 time frame is for getting some additional information in from

12 Caplin Drysdale.  Do you want to work with counsel to that end

13 and see whether after you get additional information, you're

14 satisfied or if you want to pursue the objection?

15        MR. SMITH:  Yes, Your Honor, we are always open to

16 additional information.  Is the Court contemplating that we

17 would get that before year end, Your Honor?

18        THE COURT:  No, I was actually thinking that with

19 respect to the additional information you would get it in

20 whatever the time frame is for the next omnibus.

21        MR. SMITH:  That would be fine, Your Honor.

22        THE COURT:  Is that doable for Caplin?

23        MS. BAER: Yes, it is, Your Honor, thank you.

24        THE COURT:  All right.  So, Mr. Smith and you have no

25 objection to my signing the order that has just been handed up

1  that was prepared with your numbers in it and then it can be

2  supplemented with any additional fees that are awarded to

3  Caplin at the next hearing, if there are any.

4          MR. SMITH:  Yes, that's fine, Your Honor.  And,

5  again, we prepared the exhibit to that order with the numbers.

6  So, we're fine with those numbers.

7          THE COURT:  All right.  Thank you.  And the order on

8  agenda number five is signed and here's your duplicate copy.

9          MS. BAER:  Thank you, Your Honor.

10          THE COURT:  Is there anything else for Mr. Smith, or

11  may he be excused if he choose to leave?

12          MS. BAER:  That's all, Your Honor.

13          MR. SMITH:  Okay.  Thank you, Your Honor.

14          THE COURT:  All right, thank you.

15          MS. BAER:  Your Honor, that takes us to agenda item

16  number 6, which is the Debtors 17th omnibus objection to

17  claims.  There's only one contested matter left, Your Honor,

18  that's the CSX transportation matter.  That has been resolved.

19  The claim is being reduced and I have a draft order which was

20  approved by CSX.

21          THE COURT:  Okay.  Okay, that's signed.

22          MS. BAER:  Your Honor, agenda item number seven is

23  Debtors 19th omnibus objection to claims.  This is a

24  non-substantive objection.  No responses were filed.  A

25  certificate of no objection was filed on December 11th and I do

1  have an order to hand up.

2         THE COURT:  Actually, I instructed staff last night

3  to sign orders on 7b, 8b, 9b and 10c, I believe.  Yes, that's

4  correct.  And, I think 5b as well.  Did I just sign one on 5b?

5         MS. BAER:  Yes, Your Honor, you did.

6         THE COURT:  Okay.  There may be -- let me mark this

7  because -- give me one second to go back.  That may be a

8  duplicate.  I'm not sure whether those orders have actually

9  been entered.

10        MS. BAER:  Number five is the fee application that

11 you just signed in duplicate.

12        THE COURT:  I thought that was six.

13        MS. BAER:  No, six is the 17th omni that I just

14 handed up with the CSX.

15        THE COURT:  Oh, yes.  Okay.  On five, I think I was

16 waiting for a CNO on five and said that if it was filed, it

17 could be signed.  So, let me just make sure that there was no

18 duplicate.  Okay.  So, with respect to items 7b, 8b, 9b, and

19 10c, I did leave instructions to have those orders entered but

20 I've been in court and haven't had a chance, and forgot,

21 frankly, to check on the at lunch time when I did have a few

22 minutes to do it.  I left those instructions last night.

23        MS. BAER:  Your Honor, there's one problem.  On 9b,

24 as it turns out, the certification of no objection does not

25 have an order attached.  So, I have that order with me.  Anc,

1  could I ask that that be entered?

2          THE COURT:  Well, if it's on a CNO, there would have

3  been an order attached to the motion.

4          MS. BAER:  The problem was, that was one where we

5  were asking for a stipulation -- we were asking for a

6  shortening of the time to hear the matter today, which Your

7  Honor already signed.

8          THE COURT:  Right.

9          MS. BAER:  And, the certification of counsel should

10 have had a second order that was actually asking for the

11 relief, which was the allowance of the stipulation to be

12 entered on the record.  That order was not there.  We realized

13 that this weekend when we were putting it togther, so I have

14 that order with me.

15         THE COURT:  All right.  I'll take that.  If you want

16 to give me all of those, 7b, 8b, 9b and 10c, I will sign 9b,

17 but I'll take the others, so that if they were not entered, I

18 can make sure to get them entered after court today.

19         MS. BAER:  I will do that right now.  Your Honor, for

20 the record, I am handing up the orders on items 7, 8, and 10.

21         THE COURT:  Okay.  And I've signed 9.  Thank you.

22 Okay.  I'll check those after court, Ms. Baer.

23         MS. BAER:  Thank you, Your Honor.  That takes us to

24 agenda item number 11, which is the Debtor's settled claims

25 matter.  And my colleague, Lisa Esayian is here and she will

1  address that matter.

2            THE COURT:  All right.

3            MS. ESAYIAN:  Good afternoon, Your Honor.  The

4  purpose of taking up the settled asbestos personal injury

5  claims today is to decide and have Your Honor enter an order

6  saying that certain of the claims that have been submitted as

7  "settled" claims actually do not meet the criteria of settled

8  claims under the bar date order and for those claims, the order

9  should be entered saying that questionnaires should be

10 submitted for any such claims, for which questionnaires have

11 not already been submitted and to the extent that a

12 questionnaire has already been submitted for some of those

13 claims because I think actually questionnaires have been

14 submitted for a lot of them already, that the claimants who

15 submitted those claims should be subject to the order that Your

16 Honor is going to enter shortly as a result of the December 5th

17 hearings regarding supplementation of questionnaires.

18           We filed a brief on December 1, setting forth our

19 position regarding all of the claims that were submitted as

20 settled claims and I'll briefly explain how we got to that

21 brief and then some developments since then.  But I wanted to

22 mention at the outset that attached as Exhibit C to that brief

23 is our proposed order describing that we want certain of the

24 claims to be deemed non-settled for purposes of having

25 questionnaires submitted and then attached as Exhibit B to our

1 brief, is the list of claims which at that time was

2 approximately 9,000 and as a result of some recent developments

3 and some more information that we've received, I believe it

4 will be trimmed down to closer to 8,000 claims.  So, that's

5 what we'll be looking at the end of this process, is for Your

6 Honor to enter that order attaching the list of claims saying

7 that those claims are deemed non-settled only for purposes of

8 the claimants having to submit questionnaires or supplement

9 questionnaires.

10         The way we got here is simply that, as Your Honor

11 will recall, there was the bar date of October 16th for the

12 submission of proofs of claim and supporting materials for

13 settled asbestos personal injury claims, settled in the sense

14 of, they had to meet certain criteria set forth in the bar date

15 order and where claims were submitted that did meet the

16 criteria, and Grace's records confirm that those claims were

17 settled, we notified the claimants that we did not dispute that

18 those claims were settled for these purposes.

19         Where the claims did not match our records and/or

20 were incomplete or just not in our records at all, we notified

21 the claimants that there was a disconnect with our records.

22 Some of the claimants then provided additional information.

23 So, originally, in that process, there were approximately

24 35,0000 settled claims that were submitted, 10,000 of those

25 35,000 were from two firms that Your Honor is handling a

1  separate piece of litigation regarding.  That's the Reaud

2  Morgan and Quinn firm, an environmental litigation group firm.

3  Those claims Grace does not dispute are settled, but there's a

4  dispute regarding the remaining settlement payment due.  Those

5  claims are not at issue today and we're not looking for

6  questionnaires to be submitted for those claims.  So, that

7  knocked out 10,000 of the 35,000 settled claims that were

8  submitted.

9       As to the remaining 25,000, we did receive signed

10 prepetition releases from 10,000 of those claimants and most of

11 them matched our records and we accepted those releases for

12 purposes of this questionnaire exercise.

13       That left approximately 15,000 claims that were

14 submitted as settled, but no releases, signed released, or no

15 releases were submitted in support of those claims.

16       We then reviewed our records and said, well, even

17 where a claimant did not submit a release, if our records

18 reflect a settlement, if we have a release in our records,

19 fine, obviously, we'll consider that claim to be a settled

20 claim.  We also received quite a few supplemental submissions

21 from various claimants firms and at the end of the day what we

22 ended up with, was the list of 9,000 claims that we submitted

23 to Your Honor with our December 1st brief.

24       Also, before we submitted our brief a couple of the

25 firms submitted briefs disputing the positions that we had

1 taken and I want to just touch on those briefly because those

2 briefs are in the record.

3        Two of the briefs were submitted by the Breighton &

4 Purcell firm and the Cooney & Conway firm.  We resolved our

5 issues with them and I believe both of those firms have

6 withdrawn their briefs by now.

7        Another brief was filed by the Baron & Budd firm.

8 There was a group of claims that we did not contest at all and

9 then a smaller group of claims where the Baron & Budd firm did

10 supply signed, prepetition releases, but despite multiple

11 searches of our records, we couldn't confirm that those claims

12 were settled in our records.

13        For purposes of today, and the issue for today, as to

14 whether we need questionnaires for those 100 claims or not,

15 we're saying we do not need questionnaires for those claims, we

16 understand that there might issues in the future as to whether

17 those claims are deemed settled or not settled for other

18 purposes in this case, but for the purposes of questionnaires,

19 we don't need questionnaires and we don't have a dispute for

20 today.

21        Similar situation for the Wilentz, Goldman & Spitzer

22 firm, they submitted a relatively small number of claims.  They

23 submitted releases for the claims.  Again, our records don't

24 reflect that those are settled claims but for purposes of today

25 no dispute with them, no questionnaires needed.

1          That brings me, then, to a couple of firms that

2  submitted briefs later in the process.  Let me start first with

3  one firm that submitted a conditional objection, that was the

4  Silber, Pearlman firm.  With respect to Silber Pearlman, they

5  submitted approximately 3600 claims as purportedly settled

6  claims and did not submit any releases in support of any of

7  those claims, or any other materials in support of those

8  claims.

9          I should mention that my understanding is that they

10  take the position that their claims are settled pursuant to an

11  inventory settlement agreement that was entered into in, I

12  believe it was 1999, 1197 or 1999.

13          We reviewed our records and confirmed back to them

14  that approximately 700 of those claims were settled according

15  to Grace's records, and that left roughly 3,000 of the claims

16  that we took the position are not settled.  The Silber Pearlman

17  firm in their proofs of claim, indicates that they have

18  submitted questionnaires for all of those claims already and,

19  in fact, that's what the records seem to indicate, that there

20  are questionnaires for those claims.

21          So if, in fact, questionnaires have already been

22  submitted for all of those 3,000 claims then, obviously, we

23  don't need questionnaires to be submitted again.  However, we

24  do have the question of supplementation of those questionnaires

25  along with the other firms who are going to supplement their

1 questionnaires.

2      Grace's position would be that Silber Pearlman does

3 need to supplement those questionnaires that they already have

4 submitted.

5      That brings us then to, really, only two other firms.

6 One is the Wysocker firm and I believe Mr. Kuzmin is on the

7 line from that firm, that firm originally had submitted a

8 number of claims that did not have releases, then they came

9 back and supplied additional releases, we've taken those into

10 account and we have only 11 claims left that don't have

11 releases.  They subsequently filed a brief saying, here's

12 correspondence to Grace, prior to the petition date showing

13 that we sent them the releases, we just can find the copies of

14 the releases.

15      We're willing to accept that correspondence for now,

16 for the purposes of that firm not having to do the

17 questionnaires for those 11 claims and leave for another day

18 the issue of what happens to those 11 claims for other

19 purposes.

20      I believe, then, that leaves only one firm, which is

21 the Goldberg, Persky firm.  They had originally submitted

22 approximately 2500 claims.  They subsequently provided a

23 substantial number of additional signed releases for those

24 claims and as of when we filed our brief on December 1, we

25 still had 660 claims that didn't match our system as settled

1 claims and they had not provided releases for those claims.

2      They've now filed a brief setting forth those claims

3 in various buckets and the bottom line is that what we're left

4 with, as I understand their brief, and I'm willing to accept

5 this if I've got it right and counsel can confirm this, but as

6 I understand it, they agree that there are 63 claims that are

7 not settled claims, they've already submitted questionnaires

8 for those claims this past summer, so those 63 claims they

9 would have to supplement their questionnaires.  As to the rest

10 of the claims, it's a mixed bag of some of them they gave us

11 additional releases for and some of them do not actually meet

12 the definition of either settled or non-settled claims under

13 the bar date order because they were never filed, they were not

14 lawsuits filed against Grace prior to the petition date.  So,

15 there's no need for questionnaires to be submitted or

16 supplemented for those claims at all.

17      So, I believe that leaves us with only the 63

18 Goldberg -- out of the Goldberg Persky claims, only a subset of

19 63 that we need supplementation of the questionnaires.

20      That will mean that the exhibit that we submitted to

21 Your Honor with our list of 9,000 claims, we will need to do a

22 little bit of revision on to root out a good number of the

23 Goldberg claims, and the Wysocker claims that I mentioned a

24 moment ago and then there's the question of these Silber

25 Pearlman claims and whether they do have to be supplemented or

1 not.  And, again, our position is they do need to be, the

2 questionnaires do need to be supplemented.

3          So, that's our position.  The order has been

4 submitted, we can chop down the list of claims and provided the

5 cleaned up list of claims to Your Honor probably by tomorrow.

6          THE COURT:  Okay.  Who wants to go first?  Good

7 afternoon.

8          MR. MEYER:  Your Honor, Mark Meyer on behalf of

9 claims represented by Goldberg, Persky & White.  It sounds like

10 we have our issues resolved.  As I understand what counsel

11 said, the only claims that need to be supplemented with

12 additional information on the questionnaires pursuant to your

13 December 5 order are the 63 or so cases contained on our

14 Exhibit D, is that correct?

15          MS. ESAYIAN:  Yes, that's right.

16          MR. MEYER:  Okay.  Then I won't make all the

17 arguments I was going to make and I'll go home.  Unless you

18 want me to stay.

19          THE COURT:  No.  All right.  So, you're comfortable

20 with the order then that will require the supplementation as to

21 those 63 and indicate that as to the rest, no questionnaire

22 has to be submitted at this time.  Okay.  All right.  I'm

23 sorry, what other firm --

24          MS. ESAYIAN:  I don't know if anyone is on

25 representing the Silber Pearlman firm.  If they are, if they

1 have any comments about that.

2         MR. ESSERMAN:  Yes, this is Sandy Esserman.  If I may

3 speak at this time, Your Honor.

4         THE COURT:  Yes, sir.

5         MR. ESSERMAN:  I think that the agreement with Grace

6 or the understanding with Grace is dictated into the record, is

7 basically consistent.  The Silber Pearlman firm had submitted

8 questionnaires to the Court, to the service and we're reserving

9 as to another day whether or not those are, in fact, settled

10 claims or not.

11         One firm contacted us late last week and over the

12 weekend that Ms. Esayian did not mention was David Lipman's

13 firm.  And, she did not recite any issues with regard to them,

14 but I know they've been raised in papers and there are several

15 thousand David Lipman claims that were listed at least in the

16 Grace exhibit and I did not want those to be, at least not

17 discussed by Ms. Esayian because they were raised and if you

18 would rather go first on that, I'll respond, or I can just

19 address it up front, as to what the position of David Lipman is

20 on this.

21         MS. ESAYIAN:  Okay, thank you, Sandy.  The Lipman

22 claims, there's about 3,000 of them, that we do not have

23 releases for.  We had informed the Lipman firm about that

24 awhile ago.  We didn't receive any response of objection from

25 them  I have not been contacted by them.  I don't believe

1 anyone else from our firm has been contacted by them.  So, they

2 are on our list of claims for which we are seeking

3 questionnaires.  I believe it's a similar situation that there

4 was an inventory settlement, we had releases for some, we don't

5 have releases for the rest of them and we're seeking

6 questionnaires for the ones for which we don't have released.

7             MR. ESSERMAN:  May I respond now?

8             THE COURT:  Yes, please.

9             MR. ESSERMAN:  The David Lipman firm settled, I

10 believe there was approximately 4,000 cases of which

11 approximately 1300 remain unpaid and disputed.  There are about

12 983 claims that are included in Grace's list that will be

13 withdrawn by David Lipman and were submitted -- I'm not sure

14 whether these were paid claims or submitted in error, but they

15 should not -- there's going to be no questionnaire submitted

16 and those proofs of claim will be withdrawn with regard to

17 those claims which will leave approximately 1300 claims that

18 are in play.

19       The David Lipman settlement with Grace is reflected,

20 basically, in a letter agreement and it's been partially

21 performed and if the standard that Your Honor wants to know is

22 whether or not a release is submitted, out of the 4,000 claims,

23 many of which have been paid in full and are no longer pending

24 against Grace, there are about 1300 claims for which no

25 releases have been submitted and no data has been submitted,

1  the claimants were specifically identified along with the

2  amount to be paid.  It was a -- I don't want to say nominal, it

3  was $2750 per claimant and they were simply identified on a

4  list and a lawsuit.  The lawsuit has not been dismissed as to

5  these claimants.

6          One additional factor that Your Honor may wish to

7  consider is, pursuant to the settlement agreement, in order to

8  get paid, David Lipman not only had to submit a release, but he

9  had to submit exposure requirements, a medical report, as well

10 as a voluntary dismissal with prejudice and Grace certainly

11 would have a legitimate argument that the medical report has

12 not been submitted for these claims and, therefore, a

13 questionnaire should be submitted.

14         I do understand that the issue of whether or not

15 these are, in fact, settled claims for purposes of the

16 settlement is not up for today.  The only issue is whether or

17 not they're settled for purposes of Grace's order and the

18 requirement to submit a questionnaire.  The settled claims has

19 been defined in the Court's order as follows.

20         Number one, a claim was filed in the court as a

21 lawsuit of civil action prior to April 2, 2001.  That has been

22 complied with.  These were filed claims.  Two, is subject to a

23 settlement agreement.  We contend this clearly is subject to a

24 settlement agreement.  That A) is evidenced by a writing prior

25 to April 2, 2001.  This writing is October 23rd, 2000, which

1  the holder must attach to their asbestos PI proof of claim.

2  These were attached to he asbestos proof of claim.  B is

3  enforceable under applicable non-bankruptcy law and C) provides

4  for release of one or more of the debtor and D) has not been

5  fully paid or satisfied.

6       We think under that definition these 1300 claims that

7  we're talking about are settled claims consistent with the

8  order and we'd be willing to brief the fact that under Florida

9  law, where these claims are pending and which governs, they

10 would be settled claims, clearly.

11      That said, if Your Honor wants questionnaires to be

12 filed for these 1300 or so claims, the law offices of David

13 Lipman is basically a one lawyer shop, with a paralegal or two,

14 and one of the reasons we were contacted so late is because

15 they were in trial and when they're in trial, they basically --

16 their office shuts down and they go to trial.  So that said,

17 this is not a big law firm that settled these cases for

18 particularly high dollars, and they certainly would be able to

19 complete questionnaires for these particular 1300 or so cases,

20 however, they certainly would not be able to complete them by

21 the January date that Your Honor has requested and they have

22 asked me to request should Your Honor so decide, an additional

23 90 days to submit questionnaires.

24      THE COURT:  Okay.  Is there a document that evidences

25 the settlement with a list of these claimants attached?  I'm a

1  little unclear --

2        MR. ESSERMAN:  Yes.

3        THE COURT:  There is a document and the document

4  provides that a release either has been or will be given when

5  the payment is made?

6        MR. ESSERMAN:  Yes, yes.

7        THE COURT:  But in some instances, the releases have

8  not, in fact, been provided?

9        MR. ESSERMAN:  That's correct.  The releases had not

10  been provided for these 1300 claims, Your Honor.  They all were

11  identified on Exhibit A, but one of the reasons the releases

12  weren't provided is, the releases are to be provided at the

13  time that the payment is supposed to be made and Grace filed

14  bankruptcy to the time the payment was to be made.

15        THE COURT:  Okay.  So, these are in the process, no

16  payments have been made, no release has been provided, but the

17  settlements are keyed up and the medical information and so

18  forth was provided to the Debtor?

19        MR. ESSERMAN:  No.

20        THE COURT:  No.

21        MR. ESSERMAN:  It was partially performed in that

22  2000 out of these approximately 4,000, 2,664, are not in issue.

23  And Grace does not -- those claims are not claims before Grace.

24  They've been paid approved medical reports, everything has been

25  done.

1          With regard to the 1300, they comply, we believe,

2  with the Court's order to what defines a settled claim,

3  however, I want to make it clear that Litman was to provide

4  various materials to Grace at a point in time post petition

5  which would include a release, a dismissal with prejudice, a

6  medical report and exposure evidence for these 1300 cases.

7  None of that was provided because the time frame for providing

8  it was all post petition.

9          THE COURT:  I see, so the Debtor at this point

10  doesn't have any information with respect to these 1300 claims

11  and that's the reason that the Debtor is asking for the

12  questionnaire.

13          MR. ESSERMAN:  Yes, other than the fact that proofs

14  of claim were filed which attached the settlement agreement

15  which set forth that each of these claims were to be paid in

16  the amount of $2,750 each upon submission of these materials.

17          THE COURT:  Okay.  So, I think at this point those

18  claimants probably do need to file the questionnaire because at

19  this point there hasn't been the medical criteria or anything

20  else that's been submitted to the Debtor to show what the

21  Debtor is looking for, for purposes of this estimation.

22          MR. ESSERMAN:  And I understand that, Your Honor, and

23  I wanted to make sure that that was clear on the record and I

24  pointed that out so Your Honor would have all the facts.  I

25  still think it complies as a technical matter with the Court's

1  order as to what is a settled claim that does not need to

2  submit a questionnaire, but I do recognize the fact that no

3  medical reports is in the possession of the Debtor and,

4  therefore, I guess I understand why they would want further

5  information on these claims.

6         That said, once again, it's a question of timing and

7  compliance for the Litman firm because it is a -- I don't want

8  to say mom and pop operation, but it's a small firm that really

9  doesn't have the resources --

10        THE COURT:  Well, can they do this on some sort of a

11 rolling basis and how much time do they need to get it all

12 done?

13        MR. ESSERMAN:  Absolutely, and Your Honor has

14 indicated before that basically, you know, when you get your

15 completed claims you need to send them in and I think they can

16 do that but they did say in order to get them all in, they'd

17 probably need 90 days.

18        MR. BERNICK:  Your Honor, this is David Bernick.  It

19 seems to me that the issue for today is, should they do the

20 questionnaires in accordance with the Court's order and we know

21 that there will be people who will want more time to comply

22 with the requirements of the questionnaire.  That is something

23 that we would like to be able to have a dialogue about with

24 people who are going to come in with that kind of application.

25 And, if it's necessary to raise it before Your Honor, then we

1  can do that, but I think it would be -- we just don't know

2  enough at this point to be able to know whether they need 90

3  days, there are ramifications that that has with respect to the

4  overall schedule of the case.  I know there are other people

5  who are going to come in with similar requests for more time

6  and, you know, we just know that this is going to be an issue

7  that's got to be resolved on a consistent basis.

8          So, it seems to me, we're happy to sit down and talk

9  with Sandy about this late coming client and try to resolve

10 that, but I think it wouldn't be a good idea to rule on the

11 extension of time for completing the questionnaires today.

12         MR. ESSERMAN:  The only thing I can say, Your Honor,

13 is that this is an unusual circumstance and this is one of the

14 few firms that, basically are, you know, solo type

15 practitioners with a very limited staff.  And so, the number of

16 intersects on those lines are going to be very far and few

17 between and I think, you know, we're not, certainly, interested

18 in spending a lot of money or time arguing about extensions and

19 how much, coming back to the Court going back and forth.  I

20 think they'll use their best efforts to get it done, I think

21 they can get it done within 90 days and they should submit them

22 on a rolling basis.  And we're talking about a thousand claims

23 out of multiple hundreds of thousands of claims, I can't

24 believe that would do violence to Grace's schedule, and we're

25 talking about claims that Grace had settled, we contend, at

1  $2750.  So, I mean, these are not cancer cases.

2        MR. BERNICK:  Yes, all that is great, these are

3 people that never even objected and came back to us and it may

4 be that there are good reasons for that, but we can't resolve

5 in the abstract what their situation is, no matter how

6 understandable it may be at the end of the day.

7        THE COURT:  Okay.  But this is what I'm going to do.

8 This is a solo practitioner.  Mr. Esserman, on the assurance

9 that they will provide these claims on a rolling basis, then

10 I'm going to grant an extension to get this all done, not some,

11 but all done until the end of February for this firm only,

12 because it's a solo practitioner.  If that turns out not to be

13 workable, and you can discuss the matter with Mr. Bernick to

14 see whether they need additional time.

15        MR. ESSERMAN:  That's fine, Your Honor.

16        THE COURT:  But that's 60 days, that should be

17 enough.  It's a thousand claims, I realize the questionnaire is

18 somewhat complicated but once you get started on some of those

19 answers, in some instances they flow from entity to entity not

20 always.  So, why don't you try it by the end of February and if

21 that's not enough, then you folks can talk, but that's for this

22 firm only because it is a solo practitioner.

23        MR. ESSERMAN:  That's fine, Your Honor, thank you.

24        THE COURT:  All right.  So --

25        MS. ESAYIAN:  With that, Your Honor, I'm not aware of

1 any other issues, that would mean that we're down to, perhaps,

2 something less than 8,000 claims that will be on the list that

3 we will resubmit to Your Honor tomorrow.

4          MR. KUZMIN: Your Honor, William Kuzmin from Wysocker,

5 Glassner.  I just wanted to confirm based on what counsel for

6 Grace said, that my 11 cases would be excluded from Your

7 Honor's order?

8          MS. ESAYIAN:  That's correct.

9          MS. KUZMIN:  Okay.

10          MS. ESAYIAN:  From my perspective, that's correct.

11          THE COURT:  That's fine.

12          MR. KUZMIN:  (Indiscernible).

13          MR. BERNICK:  (Indiscernible).

14          THE COURT:  I'm sorry?

15          MR. BERNICK:  With respect to Silber Pearlman, Sandy,

16 will they, in fact, be -- are you agreeable that they will be

17 supplementing their questionnaires?

18          MR. ESSERMAN:  I think they will be -- it's my

19 understanding that they will be supplementing their

20 questionnaires.

21          MR. BERNICK:  So, they should be included in this

22 order.

23          MR. ESSERMAN:  Well, first of all, they submitted

24 questionnaires that I thought were pretty much in compliance,

25 but they --

1          MR. KUZMIN:  No, no.  The reason that we're moving

2  today was that they were taking the position and I thought you

3  were taking the position on their behalf that these were

4  settled claims, in which case they wouldn't have to submit the

5  questionnaires.

6          MR. ESSERMAN:  No, they are submitting -- they have

7  submitted the questionnaire, even though they are settled

8  claims, we contend, we're agreeing not to resolve that or

9  address that issue today and for purposes of your

10 questionnaires Silber Pearlman agrees to submit questionnaires.

11         MS. ESAYIAN:  So, that's fine, and the order that

12 we've submitted to Your Honor states that these questionnaires

13 must be in compliance with all rulings regarding

14 supplementation of questionnaires, so that should cover it.

15         THE COURT:  That's fine.  As I had indicated earlier,

16 you know, some of these firms have an awful lot of claims.

17 They may not be able to make the deadline, but I want some good

18 faith efforts to do it.

19         MS. ESAYIAN:  I believe we've dealt today with the

20 firms that have the largest number of claims, so we shouldn't

21 hear that from too many other ones.

22         THE COURT:  Anyone else on the phone have any

23 comments before I turn to counsel in the court?  No, okay.

24 Good afternoon.

25         MR. WILSON:  Good afternoon, Your Honor, Thomas

1  Wilson, Kelley & Ferraro, Cleveland, Ohio.  I'm here on behalf

2  of some settled claims that we submitted proof of claims on, on

3  behalf of Robert Taylor's law firm, Taylor and Singer.  We have

4  approximately, I think, 13 or 1400 of the settled claims and

5  it's my understanding that Grace contends that these matters

6  are not settled because they don't have a signed settlement

7  agreement.

8         Unfortunately, I don't also have a signed settlement

9  agreement, I have the signed settlement agreement signed by Mr.

10 Taylor in 1999, but I also have, based upon that signed

11 settlement agreement, 23 separate payments from Grace totaling

12 over $10 million dollars for the individuals that were paid,

13 under this settlement agreement and we'd contend that based

14 upon this information, and the course and practice that these

15 individuals were paid by Grace, that this matter does fall

16 within the signed settlement agreement.

17        Unfortunately, Your Honor, Mr. Taylor's processing

18 was handled by an outside company and which the individual in

19 charge of it recently passed away.  And, things are a little

20 bit hectic in that case.  But it seems that if they were paying

21 over $10 million dollars over the course of five plus years, or

22 I'm sorry, over two plus years, that that would be indicative

23 of a settlement agreement.

24        THE COURT:  It would seem to be.  I guess the

25 question is, is that his whole -- that all of his claims have

1  fallen within that path or are there still claims that are --

2         MR. WILSON:  No, Your Honor, there are claims that we

3  have submitted, that we did not submit proof of claims for on

4  the settled payment date and we will be providing

5  questionnaires for the unsettled individuals as we have for

6  Kelley & Ferraro on, in January, as the Court ordered.  But we

7  would request that the individuals that Grace contends are not

8  settled based solely upon the settlement agreement, that we not

9  have to provide questionnaires for those individuals.

10         THE COURT:  Well, if they can pay it, I think that

11  should be the end of the matter.

12         MR. WILSON:  No, I'm sorry, I must not have been

13  clear.  There are individuals who have not been paid that we

14  believe fall within the settlement agreement signed in 1999 and

15  that is evidence of that agreement, the other individuals who

16  have been paid.  In other words, they didn't pay everybody, and

17  it's my understanding that Grace is saying that this settlement

18  agreement doesn't exist because they don't have a copy signed

19  by Mr. Hughes from Grace, even though we have, like I say, 23

20  separate payments under this settlement agreement for the

21  remainder of the individuals who were there.  So, I would

22  request that the people that we've already filed proof of

23  claims on, that they not have to respond to the questionnaires.

24         THE COURT:  Okay.  If Grace has the information that

25  the settlement agreement requires, such as the medical proof,

1 or some release and the only issue is that they haven't been

2 paid, I would agree that they're part of the settled claims.  I

3 think what I'm not following is whether even though they may

4 have signed a settlement agreement, they actually ever followed

5 up with any of the information that Grace would have needed in

6 order to pay those claims and if they didn't, then they need to

7 do the questionnaire.

8          MR. WILSON:  It's my understanding that the releases

9 were provided to Grace, however, again, Your Honor, I'm coming

10 in late in the game and Grace would know that because they

11 would have the releases.  It's my understanding, though, the

12 releases are already at Grace.

13          MS. ESAYIAN:  Your Honor, the Kelley & Ferraro firm

14 submitted, I believe, in the neighborhood of 3500 claims as

15 "settled" claims, all together.  They didn't submit any

16 releases for any of them.  We went to our records and found

17 releases for quite a few of them, and dropped our objections to

18 any of those claims.  We're left with 1600 claims for which we

19 have nothing in our records indicating any kind of information

20 provided by that firm or releases or anything.  And this is the

21 first time that I'm hearing any of this from counsel.  We sent

22 them letters at the time we were supposed to, we filed our

23 brief on December 1 setting forth our position about their

24 claims.  So, I mean, not only have they long ago waived any

25 objection to submitting the questionnaires, but just so the

1 record is clear, we don't have releases for these claims and

2 that's why we're seeking questionnaires for them.

3        THE COURT:  I think you need to do a questionnaire.

4 If the Debtor has no information in the records, and the Taylor

5 firm has no information in its records that the medical

6 criteria, the releases, whatever, were submitted to Grace,

7 that's the purpose for the questionnaire.  I think they need to

8 submit a questionnaire.

9        MR. WILSON:  Well, Your Honor, when they sent us

10 back, they didn't send us back, you know, these individuals

11 doesn't have the particular information.  If they were wiling

12 to provide us with the names and/or other identifications  of

13 the individuals that they say do not fall within the settlement

14 agreement and I have or I'm able to get that information, I'd

15 be happy to do that, but if I don't have the names or other

16 identifying information, I can't do that because we believe we

17 submitted it all.

18        THE COURT:  Well, you clearly need some indication of

19 who these 1600 individuals are, yes.

20        MS. ESAYIAN:  Well, again, we did that in our

21 December 1 brief and this is -- now it's December 18 and this

22 is the first time we're hearing about that.  Going back to

23 November, we sent them a letter saying that we didn't have any

24 releases at all from any of their clients and that we were

25 objecting to all of them.  So, they were on notice in November

1  that we had a problem with all of their claims.  And I didn't

2  hear anything from them.

3       MR. WILSON:  Your Honor, all I can do is get the

4  information as best I can.  It's unfortunate for me, I can't

5  make people come back to life and I understand Grace is not

6  arguing that, but if they have the -- if they can provide me

7  with information as to these 1600, I will provide them with

8  whatever medical documentation we have and in lieu of that,

9  then we'll answer the questionnaires, but I need something from

10 Grace telling me who these 1600 people are, because my

11 understanding was, they just said, look, we don't have a signed

12 agreement, therefore, they're not there.

13      MS. ESAYIAN:  They're listed on Exhibit B to our

14 December 1st brief.

15      MR. WILSON:  Do they have, again, is there

16 information such as -- often times, Your Honor, we run into

17 this problem.  You know, I have Willy Smith, okay.  Well, if I

18 have 100 Willy Smith's, I can't give them information unless

19 they provide me with more information.

20      MS. ESAYIAN:  This is a list of 1600 Kelley & Ferraro

21 claims attached to our -- it's Exhibit B to our December 1st

22 brief, has the last four digits of their social security number

23 and the full creditor name.  I'd be happy to send you another

24 copy of the brief if you'd like.

25      MR. WILSON:  I would, thank you.

1          MR. BERNICK:  Your Honor, this is Dave again.  We

2     were under instructions from Your Honor to do this on an

3     individual basis.  We did it.  The information was there on

4     December 1.  The reason that we're here today is not that we

5     didn't give them the information, we did, it's just that we

6     didn't get anything back.  And the fact is, as Ms. ESAYIAN has

7     represented to the Court that today, not only do we not have

8     the information that says that they are, in fact, settled

9     claims within the meaning of the order, we don't have the

10    information that's necessary for us through the questionnaire.

11    So, they're no different than, I think, the case that we just

12    got done talking about.

13          THE COURT:  Yes.  I think you're right, Mr. Bernick.

14    I think what I've just heard from counsel is, that they will

15    submit the medical information or whatever was submitted to

16    Grace earlier if, in fact, something was and if not, they'll

17    answer the questionnaire.  But he just wants to know who the

18    1600 individuals are.  Ms. Esyian has agreed to send him

19    another copy of the list so he'll have it, so they can be

20    included in the order to the same extent as everyone else to

21    submit the questionnaire.

22          MR. WILSON:  Thank you, Your Honor.

23          THE COURT:  Okay.

24          MR. BERNICK:  That's fine.

25          THE COURT:  All right.  So, you're going to submit --

1  I'm sorry, does that cover everyone?  So, Ms. Esayian, you're

2  going to submit a new order with new lists.

3          MS. ESAYIAN:  That's correct, Your Honor.

4          THE COURT:  And, I'm sorry, was this 11, agenda 11?

5          MS. ESAYIAN:  Yes.

6          THE COURT:  Okay.  When I get that certification of

7  counsel, I'll sign it.  I think that process needs to have

8  (indiscernible) itself down (indiscernible).

9          MS. ESAYIAN:  That brings us to agenda items 12 and

10  13, which Mr. Bernick is going to address.

11          MR. MALLADY:  Your Honor, excuse me, Ray Mallady for

12  the FCR.  Before we do that, can I just apprize the Court of

13  two matters as relates to the PI?

14          THE COURT:  To what?

15          MR. MALLADY:  To the personal injury plaintiffs who

16  round this out?

17          THE COURT:  Yes.

18          MR. MALLADY: By way of --

19          THE COURT:  Are you back on item 11?

20          MR. MALLADY:  I'm not on item 11 because they're not

21  agenda items for today but just --

22          THE COURT:  Okay.

23          MR. MALLADY:  -- an FYI for the Court.

24          THE COURT:  All right.

25          MR. MALLADY:  We have reached agreement with the

1 Debtor on a stipulation resolving the motion to compel that the

2 ACC and FCR had filed.  So, that's done.  We hope to be

3 entering that stipulation with the Court this week.  And we've

4 also --

5         THE COURT:  You've reached a stipulation with the

6 Debtor on what?

7         MR. MALLADY: On the -- it's a stipulation resolving

8 the motion to compel that the ACC and the FCR had filed

9 regarding the Debtor's prepetition asbestos settlement history.

10         THE COURT:  All right.

11         MR. MALLADY:  And deposition discovery that will take

12 place in that subject area.

13         THE COURT:  Didn't I already sign an order?

14         MR. MALLADY:  I don't believe it's been submitted to

15 Your Honor.

16         MR. BERNICK:  No.  Your Honor, this was the situation

17 that was argued on the 5th where we agreed to allow certain

18 discovery and, therefore, Your Honor, did not have to rule on

19 the issue and I think what Mr. Mallady is doing is reporting,

20 that since that time we've worked out the language of the

21 stipulation that would allow that discovery to proceed.

22         MR. MALLADY:  That's correct.

23         THE COURT:  Okay.  I guess I'm making this up.  I

24 thought I signed an order to that effect, or at least read one.

25         MR. O'NEILL:  Your Honor, this is James O'Neill.  We

1  did receive an order that was a stipulated order on Friday of

2  this week and we did submit it, so that may be the order that

3  you're talking about.  It was very late in the day on Friday,

4  I'm not sure whether its made its way to you.

5          THE COURT:  Ah.

6          MR. FINCH:  (Indiscernible).  Mr. Mallady and I

7  worked out the language (indiscernible).

8          THE COURT:  Yes, I'm pretty sure I signed an order so

9  you'd better look at it.  If it's different -- if you've worked

10 out something different from what that order says, let me know

11 but I"m pretty sure I signed that order.

12         MR. MALLADY:  That must be the order that we all saw

13 before the weekend.

14         MR. O'NEILL: We'll double check.

15         MR. MALLADY:  We'll double check it, but neither of

16 these points is a matter of controversy and the second one is

17 that, Your Honor, we've reached agreement with the Debtor on an

18 amended case management order for the estimation of asbestos

19 personal injury liabilities.  And I'll just give Your Honor the

20 dates and also offer Your Honor a copy of the filing.  It may

21 already have been submitted, do you have it?

22         THE COURT:  I just got it, before Court, January

23 12th, all supplemental responses --

24         MR. MALLADY:  Correct.

25         THE COURT:  -- down through June 1st, deadline for

1  completion of all written and deposition discovery?

2        MR. MALLADY:  Correct.

3        THE COURT:  Okay.  And then -- I have not signed it

4  yet, I just got this today.  So, this is the agreed order?

5        MR. MALLADY:  Yes, Your Honor, this is the agreed

6  order.

7        MR. BERNICK:  This is pursuant to the discussion that

8  we had not on the 5th, but I think at the last omnibus about

9  the need to shift some of the dates in light of how long the

10 questionnaire process is taking.  It does not consider,

11 obviously, what ultimately happens when the questionnaires come

12 in, it is done pursuant to the discussion that we had before

13 Your Honor, and the agreement that we reached in connection

14 with the last omnibus hearing.  I think that's correct and if

15 not, Ray will tell you.

16       THE COURT:  Yes.  It relates to the November 14th

17 omnibus and if this is the agreement, it's fine.  I'll sign

18 this order right now.

19       MR. MALLADY:  And, Your Honor, Mr. Bernick is

20 correct, he's characterized the agreement correctly.  The most

21 significant new date is the March 16th date for the exchange of

22 estimation reports by the parties.

23       THE COURT:  Okay.

24       MR. BERNICK: Correct.

25       MS. HARDING: Your Honor, this is Barbara Harding, I

1  apologize for interrupting, but it's my understanding that we

2  actually have not submitted the order yet, we were to do that

3  this evening at five o'clock, so I'd just like Jane Baer or

4  Jamie O'Neill to take a look at it and maybe Mr. Finch and Mr.

5  Mallady, to make sure that we're talking about the same order.

6         THE COURT:  Okay.  Somebody want to look at this or

7  do you want to just submit it on a COC later and I'll throw

8  this one away?

9         MS. HARDING: I think we should do that because I just

10 circulated the final revised draft, and so I'm not sure how

11 Your Honor has a copy of it.

12        THE COURT:  Somebody brought it to chambers over the

13 lunch hour and handed it to my staff and they brought it in and

14 handed it to me.

15        MR. BERNICK:  Oh, okay.

16        MR. MALLADY:  We have a chain of custody issue, Your

17 Honor.  We'll investigate this.

18        MR. FINCH: It didn't come from Caplin & Drysdale.

19        THE COURT:  All right.

20        MR. BERNICK:  No one is going to accept

21 responsibility.  We'll get it figured out.

22        MS. BAER:  I think it was Santa Claus.

23        THE COURT:  Mr. O'Neill, okay, I did sign that order,

24 so if it's being destroyed, give it back to me, I'll throw it

25 away and I'll just say that a COC is going to be submitted.

1  Okay.  Is that what you prefer to do?

2         MS. BAER:  I think that's the safe thing to do

3  because nobody seems to know exactly what order was submitted

4  when.

5         THE COURT:  All right.

6         MR. MALLADY:  Your Honor, just so the record is

7  clear, not that I expect there to be an issue about this, but

8  if this record ever becomes important, the dates as we

9  understand them by agreement with counsel for Grace are as

10 follows.  January 12th, all supplemental responses to the Grace

11 asbestos personal injury questionnaire are due.  March the 2nd

12 2007, the Debtors claims agent shall compile the information

13 contained in the supplemental questionnaire, responses into and

14 navigable data base.  March 16th, 2007, the parties shall

15 exchange pursuant to FRCP 26(a)(2), reports on the number,

16 amount and value of present and future asbestos claims.  And

17 next, March 30, 2007, all experts as to matters other than the

18 number, amount and value of present and future asbestos claims

19 may file supplemental or rebuttal reports and June 1, 2007,

20 deadline for completion of all written and deposition

21 discovery.

22        THE COURT:  (Indiscernible) Mr. O'Neill.

23        MR. O'NEILL:  I am going to hand this back to you,

24 Your Honor, because this order is supposed to have the old

25 order attached as an exhibit.  So, I'm going to -- we'll

1  resubmit it.

2          THE COURT:  Okay.

3          MR. O'NEILL:  And I can it back to you to destroy it.

4          THE COURT:  Yes, I'm just going to rip it up and

5  throw it away so there isn't some confusion with multiple

6  orders.  Thank you.

7          MR. MULLADY:  Nothing further from us, Your Honor.

8          MR. FINCH:  Your Honor, this is Nathan Finch.  Are

9  there any more matters that relate to personal injury issues

10 that the Debtor wishes to raise?

11         MR. BERNICK:  Yes, there are.

12         MR. FINCH:  I guess I would just like to --

13         MR. BERNICK:  Would you like to -- we wouldn't have

14 any problem if the effort is by Mr. Finch to devote his time to

15 more productive things than listening to property damage

16 matters.

17         MR. FINCH:  That's exactly my --

18         MR. BERNICK:  The only other matter that we wanted to

19 raise this afternoon that relates to personal injury concerns

20 the x-ray issue and, Your Honor, we went over this last time in

21 detail and it was left to write up and have an order drafted up

22 for Your Honor to enter.  And we received an indication that

23 there's a new development which is that people are taking the

24 position that if the certification that Your Honor said was

25 necessary with respect to copies, that is the copies are for

1 purposes of this litigation, the same and identical to the

2 originals, if that certification were not forthcoming, then it

3 would be left to us to, again, seek recourse to the originals,

4 kind of wherever they might be.  The effect of all that being

5 that once again we're back to dealing with originals and we've

6 got to go find them wherever they are.  That is a very, very

7 problematic change from where we were last time.

8          I don't wan to rush Your Honor's consideration of

9 that by injecting it today and then having all kinds of people

10 gather round to reargue what we argued last time.  We have the

11 transcript, it's very clear what Your Honor said, but we do

12 have to get this thing resolved very soon because all of these

13 things affect the very schedule that Mr. Mallady was very

14 focused on, and if we can't get the stuff, we can't proceed.

15          So, what I wanted to propose is that we have -- if

16 this is really going to be an issue that we have a separate

17 call at some point in the next couple of days, to get it

18 resolved.

19          THE COURT:  Well, I got two proposed orders, along

20 with whatever else was submitted to chambers by Santa Claus

21 today.  One that appears to be drafted by the Debtor and the

22 other appears to have been drafted by somebody not the Debtor,

23 because they're a little different, they cover the same issues,

24 basically, but they don't cover them the same way.  So, if you

25 want to work out which of these -- I don't --

1          MR. BERNICK:  Well, this is the issue and, frankly, I

2   didn't think that this was going to come up because I didn't

3   think that there was going to be any controversy about the

4   copies and what was required for the copies.  And, you know,

5   time is just ticking away.

6          What I would suggest, again, is that rather than

7   having this injected today because we have other matters to

8   take up and, frankly, I'm not there and there's nobody who is

9   in court is really familiar with these issues, we were not

10  expecting that this would develop in the way that it has

11  developed, is that we set aside, we have a telephone conference

12  with your where we can focus on this issue of copies because it

13  goes to the core of the x-ray process.  I think it would be

14  time consuming and Your Honor does not have the transcript from

15  last time, I think it's been put before you, where Your Honor

16  dealt specifically with this, all we're going to do is have a

17  long discussion today and I don't think we'll get a definitive

18  resolution whereas if we have a call to deal with it, I think

19  we will.

20         THE COURT:  Okay.  Well, if we're going to do a call,

21  it's going to have to be tomorrow.

22         MR. BERNICK:  That's fine.

23         THE COURT:  Because otherwise, it's going to wait

24  until after the first of the year and I don't think you want to

25  wait that long and I'm prepared to rule.  I've been through the

1 briefs, I have not read the transcripts, I have your draft

2 orders, so I'm ready to go.  I figured after court today I was

3 going to cut and past these two orders together, come up with

4 one that probably splits the baby down the middle, and that was

5 the order that you were going to have.

6        MR. BERNICK:  Yes, well, that is the -- I understand

7 that and that's great.  The difficulty is, I don't know about

8 that baby and where it's going to get divided.  And --

9        THE COURT:  You won't until you see the order.

10       MR. BERNICK -- and I thought this had all been

11 resolved last time.

12       THE COURT:  Well, okay.  Ms. Ramsey?

13       MS. RAMSEY:  Your Honor, we don't know how the Court

14 came to have those two draft orders in front of it.  What

15 happened here was, following the hearing, I think last

16 Thursday, the Debtor circulated a proposed form of order.  We

17 sent back consolidated comments through the ACC on Friday, late

18 in the day and we understood from an email this morning that

19 some of the comments were unacceptable.  What you presumably

20 have is a form of order that reflected some of our comments,

21 however, it's not complete.  So, in any circumstance we

22 wouldn't want the Court to blend those two orders, we would

23 like the opportunity, even by tomorrow morning --

24       THE COURT:  I will give you -- we'll set up a time

25 for a call and do it tomorrow by phone.

1      MS. RAMSEY:  Okay.

2      THE COURT:  And I'll just work through these, but to

3  the extent that you have some agreement, I would like to see

4  your draft, at least agreed upon language and even if you don't

5  agree, I'd like to see your alternatives for what you don't

6  agree on.

7      MS. RAMSEY:  Your Honor, I think it would be very

8  helpful, and I know we're dealing with a short time frame if

9  we're going to do the call tomorrow, which is fine, but we

10 haven't had a conversation or a dialogue at all with the Debtor

11 about these issues and it sounds from what Mr. Bernick was

12 staying today, that we're not off on all of the issues, that

13 there may be only one or two that we disagree on.  So, I think

14 it would also be helpful if the parties could get together

15 before we ask the Court to intervene.

16     THE COURT:  Okay.  I had --

17     MR. BERNICK: We're happy to do that, Your Honor.

18 Our, at least our impression, was that the only issue that

19 really did get raised, that kind of cuts to the core, is the

20 fundamental issue of whether we're going to have certified

21 copies, or whether we're then going to have to go chase down

22 originals.  I don't -- at least my sense, from talking with Ms.

23 Harding, who is also on the phone, that with respect to the

24 other issues, we would agree with Ms. Ramsey that they're

25 probably very capable of being worked out.  And we'd certainly

1  endorse the idea of our talking with Ms. Ramsey and anybody

2  else, between now and then to try to do that.

3         THE COURT:  Okay.  The one difference in these orders

4  that was proposed on the issue that you're raising is the

5  Debtor wanted in the event that the x-ray copies were not

6  certified, have the x-rays in counsel's office, the other

7  parties wanted the Debtor to go find them wherever they were

8  but would provide the appropriate releases so that the Debtor

9  could do it.

10         Frankly, it seems to me in this instance it's better

11  to get them into counsel's office because then counsel can be

12  quite sure about what it is the Debtor is looking at, that

13  they're the original x-rays and so forth.  So, I'm not going to

14  make a ruling, I understand there may be some difficulties with

15  respect to getting those document into counsel's office, but I

16  don't think the Debtor should have to traipse all over the

17  world  to try to find these, either.  So, some sort of

18  centrally located repository, not in the Debtor's possession,

19  but in counsel's possession, I think would be better.  If you

20  can work along those lines, please try.  I'll continue this

21  issue until December 19th, that's tomorrow, at eleven o'clock.

22  I had a trial that canceled, so I know I have time, I'll do it

23  at 11 tomorrow.  If you want to be here, fine, if you want to

24  be by phone, that's okay.

25         MR. BERNICK:  Okay, that's fine and, Natalie, we'll

1  just try to set up a conference call with you and Barb and

2  anybody else, see if we can work this out.

3            MS. RAMSEY:  Thank you.

4            MR. FINCH:  Please include Caplin & Drysdale on that

5  call as well as Mr. Esserman's firm.

6            MR. BERNICK:  We will be certain to do that.

7            MR. ESSERMAN:  Yes, David, this is Sandy Esserman.

8  Please include us and make sure that you include Van Hook or

9  David Klingler because I may be traveling.

10           MR. BERNICK:  Okay.

11           THE COURT:  I'm not sure, who for the Debtor sets

12 these calls up?  This may cause -- oh, is the court call

13 operator on?

14           UNIDENTIFIED MALE SPEAKER:  Yes, ma'am, I am.

15           THE COURT:  Okay.  This will normally -- this process

16 that I'm setting up will not follow our normal case management

17 processes because parties normally need to give you, I think,

18 48 hours notice of the fact that they're going to participate.

19 Obviously, there aren't 48 hours between today at three and

20 tomorrow at 11 in the morning.  So, how can I work something

21 that will be acceptable to you?  As far as I'm concerned

22 anybody who wants to participate in this call by phone, either

23 as listen only or to speak, may do so, I would just like to get

24 an email list from you if it's possible by, say ten o'clock

25 tomorrow, so that I am prepared for court at 11.

1          MR. BERNICK:  What I would suggest, Your Honor, if

2  this meets with your approval, is that we'll undertake the

3  administrative burden of setting up the call, and anybody who

4  wants to set up, who wants to participate in the call, even the

5  folks in property damage, of course, as Your Honor indicated

6  are invited, all they have to do is let Barbara Harding's

7  office know and we will take charge of setting up a call with

8  the call in number, including Your Honor and then when

9  everybody is on, we will notify Your Honor's chambers and then

10 you can tap into the call, if it's taking place.

11         THE COURT:  You mean rather than use court call?

12         MR. BERNICK:  Well, I was just -- I'm sorry, I

13 presumed that you were suggesting that court call might not be

14 able to do it.

15         THE COURT:  No, I think court call can do it, I think

16 the problem is that my normal case management order tells court

17 call not to let people in if they haven't notified court call

18 at least within 48 hours that they want to participate and

19 there, obviously, aren't 48 hours.  So, I just wanted to make

20 sure that the call list would be cut off by, let's say ten

21 o'clock, so that I can get an email list from court call

22 shortly after ten as to who is going to participate.  Does that

23 work for court call?

24         UNIDENTIFIED MALE SPEAKER:  Your Honor, this is the

25 operator and I will certainly notify our reservations

1  department that you want to do it that way so that, therefore,

2  everyone that calls in to us -- I can find out whoever wants to

3  tap into the call will have to make their reservations with the

4  court call and they won't need the 48 hours.  Yes.

5          THE COURT:  Right.  That's right.  The list should be

6  shut off by ten o'clock tomorrow morning --

7          uNIDENTIFIED MALE SPEAKER:  Ten o'clock.

8          THE COURT:  The hearing is at 11, so that everybody

9  -- so the court call can the email  me the participant list.

10         UNIDENTIFIED MALE SPEAKER:  I will make sure to

11 notify them of that.

12         THE COURT:  All right, thank you.

13         UNIDENTIFIED MALE SPEAKER:  Thank you.

14         THE COURT:  Okay.  Is that it on that subject?

15         MR. BERNICK: Yes, there's nothing else that we

16 intended to raise with respect to personal injury today.

17         THE COURT:  All right.  That issue is deferred until

18 tomorrow, then.

19         MR. FINCH:  May I be excused, then, Your Honor?

20         THE COURT:  Yes, thank you.

21         MS. BAER:  Yes, okay, so that brings us to agenda

22 items 12 and 13, which are status on two briefs that we filed

23 approximately a month ago and Mr. Bernick is going to address

24 those.

25         THE COURT:  Okay.  Just one second let me get caught

1  up on this note for a minute, please, so I after court remember

2  what to tell my staff.

3                          (Pause)

4           THE COURT:  Okay, Mr. Bernick, go ahead.  Thank you.

5           MR. BERNICK:  Yes, I'm sorry.  If I can't be heard,

6  let me know.  This goes back to the question of the briefing

7  schedule on summary judgment motions in connection with the

8  property damage claims.  And Your Honor did determine that

9  basically the summary judgment motion process should await the

10 completion of discovery.  However, there was already ongoing

11 motion practice with respect to Prudential.

12         And we did discuss the Prudential situation last

13 time.  I think Your Honor's observations were that it might

14 actually be beneficial to have a determination from Your Honor

15 with respect to the balance of the Prudential claims so that in

16 a sense all the claims could be up before the Court on any

17 appeal.

18         We contacted Prudential with a view to working out

19 the schedule for that, consistent with Your Honor's suggestion

20 to that effect last time and we understand from Prudential that

21 their feeling is that they'd rather have the -- proceed with

22 respect to the first traunch of claims and that the briefing on

23 the second traunch of claims would simply await the result of

24 the appellate process.

25         I'm not going to belabor the question of whether Your

1  Honor already has ruled on this, although, I believe that Your

2  Honor was clear in the guidance that you offered up last time.

3  But I do think that the right idea regardless of when the

4  district court actually rules, and we would hope that it

5  doesn't rule until after Your Honor has ruled on the second

6  traunch, is to get the second traunch done, because I believe,

7  we believe, that the same principle will be dispositive of the

8  second traunch, so why -- there's no point under any set of

9  circumstances, of delaying it.

10           So, that's where we are in Prudential and the second

11  matter relates to certain New York based claims that I guess

12  I'll hold off on until Your Honor can hear from Prudential.

13           THE COURT:  Okay.  Somewhere representing Prudential?

14           MR. SCHWARTZ:  Yes, Your Honor, good afternoon,

15  Joseph Schwartz, Riker, Danzig, Scherer, Hyland & Perretti on

16  behalf of Prudential Insurance Company of America.

17           Your Honor, I wasn't --

18           THE COURT:  Mr. Schwartz, are you on a speaker phone?

19           MR. SCHWARTZ: Yes, Your Honor.  Can you hear me now?

20           THE COURT:  Please folks, how many times do I have to

21  ask you not to use the speaker phone?  I don't -- you must

22  never be in court, or you'd know that you can't hear on this

23  end.

24           MR. SCHWARTZ:  I apologize.

25           THE COURT:  Please, pick up the handset.  Go ahead,

1 Mr. Schwartz.

2       MR. SCHWARTZ:  I apologize, Your Honor.  Your Honor,

3 I wasn't at the last hearing because we received a copy of the

4 motion about a day before the hearing, when the Debtor asked

5 the Court to hear an expedited motion schedule with respect to

6 the claims objection on the remaining six claims of ours.  But

7 we don't believe that the Court should hear those six claims

8 out of turn.  The Court entered it's amended CMO on October

9 13th, scheduled objections with respect to all PD claims, that

10 CMO was heavily negotiated between the Debtors and the PD

11 Committee.  It provided claimants with time to object to the

12 deadlines contained therein.  They're attached as Schedule B or

13 Exhibit B to the amended CMO.  Our deadlines with respect to

14 discovery, there's a discovery schedule and there's a deadline

15 of March 5th with respect to discovery.

16       The Debtors in their summary judgment motion allege

17 all sorts of facts and they say that the facts are not in

18 dispute and as a result, the Debtors contend that they're

19 entitled to summary judgment as a matter of law.  Discovery is

20 still ongoing.  Again, the discovery deadline is in March.  We

21 believe that there are factual disputes.  The remaining six

22 claims deal with buildings that are located in Florida,

23 Minnesota, New Jersey and Texas.  There are different statutes

24 of limitation, there are different standards with respect to

25 those various statutes.  There's separate sets of facts with

1  respect to each of the buildings, et cetera.  And, so, we

2  believe that the Court should not hear these out of turn.  We

3  don't think it's a matter of simply saying these six claims are

4  exactly the same as the other two claims that were already

5  expunged in our appeal.  We believe that we should let the

6  process run its course, let the Court hear the complete set of

7  facts and the Court has scheduled hearings for summary judgment

8  motions with respect to all claims pursuant to the CMO and

9  those summary judgment motions are to be heard in April, April

10 9th specifically.  And, there's a deadline to file briefs in

11 March and we believe that the Court should stick to the prior

12 CMO because that was what was negotiated among the parties.

13        MR. BERNICK:  Your Honor with respect to the CMO, I

14 think the CMO is going to be germane to the next issue which

15 are the New York cases and I'll save my comments with respect

16 to the CMO to talking about the New York cases.  I think that

17 Prudential under all circumstances was different.  Your Honor

18 was able to rule on the summary judgment motion with respect to

19 the first traunch of Prudential buildings.  The essence of our

20 summary judgment motion with respect to the balance is the same

21 facts that you found to be undisputable and dispositive in

22 connection with the first motion, are undisputable and

23 dispositive with respect to the second traunch.

24        If Your Honor rules against us on that and says, no,

25 these buildings are different, then I would agree with counsel

1 that any further dispositive motions with respect to the second

2 set of buildings, ought to await the completion of discovery.

3 But the whole point here is, are we right that these cases are

4 governed by those same facts.  This is a situation where the

5 potential litigation was very mature litigation, resulted in

6 opinions, those opinions were against Prudential.

7          So, the issue is whether the same facts that were

8 controlling in the first set are also controlling in the

9 second.  If they're able to persuade Your Honor that these

10 cases are somehow different and they don't involve those facts,

11 then I guess our motion would be unsuccessful this time around.

12 But there's no reason why Prudential should get the benefit of

13 a process that doesn't really apply to them at all.

14          MR. SCHWARTZ:  Your Honor, again, this is Joseph

15 Schwartz.  The process does apply to us, the process

16 specifically applies to PD claims and we were listed as one of

17 the objected to claims on Exhibit A to the process.  It

18 definitely applies to us.

19          We believe, again, that the set of facts are

20 different.  We believe that, first of all, we don't believe

21 that as Mr. Bernick just pointed out, that the opinions go

22 against us as Mr. Bernick would have the Court believe.  We'd

23 like to lay this out, we'd like to go through discovery, we'd

24 like the Court to consider this carefully, after considering

25 all the facts.  This is a process that the Debtor agreed to and

1   the Debtor negotiated and the Debtor is now trying cherry pick

2   and bring these before the Court for whatever reason.  We

3   believe that these should be heard in connection with the

4   process that's already been approved by the Court.

5           THE COURT:  Mr. Baena.

6           MR. BAENA:  May it please the Court, Scott Baena on

7   behalf of the Property Damage Committee.  Judge, I rise because

8   as you know, I have some familiarity with the property damage

9   CMO and in particular, you'll recall that at the end of the day

10  when we were negotiating back in July and August, the property

11  damage CMO, at the end of the day there were two issues that we

12  could not reach an agreement on.  And by way of certificates of

13  counsel, each of the sides to the CMO, the Property Damage

14  Committee on one hand, and the Debtor on the other, set forth

15  their positions in respect of those issues.

16          And, the first and foremost issue was this very

17  issue.  When can summary judgments be heard and determined by

18  the Court.  And, our position was that it should not happen

19  until the close of discovery.  And, for a very elegantly simple

20  reason.  The Debtor has had even before the formal discovery

21  began in respect to property damage objections, the benefit of

22  discovery through a very extensive specialized proof of claim

23  form and the claimants have been shutdown in the prosecution of

24  their claims during the pendency of this case, for the last

25  five years.  Some of them haven't been able to take any

1  discovery at all.

2        And, so, we sent this issue to you for determination

3  and in your wisdom, you decided we were right.  This should

4  await the conclusion of discovery.  And, you entered a very

5  specific order that specifically put off in respect of each

6  group of objections to property damage claims, your

7  determination of summary judgments until the conclusion of

8  discovery.  You said that anybody can file those motions in

9  advance, but you wouldn't determine them in this case, I

10 believe, before April 9.

11        And, there is just a compelling reason beyond the one

12 we advanced then, that I believe the Court needs to take into

13 account.  There are hundreds of claims and I'm sure, Judge,

14 it's going to become an irresistible impulse on occasion for

15 the Debtors to say, Judge, just one more time, this one is very

16 simple.  We can resolve this quickly and if we can't we can go

17 back to the original order and then follow the process that you

18 had originally intended.

19        With 602, I believe, extant, property damage claims,

20 that creates all sorts of prospects for (indiscernible) results

21 and impositions upon the claimants.  We think the rules of

22 engagement were set.  It took almost a year to do it, Judge,

23 le's not deviate from them, lest we want to have all sorts of

24 exceptions coming from all parties, creating pandemonium and in

25 short order, of course, those deadlines will come to fruition

1  anyway and these matters will be heard.

2       MR. BERNICK:  Your Honor, again, I would like to

3  respond to that but in the context not of Prudential but the

4  next issue because I don't think that Prudential has much to do

5  with anything that Mr. Baena has said.

6       MR. SCHWARTZ:  Your Honor, before Mr. Bernick goes

7  into the next claim, I'd like to point out one thing, and this

8  is in furtherance of what Mr. Baena just said.  In footnote

9  five on Page 7 of the Debtors summary judgment brief, the

10 Debtors reserve the right to prosecute any remaining objections

11 with respect to Prudential's claims.

12      As the Court might recall, BOCA Rule 3007(1)(f)(3),

13 which Your Honor has heard a lot about in these proceedings,

14 require the Debtor to object to claims on every basis in one

15 fell swoop and the Court has heard this before and,

16 essentially, has allowed the Debtor to get two bites of the

17 apple and prosecute objections twice.  Here, what the Debtor is

18 seeking to do is let's object to Prudential's claims on the

19 basis of statute of limitations.  If for some reason the Court

20 doesn't grant that, then we'll go back and we'll prosecute our

21 remaining objections.  We'll then go back and we'll prosecute a

22 third set of objections on the basis that there's a lack of --

23 or some other basis.  And so, what the Debtor is trying to do

24 is require Prudential to possibly come back to this court

25 numerous times for numerous objections to Prudential's claim

1 and, again, we submit that that is in violation of local rules

2 and in violation of this Court's prior determinations.  And so,

3 similar to what Mr. Baena just said, we request that the Court

4 follow the rules of engagement that were previously set.

5      MR. BERNICK:  Your Honor, on that score, that's just

6 wrong and I think counsel doesn't -- I'm not taking fault with

7 counsel here, but doesn't know the history of the claim

8 objection process.  We have made all the objections, we did so

9 in connection with the 15th omnibus, we've objected to

10 Prudential's claims on numerous grounds.  We preserved our

11 right in that footnote to be able to make motions based upon

12 the objections, but the issue here is with respect to a single

13 objection, which is statute of limitations and what ought to

14 happen with regard to the briefing on summary judgment.  It's

15 not a question of the local rule, it's just really not at issue

16 here.  We've already made the objections.

17      MR. SCHWARTZ:  Your Honor, the purpose behind the

18 local rule is to not require a claimant to have to come into

19 court many times, numerous times and that's precisely --

20      THE COURT:  Well, even the local rules in Delaware

21 with respect to the Gateway objections generally will allow

22 entities to raise the Gateway objections that can be raised.

23 And we've had discussions in this record numerous times about

24 whether the statute of limitations is or is not one such

25 Gateway objection.

1      You know, clearly if you can rule as a matter of law

2  and parties don't have to do extensive discovery, then it's a

3  lot less expensive and a lot less time consuming.  But if you

4  need discovery on the issues, then you're going to have to do

5  discovery anyway.  That's the reason I said that I would hear

6  the matters at the end of the discovery period because in this

7  instance if somebody raises something as a matter of law, and

8  the parties want to join that issue, as a matter of law and not

9  do the discovery, you're free to do it.  If you think you need

10  discovery, then you'll take it through the discovery period and

11  you'll brief it at the end and then I'll have all the issues

12  before me.

13      So, I think in ths case if the Prudential wants to

14  stick with the case management order, then fine you can stick

15  with the case management order.  If the appeal is finished by

16  then, it is and if it isn't finished by then it isn't, and

17  we'll go forward at that time.

18      So, the Debtor's motion, at least on the statute of

19  limitations issue is pending, its briefing has been done and

20  Prudential will have to respond to it in the appropriate time

21  to get it onto that April 9th argument list if that's when it's

22  going to be heard.

23      I don't know how many motions are going to be file.

24  I don't know whether April 9th is going to be a day that I can

25  address all of these issues or not but, you know, closer to

1 then, maybe in March, we should have a status conference and

2 see what motions the Debtor has filed by then.  We can,

3 perhaps, get a better schedule.

4        MR. BERNICK:  Yes.  Your Honor, I think that's fine

5 and I do acknowledge as I said at the outset, the case

6 management order and Mr. Baena's heartfelt recitation of how

7 the circumstances that gave rise to it, that he is factually

8 accurate in what he says and I remember specifically pointing

9 out to the Court what I think Your Honor already knew, which is

10 you know, in the sense of the merit of taking some of these

11 matters up earlier is that you don't have to have a continuing

12 lump of 600 cases to work with because we believe that as

13 already has been demonstrated, we went down from 4000 to 600.

14 A lot of them are going to get resolved on the basis of these

15 threshold issues.

16        What we, I guess, would like to do is take Your Honor

17 up on what Your Honor just said, and maybe set some time in

18 March or maybe even earlier, to kind of go through the motions

19 that are going to -- we can even do it next time, we can tell

20 you what motions are penned and ready to go.

21        THE COURT:  I think it should be done after the

22 motions are filed, so that we see exactly what the universe of

23 objections are going to be.  And then we'll have some better

24 estimate of what kind of time is going to be there.  It won't

25 be perfect, because some people may choose to object or respond

1  and others may not, but at least at that point we'll know how

2  many motions are pending and be able to see whether it makes

3  sense to put some of the together for argument purposes which

4  at this point in time, I don't have any way of knowing.

5         MR. BERNICK:  Well, let us back and work on that.

6  But I think that we will be able to show Your Honor that

7  there's just an awful lot of this that may well just go away

8  and we don't have to have all of this process continue.  But

9  rather than talking about it more in the abstract, Your Honor,

10 we'll go back and put something together and figure out which

11 motions can be brought on very quickly.

12        THE COURT:  All right.

13        MR. BERNICK:  And then report to the Court.

14        THE COURT:  Okay, that's fine.

15        MR. BERNICK:  I guess that would then -- we would

16 then withdraw our request to schedule the New York summary

17 judgment motions because that falls within the same rubric.

18 For Your Honor's information, New York has got a choice of law

19 -- a statute of limitations that's triggered by the date of

20 installation which we believe can be ascertained from the proof

21 of claim or in any event, extremely easily.  That's why that

22 was T'd up but we'll take that off the agenda for today.

23        Then Jan correctly, but I think that brings us to

24 item 13.

25        THE COURT:  Wait, Mr. Bernick, before you move off

1 | 12, I want to make it clear.  If the responding parties want to

2 | go forward in advance, I'm happy to do that.  It's just that if

3 | they don't want to go forward because they think they need the

4 | discovery, I don't want to continually deal with these

5 | discovery deadlines.  I want one discovery deadline, let's get

6 | through it and then we'll address it later.

7 | So, as to the New York issues, if the responding

8 | parties want to go forward, I'm happy to do that.  If not, just

9 | withdraw this, I guess your withdrawal is fine.  I just want to

10 | clarify what I'm saying.

11 | MR. BERNICK:  Yes. I understand that.  I'm somewhat

12 | skeptical that anyone will want to agree to earlier briefing,

13 | but certainly if Mr. Speights wants to have -- will agree to

14 | have New Your briefed, then we'll reach out to him and develop

15 | a schedule.  I don't think that that's going to be so.

16 | THE COURT:  All right.

17 | MR. SPEIGHTS:  Your Honor, this is Dan Speights.  I

18 | advised Mr. Bernick's office before we ever put this on the

19 | agenda that I did not want to agree with that.

20 | THE COURT:  Okay.  So, items 11 and 12 are deferred

21 | until whatever the -- I'm sorry --

22 | MS. ESAYIAN:  12 and 13.

23 | THE COURT:  Oh, I apologize.  Items 12 and 13 are

24 | deferred until -- to be treated under the case management order

25 | which governs.

1          MR. SPEIGHTS:  Right.

2          THE COURT: Okay.

3          MS. ESAYIAN:  And, that brings us to item 14, Your

4  Honor, that was the -- that's a status on the requirement that

5  the Speights and Runyan firm provide signatures from Canadian

6  claimants for one of the questions on the PD questionnaire.  We

7  did receive 89 out of 97 signatures.  For the remaining eight

8  Canadian claims, Mr. Speights and I have agreed to a

9  stipulation and order to expunge those claims and I can hand

10  the order up to Your Honor.

11          THE COURT:  All right.  Mr. Speights, the order I've

12  been handed simply disallows and expunges the eight Canadian

13  property damage claims which are on Exhibit A that's attached

14  to the order.  Hamilton District School Board, Bell Canada,

15  Southern Ontario Properties, Shell Canada, LaBatt Brewing,

16  LaBatt -- two of those for LaBatt Brewing, pardon me, the

17  Record and Providence Healthcare.  Is that your agreement?

18          MR. SPEIGHTS:  Yes, Your Honor.  I assume what has

19  been handed to you has my signature on it.  I've already signed

20  and sent it back to counsel.

21          MS. ESAYIAN:  Yes, the stipulation is signed in the

22  first page, Your Honor.

23          THE COURT:  Yes.  It does have a signature, Mr.

24  Speights.  I wouldn't want to guess at whose it really is, but

25  if you'll verify that that's yours, that's great.

**J&J COURT TRANSCRIBERS, INC.**

1          MR. SPEIGHTS:  If it's illegible, it's mine, Your

2 Honor.

3          THE COURT:  Okay.  It's yours.  All right, that order

4 is entered.  This is with respect to item 14?

5          MS. ESAYIAN:  That's correct, Your Honor.

6          THE COURT:  Okay.

7          MS. ESAYIAN:  That leaves 15 and 16, which relate to

8 various Anderson Memorial issues and I believe Mr. Bernick is

9 going to address those.

10          THE COURT:  Okay.  Just one second until I get my

11 note made here, please.  Okay, Mr. Bernick.

12          MR. BERNICK:  Yes.  I think last time we had a very

13 extended discussion of discovery matters relating to Anderson,

14 a discussion which we will not recount today.  And I think at

15 the conclusion of that, Your Honor indicated that because the

16 matter really had come up earlier than what you had

17 anticipated, that you wanted to take a look back at the

18 materials.

19          In the meantime, we had a telephonic meet and confer

20 with Mr. Speights.  I think coming out of that meet and confer

21 were two things.  One was a request, an expedited request to

22 take the deposition of the records custodian.  That matter --

23 the motion for expedited treatment, Your Honor denied that and,

24 therefore, the request for the records custodian is not up

25 today.  There was a further undertaking by Grace to go look for

1 documents that specifically related to Anderson Memorial

2 itself.  That is the underlying documents relating to Anderson

3 Memorial as opposed to all these things that got into the class

4 action litigation.  And the company is looking for those

5 documents.

6        And, then the last item I think that was outstanding,

7 was the review of the transcript and Your Honor now has under

8 -- as submitted by the South Carolina court, that transcript.

9 Your Honor asked last time if you could have some guidance from

10 the parties on what part of the transcript was actually

11 germane.  We've not really been able to determine that without

12 getting access to it.  I think we contacted your chambers who

13 suggested that the matter be raised before you today.  We would

14 like to have permission to look at the transcript so that we

15 can pick out the parts that we think would be most helpful to

16 Your Honor to the extent that there's anything there that's

17 helpful, and I'm sure that Mr. Speights would want the same

18 kind of opportunity.  So, if Your Honor can give us that

19 permission today, we will be back to you with the parts of the

20 transcript that we think are germane, if any.

21        THE COURT:  Okay.  I thought at the last hearing I

22 said that you could contact my staff and tell me what copies of

23 things you needed because I've only gotten this in paper copy,

24 I don't have it electronically.  So, you know, there are, I

25 think, four boxes of records, one of which I think is the

1 docket and the other three are a lot of things other than the

2 transcript.  I think they're all the pleadings that were filed

3 in the case.  And, you know, you -- unless Mr. Speights has

4 some objection and I doubt it since Grace was a party too, you

5 can both have access to the whole nine yards. It's just that I

6 need it at the end so that I can --

7 　　　　　MR. BERNICK:  I understand that.  And with that,

8 there's probably -- we'll accept -- we thought that we were

9 supposed to raise that again with you today.  But we're happy

10 and ready, willing and able to go look at the transcript to

11 make some suggestions, and that Mr. Speights, I'm sure, will do

12 whatever he thinks is appropriate.

13 　　　　　MS. ESAYIAN:  We'll just have someone contact your

14 chambers, then, Your Honor, and make arrangements to borrow

15 those materials from you, and we'll make a copy for Mr.

16 Speights as well.

17 　　　　　THE COURT:  Mr. Speights --

18 　　　　　MR. SPEIGHTS: Your Honor, this is Dan Speights again.

19 I think what you have is a certified copy of the court file

20 from South Carolina and while I have no reason at all to

21 suggest that lawyers shouldn't take your copy, or do anything

22 with it if they took it away, I do want to point out it is the,

23 you know, the Court's copy that was given to you.  So, at least

24 I would want you to -- if you're going to permit counsel to

25 take it and copy it, to at least give directives on how that

1  should be done, et cetera, et cetera.  I know my clerk -- I

2  know the clerk of the court in South Carolina was very nervous

3  about sending off all of these materials under seal to Your

4  Honor, a certified copy of everything.

5          At the end of the day, we need to be able to point

6  back to the record as it is, so the integrity of the file needs

7  to be maintained.  I really didn't know this was coming up

8  today, nobody told me that and I really hadn't thought it out.

9  But, clearly, Grace is entitled to see everything that Your

10 Honor has, I think Grace has everything Your Honor has, it just

11 happens to be in the lawyers office who handled the case,

12 rather than bankruptcy counsel.

13         MR. BERNICK:  Well, it may or may not be that that is

14 true.  I wouldn't be certain that it is, but whatever it is, I

15 believe that the Court here is asked to receive whatever it is

16 that he South Carolina court has gotten and from that point of

17 view, it would just make sense that we ought to be working with

18 the same documents and we'll abide by whatever instructions

19 Your Honor determines are appropriate in terms of how we work

20 with those materials.  We don't really care.  Whatever Your

21 Honor wants to do is fine with us.

22         THE COURT:  Mr. Speights, you already have a set of

23 these materials or -- because I think what I would do is just

24 direct Grace to take them to a copy center, get two sets made,

25 one for Grace and one for you, you know, have somebody wait or

1 take them to a local office if you prefer here, your local

2 counsel's office and get two sets made, one for Grace and one

3 for you unless you've already got a copy of the certified

4 documents.

5        MR. SPEIGHTS:  Well, if you're going to make a set, I

6 would want a copy, too, so we would know that we're referring

7 to the same line and verse on everything, although I believe

8 everything that was there I would have somewhere in my office,

9 I don't have it as a discrete set as you would have and Grace

10 would have and so, if we start referring to certain aspects of

11 the file later on, I would want a copy, too.  And I think

12 that's appropriate, Your Honor, to send it somehow to a copy

13 shop and have copies made for both of us.

14        MR. BERNICK:  Well, would it be --

15        MR. SPEIGHTS:  I'm not going to question how you do

16 it, Your Honor, I just know it's your file, and not our file.

17        MR. BERNICK:  Maybe in order to cut through this,

18 would counsel have an objection if we simply asked Mr.

19 O'Neill's firm to come over to -- well, I guess they're in

20 Pittsburgh --

21        THE COURT:  They're in Pittsburgh, yes.

22        MS. ESAYIAN:  Reed Smith, yes.

23        MR. BERNICK:  Yes.  So, maybe have the Reed Smith

24 people come over to your chambers or make arrangements through

25 your chambers to have a copy service come and pick up the

1  documents, make two copies at our expense, return the original

2  to Your Honor's chambers, have one of the copies sent directly

3  from the copy service to Mr. Speights and the other copy sent

4  from the copy service to Grace.  That way, Grace never touches

5  it, we'll simply make the arrangements to have the copy made.

6          THE COURT:  Mr. Speights, is that okay?

7          MR. SPEIGHTS:  Your Honor, I have no problem with

8  that if it's okay with you.  Again, it's your file and if that

9  suits you, it suits me.

10         THE COURT:  Well, I will know if -- I will make a

11 copy of the docket sheet, Mr. Speights, before I release

12 custody of any -- and I'll know whether I get the whole file

13 back because I'll check it against -- all right, I won't

14 personally, but I'll have somebody check it against the docket

15 sheets.  So, if something is missing, we'll know that something

16 is missing because I believe the clerk's letter indicates that

17 it's a complete copy of the entire file.

18         Frankly, it may be better since Reed Smith is

19 accustomed to making these kinds of copies, you know, to have

20 it in the custody of a law firm for that purpose, but we've had

21 some success -- we used to have a copy service here at the

22 clerk's office, but we don't anymore because people don't use

23 copies, so it would have to go out to a place like Kinko's or

24 something on that order.  So, Mr. Speights, what do you prefer?

25         MR. SPEIGHTS:  I don't -- Your Honor, I have great

1  respect for Reed Smith.  If Reed Smith knows this is your file

2  and you're giving it to them with instructions to do it a

3  certain way, I'm confident they'll do it that way.  It's

4  whatever you're comfortable with.

5          THE COURT:  All right.  Well, I would --

6          MR. SPEIGHTS:  I'm not trying to be a problem here, I

7  just wanted to point out it's your file, it's the court file

8  and whatever way is the best way to keep the integrity of the

9  file I'm in favor of.

10         THE COURT:  All right.  Well, I will check with the

11 clerk of the bankruptcy court, Mr. O'Neill if you could call --

12 you'll be calling in tomorrow anyway, I will let you know

13 tomorrow what the clerk prefers to have done.  I doubt that

14 he's going to be able to have a staff person here -- because I

15 think it's going to have to go somewhere else, it's a very big

16 copy job and I think it would probably take a staff person two

17 or three days if we had to do it one page at a time here.  We

18 simply, probably can't do that.  If he can, somehow manage to

19 do it, that's the way I'll have it done. I'll just have it

20 copied here, we'll send you a bill for the copies, the Debtors

21 can pay for them, you can tell me what addresses you want me to

22 send them to, and that will be that.  Otherwise, I think either

23 a law firm in town or a copy service would be acceptable,

24 however, the clerk wants to do it, will be up to the clerk.

25 They're actually, you know, the clerk is really the custodian

1 of the files, not me.  So, I would prefer to make sure that the

2 clerk is happy with whatever method.

3          So, Mr. O'Neill, if you'll call Ms. Baker or Mrs.

4 Cannelli tomorrow morning, I'll let you know how it's going to

5 be done.

6          MR. O'NEILL:  We'll make those arrangements, Your

7 Honor.

8          THE COURT:  All right.  And, then, also we'll need to

9 get both the address where the Debtor wants the copy sent and

10 Mr. Speights's copy from you tomorrow if you could, Mr.

11 O'Neill.

12          MR. O'NEILL:  Yes, Your Honor.

13          THE COURT:  Okay.  Mr. Bernick.

14          MR. BERNICK:  I think that that's all that we really

15 had and then once those designations are made, I think that at

16 the next omnibus we'll take up Mr. Speights' motion.  Maybe by

17 that time if Your Honor has had the opportunity to look at the

18 -- well, I think -- we will get designations from the files to

19 Your Honor as I'm sure Mr. Speights will, and I think it really

20 is at that point up to Your Honor to give us further guidance

21 on how you want to proceed with the discovery in this, if any.

22          THE COURT:  All right.  I hope to get that off my

23 desk as soon as possible.  So, the sooner you folks can do this

24 the happier I will be.

25          MR. BERNICK:  Great.

1          THE COURT:  I really don't want this one to last --

2   wait very long.  I don't want to hold up the discovery process.

3          MR. BERNICK:  I think that beyond that, there were

4   only two other administrative matters that we wanted to point

5   out to Your Honor this afternoon.  One was that following or in

6   connection with Your Honor's decision on the ZAI matter, which

7   we will say at least for the Debtors obviously reflects a lot

8   of work from the Court and we hope will be material to ongoing

9   discussions and maybe lead to some progress in resolving the

10  case, but as a consequence of that, Your Honor indicated that

11  the ZAI matter would be on for a status on January the 22nd, I

12  believe, which has now been shifted to the 23rd.

13         Mr. Westbrook contacted the folks at Reed Smith, or

14  us, I'm not sure, which but in any event, indicated that he was

15  going to be out of the country at that time and asked if we

16  could put the matter over till the February omnibus and we're

17  agreeable to that and we would ask that Your Honor's order

18  would call for deferring the status conference on ZAI to the

19  February omnibus.

20         THE COURT:  Sure, that's no problem.

21         MR. BERNICK:  And then, finally, we did want to

22  remind Your Honor of all the blizzard of things that you face,

23  there is one matter that has been under submission, briefed and

24  I think Your Honor was going to rule, and that had to do with

25  the late authorization issue.  You'll recall that there were

1  some of Mr. Speights claims where he purported to get authority

2  after the bar date for the presentation of proofs of claim that

3  were made by his office as a result of the bar date.  And if

4  I've got the characterization wrong, I apologize, but we call

5  it the late authorization issue, or after the fact

6  authorization.  That was a matter that was briefed and argued

7  before Your Honor and you were going to rule and I think it

8  still is probably the only thing that's out there today.

9        THE COURT:  No, actually I forgot about that one, Mr.

10 Bernick.  I have one other, it's the State of Montana issues

11 that I'm working on right now.  So, I totally forgot about the

12 authorization issue, I'm glad you raised it because it just

13 simply slipped off my radar screen.  So, I will get that one --

14 get somebody started on that, probably not until the first of

15 the year at this point, because I have someone else working on

16 the Montana issue right now.

17       MR. BERNICK:  Okay.  And, that's all that we have,

18 Your Honor.

19       THE COURT:  Do you know, Ms. Baer where the

20 authorization issue resides, what agenda, what hearing?

21       MS. BAER:  It was argued at the August 21st omnibus

22 hearing, Your Honor, and it was originally the Debtor's 13th

23 omnibus which was docket number 9311.

24       THE COURT:  Oh, wait, excuse.  The 13th omnibus?  At

25 docket number what?

1          MS. BAER:  9311.

2          THE COURT:  Okay.

3          MS. BAER:  And then there were some supplemental

4  briefs on this specific issue.  I can give you those docket

5  numbers also.

6          THE COURT:  All right.

7          MS. BAER:  9607.

8          THE COURT:  Okay.

9          MS. BAER:  11621.

10          THE COURT:  11621.

11          MS. BAER:  11712.

12          THE COURT:  11712.

13          MS. BAER:  And, 11709.

14          THE COURT:  11709.

15          MS. BAER:  Those were a mixture of Grace briefs and

16  briefs from the Speights and Runyan firm.

17          THE COURT:  Okay.  Thank you.

18          MR. BERNICK:  That's, I think, all we have for today,

19  at least for the Debtors.

20          MS. SPEIGHTS:  Your Honor, I would like -- this is

21  Dan Speights again.  I just want to comment on the

22  authorization matter that Mr. Bernick just brought up.  There

23  is no question that you took the matter under advisement.  I

24  understand that.  I just want to say that during the argument

25  on that matter, I made the suggestion that the authorization

1  issue should be decided at the same time as the certification

2  issue because the two are interrelated and I'm sure that's

3  reflected in the briefs and the record, but I did not want my

4  silence to suggest that I thought you ought to decide that now.

5  You certainly took it under advisement and you have every right

6  to decide it now, but I did make the argument that it should be

7  decided at the same time as certifications.

8          THE COURT:  Okay, thank you.  Mr. Baena.

9          MR. BAENA:  May it please the Court, Scott Baena on

10  behalf of the Property Damage Committee.  Judge, I'm here,

11  actually to take you up on an offer you made a long time ago.

12          As you know, the parties are very, very focused right

13  now on property damage claim issues.  There is a hearing on

14  methodology before Your Honor at the end of January, there's

15  only one more omnibus hearing between now and then and it's six

16  days ahead of the hearing.

17          In addition, claimants and the Debtors are focused on

18  the objections that the Debtors have lodged in respect to their

19  claims and that gets rolled out over the spring and summer

20  months.  And, inevitably there will be eruptions in those

21  proceedings regarding discovery regarding issues concerning

22  witnesses and the process.  Indeed, motions were filed today,

23  in respect of the claims objection process and the late

24  designation of witnesses that need to be attended to by Your

25  Honor.

1     The problem we have is that we don't understand the

2 method of getting before Your Honor, other than at an omnibus

3 hearing.  You had indicated way back, when we conceptualized

4 this whole process, that it wouldn't be necessary to wait,

5 recognizing that, indeed, we couldn't wait, for omnibus

6 hearings.  And so I inquire as a result of all that, Judge, how

7 we go about now getting matters set?

8     THE COURT:  Just call Mrs. Cannelli, my courtroom

9 deputy here in Pittsburgh, try to get some dates and times.

10 What she will want to know, basically, is what the issue is, in

11 global terms.  You know, it's a discovery dispute, for example,

12 and you're going to need two hours to argue it.  Because she

13 will fit those cases into whatever else I have going on in the

14 case.  It will not be, in all probability, just a day for Grace

15 cases, especially through the end of January.  I don't think I

16 have any days that are not already committed to something.

17     So, if we can do most of them by phone, so that

18 people don't have to travel here, maybe all of them by phone,

19 unless there's some evidentiary hearing that's required, then

20 you have to be here.  But if it's a discovery issue, in all

21 probability it's not going to be an evidentiary hearing.

22     MR. BAENA:  I'm not anticipating evidentiary

23 hearings, Your Honor, but could I impose upon the Court most

24 respectfully, to apprize Ms. Cannelli that we would be

25 contacting her for that purpose?

1          THE COURT:  Oh, yes.

2          MR. BAENA:  So it's not a total surprise?

3          THE COURT:  She'll be surprised anyway, but yes, I'll

4     tell her.

5          MR. BAENA:  And, I do appreciate Mr. Bernick bringing

6     up your decision in the Zonlite case.  Obviously, we are very

7     carefully scrutinizing and reviewing that opinion, from a

8     number of perspectives, including its impact on the methodology

9     trial.  And, indeed, we may wish to visit with you about that

10    as well.  I appreciate Your Honor, we'll call Ms. Cannelli and

11    make those arrangements.

12         THE COURT:  Yes, that's fine.  Her number is the same

13    as the main phone number here.  412-644-3541.

14         MR. BAENA:  The same number.

15         MR. BERNICK:  Okay.  With respect to that, and I

16    appreciate Mr. Baena raising this as a process point because a

17    lot of things are going to be happening, but one of the virtues

18    of the omnibus process is that it creates certainty on A)

19    people's schedules and availability and B) that we don't bet

20    overrun with expedited motions and the like.

21         And, I'm assuming that Your Honor would be following

22    what I think has become the practice of this case still, which

23    is that we only make arrangements for hearings on days other

24    than the omnibus, A) significantly far in advance so that

25    people can get their schedules.  For example, we had the motion

1  to compel hearing on the 5th of December, and the like, and

2  that B) if something is being scheduled not far in advance but

3  on a short notice and not on an omnibus date, that there's

4  some, you know, pretty pressing emergency that's associated

5  with it, because otherwise, I think what we're going to have is

6  that people seeking our Your Honor's advice on more of an ad

7  hoc basis, which isn't to suggest that the issues aren't

8  meritorious but becomes then extremely difficult to get people

9  together for these matters that are not on the omnibus

10  hearings.

11        THE COURT:  No, Mr. Bernick if something can be

12  scheduled on the omnibus, it should be scheduled on the

13  omnibus.  If somebody requests something on an emergency basis

14  and I don't think it's an emergency, as I've done in the past,

15  I'll deny the emergency and schedule it on the omnibus.  So, my

16  preference, the reason I do omnibus hearings, is so that

17  everybody who is interested in the case knows when to show up,

18  knows when to put their motions on.  Occasionally, things don't

19  it in that track, but for the most part they should.  I very

20  rarely have any hearings or arguments on discovery motions.  My

21  general view is, if somebody wants it, give it to them. If

22  you've got a claim of privilege, assert it, do it the way the

23  rules require and that's that.  Otherwise, if somebody wants

24  something, in all probability the federal courts are not trials

25  by ambush, so generally speaking, give it to them.  If there's

1 a legitimate objection, raise it.

2      What I want from you, if you're going to do a

3 discovery dispute is, I want to know the specific items that is

4 contested, I want any response that has been submitted, I want

5 to know why you're contesting it, I want a brief statement of

6 the law that supports your position.  And I want to know if

7 there's something less onerous, I'll put it those terms, that

8 is acceptable by way of a resolution, at least to get you

9 forward so that you can get something in and reserve the right

10 to come back for additional information if what you get in

11 isn't sufficient.

12      I expect you to meet and confer as the local rule

13 requires before you file any of these discovery matters, in a

14 good faith effort to get them resolved.  By way of response, I

15 want exactly the same thing.  I want to know what response

16 you've given, I want to know why you haven't responded in full,

17 what the objection is, the law that supports it, and what

18 you're willing to produce without the need for any further

19 hearing.  I do not want the whole panoply of everything that

20 you've submitted.  I only want the parts that are in dispute

21 with the responses for them.  So, let's say you've submitted

22 25 interrogatories and two are in dispute, I only want the two

23 that are in dispute.

24      MR. BAENA:  Understood, Judge.  And, I'm not

25 predicting, you know, lots of discovery disputes, but I'd like

1  to be prepared.

2          THE COURT:  Yes.

3          MR. BAENA:  And the methodology issue is really the

4  pressing one.  Your Honor has said many, many times there's

5  very few things that are emergencies and I don't want to have

6  to call everything an emergency to get somebody's attention.

7  When you have a hearing date of January 29, that alone creates

8  a sense of urgency to get resolution.  And, if the next omnibus

9  hearing is January 23, that resolution may come too late in the

10  day.

11          THE COURT:  Yes, I appreciate the fact that sometimes

12  the schedules just happen to work that way, but the general

13  rule is -- oh, I should add one thing in this case with respect

14  to discovery disputes because if they're not coming up in the

15  binders, I may not know about them.  So, you have to email

16  whatever your filing to my Delaware clerk, whose name is now

17  Jennifer Capone Cook.  Jennifer Cook.

18          MR. BAENA:  Jennifer Cook.

19          THE COURT:  And, please also do just a courtesy call

20  to Ms. Baker or somebody on my staff, to let her know that it's

21  been filed because I would like to try to take care of

22  discovery issues as soon as I can.  I really don't like to have

23  them sitting around.  Once in a while I have to, but I'd prefer

24  not to.

25          MR. BAENA:  Okay, thank you, Judge.  We'll adhere to

1   that.

2         MR. BERNICK:  And, in terms of the methodology, we

3   haven't heard about this from counsel, we'd be more than

4   interested to hear what their ideas are and so, we'll look

5   forward to hearing that when it's appropriate.

6         I guess there's only one other administrative -- I

7   dint' want to cut Mr. Baena off, is there something else that

8   he wanted to raise?

9         THE COURT:  He's sitting, no there's nothing else.

10        MR. BERNICK:  Okay.  Your Honor has received -- Your

11  Honor granted a motion for some further limited briefing on the

12  questionnaire process and you have, I believe, received briefs

13  both from the Debtor and from I think three of the firms.  Can

14  you give us any indication about when you expect to be able to

15  rule on that outstanding issue?

16        THE COURT:  Is this not tied up with the x-ray issue?

17        MR. BERNICK:  No, the x-ray issue is separate.

18        THE COURT:  Okay.  What's --

19        MR. BERNICK:  This was the issue --

20        THE COURT:  Oh, the 408 issue.  On the 408 issue.

21        MR. BERNICK: Yes, this is the -- well, it was the --

22        THE COURT:  The consulting privilege.

23        MR. BERNICK: -- the consultants privilege, that the

24  argument was over whether we get access to B. Reads that relate

25  to the same claimant that haven't been produced because only

1 certain of the B Reads have been produced and the remainder

2 have been claimed to be subject to the consultant's privilege.

3 　　　　THE COURT:  Okay.  I've received the Debtors brief,

4 if other briefs were filed, they -- I don't know when they came

5 in.  When I left here around 11 o'clock or 12 o'clock on Friday

6 morning, they were not filed and I have been in court since

7 then, so I haven't had a chance to check.

8 　　　　MR. BERNICK:  Okay.  Well, they would ave been filed

9 after that and, obviously, then Your Honor hasn't had a chance

10 to take a look at them.  We were just -- because of the January

11 12th date, we were just focused on whether you had some

12 particular expectation about when you'd be able to rule.

13 　　　　THE COURT:  Well, I'm hoping that I can --

14 　　　　MR. BERNICK: Beyond that, I won't go any further at

15 risk of irritating the Court.

16 　　　　THE COURT:  Do you have -- Mr. Bernick, do you know

17 the docket number so that I can pull the responses.  If I can

18 I'll try to read them tonight, and give you a ruling tomorrow.

19 　　　　MR. BERNICK:  Oh, maybe -- Natalie, do you have those

20 there?  Is she still there or is she gone?

21 　　　　THE COURT:  No, she left.

22 　　　　MR. BERNICK:  Okay.  Hang on, I think I've got the

23 briefs here, hang on.

24 　　　　MR. BAENA:  I don't think there's anybody here from

25 PI anymore, Judge.

1        THE COURT:  Oh, that's right.  So, they won't be here

2  to know about the ruling tomorrow.

3        MR. BERNICK:  Let me make this simpler, Your Honor.

4  We will send you, because I'm sitting here with a bunch of

5  stuff on my would be vacation and I've just gotten it and I can

6  pile through it while everybody is sitting here listening to

7  me, but it might be a little bit easier if we just communicated

8  the docket --

9        THE COURT:  Just call Ms. Baker, she can do a search

10  and probably find them, too, but I don't want to miss any and

11  then I think what the Debtor may need to do is try to notify

12  the PI people that in addition to the issue I said I'd deal

13  with tomorrow, they'll probably be involved anyway since it's a

14  PI issue tomorrow, that I will attempt to make a ruling on the

15  record tomorrow.  I'm not promising, I will try.  My main

16  commitment tonight is, hopefully try to finalize the Pittsburgh

17  Corning plan confirmation order.  So, if I can do that, then

18  I'll get to this next.  If I can't then for whatever reason, I

19  will do this tonight.  I'll do my best.

20        MR. BERNICK: Okay.  Is Barbara Harding still on the

21  line?

22        MS. HARDING:  I am, David.  I have them in front of

23  me as well, but I can't tell what the docket number is, so

24  we'll have to get that.  I'll talk to Jan right after this

25  hearing and we'll get that to the Court right away.

1          MR. BERNICK:  Okay great.

2          THE COURT:  All right, okay.  Thank you.

3          MR. BERNICK:  Thank you, Your Honor.

4          MS. BAER:  Your Honor, I've got two other

5    housekeeping orders that we have with us that I'd like to see

6    if we could entered.

7          The first one, Your Honor, is the amended order

8    scheduling the omnibus hearing dates.  This is the order that

9    reschedules both the January date which we had sent out a

10   separate notice on and it also reschedules the hearing which

11   was going to be at the end of April and it reschedules it until

12   May 2nd.  And that was pursuant to an email that your chambers

13   sent us asking for us to --

14         THE COURT:  Okay.  Yes, because the Third Circuit

15   Judicial conference apparently messed up my days.

16         MS. BAER:  We filed a certification of counsel on

17   this on the 15th, docket number 14042 and I have the

18   certification of counsel and the order right here.

19         THE COURT:  I'll take them.  Okay, that order is

20   signed.

21         MS. BAER:  Thank you, Your Honor.  The other

22   housekeeping matter is, on August 25th, we filed a

23   certification of counsel 13068, on an order approving the terms

24   of a stipulation with Williams Industry.  This related, Your

25   Honor, to an unsecured claim in the amount of $10 million

1  dollars and the agreement on the stipulation was an allowance

2  of a claim of $145,000 and somehow it slipped through the

3  cracks and didn't get entered.  So, I haves the order as well

4  as the certification of counsel and would ask if you could

5  enter this order today.

6          THE COURT:  Was it emailed because if it's not

7  emailed to my staff, I don't get them.

8          MS. BAER:  We understand it was sent the way they

9  always are, whether emailed both to Delaware and to Pittsburgh

10  and somehow it just did not get entered.

11          THE COURT:  All right.  I'll take it.  I really -- I

12  remember this issue, I do not remember the order.  Okay, that's

13  entered, too.

14          MS. BAER:  Thank you, Your Honor.  That's all the

15  items that the Debtor has on its agenda as well as clean up for

16  today.

17          THE COURT:  Any other matters?

18          UNIDENTIFIED MALE SPEAKER:  Just wish to extend our

19  best wishes, Your Honor.

20          THE COURT:  Thank you, you too.  Happy Holidays and

21  safe travels home.  I'll see you in January.

22          MS. BAER:  Thank you.

23          MR. BERNICK:  Thank you, Your Honor.

24          THE COURT:  We're adjourned.

25                              *****

**J&J COURT TRANSCRIBERS, INC.**

**CERTIFICATION**


    I, ELAINE HOWELL, court approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter and to the best of my ability.




/s/ Elaine Howell        Date: January 2, 2007

ELAINE HOWELL

J&J COURT TRANSCRIBERS, INC.