IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| W. R. GRACE & CO., *et al.*[1] | ) | Chapter 11 |
| | ) | |
| Debtors. | ) | Case No. 01-01139 (JKF) |
| | ) | (Jointly Administered) |
| | ) | |
| | ) | Re: Docket No. 14100 |

RESPONSE OF CLAIMANT ROBERT H. LOCKE
TO DEBTORS' OBJECTION TO CLAIM OF ROBERT H. LOCKE
AND AGREEMENT FOR REFERRAL TO MEDIATION

On December 21, 2006, the Debtor filed an Objection to Robert H. Locke's Claim No. 9566, together with a request for referral to mediation [Docket No. 14100] (the "Objection"). Locke hereby opposes the Objection, but joins the Debtor's request for referral to the ADR Program established by this Court's ADR Order of November 8, 2004.

---

[1] The Debtors consist of the following 62 entities: W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.), W. R. Grace & Co.-Conn., A-1 Bit & Tool Co., Inc., Alewife Boston Ltd., Alewife Land Corporation, Amicon, Inc., CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace II, Inc., Creative Food ‖N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC (f/k/a Dewey and Almy Company), Ecarg, Inc., Five Alewife Boston Ltd., G C Limited Partners I, Inc. (f/k/a Grace Cocoa Limited Partners I, Inc.), G C Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC Management Corporation, GN Holdings, Inc., GPC Thomasville Corp., Gloucester New Communities Company, Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical Company of Cuba, Grace Culinary Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe, Inc., Grace H-G Inc., Grace H-G II Inc., Grace Hotel Services Corporation, Grace International Holdings, Inc. (f/k/a Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W. R. Grace Capital Corporation, W. R. Grace Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-Caribe Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai Development Company, L B Realty, Inc., Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH, Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Inc., MRA Holdings Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (f/k/a Nestor-BNA, Inc.), MRA Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental Liability Management, Inc., E&C Liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin & Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country Staffing), Hayden-Gulch West Coal Company, H-G Coal Company.

## Claimant

This Response is filed by Claimant Robert H. Locke in support of his Claim No. 9566 (the "Claim") in the amount of approximately $6-7 million for age and handicap discrimination. This Claim arises from a civil action filed by Locke in the Middlesex (Massachusetts) Superior Court, Civil Action No. 99-2530, *Robert Locke v. W.R. Grace and Robert Bettacchi* for violation of his rights as protected by Massachusetts General Laws Chapter 151B, § 4 by terminating Locke's long-term employment with Grace on account of Locke's age and disability. Locke's Claim was timely filed with this Court.

## Basis for Locke's Opposition to Debtor's Objection to His Claim

### Locke's Employment with Grace

1.   Locke was a Grace employee for more than twenty-five years until his termination in July 1998. He held senior level management positions since 1982 and was first appointed as a Grace Vice President in Grace's Polyfibron Division in 1988, at which time he was named Vice President and Chief Operating Officer of Diamonite Products of Shreve, Ohio, a fully-owned subsidiary of Grace. Previously, Locke had been General Manager of Diamonite products. Subsequently, Locke was promoted from Grace's Polyfibron Division to Grace Construction Products (GCP) in Cambridge, Massachusetts. In that position he reported directly to Robert Bettacchi.

2.   Locke assumed significant responsibilities at GCP. His initial position was Vice President and General Manager, Specialty Materials Group. Five individual operating businesses, each run by Vice Presidents, General Managers and Directors, reported to him. In 1992, Locke was promoted to Global Vice President and Chief Technical Officer at GCP, still reporting to Bettacchi.

3. By the time of his termination in 1998, Locke was responsible for nine direct-reports, eight of whom involved research and development activities. In the area of Research and Development alone, Locke's direct reports included 155 salaried personnel, including about 30 Ph.D.'s and other degree personnel, and a $17 million global budget. In addition, Locke was responsible for the area of New Business Development, which had a single salaried employee and a budget of just $300,000.

### Events Leading to Locke's Termination

4. In May 1994, Locke became temporarily incapacitated due to depression and anxiety while on a business trip to Jakarta, Indonesia. Bettacchi witnesses this breakdown and GCP's head of Human Resources was also aware of it. Bettacchi interrogated Locke at length about this breakdown. He was returned to the United States and took a five-week leave to recover. Locke because temporarily incapacitated again in February 1998, at which time he took another leave.

5. Bettacchi treated Locke differently in regard to this second leave, demanding a physician's report before approving the leave and removing Locke from Grace's employee roster. Even though Locke's physician recommended a gradual return to work as an accommodation, Bettacchi's treatment of Locke worsened and grew increasingly abusive and humiliating. Bettacchi criticized Locke in front of others and went out of his way to publicly disagree with Locke's recommendations, all in an effort to place Locke under unbearable stress.

6. Although prior to his illness Locke had consistently received excellent performance reviews and promotions, shortly after his return to work in 1998 Bettacchi gave Locke a highly negative verbal review.

7. Finally, in June 1998, less than two months after Locke returned from disability leave,

Bettacchi told Locke his CTO position was eliminated and Locke would no longer be responsible for Research and Development. Instead, Locke, who had directed 155 employees and managed a $17 million budget, was "offered" the position of Vice President for New Business Development, with a "staff" of one person and a budget of $300,000. That position was virtually identical to one Locke had held at Grace some twenty years earlier. Bettacchi made it clear to Locke, however, that if he accepted this minor position, Bettacchi would subject Locke to severe pressure and that Bettacchi was sure that Locke would fail. At the same time Bettacchi told Locke the stress of this position would be higher than any Locke had undergone, Bettacchi stated that Locke could not handle such stress and was certain to fail. In fact, in the same conversation Bettacchi specifically discussed Locke's 1994 breakdown and his 1994 and 1998 disability leaves.

8.    Nonetheless, while Locke was considering whether to accept the position, Bettacchi informed him that since Locke had not accepted the demotion, his employment with Grace was terminated.

### Locke's State Court Lawsuit

9.    Locke filed suit in Massachusetts Superior Court in May 1999 against Grace and Bettacchi alleging that he was discriminated against on account of his age and his perceived disability, in violation of Massachusetts' employment discrimination statute, M.G.L. c. 151B § 4. Extensive discovery was conducted by all parties.

10.    In January 2001, the defendants filed a motion for summary judgment on the age and disability counts. Locke opposed the motion.

11.    Grace filed this Bankruptcy proceeding in April 2001 and the state court action against

Grace was automatically stayed. On April 27, 2001, this Court entered a preliminary injunction staying actions against certain non-debtor affiliates of the Debtor, which was extended to include managers such as Bettacchi.

12. In May 2003, this Court, at the parties' joint request, partially lifted the stay to permit the completion of discovery and the conclusion of the summary judgment proceeding in the state court.

13. In November 2004, the Massachusetts court allowed the defendants' summary judgment motion only as to the age discrimination count, permitting Locke's disability discrimination claim to go forward.

14. The present claim is based on that disability discrimination claim, as stated in the state court action.

### Locke's Disability Discrimination Claim Is Valid

15. Locke may indirectly prove his disability discrimination claim by using the prima facie case and burden shifting method set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973). *See Dartt v. Browning-Ferris Indus., Inc.,* 427 Mass. 1, 6 n.8 (1998). To establish a prima facie case of employment discrimination on the basis of handicap, "a plaintiff must present credible evidence that (1) he is handicapped within the meaning of the statute; (2) he is qualified to perform the essential functions of the job with or without reasonable accommodation; (3) he was terminated or otherwise subject to an adverse action by his employer [because of his disability]; and (4) the position he had occupied remained open and the employers sought to fill it." *Dartt v. Browning-Ferris Indus., Inc.,* 427 Mass. at 2-4 (plaintiff alleging disability discrimination need not establish as part of prima facie case "that he was terminated (or received some other adverse treatment from his employer)

'solely' because of his handicap"); *Katz v. City Metal Co., Inc.,* 87 F.3d 26, 32-33 (1st Cir. 1996). Locke presents credible evidence to support each element of his prima facie case.

16.     First, Locke has established that he is handicapped within the meaning of Chapter 151B, which defines "handicapped" to include: "(a) a physical or mental impairment which substantially limits one or more major life activities of a person; (b) a record of having such impairment; or *(c) being regarded as having such impairment."* M.G.L. C. 151B, § 1(17) (emphasis added).

17.     Bettacchi and Piergrossi both witnessed Locke's incapacitation as a result of severe clinical depression and anxiety while on a business trip in Jakarta. Both knew of Locke's first medical leave of absence from his employment, which lasted approximately five weeks. When Locke again became incapacitated in February 1998, and took another leave of absence on doctor's orders, Bettacchi removed Locke from Grace's roster of active employees and listed him as "<u>Disabled</u>, on Leave of Absence" on the inactive roster. (Emphasis added). These facts are highly indicative of defendants' perception of Locke's disability.

18.     Locke also establishes the second element of his prima facie case of disability discrimination, that he was qualified to perform the essential functions of the job with or without reasonable accommodation. "Regarded as" plaintiffs may satisfy the second element of the prima facie case by offering evidence that they were qualified to perform with reasonable accommodation. *See Katz v. City Metal Co., Inc.,* 87 F.3d 26, 33 (1st Cir. 1996). ("Congress, when it provided for perception to be the basis of disability status, probably had principally in mind the more usual case in which a plaintiff has a long-term

medical condition of some kind, and the employer exaggerates its significance by failing to make a reasonable accommodation."). Bettacchi's own testimony establishes that Locke was qualified to perform the essential functions of the CTO position, which Locke had done for years.

19. Locke sustains his burden on the third element of his prima facie case by demonstrating that his perceived disability was a motivating factor in defendants' decision to demote and constructively discharge him. The close timing of Locke's return from his second medical leave and his demotion alone provides circumstantial evidence that his disability triggered his demotion. *See Katz v. City Metal Co., Inc.,* 87 F.3d at 33 (timing of employee's termination, one month after heart attack, was circumstantial evidence from which jury could find that disability or perceived disability triggered the termination, in whole or in part). Defendants' pattern of forcing out other senior executives who had begun to experience health problems further demonstrates that Locke's perceived disability was a motivating factor in their decision to demote and constructively discharge him. *See Dartt v. Browning-Ferris Indus., Inc.,* 427 Mass. at 2-4. Further, as part and parcel of informing Locke of his demotion, Bettacchi specifically referred to Locke's perceived disability and told Locke that in the new position he would be under even more stress than previously, predicting that Locke's perceived disability would cause him to fail in the position.

20. Finally, with respect to the fourth prong of the prima facie case, it is undisputed that defendants filled both the position of VP of NBD and the position of VP of R&D after Locke's demotion and constructive termination. *See Dartt v. Browning-Ferris Indus., Inc.,* 427 Mass. at 2-4.

21. Having met his burden of proving a prima facie case, Locke also succeeds in proving that

the defendants' stated reason for demoting and terminating him was a pretext for discrimination. Locke had been highly successful in managing both the Research and Development and New Business functions of his position. There was no sound business reason for splitting these responsibilities. Bettacchi claimed that he split the New Business Development duties from Locke's position because of a newly instituted emphasis on business growth. Locke contradicts this purported justification by proving, through Grace's Annual Reports, that growth had been a primary goal of the defendants since at least 1990. Moreover, Locke's performance and qualifications did not warrant his demotion which, instead, was entirely consistent with defendants' pattern of forcing out senior management executives who had begun to experience health problems. Instead, a jury is likely to find that Bettacchi removed Locke from his position because Bettacchi wrongfully perceived that Locke was too disabled to perform his job duties, conduct that was in violation of Massachusetts' employment discrimination statute.

**Referral to ADR**

22.    Locke joins the Debtor in requesting that his claim be referred to the Court's ADR Program.

                          Respectfully submitted,

                          SMITH, KATZENSTEIN & FURLOW LLP

                          /s/ Etta R. Wolfe
                          Etta R. Wolfe (ID No. 4164)
                          800 Delaware Avenue, 10th Floor
                          P.O. Box 410
                          Wilmington, DE  19899
                          (302) 652-8400
                          (302) 652-8405 – fax
                          erw@skfdelaware.com – email

                          and

                          Harvey A. Schwartz, BBO # 448080
                          Rodgers, Powers & Schwartz LLP
                          18 Tremont Street
                          Boston, MA 02108
                          (617) 742-7010
                          (617) 742-7225 (facsimile)

                          Attorneys for Robert H. Locke, Claimant

Dated:  January 4, 2007