Estate of Rosario Rapisardi
c/o James P Rapisardi - Executor
2251 Township Line Rd
Logan Twp. N. J. 08085
Work Phone + FAX - 856-467-2904

U.S. Bankruptcy Court                           Jan. 3 2007
District Of Delaware                            W. R. Grace + Co, ETAL
824 Market St - 3rd Floor                       CHapter 11   (JKF)
Wilmington, DE 19801                            Case# 01-01139
ATTEN: Clerk of The Court
RE: Creditor response To Debtor's Filed Notice OF Twentieth Omnibus
    Objection To Claims. - To be Heard Jan 23, 2007

Dear Clerk,
    Enclosed please find Copy of Creditor's Response To Debtor's
    Twentieth Omnibus Objection To claims, with Copies of Court Transcripts
    Exhibits Attached.
    If you have any questions please call or fax me with any
    other documents needed.
    I have Also sent Copies to Debtor's Attorneys.

                            Sincerely,
                            James Rapisardi - Executor OF
                            The Estate of Rosario Rapisardi

The United States Bankruptcy Court
For The District Of Delaware

| | |
|---|---|
| Debtors: | Chapter 11 |
| W. R. Grace + Co, ETAL., | |
| Gloucester New Communities Co. | Case # 01-01139 (JKF) |
| (GNCC) | |
| | (Jointly Administered) |
| Unsecured Creditor: | |
| The Estate Of Rosario Rapisardi. | Creditor's Response To Debtor's |
| C/o James P. Rapisardi-Executor | Filed Notice Of Twentieth |
| | Omnibus Objection To Claims |
| Case # 01-01160  Claim # 15073 | (Substantive) |

Claimant's response to Debtor's Filed notice of twentieth Omnibus Objection is as follows: Several years ago Gloucester New Communities Co. entered into an agreement with the Rapisardi's to purchase their entire farm. In, on or about 1974 G.N.C.C. returned said properties back to Rapisardis, except for the piece of Approx. 4.5 acres that was carved out of lot 3 Block 2304 Logan Twp, Gloucester County, which is the Subject of this Claim.

The 4.5 acres of property was part of a Larger tract of land which contained a Prior Converted Cropland Exemption from the USDA and Army Corps Of Engineers under the section 404 Clean Water Act, and Farm Bills. This entire tract along the front of main Rd, had installed tile underdrains that were connected to ditches. These were

property restrictions of Prior Converted acres, drainage ditches, and Easements were shared with remaining Rapisardi property. When G.N.C.C. carved out 4.50 acres from the Original Rapisardi tract of Land, either G.N.C.C. never explained these restrictions of Prior Converted Croplands, or simply ignored these restrictions, when the 4.5 acres were made available to new owners the Langes.

The N.J. Dept. OF Environmental Protection Enforcement Personnel, claim that when the access road was constructed, together with the filling of lawn areas, and the construction of a duck pond, with the unmaintained and cleaned out drainage ditches, that prior Converted cropland exemption was compromised. In short, the hydrology of the front parts of these parcels has increased along with water table.

To complicate matters, drain tiles were intersected when all this Construction took place on these 4.50 acres. These facts were varified by an Engineering employee of at that time with G.N.C.C., and testified to in a four day trial. Excerpts of Transcripts from Vincent R. Mariani attached.

This has caused major impact of problems for the Rapisardi Estate, and disrupted our Right to Farm, and to build Bene-ficiaries and Heirs homes as directed by Lifetime Estate Plans.

The Estate has incurred unnecessary Legal, Engineering and Crop planting Losses, and expences due to G.N.C.C.'s Conduct.

In Aug. 2003, Claimant filed a response with the Bankruptcy Court to amend current claim amount, for additional Legal, Engineering, Restoration, and daily penalty expences, that have been incurred Since aug 2003, to date.

The transcripts make it clear, that G.N.C.C. does have Liability in this claim, and made a performance guarantee to the Rapisardi's through agreement that G.N.C.C. would be responsible for any losses, incurred by the Rapisardi's in this Land deal. Now G.N.C.C. is using Bankruptcy protection to hide their unclean hands behavior over this Land deal.

The Bankruptcy Court must not dismiss this claim, it is clear that G.N.C.C. knew exactly what they were doing, when P.C. exemption and drain ditches and maintenance restrictions were not added to the Langes new Deed. The Court must also grant an amended claim to pay for additional expences in this case.

C.C. Kirkland + Ellis LLP

777 South Figueroa St. Los Angeles

California 90017

ATTEN: Lori Sinanyan

Also: Pachulski, Stang, Ziehl, Young, Jones,

Weintraub LLP

919 North Market St., 17th Floor. P.O. Box 8705

Wilmington, DE 19899-8705 (Courier 19801)

ATTEN: James E. O'Neill

C.C. U.S. Bankruptcy Court - District of Delaware

Sincerely,

James P Rapisardi-Executor

The Estate of Rosario Rapisardi

2251 Township Line Rd

Logan Twp N.J. 08085

Fax + work Phone-856-467-2904

1/2/07

Claim amount-$680,060.44

Plus additional Expense claim

1

ORIGINAL

1

2

                              STATE OF NEW JERSEY
                              OFFICE OF ADMINISTRATIVE LAW
                              DOCKET NO: ESAO3739-94S

3    NJDEPE and              :
     LAND USE ENFORCEMENT:
4         Petitioners,  :
          VS.                :
5
     JAMES & ROSARIO         :
6    RAPISARDI               :
          Respondents.  :
7    - - - - - - - - - - - - - - - - - - - -

8
                                   January 5, 1995
9                                  Trenton, New Jersey

10   B E F O R E :

11             THE HONORABLE JOSEPH F. FIDLER
               JUDGE OF ADMINISTRATIVE LAW
12

13   A P P E A R A N C E S :

14
               DEBORAH T. PORITZ, ESQ.
15             ATTORNEY GENERAL
               BY: DAVID RESTAINO, ESQ.
16             BY: GAURI SHIRALI, ESQ.
               DEPUTY ATTORNEYS GENERALS
17             Attorneys for the Petitioner

18             LEVIN & HLUCHAN, ESQS.
               BY: TERRIE-ANNE DUDA, ESQ.
19             Attorneys for the Respondents

20

21

22
               JOHN F. TRAINOR, INS.,
23             BY: GINA BOHR-GIOVACCHINI
               CERTIFIED SHORTHAND REPORTER
24             LICENSE NO: XIO-1611

25

4

1          THE COURT: If Counsel are ready,

2    well resume the hearing.  Are you ready?

3          MS. DUDA: I just want to let you

4    know, Judge, my client couldn't be here

5    today because his aunt passed away on

6    Saturday and today is the funeral so he

7    couldn't be here.  I would like to call

8    Mr. Vincent Mariani also known as Dick

9    Mariani to the stand.

10   V I N C E N T   R I C H A R D   M A R I A N I, having

11   been first duly sworn, testifies as follows:

12          THE COURT: Please have a seat.

13   Would you state your full name and spell

14   your last name?

15          THE WITNESS: Vincent R. Mariani,

16   M-a-r-i-a-n-i.

17          THE COURT: Thank you.  Ms. Duda,

18   please go ahead.

19          MS. DUDA: Thank you, Judge.

20   DIRECT EXAMINATION BY MS. DUDA:

21

22          Q.    Mr. Mariani, would you please briefly

23   explain to the Court your educational background and

24   any licensees that you hold?

25   A.    I have a Bachlor's and a Master's degree in

JOHN F. TRAINOR, INC. TRENTON, NEW JERSEY

1    Civil Engineering from the University of Pennsylvania

2    and Lehigh University respectively.  I'm a registered

3    professional engineer in four states Pennsylvania, New

4    Jersey, Virginia and Delaware.  And a licensed Planner

5    in the State of New Jersey.

6          Q.     Would you briefly describe your work

7    history beginning in 1974?

8    A.     In 1974, I came to the employ of Glouster New

9    Communities Company.  I refer to it as GNCC which was

10   the developer of eight acres in Glouster and I came to

11   them as an engineer and during the course of my eight

12   years there I basically administered the engineering

13   work and carried out the construction of site

14   improvements and dealt with the municipalities and

15   regulatory agencies for the type of approvals we

16   needed.  Then in 1982, the project basically was

17   shelled and I came to the employ of Pennoni Associates

18   in February of 1982.  Not surprising my first client in

19   the consulting engineering business was GNCC.  We

20   continued to need engineering services and a good part

21   of my consulting engineering practice since 1982 has

22   been in Logan and Woolwich Townships for various

23   clients in the area.

24         Q.     Can you explain for the Court the

25   development known as Beckett in Logan Township?

6

1    A.    Yes, the Beckett development was to cover 727

2    acres in Logan Township.    There was second section that

3    was much larger in Woolwich Township which no activity

4    has ever taken place since.    The 727 acres had been

5    zoned for 3,000 residential units, approximately

6    100,000 commercial, and approximately 60 acres of

7    industrial land.    The development was never very much

8    of a success.    To date approximately 1,400 homes have

9    been built within Beckett and Logan Townships.    It's

10   still -- the land that is undeveloped is still owned by

11   Glouster New Communities Company but the residential

12   work is pretty much wrapped up at this point.    There

13   are still some tracts of commercial and industrial land

14   left to develop.

15            Q.    Where is the Beckett development in

16   relation to the Rapisardi property?

17   A.    The Beckett development is approximately a half

18   mile to the east of the Rapisardi property.    In

19   addition to the 727 contiguous acres GNCC also owned a

20   French parcel of land, four and a half acres of which

21   was adjacent to what is known as the Rapisardi

22   property.

23                    (Whereupon a map was received and

24                    marked as R-6 for identification.)

25            Q.    Mr. Mariani, this exhibit that has been

7

1   marked as R-6 is what is known as a topographic map of

2   the Rapisardi property.   Can you explain the origin of

3   this map?

4   A.      The topography was prepared in 1973.   At the

5   time, Gloucester New Communities Company had the option

6   of buying 8,000 acres of land including the entire

7   Rapisardi property.   And as a result, we mapped all

8   that land at scale one inch equals 50 feet.   That's

9   what you have here.   Additionally, we superimposed some

10   other information.   As well we superimposed, if I can

11   just show you here, the property line of the four and a

12   half acres that Gloucester New Communities Company

13   retained as part of the option to purchase the

14   Rapisardi property.   We also superimposed the property

15   line for two tracts of land that the Rapisardi family

16   sold to other parties and we've also shown the current

17   Rapisardi home at the corner of Township Line and

18   Center.   We superimposed Petricktown Road and the new

19   buildings that were constructed on the Rapisardi

20   property since 1973 which is the home here and a shed

21   and a barn back in this vicinity here.

22          Q.      So clearly the topographic lines that are

23   on this map are as of 1973?

24   A.      Yes, unless there has been manmade activities I

25   don't think you will find a whole lot of difference in

1    the topography.

2         Q.      Going back to the property, would you

3    explain again?

4    A.    Gloucester New Communities Company had an option

5    to purchase the Rapisardi property.  They elected not

6    to go through with the purchase but the down payment as

7    part of the option entitled them to take four acres of

8    land subject to a certain restriction as to how much

9    maximum frontage.  Essentially this parcel of ground

10   here was what was deeded to Gloucester New Communities

11   Company as part of the set of the failure not to

12   exercise the option.  That four and a half acres of

13   land was sold to the Lang family in 1979 when the Lang

14   family was looking for a place to move their existing

15   home.

16        Q.      What year did the option expire?

17   A.    1974.

18        Q.      Can you explain the significance of a

19   scale of one inch equals --

20   A.    That is a formal scale.  That topography is

21   prepared after development work.  It's a good general

22   scale to do development plans at.

23        Q.      In this area it's written in orchard?

24   A.    Yes.

25        Q.      When was that written in orchard and why?

such an opinion.  If I do permit it, it's
a question of what weight is to be given.
First let's find out his factual
knowledge.

MS. DUDA: Thank you, Judge.

Q.    Mr. Mariani, before this all began, I
think my original question was what is a tile drain,
can you explain what a tile drain is?

A.    A tile drain is basically a soil underdrain.  In
engineering practice we use soil underdrains to dewater
soils for whatever purpose we have.  In the case of
tile drains obviously farmers uses them to dewater the
fields so they can plow earlier in the spring.  The
tile drain is just one method of constructing an
underdrain.  I would dare say if a farmer put in
underdrains today the type of construction probably
would be different from the type of construction that
was used years ago.  There are a lot better techniques
now but however, what they did then seemed to
accomplish the purpose.  That is what I dealt with
during the --

Q.    Have you seen a tile drain?  Can you draw
one?

A.    Yes, I prepared a sketch.  Basically a tile --

Q.    Let's see your sketch?

34

A.      And I prepared a sketch here.  This is the type
of tile drain that seems to be in use in Logan
Township.   It was constructed of terra cotta tiles, the
tiles people use for their roofs in a lot of Latin
American and Mediterranean Countries in Europe to.
Those tiles are placed inverted with the opening to the
bottom on a board and they are put end to end as close
as possible.   There are gaps between -- because there
will be gaps between the tile, the gaps between
basically are where the water migrates.   They are
placed on a board before they are put in the ground
because there is no way to align the tiles any other
way except by putting them on the board because they
have essentially been somewhat well aligned.   If they
were placed at the bottom of the trench that the farmer
dug, there is no way these things would have any
reasonable alignment whatsoever.   The board basically
was a permanent part of the installation because the
board never dried, it was always in a wet condition.
There was no oxygen.   The wood didn't deteriorate.
Over the top of the tile drain was generally placed a
layer of salt hay which took a long time to rot and
basically slowed the progress of dirt washing into the
tile drain and effectively the gaps between the tiles
picked up water and conveyed it to some point away from

he farm field, taking it on a slight downhill path and
generally these things discharged into a ditch, a
manmade ditch and these ditches generally were put on
property lines or various places for the convenience of
the farmers.  Quite often it appeared that two farmers
would share a ditch.  They both dewatered their sides
of the property line.  They put the ditch on the
property line to receive the tile drains.

Q.    Are they installed in a glide system?

A.    Generally they are in a parallel -- they are
directed towards a ditch or a stream.  They run
parallel towards that stream as opposed to a glidterian
(ph) network.

Q.    Can you explain what you mean by
parallel, install parallel?

A.    Probably looking at the sheet here,
I don't pretend specifically to know where the
underdrains are.  Lang told me that they are and the
Rapisardi family told me generally they would run in a
parallel fashion towards this particular ditch here
that was dug on the property line between what used to
be the Rapisardi property and what is the Patain (ph)
property.  The ditch was sort of shared.  It was right
on the property line and picked up underdrains from
both of them sort of running in parallel to them.   I

MS. DUDA: I have a couple of
questions, Your Honor.

REDIRECT EXAMINATION BY MS. DUDA:

Q.    Mr. Mariani, earlier you talked about the
ditch that runs along the Lang property.  How deep is
that ditch?

A.    I would say that's about 12 feet deep typical.

Q.    Mr. Mariani, do you have any -- let me
backup.  Do you know Rusty Lang?

A.    Yes.

Q.    Who is Rusty Lang?

A.    Rusty Lang was a -- well, he was Pat and
Margaret Lang's son.  They owned a property that was
brought by Perland.  Perland moved the Lang home to
this particular property here that we talked about.
Rusty was also a landscape contractor who I dealt with
considerably during this time in business.  He started
in business in 1976, until he died in September of
1994.

Q.    And in your dealings with Rusty Lang over
the years, did you obtain any knowledge of him tearing
up tile drains on his property?

A.    Yes, Rusty occasionally did talk about having
intersected tile drains when they put the driveway into

1          Thank you, Your Honor.

2                    THE COURT: Ms. Duda, anything

3          else?

4                    MS. DUDA: Briefly, Your Honor.

5    REDIRECT EXAMINATION BY MS. DUDA:

6

7          Q.    Mr. Mariani, when did you say Rusty Lang

8    put the house on his property?

9    A.    It was moved to the property in 1979, the later

10   part of 1979.

11         Q.    To your knowledge, did Mr. Lang alter the

12   front portion of his property by digging a pond?

13   A.    Yes.   There's a pond.   I believe in this

14   vicinity in here, there was a duck pound.

15         Q.    Was the topographic information on that

16   map updated to reflect any activity by Mr. Lang on his

17   property?

18   A.    No.

                    MS. DUDA: I have no other

           questions, Your Honor.

                    THE COURT: Okay.  Ms. Shirali?

                    MS. SHIRALI: One last question,

           Your Honor.

     RECROSS-EXAMINATION BY MS. SHIRALI:

Q.      You testified that you're aware of Mr.
Lang removing tile drains as he constructed his
driveway and other features on his property; is that
correct?

A.      What Rusty eluded to in various conversations
over I don't know how many years it was, was that he
had intersected tile drains.  He didn't say anything
about removing -- I don't know if he removed them or
just hit them or what he did when he hit them actually.

Q.      Rusty never eluded to replacing them, did
he, sir?

A.      No.

THE COURT: Ms. Duda, anything
else?

REDIRECT EXAMINATION BY MS. DUDA:

Q.      Just to clarify what you know from Mr.
Lang Mr. Mariani, did you say he encountered tile
drains?

A.      That's what he led me to believe in the course
of various conversations.

MS. DUDA: Nothing further, Your
Honor.

THE COURT: Ms. Shirali?

MS. SHIRALI: Nothing, Your Honor.