IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W. R. GRACE & CO., et al.[1] | ) | Case No. 01-01139 (JKF) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |

**Objection Deadline: January 5, 2007**
**Hearing Date: January 23, 2007 at 8:30 AM**

## W.R. GRACE & CO.'S OPPOSITION TO MOTION OF THE OFFICIAL COMMITTEE OF ASBESTOS PERSONAL INJURY CLAIMANTS TO COMPEL DEBTORS' PRODUCTION OF CERTAIN ACTUARIAL STUDIES REFERENCED IN THEIR SECURITIES FILINGS

The Official Committee of Asbestos Personal-Injury Claimants ("ACC") has filed a

motion, which the Future Asbestos Claimants ("FCR") have joined, to compel Grace to produce

any actuarially based estimates referenced in Grace's 10-Ks filed with the Securities and

---

[1] The Debtors consist of the following 62 entities: W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.), W. R. Grace & Co.-Conn., A-1 Bit & Tool Co., Inc., Alewife Boston Ltd., Alewife Land Corporation, Amicon, Inc., CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace II, Inc., Creative Food 'N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC (f/k/a Dewey and Almy Company), Ecarg, Inc., Five Alewife Boston Ltd., G C Limited Partners I, Inc. (f/k/a Grace Cocoa Limited Partners I, Inc.), G C Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC Management Corporation, GN Holdings, Inc., GPC Thomasville Corp., Gloucester New Communities Company, Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical Company of Cuba, Grace Culinary Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe, Inc., Grace H-G Inc., Grace H-G II Inc., Grace Hotel Services Corporation, Grace International Holdings, Inc. (f/k/a Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W. R. Grace Capital Corporation, W. R. Grace Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-Caribe Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai Development Company, L B Realty, Inc., Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH, Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Inc., MRA Holdings Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (f/k/a Nestor-BNA, Inc.), MRA Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental Liability Management, Inc., E&C Liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin & Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country Staffing), Hayden-Gulch West Coal Company, H-G Coal Company.

Exchange Commission ("SEC") for the years 2004 and 2005. The ACC and FCR have also

moved to compel production of pre-petition actuarial estimates prepared from 1996 onwards, but

those pre-petition estimates have already been produced in the *Sealed Air* litigation. Grace did

not obtain any post-petition documents responsive to the motion until 2004, shortly before the

filing of the proposed plan of reorganization and the subsequent release of the 2004 10-K.

The ACC is not entitled to discover the actuarially-based estimates referenced in the 2004

10-K and 2005 10-K for two independent reasons. First, the parties have expressly stipulated

that expert discovery, including discovery of actuarial consultants who will be called to testify at

the estimation trial, will be limited to the final studies on which the expert will rely at trial, and

that no disclosure will be required of prior expert work papers, intermediate or draft reports, or of

any other expert materials that the expert will not be relying upon in his trial testimony. The

2004 estimates at issue in this motion were preliminary in nature and will not be relied upon by

Grace's experts at trial.

Second, the supporting documentation for the 2004 10-K and 2005 10-K reserve

disclosures is work-product and attorney-client privileged. The actuarially-based estimates

referred to in the 10-Ks were prepared at the request and under the direction of Grace's counsel

in 2004, to facilitate the Company's formulation and defense of its proposed plan of

reorganization in these contested litigation proceedings. Numerous courts have held that such

litigation reserve calculations are privileged and protected from discovery. The Bankruptcy

Court presiding over the *Celotex Corp.* asbestos bankruptcy case concluded that similar expert

analyses prepared at the request of the debtor's counsel in connection with its proposed plan of

reorganization constituted information that "clearly falls within the bounds of attorney-client

privilege and the work product doctrine as to Debtor in the general [bankruptcy] case." *In re*

2

*Celotex Corp.*, 196 B.R. 596, 598 (Bankr. M.D. Fla. 1996). The two cases relied upon by the

ACC and the FCR, *Simon v. G.D. Searle & Co.*, 816 F.2d 397 (8th Cir. 1987) and *In re Royal*

*Ahold N.V. Sec. & ERISA Litig.*, 230 F.R.D. 433 (D. Md. 2005), do not hold otherwise. The

documents at issue in *Simon* were found by the court to have been prepared by non-lawyers for

business planning rather than litigation purposes, and did not as a factual matter disclose any

privileged work product, legal advice or strategy. The disputed witness interviews in *Royal*

*Ahold* were also primarily conducted for business rather than litigation purposes, and in any

event the party opposing their production was found based on other facts in the case to have

waived any applicable privileges. The holding in *Celotex* should therefore control here.

  Grace respectfully requests that this Court deny the ACC's motion to compel production

of the supporting documentation for the actuarially based estimates referenced in Grace's 10-K

filings.

## BACKGROUND FACTS

  While the motion ostensibly seeks to compel production of "all estimates of aggregate

asbestos personal injury liability prepared by or for Grace between January 1, 1996 and the

present" (December 18, 2006 Motion To Compel at 1), the ACC's and the FCR's argument in

the motion focuses exclusively on the "actuarially-based estimates of future personal injury

claims" referenced in Grace's 2005 10-K, which was filed on March 13, 2006. (See Ex. 1 to the

Motion to Compel) Grace produced all pre-petition actuarial estimates of its aggregate liability

in the *Sealed Air* fraudulent conveyance litigation. It is also undisputed that Grace did not refer

in its 10-K disclosures (or any other SEC filings) to any updated or revised post-petition asbestos

reserve figures until after the filing of its proposed plan of reorganization in 2004. (Grace's 2004

10-K was filed with the SEC on March 7, 2005.)

3

With the filing of its 2004 10-K, Grace increased its recorded accounting reserve for the funding of asbestos-related claims under the proposed plan of reorganization by $714.8 million from the amount carried on its books as of the petition date, raising the reserve to a total of $1,700 million. The reason for this increase was "to increase Grace's recorded asbestos-related liability to that which is reflected as the maximum amount allowed under the conditions precedent to the Plan . . . . It is a condition to confirmation that the Bankruptcy Court shall conclude that the Funding Amount is not greater than $1,613 million (excluding pre-petition asbestos-related contractual settlements and judgments of $87 million--treated as general unsecured claims), which would result in total asbestos-related liability of $1,700 million." (Ex. A, attached hereto, 2004 10-K at F-15-F-16)

This same $1.7 billion total asbestos-related claim reserve was maintained the next year in Grace's 2005 10-K filing. As it did in 2004, Grace disclosed in its 2005 10-K that its proposed plan of reorganization "provides that, as a condition precedent to confirmation, the maximum estimated aggregate funding amount for all asbestos-related liabilities . . . and trust administration costs and expenses as determined by the Bankruptcy Court cannot exceed $1,613 million, which Grace believes would fund over $2 billion in claims, costs and expenses over time." The 2004 10-K and the 2005 10-K do not break down this reserve estimate between asbestos personal injury claims and other forms of alleged asbestos claims, such as property damage claims or ZAI claims. Nor do the SEC disclosures identify the methodology used to develop either the maximum funding preconditions in the proposed plan of reorganization, or the total reserve. The 2005 10-K does mention that the reserve was "based in part on Grace's evaluation of . . . actuarially-based estimates of future personal injury claims," but that is only one of five factors listed. The other factors relied upon by Grace included the "proposed claim

4

payments reflected in the plan of reorganization" and Grace's evaluation of "existing but unresolved personal injury and property damage claims." (Ex. B, attached hereto, 2005 10-K at 22-23)

The accompanying declaration of Grace's general counsel, Mark Shelnitz, confirms that the actuarially-based estimates of Grace's funding obligations for asbestos claims under the proposed plan referred to in the 2005 10-K were prepared by Grace's actuarial consultant at the request of counsel, to facilitate Grace's and its counsel's development of the proposed plan of reorganization that was filed with this Court in 2004, and to assist the Company and its counsel in defending that proposed plan in the current contested litigation proceedings. (Ex. C, attached hereto, Declaration of Mark Shelnitz)

## ARGUMENT

I.    **THE ACC AND FCR ARE BARRED BY THE OCTOBER 2, 2006 STIPULATION FROM SEEKING ANYTHING OTHER THAN THE FINAL OPINIONS OF GRACE'S ACTUARIAL EXPERT.**

The parties stipulated just three months ago, on October 2, 2006, that all testifying experts in this case, including actuarial experts, shall be required to produce and to answer only questions concerning their <u>final</u> expert opinions, and that any discovery concerning their prior draft or intermediate reports, work papers and communications would be barred. The stipulation expressly provides that:

> 2.      The following categories of data, information, or documents need not be disclosed by any party, and are outside the scope of permissible discovery (including deposition questions): (i) any notes or other writings taken or prepared by or for an expert witness in connection with this matter . . . **(ii) draft reports, draft studies or draft work papers, preliminary or intermediate calculations, computations or data runs, or the preliminary, intermediate or draft materials prepared by or at the direction of the expert witness; (iii) any oral or written communication between an expert witness and . . . one or more attorneys for the party offering the testimony of such expert witness,** unless

5

the expert witness is relying upon the communication in
connection with the expert witness's opinions in this matter . . . .
**Finally, to the extent that the specific agreements herein waive
disclosure requirements under Fed. R. Civ. P. 26(a)(2)(B) or
(C), the parties agree to such waiver.**

(Ex. D, attached hereto, Stipulation Regarding Expert Discovery (Dkt. No. 13337) (Oct. 2,

2006), at 2-3, emphasis added)  The actuarially-based estimates referred to in Grace's 2005 10-K

were prepared by one of Grace's testifying experts.  (Ex. C, Shelnitz Declaration at ¶ 2)  That

expert's opinions were not final in 2004 or 2005, and are not yet final today.  The 2004 estimates

were preliminary in nature and will not be relied upon by the expert at trial.  To streamline and

expedite expert discovery, the parties mutually agreed not to seek discovery of "preliminary and

intermediate calculations, computations or data runs, or the preliminary, intermediate or draft

materials prepared by . . . the expert witness."  (*Id.*)  The ACC and the FCR should be held to

that stipulation.

Having stipulated that only these final expert reports were discoverable, the ACC is in no

position to complain that Grace was obligated to list the documentary support for these

preliminary 2004 actuarial estimates in its November 16, 2006 privilege log.  (ACC Motion To

Compel at 6 fn. 4)  But in fact, Grace's log does include references to the withholding of e-mails

sent by Grace's general counsel and by its outside counsel dated October 4, 2004 "forwarding

and commenting on expert estimates of personal injury and property damage claim values" and

"forwarding expert comments re ZAI claims and attachments with expert estimates of personal

injury and property damage claim values," as well as later e-mails in December 2004 regarding

"asbestos reserves and condition precedent for Plan of Reorganization."  (Ex. 2 to ACC Motion,

at page 1 of 2)  Moreover, in forwarding the November 16, 2006 privilege log, Grace's counsel

advised the ACC and FCR that its document search was continuing, and that it intended to

6

supplement its privilege log.  (Ex. E, attached hereto, November 16, 2006 Letter from David

Mendelson to Nathan Finch)

## II.    THE ACC AND FCR ARE NOT ENTITLED TO DISCOVER GRACE'S RESERVE ESTIMATES AND SUPPORTING ACTUARIAL ESTIMATES BECAUSE THEY ARE PRIVILEGED.

The ACC's motion to compel should also be denied because the reserve documents they

seek are privileged.  As set forth in Rule 26(b)(3), claimants are not entitled to discovery of work

product except upon a showing of "substantial need."  Fed. R. Civ. P. 26(b)(3).  Reserve

calculations prepared by or under the direction of attorneys in anticipation of litigation fall

squarely within this prohibition and are shielded from discovery.

In *Rhone-Poulenc Rorer Inc. v. Home Indem. Co.*, 139 F.R.D. 609 (E.D. Pa. 1991), for

instance, the court held that both individual case reserves and aggregate reserves were equally

protected from discovery.  *Id.* at 614-16.  Individual reserves were protected because they

"reveal the mental impressions, thoughts, and conclusions of an attorney in evaluating a legal

claim.  By their very nature they are prepared in anticipation of litigation, and consequently, they

are protected from discovery as opinion work-product."  *Id.* at 614.  Similarly, aggregate reserve

information is protected because:

> the aggregate reserve figures may give some insight into the mental processes of
> the lawyers in setting specific case reserves.  This is inevitable, considering that
> these aggregates and averages are based upon the attorney's evaluations of the
> value of specific claims . . . . They could not be formulated without the attorney's
> initial evaluations of specific legal claims.  Thus, it is impossible to protect the
> mental impressions underlying the specific case reserves without also protecting
> the aggregate figures.

*Id.* at 614-15.  Consequently, the court held that the reserve calculations were protected from

discovery.

Other courts agree.  *See Ohio Mgmt., LLC v. James River Ins. Co.*, 2006 WL 1985962, at

* 2 n.10 (E.D. La. July 13, 2006) (Exhibit F, attached hereto) ("Where the reserves have been

7

established based on legal input, the results and supporting papers most likely will be work-product and may also reflect attorney-client privilege communications. Whether aggregate or individual, case reserve figures reveal the mental impressions, thoughts, and conclusions of an attorney in evaluating a legal claim. By their very nature they are prepared in anticipation of litigation, and consequently, they are protected from discovery as opinion work product"); *Bondex Int'l, Inc. v. Hartford Accident & Indem. Co.*, 2006 WL 355289, at *3 (N.D. Ohio Feb. 15, 2006) (Exhibit G, attached hereto) ("[T]he decision is the work product of either legal counsel or members of the risk management department and hence is protected by Fed. R. Civ. Pro. 26(b)(3) and caselaw."); *Montgomery v. Aetna Plywood, Inc.*, 1996 WL 189347 (N.D. Ill. July 2, 1996) (Exhibit H, attached hereto) (valuation reports protected by work-product doctrine).

As in these cases, Grace's actuarial studies are entitled to work-product protection. Indeed, the case for work product protection here is even more compelling because the calculations were made as part of ongoing litigation — Grace's bankruptcy and its contested plan of reorganization — rather than merely in anticipation of litigation. Documents prepared in the development or defense of a contested plan of reorganization are protected work-product. *See In re Celotex Corp.*, 196 B.R. 596, 598 (Bankr. M.D. Fla. 1996) (holding that documents "prepared by Debtor's financial consultants and counsel" and pertaining to "the formulation of the plan of reorganization proposed by Debtor" were protected by the attorney-client privilege and the work product doctrine). [2] The disputed documents in *Celotex* included a preliminary draft of a

---

[2] Grace did not waive the privilege when Messrs. Hughes, Siegel, and Beber testified in 2002 about Grace's reserve calculations because the Court in *Sealed Air* ordered that these witnesses could testify about reserve analysis without it being a waiver of privilege. (Order To Compel And Protective Order (Adv. No. 02-2210, Dkt. No. 26) (May 21, 2002) (Exhibit I, attached hereto).)

8

valuation report prepared by the debtor's testifying financial expert, an update to that earlier report, and documents from another consultant involved in the formulation of the proposed plan of reorganization. 196 B.R. at 598-599. Finding that the documents "all pertain to issues surrounding the ongoing confirmation battle in the general bankruptcy case," the court ruled that the "documents at issue contain information this Court finds clearly falls within the bounds of attorney-client privilege and the work product doctrine as to Debtor in the general case." *Id.* at 599, 601.

The ACC cites two cases for the proposition that the actuarial estimates at issue here are not privileged: *Simon v. G.D. Searle & Co.*, 816 F.2d 397 (8th Cir. 1987) and *In re Royal Ahold N.V. Sec. & ERISA Litig.*, 230 F.R.D. 433 (D. Md. 2005). But neither of these cases establishes that the ACC here is entitled to discovery.

First, the *Simon* decision does not alter the traditional rule that materials prepared in anticipation of litigation are privileged. In *Simon*, a party sought to compel production of documents prepared by G.D. Searle's corporate risk management department. After an *in camera* review of the documents, a special master and the district court found that the disputed documents were "in the nature of business planning documents," a finding that the Eighth Circuit determined was a "reasonable factual conclusion." *Simon*, 816 F.2d at 401  While the non-lawyer risk management employees utilized individual case reserves established by counsel in formulating the aggregate reserve information set forth in the disputed documents, the *Simon* court emphasized that the sole purpose of the risk management reports was "business planning," and that the reports served no litigation function: "The aggregate reserve information in the risk management documents serves numerous business planning functions, but we cannot see how it enhances the defense of any particular lawsuit." *Id.* The Eighth Circuit thus held that these

9

documents were not protected by the work product doctrine because they were prepared for business rather than legal purposes and did not reveal the legal advice or mental impressions of attorneys: "The risk management department was not involved in giving legal advice or in mapping litigation strategy in any individual case." *Id.*

In contrast, here Grace's counsel requested and obtained the actuarially based estimates from the Company's testifying expert in order to develop and then defend its proposed plan of reorganization in these contested bankruptcy proceedings. As noted above, the 2004 10-K specifically discloses that the increase that year in the asbestos reserve to $1.7 billion was a direct result of the filing of the Company's proposed plan of reorganization. (Ex. A, attached hereto, 2004 10-K at F-15-F-16) Any documents underlying the development and defense of this plan would necessarily disclose the mental impressions of Grace's attorneys and reveal Grace's litigation strategy in this proceeding. As stated in the 2005 10-K: "the Bankruptcy Court is expected to use the estimated liability to determine the amounts to be paid into the trust on the effective date of the Plan." (Ex. B, 2005 10-K at F-13.)

Materials prepared under the direction of counsel to prove up a contested plan of reorganization are privileged. *See In re Celotex Corp.*, 196 B.R. at 598. Therefore, even under the reasoning of *Simon*, the reserve calculations in this case are protected work product, because they were prepared in anticipation of litigation. *See Hatco Corp. v. W.R. Grace & Co. -- Conn.*, 1991 WL 83126, *5 (D. N.J. May 10, 1991) (Exhibit J, attached hereto) ("Unlike the risk management documents in *Simon*, the memoranda in this case were prepared by lawyers. Moreover, the motivation for the memoranda was not business planning but the prospect of litigation"); *see also Erie Ins. Prop. & Cas. Co. v. Mazzone*, 625 S.E.2d 355, 364-65 (2005) ("I believe that the positions taken by *Simon* and *Rhone-Poulenc*, on the issue of commingled

10

aggregate reserve information, both have merit.  To the extent that aggregate reserve information

is not compiled in anticipation of specific litigation, but is merely done as a routine business

practice, then *Simon* is correct in holding that the opinion work product rule does not shield the

information . . . .  However, if the aggregate reserve information is compiled in anticipation of

specific litigation, then the position taken by *Rhone-Poulenc* is correct.  Such information is

protected by the opinion work product rule.").

    To the extent *Simon* stands for anything beyond the narrow factual issue decided in that

case — whether the specific documents at issue in *Simon* were protected by the work product

doctrine — the case was erroneously decided and has not been followed by courts in the Third

Circuit.  As Judge Gibson observed in his dissent in *Simon*, the *Simon* majority erred:  (1) by

limiting work product protection solely to the mental impressions of Searle's lawyers and

unreasonably discounting the possibility that work-product protection might extend to documents

prepared by business representatives, 816 F.2d at 407; (2) by ruling that discovery of protected

work-product was authorized merely because it also served a business purpose, *id.*;  (3) by

ignoring the fact that aggregate reserves, no less than individual reserves, reveal the mental

impressions of lawyers, *id.* at 406; (4) and, by making "it extremely hazardous for a business to

finance and plan for its defense." *Id.* at 409.  For those reasons, courts in the Third Circuit have

followed the approach taken in Judge Gibson's dissent. *Rhone-Poulenc Rorer*, 139 F.R.D. at

613-615, and numerous other courts have declined to follow the approach taken by the *Simon*

majority. *See Ohio Mgmt.*, 2006 WL 1985962, at * 2 n.10; *Bondex Int'l*, 2006 WL 355289, at

*3; *Aetna Plywood*, 1996 WL 189347.

    Nor does *Royal Ahold* support the ACC's and the FCR's position.  That case involved a

motion to compel production of notes and summaries of witness interviews conducted by outside

11

counsel retained to investigate allegations of fraudulent and improper accounting practices at the company. *Royal Ahold*, 230 F.R.D. at 435. The court concluded that these notes were not protected by the work product doctrine because the principal purpose of the outside counsel's investigation was not to prepare for the defense of litigation, but rather to satisfy the company's auditors and to clear the way for a major financing transaction. *Id.* at 435-436. Moreover, the court also concluded that any attorney-client privilege claim and any non-opinion work product claim had been waived by the company's submission of many of the interviews to the SEC and DOJ, by the public disclosure of the investigation findings, and by the offensive use of the witness testimony by the company in the litigation with the plaintiffs at issue. *Id.* at 435-38. Here, in contrast, the actuarially based estimates were requested by Grace's counsel to facilitate the Company's formulation and defense of its proposed plan of reorganization in the pending litigation before this Court. Moreover, the actuarially based estimates themselves have not been disclosed to the SEC or anyone else (only the total asbestos-related funding reserve has been disclosed--none of its component parts and none of the methodology used to reach those results).

12

**CONCLUSION**

For the foregoing reasons, Grace respectfully requests that this Court deny the ACC's and

FCR's motion to compel.


Dated:  January 5, 2007

Respectfully submitted:

KIRKLAND & ELLIS LLP
David M. Bernick, P.C.
Janet S. Baer
200 East Randolph Drive
Chicago, Illinois 60601
(312) 861-2000


and

PACHULSKI STANG ZIEHL YOUNG JONES
& WEINTRAUB LLP


Laura Davis Jones (Bar No. 2436)
James E. O'Neill (Bar No. 4042)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705 (Courier
19801)
Telephone: (302) 652-4100
Facsimile:  (302) 652-4400

Co-Counsel for the Debtors and
Debtors in Possession

13