# EXHIBIT J

Westlaw.

Not Reported in F.Supp.                                                                                                    Page 1

Not Reported in F.Supp., 1991 WL 83126 (D.N.J.)
**(Cite as: Not Reported in F.Supp.)**

Briefs and Other Related Documents
Hatco Corp. v. W.R. Grace & Co.-Conn.D.N.J.,1991.Only the Westlaw citation is currently available.
United States District Court, D. New Jersey.
HATCO CORPORATION, Plaintiff,
v.
W.R. GRACE & CO.-CONN., Defendant and Third-Party Plaintiff,
v.
ALLSTATE INSURANCE CO., et al., Third-Party Defendants
CONTINENTAL CASUALTY COMPANY, Third-Party Defendant, Fourth-Party Plaintiff,
v.
MARYLAND CASUALTY COMPANY, Fourth-Party Defendant.
**Civ. a. No. 89-1031.**

May 10, 1991.

Eileen McCabe, Mendes & Mount, New York City, and William J. Hanley, Ronca, McDonald & Hanley, Livingston, N.J., for third-party defendants, Certain London Market Insurance Companies.
John Kazanjian, Anderson, Kill, Olick & Oshinsky, New York City, for defendant.

OPINION
WOLIN, District Judge.
*1 The London Market Insurers (the "Insurers") have appealed the Special Master's February 26, 1991 Letter Opinion and Order compelling them to produce documents to W.R. Grace Co. ("Grace"). The Special Master's order to compel will be affirmed in part and reversed in part.

I. *BACKGROUND*

The documents at issue are seven legal memoranda and two cover letters written by six American law firms, including Mendes & Mount, which represents the Insurers in this case. One cover letter is dated July 8, 1985 and is addressed to an attached list of 17 persons who are associated with various Insurers. These Insurers comprise the Environmental Claims Group ("ECG"), an informal group of Insurers who took a lead role in organizing the Insurers' response to the prospect of claims and suits relating to coverage of environmental policies. The letter, which bears no letterhead, is marked " PRIVILEGED AND CONFIDENTIAL ATTORNEY-CLIENT AND WORK PRODUCT COMMUNICATION" and encloses a legal memorandum that it refers to as a "position paper." The July 8, 1985 letter also promises future position papers. The letter begins as follows:

Gentlemen:

Pursuant to your request, the undersigned attorneys have met on several occasions in contemplation of advising you with respect to various legal issues concerning insurance coverage for environmental claims. This report and its attached position paper contain the work product of the undersigned attorneys, who have entered into a cross-consultation agreement. This report is a privileged and confidential communication, which you should treat accordingly.

July 8, 1985 letter at 1. The letter discusses the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA") and also states that CERCLA litigation has begun. The letter continues:

Certain leading Underwriters in the London Market [*i.e.*, the ECG] have asked attorneys in several law firms in the United States jointly to consider the applicable legal principles on coverage for environmental claims, the procedures for servicing of assureds facing environmental claims and the defense of the Underwriters in actions by assureds seeking declaratory judgments or money damages

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                   Page 2
Not Reported in F.Supp., 1991 WL 83126 (D.N.J.)
**(Cite as: Not Reported in F.Supp.)**

for environmental claims.

*Id.* at 2. The letter discusses in general terms administrative and litigation issues to be addressed in the future. The first position paper is entitled " Coverage for Legal Liability for Property Damage Under CERCLA."

The second letter, which is dated July 11, 1986, is on Hannoch, Rothert & Bunshoft letterhead. The letter does not include a warning that its contents are privileged or confidential; although it is stamped "CONFIDENTIAL," the Insurers do not claim that it was originally so marked. The letter, which encloses six position papers, states that " [u]nder cover of a letter from the ECG dated 31 July 1985 the Market was supplied with a copy of Position Paper 1...." The Insurers other than the ECG thus received the first memorandum a few weeks after the ECG did. The July 11, 1986 letter describes administrative details concerning the law firms' representation of the Insurers, as well as the content of the enclosed position papers. The second through seventh position papers are entitled, respectively: (2) Protection of Attorney-Client and Attorney Work Product Privileges; (3) Guidelines with Respect to Administration of Handling of Claims; (4) Coverage for Legal Liability for Common Law Bodily Injury and Personal Injury Caused by the Assured's Hazardous Substances; (5) Coverage for Legal Liability for Common Law Third Party Property Damage Caused by the Assured's Hazardous Substances; (6) Nondisclosure of Material Information as a Defense to Hazardous Waste Claims; and (7) Underwriters' Obligation to Notify the Assured of Reservation of Policy Rights and Defenses upon Presentation of Claim.

*2 Judge VanArtsdalen held in a different case that the London Insurers had failed to meet their burden of proof to establish the confidentiality requirement of the attorney-client privilege or the work product privilege. *In re Texas Eastern Transmission Corp. PCB Contamination Insurance Coverage Litigation* ("*Texas Eastern* "), MDL Docket No. 764 (E.D.Pa. September 18, 1990), slip op. at 5. Specifically, Judge VanArtsdalen found no evidence that any of the documents were marked as "confidential" or " privileged" or that they were maintained as privileged. The same documents were also ordered to be produced in *Public Serv. Elec. & Gas Co. v. Associated Elec. & Gas Insurance Serv., Ltd.* ("*PSE & G* "), No. 88-4811. An October 24, 1990 hearing transcript indicates that Magistrate-Judge Hedges held that the Insurers had not satisfied their burden of showing that the documents were distributed solely within the scope of the attorney-client privilege. Tr. 21:17-22:15.

The Special Master held that the Insurers did not establish that all of the London Market Insurers were clients of the American firms. February 26, 1991 Letter Opinion and Order at 6. In addition, he held that the documents were distributed in such a way that their recipients waived any claim of privilege. *Id.* at 3. Finally, he held that the work product immunity does not apply to the documents because they were not prepared for a specific case or in anticipation of litigation. *Id.* at 6.

II. *DISCUSSION*

A. *Attorney-Client Privilege*

A nondispositive order of a special master may be set aside only when the order is clearly erroneous or contrary to law. Fed.R.Civ.P. 53(e)(2); Local Rule 40(D)(4)(a). The proponent of the attorney-client privilege has the burden of proving that the privilege applies. *Matter of Grand Jury Empanelled February 14, 1978,* 603 F.2d 469, 475 (3d Cir.1979).[FN1] Legal advice or opinion from an attorney to his or her client is within the protection of the privilege. *United States v. Amerada Hess Corp.,* 619 F.2d 980, 986 (3d Cir.1980). As counsel for the London Market Insurers conceded at oral argument, because the proponent of the privilege has the burden of proof and the privilege protects only those communications from attorneys which were distributed to their clients, the proponent must prove that the purportedly privileged communications from attorneys were distributed only to clients.

The Court agrees with the Special Master that the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                         Page 3
Not Reported in F.Supp., 1991 WL 83126 (D.N.J.)
**(Cite as: Not Reported in F.Supp.)**

London Market Insurers have not met their burden of proving that each person or entity to which the memoranda were sent was a client of one of the six American firms at the time they were sent. The January 17, 1991 Affirmation of James Teff, ¶ 9, states that each of the recipients was a client of one of the law firms at the time the memoranda were prepared and distributed.$^{FN2}$ However, this is hearsay in that Mr. Teff does not appear to have personal knowledge that the insurers which received the memoranda were all clients of one or more of the law firms at the time they received the memoranda. Even if Mr. Teff were responsible for the distribution of the memoranda, which he does not affirm, he would not have personal knowledge of all the attorney-client relationships at issue. Therefore, Mr. Teff's affidavit does not satisfy the Insurers' burden of demonstrating that the legal memoranda went only to clients. Nor do the numerous affirmations of other insurers establish this crucial point. Therefore, the Court concurs with the Special Master that the documents are not within the attorney-client privilege. This decision is consistent with Magistrate-Judge Hedges' rejection of the attorney-client privilege in *PSE & G*.

### B. *Work-Product Protection*

*3 As with the attorney-client privilege, the proponent of the work product immunity has the burden of proving the applicability of the immunity. *Conoco, Inc. v. United States Dep't of Justice,* 687 F.2d 724, 730 (3d Cir.1982). Rule 26(b)(3) of the Federal Rules of Civil Procedure describes work product subject to protection as "documents and tangible things otherwise discoverable ... and prepared in anticipation of litigation or for trial by or for another party or by or for that other party's representative (including his attorney, consultant, surety, indemnitor, insurer, or agent)...." Such documents may only be produced upon a showing of substantial need and undue hardship. *Id.* Even if such a showing has been made, "the court shall protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation." *Id.*

The Supreme Court firmly established the work product doctrine in *Hickman v. Taylor,* 329 U.S. 495 (1947). In *Hickman,* the plaintiff sought in discovery statements taken by defendants' lawyer. *Id.* at 498-99. The Supreme Court held that the statements were protected:

Proper preparation of a client's case demands that [the attorney] assemble information, sift what he considers to be the relevant from the irrelevant facts, prepare his legal theories and plan his strategy without undue and needless interference. That is the historical and the necessary way in which lawyers act within the framework of our system of jurisprudence to promote justice and to protect their clients' interests. This work is reflected, of course, in interviews, statements, memoranda, correspondence, briefs, mental impressions, personal beliefs, and countless other tangible and intangible ways.... Were such materials open to opposing counsel on mere demand, much of what is now put down in writing would remain unwritten. An attorney's thoughts, heretofore inviolate, would not be his own. Inefficiency, unfairness and sharp practices would inevitably develop in the giving of legal advice and in the preparation of cases for trial. The effect on the legal profession would be demoralizing. And the interests of the clients and the cause of justice would be poorly served.

329 U.S. at 511. In his oft-quoted concurrence, Justice Jackson emphasized that discovery of attorney work product would undermine the adversarial nature of trial: "Discovery was hardly intended to enable a learned profession to perform its functions either without wits or on wits borrowed from the adversary." *Id.* at 516.

The Special Master stated five grounds for rejecting the London Market Insurers' assertion of work product immunity: "[1] The documents at issue were not prepared for a specific case or [2] in anticipation of litigation. [3] They were prepared at the request of London Market representatives [4] to provide an overview on American law." Letter Opinion and Order of February 26, 1991 at 6. Fifth, the Special Master held that the Insurers had waived any claim of privilege by the way in which the documents were distributed. *Id.* at 3. The

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                           Page 4
Not Reported in F.Supp., 1991 WL 83126 (D.N.J.)
(Cite as: Not Reported in F.Supp.)

Court will discuss each aspect of the Special Master's decision that the documents should not be accorded work-product protection.

*4 First, with respect to anticipation of litigation, the Court of Appeals has employed the following formula to determine whether the work-product doctrine applies to documents prepared before a case begins:

Prudent parties anticipate litigation, and begin preparation prior to the time suit is formally commenced. Thus the test should be whether, in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained *because* of the prospect of litigation.

*In re Grand Jury Investigation,* 599 F.2d 1224, 1229 (3d Cir.1979) (emphasis added by Court of Appeals) (quoting 8 C. Wright & A. Miller § 2024 at 198). The relevant question, then, is whether the documents at issue were prepared because of the prospect of litigation.

Answering this question requires a general discussion of the unique facts surrounding the onset of environmental claims against the Insurers in the mid-1980s. The purpose of the ECG was, as the Special Master found, "to establish a consistent position for the London Market companies with respect to environmental claims." Special Master's Letter Opinion at 3. In order to help unify the position of the Insurers, six American law firms wrote several memoranda relating to insurance coverage. *Id.* The reason the London Market Insurers set out through the ECG to unify their position was that they wanted to avoid the market split that occurred in the 1970s with respect to coverage of asbestos and certain drug-related claims. Grace Brief at 5. As Grace argued to the Special Master, certain Insurers took the position that coverage was triggered when the claimant was first exposed to the harmful product, while others argued that coverage was triggered when plaintiff manifested injury. November 8, 1990 Letter Brief at 3.

Mendes & Mount, which represents the Insurers in this case, represented certain London Market insurers in various American environmental cases during 1985, when the six law firms issued the first of the position papers. For example, Mendes & Mount represented certain London Market insurers in the Times Beach litigation. *Independent Petrochemical Corp. v. Aetna Casualty & Surety Co.,* 1984 WL 3656 (D.D.C. August 13, 1984). Remarkably, Jerold Oshinsky of Anderson, Baker, Kill & Olick, which represents Grace here, was counsel of record for plaintiffs in the Times Beach litigation. *Id.* At the time the six law firms prepared the position papers, environmental litigation involving the London Market Insurers was not remote; some cases were pending, and others were about to begin. The law firms prepared the documents because of the prospect of litigation.

Second, although the law firms prepared the position papers in anticipation of litigation, the Special Master correctly found that they were not prepared in anticipation of a specific case. Rule 26(b)(3) applies to "documents ... prepared in anticipation of litigation or for trial by or for another party or by or for that other party's representative...." The Supreme Court has stated that the literal language of Rule 26(b)(3) "protects materials prepared for *any* litigation or trial as long as they were prepared by or for a party to the subsequent litigation." *FTC v. Grolier, Inc.,* 462 U.S. 19, 25 (1983) (emphasis in original) (citing 8 C. Wright & A. Miller, *Federal Practice and Procedure* § 2024 at 201). Thus, according to Professors Wright and Miller, documents prepared for a party in the present litigation are protected from discovery even though they were prepared for another wholly unrelated litigation. Wright & Miller § 2024 at 201. *See also Duplan Corp. v. Moulinage et Retorderie de Chavanoz,* 487 F.2d 480, 484 n. 15 (4th Cir.1974) (work product developed in closed case not discoverable in subsequent, unrelated litigation).

*5 *Grolier* and *Duplan,* however, involved work product developed in anticipation of a specific case or investigation. Here, the law firms wrote the memoranda not in anticipation of a single case but in anticipation of numerous pending and future cases involving the London insurance market.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                                   Page 5
Not Reported in F.Supp., 1991 WL 83126 (D.N.J.)
**(Cite as: Not Reported in F.Supp.)**

Several cases hold that, in order for the work product immunity to attach, a specific claim must have arisen. *E.g., Coastal States Gas Corp v. Dep't of Energy,* 617 F.2d 854, 855-56 (D.C.Cir.1980); *SCM Corp. v. Xerox Corp.,* 70 F.R.D. 508, 515 (D.Conn.1976). Here, several cases, including the Times Beach case, had arisen as of July 11, 1985, the date of the first cover letter and position paper. The second cover letter mentions by name two other cases in which the law firms "conduct[ed] a very thorough and far-ranging discovery search through the Market's records." July 11, 1986 letter at 2. Likewise, the letter discusses the possibility of a specified insured's attempt to recover punitive damages against the Insurers in London. *Id.* at 3. Thus, some specific environmental claims had arisen against the Insurers to the extent that they had ripened into litigation.

The present action did not begin until 1989, and the Insurers have not argued, let alone proved, that Grace had made a claim in 1985 of which the Insurers were aware. Such a requirement would be too stringent in this case, which involves letters and memoranda directed at hundreds of Insurers for the purpose of creating a united front. If the law firms had waited for each of the Insurers to have a claim made against them, the Insurers may well have taken inconsistent positions, as they did in the asbestos cases. Therefore, the fact that the documents at issue here were not drafted in anticipation of a specific case does not lead the Court to hold that they are not to be protected.

The Court is aware of one other case in which a party claimed work-product protection for a document that concerned several cases. *Simon v. G.D. Searle & Co.,* 816 F.2d 397 (8th Cir.1987). In *Simon,* the court held that risk management documents that evaluate product liability claims against the company for which they were prepared do not constitute protectible work product. *Id.* at 401. Non-lawyers in defendant's risk management department prepared the documents at issue in *Simon,* which contained aggregate litigation reserves. *Id.* The aggregate reserves were calculated from reserves for specific cases. *Id.* The documents were motivated by business planning, including budget, profit, and insurance considerations, rather than for the defense of any particular lawsuit. *Id.* The court rejected defendant's argument that the documents could not have been motivated by business planning because defendant's business was not litigation; the court reasoned that, under the circumstances of the case, business planning included litigation planning. *Id.* However, lawyers prepared individual case reserve figures after evaluating the specific legal claims. *Id.* Because these case-specific figures were deemed to have been prepared in anticipation of litigation, they were protected as opinion work product. *Id.* Unlike the risk management documents in *Simon,* the memoranda in this case were prepared by lawyers. Moreover, the motivation for the memoranda was not business planning but the prospect of litigation.

*6 Third, the Special Master stated that the memoranda "were prepared at the request of London Market representatives...." In other words, the ECG, not the Insurers as a whole, requested the preparation of the memoranda. Indeed, the first page of the July 8, 1985 letter is addressed to the ECG [FN3] and states that the attorneys had met at "your request." Thus, it is clear that the ECG, and not the Insurers as a whole, instigated the memoranda. Even though the July 11, 1986 letter is addressed to "Insurers at Interest" generally, it reflects the ECG's organizing capacity.

Rule 26(b)(3) protects documents "prepared ... by or for another party or by or for that other party's representative (including the other party's attorney, consultant, surety, indemnitor, insurer or agent)...." The fact that the first memorandum, at least, was provided for the ECG, not for the Insurers as a whole, raises the question of whether the ECG was the representative or agent of the Insurers for the purposes of Rule 26(b)(3). The Special Master characterized the ECG as "London Market representatives" when they requested the memoranda of the law firms. The Special Master also found that the ECG "coordinates insurance coverage positions in environmental cases." February 26, 1991 Letter Opinion and Order. Although made in the context of determining the relevance, "in the discovery sense," of the documents, *id.,* the Special Master's finding

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                                Page 6
Not Reported in F.Supp., 1991 WL 83126 (D.N.J.)
**(Cite as: Not Reported in F.Supp.)**

strongly supports the conclusion that the ECG acted in the capacity of the other Insurers' agent in having the memoranda prepared. Because of the numerosity of the Insurers, some central coordination was necessary. The Court concludes that the ECG was the Insurers' representative or agent within the meaning of Rule 26(b)(3).

Fourth, the memoranda "provide an overview on American law," as the Special Master aptly characterized them. But the generality of the memoranda does not make them any less worthy of protection. The very litigation strategy that motivated them-the united front-required a broad approach. The general character of the memoranda does not preclude them from protection under the facts of this case.

Not all of the memoranda, however, concern general coverage or liability issues that the ECG could have been expected to be divisive in litigation. The second position paper, which deals with attorney-client privilege and work-product protection, does not discuss coverage or liability and is therefore, ironically, not protectible. The third position paper, on guidelines for claims handling, does not deal with coverage or liability issues either. Likewise, the seventh, on reservation of rights, deals primarily with claims handling rather than liability or coverage. The two cover letters that introduce the memoranda deal largely with administrative aspects of the law firms' representation of the business. Their text does not implicate the law firms' legal analysis of liability and coverage issues. Therefore, the second, third, and seventh position papers, as well as the two cover letters, are not protectible as work product.

*7 On the other hand, the first, fourth, and fifth memoranda (on CERCLA, common law physical injury and common law property damage, respectively), discuss universally applicable questions of liability. They also address commencement of coverage, which is the precise issue that had divided the Insurers in the past. The sixth memorandum, which deals with nondisclosure, is a borderline case. However, it does deal with a defense to liability that could be subject to conflicting stances by different Insurers. The first, fourth, fifth and sixth position papers are therefore protectible as work product. Because the memoranda express attorney opinion, they are accorded the highest level of protection. *See* Rule 26(b)(3).

Fifth, the Special Master apparently held that the Insurers waived any work product immunity that otherwise would have applied to the documents. *See id.* at 3 ("documents were distributed in such a manner as to waive any claim of privilege"). Even though four of the documents were protectible, they are nevertheless subject to production if the Insurers waived the work-product protection. As counsel for Grace conceded at oral argument, the party seeking to obtain protected work product bears the burden of proving that the protection has been waived. *Accord In re Convergent Technologies,* 122 F.R.D. 555, 565 (N.D.Cal.1988). Grace did not satisfy its burden of proving waiver.

The work product doctrine protects information from opposing parties, rather than from all others outside a particular confidential relationship. *United States v. American Telephone & Telegraph Co.* ("AT & T"), 642 F.2d 1285, 1299 (D.C.Cir.1980). *See also* 8 C. Wright & A. Miller, *Federal Practice and Procedure* § 2024 at 210 (1970) (work product doctrine protects against disclosure to opposing counsel and client). The work product doctrine protects information from opposing parties, rather than from all parties outside a particular confidential relationship. *AT & T,* 642 F.2d at 1299. A showing of disclosure to a third party does not result in a waiver of the work product protection if the parties have common interests. *Id; In re Doe,* 662 F.2d 1073, 1081 (4th Cir.1981), *cert. denied,* 455 U.S. 1000, (1982); *In re Sunrise Securities Litigation,* 130 F.R.D. 560, 564 (E.D.Pa.1989). *Cf. In re Subpoenas Duces Tecum,* 738 F.2d 1367, 1372 (D.C.Cir.1984) (waiver where disclosure to an adversary).

In this case, the only possible showing that third parties received the memoranda is an inference that not all of the Insurers were clients of the law firms. Letter Opinion and Order of February 26, 1991 at 5. Thus, the only "third parties" who received the memoranda were other Insurers, all of whom had

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                                Page 7
Not Reported in F.Supp., 1991 WL 83126 (D.N.J.)
**(Cite as: Not Reported in F.Supp.)**

the same interests. Distribution to Insurers other than those which may have not been clients does not constitute waiver. Grace does not argue that the distribution of the memoranda was such that Grace or any other adversary acquired them, except under court order. That the documents have been ordered to be produced in *PSE & G* and *Texas Eastern* does not constitute a waiver of the work-product protection in this case. *See Shields v. Sturm, Roger & Co.*, 864 F.2d 379, 382 (5th Cir.1989) (one court's disregard of work-product nature of material does not waive work-product protection before another court).

*8 In *Texas Eastern*, Judge VanArtsdalen ruled, in effect, that the Insurers had waived any work-product protection that otherwise would have applied. Judge VanArtsdalen stated that the work-product protection does not attach unless the parties had a reasonable basis for believing that the communication would be kept confidential. *Texas Eastern*, slip op. at 4-5 (citing *Sunrise*, 130 F.R.D. at 564 (quoting *Subpoenas Duces Tecum*, 738 F.2d at 1372))). The lack of "confidential" markings on the documents was held in *Texas Eastern* to bar a reasonable belief in confidentiality.[FN4]

Although *Texas Eastern* appears to hold that confidentiality is an element necessary to establish the application of the work-product immunity, the cases on which it relies, *Subpoenas Duces Tecum* and *Sunrise*, are both waiver cases. Moreover, in both cases, waiver resulted from disclosure to an adversary. *Subpoenas Duces Tecum*, 738 F.2d at 1372; *Sunrise*, 130 F.R.D. at 564. No such disclosure has occurred in this case. Finally, because work-product immunity does not exist to protect a confidential relationship, the lack of "confidential" markings on documents does not result in a waiver of the immunity.

Because the four liability/coverage memoranda are opinion work-product, and no waiver has occurred, the Insurers need not produce them unless Grace makes the appropriate showing. This matter will be remanded to the Special Master for such a determination, should Grace request it.

### III. *CONCLUSION*

For the reasons set forth herein, the Special Master's order to compel will be affirmed as to the July 8, 1985 and July 11, 1986 cover letters, and as to the second, third, and seventh memoranda. The order to compel will be reversed as to the first, fourth, fifth and sixth memoranda.

An appropriate order is attached.

### *ORDER*

In accordance with the Court's opinion filed herewith,

IT IS on this 10th day of May, 1991,

ORDERED that the Special Master's February 26, 1991 Letter-Opinion and Order is hereby AFFIRMED as to the July 8, 1985 and July 11, 1986 cover letters, and as to the second, third and seventh memoranda; and it is further

ORDERED that the Special Master's February 26, 1991 Letter-Opinion and Order is hereby REVERSED as to the first, fourth, fifth and sixth memoranda, and this matter is REMANDED as to those memoranda for further proceedings consistent with the court's opinion.

> FN1. Federal Rule of Evidence 501 provides that "with respect to an element of a claim as to which State law supplies the rule of decision, the privilege of a witness, [or] person ... shall be determined in accordance with State law." Thus, it appears state, not federal, attorney-client privilege law should apply to the coverage disputes between Grace and the Insurers. However, the parties and the Special Master have applied federal attorney-client privilege law and this Court will do likewise. The work product doctrine is codified in Federal Rule of Civil Procedure 26(b)(3) and thus is clearly governed by federal law.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp. Page 8
Not Reported in F.Supp., 1991 WL 83126 (D.N.J.)
(Cite as: Not Reported in F.Supp.)

FN2. The Special Master did not hold that the privilege is inapplicable because each of the insurers was not a client of each of the six law firms. Although Grace asserts such a requirement, it provides no legal support for it. Memorandum at 13.

FN3. The Insurers incorrectly state that the July 8, 1985 and July 11, 1986 letters were both addressed to "Underwriters at Interest." Brief at 3. This is incorrect, as only the second letter was thus addressed. Obviously counsel's obligations of accuracy and candor are heightened when describing documents provided for *in camera* review.

FN4. The first of the documents, the July 8, 1985 cover letter, bears a typed "confidential" marking. The second letter and the memoranda also bear such a marking; however, these documents appear to have been so marked during the *Texas Eastern* case. One of the memoranda is entitled "Protection of Attorney-Client and Attorney Work Product Privileges" and addresses "recommended procedures and structures which may assist in preserving the confidentiality of attorney-client communications to the extent possible under current law."

D.N.J.,1991.
Hatco Corp. v. W.R. Grace & Co.-Conn.
Not Reported in F.Supp., 1991 WL 83126 (D.N.J.)

Briefs and Other Related Documents (Back to top)

• 1989 WL 1631671 () (Report or Affidavit of Richard Grzywinski) (Oct. 10, 1989) Original Image of this Document (PDF)
• 1989 WL 1631670 () Affidavit of David G. Seabrook (Oct. 6, 1989) Original Image of this Document (PDF)
• 1989 WL 1594389 (Trial Pleading) Fourth-Party Complaint of Commercial Union Insurance Company against Maryland Casualty Company and Demand for Jury Trial (Apr. 12, 1989) Original Image of this Document (PDF)

• 2:89cv01031 (Docket) (Mar. 15, 1989)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.