**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>W.R. GRACE & CO., *et al.*,<br><br>Debtors. | : Chapter 11<br>:<br>: Case No. 01-1139 (JKF)<br>: Jointly Administered<br>:<br>: Hearing Date: January 23, 2007 @ 8:30 a.m.<br>  Related Docket No.: 14044 |

**OPPOSITION AND JOINDER OF THE OFFICIAL COMMITTEE OF ASBESTOS
PERSONAL INJURY CLAIMANTS TO W.R. GRACE & CO.'S MOTION TO QUASH
30(b)(6) DEPOSITION NOTICE AND FOR A PROTECTIVE ORDER**

The Official Committee of Asbestos Personal-Injury Claimants ("Committee" or "ACC"), by and through its undersigned counsel, hereby files this Opposition and Joinder to W.R. Grace's Motion To Quash 30(b)(6) Deposition Notice and For a Protective Order (hereinafter "Grace Motion"). The ACC joins in and adopts by reference the Opposition of the Future Claimants Representative ("FCR") to Grace's Motion in its entirety, but writes separately here to briefly emphasize the following points related to the "Aggregate Asbestos Liability Reserve" Topic (Topic #1) of the ACC/FCR 30(b)(6) deposition notice.

**ARGUMENT**

As set forth below and more fully explained in the Motion of the Official Committee of Asbestos Personal Injury Claimants to Compel Debtors' Production of Certain Actuarial Studies Referenced in Their Securities Filings, filed December 18, 2006 [Docket #14057] (hereinafter "ACC Motion to Compel"), Grace's post-petition aggregate asbestos personal injury liability estimates prepared for SEC disclosure and internal financial planning purposes (1) are highly relevant to the matters that will be tried during the Asbestos Estimation Hearing, (2) were not prepared in anticipation of litigation, and (3) are not protected by the attorney client privilege or

the work product doctrine. Moreover, the discovery sought is not cumulative, nor can Grace dictate the procedures by which the ACC and FCR are entitled to obtain needed discovery into this area.

  **(1)  There Can be No Dispute that The Asbestos Reserve Deposition Topic Seeks Discovery That Is Highly Relevant.**

  As this Court is keenly aware, Grace has strived to turn the Asbestos PI Estimation Hearing into a contest of methodologies. The ACC and FCR will present experts who base their estimates of Grace's liability on Grace's claims and settlement history combined with actuarially based projections of future claims tied to the expected nationwide disease incidence of asbestos related diseases, taking account of foreseeable post-petition changes in the litigation environment. This is exactly the approach that Grace itself used to estimate its aggregate liability for SEC reporting and internal financial planning purposes and which has been recognized and adopted by all the courts that have rendered estimation decisions in asbestos bankruptcy cases. See, e.g., In re Armstrong World Indus., Inc., 348 B.R. 111, 123-24 (D. Del. 2006); In re Owens Corning, 322 B.R. 719, 721-23 (D. Del. 2005); In re Federal-Mogul Global, Inc., 330 B.R. 133, 155-57 (D. Del. 2005); In re Eagle-Picher Indus., Inc., 189 B.R. 681, 683-86 (Bankr. S.D. Ohio 1995). On the other side, Grace and its lawyers are striving mightily to escape Grace's own claims history, asking the Court to base the estimation on data from claimant questionnaires – an unorthodox and defective approach that *no* court to date has recognized or adopted. In the process Grace is, the ACC and FCR believe, repudiating the manner by which Grace itself estimated its aggregate liability for SEC and internal financial planning purposes and in developing its own proposed Plan of Reorganization.

  In its most recently available 10-K, Grace says that it calculated the estimated asbestos liability it disclosed to the SEC and the "Funding Amount" in its proposed plan of reorganization

based upon on "actuarially-based estimates" of its liability for pending and future asbestos personal injury claims. If, as the ACC believes to be the case, these estimates were calculated using a far more conventional approach that largely mirrors the type of history-based methodology that the ACC and FCR will present at trial, then that fact is highly relevant to the choice-of-methodology issue that will be the central dispute in the Estimation Hearing. Since methodology of estimation is a – perhaps the – key issue here, it is centrally relevant that, in asking this Court to adopt its unprecedented approach, Grace is asking the Court to reject Grace's own methodology that it used in its SEC reporting, both pre- and post-petition, in its financial planning, and, incidentally, in developing its own proposed Plan.

Moreover, Grace's use of and reliance upon (for non-litigation business planning and SEC disclosure purposes) a different estimation methodology than they are advocating here is also a highly relevant consideration in this Court's Daubert determinations concerning the reliability and admissibility of an expert's estimation methodology. In the Daubert analysis, courts have made clear than an important test of reliability under Daubert is whether the evidence to be proffered used a method "generally and reasonably replied upon by other scientists in the relevant field" and was based on "research unrelated to the litigation." Daubert v. Merrell Dow Pharm., Inc., 43 F.3d 1311, 1316-17 (9th Cir. 1995) ("Daubert II"); see Kumho Tire Co. v. Carmichael, 526 U.S. 137, 152 (1999) (holding that the purpose of Daubert's gatekeeping requirement is to "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom *the same level of intellectual rigor that characterizes the practice of an expert in the relevant field*" (emphasis added) (citing Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579 (1993) ("Daubert I");. Therefore, it is highly relevant to the admissibility of Grace's "substantive estimation

methodology" that Grace itself did not use its proffered methodology in its non-litigation efforts to project its asbestos liability.

None of the other arguments Grace makes in its Motion to Quash against permitting the ACC and the FCR to conduct this highly important discovery are sound.

(2)   **The 30(b)(6) Discovery Is Not Cumulative.**

A 30(b)(6) deposition on Grace's asbestos reserves is not cumulative of the discovery taken in the Sealed Air litigation. Even if all the currently-relevant discovery concerning Grace's asbestos reserves described in its *pre-petition* financial statements had been taken in the Sealed Air proceeding (which is not the case), the Sealed Air discovery took place in the summer of 2002; thus, it was impossible in that proceeding to take any discovery concerning Grace's *post-petition* asbestos reserves reflected in its 2003, 2004, 2005 (and soon to be filed 2006) 10-Ks. Moreover, in the Sealed Air litigation there was no real dispute between the parties over methodology – both sides sought to estimate the aggregate liability based upon Grace's past claims history and actuarial projections of future claims. Thus, in Sealed Air, the discovery into Grace's liability estimates focused on areas other than basic methodology; here, the ACC and FCR are taking discovery of Grace's asbestos reserve methodology to demonstrate the highly relevant fact that Grace itself chose to estimate its aggregate asbestos liability for business planning, SEC reserve, and bankruptcy plan formulation purposes using essentially the same type of methodology that will be used by the ACC/FCR experts in the Estimation Hearing.

(3)   **Grace Cannot Avoid Its Obligations to Produce a 30(b)(6) Witness Through "Confirmation" by Affidavit.**

Grace offers, at pages 13-14 of its Motion, to file an affidavit to "confirm what is already disclosed in the 2005 SEC 10-K disclosure: that the asbestos litigation reserve disclosed in that filing was based on the conditions for acceptance of the plan of reorganization filed with the

Court." However, that is not all that the 10-K discloses, nor is it, as Paul Harvey would say, the rest of the story. Grace's 10K also discloses that that the "Plan Funding Amount" of $1.613 billion "is based in part on Grace's evaluation of: existing but unresolved personal injury and property damage claims; [and] *actuarially-based estimates of future personal injury claims.*" See W.R. Grace & Company 10-K for the year ended December 31, 2005 at 22-23 (attached as Exhibit 1) (emphasis added).

  Grace could have chosen to file a Plan that provided that the amount that is required to fund the § 524(g) asbestos personal injury trust will be determined by the Court at the Estimation Hearing, and disclosed to the SEC and its shareholders that its aggregate asbestos liability is whatever a Court determines it to be. Instead, Grace filed a Plan that is premised upon a specific estimate of its asbestos liability, and disclosed to its shareholders and the SEC both the magnitude of that estimate and a general description that this amount was based on a global estimate of the value of its pending claims and an actuarially-based estimate of future claims. The ACC and FCR are thus entitled, not just to a self-serving and conclusory affidavit repeating Grace's 10-K disclosures, but (1) to discover both the details of the internal estimates of liability that underlie Grace's Plan and 10-K, and (2) to have a witness explain those estimates, the basis on which they were created, and the assumptions that went into them.

  The ACC and FCR are not required to accept Grace's self serving declaration (likely drafted by its lawyers) concerning what its 10-K is based upon and how its asbestos liability reserve was calculated; that is not the way discovery works. Depositions have often been described as the best discovery tool available to learn the facts and information known by a company or fact witness. Unlike interrogatories or a sworn declaration, a deposition provides the party seeking the discovery with the opportunity (1) to have the witness answer the question that

the deposing party wants to know the answer to (as opposed to only answering part of the inquiry in a declaration as Grace proposed to do here), (2) to ask follow up questions, (3) to understand an adversary's case by having the witness explain the factual basis for it, and (4) to explore the knowledge of a company or witness without the interference of opposing counsel and in a level of detail and precision that is simply not possible with any other form of discovery.

Here, the ACC and FCR chose to obtain discovery of the basis and methodology for Grace's asbestos liability reserves by 30(b)(6) deposition rather than proceed with a series of 30(b)(1) depositions of Grace employees or agents to (a) minimize the number of deponents and (b) ensure that a witness who has the requisite knowledge and the authority to speak on behalf of Grace (and thus bind it) will be the person or persons deposed. That approach should be respected by Grace, and the Court should order Grace to produce a witness or witnesses as its corporate designee on Topic Number 1.

**(4)    Grace's Asbestos Reserves Are Not Protected by Either the Attorney-Client Privilege or the Work Product Doctrine**.

As detailed by the FCR in its Opposition, even if the documents and analyses underlying Grace's asbestos liability reserves were at one time protected by any type of privilege (which they are not), Grace waived any such protection by voluntarily producing them in the Sealed Air litigation and then allowing them to be produced by the ACC to the United States Government pursuant to a subpoena without any objection from Grace. It is black letter law that once supposedly privileged or work product documents are disclosed to an adverse party (such as the ACC or the United States Government in Grace's case), any such protection is waived forever. See, e.g., In re Steinhardt Partners, LP, 9 F.3d 230, 234-35 (2d Cir. 1993); Westinghouse Elec. Corp. v. Republic of the Philippines, 951 F.2d 1414, 1423-24 (3d Cir. 1991) (Voluntary disclosure to a third party of purportedly privileged material effects a waiver of the applicable

privilege); Permian Corp. v. United States, 665 F.2d 1214, 1219-1221 (D.C. Cir. 1981); In re Sealed Case, 676 F.2d 793, 809 (D.C. Cir. 1982); see also 8 Wigmore on Evidence § 2328, at 638 (McNaughton rev. ed. 1961).

As we explained in the ACC Motion to Compel at pages 9 to 12, and as more fully set forth by the FCR in its Opposition to Grace's Motion, Grace is incorrect on the law – aggregate liability estimates relied upon for financial planning and SEC disclosure purposes are not protected by either the attorney-client privilege or the work product doctrine. The aggregate asbestos liability estimates, and their underlying documents and analyses, prepared for Grace's 10-K disclosures and adopted in its Plan are simply not the kind of documents or materials that contain work product information which would reveal Grace's advisers' thoughts about the merits or likely outcome of litigation or its lawyers' advice. Attached as Exhibits 2, 3, and 4 to this Opposition are some of the actuarial estimates (or summary descriptions of same) prepared by the consulting firm which Grace used in setting its *pre-petition* asbestos liability reserves. As even a cursory review of these exhibits demonstrates, none of these types of documents contain a lawyer's advice, confidential communications with counsel, or advisors' litigation-associated analysis of the likely merits or outcomes of any asbestos claim or any group of asbestos claims.[1] These analyses, rather, lay out the methodologies and assumptions that went into Grace's projections of the financial cost for indemnity and defense of its pending and future asbestos personal injury claims, and do not reflect any lawyer's judgments or adviser's thought processes about litigation.[2] It is highly likely, the ACC submits, that the information and documentation

---

[1] Although some of these documents are labeled "Privileged & Confidential" or the like, stamping a document privileged does not make it so. Indeed, these actuarial studies and the summary documents concerning the same topics were not even prepared by lawyers.

[2] If Grace believes that certain responsive documents (or the answers to certain question) are privileged, the proper course is to file a privilege log or instruct its witness not to answer a

concerning the "actuarially-based estimates" used in setting Grace's *post-petition* asbestos liability reserves as described in Grace's most recent 10-K will be very similar to, and contain the same type of non-privileged/non-work product analyses, that are contained in the exhibits to this Opposition.

More fundamentally, the estimates of liability that Grace prepared for Plan Funding and SEC disclosure purposes are demonstrably not documents prepared "in anticipation of litigation." Materials prepared in order to make SEC financial disclosures, like other regulatory disclosures, are not prepared in anticipation of litigation; and thus are not entitled to work product protection. See United States v. El Paso Co., 682 F.2d 530, 543-44 (5th Cir. 1982) (determining that documents which were "[w]ritten ultimately to comply with SEC regulations" were prepared "with an eye on its business needs, not on its legal ones" and did not "contemplate litigation in the sense required to bring it within the work product doctrine"); McEwen v. Digitran Sys., Inc., 155 F.R.D. 678, 684 (D. Utah 1994) (ruling that "foundational documents in the preparation of the [SEC] 8-K report which was required for compliance with federal securities laws" were not subject to work product protection because the Court was "not convinced that the 'primary motivating purpose' in the creation of the [SEC reports] was to assist attorneys in connection with pending or anticipated litigation"); see also United States v. Rockwell Int'l, 897 F.2d 1255, 1259-60 (3d Cir. 1990) (citing United States v. El Paso Co., 682 F.2d at 534-44). The mere fact that a lawyer is involved in a matter, is copied on a document, or assists in the preparation of a document does not automatically turn that matter or the documents into something which is protected by the attorney-client privilege or the work product doctrine. See Martin v. Bally's Park Place Hotel & Casino, 983 F.2d 1252, 1260 (3d Cir. 1993) (noting

---

particular question. It is not proper to assert a blanket immunity to inquiry into the whole subject area.

that regardless of the participation of "Bally's General Counsel" in preparing documents, "the test should be whether in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained because of the prospect of litigation."); In re Grand Jury Subpoena, 599 F.2d 504, 511 (2nd Cir. 1979) ("Participation of the general counsel does not automatically cloak the investigation with legal garb."); see also Pacific Gas and Elec. Co. v. United States, 69 Fed. Cl. 784, 793 (Fed. Cl. 2006) ("In the securities regulation context, some courts have held that documents prepared for an independent auditor in connection with a publicly held corporation's efforts to comply with the federal securities laws do not constitute attorney work product because they are created primarily for (or because of, depending on the standard used) the business purpose of preparing financial reports that would satisfy the requirements of the federal securities laws."). Grace's aggregate liability estimate for pending claims and the actuarial studies that it relied on when it disclosed its liability projections to its shareholders and the SEC are classic examples of business planning/financial documents which were prepared for purposes and reasons well beyond any potential litigation in this bankruptcy case.

That the amounts used in the SEC disclosures were also used in setting the Plan Funding level of Grace's Plan of Reorganization does not transform their methodology and basis from discoverable to protected. Indeed, the fact that Grace's liability is an issue in the case is the strongest possible demonstration of the relevance of an inquiry into how Grace has calculated that liability, not a reason for blanket protection.

Nor is it correct, as Grace claims, that immunity from discovery attaches automatically to everything that forms the basis for a proposed Plan. If the financial documents and projections that underlie the financial aspects of a proposed plan of reorganization could be shielded from

discovery based upon the assertion that because the plan is likely to be contested the documents or assumptions were "prepared in anticipation of litigation" as Grace posits in page 12 of its Motion, then no debtor or plan proponent would ever be subject to discovery concerning the basic financial assumptions and documents which underlie a proposed plan. Such an overbroad interpretation of the work product doctrine is simply not the law.[3]

---

[3] The protection afforded certain documents in <u>Matter of Celotex Corp.</u> did not, as Grace claims in page 13 of its Motion, turn on the documents at issue being related to a proposed plan, but on the fact that they were "direct evidence of Debtor's *professional activities* associated with the general case," i.e., the professional advice it received from counsel and experts in the underlying bankruptcy, and not the transfers at issue in the fraudulent transfer proceeding in which their discovery had been sought. 196 B.R. 596, 599 (Bankr. M.D. Fla. 1996) (emphasis added).

**CONCLUSION**

Grace's Motion to Quash 30(b)(6) Deposition Notice and For a Protective Order should be denied in all respects.

Dated: January 5, 2007

Respectfully submitted,

CAMPBELL & LEVINE, LLC

/S/ Mark T. Hurford
Marla R. Eskin (No. 2989)
Mark T. Hurford (No. 3299)
800 North King Street, Suite 300
Wilmington, DE  19801
(302) 426-1900

   -and-

CAPLIN & DRYSDALE, CHARTERED
Elihu Inselbuch
375 Park Avenue
New York, NY  10152
(212) 319-7125

   -and-

CAPLIN & DRYSDALE, CHARTERED
Nathan D. Finch
Walter B. Slocombe
Adam L. VanGrack
One Thomas Circle, N.W.
Washington, D.C.  20005
(202) 862-5000

*Counsel to the Official Committee of Asbestos Personal-Injury Claimants*