**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W.R. GRACE & CO., *et al.*, | ) | Case No. 01-1139 (JKF) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |
| | ) | Related Docket Nos.: 14057 & 14239 |
| | ) | Hearing Date: January 23, 2007 @ 9:00 a.m. |

**THE OFFICIAL COMMITTEE OF ASBESTOS PERSONAL INJURY CLAIMANTS'
REPLY MEMORANDUM IN SUPPORT OF ITS
MOTION TO COMPEL DEBTORS' PRODUCTION OF CERTAIN DOCUMENTS
<u>REFERENCED IN THEIR SECURITIES FILINGS</u>**

CAMPBELL & LEVINE, LLC

*/S/ Mark Hurford*
Marla R. Eskin (No. 2989)
Mark T. Hurford (No. 3299)
800 North King Street, Suite 300
Wilmington, DE  19801
Telephone: (302) 426-1900
Telefax: (302) 426-9947

-and-

CAPLIN & DRYSDALE, CHARTERED
Elihu Inselbuch
375 Park Avenue
New York, NY  10152-3500
(212) 319-7125

Peter Van N. Lockwood
Nathan D. Finch
Walter B. Slocombe
Adam L. VanGrack
One Thomas Circle, N.W.
Washington, D.C.  20005
(202) 862-5000

*Counsel to the Official Committee of
        Asbestos Personal Injury Claimants*

Dated:  January 12, 2007

{D0078458.1 }DOC# 275840 v3 - 01/12/2007

W.R. Grace & Company's ("Grace") arguments that the documents which underlie the asbestos liability reserve reflected in its securities filings are exempt from discovery are unavailing because (1) the documents at issue are materials prepared for SEC filings and are therefore not work product prepared in anticipation of litigation; (2) Grace has waived any work product or attorney client privilege; and (3) the parties' expert discovery stipulation does not cover documents prepared for purposes unrelated to the Estimation Hearing.

I.    **<u>The Documents Underlying Grace's Asbestos Reserves are Not Privileged</u>**

Grace's broad assertion that "[d]ocuments prepared in the development or defense of a contested plan of reorganization are protected work-product," Opp. at 8, is a red herring. Grace did not just use its consultant's estimate in formulating a plan, it also used it as the basis for the asbestos liability reserve reported in its 10-Ks as it was required to do under the accounting rules and SEC regulations. Under SEC Rules and Regulations, public companies are required to publish their audited financial statements in their annual 10-K filings. Securities Exchange Act of 1934 (15 U.S.C.A. § 78m). Generally Accepted Accounting Principles ("GAAP") governing the presentation of financial results in a financial statement in turn require that an estimated loss from a contingent liability must be accrued and an estimate of the liability recorded as a "reserve" on the balance sheet when (1) it is probable that the liability had been incurred as of the date of the financial statements and (2) the amount of the liability can be reasonably estimated. Financial Accounting Standards Board, SFAS No. 5, ¶ 8 (Exh. 1). GAAP also requires that when a contingent liability for litigation meets these criteria the estimate must be a reasonable estimate of at least the minimum likely cost to resolve the liability, as opposed to the company's litigation position on the amount of the claim. Id. ¶¶ 26, 33-39; see also Financial Accounting Standards Board, FASB Interpretation No. 14, Reasonable Estimation of the Amount

of a Loss (Exh. 2).  Thus by putting an asbestos liability reserve of $1.6 billion in its 10-K, Grace

and its auditors represented to Grace's shareholders and the SEC that this was a reasonable

estimate of the likely minimum cost of its asbestos litigation, and not simply Grace's litigation

position in the bankruptcy court.

The Eighth Circuit's decision in Simon v. G.D. Searle & Co., 816 F.2d 397, 401-02 (8th

Cir. 1987) is directly on point and should be followed here:  Grace's aggregate reserve

information served "numerous business planning functions" and did not "enhance[] the defense

of any particular lawsuit."  Id. at 401; see also United States v. El Paso Co., 682 F.2d 530, 543-

44 (5th Cir. 1982) (documents "[w]ritten ultimately to comply with SEC regulations" were

prepared "with an eye on its business needs, not on its legal ones" and did not "contemplate

litigation in the sense required to bring it within the work product doctrine"); McEwen v.

Digitran Sys., Inc., 155 F.R.D. 678, 684 (D. Utah 1994) ("foundational documents in the

preparation of the [SEC] 8-K report which was required for compliance with federal securities

laws" were not subject to work product protection; Court was "not convinced that the 'primary

motivating purpose' in the creation of the [SEC reports] was to assist attorneys in connection

with pending or anticipated litigation"); see also United States v. Rockwell Int'l, 897 F.2d 1255,

1259-60 (3d Cir. 1990) (citing United States v. El Paso Co., 682 F.2d at 537).

II.    **Grace Has Waived Any Privilege Or Work Product Protection Of Materials Related To Its Asbestos Liability Reserves.**

We submit that an in camera review would demonstrate that the aggregate asbestos

liability estimates, and their underlying documents and analyses, prepared for Grace's 10-K

disclosures (both pre and post-petition) are simply not the kind of documents or materials that

would reveal Grace's advisers' thoughts about litigation or its lawyers' advice.  But even if the

documents and analyses underlying Grace's asbestos liability reserves were at one time protected

by any type of privilege (which they are not), Grace waived any such protection by voluntarily producing them in the <u>Sealed Air</u> litigation and then allowing them to be produced by the ACC to the United States Government pursuant to a subpoena.  In <u>Sealed Air</u>, Grace made the tactical choice to produce the documents and actuarial studies underlying its asbestos reserves to the ACC and PD Committees.  Judge Wolin's May 21, 2002 Order (Exh. I to Opp.) does not provide that all of the reserve materials produced in <u>Sealed Air</u> are privileged or work product.  The Order was the result of a compromise of a discovery dispute without prejudice to the rights of the parties to assert later that a waiver had already occurred and provides only that the production of documents pursuant to the Order would not in and of itself effect a waiver.

More importantly for present purposes, all of the documents Grace ever produced to the ACC, including the asbestos reserve documents it produced in the <u>Sealed Air</u> litigation, were later produced by the ACC to the United States Government pursuant to a subpoena (Exh. 3). Grace was notified of this subpoena yet did not object on work product, privilege, or other grounds.  It is black letter law that once supposedly privileged or work product documents are disclosed to an adverse party (such as the ACC or the United States Government), any such protection is waived forever.  <u>See, e.g.</u>, <u>In re Steinhardt Partners, LP</u>, 9 F.3d 230, 234-35 (2d Cir. 1993); <u>Westinghouse Elec. Corp. v. Republic of the Philippines</u>, 951 F.2d 1414, 1423-24 (3d Cir. 1991) (voluntary disclosure to a third party of purportedly privileged material effects a waiver of the applicable privilege); <u>Permian Corp. v. United States</u>, 665 F.2d 1214, 1219-21 (D.C. Cir. 1981); <u>In re Sealed Case</u>, 676 F.2d 793, 809 (D.C. Cir. 1982).  It is equally clear that once the privilege or work product protection is waived, the waiver extends to all materials related to the same subject matter (in this case, all materials related to Grace's estimates of its asbestos liability prepared for SEC purposes).  <u>See Weil v. Investment/Indicators, Research & Mgmt., Inc.</u>, 647

F.2d 18, 24 (9th Cir. 1981) ("it has been widely held that [a waiver of privilege] constitutes waiver of the privilege as to all other such communications on the same subject"); <u>Sheet Metal Workers Int'l Ass'n v. Sweeney</u>, 29 F.3d 120, 125 (4th Cir. 1994); 8 Wigmore on Evidence § 2328, at 638 (McNaughton rev. ed. 1961); <u>see also, e.g.</u>, <u>Novartis Pharms. Corp. v. Eon Labs Mfg.</u>, Civ. No. 00-800-JJF, 2002 U.S. Dist. LEXIS 6491, at *8-9 (D. Del. March 28, 2002) (once privileges are waived, "everything with respect to the subject matter of counsel's advice is discoverable"); <u>In re Nat'l Smelting of New Jersey, Inc. Bondholders' Litig.</u>, Civ. No. 84-3199, 1989 U.S. Dist. LEXIS 16962, at *41 (D.N.J. June 29, 1989)("The waiver . . . waives the privilege not only with respect to the communications actually relied upon or revealed, but also with respect to all documents and communications upon the same subject matter.").

## III.    The Expert Discovery Stipulation Does Not Shield These Documents

Grace argues that information about the $1,613 million reserve it reported in its 2004 and subsequent 10-Ks is protected from discovery by the parties' stipulation covering "preliminary, intermediate, or draft materials prepared by or at the direction of the expert witness."  Opp. at 5. Grace's argument that the stipulation protects the information underlying the reserve from discovery amounts to saying that any work done by a person designated as a prospective testifying expert is protected from discovery, even if that work is in a wholly different context than prospective testimony, and the product was used for wholly different purposes.  That extends the stipulation far beyond its clear intent and terms, which relate only to drafts of an "expert's opinions in this matter" (Stipulation at ¶ 1, Exh. D to Opp.), not to everything a consultant may have done for Grace for purposes unrelated to the Estimation Hearing.

The ACC does not dispute that if Grace had – even before the date of the stipulation – engaged an expert to testify in the estimation proceeding, a preliminary version of his or her expert report would be within the scope of the stipulation.  However, that is not what has

happened here. Assuming that a prospective testifying expert did the actuarial analysis underlying the $1,613 million reserve,[1] that work appears to have been unconnected to whatever possible testimony on the amount of the estimated aggregate liability which Grace will proffer at the Estimation Hearing, and instead was prepared for SEC reporting and plan formulation purposes. The 10-K itself explains that Grace has no intention of adopting the $1,613 million number as its estimate of the aggregate liability, noting that it "will seek to demonstrate that most claims should not be allowed" and that "if the Bankruptcy Court agrees with Grace's position on the number of, and the amounts to be paid in respect of, allowed personal injury…claims, then Grace believes that the Funding Amount [that is the estimated aggregate liability] could be less than $1,613 million." Grace 2005 10-K at 23. The Shelnitz Declaration describes the consultant's product as "a preliminary estimate of Grace's asbestos-related funding obligations *under the claims resolution procedures in its draft proposed plan,*" (¶ 2, emphasis added), not a reflection of what Grace plans to present as the correct estimate. Nor does Grace even pretend that the consultant used the same "questionnaire-based" methodology to arrive at the Funding Amount that Grace's testifying experts will rely upon for their estimate of the aggregate liability at the Estimation Hearing.

The stipulation thus protects only material related to the preparation of eventual testimony on estimation, not work done for Grace (even if by a potential witness) for purposes unrelated to the Estimation Hearing such as reporting the company's liabilities in its 10-Ks.

---

[1]  It is not even clear that whoever did the actuarial work underlying the $1.613 million reserve is among Grace's designated testifying experts, who are the only consultants covered by the stipulation. Grace's Opposition (at 6) says the numbers used in the 2005 10-K "were prepared by one of Grace's testifying experts." However, the Declaration of its General Counsel speaks only of a request to "its expert actuarial consultant." Opp., Exh. C at ¶ 2. The above discussion assumes that Grace is prepared to represent unequivocally that its testifying expert did the work underlying the reserve.