

# Expert Report of
# Richard J. Lee, Ph.D.

*For Asbestos Property Damage Claims*
*Lack of Hazard Proceeding*

*Project Number: LSH505344*

**Report Date: January 15, 2007**

**Prepared for:**
**W. R. Grace & Co.**

Prepared by:
**RJ Lee*Group*, Inc.**
350 Hochberg Rd.
Monroeville, PA 15146
www.rjlg.com

*Expert Report*

# Table of Contents

Preface ....................................................................................................................... 1

Executive Summary ................................................................................................. 1

1.0    Qualifications ................................................................................................. 4

2.0    Background .................................................................................................... 6

2.1    Usage of ACM in Buildings ........................................................................ 6

2.2    Hypotheses of the 1970's and 1980's Concerning Asbestos ................... 6

      2.2.1    Asbestos Exposure in a Yale Building ........................................ 6

      2.2.2    Early Tests of Sprayed Asbestos Surfaces in School Buildings ... 7

      2.2.3    EPA's Guidance Document (Orange Book) ................................. 7

      2.2.4    EPA Algorithm ............................................................................. 8

      2.2.5    EPA Guidance Document (Blue Book) ....................................... 8

      2.2.6    EPA Guidance (Purple Book) ...................................................... 9

2.3    Current Regulatory Environment ............................................................... 9

3.0    Grace ACM Surfacing Products are Competent Materials ...................... 10

3.1    Physical Characteristics, Composition and Properties of Grace Surfacing Materials ............... 10

3.2    Grace Building Materials are Cementitious .............................................. 11

3.3    Cementitious Materials Do Not Spontaneously Degrade or Shed Fibers .................... 11

3.4    Cementitious Materials, Properly Applied, Are Strong and Resistant to Spalling,
      Delamination and Impact ......................................................................... 12

3.5    The Asbestos in the Materials at Issue Is Not Respirable ........................ 12

4.0    Only Airborne Asbestos is Relevant to Risk of Harm .............................. 13

4.1    Air Sampling is Required to Assess Asbestos Exposure .......................... 13

4.2    Air Sample Analysis ................................................................................... 14

      4.2.1    Indirect Preparation .................................................................... 14

      4.2.2    Relevant Fiber Size ..................................................................... 14

      4.2.3    Environmental Surveys ............................................................... 15

4.3    Regulatory Agencies Determined Permissible Exposure Limits to Airborne Asbestos Fibers 15

      4.3.1    EPA Risk Analysis ....................................................................... 15

5.0    In-place asbestos-containing surfacing materials do not spontaneously release or shed
      respirable asbestos fibers, nor, under conditions of normal usage, result in elevated airborne
      asbestos levels in buildings. ..................................................................... 15

5.1    Airborne Asbestos Levels in Canadian Public Buildings ......................... 16

5.2    GSA Study ................................................................................................... 16

5.3    Airborne Asbestos Levels in United Kingdom Buildings ......................... 18

5.4    71 Schools in Asbestos in Buildings Litigation ........................................ 19

*Expert Report*

5.5    Health Effects Institute – Asbestos Research ........................................................................ 19

5.6    Exposure to Airborne Asbestos in Buildings – 315 Buildings in Litigation ................................. 21

5.7    Airborne Asbestos Concentrations in 752 Buildings .............................................................. 22

6.0    Airborne asbestos fiber levels produced by impacts of ordinary operations and maintenance activities on in-place asbestos-containing surfacing materials do not result in airborne exposures to maintenance or other workers above the OSHA excursion limit or above the current or past OSHA Permissible Exposure Limit (PEL). ................................................... 23

6.1    Maintenance Worker and Occupant Exposures – 1227 Samples, non-litigation ..................... 23

6.2    Maintenance Worker Sampling During O&M Activities – 1345 Samples .............................. 24

6.3    The Health Effects Institute-Asbestos Research (HEI-AR) Report ....................................... 25

6.4    Assessment of Airborne Asbestos Exposure to Custodial Employees – 138 Samples ............. 25

6.5    Asbestos Exposures of Building Maintenance Personnel – 500 Samples .............................. 26

6.6    Airborne Fiber Levels in a Hospital Operations and Maintenance Program – 394 Samples. 27

6.7    O&M in Large Washington DC Office Building ..................................................................... 27

6.8    Asbestos Exposure of Building Maintenance Personnel – 1008 Samples ............................. 28

6.9    Building Owner Air Sample Data ....................................................................................... 29

6.10   Plaintiff Expert Simulation Data Developed for Asbestos in Buildings Litigation ................... 31

        6.10.1 Cable Pulling ......................................................................................................... 31

        6.10.2 Playing in a Gym and Cleaning Bookshelves ......................................................... 31

        6.10.3 Maintenance Worker Activities .............................................................................. 32

7.0    Air Sample Data Provided by the Claimants Are Consistent with Published Data ................. 32

8.0    The disturbance of ACM materials, dust or debris in the normal course of building operations produces only localized airborne asbestos levels that are even then generally well below the OSHA permissible exposure limit. ................................................................ 33

8.1    Airborne Asbestos Concentrations in Buildings Following the Loma Prieta Earthquake ....... 33

8.2    Airborne Asbestos Concentrations During Crumbling / Pulverization of Fireproofing Material ........................................................................................................................... 34

8.3    Report on On-Site Investigation of Asbestos Redispersion in Air ......................................... 35

9.0    Surface concentration of asbestos structures, measured using indirect preparation methods, is not an indicator of past release of respirable fibers or a predictor of the potential for future releases. ................................................................................................................ 35

9.1    Post Earthquake Residential Sampling – Northridge Earthquake ....................................... 37

10.0   The extensive body of exposure data demonstrates that the cumulative exposures to building occupants and maintenance workers are well below the lifetime exposures permitted by OSHA .......................................................................................................... 39

*Expert Report*

# List of Tables

Table 1. Summary of Indoor Air Concentrations for Various GSA Buildings..........................................................17

Table 2. Summary of Indoor Air Concentrations for Various Buildings Nationwide ............................................23

Table 3. Summary of Indoor Air Concentrations for Various Buildings Nationwide ............................................30

Table 4. Summary of Claimant Air Sample Data ................................................................................................33

Table 5. Summary of Reported Airborne Fibers Levels .......................................................................................40

# List of Figures

Figure 1.  Testing Performed by the EPA in Libby shows no correlation between airborne asbestos concentrations and asbestos in the surface dust.  Each point corresponds to a measurement of asbestos concentration in surface dust and a corresponding measurement of airborne asbestos fiber concentration.  If surface dust was a predictor of airborne levels, the points would tend to fall along a line, not along the axes of the graph. ................................................................................37

Figure 2.  Testing performed following the Northridge earthquake shows no correlation between airborne asbestos concentrations and asbestos in the surface dust.  As in the graph of Libby samples (Figure 1), had the surface dust levels been a predictor of airborne levels, the points would not have clustered along the axes of the graph. ...................................................................................39

# List of Attachments

Attachment 1 – Richard J. Lee, Ph.D., CV and Publications List

Attachment 2 – Richard J. Lee, Ph.D., List of Testimony

Attachment 3 – Expert Report of Richard J. Lee, "Limitations of Dust Sampling Methodology", In the matter of In Re: W. R. Grace & Co., et al., October 17, 2005; Rebuttal Expert Report, "Limitations of Dust Sampling Methodology", In the matter of In Re: W. R. Grace & Co., et al., January 19, 2006.

# Expert Report
# Asbestos Property Damage Claims

## Preface

RJ Lee Group, Inc. (RJLG) was asked by W. R. Grace & Co. (Grace) to prepare a report summarizing the work of RJLG and others related to asbestos-containing surfacing materials in buildings and the potential for those materials to pose an unreasonable risk of harm to building occupants.

## Executive Summary

Asbestos-containing materials (ACM) were installed in buildings throughout the US for more than 60 years. The usage dramatically increased with the advent of spray-on surfacing materials and the corresponding increase in high-rise buildings in the early 1960's. Estimates were that at least 733,000 public and commercial buildings had asbestos-containing surfacing materials, possibly many more[1],[2]. Discovery of asbestos disease among asbestos insulators in the 1960's prompted concerns about the potential for disease in other populations and led to restrictions on asbestos usage in the early 1970's.

In the late 1970's, work by Sawyer[3] prompted widespread concern about the potential implications of asbestos surfacing materials in buildings. Sawyer found asbestos debris in the Yale Law Library and measured elevated fiber concentrations by PCM. Sawyer postulated a pathway model for exposure that included spontaneous release of fibers from in-place materials and episodic exposures through entrainment of fibers from asbestos dust and debris as primary pathways or exposure routes for asbestos exposure to building occupants.

Inspired by Sawyer's model, hypotheses were formulated in the late 1970's that the mere presence of asbestos-containing surfacing materials in buildings would cause a second wave of asbestos disease, particularly mesothelioma, in the general population. More than 30 years have elapsed since the formulation of those hypotheses. However, no scientific data emerged to support the postulate, and it was generally discredited by the early 1990's.

Hypotheses were formulated in the 1980's, using Sawyer's model, that airborne levels in buildings could be predicted based on the condition and extent of damage to asbestos-

---

[1] J.F. Strenio, P.C. Constant, D. Rose, M. Gabriel, D.E. Lentzen (U.S. Environmental Protection Agency (EPA)), "Asbestos in Buildings: A National Survey of Asbestos-Containing Friable Materials - Final Report," Exposure Evaluation Division, Office of Toxic Substances, U.S. Environmental Protection Agency (EPA), EPA Contract no. 68-01-6721 and 68-02-3938 ;June 1984 & October 1984.

[2] Health Effects Institute - Asbestos Research (1991). "Asbestos in Public and Commercial Buildings: A Literature Review and Synthesis of Current Knowledge," p. 4-10.

[3] R. N. Sawyer (1977). "Asbestos Exposure in a Yale Building", *Environmental Research*, 13, p. 146-169.

Expert Report

containing surfacing materials. By the late 1980's, however, these hypotheses were generally discredited by the data, including data analyzed for the EPA.[4]

Using Sawyer's model, measurements of asbestos surface dust concentrations on surfaces were postulated in the mid 1980's as a predictor of airborne asbestos levels in buildings and exposures to maintenance workers in general. This assumption suggests that indoor air levels should be elevated relative to outdoor air levels. It is now generally accepted that this is not the case. Based on an extensive evaluation of 67 public buildings in five cities, the EPA in a 1987 report to Congress concluded that airborne asbestos levels in public buildings with asbestos-containing surfacing materials were no different than outdoor air.

By 1990, EPA had altered its guidance on asbestos to recommend that in-place ACM in good condition be managed in place. As noted by the EPA, "Based upon available data, the average airborne asbestos levels in buildings seem to be very low. Accordingly, the health risk to most building occupants also appears to be very low"[5]. By 1992, a study conducted by the Health Effects Institute-Asbestos Research Panel (HEI), under a mandate from Congress, concluded that airborne levels in well-maintained buildings with asbestos-containing surfacing materials were no different than ambient background levels.

Subsequently, in the last 15 years, numerous other studies and peer-reviewed publications have been published with substantially the same conclusions. These studies generally show indoor air levels are not significantly different than outdoor air levels and that maintenance worker exposures are generally well below OSHA levels.

Ultimately, the explanation for why in-place ACM does not result in the unacceptable asbestos exposures predicted nearly three decades ago lies in the nature of the products and materials used. In particular, Grace manufactured products that were generally within the ASTM definition of "cementitious". Grace's asbestos-containing sprayed-on fireproofing product, MK-3, contained vermiculite, anhydrite, asbestos and water. The anhydrite and water react to form gypsum that binds the entire matrix together. Moreover, whenever the product is disrupted, the fracturing occurs in the gypsum, resulting in the released particles being mixtures of asbestos, vermiculite and gypsum with very few, if any, free asbestos fibers produced. In the case of the non-gypsum acoustical plaster products, high surface area clays adsorb water and bond tightly to the polar opposite high surface area chrysotile. Again, the nature of the product is such that the asbestos is encapsulated and bound to the matrix in a manner that prevents release of respirable fibers during the disruptions that might normally be expected to occur in a building environment.

---

[4] D. L. Keyes and B. P. Price (1983). "Guidance for Controlling Friable Asbestos-Containing Materials in Buildings", EPA 560-5-83-002.

[5] U.S. Environmental Protection Agency (1990). "Managing Asbestos In Place - A Building Owner's Guide to Operations and Maintenance Programs for Asbestos-Containing Materials." July 1990, p. vii..

*Expert Report*

Investigations over the years addressed cementitious and non-cementitious surfacing materials. As concluded by HEI, cementitious materials are less likely to release fibers when disrupted than are non-cementitious materials.

In addition, for over 20 years RJLG has been evaluating airborne concentrations of asbestos in buildings alleged to contain fireproofing and other building products manufactured by Grace. These studies and the results of investigations into the significance of asbestos-containing surfacing materials in buildings by other researchers permit the following conclusions:

- In-place asbestos-containing surfacing materials do not spontaneously release or shed respirable asbestos fibers, nor, under conditions of normal usage, result in elevated airborne asbestos levels in buildings.

- Airborne asbestos fiber levels produced during impacts of ordinary operations and maintenance activities on in-place asbestos-containing surfacing materials do not result in airborne exposures to maintenance or other workers above the OSHA excursion limit or above the current or past OSHA Permissible Exposure Limit (PEL).

- The disturbance of ACM materials, dust or debris in the normal course of building operations produces airborne asbestos levels only in the immediate vicinity of the disturbance, and even those localized airborne levels are generally well below OSHA PEL.

- Surface concentration of asbestos structures, measured using indirect preparation methods, is not an indicator of past release of respirable fibers or a predictor of the potential for future releases.

- For equivalent work histories, the expected lifetime exposure (i.e. concentration, frequency and duration of exposure) associated with airborne asbestos levels in buildings is only a small fraction of the projected lifetime exposure contemplated by the OSHA PEL concentration of 0.1 f/cc on an 8-hour Time Weighted Average (TWA).

I hold the opinions in this report to a reasonable degree of scientific certainty. In addition to the opinions set forth in this report, I may also rely on or comment on the publications, opinions, data and materials produced in discovery or contained in reports of other experts designated by the claimants or Grace in this action, and I reserve the right to amend or supplement this report as necessary.

Richard J. Lee, Ph.D.
President
RJ Lee Group, Inc.

*Expert Report*

## 1.0   Qualifications

Dr. Richard J. Lee obtained a Bachelor of Science degree in physics from the University of North Dakota in 1966 and a Ph.D. in theoretical solid state physics from Colorado State University in 1970. He then went to Purdue University as an Assistant Professor in physics where he taught courses on the principles of optical microscopy. He received tenure at Purdue in less than two years.

In 1973, Dr. Lee went to work for United States Steel, first as a research scientist and thereafter, as director of their physics and electron microscopy department in the Technical Center. He remained at the United States Steel Research Center until 1985. While at United States Steel, he analyzed a wide range of materials and was employed by NASA to analyze moon rocks brought back by the Apollo missions.

During his tenure at USS Research, Dr. Lee was responsible for developing the first techniques for quantitatively identifying amphibole asbestos fibers and cleavage fragments by a combination of transmission electron microscopy and energy dispersive X-ray analysis. He participated in the original ASTM committee that developed and evaluated the first TEM methods for preparing samples of air, bulk and water for the determination of asbestos content. Dr. Lee was the first scientist to develop methods for distinguishing asbestos amphiboles from cleavage fragments using transmission and scanning electron microscopy.

Since 1985, Dr. Lee has been President of a company now known as RJ Lee Group, Inc., (RJLG) which has its principal office in Monroeville, Pennsylvania, and laboratories in San Leandro, California; and Manassas, Virginia. RJLG provides research, analytical and consulting services relating to materials characterization. Materials characterization of bulk building materials, also referred to as "constituent analysis", involves analyzing a sample of material using various techniques to identify and quantify the components of that material.

Dr. Lee has a long history of scientific consulting and service for government agencies, including the EPA. RJLG's laboratory serves as a quality assurance and referee laboratory on a number of EPA programs. RJLG's laboratory performed the analyses for the EPA's major study on airborne levels of asbestos in public buildings. Dr. Lee has participated in the development by the EPA of analytical methods and procedures for asbestos analyses. The EPA requested that he personally participate in several projects, including the drafting of the portions of the EPA AHERA regulations governing air sample analysis after abatement.

RJLG also performs analyses for the United States Navy, the United States Army and the United States General Services Administration. Dr. Lee developed a program to determine the cause of failure in components of the guidance system in the Trident missile for the Department of the Navy.

Expert Report

RJLG's laboratory has also performed microscopic analyses for the State of California Air Resources Board when that agency performed testing of the air in major cities in the State of California to determine the presence of asbestos.

Dr. Lee is now engaged in and specializes in materials characterization, which is the science that uses a variety of analytical techniques to determine the identity and amount of each component of a material. He has performed materials characterization analyses on many samples of vermiculite produced from different sources for over 15 years. He is familiar with all methods of microscopy that are commonly used in characterizing asbestos or identifying and quantifying asbestos, including optical microscopy, scanning electron microscopy and transmission electron microscopy. He is also familiar with all known methodologies, from air sampling to dust sampling, with respect to asbestos. He has worked extensively with, and is an expert in, analytical techniques, including light and electron microscopy, materials characterization, asbestos air, bulk, and dust samples, and methods of evaluation. He has also served as an expert witness in litigation involving asbestos in buildings and ZAI and has testified in state and federal courts.

Dr. Lee is familiar with airborne levels of asbestos fibers both in buildings and in outdoor air, the sources of asbestos in the outside or ambient air, scientific knowledge and techniques regarding the measurement of levels of asbestos in the air, the development and use of the technology to measure both airborne levels of fibers and levels in materials samples, and the standards and methods used for air sampling. He has been involved in analyzing and producing bodies of air sampling data for EPA and other governmental and private entities including analysis of samples taken in an ongoing nationwide study of airborne levels in buildings and his analysis of air samples taken in an EPA-sponsored study in Texas.

He is also familiar with the history of standards governing asbestos including the current standards, regulatory positions and philosophies, different types of asbestos fibers, asbestos fiber levels as reported in the literature, as well as his own work concerning buildings with asbestos-containing materials.

A copy of Dr. Lee's curriculum vitae and publications list, as well as a list of his testimony for the past four years are attachments 1 and 2 hereto.

*Expert Report*

## 2.0   Background

### 2.1   Usage of ACM in Buildings

Asbestos was used in over 3000 products in buildings including plaster, insulation, floor tiles, gaskets, fireproofing, and textiles. Because of the large number of possible asbestos-containing products, the EPA and others conducted surveys to determine an estimate of the number of buildings nationwide with asbestos-containing material (ACM). Those estimates included 733,000[1] buildings with friable ACM. Other surveys suggested the number of buildings to be much higher (1 to 2 million), especially if non-friable ACM was considered.[2]

### 2.2   Hypotheses of the 1970's and 1980's Concerning Asbestos

Beginning in 1977 and extending through 1990, the EPA has discussed issues related to asbestos-containing materials and advised building owners on the purported hazards associated with ACM that may be in buildings. EPA's initial advisory indicated that the mere presence of ACM in a building may lead to asbestos contamination throughout the building. EPA has since revised its advisory several times and now advises that in-place ACM that is well maintained does not pose a threat to the building occupants. EPA recommends that building owners have an operations and maintenance (O&M) plan for the building to minimize the possibility of fiber release if the ACM is disturbed.

The development of data over the years led to the change in the EPA's conclusions: as more air data became available, it became apparent that airborne asbestos levels in buildings were not substantially different than ambient background concentrations. The reported airborne asbestos concentrations in buildings were shown to have no relationship to the presence of ACM, the location of the ACM, or the activity level in the room where the ACM was located. This later finding substantially discredited the contamination model postulated by the EPA by demonstrating that surface dusts generally do not become resuspended into the air due to normal work activities.

### 2.2.1   Asbestos Exposure in a Yale Building

Sawyer's work[6] was the first publication of a conceptual mode of building contamination from asbestos fibers contained in spray-on ceiling materials. A building at Yale University had spray-on ceiling materials, some of which was in poor condition due to vandalism ("capricious contact"). In addition, Sawyer postulates that some of the ceiling material experienced "gradual deterioration as air currents, ventilation leaks, and vibration resulted in fiber loss". He reported that air testing conducted between 1971 and 1975 showed airborne fiber content ranging from no fibers detected to 17 f/cc (as determined using phase contrast microscopy(PCM)).

---

6 R. N. Sawyer (1977). "Asbestos Exposure in a Yale Building", Environmental Research, 13, p. 146-169.

*Expert Report*

## 2.2.2   Early Tests of Sprayed Asbestos Surfaces in School Buildings

In 1978 Nicholson, et al[7] presented a general review of the literature (up to 1978) that concluded that chrysotile asbestos could be found in the ambient atmospheres at concentrations up to 100 ng/m³. Indoor air concentrations in 19 buildings averaged from 2.5 to 200 ng/m³ with individual measurements as high as 800 ng/m³. During an inspection of various New Jersey schools, an attempt was made to relate airborne asbestos concentrations to the physical condition of asbestos-containing materials. While air concentrations were higher in rooms with damaged materials when compared to intact materials, the degree to which the ACM was damaged appeared to have no correlation to airborne concentrations.

The authors tested friable ceiling material and a cementitious ceiling material by brushing and showed the friable ceiling material to release 16 times more fibers than the cementitious ceiling material. No fibers were observed on the personal air samples taken during brushing of the cementitious material.

## 2.2.3   EPA's Guidance Document (Orange Book)

The results of these early studies and the absence of a scientific basis on which to conclude that they were not representative of the universe of buildings with ACM had profound consequences. A two-volume document published in 1978[8] and known as the "Orange Book" represented the EPA's initial description of the issues related to asbestos-containing materials in schools. As noted by the EPA:

> "an equally serious exposure problem ... can occur in all types of buildings in which certain asbestos-containing materials have been used for fireproofing, insulation, and decoration. Asbestos can be released from these materials and contaminate the building environment."[9]

The document was an extension of the earlier Sawyer work[3] and proposes, in an EPA document, a schematic description of how asbestos could contaminate a building. Sawyer and Spooner (utilizing the same illustration as that in the Yale report) postulated three contamination procedures: fallout of fibers from the ceiling material, fiber release due to contact or disturbance of the material, and reentrainment of previously settled fibers. They suggested that the fallout was a continuous process resulting in low levels of asbestos; that fiber release due to contact happened occasionally but may result in high fiber concentrations; and that reentrainment (also called secondary dispersal) occurred frequently due, in part, to custodial activity. While never quantified, both the EPA Orange Book and the Sawyer paper implied that the mere presence of asbestos in buildings would substantively increase occupant risk of asbestos disease.

---

[7] W. J. Nicholson, A. N. Rohl, R. N. Sawyer, E. J. Swoszowski, Jr., and J. D. Todaro (1978). "Control of Sprayed Asbestos Surfaces in School Buildings: A Feasibility Study", report to NIEHS dated 6/15/1978, Environmental Sciences Laboratory.

[8] R. N. Sawyer and C. M. Spooner (1978). "Sprayed Asbestos-Containing Materials in Buildings: A Guidance Document", EPA-450/2-78-014. (Orange book)

[9] Ibid. Preface letter from S. D. Jellinek to School Officials, dated March 16, 1979, Orange Book Part 1.

*Expert Report*

### 2.2.4 EPA Algorithm

The premise that asbestos fibers were spontaneously released led to the concept that the condition of the ACM would be a key predictor of airborne fiber levels. An algorithm that reflected the physical characteristics of asbestos-containing materials was proposed as a tool that could be used to identify and prioritize materials control and/or remediation[10]. The premise behind the algorithm was that "a hazardous condition exists due to the presence of asbestos" in ACM (page A-1). Seven factors were examined as part of the rating system (algorithm): (1) the condition of the ACM; (2) the accessibility of personnel to the ACM; (3) the integrity of the ACM; (4) whether the ACM was part of a plenum; (5) what fraction of the ACM was exposed; (6) whether there was water damage to the ACM; and (7) the amount of activity in the vicinity of the ACM.

EPA's evaluation of the rating system in eight buildings (27 unique locations) indicated there was excessive variability in applying the rating system among a number of people. The report postulated that a four-hour training course would be necessary for each person applying the system in order to achieve acceptable reproducibility.

Fiber release experiments were conducted by placing a vibrating pad against ACM and measuring the resulting airborne fiber concentrations. Whether the ACM was cementitious or friable, the asbestos content of the ACM was shown to be related to the amount of released fibers. However, there was no relationship between the algorithm (nor the individual factors in the algorithm) and fiber release.

Patton, et al also reported on limited air sampling during periods of normal school activity and indicated there was "no relationship ... between the airborne fibers levels longer than 5 microns with an aspect ratio of 3:1 (OSHA fibers) and the exposure scores computed by the algorithm".[11]

### 2.2.5 EPA Guidance Document (Blue Book)

The Blue Book[12] was the next in the series of EPA guidance documents and was essentially an updated version of the Sawyer and Spooner paper. This work postulated that school buildings had airborne asbestos concentrations 100 times higher than outdoor air, but concentrations 1000 to 10,000 times lower than asbestos insulation workplaces. The Blue Book recommended avoiding exposures to airborne asbestos at levels above outdoor air levels. It suggested that a "prudent response by building owners requires recognition of the potential hazards and serious consideration of appropriate abatement actions." The school building air levels were based on the Constant Study[13] that was conducted in the

---

[10] J. L. Patton, C. W. Melton, E. W. Schmidt, J. S. Ogden, C. Bridges, T. A. Bishop, B. P. Price, and C. W. Townley (1981). "Asbestos in Schools", EPA 560/5-81-002.

[11] Ibid., page viii.

[12] D. L. Keyes and B. P. Price (1983). "Guidance for Controlling Friable Asbestos-Containing Materials in Buildings", EPA 560-5-83-002 (Blue Book).

[13] P. C. Constant, F. Bergman, D. Rose, G. Atkinson, D. Watts, E. Logue, T. Hartwell, and B. Price (1983). "Airborne Asbestos Levels in Schools", EPA 560/5-83-003.

*Expert Report*

Houston School District. Subsequent reviews of that study revealed serious flaws, including possible tampering with samples.[14,15]

The report also reviewed the results of the application of the scoring algorithms proposed by the EPA[10] and others. The results indicated that the "numerical ratings derived from subjective assessments of fiber release potential are not reliable indicators of measured airborne asbestos levels" (page 3-7).

### 2.2.6   EPA Guidance (Purple Book)

In 1985 the EPA issued another document, commonly referred to as the "Purple Book," which was titled "Guidance for Controlling Asbestos-Containing Materials in Buildings"[16]. This document modified the scope of EPA's recommendations from simply "removal is prudent" to recognizing that a number of factors affect the decision to remove ACM and offered guidance on the decision-making process. The document provided: (1) a current summary of data on exposure to airborne asbestos; (2) survey procedures for determining if asbestos-containing material was present in buildings; (3) procedures for establishing an asbestos operations and maintenance program in buildings found to contain asbestos; (4) a review of technical issues confronted when assessing the potential for exposure to airborne asbestos, particularly indoors; (5) a process for selecting a particular course of action given information on the physical condition of the asbestos, exposure levels, assessment methods, and abatement techniques; (6) updated information on the applicability, effectiveness, and relative costs of alternative remedial actions; and (7) criteria for determining successful asbestos control.

The guide pointed out that testing for ACM in buildings was required in primary and secondary schools only. No federal regulations required abatement actions (repair, removal, enclosure, or encapsulation) except as part of pre-demolition activities. The guide stated that although not required to do so by federal law, the prudent building owner should take steps to limit building occupants' exposure to airborne asbestos.

### 2.3   Current Regulatory Environment

The regulatory environment evolved rapidly over the ten years following the Sawyer study.[3] In 1990 the EPA issued another asbestos guidance document, more commonly known as the "Green Book," which was titled: "Managing Asbestos in Place: A Building Owner's Guide to Operations and Maintenance Programs for Asbestos-Containing Materials"[17]. The Green Book expanded and refined the Purple Book's guidance for an asbestos O&M program. In particular, the Green Book more strongly emphasized the

---

[14] G. J. Burdett (1985). "Inter-Laboratory Comparison of the U.S. Environmental Protection Agency School Samples by the UK Health and Safety Executive," Report No. IR/L/DI/86/03, November, 1985.

[15] Lee constant review

[16] U.S. Environmental Protection Agency (EPA) (1985). "Guidance for Controlling Asbestos-Containing Materials in Buildings." EPA 560/5-85-024, June 1985.

[17] U.S. Environmental Protection Agency (1990). "Managing Asbestos In Place - A Building Owner's Guide to Operations and Maintenance Programs for Asbestos-Containing Materials." July 1990, pp. 1-40.

importance of in-place management of ACM. It offered building owners more detailed and up-to-date instructions on how to carry out a successful O&M program. It also informed building owners, lenders, and insurers that a properly conducted O&M program could be, in many cases, a more appropriate strategy than other asbestos control strategies including removal.

Some of the key points described in more detail in the Green Book and which are referred to as "the Five Facts" are:

- Although asbestos is hazardous, the risk of asbestos-related disease depends upon exposure to airborne asbestos fibers.

- Based upon available data, the average airborne asbestos levels in buildings seem to be very low. Accordingly, the health risk to most building occupants also appears to be very low.

- Removal is often not a building owner's best course of action to reduce asbestos exposure. In fact, an improper removal can create a dangerous situation where none previously existed.

- EPA only requires asbestos removal in order to prevent significant public exposure to airborne asbestos fibers during building demolition or renovation activities.

- EPA does recommend a pro-active, in-place management program whenever asbestos-containing material is present.

Thus in just over a decade, the presumption that in-place ACM posed an unreasonable risk to occupants evolved to a presumption that in-place ACM posed little or no risk except in special circumstances. This change was largely a result of the accumulation of exposure data that had not been available in the early years. Subsequent events, additional studies, and the accumulation of data have merely strengthened the conclusions of the Green Book.

## 3.0   Grace ACM Surfacing Products are Competent Materials

There are physical reasons that surfacing materials do not give rise to significantly elevated airborne asbestos levels. In retrospect, it seems extraordinary that the community of scientists and regulators could have been so wrong in their assessment of the potential release of asbestos from asbestos-containing surfacing materials. The explanation is in large part due to the physical characteristics of surfacing materials, and in particular with Grace products.

### 3.1   *Physical Characteristics, Composition and Properties of Grace Surfacing Materials*

Fireproofing materials are applied to the surface of decks, beams and other structural members of buildings. Sprayed-on fireproofing containing asbestos was applied by either wet or dry methods beginning in the late 1950's through the early 1970's. In the dry method, the materials are blown through a hose and mixed with water at the point of

*Expert Report*

application. In the wet process, the materials are mixed with water, then pumped through a hose and applied. In both cases, the action of a water-activated binder causes them to adhere to the surface and, when dried or set, form a resilient cohesive coating.

The primary requirement of fireproofing materials applied to steel structures is that they both prevent the spread of fire and protect the steel structure against deformation during fire at least for sufficient time to permit the safe evacuation of building occupants. Thus, they must be fire resistant and they must provide a mechanism for the safe dissipation of heat to protect the steel members so that they retain their integrity, both long term over the life of the building and short term when subjected to a fire episode.

Fireproofing materials are tested and approved by the Underwriters' Laboratory before commercial usage. The American Society for Testing and Materials (ASTM), through its Committee E-6 on Performance of Building Constructions, has developed a number of standards designed to ensure the performance of fire resistive coatings[18]. Each of these standards stresses the importance of testing material which has been applied in accordance with the manufacturers' published instructions. The emphasis throughout these standards is to ensure serviceability of the fireproofing while in place ". . . to withstand the various influences that may occur during the life of the structure, as well as upon its satisfactory performance under fire tests"[18].

## 3.2    Grace Building Materials are Cementitious

The constituents of the Grace products at issue are such that the material meets the ASTM's definition of cementitious. It is this definition of cementitious which will be used throughout this report. The principal building products referred to are Grace Monokote fireproofing and Zonolite acoustical plasters.

The definition of *cementitious* given by ASTM, an organization that defines terms, standards and testing methods for materials, is "*A material that, when mixed with water, with or without aggregate, provides the plasticity and the cohesive and adhesive properties necessary for placement and the formation of a rigid mass*"[19]. Implicit in this definition is the ability of the material to adhere to the structure to which it is applied not only during application but also after setting in place.

## 3.3    Cementitious Materials Do Not Spontaneously Degrade or Shed Fibers

The constituents of the cementitious fireproofing materials at issue in this case are stable. They do not spontaneously degrade or shed fibers unless physically or chemically attacked. The constituents typically used in Grace building materials, in addition to various quantities of asbestos, include gypsum, cement, vermiculite, and clays. These materials are, after setting, chemically inert with respect to normal building conditions and environments. The bonding action between the cementitious matrix and its fiber

---

[18] ASTM Standards: E736, E759, E760, E761, E859, American Society for Testing and Materials, Philadelphia, 1995.
[19] ASTM Standard Definitions, C11-89, 1989.

*Expert Report*

reinforcement results in products which are dimensionally stable and possess excellent cohesion by virtue of the reinforcing action of the asbestos fibers. The components of these materials are found in nature giving rise to their intrinsic stability. The asbestos is encapsulated or otherwise tightly enmeshed by the primary constituents and itself becomes an interlocking member of the system. If mechanically disturbed or intruded upon, the system will fracture in such a manner as to release composite particles, not free, respirable fibers. These materials have been subjected to a variety of air erosion tests[20],[21],[22] which demonstrated, within the state-of-the-art, that they did not release asbestos fibers. In addition, RJLG has subjected one of these materials to extensive pulverization tests[23], demonstrating that no significant airborne fiber levels were produced by the action.

Thus, cementitious building materials do not spontaneously release fibers, delaminate or lose adhesion if they are correctly applied and if the building is properly maintained.

3.4    *Cementitious Materials, Properly Applied, Are Strong and Resistant to Spalling, Delamination and Impact*
Correctly applied and maintained cementitious fireproofing material will withstand degradation due to impact, bending, compression and air erosion. The materials of interest in this case are inert, nonreactive materials. They have been consolidated into a system that in and of itself will not degrade or deteriorate. Unless improperly applied or subjected to adverse environmental conditions, these materials will maintain their integrity. These materials have been subjected to impact tests and no evidence of cracking, delamination or flaking was found.[24]

3.5    *The Asbestos in the Materials at Issue Is Not Respirable*
Asbestos incorporated in building products does not normally fall into the respirable size range. The predominant form of asbestos in Grace's fireproofing is nonrespirable chrysotile fibers having diameters up to 2 mm or more with lengths several times greater. It is generally accepted that particles of diameter greater than 10 μm (0.01 mm.) are not respirable (for fibers of equivalent aerodynamic diameter, a maximum diameter of 3 μm, 0.003 mm, is often quoted as the respirable limit). Furthermore, the rate of settling out of air of particles greater than 10 μm is such that they will not remain suspended in the atmosphere absent some force maintaining them in the air stream. The grades of asbestos used in the asbestos-containing sprayed fireproofing at issue here include grades 5, 6 and

---

[20] Boyle Engineering Laboratory, " Report of Air Velocity Surface Erosion Test or Firecode Plaster", June 28-30, 1965.

[21] Boyle Engineering Laboratory, Report of Effect of High Velocity Air Upon The Surface of Mono Kote Material Having A Dry Bulk Density of 16.85 lbs. Per Cu. Ft., January 16-20, 1967.

[22] Bowser-Morner Testing Laboratories, "Dusting Test Conducted on Zonolite Mono-Kote Fireproofing Material," October 6, 1970.

[23] RJ Lee Group, Inc., Video tape, The Measurement of Fiber Release During Pulverization of Friable Fireproofing, September 1995.

[24] Froehling & Robertson, Inc., "Report of Test Sprayed on Fire Protection Type MK for Resistance to Cracking, Flaking, and Delamination under 240 Foot-Pound Impact," September 1965.

*Expert Report*

7. The grade which includes the smallest asbestos fibers is Grade 7. As much as 30% of the Grade 7 material is larger than 2 mm (2000 µm).

## 4.0   Only Airborne Asbestos is Relevant to Risk of Harm

Research to determine the relationship of asbestos and the potential to cause asbestos disease has reached a consensus that only airborne asbestos fibers are relevant to health and that mineralogy and the number of asbestos fibers in the air are related to risk. More recent research has indicated that durable fibers longer than 10 µm and thinner than 0.4 µm are most closely related to risk[25,26].

Government regulations are designed to control asbestos disease risk by limiting uncontrolled exposures to airborne asbestos. Measurement methods have been designed to count the number of asbestos fibers in accordance with the regulations.

In order to determine the potential risk to health due to inhalation of asbestos fibers, only the fiber content of the air is relevant. Governmental regulations designed to protect those working with asbestos specify a method for measuring the asbestos content in the air in a worker's breathing zone.

### 4.1   Air Sampling is Required to Assess Asbestos Exposure

For more than 20 years, air sampling has been the only recognized industrial hygiene method of assessing the risk of airborne asbestos exposure. Its value in evaluating exposure is recognized by every international regulatory and public health agency. It is mandated by OSHA, MSHA and recommended by ACGIH for the purpose of determining either potential or current worker exposure. It is required by EPA for the purpose of permitting re-entry after asbestos abatement.

Some studies have attempted to utilize surface dust sampling as a surrogate for measurements of airborne asbestos concentrations. In general, the dust methods have been discredited as a means for establishing either past airborne concentrations or predicting the likelihood of future exposures. RJLG addressed those topics in its Expert Reports on the "Limitations of Dust Sampling"[27], copies of which are attached hereto (Attachment 3) and incorporated herein.

---

[25] D. W. Berman and K. S. Crump (2003). "Final Draft: Technical support document for a protocol to assess asbestos-related risk," EPA, U.S. Environmental Protection Agency, Revision of original from September 4, 2001, Peer-reviewed consultation held in San Francisco on February 25-26, 2003.

[26] E. D. Kuempel, L. T. Stayner, J. D. Dement, S. J. Gilbert, and M. J. Hein (2006). "Fiber Size-Specific Exposure Estimates and Updated Mortality Analysis of Chrysotile Asbestos Textile Workers", presented at the Society of Toxicology meeting, March 6, 2006.

[27] Expert Report of Richard J. Lee, "Limitations of Dust Sampling Methodology," In the matter of In Re: W. R. Grace & Co., et al, October 17, 2005; and Rebuttal Expert Report of Richard J. Lee, "Limitations of Dust Sampling Methodology," In the matter of In Re: W. R. Grace & Co., et al, January 19, 2006.

*Expert Report*

### 4.2   Air Sample Analysis

Air sampling and analysis is the methodology by which exposure to asbestos fibers is measured. The concentration is determined by the number of fibers per unit volume of air measured. The methodology utilizes sampling apparatus that creates a partial vacuum at a membrane filter surface in order to capture airborne particles on the filter surface. The collected particulate is analyzed by either optical or electron microscopy. When the purpose of the sampling and analysis is to evaluate occupational exposure to asbestos, an air sampling apparatus is worn by a person. In other cases, the objective is to evaluate prevalent airborne concentrations in buildings or outdoor air in which case air sampling apparatus are set up in fixed locations.

### 4.2.1   Indirect Preparation

Performing the measurements of airborne concentrations requires the transfer of the particles collected on the surface of filters to media suitable for examination by optical or electron microscopy. Historically such measurements were made using a "direct transfer" method that minimizes disruption of the particles, and more particularly disruption of any asbestos fibers collected on the filters (NIOSH 7400). There is another method of preparation termed "indirect preparation", which uses a liquid media as the transfer mechanism. The "indirect preparation" method also utilizes sonication which results in apparent concentrations that are significantly higher than those made by the "direct preparation method"; the indirect method has been demonstrated to modify the asbestos fiber size distribution.[28],[29]   Indirect preparation dissolves the matrix materials that otherwise bind the asbestos fibers together generating or liberating individual, free asbestos fibers. As pointed out by Berman[30], this modification of the fiber distribution derived using the indirect preparation method invalidates the use of historical risk estimates. Thus, indirect preparation methods, while useful to determine the presence of asbestos, have no use in the evaluation of exposures. [31]

### 4.2.2   Relevant Fiber Size

OSHA regulations and EPA risk models are based on the risk associated with exposures to asbestos fibers $\geq 5$ μm long. The metric of exposure is based on the measurements using the NIOSH 7400 method (PCM). Electron microscopy is permitted as a supplement to the PCM to distinguish between asbestos fibers and other fibers. The relevant TEM parameter is called the PCME fiber, and is calculated to represent the range of fiber diameters visible in the optical microscope.

---

[28] D. R. Van Orden, R. J. Lee, R. J., and S. Badger (2006). "Characterizing asbestos fiber comminution resulting from preparation of environmental samples", Powder Technology, 162, pp. 183 – 189.

[29] RJ Lee Group, Inc. (1993). Videotape: "Ultrasonic Breakup of Chrysotile Grade 7M and Fireproofing", March 2, 1993.

[30] D. W. Berman (2006). Evaluation of the Approach Recently Proposed for Assessing Asbestos-Related Risk in El Dorado County, California. Report to the NSSGA.

[31] Health Effects Institute - Asbestos Research, "Asbestos in Public and Commercial Buildings", 1991.

### 4.2.3   Environmental Surveys

Environmental surveys generally rely on TEM analysis and report all fibers, including those less than 5 μm in length. Fibers of all diameters are typically included in the analysis, not just the PCME fibers. In such cases, the PCME concentration can be computed if the fiber diameters are known, or in the event fiber diameters were not recorded, the concentration of all fibers ≥ 5 μm in length can be treated as an upper bound on the PCME concentration and used accordingly.

### 4.3   Regulatory Agencies Determined Permissible Exposure Limits to Airborne Asbestos Fibers

On the basis of epidemiological data and risk analysis, permissible exposure levels (PEL) have been set by OSHA in the US. The PEL is the concentration of airborne asbestos to which a worker may be exposed for an 8-hour day, 5 days a week for a working lifetime of 45 years. The PEL has been reduced from ACGIH's proposed TLV of 12 fibers/cc in 1968 to OSHA's PEL of 5 in 1971, to 2, to 0.2, and to the current value, 0.1 f/cc for an 8-hour period.

### 4.3.1   EPA Risk Analysis

Exposure measurements made in occupational environments have been utilized to develop models of the risk associated with exposure to asbestos concentrations for various periods of time. This culminated in the development of the IRIS model by EPA, a model for estimating risk that is based on exposures to commercial asbestos fibers, longer than five micrometers, as measured by PCM in 15 environments[32]. The vast majority of the airborne fibers present in these environments was asbestos. IRIS recommends use of TEM to separate asbestos from nonasbestos fibers in mixed fiber environments.

## 5.0   In-place asbestos-containing surfacing materials do not spontaneously release or shed respirable asbestos fibers, nor, under conditions of normal usage, result in elevated airborne asbestos levels in buildings.

The results of air tests, from a wide range of buildings both here and abroad, consistently show that airborne asbestos concentrations in buildings are not significantly different than ambient background asbestos concentrations. Thus, the mere presence of asbestos-containing material does not give rise to elevated asbestos concentrations in buildings.

Levels of airborne asbestos in buildings throughout the US and other countries with asbestos-containing building products that have been significantly damaged do not differ significantly from levels of asbestos measured (1) outside these buildings, (2) in buildings with asbestos-containing products that have been maintained in good condition or (3) in buildings without asbestos-containing products.

Studies have been conducted in buildings from many locations detailing the levels of airborne asbestos in buildings. The lifetime exposure to building occupants, assuming a

---

[32] US Environmental Protection Agency, Integrated Risk Information System (IRIS), http://www.epa.gov/iris/subst/0371.htm.

*Expert Report*

45 year working lifetime, is less than one-tenth the exposure permitted by OSHA. The following sections summarize these studies.

5.1    *Airborne Asbestos Levels in Canadian Public Buildings*

Chatfield reviewed several studies[33] on airborne asbestos fiber concentrations both in the ambient atmosphere and in buildings and found urban areas to have slightly higher asbestos concentrations than rural area.

It was believed that the concentrations of asbestos in ambient air were likely to be different in urban and rural locations. Chatfield described one study comparing air samples from a city center, two suburban, one rural, and one remote rural location. At the rural and suburban locations, the majority of the samples reported no detected fibers (the results were below detection limits). Thus the concentrations were below the detection limit, which varied between 0.002 and 0.004 f/ml depending on the sample air volume. In the case of samples collected near the Toronto city center, fibers were detected in the majority of the samples, even though the analytical sensitivities were degraded as a consequence of the reduced sample volumes. Only one of the city center samples contained fibers ≥ 5 μm at an estimated concentration of 0.013 f/ml.

In another study conducted in an area upwind of an asbestos plant, the measured asbestos levels were comparable with those found in and around Toronto. In yet another study on asbestos levels in ambient air, no mean value exceeding 0.060 f/ml was found in the Metropolitan Toronto area, or exceeding 0.051 f/ml in other areas of southern Ontario. In terms of fibers ≥ 5 μm, all results in this study were below the detection limit of the measurements, which was generally in the range of 0.008 f/ml.

Chatfield referenced a number of studies on asbestos levels in Ontario buildings. In almost all cases, results were below or close to the detection limit of the analytical technique and thus not different than outdoor air.

5.2    *GSA Study*

A study of GSA buildings was the first major evaluation of asbestos in buildings with asbestos-containing surfacing materials that demonstrated that the presence and condition of the ACM did not impact airborne asbestos levels in buildings. In response to a directive from Congress, EPA commissioned a study[34] to evaluate indoor air in 1986. Public and commercial buildings managed by the General Services Administration (GSA) were the focus of this survey.

The primary goal of the study was to provide input to policy makers on whether an AHERA type regulation of the kind enacted for schools was needed for public and commercial buildings. However, as mentioned above, there was strong interest in the

---

[33] E. J. Chatfield (1985). "Airborne Asbestos Levels in Canadian Public Buildings." Proceedings of the Asbestos Fibre Measurements in Building Atmospheres, Ontario, Canada, pp.177-207.

[34] U.S. Environmental Protection Agency, General Services Administration, "Assessing Asbestos Exposure in Public Buildings." Final Report, May 1988.

*Expert Report*

Sawyer postulate, and whether a visual assessment of the ACM in a building was a valid means to determine associated risk. Therefore, additional goals of the GSA study were to field test the visual assessment method for differentiating and classifying buildings with ACM and determine if there was a relationship between airborne asbestos levels and building category. Based on the building categories, it was postulated that relatively low airborne asbestos levels would be found in building categories 1 and 2 (i.e., buildings with no ACM or buildings with ACM primarily in good condition) and relatively high asbestos levels would be found in building category 3 (i.e., buildings which had at least one area of significantly damaged ACM or numerous areas of moderately damaged ACM).

A total of 67 buildings were chosen for the study and classified into three Categories: (1) buildings without ACM; (2) buildings with all or most of the ACM in good condition allowing for a limited number of areas of moderate damage; and (3) buildings that had at least one area of significantly damaged ACM or numerous areas of moderately damaged ACM. After inspection, assessment, and bulk sampling and analysis, a total of 49 buildings were chosen for air monitoring.

A total of 387 air samples were collected from the 49 buildings. There were approximately eight indoor samples collected per building including 48 outdoor air samples. Pursuant to a contract with EPA, RJLG analyzed the samples using a direct preparation TEM method. There was no appreciable difference between outdoor air and air levels in any of the building groups. Of note, however, was that the single highest concentration observed was in a building with no ACM surfacing material.

In order to identify differences in asbestos concentrations between building categories, summary statistics of the airborne asbestos levels (determined using the AHERA TEM analytical protocol) for each of the three building categories was calculated. The average values[35] (Table 1) of the airborne asbestos concentrations for buildings from Category 1, 2, and 3 all showed very small values. In addition, no correlation could be made between the mean of outdoor samples and the mean of indoor samples for any of the building categories. Therefore, the EPA's assessment of the statistical data concluded that the presence or material condition of the ACM in the buildings was not directly related to the airborne asbestos concentrations.

Table 1. Summary of Indoor Air Concentrations for Various GSA Buildings

| Building Materials | Building Category | Mean, s/cc | Median, s/cc |
|---|---|---|---|
| No ACM | 1 | 0.00099 | 0.00010 |
| ACM | 2 | 0.00059 | 0.00040 |
| ACM | 3 | 0.00073 | 0.00058 |

---

[35] The GSA Study did not report concentration of fibers $\geq 5$ µm.

*Expert Report*

After no correlation between the airborne asbestos levels and the building categories was found, the consistency among different raters assessing the same sites and materials was evaluated. Inconsistencies were found and attributed to imprecision in definitions and lack of training.

In 1989 Crump and Farrar published a detailed statistical analysis[36] on the GSA data. They found no statistically significant differences in asbestos levels between indoors and outdoors and no statistical differences among the three categories of buildings. The average concentration of fibers ≥ 5 μm (0.00007 f/cc) found in indoor air was more than 2500 times lower than the OSHA standard at the time of 0.2 f/cc (as measured by PCM) and the highest concentration of such fibers measured in any single building (0.0005 f/cc) was about 400 times lower than the OSHA standard at the time.

Assuming a building occupant was exposed to these average airborne levels for 45 years, the cumulative exposure to the occupant would be < 1 percent of the current OSHA level. Given this low exposure, no AHERA-type regulation was ever promulgated for public and commercial buildings.

5.3   *Airborne Asbestos Levels in United Kingdom Buildings*

A study of airborne asbestos fiber levels in UK buildings[37], raised questions about the benefits of abatement when it was discovered that abatement projects could raise airborne levels in buildings. In that study, the UK Health and Safety Executive, in conjunction with the Department of the Environment, evaluated airborne asbestos concentrations in buildings under normal occupancy that contained ACM and buildings in the process of asbestos abatement.

A total of 43 normal occupancy buildings were sampled and divided into four categories including non-domestic buildings containing sprayed or trowelled asbestos material (12), domestic buildings containing sprayed asbestos or asbestos plaster (3), buildings with warm air heaters containing asbestos (25) and buildings with no asbestos materials (4). A total of three asbestos abatement sites were sampled and included in the study.

The air samples were prepared using a direct preparation method and the study reported only the concentration of asbestos fibers > 5μm long, < 3 μm wide and having an aspect ratio ≥ 3:1 as determined by TEM. A limit of quantification of four asbestos fibers was used in the study. Of the 39 asbestos-containing sites, 30 (73%) of the buildings did not exceed the limit of quantification. At the 12 sites with the sprayed/trowelled asbestos material, only three (25%) exceeded the limit of quantification. In the 24 buildings with

---

[36] K. S. Crump and D. B. Farrar (1989). "Statistical Analysis of Data on Airborne Asbestos Levels Collected in an EPA Survey of Public Buildings." Regulatory Toxicology and Pharmacology, pp. 51-62.

[37] G. J. Burdett, S. A. M. T. Jaffery, and A. P. Rood (1987). "Airborne Asbestos Fibre Levels in Buildings: A Summary of UK Measurements," presented at the WHO/IARC Symposium on Mineral Fibres in the Non-occupational Environment, September 1987, pp 227.

Expert Report

warm air heaters containing asbestos, there were no fiber concentrations in excess of 0.001 f/ml during normal usage and only five sites exceeded the limit of quantification.

All three asbestos abatement sites showed evidence of leakage from the plastic enclosures that surrounded the work areas during the abatement process. The studies found significant contamination of areas adjacent to abatement work sites. The studies also showed that concentrations of airborne asbestos during and several weeks following the abatement process were higher than prior to the abatement activity.

5.4   71 Schools in Asbestos in Buildings Litigation
Claims in the asbestos-in-buildings litigation were filed in hundreds of locations throughout the country claiming that occupants of buildings with ACM were exposed to elevated levels of airborne asbestos fibers. Defendants in the litigation, including Grace, commissioned air testing in buildings at issue. The first peer-reviewed publication of the data reported on 473 air samples collected in 71 school buildings[38]. In general for fibers ≥ 5 μm, the airborne levels were found to be orders of magnitude lower than OSHA occupational exposure limits, and not significantly different than outdoor concentrations in the vicinity of the schools.

The 71 schools included 44 from Texas, 15 from Colorado, 4 from Michigan, 3 from Ohio, 2 from Pennsylvania and 1 each from Florida, Tennessee, and Massachusetts. The 473 air samples analyzed included 328 indoor samples, 51 personal samples and 94 outdoor samples.

The air samples were analyzed by RJLG using direct TEM methods: Yamate et al. (1984) and the AHERA (USEPA, 1987). The average concentration of asbestos structures in indoor samples was 0.00023 f/cm³ for fibers ≥ 5 μm. The average concentration for outdoor samples was 0 f/cm³.

A statistical analysis of the type of ACM present, the condition of the ACM, the accessibility of the ACM to students and whether the ACM was covered, air flow, or whether sweeping was occurred during the sample collection was found to have no correlation with any of these parameters and airborne asbestos concentrations. There was also no correlation found between the mineral type of asbestos found in the air and the type found in bulk samples of building materials. Airborne asbestos concentrations were not significantly different in different types of schools or in schools constructed during different time periods.

5.5   Health Effects Institute – Asbestos Research
Concerns about the appropriate policy for handling asbestos in buildings continued even though the evolving air data continued to contradict the early assumptions that asbestos in buildings would be a significant risk factor to occupants. In 1992, an international panel of experts published a report concluding that under normal conditions, the lifetime

---

[38] M. Corn, K. Crump, D. B. Farrar, R. J. Lee, and D. R. McFee (1991). "Airborne Concentrations of Asbestos in 71 School Buildings." Regulatory Toxicology and Pharmacology, 13, pp. 99-114.

Expert Report

risk to occupants of buildings with asbestos-containing surfacing materials was no different than that to an individual who only lived outdoors. The study was conducted under the auspices of a multidisciplinary, independent, nonprofit organization called the Health Effects Institute-Asbestos Research (HEI-AR). Under a Congressional mandate, the HEI-AR was directed to (1) determine levels of airborne asbestos prevalent in buildings, (2) characterize peak exposures and their significance, and (3) evaluate the effectiveness of asbestos abatement and management strategies "in a scientifically meaningful manner". In response to the mandate, the HEI-AR reviewed scientific articles, reports and unpublished data and reported on (1) concentrations of airborne asbestos fibers found in public and commercial buildings; (2) exposure of building occupants, custodial, maintenance, and abatement workers; (3) possible impact on occupants and workers due to different asbestos removal strategies; and (4) significance of the different forms of asbestos on health effects.  These results were published in 1991[2] and a supplemental document dealing with three major collections of previously unpublished data was issued in 1992[39].

The HEI-AR report[2] stated that the concentrations of airborne asbestos fibers that building occupants or maintenance and custodial personnel could be exposed to in ACM containing buildings fall into three categories including (1) low ambient asbestos conditions as is typically found in well-maintained public buildings and where indoor and outdoor levels are very similar; (2) generally elevated ambient asbestos concentrations typically found in buildings with damaged ACM and released through human activities; and (3) locally elevated airborne concentrations due to specific activities of custodial and maintenance workers, construction activities, or abatement projects.

Ambient airborne asbestos concentrations were evaluated for a large number of buildings in several countries including the United States. The airborne asbestos concentrations were summarized for 1377 air samples obtained from 198 buildings that contained ACM. The data from the TEM direct preparation analyses showed that the concentrations in schools, residences and public and commercial buildings were 0.00051, 0.00019, and 0.00020 f/ml, respectively. In order to assess potential bias in the data collected for the purposes of asbestos in buildings litigation, the data from buildings sampled for litigation purposes were summarized separately and an arithmetic average for 171 schools, 10 residences, and 50 public and commercial buildings was 0.00011 f/ml, below the limit of detection, and 0.00006 f/ml, respectively.   The average outdoor airborne asbestos concentrations in rural and urban areas were 0.00001 f/ml and 0.0001 f/ml, respectively.

The HEI-AR panel found that the data supported that "ACM within buildings in good repair and undisturbed is unlikely to give rise to airborne asbestos concentrations above the levels found outside those buildings." The panel therefore concluded that "there does not appear to be sufficient justification on grounds of risk to health of general occupants for arbitrarily removing intact ACM from well-maintained buildings." HEI-AR reported

---

[39] HEI-AR (1992).  "Asbestos in Public and Commercial Buildings, Supplementary Analyses of Selected Data Previously Considered by the Literature Review Panel".

Expert Report

that the estimated cancer lifetime risk for building occupants was the same as that of a lifetime of continuous outdoor exposure, both 0.2% of the OSHA PEL.

5.6     *Exposure to Airborne Asbestos in Buildings – 315 Buildings in Litigation*
In 1995 an expanded study[40] involving a total of 2892 air samples from 315 public, commercial, residential, school and university buildings collected by defendants and building owners in asbestos in buildings litigation found similar results to those published in the earlier paper on airborne asbestos in 71 school buildings.  As with the schools, the 315 buildings were the subject of lawsuits claiming that the general building occupants were exposed to a potential health hazard as a result of ACM in the buildings. As in the schools, the lawsuits claimed that the building occupants could be exposed to airborne asbestos as a result of the mere presence of ACM, spontaneous emission of asbestos fibers from the ACM or the disturbance of the ACM during routine custodial, maintenance and renovation activities.

Over a five year period, 2892 air samples were collected, including 921 samples from 177[41] schools, 426 samples from 78 university buildings, 213 samples from 28 commercial buildings, 123 samples from 32 public buildings, and 10 samples from one residential building.   The distribution of sample types was: 1693 indoor samples, 759 outdoor samples, 106 personal samples and 334 blanks.  The samples represented locations where ACM was present and locations where there was no ACM.  In addition, factors such as low versus high activity levels, concentration of people, time duration of occupancy, and exertion levels were considered.

The air samples were analyzed by RJLG using direct TEM methods described by Yamate et al. (1984), and the AHERA (USEPA, 1987).  The average concentration of asbestos fibers $\geq$ 5 $\mu$m long was 0.00013 f/ml.  No asbestos fibers were detected in 48% of the indoor samples and 75% of the outdoor samples.  The analytical results also showed that the airborne asbestos concentration in 74% of the indoor samples and 96% of the outdoor samples was below the AHERA clearance level of 0.01 s/ml.  Considering the fibers which could be observed optically, all indoor and all outdoor samples were below the OSHA permissible exposure level of 0.1 f/ml.  The highest average PCME concentration was reported in school buildings (0.00011 f/cc).

The analytical results of this study showed that the average ambient air levels in buildings containing ACM are far below federal action levels and not different than outdoor air levels.   The lifetime exposure for buildings occupants (assuming a 45-year working lifetime) would be less than 0.5% of the OSHA level based on these data.  The results reinforced the EPA's public building study [34] which found very low ambient

---

[40] R. J. Lee, D. R. Van Orden, M. Corn, and K.S. Crump (1992).  "Exposure to Airborne Asbestos in Buildings", Regulatory Toxicology and Pharmacology, 16, pp. 93-107.
[41] 71 of the 177 school buildings were previously reported (see section 3.4 of this report) and are a subset of these data.

*Expert Report*

concentrations of asbestos fibers in buildings with ACM regardless of the condition of the ACM in the buildings.

5.7     *Airborne Asbestos Concentrations in 752 Buildings*

In all, the asbestos in buildings litigation resulted in a total of 6566 air samples from 752 nationwide buildings. The data represent an equivalent of 32 man-years of air sampling in a variety of buildings with different surfacing material, different maintenance regimes, in different localities, and of different age. The air samples demonstrate that air in buildings is generally not affected by the presence of asbestos-containing surfacing materials or actions associated with maintenance workers.

The 6566 air samples were collected for the defendants over a ten year period and included 1615 indoor air samples from 317 schools, 989 indoor air samples from 196 university buildings, 1336 indoor air samples from 234 public and commercial buildings, 39 indoor air samples from 5 residential buildings. There are a total of 3979 indoor samples (exclusive of personal samples), 1678 outdoor samples, and 111 personal samples.

The air samples were analyzed by RJLG using a Yamate Level II direct TEM method. The average concentration of all asbestos structures was 0.01 s/ml and the average concentration of asbestos ≥ 5 μm long was 0.00012 f/ml. The corresponding values for the outdoor air samples were 0.00109 s/ml and 0.00003 f/ml, respectively. For all samples, 99.9% of the samples were < 0.01 f/ml for fibers ≥ 5 μm long; no building averaged above 0.004 f/ml for fibers ≥ 5 μm long.

The analytical results showed that the average ambient air levels in buildings containing ACM are significantly below federal action levels. In fact, of the total 3979 indoor air samples collected, no sample exceeded 0.1 f/ml and in the 32 man-years of sampling there were only six days where the airborne asbestos concentrations even approached, but did not exceed, the OSHA PEL of 0.1 f/ml. The data indicate that average asbestos concentrations in buildings with ACM are far below (typically on the order of 1000-fold) federal action levels and historical levels observed in epidemiology studies.

Table 2 summarizes the indoor air concentrations for the various buildings. The data were divided into buildings with alleged Grace products and buildings which allegedly contained asbestos products from other manufacturers. The data indicate buildings with Grace products have slightly lower airborne asbestos concentrations than buildings with other ACM products.

*Expert Report*

Table 2. Summary of Indoor Air Concentrations for Various Buildings Nationwide

| Building | Type | Count | | PCME Asbestos Concentration (f/cc) | | |
|---|---|---|---|---|---|---|
| | | Building | Sample | Average | Median | 90th Percentile |
| Non-Grace | Commercial | 14 | 88 | 0.0003 | < 0.0001 | 0.0012 |
| | Public | 35 | 158 | < 0.0001 | < 0.0001 | < 0.0001 |
| | School | 139 | 679 | 0.0001 | < 0.0001 | 0.0006 |
| | University | 64 | 303 | 0.0001 | < 0.0001 | < 0.0001 |
| Grace | Commercial | 106 | 658 | < 0.0001 | < 0.0001 | < 0.0001 |
| | Public | 79 | 432 | < 0.0001 | < 0.0001 | < 0.0001 |
| | School | 178 | 936 | 0.0001 | < 0.0001 | 0.0002 |
| | University | 132 | 686 | < 0.0001 | < 0.0001 | < 0.0001 |

**6.0    Airborne asbestos fiber levels produced by impacts of ordinary operations and maintenance activities on in-place asbestos-containing surfacing materials do not result in airborne exposures to maintenance or other workers above the OSHA excursion limit or above the current or past OSHA Permissible Exposure Limit (PEL).**

With the development of significant data demonstrating that the presence of ACM in buildings did not present a health issue, attention in the asbestos in buildings litigation shifted from the general occupant to maintenance workers who might incidentally intrude into ACM during the course of their work.  Maintenance workers were initially believed to potentially be exposed to airborne asbestos levels similar to those observed in historical epidemiology cohorts.  It was postulated by some that incidental contact with asbestos-containing materials released significant quantities of free asbestos fibers that the worker would potentially breathe.  Some proponents also asserted that the release of asbestos fibers from such contact would also spread throughout a building potentially exposing general building occupants.

Gradually, review of historical exposure records and the accumulation of new exposure data showed that any exposures to maintenance workers performing routine O&M procedures were generally well below the airborne levels set to protect workers from continuous exposures accumulated over their working careers (OSHA PEL).  The major published studies of maintenance worker exposures are summarized below.

**6.1    Maintenance Worker and Occupant Exposures – 1227 Samples, non-litigation**

Price,[42] in a review of documents submitted to OSHA by a number of independent organizations, found exposures to airborne asbestos of maintenance workers in public buildings containing ACM (OSHA Docket No. H-033-e) to be far below historical occupational levels.  The data were collected as part of OSHA's 1990 proposed revisions to

---

[42] B. Price, K. S. Crump, and E. C. Baird, III (1992).  "Airborne Asbestos Levels in Buildings:  Maintenance Worker and Occupant Exposures", Journal of Exposure Analysis and Environmental Epidemiology, 2, p. 357-374.

*Expert Report*

the worker asbestos exposure rule. Nineteen organizations submitted air monitoring data to the docket by the November 30, 1990 submission deadline; however, only ten organizations in addition to OSHA submitted their air monitoring data with sufficient supporting documentation to be included in the docket. In total, the sample database consisted of 1227 air samples collected during small-scale, short-duration, routine maintenance activities; 349 samples were from OSHA studies and 878 samples came from the other ten organizations that submitted data with proper documentation. The samples fell into two categories: (1) samples collected to measure the exposure of workers while they were engaged in routine maintenance and repair activities; and (2) samples collected during normal building activity to measure prevalent levels in buildings. The median sample collection time across all of the samples was 130 minutes and ranged from 6 to 650 minutes.

Measurements of airborne asbestos levels during routine maintenance and repair work were based on fiber counting by PCM using either P&CAM 239[43], NIOSH 7400[68], or ID 160[44] fiber counting rules, depending on the source of the data. The data reflecting prevalent levels inside buildings were obtained from studies where direct TEM was used to measure fiber concentrations. Results across all categories indicated that maintenance and repair workers in buildings with ACM, after accounting for the frequency and duration of these types of activities, have typical annual exposure levels ranging from a median value of 0.002 f/cc per year to 0.02 f/cc per year at the 90th percentile.

The database also contained some information relevant to building occupants not involved in maintenance and repair work. Price found general occupant exposures consistent with those in the other major studies reported above. According to Price, building occupants experience average exposure levels ranging from 0.0003 f/cc to 0.0005 f/cc. It should be noted that the data presented in this study were obtained in a broad collection of buildings and for activities in those buildings that were not identified as being atypical in any way. The authors concluded that although the results from the study cannot be represented as national estimates, they should reflect typical airborne asbestos levels found in buildings and exposure levels experienced by building maintenance workers and other building occupants.

6.2    *Maintenance Worker Sampling During O&M Activities – 1345 Samples*
Price and Crump performed a review of another large database of air samples and found that episodic exposures were of little or no consequence in determining cumulative exposure to maintenance workers. The data were collected for the purpose of assessing the exposure of asbestos to building occupants and building maintenance personnel[45]. It had long been speculated that typical building air monitoring would under report possible

---

[43] NIOSH Manual of Analytical Methods, 2nd edition, Vol. 1., P&CAM 239, U.S. department of Health, Education, and Welfare, publication (NIOSH) 77-157-A (1977).
[44] D. T. Crane (1988). "Asbestos in Air", OSHA Analytical Methods Manual, Method ID-160, July 1988.
[45] B. Price and K. S. Crump (1992).  "Exposure Inferences from Airborne Asbestos Measurements in Buildings", IAQ 92, Environments for People, pp. 63-68.

Expert Report

airborne asbestos because these studies would not typically include episodic events such as maintenance work. The purpose of the Price study was to use the database of samples to evaluate the exposure potential of fiber release episodes, including the disturbance of ACM during repair or maintenance of a building, the accidental disturbance of ACM, or the "falling and dislodging" of ACM.

During normal building activities 1345 samples were collected from 288 buildings and represented 1000 days of air sampling. The air samples were analyzed with a direct TEM method. Measurements from samples collected during routine maintenance and repair were based on PCM—NIOSH 7400[68]. The results demonstrate that random fiber release episodes are not likely to significantly increase exposure in buildings as compared to routine building monitoring. In addition, the data showed that typical maintenance and repair practices involving ACM do not increase the levels of airborne asbestos in a building.

6.3    The Health Effects Institute-Asbestos Research (HEI-AR) Report
As part of their investigation into the significance of asbestos in public and commercial buildings, the Health Effects Institute-Asbestos Research (HEI-AR) report[2,39] reviewed data from a large O&M program and concluded that 90% of all samples were below the current OSHA limit of 0.1 f/cc. The data were provided as a result of a public request by the panel for any documented exposure studies. Other contributions included a number of smaller studies provided by McCrone Associates that showed no significant increase in fiber concentration during janitorial activities. Millette and Heffernan found concentrations generally below the TWA during dry sweeping of asbestos debris, cable pulling and tile removal. Kinney reviewed a large O&M program, finding that TEM concentrations on filters with elevated PCM counts (<0.029 f/cc) averaged 0.0109 f/cc (fibers > 5μm), well below the OSHA PEL. Keyes reported concentrations lower than the current TWA in a variety of simulations. Corn reviewed the data from a number of buildings and concluded that, with relatively simple procedures, airborne levels during O&M could be maintained below the PEL.

6.4    Assessment of Airborne Asbestos Exposure to Custodial Employees – 138 Samples
The Missouri Department of Health, under EPA sponsorship, found minimal elevation of airborne levels during routine maintenance activities, including sweeping up asbestos-containing debris. They conducted a study to assess the occupational exposure of custodians[46] to airborne asbestos during routine activities such as dry broom sweeping, hand dusting, vacuuming, dust mopping, and stripping vinyl asbestos tiles (VAT) and buffing VAT in buildings where ACM was present. The air sampling did not involve intentional disruption of the ACM as might occur with building maintenance personnel. However, the study was biased as to emphasize the occupational exposure to ACM by

---

[46] A. R. Wickman, D. W. Roberts, and T. L. Hopper (1993). "Exposure of Custodial Employees to Airborne Asbestos", Missouri Department of Health, Bureau of Environmental Epidemiology. pp. 1-22. June 16, 1993.

Expert Report

scheduling activities with a potential to dislodge asbestos fibers and choosing buildings containing extensive and damaged ACM.

A total of eight custodians working in six public buildings in Missouri took part in the study. During two three-day sampling sessions 138 samples were collected and analyzed by the direct preparation AHERA TEM method[47]. Of the 138 samples, 47 (34%) were personal air samples representing full shift occupational exposures and 91 (66%) were area air samples representing a potential exposure to building occupants.

The analytical results indicated that the airborne asbestos exposure of custodians performing routine activities in buildings, even where extensive and damaged ACM was present, was very low. The concentrations of airborne asbestos that the custodians were exposed to were far below the OSHA PEL of 0.1 f/cc. The arithmetic mean for the fibers $\geq$ 5 $\mu$m in personal samples was 0.0010 f/cc (0.0001 f/cc TWA); the arithmetic mean for the analyzed area samples was 0.0003 f/cc. These data showed that routine activities of custodians in buildings containing ACM do not pose a high risk for the development of asbestos related diseases.

6.5    Asbestos Exposures of Building Maintenance Personnel – 500 Samples

Corn, in a separate review of historical data, found that maintenance worker exposures were well below even today's OSHA standards. Corn et al.[48] analyzed the maintenance logs compiled by the owners of five buildings containing spray-applied asbestos fireproofing to evaluate the risk to maintenance personnel from exposure to airborne asbestos. Four of the buildings were commercial and one was a hospital. The building owners were all plaintiffs in litigation against the manufacturers of the ACM including fireproofing material. The maintenance logs were kept to document protective measures and exposures of maintenance personnel as they performed routine maintenance during the 1991-92 time period. All of the buildings had relatively simple and straightforward O&M programs such as high efficiency particulate air (HEPA) vacuuming prior to entering above ceilings, wetting down exposed ACM with amended water, HEPA vacuuming of the area after work was performed, vacuuming of personnel after work was performed, use of air purifying respirators, etc.; negative containment was not used. Typical maintenance tasks included ceiling removal and replacement, electrical and plumbing work, HVAC work, cable running, and other miscellaneous work.

Professional hygienists and commercial laboratories were used to collect and analyze, respectively, personal, and in some cases, area samples for asbestos in air. Approximately 500 personal and area samples were obtained during maintenance activities. All exposure concentrations were based on PCM analysis of samples collected and analyzed in accordance with the OSHA standard for air monitoring and NIOSH Method 7400[68],

---

[47] U.S. Environmental Protection Agency (1987). Asbestos Hazard Emergency Response Act, 40 CFR Part 763, Appendix A to Subpart E. USEPA, Washington, DC.

[48] M. Corn, B. McArthur, and M. Dellarco (1994). "Asbestos Exposures of Building Maintenance Personnel," Applied Occupational and Environmental Hygiene, 9, pp. 845-852.

*Expert Report*

respectively.  The maintenance logs and analysis results indicated that in all cases, the maintenance personnel's 8-hour time weighted average (TWA) exposures to asbestos never exceeded the newly proposed (1994) OSHA PEL of 0.1 f/cc > 5 μm length.  The authors concluded that "these results suggest that, fortunately, the concern for maintenance personnel exposure to asbestos has been prudent, but exaggerated.  The health risk to maintenance personnel in the presence of a simple O&M plan is low and far below that associated with the OSHA PEL."

6.6     *Airborne Fiber Levels in a Hospital Operations and Maintenance Program – 394 Samples*

Shaikh et al.[49] published data for airborne asbestos fiber concentrations for 394 samples with similar very low results.  The samples (191 area and 203 personal) were reviewed that had been collected from September 1988 through February 1990 during 106 maintenance jobs that were part of an O&M program at a hospital.  Typical ACM materials present in the hospital buildings included pipe insulation, chrysotile and amosite sprayed on I-beams, thermal insulation on exhaust ducts and other materials.

All sample analysis was done by the NIOSH 7400[68] PCM method.  Ninety-five percent (95%) of the TWA estimates were below 0.1 f/cc (the current OSHA PEL) and 99% were below 0.2 f/cc (the OSHA PEL prior to 1994).  Jobs associated with asbestos removal had a 2 to 2.5 fold higher average fiber concentration than jobs not involving removal.  Among the different buildings at the hospital facility, the highest mean value for personal samples was found in the building with the oldest and greatest variety of ACM; such a relationship was less clear-cut for area samples.  Several variables that were expected to be related to fiber concentrations, including degree of engineering control, type of maintenance work, and type of room, were not found to have a significant effect on the airborne asbestos levels determined in this study.  The authors concluded that the main finding of this study was that airborne asbestos levels drop rapidly with distance from the actual worker.  In other words, disruption of ACM during maintenance work causes only localized elevation of fiber levels.

6.7     *O&M in Large Washington DC Office Building*

Kinney et al.[50] also found exposures to maintenance workers far below OSHA regulatory limits.  Kinney analyzed air sampling data collected in conjunction with a wide variety of O&M work over a 5-year period (September 1987 to August 1992) in a large Washington, D.C. office building.  The office building had a total floor area of 1,920,000 ft[2] and consisted of seven above-ground floors plus a penthouse and two basement levels.  The building contained several forms of ACM including: pipe insulation (10-70% asbestos), air handling unit (AHU) insulation (corkboard with 40-50% chrysotile skim coat), acoustical ceiling plaster (40-60% asbestos), and air supply ductwork (50-80% chrysotile).  Typical

---

[49] R. A. Shaikh, M. H. Satterfield, and P. L. Kinney (1994).  "Airborne Fiber Levels in a Hospital Operations and Maintenance Program", Applied Occupational and Environmental Hygiene, 9, pp. 811-824.

[50] P. L. Kinney, M. H. Satterfield, and R. A. Shaikh (1994).  "Airborne Fiber Levels During Asbestos Operations and Maintenance Work in a Large Office Building," Applied Occupational and Environmental Hygiene, 9, pp. 825-835.

*Expert Report*

O&M work activities in the building associated with ACM included: repair and maintenance of the suspended ceilings, repair and installation of light fixtures, repair of ductwork, cable running, carpet removal and repair, heating or water pipe repairs, and other miscellaneous tasks.

The air sampling results included 916 samples that were analyzed by PCM using the NIOSH 7400 Method[68] and 163 samples that were analyzed by TEM using the Yamate[51] direct preparation method. Seventy-six samples were analyzed by both PCM and TEM. Overall, TEM and PCM concentrations averaged 0.0109 f/cc for fibers ≥ 5 µm length (0.0035 f/cc after excluding two outliers) and 0.0059 f/cc, respectively. The numbers are significantly lower than the OSHA PEL of 0.1 f/cc.

6.8   *Asbestos Exposure of Building Maintenance Personnel – 1008 Samples*

Mlynarek[52] found that work practice was an effective means of controlling exposure of maintenance workers during their normal activities. The subject of this study was a large US metropolitan county with numerous public buildings that routinely conducted air sampling for asbestos. In this investigation, 31 different maintenance task activities were studied and a total of 1008 air samples were collected in three categories – personal, clearance, and environmental. Samples were analyzed for fibers ≥ 5 µm in length by PCM – NIOSH 7400[68]. A total of 302 personal air samples in nine main task categories collected during maintenance worker activities in proximity to ACM were analyzed. The nine main personal task categories included: ACM debris cleanup, bulk sample collection, cable pulling, ceiling tile replacement, electrical installation, electrical repair, fluorescent lamp replacement, HEPA vacuuming or wet wiping of dust and debris, and wet wipe cleaning. In addition, 102 environmental air samples in four main task categories were also examined. The four main environmental task categories included: ceiling tile replacement, fluorescent lamp replacement, HEPA vacuuming or wet wiping of dust and debris, and sampling in the office environment.

Results from this study indicated that the arithmetic means of the 8-hr TWA exposures for personal sampling for each task category were all below the OSHA PEL of 0.1 fibers (f)/cc >5 µm length. The highest mean 8-hr time weighted average exposure was 0.030 f/cc >5 µm length for ceiling tile replacement. The maximum asbestos concentration during sample collection for the environmental samples was 0.027 f/cc > 5 µm length for HEPA vacuuming/wet wiping of dust and debris activities. The mean asbestos air concentration for all 363 environmental air samples was 0.0090 f/cc > 5 µm length. The results from this study indicated that routine O&M, involving surveillance and precautions to minimize release of asbestos fibers from bulk materials to the air when essential maintenance must

[51] G. Yamate, S. C. Agarwal, and R. D. Gibbons (1984). "Methodology for the Measurement of Airborne Asbestos by Electron Microscopy." EPA Contract No. 68-02-3266, July 1984.

[52] S. Mlynarek, M. Corn and C. Blake (1996). "Asbestos Exposure of Building Maintenance Personnel," Regulatory Toxicology and Pharmacology, 23, pp. 213-224.

be performed, can be effective in protecting building maintenance personnel performing tasks in proximity to, or associated with, ACM.

6.9   *Building Owner Air Sample Data*

Unpublished data developed by various building owners supplement the data discussed above. These additional data also show that airborne concentrations in buildings are very low and that exposures to maintenance personnel are below regulatory levels. These data, developed during routine operations at the buildings and produced by the building owners in asbestos in buildings litigation, include:

- Data from the Chicago Public School[53] system of airborne asbestos concentrations at its various schools.

- Data from Connecticut Mutual[54], a large commercial building in which there was an active O&M program and routine monitoring of airborne asbestos concentrations in preparation for the abatement of ACM (including sprayed on fireproofing).

- Data from a large commercial office building in California compiled in connection with the Federal Insurance v. Irvine Company[55] matter.

- Data from 17 buildings in The Prudential Insurance Company of America, et al. matter[56].

Typically, in the above matters, RJLG was provided with boxes containing air monitoring documents. RJLG then compiled and summarized the voluminous sets of air sample data. The documents included, but were not limited to, reports of ambient air monitoring, semi-annual air monitoring surveys, asbestos abatement project monthly reports, construction reports for asbestos abatement projects, and weekly summaries of work activities reports (including O&M activities) and air monitoring data from buildings at issue in the subject case. The air monitoring data included building name, date, sample number, sample location, sample time, flow rate, volume and results (concentration) which were entered into a database. Where possible, identification of the activity performed at the time of the sampling was also included. The samples were categorized as general monitoring, O&M, pre-abatement, abatement or clearance, and subcategorized as personal, area or background.

---

[53] RJ Lee Group, Inc., Summary of Air Sample Data, In the Matter of Board of Education of the City of Chicago v. A, C and S, Inc., et al., 1995.

[54] RJ Lee Group, Inc., Summary of Air Sample Data, In the Matter of Connecticut Mutual Life Insurance Company v. W. R. Grace & Co., and W. R. Grace & Co.-Conn., 1995.

[55] RJ Lee Group, Inc., Summary of Air Sample Data, In the Matter of Federal Insurance Company v. The Irvine Company, 1995.

[56] Expert Report of Richard J. Lee, Prepared in Connection with The Prudential Insurance Company of America, et al. v. United States Gypsum Company, et al., Civil Action Nos. 887-4227 and 87-4238, September 1996.