RE: W.R. GRACE & CO.
CHAPTER 11 BANKRUPTCY PROCEEDINGS
EXPERT REPORT OF PROFESSOR LEWIS N. KLAR, Q.C.

# CANADIAN PRODUCT LIABILITY LAW AND ITS APPLICATION TO ASBESTOS IN BUILDINGS CLAIMS

## I.    INTRODUCTION

### A.    Scope of Report

I have been retained by the law firm of Kirkland & Ellis LLP, counsel for W.R. Grace & Co. [hereinafter referred to as W.R. Grace], to provide an opinion that describes Canadian product liability law generally and, more particularly, addresses the issues of the potential liability, if any, of manufacturers of asbestos-containing products for losses arising as a result of the alleged need to remove these asbestos-containing products from buildings. I have been asked to provide my opinion as to what a properly instructed Canadian court, applying Canadian law, would likely decide in terms of the tort liability of W.R. Grace with respect to this type of claim. This Report will not deal with the law of the Province of Quebec, which, unlike all other Canadian provinces and territories, is governed not by the Common Law, but by the Civil Code of Quebec.

### B.    Qualifications of Professor Lewis N. Klar, Q.C.

I am a Professor of Law in the Faculty of Law, University of Alberta, Edmonton, Alberta, Canada, specializing in the field of tort law. I have been at the Faculty of Law since July 1, 1973 and served as the Dean of the Faculty from July 1, 1997 to June 30, 2002. I have been a visiting professor at a number of other universities including McGill University, University of British Columbia, Arizona State University, University of San Diego, University of New South Wales, University of Western Australia, Auckland University and the National Law School of India University. I have been teaching and writing on tort law since 1973.

I studied at McGill University where I received my B.A. in 1967, my B.C.L. in 1970, and my Masters in Law in 1973. I was admitted to the Bar of the Province of Quebec in 1971 and the Bar

2

of the Province of Alberta in 2000, and am currently a non-practicing member of the Law Society of Alberta. I was designated a Queen's Counsel in 2002 in recognition of my contribution to the legal profession and, more specifically, legal scholarship. I was an Honorary Bencher of the Law Society of Alberta from 1997-2002 and in recognition of my service to the Law Society was awarded a Certificate of Merit in 2002. In 2005, I was awarded the Distinguished Service Award In Legal Scholarship by the Law Society of Alberta and the Canadian Bar Association (Alberta). I am an elected member of the American Law Institute. In 2007, I was awarded the "J. Gordin Kaplan Award for Excellence in Research." This is the most prestigious and senior research award at the University of Alberta.

My field of expertise is tort law and, more specifically, Canadian tort law. I am the author of one of the leading Canadian treatises on tort law; namely, Klar, *Tort Law* (Thomson Carswell), which is currently in its third edition, 2003. I am also the co-author of the leading Canadian case book on tort law; namely Linden, Klar, Feldthusen, *Canadian Tort Law: Cases, Notes, & Materials* (Butterworths) which is currently in its 12th edition, 2004. I have co-authored the 8th, 9th, 10th and 11th editions of that book with Mr. Justice Allen Linden of the Canadian Federal Court of Appeal. These books are used in tort law classes in law schools across Canada. In addition to these major works, I am the editor of *Studies in Canadian Tort Law* (Butterworths 1977), a consultant to the four volume set, *Remedies in Tort* (Carswell), and the author of numerous articles on tort law which have appeared in texts and law journals. I have also authored law reform reports for the Alberta Law Reform Institute on tort law issues.

I am regularly invited to speak at conferences and seminars nationally and internationally on Canadian tort law. I am a frequent speaker at continuing legal education seminars organized by the Legal Education Society of Alberta, the Continuing Legal Education Society of British Columbia, and the Canadian Bar Association, as well as judicial education seminars organized by the National Judicial Institute. I was an invited speaker at the Supreme Court of Canada's international conference to commemorate the 125th anniversary of the Court.

My published works on tort law have been cited by courts in Canada in hundreds of judicial decisions. These include judicial citations in the Supreme Court of Canada and from courts in every Canadian province. As well, my work has been cited by the English House of Lords and the High

3

Court of Australia. There are also a large number of academic citations. A copy of my Curriculum Vitae is attached to this Report, as Exhibit "A".

I have been retained at an hourly rate of $250.00 to provide this expert opinion. Kirkland & Ellis LLP, counsel for W.R .Grace, has provided me with the materials listed in Exhibit "B".

Within the past four years, I have acted as an expert on Canadian tort law in two U.S. cases. In 2005, I submitted a "Declaration Concerning The Laws of Canada" in Cause No. 03 VC-139: *Emmanuel Archondakis et al. v. 3M Company et al.;* In the United States District Court, Eastern District of Texas, Texarkana Division. I was retained by the firm of Brown McCaroll LLP, Dallas, Texas. In 2004, I submitted an opinion on the law of Canada in Chapter 11 Bankruptcy Proceedings *Re: National Spa and Pool Institute.* I was retained by the firm of McMillan Binch, Toronto, Ontario, Canadian counsel for the N.S.P.I..

### C.    Factual Context

I have been informed of the following facts and assume them to be true. W.R. Grace, through its subsidiaries, is one of the world's leading specialty chemicals and materials companies. In the past, W.R.Grace produced and marketed products containing commercially-added asbestos primarily to the commercial construction industry. In Canada, from 1959 to 1975, W.R. Grace marketed Mono-Kote 3 ("MK-3") an asbestos-containing, wet spray-applied cementitious fireproofing product, used to provide fire protection for the enclosed steel structures of large buildings. W.R. Grace did not sell MK-3 in Canada after 1975. Other W.R. Grace asbestos-containing products included Zonolite Acoustical Plaster, and other acoustical plaster and texture products, which were used primarily on interior ceilings and walls. Acoustical plaster was not sold in Canada after approximately 1969.

Claimants, who own buildings located in Canada, allege that their buildings currently contain, or at one point contained, asbestos-containing surfacing materials manufactured by W.R. Grace (specifically, MK-3 or acoustical plaster). They claim that these materials are "hazardous" and "create unreasonable health risks under routine and foreseeable conditions" because they

4

allegedly release asbestos fibers "over time and when they are disturbed." Claimants are seeking
to recover costs associated with management and removal of the asbestos-containing surfacing
materials allegedly sold by W.R. Grace and installed in their buildings. At all relevant times, W.R.
Grace did not sell the asbestos-containing surfacing materials at issue here directly to building
owners; it instead sold them to the contractors responsible for their installation.

## II.    EXECUTIVE SUMMARY AND CONCLUSIONS

1.    The law which would be applied to asbestos in buildings claims in Canada would be the law
of negligence. Canadian product liability law in tort is based not on strict liability but on
negligence law principles. Thus, the claimants' burden will be to show that W.R. Grace was
negligent in manufacturing and marketing its asbestos-containing products, because it knew
or should have known that, at the time of their manufacture or marketing, they were defective
and would pose a real and substantial danger to the occupants of buildings in which they had
been installed.

2.    Asbestos in buildings claims in Canada will be characterized by Canadian courts as "pure
economic loss" claims. The duty of care owed in these types of economic loss claims is
restricted to taking reasonable care to ensure that the asbestos-containing products do not
pose a real and substantial danger to the occupants of buildings in which they had been
installed. Thus, in addition to proving negligence, claimants will have the burden of proving
that the asbestos-containing products posed a real and substantial danger to the occupants of
buildings.

3.    The leading authority on asbestos in buildings claims in Canada is *Privest Properties Ltd.
v. Foundation Co. of Canada* (1995), 128 D.L.R. (4th) 577, affirmed (1997), 143 D.L.R. (4th)
635 (B.C.C.A.), leave to appeal to the Supreme Court of Canada denied (1997), 149 D.L.R.
(4th) *vii* (S.C.C.). The *Privest* case is the only asbestos in buildings claim that has ever been
fully litigated in Canada, of which I am aware. The *Privest* judgments rejected the asbestos

5

in buildings claim made in that case. The *Privest* judgments have had and are likely to continue to have an influential impact on asbestos in buildings cases in Canada.

4.    In view of the current state of Canadian tort law, it is my opinion that the asbestos in buildings claims made against W.R. Grace in these cases would very likely fail in Canadian courts.


## III.    OVERVIEW OF CANADIAN PRODUCT LIABILITY TORT LAW

The relevant Canadian law for these asbestos in buildings cases is Canadian tort law as it relates to product liability.

The law of torts involves the protection of the individual's property and civil rights and is accordingly a matter which falls within the jurisdiction of the Canadian provinces under Section 92(13) of the *Constitution Act*, 1867. In the nine common law provinces of Canada, and the three territories, the law of torts is principally judge-made law, although there are a large number of statutes which deal with issues relating to tort law. None of these statutes would be relevant to the tort liability issues considered in this Report. In Quebec, the law of delicts (torts) is governed by the Quebec Civil Code.

The law of torts in each province is found in its court judgments and statutes. Due to the fact, however, that the Supreme Court of Canada is the court of highest authority in Canada, which hears final appeals from the Courts of Appeal in each of the provinces, and the Supreme Court of Canada's judgments are binding on all of the courts in Canada, the law of torts is fairly uniform across all of the common law provinces. Thus, when considering what the law of torts is in any of the Canadian provinces, one should look to the judgments of the Supreme Court of Canada, the application of these judgments by lower courts, judgments of the Courts of Appeal and trial courts in the provinces, and any statutory modifications which may have been made to the common law.

6

## IV.    THE NEGLIGENCE STANDARD

### A.    Fault Based Liability

Product liability in tort in Canada is part of the general law of negligence. In order to succeed in an action for negligence, a plaintiff has to establish the following elements:

(1)    the defendant owed the plaintiff a duty to take care;

(2)    the duty of care was breached; *i.e.* the defendant was negligent;

(3)    the defendant's negligence caused the plaintiff an injury or damage; and

(4)    the injury which was caused was not too remote.

As noted above, Canadian product liability law in tort is fault based. Strict liability does not apply. There are many judicial statements to this effect. In the recent judgment in *Andersen v. St. Jude Medical Inc.*, [2002] O.J. No. 260 the issue was extensively discussed by Dambrot J.. The plaintiffs had alleged, among other things, strict liability against the defendant, a manufacturer of mechanical heart valves. The valves had allegedly caused serious side effects to the claimants. The trial judge struck the allegations of strict liability from the statement of claim on the basis that it did not disclose a recognized cause of action under Canadian law.

The learned judge referred to four Ontario Court of Appeal judgments which specifically rejected the application of strict liability into the law of Ontario. In *Phillips v. Ford Motor Company* [1971] 2 O.R. 637 (C.A.), in a dissenting judgment, Schroeder J.A. writing for himself and MacKay J.A., on a point not dealt with by the majority, stated at 653:

> ...our Courts do not, in product liability cases, impose upon manufacturers, distributors, and repairers, as is done in some of the States of the American Union, what is virtually strict liability. The standard of care exacted of them under our law is the duty to use reasonable care in the circumstances and nothing more.

7

In the most recent one of the four Appellate Court cases cited in *Andersen, Walker Estate v. York-Finch General Hospital* (1997) 39 C.C.L.T. (2d) 1, affirmed (1999) 43 O.R. (3d) 461, aff'd. [2001] 1 S.C.R. 647, the trial judge rejected the application of strict liability to a case involving tainted blood. Borins J. made it clear that "in Canada manufacturers of defective products are not subject to strict liability in tort." Borins J. went on to say that "any change in the common law in respect to strict liability in tort in Canada must necessarily be determined by an appellate court, or be accomplished by legislation."

In commenting on the *Walker* decision, Dambrot J. stated:

> It seems to me that *Walker* is nothing more than the most recent indication that strict liability is not recognized as part of tort law in Ontario. Although a couple of academic writers have expressed the view for many years that strict liability should be recognized as a tort in Canada, our courts have steadfastly declined to do so. There is no uncertainty in the state of the law today. The courts have left it to the legislatures to draft legislation imposing strict liability if considered appropriate.

The judgment in *Walker Estate* was affirmed by the Supreme Court of Canada.

The leading and, as noted above, the only fully litigated Canadian case on the liability of a manufacturer and supplier of an asbestos-containing product is the *Privest* case, which will be discussed below. The judgment of the trial judge in *Privest* discussed the nature of the duty owed by manufacturers and suppliers of products under Canadian law. A manufacturer of a product generally owes a duty to a consumer *to take reasonable care* to ensure that its product does not cause injury or damage property as a result of defects in the manufacture, the design or the marketing of the product. (As will be discussed below, in cases of pure economic losses the duty to take reasonable care is more restricted. It is a duty to take reasonable care to ensure that the product does not pose a real and substantial danger to its user.) Merely because a product causes injury or fails to conform to required quality standards does not by this fact alone result in tort liability to a person injured thereby. As stated in *Privest*, "Canadian courts have always insisted upon some degree of fault."

8

## B.    Determining The Standard of Care

In order to succeed in their claims, claimants will have to establish that *at the time* that W.R. Grace manufactured and sold its asbestos-containing products, it was negligent. Proof will have to be made that W.R. Grace was negligent in manufacturing and marketing its asbestos-containing products because, at the time of their manufacture and marketing, W.R. Grace knew or should have known that its asbestos-containing products were defective and dangerous, and posed an unreasonable risk of harm to the occupants of buildings in which they had been installed.

In determining whether W.R. Grace was negligent factors such as (i) the knowledge of the parties, (ii) general practice at the time, (iii) the state of the art, (iv) existing safety standards and regulations, (v) the risks posed by the products as compared to their utility, (vi) the availability of safer alternatives, and (vii) the knowledge of the consumer concerning the products, among others, will be relevant.

Although generally approved practice does not conclusively settle the standard of care issue, evidence that the defendant's conduct conformed to generally accepted practice, or the state of the art, is an important factor in determining the standard of care question under Canadian law. General practice assists in crystallizing, with some precision, the standard which should be adhered to. It will guard against findings which may prove to be economically unrealistic. Mr. Justice Cote of the Alberta Court of Appeal stated the following in *Warren v. City of Camrose* [1989] 3 W.W.R. 172 at 179:

> The court can override expert evidence and brand a universal practice as negligent only in a strong case; the experts' thinking or the profession or trade's practice, properly understood, must offend logic or common sense, or flow from a gross error in weight.

Thus, evidence that W.R. Grace's conduct in manufacturing and marketing its asbestos-containing products conformed to the industry practice at the time, would be an important factor in determining that W.R. Grace met the standard of care required of it.

9

The existence of statutory duties and regulations can be used by either party in a torts case to strengthen their claims. Compliance with the statutory standards can be strong evidence of reasonable care. In the recent Supreme Court of Canada case *Ryan v. Victoria* (1999), 168 D.L.R. (4th) 515, Major J. writing for the court confirmed that "statutory standards can be highly relevant to the assessment of reasonable conduct in a particular case, and in fact may render reasonable an act or omission which would otherwise appear to be negligent." Where the statutory standard was directed at the event or accident in question, where it is a specific standard, or where there is little discretion in the manner of performance, it is more likely that compliance will constitute reasonable care. Where, on the other hand, the statute is general, permits discretion, or where the circumstances of the event or accident are unusual, the statute will be given less weight. As discussed below, the burden of proving that the defendant was negligent by, for example, failing to meet the statutory standards imposed upon it lies on the claimants.

### C.    Burden of Proof

The rule in tort is that the party who alleges a fact has the burden of proving it. Thus, the claimants will have to prove all of the factual requirements necessary to support their cause of action. This will include proof that the asbestos-containing products relevant to their claims posed a real and substantial danger to the occupants of the buildings in which they were installed, and, at the time of their manufacture and installation, the defendant W.R. Grace was negligent. Failing to prove all of these elements on a balance of probabilities will lead to the dismissal of the claimants' actions, just as the failure of the plaintiffs in the *Privest* case to prove these elements led to a dismissal of their actions.

10

## V.   RECOVERY OF PURE ECONOMIC LOSSES

### A.   Traditional Rule of Non-Recovery

The typical product liability tort action in Canada is brought where a user of a product suffers personal injury, death or property damage as a result of an allegedly negligently manufactured, designed, or marketed product. Canadian courts have long recognized a duty of reasonable care owed by a manufacturer, supplier or distributor of goods to those who may suffer personal injury or physical damage as a result of a defective product.

In cases of pure economic losses, however, allegedly incurred by users of defective products or owners and occupants of defective structures, Canadian law is much more restrictive. A pure economic loss claim is one in which a defendant's defective product has resulted in neither a personal injury to a claimant, nor damage to any property owned by the claimant. The essence of a pure economic loss claim is that due to the defective nature of a product, its owner has suffered financial losses. In other words, it is a claim which seeks compensation for a low quality product or structure. *As a general rule, Canadian tort law does not impose liability on manufacturers of defective products or structures which have not caused personal injury or physical damage.*

The policy reason behind the rule that there is no recovery in tort for pure economic losses caused by defective products or buildings, except in limited cases, has been expressed by Canadian courts in a number of cases. Chief Justice Finch made the following comment in the recent case of *Hasegawa v. Pepsi Bottling Group* [2002] B.C.C.A. 324, para. 57: "a legal rule which imposed liability for the manufacture or supply of defective, but non-dangerous, goods would create an implied warranty of product quality for the sale of commercial products, in the absence of contract. Such a rule would be an enormous change in the law, and would indeed create 'liability in indeterminate amount for an indeterminate time to an indeterminate class': per Cardozo C.J. in *Ultramares Corp. v. Touche*, 174 N.E. 441 (NYCA 1931) at 444."

11

## B.    "Real and Substantial Danger" Exception

In order for claimants to recover the costs of removing W.R. Grace's asbestos-containing products from their buildings, Canadian tort law will require that W.R. Grace not only be shown to have been negligent and the products defective, but that the asbestos-containing products posed *a real and substantial danger to the safety of building occupants*. Otherwise, pure economic loss claims relating to defective products must be dealt with under the law of contract, and not tort, and the claims could only arise between the parties to the contract and according to its terms.

The leading Canadian case in this area of the law is *Winnipeg Condominium Corporation v. Bird Construction,* [1995] 1 S.C.R. 85. In *Winnipeg Condominium*, the owners of a building sued the general contractor who had built the structure under contract with an earlier owner, for defects in the building. The building had been built in 1974. In 1989, large pieces of cladding fell from the building. Structural defects were discovered and the entire cladding was replaced at the building owner's expense. The claimants were seeking recovery of their expenses.

The Supreme Court rejected the owners' argument that this was a damage to property case, as opposed to a pure economic loss case. The defect in the structure of the building did not cause personal injury or damage to property, other than to the structure itself. The Supreme Court rejected the "complex structure" theory which maintains that a case can be classified as a property damage case when one part of a structure damages another part of that structure. A structure is a single indivisible unity of which the different parts are essentially interdependent. La Forest J. agreed (at para. 15) with the English jurisprudence that "any defect in the structure is a defect in the quality of the whole and it is quite artificial, in order to impose a legal liability which the law would not otherwise impose, to treat a defect in an integral structure, so far as it weakens the structure, as a dangerous defect liable to cause damage to other property."

Treating this therefore as a pure economic loss case, the Supreme Court of Canada revisited the issue which had been raised in the earlier case of *Rivtow Marine Ltd.* v. *Washington Iron Works,* [1974] S.C.R. 1189. That case concerned a defective and dangerous logging crane. The dissenting judge, Laskin J., wrote that since the manufacturer of the defective crane would have been liable for personal injuries or property damage caused by the negligent design or manufacture of the crane, had

12

it collapsed, it should be liable for the costs expended to avert the threatened harm. The Supreme Court of Canada, in *Winnipeg Condominium*, decided to accept the dissenting judgment of Laskin J. and held that where defects arising from negligence "pose a real and substantial danger to the occupants of the building, the reasonable cost of repairing the defects and putting the building back into a non-dangerous state are recoverable in tort by the occupants." Adopting the reasoning of Laskin J., the Court was persuaded that, as a matter of sound policy, owners of defective buildings which threaten substantial danger should be encouraged to repair the defects prior to the injury occurring. La Forest J. stressed the distinction between the contractual duty imposed on a contractor with respect to the quality of materials and workmanship and the tort duty imposed on the contractor to ensure that the building meets a reasonable and safe standard of construction. As stated by La Forest J:

> In my view, the reasonable likelihood that a defect in the building will cause injury to its inhabitants is also sufficient to ground a contractor's duty in tort to subsequent purchasers of the building for the cost of repairing the defect if that defect is discovered prior to any injury and if it poses a real and substantial danger to the inhabitants of the building. In coming to this conclusion, I adopt the reasoning of Laskin J. in Rivtow, which I find highly persuasive. If a contractor can be held liable in tort where he or she constructs a building negligently and, as a result of that negligence, the building causes damage to persons or property, it follows that the contractor should also be held liable in cases where the dangerous defect is discovered and the owner of the building wishes to mitigate the danger by fixing the defect and putting the building back to a non-dangerous state. In both cases, the duty in tort serves to protect the bodily integrity and property interests of the inhabitants of the building.

In view of the fact that there was proof of a real and substantial danger in *Winnipeg Condominium,* La Forest J. stated that he did not find it necessary to consider whether contractors should also, in principle, be held to owe a duty to subsequent purchasers for the cost of repairing non-dangerous defects in buildings. La Forest J. went on to note, however, that "the present case is distinguishable on a policy level from cases where the workmanship is merely shoddy or substandard but not dangerously defective. In the latter class of cases, tort law serves to encourage the repair of dangerous defects and thereby to protect the bodily integrity of inhabitants of buildings. By contrast

13

the former class of cases bring into play the questions of quality of workmanship and fitness for purpose."

In my opinion, under existing Canadian jurisprudence, the overwhelming weight of leading authority supports the argument that proof of a real and substantial danger is a necessary requirement to succeed in a tort claim for the economic losses required to repair a defective structure.

My opinion is based on the following. First, proof of real and substantial danger was the basis of the Supreme Court of Canada's decision to impose a duty in *Winnipeg Condominium*. The entire rationale of the decision was premised on the critical distinction between defective but non-dangerous goods and structures, and those which pose a real and substantial danger to persons or their property. La Forest J. raised the requirement that the product be dangerous throughout his opinion. For example, at para. 46 of his judgment, La Forest J. stated: "It must be remembered that we are speaking here of a duty to construct a building according to reasonable standards of safety in such a manner that does not contain <u>dangerous</u> defects." (Emphasis provided by La Forest J.) An argument that there could be liability in tort for non-dangerous goods or structures would be contradicted by the entire thrust and reasoning of La Forest's judgment.

Second, the requirement that there be a "real and substantial" danger has been affirmed in the vast majority of Canadian cases for this type of pure economic loss product liability tort claim, and by all Court of Appeal judgments, of which I am aware, that have been called upon to decide this type of dispute since *Winnipeg Condominium*. Courts of Appeal in British Columbia, Alberta, Manitoba, Nova Scotia, and Ontario have all confirmed this to be a requirement. Thus, unless changed by the Supreme Court of Canada, the requirement that there be proof of a real and substantial danger in order for there to be recovery, would be binding on all lower courts in these Provinces.

A few case examples will illustrate this point. In *Hasegawa & Co. v. Pepsi Bottling Group (Canada) Co.* [2000] B.C.J. No. 1507 the plaintiff purchased over one million bottles of drinking water from a vendor. Mould flocs, a brown substance, were later found in one of the bottles. As a result, all of the bottles of water were subsequently discarded. The plaintiff sued the company which had bottled the water under contract with the company that sold it. The court rejected the argument that this was a negligence case involving damage to property, *i.e.* the water. It was characterized as

14

a case of pure economic losses arising from a defective product, *i.e.* the bottled water. Both *Winnipeg Condominium* and *Privest* were followed and the plaintiff was required to prove that the bottled water "posed a real and substantial danger" to consumers. The plaintiff failed to do this and the action was accordingly dismissed.

The plaintiff appealed to the British Columbia Court of Appeal - 2002 BCCA 324. The Court of Appeal affirmed the trial judgment. The Chief Justice specifically rejected the plaintiff's argument that this was a damage to property case. The plaintiff had argued that the defendant bottling company's negligence damaged its property, *i.e.* the water. The Chief Justice held that the product, bottled water, was an integral unit and it could not be argued that the bottle and the water were divisible entities. Thus, just as the Supreme Court of Canada in *Winnipeg Condominium* rejected the "complex structure" theory to separate the cladding and the building, the British Columbia Court of Appeal rejected the idea that the water which was contaminated existed separately from the bottle in which the water was contained. The Court of Appeal followed *Winnipeg Condominium* and held that the duty of care in cases of defective products is not to put into circulation "dangerous" products. Since the evidence failed to establish that the defective bottled water posed a real and substantial danger to the health of potential consumers, the Court of Appeal affirmed the trial judge's dismissal of the action.

Courts in other Canadian provinces have also followed and applied *Winnipeg Condominium*. In *Hughes v. Sunbeam Corporation Canada Ltd.* (2002) 61 O.R. (3d) 433, Ontario Court of Appeal, a class action was brought for allegedly defective smoke detectors. The claim was that these smoke detectors failed to detect fires, although no damage or injuries from an undetected fire had yet occurred. The Court of Appeal accepted that under current Canadian law, the claim for the allegedly defective smoke detectors could not succeed unless it could be established that they were "dangerous." The Court of Appeal conceded that the claim in this case was unlikely to succeed, but allowed the case to proceed. This is because it was not clear, particularly at this preliminary stage of the proceedings, whether there was an evidentiary basis for asserting that the smoke detectors were or were not dangerous. The Court conceded that the plaintiff's claim was "problematic" for a number of policy reasons. The relevant point for the purposes of this opinion, however, is the

Ontario Court of Appeal's recognition of the danger requirement for this type of pure economic loss product liability claim.

The Alberta Court of Appeal has also accepted the requirement that for economic losses to be recovered in a defective product or building case, there must either be physical harm or the "imminent risk of it." In *Blacklaws v. 470433 Alberta Ltd.* (2000) 84 Alta. L. R. (3d) 270, the Court of Appeal recognized the restrictive nature of Canadian law with respect to pure economic loss tort claims.

The Manitoba Court of Appeal, in *Valley Agricultural Society v. Behlen Industries Inc.* [2004] M.B.C.A. 80, also has held that the law in Canada is that, to be actionable in tort, a defect in a structure must pose a "substantial danger" to the health and safety of the occupants of the building. A relevant Saskatchewan case which applies the same principle is *Roy v. Thiessen* [2003] S.J. No. 385.

The Nova Scotia Court of Appeal has followed the same approach. In *United Dominion Industries v. North Sydney Associates* (2006), 268 D.L.R. (4th) 491 (N.S.C.A.), the Court stated:

> After properly reviewing the applicable law, including the *Winnipeg Condominium* case, the trial judge confirmed that it was necessary for the plaintiff to prove that the effects were dangerous, that they posed a real and substantial danger, not just that they were as shoddy or substandard workmanship.

Other cases are cited by Linden and Feldthusen in their recently published book *Canadian Tort Law*, 8th ed. (2006) who write at 476 that "the recent trend is simply towards disallowing recovery for non-dangerous defects as a matter of law."

In summary, current Canadian law allows recovery for pure economic losses arising in tort arising out of a defective product or structure only in very limited circumstances. The plaintiff must establish that there was a defect, that it was caused by the negligence of the manufacturer, and that the defect posed a real and substantial danger to the safety of persons or property.

16

### C.    Characterization of Asbestos in Buildings Claims

In assessing the potential liability of W.R. Grace for the asbestos in buildings claims described above, a Canadian court will have to characterize the claims. Under Canadian law, will these claims be considered as personal injury or property damage claims, or as claims for pure economic losses?

Canadian law will treat these as pure economic loss claims and apply the more restrictive tort liability approach to them. That claims for the costs of removing asbestos-containing products from buildings in Canada will be characterized as pure economic loss claims and not as property damage claims was made clear in the *Privest* judgments (to be discussed below). This will be so even if the claimants allege that fibres released from asbestos-containing products have "contaminated" parts of the buildings in which they had been installed. The argument that a property damage claim can be made when one part of a defective structure damages or weakens another part of that same structure - the so-called "complex structure" theory - has been unequivocally rejected under Canadian law. Rather, the claim will be characterized as a pure economic loss claim - a claim for the costs of repairing or replacing a defective product or structure.

## VI.    ASBESTOS IN BUILDINGS CLAIMS: THE *PRIVEST* JUDGMENTS

The *Privest* case is an important judgment for the purposes of this Report. The action in this case was an asbestos in building claim, just as are the claims here. It was brought by owners/managers of a building in which MK-3, manufactured and supplied by W.R. Grace, had been installed. The claim was for the costs incurred as a result of the removal of MK-3 from the building and its replacement with another fireproofing agent. The action was in part brought in tort against W.R. Grace. The action was dismissed by the trial court judge and the dismissal was upheld by the British Columbia Court of Appeal. Leave to appeal to the Supreme Court of Canada was denied.

The first important point to note is the characterization of the claim by the British Columbia trial court. The claim was characterized as a claim for pure economic loss. The trial judge applied the law which recently had been articulated by the Supreme Court of Canada in the *Winnipeg*

*Condominium* case. The trial judge rejected the application of strict liability to the claim and held that in order to be actionable in tort, the product must have been negligently manufactured and "found to be dangerously defective in that it poses a 'real and substantial danger' of causing injury to persons or property".

After a very lengthy trial, the trial judge in *Privest* rejected all aspects of the plaintiff's claim. The court concluded that the plaintiff had failed to prove that W.R. Grace's MK-3 product was dangerous and needed to be removed. Drost J. specifically stated that "[b]ased on the medical evidence that I have accepted, I find that exposure to low levels of asbestos fibres typically found in the air circulating in public buildings poses no appreciable risk to the health of building occupants".

Drost J. found that at the time W.R. Grace manufactured and sold MK-3, the state of medical knowledge was that there was no risk of harm arising to occupants of buildings in which MK-3 was installed. Moreover, the trial judge found that there was in fact no risk.

The following paragraph sums up a portion of Drost J.'s findings:

> So far as the Spencer Building itself is concerned, far from establishing a real and substantial danger to persons, the evidence satisfies me that the MK-3 that was installed between 1972 and 1975 was not and is not an inherently dangerous product. I have no hesitation in concluding that the asbestos fibers contained in that MK-3 did not 'contaminate' the Building, nor did they expose its occupants and workers to an increased risk of contracting any of the asbestos-related diseases. Nor did any asbestos fibers that were released into the atmosphere of the Building by that product cause damage to property.

The trial judge dismissed the action based on his findings that there had been no negligence proved, no breach of a duty of care or a duty to warn, and no misrepresentation.

The British Columbia Court of Appeal affirmed the trial judgment. The Court of Appeal held that the trial judge did not err in its finding that, based on the evidence presented to Drost J., W.R.Grace's MK-3 was not an inherently dangerous product. The Court of Appeal summarized the trial judge's findings and the evidence. It noted that "this was a very long trial with complex evidence. We cannot conclude from the reasons that the trial judge overlooked a major feature of this case." The Court of Appeal affirmed the trial judgment not only because it believed that the trial

judge had not made an "overriding and palpable error", which is the standard of appellate court review on questions of fact in Canada, but because *it agreed with the trial judge's findings.* It asked whether the plaintiffs were able to show that W.R. Grace's MK-3 was a dangerous product when disturbed, and answered (at para. 29): "We cannot say that they did."

The Court of Appeal did not find it necessary, therefore, to consider or comment upon the other issues raised in the trial judgment, and did not do so. Leave to appeal the decision to the Supreme Court of Canada was refused.

## VII.  IMPACT OF THE *PRIVEST* JUDGMENTS ON ASBESTOS IN BUILDINGS LITIGATION IN CANADA

The leading asbestos in buildings case in Canada, and the only one litigated to a decision, is the *Privest* case. Although the findings of fact in the trial judgment in *Privest,* which findings were affirmed by the British Columbia Court of Appeal are not binding on other claimants in other cases, they have had and are likely to continue to have an influential effect on asbestos in buildings litigation in Canada.

As pointed out by the British Columbia Court of Appeal, the trial in *Privest* was lengthy and the evidence complex. The trial involved 182 days of evidence over a period of two years and resulted in a 309-page judgment. According to the judgment of Drost J. in his decision regarding the awarding of costs (1999 Carswell BC 2257), the proceedings in the case filled 13,564 pages of transcript. Three hundred and twenty-three numbered exhibits were filed. Some 28 lawyers were involved in the trial, many of them being senior counsel. There were 21 expert reports tendered, twenty-seven separate examinations for discovery and eight pre-trial conferences.

Canadian courts are likely to be interested in discouraging the relitigation of the identical issues determined in *Privest,* especially where the trial was so lengthy and the evidence so complex. It is noteworthy that, as far as I am aware, there have been no similar asbestos in buildings claims brought in Canada since the *Privest* litigation. In fact, it has been reported that "38 asbestos abatement actions in British Columbia, valued in the range of hundreds of millions of dollars, were settled shortly after *Privest* was decided." [Source: Gregory Miller, "Asbestos Liability: *Privest Properties v. Foundation Company*" 6 Can. Ins. Law Rev.173 at 175].

19

In this respect, it is important to highlight the following findings made by Drost J., in the *Privest* case, as these would be relevant in any future asbestos in buildings litigation undertaken in Canada.

(1)    W.R. Grace's MK-3 that was installed between 1972 and 1975 was not then and is not now (1995) an inherently dangerous product;

(2)    W.R. Grace's MK-3 does not pose a real and substantial danger to the health of persons;

(3)    W.R. Grace's MK-3 did not contaminate the buildings in which it was installed and did not expose its occupants and workers to an increased risk of contracting any of the asbestos related diseases;

(4)    the release of asbestos fibres did not cause damage to property;

(5)    the plaintiffs were aware of the controversies surrounding asbestos and either knew or ought to have known that W.R. Grace's MK-3 contained asbestos;

(6)    the regulatory provisions in British Columbia which did not enact an outright ban on the sprayed application of MK-3 provided evidence that MK-3 was not considered an inherently dangerous product by the statutory body charged with the protection of the health and safety of the work force;

(7)    W.R. Grace's MK-3 is considered a "cementious" product as distinguished from a dry-sprayed product;

20

(8)     the defendants belief that its MK-3 was a safe product was entirely reasonable based on the test results which they received and upon which it was reasonable for the defendants to have relied; and

(9)     the expert evidence adduced at trial satisfied the trial judge that the type of exposure to asbestos encountered in buildings was far too low to increase the risk to occupants or workers of contracting any asbestos-related diseases.

In order for a litigant in a similar asbestos in building claim in Canada to succeed in such a claim, the litigant would have to convince the court that the findings made in *Privest* were wrong in *each and every* respect.

## VIII.   CONCLUSION

It is my opinion, that in view of the requirements of Canadian product liability law, the nature and results of the *Privest* litigation, and the substantial evidentiary hurdles which claimants would face, any new litigation brought against W.R. Grace in Canada seeking the costs of removing asbestos-containing products from buildings, in which they had been installed before 1976, would very likely fail.

SIGNED:_____

DATE:  _____January_11,_2007_____