UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE


IN RE:                              .    Chapter 11
                                    .
W.R. GRACE & CO., *et al.,*         .    Case No. 01-01139(JKF)
                                    .    (Jointly Administered)
        Debtors.                    .
                                    .    Jan. 23, 2007 (10:18 a.m.)
                                    .    (Wilmington)


TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE JUDITH K. FITZGERALD
UNITED STATES BANKRUPTCY COURT JUDGE


Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

1          THE COURT: Good morning, everyone.  Please be

2     seated.  I'm sorry for being so late.  It just took a little

3     longer upstairs than I thought it would this morning.  Okay,

4     this is the matter of W.R. Grace, 01-1139.  The parties I

5     have listed to appear by phone are: Erin Van Valkenburg,

6     that's my assistant; Michael Davis, Robert Guttmann, Amelia

7     Wong, Tiffany Cobb, Peter Shawn, Andrea D'Ambra, John

8     O'Connell, Kenneth Thomas, David Beane, Michael Joyce, Brian

9     Kasprzak, Leslie Epley, Mark Plevin, David Liebman, Rita

10    Tobin, Sandy Esserman, Martin Dies, Darrell Scott, Terence

11    Edwards, Sean Walsh, Arlene Krieger, Craig Moran, Andrew

12    Craig, Oscar Mockridge, Stephanie Kwong, Guy Baron, Marti

13    Murray, Beau Harbour, Ashok Vasvani, Andrew Chan, Steven

14    Eisman, Warren Smith, Lewis Kruger, Barbara Seniawski, David

15    Siegel, Mark Sheinitz, David Parsons, Alex Mueller, Christina

16    Kang, Sarah Edwards, John Mackin, Elizabeth DeCristofaro,

17    Daniel Glosband, Christopher Candon, Roger Frankel, Sara

18    Gooch, Richard Wyron, Debra Felder, Ritwik Chatterjee,

19    Jonathan Brownstein, David Mendelson, Sal Bianca, Sam

20    Blatnick, Stephen Vogel, Matthew Kramer, Van Hooker, Paul

21    Norris, and Jay Hughes.  I'll take entries in court, please.

22          MR. BERNICK: Good morning, Your Honor.  David

23    Bernick for Grace.

24          MS. BAER: Good morning, Your Honor.  Janet Baer for

25    Grace.

1          MR. O'NEILL: Good morning, Your Honor.  James

2   O'Neill for Grace.

3          MR. BECKER: Good morning, Your Honor.  Gary Becker

4   for the Equity Committee.

5          MR. PASQUALE: Good morning, Your Honor.  Ken

6   Pasquale for the Creditors Committee.

7          MR. RESTIVO: Good morning, Your Honor.  James

8   Restivo for Grace.

9          MR. FINCH: Good morning, Your Honor.  Nathan Finch

10  for the Asbestos Claimants Committee.

11         MR. MALADY: Good morning, Your Honor.  Ray Malady

12  for the Futures Claimants Representative.

13         MR. BAENA: May it please the Court, good morning,

14  Your Honor.  Scott Baena on behalf of the Property Damage

15  Claimants Committee.

16         MR. HURFORD: Good morning, Your Honor.  Mark

17  Hurford for the ACC.

18         THE COURT: Pardon me.  I'm sorry, pardon me, but

19  can the Court Call operator - I'm getting some people talking

20  on the phone.

21         TELEPHONE OPERATOR: Okay.

22         THE COURT: Thank you.  I'm sorry, go ahead.

23         MR. HURFORD: Good morning, Your Honor.  Mark

24  Hurford for the ACC.

25         MR. SAKALO: Good morning, Your Honor.  Jay Sakalo

1    for the Property Damage Committee.

2            THE COURT: Anyone else?  Okay, thank you.  Ms.

3    Baer?

4            MS. BAER: Good morning, Your Honor.  The first six

5    items on the agenda all have orders, and I'll just hand them

6    up now and go through them one at a time.

7            THE COURT: All right.  Thank you.

8            MS. BAER: Your Honor, the first item is the

9    debtors' fifth omnibus objections to claims.  There are four

10   claims left.  They're all environmental claims with a company

11   called Weatherford.  The parties are continuing to discuss

12   potential resolutions, so we're continuing that to February

13   26th.

14           THE COURT: Okay, thank you.

15           MS. BAER: Agenda item number 2 is the debtors'

16   eighteenth omnibus objection.  On that one, Your Honor, there

17   are two matters that are being continued to February 26th.

18   All of the other relief has already been granted.  Those two

19   are environmental matters that we're trying to resolve.

20           THE COURT: All right.

21           MS. BAER: Item number 3 is the debtors' objection

22   to the claim of Anton Volovsek.  That matter at Mr.

23   Volovsek's request we gave him additional time to respond

24   until February 9th and continued the hearing on that objection

25   to February 26th.

1          THE COURT: Okay.

2          MS. BAER: Item numbers 4 and 5 are the New Jersey

3    matter and the New Jersey injunction.  The parties actually

4    have an in-person meeting for later in February.  The

5    matter's being continued to February 26th.

6          THE COURT: Okay.

7          MS. BAER: Item number 6, Your Honor, is the

8    debtors' twentieth omnibus objection to claims.  This is the

9    first time that this matter has come up.  Your Honor, the

10   order that we have presented provides for various relief.

11   The claims on Exhibit A, there were no responses filed nor

12   objections filed.  Those are either no liability or

13   insufficient documentation.  They're being expunged and

14   disallowed.  The matters on Exhibit B are being reduced and

15   allowed or reclassified, reduced, and allowed.  The claim on

16   Exhibit C is being reclassified but not allowed, and the rest

17   of the claims listed on Exhibit D, we did receive responses

18   or contact from the claimants, and they've asked that those

19   matters be continued to February 26th.

20         THE COURT: Okay.

21         MS. BAER: Your Honor, item number 7 is the

22   continued application of Caplin & Drysdale for fees.  There

23   was a contested matter last time, and I believe that on the

24   telephone are Mr. Smith and counsel for Caplin who are going

25   to address that issue.

1          THE COURT: All right, Mr. Smith.

2          MR. SMITH (TELEPHONIC): Yes, Your Honor.   As the

3   Court may recall, at the last fee application hearing, we had

4   challenged some time entries by paralegals for Caplin.  They

5   were essentially for filing and for Pacer - for going on line

6   and retrieving documents from Pacer.  We've been consistent,

7   Your Honor, in recommending such time entries be compensated

8   at $80 an hour feeling that those kind of tasks, even when

9   performed by a paralegal or indeed a lawyer should be

10  compensated at a certain rate appropriate for those tasks.

11  We cite Vicky Deever (phonetical), Your Honor, to the effect

12  that the type of service being performed affects the rate of

13  compensation, not wether it is compensable at all.  Again,

14  Your Honor, we've been consistent in suggesting that these

15  types of tasks be compensated at this rate.  At the last

16  hearing, it was suggested by the Court that Caplin provide us

17  further information regarding these time entries.  We haven't

18  received any further information, Your Honor.

19          MS. TOBIN (TELEPHONIC): Your Honor, excuse me.

20  This is Rita Tobin.  Not only did we send further information

21  to Mr. Smith, but my office called Mr. Bowsay (phonetical)

22  yesterday to ask why we had not gotten a response to our

23  further submission, and Mr. Bowsay assured my paralegal,

24  Andrew Capswilson (phonetical) that the information has been

25  received and forwarded on to Mr. Smith.  So I think there may

1    be a communication problem here.

2        THE COURT: I guess there is.

3        MR. SMITH (TELEPHONIC): Well, I guess there is,

4    Your Honor.

5        MS. TOBIN (TELEPHONIC): We e-mailed Mr. Bowsay and

6    then followed up with a telephone call, and we had not heard

7    from him, and I know Mr. Capswilson told me he spoke to him

8    directly.

9        THE COURT: Okay, what's the nature of the

10    additional information, Ms. Tobin?

11        MS. TOBIN (TELEPHONIC): Yes, we handed - submitted

12    a spreadsheet.  Mr. Smith's time from each time entry from

13    April 6th, 2006 through June 30th,  2006, and in each case Mr.

14    Smith further explained the task that he had performed, so -

15    David Smith, excuse me.  So that Warren Smith could review

16    them and decide whether or not he felt it met with the

17    criteria that he was arguing should be met before we could be

18    paid in full.  So there were more detailed time entries

19    submitted, and I don't know what happened and why they fell

20    through the cracks.

21        MR. SMITH (TELEPHONIC): And I don't know either,

22    Your Honor.  I talked with Mr. Bowsay this morning about this

23    matter and didn't receive any further information.

24        MS. TOBIN (TELEPHONIC): This is very odd because

25    this was - Also I'll explain to Mr. Smith, this was e-mailed

1   well over a week ago because I was leaving on vacation, and I

2   made sure that it got out before I left.  I am not in the

3   office now, but I will have to check back with Mr.

4   Capswilson, and I believe there's some e-mail correspondence

5   from yesterday that we can look at to try to straighten this

6   out.

7           THE COURT: Okay.  Is there another Grace hearing

8   coming up before the next omnibus?

9           MS. BAER: Not currently.

10          THE COURT: No?  Why don't you two see if you can

11  get this resolved and submit something on a COC rather than

12  having to put this over another month, but if you can't, then

13  I guess under these circumstances, I don't really have much

14  choice to put it over yet another month.

15          MR. SMITH (TELEPHONIC): Your Honor, we will dig up

16  that information wherever it may be, and we'll look at it;

17  okay?

18          MS. TOBIN (TELEPHONIC): And I will check back with

19  my office and find out what we have from yesterday that we

20  can forward to Mr. Smith to assist him.

21          MR. SMITH (TELEPHONIC): Your Honor, we apologize

22  for this mis-communication.

23          THE COURT: Okay, well, it happens from time to

24  time, but if you can get it resolved, I think that would

25  probably save everybody a little bit of time, so, I'll -

1          MR. SMITH (TELEPHONIC): Yes, Your Honor.

2          THE COURT:  - rely on you to do your best.  Thank

3   you.

4          MR. SMITH (TELEPHONIC): Could we be excused, Your

5   Honor?

6          THE COURT: Are there any other fee matters in this

7   case?

8          MS. BAER: No, Your Honor.

9          THE COURT: Okay, yes, thank you, Mr. Smith.

10          MR. SMITH (TELEPHONIC): Thank you, Your Honor.

11          MS. BAER: Your Honor, that takes us to agenda item

12   number 8, and Mr. Bernick will address that.

13          THE COURT: Mr. Bernick?

14          MR. BERNICK: Good morning, Your Honor.  I think

15   that the way that we're going to proceed on this is to

16   combine items 8 and 9, which essentially focus on the same

17   subject matter, and the claimants are so anxious to proceed

18   that they're going to argue first.  We talked and they're

19   prepared to argue first and I'll just respond.

20          THE COURT: All right.

21          MR. MALADY: Good morning, Your Honor.

22          THE COURT: Good morning.

23          MR. MALADY: Once again, Ray Malady for the FCR.

24   Your Honor, I'll be addressing Grace's motion for a

25   protective order and to quash the Rule 30(B)(6) deposition

1    notice of W.R. Grace & Company that was issued by the FCR and

2    the ACC in combination.  That notice was served on October 3,

3    2006.  We've had some discussions with the debtor's counsel.

4    I would like to provide some background for the Court and for

5    those in attendance at the hearing and listening on the phone

6    as to how we got to the place where we are today because we

7    have narrowed the issues for discussion somewhat.  We

8    provided the debtors' counsel with a demonstrative, Your

9    Honor, that I'd like to hand up to the Court.  We don't have

10   any viewing equipment in the courtroom today so I'll have to

11   ask the Court to bear with me on this, but -

12           MR. BERNICK: Yeah, I don't have a problem with that

13   document being tendered, if the purpose is to go through all

14   of the other items in the 30(B)(6) that are not going to be

15   presented for decision today.  I'd have to confess to Your

16   Honor, I'm not the one who negotiated this with Mr. Malady,

17   and I'm not familiar with the details of that negotiation -

18           MR. MALADY: That's not the purpose of it.

19           MR. BERNICK: Well, that's fine, then I'm not sure

20   what the purpose is but go ahead.

21           THE COURT: Thanks.

22           MR. MALADY: Your Honor, I should begin by stating

23   that the FCR and the ACC believe that the debtors' motion to

24   quash and for protective order should be denied and would

25   remind the Court that the debtors bear the burden on that

1    motion, and as we'll go through the arguments, they have

2    other burdens on this motion as well including the burden to

3    establish that any of the information requested is privileged

4    attorney work product or privileged attorney/client

5    communication.  On this demonstrative as you can see, Your

6    Honor, although Grace objected to every topic on the 30(B)(6)

7    notice, we have engaged the debtors in a discussion about

8    what topics would be suitable for 30(B)(6) inquiry, and I

9    just want to go through what we've accomplished to get to the

10   point where today we are only dealing with topic number 1,

11   which is Grace's pre- and post-petition asbestos tort claim

12   estimates.  Topics 2 to 6 - these deal with Grace's pre-

13   petition settlements and here, as the Court will recall from

14   the December 5 hearing, we have agreed and worked out a

15   stipulation with the debtors to depose Grace's present and

16   former in-house counsel, Messrs. Beaver, Segal, and Hughes

17   (phonetical), in their individual capacities while reserving

18   our right to seek 30(B)(6) testimony if complete discovery on

19   these topics is not forthcoming.  Those depositions are now

20   scheduled to take place next month, and by agreement, the

21   debtors and the Committee are asking this Court today to

22   defer Grace's motion to quash on topics 2 through 6.  Topics

23   7 through 10, these deal with Grace's asbestos-containing

24   products.  Here we've dropped our request for a deponent and

25   are accepting the alternative discovery that the debtors have

1   provided.  Which takes us to topic 11, and this addresses

2   Grace's CNS claims database.  As with topics 2 through 6, the

3   parties by agreement are asking the Court to defer ruling on

4   Grace's motion to quash.  Counsel had represented - Debtors'

5   counsel have represented to us that Mr. Hughes will testify

6   concerning Grace's knowledge of the CNS database which is

7   topic 11, subject to the understanding that he will not

8   address any analysis of that database by Grace's testifying

9   experts, and we're fine with that.  Which brings us back to

10  number 1, and, as you can see from the demonstrative, Your

11  Honor, you see what we want Grace to prepare a witness to

12  tell us about there on the left side.  Their objections are

13  listed in the center, and the discovery they've offered in

14  lieu of a 30(B)(6) deponent is indicated in the block on the

15  right.  Now, there's a lot here, so I think it's worth

16  spending a few minutes to just unpack this and make for an

17  easier discussion as we go through this, and what I've done,

18  again, with the hope that it might assist the Court is just

19  make a few notes on the whiteboard.  Can Your Honor see this?

20          THE COURT: Yes, I can.

21          MR. MALADY: This is a test of my eyesight, but

22  we'll see if we can read it from back here.  What I've

23  written on here, Your Honor, is - and for those listening by

24  phone, it's just a note that is labeled, 30(B)(6) Estimates,

25  and I've got three things on the left and then some things on

1    the right.  And what I've tried to do here, Your Honor, is

2    really outline the issues for the Court.  Why is this

3    discovery relevant?  That's issue number one on the left.

4    Why isn't it cumulative?  In other words, why hasn't the

5    discovery that Grace has already provided, why isn't that

6    sufficient to give us the discovery we need?  Why do we need

7    to take a deposition of the 30(B)(6) deponent?  And lastly,

8    is this information privileged such that no matter how

9    relevant, whether or not cumulative or burdensome or anything

10   else, we're even entitled to have this discovery or is it

11   protected by applicable privileges? . . . (microphone not

12   recording).

13          THE COURT: Oh, okay, do you need a little pell-

14   mike, Mr. Malady?  There's the little pell-mike if you need

15   to get closer.

16          MR. MALADY: (Microphone not recording.)

17          THE COURT: I did too.

18          MR. MALADY: You are the expert at this, David.  I

19   want to say that after further review the play stands as

20   called on the field.  In any case, okay, Why is this

21   relevant?  And how will it be not only relevant but helpful

22   to the Court in the estimation proceeding?  And we submit

23   it's important in three significant ways, which I've

24   indicated to the right of the why-relevant question on the

25   board.  Methodology, Dalbert, and impeachment.  Methodology -

1   What is that about?  This Court, as Your Honor is well aware,

2   needs to settle on an appropriate methodology to assess the

3   amount of Grace's current and future asbestos tort claim

4   liability.  Now you'll hear experts on our side who will base

5   their estimates on Grace's claims and settlement history

6   combined with actuarially based projections of future claims

7   which will be tied to the nationwide incidents of asbestos-

8   related diseases.

9         THE COURT: Actually, Mr. Malady, I can't hear you

10  now.  Your voice is going in and out with that microphone.

11  So, if -

12        MR. MALADY: I'm going to tender this back.

13        THE COURT: The Court has to settle on one

14  methodology and that's - I'm not sure.

15        MR. MALADY: Right.  You didn't lose the point,

16  thank you, Your Honor.

17        THE COURT: Okay.

18        MR. MALADY: And this is the approach that all

19  courts - the approach that we're using is the approach that

20  all courts that render estimation decisions in asbestos

21  bankruptcy cases have recognized and adopted, and those

22  courts, as the Court is well aware, are the Armstrong, Owens

23  Corning, Federal Mogul, and Eagle Pitcher Courts.  Now, this

24  is also the approach that Grace used to estimate its

25  aggregate liability, for SEC reporting, and internal

1   financial planning purposes.  In its most recently available

2   10k, Grace says that it calculated the estimated asbestos

3   liability it disclosed to the SEC and the quote, "Funding

4   Amount", end quote, in its proposed plan of reorganization

5   based on the same actuarially based estimates of its

6   liability for pending and future asbestos claims.  Now Grace

7   advocates a different estimation methodology in its

8   estimation proceeding.  A questionnaire-based approach that

9   is unorthodox, unaccepted, not tested by any court.  Now we

10  highly suspect, although we don't know for sure until we have

11  the debtors' estimation report, that Grace's created-for-

12  litigation methodology will repudiate, to some extent, the

13  methodology that Grace used in its SEC reporting both pre-

14  and post-petition and also in its financial planning and in

15  developing its plan of reorganization.  We think there will

16  be an inconsistency there.  Now, Grace understandably would

17  like to hide its post-petition estimation methodology from

18  the Court and the Committees.  It doesn't want to be forced

19  to concede that it liked the Committees' methodology and

20  approach just fine, and was comfortable with using that

21  approach until it realized that when applied to the facts in

22  this it would not protect equity, and a different approach

23  was needed.  So Grace's use of a different methodology then

24  that which is advocated here in this estimation proceeding

25  is, we submit, a highly relevant issue on which - and which

1   of these methods is the proper method to choose may be the

2   central issue in this estimation proceeding.  So that's the

3   relevance on methodology.  Now, Dalbert; why have I put that

4   there?  Grace's use of a different methodology for this

5   litigation then it has for financial planning and SEC

6   disclosure purposes is relevant to the Court's Dalbert

7   analysis of the reliability of the opinions of Grace's

8   testifying expert.  The Court is familiar with the Dalbert

9   case.  I won't go through all the factors, but the Supreme

10  Court in Dalbert did recognize a number of factors pertinent

11  to the reliability inquiry, including test-ability, peer

12  review or publication, potential rate of error, existence of

13  standards and controls, and general acceptance.  The Third

14  Circuit has adopted these and other factors relevant to

15  reliability including, and this is the important one, whether

16  the experts are proposing to testify about matters growing

17  naturally and directly out of research they've conducted

18  independently of litigation or whether they have developed

19  their opinions expressly for purposes of testifying, and

20  that's from the In Re: Eunice's Savings Plan litigation case

21  in 1999, Third Circuit case which the Court can find at 173

22  F3d 145.  Another useful case for the Court to look at is In

23  Re: TMI Litigation Cases Consolidated II from the Middle

24  District of Pennsylvania, which can be found at 911 F.Supp.

25  775.  In that case the Court applied the Dalbert reliability

1  criteria to the testimony of an expert in meteorology, and

2  this gentleman had developed a water plume model to perform

3  dost estimates that had not been subjected to peer review.

4  The Court found that to the extent the expert's analysis used

5  standard techniques, in a standard manner that had been

6  subjected to peer review, the reliability criteria was met.

7  However, because he also testified that the treatise that he

8  had prepared for the litigation had not been peer reviewed

9  and that it deviated from standard methodology and appeared,

10 as the Court said, to have been derived solely in connection

11 with this litigation, that this factor, and the quote said,

12 "Will weigh against the admission of his dost estimate

13 testimony."  So, the point here, Your Honor, is that in order

14 for this Court to properly perform its gate-keeping function

15 it should be able to assess whether the analysis Grace's

16 expert will be advocating here has been peer reviewed, which

17 we don't believe will be the case, or finds acceptance

18 outside the courtroom, which we also don't believe will be

19 the case.  Knowing what the expert did for non-litigation

20 purposes is highly relevant to this inquiry.  Now, one of the

21 purposes of our deposition is to find out exactly what was

22 done outside the courtroom.  Last relevancy item on the board

23 here, impeachment.  Why is impeachment relevant?  Well, if it

24 turns out that Grace's testifying expert on the estimation of

25 the asbestos PI liability is the same person who performed

 1    these actuarially based estimates used for Grace's financial

 2    planning purposes and SEC reporting purposes, and we think it

 3    is, and we think that happened, you know, he did that post-

 4    petition as well, the Committee should be able to impeach

 5    Grace's expert to the extent his opinions in this case

 6    deviate from his views in a non-litigation world.  That is

 7    just fundamental to our adversary system that the Committees

 8    and the Court should have the ability to test the credibility

 9    of the debtor's expert opinions by reference to his prior

10    work.  So that's why this is relevant, Your Honor, and why we

11    believe it will be useful to the Court in its gate-keeping

12    function to permit this discovery to go forward.  So let me

13    now turn to the second question I presented for discussion

14    which is, Why isn't this cumulative?  The debtors have made

15    much of the fact that they've provided discovery lists,

16    various things, and in many cases, as I said at the outset of

17    my remarks, we've accepted what they've provided in lieu of

18    deposition but not on this topic one, and we don't think

19    there's cumulative testimony here for various reasons, and

20    here's where my writing get a little harder to read, but I've

21    got three points to the right of the question, Why not

22    cumulative?  And let's go through these.  The first is that

23    the Sealed Air discovery, which is where Grace is referring

24    us for this information, this is the Sealed Air fraudulent

25    conveyance case that was litigated before this Court where

1   the ACC was a party, the FCR was not.  Depositions were taken

2   of the same gentleman that we are deposing next month,

3   Messes. Beaver, Segal and Hughes, on some of these same

4   topics.  Why isn't that discovery sufficient?  Why shouldn't

5   we just be satisfied with those transcripts?  Well, first of

6   all, that discovery took place in 2002.  It is 2007.  That's

7   five years since those transcripts were taken.  The FCR was

8   not a party there, that's why I have FCR with a circle around

9   it and a line through it.  And also, and perhaps more

10  significantly, methodology was not an issue in the Sealed Air

11  case.  There was no contest about what methodology would be

12  used to estimate Grace's asbestos tort claim liability.  So -

13  and why is that important?  Well, you know, in Sealed Air

14  there was no dispute about methodology, and so there wasn't

15  any need to prob how these historical estimates were

16  developed or how settlement litigation decisions were made,

17  and what factors went into setting reserve amounts and

18  reserve levels.  All of those issues are central to the

19  methodology battle before the Court here and which the Court

20  must resolve.  And the absence of our client to those

21  proceedings is also important, Your Honor, because, I mean

22  I'll just give the Court an example: When Mr. Beaver was

23  deposed he spoke to the extent to which projections of future

24  claims were done and how those were done, and some of that

25  transcript is sealed.  I don't want to go into it too much,

1    but suffice it to say that there are many questions that we

2    would have asked in followup to the questions that the ACC

3    put to Mr. Beaver that would go to the process that they used

4    to get to an estimate of future claims, which is really the

5    whole ball game as far as we're concerned in this case.  So

6    let me now turn to privilege.  As I mentioned, the debtors

7    have asserted both the attorney/client privilege and the

8    attorney work product doctrine to bar this 30(B)(6)

9    deposition of a designee on the estimates of its asbestos

10   tort liability.  Grace bears the burden of establishing the

11   facts that demonstrate the existence of the attorney/client

12   privilege or the work product privilege.  It is their burden.

13   They also must demonstrate or bear the burden on the issue of

14   non-waiver.  It's not our burden to demonstrate that Grace

15   has waived the privilege.  It is the reverse.  On

16   attorney/client privilege, it seems that Grace has only half-

17   heartedly asserted that privilege in its papers.  They've

18   really made the thrust of their argument that this is

19   protected work product.  They really hang their hat on that,

20   and I don't think I need to say too much about

21   attorney/client except that I would like to refer the Court

22   to the privilege log that Grace has provided to us.  May I

23   approach the bench?

24          THE COURT: Yes.  Thank you.

25          MR. MALADY: And we think, Your Honor, this

1    privilege log really makes our case.  What Grace has done

2    here, as any good counsel would in listing out the - trying

3    to make a claim of privilege, they've listed the documents by

4    description, Bates range, date, author, recipient, cc, and

5    type of privilege asserted.  If we look at this, directing

6    the Court's attention to the second entry, there's a document

7    described as, D. Segal edits to memorandum in determination

8    of et cetera, et cetera.  The author of that document is not

9    a lawyer.  It's Robert Terola, who we understand to be the

10   chief financial officer of Grace and a senior vice president

11   as well, and that document's also cc'd to Grace's outside

12   auditors, PricewaterhouseCoopers.  The next document on this

13   list right behind that is the same thing.  It's another

14   memorandum from Mr. Segal who is a lawyer - excuse me, it's

15   not a memorandum from Mr. Segal.  The author of the document

16   is Mr. Terola, the CFO, a non-lawyer.  The description of it

17   is essentially the same as the prior document, and once

18   again, it's copied to Grace's outside auditors.  And then if

19   the Court would turn the page and look at the third entry

20   from the bottom on this privilege log, the Court will see

21   that there's a document entitled, Preliminary Expert

22   Estimates of Personal Injury Liability prepared at the

23   request of and under the direction of counsel for formulation

24   and defense of proposed plan of reorganization.  The author

25   of that document is ARPC, which is Grace's outside expert

1  consulting firm, which has been designated as a testifying

2  expert in this case, and which also prepared Grace's pre-

3  petition reserve estimates for the company, and that document

4  is also cc'd to Mr. Terola, the chief financial officer of

5  the company.  So there are - This privilege log really points

6  up a number of issues, waiver being one.  The privilege is

7  waived when documents are disclosed to outside auditors.

8  There are reams of cases on that.  I can provide some cites

9  to the Court, but also just on whether the privilege

10  attaches.  There are some interesting observations about this

11  log.  The fact that -

12        THE COURT: How do we know it's disclosed to the

13  outside auditors, I'm sorry?  This says it's -

14        MR. MALADY: It's carbon copied to

15  PricewaterhouseCoopers, LLP, the second document on the first

16  page as well as the third document.

17        THE COURT: I'm sorry, I'm looking at the third

18  document up on the - third line from the bottom on the second

19  page.

20        MR. MALADY: That one was on, apparently.

21        THE COURT: Okay, so your claim as to this one is,

22  Why is it not subject to some privilege?

23        MR. MALADY: This one, Your Honor, prepared by

24  outside expert consultants, not for purposes of rendering

25  legal advice or providing legal advice, cc'd to the CFO of

1   the company, certainly not work product protected, and this

2   gets into, What is the predominant purpose for which this

3   document is prepared?  I'm about to go into that, and I don't

4   see how it's attorney/client privileged.

5          THE COURT: If it goes to the CFO of a company?

6          MR. MALADY: No, not for that reason specifically,

7   Your Honor, but it just doesn't appear to be a document that

8   is being provided to Grace for the purpose of rendering legal

9   advice or in response to -

10         THE COURT: Well, I mean, it seems if he's

11  designated as a testifying witness you're going to get it as

12  an expert report anyway as a testifying witness; aren't you?

13         MR. MALADY: I don't believe so, Your Honor, because

14  this is a preliminary expert estimate, as described.  We

15  expect that we will get the final expert report of this

16  witness.

17         THE COURT: Oh, oh, I see what you're saying.

18         MR. MALADY: This was done back in 2004.  We suspect

19  that the methodology that was used to prepare this report

20  will be markedly different than the methodology being used

21  for this case, and this again goes to what I was saying

22  earlier about we think we need to see the work that was done

23  by this firm outside the courtroom, outside the litigation

24  environment and compare that to what they're doing for this

25  litigation.

1          THE COURT: Well, okay.  I think with respect to

2   that issue, I think I need something from you that indicates

3   why you're entitled to get preliminary expert estimates as

4   opposed to final expert estimates.  I mean, I'm just not

5   aware of the fact that in discovery regardless when you get a

6   testifying expert that you're entitled to that.  If you are,

7   then I think as part of the expert witness discovery you may

8   get it, but I'm not sure how you're going to get it in what

9   you're trying to do at this stage of this proceeding with

10  respect to your fact discovery.  It's a different issue.

11         MR. MALADY: Let me be clear.  I probably was not

12  clear enough on this, Your Honor, and let me try to make this

13  clear.  We are not seeking this document because we believe

14  it to be a preliminary report done by the testifying expert,

15  and we should be able to see it for that reason.  In fact, we

16  have an agreement that we're not exchanging anything but

17  final reports in this case, and that's been reduced to a

18  stipulation.  So that's not the purpose of the request.  This

19  analysis appears to have been done for financial planning

20  purposes, for SEC reporting purposes, and it's in connection

21  with that exercise -

22         THE COURT: Well, that's not what the stated purpose

23  of it is.

24         MR. MALADY: Well, Your Honor, there is an

25  inextricably intertwined relationship here between what Grace

1   was doing to prepare its plan of reorganization and what it

2   was reporting to its outside auditors, and we think we will

3   be able to establish that.  They were estimating their

4   asbestos tort liability for a number of reasons, purposes.

5   One was to prepare their plan of reorganization.  A second

6   was to report to the SEC -

7              THE COURT: Right.

8              MR. MALADY:  - and third was to do internal

9   financial planning.

10             THE COURT: I understand.

11             MR. MALADY: And the cases that we present to the

12  Court in our briefs, in particular the Simon vs. G.D. Serle

13  (phonetical) case, and another case which we have not cited,

14  but which we discovered in preparation for this hearing out

15  of the Southern District of New York, which I really would

16  commend to the Court's reading, In Re: Pfizer, Inc.

17  securities litigation, which is reported in Lexis 1993 U.S.

18  District Lexis 18215 a 1993 case, and these cases are

19  directly relevant because they speak to the distinction

20  between the discovery of aggregate reserve calculations

21  versus individual case reserve projections.  The latter of

22  course being protected work product because they disclosed

23  the mental impressions and opinions of the lawyers in

24  assessing the company's liability for a specific case and the

25  latter, which are aggregate compilations based on gross data

1   and numbers, the disclosure of which would not signify or

2   disclose any mental impressions of any lawyer.  And so, the

3   whole fundamental purpose behind work product protection,

4   which is to protect the lawyers' opinions and processes,

5   mental processes.  None of that is undermined by the

6   disclosure of aggregate reserve information.

7          THE COURT: Well, it may not with respect - It may

8   not.  I'm not making findings.  I'm just articulating a point

9   that I think comes up in some of the cases.  It may not

10  where, for example, the aggregate is prepared for some public

11  reporting purpose such as for an SEC or reporting function,

12  but that's not what the stated purpose of this document is.

13  This says specifically, Prepared at the request of and under

14  the direction of counsel for formulation in defense of the

15  proposed plan of reorganization.  There is nothing listed

16  here with respect to SEC reporting purposes.  If you can at

17  some point substantiate through a witness that in fact this

18  document was used for purposes of SEC reporting, then perhaps

19  you've got a leg to stand on, but unless and until you've got

20  something that goes around that stated purpose, I just don't

21  think you're going that far with this document.

22         MR. MALADY: Understood, Your Honor.  Well, here's

23  how I think we would like to see the Court approach it, and

24  the Court can make your own determination.  We're not here

25  specifically today to move to compel or have Grace produce

1    the documents on this privilege log.

2              THE COURT: Okay.

3              MR. MALADY: That's not the purpose of this.  We

4    would like - Okay, well the ACC does have a companion motion

5    that seeks to compel this document, so I stand corrected.

6    But in the context of the 30(B)(6) what we'd like to do is

7    ask questions about the documents on this log if they have

8    not been produced in response to the motion the ACC has

9    filed.  And, Your Honor, we also would submit that these

10   documents can be reviewed by the Court in camera if it comes

11   to that, but there's no question but that Grace, as part of

12   its financial planning, used actuarially based estimates of

13   its future personal injury litigation that were prepared by

14   ARPC, and that's right out of Grace's financial statements

15   given to the SEC.  In Sealed Air as well, Your Honor, and

16   this really goes to the issue of waiver, Grace was asked by

17   the ACC whether it gave some of this information to its

18   insurance companies.  I have an excerpt from the testimony

19   given in that case by Mr. Hughes, which is under seal, and

20   with the Court's permission, I'll just hand it up to you.  Do

21   you have a copy for counsel?

22             THE COURT: Thank you.  I'm sorry, this is so small

23   I can't read it.  I simply can't read it.

24             MR. MALADY: We'll see if we can provide the Court

25   with a better copy and it certainly wasn't our intention that

1    the Court read it right now, but we would ask the Court to

2    review that, if we can find a better copy of it, because it

3    simply goes to whether the extent to which this type of

4    information was provided to Grace's outside insurance

5    carriers.  Common sense would tell you that in determining

6    the pricing for Grace's insurance, it's likely that Grace's

7    insurers would have required Grace to hand over this kind of

8    information as well as individual reserve information as

9    well, and certainly aggregate reserve information.  In this

10   <u>Pfizer</u> case that I mentioned that the Court might want to

11   take a look at, the District Court of New York rejected the

12   attorney/client privilege claim on the fundamental ground,

13   and I'm quoting here, "That disclosure to an insurer is not

14   different than disclosure to an independent auditor.  Both

15   waive the attorney/client privilege."  On the work product

16   protection issue, as I've stated, Grace's liability reserves

17   and estimates were prepared for SEC disclosure and internal

18   financial planning purposes.  That they happened to also be

19   used to support Grace's plan of reorganization doesn't

20   transform them into reports prepared in anticipation of

21   litigation.  Now, here's where it gets a little bit tricky,

22   and you have to read these cases carefully to understand what

23   they're saying because there are nuances.  We are in the

24   Third Circuit.  The standard for determining whether

25   something was or was not prepared in anticipation of

1   litigation in this circuit is right from the <u>Wright & Miller</u>

2   treatise, and the test is whether in light of the nature of

3   the document and the factual situation in the particular

4   case, the document can fairly be said to have been prepared

5   or obtained because of the prospect of litigation.  All

6   right, so it's a highly fact specific, individually case-

7   specific inquiry.  Now, we've cited the <u>G.D. Serle</u> case from

8   the 8th Circuit.  The debtors have cited in response a

9   District Court case, an opinion by a magistrate judge here in

10  the Third Circuit in the Eastern District of Pennsylvania.

11  And if you read their briefs, you almost get the sense that

12  we're relying - the Committees are relying on an 8th Circuit

13  standard that has no applicability here and the Court should

14  follow the <u>Runcolant</u> (phonetical) which is that magistrate

15  judge ruling from the Eastern District of Pennsylvania.  But

16  when you get into these opinions and read them, you see that

17  the <u>G.D. Serle</u> opinion from the 8th Circuit is correct - not

18  only correct but not inconsistent with the Third Circuit

19  standard.  The <u>Serle</u> court looked at the nature of the

20  document and the factual situation in that case, and it

21  concluded that Serle's aggregate reserves could not fairly be

22  said to have been prepared in anticipation of litigation.

23  They were prepared for business planning purposes.

24  <u>Runcolant</u>, that case involves - that's discovery of aggregate

25  reserve figures in an insurance coverage case.  The Court

1    there found that the aggregate reserves would disclose the

2    individual case reserves, individual case reserves calculated

3    by the defendant's attorneys, and it's for that reason that

4    discovery was not allowed.  And if you'll look toward the end

5    of that opinion, there are two things the Court pins its

6    analysis on, two rationales given, and both, we submit, are

7    inapplicable here.  The first is, the Court said the

8    aggregate reserve figures may give insight into the mental

9    processes of the lawyers in setting specific case reserves,

10   and second, in the Court's view, it was impossible to protect

11   the mental impressions underlying the specific case reserves

12   without also protecting the aggregate figures.  Well, neither

13   is true here.  In the case of its personal injury claims,

14   Grace didn't prior to bankruptcy or even after bankruptcy

15   estimate its aggregate liability by performing an individual

16   case reserve estimate for each of its over 100,000 asbestos

17   claims and then totaling that all up and having that serve as

18   the aggregate number.  They didn't do it that way.  We know

19   how they did it because we have the reports of ARPC that were

20   produced in Sealed Air.  We know they used this actuarially

21   based estimate.  They relied on gross figures.  They made

22   assumptions.  They did essentially what we're going to be

23   doing in the estimation case.  So there's no chance that the

24   disclosure of the aggregate reserve information that we're

25   seeking here is going to disclose any privileged attorney

1   opinion work product.  And so, for that reason, the <u>Serle</u>

2   opinion and the <u>Pfizer</u> case are much closer here and in both

3   of those cases, the Court analyzed it and said, You know

4   what, we're just not going to be imperiling the mental

5   impressions.

6          THE COURT: Mr. Malady, you need to move, because at

7   1 o'clock this afternoon or 1:30, I've got a class action

8   fairness hearing and this case is over at 1:25.  So, please,

9   we've got to move.  We've got to move.  This case is over

10  today at 1:25, so please, you've got to move along.  Okay.

11         MR. MALADY: My last point is simply that Grace

12  suffers no prejudice from disclosure of a process for setting

13  aggregate reserves.  The bankruptcy stay halted all the

14  litigation in this matter.  Grace's plan of reorganization

15  does not contemplate that Grace will ever again have to

16  defend asbestos cases.  This may be why Grace has been unable

17  to find authority in a bankruptcy case to protect the work

18  product here, the so-called work product.  All of its cases

19  are in the non-bankruptcy world.  Thank you, Your Honor.

20         THE COURT: Don't repeat anything, Mr. Finch, I

21  understand these arguments.  Move onto a new point.

22         MR. FINCH: I'm not going to repeat anything. I'm

23  going to emphasize a couple of points -

24         THE COURT: Don't emphasize anything.  Tell me new

25  things.

1          MR. FINCH:  - focusing - I'm going to provide the

2     Court with some cites -

3          THE COURT: Okay.

4          MR. FINCH:  - on the privileged and not-work

5     product issues.

6          THE COURT: All right.

7          MR. FINCH: The Serle case, which we cite for the

8     proposition that aggregate reserves are not privilege, and

9     the reason that this document, my motion to compel these

10    documents, the reason that it is discoverable is because

11    Grace, in addition to creating those documents for whatever

12    purpose they said on their privilege log, they used them for

13    setting their SEC reserves, and under the Securities and

14    Exchange Act, when you're a public company, you have to file

15    audited financial statements, which means, almost certainly

16    they had to give this report to their auditors, even though

17    their privilege log doesn't say they did, and I think if it

18    comes to an evidentiary hearing about that, we have to have

19    an evidentiary hearing, but the long story short is they used

20    this and relied on this for setting their SEC reserves.  That

21    is a classic business planning and non-litigation function.

22    And the Third Circuit test is exactly the same as the Serle

23    test.

24          THE COURT: Won't the witnesses tell you that

25    though?  I mean you're doing a 30(B)(6) witness deposition.

1    Won't your witnesses be able to tell you whether they -

2          MR. FINCH: We're not doing a 30(B)(6) witness on

3    this topic, unless the Court orders Grace to do it, and we're

4    not going to have the documents to do the 30(B)(6) deposition

5    on this topic unless the Court orders Grace to do it related

6    to their post-petition asbestos reserve.

7          THE COURT: But, one second.  Isn't the appropriate

8    place to test whether or not the documents were used for a

9    non-litigation purpose, which is for the purpose of the

10   public filings to find out from the witnesses who were

11   involved in the preparation, which I take it to be the three

12   deponents who are scheduled at this point to give their

13   positions, to ask that question.  And if in fact they are,

14   then I think the case law would probably tend to support the

15   fact that if there is either no privilege or that it's been

16   waived.

17         MR. FINCH: Well, Your Honor, what we are concerned

18   about is we've got David Segal's deposition on Valentine's

19   Day, February 14th.  If, for example, I started in asking him

20   questions, Grace is probably not going to keep me from asking

21   questions about their post-petition reserves because it was

22   already discovered in Sealed Air.  If I start going into,

23   Okay, you've got this privilege log, Mr. Segal, that Grace

24   has produced, and they're talking about this ARPC report,

25   what did you do with that ARPC report?  Did you rely on it in

1    any way for your SEC financial reporting?   They're going to

2    instruct the witness not to answer, I would anticipate and

3    imagine.   I would prefer not to come back here in March or

4    April and tee this up.   So I think that that's why we're

5    asking for a motion to compel, both to get the documents in

6    advance of the deposition and to have the witness prepared to

7    testify on that topic.

8         THE COURT: Well, with respect to the testimony, it

9    seems to me that asking a very, you know, simple question,

10   Were these documents used for some purpose other than that

11   which is listed on the privilege log? may be an appropriate

12   question, and I'm not suggesting the question.   I'm trying to

13   get to whether or not in fact the documents were used for

14   some public filing purpose.   I don't see how there is a

15   privilege that can be asserted for that question if in fact

16   the documents were used for some public purpose.   But a

17   disclosure of the documents which would by itself disclose

18   the nature of the documents that may be subject to a

19   privilege before you can assert that in fact they were used

20   for another purpose seems not proper.

21        MR. FINCH: Your Honor, I think we have established

22   that the documents were used -

23        THE COURT: No, you have to at least with respect to

24   this one that you just mentioned, the ARPC document, in 2004

25   that's listed specifically for purposes of having been

1   prepared at the request of and under the direction of counsel

2   for purposes of plan of reorganization purposes.

3            MR. FINCH: Your Honor, I would refer the Court to

4   Grace's financial statements, which we attached as Exhibit 1

5   to our response to the motion to quash the deposition

6   subpoena.

7            THE COURT: Which year?

8            MR. FINCH: Which year?  The year - fiscal year

9   ended December 31st 2005.

10           THE COURT: Okay.

11           MR. FINCH: And it goes to the plan of

12  reorganization and estimate of the SEC liability, and it

13  talks about that the liability - This amount, which should be

14  sufficient to fund over $2 billion in pending and future

15  claims is based in part on Grace's evaluation of (1) existing

16  but unresolved personal injury and property damage claims,

17  and (2) actuarially based estimates of future personal injury

18  claims.

19           THE COURT: Yes.

20           MR. FINCH: The only document that can be is this

21  2004 report by ARPC.

22           THE COURT: Well, that's an assumption you're

23  making.  I don't know if that's true or not.

24           MR. FINCH: Well, Grace has the burden to establish

25  that the privilege applies, and I don't think this entry on

1   the privilege log cuts it.  I would suggest, Your Honor, that

2   you review the documents in camera and see if there is any

3   work product or privilege protection to the ARPC actuarial

4   study, and the cite that I would leave Your Honor is the

5   Third Circuit controlling case law is In Re: Grand Jury

6   Investigation which the Runcolant court cites, and the cite

7   is 599 F2d 1224, and at page 1229, the Court says, "The test

8   should be whether in light of the nature of the document and

9   the factual situation in the particular case, the document

10  can be fairly be said to have been prepared or obtained

11  because of the prospect of litigation."

12          THE COURT: Yeah, but let me just assume, just for

13  purposes of this discussion that this ARPC report looks very

14  much like all the other ARPC reports that you already have,

15  that are filed under seal.  Just hypothetically, for purposes

16  of discussion, and therefore, it is an actuarial study of

17  sorts, that doesn't mean that there aren't other actuarial

18  studies that may have been prepared even by the same company

19  for purposes of use by the SEC and that this one is in fact

20  only for use for the counsel's purposes in preparing the

21  plan.

22          MR. FINCH: Well, the point is, Your Honor, we have

23  asked for all of their documents which underlie their SEC

24  reporting and reserves.

25          THE COURT: Okay.

1        MR. FINCH: And they haven't given us the document

2   on - They haven't given us the document that is referenced in

3   their 10k.  The document that's referenced in their 10k is

4   the actuarially based estimate of future claims.  They

5   haven't produced that.  Instead they produced a privilege

6   log, and they say, No, you don't get it unless you win your

7   motion to compel.  Therefore, that issue is squarely before

8   the Court.  Either they haven't given me the document, they

9   haven't claimed privilege - I don't think that's what they're

10  doing, or they've identified it on the privilege log, and

11  that's a document on which they rely for purposes of

12  estimating their liability for SEC reserve purposes, that's

13  probably what went to their auditors, and therefore, I urge

14  the Court to decide the motion to compel on the documents

15  based on the record before it, or at a minimum, to review the

16  actuary report referred to in their 10k and their estimate of

17  the pending claims liability referred to in their 10k, and I

18  defy you to find anything in there that reflects the legal

19  advise from Grace's lawyers or their mental impressions about

20  how they're going to defend particular cases or even cases in

21  the aggregate.  Those documents just don't look like that.

22       THE COURT: Okay, well, I think the first thing is

23  for me to find out why, if Grace has produced no documents

24  that support the 10k information, there are no documents that

25  are being produced because the 10k itself says they rely on

1    documents.  So, that's -

2         MR. FINCH: Yes, I suspect that these are the

3    documents listed on the privilege log, but I'll turn the

4    podium over to my esteemed colleague, Mr. Bernick, and he can

5    answer the Court's question about that, but the point is,

6    Your Honor, I think the documents are not protected by any

7    privilege.  They're clearly relevant.  The Court should order

8    them to be produced, and we should be able to use them in the

9    depositions, and we should get a witness to tell us about

10   them.

11        THE COURT: Mr. Bernick?

12        MR. BERNICK: At the risk of running into the same

13   problem, if I could use the microphone and . . . (microphone

14   not recording).  I know Your Honor is as anxious as we are to

15   get onto other business, but a lot of things have been said

16   here where hope springs eternal, but the facts don't support

17   the hope.  I think an awful lot of this could have been

18   simply avoided if folks read carefully what the 2005 10k

19   actually says as opposed to what it is that they would hope

20   that it says.  We have estimates that were done prior to the

21   Sealed Air transaction, and these were ARPC estimates, and it

22   is a stunning non-secret that the ARPC in connection with

23   these estimates used an actuarial method.  What they're

24   basically doing is actuarial.  It's not litigation merits or

25   anything.  You're basically taking costs as a number over

1    time.  You trying through actuarial means to project what

2    those costs are going to be assuming that the company stays

3    in the court system, and that is the assumption.  The

4    assumption - not only this stays in the tort system, but the

5    assumption is that nothing changes.  You get an actuarial

6    model.  It's actually run by people who are experts in

7    mathematical modeling that simply says, Based upon the

8    history, what do we expect the cost to be going forward.  So

9    these are done - some of these were produced in the Sealed

10   Air litigation because of the issue of advice of counsel.

11   This was a fraudulent conveyance case and where you have

12   advice of counsel, that's a defense.  So the counsel went out

13   and got advice from a variety of sources including ARPC.  So,

14   in order to defend the fraudulent conveyance claim, some of

15   the air piecing materials were produced and made available

16   and it was all under seal.  This was '98.  Then fast forward

17   to '01, which is the date - the petition date, and there were

18   updates to the ARPC analysis prior to the company going into

19   Chapter 11, and the updates were similar to the earlier

20   versions.  This section - that is these were not produced

21   voluntarily.  They were ordered to be produced by Judge

22   Wolin, and Judge Wolin's order, which I believe we cite in

23   our briefs, and if not, we'll furnish it to the Court,

24   specifically says they were for use only in the litigation

25   and there's no subject matter waiver.  So, with respect to

1    all of these, care was taken that they would only be using

2    that litigation, there was no waiver.  All of these share the

3    common denominators, as counsel well knows, because they've

4    seen them, but they're pure actuarial models and they say

5    right up at the front, we're just assuming that everything

6    stays the same.  The company's in the tort system, that its

7    cost trends historically continue into the future, and we run

8    the models, and out the answer comes.  We now go to 2004, and

9    between '01 and 2004, these models were not updated.  So,

10    what's going to happen in 2004 and then we'll deal with 2005

11    very briefly because it doesn't really add very much to the

12    equation.  Well a new analysis we know is done in 2004

13    because there is a log listing for the analysis in October of

14    '04.  So I'll just put this down here, and I'll actually make

15    it lower because this analysis was a very different kind of

16    analysis.  But all that we know, based upon the record that

17    is there, and it's very clear, is that this analysis was done

18    at the direction of counsel and, as the log states, and as

19    the affidavit from Mr. Shelness (phonetical) states, it was

20    done for purposes of plan formulation and defense of the

21    litigation in this case.  And Your Honor will well recall

22    that there was a very significant development that prompted

23    all of this in 2004, which was that Judge Wolin was recused,

24    and Your Honor said to us, You've got to go file a plan and

25    you've got to be prepared to go basically litigate the merits

1    of what you want to litigate.  So, with that injunction - in

2    fact, I think our due date for that was the end of October,

3    Your Honor gave that direction.  It was in connection with

4    that effort that for the first time since the company had

5    been in a Chapter 11 there was a new ARPC analysis done

6    working with our firm for purposes of complying with Your

7    Honor's direction for what was going to happen in this case.

8    The affidavit from Mr. Shelness, who is the general counsel

9    now of Grace and was present at the time says specifically

10   that this analysis was done for that purpose.  If you take a

11   look at the log, it's very interesting what they have told

12   you and what they have not told you about this log.  The log

13   actually goes through and lists - if I can find the thing

14   here - I've got it, thank you.  Your Honor will see that it's

15   not really in chronological order, but if you actually take a

16   look at the first time there's some discussion, there's some

17   log entries before October, and there's a log entry for

18   October that's ARPC.  It's October of 2004.  It reads:

19   "Preliminary expert estimates of personal injury liability

20   prepared at the request of and under the direction of counsel

21   for formulation and defense of proposed plan of

22   reorganization."  The recipients are Ellie Liebenstein, who's

23   a partner of mine, and David Segal, who was then the general

24   counsel.  Mr. Tarola is a cc and there's no other recipient.

25   So, this was a document that was done as it says, and as Mr.

1    Shelness has said, under oath and an affidavit, specifically

2    for that purpose at this time in order to comply with what

3    Your Honor directed be done.  Now, what's very interesting

4    there and just to understand, this is now an estimate for

5    that purpose at this time.  What happens thereafter, and this

6    is all set out, actually it's known because it's been

7    presented to Your Honor previously, is that there was a plan

8    negotiation at this time, and you will recall that we

9    actually got a 30 day - by agreement of everybody there was a

10   30-day extension of time because it looked like we might

11   actually do a deal to resolve this case.  After that

12   concluded, after that process ended, we had taken a

13   settlement position, so I'll call it a settlement position.

14   And the settlement position was rejected, but because we had

15   put it on the table, we put it in our new plan which

16   ultimately was issued on 1/13 of '05.  So instead of saying,

17   Well, we said that this was our settlement position before,

18   but we're now going to go back to ground zero in our plan.

19   We incorporated in our plan of reorganization - proposed plan

20   of reorganization the very settlement position that we had

21   set out with the other side in order that we hoped we could

22   still make progress.  So the plan document simply

23   incorporated the settlement position.  Did the plan document

24   say, Here is the estimate for personal injury liability?  No.

25   The settlement position that we took in the plan was way

1    different than what we would have said in the estimation

2    process even at that point in time, and there's documentation

3    of this that we'll see in just a minute, if they actually

4    took a look at what the 10k says.  This January 13, '05

5    document now tees up the question, which had been anticipated

6    before, and that's why there are some entries that you see in

7    the log before, Well, what do we now do for SEC reporting

8    purposes?  Do we go back and continue to use this old number

9    here?  Do we use the litigation and plan formulation estimate

10   that was done more recently at the direction of and with the

11   supervision of counsel, which was based still not on the

12   available information which we're only now getting?  It was

13   based upon whatever information was available at the time.

14   Do we use the settlement position that we took in the plan or

15   do we do something else?  It's a classic issue for in-house

16   counsel to take up, and lo and behold - and for the financial

17   officer to take up, and lo and behold, there are a bunch of

18   documents where they're all talking about, Geez, what do we

19   do now for SEC reporting purposes given all of these

20   different options?  What a shocking surprise.  Now, the final

21   answer to what ultimately takes place is in the 10k itself

22   because the 10k itself comes out, you know, in the early part

23   of the year following and basically in the March time frame.

24   So, again, we've got privilege log entries in the early part

25   of '05 that deal with all of this.  But I want to turn to the

1   10k itself and in particular the 10k for the following year,

2   which is more expansive on the same subject and go through it

3   a little bit carefully because it is the ultimate answer to

4   the question of what occurred, and I believe that it answers

5   these questions in a definitive fashion.  This is Exhibit B,

6   and it's very, very careful, and we'll pick out what it says

7   in relationship to the numbers I've just put -

8           THE COURT: What 10k are you looking at?

9           MR. BERNICK: This is the 10K for now '05 that came

10  out in March of '06.

11          THE COURT: All right.

12          MR. BERNICK: And it's the one that counsel cited in

13  saying, Geez, this is establishes that their 10k is a

14  calculation, I think Mr. Malady says, contains the

15  calculation that we're talking about.  It doesn't.  Here's

16  what it says: "Treatment of asbestos litigation under plan of

17  reorganization, under the plan of reorganization raises

18  requests in that the Bankruptcy Court determine the aggregate

19  dollar amount", dah, dah, dah, dah, "that must be funded on

20  the effective date and related costs."  We refer to this

21  amount here as the funding amount.  So, Your Honor is to

22  determine the funding amount.  It is a condition of

23  confirmation of the plan of reorganization that the

24  Bankruptcy Court shall conclude that the funding amount is

25  not greater than 1.613 million or $1.6 billion.  So what the

1    plan did that we filed on January 13 of '05 is to set 1.6

2    billion as a condition for confirmation.  This then is what

3    gets reported in the filing.  So the decision that the

4    company took in making this filing, with all these different

5    options, was to say, Because we have no plan of

6    reorganization out there, even though it may not be the

7    estimate because we don't know what the estimate is, it

8    reflects that ultimately we will stand by a deal that pays

9    out up to $1.6 billion, which was the settlement position.

10    So, the settlement position is out there in the negotiations.

11    It's put into the plan of reorganization as a condition for

12    confirmation, and then it makes its way into this filing that

13    takes place in March of '05.  In short, what was in the

14    filing of March of '05 is the same thing as in the plan, is

15    the same thing which is a settlement position expressed as a

16    condition for confirmation.  That's all that's there.  And

17    this document goes on to make it crystal clear for the eager

18    reader.  And we're all eagerly reading here.  This says, This

19    amount, which should be sufficient to fund over 2 billion in

20    pending and future claims, is - it's not the calculation - is

21    based in part on Grace's evaluation of.  We then have the

22    litany of existing but unresolved claims, actuarial based

23    estimates, et cetera, et cetera.  Does that mean - Does this

24    list, because it says "actuarial based estimates" mean that

25    the 1.6 number is the estimate?  That's not what the document

1    says.  It says completely something else.  It says, It's the

2    condition for confirmation.  It is what we are prepared to

3    pay in the plan.  It does not say that it's the estimate.  So

4    when they say that we disclosed the estimate by making this

5    SEC disclosure, they're just flat wrong.  The estimate was

6    far less.  And how do we know that?  Because the document

7    goes on to say it.  It says, The funding amount will be

8    primarily a function of the estimated number of allowed

9    property damage and personal injury claims in the amount

10   payable per claim.  So, this 1.6 is not simply PI.  It's PD,

11   traditional.  It's ZAI.  It's everything all built into one.

12   It's just the total condition for confirmation number.  It is

13   not even a disclosure of any of the component estimates at

14   all.  What about the actual estimate?  Well, this goes on to

15   say, The primary function, et cetera, et cetera, through the

16   estimation process Grace will seek to demonstrate that most

17   claims should not be allowed because they fail to establish

18   any material property damage, health impairment, or

19   significant occupational exposure to asbestos from Grace's

20   operations or products.  That's our position.  If the

21   Bankruptcy Court agrees with Grace's position on the number

22   of and the amounts to be paid in respect of allowed personal

23   injury and property damage claims, that is if the Court

24   believes that we have the better position, then Grace

25   believes that the funding amount could be less than the $1.6

1  billion.  Why?  What was Grace saying?  If you go along with

2  what we believe the estimate to be, that is down here, it's

3  lower than the 1.6.  Certainly different from the 1.6.  By

4  the same token, if able counsel for the claimants are

5  successful, this is what it goes on to say, conversely, et

6  cetera, et cetera, if you go with their position, it's

7  substantially higher, and we now come to the key sentence.

8  Quote: "Therefore, due to the significant uncertainties of

9  this process and asbestos litigation generally, Grace is not

10  able to estimate a probable funding amount that would be

11  accepted by the Bankruptcy Court."  There is no estimate that

12  appears or is disclosed in this document, period, end of

13  statement.  What are we doing then?  So it goes on to say,

14  just as I've indicated here, However, as Grace is willing to

15  proceed with confirmation of the plan of reorganization with

16  a funding amount of up to 1.6 billion, we're now including it

17  and we're taking a reserve.  Nothing could be any clearer.

18  This is absolutely, perfectly clear.  We're talking about a

19  settlement position that wraps in all of the liabilities.  It

20  then gets incorporated into a plan because we want to keep

21  moving with the negotiation process, and ultimately gets

22  incorporated into a filed financial statement, not because it

23  represents the estimate, but because it represents, as this

24  document says, what it was that Grace was prepared to do.

25  There is zero disclosure of the much lower ARPC estimate that

1   took place.  There's no disclosure of the methodology.

2   There's no disclosure of anything.  All there is is the

3   aggregate number.  That was what the financial statement

4   says.  And the essence of their position is, Gee, because you

5   committed to do, you did the right thing which is to take

6   your settlement position and put in the plan document and put

7   it in the financial filing - Aha, we now get to look at all

8   of the work product that you've done in connection with this

9   case.  All these facts are out there in black and white.  Now

10  the law is very, very clear, and I'll be very brief on this.

11  This product here is protected in three different ways.

12  First, it's protected if it were created outside of

13  bankruptcy because it would be clear work product.  This is

14  lawyer driven work product.  In the <u>Simon</u> case you're talking

15  about a management risk assessment that was done for business

16  purposes.  This was not a risk assessment that was done for

17  business purposes because the risk was all there.  The risk

18  was long ago.  This was an assessment done by counsel working

19  with an expert for purposes of a litigation analysis.  That's

20  what it was.  <u>Simon</u> has nothing to do with this case.  So it

21  is clear work product and attorney/client protected because

22  it deals specifically with a matter that's in litigation.  I

23  don't believe that there is a single case that they have

24  cited or that is out there and we have cited cases that are

25  in our favor, I don't believe that there's a single case

1    that's out there that says a piece of internal attorney

2    driven work product that deals with ongoing litigation is

3    subject to disclosure as being non-work product when it was

4    done and never disclosed and never actually disclosed in an

5    SEC filing.  This is plain and simple, this is my firm

6    working with ARPC to aid us in complying with the Court's

7    directions.  It is about as square a work product as you can

8    possibly imagine, and <u>Simon</u> has got nothing to do with this

9    case.  That was a risk assessment document that was done by

10   management people with no involvement of outside counsel, and

11   we've indicated to the Court the cases that we believe

12   support our position.  They're in the briefs, and I'm not

13   going to go over them again here.  Now, that's just the first

14   protection.  Second protection, this case is in bankruptcy

15   and because it's in bankruptcy there are work product

16   protections that are associated with the bankruptcy process.

17   This is, after all, an estimate that's done of underlying

18   liabilities for purposes of litigating and preparing a plan.

19   And the case law is clear, it's the <u>Celetex</u> case, that deals

20   exactly with this situation.  Work product that is prepared

21   in the course of a general bankruptcy case is protected from

22   discovery as being work product.  And then we come to the

23   third thing, and the third thing has not been emphasized very

24   much but it is key, and that is that there is an agreement in

25   this case that actually governs the discover-ability of this

1    very material.  Dr. Florence was with ARPC is in fact one of

2    our experts.  He will testify in this case.  This is work

3    product from his firm.  We worked with him in 2004 in

4    developing this alternative view of the world.   So, he's our

5    expert.  Now there is an agreement that has been entered

6    into, was negotiated with the futures claimants, with the

7    asbestos claimants.  It's called a stipulation regarding

8    expert discovery, and we have attached it, I believe to our

9    briefs, and what this contemplates is that nobody is going to

10   get discovery of work product unless it is actually relied

11   upon by the expert in connection with that expert's

12   testimony, and that's exactly what it says.  The following

13   categories of data information or documents need not be

14   disclosed by any party and are outside the scope of

15   permissible discovery including deposition questions.

16   Nothing could be clearer.  Number one or Romanet I: Any

17   notice or any notes or other writings taken or prepared by or

18   for an expert witness in connection with this matter,

19   including correspondence or memos to or from, and notes of

20   such conversations with the expert's assistants, and/or

21   clerical staff or support staff, one or more - it reads about

22   as broad as you can possibly imagine - unless the expert

23   witness is relying upon those memo, notes, or writings in

24   connection with the expert opinions.  Number 2: Draft

25   reports, preliminary or interlineate calculations or

1     computations or other preliminary intermediate or draft

2     materials prepared by or at the direction of the expert

3     witness, which is exactly what this was because we don't yet

4     have the data to do the final analysis.  We're only getting

5     it now.  Romanet III: Any oral or written communication

6     between an expert witness and the expert's assistant and/or

7     clerical or support staff, et cetera, et cetera, unless the

8     expert is relying on it.  The whole idea was that discovery

9     with respect to Dr. Florence and ARPC is being our expert,

10     just like their experts, is constrained the materials that he

11     actually relies upon in connection with his testimony in this

12     case.  The effect of what they're doing is to say, This

13     stipulation is a nullity, is a nullity in this case.  It

14     doesn't read out an exception.  This is not something that

15     says, Well, we're therefore preserving privileges.  This

16     assumes.  Ordinarily expert would be subjected to discovery

17     on these things.  It would all be discoverable.  This assumes

18     that it will otherwise be discoverable, and what we're saying

19     is, by agreement, even if it would ordinarily be

20     discoverable, it's not discoverable.  There's no exception in

21     here for, Well, what if your expert worked with you earlier

22     in this matter?  There's no exception here that says, Well,

23     with respect to Dr. Florence, because of historical

24     involvement, there's no exception here for any number of

25     other things that might conceivably make this earlier work by

1    Dr. Florence discoverable.

2              THE COURT: You've got to move along.

3              MR. BERNICK: Yes.  So, it's protected in three

4    different ways.  Indeed, Your Honor, using the four corners

5    of this stipulation, which was entered into long after all of

6    this took place, need not analyze anything further than the

7    language of this stipulation.  It is binding and if it

8    applies by its language, it is a deal in this case, there's

9    no law that says that it can be broken.  I come back then to

10   the question, finally, of need.  Need and relevance are two

11   different things.  There's a lot of argument about relevance,

12   and I think that that really is a way of saying, Oh, well,

13   let me into the merits of this controversy and kind of air

14   condition the Court with what they believe is this

15   fundamental inconsistency that is not - but it doesn't make a

16   difference if this material is relevant, if it's work product

17   there has to be a need for getting this material.  There's no

18   need for getting this material.  The fact that Dr. Florence

19   has used actuarial methods is well known to the world, if

20   they want to cross-examine him about it they can.  The fact

21   that actuarial estimates are commonly used, they may believe

22   supports their position on Dalbert.  They don't need this in

23   order to get there.  The reason that they want this is to be

24   able to impeach.  They want to be able to impeach Grace

25   because they believe it's inconsistent even though we

1    disagree.  They want to be able to use it to impeach Dr.

2    Florence even though we believe it is totally consistent.

3    They gave away their right, if they ever had a right, to use

4    this for impeachment purposes.  That's what the stipulation

5    says, and they certainly never had a right to say that work

6    product dissolves in the face of a desire for impeachment.

7    That is not need under the rules for the discovery of work

8    product.  So we're talking about work product today that has

9    never ever been disclosed, not disclosed, not in the public

10   filings.  We're talking about work product where every

11   indicia of work product has been satisfied both through an

12   affidavit and through the very documents that they're relying

13   upon to make their arguments here.  And they want to say,

14   forget all of that, because we would like to impeach Dr.

15   Florence.  That's not the way the rules work.  Now, I believe

16   that we have more than satisfied with the affidavit, with the

17   log, and with the 10k itself our predicates for saying, This

18   is work product and it's not been waived.  Mr. Segal will be

19   produced for a deposition in February.  If they want to ask

20   Mr. Segal whether the ARPC analysis was prepared for the

21   purposes that Mr. Shelness has already said in his affidavit

22   it was prepared, that is, if they want to ask Mr. Segal who

23   was then the general counsel whether Mr. Shelness is right in

24   his affidavit, that is, what was the purpose for which the

25   ARPC report and the ARPC analysis is prepared, we will not

1    instruct him not to answer that question, and they can ask

2    Mr. Segal what the purpose of the ARPC analysis is, and I

3    don't believe that that's necessary, but we're prepared to do

4    it to get another person who was there at the time testifying

5    under oath that the log as it reflects now is accurate.  But

6    beyond that, they have got no leg to stand on.  That was

7    simply confirmatory of what their own documents reflect.

8          THE COURT: Okay, I don't know who all of the people

9    are who are listed on this log.  Some of them are listed as

10    counsel.  I assume that as counsel they're affiliated one way

11    or another with the debtor even though that's not disclosed.

12    I just make that assumption.  I take it that that's not an

13    incorrect assumption to make.  But I don't know who the other

14    people are.  Sometimes they're identified - audit, committee

15    of the board.  I can assume that's not a committee of the

16    board, but I know Mr. Norris through representations of other

17    matters before this Court, but I am not aware of each

18    specific person on this list.  So I don't have a way of

19    identifying through all of the recipients and cc's whether

20    these are all employees who would otherwise not cause some

21    privilege to be waived by virtue of the fact that the

22    documents were provided to those entities.

23          MR. BERNICK: Well, if you're asking is there

24    anybody from outside the company and its board and counsel to

25    the company, that is, are there any third-party non-lawyers -

1           THE COURT: Yes.

2           MR. BERNICK: The only one that I can see here is

3    PricewaterhouseCoopers which is listed on the third and I

4    guess it's Document 12, Document 18.  Now it may be that

5    there are others.  I don't see them right here.  They are all

6    in-house people and most all of them are lawyers, but the

7    only one that I can see is PricewaterhouseCoopers, and again,

8    our position with respect to that is - Do you see what the

9    date of that, that is November of 2004.  That is actually

10   before the plan was filed.  It is after the plan gets filed

11   that contains this number that ultimately the decision had to

12   be made about what to do in the filings, and that, I believe,

13   is after November.  That continues on, you see entries in

14   December, even into January of 2005, and all of those

15   documents are documents that are internal documents.  They're

16   not documents that go to third parties.  So we have that

17   document that was disclosed to an auditor at that time.  We

18   clearly do not believe that that is a waiver.  There's no

19   indication that it actually - that it achieved any broader

20   dissemination than to go to that one person, and -

21           THE COURT: Well, but how is that person within the

22   privilege?

23           MR. BERNICK: Well, because you're talking - it

24   would be a waiver if that person then went and disclosed it

25   to somebody else, but you're talking about somebody who is an

1    auditor of the company.  They work directly with the company.

2    The auditors often see reserve information.  You know, you

3    can have a - If you have a reserve on your books and -

4            THE COURT: This is an outside auditor.

5    Pricewaterhouse is not -

6            MR. BERNICK: Absolutely.  If you have a reserve

7    that's on - if you have to carry a number on your reserve

8    that's a liability number, auditors all the time look at

9    those numbers and ask what the basis for it is.  If you have

10   a waiver of the underlying work product and attorney/client

11   privilege, every time the auditor looked at it, it would

12   dissolve the protection that applies in all these cases that

13   deal with the reserves.  The fact that an outside person -

14   one outside person or an outside organization that's working

15   hand in glove with the company it sees something does not

16   mean it is waived.  There has to be some use made of that.

17   There has to be some contemplation that it will become more

18   public and more broadly disseminated.  And then also, this

19   did not take place before the plan came out, and it was

20   ultimately the plan that contained the number, the 1.6

21   number.  The plan that contained the number that ultimately

22   was disclosed.  What I'm concerned about, and I don't know as

23   sit here today, Your Honor, I don't know whether this same

24   document includes information that was taken from the ARPC

25   report that was done a month earlier.  The sequence is, you

1    have October, because Your Honor directed us to prepare the

2    plan and to negotiate; October is when the ARPC analysis is

3    done.  You then get this interim period of time where there's

4    discussion about what to do including those two documents.  I

5    don't know whether that discloses this or not.  You then get

6    the plan coming out with the 1.6 number, and then that

7    ultimately was disclosed and between the plan number and the

8    ultimate disclosure, I don't see any documents here that were

9    shared with anybody outside the organization at all.

10         THE COURT: Well, I don't either except for those

11   two, and it may be the same document, I can't tell.  They

12   have different Bates Stamp numbers, but, you know, just

13   looking at this list, it's got the same caption, and it has

14   the same disclosure.  So, whether it's the same document or a

15   different document, two supplementals dated the same date, I

16   don't know.  But nonetheless, that - on this list, from

17   looking just at the face of this list, those two documents,

18   12 and 18, appear to me to be the only two that would be

19   suspect to possible disclosure.

20         MR. BERNICK: I understand that, and again, we have

21   once more the question of the stipulation which says -

22         THE COURT: Well, this doesn't - I don't know is Mr.

23   Tarola or Mr. Robert, who - are the authors, going to be

24   experts?

25         MR. BERNICK: No, but that's not the point.  If

1   those documents don't disclose the ARPC work, then the

2   stipulation wouldn't apply.

3         THE COURT: Right.

4         MR. BERNICK: But if they do disclose the ARPC work,

5   the stipulation does apply because Mr. Florence is ARPC, he's

6   the one that did this, he's the one that's going to be

7   testifying.

8         THE COURT: You need to take a look at these two

9   documents, Mr. Bernick -

10        MR. BERNICK: We'll take a look.

11        THE COURT:  - and see what's going on with them,

12  because it appears to me that they may be subject to

13  disclosure.

14        MR. BERNICK: Well, we'll take a look, and we'll

15  also see if there's some way - We'll take a look at the

16  documents, Your Honor, but at the end of the day, again, to

17  the extent that it reflects the ARPC analysis, the

18  stipulation then would apply no matter whether these

19  documents were in the New York Times.

20        THE COURT: Well, I don't know.  There may be some

21  redacted version.  I mean, you'll have to - you need to take

22  a look at those two documents.

23        MR. BERNICK: I'll take a look at them.

24        THE COURT: Okay.  With respect to the privilege

25  log, it appears to me, with the affidavits with the list here

1    with the non-disclosure to anyone other than attorneys and

2    in-house employees who would be assisting the debtor and with

3    the specification -

4            MR. FINCH: Your Honor, may I be heard?

5            THE COURT: All right, just a minute.  Not all of

6    these documents, however, deal with the plan.  There's

7    another one.  On the top of page 2, number 48, the second

8    line down, which is dated back in 2000 which is clearly a

9    pre-petition date.

10           MR. BERNICK: Yeah, it is a pre-petition date but

11    that doesn't mean that it's discovery.

12           THE COURT: Well, I don't even know what it is.  It

13    doesn't have an author.  It doesn't have a recipient.  It

14    simply says attorney work product, but I don't know for what

15    purpose.  So that one -

16           MR. BERNICK: We'll supplement that description,

17    Your Honor.

18           THE COURT: Yeah, I think you need to because

19    otherwise that one needs to be disclosed.  It doesn't -

20    There's no support whatsoever for the fact that there's a

21    privilege claim as to that.  Nor does the time period support

22    one.

23           MR. BERNICK: Well, it's pre-petition, end of the

24    year.  It could well be again an analysis that relates to,

25    you know, liability.  I just don't know, but we will

1   certainly take a look at that.

2           THE COURT: The rest of these documents all appear -

3   Okay, no, they don't.  If you take a look at the next one

4   down, 87, and then there are a number of them after this that

5   have the same description.  Memorandum re: Quarterly legal

6   reserves meaning discussing claims against Grace including

7   asbestos PI once PD claim's filed in Chapter 11.  I'm not

8   really sure what that means, frankly, but who are Joy and

9   Michelle?

10          MR. BERNICK: Michelle Joy.

11          THE COURT: Oh, okay.  Who is Michelle Joy?

12          MR. BERNICK: We'll supply the information with

13  respect to those.  I believe that the representation that I

14  made concerning outside people, that is the only outside

15  person here, is the Pricewaterhouse person and outside with

16  counsel either to the Board or to the company is accurate,

17  and, for that matter, most of the people in-house who are

18  listed here, are also lawyers, although not - obviously Mr.

19  Tarola is not a lawyer.

20          THE COURT: Well, I'm not - the privilege log

21  simply, I think, is insufficient to permit that assessment.

22  I really don't know what the description means.  I mean, I

23  can figure out some of the words but meeting discussing

24  claims against Grace including asbestos PI once PD claims are

25  filed in the Chapter 11?  I mean, the description doesn't

1    mean anything to me.

2          MR. BERNICK: Yeah, we'll work on that.

3          THE COURT: So I don't know whether - is it a

4    memorandum prepared for discussion with counsel?  Is it for

5    financial reserve purposes?

6          MR. BERNICK: We will eliminate that ambiguity.

7          THE COURT: All right, Mr. Finch.

8          MR. FINCH: Your Honor, may I suggest that the Court

9    review all of these documents in camera and make an

10   assessment as to whether they reveal any work product or not.

11   We are going to trial in June in this case.  The deadlines

12   are very tight.  Every reserve case that Grace cited, the

13   Court ultimately reviewed the documents in camera, and Your

14   Honor can decide whether a document discloses attorney work

15   product or not.

16         THE COURT: All right, I will review them all in

17   camera after I get a supplemental list that tells me who

18   these people are and what position they have within the

19   company so that - and a better description so I know what

20   this -

21         MR. FINCH: May I ask the Court to set a deadline

22   for producing the documents for in camera review?

23         THE COURT: Yes.

24         MR. BERNICK: I'm sorry, I'm sorry, Your Honor.  An

25   in camera review of these documents is not necessarily

1    completely indicative of what the documents are about.  We

2    have a situation to compel in camera review.  We've got a lot

3    of documents here where all you'll see are numbers and

4    assumptions, and you won't necessarily know where in the

5    world those assumptions came from.

6              THE COURT: Well, if that's the case then I guess

7    that's what I'll have to say.  I mean, the problem, Mr.

8    Bernick, is, at the moment, unless you want me to simply say

9    that this privilege log is inadequate, and therefore they

10   have to be disclosed, I can't tell what these are.  I mean

11   this says, there's a memorandum to the file prepared by an

12   unidentified person who claims an attorney work product.  I

13   don't even know if the person who prepared it is an attorney

14   let alone if it's prepared under the auspices of an attorney,

15   and I don't know for what purpose.

16             MR. BERNICK: Well, Your Honor, this is - Take for

17   an example, anyone of these things, take for example the

18   11/13/04 document that Your Honor indicated.  This is an

19   absolutely traditional privilege log.  It states what the

20   purpose was.  It states who got it -

21             THE COURT: Wait, I'm sorry, which one are you

22   looking at?

23             MR. BERNICK: The third one on the list, the one

24   that you were talking about.

25             THE COURT: The memorandum re: Quarterly legal

1    reserves?

2            MR. BERNICK: Right.

3            THE COURT: What's a legal reserve?

4            MR. BERNICK: Your Honor, a privilege log does not

5    typically contain any more information than what you see

6    here.  If you wanted to get an explanation of what the

7    reserve was in more detail, then the typical recourse would

8    be to ask for an affidavit or perhaps ask for testimony that

9    relates to the log.  The typical recourse is not conduct an

10   in camera review -

11           THE COURT: Fine, you may have a deposition with

12   respect to what this log means, and then -

13           MR. BERNICK: I'm happy to have a deposition with

14   respect to what the log means, and Mr. Segal will be the

15   deponent who will testify as to what this log means.

16           THE COURT: And then if there is still some question

17   as to whether there is a privilege, you may re-approach the

18   Court with respect to that.  You do not need to wait until

19   the next omnibus hearing after the deposition.  You may do it

20   on an expedited basis.

21           MR. FINCH: And so we can, we don't have to re-brief

22   the issues or re-tee it up.

23           THE COURT: You do not need to brief the issues

24   again, but I do need to know some better articulation of what

25   the issue will be.

1          MR. FINCH: I will just leave the Court with one

2     thought.  The accounting firm, PricewaterhouseCoopers, works

3     for the shareholders and the creditors of the company.  They

4     have an independent duty to certify that the financial

5     statements fairly present the financial position of the

6     company, and they can't just say, Oh, well, this is Grace's

7     litigation position in the bankruptcy, or it's settlement

8     position.  In our reply on this, we cited to the various

9     accounting literature and attached a copy of Fast B-5 the

10    financial accounting statement that says that when there is a

11    contingent liability you have to do a reasonable estimate of

12    the liability, and so Grace and its accounting firm were

13    saying, This in our view - and telling their shareholders,

14    not the people involved in this case.  Think about all the

15    people who are buying and selling Grace stock, in reliance on

16    their financial statements.

17          MR. BERNICK: I object to all of this.

18          THE COURT: What's the point?

19          MR. FINCH: The point is, Your Honor, that once the

20    - and this is the reason why the stipulation doesn't cover

21    this, once they gave it to their outside accounting firm,

22    once their accounting firm relied on it, and they relied on

23    it as a reasonable minimum estimate of the liability in part

24    on the ARPC study, then I submit to you there's no longer any

25    work product protection.  It's all squarely in the Serle and

1    therefore we're entitled to the document.

2        THE COURT: All right.  I think I just asked Mr.

3    Bernick to take a look at what this document is for that

4    purpose.  It appears to me that those two documents, whatever

5    they are, because they have been disclosed to outside

6    auditors may very well be subject not to the claim of

7    privilege, but I believe that Mr. Bernick has a right to take

8    a look at them to make sure that something isn't being

9    missed, and to raise that issue.

10        MR. FINCH: Your Honor, I -

11        MR. BERNICK: Your Honor, I really object.  We're

12    now an hour and 45 minutes -

13        THE COURT: This is not my fault, folks, let's go.

14    I've already made rulings.  You can either continue to argue

15    the point after my rulings or we can move on to something

16    else.

17        MR. FINCH: Your Honor, if any other documents were

18    disclosed to the auditors, may I get them as well.

19        MR. BERNICK: Your Honor, this is another request

20    and I object to it.  It's out of time and we've got to get on

21    to other business.

22        THE COURT: This is the privilege log that I have.

23    I'm not aware of any other documents.  These are the

24    documents on which you may take the deposition.  Mr. Bernick,

25    within one week you must examine these two documents and

1      either turn them over if they are not somehow subject to the

2      expert ARPC issue that you have identified or supplement this

3      list to explain why they are still subject to the privilege.

4      Mr. Finch, you may approach the Court on an expedited basis

5      with respect to those two documents.   As to the other

6      documents, you may take Mr. Segal's deposition.   You may come

7      back if there is some issue still remaining as to whether

8      there is or is not a privilege left with respect to the

9      documents.  If there is some assertion of privilege that

10     remains after Mr. Segal's deposition and you think that there

11     is no privilege, you may come back, but I want in some better

12     fashion an articulation of what the issue will be and what

13     the document has been - what use has been made of the

14     document as explained by the witness.

15             MR. FINCH: So if, for example, document 681 -

16             MR. BERNICK: Your Honor, this is not - this is not

17     -

18             MR. FINCH:  - the ARPC report was provided to

19     PricewaterhouseCoopers, I can come back to the Court on an

20     expedited basis.

21             MR. BERNICK: This is not appropriate. This is like

22     the 10th request he's made for Your Honor to rule from the

23     bench without going through what Your Honor has now ordered

24     two different times -

25             THE COURT: I've ordered the deposition, Mr. Finch,

1    so that's it.  That's what I've ordered.

2           MR. FINCH: Thank you, Your Honor.

3           MR. BERNICK: I believe, Your Honor, that there are

4    a couple other housekeeping matters that relate to personal

5    injury.

6           THE COURT: I don't think I've ruled on the

7    deposition.  Pardon me.  With respect to the deposition

8    request for a 30(B)(6) witness, is the ruling that I've made

9    on the privilege log sufficient or is there some other issue

10   that you need to be addressed?

11          MR. BERNICK: I believe the ruling on the privilege

12   log is where Your Honor's coming out on the central issue

13   with regard to privilege which is the issue that governs that

14   first category.  I think, I mean, from our point of view, Mr.

15   Segal will testify about the log.  If they believe that

16   there's still some issue about whether it's privileged or

17   not, these matters are privileged or not, they can come back

18   before the Court.

19          THE COURT: I'm trying to find out from Mr. Malady

20   whether I've covered everything by looking at the privilege

21   log.

22          MR. MALADY: Thank you, Your Honor, and I did think

23   that that question was posed to me.  We do believe that the

24   deposition is necessary if for no other reason than to ask -

25          THE COURT: Have I covered everything by looking at

1    the privilege log, is the question.

2            MR. MALADY: No, I don't believe so, Your Honor.

3            THE COURT: Okay, what am I missing?

4            MR. MALADY: Well, I think what you're missing are

5    the questions that are raised by the very colloquy that Mr.

6    Bernick had with the Court which he made some notes about on

7    the easel over there, what was going on at various times;

8    what was or was not encompassed within the report to the SEC;

9    the extent to which these estimates were based on a

10   settlement position.

11           THE COURT: Oh, you want to examine him about the

12   10k?

13           MR. MALADY: We want to examine him about Grace's

14   estimates of its personal injury liability for asbestos

15   claims and all the questions that were implicated by this

16   colloquy are directly relevant, and we had a substantial

17   need, we've demonstrated that -

18           THE COURT: With respect to what is incorporated

19   within the 10k you may examine with respect to what is in the

20   10k.  Mr. Bernick has just articulated the basis for the

21   numbers that have been put into this 10k.  What you may not

22   do is go behind the purposes or the settlement discussions to

23   the extent that settlement discussions are otherwise

24   protected by Rule 408 or the other rules.  But you may

25   inquire whether - if you're looking for documents or other

1    witnesses, they exist with respect to the information that is

2    in the public document un-10k.  That is not leave to get

3    behind the plan of reorganization issues which will come up

4    in another time frame and for another purpose.

5              MR. MALADY: Are we -

6              MR. BERNICK: I take it - Excuse me.  I take it that

7    this again is now another request that's being made where

8    there is zero, zero showing that there's some problem with

9    Mr. Shelness's affidavit which otherwise would be in most

10   courts dispositive.  Be that as it may, when Your Honor says

11   there can be examination of Mr. Segal, now, with respect to

12   the 10k -

13             THE COURT: No, of the 30(B)(6) witness.  They're

14   asking to have a 30(B)(6) witness designated with respect to

15   estimates that have gone into the debtor's preparation of its

16   10k, and I'm saying that to the extent that the debtor - to

17   the extent that the debtor has relied on an actuarial study

18   or studies for purposes of its 10k.  You're saying they're

19   going to say that it was the pre-petition estimates that were

20   relied on, and they've got it, fine.  If that's what the

21   witnesses say, that's going to be a short deposition.  To the

22   extent that that's the answer to the question, that's the

23   answer.

24             MR. BERNICK: Your Honor, no, that's not what we

25   said.

1          THE COURT: You're saying among other things.

2          MR. BERNICK: No, that's not - again, that is not

3    what we said.  The 10k first of all speaks for itself.  That

4    is the only public document.  We have no quarrel with the

5    idea that if they want to take the person who will be our

6    30(B)(6) witness on this issue, which is Mr. Segal, and they

7    want to ask him whether the matters that are set forth in the

8    10k are, as they appear in the 10k, if they want to ask him

9    wether the 10k 1.6 number is in fact the estimate, they can

10   ask them that question.  What I want to protect is the work

11   product, and I take it from what Your Honor has said, you've

12   made no determination that says that they get access or can

13   ask questions about the work product.  Now, if what Your

14   Honor is saying is, they can ask questions about the 10k and

15   whatever that might entail including the basis for what's in

16   the 10k, then Your Honor has just essentially said, they get

17   access to the work product, and then we're going to have a

18   lot of different proceedings because we're not prepared to

19   waive that work product, and the stipulation specifically

20   covers this work product because it's Mr. Florence's work

21   product.  So if they want to ask -

22          THE COURT: I am specifically finding that they

23   cannot get Mr. Florence's work product because he is being

24   designated as the testifying expert and is covered within the

25   stipulation that was otherwise ordered.  I am specifically

1    making that finding.

2         MR. BERNICK: I think that would probably - Again,

3    we'll produce Mr. Segal to talk about the 10k, and he will be

4    able to answer questions to the extent, for example, I say

5    that the 1.6 comes from the plan as opposed to being from the

6    - as opposed to being the estimate, comes from the plan, he

7    can verify that.

8         THE COURT: Okay.

9         MR. MALADY: Right, and, Your Honor, we respect the

10   Court's ruling obviously.  Just for the record so it's clear,

11   our view is that we are entitled to the actuarially based

12   estimates that underlie that 10k for the reasons in our

13   papers and additionally because we learned today for the

14   first time from Mr. Bernick that the analysis performed for

15   the 2004 exercise was, as he put it, a very different kind of

16   analysis from what had been done previously that was

17   discovered in _Sealed Air_ and what is presumably going to be

18   much different from the questionnaire based process.

19        MR. BERNICK: No, no.  The characterization

20   basically -

21        THE COURT: But it doesn't matter.  He can't get it.

22   It's a preliminary draft.  If covered by the stipulation,

23   he's not going to get it.  It doesn't matter.

24        MR. MALADY: Thank you, Your Honor.

25        THE COURT: Okay.  What's next?  I will take - Are

1   you going to try to put an order together or is this record

2   simply going to be -

3            MR. BERNICK: I think the record is more than

4   adequate.

5            THE COURT: All right.

6            MR. BERNICK: With respect to the - there's a couple

7   of housekeeping matters but there are some much, in fact of

8   greater importance, that we take them up right now on

9   personal injury, and I believe the balance of the agenda has

10  really only two items which are both PD items.  They are the

11  pretrial conference with respect to the upcoming hearings,

12  and also then what is essentially a status report or whatever

13  else it is that Mr. Speights may want to take up for Mr.

14  Runyan with respect to Anderson Memorial.  I don't think that

15  that should take too terribly long.  The pretrial conference

16  might take a little bit more time.  With respect to personal

17  injury, there are two different outstanding issues.  One is

18  the x-ray.  Your Honor will recall that in the personal

19  injury questionnaire, it stated our right to seek access to

20  the x-rays.  We then made a request to get all of the x-rays

21  that were associated with non-mesothelioma malignant claims.

22           THE COURT: Let me back you up.  What agenda item

23  are we looking at?

24           MR. BERNICK: It is not an agenda item.

25           THE COURT: We do the agenda and then see if we have

1   time for anything else.

2          MR. BERNICK: I thought that we would accommodate

3   Mr. Finch's request that we do it now.  This is the most

4   immediate problem that we face in this case right now, this

5   and requests for more time to supplement questionnaires, so

6   they really must be taken up today.  They're more important

7   in terms of the ongoing evolution in the case than anything

8   that's going on right now.

9          THE COURT: All right, go ahead.

10         MR. BERNICK: Okay.  With respect to the x-rays, we

11  were assured that copies would be provided.  That was their

12  alternative to working with the originals.  Your Honor picked

13  up on that and entered an order that basically said, and this

14  was after you indicated to us that you didn't want to talk

15  about it anymore because it had already been resolved, that

16  the order says, You've got to produce copies that are

17  certified to be as good as the originals.  And that if that

18  was not possible, that would be an exception, not the rule,

19  and then arrangements could be made to get access to the

20  originals.  We now have heard on the appointed date from 37

21  different law firms who have said, Oh, well, we can't give

22  you those copies so we're going to make the originals

23  available in our offices.  That's 37 different law firms in

24  19 different states.  So as we sit here today, what's now

25  happened was we have gone back to the idea after all of the

1   originals but they haven't solved the problem which is making

2   the originals available on a basis that provides realistic

3   access.  And today, we're not getting the x-rays.  And by the

4   end of the month, which is when they were all supposed to be

5   provided, we are not getting the x-rays.  So, we're in a

6   situation where we have to come back and say that the only

7   alternative is relatively simple, which is the - And they can

8   choose a location.  Let them choose whatever location they

9   want so that they can have, quote, "custody through the agent

10  that is in charge of that location."  It will not be our

11  facility.  It will be somebody else's facility.  Anybody who

12  is not going to give us the copies or give us the originals,

13  needs to put the originals into that office, that law office,

14  or whatever it's going to be.  It has to take place no later

15  than February 15 because otherwise we can't get it done.  We

16  want them to be there for 30 days, and what we will do is we

17  will bring in our three different reading experts at that

18  location so that it's the plaintiff's control.  There has to

19  be privacy and all the rest of that, to review any remaining

20  x-rays.  Otherwise, we're just not going to get it done.  So,

21  that would be our proposal rather than going around to 39

22  different - 37 different law firms in 19 different states.

23          THE COURT: Wait.  At the request of the law firms,

24  we said copies could be made, and now the law firms are

25  saying, No, we can't make the copies even though they said

1    they'd make them?

2            UNIDENTIFIED SPEAKER: (Microphone not recording.)

3            MR. BERNICK: Excuse me, excuse me.  You said that

4    the copies had to be certified as being sufficient.

5            THE COURT: Right.

6            MR. BERNICK: And now they're saying, No, we can't

7    do that.  It's not possible or feasible to do that, so we're

8    going to make the originals available but they're making them

9    available in all their different offices all over the

10   country, and that is not workable.  We're satisfied with the

11   certification.  We're satisfied with making all of the x-rays

12   available as originals, but at a location so our experts can

13   come there.  So, it's one way or the other.  They're either

14   going to give us the certification or they pick somebody's

15   office, they get them all there by February 15, we'll review

16   them all in the next 30 days, and we'll be done.

17           THE COURT: Right.

18           MR. BERNICK: That's issue one.

19           MR. FINCH: Your Honor, may I respond.  Is Mr.

20   Esserman on the phone?

21           THE COURT: Mr. Esserman?

22           MR. ESSERMAN (TELEPHONIC): Yes, I am.

23           MR. FINCH: First, as a process point, this is an

24   attempt to -

25           MR. ESSERMAN (TELEPHONIC): Yes, I am, Nate.  This

1    is Sandy Esserman.

2          THE COURT: Mr. Esserman, Mr. Finch wants to ask you

3    a question if you can hear him?

4          MR. ESSERMAN (TELEPHONIC): Yes, I can.

5          THE COURT: Okay.

6          MR. FINCH: First I want to address the Court and

7    then I'll turn the floor over to Mr. Esserman and Ms. Ramsey.

8    This as a point of process, Grace is attempting to reargue

9    something that the Court ruled upon last month on an

10   expedited basis, and the order was heavily litigated, and it

11   basically came out that people could produce originals to

12   Grace, but if they could produce copies to Grace, if they had

13   an appropriate medical person who could certify that the copy

14   is as good as an original, or they could make the originals

15   available in their offices.  That is what the Federal Rules

16   of Civil Procedure provide.  There is no provision in the

17   Federal Rules of Civil Procedure that says you have to take

18   your original documents and give it to somebody else, and I

19   don't think that that is appropriate or the Court has the

20   power to do that, particularly when there's not even a motion

21   that's been filed that affects all these firms.  Many of the

22   firms have - upon inquiry of the x-rays, and I've seen some

23   of the correspondence, they said, We've attempted to get

24   certification.  We can't do it.  It's not reasonable.  It's

25   not reasonably practical or possible.  The x-rays are

1  available at our offices, come and look at them within, you

2  know, at your convenience over the next 30 days.  Some of

3  them they said, We don't have the x-rays.  The hospital has

4  them.  We will get them back from the hospital.  We have

5  correspondence out to the hospital.  This was a heavily

6  litigated order.  There were several hearings on this.  Mr.

7  Esserman and Mr. Ramsey addressed this, and I think it's a

8  point of process.  It's improper for Mr. Bernick to raise the

9  issue now at a quote - it's not even on the agenda.  It's

10  just something he brought up out of thin air with no notice

11  to anybody, no attempt to file papers.  It's completely

12  contrary to the Court's earlier ruling, and therefore, I

13  suggest it's highly improper.  You should just deny the

14  request out of hand, and I'll turn the floor over to Ms.

15  Ramsey and Mr. Esserman.

16        THE COURT: Okay.  What is the issue about getting

17  the certification.  Is it some impossibility for some reason,

18  Ms. Ramsey?

19        MS. RAMSEY: Yes, Your Honor.  There are various

20  reasons for the impossibility to get a certification.  In

21  some instances what the law firms have in their possession

22  are copies, and what the law firms have said is, We're unable

23  to certify this.  We have no reason to believe that it's not

24  a true and correct original.  We believe in fact that it is a

25  true and correct original, but we can't certify that it's

1   exactly like the original because we don't have the original

2   here so that we can make that side-by-side comparison.  In

3   some instances, some of the firms have said, We don't have

4   the capability, the special education that it would need to

5   make that certification, however, they've made the same kinds

6   of statements.  We have no reason to believe it's not, and we

7   in fact believe that it is.

8           THE COURT: And that's not acceptable to the debtor?

9           MR. BERNICK: As Your Honor said, under almost

10  identical circumstances before the order was entered, was,

11  because I raised exactly this issue, I said, Look, folks,

12  this is really wasting my time.  I'm sorry but I really have

13  other things to do, as we have today.  The copies of the

14  things that are to be transmitted, the copies, unless the

15  copies for some reason or another are not certified as

16  accurate, you're not even going to get into this issue about

17  the originals if you get the copies, so you're really wasting

18  a lot of time.  If somebody has a legitimate reason why an

19  original can't be provided in lieu of a copy, they're going

20  to give a certification.  They're going to give you a

21  certification, and if you have some challenge to it, then

22  file a motion and we'll deal with it.  You know, this process

23  is supposed to be the exception -

24          THE COURT: Okay.

25          MR. BERNICK:  - not the rule.

1          THE COURT: Yes.  Fine, so file a motion.  Mr.

2    Bernick, really, I mean this process is getting out of hand.

3    All of you are getting out of hand with it.  If you've got a

4    legitimate motion raise it.  If you get an assertion from

5    counsel that they don't have an original, and therefore, they

6    can't certify something to be a copy of an original because

7    they don't have an original, and you're not willing to accept

8    that this is an accurate copy of the copy they have, then go

9    look at the copy that's in the law firm.

10          MR. BERNICK: I'm sorry, that's not what - Your

11   Honor, respectfully, and the only reason we're doing this now

12   is the same pressure that we had before is that we don't - we

13   have a situation where a representation was made to the Court

14   in service of getting this order reading out a certain way

15   and now it turns around and the net effect of where we are is

16   that we're not getting what it is that we're supposed to be

17   getting.

18          THE COURT: You're not getting it because they don't

19   the originals.

20          MR. BERNICK: No -

21          THE COURT: If you're not willing to accept a

22   certification that this is a true and accurate copy of what

23   they have, then go look at what they have.

24          MR. BERNICK: I'm sorry, that is not -

25          THE COURT: Mr. Bernick, that's my ruling.  Go look

1    at what they have in the possession of the law firms or else

2    accept a certification.  I don't have the -

3         MR. BERNICK: There's no certification, Your Honor.

4    They haven't given us that.

5         THE COURT: Ms. Ramsey, can they make a

6    certification that this is a true copy of what they have, and

7    that they cannot get a copy of the original?

8         MS. RAMSEY: Your Honor, what the firms, and I'm not

9    aware of all the 37 firms, but with the firms that I

10   represent have said is, We are prepared to provide a

11   certification that says exactly what I have related to the

12   Court, depending upon the circumstances.  If, you know, let

13   us know if that certification is acceptable.  If it's not

14   then we're prepared to comply with the form of the order and

15   make originals available to them, and we have not heard back

16   in response to that correspondence.

17        MR. BERNICK: Your Honor, that may be Ms. Ramsey's

18   situation.  We have heard from 37 different law firms that

19   say they are not prepared to give us the certification that

20   Your Honor has just said you believe that they are prepared.

21   That is why they are making the originals available at their

22   offices in 37 different locations.

23        THE COURT: Then file a motion for sanctions, Mr.

24   Bernick, file a motion.

25        MR. BERNICK: Yes, we will file a motion for

1   sanctions.  Issue number 2 -

2           MR. ESSERMAN (TELEPHONIC): Your Honor, this is

3   Sandy Esserman, before we go off issue number one.

4           THE COURT: Yes, sir.

5           MR. ESSERMAN (TELEPHONIC): Let me just address it

6   quickly.  The law firms that I represent have tried to get

7   certifications as required under the court order for the

8   copies.  The general rule, they cannot get them.  Some of

9   them cannot get them and where the cannot get them the

10  order's very clear.  You're to make the originals available

11  to the debtor at their offices, which they've done.

12          THE COURT: Mr. Esserman -

13          MR. ESSERMAN (TELEPHONIC): They've tried to make

14  the certification and in some cases the hospitals won't give

15  it.  Some cases they've gotten a copy service to give it, and

16  where they haven't given it, or haven't been able to get it,

17  they made the originals available.  I don't know how many of

18  those 37 firms I represent, but we - all of my clients tried

19  to get certifications first, and - which is what the order

20  provided, and then barring that are making the originals

21  available all pursuant to the order entered by the Court.

22          THE COURT: All right, Mr. Esserman, for those firms

23  that have tried to get the certification, can they please

24  notify the debtor the effort that was made and why they can't

25  get it and see whether the debtor will accept whatever copy

1    can be provided.

2          MR. BERNICK: Your Honor, that is - Your Honor,

3    yourself said very, very clearly, that in order to have this

4    matter tried properly it is standard procedure they have the

5    certifications so there's no issue about whether the copy is

6    a true copy.  If a copy is not certified to be a true copy,

7    we are wasting our time because they will say it's not the

8    same thing as what they saw in the original.  Your Honor,

9    they represented to you specifically that this -

10          THE COURT: Okay.

11          MR. BERNICK: - was the exception.  It was on the

12    basis of that representation that Your Honor entered the

13    order and now it turns out it's not the exception it's the

14    rule, 37 different firms in 19 places, and I'm sorry, there's

15    nothing else that we can do except to do what is absolutely

16    the most reasonable thing to do and it's not like - it's not

17    in the rules.  There are all kinds of cases where actual

18    evidence, irreplaceable original evidence is put into a

19    depository.

20          THE COURT: Mr. Bernick, that sounds like a

21    reasonable solution to me.  Apparently the other side thinks

22    it's not, file a motion.  That's what the process said, file

23    a motion.  I am not going to deal on a piecemeal basis in

24    this case without motions.  I have enough -

25          MR. BERNICK: Can we file it and have it heard -

1           THE COURT:  - to do on the agenda.

2           MR. BERNICK:  - on an expedited basis.

3           THE COURT: You can get it scheduled on an expedited

4     basis, file a motion.

5           MR. BERNICK: Okay.  Next issue that relates to the

6     same basic problem is the questionnaires.  Your Honor, I

7     won't go through the long history of how long the

8     questionnaires have been out there.  People were supposed to

9     answer them last January, then it got moved to July, then we

10    had the question of supplementation, and Your Honor finally

11    said, All supplements are to be done by January the 12th.  We

12    now have three different firms that have asked us for more

13    time to do the supplementation, and they are - what is it,

14    Foster & Sear, Angelos -

15          UNIDENTIFIED SPEAKER: (Microphone not recording.)

16          MR. BERNICK: And Hurley, yeah.  This is now

17    supplementation.  It's not people who all of a sudden want to

18    file new questionnaires, that was months ago.  This is

19    supplementation.  We're prepared to agree to that extension

20    for those firms to do their supplementation by the end of

21    this month.  I think they asked for 2 or 3 weeks.  That is

22    all we can do.  We can't do any more.  So we are agreeing now

23    that those firms can do supplements, supplements only by the

24    end of the month.  Where this is going though is the point

25    that I have to underscore to Your Honor, we have the x-rays,

1    which haven't been resolved.  We have the questionnaire

2    supplements that are still coming in, and, Your Honor, with

3    due respect, there was a motion for reconsideration on the B-

4    reads, and the result is, of course, that we're not going to

5    be getting the B-reads.  Now asked that Your Honor expedite

6    the ruling on that.  We filed an expedited response why the

7    motion for reconsideration was not well taken.

8          THE COURT: I thought that was on today's agenda.

9          MR. BERNICK: No, I think that it's in the ordinary

10   course, it would be on for the next time, but -

11         THE COURT: Well, I'm prepared.  If everybody is

12   here to address it today I'm prepared to address it because

13   otherwise I'm going to be addressing it without an argument.

14   I don't see a need for an argument on that one.

15         MR. BERNICK: Then I think Your Honor ought to

16   simply - we're prepared - we need to get the order because

17   we're falling way, way behind.

18         THE COURT: All right.

19         MR. BERNICK: And we're prepared to rest on the

20   papers, we think the matter is clear.  What all this adds up

21   to, though, is that we're getting squeezed.  We have the

22   hearing in June.  We've a pretrial order that anticipated

23   that this material be available a long time ago, and what's

24   happening now is, they're saying, Let's hold the date.  Let's

25   hold the whole pretrial order, but we're still not giving you

1    the information that's necessary for us to complete the

2    preparation of the case.  I'm just alerting the Court to

3    this, that we will take up at the next omnibus - we'll make a

4    proposal for shifting some of the pretrial dates so we can

5    get now this data analyzed.  This is the crunch time is to

6    get the data analyzed and we still don't even have the data

7    that we need.  So I'm just alerting the Court to the fact

8    that, you know, it's the b-reads, it's the x-rays, it's the

9    questionnaire supplements.  This is the essence of the case,

10   and because we're not getting it in time, indeed, we don't

11   even have agreement now to turn it over, and we have to file

12   motions.  It's going to have an impact on the pretrial

13   schedule.

14           THE COURT: Okay, we're back to the - Mr. Esserman?

15           MR. ESSERMAN (TELEPHONIC): Yes, this is Sandy

16   Esserman.  I, of course, was not aware that any of these

17   matters were going to be raised.  They're certainly not on

18   the agenda.  I would like to talk first about the motion for

19   routine consideration.  We do think that it has been briefed

20   in the papers, and there's just a couple of quick points in

21   the motion, the thrust of the motion is that some law firms

22   get clients in their door, sign attorney/client fee

23   agreements with the client and then send the client for a

24   consultation, which may not necessarily be to a doctor, but

25   may be to a screening van.  Some firms do business that way,

1    and just because it was a screening van, the doctor at the

2    screening van doesn't necessarily make those x-rays

3    discoverable.  We think that that's clear.  Also, some of the

4    information that Your Honor has requested, in Texas is

5    specifically not discoverable in proceedings in Texas, and

6    we've asked for a protective order just to say that the

7    information being provided here is to be used in the Grace

8    proceedings only and can only be accessed by Grace and the

9    Committees pursuant to Court order because that information

10   specifically, for instance, any screening x-rays are not

11   discoverable in Texas.  That has to do with the motion for

12   reconsideration.  On the extension issue, our firm filed on

13   behalf of two firms, one is the DeAngelos firm, and I think

14   they asked for an extra two weeks, and they're trying to get

15   all their questionnaires done.  In fact, they will be

16   supplementing today is what I understand.  Both these motions

17   were set on the Court's agenda for the next time, by the way.

18   The other motion is the motion of Foster & Sear and they had

19   requested more time then they had.  I believe they requested

20   four months, and the reason they had is because this once

21   again is a small firm, and it's a small firm with a

22   paralegal, and they're just working as hard as they can and

23   they're - they told me they would be submitting the

24   questionnaires on a rolling basis.  I don't have the moving

25   papers in front of me, so I cannot tell you how many

1    questionnaires they have to fill out, but the questionnaires

2    are time consuming for the firm, and they're doing as best as

3    they can.  So, I don't know - I'm not saying material, but I

4    imagine the number of additional questionnaires are somewhere

5    in the neighborhood of five or six hundred, which certainly

6    in the scheme of things, the scheme of the 100,000 or more

7    questionnaires and claims cannot be material to the Grace

8    case in any event.  And I suspect that probably 90 or 89

9    percent of those claims are not malignant claims.

10          MR. BERNICK: Your Honor, with respect to what I

11    heard Mr. Esserman say, we agreed with respect to the request

12    that had been made to supplement the questionnaires by the

13    end of the month, and if they're done earlier, that's fine.

14    We are not agreeable to now what I hear Mr. Esserman saying,

15    which is we're going to get whole new claimants in

16    questionnaires.  That deadline passed last July, and there's

17    nothing that's happened.  There's no request that's been made

18    and it couldn't be made to now somehow now change the entire

19    population of people that we're talking about.

20          MR. ESSERMAN (TELEPHONIC): I said supplements.  I

21    may have mis-spoken, David.

22          MR. BERNICK: Okay.

23          MR. ESSERMAN (TELEPHONIC):  I don't have the motion

24    in front of me but I think these are supplemental

25    questionnaires -

1          MR. BERNICK: Again, we have no problem, Sandy, with

2     the people who have submitted requests already, and I think -

3     supplementing by the end of the month.  With respect to the

4     motion for reconsideration, Your Honor, you know, we laid it

5     out.  This is a motion for reconsideration.  There are no new

6     facts.  There's no new law.  This is now the fourth time that

7     we've been through it, and essentially what they're asking

8     is, that Your Honor gut the two paragraphs of your order that

9     are actually the operative paragraphs.  We think that Your

10    Honor has heard this extensively, and that Your Honor should

11    rule, and so that we can get on with finishing up the data

12    gathering process.

13          THE COURT: All right, well, with respect to the

14    motion for reconsideration, I'm not sure that I was aware -

15    maybe I was and just simply missed it, but if I was aware I

16    did miss it.  The fact that some of the information that I

17    was requiring may not be discoverable under some state

18    provisions.  And my intent has never been to make the use of

19    the discovery that I'm ordering here available outside the

20    proceedings except for use in this case including for some

21    trust distribution procedures that may apply if this case

22    gets through a plan confirmation process that has that type

23    of procedure in place.  So, I don't have any problem amending

24    an order to provide that the discovery and the use of the

25    documents and information to be provided is for the use of

1    the parties in this case and whatever, you know, subsequent

2    proceedings may take place but in this case in this

3    bankruptcy.

4         MR. BERNICK: I understand.

5         THE COURT: So, I don't have a problem with that.

6    With respect to the issue as to how the law firms conduct

7    their business, the motion for reconsideration asks me to

8    amend the paragraph to say that the consultant privilege

9    applies not just to the fact of an attorney retaining a

10   consultant after there is an attorney/client privilege

11   established but also substantially contemporaneously with an

12   attorney/client privilege being substantiated.  Frankly, I

13   think that is simply - I think it's unlawful.  I don't mean

14   in a criminal sense, I just don't see how you can have a

15   consultant privilege apply until you have an attorney/client

16   privilege.  You can't be consulting with respect to

17   litigation until you have a client and know that you're

18   intending to pursue some litigation.  So you can't have a

19   consultant privilege apply until you have an attorney/client

20   privilege, and that can't be a substantially contemporaneous

21   event.  You have to have a client first.  So, I am not going

22   to make that amendment because I don't think, as a matter of

23   law, that I can make that amendment.  You have to have an

24   attorney - you have to have a client that you can reasonably

25   anticipate you're going to have a litigation for before you

1   can have a consultant to assist you with the litigation.  So,

2   I don't think that amendment is proper, and I'm not going to

3   make it.  I think the argument is somewhat circular.  You

4   know, the argument that's being made is that essentially

5   anybody who walks in the door provides a lawyer with the

6   anticipation of litigation.  Well, I suppose because we're

7   lawyers, we can always expect that somebody's going to

8   anticipate litigation, but I don't think that's what the

9   purpose of this privilege is all about.  An attorney can't

10  anticipate litigation until you have a client, therefore, I

11  don't think you can have a consultation privilege without

12  anticipating litigation, and you can't do that without

13  knowing of the existence of a claim which would support

14  litigation.  So to the extent that a person may at some

15  unspecified time in the future sue some unidentified entity

16  on an unknown cause of action through an un-retained law

17  firm, I don't think that that's enough to show that there is

18  the possibility or anticipation of litigation sufficiently to

19  support a consultative privilege.  Therefore, I don't see a

20  basis for the amendment that I'm being asked to make in that

21  respect.  I think there was one other -

22        MR. ESSERMAN (TELEPHONIC): There were two

23  amendments, Your Honor.  One was the one you just discussed.

24  The other was after the formation there are some firms that

25  do business specifically after a client comes in, the lawyer

1    sometimes will suggest a doctor for consulting privilege.  In

2    some instances, that doctor may be in connection with a

3    screening van, and the question that I raised was your order

4    was very broad in that basically any screening van review was

5    not covered by a potential consultant privilege and the facts

6    of that just would indicate a different result, I think, in

7    those particular instances, excepting, of course, your first

8    ruling on the contemporaneous issue, I understand that, but

9    that was the - I don't want to say the primary thrust, but

10   that was a thrust of the motion.

11        THE COURT: Okay, I didn't intend to say that all

12   screenings are not subject to a consultive privilege, and I

13   don't think the order is -

14        MR. BERNICK: No, it says differently.  It is that -

15   this is paragraph (5), However the Court finds that

16   physicians, b-readers, or other medical professionals who

17   first screen a claimant, that is prior to the time that any

18   other diagnosis, dah, dah, dah, was sought or known are not

19   consulting experts.  Which says, that the first time you go

20   into get a screening, the principal purpose of that screening

21   is to find out if you're sick, and so then to say, Well, that

22   really was only for consulting purposes, it's not for

23   consulting purposes.  It's to find out if you've got a

24   diagnosable illness at all.

25        THE COURT: Right, that was the point.  That was the

1    distinction I was trying to make.  I think there's a

2    difference between attempting to find a factual percipient

3    witness as a diagnostic method to find out whether there is a

4    claim that can be supportive of litigation at the outset, and

5    a consultive privilege for the attorney to prepare for,

6    anticipate, or whatever, consult with litigation secondarily,

7    and I believe that the first i.e. diagnostic test that

8    determines whether or not there is a - something, a disease,

9    a symptom, a something that will in fact support as a medical

10   condition precedent to a personal injury lawsuit which is

11   what is being brought in these cases.  These are personal

12   injury actions that are the subject of the dispute.  I want

13   to make that clear, because that's the limit of my ruling,

14   personal injury lawsuits, the limit of my ruling.

15          MR. BERNICK: Your Honor's language says, Or any

16   other diagnostic of an asbestos-related disease or injury,

17   that is the injury that is the basis for the allegation in

18   the claim.

19          THE COURT: See, I think the problem is that at the

20   time that you first consult the doctor, see the doctor, at

21   that point you don't - the anticipation of litigation itself

22   is contingent.  It's not just the litigation that's

23   contingent, it's the anticipation of litigation that's

24   contingent, because you don't even know the underlying

25   operative facts to determine whether or not you can

1   anticipate litigation.  I don't see how you can have a

2   consulting privilege that applies until you anticipate

3   litigation.  You can't anticipate litigation until you know

4   the facts.  You don't have the facts because you don't have

5   the diagnosis.  And that's the basis for my ruling.  So, for

6   those reasons, I don't see a basis to amend the order except

7   to add the limitation with respect to the use that Mr.

8   Esserman has required.  So I do expect that the use is only

9   for purposes of this case, and I will amend the order to that

10  respect.

11          MR. BERNICK: We'll submit some language by

12  agreement to Your Honor to do that.

13          THE COURT: All right.

14          MR. BERNICK: And I believe that that is all of the

15  personal injury matters that we have, so we can turn to

16  property damage.

17          THE COURT: All right, let me make a note, please,

18  before we turn to that.

19          MR. FINCH: Your Honor, may Mr. Malady and I be

20  excused?

21          THE COURT: As long as you're not interested in what

22  else happens in the rest of this agenda.

23          MR. FINCH: Thank you, Your Honor.

24          THE COURT: But I don't want to hear later that you

25  didn't know that something was coming up.

1          MR. FINCH: Well, may I have representation from Mr.

2     Bernick that no other personal injury issues will be raised

3     today?

4          THE COURT: I won't accept that representation even

5     if he makes it.

6          MR. BERNICK: That being something that's not

7     entirely within my control.

8          MR. FINCH: Thank you, Your Honor.

9          MR. MALADY: Thank you, Your Honor.

10         THE COURT: Okay, thank you, Mr. Restivo.

11         MR. RESTIVO: Good morning, Your Honor, or actually

12    good afternoon, Your Honor.  This will be a status report,

13    Your Honor, on where we are on the remaining property damage

14    claims and where we think we are going.  I will be brief, but

15    I would like to be complete on item 10 of the agenda.  First,

16    as Your Honor knows, the parties stipulated away the need for

17    the dust methodology hearing that was set for January 29 to

18    31, and that's item number 13 on your agenda, and I don't

19    believe any responses or oppositions were filed to that.

20    Secondly, Your Honor, with respect to the May 30-31 no hazard

21    hearing, expert reports were to be submitted by January 15.

22    We have agreed with counsel for the claimants that we do not

23    object to any late designations of Dr. Frank or Dr. Brody.

24    There's some question whether or not Jack Hallowell

25    (phonetical) is a late designation.  If he is, we told him we

1    don't object to that either.  Third, Your Honor, the debtor

2    has agreed with Mr. Dies that he could have a little bit more

3    time to list any testimony given by his experts over the last

4    four years, which was a detail overlooked in his submissions.

5    Fourth, Your Honor, we may want to file an expert report

6    after January 15.  We've asked the claimants to agree that we

7    can do that, and we would give them the same 24 days to

8    respond.  I'd like to address that at the end of my report.

9    Your Honor, I'd like to describe to the Court our roadmap for

10   resolving the remaining property damage claim so the Court

11   understands where at least the debtor thinks this process is

12   going.  As you know, we started with 4,000 or more

13   traditional property damage claims and allegedly millions of

14   homes where ZAI in attics allegedly posed a health hazard.

15   The mountain of property damage claims has been reduced to

16   628, and while additional work remains to be done on those

17   ZAI claims, we now know that ZAI does not pose a health

18   hazard.  We intend to cut down the remaining 628 property

19   damage claims, Your Honor, by way of summary judgment

20   motions.  Under the current CMO they're to be filed on

21   February 16, responses are due on March 19, replies to

22   responses on March 23, and then arguments are set for April

23   9.  We will try to convince Your Honor on April 9 to issue

24   rulings at that time on the various motions for summary

25   judgment because the trial with respect to product

1    identification and statute of limitations is a few weeks

2    later and obviously getting the Court's rulings will be

3    helpful.

4           THE COURT: Now, Mr. Restivo, you know, as a point

5    of personal privilege, that April 9 date has to have some

6    flexibility built into it.

7           MR. RESTIVO: We know that, Your Honor, and we are

8    assuming that and that's going to be beyond anyone's control,

9    but we're using that as a date because that's the date we

10   have now.

11          THE COURT: All right.

12          MR. RESTIVO: What we hope to do with this pile of

13   628 claims, Your Honor, is basically chop away at it.  We

14   want to chop off the 6 Prudential claims and the 10 New York

15   claims.  You've already heard argument on it - or they've

16   already been filed, but you haven't heard argument on it, and

17   that will take 16, brining the number down to 612 claims.

18   We're going to move for summary judgment, Your Honor, on 88

19   Canadian claims, which we believe, under the undisputed

20   facts, are barred by the Canadian limitations period.  That

21   will bring the number down to 524.  We're going to move, Your

22   Honor, on approximately 120 Louisiana claims barred by the

23   Louisiana statute of limitations.  We're going to show the

24   Court the identical statute of limitations rulings and

25   identical property damage cases from the Louisiana Supreme

1    Court in <u>Cameron Parish vs. AC&S</u> and from the Fifth Circuit

2    Court of Appeals in <u>Orleans Parish vs. U.S. Gypsum</u>.  That

3    will bring the number of cases down to 404.  We're going to

4    move, Your Honor, on approximately 52 Libby residences where

5    we believe the undisputed facts are that either the home

6    owners have suffered no damage or any damage they suffered is

7    being re-mediated at no cost to them, and those 52 cases will

8    bring the remaining number down to about 350.  We're going to

9    move on approximately 100 California claims, Your Honor, that

10   we think have to be expunged due to claimants' admissions

11   that by 1990, in fact in three different lawsuits, I think,

12   1982, '85, and 1990, they knew they had alleged claims of

13   asbestos-related property damage and in fact had filed suit.

14   We think those hundred California claims have to be chopped

15   bringing the number of claims down to about 250.  There's 25

16   buildings, give or take, Your Honor, where plaintiffs have

17   agreed and conceded that they have no product identification

18   information showing, suggesting, or implying that Grace

19   product is involved.  That will knock another 25 buildings

20   out of this pile.  Lastly, you have, Your Honor, under

21   advisement and there's some in duplication.  You have under

22   advisement 61 claims of Mr. Speights involving alleged lack

23   of authority or alleged late authority.  If those motions are

24   granted, that will bring the number down but there's some

25   duplication, it won't bring it down by 61.  Lastly, Your

1    Honor, we believe, and we're studying it now, we will file

2    another 25 to 75 buildings where the undisputed facts will be

3    that the statute of limitations is similar to the situation

4    we'll brief in Louisiana, California, or Canada, or where the

5    undisputed facts on product identification show we don't have

6    a product in the building.  That will leave about 14 days

7    between the argument on those summary judgment motions and

8    the start of the trial on the buildings that remain under the

9    current schedule, which is subject to some doubt, and so

10   we're going to try to convince the Court that if everyone

11   briefs these issues and we have good arguments, hopefully the

12   Court will be able to issue rulings at the conclusion of the

13   arguments so the parties know what we're trying two weeks

14   later.  With respect to what we are trying, Your Honor -

15        THE COURT: You're going to expect rulings on the

16   different theory of, let's see, 10 different theories on 650

17   buildings in two weeks?  I just think that's not likely to

18   happen.

19        MR. RESTIVO: I think, Your Honor, that we're going

20   to put these buildings, we believe, in nice, understandable

21   categories.  I think, if we're correct on our analysis, the

22   facts will not be in dispute, and some of the buildings, we

23   hope, but until they see our papers, the other side may

24   concede some of them are out, you don't have to decide, but

25   if we file the papers on time, the Court may be in a

1   position, depending on scheduling, if the Court is able to

2   read the papers, by the time we get to argument, the Court

3   may be able to indicate on various buckets of cases whether

4   she thinks we're going to have to try them or just where we

5   are.  The hallmark here is we're going to try to keep it real

6   simple.  If I can't understand the categories and it's not

7   simple, we're not going to move on them.  With respect -

8          THE COURT: It's not the simplicity of the

9   categories, it's the amount of paper that you folks generate

10  by way of briefs and attachments.  I mean I've gotten the

11  expert report because it was filed and I saw it, so I read it

12  on one of the Canadian expert claims on the statute of

13  limitations in Canada, and I think it's about 80 pages.  So,

14  I mean, if everyone of these things - and that's just one of

15  the reports, and if everyone of these things are going to be

16  80 pages long, that's just not physically going to be

17  possible to do, and that's just a report.   That's not even a

18  brief, and it's not the factual evidence.

19          MR. RESTIVO: Your Honor, we appreciate that, and we

20  appreciate if we don't make it clean, precise, indisputable,

21  short, and easy, we're not going to get the rulings.  Our

22  hope is to be able to do that in these buckets.  If we can't

23  do that and the Court says I can't rule because there's too

24  much here, we will have caused the problem ourselves, we

25  understand that.

1           THE COURT: Okay.

2           MR. RESTIVO: With respect, Your Honor, to the April

3   23, 24, and 25 hearings, where we are going to try product

4   identification, statute of limitations, and the Libby claims

5   if the Libby claims survive summary judgment for those

6   buildings that are still left, it is our proposal to the

7   Court and to the claimants that we have three days for a

8   number of buildings and that we conduct the trial with a

9   five-minute summary of an expert or witness's declaration or

10  report, that we submit the declaration or report as the

11  direct testimony and that we put the witness on the stand for

12  cross.  As the Court knows, this procedure worked very

13  efficiently in some confirmation hearings before Your Honor.

14  We would proposed to split the trial time 50/50 with the

15  claimants.  I have indicated our desire to do it this way to

16  Mr. Dies and to Mr. Baena, but no one can speak for all the

17  claimants, and so the fact that one or the other may have

18  thought about this one way or the other, doesn't help us, and

19  so I'm really presenting to the Court and asking the Court as

20  an aspect of trial control, to indicate that's the program we

21  ought to use, because I just simply can't touch base with

22  everyone who represents a claimant.

23           THE COURT: I think if the principal counsel are

24  involved or onboard with that, that has been a very effective

25  tool in the past.  It has certainly minimized some of the in-

1    trial time, and I think it has made good use of the witness's

2    time on the stand and counsel's time in preparing both your

3    witnesses and for cross-examination.  It certainly gives you

4    a good heads up about what the witness is going to testify to

5    because you've got a whole written report to talk about it.

6    So, from my point of view, I think that would be a fine

7    thing, and I'm willing to do that by way of order, as long as

8    the principal counsel are in accord with that process.

9         MR. RESTIVO: And, Your Honor, you'll have to hear

10   from the principal counsel.  I didn't mean to suggest or

11   imply that while I disclosed to Mr. Dies or Mr. Baena, they

12   indicated they were in agreement or weren't in agreement.

13   They did indicate they couldn't speak for everybody, and at

14   that point I realized I had to present it to the Court.  Any

15   buildings, Your Honor, that are left standing after that

16   hearing will then be subject to the no hazard hearing set for

17   May 30, 31.  We believe by that time, whatever buildings are

18   left will be a fraction of the 628 buildings currently

19   remaining.  We can't do an estimation, to coin a phrase, as

20   to how many will be left, but we think it will be certainly

21   short of 200, maybe between 100 and 200, and we would do that

22   on the no hazard hearing.  Lastly, Your Honor, coming back,

23   we are giving consideration, and again I've indicated this to

24   Mr. Dies and to Mr. Baena, but same issue.  They can't bind

25   all the claimants.  We are giving consideration to submitting

1    a risk assessment report for the no hazard hearing set for

2    May 30, 31.   We have missed the January 15 deadline.  We did

3    not file a risk assessment report.  We have asked them and

4    now we're asking the Court for permission to file a risk

5    assessment report if we so elect to do so out of time with

6    the understanding that the claimants would have the same 24

7    days to respond to it that they would have if we had filed it

8    on January 15, and we're going to make a decision whether to

9    do such a report in the next few days, but if we are going to

10   do such a report, we have to retain an expert.  It has to be

11   written, and so we're not going to be able to file it for a

12   little bit of time, and we would like the opportunity to file

13   it out of time, giving the other side 24 days to respond, and

14   again, while I have raised this with a couple of the

15   attorneys, since they can't bind everyone, I'm now raising it

16   with the Court to see if there's any opposition to that and

17   see where we are.

18        THE COURT: Okay, so the risk assessment would be

19   for all the buildings that are left?

20        MR. RESTIVO: For all the buildings that are left

21   with respect to the May 30, 31 hearing.

22        THE COURT: And how are you going to do that risk

23   assessment until you know what buildings are left?

24        MR. RESTIVO: I believe, Your Honor, subject to

25   talking to the risk assessment expert, that the information

1    we will have on what the information is publicly on what

2    happens in buildings if one goes above a plenum and disturbs

3    material and how often it happens, whether or not based on an

4    awful lot of information in the public record already, there

5    may be able to be a risk assessment opinion given which

6    really wouldn't vary building by building, but again, we're

7    still evaluating whether we need to do something like that.

8              THE COURT: All right.  Mr. Speights?

9              MR. SPEIGHTS: May it please the Court.  Dan

10   Speights representing Anderson and claimants claiming under

11   the Anderson umbrella.  Your Honor, my law partner, Alan

12   Runyan was here but left just a few minutes ago.  He had to

13   catch a plane because he has a conflict, and I just point out

14   to you that throughout this proceeding, Mr. Runyan will be

15   representing the California clients, University of

16   California, Cal State, and one large commercial building

17   which was being litigated at the time of the bankruptcy, and

18   I'll be appearing on behalf of Anderson and the claimants

19   claiming under that umbrella including the Canadian clients.

20   I understand what Mr. Restivo was saying, and I appreciate

21   the clarity of what he was saying, and I just make several

22   comments.  I have not talked to Mr. Restivo about these

23   matters before today, which is perfectly okay, but I'm just

24   giving an initial reaction to what he said.  Number one, I

25   point out the obvious that we're not in an estimation

1    proceeding.  As Your Honor knows it was estimation for a long

2    time and then at the end we changed to objections, and I

3    pointed out well, I'll now enter the fray, since it's an

4    objection proceeding, and I think many things that Mr.

5    Restivo suggested to the Court would be much more possible to

6    implement if we were in an estimation proceeding.  I'm not

7    complaining about that, but the reality is, we're now dealing

8    with the claims objections proceeding in which claims of each

9    of our clients, some 600 and something according to Mr.

10   Restivo's statistics, each of our claims will be allowed or

11   disallowed as opposed to an estimation in which we're just

12   setting a number for all of the property damage claims, and

13   among other things that I have quickly jotted down, while Mr.

14   Restivo was talking, I bring out the following: First of all,

15   Mr. Baena is not involved in this process.  He's Committee

16   counsel.  We're without our order, basically, we're all

17   claimants' counsel out here trying to come to grips with in

18   effect individual lawsuits against our claims.  We don't even

19   have a liaison counsel.  I cannot speak for Mr. Dies, Mr.

20   Dies can't speak for Ms. Kearse, and none of the three of us

21   can speak for the other claimants out there who are

22   represented by counsel, and I think, just as a housecleaning

23   matter, it might be useful if Mr. Restivo would write a

24   letter to all the claimants' counsel and so we could see who

25   we all are, I'm not even sure, and then have some form of

1   communication to the core counsel involved in this proceeding

2   and at least by e-mail can exchange ideas and see what

3   reactions are.  The second thing I would point out, Your

4   Honor, is that because this is an allowance process where

5   we're going to be allowed or disallowed, presumably, that we

6   must be vigilant in protecting the rights of our clients.

7   For example, my reaction to Mr. Restivo's approach and Your

8   Honor's encouragement of an approach where we present

9   testimony in some summary way, might be, I'm not sure

10  entirely appropriate in an estimation proceeding.  Certainly

11  in a confirmation proceeding, but if any one of my clients

12  wants to present evidence and wants to contest matters in a

13  different way, I'm going to have to consult with them, and I

14  can tell you my knee-jerk reaction is, I haven't heard from

15  Mr. Dies and Ms. Kearse, is that we probably would want all

16  of the rules enforced and do it in the traditional way

17  because it's an allowance or disallowance procedure.  Again,

18  I will take his suggestion in good faith and we'll caucus and

19  talk about it and do all those sorts of things, and that

20  leads me to the more distressing thing that maybe I'm not yet

21  to distressing with Mr. Restivo, the more troublesome thing

22  about Mr. Restivo's suggestion is, Well, we'll just divide

23  the time up 50/50.  Well, if I had one claimant and Mr.

24  Restivo wanted to divide the time up 50/50, I would readily

25  agree.  What in effect that is, is dividing half the time to

1    W.R. Grace and dividing the other half by 600 and something

2    claimants, and we get down to a very small amount of time on

3    some very important issues that might take a lot of

4    testimony.  So because it is a claims allowance proceeding, I

5    think, and I'd be happy to talk to Mr. Restivo at any time,

6    in fact, I think I might be good if we had a meet and confer

7    about the whole process where if the claimants' counsel are

8    involved and Mr. Restivo and see if we can assist the Court

9    in trying to deal with this massive problem.

10            THE COURT:  I think that's a good idea.  I think

11   what I will do is have the debtor set up an order that

12   requires all claimants' counsel and debtor's trial counsel to

13   appear before the Court and we'll set up the process because

14   from my perspective, the debtor has the burden of proof with

15   respect to the claim disallowance after, of course, the

16   claimants come forward with the presumptive evidence that

17   substantiates the *prima facie* validity of the claim, which

18   based on the proof of claim having been filed.  I assume

19   you're pass that burden, and that's a claim-by-claim

20   analysis.  So the 50/50 sharing of the trial time seems to be

21   appropriate.  The debtor has the burden of proof.  You've got

22   a burden of proof, and with respect to that burden that

23   allocation seems all right.  With respect to the process

24   involved, I mean, I've used this process in claims allowance

25   trials and preference litigation and fraudulent conveyance

1    litigation and all sorts of things, so, I don't think the

2    process has to be limited to the estimation process, but I

3    certainly agree that your clients have to feel comfortable

4    with the fact that their rights are being adequately

5    protected and understand that if a witness's direct

6    testimony, an expert witness's direct testimony is going to

7    come in by way of the report that the cross-examination live

8    and the rebuttal live is certainly going to be adequate for

9    their purposes, and I wholly agree.  So I think the thing to

10   do is to get everybody in, in person for a live pretrial

11   conference, and maybe some of these issues can be flushed out

12   in that respect.

13          MR. SPEIGHTS: And that leads me to my next point,

14   Your Honor, it's a little bit of a chicken and an egg, when

15   Mr. Restivo is arguing about how 600 are going down to just a

16   few claims, well, if the Pittsburgh Pirates' new first

17   baseman, Adam LaRoche, hits 90 home runs, the Pirates may win

18   the World Series this year, but we can't count on Mr. LaRoche

19   doing that.  He didn't do it for the Braves.  So, Mr. Restivo

20   can come and give all his numbers and say we're going to get

21   down to this and that, and if we got down to that amount,

22   maybe some summary procedure would be easy, but I happen to

23   believe that the number's going to be far north of where Mr.

24   Restivo is, that you will find factual issues in most of

25   those motions for summary judgement, and it's a chicken and

1   an egg because we're not going to know until sometime in

2   April.  So agreeing to some procedures before we know whether

3   we have limited the scope of this hearing dramatically is a

4   very difficult thing.  Again, we're happy to talk to Mr.

5   Restivo about that, and finally, Your Honor, I'm trying to be

6   brief.  I've got other counsel here.  On the risk assessment

7   issue, I would - you know, my philosophy is that you work

8   with opposing counsel on these issues, and Mr. Restivo has

9   generously agreed that I can list Dr. Frank Lee (phonetical),

10  and I appreciate that, and I'm sure I'll work with Mr.

11  Restivo about the risk assessment person.  It may be when I

12  talk to him I might say, Well, now, if you're introducing a

13  risk assessor person, we might want, I doubt it, a risk

14  assessment person too, but I believe that I can and I believe

15  that other PD claimants can work with Mr. Restivo to narrow

16  the disputes.  I think it is the nature of the animal that is

17  an allowance procedure involving 600 claims that will

18  challenge even the most cooperative counsel to come to grips

19  with this.   Thank you, Your Honor.

20         THE COURT: Mr. Baena, does the Committee have

21  anything to add?

22         MR. BAENA: No, Your Honor, we don't.

23         THE COURT: All right.

24         MS. KEARSE: I haven't had the pleasure, Your Honor.

25  My name is Anne Kearse.  I represent a number of the

1    claimants with the Motley Rice firm, and I think it would be

2    a good idea to have a meeting.  I just wanted to share a

3    couple of my concerns, Your Honor.  One is on the expert

4    issue.  A lot of these claims are going to be very factually

5    driven, and as I'm just getting into the fray in working with

6    Mr. Baena on how am I going to prepare my clients and what do

7    I have to do coming up, I'm concerned about the process of

8    having to get a lot of individual factual witnesses here in a

9    limited amount of time.  I think those are things maybe if we

10   sit down with Mr. Restivo on how we do that.  I think that's

11   a huge concern on my part not so much from the experts, just

12   on a procedural point.  If we have 600 buildings, I think

13   there's an assumption that we're not, but to the extent we

14   have a great number there, honestly, I don't see how it's

15   done in three days or how we even plan a day on each claimant

16   on how we get across that process there.

17          THE COURT: Well, I'm not sure of that either.  If

18   there are going to be 600 buildings and 600 building owners,

19   I'm sure we're not going to get done with that in three days.

20   However, there are some uses of trial techniques that don't

21   necessarily always require you to have live witnesses here,

22   and you can certainly - if you choose to do it, not have to

23   bring all of those witnesses here, if you want to, obviously

24   that's fine.  I'm happy to hear live witnesses, but, you

25   know, some of your building owners in California and Texas

1    and Canada may not want to make live appearances.  You can

2    use video depositions, you know, you can preserve testimony

3    for trial in some instances.  So there are some other

4    techniques that if you choose to you may certainly use for

5    that purpose.

6         MS. KEARSE: And that's why I think we need to sit

7    down and go over those things, and the time period between

8    the motions for summary judgment and getting prepared for

9    trial too is going to be an issue if we can, you know, have

10   that time prepared there as well.  And, Your Honor, I've

11   talked to Mr. Baena with some things too, and I'm not sure if

12   any of these procedures would be revisited in a trust

13   distribution process there or if that's been discussed with

14   Your Honor on - deal with some of these issues where perhaps

15   it's not all claim by claim in a trial basis, but there may

16   be some format to actually set up procedurally if there's

17   issues on PID, particularly on the amount of square footage

18   you're going to have in buildings and if we're going to be

19   fighting whether or not there's 2,000 feet versus 5,000 feet.

20   The way it's set up now, it seems like we're going to be

21   litigating those same things during the PID process of the

22   mini-trials there.

23        THE COURT: Well, now, that's something I wasn't

24   thinking that was going to happen before me.  Mr. Restivo?

25        MS. KEARSE: As I read some of the objection, Your

1    Honor, that's -

2             THE COURT: Okay.

3             MR. RESTIVO: I think how many square feet, Your

4    Honor, is really a damage question, and I don't think that's

5    part of these three trials that were set up.  I mean at some

6    point, we may get to how many square feet, but - and I'd be

7    happy to talk to anyone about it.  I see that as a damage

8    issue, and I don't see what we're doing right now as damages.

9    My reaction as to what has been said are as follows, Your

10   Honor: I have not talked to all of the property damage

11   counsel.  I'm not even sure I know who all the property

12   damage counsel are to whom I should be talking.  I was under

13   the impression that there was supposed to be Mr. Dies, who

14   was special counsel.  Once we did the stipulation, it was no

15   longer Mr. Dies.  I'm willing to talk at any pretrial

16   conference with whomever we need to talk to so, if I want

17   more time to file something, I can bind everyone.  Secondly,

18   we appreciate that if we are going to chop into this pile of

19   628 claims we have to chop into them in groups.  We have to

20   present to the Court a group.  We will try to convince the

21   Court if a 109 California buildings filed a lawsuit in 1990,

22   having the same claims they have now, the statute of

23   limitations has run.  I mean, the Court will either agree

24   with us or not agree with us, but we're not going to present

25   that as to each of the 109 buildings.  And so, we're willing

1    to have a status conference as soon as the Court wants to

2    have it primarily because we don't know who to talk to

3    otherwise so we can bind everyone on a procedure I do think

4    the Court, under its general powers to control its courtroom

5    once it hears what people think about a process, certainly

6    can institute whatever process makes sense that you don't

7    need unanimous agreement, the Court has the power to control

8    the introduction of testimony.

9         THE COURT: Okay, well, I guess the question, maybe

10   Mr. Dies should be the appropriate person to answer this.

11   I'm not sure.  With respect to the 628 remaining claims, I

12   take it since they're all building owners, they all at this

13   point either have counsel or represent themselves, so we must

14   on the proof of claim forms have an identification of who has

15   submitted the claim and have an entity to notify as to how to

16   set up a status conference.

17        MR. DIES: Well, Your Honor, I'll let Mr. Baena

18   address that.  He's looked at the claims more than I have.  I

19   just wanted to say a couple of things: One, I do think we

20   have to have more information.  We've got disparate state

21   laws.  I've seven states.  We need to get the claimants in,

22   obviously.  On the issue of adding the risk assessment, for

23   the record, I told Mr. Restivo I'm inclined to agree to that,

24   subject to working that out.  I just wanted to say that.  So,

25   in terms of identifying the claimants, I think that our

1    Committee counsel has been in touch with most of them.  We

2    should hear from Mr. Baena on that.

3           THE COURT: All right.

4           MR. BAENA: May it please the Court, Your Honor.

5    May I speak from here?

6           THE COURT: I can't really hear you from there, Mr.

7    Baena.

8           MR. BAENA: May it please the Court, Scott Baena on

9    behalf of the Committee.  We're happy to share with Mr.

10   Restivo what we believe, our clients and counsel for property

11   damage claimants, we principally get that information from

12   proof of claim forms and contacts that have been made of us.

13   Some have made appearances already in respect to their

14   claims, and those are the easy ones.  But we'll share that

15   information.

16          THE COURT: Okay, so, is there a way that working

17   with the Property Damage Committee we can get a status

18   conference set up for just the purpose of assessing, I guess

19   summary judgment - those procedures are pretty well

20   established, but also the trial procedures?

21          MR. RESTIVO: Yeah, I assume what we would do is we

22   would get a list of names and addresses, and send out a

23   notice that there will be a status conference before Your

24   Honor at such and such a time and place, and whoever shows up

25   shows up.

1              THE COURT: Well, no, I want it more specific than

2     that.  I want it to say that we're going to be specifically

3     addressing the trial procedures and that the order that comes

4     out of it is going to bind everybody.  So you either appear

5     or you don't appear at your own risk, but the order that

6     comes out is going to bind those procedures.  So it's going

7     to be a very specific order so that everyone knows if you

8     choose not to come, that's okay, but if you don't come, you

9     don't come at your own risk.

10             MR. RESTIVO: I think we can work on that.  I think

11    it's just a matter of language.  I think the only question is

12    what date should be put into that communication.

13             THE COURT: Well, this is the end of January,

14    already.  I would assume we should do it maybe some time in

15    February.  There isn't really that much of an urgency to get

16    the trial process done.  We have to get through the summary

17    judgment process first anyway.  So, the next omnibus hearings

18    are the 27th?

19             UNIDENTIFIED SPEAKER: 26th.

20             THE COURT: 26th?

21             MR. BAENA: Your Honor, just to conclude the part of

22    this conversation I'm involved in.  We will provide that

23    information to Mr. Restivo by Friday.

24             THE COURT: All right, thank you.  Mona, do you have

25    DeCal up here?  Are they - Pittsburgh DeCal?

1          MR. RESTIVO: Your Honor, as we're looking at the

2     calendar, our motions for summary judgment have to be filed

3     by February 16th.  I think it would be helpful to the Court

4     and the participants to know what chunks of buildings we're

5     moving on and so it seems to me that sometime between the 16th

6     and the omnibus, if the Court has time available, would be

7     good rather than have a meeting and then we hit everybody

8     with a whole bunch of summary judgment motions.

9          THE COURT: Well, yeah, what's surprising me is that

10    the dates that Ms. Baker handed me, tell me I have partial

11    days through most of that next week, which just doesn't seem

12    right, because I hardly have for the next year a whole week

13    of partial days open, so there just seems to be something not

14    right about this, but I don't know what it is because I don't

15    have access to the calendar.

16         MR. RESTIVO: I should say, Your Honor, that Mr.

17    Dies and I were hoping to score brownie points by giving you

18    back full days of January 29, 30, and 31.

19         THE COURT: Actually you did, Mr. Restivo, both of

20    you.  I'm going to come around Mona, so I can see what you've

21    got there.  Well, I actually do have two partial days that

22    week, so, I can do this either on - This would have to be in

23    Pittsburgh, either on February 20th or February 21st, which is

24    Tuesday or Wednesday.

25         MR. RESTIVO: Either day is fine with us, Your

1    Honor, and we will just have to live with the fact that it's

2    going to be in Pittsburgh.

3         MR. SPEIGHTS: Well, since I have to travel, unless

4    Your Honor wants to come to South Carolina.

5         THE COURT: I'd love to.

6         MR. SPEIGHTS: I would prefer the 21st.

7         THE COURT: Okay.  I can try to arrange this by a

8    video conference call if there are some courtroom locations

9    where people can participate, but quite frankly, if there are

10   going to be, you know, as many as 200 lawyers or something in

11   this process -

12        MR. RESTIVO: Your Honor, my guess is 10, 15 at the

13   most.

14        THE COURT: Oh.

15        UNIDENTIFIED SPEAKER: Slightly higher.

16        MR. RESTIVO: A little bit higher but we're not

17   going to have 200.

18        THE COURT: All right.  Is there - Would it be

19   beneficial in these circumstances if these are pretty big

20   claims to try to get everybody in court anyway?  I do have

21   two conference rooms where sometimes I can put people and

22   throw away the key to try to see whether settlements can be

23   negotiated.

24        MR. SPEIGHTS: I think the major claimants, that is

25   those with the most claims, including the three firms

1    represented here today would be in Pittsburgh on the 21st.

2              THE COURT: Anyway?  Okay, you wanted the 21st; is

3    that correct, Mr. Speights?

4              MR. SPEIGHTS: I would prefer that, Your Honor.

5              THE COURT: Wednesday.

6              MR. SPEIGHTS: The previous weekend is President's

7    weekend holiday and that Monday is a holiday, so I would

8    prefer it being on Wednesday.

9              THE COURT: All right.  We'll do a status conference

10   on all property damage claims to set a process for trial in

11   Pittsburgh on February 21 - Do you want to - If everyone's

12   coming in from out of town, start at 11?  Or 10 o'clock?  Or

13   will you have to come in the night before anyway?

14             MR. SPEIGHTS: Well, I'll probably have to come in

15   the night before, but there are those, for instance,

16   Prudential I know is represented by New Jersey counsel,

17   probably could come that morning.  So I'm not the one to ask.

18   I mean, I think the three of us would probably have to come

19   in the night before but there are many others, apparently, I

20   don't them.

21             MR. BAENA: My recollection, Judge, for what it's

22   worth, is that if you don't set it at 12 or later -

23             THE COURT: It doesn't matter?

24             MR. BAENA: - nobody can travel that morning.

25             THE COURT: All right then I'm going to start it at

1  9 o'clock because frankly I hope to have some meaningful

2  discussions with the parties anyway, so, we'll start at 9

3  o'clock in Pittsburgh - the whole purpose is to set a process

4  for trial and to see whether or not any of these issues can

5  get resolved short of trial and further summary judgment

6  arguments.  And you will notify, Mr. Restivo, everyone that

7  all trial counsel must appear, all trial counsel must appear.

8         MR. RESTIVO: Your Honor, if you made that direction

9  to Mr. Baena and myself that we would work together to send

10  out the communication.

11         THE COURT: I would like to do an order.  What I'm

12  directing is that you give me an order that will say, All

13  trial counsel must appear.  Mr. Baena has already said that

14  he will assist you -

15         MR. RESTIVO: Fair enough.

16         THE COURT:  - making sure that the appropriate list

17  gets notified.  I want to do an order that directs all

18  counsel to appear.

19         MR. BAENA: Judge, just anticipating all the comic

20  possibilities here, there may be counsel that have very few

21  claims that are implicated by all of this that may not wish

22  to travel to Pittsburgh because of the cost and time and what

23  have you.  Will you allow them to appear telephonically?

24         THE COURT: How many people have, let's say, you

25  know, fewer than three buildings involved in this process?

1          MR. BAENA: I would not be candid with the Court if

2     I attempted to answer that without our files in front of us.

3     We just know that there are counsel who represent very few

4     buildings, and I can think of one, I believe, is in San

5     Francisco.  I don't know if he's going to want to travel from

6     San Francisco.

7          THE COURT: All right.  I'll have the debtor set the

8     Court Call arrangements up.

9          MR. BAENA: Thank you.

10          THE COURT: But, anyone who wants to appear by Court

11     Call has to call me in Pittsburgh, call my staff in

12     Pittsburgh, and tell me why they want to appear by Court Call

13     because I want to make sure - The purpose for this is to try

14     to get everybody into a room and negotiate a process that's

15     going to work.  I really think in this instance, it would be

16     helpful to have everyone there.

17          MR. BAENA: Maybe that's all you need to do is say

18     that in your order, Judge, as opposed to filtering through

19     those kinds of calls.  If you could say, It's the Court's

20     preference that you be here in person but Court Call will be

21     available if there is no way you can do that.

22          THE COURT: Mr. Baena, it's not uncommon for federal

23     court judges to tell the trial counsel to come for a pretrial

24     conference.  My preference is that counsel appear, and I'm

25     exercising that prerogative.  If people want to be excused

1   from it, they can tell me why and I'll consider it on a case-

2   by-case basis.  I don't want to add unnecessarily to the cost

3   of prosecution.  That's not of a claim.  That isn't the

4   intent, but I do want to make sure that this process is as

5   orderly and actually as expeditious to try to get this as

6   resolved as possible.  So, I really would prefer in this

7   instance that everybody be there.

8        MR. BAENA: I appreciate that.  I just don't want

9   the next shoe to fall being the, you know, the disallowance

10  of a claim because counsel couldn't get client permission,

11  couldn't make it or whatever, and they're representing a

12  single claim.

13       THE COURT: All right.  All counsel must appear

14  unless excused by the Court for cause.  That's what the order

15  is to say.  Debtor's to set up Court Call for anyone who is

16  excused from physical presence.  If there is an unrepresented

17  claimant - I think that's unlikely, but if there is, those

18  people may appear by phone.  I will accept those people's

19  representation by phone.

20       MR. BAENA: There may well be some.

21       THE COURT: All right, I will -

22       MR. BAENA: And it may be governments.

23       MR. RESTIVO: Yeah, well I think I've seen like half

24  a dozen individual property owners where I'm not sure we have

25  counsel, but they'll be on the list, and they can appear by

1    phone, and we'll take care of that.

2         THE COURT: All right, they may appear by phone.

3    Okay, you can take a draft - a stab at the draft order and if

4    I'm unhappy with it, I'll modify it.  Okay?  So, that you can

5    submit it on a certification of counsel after you and Mr.

6    Baena have a chance to look at it, Mr. Restivo.

7         MR. RESTIVO: The only other thing I have, Your

8    Honor, is item 13 where there were no objections, and I don't

9    know if the Court has signed that order, yet, and I have

10   another copy if the Court would like another copy.

11        THE COURT: I'm sorry, on what?

12        MR. RESTIVO: This is number 13, the order regarding

13   the methodology issue for asbestos property damage claims

14   that does away with the January - This has been on file since

15   -

16        UNIDENTIFIED SPEAKER: (Microphone not recording.)

17        MR. RESTIVO: Okay.

18        THE COURT: Okay, I'll take it, Mr. Restivo.  Thank

19   you.  Oh, no, I'm sure I signed this order.  Whether it's not

20   been docketed yet or not, I don't know, but I had a

21   discussion with my clerk who assisted in the preparation of

22   the ZAI opinion about specifically what this meant because,

23   frankly, I don't know what it means.

24        MR. RESTIVO: If it's been signed, Your Honor, it

25   hasn't come to our attention yet, and that's fine.

1          THE COURT: Okay.  What does it mean?

2          MR. RESTIVO: It means what it says, Your Honor.

3          THE COURT: You're asking me to sign this order, Mr.

4    Restivo, I would like to know what it means with respect to

5    what you're going to do for the estimation hearing.

6          MR. RESTIVO: That will probably be a subject of

7    discussion at the pretrial, Your Honor.  I think it's pretty

8    clear, but I suspect my colleagues might disagree with me.

9    The words in that stipulation took about a week to negotiate

10   every word has meaning to someone, and I'm not sure I'm the

11   right person to try to explain what the meanings are.

12         THE COURT: All right, well, I guess I have my own

13   spin on what it means, so we'll find out later on my own spin

14   as to the meaning of the order I'm entering is right at that

15   hearing.  Okay.  I think this should have been docketed.  If

16   it hasn't, I'll have it docketed, but I did already sign the

17   order.  Okay.

18         MR. BERNICK: I think there's only one item left on

19   the agenda.  Actually it's a couple of items but they relate

20   to the same thing, and that is Anderson Memorial.  I have

21   actually suggested to Mr. Speights that maybe we can take

22   this up because it keeps on moving and moving and moving.  I

23   don't know if there's a press to do it today, but  Mr

24   Speights would like to take it up, and that's fine.  What is

25   there to report?  There is to report that the Court file was,

1    I believe -

2         MR. SPEIGHTS: May I, Your Honor, just to clarify

3    that.  I said if there is a motion to compel, which is my

4    motion, and I would like to take that up.  It's fine if Mr.

5    Bernick wants to go into the whole history of Anderson and

6    everything again, and I'll respond to that, but all I

7    requested was my motion to compel be heard on the document

8    custodian.

9         THE COURT: All right, that's fine.

10        MR. BERNICK: Okay, I'll be happy to follow Mr.

11   Speights.

12        MR. SPEIGHTS: Your Honor, my goal is to make the

13   shortest argument ever made to you in a contested matter in

14   the W.R. Grace bankruptcy, and I told Mr. Bernick when he

15   suggested putting it over, I said, I can't do that, but I'll

16   be happy if you will just spend as little time as I will on

17   this matter, and we'll get out of here, and we'll see whether

18   I'm as short as I think I will be, or plan to be on this

19   argument.  Your Honor, as you know, we instituted discovery

20   over a year ago in response to certain statements made and

21   the debtor's opposition to the certification brief.  The

22   debtors moved for a protective order saying no discovery

23   should be had.  After the mediation efforts failed and we had

24   one or two or three hearings, Your Honor said on two or three

25   occasions that I'm entitled to some discovery.  In October, I

1   sent out a simple notice to take the deposition of the

2   records custodian of W.R. Grace, the custodian of those

3   records pertaining to Anderson which existed as of the

4   petition date.  That is the narrow scope of a narrow form of

5   deposition.  I am not seeking documents.  I'm not seeking

6   anything that was generated after the petition date.  I just

7   want to sit down and presumably it would be less than an hour

8   to deal with what documents exist.  I'm not raising issues of

9   privilege.  I'm not raising questions of relevancy.  It's

10  just a documents custodian's deposition.  And, Your Honor,

11  for the life of me I don't know why Grace opposes that.  Why

12  can't I get to find out what documents they are?  Grace has

13  taken the position, among other things, that at a certain

14  point, discovery is excessive.  It's too costly.  It's too

15  time consuming.  It's harassing.  My request and other

16  requests for documents are extremely burdensome and overly

17  broad.  Your Honor expressed a concern that my requests were

18  overly broad and made me redo the request, which I have done,

19  and they've answered, and they have now objected to producing

20  a lot, although they gave me a few invoices the other day.

21  So, I just want to cut to the chase, Your Honor.  If I take a

22  deposition of a person who knows what documents exist as of

23  the petition date related to Anderson, and that person tell

24  me there are hundreds of boxes located all over America, I've

25  got a big uphill climb.  There's some substance to these

1  assertions that have been made.  But if I go take that

2  deposition, for less than an hour probably, and I find out

3  all of the documents relating to Anderson and I'm not

4  interested in pleadings, all the documents related to

5  Anderson other than pleadings are in three file drawers

6  somewhere, then we won't have to be arguing to you about it's

7  oppressive, and it's burdensome, and we can't do a privilege

8  log and all those things.  So I just ask if you'll let me

9  take a documents custodian, and then that will place the

10  context of the rest of - that will give us context to the

11  rest of the discovery I'm seeking.  Thank you, Your Honor.

12        THE COURT: Okay.  Mr. Speights, may I ask, because

13  I'm still lost about what I'm supposed to do with the Court

14  record.  I thought once you folks got the South Carolina

15  court record copied, that I was then going to get something

16  from you that told me what I was supposed to do with that

17  court record and I haven't.  So, I'm kind of on hold with

18  respect to your motions and the debtor's motions because I

19  thought they were somehow tied up with this court record and

20  so I've been waiting and not doing anything until I find out

21  what I'm supposed to do with the court record and how it fits

22  into this mix.

23        MR. SPEIGHTS: I'm sorry for the confusion, Your

24  Honor, and I don't - the short answer is I don't think you're

25  supposed to be doing anything from my standpoint.  I envision

1    filing a supplemental brief when I finish my discovery which

2    would incorporate what I found in discovery and what's in the

3    court records before Your Honor, in anticipation of the final

4    hearing on Anderson's certification, and so, until I get my

5    discovery, it's premature to be filing that brief but I will

6    be referring to parts of the record which are now before you

7    from South Carolina.  I could probably go ahead and do that,

8    but I think we'd be spinning our wheels until we finish this

9    aspect of it.  I envision if I get my records custodian, I'm

10   going to file a motion to compel on the other outstanding

11   discovery so I can point to you at that time, hopefully, that

12   my discovery requests are extremely narrow, and they're all

13   in a file drawer in Boca Raton or one in Cale Gordon in New

14   York.

15        THE COURT: Okay, so the South Carolina record does

16   not impact on your discovery motion except that you now are

17   not asking for pleadings, it's simply something that you're

18   going to argue in terms of the final class certification

19   hearing.

20        MR. SPEIGHTS: That's correct, Your Honor.

21        THE COURT: Okay.  I apologize.  I misunderstood.  I

22   thought somehow you wanted to mix together those two

23   documents and so I've sort of been holding off on the

24   discovery issues.

25        MR. SPEIGHTS: I'm sorry, and I don't envision that.

1    I don't know what I'm going to learn in discovery, whether

2    I'll refer you to something on a motion to compel, but I

3    can't envision that.  I wanted to be able to refer to that

4    portion of the record under seal during the argument on the

5    certification.

6            THE COURT: Okay, thank you.

7            MR. SPEIGHTS: Thank you, Your Honor.

8            MR. BERNICK: Your Honor, it's a bit late to have

9    the shortest argument, because this is about the fifth time

10   that we've been through this whole process, and nothing

11   really has been done by Mr Speights on behalf of his client

12   to comply with what your order Your Honor has now repeatedly

13   order that he do.  This is all related to class

14   certification, and we now have had several arguments where

15   Your Honor has made clear that (a) settlement matters and

16   settlement discussions are off limits; (b) with respect to

17   any discovery that takes place, it must be tied specifically

18   to an issue on class certification.  I can go back over the

19   record and quote back to Your Honor, but I know that Your

20   Honor will recall that.  Where things were left at the end of

21   the last time, because there was a paring of the custodial

22   deposition in the document requests.  We can't comply with

23   the requirement to produce a custodial deponent without

24   actually learning where all the documents are.  He was to go

25   back and narrow and focus his document request on specific

1    matters that are germane to class certification.  In

2    connection with that, because we had discussion about what

3    really are we talking about that is germane to class

4    certification anymore, that being a motion that was argued

5    more than a year ago, or almost a year ago, Your Honor asked

6    us whether we would be prepared in connection with class

7    certification to agree that adequacy of counsel was not at

8    issue because that apparently drove a lot of the requests for

9    discovery.  We have made that undertaking in that agreement.

10   So, adequacy of counsel is not an issue.  Numerosity of

11   claimants is not an issue because Your Honor has said in

12   court specifically ruled that we now know how many claimants

13   there are because we had a bar date and we had people show

14   up.  In Your Honor's words, quote, "The universe of claimants

15   are those people who filed a proof of claim."  And we know

16   with respect to South Carolina there are only three such

17   claimants that remain.  So numerosity cannot possibly be an

18   issue.  In any event, without predetermining that, Your Honor

19   said what is, I want you to go back and to be specific.  And

20   I have Your Honor's words here that you have to have the

21   specificity, I want you - you said, Mr. Speights - and this

22   was God knows when, I want you to recast the deposition

23   notice and the discovery request because the two are

24   obviously linked, tying the class of documents for the nature

25   of the deposition testimony you're looking at to an element

1   of Rule 23 so that when, Mr Bernick, I want you to raise

2   every objection you intend to argue.  I'm not going to have

3   another proceeding like this where I hear objections to

4   relevance and delay.  When they get there, I've got Rule 408

5   and settlement issues in over-breath argued.  And so the

6   direction was very, very clear and specific.  It's not a

7   question of how long is the deposition going to last.  It's a

8   question of what the deposition is about if anything, and the

9   touchstone of that has to be the underlying documents.  So,

10  we needed to have a focus document request that complied with

11  what Your Honor specifically said, which is it has to pertain

12  to an element of Rule 23.  What we have now gotten back is a

13  document request that goes to - I think it's 16 or so

14  different paragraphs, 16.  Now, these document requests are

15  no different from what's been pursued historically, which are

16  all kinds of matters that relate to the merits of Anderson

17  Memorial but not to any issue that actually is a live issue

18  in connection with class certification.  So, a total of zero

19  progress has been made.  If we were to produce a custodian

20  because Mr. Speights believes that it's so simple to do so,

21  who actually is responsive to all these different categories,

22  yeah, you're talking about very, very broad stuff, all

23  documents generated prior to the petition date for this case

24  which refer or relate to Anderson's lawsuit.  This is the

25  very thing that Your Honor specifically told Mr. Speights

1   back in the fall that you didn't want to see, and yet it's

2   here again, and we have objected to it.  So, I didn't think

3   it was appropriate to take this up today because inevitably

4   Your Honor's going to have to take a look at what he's now

5   done on behalf of his client to so-call narrow the focus of

6   the document request, which is the subject of the deposition.

7   We don't really have the time, and it's not before Your

8   Honor, and we can go through all 16 of these, because we

9   cannot produce a deponent and meet our obligations without

10  reference to a document population request.  And this is no

11  different than the way it was before, and is not our

12  obligation to come forward and say, Let me tell you where all

13  these documents are that relate to things that are not at

14  issue in class certification.   That's all that we're talking

15  about.  So, zero progress is made, none.  He has not followed

16  Your Honor's instructions.  We are no more able to produce a

17  document custodian on these incredibly broad and undefined

18  categories than we were before, and our objections have now

19  been stated, we think every single objection that we possibly

20  have.  So, Your Honor, there's no issue about whether we set

21  them out, and I believe the matter either should be denied or

22  if we're going to go through this, we just set it over for

23  the next omnibus.  There's no hearing.  I mean there's

24  nothing that's emerged in this process that changes one iota

25  of the numerosity issue, which is really at gut-level the

1   reason why it doesn't make sense to have class certification,

2   not only under Rule 23 but under American Reserve which says,

3   It's not really Rule 23 that has to be met, but it has to

4   make sense in the case, and how in the world it can make

5   sense when we now have the three claimants who are going to

6   be before the Court defies the imagination.  In any event, we

7   believe that this ought to be put over to the next time, and

8   if Your Honor believes that we have to, we can go through the

9   document requests and see whether Mr. Speights has complied

10  with Your Honor's clear direction the last time this was

11  argued to tie it specifically to an issue that's an active

12  issue on Rule 23.

13          THE COURT: Okay.  I think at least - Oh, I'm sorry,

14  Mr. Speights, go ahead.

15          MR. SPEIGHTS: Well, if you're going to rule with

16  me, I'd sit back down, Judge.

17          THE COURT: No, I was going to say that I think that

18  based on the briefs that you've submitted and my

19  misunderstanding because I thought I was waiting for more

20  information from you with respect to the case file, that I

21  probably have what I need in the office to make a ruling

22  based on the document submission that you've made and the

23  debtor's opposition to it.  So, if there's more that you want

24  to argue, I prefer you do it now and when I get back to

25  Pittsburgh, I'll just attempt to give you a ruling.

1          MR. SPEIGHTS: A ruling on the discovery or

2    certification?

3          THE COURT: No, no, on your discovery request.

4          MR. SPEIGHTS: Your Honor, then the only thing -

5    I'll be very quick.  We did recast our discovery.  Mr.

6    Bernick raised the same objections, overly broad, et cetera.

7    I'm trying to clarify one point before we argue about that

8    discovery, and with all due respect to Mr. Bernick and most

9    every lawyer does it, lawyer talk is not the same thing as

10   what the reality is sometimes.  We're advocates.  In essence

11   all I've said is give me the records custodian for the

12   Anderson file that existed before the petition date.  They're

13   not documents in Tokyo.  They're not documents all over the

14   country.  There was a case file, and it was managed by Grace,

15   and there is somebody there already who knows where the

16   Anderson file would be located and generally what is

17   contained in the Anderson file.  It may be one location or

18   two or three, and if that person doesn't know an answer to

19   some question, he or she can say he doesn't know, but if we

20   could just find out if we're talking about a file cabinet or

21   a file drawer of documents, we will save ourselves a whole

22   lot of time before we argue all of these motions to compel.

23   The only other point I make, Your Honor, is, you know, I've

24   been trying to discover this for a long time, I believe today

25   I can go ahead and serve a new request for the custodian in

1    the objections proceeding.  They've objected to Anderson's

2    claim, and we'll be right back here, and that will just be

3    another 30 days or 45 days.  So I just don't see the problem.

4    What is the problem of me deposing somebody who's familiar

5    with what files exist on the Anderson Hospital case that

6    existed from '92 to 2000 in the Court of Common Pleas.

7            MR. BERNICK: Your Honor, I'd say for purposes of

8    your consideration of this there is the new document request

9    which Mr. Speights has now represented complies with Your

10   Honor's clear instruction last time, and then our objections,

11   and I don't believe that the new document request or our

12   objections per Your Honor's instructions have been submitted

13   to the Court.

14           THE COURT: I'm sorry?  You don't think -

15           MR. BERNICK: Your Honor, he says he filed, you

16   know, narrower requests.  Your Honor directed us to object

17   and to raise any issues.

18           THE COURT: Yes.

19           MR. BERNICK: So we objected and raised any issues.

20   I don't believe that the new requests and our responses to

21   those requests have been submitted to the Court.  So you

22   right now don't have before you the documents with respect to

23   which he's asking to have this easy custodial deposition.

24           MR. SPEIGHTS: I agree with that.

25           THE COURT: Oh, well then, I can't rule.

1          MR. SPEIGHTS: I just wanted, no - I thought that it

2     makes sense, and Your Honor can take it under advisement as

3     you indicated, I thought it made sense to let's take the

4     custodian deposition before I filed a motion to compel on

5     those latest responses so at least we can quantify what's

6     there.  Your Honor, if you disagree with me, I'll file a

7     motion to compel there and Mr. Bernick will be back saying,

8     Your Honor, this is overly broad, we'd have to search

9     everywhere in W.R. Grace's empire to find these documents.

10         THE COURT: How about doing this, gentlemen, because

11    honestly you just lost me.  How about doing this: Put

12    together for me in one binder what it is you want me to rule

13    on.  If you want me to rule on a motion to compel, fine.  Put

14    it in a binder, give me the motion to compel, give me the

15    response, you know, give me the specifics of what it is you

16    want me to rule on, but only give me the specifics.  Don't

17    give me everything under the sun.  If you've got some

18    agreement, I don't need it.  Just show me the question that

19    you're objecting to, what the objection is, what any

20    responses that you are objecting to, that's all I want.  With

21    respect to the depositions, put everything in a binder that

22    you want me to rule on.  Send it to me in Pittsburgh, and I

23    will give you rulings on the discovery, the outstanding

24    discovery requests, because I think somehow in the course of

25    these arguments, I simply have lost track of what is still

1    open.  I know I haven't given you firm rulings.  I have tried

2    to steer this process through, obviously unsuccessfully.  So,

3    you need some rulings.   You need them now so you can get

4    this discovery either done or underway or whatever the

5    rulings are going to be.  Put it all for me, please, in one

6    binder.  Mr. Speights, whatever your requests are; Mr

7    Bernick, your objections; Mr. Speights, your responses, and

8    then I will give you rulings.

9         MR. BERNICK: You're not asking for new briefs to be

10   done -

11        THE COURT: I don't want new briefs, just give me

12   whatever it is that is - whatever has not been adjudicated

13   that you want an adjudication on.  Just send it to me in one

14   separate binder, please, so that I have it all together in

15   one place and can make a ruling so I understand that I

16   haven't missed something, and I know I'm not waiting for

17   anything more.

18        MR. SPEIGHTS: Thank you, Your Honor.

19        MR. BERNICK: Thank you.

20        THE COURT: Okay.  When can I expect it?

21        MR. BERNICK: Well, I think we should be able to get

22   that to you within a week.

23        MR. SPEIGHTS: I think it's a matter of days because

24   it's very simple what I want Your Honor to rule on, it's one

25   matter outstanding.

1          THE COURT: Okay, well, I want you to put it all

2    together in one binder so I have it all -

3          MR. SPEIGHTS: It's a very thin binder from my

4    standpoint that I'm asking -

5          MR. BERNICK: Your Honor, I take it that you want a

6    binder that contains what both sides -

7          THE COURT: Both sides.  I want everything together

8    in one binder, both sides, everything in one binder.  So,

9    whom am I going to get it from?

10          MR. SPEIGHTS: Your Honor, I think - let me just say

11    this, because I don't want to have anymore confusion or

12    anymore continuances.  There is one motion pending before

13    Your Honor.  It's a motion to compel the documents custodian

14    deposition.

15          THE COURT: Okay.

16          MR. SPEIGHTS: And if I sent you a binder based upon

17    on what I think you want, that's what I would send.

18          THE COURT: Well, I have that motion.

19          MR. SPEIGHTS: Now, I know that there were going to

20    be more discovery disputes but I have not filed an additional

21    motion to compel on new discovery that has now been answered.

22    I made a judgment and I would rather have this motion to

23    compel heard first.

24          THE COURT: Well, I have that motion to compel.

25          MR. SPEIGHTS: And that's all I'm asking.  That's

1    the only motion outstanding, is a motion to compel the

2    documents custodian.

3        MR. BERNICK: Your Honor, Your Honor, this is an

4    unbelievable kind of thing.  The motion to compel relates to

5    a deposition notice.

6        THE COURT: Yes.

7        MR. BERNICK: The deposition notice has already been

8    discussed.  Your Honor already has ruled and the direction

9    was very simple which is that you should recast the

10   deposition notice and the discovery request because the

11   discovery request is what the custodial deposition is all

12   about.  It's documents.  So, Your Honor can't even consider

13   the custodial deposition until you know what it is that Mr.

14   Speights has done to comply with Your Honor's direction that

15   he narrow the focus of the documents that are the subject of

16   the custodial deposition.  So the two things are tied

17   together, the document request and the custodial deposition.

18   He's got a motion to compel the docket on the custodial

19   deposition.  We've got an answer.  The additional piece of

20   paper is (a) Your Honor's directions to him the last time,

21   and (b) his effort to comply with that direction, which are

22   new requests, and then our objections which Your Honor also

23   asked for at the same time.  That's the package.  So you know

24   the deposition, you've got the briefs and what the deposition

25   is supposed to be about, which are the documents that are the

1    subject of the requests.

2         MR. SPEIGHTS: Your Honor, that is absolutely wrong.

3    It is absolutely wrong.  You know, and I know you get

4    frustrated.  Let me just clarify.  We had all these arguments

5    and you said to recast, and all that happened, and there were

6    notices of deposition outstanding, there were requests to

7    produce outstanding, and you told me to recast and I recast

8    them.  In addition, after that hearing, after that argument,

9    I served later, never been before the Court, a motion to take

10   the custodian's deposition.  That's what's before Your Honor.

11        THE COURT: Okay, look, whatever - I don't care.

12   Whatever it is that you folks want me to rule on, I go back

13   to what I said before, whatever it is that you think I owe

14   you an order on that relates to the Anderson Memorial

15   deposition, put it in a binder, one binder.  Mr. Speights

16   send your material to Mr. O'Neill.  Mr. Bernick send your

17   material to Mr. O'Neill.  Mr. O'Neill, do an index, put them

18   behind tabs, and send me the binder.  Okay, whatever they

19   send you, just put it in a binder and send it to me in

20   Pittsburgh, please.  Okay, that's what I'm going to do.  As

21   soon as I get that binder, I'm going to take it home, make it

22   my bedtime reading for a night for which I'm sure my husband

23   will be more than grateful to all of you, and then I'm going

24   to give you a ruling on these issues.

25        MR. SPEIGHTS: Well, tell him mine was the little

1    part of the binder.

2            THE COURT: Okay.  Will that be able to be done

3    within a week?

4            MR. BERNICK: Yes, Your Honor.

5            THE COURT: All right.  I will expect it within a

6    week.  Okay, what else is there today?

7            MR. BERNICK: There was a status conference on the

8    motion for class certification with respect to Anderson

9    Memorial, but I suppose you've already had that in a sense

10   that there's nothing more I believe that there really has to

11   be discussed on that subject.

12           THE COURT: Until I get this discovery issue done,

13   correct.

14           MR. BERNICK: Well, that's correct, and our position

15   is that it's totally irrelevant.  That is correct, the

16   discovery issue is there.  We've given up on the idea of

17   having an expedited consideration of any of this because it

18   was argued last hearing and it obviously is not happening.

19   So, we're happy to have the motion for class certification,

20   you know, put on hold until this discovery issue is resolved,

21   and at that point Your Honor can take it up again.

22           THE COURT: Okay.  This discovery issue will be

23   resolved.  I will do my very, very, very best to get this

24   resolved absent some bomb going off in Pittsburgh or

25   something equivalent to that before the next omnibus.  So, at

1   the next omnibus hearing, hopefully we can take up whatever

2   the process is going to be that actually gets us to a ruling

3   on the class certification issue.  So, Mr. Speights, whatever

4   discovery and so forth that you're going to need or briefing

5   or whatever, please, see if you and Mr. Bernick can talk

6   about it when you get my ruling on the discovery issue to see

7   whether some time frame can be done.  I really would like to

8   get this off my desk just as much as you folks would like to

9   get it off yours.  So, I would like to move this issue along.

10  Okay.

11         MR. BERNICK: That is all that the debtor has for

12  today, Your Honor.  We appreciate -

13         THE COURT: All right.  Anyone else?  Any

14  housekeeping matters or other matters to address?  Okay,

15  we're in recess.  Thank you.

16         (Whereupon at 1:42 p.m., the hearing in this matter

17  was concluded for this date.)

18         I, Elaine M. Ryan, approved transcriber for the

19  United States Courts, certify that the foregoing is a correct

20  transcript from the electronic sound recording of proceedings

21  in the above-entitled matter.

22

23  /s   Elaine M. Ryan                      January 29, 2007
    Elaine M.  Ryan
    2801 Faulkland Road
    Wilmington, DE 19808
    (302) 683-0221