UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

```
IN RE:                   .    Case No. 01-1139
                         .
W.R. GRACE & CO.,        .
et. al.,                 .    USX Tower - 54th Floor
                         .    600 Grant Street
                         .    Pittsburgh, PA 15219
          Debtors.       .
                         .    February 5, 2007
. . . . . . . . . . . . ..    1:01 p.m.
```

TRANSCRIPT OF HEARING
BEFORE HONORABLE JUDITH K. FITZGERALD
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtors:          Kirkland & Ellis LLP
                          By:  JANET BAER, ESQ.
                               DAVID M. BERNICK, ESQ.
                               SCOTT McMILLIN
                               BRIAN STANSBURY
                          200 E. Randolph Drive
                          Chicago, IL  60601

                          Kirkland & Ellis
                          By:  BARBARA HARDING, ESQ.
                          655 Fifteenth Street, N.W.
                          Washington, DC  20005

Audio Operator:           Janet Heller

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

---

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@optonline.net**

**(609)586-2311      Fax No. (609) 587-3599**

APPEARANCES (continued):

| For the Debtors: | Kirkland & Ellis |
| | By:  BARBARA HARDING, ESQ. |
| | 655 Fifteenth Street, N.W. |
| | Washington, DC  20005 |

Pachulski, Stang, Ziehl, Young &
  Weintraub
By:  JAMES E. O'NEILL
919 N. Market Street
P.O. Box 8705
Wilmington, DE  19899

For Certain Law        Stutzman, Bromberg, Esserman,
Firms:                  & Plifka, PC
                       By:  SANDER L. ESSERMAN, ESQ.
                            VAN J. HOOKER, ESQ.
                            DAVID J. PARSONS, ESQ.
                            DAVID KLINGLER, ESQ.
                       2323 Bryan Street, Suite 2200
                       Dallas, TX  75201

For Committee of       Campbell & Levine
Asbestos Personal      By:  MARK HURFORD, ESQ.
Injury Claimants:      KATHRYN KELLER, ESQ.
                       1700 Grant Building
                       Pittsburgh, PA 15219

For Asbestos Claimants:   Baron & Budd
                       By:  Alan B. Rich
                       3102 Oak Lawn Avenue
                       Suite 1100
                       Dallas, TX  75219

Peter Angelos
By:  PAUL MATHENY
One Charles Center
100 N. Charles Street
Baltimore, MD  21201

For the Creditor,      Montgomery, McCracken, Walker &
et al.:                 Rhoads
                       By:  NATALIE RAMSEY, ESQ.
                            LEONARD A. BUSBY, ESQ.
                            NOEL C. BURNHAM, ESQ.
                       123 South Broad Street
                       Philadelphia, PA  19109

```
APPEARANCES (continued):

For the Creditor,          Stroock & Stroock & Lavan
et al.:                         By:  KENNETH PASQUALE, ESQ.
                                LEWIS KRUGER, ESQ.
                                180 Maiden Lane
                                New York, NY  10038

For the Creditor,          Cooney & Conway
et al.:                    By:  KATHY BYRNE, ESQ.
                           # 3000
                           120 N Lasalle Street
                           Chicago, IL  60602

                           Bilzin, Sumberg, Baena, Price &
                             Axelrod
                           By:  JAY SAKALO, ESQ.
                           200 S. Biscayne Boulevard
                           Suite 2500
                           Miami, FL  33131

                           Ferry, Joseph & Pearce
                           By:  THEODORE TACCONELLI, ESQ.
                           824 Market Street
                           Suite 904
                           P.O. Box 1351
                           Wilmington, DE  19899

                           Thornton & Naumes
                           By:  ANDREA MARINO, ESQ.
                           100 Summer Street
                           30th Floor
                           Boston, MA  02110

For the Future            Orrick, Herrington & Sutcliffe
Claimants                 By:  RAYMOND MULLADY, ESQ.
Representative:                 DEBRA FELDER, ESQ.
                          Washington Harbour
                          3050 K. Street, N.W.
                          Washington, DC  20007

                          David Austern
                          By:  DAVID AUSTERN, ESQ.

For Libby Claimants:      Cohn, Whitesell & Goldberg
                          By:  CHRISTOPHER M. CANDON, ESQ.
                          101 Arch Street
                          Boston, MA  02110
```

APPEARANCES (continued):

| | |
|---|---|
| For the Official<br>Committee of Asbestos<br>Personal Injury<br>Claimants: | Caplin & Drysdale<br>By: NATHAN FINCH, ESQ.<br>One Thomas Circle, N.W.<br>Washington, DC 20005 |
| For Thornton & Naumes: | Hogan Firm<br>By: DANIEL HOGAN, ESQ. |
| For Tort Claimants: | Simmons Cooper, LLC<br>By: ROBERT PHILLIPS, ESQ.<br>707 Berkshire<br>East Alton, IL 62024 |
| For Motley Rice: | Motley Rice, LLC<br>By: JOHN HERRICK, ESQ.<br>28 Bridgeside Boulevard<br>Mount Pleasant, SC 29464 |
| For Interested Party: | Willkie Farr & Gallagher, LLP<br>By: STEPHEN B. VOGEL, ESQ.<br>787 Seventh Avenue<br>New York, NY 10019 |
| | Kelley & Ferraro<br>By: THOMAS WILSON, ESQ.<br>1300 East Ninth Street, #1901<br>Cleveland, OH 44114 |
| For James Swango,<br>et al.: | George & Sipes<br>By: KATHLEEN FARINAS, ESQ.<br>156 E. Market Street<br>Suite 600<br>Indianapolis, IN 46204 |
| For Creditor,<br>James Adamson, et<br>al.: | Brayton Purcell<br>By: CHRISTINA SKUBIC, ESQ.<br>222 Rush Landing<br>Novato, CA 94945 |
| For Claimant,<br>Robert Pierce: | Robert Pierce and Associates<br>By: SCOTT MARSHALL, ESQ. |
| For Interested Party,<br>Asbestos Claimants: | Wilentz, Goldman & Spitzer<br>By: DEIRDRE PACHECO, ESQ.<br>90 Woodbridge Center Drive<br>Suite 900, Box 10<br>Woodbridge, NJ 07095 |

APPEARANCES (continued):

```
For Interested Party,     Kenneth Thomas
Kenneth Thomas:           By:  KENNETH THOMAS, ESQ.

For Debtor,               W.R. Grace & Company
W.R. Grace & Co.:         By:  MARK SHELNITZ, ESQ.
                               JAY HUGHES, ESQ.
                          7500 Grace Drive
                          Columbia, MD 21044

Creditor,                 Goldberg, Persky, & White
Certain Claimants:        By:  MARK MEYER, ESQ.
                          1030 Fifth Avenue
                          Pittsburgh, PA  15219

For Plaintiffs            Ward Black Law
at Issue:                 By:  JANET WARD BLACK, ESQ.
                          208 West Wendover Avenue
                          Greensboro, NC  27401

For Creditor              Kramer, Levin, Naftalis & Frankel
Official Committee        By:  PEGGY FARBER, ESQ.
of Equity Holders:        1177 Avenue of Americas
                          New York, NY  10036

For Plaintiffs            Martin & Jones
Jack Ammons, et al.:      By:  MARK RILEY, ESQ.

For Creditor, Ad Hoc      Weil, Gotshal & Manges
Committee of Equity       By:  DAVID HICKERSON, ESQ.
Secured Creditors:        1300 Eye Street, NW
                          Suite 900
                          Washington, DC  20005

For Interested            Hartley & O'Brien
Parties, Asbestos         By:  J. MICHAEL PRASCIK, ESQ.
Claimants:                2001 Main Street, Suite 600
                          Wheeling, WV  26003

For Interested            Latigo Parnters
Party, Latigo             By:  STEPHEN BLAUNER, ESQ.
Partners:

For Allstate              Cuyler Burk, LLP
Insurance Company:        By:  ANDREW CRAIG, ESQ.
                          Parsippany Corporate Center
                          Four Century Drive
                          Parsippany, NJ  07054
```

1                  (Attorneys are not always clear)

2             THE COURT:  Good afternoon.

3             UNIDENTIFIED ATTORNEY:  Good afternoon.

4             THE COURT:  This is the matter of W.R. Grace, 01-1139

5   pending in the District of Delaware.  Everyone is participating

6   by phone.  The parties I have listed are David Parsons, Raymond

7   Mullady, Scott Marshall, Deirdre Pacheco, Alan Rich, Daniel

8   Hogan, Robert Phillips, Paul Matheny, Kenneth Thomas, Mark

9   Shelnitz, David Klingler, John Herrick, Christopher Candon, Jay

10  Sakalo, Debra Felder, David Austern, Theodore Tacconelli,

11  Kathryn Keller, Mark Meyer, Janet Wardblack, Andrea Marino,

12  Stephen Vogel, Kathleen Farinas, Christina Skubic, Peggy

13  Farber, Mike Riley, David Hickerson, James O'Neill, Sander

14  Esserman, Van Hooker, Thomas Wilson, Nathan Finch, Mark

15  Hurford, Scott McMillin, Brian Stansbury, Natalie Ramsey,

16  Michael Prascik, David Bernick, Janet Baer, Leonard Busby, Noel

17  Burnham, Ken Pasquale, Andrew Craig, Barbara Harding, Jay

18  Hughes, Lewis Kruger, Irwin Zandman, Kathy Byrne, and that is

19  all.

20            I'm not sure who is on the phone from Pittsburgh;

21  however, because -- Jan, could you tell me, please?

22            THE CLERK:  Yes, (indiscernible) is in the courtroom.

23  And I'm here.

24            THE COURT:  Okay, thank you.  Did I miss anyone on

25  the phone?  All right.

1        THE CLERK:  Judge, could you just remind parties when

2  they speak just to state their name for the record.

3        THE COURT:  Yes, please, everyone, when you speak

4  -- because everyone is by phone, please identify yourself for

5  the record.  Mr. Bernick?

6        MR. BERNICK:  Yes, thank you, Your Honor.  I hope

7  that you have timely escaped what is a very severe cold front

8  that went through our part of the United States.

9        THE COURT:  That seems to be about 90 degrees here

10  right now.

11        MR. BERNICK:  Right.

12        THE COURT:  So, yes, I'm definitely in the preferred

13  location.

14        MR. BERNICK:  Right.  You know this has a significant

15  amount of history -- this issue.  And unless there's a need for

16  it, I think the more productive thing to do is try to figure

17  out how to solve what I think has got to be all counts a

18  problem.  And do so in a way that causes the least pain to all

19  concerned, but still gets us the information that we need.

20        We sent through both on Friday and then again -- Your

21  Honor, some of the data that tries this issue -- and I'm not

22  going to go over all the details.  But I think that the top

23  line is that out of approximately 5,900 claimants, who by our

24  account have referred to x-rays in connection with the

25  complaint for lung cancer -- we have accounted for

1 approximately -- I'm kind of eye-balling it -- about 5,300 of

2 them, meaning that others have not yet been processed.  And of

3 those 5,300, there are only 704 claimants who have actually

4 submitted the x-ray to Rust (phonetic) with the acceptable

5 -- with the appropriate certification.  That is to say, Your

6 Honor expressed the preference that would be (indiscernible) in

7 your order of December 22 states, the people should submit

8 copies of x-rays with certification of the same thing for

9 purposes of our proceeding, as the original.

10          Only 704 claimants have done that, coming from 23 law

11 firms.  There are a total of 910 claimants who have submitted

12 the x-rays.  They come from about 17 law firms, have not

13 submitted any certification.  And then we have approximately

14 3,783 claimants who have basically said that it is not

15 practical to certify.  And therefore, (indiscernible) come to

16 review the x-rays in their law office.  Thereby taking us back

17 to where we were back in December, which is the -- it is a

18 impossibility for us to get the reviews done because we

19 wouldn't have to troop around with our various experts because

20 to get where -- not one but three kinds of in accordance with

21 the appropriate standard, we'd have to get those experts to

22 show up in various permutations of 39 different cities to look

23 at various collections of x-rays.  It's just -- it's just not

24 going to work.

25          What we would like to propose is -- are really two

1  possible solutions.  And the solutions are of different kinds.

2  The first solution is to -- and this would be of course with

3  respect to anybody does not submit the properly certified copy.

4  We would have them -- have the original x-rays available in

5  three different repositories geographically situated around the

6  United States.  They would be places where there are

7  significant collection of claimants.

8          These would be repositories incidentally that would

9  not pose the custody issue.  I'm not saying that the custody

10  issue has been properly characterized by the other side.  But

11  to avoid any custody issue, these would repositories that are

12  run by folks who act on behalf of the claimants and their law

13  firms alone.  So, they are technically agents of those law

14  firms.  We could get a repository in the New York area, the

15  Texas area, and then I have a preference for Chicago as perhaps

16  Mr. Cooney does, as well.  But we're thinking about Chicago.

17          It is not difficult to locate facilities of these

18  different jurisdictions that can act as a repository.  There's

19  no rocket science associated with this.  Basically, somebody

20  gets space that's rented.  We would pay for the rent for the

21  space.  And is basically a secured facility so the people can

22  send the x-rays there, and they can be -- they can be viewed.

23  It seems to us that that is a reasonable compromise that's

24  designed to get us to where we need to be.

25          Now, I in fact have inquired of different folks in

1 the interim to see whether they might already be a facility in

2 existence that have handled these kinds of things, that still

3 handle them today.  But I think that that's probably a subject

4 for a more detailed discussion that warrants taking up Your

5 Honor's time.  But that would be one solution.

6       The second solution may be somewhat simpler which has

7 been bearing in mind this proceeding is really kind of -- it's

8 a proceeding for estimation.  And that really is the be all and

9 the end of all of the problems.  It's not designed to actually

10 adjudicate the merit of any claim or to allow or disallow it.

11       We simply ask the Court to enter an order about the

12 implications or to spell out the implications of not having the

13 certified copy.  It seems to me that there are two things that

14 that order could say.  One is that where a copy is furnished,

15 that is, the X-ray is sent through -- that if there is not a

16 certification, the copy is deemed to be identical for

17 estimation purposes to the original.  Nobody is hurt by that in

18 the sense that it doesn't -- it doesn't adjudicate whether the

19 claim is going to be allowed or not.  But effectively, what it

20 does is to say that if all they've got is the copy, the copy is

21 all that we can use.  It is deemed to be the same as the

22 original for purposes of the estimation.

23       If there is no copy and no original that's furnished,

24 that seems to be the given all of the effort has been

25 undertaken to obtain the certified copy.  The order would then

1  provide that instance -- the x-ray is deemed not to provide

2  evidence of an asbestos related need.

3          And be careful on that.  We're talking about lung

4  cancers.  So, this is not a statement that people don't have

5  lung cancer.  The purpose of looking for the x-ray was to

6  determine whether there is evidence of fibrosis that would be

7  consistent with exposure to asbestos.  So, this is not that

8  there's not lung cancer, just that it's not evidence of

9  asbestos-related disease that it's the lung cancer is due to

10 asbestos.  Maybe that there are other sources of data that are

11 available to the claimant, that enables us to say, yes, it is

12 asbestos-related, but the x-ray would be deemed not to provide

13 evidence to support the assertion of asbestos-related disease.

14          If Your Honor would enter that order, then it

15 obviates the need to go through the process of finding the

16 repositories and people can make up their minds what they want

17 to do.

18          We would be happy -- not happy, but we would be -- we

19 believe it would be satisfactory to go down either road.  We

20 have no preference that way.  But we need to get to a position

21 yesterday where we effectively have what it is that we need to

22 be able to test what's going on with these lung cancer

23 claimants.

24          And it seems to us that at this stage there really

25 isn't too much options.  We cannot send people around to law

1  offices and you know kind of orchestrate a very elaborate

2  Waltz, Tango, pick your dance, it's just not feasible to

3  accomplish.

4          THE COURT:  Mr. Esserman?

5          MR. ESSERMAN:  Yes, Your Honor, this is Sandy

6  Esserman.  One minor thing, and I want to try and stick to the

7  guts of the issue.  But we know that certain materials have

8  been sent to the Court, and we're getting them two or three

9  hours after the Court is getting them.  And we would -- we

10  think that when in fact the Court is sent exhibits or papers,

11  we ought to be getting them at the same time, not two or three

12  hours later which is like an hour or so before the hearing.

13  That's an obvious statement.  And I don't think it really

14  merits further discussion.

15          MR. BERNICK:  Well, let me just say because -- it's

16  inevitably because it was said, it's presumably (indiscernible)

17  the Court's consideration.  We apologize.  We didn't copy -- we

18  didn't just -- it isn't a question clerical support, we sent

19  out separate e-mails with the identical information that was

20  sent within, I think minutes, of this transmission to the

21  Court.

22          MR. ESSERMAN:  Well, not ours.  And we've got the

23  e-mails to show it.  But regardless, I know you don't do that

24  intentionally.  And just make sure it doesn't happen again.

25  First, I'd like to say that the firms that we represent, and I

1  think the firms in general, have in general complied with the

2  x-ray order.  And I understand what David is trying to

3  accomplish here, and Grace is trying to accomplish.  But the

4  x-ray order provided several alternative routes.  Number one,

5  you provide -- you can provide a copy, but you've got to have a

6  certification.  And the certification has to be basically

7  pursuant to the court order, has to show that the x-rays is the

8  same in essence as the original.  The alternative was, if we

9  couldn't get the certification, we would tell Grace and let

10  them know, and they could come out to the firms to inspect

11  their x-rays.

12         As starters, this whole procedure -- as the whole

13  questionnaire is very unusual procedurally, we think it's

14  probably improper.  Nevertheless, we've tried to comply and

15  give the Court what it needs to make an estimation.  It's

16  proven very difficult by some firms to get the certification

17  that is acceptable to Grace.  In some cases, certifications

18  have been received, and they're not acceptable to Grace.  In

19  that instance, there's really only one thing that we could do.

20  We've run into other problems that were more or less

21  predictable.

22         And that's -- we've got situations where the firms do

23  not have the x-rays, and they're with the hospitals.  In some

24  cases, the hospitals will not release it unless certain

25  administrative and other fees are paid by the person seeking to

1  get -- release of the x-ray, and in particular the Angelos firm

2  which I believe was the largest -- the largest number of x-rays

3  of any of the firms involved in lung cancer cases.

4          We informed Grace of this.  We informed them of the

5  charges, and Grace refused to pay.  And it's certainly in our

6  view improper if Grace is seeking the x-rays for us to have to

7  pay that cost which is a pure third party cost.  And I think if

8  nothing else was contemplated by the order -- so, first of all,

9  I'd like to say, we have complied with the order to the letter

10  and the spirit of the order.  We have tried to get the

11  certifications where we can.  Where we can't, we've told Grace

12  to come and get it.  And there's another category where the

13  x-rays are with third parties, and we're trying to get them.

14  And in some cases, there are costs that Grace has refused to

15  pay.

16          Now, having said all that, I understand the problem

17  that David Bernick described to the Court.  And if in fact the

18  Court is interested in having a facilities set up for which the

19  original x-rays can be sent, it would seem to me that Grace

20  would not only have to pay for the rent of that facility, but

21  the manning of the facility, and the administrative charges,

22  and any other charge that would be incurred.

23          And if I also understand it, the x-rays including

24  transportation of the x-rays -- as I understand it, they would

25  only need those -- that for 30 day.  We're still going to run

1  into certain circumstances where it's impossible to get the

2  x-rays out of doctors' offices, hospitals, et cetera, without

3  fees and charges.  Clearly, I think Grace needs to pay those.

4          With regard to the second alternative, I'll let Nate

5  Finch speak to that.  But it seems to me that we would oppose

6  that.  Well, of course.  And I'm not going to address it, I'll

7  let Nate address it.  But the first alternative, I don't know

8  that it's necessarily acceptable.  I haven't passed it by my

9  clients.  Looking over the list of where people are located

10  -- and frankly it seems to me that Chicago is not a place where

11  you've got the top law firms with numbers of x-rays.  It would

12  seem to me that it might be more California than Chicago.  But

13  I'm not going to fuss about that.  I think Greg Purcell has a

14  fair amount of x-rays that -- and they're out there in San

15  Francisco.

16          But be that is at it may, I just want to make sure

17  that the Court understands, number one, this was a highly

18  unusual procedure.  Two, we've got an agreed order which was

19  agreed to by Grace, agreed to by the claimants which the

20  claimants have fully complied with.  Three, I understand

21  Grace's problem.  I don't think Grace has fully understood our

22  problems in getting these x-rays.  And I certainly want to work

23  with the Court and work with Grace to try and solve the issues.

24  But in many respects, we view this is as a problem of Grace's

25  making, not of the claimants making.

1          I'll let -- I'll turn over the floor to either Nate

2  or Natalie.

3          THE COURT:  Okay.  I'm not sure who wants to go next,

4  Mr. Finch?

5          MR. FINCH:  This is Nathan Finch on behalf of the

6  Asbestos Claimant Committee.  First of all, I think the Court

7  should bear in mind that the central legal issue is the

8  possession, custody, and control of the x-rays.  And the Court

9  has already, correctly in my view, ruled that the federal and

10  civil procedure do not require a party to turn over original

11  materials to the custody and control of their opponent, or

12  indeed to the custody and control of anyone else.

13          And the reason it was written like that is in many

14  instances, there would -- there could be chain of custody-type

15  issues.  And particularly when you're trying to get 5,000

16  x-rays sent from around the country, even just to three

17  repositories -- there are many people who have expressed

18  concerns, you know, what happens if the x-rays get to the

19  repository and somebody looks at Mr. Smith's x-rays and puts

20  them back in the jacket for Mr. Jones, and they're in the

21  incorrect jacket, how am I going to prove the chain of custody

22  as -- you know, first of all that would undermine Mr. Smith or

23  Mr. Jones' claims?  And then how would you prove up the chain

24  of custody?  I mean, the custody issues alone, I think,

25  preclude doing what Mr. Bernick's first suggestion.

1          And the second thing I think the Court should bear in

2 mind is that there has been absolute compliance with the

3 Court's order.  If you read the materials that the debtor

4 submitted, they most helpfully fail to include the Court's

5 December 22nd, 2006 x-ray order.  And I suggest to Your Honor

6 that if you read that order, particularly Paragraphs 2 and

7 Paragraph 3 in conjunction, and then read the correspondence

8 that the debtor attached to -- I think -- three to its papers,

9 you will see that people have done a variety of things to

10 comply with the order.  They have either -- in some instances

11 sent original x-rays to Rust, in other instances they have sent

12 certified x-rays that Grace finds acceptable.

13          In many instances, and this is what Grace is

14 complaining of, they have said, it is not possible or

15 reasonably practical for us to certify this.  And they've gone

16 on to explain medical reasons why they couldn't get the

17 certification.  And it's not a one size fits all solution here.

18 Some places in the country where apparently there are x-ray

19 copying facilities and doctors willing to make the

20 certification, there are many others that aren't.  And that's

21 what Your Honor's order envisioned.  And Grace agreed to that

22 order.

23          So, I think that what they're doing is, they're

24 coming in and saying, this is an emergency, Your Honor.  You

25 have to -- we haven't had -- we don't have the time to go

1 around and look at all these x-rays that we, Grace, has

2 requested.  You have to modify the order that in fact we agreed

3 to.  And I think that is improper.  And I think it flies in the

4 face of the federal rules of civil procedure.  And I also think

5 that is a problem of Grace's own making.

6        My third point, the latest of Mr. Bernick's second

7 suggestion which is, well, the Court can just enter an order

8 that says if there's no copy or no original, the x-ray is

9 deemed not to provide evidence of asbestos-related disease or

10 the copy is deemed to be identical for estimation purposes.

11 Effectively, what he's asking is the Court to make a factual

12 finding on an issue that may well be disputed by the ACC of the

13 Future Claimants Representative without any proof.  And I

14 would, you know, heatedly oppose that.

15        At one point in time, the x-ray was reviewed by

16 somebody for the claimant.  And that person stated that there

17 were interstitial fibrosis and/or pleural plaques.  The fact

18 that the x-ray may or may not be readily retrievable on Grace's

19 time-line, it says nothing about what it proves that trial with

20 the claimant would have.

21        And once again, Mr. Bernick reminds the Court this is

22 an estimation proceeding and not an individual claims allowance

23 proceeding.  But were it a claims allowance proceeding, there

24 may well be proof that's very different from whatever x-ray

25 people had access to at the time that Grace went into

1 bankruptcy.  And therefore, I think asking effectively the

2 Asbestos Claims Committee and the Future Claimants

3 Representative to be bound by some kind of factual finding of

4 the Court or a stipulation or fact that may not be true, isn't

5 -- is simply improper.

6        And my bottom line, Your Honor, this is an order that

7 the Court's got it absolutely right on an key legal issue which

8 is who has the right to require custody (indiscernible) and the

9 rules lay that with the party who has the document.

10       Grace agreed to an order following the December 5th

11 hearing.  If Grace truly felt these x-rays were critical to

12 this case, it could have started asking for them months if not

13 years prior to October of 2006 when they first -- first sent

14 any kind of a letter to anybody asking for an x-ray, they could

15 have reviewed them by now.

16       So, for all these reasons, I respectfully urge the

17 Court to deny Grace's motion to modify the order they'd agreed

18 to and instruct people just to follow the rules.  With that I

19 turn the floor over to Natalie Ramsey.

20       THE COURT:  Ms. Ramsey?

21       MS. RAMSEY:  Good afternoon, Your Honor, Natalie

22 Ramsey for the MMWR firm.  Your Honor to reiterate a couple of

23 points and then to make a couple of additional ones.  First of

24 all as Mr. Esserman and Mr. Finch indicated, the x-ray order

25 was drafted by the parties, by the debtor's representatives and

1 by representatives of the asbestos claimants to be in

2 accordance with the Court's order and direction of December 5th

3 hearing.  And at that hearing, the Court did find that the

4 federal rules, specifically 34 and 26, did not require us to

5 relinquish control of this vital and irreplaceable piece of

6 evidence.  And with respect to its state, it is truly

7 irreplaceable.

8        And after that hearing, the parties sat down and

9 negotiated.  In that negotiation, it was specifically

10 contemplated that there would be circumstances where either the

11 copies or certifications could not be obtained and where

12 originals would be made available by the firm at their office.

13 Jointly, this was submitted under the debtor's certification,

14 and was entered by the Court.  That was roughly a month or so

15 ago.

16        During that period of time, the firms that I

17 represent, the MMWR firm have complied absolutely with the

18 letter and spirit of this order.  And so, when we're now faced

19 with this motion which seeks broad based relief against unnamed

20 claimants who haven't complied, we find ourselves, both

21 -- feeling that the order -- that motion is filed in bad faith

22 and also finding that it is impossible to handle this without

23 specific circumstances and specific plans.

24        The debtor has created a chart which we know he has

25 provided to the Court.  I don't know if the Court has had an

1  opportunity to review it.  But in the chart -- the debtor

2  identifies the chart filed today.  The debtor identifies four

3  of the MMWR firms that it says has sent acceptable

4  certifications along with x-rays.  And then it divides

5  additional firms into pockets of non-compliance or -- either by

6  reason of failing to have fully submitted x-rays or failing to

7  provide acceptable certification.

8         As I indicated to the Court in the last omnibus, in

9  two of these instances, the certification that was provided by

10 the MMWR firm -- that there's one of them that's attached to

11 our response -- specifically says that the firms believe them

12 to be accurate reproductions of the original, do not have any

13 reason to believe that they're not, but simply they're not able

14 to say that they are because they don't have possession of the

15 original (indiscernible).  That's one set of circumstances.

16        In other sets of circumstances, the firms that

17 certified that they have made good faith effort to obtain

18 copies and that they are working on that, but that they don't

19 know whether they're going to be -- you know, they don't know

20 the time-frame for doing that.  In some instances, they've

21 already received them and have sent them in even after sending

22 those letters.  And in some instances, we have not yet received

23 copies.  We're trying to get certification at the same time.

24        So, there are a number of different facts that go

25 -- that are reflected in the allegations of non-compliance.

**J&J COURT TRANSCRIBERS, INC.**

1  And in some instances, we would take the position that the

2  allegation that the certification is not acceptable is also

3  just not correct and does not form the basis for the Court

4  being asked to reverse a decision that it made after extensive

5  briefing and argument not that long ago.

6        And I would finally reiterate two other points, one

7  is that in many instances, it's reflected by the information

8  that Grace has provided itself to the Court, Grace has been

9  aware of these issues since January 11 or 12.  And in that

10 time, it has failed utterly to attempt to contact us and reach

11 out to us to work these situations out.  And in some instances,

12 there are solutions that could have been reached out -- in some

13 instances, the firms are willing to make available originals.

14 Some of the firms -- some of the firms are not willing to do

15 that, but they're willing to work with the debtor to accomplish

16 or satisfy the debtor in other ways.

17       We have not had that opportunity before the filing of

18 the debtor's motion.  And finally, I would reiterate the final

19 point that Mr. Finch made that the debtor's delay should not be

20 our emergency.

21       THE COURT:  I'm sorry, the debtor's what?  I

22 couldn't --

23       MS. RAMSEY:  Delay in --

24       THE COURT:  Delay?

25       MS. RAMSEY:  -- delay in seeking these x-rays should

1  not be the emergency of the asbestos --

2        THE COURT:  Okay.  Anyone else wish to speak in

3  opposition to this motion?  Okay, Mr. Bernick?

4        MR. BERNICK:  Yes, I'll try to be brief.  I hoped

5  that we wouldn't go back over the history, but the history

6  obviously is the whole reason why we're here.  And we have a

7  very, very different view of it as the Court I'm sure will

8  recall, and that is that beginning in October, we asked for

9  these things.  And we knew that there was going to be some

10  discussion about it.  Albeit our initial contact with Mr.

11  Esserman and with others suggested that it would probably be

12  something that could be worked out.

13        Because we're concerned about timing, we made a

14  specific effort to have this issue considered in connection

15  with the December 5 hearing, remember the hearing on the motion

16  to compel.  Because at that point, everybody was focused on

17  getting their particular issues resolved in a timely fashion.

18  The asbestos claimants wanted Your Honor to consider right up

19  front the question of the admissibility and discoverability of

20  settlement evidence.  We wanted to get final resolution of the

21  question of what the questionnaires would have to say, and the

22  timing for submission of those questionnaires.

23        And therefore, we took specific efforts to assure

24  that this issue that is access to the x-rays which is

25  (indiscernible) and the questionnaires all along, albeit Your

1  Honor will recall, we can reach closure on the questionnaire
2  because we litigated through two rounds until the late summer
3  of last year.  So, we wanted to raise this issue.  We did raise
4  that issue.  I remember still today being in court with Your
5  Honor with the other side -- a number of issues did get raised
6  again.  And we received assurances that this thing could be
7  worked out.  I believe Mr. Esserman was participating
8  telephonically and indicated that this would not be a problem.

9       It was I who raised this question again, I believe it
10 was on the 19th of December but it was before Your Honor issued
11 the -- signed off on the agreed order, because I was concerned
12 that the fact that this was going to be a problem and that we
13 were going to have to look -- that we were not going to get
14 access to all the originals because notwithstanding the fact
15 that these assurances had been provided informally that we're
16 just not going to get compliance.

17      And I specifically raised this matter.  Your Honor
18 was a little bit impatient with me, and I have the transcript
19 page, Page 14 where Your Honor said, "This is really wasting my
20 time.  I really have other things to do.  The copies are the
21 same -- are to be transmitted unless the copies for some reason
22 or other are not certified as accurate, you're not even getting
23 into this issue about the originals if you get copies and
24 you're really wasting a lot of time.  If something has a
25 legitimate reason why an original can't be provided in lieu of

1  a copy, they're going to give you a certification.  If you have

2  some challenge to it, then file a motion and we'll deal with

3  it.  You know this process is the -- supposed to be the

4  exception, not the rule."  And that fact and that statement

5  -- and that has (indiscernible) with absolutely of the

6  evidence.  There was no -- there'll no point in force to an

7  order that provided for the submission of copies that were to

8  be certified, and certified precisely.  And at the end of the

9  day, everybody was going to come back if essentially they have

10  -- with -- you know is a minority exception and say, they

11  couldn't do it, and therefore, we have to go back to the idea

12  of looking at original of the offices'.

13          That's what they started out.  They started out with

14  the originals of the offices', that's why we went back.  We

15  went over this whole thing to begin with is to establish not

16  going to be sufficient.

17          So, when everybody says that this order was agreed,

18  it absolutely was agreed.  If pursuant -- it was agreed

19  pursuant to the statement that Your Honor made in December that

20  this would be an exceptional circumstance.  That is why it was

21  agreed.  If it were to be in fact the rule rather than the

22  exception, the order provided absolutely no relief whatsoever.

23          So, that order is something that we had hoped would

24  work because Your Honor could not have been clearer in December

25  what would take place.  And in fact, what's happened is that

1 it's not worked.  And I'm not making any allegations of bad

2 faith or suggestions of bad faith, but this is not a problem of

3 Grace's creation.  This is a problem in part having entered

4 into an order where people did not in fact do what Your Honor

5 suggested was going to be the rule that you utilize the

6 exception and swallow the rule.

7          Now then the question is well, what are the concrete

8 factual circumstances that lead to non-compliance with the

9 order?  Well, there are two statements that have been made.

10 One is that people have provided acceptable certifications and

11 somehow we've been we've been resistant to that, that is

12 absolutely and completely incorrect.  What we have is the

13 people generally say they cannot provide any certification.

14          And I'll pick out the Wartnick firm because I think

15 that Natalie was referring to this firm because the language is

16 very constructive.  It says, "We have no reason to believe that

17 the x-rays" -- this is what the Wartnick firm says -- "we are

18 submitting are not representative of the original and believe

19 them to be representative of the original."  That's very

20 carefully stated.

21          We're not talking about representative.  We're

22 talking about whether they are identical to the original.

23 That's the whole idea of having a copy is that it is not an

24 approximation.  So, they say there's no reason to believe

25 they're not representative, but they go on to say, "We are

1  unable to certify that these copies are identical to the

2  originals as we don't have the originals."

3         Well, at that point, we don't have satisfaction of

4  the evidentiary predicate for using the copies, that doesn't do

5  us any good.  The certification has to be that the copy is the

6  same as the original, otherwise, we've accomplished zero.  It's

7  not admissible in place of the original.  People, when they

8  sent (indiscernible) are for all their testimony is predicated

9  on the fact what they may say is disputed.  So, it undercuts

10 the entire purpose of the order.

11        We haven't been unreasonable on this.  The order

12 specifically called out that there had to be identity.  You

13 said -- what Your Honor said was that's what the rules require.

14 We're not blaming people for anything -- failing to provide

15 that certification.  The fact of the matter is however, that

16 their certification is not there.

17        We then get to the second circumstance where people

18 say they don't have the x-ray, that it's going to cost -- it's

19 going to cost them to get it, and that we've not been prepared

20 to kind of work this out.

21        We've had to prepare to work it out.  We had to be

22 prepared to work it out on a basis that actually put these x-

23 rays in a location where they're useful for us, not in

24 somebody's law offices.  Then you have to take the cost of

25 somehow transporting them and handling them, fees of the

1    hospital would not only be unreasonable, it is not called for

2    in any procedure that I'm aware of.  If the originals need to

3    be examined, it's the duty of the party that's relying upon the

4    original as opposed to the copy in making the claim to make

5    that original available.

6          And can you imagine the administrative problem that

7    we would get into if we took on the task of monitoring the

8    costs that are associated with bringing the originals to a

9    certain location?  It makes absolutely no sense, and again, was

10   not provided in the order because we would never have agreed to

11   it in the context of the order.

12         So, we don't have too much choice here.  We can't get

13   people to certify the copies.  We can't get them to make the

14   originals available to us on a reasonable basis.  And

15   therefore, we come back here.

16         Now, on the question of whether a repository somehow

17   violates the rules of evidence, that is again false.  The rules

18   of evidence do not preclude the Court from making orders that

19   say -- or will supercede your -- make the -- not -- for the

20   Court for making an order that says, if there's the originals

21   that alone are what we have to work with in the case, the

22   originals can't be transported.  That's just wrong.  If the

23   originals are the evidence in the case, the Court can order

24   that they may be transported in any way, that it's important to

25   the prosecution of the case.

1       I've been involved in several cases where Courts have

2 issued orders that for purposes of adjudicating issue that

3 turns on the originals, the originals are actually filed with

4 the Court or maintained in the custody of the Court, including

5 hard, you know, pieces of material evidence in construction

6 cases, in the <u>San Juan Dupont Plaza</u> case, the Court ordered

7 that all originals, all demonstratives -- everything, be in the

8 depository in San Juan, Puerto Rico for purposes of the trial

9 at the party's expense.  They don't want to do that, but

10 there's nothing that says the Court can't make that order.

11       Effectively, what's being said here is that, yes, our

12 claim's depend in part on the originals, but we can't make the

13 originals available to you because -- if not provided for in

14 the rules.  And therefore, you can't have the appropriate

15 access to them that your experts need, so, we're just going to

16 keep them.

17       Now, they're not saying, oh, well, gee, there really

18 is an issue about whether the copies are true copies or not.

19 They're saying, they don't believe that there's an issue.  Got

20 to have it one way or the other.  If the originals are going to

21 be the evidence, they have to be reasonably available to the

22 other side so that they can be -- so that we can prepare our

23 case.  If they're not, then they shouldn't be saying that the

24 originals somehow are going to be the originals that they'll

25 produce at trial.  You can't have it at trial and not at

1   discovery.

2        Which then brings me to what I think was a reasonable

3   proposal for how to deal with this.  We have the problem of

4   the provision of the x-ray, but not the certification.  If

5   people can't certify today that the x-ray is an accurate copy,

6   then all we're saying is that they can't later contest that it

7   is an accurate copy.

8        Whatever the situation is going to be when the

9   estimation comes to trial should apply today.  So, if it is a

10  copy that they don't believe is not identical, and they're not

11  going to later on that it's not identical, then I don't see

12  what the problem is with saying that -- the Court saying that

13  for purposes of the estimation, it could be considered to be

14  identical.

15       THE COURT:  Frankly, I don't see a problem with that

16  for the estimation purpose either, provided that that's what

17  it's limited to.  If people are saying that we'll give you a

18  copy, we don't have any reason to believe that it's not the

19  same as the original.  But if for whatever reason, we can't

20  produce a certification to that effect, well -- you know, for

21  whatever reason, I understand that there are some -- either

22  doctors or lawyers or witnesses who would feel uncomfortable

23  making the certification for whatever the reasons are.

24  Nonetheless, to the extent that a copy is what is going to be

25  produced -- or used by Grace in the estimation proceeding in

1   lieu of the original.

2           I also agree with you that if they're going to say,

3   here's a copy, and we agree that for estimation purposes, this

4   is -- I'll use my words "as good as the original" -- then I

5   think you're quite correct, Mr. Bernick, that probably should

6   do it for estimation purposes.  And that's not to say that for

7   actual litigation on the merits of the claims, that there can't

8   be a different ruling or a different analysis when someone is

9   looking at the specific original and tying it to the proof of

10  claims.  But for estimation purposes, I really don't see where

11  anybody would be prejudiced by that.  This -- I think the order

12  is intended to get everybody on to the same page so that you're

13  all looking at the same data set.

14          And if the same data set is going to include a copy

15  -- I think I was the one who insisted that the copies had to be

16  served by -- because I think it's important to make sure that

17  we're looking at the same data set.  But if people are not

18  going to contest that data set, then that's fine.  But I agree

19  that all parties are entitled to know that no one is going to

20  contest that data set.  So, if you're not going to contest it,

21  I agree.  If the x-ray is a copy and all parties agree that for

22  estimation purposes, the copy can be used in lieu of an

23  original, I think that's probably all you need.

24          With respect to the second part, however, of your

25  order that if the x-ray does exist and can't be produced, that

1 that means that there is no evidence of lung disease that is

2 tied to asbestos, I don't know that I could go there.

3       MR. BERNICK:  Well, I'll make -- let me -- let me

4 really make sure I gave clear -- I wouldn't advocate that.

5 What I'm saying is that if they're not going to provide the

6 certified copy, and they want to use -- I'm sorry, if they're

7 not going to provide the certified copy, then they at that

8 point -- we don't have any basis for being able to ascertain

9 whether the original was properly read.  And --

10       THE COURT:  Yes, you do, you could go look at the

11 originals.

12       MR. BERNICK:  No -- well, but that -- okay, that then

13 gets back to the question that again is going to swallow --

14       THE COURT:  But that's your choice.  I mean, you and

15 your clients have decided the method by which you choose to do

16 this estimation hearing.  And there are costs involved in

17 discovery.  If you've chosen the method of doing discovery,

18 this happens to be an expensive method, that's your choice.  I

19 don't think that's up to the parties to bear that expense.  I

20 don't like to see the estate using a lot of dollars in a

21 fashion that isn't going to be productive.  But nonetheless,

22 that's still your choice.  So, to the extent that you have a

23 contest about a specific x-ray, you've got access to the

24 originals.  And I think you just have to go look at the

25 originals.  But with respect to this copy issue, it seems to me

1  that if the parties are going to say, here's a copy, you know,

2  we agree you can use it in lieu of an original, maybe that's

3  the long and short of the major problems that both the debtor

4  and frankly the parties face.

5          MR. BERNICK:  Well, the difficulty, Your Honor, I

6  think if you -- if you kind of part through how that will be

7  treated is that if people still have the latitude as this order

8  now provides them, not to provide the copy -- not to provide

9  the certification that say, we intend to rely upon the

10 originals, that --

11         THE COURT:  No, no.  No, I don't think that's the

12 issue.  I thought that there were certain firms who have

13 already notified you that for one reason or another an original

14 is not available.

15         MR. BERNICK:  But if that is true that if the

16 original no longer exists, then I guess we have to be satisfied

17 with the copy.  And then again, it seems to me that we're back

18 to your first principle which I believe is correct, that there

19 should not be an issue about the accuracy of the copy.  So,

20 I --

21         THE COURT:  For purposes of estimation.

22         MR. BERNICK:  For purposes of estimation which really

23 (indiscernible) that if there is an original, certainly a copy

24 could be furnished.  If there is not an original, there is a

25 copy, and the original no longer exists, then the copy again

1   should be usable without there being an issue about its

2   accuracy because it's the only thing that's there.  If there's

3   nothing, there's no longer an original or there's no longer a

4   copy, and all that's there in the record is the prior

5   assessment by whatever doctor it is who looked at it, well, I

6   can't make them produce something that's not there.  And the

7   Court can't either.  And we'll just have to deal with that as a

8   category  of cases.

9           But if there's an original that exists or a copy that

10  exists, then it seems to me that they either -- they either say

11  that it's an accurate copy, get an accurate copy, or the Court

12  orders that whatever the copy is, is an accurate copy.  It

13  shouldn't be up to us to go look at the original.  We don't

14  want to look at the original.  We don't care about looking at

15  the original.

16          MR. FINCH:  Your Honor, may I be heard on this.

17          THE COURT:  Yes, yes.

18          MR. FINCH:  This is Nathan Finch for the asbestos

19  claimant.  Mr. Bernick is stating three very different

20  situations.

21          THE COURT:  Yes, I think he is.

22          MR. FINCH:  One situation is where people say, we

23  have a copy.  We have no reason to believe that it's not the

24  same as the original.  We don't have the original.  In that

25  circumstance, we're willing to say that this is what we would

1   -- this is what the x-ray that we have is.  In that

2   circumstance, there is probably no harm in an order that says,

3   if the firm is willing to -- think that it believes the copy to

4   be the same as the original, that's one circumstance.  But --

5            UNIDENTIFIED ATTORNEY:  Excuse me, Your Honor, we

6   can't hear Mr. Finch.

7            MR. FINCH:  The -- can you hear me now?

8            THE COURT:  Yes.  Are you on a speaker phone, Mr.

9   Finch.

10           MR. FINCH:  No, I'm not.  Can you hear me, Your

11  Honor?

12           THE COURT:  I can hear you fine.  But they

13  -- apparently, they can't in the courtroom.  Can you get him

14  now, Jan?

15           THE CLERK:  Yes.

16           THE COURT:  Okay, go ahead, Mr. Finch.

17           MR. FINCH:  The second situation, however, is where

18  the law firm has the original in its possession.  And they are

19  unable to make a copy of the x-ray and have anyone certify that

20  the x-ray is identical to the original.  That's a very

21  different circumstance.  And neither -- the ACC nor the

22  claimant be willing to certify that whatever copy is that

23  result from that is identical in all material respect to the

24  original if the claimant's doctor or the claimant's copying

25  facility is unwilling to do that.

1          THE COURT:  No, I think the issue for the second one,

2 Mr. Finch, is if that's the copy that you're giving to the

3 debtor to rely on for purposes of estimation, that you won't

4 later come back and say, that's not an accurate copy for

5 estimation purposes.  Whatever you produce to the debtor is

6 what -- or whoever produces to the debtor -- as the evidence of

7 the lung cancer should be what the debtor is entitled to rely

8 on for purposes of estimation.

9          MR. FINCH:  But if the response is, we have an

10 original, we can't get a copy, the debtor is free to come look

11 at the original, that should be sufficient, Your Honor.

12          THE COURT:  But there isn't any reason if they have

13 an original that they can't get a copy.  They may not be able

14 to get a certification, but they ought to be able to get a

15 copy.

16          MR. FINCH:  But then you are basically making a

17 finding of fact that is -- that the -- that the -- because the

18 reason the people are having difficulty getting certification

19 as I understand it, is people -- their B-readers or their

20 doctors are saying that, you know, I can't say that what is on

21 the copy is identical to what's on the original.  And I very

22 well would like perhaps the right to send one of my doctors go

23 look at the original.  Because if the copy is submitted by the

24 law firm, and they say, we can't say anything about this, what

25 Your Honor is effectively doing, is making a finding of fact

1   about a fact that may not be true and may well be in dispute.

2        THE COURT:  Well, that's why -- I guess why I'm lost

3   is that -- maybe I'm not lost.  Maybe what you're saying is,

4   people who -- well, let me start -- I guess maybe the problem

5   is my fundamental lack of understanding as to why you can't get

6   a copy of the x-ray that is -- that is reflective of what the

7   original is.

8        MR. BERNICK:  Your Honor, maybe I can help with that

9   a little bit.  And I'll say something that is, you know, not

10  necessarily the most useful thing for my position.  We believe

11  it's possible to get good and accurate copies.  And the copies

12  are sufficient.

13       But we recognize that there may be doctors who for

14  whatever reason will take the position that the copy is not

15  quite as accurate as the original when it comes to looking for

16  what these B-readers look for.  They're looking for things that

17  are, you know, opacities.  There are features of the x-ray, and

18  their it's their expert judgment on whether they see it or not.

19  Now, we again -- there's a whole discussion there about whether

20  they should therefore be read once, or twice, or three times by

21  somebody who is objective, but that's for another day.

22       I could see that there maybe some expert who says,

23  well, I don't know that the copy is necessarily identical to

24  the original.  I entertain that as a possibility.

25       Our position here, therefore, is that they either

1  give us the original in someway that we realistically can get

2  it read.  If that's going to be their position that their

3  experts are going to think, no, there's no copy that I can

4  certify as being original, and you've got to have the original,

5  then and only then do we believe that it's important to have

6  that x-ray made available to us as presumably it will be made

7  available at the estimation itself, that x-ray made available

8  to us on a reasonable basis.

9         If however, they believe that it is possible to have

10 a copy, then the copy is fine with us if it's fine with them.

11 But you can't have it -- they say it's only the original that

12 is sufficient, but it's we that don't have the ability as a

13 practical matter to review that original given the time frame

14 that we have.

15        We're not asking for the Court to make any finding of

16 fact whatsoever.  It's not a question of making any finding.

17 It's not something that would be in any way, shape, or form,

18 binding with respect to some future proceeding.  We're asking

19 that Your Honor say as you did that copies are going to be the

20 way to go, that copies will be taped or it could be supplied by

21 the claimants here so that they are as good as they can be.

22 That is the data set that we're going to work with.  And that

23 we're not going to have issues about whether the copy is as

24 opposed to the original.

25        THE COURT:  Well, I can't make that statement if the

1 || other parties aren't willing to go along with it.

2 ||          MR. BERNICK:  Well, but --

3 ||          THE COURT:  You can do it by way of stipulation.  It

4 || seems to me the you'll be saving a lot of cost and expense for

5 || everyone.  But if you can't, and the parties aren't willing to

6 || do it, then I think your choice is to go look at the originals.

7 || And I think, unfortunately, the cost of the -- can and should

8 || reside with the entity that's entitled to them.

9 ||          Now, like you Mr. Bernick, I've been in trials where

10 || the Court ordered that all original evidence be brought to

11 || Court.  So, if  you want to lodge it with the Court, I suppose,

12 || I can make that order.

13 ||          MR. BERNICK:  Well, then --

14 ||          THE COURT:  I can order the original to be produced

15 || and kept in the registry of the Court.

16 ||          UNIDENTIFIED ATTORNEY:  Your Honor --

17 ||          MR. BERNICK:  Well, it's just -- before we get a

18 || further response to that, that is then exactly what we will do.

19 || We will -- we will work with -- we'll simply submit an order.

20 || We will work with Your Honor's chambers to set up an area in

21 || Pittsburgh which is subject to whatever security is necessary.

22 || We'll pay for the rent, we'll pay for personnel to be there.

23 || And we will then ask, does any and all originals that will

24 || actually be relied upon for purposes of the estimation; that

25 || is, original x-rays be put in there.

1          It's just that -- it's just that simple because we

2   don't -- we do not have -- it's a practical matter, it's not a

3   question of expense, Your Honor.  We have three different sets

4   of experts to review these because we believe that they

5   according to the methodology as it's spelled out in the

6   B-reading protocol, requires repetition reading.  It has to be

7   replicated.

8          So, literally, we would have to have a team of three

9   experts travel around to 39 different cities so they can all

10  sit there and wait 'til one has read it, then another to read

11  it, then another to read it.  This is not -- this is not

12  feasible.  We're not trying to force anything here.  We're

13  trying to get access to the original evidence that they

14  apparently say is the only evidence that's reliable.

15         So, it's one way or the other.  We either -- we

16  either, you know, have to create the depository or we don't get

17  access to the information.

18         MR. FINCH:  Your Honor, may I respond to that please?

19  Let's go back to first principles.  This is a contested matter

20  in a bankruptcy case where the debtor has on file a plan that

21  has an implied asbestos liability estimate in it.  And Your

22  Honor is holding this hearing for purposes of determining in

23  part whether that plan is confirmable.  No individual asbestos

24  claimant or even groups of asbestos claimants are going to be

25  putting on an individual case, at all.  None of them, Your

1  Honor -- and the debtor has repeatedly said this isn't for

2  purposes of individual case valuation or individual case

3  allowance or disallowance or individual case trials.  There

4  will not be a single x-ray put forward by the Asbestos

5  Claimants Committee or the Future Claimants Representative.

6  The only parties who are litigating the magnitude of the

7  debtors' (indiscernible) liability with the debtor in the

8  estimation proceeding.

9        The way this is going to come up is the debtor will

10 put on an expert that says -- or three experts or some

11 combination of that -- and they'll say, we have looked at 3,000

12 individual x-rays.  And in our opinion, only 22 percent of them

13 show evidence of interstitial pulmonary fibrosis consistent

14 with asbestosis.  And another 18 percent of them show pleural

15 plaques.

16       Well, my client would be entitled to rebut that.  And

17 one way to rebut that is to put on a -- first of all, we put on

18 testimony that you don't need underlying interstitial fibrosis

19 or evidence of pleural plaques in order to have

20 asbestos-related lung cancer.  And the medical literature is

21 clear about that.  But another way to rebut that is to put on a

22 doctor that says, I have looked at the same 2,000 x-rays that

23 the debtor's experts have looked at, and in my opinion, it's a

24 higher percent of -- that show interstitial fibrosis or pleural

25 plaques.  And the debtor's x-rays -- the debtor's experts are

1  looking at copies.

2        I actually went back and looked at some of the

3  originals.  And in some instances the originals were better and

4  showed more stuff then the copies did.  That's what I -- if you

5  enter this order, I and the Future's Rep would be precluded

6  from doing.  And the --

7        THE COURT:  No, you won't because the originals are

8  in the custody of the Court, everybody can have access to the

9  custody in court.

10        MR. FINCH:  But --

11        THE COURT:  That probably makes the most sense

12  because then originals are there for everyone.  And at the end

13  of the court proceeding, or as needed in the -- to the extent

14  that the individual plaintiffs need their x-rays back for

15  whatever reason as the trials goes on, they can get them back

16  out of the court registry.

17        MR. FINCH:  Your Honor, I don't think the Court

18  -- the case that Mr. Bernick was talking about the Court

19  requiring original evidence be put in the repository, talking

20  about original trial exhibits.  This is basically the Court

21  creating a repository for discovery.  And I don't think the

22  federal, civil procedure permit that or allow for it.  They

23  talk about producing for inspection and copying, not turning

24  over possession to the Court.  And --

25        THE COURT:  Well, I'm assuming that Mr. Bernick is

1 talking about using these as original trial evidence.

2          MR. BERNICK:  That's right.  I mean if Mr. Finch

3 opposes it, his experts are going to use the fact that they had

4 access to the original.  It basically undercuts the testimony

5 of our experts and we will not have the opportunity to have our

6 experts be in the same position that they are in because they

7 will not have had access to the originals.

8          MR. FINCH:  But they absolutely have access to the

9 -- Judge, Your Honor.

10          MR. BERNICK:  I'm sorry, as a practical matter --

11          THE COURT:  No, Mr. Bernick, they have the same

12 access.  The debtor has the same -- exact same rights to go

13 look at these original x-rays anywhere else as the Asbestos

14 Committees' experts and everyone else's experts do.  The

15 reality is the debtor just doesn't want to do it this way.  I

16 mean that's what the bottom line is, the debtor just doesn't

17 want to make the dog and pony show of having three experts

18 travel around the 39 cities.

19          MR. BERNICK:  We'll do whatever it is that Your Honor

20 believes we are entitled to do.  We will go -- we will have our

21 experts troop around and do this.  And it will take a long

22 time.

23          THE COURT:  Well --

24          MR. BERNICK:  It just will.  I mean there's nothing

25 else that I can -- I can do about it.  I have tried, Your

1 Honor, for four or five months now.  We have -- my client has

2 tried for two years to get access to the underlying data so

3 that we are in the same position as the other side is and

4 there's no hide the ball situation.

5          THE COURT:  No, wait.  Let's start -- I don't want to

6 get into the pot calling the kettle black situation because

7 it's going to dissolve into a he said, she said.  And frankly,

8 these discussions always dissolve into that and it's wholly

9 unproductive.

10          MR. BERNICK:  Right.

11          THE COURT:  What you are searching for is evidence of

12 x-rays from people who sued the debtor or had actions pending

13 against the debtor before the bankruptcies were filed.

14          MR. BERNICK:  Right.

15          THE COURT:  So, this evidence has been out there and

16 available for a very long time.  It's not something new that

17 has been newly created.  It's been there.

18          MR. BERNICK:  We --

19          THE COURT:  -- to the extent that anybody needs it,

20 it is available and has been available.  The question is, how

21 best to get into a format that anybody who wants to make use of

22 it for purposes of discovery and trial --

23          Mr. Esserman, let's go back to you, you seem to have

24 been able in some other instances to work through some of these

25 things.  What about the concept of either a temporary

J&J COURT TRANSCRIBERS, INC.

1  repository, a you know, three repositories, wherever they need

2  to be, or what about the concept that parties produce a copy,

3  again at the expense of the debtor -- of the debtor -- but with

4  the understanding that if a copy is going to be produced, that

5  that is the copy that everyone will rely on for purposes of the

6  estimation?  That you know, if someone decides that they will

7  not produce a copy, then everyone knows you have to go look at

8  the original, and the original will be the evidence that people

9  need to go look at.

10       But to give the plaintiff's counsel an opportunity to

11  get copies because it can't be that all of these originals will

12  be so suspect that B-readers will refuse to look at them saying

13  that -- especially when somebody's already been diagnosed with

14  lung cancer already -- the circumstance where we're looking at

15  the least level of exposure to asbestos and most minimal

16  asbestos in these level -- this is simply to -- whether or not

17  the type of lung cancer is consistent with asbestos exposure.

18       So, I wouldn't think that most of these x-rays -- I

19  wouldn't think -- I mean, again, I'm not a medical expert,

20  maybe I'll be surprised, but I wouldn't suspect that most of

21  these x-rays are going to be that open to question, are they?

22       MR. ESSERMAN:  Well, Your Honor, this is Sander

23  Esserman for the record.  I think Your Honor's hit on a

24  suggestion that maybe can work.  And that is, what about

25  something like this, that is that the plaintiff's law firms

1 where they've got access to the original, send the original out

2 for copying.

3        And where they can't get the certification which they

4 haven't been able to do, they just -- they just request and

5 they certify that they have requested the copy service to make

6 -- to make an identical copy.  That way, you'd have the law

7 firm's requesting from the copy service an identical copy.  And

8 the copy service -- to the extent -- we've tried to get

9 certifications from some of them, and they're just -- they're

10 just goofy about it because they're copy services, they're not

11 in the business of making, you know, kind of specialized

12 certifications here.  That we do that where someone who wants

13 to inspect the originals, that's all they have to do is give us

14 notice and the firms will provide the originals.  That seems to

15 me to be the easiest way.

16        The second issue that I think we need to confront

17 -- and that should get most of the -- most of the x-rays to

18 Grace that are outstanding with at least a certification of

19 reliability that the plaintiffs have sent it out for copying,

20 and they've requested that the copy by equivalent to the

21 original.

22        The second instance is where the plaintiffs don't

23 have access to the original x-rays and there would -- some

24 third party or third party repository where we're having

25 difficulty getting that -- getting that without fees and

1 administrative fees.  And I think that it's clear that Grace,

2 number one, pay for those.

3          And number two, we then get those documents and we

4 send them out for copies.  We request that the copies be

5 substantially or equivalent to the originals.  And Grace has

6 its evidence of this -- it wants to rely on.  And to the extent

7 they want to -- they want to look at originals at any one firm

8 at any time, they just send us notice, like the order

9 contemplated and they make arrangements to view it.  We --

10          THE COURT:  I think -- I think there's one piece

11 that's missing, though, Mr. Esserman.  And that is that the

12 plaintiff firm who have sent the originals out for copying,

13 asking that the copy be a duplicate of the original, an

14 identical copy of the original, will then not somehow -- oh,

15 but they won't be the parties in interest, it will be the ACC.

16 That's the problem.

17          MR. FINCH:  Well, Your Honor, this is Nathan Finch --

18          MR. BERNICK:  Wait, wait, wait.

19          MR. FINCH:  Actually, I was going to say, you might

20 agree with me.

21          THE COURT:  Go ahead, Mr. Finch.

22          MR. FINCH:  I'm sorry, Your Honor.

23          THE COURT:  Mr. Finch, go ahead.

24          MR. FINCH:  I was going to say, I believe the ACC

25 would be able to live with the kind of certification for

1  example that the Wartnick firm provided, which is that we have

2  no reason to believe that this copy is not identical at all

3  with material respect to the original.  But we're not doctors

4  and we can't -- we can't, you know, make the certification that

5  the Court requires.  That is something that I think I would not

6  -- the ACC would not challenge.

7         It's a situation where people have an original and

8  they can't get even a minimally acceptable copy.  And that's

9  where sort of the rubber hits the road, I guess what Mr.

10  Bernick was seeking to address.  And there I think we would

11  have to be in a position to go and look at the originals as

12  opposed to a copy that no nobody would even say, you know, we

13  the law firm think is identical or at least is, we have no

14  reason to believe that it's not identical to the original.

15         MR. BERNICK:  But why -- let me -- let me --

16         THE COURT:  Pardon me.  Pardon me.

17         MR. BERNICK:  Okay.

18         THE COURT:  If we can get a certification from the

19  firm that they have requested that the copy be an identical

20  copy of the original, and then we can get a certification from

21  the firm that they have received back a copy that they have no

22  reason to believe that it is not a duplicate of the original

23  based on the fact that they sent it out for that purpose, can

24  we then get a stipulation from anybody who is going to appear

25  at the estimation hearing that will indicate that this

1 documents -- or that the copies that were received with those

2 certifications will be treated as the originals for purposes of

3 estimation?  If we can, I think (indiscernible) is done.

4          UNIDENTIFIED ATTORNEY:  I think so, too.

5          MR. ESSERMAN:  And Your Honor, this is Sandy

6 Esserman.  I think that that is something that is also

7 achievable by the law firms and I would think that you could

8 have a third permutation of that.  And that is to the extent

9 either the ACC or the debtor want to view originals that they

10 can -- they have the right to request the law firm to view the

11 originals as -- in the custody of both of the individual law

12 firms.  So, we've got sort of a double protection there.

13          Number one, we've got the certification that you just

14 described.  And number two, to the extent that anyone wants to

15 view the originals on premises so we don't have a custody

16 issue, and we don't have a issue of x-rays getting switched out

17 which you certainly do when you're dealing with 5,000 x-rays.

18 That would solve those problems.

19          MR. BERNICK:  But we wouldn't want that third option

20 because we would -- if the way that this reads out now, is that

21 the originals are sent out for copying and their -- the request

22 is made that the copy center make them identical.  And when

23 they come back pursuant to the request, anybody appearing at

24 the hearing will -- that there will be a stipulation that

25 anybody appearing at the hearing will accept the copies as

1  being identical with the original for the purposes of the

2  estimation.  There won't be any need to look for an original.

3         MR. ESSERMAN:  Well, I'm not appearing at the

4  estimation.  It's really Nate Finch and --

5         MR. BERNICK:  But what -- that's fair.  I understand

6  that.  But whoever it is that's being there, that becomes the

7  key because after the provision to make the originals

8  available, and that becomes an avenue that people have not to

9  enter into the stipulation or not to send the documents out for

10 copying that were back --

11        MR. ESSERMAN:  No, that's not what I said.

12        MR. BERNICK:  I'm not suggesting it is what you said.

13        MR. ESSERMAN:  No.

14        MR. BERNICK:  I'm saying -- I'm saying that I'm

15 concerned that that's what will happen.

16        MR. ESSERMAN:  Well, from the firm standpoint, it's

17 very simple.  I'm willing to live with what the Court suggested

18 which I think is a variation of what I suggested.  And forget

19 my permutation.  I would -- I was basically trying to be

20 helpful so the debtor and the ACC -- create the problem.  We

21 just as soon -- we'll make our copies.  We'll do everything at

22 Grace's expense.  We'll get that certification that says we

23 requested that they be identical, that we have no reason to

24 believe that what we got back is not a duplicate of the

25 original.  And we'll send them -- we'll send them off to Grace

1  for the -- for Grace and the ACC to inspect that.

2          From the firm -- from the firms that I represent,

3  from our perspective, that is not a problem.

4          THE COURT:  Ms. Ramsey?

5          MS. RAMSEY:  Your Honor, I have one other permutation

6  that I'm aware of, and there could be others, I'm told that in

7  some instances, the law firms have copies.  And those copies

8  are for all practical purposes the original because the

9  hospital that has possession of the original has destroyed the

10 original.  And that when a copy is made of a copy of an x-ray,

11 that is almost never in that circumstance is as good as the

12 original copy or the original.

13         And so in that circumstance, what I guess I want to

14 throw that out because the firms are then in a position of I

15 guess either being forced to stipulate that an inexact copy is

16 good enough.  Or they're going to be forced to relinquish

17 custody control --

18         MR. ESSERMAN:  Well this is only for exploration

19 though.

20         MS. RAMSEY:  -- original evidence.

21         THE COURT:  Ms. --

22         MR. ESSERMAN:  This is only for estimation.  This is

23 not for -- this is not individual claims litigation.

24         MS. RAMSEY:  Understood.

25         THE COURT:  But Ms. Ramsey, how many firms, how many

1 x-rays are we talking about in that category, do you know?

2          MS. RAMSEY:  I do not know, Your Honor.  I believe

3 that this is the case with the -- for instance the Paul,

4 Hanley, Harley firm, I believe that is their circumstance with

5 that -- with respect to that particular firm, they were

6 prepared to work with the debtor to, you know, relinquish

7 control of their original copies.  But I know that there are a

8 couple of other firms that have -- have that situation with

9 respect to limited cases, not their entire client list.

10          And I don't know what the number of the those

11 additional situations are.  And in some instances, the firms

12 are reluctant and don't wish to relinquish control of what is

13 essentially their original evidence.

14          THE COURT:  Well, I think the debtor is going to have

15 to make a choice.  If the debtor can work out a deal with the

16 particular firm to get a temporary, you know, exchange or

17 release of custody, to look at those x-rays, fine.  Or go look

18 at them on site, fine.  Or else take them out of the data base.

19 I mean, you know, I don't think one order is going to solve all

20 these problems.  It just isn't.  So --

21          MR. BERNICK:  As a practical matter, here -- is that

22 Nate?

23          MR. FINCH:  Yes, I --

24          MR. BERNICK:  Go ahead, I was going to ask you a

25 question, but go ahead.

1          MR. FINCH:  I think it sort of falls into two camps.

2 I can't speak for the Future Claimants Representative who I

3 understand is on the phone.

4          UNIDENTIFIED ATTORNEY:  I am.

5          MR. FINCH:  But the ACC, I believe would be -- would

6 be willing to live with an order or stipulation that says, if a

7 claimant law firm has either originals or copies of originals

8 of x-rays, and sends those out for copying and then sends in

9 the copy to the debtor with a certification that says, we have

10 asked a copying facility to make an identical copy of the x-ray

11 that we have in our possession, and we have no reason to

12 believe that the x-ray is not identical in all material

13 respects to the copy that we have in our possession, then the

14 ACC is not going to go behind that and challenge that for

15 purposes of the estimation hearing.

16          However, if for whatever reason that certification

17 isn't able to be made, I mean, some people may not be able to

18 have access to the type of high quality x-ray scanning facility

19 that could -- that you could in good faith or in good

20 conscience say that the copy is identical in all -- you know,

21 we have no reason to believe that the copy isn't the same as

22 the original.  Then I do think that -- there has to be a

23 separate provision for that would effectively say that -- in

24 that case, people would know that they would have to go look at

25 both the original/copy, whatever happens to be in the

1  possession of the firm.

2          And if it means that, you know, out of the 5,000 that

3  1,000 of them drop out, then, you know?

4          MR. BERNICK:  Well, it won't be -- go ahead, I'm

5  sorry.

6          THE COURT:  Okay, who's representing the FCR?

7          MR. MULLADY:  This is Raymond Mullady, Your Honor

8  representing the Future Claimants Representatives.

9          THE COURT:  Yes, sir.

10          MR. MULLADY:  Our position on this is that the

11  majority of this compromise that's being discussed is

12  acceptable.  The only reservation that we have is, we don't

13  believe we can nor should we be required to stipulate in the

14  blind that copies are the equivalent of originals without the

15  ability to be able to look at originals in the event that in

16  the course of discovery, the debtor's experts -- or experts for

17  any other adverse party -- make a statement about findings from

18  a copy where an original exists that -- which opinion does not

19  seem to comport with reality of the x-ray or what we would

20  anticipate would be shown in the original.  We don't want to

21  -- nor do we believe we should be compelled to agree to

22  stipulate or waive our right to have our experts look at that

23  original.

24          THE COURT:  Okay.

25          MR. BERNICK:  Well, that's fine.  But then -- but

1 then, it seems to me that the exception that you've created

2 -- would then mean that you would go look for the original and

3 we would look for the original when we don't have access to the

4 original.

5          MR. MULLADY:  -- it fall legally on all  parties --

6          MR. BERNICK:  Yes.

7          MR. MULLADY:  -- to use the originals for that

8 purpose if they deem that they need to do that to protect their

9 client's rights.  That's our view.

10          MR. BERNICK:  Okay, well, so concretely --

11 concretely, the procedure would be that by a certain date

12 presumably we can agree to, the law firms will furnish copies

13 that they believe to be identical copies that -- with that

14 -- for purposes of the estimation, that the FCR and the ACC

15 will agree that to the extent that the different firms have

16 said that -- by that I mean, putting the language that was in

17 the Wartnick letter, they don't have reason to believe that

18 they are not identical.

19          If the ACC and the FCR will agree for purposes of the

20 estimation, the copies will be treated as identical.  However

21 if at any time, either the ACC or the FCR believe in the course

22 of expert discovery that they would like to have access to the

23 originals for purposes of testing that proposition, at that

24 point, everybody will then have access to the originals and

25 whatever comes from that, comes of that.  That way, really, I

1 hope it will be in fact the exception and in a sense the burden

2 of its being made to the exception falls equally on all sides.

3         MR. MULLADY:  And I would just add, Mr. Bernick, that

4 -- we would also want that order to say that we would not be

5 precluded from drawing a distinction between the original and

6 the copy, notwithstanding the certification that there's no

7 reason to believe that there's a distinction.

8         MR. BERNICK:  Well --

9         THE COURT:  That circumstance, you're talking about

10 if -- it's -- basically what you're saying is, if some report

11 now comes in that so far different from the original report

12 based on the original x-ray viewing that you've got some

13 question about it, you want the rights to go back and look at

14 the original.  And I think all parties probably want that

15 right.

16         MR. MULLADY:  That's correct, Your Honor.

17         MR. BERNICK:  Well, wait, Your Honor.  Just be -- I'm

18 not sure that any of this may actually work.  Just to be very

19 clear, we expect that there is going to be a dramatic

20 difference because the whole difference is having one reader

21 who looks at it versus other readers -- that is, more than one

22 reader look at it, and the relationship that exists between the

23 first reader in the law firm.  It's not -- we expect that there

24 is going to be a very significant difference.

25         Now, the question -- what we want to eliminate is any

1 argument that the difference is due to the copying process.

2 That's all that we're doing is trying to eliminate that.  And

3 we're prepared to work with, you know, all that we've talked

4 about so far and in deed Mr. Mullady's concern that he'll want

5 to test out what it is that our experts do.  But then you have

6 to be -- unless -- it's not driven by whether the statistics or

7 the results turn out to be different.  It has to be driven by

8 -- and in some sense that the copy really is not a good copy.

9 But --

10            THE COURT:  Well, that's fine.  And if it turns out

11 not to be a good copy, he wants the right to be able to use the

12 original --

13            MR. BERNICK:  But --

14            THE COURT:  -- notwithstanding the stipulation, I

15 think --

16            MR. BERNICK:  Sure.

17            THE COURT:  -- he's got that right, too.

18            MR. BERNICK:  Sure, but then it really has -- the

19 difficulty.  If we then go through the process, let's say that

20 -- let's say that there is a difference in the thousand he

21 reads, then presumably, we're going to look at 1,000 original

22 x-rays.  That is going to take a significant period of time.

23 What we can't do is be in the position where ultimately the

24 fact of copying -- the fact that their being a copy is made

25 into a substantive reason for rejecting the testimony and the

1  opinion of our expert.  And we don't have the ability to

2  address that.

3          THE COURT:  You do have the ability because you have

4  the same right to go back at the original.  If they test it,

5  then you can test it.

6          MR. BERNICK:  I understand that.  That is -- that is

7  -- what we want to eliminate is anything that says that

8  somebody at the time of estimation can come back and say, well,

9  because I have not had the opportunity to look at each and

10 everyone of the originals that I want to look at, then I'm no

11 longer going to be prepared to stand by the stipulation.

12         THE COURT:  No, I'm talking about the particular

13 originals that somebody goes to look at -- if someone goes to

14 look at an original --

15         MR. BERNICK:  Right.

16         THE COURT:  -- and that original turns out to be far

17 different from the copy --

18         MR. BERNICK:  Right.

19         THE COURT:  -- then notwithstanding the stipulation

20 as to that particular x-ray, you can use the original and not

21 the copy.

22         MR. BERNICK:  And both sides will have access to it,

23 yes.

24         THE COURT:  Right.

25         MR. BERNICK:  I've no -- I've on quarrel with that.

1          THE COURT:  Okay.  Then that's the issue.  It's not a

2  way around the entire stipulation.  Mr. Mullady, you're not

3  suggesting that's a way around the entire stipulation.

4          MR. MULLADY:  Of course not, Your Honor.  We would

5  envision this to be the rare circumstance where there's a

6  genuine issue presented as to whether an accurate

7  interpretation has been made on a copy of an x-ray for reasons

8  that events that the copy being viewed is not representative of

9  what must have been in the original when the report was made.

10 This would be -- in our estimation, the extraordinarily rare

11 circumstance.

12         And this is only -- I should make myself very clear

13 on this.  This is only to protect against the erosion of our

14 due process right to assert a position add to a particular

15 interpretation of a film in the absence of any finding by this

16 Court to date, and I've heard none on this call, that there has

17 been a violation of this order of December 22, 2006.

18         And we would -- we would have a strong due process

19 objection and a point for appeal I would respectfully submit if

20 an order were made without a finding of a violation of a

21 discovery order that effectively sanctions the Future Claimants

22 Representative from being able to or preclude it from making an

23 argument that he otherwise would be entitled to make.  And I

24 would respectfully submit that that is the issue that I'm

25 making this point on, again, noting that we would anticipate it

**J&J COURT TRANSCRIBERS, INC.**

1  being the rare circumstance.

2         MR. BERNICK:  Let me try to -- I'm not going to

3  respond to that, but --

4         THE COURT:  Can we cut through this because --

5         MR. BERNICK:  Yes, well --

6         UNIDENTIFIED ATTORNEY:  Your Honor?

7         MR. BERNICK:  But there's one -- there is one part

8  that I don't think that we've addressed -- nailed it down.  And

9  that is going back to Natalie's situation where she's got a

10 firm that has -- that says, I've got the original or I've got a

11 copy.  There is no copy that is going to be as good as this.

12 And that's just it.  I'm not going to -- I'm not going to say

13 that I -- I'm not going to make the statement that appears in

14 the Wartnick letter that I --

15        THE COURT:  Then you have to go look at that.

16        MR. BERNICK:  Well, if that point --

17        THE COURT:  Or take them out of the data base.

18        MR. BERNICK:  Well, no, you can't take it out of the

19 data base.

20        THE COURT:  Well.

21        MR. BERNICK:  Then you have selection bias.  That

22 anybody -- we don't know why they're doing it.  We don't know

23 whether it's strategic or not.  I mean you certainly can't have

24 -- it's not a representative event.  It is the events that

25 arises by virtue of circumstances that are non-random.

1        It would be clear selection bias, probably, you just
2  can't move forward with that kind of situation.  What we would
3  say in those circumstances, is that it's at least there.  Those
4  people who are not prepared to say -- to say what this -- and
5  therefore -- we wouldn't be able to trigger the undertaking of
6  both the FCR and the ACC and counsel on this call.  And that
7  narrow circumstance, either that copy or that original should
8  be forwarded to the custody of the Court because there's no
9  other way to proceed.

10        MS. RAMSEY:  Your Honor, may --

11        THE COURT:  You can go look -- yes, you can go look
12  at them.

13        MR. BERNICK:  But, Your Honor says there is no --

14        THE COURT:  Mr. Bernick --

15        MR. BERNICK:  -- there's no incentive, that any --

16        THE COURT:  Mr. Bernick, you need to get a handle on
17  how many there are.  You've submitted I don't know how many
18  pages, probably 40 or 50 pages of exhibits today indicating how
19  many x-rays have already come in and how many have not.

20        MR. BERNICK:  I know -- I know what the answer is,
21  Your Honor, it's a very -- the number of people who have
22  actually given us the certification is a total of 704 claimants
23  out of 5,000.

24        THE COURT:  But that doesn't mean that they're going
25  to say -- that of those, the rest, that they're going to say

1 that the hospital has destroyed the original and they only have

2 a copy.

3          MR. BERNICK:  Well, no, I've got 17 law firms that

4 have sent in x-rays, but have not submitted certification.

5 That's 910 claimants.

6          THE COURT:  I understand.  But Ms. -- if I am -- Ms.

7 Ramsey, maybe I should let you address this.  My -- I

8 understood that you were talking about the circumstance where

9 the firm had a copy, the hospital had destroyed the original,

10 and so the copy was at this point, all that was left?

11          MS. RAMSEY:  That's correct.  Your Honor, moreover, I

12 wanted just to reiterate for the record, with respect to a

13 number of issues that have been identified during today's call,

14 the clients that I represent are prepared to work with the

15 debtor.  I'm not saying that in every circumstance, we'll reach

16 an accommodation, but I believe in many of them, we will if the

17 debtor contacted us.

18          For example, with respect to the Wartnick firm, the

19 Wartnick firm went very far to try to get the debtor the

20 comfort it wanted, but it wasn't able to make the precise

21 certification.

22          UNIDENTIFIED ATTORNEY:  Yes.

23          MS. RAMSEY:  At the end of that letter, the Wartnick

24 firm specifically said, if you have any concerns about the

25 certification, please let us know.  With respect to Paul,

1  Hanley, Harley who appear on the list of those who have not

2  provided a certification, as I've indicated, there's a reason

3  for that that I've articulated.  And that firm is prepared to

4  work with the debtor.

5       Maybe what makes most sense to me at least is that

6  the debtor engage in a dialogue with the law firm and to the

7  extent that there are problems that we then identify those

8  problems and let the Court work them out.

9       MR. BERNICK:  I'm happy to do that.  That's what I

10  was going to get to is that it seems to me that this week we

11  have to have a follow up call with the people who are on this

12  call to hammer out the details of how this is going to occur

13  and when it's going to occur.

14       All that I'm saying, Your Honor, is that I take at

15  face value when Natalie says that her clients are prepared to

16  work this out.  I take that at face value.  I know Natalie.  I

17  think that will happen.  I don't know the same thing will

18  happen with respect to many of these other firms, I just don't

19  know.  We're prepared to go down the road to check and try it

20  out.

21       But our history here says that the exception can't

22  swallow the rule.  That's what we want to avoid.  All that I'm

23  saying is that with respect to the situation where we just

24  can't get access to the originals of the -- by sending three

25  people around the country to pick our pockets, at that point, I

1  think my client is entitled to resort to what would be a very

2  exceptional circumstance we owe, that they have the documents

3  or have the originals deposited with the Court.

4          I hope we don't have to do that at all.  But I don't

5  want to have this call end with somehow the notion that this

6  then comes up to each individual firm to tell us what they're

7  prepared to do because I think a lot of these firms will not

8  treat this the same way that perhaps the Wartnick does, and

9  will say, to hell with them.

10         THE COURT:  Well, I don't know that I'm prepared to

11 address that until I find out who gives you a certification

12 that in fact the original has been destroyed because that's the

13 only -- at least the only one I can think of now -- reason why

14 a copy of an original can't be produced.

15         MR. CANDON:  Your Honor?

16         THE COURT:  Yes.

17         MR. CANDON:  Chris Candon for the Libby claimants.

18         THE COURT:  Yes.

19         MR. CANDON:  And that is actually the scenario that

20 we're working we're faced with right now.  That we do actually

21 have an original, but the doctor is not willing to state that

22 the original can be duplicated to the point of it being an

23 exact duplicate.

24         THE COURT:  Well --

25         MR. CANDON:  So, in that scenario, there are seven

1 claimants. And we said, you know, if we can get these on

2 digital, we'll give them to Grace. And I think that that's --

3          MR. BERNICK: I think that's fine.

4          MR. CANDON: -- to Grace. But if we can't put it on

5 a digital, then they have to come to Montana.

6          MR. BERNICK: Well, then we'll --

7          MR. CANDON: And which you already have people there.

8 So --

9          MR. BERNICK: For seven -- for seven people, I don't

10 think we should take up more time on this call. The Libby

11 situation actually is a special situation because they claim

12 there's some kind of special disease.

13          But Your Honor has said, let's try to work it out and

14 see how many people really are the exception. We're prepared

15 to do that.

16          THE COURT: Mr. Candon --

17          MR. CANDON: Okay, well, if that's the case, if

18 that's it, then I'm willing to work with, you know, Grace on

19 that situation. I just wanted to say because I think we are a

20 little bit different from what was being stated on the call.

21          THE COURT: Well, but I think in your circumstance,

22 you do have an original, so it can be copied. The only issue

23 is, you would then be in the position of being one of those

24 firms who would say, I certify that I asked that a duplicate

25 copy of the original be made. And then when you get it back,

1 certify that in fact, you have back the copy that you asked to

2 be an -- to be a duplicate of the original and that that's what

3 you're sending to Grace that you have no reason to believe that

4 it's not a duplicate.

5       MR. CANDON:  We have no reason to believe that it's

6 as good as the original because we have been told by the

7 doctor.

8       THE COURT:  Not as good as the -- well, okay.  I

9 guess --

10       MR. CANDON:  There's a distinction there.

11       THE COURT:  -- the original.

12       MR. CANDON:  Yes, the distinction that the Ward Black

13 is different than that firm.

14       THE COURT:  Okay, well, I think in those couple of

15 cases, maybe you are going to have to try to work something out

16 with both the debtor and the ACC and the FCR to make sure that

17 all of them are on board with whatever the certification is

18 because --

19       MR. CANDON:  That's fine.  I just wanted to make sure

20 that at least --

21       MR. BERNICK:  We'll try to work that out.  What I

22 -- I think that Your Honor -- I don't want to seem presumptuous

23 here -- I think that we probably have enough to have this

24 follow up call.  I think it's important though if Your Honor

25 can express the desire to have that done this week so that we

1  know where things are.  And the people who come on to the call,

2  pretty knowledgeable about what their constituent firms are

3  -- what the firms that they're representing, what their view is

4  going to be about this so that we can come out of that call

5  with some notion of, you know, do we really have a continuing

6  problem or not?

7          I think that -- I guess to put it simply, I think

8  we've probably gone as far today as we can go.  And I think we

9  ought to have a follow up call to see if we could reduce it to

10  writing.

11          MR. FINCH:  Your Honor, this is Nathan Finch from

12  Caplin and Drysdale for the Asbestos Claimants Committee.  I

13  agree with that.  I would, I guess, ask for a recognition that

14  sometimes the perfect is the enemy of the good.  If I

15  understand the figures here, the debtor already has 1,600

16  x-rays, people have either sent in with a certification or

17  without a certification, but the people that have sent it in

18  believe that, you know, the copy was -- is good as what they

19  had in their files.  And then apparently there's another 1,296

20  in the Angelos firm which I understand from what Mr. Esserman

21  said, they were trying to work out some kind of a certification

22  language but that it wasn't acceptable to Grace, but they're

23  willing to submit the copies.  That gets you, you know, to well

24  over half of the 5,300 --

25          MR. BERNICK:  I understand that, but that's not

1  -- what I'm saying is the gross number, 25, 30, 50, it's

2  -- that doesn't mean anything to people who are operating on

3  the basis of offering an expert opinion based upon

4  statistically sound samples.  Either have a statistically sound

5  sample or you have the total population or something that comes

6  pretty close to it.

7        We for a variety of reasons because of the small

8  numbers that we have with some of these firms, felt that we

9  could not do a statistically significant sampling.  We did not

10 do a statistically significant sampling.  And therefore, you've

11 got to go with the whole.  That's very, very important.  You

12 can't say, well, gee, it looks like it's kind of a lot of

13 people; therefore, it's sound.  It doesn't work that way.

14        MR. FINCH:  Well, there's nothing --

15        THE COURT:  That's okay.  If they want them all,

16 we're going to do the best we can to get them all or as close

17 to all as possible.  When originals don't exist, if there are

18 copies, and they want copies of copies, we'll try to get them.

19 If they want to go look at the copies because someone won't say

20 that a copy of a copy is good enough, they have the right to go

21 look at the copies.

22        I think you folks certainly -- I hope you folks can

23 try to work this out.  You're all going to have the same

24 discovery problem.  So, at some point, you really do need to

25 work this issue out.  If you're all going to want to see the

1  original -- when I say original in this instance, where the

2  originals are destroyed, all that exists is the copy -- if the

3  certifications come back saying the copy of that copy just

4  isn't worth the paper it's printed on, you're all going to want

5  to see them.  So, why don't you see if you can't figure out a

6  method that's going to facilitate all of your looking at them

7  rather than hampering them because that is going to be

8  necessary.  You're all going to want to look at them.

9         So, you know, something that protects the chain of

10 custody makes the law firms who have the custody of those

11 x-rays feel comfortable that it isn't going to be a big mixup

12 and you know some kind of traffic jam somewhere down the road,

13 is necessary.  If it means putting them into the custody of the

14 Court for a while, fine.  If you can put them in a repository

15 that everyone agrees to, fine.  If it means that you have to go

16 look at them in the law firm premises, you know, fine.  I don't

17 think (indiscernible) if that's the way it has to be, then

18 that's the way it has to be.

19         But why don't you folks have a call this week that's

20 not a request.  That's an order.  But during that call, see if

21 you can't work out that specific detail as well as language for

22 this order.  I'm not making findings in response, Mr. Mullady,

23 to your comment.  I'm not making findings that there was any

24 violation of the prior order.  But it does seem to me that the

25 prior order could be tweaked a little bit to make it more -- I

1 guess more readily workable for all parties concerned,

2 including the law firms who are trying to comply with the

3 order, but for whatever reason, compliance just isn't as easy

4 as everyone thought it would be.  So, for purposes of ease of

5 convenience of all parties including the debtor, the ACC, the

6 FCR, and the law firm, I think it may be advisable to modify

7 this order.  So, why don't you all sit down this week, see if

8 you can come up with acceptable language.

9          Mr. Bernick or Ms. Baer, perhaps one of you can call

10 Pittsburgh chambers.  See if you can set up a time for a

11 continued status call next week with me.  Unless you can submit

12 an agreed upon order on a certification of counsel on say the

13 day before whatever that call will be.

14          So, give yourselves a week perhaps to work out an

15 agreed order.  Set up a conference call the day or so after

16 that.  And in the event that a certified -- a certification

17 comes in, we won't need the call.  If a certification doesn't

18 come in, then we'll see where you stand.

19          MR. FINCH:  Your Honor, may I suggest that while we

20 have the people on the call, we try to work out a time when

21 people are available this week to do the (indiscernible)

22 involved call if Your Honor would indulge us with letting us

23 use your --

24          MONA:  Judge, this is Mona, Your Honor.

25          THE COURT:  Yes.

1          MONA:  There is a hearing set for February 14 on the

2    Foster and Sear matter so, if you want put a continued hearing

3    on this on that same date and time --

4          THE COURT:  What time is it, Mona?

5          MONA:  It's February 14th.  I believe it's at ten in

6    the morning by phone.

7          THE COURT:  How's that -- then we'll do this?

8          MR. FINCH:  I have the following suggestion to throw

9    out.  I have a lot of things going on this week.  The only time

10   I'm absolutely not available is after six p.m. tomorrow night.

11   So, I would have a suggestion that we try to have a call with

12   the people who are on the phone now, say Wednesday, and have

13   the debtor circulate a court order/stipulation maybe by close

14   of business tomorrow for people to look at in advance of the

15   Wednesday afternoon call.

16         MS. RAMSEY:  This is Natalie Ramsey.  I'm available

17   with the afternoon.

18         MR. BERNICK:  Yes, I could probably do the same, as

19   well.  That's fine.  We'll work out --

20         MR. FINCH:  Sandy, are you available Wednesday

21   afternoon, since you're the lawyer that probably represents the

22   most claimants in this?

23         THE COURT:  Did we loose parties?

24         MR. ESSERMAN:  Hello, hello.  I'm just thinking.

25         THE COURT:  Oh, sorry, I couldn't hear you.

1          MR. ESSERMAN:  I had you on mute, I'm sorry.  I'm

2 available late on Wednesday probably three o'clock central,

3 four o'clock eastern?

4          MR. FINCH:  Why don't we try to reconvene four

5 o'clock central -- excuse me, four o'clock eastern time.

6          MR. BERNICK:  Okay.  If Your Honor -- it would be all

7 right with us at least if you wanted to have an update on this

8 on the 14th.

9          THE COURT:  That's fine.  Why don't we continue this

10 matter to February 14th at ten.  Though I have the Foster and

11 Sear argument scheduled at ten, so we'll do this as soon as

12 that argument is over?

13          MR. ESSERMAN:  And Your Honor, just so you know from

14 a time perspective -- this is Sandy Esserman speaking -- my

15 guess is that the Foster and Sear matter will take five or ten

16 minutes that I suspect whereby they will be in full compliance

17 by the time of that hearing.

18          THE COURT:  Okay.  Well, if that's the case, that's

19 good.  Then everyone just call in as though for a ten o'clock

20 hearing and I'll get to it as close to ten as I can.

21          MR. FINCH:  Just so, we're clear, the debtor will

22 circulate a dial-in number for four p.m. eastern time call on

23 Wednesday.

24          And could -- David Bernick, is it possible for you to

25 circulate a proposed stipulation/order based on what we talked

1  about by the close of business, Chicago time, tomorrow so we

2  could have something to look at?

3          MR. BERNICK:  Well, I think it's always possible.

4  I'm going to be from L.A. --

5          MR. FINCH:  Possible or reasonably practical?

6          MR. BERNICK:  Yes, I'm going to be taking the red eye

7  this evening.  So, it depends on when I can climb out of bed

8  tomorrow and what Barbara Harding is doing.  But we will

9  endeavor to do that.

10          MR. ESSERMAN:  Okay.  And one other thing before I

11  leave.  I just want to correct the record on the Angelos

12  situation.  The Angelos situation was that the x-rays were at a

13  hospital and the hospital had some administrative charges that

14  needed to be paid.  It's my understanding that Grace will pay

15  those administrative charges.  And that will solve the x-ray

16  --there should not be a problem getting a -- copies made with

17  the appropriate certification.

18          MR. BERNICK:  I don't know what the administrative

19  charges are, but that's certainly something that we can talk

20  about.

21          MR. ESSERMAN:  Well, they're third party charges.

22          MR. BERNICK:  I don't know what they are.  There's no

23  point in talking about that now.  We'll just take that up when

24  we talk on Wednesday.

25          MR. ESSERMAN:  That's fine.


                    **J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  Okay, folks, are we finished then for

2   today?

3          MR. BERNICK:  Yes, thank you very much.

4          UNIDENTIFIED ATTORNEY:  Thank you, Your Honor.

5          THE COURT:  Adjourned.

6          UNIDENTIFIED ATTORNEY:  Thank you.

7                         * * * * *

8

9                    **C E R T I F I C A T I O N**

10          I, Vidhya Veerappan, court approved transcriber,

11   certify that the foregoing is a correct transcript from the

12   official electronic sound recording of the proceedings in the

13   above-entitled matter, and to the best of my ability.

14

15   /s/ Vidhya Veerappan          DATE:  February 12, 2007

16   VIDHYA VEERAPPAN

17   J&J COURT TRANSCRIBERS, INC.

18

19

20

21

22

23

24

25