**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| In re: | Chapter 11 |
|  | Case No. 01-1139 (JKF) |
| W.R. GRACE & CO., <u>et al.</u>, | (Jointly Administered) |
|  |  |
| Debtors. | Related Docket Nos. 12858, 14079 |
|  | Hearing Date: February 26, 2007 @ 2:00 p.m. |

**STATUS REPORT REGARDING THE ESTIMATION**
**OF ASBESTOS PERSONAL INJURY LIABILITIES**

David T. Austern, the Court-appointed legal representative for future asbestos personal injury claimants (the "FCR"), and the Official Committee of Asbestos Personal Injury Claimants (the "ACC") respectfully submit this Report in advance of the February 26, 2007 omnibus hearing to update the Court on the status of the impending estimation of W.R. Grace & Co., <u>et al.</u>'s (collectively, the "Debtors") asbestos personal injury liabilities (the "PI Estimation") and on the Debtors' intention to "take up at the [February] omnibus [hearing] . . . a proposal for shifting some of the pretrial dates" set by the PI CMO.[1] Jan. 23, 2007 Hr'g Tr., Dkt. No. 14465, p.85, lines 3-4.

    **A.**    **The Amended Case Management Orders For The PI Estimation**

As the Court may recall, the PI CMO has been amended numerous times at the Debtors' request in order to extend the deadlines for claimants to respond to the Personal Injury Questionnaires (the "Questionnaires"), for the Debtors' claims agent, Rust Consulting, to compile the Questionnaire responses into a navigable database, for experts to submit estimation and non-estimation reports, and for the completion of all discovery.

---

[1] The "PI CMO" refers collectively to the Amended Case Management Order For The Estimation Of Asbestos Personal Injury Liabilities, entered July 25, 2006 (Dkt. No. 12858) and the Order Regarding Amended Case Management Order For The Estimation Of Asbestos Personal Injury Liabilities, entered December 20, 2006 (Dkt. No. 14079).

{D0080638.1 }

<u>See</u> Dkt. Nos. 9301, 11697, 11885, 12151, 12314, 12858, 13354 and 14079.  As recently as December 20, 2006, the following deadlines were agreed to by the parties and approved by the Court:

> **March 2, 2007:**  Deadline for the Debtors' claims agent, Rust Consulting, to produce a navigable database containing the responses and supplemental responses to the Questionnaire
>
> **March 16, 2007:**  Deadline to submit expert reports related to the number, amount, and value of present and future asbestos claims (the "Estimation Expert Reports")
>
> **March 30, 2007:**  Deadline to submit supplemental or rebuttal expert reports on matters other than the number, amount, and value of present and future asbestos claims ("Supplemental/Rebuttal Non-Estimation Expert Reports")
>
> **April 27, 2007:**  Deadline to submit supplemental or rebuttal expert reports related to the number, amount, and value of present and future asbestos claims ("Supplemental/Rebuttal Estimation Expert Reports")
>
> **May 2007:**  Final pre-trial conference
>
> **June 1, 2007:**  Deadline to complete all written and deposition discovery
>
> **June 13, 2007:**  PI Estimation hearing begins – hearing on <u>Daubert</u> motions
>
> **June 14, 15, 18-21, 26-29, July 30, 31, August 1, 2007:**
> PI Estimation hearing continues

<u>See</u> Dkt. Nos. 12858, 14079; July 24, 2006 Hr.'g Tr., Dkt. No. 12919, pp. 72-75.  The parties recognize that this schedule puts them on a tight time frame, particularly between the April 27, 2007 deadline to produce Supplemental/Rebuttal Estimation Expert Reports and the June 1, 2007 discovery cut-off date.  During that time period, the FCR and ACC have just twenty-five (25) business days to depose the Debtors' myriad fact and expert witnesses (the Debtors have listed over 20 experts), and to defend their own expert depositions (at least 7 experts).  Despite this compressed schedule, the FCR, the ACC and

the Court have committed to beginning the PI Estimation hearing on June 13, 2007.

During the July 24, 2006 omnibus hearing when the Court entered an earlier iteration of the PI CMO and set dates for the PI Estimation hearing, the Court warned:

> THE COURT: . . . The problem is going to be that when I commit three weeks of my schedule, there is not going to be any change, not for reason of births, deaths, marriages, vacations, nothing. That is going to be the trial. People will change their schedules if need be. That's it. So, there will not be a change.
>
> MR. BERNICK: That's fine. That's the intent.

July 24, 2006 Hr'g Tr., Dkt. No. 12919, p. 73, lines 1-7. The Court further cautioned that:

> . . . Frankly, you can change all deadlines except that the date that the stipulations - - the pretrials are due, the final pretrial conference and the trial dates. I will not permit those to be changed because I need those as well. So, I'll add [to the PI CMO], "the deadlines specified herein except the dates to file pretrial stipulations, the date of the final pretrial conference and the trial dates" can be extended by all of you by asking anything of the Court.

Id. at p. 74, lines 18-25. And again when the Court informed the parties that the PI Estimation hearing would commence on June 13, 2007 and continue throughout June, the Court received no response or objections when it asked: "Anybody have an objection? This is a speak now or forever hold your peace deal." Id. at p. 75, lines 21-22.

Despite the Court's clear statements, the Debtors have indicated, as they foreshadowed during the January 23, 2007 omnibus hearing, that they intend to "take up at the [February] omnibus [hearing] . . . a proposal for shifting some of the pretrial dates" set by the PI CMO.[2] See Jan. 23, 2007 Hr'g Tr., Dkt. No. 14465, p. 85, lines 3-4. But any adjustment in the pretrial deadlines would make it almost impossible for the parties

---

[2] Despite repeated requests, the Debtors have not provided the FCR or the ACC with their proposal for shifting the pretrial dates.

to complete their discovery in time for the June PI Estimation hearing and, as the FCR and ACC suspect is the Debtors' real intention, would have the intended consequence of delaying the start of the June PI Estimation hearing.[3]

### B. The Questionnaire Process, the X-Ray Order and the Debtors' Ongoing Discovery Efforts

The Court said it best more than a year ago when it recognized that "[t]his is the only case in which the parties are this contentious and it's largely because the Debtor is taking the track where it wants to litigate everything." Nov. 14, 2005 Hr'g Tr., Dkt. No. 11563, p. 143, lines 20-23. With that statement in mind, the FCR and ACC wish to update the Court on the Debtors' ongoing discovery efforts.

#### 1. *The Questionnaire Process*

As the Court may recall, in late 2005, the Debtors reported that they mailed approximately 116,000 Questionnaires to asbestos personal injury claimants (or their lawyers) who have unresolved pre-petition asbestos-related personal injury or wrongful death claims pending against the Debtors. The parties set July 12, 2006 as the return date for the Questionnaires. See Dkt. No. 12858. Numerous motions to compel were filed by the Debtors and ultimately the parties agreed to submit supplemental responses to the Questionnaires by January 12, 2007. See Dkt. No. 14079.

As of February 2007, over 72,000 Questionnaires have been returned along with an average of forty-nine (49) pages of attachments per Questionnaire for a total of well over 3.5 million pages of documents. The ACC expects that additional supplemental

---

[3] The FCR and ACC have, as the Court requested, cleared their calendars during the month of June for the PI Estimation hearing. The FCR and ACC wish to appraise the Court that if it entertains the Debtors' request to delay the PI Estimation hearing, the first month that the counsel for the FCR and ACC are available to begin the hearing is October 2007.

responses to the Questionnaires will be submitted shortly by several law firms that have requested additional time to submit their documents.

Despite the enormous quantity of data available to the Debtors to date, they have taken the position, by apparently pointing to the universe of unreturned Questionnaires, that the "information . . . necessary for [them] to complete the preparation of the case" is still outstanding and, taken to its logical conclusion, the Debtors need to adjust the pretrial deadlines and, by consequence, the PI Estimation hearing. Jan. 23, 2007 Hr'g Tr., Dkt. No. 11465, p. 85, lines 1-2. But when the Court approved the Questionnaire process over a year ago, the Court made it clear that it did not expect a 100% return rate and that the process was "only ever supposed to be a sample." Nov. 14, 2005 Hr'g Tr., Dkt. No. 11533, p. 140, line 12. Specifically, the Court stated:

> the reason [the Court] permitted the questionnaires was to try to get the – what the Debtor said the Debtor needed for its experts to evaluate in terms of the current mass of claims and it was only ever supposed to be a sample. Nobody ever expected that every claimant was going to answer that questionnaire, at least I certainly didn't. Just like probably not every claimant's going to file a Proof of Claim. There will be entities that will miss bar dates. It happens all of the time. There will be entities that don't respond to the questionnaire.

Nov. 14, 2005 Hr'g Tr., Dkt. No. 11563, p. 140, lines 9-18. Nevertheless, the FCR and ACC understand that the Debtors intend to ask the Court to adjust the pretrial schedule in the PI CMO, presumably to allow for additional time to collect and analyze the Questionnaire responses or perhaps to collect additional "data" the Debtors now deem

important.[4]  Any such adjustment, however, will necessarily delay the June PI Estimation hearing, which the FCR and ACC oppose.

### 2.    *The X-Ray Order*

Without dwelling on the events leading up to or following the entry of the Court's December 22, 2006 Order Regarding X-Ray Evidence, Dkt. No. 14148 (the "December 22 Order"), the Debtors, the ACC, the FCR and counsel for certain plaintiffs' law firms are very close to reaching an agreed stipulation regarding the protocol for the production of chest x-rays of pre-petition asbestos personal injury claimants with non-mesothelioma, malignant claims.  The agreed stipulation provides, among other things, that copies of such x-rays will be produced and/or otherwise available to the Debtors by March 15, 2007.  The parties intend to finalize the agreed stipulation and submit it to the Court shortly.  Putting aside the fact that the Debtors could have requested these x-rays more than a year ago, relevant here is the fact that the parties have now reached agreement and the Debtors will have access to the data they seek by March 15.

### 3.    *The Debtors' Ongoing Discovery Efforts*

In September 2006, when the Court heard argument on the Debtors' motions to compel Questionnaire responses, the Debtors acknowledged that they would "keep the schedule that we are currently on, which is a tight one, for the estimation in June" but indicated that if they did not have "answers [to the Questionnaires], [they would] then

---

[4]  On October 3, 2006, the Debtors submitted fourteen (14) Non-Estimation Expert Reports, which address, among other things, asbestos medicine, exposure levels and epidemiology. The FCR and ACC believe those Reports will be used by the Debtors to examine each Questionnaire on its merits, a method that is, in addition to being extremely time consuming, improper as part of an aggregate estimation of present and future asbestos personal injury claims.  Nevertheless, the Debtors have received a sufficient sample of Questionnaire responses – approximately 72,000 – to proceed with their methodology.

move very, very promptly and ask Your Honor to order [the claimants] to comply." Sept. 11, 2006 Hr'g Tr., Dkt. No. 13283, p. 259, lines 12-15.  As discussed above, the issues surrounding compliance with the Questionnaire have now been resolved, removing the need for any prompt action by the Debtors.  What the Debtors failed to move promptly on, however, was the Court's suggestion, in September 2006, to "subpoena some of this information from the [asbestos claims settlement] trust." Id., lines 18-19.  In response to the Court's suggestion, the following exchange occurred:

> MR. BERNICK:  That is – Your Honor, I can just assume, as you involve a third party in this case, immediately they have their own counsel.  We – to execute a subpoena for trust records, we won't even have the lawyers in this court for three months.
> . . .
>
> It is extremely difficult to get individual information in a reliable fashion.  And then you're going to have to – we have to sit here, this is all – you know – we can spend two hours talking about this and we won't, the claim forms in those trusts are different than the claim forms here.  Supporting information is different.  The requirements are different.  Now, the estimators have access to a lot of that information.
> . . .
>
> THE COURT:  All right.  So they have it already.
>
> MR. BERNICK:  But – no.  It only gives you – no.  No.  It only gives you where you have a trust.  So the Manville Trust, we'll know if they have exposure to Manville product, in some cases if they've submitted a claim.  We'll know if they've got exposure to Eagle [Picher p]roduct in some cases if they have a claim; what the exposure is, how much it was, when it was.

Sept. 11, 2006 Hr'g Tr., Dkt. No. 13283, pp. 259-260.  Despite this exchange in September 2006, on February 2, 2007, the Debtors decided to serve subpoenas on the Manville Trust and the Celotex Trust, and on February 7, 2007, on the claims processing

unit for the Eagle Picher Trust and the UNR Trust. These discovery requests, served just four weeks from the March 16, 2007 deadline for Estimation Expert Reports, on their faces call for practically every document in each trust's respective files. Given this blunderbuss approach, the FCR and ACC have to ask themselves "what's next?" If the Court is going to countenance further extensions of the deadlines in the PI CMO (and as a consequence, the June PI Estimation hearing) every time the Debtors think of additional "last minute" litigation, or conclude that they do not have enough "data," when will this process ever end?

### C.    The Debtors Have Ample Data to Estimate Their Liability

As the Court will recall, in the Debtors' Form 10-K Annual Reports filed with the U.S. Securities and Exchange Commission for the fiscal years ending December 31, 2004 and December 31, 2005, the Debtors represented that the aggregate dollar amount that must be funded on the effective date of their proposed plan of reorganization (the "Funding Amount") was based upon, in pertinent part, the Debtors' evaluation of their liability for existing but unresolved personal injury and property damage claims and "actuarially-based estimates of future personal injury claims." At the January 2007 omnibus hearing, counsel for the Debtors represented the following with respect to the Funding Amount:

> This was an assessment done by counsel working with an expert for purposes of a litigation analysis . . . . Dr. Florence was with ARPC and is in fact one of our experts. He will testify in this case. This is work product from his firm. We worked with him in 2004 in developing this alternative view of the world.

Jan. 23, 2007 Hr'g Tr., Dkt No. 14465, pp. 48-51. This "new ARPC analysis" differed from those previously prepared for the Debtors by ARPC in that it was prepared taking into account the Debtors' supposed "alternative world" liability defenses that the Debtors

seek to assert in the PI Estimation hearing.  Id. at p. 41.  Given that their experts have had their litigation-driven estimation methodology in hand for several years, and now have Questionnaire responses from approximately 72,000 claimants (plus proof of claim forms for the settled claims of an additional 35,000 claimants), the Debtors' experts have ample data to come forward with an estimate of the Debtors' aggregate asbestos personal injury liability.

## CONCLUSION

This bankruptcy has dragged on long enough.  The only way this case will ever be resolved is if the Court holds firm to its June 2007 trial dates for the PI Estimation hearing.

[SIGNATURES FOLLOW ON NEXT PAGE]

Respectfully submitted,

| | |
|---|---|
| ORRICK, HERRINGTON & SUTCLIFFE LLP | CAMPBELL & LEVINE, LLC |
| | |
| */s/Debra Fedler*_____ | */s/Mark Hurford*_____ |
| Roger Frankel | Marla R. Eskin (#2989) |
| Richard H. Wyron | Mark T. Hurford (#3299) |
| Raymond G. Mullady, Jr. | 800 King Street, Suite 300 |
| Debra L. Felder | Wilmington, DE 19801 |
| 3050 K Street, NW | Telephone:  (302) 426-1900 |
| Washington, DC 20007 | |
| Telephone:  (202) 339-8400 | Elihu Inselbuch |
| | CAPLIN & DRYSDALE, CHARTERED |
| John C. Phillips, Jr. (#110) | 375 Park Avenue, 35th Floor |
| PHILLIPS, GOLDMAN & SPENCE, P.A. | New York, NY 10152-3500 |
| 1200 North Broom Street | Telephone:  (212) 319-7125 |
| Wilmington, DE 19806 | |
| Telephone:  (302) 655-4200 | Peter Van N. Lockwood |
| | Nathan D. Finch |
| *Counsel for David T. Austern,* | Jeffrey A. Liesemer |
| *Future Claimants' Representative* | CAPLIN & DRYSDALE, CHARTERED |
| | One Thomas Circle, NW |
| | Washington, DC 20005 |
| | Telephone:  (202) 862-5000 |
| | |
| | *Counsel for the Official Committee of Asbestos Personal Injury Claimants* |

Dated:  February 16, 2007