# EXHIBIT A

## GRAEME MEW

B.A. (HONS), LL.B, FCIARB, BARRISTER AND SOLICITOR

## OPINION ON CANADIAN LIMITATION ISSUES

## I.    INTRODUCTION

### (a)    Scope of Report

I have been asked by counsel representing W. R. Grace and Co. ("Grace") to assist the court by providing my opinion on the operation of the law of limitations in certain Canadian provinces[1] with respect to asbestos property damage claims within those provinces. Specifically, I have been asked to provide an opinion on whether, having regard to the operation of the law of limitations in Canada, the Canadian claims that have been filed against Grace (the "Claims") are time-barred.

I am informed that on April 2, 2001, Grace filed for bankruptcy. For the purposes of this opinion, I have taken that date as the date from which the limitation consequences of Canadian law with respect to the Claims should be viewed. In doing so, I do not preclude the possibility of a court holding that the appropriate date, for limitations purposes, would in fact be a later date than that.

In addition to the opinions set forth in this report, I may also rely on or comment on the publications, opinions, and materials produced in discovery or contained in reports of other experts designated by the claimants or Grace in this action, and I reserve the right to amend or supplement this report as necessary.

---

[1] I understand that the Claims, which are the subject of the "Debtors' Fifteenth Omnibus Objection (Substantive) To Asbestos-Related Property Claims" (the "Objection") are based on allegations of asbestos-related property damage to properties located in various Canadian provinces. I do not propose to offer an opinion on Claims originating out of installations of Grace products in the Province of Québec. Québec civil law is based on a *Civil Code* which is derived from the French Napoleonic Code. All of the other provinces and territories in Canada use a common law system. As my academic and vocational background is in common law systems, I do not consider myself to be qualified to provide an expert opinion on Québec law. Accordingly, this opinion deals with the limitations law implications on the Claims originating out of installations of Grace products in the common law provinces of Alberta, British Columbia, Manitoba, Newfoundland, Nova Scotia, Ontario and Saskatchewan.

# EXHIBIT A

**(b)      Qualifications**

Currently, I am the Office Managing Partner at the law firm of Nicholl Paskell-Mede, which has an office at 390 Bay Street, Suite 612, Toronto, Ontario, M4H 2Y2, Canada. I have practised law since 1984, initially in England and, subsequently, in Canada. For the past 19 years, at Nicholl Paskell-Mede and at other law firms in Toronto, I have served as an advocate, mediator and arbitrator in civil, administrative and criminal litigation with a particular emphasis in insurance law (coverage, defence, primary/excess and reinsurance issues) products liability, personal injury, professional liability, directors' and officers' liability, transportation, business disputes, other contract and tort litigation, sports and entertainment disputes, administrative law and conflict of laws issues. For several years, including 2006, I have been ranked as a Leading Practitioner in Litigation-Commercial Insurance by The Canadian Legal Lexpert Directory. (Attached hereto as Exhibit "A" is a copy of my curriculum vitae summarizing my qualifications and experience).

I received a Bachelor of Arts (Honours) in Law in 1980 from Kingston University in London, England and, upon completion of professional legal education at the Inns of Court School of Law in 1982, was called to the Bar of England and Wales (as a barrister) by the Honourable Society of the Middle Temple. I received a Bachelor of Laws in 1986 from the University of Windsor in Ontario, Canada and, in 1987, I was admitted as a Barrister and Solicitor in Ontario, Canada. In 1994, I was certified as an arbitrator (as an Associate and, subsequently, a Fellow of the Chartered Institute of Arbitrators) and, in 1999, I was certified as an accredited mediator by the Centre for Effective Dispute Resolution in England. I have also completed certified basic and advanced alternative dispute resolution ("ADR") training with the University of Windsor.

I have written and spoken extensively on the subject of the law of limitations[2] in various Canadian provinces and territories. (See Exhibit "B" to this Affidavit for a list of

---

[2]   The "law of limitations," as referred to in this report, is understood by me to be analogous to the law pertaining to statutes of limitations and statutes of repose in the United States and the various states thereof.

all publications).  In particular, I am the author of <u>The Law of Limitations</u> (2nd ed. 2004), published by the Butterworths division of LexisNexis, which I believe to be the most widely-used Canadian textbook on the law of limitations and which is the only limitations text of national scope currently in print in Canada.

As a specialist on the law of limitations, I have been regularly cited by Canadian courts, including the Supreme Court of Canada, on the law of limitations for most, if not all, common law Canadian provinces and territories (See Exhibit "C" to this report for a list of court cases in which my book, <u>The Law of Limitations</u>, has been cited).  I am also regularly retained by the Lawyers Professional Indemnity Company (the professional liability insurer to lawyers in Ontario and Newfoundland) as one of that company's "preferred counsel," to advise on limitation issues, to attempt "repairs" where lawyers have encountered limitation issues, and to represent lawyers in malpractice litigation involving limitation issues.  I also regularly encounter limitations issues in my practice as a mediator and arbitrator.

My compensation for the preparation of this report, as well as all preliminary and preparatory work, and any attendances that may be required by me to give evidence, has been agreed at Canadian $495 per hour.  I have derived assistance with research and preparation of this report from my associate Christine Goldsack, whose time has been charged at Canadian $180 per hour as well as students and library researchers employed by my firm, whose time has been billed at rates ranging between Canadian $80 per hour and $215 per hour.

I have provided opinion evidence in court proceedings on a number of previous occasions including the following:

- Opinion on English negligence law (Ontario Superior Court)
- Opinion on English practice and procedure (Ontario Superior Court)
- Opinion on English insurance policy law (Ontario Superior Court)

- Opinion on the Canadian law of limitations in connection with other US Chapter 11 proceedings involving asbestos related property damage claims[3]

(c)     **Factual Context**

I have been informed of the following facts and assume them to be true. Grace, through its subsidiaries, is one of the world's leading specialty chemicals and materials companies. In the past, Grace produced and marketed products containing commercially-added asbestos primarily to the commercial construction industry. In Canada, from 1959 to 1975, Grace marketed Mono-Kote 3 ("MK-3") an asbestos-containing, wet spray-applied plaster, or cementitious fireproofing product, used to provide fire protection for the enclosed steel structures of large buildings. Grace did not sell MK-3 in Canada after 1975. Other Grace asbestos-containing products included Zonolite Acoustical Plaster, and other acoustical plaster and texture products, which were used primarily on interior ceilings and walls. Acoustical plaster was not sold in Canada after approximately 1969.

II.     **EXECUTIVE SUMMARY**

In my opinion, all of the Claims against Grace are time-barred as a result of the law of limitations. This results from the application of "ultimate" or "longstop" limitation provisions in certain provinces, as well as from the application of "normal" (i.e. non-ultimate) limitation periods in all common law provinces and territories of Canada.

Ultimate limitation periods begin to run at the date of installation of the allegedly defective product, regardless of whether the claims could have been "discoverable". Specifically, in Alberta, all Claims where alleged installations of asbestos products of any of the Debtors occurred prior to April 2, 1991 are time-barred due to the operation of Alberta's 10-year ultimate limitation period. In each of British Columbia, Manitoba, and Newfoundland and Labrador, all Claims in respect of installations of asbestos products of

---

[3] In re: *Federal-Mogul Global Inc., T&N Limited, et al.*, Debtors. Chapter 11 Case No. 01-10578.

any of the Debtors occurring prior to April 2, 1971 are time-barred due to the operation of the 30-year ultimate limitation periods in each of these provinces.

In all of the provinces under consideration, normal limitation periods would render any remaining Claims, which are not otherwise eliminated by ultimate limitation period provisions, time–barred. In considering when the normal limitation period will start to run, Canadian courts would follow the leading decision on liability for the installation of asbestos containing products (including the limitation issues that arise) in *Privest Properties Ltd. v. Foundation Co. of Canada Ltd.* [4] Such courts would also consider the Supreme Court of Canada's decision in *Canadian Indemnity Co. v. Johns-Manville Co. Ltd.*[5], the widely publicly disseminated information catalogued in the Roger Morse reports, as well as the existence of legislation throughout Canada that made it a statutory duty for building owners to know whether asbestos products were contained in their buildings. The end result would be that, under the applicable Canadian law, the claimants cannot escape the effect of a limitation defence by relying on the "discoverability" principle or any other argument that would delay or suspend the running of time from the date that the impugned product was installed.

Given the aforementioned factors, it is my opinion that all of the remaining Claims against Grace are time-barred due to the operation of the provincial limitations statutes.

## III.    OVERVIEW OF CANADIAN LEGAL SYSTEM

### (a)    Jurisdictional System

Canada is a federation of provinces and territories. It is a constitutional monarchy. Canada's current head of state is Queen Elizabeth II. Most of the Queen's

---

[4] [1995] 10 W.W.R. 385 (B.C.S.C.), *aff'd*, [1997] 5 W.W.R. 265 (B.C.C.A), *leave to appeal dismissed*, [1997] S.C.C.A. No. 216 (S.C.C.).

[5] (1988), 54 D.L.R. (4ᵗʰ) 468 (Que. C.A.); (1990), 72 D.L.R. (4ᵗʰ) 478 (S.C.C.). In that case, the Supreme Court of Canada stated that asbestos issues were clear and known by the general public in Canada in the 1970's onward.

constitutional responsibilities are carried out by the Governor General of Canada, who is appointed by the Crown upon the recommendation of the elected government of Canada.

The division of powers between the federal government and the provinces is set out in a law now known as the *Constitution Act, 1867.*[6] In the Canadian federal system, sovereignty is divided between two orders of government, with each level of government restricted to the areas of jurisdiction assigned to it. Part VI of the *Constitution Act,* 1867 (which is made up of sections 91 to 95) distributes legislative powers between the Parliament of Canada and the legislatures of the provinces. An independent judiciary, appointed in the name of the Crown, monitors the distribution of powers and ensures that neither level of government exceeds the powers that are allocated to it under the constitution.

**(b)     Unitary System**

The Supreme Court of Canada is the highest court in Canada. It has final jurisdiction over all matters of Canadian law, including matters falling under both federal and provincial jurisdiction. It has the right to hear appeals from provincial courts established and maintained by the provinces as well as from federal courts established and maintained by the Parliament of Canada.

The Supreme Court of Canada was contemplated by section 101 of the *Constitution Act,* 1867, which granted Parliament legislative authority to provide for the creation of a "General Court of Appeal for Canada." Pursuant to this authority, Parliament enacted the *Supreme Court Act* in 1875, creating the Supreme Court of Canada. At that time, the Supreme Court was not Canada's ultimate legal authority, since appeals could still be taken from the Supreme Court of Canada to the Privy Council (which sat in England). However, Privy Council appeals were finally abolished in 1949

---

[6] Formerly known as the *British North America Act,* 1867. There are 10 provinces and 3 territories in Canada. The provinces are: British Columbia, Alberta, Saskatchewan, Manitoba, Ontario, Quebec, New Brunswick, Nova Scotia, Prince Edward Island, Newfoundland and Labrador. The three territories are: Yukon Territory, Northwest Territories and Nunavut.

6

pursuant to a federal statute and, since that time, the Supreme Court of Canada has served as the final court of appeal in all matters of Canadian law.

In addition to hearing appeals from provincial courts or the federal court of appeal, the Supreme Court of Canada also provides advisory opinions on questions referred to it by the federal government. References to the Supreme Court may raise questions respecting the laws or powers of either the federal Parliament or the provinces.

(c)    **Appointment of Judges**

The power to appoint the judges of the superior, district, and county courts of all provinces is granted to the Crown (as represented by the Governor General of Canada) pursuant to section 96 of the *Constitution Act*, 1867. The Crown appoints judges upon the recommendation of the federal government. There is no requirement of consultation with or approval by the provinces. This appointing power is significant, since the provincial courts are general jurisdiction courts with authority over the interpretation and application of all provincial laws. Thus, the federal government is given the power to select the persons who have ultimate authority over the manner in which provincial laws are to be applied. The Canadian system and, particularly, s.96 appointment of judges, is thus a departure from the approach taken in many federal states, where provinces or states are granted the power to appoint judges charged with the responsibility of interpreting local laws.

(d)    **Conflicts of laws principles**

In Canada, the primary determiner in tort law in selecting the applicable limitation period is the *lex loci delicti* (i.e. the location where the alleged wrong occurred).[7] The law of limitations in Canada is generally a matter of provincial legislative competence.[8] In

---

[7] *Tolofson v. Jensen*, [1994] 3 S.C.R. 1022 (S.C.C.).

[8] Property and civil rights are a matter of provincial jurisdiction under the Canadian constitution, and, although there are a few subject areas in which the federal government has authority to legislate limitation periods, negligence is a matter dealt with in provincial limitation statutes.

each province of Canada there are statutes of limitation which are quite distinctive.[9] Under Canadian law, it would therefore be the limitation period of the province in which the installation of an asbestos-containing product occurred that would govern.

## IV.    GENERAL DISCUSSION OF CANADIAN LIMITATIONS STATUTES

### (a)    Normal Limitation Periods and Ultimate Limitation Periods

The law of limitations considers the time limits within which legal proceedings in a given set of circumstances must be brought. A limitation period is a stated period of time, the expiry of which extinguishes a party's legal remedies. The effect of limitation periods is that a party seeking a remedy must commence an appropriate proceeding in a court or tribunal having jurisdiction over the case before the limitation period expires in order to preserve its legal remedies.

Normal limitation periods are set out in each of the provincial limitations statutes. In the case of the Claims against Grace, the normal limitation period is six years in all except one of the common law provinces whose laws are discussed in this report[10], subject to the discoverability principle (which will be discussed later in this report). Some provinces also contain ultimate limitation periods which are "longstop" provisions or ultimate cut off points within which time a claim must be brought regardless of when the claims were or ought to have been "discoverable".

---

[9] *Limitations Act*, R.S.A. 2000, c. L-12; *Limitation Act*, R.S.B.C. 1996, c. 266; *Limitation of Actions Act*, C.C.S.M. c.L-150; *Limitation of Actions Act*, R.S. N. B. 1973, c.L-8; *Limitations Act*, S.N.1995, c.L-16.1; *Limitation of Actions Act* (also known as the *Statute of Limitations Act*), R.S.N.S. 1989, c.258, as amended by 1993, c.27; 1995-96, c.13, s.82;2001, c.6, s.115; 2003 (2nd Sess.), c.1, s.27; *Limitations Act 2002*, S.O. 2002, c.24 Sch.B; *Limitation of Actions Act*, S.S. 2004 c.L-16.1.

[10] Alberta's act contains a 2 year normal limitation period.

8

(b)     **Characterization of the Claims under Canadian Law**

The characterization of the Claims against Grace is significant because the characterization affects the determination of which limitation period applies and when the limitation period starts to run.

*(i)     Pure Economic Loss*

The Claims that are the subject of the Grace Objection are not characterized in Canadian law as personal injury or property damage claims. Rather, it is central to the discussion of limitations law in the context of the Claims against Grace to understand that, in Canada, claims for the removal or other abatement of asbestos-containing materials installed in buildings are characterized as claims in negligence for "pure economic loss", not as property damage claims. An explanation of this distinction follows.

Pure economic loss claims are rooted in the theory that there can be recovery for the cost of removing a potentially hazardous product even though there is no physical damage. The Supreme Court of Canada dealt with the subject of recovery in tort for pure economic loss due to alleged defects in the construction of buildings in *Winnipeg Condominium Corporation No. 36 v. Bird Construction Co.*[11] The Supreme Court of Canada in *Winnipeg Condominium* stated conclusively that the cost of repairing or replacing allegedly defective work and products is characterized in Canadian law as "pure economic loss" because such costs do not arise from injury to persons or damage to property. This approach to claims for allegedly defective products in buildings was applied in *Privest Properties Ltd. v. Foundation Co. of Canada Ltd.*[12], the definitive case in Canada applying *Winnipeg Condominium* to claims relating to asbestos-containing materials installed in buildings.

---

[11] [1995] 1 S.C.R. 85 (S.C.C.).

[12] [1995] 10 W.W.R. 385 (B.C.S.C.), *aff'd*, [1997] 5 W.W.R. 265 (B.C.C.A), *leave to appeal dismissed*, [1997] S.C.C.A. No. 216 (S.C.C.).

Since the decisions in *Winnipeg Condominium* and *Privest*, it is firmly established in Canadian law that, in situations where there is an alleged design flaw or an alleged defective product in a building, the claim is not characterized as physical property damage, but rather as a claim for pure economic loss. As such, the Claims which are the subject of the Objection fall under the heading of pure economic loss, and are subject to the limitation periods for pure economic loss claims.

### (ii)    Impact on limitation periods

The significance of these Claims sounding in pure economic loss it that the date upon which the cause of action arises is the date of installation of the allegedly defective product.[13] Therefore, the date of installation of the allegedly defective product is the date from which the ultimate limitation period begins to run.

### (c)    The Discoverability Principle

It is of critical importance to understand at the outset that the discoverability principle does not apply to postpone the running of ultimate limitation periods, a concept that will be discussed below.

In most provincial limitations acts, the limitation period starts to run for the normal limitation period when the cause of action accrues. The discoverability principle has developed as a rule of statutory construction[14] which states that the limitation period does not begin to run against a claimant, and may be postponed, until the material facts

---

[13] *Armstrong v. West Vancouver (District)*, [2003] B.C.J. No. 303 (B.C.C.A.) (Q.L.).

[14] *Fehr v. Jacob*, [1993] 5 W.W.R. 1 at 6 (Man. C.A.).

upon which the cause of action is based have been discovered or ought to have been discovered by the plaintiff with the exercise of reasonable diligence.[15]

To establish a limitations defence, the defendant has only to show that the claim was brought after the expiry of the limitation period set out in the applicable statute. Normally this will be done by establishing that more time than provided for in the applicable limitation period has elapsed between (a) the date of the act or omission on which the claim is based, and (b) the date on which a proceeding is commenced. However, a claimant can overcome a limitation defence by establishing that the material facts upon which its cause of action is based were not discoverable with the exercise of reasonable diligence until some time after the date of the alleged wrong. If the plaintiff raises discoverability arguments, the burden is on the plaintiff to prove that date of commencement of the running of the limitation period should be postponed until some time after the date of the alleged wrong.

In all cases where the discoverability principle is invoked, the plaintiff must establish that he/she exercised reasonable diligence in discovering the material facts upon which to begin an action. It is clear that wilful blindness to the existence of injury or damage will not be an effective answer to a limitations defence.[16] Furthermore, a plaintiff cannot simply wait until he or she has an expert report in hand which supports the claim before being deemed to have discovered the existence of a claim.[17]  As stated by the Supreme Court in *M. (K.) v. M. (H.)*, "...plaintiffs are expected to act diligently and not

---

[15] See *Peixeiro v. Haberman* [1997] 3 S.C.R. 549 (S.C.C.) and *Novak v. Bond* (1999), 172 D.L.R. (4th) 385 (S.C.C.). It was in the mid-1980's with the Supreme Court of Canada decisions in *Kamloops (City) v. Nielsen*, [1984] 2 S.C.R. 2 (S.C.C.) and *Central Trust Co. v. Rafuse*, [1986] 2 S.C.R. 147 at 224 (S.C.C.) that the discoverability principle became firmly entrenched in Canadian common law.

[16] *Knudsen v. Holmes* (1995), 22 O.R. (3d) 160 (Ont. Gen. Div.); *Webster v. Webster Estate*, [2006] O.J. No. 2749 (Ont. Sup. Ct.) (Q.L.); *Paone v. St. Joseph's Health Centre*, [2002] O.J. No. 4169 (Ont. Sup. Ct.) (Q.L.); *Miller v. Miller*, [2001] O.J. No. 4385 (Ont. Sup. Ct.) (Q.L.); *Pagliaro v. Pantis* (1997), 84 C.P.R. (3d) 149 (Q.C.A.); *Krusel v. Firth*, [1991] B.C.J. No. 2545 (B.C.C.A.) (Q.L.).

[17] *Soper v. Southcott* (1998), 39 O.R. (3d) 737 (Ont. C.A.). The case considered s.17 of the *Health Disciplines Act*, R.S.O. 1990, c.H.4, under which time in a malpractice action ran from the date the claimant knew or ought to have known the facts upon which the allegations of malpractice were made.

11

'sleep on their rights'; statutes of limitation are an incentive for plaintiffs to bring suit in a timely fashion."[18]

The "reasonable diligence" standard was applied in the specific context of claims for pure economic loss as a result of asbestos installed in buildings in the case of *Privest*.[19] *Privest* is significant to the analysis of limitations in this report. Specifically, the *Privest* decision dealt with, *inter alia*, the notoriety of asbestos and its allegedly harmful effects on health in its discussion of when claims for pure economic loss for alleged installation of asbestos products in buildings were discoverable. In *Privest* the trial judge ruled that all of the factors necessary to bring an action existed as of the date of completion of the installation of the asbestos-containing product in the building. Thus, it was held that the limitation period began to run as of the date of completion of installation of the asbestos-containing product. *Privest* was affirmed by the British Columbia Court of Appeal and leave to appeal to the Supreme Court of Canada was refused. It is thus the definitive case in Canada on the issue of claims for pure economic loss arising out of the alleged installation of asbestos-containing products, as well as being the definitive case on the issue of the notoriety of asbestos issues in Canada and, thus, when such claims were discoverable.

In determining the notoriety of asbestos and the alleged health hazards of asbestos, the court in *Privest* relied upon the Supreme Court of Canada decision in *Canadian Indemnity Co. v. Johns-Manville Co. Ltd.*[20] In *Johns-Manville*, the Supreme Court of Canada held that the alleged health hazards of asbestos were of "public character and notoriety" in Canada in the late 1960's and early 1970's. The Supreme Court of Canada stated that it was clear from the relevant Canadian and American material that was placed before the Court that information about asbestos-related health risks had

---

[18] [1992] 3 S.C.R. 6, at para. 24.

[19] [1995] 10 W.W.R. 385, *aff'd*, [1997] 5 W.W.R. 265 (B.C.C.A), *leave to appeal dismissed*, [1997] S.C.C.A. No. 216 (S.C.C.).

[20] (1988), 54 D.L.R. (4th) 468 (Que. C.A.); (1990) 72 D.L.R. (4th) 478 (S.C.C.)

spread well beyond the boundaries of industry knowledge and was by 1970 in wide public circulation.

In addition to the statement of the Supreme Court of Canada in *Johns-Manville*, as well as the decision in *Privest*, across Canada through the 1960's, 1970's, 1980's and 1990's there have been numerous regulations requiring building owners to have knowledge of whether alleged asbestos hazards are present in their buildings. Attached as Exhibit "D" to this report is a listing of these provincial regulations.

Furthermore, Roger Morse issued a report on what was known about asbestos and asbestos in buildings in various publications in the United States throughout the 70s, 80s, and 90s, concluding that by at least the mid-1980's building owners already had knowledge or should have been aware of the widespread use of asbestos-containing materials in buildings and the issues surrounding the use of asbestos-containing materials in their buildings.[21] In this regard, it is important to note that the Supreme Court of Canada in *Johns-Manville* refused to ignore articles published in American newspapers and other publications when assessing the notoriety of the alleged health effects of asbestos in Canada, stating that: "Canadians, and Canadian insurers in particular, are not isolated from the mainstream of news and knowledge in North America and, in my respectful opinion, these American articles were relevant to the issue of the public character of asbestos fibre hazards, at the very least as a compliment to the Canadian material that was put into evidence." Roger Morse has also compiled a report on the information available to Canadian building owners and managers about asbestos-containing materials in buildings in the 70's, 80's and into the mid-90's.[22] Mr. Morse concludes that, based on the vast amount of information on asbestos in buildings that was available to building owners and managers in the mid- to late 1980's, and certainly by 1995, building owners should have been aware of the widespread use of asbestos-

---

[21] Report of Roger G. Morse, AIA, on Summary of Information Available to Building Owners and Managers About Asbestos in Buildings, 1970-1995.

[22] Report of Roger G. Morse, AIA, on Summary of Information Available to Canadian Building Owners and Managers About Asbestos in Buildings in the 1970's, 1980's and 1990's.

containing materials in buildings (including sufacing materials such as fireproofing), the controversy concerning the alleged potential health effects of asbestos in such building materials and the development of the asbestos-in-buildings litigation in Canada.

Thus, a claimant would not succeed in avoiding a limitation defence by arguing that its Claim was not discoverable given (1) the decision in *Privest* that all material facts about the asbestos-containing product were known as of the date of installation; (2) the statement of the Supreme Court of Canada in *Johns-Manville* on the notoriety of asbestos in the early 1970's and, at the latest by the late 1970's; (3) Roger Morse's reports and opinions on the notoriety of the issues surrounding the use of asbestos-containing materials in buildings in Canada and the United States; and (4) the Canadian legislation throughout the 1970's and 1980's imposing duties on building owners to know about asbestos.

**(d)     Fraudulent Concealment**

Fraudulent concealment is the concealment of the existence of a cause of action by the fraud of the person relying on a limitations defence. A number of provincial limitation acts contain general provisions dealing with fraudulent concealment.[23]

Fraudulent concealment on the part of one party prevents the normal limitation period from running until it is discovered by the claimant (or ought to have been discovered with reasonable diligence) and where there are no laches on the part of the claimant. The onus of proving fraudulent concealment is on the claimant.

As a general rule, fraudulent concealment will not postpone the running of ultimate limitation periods since, to do so, it would be inconsistent with the policy

---

[23] Section 4 of the Alberta Act. Manitoba's former Act, (which applies to the present claims), contained a fraudulent concealment provision at section 5. British Columbia's Act deals with fraud in the context of grounds for postponement of the running of time in subsections 6(3) and 6(4). Ontario's former limitations act, (which applies to the present Claims) did not contain a generally applicable fraudulent concealment provision, but rather only contained a section that pertained to concealed fraud in actions to recover land (s.28) and fraud on the part of a trustee (s.43(2)). Nova Scotia's act only contains a section that pertains to concealed fraud in actions to recover land (s.29).

14

rationale behind ultimate limitation periods.[24] Ultimate limitation periods and their application are discussed in greater detail in the next section.

Fraudulent concealment is not a concept that could apply to the Claims against Grace.[25] Furthermore, even if the concept were applicable (which it is not) an element of reasonable diligence is required on the part of a claimant who asserts fraudulent concealment.[26] Given the notoriety of asbestos related health risks and asbestos in buildings, it is my opinion that even if fraudulent concealment were applicable to the Claims, a claimant could not demonstrate fraudulent concealment. Put simply, one cannot conceal what is well-known or notorious.

## V.    APPLICATION OF LIMITATION PERIODS TO CLAIMS AGAINST GRACE

### A.    Ultimate Limitation Periods

Ultimate limitation periods, sometimes referred to as "longstop" provisions, set an outside time limit for asserting a claim, regardless of discoverability considerations. Ultimate limitation periods run from the date of installation.[27] A statutory provision postponing the running of the limitation period on the basis of the discoverability principle is thus "trumped" where a province's limitation statute contains an ultimate

---

[24] Alberta's limitations statute states in subsection 4(1) "The operation of the limitation period provided by section 3(1)(b) is suspended during any period of time that the defendant fraudulently conceals the fact that the injury for which a remedial order is sought has occurred." However, as I will discuss in the next paragraph, fraudulent concealment only applies in narrow circumstances which are distinguishable from the circumstances involving the Claims against Grace.

[25] The Alberta Court of Appeal per Wittman J.A. in *Huet v. Lynch* (2000), 255 A.R. 359 (Alta. C.A.) reiterated the traditional definition in *Kitchen v. Royal Air Forces Ass'n* [1958] 2 All E.R. 241 requiring a "special relationship" between the parties for fraudulent concealment to arise. Furthermore, Cameron J. in *Buell v. C.I.B.C. Wood Gundy Securities Inc.*, [1998] O.J. No. 2861 (Ont. Gen. Div.) (Q.L.) (a case involving economic loss claims in a jurisdiction in which the common law discoverability rule applied) stated that the doctrine of concealed fraud will stay the running of a statutory limitation period where the defendant's conduct constitutes abuse of a confidential relationship. This does not exist in the present Claims against Grace. The relationship between Grace and the Claimants is a consumer relationship which does not fall within the "special relationship" contemplated by Lord Evershed in *Kitchen*.

[26] *Paszkowski v. Canada (Attorney General)*, 2006 F.C. 198 (F.C.C.).

[27] *Armstrong v. West Vancouver (District)*, [2003] B.C.J. No. 303 (B.C.C.A.) (Q.L.); *Dean v. Kociniak*, [2001] A.J. No. 643 (Alta. Q.B.) (Q.L.).

limitation period. Ultimate limitation periods provide defendants with protection from stale claims and ensure that defendants are not subject to open-ended liability. The policy rationale behind such provisions was explained by the Manitoba Court of Appeal in *M.(M.) v. Roman Catholic Church of Canada*[28] as follows:

> "The purpose of a longstop provision is to give a sense of absolute finality in certain cases. As with all limitation periods, it represents the legislative attempt to create proper balance. Injured parties should not be deprived of a claim because of circumstances beyond their control, such as minority or incapacity or discoverability. Putative defendants, on the other hand, should not be compelled to have the sword of Damocles hanging over their heads forever. The first objective can be met if the period is truly long; 30 years in Manitoba. **The second objective can be met, however, only if that very long period applies no matter what, even in the face of ongoing and continuing disability or in the absence of knowledge despite reasonable efforts.** A legislated longstop provision prescribes a date by which courts and parties alike are obliged to recognize that there has been closure. If societal standards of the past are later regarded as unacceptable or unjust in the eyes of a new generation, and if remedies or compensation are deemed to be necessary to rectify the situation, then that initiative must come from government policy and legislative action." [emphasis added]

The applicable limitations statutes in Alberta, British Columbia, Manitoba, and Newfoundland & Labrador contain ultimate limitation periods. Many of the Claims against Grace arising out of alleged installation of Grace products in buildings are time-barred due to the operation of the provincial limitations statutes' ultimate limitation provisions. Specifically, Alberta's 10 year ultimate limitation period bars Claims for installations of Grace products that were allegedly installed on or before April 2, 1991. Furthermore, Claims against Grace arising out of alleged installation of Grace products in British Columbia, Manitoba, Newfoundland and Labrador buildings prior to April 2, 1971 are time-barred due to the operation of those provinces' 30 year ultimate limitation provisions.

---

[28] 2001 MBCA 148, at para.41.

*(i)    Alberta*

The current Act[29] in Alberta applies to proceedings commenced on or after March 1, 1999. The Act contains a 10 year ultimate limitation period, which states:

> 3(1)    Subject to section 11, if a claimant does not seek a remedial order within
> (a)    2 years after the date on which the claimant first knew, or in the circumstances ought to have known,
>> (i)    that the injury for which the claimant seeks a remedial order had occurred,
>> (ii)    that the injury was attributable to conduct of the defendant, and
>> (iii)    that the injury, assuming liability on the part of the defendant, warrants bringing a proceeding,
> or
> (b)    **10 years after the claim arose,**
> whichever period expires first, the defendant, on pleading this Act as a defence, is entitled to immunity from liability in respect of the claim. [emphasis added]

Claimants thus have 10 years from when the claim arises, regardless of discoverability, to bring a Claim.[30] Accordingly, it is my opinion that Claims with respect to alleged installations of Grace product into Alberta buildings that allegedly occurred prior to April 2, 1991 are time-barred by the ultimate limitation period (April 2, 2001 – 10 years = April 2, 1991).

The remaining Alberta Claims are time-barred by the normal limitations period as discussed in section V. B. of this report entitled "Normal Limitation Periods"

---

[29] *Limitations Act*, R.S.A. 2000, c. L-12.

[30] *Bowes v. Edmonton (City)*, [2005] A.J. No. 941 (Alta. Q.B.) (Q.L.); *Dean v. Kociniak*, [2001] A.J. No. 643 (Alta. Q.B.)(Q.L.) Note, however, that the ultimate limitation period does not start to run for third party claims for contribution until discoverable by the third party, (see *Dean v. Kociniak* as well as *James H. Meek Trust v. San Juan Resources Inc.*, 2005 ABCA 448 (Alta. C.A.), at para.36).

17

*(ii)    British Columbia*

The applicable limitations act[31] in British Columbia contains an ultimate limitation provision at subsection 8(1) which states:

> 8 (1) Subject to section 3 (4) and subsection (2) of this section but despite a confirmation made under section 5, a postponement or suspension of the running of time under section 6 or 11 (2) or a postponement or suspension of the running of time under section 7 in respect of a person who is not a minor, **no action to which this Act applies may be brought**
>
> (a) against a hospital, as defined in section 1 of the *Hospital Act*, or against a hospital employee acting in the course of employment as a hospital employee, based on negligence, after the expiration of 6 years from the date on which the right to do so arose,
>
> (b) against a medical practitioner, based on professional negligence or malpractice, after the expiration of 6 years from the date on which the right to do so arose, or
>
> (c) in any other case, **after the expiration of 30 years from the date on which the right to do so arose.** [emphasis added]

The British Columbia case law has interpreted "30 years from the date on which the right to do so arose…" as meaning that a plaintiff has 30 years from the date of installation of the allegedly defective building product to bring his or her claim.[32] Accordingly, it is my opinion that Claims based on alleged installations of Grace product in British Columbia buildings prior to April 2, 1971 are time-barred by the ultimate limitation period (April 2, 2001 – 30 years = April 2, 1971).

---

[31] *Limitations Act*, R.S.B.C. 1996, c. 266.

[32] *Armstrong v. West Vancouver (District)*, [2003] B.C.J. No. 303 (C.A.) (Q.L.).

18

### (iii)    Manitoba

Subsection 19(1) of the current limitations statute in Manitoba[33] (the transitional provision) reads as follows:

> 19(1)   Subject to subsection (2), this Part has effect in relation to causes of action that accrued before as well as causes of action that accrued after July 29, 1980 and has effect in relation to any cause of action that accrued before that date notwithstanding that an action in respect thereof had been commenced and is pending on that date.

The application of the Act provision is set out at section 58 of the current legislation and reads as follows:

> 58  This Act applies to all causes of action whether they arose before or after the coming into force of this Act.

As such, the current limitations act applies to the present Claims. The current limitations act contains an ultimate limitation provision at subsection 14(4) which states:

> The court shall not grant leave
> (a)      to begin an action; or
> (b)      to continue an action that has been begun
> **more than 30 years after the occurrence of the acts or omissions that gave rise to the cause of action.** [emphasis added]

Thus, the ultimate limitation period begins to run at the occurrence of the act(s) or omission(s) that gave rise to the cause of action. As such, it is my opinion that the ultimate limitation period in subsection 14(4) runs from the date of alleged installation, and bars Claims based on all alleged installations of Grace products in Manitoba buildings prior to April 2, 1971 (April 2, 2001 − 30 years = April 2, 1971).

### (iv)    Newfoundland and Labrador

The current limitations act in Newfoundland and Labrador applies to the Claims against Grace.[34] The ultimate limitation period at section 22 of the act states:

---

[33] *The Limitation of Actions Act*, C.C.S.M. c.L150.

> 22. Notwithstanding a confirmation made under section 16 or a postponement or suspension of the running of time under sections 13, 14 and 15, **no action to which this Act applies shall be brought after the expiration of 30 years from the date on which the event which gave rise to the cause of action last occurred.**[emphasis added]

The event giving rise to the cause of action is the alleged installation of the asbestos product in buildings. As such, all claims in relation to the alleged installation of Grace products into Newfoundland and Labrador buildings that took place prior to April 2, 1971 (30 years prior to the Bar Date) would be time-barred.

### (v)  Nova Scotia

The current Nova Scotia limitations act applies to the Claims against Grace arising in that province.[35] The current act does not contain an ultimate limitation provision.

### (vi)  Ontario

Ontario did not have an ultimate limitation period until the effective date of the new *Limitations Act*, (i.e. January 1, 2004). The transition provision of the new act mandates that proceedings commenced before January 1, 2004 are governed by the previous act's limitation period. The previous act did not contain an ultimate limitation period.

### B.   Normal Limitation Periods

The remaining Claims, that is, those which are not automatically barred by ultimate limitation periods, are time-barred by the provinces' normal limitation periods. Furthermore, it is my opinion that discoverability arguments would not be successful in postponing the running of the limitation periods past the date of installation of the

---

[34] *Limitations Act*, S.N.L. 1995, c. L-16.1.

[35] *Limitation of Actions Act*, R.S.N.S. 1989, c. 258

asbestos-containing product in the buildings. Indeed, aside from these obstacles, for a discoverability argument to operate successfully, a claimant would have to demonstrate that the Claims were not discoverable in Alberta until on or after April 2, 1999, and that the Claims were not discoverable in the rest of the provinces until on or after April 2, 1995. It is my opinion that a plaintiff would face an insurmountable barrier to succeeding with such an argument, given (1) what was stated in *Privest*, (2) what has been stated about the notoriety of asbestos issues by the Supreme Court of Canada in *Johns-Manville*, (3) the requirements in provincial regulations, and (4) Roger Morse's reports and opinions on the notoriety of the issues surrounding the use of asbestos-containing materials in buildings in Canada and the United States. The following is a province-by-province application of the normal limitation periods.

*(i)*      *Alberta*

        The Alberta[36] Act is comprehensive in setting out the applicable limitation period in any given circumstance and when the limitation period starts running. The Act combines the ultimate limitation period, discoverability, and normal limitation period in the same section, which states:

> 3(1) Subject to section 11, if a claimant does not seek a remedial order within
> (a)      2 years after the date on which the claimant first knew, or in the circumstances ought to have known,
>> (i)      that the injury for which the claimant seeks a remedial order had occurred,
>> (ii)      that the injury was attributable to conduct of the defendant, and
>> (iii)      that the injury, assuming liability on the part of the defendant, warrants bringing a proceeding,
> *or*
> (b)      10 years after the claim arose,
> whichever period expires first, the defendant, on pleading this Act as a defence, is entitled to immunity from liability in respect of the claim.
>
> (3) For the purposes of subsection (1)(b),

---

[36] *Limitations Act*, S.A. 1996, c. L-15.1, note that the Act was not brought into force until March 1, 1999.

(a)    a claim or any number of claims based on any number of breaches of duty, resulting from a continuing course of conduct or a series of related acts or omissions, arises when the conduct terminates or the last act or omission occurs;
(b)    a claim based on a breach of a duty arises when the conduct, act or omission occurs;

Paragraph 3(3)(a) of the Act imposes on the Claimant the burden of proving that the Claim was brought within the limitation period. A Claimant attempting to invoke the postponement provision would only be able to succeed if the Claimant were able to successfully demonstrate all 3 of the postponement prerequisites in paragraph 3(1)(a) of the Act. It is my opinion that a claimant would not be successful in demonstrating that it did not know the aforementioned factors prior to April 2, 1999 (i.e. two years prior to the effective date of the commencement of this proceeding) given the notoriety of asbestos issues prior to that date.

*(ii)    British Columbia*

In each of the versions of the limitations statute from 1975 to the present,[37] the limitation period is six years, commencing from the date on which the right to bring an action arose. The Claims against Grace fall within subsection 3(5), the "catch-all" provision of the act[38], which states:

3(5). Any other action not specifically provided for in this Act or any other Act shall not be brought after the expiration of 6 years from the date on which the right to do so arose.[39]

For Claims where the alleged installation of Grace products in British Columbia buildings occurred after April 2, 1971, (prior to which the ultimate limitation period

---

[37] *Limitations Act*, S.B.C. 1975, c. 37; *Limitation Act*, R.S.B.C. 1979, c. 236; and *Limitation Act*, R.S.B.C. 1996, c. 266.

[38] The Claims fall within the catch-all provision because claims for pure economic loss are not provided for specifically in the statute.

[39] The case law makes it clear that another potentially relevant provision, referring to "an action for damages in respect of injury to property, including economic loss arising therefrom, whether based on contract, tort, or statutory duty" does not apply to allegedly defective products in buildings. See *The Owners, Strata Plan NW 3341 v. Delta (Corporation)*, 2002 BCCA 526 (B.C.C.A.).

would apply), the 6 year limitation period would apply, subject to a successful postponement argument. The postponement provision in the Act states:

> 6.(3)  The running of time with respect to the limitation periods set by this Act for any of the following actions is postponed as provided in subsection (4):
>> (a) for personal injury;
>> (b) for damage to property;
>> (c) for professional negligence;
>> (d) based on fraud or deceit;
>
> (e) in which material facts relating to the cause of action have been wilfully concealed;
>> (f) for relief from the consequences of a mistake;
>> (g) brought under the *Family Compensation Act;*
>> (h) for breach of trust not within subsection (1).
>
> (4)  Time does not begin to run against a plaintiff with respect to an action referred to in subsection (3) until the identity of the defendant is known to the plaintiff and those facts within the plaintiff's means of knowledge are such that a reasonable person, knowing those facts and having taken the appropriate advice a reasonable person would seek on those facts, would regard those facts as showing that
> (a) **an action on the cause of action would,** apart from the effect of the expiration of a limitation period, **have a reasonable prospect of success,** and
> (b) **the person whose means of knowledge is in question ought,** in the person's own interests and taking the person's circumstances into account, **to be able to bring an action.**
>
> (5)  For the purpose of subsection (4),
> (a) **"appropriate advice",** in relation to facts, means the advice of competent persons, qualified in their respective fields, to advise on the medical, legal and other aspects of the facts, as the case may require,
> (b) **"facts"** include
>> (i)  the existence of a duty owed to the plaintiff by the defendant, and
>>
>> (ii)  that a breach of a duty caused injury, damage or loss to the plaintiff,
>
> (c) if a person claims through a predecessor in right, title or interest, the knowledge or means of knowledge of the predecessor before the right, title or interest passed is that of the first mentioned person, and
> ...

(6) The burden of proving that the running of time has been postponed under subsections (3) and (4) is on the person claiming the benefit of the postponement.

(7) Subsections (3) and (4) do not operate to the detriment of a purchaser in good faith for value.[emphasis added]

The postponement provision in the statute creates two different tests. The first test relates to discovery of the identity of an individual defendant, the second to discovery of facts from which it may be concluded that there is a reasonable possibility that an action against that potential defendant would succeed. The first test requires the court to decide when that potential defendant's identity would have been reasonably known to the plaintiff. The second test requires that the court determine when facts, from which it could be concluded that a successful action could be brought against the potential defendant, would reasonably have been within the plaintiff's means of knowledge. The time for the commencement of the limitation period runs from the latest of these dates;[40] when the plaintiff could have reasonably discovered such facts.

In order to succeed against a limitations defence, a claimant would therefore have to demonstrate that it could not reasonably have known that Grace was a potential defendant and that the facts from which it could be concluded that a successful action could be brought against Grace were not reasonably within the claimant's knowledge prior to April 2, 1995, (i.e. six years before the date Grace filed for bankruptcy). Given the notoriety of the issues surrounding the use of asbestos-containing materials in buildings prior to 1995, a discoverability argument would not be successful in defeating a limitation argument. Therefore, it is my opinion that all remaining Claims in British Columbia are time-barred.

---

[40] *Krusel v. Firth*, [1991] B.C.J. No. 2545 (B.C.C.A.) (Q.L.).

### (iii)   Manitoba

From 1931 to the present,[41] in each of the limitation statutes governing in Manitoba, there have been two possible causes of action that could potentially capture the Claims against Grace. However, nothing significant turns on which of these provisions best applies, since both provisions provide for the same limitation period of six years, running from "when the cause of action arose".[42]

Any claims based on alleged installation of Grace products in Manitoba buildings after April 2, 1971 would have to be brought within the six year limitation period set forth in the Act, subject to the operation of the postponement provision at subsection 14(1) of the Act, which states that an applicant may seek leave to commence an action that is outside the ordinary limitation period where the applicant can demonstrate that it did not know all the material facts of a decisive nature relevant to its proposed action before the limitation period expired. Specifically, subsection 14(1) states:

> 14(1) ... the court, on application, may grant leave to the applicant to begin or continue an action if it is satisfied on evidence adduced by or on behalf of the applicant that not more than 12 months have elapsed between (a) the date on which the applicant first knew, or, in all the circumstances of the case, ought to have known, of all material facts of a decisive character upon which the action is based; and
> (b) the date on which the application was made to the court for leave.

The onus of proving that there should be postponement of the running of the normal limitation period is on the claimant.[43] If the claimant files its claim outside the

---

[41] *Limitation of Actions Act, 1931*, R.S.M. 1931, c. 30; *Limitation of Actions Act*, R.S.M. 1940, c. 121; *Limitation of Actions Act*, R.S.M. 1954, c. 145; *Limitation of Actions Act*, R.S.M. 1970, c. L150; and *The Limitations of Actions Act*, R.S.M. 1987, c. L150; *Limitation of Actions Act*, C.C.S.M. c.L150.

[42] Those provisions each read as follows: "The following actions shall be commenced within and not after the times respectively hereinafter mentioned: . . . actions for trespass or injury to real property or chattels, whether direct or indirect, and whether arising from an unlawful act or from negligence, or for the taking away, conversion or detention of chattels, within six years after the cause of action arose"; and "any other action not in this or any other Act specifically provided for within six years after the cause of action arose." In the *Limitation of Actions Act*, R.S.M. 1970, c. L150, the former cause of action reads (at section 3(1)(e) of the Act) as follows: "The following actions shall be commenced within and not after the times respectively thereinafter mentioned: Actions for trespass or injury to real property, whether direct or indirect, within six years after the cause of action arose."

[43] *Limitation of Actions Act*, C.C.S.M. c.L150, s.7(6).

25

limitation period without first obtaining leave to do so, pursuant to subsection 15(3)[44] of the Act, the claimant must also demonstrate that, at the time of filing, the claimant did not know, or reasonably ought to have known, that the action was time-barred.

With respect to the postponement provision in subsection 14(1), "material facts" are deemed to be facts of a decisive character if they were facts which a person of the claimant's intelligence, education and experience, knowing those facts and having obtained appropriate advice in respect of them, would have reasonably regarded at that time as determining, in relation to that cause of action, that an action would have a reasonable prospect of succeeding and resulting in an award of damages or remedy sufficient to justify the bringing of the action.

To be successful against a limitations defence, a claimant would thus have to demonstrate that on the date Grace filed for bankruptcy, (April 2, 2001), it did not know that the Claim was time-barred. The claimant would also have to show that as of April 2, 2001, not more than 1 year had elapsed between the date on which the claimant first knew or, in all the circumstances, ought to have known, all material facts of a decisive nature upon which its Claim was based.

In my opinion, a claimant would not succeed in arguing that, through the exercise of reasonable diligence, the Claim against Grace was not discoverable until on or after April 2, 2000. Given the notoriety of asbestos issues discussed earlier, it is my opinion that any of the remaining Claims against Grace involving Manitoba properties are time-barred.

---

[44] Subsection 15(3) states:
  15(3) Where an application is made by a plaintiff under section 14 to continue an action already begun by him, the court shall not grant leave unless, on evidence adduced by the plaintiff, it appears to the court that, only after the date the action was begun, the plaintiff first knew or, in all the circumstances of the case, ought to have known, that the matters constituting the cause of action had occurred at a time which, apart from section 14, afforded a defence based on a provision of this Act or of any other Act of the Legislature limiting the time for beginning the action.

*(iv)*    *Newfoundland and Labrador*

In the 1995 *Limitations Act*[45] it is unclear whether claims for pure economic loss fall under subsection 5(a) or section 9. Subsection 5(a) states:

> 5(a) Following the expiration of 2 years after the date on which the right to do so arose, a person shall not bring an action for damages in respect of injury to a person or property, including economic loss arising from the injury whether based on contract, tort or statutory duty.

Section 9 states:

> 9. An action for which a provision as to limitation is not made in sections 5 to 8 or in another act shall not be brought after the expiration of 6 years after the date on which the cause of action arose.

The case law is not clear as to which of the two limitation periods applies in the present circumstances.[46] There is significance as to which of the sections of the Act applies, in that subsection 5(a) sets out a 2 year limitation period, whereas section 9 sets out a 6-year limitation period. Furthermore, if the Claims fall under subsection 5(a), they are subject to the 10 year "ultimate" limitation on discoverability that applies to property damage claims under subsection 14(3).[47] Given the law established by *Winnipeg Condominium*, the present Claims against Grace are claims for pure economic loss,

---

[45] *Limitations Act*, S.N.L. 1995, c. L-16.1.

[46] *Quigley v. St. John's (City)*, [2001] N.J. No. 158 (N.S.C.C.A.) (Q.L.)

[47] Section 14 of the Act states:
14.(1) Notwithstanding section 13, in an action
    (a)     for personal injury;
    (b)     property damage;
    (c)     professional negligence;
    (d)     for relief from the consequences of a mistake;
    (e)     under the *Fatal Accidents Act*; and
    (f)     for a non-fraudulent breach of trust,
the limitation period fixed by this Act does not begin to run against a person until he or she knows or, considering all circumstances of the matter, ought to know that he or she has a cause of action.

(2)     The burden of proving that the running of the limitation period has been postponed or suspended under this section is on the person claiming the benefit of that postponement or suspension.

(3)     Notwithstanding subsection (1), an action included in subsection (1) shall not be taken by a person after the expiration of 10 years from the later of the date of
    (a)     the act or omission on which that action is based; or
    (b)     the last of a series of acts or omissions or the termination of a course of conduct where that action is based upon a series of acts or omissions or a continuing course of conduct.

distinguishable from "property damage" and, as such, fall under section 9 of the Act. There is no corresponding postponement provision. However, the common law discoverability rules would apply where justifiable in the circumstances.

Therefore, allowing for the most generous possible interpretation from the claimant's perspective, the 6 year limitation period set out at section 9 of the Act would apply to alleged installations of Grace products that occurred after April 2, 1971. The effect of the 6 year limitation period is that it would bar any Claims made with respect to alleged installations of Grace products that occurred prior to April 2, 1995, subject to successful discoverability arguments. However, it is my opinion that claimants will not succeed in demonstrating that their Claims were not discoverable until on or after April 2, 1995, given the notoriety of asbestos issues prior to that date.

(v)    *Nova Scotia*

In each of the versions of the limitation statute applicable in Nova Scotia from 1923 to the present, the applicable provision for "an action for trespass on the case" must be brought within six years after the cause of any such action arose.[48] The particular provision in the act states:

> 2 (1) The actions mentioned in this Section shall be commenced within and not after the times respectively mentioned in such Section, that is to say:
>
> (e) all actions grounded upon any lending, or contract, expressed or implied, without specialty, or upon any award where the submission is not by specialty, or for money levied by execution, all actions for direct injuries to real or personal property, actions for the taking away or conversion of property, goods and chattels, actions for libel, malicious prosecution and arrest, seduction and criminal conversation and actions for all other causes which would formerly have been brought in the form of action called trespass on the case, except as herein excepted, within six years after the cause of any such action arose; ...

---

[48] *The Statute of Limitations*, R.S.N.S. 1923, c. 238; *The Statute of Limitations*, R.S.N.S. 1954, c. 153; *Limitation of Actions Act*, R.S.N.S. 1967, c. 168; *Limitation of Actions Act*, R.S.N.S. 1989, c. 258; and *Limitation of Actions Act*, R.S.N.S. 1989, c. 258.

The limitations act does not contain a statutory postponement provision. As such, the six year statutory limitation period applies subject to the common law discoverability principle.[49] The successful claimant would have to demonstrate that the cause of action against Grace was not discoverable prior to April 2, 1995. As discussed above, it is my opinion that the claimants would not succeed in asserting that their Claims were not discoverable until on or after April 2, 1995, given the notoriety of asbestos issues prior to that date.

*(vi)*    ***Ontario***

The current limitations act provides for a 2 year limitation period.[50] However, it is the former act which applies in the present case.[51] The applicable limitation period in the former act was six years, running from the date the cause of action arose.[52] Specifically, section 45(1)(g) of the former act stated:

> 45. (1) The following actions shall be commenced within and not after the times respectively hereinafter mentioned,
>
> (g) an action for trespass to goods or land, simple contract or debt grounded upon any lending or contract without specialty, debt for arrears of rent, detinue, replevin or upon the case other than for slander, within six years after the cause of action arose,...

The former act did not contain a postponement provision. Nevertheless, when there is no statutory postponement provision, and a discoverability argument is asserted by the claimant, the common law discoverability principle will determine whether the running of the limitation period should be postponed. Given the notoriety of the issues surrounding the use of asbestos-containing materials in buildings prior to 1995, a

---

[49] *Burt v. LeLacheur* (2000), 189 D.L.R. (4th) 193 at 198 (N.S.S.C.A.).

[50] *Limitations Act 2002*, S.O. 2002, c. 24, Schedule B.

[51] *Limitations Act*, R.S.O. 1990, c. l-15.

[52] The current legislation is not based on enumerated causes of action but provides for a basic limitation period which reads as follows at section 4: "Unless this Act provides otherwise, a proceeding shall not be commenced in respect of a claim after the second anniversary of the day on which the claim was discovered": *Limitations Act 2002*, S.O. 2002, c. 24, Schedule B.

claimant would not succeed in arguing that, through the exercise of reasonable diligence, the Claim against Grace was not discoverable until on or after April 2, 1995. Accordingly, it is my opinion that the instant Claims against Grace involving Ontario properties are time-barred.

## VI   SUMMARY

Using the date that Grace filed for bankruptcy (April 2, 2001) as the pertinent date from which we can assess limitations issues, it is my opinion that all of the Claims are time-barred as a result of the provincial limitations acts' ultimate limitation periods and normal limitation periods.

In Alberta, all Claims with respect to Grace products allegedly being installed in buildings prior to April 2, 1991 are time-barred due to the operation of Alberta's 10-year ultimate limitation period. In fact, Grace stopped selling asbestos-containing products more than 15 years prior to the ultimate limitation period cut-off date of April 2, 1991.

In British Columbia, Manitoba, Newfoundland and Labrador, all Claims with respect to Grace products allegedly being installed in buildings prior to April 2, 1971 would be time-barred due to the operation of the 30 year ultimate limitation period. Any installations of MK-3 or acoustical plaster after April 2, 1971 are subject to a 6 year limitation period. Therefore, in respect of any Claims that survive the April 2, 1971 ultimate limitation cut-off date, the claimants have the onus of proving that such Claims were not discoverable until April 2, 1995 (6 years prior to the Claim date). It is my opinion that a claimant would not be able to make this argument successfully. As such, it is my opinion that the remaining Claims in these three provinces are also time-barred.

In Nova Scotia and Ontario, Claims originating from alleged installation of Grace products in buildings are subject to a 6 year limitation period. As such, for the Nova Scotia and Ontario Claims to be successful, the claimants would have to prove that such Claims were not discoverable until April 2, 1995. It is my opinion that a claimant would

not be successful in making this argument. As such, it is my opinion that the remaining Claims in Nova Scotia and Ontario are also time-barred.


Toronto, 21 December 2006

Graeme Mew, B.A. (Hons), LL.B, FCIArb,
Barrister (England & Wales), Barrister & Solicitor (Ontario)

31

## EXHIBIT A

# GRAEME MEW



Nicholl Paskell-Mede
Lawyers – Avocats
390 Bay Street, Suite 612, Toronto, Ontario. M4H 2Y2.  Canada

Tel:    +1.416.366.4555  +1.416.822.0020 (mobile)
Fax:    +1.416.366.6110
Email:  gmew@npm.ca
Web:   www.npm.ca

**POSITION:** Office Managing Partner, **Nicholl Paskell-Mede** (Toronto Office); Member of the Chambers of Roger Stewart QC at **Four New Square**, Lincoln's Inn, London.

**PERSONAL:** Born London, England, 1959.  British and Canadian citizen.  2 children. Principal residence in Toronto, Canada.

**EDUCATION:** Kingston University (formerly Kingston Polytechnic), B.A. (Honours) Law, 1980 (Law School Prize); University of Windsor, LL.B., 1986 (Dean's Honour Roll). Professional legal education at the Inns of Court School of Law in London and Osgoode Hall (Law Society), Toronto. A qualified arbitrator (Fellow of the Chartered Institute of Arbitrators) and mediator (University of Windsor Faculty of Law; CEDR Accredited Mediator)

**Qualifications:** Barrister (England and Wales), 1982; Barrister and Solicitor (Ontario), 1987; Admitted *pro hac vice* as an Attorney, District Court of the United States Virgin Islands in 2003; Fellow of the Chartered Institute of Arbitrators, 1994; Centre for Effective Dispute Resolution (CEDR) Accredited Mediator, 1999.

**PROFESSIONAL AND BUSINESS HISTORY:** 1982-84 Pupil to Paul Norris.  1985-2000 Non-resident member of the Chambers of Sir Ivan Lawrence QC at 1 Essex Court, Temple, London EC4Y 9AR. 2001 - joined Four New Square.  1987-89 Associate, Dutton Brock.  1989 – 2005 Associate, then Partner (1992) at Smith Lyons, Toronto (merged with Gowling Lafleur Henderson LLP in September 2001). 2006 – joined Nicholl Paskell-Mede.

**RANGE OF EXPERIENCE:** Principally practising as an advocate, mediator and arbitrator.  Experience in many areas of civil, administrative and criminal litigation with appearances before trial and/or appellate courts in England & Wales, British Columbia and Ontario, including the Supreme Court of Canada and before administrative tribunals and boards, including the Employment Tribunal, the Financial Services Commission of Ontario, the Workplace Safety and Insurance Appeals Tribunal, the Immigration Appeal Board and the Canadian International Trade Tribunal. Continuing to assist clients with legal concerns arising under both Canadian and English law.  Advising on and directing litigation in a number of jurisdictions in the United States and the Commonwealth Caribbean.

Particular areas of practice include insurance law (coverage, defence, primary/excess and reinsurance issues), products liability, personal injury,

2

professional liability, directors' and officers' liability, transportation, business disputes, other contract and tort litigation, sports and entertainment disputes, administrative law and conflict of laws issues. Head of Gowlings' National Insurance and Professional Liability Practice Group 2002-2005. Ranked by *The Canadian Legal Lexpert Directory* as a Leading Practitioner in Litigation-Commercial Insurance.

As the author of the leading Canadian text on the law of limitations, regularly retained to advise on limitation issues and to "repair" potential errors and omissions claims against lawyers. Regularly cited by courts in Canada on limitation issues.

Expert witness retainers on the Canadian law of limitations, English law (retained by Canadian clients) and Ontario law (retained by English clients).

Extensive experience as both counsel and neutral with arbitration, mediation and other forms of non-court dispute resolution. Panel arbitrator for the ADR Institute of Canada, ADR Chambers (UK), ADR Chambers International, Sports Dispute Resolution Centre of Canada, The Private Court and the International Centre for Dispute Resolution (American Arbitration Association). Judicial officer for the International Rugby Board. Roster mediator for the Ontario Superior Court (Toronto) 1999-2004. A Chair of Appeals at the Rugby World Cup, Sydney, Australia, 2003. Arbitrator of the Court of Arbitration for Sport, Lausanne, Switzerland.



**NICHOLL PASKELL-MEDE**

Nicholl Paskell-Mede is a defence and insurance litigation firm founded in 1992, which handles claims and litigation across Canada from its offices in Montreal and Toronto.

NPM represents an international client base of property, liability and special risks insurers, as well as corporations in both insurance and non-insurance related matters, including product liability and class actions. The firm's practice is focused principally on liability defence and coverage litigation including class actions, but also extends beyond the traditional claims-related services to include arbitration, mediation, claims audits, policy drafting and review, and risk management consulting. NPM believes that the specialised expertise and experience it has developed in the firm's area of practice allows them to give their clients added value and efficient, cost effective service. NPM is a team of 30 lawyers, many of whom are fluently bilingual (English and French) and hold both civil and common law degrees.

**PUBLICATIONS, SPEECHES & COURSES TAUGHT:**

Author of *The Law of Limitations*, published by Butterworths in 1991 and 2004 (2nd Edition). Has written extensively for publication in both Canada and the United Kingdom on limitations, insurance law, remedies and legal professional issues. Panel member and speaker in the Continuing Legal Education programmes of the Canadian Bar Association, the Law Society of Upper Canada, the ADR Institute of Ontario, the Commonwealth Lawyers' Association, the Continuing Legal Education Society of British Columbia and the Advocates' Society on personal injury, civil evidence, products liability, insurance, professional responsibility, international law, ADR and limitations topics. Guest instructor at the annual Intensive Trial Advocacy Programme at Osgoode Hall Law School.

3

Articles and Recent Presentations on limitation related issues include:

*Case Comment – Seals and Limitations*, (1999) 21 Adv. Q. 523

*Taking on the Government in Time: An Overview of Government Limitations* (2001) The Litigator (Ontario Trial Lawyers Association)

*The Limitations Act, 2002 – Learn the New Rules Before Time Runs Out*, (2203) Law Society of Upper Canada/Interactive Learning Network

*Limitations Act 2002: A huge reform of existing law*, (2003) Practice Pro (Lawyers Professional Indemnity Company)

*When Does Time Start to Run?* (2004) 28 Adv. Q. 448

*Update on the Limitations Act, 2002: Variations on a Familiar Theme*, (2006) Ontario Bar Association

**PROFESSIONAL AND BUSINESS AFFILIATIONS:**

Member of committees of the Law Society of Upper Canada considering the role of benchers (1988-91) and on bencher voting (1990-91). Active participant in the affairs of the Advocates' Society, the Canadian Bar Association and the Commonwealth Lawyers Association. Executive Committee, ADR Section of the Canadian Bar Association (Ontario) 1997-98. Chair of Advocates' Society's Limitation Act Reform committee (2000-2). Commonwealth Lawyers Association (Honorary Secretary 2003-2005, President 2005 to date).

Other memberships include Sports Lawyers' Association (U.S.), Australian and New Zealand Sports Law Association, London Common Law and Commercial Bar Association, Toronto Lawyers' Association, Medico-Legal Society of Toronto, Commercial Bar Association (U.K.), Federation of Defense and Corporate Counsel (U.S.), Chartered Institute of Arbitrators, ADR Institute of Ontario, American Arbitration Association (subscriber), Centre for Effective Dispute Resolution (subscriber).

**COMMUNITY INVOLVEMENT:**

Gold Award of the Duke of Edinbugh's Award Scheme 1977. Active in a variety of student and social welfare organisations in the U.K. between 1977 and 1984. Board of Governors of Kingston Polytechnic in 1978-79 and again in 1980-81; President of the Kingston Polytechnic Students' Union in 1980. Served the Toronto Nomads Rugby Football Club in various capacities since 1986 including President (2001). Member of the legal network of Amnesty International (Canada). Honorary legal adviser to the British Consul General in Toronto and to the Canadian Rugby Union. Director, Artists' Health Centre Foundation (2003 to 2006). Member, Anti-Doping Advisory Committee, International Rugby Board, Dublin (2000 to date).

4

**REPORTED CASES:**

*Royal Insurance v Canadian Indemnity Co.* (1988) 32 C.C.L.I. 32 (Ontario High Court)
- • Private International Law – Jurisdiction (Convenient Forum)

*Shachar v Bailey* (1989) 67 O.R. (2d) 726 (Ontario High Court)
- • Joiner of Parties – Addition of Party After Expiry of Limitation Period

*Muller Martini v Kuehne & Nagel* (1990) 71 O.R. (2d) 794 (Ontario High Court)
- • Contracts – Bailment - Limitation of Liability

*South River Power Corp. v Sandwell* (1992) 1 Construction L.R. (2d) 297 (Ontario Court)
- • Contract – Professional Services (Engineering) – Limitation of Liability

*Tolofson v Jensen; Lucas v Gagnon* (1992) 71 O.R. (2d) 794 (Ontario Court of Appeal) and [1994] 3 S.C.R. 1022 (Supreme Court of Canada)
- • Private International Law – Choice of Law

*771225 Ontario Inc. v Bramco Holdings Co.* (1995) 21 O.R. (3d) 739 (Ontario Court of Appeal)
- • Contract – Rectification - Mistake

*Chubb Insurance Company of Canada v Liss* (2000) 49 O.R. (3d) 439 (Ontario Superior Court)
- • Insurance - Subrogation

*Alie v Bertrand & Frere* (2000) 30 C.C.L.I. (3d) 166 (Ont. S.C.J.) and (2003) 62 O.R. (3d) 345 (C.A.)
- • Insurance – Coverage Triggers
- • Insurance – Allocation Among Excess Insurers Where Successive Policies Triggered

*Tai Fong International v Lombard Canada* (2001) 53 O.R. (3d) 595 (S.C.J.) and 35 C.C.L.I. (3d) 354 (Ont. C.A.)
- • Insurance – Contractual Limitation Periods

*Fuller v McCartney* (2003) 63 O.R. (3d) 393 (S.C.J.)
- • Limitations – Discoverability principle

*Somerset v Lloyd's Underwriters* (reported as *McNaughton Automotive Ltd. v Co-operators General Ins. Co)* (2003), 66 O.R. (3d) 112 (S.C.J.)
- • Private International Law – Jurisdiction – Class Proceedings – Representative Plaintiffs not resident in the forum

5

- Limitations · — applicability of limitation in automobile insurance statutory conditions

- Insurance – deductibles – salvage

*Three Seasons Homes Limited v Faris* (Ontario Court of Appeal, 16 November 2005, not yet reported)
- Mortgages – survival of right of first refusal after expiry of mortgage term

*Lloyd's Underwriters v Teck Cominco* (Supreme Court of British Columbia, 21 August 2006, not yet reported)
- Private International Law – Jurisdiction – Parallel Proceedings in U.S. District Court and Supreme Court of British Columbia

**Exhibit B**

**PUBLISHED ARTICLES, PAPERS, TEXTS OF GRAEME MEW**

The Law of Limitations (Butterworths, 2004), 2nd ed. (1st edition in 1991)

"When Does Time Start to Run?" (2004) 28 Adv. Q. 448.

"The Insurance Defence Lawyer's Conundrum: Conflicts of Interest and Ethical Dilemmas Between Insurer and Insured" (2003) 26 Adv. Q. 429.

"Discoverability Principle Not a Licence to Ignore Time Limits" (Oct. 1998) 18 Lawyers Wkly. No. 23, 8(2).

"Oral Discovery Could Become Obsolete with Mandatory ADR [alternative dispute resolution]" (June 1998) 18 Lawyers Wkly. No. 5, 9(2).

Case Comment: "Seals and Limitations" (1999) 21 Adv. Q. 523.

"Lawyers: The Agony and the Ecstasy of Self-Government" (1989) 9 Windsor Yearbook of Access to Justice 210.

"Settlement Negotiations and Limitation Periods" (June 1992) 1 Uberrima Fides 56.

"Impact of part V, Family Law Act, 1986" (Ont.) (Part 1), (1987) 5 Can. J. Ins. L. 42.

"Impact of part V, Family Law Act, 1986" (Ont.) (Part 2), (1987) 5 Can. J. Ins. L. 66.

Case Comment: "Damages - Personal Injuries - Non-Pecuniary Damages - Unaware Plaintiff and the Functional Approach" (1986) 64 Can Bar Rev. 562.

## Exhibit C

**Instances of Canadian Court Citations of:**

Graeme Mew, *The Law of Limitations*, (Butterworths, 2004), 2nd ed. (1st edition in 1991)


*872899 Ontario Inc. v. Iacovoni*
**33 O.R. (3d) 561**
ONCtGD - 1997 May 7

*Alvis v. Alvis*
**[2005] M.J. No. 425**
MBQB - 2005 Nov 17

*Air Line Pilots Assn. v. Canadian Airlines International Ltd*
**[2000] B.C.J. No. 1698**
BCSC - 2000 Apr 12

*Beloit Canada Ltd. v. Valmet-Dominion Inc. (C.A.)*
**[1997] 3 F.C. 497, 73 C.P.R. (3d) 321**
CAFCA - 1997 Apr 23

*Binder v. Royal Bank of Canada*
**[2005] N.S.J. No. 239**
NSCA - 2005 Jun 16

*Boyle, Re*
**29 O.S.C.B. 3365**
Ontario Securities Commission - 2006 Apr 12

*Business Development Bank of Canada v. Papke*
**[2003] B.C.J. No. 2689**
BCSC - 2003 Nov 24

*Butler v. Southam Inc.*
**[2001] N.S.J. No. 332**
NSCA - 2001 Sep 7

*Calandra v. Singh*
**[2006] WL 1230732**
ONSupCtJus - 2006 Feb 22

*Canada v. Chmilar*
**[1994] F.C.J. No. 878**
CAFCTD(1reInst) - 1994 Jun 6

*Dutchak v. Paterson*
**[2005] A.J. No. 1896**
ABProvCt - 2005 Dec 22

*Frumusa v. Ungaro*
**[2005] O.J. No. 2412**
ONSupCtJus - 2005 May 20

*Garth v. Halifax (Regional Municipality)*
**[2006] N.S.J. No. 300**
NSCA - 2006 Jul 20
*Gillis v. Gillis*
**[1995] N.S.J. No. 476**
NSSC - 1995 Nov 7

*Halloran v. Ontario (Employment Standards Act Referee)*
**217 D.L.R. (4th) 327**
ONCA - 2002 Aug 27

*Hamel v. Canada (C.A.)*
**[1999] 3 F.C. 335 , 175 D.L.R. (4th) 323**
CAFCA - 1999 Feb 26

*Heuman (Next Friend of) v. Andrews*
**[2005] A.J. No. 1509**
ABQB - 2005 Nov 4

*Josvanger v. Folk*
**[2005] S.J. No. 724**
SKCA - 2005 Nov 29

*Karais v. Guelph (City)*
**11 O.R. (3d) 89**
ONCtGD - 1992 Sep 30

*Kenmount Management Inc. v. Saint John Port Authority*
**210 D.L.R. (4th) 676, [2002] N.B.J. No. 32**
NBCA - 2002 Jan 31

*Kingstreet Investments Ltd. v. New Brunswick (Department of*
**254 D.L.R. (4th) 715, [2005] N.B.J. No. 205**
NBCA - 2005 May 26

*Lacroix (Litigation guardian of) v. Dominique*
**[1999] M.J. No. 397**
MBQB - 1999 Sep 21

*Macdonald v. Macdonald*
**[1996] B.C.J. No. 642**
BCSC - 1996 Mar 21

*MacKay v. Russell*
**[2006] N.B.J. No. 437**
NBQB - 2006 Oct 19

*Markevich v. Canada (C.A.)*
**[2001] 3 F.C. 449**
CAFCA - 2001 May 7

*Mendonca v. Dominion of Canada General Insurance Co.*
**[2006] O.J. No. 1029**
ONSupCtJusSmClCt - 2006 Mar 21

*Menzies v. Bank of Nova Scotia*
**[1996] M.J. No. 201**
MBQB - 1996 Feb 27

*M.M. v. Roman Catholic Church of Canada*
**[2001] M.J. No. 401**
MBCA - 2001 Sep 26

*Moar v. Roman Catholic Church of Canada*
**205 D.L.R. (4th) 253**
MBCA - 2001 Sep 26

*Nahum v. Toronto Dominion Bank*
**[1996] O.J. No. 2855, [1998] O.J. No. 4701**
ONCtGD - 1996 Aug 20; 1998 Nov 18

*Normandeau c. Lévesque (Succession de)*
**[2006] A.C.F. no 1016**
CAFC - 2006 Jun 22

*Payne v. Brady Estate*
**[1996] N.J. No. 245**
NLCA - 1996 Sep 11

*Perry, Farley & Onyschuk v. Outerbridge Management Ltd.*
**199 D.L.R. (4th) 279**
ONCA - 2001 May 7

*Quigley v. St. John's (City)*
**201 D.L.R. (4th) 306**
NLCA - 2001 Jun 13

*Rivergate Properties Inc. v. West St. Paul (Rural Municipality)*
**[2006] M.J. No. 281**
MBCA - 2006 Jul 20

*Ryan v. Moore*
**[2005] 2 R.C.S. 53,**
**254 D.L.R. (4th) 1**
SCC - 2005 Jun 16

*Schapelhouman v. Ontario Cream Producers Marketing Board*
**[1995] O.J. No. 3132**
ONCtGD - 1995 Oct 16

*Steffensen v. Canadian Tire Corp.*
**[1996] M.J. No. 197**
MBQB - 1996 Apr 17

*Swiderski v. Broy Engineering Ltd.*
**11 O.R. (3d) 594**
ONDivCt - 1992 Nov 16

*Thompson v. Manitoba*
**[1997] M.J. No. 639**
MBQB - 1997 Nov 4

*Vine Hotels Inc. v. Frumcor Investments Ltd.*
**73 O.R. (3d) 374**
ONSupCtJusDivCt - 2004 Nov 24

*Wong v. Sherman*
**[1998] O.J. No. 1534**
ONCtGD - 1998 Apr 8

**Exhibit D**

**CANADIAN REGULATIONS**
**RE: ASBESTOS-CONTAINING MATERIALS IN BUILDINGS**

| PROVINCE | DATE | REGULATION |
|---|---|---|
| Alberta | | **1. *Alberta Building Code*** <br><br> The Alberta Building Code is the provincial legislation that has specific prohibitions on the types of asbestos products that can be used in buildings. The Code also has provisions regarding when asbestos containing building products had to be removed or otherwise managed in buildings being demolished or renovated. These provisions have been transferred to the *Occupational Health and Safety Code.* |
| | 1977 | **March 1977: Alberta Heating, Ventilating and Air Conditioning Regulations** <br> Supply and return air may not pass over surfaces containing asbestos except for the surfaces of fire stops. This provision was incorporated into the 1978 Alberta Heating, Ventilation and Air Conditioning Code. |
| | 1981 | **May 1981: Alberta Building Code** <br> No product that has a potential for releasing asbestos fibres in a building may be installed apart from asbestos cement board and asbestos cement pipe (as long as the latter two were not used in a supply or return air system) |
| | 1985 | **June 1985: Alberta Building Code** <br> Asbestos may not be used in air distribution systems or equipment in a form or location where asbestos fibres could enter the air supply or return systems |
| | 1987 | **February 1987: Standata 85-DR-009** <br> Alberta became a signatory to an International Labour Organization convention banning the spray application of asbestos products and products containing crocidolite. |
| | 1991 | **September 1991: Alberta Building Code** <br> • Any condition where there is a potential for asbestos fibres to be released in a building may be declared by the Director to be an unsafe condition. <br> • The use of materials containing crocidolite is prohibited. <br> • Spray application of asbestos products is prohibited. |

1

|  |  | <ul><li>In buildings being altered or renovated, any materials having the potential for releasing asbestos fibres in the area of alteration or renovation must be encapsulated, enclosed or removed.</li><li>In buildings to be demolished, materials having the potential for releasing asbestos fibres must first be removed.</li></ul><br>**2. *Public Health Act,*** R.S.A. 1955, c. 255. |
|  | 1966 | **Reg. 186/66 -** Regulations Respecting the Protection of Persons with Fibrosis of the Lungs (Amended AR 572/57 by inserting Division 25)<br>The Regulation includes health assessment requirements for anyone who may be exposed to a substance that causes fibrosis. |
|  | 1971 | **Reg. 375/71** – Fibrosis of the Lungs<br>The Regulation includes health assessment requirements for anyone who may be exposed to a substance that causes fibrosis.<br>Amended by Reg 9/82 (where some requirements related to silica were added)<br>Repealed by Reg. 243/83<br><br>**3. *Occupational Health and Safety Act,*** R.S.A. 1976, c.40 |
|  | 1976 | **Reg. 267/76** – General Accident Prevention Regulation<br>Requirements for ventilation systems to ensure that exposure to asbestos is kept below the ACGIH TLVs.<br><br>**4. *Occupational Health and Safety Act,*** R.S.A. 1980, c.0-2 |
|  | 1982 | **Reg. 7/82** – Asbestos Regulation<br>This Regulation came into force on March 1, 1982. It covered definitions; employer's responsibilities; labelling; handling; waste treatment; prohibition of drinking, eating or smoking in a restricted area; and medical assessment of exposed workers. It contained health assessment requirements that had been in the fibrosis regulations. |
|  | 1982 | **Reg. 8/82** – Chemical Hazards Regulation<br>Contained occupational exposure levels for asbestos fibres |

2

| | | |
|---|---|---|
| | | (2 f/cc for chrysotile, 0.2 f/cc for other forms of asbestos). |
| | 1988 | **Reg. 393/88** – Chemical Hazards Regulation<br>This Regulation replaced the Asbestos Regulation 8/82. This Regulation came into effect on 15 March 1989, incorporating amendments up to and including Alberta Regulation 15/8 covering the Occupational Health and Safety provisions relevant to work involving harmful controlled substances. Permissible occupational exposure limits for chrysotile fibres are regulated in this Regulation. Amended by AR 17/89 to add Schedule 2 (asbestos included in Schedule) |
| | 1992 | **Reg. 303/92** – Chemical Hazards Regulation<br>Asbestos was added to Part 3 of the Regulation and the Asbestos Regulation was repealed. |
| | 1997 | **Reg. 169/97** – Chemical Hazards Regulation<br>Amendments were made to section 41. Section 42 (worker registry) was repealed.<br><br>**5. *Occupational Health and Safety Act*, R.S.A. 2000, c.O-2.**<br>Continued the regulations that were in place under the prior Act.<br><br>**6. *Workers Compensation Act*, S.A. 1973, c. 87.** |
| | 1973 | **Reg. 362/73**, section 14, recognizes Asbestosis as an industrial disease |
| | 1984 | **Reg. 326/84** - Ventilation Systems<br>Coming into force on 1 Jan. 1985, this Regulation applied to all work sites where airborne contaminants or oxygen deficiency might reasonably affect workers' health. The adequacy, design, development or modification of a ventilation system shall be determined on the basis of a thorough assessment of the hazards present. The maintenance of the ventilation system is the responsibility of the employer, who shall also ensure that workers are trained in its use. |

| British Columbia | 1968, 1979 | 1. *Workmen's Compensation Act*, S.B.C. 1968, c.59 and *Workers Compensation Act*, R.S.B.C. 1979, c.437

These Acts contemplated that building owners must know what is in their buildings, including asbestos-containing products, in order to comply with numerous provisions of the Acts and regulations.

The 1968 Act defines an employer as including: "every person having in his service under a contract of hiring or apprenticeship, written or oral, express or implied, any person engaged in any work or about an industry;..." (1968 Act, s.2) The 1979 Act contains a virtually identical definition: "every person having in his service under a contract of hiring or apprenticeship, written or oral, express or implied, a person engaged in work in or about an industry;..." (1979 Act, s.1)

Section 4(1)(b) of the 1968 Act states that:
(1) This Part [Part 1 "Compensation to Workmen and Dependants"] applies to employers and workmen (b) in or about the operation of industrial undertakings listed in Schedule A;...

"Commercial buildings or properties where space is rented to a tenant" and "schools, colleges, or universities and hospitals" are among the industrial undertakings listed in Schedule A of the 1968 Act. The 1979 Act has the same language on this issue (1979 Act, s.2(1)(b) and Schedule A)

Under section 61 of the 1968 Act, the Worker's Compensation Board was permitted to assess a levy against employers for:
    (i)     failing to take sufficient precautions to prevent injuries and industrial diseases;
    (ii)    failing to comply with regulations, orders and directions of the WCB; and
    (iii)   allowing unsafe working conditions. |
| | 1972 | **Reg. 64/72** - (the "1972 Regulations") placed specific obligations on employers to comply with the 1968 Act and address potentially hazardous conditions. For example, the 1972 Regulations state the following:

8.04. All buildings, excavations, structures, machinery, equipment, tools, and places of employment shall be maintained in such condition that workmen will not be endangered.

8.05: Regular inspections of all buildings, excavations, structures, |

| | | machinery, equipment and places of employment shall be; made, by the employer or his representative, at intervals that will ensure that safe working conditions are maintained. Unsaf3e conditions fo0und in these inspections shall be remedied without delay. |
|---|---|---|
| | | ... |
| | | 12.14 Where workmen are exposed to, or handle toxic or corrosive substances, or substances containing harmful ingredients, the employer shall ensure that the harmful nature of the substances is known, that safe means of handling and using the substances are followed, and that the workmen are trained in the safe handling the substances and are wearing any necessary protective clothing as required by regulations 14.02. |
| | | (Section 12 of the 1972 Regulations is headed "Health Hazards and Harmful Substances." Asbestos is dealt within the section under the subheading "Asbestos Hazards". |
| | | The 1972 Regulations gave notice to all employers and workers in British Columbia that specific precautions had to be observed when dealing with asbestos and asbestos containing materials. |
| | | Section 4 of the 1972 Regulations dealt with compliance with the Regulations. Every provision contained within Section 4 was mandatory in nature. |
| | | Specific precautions to be followed when dealing with asbestos-containing products were dealt with in sections 12.30 through 12.42 of the 1972 Regulations. |
| | | Section 12.30 entitled "Control of hazards", stated that when work or manufacturing process cause or are likely to cause workmen tot be exposed to asbestos or dusts containing asbestos, means shall be provided to control asbestos dusts at or below the threshold limit value listed in appendix "A:. |
| | 1978 | **Reg. 585/77** (effective January 1, 1978) (the "1978 Regulations"), also placed significant responsibilities on employees, including building owners, to know what potentially hazardous materials there were in the workplace, including asbestos-containing materials, and to reduce any risk of injury to employees and other workmen from those materials. Moreover, as was the case with the 1972 Regulations, the 1978 Regulations made plain in section 2,04 that: |
| | | "Notwithstanding the absence of a specific regulation, all employment and work shall be carried out without undue risk of injury or industrial disease to any person subject to these regulations." |

5

As was the case under the 1972 Regulations, any contravention of a regulation was, under section 2.16 of the 1978 Regulations, deemed to be "a contravention by the employer". Accordingly, all employers, including building owners, had to know what potential hazards were in the workplace to make sure that all proper precautions were taken.

Several provisions of Section 8, "Places of Employment – General Requirements", required employers, including building owners, to maintain safe work conditions and to instruct workers in the safe performance of their duties. Building owners would have to become familiar with all potentially hazardous materials in order to discharge these responsibilities.

Section 12 of the 1978 Regulations deals specifically with "Harmful Substances". Section 12.01 "General Requirements', emphasizes the duty of the employer to know about the presence and characteristics of "any substance likely to cause adverse health affects".

Section 13(1) of the 1978 Regulations states that "A worker's exposure to airborne contaminants shall be limited to the stated permissible concentrations as specified in Appendix "A", Appendix "B" and the preambles thereto" Appendix "A", Table 1 gave "permissible concentrations for Airborne Contaminant Substances", including asbestos. This required an employer, including a building owner, to know the composition of any asbestos-containing material to determine whether it contained crocidolite Moreover, Appendix "B" listed asbestos as a carcinogen.

Section 13.03 stated: Where it is necessary for an employer to reduce or contain the level of contamination at any place of employment, preference must be given to methods that do not involve pollution of the environment.

In doing maintenance work, renovations or demolition, building owners would have to be aware of what building materials could potentially pollute or contaminate the environment.

Section 35 of the 1978 Regulations set out a regime for the safe handling of asbestos materials.

The building owner and other employers had to be familiar

| | | |
|---|---|---|
| | | with the composition of asbestos-containing materials, since different permissible exposures were mandated for crocidolite and Section 35.25 stated that "crocidolite asbestos shall not be used in any place of employment." |
| | 1980's and 1990's | During the 1980's and 1990's the Worker's Compensation Board published and disseminated a brochure entitled "Safe Handling of Asbestos [:] A Manual of Standard Practices." On page 8 of the fifth printing of the brochure, (September, 1990), the following statement appeared under the title "Employer Responsibilities": "Work that involves the handling of materials containing asbestos can vary from a major friable asbestos removal project to removing or replacing a gasket. To prevent the inhaling of asbestos fibres by the workers doing the work or those who may be affected by such work, the employer of those workers has responsibilities which include…" Numerous examples of the employer's responsibilities were given, such as<br>    (a) instructing and training the workers in the work procedures;<br>    (b) ensuring experience and qualified supervision of the work;<br>    (c) ensuring workers have and are provided with, wear, and are trained in the use of necessary personal protective clothing and equipment; and<br>    (d) informing workers of health hazards associated with exposure to asbestos fibres<br><br>Another duty of a building owner/employer cited in the manual requires the owner/employer to ascertain the manufacturer of the asbestos-containing material in question; the owner/employer has the responsibility of: "…making available manufacturer's detailed work procedures or, where such procedures do not exist, preparing written work procedures." |
| | 1978-1993 | During 1978 to 1993, various amendments were made to the 1978 Regulations. For example, exposure limits (permissible concentrations) for asbestos changed as a result of BC Regulations 374/79 and 267/93. Regulation 374/79 gave individual exposure limits for amosite, chrysotile, crocidolite, and tremolite. Building owners had to know the composition of the asbestos-containing materials in order to ensure compliance. |

7

| Manitoba | | 1. ***Workplace Safety and Health Act,*** S.M. 1976, c. 63 (R.S.M. W210) |
|---|---|---|
| | 1977 | **Reg. 209/77** - Respecting Workers Employed in Certain Industries in Which Fibrosis (including silicosis) May be Contracted |
| | | (Reg. 109/77 was repealed and replaced by Reg. 100/88, "Fibrosis and Silicosis Regulation", which is identical in relevant part.) |
| | | s. 1(1)(b): "prescribed occupation" means an occupation |
| | | (i) that is in an industry mentioned in Schedule A to this Regulation; and |
| | | (ii) in which a worker is, or may be, exposed to the inhalation of any substance that may produce fibrosis of the lungs; |
| | | but which does not include an occupation in which the worker is exposed to the inhalation of such substance for a period of less than fifty hours in each month ... |
| | | Schedule A |
| | | ... |
| | | (6) Any industry in which asbestos, or any mixture of asbestos, is worked or handled, or any asbestos textiles, or any article composed of or containing asbestos, is manufactured or repaired. |
| | 1988 | **Reg. 53/88** -Workplace Health Hazard Regulation |
| | | Regulates as "controlled products" those products specified by the regulations made pursuant to paragraph 15(1)(a) of the federal *Hazardous Products Act* to be included in any of the classes listed in Schedule II federal Act. |
| | | Asbestos is specifically listed as a "designated material" in Schedule B, Section 1. Designated materials are a sub-set of "controlled products" that are deemed to be health hazards: |
| | | s. 18(1)   Subject to subsections (3) to (5), an employer shall in consultation with the workplace safety and health committee or worker safety and health representative ensure that the hazard information for each controlled product in a workplace is evaluated to determine if the controlled product poses or may pose a health hazard to any worker in the workplace, and, if so, comply with the requirements of this part. |
| | | (2) Where a controlled product is or contains a designated material, the evaluation required under subsection (1) shall be deemed to have been done and to have disclosed that the designated material is a health |

8

hazard.

See also s. 19(2), which sets a lower level of exposure to designated materials than to other controlled products.

Section 29 requires employers to restrict access to areas in which designated materials are located.

2. *Worker's Compensation Act*, R.S.M. 1954, c. 297.

1954

Schedule 1, para. 26 refers to "asbestos goods" as an industry within the scope of the Acts provisions relating to contribution to the accident fund. Para. 35 refers to "the work of artisans and mechanics employed for their whole time at their trade in an industry not classified herein". The full paragraphs are quoted below. As you can see, the paragraph containing the reference to asbestos goods relates primarily to manufacturers of fibrous or fabric goods, while the paragraph containing the "artisans and mechanics" language is a composite, and may have been intended as a residual clause. A 1974 regulation clarifies that "artisans and mechanics" includes asbestos workers.

Schedule 1

26. Flax mills, manufacture of textiles or fabrics, spinning, weaving, and knitting manufactories, manufacture of yarn, thread, hosiery, cloth, blankets, carpets, canvas, bags, shoddy, felt, cordage, plastic material, ropes, fibre, brooms, or brushes; asbestos goods, hair cloth and other hair goods; work in manilla or hemp; tents, awnings and articles not otherwise specified made from fabrics or cordage; the erection of awnings by the manufacturer.

...

35. Plumbing, sanitary or heating engineering, gas and steam fitting; the work of **artisans and mechanics employed for their whole time at their trade in an industry not classified herein;** operation of theatres; operation of passenger or freight elevators which are not operated in connection with an industry included in another class, including the operation of elevators used in connection with an industry to which this Schedule does not apply or in connection with a warehouse or shop or an office or other building or premises. (Para. 35 became para. 39 in the later revision.)

**Reg. 82/74** - A Regulation Under the Workmen's Compensation Act Relating to Miscellaneous Matters

1974

1. The words "artisans and mechanics" as set out in paragraph 39 of Schedule 1 to The Workmen's Compensation Act

9

| | | |
|---|---|---|
| | | (hereinafter called "the Act") include on workers and their helpers of the following trades:<br><br>      (1) Airframe and Aeroengine Mechanics<br><br>      (2) **Asbestos Workers**<br><br>      (3) Auto Mechanics<br><br>      (4) Bakers<br><br>      (5) Boiler Makers<br><br>      (6) Bookbinders<br><br>      ... |
| | 1987 | 3. *Workers Compensation Act,* R.S.M. 1987, c. W200.<br><br>The "artisans and mechanics" language continued to be used. See, e.g., s. 2.1(1):<br><br>2.1(1) The Lieutenant governor in Council may, by regulation, exclude an industry, an employer or workers from being within the scope of this Part and, in doing so, may<br><br>(b) permit the inclusion of **artisans and mechanics** employed full-time at their trade in the excluded industry |
| Newfoundland and Labrador | 1981 | 1. *The Regulation of Mines Act,* R.S.N. 1970, c.330.<br><br>**Reg. 83/81,** "The Asbestos Exposure Code", adopted pursuant to the Mines (Safety of Workmen) Regulations, 1957. Repealed and replaced by 1144/96. |
| | 1979 | 2. *Occupational Health and Safety Act,* S.N. 1978, c.23.<br><br>**Reg. 104/79** - Occupational Health and Safety Regulations, 1979<br><br>Includes pneumoconiosis due to asbestos, and also mesothelioma of the pleura or peritoneum as notifiable occupational diseases.<br><br>24(1) The occupational diseases for which notification is required under Section 58 of *The Occupational Health and Safety Act* are:<br><br>(d) Pneumoconiosis due to silica or silicate, **including asbestos, talc,** |

10

| | | |
|---|---|---|
| | | mica or coal. |
| | | (j) Mesothelioma of the pleura or peritoneum |
| | 1988 | **Reg. 169/88** - Workplace Hazardous Materials Information System Regulations (WHMIS) |
| | | Defines controlled products as those products specified by the regulations made pursuant to paragraph 15(1)(a) of the federal *Hazardous Products Act* to be included in any of the classes listed in Schedule II federal Act.  Newfoundland therefore included asbestos as a controlled product from 1988, if the *Hazardous Products Act* listed asbestos as of that date. |
| | | Repealed and replaced by Reg. 148/89 (identical in relevant part). |
| | 1991 | **Reg. 194/91** - Asbestos Abatement Code of Practice |
| | | (2) Application |
| | | This Code of Practice applies to: |
| | | 1.(a) Applies to every workplace covered by the Occupational Health and Safety legislation where asbestos or material containing asbestos is likely to be handled, dealt with, disturbed or removed and including every project, project owner, contractor, employer and employee engaged in or on the project; |
| | | (b) the repair, alteration or maintenance of a building containing asbestos and to the owner thereof, and to every employer and employee engaged in such repair, alteration or maintenance; |
| | | (c) every building in which material that contains asbestos has been used and to the owner thereof; |
| | | (f) other operations involving a risk of exposure to airborne asbestos fibers. |
| | | Repealed and replaced by Reg. 1147/96. |
| | 1970 | **4. *Workmen's Compensation Act*,** R.S.N.L. 1970, c. 403. Title changed to the *Workers' Compensation* in 1983 (in force January 1, 1984).  The 1983 Act redesigns the structure of the legislation, so that Industrial Diseases are prescribed by Regulation rather than set out in a Schedule to |

| | | |
|---|---|---|
| | | the Act. See description of Reg. 330/83, below. |
| | 1967 | **Reg. 29/67 - Workmen's Compensation Regulations**<br><br>Repeals and replaces the "Workmen's Compensation Regulations, 1957".<br><br>Includes asbestos mining in Class 1 workers covered by the Act and Regulations.<br><br>Repealed and replaced by Reg. made April 30, 1974 (doesn't provide the regulation number) |
| | 1983 | **Reg. 330/83 - Workers' Compensation Regulations, 1984**<br><br>S. 28, para. 1 includes asbestosis as an industrial disease. (In force January 1, 1984.):<br><br>**Industrial Disease**<br><br>1. pneumoconiosis caused by sclerogenic mineral dust (silicosis, anthraco-silicosis, asbestosis) and silicio-tuberculosis, provided that silicosis is an essential factor in causing the resultant incapacity or death.<br><br>**Description of Process**<br><br>All work involving exposure to the risk concerned. |
| Nova Scotia | 1987 | **1. *Building Code Act*, S.N.S. 1977, c. 5**<br><br>**Reg. 45/87:** Adopts The National Building Code, National Research Council publication number NRC No. 23174. |
| | 1986 | **2. *Dangerous Goods and Hazardous Wastes Management Act*, S.N.S. 1986, c. 7** |
| | 1988 | **Reg. 238/88 - Asbestos Waste Regulations**<br><br>Sample sections:<br><br>2(c) "asbestos waste" means a waste containing friable asbestos fibers or asbestos dust in a concentration greater than 1% by weight<br><br>3. For the purposes of the Act and these regulations, asbestos waste is designated as a dangerous good. .<br><br>4. Every person involved in the transportation, handling, storage or disposal of asbestos waste shall ensure that asbestos fibers do not |

12

<table>
<tr><td></td><td></td><td>

become airborne.

5. No person shall remove asbestos from the interior or exterior of any building or other structure or part thereof unless the removal is carried out in accordance with the requirements of the Codes of Practice respecting Managing Asbestos in Buildings and Removal of Friable Asbestos Containing Materials made pursuant to the Occupational Health and Safety Act.

Repealed and replaced by Reg. 197/90 (under the *Dangerous Goods and Hazardous Wastes Act*, which was repealed and replaced by Reg. 56/95, made under the *Environment Act*).

**3.   *Environmental Protection Act*, S.N.S. 1973, c. 6.** Repealed and replaced by the *Environment Act*, S.N.S. 1994-95, c. 1.

**Reg. 56/95** - Dangerous Goods Management Regulations

Repeals and replaces Reg. 197/90 (under the *Dangerous Goods and Hazardous Wastes Act*). This regulation defines "dangerous goods" to mean goods as defined in the federal *Transportation of Dangerous Goods Act* regulations:

1.In these regulations

(d) "dangerous goods" means a substance that

(i) conforms to the criteria set out in subsections 3.8 to 3.27, inclusive, of the Transportation of Dangerous Goods Regulations (Canada),

(ii) is included in List 1 of Schedule II or List II of Schedule II of the Transportation of Dangerous Goods Regulations (Canada), or

(iii) is designated in Schedule "B" of these regulations

Note: if asbestos is listed in List I of Schedule II or List II of Schedule II of the federal Act, then it's included here by reference.

**4.   *Occupational Health and Safety Act*, SN. 1985, c. 3.** The *Occupational Health and Safety Act* repealed and replaced the *Industrial Safety Act*, R.S.N.S. 1967, c. 141, which repealed and replaced the *Factories Act*, R.S.N.S. 1954, c. 92.

</td></tr>
</table>

1995

13

| | | |
|---|---|---|
| | 1969 | General regulations under the 1967 *Industrial Safety Act* were made on February 11, 1969. |
| | 1988 | **Reg. 196/88** - The Workplace Hazardous Materials Information System (WHMIS) Regulations |
| | | Defines controlled products as those products specified by the regulations made pursuant to paragraph 15(1)(a) of the federal *Hazardous Products Act* to be included in any of the classes listed in Schedule II federal Act. Nova Scotia therefore included asbestos as a controlled product from 1988, if the *Hazardous Products Act* listed asbestos as of that date. |
| | | "Code of Practice Respecting Managing Asbestos in Buildings" made pursuant to the *Occupational Health and Safety Act*. (See reference in Reg. 238/88 under the *Dangerous Goods and Hazardous-wastes Management Act*, above.) |
| | | Code of Practice Respecting Removal of Friable Asbestos Containing Materials" made pursuant to the *Occupational Health and Safety Act*. (See reference in Reg. 238/88 under the *Dangerous Goods and Hazardous-wastes Management Act*, above.) |
| | | **5. *Workers' Compensation Act*,** R.S.N.S. 1967 |
| | 1996 | **Reg. 22/96** - Appendix A includes "rock wool manufacturing" workers in the list of employees covered by the Act, and also lists "insulation manufacturing", "building" and "building construction", but does not name asbestos or asbestos workers specifically. "Rockwool" is defined in the Oxford Canadian Dictionary (1998) as "a wool-like substance made from inorganic material, used esp. for insulation etc.". Rockwool may be a synonym for asbestos. |
| Ontario | | **1. *Environmental Protection Act*,** R.S.O. 1980, c. 141 (from S.O. 1971, c. 86). |
| | 1983 | **Reg. 175/83** – General: Waste Management |
| | | Adds provisions respecting asbestos waste. Amends R.R.O. 1980, Reg. 309. See, e.g., Reg. 175/83, s. 3, adding new s. 14 to the General Regulation: |
| | | 14.The management of asbestos waste shall be carried out in accordance |

14

| | | |
|---|---|---|
| | | with the following provisions:<br><br>1. No person shall cause or permit asbestos waste to leave the location at which it is generated except for the purpose of transporting it to a waste disposal site, the operator of which has agreed to accept it and has been advised as to its anticipated time of arrival and, ...<br><br>"asbestos waste" means solid or liquid waste that contains asbestos in more than a trivial amount or proportion and that does not contain a significant amount or proportion of other components that would bring the waste within the meaning of hazardous waste; |
| | 1985 | **Reg. 322/85**, amending R.R.O. 1980, Reg. 309. Amends the definition of "asbestos waste".<br><br>"asbestos waste" means solid or liquid waste that results from the removal of asbestos-containing construction or insulation or materials or the manufacture of asbestos-containing products and contains asbestos in more than a trivial amount or proportion. |
| | 1988 | **Reg. 597/88**, s. 2, amending R.R.O. 1980, Reg. 309. Amends subsection 14(1) as follows:<br><br>Subsection 14(1) of the said Regulation, exclusive of the paragraphs, as made by section 3 of Ontario Regulation 175/83 and amended by section 1 of Ontario Regulation 574/84 and section 4 of Ontario Regulation 464/85, is revoked and the following substituted therefore:<br><br>(1) No person shall manage asbestos waste except in accordance with the following: |
| | 1998 | **Reg. 524/98** - Certificate of Approval Exemptions: Air<br><br>Exempts from Section 9 of the Act mobile equipment used for asbestos removal.<br><br>Amended to O. Reg. 273/03. |
| | | **2. *Industrial Safety Act, 1971*,** S.O. 1971, c. 43. The *Industrial Safety Act* became the *Occupational Health and Safety Act,* S.O. 1978, c. 83 (in force October 1, 1979). |
| | 1972 | **Reg. 259/72** - Regulation Made Under the Industrial Safety Act, 1971<br><br>Required examinations of workers exposed to asbestos.<br><br>5(1) Where a person is exposed to a concentration of lead, mercury, beryllium, asbestos, isocyanates, silica, enzymes, fluorides, benzol or other substances of similar toxicity that is likely to endanger his health, |

15

| | | |
|---|---|---|
| | | he shall be examined by a qualified medical practitioner at such intervals as specified in writing by the chief inspector .... |
| | 1982 | **Reg. 570/82 - Designated Substance: Asbestos**<br><br>3(1)  Subject to subsection (3) this Regulation applies to every employer and worker at a work place where asbestos is present, processed, mined, used, handled or stored and at which the worker is likely to inhale or ingest asbestos.<br><br>(2) Subject to subsection (3) , an employer to whom this Regulation applies shall take every precaution reasonable in the circumstances to ensure that every worker who is not an employee of the employer but who is working in the work place of the employer and is exposed to asbestos and whose health is likely to be affected thereby is protected and the worker shall comply with the requirements of the employer.<br><br>(3) Subsection (2) and sections 4 to 17 do not apply to a constructor , to an employer who is carrying out a project, or to a worker working on or at a project.<br><br><div align="center">Amended by O. Reg. 23/87, s. 5</div> |
| | 1985 | **Reg. 655/85**, repealing and replacing **Reg. 570/82**, s. 3 (filed December 16, 1985; in force 90 days after filing)<br><br>1.Section 3 of Ontario Regulation 570/82 is revoked and the following substituted therefore:<br><br>3(1) This regulation applies,<br><br>(a) to every employer operating a mine or mining plant for the purpose of mining, crushing, grinding or sifting asbestos and to those workers of such an employer who are likely to inhale or ingest asbestos;<br><br>(b) to every employer processing, adapting or using asbestos in connection with the manufacturing or assembling of goods or products and to those workers of such an employer who are likely to inhale or ingest asbestos; and<br><br>(c) to every employer,<br><br>(i) engaged in the repair, alteration or maintenance of machinery, equipment, aircraft, ships, locomotives, railway cars and vehicles and to those workers of such an employer who are likely to inhale or ingest asbestos, or<br><br>(ii) engaged in work on a building that is necessarily incidental to the repair, alteration or maintenance of machinery or equipment and to those workers of such an employer who are likely to inhale or ingest asbestos, if the employer has on or before the day Ontario Regulation 654/85 is filed with the Registrar of Regulations, put into effect and maintained measures and procedures to control the exposure of workers to asbestos and has incorporated the measures and procedures in an |

16

<table>
<tr><td></td><td></td><td>asbestos control program in accordance with this Regulation.</td></tr>
</table>

|  |  |  |
|--|--|--|
|  |  | (2) An employer to whom this Regulation applies shall take every precaution reasonable in the circumstances to ensure that every worker who is not an employee of the employer and who works in the workplace of the employer is protected and every such worker shall comply with the requirements of the employer. |
|  | 1985 | **Reg. 654/85** - Designated Substance: Asbestos on Construction Projects and in Buildings and Repair Operations<br><br>The entire regulation deals with the use of asbestos on construction projects. As noted in my May 29, 2006 chart, Section 3(1) (Reg. 654/85) provides:<br><br>3(1) No person shall apply or install by spraying or cause to be applied or installed by spraying material containing more than 1 per cent asbestos by dry weight that can become friable.<br><br>Amended by Reg. 529/88. Becomes R.R.O. 1990, Reg. 838. Amended by Reg. 278/05. |
|  |  | **3. *Workmen's Compensation Act*,** R.S.O. 1970, c. 505 |
|  | 1970 | **R.R.O. 1970, Reg. 834** classifies industries covered by the Act. Class 17(1)(i)(m) lists "manufacturing fibre or asbestos goods". Asbestosis or exposure to asbestos is not included in Schedule 3 list of industrial diseases. |
|  | 1992 | **Reg. 276/92,** adds Schedule 4 to the general regulations under the *Worker's Compensation Act*. In Schedule 4, asbestosis is included as an occupational disease deemed under subsection 15(4) of the WSI Act as resulting from the prescribed process. (Section 15(4) creates a rebuttable presumption of causation for Schedule 3 diseases and an unrebuttable presumption of causation for Schedule 4 diseases.) It also adds the generation of asbestos fibres as the unrebuttable causative process for the development of mesothelioma:<br><br>**Schedule 4: Occupational Diseases (Deemed Under subsection 15(4) of the Act)**<br><br>**Column 1: Description of disease**<br><br>1. Asbestosis |

| | | **Column 2: Process**<br><br>mining, milling, manufacturing, assembling, construction, repair, alteration, maintenance or demolition process involving the generation of asbestos fibres (Schedule 4, columns 1 (description of disease) and 2 (process))<br><br>**Column 1: Description of disease**<br><br>2. Primary malignant neoplasm of the mesothelium of the pleura of peritoneum<br><br>**Column 2: Process**<br><br>Any mining, milling, manufacturing, assembling, construction, repair, alteration, maintenance or demolition process involving the generation of airborne asbestos fibres |
|---|---|---|
| | 1997 | **4. *Workplace Safety and Insurance Act, 1997*, S.O. 1997, c. 16.** The WSI Act repeals the *Workers' Compensation Act* and amends the *Occupational Health and Safety Act* (but not in respect of asbestos). |
| | 1998 | **Reg. 175/98, "General".** Repeals and replaces R.R.O. 1102 and Ont. Regs. 6/91, 758/91, 276/92, 746/92, 747/92, 899/93, 900/93 and 716/94. (In force January 1, 1998). Schedule 4 of Reg. 276/92 under the *Workmen's Compensation Act* was unaffected. |

18