UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

```
IN RE:                        . Case No. 01-1139(JKF)
                              .
                              .
W.R. GRACE & CO.,             . 5414 USX Tower Building
                              . Pittsburgh, PA  15222
                              .
             Debtor.   .
                              . February 20, 2007
. . . . . . . . . . . . . . . . 10:03 a.m.
```

TRANSCRIPT OF TELEPHONIC HEARING
BEFORE HONORABLE JUDITH K. FITZGERALD
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

```
For the Debtor:            Kirkland & Ellis, LLP
                           By:  JANET BAER, ESQ.
                                AMANDA BASTA, ESQ.
                                DAVID M. BERNICK, P.C., ESQ.
                                Aon Center
                           200 East Randolph Drive
                           Chicago, IL  60601

Unsecured Creditors'       Stroock & Stroock & Lavan, LLP
Committee:                 By:  ARLENE KRIEGER, ESQ.
                           180 Maiden Lane
                           New York, NY  10048-4982

Audio Operator:            Cathy Younker
```

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

---

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@optonline.net**

**(609) 586-2311  Fax No.  (609) 587-3599**

APPEARANCES (Cont'd.):


For David T. Austern,          Phillips, Goldman & Spence, P.A.
Future Claimants Rep:          By:  JOHN C. PHILLIPS, JR., ESQ.
                               1200 North Broom Street
                               Wilmington, DE  19806


For Asbestos Creditors'        Caplin & Drysdale, Chartered
                               By:   PETER LOCKWOOD, ESQ.
                               399 Park Avenue, 27th Floor
                               New York, NY  10022


                               Campbell & Levine, LLC
                               By:  MARK T. HURFORD, ESQ.
                               800 N. King Street
                               Suite 300
                               Wilmington, DE  19801


For Official Committee of      Bilzin Sumberg Baena Price
Property Damage Claimants:      & Axelrod LLP
                               By:  JEFFREY SNYDER, ESQ.
                               Wachovia Financial Center
                               200 South Biscayne Boulevard
                               Suite 2500
                               Miami, FL  33131


For Reaud, Morgan & Quinn      Stutzman, Bromberg, Esserman,
and ELG:                        & Plifka, PC
                               By:  SANDER L. ESSERMAN, ESQ.
                                    VAN J. HOOKER, ESQ.
                                    DAVID A. KLINGER, ESQ.
                                    DAVID J. PARSONS, ESQ.
                               2323 Bryan Street, Suite 2200
                               Dallas, TX  75201


For Ad Hoc Committee           Weil, Gotshal & Manges, LLP
of Equity Security-Holders:    By:  M. JARRAD WRIGHT, ESQ.
                                    DAVID HICKERSON, ESQ.
                               1300 Eye Street, NW, Suite 900
                               Washington, DC 20005

APPEARANCES (Cont'd.):


For Official Committee of      Ferry, Joseph & Pearce, P.A.
Asbestos Property Damage       By:  THEODORE J. TACCONELLI, ESQ.
Claimants:                     824 Market Street
                               Suite 904
                               P.O. Box 1351
                               Wilmington, DE  19899


For Future Claimants Rep:      Orrick, Herrington & Sutcliffe
                               By:  RAYMOND G. MULLADY, JR. ESQ.
                                    DEBRA FELDER, ESQ.
                               3050 K Street, NW
                               Washington, DC  20007


For Latigo Partners:           Latigo Partners
                               By:  STEPHEN BLAUNER, ESQ.


For Future Claimants:          Phillips, Goldman & Spence, P.A.
                               By:  JOHN C. PHILLIPS, JR., ESQ.
                               1200 North Broom Street
                               Wilmington, DE  19806


For Halcyon Asset              Halcyon Asset Management, LLC
Management, LLC:               By:  OSCAR MOCKRIDGE, ESQ.


For Grace Certain Cancer       Montgomery, McCracken, Walker
Claimants:                       & Rhoads, LLP
                               By:  NOEL C. BURNHAM, ESQ.
                                    NATALIE RAMSEY, ESQ.
                               300 Delaware Avenue, Suite 750
                               Wilmington, DE  19801-1607


For Kenneth Thomas:            KENNETH THOMAS


For Murray Capital
Management, Inc.:              MARTI MURRAY


For Motley Rice, LLC:          Motley Rice, LLC
                               By:  JOHN HERRICK, ESQ.
                               28 Bridgeside Blvd.
                               P.O. Box 1792
                               Mount Pleasant, SC  29465

1          THE COURT:  Good morning, everyone.  This is the

2   matter of W.R. Grace, bankruptcy number 01-1139.  There are two

3   matters scheduled this morning.  One is the opposition to

4   Foster and Sear's motion for an extension of time to respond to

5   the asbestos questionnaire, and the other is the expedited

6   hearing on a discovery matter.  Will you enter your

7   appearances?  Oh, well, I'll read the list of what I have, and

8   then I'll if this includes everyone.

9          I have Raymond Mullady, Arlene Krieger, Oscar

10  Mockridge, Jarrad Wright, David Hickerson, Kenneth Thomas,

11  Stephen Blauner, Alex Mueller, Marti Murray, John Herrick, John

12  Macklin, Alan Rich, Sander Esserman, Van Hooker, David Klinger,

13  David Parsons, Natalie Ramsey, Theodore Tacconelli, Noel

14  Burnham, Janet Baer, Amanda Basta, Barbara Harding, Jeffrey

15  Snyder, John Phillips, Nathan Finch, Mark Hurford, and Debra

16  Felder.  Is there anyone else on the line?

17          MR. LOCKWOOD:  Your Honor, Peter Lockwood is

18  replacing Nathan Finch.

19          THE COURT:  All right.  Anyone else?

20                  (No verbal response)

21          THE COURT:  Okay.  Then I'm not sure how you want to

22  proceed.  Whichever motion you want to start with is fine with

23  me.

24          MS. BAER:  Your Honor, this is Janet Baer on behalf

25  of W.R. Grace.  I didn't hear David Bernick enter his

1 appearance.

2          MR. BERNICK:  No.  I'm sorry.

3          MS. BAER:  There he is.

4          MR. BERNICK:  I was looking at a transcript.  I'm

5 sorry, Your Honor.  I'm here, and I'm taking Barbara Harding's

6 place.

7          THE COURT:  Okay.  Is the operator able to turn the

8 sound system up a bit?  It's a little bit faint here.

9          OPERATOR:  I can try.

10          THE COURT:  Okay.  I should point out for the record

11 that other than court staff there is no one present in the

12 courtroom.  So, okay, Mr. Bernick, do you want to start with

13 the debtor's opposition to Foster and Sear's motion?

14          MR. BERNICK:  Yes.  This is a -- it seems like an

15 administrative matter, but it really has turned out to be a

16 much more substantial issue, and I'll just have to lay it out

17 for Your Honor, and you'll see that there's more that rises on

18 this than just Foster and Sear at this point.

19          THE COURT:  I'm sorry.  Mr. Bernick, are you on a

20 speaker phone?

21          MR. BERNICK:  No, I'm on a regular phone here.

22          THE COURT:  Okay, then can the operator please turn

23 this up?  It's very, very faint.

24          OPERATOR:  I have to turn up every line individually,

25 and I'm doing that right now.

1          THE COURT:  Okay.  I'll give you a few seconds.

2          MR. BERNICK:  I'll try to speak up here, Your Honor.

3   Is that a little bit better?

4          THE COURT:  Yes, it is.  Thank you.

5          MR. BERNICK:  Okay.  The deadline for supplementation

6   of the questionnaire was January 12, and Your Honor will recall

7   that there was a dialogue that took place in January about

8   whether some people should get more time for their

9   supplement --

10          THE COURT:  Can you turn that up here?

11          MR. BERNICK:  -- and we resisted that, and it looked

12   like there were a small number of people, so basically they

13   were given until January 31.  The Foster and Sear people were

14   included in that group.  They filed a motion though to be able

15   to get even more time.  I think it was a motion to get even

16   more time.  Well, it turned out, in fact, that for whatever

17   reason they did not complete their submission by January 31,

18   and they wanted more time.  And because these were represented

19   to be supplements to questionnaires that had originally been

20   filed, in the dialogue that I and Mr. Esserman had on the phone

21   with Your Honor, I said, well, if they're just supplements, and

22   they're already being filed, because the representation was

23   that they were being filed, I said that we would not have a

24   problem with that.

25          Well, it turns out that these are not supplements.

1 These are brand new claimants.  The deadline originally for new

2 questionnaires to be filed -- that is people who had not filed

3 at all.  The original questionnaire deadline was in July of

4 last year, and there has been no extension, no relief from that

5 deadline.  Instead, the only additional submissions that have

6 been permitted are supplements.  So the questionnaire -- any

7 questionnaire for any claimant should have been submitted in

8 July of last year, in which case these questionnaires -- I

9 understand there to be about 300 of them -- would be completely

10 out of time.

11      Now, they were submitted anyhow, as what's indicated,

12 and in light of the fact that they were submitted, we were

13 prepared to regard their motion for permission to submit as

14 being moot, because they basically had gone ahead and done it

15 already.  But it turns out that that was not acceptable to the

16 other side.  They do want Your Honor to determine that these

17 supplements -- that these questionnaires -- excuse me -- were

18 timely filed, and that becomes a very big issue.

19      Number one, they're obviously grossly out of time,

20 because they should have been submitted last July.  But, two,

21 it turns out that this problem is much more -- much broader

22 than even Foster and Sear.  It turns out that there are

23 literally thousands, as we believe right now -- and this is

24 being confirmed -- thousands of new questionnaires that are

25 being turned in basically under the deadlines that apply to

1   supplements.  So they are new questionnaires.  They're not

2   supplements, and they're coming in months and months late.  And

3   essentially what this motion asks for, so far as I can see,

4   that Your Honor now determine that this last straggling group

5   of new questionnaires was timely, which then would mean that

6   all of the other late-filed questionnaires would be timely,

7   which would be fairly traumatic, because I believe we're

8   talking about thousands, perhaps tens of thousands, of

9   questionnaires.

10          MR. HOOKER:  Your Honor, this is Van Hooker.  This is

11  my motion on behalf of the Foster and Sear firm, and I hate to

12  interrupt David, but it's my understanding from speaking to

13  Amanda last evening that we have agreed upon a form of order to

14  submit to the Court that would resolve this.  And, you know,

15  argument is great for everybody else who hasn't filed the

16  motion, but I believe our motion has been resolved.

17          MR. BERNICK:  Oh, that's not my understanding.  My

18  understanding was that we couldn't reach agreement.  That this

19  was simply moot.

20          MR. HOOKER:  You know, she sent me an e-mail last

21  night saying that we had approved -- that you had approved the

22  form of order that everybody had circulated.

23          MR. BERNICK:  No, I --

24          MR. HOOKER:  So we're --

25          MR. BERNICK:  Well, I apologize if there's

1  miscommunication, but unless there's an agreement that there's

2  no determination of this Court that these questionnaires have

3  been timely filed and this matter is certainly moot, then there

4  is no agreement.  I may have looked at a different --

5       MR. HOOKER:  Yes, that's basically what it says.  It

6  does say that it is -- as far as it needs an extension past

7  when they were filed, it is -- it's currently moot, and that

8  the Court makes no ruling with regard to the motion itself, and

9  that all parties reserve all rights into the future to complain

10 about the timeliness.

11      MR. BERNICK:  That's fine.  I apologize for the

12 miscommunication.  The reason, Your Honor, this is going to be

13 a big issue front and center, because we are now being told

14 that the other side -- the claimants and the committees will

15 not agree to any extension of our schedule for processing all

16 these thousands of new questionnaires, and that's why this is a

17 very big issue.  But for today if they're agreeable that this

18 matter is simply moot, and the Court will then hear I think

19 probably at the next omnibus this whole story -- whole

20 situation with these questionnaires and our need for time to

21 process them, for today that's I guess all we would have to do.

22      MR. HOOKER:  Okay.  Your Honor, I -- this is Van

23 Hooker again.  I apologize.  I don't like to interrupt counsel.

24 I do that rarely, but I thought that Mr. Bernick might be

25 misunderstanding that, in fact, we had reached the agreement

1 last night, and I think it is the agreement that he is seeking

2 or certainly does get him to the place he wants to be.

3        THE COURT:  Okay.  Well, Mr. O'Neal called my office

4 a few minutes before this proceeding started and pointed out

5 that an order had been submitted on -- well, I don't know

6 whether there's -- I guess there's a certification of counsel.

7 My staff didn't print that, but there is apparently an order at

8 docket number 14607 that was file today.  Is that the order

9 that you're talking about?  Oh, I'm sorry.  I apologize.  It is

10 on a certification of counsel.  I was looking at the order

11 without the COC.  It's called supplemental order regarding

12 production of x-rays by non-mesothelioma cancer claimants, and

13 it's related to docket number 13120.  Is that the order that

14 you're telling me is the agreed upon order?

15        MR. BERNICK:  No, that's a different one.  We did

16 reach agreement on the x-rays, and there is an agreed order

17 that was very thoroughly negotiated, and that is -- that matter

18 is just before Your Honor for, we would hope, signature on the

19 order.  That's completely agreed.  We've worked out all the

20 different aspects of mechanics of the trade.  Copies or

21 originals are now due I believe on March the 15th.

22        THE COURT:  Okay.  Well, then the agreed x-ray

23 submission order I do have here, and I'll sign that one, but I

24 haven't seen one that you're -- you two are talking about with

25 respect to the Foster and Sear issue then.

1           MR. HOOKER:  It was -- Your Honor, this is Van

2     Hooker.  It was a bit late last night, around 6:00 I think

3     eastern time, and I doubt that a certificate of counsel has

4     been prepared and submitted on that yet, but I expect it would

5     probably be done this morning at some point.

6           MR. BERNICK:  Well, I'm prepared on that

7     representation, Your Honor, to go on and to take up the other

8     matter.  Our position I think is fairly clear on this.  We're

9     going to be before the Court, in any event, on Monday to talk

10    about where things are.  The committees have filed a status

11    report that purports to get into why we've got enough, and we

12    don't need anymore time.  So this matter's going to come up in

13    the more general proposition, in any event.  So we'll take a

14    look for the order, and I'm assuming that counsel's

15    representing this correctly, and that this is moot.

16           THE COURT:  All right.

17           MR. BERNICK:  That's satisfactory with us.

18           THE COURT:  Okay.  That's fine.  If I get an order on

19    a certification of counsel on the Foster and Sear matter, I'm

20    assuming at this point if you've agreed to it, I will --

21           MR. BERNICK:  Yes.

22           THE COURT:  -- probably enter it, and then we can

23    deal with anything further.  I have not seen anything with

24    respect to Monday's or -- I'm sorry -- next week's hearings

25    yet.  Nothing.  So I'm not aware of what's on the calendar for

1  next week at this point in time.  I just simply haven't seen

2  anything yet.  Okay.  Let's turn to the next matter then, the

3  expedited motion.

4          MR. BERNICK:  Yes, the expedited motion -- and let's

5  make sure that we're now talking about the same thing, because

6  this happened very quickly, and I have to say, Your Honor, that

7  things are hopping so quickly around here that it is difficult

8  to keep track -- relates to the deposition of a Dr. Lucas.

9          THE COURT:  Yes.

10         MR. BERNICK:  And I think our -- the papers pretty

11 much lay out the state of play.  This individual's deposition

12 was sought by a subpoena, you know, pretty much a year ago, and

13 in order to make sure that we wouldn't have a problem with the

14 Health Insurance Portability and Accountability Act, HIPAA, we

15 did file a motion to have it determined that that Act would not

16 be the reason why Dr. Lucas couldn't testify.  We filed the

17 motion.  Dr. Lucas is agreeable to the motion.  The motion is

18 predicated on the -- what I think is fairly clear, which is

19 that the propose of HIPAA was not to foreclose the taking of

20 evidence, and these types of orders are routinely sought and

21 granted in connection with litigation, including the asbestos

22 litigation.  That's precisely to free up the individual, so

23 that he can testify.

24         We think it's clear from his own testimony that he's

25 not a treating physician.  He's a litigation physician, and as

1 a consequence, he himself doesn't believe that he's actually

2 covered by the Act.  The only objection that I understand

3 that's been lodged is that somehow we should have -- while the

4 ACC itself cannot object on the substance of the motion that's

5 being made, they suggest that somehow we have to provide actual

6 notice to all of the people who might have been or might be Dr.

7 Lucas' patient, so that if they want to come forward and

8 object, they should come forward, because they have the

9 opportunity to do that.

10         We don't believe that that's required nor that it

11 might be feasible for us to do it.  The person who's got the

12 burden of notification is Dr. Lucas himself, even assuming that

13 he were covered by HIPAA.  So this is -- it's just very

14 standard procedure.  It's very clear, and, you know, at the end

15 of the day it's - it would simply be something that would delay

16 the deposition.  I think the delay is half the job at this

17 point, because again you're not all here.  They want to cut off

18 our ability to really discuss the further processing of  data

19 that we need to do.  This is now kind of a larger plan to use

20 the timing of the case management process to foreclose our

21 discovery, and this is just another example of it.

22         THE COURT:  Okay.

23         MR. RICH:  Your Honor, this -- I'm sorry.  This is

24 Alan Rich, Your Honor.  We file an objection yesterday

25 afternoon, which I hope Your Honor received, since it was

1  emailed.

2          THE COURT:  I got it, but who are you representing,

3  Mr. Rich?

4          MR. RICH:  We represent approximately 15 hundred

5  individuals who have retained Dr. Lucas -- a total of about 15

6  hundred.

7          MR. BERNICK:  I've not even received the objection.

8          MR. RICH:  Well, all your folks are on the ECF

9  receipt list.

10          MR. BERNICK:  Well, that's great, but I'm sitting

11  here in New York, and I don't have it.

12          THE COURT:  Okay.  Mr. Rich, you're going to have to

13  speak up.

14          MR. RICH:  I'm sorry.  I've got the phone close up to

15  my mouth, and I'm on a real telephone.

16          THE COURT:  Okay.

17          MR. RICH:  I don't -- I disagree with Mr. Bernick's

18  characterization of this is just some routine situation.  It's

19  true that individuals often sign releases of HIPAA -- of their

20  HIPAA rights, but it is not routine that courts enter orders

21  saying that physicians performing services are exempt from

22  HIPAA.  That is far from routine.  In fact, that is very

23  unusual.  The only orders of that --

24          THE COURT:  These individuals are involved in

25  litigation, and HIPAA is pretty clear that if you're involved

1  in litigation, you know, you're filing a claim potentially

2  against an -- because of asbestos-related diseases.  How are

3  you going to meet your burden of proof with respect to the

4  claim that you're filing without the evidence of the asbestos

5  disease?  HIPAA is very clear that the purpose is not to

6  prohibit the parties who need discovery from getting the

7  discovery, and it's also very clear that provided that the

8  Court also makes reasonable efforts to make sure that the

9  covered entity either gets the documents back or that the

10 documents are ordered destroyed at the end of the litigation,

11 and that they're used only for the purpose of the litigation,

12 that there are no other rights by the individual entity.  So

13 I'm really not sure what the issue is.

14        MR. RICH:  Well, the issue is they're seeking an

15 order, Your Honor, the exempts Dr. Lucas from HIPAA.  It is one

16 thing to say that because of a posture that is -- that these

17 folks are in that the provisions of HIPAA are overridden.  It

18 is another thing to say that he's exempt from HIPAA to begin

19 with.  I think one thing they're asking is for the wrong

20 relief, number one.  They're asking for a finding from this

21 Court that a person who is in Dr. Lucas' position, i.e., a

22 person who takes x-rays and performs diagnostic tests, is

23 exempt from the Act entirely, simply because he's doing it in

24 the context that involves litigation, and that is just wrong.

25 He is covered by HIPAA.

1          Now, if there are exceptions to it because of

2  litigation, just like if there's exceptions to physician-

3  patient privilege or there's exceptions to privacy rights,

4  etcetera, etcetera, it's different from not having those rights

5  in the first instance.  That's the first problem I have with

6  the order they submitted and the relief they're seeking.

7          Secondly, I think the problem is -- another problem

8  is the fact that no one is getting notice of this.

9          THE COURT:  But it doesn't require anybody to get

10 notice of this, not from the debtor.  I mean if Dr. Lucas has a

11 requirement to provide that notice, then that's one thing, but

12 this order doesn't deal with who has to provide notice.  It

13 only deals with the fact that the deposition can go forward,

14 and, quite frankly, when you're in a litigation mode, you're

15 subject to litigation.  HIPAA doesn't provide a litigation

16 privilege for these -- for anybody who is using -- who has to

17 produce some type of proof of a medical condition in order to

18 prove an injury.  So if you go to a diagnostic physician for

19 purposes of getting a diagnosis to show that, in fact, you've

20 got some asbestos-related disease, I don't know what you think

21 is going to be done with that diagnosis, except that it's going

22 to be used to prove the fact that you have a diagnosis.  Why

23 else are you getting it?

24         MR. RICH:  There's a number of reasons why you might

25 be getting it.  Number one, there's some of the clients who we

1  represent have retained Dr. Lucas as a consulting only expert,

2  and that HIPAA certainly doesn't provide a sword to get at

3  consulting expert documents, and if the proper notices would

4  have been given, maybe we wouldn't have been in this posture

5  when it comes to trying to litigate that issue through --

6            THE COURT:  But they -- if they're entitled to

7  notice, they're entitled to it from Dr. Lucas not from the

8  debtor.  There is nothing in HIPAA that says that if, in fact,

9  discovery is going forward, that the person who is seeking the

10 discovery has to try to figure out who Dr. Lucas' patients are

11 and to give them notice.  It's the covered entity that has the

12 obligations to provide the notice not the person who's trying

13 to take the discovery.  How can the debtor possibly know who

14 Dr. Lucas' patients are before they even get the discovery?

15 That doesn't make any sense.

16           MR. HURFORD:  Your Honor, this is Mark Hurford.  Can

17 I respond to this issue, since we also object on the notice

18 issue?

19           THE COURT:  Well, let me finish with one person at a

20 time, please.  Mr. Rich --

21           MR. HURFORD:  Certainly.

22           THE COURT:  -- has the podium at the moment.  Mr.

23 Rich.

24           MR. RICH:  Yes.

25           MR. HURFORD:  I apologize.

1          MR. RICH:  Your Honor, as I said, I think if the --

2   the most -- the thing that I most -- have the most difficulty

3   with is the fact that they're seeking an order from the Court

4   which seeks the Court's blessing on the legal conclusion that a

5   person in Dr. Lucas' position, a person who is doing diagnostic

6   tests and providing physician services, is not even covered by

7   HIPAA, simply because it's related to litigation.

8          THE COURT:  Well, I mean I don't know the facts well

9   enough, frankly, to determine whether he is or isn't covered.

10  For example, no one's told me whether he provides electronic

11  notice of anything.  He may not be covered, because he may not

12  be providing electronic notice.  So I don't know whether he is

13  or isn't covered, but I don't think I need to go that far.  The

14  reality is this is litigation.  The debtor needs this

15  discovery.  The debtor's going to get the discovery, and I'm

16  going to issue a court order that protects the rights as HIPAA

17  requires that prohibits the parties from using or disclosing

18  this protective health information for purposes other than this

19  litigation, and that requires either the return or the

20  destruction of the documents at the end of the litigation.

21  That's what HIPAA requires.  That's what I'm going to do.

22          MR. BERNICK:  Okay.  Should we just -- would it be

23  best if we -- do you want us to just draft up something and

24  circulate it, or --

25          THE COURT:  Yes.

1          MR. BERNICK:  -- what would be your preference?

2          THE COURT:  I think that would be better, because I

3 simply don't see why I need to determine whether he is or isn't

4 covered.  The HIPAA provides for a litigation exception, so

5 whether he's covered or not, it seems to me that it's clear

6 that the litigation exception applies.  So, Mr. Rich, does that

7 take care of your objection?

8          MR. BERNICK:  I'm sorry, Your Honor, was that to the

9 ACC?

10          THE COURT:  No, it was to Mr. Rich.  Does that take

11 care of your objection, sir?

12          MR. RICH:  That would've -- that would take care of

13 my objection, an order in the form that you set out except for

14 the issue of the consulting-only experts.  But I understand

15 that, you know, Your Honor has ruled on that issue in a

16 separate context, but I guess those objections would be taken

17 care of in that other context.

18          THE COURT:  Okay.  Well, then I'll ask the debtor

19 when the order is drafted to run it by you to make sure that it

20 tracks the language of the CFR or HIPAA for the purposes of

21 making sure that it does resolve that objection.  But the

22 language is included in the CFR, and I'm not sure I have the

23 correct cite in front of me, but I think it's at 45 CFR

24 164(5)(12), if I have the page open to the right section.

25          MR. BERNICK:  Yes --

1           THE COURT:  Yes.

2           MR. BERNICK:  -- it's a forestalled dialogue, Your

3    Honor, on this consultancy privilege.  There's nothing about

4    our motion that implicates the consultancy privilege -- that

5    all consultancy privilege is there.  It would have to raised as

6    a matter in a timely fashion, and that hasn't been raised.  We

7    simply sought the ruling under HIPAA, and we do not intend to

8    include in the draft order anything that addresses any other

9    issues.  This is just a very clean and simple issue.  So I'm

10   not sure what the relevance is at this point of some assertion

11   about the consultant's privilege.

12          THE COURT:  All right.  Well, in any event, Mr.

13   Hurford.

14          MR. HURFORD:  Your Honor, I guess I'm not really sure

15   what I can say.  It sounds like you're pretty far down the

16   line.  You know, our issue was that the notice is not being

17   provided to the claimants, and Grace certainly has at least

18   questionnaires from people who identified Dr. Lucas on their

19   questionnaires.  So I don't think that Grace has absolutely no

20   idea of who Dr. Lucas saw, and they certainly could --

21          THE COURT:  Where in HIPAA or in the CFR is the

22   requirement that the debtor provide this notice?  I mean this

23   appears to me on behalf of the ACC to really approach -- I'm

24   not sure where the ACC's standing is.  You keep telling me that

25   you don't represent these individuals, and the first statement

1  in the response that you file is that you don't have an

2  objection on the merits, and then you proceed to say that the

3  debtor has some notice obligation.  To the extent that you know

4  who the patients are, the ACC has a notice obligation.  This

5  comes as close to a bad faith objection as I have seen the ACC

6  behave in this case, and I hope not to see this type of action

7  again.  Now, where in HIPAA is the obligation on behalf of the

8  person who is trying to obtain the discovery to try to figure

9  out who it is that's supposed to get notice before they even

10  get the discovery?  Now how can that work?

11          MR. HURFORD:  But, Your Honor, the motion was filed

12  as an agreed motion between Dr. Lucas and the debtors, and,

13  frankly, if Dr. Lucas provides the notice, then that would

14  solve our concerns.  I think -- our position is somebody needs

15  to provide the notice.  And, Your Honor, on your other comment

16  I can assure you that this was not a bad faith motion.  We

17  reached out to the debtors before the -- or a bad fait

18  objection.  We reached out to the debtors before we filed the

19  objection, had a conference call with the debtors.  I discussed

20  it with Jan Baer.  We discussed our point of view.  They

21  discussed their point of view.  Our hope was that the only

22  result of this was that notice would go out to these claimants.

23  And like I said, I actually confirmed with them --

24          THE COURT:  Where in HIPAA is the requirement that

25  the person seeking the discovery has a notice obligation?  How

1  can it work?

2         MR. HURFORD:  I think there's a -- I think you're not

3  understanding my response, because I think we looked at the

4  motion being different.  We looked at the motion as an agreed

5  motion, basically a joint motion between the debtors and Grace.

6  And although Grace picked part of the objection to talk about

7  Grace providing the objection, most of the objection talks

8  about somebody giving notice to the individual claimants.

9         Our concern is that there is very little factual

10  information to support the motion.  The original motion

11  basically had no factual support.  There was no affidavit.

12  There was no declaration as to the facts as it applies to

13  HIPAA.  The reply added some additional information, which was

14  really a deposition transcript from some State Court proceeding

15  in 2002, so our concern was that there may be claimants who

16  take a different point of view as to the scope of testimony

17  that's sought by him, and that those people should at least

18  know.

19         THE COURT:  Well, that's fine.

20         MR. HURFORD:  I understand where Your Honor's headed.

21  I can assure you that this is by no means a bad faith

22  objection.  We've had nothing to do with the delay in this

23  deposition moving forward from when it was originally noticed

24  until now, and in all honestly, Your Honor, we filed the

25  objection within a few days of the motion being filed.  So the

1  timeliness issue and some argument that we've been trying to

2  delay this is just completely untrue.

3          THE COURT:  I don't know about a delay issue.  That's

4  not the scope of my concern.  The scope of my concern is that

5  to the extent that the ACC has some fiduciary obligation to

6  these entities, whoever they are, then it's the ACC who ought

7  to get its act together and provide the notice if you think

8  notice is required.  How is the debtor, who doesn't know who

9  the individuals are, who is attempting to ascertain who the

10  individuals are by taking the deposition, supposed to give the

11  notice that HIPAA prevents them from providing, because they

12  don't even know who the entities are?  Now --

13          MR. HURFORD:  They do.  They do, Your Honor, because

14  there were claimants who identified Dr. Lucas in their

15  questionnaire responses.

16          THE COURT:  And you keep telling me on behalf of the

17  ACC that this is not individual claims litigation, and the

18  purpose for this discovery is to ascertain whether the

19  methodology and the basis on which the information that is

20  being -- going to be submitted to the experts has some

21  credibility as a global matter not as to an individual claim

22  essentially but as a global construct.  That's the point of

23  this type of discovery.  So if that's the case, what is the

24  individual's standing with respect to looking at these

25  discovery issues?  I mean the ACC I think keeps arguing both

1  sides of the coin, and every time I try to pin you down as to

2  what position you're going to take with respect to the

3  individuals, you tell me none.  But every time you raise an

4  objection, it's on behalf of the individuals.  Now, you can't

5  keep having it both ways.  You've got to figure out which

6  litigation strategy you're taking and stick to it.

7         MR. HURFORD:  Well, Your Honor, in a situation where

8  the individual claimants have not been given notice, if we saw

9  that it was the obligation of the ACC to step in and say that

10  they should, if they would've filed individual objections, we

11  wouldn't get involved in that.  When individuals have come

12  forward and argued things specific to them, we have not gotten

13  involved in that.  If individuals were to step forward --

14  frankly, I didn't even know Mr. Rich was to be on the phone

15  arguing this today.  If individuals were to step forward, we

16  would not have gotten involved in that.  Our concern was that

17  the individuals didn't know.  We saw this as our obligation

18  generally to the constituency that, hey, they should at least

19  know.  But with individual, law firm claimant specific issues,

20  we don't get involved in that.

21         THE COURT:  That's a lot of words that didn't tell me

22  much, with all due respect.  All right.  My ruling is what I

23  said.  It appears to me that with respect to HIPAA, I do not

24  need to make a determination whether Dr. Lucas is or isn't

25  covered, because whether he is or not, HIPAA provides for a

1  litigation exception to the discovery, and in this instance,

2  the discovery is appropriate because of the nature of the

3  litigation and the fact that for diagnostic purposes the

4  information is something that the debtor needs in order to take

5  a look at the claims for estimation purposes.  However, HIPAA

6  or the CFR also provide that the information is only to be used

7  in the course of a litigation, and then either to be returned

8  or destroyed.  Either or is in the statute or in the CFR --

9  pardon me.  If you have a preference for one or the other, you

10 may put it in.  You can give yourselves the alternative.  I

11 don't care.  The CFR gives you the ability to do both.  You can

12 work out those details, and I will sign that order when you

13 submit it.  Mr. Bernick, please run it by both the ACC and Mr.

14 Rich.

15          MR. BERNICK:  Will do.

16          THE COURT:  All right.  Anything more for today?

17          MR. BERNICK:  I don't think at least from the

18 debtor's point of view.

19          THE COURT:  Okay.  We're adjourned.  Thank you.

20          MR. BERNICK:  Thank you.

21          UNIDENTIFIED ATTORNEY:  Thank you, Your Honor.

22                    *  *  *  *  *

23

24

25

### CERTIFICATION

I, PATRICIA C. REPKO, court approved transcriber,

certify that the foregoing is a correct transcript from the

official electronic sound recording of the proceedings in the

above-entitled matter to the best of my ability.


/s/ Patricia C. Repko                Date:  February 22, 2007
PATRICIA C. REPKO
J&J COURT TRANSCRIBERS, INC.