IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re | ) ) ) | Chapter 11 |
| W. R. GRACE & CO., et al.,[1] | ) ) ) | Case No. 01-01139 (JKF) Jointly Administered |
| Debtors. | ) ) ) | February 26, 2007 Agenda No. 17 |

## DEBTORS' STATUS REPORT REGARDING THE ESTIMATION OF ASBESTOS PERSONAL INJURY LIABILITIES

### Introduction

This status report addresses a basic fact about the pretrial schedule that has been evident for some time, and now, after continuing developments in the case, cannot be disputed: to wit, Claimants' continued massive delay in producing information critical to the upcoming estimation means that the trial must be continued for at least six weeks, so that the estimation can be informed by an adequate factual record. This delay has not just encompassed the x-rays and

---

[1] The Debtors consist of the following 62 entities: W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.), W. R. Grace & Co.-Conn., A-1 Bit & Tool Co., Inc., Alewife Boston Ltd., Alewife Land Corporation, Amicon, Inc., CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace II, Inc., Creative Food 'N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC (f/k/a Dewey and Almy Company), Ecarg, Inc., Five Alewife Boston Ltd., G C Limited Partners I, Inc. (f/k/a Grace Cocoa Limited Partners I, Inc.), G C Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC Management Corporation, GN Holdings, Inc., GPC Thomasville Corp., Gloucester New Communities Company, Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical Company of Cuba, Grace Culinary Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe, Inc., Grace H-G Inc., Grace H-G II Inc,, Grace Hotel Services Corporation, Grace International Holdings, Inc. (f/k/a Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W. R. Grace Capital Corporation, W. R. Grace Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-Caribe Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai Development Company, L B Realty, Inc., Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH, Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street,lzi.c., MRA Holdings Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (f/k/a Nestor-BNA, Inc.), MRA Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental Liability Management, Inc., E&C Liquidating Corp., Emerson & Curving, Inc.), Southern Oil, Resin & Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country Staffing), Hayden-Gulch Nest Coal Company, H-G Coal Company.

B-Reads. It includes the questionnaires themselves. Repeated objections to the questionnaires, prolonged supplementation, the unapproved submission of thousands of NEW questionnaires months late, and continuing non-compliance today with the instructions for attachments have taken literally months out of an already tight schedule.

This status report reviews these facts and proposes a new, still aggressive, date for reaching the estimation trial. The proposal is that the trial start at the end of July, on dates already set aside.

## I.    THE JULY 24, 2006 CMO: THE JUNE 2007 TRIAL IS SET.

On July 24, 2006, the Court entered an amended Case Management Order for the estimation of asbestos personal injury claims (Docket No. 12858). The CMO set key discovery deadlines and scheduled the PI estimation trial for June 2007. Among the deadlines set were the following:

- July 12, 2006: Due date for questionnaire responses.
- October 12, 2006: Date for completion of a navigable database of questionnaire information.
- December 1, 2006: Due date for estimation expert reports.
- February 1, 2007: Due date for supplemental or rebuttal estimation expert reports.
- June 13, 2006: Estimation trial.

## II.    A NEW ROUND OF LITIGATION OVER THE QUESTIONNAIRES PROMPTS CMO AMENDMENTS.

This schedule was not to be, not even in its first deadline. While approximately 60,000 questionnaires were in fact submitted, the overwhelming majority contained gaping holes -- a fact known to Claimants' counsel when the July 24 CMO was being entered. As justification for

these gaps, Claimants lodged the same objections that had been litigated on their behalf by certain Claimants' counsel, the ACC and the FCR at the time the questionnaire originally was approved. The most frequently occurring problems that pertained to approximately 75% of the questionnaires were:

- Pro forma objections, made by merely referring to a long list of general objections, including, *inter alia*, that the questions asked are "not relevant" or are "unduly burdensome;" and

- Responding to the questions by means of: (1) designating thousands of pages of documents as supporting numerous questionnaires without specifying which documents support which claims; (2) referring to documents in the public record; (3) attaching voluminous records to the questionnaire; or (4) referring to documents located in various counsels' offices, rather than providing responses to the questions in the space provided in the questionnaire.

The Court then decided to entertain a new round of objection litigation. This, in turn, made supplementation inevitable and, with it, changes in the pretrial schedule.

Specifically, January 12, 2007 ultimately was set as the deadline for the submission of all questionnaire supplements. This deadline meant that the schedule set forth in the July 24 CMO for the submission of expert reports was not feasible. The Court ordered the parties to come up with a modified PI CMO that would not disrupt the established trial dates. *See* Tr. of Hr'g at 148 (Nov. 20, 2006); *see also* Order Regarding Questionnaires to be Filed for Non-Settled PI Pre-Petition Claims (Docket No. 14092) (Dec. 20, 2006).

On December 19, 2006, the Court entered a revised PI CMO. The new CMO assumed that the Debtors' claims agent, Rust Consulting, would need six weeks to process the expected volume of supplements. Thus, various deadlines were changed and compressed as follows:

- July 12, 2006: Date for questionnaire responses (unchanged).

- January 12, 2007: Date for supplemental questionnaire responses.

- March 2, 2007: Date for navigable database to be completed.

- March 16, 2007: Date for estimation expert reports.

- April 27, 2007: Date for supplemental and rebuttal estimation expert reports.

- June 13, 2007: Estimation trial.

On its face, the new schedule was ambitious. The stated goal was to leave the estimation trial date intact, and the inevitable result was compression. (*See* Exhibit 1). Indeed, in discussing the new amendments of the new CMO, Grace expressed its concern about compression of the schedule and flagged the possibility that the trial date might not be achievable:

> THE COURT: I don't think, based on what the debtor is telling me, that the December 1st date is going to do, but I think all of these dates will have to be somewhat adjusted because I do think the sequencing probably is important, and I agree with you that you probably don't want to be taking 25 expert depositions in the last month if there's a way to avoid it. I'm not sure you need 25 experts, either.
>
> MR. BERNICK: I think that those are all fair points, and we've done enough business across the aisle in these cases, I don't think it's going to be a problem to figure out how to keep the discovery focused. And I don't think that anybody is arguing that somehow people should be jammed up and shouldn't have an opportunity to prepare. That's why, really, we're suggesting to move back this date. <u>We would like to hold a trial date really because we know that it's probably important also for psychological reasons, but if there's some part of it that has to slip some, you know the important thing is to get it done right.</u>

Tr. of Hr'g at 148 (Nov. 20, 2006) (emphasis added).

## III. DEVELOPMENTS SINCE THE DECEMBER 19, 2006 CMO AMENDMENTS.

Since December 19, 2006, numerous developments have conspired to render the remaining deadlines in the CMO entirety unrealistic. They include the following:

**The X-Rays**

- Despite counsels' representations at the December 19, 2006 hearing about providing the x-rays and the January 30, 2007 deadline set for this to take place, Claimants did not provide the copies promised. *See* Tr. of Hr'g at 14-15; Order Regarding X-Ray Evidence (Docket No. 14148) (Dec. 22, 2006).

- The parties met and conferred on numerous occasions, and the Court conducted a telephonic hearing on the matter on February 5, 2007.

- Finally, on February 20, 2007, the parties reached agreement on a supplemental order which gives claimants until March 15, 2007 to provide the copies of the x-rays.

**The B-Reads**

- On December 22, 2006, the Court ordered that Claimants provide B-Reads by January 12, 2007 (Docket No. 14150).

- Instead of providing the B-Reads, on January 2, 2007, certain Claimants filed a motion to alter and amend the Court's order. (Docket No. 14203).

- On January 23, 2007, the Court denied the Claimants' Motion. *See* Tr. of Hr'g at 91-92 (Jan. 23, 2007).

- However, since the Court's January 23, 2007 ruling, it appears that no B-Reads have been received from any of the Claimants who had objected and moved to amend the order.

- On February 22, 2007, Grace sent a letter to Claimants' counsel requesting a log of the B-Reads still being withheld.

**Questionnaires**

- It appears that tens of thousands of new questionnaires have been received as a result of the Proof of Claims process. It turns out that these are *not supplements* to the questionnaires due on July 12, 2006. Rather, they appear to be *brand new* questionnaires received over six months after the deadline set forth in the CMO.

- Despite very clear and explicit directions in the questionnaires and subsequent rulings from the Court with respect to providing attachments to the questionnaires, some firms (representing thousands of Claimants) still have not complied with the orders regarding attachments. *See* Order Concerning Debtors' Motion to Compel Asbestos

Personal Injury Claimants to Respond to the W.R. Grace Asbestos Personal Injury Questionnaire (Docket No. 13393) (October 12, 2006).

## IV. IMPACT ON THE SCHEDULE.

As a result of the forgoing, there has been massive slippage in dates and events set out in the July CMO (and even those in the amended December CMO) as follows:

- Questionnaire Receipt. The deadline of July 12, 2006 for final questionnaire responses has effectively slipped to approximately February 15, 2007 when Grace still received new questionnaire responses. Approximately 60,000 questionnaires were returned by the July 12, 2006 deadline but approximately 40,000 *brand new* questionnaires were received after that deadline. This was a total slippage of 6-7 months from the dates established in both the July and December CMO.

- Attachments. The questionnaires submitted were not complete and not in compliance with the Court's Orders. This situation has required extraordinary and unanticipated efforts by Grace and impacts Rust's ability to complete assembly of a navigable database. The results are a further slippage of approximately 60 days. And the attachments must be analyzed for Grace's experts by non-Rust personnel.

- X-Rays. Review of x-rays was originally anticipated to occur between Feb. 1 and March 10, 2007. As a result of the Claimants' failure to comply, this review cannot even begin for a substantial portion of the x-rays until March 15, 2007 at the earliest, a slippage of over six weeks.

- B-Reads. Incorporation of B-Reads cannot even occur until the data are received. Despite three Court orders, the date these data will be received still is unknown.

(*See* Exhibit 2.)

Completion of the review of the x-rays, B-Reads and questionnaires, including coding by Rust and a meaningful review of the attachments, must be done. The process established by the CMO is dependent upon the completion of this review. Working at top speed, this will take an additional 60 days. The review will involve the following tasks:

- Incorporating the new questionnaires received into the Rust database.

- Completing a meaningful review of attachments for Grace's experts.

- Incorporating the result of the x-ray review and analysis into the supplemental non-estimation expert reports.

- Incorporating the results of the information received from any new B-Reads, into the appropriate expert reports.

As a result, there will have to be corresponding movement in the deadlines for expert reports and a comparable postponement of the estimation trial so that it commences on July 30, 2007, one of the dates currently set for this matter.

## V.    RESPONSE TO FCR/ACC STATUS REPORT.

In their Status Report, the FCR and ACC vigorously oppose any extension, yet they concede the fundamental obstacle to maintaining the existing schedule. They admit that Grace has not received the requested data in a timely fashion. Despite this, they blithely insist that Grace should be forced to proceed to trial without an opportunity to meaningfully review and analyze the data that has been submitted. That view is fundamentally at odds with this Court's previous rulings that both sides should have the data they need to perform their respective estimations.

Further, the FCR and ACC grossly abuse the fact -- a fact of their making -- that Grace has received far less than the required questionnaires from Claimants. The obvious problems are several fold. First, the questionnaires are way late. Second, many do not contain any answers and refer only to attachments, and, in many instances, the reference to attachments does not comply with the Court's previous orders. The manner of the submissions has made it impossible and improper for Rust Consulting to code them. An effective analysis of the attachments requires additional time that simply is not accounted for in the current CMO. Third, the ACC and FCR seem to suggest that Grace has answers to many questions on the questionnaire forms themselves and that Grace should simply be content to conduct its analysis without a review of the attachments. Grace declines to accept this offer. Fourth, the FCR and ACC's suggestion that the receipt of many questionnaires somehow absolves those who did not comply with the Court's

order is without merit. The failure of those Claimants to fill out questionnaires notwithstanding repeated instructions can only mean that the non-responders do not have the information to support their claims.

<u>Finally</u>, the FCR and ACC mischaracterize the discovery Grace has served on the Manville, Celotex and Eagle Pitcher Trusts. The subpoenas served by Grace are aimed primarily at gathering information concerning the exposures alleged by Claimants, as well as the criteria and basis for Trust decisions to deny payment for claims supported by certain doctors and screening companies. Counsel for Grace are working cooperatively with Trust counsel and counsel for plaintiffs to limit the scope of the subpoenas. All communications concerning the subpoenas have been amicable, and Grace expects to receive the Trust data on a timely basis.

February 23, 2006                                              Respectfully submitted,

                                                 KIRKLAND & ELLIS LLP
David M. Bernick, P.C.
Janet S. Baer
Barbara Mack Harding
200 East Randolph Drive
Chicago, ILL 60601
(312) 861-2000

and

PACHULSKI STANG ZIEHL YOUNG JONES
& WEINTRAUB LLP

*/s/ James E. O'Neill*
Laura Davis Jones (Bar No. 2436)
James O'Neill (Bar No. 4042)
919 North Market Street, 17th Floor
Wilmington, Delaware 19899-8705
Telephone: (302) 652-4100
Facsimile: (302) 652-4400

Co-Counsel for Debtors and Debtors in Possession