The foregoing instrument has been compared and is
a true and correct transcript of the original thereof
on file in the records of my office.
Dated this ____ day of ____ 2006
                                    AUDITOR
_____ DEPUTY
In and for the County of Klickitat, State of Washington

**RECORDING REQUESTED BY
AND WHEN RECORDED MAIL TO**

257336

Anton Frank, Volovsek
c/o System Solutions
P.O. box 522
White Salmon, Washington
NDPZ            [98672]

FILED BY *A. F. Volovsek*
RETURN TO *Same*

_____

VOL *343*   PAGE *788-794*

RECORDER'S USE_____

## CAVEAT/NOTICE:

*Failure To Respond To This Affidavit As Herein Required Within Ten (10) Days, Will Invoke The Doctrine Of Acquiescence And/Or Admission And/Or Claims Made, By This Affiant And Further, Will Be A Tacit Admission Of Affiant's Right To Recover In Commerce For Damages Caused By Respondent, But Not Limited To Penalties And Costs.*

Anton Frank, Volovsek
    Affiant:
    vs.

A. L. Costelio Chrman, Pres., &. Ceo
W. R. Grace & Co, One Town Ctr Rd
Boca Raton, Fl. 33496,
 And,
A. L, Costello Chrman, Ceo,
And,
Robert J. Bettacchi Pres.;
Grace Construction Products
62 Whitemore Ave, Cambridge, Ma. 02140,
And,
A.l. Costello Chrman, Pres., & Ceo;
Grace W- R. & Co. Inc. (Ny)
One Town Ctr, Rd, Boca Raton, Fl. 33486,
    Respondents

**A SECURITY\* (15 USC )**

\* A SECURITY: "Any evidence of DEBT"

**COMMERCIAL AFFIDAVIT
OF DEFAULT,
NOTICE AND WARNING OF: 10 Day
COMMERCIAL GRACE;**
    and,
**NOTICE OF NON-JUDICIAL,**
    and
**PRE-JUDICIAL PROCEEDING**

## AFFIDAVIT OF DEFAULT

STATE OF WASHINGTON    )
                               )  Ss

COUNTY OF KLICKITAT     )

### On Principle of Respondent Superior

I, Anton Frank, Volovsek, the Undersigned, do solemnly affirm, declare, and depose the following:

1.    **AFFIANT** is of lawful age possessing sound mind and competent to state to the matter set forth herein; and,

2.    **AFFIANT** has personal knowledge of the facts stated herein; and,

3.    **FACTS** stated herein are true, correct, and certain, admissible as evidence, and if called upon as a witness, this Affiant will testify to their veracity; and,

4.    **AFFIANT** presents this Affidavit as the highest form of prima facie evidence in these matters; and,

5.    a.    Lien instrument must obviously, patently, and evidently be a lien by being clearly and explicitly titled "LIEN", "CLAIM OF LIEN", or "DECLARATION OF LIEN" and must contain full disclosure by exhaustive Commercial content, as follows in b), c), and d); and,

        b.    Lien instrument must contain a notarized hand-signed affidavit, for which the issuer is Commercially liable, containing a plain statement of fact disclosing how the obligation of the lien was created or established, and attesting that the commercial condition is true, correct, and certain; and,

        c.    Lien instrument must contain a ledger or bookkeeping statement connecting purchases, services rendered, and/or injury sustained, presented in a one-to-one correspondence, with their partial claim obligation. The partial obligations are then totaled to obtain the obligation. This called a "True Bill in Commerce"; and,

        d.    Lien instrument must contain a statement, either specific, or general, of the property be     seized from the lien debtor to satisfy, or to guarantee satisfaction, or the obligation of the lien; and,

        e.    A "NOTICE" of lien, to be valid, must contain a clear statement as to where the lien is filed, where it can be found and how a copy can be obtained.

## TRUE BILL IN COMMERCE

6.   RESPONDENTS, their agents, and principal corporation must follow public Antitrust Civil Process 15: 131 1, §§1. 166-1, and federal Procedures and Process, applicability of Federal Civil Process, Wright and Miller, Civil 2451 and Wright, Criminal 109 and applicable Uniform Commercial Code while conducting business or be liable for the damages to injured party and are subject to penalties prescribed therein; and,

7.   RESPONDENTS, their agents, and principal corporations refused to sell, this Affiant, their product, heavy duty Bituthene, which was on the open market.  It was the only product on the market at that time which met specifications needed to utilize Affiant's patented roof systems, (See attached letters); and,

8.   RESPONDENTS, their agents, and principal corporations also notified all membrane distributors that if they sold any membrane to this Affiant for the One Hundred Thirty Five Thousand ($135,000.00) Dollar contract, then in place, or if they sold Affiant any membrane for future contracts, they would be black-listed and never be able to handle the Grace  Product lines, (See Exhibit B); and,

9.   RESPONDENTS, are responsible and liable for all acts, non-acts, omissions, or commission of their agents, officers, or others, living or deceased, for the acts of the agents are the acts of the principals; and

10.  RESPONDENTS, their agents, and principal corporations committed the above acts compromising the thirty thousand square foot, One  Hundred Thirty Thousand ($135,000) Dollar contract and a Two Thousand Five Hundred ($2500.00) Dollar contract on or about 1975. (See Exhibit A); and,

11.  SAID ACTS also compromised future contracts to apply my EER System because no other product would produce the same results in my roofing system, which was later tested, patented and approved by Underwriters Laboratories, and U.S. Army Corps of Engineers. Additional losses to business, due to Affiant's inability to develop and use patented system, resulted in financial losses amounting to approximately One Hundred Billion ($100,000,000,000) Dollars, (See exhibit A): and,

12.  RESPONDENTS, their agents, and principal corporations, cost Affiant a marriage of 25 years and caused Affiant's four children to be alienated from him; and,

13.  RESPONDENTS, their agents, and principal corporation caused Affiant, humiliation, trauma and left Affiant to be incapable of communication due to the server stress, abuse and financial losses.  This resulted in Affiant having a severe nervous breakdown. The aggravated mental condition allowed for Affiant's attorney to steal his patent.  The cost of litigation to retrieve his patent was approximately Two Hundred Twenty Five Thousands ($225,000.00) Dollars; and,

14. SAID ACTS resulted in Affiant's second wife support him during his time of disability without whom Affiant would surely have died from the constant stress and aggravation caused by Respondents. This caused nearly One Hundred Thousand ($100,000) Dollars in expenses for physicians, hospitalization and medications; and,

15. RESPONDENTS, their agents, and principal corporations by the above said actions, also caused this Affiant, difficulty communicating with anyone for twenty years due to his nervous breakdown caused by agents act, no-acts, omissions, commissions and Black Balling; resulting in his inability to market his EER System or earn even a meager living for twenty years. Losses amounted to Five Hundred Eighty Nine Billion Four Hundred Sixty Two Thousand Five Hundred ($589,000,462,500) Dollars (See exhibit C); and,

16. RESPONDENTS, their agents, and principal corporations were recently given the opportunity, by this Affiant, to market his system with the opportunity of making an estimated gross profit in five years, for themselves, of One Hundred Fifty Billion ($150,000,000,000.00) Dollars therein mitigating the above said damages by royalties paid to him. This failure to mitigate damages and continuing in bad faith causing additional losses of Sixty Three Billion ($63,000,000,000,) Dollars (See exhibit D); and,

17. RESPONDENTS, their agents, and principal Corporation caused this Affiant the total losses and injuries exceeding Five Hundred Eighty Nine Billion Four Hundred Sixty Two Thousand Five Hundred ($589,000,462,500. 00) Dollars and the loss of his first wife, and the loss or his children, health and self esteem to the point of self destruction.

Work sheet is for calculating the alternative demand for injuries and losses at acceptable minimums.
Work sheet calculations is based on Ten (10) billion ft². per year of estimated EER System potentially sold. Footage's are based only on American markets as shown herein before by Canadian and American Patents.
Work sheet calculations is based on 2.5 cents per ft² royalties sold at U.S. markets only. 2.5 cents x 10 billion sq. ft. equals to the amount of $250,000,000 million dollars of losses for one year only.
These figures, if calculated over the last 20 years would be at phenomenal levels, not including foreign market potentials. $250,000,000 million x ten (10) years would equal to $2.5 billion and so on.
So as you can see, if you calculated this for twenty (20) years it would be 500 billion dollars.

## CRIMINAL COMPLAINT

18., This Criminal Complaint and the Defendants herein are in violation of various Constitutional secured rights, these rights are listed below:

    a. Article 1, § 10 cl.1, impart; No state shall pass any law impairing the obligation of contracts; and,

    b. Amendment V , in part, nor be deprived of life, liberty or property without just compensation; and,

    c. The Defendants herein are in violation of 15 USCA. Sherman Anti Trust Act; as placed below:

    e. The Defendants herein are in violation of 15 USCA § 1; as placed below, Trust, Etc., In Restraint Of Trade Illegal; Penalty:

        Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal. Every person who shall make any contract or engage in any combination or conspiracy hereby declared to be illegal shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding $10,000,000 if a corporation, or, if any other person, $350,000, or by imprisonment not exceeding three years, or by both said punishments, in the discretion of the court.

    f. The Defendants herein are in violation of 18 USCA § 4; as placed below, Misprision of Felony:

        Whoever, having knowledge of the actual commission of a felony cognizable by a court of the United States, conceals and does not as soon as possible make known the same to some judge or other person in civil or military authority under the United States, shall be fined under this title or imprisoned not more than three years, or both.

    g. The Defendants herein and all that conspired to embezzle the patented system whether from the beginning or whether they joined the conspiracy after the fact are equally guilty as stated in 18 USCA § 3; as placed below, Accessory after the fact:

        Whoever, knowing that an offense against the United States has been committed, receives, relieves, comforts or assists the offender in order to hinder or prevent his apprehension, trial or punishment, is an accessory after the fact. Except as otherwise expressly provided by any Act of Congress, an accessory after the fact shall be imprisoned not more than one-half the maximum term of imprisonment or (notwithstanding section 3571) fined not more than one-half the maximum fine prescribed for the punishment of the principal, or both; or if the principal is punishable by life imprisonment or death, the accessory shall be imprisoned not more than 15 years.

    h. The Defendants herein are in violation of 18 USCA § 241; as placed below, Conspiracy Against Rights Of Citizens:

        If two or more persons conspire to injure, oppress, threaten, or intimidate any Citizen in the free exercise or enjoyment of any right or privilege secured to him by the Constitution or laws of the United States, or because of his having so exercised the same; or if two or more persons go in disguise on the highway, or on the premises of another, with intent to prevent of hinder his free exercise or

enjoyment of any right or privilege so secured- they shall be fined not more than $10,000 or imprisoned not more than ten years, or both; and if death results, they shall be subject to imprisonment for any term of years or for life.

I.   The Defendants herein are in violation of 18 USCA § 242; as placed below, Deprivation Of Rights Under Color Of Law:

Whoever, under color of law, statute, ordinance, regulation, or custom, willfully subjects any inhabitant of any State, Territory, or District to the deprivation of any rights, privileges or immunities secured or protected by the Constitution or laws of the United States, or to different punishments, pains, or penalties, on account of such inhabitant being an alien, or by reason of his color, or race, than are prescribed for the punishment of citizens, shall be fined not more than $1,000 or imprisoned not more than one year, or both; and if death results shall be subject to imprisonment for any term of years or for life.

## DEFAULT

19.  Take Notice that  demand was made on you, to answer the Notice and Demand in the document known as:

**COMMERCIAL AFFIDAVIT OF FACT,**
**NOTICE AND WARNING OF COMMERCIAL GRACE, and**
**NOTICE OF  NON-JUDICIAL and PRE-JUDICIAL  PROCEEDING**

which was  mailed to each of you herein named, by Certified Mail, on  2nd day of October, 1996.

20.  FAILURE TO RESPOND as therein required, has been considered a willful disregard of that Instrument. Said failure has provoke the immediate filing of a Lien making Respondents liable for the sum certain amount of damages occurring to this Affiant for Two Billion Five Hundred Million ($2.5 billion) Dollars in lawful money of account of the United States of America, i.e. gold or silver minted by the U.S. Mint, (3 1 USC § 5112) , at the price of Gold in Washington DC at the time of default; or Federal Reserve Notes; and,

21.  THAT failure of accused to prove their claims by rebuttal against said affidavit within ninety (90) calendar days (or in the alternative, fully comply with all numbered points above), has been considered a willful breach of and default on a bilateral contract (Affidavit of Agreement) formed knowingly, intentionally, and voluntarily by and between the undersigned and the accused and the Criminal complaint will issue Forthwith; and,

22.  THAT Affiant, the undersigned affiant, depose and certify that we have written the foregoing with intent and understanding of purpose, and believe the statements, allegations, demands and contents herein to be true, correct, complete, certain and commercially reasonable, and just, to the best of our knowledge and believe; and,

23.  THAT Affiant now places a lien on all assets of W.R. Grace. This is to include, but is not limited to, Machinery (On Site and Factory), Buildings, Liquidate sole merchandise and Products.

**NOTICE TO PRINCIPALS, IS NOTICE TO AGENTS.**
**NOTICE TO AGENTS, IS NOTICE TO PRINCIPALS.**

24. SERVICE of this Notice and Demand upon the Chief Executive Officer of each of the W.R. Grace divisions named on page one of this instrument; each officer being a respondent.

25. Further Affiant saith not.

_Frank_
_Anton Volovsek_
Anton Frank, Volovsek

**STATE OF WASHINGTON** )
 ) Ss
**COUNTY OF KLICKITAT** )

Subscribed and sworn before me, _Robin R. Cameron_

This _7th_ day of _Jan_ , 19 _97_ .

_Robin R Cameron_
Notary Public, State Of _Wash_
My Commission Expires: _3-6-2000_

**WHEN RECORDED, RETURN To:**
Anton Frank, Volovsek
c/o P.O. Box 522
White Salmon, Washington
NDPZ          [98673]



FILED BY *Anton Frank Volovsek*

RETURN TO *Same*

255865

VOL *340* PAGE *280-330*

96 COT

Certified Mail #

**When Recorded, Please Return to:**
Anton Frank, Volovsek
c/o System Solutions
PO Box 522
White Salmon, Washington [98672]

### CAVEAT/NOTICE:

*Failure To Respond To This Affidavit As Herein Required Within Twenty (90) Days, Will Invoke The Doctrine Of Acquiescence And/Or Admission And/Or Claims Made. By This Affiant And Further, Will Be A Tacit Admission Of Affiant's Right To Recover In Commerce For Damages Caused By Respondent, But Not Limited To Penalties And Costs.*

Anton Frank, Volovsek                          )

   Affiant:                                       )

   vs.                                            )

A. L. COSTELIO CHRMAN, PRES., & CEO        )
   W. R. GRACE & CO, ONE TOWN CTR RD       )
   BOCA RATON, FL. 33496,                  )
     and,                                )
A. L, COSTELLO CHRMAN, CEO,                 )
     and,                                )
ROBERT J. BETTACCHI PRES.;                  )
   GRACE CONSTRUCTION PRODUCTS             )
   62 WHITEMORE AVE, CAMBRIDGE, MA.        )
   02140,                                  )
     and,                                )
A.L. COSTELLO CHRMAN, PRES., & CEO;         )
   GRACE W- R. & CO. INC. (NY)             )
   ONE TOWN CTR, RD, BOCA RATON, FL.       )
   33486,                                  )

   Respondents                                )

country of **Washington**    )

                      )    Ss

**Klickitat county**        )

Commercial Affidavit of Fact

---

**A SECURITY\* ( 15 USC )**

\* A SECURITY: "Any evidence of DEBT"

**COMMERCIAL AFFIDAVIT**

**OF FACT,**

**NOTICE AND WARNING OF:**

**COMMERCIAL GRACE;**

and,

**NOTICE OF NON-JUDICIAL,**

and

**PRE-JUDICIAL PROCEEDING**

The foregoing instrument has been compared and is a true and correct transcript of the original thereof on file in the records of my office.

Dated this *4th* day of *October* 1996

DIANA HOUSDEN, Auditor

*Elizabeth Richardson* DEPUTY

in and for the County of Klickitat, State of Washington.

Page 1 of Fourteen

VOL 340 PAGE 280

**NOTICE AND DEMAND BY AFFIDAVIT**

On Principle of Respondent Superior

I, Anton Frank, Volovsek, the Undersigned, do solemnly affirm, declare, and depose the following:

**Full Disclosure Of Venue And Jurisdiction**

1.  **AFFIANT** of lawful age possessing sound mind and competent to state to the matter set forth herein; and,

2.  **AFFIANT** has personal knowledge of the facts stated herein; and,

3.  **FACTS** stated herein are true, correct, and certain, admissible as evidence, and if called upon as a witness, this Affiant will testify to their veracity; and,

4.  **AFFIANT** presents this Affidavit as the highest form of prima facie evidence in these matters; and,

5.  **THE ETERNAL**, unchanging principles of Commercial Law are:

    a.  **All** are equal under the law; and,
    b.  **A Workman** is worthy of his hire; and,
    c.  **In Commerce**, truth is sovereign; and
    d.  **Truth Is Expressed** in the form of an affidavit; and,
    e.  **All Matters** must be expressed to be resolved; and,
    f.  **A Lien** or claim can be satisfied only through an **affidavit** containing a point-for-point rebuttal, resolution by jury, or payment of the lien or claim; and,
    g.  **An Un-Rebutted** affidavit becomes the judgment in Commerce; and,
    h.  **Fraud** vitiates title most solemn promise; and,
    i.  **He Who** leaves the battlefield first loses by default.

6.  **COMMERCIAL PROCESSES**, including, the Affidavit and the required responses to it, are non-judicial and pre-judicial because:

    a.  only a party affected by an affidavit can speak and act for himself and be solely responsible for responding will, his own signed affidavit of truth, made under oath. No one else can respond via an Affidavit on his behalf; and,
    b.  no **judge**, court, government or agencies thereof, or other third parties whatsoever, can abrogate one's affidavit of truth.

7.  **LAWFUL** seizure, collection and/or transfer of ownership of money or other property must be effected by a valid Commercial Lien which must contain certain elements in order to be of lawful Commercial force and effect; to wit:

// //

a. **Lien** instrument must obviously, patently, and evidently be a lien by being clearly and explicitly titled "LIEN", "CLAIM OF LIEN", or "DECLARATION OF LIEN" and must contain full disclosure by exhaustive Commercial content, as follows in b), c), and d); and,

b. **Lien** instrument must contain a notarized hand-signed affidavit, for which the issuer is Commercially liable, containing a plain statement of fact disclosing how the obligation of the lien was created or established, and attesting that the commercial condition is true, correct, and certain; and,

c. **Lien** instrument must contain a ledger or bookkeeping statement connecting purchases, services rendered, and/or injury sustained, presented in a one-to-one correspondence, with their partial claim obligation. The partial obligations are then totaled to obtain the obligation. This called a "True Bill In Commerce"; and,

d. **Lien** instrument must contain a statement, either specific, or general, of the property being seized from the lien debtor to satisfy, or to guarantee satisfaction, of the obligation of the lien; and,

e. **A "NOTICE"** of lien, to be valid, must contain a clear statement as to where the lien is filed, where it can be found and how a copy can be obtained.

### Identification Of Character Of Parties

8. **AFFIANT**, a private Citizen living on the land on the country of Washington, more fully described as Klickitat county, with a venue foreign to Respondent, is not the creation or chattel property of a corporation, quasi-government, or government agency or subdivision there of; and,

9. **AFFIANT**, is not under an obligation to a governmental agency, state or federal, or their self-passed private laws statutes, regulation or policies, and makes explicit reservation of all unalienable rights, remedies, defenses and character in these and all matters; and,

10. **RESPONDENTS**, are:

> A. L, Costello Chrman, Ceo, Grace W- R. & Co. Inc.,
> A. L. Costello, Chrman, Pres. &. Ceo, W. R. Grace & Co. Inc.,
> Robert J. Bettacchi, Pres. Grace Construction Products.

Enfranchised citizens of the United States residing in a corporate State, a fictitious creation of the United States, and are subject to the private statutory rules and regulations Respondent has voluntarily chosen to follow; and,

11. **RESPONDENT**, has consented to be liable, for the demands made herein by verbal and written agreements:

a. **Respondents**, have a civil indebtedness and trust obligation by the contractual agreement to material without reservation and without discrimination; and,

**b. Respondent,** has a moral obligation to refrain from actions that will injure or impair the rights of this Affiant.

## HISTORY

12. In the fall of 1974 with approximately 25 years of roofing experience, I began experimenting with a combination of commercial roofing products to try and improve the existing built up roofing system. I succeeded: after several months of testing different products, I came up with three products, combining them into one system which I later had patented in both the United States and Canada.

13. During the three to four months of testing, the main product being "Bituthane" manufactured by W.R. Grace, became the most important of the three products. Hayden Clark of W.R. Grace flew out from Boston five times to watch me put the system together. To my knowledge Grace was the only company to manufacture this membrane that would work in my system. Mr. Clark's last words to me were, that is the most beautiful or greatest thing I have ever seen. W.R. Grace's regional representative, Don Cauglin, was very excited and could envision selling hundreds of car loads of membrane. (heavy duty Bituthane).

14. I shot off a letter to Hayden Clark of W.R. Grace on 12/18/74 if they would warrant their product in a roofing system the same as in their waterproofing and on what types of deck this material would adhere to. I got no response. Almost immediately one of our good customers, Span Crete, wanted my new system on 30,000 sq.ft. of their building over a concrete deck for which this product was originally designed and manufactured. I also was approached to put this system on a car wash building which always had conventional roof problems.

15. I quickly called Don Cauglin, the W.R. Grace representative, and ordered the membrane. He returned my call only to tell me they (W.R. Grace) would not sell me the material. I was devastated; I was already forming my own company with the architect and engineer that assisted me in the testing and final invention of this system, which we named EERS, Energy Efficient Roof System. I had already spent many days

Commercial Affidavit of Fact

1     and dollars with my patent attorney with confirmation from the patent office that this

2     system was patentable.

3 **16.** My attorney then sent a letter to Mr. Peter Grace on October 14, 1975 (see letter

4     exhibit E attached.) requesting a reason for their refusal to sell us their heavy duty

5     Bituthane, which was on the open market. A reply was received from Vice President

6     Leonard Rosenblatt of W.R. Grace refusing to sell us any material, but offering us five

7     rolls for further testing. In the meantime I lost my two contracts, had to close down my

8     new company, and was without a job with four children to feed.

9 **17.** A second letter was sent to Mr. Rosenblatt of W.R. Grace on November 7, 1975 with

10     the same negative response. I tried to find a distributor who might have some of that

11     membrane in stock. I found Highway Pavers, (see exhibit B.) but they told me that

12     they could not sell me the membrane because W.R. Grace threatened to blacklist

13     them if they did. The same response came from Milwaukee Insulation (see exhibit B.)

14     Both companies had enough material for the jobs I had, but neither company wanted

15     to lose their source of supply of this good product, from W.R. Grace.

16 **18.** I then contacted Don Cauglin again, representative of W.R. Grace who was as

17     devastated as I was, to see if we could find another company who might have a

18     product we could use in my system. We both searched, but to no avail. Don Cauglin

19     then quit working for W.R. Grace in disgust and I checked on a product from Protecto

20     Wrap in Denver, Colorado. My attorney, Ed Snyder, sent them a letter describing my

21     system and inquired if it might work as a substitute for W.R. Grace's product. After

22     several trips to Denver we found that it would not work as a substitute for W.R.

23     Grace's product.

24 **19.** Now I was broke, my health was failing, and I had lost everything, my company, my

25     marriage, and my family. With my last ounce of energy I made some phone calls, and

26     everyone suggested that I go to see a chemical engineer Keith Coultrap in Phoenix,

27     Arizona who was very knowledgeable in roofing and urethane foam insulation. I called

28     him, and he agreed to hire me for a meager salary and help me promote my roofing

Commercial Affidavit of Fact

1  system. My attorney thought this was a good idea and loaned me the money to get
2  there. After four or five months the chemical engineer (Keith Coultrap) decided that if I
3  wished to stay with him I would have to give him 90% of my system, for which at that
4  time I hold patents in the U.S. (U.S. Patent #4,016,323) and Canada (Canada Patent #
5  1,047,219). I decided that was too much to give up, and I was promptly fired. I could
6  take no more, and had a nervous breakdown. Luckily, I was keeping company with a
7  very nice woman who understood my situation and my system. She took me in and
8  cared for me, handling whatever was needed to protect my patented roof system.

9  20. Shortly thereafter, my own attorney saw the opportunity to steal my patent. He then
10  convinced Keith Coultrap, the chemical engineer, into joining forces to market my
11  system and leave me holding an empty bag. But, my good lady friend stepped in and
12  helped me find a law firm to retrieve my patent. What happened was, this lawyer also
13  tried to steal the patent in the process of getting it back from my lawyer (E.H. Snyder).
14  After a tough battle we were able to fire this lawyer (Ron Logan) and were informed by
15  the judge that I had to file my suit back in Wisconsin. Now I was really down, as I had
16  no way to do that. Many months later my good lady friend, Terry, gave me enough
17  money and plane fare to go back to Wisconsin to try to find a law firm to get my patent
18  back. I stayed by a friend's house and they helped me find a law firm who would take
19  my case without any up-front money. "Aul and Mawicke," a young Jewish law firm,
20  looked at my file and said they couldn't believe anyone could go through what I had
21  already been through and still be sane. They took the case and won after almost a
22  year. By then I owed almost everyone. The law firm tried to get my lawyer disbarred,
23  but only got from the Bar Association that they had told him it was not a nice thing to
24  do and that he shouldn't do it again. However, five years later this young Jewish law
25  firm did manage to get Snyder disbarred.

26  21. When I returned to Phoenix my good lady friend picked me up and said that I looked
27  like I just came from a war. I felt like it, too. In 1980 Terry quit her job at the
28  newspaper in Phoenix and went to work for another newspaper in Alaska, and without

Commercial Affidavit of Fact

1    a complaint or compensation, asked me to go along. For several years I did very little,
2    but began to feel better. So much better, in fact, that I began to put out feelers to see
3    if I could get investors interested in helping me get my system marketed. Over a
4    period of a year I managed to get about $100,000, but expenses were high and my
5    knowledge of marketing low. My contact with the oil companies was a total disaster.
6    They wanted no part of my system because it was too energy efficient and would cost
7    them a few dollars in fuel. I hired a marketing firm from Boston on a percent basis, but
8    they didn't fare any better than I had.

9    22. I showed the system to the U.S. Government, explaining how they could save the
10    taxpayers over one billion dollars a year by using my patented system, tested and
11    approved by Underwriters Laboratories. They wanted no part of saving the taxpayers
12    any money. I then learned that regardless of how good this system was, architects
13    would not specify it unless it was owned or backed by a major firm or company, so I
14    proceeded to contact all the major companies who manufactured the products I had
15    incorporated into my roofing system. I sent letters to probably 30 or more companies
16    with the same result: it's too big. W.R. Grace would have been an ideal company, but
17    they too refused. I have four or five letters, maybe more.

18    23. By this time three other manufacturers made a membrane that was almost identical to
19    W.R. Grace's. I contacted them all. They all liked my system but not one would
20    market it. The coating companies loved my system, but none were big enough to
21    market a system that had all the potential that my system had. Once this system takes
22    off we're talking billions and billions of square feet.

23    24. By this time I was feeling much better and took a job for Alaska State Housing
24    Maintenance. One year later, however, I ruptured two discs in my back, the
25    newspaper was sold out from under Terry, and we ended up back in Phoenix. At this
26    time I learned that Phillips 66 was making the best membrane and Grace quit making
27    the stuff that had worked so well in my system, so I promoted my system to Phillips 66.
28    There was much interest, and I installed a job for them in Miami, Florida. They loved

Commercial Affidavit of Fact

it, but in the meantime, unknown to most, Phillips 66 sold this good product to the Henry Company in California. So off to California I went with a retired colonel from the U.S. Army Corps of Engineers to meet with the Henry Company. They liked it, but said they weren't big enough to market it. In the meantime, the colonel gets my system approved by the U.S. Army Corps of Engineers and I was promised the first job that came up. Shortly thereafter, however, the Corps money was cut off and the Corps itself was cut in half. I still wouldn't quit. I met with the ex-Governor of Arizona and Senator Don Rogers of California to see if they might be able to get in touch with W.R. Grace and convince them to reconsider and market my system. Before they made contact with W.R. Grace, I contacted the W.R. Grace waterproofing representative myself. He was very interested, and asked me to write to his boss in Boston, Massachusetts to see if they would be interested at this time to market my system (see exhibit F letter attached), since they were now making the membrane again. Once again I got a negative reply (see exhibit F letter attached).

25. I have nowhere else to turn or contact, and I feel W.R. Grace should now compensate me for my losses and damages over the past 20 years. I have now also lost my second wife because of W.R. Grace.

## STATEMENTS OF FACTS

26. **RESPONDENTS**, their agents, and principal corporation must follow public Antitrust Civil Process 15:131 1, §§1. 186-1, and federal Procedures and Process, applicability of Federal Civil Process, Wright and Miller, Civil 2451 and Wright, Criminal 109 and applicable Uniform Commercial Code while conducting business or be liable for the damages to injured party and are subject to penalties prescribed therein; and,

27. **RESPONDENTS**, their agents, and principal corporations refused to sell, this Affiant, their product, heavy duty Bituthene, which was on the open market. It was the only product on the market at that time which met specifications needed to utilize Affiant's patented roof systems. (See attached letters); and,

/// ///

1    28. **RESPONDENT**, their agents, and principal corporations also notified all membrane

2    distributors that if they sold any membrane to this Affiant for the One Hundred Thirty

3    Five Thousand ($135,000.00) Dollar contract, then in place, or if they sold Affiant any

4    membrane for future contracts, they would be black-listed and never be able to handle

5    the Grace Product lines. **(See Exhibit B)**; and,

6    29. **RESPONDENT**, are responsible and liable for all acts, non-acts, omissions, or

7    commission of their agents, officers, or others, living or deceased, for the acts of the

8    agents are the acts of the principals; and

9    30. **RESPONDENTS**, their agents, and principal corporations committed the above acts

10   compromising the thirty thousand square foot, One Hundred Thirty Thousand

11   ($135,000) Dollar contract and a Two Thousand Five Hundred ($2500.00) Dollar

12   contract on or about 1975. **(See Exhibit A)**; and,

13   31. **SAID ACTS** also compromised future contracts to apply my EER System because no

14   other product would produce the same results in my roofing system, which was later

15   tested, patented and approved by Underwriters Laboratories, and U.S. Army Corps of

16   Engineers. Additional losses to business, due to Affiant's inability to develop and use

17   patented system, resulted in financial losses amounting to approximately One Hundred

18   Billion ($100,000,000,000) Dollars, (See exhibit A); and,

19   32. **RESPONDENTS**, their agents, and principal corporations, cost Affiant a marriage of

20   25 years and caused Affiant's four children to be alienated from him; and,

21   33. **RESPONDENTS**, their agents, and principal corporation caused Affiant, humiliation,

22   trauma and left Affiant to be incapable of communication due to the server stress,

23   abuse and financial losses. This resulted in Affiant having a severe nervous

24   breakdown. The aggravated mental condition allowed for Affiant's attorney to steal his

25   patent. The cost of litigation to retrieve his patent was approximately Two Hundred

26   Twenty Five Thousands ($225,000.00) Dollars; and,

27   34. **SAID ACTS** resulted in Affiant's second wife support him during his time of disability

28   without whom Affiant would surely have died from the constant stress and aggravation

Commercial Affidavit of Fact

1  caused by Respondents.  This caused nearly One Hundred Thousand ($100,000)
2  Dollars in expenses for physicians, hospitalization and medications; and,

3  **35. RESPONDENTS**, their agents, and principal corporations by the above said actions,
4  also caused this Affiant, difficulty communicating with anyone for twenty years due to
5  his nervous breakdown caused by agents act, no-acts, omissions, commissions and
6  Black Balling; resulting in his inability to market his EFR System or earn even a
7  meager living for twenty years.  Losses amounted to Five Hundred Eighty Nine Billion
8  Four Hundred Sixty Two Thousand Five Hundred ($589,000,462,500) Dollars (See
9  exhibit C); and,

10  **36. RESPONDENTS**, their agents, and principal corporations were recently given the
11  opportunity, by this Affiant, to market his system with the opportunity of making an
12  estimated gross profit in five years, for themselves, of One Hundred Fifty Billion
13  ($150,000,000,000.00) Dollars therein mitigating the above said damages by royalties
14  paid to him.  This failure to mitigate damages and continuing in bad faith causing
15  additional losses of Sixty Three Billion ($63,000,000,000,) Dollars (See exhibit D);
16  and,

17  **37. RESPONDENTS**, their agents, and principal Corporation caused this Affiant the total
18  losses and injuries exceeding Five Hundred Eighty Nine Billion Four Hundred Sixty
19  Two Thousand Five Hundred ($589,000,462,500. 00) Dollars and the loss of his first
20  wife, and the loss or his children, health and self esteem to the point of self
21  destruction.

22  **38. CRIMINAL COMPLAINT**

23  This Criminal Complaint and the Defendants herein are in violation of various
24  Constitutional secured rights, these rights are listed below:

25  **a.** Article 1, § 10 cl.1, impart; No state shall pass any law impairing the obligation of
26  contracts; and,

27  **b.** Amendment V , impart, nor be deprive of life, liberty or property without just
28  compensation; and,

Commercial Affidavit of Fact

c. The Defendants herein are in violation of  15 USCA  Sherman Anti Trust Act; as place below:

e. The Defendants herein are in violation of 15 USCA § 1; as placed below.

**Trusts, Etc., In Restraint Of Trade Illegal; Penalty:**
Every contract, combinat n in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal. Every person who shall make any contract or engage in any combination or conspiracy hereby declared to be illegal shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding $10,000,000 if a corporation, or, if any other person, $350,000, or by imprisonment not exceeding three years, or by both said punishments, in the discretion of the court.

f. The Defendants herein are in violation of 18 USCA § 4; as placed below,

**Misprision of Felony:**
Whoever, having knowledge of the actual commission of a felony cognizable by a court of the United States, conceals and does not as soon as possible make known the same to some judge or other person in civil or military authority under the United States, shall be fined under this title or imprisoned not more than three years, or both.

g. The Defendants herein and all that conspired to embezzle the patented system whether from the beginning or whether they joined the conspiracy after the fact are equally guilty as stated in 18 USCA § 3; as placed below.

**Accessory after the fact**
Whoever, knowing that an offense against the United States has been committed, receives, relieves, comforts or assists the offender in order to hinder or prevent his apprehension, trial or punishment, is an accessory after the fact.
Except as otherwise expressly provided by any Act of Congress, an accessory after the fact shall be imprisoned not more than one-half the maximum term of imprisonment or (notwithstanding section 3571) fined not more than one-half the maximum fine prescribed for the punishment of the principal, or both; or if the principal is punishable by life imprisonment or death, the accessory shall be imprisoned not more than 15 years.

h. The Defendants herein are in violation of 18 USCA § 241; as placed below,

**Conspiracy Against Rights Of Citizens:**
If two or more persons conspire to injure, oppress, threaten, or intimidate any Citizen in the free excercise or enjoyment of any right or privilege secured to him by the Constitution or laws of the United States, or because of his having so exercised the same; or if two or more persons go in disguise on the highway, or on the premises of another, with intent to prevent or hinder his free exercise or enjoyment of any right or privilege so secured- they shall be fined not more than $10,000 or imprisoned not more than ten years, or both.

and if death results, they shall be subject to imprisonment for any term of years or for life.

i.    The Defendants herein are in violation of 18 USCA § 242; as placed below.

**Deprivation Of Rights Under Color Of Law:**
Whoever, under color of law, statute, ordinance, regulation, or custom, willfully subjects any inhabitant of any State, Territory, or District to the deprivation of any rights, privileges or immunities secured or protected by the Constitution or laws of the United States, or to different punishments, pains, or penalties, on account of such inhabitant being an alien, or by reason of his color, or race, than are prescribed for the punishment of citizens, shall be fined not more than $1,000 or imprisoned not more than one year, or both; and if death results shall be subject to imprisonment for any term of years or for life.

## DEMAND AND DISCLOSURE

39.  **RESPONDENTS**, must produce an individual, personal Commercial Affidavit of Fact, sworn or affirmed by each Respondent to be "true, correct, and certain" to rebut Affiant's Affidavit; and,

40.  **IN THE ALTERNATIVE**, if Respondents agree to accept responsibility for the losses and injuries they have caused affiant with the herein prescribed ninety (90) day grace period, Affiant will agree to accept an immediate settlement of Two Hundred Fifty Million ($250,000,000) Dollars (see exhibit G) in Lawful Money of Account or the United States of America, i.e. gold or silver minted by the U.S. Mint, (See 31 USC § 5112) subject to listed price of gold in Washington DC as of this date; or Federal Reserve Notes, and,

41.  **FAILURE**, to properly respond to Affidavit within ninety (90) days, will invoke the doctrine of acquiescence and/or admission of the claims made by Aff ...t and further, will be a tacit admission of his right to recover in Commerce for damages caused by Respondents, including but not limited to penalties a... costs, and,

42.  **FAILURE TO RESPOND** as herein required, shall be considered a willful disregard of this Instrument.  Said failure shall provoke the immediate filing of a Lien making Respondents liable for the sum certain amount of damages occurring to this Affiant for Two Billion Five Hundred Million ($2.5 billion) Dollars (see exhibit G) in lawful money of account of the United States of America, i.e. gold or silver minted by the U.S. Mint.

1   (3 1 USC § 5112) , at the price of Gold in Washington DC at the time of default, or
2   Federal Reserve Notes; and,

3   **43.   THIS COMMERCIAL AFFIDAVIT OF FACT**, Notice and Warning of Commercial
4   Grace, and Notice of Non-Judicial Proceeding the **ONE AND ONLY** such Notice and
5   Warning Respondent will receive, and,

6   **44.   THE FOUNDATION OF COMMERCIAL LAW**, being based on certain eternally just,
7   valid, and moral precepts, has remained unchanged for at least six millennia.  Said
8   Commercial Law, forms the underpinnings of Western Civilization, if not all nations,
9   law, and commerce in the world, non judicial and prior and superior to the basis there
10  of, and cannot be set aside or over-ruled by the laws and statutes of governments,
11  legislatures, quasi-government agencies, or courts.   It is therefore, an inherent
12. obligation on all authorities, officials, governments, agencies, courts, judges, attorneys,
13  and all aspects and agents of all law enforcement agencies to uphold said Commercial
14  Law, without which said entities are violating the just basis of their alleged authority
15  and serving to disintegrate the society they allegedly exist to protect; and,

16  **45.   THAT** failure of accused to prove their claims by rebuttal against this affidavit within
17  ninety (90) calendar days (or in the alternative, fully comply  with all numbered points
18  above), will be considered a willful breach of and default on a bilateral contract
19  (Affidavit of Agreement) formed knowingly, intentionally, and voluntarily by and
20  between the undersigned and the accused and the Criminal Complaint will issue
21  forthwith.

22  **46.   THAT I**, the undersigned affiant, depose and certify that we have written the foregoing
23  with intent and understanding of purpose, and believe the statements, allegations,
24  demands and contents herein to be true, correct, complete, certain and commercially
25  reasonable, and just, to the best of our knowledge and belief.

26          **NOTICE TO PRINCIPALS, IS NOTICE TO AGENTS.**
27          **NOTICE TO AGENTS, IS NOTICE TO PRINCIPALS.**

28  // //

Commercial Affidavit of Fact

1  **47. SERVICE** of this Notice and Demand upon the Chief Executive Officer of each of the

2  W.R. Grace divisions named on page one and three of this instrument; each officer

3  being a respondent.

4  **47. FURTHER AFFIANT SAITH NOT.**

5  Verification of Party

6  Without waiving any right to dispute, I, Anton Frank, Volovsek, certify under penalty of perjury

7  under the laws of the united states of America, that I have read the foregoing and know the contents

8  thereof, and that to the best of my knowledge and belief it is true, correct and materially complete, relevant and not misleading; the truth, the whole truth, and nothing but the truth, so help me God.

9  Dated this 2nd day of Oct , 1996.

10                                             _Anton Frank Volovsek_
                                             Anton Frank, Volovsek

11  country of Washington          )

12  Klickitat county                    )   Ss
                                         )

13

14  Signed and Sworn to before me on the 2nd of Oct , 1996.

15

16                                   Notary Public in and for

17                                   the State of Washington
                                     My Commission Expires: 11-1-67

18

19

20

21

22

23

24

25

26

27

28

Commercial Affidavit of Fact

VOL 340 PAGE 293                    Page 14 of Fourteen

1   Anton Frank, Volovsek
2   c/o
3   P.O. Box 522
4   White Salmon, Washington
    NDPZ [98672]
5
6   country of Washington        )
7                                )  Ss
8   county of Klickitat          )
9

10                    **Affidavit of Anton Frank, Volovsek**
11  I, Anton Frank, Volovsek, do depose and state;
12

13  1.   In the fall of 1974, I began experimenting to try and improve the roofing system.  I
14       succeeded and I have patented my new roofing sysytem both in the United States
15       (U.S. Patent #4,016,323) and Canada (Canada Patent # 1,047,219).
16  2.   The main product required by my system is a "Bituthane" manufactured by W.R.
17       Grace.  To my knowledge Grace was the only company to manufacture this
18       membrane that would work in my system.  Hayden Clark of W.R. Grace flew out
19       from Boston five times to watch me put the system together.  Mr. Clark implied that
20       it was quite a revolutionary system.
21  3.   Don Coghlan, Grace's regional representative, implied that a large amount of sales
22       of the membrane Heavy Duty Bituthane' would be forthcoming.
23  4.   I wrote to Hayden Clark on 12/18/74 in reference to warranting their product in a
24       roofing system and on what types of decks this material would adhere to.  I got no
25       response.
26  5.   Straightaway Span Crete wanted my new system on 30,000 sq. ft. of roof area of
27       the type which this system originally designed and manufactured.  I also was
28       approached to put this system on a car wash building which always had
29       conventional roof problems.
30  6.   I quickly called Don Coghlan, Grace representative, and ordered the membrane.
31       He returned my call to inform me that they (Grace) would not sell me the material.
32  7.   I was already forming my own company with the architect and engineer that
33       assisted me in the testing and final invention of this system, which we named
34       EERS, Energy Efficient Roof System. I had already spent many days and dollars
35       with my patent attorney with confirmation from the patent office that this system
36       was patentable.
37  8.   My attorney then sent a letter to Mr. Peter Grace on October 14, 1975 (See
38       Exhibits Attached) requesting a reason for their refusal to sell us their heavy duty
39       Bituthane, which was on the open market.
40  // //

Affidavit of Fact of Anton Frank, Volovsek

9. A reply was received from Vice President Leonard Rosenblatt refusing to sell us any material, but offering us five rolls for further testing. In the meantime I lost my two contracts and had to close down my new company. This left me without a job with four children to feed.

10. A second letter was sent to Mr. Rosenblatt on November 7, 1975 with the same negative response. I tried to find a distributor who might have some of that membrane in stock  I found Highway Pavers, but they told me that they could not sell me the membrane because W.R. Grace threatened to blacklist them if they did.

11. The same response came from Milwaukee Insulation. Both companies had enough material for the jobs I had, but neither company wanted to lose their source of supply of this good product.

12. I then contacted Don Coghlan again to see if we could find another company who might have a product we could use in my system. We both searched, but to no avail. Don Coghlan then quit working for W.R. Grace in disgust.

13. I checked on a product from Protecto Wrap in Denver, Colorado. My attorney, Ed Snyder, sent them a letter describing my system and inquired if it might work as a substitute for Grace's product. After several trips to Denver we found that it would not work as a substitute for Grace's product.

14. Now, on the verge of bankruptcy and my health failing because of the stress generated from the deeds done to me and my company by W.R. Grace, I fought to keep what was left of my company, my marriage, and my family from diminishing any further. I failed.

15. In a last chance effort I made some phone calls, and everyone suggested that I go to see a chemical engineer in Phoenix, Arizona who was very knowledgeable in roofing and urethane foam insulation. I contacted him, and he agreed to hire me at a minim wage salary and help me promote my roofing system. My attorney supported this idea by lending me money to get there.

16. After a short time Mr. Coultrap, the chemical engineer, decided I would have to give him 90 percent of my system to remain with his company. I declined his offer, and I was promptly fired.

17. At this point I had a nervous breakdown. The soul person responsible for my recovery was a woman, Terry, that I was keeping company with who understood my situation and my system.

18. My attorney saw the opportunity to steal my patent, and proceeded to do so. He persuaded Mr. Coultrap into joining forces to produce and market my system.

19. Terry helped me find a law firm to retrieve my patent. This lawyer also tried to steal the patent in the process of getting it back from my lawyer (Snyder). After a tough battle we were able to fire this lawyer (Ron Logan) and were informed by the judge that I had to file my suit back in Wisconsin.

// //

Affidavit of Fact of Anton Frank Volovsek

Page 2 of Four

20. Because of my financial situation I had no way to do that. Many months later I acquired enough money and plane fare to return to Wisconsin to find a law firm to get my patent back. Aul and Mawicke took the case and won after almost a year. Five years later Aul and Mawicke did manage to get Snyder disbarred.

21. In 1980 Terry quit her job at the newspaper in Phoenix and went to work for another newspaper in Alaska, and asked me to go along. After several years of recovery I began to search for investors interested in helping me get my system marketed.

22. In the next year I put together about $100,000, but expenses were high, and my knowledge of marketing low. I hired a marketing firm from Boston on a percent basis, but they fared as well as I had.

23. I made contact with:
    a. Oil companies, but they wanted no part of my system because it was to energy efficient and would cost them a few dollars in fuel.
    b. The U.S. Government, explaining some possible net-savings to taxpayers of more than one billion dollars' per-year, but they were not interested in saving the taxpayers any money.
    c. W.R. Grace would have been an ideal company, but they too refused.

24. I learned, regardless of how efficient this system was, architects would not specify it unless it was corporately endorsed. I then proceeded to contact 30 or more major companies who manufactured the products I had incorporated into my roofing system.

25. By this time three other manufacturers made a membrane that was almost identical to Grace's. I contacted them all. They all liked my system but not one would market it. The coating companies loved my system, but none were big enough to market a system that had all the potential that my system had.

26. Due to Physical and Financial problems Terry and I ended up back in Phoenix. At this time I learned that W. R.Grace was no longer manufacturing the quality of membrane that I needed for my system and that Phillips 66 was. So I promoted my system to Phillips. There was much interest, and I installed a job for them in Miami, Florida. The system was a success.

27. In the meantime Phillips sold this product to the Henery Company in California. So off I went with a retired colonel from the U.S. Army Corps of Engineers to California to meet with the Henery Company. They liked it, but said they weren't big enough to market it.

28. In the meantime, the colonel gets my system approved by the U.S. Army Corps of Engineers and I was promised the first job that came up. Shortly thereafter, however, the Corps money was cut off and the Corps itself was cut in half.

29. I next met with the ex-Governor of Arizona and Senator Don Rogers of California to see if they might be able to get in touch with W.R. Grace and convince them to

Affidavit of Fact of Anton Frank, Volovsek                    Page 3 of Four.

reconsider and market my system.  Before they made contact with W.R. Grace, I contacted the Grace waterproofing representative myself.

30. He was very interested, and asked me to write to his boss in Boston, Massachusetts to see if they would be interested at this time to market my system Since they were now making the membrane again.  Once again I got a negative reply. (See Letters Attached)

Without waiving any right to dispute, I, Anton Frank, Volovsek, certify under penalty of perjury under the laws of the united states of America, that I have read the foregoing and know the contents thereof,  and that to the best of my knowledge and belief it is true, correct and materially complete, relevant and not misleading: the truth, the whole truth, and nothing but the truth, so help me God.

Dated this _2nd_ day of ___Oct___, 1996.

_Anton Frank Volovsek_
Anton Frank, Volovsek

STATE OF WASHINGTON      )
                         )   Ss
COUNTY OF KLICKITAT      )

Signed and Sworn to before me on _2nd_ day of ___Oct___, 1996.

_____
Notary Public in and for
the State of Washington
My Commission Expires: _11-8-97_

Affidavit of Fact of Anton Frank, Volovsek                        Page 4 of Four

Anton Frank, Volovsek
c/o P.O. Box 522
White Salmon, Washington

# EXHIBIT A

## STATEMENT OF LOSSES INCURRED, DUE TO W. R. GRACE

1.  **HEALTH:**

     Two (2) years prior to Nervous Brake-down my health began to fail due to the stress that was incurred from dealing with W. R. Grace.

     Ten (10) years to recover from the stress of destroying my lively-hood and allowed Mr. Snyder (My trusted friend and Lawyer) to steal my Patent.

2.  **FAMILY:**

     First Marriage; Wife, Daughter, three(3) Sons, my home and all accumulated material wealth possessed at that time.

     Second Marriage; Wife who supported me for fifteen (15) years through my nervous brake-down and there after.

3.  **INVESTOR:**

     $125,000.00 collected from various investors to promote my roofing system.

4.  **POTENTIAL MARKETING FIRMS:**

     (See Attached Letters)

5.  **EXPENSES:**

     Incurred form trying to put my system on the open market.

6.  **PERSONAL CREDIBILITY:**

     Opposing Firms doing everything possible to keep my patented Roofing System off the open Market, i.e. B.U.R., Oil, and Insulation Companies The Government ect..

7.  **BUSINESS CREDIBILITY:**

     People that believed in me and my system lost confidence that my system would ever reach the market, i.e. Dan Hanson, Bob Kirkham, Don Coghlin, Dr. Bob Alumbaugh, Tim Seats, Don McNamara, Jerry Simonson, Polygard, Carpenter, Span Crete ect..

8.  **SPAN CRETE JOB:**

     30,000 sq.ft. had to be carceled because the Bituthene ordered could not be acquired.   There was also a job to do a Car-Wash that was lost due to the withholding of the needed material.

9.  **GENERAL LOSS TO THE BUILDING INDUSTRY:**

     Due to the light weight material to be used in applying this new roofing system the structural steel would be lighter without compromising the integrity and/or the dead load of the building.   This would have reduced the cost of the structure by as much as $3.00 per sq.ft. of which 50% would have gone to me.

*Statement of Losses: Anton Frank, Volovsek*

*Page 1 of One*

Anton Frank, Volovsek
c/o P.O. Box 522
White Salmon, Washington

**EXHIBIT B**

### STATEMENT OF SAVINGS ACHIEVABLE WITH EER SYSTEM

**1.   GENERAL GAINS TO THE BUILDING INDUSTRY:**

Due to the light weight material to be used in applying this new roofing system the structural steel would be lighter without compromising the integrity and/or the dead load of the building.  This would have reduced the cost of the structure by as much as $3.00 per sq.ft., which is equal to the cost of the system.

**2.   ENERGY SAVINGS:**

Heating and Cooling cost savings would pay for the system within an eight (8) year time frame.

**3.   NO INTERIOR DAMAGE:**

Because of the unique capabilities of this system there would be zero cost due to water damage.

**4.   NO REPAIR COST:**

This system is maintenance free, with the exception of non-natural damage.  But should damage to the roof happen this system makes repair simple and inexpensive.

**5.   LOWER INSURANCE PREMIUMS:**

According to the National Ratings Bureau, 90% of claims on Insurance policies coverings roofs are made on wind damage.  The technique used in this system totally eliminates the likelihood of this damage taking place.

**6.   STEEL DECK INSTITUTE:**

This Company would relies huge savings, as this would allow them to minimize the types of decks that they would have to manufacture.

**7.   LABOR SAVINGS:**

At least 50% less labors needed to install this system, cutting the cost of installation to less the half of a normal B.U.R. type of roof.

// //
// //
// //

Statement of Losses: Anton Frank, Volovsek

Page 1 of Two

**8. NO COST FOR TEMPORARY ROOF:**

*Other trades can work instantly with application of membrane, and can be code approved as permanent roof. This reduces the cost by approximately $0.40-$0.50 per sq.ft.*

**9. PROVEN FACT:**

Two Fire Chiefs have claimed that my system is much less of a fire hazard the normal B.U.R. systems.

**10. YEAR ROUND INSTALLATION:**

This system can be installed 365 days a year.

**11. BEST WARRANTY:**

When the EER system is used to roof a building it never has to be removed just washed and a new rubberized coating applied. The warranty on this system is in ten (10) year increment and is updated along with the application of the new rubberized coating.

**12. FOREIGN MARKET:**

Because there is 42 different countries that honor the American Patents, this increases the market for the EER system approximately six (6) time of that here in the United States.

**13. ROOFING EVALUATION:**

The EER roofing system is comparable to invention of the automobile to the Horse and buggy. This system would put most applications of the B.U.R. system out of used and eventually make it totally obsolete.

· Milwaukee Insulation was The other
Company That Said the Same Thing
Hyway Pavers did.

On Jan 13-1976 I
stopped by Hy Way Pavers
to purchase some H.D. Bitithene
Joe Prekop informed me that
he was notified by A W.R. Grace
Rep that H.D. Bitithene was
not to be sold to me. He
stated that he couldn't stop
Hy way Paver from selling the
surplus he had but - - - -
Joe said Nobody would tell him
who he could sell to but on the
other hank didn't want to
jepardize his chances to buy H.D.B
J.d.

Milwaukee
Insulation
affiliate

G.O. ARTHUR CO
2050 RAYMOND AVE
ST. PAUL, MINN. 55114
ATTN:

I Called & talked to John

called to John
2-23-96
7:25 Am
will check on who
renew ber I ord will
call Back network

612-646-2773
414-790-2000 MIL. OFF.ec  7:36 Am
office - Talked to her 2-23:96

Remember 5:00 AM I 6-16-79

EX.Bit
B

Anton Frank, Volovsek                                    **EXHIBIT C**
c/o P.O. Box 522
White Salmon, Washington

### STATEMENT OF MARKET POTENTIAL
### (This Estament is Based on Commercial Use)

**1977**  Approximately Five Billion square foot was applied every year.

**1987**  The application of Flat-Tar roofs escalated to approximately Nine Billion square foot.

**1996**  The square footage has reach approximately Twelve Billion square footage.  If Dan Hanson (Architect) and Bob Kirkham (Architect) would announce at the annual A. I. A. convention that the EER system was available and that they supported it strongly, then the EER roof system would have taken over approximately 90% of the total market by now.

$$5 + 9 + 12 = 26 \text{ Billion} / 3 = 8.66 \text{ Billion sq.ft. per year}$$

```
  8.66     75% of 164.54 sq.ft. = 123.51 Billion sq.ft.
 x 19
 7794      123.51 x $1.50 = $186.265 Billion Dollars
  866                        +24.00
164.54 Billion sq.ft.        $210.265 Billion Dollars
```

164.54 Billion sq.ft / 2 = 82.77 Billion sq.ft.

**Plus - 4 Billion sq.ft. Military Installations**
    4 Billion sq.ft. x $5.00 = $20,000,000,000.00 in a Ten (10) year period
**GSA**  2 Billion sq.ft. x $2.00  =  $4,000,000,000.00 in a Ten (10) year period

**Foreign Market**
    $210.265 Billion Dollars x 6 = $1,261,590,000,000.00 @ 75%
**Plus - % of Steel Savings**
**Plus - % of Insurance Savings**
**Plus - A.C. Units not needed**
**Plus - Electrical Savings**
**Calculated @ 50% = 82.77 x $1.50 = $124,655,000,000.00**
**(124.655 + 20 + 4) x 6 (Foreign Market) = $891,930,000,000.00**

Statement of Potential Market: Anton Frank, Volovsek                   Page 1 of One