UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

IN RE:                            .    Chapter 11
                                  .
W. R. GRACE & CO., *et al.*,      .    Case No. 01-01139(JKF)
                                  .    (Jointly Administered)
        Debtors.                  .
                                  .    Feb. 26, 2007 (2:39 p.m.)
                                  .    (Wilmington)


TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE JUDITH K. FITZGERALD
UNITED STATES BANKRUPTCY COURT JUDGE


Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

1           THE COURT: Okay, folks, I don't know if you heard

2    me.  I may have to vacate this courtroom by 4:30 or

3    approximately so we need to get going on W.R. Grace so we

4    have time to get through this agenda.  This is the matter of

5    W.R. Grace, 01-1139.  The participants I have listed by phone

6    are: Joseph Schwartz, Daniel Speights, Karen Edwards, Martin

7    Dies, Stephen Blauner, Mark Shelnitz, Paul Norris, Lisa

8    Esayian, James Restivo, Douglas Cameron, Oscar Mockridge,

9    Edward Westbrook, Stephen Vogel, Michael Davis, Robert

10   Guttmann, John O'Connell, Stephanie Kwong, Brian Kasprzak,

11   Michael Joyce, Leslie Epley, Mark Plevin, Sander Esserman,

12   Van Hooker, David Klingler, David Parsons, Darrell Scott,

13   Elizabeth DeCristofaro, David Liebman, Marti Murray, Janet

14   Baer, Sam Blatnick, Theodore Freeman, Sal Bianca, Barbara

15   Harding, David Bernick, Sara Gooch, Daniel Cohn, Matthew

16   Kramer, Andrew Chan, Sean Walsh, David Beane, Peter Shawn,

17   Nathan Finch, Guy Baron, Tiffany Cobb, Arlene Krieger,

18   Kenneth Thomas, Stefano Calogero, Daniel Glosband, and Walter

19   Slocombe.  I'll take entries in court, please.

20           MR. BERNICK: David Bernick for Grace this

21   afternoon, Your Honor.

22           MS. BAER: Good afternoon, Your Honor.  Janet Baer

23   on behalf of Grace.

24           MS. HARDING: Barbara Harding on behalf of Grace,

25   Your Honor.

1          MR. KRUGER: Louis Kruger, Your Honor, on behalf of

2     the Unsecured Creditors Committee.

3          MR. O'NEILL: James -

4          THE COURT: One second, please.  I'm sorry, just a

5     second, please.  I'm sorry, whoever spoke after Mr. Kruger, I

6     didn't get you.  The only picture I have is at the podium.

7     So if you're speaking from anywhere else and I can't hear

8     you, I also don't know who you are.

9          MR. O'NEILL: James O'Neill, Your Honor, for Grace.

10         MS. SIMANYAN: Lori Simanyan of Kirkland & Ellis for

11    Grace, Your Honor.

12         MR. BECKER: Good afternoon, Your Honor.  Gary

13    Becker from Kramer Levin Naftalis & Frankel representing the

14    Equity Committee.

15         MR. BURNHAM: Good afternoon, Your Honor.  Noel

16    Burnham from Montgomery, McCracken, Walker & Rhoads

17    representing the MMWR firms and the Grace Certain Cancer

18    Claimants.  Also, I wish to note that Natalie Ramsey is on

19    the telephone.

20         MR. MULLADY: Good afternoon, Your Honor, Raymond

21    Mullady on behalf of the Futures Claimants Representative.

22         MR. WRIGHT: Good afternoon, Your Honor.  Jarrad

23    Wright from Weil, Godshal & Manges on behalf of the Ad Hoc

24    Committee of Equity Security Holders.

25         MR. FINCH: Good afternoon, Your Honor.  Nathan

1    Finch from Caplan & Drysdale for the Official Committee of

2    Asbestos Personal Injury Claimants.

3            MR. FARNAN: Good afternoon, Your Honor.  Brian

4    Farnan of Phillips Goldman & Spence, local counsel for the

5    Future Claimants Representatives.

6            THE COURT: Okay, Mr. Bernick, Ms. Baer?  Ms. Baer.

7            MS. BAER: Good afternoon, Your Honor.  A number of

8    orders have been entered.  I thought it made sense for us to

9    just go through and make sure we're all on the same page on

10   that.

11           THE COURT: All right.

12           MS. BAER: First of all, Your Honor, number 1 on the

13   agenda, an order was not submitted on that one.  In fact, the

14   agenda indicated the matter had been resolved.  As it turns

15   out, after we indicated it was resolved, we discovered that

16   there are - we believe there are a number of new

17   questionnaires that came in that were not supplements.  I've

18   spoken with Mr. Hooker and Mr. Esserman's colleague this

19   morning, and we've agreed, Your Honor, we'd like to just put

20   this matter over on the agenda to next month.  Hopefully

21   we'll submit a certification of counsel on it soon, but we

22   just have to work through what Russ Consulting's records show

23   versus what the claimant's records show.

24           THE COURT: All right.

25           MS. BAER: Your Honor, items show that you entered

1   orders on matters 2, 3, 4, 5, 7, 8, 9, 12, 13, and 14.

2           THE COURT: Okay.

3           MS. BAER: Your Honor, on matter 11, we filed that

4   on a certification of counsel.  That's the B-read order, the

5   consulting expert order.  We do not show that that order has

6   actually been entered, but it was submitted on a

7   certification of counsel.

8           THE COURT: I'm sorry, when was that?

9           MS. BAER: The certification of counsel on that

10  order was submitted on February 16th.  It's Docket No. 14589.

11  That's the consulting expert order.

12          THE COURT: I thought I signed that one during

13  another court proceeding that we had.  Am I confused?

14          MS. BAER: Yeah, that - this one was after the last

15  court proceeding, and I think it just may have fallen through

16  the cracks.  We can certainly contact your chambers

17  afterwards and try to figure that one out.

18          THE COURT: Okay, I'm sorry, Ms. Baer, maybe I've

19  lost track.  I'll try to make sure that somebody e-mails that

20  to me to make sure, I thought that I - maybe I just got the

21  orders confused.

22          MS. BAER: Okay.

23          THE COURT:  I'll take a look at it again.

24          MS. BAER: Thank you.

25          THE COURT: Docket 14589?

1          MS. BAER: Yes.

2          MS. BAKER: Judge, this is Mona.  We have it.  You

3     were reviewing it.  We're just waiting for that to be

4     completed.

5          THE COURT: Okay.  I'm sorry, I'll take a look at it

6     again.  I thought it had been entered so I will double check.

7     Maybe I saw a problem but I thought I'd entered it.

8          MS. BAER: Thank you, Your Honor.  Matter number 6

9     on the agenda was the ZAI status, and by agreement of the

10    parties, that matter's been put over to our next omnibus

11    hearing on April 2nd.

12         THE COURT: All right.

13         MS. BAER: That takes us, Your Honor, to matter

14    number 10, which is the debtors' claims objection to the

15    claim of Anton Volovsek.  My colleague Lori Simanyan is here,

16    and she will handle that matter.

17         THE COURT: All right.

18         MS. SIMANYAN: Good afternoon, Your Honor.  Lori

19    Simanyan of Kirkwood & Ellis on behalf of the debtors.  The

20    court clerk informed us today that Mr. Volovsek is actually

21    here in person in Wilmington, and had asked you for a

22    continuance, which you had denied.  The court clerk

23    subsequently informed us that Mr. Volovsek was taken away in

24    an ambulance.  We're prepared to go forward today, but in

25    light of what happened, I turn to Your Honor to give us

1   instruction.

2          THE COURT: He was taken away in an ambulance?

3          MS. SIMANYAN: That's what Mona told Jan Baer by e-

4   mail, I believe.

5          THE COURT: All right.  This is new, I haven't heard

6   this, so I don't know.  Mona, what happened?

7          MS. BAKER: Apparently while he was at the Clerk's

8   Office, after he asked for the continuance and was denied

9   that continuance, he, I think - He needed an ambulance so

10  they called it for him, and he was -

11         THE COURT: Ah, okay.  I think at this point we're

12  going to proceed anyway.  I have no information as to what

13  happened to this gentleman.  We're going to go forward.  If

14  in fact he comes in with a doctor's excuse within the next 10

15  days, I will reconsider any order if I'm able to issue an

16  order today, based on medical information that says that in

17  fact he had a medical condition that required treatment, and

18  if I get that order, then I apologize to the debtor up front.

19  I will reconsider, but otherwise, at this point I have no

20  information that indicates that he in fact really did need an

21  ambulance and some medical treatment, so we're going forward,

22  and, as I said, if it turns out that I'm incorrect, then I

23  will apologize both to him and you, and we will redo it with

24  him present.  Go ahead.

25         MS. SIMANYAN: Okay, Your Honor.  We are here today

1   on the debtors' objection to the claim of Mr. Volovsek.   In

2   2002 Mr. Volovsek filed a $491 billion claim based entirely

3   on the debtors' business judgment to not sell him a certain

4   product that the debtors manufactured.   Even when given any

5   of the benefit of the doubt, Mr. Volovsek has failed to state

6   any actionable claim.   He does not have standing as an

7   individual to bring a criminal action nor does he have

8   standing to bring an anti-trust action as he has alleged.

9   Most important, by waiting more than 20 years to first take

10   any action which actually he took in 1996 by filing a lien in

11   the State of Washington, Mr. Volovsek has long since been

12   barred by the statute of limitations.   As there is no basis

13   in law for his claim, we ask that this Court disallow and

14   expunge his claim under 502 of the Bankruptcy Code, and we

15   ask that this Court void the liens on which his claim are

16   based under Your Honor's authority pursuant to § 506(d) of

17   the Bankruptcy Code.   Unless Your Honor has -

18           THE COURT: Is -

19           MS. SIMANYAN: I'm sorry.

20           THE COURT: No, I just wanted to make sure that no

21   one was present in the courtroom representing Mr. Volovsek

22   and that Mr. Volovsek himself was not there.

23           MS. SIMANYAN: Oh, I'm not -

24           THE COURT: Is anyone present - There's no response.

25   Is anyone on the phone representing Mr. Volovsek?   There is

1   no response.  Is Mr. Volovsek present either in the courtroom

2   or on the phone?  There is no response.  I will take an

3   order.  Is the order that's attached to the motion

4   appropriately written or are any changes necessary?

5        MS. SIMANYAN: Your Honor, I believe we did not

6   attach an order to the motion.  We'll have to submit one

7   under certification of counsel.

8        THE COURT: Okay.  If that's the case, please do.  I

9   will sign an order that disallows the claim.  I see no basis

10  for this claim.

11       MS. SIMANYAN: Okay, Your Honor.  Would you like me

12  to contact Mr. Volovsek to make sure that he knows Your

13  Honor's instructions about submitting a doctor's note as

14  well?

15       THE COURT: No, I want it put into the order that if

16  he submits a medical doctor's affidavit - make it an

17  affidavit that indicates that he in fact needed medical

18  treatment and what the nature of that treatment was, that I

19  will reconsider and put the matter on to the April agenda,

20  then put the date and the time of the agenda, direct Mr.

21  Volovsek to appear at that time.  Without that affidavit from

22  a medical doctor, I will not reconsider.

23       MS. SIMANYAN: Thank you, Your Honor, then we'll

24  submit an order under certification of counsel.

25       THE COURT: Okay, thank you.  Ms. Baer?

1           MR. BERNICK: Your Honor, it's David Bernick for

2      Grace.

3           THE COURT: Oh.

4           MR. BERNICK: I believe that actually brings us up

5      to item 15 on the agenda which relates to the property damage

6      side of the case.  I'm not sure that there's anything of

7      particular consequence to report to the Court.  I know that

8      the Court is familiar with the basic pretrial schedule that

9      we have in place, and we continue to move forward.  I don't

10     see Mr. Speights here nor do I see Mr. Baena for the Property

11     Damage Committee.  I'm assuming that somebody from the

12     Property Damage Committee is on the telephone, so, I don't

13     know that there's any particular matter that we have to

14     address here this afternoon, but I'll defer to other counsel

15     who are on the phone.

16          THE COURT: Anyone on the phone have anything to

17     report with respect to item 15, the property damage status

18     conference.

19          MR. BAENA (TELEPHONIC): Your Honor, may it please

20     the Court, Scott Baena, I am on the phone.

21          THE COURT: Anything you want to report, Mr. Baena?

22          MR. BAENA (TELEPHONIC): Just one item, Judge, and

23     that is, there was supposed to be per your CMO governing the

24     PD objection process, there was supposed to be a status

25     conference today in respect of that, and notice didn't go out

1   other than by the original CMO.  The agenda was silent about

2   the fact of the status conference, and moreover the agenda

3   was not, based upon the resources available to us, it does

4   not appear that the agenda was served on all PD claimants.

5   So I just merely wish to bring to the Court's attention the

6   fact that you scheduled a status conference, it's not going

7   forward today, there was no notice, and that needs to be

8   dealt with at some point in time too.

9          THE COURT: What I had as agenda 15 today actually

10  was the Anderson Memorial class certification status

11  conference.

12         MR. BAENA (TELEPHONIC): That's correct.  It was

13  another status conference that was supposed to happen as

14  well.  On Hazzard.

15         THE COURT: Okay, well that -

16         MR. BERNICK: Well, yeah, I can make a report on

17  that, but that's why asked if Mr. Speights was on the phone

18  because I didn't think it was appropriate to comment on that

19  if he -

20         MR. BAENA (TELEPHONIC): I'm not talking about the

21  certification status conference, Your Honor.  In the PD CMO,

22  you set today as the date on which you would hold a

23  preliminary pretrial conference in respect of the Hazzard

24  objections, and the agenda does not refer to that, moreover,

25  it wasn't even served on everybody, and my point is very

1   simple.  The status conference has not been teed up for

2   today.

3          MR. BERNICK: That is correct, Your Honor, and it

4   may have been an omission that wasn't discovered until Mr.

5   Baena was good enough to point it out to us, but the

6   consequence of that, I don't think - I just don't know that

7   this really bears a lot of discussion.  We have a - there was

8   supposed to be a pretrial conference with respect to the

9   upcoming April hearing, which relates to the prior matters of

10  the statute of limitations and product ID that obviously is

11  going to take place next week, and I don't know that there's

12  a lot of point to belaboring a pretrial conference with

13  respect to the May hearing when we haven't even had one with

14  respect to the April hearing, but to the extent that we, the

15  debtor, were to have noticed up a pretrial conference today

16  so that we could all have devolved upon the same fact, which

17  is that we haven't had a pretrial conference with respect to

18  the prior hearing, we take note of Mr. Baena's point and to

19  the extent that anybody has been inconvenienced, although I

20  don't believe anybody has been inconvenienced because there

21  wasn't any notice, as he indicates, to all of those people,

22  that is to say, I'm not sure what the debate is all about.

23  If it's designed to show that we omitted to put something on

24  the agenda, yes, we omitted to put something on the agenda.

25          THE COURT: Okay, well, I guess the question is, do

1    we need a status conference?  If we do we need to get a

2    status conference and a notice out at some point.

3         MR. BERNICK: I think that we probably will need a

4    status conference and maybe it would be most appropriate

5    point in time to take that up is in connection with the

6    status conference that's to be held next week with respect to

7    the hearing that's to take place in April, and maybe at that

8    point in time when all counsel are present, presumably in

9    connection with that matter, we can also schedule a pretrial

10   conference with respect to the matters that are germane to

11   the May hearing.

12        MR. BAENA (TELEPHONIC): Your Honor, Scott Baena

13   again.  Mr. Bernick has now alluded several times to a status

14   conference next week.  I'm unaware of that status conference.

15        MR. BERNICK: It's March 8th is a pretrial

16   conference.  It's the one that was moved the other day at the

17   Court's request.

18        MR. BAENA (TELEPHONIC): I was unaware that that

19   hearing had been reset, and I'm wondering how notice of it is

20   being given?

21        MR. BERNICK: Well, I - presumably that's something

22   that we can take up without taking up the Court's time.  I

23   heard about it orally myself this morning, and I don't know

24   all the details of that, but again, I think that's something

25   that we can discuss among ourselves.

1          THE COURT: Okay, I thought that I had an order

2    issued, but my staff in Delaware had a death in the family

3    and perhaps the order never got docketed.  I don't know.

4    This one may be my fault, Mr. Baena, not anybody else's.

5    When I had to leave at literally pretty much on the spur of

6    the moment, I did call and asked to have an order docketed.

7    I wasn't sure that one would be, but maybe it hasn't been, I

8    don't know.  Mona, can you please check, make sure that

9    notice of the continuation from last week on the 21st to March

10   8th is docketed.

11         MS. BAKER: It was my understanding that debtors'

12   counsel was going to send out a notice.

13         THE COURT: No, I asked Julie, I spoke directly to

14   Julie.  I asked her to do an order, and she assured me that

15   she would.

16         MS. BAKER: I'll do it then.

17         MR. SPEIGHTS (TELEPHONIC): Your Honor, this is Dan

18   Speights, may I be heard a moment?

19         THE COURT: Yes, Mr. Speights.

20         MR. SPEIGHTS (TELEPHONIC): I understand there's

21   some confusion about it, and I don't want to be difficult

22   about the situation if Your Honor wants to go forward on the

23   8th.   I do have an absolute conflict on the 8th, and I never

24   heard about a hearing next week, and I also point out that

25   there are no claimants' counsel on the call, I believe, other

1    than Mr. Dies and Mr. Schwartz.  So, to my knowledge, nobody

2    has had any knowledge of a hearing on the 8th, and I do have a

3    conflict on the 8th, but if Your Honor goes forward, maybe

4    somebody else can cover it for me.  But you had in your last

5    order said everybody must be there upon pain of something, I

6    can't recall.

7          THE COURT: Yeah, well, I tried to get that canceled

8    too, because I couldn't be there on pain and suffering

9    myself, but apparently because of the death that may have

10   caused some problems.  Okay, I don't - Well, let me see, I

11   don't know what I can suggest in terms of dates to try to do

12   this.  I don't care whether we do it by phone.  That's what

13   the new order was supposed to say, that it could be done by

14   phone, but I do need everybody to participate so that we can

15   make sure that everyone's on the same page with respect to

16   going forward with this evidentiary hearing process.  So, I

17   don't know, Mr. Speights, if it's just your conflict, is

18   anyone else able to cover for you?

19         MR. SPEIGHTS (TELEPHONIC): Well, if it's not - If

20   you're having a telephone hearing, then I can see if I can

21   rearrange things and participate by telephone.  I didn't know

22   that.

23         THE COURT: Okay, yes, it was supposed -

24         MR. SPEIGHTS (TELEPHONIC): (Microphone not

25   recording.)

1          THE COURT: All right, yes, it was - I was going to

2     do it by phone because I was the one who had to cancel the

3     hearing, and so I thought it was not polite to be able to

4     insist that everyone be present when I had insisted before,

5     and I had to cancel the hearing, so, I was going to do it by

6     phone.  So, if you can be present then - You can be present

7     then, Mr. Speights?

8          MR. SPEIGHTS (TELEPHONIC): Your Honor, I don't want

9     you to change everything around just for me.  If it's by

10    telephone, I would do my best to be present by telephone.  I

11    don't know about my law partner, but I assume he can as well.

12    Again, we didn't know about this, and I don't think they're

13    on the call either.

14         MR. BAENA (TELEPHONIC): Your Honor, Scott Baena

15    again.  Could you tell us what time that hearing is going to

16    be?

17         THE COURT: Well, now that's a bigger problem, Mr.

18    Baena, because I don't remember.

19         MR. BERNICK: I think it was at 9 a.m., at least the

20    information that we had, Your Honor.

21         THE COURT: Nine Eastern Time?

22         MR. BERNICK: Yeah.

23         MR. BAENA (TELEPHONIC): Thank you.

24         THE COURT: Okay, Mona, would you be able to get an

25    order on the docket today that reschedules that hearing to a

1   telephonic hearing only, March 8th at 9 Eastern Time.  All

2   counsel, claimants' counsel, everyone to participate by

3   phone.

4           MS. BAKER: All right, Judge.

5           THE COURT: Okay.

6           MR. BERNICK: Then with respect -

7           THE COURT: All right, we'll do the best we can.

8           MR. BERNICK: With respect, Your Honor - again David

9   Bernick for Grace.  With respect to Anderson Memorial that is

10  the agenda item, and I don't know if Mr. Speights wants to

11  make a report to the Court or not.

12          MR. SPEIGHTS (TELEPHONIC): I don't think we need to

13  make a report, Your Honor.

14          MR. BERNICK: That's fine, unless Your Honor has

15  some further question, we can go onto the next item, but I

16  don't want to -

17          THE COURT: No, did - Was the order - I did an

18  order, but I was also out of town for that one because of the

19  family medical issues that I've been dealing with lately.

20  Did you get the order that I - You did.  Okay, that one was

21  done, all right.

22          MR. BERNICK: Yeah, the order with respect to the

23  custodial deposition?

24          THE COURT: Yes.

25          MR. BERNICK: Yes.  We did receive that order and

1    there is activity pursuant to that order that is to comply

2    with it, but I think that that probably should suffice for

3    this afternoon unless Your Honor had any further questions.

4    At some point I'm sure that there will be a report to the

5    Court after that process is complete.

6              THE COURT: No, that's fine.  Just put it back on

7    the agenda, in fact, maybe on March 8th, if Mr. Speights is

8    available on it, if not then we'll continue it to the April

9    date just for another status report to see what you need

10   next.  How's that?

11             MR. BERNICK: That's fine, Your Honor.

12             MR. SPEIGHTS (TELEPHONIC): Yes, Your Honor, that's

13   fine.

14             THE COURT: All right, okay, thank you.

15             MR. SPEIGHTS (TELEPHONIC): And because it is at 9

16   o'clock I think I can be available by telephone.

17             THE COURT: All right, thank you.  Then we'll

18   continue item 15 to March 8th at 9 o'clock.  We'll do it

19   first, Mr. Speights, so that if you do need to leave you'll

20   be able to do that.

21             MR. RESTIVO (TELEPHONIC): Your Honor, Jim Restivo.

22   Are you saying for the March 8th status conference no one can

23   show up in person or are you saying that if people want to

24   also participate by telephone that will be okay?

25             THE COURT: I think it's just as easy for everybody

1    to call into Court Call, Mr. Restivo.  I'm going to be - I

2    think I'm going to be in Pittsburgh.  I don't even know - at

3    this point in time I don't even know where I'm going to be

4    from day to day.  I believe I will be in Pittsburgh on March

5    8th, but I think it would be just easier for everyone to

6    appear by phone.  It's just a status conference, I believe;

7    correct?  And a pretrial conference.

8            MR. RESTIVO (TELEPHONIC): That is correct, Your

9    Honor.

10           THE COURT: So, we'll just - and do you have - there

11   are no exhibits or anything that need to be presented;

12   correct?

13           MR. RESTIVO (TELEPHONIC): I have a pretty

14   demonstrative, Your Honor, that, you know, I'd kind of like

15   to show the Court, but if we do it by phone, we'll do it by

16   phone.

17           THE COURT: Well, is it possible to file it, Mr.

18   Restivo?

19           MR. RESTIVO (TELEPHONIC): Sure, Your Honor.

20           THE COURT: Okay, if you can e-file it, then

21   everyone can pick it up including me.

22           MR. RESTIVO (TELEPHONIC): Okay.

23           THE COURT: All right, that's fine.

24           MR. RESTIVO (TELEPHONIC): Thank you, Your Honor.

25           THE COURT: Okay, thank you.

1          MR. BERNICK: With respect - Is it all right, Your

2     Honor, to proceed to item 16, which is, I believe, the status

3     report with respect to the personal injury estimation?

4          THE COURT: Yes.

5          MR. BERNICK: Okay, I think that there are some

6     matters to take up here.  Both sides have made status reports

7     to the Court, and I believe, based upon some of the

8     activities that have taken place recently, that there are

9     probably a couple of different issues, and I know I see Mr.

10    Mullady standing here and I'm sure that others will have the

11    opportunity to chime in, but I think that the principal

12    matter that has to be resolved today is the schedule going

13    forward for completing the work necessary for the estimation

14    trial and in the timing of that estimation trial itself.  And

15    before I proceed any further, maybe if I can inquire, Your

16    Honor, as to whether you received both of the status reports,

17    that is the status report from the plan proponents or I

18    believe it was actually just from Grace and the status report

19    from the ACC and Mr. Austern, the FCR.

20         THE COURT: Well, I got the status report that had

21    the two exhibits that were labeled as Exhibits 1 and 2 at the

22    back with the questionnaires.

23         MR. BERNICK: The two -

24         THE COURT: This was Kirkland & Ellis', so I got the

25    debtors.

1          MR. BERNICK: Right.

2          THE COURT: But I did not get the ACC's.

3          MR. MULLADY: Your Honor, this is Mr. Mullady, and

4  as a point of procedural order, I would point out that item

5  16 on the agenda, which precedes item 17, is the status

6  report that the FCR filed.  It is Docket No. 14582, and I

7  would propose that we take these matters in turn, and in the

8  turn that they were filed, Your Honor, beginning with item 16

9  which is our status report.  I would also point out that our

10 status report was filed in conformity with the Court's

11 procedures in this matter ten days prior to today's hearing,

12 on February the 16th.  The debtors' status report was served

13 on us after close of business hours just this past Friday,

14 February the 23rd.  We don't believe it's properly before the

15 Court today.  Our view is that it is in fact a motion to

16 postpone not only some of the pretrial hearing dates but to

17 postpone the estimation hearing itself.  As such, we believe

18 it's inappropriate for the Court to take up that motion

19 without all parties having the opportunity to respond in

20 writing, and I'll stop there, but I would say that to take

21 these matters procedurally in the correct order, we should

22 speak to our status report and then Mr. Bernick should

23 respond to the extent he wants to, recognizing that his paper

24 was filed three days ago and out of procedural order.

25          MR. BERNICK: Your Honor -

1          THE COURT: Okay, that's fine, Mr. Mullady, I'm

2     happy to do that.  In fact, I thought I saw the ACC's report.

3     It's possible that in the process of coming here as quickly

4     as I did that I may just have left it at home because I have

5     a clear recollection of having read it, but maybe I printed

6     the debtors here because I was here when it was filed and

7     just simply didn't bring the order with me.  So, that's

8     possible.

9          MR. BERNICK: It was filed, Your Honor, I believe in

10    the notebook behind Tab 16, I'm told by Mr. O'Neill.  So, if

11    you have the notebook that was submitted, then it would -

12         THE COURT: I didn't bring any notebooks, Mr.

13    Bernick, thank you.  I didn't do that.  I was leaping for

14    things, but I was pulling pieces out as I was leaving the

15    house and not bringing things that I'd already read, so -

16    Okay, Mr. Mullady, go ahead, I'll hear from you first.

17         MR. BERNICK: I'm sorry, Your Honor.  I believe that

18    Mr. Mullady has suggested that nothing can be heard by the

19    Court that constitutes a request for relief except by motion.

20    And if that is true, most of his status report is effectively

21    a request the schedule not be changed, and it's further a

22    request relating to certain items of specific discovery.  So,

23    Mr. Mullady -

24         THE COURT: That probably is not the case.  The

25    rules provide for the Court to hear oral motions.  I don't

1    like to do it, especially in cases like this, but

2    nonetheless, could we just get to the merits -

3           MR. BERNICK: Sure.

4           THE COURT:  - because I may only have until 4:30.

5    Let me hear from Mr. Mullady to find out what the issues are

6    and see if we can work through this, folks, please.

7           MR. MULLADY: Thank you, Your Honor.  Once again,

8    Raymond Mullady for the Future Claimants Representative, Your

9    Honor.  As I stated a moment ago, it's our view that what the

10   debtors have done here is to file a motion to extend the

11   pretrial deadlines and the estimation hearing date.  If the

12   Court - just to familiarize the Court with the issues, our

13   status report really just was meant to point out to the Court

14   what data has been received by the debtors for which they can

15   prepare their estimation methodology.  In short, 72,000

16   questionnaire responses have been received accompanied by

17   about 3 ½ million pages of attachment data.  The debtors have

18   designated 14 non-estimation expert reports.  They have

19   designated a total of about 20 expert reports - excuse me,

20   experts who are presumably going through that material.  In

21   previous hearings before this Court, Mr. Bernick has

22   disclosed that he's been working with Mr. Tom Florence of

23   ARPC since 2004 on the so-called alternative world scenario,

24   and of course, which is at the heart of the debtors'

25   liability filters estimation methodology.  We filed this

1  status report, Your Honor, because Mr. Bernick said in open

2  court at the last omnibus that he intended to come in here

3  today and ask that some of the dates be shifted around.  We

4  didn't know what the specifics of that were, but we assumed

5  that that would involve not only the movement of pretrial

6  deadlines, but also a postponement request of the hearing

7  date.  On Friday afternoon last week, we learned that our

8  suspicions were correct, that in addition to a request to

9  move the pretrial dates to advance those forward, that there

10  would be a request, there is a request to now start the

11  estimation trial not on the dates previously set by the Court

12  but in late July, a six-week extension, and our comments

13  briefly on that, Your Honor, are as follows: We, first of

14  all, don't believe that this matter should be taken up today

15  because accompanying the debtors' status report or predicated

16  - the request that they're making in the report is predicated

17  on a number of assumptions - assertions, I should say, that

18  are disputed.  For example, and just taking one example, the

19  issue of the x-ray evidence.  The assertion is made that this

20  deadline has been pushed back because of non-compliance on

21  the part of the claimants' firms.  There's been no non-

22  compliance on the part of the claimants' firms with the order

23  that Grace negotiated on December the 22nd.  I won't get into

24  the merits of that issue, but it, again, is one issue that

25  were we to respond to this motion to postpone the hearing

1    date, I'm sure a lot of the parties before this Court would

2    have a lot to say about it.  But, you know, cutting to the

3    chase, you know, this Court back in July of 2006 made it

4    quite clear that once the Court committed three weeks of her

5    time and three weeks of the parties' time that this hearing

6    date would not change, and you said, Your Honor, quote, "Not

7    for reason of births, deaths, marriages, vacations, nothing,

8    that is going to be the trial."  The debtors' proposal that

9    this case now begin in late July is in practical application

10   for reasons that you'll hear if we get into a discussion of

11   new dates, really in effect, a request to push this

12   estimation hearing into the fall, maybe as late as November

13   because of complications that parties and counsel have after

14   the end of July.  But the real question that we see, Your

15   Honor, is the way that the debtors are approaching this

16   process, are we ever going to have an estimation hearing.

17   They say in their paper that the estimation must be, quote,

18   "Informed by an adequate factual record", end quote.  But

19   they never really define what an adequate factual record is.

20   They've served 119,000 questionnaires.  There are 72,000 that

21   are back.  Admittedly, some have come in later than the

22   deadline.  The data is coming in, as one would expect with

23   that amount of information, slowly, in a staggered way over

24   time.  We don't disagree.  The FCR certainly does not, nor do

25   I believe the ACC disagrees with the fundamental proposition

1    that there must be an adequate factual record.  But what the

2    definition of an adequate factual record is, I think the

3    parties are somewhat apart on.  The Court's view, when Your

4    Honor considered this questionnaire process over a year ago,

5    was you made it clear that you did not expect a 100 percent

6    return rate on the questionnaires, and the process was, as

7    you said, Your Honor, quote, "Only ever supposed to be a

8    sample".  Well, our position is the same.  The debtors have

9    72,000 personal injury questionnaire responses.  They have 3

10   ½ million pages of documents.  They have 14 non-estimation

11   experts, another 6 or so estimation experts who are working

12   on their liability filters, they've been working with Mr.

13   Florence since 2004.  The debtors don't believe this is

14   enough.  They want the ability to analyze each and every

15   questionnaire on its merits, the B-reads, the x-rays, the

16   responses, and they want discovery from third parties on top

17   of that to cross-reference against it.  That's all great in a

18   perfect world, Your Honor, but it just can't physically be

19   done anytime soon.  To sum up, Your Honor, the Court should

20   not postpone the estimation hearing, certainly should not do

21   so on the basis of an oral motion without the opportunity for

22   other parties to respond, but if you are inclined to do so,

23   Your Honor, today, we would respectfully request that the

24   Court set a deadline for the end of this data gathering

25   process.  Right now it is a recipe for a perpetual series of

1  motions to postpone and extend, and that may be perfectly

2  acceptable to Grace, which we suspect would be as pleased as

3  punch if this bankruptcy dragged on for another two years.

4  Mesothelioma victims don't have two years, Your Honor, and we

5  would request that this postponement request be denied.

6          MR. FINCH: Your Honor, Nathan Finch for the

7  Asbestos Claimants Committee.  We agree with everything that

8  counsel for the Futures Representative said.  We have -

9  counsel for the ACC has blocked out the - pretty much the

10  entire month of June to try this case.  As a practical

11  matter, Mr. Insobach (phonetical) and I are not available in

12  late July and August.  We can't extend the trial date into

13  August because for me, for family and personal medical

14  reasons that are going to make me unable to travel from

15  around August the 1st until two to three weeks later, and so,

16  I think that we can try this case in June, get it done, and

17  there's no reason why we can't do this in the 10 trial dates

18  that are available to the Court and the parties in June.  I

19  think the additional discovery that the debtor has said that

20  it needs is just a red herring, Your Honor.  I mean no

21  discovery is perfect.  Courts get cases resolved by setting

22  trial dates and sticking to them, and the ACC joins in the

23  request that the motion for a continuance be denied.  If the

24  Court is going to entertain such a motion, we would suggest

25  that you set a firm date for having the discovery done, the

1    estimation expert reports done, and that we schedule a trial

2    date that really does not move at all.  I thought that the

3    June 2007 trial date was not going to move at all, and it's

4    my goal to try this case sometime in the very near future,

5    but this sort of, you know, continual pushing back of the

6    deadlines and the dates, as a practical matter, means the

7    case will never be finished.  So, with that, Your Honor, we

8    rest and would suggest that no continuance is warranted here.

9         MR. BURNHAM: Your Honor, Noel Burnham from McGomery

10   McCracken, on behalf of the MMWR firms and the Grace Certain

11   Cancer Claimants.  We strongly support both the ACC and the

12   FCR positions in this matter.  The continuance of an

13   estimation process which delays further the time within which

14   finalization of this matter can be obtained is not in the

15   interest of our clients, which for the most part are

16   mesothelioma claimants, and hopefully the people who are

17   still alive and are expecting some compensation for their

18   injuries will survive long enough to receive the benefits of

19   this process, therefore, we support both the ACC and the FCR

20   positions that this matter proceed as originally set.  Thank

21   you, Your Honor.

22        THE COURT: Well, Mr. Bernick, I guess I'll hear

23   whatever this status report is in the way of a motion since

24   everybody's argued against it, I guess I might as well hear

25   what's in favor of it.

1          MR. BERNICK: That was exactly the point, and I

2     guess it's not very surprising because much as they say and

3     insist today that it's not right and they haven't had an

4     opportunity to respond, it is their paper that raises all of

5     these issues including their insistence that they complied

6     with the instructions regarding the x-rays, their insistence

7     that they complied with the instructions regarding the

8     questionnaires.  They did realize that we were going to ask

9     for an extension.  They anticipated it with their own piece

10    of paper, and they basically said, Don't give it to them, and

11    they're saying the same thing today.  So I think that Your

12    Honor is absolutely right on, that is to say, we've got to

13    come to grips with this.  It's not rocket science.  This is

14    not an extraordinary judgment to make.  It's a very

15    extraordinary case, but it's not an extraordinary judgment.

16    So, I'd say the following things by way of responding to

17    their paper and making my oral motion and incorporating, by

18    way of reference to my oral motion, the status report that we

19    did supply to the Court and let me say, we apologize for its

20    being late, but frankly, what we tried to do over the last

21    several days is to try to gather all of the information that

22    we could from the people who are processing all of this paper

23    and all this information and are now telling us what is not

24    there as well as what is there so that we could try to put

25    together a schedule that we thought would be the least

1    possible delay and would keep this case moving along, and it

2    took us more time than we anticipated, but that's exactly

3    what we've been up to.  So, on the issue of procedural

4    posture, where we are this afternoon, they do want to take it

5    up this afternoon, they just didn't want to take it up with

6    the benefit of Your Honor having read our submission, and our

7    submission is before the Court, and I'm going to make brief

8    reference to it, but the matter clearly is ripe, and we have

9    to get these things resolved now so that we can keep this

10   process on track.  The questions that have been raised this

11   afternoon are first of all in a sense what is the test or

12   what is the benchmark for what is enough, and Your Honor has

13   already clearly and specifically addressed that issue and

14   repeatedly because that issue has been framed by the

15   questionnaires.  We have been before the Court for the better

16   part of 2 ½ years specifying exactly what it is that's

17   necessary for us to go forward and complete our work towards

18   our estimate in the case.  We've litigated that questionnaire

19   twice, three times, four times, you pick the number.  What it

20   is that is enough has been specified by us repeatedly, and

21   has been endorsed by the Court repeatedly, and, Your Honor,

22   the last time we actually had this kind of broad argument

23   about what was enough was back in November of last year, and

24   at that time the same kind of argument was made which is,

25   Well, they've got enough.  They can just do a sample or

1    something like that.  You can't create an unbiased sample

2    after the fact.  This was never set up to be a sampling

3    process.  This was set up to be a process to get the

4    information from all the claimants so we wouldn't have

5    disputes about sampling methodology.  And Your Honor clearly

6    articulated that at that time and the language that Your

7    Honor used is very clear and very apparent in November 20 of

8    '06, Your Honor said, and this was in connection with the

9    schedule that we were then amending because of the new

10   objection process, "Now you can argue whether that's an

11   appropriate methodology", that is, you're referring to Mr.

12   Finch and whether our methodology was appropriate, "but I

13   think I've tried to make clear, as I'm going to let the

14   debtor take its best shot, it's proving its case its way, and

15   I'm going to give everybody else the same opportunity to

16   prove it your way.  So I think we're going to be basically

17   doing two trials that aren't going to look much alike at the

18   same time, but that's how it seems to me that this is shaking

19   down, but that's how it is, that's how it's going to be."

20   Your Honor, we were crystal clear in what it is that was

21   required for our case.  We set it out in writing and

22   repeatedly.  Your Honor was crystal clear in ordering

23   repeatedly that it was going to take place, and what they're

24   saying to you today is that somehow all of that is wrong or

25   somehow hasn't been decided and we're dragging our feet and

1    enough is enough, which is another way of saying, they still

2    don't like the approach that Your Honor already has

3    articulated for this case.  They still don't like the

4    questionnaire which is the answers to which or the non-

5    answers to which are still what we're wrestling with.  Well,

6    they may not like our case, but it's not up to them to decide

7    what our case is.  It's up to Your Honor to decide, and Your

8    Honor has decided, what we should be permitted to do.  So the

9    test is not an issue.  Your Honor already has articulated the

10    test and has said that they should be complying and has said

11    repeatedly they should be filling out the questionnaires.

12    That's not a matter that they dictate, and they can't take

13    and - it's almost like a jujitsu move.  They failed to comply

14    with the questionnaire.  They failed to submit the

15    information, but then they say, Oh, well, whatever it is that

16    we've done, gee, it must be enough.  It doesn't work that

17    way.  Then we come to the question of, Well, where do we

18    stand?  And how long has it taken to get there and how much

19    time do we need?  And let me say parenthetically or by way of

20    responding to the comments that suggest that somehow we're

21    happy to stay here as long as it takes.  We are not happy to

22    stay here as long as it takes.  We are very anxious to keep

23    this case on track and to get this done as soon as

24    practically possible.  We are very much of the view that the

25    closer that we come to trial and the data comes in, this case

1    will actually resolve or it won't resolve, and until that

2    time is nigh, we're not going to make progress towards the

3    resolution of this case.  Your Honor has repeatedly

4    instructed me to assure that the debtor continues with its

5    obligation to assure that there's dialogue, and, Your Honor,

6    I can tell you that that has been going on, and at some point

7    when it's more appropriate, we'll make a fuller report to the

8    Court, but as we approach the date for the estimation trial,

9    it is very important from the debtor's point of view that

10   these dates stick so that we can get through that trial or up

11   to that trial and get this case resolved.  So we're not

12   trying to get more time because we want more time.  We're

13   trying to get more time because we've just got no choice.  We

14   haven't gotten the information in a timely fashion.  Today we

15   are here, our experts are being told that they must submit

16   reports pursuant to the already existing schedule.  They

17   can't issue reports on data that they don't have, and the

18   reason that they don't have the data is that there has been a

19   systematic, whether it's deliberate or not deliberate, a

20   systematic pattern here where each and every feature of

21   compliance with the Court's orders in providing us with

22   information has been litigated and re-litigated and re-

23   litigated, and I'm not going to go through the details.  They

24   are in the status report that we furnished to the Court.  We

25   are now sitting here with an absolute deadline of July of

1    last year for the original questionnaires to be submitted for

2    every claimant who is going to submit a questionnaire to

3    submit a questionnaire, and we've now found out that by way

4    of supplementation, we've got people who are submitting new

5    questionnaires that should have been turned in last July.  We

6    still have questionnaires, and I can go through the law

7    firms, we probably have the better part of 8 to 10 law firms

8    that are still playing the games with the attachments.  Your

9    Honor, after laborious hearings and process specifically

10   provided how the attachment process was to take place.  All

11   counsel, including counsel from Mr. Burnham's firm, stood up

12   and said, That's right, we can make that work.  And what that

13   required was the people list specific documents by number in

14   their answers to the questionnaires and that the documents be

15   responsive and that there be no more documents listed that

16   weren't responsive.  I'm here to tell you today, and I've

17   seen the responses myself, we're still not to the point where

18   that is being done.  We've still got a large incorporation of

19   large populations of documents.  One of the main reasons why

20   we don't have the data before our experts is we're now having

21   to retain yet a separate firm to go through the attachments

22   and figure out how those attachments possibly relate to this

23   form.  That is not within Russ expertise.  Russ, that has the

24   responsibility under the order for providing the database,

25   doesn't have the expertise to read medical records, and

1    because the answers don't appear on the face of the

2    questionnaire, they're buried in the attachments, it's going

3    to take us more time.  X-rays, last November Mr. Esserman

4    said, and I've got the transcript here, X-rays should not be

5    a problem.  There are details that have to be resolved, but

6    we think in terms of the broad strokes, we don't have a

7    problem with the debtors' request for x-rays.  We now have a

8    deadline that's been agreed in March 15 to get those x-rays.

9    That is months after that statement was made.  With respect

10   to the B-reads, they were before and have been before Your

11   Honor repeatedly to say, Oh, well, the B-reads, we don't want

12   to do them.  We don't want to produce them.  They're

13   privilege.  The number of hours Your Honor has heard that, I

14   don't have to remind the Court about, but it's been

15   persistent.  So, Your Honor finally denied their last request

16   for reconsideration.  I don't know which request it was.  I

17   expected - We expected to be flooded with B-reads that were

18   the B-reads that had been withheld under the cloak of the

19   privilege that's been rejected.  We haven't been inundated

20   with new B-reads from those law firms.  Well, where are they?

21   So now we have to send a letter saying, Tell us what it is

22   that you're withholding.  Your Honor, I can't say, and it's

23   interesting to me that the only law firm that is here

24   represented or claimants that are here represented is Mr.

25   Burnham's law firm.  Once again, we have the FCR and the ACC

1    coming in here and saying, Cut the debtor off.  Enough is

2    enough.  They have enough to work with, and yet the law firms

3    that are sitting here and not complying with Your Honor's

4    order or complying with them late are nowhere to be found in

5    this courtroom.  I'm sure that there are some of them on the

6    telephone.  Where are the submissions?  Where are they?

7    Where's the explanation?  Where's the single answer you heard

8    this afternoon to all the different points that we made in

9    our brief?  They haven't cited facts to say that we're wrong.

10   There's no question that there's been a slippage of the

11   schedule.  I think that the real business of today is with

12   respect to the Court is to inquire of the Court what Your

13   Honor's schedule is so that we can get some more dates and

14   get this process done, and if we have to keep on coming back

15   in here saying they're still not giving us the information, I

16   suppose we'll do this although there's a simple alternative

17   which is that we'll simply say, we don't have it, and we'll

18   ask the Court to draw an adverse inference for purposes of

19   the estimation to say if the information is not here, it's

20   not been provided to this Court and, therefore, the inference

21   must be drawn that the information is not there.  Maybe

22   there's a limit as to how much we should do to pound the

23   table to get these people to submit information that's in

24   support of their own case.  So we would propose very

25   concretely that the Court schedule additional dates - We

1    already have some dates at the end of July and early August

2    the Court already has set aside, that we start with those

3    dates, and that we schedule some further dates, and if we

4    have to move things back a couple of weeks because of

5    counsel's schedule, there's obviously not an objection to

6    that in terms of taking a break, but it's not feasible for us

7    to work with material that we do not have available.  The

8    facts are as set forth in our papers.  The matter is ripe.

9    We would urge Your Honor to pick some dates in your schedule,

10   and then I think the parties can probably maybe take a step

11   by the 8th, that is by next week, to hammer out some dates

12   within that period of time as being the new deadlines for the

13   schedule.  Thank you, Your Honor.

14        MR. MULLADY: Your Honor, Ray Mullady for the FCR.

15   Just by way of a very brief response.  What we didn't hear

16   from Mr. Bernick is - We heard about the benchmark, and that

17   the benchmark in their view is complete compliance with the

18   personal injury questionnaire to be responded to in full, and

19   that's the benchmark.  What we didn't hear him say is, What

20   happens if there are not 119,000 personal injury

21   questionnaires returned complete with original x-rays and B-

22   reads, et cetera, that can be reviewed by Grace's stable of

23   experts?  What if it's 118,998 questionnaires?  My point

24   here, Your Honor, is very simply.  There will not be 100

25   percent data retrieval.  You recognized that yourself a year

1   ago.  We have to establish a benchmark for moving this case

2   forward.  We don't have one right now, based on what Mr.

3   Bernick said.  We're suggesting, the FCR and the ACC, that

4   the benchmark be, take the data you have now, use it.  You

5   have 20 experts, they're smart enough to figure out a way to

6   do a sampling and let's go forward.  If the Court is of the

7   view that the answer lies somewhere in the middle, we're

8   prepared, Mr. Finch and I, and our clients are prepared to

9   work with the Court, with Mr. Bernick to devise some solution

10  to this problem, but what we're not prepared to do is agree

11  to a never-ending series of, as Mr. Bernick correctly put it,

12  litigation over each and every step in this process that

13  inevitably takes us to a place where we are today, which is

14  where we're asking for another 6 weeks, 8 weeks, 2 months, 2

15  years, and we never get to an estimation hearing.  I'll sit

16  down and take the Court's advice on how we proceed from here.

17          THE COURT: Well, I'm not very happy about trying to

18  move the date because I don't very often say that I won't

19  move any dates.  I tend to be a little flexible about dates

20  when it's possible, but when I commit 10 days to a trial, I'm

21  not very happy about moving those 10 days.  So, Mr. Bernick,

22  I tend to think that maybe if the debtor really needs the

23  information and for some reason can't live with if its 72,000

24  questionnaires that have come back in and having heard that

25  number, I do recall having read the FCR's response because

1    that number was in the report that was filed by the FCR,

2    then, I guess, the debtor probably ought to be filing motions

3    to have some information or admissions deemed admitted, and

4    we'll go from there, if that's what it takes, and if, in

5    fact, people need to get some additional information into the

6    debtor, I guess you'll get it pretty promptly, and if you do

7    and you need time to analyze it, then maybe at that point we

8    have to consider some slippage, but I, like Mr. Mullady, I'm

9    a little concerned about the fact that if give you some

10   additional time all that's going to do is prompt more people

11   to send in new questionnaires, and it will be a never-ending

12   process, and I think at some point it has to end.  I go back

13   to what I said before, it's the debtor's case.  I think

14   they're entitled to try the case the way you want to try the

15   case, you know, it's your evidence to put in, you certainly

16   can control that type of estimation process, and, you know,

17   prove the case the way you want to try to prove the case.

18   So, if you think 119,000 is necessary - I don't think you're

19   going to get 119,000, I doubt that any expert would expect

20   100 percent return to a questionnaire, but you might do

21   better than 72,000.  I don't know, but maybe your experts

22   ought to tell you what they think the benchmark is.  I mean,

23   are they just going to be satisfied with whatever comes in

24   and if so by what date?

25            MR. BERNICK: Well, Your Honor, that is exactly

1    where we are, and maybe I should be a little bit more

2    specific.  There were timely filed about 60,000

3    questionnaires, and that was back in July.  Now, most of

4    those questionnaires didn't answer the questions as we

5    previously pointed out to the Court and have done in our

6    status report.  Since that time we have in fact pursued as

7    vigorously as we possibly can getting complete answers to the

8    questionnaires, as Your Honor knows, and getting the x-rays

9    and getting the B-reads also which were, incidentally, called

10   for in the questionnaires.  Where we are today is that we

11   don't have the x-rays, they're to be turned in by March the

12   15th.   If Your Honor goes along with what has been

13   articulated, which is, Gee, maybe we've got enough, then I

14   can assure Your Honor we won't get the x-rays on March 15th.

15   Same thing with the B-reads.  If Your Honor says, Well, what

16   I said about the B-reads doesn't count, we won't get anymore

17   B-reads.  So it seems to me that those orders should stand,

18   and people should turn in those materials and then if they're

19   not turned in at that time, we clearly will ask the Court to

20   draw an adverse inference for purposes of this estimation.

21   Now, with respect to the rest of the questionnaires - so

22   that's the x-rays and the B-reads.  X-rays, March 15; B-reads

23   should already have been done and we actually sent letters to

24   counsel telling them to give us the B-reads, I think, within

25   30 days.  So, we would suggest that as a deadline for any and

 1    all B-reads would be 30 days from today.  So we have March 15

 2    for the x-rays and any supplemental B-reads and if not then

 3    what we ask for is for them to identify the ones they're

 4    withholding, otherwise we have no idea.  Your Honor said,

 5    Here's what we want you to do, but they could well say, Well,

 6    gee, we're now claiming that these B-reads don't fall within

 7    the scope of your order and we'll never know.  So, we need

 8    them to log any B-reads that they continue to withhold.  So,

 9    we would ask for 30 days to have that process complete.

10    Beyond that, Your Honor, we're not asking for them to give us

11    any more information on the questionnaires, and if I

12    suggested to Your Honor that we were by anything that we've

13    said this afternoon, that's not what we're doing.  We realize

14    at this point we have gotten from the questionnaires all that

15    we're going to get, and we're not asking for any more time to

16    get more in response to the questionnaires.  What we are

17    asking for is for time to read what's now been provided to

18    us.  We're very close to being done with reading the

19    questionnaires themselves, that's what Russ was supposed to

20    do originally.  What we're not close to being done with is to

21    read the attachments to the questionnaire, the 3.5 million

22    pages.  That is going to have to be done by a different group

23    of people, and that we don't have guidance for as we were

24    supposed to get from the questionnaires.  So, our request to

25    extend the hearing is not driven by the idea that we're going

1    to get perfect compliance.  We don't think we're going to get

2    perfect compliance.  We don't think it's our burden to get

3    perfect compliance.  It is the respondent's burden to provide

4    us the information that the Court ordered.  So, the time that

5    we need is time to read the attachments, and we've got a

6    separate group of people who are right now reading the

7    attachments, and we think it all can get done such that we

8    don't need more than the 6 weeks that we're asking for.  So

9    on direct response to Mr. Mullady's question or the question

10   about, Gee, is this an unending path? and Is that what we're

11   asking for more time for?  That's not what we're asking for

12   more time for.  We're asking for time to review the

13   information that now has been provided to us in very

14   inadequate and obscure form so that in fact we can get our

15   experts to do the work that has to be done, and we wouldn't

16   be asking for more time, Your Honor, unless we had thought

17   through very carefully precisely the words that were recited

18   back to Your Honor about how you are reluctant to change this

19   date.  We do not want to change this date.  We don't.  We

20   have no choice but to ask that you change the date because

21   otherwise we can't review the information that's been

22   provided to us in the form in which it's been provided to us.

23   So, very concretely, I am reporting to Your Honor per our

24   experts that we need the extra time to review the attachments

25   that we already have.  We need the extra time to assure that

1    their claimants respond and comply with the x-ray and B-read

2    order, and that is the only extra time that is driving the

3    schedule at this point beyond the slippage that's already

4    taken place.  Now, I hate to raise another issue in this

5    process, but I will because I want Your Honor to realize that

6    there is other information that we're seeking in discovery

7    out there that's very important information, and it makes me

8    very uneasy about the idea of saying, Well, whatever you've

9    got is enough, is we have conducted and are conducting third-

10   party discovery.  It's very important discovery.  Just like

11   they're taking discovery of the company, we're taking

12   discovery of third-party players in this industry that's very

13   important, and they've highlighted in their report

14   discoveries that we're conducting against three trusts.  Now,

15   it's interesting that the trusts have not appeared here by

16   counsel to take any issue with anything.  In fact, we are

17   involved in discussions with people who are representing the

18   trusts, but that is very important information.  We know that

19   there's a very well publicized opinion, it came out of state

20   court in Ohio where law firms - a law firm, including a law

21   firm that actually is represented, I believe, by Mr.

22   Burnham's firm, was found by an Ohio court to have submitted

23   different kinds of claim information to different people.

24   One kind of claim information goes to the Manville Trust.

25   Another kind of claim information gets submitted to a case,

1   and the firm was sanctioned.  It was a very visible opinion.

2   We think that that problem is not an isolated problem.  We

3   have other information that indicates that it's not an

4   isolated problem.  So, one of the things that we've asked for

5   from the trusts is the ability to see what these same

6   claimants who have submitted claims against Grace have said

7   elsewhere, and that's all in databases, it ought to be very

8   easy to get and to compare using data sets.  We have also

9   asked for the - these same trusts have decided to reject

10   certain kinds of medical information coming from certain

11   kinds of doctors as being unreliable, the same doctors that

12   we're talking about in our case.  It is powerful evidence in

13   our view that other trusts that are not run for the benefit

14   of any company, that are run simply to produce payment to

15   given claimants, have decided to adopt the same position with

16   respect to these doctors who are running the screening

17   operations.  So, we have those requests that are outstanding.

18   They read, of course, broadly, but they're going to be pretty

19   focused, and as soon as Your Honor says, Well, gee, you know,

20   we've got to get on with business and somehow that means that

21   we can't conduct discovery, you're going to create a problem

22   - not you, Your Honor, but the problem will arise, the people

23   will drag their feet, and we have to have some way of

24   assuring that folks do not drag their feet and they comply

25   with the discovery process in this case, otherwise we're

1   going to be in a situation where effectively we're denied

2   access to information because counsel for the Committees

3   comes in and insists upon deadlines and then their clients,

4   the claimants themselves or their law firm or whatever, their

5   constituency, let me say, is out there continuing to resist

6   the idea of turning over the information.  Now that issue

7   probably is for another day.  If we have a problem in getting

8   compliance from the trusts, we will pursue that as we have

9   with respect to other third parties.  But I'm alerting Your

10  Honor to this because it's another dynamic that is at work,

11  that is to say, discovery must go on.  So the narrow request

12  that we're making for more time is driven by three simple

13  facts.  One are the compliance with the x-ray and B-read

14  orders, and then second - or third, and really what is

15  foremost, is literally the opportunity to now review the

16  swamp of attachments that we have received which were

17  submitted, Your Honor, remember kind of as a second best in

18  place of actually answering the questionnaires, and it was

19  supposed to be very narrow.  It's not turned out to be that

20  way.  So, I go back, Your Honor, to our request.  The status

21  report sets out the predicates for this very, very clearly,

22  and we will be seeking to have adverse inferences drawn

23  because we are not going to get 100 percent compliance.  What

24  we're trying to do is review what it is that we already have.

25          MR. MULLADY: But I think, Your Honor - Ray Mullady

1   for the FCR, that it's a moving target.  In September, Your

2   Honor suggested that the trust be subpoenaed for these

3   records, and Mr. Bernick disputed it, and he said - and this

4   is in our status report, he said, Your Honor, you know, you

5   involve a third party in this case - and I'm paraphrasing -

6   immediately they have their own counsel.  We have to execute

7   subpoena for records.  You won't even have lawyers in this

8   Court for three months.  It's extremely difficult to get

9   information in a reliable fashion, and well, they make the

10  decision several months later to do it, and now all of a

11  sudden it's powerful evidence.  It's a new dynamic.  He's

12  essentially saying that if the evidence doesn't come in, the

13  discovery doesn't come in the way they now want to see it to

14  prove up these two points that he outlined, that we'll be

15  back here again.  So, it's a moving target, and we have to

16  have these targets put into place where they can be hit, and

17  I don't think we have that yet.  Mr. Finch has some comments

18  as well.  Thank you, Your Honor.

19          MR. FINCH: Your Honor, I would just point out as

20  recently as December, the parties agreed to a schedule that

21  requires on this Friday that Russ Consulting is supposed to

22  produce a navigable database of the claims information from

23  the questionnaires received to date, and two weeks later each

24  side is supposed to exchange the expert witness reports from

25  what I think everyone would regard as the key expert

1   witnesses, the people who will put an estimation and a number

2   and they're paying on the line that I estimate Grace's

3   aggregate liability for pending and future asbestos personal

4   injury claims at $4 billion, and Mr. Bernick's expert will

5   say, It's $900 million, and that's the heart of the case.

6   Well, what he is saying is they need more time to read the

7   stuff that they have - the attachments to the questionnaires

8   and they've had to hire a firm to do that.  I think the - I

9   know what the firm is that they hired to do that.  I think

10  they made inquiries and hired that firm months ago, not just

11  yesterday, and they had to have known in December of 2006

12  that they're going to have to read the attachments to the

13  questionnaire.  Indeed they had to know that by September

14  11th, 2006.  And so, I think it's a little bit disingenuous to

15  say, Oh, we've got to have more time to read all this

16  information that we asked for in the first place.  The second

17  point, Your Honor, is that if we don't have a fixed deadline

18  to get expert witness reports from the estimation experts

19  that is a real report, not a report that says, Well, I'm

20  still working on it.  I'm still waiting for new data, waiting

21  for new data.  We need - and Mr. Mullady and our respective

22  clients are not going to be in a position to attack the

23  debtors' methodology, understand the debtor's methodology,

24  deal with the debtor's methodology.  The debtor has proposed

25  a plan of reorganization.  It has the burden of going forward

1   and proving that its plan doesn't unfairly discriminate

2   against my clients or that it doesn't unfairly discriminate

3   against the future claimants and/or that there's anything

4   left for equity.  And so it's unfair for them to put a

5   deadline in the case management order and then not stick to

6   it.  So, as a practical matter, Your Honor, if you don't keep

7   the March 16th deadline for the estimation experts to have

8   their reports, we're just not going to have the time to

9   depose Grace's 25 experts or 20 experts plus the estimation

10  experts and get to trial in June.  If you keep the deadlines

11  that are in the schedule right now, we can try the case in

12  June.  Otherwise if you give Mr. Bernick the additional time

13  that he is asking for, you're going to have to push the

14  hearing dates, and my client and Mr. Mullady's clients are

15  opposed to that, and I believe that it's just not warranted

16  here.  They had to have known by December that they would

17  need this time, and why didn't they build it into the

18  schedule then.  So, I respectfully suggest, Your Honor, that

19  the Court enter an order saying that the request for any

20  continuance of any of the dates is denied.  We'll start the

21  trial and go forward in June, and I think with, you know, God

22  willing, we'll finish it this, you know, in the dates you've

23  allotted in June and that will be the way we resolve this

24  bankruptcy.  Thank you, Your Honor.

25          MR. BERNICK: Your Honor, just two couple factual

1    points.  The statements that were made back in September

2    about going to the trusts were made in an entirely different

3    context.  That raised the question about whether we could get

4    the same information, exactly the same information of all the

5    other exposures that these individuals would have had by

6    going to the trusts.  And the answer to that clearly was, no,

7    and the reason that it was no is that only the claimant knows

8    all of - or his counsel know all of the different exposures

9    and then presumably for each trust that has responsibility

10   for the claims arising from each type of exposure, they make

11   a claim against the trust.  So you literally would have to go

12   around and round up all of the different lawsuits that were

13   filed, all the different trusts in which claims were made and

14   somehow compile information that was readily available in the

15   first instance from each of the claimants.  So it's a

16   completely different proposition.  It's a proposition that

17   was rejected by us.  It was never adopted by the Court.  The

18   Court agreed with Grace that the questionnaire should ask for

19   that information and we are making very specific requests of

20   only three trusts for certain kinds of information that

21   should readily be available from data.   So it's not a moving

22   target at all.  With respect to Russ and the deadline that

23   was set for Russ back in December of '06, yeah, there was a

24   deadline set for Russ, and as I indicated at that time, and I

25   quoted from the status report, we said we might have to come

1   back and change that based upon what's happening because

2   recall that the difficulty was that we still didn't even have

3   rulings at that time on what the claimants were going to have

4   to answer, and we certainly didn't have the supplements.  And

5   now the supplements have come in, and they don't comply.

6   Remember that the attachment protocol said that each

7   attachment must actually answer the question, it must be

8   specified by number or by letter in the response itself, and

9   the specification should not include any pages that are not

10  directly responsive because we foresaw, based upon the first

11  responses, that they would do exactly what the prior order -

12  not prior order, but what their own suggestion and approach

13  would permit them to do, which is give us these broad, you

14  know, saying, Well, gee, go see what I've produced

15  previously.  So the protocol was very specific.  We do not

16  have compliance with that protocol.  Now, I understand that

17  counsel is now anxious to keep to the schedule.  The reason

18  that they're anxious to keep the schedule is obvious because

19  they would rather have this case proceed without our getting

20  the information that Your Honor already has said that we're

21  entitled to review.  We're reviewing it as fast as we can.

22  The attachments take time to review, but to throw out the

23  baby - They're asking you to throw out the baby with the bath

24  water.  It's not important to give the debtor a few more

25  weeks to review this information and turn out proper expert

1    reports, and it's a -

2          THE COURT: Well, I don't think that's the

3    motivation, Mr. Bernick, but the motivation really doesn't

4    matter.  The issue is, I think at this point in time, whether

5    we can get a trial done, because once it gets started, folks,

6    I want to get it done, like everybody else, I think this case

7    has to come to end either peacefully or war-like, at this

8    point in time, it really doesn't matter.  It just needs to

9    come to an end.  Peacefully would be better, but, you know -

10   That, I guess, is just the way it is.  I have gone through my

11   calendar while we've been talking to see - the problem is, I

12   can give you tentative dates, but I'm going to have to double

13   check these when I get back home with my staff to make sure

14   that what I am picking up are correct dates.  First of all,

15   as I said, what I will give you are tentative dates, but if I

16   give you these, I am not going to change these dates; is that

17   clear?  Not for any reason.  So whatever discovery dates you

18   need to do to get six deadlines for all discovery, all

19   sanctions motions, all anything, the preliminaries to getting

20   these trial dates done, you folks need to work out or if you

21   can't work, you need to tell me what deadlines you need and I

22   will pick the dates, but nonetheless, I will give you trial

23   dates.  Now, let me back up here for a second.  The dates

24   that I have scheduled in July for this case, you were

25   proposing, I believe, July 30th, 31st, and August 1st, is three

1    dates to begin; correct?

2              MR. BERNICK: Yes.  That's what we would propose.

3              THE COURT: All right.  Mr. Finch -

4              MR. FINCH: Your Honor, that -

5              THE COURT: I'm sorry.

6              MR. FINCH: That date had - subsequent to your

7    entering that order that date, for family and personal

8    medical reasons, which I would be happy to describe to the

9    Court in chambers but prefer not to do in open court, the 30th

10   and the 1st no longer work for me for counsel to the ACC.

11             THE COURT: Well, that causes a problem.

12             MR. FINCH: And it's going to take about three weeks

13   for me to get back to be able to travel.

14             THE COURT: Well, it appears that I have three days,

15   September 17th, 18th, and 19th.  Mona, tell Winnie, please, to

16   cancel motions day on September 28th.  There's nothing

17   scheduled yet on September 28th.  So then I would have

18   September 27th and 28th.  So September 17, 18, and 19 are

19   Monday, Tuesday, and Wednesday.  September 27 and 28 are

20   Thursday and Friday, but then unfortunately, the next time

21   that I have any block of time together is October 31st,

22   November 1st, and November 2nd, and Mona, tell Winnie to cancel

23   motions on November 2nd.

24             MS. BAKER: All right.

25             THE COURT: That's Wednesday, Thursday, and Friday.

1   That is literally the best and all that I can do till the end

2   of the year.

3          MR. BERNICK: If you could give us a moment, Your

4   Honor, just to huddle here for a second; will that be all

5   right?

6          MR. FINCH: Your Honor, could we take a five-minute

7   recess, please?

8          THE COURT: Yes, we'll take a five-minute recess.

9          MR. FINCH: Thank you.

10          THE COURT: I'm just going to put the phone on mute.

11          MR. BERNICK: That's fine.

12          THE COURT: And I'm going to leave the room for five

13   minutes.

14          (Whereupon at 3:53 p.m., a recess was taken in the

15   hearing in this matter.)

16          (Whereupon at 3:57 p.m., the hearing in this matter

17   reconvened and the following proceedings were had:)

18          THE COURT: Yes, folks, I'm sorry.

19          MR. BERNICK: Your Honor, we've had the opportunity

20   to discuss this among ourselves, and I know that if I

21   misstate this I will be promptly corrected.  We think that

22   the best idea is to get the dates that Your Honor has offered

23   to us down and reserved, and they would begin, at least my

24   notes reflect, the 17th, 18th, and 19th of September.  Then we

25   would go to the 27th and 28th of September, then October 31,

1    November 1, and November 2.  Did I get those dates correct,

2    Your Honor?

3         THE COURT: Yes.

4         MR. BERNICK: We would then ask Your Honor, as our

5    observation from the time that we've been before the Court,

6    that sometimes Your Honor's schedule opens up as things get

7    canceled or resolved, and obviously, none of us really

8    believe that we could comfortably try the case in 8 trial

9    days albeit if the trial days are kind of clockwork days

10   where people show up and actually get things done on a solid

11   basis from 9 to 4, we certainly can aim to keep this trial as

12   short as possible, but we're concerned that 8 days are not

13   going to be enough and, therefore, we would ask Your Honor as

14   time goes on to look for other opportunities to see our happy

15   faces at this trial so that we can get it done as soon as we

16   possibly can, and then the last point would be that I think

17   all counsel are prepared to sit down and try to figure out an

18   agreeable pretrial schedule that would conform to this basic

19   period of time, and we can do that promptly and report back

20   to the Court.  I don't know if there's anything else that I

21   missed.

22        THE COURT: All right.  How much time are you

23   seriously looking at if 8 days is not going to do this?  I

24   think we had 10 days before.

25        MR. FINCH: Your Honor, it kind of depends on how

1    many expert witnesses the debtor ultimately calls and how

2    many we need to rebut them.  I think, given my experience in

3    these cases, even the ones where insurance companies run the

4    other side and there were multiple, multiple experts, I think

5    it's probably 15 trial days at the outside, but until Mr.

6    Bernick narrows his case down a little bit and I'm able to

7    narrow my case down a little bit, I can't commit that it

8    would be 15 trial days.  We know on its face, if you look at

9    all the experts and look at all the sort of discovery that's

10    happened, you know, conceivably you could say, Well, geez,

11    this could be a 30-day trial.  I certainly don't think it's

12    going to be a 30-day trial, but I would say best estimate

13    right now, as long as, you know, past performance is no

14    guarantee of future results, 15 trial days.

15         THE COURT: Mr. Finch, some of those experts have to

16    be cumulative.  I mean, I understand that the debtor may need

17    that to go through the reports, but, you know, the Court does

18    control cumulative testimony, and I have - I am here to tell

19    you that presenting 15 experts or 20 experts is not too

20    likely to be the case.

21         MR. BERNICK: Your Honor, I don't think - I've tried

22    many cases with many experts and technical issues, and it is

23    by no stretch of the imagination, our style to go on and take

24    more time than we have to.  So, there will not be cumulative

25    testimony.  Our direct examinations will be streamlined.  We

1   know that the Court is very sophisticated in these matters,

2   had heard a lot of the related matters already, so, I don't

3   think that there's going to be a problem with Your Honor

4   being displeased over the amount of time that we're taking or

5   the value of the testimony and value of the expenditure of

6   the Court's time.  I think that we'll do a good job on that.

7   I think that we'll have a much better idea of how many trial

8   days it will take when, you know, since we get through the

9   data and we see exactly what it is that we want to focus on,

10  and we will be dropping witnesses.  I don't think that we're

11  going to keep all the witnesses that we have.  It's

12  conceivable that we would, but I doubt it, but I think that

13  Mr. Finch is correct, that is, at least for planning purposes

14  we ought to think about 15 days not with the expectation that

15  we'll use all the time that we've got, but because we may

16  need that time.  I think at this point -

17         THE COURT: Okay - I'm sorry, if you're serious

18  about that, I think we're looking at January, I mean to take

19  the rest of the days unless you really want to come in to do

20  them one at a time.  I do, from time to time, have things

21  canceled, but I don't have any major things coming up that

22  are going to be 4 and 5 day deals at a time -

23         MR. BERNICK: No, I understand -

24         THE COURT:  - that are likely to cancel.

25         MR. BERNICK: Yeah, I think that we'd rather keep

1    these days and then work to shorten our case and make it

2    focused.  You know, there are a lot of ways -

3          THE COURT: No, I didn't mean to give up - I'm

4    sorry, I didn't mean to give up these days.  I meant that if

5    you want me to try to commit additional days to you now, I

6    think we should -

7          MR. BERNICK: No, no, no, let me be clear.  And if

8    others disagree with me, I know that they'll speak up.  I

9    think we ought to get these days and rather than Your Honor

10   give us now additional days in something like January, I

11   think that what we're kind of counting on is that there will

12   be other days that open up.  They won't all be contiguous,

13   obviously we know that, but there will be other days that

14   open up, and rather than have everybody believe that this

15   process is going to stretch in some fashion over four months,

16   which would be a very disconcerting prospect I think from

17   everybody's point of view and certainly not productive with a

18   view to getting this case resolved, I think that we should

19   stick with these dates and just ask Your Honor if it's

20   possible as time unfolds to look for other dates, not all

21   contiguous or anything like that, but just any other days,

22   and maybe we can grab a couple here or there and maybe we

23   won't need as many as we're thinking that we might, and I

24   don't know if I kind of got that right.

25          THE COURT: Okay, that's fine.  It's just that if

1    you're really looking for days in a row, then I think we

2    should go into January and commit them now.

3          MR. MULLADY: Your Honor, I don't have any

4    objections - Mr. Mullady for the FCR.  What Mr. Bernick said

5    is what we discussed.  I do wish to make it clear that the

6    change in the trial date is over our objection.

7          THE COURT: Yes.

8          MR. MULLADY:  We do object to any postponement of

9    the hearing dates for the reasons stated previously.

10         THE COURT: It's over mine too, Mr. Mullady.

11         MR. FINCH: Counsel for the ACC joins in that

12   objection, Your Honor, just so the record's clear.

13         THE COURT: I join in it too, Mr. Finch.

14         MR. BERNICK: Well, then, I'll be the only one who

15   doesn't join in.

16         THE COURT: All right.  So, you folks will get

17   together with these dates in mind, and whatever other issues

18   you know that you have to get resolved, put dates into an

19   order that will mean that September 17th will be the beginning

20   date for trial, and everything else is going to be on a

21   schedule that will -

22         MR. BERNICK: Yes.

23         THE COURT:  - commence or - I'm sorry, finish, is

24   what I mean, before September 17th.  Knowing that, I want the

25   pretrial binders with every document pre-marked for

1    identification, every witness identified, all the objections

2    that you know that you've the documents marked and so forth,

3    a real pretrial binder, everything submitted to me two

4    weekends before that; correct?

5             MR. BERNICK: Correct.

6             THE COURT: Two Fridays before - I should go back in

7    and just look and see what that date is.  One minute, please.

8    September 7th is the binder date.

9             MR. BERNICK: Pardon me for just a moment, Your

10   Honor.

11            THE COURT: All right.

12            MR. BERNICK: I think we're all done, Your Honor,

13   with the personal injury side of the case estimation.  I

14   think Ms. Baer has one other brief matter to raise.

15            THE COURT: Wait, before we turn from that, what do

16   I do with all these other days that I've got committed.

17   Frankly, I'm hesitant to give them up because something else

18   is going to come in this case, I think.

19            MR. BERNICK: Your mean for pretrial matters, I

20   think that that would probably be wise to keep them.

21            THE COURT: I mean, we may not need all of them, but

22   you may need - Why don't I at least keep them until you do

23   the schedule that you're going to submit on this CMO so that

24   you can make use of some if not all of those dates.

25            MR. BERNICK: That's fine.

1          THE COURT: Knowing that I can perhaps cancel some

2     of them and knowing that Mr. Finch has a problem with those

3     July dates, perhaps they'll be canceled.

4          MR. BERNICK: Right.

5          THE COURT: All right.

6          MR. BERNICK: I think we're done with that, Your

7     Honor.  Yes, the answer to your question is, please, do keep

8     those dates and as soon as we resolve what we hope to be an

9     agreed schedule, maybe we can then give Your Honor further

10    input on whether it might be useful to keep them open.

11         THE COURT: Okay, well, I'm expecting that if you

12    need them you're going to put them into this order.

13         MR. BERNICK: Yes, well, that's fine.

14         THE COURT: You know, if you need a status

15    conference, or you think you have a discovery issue, or

16    whatever, you're going to put a date in, otherwise, if it's

17    not in there, I'm going to release them.

18         MR. BERNICK: That's fine.

19         THE COURT: Okay, all right.  Ms. Baer.

20         MS. BAER: Thank you, Your Honor.  One scheduling

21    matter to take up.  As you may recall, one of the other

22    matters that was up last week that was canceled was the

23    adversary proceeding, National Union Fire Insurance vs. RMQ/

24    ELG and Grace.  It's an adversary complaint with respect to

25    some settled claims and issues regarding the Nation Union

1    bonds.  The matter that was set for last week was a status

2    conference with respect to our discovery issues, vis-a-vis,

3    the potential fraud in some of these claims that we have

4    alleged.  In addition to that, Your Honor, there is a matter

5    that's being briefed on § 108 and whether Grace can reject

6    certain claims that were filed within 60 days of the petition

7    date.  The 108 matter has been set on your calendar for April

8    2nd, the next omnibus hearing, and also recently the status

9    that was supposed to be last week was moved to April 2nd.

10   Counsel for National Union has requested that both of those

11   matters be moved to a separate date.  April 2nd happens to be

12   the beginning of Passover, and it creates problems for him

13   getting back to town and the like.  I know that counsel for

14   National Union, I believe, is on the phone as well as counsel

15   for RMQ and ELG.  None of us had any objection to continuing

16   both of those matters to a set date wherever, Your Honor,

17   whether it be Delaware or Pittsburgh is no matter to us.

18           THE COURT: All right, just a second.  Did anybody

19   contact my staff and get some potential dates for this?

20           MS. BAER: Your Honor, we kind -

21           THE COURT: How much time?

22           MS. BAER: Your Honor, probably no more than an

23   hour, maybe an hour and a half.

24           THE COURT: For both matters?

25           MS. BAER: Yes, Your Honor.

1            MR. GOVEN (TELEPHONIC): Your Honor, Robert Goven

2    for National Union.  Mike Davis is not here currently.

3            THE COURT: All right.

4            MR. GOVEN (TELEPHONIC): Mr. Davis just wanted me to

5    relate that he's free pretty much all of April starting from

6    April 3rd in the afternoon going forward.

7            THE COURT: Okay, April 6th, Friday, happens to be

8    Good Friday, does that cause a problem for anyone?

9            MS. BAER: Not for me, Your Honor.

10            MR. ESSERMAN (TELEPHONIC): Your Honor, this is

11    Sandy Esserman.  I have an argument in Chicago that morning.

12    I thought that there were other days that week that were

13    available.  We did contact your chambers.  It's possible they

14    filled up by now.  It was April 3rd, 4th, or 5th, I don't

15    remember the exact date.

16            THE COURT: Well, April 5th is not available.  April

17    4th doesn't appear to be available.  That's my Virgin Island

18    date, and I have a conference call in the afternoon.  April

19    3rd, is Passover, so that won't help anybody.

20            MR. GOVEN (TELEPHONIC): Your Honor, April 3rd, for

21    Mr. Davis, from the afternoon on would be fine as long as

22    it's not in the a.m.

23            THE COURT: Okay.  Mona, I'm a little confused.  Are

24    we - This is where the schedule in Delaware got changed

25    because of my being here in Maine, and so I'm not totally

1  sure what is going on in Delaware that day.  Do you know

2  whether DeCal's (phonetical) accurate for this.  It says at

3  3:30 - I'm tied up in the morning and then again at 3:30?

4         MS. BAKER: Which day again, Judge?

5         THE COURT: April 3rd, Tuesday, April 3rd?

6         MS. BAKER: I think we are in Delaware; is that what

7  you're asking?

8         THE COURT: Yes.  Do you know whether - What's

9  currently on the schedule is an event at 3:30?

10         MS. BAKER: Oh, I see.  Yes, I think that all got

11  moved to that date.

12         THE COURT: All right, so that's correct.  So what

13  time would Mr. Davis be available on the 3rd?

14         MR. GOVEN (TELEPHONIC): I think from 1 on would be

15  fine for him.

16         THE COURT: So if we did 1 o'clock?  So if we can do

17  it from 1 to like 3:15, but I'll have to be finished by 3:15.

18         MR. ESSERMAN (TELEPHONIC): This is Sandy Esserman,

19  Your Honor.  I suspect we'll be done in approximately an hour

20  and a half as Ms. Baer suggested.

21         MS. BAER: And, Your Honor, that's in Wilmington.

22         THE COURT: That's correct.

23         MR. ESSERMAN (TELEPHONIC): That's fine with me,

24  Your Honor.

25         MS. BAER: That's fine with the debtor.

1           MR. GOVEN (TELEPHONIC): That should be fine with

2    Mr. Davis as well.

3           MR. ESSERMAN (TELEPHONIC): So 1 o'clock on April

4    3ʳᵈ.

5           THE COURT: Say 1 till 3 in Wilmington.  Mona, will

6    you make sure that I'll have a courtroom then, please.  Mona?

7    Is Court Call still on?

8           TELEPHONE OPERATOR: Yes, I am.

9           THE COURT: Did I lose my office?

10          TELEPHONE OPERATOR: They are connected as far as I

11   see.

12          THE COURT: They are - I'm sorry?

13          TELEPHONE OPERATOR: Yes, they are, they are

14   connected, unless they muted themselves.

15          THE COURT: Mona?

16          THE CLERK: Your Honor, this is Matt, the court

17   reporter.

18          THE COURT: Yes.

19          THE CLERK: I have an instant message from Mona that

20   she is disconnected, however, Court Call is still connected

21   here in the courtroom.

22          THE COURT: Okay, Matt, can you her, Matt, im her

23   back and ask her if she can please reconnect?

24          THE CLERK: Yes.

25          THE COURT: Ms. Baer, will you be able to do a

1    notice that will reschedule these two matters for April 3ʳᵈ

2    from 1 to 3 in Delaware?

3              MS. BAER: Yes, Your Honor, I will do so.

4              THE COURT: Mona, are you back?

5              TELEPHONE OPERATOR: No, she's not.  She hasn't

6    dialed in yet.

7              THE COURT: Is it possible for you to call her?

8              TELEPHONE OPERATOR: I sure can.

9              THE COURT: Okay, it's 412-

10             TELEPHONE OPERATOR: 412-

11             THE COURT: -644-

12             TELEPHONE OPERATOR:  -644-

13             THE COURT:  -3541.

14             TELEPHONE OPERATOR: -3541.  Let me call her.

15             THE COURT: Yes, thank you.

16             TELEPHONE OPERATOR: Let me try it again.  I got

17    them connected and they disconnected.

18             THE COURT: Okay, yes, please.  Maybe they're having

19    some phone problem, I don't know.  Is there anything else,

20    Ms. Baer, that you're waiting for?

21             MS. BAER: No, Your Honor, I think that's the

22    conclusion of the agenda.

23             THE COURT: Okay, well, then maybe I can just deal

24    with her separately if that's everything anyone's waiting

25    for.  Are there any other matters in Grace?

1          MS. BAER: No, Your Honor.

2          THE COURT: Okay, we're adjourned then.  I'll deal

3    with Mona separately.

4          MS. BAER: Thank you.

5          THE COURT: Okay, thank you very much, folks.

6          ALL: Thank you, Your Honor.

7          (Whereupon at 4:16 p.m., the hearing in this matter

8    was concluded for this date.)

9

10

11

12

13

14

15

16

17

18          I, Elaine M. Ryan, approved transcriber for the

19    United States Courts, certify that the foregoing is a correct

20    transcript from the electronic sound recording of proceedings

21    in the above-entitled matter.

22

23    /s/  Elaine M. Ryan                          March 5, 2007
      Elaine M.  Ryan
      2801 Faulkland Road
      Wilmington, DE 19808
      (302) 683-0221