# Exhibit 6

CanLII
Canadian Legal Information Institute
British Columbia >> Court of Appeal >>

**This document: 1997 CanLII 2886 (BC C.A.)**
**Citation:** *Privest Properties Ltd.v. Foundation Co. of Canada Ltd.*, 1997 CanLII 2886 (BC C.A.)
**Parallel citations:** (1997), 143 D.L.R. (4th) 635; [1997] 5 W.W.R. 265; (1997), 31 B.C.L.R. (3d) 114
**Date:** *1997-02-20*
**Docket:** *CA021008*

[Noteup] [Cited Decisions and Legislation]

```
                                         Date: 19970220
                                         Docket: CA021008
                                         Registry: Vancouver
```

# COURT OF APPEAL FOR BRITISH COLUMBIA

BETWEEN:

> PRIVEST PROPERTIES LTD., LORD REALTY HOLDINGS LTD.,
> POLARIS REALTY (CANADA) LIMITED, LORDINA LIMITED,
> AND POLARIS REALTY (WESTERN) LIMITED

>> PLAINTIFFS
>> (APPELLANTS)

AND:

> THE FOUNDATION COMPANY OF CANADA LIMITED, DONALCO
> SERVICES LTD., W.R. GRACE & CO. OF CANADA LTD., ENG & WRIGHT
> PARTNERS, ARCHITECTS and W.R. GRACE & CO. - CONN

>> DEFENDANTS
>> (RESPONDENTS)

AND:

> LORDINA LIMITED

>> DEFENDANT BY COUNTERCLAIM
>> (APPELLANT)

AND:

> THE FOUNDATION COMPANY OF CANADA LIMITED, DOUBLE
> A/D DISTRIBUTORS LTD., DONALCO SERVICES LTD.,
> MACKENZIE SNOWBALL, SKALBANIA & ASSOCIATES LTD., WEBB, ZERAFA,
> MENKES, HOUSDEN; ENG & WRIGHT PARTNERS, ARCHITECTS,
> NELSON SKALBANIA, DONALD THOMAS, CHARLES WRIGHT,
> GERHARD K. SCHADOW, DOUGLAS FAULKNER, MARTIN BRUCKNER,

WORKERS' COMPENSATION BOARD, GILBERT ENG, and W.R. GRACE
& CO. OF CANADA LTD.

THIRD PARTIES
(RESPONDENTS)

Before:   The Honourable Madam Justice Prowse
          The Honourable Mr. Justice Donald
          The Honourable Madam Justice Newbury

| | |
|---|---|
| Darrell Roberts, Q.C.<br>Susan Griffin<br>Leslie J. Muir | Counsel for the Appellants:<br>Privest et al. |
| Robert W. Hunter<br>David A. Garner | Counsel for the Respondents:<br>Eng & Wright et al. |
| Jack M. Giles, Q.C.<br>Robert J. McDonell | Counsel for the Respondent:<br>Foundation Co. of Canada |
| John P. Singleton<br>Jane Ingman-Baker | Counsel for the Respondent:<br>Donalco Services Ltd. |
| Doug F. Robinson<br>Rodney L. Hayley<br>Thomas S. Woods | Counsel for the Respondent:<br>W.R. Grace & Co.<br>W.R. Grace & Co. - Conn |
| Bernie McGarva | Counsel for the Third Party/Respondent:<br>Webb, Zerafa |
| Todd L. Cherniak<br>R.W. Taylor | Counsel for the Third Party/Respondent:<br>Workers' Compensation Board |
| Place and Dates of Hearing | Vancouver, British Columbia<br>November 25, 26, 27, 28, 29,<br>December 2, 3, 4, 5 and 6, 1996 |
| Place and Date of Judgment | Vancouver, British Columbia<br>February 20, 1997 |

**Written Reasons for Judgment of the Court:**

**Reasons for Judgment of the Court:**

**NATURE OF APPEAL**
[1]   This is an appeal from the decision of Mr. Justice Drost pronounced 16 September 1995 dismissing the plaintiffs' claims against the defendants, dismissing the third party claims, and allowing the counterclaim of The Foundation Company of Canada Limited ("Foundation") for its expenses in defending the action.  The action arose out of the installation, and ultimate removal, of asbestos-containing spray fireproofing, Monokote ("MK-3") from a building owned and\or managed during the relevant period by the plaintiffs.  The trial involved 182 days of evidence over a period of two years and resulted in a 309-page judgment.

[2]   The trial decision is reported at 1995 CanLII 3385 (BC S.C.), (1995), 11 B.C.L.R. (3d) 1; [1995] 10 W.W.R. 385; 128 D.L.R. (4th) 577; 23 C.L.R. (2d) 1.

**ISSUES ON APPEAL**
[3]   The plaintiffs submit that Mr. Justice Drost erred in:
   1.   finding that MK-3 was not an inherently dangerous product;

   2.   finding that Geoffrey Kendrick (the project manager), and therefore the plaintiffs, "knew, or must be deemed to have known, that the fireproofing product specified by Eng & Wright ... for installation in the building contained asbestos";

   3.   holding that the plaintiffs' claims were barred by the *Limitation Act*, R.S.B.C. 1979, c. 236;

   4.   finding that a 1977 Settlement Agreement with Foundation applied to bar the plaintiffs' claims against Foundation, the Grace defendants, and Donalco Services Ltd.

**CONCLUSION**
[4]   For the reasons which follow, we have concluded that Mr. Justice Drost did not err in finding, on the evidence before him, that MK-3 was not an inherently dangerous product.  Since our conclusion in that regard is determinative of the appeal, it is unnecessary for us to deal with the other issues raised. We would, therefore, dismiss the appeal.

**BACKGROUND**
[5]   Because the trial decision has been reported, we will limit our comments to a brief description of the background giving rise to this litigation.

[6]   The plaintiffs are the owners/managers of the Spencer building (the "Building") which forms part of a large retail/commercial complex

in downtown Vancouver. In 1973-1975, the Building underwent construction, including the addition of a tower. During the course of construction, MK-3, a fire-proofing agent, was installed in the Building. Eng & Wright were the architects on the project, Foundation was the contractor, and Donalco Services Ltd. ("Donalco") was the installer. Mr. Geoffrey Kendrick, who played a significant role in the ensuing litigation, was the project manager hired by the plaintiffs. The MK-3 was manufactured and supplied by Grace Canada, which is wholly owned by W.R. Grace & Co. - Conn. (the "Grace defendants").

[7] In 1987, the 3rd and 4th floors of the Building were extensively renovated to meet the requirements of a new tenant. During the course of that renovation some of the existing fireproofing material was disturbed, and the presence of asbestos-containing MK-3 in the Building came to the attention of the Workers' Compensation Board (the "WCB"). The WCB issued an order closing the area to unprotected workers. Shortly thereafter, the plaintiffs embarked upon an abatement program which eventually led to the removal of most of the MK-3 fireproofing from the Building and its replacement with an asbestos-free fireproofing product.

[8] The plaintiffs commenced action in 1988 for damages totalling $7,555,841. which they say they suffered as a result of having to remove the MK-3 from the Building and replace it with another fireproofing agent. They maintained that they removed the MK-3 because it was an inherently dangerous product which caused physical damage to their property and which, when disturbed, endangered the health and safety of Building workers and occupants. They claimed that they had no knowledge that MK-3 contained asbestos until the time of the WCB stop-work order and that, had they known, they never would have agreed to its installation.

[9] The plaintiffs framed their action against Foundation and Eng & Wright in contract and in tort, and against Donalco and Grace in tort.

[10] The trial judge found that:

    (1)   MK-3 was not an inherently dangerous product;

    (2)   The plaintiffs' claims were barred by the **Limitation Act**;

    (3)   The plaintiffs knew or ought to have known that there was asbestos in the MK-3 fireproofing when it was installed;

    (4)   The Settlement Agreement signed in 1977 operated to bar the plaintiffs' claims against Foundation, Donalco and Grace.

[11] As earlier noted, all of these findings are challenged by the plaintiffs.

**ANALYSIS**

*DANGEROUS PRODUCT*

[12] The pivotal question in this case is whether the MK-3 in the Building was a dangerous product. If the plaintiffs did not prove that it was dangerous, then all the other issues become academic.

[13] The trial judge found that MK-3 was not dangerous. The plaintiffs argue on appeal that his finding related only to the allegation that the ambient air in the Building was contaminated. They say that he did not decide the real issue in the action, which was the risk of harm to workers when their activities disturbed the fireproofing during maintenance, repairs, and renovations. They submit that the evidence at trial established a serious hazard to worker health and safety.

[14] We do not think the plaintiffs can succeed on either contention. Although the trial judge gave greater emphasis to the ambient air question his reasons show that he also decided the issue of workers' health. As to the nature of proof, the plaintiffs advanced their case by an indirect approach when air sampling during disturbance activities would have shown conclusively whether the exposure to workers was dangerous. The plaintiffs relied on the actions taken by regulators such as the Environmental Protection Agency in the United States ("EPA") and the WCB regarding the use and handling of asbestos-containing fireproofing for the inference that MK-3 is dangerous to workers. The plaintiffs also presented the expert opinion of an industrial hygienist who sampled dust and debris from the fireproofing in the Building to determine the potential for disturbance. From those results the expert derived a conclusion that the fireproofing had to be removed.

[15] Experts called by the Grace defendants challenged this evidence. The experts said that there is no scientific proof that working with or around MK-3 in place would create a measurable risk of harm. They referred to tests that indicate the contrary. They further testified that regulators have erred on the side of worker safety in banning MK-3 and in requiring elaborate precautions. The trial judge said that he preferred the experts called by Grace. He was not prepared to infer dangerousness from the indirect evidence offered by the plaintiffs.

[16] What does "dangerous" mean in a hazardous building products suit? In ***Winnipeg Condominium Corporation No. 36 v. Bird Construction Co.***, 1995 CanLII 146 (S.C.C.), [1995] 1 S.C.R. 85, the court required the showing of "a real and substantial danger", and held that the plaintiff must prove a "serious risk to safety" (at 125) and that "the danger was substantial and foreseeable" (at 130). The parties appear to agree on this definition.

[17] The specific danger alleged by the plaintiffs is the inhalation of airborne fibres released from the fireproofing which may cause serious illness in the form of asbestosis, lung cancer or mesothelioma. The plaintiffs' case was presented to the trial judge on the basis that one asbestos fibre in the atmosphere of the Building was too many. They alleged that fibres would enter the breathing areas of the Building as a result of the natural breakdown of the

surface of the product over time and when the fireproofing was disturbed by maintenance, repairs, and renovations. According to the plaintiffs, all occupants and users of the Building were placed in serious danger by MK-3.

[18] The trial judge rejected the plaintiffs' theory, mostly based on the evidence of their medical expert, Dr. Arthur Frank, that there is no safe level of airborne asbestos fibres. The court preferred the defence experts' opinions on the risk of harm. They said, and the trial judge accepted, that the hazard must be assessed according to the intensity of the exposure, i.e., the concentration of the fibres in the breathing area, and the duration of the exposure. He expressed his preference in this way at 173 (11 B.C.L.R. (3d)):

> Where there is a conflict between the evidence of Dr. Frank and the medical experts called by the Grace defendants, I prefer the evidence of the latter. In my opinion, the plaintiff was not successful during cross-examination in refuting their very convincing opinions on this point. A good deal of those cross-examinations consisted of putting to the witness other studies that suggested a contrary opinion. Those studies were not, for the reasons I gave earlier, allowed into evidence for the truth of their contents, but only to test the veracity of the witness's opinion.

[19] We cannot interfere with the weight attached to expert evidence by the trial judge. In ***Toneguzzo-Norvell v. Burnaby Hospital***, 1994 CanLII 106 (S.C.C.), [1994] 1 S.C.R. 114, McLachlin J. said at 121-2:

> It is by now well established that a Court of Appeal must not interfere with a trial judge's conclusions on matters of fact unless there is palpable or overriding error. In principle, a Court of Appeal will only intervene if the judge has made a manifest error, has ignored conclusive or relevant evidence, has misunderstood the evidence, or has drawn erroneous conclusions from it: see ***P. (D.) v. S. (C.)***, 1993 CanLII 35 (S.C.C.), [1993] 4 S.C.R. 141, at pp. 188-89 (*per* L'Heureux-Dubé J.), and all cases cited therein, as well as ***Geffen v. Goodman Estate***, 1991 CanLII 69 (S.C.C.), [1991] 2 S.C.R. 353, at pp. 388-89 (*per* Wilson J.), and ***Stein v. The Ship "Kathy K"***, [1976] 2 S.C.R. 802, at pp. 806-8 (*per* Ritchie J.). A Court of Appeal is clearly not entitled to interfere merely because it takes a different view of the evidence. The finding of facts and the drawing of evidentiary conclusions from facts is the province of the trial judge, not the Court of Appeal.
>
> The Court of Appeal justified its intervention on the ground that it was in as good a position to draw inferences from the evidence as was the trial judge (at pp. 121-22):
>
>> There is no issue with respect to the veracity of these expert witnesses. As the trier of fact the trial judge was free to reject or adopt in whole or in part the

evidence of experts he found qualified but in the absence of findings of credibility this court is in as good a position as the trial judge to review the expert evidence and to draw inferences of fact therefrom: ***New Brunswick (Workmen's Compensation Board) v. Greer*** (1973), [1975] 1 S.C.R. 347, 7 N.B.R. (2d) 171, 42 D.L.R. (3d) 595, 1 N.R. 99. It should undertake this task if the trial judge has failed to take into account some obvious feature of the evidence or has misapprehended its significance: ***Croke (A Minor) v. Wiseman***, [1982] 1 W.L.R. 71, [1981] 3 All E.R. 852 (C.A.), per Griffiths L.J. at p.859 (All E.R.).

I agree that the principle of non-intervention of a Court of Appeal in a trial judge's findings of facts does not apply with the same force to inferences drawn from conflicting testimony of expert witnesses where the credibility of these witnesses is not in issue. <u>This does not however change the fact that the weight to be assigned to the various pieces of evidence is under our trial system essentially the province of the trier of fact, in this case the trial judge.</u>

[Emphasis added]

[20] The WCB regulates occupational health and safety. It sets threshold limit values ("TLVs") for exposure to potentially harmful substances by workers in their employment. In the 1972 *Accident Prevention Regulations*, B.C. Reg. 64/72, passed by the WCB (in force when the MK-3 was applied to the Building) the concept of threshold limit values is explained:

**THRESHOLD LIMIT VALUES FOR 1972**

Threshold Limit Values (TLV) refer to concentrations of airborne contaminants to which workmen may be repeatedly exposed without adverse effects. Because of individual susceptibility, a small percentage of workmen may experience some discomfort at concentrations at or below the stated concentrations. A smaller percentage of workmen may be more severely affected due to aggravation of pre-existing medical conditions.

Threshold Limit Values refer to time-weighted average concentrations for a 7-8 hour workday and 40 hour work week. These values are based on the best available information from industrial experience and human and animal experimental work. Because TLV's are time-weighted averages, excursions above the limit may be permitted provided they are compensated by an equivalent excursion below the limit. The extent of the excursion above the limit are very dependant on the toxicity of the contaminant, the frequency of these excursions, their cumulative effects and the duration of the high concentration periods.

[21] The TLV set for asbestos in 1972 was 30 fibres per cubic centimetre of air. In 1978 it was reduced to 2 fibres/cc, where it remains.

[22] The experts at trial discussed exposure hazard in relation to the 2 fibre/cc standard. The question of dangerousness turned on whether any building occupant or worker would likely encounter asbestos dust concentrations in excess of the threshold limit.

[23] The plaintiffs allege that hazardous exposure would result from passive release of MK-3 in place (as a result of deterioration) and from disturbance in the course of maintenance, repair, and renovations. In his reasons Drost J. addressed himself primarily to the assertion that MK-3 contaminated the breathing air in the Building, the general ambient air, and therefore had to be removed. He found that MK-3 in place presented no hazard.

[24] The plaintiffs do not attack that finding on appeal. They say the trial judge failed to grasp the real issue, the hazard to workers when they disturbed the fireproofing.

[25] We do not accept that criticism of the trial judgment. While Drost J. devoted more space in his reasons to the alleged contamination of the ambient air, he expressly concluded that MK-3 did not present a danger to workers. He said at 174:

> As I have stated, all of the medical experts, except Dr. Frank, opined that the levels of exposure to asbestos fibres encountered in buildings is far too low to increase the risk of a <u>building worker</u> or occupant contracting any of the asbestos-related diseases, including mesothelioma. I accept those opinions.

\* \* \*

> So far as the Spencer Building itself is concerned, far from establishing a "real and substantial" danger to persons, the evidence satisfies me that the MK-3 that was installed between 1972 and 1975 was not and is not an inherently dangerous product. I have no hesitation in concluding that the asbestos fibres contained in that MK-3 did not "contaminate" the Building, nor did they expose its occupants <u>and workers</u> to an increased risk of contracting any of the asbestos-related diseases. Nor did any asbestos fibres that were released into the atmosphere of the Building by that product cause damage to property.
> [Emphasis added]

[26] Earlier in his judgment, the trial judge discussed the experts' evidence about the risk of harm when workers disturbed asbestos-containing fireproofing. It is important to know as background that MK-3 was mixed with water, vermiculite and gypsum on site and then sprayed on the surface to be fireproofed. This gave the product a cementitious quality, like plaster, which was designed to hold the material in place. This gave greater stability than that in dry sprayed products which are not bound in a matrix and tend to throw

off fibres without deliberate disturbance.

[27] In their evidence at trial several expert witnesses referred to a study by Dr. William Nicholson of Mount Sinai Hospital on asbestos exposure. Dr. Gordon Bragg was called by the Grace defendants to give expert evidence concerning the measurement and behaviour of airborne asbestos fibres in buildings. The trial judge made these observations at 137 of the reasons:

> Dr. Nicholson's study shows that counts of asbestos fibres in the air in buildings in which <u>cementitious</u> asbestos-containing material was used were lower or equivalent to the counts found in the outside air. It also showed that some of the buildings in which dry sprayed fireproofing or insulation materials had been applied had slightly raised fibre counts.
>
> * * *
>
> As to the current state of knowledge, in my opinion, the evidence given by all of the medical experts, with the exception of Dr. Frank, clearly establishes that the type of exposure encountered in buildings is far too low to increase the risk of contracting any of the asbestos-related diseases.

And further, at 138:

> Dr. Bragg is familiar with a great many studies that compare the indoor asbestos levels of buildings containing ACMs [asbestos-containing materials] with the outdoor level around the same buildings. He said that, in the great majority of those studies, it was concluded that there was no significant difference between indoor and outdoor levels.
>
> Dr. Bragg noted that these findings applied whether or not the ACM was in good condition, and that they took into account the possibility of repairs being performed in the building.

Finally, on the risk of inhaling the ambient air the trial judge said at 142:

> In short, Dr. Bragg's evidence confirms the opinions expressed by the medical experts called by the Grace defendants that there is no increased risk to workers or occupants from the low level of exposure to asbestos that one may expect to encounter in public buildings generally.

[28] As we have said, the trial judge's reasons concentrate mainly on general air quality in the Building. Drost J. did not expressly deal with the arguments about the hazard to workers in the personal breathing zone of the disturbance they create. But the issue was squarely before him and he concluded that the Building was not unsafe for users or workers because of the asbestos in MK-3. This was a very long trial with complex evidence. We cannot conclude from the reasons

that the trial judge overlooked a major feature of the case. In our view, his general conclusions about dangerousness must be taken to embrace the alleged hazards from MK-3 in place and when disturbed. He showed that he was alive to the issue of the dangerousness of MK-3 to workers, if it was disturbed, in the concluding part of his judgment at 171:

> Fundamental to the success of the plaintiffs' claims is proof, on a balance of probabilities, that:
>
> 1. the MK-3 fireproofing material contaminated the Building by continually releasing asbestos fibres into its atmosphere, thus causing physical damage to property of the plaintiffs and exposing tenants and others properly using the premises to such fibres;
>
> 2. <u>the asbestos fibres</u> contained in the product MK-3 <u>posed a hazard to the health of workers</u> and occupants of the Building;
>
> 3. <u>as a consequence, Building workers</u> and occupants <u>have been exposed</u> and continue to be exposed <u>to an increased risk of contracting an asbestos related disease</u>;
>
> and that
>
> 4. <u>as a consequence of</u> the inherently dangerous nature of the product, and <u>the inability of the plaintiffs to repair, modify, perform ordinary maintenance work, or renovate the Building without causing the further release of asbestos fibres thereby endangering the health of Building occupants and workers</u>, the plaintiffs undertook the removal and replacement of all of the asbestos-containing fireproofing in the Building.
>
>                                           [Emphasis added]

[29] Did the plaintiffs prove that MK-3 is a dangerous product when disturbed? Put another way, did the plaintiffs show that the exposure of workers to airborne asbestos fibres would exceed the TLV of 2 fibres/cc? We cannot say that they did. Air sampling during renovations would have produced the evidence one way or the other, but the plaintiffs did not perform those tests. Instead they relied on the opinion of an expert, William Ewing, whose methodology involved sampling the dust and debris accumulated on the surfaces beneath the fireproofing. From that he determined the potential for disturbance which he found to be so high that he recommended removal as the best method of abatement of the risk.

[30] Mr. Ewing's approach did not go to the heart of the dangerousness question: will workers inhale dangerous amounts of asbestos fibres? Exposure risk was the field of the experts called by Grace, Dr. Peter Elmes and Dr. Gordon Bragg, who said that disturbance potential determined by settled dust sampling will not reveal the concentration of airborne fibres. The trial judge accepted their criticisms of Mr.

Ewing's methodology. We will set out his reasons (at 161-3) in full on this point because of their importance:

> Some of the experts called by the Grace defendants were asked for their opinion of Mr. Ewing's Report.
>
> Over the objections of Mr. Roberts, I found Dr. Elmes qualified to comment on the Report, on the basis that he had an expertise in the interpretation of air samples taken by others.
>
> Dr. Elmes was asked whether the air sampling results from the Ewing Report suggest a risk to the Building occupants. Dr Elmes stated:
>
>> There are no air sampling, in the accepted sense of the word, results in this report. The samples were taken by picking up dust off various surfaces. They weren't taken from the air. So they consisted of particles, many of which were too large to be respirable. They were then subjected to ultrasonic treatment to break up these particles and, therefore, they may have created an artificial situation which may or may not represent what might have occurred at some time in the air of the building . . .
>>
>> This investigation, this examination of this dust that was taken from the surfaces within the building can be used to give us some idea of what the fibres are in the material which might be released if the material was damaged or disturbed. *It doesn't give us an idea of how much release was occurring or whether the people in the building were at any risk from the presence of this material in the building* . . .
>>     (emphasis in text)
>
> Dr. Elmes went on to suggest that these type of sampling techniques could be used to find out what "*might* be released" if the building was demolished or the material being stripped out.
>
> Dr. Bragg expressed similar concerns. He suggested that the surface sampling techniques used by Mr. Ewing were procedures that existed in draft form only, in the sense that the procedure had not been codified by any of the codifying bodies. Indeed, he suggested that he was not aware of any regulatory body that suggests the use of this procedure, nor was he aware of its acceptance or use by any scientific organization.
>
> According to Dr. Bragg, the problem with surface sampling is that it provides no insight into the key question, namely, whether there are measurable airborne levels of asbestos. In this regard, he stated:
>
>> There has been an enormous amount of research over the

years, particularly in the nuclear industry, attempting to relate material on surfaces to material in the air and I think it's generally accepted now that there is no relationship and that the fundamental reason for that is that the relationship is between disturbance and airborne material and not between material on the surface.

In other words, simply because asbestos can be detected on the surface does not mean that fibres from it will become airborne and in turn pose a health risk.

When asked in cross-examination if an examination to determine whether the particle had moved was a reasonable thing to do, Dr. Bragg responded:

> It depends on what our objective is. If our objective is to inquire whether it has moved, yes, it is. If our objective is to determine whether or not it's going to result in inhalable fibres in the air, then I would suggest that it is not an appropriate procedure.

Such a study, he acknowledged, may indicate whether there had been some form of disturbance, but he said that:

> . . . it's important to discriminate between a disturbance which produces visible debris where the lay understanding that vibration and air flows may produce a disturbance is indeed true. Vibration and that type of air flow will, indeed, be capable, with certain types of materials, particularly with the dry sprayed material, of producing a disturbance which causes a change in location. What's important to do is to discriminate, though, between that - and we are now able to do so on the basis of the type of study that Mr. Ewing has done, for example - between that and the airborne material that is small enough to be of health significance.

> I accept the criticisms expressed by Drs. MacDonald [sic - Dr. Elmes] and Bragg about the methodology employed by Mr. Ewing. I am, accordingly, unable to accept that the results support a finding that the Building is in fact contaminated to a point where it posed a health hazard to its occupants, necessitating removal.

[31] Dr. Bragg said that it was unlikely that disturbance would produce concentrations at the 2 fibre/cc level. He made reference to several studies: pounding a large dowel into the fireproofing; pulling wire cable over settled dust and debris; and sandblasting fixtures coated with fireproofing. In none of these tests did the air samples even approach the hazard level set by the WCB.

[32] The plaintiffs argue that the danger can be inferred from the extent of the precautions required by the WCB in the safe handling of

asbestos-containing materials. They point to the WCB's Manual of Standard Practices on the subject which divides risk of exposure into three categories: low, moderate, and high. The categories are defined by activities, not according to fibre counts in air sampling. At all levels some form of respirator must be worn and steps taken to prevent the escape of any dust from the work area. Protective clothing is required at the moderate level along with elaborate clean-up procedures. At the high risk level the work area must be sealed and air drawn to the outside by negative pressure. Workers must have a multi-chambered decontamination facility allowing them to remove their protective clothing, to shower, and to dress without the risk of carrying fibres from one activity to the other.

[33] The plaintiffs also submit that Grace's theory at trial, obviously accepted by the trial judge, that MK-3 is safe <u>if handled properly</u>, implies dangerousness in that proper handling during disturbance involves extensive precautions. They say that this is confirmed by the trial judge's remarks (at 133) about demolition, which is just another form of disturbance:
> It is clear that when an asbestos-containing building is demolished, stringent safety precautions of the nature described during this trial, and mandated by the regulatory authorities, must be taken.

[34] Do these precautions prove a hazard to health? This was not the view taken by either Dr. Bragg or Dr. Elmes, both of whom felt that the increased risk of workers developing an asbestos related disease was negligible. Dr. Bragg said in his testimony:
> Q So your evidence is that these regulatory agencies such as the EPA and the Provincial Government of British Columbia are publishing these documents for the public and they are promulgating information that is contrary to scientific facts; is that what you are saying?
>
> A At the current time I am suggesting that it has caused the regulatory agencies to err extremely on the side of safety.
>
> Q A prudent course?
>
> A Not if it results in a redirection of resources to places where there is no significant risk.
>
> Q I take it, Dr. Bragg, you wouldn't want them to err on the other side?
>
> A I think that in the practice in this province there is a modest error on the side of safety and I think this is appropriate.

[35] There is evidence on both sides of the issue. Drost J. found that the plaintiffs had not proven their case. In our opinion, the plaintiffs are asking us to re-weigh the evidence and make a different

choice as to expert opinion. This we cannot do. As we have said, the plaintiffs had the opportunity to sample the air and demonstrate conclusively that when disturbed MK-3 is a dangerous product. In the end, the trial judge was not persuaded by the methods of proof adopted by the plaintiffs on this crucial issue of fact. We are unable to find that he committed any palpable or overriding error in his conclusion on dangerousness.

**DISPOSITION**
[36] The appeal is dismissed.


"THE HONOURABLE MADAM JUSTICE PROWSE"


"THE HONOURABLE MR. JUSTICE DONALD"


"THE HONOURABLE MADAM JUSTICE NEWBURY"

[About CanLII] [Conditions of Use] [Advanced search] [Help] [Français]
[Privacy Policy] [Mailing Lists] [Technical Library]
[Contact CanLII]

by  _____ for the Federation of Law Societies of Canada