IN THE UNITED STATES BANKRUPTCY COURT FOR THE WESTERN DISTRICT OF PENNSYLVANIA

- - - -

In Re: ) Chapter 11
)
W.R. Grace & Co., et al., 1, ) Case No. 01-01139 (JKF)
) Jointly Administered
Debtors. )

- - - -

DEPOSITION OF: RICHARD J. LEE, Ph.D.

- - - -

DATE: February 14, 2007
Wednesday, 1:37 p.m.

LOCATION: REED SMITH, LLP
435 Sixth Avenue
Pittsburgh, PA 15219

TAKEN BY: Claimants

REPORTED BY: Heidi H. Willis, RPR, CRR
Notary Public
AKF Reference No. HW99625A

**EXHIBIT "A"**

DEPOSITION OF RICHARD J. LEE, Ph.D., a witness, called by the Claimants for examination, in accordance with the Federal Rules of Civil Procedure, taken by and before Heidi H. Willis, RPR, CRR, a Court Reporter and Notary Public in and for the Commonwealth of Pennsylvania, at the offices of Reed Smith, LLP, 435 Sixth Avenue, Pittsburgh, Pennsylvania, on Wednesday, February 14, 2007, commencing at 1:37 p.m.

----

APPEARANCES:

FOR THE DEBTORS:
James Restivo, Esq.
REED SMITH, LLP
435 Sixth Avenue
Pittsburgh, PA 15219
412-288-3131
jrestivo@reedsmith.com

FOR SAN DIEGO GAS & ELECTRIC COMPANY, SEMPRA ENERGY, and ENOVA CORPORATION:
Mark A. Bartholomaei, Esq.
OBERMAYER REBMANN MAXWELL & HIPPEL, LLP
One Mellon Center, Suite 5240
500 Grant Street
Pittsburgh, PA 15219
P 412-566-1500
F 412-566-1508
mark.bartholomaei@obermayer.com

FOR THE STATE OF CALIFORNIA:
Christina Kang, Esq.
(Appearing Telephonically)
HAHN HESSEN
488 Madison Avenue
New York, NY 10022
P 212-478-7200
ckang@hahnhessen.com

APPEARANCES (CONT'D):

FOR THE OFFICIAL COMMITTEE OF EQUITY SECURITY HOLDERS:
Jessica Glass, Esq.
(Appearing Telephonically)
KRAMER LEVIN NAFTALIS & FRANKEL, LLP
1177 Avenue of the Americas
New York, NY 10036
P 212-715-9185
F 212-715-8318
JGlass@kramerlevin.com

FOR THE AMERICAN LEGION, CATHOLIC DIOCESE OF LITTLE ROCK, CHP ASSOCIATES, FARGO HOUSING AUTHORITY, PORT OF SEATTLE, STATE OF WASHINGTON:
Anne McGinness Kearse, Esq.
(Appearing Telephonically)
MOTLEY RICE, LLC
28 Bridgeside Boulevard
Mt. Pleasant, SC 29464
P 843-216-9140
akearse@motleyrice.com

*INDEX*

Examination by Ms. Kearse ----------- 4
Examination by Mr. Bartholomaei -------- 55
Re-Examination by Ms. Kearse ---------- 57

Certificate of Court Reporter --------- 58
Errata Sheet ------------------ 59
Notice of Non-Waiver of Signature ------- 60

(No Deposition Exhibits were marked.)

----

PROCEEDINGS

----

MR. RESTIVO: We are starting a new deposition, same day, same case. You should reswear the witness, and we'll go some more. I don't want to say start over because I don't want you to repeat everything that's been done. I can't say continue because it's a new deposition, but we will start over. We will start again.

---

RICHARD J. LEE, Ph.D.,
being first duly sworn,
was examined and testified as follows:

----

EXAMINATION

----

BY MS. KEARSE:
Q. Good afternoon, Dr. Lee.
A. Good afternoon.
Q. My name is Anne Kearse, and I'm here on behalf of the Motley Rice Claimants, and we just made some comments on and off the record, but we've been going for many, many hours today on behalf

of some of the Speights & Runyan Claimants, and to the extent there's some questions of a general nature, they can certainly apply in this deposition as well. I'll try not to rehash everything, but of course I have to ask for some clarification on a couple of things.

Let me start off, because I missed the first three minutes of your deposition, did you produce today a copy of your CV, a recent copy of your CV?
A. I have not.
Q. Do you have one with you?
A. I do not.
Q. Can we just go ahead and provide that to counsel and make that as an attachment, I guess it's a new exhibit, so new Exhibit No. 1? Would that be any problem, Counsel?

MR. RESTIVO: I don't think it's a problem. I think it's probably attached to one or more of Dr. Lee's expert reports in this case, but if you want us to pull it off an expert report and attach it to this transcript, I don't have a problem doing it.

MS. KEARSE: Let's see. Let me clarify. I've got, Dr. Lee, one of your

Page 6

reports from January 15th, 2007, and it does have a copy, it looks like it doesn't have –

MR. RESTIVO: But all we would do is pull that copy off. I don't think we have anything that postdates January of 2007.

MS. KEARSE: Okay. Well, let me ask it this way.

BY MS. KEARSE:

Q. Dr. Lee, I have attached to that January 15th, 2007 report on lack of hazards a CV that looks like it's dated 4/28/2006. Would that be your most recent CV?

A. I would think so.

Q. Is there anything, without having it in front of you, that you would be aware of that you are working on that would not appear on that CV as it relates to asbestos?

A. No.

Q. Then I won't make that part of the record. I've got that.

I understand that you have with you today a number of claim files that you or your staff have reviewed; is that correct?

A. Almost. We've got a number of Claimant files, the physical files which were requested by

Page 7

Speights –

MR. RESTIVO: We do not have, Anne, because I was going to look at it once you identified the numbers you were going to talk about, we do not have the actual claim file material for the four claims you identified.

Dr. Lee does have information on his spreadsheet with respect to those claim numbers, but because they were not included in the Speights & Runyan document request, they never ended up in the two boxes of claim files we have here.

MS. KEARSE: Okay. Jim, is there a way – you know, I don't want to prolong it or reopen a deposition, or I could even do a quick deposition on those four. I was under the impression you would have all of those there today, but maybe I had it wrong as well, but that's what we were told, we didn't really have to renotice anything in order to participate.

I can go forward, but I probably would at least like to have what the doctor and his office actually have in their possession regarding the claims and probably be given an opportunity, very briefly, again, by telephone,

Page 8

to make some inquiries about that, because I do have some questions specifically about those four. That's why I was going to short circuit everything.

Is that going to be a problem?

MR. RESTIVO: I don't think so. I mean I'm not answering you because I don't have the claim files here. I think what you are requesting is Dr. Lee should dig out those four claim files. I'm requesting, Doctor, you send a copy to me so I know what it is people are talking about, and then I will engage with you, Anne, on perhaps having a quick telephonic deposition limited to whatever's in those four claim files.

MS. KEARSE: Right.

MR. RESTIVO: And, again, we would have brought them if someone would have specifically asked us.

MS. KEARSE: Okay. I thought you were going to have all the data that backed up these reports, but we can work that out again, and it shouldn't take very long, and I'll still go through what I have and see how far we can get, and if there's some specific things that

Page 9

the doctor would have to rely on what's in the files, then I would like to open that up for a brief deposition.

MR. RESTIVO: All right. With the same ground rules? Off the record.

\----

(There was a discussion off the record.)

\----

MS. KEARSE: I'd also like to, for the record, in an earlier deposition there was a request for the amount of time and money you received from W.R. Grace in relation to those product ID charts, any such information I'd ask also be provided to Motley Rice counsel as well.

MR. RESTIVO: We will similarly take your request under advisement.

BY MS. KEARSE:

Q. And in addition to that, I don't know if this question was asked, Dr. Lee, can you estimate for me how much money you have made from W.R. Grace in asbestos litigation matters since the first time you consulted with them?

A. No.

Q. Have you ever been asked to calculate that?

Page 10

A. I've been asked how much money I've made in asbestos litigation. I think I've been asked most of the questions, but I would have no way of finding that out.
Q. Have you been asked to specifically address the question about how much money you have made from your consulting with W.R. Grace?
A. I don't believe so. I can't -- I don't remember, frankly, but I don't -- not that I remember, let me put it that way.
Q. Let me ask you this: When did you first start working with W.R. Grace?
A. Probably the latter part of the '80s.
Q. And can you give me a rough estimate of the percentage of time that you have worked on W.R. Grace matters?
A. I really can't.
Q. Doctor, you referred to a protocol earlier. Do you actually have a protocol that's written out that you used in order to look at the data and work on these spreadsheets and reports?
A. We had -- we had -- I think if you look in our report, I put down the synopsis of the procedure, protocol that we used.
Q. But prior to this report dated January 17th,

Page 11

2007, while you were going through the analysis and the methods you were going through, do you have a protocol that gives guidance on the material?
A. I think the answer is -- I guess the answer is I don't recall from when we started. I know we had tried a number of forms and laid out definitions and, you know, for the various categories we were going to consider, and I think those were on some kind of paper. I don't know that we ever classified it as one of our protocols, you know, that we would have in the standard operating procedure.
Q. Do you have a file that you could go to that's just pretty much this W.R. Grace product ID project that you did on behalf of -- in a bankruptcy setting?
A. For this case?
Q. Yes.
A. Yes, we would.
MS. KEARSE: Counsel, any objection to producing that file?
MR. RESTIVO: I don't know what's in it, so I certainly would not agree to produce it. If you are requesting it now, I will find

Page 12

out what it is, see whether it's relevant or privileged and take under advisement your request.
MS. KEARSE: Okay. I hereby request that file.
BY MS. KEARSE:
Q. Dr. Lee, aside from that file, within I guess your organization, would the Mr. Potter and I believe it was a Ms. Christina --
A. Yes.
Q. -- would they have separate files in regard to this case as well?
A. No.
Q. It would all be located in one case file?
A. Yes. Just by way -- the vast majority of that file is actually a claim document, and there's like 45 boxes of those documents.
Q. And, I told counsel I'm not looking for any of that claim documents but --
A. I think you just make that clear in your letter, so I don't get requested to copy 45 boxes of stuff.
Q. Dr. Lee, within that file, would that have various iterations of what classifications you were looking at?

Page 13

A. I would doubt it. I can check. You know, I would have been working on those as drafts.
Q. To the extent all that's in the file, we have an outstanding request to review that.
Dr. Lee, let me just clarify a couple of things. You've done no independent analysis of any of the samples in this case?
A. That's correct.
Q. Dr. Lee, in the past, you'll agree with me that when you've consulted with Grace, you've typically looked at bulk samples; is that correct?
A. To the extent there is a typical, I've done both, but certainly I've done a lot of bulk analysis for Grace.
Q. Do you know how many, over your career, how many bulk samples you've reviewed for Grace?
A. No, I do not.
Q. Do you have an idea of how many bulk samples you've reviewed within your career, regardless of who asked you to do that?
A. No.
Q. Would you have anything in your office that would help calculate it?
A. No, I don't think I would have any way of

knowing. That's not a record we would keep or compile.

Q. I just didn't know if maybe it was in a brochure somewhere or --

A. Are you waiting for an answer from me?

Q. No, no, no, I'm cutting out some things I don't need to ask you.

A. That's okay. I was just checking.

Q. Doctor, if I'm correct from your report and your prior testimony, you actually reviewed data for 15,000; is that correct?

A. That's correct.

Q. And it's my understanding you reviewed the data for 15,000 samples under the assumption that the Claimants were alleging all 15,000 samples were W.R. Grace products; is that your understanding?

A. Well, not quite. We reviewed data, we reviewed the data that was -- the decision -- the request to us was to evaluate bulk sample data as a part of Claimants files and determine whether or not it provided evidence of W.R. Grace product in the building, in the various buildings.

Q. But did you do that under the assumption that

Claimants were alleging that those samples were W.R. Grace products?

A. Under the assumption that they had provided those in support of their claims, and generally they had the product alleged, so I think it was necessary that you at least sort out and say this -- like in your first claim, the product alleges MonoKote-3, but there was floor tile and so on, that at least that was not the product.

Q. Who told you to go about it that way?

A. Well, this was done in discussions with the attorneys. I don't think anyone told me. I -- they asked -- they said we would like you to review the information. We took a look at some initial claims and said here's -- here's the kinds of things we think we are going to be able to say and about these individual samples, and the decision was made that that's what we should do.

MR. RESTIVO: Anne, Jim Restivo, we understood, and I'm not trying to testify for Dr. Lee, but to move this along --

MS. KEARSE: Are you sure?

MR. RESTIVO: -- what we, the

attorneys, understood was that the Claimants were to provide information establishing the product, and so at least the attorneys, to the extent that a bulk sample was provided by a Claimant, yes, Dr. Lee's organization was asked to look at the bulk sample information provided because it came in with the claim form, and we thought that's what the claim form was asking for.

BY MS. KEARSE:

Q. And just to be clear, Doctor, you are not going to opine that the Claimants were claiming these nonsurface materials were, in fact, Grace products, are you?

A. No, I -- I'll testify to what we analyzed and what I have concluded.

Q. Let me ask it this way: Without even looking at the first piece of paper or claim form, would you agree with me that you could have advised counsel that if it's not surface material, it's not W.R. Grace?

A. Well, I think that -- I think the attitude is insofar as any information I've been provided related to asbestos-containing materials, building products, if it were floor tile,

ceiling tile or other nonsurfacing, we would put it in a non-Grace category.

Q. But it could have saved a lot of work on your part just to say a nonsurface material is not Grace; correct?

A. Well, I think that's, you know, that's sort of an administrative matter more than anything else. The primary time that gets consumed in reviewing files is, in fact, validating that you haven't missed anything and that what data you've got is entered properly.

When you start -- when you start doing sort of half measures, even if you would have said this is not, you would still have had to catalog them somehow. I think that what we did was far and away the most efficient utilization of time but still permitted conclusions to be drawn.

Q. Well, are you aware that you reviewed a lot of data for claims that W.R. Grace isn't even objecting to product ID?

A. I have no idea about that.

Q. Would you agree with me that your report does indicate that 51 percent of the samples or data that you reviewed was for nonsurfacing

products; correct?
A. Yes.
Q. And would you agree with me that another probably sweeping suggestion could be that if you've got a bulk sample analysis that only shows that asbestos is in the product, that you would find that an insufficient basis to opine one way or the other that it's a Grace product?
A. Unless it was either very high or very low, then I could conclude it's most likely not a Grace product.
Q. And would you have a range of your high/low?
A. No. I think we went through that before, and, you know just as a general rule, if it's more than twice the product formula or less than half, you can start to say that most laboratories will get it right within that boundary.
Q. In your analysis about 35 percent of the claims were insufficient information because it didn't have the additional constituents other than asbestos; correct?
A. Yes.
Q. And you state that 10 percent of the surfacing material and results didn't match Grace. Do

you know how many claims, buildings that represents?
A. No, I do not.
Q. Is there any way you could calculate for me what the percentage of claims that just out of the surface material that had sufficient data to enable you to opine one way or the other as to whether it's Grace?
A. Well, if -- I think this -- I think the answer is about 20 percent of the surfacing claims -- I'm sorry, what was your question again? I'm sorry, I'm looking at a spreadsheet here trying to figure out whether I can answer your question.
Q. Okay. Let me do it this way. You went through the analysis based on 15,000 bulk sample materials, okay. If I do the analysis from -- take those claims that were surface materials with sufficient data, what percentage out of that population would you be able to opine as to whether or not it was a Grace product?
A. I don't know the answer to that.
Q. Is that something you could calculate for me?
A. I'm not sure. I'm sure I could go through and do it with sufficient time, but I'm -- I don't

know that I can --
Q. Okay. Well maybe that's something we can work on down the road if we have to.
A. Yeah.
Q. All right. Doctor, I'm going to give a little bit of scope of where I'm going with my four claims and why I'm just going to concentrate on them. For a number of my Claimants, you found samples that were, quote, not inconsistent with a Grace product; right? You found that generally. You don't know which ones are mine, which ones are not?
MR. RESTIVO: He really doesn't.
Q. There's a number of my Claimants in which you found that the samples were not inconsistent with a Grace product.
A. Okay. I had for you 3406, 3515, 6941, and the last one I seem to have gotten the number wrong.
Q. It's 6941.
A. 27 something?
MR. RESTIVO: Well, the number was wrong, 2977 I think is what she's talking about.
Q. Yeah, 2977. Let me do it this way because I'm

going to go over the ones I'm really not going to talk about today except to say we are not going to talk about them, but I'll give you an example, how's that.
No. 3405, you found that samples that were not inconsistent with a Grace product?
A. This is the Fargo housing --
Q. I'm just using this as a way of example so I can get to the four we need to talk about.
A. Okay. Yeah.
Q. And let me just ask you this, when you use this not inconsistent with a Grace product, is it okay to infer that that item would be consistent with a Grace product?
A. Well, it's trying to keep that sharp. It is consistent within the analysis provided, but not inconsistent is really somewhat different in that it only means that the information we have is -- falls within the Grace product formula, but there may well be, to make an identification, with you may well need more information.
Q. Right, but really if it's not inconsistent, it's somewhat consistent with?
A. Yeah, the data you have is not inconsistent.

Page 22

Q. We are getting double negatives in there, so trying to make it a little easier.
So would you agree with me that your report states and you've opined today when you say it's, quote, not inconsistent with a Grace product, that you do mean that it possibly is a Grace product?
A. It – I would mean it could possibly be a Grace product.
Q. And you were not asked to make conclusive opinions as to whether or not they are, in fact, Grace product; correct?
A. That's not true.
Q. That's not true?
A. I am asked to make a conclusive opinion where there's sufficient data where it's not a Grace product, which I can do, and it's not really not a Grace product, it's –
Q. Let me clarify that. For those cases and samples that you've stated are, quote, not inconsistent with a Grace product, for those samples, you have not been asked to make any more conclusive opinion as to whether, in fact, they are a Grace product or not; correct?
A. That's correct. We are looking at a comparison

Page 23

with the results of the analysis with product formula.
Q. And you'll agree with me based on that information we have today, additional information, such as sales records, applicator testimony or other such information may assist in whether or not those are actually Grace products within those buildings; correct?
A. Well, I think it's just beyond the scope, beyond my scope. It's –
Q. That would be a fair analysis of some further steps you could take to state whether or not there is a Grace product in the building; correct?
MR. RESTIVO: I'm going to object to the form of the question, and I would ask you to make it clearer. Are you asking for his expert opinion on that question? And if so, I object because that's not his area of expertise.
BY MS. KEARSE:
Q. Okay. You have no opinion as to whether or not additional information, such as sales records, could help someone actually determine whether or not it's a Grace product within the building

Page 24

in addition to what you have done in your analysis to say it's not inconsistent with a Grace product?
A. Well, I think my analysis and my opinion is based solely on the data. To the extent that you go beyond that, it really falls outside the range of what I'm asked to do or what I do do.
Q. So one way or the other, if there's a sales invoice to a particular job that you've actually looked at samples for, you don't look at that material?
A. Well, I don't know that I don't look at it, but I don't rely on it.
Q. Have you requested such information from W.R. Grace in any of these claim files in this case?
A. No.
Q. And for the record, the reason I'm going to limit my questioning to the four claims that I asked for earlier – 2977, 3406, 3515 and 6941 – is that it's my understanding that W.R. Grace did not object on a PID basis to those claims, so if that's stated for trial, I don't need to go into any other ones except the ones they raise an objection to, which is why I'm focusing on those four claims, just so you know

Page 25

that's why I'm going there.
MR. RESTIVO: And I am not going to concede what you just said because I don't know one way or the other whether or not as to your other claims what the objections were, but I don't think you are asking me to do that, but so the record's clear, I don't know whether you are right or not. Whatever the objections are, they are, and the record will speak for itself. I just simply don't know what they are.
MS. KEARSE: And I agree, and I did e-mail Cameron yesterday to make sure I'm clear on that. I've gone through all the objections, and for this phase of the proceedings, it's my understanding I only need to really provide information based on your objections to support my claim, but I agree, if we somehow – if you are going to raise new objections in substance, I would ask the record to reflect that I would reopen the deposition based on new objections, otherwise that's pretty much where we are.
BY MS. KEARSE:
Q. And, Doctor, I think we clarified, you'll agree that your testimony is limited to laboratory data; is that correct?

A. Yes.
Q. In preparation for this case, you have not reviewed any W.R. Grace specific documents other than the recipes you referred to in your report, or the formulas?
A. That's correct.
Q. And you have not been asked to testify in this matter as to any square footage in buildings that have products consistent with W.R. Grace, have you?
A. That's correct.
Q. Is there a way to calculate on a per sample basis what it cost you to review this data?
A. I don't think there's a fair way.
Q. In your expertise, an estimate of such?
A. No, because, you know, like I don't know, 50 percent of them was a matter of a data entry point and the answer is obvious, and for one reason or another they weren't, so I don't think there's any way an average would make any sense.
Q. I was just wondering if in 15,000 bulk samples there was any way to make a determination of amount of time for each sample.
A. I think you can make whatever division people

want, but I don't think it's -- it's one of those cases where the bulk of the time gets spent on a limited portion of the data.
Q. Okay. That's fair. Now, for the four cases that I've asked to pull, which I know you don't have but you've got some of your data with you, do you know when you received the files and data for those four cases? And, again, it's claim 2977, 3406, 3515 and 6941.
A. I do not.
Q. Would that be something in your files today?
A. It may be under some kind of chain of custody or something like that.
Q. And with each one of those cases, would you also be able to determine who actually reviewed a file in order to document the analysis and data?
A. Well, the people that would have reviewed the file, primary people would be Mike Potter, and I'm not sure if we could identify the typist or data entry person or not.
Q. Is there any worksheet for each file that someone would fill out and then it would be put into a database?
A. No. Each file is -- would have been reviewed

and information picked off and entered.
Q. And entered simultaneously with that?
A. Yeah, contemporaneously.
Q. You can tell how computer literate I am. Write it down on a piece of paper and give it to someone.
Dr. Lee, with all the bulk sample analysis that you did and building names, did you do any match within your company as to what independent work you may have done on some of those samples in the past?
A. We did not.
Q. Is that something you could do?
A. It's -- in theory, but I don't know the practicality of it.
Q. And I'm just curious for the four Claimants that I have, maybe for some reason you have looked at bulk sample analysis on those cases before, and to the extent you found it was insufficient information, you may have, in your own file, additional constituent analysis that may help with the additional data, and that's why I'm asking if there was some way to go about doing that.
A. Not that I know of, but I can't -- I really

don't know.
Q. Okay. Well, what I'll do, and I'll just request on the off chance that your organization has done any prior work on bulk sample analysis with the four buildings that I've mentioned, that we be provided that information. Is that fair?
MR. RESTIVO: Well, it's fair that you ask. I don't think it's a fair request.
MS. KEARSE: Well, to the extent you have additional information that Dr. Lee has regarding these Claimants, I think it's a fair request.
MR. RESTIVO: Well, if your request requires Dr. Lee's organization to pour through contractual commitments with a whole bunch of other folks in order to try to identify a building, we will take the position that that is not a fair request, and it's too difficult and burdensome --
MS. KEARSE: I will work with you on that, and that's why I was asking the doctor. It could be as simple as plugging in a name, and it may not be. So to the extent it's accessible on that and you have it, I do

request it. I think if it's an overburdensome thing, then I think, Jim, you and I can talk about it.

MR. RESTIVO: I mean I am willing to ask Grace whether or not to its knowledge one of these buildings was involved in a claim or in litigation where Dr. Lee's organization may have been provided with bulk samples. My question is Grace would know if they have seen one of these buildings before, and that might help Dr. Lee determine what data he has.

MS. KEARSE: I think that's fair.

MR. RESTIVO: But, you know, any other clients he had, we are just taking on more than I think we ought to ask the good doctor to do.

MS. KEARSE: I agree. It's just four Claimants, and to the extent that you've got data there and we can determine that it's accessible, we can work on it that way. I think that's a fair way to do it, Jim.

BY MS. KEARSE:

Q. All right. Doctor, I'm going to the individual Claimants, and we'll see based on what you have if you can answer these or not.

First I'll start with the American Legion, which is 3406.

A. Okay. Let me -- I've got the summary on the spreadsheet. I'll pull it up.

Q. Okay.

Q. Are you looking at your spreadsheet on a computer?

A. Yes, I am.

Q. And is that the same spreadsheet that we were produced with by a CD?

A. Yes.

MR. RESTIVO: With the exception as stated in the earlier testimony that the spreadsheet he is looking at on his computer also has an entry to designate the claim file that Speights & Runyan asked to be brought today, which files were brought, you do not have that designation I do not believe on your spreadsheet.

Q. Okay. Doctor, you let me know when you are ready.

A. I've got it.

Q. Are you able to tell from that spreadsheet what you were actually provided in regards to the American Legion claim?

A. Relative to this, we were provided, you know, the address, the lab report, the name of the laboratory --

Q. Any time you need a break, you let me know.

A. Yeah, summary of analysis sheets, and then the actual results of analysis, plus there may have been asbestos surveys. These may have been attached to asbestos surveys or other, and that information I don't have here.

Q. Were you shown any sample analysis that showed that the samples contained vermiculite?

A. No.

Q. And it's my understanding that you are not ruling out that it's not a Grace product, you just can't say one way or the other?

A. Well, I'd say there's insufficient data, but if you took the laboratory analysis at face value, it's got too much asbestos for a Grace product, but without having any information about the particular laboratory that did the work and their reliability, I think it's a little bit fairer to say there's insufficient data.

Q. Were you provided with any internal Grace documents that actually list the American Legion building as a recent plaster job?

A. Not to my knowledge.

Q. Doctor, in your work over the years in regards to various fireproofing and acoustical plasters, would it be common for acoustical plasters to often get painted if they are on a ceiling?

A. I'd say more often than not, but I don't know is probably the best way to describe it.

Q. Is there any particular constituents you would expect to find if you had painted zonolite acoustical plaster?

A. I don't understand the question.

Q. You've got your formula and your analysis for zonolite acoustical plaster?

A. Right.

Q. If an acoustical plaster had paint on it, what additional constituent would you expect to find?

MR. RESTIVO: Your assumption is that the bulk sample includes not only the acoustical plastic, but also the painted?

MS. KEARSE: Yes.

Q. Well, let me ask this this way, Doctor: Is it possible that a sample that contains both acoustical plaster and painted?

A. The bulk samples, sure.
Q. And a bulk sample where you've got acoustical plaster and painted, what additional constituent would you expect to find generally?
A. Generally you would just see the paint as a surface layer separate from the bulk.
Q. Would you include the surface layer in your analysis?
A. We would report the surface layer in the description, not in the analysis.
Q. Is there a way that you can tell whether or not a lab, from the data that you reviewed, would have made that distinction as well?
A. No.
Q. Doctor, if Grace does have files that support the proposition that a Grace product was applied in the American Legion building, that's not something you necessarily would look at; is that correct?
A. That's not something I would have relied on.
Q. All right. For the American Legion building, what I'm going to request is that I get a copy of the file, that I know exactly what you did have in there.
Doctor, in your --

MR. RESTIVO: Wait a second. What's your request on that?
MS. KEARSE: What we talked about earlier, just so I actually have the file he has on American Legion since we didn't pull it here.
MR. RESTIVO: Well, the file he has on American Legion is the claim material you presented with the claim.
MS. KEARSE: Well, I think it's not clear whether or not he's got everything that was submitted with the claim or just the bulk sample analysis and the claim. That's all I'm asking. Jim, that just goes to our earlier discussion on pulling the file so I can look at them to see if it was everything or just parts.
BY MS. KEARSE:
Q. Doctor, do you know within the American Legion file what products the Claimant was putting the claim in for?
A. Which -- that is the --
MR. RESTIVO: She's still on 3406.
A. That's the 3406 one we are talking about?
Q. Yes.
A. Vermiculite acoustical plastic.

Q. Okay. Let's go ahead to 3515. I did say I'd try to limit it to an hour. I didn't check what time I started so --
MR. RESTIVO: You got three minutes left.
A. 3515?
Q. 3515.
A. Okay. Catholic Diocese.
Q. And, again, Doctor, can you tell me what you were provided in regards to the claim?
A. The product, the name, location of the building, the bulk characterization from -- and the name of the laboratory, the product alleged in the claim file, and then the polarized light microscopy analysis.
Q. And what's your understanding of what the Claimant has alleged are the Grace products?
A. MonoKote-3.
Q. And it's my understanding that you concluded in at least 2 samples you had insufficient data; is that correct?
A. That's correct.
Q. And as to the nonsurface samples, you'll agree that those are non-Grace products; correct?
A. That's correct.

Q. And can you tell me if the 2 samples you reviewed came from the fireproofing material?
A. It says spray applied, but does not indicate specifically whether it's fireproofing or not.
Q. It's in the data sheets or the data that was provided to you, it did have such language that the sample was from what was described as fireproofing material, would you note that in your --
A. Yes.
Q. I'm sorry, was that yes?
A. Yes, assuming nobody screwed up.
Q. Okay. And just by way of example, Doctor, and I'm not suggesting any one, but if I've got a sample -- and this is an example in the Catholic Diocese. I know you don't have the actual document in front of you -- but I do have a sample CD 10300/0S015. Is that number within your database?
A. Yes, it is.
Q. And on that same data sheet I do have an indication it was sprayed-on fireproofing with that?
A. Okay.
Q. That's not in your --

Page 38

A. Well, in mine it's called spray applied.
Q. Does that have any bearing one way or another in your analysis?
A. No. It made – I made the presumption that it was fireproofing.
Q. In my data you refer to this group sample as having a nonasbestos component. Does that mean that it only had asbestos or what does it mean?
A. There were two categories, asbestos and everything else.
Q. And these I believe say nonasbestos component?
A. Not specified.
Q. Okay.
Q. And within the Catholic Diocese of Little Rock, have you been provided any documents that actually reference the sale of MonoKote for this building?
A. Not to my knowledge, but I'd – to be specific, I'd have to look at the file.
Q. As we sit here today, you do not recall?
A. No, I don't recall.
Q. To the extent you were provided any of those type of documents, would they be referenced in your spreadsheet?
A. No.

Page 39

Q. They would not?
A. No. The only thing referenced in the spreadsheet is the information relative to the samples.
Q. Do you recall in any of the prior – I know you went through the classifications. Was there ever a column for internal Grace documents reflecting a product in a building?
A. No, I don't think so, because we were only asked to deal with laboratory work.
Q. And am I correct then you are not prepared to give testimony one way or the other whether or not MonoKote is actually present in the building; correct?
A. Beyond that, beyond the information in the laboratory analysis provides as to the possibility of it being present, that's what I'll testify to. So in this case I would, for example, say there is no evidence that MonoKote is present in the building based on the laboratory work.
Q. But you are simply saying based on the laboratory work. You can't say one way or the other whether or not it was there; correct?
A. No, it's a little bit stronger than that it's

Page 40

actually based on the laboratory work. There's no evidence that it is there, and to some extent there's some – there's some indication that it is not Grace MonoKote, but I don't think the data is strong enough to render that opinion.
Q. So we are on the same page, you are not prepared to opine one way or the other that it's a Grace product or not in the Catholic Diocese of Little Rock; correct?
A. Yeah, that's –
MR. RESTIVO: I think that's been asked and answered. In any event, we intend to put on this witness' expert testimony that one cannot conclude on these two bulk samples, from those two bulk samples that it is a Grace product. That is the testimony that is in his report and the testimony that we will introduce at trial, which is I believe stronger than –
MS. KEARSE: I know.
MR. RESTIVO: Just so you know exactly where we are coming from.
MS. KEARSE: I know where you are coming from. I want to know exactly where the doctor is coming from and if I ask the question

Page 41

a different way.
BY MS. KEARSE:
Q. At least today, though, Doctor, you cannot say W.R. Grace's product was not in that building; is that correct?
A. That's correct.
Q. And, Doctor, if you were shown any documents that reference the sale of MonoKote to those buildings, does that give you any more information that would help in your determination of whether or not Grace's product is actually in the building?
A. No, because it's really outside the range of things that I was asked to do or do do in practice.
Q. In fact, you are limited to one focus, and that's whether or not you got a lab report and whatever it states on that piece of paper; correct?
A. That's correct.
Q. But you agree with me if there's additional information out there, that could be beneficial for someone to determine whether or not Grace product is actually there; correct?
MR. RESTIVO: Asked and answered.

MS. KEARSE: I don't think it's been asked.

MR. RESTIVO: He told you that's not his area of expertise.

MS. KEARSE: He's not going to testify about it, but I'd like an answer to my question.

THE WITNESS: I think the answer is that's just beyond the scope of my testimony.

MS. KEARSE: For the Catholic Diocese, I'll make the same request, if I could just have a copy of the file that actually was reviewed in order to do the analysis, I'd appreciate that.

BY MS. KEARSE:

Q. All right. Doctor, we've got the CHP, which is 2977. Just let me know when you have it.

A. I got it.

Q. And you'll agree with me if it's a nonsurface material, we are not going to deal with it; correct?

A. Okay.

Q. And from your review of the data, you looked at 3 samples that you'll agree with me were surface materials?

A. Yes.

Q. And would you agree with me they are referred to as sprayed-on fireproofing? Is that in your data?

A. They are listed as spray applied here in my – on my summary.

Q. What's your understanding of what product is being claimed in –

A. MonoKote 3.

Q. And is it correct the data you had only identified the asbestos content?

A. Yes.

Q. And this, like other samples, for all you know, they could have contained vermiculite, but the only thing that was recorded was the asbestos content; is that correct?

A. That's correct, and this is another good illustration where if you take the data at face value, one of the samples is -- suggests it's not a Grace product, but given the overall lack of availability, we just classified it as insufficient data.

Q. What specific sample are you referring to in that?

A. That is the – it's sample identified is

01-03 – 01-02. It shows, if my -- I don't have a typo, it shows as having .05 percent asbestos on my sheet.

Q. All right. Doctor, let me make sure in this case, similar to the other one, you are not here today to opine with certainty that a Grace product is not there; correct?

A. In the building.

Q. Right.

A. That's right. I'm saying that there's insufficient information in general, and one, if you take data at face value, at least one of the samples it would indicate it would not be there.

Q. And that is the data at face value that you have been provided simply on a laboratory analysis; correct?

A. That's right.

Q. And, again, if there was invoices totaling 810 bags of MonoKote that were actually delivered to this building, that would not in any way influence your opinion today?

A. No.

Q. Is that something you just would want to know?

MR. RESTIVO: You mean purely on

interest or as an expert on this assignment?

Q. You can tell me either way. If W.R. Grace has invoices for 810 bags of MonoKote to the Cherry Hill Plaza, is that something you'd be interested in knowing?

A. Well, I don't think that one way or the other it affects this analysis.

Q. So you really don't care if there's 810 bags being delivered there one way or the other?

A. No. What I was asked to do was review the analytical data and give an opinion as to what it does or does not demonstrate.

Q. Is it fair to say that W.R. Grace didn't provide you with any of the invoices showing the sale of MonoKote 3 to this building?

A. I don't know the answer to that. Insofar as I know, we have what's in the claim file –

MR. RESTIVO: Do you know whether or not any such invoices were in the claim file, Anne?

MS. KEARSE: That's not my question.

MR. RESTIVO: Okay. Then we will answer it this way then –

MS. KEARSE: I'm asking my question, and that is do you know whether or not W.R.

Grace provided you with any invoices showing the sale of MonoKote-3 for this building.

MR. RESTIVO: I'm going to object to the form of that question.

MS. KEARSE: Let him answer that --

MR. RESTIVO: No, I'm not going to let him answer until you clarify your question. W.R. Grace provided him with copies of these claim files.

MS. KEARSE: I can ask him two different ways, okay.

MR. RESTIVO: If you are asking independent of the claim files, I think that's a fair question. If you stuck something in a claim file and he happened to get your claim file from Grace, that's a different question.

MS. KEARSE: I'll ask it two different ways then.

MR. RESTIVO: Okay. That's fair.

BY MS. KEARSE:

Q. Doctor, do you know whether or not what's in the claim packages that you received from W.R. Grace, whether or not there were invoices for the sale of MonoKote-3 for this building?

A. I do not.

Q. Independent of those claim files, has W.R. Grace provided you with any information or invoices showing the sale of MonoKote-3 to this building?

A. Not that I'm aware of.

Q. Do you know whether or not you were provided with complete claim files or just with the information regarding the laboratory analysis?

A. I do not.

Q. You don't know one way or the other what's contained in the files?

A. Not beyond -- not beyond what we have. I don't know if the entire claim file is there or not.

Q. In your protocol for reviewing this data, was there anything that would have alerted you to that information that such information was in that file?

A. What my -- what we had asked was that the attorneys would go through the claim files as they received them, identify those with bulk sample analysis and provide that information to us. Whether or not that's the whole claim or -- I mean there's a fair amount of stuff that was extraneous for my actual analysis, but whether in all cases that's the whole claim

file or not, I do not know.

Q. But for your purposes it was basically if there was laboratory analysis in there, that's what you would use?

A. That's right.

Q. And, again, similar to the other claim file, I'll request an actual copy of what Dr. Lee had in regards to that Claimant.

All right. Last one.

A. Okay.

Q. 6941, I'm just going to wait for you to tell me you are there.

A. 6941, got it.

Q. Now, in my review of your spreadsheet, it's my understanding that this is part of the Washington Daggy Hall, that you had 3 samples with insufficient data; is that correct?

A. That's correct.

Q. And, again, these are samples that only showed the asbestos content, is that correct?

A. Yes, well, they show a secondary number, but they don't identify.

Q. Do you know where those samples came from?

A. Beyond -- there is probably information in the file that came from environmental health

services. Do you mean where they were collected in the building?

Q. Yes.

A. No.

Q. What is your understanding this claim is for?

A. For the -- for the product?

Q. Yes.

A. MonoKote-3.

Q. With regard to the Claim 6941, you don't plan to opine that Grace's products was not applied there; correct?

MR. RESTIVO: Not applied where?

Q. Within the Washington State -- the State University of Washington, Daggy Hall.

MR. RESTIVO: Okay. I would ask you to sharpen your question, if I'm looking at right one, because it looks like there's three insufficient data and two wrong components, and there may be testimony obviously with respect to the two wrong components.

MS. KEARSE: I'm not asking about that.

MR. RESTIVO: That's why I asked please sharpen your question.

BY MS. KEARSE:
Q. My question centered around the 3 samples with insufficient data, and for those 3 samples, we determined that within those samples you only have them showing how much asbestos was there; correct?
A. That's correct.
Q. And it's my understanding you don't have enough information one way or the other to say whether Grace MonoKote was applied within that building; correct?
A. I think when you extend that term to in that building, then the answer is slightly different than when you looked at the sample. In that building you have the other 2 samples which had mineral wool in them. Those samples you can clearly say were not Grace fireproofing.
And then you have these other 3 which don't give you any specific information but -- as to what the product is, but for which if you draw any generalized inference, you would say, well, the only evidence we have suggests that there is no fireproofing.
Q. Would you know in relation to those 5 samples where they were all taken?

A. I do not at this point.
Q. So you don't know if they were samples from something originally installed or something later installed; is that correct?
A. No, and I think that's the point in general relative to this material when you try make a proof.
Q. Well, let's look at these 3 samples in which you have insufficient data; correct?
A. Yeah.
Q. You cannot opine one way or the other whether those samples are W.R. Grace products; correct?
A. Yeah, I can -- that's true, and beyond that I can opine that there is no evidence in those 3 samples that there are -- that that is W.R. Grace product.
Q. So you can't opine today that they are not?
A. You are exactly right, and I can't opine that there's any information that they are.
Q. I like when I'm right. Let me ask, with Daggy Hall, have you been shown any internal W.R. Grace products regarding the application of MonoKote in that building?
A. No, and I answered those within the context of my recollection. I've been doing this for --

Q. That's fair. But to the extent if they were attached to a Claimant form, that was not something you necessarily looked at in order to do what you were doing on behalf of W.R. Grace in this case; is that correct?
A. That's correct, but just a little bit stronger, that's not something I would have looked at because under the normal course I would have people pull the analytical sheets from the file for me to review as opposed to me going through the whole file.
Q. Right, and to the extent that's in the files, the people that are reporting to you would not have pulled that for your review; is that right?
A. That's right.
Q. Is there a way to determine, Doctor, from these files what was actually pulled in order to do the analysis?
A. Well, I think you could look at what is documented in the spreadsheet, and that will tell you what was pulled.
Q. Did you do any type of audit just to go back to make sure the data was entered correctly?
A. We had a three -- well, two-and-a-half step

audit process. The data was originally verified by an independent person at the data entry or secretarial level. Then it was -- each file was independently reviewed by Mr. Potter. Then those files that I found of interest, primarily those files where there was a reasonably complete analysis, were checked by me.
Q. And do you have a list of which ones you actually took more of a hands-on approach with?
A. I do not.
Q. Is there any way to tell from the file which one you had more of a hands-on approach?
A. I doubt it. It was much heavier in the early part because we were work -- I spent a fair amount of time trying to sort out how we were going to make sense out of this mass of information.
Q. And to the extent that was any part of the protocol in the file there, I guess to the extent we can review that as well?
A. Yeah.
MS. KEARSE: With that, I'm going to not ask any further questions, but, Jim, if we can have copies of the file that Dr. Lee has,

and anything else I put on the record that I wanted, that would be great.

MR. RESTIVO: Again, I will do what I said I would do. If you remember, send me a short e-mail; otherwise, what I'll do is I'll wait for the transcript, and then that will remind me what it is I promised to do.

I have written down the four files that I'll ask Dr. Lee when he goes back to the shop to send down to me, but to the extent you've asked for something else and you don't want to wait for me to read the transcript, put it in an e-mail to me.

MS. KEARSE: I will, and I will be up there, hopefully you'll have nicer weather up there next week, I'll be in Pittsburgh Monday, Tuesday, well, down in Wheeling Monday, but to the extent there's anything for me to review then, I can certainly do it then too.

MR. RESTIVO: Okay. All right. I have no questions. Again, I would --

MR. BARTHOLOMAEI: I have a question.

MR. RESTIVO: I'm sorry, I apologize.

MS. KEARSE: I'm sorry, who is asking a question?

MR. BARTHOLOMAEI: I'm about to say who it is. It's Mark Bartholomaei from Obermayer, and I represent San Diego Gas & Electric Company, Sempra Energy Company, and Enova Corporation.

----

EXAMINATION

----

BY MR. BARTHOLOMAEI:

Q. And, Doctor, I just have one or two questions for you. This should go pretty quickly, but the claim file that I'm concerned with is No. 11308, and I was going to ask you, were you sent any information regarding that claim file?

A. Beyond the -- it does not appear in my spreadsheet.

Q. So you can't testify today whether any W.R. Grace products were at the 101 Ash Street location, San Diego, California?

A. My question is do we have that, 11 --

Q. 11308.

THE WITNESS: Is that in there?

MR. RESTIVO: No. Under the procedure, if when this process was underway someone did not see bulk sample information in

a particular claim file, that claim file was not sent to Dr. Lee.

MR. BARTHOLOMAEI: I'm just trying to confirm that you have no information and you are not going to offer any testimony about W.R. Grace materials at that location, that's all.

THE WITNESS: I don't think that's -- that's right insofar as we sit here today.

MR. BARTHOLOMAEI: Exactly.

THE WITNESS: To the extent someone discovers it and forwards it to me.

MR. BARTHOLOMAEI: Something might happen in the future, but you don't have it sitting here today?

THE WITNESS: That's right.

MR. BARTHOLOMAEI: Thank you, Doctor.

MR. RESTIVO: So the record's clear, sitting here today, Dr. Lee doesn't have any information, and counsel for Dr. Lee doesn't know of any information. As I stated in the prior deposition, I understand that supplemental information has continued to come in. I don't know from your client or not --

MR. BARTHOLOMAEI: It's not a trick, I'm just asking.

MR. RESTIVO: So you know what we have. Sitting here today, we don't believe we have any bulk samples from your client.

We don't waive signature --

MS. KEARSE: Let me just, if I can just clarify one quick question, is that okay?

MR. RESTIVO: Yeah.

----

RE-EXAMINATION

----

BY MS. KEARSE:

Q. Doctor, is there anything else you brought with you today that you have not testified about?

A. No.

MS. KEARSE: Okay. I just wanted to know what he brought with him today. That's fine. Thank you.

----

(The proceedings were concluded at 2:53 p.m.)

----

Page 58

COMMONWEALTH OF PENNSYLVANIA ) CERTIFICATE
COUNTY OF ALLEGHENY ) SS:

I, Heidi H. Willis, RPR, CRR, a Court Reporter and Notary Public in and for the Commonwealth of Pennsylvania, do hereby certify that the witness, RICHARD J. LEE, Ph.D., was by me first duly sworn to testify to the truth; that the foregoing deposition was taken at the time and place stated herein; and that the said deposition was recorded stenographically by me and then reduced to printing under my direction, and constitutes a true record of the testimony given by said witness.

I further certify that the inspection, reading and signing of said deposition were NOT waived by counsel for the respective parties and by the witness.

I further certify that I am not a relative or employee of any of the parties, or a relative or employee of either counsel, and that I am in no way interested directly or indirectly in this action.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my seal of office this 26th day of February, 2007.

______________________________
Notary Public

Page 59

COMMONWEALTH OF PENNSYLVANIA ) E R R A T A
COUNTY OF ALLEGHENY ) S H E E T

I, Richard J. Lee, Ph.D., have read the foregoing pages of my deposition given on February 14, 2007, and wish to make the following, if any, amendments, additions, deletions or corrections:

Page/Line Should Read Reason for Change

In all other respects, the transcript is true and correct.

______________________________
RICHARD J. LEE, Ph.D.

Subscribed and sworn to before me this
________ day of _______________, 20_____.

______________________________
Notary Public
AKF Reference No. HW99625

Page 60

AKF REPORTERS, INC.
AKF Building
436 Boulevard of the Allies
Pittsburgh, PA 15219
(412) 261-2323

February 26, 2007

TO: James Restivo, Esq.

RE: DEPOSITION OF RICHARD J. LEE, Ph.D.,
NOTICE OF NON-WAIVER OF SIGNATURE

Please have the deponent read his deposition transcript. All corrections are to be noted on the preceding Errata Sheet.

Upon completion of the above, the Deponent must affix his signature on the Errata Sheet, and it is to then be notarized.

Please forward the signed original of the Errata Sheet to Anne Kearse, Esq., for attachment to the original transcript, which is in her possession. Send a copy of same to all counsel, and also a copy to me.

Please return the completed Errata Sheet within thirty (30) days of receipt hereof.

Heidi H. Willis, RPR, CRR
Court Reporter