IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| ---------------------------------------------------------) | |
| In re ) | Chapter 11 |
| ) | |
| W. R. GRACE & CO., et al., ) | Case No.  01-01139 (JKF) |
| ) | (Jointly Administered) |
| ) | |
| ) | **Response Date:  April 10, 2007** |
| Debtors. ) | **Hearing Date:  TBD** |
| ) | **Re:  Docket Nos. 9315 and 13406** |
| ---------------------------------------------------------) | |

## MOTION *IN LIMINE* OF THE OFFICIAL COMMITTEE OF ASBESTOS PROPERTY DAMAGE CLAIMANTS TO STRIKE AND EXCLUDE DEBTORS' EXPERT AND EXPERT REPORT REGARDING CONSTRUCTIVE NOTICE FOR PROPERTY DAMAGE CLAIMS AND MEMORANDUM OF LAW

TO:   THE HONORABLE JUDITH K. FITZGERALD,
       UNITED STATES BANKRUPTCY JUDGE:

The Official Committee of Asbestos Property Damage Claimants (the **"PD Committee"**)

of the above-captioned debtors and debtors in possession (the **"Debtors"** or **"Grace"**), by and

through undersigned counsel, respectfully moves the Court to strike the Debtors' expert, Roger

G. Morse and Mr. Morse's purported expert report on the issue of "Constructive Notice" in

connection with the Debtors' objections to individual asbestos property damage claims (**"PD**

**Claims"**).[1]

### PRELIMINARY STATEMENT

Here we go again!

---

[1] The specific PD Claims which are subject of such objections are listed in Exhibit D-2 [Dkt. No. 9335] to the Debtors' Fifteenth Omnibus Objection (Substantive) to Asbestos Property Damage Claims [Dkt. No. 9315].

In October 2005, the Debtors urged that "the Court during Phase I of the estimation proceedings should convene a hearing at which it considers and decides the issue of when property owners were on constructive notice of property damage claims under the laws of three key states that have the highest number of claims, California, New York and Louisiana," the so-called Constructive Notice issue. *Debtors' Brief in Support of an Estimation Hearing on Constructive Notice in Property Damage Claims*, p. 2 ("**Debtors' Constructive Notice Brief**") [Dkt. No. 9673]. The PD Committee vociferously objected to the Debtors' unprecedented attempt to have this Court decide a universal date by which all PD Claim holders purportedly had Constructive Notice for statute of limitations purposes, as part of Phase I of the estimation of PD Claims (the "**PD Estimation**"), without regard for the particularized knowledge and facts pertinent to each individual asbestos property damage claimant. *See Response and Memorandum of Law of the Official Committee of Asbestos Property Damage Claimants In Opposition to Debtors' Brief in Support of an Estimation Hearing on Constructive Notice in Property Damage Claims* [Dkt. No. 10940].

On October 17, 2005, the Debtors provided their initial disclosure of Phase I fact and expert witnesses and, in that disclosure, the Debtors designated Roger Morse, AIA, as a fact and expert witness in respect of the Constructive Notice issue and they also provided the *Report of Roger H. Morse AIA On Summary of Information Available to Building Owners and Managers About Asbestos in Buildings, 1970 – 1995* (the "**U.S. Morse Report**"). However, the U.S. Morse Report was rendered altogether inconsequential by the Court's determination of the correctness of the PD Committee's position at the November 14, 2005 Omnibus Hearing, and the Court's refusal to consider Constructive Notice globally as part of Phase I of the PD Estimation. At that hearing, the Court stated:

> But I think Mr. Baena is correct, from limited research I've been
> able to do so far, I don't think you can knock out every building in
> California by saying that as of a certain date everybody in
> California knew that asbestos in a building created some property
> damage claim that should have been addressed by the -- should
> have been raised with and then addressed by the Debtor.

(Tr. of Hr'g 82, Nov. 14, 2005).[2]

On November 6, 2006, in accordance with the Court's case management order governing

the Debtors' objections to <u>individual</u> PD Claims,[3] the Debtors filed their *Preliminary Witness*

*Disclosure for Adjudication of Product Identification, Limitations Periods and the Libby Claims*

*Issues* [Dkt. No. 13587]. By this disclosure, the Debtors once again designated Mr. Morse as

their expert on Constructive Notice and proffered as follows:

> Mr. Morse may testify as a fact and expert witness about the issue
> of constructive notice and information available to building owners
> <u>based upon his literature reviews,</u> his consulting experience and his
> experiences with historical standards, policies and regulations
> applicable to asbestos and asbestos-containing products over time,
> including the federal government's enactment of statutes,
> promulgation of regulations and issuance of guidance documents.
> <u>Mr. Morse has previously submitted an expert report entitled</u>
> <u>"Summary of Information Available to Building Owners and</u>
> <u>Managers About Asbestos in Buildings, 1970 – 1995."</u> He may
> supplement that report with additional information or information
> available in specific geographic areas. (emphasis added).

Thusly, the Debtors now seek to use Mr. Morse and the U.S. Morse Report exactly as it

was submitted when the Debtors sought the determination of a universal Constructive Notice

date to do the very same thing that the Court determined the Debtors could not do as part of

---

[2]     The PD Committee interjects itself by this Motion because it opposed the Debtors' attempt to treat the
Constructive Notice issue on a global basis in the context of Phase I of the PD Estimation and thus, it is more
efficient for the Committee to make this Motion than for individual claimants. Moreover, the issue framed by the
Motion is an overarching one that applies to all PD Claims which are subject of a Constructive Notice objection. At
the July 24, 2006 omnibus hearing, the Court stated that the PD Committee can weigh in on such issues.  Tr. of Hr'g
166, July 24, 2006.

[3]     Dkt. No. 13406.

3

Phase I of the PD Estimation.[4]  The fact that the Debtors now wish to use Mr. Morse and the
Morse Reports in conjunction with the Debtors' objections to individual PD Claims is of no
moment as the Debtors continue to attempt to paint all property damage claimants with the same
brush for purposes of Constructive Notice, without any regard for the applicable state law
standard for Constructive Notice or the specific relevance of any of Mr. Morse's opinions to each
individual property damage claimant.  Making matters worse, Mr. Morse freely admits he has
neither the expertise nor the specific knowledge to opine on what each individual building owner
knew or should have known about asbestos in its building(s).

    Moreover, Mr. Morse should not be allowed to testify and the Morse Reports should not
be admitted into evidence on the issue of Constructive Notice because neither his testimony, nor
the Morse Reports, meets the standards for admissibility of expert testimony established under
Federal Rule of Evidence 702.  In the Morse Reports, Mr. Morse attempts to identify a precise
date upon which all holders of PD Claims knew or should have known about asbestos-containing
materials ("ACM") in their buildings.  The Morse Reports, however, are little more than an
unscientific summary[5] of what Mr. Morse and his unidentified assistants found when they

---

[4]    Mr. Morse has submitted a total of five expert reports: (i) October 17, 2005 Summary of Information
Available to Building Owners and Managers About Asbestos in Buildings, 1970 – 1995, (ii) October 17, 2005
Report on ASTM Microvacuuming Dust Sampling Methods, (iii) January 19, 2006 Rebuttal Report on ASTM
Microvacuuming Dust Sampling Methods, (iv) November 14, 2006 Rebuttal Report on Expert Report of William E.
Longo, Ph.D, and (v) December 21, 2006 Summary of Information Available to Canadian Building Owners and
Managers About Asbestos in Buildings, 1970–1995 (the **"Canadian Morse Report"**; together with the U.S. Morse
Report, the **"Morse Reports"**).  The Morse Reports are the only Reports which discuss the issue of constructive
notice of PD Claimants and it is only these Reports which the PD Committee seeks to strike by this Motion.

[5]    Indeed, the Morse Reports are actually entitled *Summary of Information Available to Building Owners and
Managers About Asbestos in Buildings, 1970-1995* and *Summary of Information Available to Canadian Building
Owners and Managers Asbestos in Buildings, 1970-1995* and *Summary of Information Available to Canadian
Building Owners and Managers Asbestos in Building 1970-1995*.

undertook a search[6] to determine the existence of journal articles, reports, advertisements, announcements, notices and newspaper articles "relating to asbestos." In other words, rather than reporting on what Mr. Morse—by his purported experience and training[7]—knew to be available to the holders of PD Claims by 1983, the Morse Reports merely catalog what Mr. Morse and his unidentified colleagues assert was the body of asbestos-related printed materials allegedly in existence.

Mr. Morse has no experience, let alone the necessary special expertise, that would qualify him to express an opinion as to what any individual property damage claimant knew or should have known about the presence of ACM installed in their buildings in 1983, or at any other point in time. Indeed, it is abundantly clear from the Morse Reports that until Mr. Morse began his search for asbestos related print materials, Mr. Morse had no knowledge as to what materials may have existed. Rather, his Reports are intended to "back and fill" the gulf between Mr. Morse's hypothesis that <u>all</u> "building owners were very aware of asbestos in buildings," and the source of information which purportedly gave rise to that alleged awareness. Again, however, Mr. Morse approaches the task from a global perspective without addressing the seminal issue in respect of Constructive Notice which is what <u>individual</u> holders of PD Claims knew or should have known. Furthermore, the relevant determination is not what they knew or should have known about ACM in their own buildings but rather, whether their buildings had been contaminated by Grace ACM so as to give rise to an actionable claim. As a result, neither Mr.

---

[6]     The Morse Reports altogether fail to describe the methodology or medium that Mr. Morse and his colleagues used to conduct their search.

[7]     The Morse Reports fail to comply with Fed. R. Bankr. P. 7026(a)(2)(B) as they do not include a listing of any other cases in which Mr. Morse has testified as an expert at trial or by deposition within the preceding four years. The PD Committee reserves all rights and objections related to such omission.

5

Morse, nor his contemplated testimony has any relevance to the issues before the Court in respect of Constructive Notice.

## **DISCUSSION**

### I.   **Standard of Review**

Federal Rule of Evidence 702 governs the admissibility of expert testimony in federal courts.   Rule 702 allows for the admission of "scientific, technical, or other specialized knowledge [if it] will assist the trier of fact to understand the evidence to determine a fact in issue". Fed. R. Evid. 702. A "witness qualified as an expert by knowledge, skill, experience, training or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." Fed. R. Evid. 702. The proponent of the expert testimony bears the burden of establishing the admissibility of the expert testimony by a preponderance of the evidence. *See AstraZeneca LP v. Tap Pharm. Prods., Inc.*, 444 F. Supp. 2d 278, 288 (D.Del. 2006) (citing *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592 n.10 (1993)).

In *Daubert,* 509 U.S. at 589-92, the Supreme Court explained that after a witness is first qualified as an expert, Rule 702 requires a trial judge to make two determinations before admitting scientific expert testimony—first, the evidence must be reliable and second, the evidence must be helpful or relevant. *See also, United States v. Mitchell*, 365 F.3d 215, 234 (3d Cir. 2004) *cert. denied* 543 U.S. 974 (2004). The United States Supreme Court later extended the principles of *Daubert* to all "expert matters described in Rule 702." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147-48 (1999).

In *Daubert*, the Supreme Court enumerated a "nonexclusive list of five factors that a district court might consider in deciding whether to admit evidence under Rule 702." *Mitchell*, 365 F.3d at 235. The five factors a court should consider when evaluating the reliability of an expert's testimony include:

> (1) whether the expert's technique or theory can be or has been tested—that is, whether the expert's theory can be challenged in some objective sense, or whether it is instead simply a subjective, conclusory approach that cannot reasonably be assessed for reliability; (2) whether the technique or theory has been subject to peer review and publication; (3) the known or potential rate of error of the technique or theory when applied; (4) the existence and maintenance of standards and controls; and (5) whether the technique or theory has been generally accepted in the scientific community.

*Mitchell*, 365 F.3d at 235 (citing Fed. R. Evid. 702 advisory committee's note).

In *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717 (3d Cir. 1994) ("*Paoli II*"), the Third Circuit created an expanded list of factors for courts to consider in determining whether to admit expert testimony. The Third Circuit further defined the contours of Rule 702, explaining that expert testimony must satisfy a three-part test for admissibility: qualification, reliability and fit. The eight factors enumerated by the Court are:

> (1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.

*Id.* at 741-44.

Under the issue of qualification, the proponent of the testimony must show that the expert possesses certain specialized knowledge; under the reliability requirement, the proponent must show that the expert's opinion must be "based on the 'methods and procedures of science' rather than on 'subjective belief or unsupported speculation';" and, under the fit requirement, the expert

7

testimony must be useful to assist the trier of fact. *Id.* at 741-42 (citing *Daubert*, 509 U.S. at 589).

## II. Mr. Morse is Not Qualified to Render the Opinions Set Forth in the Morse Reports.

The threshold issue is whether Mr. Morse is qualified to present his purported expert opinions. While the decisional law from the Supreme Court and the Third Circuit since *Daubert* confirms that Fed. R. Evid. 702 embodies a liberal admissibility threshold,[8] the standards for the qualification of an expert remain substantial. First and foremost, the witness must "possess specialized expertise." *Schneider v. Fried*, 320 F.3d 396, 405 (3d Cir. 2003). Put another way, federal courts "must ensure that expert opinion testimony is in fact expert opinion, not merely opinion given by an expert." *United States v. Lundy*, 809 F.2d 392, 396 (7th Cir. 1987). The "opinion must be an *expert* opinion (that is, an opinion informed by the witness' expertise) rather than simply an opinion broached by a purported expert." *United States v. Benson*, 941 F.2d 598, 604 (7th Cir. 1991) (emphasis in original); *see also, Jones v. Lincoln Elec. Co.*, 188 F.3d 709, 723 (7th Cir. 1999). "Whether a witness is qualified as an expert can only be determined by comparing the area in which the witness has superior knowledge, skill, experience, or education with the subject matter of the witness's testimony." *Carroll v. Otis Elevator Co.* 896 F.2d 210, 212 (7th Cir. 1990). When determining whether a witness is indeed an expert, "the issue . . . is not the qualifications of a witness in the abstract, but whether those qualifications provide a foundation for a witness to answer a specific question." *Smelser v. Norfolk S. Ry. Co.*, 105 F.3d

---

[8] *See Kumho Tire*, 526 U.S. at 154, 156 (1999); *U.S. v. Mitchell*, 365 F.3d at 245 (3d Cir. 2004) (citing *Paoli II*, 35 F.3d at 741); *Elcock v. Kmart Corp.*, 233 F.3d 734, 741 (3d Cir. 2000); *In re Unisys Sav. Plan Litig.*, 173 F.3d 145, 162 (3d Cir. 1999) (citing *Habecker v. Copperloy Corp.*, 893 F.2d 49, 51 (3d Cir.1990)); *accord Waldorf v. Shuta*, 142 F.3d 601, 625 (3d Cir. 1998); *Holbrook v. Lykes Bros. S.S. Co., Inc.*, 80 F.3d 777, 782 (3d Cir. 1996); *U.S. v. Downing*, 753 F.2d 1224, 1230 (3d Cir. 1985); *Knight v. Otis Elevator Co.*, 596 F.2d 84, 88 (3d Cir. 1979); *see also, Kannankeril v. Terminix Int'l, Inc.*, 128 F.3d 802, 806 (3d Cir. 1997); *In re Paoli R.R. Yard PCB Litig.*, 916 F.2d 829, 855 (3d Cir. 1990) ("*Paoli I*").

8

299, 305 (6th Cir. 1997), *abrogated on other grounds*, 522 U.S. 136 (1997); *see also, Berry v. City of Detroit*, 25 F.3d 1342, 1351 (6th Cir. 1994).

The Constructive Notice issue as framed by the Debtors when it sought to include the issue in Phase I of the PD Estimation was "when property owners were on constructive notice of property damage claims under the laws of three key states that have the highest number of claims, California, New York and Louisiana." (Debtors' Constructive Notice Brief 2.)  The Debtors posited that PD Claimants had such constructive notice "since at least 1983." *Id.* at 15. Now, it seems that the Constructive Notice issue upon which Mr. Morse is to testify is "when building owners knew or should have known about asbestos-containing materials in their building." *Tr. of Roger G. Morse Depo. 116, Mar.1, 2007, 9:00 a.m.* Putting aside that the issue framed by the Debtors should not even be heard by the Court as it is not relevant under any applicable statute of limitation, Mr. Morse has absolutely no expertise whatsoever on the subjects of his Reports.[9]  Specifically, Mr. Morse, an architect from Pittsburgh, has no particular qualifications that enhance his ability to identify and reach any conclusions concerning the printed matter catalogued in the Morse Reports.  There is absolutely nothing about Mr. Morse's background or credentials that expertised him in the collection of all of the printed matter on asbestos to which he refers in his Reports.  Indeed, it would undermine the Debtors' entire theory on Constructive Notice if some special expertise was required to find these materials!

Likewise, even though Mr. Morse claims to have some specialized knowledge concerning asbestos, he does not claim, nor can he, that he has any expertise on the established

---

[9]     *See generally Response and Memorandum of Law of the Official Committee of Asbestos Property Damage Claimants In Opposition to Debtors' Brief in Support of an Estimation Hearing on Constructive Notice in Property Damage Claims.* [Dkt. No. 10940].

9

principles of adequacy of notice, generally,[10] or as to the level of knowledge that individual PD

Claim holders had or when individual PD Claim holders attained such level of knowledge,

specifically.   Indeed, Mr. Morse does not – and cannot – assert with any degree of scientific

certainty whether any PD Claim holders saw the publications detailed in his reports, or if so,

when PD Claim holders allegedly saw the publications.[11]   Mr. Morse has no idea, let alone

expertise in what the reading habits of individual PD Claim holders are, or what newspapers of

general circulation should be deemed to be required reading by PD Claim holders.[12]   Nor does

Mr. Morse suggest he has some special expertise or knowledge – as opposed to general

familiarity – concerning the publications themselves in which the printed material he has

---

[10]     Q. Okay. Have you ever designed a system to provide nationwide notice to people who are diverse geographically?
         A. No.
         Q. Have you ever had any training on how to effectively communicate through the mass media?
         A. No.
         Q. Have you ever testified in a court as an expert on the issue of notice to many people?
         A. No.
                                            ***
         Q. Have you ever had any training in marketing?
         A. No. I have had experience in marketing, but not training in marketing.
         Q. Have you had any formal or informal training in marketing concepts as relates to reaching a target population?
         A. No.
         Q. Do you consider yourself an expert in any way in the effect of an article's placement on a person's likelihood to see or read it?
         A. No.
         Q. Do you have any expertise on the effect of headlines in an article, both its wording and font size, anything associated with getting attention to that article?
         A. No.     *Tr. of Roger G. Morse Depo. 52-55, Mar.1, 2007, 9:00 a.m.*

[11]     Mr. Morse testified, "Specifically what they saw, when they saw it, that I can't tell you, that would be a whole different study." *Tr. of Roger G. Morse Depo. 112, Mar.1, 2007, 9:00 a.m.*

[12]     Q. Let's see if we can again cut through this.  You don't know if a building owner in Harrison, Arkansas read the Times, do you?
         A. No, I can't know that.
         Q. Or the Post?
         A. That's correct.
         Q. Or the Engineering News Record?
         A. What a particular individual read, the specific documents that he read, I can't know that, but he would be reading in his local newspaper news that came from the Times or Times News Service or UPI and the news services like that. *Tr. of Roger G. Morse Depo. 46-47, Mar.1, 2007, 9:00 a.m.*

catalogued appeared, such as their circulation, frequency of publication, market penetration, placement of articles, size of the articles, etc.

The sum and substance of Mr. Morse's opinion is that as a result of his experience as an architect who counseled building owners in the mid-1980's on asbestos in their buildings – none of whom Mr. Morse believes to be a holder of a PD Claim – Mr. Morse hypothesizes that building owners knew or should have known that surface treatments in their buildings during that time period contained ACM and they needed to do something about it.   To prove such knowledge existed, Mr. Morse points to the spate of articles and other print materials, although he is unable to specifically show that any holder of a PD Claim subscribed to such publications, let alone read them.   Rather, he "opines" that all building owners likely have the same reading habits as his former unidentified clients. *Tr. of Roger Morse Depo. 14, Mar. 1, 2007, 9:00 a.m.* Were that not ridiculous enough to warrant the exclusion of Morse as an "expert," Morse further claims that he does not have any records or any database which identify the building owners he purportedly consulted with and which comprise the group whose reading habits are attributed to all  PD Claim holders. *Id. at* 120-121.  Moreover, Mr. Morse is not even entirely sure whether any PD Claim holders were his former clients. *Id. at* 121.

In short, what Mr. Morse does for a living has nothing to do with what he was asked to opine on in the Morse Reports by the Debtors.  When an expert witness is not in a better position than the fact finder to render an opinion on a matter, that witness's testimony should be excluded.[13]  Mr. Morse is no expert in these matters and he should not be permitted to testify as such. What we have here is "simply an opinion broached by a purported expert." *United States v. Benson, supra at* 604.

---

[13]     *See Noland v. French*, 134 F.3d 208, 217 (4th Cir. 1998).

11

## III.    The Morse Reports Are Merely Compilations.

The Morse Reports are nothing more than compilations of printed matter that apparently

in any way was related to asbestos.  Moreover, the totality of the "expert" conclusions drawn by

Mr. Morse from the gathered information is as follows:

> The opportunities that people had during the 1970s, 1980s, and
> early 1990s to become aware of asbestos in buildings were
> plentiful.
>
> U.S. Morse Report 6.

***

> In total, we identified and collected approximately 18,000 items
> (articles, advertisements, reports, regulations, studies, notices, and
> other documentation) relating to asbestos that were available to the
> public during the 1970-1995 time period.
>
> U.S. Morse Report 7.

***

> Consistent with my experience, this research shows that, starting in
> the early 1970s and continuing through to the mid-1990s, a large
> amount of information about asbestos in general and specifically
> about asbestos in buildings existed and was available to building
> owners from a wide variety of sources.
>
> U.S. Morse Report 7-8.

***

> All of this information would have served to increase the
> awareness of asbestos in buildings for people interested in or
> somehow associated with buildings.
>
> U.S. Morse Report 8.

## IV.    The Morse Reports Should Be Excluded Because They Do Not Contain Any Reliable Methodology.

The Court is not obligated to admit testimony just because it is given by an expert.  *See*

*Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997); *see also, United States v. Mamah,* 332 F.3d

12

475, 478 (7th Cir. 2003) *quoting Joiner*, 522 U.S. at 146 ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert."). Thus, even if the Court were to conclude that Mr. Morse is sufficiently well-qualified to render the opinions contained in the Morse Reports (with which we obviously and vehemently disagree), the Morse Reports, which would comprise the entire scope of Mr. Morse's testimony, should be stricken and excluded from any proceedings related to objections to PD Claims as they are entirely unreliable.

An expert's opinion is <u>reliable</u> if it is "based on the 'methods and procedures of science' rather than on 'subjective belief or unsupported speculation'; the expert must have 'good grounds' for his or her belief." *Paoli II*, 35 F.3d at 742 (quoting *Daubert*, 509 U.S. at 589). Expert testimony may be excluded if it addresses matters that people of common understanding can easily comprehend. *Lundy*, 809 F.2d at 395; *Elcock v. Kmart Corp.*, 233 F.3d 734, 741 (3d Cir. 2000). It may likewise be excluded if based on speculation, unsupported assumptions, or conclusory allegations. *United States v. Tranowski,* 659 F.2d 750, 755 (7th Cir. 1981).[14]

At bottom, the Morse Reports contain nothing more than subjective beliefs and unsupported assumptions and conclusions. They are the quintessential example of *ipse dixit* testimony. *See Joiner*, 522 U.S. at 146. After performing searches of public repositories of information to identify printed asbestos-related material, Mr. Morse concluded from his impression that there was a "plentiful" amount of such material, that "information about asbestos in general and specifically about asbestos in buildings existed and was available to building owners from a wide variety of sources," and that "this information would have served to increase

---

[14]     Also, if proposed expert testimony relies on research created solely for the purposes of litigation, the proponent must meet a higher burden to establish reliability. *See Daubert v. Merrell Dow Pharm.*, 43 F.3d 1311, 1317-19 (9th Cir. 1995).

13

the awareness of asbestos in buildings for people interested in or somehow associated with buildings." U.S. Morse Report 8. The fact is that the published information purportedly available was conflicting. Some of the articles advocated removal of ACM, others said leave it in place, and to this day, Grace says its ACM was not even harmful. According to Morse, the conflict should have heightened concern. *Tr. of Roger G. Morse Depo. 55-56, Mar. 1, 2007, 9:00 a.m.* Thus, at best, it was the mere existence of the information that gave rise to Mr. Morse's unqualified "opinions" and from which he literally invented his theories.

Furthermore, after collecting the printed material which allegedly supports his opinion, Mr. Morse did absolutely nothing to test his hypothesis. He made no surveys of building owners or managers; he made no examination of proofs of claim filed by property damage claimants to assess any demographic information that could be used to determine the prospect of property damage claimants being aware of the printed matter he discovered; and, he made no analyses of the placement of the articles he discovered in the periodicals in which they appeared, or the circulation and penetration of or audiences served by such periodicals. Mr. Morse did not do anything besides locate the printed matter and summarize its content because he is devoid of any technical or specialized knowledge which qualifies him to do any of those things. As a consequence, the Morse Reports are expressly based on Mr. Morse's subjective beliefs and unsupported speculation which renders them completely unreliable.

In short, Mr. Morse is not an expert on the matters for which he is being offered by the Debtors and the Morse Reports are hardly reliable expert testimony pursuant to Fed. R. Evid. 702 or *Daubert*. Respectfully, the Court should strike Mr. Morse as an expert witness in respect of the Constructive Notice issue and/or the Morse Reports should be excluded.

**V.    The Morse Reports Should Be Excluded Because They are Not Helpful to the Court.**

14

Perhaps the most fundamental question that must be answered before the Morse Reports may be admitted is whether the Reports would even be helpful to the Court. An expert's testimony must, of course, be relevant to the issues in the case and must assist the trier of fact. *See Daubert*, 509 U.S. at 591; *Schneider*, 320 F.3d at 405. The Morse Reports are not relevant to the statute of limitations analysis required by applicable state law and thus, cannot possibly help this Court determine whether any individual PD Claim is time-barred.

A.   **A Statute of Limitations Determination Requires Individualized Analysis of What Each Particular PD Claimant Actually Knew or Should Have Known Based on the Specific Facts Underlying Each PD Claim**

Morse did not determine who property damage claimants are, where they are situated or where they were situated when the identified publications appeared in print, whether the claimants were in the reach of such publications, or whether any claimants in fact had occasion or were likely to see or, better yet, read the identified asbestos-related articles when they were published. Rather, Morse simply assumed that all PD Claim holders could have read the same materials as his former clients purportedly did. The Debtors cannot cite to this Court a single case—not one—where a statute of limitations determination was made in an asbestos property damage case in a jurisdiction where a cause of action accrues upon the occurrence of contamination based on information about asbestos generally available to the public, as opposed to the particular plaintiff in the case.[15] Indeed, it was for this precise reason that the Court refused to entertain Constructive Notice on a global basis as part of Phase I of the PD Estimation.

---

[15]   In prior briefing as well as prior arguments before this Court, the Debtors repeatedly refer to the Third Circuit's opinion in *Prudential Ins. Co. of Am. v. U.S. Gypsum Co.*, 359 F.3d 226 (3d Cir. 2004). However, in affirming the lower court's decision that the plaintiff's RICO claim (not a claim traditionally brought by PD Claimants) was time-barred under federal RICO law, the Third Circuit emphasized the numerous facts individual to Prudential, such as the knowledge of its employees and evidence pertinent to Prudential's own buildings, which supported the lower court's ruling. *Id.* at 234-235. Moreover, the Court specifically discussed why knowledge of certain government regulations and publications could be imputed to Prudential for purposes of determining whether Prudential's RICO claim was time-barred as a result of facts specific to Prudential. *Id.*

Even a cursory review of the numerous asbestos property damage cases that have addressed statute of limitations defenses makes abundantly clear that the statute of limitation analysis is always a particularized factual inquiry based on the facts applicable to each plaintiff. *See e.g., Bell South Telecomm., Inc. v. W.R. Grace & Co.-Conn.,* 77 F.3d 603, 606-609 (2d Cir. 1996); *MDU Res. Group v. W.R. Grace and Co.,* 14 F.3d 1274, 1276-1277, 1279 (8th Cir. 1994); *State Farm Mut. Auto. Ins. Co. v. W.R. Grace & Co.*, 834 F. Supp. 1046, 1049 (C.D. Ill. 1992); *NCR Corp. v. U.S. Mineral Prods. Co.,* 649 N.E.2d 175, 178 (Ohio 1995); *Kansas City v. W.R. Grace & Co., et al.*, 778 S.W.2d 264, 269-271 (W.D. Mo. App. 1989).

Thus, the Morse Reports should be excluded because they are simply not relevant to what any individual PD Claim holder actually knew or should have known based on the facts underlying its particular PD Claim.

**B.    The Date by Which a PD Claimant Should Have Known That Asbestos Was Hazardous Based on Publicly Available Information is Irrelevant to the Statute of Limitations Analysis Prescribed Under Applicable State Law**

Putting aside the fact that the Morse Reports are not individualized to any particular PD Claimant, they also fail to even address the relevant question for purposes of the Debtors' statute of limitation defense. Indeed, Mr. Morse freely admits he does not even know what constitutes Constructive Notice under any state's law. *Tr. of Roger G. Morse Depo. 115-116, Mar.1, 2007, 9:00 a.m.* Of course, the relevant inquiry is not when a PD Claim holder first "knew or should have known about asbestos-containing materials in their building," which is the standard that Mr. Morse was apparently instructed to apply. *Id. at 116.* We are unable to find a single decision in a single state where actual or constructive knowledge of the hazardous nature of asbestos was found to be the pertinent statute of limitations determinant in an asbestos property damage

case.[16]  Rather, the relevant question in most states is when a particular claimant knew or should

have known <u>that its particular building had been contaminated by asbestos.</u>[17]  The Morse Reports

can shed no light whatsoever on this issue.

---

[16]      Again, the case most often cited by the Debtors in support of their constructive notice theory is the Third
Circuit's decision in *Prudential*. However, that case was decided under Federal RICO law, not under the law of any
state, and the Third Circuit itself made clear that its holding was only applicable to <u>RICO</u> claims, not the traditional
state law claims brought by PD Claimants.  Specifically, in distinguishing the cases cited by Prudential, the Third
Circuit explained, *inter alia,* that the plaintiffs in those cases had "pursued their redress through state-law claims <u>that</u>
<u>require different accrual analyses than used in RICO cases.</u>"  *Prudential Ins. Co. of Am.*, 359 F.3d at 237 (emphasis
added).  Thus, for example, in distinguishing *MDU Res. Group v. W.R. Grace & Co.*, 14 F.3d 1274 (8th Cir. 1994),
the Third Circuit explained that the plaintiff in *MDU* had asserted state-law claims of negligence, strict liability,
failure to warn, and breach of warranty, and that the statute of limitations with respect to these claims—unlike the
analysis applicable to a RICO claim—"focused on actual asbestos contamination as the point when injury occurs."
*Prudential Ins. Co. of Am.*, 359 F.3d at 237.  The Third Circuit went on to conclude that "[t]he different legal
principles governing the [state law] claims and the limited scopes of injury involved in these cases <u>required different</u>
<u>considerations for calculating statute of limitations periods that are not applicable to Prudential's broad RICO claims</u>
<u>here.</u>" *Id.* (emphasis added).

[17]      *See e.g,, Bellsouth Telecomm.,* 77 F.3d at 611 (under Connecticut law, claim for asbestos abatement
accrues when "a plaintiff discovers, or should discover, actionable harm caused by an asbestos-containing product.
Actionable harm, in the context of an abatement claim, occurs when the plaintiff has knowledge, or should have
knowledge, of (i) actual contamination and (ii) the causal connection between the defendant's product and the
contamination."); *T.H.S. Northstar Assocs. v. W.R. Grace and Co.,* 66 F.3d 173, 176 (8th Cir. 1995) (under
Minnesota law, "the distinction between the mere presence of asbestos-containing materials in a building and actual
release and contamination is critical.  Indeed, no cause of action exists until there has been a substantial release.");
*MDU Res.,* 14 F.3d at 1279 (under North Dakota law no tort cause of action for asbestos property damage arises
before plaintiff's building contaminated with asbestos); *Adams-Arapahoe School Dist. No 28-J v. GAF Corp.,* 959
F.2d 868, 1329 (10th Cir. 1992) (under Colorado law, "only asbestos contamination constitutes a physical injury
compensable under tort law.")  *City of Greenville v. W.R. Grace & Co.,* 827 F.2d 975, 978 (4th Cir. 1987) *reh'g
denied* 840 F.2d 219 (4th Cir. 1988) (under South Carolina law, contamination of building with asbestos fibers,
which endanger the lives and health of building occupants, gives rise to actionable tort claim); *NCR Corp.,* 649
N.E.2d at 178) ("We hold that in Ohio . . . a cause of action for asbestos removal accrues when the plaintiff
discovers or in the exercise of reasonable diligence should have discovered that the asbestos constitutes a hazard
requiring abatement.  2.  'Hazard requiring abatement' means that the premises are contaminated by the asbestos to
the extent that a potential health hazard to occupants exists."); *Farm Credit Bank of Louisville v. U.S. Mineral Prods
Co.,* 864 F. Supp. 643, 650 (W.D. Ky. 1994) (Kentucky law requires "contamination" of environment as prerequisite
to accrual of asbestos property damage action); *Clayton Ctr. Assocs. v. W.R. Grace & Co.,* 861 S.W.2d 686, 690
(Mo. Ct. App. 1993) ("In Missouri, a cause of action in tort for asbestos contamination accrues upon 'release of toxic
asbestos fibers into the environment . . . together with the ability to ascertain a substantial and unreasonable risk of
harm from the release of the toxic asbestos fibers.'") (citing *Kansas City v. W.R. Grace & Co.,* 778 S.W.2d at 268
and *School Dist. of Independence v. U.S. Gypsum Co.,* 750 S.W.2d 442, 457 (Mo. Ct. App. 1988)); *State Farm Mut.
Auto. Ins. Co.,* 834 F. Supp. 1046, 1049 (C.D. Ill. 1992) ("statute of limitation did not begin to run until State Farm
had sufficient knowledge of asbestos *contamination*.  Therefore the relevant factual inquiry for this Court is not
whether [the plaintiff] had knowledge that asbestos was being used, but whether [the plaintiff] had knowledge that
asbestos was being released from the fireproofing material and that it presented a hazard.") (emphasis in original,
internal citations omitted); *Town of Hooksett School Dist. v. W.R. Grace and Co.,* 617 F. Supp. 126, 131 (D.N.H.
1984) (contamination constitutes the physical injury which gives rise to tort claim for asbestos property damage).

As the Court will recall, virtually all of the PD Claims in respect of California buildings are subject of the Constructive Notice objection. Thus a review of California law is perhaps the easiest way to illustrate that the Morse Reports cannot possibly assist the Court in adjudging the Debtors' statute of limitations defense and can only lead to legal error.

In California, like most other jurisdictions, the statute of limitations in an asbestos property damage case cannot begin to run until there has been contamination of the plaintiff's building:

> we hold—consistent with the vast majority of other jurisdictions that have considered this issue—that the owner of a building containing asbestos cannot state a cause of action in tort against an asbestos manufacturer until contamination occurs. Thus, the statute of limitations in an asbestos-in-building case does not commence until there has been damage in the form of contamination.

*San Francisco Unified School Dist. v. W.R. Grace & Co.*, 44 Cal. Rptr. 2d 305, 307 (Cal. Ct. App. 1995); *see also, California Sansome Co. v. U.S. Gypsum and W.R. Grace & Co.*, 55 F.3d 1402, 1406 n.5 (9th Cir. 1995).

Thus, the issue which must be determined by this Court in disposing of the Debtors' Constructive Notice objection under California law is <u>when a PD Claim holder knew or should have known that its particular building was actually contaminated with asbestos.</u> *See San Francisco Unified School Dist.*, 44 Cal. Rptr. 2d at 315.  The *San Francisco Unified School Dist.* court could not have been more explicit in its holding: "[u]nder the discovery rule, a cause of action does not accrue until the plaintiff either discovers the injury [contamination of its building by asbestos] and its negligent cause or could have discovered the injury [contamination of its building by asbestos] and cause through the exercise of reasonable diligence." *Id.* at 309.

In that case, the appellate court reversed the trial court's decision in favor of Grace on its statute of limitations affirmative defense because the trial court had "<u>erroneously focused on</u>

when [the plaintiff] was put on notice that its schools contained potentially dangerous asbestos."
*Id.* at 315 (emphasis added).   The trial court was instructed that (i) "the dates of actual
contamination of each school" were "issues of fact" that must be resolved on remand, and (ii) the
ultimate inquiry on remand for purposes of Grace's statute of limitations affirmative defense was
"when [the particular plaintiff] should reasonably have discovered that each school's
contamination [had] occurred." *Id.* (emphasis added).   We fail to perceive how the Debtors can
urge reliance on the U.S. Morse Report in the face of such black letter law which necessarily
leads to the conclusion that the U.S. Morse Report has no bearing on the applicable statute of
limitations analysis in California or any other "contamination" state.

   The Morse Reports must be excluded for the foregoing reasons.

## VI.   Mr. Morse Should Not Be Permitted to Testify on the Issue of Constructive Notice and the Morse Reports Should Be Stricken Because Morse May Not Opine As To Legal Conclusions

   It cannot be gainsaid that an expert may not testify as to legal conclusions. *United States
v. Leo*, 941 F.2d 181, 196-97 (3d Cir. 1991).   A court must limit expert testimony so as to not
allow experts to opine on what the law required. *See id.*   The Morse Reports are replete with
legal conclusions on the issue of Constructive Notice.      Indeed, Morse freely concedes,
"constructive notice is a pretty complicated legal issue." *Tr. of Roger G. Morse Depo. 111,
Mar.1, 2001, 9:00 a.m.*   For this reason too, the Court should preclude Mr. Morse from testifying
on this issue and it should strike the Morse Reports.

   To dramatically make our point, the U.S. Morse Report actually begins with a legal
conclusion: "Building owners were inundated with information about asbestos in buildings to the
extent that, by the early to mid-1980s, virtually all building owners should have been aware of
the widespread use of asbestos-containing materials and the potential risks of those materials in

19

their facilities." U.S. Morse Report 4. Throughout the Morse Reports, Mr. Morse offers legal conclusions under the guise of an expert opinion. For example, Mr. Morse writes: "Consistent with my experience, this research shows that, starting in the early 1970s and continuing through to the mid-1990s, a large amount of information about asbestos in general and specifically asbestos in buildings existed and was available to building owners from a wide variety of sources. In addition to governmental agency regulations and guidance documents and the publicity surrounding those events, building owners and managers . . . had a great deal of information about asbestos-containing building materials available to them through their respective trade journals or trade association newsletters." U.S. Morse Report 7-8.

The determination of legal conclusions belongs to the Court alone. By spewing legal conclusions as though his expert opinions, the Debtors would have Mr. Morse usurp the role of the Court. As a result, Mr. Morse's proffered testimony on the issue of Constructive Notice and the Morse Reports are inadmissible and must be excluded.

## CONCLUSION

It is patently obvious that the Debtors seek to use both Mr. Morse and the Morse Reports much as a drunk leans on a lamp post, for support rather than for illumination. Without Mr. Morse's manufactured opinion testimony, all of the printed materials he cataloged falls, as it should, into a heap of rank hearsay, idle speculation and musings toppling the Debtors' ill-conceived Constructive Notice theory. Consideration of the threshold requirements of expert testimony under Fed. R. Evid. 702 and *Daubert* clearly establishes that Mr. Morse does not have the requisite expertise to opine on the issue of Constructive Notice and thus, he should not be qualified to testify as an expert on this issue. Furthermore, the Morse Reports are both unreliable

and irrelevant on the issue of Constructive Notice and thus, they should be summarily stricken by this Court.

WHEREFORE, the PD Committee respectfully moves (1) that Roger Morse be disqualified as an expert in respect of the Constructive Notice issue, (2) that the Morse Reports be stricken and thus, excluded from evidence in respect of the Constructive Notice issue, and (3) for such other and further relief as the Court may deem just and proper.

Dated: March 20, 2007.

BILZIN SUMBERG BAENA
PRICE & AXELROD LLP

Scott L. Baena (admitted pro hac vice)
Jay M. Sakalo (admitted pro hac vice)
2500 Wachovia Financial Center
200 South Biscayne Boulevard
Miami, Florida 33131-2336
(305) 374-7580

and

FERRY, JOSEPH & PEARCE, P.A.
824 Market Street, Suite 904
P.O. Box 1351
Wilmington, Delaware  19899
(302) 575-1555

By: /s/ Theodore J. Tacconelli
        Theodore J. Tacconelli
        (Del. Bar No. 2678)

Co-Counsel for the Official Committee of
Asbestos Property Damage Claimants

MIAMI 1224272.2 7481715545

21