# EXHIBIT D

# VICTORY VERBATIM COURT REPORTING SERVICES

RD/kw

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

In re:                    ) Chapter 11
                          )
W. R. GRACE & CO., et al.,) Case No. 01-01139 (JKF)
                          ) (Jointly Administered)
          Debtors.        )
                          ) Re: Docket No. 13406

- - - - - - - - - -

This is the Deposition of DONALD PINCHIN, in the above-noted matter, taken at the law offices of Ogilvy Renault, 38th Floor, 200 Bay Street, Toronto, Ontario, on the 14th day of March, 2007.

- - - - - - - - - -

APPEARANCES:

| | |
|---|---|
| DANIEL A. SPEIGHTS | -- for the Canada Claimants |
| Speights & Runyan | |
| 200 Jackson Ave. E. | |
| P.O. Box 685 | |
| Hampton, SC 29924 | |
| U.S.A. | |
| DOUGLAS E. CAMERON | -- for W. R. Grace & Co. |
| ReedSmith LLP | |
| 435 Sixth Avenue | |
| Pittsburgh, PA 15219 | |
| U.S.A. | |
| JESSICA GLASS | -- for the Official Committee |
| Kramer Levin Naftalis | of Equity Shareholders |
| & Frankel | |
| 1177 Avenue of the Americas | |
| New York, NY 10036 | |
| U.S.A. | |

Also Present:
Allison Kuntz

Ernst & Young Tower
222 Bay St. Suite 900
Toronto, Ont. M5K 1H6  416 360 6117

# VICTORY VERBATIM COURT REPORTING SERVICES

D. Pinchin - 38

```
1    required, first, consulting expertise and, second,
2    U.S. legal expertise that was, in most cases, just
3    out of their reach.
4  135.    Q.    From a cost standpoint?
5          A.    From a cost standpoint, yes.
6  136.    Q.    Okay, but you also indicate that,
7          "...The potential for success for a
8          Canadian property owner proceeding
9          independently is very low..."
10         What do you mean by that?
11         A.    They will give up. It is going to
12   take...we are already four years into the process.
13   There is no item...they just...they will give up.
14 137.    Q.    But your reference there is to the
15   bankruptcy procedure?
16         A.    Yes.
17 138.    Q.    And it was in response to this
18   notice that the building owners contacted you and
19   you got involved in assisting them in filing the
20   proofs of claim in the Grace bankruptcy; correct?
21         A.    That is correct.
22 139.    Q.    Okay. When you provided consulting
23   services in the past for litigation, did you take
24   those matters on a contingency basis?
25         A.    No.
```

D. Pinchin - 39

```
1  140.    Q.    This is the first time you have done
2          that?
3          A.    This is the very first time, yes.
4  141.    Q.    Okay. Can you tell me, Dr. Pinchin,
5          what you did to prepare for your deposition today?
6          A.    I printed out this yesterday.
7  142.    Q.    By "this", you mean?
8          A.    Exhibit number 2.
9  143.    Q.    Okay.
10         A.    The Exhibit number 2 or a very near
11   cousin of Exhibit number 2, and read that. And I
12   met with Dan Speights for about, I would say it
13   would have been, an hour to an hour and a quarter
14   yesterday.
15 144.    Q.    Did you review any other documents
16   prior to your deposition?
17         A.    No.
18 145.    Q.    Did you talk with anybody else,
19   other than Mr. Speights?
20         A.    I had about a two-minute
21   conversation with John Holland.
22 146.    Q.    And what did you discuss with Mr.
23   Holland?
24         A.    Just the name of some people in
25   British Columbia of both clients and experts out
```

D. Pinchin - 40

```
1    there. I asked him who was...I can't remember the
2    name, Gordon Spratt, I think it was.
3  147.    Q.    And what did you discuss with Mr.
4          Holland about Mr. Spratt?
5          A.    I just said, "Was Mr. Spratt or
6    Gordon Spratt an asbestos consultant?" And he said,
7    "No, he was basically a mechanical consultant or a
8    structural consultant", he wasn't quite sure which.
9  148.    Q.    Okay. What caused you to ask Mr.
10         Holland about Mr. Spratt?
11         A.    Mr. Speights mentioned the name,
12   Doug Spratt, I think it is, just in our
13   conversation. That is all and I was curious.
14 149.    Q.    Did you discuss anything else with
15         Mr. Holland?
16         A.    No.
17         MR. SPEIGHTS:    Mr. Cameron, I need to
18   take a break for a minute. We have been
19   going a little over an hour.
20 150.    MR. CAMERON:    Sure.
21         MR. SPEIGHTS:    Let's go off the record.
22
23 --- DISCUSSION OFF THE RECORD
24
25
```

D. Pinchin - 41

```
1  --- EXHIBIT NO. 3 :  Proposal dated June 11, 1992 to Bell
2                       Canada from Pinchin & Associates
3
4  BY MR. CAMERON:
5  151.    Q.    Dr. Pinchin, I am going to ask you
6          if you could identify what has been marked as
7          Deposition Exhibit number 3, please?
8          A.    Yes. This is a semi-historical
9    document dating from 15 years ago. It is a proposal
10   June 11th, I believe it is, 1992, to Bell Canada
11   from Pinchin & Associates, one of the predecessor
12   firms of Pinchin Environmental.
13 152.    Q.    Okay. And this is a communication
14   enclosing qualifications for asbestos consulting
15   services; is that correct?
16         A.    That is correct.
17 153.    Q.    Is this something that you routinely
18   provided to building owners as part of your
19   consulting services?
20         A.    Back at this time, yes.
21 154.    Q.    Okay. I just wanted to focus on a
22   couple of things because we went over..you gave me
23   some of this information earlier, but under number
24   2, "Summary of asbestos-related services"...do you
25   see that?
```

Ernst & Young Tower
222 Bay St. Suite 900
Toronto, Ont. M5K 1H6  416 360 6117

D. Pinchin - 42

```
1              A.  Yes, I do.
2      155.    Q.  You identify "building surveys and
3   assessments"?
4              A.  Yes.
5      156.    Q.  And that is consistent with what you
6   had said before, you did surveys and you did
7   asbestos management programs; correct?
8              A.  That is correct.
9      157.    Q.  And then you refer in the second
10  paragraph there to,
11             "...Examples of typical multi building
12             surveys include..."
13  And you have a list of clients that you had done
14  work for as of 1992; do you see that?
15             A.  Yes, I do, although this is
16  obviously a partial list.
17     158.    Q.  Right. You obviously had more
18  clients than just the ones listed there?
19             A.  That is correct.
20     159.    Q.  "The Hamilton Board of Education";
21  do you see that?
22             A.  Yes, I do.
23     160.    Q.  And the Hamilton Board of Education
24  is one of the building owners at issue that has
25  claims in this case; correct?
```

D. Pinchin - 43

```
1              A.  I will believe...
2      161.    Q.  Do you know that?
3              A.  No.
4      162.    Q.  Okay.
5              A.  I don't remember. I didn't review
6   the claimant list.
7      163.    Q.  How about Carleton University; do
8   you know if Carleton University has a claim or
9   claims in this bankruptcy?
10             A.  I know for sure they have a claim in
11  the Federal Mogul, but I can't swear on this one.
12     164.    Q.  Okay. How about Toronto Board of
13  Education?
14             A.  Yes, I do know they do have some
15  claims in this.
16     165.    Q.  And the services you provide for
17  Hamilton Board of Education, Carleton University and
18  Toronto Board of Education as of 1992, that included
19  building surveys and assessments; is that correct?
20             A.  Yes, it did.
21     166.    Q.  Did it also include abatement
22  projects?
23             A.  Yes, it did.
24     167.    Q.  Now, I think if you go back to
25  Appendix 1, a list of typical projects undertaken;
```

D. Pinchin - 44

```
1   do you see that?
2              A.  Yes.
3      168.    Q.  There is a couple of entries for the
4   Toronto Board of Education in connection with
5   removal projects; is that correct?
6              A.  Yes.
7      169.    Q.  And would you have provided the
8   design services for those removal projects?
9              A.  Yes...let's see, the design...no, I
10  believe the design services on those projects were
11  done by the Board themselves. I am going from
12  memory, but I don't believe we wrote the
13  specifications for the Toronto Board.
14     170.    Q.  Okay.
15             A.  They had their own staff prepare
16  those, as far as I remember.
17     171.    Q.  So what services were provided in
18  connection with the abatement projects in 1984/1985?
19             A.  The inspection, the observation of
20  work being performed by the contractors, the air
21  monitoring and the final approval of work and
22  approval of payment of progress draws.
23     172.    Q.  Okay. How about the work that was
24  done for the Toronto Board of Education in 1990 and
25  '92, at the top of that list?
```

D. Pinchin - 45

```
1              A.  Those were the surveys and the
2   management plans and there may have been, at that
3   point, although I can't remember, there may have
4   been some minor removal projects done then that we
5   did specify.
6              But I think in '85...'84/'85...I believe
7   they did their own designs or they might have been
8   done by another consultant. It was one or the other
9   of those two.
10     173.    Q.  Okay. You indicated earlier that
11  you started...about 1981...you started about 1981
12  providing your asbestos consulting service is when
13  you formed Pinchin...
14             A.  DJ Pinchin Technical Consulting.
15     174.    Q.  Right. This document refers to
16  Pinchin & Associates Limited being incorporated in
17  May 1981; is that a different entity, was that one
18  of the related companies?
19             A.  It was the same company, it was only
20  a change in name so we could, hence, refer to it as
21  the same founding date. We commonly refer to that
22  1981 founding date, even though the name was
23  changed.
24     175.    Q.  Okay. And you testified earlier
25  that it was fair to say that you had been providing
```

# VICTORY VERBATIM COURT REPORTING SERVICES

D. Pinchin - 70

```
 1         material by Polarized Light Microscope [you
 2         say] and a knowledge of the type and
 3         manufacturers of asbestos-containing
 4         fireproofing with these characteristics in
 5         Canada at the time the fireproofing was
 6         applied..."
 7      Do you see that?
 8         A.   Yes, I do.
 9  272.   Q.   Can you tell me...I will try to
10      break that down...can you tell me what
11      characteristics you are referring to there when you
12      say "these characteristics"?
13         A.   Well, effectively, the ones that
14      have not been identified as positive. If it
15      contained amosite or crocidolite, then we would
16      exclude and not send this to those clients. We
17      would not identify it.
18              If it had mineral wool of an analysis we
19      relied on, we would not identify it. That is a
20      characteristic. If it was a fibrous product, in
21      general, in other words, not a cementitious product,
22      then we would not identify it.
23              If it was...and I had not even mentioned
24      this before, it seems so obvious to me...if it were
25      white, if it were blue, we would not identify it.
```

D. Pinchin - 71

```
 1  273.   Q.   What was the colour of the MK-3?
 2         A.   Basically dirt.
 3  274.   Q.   Dirt?
 4         A.   Dirt, mud. Light brown tan, if you
 5      prefer or medium brown.
 6  275.   Q.   Okay. Where I am a little bit
 7      confused is you are talking about identifying it as
 8      MK-3 and then saying "these characteristics". And
 9      now you have just given me characteristics that
10      would not be MK-3. So I am a little bit confused.
11              I thought what you were saying in this
12      letter was, "We have a knowledge of these
13      characteristics, therefore we identify it as MK-3".
14      Am I misunderstanding what you are saying?
15         A.   Well, those characteristics it has
16      and those characteristics it doesn't have, basically
17      both go together to form an opinion. And they are
18      mutually exclusive. So we would assess all of
19      those.
20  276.   Q.   And the characteristics that it has
21      are the ones that we went over earlier and, for the
22      most part, you need to have multiple
23      characteristics, not just one of them, to be able to
24      make the conclusion?
25         A.   That is correct.
```

D. Pinchin - 72

```
 1  277.   Q.   Okay. And when you say,
 2      "...type and manufacturers of
 3      asbestos-containing fireproofing..."
 4      is "type" the cementitious versus fibre?
 5         A.   Well, a type would really...yes, it
 6      would be cementitious rather than fibre, although
 7      these points are all somewhat interrelated, the
 8      visual examination, the analysis, the type, if you
 9      prefer.
10  278.   Q.   So "type" could include the
11      mud-like, rough surface?
12         A.   That is right.
13  279.   Q.   Okay. And then the manufacturers of
14      fireproofing you identified earlier that, to your
15      knowledge, Grace was the only manufacturer who
16      marketed and sold cementitious asbestos-containing
17      fireproofing with vermiculite in Canada; is that
18      correct?
19         A.   It is the only one we are aware of,
20      yes.
21  280.   Q.   Can you tell me when you obtained or
22      gained this knowledge about the Grace fireproofing?
23         A.   It is a very prolonged process but,
24      yes, I can tell you when I first started gaining the
25      knowledge.
```

D. Pinchin - 73

```
 1              When I was working at the Ontario Research
 2      Foundation or ORTECH back...and it would have been
 3      approximately early '79, it would have been late
 4      1980, but I think it is more likely early 1979. The
 5      Ontario Research Foundation, and I was the project
 6      manager on it, were hired to develop an
 7      asbestos-free...obviously asbestos-free, because
 8      asbestos was not in use in fireproofing at that
 9      time, but an asbestos-free Canadian sourced
10      fireproofing to eliminate or compete with the
11      effective monopoly that W. R. Grace had on that type
12      of fireproofing in Canada.
13              And that is when my knowledge started.
14      Basically, I became extremely familiar with the
15      cementitious fireproofing that was then being
16      applied.
17  281.   Q.   Which was not asbestos-containing?
18         A.   Which was not asbestos-containing,
19      no. It was the later Monokote product which I
20      believe, at that point, was MK-5 or MK-6. One of
21      them was never marketed in Canada.
22  282.   Q.   When did you gain a knowledge of
23      what the constituents were for the Grace
24      asbestos-containing fireproofing?
25         A.   At the same time.
```

Ernst & Young Tower
222 Bay St. Suite 900
Toronto, Ont. M5K 1H6   416 360 6117

# VICTORY VERBATIM COURT REPORTING SERVICES

D. Pinchin - 78

1 no, really, it played no part.
2 300.    Q.    And you indicated that your
3         knowledge of the W. R. Grace asbestos-containing
4         fireproofing products started in or about...some
5         time in 1979 when you were at ORTECH. Did that
6         knowledge develop, change over time?
7         A.    It certainly either developed or was
8         confirmed over time. I am not sure which of those
9         descriptions would be more accurate.
10 301.   Q.    Okay. And would that development be
11        in connection with your consulting firm, building
12        owners, beginning in 1981?
13        A.    It would be in connection with
14        firstly the development of that project, which was
15        about a two and a half year project. So over that
16        period of '79 to, roughly, '81, I would certainly
17        developed in that time because we were trying to
18        replicate the product and other information we came
19        across over the years just on the formulations,
20        which confirmed that.
21 302.   Q.    Based on that knowledge, would you
22        have been able to identify Grace asbestos-containing
23        fireproofing products in buildings when you first
24        started your Pinchin identity in 1981?
25        A.    I might have. I believe I could

D. Pinchin - 79

1 have. Certainly, in the early '80s, I could have,
2 yes. Prior to '85, I could have. I can't say
3 exactly when I would have been comfortable making
4 that decision, but it would have been prior to '85.
5 303.   Q.    Is there a reason why you can more
6         readily say prior to 1985?
7         A.    Because it would have been when I
8         was more heavily involved in specifications and
9         surveys, seeing the repeated specifications for
10        Monokote, talking to applicators who had applied the
11        material and just getting more of a visual comfort
12        with seeing the old product and the multiple
13        analysis we would get.
14 304.   MR. CAMERON:    You want to take a break?
15        MR. SPEIGHTS:   Sure.
16
17 --- A BRIEF RECESS
18
19 DONALD PINCHIN, resumed
20 CONTINUED EXAMINATION BY MR. CAMERON :
21 305.   Q.    Dr. Pinchin, if you go back to
22        Exhibit 2 for a minute, the notice that you sent out
23        to building owners in about 2003; do you see that?
24        A.    Yes.
25 306.   Q.    You indicated this related to the W.

D. Pinchin - 80

1         R. Grace bankruptcy and also the Federal Mogul
2         bankruptcy; is that right?
3         A.    Yes.
4 307.    Q.    Were there other bankruptcies that
5         you were working with building owners to assist in
6         the submitting of claims?
7         A.    No.
8 308.    Q.    Did you have any involvement with
9         the U.S. Gypsum bankruptcy?
10        A.    No.
11 309.   Q.    You indicated that you...have you
12        done consulting work in the U.S., other than expert
13        work?
14        A.    Rather limited.
15 310.   Q.    Based on your consulting work in the
16        U.S., are you aware as to whether or not there were
17        any other cementitious asbestos-containing spray
18        applied fireproofing products containing vermiculite
19        that were marketed and sold in the U.S.?
20        A.    No.
21 311.   Q.    So you don't know if they were in
22        the U.S. or Canada? You are not aware of any in the
23        U.S. or Canada?
24        A.    I am much more aware they were not
25        in Canada from my knowledge of the industry but I am

D. Pinchin - 81

1 not able 100 percent to say they were not in either.
2 312.   Q.    Okay. Number Exhibit number 2,
3        before entering into your contingency arrangement
4        with the claimants, did you check to whether...get
5        any legal advice as to whether that was an
6        appropriate arrangement for an expert to undertake?
7        A.    We talked to our lawyers because we
8        had them, our lawyers, help draft the agreement that
9        we sent to the building owners. Did we ask them if
10       it was legal? I think they would have told us if it
11       wasn't, but I am not sure we asked that question.
12 313.  Q.    Okay. Now, if I understand your
13       testimony earlier, you had indicated that,
14       throughout the 1980s and in to at least the mid
15       1990s and beyond, you and your related companies
16       were routinely advising Canadian building owners
17       about issues associated with asbestos in buildings;
18       is that correct?
19       A.    That is correct.
20 314.  Q.    And were there other industrial
21       hygienists, environmental engineers or consultants
22       who were doing the same thing that your company was
23       doing?
24       A.    Unfortunately, yes.
25 315.  Q.    You wouldn't want a monopoly there.

Ernst & Young Tower
222 Bay St. Suite 900
Toronto, Ont. M5K 1H6   416 360 6117

# VICTORY VERBATIM COURT REPORTING SERVICES

D. Pinchin - 82

1  And you indicated that your asbestos consulting
2  services were in great demand in the mid to late
3  1980s and into the 1990s; is that correct?
4      A.   Yes.
5  316.    Q.   And that was as a result of building
6  owners contacting you concerning asbestos in their
7  buildings; is that correct?
8      A.   That is correct.
9  317.    Q.   Okay. During that time period, in
10 the 1980s into the early or mid 1990s, did you and
11 your colleagues give presentations and conduct
12 training sessions for building owners?
13     A.   We conducted those sessions for
14 building owners and contractors and government
15 officials and many others.
16 318.    Q.   And was that throughout Canada?
17     A.   It was throughout Canada, yes.
18
19 --- EXHIBIT NO. 5 :   Pinchin-Harris & Associates document
20             dated October 29, 30, 31, 1986
21
22 BY MR. CAMERON:
23 319.    Q.   Dr. Pinchin, I am going to show you
24 what has been marked Deposition Exhibit number 5,
25 which is a Pinchin-Harris & Associated Limited, that

D. Pinchin - 83

1  was one of the prior names of one of your affiliate
2  related companies; correct?
3      A.   That is correct, yes.
4  320.    Q.   And it says,
5  "...Asbestos control in buildings, October
6  29, 30, 31, 1986..."
7  And my question is, is this one of the examples or
8  types of training courses that you were conducting
9  in Canada in the 1980s?
10     A.   This is a small portion of it, of
11 the notes used, yes.
12 321.    Q.   There was a much more extensive
13 program?
14     A.   I believe this is only a couple of
15 the chapters.
16 322.    Q.   For this, who were the attendees in
17 a session like this; does this include building
18 owners and contractors?
19     A.   Building owners, contractors,
20 government officials and competitors.
21 323.    Q.   You let your competitors in?
22     A.   If they pay, I would rather have a
23 good competitor than a bad competitor.
24 324.    Q.   If you look over on page 2 there is
25 contents or a table that has various sections for

D. Pinchin - 84

1  the course; do you see that?
2      A.   I see that.
3  325.    Q.   And included in your course was you
4  discussed the various types of friable products that
5  were used in buildings; is that correct?
6      A.   That is correct.
7  326.    Q.   And the health effects and reasons
8  for concern; correct?
9      A.   Yes.
10 327.    Q.   And in the identification, detection
11 of asbestos?
12     A.   Yes.
13 328.    Q.   You also addressed both current and
14 proposed regulations in various Canadian provinces;
15 is that correct?
16     A.   Yes. This particular course only
17 touched on the three western provinces, which is the
18 three that were actually provided.
19 329.    Q.   Okay. If you go back on page 1-5,
20 also discuss some of the trade names of the products
21 that were...at least one time contained asbestos;
22 correct?
23     A.   That is correct, yes.
24 330.    Q.   Is this list just generated from
25 your experience?

D. Pinchin - 85

1      A.   It is generated from experience. It
2  is generated from seeing specifications of building
3  that we know had asbestos and it is seen from
4  getting some old product literature.
5      It was also based on...and I would say that
6  applies to most. The only one here that likely I
7  had picked up from someone else was Kilnoise
8  Plaster. It is not one that I am personally
9  familiar with.
10 331.    Q.   Included in that list is the
11 Monokote MK-3; correct?
12     A.   That is correct, yes.
13 332.    Q.   There are other products that are
14 listed there. Are these products that you
15 understood were marketed and sold in Canada?
16     A.   Yes, I believe so.
17 333.    Q.   Okay. Any of the products, other
18 than Monokote MK-3, cementitious?
19     A.   Ones like Audicote or Kilnoise
20 Plaster and, I believe, Soundshield, would have been
21 cementitious, but they were not a fireproofing
22 product similar to this.
23     They would have had quite a different use,
24 such as a decorative or sound absorbing purpose.
25 So, yes, some of these would have mixed

D. Pinchin - 86

fireproofings and decorative popcorn-like finishes.
334.   Q.   Okay. You were addressing generally spray-on surfacing materials?
A.   That is correct.
335.   Q.   And was that a routine part of your courses to discuss products that were believed to contain asbestos maybe in various buildings?
A.   That is correct.
336.   Q.   Okay. This one is in 1986, but were you conducting these...you were conducting these courses as early as 1981; correct?
A.   The first course, as I said, was 1980.
337.   Q.   Did you and/or the Pinchin companies, I guess, publish newsletters containing articles on the subject of asbestos in buildings?
A.   Yes, we did.
338.   Q.   And did that include the Occupational Health News; was that one of your publications?
A.   That was a publication that came from our associated firm, PHH. I think at the time it might have been called...
339.   Q.   Pinchin Harris Holland Associates?
A.   ...Pinchin Harris Holland. I don't

D. Pinchin - 87

know what name existed at the time of that.
340.   Q.   Was there also a newsletter by Pinchin Environmental Consultants Limited called "News"?
A.   I don't remember it, but if you show me, it may have been a short existence. I would certainly recognize it, but was it from PHH or was it from Pinchin?
341.   Q.   I think it was Pinchin Environmental Consultants Limited, was the name of it, but I have one here and I will show you to see if that refreshes your recollection.
A.   All right.
342.   Q.   Any other specific publications that I didn't mention that you recall?
A.   You have a list on my CV of sort of specific articles I have published elsewhere, but I would not have listed our newsletters in a list of publications.
343.   Q.   The newsletters that you sent out, were they targeted to go to building owners?
A.   They were targeted to building owners, contractors and government officials. Whenever you ask that question about building owners, it really is generally. We didn't

D. Pinchin - 88

specifically target one group over another. They were all in our client range.
344.   Q.   All three; building owners, contractors and government officials?
A.   That is correct.
345.   Q.   How were the newsletters distributed to building owners? Was it through an organization or just general, using a client mailing list?
A.   We would use a client mailing list. In the odd case, an organization, such as BOMA, might request 30 or 40 copies and we would give it to them, but generally, they were direct mailing.
346.   Q.   Are you familiar with BOMA?
A.   Yes.
347.   Q.   What is BOMA?
A.   Building Owners & Managers Association. It is the largest organization of building management firms across the world.
348.   Q.   And is there a chapter in Canada or is it not organized in that fashion?
A.   There is BOMA Canada and there is also BOMA Toronto. And then there is BOMA Vancouver and there is BOMA here and BOMA there.
349.   Q.   Are you or your companies members of BOMA?

D. Pinchin - 89

A.   Yes.
350.   Q.   And I think you testified earlier that as part of your consulting services you were aware that applicable regulations or guidelines concerning asbestos in the various provinces require building owners to take particular action with respect to asbestos in their buildings; correct?
A.   Either regulations are often just codes or guidelines published by the government. Frequently it wasn't defined as a regulation.
351.   Q.   Okay. And those regulations or guidelines or codes first came into effect in some of the provinces when, late 1970s?
A.   No, the absolutely earliest thing published that I know of was basically sort of a four-page bifold that the Ontario Government published in 1983, I believe. It could have been late '82, but I think it was 1983. That was the very, very, very first. And it was very vague.
352.   Q.   And did these guidelines, codes or regulations have...could building owners or contractors be sanctioned if they didn't meet the regulations? Were there enforcement penalties?
A.   Certainly in Ontario there were. In other provinces I think you would have to actually

# VICTORY VERBATIM COURT REPORTING SERVICES

D. Pinchin - 106

    60 to 80.
413.    Q.    By 1990?
    A.    By 1990.
414.    Q.    When was the largest growth?
    A.    The largest growth has been in the last three years.
415.    Q.    And I take it that all 400 employees are not involved in providing asbestos consultation?
    A.    That is correct.
416.    Q.    What portion of the business is asbestos consultation?
    A.    I would say about 40 percent in number 42, 45.
417.    Q.    Okay. Over the time period in mid '80s, through the mid '90s, who were your competitors?
    A.    Could you give me the years again?
418.    Q.    Between mid 80s and mid 90s, the time period when you said you got very busy. You said between '84 and '87 for one period and by 1990 to '97.
    A.    Our largest...
MR. SPEIGHTS: I am going to object to the question. I am not sure if that accurately characterize as a testimony, but

D. Pinchin - 107

go ahead and answer the question, Mr. Pinchin.

BY MR. CAMERON:
419.    Q.    Okay, mid '80s to mid '90s.
    A.    All right. Our largest competitors would be small, local firms that are likely too numerous to mention. There were no truly national competitors, whatsoever.
    Some were there in the '80s, like Monenco and Dillon simply dropped out. Other ones started up, like Amec, but there were no national ones. I could give you a list of likely...well, if I could remember them, I could give you a list of 20 firms that were competing that might have had a local office somewhere.
    Jacques Whitford...I don't know how you pronounce it. It is spelled like Jacques, it is pronounced like "Jakes"...started in the mid '90s.
420.    Q.    So the Pinchin Group of companies was the only national consulting firm in Canada on asbestos issues?
    A.    That is correct.
421.    Q.    Is that still true today?
    A.    No, there are...Golder would

D. Pinchin - 108

consider themselves an equivalent. Jacques Whitford would. And that would be all.
422.    Q.    When did they come into play on a national basis?
    A.    Jacques in the mid '90s, Golder likely 2000.
423.    Q.    Okay. I am going to try and get through some of these building reports And I apologize, but...it is a little disjointed because that is kind of the way we have the documents. So I am going to try my best to get through this as efficient as possible. This is Exhibit 11.

--- EXHIBIT NO. 11 : Letter dated March 26, 2003 from Dr. Pinchin to Hamilton-Wentworth District School Board

BY MR. CAMERON:
424.    Q.    I am going to show you what has been marked as Deposition Exhibit number 11, which is a March 26, 2003 letter, one of your letters stating the opinion that the product in the building issue is Monokote 3; is that correct?
    A.    Yes.
425.    Q.    Okay. I want to go through at least

D. Pinchin - 109

some of what I understand are the supporting documents or at least the PLM analysis that is contained in the file. And could you walk me through those?
    A.    Fine.
426.    Q.    For our reference, this claim has a claim number of 11322. That is a claim number that has been given in the bankruptcy. And if you look down in the right-hand corner, these documents have been identified by first the claim number and then consecutive Bates numbers; do you see that?
    A.    Yes.
427.    Q.    So sometimes, as opposed to marking all these, I may just refer to the document number at the bottom, so that we will able to more easily reference it.

--- EXHIBIT NO. 12 : Lab analysis contained in the claims file material

BY MR. CAMERON:
428.    Q.    I am going to show you what has been marked as Deposition Exhibit number 12, which was the lab analysis that was contained in the claims file materials. And who is Occupational Health