**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W.R. GRACE & CO., *et al.*, | ) | Case No. 01-1139 (JKF) |
| | ) | Jointly Administered |
| Debtors. | ) | |
| | ) | **Objection Date: April 13, 2007 @ 4:00 p.m.** |
| | ) | **Hearing Date: May 2, 2007 @ 2:00 p.m. in Pittsburgh, PA** |

**MOTION OF THE OFFICIAL COMMITTEE OF ASBESTOS PERSONAL INJURY CLAIMANTS AND DAVID T. AUSTERN, THE COURT APPOINTED LEGAL REPRESENTATIVE FOR FUTURE ASBESTOS PERSONAL INJURY CLAIMANTS TO COMPEL TESTIMONY AND DOCUMENT PRODUCTION CONCERNING GRACE'S PRE-PETITION ESTIMATES OF ITS PERSONAL INJURY ASBESTOS LIABILITY**

## I. INTRODUCTION

The W.R. Grace Official Committee of Asbestos Personal Injury Claimants ("ACC") and David T. Austern, the Court Appointed Legal Representative for Future Asbestos Personal Injury Claimants ("FCR"), respectfully move jointly for an Order compelling Debtor W.R. Grace & Company ("Grace") to produce documents and deposition discovery concerning Grace's pre-petition estimates of its potential asbestos personal injury ("PI") liability.

Contrary to its own written representations and prior statements to the Court, Grace now claims privilege over its pre-petition PI liability estimates. This is highly pertinent evidence that is either not privileged at all, or which long ago lost its privileged status through Grace's knowing waiver. Indeed, the motion merely seeks discovery into the same materials and subject matters that Grace previously produced in the Sealed Air litigation.

The Court should order Grace to provide the information without further delay.

## II. PERTINENT FACTS

### A. Early 2002: Grace Voluntarily Produces PI Liability Estimates and Reserves Information in Sealed Air, Including Voluminous Privileged Information

Grace's asbestos creditors sought to set aside its 1998 Sealed Air transaction as a fraudulent conveyance, on the grounds that Grace's asbestos liabilities had already rendered the company insolvent. The primary focus of Grace's defense of the Sealed Air transaction against the claimants' fraudulent transfer allegations was Grace's claim that its estimates of its asbestos liabilities were reasonable. Grace had published these estimates in public SEC 10K filings each year between 1996 and 2001.[1] It was Grace's attorneys who had assessed the asbestos claims against it and managed its asbestos litigation, and it was Grace's outside consultants, in consultation with Grace's attorneys, who had calculated the liability estimates at issue in the Sealed Air litigation. Accordingly, to defend the fraudulent transfer claim, Grace asserted that the estimates of its asbestos liabilities by its attorneys and consultants, were reasonable and appropriate; and thus it was not insolvent at the time it transferred its packaging business to Sealed Air for little or no consideration.

Indeed, Grace's counsel recently recounted to this Court that reliance upon the advice of counsel is a defense against fraudulent transfer claims, and that Grace raised that defense in Sealed Air:

> We have estimates that were done prior to the Sealed Air transaction, and these were ARPC [one of Grace's consultants] estimates, and it is a stunning non-secret that the ARPC in connection with these estimates used an actuarial method. . . . The assumption – not only this stays in the tort system, but the assumption is that nothing changes. You get an actuarial model. It's actually run by people who are experts in mathematical modeling that simply says, Based upon the history, what do we expect the cost to be going forward. So these are done – some of these were produced in the Sealed Air litigation because of the

---

[1] Grace also provided these estimates to Sealer Air and its executives in connection with the 1998 Sealed Air fraudulent transfer.

> issue of advice of counsel. This was a fraudulent conveyance case and where you have advice of counsel, that's a defense. So the counsel went out and got advice from a variety of sources including ARPC. So, in order to defend the fraudulent conveyance claim, some of the [ARPC] materials were produced and made available and it was all under seal.

See Hearing Transcript, January 23, 2007, at 38-39 (emphasis added) (excerpt relevant to this motion attached as Exhibit 1).

Thus, in February 2002 – before the asbestos creditors' complaint was even filed, and thus before any discovery demands had been served – Grace voluntarily produced to the ACC and the Property Damage Committees numerous documents relating to Grace's PI liability estimates, including detailed descriptions of the bases and methodologies Grace used to estimate its liability and set its reserves. These materials included documents prepared by, and exchanged among (i) Grace's internal counsel, (ii) Grace's outside actuarial consultant, ARPC (but limited to certain 1995 – 1999 analysis), (iii) its business solvency and insurance consultants, Houlihan Lokey and Stewart Economics, and (iv) Grace's outside counsel, Wachtell, Lipton, Rosen & Katz. See Letters from Michelle Browdy, counsel to Grace, to Scott Baena, Peter Lockwood et al., February 5 and 22, 2002 (attached as Exhibits 2 and 3).

Upon review of these documents, the asbestos creditors moved to compel Grace to produce additional documents from 1995 – 1999 relating to its asbestos liability estimates, and also sought materials covering the exact same subject matter prepared from 1999 to the bankruptcy petition date, April 2, 2001. By Order dated May 21, 2002, the District Court found that the creditors' showing of particular need and hardship justified requiring Grace to produce additional "documents prepared as part of Grace's calculation of asbestos and environmental reserves for its audited financial statements." See Order to Compel and Protective Order, May

21, 2002 (Alfred M. Wolin, U.S.D.J.), at 2 (attached as Exhibit 4).[2] Grace thus produced additional documents from its lawyers' files. Grace also permitted its attorneys and consultants to give deposition testimony in Sealed Air regarding their estimations of Grace's "contingent liabilities" for future PI claims, and about Grace's related accounting reserves and SEC disclosures.

Indeed, in June 2002, Grace's renewed motion to intervene in Sealed Air was granted. In support of its motion, Grace argued that "Plaintiffs fail to consider . . . the effect on the estate from [plaintiffs'] success on certain issues – such as Grace's solvency and the methodology for claims estimation. Success by plaintiffs on those issues would have potentially devastating effects on Debtor's estate." W.R. Grace & Co. - Conn's Memorandum in Support of Its Renewed Motion to Intervene, June 20, 2002, at 4 (excerpt relevant to this motion attached as Exhibit 5). In its Answer, Grace denied all of the claimants' allegations that Grace's estimates of its asbestos liabilities were grossly understated. Grace made plain that among the reasons for its intervention was to affirmatively put on evidence in defense of its asbestos liability estimates. Thus, Grace stated to the Court that its role in the case would be:

> (1) responding to discovery, (2) the presentation of witnesses who were involved in the events and liabilities at issue, (3) the presentation of witnesses regarding Grace's solvency and estimates of its liabilities, including asbestos and environmental liabilities, and (4) the cross examination of plaintiffs' experts on these issues. These issues are squarely within the interests of Grace's estate.

Exhibit 5, at 3 (emphasis added).

---

[2] The Order also provided that its effect was "without prejudice to the rights of any party to discovery in any other matter, including without limitation in proceedings in the above-captioned consolidated Chapter 11 cases In re W. R. Grace et alia, provided, however, that production of documents or testimony pursuant to this Order . . . shall not constitute a waiver of the attorney work product or other privilege against discovery of the information disclosed." See Exhibit 4, at 3. The effect of this Order on further discovery is discussed below.

After Grace intervened in the case, it produced additional documents and permitted its lawyers (Messers. Beber, Siegal, and Hughes) to testify concerning how (i) Grace's asbestos PI liability estimates were prepared and (ii) how Grace's claims settlement and resolution history was used in estimating its liability for pending and future asbestos claims.

B.  August 2004: Without Objection from Grace, the ACC Produces All of Grace's Sealed Air Discovery to the United States Government

In August 2004, the United States issued a subpoena to counsel for the ACC seeking all documents received from Grace in connection with any aspect of the bankruptcy proceeding, and all Grace deposition transcripts.  See Subpoena, August 3, 2004 (attached as part of Exhibit 6).  Materials responsive to the government's subpoena thus included (i) the various pre-petition reserves analyses that Grace had voluntarily produced in Sealed Air in February 2002, and (ii) all documents that Grace produced pursuant to Judge Wolin's May 2002 Order to Compel.  In keeping with its obligations under the Protective Order in Sealed Air, the ACC promptly notified Grace of the government subpoena and gave Grace the opportunity to object.  See Letter from Bernard Bailor, counsel to ACC, to Janet Baer, counsel for Grace, et al., August 4, 2004 (the letter and its attachment are attached as Exhibit 6).  Grace, however, made no objection whatsoever.

Thus, in August 2004, the ACC produced to the third-party United States all of the documents produced by Grace in Sealed Air, as well as all of the deposition testimony taken in that proceeding.

C.  September 2006: Grace Represents that it Will Not Assert Privilege Over the Materials Previously Produced In Sealed Air

In August 2006, the ACC provided Grace with a list of all the Sealed Air deposition exhibits that were turned over to the United States government pursuant to the subpoena, and advised Grace that the ACC did not consider any of the materials to be privileged or confidential.

See Letter of Jeffrey A. Liesemer, to Barbara Harding, August 16, 2006, at 8 (the letter and its attachment are attached as Exhibit 7). In September 2006, Grace's counsel advised the ACC:

> After comparing your [ACC's] chart of previously-produced documents with our chart of potentially-privileged documents, Grace has concluded that it will no longer seek to assert privilege over the Sealed Air Documents in the chart that you provided.

See Letter of Barbara Harding, to Nathan Finch, September 22, 2006, at 1 (attached as Exhibit 8).

D. February 2007: Grace Does an About Face and Instructs Its Witnesses Not to Answer Questions About Its Pre-Petition Reserves Analysis On Privilege Grounds, and Claims Privilege Over Pre-Petition Reserve Documents

In this estimation proceeding, Grace contends that its PI claims payment history is an improper basis for estimating its future asbestos liabilities. In support of its position, Grace has maintained that the hundreds of millions of dollars it paid in asbestos PI settlements prior to bankruptcy allegedly were not paid to avoid legitimate trial risks. Rather, its position has been that the payments largely reflect claims that its lawyers judged were meritless, but which Grace nevertheless paid because it could not get fair trials. See, e.g., W.R. Grace & Co.'s Informational Brief, April 2, 2001, at 29-30 ("Grace considered many of these claims to be meritless . . . .") (excerpt relevant to this motion attached as Exhibit 9); Hughes Deposition, February 22, 2007, at 253 (excerpt relevant to this motion attached as Exhibit 10) ("[W]e made the business judgment that it was a better judgment to pay these kinds of settlements than to litigate the cases, because we weren't going to get a fair shake in the litigation process as it existed"). In order to test Grace's position, the ACC and FCR moved to compel Grace to comply with discovery requests aimed at uncovering the actual views of Grace's lawyers. See Motion of the Official Committee of Asbestos Personal Injury Claimants to Compel Production of Documents, Docket #13598 (filed in advance of December 5, 2006 hearing).

At the December 2006 hearing, prior to a ruling by this Court on that motion to compel, Grace proposed as a compromise that it would produce for deposition three in-house attorneys who had managed its asbestos litigation. Grace also agreed to produce certain documents from these attorneys' files. The ACC and FCR agreed to this proposal as a first step, reserving their rights to seek further discovery if necessary. Thus, the ACC and FCR agreed to a Stipulation calling for Grace attorneys to testify "concerning any evaluation they conducted or criteria they used for settling pre-petition asbestos personal injury claims and the reasons why Grace chose to settle pre-petition asbestos personal injury claims at the time those claims were settled." See Stipulated Order, Docket #14101 (attached as Exhibit 11). At no time did the ACC or FCR agree to waive their right to examine Grace's attorneys on any other discoverable topics.

At the two attorney depositions that have occurred to date, however, Grace counsel instructed its witnesses not to answer questions relating to its settlement policies and tort system experience, as reflected in its pre-petition PI liability estimates. For example, at the February 21, 2007, deposition of its former General Counsel, Robert Beber, Grace's counsel instructed Mr. Beber not to answer questions touching upon the historical bases of Grace's pre-petition liability estimates of its asbestos liabilities, Grace's compliance with FASB requirements that it establish contingent liability accounts that included its estimated cost of settling asbestos cases, and how such estimates reflected Grace's case assessments and settlement history. See Beber Deposition, February 21, 2007, at 21-22, 195-96 (excerpts relevant to this motion attached as Exhibit 12); see also Hughes Deposition, Exhibit 10, at 289.

In addition, on grounds of alleged inadvertent disclosure of a privileged document, Grace requested the return of a 1993 memorandum and attachment prepared by Mr. Hughes for Mr. Beber regarding estimates of Grace liability for then pending PI claims, and the methodology

used in making such assessments. See Hughes Deposition, Exhibit 10, at 6-8. Over objection, and with a full reservation of rights, the ACC and FCR agreed to return the document. Id. at 8-13. Grace is also refusing to produce additional documents regarding the asbestos reserves that both pre- and post-date the March 1998 Sealed Air transaction.

The subject matter of the questions that ACC and FCR put, or planned to put, to the Grace witnesses, and of the documents at issue, were opened and partially explored in the Sealed Air proceeding. However, because the methodology for estimating its asbestos liabilities was not disputed by Grace during the Sealed Air litigation, as it is here, additional testimony from Grace witnesses who were involved in settling its reserves is of great importance here because it bears directly on the "methodology" dispute. Likewise, documents that the ACC and FCR planned to show to these witnesses were previously produced by Grace in Sealed Air, and were marked as exhibits at the Beber and Hughes depositions in that case. Indeed, Grace's most recent privilege log submitted in this estimation proceeding reflects that it has withheld a number of documents that were produced to the United States, and as to which Grace has expressly waived any privilege assertion.

## III. ARGUMENT

As a threshold matter, as demonstrated below, the documents and testimony sought by this motion all arise in connection with Grace's pre-petition business planning and SEC disclosures. Much of the information therefore simply is not privileged.

With respect to other materials and information that may have been privileged at one time, there can be no legitimate dispute that the privilege no longer applies. First, there is no dispute that Grace knowingly waived the privilege in 2002 when it voluntarily disclosed large volumes of materials which it now asserts are attorney-client privileged and attorney work product (including documents and extensive deposition testimony) in Sealed Air. Second, not

only did Grace waive privilege as to the specific documents and testimony it chose to disclose, but controlling law imputes a subject matter waiver for all Grace information relating to its pre-petition PI liability estimates and reserves analysis. Third, even holding its waivers by voluntary disclosure aside, Grace waived the privilege by its intervention into Sealed Air for the express purpose of presenting evidence of its liability estimates. Fourth, by its silence in the face of the United States' subpoena seeking all of its discovery produced in Sealed Air (including Grace's allegedly work product reserves analysis ordered produced by Judge Wolin), Grace acknowledged that it had waived privilege over any of those materials. Finally, in this estimation proceeding Grace has reiterated its 2004 waiver of the privilege, in writing.

On this record, there is simply no basis for Grace's refusal to produce the very same documents and permit its witnesses to answer questions on the very same topics as to which any privilege has long since been waived.

A. Grace's Pre-petition Estimates of its Asbestos PI Liabilities Were Prepared for Business and SEC Disclosure Purposes and Therefore are Not Privileged

It is indisputable that Grace's pre-petition asbestos PI estimates and reserves analyses were prepared for business reasons and to comply with SEC disclosure requirements. David Siegel, Grace's general counsel from 1999 to 2004, testified in the Sealed Air proceeding that, beginning in 1995, Grace booked a "liability reserve" for pending asbestos personal injury claims in its public financial statements as it was required to do under SEC and accounting rules. Beginning in late 1998, Grace decided that, for business reasons related to better communications with its shareholders and the stock analysts which followed the company, Grace would calculate – and publish that estimated liability in its financial statements – an estimate of the cost of resolving all pending and future claims through the year 2039. Mr. Siegel also noted that the "all time" estimates of the total liability had also been used by Grace in planning for the

1998 Sealed Air transaction. Siegel Deposition, September 19, 2002, at 251-58 (excerpt relevant to this motion attached as Exhibit 13). Indeed, the documents underlying Grace's pre-petition liability estimates which form the basis for the reserves set forth in its 10-K filings were disclosed each year to its outside auditors.[3] Given these facts, Grace has absolutely no basis for withholding from disclosure its pre-petition asbestos liability reserve analyses on any claim of privilege.

The Eighth Circuit's decision in Simon v. G.D. Searle & Co., 816 F.2d 397, 401-02 (8th Cir. 1987) is directly on point. In Simon, Searle faced numerous product liability suits arising from its birth-control devices. Searle's attorneys determined reserve amounts for each of the cases to pay judgments or settlements. See id. at 399. In turn Searle compiled aggregate reserve information based upon the individual case reserve figures "in an attempt to keep track of, control and anticipate costs of product liability litigation for business planning purposes." See id. at 399-400.

Searle resisted disclosure of the reserve information on attorney work product grounds. See id. at 400. As to the aggregate reserve information, however, the Eighth Circuit found no basis for work-product immunity because, inter alia, it served "numerous business planning functions" and did not "enhance[] the defense of any particular lawsuit." Id. at 401. The court also rejected Searle's argument that the aggregate reserves were related to litigation, not its core health-care business, recognizing that "[a] business corporation may engage in business planning

---

[3] SEC Rules require public companies to publish their audited financial statements in their annual 10-K filings. In turn, Generally Accepted Accounting Principles ("GAAP") require that an estimated loss from a contingent liability must be accrued and an estimate of the liability recorded as a "reserve" on the balance sheet when (1) it is probable that the liability had been incurred as of the date of the financial statements and (2) the amount of the liability can be reasonably estimated. Financial Accounting Standards Board, SFAS No. 5, ¶ 8 (attached as Exhibit 14).

on many fronts, among them litigation." Id. at 401; see also United States v. El Paso Co., 682 F.2d 530, 543-44 (5th Cir. 1982) (documents "[w]ritten ultimately to comply with SEC regulations" were prepared "with an eye on its business needs, not on its legal ones" and did not "contemplate litigation in the sense required to bring it within the work product doctrine"); McEwen v. Digitran Sys., Inc., 155 F.R.D. 678, 684 (D. Utah 1994) (documents underlying an [SEC] 8-K were not subject to work product protection because the "primary motivating purpose" for the documents was not "to assist attorneys in connection with pending or anticipated litigation").

The same result should obtain here because Grace's aggregate reserve information served "numerous business planning functions" and did not "enhance[] the defense of any particular lawsuit." See Simon, 816 F.2d at 401. Rather, Grace estimated its asbestos liabilities as part of its assessment of the Sealed Air transaction, and to comply with various accounting and SEC disclosure requirements. Because the primary motivating purpose of Grace's pre-petition estimates was business, not defense of lawsuits, they are not privileged or work product, and should be produced.

  B. Even if its Pre-Petition Reserves Information Was Privileged At One Time, Grace Has Waived Any Applicable Privilege

Even if the information Grace seeks to withhold was privileged at one time, any such privilege has been waived.

    1. Grace's Voluntary Disclosure of Pre-Petition Reserves Information Waived any Privilege for the Materials Produced and Constituted a Subject Matter Waiver for any Related Materials

There is no dispute that in Sealed Air, Grace voluntarily produced information generated by its attorneys and actuarial consultants regarding Grace's pre-petition liability and reserve calculations. Grace also permitted its attorneys and consultants to testify on these topics.

Grace's tactical decision to disclose this information effected a waiver of any privilege that might otherwise have attached – not just to the particular information Grace chose to disclose, but for all otherwise privileged information on the subject matter of how Grace estimated its asbestos PI liabilities and set its asbestos reserves.

A party may not selectively disclose some privileged information on a subject and then hide behind the privilege to conceal other privileged material on the same subject. The Third Circuit has long held that "voluntary disclosure to a third party of purportedly privileged communications has long been considered inconsistent with an assertion of the privilege." Westinghouse Elec. Corp. v. Republic of the Philippines, 951 F.2d 1414, 1423-24 (3d Cir. 1991). Thus, "[t]he general rule regarding the voluntary disclosure of privileged attorney-client communications is that the disclosure waives the privilege as to all other communications on the same subject." Greene, Tweed of Delaware, Inc. v. Dupont Dow Elastomers, LLC, 202 F.R.D. 418, 420 (E.D. Pa. 2001). "The waiver principle applies to work product immunity as well as to the attorney-client privilege." Id.; see also In re Nat'l Smelting of N.J., Inc. Bondholders' Litig., No. 84-3199, 1989 U.S. Dist. LEXIS 16962, at *41 (D.N.J. June 29, 1989) ("[D]isclosure, waives the privilege . . . with respect to all documents and communications upon the same subject matter. . . . Once the privilege has been waived as to some communications upon this subject, it is waived as to all.").[4]

Here, Grace's voluntary disclosure of purportedly privileged documents and deposition testimony in Sealed Air regarding its pre-petition asbestos liability estimates and reserves waived

[4] Parkway Gallery Furniture, Inc. v. Kittinger/Pennsylvania House Group**,** 116 F.R.D. 46, 50 (M.D.N.C. 1987) (holding that disclosure generally waives the privilege not only as to the specific communication but as to other communications relating to that same subject matter)[4]; United States v. Jones, 696 F.2d 1069, 1072 (4th Cir.1982); In re Grand Jury Proceedings, 727 F.2d 1352, 1356 (4th Cir.1984); Novartis Pharms. Corp. v. Eon Labs Mfg, Inc., 206 F.R.D. 396, 398 (D. Del. 2002);

the privilege for the disclosed materials, and as to any other information relating to that subject matter.

2. Grace Also Waived any Privilege By Affirmatively Relying Upon the Advice of Its Counsel to Defend the Sealed Air Transaction

Aside from the waivers arising from its disclosures in Sealed Air, Grace also waived the alleged privilege by virtue of its reliance upon the advice of its counsel as part of its defense of the Sealed Air transaction. It is not necessary for a waiver that a party expressly plead that its lawyers' advice is an issue in the case.

The Third Circuit has made clear that "[t]he attorney-client privilege is waived for any relevant communication if the client asserts as a material issue in a proceeding that . . . the client acted upon the advice of a lawyer or that the advice was otherwise relevant to the legal significance of the client's conduct." Livingstone v. North Belle Vernon Borough, 91 F.3d 515, 537 (3d Cir. 1996) (quoting Restatement of the Law Governing Lawyers § 130(1) (Final Draft No. 1, 1996) (emphasis added); Berckeley Inv. Group, Ltd. v. Colkitt, 455 F.3d 195, 222 (3d Cir. 2006) (same); see also Glenmede Trust Co. v. Thompson, 56 F.3d 476, 486 (3d Cir. 1995) ("[A] party should not be permitted to define selectively the subject matter of the advice of counsel on which it relied in order to limit the scope of the waiver of the attorney-client privilege and therefore the scope of discovery. To do so would undermine the very purpose behind the exception to the attorney-client privilege at issue here-fairness."); Novartis Pharms., 206 F.R.D. at 398 (where a party relies on the advice of counsel, that party waived the attorney-client and work product privileges with respect to everything relating to the subject matter).

Here, Grace stated unambiguously that it was necessary for it to intervene in Sealed Air in order for it to "present[] witnesses regarding Grace's solvency and estimates of its liabilities, including asbestos and environmental liabilities." Exhibit 5, at 3. In other words, Grace

affirmatively relied upon the purportedly privileged attorney-client communications and work product that it now seeks to withhold, in defense of the Sealed Air transaction.

Thus, at the January 23, 2007 hearing in this estimation proceeding, Grace's counsel conceded that documents that may have been privileged attorney-client communications were produced in Sealed Air in furtherance of its advice of counsel defense. See Exhibit 1, at 39 ("[I]n order to defend the [Sealed Air] fraudulent conveyance claim, some the [ARPC] materials were produced . . . ."). Grace seeks, however, to limit the scope of its privilege waiver to reserve estimates made prior to the Sealed Air transaction in March 1998, and contends that the privilege is still intact for estimates made between the Sealed Air transaction in 1998 and the petition filing in 2001. The distinction is specious.[5] Grace voluntarily produced documents concerning its 1999 asbestos liability estimates from after (as well as before) the Sealed Air transaction, and Grace concedes that it followed the same methodology for estimating its total asbestos liability both before and after 1998 – until it changed course for purposes of the bankruptcy proceeding.

Finally, Grace has previously argued that its disclosures in Sealed Air allegedly did not effect a waiver because the advice of its counsel regarding asbestos liabilities was injected into the case by the claimants, not Grace, by the very nature of the fraudulent conveyance claim itself. But the argument that Grace disclosed privileged information only because it had no choice but to comply with its discovery obligations and not "affirmatively" is belied by the facts. First, the argument ignores that among the materials sought by this motion that Grace produced in Sealed Air, are materials that Grace produced voluntarily before the complaint was even filed, and not response to discovery demands. Second, as noted, Grace's motion to intervene stated

[5] In any event, Grace's instructions to Messers. Hughes and Beber not to answer questions at their recent depositions in the estimation proceeding were not limited to the period between the Sealed Air transaction and the bankruptcy petition. Moreover, many of the withheld reserve-related documents dated before March 1998.

that its purpose was to present evidence of its asbestos liabilities; it listed its obligation to respond to discovery as a separate item, because the two are fundamentally different. Exhibit 5, at 3.

Finally, and perhaps most importantly, assuming that Grace actually believed that the information at issue was privileged, it did indeed have a choice whether to produce it. That choice was to either (i) abandon its defense of reliance on counsel and refuse to disclose its privileged information (and presumably settle the case) or (ii) go forward with the defense and elect to disclose privileged materials. See Chimie v. PPG Indus., Inc., 218 F.R.D. 416, 418 (D. Del. 2003) ("accused [patent] infringer must choose between relying on advice of counsel or maintaining typical privileges") (emphasis added)[6]; Michlin v. Canon, Inc., 208 F.R.D. 172, 174 (E.D. Mich. 2002) (where advice of counsel underlies a defense, party must disclose privileged information or "[i]n the alternative, defendant may avoid production by abandoning" the defense) (emphasis added). Having made that choice, Grace waived the privilege and now must permit the discovery.

3. Grace Acknowledged that Any Privilege No Longer Applied When it Made No Objection to the ACC's Production of All of Grace's Sealed Air Discovery to the United States Government

Any doubt that Grace's disclosure of its allegedly privileged information in Sealed Air constituted a waiver was dispelled by Grace itself, when it raised no objection to the ACC's production of all its allegedly privileged materials to the government pursuant to a subpoena.

It is black letter law that once a document is disclosed to a third party, communications to whom are not privileged, any privilege that may have been associated with the document is

6 While Chimie was a patent infringement action, the court there recognized that "questions of waiver are not unique to patent law and are a matter of either state law, as to claims and defenses that arise under state law, or precedent from the regional circuits." Chimie, 218 F.R.D. at 419 n.4.

forever waived. Westinghouse Elec. v. Republic of Philippines, 951 F.2d 1414, 1423-24 (3d Cir. 1991); Permian Corp. v. United States, 665 F.2d 1214, 1220-21 (D.C. Cir. 1981); In re Sealed Case, 676 F.2d 793, 809 (D.C. Cir. 1982); 8 Wigmore on Evidence § 2328, at 638.

Here, the United States' subpoena required that the ACC and its counsel produce all "records, depositions transcripts, and exhibits produced by [Grace] in case number 01-01139 (JKF), District of Delaware." See Exhibit 6, attachment. This included all documents and testimony that Grace had produced to the ACC in any aspect of the bankruptcy proceeding, including documents from both before and after March 1998 related to Grace's pre-petition asbestos reserves, and the documents produced by Grace pursuant to Judge Wolin's May 2002 Order to Compel.

If Grace actually believed that any privilege continued to apply to this information, it doubtless would have exercised its right to interpose an objection. Yet, having received notice and the opportunity to be heard, Grace sat silently as the ACC produced all of the information requested. This disclosure – by definition – constituted knowing waiver by Grace over any possible privilege assertion, both for the materials produced, and as to their subject matter generally.[7] See, e.g., Kraemer v. Franklin & Marshall College, No. 95-0020, 1995 WL 447634, at *2 (E.D. Pa. July 27, 1995) ("However, because Defendant's counsel failed to object to the discussion of Hopkins's interview during his deposition, Defendant waived any privilege attached to this communication.") (citing 8 Charles A. Wright et al., Federal Practice and Procedure § 2016.1 (1994)); United States v. Fisher, 692 F. Supp. 488, 494 (E.D. Pa. 1988) ("[A]

---

7 While Judge Wolin's Order states that it would not effect a waiver of materials produced pursuant to it, the Order did not, and could not, purport to reverse the waiver effect of Grace's prior waiver (i.e., Grace's reliance on advice of counsel and voluntary disclosures of allegedly privileged documents), nor of subsequent events (i.e., the disclosure of all of Grace's discovery to the United States government).

failure to object to questioning that may have implicated the privilege resulted in a waiver of the attorney-client privilege.") (citing Hollins v. Powell, 773 F.2d 191, 197 (8th Cir. 1985)). Indeed, Grace's silence stands as its acknowledgement that any privilege no longer applied.

C. Grace's Refusal To Permit Discovery Is Not Justified by the Fact that Some of the Documents Were Produced in the Sealed Air Proceeding Pursuant to an Order from the District Court which Was then Presiding Over that Proceeding

At the hearing on January 23, 2007, counsel for Grace maintained that the order issued by Judge Wolin in May 2002 during the Sealed Air proceeding entitled Grace to refuse to produce the information at issue here, despite its prior disclosures.[8] That contention is a fundamental misreading of the order in question. The order explicitly stated that it did not affect discoverability in the rest of the Chapter 11 proceeding of which the Sealed Air proceeding and this estimation proceeding are parts. The order did not, and could not, purport to reverse the waiver effect of prior action (Grace's reliance on advice of counsel and voluntary production in the Sealed Air proceeding) or of subsequent action (the delivery of the documents to the Justice Department). It provided, and it lawfully could provide, only that production pursuant to the order would not in itself waive any applicable privilege.

This view is clear from the text of Judge Wolin's Order, which provides only that the "production … pursuant to this Order … shall not constitute a waiver of … privilege against discovery of the information disclosed." Exhibit 4, at 3 (emphasis added). The order further provides that "the effect of this Order to Compel … is without prejudice to the rights of any party to discovery in any other matter, including without limitation in … [the] consolidated Chapter 11 cases In re W.R. Grace, et alia." Id. Thus, if the Sealed Air production (and the setting up of attorney client privilege as a defense) did, as a matter of law, waive the privilege as to the subject

---

[8] A copy of the District Court's May 21, 2002 Discovery Order is attached as Exhibit 4.

matter, Judge Wolin's Order does not restore it. Similarly, Judge Wolin did not (and could not) confer permanent immunity from waiver by some future event such as the production to the Department of Justice in response to subpoena. In short, the May 21, 2002 Discovery Order simply provided that production pursuant to it is not itself a waiver, not that everything produced is automatically and forever privileged, even if the privilege was waived earlier (by setting up advise of counsel) or later (by production to the United States).

D. The Parties' Stipulation Regarding the Grace Attorney Deposition Provides No Basis for Grace's Refusal to Provide Documents and Testimony Regarding Its Pre-Petition Reserves

To the extent that Grace argues that the discovery sought is not within the scope of the parties' initial compromise reflected in the stipulation, the argument is both irrelevant and false. It is irrelevant because on its face, the stipulation does not limit the rights of the parties with respect to future motions to compel. The argument is false because the discovery sought is indeed within the ambit of the stipulation.

The stipulation provides that "[b]y agreeing to this compromise, the parties do not waive any of their positions with respect to the motion to compel that is being resolved as set out above and reserve all their rights with respect to any future motions that may be filed with respect to the subjects of the motion to compel." Exhibit 11, at 2. Thus, however one might interpret the stipulation's remaining language, its express reservation of rights renders it irrelevant to the issue here.

But even if the stipulation were the final word on what is and is not discoverable (which it is not), Grace's instructions and non-production would still be improper. The stipulation calls for discovery regarding how prior tort system experience was factored into the pre-petition reserve calculation. It requires, and Grace agreed, that its three attorneys be permitted not just to speak to their view of particular cases but also "to testify concerning any evaluation they

conducted or criteria they used for settling pre-petition asbestos personal injury claims." The purpose of Grace obtaining its attorneys' input into calculating the reserves was obviously to secure its counsel's evaluation for settling asbestos personal injury claims and the criteria they judged would have to be applied by Grace to resolve claims in the future.[9]

The three Grace attorneys' role in projecting the cost of settling future claims – at a time prior to any bankruptcy petition – thus falls squarely within the agreed scope of the stipulation on initial agreed discovery. Accordingly, the ACC and FCR are entitled under the stipulation to inquire into how Grace's settlement history and litigation/settlement criteria was used in estimating its aggregate liability for asbestos personal injury claims for internal planning and SEC reporting purposes.

## IV. CONCLUSION

For the foregoing reasons, the Court should grant the motion and order Grace provide the requested discovery.

Dated: March 28, 2007

CAMPBELL & LEVINE, LLC

*/S/ Mark Hurford*_________________
Marla R. Eskin (DE ID No. 2989)
Mark T. Hurford (DE ID No. 3299)
800 King Street, Suite 300
Wilmington, DE 19801
Telephone: (302) 426-1900

- and –

ORRICK, HERRINGTON & SUTCLIFFE LLP

*/S/ Debra Felder*_______________________
Roger Frankel
Richard H. Wyron
Raymond G. Mullady, Jr.
Debra L. Felder
3050 K Street, NW
Washington, DC 20007
Telephone: (202) 339-8400

---

9 At the January 23 hearing, counsel for Grace emphasized that the pre-petition estimates made after the Sealed Air transaction, like those made before it, were "actuarial models," based on "the company[ ] in the tort system." Exhibit 1, at 40.

Elihu Inselbuch
CAPLIN & DRYSDALE, CHARTERED
375 Park Avenue, 35th Floor
New York, NY 10152-3500
Telephone: (212) 319-7125

Nathan D. Finch
Walter B. Slocombe
Adam L. VanGrack
CAPLIN & DRYSDALE, CHARTERED
One Thomas Circle, NW
Washington, DC 20005
Telephone: (202) 862-5000

*Counsel for the Official Committee of Asbestos Personal Injury Claimants*

John Ansbro
ORRICK, HERRINGTON & SUTCLIFFE LLP
666 Fifth Avenue
New York, N.Y. 10103-0001
Telephone: (212) 506-5000

- and –

John C. Phillips, Jr. (#110)
PHILLIPS, GOLDMAN & SPENCE, P.A.
1200 North Broom Street
Wilmington, DE 19806
Telephone: (302) 655-4200

*Counsel for David T. Austern, Future Claimants' Representative*