IN THE COURT OF COMMON PLEAS
CUYAHOGA COUNTY, OHIO

| | | |
|---|---|---|
| Jack Kananian, et al. | ) | Case No. CV 442750 |
| Plaintiffs, | ) | |
| vs. | ) | Judge Harry A. Hanna |
| Lorillard Tobacco Company, | ) | |
| Defendant. | ) | Order & Opinion |

The Defendant has asked the Court to revoke Brayton Purcell's privilege to practice before this Court, which was granted on an *ad hoc* basis, and to dismiss the complaint. The basis of Defendant's motion is a claim that "the objective record in this case tells an appalling story…." of lawyers' oaths of office dishonored and ethical standards of practice unmet. Specifically, it is alleged that counsel engaged in the following acts of impropriety, *inter alia*:

1. lied to the Court concerning destructive testing of the late Mr. Harry Kananian's pathology while seeking an order from this Court barring the defense from destructive testing;

2. submitted a claim form to the Johns-Manville Trust which distorted Mr. Kananian's work history and exaggerated his exposure to Johns-Manville products;

3. lied to this Court concerning when he knew that his office was amending the Johns-Manville claim form;

4. lied to the Court that the claim form was not signed and not submitted to the Trust for payment;

1

5. represented to the Court that he would cooperate in the discovery of other claims made on behalf of the Kananian family, but urged the Celotex trust to resist disclosure;

6. misrepresented his role in the amendment of claim-forms which had been previously prepared and submitted by Early, Ludwick and Sweeney, another law firm representing the Kananian family before several bankruptcy courts;

7. refused to obey the Court's orders concerning discovery ordered at the March 27, 2006 hearing;

8. intentionally withheld e-mails whose production had been ordered;

9. lied at his June 28, 2006 deposition concerning his awareness of the amended Johns-Manville form and thereafter submitted written answers to interrogatories with the same false information;

10. lied about the whereabouts of pathology and radiology materials;

11. was disrespectful, obstructive, and untruthful at his June 28, 2006 deposition;

12. after his deposition, and after the production of additional materials had shown that his testimony was untruthful, he submitted a tardy errata sheet which completely reversed his testimony concerning the amended Johns-Manville form; and,

13. the privilege logs tendered by counsel were incomplete and misleading.[1]

We review each of these allegations seriatim.

1. Destructive Testing

Harry and Ann Kananian first filed a personal injury lawsuit in California based on Mr. Kananian's alleged asbestos exposure. A case management order applicable to that lawsuit

---

[1] There were several other allegations of unprofessional conduct but, in contrast to the above thirteen, they pale into insignificance.

2

specifically forbade parties from conducting destructive testing without first providing notice to all other parties to the litigation. That case management order provides:

> No party may conduct destructive testing or destructive preparation of pathology material without giving ten calendar days' notice to all parties by facsimile or personal service on all parties. If any party objects, they may seek a protective order from the Court for good cause. Thereafter, no testing shall proceed without further order of the Court.

Additionally, on June 28, 2000, four days after Mr. Kananian's death, David Thorne, counsel for Lorillard, wrote Mr. Andreas and specifically asked him to notify Lorillard before performing any destructive testing on Mr. Kananian's lung tissue and to agree upon a protocol for any destructive testing. Mr. Andreas never responded to Mr. Thorne's letter.

Despite the California court order, and despite Lorillard's effort to coordinate with Plaintiffs regarding tissue testing, Plaintiffs sent Mr. Kananian's lung tissue to Dr. Samuel Hammar for destructive testing in August of 2000. At no point prior to Dr. Hammar's destructive testing did Plaintiffs notify Lorillard that Dr. Hammar was performing such testing on this unique evidence. On November 24, 2000, approximately seven months prior to Plaintiffs filing this action for wrongful death in Ohio, Dr. Hammar began conducting destructive testing on Mr. Kananian's lung tissue. Dr. Hammar did not prepare duplicate adjacent samples, so his tests could be neither confirmed nor duplicated.

Later, after this lawsuit had been filed, when Lorillard requested Mr. Kananian's lung tissue, Plaintiffs refused to produce the tissue unless defense counsel first signed a stipulation regarding destructive testing. In the interim, Plaintiffs counsel sent Mr. Kananian's lung tissue to another previously undisclosed expert, Dr. Ronald Dodson, so that he could perform more destructive testing. At no point prior to sending this tissue to Dr. Dodson did Plaintiffs notify Lorillard, or this Court, that Dr. Dodson was destroying unique evidence. Like Dr. Hammar,

3

Dr. Dodson failed to prepare duplicate adjacent samples. His tests therefore could neither be confirmed nor duplicated. Thereafter, on December 22, 2004, Mr. Andreas received a report from Dr. Dodson detailing the results of his secret destructive testing. On the very same day, Mr. Andreas sent Lorillard's counsel a letter demanding that Lorillard sign a stipulation pertaining to any destructive testing that was to occur <u>from that point forward</u>. Thus, it appears that at the same time Plaintiffs were conducting unilateral destructive testing, they were asking this Court to enter an order prohibiting destructive testing without first receiving this Court's approval or opposing counsel's permission.

It is possible that, up to this point, counsel was just disingenuous to this Court. However at the January 27, 2005 hearing on Lorillard's motion to compel, this Court asked Plaintiffs' counsel whether Dr. Hammar, or anyone else, had conducted any destructive testing and Mr. Andreas said no. Cf. Declaration of Terrence Sexton 7-15-05, ¶ 24.[2] At a subsequent hearing, Mr. Andreas told this Court on the record that no destructive testing was performed.

> THE COURT:     Mr. Andreas, we asked this question before you joined us.
>                Did the plaintiffs perform any destructive testing?
>
> MR. ANDREAS:   Dr. Hammar perform any destructive testing?
>
> THE COURT:     Yes.
>
> MR. ANDREAS:   No.

Hearing, Tr. (May 27, 2005), p. 21.

Finally, during a telephone conference, Plaintiffs' counsel specifically misrepresented to Lorillard's counsel that Dr. Dodson did no destructive testing stating that no lung tissue or

---

[2] There is no transcript of the January 27, 2005 hearing, but the Court's memory coincides with that of Mr. Sexton; that is why the Court was persuaded to grant the order to prevent unilateral destruction by Defendant since Plaintiffs' counsel claimed that he had not had destructive testing performed.

4

pathology material was sent to Dr. Dodson. Cf. Declaration of Terrence Sexton 7-15-05, ¶ 37. In fact, the evidence now shows that counsel had secretly directed Dr. Dodson and Dr. Hammar to conduct destructive testing on Mr. Kananian's lung tissue without notifying Lorillard or its counsel and without preparing duplicate adjacent samples, and told both Lorillard and this Court that no destructive testing was ever conducted. This evidence was secreted from the Court before Plaintiffs' motion was granted to prevent unilateral testing by Lorillard.

2.   Fraud in the Original Johns-Manville Claim

Brayton-Purcell prepared the original claim form for submission to the Johns-Manville Trust. In that application, they stated that Harry Kananian was a shipyard laborer working in direct contact with asbestos, mentioning Thermobestos pipe covering, 85% Magnesia Block, and 500 Cement. While these Johns-Manville products may have been previously installed on ships where he slept, there is no evidence that Harry Kananian ever worked with these products. This fiction, of course, improved chances of recovery from the trust, but was not based on Mr. Kananian's work history, client interview(s), or deposition.

3.   Mr. Andreas' Awareness of the Amendment

When the original claim was presented to this Court by Defendant Lorillard, and its admissibility urged at the pending trial herein, the Court determined that the claim forms, if signed and submitted to the trusts, would be admissible. Later on Mr. Andreas questioned the accuracy of the forms prepared by Early, Ludwick and Sweeney, but not his office:

> So yes, I do stand by what we filed in this case. I don't stand by what Early, Ludwick & Sweeney did, Judge. I'll stand by what we filed in this case, but I don't think it's necessary to go in, but, you know, I understand if the Court's going to admit something. <u>Again, I can deal with what we filed here because I think it's entirely accurate.</u>

5

Hearing Tr. (March 23, 2006), p. 95. Despite Mr. Andreas's pledge to "stand by" the original Johns-Manville claim form, he had already expressed misgivings about the Johns-Manville claim form 13 days earlier in an e-mail to his partners:

> ...But I believe we also overstate Mr. Kananian's exposure by indicating he was exposed as some type of shipyard worker at HPNSY (he was there one day to pick up his ship).
>
> These innacurate (sic) claim forms are now going into evidence at trial. I am forced to try to explain them away as mistakes by clerks or attys (sic). A jury is going to look down on this type of fabrication by lawyers and can use this information to dump plaintiffs...
>
> What do you want to do? 1. Give the money back and improve our chances at trial in a joint and several jurisdiction with pain and suffering surviving? ... Amended claims could be submitted later to try to recoup something from the trusts.
>
> *—March 10, 2006 e-mail from Mr. Andreas to Group Partners*

Indeed, when he stood before this Court on March 23, 2006 and declared that the original Johns-Manville claim form was "entirely accurate," he knew that his office had already prepared an amended Johns-Manville claim form on March 22, 2006 with material factual changes; in fact, he had reviewed it and commented upon the changes to Mr. Poole in his office. Therefore, Mr. Andreas's representations to this Court on March 23, 2006 were patently false and could only have been designed to deceive this Court and Lorillard.

The questions surrounding the claim forms prompted the Court to continue the trial from March 27, 2006 in order to resolve those questions, including: "When plaintiffs' counsel announced a willingness to stand by, on March 23rd, the claim form that had been previously presented...we need to know whether that was inadvertent....or we need to know whether or not Mr. Andreas was aware or unaware of it." It is now clear that Brayton Purcell submitted an amended Johns-Manville claim form on March 22, 2006. Mr. Andreas, however, repeatedly

6

disavowed having any knowledge at the time of the March 23, 2006 hearing that his firm was preparing or submitting an amended Johns-Manville claim form. But the subsequently disclosed e-mails reveal the truth.

At the March 28, 2006 hearing, Mr. Andreas stated to this Court:

> For instance, I'm prepared to be sworn right now about that last category about when did I find out about the amended claim form. And I can tell you, I'll just tell you right on the record and I'll repeat it under oath at any other point, <u>I did not know about it when we argued on Thursday, last Thursday [March 23, 2006]. I did not know it had been prepared.</u>

Hearing Tr., p. 177. Similarly, at the hearing on June 1, 2006, Mr. Andreas maintained his story:

> ... I became aware actually late, late in the day or in the early evening of the 23rd, the amended claim forms from Johns-Manville had been sent to me after seven o'clock Pacific standard time on the night of the 22nd. I didn't read my e-mails until I got back from Court late in the afternoon on the 23rd, and at which time I saw the amended claim form.

Hearing Tr., pp. 10-11. Then, on June 13, 2006, Mr. Andreas told this Court that he did not become aware that his office was amending the claim form until March 24, 2006:

> Now, the sum total of those emails, Judge, were basically Mr. Poole attaching a copy of an amended complaint [sic] that apparently my office had prepared the evening of March 22nd, I think it was after seven o'clock PST, and my response in the morning of the 24th was when I finally got around to looking at this email because I was in court all day on the 23rd, and I asked simply whether it had been submitted. And that's the extent of the two emails.

Hearing Tr., p. 12. Mr. Andreas furthered his deception in his testimony under oath at his June 28, 2006 deposition:

> Q. All right. It's your testimony that you were in bed and asleep by 10:19 Eastern Standard Time, which is 7:19 California time, on the evening of March 22nd; correct?
>
> A. I was asleep or – yeah. I just don't recall. I wasn't sitting there timing, you know, when I actually went to sleep. All I know is that I was not picking up e-mail, including this e-mail, specifically this e-mail from Mr.

7

>   Poole that came in very late in the day, and apparently he stayed late that day –
>
> [Colloquy of counsel]
>
> Q. But whatever time you went to sleep, you knew, at that time, that your office had been working on preparing an amended claim form?
>
> A. No, I did not.
>
> Q. You knew that your office had been working on that for some time.
>
> A. No, I did not.
>
> [Objection by counsel]
>
> Q. When did you first learn that your office has [sic] commenced working on the John [sic] Manville e-mails [sic]?
>
> A. Mr. Boggs, we went through this; okay? I knew that it had been commenced, prepared and submitted – well, I should say commenced and prepared sometime on the afternoon or evening of March 23rd. I did not know it had actually been submitted until the next morning, which I think there's another e-mail that you have.

Andreas Deposition Tr. (June 28, 2006), at 62:24–64:8.

Brayton Purcell continued the deceit in its amended answers to Lorillard's Interrogatories, which were signed by Mr. Andreas:

> The amended claim form was sent by e-mail attachment to Mr. Andreas after 7:00 p.m. (PDT) on March 22, 2006 (10:00 p.m. EST). <u>Mr. Andreas did not receive or review this e-mail until late in the afternoon on March 23, 2006, after he returned from court in Cleveland, Ohio.</u> (Emphasis supplied).

On July 11, 2006, Brayton Purcell amended its answer to Interrogatory No. 43, now claiming:

> The amended claim form was sent by e-mail attachment to Mr. Andreas after 7:00 p.m. (PDT) on March 22, 2006 (10:00 p.m. EST). <u>Mr. Andreas does not recall reviewing the attached amended claim form until late in the afternoon on March 23, 2006, after he returned from court in Cleveland, Ohio.</u> (Emphasis supplied).

8

Despite Mr. Andreas's repeated claims to the contrary, both under oath and before this Court, it is now crystal clear that he knew that his office was amending the Johns-Manville claim form on March 22, 2006 at the very latest. Mr. Andreas did, in fact, read his e-mails at 8:57 p.m. (PST)/11:57 p.m. (EST) on March 22, 2006. When he received an e-mail from Ryan Poole attaching the amended Johns-Manville claim form on the night of March 22, he replied to it. Accordingly, Mr. Andreas knew that Brayton Purcell had prepared and was submitting an amended claim form before the March 23, 2006 hearing. These e-mails confirm that Mr. Andreas lied to this Court and testified falsely under oath when he claimed that he did not look at, read, or respond to Mr. Poole's e-mail until March 23, 2006. Eventually, Mr. Andreas admitted to the truth once this information came to the Court's attention. He apparently never expected that the Court would order him to produce the e-mails that exposed his deceit.

4. **Counsel Encouraged Celotex to Resist a Subpoena, Even as it Promised This Court Full Cooperation**

In another attempt to exclude the original claim forms from evidence, Mr. Andreas argued that there was no evidence that the original claim forms were actually submitted to the bankruptcy trusts. This Court, therefore, ruled that the claim forms were admissible only if Lorillard could prove they were actually submitted.

At significant expense, Lorillard obtained commissions from this Court, engaged local counsel, procured subpoenas from courts in other jurisdictions, and took other steps to comply with the trusts' requirements. On March 10, 2006, Lorillard sought an order from this Court asking Plaintiffs' counsel to stipulate that the claim forms were submitted to the trusts. Mr. Andreas told this Court that he did not know if the Early Ludwick claim forms had been submitted. He also told this Court that he would "welcome" documentation from the trusts indicating that the claim forms were submitted. Mr. Andreas did this while knowing that his

9

firm and Early Ludwick had received money on behalf of Mr. Kananian from all of the trusts. He attempted to deceive this Court and Lorillard about the filing of these claims in an effort to further his "win at all costs" strategy.

After the March 10, 2006 hearing, Amy Hirsch, an employee of the Celotex Trust, asked Early Ludwick to approve the release of the Trust's file for Harry Kananian, and Early Ludwick then asked Brayton Purcell for guidance. Christina Skubic, a Brayton Purcell attorney, asked Mr. Andreas how she and Early Ludwick should respond to Ms. Hirsch's inquiry. Mr. Andreas told her to "urge Celotex to resist."

Ms. Skubic followed Mr. Andreas's instructions and encouraged Celotex to resist Lorillard's efforts. And, in an internal e-mail dated March 22, 2006, Mr. Andreas stated, "I would love if Celotex gave these (expletive deleted) a hard time."

The next day, on March 23, 2006, Mr. Andreas told this Court a different story:

> There was a letter apparently – I have just been informed of this – a letter that came from the Celotex Trust and I'm not sure if it was sent to counsel, if they received it or not. The Celotex Trust ... has a very strong policy ... They take a position that they're not going to turn this over. ... They will resist efforts to do this <u>independently</u>. ... So I don't know what to do at this point.

Hearing Tr., p. 54 (emphasis added). And on March 24, 2006, Mr. Andreas sent an e-mail to counsel for Lorillard stating:

> I have instructed my paralegal to advise the trust that my office will not be filing a motion to quash and that to our knowledge neither will Early Ludwick. That is the best I can do. Celotex may wish to take action on its own, but that is not in my control.

Then, on March 27, 2006, Mr. Andreas told this Court that his firm was not putting up any roadblocks. Yet, on March 29, 2006, with Mr. Andreas's knowledge, his firm advised Ms. Hirsch "that if the trust wants to object they can." This does not equate to the full cooperation he promised the Court to obtain the various claims forms for Lorillard.

10

5.  Counsel Lied to This Court About Producing an Unsigned Copy of the Original Johns Manville Claim Form During Discovery

Several times Mr. Andreas indicated to the Court that the original claim forms were not submitted to the bankruptcy trusts. Plaintiffs submitted a claim form signed by Mr. Andreas's partner, Alan Brayton, to the Johns-Manville Trust in April of 2000. During discovery, however, Plaintiffs produced an *unsigned* copy of the original Johns-Manville claim form. Later, Plaintiffs moved to exclude the original claim forms from evidence. During oral argument, Mr. Andreas argued that the original Johns-Manville claim form should be excluded from evidence because, among other things, it was "unsigned." In fact, Mr. Andreas stressed, "It's an unsigned document, wasn't even executed by an attorney at my office." Hearing Tr. (February 23, 2006), p. 283.

Mr. Andreas acknowledged that the original Johns-Manville claim form came from Brayton Purcell's files and was produced to Lorillard during discovery. He argued, "I don't know whether that claim form was ever actually submitted or not. It was prepared apparently by my office." *Id.* After expending time and effort, and incurring expense, Lorillard then verified that Brayton Purcell had submitted the original Johns-Manville claim form, that Alan Brayton had signed it, and that Johns-Manville had paid money on the claim. Realizing that his argument for excluding the original Johns-Manville claim form as "unsigned" would now fail, Mr. Andreas changed his story and told the Court on March 23, 2006 that he had produced an executed copy of the original Johns-Manville claim form during discovery. Specifically, he stated, "I believe what we did give them was the executed copy because I'm looking at it right now. It was executed, had all attachments to it. There's no reason to hold that back." Hearing Tr., p. 83.

11

Later, in Plaintiffs' Amended Responses to Defendant Lorillard Tobacco Company's Second Requests for Admissions, Brayton Purcell finally admitted that it had produced an *unsigned* version of the original Johns-Manville claim form earlier in discovery. Mr. Andreas has not explained why he produced an unsigned copy of the original Johns-Manville claim form during discovery or why he told this Court the exact opposite. More importantly, Mr. Andreas represented to this Court that the original Johns-Manville claim form was unsigned when he knew that it was signed and submitted, and that his firm had collected money from the Johns-Manville Trust.

6.  **Brayton Purcell's Influence Over Early Ludwick**

Mr. Andreas has continually denied having any control over Early Ludwick or having any involvement in the preparation of the Early Ludwick claim forms. For example, on March 10, 2006, when asked whether settlement monies had been collected as a result of the claims filed by Early Ludwick, Mr. Andreas responded, "I don't know. I don't work for Early, Ludwig [sic] & Sweeney." Hearing Tr., p. 36. On March 23, 2006, Mr. Andreas told this Court, "We didn't prepare them [the Early Ludwick forms]; we didn't file them... we weren't involved in those at all." Hearing Tr., p. 61. On March 23, 2006, Mr. Andreas also told this Court, "I've said repeatedly, I don't work for Early, Ludwick & Sweeney. I don't know what they did in this case." *Id* at 138-39. On June 1, 2006, Mr. Andreas told this Court, "[we] keep hearing references to what Early Ludwick did with their amended claim forms. We hear about 48 Insulations and Celotex and all these others. That has nothing to do with my office." Hearing Tr., p. 29.

Communications between Brayton Purcell and Early Ludwick prove otherwise. An internal Early Ludwick e-mail shows that Brayton Purcell actually approved all of the payments

12

that Early Ludwick accepted from the trusts on the original claim forms. And, during his second deposition, Alan Brayton confirmed that he personally approved at least some of the Kananians' bankruptcy recoveries obtained by Early Ludwick. *See* Brayton Deposition Tr. (Oct. 12, 2006), p. 197.

Mr. Andreas's representation that he was not involved with the Early Ludwick amended claim forms was also false. Indeed, the e-mails show a close coordination between Brayton Purcell and Early Ludwick to amend the claim forms. On March 24, 2006, Early Ludwick informed Brayton Purcell that it was working on amending its claim forms at Brayton Purcell's request. Drafts of the amended claim forms were then sent to Brayton Purcell for review and approval. A few days later, Mr. Andreas and Bruce Carter both provided Early Ludwick with specific instructions for editing the claim forms. Early Ludwick incorporated their edits and submitted the amended claim forms to the trusts.

7. **Claim of Inaccurate Privilege Logs**

When the Court first ordered discovery of the materials used to prepare the bankruptcy claim forms, Mr. Andreas prepared and signed Plaintiffs' original privilege log, which identified 27 e-mails. During his first deposition, Mr. Andreas continually instructed counsel for Lorillard to "just look at the document," and he stressed, "the document speaks for itself." Andreas Deposition Tr. (June 28, 2006), pp 54-57. Mr. Andreas also relied upon the privilege log several times at the deposition, but he did not mention that it was inaccurate or that each of the 27 entries represented a larger "string" of e-mails containing many undisclosed messages, authors, and recipients.

Then, during Alan Brayton's deposition, after Mr. Andreas, Mr. Poole and Ms. Skubic had testified, it became apparent that there were numerous errors in the original privilege log.

13

The privilege log misidentified several senders and recipients and failed to include a number of relevant e-mails.

After the Court required Brayton Purcell to produce the e-mails for *in camera* review, Mr. Andreas admitted that the original privilege log was materially inaccurate. Andreas Deposition Tr. (Oct. 11, 2006), p. 218. Mr. Andreas explained, "I did not involve myself in a detailed review of the actual e-mails when I prepared the original privilege log." *Id.* Mr. Andreas could not even recall if he reviewed the original privilege log for accuracy. *Id.* at 235.

Brayton Purcell produced an amended privilege log after the first log was shown to be at least incomplete. Mr. Andreas once again decided which e-mails to include in the document, and he signed it. There were now 81 e-mails listed on the amended privilege log, 54 of which were not on the original log.

The reason for Mr. Andreas's initial deception became evident after the amended privilege log was produced. One of the new e-mails was Mr. Andreas's reply to Ryan Poole at 11:57 p.m. (EST) on March 22, 2006. That e-mail proved Mr. Andreas lied to this Court when he told it that: (1) he was in bed by 10:00 p.m. (EST) on March 22; (2) he did not look at Mr. Poole's e-mail on March 22; (3) he did not send any e-mails to his office on the evening of March 22; and (4) he was not aware his office had started preparing an amended Johns-Manville claim form on March 22, 2006.

Thereafter, Mr. Andreas produced a third, so-called "final amended privilege log," containing 12 more e-mails that were omitted from the amended log. Notwithstanding Mr Andreas's claim that the third privilege log was the "final" one, after Mr. Andreas's and Alan Brayton's second depositions, counsel produced still more new e-mails authored by Mr. Andreas and Mr. Brayton. *See* Poole Deposition Tr. (Oct. 13, 2006), at 290-295. After Lorillard filed a

14

renewed motion to compel a forensic computer inspection, counsel produced yet another undisclosed email dated March 23, 2006, dealing with amendment of the claim forms.

Mr. Andreas assured this Court many times that he had produced all of the e-mails owed to Lorillard; each time, however, those assurances proved false. He amended the privilege logs only after the Court obtained the underlying e-mails that exposed Mr. Andreas's deception and after key Brayton Purcell witnesses had been deposed. At best, Mr. Andreas inadvertently withheld e-mails because Brayton Purcell never engaged in a meaningful review of its files – as it should have. At worst, Mr. Andreas intentionally withheld responsive documents from Lorillard. Either way, Mr. Andreas was untruthful when he told this Court, "Brayton Purcell has done everything on its end to get its obligations for this discovery process completed in a timely manner." Hearing Tr. (June 15, 2006), p. 8.

8.     Mr. Andreas' Deposition

There are three areas of concern arising from Mr. Andreas's June 28, 2006 deposition: appearance, attitude and veracity. Mr. Andreas appeared in a T-shirt emblazoned with this message: KILLER SMOKES – KENT CIGARETTES – 1952 - 1956 – MADE BY LORILLARD TOBACCO. The deposition was videotaped. If a lay witness had appeared so attired for a video deposition, the Court would certainly have been offended – perhaps moved to censure the witness. For an officer of the court to show such lack of respect is shocking.

Mr. Andreas spent much of the time lecturing opposing counsel, ruling on the propriety of issues of inquiry, and refusing to answer many questions. His obstructionist tactics necessitated a resumption of his deposition, and those of other Brayton Purcell witnesses, in October.

15

Of course, the worst aspect of the June deposition is the veracity question. Since the return e-mail of March 22, 2006 from Mr. Andreas to Ryan Poole clearly establishes that Mr. Andreas was aware of the amendment of the Johns Manville claim form, his testimony under oath at his June 28, 2006 deposition is most alarming:

> Q. Did you send any e-mails, on March 22nd, to your office on the subject of the amendment of claim forms?
>
> A. ...Yeah. I sent no e-mail on the 22nd in which I said that the John Manville claim form should be amended, if that's your question...No, I did not.
>
> Q. ...Did you send any e-mails, the evening of March 22nd, to your office on the subject of John Manville claim forms?
>
> A. No.
>
> Q. ...Did you receive any e-mails on that evening of March 22nd, from your office on the subject of John Manville claim forms?
>
> A. ...Right. I did receive an e-mail on the 22nd at, I believe, 7:19 p.m. Pacific time, from Ryan Poole. I found out about this, of course, the next afternoon or evening, on the 23rd, when I finally got around to picking up my e-mail.
>
> I was extremely busy. I was asleep before 10:00 p.m. on the 22nd, which is before the e-mail arrived. So I'm trying to make this as clear as possible for you. I wasn't aware that that had actually been sent to me until the afternoon or evening of the 23rd.
>
> Q. ...But whatever time you went to sleep, you know, at that time, that your office had been working on preparing an amended claim form?
>
> A. No, I did not.

Andreas Deposition Tr. (June 28, 2006), p. 62.

There is simply no justification for these falsehoods. It is one thing, perhaps, to have imperfect memory; however, when you blatantly create a falsehood (I was asleep at ten o'clock) to buttress your previous lies, it can only be attributed to a purposeful plan to deceive the Court.

16

The bitter irony of all this deception is that it was directed at a relatively innocuous issue, i.e., when did Mr. Andreas become aware of the amendment? His statement of support for the original claims form could have been explained or withdrawn or ignored as an obscure issue in a case fraught with dozens of more compelling issues. But rather than admit that he rashly supported his firm's original claim form even though he was aware of its impending amendment, he chose to weave a seemingly endless web of deceit. What a shame! He jeopardized his client's case and his own reputation because he would not admit to a little bravado in the heat of the moment.

9.      Obstruction of the Discovery

The Court-ordered discovery of March 27, 2006 was accomplished only after interruptions, motions and hearings. We need not repeat the previous findings that Plaintiffs' counsel consistently and persistently obstructed the discovery process, turning what should have been an orderly examination of the issues into a nine-month saga of frustration. We are reminded of the Ohio Supreme Court's take on lawyers who stifle the discovery process. In *Cincinnati Bar Ass'n v. Marsick* (1998) 81 Ohio St.3d 551, where the attorney at issue failed to disclose information and caused his client to submit false discovery responses about the existence of a witness secured by the attorney, the Court stated:

> Our system of discovery was designed to increase the likelihood that justice will be served in each case, not to promote principles of gamesmanship and deception in which the person who hides the ball most effectively wins the case.

*Id.*, quoting *Abrahamsen v. Trans-State Express, Inc.* (6th Cir. 1996), 92 F.3d 425, 428-429.

The Court stated further:

> A discovery request raises an obligation to produce the evidence sought when it is relevant and not privileged. Concealing evidence that is clearly requested is tantamount to deceiving both opposing counsel and the court. We have

17

consistently imposed sanctions for lying to clients, to opposing counsel, and to the court.

*Id.*, citing *Disciplinary Counsel v. Greene* (1995), 74 Ohio St.3d 13, 16, 655 N.E.2d 1299, 1301; *Disciplinary Counsel v. Fowerbaugh* (1995), 74 Ohio St.3d 187, 658 N.E.2d 237.

The Court concluded that:

> The integrity of the individual lawyer is the heart and soul of our adversary system [that] depends on the integrity, moral soundness, and uprightness of the lawyer. . . . There can be no breach or compromise in that essential quality of an officer of the court without seriously undermining our entire adversary system.

Conclusion

If there is one singular characteristic of the American system of jurisprudence, it is the relentless pursuit of truth. All of our rules of procedure and evidence are designed to provide the decision maker with all relevant and trustworthy information so that the controversy can be decided based upon the truth. The process of gathering and presenting that information is to be conducted with dignity and civility. When lawyers in Ohio participate in that process, they are specifically proscribed from engaging in "...conduct involving dishonesty, fraud, deceit or misrepresentation." 19 Ohio Rev. Code, DR 1-102(A)(4). Attorneys seeking admission to practice in Ohio must swear that

> ...I will support the Constitution and the laws of the United States and the Constitution and the laws of Ohio, and I will abide by the Code of Professional Responsibility.
>
> In my capacity as an attorney and officer of the Court, I will conduct myself with dignity and civility and show respect toward judges, court staff, clients, fellow professionals, and all other persons.
>
> I will honestly, faithfully, and competently discharge the duties of an attorney at law."

The record before this Court indicates that Brayton Purcell institutionally and Christopher Andreas individually have failed to abide by our rules. They have not conducted themselves with dignity. They have not honestly discharged the duties of an attorney in this case. Therefore, they have forfeited their privileges to practice before this Court. The motion to revoke *pro hac vice* privileges is granted.

The motion to dismiss is more troubling. Normally, for such egregious behavior as chronicled herein, there should be consequences. Rule 37 of the Ohio Rules of Civil Procedure provides for dismissal under such circumstances. If there had been any complicity by any member of the Kananian family, such a Draconian measure might be appropriate; however, the family did nothing improper. Furthermore, the current counsel for Plaintiff, Mr. Bruce Carter, was completely blameless as well. Therefore, the motion to dismiss is overruled.

IT IS SO ORDERED.

_(signature)_
JUDGE HARRY A. HANNA

JANUARY 18, 2007