UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE


IN RE:                          .    Chapter 11
                                .
W.R. GRACE & CO., *et al.*,      .    Case No. 01-01139(JKF)
                                .    (Jointly Administered)
                                .
        Debtors.               .    April 2, 2007
                                .    1:30 p.m.
                                .    (Wilmington)


TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE JUDITH K. FITZGERALD
UNITED STATES BANKRUPTCY COURT JUDGE


Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

1          THE COURT: This is the matter of W.R. Grace, 01-

2    1139.  The participants I have by phone, John O'Connell, Guy

3    Baron, Dale Cockrell, Christopher Candon, Daniel Cohn, Debra

4    Felder, Richard Wyron, Joseph Radecki, Jason Solganick, Beau

5    Harbour, Peter Lockwood, Walter Slocombe, Elisa Alcabes,

6    Oscar Mockridge, Leslie Epley, Sarah Edwards, Paul Malek,

7    Martin Dies, Andrew Chan, Kenneth Thomas, David Klingler,

8    David Parsons, Brian Kasprzak, Michael Joyce, Mark Plevin,

9    Daniel Speights, Darrell Scott, Edward Westbrook, Sean Walsh,

10   Scott Baena, David Siegel, Paul Norris, Jarrad Wright, Warren

11   Smith, Barbara Seniawski, Andrew Hain, David Hickerson,

12   Natalie Ramsey, Alex Mueller, Arlene Krieger, David Liebman,

13   Jacob Cohn, Peter Shawn, George Calhoun, Marti Murray, James

14   Restivo, Douglas Cameron, Sander Esserman, Van Hooker, Lisa

15   Esayian, Tiffany Cobb, Andrew Craig, Elizabeth DeCristofaro,

16   Curtis Plaza, Cleve Preece, Sam Blatnick, Michael Davis,

17   Robert Guttmann, Steve Mandelsberg, Janet Baer, David

18   Mendelson, and Theodore Freedman.  Folks please, if you are

19   on the phone or in court, turn off your Blackberries.  It's

20   causing interference with the phone system when you're using

21   your Blackberries.  I'll take entries in court, please.

22          MR. BERNICK: Good afternoon, Your Honor.  David

23   Bernick for Grace.

24          MR. O'NEILL: Good afternoon, Your Honor.  James

25   O'Neill for Grace.

1          MR. KRUGER: Your Honor, Lewis Kruger and Ken

2    Pasquale of Strook for the Unsecured Creditors Committee.

3    And with respect, Your Honor, because of the holiday this

4    evening, I'll be leaving at 3 o'clock - -

5          THE COURT: Yes, sir.

6          MR. KRUGER:  - - and my colleague will be staying

7    on.

8          THE COURT: Thank you.

9          MR. BECKER: Good afternoon, Your Honor.  Gary

10   Becker from Kramer, Levin, Naftalis & Frankel for the Equity

11   Committee.

12         MS. HARDING: Good afternoon, Your Honor.  Barbara

13   Harding for Grace.

14         MS. SINANYAN: Good afternoon, Your Honor.  Lori

15   Sinanyan for Grace.

16         MR. MULLADY:  Your Honor, good afternoon.  Raymond

17   Mullady for the FCR.

18         MR. FINCH: Good afternoon, Your Honor.  Nathan

19   Finch for the Asbestos Claimants Committee.

20         MR. SCHEPACARTER: Good afternoon, Your Honor.

21   Richard Schepacarter for the United States Trustee.

22         MR. HURFORD: Good afternoon, Your Honor.  Mark

23   Hurford of Campbell Levine on behalf of the ACC.

24         THE COURT: Mr. Bernick?

25         MR. BERNICK: Yes, Your Honor.  I think that there

1    was an expedited motion that had been set to be heard at

2    1:30.

3              THE COURT: Yes.

4              MR. BERNICK: We know how hard you work and how busy

5    it was today.  In any event, would it be Your Honor's

6    preference just to begin with that, and then go to the rest

7    of the agenda, or?

8              THE COURT: What are the, what is the majority of

9    - - the people who have to leave early, what is their

10   interests in hearing?  What is it that they need heard first?

11             MR. KRUGER: Not the original 1 o'clock agenda, Your

12   Honor.

13             THE COURT: Okay.  Then why don't we start with

14   those issues first, if that's all right.  And then we'll back

15   into whatever else, if there are things that the people who

16   have to leave early need to hear.

17             MR. BERNICK: Okay.  I don't know that there's

18   anybody that wants to have that one heard.  We're more than

19   happy to proceed with that one.  And I don't know how long

20   Mr. Mullady intends to take with it.

21             THE COURT: Mr. Kruger is there something specific

22   that you're more interested in than that?

23             MR. KRUGER: I think really just the agenda, the

24   regular 1:30 meeting.  All right?  And as I said, Mr.

25   Pasquale will be here, so even if I miss some of it we'll - -

1          THE COURT: Oh, all right.  So you don't care if we

2     start with the - - all right.

3          MR. KRUGER: Not at all.

4          THE COURT: Then we'll just start with the expedited

5     matter, then.

6          MR. KRUGER: Half an hour?  Okay.  Go ahead.

7          THE COURT: Mr. Mullady, good afternoon.

8          MR. MULLADY: Good afternoon, Your Honor.  Raymond

9     Mullady for the FCR.  As Mr. Bernick correctly stated, we,

10    the committees, the Asbestos Claimants Committee and the FCR,

11    have moved for the entry of an order compelling the Debtors

12    to compile the personal injury questionnaire information,

13    including data taken from attachments to the PIQ forms, into

14    a complete navigable database, and to make the complete

15    navigable database available to all parties on April 13th.

16    It's an emergency motion, Your Honor, because the database is

17    due in two weeks, and absent this Court's intervention the

18    database Grace intends to produce will be substantially

19    incomplete and in contravention, we submit, of the Court's

20    orders.  Now Grace's counsel announced at the last omnibus on

21    February 26th for the first time that because of Rust's

22    inability to process documents attached to the questionnaire

23    forms, Grace had retained a supplemental claims processing

24    agent to complete Rust's work.  Now the Debtors didn't reveal

25    the name of that supplemental claims processing agent, but we

1   have it on information and belief that it is the Delaware

2   Claims Processing Facility.  Grace wants to treat the, the

3   work that the DCF performed, Your Honor, as consulting expert

4   witness work product, and not include it in a navigable

5   database provided to all parties on April 13th.  They want to

6   give us a database that does not reflect any coding of

7   materials attached to PIQ's and presumably require the

8   committees, and the other parties in this proceeding, to

9   undertake the duplicative step of treating, excuse me of

10  retaining similar processing facilities on their own to the

11  expense of the estate.  The Court's orders, Your Honor,

12  clearly provide otherwise.  The currently operative CMO,

13  which is dated December 19, 2006, requires that, and I quote,

14  "The Debtors' claims agent shall compile the information

15  contained in the supplemental questionnaire responses into a

16  navigable database."  End quote.  The Court's October 12th,

17  2006 order dealing with Grace's initial objections to the use

18  of attachments, provides at paragraph 2, and I quote, "The

19  portion of the Debtors' motion seeking a ruling that answers,

20  that answers to the questions contained in the questionnaire

21  may not be provided solely by means of attachments is denied.

22  However, if a response is made by way of an attachment, the

23  attachment must have" and then the Court listed its

24  conditions.  Read together, it is absolutely clear that these

25  two orders require that the navigable database reflect,

1   quote, "information contained in the responses", end quote,

2   and that a quote, "response", end quote, may be by way of an

3   attachment.  Any other reading would just be nonsense.  It is

4   the responses that must be reflected in the questionnaire.

5   There is no information in the questions themselves that's

6   pertinent to this inquiry.  Only the responses.  And if the

7   responses are by way of attachments, these orders require

8   that information to be coded and provided to all parties by

9   April 13th.  And let's not forget Your Honor, that the October

10  12th, 2006 order - - I'm sure you won't - - was hard fought

11  and that Grace got what it wanted.  This Court imposed strict

12  conditions on when attachments could be used or provided as a

13  response.  Having secured that relief, Grace must now include

14  all responses in the navigable database.  Now when I sit down

15  Mr. Bernick's going to stand up here and he has some slides,

16  and he's going to argue that there has not been full

17  compliance with the Court's October 12 order on attachments.

18  I think he's also going to argue, based on what we saw in his

19  slides, that there has not been compliance with the Court's

20  consulting expert order, or at least the x-ray order.  Now

21  those are red herring arguments, Your Honor, for today's

22  purposes.  I'm not suggesting that they're not relevant

23  arguments for this proceeding, but for today's purposes, they

24  are an aside.  In the CMO the parties have proposed to the

25  Court, in fact, there - - which awaits the Court's signature,

1   and which will, believe will be presented to you in the body

2   of the omnibus hearing - - there are dates, briefing dates,

3   and hearing dates for some of these issues that Mr. Bernick

4   wants to talk about today.  So the issue of compliance isn't

5   what we're here about.  What we're here about is whether

6   Grace, under the existing orders, has to give us the

7   information that the DCF has been working on.  Now the

8   statistics that Mr. Bernick has do speak to a broader issue,

9   and one that I believe is related to our motion.  And that is

10  to point out how predictable it is that the PIQ exercise

11  would get to this point.  That it would be overly complex,

12  that it would be fraught with error and delay, and simply

13  unreliable as an estimation tool.  Now for proof of this, the

14  Court need look no further than Grace's slides, and Mr.

15  Bernick will display them.  You'll see that the PIQ data in

16  them is incomplete and erroneous because it doesn't reflect

17  the attachments.  And Grace knows this full well.  So the

18  statistics ignore the attachments, the attachments are

19  responses, and there's also a time line history that's

20  important and relevant, Your Honor, which with the Court's

21  permission I'll step over to the easel, because I made some

22  notes.

23          THE COURT: All right.

24          MR. MULLADY: I'll keep my voice up.  I need one of

25  those walk around mics (microphone not recording.)

1        THE COURT: I don't know if this one helps.  This

2   one - -

3        MR. MULLADY: Thank you, Your Honor.

4        THE COURT:  - - (microphone not recording) can't

5   take the cord too far.

6        MR. MULLADY: Well, this should help a little.  And

7   with the Court's permission I'll stand closer to you than I

8   ordinarily would so I can read and speak into the microphone.

9   What I've put on the easel here, and I hope this is visible

10  to counsel, are two columns.  The Court's orders and Grace's

11  public posture on the left, and then on the right the actual

12  facts known to Grace.  And I want to go back to 2004,

13  November, 2004, which - - when during Grace's motion for the

14  estimation Mr. Bernick argued that the PIQ process, and all

15  discovery associated therewith, could be done in six months.

16  And that was Grace's motion filed on November 13th, 2004, and

17  there was also a hearing in late August of 2005 where Mr.

18  Bernick laid out the time line and provided this six month

19  period and notably said that the, Grace's claims processing

20  agent could process all the PIQ's and information in 21 days.

21  Now what did Grace actually know at that time?  They knew

22  that was totally unrealistic.  We know now that the process

23  has dragged on inexorably.  Anyone could have seen that this

24  was going to be the case.  In fact Your Honor, back in June

25  of 2005 at the hearing on the 27th of that month said, and I

1  quote, "This case needs to be out of bankruptcy.  There is no

2  benefit to anyone having it here this long.  It should be

3  done.  Mr. Bernick, the plan has what I think is a defect.

4  Whether it's fatal or not, I don't know, but it has no

5  alternative to what happens in the event that the personal

6  injury estimates are greater than what the Debtor thinks the

7  cap should be.  And since it has to be 100% plan, there has

8  to be some alternative."  End quote.  And that's from the

9  June 27, 2005 transcript at page 81, line 7 through 14.  So

10  there was scepticism about it then.  We move into August of

11  2005 and here is when the issue of attachments first becomes

12  an issue in the case.  The CNO approving the PIQ is entered,

13  and requires that the Debtors' claims processing agent shall

14  compile the questionnaire information into a navigable

15  database and make it available to all parties.  Well Grace

16  understood, at this point in time, that there would be

17  documents attached to the PIQ.  Indeed, it requested

18  attachments.  It insisted upon them.  The CMO always

19  contemplated that Rust would include all information in the

20  database, and one of the reasons was to give it to the ACC

21  and the FCR experts so they'd have the benefit of it.  And

22  all parties.  We move to June of 2006.  And this is when we

23  have a critical fact.  This is when Grace hires the Delaware

24  Claims facility.  We have this on very good information.  And

25  it's hired to review not only the PIQ responses and code the

1    results, but also to code the attachments.  Grace knows at

2    this point that attachments are an issue.  They're part of

3    this process.  So what does it do?  I hires the DCF.  It

4    doesn't inform the other parties of that, but that's what it

5    does.  July of 2006 the, an amended CMO is entered.  It

6    adjusts dates for the cured responses.  The Court will

7    remember that process.  Rust shall compile the questionnaire

8    information into an navigable database and Rust shall compile

9    information provided in cured responses.  That's from the

10   July 24th, 2006 CMO.  So the CMO's have always contemplated

11   that the database would include all PIQ information,

12   including cured ones.  September 2006.  This is the hearing

13   of September the 11th.  And I have the transcript here.  And

14   it was notable to me that this was the hearing where Mr.

15   Bernick purported to make some rulings.  I say that only

16   semi-euphemistically, because he said, "Ruling one, ruling

17   two".  His ruling one, euphemistically, was, and I quote, "If

18   they're going to rely upon a document, they attach the

19   document and identify it with, identify it specifically by

20   page where appropriate.  Number 2, they answer the

21   questions."  So he's contemplating that the attachments be

22   provided, and at this point we know from our information that

23   Grace sends 2,563 PIQ's with attachments to the Delaware

24   Claims Facility.  It doesn't send all of them.  It sends

25   2,563.  We move to October, 2006.  By then the Delaware

1    Claims Facility has complete coding these 25 hundred and some

2    odd PIQ's.  Now we're into January of 2007.  We have an

3    omnibus hearing.  Counsel says that Grace might have to seek

4    an extension to get it all done.  And clearly the implication

5    was that they were going to go through all these PIQ's, all

6    of the attachments, and try to code everything, and they

7    needed an extension.  Well, what was Grace actually doing?

8    They weren't coding all attachments.  They had the Delaware

9    Claims Facility 25 hundred that had been done and now in

10   around January they give them 15 hundred more PIQ's to look

11   at.  They know they won't be coding all of them.  Just these

12   15 hundred plus the 25 hundred.  And then February 23, 2007,

13   a status report is filed by Grace.  This is where Grace says,

14   "The situation has required extraordinary and unanticipated

15   efforts by Grace and impacts Rust's ability to completely

16   assemble a navigable database.  The results are a further

17   slippage of approximately 60 days."  Well was it

18   unanticipated?  Grace knew that since October, 2006 it didn't

19   intend to submit all of the attachments to the Delaware

20   Claims Facility.  It knew it had just given them 25 hundred

21   plus a new round of 15 hundred for about 4,063.  So the

22   impression that was created that more time was needed so that

23   all of this work could be done, it was an artificial

24   impression, with all due respect.  We know that it's 4

25   thousand, we know that they're doing that.  And then Mr.

1    Bernick said at the hearing, quote, "One of the main reasons

2    why we don't have the data before our experts, our experts,

3    is we're now having to retain a separate firm to go through

4    the attachments and figure out how those attachments possibly

5    relate to this form." End quote. Now we know that he didn't

6    just then retain the Delaware Claims Facility. They'd been

7    retained months ago, and they'd be doing their work, and

8    they'd been analyzing these PIQ's. And the last fact, Your

9    Honor, I think that's relevant is in the March 26th - - I

10   didn't put it on my chart - - but in the March, on March 26th,

11   2007, when Grace filed its opposition to the motion I'm

12   arguing right now, it claimed for the first time that only 2

13   thousand PIQ's and attachments are being coded by this

14   supplemental claims processing facility. So what do we know

15   here? We know that there were a hundred thousand or so PIQ

16   responses and sets of attachments. Four million pages.

17   We've extended this process for months, so that this amount

18   of data could be gone through by Grace's experts. Rust, the

19   Delaware Claims, and the Delaware Claims Facility. Now we

20   find out that it's really an exercise to look at 2 thousand,

21   and we don't want to give you the 2 thousand, we don't want

22   to code those, because this is attorney work product. Your

23   Honor, we submit that this motion should be granted. The

24   orders that the Court entered are clear. This process has

25   been one that has taxed the resources of the Court and the

1   parties, and it's time that we get to the heart of the

2   schedule, which is to get the expert reports exchanged, get

3   this navigable database produced in a form that the Court

4   contemplated, which was a complete form.  And Your Honor, if

5   the reality of this matter is that Grace only intends to rely

6   on 2 thousand PIQ's, or if it intends to rely on 98 thousand,

7   from the Committee's perspective, this is a meaningless

8   exercise in any case, because it's not going to inform the

9   Court of what Grace's true liability is.  But at least for

10  today, we would like the Court to order that the complete

11  navigable database be produced.  Thank you.

12          THE COURT: Mr. Finch.

13          MR. FINCH: Good afternoon, Your Honor.  Nathan

14  Finch for the Asbestos Claimants Committee.  I join in

15  everything that Mr. Mullady just said, but rise briefly to

16  address two points.  First of all, it is not our intention

17  here to delay the case by eight years, as Grace seems to

18  suggest at the end of its papers where they say, Well it

19  would take eight years to compile the documents and

20  attachments to a hundred thousand questionnaires into a

21  database.  It's our intention to, that our experts have the

22  same navigable database that their experts have at the same

23  time that they get it.  If all they have is 2 thousand on

24  April 13, or actually what our information - - which I think

25  is very reliable information - - suggests is they have coded

1    the attachments for four thousand questionnaires, we should

2    get the benefit of that the same time that Grace, Grace gets

3    that.  Their experts have probably been working with it

4    already.  Secondly, I think the issue of expert work product

5    is a red herring.  It is true that I have hired a defense

6    firm to go through a certain subset, a very different subset

7    than what Mr. Bernick is doing, of the questionnaires, and

8    that work has just been underway and it's not going to be

9    ready until probably July when the expert rebuttal reports

10   are done.  And Mr. Bernick will certainly get access to that

11   at that point in time.  That is sort of pure expert work

12   product.  Or it's actually more likely my work product.  And

13   to the extent any of our experts rely on it, he'll be getting

14   it.  But the whole questionnaire process.  When the

15   questionnaire was sent out, Grace represented to Your Court

16   that its experts needed all this stuff to do their estimates.

17   And now we find out they're not even going to look at 98% of

18   it.  Basically what they did is they did discovery against

19   100 thousand people at the same time, and it's kind of like

20   the dog that's chasing the car.  When the dog finally catches

21   the car, what's he going to do with it?  Well, they've got

22   100 thousand people who sent in the equivalent of document

23   responses and interrogatory answers, and I submit to you it

24   probably would take eight years to wade through all that

25   stuff and to decode it into anything that is, that is usable.

1    Which is sort of what we told Your Honor all along.  But the

2    point is though that they hired Rust Consulting.  Rust is in

3    part an agent to the Debtor, but it's also an agent of the

4    Court.  Rust was going to type this information into a

5    questionnaire.  And now they have basically hired an

6    additional firm to supplement Rust, but only given it some of

7    the questionnaires, i.e. the 4,100, to do that.  And I see

8    this as no different as if Rust had gotten some of the

9    questionnaires in French, and they hired a French translating

10   firm to help them.  They hired a document translating firm to

11   help them type a subset of this in.  And if it is, if it's

12   physically impossible to get 100 thousand questionnaires and

13   their attachments coded by April 13th, which is obviously the

14   case, then that's fine.  But we should get whatever Rust and

15   the Delaware Claims Facility has pulled together to date.

16   And it's our understanding, based on information and belief,

17   that the Delaware Claims Facility will be done with the

18   coding of the 4 thousand questionnaires and all their

19   attachments within 5 to 6 business days.  So that, you know,

20   should be ready by this week, next week.  So what I, what I

21   suggest is, Your Honor, is that at a minimum you order the

22   Debtor to turn over to the ACC and the FCR whatever coding

23   work up the Delaware Claims Facility has done with the 4

24   thousand questionnaires and their attachments that it has.

25   Even if they haven't gotten to the other 96 thousand of them.

1   With that, Your Honor, I'll sit down and let Mr. Bernick

2   speak.

3           MR. BERNICK: This afternoon, Your Honor, I'm

4   gratified to see that Mr. Finch, much as I disagree with him,

5   has the virtue, among many others, of being very consistent.

6   And I want to show the Court a document that makes a very

7   important distinction that is the heart of the issue that you

8   have before you.  May I approach and use the ambo, please,

9   Your Honor?  More than one year ago, an email was sent by Ms.

10  Basta from my firm, who is with us here in court today.  And

11  you'll see it's dated January 31 of 2006.  And it says, it

12  goes to the folks on the other side of the case, it says,

13  "All, attached please find the proposed data, data export

14  structure that Rust Consulting intends to use in compiling

15  the W.R. Grace's asbestos personal injury questionnaires into

16  a navigable database per the case management order.  Please

17  contact us by Tuesday, February 7 if you have any questions

18  or comments on the protocols."  Well on the very last date of

19  the contact request, that is the 7th of February, Mr. Finch

20  writes back.  And he says, in substance, With respect to the

21  protocols for reviewing the questionnaires, our experts are

22  still reviewing them, but have already identified a host of

23  flaws with the approach.  Rust is the Debtors' claims agent,

24  not an agent of the Court, and this is your discovery not

25  ours.  We have no obligation to improve your discovery

1    efforts and our experts will identify the flaws in Rust's

2    approach, and any reliance experts, any reliance your experts

3    place upon the database Rust constructs at the appropriate

4    time in the process.  Which in our view is in connection with

5    the expert reports.  So Mr. Finch is making a critical

6    distinction, and the distinction is at the heart of

7    understanding the very dramatic request that is being made

8    here in understanding why it's wrong, why the case management

9    order cannot reasonably be construed to call for the very

10   dramatic result that's being advocated here.  The

11   questionnaire itself actually called for both responses to

12   the specific questions, fill in the blanks, we'll call it,

13   the questionnaire answers, and also called for attachments,

14   or documentation that would be associated with the

15   questionnaires.  Both of these were called out in the PIQ's,

16   both of them are still called out today.  They were always

17   separate requirements in the sense that even the original

18   questionnaire, even if you answered every single question on

19   the face of the questionnaire, you also had to supply

20   attachments because they were required by the questionnaire

21   itself.  This distinction goes back to the questionnaire, and

22   therefore going back to the very beginning in complying with

23   the case management order in the case.  We called out that

24   Rust would be given the task of going through all of the

25   questionnaires and seeing what answers were there, and

1    basically re-typing the answers into a database.  That's what

2    their job was.  Not selected data, but all data.  Not

3    selected questionnaires, but all questionnaires.  Expertise?

4    No expertise.  This didn't require any expert analysis.  That

5    was their job.  It was revealed openly in the very first

6    email that went to Mr. Finch.  Mr. Finch's response was,

7    Well, this is your deal.  We have got a different process

8    underway, and we don't have any obligation with respect to

9    what Rust is doing because he says his process involved his

10   experts.  That his experts were going to take a look at what

11   it is that Rust did at an appropriate point in time under the

12   CMO that is in connection with the expert reports there would

13   be disclosure of what it is that his experts believed.  So

14   that we're all carved out for Rust from the very beginning,

15   understanding the questionnaire itself that required both

16   answers and attachments, Rust was focused on the answers in

17   the PIQ.  That was their only job.  And we told them that at

18   the outset, and we repeated it again, and again, and again.

19   And never said, Oh, well, gee.  There's some problem with

20   that.  Or, gee, why aren't these people, are they going to do

21   an expert report, and they don't have show anything until

22   they do the expert report?  No.  They said, In accordance

23   with the CMO we're entitled to all the data when it's

24   actually turned out and given to the Debtor.  The problem

25   with their motion is that their motion now conflates,

1   deliberately conflates, the function of Rust in simply typing

2   out the answers that have been put in the places on the PIQ,

3   and the very different function of analyzing the attachments.

4   And it's true.  We did retain other experts to analyze the

5   attachments.  They say on information and belief.  In point

6   of fact, they have sought to dissuade this other expert from

7   actually helping us out in the case.  Mr. Mullady is smiling

8   because he knows that it's so.  They tried to get these

9   people not to do it.  We retained, under his own chronology

10  we retained these folks in, in June of '06.  That was long

11  before Your Honor issued the order that allowed them to use

12  attachments in place of an answer.  Subject to certain rules.

13  What does that say?  It says we always contemplated that the

14  attachments would require a different level of expertise.  We

15  ourselves, therefore, completely properly made a distinction

16  between Rust, who was focused on the answers to the

17  questionnaires, and the analysis of attachments, which was

18  not simply typing in data, but required expert analysis.  The

19  DCF people are not from, in terms of how we're using them,

20  they're not a claims agent.  They are undertaking very

21  different work.  What is the work that's being done in

22  connection with the attachments?  It is DCF plus our experts

23  who are going to be testifying, just like Mr. Finch's experts

24  are going to be testifying.  What are they doing?  Are they

25  simply retyping answers? No.  They are reviewing selected

1    data from the, from the attachments.  They're not reviewing

2    and simply recording down all of the data that's in all of

3    the attachments.  That would be an impossibility.  We'd never

4    get finished.  We'd never be done.  Are they analyzing all of

5    the claimants, all the questionnaires?  No.  It is certainly,

6    it's only selected questionnaires.  And what is it that's

7    providing the guidance for what's being done?  It is

8    expertise.  It's expert driven.  These people are performing

9    analyses that are being directed by our other experts for

10   purposes of fleshing out our expert theories in the case.

11   Fundamental distinction between Rust's job and the job of

12   experts in the case.  Now they say, Well, we have to go

13   through and construe the first CMO which says Rust is

14   supposed to look at all the responses together with your

15   supplemental order that says responses can be provided, or be

16   provided by way of attachment subject to certain rules to

17   say, Well, by means of that we then undertook that Rust would

18   now in fact have to go through the entire population of

19   attachments and record all of the attachments in a navigable

20   database, and they want it yesterday.  That was never in the

21   cards.  We wanted the answers to be provided by way of

22   attachment, but to get the data out of attachments was going

23   to require that we had new experts involved.  And it simply

24   is not feasible.  They have now orchestrated this so that

25   it's impossible to simply go through all of the attachments

1    and fill out with respect to each and every claim all the

2    necessary information from the attachments.  It's not doable.

3    We're not trying to do it.  What we're trying to do is

4    through out own experts, bring in people who can read the

5    attachments, look at selected data that pertains to certain

6    questions that are of strategic value to us, and to do it on

7    a sampling basis.  We presume that their own experts are

8    going to do the same thing.  And so their experts will come

9    in with their expert reports, our experts will come in with

10   our expert reports.  But this expert work is not available to

11   them simply because Rust was hired at a certain point to do

12   word processing.  The CMO doesn't require that.  No one ever

13   made such an application to the Court.  In fact, what the CMO

14   says is that expert work would be handled separately.  So the

15   conflation that is the source of the problem today is that

16   the work of Rust that's being done for purposes of simply

17   recording what appears on the face of the questionnaire is

18   now being conflated with expert work that's being done by a

19   group of other people subject to the CMO provisions that deal

20   with expert work.  We're not going to disclose this until our

21   experts disclose it in their expert reports, just as Mr.

22   Finch so bluntly, frankly, said in his email on February the

23   7th, We're not going to tell you what our experts think now.

24   We're not going to tell you what they think later about your

25   protocol.  We're going to tell you when we have to under the

1   CMO.

2           THE COURT: Is Rust doing any analysis with respect

3   to the attachment, or analysis, recording of data, whatever

4   you want to call it, is Rust doing anything with respect to

5   the attachments?

6           MR. BERNICK: I don't believe that Rust is doing

7   anything with respect to the attachments.

8           THE COURT: All right.  To the extent that Rust is

9   doing something with respect to the attachments, it seems to

10  me that that is a recording function that ought to be

11  disclosed.  To the extent that it's DCF, or whoever your

12  expert analysis is, if they're taking their marching orders

13  from you in preparation for your experts, it seems to me

14  that's not disclosable.

15          MR. BERNICK: Well I don't know, I mean, my, my - -

16          THE COURT: Not now.  Not at this point.

17          MR. BERNICK: Yeah.  Well Rust in fact, I would

18  stress to Your Honor, Rust is also subject to another

19  stipulation that's very important.

20          THE COURT: Well, yes.  That's true too.

21          MR. BERNICK: Okay.  In fact, Rust is specifically

22  called out in that stipulation as being subject to it.  And

23  as what Your Honor remembers is that anything that is not

24  actually relied upon for purposes of a final expert's opinion

25  is not discoverable, and that specifically pertains to Rust.

1   Rust is actually written out in the stipulation.  Your Honor,

2   we went down the road with a very plain and simple function.

3   And we thought at the time that it really was going to be

4   relatively simple, because we thought at the time people were

5   going to actually answer these questionnaires as they were

6   styled to be answered.  And it was - - they were designed to

7   be a pure data processing exercise, and all that we had to do

8   was give the navigable database, everybody would have it, and

9   their experts would pick and choose what they wanted.  It

10  didn't turn out to be so simple for all the reasons that Your

11  Honor well knows.  But the fact that the database turned out

12  to be more limited, really as a result of what the claimants

13  themselves wanted, doesn't aggregate our work product rights

14  with respect to our experts, which are just as they would

15  always have been, and just as the Plaintiffs have so

16  vigorously insisted that they should be preserved in their

17  case.  So we set Rust down to the task, and they did the best

18  that they could.  And the database that's now been created,

19  per the protocols that we always disclosed, that database is

20  being disclosed.  There's no question about that.  So what we

21  promised to have Rust do, and what we promised to disclose

22  from Rust, is absolutely being disclosed.  We're living up to

23  every letter of the CMO in that respect.  The question that's

24  before the Court is whether the other side can somehow use

25  what was really their preference to answer by virtue of

1    attachment to turn Rust into something it was never designed

2    to be, and in the process undercut our rights to have our

3    experts work in peace and quiet until the expert reports are

4    used.

5         THE COURT: Well to the extent that Rust is the

6    entity that is doing some recording, and it is, and it is

7    available to be put into the navigable database, it seems - -

8    not on a selected basis.  To the extent that Rust is given a

9    document, and essentially told to retype, reformat that

10    document into the navigable database, it seems to me that

11    that navigable database should be available to everyone.

12         MR. BERNICK: The navigable database that Rust is

13    creating under their protocol is going to be made available

14    to everybody.  Has Rust done some word processing activity in

15    service of this other effort?  I don't know.  But the fact of

16    whether Rust does the word processing, or somebody else does

17    the word processing, doesn't make it discoverable as Rust's,

18    as a Rust database as the claims agent.  That's just a word

19    processing function.  I don't know that they've done it, Your

20    Honor, but to interpret, to interpret their role here as

21    allowing the other side to understand what we have selected

22    from the attachments for our purp - - there are 4 million

23    pages.  They - - we are - - there is all kinds of work

24    product and draws that are made in terms of what to look at

25    here.  We're not - -

1        THE COURT: I understand.  But I never understood

2    that Rust was going to be used in the capacity of an expert,

3    or protected as an expert for anybody in the case.  They were

4    to be the equivalent of a processing function.

5        MR. BERNICK: But Your Honor, Rust was specifically

6    called out in the stipulation.

7        THE COURT: Yes.

8        MR. BERNICK: And the whole idea of that was that to

9    the extent that Rust did, to the extent that Rust did do

10   additional work, that was then, not - - was then shown to an

11   expert and not relied upon, it would be protected as well.

12   And unfortunately I don't have that particular document here.

13   Although maybe I do have it here somewhere.  But in any

14   event, all that - - to my, my understanding and as I'm being

15   told here, all of the Rust database is being disclosed on a

16   rolling basis and has been since last September.

17       THE COURT: Okay.  That's what I'm saying.

18       MR. BERNICK: Yeah.

19       THE COURT: Anything that's in that navigable

20   database that Rust is hired to create I think has to be

21   disclosed.

22       MR. BERNICK: I don't think that that's why we're

23   here today.

24       THE COURT: Okay.

25       MR. BERNICK: Now there's been a lot said by counsel

1    about how this process is really, this process is really not

2    going to work here.  And I think all that I would say at this

3    point is number one, to the extent that the process has been

4    followed, it is very, very much working, and we're getting a

5    lot of very valuable data and we'll be talking to the Court

6    in a little bit about some of that data.  But what's really

7    taking place here, and you're going to see throughout the

8    day, is that there's a very concerted effort by the Claimants

9    and their counsel, I'm not referring to counsel present here

10   in the courtroom, to show the Court that the process is not

11   workable.  Not on it's merits, but because they're not

12   furnishing the information that Your Honor has ordered them

13   to furnish.  And this is one manifestation of it.  We've had

14   to deal with it, we're dealing with it.  We're doing the best

15   that we can.  We think that the data is going to be very

16   revealing.  But the answer we hear, have today is, Okay, now

17   that you've figured out a way to deal with our problem, we

18   now want special rules under the CMO to give it, give it, for

19   you to give it to us in advance.  And that's just, that's

20   just not appropriate under the CMO, and it's not fair.  And I

21   will, as I figure out where the rest of my papers are, show

22   Your Honor the stipulation that very specifically calls out

23   for protection of Rust.

24            THE COURT: Okay.  Mr. Mullady to the extent that

25   what this is is the Debtors contacting an agency to assist

1   with preparation of expert reports, you'll get it if and when

2   the expert reports are available.  I don't see how the use of

3   the Debtors' selecting portions of the attachments for

4   preparation of an expert report, and preparation for trial is

5   disclosable.  To the extent that what you want is copies of

6   the questionnaires with the attachments so that your experts

7   may cull through them and determine what questions or

8   portions of the attachments they want to use, you may

9   certainly have the primary data.  There is absolutely no

10  reason why you can't have access to the primary data.  But I

11  am not going to force the Debtor to make an early disclosure

12  of its strategy or its expert reports.  You'll get them when

13  the case management order says they're to be disclosed.

14        MR. MULLADY: Your Honor, I understand the Court's

15  ruling.  If I might just by way of a brief reply to Mr.

16  Bernick's statements - -

17        THE COURT: Sure.

18        MR. MULLADY:  - - and for a complete record.  I

19  would ask the Court, rhetorically, why then on March the 2nd

20  were we not provided with the Rust database?  If Rice, if

21  Rust is a typist and all they're doing is performing a

22  clerical function, why couldn't we have had the complete

23  clerical function provided to us on March the 2nd?  I'll

24  answer my own question.  The answer to my question is because

25  Grace wanted to extend this process to permit the review of

1    the attachment data.  It was granted that opportunity.  And

2    now it's telling us that notwithstanding this sliding of this

3    date from March the 2nd to April the 13th, we're going to get

4    essentially the same thing we would have gotten on March the

5    2nd.  Not one wit of work product on the attachments, which

6    are responses under the Court's order.  And as far as Rust

7    being a typist is concerned, I would commend the Court to the

8    order, excuse me, the application the Debtors filed back in

9    2001 for the entry of an order approving and authorizing the

10   retention of Rust Consulting.  And that order, that request

11   paints a slightly different picture of what Rust's function

12   would be.  It is not purported to be a typist.  Among other

13   things, Rust is to quote, perform the quote, "analysis and

14   capture of data included in the proof of claim form through

15   computer scanning and imputing methods and transfer data and

16   images to all parties in interest."  They're not just a

17   typist, Your Honor.  They're going through this material.

18   They're taking it, they're culling it, and they're providing

19   it, putting it, loading it onto the database.  There is no

20   reason why if a medical record says mesothelioma and Rust has

21   that medical record in front of it, it shouldn't be putting

22   that in the database, and that shouldn't be provided to us.

23             THE COURT: Well Mr. Mullady, this is an argument

24   that we had at least fifteen times in the course of going

25   over the questionnaire and whether or not the attachments

1    could be used.  And the Debtor brought up the fact that at

2    some point in time, there would be this issue.  About whether

3    or not there was some either medical expertise that would be

4    necessary, or some discretionary function as to exactly how

5    far Rust could go in terms of analyzing the attachments.  And

6    it was in the course of those hearings, I can't quote you

7    chapter and verse, my memory's not good enough to recall

8    when, but it was in the course of those hearings at which I'm

9    sure Mr. Bernick several times mentioned the fact that he was

10   uncomfortable, and Rust itself was uncomfortable with having

11   to do any form of interpretation of the attachments.  And I

12   am sure at that point in time that there was some recognition

13   that Rust was not going to be interpreting data.  That is the

14   reason why I went to the extent of saying, If you use an

15   attachment, you've got to point out specifically where in

16   that attachment the reference that answers the question is.

17   So that there was no possibility that anyone had to make an

18   interpretation for the claimant.  That the claimant's own

19   view of what the claimant was saying would appear.  So Rust,

20   at this point in time, should not be, in this process,

21   interpreting data.  It should simply be recording the data as

22   the claimant has put it onto the form.  So I agree with you.

23   That's why I was asking Mr. Bernick.  If Rust has in fact

24   recorded data from an attachment into this navigable

25   database, because - - this is hypothetical - - hypothetically

1   someone answers the question rather than saying, Yes I was

2   diagnosed with mesothelioma, by attaching a document that

3   says this person was diagnosed with mesothelioma, and the

4   answer to the question says See Attachment A, page 2,

5   paragraph 4, and that reference says, Diagnosis of

6   mesothelioma, and that's what Rust types in, then yes.  That

7   should be part of the navigable database that you're entitled

8   to see.  But if it's part of what DCF, or whoever it is that

9   the Debtor has retained, and the Debtor has given to DCF a

10  particular selection of documents and said, Analyze this,

11  that you're not entitled to at this point in time.  So if

12  it's part of the Rust database, you're entitled to it, the

13  Debtor is to produce it.  If it's something that DCF is doing

14  in preparation for expert testimony, until the expert reports

15  are due, you're not entitled to it in advance.

16       MR. MULLADY: That is completely understood, Your

17  Honor, but - - and just my last point - - the problem we have

18  with this, the Committees have with this, one of them, Mr.

19  Finch may have others, is that it seems to me that it allows

20  Grace to take away a function from Rust and provide to a

21  consulting expert.  The process that Your Honor just

22  delineated is very clear cut and directly within Rust's

23  expertise.  These attachments, in order to be considered a

24  response per your order in October, have to be clearly

25  understandable and specific that even a typist could take the

1   data and put it in a database.  They made the decision

2   unilaterally, while pushing for months of additional time

3   here, made the decision to delegate that function to a

4   consulting expert, and now they say we can't have the data.

5   And I ask the question - -

6              THE COURT: Wait, I'm sorry.  I'm sensing a

7   disconnect, and I'm not sure which of you I'm

8   misunderstanding.  Because I'm either misunderstanding you or

9   I'm misunderstanding Mr. Bernick.  So let, let me get it - -

10             MR. MULLADY: Sorry if I wasn't clear.

11             THE COURT:  - - straightened out.  Mr. Bernick I

12  thought told me that Rust is putting into the navigable

13  database, in fact it says it on the board, all data from all

14  questionnaires.  And so if there is an answer on a

15  questionnaire that refers to an attachment, and the

16  attachment instead of answering it on the questionnaire

17  answers it in an attachment page, that information should

18  then be plugged into the navigable database.

19             MR. MULLADY: I don't think that's what he's saying.

20             THE COURT: Well, then it should be in there.

21             MR. MULLADY: I agree.

22             THE COURT: That's - - okay.

23             MR. MULLADY: Thank you, Your Honor.

24             THE COURT: If it's there, and it's clear, it should

25  be in the navigable database.

1            MR. MULLADY: If we could at least get the Court to

2    order that much, we would be happier than - -

3            THE COURT: However, if there's any - -

4            MR. MULLADY:  - - with the - -

5            THE COURT:  - - if there's any discretionary

6    function, I'm not ordering Rust to exercise any discretion.

7            MR. MULLADY: Understood.  Thank you, Your Honor.

8            MR. BERNICK: Your Honor, well that's the whole

9    problem.

10           THE COURT: Well.

11           MR. BERNICK: Is that, is that it's impossible when

12   you're - - first of all, we're presuming the ideal case where

13   the very page number was called out.  The page number - -

14           THE COURT: Yes.

15           MR. BERNICK:  - - was called out, and you go to the

16   page, and there's nothing to interpret.  It's just right

17   there.  And I'm going to tell you, Your Honor.  That's just

18   not true.  It doesn't happen.

19           THE COURT: Well, then - -

20           MR. BERNICK: Or maybe some cases - -

21           THE COURT:  - - Rust won't be able to put it in.

22           MR. BERNICK: But that's, that's the problem.  Is

23   that there is massive non-compliance with that.  We're going

24   to get into that a little bit later on in the day.  But even

25   that assumption that is that Rust would be able to go to the

1  backup piece of paper - - and remember, it's not just that

2  there is a piece of paper with the answer, it is that that's

3  the only piece of paper that's referred to.  Your order says,

4  That piece of paper and no more, no less.

5      THE COURT: That's right.

6      MR. BERNICK: As far as I'm concerned, I'm not even

7  sure that there are any answers that actually satisfy that

8  requirement.  But be that as it may, we have not sent Rust to

9  go back and track through these pieces of paper to try to

10  find out whether the answer is there, because they are not

11  qualified to do that.

12      THE COURT: But they are.

13      MR. BERNICK: No they are not.

14      THE COURT: They - -

15      MR. BERNICK: I'm sorry, Your Honor.  They're not

16  - -

17      THE COURT: They've been retained by the Court as

18  the claims processing agent.  If they can't take a look at a

19  question that says, Refer to Attachment A, paragraph 1, line

20  15 and see what - -

21      MR. BERNICK: Ah, ah - -

22      THE COURT:  - - word is there, then - -

23      MR. BERNICK: That does not - -

24      THE COURT:  - - they're not qualified to be paid.

25      MR. BERNICK: That does not - - that does not

1   happen.  That does - - we only have - - I don't think there

2   is probably a single situation in which the answer, it says,

3   Go to page X, paragraph 1, line 3.  That's just not there.

4   And if it is, I suppose we can try to figure it out, but

5   here's the problem.  Four million pages we're talking about.

6   Well Your Honor, four million pages we have to go through in

7   order to track that out.

8           THE COURT: Mr. Bernick you asked.

9           MR. BERNICK: No.

10          THE COURT: You bought.

11          MR. BERNICK: No, no, no.  No, I didn't, I did not

12  ask, Your Honor.  With all due respect, I did not ask.  They

13  asked.  They insisted that they be able to look to the

14  attachments.  And as Your Honor well recalls, I said we were

15  going to get into exactly this situation.  And that's exactly

16  what's happened.  We are not having Rust go back on a

17  comprehensive basis and do that.  We asked Rust to process

18  all of the questionnaires.  That's what they have done.  To

19  the extent that the questionnaire has the answer, it's there,

20  to the extent the questionnaire does not have the answer,

21  it's not there.

22          THE COURT: If the questionnaire refers to an

23  attachment, and it is in compliance with the Court order, and

24  the Court order was very specific, then Rust should be

25  incorporating that information.  They are not to use their

1   discretion.  But if, in fact, the information is in the form

2   that the Court required, which essentially is refer to

3   Attachment A, page X, you know, paragraph Y.  If it's in that

4   format, I think they should add that information.

5           MR. BERNICK: We'll see, we'll see and make a

6   further report to the Court on whether there's anything

7   that's even there to argue about.

8           THE COURT: That - - all right.

9           MR. BERNICK: Because I suspect that it's a null

10  set.

11          THE COURT: All right.

12          MR. BERNICK: But that is an undertaking that was

13  never in Rust's ambit.  Ever, ever, ever.  All the way going

14  back to last year.  We - -

15          THE COURT: Well I thought it was.

16          MR. BERNICK: No.  We specifically disclosed what

17  the protocol was.  And when the attachment order was issued,

18  there was no statement of any new protocol that was being

19  adopted by Rust, and for a very good reason.  Because we were

20  desperate to try to figure out how to get the work done that

21  Rust was even doing.  I would add, Your Honor, so that this

22  is not - - I mean, the whole idea - -

23          THE COURT: It doesn't matter.  This is what I want

24  done.  To the extent that the questionnaire refers to an

25  attachment rather than having an answer, and the attachment

1    is in the form that the Court order required, which I've just

2    put on the record is something along the lines of, Refer to

3    Attachment A, Page X, Paragraph Y, and the answer is, and

4    there is an answer there, I want Rust to supplement the

5    answer.

6            MR. BERNICK: With no interpretation.

7            THE COURT: No interpretation.

8            MR. BERNICK: It's on the face of the document.

9    It's right there.

10           THE COURT: Exactly.

11           MR. BERNICK: Well, we'll see, we'll see if there's

12   anything in that set.

13           THE COURT: Okay.  If there's nothing there, there's

14   nothing to be supplemented.

15           MR. BERNICK: Now with respect, with respect to - -

16   to the extent that that is so, we would then supplement the

17   navigable database - -

18           THE COURT: Yes.

19           MR. BERNICK:  - - with that kind of information.

20   Now just to be clear, what I want, the last thing I wanted to

21   get to, so that - - there's all kinds of suggestion that

22   somehow we've been waiting and holding back on things.  The

23   reason that the database wasn't turned over until March 2,

24   the reason, is that - - and Your Honor will see in an order

25   that's now been fully agreed to, there's no longer any

1   objection to the revised CMO.  What's been happening is since

2   March 1, this is the CMO that Your Honor will have before you

3   without objection, as of this date, March 1, the Debtors'

4   claims agent will acknowledge receipt of, but will not

5   process any subsequent responses or supplemental submissions,

6   with the exception of documents required pursuant to the x-

7   ray order.

8          THE COURT: Um-hum.

9          MR. BERNICK: Now what does that tell Your Honor?

10  What it tells you is that they didn't comply with the

11  deadline for the questionnaires back in July.  Massive non-

12  compliance.  They didn't comply with the deadline on January

13  12th.  Massive non-compliance.  We then had all kinds, we had

14  literally thousands of supplements coming in after January

15  12, and in fact but for this order, we would still be getting

16  supplements.  So Rust has not even had all of the

17  supplemental questionnaires, supplemental questionnaires

18  until March 1.  And we get them coming in and saying, Oh

19  well, gee, you should have an expedited motion when they are

20  the ones who have caused this entire problem.  That we should

21  have expedited answers from Rust?  We will set Rust to the

22  task that Your Honor has indicated, and we'll see what's

23  there.  But this is not a situation where Rust has been

24  dilatory.  They've been working.  We have reports they've

25  been working around the clock just to get done with what was

1  put on their plate and what they agreed to in the protocol

2  back at the beginning.  And if Your Honor wants to say they

3  should do more, we can certainly ask them to do more.  But we

4  can't ask them to work harder than they're already working.

5  These people are killing themselves to comply with Your

6  Honor's deadlines.

7        THE COURT: All I want is to make sure that you get

8  what you did ask for, Mr. Bernick, which is a complete

9  navigable database.  You wanted as much information into it

10  as possible.  To the extent that the supplemental answers are

11  achievable from the attachments, I think they should be on

12  the navigable database.  That's all.  If there is no

13  information that's readily achievable, I'm sure I'll hear

14  that from you in short order, and Rust won't have anything

15  more to do.

16        MR. BERNICK: Achievable without the exercise of

17  discretion.

18        THE COURT: Yes.  I've said that.

19        MR. BERNICK: Yeah.  And Your Honor, I know you can

20  see me smiling.  What I would have liked to have is to have

21  - - they say it's so simple to see it on the document, why

22  - - we would have avoided this whole thing, if they would

23  just fill in the document.  Why don't their own clients - -

24        THE COURT: Well - -

25        MR. BERNICK: - - fill in the questionnaire?  And

1    then we won't have any - -

2          THE COURT: Mr. Bernick - -

3          MR. BERNICK:  - - there'll be no more - -

4          THE COURT:  - - this is - -

5          MR. BERNICK:  - - there'll be no more issue.

6          THE COURT: This is water over the damn.  It's water

7    over the damn.  They're not going to do it.  They haven't

8    done it.  They wanted the ability to do the attachments.  I

9    tried to, you know, split this baby as well as I could.

10   We're down the road past that.  See what you can get into the

11   database.  If it's not possible to add anything, then they'll

12   get the database - - whatever the Debtor has, they'll get in

13   the database.

14         MR. BERNICK: Okay.

15         THE COURT: So everybody will be working from the

16   same page.

17         MR. BERNICK: Your Honor, one last thing now that

18   we're there, and we'll do all that.  Is if they now come back

19   and say, No.  What you put into the database was the wrong

20   part of the document, or you didn't, you, Rust, didn't

21   exercise your discretion, how does that, how does that sit?

22   I would go back to - -

23         THE COURT: If they'd like to supplement the

24   database, they may take Rust's database, they may ask Rust if

25   Rust would like to supplement it, at somebody else's expense.

 1    If there's some reason why they should get some additional

 2    work done in preparation for this trial that's actually going

 3    to advance the trial, we'll have another meeting about it

 4    all, Mr. Bernick.

 5         MR. BERNICK: I would like to go down that road, but

 6    I can't go down that road, and it's very - -

 7         MR. MULLADY: It's hypothetical, Your Honor.  It's

 8    hypothetical.

 9         THE COURT: It's all hypothetical, Mr. Mullady.  We

10    deal with hypotheticals in this case every month.

11         MR. BERNICK: Your Honor, I would like to say that

12    I'd like to go down that path.  We asked to do that last

13    year.  I am very concerned that in order to meet the schedule

14    that Your Honor has put out, the Rust database needs to be

15    done.  They'll do the best job that they can, subject to Your

16    Honor's orders, and we'll let Your Honor know, as soon as we

17    can, when we expect that they'll be able to, to say - -

18         THE COURT: That's fine.  I'm - - what I'm saying,

19    Mr. Bernick, is if someone is unhappy with the database,

20    they'll file a motion, and we'll have a hearing.  Just like

21    we do for everything else.  And I'll find out whether or not

22    there's something else that can, should, would, whatever the

23    appropriate o-u-l-d word is, can be added to this database.

24         MR. BERNICK: Well Your Honor, then with respect,

25    that's why we asked them last year.  And if we go through

1    that process now, I'm just telling you, Your Honor - -

2             THE COURT: Mr. Bernick - -

3             MR. BERNICK:  - - we will be - -

4             THE COURT:  - - they keep telling me they're not

5    going to make use of this.

6             MR. BERNICK: No.

7             THE COURT: All they're going to do is challenge the

8    fact that the Debtor doesn't have any basis for creating this

9    whole thing in the first place.

10            MR. BERNICK: No.  I would only wish that it would

11   be merits oriented.  But what we've seen, and what you will

12   see now in response to that very invitation is an effort to

13   make exactly that motion in order to set - -

14            THE COURT: Mr. Bernick.

15            MR. BERNICK:  - - the database back.

16            THE COURT: I have not made an invitation.  You said

17   to me what if, I'm addressing the what if.

18            MR. BERNICK: I'm regretting that.

19            THE COURT: All right.  Let's strike it all, then.

20            MR. BERNICK: I'm happy with that.

21            THE COURT: All right.  It's all stricken.  What's

22   next?  Can I - -

23            MR. BERNICK: The first item on the agenda, we can

24   go to the regular agenda.

25            THE COURT: I - - well I need an order with respect

1    to this one that will, I guess - -

2           MR. BERNICK: Well I think that, Your Honor at the

3    risk - - if we have an order, it will take a month to get the

4    order entered, because there will be a debate about it.  I

5    think that we undertook, as we have just done, to comply with

6    the letter of what Your Honor has just said.  We'll go back

7    to Rust, we'll find out if there's a null set here, or a

8    meaningful, a meaningful set here.  It may be that that can

9    be done by looking at the questionnaire answers.  So I think

10   that we ought to just get the process underway and we'll make

11   a further report to the Court.  If that's, if that's

12   satisfactory to the Court.

13          THE COURT: All right.  So you simply want this

14   continued until your April 13th hearing to see what's been

15   disclosed by that date?

16          MR. BERNICK: Well Your Honor, I would suggest that

17   I don't know that there really is a need for any order.  That

18   is to say that they've made a request to get the expert

19   materials.  You've denied that request.

20          THE COURT: I have to have an order.

21          MR. BERNICK: Yeah.

22          THE COURT: I'm going to get an order on the docket

23   that closes out - -

24          MR. BERNICK: Okay then - - well then - -

25          THE COURT:  - - my motion.

1          MR. BERNICK: That's fine, Your Honor.  Then we'll

2     exchange proposed orders.  And - -

3          THE COURT: No.  Let me tell you what the order is

4     going to say, and you can prepare it, Mr. Bernick.

5          MR. BERNICK: Fine.

6          THE COURT: Okay.  The order will say that whatever

7     the Rust database is that the Debtor has available as of

8     whatever that disclosure date was.  April 13th?

9          UNIDENTIFIED SPEAKER: April 13th, 2007.

10         THE COURT:  Yes.  Okay.  April 13th, 2007 is to be

11    turned over to the Committees.  Okay.  That between now and

12    then I have asked Rust, the Debtor to consult with Rust to

13    see whether there is any additional information from the

14    attachments that can be added and supplemented, and if there

15    is it's to be included along the parameters that I've

16    discussed on the record.  And secondly, the request for the

17    DCF and expert information is denied without prejudice.  And

18    will track the CMO with respect to expert disclosure.

19         MR. BERNICK: Thank you.

20         MR. FINCH:  Thank you, Your Honor.

21         THE COURT: All right.

22         MR. MULLADY: Thank you, Your Honor.

23         THE COURT: That order will be entered when I get it

24    from the Debtor on a COC.  Okay.  Anything more on that?  Can

25    we move to the omnibus?  Okay.  The omnibus, Mr. Bernick.

1        MR. BERNICK: I'm sorry to say that Jan Baer was not

2   able to make it today.  She got stranded with her family on

3   vacation.

4        THE COURT: Oh, terrible.

5        MR. BERNICK: So we will - - well, it's terrible for

6   us.  It may be fine for her, although she tells me that the

7   airport hotel is not a, is not all that terrific.  In any

8   event, we're going to have to backfill, and I hope we'll do

9   as good a job as Ms. Baer generally does.  But Mr. O'Neill

10  will be talking about the first two items on the agenda, and

11  then we'll kind of have different people speaking to the

12  other items as we proceed, Your Honor.

13       THE COURT: All right.

14       MR. O'NEILL: Thank you, Your Honor.  Your Honor,

15  item no. 1 on the agenda is the quarterly fee applications.

16  The Court has already entered an order entering, or approving

17  the quarterly fee applications, so there's nothing further on

18  that.  If any parties are on the phone with respect to the

19  quarterly fee applications, may they be excused, Your Honor?

20       THE COURT: Yes they may.

21       MR. O'NEILL: Thank you.  Item no. 2, Your Honor, is

22  the Debtors' application for an order authorizing the

23  retention and employment of Fragomen, Del Rey, Bernsen &

24  Loewy.  Your Honor, we have filed a certification of no

25  objection with respect to this matter, and if the Court

1    doesn't have any questions I can hand up the order.

2            THE COURT: Okay.  I understood that a COC was to be

3    filed, but I have still not seen it.  Was it actually filed?

4            MR. O'NEILL: Certification of no objection was

5    filed.

6            THE COURT: A CNO.  I have not seen that either.

7    Can you tell me the docket number?

8            MR. O'NEILL: Yes, Your Honor.  It was filed at

9    Docket No. 14982.  And it was filed on March 26th, 2007.

10           THE COURT: Yes.  If you have the order, I'll take

11   it.

12           MR. O'NEILL: Thank you.

13           THE COURT: Thank you.

14           MR. O'NEILL: Thank you, Your Honor.

15           THE COURT: All right.  I've signed that order.

16   Thank you.

17           MR. O'NEILL: Thank you, Your Honor.  Mr. Bernick is

18   going to address number 3 and 4.

19           MR. BERNICK: Your Honor, I think that we're pretty

20   close to agreement.  In fact we are, I believe, at agreement

21   with respect to items 3 and 4, but to provide Your Honor with

22   a little bit of context, I'd just like to review briefly what

23   these relate to.  There's a law firm, the Forman Perry firm,

24   I think there's been some reference to Forman Perry in the

25   context of talking about the decision in the Silica

1   (phonetic) case.  Forman Perry is very familiar with

2   discovery relating to the screening doctors and the screening

3   companies, and as a consequence Grace decided to retain

4   Forman Perry as an OCF back in I believe it was February of

5   2005.  I'm not sure if that's the correct date, but it was,

6   it was a little while ago.  They proceeded to do a lot of

7   work.  It ended up being a larger amount of work than we

8   anticipated, just because as probably would have, we should

9   have predicted, there's a lot of resistance by the doctors to

10  this kind of discovery.  We had a number of people taking the

11  Fifth Amendment relating to the screening activities.

12  There's also a lot of documentation that had to be gone

13  through.  There was a million pages of documents that were

14  produced.  So it ended up being a fairly significant

15  undertaking, and very contentious.  We had to file motions

16  and the rest in a bunch of different courts.  Compounding

17  that matter, there was a kind of a communication problem with

18  respect to their bills.  The Forman Perry firm sent their

19  bills in to Kirkland & Ellis, but didn't send them all in to

20  Grace.  So as a consequence, only a modest portion of those

21  bills actually ended up getting paid.  And there's a much

22  more substantial amount of outstanding fees and expenses that

23  have not been paid by Grace, and have not been processed.

24  This has generated two issues.  First there was a quarterly

25  statement made for the final quarter of 2006 with respect to

1    all the OCF, or the OCP's, including Forman Perry, and that

2    disclosed I think about a hundred, 140 odd thousand dollars

3    worth of fees for the period of time that was covered by that

4    statement.  That was not all the bills that had been rendered

5    prior to that time, but it was some of the bills that had

6    been rendered prior to that time.  And that was filed with

7    the Court and amended.  I think the amended statement was

8    January the 17th of this year.  That's one item.  The second

9    item was what the proper mechanism was in order to achieve

10   approval of the amounts that we want to pay Forman Perry in

11   excess of the cap that exists under the OCP program.  Our

12   first idea for solving that issue was to make a *nunc pro tunc*

13   application to retain Forman Perry as regular counsel.  And

14   that way they wouldn't be subject to the cap.  But in

15   consultation with other counsel, and also in consultation

16   with the other side, and also having read the US Trustee's

17   objection, it occurred to us that the simpler course was that

18   there really wasn't a new retention that was required, we

19   would simply make application for the amounts in excess of

20   the cap.  And there would be fee applications for the amounts

21   in excess of the cap.  So we then would need approval from

22   Your Honor to be able to submit those fee applications.  So

23   items 3 and 4 are first the statement with respect to the

24   fees that were reflected in the January statement, and then

25   secondly what we now have, and I believe there is a modified

1   order that Mr. O'Neill has, as an application for leave to

2   seek approval of amounts in excess of the cap.  Now the

3   agreement that we've reached - - and if I'm mistaken about

4   this, I know I'll be corrected.  The agreement that we've

5   reached is that there is no objection, that is that the ACC

6   that had objected to the first set of fees that were

7   reflected in the January statement, they're going to withdraw

8   that objection, but they are preserving, and we recognize

9   that they're preserving, they're not waiving a potential

10  issue that they believe exists with respect to conflicts of

11  interest in connection with Forman Perry's work.  That is an

12  issue that they may or may not raise, may or may not seek

13  discovery on with respect to further applications that are

14  made for fees.  Second, with respect to the requests for the

15  ability to submit fee applications in excess of the cap, same

16  agreement that is without waiver to that conflict of interest

17  potential issue, and also the US Trustee has indicated that

18  they may still have an issue on whether there's a problem

19  with sharing of fees.  We don't think that that is applicable

20  here, but they may choose to raise that.  So as we understand

21  it, both of these matters are not - -

22          THE COURT: They're not sharing the fees they're

23  getting from this estate.

24          MR. BERNICK: No.  They, they are - - it's the

25  clients who are sharing the costs.  That is - -

1          THE COURT: Right.

2          MR. BERNICK:  - - what happens is - -

3          THE COURT: That's what I understood.  Okay.

4          MR. BERNICK: Yeah, but - - and I don't know whether

5    the US Trustee intends to pursue that matter down the road,

6    but they're not waiving it.  So basically I think where we

7    are is is there's agreement with respect to both matters.

8    That is the withdraw of the objection as to agenda item no. 3

9    and approval of the application that is, or the motion that

10   is agenda item no. 4.  But without prejudice to the potential

11   issue of conflicts of interest or fee sharing, which may or

12   may not be raised in connection with future applications.

13          THE COURT: Okay.

14          MR. BERNICK: I think I got all of that.

15          THE COURT: Mr. Finch?  I'm not sure.  Mr.

16   Schepacarter.

17          MR. SCHEPACARTER: Thank you, Your Honor.  Good

18   afternoon.  Richard Schepacarter for the United States

19   Trustee.  I believe Mr. Bernick fairly stated our agreement.

20   I just wanted to make sure that I was clear with respect to

21   my representations to counsel for the Debtor.  Is that not

22   only are we going to reserve our right to object to the fees

23   once a fee application is filed, but also as the Committee

24   has reserved that issue of the conflict of interest, we also

25   feel compelled that we would look at that issue, whatever

1    that issue may turn out to be.  And we reserve all of our

2    rights with respect to if we need to take discovery, more

3    information, or whatever it may be.  If it's brought up in

4    the context, and it probably will most likely be brought up

5    in the context of the fee application once that is filed.

6    With respect to the fee sharing issue, I sort of tried to

7    clarify that.  It's really not a fee sharing issue.  The

8    classic 504 type issue.  It's more of a, an issue where these

9    professionals are getting compensated by the Debtors and non-

10   debtors, and how that sort of, that allocation of fees and

11   expenses and work is sort of being done.  So we're going to

12   probably take a look at that as well.  Once the fee

13   applications are filed.

14            THE COURT: Okay.  That's fine.

15            MR. SCHEPACARTER: Thank you.

16            MR. HURFORD: Good afternoon, Your Honor.  Mark

17   Hurford, Campbell Levine on behalf of the ACC.  I believe

18   that everything Mr. Bernick just stated is correct.  However,

19   there was a little - - one minor caveat at the end of his

20   statement.  What we were seeking to do is reserve our rights

21   with regards to a specific issue as to whether or not Forman

22   Perry holds or represents an interest adverse to the estate.

23   It's the 327(e) issue.  And to the, to the extent that that

24   goes forward, to the extent that there's discovery on that,

25   to the extent that that's an actual issue, we are reserving

1    the right to seek disgorgement of any fees paid to Forman

2    Perry.  So I think Mr. Bernick made a reference to with

3    respect to further fee applications filed on down the road.

4    I think if there's an issue of conflict and disgorgement, it

5    should apply to all fees, once again, if that issue does come

6    up.

7            THE COURT: All right.

8            MR. HURFORD: Thank you.

9            MR. O'NEILL: Your Honor, can I hand up the form of

10   order?

11          THE COURT: Okay.  Is Forman Perry comfortable with

12   this resolution?

13          MR. WATKINS: Your Honor, I'm Walt Watkins from

14   Forman Perry.

15          THE COURT: Sir I can't hear you back there.  You

16   need to use the microphone.  I'm sorry.

17          MR. WATKINS: Good afternoon.  I'm Walter Watkins

18   with Forman Perry.  And yes, we are comfortable with the

19   agreement as stated.  We don't agree, obviously, that there

20   is a conflict, and we think that that will be sorted out.

21   But yes, we are in agreement.

22          THE COURT: All right.

23          MR. WATKINS: Thank you.

24          THE COURT: Thank you.

25          MR. O'NEILL: May I approach, Your Honor?

1            THE COURT: Yes, please.  Thank you.  Okay.  This

2    order that's being presented doesn't specifically preserve

3    anybody's rights, but the record, I think, is adequate to

4    make sure that no one is waiving anything.  Okay.  The order

5    is entered.  Thank you.

6            MR. SCHEPACARTER: Your Honor, if I might, for the

7    record, Richard Schepacarter for the United States Trustee.

8    I have no further matters before this Court.  May I be

9    excused?

10            THE COURT: Yes, sir.

11            MR. SCHEPACARTER: Thank you.

12            THE COURT: Thank you.

13            MR. BERNICK: I don't know what Your Honor's

14    preference is.  There are now a series of what I think will

15    be relatively short matters, but there are a number of them.

16    There's then a status report with respect to the personal

17    injury estimation.  And then the last item is the Anderson

18    Memorial case.

19            THE COURT: Why don't we do the short items in the

20    order on the agenda, so that if people do need to leave for

21    the holiday, they can.

22            MR. BERNICK: Okay.  I just don't know.  Would you

23    prefer then not to have a break, and just go straight

24    through.

25            THE COURT: Yes.  I think we'll just go.  If anybody

1    needs to leave for a recess, they're free to do it.  And they

2    can come back in if they choose.

3         MR. BERNICK: Well, that's good, because I was going

4    to ask Your Honor for a little bit of indulgence.  I have a

5    little bit of an emergency matter.  I can take up the next

6    item, which is BNSF, and then if Your Honor will excuse me,

7    I'll just be absent for a few minutes.

8         THE COURT: That's fine.

9         MR. BERNICK: Item no. 5 relates to the Burlington

10   Northern litigation.  And for Your Honor's benefit, you'll

11   recall that there have been a series of claims made by people

12   who lived or worked at Libby.  And the litigation, obviously,

13   was being pursued against Grace before Grace filed for

14   Chapter 11.  At that point the litigation was suspended.  And

15   there have been a series of matters that have come before the

16   Court since that time.  Where other litigation or discovery

17   matters have been undertaken there, and we've asked Your

18   Honor to act with respect to them.  There are two items that

19   are encompassed by the Burlington Northern issue today.  One

20   is that Burlington Northern in February of this year moved

21   for clarification of the scope of the preliminary injunction.

22   And in the alternative, I believe, made a request for

23   permission to conduct certain discovery.  It turns out that

24   Burlington Northern is now the subject of active litigation

25   that's being brought by people who say that they were exposed

1   to asbestos from the mine or mine by-products.  Burlington

2   Northern was the railroad carrier that served the Libby mine

3   for many, many years.  So there was that application.  There

4   was then a cross motion that Grace filed in March that we

5   sought to basically enjoin and shut down the underlying

6   litigation in much the same fashion as we had done previously

7   with respect to Maryland Casualty.  I think Your Honor will

8   probably recall that.  That I think went all the way up to

9   the 3rd Circuit and was, and was affirmed.  Your Honor

10  instructed Grace to separate out the motion to correct the

11  cross motion that Grace had filed so that that could be

12  presented separately, and that has now been done.  That is

13  scheduled to be heard on the 2nd of May.  As a result, the

14  only matter that is actually before the Court today is the

15  request of Burlington Northern for permission, essentially,

16  to pursue discovery relating to Grace's insurance policies.

17  It is Grace's position that it's unnecessary to pursue that

18  matter now.  That the dog as opposed to the tail of the dog

19  is the question of whether the underlying litigation should

20  go forward, and we think that Your Honor should take up the

21  matter of whether there should be any ancillary discovery in

22  the, only in the event that Your Honor actually decides that

23  that litigation and underlying litigation is to proceed.  I

24  would add that apparently there's been an undertaking that's

25  been designed to mute the discovery that's being sought by

1    Burlington Northern.  Burlington Norther apparently does not

2    agree that their discovery request has been muted.  But

3    regardless of the merits of the muting issue, the real

4    question is the underlying litigation.  So our proposal would

5    be to put over the motion of Burlington Northern to May the

6    2nd, when it can be heard in connection with Grace's now

7    independent motion to enjoin the prosecution of the

8    underlying litigation against Burlington Northern.

9         THE COURT: Okay.  Does someone want to be heard for

10   Burlington?

11        MR. CARIGNAN: Good afternoon, Your Honor.  James

12   Carignan of Pepper Hamilton appearing today for BNSF.  With

13   the Court's indulgence, I'd like to introduce my colleague

14   Mr. Toole from the Philadelphia office of Pepper Hamilton.

15        THE COURT: Mr. Toole.

16        MR. TOOLE: May it please the Court.  Counsel for

17   the Debtors characterization while generally accurate was

18   inaccurate in one major aspect, Your Honor.  Counsel has

19   suggested that the motion of the railroad pertains to Grace's

20   insurance policies.  This is simply incorrect.  The

21   Burlington Northern Railroad, going back to the 1930s and

22   1940s, obtained collateral insurance where it was the named

23   assured on policies.  The Debtor has indicated in its

24   pleadings that these policies did not include the Debtor.  So

25   the, these are independent policies where only the railroad

1   was a named assured or as an additional assured.  Premiums

2   were paid by the Grace company as part of an overall

3   agreement pertaining to the transportation of ore from the

4   Libby mines.  However, that was a contractual obligation, and

5   the essence of this is that it is Grace's – – it is the

6   railroad's position that there are collateral policies in

7   which the railroad is the named assured, and that as such it

8   falls outside of this Court's order mandating the injunction

9   of any actions against certain insurance companies.  To be

10  sure, some of these insurance companies are the same carriers

11  involved in providing coverage to Grace or to Grace's

12  affiliates.  However, the railroad is not an affiliate of

13  Grace, it is an independent entity with independent policies.

14  It is this which the railroad seeks to ascertain to a greater

15  extent.  If arguably, there is such coverage and this

16  coverage does not impact on the estate, that is to say there

17  is an underwriter who has assured risks to a non-debtor, non-

18  affiliated entity called the Burlington Northern Railroad,

19  then the railroad is entitled to proceed and to pursue this.

20  The protestations of the insurance companies notwithstanding.

21  In order to put this matter in proper context, I would seek

22  leave to approach the Court and provide the Court with a copy

23  of the discovery that has been requested by the railroad in

24  Montana in order to ascertain the existence of this

25  collateral coverage.

1           THE COURT: All right.  Thanks.

2           MR. TOOLE: Your Honor, please, at the risk of

3    oversimplification, this is straightforward discovery seeking

4    documents and other facts pertaining to the existence and the

5    placement of these independent collateral policies.  It is

6    that simple.  Efforts to suggest that this has somehow become

7    mute because one of the bases that was asserted by the

8    railroad in order to obtain this discovery was the existence

9    of cross-discovery as asserted by the personal injury

10   plaintiffs, again seeking to ascertain the existence of this

11   coverage.  Quite inexplicably, the asbestos claimants

12   suddenly, quote, "withdrew", end quote, their request in

13   these Montana actions to obtain insurance policy coverage.

14   Predicated on that assertion, the asbestos claimants,

15   together with some of the affected insurance companies, are

16   suggesting that this matter is mute.  Nothing could be

17   further from the truth.  The existence of this collateral

18   coverage is essential for the proper defense of these cases

19   by the Burlington Northern.  And if there is such coverage,

20   if there is such coverage, and it's available on a collateral

21   basis, then this is something that is the subject of proper

22   discovery and the proper application at a later time with

23   regard to the question of whether the underwriters are

24   compelled to provide a defense and whether, ultimately, the

25   underwriters are compelled to provide indemnification should

1   their, these claims mature into settlements or judgments.

2   Your Honor, it is that simple.  The efforts by the insurance

3   companies primarily to obfuscate this into something that

4   involves the Debtor is simply not accurate.  The Debtor

5   itself has indicated, in its response, these, that these are

6   quote, "separate insurance policies", end quote, that the

7   railroad obtained with Royal, Maryland Casualty, and

8   Continental.  That appears in paragraph three of the Debtors'

9   response.  The Debtors also asserted that they did not settle

10  any insurance policies that were separately provided to the

11  railroad.  That appears in Footnote 4 of the Debtors'

12  submission.  The Debtors have also asserted in par, in

13  Footnote 24, that they do not believe that the Debtor has any

14  indemnification obligation to the insurers arising out of

15  these policies.  So in essence, regardless of what the

16  outcome may be with regard to the question of expanding the

17  injunction to include these claims, the fact remains that

18  some day the issue of railroad ability to seek insurance

19  that's collateral to the insurance of the Debtor, in

20  satisfaction of claims that will be asserted against the

21  railroad in a collateral way, will still come up.  So it is

22  urged that the railroad be permitted to move forward with

23  this discovery, and that it be authorized to do this

24  immediately.  And the discovery, in essence, is what has been

25  given to Your Honor.  Thank you.

1          THE COURT: Okay.  I don't know what it is that the

2     Debtor has filed that is coming up for hearing on, in, on the

3     May agenda.  So as a result I'm not sure I understand what

4     the inter-relationship is between the discovery request and

5     the Debtors' motion.

6          MR. BERNICK: The Debtors' motion is very much

7     similar to the motion that we filed in connection with the

8     previous litigation brought against Maryland Casualty.  It

9     basically seeks to enjoin the continued, or bring within the

10    scope of the existing preliminary injunction, the - -

11         THE COURT: The suit against - -

12         MR. BERNICK:  - - the prosecution of the underlying

13    lawsuit against Burlington Northern, which has generated

14    their interest in the insurance policies.  So from our point

15    of view, the reason we made the proposal is very simple.

16    Which is that if our motion is successful, as we believe it

17    will be, Your Honor, given the long history of Your Honor's

18    dealing with these kinds of matters at Libby, then there

19    won't be any continuing litigation against Burlington

20    Northern.  They may still have an interest in these policies

21    at some point down the road, if the litigation is revived.

22    But at this point there would be no need to go forward.  The

23    matter is not as simple, unfortunately, as whether the

24    policies are separate policies or not.  Royal Indemnity, one

25    of the carriers, has pointed out in their opposition that the

1    insurance policies that Burlington is seeking were obtained

2    by one of the predecessors of the Debtor pursuant to some

3    alleged indemnity obligation that the Debtor holds.  So it

4    looks like, at least from Royal's point of view, that if this

5    discovery proceeds, even if the insurance policies are

6    separate policies, that it will, the discovery still will

7    implicate Grace.  Grace's motion is not simply driven,

8    however, by this discovery dispute.  Grace's motion is driven

9    by the same basic factors that animated its prior requests

10   for injunctive relief.  That is that the continued

11   prosecution of these Libby claims are the same people who are

12   claiming against Grace for the same exposures.  That the

13   underlying litigation is interwoven with the claims that are

14   being presented by the same claimants before this Court.  And

15   under those circumstances, it would be inappropriate to allow

16   that litigation to proceed against anybody.  Because of

17   record taint concerns, and because basically the matter in

18   controversy is one that is inextricably intertwined with

19   Grace's own interest.  We have the same issue with respect to

20   Maryland Casualty.  Albeit with respect to Maryland Casualty,

21   there was, I believe that there was a, a policy, a Grace

22   policy at issue.  But be that as is may, that is the concern

23   that drives our motion.  Our motion is not limited to this

24   very narrow issue of discovery.  It really goes to the

25   prosecution of the underlying claim.  So again, our proposal

1   is to allow that to be heard.  If that litigation is enjoined

2   by Your Honor, then maybe some day Burlington will need the

3   discovery, but that day is not now.

4        THE COURT: All right.  Mr. Toole, I guess what I'm

5   hearing is that the Debtor would prefer if possible to

6   adjourn this until May 2nd, to see whether or not the

7   injunction is granted, because I'm not certain why you'd need

8   the discovery if in fact your client is added to the

9   preliminary injunction.

10       MR. TOOLE: Your Honor, please, the Maryland

11   Casualty matter pertained to insurance that was available to

12   the Debtor.  This is not what we're talking about here.

13   We're talking about insurance that's available only to the

14   railroad.  The predecessor of the Debtor did indeed provide

15   the premium payment pursuant to a contract.  However, it was

16   not a named assured, and as such, no requirement to indemnify

17   the Debtor arose as a result of these insurance policies.  In

18   essence, the argument that counsel is making is fine for

19   another day, and for another proceeding.  But to the question

20   that the Burlington Northern has been able to obtain

21   collateral coverage independent of the Debtor, it should be

22   entitled to receive the discovery that would provide a basis

23   for assessing whether this independent indemnification and

24   underwriting of the risk is something that would be

25   advantageous.  And it may well be advantageous to the Debtor

1   as well, to the extent that there is another entity, albeit

2   the same carrier, but under another contractual obligation of

3   this carrier, to satisfy these claims.  The Debtor may well

4   have an advantageous interest in that.  None of this, we

5   submit, can be properly assessed by this Court until and

6   unless the underlying discovery regarding these collateral

7   insurance policies, and I am making this clear, these are

8   collateral policies, until this is decided.  And I would

9   certainly hope that the concept of preserving record, of

10  avoiding a record taint, as has been suggested by the Debtor,

11  is not going to trump the due process rights that a party may

12  have to proceed to ascertain the, the availability of

13  collateral coverage or insurance.  We believe that this Court

14  should properly order that the insurance companies respond to

15  this relatively modest discovery so that the time to question

16  of any, of application of this, whenever that's to be made by

17  this Court, that it would be done on a reasoned, enlightened

18  basis predicated on the facts and not simply supposition.

19       MR. FINCH: Nathan Finch for the Asbestos Claimants

20  Committee.  The Committee will certainly be objecting to the

21  Debtors' request to extend the injunction to cover Burlington

22  Northern.  I think Mr. Toole's presentation makes clear

23  they're not an affiliate of Grace, and the impact of the

24  litigation by the Libby claimants on them will in no way have

25  an impact on the Debtors' estate.  And that under the PayCorp

1   (phonetic), and <u>Federal Mogul</u>, and <u>Combustion Engineering</u>

2   (phonetic) line of courses, the Court has no basis to protect

3   a non-debtor, non-affiliate with the preliminary injunction

4   when the, when the, there will be no impact on the Debtors'

5   estate.  I rather suspect the Libby claimants will weigh in

6   in opposition to that as well.  But I'm sort of agnostic on

7   exactly when this discovery goes forward, but the Court

8   should be under no allusion that we believe the Maryland

9   Casualty case that Mr. Bernick keeps referring to is

10  completely distinguishable, and doesn't govern this

11  situation, and that in fact is controlled by <u>Combustion</u>

12  <u>Engineering</u> and the other cases that say that this is not

13  something that the Court can enjoin.  And therefore we will

14  be opposing this, and will hear it, would ask the Court to

15  hear it on May the 2nd.  As for the timing of the discovery,

16  the Committee takes no position on that, but I will leave

17  that to the Court to decide.

18      MR. WISLER: Good afternoon, Your Honor.  Jeff

19  Wisler on behalf of Maryland Casualty.  We object to this

20  motion.  And Your Honor let me, since I represented Maryland

21  Casualty all the way through that litigation, let me make it

22  clear what happened there.  That case has nothing to do with

23  insurance policies.  That was the Libby claimants going after

24  Maryland Casualty, as Maryland Casualty, not an affiliate of

25  the Debtor, but as an independent third party.  And what this

1    Court held, and what the 3rd Circuit held was that Your

2    Honor's preliminary injunction protecting Maryland Casualty

3    through the life of the preliminary injunction was absolutely

4    appropriate, and that neither PayCorp nor the Federal Mogul

5    cases said to the contrary.  Mr. Toole ended his initial

6    presentation with the some day.  This is about some day, Your

7    Honor.  That's what the preliminary injunction is about.

8    There is a some day for a lot of these issues, but today

9    isn't the day.  As Your Honor has held, that day will be when

10   there's a plan in place that either takes care of these

11   issues, or doesn't take care of these issues.  But for now

12   the preliminary injunction is in place.  And there will be a

13   some day to resolve these issues and for BNSF to resolve

14   these issues, but today isn't it.  Your Honor, I join the

15   Debtors' suggestion that this motion be continued and heard

16   only if Your Honor does not ultimately grant the Debtors'

17   motion to expand the preliminary injunction.  Because if the

18   preliminary injunction is expanded to protect BNSF from these

19   cases, there's no need for the discovery that BNSF seeks.

20   Another reason to continue it, Your Honor, is because I think

21   based on Mr. Toole's presentation, this motion, at least as

22   presented, goes beyond what was submitted to the Court.  What

23   was submitted to the Court was BNSF specifically and

24   expressly wanted discovery related to policies purchased by

25   the Debtors.  It's the top of page 5 of their motion.  And

1    they specifically, expressly, and exclusively wanted

2    discovery about those policies because they said, they were

3    subject to discovery from the litigants in the Montana

4    litigation, and they found themselves in a difficult

5    position.  Where they either had to violate, or be in trouble

6    with the Montana Court for not responding to discovery, or be

7    in trouble with this Court for violating the preliminary

8    injunction.  But Your Honor, that problem doesn't exist for

9    two reasons.  First, because the first response to BNSF's

10    motion was by the Libby claimants who said, Fine.  We'll

11    withdraw the discovery, there's no discovery, there's nothing

12    you need to answer.  And the second is I'm not aware of any

13    rule in the Federal rules of procedure that require a party

14    to disclose any information other than what it has.  So even

15    if BNSF were hit with a discovery request about insurance, if

16    it doesn't know the answer, and it doesn't have the

17    information, there's no Montana rule of law, at least none

18    was cited in the papers, that would require BNSF to disclose

19    something they don't have and they don't know.  There's no

20    discovery need here, Your Honor.  BNSF also says they need

21    clarification.  And here's what they say.  They say it is

22    doubtful that the Court also intended to enjoin actions

23    against the insurance carriers alleging coverage for claims

24    brought against non-debtor, unrelated parties.  That's

25    exactly what the Maryland Casualty litigation was.  And

1    that's exactly what the 3rd Circuit ruled on.  Maryland

2    Casualty, one of the targets of BNSF's request for discovery,

3    is an insurance carrier under the injunction.  The injunction

4    couldn't be clearer.  It prohibits actions against insurance

5    carriers that arise from alleged exposure to asbestos,

6    indirectly or directly allegedly caused by the Debtors.

7    That's exactly what this is.  The preliminary injunction

8    prohibits action for which there may be coverage under the

9    insurance policies.  BNSF's motion seeks discovery related to

10   policies purchased by the Debtors.  That's the insurance

11   policies.  Third, the preliminary injunction restrains

12   actions against insurance carries, Maryland Casualty being

13   one of them, alleging coverage for asbestos related

14   liabilities.  That's exactly what this is.  There's no need

15   for discovery.  There's no need for clarification.  This

16   motion should be denied or at worst, continued until this

17   Court determines whether this motion is mute or not, based on

18   the Debtors' pending motion.

19        THE COURT: Thank you.

20        MS. DeCRISTOFARO: Good afternoon, Your Honor.

21   Elizabeth DeCristofaro for Continental Casualty Company.  We

22   do join in the request to put this over to May 2nd.  But I

23   think a very strong clarification has to be made.  BNSF just

24   made a very misleading presentation to Your Honor saying that

25   the insurance coverage at issue, and for which is in its

1   insurance discovery request, does not involve the Debtor.

2   Now first of all, as we've repeatedly told BNSF and have

3   provided Your Honor's order the discovery they're seeking is

4   regarding an insurance policy issued to the Debtor.  It is

5   expressly listed on Your Honor's order.  It is not

6   independent.  It is a policy issued to the Debtor.  That is

7   in no way independent.  As for any other coverage that's

8   alleged, as we've discussed with the Debtor, it is regarding

9   coverage allegedly - - and there are issues as to whether it

10  exists - - purchased not by BNSF for itself, but by the

11  Debtor, and there are, and it is limited, allegedly, to

12  issues related to the Debtors' operation.  The existence of

13  the coverage, the issues arising as to coverage, all directly

14  put the Debtor at the center.  Now Mr. Toole read to you some

15  of the Debtors' papers which will be heard on May 2nd.  But at

16  paragraph 29, and we've discussed the discovery which is

17  before Your Honor, and the Debtor concluded just as we did.

18  The Debtor concluded that the broad discovery sought by BNSF

19  may very well implicate the Debtor and require the Debtors'

20  involvement.  The Debtors believe this broad discovery is

21  precluded by the terms of the injunction and do not believe a

22  modification to permit such discovery is warranted.  We have

23  repeatedly raised the complexity of this issue, provided Your

24  Honor's orders, and yet we have this motion, which is not a

25  motion - - Mr. Toole's spoke about due process.  This is not

1    about due process regarding their insurance rights.  This is

2    a Montana state personal injury action in which the discovery

3    requests have been dropped.  What rights do they have to

4    investigate the Debtors' insurance, or insurance purchased by

5    the Debtor in a Montana state personal injury action?  We

6    think the whole entire motion is inappropriate,

7    inappropriately pursued in light of it expressly involves

8    Debtor coverage.  We've already expressed to the Debtor, and

9    part of that is one of the prompting of the motions, is that

10   there are numerous ways that this can come back to the

11   Debtor.  Specifically with respect to the policy issued to

12   the Debtor, but otherwise because of the terms of the

13   Debtors' insurance program.  And the discovery here does not

14   implicate stand alone insurance, it implicates the Debtors'

15   discovery program.  There was no communication, no

16   transaction between BNSF and the insurers.  The only

17   transactions are BNSF to the Debtor and from the Debtor to

18   the insurance companies.  The Debtor is at the middle of

19   everything here.  That is why we have raised the injunction.

20   I'm not going to repeat how Mr. Wisler explained how the

21   injunction prevents this and what's at stake, but I do point

22   out that we, we raised the issue of this discovery with the

23   Debtor and the Debtors' conclusion is there.  They are

24   implicated, and they will be implicated.  So we think the

25   motion should be denied.  We think it is mute already, but it

1   will be more so if the actions are enjoined against

2   Burlington.  And thank you, Your Honor.

3           THE COURT: Okay.

4           MR. PERNICONE: Your Honor, good afternoon.  Carl

5   Pernicone for Royal Indemnity.  I'll be brief.  I echo the

6   comments of my coverage counsel.  I just wanted to focus on

7   one particular point that Mr. Toole had emphasized.  He

8   stressed repeatedly the collateral or independent nature of

9   the insurance.  Specifically mentioning Royal Indemnity.  But

10  as Mr. Bernick correctly pointed out, while the policies, the

11  alleged policies involving Royal were not issued to Grace,

12  they were purchased by a Grace predecessor.  Okay.  Pursuant

13  to an indemnity agreement between a Grace predecessor and a

14  predecessor of Burlington Northern.  Therefore it's

15  inevitable that discovery will ensue that will implicate

16  Grace because of the understanding with respect to the rights

17  and obligations under both the indemnity agreement and the

18  coverage.  So while the policy wasn't issued to Grace,

19  they're inevitably going to be entangled in any discovery

20  relating to a policy that was issued pursuant to an indemnity

21  agreement that they agreed to provide.  I don't want to

22  repeat everything that everybody else said, but I just wanted

23  to emphasize that point.  Thank you, Your Honor.

24          THE COURT: Okay.  Mr. Toole.

25          MR. TOOLE: Your Honor, I think William Shakespeare

1    would have something to say about the level of protestation

2    that we're hearing from these insurance companies.  Many of

3    the arguments that you have heard go to the possible impact

4    or result that might arise if, if the facts surrounding these

5    policies are construed in the light most favorable to these

6    insurance companies.  That's not what we're here to do.  We

7    are miles before that position.  Right now, the parties, the

8    railroad is simply attempting to ascertain precisely what is

9    the extent of the coverage that was issued.  The efforts by

10   these carriers to preclude even rudimentary discovery, which

11   is designed simply to ascertain the extent of coverage, this

12   is a very telling aspect here.  The technique of trying to

13   suggest to this Court perhaps in a melodramatic way of the

14   complexity of the issues and the implication of the Debtors'

15   insurance programs.  That the Debtors are in the middle of

16   everything.  I would submit that's for another day.  And I

17   would submit that until and unless the railroad is able to

18   ascertain, to a level of reliability, of precisely what the

19   extent of the coverage that was placed where it was the named

20   assured, not the Debtor, that the second aspect of this

21   cannot really properly be adjudicated.  The carriers took the

22   premiums.  The premiums were an exchange for an undertaking

23   to defend, and an undertaking to provide underwriting.  And

24   this is precisely what the railroad is trying to ascertain

25   after all these years.  Thank you.

1    MR. BERNICK: Your Honor, speaking for the Debtor,

2    the discovery is directed to us.  Yes, discovery is directed,

3    I'm sorry, to the insurance carriers, but it obviously is

4    going to involve Grace because the insurance carriers have

5    stood up and said, This discovery is going to implicate

6    Grace's predecessor and Grace's conduct.  So it's kind of a

7    foregone conclusion that in fact there is going to be an

8    impact on Grace.  That's the very reason that Burlington

9    Northern filed its motion to begin with.  So the idea of - -

10   we would like not to have this issue, we would like not to

11   have this issue go forward, not because it has zero impact on

12   it, but precisely because it does have some impact on it.  So

13   the notion that somehow this matter is so important to take

14   place now, that Grace has got to be involved in this

15   discovery when we don't even know whether the underlying case

16   is going to go forward.  It may never have to go forward.

17   And that's the very thing that strikes us as being so

18   curious.  Is if all of this is so completely independent of

19   Grace, why are they filing the motion for clarification?  Why

20   are they even here in court?  It does involve Grace.  That's

21   a problem.  And there's no reason why this has to be taken up

22   on some kind of expedited basis in advance of Your Honor's

23   determination about whether the underlying litigation should

24   proceed.  So I don't know at this point in time where the

25   ultimate truth will lie about how separate it is or not.

1   Maybe a further record has to be developed.  But what is here

2   and now is a discovery request that is going to implicate

3   Grace on the record, because the insurers themselves have

4   said that's where they're going.  That's what they believe is

5   the case.  And under those circumstances, it does become our

6   business.  However the merits of the coverage, and whatever

7   the merits of the facts ultimately turn out to be, it is a

8   matter that's germane now.  And the other question is, why do

9   we have to take it up at this very moment in time, when we're

10  going to be back to talk about whether the underlying

11  litigation should proceed?  And that's all that we would add

12  to the process here, Your Honor.

13         THE COURT: All right.  Well obviously, if the

14  underlying litigation does not go forward then at this point

15  in time the scope of the insurance policies, and whether or

16  not there is an obligation to undertake a defense, or even an

17  obligation to underwrite a liability that may never come to

18  fruition if in fact, if the plan is somehow or other going to

19  address these obligations, I think is a bit premature.  So I

20  think you're correct.  But I need to hear this in context

21  with the Debtors' motion on May 2nd.  Because if in fact the

22  injunction includes the railroad, I don't know that I see the

23  basis for discovery.  So Mr. Toole, I think I need to know

24  why you need to go forward with discovery if the preliminary

25  injunction includes the railroad.  And if it does not include

1    the railroad, then I think I need to give you a decision as

2    to, on the merits as to whether or not discovery should go

3    forward against the insurance companies at that time.

4            MR. TOOLE: Your Honor, please.  As we sit here

5    today, there is no assurance that whatever the ultimate

6    outcome of the claims pertaining to asbestos and specifically

7    the Libby mines, how these are going to be resolved.  And

8    certainly with regard to entities such as the railroad that

9    are not affiliated with this Debtor.  Sooner or later this

10   issue of whether the, the railroad has any collateral

11   liability will have to be dealt with.  If the railroad is

12   precluded from proceeding with discovery as to the existence

13   of these collateral independent policies, its rights will be

14   substantially and fundamentally altered.  There is no way

15   that an injunction kept in place for a few years is going to

16   enhance the position of the railroad in order to ascertain

17   the existence of this coverage.  Maybe it will effect the

18   Debtor.  That's for another day.  But we submit that until

19   these policies are examined, there is no way that a

20   definitive evaluation can be made with regard to whether

21   there is a basis for proceeding independently against these

22   carriers, which of course, they are very vigorously

23   contesting.  Why are we here?  Asks counsel for the Debtor.

24   We are here because one of these carriers chose to threaten

25   the railroad with a contempt proceeding in the event that it

1    proceeded with its discovery in the Montana actions.  And I

2    would ask leave to approach the Court and provide the Court

3    with a copy of a letter that emanated from Continental

4    Casualty's counsel to counsel who's defending the railroad,

5    in essence threatening with a proceeding before Your Honor.

6              THE COURT: Well - -

7              MR. TOOLE: That's why we're here.

8              THE COURT: Yeah.  I don't, I don't have any dispute

9    about the fact that that's the basis for being here for a

10   clarification request.  I think my concern, thank you, is

11   whether or not today is the day to address this issue.

12   Because I still think I need to put it into the context of

13   the preliminary injunction.  If the carrier is in fact

14   covered by the preliminary injunction and from counsel's

15   recitation at least one of the policies as I understand it

16   names the Debtor, if that's the case, and the Debtor is

17   indeed a named insured along with the railroad, then that is

18   an asset of the estate, and I can assure you that at this

19   point in time I will not be releasing that policy for the

20   railroad's access or anyone else's access at this point in

21   time.

22             MR. TOOLE: Perfectly understandable, Your Honor.

23   However, let's hypothetically suggest the opposite.  And I

24   believe that as the movant the Court should consider the

25   facts as pleaded in our motion in the light most favorable to

1    the movant.  We are asserting that this is not a policy of

2    the Debtor.  You're only hearing that from counsel for the

3    insurance company in a conclusory way.  Until these policies

4    are examined, there is no way that that determination can be

5    properly assessed.

6              THE COURT: Well - -

7              MR. TOOLE: And that's all that we are asking for.

8              THE COURT: Okay.  If I understood correctly, it's

9    already one of the enumerated policies that's included within

10   the preliminary injunction.  So it should be a matter of

11   record at this point as to the fact that the Debtor is a

12   named insured on that policy.

13             MR. TOOLE: Number one, there is a substantial

14   disagreement on this point.  Number two, what the insurance

15   companies are asking is in essence to shut down the

16   railroad's efforts to evaluate the rest of the policies as

17   well.  Focusing on one policy, we're suggesting that until we

18   get the discovery as to all of these policies, that a proper

19   assessment cannot be made.

20             THE COURT: Okay.  It's continued 'til the May 2nd

21   hearing in conjunction with the preliminary injunction matter

22   that the Debtors raised.  And hopefully we will put it to bed

23   at that time.

24             MR. TOOLE: Thank you.

25             THE COURT: We'll take a ten minute recess, and then

1    we'll reconvene.

2              MR. BERNICK: Your Honor, while we're on recess I do

3    note that it is - -

4              (Whereupon at 3:59 p.m. a recess was taken in the

5    hearing in this matter.)

6              (Whereupon at 4:16 p.m. the hearing in this matter

7    reconvened and the following proceedings were had:)

8              MR. BERNICK: Ms. Sinanyan is going to be - -

9              THE COURT: All right.

10             MR. BERNICK:  - - handling the next several items.

11             THE COURT: All right.  Ms. Sinanyan.

12             MS. SINANYAN: Good afternoon, Your Honor.  The next

13   two items on the agenda are the New Jersey matter, Your

14   Honor.  This is a long standing matter.  We filed our

15   original motion for an injunction under §§105 or 362 of the

16   Bankruptcy Code back in September of 2005.  The Debtors

17   wanted to prevent New Jersey Department of Environmental

18   Protection from bringing a civil action in New Jersey State

19   Court against Grace and certain of its employees.  New Jersey

20   was seeking a $75 thousand per day fine for an allegedly

21   false report that Grace filed in 1995.  You heard this motion

22   on November 14th, 2005, Your Honor.  I have a copy of the

23   transcript.  I don't know if you've had an opportunity to

24   review the transcript or not, Your Honor.

25             THE COURT: No.

1          MS. SINANYAN: Okay.  If you would like, I can

2     briefly summarize the issues.  But when, where we stood back

3     in November of 2005, Your Honor, you were inclined to grant

4     the, our request, our motion for an injunction under §362

5     finding that there was no police action, finding that this

6     was simply a fine that wasn't accepted under the automatic

7     stay exceptions under 362(b)(4).  You requested, however,

8     that we meet and confer.  We finally were able to hold a

9     meeting about a month ago, which meeting did not bear fruit.

10    So we're back in front of Your Honor after 12 continuation

11    orders, to request that Your Honor enter the order enjoining

12    the matter, and not allow New Jersey to proceed with its

13    civil action.  I don't know if you need more detail from me.

14    I'd be happy to go into it, if you like.

15          THE COURT: No I don't.

16          MS. SINANYAN: Okay.

17          THE COURT: Thank you.

18          MS. SINANYAN: Thank you, Your Honor.

19          THE COURT: Someone here for New Jersey?

20          MR. DEVINE: Yes, Your Honor.  Good afternoon.

21    Edward Devine.  I'm the Deputy Attorney General representing

22    the State of New Jersey.  And it appears that the first thing

23    I need to say is to respectfully take issue with Your Honor

24    as to the scope of the automatic stay under 362(b)(4) of the

25    Code.  If we look at certain cases, Pantera, I'm sure Your

1    Honor's familiar with.  That's been cited in both side's

2    briefs.  We have a case called <u>James</u> from the 3rd Circuit.

3            THE COURT: James?

4            MR. DEVINE: Yeah, James.  I'm going to get the

5    whole caption right here.  In Re: <u>Norma James</u>, Your Honor.

6    Debtor.  That's, I'm sorry, Bankruptcy Court, Western

7    Pennsylvania.  And there what we had was the state enforcing

8    a fine, not a future action, not environmental cleanup, and

9    that court finding that such a civil forfeiture fell under

10   the exception of 3625(b)(4).  And thirdly, a matter called

11   <u>Travcom</u>, also in the Bankruptcy Court, 300 BR 635.  Let me

12   just quote quickly, "A government agency does not run afoul

13   of an automatic stay by reducing such damages, once they are

14   liquidated, to judgment.  Provided, of course, that such

15   agency refrains from attempting to enforce that judgment."

16   Ever since New Jersey arrived here, so to speak, the only

17   goal we have had is to be allowed to proceed with a civil

18   action against Grace for the acts of two of Grace's

19   employees.  Considerable years ago, granted.  The state

20   contends that that proceeding in New Jersey, whether it be in

21   the Federal District Court or in our own State Court, will

22   not impact this proceeding here in this courtroom, and

23   therefore the purpose of the automatic stay is not served by

24   enjoining the state from going forward.  The state is

25   enforcing its police powers.  It is seeking to enforce a

1   penalty, because one of the functions of penalties, as we all

2   know, is to deter others from similar action.  The State of

3   New Jersey has 8 million people.  X number of them deal in a

4   certain kind of business.  Be it gasoline, chemicals,

5   etcetera.  Millions of pages of applications, requests for

6   permits, go through that department every year.  If we cannot

7   take the applicant at their word, we would never in a million

8   years have the number of staff to go out and verify every

9   single thing.  And what happened here was that very problem.

10  The Grace officers filled out a form, that form was relied

11  upon by the DEP, and eight years later, low and behold, the

12  DEP gets notice from their colleagues, the EPA.  Guess what?

13  That form was not accurate.  They told you there was no

14  vermiculate (phonetic) on the ground.  The ground is full of

15  it.  And that's when we had to take our own action.  Finally,

16  there is - - you've heard of the 800 pound gorilla, Your

17  Honor.  What we have in this case is the $800 million

18  gorilla.  This figure has been thrown around every chance

19  that Grace has gotten.  On paper, in argument.  800 million,

20  Oh my God, they're going to ruin us.  Oh, they're going to

21  destroy this whole proceeding.  Never did the State claim 800

22  million.  Never did it put any dollar figure on it.  That is

23  perhaps a theoretical maximum.  But the State, the DEP

24  itself, always has discretion.  Always looks at circumstances

25  in defining the amount of any penalty.  So - -

1          THE COURT: But you're telling me you want to pursue

2   this against the officers, not against the Debtor.  But the

3   claim is against the estate.

4          MR. DEVINE: No, Your Honor.  I'm sorry if I

5   misstated.  We intend to go against Grace in the state court

6   action.

7          THE COURT: Okay.  So not against the officers.

8   Against the officers and against Grace.

9          MR. DEVINE: Yes, Your Honor.  That's where it would

10  stand.

11         THE COURT: Okay.  So I apologize.  I, I got

12  sidetracked for a minute because of that recitation.  So you

13  have discretion and you look to the circumstances.

14         MR. DEVINE: That's right.

15         THE COURT: But nonetheless, what you intend to do

16  is go against Grace to seek a judgment, and the maximum, at

17  this point, still is $800 million going back 10 or 12 years,

18  however long ago this action happened.

19         MR. DEVINE: If we follow their math, I believe it's

20  closer to 900 million.  As time goes by.

21         THE COURT: Okay.

22         MR. DEVINE: Just for the record.  But I can promise

23  the Court this much, no one ever considers such a fine.  It's

24  just beyond anything we've ever done.  Thank you, Your Honor.

25         MS. SINANYAN: Your Honor, New Jersey's counsel

1    stated a couple of, made a couple of statements.  The first

2    is that this is a police power action.  It clearly is not.

3    There is no case that he cited - - he's selectively quoting.

4    There is no case that he cited that states that New Jersey

5    has the authority to go forward with this action in civil

6    court and get a fine imposed against us, even if they're not

7    going to collect the action.  In fact, I'd like to point out

8    to Your Honor the <u>Brock</u> case in the 3rd Circuit, which is 829

9    F.2d 383, which is a case dealing with the OSHA violations.

10   The Court found that to the extent that they were seeking a

11   fine, that it was specifically not a police power action, and

12   that it was stayed by the automatic stay.  Back in November

13   of 2005, Your Honor, you recognized that fact.  You said,

14   "But this isn't a penalty provision seeking to fix damages.

15   It's just a fine.  So I'm not sure how that's not stayed by

16   §362."  The other statement I wanted to address is that New

17   Jersey's comment that it, this isn't an $800 million

18   question, or a $900 million question for that matter, and

19   that the state has discretion.  You recognize that fact.  You

20   stated last time, at the November hearing, that if this was a

21   dollar a day penalty, then Grace might not have an issue

22   settling this, but if it's a $75 thousand a day penalty you

23   said, quote, "That's probably larger than the Libby

24   Plaintiffs claimants in this case, and that it would probably

25   render Grace a Chapter 7, Chapter 7 case."  You asked us to

1    meet and confer.  We did meet and confer.  It did not bear

2    any kind of a fruitful discussion.  Therefore, we're back

3    here in court to say that the cap is still 8 or 900 million

4    dollars.  And that Grace should not be subject to having to

5    defer its resources and its attention to prosecute this

6    action in New Jersey State Court.  One other comment that I

7    wanted to make, just for clarification is that this action

8    was filed against Grace, one of its officers, and one of its

9    employees, and Grace is under indemnification obligations to

10   defend and pay for the actions, defense of those actions

11   against those employees and officers.  And that we would ask

12   that the injunction also enjoin any actions from continuing

13   against them.  One last statement.  Our local counsel is here

14   and I want to make sure he doesn't have anything to add to

15   what I said.

16           MR. MARCHETTA: Just one item, Your Honor.  The cite

17   itself - -

18           THE COURT: I'm sorry.  What's your name, sir?

19           MR. MARCHETTA: Anthony Marchetta.  Day Pitney.  The

20   site itself has been cleaned by the EPA, which has reserved

21   its claim in this proceeding.  So the site itself, the

22   cleanup of the site is not at issue, this is merely the fine

23   that we're talking about.

24           THE COURT: Okay.  When was the site cleaned up?

25           MR. MARCHETTA: The site's been under cleanup since

1    2000, and the last little piece of it is due this spring, as

2    soon as the weather breaks.  But the EPA has been doing that,

3    and the EPA, of course, has a claim in this case.

4              THE COURT: So even though the EPA is cleaning up

5    the site, the state still has a penalty provision that can be

6    enforced against the Debtor for filing the false report?

7              MR. MARCHETTA: Yes.  It's just for the, for the

8    alleged false report.

9              THE COURT: And - -

10             MR. MARCHETTA: For the mis-reporting.

11             THE COURT:  - - that can be a $70 thousand a day

12   fine?

13             MR. MARCHETTA: Yes, Your Honor.

14             THE COURT: For a false report?

15             MR. MARCHETTA: 75 thousand.  Yes, Your Honor.  New

16   Jersey needs all the money it can get.

17             THE COURT: So does the Debtor.  Yes, sir.

18             MR. DEVINE: One slight misstatement on the other

19   side.  The indemnification that they harp on in all the

20   briefs is a conditional one.  In fact, if you read their

21   bylaws, the bylaws of Grace, there are conditions whereby

22   that indemnification can be waived or lost by the employee.

23   So when they say we must indemnify the person, they may or

24   may not.

25             THE COURT: Okay.  Is that so?  For the employee and

1    the officer?

2        MS. SINANYAN: Your Honor, it is a conditional

3    indemnification with certain exceptions.  But that's

4    irrelevant, because Grace would have to defend up until one

5    of those exceptions was met.  So we still have an obligation

6    to defend the matter.

7        THE COURT: Okay.  I did not re-look at the

8    transcript from November.  I did take a look at my notes from

9    that hearing and the pleadings that you filed.  I'm going to

10   take a look at the cases again.  I was ready to address this

11   two years ago, but I'm not ready to address it today, because

12   I haven't looked at the cases again.  So I am going to take

13   this home with me, and I will be issuing a ruling.  I am

14   still pretty much convinced that because of the fact that

15   this is not an ongoing problem, that it is not going to be

16   subject to the exception of 362(b)(4).  I think that when I

17   looked at these cases before I was pretty much convinced that

18   Torliqua (phonetic), and Pantera, and Brock and the other

19   cases seemed to indicate that to the extent that what the

20   State, or the agency, environmental agency, wanted to do was

21   to enjoin ongoing conduct, that that was an exercise of a

22   police power, and to the extent that there was a claim that

23   could be liquidated in conjunction with that exercise of the

24   police power that you could go that far without violating the

25   stay, but you could not collect the penalty without violating

1    the stay.  But I need to go look at them again, because my

2    recollection may not be perfect along those lines.  So I have

3    to go look at the cases.  I'll take this under advisement and

4    issue, issue a ruling.

5         MS. SINANYAN: Okay.  Thank you, Your Honor.

6         MR. DEVINE: Thank you, Your Honor.

7         THE COURT: Okay.  Thank you.  I'm sorry.  That was

8    7 and 8?  Is that correct?

9         MS. SINANYAN: 6 and 7.

10        THE COURT: 6 and 7.  Thank you.

11        MS. SINANYAN: 8 is the Scots matter, Your Honor.

12   This too has been one that has been continued, has been

13   continued on several occasions.  We'd like to continue the

14   matter again.  I believe there's counsel for One Beacon here

15   who would like to make a statement to the Court, but is in

16   general agreement that the matter be continued.  I don't know

17   if someone is here from Scotts.

18        MS. COBB(Telephonic): Tiffany Cobb, Your Honor, on

19   behalf of the Scotts Company.

20        THE COURT: All right.

21        MS. COBB(Telephonic): Your Honor may recall that, I

22   believe it was actually the insurance company defendants, and

23   in particular One Beacon, who asked that this matter be

24   placed again on the March omnibus.  I'm happy to talk first,

25   and just briefly recap that some time ago Scotts filed it's

1   motion for relief from the injunction order.  About two years

2   ago, April 25th, 2005, to be precise, there was a hearing on

3   Scotts' motion, and at that time Your Honor noted, among

4   other things, that the plan as crafted did not set up a trust

5   to be paid with insurance proceeds.  And given this Your

6   Honor stated that you were not sure that the action needed to

7   go forward at that time.  To our knowledge, Your Honor,

8   nothing has changed with respect to the currently proposed

9   plan.  It's our understanding that the status quo is the same

10  as far as the insurance proceeds are concerned.  We'd

11  certainly be interested in any updates from Debtor that would

12  I guess renew their prior statement that nothing is being

13  done with the insurance proceeds pre-plan confirmation.  And

14  if that status quo is in fact the same, we have no objection

15  to continuing this matter.

16          THE COURT: All right.  Perhaps the Debtor can just

17  address first whether or not there's anything being done with

18  insurance proceeds prior to confirmation.

19          MS. SINANYAN: There is nothing being done.

20          THE COURT: All right.

21          MS. COBB(Telephonic): Thank you.

22          THE COURT: Okay.  Yes.  Good afternoon.

23          MR. PRIMACK: Good afternoon, Your Honor.  David

24  Primack, Drinker, Biddle, & Reath for One Beacon and Seaton.

25  I guess I'm in the unique position of representing insurers

1   who want something to go forward.  We want to know how our

2   claims are going to be, whether or not they're - - these are

3   indemnity claims.  Whether or not they're going to be

4   triggered.  How they're going to be treated in the plan. We

5   feel like this should just continue, go forward and, and

6   allow us to discover what will happen.  Of course, we're in

7   agreement with the Debtor on the underlying case, but we'd

8   like it to go forward and figure out how our claims are going

9   to be treated.

10       THE COURT: Now, I would like the whole case to go

11  forward and see how claims are being treated, but I still

12  don't think this is the time to do it.  I think the Debtor

13  has other fish that need to be fried first, and although this

14  is one that does have to be addressed, I still don't think

15  this is the time to do it.  So much as I really don't like

16  continuing to delay this issue, I really do think this one

17  needs to be continued to be delayed, until we can see what

18  the context of the plan is going to look like.  If the one

19  that's on the table is in fact going forward for

20  confirmation, then this needs to get litigated pretty

21  promptly after that.  But hopefully we're going to get

22  something that will be a little more consensual than the one

23  that's here, and maybe this issue will be wrapped up in it.

24  So I still don't think this is the time.  Based on the

25  confirmation - - not the confirmation.  Pardon me.  The

1    trials.  The personal injury and property damage trials - -

2    what, Mr. Bernick, give me a schedule for when we may be

3    looking at, you know, true modifications to plans, if they're

4    going to be modified or confirmation hearings.

5        MR. BERNICK: Well, that is a broad question.

6        THE COURT: Yes.

7        MR. BERNICK: I think that the property damage

8    claims, obviously, are the ones that are in the front of the

9    queue.  And we had a short report from Mr. Restivo on some of

10    the efforts that have been undertaken that have met with some

11    success in resolving some of the key claims that are being

12    prosecuted in the property damage side.  Our discussions are

13    ongoing.  We think that, as is typical with ordinary

14    litigation, as matters come closer to trial, low and behold

15    they tend to get resolved.  So the time line for property is

16    relatively short.  Your Honor, of course, is familiar - - I

17    shouldn't say that.  I'm assuming Your Honor is familiar that

18    the requests for an interlocutory appeal was filed by the CAI

19    claimants was recently denied by Judge Buckwalter, who also

20    actually addressed, in the course of doing that, one of the

21    key legal issues that had been discussed and was imbedded in

22    Your Honor's opinion.  May be worth talking about that at

23    some point, probably not today.  But so we think that the, as

24    a certain mediator that's probably well known to the Court

25    was fond of saying in connection with other matters, The

1   walls of the canyon are shaping up with respect to property.

2   On personal injury, that's further down the queue.  We have a

3   CMO that we're going to be tendering up to the Court today

4   that is no longer objected to that contemplates that the

5   estimation trial will take place in September.  And I think

6   really, as promptly as we can get some indication from the

7   Court about how the Court regards the outcome of that

8   proceeding, that really should be the key trigger in helping

9   the parties perhaps reach consensual resolution.  Now that's

10  not to say that we're waiting for that.  We've taken very

11  seriously Your Honor's indication that we ought to be talking

12  whenever the opportunity presents itself.  And we have been

13  doing that.  I think one other thing that I would add is that

14  as these databases become, the Rust database becomes

15  available and then as the expert reports get done, and Your

16  Honor can hear from both sides what the attachments show, I

17  think that both sides and the Court will be familiar with in

18  a sense what the data is like on the basis of data coming

19  from the questionnaires and from the attachments.  And that

20  will actually take place significantly before the estimation

21  trial.  I guess the CMO calls for that to take place late

22  this spring.  So our hope is that all of these different

23  developments will enable the parties, perhaps, to come

24  somewhat closer together, and to reach out for a consensual

25  plan.  We're very cognizant of the fact that the claimant

1   constituencies want to see this case coming to a conclusion.

2   We feel exactly the same way.  And I think that the best hope

3   that there is for that is for Your Honor to see the data,

4   everybody share the data, and for us to see where Your Honor

5   is coming out, because that's what we're looking for for

6   guidance on what the plan should say.

7           THE COURT: All right.  What about a, what about a

8   continuance of the Scotts matter until the October 23rd

9   omnibus with the caveat that anybody can put it back on the

10  agenda earlier for cause?  Or continue it until later if

11  we're still in the process of the trials and it's evident

12  that nothing is going to happen with respect to this

13  preliminary injunction at that time.  By agreement you can

14  just continue it to a later date.

15          MR. BERNICK: That's fine with the Debtor.

16          MS. COBB(Telephonic): That's fine with the Scotts

17  Company.

18          MR. PRIMACK: Thank you, Your Honor.  That's - -

19          THE COURT: All right.  Okay.  Thank you.  So it's

20  continued to October 23rd then, and we'll see what happens

21  subject to that.  All right.  Thank you, that's item 8.

22          MS. COBB(Telephonic): Thank you, Your Honor.

23          THE COURT: Item 9.

24          MS. SINANYAN: Your Honor that brings us to the

25  claims items, agenda items no. 9 through 13.  Before I start

1  on that, Your Honor, when I was signing in today, I noticed

2  that Mr. Volovsek is present in the courtroom today.  Your

3  Honor entered the order finally expunging his claim on March

4  13.  We sent a copy of the order to Mr. Volovsek.  He says

5  that he did not receive the order, and that's why he's here

6  today.  I don't know if Your Honor wants to entertain his,

7  any argument by him or since you have finally entered the

8  order, Your Honor, if this matter is just fully resolved and

9  Mr. Volovsek can go home.

10        THE COURT: No.  As far as I'm concerned, the matter

11  is fully resolved.  I requested a particular report in order

12  to substantiate that - - well, I'm not going to put it on the

13  record because it involves medical treatment, and I don't

14  think that's appropriate.  Why Mr. Volovsek was not present

15  at the last hearing, I did not get that specific report, and

16  as a result I entered the order on a final basis.  So I think

17  at this point in time, it's final.

18        MS. SINANYAN: Thank you, Your Honor.  That brings

19  us to agenda item no. 9, the 20th omnibus objection.  We filed

20  the exhibit to the agenda which shows that five claims are

21  being continued.  These are the only pending claims.  We hope

22  to resolve three of them by the next hearing, and we have a

23  continuation order, Your Honor.

24        THE COURT: All right.

25        MS. SINANYAN: Would you like me to hand up the

1    orders one by one, or just hand them all collectively?

2              THE COURT: You can give them all to me at one time.

3              MS. SINANYAN: Okay.  Then on the 21st omnibus

4    objection, which is agenda item no. 10, we have an order

5    regarding the uncontested claims.  Four sets of claims are

6    being continued as noted on our agenda, and as noted in the

7    order.  Hopefully three or four of these should be resolved

8    by the next hearing.  You've already entered two orders per

9    the stipulations with Fresenius and Sealed Air.  There are

10   four more certificates of counsel filed.  You haven't entered

11   the orders on those, and those would resolve a whole set of

12   claims as well.  And there are five orders, therefore, that I

13   could hand up to Your Honor.

14             THE COURT: Okay.  I have seen two of the COC's on

15   item 10.  I have not seen more than two.  But I did not get

16   to enter those orders yet.  So if you have them, I will sign

17   them.

18             MS. SINANYAN: I have all four of those orders, Your

19   Honor.

20             THE COURT: All right.

21             MS. SINANYAN: I'll submit those.  Agenda item no.

22   11 is our objection to the claim of Circle Bar Ranch.  You

23   just entered the order on that today.  Thank you, Your Honor.

24   I don't know that there's anything more on that.

25             THE COURT: No.

1          MS. SINANYAN: Okay.  Agenda item no. 12 is the

2    objection to the claim of Mr. Palazzo.  He just filed a

3    response on March 30th requesting an extension.  This is the

4    same thing as the Circle Bar Ranch.  Obviously he failed to

5    timely file any kind of a response.  We submitted a

6    certificate of no objection on that as well.  You haven't

7    signed it.  I have that if you'd like me to hand that up as

8    well.

9          THE COURT: Well, why is he asking for an, for an

10   extension?

11         MS. SINANYAN: He doesn't say, Your Honor.  I have a

12   copy of the letter that he sent, if you will give me one

13   moment, Your Honor.  I request at time extension past the

14   date of March 16, 2007 to file a response to the objection by

15   the above mentioned Debtors.  The reasons are one, I received

16   the objection through legal mail date March 9, 2007.  Two, I

17   have very limited access to the prison library.  Also I have

18   little or no legal skills such as the Debtors' legal staff.

19   Please advise, thank you.

20         THE COURT: All right.  But this is just an

21   objection to a duplicate claim.

22         MS. SINANYAN: It is, Your Honor.  He filed two

23   claims.  They're really both medical monitoring claims.  All

24   we ask is that you disallow Claim 2661 and essentially roll

25   it into 2662 and consolidate the claims.  And then we reserve

1    our right to object to Claim 2662 at a later date.  We

2    believe there's no reason for it to be continued.

3        THE COURT: All right.  As long as the order is

4    clear that that's what's happening.

5        MS. SINANYAN: That's - -

6        THE COURT: That's fine.

7        MS. SINANYAN: Yes, Your Honor.

8        THE COURT: All right.

9        MS. SINANYAN: I'll submit a copy of that order as

10   well.  That brings me to the last claim agenda item, which is

11   claim no., which is objections to the claims filed by Berger

12   & Montague and Richardson, Patrick, Westbrook, & Brockman,

13   which is agenda item no. 13.  Berger & Montague filed 62

14   identical claims.  We filed our objection, obviously, to

15   these claims.  They did not file any kind of a response.  In

16   fact I spoke with Mr. Berger, and he confirmed that they have

17   no objection because those claims have been paid, and the

18   coupons have expired.  Which leaves us with, really, only one

19   claim that is part of that objection.  That was a class

20   action law suit that we settled - - that claim is based on a

21   class action law suit that we settled in 2000.  The Debtors

22   agreed to pay $25 million in cash and issued $25 million in

23   face value in coupons which are due to expire in 2010.  A

24   settlement agreement was approved by this Court on March 21,

25   2000.  The cash portion has been paid.  It was paid back in

1   2000.  That leaves really on the coupons that, as I

2   mentioned, expire in 2010.  The Debtors filed a motion

3   seeking to honor these coupons in the ordinary course of

4   business.  That motion was filed in January 2002.  This Court

5   entered an order - - I'm sorry.  The order approving that

6   motion was filed in January of 2002.  The Debtors have

7   basically stated that they will comply with the settlement

8   agreement, and that we will continue to honor those coupons

9   as and when they are submitted.  Yet counsel for the

10  claimants filed a response to our objection.  He and I spoke

11  and I was, I tried to explain and distinguish, really,

12  between what is a bankruptcy claim and a legitimate claim in

13  these cases, and what is a claim in the layman's terms.  Your

14  Honor, our objection is based on two reasons.  One that we

15  have agreed to comply with the settlement agreement.  There

16  is an order saying that we will do that.  We have stated on

17  the record that we will do that.  We will continue to do

18  that, and we state that on the record today.  The agreement

19  has not been assumed, it hasn't been rejected.  If and when

20  it's ever rejected, then Your Honor, I'm sure as part of the

21  rejection order you will give the claimant time to file an

22  actual claim in the bankruptcy case, but up until that time,

23  although the claimants have a right to have their coupons

24  honored, they do not have a bankruptcy claim in this case.

25  Also, Your Honor, I'd like to point out that the claim was

1    filed as a class claim, and Your Honor has ruled - - and I

2    have language from a transcript that I would be happy to read

3    to you, Your Honor - - that to file a class claim, a claimant

4    must first move the Bankruptcy Court to actually recognize

5    the class.  And that is something that the claimant never

6    did.  Although there was a class action that was recognized

7    in the court that was settled pre-petition, that is

8    irrelevant.  The claimant would need to file a motion to have

9    the class claim approved in this case.  Claimant cites two,

10   cites the Kaiser(phonetic) case, which the Debtors don't

11   believe is applicable.  It's a case in which the Debtors

12   objected to the claimants motion for class certification.

13        THE COURT: But - -

14        MS. SINANYAN: Something that he didn't file.

15        THE COURT: But where - - why am I going there

16   today?

17        MS. SINANYAN: You don't have to go to the class

18   issue at all if you will disallow the claim as an untimely

19   filed claim.  Untimely, I'm sorry, is a misnomer.  As a claim

20   that should not be filed in these bankruptcy cases, because

21   the Debtors are complying with the agreement.

22        THE COURT: I think the problem at the moment is

23   that there is not a bankruptcy claim because it's, the

24   Debtors have agreed to pay it.  Or to the extent there is a

25   bankruptcy claim, it's been resolved.  Because the Debtors

1    have agreed to pay it.  I don't see how the Debtors are going

2    to reject it.  The Debtors have already come forward with a

3    request to have the Court approve it, and the Court's

4    approved it.  So the Debtors can't, I think, turn around and

5    then ask to reject it.  If they do, they're just going to

6    have an administrative claim liability, and they're going to

7    end up paying the same dollars out anyway.

8         MS. SINANYAN: Your Honor, I don't mean to imply at

9    all that we have any intention of rejecting it.  It is just

10   something that I stated to the claimant's counsel to reassure

11   him that if there was any possibility that it would ever be

12   rejected, that he would have an opportunity to file a claim

13   at that time.  You're absolutely correct that the Debtors

14   have every intention of complying with it, and we filed an

15   order stating that we would, and we have stated on the record

16   that we will comply with that agreement.  So we don't think

17   there is a legitimate basis for his claim at this time.

18        THE COURT: Okay.  So I think the issue is that the

19   claim, to the extent there is a claim, it's basically mute,

20   because the Debtor has worked out an agreement by which that

21   claim will be paid.

22        MS. SINANYAN: Yes, Your Honor.

23        THE COURT: So it's either settled or there is a

24   contract in place by which the claim is going to be paid.

25        MS. SINANYAN: Yes, Your Honor.

1          THE COURT: Is someone present representing the

2     college?

3          MR. WESTBROOK(Telephonic): Your Honor, Ed

4     Westbrook, somewhat distant down in Charleston, South

5     Carolina, representing the college class.

6          THE COURT: Yes, sir.  Go ahead.

7          MR. WESTBROOK(Telephonic): Your Honor had

8     Shakespeare quoted to you a little earlier this afternoon.

9     This motion really brought to my mind Yogi Berra saying this

10    is deja vu all over again.  In 2005, Your Honor, we ran

11    through this.  We had our claim on file, Grace objected, I

12    had a nice conversation with counsel for Grace at the time.

13    Grace agreed to withdraw it's objection, recognizing it had a

14    duty to pay the, to pay the rebates as they came up.  Then

15    everything was good and fine, and then a few weeks ago, or

16    months ago, I received another objection.  And counsel and I,

17    Ms. Sinanyan, did have a very nice conversation about it.

18    And my position was simply this.  Grace has an obligation for

19    2½ years to pay these rebates.  Grace says it plans to pay

20    these rebates.  I agree that Grace should be paying the

21    rebates.  But the, the conclusion that I draw from that is

22    not that our claim should be expunged, but simply that it

23    should be allowed, and that Grace should be ordered to

24    continue to pay the rebates as they come up.

25          THE COURT: Well, okay.  Isn't it mute?  I mean,

1    haven't I already done an order?

2            MR. WESTBROOK(Telephonic): Well, you did, Your

3    Honor.   Except your order back in 2002 says Grace can

4    continue to pay this as they see fit in their business

5    judgment.

6            THE COURT: Oh, it doesn't allow the claim?

7            MR. WESTBROOK(Telephonic): No, Your Honor.

8            THE COURT: Oh.

9            MR. WESTBROOK(Telephonic): That one doesn't, by its

10   terms, allow the claim.  We would be happy, Your Honor, if

11   you allowed the claim and put on the record today that Grace

12   is required to pay this, pay these rebates through the end of

13   the settlement period, 2010, and we can all go home this

14   afternoon.

15           THE COURT: Well, okay.  I'm not really sure what

16   kind of other order you folks need.  I mean, either this

17   claim is mute because you've got it settled, which is what I

18   think is the case.  You have an agreement that has made this

19   mute.  I don't know that there's any further litigation.  Or

20   else, to the extent that there is a claim out there hasn't

21   yet been paid, maybe it's not mute.  So you have a claim

22   that's already been allowed because you've already settled

23   it.

24           MR. WESTBROOK(Telephonic): Your Honor, we have a

25   settlement back in the year 2000.

1          THE COURT: Right.

2          MR. WESTBROOK(Telephonic): Before bankruptcy with

3     Grace.  And then Grace, when Grace went into bankruptcy we

4     filed the claim to be sure that Grace would not try to avoid

5     this.

6          THE COURT: Right.  And you got an order.

7          MR. WESTBROOK(Telephonic): Your order in 2002, Your

8     Honor, our problem is the order says that Grace can continue

9     to live up to the agreement, quote, "to the extent Debtors

10    see fit in their business judgment", unquote.  I don't know

11    who's going to be running Grace next year after, God willing,

12    there's a reorganization someday.  And I just would like the

13    *infer mater* (phonetic) of the Court to say that Grace must

14    honor its obligations, our claim is allowed, all we're asking

15    for is that the claim be allowed in the amount of the

16    remaining rebate amounts.

17         THE COURT: Well okay.  I think, I think it makes

18    sense that the claim be allowed, and the Debtor has to honor

19    its coupon obligations.  That seems to be the case.

20         MS. SINANYAN: Your Honor - -

21         MR. WESTBROOK(Telephonic): That satisfies us, Your

22    Honor.

23         MS. SINANYAN: There isn't any issue with the Debtor

24    satisfying its obligations and honoring the coupons in the

25    case.  There is no reason for a claim in this case.

1        THE COURT: Well, sure there is.  It's a pre-

2  petition claim that the Debtor hasn't paid.  So there is

3  reason for a claim.  If they hadn't filed one, you'd be here

4  saying that it should be disallowed, and you shouldn't have

5  to pay the coupons because they haven't filed a proof of

6  claim.

7        MS. SINANYAN: Your Honor, the claim - - the only

8  thing that is left for the Debtors to do is to honor the

9  coupons if and when they are ever submitted to the Debtors.

10       THE COURT: Right.

11       MS. SINANYAN: Our clarification order that we have

12  referenced in the objection that we filed, states that the

13  Debtors will be honoring the coupons in the ordinary course

14  and request permission to do so under §363.  That order

15  obligates us to comply with the terms of the settlement

16  agreement and to honor the coupons.  There is no reason to

17  have a bankruptcy claim in this case.

18       MR. WESTBROOK(Telephonic): Your Honor, counsel has

19  left out a few words in the order.  The order does not

20  require the Debtors.  It says the Debtors are authorized,

21  pursuant to the Consumer Practices Order, to honor the

22  coupons in the ordinary course of business and as the Debtors

23  see fit in their business judgment.  Your Honor all we're

24  asking for is that they be, the claim be allowed, they be

25  ordered to do what they say they're going to do anyway.  I

1   can't understand why they would resist that.

2          THE COURT: Okay.  I don't know the terms of the

3   class action settlement.  Is there some requirement on behalf

4   of the individual claim holder to present the coupon to the

5   Debtor?

6          MR. WESTBROOK(Telephonic): Yes, Your Honor.

7          THE COURT: Okay.  Well then there's the problem.

8   What about an order that simply says that if as and when the

9   coupons are presented to the Debtor, the Debtor will honor

10  them.  Period.

11         MR. WESTBROOK(Telephonic): Perfectly fine in South

12  Carolina, Your Honor.

13         MR. BERNICK: Presented in accordance with the

14  agreement.

15         THE COURT: Yes.  Presented in accordance with the

16  agreement.  Thank you.

17         MR. WESTBROOK(Telephonic): Also perfectly fine,

18  Your Honor.

19         THE COURT: All right.  And to the extent that they

20  are so presented, the claim is allowed to the extent that

21  they are not so presented, the claim is disallowed.  Then we

22  take care of the claim issue.

23         MS. SINANYAN: That we're fine with, Your Honor.

24         MR. WESTBROOK(Telephonic): And that's fine with us,

25  Your Honor.

1          THE COURT: Okay.  Then I expect to get an order

2     from you two on a certification of counsel and see whether we

3     can work this one out that way.

4          MS. SINANYAN: Thank you, Your Honor.

5          MR. WESTBROOK(Telephonic): Thank you, Your Honor.

6          THE COURT: All right.

7          MS. SINANYAN: I have all of the orders to submit to

8     Your Honor that I mentioned earlier.

9          THE COURT: All right.  This one, item 13, I suppose

10    you will be filing electronically.

11         MS. SINANYAN: We will.

12         THE COURT: All right.

13         MS. SINANYAN: May I hand up the rest?

14         THE COURT: Yes.  Thank you.

15         MS. SINANYAN: Thank you, Your Honor.

16         THE COURT: Thank you.  Okay.  Number 14?

17         MR. BERNICK: Excuse me.  Number 14, at least the

18    agenda indicates that you should have a signed order on that?

19    Is that right Jamie (phonetic)?

20         MR. O'NEILL: That's right.

21         THE COURT: I have signed an order?

22         MR. BERNICK: Yes.

23         MR. O'NEILL: You have, Your Honor.

24         THE COURT: Okay.  Thank you.

25         MR. BERNICK: Which then brings us to item 15, which

1   is the status conference on the personal injury estimation.

2   And I think beyond that, the only other item on the agenda,

3   because 16 and 17 have been continued, they relate to ZAI and

4   the adjudication on April 23 through 25 of the, of certain PD

5   claim objections.  Both of those matters have been continued.

6   So the only other item on the agenda is the Anderson Memorial

7   motion for class certification which is a status conference.

8   I think that's where we are in the agenda.

9        THE COURT: Okay.  Before you get to that then, I am

10   still a bit confused.  And I don't know if Mr. Speights is on

11   this call.  If he is not, then I may need to defer this, and

12   I am sorry to do that, because it relates to a discovery

13   order, and I'm not sure if I still owe you an order or if I'm

14   caught up.  And I apologize for this confusion, but for some

15   reason or other, this Anderson Memorial issue has really just

16   set me for a loop.  I asked to have a binder submitted, which

17   you folks did submit, and on which I did an order that set

18   the discovery.  I asked to have in that binder all of the

19   open issues on the Anderson Memorial discovery issues.  I

20   thought when I got that binder, and did that order, that that

21   took care of all of the Anderson Memorial discovery issues.

22   But Ms. Baker tells me that the other order that I was

23   carrying around for weeks before that discovery order still

24   has to be addressed.  That there are still some open issues.

25   The order that I did enter had to do with the custodian of

1    records issue.

2            MR. BERNICK: Yes.

3            THE COURT: I thought that was the only order that

4    was still open.  That somehow or other all the rest of them

5    got incorporated into that one.  But Ms. Baker doesn't think

6    I'm correct and so I need to be sure - -

7            UNIDENTIFIED SPEAKER:  It's Docket No. 13588.

8            THE COURT: Docket No. 13588.

9            MR. BERNICK: Well I know, Your Honor, that there

10   are - - well, first I guess we should find out of Mr.

11   Speights is still on the telephone before we say anything

12   else.

13           MR. SPEIGHTS(Telephonic): Your Honor, I am on the

14   phone.  Can you hear me?

15           THE COURT: Yes, sir.  Thank you.

16           MR. SPEIGHTS(Telephonic): The short answer is while

17   I'm not a hundred percent sure, I believe you are right and

18   Ms. Baker is wrong.

19           THE COURT: Well that would be very encouraging for

20   once.

21           MR. BERNICK: I believe that the, I believe that the

22   only matter that actually remains pending before Your Honor

23   by way of discovery was the custodial deposition.  Mr.

24   Speights had indicated that he might be filing some further

25   motions.  But I believe that Your Honor did resolve that

1   through that order.  And I am not aware of any other pending

2   motions before Your Honor other than the motion for class

3   certification itself.  And I would like spend a few minutes

4   addressing that.

5        THE COURT: Okay.  Well with respect to the

6   discovery issues then, I am going to throw away the draft

7   opinions that I have been holding with respect to the other

8   discovery issues on the assertion that I don't need to issue

9   them.  That they are mute.  So I'll wait until May just to be

10  sure to give you two a chance to look to be sure that I don't

11  owe you any other orders on Anderson Memorial discovery

12  issues.  I was - - and again I apologize for this, but I

13  thought I had attempted to get this resolved by asking you to

14  do the binder.  I thought that's what you had done, and I

15  thought I had complied with what I said I'd do as a result.

16  But just in case would you please double check - -

17       MR. BERNICK: Yeah.

18       THE COURT:  - - to be sure that I don't owe you an

19  order.

20       MR. BERNICK: Your Honor the - - my understanding,

21  and again, I'd like to spend a few moments - - can we just

22  shift the agenda item, go right to that - -

23       THE COURT: Yes.

24       MR. BERNICK:  - - and spend a few minutes on that,

25  and come back to the - -

1          THE COURT: That's fine.

2          MR. BERNICK:  - - personal injury - -

3          MR. SPEIGHTS(Telephonic): Can I, can I respond to

4     the discovery issue before we jump into this a minute, Your

5     Honor?

6          THE COURT: Yes, sir.

7          MR. SPEIGHTS(Telephonic): I just want to make it

8     clear that I, I don't believe there are anymore outstanding

9     motions regarding discovery, but there is still outstanding

10    discovery that has not been presented to you by way of a

11    motion.

12         THE COURT: That's okay.

13         MR. SPEIGHTS(Telephonic): I also want to say, Your

14    Honor, before Mr. Bernick begins, that at 6:30 p.m.

15    approximately, give or take a couple minutes, last Friday, I

16    received an email from Mr. Bernick's office with a proposed

17    overhead for him to use in, quote, "argument", end quote,

18    today on the status conference.  And before Mr. Bernick uses

19    that overhead, I would like to be heard and would object to

20    the use of that overhead.  I'm not sure in what format he

21    intends to present it to the Court, and obviously I'm not

22    there.  And address the question of is this a status report,

23    which I understand it is, or whether Mr. Bernick wants to

24    proceed with some argument, as his firm's email suggests.  At

25    which point I would like to - - I'm not trying to take the

1   floor from Mr. Bernick, but if that's what he wants to do, I

2   think we ought to discuss what it is we are going to do,

3   because if we're going down history lane and having argument,

4   I want to state my objection to that today because I did not

5   come to Delaware.  I believe all we have is a status

6   conference on where we are.

7            THE COURT: I'm not having any argument on Anderson

8   Memorial today.  And I - - as to overheads, I don't know.  I

9   haven't seen an overhead.  Mr. Bernick has - -

10           MR. BERNICK: I don't - - I have one - - I have the

11  first of the overheads up on the screen.  I provided notice

12  to Mr. Speights sufficiently far in advance that this would

13  be presented.  And there's another overhead as well.  It

14  relates to property damage only, Mr. Finch, who's a little

15  bit exercised over here.  But - -

16           MR. SPEIGHTS(Telephonic): Well, Your Honor - -

17           MR. BERNICK: Excuse me counsel.

18           MR. SPEIGHTS(Telephonic): (Microphone not

19  recording.)

20           MR. BERNICK: We have, we have a status report to

21  make and the, the demonstrative helps me make the status

22  report, because it deals with the one matter beyond the

23  custodial deposition, which I believe was resolved, the one

24  matter that is the subject of the status report, and that is

25  the motion for class certification.  So we intend to make a

1   status report on the motion for class certification, and we

2   intend to make a proposal about how to proceed with bringing

3   that motion on for hearing before the Court.  I'm not going

4   to argue the merits of the motion.  I'm going to talk about

5   the history of how the motion has been presented.  And I'm

6   also going to talk about the status of the many, many

7   discovery requests that are still being pursued in this case.

8   Because although Mr. Speights has not presented a motion to

9   compel on each of the discovery requests that are

10  outstanding, as Your Honor sees from this slide, there are a

11  whole series of discovery requests that have been made.  They

12  keep on dribbling in.  We've now gotten requests to take the

13  deposition of a former member of the US Trustee's staff.  Mr.

14  Frank Perch (phonetic).  That request came in last week.  We

15  have a request in the Anderson Memorial case for all of the

16  fees that have been paid to Grace's property damage experts

17  in connection with this case.  Not limited to the Anderson

18  Memorial claim.  There is now only one claim in the so-called

19  Anderson Memorial requested class.  That's a South Carolina

20  class, and there is - - purported class.  There is now one

21  claim that remains in that entire class.  That is the claim

22  of Anderson Memorial itself.  And - -

23          MR. SPEIGHTS(Telephonic): Your Honor, please let

24  me, hear my objection to the overhead.  That's all I asked to

25  do before Mr. Bernick started.

1           MR. BERNICK: Well I - - Your Honor, I'm explaining

2    why - -

3           MR. SPEIGHTS(Telephonic): (Microphone not

4    recording) that you have an overheard before Her Honor, and

5    I've objected to it.

6           THE COURT: Okay.

7           MR. SPEIGHTS(Telephonic): And I just want to state

8    my objection for the record.

9           THE COURT: I will hear your objection, Mr.

10   Speights.  But so you can take comfort in this, I can't see a

11   single thing on the overhead except the words Time Consumed

12   by Anderson Memorial Class Certification Motion.  That's it.

13   That's what I can read.  But go ahead.  State your objection.

14          MR. SPEIGHTS(Telephonic): Well, thanks, Your Honor.

15   And I hope it will not be any more moved around so you can

16   see anything else.  Because we addressed this back in

17   November, and we addressed the whole issue of overheads and

18   serving them beforehand.  And Mr. Bernick objected to one of

19   my overheads.  And it may seem very technical, but this has

20   been going on for years and years.  And I said to Your Honor,

21   at the November 20 hearing, that I would agree to, I would

22   suggest a procedure where everybody should serve overheads

23   prior to the hearing.  And Your Honor said, That's a good

24   idea.  And Your Honor said, 24 hours in advance.  And I said,

25   Your Honor, is that a business day?  And you said, That's a

1  business day.  And I said, What if on Monday?  And you said,

2  On Friday.  And I said, 5 o'clock?  And you said, Your Honor,

3  at that time, 5 p.m. on Friday, eastern time.  We are sitting

4  in the east.  Eastern time.  And yet, once again, Friday

5  night, after my office is closed, in the night, or an hour

6  and a half after then, Kirkland & Ellis serves overheads and,

7  along with serving overheads, says, we intend to use these

8  in, quote, "argument".  And I object to the use of overheads

9  that were not supplied in accordance with your ruling at the

10  November 20 hearing.  Now I've stated my objection to that.

11  I've also objected to going down history lane again.  But if

12  that's where we are, Mr. Bernick will go, and then I will

13  respond in full.

14       THE COURT: All right.  I don't personally see the

15  need for me to have an overhead.  You may use it so that it

16  will inform whatever presentation that you need.  But I

17  honestly can't read it anyway, Mr. Bernick.  So go ahead.

18  You, you can - -

19       MR. BERNICK: Okay.  Well, I understand that, Your

20  Honor.  We believe that we did comply.  We believe it's of

21  critical importance that Your Honor revisit this history

22  because while Mr. Speights, both in the substance of what he

23  has to say and in his tone, would indicate to the Court that

24  this is a matter of kind of lightheartedness and ease, in

25  fact, this represents probably the most protracted single

1    motion in the case.  It was filed 3½ years after it should

2    have been filed.  Your Honor gave very specific instructions

3    to Mr. - - to everybody, saying that no class claim should be

4    filed without a motion.  Notwithstanding that, Mr. Speights

5    proceeded to file a class claim.  That claim, that class

6    claim encompassing as it did, hundreds maybe even thousands

7    of claims, almost, most of which he had absolutely no

8    authority to file, and which we now know he was given no

9    authority to file, caused an enormous expenditure of our

10   time, the Court's time, sorting through all of the

11   unauthorized claims that were filed.  We then had the motion

12   itself.  The motion itself was filed 3½ years after Your

13   Honor issued instructions about when class motions for class

14   certification should be filed.  It was filed at the end of

15   last year.  And since that time, and for Mr. Speights - -

16   well, Mr. Speights knows because he is looking at it, we have

17   now spent over a year dealing with this grossly belated

18   motion.  A motion that purported to be brought on behalf of

19   people who are not even in South Carolina, even though he had

20   specifically been told in South Carolina that there wasn't

21   the authority to proceed, indeed he filed an amended

22   complaint in South Carolina limiting it to South Carolina.

23   He nonetheless moved for a nationwide class.  Even though

24   that was in direct violation of what had happened in South

25   Carolina.  So just that fact alone, and then the incredible

1   arguments.  Remember all that we went though to try to sort

2   out what happened in South Carolina.  And there were

3   representations to the Court that no, the South Carolina

4   Court didn't do this or that until we actually got the

5   letters.  The letter that had been issued to Mr. Speights

6   himself by the Judge in South Carolina.  We now know that in

7   fact the door closing statute went up to the Supreme Court of

8   South Carolina, they stood by the motion.  That there wasn't

9   jurisdiction to proceed against those outside of South

10  Carolina.  And still he's got a nationwide class here.  So

11  the idea that this is a matter of no consequence, and there

12  should not be matters taken up today about the incredible

13  continued waste of time and effort in connection with the

14  class claim that now encompasses one single claim.  And this

15  shouldn't come to the Court's attention?  It is an outrage.

16  I have never before observed the willingness of counsel to

17  proceed with a protracted process.  Your Honor is extremely

18  flexible, and allows people to be heard, and allows them

19  opportunities to present their motions.  But it's been abused

20  here.  We have now had hours, I've got them listed here.

21  We've had multiple hearings.  Hours of time spent, all for

22  the purpose now of devolving upon a class that involves one

23  claim.  And my client - - now we complied with the custodial

24  order.  We submitted a document custodian.  We went through,

25  I think there were a total of about 15 hundred boxes that

1    were considered for production.  We obtained them from the

2    Cahill Gordon firm in New York, from Grace.  We submitted an

3    index.  The deposition took place.  And still it doesn't end.

4    They now want a - - he wants a document custodian from the

5    South Carolina law firm.  He wants a privilege log.  He wants

6    depositions taking place of Mr. Perch, presumably to find out

7    that somebody, that is that Grace, didn't want Mr. Speights

8    to be on the property damage committee.  And it could well be

9    that that was true.  And for the very reason that we're

10   seeing here.  But that's not a proper subject for discovery.

11   To depose a staff member of the US Trustee's Office.  Your

12   Honor has told Mr. Speights three different things.  And

13   they've all been completely and systematically ignored.

14   Number 1, that the discovery has to be tailored to an active

15   issue in class certification.  That has yet to take place.

16   Number 2, that the suggestion to Grace that Grace consider

17   withdrawing the objection on the grounds of adequacy of

18   counsel, we did that.  And there's been no appreciable

19   recognition of how that might affect the discovery that he's

20   looking at.  And number 3, numerosity was probably going to

21   be an extremely difficult barrier for Mr. Speights to meet.

22   And Your Honor said that, said that repeatedly, I've got the

23   transcript here.  And what we now know is that we're sitting

24   here in a Federal Court devolving on a class action comprised

25   of a single claimant who remains in the so called South

1   Carolina Court.  Your Honor, it is an outrage the amount of

2   money that's been spent.  And Your Honor I said this last

3   year, and then I stopped talking, because Your Honor gave him

4   the opportunity to conduct some discovery.  And I'm back here

5   again because that opportunity, once again, and totally

6   predictably, has been totally abused.  Our proposal is to

7   have the class certification motion set down for a hearing at

8   the Court's earliest convenience.  And if Mr. Speights at

9   that point in time wants to make a record under 54, 56(e), or

10  whatever the appropriate provision is, that he's been denied

11  some discovery that actually goes to an issue that is germane

12  to the Court's disposition of the class certification motion,

13  well he can come in and in that argument he can make that, he

14  can make that record.  But for the estate to continue to

15  spend money on this fool's errand is intolerable.  And, you

16  know, I guess, we're probably making a mistake by showing Mr.

17  Speights that we, that we react that way to this, because I

18  think it's in part for that reason that he does that.  But

19  whatever his motivations are, we should not be spending

20  another dime on a motion that had no merit to begin with, and

21  has simply cost the estate a tremendous amount of money.  So

22  we would ask the Court to set a date for the class

23  certification motion.  The custodial deposition has already

24  taken place.  There was a request for the transcripts from

25  South Carolina.  Those have now been obtained.  Your Honor

1    has suggested to that parties that if there was some portion

2    of those transcripts that should be brought to Your Honor's

3    attention, that should be done.  I'm not aware that Mr.

4    Speights has done that at all.  If he wants to do that in

5    preparation for the hearing, fine.  But let's get this thing

6    heard and resolved so we don't hear the word Anderson

7    Memorial again in this case.

8              THE COURT: Mr. Speights.

9              MR. SPEIGHTS(Telephonic): Well Your Honor, if that

10   was not argument, I don't recognize argument.  Mr. Bernick

11   has gone through almost every issue that will be before you

12   when we argue certification, including whether or not we had

13   what Your Honor said in the transcript at a certain point in

14   time, versus what Your Honor ruled at other points in time.

15   What's relevant and what's not relevant.  Numerosity,

16   etcetera, etcetera.  I'm not here to argue Anderson today.

17   Every time Mr. Bernick does this I resist going down the line

18   of arguing the merits of certification.  I suspect Your Honor

19   is impatient.  I'm impatient.  If you will remember Your

20   Honor, just a couple of points.  First of all, I served some

21   very basic discovery seeking documents, etcetera, over a year

22   ago.  And after maybe a year or so, Mr. Bernick did, at Your

23   Honor's suggestion, withdraw his attack on me and my law

24   firm.  And that's something I appreciate, and I do think it

25   narrowed the issues somewhat.  But it took a year or two to

1    get to that.  And then we had some basic discovery

2    outstanding.  And I went and noticed the custodian's

3    deposition in light of what Mr. Bernick kept arguing about

4    how broad this discovery was, and why he couldn't do X, Y,

5    and Z.  And I filed the custodian's deposition, sought an

6    expedited hearing on that.  I wasn't trying to delay things.

7    I sought the expedited hearing on that, and Grace opposed

8    that.  So we were put over for another month.  And then we

9    got an order from Your Honor - - then we argued that, and

10   Your Honor had to issue a written order on me taking the

11   custodian's deposition.  And I argued at that time that all

12   of the documents of Grace would be in three places, at Cahill

13   Gordon in New York, at W.R. Grace, or in South Carolina, the

14   South Carolina law firm's office.  So they finally produced a

15   witness, after many requests, in Washington, D.C. who had

16   the, who was the custodian of both the Cahill Gordon

17   documents and the Washington documents.  That is the Grace

18   documents.  And I took the custodian's deposition.  That's

19   all it was, the custodian's deposition.  However, they did

20   not have, had not looked at, could not respond to, the

21   documents maintained in South Carolina by the lawyer who was

22   involved in Anderson from day one.  So I asked to take the

23   deposition of the custodian of those documents pursuant to

24   your order.  I believe those documents are under the care,

25   custody, or control of Grace under the rules.  And Grace had

1   an obligation to produce the custodian.  Grace disagrees.

2   Lawyers disagree all the time, and particularly in this law

3   suit.  So I noticed the deposition then of the custodian of

4   the South Carolina law firm to finish off the custodian's

5   deposition.  And that's what I've been doing, and it's a very

6   frustrating effort on my part to try to get just the basic

7   documents so I can deal with the arguments that Grace has

8   made.  Now Your Honor, I don't - - at the end of the day,

9   I'll be glad to discuss with you about when we can bring this

10  all to a head and have the hearing.  At one point in time I

11  was pushing and Mr. Bernick was, was trying to hold

12  everything up.  But I agree that we should get this matter

13  resolved.  I do not anticipate going forward with any new

14  discovery.  I do want responses to my outstanding discovery.

15  They filed responses to my request to produce finally.  After

16  I think three times we argued that before Your Honor.  And

17  when they filed the responses to request to produce, as I

18  read Your Honor's transcript, and again I wasn't prepared to

19  argue today, as I read Your Honor's transcript, you told them

20  that they would have to file a privilege log.  Well I've

21  gotten no privilege log on the response to request to

22  produce.  So I have filed a motion the end of last week

23  asking them to file a privilege log.  If they will give me

24  the privilege log, I take the last custodian's deposition, I

25  may have a motion to compel with respect to documents on the

1  privilege log or documents they've refused to produce, but if

2  we do that we will be essentially through with the document

3  discovery in this case.  It could have been done a year ago

4  in my opinion.  I'm not trying to delay it, I just want to

5  finish off what I've been trying to do for a year.  I did

6  notice Mr. Perch's deposition, and I called the US Trustee in

7  advance, as a matter of courtesy.  And I believe Mr. Perch

8  has information that would be relevant to the issues before

9  the Court on certification.  If they want to file a motion

10  for protective order, I'll be prepared to argue it at that

11  time.  I'll be happy to agree to any expedited hearing on

12  these discovery matters.  They can file a motion on Mr.

13  Perch, and we will hear it as quickly as convenient to Your

14  Honor.  But that's the only notice of deposition I believe I

15  have out there now.  Although I don't believe there's

16  anything else.  I don't have a file in front of me to deal

17  with that.  So the bottom line is, Your Honor, despite all

18  the hyperbole, for over a year I've wanted some basic

19  discovery.  I'm still trying to finish it.  I would like to

20  move forward.  I would like to resolve this.  And I don't

21  have a problem with us trying to decide when we can have a

22  hearing on the Anderson certification.

23          MR. BERNICK: Your Honor, the burden is on Mr.

24  Speights.  And the burden is on Mr. Speights to do more than

25  what he has done.  This is a class certification motion.

1    It's not discovery on the merits of the case.  Your Honor has

2    already told him that.  We actually had a full argument on

3    this motion in December of '06.  Coming out of that argument,

4    there was only one issue that Your Honor asked about.  Which

5    was, Well what about the idea of the notice?  The class

6    notice, and is it dispositive.  And Your Honor well recalls

7    that ultimately you determined that the fact of the notice

8    having been approved was dispositive, and therefore the pool

9    of claims that could conceivably be part of the class, or

10   only those claims that had come forward by the bar date and

11   were capable of being pursued.  So Your Honor resolved that

12   issue.  Your Honor resolved that issue in the fall.  And when

13   Your Honor resolved that issue is then that we got all of

14   these different requests.  They had certainly, they had been

15   referenced to earlier.  We got, then got this effort to

16   somehow keep this dead horse alive by prosecuting all of

17   these discovery requests.  And Your Honor will recall there

18   were so many in so many different categories, I had to keep a

19   chart to reflect what they were.  And to talk about all the

20   different categories that they filled.  And Your Honor said,

21   in no uncertain terms, and this was in October of the omnibus

22   hearing, "So I think with respect to the discovery that to

23   the extent that the request is as broad as it is, I can't

24   even see how it's calculated to lead to relevant admissible

25   evidence, because it's too broad.  So I think you need to

1   narrow the scope whether the Debtor has raised the issue or

2   not."  Essentially what you were saying, in fact you said

3   then at page 76, "Asking someone to give them everything that

4   you have related to a topic is I think simply a fishing

5   expedition.  And even the rules of discovery don't give you

6   that much.  I think you need to narrow this topic."  So what

7   happened was we got a regurgitation of all of the same

8   discovery requests.  We got a regurgitation of the same kind

9   of broad brush approach, and it, and it's now been expanded.

10  He now wants a privilege log.  A privilege log with respect

11  to files that are inherently privileged files, because

12  they're lawyers files.  The Anderson Memorial case is a

13  litigated case.  So we're going to go and do a privilege log,

14  and then we're going to litigate the privilege log.  We're

15  going to have a custodial deposition with respect to a law

16  firm's files.  And then we're going to take the deposition of

17  Mr. Perch.  And Mr. Speights says, Oh, well, it's just not

18  that big a deal.  If he would just do it, they would just do

19  it, we would get their - -

20          THE COURT: Can I - - look, look, this is a status

21  conference.  I don't have any motions about discovery.  I

22  don't know what you're asking me to do.  You want a - -

23          MR. BERNICK: What I'm asking you to do - -

24          THE COURT:  - - date for a hearing?

25          MR. BERNICK:  - - Your Honor - -

1          THE COURT: I'll give you a date for a hearing.

2          MR. BERNICK: What I'm asking you to do Your Honor

3    is exactly what we asked for before.  I'm asking Your Honor

4    to give us protection against this discovery, and to impose

5    the burden on Mr. Speights, in the context of a hearing on

6    the class certification motion, to specify what particular

7    piece of information is germane to class cert - - Your Honor

8    told him that last fall.  He has refused to do it.  And Your

9    Honor the - -

10         THE COURT: File objections.  I can't deal - -

11         MR. BERNICK: I did, we did already, Your Honor.

12   We've been through this.  Your Honor - -

13         THE COURT: That's what I said.  Do I owe you any

14   rulings?  That's how this started.

15         MR. BERNICK: He hasn't moved on any of this.

16         THE COURT: Well then I don't have any issues before

17   me.

18         MR. BERNICK: Well, but see Your Honor, while all

19   that takes place, we can go file a motion for protective

20   order, and recycle the same process that we went through.  I

21   understand you're frustrated, Your Honor.  My client and we

22   are unbelievably frustrated with the waste of time and effort

23   that's associated with this, because he takes the opportunity

24   of Your Honor saying, I'm not going to give you protection,

25   and he exploits it.  That's what's going on here.

1          THE COURT: I, I haven't said that I wouldn't give

2    protection when protection is due.  I haven't said I wouldn't

3    compel or I would compel.  I don't have any motions Mr.

4    Bernick.  I can't deal with hypothetical give us protection.

5          MR. BERNICK: I - - we - -

6          THE COURT: The way discovery works is somebody asks

7    for discovery, somebody objects to it if you don't want to

8    answer it.  I get a reason why somebody wants it, and I make

9    a ruling.

10         MR. BERNICK: Your Honor - -

11         THE COURT: I can't - - you're painting with just as

12   broad a brush as Mr., as you're accusing Mr. Speights of

13   painting.

14         MR. BERNICK: Your Honor, with due respect to the

15   Court, we went through exactly that process last year.

16         THE COURT: Fine.

17         MR. BERNICK: One hundred percent that process.  And

18   it has not moved.  What happened was when Your Honor denied

19   the motion for protective order the whole thing opened all

20   over again.

21         THE COURT: I'm giving you a date for a hearing.

22         MR. BERNICK: Great.

23         THE COURT: And you folks will finish discovery one

24   way or another before then.  If you don't want to answer, if

25   you don't, if your client feels it has legitimate objections,

1   raise them.

2         MR. BERNICK: Fine.

3         THE COURT: If you're going to respond, respond.   I

4   think it's time to get this done by way of a hearing.

5         MR. BERNICK: Okay.

6         THE COURT: Okay.   This is - - the unfortunate thing

7   is I think the first hearings I have, dates I have, because

8   between Grace and Federal Mogul you're taking up most of my

9   life.   And that's not necessarily a complaint, it's just the

10  reality.   I think the first hearing dates I have are in June.

11        MR. BERNICK: That's fine with us.

12        MR. SPEIGHTS(Telephonic): That's fine with me, Your

13  Honor.

14        MR. BERNICK: May 9th, I am told - -

15        MR. SPEIGHTS(Telephonic): (Microphone not

16  recording) specifically, but that would allow me to live

17  through this trial on objections.

18        MR. BERNICK: The main - - the main - -

19        THE COURT: Can you check June the 8th, Mona?   Is

20  that just a motions day?

21        MR. BERNICK: There's actually - - Your Honor, I

22  don't mean to interrupt.   There's a - - there are PD, three

23  PD dates in the first part of May.   May 7, 8, and 9, I think.

24  And I don't know that they're actually occupied with anything

25  at this time.

1          THE COURT: Okay.

2          MR. SPEIGHTS(Telephonic): Your Honor, Mr. Bernick

3    may not be occupied with them, but I'm totally occupied with

4    the PD litigation that's going forward.  And I won't give you

5    a song and dance about what's going on on that, but - -

6          MR. BERNICK: Well, those are dates that have to be

7    blocked out in any event.  Those are dates that were blocked

8    out for PD in any event.  The 7th, 8th, and 9th.  And this

9    matter has been briefed.  It should not require a lot of

10   time.

11         MR. SPEIGHTS(Telephonic): Your Honor, we have

12   asked, as you recall, for an evidentiary hearing.  So I don't

13   know how that effects your scheduling as well.  I'll wait

14   until you get your calendar, and then respond to the

15   particular dates.

16         THE CLERK: (Microphone not recording.)

17         THE COURT: On the 8th?

18         THE CLERK: (Microphone not recording.)

19         MR. BERNICK: Of?

20         THE COURT: June.

21         THE CLERK: (Microphone not recording.)

22         THE COURT: Okay.  Could you check the 6th?  You gave

23   me a note earlier that said I had until 2.  What happens at

24   2?  June 6th?

25         THE CLERK: (Microphone not recording.)

1          THE COURT: For commercial. . .?  Does it just say

2    monthly?

3          THE CLERK: Yes.

4          THE COURT: Is that the only thing that's on?

5          THE CLERK: Yes.  (Microphone not recording.)

6          THE COURT: Okay.  What about Wednesday June 6th?

7          MR. SPEIGHTS(Telephonic): That's fine with me, Your

8    Honor.

9          MR. BERNICK: That's fine.

10         MR. SPEIGHTS(Telephonic): Pittsburgh?

11         THE COURT: Yes.  In Pittsburgh.

12         MR. BERNICK: At what time?

13         THE COURT: Start at 9.  I'll give you all day.

14         MR. SPEIGHTS(Telephonic): Thank you, Your Honor.

15         MR. BERNICK: Don't say that.

16         THE COURT: I've learned.  All right.  Trial on the

17   Anderson Memorial - -

18         MR. SPEIGHTS(Telephonic): Certification.

19         THE COURT:  - - certification in Pittsburgh on June

20   6th, that's Wednesday, 9 a.m.  Okay.  If you've got discovery

21   matters, and you need to - - I would suggest that you try to

22   put them on to the May calendar.  If you have to get them

23   expedited, then let me know, I'll do them by phone, if need

24   be before the May 2nd hearing.

25         MR. SPEIGHTS(Telephonic): Thank you, Your Honor.

1          THE COURT: Okay.

2          MR. BERNICK: I think that brings us to the last

3    item, which is the PI estimation status conference, and in

4    light of the late hour, I'm certainly prepared to try to

5    expedite that report.  There's one housekeeping matter.

6    Which is that there was an objection, Your Honor, to the case

7    management order, the revised case management order that had

8    been, as you know, very heavily negotiated.  There was an

9    objection by the Libby claimants.  To accommodate that

10   objection, we pushed back one of the dates.  The date for I

11   think some expert reports.  And I - -

12         THE COURT: Do we still have the people on the

13   phone?

14         UNIDENTIFIED SPEAKER(Telephonic): Yes, Your Honor.

15         THE COURT: Okay.  Sorry.  I don't know what

16   happened there.  Go ahead Mr. Bernick.

17         MR. BERNICK: We essentially pushed back one of the

18   dates and I don't know, Jamie, if we have an extra copy that

19   we've tendered up.  If you could maybe tender that up to the

20   Court.

21         MR. O'NEILL: May I approach?

22         THE COURT: Yes, please.  Thank you.

23         MR. O'NEILL: Thank you, Your Honor.

24         THE COURT: This one says 16?  Is this about the

25   ZAI?  Or do I just have the wrong - - isn't, isn't the status

1    conference on estimation 15?

2         MR. BERNICK: Status conference on estimation is 15,

3    I believe.

4         MR. O'NEILL: Oh, Your Honor, that reference is to

5    the February agenda.

6         THE COURT: Okay.

7         MR. O'NEILL: It's the reference to the item number

8    on the February agenda.

9         THE COURT: But the docket entry numbers are

10   correct.

11        MR. O'NEILL: Yes, Your Honor.

12        THE COURT: Okay.  Thank you.

13        MR. BERNICK: So what I'd like to talk about a

14   little bit is where we are with reference to the major

15   outstanding items and to alert the Court to some developments

16   there.  As Your Honor will recall when we asked the Court to

17   revise the case management order, there were essentially

18   three major areas.  This is a chart that was previously

19   displayed to the Court.  There were three major areas of,

20   where we felt, we felt that it was important to get more

21   time.  And I've shown them, this is the same slide that we

22   showed before.  The three major areas were number one, the x-

23   rays, number two were the B-reads, and that was the

24   consultant's issue, and number three was the review of the

25   questionnaire information, and that was the attachment

1   review.  Effectively we're making some progress, but with

2   difficulty in all three areas.  And it does impact on the

3   schedule, and so I want to bring it to Your Honor's

4   attention.  With respect to compliance with the x-ray order,

5   and these were circulated also on Friday.  I don't know if we

6   - -

7          MR. FINCH: Your Honor, I would, I would object to

8   the slides Mr. Bernick is about to use for two reasons.

9   First, we didn't get them until after 5 p.m. on Friday.  But

10  - -

11         MR. BERNICK: I'm sorry, what?  I'm sorry.

12         MR. FINCH: We didn't get them until after 5 p.m. on

13  Friday.  Secondly, and more importantly, what he is doing is

14  basically previewing a motion that is on file and scheduled

15  to be heard sometime in April.  I don't even know if the

16  responses have come in yet.  And I would object on behalf of

17  the ACC, at least, to essentially pre-arguing or teeing up

18  his version of a, what has or has not happened in discovery

19  on a motion to compel basis where the parties who would be

20  the targets of the motion to compel haven't even had the

21  opportunity to respond yet, and aren't even in the courtroom.

22         MR. BERNICK: Your Honor we can proceed and have

23  millions of dollars be spent, and lawyers running all over

24  the country, and Your Honor doesn't even know what's

25  happening until motions are presented, or we can have this

1    status conference.  The reason that we ran into all of these

2    different problems was in fact matters that were ongoing and

3    ultimately did require that the Court issue some relief.  The

4    fact is, and I would assume that the Court has got an

5    interest in knowing, well how did the x-rays come in?

6          THE COURT: It would be nice to know.

7          MR. BERNICK: Okay.  And I don't even have to show

8    it.  I can say to Your Honor there were six thousand, seven

9    hundred, 67 hundred say claimants who were subject to that

10   order.  And the order called for the x-rays to be submitted

11   by March the 15th.  And remember they were also to be

12   submitted with a certification that said use the magical

13   language, basically, which assured that they'd be usable in

14   this proceeding.  Of the 67 hundred people who were subject

15   to the order by the 15th of March, we only have approximately

16   27 hundred, or 41%, who submitted both an x-ray and a

17   certification in accordance with the order.  41%.  We then

18   have approximately 37 hundred - - I won't even use the word

19   non-compliant.  I would say they don't fall into the category

20   of those who provided both an x-ray and a certification.

21   There are 941, thereabouts, who provided an x-ray but no

22   certification.  There are 1,600 who simply provided nothing

23   at all.  And this is again, my data is as of I think Thursday

24   of last week.  Maybe that something else has come in.  If it

25   has, it's late.  There are 442 claimants where the statement

1   was made that the x-rays are held by third parties and

2   they're not available.  And then finally, there are 729 where

3   they say the x-rays are unknown.  So this is essentially

4   where we are at the end of this very long process is that we

5   have about a 41% return rate.  And a variety of problems that

6   are, in fact, the subject of a motion.  I'm not going to

7   argue the motion.  That is for a different day.  What I'm

8   going to inform the Court is that in light of the amount of

9   time and effort that's been undertaken to obtain the

10  information that we have, we're going to do two things.  One

11  is we're going to review the information that we do have to

12  see what use can be made of it.  And second, we are going to

13  come back with a motion, because Your Honor will recall that

14  the x-ray order said that we should come back if there was a

15  problem with the third party, you know, x-rays in the hands

16  of third parties.  We're going to do that.  That is part of

17  the motion.  I won't argue the merits, but we're going to

18  follow what Your Honor told us to do.  And then with respect

19  to any other evidence that may be in existence with regard to

20  these x-rays, that is any other radiological evidence, we're

21  going to ask for an order that says that if the evidence has

22  not been produced, it should not be usable in the case.

23  Because the case goes on, and we'll be seeking a negative

24  inference down the road.  So rather than coming back in with

25  yet more motions, after all the motions that have been filed,

1    we don't have time to come back with more motions where

2    people are not in compliance with the many orders that Your

3    Honor has issued.  We are going to come back with the motion

4    on the 442, and then we'll come back with a request for

5    orders with regard to other evidence that might be available.

6    That's where we are on the x-rays.  If we talk about the B-

7    reads.  Here's where we are on the B-reads.  Your Honor will

8    recall that there's been extensive litigation with regard to

9    the B-reads.  We filed a motion to compel, the Court issued

10   an order on that motion on December the 22nd.  There was a

11   motion for reconsideration that was made on the 2nd, and then

12   on an expedited basis Your Honor ruled and denied the motion

13   for reconsideration on January the 23rd.  No additional

14   documents, that is screening documents, that we're aware of

15   have been submitted through April the 2nd.  So it appears that

16   all of the documents, or at least that some portion of the

17   documents that prompted the opposition, and prompted the

18   motion for reconsideration, haven't been produced.  Now we

19   know that an appeal is being taken of that as well.  There's

20   an appeal that's being taken, or a request that I believe is

21   being made to the Court to allow an interlocutory appeal with

22   regard to this determination.  And that will be another

23   matter that will be heard by Your Honor, I believe, on the

24   13th of April.  But at this point in time, we don't have those

25   other B-reading documents.  Now what we've asked for, and

1    again I'm not going to argue about the merits of it, what

2    we've asked for is to at least get a log of what is being

3    withheld on grounds of privilege so we have a record of what

4    rests in the balance on this whole issue.  That also is

5    before Your Honor on April the 13th.  So when we get back to

6    our time line, this time line hasn't even changed since the,

7    we were last before the Court, other than to mature continued

8    litigation over those B-reads.  Now I will say that there are

9    some firms that have told us that they're not withholding

10   anything.  Mr. Kazea (phonetic), who's well known to the

11   Court, communicated with our firm and said, If I tell you - -

12   or not if I tell you - - I'm telling you that we're not

13   withholding anything on grounds of privilege.  Will you drop

14   the motion with respect to us?  And of course we said, yes.

15   And if other people will come forward and say, We're not

16   withholding anything, then they obviously won't be subject to

17   the motion.  We will take that representation.  But with

18   respect to those who aren't making that representation, we're

19   nonetheless proceeding.  With respect to the attachments,

20   Your Honor has heard a lot of discussion about the

21   attachments.  And the attachments are a major matter.  We

22   have, as Your Honor will recall, very specific instructions

23   what the attachments, what the protocol is that have to be

24   followed in making the attachment.  The attachment must have

25   the answer to the question, it must clearly refer, the

1  response must clearly refer to the specific pages, and it

2  need not contain, the pages that do not contain the answer

3  should not be referenced.  We have had literally thousands

4  - - Kelly & Ferraro (phonetic) is a firm that's got 25

5  thousand claims, and this is typical.  Even the name of the

6  diagnosing doctor.  They say, Well, see the ILO PFD causal

7  report attached to questionnaire.  That's as far as it goes.

8  Motley Rice (phonetic), 4 thousand, see claims documents

9  previously provided.  This is why I say I don't think we're

10  going to have many folks that have actually filled in the

11  blank.

12       THE COURT: Not from that information.

13       MR. BERNICK: Yeah.  So this is where, this is where

14  we have come.  Now what does that mean?  This is a chart that

15  shows, if you take a look, and it's based upon a preliminary

16  analysis from the Rust database.

17       MR. FINCH: Your Honor, I object to this.  This is

18  basically putting on evidence that might come from the mouth

19  of an expert at a trial.  We all know that Rust only coded

20  what was in the questionnaire boxes and ignored the

21  attachments that are attached to it.  There are, by their

22  count, there were 100 thousand people - -

23       MR. BERNICK: Your Honor, if this is an objection,

24  it should be an objection.  I don't see what the objection

25  is.

1           MR. FINCH: The point, Your Honor.

2           THE CLERK: Mr. Finch, use the microphone or it

3   won't record.  Thank you.

4           MR. FINCH: I object to going into, well before

5   trial, material that is basically argumentative evidence - -

6   or not even admissible evidence - - but argumentative

7   evidence about what his experts will say the Rust database

8   shows.

9           MR. BERNICK: No, no.  It's not the purpose - -

10          MR. FINCH: And I object to this, Your Honor.

11          MR. BERNICK: It's not the purpose for the proffer.

12  The purpose for the proffer is to say, Look what's happened

13  to the questionnaires.  These people haven't filled out - -

14  this is all about this problem here, which is people not

15  complying with the Court's order.  And if you take a look at

16  the face of the questionnaire, everything is getting buried

17  in these attachments.  How many people actually answered all

18  the important questions?  That is the diagnosing doctor's

19  name, the name of the B reader, are they being treated, is

20  there a Grace direct exposure, non-Grace exposure.  We have

21  12 hundred people out of 120 thousand that actually provide

22  on the questionnaire all the answers to these claims.  That's

23  why we're sitting here spending all of this time with Rust,

24  and Rust does not - - you know, they've got a database that

25  tells us something, but it doesn't tell us, it doesn't tell

1   us nearly what we need to know, because they've

2   systematically taken advantage of Your Honor's allowance that

3   they answer the questions through attachment.  And then when

4   they take advantage of it, this is what we get.  We get, Oh,

5   well go see the documents.  There's a - - the status report

6   is that we are going to finish the database.  There will be

7   some information off the database that will be valuable and

8   that we'll report to the Court.  But the bottom line is that

9   after how many years of having this questionnaire, we can't

10  get people to simply state, in response to the question, Well

11  what was the non-Grace exposure, to just tell us what it was.

12  They don't want to tell us what it was, because they're - -

13  we believe that this is a systematic effort, through delay

14  and through failure to comply with the questionnaire of

15  preventing this process from working out.  Now there is some

16  data that we already know on the face of the database that's

17  also relevant, and I think the Court would want to know.  We

18  have approximately 120 thousand people who, according to

19  Grace's database, had pending claims.  These are the people

20  to whom the claim forms were sent out.  These are the people

21  to whom the questionnaires were sent out.  Non-settled

22  claims.  Of those, we got POC's for about 90 thousand.  So

23  there was about a 25% drop out rate just in going to the

24  POC's.  Then we took a look at the question, Well, if we

25  match the POC's with the PIQ's, how many of the people who

1   have POC's submitted the questionnaire.  That is even took

2   that step to show that they had evidence to support their

3   claim.  Even further drop off.  Now it goes down to 79

4   thousand.  So a full ⅓ of the entire population that was

5   prosecuting the claims against Grace as of the time of the

6   bankruptcy, either didn't even file a POC, or if they did,

7   didn't even submit a questionnaire.  Now that is on the basis

8   of trying to match the individuals to our historical claims.

9   And that's a process where it's not often completely certain.

10  So we have assessed, well, is it a definite match, a probable

11  match, or only a possible match.  This gives the match the

12  benefit of the doubt.  It says even if it's only a possible

13  match.  If you factor in where it looks like the match is

14  either definite or probable, it looks like the ultimate

15  result is going to be that only half of the people who had

16  claims pending against Grace both filed a POC and took the

17  trouble to submit a questionnaire to say this is the data we

18  have to support the claims.  And this does not involve

19  applying any of the analyses that are undertaken of the

20  common issues that we think are so critical to assessing the

21  likely legal merit of those claims.  These are just people,

22  are they showing up and are they providing information.  So

23  we already see the pattern of shrinkage that we saw with

24  respect to the PD claims, we see this very dramatically with

25  respect to the PI claims as well.  We hope to be in a

1  position, when the attachments are reviewed, to provide some

2  information to the Court very, very quickly.  I think Your

3  Honor has asked us repeatedly, How is this going to work out?

4  What kind of range are you going to be in, and is it really

5  worthwhile?  We think we see already that it's very

6  worthwhile, and we believe on the basis of what we've seen so

7  far, both on the database and in the attachments, that this

8  number is going to shrink substantially as well, without

9  looking, really indeed, at very many of the questions.

10  There's just some very, very key questions that have very

11  clear answers.  So where we are today, going back to the time

12  line, is that we clearly would like to get - - we're going to

13  analyze the x-rays, we clearly would like to get prompt

14  resolution, we'd like to get the B-reads.  And the attachment

15  review is now underway.  But it's a significant task due to

16  the failure of claimants to fill out the questionnaires.  And

17  that is where we are on our status report.  And as we get the

18  data coming in from these different reviews, we'll just lay

19  it out in similar fashion to the Court.

20      MR. FINCH: We have no response to that, other than,

21  Your Honor, none of this is evidence, and we would dispute

22  Mr. Bernick's characterization of what the Rust database is

23  showing.  I mean, there are a 103 thousand different people

24  who have submitted questionnaires.  Not the 59 thousand.

25  Just because he can't match them to the pre-petition database

1  doesn't mean that somebody can't match them.  And so

2  therefore I would just caution the Court and object to

3  drawing any inference at all from this, given that it's not

4  evidence, and we'll hear it all at the estimation hearing in

5  September.

6       THE COURT: I'm not accepting anything as evidence.

7  I am trying to get my arms around how long this case is going

8  to take to try.  That's pretty much what I'm at this point

9  trying to look for.  And what I think is that I see the

10  Debtor continuing to move down one path, and everybody else

11  moving down another, so I think it's still going to go that

12  way.  We're still going to be trying two different cases.

13  That's pretty much right now what I'm getting to of this.  So

14  - -

15       MR. MULLADY: Your Honor, the FCR joins in the

16  comments Mr. Finch just made about the - -

17       THE COURT: All right.

18       MR. MULLADY:  - - status report.  Thank you.

19       THE COURT: Anyone else?

20       MS. RAMSEY: Your Honor, Natalie Ramsey for the MMWR

21  firm.  The only thing that I would add is that on behalf of

22  some of the named respondents in the motions that are pending

23  before the Court, both for hearing on the 13th and

24  subsequently, my objection is only to any characterization of

25  not responsive or failure to comply or failed to do something

1    that the Court ordered.  Those characterizations we dispute,

2    and we'll take that up at the proper time.  Thank you.

3              THE COURT: Okay.

4              MR. ESSERMAN(Telephonic): Your Honor, this is Sandy

5    Esserman.  I join in that comment for the firms that we

6    represent.

7              THE COURT: All right.  I am not, I am not

8    attributing any characterization today.  I do expect April

9    13th, though, that I will be attributing characterizations to

10   things, and frankly folks I hope to see some x-rays and some

11   B-reads that are presented to the Debtor in compliance with

12   my order.  Hopefully before April 13th so that I don't have

13   serious discovery issues and possibly contempt issues to deal

14   with.  So let's try to get it done, please.  Okay.  Anything

15   more for today?

16             MR. BERNICK: No, Your Honor.

17             MR. O'NEILL: Nothing for the Debtors.

18             THE COURT: All right.  We're adjourned.  Thank you.

19             MR. BERNICK: Thank you, Your Honor.

20             THE COURT: Oh, I'm sorry.  Item 15.  Is this order

21   agreed on?  I didn't sign it.  We kind of lost track of that.

22   Mr. O'Neill?

23             UNIDENTIFIED SPEAKER: Yes, Your Honor.

24             UNIDENTIFIED SPEAKER: Yes, Your Honor.

25             THE COURT: Okay.  I'll sign it, then.  Yes, thank

1   you.

2          (Whereupon at 5:46 p.m. the hearing in this matter was

3   concluded for this date.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18          I, Jennifer Ryan Enslen, approved transcriber for

19   the United States Courts, certify that the foregoing is a

20   correct transcript from the electronic sound recording of the

21   proceedings in the above entitled matter.

22

23   _/s/Jennifer Ryan Enslen_                    __04/09/07__
     Jennifer Ryan Enslen
24   43 Bay Boulevard
     Newark, DE 19702
25   (302)836-1905