IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W. R. GRACE & CO., *et al.* | ) | Case No. 01-01139 (JKF) |
| | ) | (Jointly Administered) |
| Debtors. | ) | |

### W. R. GRACE'S OBJECTION TO MOTION TO COMPEL TESTIMONY AND DOCUMENT PRODUCTION CONCERNING GRACE'S PRE-PETITION ASBESTOS LIABILITY ESTIMATES

A double standard exists with respect to the Asbestos Personal Injury Claimants' ("ACC")/David T. Austern's, the Court Appointed Legal Representative for Future Asbestos Personal Injury Claimants ("FCR") treatment of discovery in this case. There is no aspect of discovery propounded by W. R. Grace & Co. ("Grace") that has not been fought to the end, resulting in countless motions, hearings, and even appeals. By contrast, when responding to discovery, Grace has sought to reach agreement wherever reasonable, instead of resorting to litigation and appeals. But no agreement is enough.

With respect to the discovery at issue in the pending Motion to Compel Testimony And Document Production Concerning Grace's Pre-Petition Asbestos Liability Estimates (Mar. 28, 2007) (Docket No. 15005) ("Motion To Compel"), Grace reached two agreements whereby it provided documents it had legitimate legal grounds to withhold. First, Grace agreed that, in this estimation hearing, the ACC and FCR may use documents produced to the ACC pursuant to Court order in the *Sealed Air* litigation, including the documents relating to pre-petition estimates of asbestos liability. Grace had the right to litigate whether those documents should remain privileged in light of the *Sealed Air* protective order, but it did not. It also permitted the ACC and FCR to rely upon depositions taken of its in-house counsel in *Sealed Air*, which related to estimates of pre-petition asbestos liability.

Second, to accommodate the ACC's and FCR's request for documents and deposition testimony related to Grace's in-house counsel's pre-petition settlement strategies, Grace agreed to produce otherwise privileged documents and permit a second deposition of in-house counsel Hughes, Siegel and Beber.  But, as part of Grace's agreement to produce these documents and witnesses, the ACC and FCR agreed to limit depositions to "any evaluation they conducted or criteria they used for settling pre-petition asbestos personal injury claims and the reasons why Grace chose to settle pre-petition asbestos personal injury claims, at the time those cases were settled."  Stipulation and Order (Dec. 21, 2006) (Docket No. 14101) ("Stipulation") at 1.

But the ACC and FCR want more and more. They now appear to be demanding that Grace search for, and produce, additional pre-petition estimates of asbestos liability, as well as produce its in-house counsel for a third round of depositions on topics that both exceed the scope of the stipulation and were covered extensively in counsels' *Sealed Air* depositions.  To the extent they are seeking such information, these materials are protected by the attorney-client privilege and work product doctrine, and by express agreements between the parties. Enough is enough.

**Argument**

I.    **The ACC And FCR Have Been Given Access To And Permission To Use The Pre-Petition Estimates Of Aggregate Asbestos Liability That Were Produced In *Sealed Air*.**

A.    ***Sealed Air* Production.**

The *Sealed Air* production occurred in three waves.  In early 2002, as part of the *Sealed Air* litigation, Grace produced to the ACC documents related to the transactions at issue in that litigation.  Specifically, in order to complete the *Sealed Air* transaction, a solvency opinion was needed which required an estimate of Grace's asbestos liability.  Grace and its counsel retained an outside consultant to estimate Grace's asbestos liability for

2

incorporation into the solvency opinion. That work, as well as the materials that underlay that work, were produced in February 2002, and Grace did not claim a privilege over those documents. *See, e.g.,* Feb. 5, 2002 Ltr. from M. Browdy to S. Baena, P. Lockwood, A. Krieger, and T. Mayer, at 1 (attached as Ex. 1); Feb. 22, 2002 Ltr. from M. Browdy to S. Baena, P. Lockwood, A. Krieger, and T. Mayer, at 1 (attached as Ex. 2).

Soon thereafter, a motion to compel was filed with respect to certain reserve analyses created from 1995-1998. As to those analyses, which included privileged and work-product materials that were not prepared for purposes of the transactions at issue, Grace objected. Over Grace's objection, the Court required that Grace produce documents "prepared as part of Grace's calculation of asbestos and environmental reserves *for its audited financial statements*." *See* Order to Compel and Protective Order (May 21, 2002) (Docket No. 26) ("Protective Order") (Alfred M. Wolin, U.S.D.O.J.) (emphasis added) at 2 (attached as Ex. 3). Grace produced those documents pursuant to a protective order that expressly did not waive its privilege over the documents and that limited their use to the *Sealed Air* case. *See id.* at 3 (ordering "that production of documents or testimony pursuant to this Order to Compel and Protective Order shall not constitute a waiver of the attorney work product or other privilege against discovery of the information disclosed . . .").

Subsequently, the *Sealed Air* plaintiffs sought the production of all reserve analyses from 1999 to the time of the bankruptcy filing. After much litigation, and an *in camera* review, Grace was ordered in August 2002 to produce certain reserve analyses and related documents that post-dated 1998. Grace complied, pursuant to a protective order. Grace also allowed three of its attorneys -- namely Robert Beber, David Siegel, and Jay Hughes -- to provide deposition testimony relating to the pre-petition aggregate asbestos liability estimates as well as the transaction being challenged in the fraudulent transfer case.

3

**B.     Grace Agreed That The ACC And FCR Could Use Documents Produced To The ACC In *Sealed Air* In The Estimation.**

For purposes of the estimation, the ACC served an extraordinary number of document requests on Grace. It basically asked for every document ever created by Grace. Obviously, extensive negotiations resulted from the ACC's needlessly overbroad and burdensome requests. One portion of these requests related to personal injury pre-petition aggregate liability estimates, including reserve analyses.[1] During various meet and confers regarding these and other requests, Grace explained that materials responsive to these requests were produced in connection with the *Sealed Air* litigation, but Grace reserved claims of privilege over some of those documents, such as the reserve analyses.

As part of a compromise, the ACC requested the right to use certain documents produced during *Sealed Air* in the estimation proceeding. The ACC identified the precise documents from the *Sealed Air* case that they wanted to use at the estimation hearing. Grace agreed to withdraw any claims of privilege as to those documents, and to permit the ACC and

---

[1]     Document Requests 23, 53, 68, and 69 "relate to Grace's internal estimation of its aggregate asbestos liability and correspondence between Grace and its outside auditors." Sept. 22, 2006 Ltr. from B. Harding to N. Finch, at 4 (attached as Ex. 4). These requests read as follows:

23.     All reports filed with the Securities and Exchange Commission, including, annual and quarterly reports, proxy statements, and other financial reports, and, with respect to annual reports to stockholders, each such annual report from the year 1995 to the present, and any communication or correspondence with Grace or with its outside accountants and advisors concerning any statement in such reports referring to Asbestos.

53.     All Documents concerning (a) Grace's history of settling and litigating Asbestos Tort Claims; (b) the number of Asbestos Tort Claims likely to be filed against Grace in the future; and (c) putative future claimants' propensity to sue Grace, in each category (a) through (c), including but not limited to the number and value of personal injury claims and the aggregate Asbestos liability.

68.     For the time period January 1, 1995 to January 1, 2002 any letter from Grace or its counsel to Grace's outside auditors (Price WaterhouseCoopers or any other accounting firm which provided audit services to Grace) which mentions or describes Grace's Asbestos personal injury litigation.

69.     Documents setting forth any estimate of asbestos personal injury liability prepared by or for Grace between January 1, 1996 and the present which attempts to estimate the aggregate amount of Grace liability to present and future asbestos personal injury plaintiffs.

ACC First Set of Requests for Production of Document Directed to the Debtors (Oct. 14, 2005) ("ACC First RFP") at 17, 27, 31.

4

FCR to use those documents. *See* Sept. 22, 2006 Ltr. from B. Harding to N. Finch, at 1 (attached as Ex. 4).

Grace also believed that its production in *Sealed Air* included the pre-petition aggregate asbestos liability analyses requested by the ACC, although it was not certain. *See* Dec. 16, 2005 Ltr. from B. Harding to N. Finch, at ¶ 29 (attached as Ex. 5) ("[I]t will be a sufficient response for the Debtors to search for any estimate prepared prior to the date of petition to the extent that such estimates were not produced in the *Sealed Air* litigation, provided that such estimates are not subject to the attorney-client or work product privileges."). Ultimately, Grace was unable to identify additional broad sources or categories of documents that were not searched in *Sealed Air*, and it made clear that it was not going to re-review all of its files. *See* Sept. 22, 2006 Ltr. from B. Harding to N. Finch at 4 (with respect to estimates of aggregate asbestos liability, only "two outstanding issues remain . . . Grace currently is searching for documents relating to estimates of aggregate asbestos liability that Grace conducted *after its petition for bankruptcy* . . .") (emphasis added); Nov. 16, 2006 Ltr. from D. Mendelson to N. Finch at 1 (attached as Ex. 6) (with respect to documents relating to estimates of aggregate asbestos liability, "[a]s discussed at our various meetings, this search was limited to responsive documents that post-date the *Sealed Air* litigation"). The ACC did not object to Grace's position. *See, e.g.,* Oct. 4, 2006 Ltr. from N. Finch to B. Harding (attached as Ex.7) (restating but not objecting to the scope of Grace's search).

Nevertheless, in an exercise of caution and diligence by Grace, where Grace identified any pre-petition aggregate asbestos liability documents, it produced those documents or, to the extent it believed those documents were privileged, logged those documents. If it turns out that some of the logged documents were previously produced in the *Sealed Air* case, as

5

the ACC and FCR allege, Grace will remove them from the log. Certainly, the ACC and FCR have not been prejudiced, as they already have those documents.

### C. Grace Has Not Done An About Face -- Its Position With Respect To The *Sealed Air* Documents And Pre-Petition Estimation Analyses Has Not Changed.

Grace has not changed its position with respect to the use of *Sealed Air* documents. With its initial production in *Sealed Air*, Grace *voluntarily* produced documents related to its asbestos liability analyses *to the extent those documents impacted the transactions at issue in that litigation.* It also produced the documents that supported those analyses. Grace has never asserted privilege over that information. When additional documents and information related to Grace's internal asbestos liability reserve methodology were sought in *Sealed Air*, Grace properly asserted and litigated its privilege and work-product claims with respect to those documents. The court ultimately overruled most of Grace's objections, and Grace produced those documents. Contrary to the ACC's and FCR's allegations, Grace does not object to the use of such documents as part of the estimation.

### II. Through Stipulation Grace Agreed To Provide The ACC And FCR Discovery Related To Pre-Petition Settlement Practices.

Despite having all of this discovery in hand, on November 7, 2006, the ACC filed a motion to compel "seek[ing] entry of an Order compelling Grace to produce documents responsive to Document Request Nos. 47 and 66 concerning its settlement practices."[2] ACC

---

[2]   The Document Requests at issue read as follows:

47.   All Documents concerning Grace's experience with personal injury Asbestos litigation in the tort system of the United States, including, but not limited, to (a) the supervision and conduct of Grace's Asbestos litigation defense; (b) the litigation and settlement strategies and experience of Grace or those of any other entity; (c) defenses raised or considered by Grace to defend itself in personal injury Asbestos litigation; (d) settlements and judgments paid by Grace in connection with personal injury Asbestos litigation; and (e) claims for Asbestos related personal injuries that were disposed of without payment by Grace.

66.   For the time period January 1, 1999 through July 1, 2001, all Documents constituting or reflecting communications between Grace's outside defense counsel and Grace which explain or discuss reasons why Grace agreed to settle any Asbestos personal injury case.

ACC First RFP at 24-25, 30.

6

Motion to Compel Production of Documents  (Nov. 7, 2006) (Docket No. 13598) ("ACC Motion to Compel") at 4.   The FCR joined the ACC's motion and filed a supporting memorandum on the same day. *See* FCR's Memorandum in Support and Joinder in the ACC Motion to Compel (Nov. 7, 2006) (Docket No. 13602).  The motion demanded discovery of "Grace's contemporaneous assessment of the claims it settled when it was still a defendant in the tort system." ACC Motion to Compel at 3.  Grace opposed the ACC's Motion to Compel, arguing both that Federal Rule of Evidence 408 prevented discovery of Grace's settlement strategy and that documents related to this subject matter were protected from disclosure by privilege. *See* Grace's Opposition to ACC Motion to Compel (Nov. 22, 2006) (Docket No. 13772) at 5, 17.

Prior to the Court's ruling on this motion to compel, the parties reached a compromise and stipulation by which Grace agreed to produce certain otherwise-privileged documents. At the insistence of the ACC and FCR, Grace agreed to allow its in-house counsel, namely Jay Hughes, Robert Beber, and David Siegel, to be deposed a second time with respect to the narrow issue of the criteria for settlement of pre-petition asbestos personal injury cases:

> To resolve the motion to compel filed by the Grace Official Committee of Asbestos Personal Injury Claimants ("ACC") on November 7, 2006 and joined by the Future Claimants Representative ("FCR") [Docket Nos. 13598 and 13602] Grace agrees to produce for deposition Jay Hughes, Robert Beber, and David Siegel, and to permit them to testify concerning any evaluation they conducted or criteria they used for settling pre-petition asbestos personal injury claims and the reasons why Grace chose to settle pre-petition asbestos personal injury claims, at the time those cases were settled.   This does not include any opinions or analysis that post-date the bankruptcy petition or any non-contemporaneous analysis of the reasons for settlement.

Stipulation at 1.

Having negotiated and reached this compromise, Grace believed the scope of the depositions to be taken was a settled matter.  It thus came as quite a shock to Grace when counsel for the ACC stated, near the very beginning of Mr. Beber's deposition, his intention

to exceed the scope of the Stipulation and ask Mr. Beber about Grace's methodology for the establishment of pre-petition liability reserve. *See* Tr. of Deposition of Mr. Beber (Feb. 21, 2007) at 21:15-22:14 (Motion to Compel, Ex. 12 at 21-22). Grace properly limited the deposition to the Stipulation. Thus, once again, Grace complied with the agreement it had reached with regard to the scope of discovery.

III.   **The ACC And FCR Are Overreaching By Demanding More Documents And A New Round Of Depositions.**

A.   **The ACC And FCR Demand For All Pre-Petition Liability Estimation Documents Is Unclear and Inappropriate.**

It is not clear from the Motion to Compel what the ACC and FCR really want from this most recent motion. Grace produced three hundred boxes of documents in *Sealed Air*, scores of which related to pre-petition reserves and estimations of aggregate asbestos liability. To the extent they believe the three hundred boxes of documents produced in *Sealed Air* were not sufficient in scope, they should identify categories of documents they think are missing. The only pre-petition documents withheld from that production in *Sealed Air* were documents that (1) predated 1995, (2) related to privileged analyses for purposes of this bankruptcy, or (3) were created in conjunction with Grace's experts in this bankruptcy as part of their work on this bankruptcy. To the extent the ACC and FCR believe there are additional privileged documents in Grace's possession that have not been ordered to be produced in *Sealed Air*, they should identify those documents or categories of documents, and such documents can be reviewed and considered on a case-by-case basis.

1.   **Documents Containing Legal Analyses For Purposes Of The Bankruptcy Are Privileged.**

But to be clear, documents containing legal analyses for the purposes of this bankruptcy filing are plainly privileged. *See Rhone-Poulenc Rorer Inc. v. Home Indem. Co.*, 139 F.R.D. 609 (E.D. Pa. 1991). In *Rhone*, for example, the court held that both individual reserves -- calculations of liability for individual lawsuits -- and aggregate reserves --

8

calculations of a company's total liability -- were protected. *Id.* at 614-16. Individual reserves were protected because they "reveal the mental impressions, thoughts, and conclusions of an attorney in evaluating a legal claim. By their very nature they are prepared in anticipation of litigation and, consequently, they are protected from discovery as opinion work-product." *Id.* at 614. Similarly, aggregate reserve information is protected because:

> the aggregate reserve figures may give some insight into the mental processes of the lawyers in setting specific case reserves. This is inevitable, considering that these aggregates and averages are based upon the attorney's evaluations of the value of specific claims . . . . They could not be formulated without the attorney's initial evaluations of specific legal claims. Thus it is impossible to protect the mental impressions underlying the specific case reserves without also protecting the aggregate figures.

*Id.* at 614-15. Consequently, the court held that the reserve calculations were protected from discovery.

Other courts agree. *See Ohio Mgmt., LLC v. James River Ins. Co.*, No. 06-0280, 2006 WL 1985962, at *2 n.10 (E.D. La. July 13, 2006) ("Where the reserves have been established based on legal input, the results and supporting papers most likely will be work-product and may also reflect attorney-client privilege communications. Whether aggregate or individual, case reserve figures reveal the mental impressions, thoughts, and conclusions of an attorney in evaluating a legal claim. By their very nature they are prepared in anticipation of litigation, and consequently, they are protected from discovery as opinion work-product."); *Bondex Int'l, Inc. v. Hartford Accident & Indem. Co.*, No. 03-1322, 2006 WL 355289, at *3 (N.D. Ohio Feb. 15, 2006) ("[T]he decision is the work product of either legal counsel or members of the risk management department and hence is protected by Fed. R. Civ. Pro.[sic] 26(b)(3) and caselaw."); *Montgomery v. Aetna Plywood, Inc.*, No. 95-3193, 1996 WL 189347, at *6 (N.D. Ill. July 2, 1996) (valuation reports protected by work-product doctrine).[3]

---

[3]    In *Simon v. G.D. Searle & Co.*, 816 F.2d 397 (8th Cir. 1987), the Eighth Circuit held that individual reserve information was protected by the attorney work-product doctrine but aggregate reserve information was not.

9

2.      **Documents Prepared By Grace's Experts Are Protected By
        Stipulation.**

Likewise, to the extent the ACC and FCR are seeking discovery of analyses done by

Grace's testifying and non-testifying experts as part of their work relating to the bankruptcy,

both the ACC and the FCR entered into an express stipulation precluding such discovery.

*See* Stipulation Regarding Expert Discovery (Oct. 2, 2006) (Docket No. 13337).  Pursuant to

this stipulation, certain categories of information "need not be disclosed by any party, and are

outside the scope of permissible discovery (including deposition questions)," including: (1)

notes or other writings of a testifying expert that are not relied upon in that expert's final

report; (2) draft and preliminary reports, studies, computations, raw data, or other

preliminary, intermediate, or draft materials prepared by or at the direction of a testifying

expert; and (3) communications between a testifying expert and other testifying experts, non-

testifying experts, clerical or support staff, or attorneys for the party, unless the expert

witness is relying upon such communications in his or her opinions.  *Id* at ¶ 2.

3.      **There Has Been No Subject Matter Waiver.**

Apparently unable or unwilling to identify those documents they believe Grace has

not searched for or those documents they believe Grace is improperly claiming privilege

over, the ACC and FCR seek a universal pronouncement, in the abstract, that all documents

related to pre-petition asbestos liability estimations are not privileged because of subject

matter waiver.  Such a blunderbuss approach will not push this litigation forward, and it is

highly improper.

(a)     **Subject Matter Waiver Is To Be Narrowly Construed.**

Subject matter waiver is not a sanction to be tossed about lightly, and it is to be

construed narrowly.  *See In re Grand Jury Proceedings*, 78 F.3d 251, 255-56 (6th Cir. 1996)

---

*Id.* at 401-02.  The basis for the Court's decision was that the aggregate reserve figures in that case did not
reveal the thoughts of attorneys.  *Id* at 402.

(taking narrow view of subject matter waiver); *United States v. Skeddle*, 989 F. Supp. 905, 909 n.2 (N.D. Ohio 1997) ("courts have generally held that the 'same subject matter' is to be viewed narrowly"); *Heidelberg Harris, Inc. v. Mitsubishi Heavy Indus., Ltd.*, No. 95-0675, 1996 WL 514993, at *2 (N.D. Ill. Sept. 6, 1996) (opting "for a narrow scope of subject matter waiver of attorney-client privileges"); *In re United Mine Workers of America Employee Benefit Plans Litig.*, 159 F.R.D. 307, 309 (D.D.C. 1994) (taking narrow view of subject matter waiver); *In re Commercial Fin. Servs.*, 247 B.R. 828, 848 (Bankr. N.D. Okla. 2000) ("The doctrine of subject matter waiver is narrowly construed and should only be employed when unfairness (*i.e.*, tactical or strategic advantage) is implicated.").

Courts have made clear that subject matter waiver is reserved for circumstances where a party affirmatively inserts privileged documents into a case as part of a claim or defense, but then seeks to claim privilege over similar documents. *See Trudeau v. New York State Consumer Protection Bd.*, 237 F.R.D. 325, 340 (N.D.N.Y. 2006) ("The Fairness Doctrine will not allow the privilege to stand when the proponents seek to use it for a purpose that is inconsistent with the privilege. What the court is attempting to avoid is the wielding of the attorney-client privilege and the work product doctrine as both a shield and a sword. It is the unfairness that is the crucible for the forfeiture.") (citations omitted); *In re Hechinger Inv. Co. of Delaware*, 303 B.R. 18, 26 (D. Del. 2003) ("[T]he Third Circuit has approved the application of a similar type of 'fairness doctrine' in the context of partial, voluntary disclosure of work product protected documents. There is no persuasive showing here that Hechinger is using the Wasserstein Documents unfairly as both a sword and a shield.") (footnote and citations omitted); *see also General Foods Corp. v. The Nestle Co.*, No. 79-1844, 1982 WL 170987, at *4 (D.N.J. Oct. 14, 1982) (internal citation omitted) (holding subject matter waiver of attorney work product protection "has been narrowly construed. The privilege or immunity has been found to be waived only if facts relevant to a particular,

11

narrow subject matter have been disclosed in circumstances in which it would be unfair to deny the other party an opportunity to discover other relevant facts with respect to that subject matter") (citations omitted). Grace has not done that in this estimation proceeding with respect to its internal reserve analysis.

### (b)    Production Pursuant To Court Order Cannot Result In Subject Matter Waiver.

Grace acknowledges that it waived the privilege over estimates done by its consultants for purposes of the *Sealed Air* transaction as well as the documents which support that analysis. But that is it. All other documents produced in *Sealed Air* were produced over Grace's objection and pursuant to Court order. While Grace is no longer claiming privilege over the documents produced pursuant to those Court orders, this does not amount to a subject matter waiver. *See Cornelius v. Consolidated Rail Corp.*, 169 F.R.D. 250, 253 (N.D.N.Y. 1996).

In *Cornelius*, for example, the plaintiff argued that Conrail's previous production of records from its counsel in a prior litigation "waived any claim to the protection of the attorney work product doctrine." *Id.* The court, rejecting the plaintiff's argument, found that Conrail's "production in that case was made only after Conrail first objected to production and after a conference on the objection at which the court suggested or directed that Conrail produce the information." *Id.* As a result, the *Cornelius* court held that there was "insufficient proof that Conrail's prior partial production was voluntary and Cornelius' claim of waiver must, therefore, be rejected." *Id.*

### (c)    The Production To The United States Of Non-Privileged Documents And Documents Disclosed Pursuant To Court Order Does Not Cause A Subject Matter Waiver.

The ACC and FCR make much of the ACC's production of documents to the United States pursuant to subpoena. *See* Motion to Compel at 15-17. According to the ACC's representations, the ACC gave to the United States all the documents that Grace produced to

12

it in *Sealed Air*. The fact that Grace did not object to this production is of no moment. Grace is no longer claiming privilege over those documents. That, however, does not create a subject matter waiver as to any and all documents relating to pre-petition asbestos liability estimations. As discussed more fully above, subject matter waiver is to be construed narrowly, and only exists in circumstances where a party is using the documents affirmatively and that use will unfairly prejudice the other side. That is obviously not the case here.

The cases relied on by the ACC and FCR do not state otherwise. While it may be true that under most circumstances "once a document is disclosed to a third party, communications to whom are not privileged, any privilege that may have been associated with the document is forever waived," the authorities cited by the ACC and FCR do not extend that principle beyond the documents at issue to the general subject matter. *See, e.g.,* Motion to Compel, at 15-16, *relying upon Westinghouse Elec. Corp. v. Republic of the Philippines*, 951 F.2d 1414, 1431 (holding that the disclosure of certain documents to the SEC and DOJ waived privilege claims over those *same documents as against other adversarial parties*) (emphasis added); *Permian Corp. v. United States*, 665 F.2d 1214, 1222 (D.C. Cir. 1981) (holding that the voluntary disclosure of materials to the SEC waived attorney-client privilege *but not work product protection over the documents disclosed for the purposes of separate administrative litigation*) (emphasis added); *In re Sealed Case*, 676 F.2d 793, 824 (D.C. Cir. 1982) (holding that participation in the SEC's voluntary disclosure program *waived privilege claims with respect to documents that were identified in the disclosed documents* as material to the investigation) (emphasis added).

Moreover, in spite of representations to the contrary, the authorities cited by the ACC and FCR do not even suggest that Grace's failure to object to the ACC's production of documents pursuant to the subpoena "constituted knowing waiver by Grace over any possible privilege assertion, both for the materials produced, and as to their subject matter generally."

13

*See, e.g.*, Motion to Compel, at 16, *relying upon Kraemer v. Franklin & Marshall College*, No. 95-0020, 1995 WL 447634, at *2 (E.D. Pa. July 27, 1995) (holding that failure to object to deposition testimony relating to one of a series of otherwise privileged interviews waived privilege with respect to that interview but not as to the others in the series); *United States v. Fisher,* 692 F. Supp. 488, 494 (E.D. Pa. 1988) (concluding that any claim of privilege that might have attached to tape recordings of incriminating statements that were admitted into evidence and played in open court without objection from defendants was waived but not extending this waiver to other tapes that had not been similarly disclosed).

Further, with regard to documents protected as attorney work product, waiver is limited to the documents actually disclosed. There simply is no broad subject matter waiver. *See Pittman v. Frazer*, 129 F.3d 983, 988 (8th Cir. 1997) ("But disclosure of some documents does not destroy work product protection for other documents of the same character.") (quoting *In re Chrysler Motors Corp. Overnight Evaluation Program Litig.*, 860 F.2d 844, 846 (8th Cir. 1988)); *Duplan Corp. v. Deering Milliken, Inc.*, 540 F.2d 1215, 1222 (4th Cir. 1976) ("broad concepts of subject matter waiver analogous to those applicable to claims of attorney-client privilege are inappropriate when applied to Rule 26(b)(3)"); *Canel v. Lincoln Nat'l Bank*, 179 F.R.D. 224, 226 (N.D. Ill. 1998) ("courts have consistently held that there exists no subject matter waiver for the kind of work product expressly defined in Fed. R. Civ. P. 26(b)(3) as" opinion work product); *In re United Mine Workers*, 159 F.R.D. at 310-12 (production of documents protected by attorney work product doctrine resulted in waiver of privilege only as to those documents produced). Thus, even if there were some type of subject matter waiver, it would not apply to documents protected by the work-product privilege absent special concerns over a party's need or fundamental fairness.

14

### (d)   Grace Did Not Waive Privilege By Raising An "Advice Of Counsel" Defense In The *Sealed Air* Case.

The ACC and FCR allege that Grace waived any claim of privilege or work product protection over all pre-petition asbestos liability estimates by raising the "advice of counsel" defense in the *Sealed Air* litigation. *See* Motion to Compel at 13-15. This argument is belied by both the facts and the law. First, Grace never raised the advice of counsel as a defense to the fraudulent transfer claim relating to any of its asbestos reserves. But even if it had, subject matter waiver will only be found where a party injects advice of counsel as a defense, ***and*** not producing privileged documents would prejudice the parties ***in that case***. *See, e.g., Lugosch v. Congel*, No. 00-0784, 2006 WL 931687, at *21-22 (N.D.N.Y. Mar. 7, 2006) (recognizing that a waiver based on placing a contention at issue, such as through reliance on the advice of counsel, "turns on the consideration of fairness, or, more correctly cast, unfairness to the adversary") (collecting cases); *see also Equal Employment Opportunity Comm'n v. Johnson & Higgins, Inc.*, No. 93-54871, 1998 WL 778369, at *10 (S.D.N.Y. Nov. 6, 1998) (recognizing that there is no subject matter waiver where there is no prejudice to the opposing party) (collecting cases).

The reality is that the *Sealed Air* case is over. If Grace's production of documents *in that litigation* had been insufficient or if, as a result of its reliance on an advice-of-counsel defense, the court believed that fairness required a broader production of documents *in that litigation*, then that matter could and should have been addressed *in that litigation*. The ACC and FCR have offered no basis for claiming that this Court should revisit the *Sealed Air* litigation and make a new determination about what would have been an appropriate scope of production in that case. Even if, as was never alleged, Grace's production in the *Sealed Air* case was somehow deficient in light of its advice-of-counsel defense, no prejudice or unfairness inures to the ACC and FCR in this entirely separate litigation. Thus, to the extent

15

that any broader waiver was appropriate under the fairness doctrine as a result of Grace's

advice-of-counsel defense in that litigation, it is no longer appropriate.

Second, to the extent Grace contemplated relying on the advice of counsel defense

(*i.e.*, counsel recommended estimating asbestos liabilities and obtaining a solvency opinion to

ensure that the contemplated transactions would not leave Grace insolvent), that defense only

related to estimates done for the transactions at issue in the *Sealed Air* litigation. And Grace

fully produced those documents, regardless of whether there was an arguable claim of

privilege. But that is fundamentally different from a reserve analysis done in conjunction

with Grace counsel for financial reporting or other purposes. The general reserve analysis

was not a subject of the *Sealed Air* case, and it was not part of any contemplated advice of

counsel defense.

Third, as the Third Circuit cautioned, advice of counsel is not placed at issue merely

because it may be relevant to the litigation. The party claiming the privilege must have

affirmatively injected the attorney's advice into the litigation:

> Courts have found that by placing the advice in issue, the client has
> opened to examination facts relating to that advice. Advice is not in
> issue merely because it is relevant, and does not necessarily become in
> issue merely because the attorney's advice might affect the client's
> state of mind in a relevant manner. The advice of counsel is placed in
> issue where *the client asserts a claim or defense, and* attempts to prove
> that claim or defense by disclosing or describing an attorney client
> communication.

*Rhone-Poulenc Rorer Inc. v. Home Indem. Co.*, 32 F.3d 851, 863 (emphasis added); *see also*

*Lorenz v. Valley Forge Ins. Co.*, 815 F.2d 1095, 1098 (7th Cir. 1987) ("To waive the

attorney-client privilege by voluntarily injecting an issue in the case, a defendant must do

more than merely deny a plaintiff's allegations. The holder must inject a new factual or legal

issue into the case. Most often, this occurs through the use of an affirmative defense.").

Thus, courts have held that the privilege is waived only where a party tries to prove a

claim by disclosing an otherwise privileged communication, but then seeks to withhold

16

further information on the ground of privilege.   Again, Grace was only relying on the

estimations done for the transactions at issue in *Sealed Air*.   Indeed, the critical issue in the

fraudulent transfer case was whether the Sealed Air transaction rendered Grace insolvent

because of the magnitude of its asbestos liabilities.   The reserve analyses, which were not part

of the transaction at issue and which were done for completely different purposes -- financial

reporting -- were not part of any potential advice of counsel defense and were not put at issue

by Grace.   Indeed, they were produced over Grace's objection.   Consequently, there can be

no subject matter waiver over the pre-petition reserve analyses.

**B.      It Is Inappropriate For The ACC And FCR To Demand A Third Round
         Of Depositions Of Grace Counsel.**

The ACC and FCR may not come back and demand depositions of Grace in-house

counsel again and again.   Grace permitted the deposition of former General Counsels David

Siegel and Bob Beber and current Assistant General Counsel Jay Hughes on two occasions.

The first occasion was in *Sealed Air*, where they were deposed extensively on the very issue

that is the subject of the current motion to compel -- pre-petition asbestos liability estimation

and reserve analyses.   *See* Motion to Compel at 5 ("After Grace intervened in the case, it

produced additional documents and permitted its lawyers (Messers. [sic] Beber, Siegal [sic],

and Hughes) to testify concerning how (i) Grace's asbestos PI liability estimates were

prepared and (ii) how Grace's claims settlement and resolution history was used in estimating

its liability for pending and future asbestos claims.").   Thus, when the ACC and FCR

requested that these attorneys sit for deposition for a second time, Grace made clear that it

would not be a boundless deposition.   A stipulation was reached which specifically and

plainly limited the deposition to "any evaluation they conducted or criteria they used for

settling pre-petition asbestos personal injury claims and the reasons why Grace chose to settle

pre-petition asbestos personal injury claims, at the time those cases were settled."   Stipulation

at 1.   Grace permitted a full day of deposition testimony from each of Messrs. Hughes and

17

Beber on this topic. *See* Fed. R. Civ. P. 30(d)(2) ("[A] deposition is limited to one day of seven hours."). It has met its obligation.

### 1.    Further Deposition Of Grace Counsel Is In Violation Of Two Agreements.

The ACC's and FCR's attempt to further depose Grace's in-house counsel violates two separate agreements. The first agreement is the stipulation discussed above. Not even under the most contorted reading of the Stipulation does it "call[] for discovery regarding how prior tort system experience was factored into the pre-petition <u>reserve calculation</u>," as the ACC and FCR claim. *See* Motion to Compel at 18 (emphasis added). The agreement between the parties clearly does not encompass deposition testimony relating to pre-petition estimates of aggregate asbestos liability, privileged or otherwise.[4]

The second agreement preceded the stipulation. When the ACC and FCR requested the right to use the *Sealed Air* depositions of Grace in-house counsel in this estimation, Grace agreed on the condition that those witnesses not be re-deposed on the same topics. *See* Dec. 16, 2005 Ltr. from B. Harding to N. Finch (attached as Ex. 5) at ¶ 10 ("The PI Committee agrees that it will not re-depose those individuals with respect to any topics, issues, or documents discussed in their *Sealed Air* depositions, and may only re-depose those individuals with respect to topics that were not discussed during the original deposition.").[5]

---

[4]   Contrary to the ACC's and FCR's contention, *see* Motion to Compel at 7, Grace did not instruct Mr. Beber not to answer questions that were *within the scope* of the Stipulation. On pages 21-22 of his deposition, counsel for the ACC sought information on whether "[t]he SEC require[ed] Grace to record a liability reserve for asbestos claims." *See* Motion to Compel Ex. 12 at 21-22. Clearly, Mr. Beber's understanding of SEC requirements relating to Grace's liability reserve are well outside the scope of the Stipulation. Again, in the other example cited by the ACC and FCR, counsel for the ACC attempted to question Mr. Beber about documents related to reserve analyses from 1993. *See* Motion to Compel at 7; Motion to Compel Ex. 12 at 192-196).

[5]   Early in the discovery "meet and confer" process, the FCR recognized and agreed to be bound by the agreements Grace reached with between Grace and the ACC. *See* December 16, 2005 Ltr. from B. Harding to N. Finch (attached as Ex. 5) at ¶ 3 ("Debtors agree to provide access to the materials to the FCR, PD Committee, UCC, and Official Equity Security Committee (the "Equity Committee") (collectively, the "Committees") provided that these entities agree to accept production of such documents in lieu of serving any separate and addition requests for production on Debtors in connection with the personal injury estimation. Further, the Committees agree to enter into any such confidentiality agreements entered into by the Debtors and the PI Committee prior to the production of such documents.").

18

The ACC and FCR agreed not to re-depose those witnesses on the pre-petition asbestos liability estimates, provided Grace withdraw its claims of privilege and confidentiality over those depositions and exhibits. Jan. 10, 2006 Ltr. from N. Finch to B. Harding (attached as Ex. 8) at 1-2 ("[U]nless Grace agrees that the entirety of the Sealed Air Exhibits and depositions may be used in discovery in the estimation proceedings and will not be objected to at trial based on privilege or confidentiality grounds, the ACC will have to depose Messrs. Hughes, Beber, Siegal [sic], Rourke and Florence as part of the fact discovery in the estimation case.") Grace has withdrawn its claim of privilege over the depositions and documents that were produced to the ACC in *Sealed Air*. Any claim that Grace failed to redact the confidentiality designation from these documents is a red herring. That is obviously no longer a restriction on the use of the documents. It should not be used as a way to escape the true intentions of the parties -- *i.e.*, to use the *Sealed Air* deposition testimony and exhibits in lieu of redeposing these witnesses.

## 2.    Courts Do Not Permit Testimony Of In-House Counsel Absent Special Circumstances.

The law disfavors depositions of in-house counsel. *See Shelton v. Am. Motors Corp.*, 805 F.2d 1323, 1327 (8th Cir. 1987). "Taking the deposition of opposing counsel not only disrupts the adversarial system and lowers the standards of the profession, but it also adds to the already burdensome time and costs of litigation. It is hard not to imagine additional pretrial delays to resolve work-product and attorney-client objections, as well as delays to resolve collateral issues raised by the attorney's testimony." *Id.* It is for that reason that Courts permit the deposition of in-house counsel only when the party seeking to take the deposition has shown that "(1) no other means exist to obtain the information than to depose opposing counsel . . .; (2) the information sought is relevant and nonprivileged; and (3) the information is crucial to the preparation of the case." *Id* (citations omitted).

19

The ACC and FCR have not met the *Shelton* factors. Even assuming the information is relevant and non-privileged, they have not demonstrated that there are no other means to obtain the information they would seek from Grace counsel or that it is crucial to their preparation of the case. They have already deposed these witnesses, as well as various Grace financial officers, on these very same topics. Moreover, they have already received Grace's documents on these topics. If there is some specific piece of information they do not know from those depositions, they should identify that information for Grace, and, if appropriate, Grace will seek to provide it. Such information is more appropriately obtained through additional written discovery -- interrogatories. But it is completely improper to continually call back in-house counsel to retread the same ground simply because the ACC and FCR have determined that they now want to know more.

### Conclusion

For these reasons, the Motion to Compel should be denied. Grace should not be required to produce its in-house counsel for further deposition or to produce additional documents relating to pre-petition estimates of asbestos liability.

Dated:  April 13, 2007

KIRKLAND & ELLIS LLP
David M. Bernick
Janet S. Baer
200 East Randolph Drive
Chicago, IL 60601-6636
Telephone:  (312) 861-2000
Facsimile:  (312) 861-2200


KIRKLAND & ELLIS LLP
Barbara M. Harding
David E. Mendelson
655 Fifteenth Street, NW
Washington, DC 20005
Telephone:  (202) 879-5000
Facsimile:  (202) 879-5200

20

*and*

PACHULSKI STANG ZIEHL YOUNG JONES
& WEINTRAUB LLP

Laura Davis Jones (Bar No. 2436)
James E. O'Neill (Bar No. 4042)
Timothy P. Cairns (Bar No. 4228)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899-8705 (Courier 19801)
Telephone:  (302) 652-4100
Facsimile:  (302) 652-4400

Co-Counsel for the Debtors and Debtors in Possession

21