# EXHIBIT 4

# KIRKLAND & ELLIS LLP

AND AFFILIATED PARTNERSHIPS

655 Fifteenth Street, N.W.
Washington, D.C. 20005

Barbara Mack Harding
To Call Writer Directly:
202 879-5081
bharding@kirkland.com

202 879-5000

www.kirkland.com

Facsimile:
202 879-5200

September 22, 2006

**BY FIRST CLASS MAIL**
**BY FACSIMILE**

Nathan D. Finch, Esq.
Caplin & Drysdale
One Thomas Circle, N.W.
Washington, D.C. 20005

Re :    W.R. Grace & Co. Discovery Requests

Dear Nathan:

I am writing in response to your letter of January 10, 2006 and Jeffrey Liesemer's letters of August 3, 2006 and August 16, 2006, all of which relate to the status of outstanding discovery issues. In light of our subsequent status conferences conducted both in person and via telephone, I believe we are in substantial agreement. I will address the issues specifically referenced in these letters below as well as confirm the discussions that we have had in subsequent status conferences. Based on our September 6, 2006 conference, held in Kirkland & Ellis LLP's office, it is my understanding that the Debtors have satisfied their discovery obligations with respect to all matters not specifically addressed below. As much time has passed because of the stay and since our earlier meet and confer sessions, please advise if there are any outstanding disagreements that I have not addressed below. In connection with all of the agreements below, Grace reserves all objections raised in its answers to the interrogatories and document requests, except where specifically addressed.

Sealed Air Documents

Pursuant to our discussions, on February 17, 2006 I sent a chart to you and Richard Wyron that shows the Sealed Air documents for which we believed that we had a valid objection to the production and use for purposes of the bankruptcy estimation due to confidentiality. In response, you provided me with a chart indicating those documents which were turned over to the Government in response to a subpoena. After comparing your chart of previously-produced documents with our chart of potentially-privileged documents, Grace has concluded that it will no longer seek to assert privilege over the Sealed Air Documents in the chart that you provided. However, although Grace is no longer asserting privilege over these documents, Grace maintains its position that these documents are confidential and should be treated as such, pursuant to our confidentiality agreements. Moreover, as we agreed during our August 1, 2006 conference call,

Nathan D. Finch, Esq.
September 22, 2006
Page 2

Grace reserves all objections to the admissibility of the Sealed Air documents on, *inter alia*, grounds of relevance and hearsay, or any other relevant objection, until the estimation hearing.

Verdict Information

The PI Committee's Interrogatory 3 seeks information about payments made for asbestos-related personal injury claims that have gone to verdict. The parties are in agreement that it will be sufficient to satisfy the Debtors' obligations under this request to update the chart entitled Asbestos Bodily Injury cases with a Judgment Settlement, referenced at the September 6, 2006 meeting, with the following information: Total Verdict as to All Defendants; Verdict as to Grace; and Disposed Amount. In conformity with this obligation, Grace is currently looking for information that will be responsive to this request and will make a good faith effort to produce that information by October 10, 2006. I have spoken to Jay Hughes about this request and he is searching for the information. Originally, he believed that he could easily obtain this information by calling local counsel. However, given that much time has past since many of the cases on the list were resolved, some of the information is not readily available and requires locating the underlying litigation file and searching the file for this information.

Top 10 Outside Counsel

As per the agreement of the parties, the Debtors' discovery obligations under Interrogatories 2, 4, and 19 will be satisfied by the furnishing of a list of the Top 10 firms, by volume, that represented Grace in personal injury asbestos-related tort cases. In conformity with this request, Grace is enclosing with this letter a list of the Top 10 firms (Attachment A). However, to the extent that the PI Committee is considering contacting attorneys at these firms, Grace objects on the ground that the Court already has ruled that attorney discovery is not permitted. Moreover, if the PI Committee does intend to contact these firms, the PI Committee should only do so if Grace's current counsel is present, either in person or via telephone, at the conference.

Jobsite Lists

Interrogatories 8, 9, and 10, and Document Requests 2, 3, 4, and 5 all relate to Jobsite Lists. The parties previously agreed that it would be sufficient to satisfy these requests for the Debtors to provide a rolling production of Settled Claims Files for the PI Committee to review. *See* December 16, 2005 Letter from B. Harding to N. Finch. The Debtors have fulfilled this obligation. In addition, the PI Committee has access to database information, on CD ROMs, that includes jobsite information that Grace has relied on as a matter of practice.

The PI Committee subsequently requested, at the September 6, 2006 conference, that the Debtors also ask the Top 10 firms if they are in possession of any jobsite lists. Grace notes that

Nathan D. Finch, Esq.
September 22, 2006
Page 3

it has already sought this very information from the Top 10 firms and was told that no jobsite lists exist. However, Grace has agreed to once again make this request of the Top 10 firms. The parties are in agreement that, if Grace requests the Top 10 firms to produce any non-privileged jobsite lists in their possession, then this will satisfy Grace's obligations with respect to these Interrogatories and Document Requests. In addition, Matthew Murphy of Casner & Edwards will respond more fully to you with regard to the issue of jobsite lists, specifically addressing the concerns you raised at the September 6, 2006 meeting as to the possibility of the existence of these lists. The Debtors continue to object to the search for, and production of, documents from the files of their outside counsel and to the creation of a privilege log in connection with such searches as unduly burdensome in the context of an estimation.

### Insurance Auditors' Files

Document Request 18 relates to audits of settled asbestos tort claims. The parties are in agreement that the Debtors will satisfy their obligations under this document request by producing any correspondence between the Debtors and their auditors, in the Debtors' possession, to the extent that this correspondence is not otherwise privileged, and has not already been produced in the bankruptcy. Pursuant to your September 6, 2006 request to know the approximate volume of these materials as soon as possible, an initial inquiry has disclosed that there are approximately five boxes of documents responsive to your request. Grace is currently reviewing its documents in order to produce the subset of documents that is responsive to your request. To the extent that there are documents otherwise responsive to this document request that are privileged, Grace will provide a privilege log cataloguing those documents. Grace will make a good faith effort to accomplish this by October 30, 2006.

### Settled Claims Files

With respect to personal injury litigation settlement history information, pertaining to Document Requests 67 and 70, the Debtors have already begun rolling production of these materials and have shipped over 180 boxes of such materials to date. Additionally, the PI Committee has spent a total of 12 days reviewing the approximately 500 boxes of documents in the Boston repository beginning on December 19, 2005. We understand that the PI Committee has identified documents in approximately 205 of those boxes for copying and that the PI Committee has now completed its review of those documents. It has been Grace's understanding that this production is sufficient to satisfy Grace's discovery obligations under Document Requests 67 and 70. *See* December 16, 2005 Letter from B. Harding to N. Finch.

At our September 6, 2006 conference, you indicated that, in addition, the PI Committee would like Grace to specifically search for large group personal injury settlement agreements, in which 1,000 or more personal injury claimants settled with Grace at a single time. Pursuant to this request, you sent, by email, a list of large group settlement agreements. In conformity with

Nathan D. Finch, Esq.
September 22, 2006
Page 4

your request, I have inquired of Grace as to whether there are any additional large group personal injury settlement agreements that took place between January 1, 1996 and July of 2001. Grace is not aware of any large group personal injury settlements in addition to the ones which already have been produced to the PI Committee. If the PI Committee is aware of any large group personal injury settlements that Grace has inadvertently not produced, please identify these settlements and Grace will attempt to locate and produce these agreements.

Interrogatories and Requests for Admission

Pursuant to Document Requests 8 and 9, the PI Committee has requested responses to interrogatories and requests for admission answered in connection with asbestos tort claims. Pursuant to the agreement of the parties, it is sufficient to satisfy Grace's obligations under these requests for Grace to produce 5 interrogatories and 5 requests for admission for each year during the period 1985 through April 1, 2001. As we discussed in the September 6, 2006 conference, the interrogatories and requests for admissions identified in your letter were already sent to you by the law firm of Casner & Edwards on January 17, 2006 along with a certification from Robert Murphy regarding Grace's practice of submitting discovery responses through local counsel in the underlying tort litigation. *See* Ltr. from M. Murphy to N. Finch (Jan. 17, 2006). Matt Murphy will send the information to you again.

Estimates of Aggregate Asbestos Liability

Document Requests 23, 53, 68, and 69 relate to Grace's internal estimation of its aggregate asbestos liability and correspondence between Grace and its outside auditors. As we discussed at our September 6, 2006 conference, two outstanding issues remain with respect to these requests:

First, pursuant to your request, Grace currently is searching for documents relating to estimates of aggregate asbestos liability that Grace conducted after its petition for bankruptcy and will produce responsive documents that are not privileged or otherwise confidential. Grace will produce a privilege log for those documents that are privileged or otherwise confidential.

Second, with respect to correspondence between Grace and its outside auditors, as stated above, Grace will produce these documents to the extent that they exist and are not privileged. To the extent that they are privileged, Grace will provide a privilege log cataloguing those documents that are privileged. Grace will undertake to provide either the privilege log or the documents themselves by October 15, 2006.

Settlement Strategies

Nathan D. Finch, Esq.
September 22, 2006
Page 5


Document Requests 47 and 66 request documents related to Grace's litigation and settlement and strategies. As we discussed during our September 6, 2006 conference, we are in disagreement as to whether documents related to litigation and settlement strategies are discoverable. As I indicated during our meeting, because you seek documents relating to Grace's settlement strategy, Grace objects to the production of this information because, pursuant to the Federal Rules of Evidence, settlement strategy information is not admissible in federal court. Because this information is not admissible, and may in addition be privileged and confidential, it is outside the permissible scope of discovery because it is not likely to lead to the discovery of admissible evidence. Further, the Court previously rejected Grace's attempt to seek doctor discovery from plaintiff law firms. It is my understanding that we will not reach an agreement on the issue of whether documents relating to Grace's settlement strategies are discoverable and that you will raise this issue with the mediator.

Punitive Damages

Document Request 49 seeks information about Grace's payment of punitive damages in settlement of any tort claim. As we discussed at our September 6, 2006 conference, the PI Committee will reframe this request in the form of an Interrogatory, which it will address to Grace. As per our agreement, Grace's answer to this interrogatory will satisfy Grace's discovery obligations under this document request.

Investigations of Third Parties

Document Requests 55 and 56 request information regarding investigations by Grace or third parties of medical personnel who conducted diagnoses of individuals claiming asbestos-related conditions. The Debtors have served subpoenas, which are resulting in information that is responsive to these requests. That process is ongoing. As this information is collected, it is being transferred to a web-based repository. Grace can arrange to have the PI Committee given access to this repository. Alternatively, as per your request at the September 6, 2006 meeting, I have inquired as to whether it is practicable for Grace to have this information transferred to CD-ROM. I have not yet received an answer from the vendor as to whether this will be possible but I will inform you when I receive an answer to this request. In the meantime, the PI Committee can receive information that will allow it to obtain a password for accessing the repository through the internet by emailing wrgrace@absalominc.com and requesting such access. As discussed, this satisfies Grace's discovery obligations under this document request.

Claims Resolution History and Market Share Data

Document Request 57 requests documents related to claims resolution history of asbestos tort claimants other than claimants against Grace. Document Request 58 requests Grace's market share information. As discussed during our September 6, 2006 conference, and as stated

Nathan D. Finch, Esq.
September 22, 2006
Page 6

in Grace's Responses to Requests for Production, such materials, to the extent they exist and are not privileged, are likely to be contained in the Boston repository of documents. You have requested that we search our files again to insure that there are no additional non-privileged documents that are responsive to these requests that are not located in the Boston document repository. To the extent that Grace has such documents, they are likely in the possession of Jay Hughes. Mr. Hughes has agreed to review his files and will produce any non-privileged responsive documents. Grace has not agreed to review all its files in connection with this request as it is overly burdensome and not likely to lead to the discovery of relevant or admissible evidence.

Pleadings or Submissions in Disputes With an Insurer

Document Request 65 requests any pleading or submission made to a court or arbitrator by Grace in any litigation or arbitration involving insurance disputes. As we agreed during our August 1, 2006 teleconference, and reconfirmed in the September 6, 2006 conference, Grace will produce responsive pleadings, briefs, and testimony on insurance coverage litigation to the extent they are in Grace's physical possession. We will begin production of these documents on a rolling basis.

Occupational Characteristics

Document Request 61 requests documents concerning the occupational characteristics of claimants who claim exposure to Grace's asbestos-containing products. During our September 6, 2006 conference, we agreed that it would satisfy Grace's obligations under this request for Grace to produce documents relied on in conducting analyses of the employment characteristics of the Grace claimant population as represented in a slide used during oral argument during the bankruptcy litigation. On September 6, 2006, you sent me a copy of the slide to which you were referring. The information that provided the foundation for the slide is contained in a declaration executed by Daniel Rourke. This declaration contains a statistical analysis that Dr. Rourke performed of the 1997 and 2000 Grace personal injury database, using information from Grace's claim files. It was filed with the Debtors' Reply Memorandum in Support of Case Management Order on November 9, 2001. In response to your request, I am attaching Dr. Rourke's declaration to this letter (Attachment B). This satisfies Grace's obligation under this document request.

Questionnaire Information

In your August 3, 2006 letter, you requested "a list of the asbestos personal-injury claimants (and their law firms, if applicable) who filed questionnaire responses with Rust Consulting." Grace and the PI Committee concurrently receive the names of the claimants who have responded to the Questionnaire as these names are returned to us. As we agreed at the

Nathan D. Finch, Esq.
September 22, 2006
Page 7


September 6, 2006 conference, Grace will compile this information into a list and send it to you in its current form, which currently stands at approximately 60,000 claimants. We expect to have this information by the end of the month.

Please call me if you would like to discuss any of these matters further or if I inadvertently neglected to include any other matters that were the subject of our discussions.

Sincerely,

Barbara Mack Harding

Enclosures

cc:    Richard Wyron, Esq.
       Raymond Mullady, Jr., Esq.
       Matthew I. Kramer, Esq.
       Kenneth Pasquale, Esq.
       Gary Becker, Esq.
       Daniel Cohn, Esq.
       Matthew Murphy, Esq.

# Attachment A

## Top Ten Law Firms' Contact Information

1. Sandra F. Clark, Esq.
   Mehaffy & Weber
   Interfirst Tower
   2615 Calder Avenue
   P.O. Box 16
   Beaumont, TX 77704 (for P.O. Box: zip is 77702)
   Phone: 409 835 5011
   Fax: 409 835 5729/5177
   Houston Tel: 713 655 1200

2. Gregory M. Sullivan, Esq.
   Andrews & Kurth LLP
   600 Travis St., Suite 4200
   Houston, TX 77002
   Phone: 713 220 4200
   Fax: 713 220 4285

3. Charles F. Bagley, III, Esq.
   Campbell, Woods, Bagley, Emerson, McNeer & Herndon
   Suite 1000
   517 Ninth Street
   P.O. Box 1835
   Huntington, WV 25719-1835 (zip 25701 when NOT using P.O. Box)
   Phone: 304 529 2391
   Fax: 304 529 1832

4. William N. Graham, Esq.
   Aultman, Tyner, Ruffin & Yarbrough, Ltd.
   315 Hemphill Street
   P.O. Drawer 750
   Hattiesburg, MS 39403-0750
   Phone: 601 583 2671
   Fax: 601 583 2677

5. Robert S. Krause, Esq.
   Dickinson Wright PLLC
   One Detroit Center
   500 Woodward, Suite 4000
   Detroit, MI 48226-3425
   Phone: 313 223 3500
   Fax: 313 223 3598

6. Virginia E. Johnson
   Foley & Mansfield PLLP
   4770 Biscayne Boulevard, Suite 1000
   Miami, Florida 33137, (Miami-Dade Co.)
   Phone: 305 438 9899
   Fax: 305 438 9819

7. George C. Doub, Jr., Esq.  (no longer with Venable)
   George C. Doub, Jr., P.C.
   12 West Madison Street
   2 Hopkins Plaza
   Baltimore, MD 21201
   Phone: 410 547 0400
   Fax: 410 837 4465

8. Jeffrey S. Hebrank, Esq.
   Burroughs, Hepler, Broom, MacDonald, Hebrank & True
   P.O. Box 510
   Two Mark Twain Plaza
   Suite 300
   103 W. Vandalia Street
   Edwardsville, IL 62025-0510
   Phone: 618 656 0184
   Fax: 618 656 1364

9. Tom A. Lockhart, Esq.
   Adams & Graham, L.L.P.
   222 East Van Buren
   West Tower
   P.O. Drawer 1429
   Harlingen, TX 78550
   Phone: 956 428 7495
   Fax: 956 428 2954

10. Michael R. Sistrunk, Esq.
    Campbell, McCranie, Sistrunk, Anzelmo & Hardy
    3445 North Causeway Blvd.
    Suite 800
    Metairie, LA 70002
    P.O. Box 7310
    Phone: 504 831 0946
    Fax: 504 831 2492
    (w/ P.O. Box- use zip 70010-7310

# Attachment B

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W. R. GRACE & CO., et al., | ) | Case No. 01-01139 (JJF) |
| | ) | |
| | ) | (Jointly Administered) |
| Debtors. | ) | |

### DECLARATION OF DANIEL L. ROURKE, Ph.D.

I, Daniel L. Rourke, declare the following to be true:

1.    I am a Principal in Analysis Research Planning Corporation, a consulting firm that specializes in the estimation of liabilities for mass tort claims and the design of systems and procedures for such claims. I received my Ph.D. in Experimental Psychology in 1971 from the University of California at Los Angeles, with the concentration of my graduate work being in mathematical psychology and statistics. My professional background includes consulting work with KPMG Peat Marwick and the Resource Planning Corporation. I also have worked for the Arbitron Company and the RAND Corporation. My academic experience includes work at the Statistical Research Laboratory at the University of Michigan, Ann Arbor. As a result of my academic training and 30-year professional background, I have expertise in sample design and the design of large statistical databases and statistical analysis systems. I have personal knowledge of the matters set forth herein, and would be competent to testify thereto before this Court.

2.    I have prepared a report titled "1997 and 2000 Grace Asbestos PI Claims Sample Design, Methodology and Results," which was filed with the Debtors' Reply Memorandum In Support Of Case Management Order on November 9, 2001. That report is a

true and accurate summary of the statistical analysis I performed of the 1997 and 2000 Grace

personal injury asbestos claims, using information obtained from Grace's claim files and from

the claims databases compiled by the Center for Claims Resolution and the Manville Personal

Injury Settlement Trust.  My analysis was performed in accordance with generally accepted

standards for the statistical analysis of such claims, and it is my professional opinion that the

results set forth in that report are accurate and reliable.

I declare under penalty of perjury that the foregoing is true and correct.

Daniel L. Rourke, Ph.D

Executed on November 12, 2001
in New York, New York

### *1997 and 2000 Grace Asbestos PI Claims Sample Design, Methodology & Results*

A random sample of claims was selected from the Grace claims database for the years 1997 and 2000 and the paper documentation submitted to Grace was reviewed to complete the data collection. The sample design was a stratified random sample with the strata being defined by year received by Grace. The following table shows the number of claims in the population and sample for the two years in question.

| Year Received | Number of Claims | |
|---|---|---|
| | In the Population | In the Sample |
| 1997 | 30,075 | 500 |
| 2000 | 48,190 | 500 |
| Total | 78,265 | 1,000 |

With each stratum, the 500 sampled claims were selected using the following method. First a number was assigned to each claim using the following:

$$Number = 10 \times Status + Injury + rand(), \text{ where}$$

Status = 1 if the claim is pending or 2 if it is closed;
Injury = 1 if mesothelioma, 2 if lung cancer, 3 if other cancer, 4 if unspecified cancer, 5 if asbestosis, 6 if pleural, 7 if asbestos-related, 8 if unknown, and 9 if missing; and
rand() is the Excel function that returns a uniform random number between 0 and 1.

The integer part of Number indicates the claim status and injury; the fractional part is a random number. Next, the claims were sorted into ascending order according to Number. This has the effect of grouping all the claims with the same status and injury together in adjacent rows (the integer part of Number) and then randomly shuffling the claims within the same status-injury block (the fractional part of Number).

The 500 sampled claims were selected from the sorted claims by using a method that is named "systematic selection after a random start." To explain the method with simple numbers, assume that a sample of 100 is to be taken from a population of 1,000 items—a sampling rate of 1 of every 10. The skip interval of 10 is the ratio of the population size to the sample size = 1,000/100 = 10. The starting point is selected at random from the first 10 items. If the random start is 4, then the 4th, 14th, 24th, ..., 94th items would be selected for the sample. If the population size is not evenly divisible by the sample size, then the method must be adjusted somewhat to deal with fractional skip intervals and starting points.

1

Using Excel, systematic selection after a random start was used to select the 500 claims from the population of 30,075 claims received in 1997 and 500 from the 48,190 claims received in 2000. Because the claims are grouped by status and injury, but randomly shuffled within the same status and injury, this selection method insures that the distribution of status and injury in the population is faithfully represented in the sample. In effect, the sampling method used here implements a stratified random sample using the same sampling rate from each stratum, where the strata are defined by status and injury.

### Matching of Grace Claims to Claims Received by the Manville Trust and the Center for Claims Resolution

In order to augment the information about the claims received by Grace, Kirkland and Ellis secured the permission of the Manville Personal Injury Settlement Trust and the Center for Claims Resolution to match the Grace claims to the Manville and CCR claim databases. This section described how the matches were performed.

The same "SSN matching followed by unique name matching" methodology was independently used to match the Grace claims to the Manville and CCR databases. The steps in this procedure are:

1. Match Grace claims with SSNs to the other's claims with SSNs; set the matched claims aside as SSN matches.
2. Using Grace claims without SSNs or claims with SSNs that did not match in Step 1, find the last names + first names that occur once (Grace unique names) and the last+first names that occur more than once (Grace multiply used names); consider the multiply-used names to be non-matches.
3. Using the other's claims without SSNs or claims with SSNs that did not match, find the last+first names that occur once (unique names) and the last+first names that occur more than once (multiply-used names); consider the multiply-used names to be non-matches.
4. Match the Grace unique names to the other's unique names.
5. Total matches include SSN matches and unique name matches.

The following table presents the results of the matching methodology applied to the entire claims databases.

2

### Result of Matching the Grace Claims Database to the Manville Trust and CCR Claims Databases

| Key | Matching Variable Status | Grace | Manville | Grace | CCR |
|---|---|---|---|---|---|
| a | Total Claims | 504,623 | | 504,623 | |
| b | Loss of Consortium Claims | 159,518 | | 159,518 | |
| c = a - b | Population of Claims | 345,105 | 542,725 | 345,105 | 526,473 |
| d | No SSN or Invalid SSN | 174,462 | 3,381 | 174,462 | 99,969 |
| e = c - d | Claims with SSNs | 170,643 | 539,344 | 170,643 | 426,504 |
| f | SSN Matches | 124,978 | 125,913 | 147,947 | 147,947 |
| g = e - f | SSN Non-Matches | 45,665 | 413,431 | 22,696 | 278,557 |
| h = d + g | Claims With Names, Not Matching by SSN | 220,127 | 416,812 | 197,158 | 378,526 |
| i | Claims Associated With Names Used 2+ Times or Missing a First or Last Name | 69,716 | 150,927 | 100,930 | 146,777 |
| j = h - i | Claims for Name Matcing | 150,411 | 265,885 | 96,228 | 231,749 |
| k | Name Matches | 69,214 | 71,172 | 44,548 | 44,548 |
| l = j - k | Non-Matches | 81,197 | 194,713 | 51,680 | 187,201 |
| m = f + k | Total Matches | 194,192 | 197,085 | 192,495 | 192,495 |
| n = c - m | Total Non-Matches | 150,913 | 345,640 | 152,610 | 333,978 |
| o = m/c | Match Rate | 56.3% | 36.3% | 55.8% | 36.6% |

The surplus of Manville SSN and unique name matches over the corresponding Grace figures is due to multiple claims for the same injured party in the Manville database. Some of these claims are rejections and some claims for a malignancy subsequent to a claim for a non-malignancy.

The following table summarizes the match results to Grace claims by Manville, CCR, and Manville and CCR combined.

3

*In the Population of all Grace Claims*

| Matched to Manville | Matched to CCR | | Total |
|---|---|---|---|
| | Yes | No | |
| Yes | 158,565 | 35,627 | 194,192 |
| No | 33,930 | 116,983 | 150,913 |
| Total | 192,495 | 152,610 | 345,105 |

| | |
|---|---|
| Have at least one match | 228,122 |
| Have no match | 116,983 |
| Total | 345,105 |
| | |
| Match Rate | 66.1% |

In all, 66% of the Grace claims have a match to Manville or CCR claims. The following table presents the matching results for the sample of 1,000 claims.

*In The Sample of 1,000*

| | | |
|---|---|---|
| 1997 | Only Mvl | 55 |
| | Only CCR | 45 |
| | Both | 277 |
| | Any Match | 377 |
| | No Match | 123 |
| | Match Rate | 75% |
| 2000 | Only Mvl | 60 |
| | Only CCR | 79 |
| | Both | 192 |
| | Any Match | 331 |
| | No Match | 169 |
| | Match Rate | 66% |
| Total | Only Mvl | 115 |
| | Only CCR | 124 |
| | Both | 469 |
| | Any Match | 708 |
| | No Match | 292 |
| | Match Rate | 71% |

## Analysis of Claimed Medical Conditions and Diagnostic Medical Test Results

Any ILO rating data and PFT data for the 500 sample claims in each year that is available in the Grace or Manville claims submissions, along with the claimed medical condition in the Grace, CCR or Manville claim information, was then compiled as follows:

4

*Comparison of Sample Data Between 1997 and 2000 for Certain Medical Tests*

| Source | Test | Units | 1997 | 2000 |
|--------|------|-------|------|------|
| WRG | ILO Profusion | % ≥ 1/1 | 45% | 25% |
| | | No. with an ILO | 190 | 114 |
| WRG | TLC | Mean % Pred. | 84.7 | 91.2 |
| | | No. with TLC | 72 | 39 |
| | DLCO | Mean % Pred. | 65.4 | 67.6 |
| | | No. with DLCO | 75 | 43 |
| | FVC | Mean % Pred. | 77.8 | 79.4 |
| | | No. with FVC | 90 | 52 |
| | FEV | Mean % Pred. | 75.8 | 75.1 |
| | | No. with FEV | 86 | 50 |
| Manville | TLC | Mean % Pred. | 89.9 | 85.4 |
| | | No. with TLC | 62 | 40 |
| | DLCO | Mean % Pred. | 64.4 | 59.9 |
| | | No. with DLCO | 50 | 31 |
| | FVC | Mean % Pred. | 72.7 | 73.3 |
| | | No. with FVC | 40 | 23 |
| WRG>Mvl* | TLC | Mean % Pred. | 87.5 | 88.3 |
| | | No. with TLC | 114 | 71 |
| | DLCO | Mean % Pred. | 66.8 | 64.8 |
| | | No. with DLCO | 108 | 67 |
| | FVC | Mean % Pred. | 76.1 | 78.1 |
| | | No. with FVC | 116 | 66 |
| WRG | TLC | % < 80 | 36% | 21% |
| | | No. with TLC | 72 | 39 |
| | DLCO | % < 70 | 80% | 63% |
| | | No. with DLCO | 75 | 43 |
| | FVC | % < 80 | 49% | 52% |
| | | No. with FVC | 90 | 52 |
| | FEV | % < 80 | 55% | 50% |
| | | No. with FEV | 86 | 50 |
| WRG>Mvl* | TLC | % < 80 | 23% | 11% |
| | | No. with TLC | 114 | 71 |
| | DLCO | % < 70 | 56% | 40% |
| | | No. with DLCO | 108 | 67 |
| | FVC | % < 80 | 38% | 41% |
| | | No. with FVC | 116 | 66 |

*(*) Use WRG data if available, otherwise use Manville data.*

5

## Comparison of Sample Data Between 1997 and 2000 of Injury and the Presence and Results of Certain Diagnostic Tests

| Measure | Year Received | |
|---|---|---|
| | 1997 | 2000 |
| Malignancies | 33 | 28 |
| Non-malignancies | 381 | 320 |
| Unknown | 86 | 152 |
| Total | 500 | 500 |
| | | |
| % Malignancies (of Known) | 92.0% | 92.0% |
| | | |
| Non-malignancies Submitting ILOs | | |
| Number | 189 | 112 |
| Percent | 49.6% | 35.0% |
| | | |
| Non-malignancies Submitting PFTs | | |
| Number | 87 | 52 |
| Percent | 22.8% | 16.3% |
| | | |
| Non-malignancies Submitting Both | | |
| Number | 51 | 36 |
| Percent | 13.4% | 11.3% |
| | | |
| ILO ≥ 1/1 and at Least Mild Impairment (AMA) | | |
| Number | 13 | 9 |
| Percent | 3.4% | 2.8% |

6

*Occupational Exposure Information*

The occupational exposure information in the matched claims files was then compiled. Any claimant with work experience in the construction industry was classified as a construction worker. For claimants with no construction work history, the industry with longest duration as identified in the Grace claim, or in the CCR claim if no industry was identified in the Grace claim, or in the Manville claim if both Grace and CCR industry identifications were missing, was used to identify the applicable industry for the claimant, with the following results for those claimants for whom an industry could be identified:

| Grace Sample Claim Distribution By Percentage Of Known Industries | | |
|---|---|---|
| **Industry** | **1997** | **2000** |
| Iron/Steel Aluminum Production | 25% | 18% |
| Non-asbestos products Mfg. | 9% | 20% |
| Petro/Chemical Mfg. | 14% | 7% |
| Utility/Power Plants | 9% | 5% |
| Shipbuilding | 4% | 8% |
| Railroad | 2% | 6% |
| Auto Maintenance | 2% | 6% |
| Tire/Rubber Mfg. | 0% | 5% |
| Marine | 1% | 1% |
| Non-Grace Asb. Mining or Mfg. | 1% | 1% |
| Other Inapplicable Indus. | 17% | 12% |
| Totals | 86% | 88% |

7