*First Class Mail*
Mr. Mark Hankin
HanMar Associates, M.L.P.
P.O. Box 26767
Elkins Park, PA 19027

*First Class Mail*
(Counsel to Travelers Casualty and Surety
Company)
Lynn K. Neuner, Esquire
Simpson, Thacher, & Bartlett
425 Lexington Avenue
New York, NY 10017-3954

*First Class Mail*
(Counsel to Kaneb Pipe Line Operating
Partnership LP and Support Terminal
Services, Inc.)
Gerald G. Pecht, Esquire
Fulbright & Jaworski, LLP
1301 McKinney, Suite 5100
Houston, TX 77010-3095

*First Class Mail*
Jonathan D. Berger, Esquire
Russell Henkin, Esquire
Berger & Montague, P.C.
1622 Locust Street
Philadelphia, PA 19103-6365

*First Class Mail*
(Counsel to Novak Landfill RD/RA Group)
Noel C. Burnham, Esquire
Richard G. Placey, Esquire
Montgomery, McCracken, Walker &
Rhoads LLP
123 South Broad Street
Avenue of the Arts
Philadelphia, PA 19109

*First Class Mail*
DACA V, LLC
Attn: Julie Bubnack
1565 Hotel Cir S
Ste 310
San Diego, CA 92108-3419

*First Class Mail*
(Counsel to Lawson Electric Co.)
Ronald D. Gorsline
Chambliss, Bahner, & Stophel, P.C.
1000 Tallan Building, Ste. 1000
Two Union Square
Chattanooga, TN 37402-2552

*First Class Mail*
Jon Bauer
Contrarian Capital Management, LLC
411 West Putnam Avenue, Suite 225
Greenwich, CT 06830

*First Class Mail*
(Counsel to County of San Diego)
Martha E. Romero, Esquire
6516 Bright Avenue
Whittier, CA 90601-4503

*First Class Mail*
(Counsel to National Union Fire Insurance
Co. of Pittsburgh, PA)
Michael S. Davis, Esquire
Zeichner Ellman & Krause
575 Lexington Avenue
New York, NY 10022

*First Class Mail*
(Counsel to The Burlington Northern and
Santa Fe Railway Company)
Richard A. O'Halloran, Esquire
Burns, White & Hickton, LLC
531 Plymouth Road, Suite 500
Plymouth Meeting, PA 19462

*First Class Mail*
(Counsel to Crossroads Industrial Park, Inc.
and Weedsport Associates, LLC)
Scott Estelle, President
Crossroads Industrial Park, Inc.
P.O. Box 220
Weedsport, NY 13166

*First Class Mail*
(Counsel to the City of Knoxville)
Hillary Browning-Jones
Assistant City Attorney
P.O. Box 1631
Knoxville, TN 37901

*First Class Mail*
(Counsel to Westcor)
Don C. Fletcher, Esquire
The Cavanagh Firm, P.A.
1850 North Central Avenue
Suite 2400
Phoenix, AZ 85004

*First Class Mail*
(Carteret Venture)
Mr. Harvey Schultz
The Schultz Organization
4 Woods End
Ocean, NJ 07712-4181

*First Class Mail*
(Counsel to State of New York, Dept. of
Taxation and Finance)
Barbara G. Billet, Esquire
Elaine Z. Cole, Esquire
New York State Department of Taxation and
Finance
340 E. Main Street
Rochester, NY 14604

*First Class Mail*
(Special Counsel to Debtors)
James J. Restivo, Esquire
Reed Smith LLP
435 Sixth Avenue
Pittsburgh, PA 15219

*First Class Mail*
(Counsel to West Group)
Michael S. Sandberg, Esquire
Hellmuth & Johnson, PLLC
10400 Viking Drive, Suite 560
Eden Prairie, MN 55344

*First Class Mail*
(Counsel to Certain Underwriters at Lloyd's
London)
Thomas J. Quinn, Esquire
Mendes & Mount, LLP
750 Seventh Avenue
New York, NY 10019-6829

*First Class Mail*
(Counsel to the U.S. Environmental
Protection Agency)
Jerel L. Ellington, Esquire
U.S. Department of Justice
Environment and Natural Resource Division
Environmental Enforcement Section
1961 Stout Street – 8th Floor
Denver, CO 80294

*First Class Mail*
(Counsel to the State of Minnesota)
Ann Beimdiek Kinsella
Assistant Attorney General
445 Minnesota Street, Suite 1200
St. Paul, MN 55101-2127

*First Class Mail*
(Counsel to Union Tank Car Company)
Deborah L. Thorne, Esquire
FabelHaber LLC
55 East Monroe Street, 40th Floor
Chicago, IL 60603

*First Class Mail*
Jenny J. Hyun, Esquire
Weingarten Realty Investors
2600 Citadel Plaza Drive
Houston, TX 77008

*First Class Mail*
Brad N. Friedman
Rachel Fleishman
Milberg Weiss Bershad Hynes & Lerach
LLP
One Pennsylvania Plaza
New York, NY 10119-0165

*First Class Mail*
Xerox Capital Services, LLC
Attention: Cathy Flowers
800 Carillon Parkway
St. Petersburg, FL  33716-9876

*First Class Mail*
(Counsel to Royal Insurance)
Carl Pericone, Esquire
Wilson, Elser, Moskowitz, Edelman, Dicker
LLP
150 East 42nd Street
New York, NY  10019-5639

*First Class Mail*
(Counsel to James Grau, Anna Grau and
Harry Grau & Sons, Inc.)
Edward L. Jacobs, Esquire
Bankemper & Jacobs
The Shaw House
26 Audubon Place
P.O. Box 70
Fort Thomas, KY  41075-0070

*First Class Mail*
(Counsel to Ben Bolt-Palito-Blanco ISD,
Brownsville ISD, Cameron County,
Hildalgo County, Orange Grove, Orange
Grove ISD, Premont ISD)
Lori Gruver Robertson, Esquire
Linebarger Goggan Blair Pena & Sampson,
LLP
1949 South I.H. 35 (78741)
P.O. Box 17428
Austin, TX  78760

*First Class Mail*
(Counsel to Carrollton-Farmers Branch
Independent School District)
Andrea Sheehan, Esquire
Law Offices Of Robert E. Luna, P.C.
4411 North Central Expressway
Dallas, TX  75205

*First Class Mail*
(Counsel to Cornell University)
Anthony F. Parise
Cornell University
Office of University Counsel
300 CCC Building, Garden Avenue
Ithaca, NY  14853-2601

*First Class Mail*
(Counsel to the Libby Mine Claimants)
Daniel C. Cohn, Esquire
Christopher M. Candon, Esquire
Cohn Whitesell & Goldberg LLP
101 Arch Street
Boston, MA  02110

*First Class Mail*
(Counsel to Enron Corp., et al.)
General Counsel
Enron Energy Services
1400 Smith Street
EB 0889
Houston, TX  77002

*First Class Mail*
(Counsel to Town of Acton, MA)
Thomas O. Bean
McDermott, Will & Emery
28 State Street
34th Floor
Boston, MA  02109-1706

*First Class Mail*
(Federal Insurance Company)
Jacob C. Cohn, Esquire
Cozen O'Connor
1900 Market Street
Philadelphia, PA  19103

*First Class Mail*
Contrarian Capital Trade Claims LP
Attn: Alisa Minsch
411 W. Putnam Ave. S-225
Greenwich, CT  06830-6263

*First Class Mail*
Debt Acquisition Co of America V LLC
1565 Hotel Cir S
Suite 310
San Diego, CA  92108-3419

*First Class Mail*
Longacre Master Fund Ltd.
Attn:  Maurie Shalome
810 7th Avenue, 22nd Fl.
New York, NY  10019-5818

*First Class Mail*
Sierra Asset Management LLC
2699 White Rd., Ste. 225
Irvine, CA  92614-6264

*First Class Mail*
Trade-Debt.Net
P.O. Box 1487
West Babylon, NY  11704-0487

*First Class Mail*
(Counsel for State Street Global Advisors)
Daniel M. Glosband, P.C.
Goodwin Procter LLP
Exchange Place
Boston, MA  02109

*First Class Mail*
John Preefer, Esquire
John Preefer
60 East 42nd Street, Suite 1201
New York, NY  10165

*First Class Mail*
Michael B. Schaedle, Esquire
Blank Rome LLP
One Logan Square
130 North 18th Street
Philadelphia, PA  19103

*First Class Mail*
Peter B. McGlynn, Esquire
Bruce D. Levin, Esquire
Bernkopf Goodman LLP
125 Summer Street, Suite 1300
Boston, MA  02110

*Overnight Delivery*
(Counsel to David Austern, the Future
Claimants' Representative)
Roger Frankel, Esquire
Richard H. Wyron, Esquire
Orrick, Herrington & Sutcliffe LLP
The Washington Harbour
3050 K Street, N.W., Suite 200
Washington, DC  20007-5135

*First Class Mail*
Lauren Holzman
Claims Processor
Euler Hermes ACI
800 Red Brook Boulevard
Owings Mills, MD  21117

*First Class Mail*
(Counsel to Keri Evans, on behalf of herself
and all others similarly situated as Plaintiff
in ERISA litigation, Civil Action No. 04-
11380)
Michael S. Etkin, Esquire
Ira M. Levee, Esquire
Lowenstein Sandler PC
65 Livingston Avenue
Roseland, NJ  07068

*First Class Mail*
(Counsel to Charlotte Transit Center, Inc.)
Amy Pritchard-Williams, Esquire
Margaret R. Westbrook, Esquire
Kennedy Covington Lobdell & Hickman,
LLP
Hearst Tower, 47th Floor
214 N. Tryon Street
Charlotte, NC  28202

*First Class Mail*
(Counsel to Ancel Abadic and 410
additional claimants)
The Murray Law Firm
Attn: Julie A. Ardoin, Esquire
909 Poydras Street, Suite 2550
New Orleans, LA  70112

*First Class Mail*
(Counsel to Allstate Insurance Company)
Stefano Calogero, Esquire
Andrew K. Craig, Esquire
Cuyler Burk, LLP
Parsippany Corporate Center
Four Century Drive
Parsippany, NJ  07054

*First Class Mail*
(Counsel to Citicorp Del-Lease, Inc. d/b/a
Citicorp Dealer Finance)
Sergio I. Scuteri, Esquire
Farr, Burke, Gambacorta & Wright
211 Benigno Boulevard, Suite 201
Bellmawr, NJ  08031

*First Class Mail*
(Counsel to Everest Reinsurance Company
and Mt. McKinley Insurance Company)
Mark D. Plevin, Esquire
Leslie A. Epley, Esquire
Crowell & Moring LLP
1001 Pennsylvania Avenue, N.W.
Washington, DC  20004-2595

*First Class Mail*
(Counsel to The Van Cott, Bagley, Cornwall
& McCarthy 401(K) Profit Sharing Plan)
J. Robert Nelson, Esquire
Van Cott, Bagley, Cornwall & McCarthy
50 South Main Street, #1600
P.O. Box 45340
Salt Lake City, UT  84145

*First Class Mail*
(Counsel to Claimants, American Legion, Catholic Diocese of Little Rock, City of Barnesville, Cherry Hill Plaza, Church of the Most Holy Redeemer, Church of St. Joseph, Church of St. Luke, Church of St. Helena, Church of St. Leo the Great, First United Methodist Church, Fargo Housing Authority, Alvin Foss, State of Washington and Port of Seattle)
Joseph F. Rice, Esquire
James M. Hughes, Esquire
Motley Rice LLC
28 Bridgeside Blvd.,
P.O. Box 1792
Mt. Pleasant, SC  29465

*First Class Mail*
(Counsel to American Employers Insurance Co, Employers Commercial Union n/k/a OneBeacon A (Counsel to American Employers Insurance Co, Employers Commercial Union n/k/a OneBeacon America Insurance Co and Unigard Insurance Co)
Michael F. Brown, Esquire
Drinker Biddle & Reath LLP
One Logan Square
18th & Cherry Streets
Philadelphia, PA  19103-6996

*First Class Mail*
(Counsel to U.S. Fire Insurance Company)
George R. Calhoun, Esquire
March D. Coleman, Esquire
Steptoe & Johnson LLP
1330 Connecticut Avenue, NW
Washington, DC  20036

*First Class Mail*
(Counsel to American Premier
Underwriters, Inc.)
Matthew J. Siembieda, Esquire
Benjamin G. Stonelake, Esquire
Scott E. Coburn, Esquire
Blank Rome LLP
One Logan Square
130 North 18th Street
Philadelphia, PA  19103

**First Class Mail**
(Counsel to Certain Underwriters at Lloyd's
London and Certain London Market
Companies)
Mary K. Warren, Esquire
Brenda D. DiLuigi, Esquire
Linklaters
1345 Avenue of the Americas, 19th Floor
New York, NY  10105

**First Class Mail**
(Transfer Agent)
DK Acquisition Partners
Attn:  Michael J. Leffell
885 Third Ave., Ste 3300
New York, NY  10022

**First Class Mail**
(Transfer Agent)
Fair Harbor Capital LLC
875 Avenue of the Americas, Ste. 2305
New York, NY  10001

**First Class Mail**
(Transfer Agent)
Portia Partners LLC
One Sound Shore Dr., Ste. 100
Greenwich CT  06830

**First Class Mail**
(Counsel to Macerich Fresno LP)
William P. Bowden, Esquire
Amanda M. Winfree, Esquire
Ashby & Geddes, P.A.
222 Delaware Avenue, 17th Floor
P.O. Box 1150
Wilmington, DE  19899

**First Class Mail**
(Counsel to Macerich Fresno LP)
M. David Minnick, Esquire
Michael P. Ellis, Esquire
Pillsbury Winthrop Shaw Pittman LLP
50 Fremont Street
San Francisco, CA  94105-2228

**First Class Mail**
(Counsel to Macerich Fresno LP)
Gerald F. George, Esquire
Pillsbury Winthrop Shaw Pittman LLP
50 Fremont Street
San Francisco, CA  94105-2228

**First Class Mail**
(Counsel to HRCL and Eaves)
Joseph D. Frank, Esquire
Frank/Gecker LLP
325 North LaSalle Street
Suite 625
Chicago, IL  60610

**First Class Mail**
(Counsel to all clients of the Robles law
firm)
David Jagolinzer, Esquire
Ferraro & Associates, P.A.
Suite 700
4000 Ponce de Leon Blvd.
Miami, FL  33146

**First Class Mail**
(Counsel to PacifiCorp)
Steven  J. McCardell, Esquire
Jared Inouye, Esquire
Durham Jones & Pinegar
111 E. Broadway, Suite 900
Salt Lake City, UT  84111

**First Class Mail**
(Counsel to Iowa Dept. of Revenue)
John Waters, Esquire
Iowa Department of Revenue
Collections Section
P.O. Box 10457
Des Moines, IA  50306

Richard J. Lee, Ph.D.   February 14, 2007

Page 1

```
 1      IN THE UNITED STATES BANKRUPTCY COURT FOR THE
               WESTERN DISTRICT OF PENNSYLVANIA

 2

                            -  -  -  -

 3

        In Re:                      )  Chapter 11
 4                                  )
        W.R. Grace & Co., et al., 1, ) Case No. 01-01139
 5                                  )       (JKF)
                                    ) Jointly Administered
 6           Debtors.               )

 7

 8

 9

10

11                          -  -  -  -

12        DEPOSITION OF:  RICHARD J. LEE, Ph.D.

13                          -  -  -  -

14

                  DATE:    February 14, 2007
15                         Wednesday, 1:37 p.m.

16

              LOCATION:    REED SMITH, LLP
17                         435 Sixth Avenue
                           Pittsburgh, PA 15219

18

19            TAKEN BY:    Claimants

20

          REPORTED BY:    Heidi H. Willis, RPR, CRR
21                         Notary Public
                           AKF Reference No. HW99625A

22

23

24

25
```

**EXHIBIT "A"**

Richard J. Lee, Ph.D.    February 14, 2007

## Page 2

1    DEPOSITION OF RICHARD J. LEE, Ph.D.,
2    a witness, called by the Claimants for examination,
     in accordance with the Federal Rules of Civil
3    Procedure, taken by and before Heidi H. Willis, RPR,
     CRR, a Court Reporter and Notary Public in and for
     the Commonwealth of Pennsylvania, at the offices of
4    Reed Smith, LLP, 435 Sixth Avenue, Pittsburgh,
     Pennsylvania, on Wednesday, February 14, 2007,
5    commencing at 1:37 p.m.
6
          - - - -
7
8    APPEARANCES:
9      FOR THE DEBTORS:
       James Restivo, Esq.
10     REED SMITH, LLP
       435 Sixth Avenue
11     Pittsburgh, PA 15219
       412-288-3131
12     jrestivo@reedsmith.com
13
       FOR SAN DIEGO GAS & ELECTRIC COMPANY, SEMPRA
14     ENERGY, and ENOVA CORPORATION:
       Mark A. Bartholomaei, Esq.
15     OBERMAYER REBMANN MAXWELL & HIPPEL, LLP
       One Mellon Center, Suite 5240
16     500 Grant Street
       Pittsburgh, PA 15219
17     P 412-566-1500
       F 412-566-1508
18     mark.bartholomaei@obermayer.com
19
       FOR THE STATE OF CALIFORNIA:
20     Christina Kang, Esq.
       (Appearing Telephonically)
21     HAHN HESSEN
       488 Madison Avenue
22     New York, NY 10022
       P 212-478-7200
23     ckang@hahnhessen.com
24
25

## Page 3

1    APPEARANCES (CONT'D):
2      FOR THE OFFICIAL COMMITTEE OF EQUITY SECURITY
       HOLDERS:
3      Jessica Glass, Esq.
       (Appearing Telephonically)
4      KRAMER LEVIN NAFTALIS & FRANKEL, LLP
       1177 Avenue of the Americas
5      New York, NY 10036
       P 212-715-9185
6      F 212-715-8318
       JGlass@kramerlevin.com
7
8      FOR THE AMERICAN LEGION, CATHOLIC DIOCESE OF
       LITTLE ROCK, CHP ASSOCIATES, FARGO HOUSING AUTHORITY,
9      PORT OF SEATTLE, STATE OF WASHINGTON:
       Anne McGinness Kearse, Esq.
10     (Appearing Telephonically)
       MOTLEY RICE, LLC
11     28 Bridgeside Boulevard
       Mt. Pleasant, SC 29464
12     P 843-216-9140
       akearse@motleyrice.com
13
14        *INDEX*
15
     Examination by Ms. Kearse ----------- 4
16   Examination by Mr. Bartholomaei -------- 55
     Re-Examination by Ms. Kearse --------- 57
17
     Certificate of Court Reporter --------- 58
18   Errata Sheet ------------------- 59
     Notice of Non-Waiver of Signature ------- 60
19
20
21
22
          (No Deposition Exhibits were marked.)
23
24
25

## Page 4

1          - - - -
2          PROCEEDINGS
3          - - - -
4          MR. RESTIVO:  We are starting a new
5    deposition, same day, same case.  You should
6    reswear the witness, and we'll go some more.  I
7    don't want to say start over because I don't
8    want you to repeat everything that's been done.
9    I can't say continue because it's a new
10   deposition, but we will start over.  We will
11   start again.
12   _____
13          RICHARD J. LEE, Ph.D.,
14        being first duly sworn,
15      was examined and testified as follows:
16          - - - -
17          EXAMINATION
18          - - - -
19   BY MS. KEARSE:
20   Q.   Good afternoon, Dr. Lee.
21   A.   Good afternoon.
22   Q.   My name is Anne Kearse, and I'm here on behalf
23   of the Motley Rice Claimants, and we just made
24   some comments on and off the record, but we've
25   been going for many, many hours today on behalf

## Page 5

1    of some of the Speights & Runyan Claimants, and
2    to the extent there's some questions of a
3    general nature, they can certainly apply in
4    this deposition as well.  I'll try not to
5    rehash everything, but of course I have to ask
6    for some clarification on a couple of things.
7          Let me start off, because I missed
8    the first three minutes of your deposition, did
9    you produce today a copy of your CV, a recent
10   copy of your CV?
11   A.   I have not.
12   Q.   Do you have one with you?
13   A.   I do not.
14   Q.   Can we just go ahead and provide that to
15   counsel and make that as an attachment, I guess
16   it's a new exhibit, so new Exhibit No. 1?
17   Would that be any problem, Counsel?
18          MR. RESTIVO:  I don't think it's a
19   problem.  I think it's probably attached to one
20   or more of Dr. Lee's expert reports in this
21   case, but if you want us to pull it off an
22   expert report and attach it to this transcript,
23   I don't have a problem doing it.
24          MS. KEARSE:  Let's see.  Let me
25   clarify.  I've got, Dr. Lee, one of your

2 (Pages 2 to 5)

Richard J. Lee, Ph.D.   February 14, 2007

Page 6

1   reports from January 15th, 2007, and it does
2   have a copy, it looks like it doesn't have —
3        MR. RESTIVO:  But all we would do is
4   pull that copy off.  I don't think we have
5   anything that postdates January of 2007.
6        MS. KEARSE:  Okay.  Well, let me ask
7   it this way.
8   BY MS. KEARSE:
9   Q.   Dr. Lee, I have attached to that January 15th,
10      2007 report on lack of hazards a CV that looks
11      like it's dated 4/28/2006.  Would that be your
12      most recent CV?
13  A.   I would think so.
14  Q.   Is there anything, without having it in front
15      of you, that you would be aware of that you are
16      working on that would not appear on that CV as
17      it relates to asbestos?
18  A.   No.
19  Q.   Then I won't make that part of the record.
20      I've got that.
21          I understand that you have with you
22      today a number of claim files that you or your
23      staff have reviewed; is that correct?
24  A.   Almost.  We've got a number of Claimant files,
25      the physical files which were requested by

Page 7

1   Speights —
2        MR. RESTIVO:  We do not have, Anne,
3   because I was going to look at it once you
4   identified the numbers you were going to talk
5   about, we do not have the actual claim file
6   material for the four claims you identified.
7        Dr. Lee does have information on his
8   spreadsheet with respect to those claim
9   numbers, but because they were not included in
10  the Speights & Runyan document request, they
11  never ended up in the two boxes of claim files
12  we have here.
13       MS. KEARSE:  Okay.  Jim, is there a
14  way — you know, I don't want to prolong it or
15  reopen a deposition, or I could even do a quick
16  deposition on those four.  I was under the
17  impression you would have all of those there
18  today, but maybe I had it wrong as well, but
19  that's what we were told, we didn't really have
20  to renotice anything in order to participate.
21       I can go forward, but I probably
22  would at least like to have what the doctor and
23  his office actually have in their possession
24  regarding the claims and probably be given an
25  opportunity, very briefly, again, by telephone,

Page 8

1   to make some inquiries about that, because I do
2   have some questions specifically about those
3   four.  That's why I was going to short circuit
4   everything.
5        Is that going to be a problem?
6        MR. RESTIVO:  I don't think so.  I
7   mean I'm not answering you because I don't have
8   the claim files here.  I think what you are
9   requesting is Dr. Lee should dig out those four
10  claim files.  I'm requesting, Doctor, you send
11  a copy to me so I know what it is people are
12  talking about, and then I will engage with you,
13  Anne, on perhaps having a quick telephonic
14  deposition limited to whatever's in those four
15  claim files.
16       MS. KEARSE:  Right.
17       MR. RESTIVO:  And, again, we would
18  have brought them if someone would have
19  specifically asked us.
20       MS. KEARSE:  Okay.  I thought you
21  were going to have all the data that backed up
22  these reports, but we can work that out again,
23  and it shouldn't take very long, and I'll still
24  go through what I have and see how far we can
25  get, and if there's some specific things that

Page 9

1   the doctor would have to rely on what's in the
2   files, then I would like to open that up for a
3   brief deposition.
4        MR. RESTIVO:  All right.  With the
5   same ground rules?  Off the record.
6        ----
7   (There was a discussion off the record.)
8        ----
9        MS. KEARSE:  I'd also like to, for
10  the record, in an earlier deposition there was
11  a request for the amount of time and money you
12  received from W.R. Grace in relation to those
13  product ID charts, any such information I'd ask
14  also be provided to Motley Rice counsel as
15  well.
16       MR. RESTIVO:  We will similarly take
17  your request under advisement.
18  BY MS. KEARSE:
19  Q.   And in addition to that, I don't know if this
20      question was asked, Dr. Lee, can you estimate
21      for me how much money you have made from W.R.
22      Grace in asbestos litigation matters since the
23      first time you consulted with them?
24  A.   No.
25  Q.   Have you ever been asked to calculate that?

3 (Pages 6 to 9)

Richard J. Lee, Ph.D.    February 14, 2007

Page 10

1     A.  I've been asked how much money I've made in
2         asbestos litigation.  I think I've been asked
3         most of the questions, but I would have no way
4         of finding that out.
5     Q.  Have you been asked to specifically address the
6         question about how much money you have made
7         from your consulting with W.R. Grace?
8     A.  I don't believe so.  I can't -- I don't
9         remember, frankly, but I don't -- not that I
10        remember, let me put it that way.
11    Q.  Let me ask you this:  When did you first start
12        working with W.R. Grace?
13    A.  Probably the latter part of the '80s.
14    Q.  And can you give me a rough estimate of the
15        percentage of time that you have worked on W.R.
16        Grace matters?
17    A.  I really can't.
18    Q.  Doctor, you referred to a protocol earlier.  Do
19        you actually have a protocol that's written out
20        that you used in order to look at the data and
21        work on these spreadsheets and reports?
22    A.  We had -- we had -- I think if you look in our
23        report, I put down the synopsis of the
24        procedure, protocol that we used.
25    Q.  But prior to this report dated January 17th,

Page 11

1         2007, while you were going through the analysis
2         and the methods you were going through, do you
3         have a protocol that gives guidance on the
4         material?
5     A.  I think the answer is -- I guess the answer is
6         I don't recall from when we started.  I know we
7         had tried a number of forms and laid out
8         definitions and, you know, for the various
9         categories we were going to consider, and I
10        think those were on some kind of paper.  I
11        don't know that we ever classified it as one of
12        our protocols, you know, that we would have in
13        the standard operating procedure.
14    Q.  Do you have a file that you could go to that's
15        just pretty much this W.R. Grace product ID
16        project that you did on behalf of -- in a
17        bankruptcy setting?
18    A.  For this case?
19    Q.  Yes.
20    A.  Yes, we would.
21             MS. KEARSE:  Counsel, any objection
22        to producing that file?
23             MR. RESTIVO:  I don't know what's in
24        it, so I certainly would not agree to produce
25        it.  If you are requesting it now, I will find

Page 12

1         out what it is, see whether it's relevant or
2         privileged and take under advisement your
3         request.
4              MS. KEARSE:  Okay.  I hereby request
5         that file.
6     BY MS. KEARSE:
7     Q.  Dr. Lee, aside from that file, within I guess
8         your organization, would the Mr. Potter and I
9         believe it was a Ms. Christina --
10    A.  Yes.
11    Q.  -- would they have separate files in regard to
12        this case as well?
13    A.  No.
14    Q.  It would all be located in one case file?
15    A.  Yes.  Just by way -- the vast majority of that
16        file is actually a claim document, and there's
17        like 45 boxes of those documents.
18    Q.  And, I told counsel I'm not looking for any of
19        that claim documents but --
20    A.  I think you just make that clear in your
21        letter, so I don't get requested to copy 45
22        boxes of stuff.
23    Q.  Dr. Lee, within that file, would that have
24        various iterations of what classifications you
25        were looking at?

Page 13

1     A.  I would doubt it.  I can check.  You know, I
2         would have been working on those as drafts.
3     Q.  To the extent all that's in the file, we have
4         an outstanding request to review that.
5              Dr. Lee, let me just clarify a couple
6         of things.  You've done no independent analysis
7         of any of the samples in this case?
8     A.  That's correct.
9     Q.  Dr. Lee, in the past, you'll agree with me that
10        when you've consulted with Grace, you've
11        typically looked at bulk samples; is that
12        correct?
13    A.  To the extent there is a typical, I've done
14        both, but certainly I've done a lot of bulk
15        analysis for Grace.
16    Q.  Do you know how many, over your career, how
17        many bulk samples you've reviewed for Grace?
18    A.  No, I do not.
19    Q.  Do you have an idea of how many bulk samples
20        you've reviewed within your career, regardless
21        of who asked you to do that?
22    A.  No.
23    Q.  Would you have anything in your office that
24        would help calculate it?
25    A.  No, I don't think I would have any way of

4 (Pages 10 to 13)

Richard J. Lee, Ph.D.    February 14, 2007

## Page 14

1    knowing. That's not a record we would keep or
2    compile.
3    Q.    I just didn't know if maybe it was in a
4    brochure somewhere or —
5    A.    Are you waiting for an answer from me?
6    A.    No, no, no, I'm cutting out some things I don't
7    need to ask you.
8    A.    That's okay. I was just checking.
9    Q.    Doctor, if I'm correct from your report and
10    your prior testimony, you actually reviewed
11    data for 15,000; is that correct?
12    A.    That's correct.
13    Q.    And it's my understanding you reviewed the data
14    for 15,000 samples under the assumption that
15    the Claimants were alleging all 15,000 samples
16    were W.R. Grace products; is that your
17    understanding?
18    A.    Well, not quite. We reviewed data, we reviewed
19    the data that was — the decision — the
20    request to us was to evaluate bulk sample data
21    as a part of Claimants files and determine
22    whether or not it provided evidence of W.R.
23    Grace product in the building, in the various
24    buildings.
25    Q.    But did you do that under the assumption that

## Page 15

1    Claimants were alleging that those samples were
2    W.R. Grace products?
3    A.    Under the assumption that they had provided
4    those in support of their claims, and generally
5    they had the product alleged, so I think it was
6    necessary that you at least sort out and say
7    this — like in your first claim, the product
8    alleges MonoKote-3, but there was floor tile
9    and so on, that at least that was not the
10    product.
11    Q.    Who told you to go about it that way?
12    A.    Well, this was done in discussions with the
13    attorneys. I don't think anyone told me. I —
14    they asked — they said we would like you to
15    review the information. We took a look at some
16    initial claims and said here's — here's the
17    kinds of things we think we are going to be
18    able to say and about these individual samples,
19    and the decision was made that that's what we
20    should do.
21        MR. RESTIVO:  Anne, Jim Restivo, we
22    understood, and I'm not trying to testify for
23    Dr. Lee, but to move this along —
24        MS. KEARSE:  Are you sure?
25        MR. RESTIVO:  — what we, the

## Page 16

1    attorneys, understood was that the Claimants
2    were to provide information establishing the
3    product, and so at least the attorneys, to the
4    extent that a bulk sample was provided by a
5    Claimant, yes, Dr. Lee's organization was asked
6    to look at the bulk sample information provided
7    because it came in with the claim form, and we
8    thought that's what the claim form was asking
9    for.
10    BY MS. KEARSE:
11    Q.    And just to be clear, Doctor, you are not going
12    to opine that the Claimants were claiming these
13    nonsurface materials were, in fact, Grace
14    products, are you?
15    A.    No, I — I'll testify to what we analyzed and
16    what I have concluded.
17    Q.    Let me ask it this way:  Without even looking
18    at the first piece of paper or claim form,
19    would you agree with me that you could have
20    advised counsel that if it's not surface
21    material, it's not W.R. Grace?
22    A.    Well, I think that — I think the attitude is
23    insofar as any information I've been provided
24    related to asbestos-containing materials,
25    building products, if it were floor tile,

## Page 17

1    ceiling tile or other nonsurfacing, we would
2    put it in a non-Grace category.
3    Q.    But it could have saved a lot of work on your
4    part just to say a nonsurface material is not
5    Grace; correct?
6    A.    Well, I think that's, you know, that's sort of
7    an administrative matter more than anything
8    else. The primary time that gets consumed in
9    reviewing files is, in fact, validating that
10    you haven't missed anything and that what data
11    you've got is entered properly.
12        When you start — when you start
13    doing sort of half measures, even if you would
14    have said this is not, you would still have had
15    to catalog them somehow. I think that what we
16    did was far and away the most efficient
17    utilization of time but still permitted
18    conclusions to be drawn.
19    Q.    Well, are you aware that you reviewed a lot of
20    data for claims that W.R. Grace isn't even
21    objecting to product ID?
22    A.    I have no idea about that.
23    Q.    Would you agree with me that your report does
24    indicate that 51 percent of the samples or data
25    that you reviewed was for nonsurfacing

A. William Roberts, Jr. & Associates  (800) 743-DEPO

Richard J. Lee, Ph.D.    February 14, 2007

## Page 18

1 products; correct?

2 A. Yes.

3 Q. And would you agree with me that another

4 probably sweeping suggestion could be that if

5 you've got a bulk sample analysis that only

6 shows that asbestos is in the product, that you

7 would find that an insufficient basis to opine

8 one way or the other that it's a Grace product?

9 A. Unless it was either very high or very low,

10 then I could conclude it's most likely not a

11 Grace product.

12 Q. And would you have a range of your high/low?

13 A. No. I think we went through that before, and,

14 you know just as a general rule, if it's more

15 than twice the product formula or less than

16 half, you can start to say that most

17 laboratories will get it right within that

18 boundary.

19 Q. In your analysis about 35 percent of the claims

20 were insufficient information because it didn't

21 have the additional constituents other than

22 asbestos; correct?

23 A. Yes.

24 Q. And you state that 10 percent of the surfacing

25 material and results didn't match Grace. Do

## Page 19

1 you know how many claims, buildings that

2 represents?

3 A. No, I do not.

4 Q. Is there any way you could calculate for me

5 what the percentage of claims that just out of

6 the surface material that had sufficient data

7 to enable you to opine one way or the other as

8 to whether it's Grace?

9 A. Well, if — I think this — I think the answer

10 is about 20 percent of the surfacing claims —

11 I'm sorry, what was your question again? I'm

12 sorry, I'm looking at a spreadsheet here trying

13 to figure out whether I can answer your

14 question.

15 Q. Okay. Let me do it this way. You went through

16 the analysis based on 15,000 bulk sample

17 materials, okay. If I do the analysis from —

18 take those claims that were surface materials

19 with sufficient data, what percentage out of

20 that population would you be able to opine as

21 to whether or not it was a Grace product?

22 A. I don't know the answer to that.

23 Q. Is that something you could calculate for me?

24 A. I'm not sure. I'm sure I could go through and

25 do it with sufficient time, but I'm — I don't

## Page 20

1 know that I can —

2 Q. Okay. Well maybe that's something we can work

3 on down the road if we have to.

4 A. Yeah.

5 Q. All right. Doctor, I'm going to give a little

6 bit of scope of where I'm going with my four

7 claims and why I'm just going to concentrate on

8 them. For a number of my Claimants, you found

9 samples that were, quote, not inconsistent with

10 a Grace product; right? You found that

11 generally. You don't know which ones are mine,

12 which ones are not?

13 MR. RESTIVO: He really doesn't.

14 Q. There's a number of my Claimants in which you

15 found that the samples were not inconsistent

16 with a Grace product.

17 A. Okay. I had for you 3406, 3515, 6941, and the

18 last one I seem to have gotten the number

19 wrong.

20 Q. It's 6941.

21 A. 27 something?

22 MR. RESTIVO: Well, the number was

23 wrong, 2977 I think is what she's talking

24 about.

25 Q. Yeah, 2977. Let me do it this way because I'm

## Page 21

1 going to go over the ones I'm really not going

2 to talk about today except to say we are not

3 going to talk about them, but I'll give you an

4 example, how's that.

5 No. 3405, you found that samples that

6 were not inconsistent with a Grace product?

7 A. This is the Fargo housing —

8 Q. I'm just using this as a way of example so I

9 can get to the four we need to talk about.

10 A. Okay. Yeah.

11 Q. And let me just ask you this, when you use this

12 not inconsistent with a Grace product, is it

13 okay to infer that that item would be

14 consistent with a Grace product?

15 A. Well, it's trying to keep that sharp. It is

16 consistent within the analysis provided, but

17 not inconsistent is really somewhat different

18 in that it only means that the information we

19 have is — falls within the Grace product

20 formula, but there may well be, to make an

21 identification, with you may well need more

22 information.

23 Q. Right, but really if it's not inconsistent,

24 it's somewhat consistent with?

25 A. Yeah, the data you have is not inconsistent.

A. William Roberts, Jr. & Associates  (800) 743-DEPO

Richard J. Lee, Ph.D.   February 14, 2007

Page 22

1    Q.   We are getting double negatives in there, so
2    trying to make it a little easier.
3         So would you agree with me that your
4    report states and you've opined today when you
5    say it's, quote, not inconsistent with a Grace
6    product, that you do mean that it possibly is a
7    Grace product?
8    A.   It -- I would mean it could possibly be a Grace
9    product.
10   Q.   And you were not asked to make conclusive
11   opinions as to whether or not they are, in
12   fact, Grace product; correct?
13   A.   That's not true.
14   Q.   That's not true?
15   A.   I am asked to make a conclusive opinion where
16   there's sufficient data where it's not a Grace
17   product, which I can do, and it's not really
18   not a Grace product, it's --
19   Q.   Let me clarify that.  For those cases and
20   samples that you've stated are, quote, not
21   inconsistent with a Grace product, for those
22   samples, you have not been asked to make any
23   more conclusive opinion as to whether, in fact,
24   they are a Grace product or not; correct?
25   A.   That's correct.  We are looking at a comparison

Page 23

1    with the results of the analysis with product
2    formula.
3    Q.   And you'll agree with me based on that
4    information we have today, additional
5    information, such as sales records, applicator
6    testimony or other such information may assist
7    in whether or not those are actually Grace
8    products within those buildings; correct?
9    A.   Well, I think it's just beyond the scope,
10   beyond my scope.  It's --
11   Q.   That would be a fair analysis of some further
12   steps you could take to state whether or not
13   there is a Grace product in the building;
14   correct?
15        MR. RESTIVO:  I'm going to object to
16   the form of the question, and I would ask you
17   to make it clearer.  Are you asking for his
18   expert opinion on that question?  And if so, I
19   object because that's not his area of
20   expertise.
21   BY MS. KEARSE:
22   Q.   Okay.  You have no opinion as to whether or not
23   additional information, such as sales records,
24   could help someone actually determine whether
25   or not it's a Grace product within the building

Page 24

1    in addition to what you have done in your
2    analysis to say it's not inconsistent with a
3    Grace product?
4    A.   Well, I think my analysis and my opinion is
5    based solely on the data.  To the extent that
6    you go beyond that, it really falls outside the
7    range of what I'm asked to do or what I do do.
8    Q.   So one way or the other, if there's a sales
9    invoice to a particular job that you've
10   actually looked at samples for, you don't look
11   at that material?
12   A.   Well, I don't know that I don't look at it, but
13   I don't rely on it.
14   Q.   Have you requested such information from W.R.
15   Grace in any of these claim files in this case?
16   A.   No.
17   Q.   And for the record, the reason I'm going to
18   limit my questioning to the four claims that I
19   asked for earlier -- 2977, 3406, 3515 and
20   6941 -- is that it's my understanding that W.R.
21   Grace did not object on a PID basis to those
22   claims, so if that's stated for trial, I don't
23   need to go into any other ones except the ones
24   they raise an objection to, which is why I'm
25   focusing on those four claims, just so you know

Page 25

1    that's why I'm going there.
2         MR. RESTIVO:  And I am not going to
3    concede what you just said because I don't know
4    one way or the other whether or not as to your
5    other claims what the objections were, but I
6    don't think you are asking me to do that, but
7    so the record's clear, I don't know whether you
8    are right or not.  Whatever the objections are,
9    they are, and the record will speak for itself.
10   I just simply don't know what they are.
11        MS. KEARSE:  And I agree, and I did
12   e-mail Cameron yesterday to make sure I'm clear
13   on that.  I've gone through all the objections,
14   and for this phase of the proceedings, it's my
15   understanding I only need to really provide
16   information based on your objections to support
17   my claim, but I agree, if we somehow -- if you
18   are going to raise new objections in substance,
19   I would ask the record to reflect that I would
20   reopen the deposition based on new objections,
21   otherwise that's pretty much where we are.
22   BY MS. KEARSE:
23   Q.   And, Doctor, I think we clarified, you'll agree
24   that your testimony is limited to laboratory
25   data; is that correct?

7 (Pages 22 to 25)

A. William Roberts, Jr. & Associates  (800) 743-DEPO

Richard J. Lee, Ph.D.    February 14, 2007

## Page 26

1   A.  Yes.
2   Q.  In preparation for this case, you have not
3       reviewed any W.R. Grace specific documents
4       other than the recipes you referred to in your
5       report, or the formulas?
6   A.  That's correct.
7   Q.  And you have not been asked to testify in this
8       matter as to any square footage in buildings
9       that have products consistent with W.R. Grace,
10      have you?
11  A.  That's correct.
12  Q.  Is there a way to calculate on a per sample
13      basis what it cost you to review this data?
14  A.  I don't think there's a fair way.
15  Q.  In your expertise, an estimate of such?
16  A.  No, because, you know, like I don't know, 50
17      percent of them was a matter of a data entry
18      point and the answer is obvious, and for one
19      reason or another they weren't, so I don't
20      think there's any way an average would make any
21      sense.
22  Q.  I was just wondering if in 15,000 bulk samples
23      there was any way to make a determination of
24      amount of time for each sample.
25  A.  I think you can make whatever division people

## Page 27

1       want, but I don't think it's -- it's one of
2       those cases where the bulk of the time gets
3       spent on a limited portion of the data.
4   Q.  Okay. That's fair. Now, for the four cases
5       that I've asked to pull, which I know you don't
6       have but you've got some of your data with you,
7       do you know when you received the files and
8       data for those four cases? And, again, it's
9       claim 2977, 3406, 3515 and 6941.
10  A.  I do not.
11  Q.  Would that be something in your files today?
12  A.  It may be under some kind of chain of custody
13      or something like that.
14  Q.  And with each one of those cases, would you
15      also be able to determine who actually reviewed
16      a file in order to document the analysis and
17      data?
18  A.  Well, the people that would have reviewed the
19      file, primary people would be Mike Potter, and
20      I'm not sure if we could identify the typist or
21      data entry person or not.
22  Q.  Is there any worksheet for each file that
23      someone would fill out and then it would be put
24      into a database?
25  A.  No. Each file is -- would have been reviewed

## Page 28

1       and information picked off and entered.
2   Q.  And entered simultaneously with that?
3   A.  Yeah, contemporaneously.
4   Q.  You can tell how computer literate I am. Write
5       it down on a piece of paper and give it to
6       someone.
7           Dr. Lee, with all the bulk sample
8       analysis that you did and building names, did
9       you do any match within your company as to what
10      independent work you may have done on some of
11      those samples in the past?
12  A.  We did not.
13  Q.  Is that something you could do?
14  A.  It's -- in theory, but I don't know the
15      practicality of it.
16  Q.  And I'm just curious for the four Claimants
17      that I have, maybe for some reason you have
18      looked at bulk sample analysis on those cases
19      before, and to the extent you found it was
20      insufficient information, you may have, in your
21      own file, additional constituent analysis that
22      may help with the additional data, and that's
23      why I'm asking if there was some way to go
24      about doing that.
25  A.  Not that I know of, but I can't -- I really

## Page 29

1       don't know.
2   Q.  Okay. Well, what I'll do, and I'll just
3       request on the off chance that your
4       organization has done any prior work on bulk
5       sample analysis with the four buildings that
6       I've mentioned, that we be provided that
7       information. Is that fair?
8           MR. RESTIVO: Well, it's fair that
9       you ask. I don't think it's a fair request.
10          MS. KEARSE: Well, to the extent you
11      have additional information that Dr. Lee has
12      regarding these Claimants, I think it's a fair
13      request.
14          MR. RESTIVO: Well, if your request
15      requires Dr. Lee's organization to pour through
16      contractual commitments with a whole bunch of
17      other folks in order to try to identify a
18      building, we will take the position that that
19      is not a fair request, and it's too difficult
20      and burdensome --
21          MS. KEARSE: I will work with you on
22      that, and that's why I was asking the doctor.
23      It could be as simple as plugging in a name,
24      and it may not be. So to the extent it's
25      accessible on that and you have it, I do

A. William Roberts, Jr. & Associates  (800) 743-DEPO

Richard J. Lee, Ph.D.   February 14, 2007

|  | Page 30 | Page 32 |
|---|---|---|

**Page 30**

1  request it. I think if it's an overburdensome
2  thing, then I think, Jim, you and I can talk
3  about it.
4      MR. RESTIVO: I mean I am willing to
5  ask Grace whether or not to its knowledge one
6  of these buildings was involved in a claim or
7  in litigation where Dr. Lee's organization may
8  have been provided with bulk samples. My
9  question is Grace would know if they have seen
10  one of these buildings before, and that might
11  help Dr. Lee determine what data he has.
12      MS. KEARSE: I think that's fair.
13      MR. RESTIVO: But, you know, any
14  other clients he had, we are just taking on
15  more than I think we ought to ask the good
16  doctor to do.
17      MS. KEARSE: I agree. It's just four
18  Claimants, and to the extent that you've got
19  data there and we can determine that it's
20  accessible, we can work on it that way. I
21  think that's a fair way to do it, Jim.
22  BY MS. KEARSE:
23.  Q.  All right. Doctor, I'm going to the individual
24  Claimants, and we'll see based on what you have
25  if you can answer these or not.

**Page 31**

1      First I'll start with the American
2  Legion, which is 3406.
3  A.  Okay. Let me -- I've got the summary on the
4  spreadsheet. I'll pull it up.
5  Q.  Okay.
6  Q.  Are you looking at your spreadsheet on a
7  computer?
8  A.  Yes, I am.
9  Q.  And is that the same spreadsheet that we were
10  produced with by a CD?
11  A.  Yes.
12      MR. RESTIVO: With the exception as
13  stated in the earlier testimony that the
14  spreadsheet he is looking at on his computer
15  also has an entry to designate the claim file
16  that Speights & Runyan asked to be brought
17  today, which files were brought, you do not
18  have that designation I do not believe on your
19  spreadsheet.
20  Q.  Okay. Doctor, you let me know when you are
21  ready.
22  A.  I've got it.
23  Q.  Are you able to tell from that spreadsheet what
24  you were actually provided in regards to the
25  American Legion claim?

**Page 32**

1  A.  Relative to this, we were provided, you know,
2  the address, the lab report, the name of the
3  laboratory --
4  Q.  Any time you need a break, you let me know.
5  A.  Yeah, summary of analysis sheets, and then the
6  actual results of analysis, plus there may have
7  been asbestos surveys. These may have been
8  attached to asbestos surveys or other, and that
9  information I don't have here.
10  Q.  Were you shown any sample analysis that showed
11  that the samples contained vermiculite?
12  A.  No.
13  Q.  And it's my understanding that you are not
14  ruling out that it's not a Grace product, you
15  just can't say one way or the other?
16  A.  Well, I'd say there's insufficient data, but if
17  you took the laboratory analysis at face value,
18  it's got too much asbestos for a Grace product,
19  but without having any information about the
20  particular laboratory that did the work and
21  their reliability, I think it's a little bit
22  fairer to say there's insufficient data.
23  Q.  Were you provided with any internal Grace
24  documents that actually list the American
25  Legion building as a recent plaster job?

**Page 33**

1  A.  Not to my knowledge.
2  Q.  Doctor, in your work over the years in regards
3  to various fireproofing and acoustical
4  plasters, would it be common for acoustical
5  plasters to often get painted if they are on a
6  ceiling?
7  A.  I'd say more often than not, but I don't know
8  is probably the best way to describe it.
9  Q.  Is there any particular constituents you would
10  expect to find if you had painted zonolite
11  acoustical plaster?
12  A.  I don't understand the question.
13  Q.  You've got your formula and your analysis for
14  zonolite acoustical plaster?
15  A.  Right.
16  Q.  If an acoustical plaster had paint on it, what
17  additional constituent would you expect to
18  find?
19      MR. RESTIVO: Your assumption is that
20  the bulk sample includes not only the
21  acoustical plastic, but also the painted?
22      MS. KEARSE: Yes.
23  Q.  Well, let me ask this this way, Doctor: Is it
24  possible that a sample that contains both
25  acoustical plaster and painted?

9 (Pages 30 to 33)

A. William Roberts, Jr. & Associates  (800) 743-DEPO

Richard J. Lee, Ph.D.    February 14, 2007

## Page 34

1  A.  The bulk samples, sure.

2  Q.  And a bulk sample where you've got acoustical

3      plaster and painted, what additional

4      constituent would you expect to find generally?

5  A.  Generally you would just see the paint as a

6      surface layer separate from the bulk.

7  Q.  Would you include the surface layer in your

8      analysis?

9  A.  We would report the surface layer in the

10     description, not in the analysis.

11  Q.  Is there a way that you can tell whether or not

12      a lab, from the data that you reviewed, would

13      have made that distinction as well?

14  A.  No.

15  Q.  Doctor, if Grace does have files that support

16      the proposition that a Grace product was

17      applied in the American Legion building, that's

18      not something you necessarily would look at; is

19      that correct?

20  A.  That's not something I would have relied on.

21  Q.  All right.  For the American Legion building,

22      what I'm going to request is that I get a copy

23      of the file, that I know exactly what you did

24      have in there.

25          Doctor, in your —

## Page 35

1          MR. RESTIVO:  Wait a second.  What's

2      your request on that?

3          MS. KEARSE:  What we talked about

4      earlier, just so I actually have the file he

5      has on American Legion since we didn't pull it

6      here.

7          MR. RESTIVO:  Well, the file he has

8      on American Legion is the claim material you

9      presented with the claim.

10          MS. KEARSE:  Well, I think it's not

11      clear whether or not he's got everything that

12      was submitted with the claim or just the bulk

13      sample analysis and the claim.  That's all I'm

14      asking.  Jim, that just goes to our earlier

15      discussion on pulling the file so I can look at

16      them to see if it was everything or just parts.

17  BY MS. KEARSE:

18  Q.  Doctor, do you know within the American Legion

19      file what products the Claimant was putting the

20      claim in for?

21  A.  Which — that is the —

22          MR. RESTIVO:  She's still on 3406.

23  A.  That's the 3406 one we are talking about?

24  Q.  Yes.

25  A.  Vermiculite acoustical plastic.

## Page 36

1  Q.  Okay.  Let's go ahead to 3515.  I did say I'd

2      try to limit it to an hour.  I didn't check

3      what time I started so —

4          MR. RESTIVO:  You got three minutes

5      left.

6  A.  3515?

7  Q.  3515.

8  A.  Okay.  Catholic Diocese.

9  Q.  And, again, Doctor, can you tell me what you

10      were provided in regards to the claim?

11  A.  The product, the name, location of the

12      building, the bulk characterization from — and

13      the name of the laboratory, the product alleged

14      in the claim file, and then the polarized light

15      microscopy analysis.

16  Q.  And what's your understanding of what the

17      Claimant has alleged are the Grace products?

18  A.  MonoKote-3.

19  Q.  And it's my understanding that you concluded in

20      at least 2 samples you had insufficient data;

21      is that correct?

22  A.  That's correct.

23  Q.  And as to the nonsurface samples, you'll agree

24      that those are non-Grace products; correct?

25  A.  That's correct.

## Page 37

1  Q.  And can you tell me if the 2 samples you

2      reviewed came from the fireproofing material?

3  A.  It says spray applied, but does not indicate

4      specifically whether it's fireproofing or not.

5  Q.  It's in the data sheets or the data that was

6      provided to you, it did have such language that

7      the sample was from what was described as

8      fireproofing material, would you note that in

9      your —

10  A.  Yes.

11  Q.  I'm sorry, was that yes?

12  A.  Yes, assuming nobody screwed up.

13  Q.  Okay.  And just by way of example, Doctor, and

14      I'm not suggesting any one, but if I've got a

15      sample — and this is an example in the

16      Catholic Diocese.  I know you don't have the

17      actual document in front of you — but I do

18      have a sample CD 10300/0S015.  Is that number

19      within your database?

20  A.  Yes, it is.

21  Q.  And on that same data sheet I do have an

22      indication it was sprayed-on fireproofing with

23      that?

24  A.  Okay.

25  Q.  That's not in your —

A. William Roberts, Jr. & Associates  (800) 743-DEPO

Richard J. Lee, Ph.D.    February 14, 2007

## Page 38

1  A.  Well, in mine it's called spray applied.
2  Q.  Does that have any bearing one way or another
3      in your analysis?
4  A.  No.  It made -- I made the presumption that it
5      was fireproofing.
6  Q.  In my data you refer to this group sample as
7      having a nonasbestos component.  Does that mean
8      that it only had asbestos or what does it mean?
9  A.  There were two categories, asbestos and
10     everything else.
11 Q.  And these I believe say nonasbestos component?
12 A.  Not specified.
13 Q.  Okay.
14 Q.  And within the Catholic Diocese of Little Rock,
15     have you been provided any documents that
16     actually reference the sale of MonoKote for
17     this building?
18 A.  Not to my knowledge, but I'd -- to be specific,
19     I'd have to look at the file.
20 Q.  As we sit here today, you do not recall?
21 A.  No, I don't recall.
22 Q.  To the extent you were provided any of those
23     type of documents, would they be referenced in
24     your spreadsheet?
25 A.  No.

## Page 39

1  Q.  They would not?
2  A.  No.  The only thing referenced in the
3      spreadsheet is the information relative to the
4      samples.
5  Q.  Do you recall in any of the prior -- I know you
6      went through the classifications.  Was there
7      ever a column for internal Grace documents
8      reflecting a product in a building?
9  A.  No, I don't think so, because we were only
10     asked to deal with laboratory work.
11 Q.  And am I correct then you are not prepared to
12     give testimony one way or the other whether or
13     not MonoKote is actually present in the
14     building; correct?
15 A.  Beyond that, beyond the information in the
16     laboratory analysis provides as to the
17     possibility of it being present, that's what
18     I'll testify to.  So in this case I would, for
19     example, say there is no evidence that MonoKote
20     is present in the building based on the
21     laboratory work.
22 Q.  But you are simply saying based on the
23     laboratory work.  You can't say one way or the
24     other whether or not it was there; correct?
25 A.  No, it's a little bit stronger than that it's

## Page 40

1  actually based on the laboratory work.  There's
2  no evidence that it is there, and to some
3  extent there's some -- there's some indication
4  that it is not Grace MonoKote, but I don't
5  think the data is strong enough to render that
6  opinion.
7  Q.  So we are on the same page, you are not
8      prepared to opine one way or the other that
9      it's a Grace product or not in the Catholic
10     Diocese of Little Rock; correct?
11 A.  Yeah, that's --
12     MR. RESTIVO:  I think that's been
13  asked and answered.  In any event, we intend to
14  put on this witness' expert testimony that one
15  cannot conclude on these two bulk samples, from
16  those two bulk samples that it is a Grace
17  product.  That is the testimony that is in his
18  report and the testimony that we will introduce
19  at trial, which is I believe stronger than --
20     MS. KEARSE:  I know.
21     MR. RESTIVO:  Just so you know
22  exactly where we are coming from.
23     MS. KEARSE:  I know where you are
24  coming from.  I want to know exactly where the
25  doctor is coming from and if I ask the question

## Page 41

1  a different way.
2  BY MS. KEARSE:
3  Q.  At least today, though, Doctor, you cannot say
4      W.R. Grace's product was not in that building;
5      is that correct?
6  A.  That's correct.
7  Q.  And, Doctor, if you were shown any documents
8      that reference the sale of MonoKote to those
9      buildings, does that give you any more
10     information that would help in your
11     determination of whether or not Grace's product
12     is actually in the building?
13 A.  No, because it's really outside the range of
14     things that I was asked to do or do in
15     practice.
16 Q.  In fact, you are limited to one focus, and
17     that's whether or not you got a lab report and
18     whatever it states on that piece of paper;
19     correct?
20 A.  That's correct.
21 Q.  But you agree with me if there's additional
22     information out there, that could be beneficial
23     for someone to determine whether or not Grace
24     product is actually there; correct?
25     MR. RESTIVO:  Asked and answered.

11 (Pages 38 to 41)

Richard J. Lee, Ph.D.    February 14, 2007

Page 42

1    MS. KEARSE: I don't think it's been
2    asked.
3    MR. RESTIVO: He told you that's not
4    his area of expertise.
5    MS. KEARSE: He's not going to
6    testify about it, but I'd like an answer to my
7    question.
8    THE WITNESS: I think the answer is
9    that's just beyond the scope of my testimony.
10    MS. KEARSE: For the Catholic
11    Diocese, I'll make the same request, if I could
12    just have a copy of the file that actually was
13    reviewed in order to do the analysis, I'd
14    appreciate that.
15    BY MS. KEARSE:
16    Q.    All right. Doctor, we've got the CHP, which is
17    2977. Just let me know when you have it.
18    A.    I got it.
19    Q.    And you'll agree with me if it's a nonsurface
20    material, we are not going to deal with it;
21    correct?
22    A.    Okay.
23    Q.    And from your review of the data, you looked at
24    3 samples that you'll agree with me were
25    surface materials?

Page 43

1    A.    Yes.
2    Q.    And would you agree with me they are referred
3    to as sprayed-on fireproofing? Is that in your
4    data?
5    A.    They are listed as spray applied here in my —
6    on my summary.
7    Q.    What's your understanding of what product is
8    being claimed in —
9    A.    MonoKote 3.
10    Q.    And is it correct the data you had only
11    identified the asbestos content?
12    A.    Yes.
13    Q.    And this, like other samples, for all you know,
14    they could have contained vermiculite, but the
15    only thing that was recorded was the asbestos
16    content; is that correct?
17    A.    That's correct, and this is another good
18    illustration where if you take the data at face
19    value, one of the samples is — suggests it's
20    not a Grace product, but given the overall lack
21    of availability, we just classified it as
22    insufficient data.
23    Q.    What specific sample are you referring to in
24    that?
25    A.    That is the — it's sample identified is

Page 44

1    01-03 — 01-02. It shows, if my — I don't
2    have a typo, it shows as having .05 percent
3    asbestos on my sheet.
4    Q.    All right. Doctor, let me make sure in this
5    case, similar to the other one, you are not
6    here today to opine with certainty that a Grace
7    product is not there; correct?
8    A.    In the building.
9    Q.    Right.
10    A.    That's right. I'm saying that there's
11    insufficient information in general, and one,
12    if you take data at face value, at least one of
13    the samples it would indicate it would not be
14    there.
15    Q.    And that is the data at face value that you
16    have been provided simply on a laboratory
17    analysis; correct?
18    A.    That's right.
19    Q.    And, again, if there was invoices totaling 810
20    bags of MonoKote that were actually delivered
21    to this building, that would not in any way
22    influence your opinion today?
23    A.    No.
24    Q.    Is that something you just would want to know?
25    MR. RESTIVO: You mean purely on

Page 45

1    interest or as an expert on this assignment?
2    Q.    You can tell me either way. If W.R. Grace has
3    invoices for 810 bags of MonoKote to the Cherry
4    Hill Plaza, is that something you'd be
5    interested in knowing?
6    A.    Well, I don't think that one way or the other
7    it affects this analysis.
8    Q.    So you really don't care if there's 810 bags
9    being delivered there one way or the other?
10    A.    No. What I was asked to do was review the
11    analytical data and give an opinion as to what
12    it does or does not demonstrate.
13    Q.    Is it fair to say that W.R. Grace didn't
14    provide you with any of the invoices showing
15    the sale of MonoKote 3 to this building?
16    A.    I don't know the answer to that. Insofar as I
17    know, we have what's in the claim file —
18    MR. RESTIVO: Do you know whether or
19    not any such invoices were in the claim file,
20    Anne?
21    MS. KEARSE: That's not my question.
22    MR. RESTIVO: Okay. Then we will
23    answer it this way then —
24    MS. KEARSE: I'm asking my question,
25    and that is do you know whether or not W.R.

12 (Pages 42 to 45)

Richard J. Lee, Ph.D.    February 14, 2007

Page 46

1    Grace provided you with any invoices showing
2    the sale of MonoKote-3 for this building.
3         MR. RESTIVO: I'm going to object to
4    the form of that question.
5         MS. KEARSE: Let him answer that --
6         MR. RESTIVO: No, I'm not going to
7    let him answer until you clarify your question.
8    W.R. Grace provided him with copies of these
9    claim files.
10        MS. KEARSE: I can ask him two
11   different ways, okay.
12        MR. RESTIVO: If you are asking
13   independent of the claim files, I think that's
14   a fair question. If you stuck something in a
15   claim file and he happened to get your claim
16   file from Grace, that's a different question.
17        MS. KEARSE: I'll ask it two
18   different ways then.
19        MR. RESTIVO: Okay. That's fair.
20   BY MS. KEARSE:
21   Q.   Doctor, do you know whether or not what's in
22        the claim packages that you received from W.R.
23        Grace, whether or not there were invoices for
24        the sale of MonoKote-3 for this building?
25   A.   I do not.

Page 47

1    Q.   Independent of those claim files, has W.R.
2         Grace provided you with any information or
3         invoices showing the sale of MonoKote-3 to this
4         building?
5    A.   Not that I'm aware of.
6    Q.   Do you know whether or not you were provided
7         with complete claim files or just with the
8         information regarding the laboratory analysis?
9    A.   I do not.
10   Q.   You don't know one way or the other what's
11        contained in the files?
12   A.   Not beyond -- not beyond what we have. I don't
13        know if the entire claim file is there or not.
14   Q.   In your protocol for reviewing this data, was
15        there anything that would have alerted you to
16        that information that such information was in
17        that file?
18   A.   What my -- what we had asked was that the
19        attorneys would go through the claim files as
20        they received them, identify those with bulk
21        sample analysis and provide that information to
22        us. Whether or not that's the whole claim
23        or -- I mean there's a fair amount of stuff
24        that was extraneous for my actual analysis, but
25        whether in all cases that's the whole claim

Page 48

1    file or not, I do not know.
2    Q.   But for your purposes is basically if there
3         was laboratory analysis in there, that's what
4         you would use?
5    A.   That's right.
6    Q.   And, again, similar to the other claim file,
7         I'll request an actual copy of what Dr. Lee had
8         in regards to that Claimant.
9             All right. Last one.
10   A.   Okay.
11   Q.   6941, I'm just going to wait for you to tell me
12        you are there.
13   A.   6941, got it.
14   Q.   Now, in my review of your spreadsheet, it's my
15        understanding that this is part of the
16        Washington Daggy Hall, that you had 3 samples
17        with insufficient data; is that correct?
18   A.   That's correct.
19   Q.   And, again, these are samples that only showed
20        the asbestos content, is that correct?
21   A.   Yes, well, they show a secondary number, but
22        they don't identify.
23   Q.   Do you know where those samples came from?
24   A.   Beyond -- there is probably information in the
25        file that came from environmental health

Page 49

1    services. Do you mean where they were
2    collected in the building?
3    Q.   Yes.
4    A.   No.
5    Q.   What is your understanding this claim is for?
6    A.   For the -- for the product?
7    Q.   Yes.
8    A.   MonoKote-3.
9    Q.   With regard to the Claim 6941, you don't plan
10        to opine that Grace's products was not applied
11        there; correct?
12        MR. RESTIVO: Not applied where?
13   A.   Within the Washington State -- the State
14        University of Washington, Daggy Hall.
15        MR. RESTIVO: Okay. I would ask you
16   to sharpen your question, if I'm looking at
17   right one, because it looks like there's three
18   insufficient data and two wrong components, and
19   there may be testimony obviously with respect
20   to the two wrong components.
21        MS. KEARSE: I'm not asking about
22   that.
23        MR. RESTIVO: That's why I asked
24   please sharpen your question.
25

13 (Pages 46 to 49)

Richard J. Lee, Ph.D.    February 14, 2007

Page 50

BY MS. KEARSE:

1 BY MS. KEARSE:
2 Q. My question centered around the 3 samples with
3 insufficient data, and for those 3 samples, we
4 determined that within those samples you only
5 have them showing how much asbestos was there;
6 correct?
7 A. That's correct.
8 Q. And it's my understanding you don't have enough
9 information one way or the other to say whether
10 Grace MonoKote was applied within that
11 building; correct?
12 A. I think when you extend that term to that
13 building, then the answer is slightly different
14 than when you looked at the sample. In that
15 building you have the other 2 samples which had
16 mineral wool in them. Those samples you can
17 clearly say were not Grace fireproofing.
18     And then you have these other 3 which
19 don't give you any specific information but --
20 as to what the product is, but for which if you
21 draw any generalized inference, you would say,
22 well, the only evidence we have suggests that
23 there is no fireproofing.
24 Q. Would you know in relation to those 5 samples
25 where they were all taken?

Page 51

1 A. I do not at this point.
2 Q. So you don't know if they were samples from
3 something originally installed or something
4 later installed; is that correct?
5 A. No, and I think that's the point in general
6 relative to this material when you try make a
7 proof.
8 Q. Well, let's look at these 3 samples in which
9 you have insufficient data; correct?
10 A. Yeah.
11 Q. You cannot opine one way or the other whether
12 those samples are W.R. Grace products; correct?
13 A. Yeah, I can -- that's true, and beyond that I
14 can opine that there is no evidence in those 3
15 samples that there are -- that that is W.R.
16 Grace product.
17 Q. So you can't opine today that they are not?
18 A. You are exactly right, and I can't opine that
19 there's any information that they are.
20 Q. I like when I'm right. Let me ask, with Daggy
21 Hall, have you been shown any internal W.R.
22 Grace documents regarding the application of
23 MonoKote in that building?
24 A. No, and I answered those within the context of
25 my recollection. I've been doing this for --

Page 52

1 Q. That's fair. But to the extent if they were
2 attached to a Claimant form, that was not
3 something you necessarily looked at in order to
4 do what you were doing on behalf of W.R. Grace
5 in this case; is that correct?
6 A. That's correct, but just a little bit stronger,
7 that's not something I would have looked at
8 because under the normal course I would have
9 people pull the analytical sheets from the file
10 for me to review as opposed to me going through
11 the whole file.
12 Q. Right, and to the extent that's in the files,
13 the people that are reporting to you would not
14 have pulled that for your review; is that
15 right?
16 A. That's right.
17 Q. Is there a way to determine, Doctor, from these
18 files what was actually pulled in order to do
19 the analysis?
20 A. Well, I think you could look at what is
21 documented in the spreadsheet, and that will
22 tell you what was pulled.
23 Q. Did you do any type of audit just to go back to
24 make sure the data was entered correctly?
25 A. We had a three -- well, two-and-a-half step

Page 53

1 audit process. The data was originally
2 verified by an independent person at the data
3 entry or secretarial level. Then it was --
4 each file was independently reviewed by
5 Mr. Potter. Then those files that I found of
6 interest, primarily those files where there was
7 a reasonably complete analysis, were checked by
8 me.
9 Q. And do you have a list of which ones you
10 actually took more of a hands-on approach with?
11 A. I do not.
12 Q. Is there any way to tell from the file which
13 one you had more of a hands-on approach?
14 A. I doubt it. It was much heavier in the early
15 part because we were work -- I spent a fair
16 amount of time trying to sort out how we were
17 going to make sense out of this mass of
18 information.
19 Q. And to the extent that was any part of the
20 protocol in the file there, I guess to the
21 extent we can review that as well?
22 A. Yeah.
23     MS. KEARSE: With that, I'm going to
24 not ask any further questions, and Jim, if we
25 can have copies of the file that Dr. Lee has,

14 (Pages 50 to 53)

A. William Roberts, Jr. & Associates  (800) 743-DEPO

Richad J. Lee, Ph.D.    February 14, 2007

Page 54

1  and anything else I put on the record that I
2  wanted, that would be great.
3       MR. RESTIVO:  Again, I will do what I
4  said I would do.  If you remember, send me a
5  short e-mail; otherwise, what I'll do is I'll
6  wait for the transcript, and then that will
7  remind me what it is I promised to do.
8       I have written down the four files
9  that I'll ask Dr. Lee when he goes back to the
10  shop to send down to me, but to the extent
11  you've asked for something else and you don't
12  want to wait for me to read the transcript, put
13  it in an e-mail to me.
14       MS. KEARSE:  I will, and I will be up
15  there, hopefully you'll have nicer weather up
16  there next week, I'll be in Pittsburgh Monday,
17  Tuesday, well, down in Wheeling Monday, but to
18  the extent there's anything for me to review
19  then, I can certainly do it then too.
20       MR. RESTIVO:  Okay.  All right.  I
21  have no questions.  Again, I would --
22       MR. BARTHOLOMAEI:  I have a question.
23       MR. RESTIVO:  I'm sorry, I apologize.
24       MS. KEARSE:  I'm sorry, who is asking
25  a question?

Page 55

1       MR. BARTHOLOMAEI:  I'm about to say
2  who it is.  It's Mark Bartholomaei from
3  Obermayer, and I represent San Diego Gas &
4  Electric Company, Sempra Energy Company, and
5  Enova Corporation.
6       - - - -
7       EXAMINATION
8       - - - -
9  BY MR. BARTHOLOMAEI:
10  Q.  And, Doctor, I just have one or two questions
11     for you.  This should go pretty quickly, but
12     the claim file that I'm concerned with is No.
13     11308, and I was going to ask you, were you
14     sent any information regarding that claim file?
15  A.  Beyond the -- it does not appear in my
16     spreadsheet.
17  Q.  So you can't testify today whether any W.R.
18     Grace products were at the 101 Ash Street
19     location, San Diego, California?
20  A.  My question is do we have that, 11 --
21  Q.  11308.
22       THE WITNESS:  Is that in there?
23       MR. RESTIVO:  No.  Under the
24  procedure, if when this process was underway
25  someone did not see bulk sample information in

Page 56

1  a particular claim file, that claim file was
2  not sent to Dr. Lee.
3       MR. BARTHOLOMAEI:  I'm just trying to
4  confirm that you have no information and you
5  are not going to offer any testimony about W.R.
6  Grace materials at that location, that's all.
7       THE WITNESS:  I don't think that's --
8  that's right insofar as we sit here today.
9       MR. BARTHOLOMAEI:  Exactly.
10       THE WITNESS:  To the extent someone
11  discovers it and forwards it to me.
12       MR. BARTHOLOMAEI:  Something might
13  happen in the future, but you don't have it
14  sitting here today?
15       THE WITNESS:  That's right.
16       MR. BARTHOLOMAEI:  Thank you, Doctor.
17       MR. RESTIVO:  So the record's clear,
18  sitting here today, Dr. Lee doesn't have any
19  information, and counsel for Dr. Lee doesn't
20  know of any information.  As I stated in the
21  prior deposition, I understand that
22  supplemental information has continued to come
23  in.  I don't know from your client or not --
24       MR. BARTHOLOMAEI:  It's not a trick,
25  I'm just asking.

Page 57

1       MR. RESTIVO:  So you know what we
2  have.  Sitting here today, we don't believe we
3  have any bulk samples from your client.
4       We don't waive signature --
5       MS. KEARSE:  Let me just, if I can
6  just clarify one quick question, is that okay?
7       MR. RESTIVO:  Yeah.
8       - - - -
9       RE-EXAMINATION
10       - - - -
11  BY MS. KEARSE:
12  Q.  Doctor, is there anything else you brought with
13     you today that you have not testified about?
14  A.  No.
15       MS. KEARSE:  Okay.  I just wanted to
16  know what he brought with him today.  That's
17  fine.  Thank you.
18       - - - -
19  (The proceedings were concluded at 2:53 p.m.)
20       - - - -
21
22
23
24
25

15 (Pages 54 to 57)

Richad J. Lee, Ph.D.    February 14, 2007

| Page 58 | Page 60 |
|---|---|
| | |

### Page 58

1  COMMONWEALTH OF PENNSYLVANIA )    CERTIFICATE

2  COUNTY OF ALLEGHENY        )  SS:

3      I, Heidi H. Willis, RPR, CRR, a Court Reporter

4  and Notary Public in and for the Commonwealth of

5  Pennsylvania, do hereby certify that the witness,

6  RICHARD J. LEE, Ph.D., was by me first duly sworn to

7  testify to the truth; that the foregoing deposition

8  was taken at the time and place stated herein; and

9  that the said deposition was recorded

10  stenographically by me and then reduced to printing

11  under my direction, and constitutes a true record of

12  the testimony given by said witness.

13      I further certify that the inspection, reading

14  and signing of said deposition were NOT waived by

15  counsel for the respective parties and by the

16  witness.

17      I further certify that I am not a relative or

18  employee of any of the parties, or a relative or

19  employee of either counsel, and that I am in no way

20  interested directly or indirectly in this action.

21      IN WITNESS WHEREOF, I have hereunto set my hand

22  and affixed my seal of office this 26th day of

23  February, 2007.

24      _____

25          Notary Public

### Page 60

1      AKF REPORTERS, INC.
        AKF Building

2      436 Boulevard of the Allies
        Pittsburgh, PA  15219

3      (412) 261-2323

4

February 26, 2007

5

TO:  James Restivo, Esq.

6

7   RE:  DEPOSITION OF RICHARD J. LEE, Ph.D.,

8      NOTICE OF NON-WAIVER OF SIGNATURE

9      Please have the deponent read his deposition
    transcript.  All corrections are to be noted on the

10  preceding Errata Sheet.

11      Upon completion of the above, the Deponent must
    affix his signature on the Errata Sheet, and it is to

12  then be notarized.

13      Please forward the signed original of the
    Errata Sheet to Anne Kearse, Esq., for attachment to

14  the original transcript, which is in her possession.
    Send a copy of same to all counsel, and also a copy

15  to me.

16      Please return the completed Errata Sheet within
    thirty (30) days of receipt hereof.

17

18

19  Heidi H. Willis, RPR, CRR
    Court Reporter

20

21

22

23

24

25

### Page 59

1  COMMONWEALTH OF PENNSYLVANIA  )  E R R A T A
    COUNTY OF ALLEGHENY        )    S H E E T

2

    I, Richard J. Lee, Ph.D., have read the foregoing

3  pages of my deposition given on February 14, 2007,
    and wish to make the following, if any, amendments,

4  additions, deletions or corrections:

5  Page/Line  Should Read      Reason for Change

6

7

8

9

10

11

12

13

14

15

16

17

18

19

    In all other respects, the transcript is true and

20  correct.

21      _____

            RICHARD J. LEE, Ph.D.

22

    Subscribed and sworn to before me this

23  _____ day of _____, 20_____.

24      _____

        Notary Public

25  AKF Reference No. HW99625