UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

```
IN RE:                    .    Case No.  01-1139 (JKF)
                          .
W.R. GRACE & CO.,         .
et al.,                   .    USX Tower - 54th Floor
                          .    600 Grant Street
                          .    Pittsburgh, PA 15219
              Debtors.    .
                          .    April 9, 2007
. . . . . . . . . . . ..        8:43 a.m.
```

TRANSCRIPT OF HEARING
BEFORE HONORABLE JUDITH K. FITZGERALD
UNITED STATES BANKRUPTCY COURT JUDGE


APPEARANCES:

```
For the Debtors:          Kirkland & Ellis
                          By:  SAM BLATNICK, ESQ.
                               LISA ESAYIAN, ESQ.
                          200 East Randolph Drive
                          Chicago, IL  60601


For the Debtors:          Reed Smith
                          By:  JAMES J. RESTIVO, ESQ.
                               LAWRENCE FLATLEY, ESQ.
                               DOUGLAS CAMERON, ESQ.
                               TRACI S. REA, ESQ.
                          435 Sixth Avenue
                          Pittsburgh, PA  15219


Audio Operator:           Janet Heller
```

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

---

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@optonline.net**

**(609)586-2311      Fax No. (609) 587-3599**

APPEARANCES (CONT'D):

For the PD Committee:            Speights & Runyan
                                By:  DANIEL SPEIGHTS, ESQ.
                                     MARION FAIREY, ESQ.
                                     ALAN RUNYAN, ESQ.
                                200 Jackson Avenue, East
                                Hampton, SC  29924


For the PD Committee:            Bilzin Sumberg Baena Price &
                                   Axelrod LLP
                                By:  SCOTT BAENA, ESQ.
                                     JAY SAKALO, ESQ.
                                200 South Biscayne Boulevard
                                Suite 2500
                                Miami, FL  33131


For the PD Claimants:            Pryor Cashman LLP
                                By:  RICHARD LEVY, ESQ.
                                410 Park Avenue
                                New York, NY  10022


For MR Claimants:                Motley Rice
                                By:  VICKI ANTION, ESQ.
                                     ANNE KEARSE, ESQ.
                                28 Bridgeside Boulevard
                                Mt. Pleasant, SC  29465


For the State of CA,             Hahn & Hessen LLP
Dept. of Gen. Services:          By:  STEVEN J. MANDELSBERG, ESQ.
                                     CHRISTINA KANG, ESQ.
                                488 Madison Avenue, 14th Fl.
                                New York, NY  10022


For Macerich:                    Pillsbury Winthrop Shaw Pittman
                                   LLP
                                By:  GERALD GEORGE, ESQ.
                                500 Fremont Street
                                San Francisco, CA  94105


For UC, CSU:                     Brandi Law Firm
                                By:  THOMAS J. BRANDI, ESQ.
                                     TERENCE EDWARDS, ESQ.
                                44 Montgomery St., Suite 1050
                                San Francisco, CA  94104

APPEARANCES (CONT'D):

For the Roman Catholic          Dies, Handerson & Cafona
Church Archdiocese of           By:  MARTIN DIES, ESQ.
New Orleans:                    1009 Green Avenue
                                Orange, TX  77630


For the FCR:                    Orrick, Herrington & Sutcliffe
                                  LLP
                                By:  DEBRA FELDER, ESQ.
                                Washington Harbour
                                3050 K Street, N.W.
                                Washington, D.C.  20007
                                (Telephonic appearance)


For W.R. Grace:                 W.R. Grace
                                By:  MARK SHELNITZ, ESQ.
                                7500 Grace Drive
                                Columbia, MD  21044
                                (Telephonic appearance)


For London Market               Mendes & Mount, LLP
Companies:                      By:  ALEXANDER MUELLER, ESQ.
                                750 Seventh Avenue
                                New York, NY  10019-6829
                                (Telephonic appearance)


For Halcyon Asset               Halcyon Asset Management, LLC
Management, LLC:                By:  OSCAR MOCKRIDGE, ESQ.
                                (Telephonic appearance)


For the Official Committee      Stroock & Stroock & Lavan
Unsecured Creditors'            By:  ARLENE KRIEGER, ESQ.
Committee:                           LEWIS KRUGER, ESQ.
                                180 Maiden Lane
                                New York, NY  10038-4982
                                (Telephonic appearance)


For Asbestos Property           Riker, Danzig, Scherer, Hyland &
Damage Claimants:                 Perretti, LLP
                                By:  CURTIS PLAZA, ESQ.
                                Headquarters Plaza
                                One Speedwell Avenue
                                Morristown, NJ  07962
                                (Telephonic appearance)


For the Official                LECG
Committee of Asbestos           By:  SEAN WALSH, ESQ.
Property Damage Claimants:      (Telephonic appearance)

4

APPEARANCES (CONT'D):

For the PD Committee:          Bilzin Sumberg Baena Price &
                                 Axelrod LLP
                               By:  MATTHEW KRAMER, ESQ.
                               200 South Biscayne Boulevard
                               Suite 2500
                               Miami, FL  33131
                               (Telephonic appearance)

For CNA:                       Goodwin Procter LLP
                               By:  DANIEL GLOSBAND, ESQ.
                               Exchange Place
                               Boston, MA  02109-2881
                               (Telephonic appearance)

For the PD Committee:          Ferry, Joseph & Pearce, P.A.
                               By:  THEODORE J. TACCONELLI, ESQ.
                               824 Market Street, Suite 19899
                               Wilmington, DE  19899
                               (Telephonic appearance)

For the Debtors:               Pachulski, Stang, Ziehl, Young,
                               Jones & Weintraub
                               By:  JAMES O'NEILL, ESQ.
                                    TIMOTHY P. CAIRNS, ESQ.
                               919 North Market Street, 17th Fl.
                               Wilmington, DE  19899-8705
                               (Telephonic appearance)

For Fireman's Fund:            Stevens & Lee, P.C.
                               By:  DAVID R. BEANE, ESQ.
                               111 North Sixth Street
                               P.O. Box 679
                               Reading, PA  19603
                               (Telephonic appearance)

For Allstate Insurance:        Cuyler Burk, LLP
                               By:  ANDREW CRAIG, ESQ.
                               Parsippany Corporate Center
                               Four Century Drive
                               Parsippany, NJ  07054
                               (Telephonic appearance)

For Levin Capital              Levin Capital Strategies
Strategies:                    By:  JOHN P. MACKIN
                               (Telephonic appearance)

APPEARANCES (CONT'D):

For Lehman Brothers:            Lehman Brothers
                                By:  ANDREW CHAN
                                (Telephonic appearance)


For Murray Capital              Murray Capital Management, Inc.
Management, Inc.:               By:  MARTI MURRAY
                                (Telephonic appearance)


For Creditor, Shareholder       Tocqueville Asset Management
for W.R. Grace & Co.:           By:  PETER SHAWN
                                (Telephonic appearance)

For David T. Austern,           Phillips, Goldman & Spence, P.A.
the Future Claimants'           By:  JOHN C. PHILLIPS, ESQ.
Representative:                  1200 North Broom Street
                                Wilmington, DE  19806
                                (Telephonic appearance)


For Bank of New York:           Bank of New York
                                By:  PETER HAIN
                                (Telephonic appearance)


For Macerich:                   Ashby & Geddes, LLP
                                By:  AMANDA WINFREE, ESQ.
                                500 Delaware Avenue, 8th Fl.
                                Wilmington, DE  19899
                                (Telephonic appearance)


For City of Philadelphia:       City of Philadelphia Law
                                   Department
                                By:  JOSEPH DIGIUSEPPE, ESQ.
                                Philadelphia, PA
                                (Telephonic appearance)


For Royal Insurance:            Wilson Elser Moskowitz Edelman
                                   & Dicker LLP
                                By:  CARL PERNICONE, ESQ.
                                150 East 42nd Street
                                New York, NY  10017
                                (Telephonic appearance)

APPEARANCES (CONT'D):

For Grace Certain Cancer          Montgomery, McCracken, Walker &
Claimants:                          Rhoads LLP
                                  By:  NOEL C. BURNHAM, ESQ.
                                       NATALIE D. RAMSEY, ESQ.
                                  300 Delaware Avenue, Ste. 750
                                  Wilmington, DE  19801
                                  (Telephonic appearance)

For State of Montana              Monzack & Monaco, P.A.
Department of                     By:  FRANCIS J. MONACO, JR., ESQ.
Environmental Quality:            1201 North Orange Street
                                  Suite 400
                                  Wilmington, DE  19899
                                  (Telephonic appearance)

For Bank of America:              Bank of America Securities
                                  By:  ROBERT RYAN
                                  (Telephonic appearance)

For Committee of Asbestos         Campbell & Levine
Personal Injury Claimants:        By:  MARK T. HURFORD, ESQ.
                                  800 North King Street
                                  Suite 300
                                  Wilmington, DE  19701
                                  (Telephonic appearance)

For Ad Hoc Committee:             Weil, Gotshal & Manges
                                  By:  M. JARRAD WRIGHT, ESQ.
                                  1300 Eye Street NW, Suite 900
                                  Washington, D.C.  20005
                                  (Telephonic appearance)

For Silverpoint Capital:          Silverpoint Capital
                                  By: JOHN KU
                                  (Telephonic appearance)

For Avenue Capital:               Avenue Capital Group
                                  By:  CHELSEA CLINTON
                                  (Telephonic appearance)

For Asbestos Property             Scott Law Group
Damage Claimants:                 By:  DARRELL SCOTT, ESQ.
                                  (Telephonic appearance)

For Official Committee of         Kramer Levin Naftalis & Frankel
Equity Holders:                     LLP
                                  By:  GARY BECKER, ESQ.
                                  919 Third Avenue
                                  New York, NY  10022
                                  (Telephonic appearance)

1        THE COURT:  This is the matter of W.R. Grace,

2  Bankruptcy Number 01-1139.  This is the time set for arguments

3  on a variety of summary judgment motions concerning product

4  I.D. and statutes of limitations issues filed on behalf of the

5  debtor.  The parties I have listed appearing by phone are Debra

6  Felder, Amanda Winfree, Joseph DiGiuseppe, Andrew Hain, Mark

7  Shelnitz, Chelsea Clinton, Gary Becker, Oscar Mockridge, Daniel

8  Glosband, John Belforman, Arlene Kreiger, Curtis Plaza, David

9  Beane, Andrew Craig, John Mackin, James O'Neill, Timothy

10 Cairns, Theodore Tacconelli, Andrew Chan, Marti Murray, Peter

11 Shawn, Alex Mueller, John Phillips, Matthew Kramer, Carl

12 Pernicone, Noel Burnham, Natalie Ramsey, Francis Monaco, Robert

13 Ryan, Mark Hurford, Jarrad Wright, John Ku, Sean Walsh, and

14 Darryl Scott.  I'll take entries in Court.  Good morning.

15        MR. RESTIVO:  Good morning, Your Honor.  Jim Restivo,

16 Lawrence Flatley, Douglas Cameron and --

17        THE COURT:  Wait.  I'm sorry, Mr. Restivo.  I

18 apologize.  I'm having a computer issue here.  Okay.  Would you

19 mind starting again?  I'm sorry.

20        MR. RESTIVO:  No problem.  Jim Restivo, Lawrence

21 Flatley, Douglas Cameron, and Traci Rea for W.R. Grace.

22        THE COURT:  Thank you.

23        MR. ESAIYAN:  Good morning, Your Honor.  Lisa Esaiyan

24 and Sam Blatnick, also for W.R. Grace.

25        THE COURT:  Gentlemen?

**J&J COURT TRANSCRIBERS, INC.**

1    MR. SAKALO:  Good morning, Your Honor.  Jay Sakalo

2 from Bilzin Sumberg on behalf of the property damage committee.

3    MR. BAENA:  May it please the Court, good morning,

4 Your Honor.  Scott Baena on behalf of the PD committee.

5    MR. MANDELSBERG:  Good morning, Your Honor.  Steven

6 Mandelsberg and Christina Kang from Hahn & Hessen, for the

7 State of California Department of General Services claimants.

8    MR. GEORGE:  Good morning, Your Honor.  Gerald

9 George, Pillsbury Winthrop Shaw Pittman, on behalf of Macerich

10 Fresno Limited Partnership.

11    MR. SPEIGHTS:  Good morning, Your Honor.  Dan

12 Speights, Bud Fairey, and Alan Runyan, on behalf of the

13 Speights & Runyan Firm.

14    MR. DIES:  Your Honor, Martin Dies --

15    THE CLERK:  Please speak into the microphone.

16    MR. DIES:  Sure.  Excuse me, Your Honor.  Martin

17 Dies, on behalf of the Dies & Howe claimants, numerous state

18 attorney generals, and other governmental entities and other

19 claimants.  Also appearing, Your Honor, with me is co-counsel

20 today for the first time, is Richard Levy of the firm of Pryor

21 Cashman, and Mr. Levy will be appearing hereafter.  He will be

22 filing a motion for pro hac vice appearance shortly.

23    THE COURT:  All right.

24    MR. LEVY:  Good morning, Your Honor.  Thank you.

25    THE COURT:  Good morning.

1          MR. BRANDI:  Good morning, Your Honor.  Thomas Brandi

2    and Terence Edwards for the Board of Regents at the University

3    of California and the trustees of the California State

4    University System.

5          THE COURT:  Good morning.

6          MS. KEARSE:  Good morning, Your Honor.  Anne Kearse

7    and Vicki Antion with the Motley Rice claimants.

8          MR. BELFORMAN:  Good morning, Your Honor.  This is

9    John Belforman.  I'm a pro se claimant.

10         THE COURT:  Yes, sir.  Thank you.

11         MR. BELFORMAN:  Your Honor, may I ask a preliminary

12   question?

13         THE COURT:  Yes, sir.

14         MR. BELFORMAN:  For myself and any others that are

15   pro se that are on this call, that are taking time away from

16   work to participate, is there any arrangement, perhaps, to

17   order the hearing so that our matters might be dealt with

18   early, or what?

19         MR. RESTIVO:  Your Honor, the motion dealing with Mr.

20   Belforman's claim will be the first one argued.

21         THE COURT: All right.  Thank you.

22         MR. BELFORMAN:  Thank you very much.

23         MR. RESTIVO:  There are a number of motions in that

24   motion, Mr. Belforman being one of nine, and that will be the

25   first argument being made.

1           THE COURT:  Yes, sir.  Okay.  I think we might as

2  well start.  Mr. Restivo?

3           MR. RESTIVO:  Your Honor, I want to start by

4  summarizing where we are on property damage and where we think

5  we are going, and I'm going to use the board I have set up here

6  in the courtroom, which is simply a blow up of the chart that I

7  had distributed to the Court and the parties at the last pre-

8  trial conference, which was telephonic.

9           The Court may recall that at the time we filed our

10  summary judgment motion there were 627 remaining property

11  damage claims.  Since then, Claim Number 12315 for the Toronto

12  School District involving Rodin Junior High was voluntarily

13  expunged, and the Court has issued an order to that effect, and

14  so, in fact, we have remaining 626 claims, not 627.  And, Your

15  Honor, that claim was a Canadian claim.  So, in our green block

16  here, where we have listed 89 remaining Canadian claims, in

17  fact, now, it's 88.

18           We reported, at the last pre-trial conference, that

19  settlement agreements in principle have been reached with

20  Prudential, and that removes, Your Honor, six statute of

21  limitations -- argument on six statute of limitations claims

22  that were filed.  They are subject to an agreement in

23  principle, and the parties are attempting to document that

24  settlement.

25           Also reported at the pre-trial conference, Your

1  Honor, was that Grace and the claimants who represented by Mr.

2  Dies have reached a settlement agreement in principle.  This is

3  this large orange block toward the bottom dealing with

4  Arkansas, Oregon, Oklahoma, Arizona, Texas, and, in fact, Your

5  Honor, three of the 138 cases coming from Connecticut.  When I

6  did the chart I didn't realize there were three Connecticut

7  cases.  Those are also settled in principle and not something

8  that this Court or the parties will have to deal with today.

9        The resolution with Mr. Dies also settles, subject to

10  definitive settlement agreement, 120 of the 121 cases in

11  Louisiana, Your Honor.  We did file a motion on those cases

12  because of the time limits, that will leave us, in Louisiana,

13  with one Louisiana case.

14        Since filing the motions, Your Honor, we have also

15  reached settlements in two other cases.  I believe they're

16  listed in the last block called remaining claims.  In any

17  event, there are settlement agreements in principle with

18  Trumball Hospital, Claim Number 7028, and the Laborer's Union

19  Building, Claim Number 2785.  My count, Your Honor, that

20  reduces the number of remaining property damage claims on the

21  board from 627 to 360.

22        I should note, Your Honor, we have on the board in

23  the lilac block 18 Motley Rice claims.  In fact, three of those

24  claims, Your Honor, are covered by our statute of repose

25  motion, so that there's an overlap, Motley Rice has a total of

1   18 claims, three we will discuss today under statute of repose.

2   15 will be remaining.  My partner, Traci Rea, will address the

3   statute of repose motion.  I would like to report to the Court

4   that Grace and Motley Rice have had a number of settlement

5   discussions.  No settlement has been reached yet, but the

6   parties are still in discussions, and hope springs eternal that

7   they will be able to land on a settlement.  For now, our 360

8   claims include the 18 Motley Rice.

9           Your Honor, you'll see towards the top, in sunshine

10  yellow, 125 California claims.  My partner, Larry Flatley, will

11  be arguing our motion for summary judgment on 109 of those

12  claims as being barred by the statute of limitations.  That

13  will leave 16 remaining California claims.  There are six

14  buildings, Your Honor, in those 16 that I believe contain

15  fireproofing supplied by my client after asbestos was removed.

16  I have brought that to the attention of Mr. Runyan.  He has

17  taken that under advisement.  I believe he and his clients will

18  conclude that the fireproofing in those buildings was not

19  M.K. 3, but non-asbestos containing M.K. 4 or M.K. 5. If I am

20  correct on that, six of these claims, I believe, will be

21  voluntarily expunged, which will make remaining claims 354.

22          Your Honor, with respect to our motion, we move to

23  expunge 52 Libby claims represented by this yellow block toward

24  the bottom of the chart.  No objections to our motion were

25  received.  We can either hand up to the Court an order now, or

1  if the Court desires, file a certificate of no objection.  We

2  didn't want to do that until we got here today because we

3  didn't know if anything would come in late.  But we believe

4  that these 52 claims from Libby can now be removed and the

5  Court and the parties do not have to deal with it, bringing

6  remaining claims down to 302.

7           THE COURT:  Let me ask, is anyone present with

8  respect to any of the Libby claims, the 52 claims, as to which

9  no responses were received?  If there's no response I'll take

10  an order.

11                          (Pause)

12           THE COURT:  Thank you.

13                          (Pause)

14           THE COURT:  I'm adding to this order that no

15  responses to the debtors' objection to these claims were

16  received and no claimant appeared for hearing, and with that

17  addition I've signed the order.

18           MR. RESTIVO:  That brings us, Your Honor, to the

19  first motion for summary judgment we would like to argue, which

20  is our motion to expunge 11 claims as not involving a Grace

21  product.

22           THE COURT:  Pardon me, Mr. Restivo.  Mr. Speights?

23           MR. SPEIGHTS:  Your Honor, I would like to respond to

24  the road map presentation if I could, and I think it will

25  connect some of the arguments that --

14

1          THE COURT:  Mr. Speights, I'm sorry.  I'm having

2   trouble hearing you.

3          MR. SPEIGHTS:  Your Honor, I would like to respond to

4   Mr. Restivo's road map presentation, and I do think it's

5   relevant to some of the arguments that will be made on the

6   summary judgment motion.

7          THE COURT:  Okay.

8          MR. SPEIGHTS:  Does the ELMO work?

9          THE COURT:  It should.  It may not be turned on.

10          MR. BAENA:  Your Honor, may it please the Court.

11   While that's being dealt with --

12          THE COURT:  I'm sorry.  Yes, Mr. Baena?

13          MR. BAENA:  Your Honor, in respect to the Libby

14   claims, I thought I heard the Court say that you amended the

15   order to reflect that there was no response to the objections.

16          THE COURT:  Yes.  To those --

17          MR. BAENA:  I don't believe that that's what's

18   occurred here.  There were responses to objections.  There were

19   no responses to a motion for summary judgment.

20          THE COURT:  To the -- there were no responses to

21   these objections to the debtors' motion on these Libby asbestos

22   P.D. claims.  Correct?

23          MR. RESTIVO:  I think -- I don't know how I said it,

24   but Mr. Baena is technically correct.  We filed a motion for

25   summary judgment and there were no responses to that motion

**J&J COURT TRANSCRIBERS, INC.**

1 received.  If I said it awkwardly, I didn't mean to.

2         MR. BAENA:  No, no.  I -- I'm just respectfully

3 correcting the Court.  I believe that some Libby claimants did

4 file responses to the objection, but it's the summary judgment

5 motion that there were no responses to.

6         THE COURT:  Okay.  I think you're correct, Mr. Baena.

7 Thank you.  And I will correct this handwritten notation.

8 Thank you.  No responses to debtors' motion for summary

9 judgment as to the objections to these claims were received is

10 the correct way to state that.  Thank you.  I've amended it.

11 Okay.  Thank you.

12         MR. SPEIGHTS:  Is it working now, Your Honor?

13         THE COURT:  I'm sorry?

14         MR. SPEIGHTS:  I was trying to determine if the ELMO

15 was working.

16                    (Pause)

17         THE COURT:  I don't know that we've got the system

18 set up.  Is the -- I think you may need to turn the button.

19 Erin, do you know where the button on that -- I think that

20 needs to be turned.

21                    (Pause)

22         THE COURT:  It would help, Mr. Speights, if you would

23 just give me a head's up in the morning when you're doing this,

24 because they'll come in and set the system up.  It takes a

25 while to get these things started.  Is it turned on?

**J&J COURT TRANSCRIBERS, INC.**

1          MR. SPEIGHTS:  I'm sorry, Your Honor.  I --

2                    (Pause)

3          MR. SPEIGHTS:  Your Honor, if you'd prefer, we can do

4    it the old fashioned way, and I'll hand up the document I was

5    going to refer to?

6          THE COURT:  The screen should be working, Mr.

7    Speights, but I'm not getting a connection on mine either, so

8    I'm not sure --

9          MR. SPEIGHTS:  I guess I'm -- usually Kirkland &

10   Ellis comes in first and sets everything up because Mr. Bernick

11   can't argue without his overheads.

12         MR. RESTIVO:  Mr. Restivo doesn't use that high tech

13   stuff.

14         THE COURT:  Well, Mr. Speights, we can either take a

15   recess for a few minutes, or we can start the old fashioned

16   way.  Whichever you prefer.

17         MR. SPEIGHTS:  I would prefer the recess, if that --

18         THE COURT:  All right.  Take a recess.

19         MR. SPEIGHTS:  --  will that irritate Your Honor?

20   But if it will irritate Your Honor I'll be happy to do it the

21   old fashioned way.

22         THE COURT:  Well, we'll just take a recess for a few

23   minutes until they get here, because I'm not sure what the

24   problem is.

25         MR. SPEIGHTS:  Thank you, Your Honor.

1          THE COURT:  Okay.

2                        (Recess)

3          THE COURT:  Let it never be said that we're not

4    technically challenged in this office.  Okay.

5          MR. SPEIGHTS:  Thank you, Your Honor.

6          MR. RESTIVO:  Your Honor, not -- before we get

7    started, I can comment -- I can make an argument on Mr.

8    Belforman's single claim if the Court wants me to, since I

9    promised him he would be first when he answered about going to

10   a job.  Or I can wait.  It's purely up to the Court.

11         THE COURT:  Mr. Speights, will your comments affect

12   Mr. Belforman's claim?

13         MR. SPEIGHTS:  I don't even know what his claim is,

14   but I would not think so, if we want to take that one claim --

15         THE COURT:  If you don't object.  Could we just start

16   with his so he can return to work, then?  Thank you.

17         MR. SPEIGHTS:  Yes.

18         MR. BELFORMAN:  Thank you very much.

19         THE COURT:  All right.  Thank you.  Okay.  Mr.

20   Restivo, we'll start with that, then.

21         MR. RESTIVO:  Excuse me, Your Honor.  We moved to

22   expunge 11 claims that's represented by the top green block.  I

23   will deal with that when it's time to argue that motion, but

24   one of those claims, Your Honor, is Claim Number 12752 of Mr.

25   Belforman.  Mr. Belforman's entire claim consists of 22 pages,

1  Your Honor.  I attached the relevant pages to our motion, but I

2  would like to hand up to the Court the entire 22 pages so the

3  Court has it.

4           THE COURT:  Thank you.

5           MR. RESTIVO:  Mr. Belforman did a renovation in his

6  dining room in the year 2000.  His claim, at Page -- I should

7  say, Your Honor, that the claim form that I have handed up,

8  like all the claim forms, is Bates stamped.  The first six

9  digits refer to the claim number, and so, this is 012752, which

10 is Mr. Belforman's claim.  The next six digits refer to the

11 page of the claim.  And so, at Page 004, the Court will see

12 that Mr. Belforman did a renovation in his dining room in the

13 year 2000.  His claim, at that page, is for textured paint

14 applied to sheet rock.  He says that the paint sample tested

15 positive for asbestos and he says that on the next page at 005.

16          You will see, Your Honor, that at Page 13, the lab

17 report for the paint chip shows that the paint chip was tested

18 positive for lead.  At Page 15 you have the lab report for what

19 is called the white chalky with white paper-like asbestos found

20 in white chalky only bulk sample report.  That bulk sample

21 report shows Chrysotile one to five percent, cellulose 20

22 percent, and non-fibrous material 75 percent.  When I make my

23 entire argument on this motion, Your Honor, I will tell you

24 that there is no dispute that the Grace surfacing and

25 fireproofing products contained vermiculite, and gypsum, and

1  asbestos, and depending upon the surfacing product, maybe some

2  other materials.  You will see an absence, on Page 015, of any

3  finding of either vermiculite or gypsum.  The Grace products

4  did not contain cellulose.  Mr. Belforman had removed 550

5  square feet of wall and ceiling plaster board as indicated by

6  Page 21 of the claim form, and there's no dispute that Grace

7  did not make any plasterboard.

8       On March 19, at Docket Number 14593, Mr. Belforman

9  argued that the paper that was attached to the sample might be

10  where the cellulose might come from.  However, the actual

11  report in his claim file says the asbestos is in the white

12  chalky layer, and the paint reports only report lead, no

13  asbestos.  And, indeed, the asbestos is described as white

14  paper-like, not described as being attached to paper.

15       On March 29, he filed, or presented another document

16  in which he basically disagrees with our argument that only

17  showing the presence of asbestos does not identify the product

18  as a Grace product versus the hundreds of other asbestos

19  containing products on the market at the time.  In effect, his

20  argument, and you'll see it again on some of the other motions

21  I will argue later, is that we have a cake.  We've tested the

22  constituents of the cake, it must be a Betty Crocker cake

23  because it contains flour.  One cannot identify the maker of an

24  asbestos containing product merely by saying it has asbestos in

25  it.  You need to identify the components and the recipe, and

1  that recipe does not include cellulose.  Therefore, Your Honor,

2  the presence of asbestos in his sample with or without

3  cellulose doesn't prove it is a Grace product, and this claim

4  should be expunged.

5          THE COURT:  Mr. Belforman?

6          MR. BELFORMAN:  Yes.  Thank you very much, and I

7  thank everybody for agreeing to take mine first.  Can you hear

8  me?

9          THE COURT:  Yes, sir.

10          MR. BELFORMAN:  Okay.  First of all, the -- as Mr.

11  Restivo pointed out, what I submitted to the lab, it was a -- I

12  call it a textured paint.  It was a textured product.  And

13  their expert, Dr. Lee, in his report, refers to -- bear with me

14  here -- he makes the comment that -- I'm sorry -- he says that

15  debtors -- their asbestos-containing products, and he

16  identifies them as, quote, asbestos-containing acoustical

17  plaster, surface texture and fire proofing products.  And I

18  think -- submit the surface texture is not inconsistent with

19  what I, as a layman, call it a textured paint.  It was -- I

20  didn't chip it off.  I removed it -- peeled it off with the

21  surfacing of the wall board, and I'm not claiming the wall

22  board is one of their products, and submitted that sample.

23  Now, the laboratory report that Mr. Restivo referred to, and in

24  my response to their reply, as I think they've incorrectly

25  characterized it, it shows -- look at that page -- in percent

1  of sample, under percent of sample it says 100, then in capital

2  letters it identifies the sample grossly as white -- in capital

3  letters, white chalky with white paper-like.  Then, underneath

4  that it proceeds to proffer the analysis.  And it says,

5  asbestos found in white chalky only.  Well, obviously they

6  tested the whole sample or they wouldn't know that.  Then they

7  proceed to state the components of the sample as to Chrysotile,

8  as I understand it is asbestos, cellulose 20 percent, and non-

9  fibrous 75 percent.  Now, the debtors, in their motion, are

10  saying that this shows that there is, you know, nothing left to

11  be decided and it's ripe for summary judgment, but -- can you

12  excuse me one second, please?

13          THE COURT:  Yes.  Can the operator turn up this

14  microphone a little, please?

15          UNIDENTIFIED SPEAKER:  Certainly.

16                          (Pause)

17          THE COURT:  Mr. Belforman?  Mr. Belforman?  Operator,

18  is he still there?

19          UNIDENTIFIED SPEAKER:  He's still connected to the

20  telephone.

21          MR. BELFORMAN:  Your Honor?

22          THE COURT:  Yes?

23          MR. BELFORMAN:  I'm very sorry.  I had some tree

24  people come out that were supposed to be here at 7:30, so of

25  course they came at 9:00.  If you -- if the Court will indulge

1 me just one minute, I need to talk to them and I'll be right

2 back.  Is that okay?

3          THE COURT:  Sir, I'm sorry.  I have about 150 people

4 waiting for this.

5          MR. BELFORMAN:  All right.  Okay.  Then let's

6 proceed.  I was discussing the composition of the sample that

7 was submitted, and I see Chrysotile, cellulose, and non-

8 fibrous.  Now, the debtors are saying that based on their

9 expert's report this shows nothing left to be decided, but, in

10 fact, as I pointed out in my response, at Page 8 of Dr. Lee's

11 report he describes something called samples with insufficient

12 laboratory data, which he says were insufficient to render a

13 conclusion as to whether the material was inconsistent or not

14 inconsistent with Grace's formulas.  And he describes

15 insufficient as including laboratory results indicating the

16 amount of Chrysotile and identifying the remaining portions

17 simply as binder or, quote, non-fibrous material.  That

18 describes exactly what my lab found, asbestos, and then they

19 didn't go into a breakdown of vermiculite or anything else.

20 So, notwithstanding that Dr. Lee, on the following page, then

21 claims that this shows laboratory data that failed to establish

22 the presence, which I think is Your Honor's decision to make,

23 he then, in his -- in the table he attaches to his report,

24 shows claims that apply to the various -- our claims.  And

25 under mine, 12752, where the box says not a Grace product,

1  contrary to what the debtors are asserting, he didn't check

2  that box.  He did check wrong components, and relying on the

3  presence of the cellulose.  And as I explained, and the --

4  since the paper backing on the wall board was included and

5  obviously analyzed by the lab along with the rest of the

6  sample, that that would account for the -- arguably account for

7  the presence of cellulose, and that therefore the debtors have

8  not met the threshold of whatever they have to to positively

9  assert that this isn't their product, so that it's not a --

10  ripe for summary judgment.

11        THE COURT:  Okay --

12        MR. BELFORMAN:  In their response, they attempted to

13  say, well, it says asbestos found in a white chalky only, so

14  that -- and they conflate that with the cellulose, but I'm

15  submitting that the lab report, if you read it correctly, shows

16  that the textured material and the paper were all analyzed

17  together because the lab report says 100 percent of sample,

18  which includes the white paper-like was analyzed.  That they

19  made the distinction that the asbestos was only in the textured

20  material, but the whole sample included the cellulose, which

21  would include the paper that they -- ground up, or whatever

22  they do, and tested.  So, that explains the presence of

23  cellulose, at least for purposes of the summary judgment

24  motion, so that they haven't met their burden.  Their own

25  expert characterized a sample like mine as insufficient to say

1  one way or the other, so we're not at the point yet where the

2  Court can render summary judgment.

3        THE COURT:  Mr. Restivo, show me Dr. Lee's report.

4  Is this the part that Dr. Lee -- the part of the report that

5  Dr. Lee is saying is insufficient to determine the product?

6        MR. RESTIVO:  Yes, Your Honor.  Again, if I can use

7  my cake example, all right, if someone analyzed the constituent

8  components of a cake and found flour in it, any materials

9  analyst in the world would say simply finding flour in a cake

10 is insufficient to say this is a Betty Crocker cake versus a

11 Pillsbury cake versus hundreds of other cakes.  That's the

12 first finding of Dr. Lee that simply finding asbestos in a

13 sample doesn't provide evidence that the material sampled was a

14 Grace product.

15        Secondly, if, in our hypothetical cake, the analyst

16 finds that 20 percent of the cake is composed of cinnamon, and

17 the cake manufacturer, Betty Crocker, never puts cinnamon in

18 any of its cakes, and there's no dispute on that, the second

19 reason there's no evidence that it's a Betty Crocker cake is

20 because Betty Crocker cakes don't have cinnamon.  As applied

21 here, the fact that there's Chrysotile asbestos in the sample,

22 that in and of itself does not show it's a Grace product, and

23 secondly, if one looks at the fact that a non-Grace component,

24 namely cellulose at 20 percent was in the product, shows that

25 it wasn't a Grace product, I believe the burden of proof is on

1  a claimant to prove a claim that is insufficient evidence to

2  prove that whatever the paint material Mr. Belforman is talking

3  about is a material supplied by W.R. Grace and the claim has to

4  be expunged.

5        THE COURT:  Okay.  Dr. Lee, however, is not opining

6  that this is not a Grace product because it has cellulose in

7  it.  His opinion is that the components are not sufficient to

8  support that it's a Grace product.

9        MR. RESTIVO:  That is correct, Your Honor.

10        THE COURT:  Okay.  So, he's saying it isn't a Grace

11  product from his determination because the components are

12  wrong.  So, what I have is Dr. Lee saying it can't be a Grace

13  product because it contains cellulose.  I have a report from

14  Mr. Belforman's expert saying it contains cellulose. I have a

15  report from Dr. Lee saying if it contains cellulose, that's

16  inconsistent with Grace's products.

17        MR. RESTIVO:  I want to restate that, Your Honor.

18  You have a report from Dr. Lee that first says Grace products

19  contain Chrysotile, gypsum, and vermiculite, plus some other

20  things.  If one only finds Chrysotile in a product and you

21  don't know what else is in it, that information is insufficient

22  for anyone to say it's a Grace product.

23        THE COURT:  Yes.

24        MR. RESTIVO:  That's number one.  Number two, if you

25  find, in the constituent analysis, 20 percent of cellulose

1  which Grace never put in its product, that's a second reason

2  why it is not a Grace product, because the Grace formula didn't

3  include cellulose.  And so, number one, the fact that there's

4  asbestos in it doesn't prove it's a Grace product independent

5  of whether it has cellulose or the cellulose comes from the

6  paper.  Second, if the cellulose is part of the sample, then

7  it's not a Grace product because the Grace product didn't have

8  cellulose.  It's really as simple as that.

9            MR. BELFORMAN:  Your Honor?

10           THE COURT:  But that's not a logical -- that's not a

11  logical follow-up, because if the sample is contaminated with

12  paper, the fact that the paper is in the product doesn't mean

13  that the sample itself is not a Grace product.  It simply means

14  that the sample may have been contaminated.  However, whether

15  or not the sample is contaminated still doesn't prove that

16  because there's Chrysotile in the product that it's Grace's

17  Chrysotile.

18           MR. RESTIVO:  That's correct, Your Honor.

19           THE COURT:  So, either way there isn't sufficient

20  evidence to prove that it's Grace's product.

21           MR. RESTIVO:  That is correct, Your Honor.

22           MR. BELFORMAN:  But, Your Honor?

23           THE COURT:  Yes.

24           MR. BELFORMAN:  It's their motion, and their

25  assertion is this shows that it is not a Grace product.  At

1 this point we can only say -- the most they can say is we don't

2 know if it's Betty Crocker or Duncan Hines.

3          THE COURT:  But it's your burden to prove that it's

4 their product, sir.  It's your burden to prove that it's the

5 debtors' product at this stage of the game.

6          MR. BELFORMAN:  I thought that since it was a summary

7 judgment motion and that they're saying that this -- their

8 expert says it doesn't show one way or the other, and they

9 haven't --

10          THE COURT:  No.  Their expert is saying that it's not

11 consistent with Grace's product.  The fact that there is

12 Chrysotile simply means that it's an asbestos product.  Every

13 asbestos product has asbestos in it of one sort or another, or

14 it wouldn't be an asbestos product.  So, that doesn't tie it to

15 any particular manufacturer or distributor.  The fact that it

16 has cellulose in the sample, in Dr. Lee's view, is inconsistent

17 with Grace's formula.  Grace would not have distributed -- did

18 not manufacture or distribute products that had cellulose in

19 it, so that is inconsistent with having this be Grace's

20 product.  Your sample, if it's contaminated with cellulose, is

21 inconsistent with the fact that this is Grace's product.  If

22 your evidence shows that it's contaminated because of some

23 other substance, for example, that came from paper, it's your

24 burden to show that the product was, in fact, Grace's product,

25 but it's contaminated with something else, and the reports

1  don't show that.

2          In fact, this report says that the asbestos was found

3  only in the white chalky substance, not in the paper.  So, the

4  report itself is consistent with the fact that it -- that the

5  cellulose is not part of the asbestos in any event, but

6  nonetheless, even if I don't -- even if I can't read the report

7  that way, it's still your burden to show where this -- I'm

8  using the word contamination.  That's probably a bad word to

9  use when you're talking about asbestos, but nonetheless, I'm

10 not sure what a better choice of words is at the moment.

11         So, what I have is the debtor saying it's not our

12 product -- well, first of all, I have your claim saying it's

13 the debtor's product.  I have the debtor saying it's not our

14 product.  I have your report saying that the asbestos is only

15 in the white chalky substance.  I have the analysis saying that

16 the white chalky substance had asbestos in it, and that the

17 asbestos in that chalky substance contained 20 percent

18 cellulose.  I have the report saying the debtor never used a

19 product that had cellulose in it, therefore it can't be the

20 debtor's product.  That's what I have.  Now, if -- if that

21 evidence is inconsistent with this report and your assessment

22 of the report is that the cellulose was, in fact, from paper

23 that contaminated the product, this report, I don't think, can

24 be read that way.  But if it can be read that way, you've got

25 to get me an expert analysis that says it, and this report does

1 not say that.

2        MR. BELFORMAN:  My claim is not as to the paper

3 surfacing that came off the wall board.  It's as to the white

4 chalky that was on it, which I am alleging was a Grace product,

5 and that was what -- that only is what contained asbestos, and

6 the cellulose was in the gross sample that they analyzed.  To

7 pick up on Mr. Restivo's metaphor, my claim only goes to the

8 cake material, not to the icing.  If there's cinnamon in the

9 icing, and the icing is homemade, it -- and a lab analyzes the

10 icing along with the cake material, then saying that there's

11 cinnamon in the icing does not establish that the sample

12 otherwise consistent with Betty Crocker is not their product.

13 And --

14        THE COURT:  What I have -- let's stop the cake

15 analysis from everybody's point of view.

16        MR. BELFORMAN:  Okay.

17        THE COURT:  What I have is a mix that says they

18 analyzed white chalky with white paper-like asbestos found in

19 the white chalky only and the components of it were Chrysotile,

20 cellulose, and non-fibrous products.  That's what they

21 analyzed.  Grace's product, it is undisputed, as far as I know,

22 contained no cellulose.  This report says that there was 20

23 percent cellulose that's inconsistent with Grace's product.  In

24 order for me to have any evidence that contradicts that, you've

25 got to get an expert that tells me that, in fact, this is

**J&J COURT TRANSCRIBERS, INC.**

1  something that is in addition to Grace's product that

2  contaminated Grace's product with cellulose.  I don't have that

3  evidence before me.

4          MR. BELFORMAN:  Well, with respect to the -- the lab

5  -- the first line in capital letters identifies the gross

6  sample as white chalky with the, if you want, contaminating

7  substance.  The second line, then, iterates that asbestos was

8  found only in the white chalky.  So, they have made a

9  determination.  Then they go on to state the components of the

10  entire sample, including the paper.  I'm not alleging that the

11  paper that came off the wall board is a Grace product.  So -- I

12  think the cellulose is irrelevant --

13          THE COURT:  But you've got to prove that the asbestos

14  is a Grace product, and I don't have that evidence here.  I

15  think at this point I have to -- I have to expunge this claim.

16  I do not have any evidence that there is this claim.  I will

17  give you 30 days to go back to this report, get a supplemental

18  expert report.  If, in fact, someone is willing to say that

19  this report is inconsistent with the way I'm reading it, I will

20  reconsider this report, if you file an appropriate report that

21  tells me what it is that this report is supposed to mean that's

22  different with this interpretation within the next 30 days.

23          MR. BELFORMAN:  Okay.

24          THE COURT:  But you'll have to affirmatively

25  undertake that within 30 days, otherwise I'm expunging this

1 claim.

2      MR. BELFORMAN:  Okay.  The -- what I will attempt to

3 have them do is to go and, if they can, break down further the

4 white chalky substance, which I understand them to be alleging

5 is Chrysotile, and then everything else is lumped under non-

6 fibrous.  That's why I was saying Dr. Lee says it's something,

7 and says here's the asbestos and everything else.  Okay?  That

8 is a description that I think Dr. Lee said was insufficient to

9 say one way or the other.  If I can get them to break that out

10 further, and I think the cellulose was an extraneous -- it was

11 from the paper backing on the wall board.  So, I appreciate the

12 Court's indulgence.  I'll see -- I'll do the best I can.

13      THE COURT:  All right.  Well, I'll give you 30 days

14 to get a supplemental report.  I am going to do an order that

15 expunges the claim, but that order will state that you've got

16 30 days to seek reconsideration by attaching an appropriate

17 expert report that further identifies the nature of the report

18 that was submitted by LabCorp.

19      MR. BELFORMAN:  Okay.

20      MR. RESTIVO:  Your Honor, just to make it clear, so,

21 Mr. Belforman, if he gets the lab report, doesn't think we're

22 just jerking him around, it is our position that his lab report

23 has to explain the cellulose as you described, but also has to

24 tell us that the binder material consisted of vermiculite or

25 gypsum, otherwise he's still at the point where all he has

1 shown is it has asbestos in it, but you don't know whose it is.

2         THE COURT:  Well, I understand that you need to get

3 some indication that, in fact, there is a Grace product

4 identified, but I think the real problem at the moment is the

5 fact that there is cellulose which clearly indicates it's not a

6 Grace product.  If it came from some source other than the

7 asbestos itself, then that's number one.  If, in fact, there is

8 still nothing that pins this asbestos to Grace, then that's a

9 different issue that we'll have to deal with.

10         MR. BELFORMAN:  Yes.

11         MR. RESTIVO:  Thank you, Your Honor.

12         THE COURT:  All right.  Thank you.  You're excused,

13 Mr. Belforman.

14         MR. BELFORMAN:  Thank you very much, and thank

15 everybody for taking me first.

16         THE COURT:  Okay, Mr. Speights.

17         MR. SPEIGHTS:  May it please the Court, Your Honor, I

18 want to take about five or six minutes and go down history

19 lane, but I want to say right from the outset that I am not

20 doing that because I like history or because I want to argue

21 with history, or because I want to argue with anything that's

22 happened.  I'm not here to criticize any decision that's been

23 made.  I'm not here to criticize Grace and Mr. Bernick.  But I

24 have a dilemma, and I'm going to connect the history to the

25 dilemma I have, which affects arguments on these various

1  motions that are pending today.  In order for the Court to

2  appreciate my dilemma, I am going to just very quickly go over

3  how we got here so I can at least try to figure out how I can

4  deal with my dilemma and proceed from here.

5          Your Honor, and I've supplied this to Grace already.

6  Your Honor, just quickly, about a year and a few -- six years

7  and a few days ago, Grace filed its petition, filed its

8  informational brief, and suggested how it was going to deal

9  with asbestos liabilities.  Interestingly, for what it's worth,

10  they said in the informational brief, and I know there were

11  some inconsistent statements in there, not being critical, but

12  after a negotiated plan of reorganization, absent a negotiated

13  plan of reorganization, the debtors' plan was to file summary

14  judgment rulings and estimate the value of the remaining claims

15  and structure a trust to pay valid claims post-confirmation.

16  I'm not saying I agree with that.  I didn't have to file a

17  response to that, but it's interesting we're hearing summary

18  judgment motions now when looking over to the horizon to

19  objections, arrive with an estimation.

20          Be that as it may, more importantly, Grace filed its

21  CMO motion in June of 2001.  And, interestingly, Grace said,

22  number one, it wanted a bar date order, which it got, and it

23  said that sixty days after its bar date order it would file a

24  preliminary claims report.  And at the same time, reading right

25  here, as a part of its preliminary report to the Court, the

1  debtors will identify already pending cases that could continue

2  to be litigated in other Courts subject to regular reporting to

3  the Court so that, we can't go back to 2001, but if we were

4  there, Grace was saying to Your Honor, Anderson could have gone

5  back to South Carolina in 2001 and we would have saved Your

6  Honor a whole lot of hearings.  Again, I'm not being critical

7  now, but that's the history background.

8          Then, Your Honor, that matter was to come up before

9  Judge Farnan in November.  Of course, Judge Wolin got

10  appointed.  Your Honor got appointed to the Grace case January

11  2002.  I say that only because there were only about two

12  months' delay.  These are the traditional property damage

13  cases.  We were proceeding along.  And in 2002, at the initial

14  hearing Your Honor held, you ordered, directed Grace, which

15  readily agreed, to file a bifurcated motion.  You wanted the

16  CMO, all P.D.s, ZAI and traditional P.D., and you wanted the

17  P.I. motion separated from that so that it could proceed before

18  Judge Wolin.  2002.  So, Grace did that.  And Grace again filed

19  its bifurcated motion for a CMO in which it argued the same

20  thing, that already pending cases could continue to be

21  litigated in other Courts subject to regular reporting to the

22  Court.  So, it wasn't just an accident that in 2001 Grace said,

23  Anderson, you can go back to South Carolina.

24          Your Honor, then, in 2002, has a bar date hearing and

25  issues a bar date order, and it requires P.D. claimants to file

1 claims as of March 31, 2003.  We were the only bar date order

2 for all sets of claims in the case and P.D. claimants did that,

3 and I filed a bunch of claims.  Grace says I filed too many

4 claims, but I filed a whole lot of claims, and others in my

5 office did.  And, Your Honor, that was March 31, 2003.

6         What happened then?  Grace did not file its claims

7 report which was going to file this separation between pre-

8 filed cases.  Essentially, nothing happened in 2003.  And if I

9 were in my, you know, argument mode, and I'm not in my argument

10 mode, I could suggest why I think nothing happened, but there

11 may be very good reasons why nothing happened.  There was a lot

12 going on.  Judge Wolin, legislation, etcetera, etcetera,

13 etcetera, which may provide a perfectly innocent explanation.

14 But P.D. had filed their claims.

15         2004 comes along, and Your Honor appoints David

16 Austern the future claimants' representative.  And Mr. Dies and

17 I, P.D. representatives, traditional P.D. representatives, went

18 to David Austern, as Your Honor knows, I've said this in the

19 past, and we encouraged him to try to settle this case, and we

20 had the Austern negotiations and Mr. Bernick has told you

21 several times he puts his hands up, we were this close to a

22 deal in late 2004.  It didn't work out for whatever reason, but

23 again, traditional P.D. claimants had done a good job in trying

24 to bring that to closure, to get a consensual plan, in

25 particular Mr. Dies and I instigated that negotiation.

1          Now, Your Honor, it's late 2004, and Grace files a

2     proposed plan, but it does something else which is far more

3     interesting than everything I've said before, I believe.  It

4     files a new motion for a CMO, but it gives us the option, gives

5     claimants the option.  It says, number one, we will proceed

6     like we've always wanted to proceed with the CMO, presumably

7     with Anderson, etcetera, going back, or we will, in the

8     alternative, this is the motion, enter an order granting the

9     relief requested in the new CMO motion establishing litigation

10    protocols for post-confirmation.  And then, Your Honor, what

11    Grace proposed was, in 2004, and again, I'm going to connect

12    these dots, I promise you, at least in my mind I'm going to

13    connect them, in 2004 that the debtors asked for P.D. claims to

14    be estimated.  We already have a bar date, and here's a motion

15    that comes in, 88, the debtors propose to estimate the

16    aggregate traditional asbestos P.D. claims as follows.  First,

17    debtors will object to the claims that fail to provide material

18    information, the so-called gateway objections.  Fine.  Second,

19    the debtors will file within two months an expert report

20    estimating the debtors' liability for the preceding claims.

21    Fine.  I've always said it's a two-month process to estimate

22    P.D. claims.  They get an expert, we get an expert.  They

23    testify one day, we testify the next day.  And third, after the

24    debtors and asbestos P.D. committee's estimation experts file

25    their reports and are deposed, the debtors expect that a

1  hearing on the debtors' estimation motion for these claims

2  could be held promptly.  So, that's the end of 2004, and

3  obviously that's not where we are today.  I don't know why.  I

4  don't care why.  Okay.  At this moment in time we are where we

5  are.  I understand that.  But that's the backdrop to what

6  happened next.

7         Because then, in December of 2005, I won't go with

8  the order where Grace proposed all this, in December of 2005

9  the holy war broke out between P.D. and especially Speights and

10  Runyan and Grace, but something else happened that was far more

11  important than the slugfest we had, and I won't post the number

12  of claims and what happened about that.  Mr. Dies, through his

13  everlasting credit, initiated a process to negotiate a split,

14  and that's ultimately where I'm headed, because that presents

15  my dilemma today.

16         Mr. Dies first, working non-stop, Mr. Scott, Mr.

17  Westbrook, and Ms. Gabrasia (phonetic) and me, in a lengthy,

18  torturous, difficult negotiation, agree on a split between the

19  P.I. -- between the traditional P.D. claimants and the ZAI

20  claimants, an internal split, not unlike P.I. does all the time

21  between its impaired and unimpaired claimants.  And by December

22  of 2005 Mr. Dies had put together that split between ZAI and

23  P.D., and on that occasion Your Honor was considering

24  exclusivity, and Mr. Bernick argued strenuously for a 60-day

25  extension of exclusivity.  And the basis of it, and again, I'm

1 not being critical of Mr. Bernick, I salute him for making this

2 the basis of it, the basis of it, Your Honor, was that Mr. Dies

3 was now talking to Russell Budd of the P.I. committee and

4 trying to take the first split, and then do the second split,

5 the split between P.I. and P.D.  And, Your Honor, Mr. Bernick

6 unequivocally said this is our best chance to get a deal.  And,

7 Your Honor granted the extension of exclusivity and without

8 reading every line in the transcript, I don't want to trespass

9 on the Court's time, Your Honor said that's substantial

10 progress, go, try to put this together.  So, again, at the end

11 of 2005, as at the end of 2004, P.D., Mr. Dies and I, went to

12 Mr. Austern, we came that close.  At the end of 2005 P.D. had

13 come to Your Honor, had been praised by Mr. Bernick, had been

14 praised by Your Honor that we were promoting a consensual plan

15 of reorganization.

16        So, off we go to Judge Pointer's mediation.  And

17 Judge Pointer picked up, initially, that the way to proceed,

18 and I can't discuss what went on in the mediation, only the

19 results, let's try to push this four foot piano through the

20 three foot door.  That is, the split agreement between personal

21 injury attorneys and property damage attorneys that everybody

22 thought was a great idea to proceed with in December of '05, to

23 try to push that through the door and get a split agreement.

24 Months and months, and hundreds of thousands of dollars, and

25 trips all over this country in that process, hallelujah, we did

1  it.  And we reported back to the Court that we did it.

2       But then comes the crucial matter, Your Honor.  We

3  were not able to do a consensual deal.  I'm not being critical

4  of anybody.  For whatever reason, there was no consensual deal

5  with the debtor or the unsecured committee.  We had our split

6  agreement, but we did not have the deal.

7       And then, Your Honor, we came back before the Court,

8  and this is what presents my dilemma.  Grace objected to the

9  split agreement.  It didn't formally object, but it had a

10 discussion with you on the record on September 11, along with

11 other times, and said, Your Honor, this thing is not worth

12 anything.  Albeit we did it at the encouragement of the debtor,

13 because we didn't get a consensual plan, Grace expressed a

14 concern that this split agreement should not be honored and

15 should be thrown out.  And Your Honor said this on Page 49 of

16 the transcript of September 11, 2006, in response to Mr.

17 Frankel.  Well, I'm a little confused about the agreement to

18 split up the assets because frankly of something that Mr.

19 Bernick raised in his argument, and that is this.  I do expect

20 that within a week or so the ZAI opinion is coming out, and I

21 do expect at some point we're going to be looking at other

22 property damage claims.  Now, just hypothetically, what happens

23 if those decisions aren't in conformity with the value of the

24 trust that has been devoted to property damage claims?  Either

25 higher or lower, it doesn't matter.  Just what if it doesn't

40

1  reflect those claims?  I don't think you can agree your way

2  around a Court decision.  And that brings me here today, Your

3  Honor.

4           And again, I'm not being critical.  I have a dilemma,

5  and I have several dilemmas, actually.  Here's my first

6  dilemma, Your Honor.  I am co-chair of the property damage

7  committee.  The property damage committee, ZAI and P.D.,

8  negotiated this split agreement in the interest of all P.D.

9  claimants.  We thought it was in our best interest.  I first

10 shook the hand of Mr. Scott and Mr. Westbrook when I split

11 between traditional and ZAI, and then I shook the hand of Mr.

12 Lockwood, and Mr. Enselbach, and Mr. Rice, and Budd, and

13 Whites, and Cooney, on the overall split.  The committee

14 supported this unanimously.  Now, I don't want to be, and this

15 is a little rhetorical, but I don't want to be placed in the

16 position, without some formal rejection or acceptance of this,

17 being in the position of trying to settle claims on my own that

18 would in any way sabotage the split agreement which in my mind

19 is still alive, because --

20          MR. RESTIVO:  Your Honor, at this point -- I don't

21 mean to interrupt, but I guess I want to object.  The split

22 agreement, or the approval Mr. Speights needs, or his dilemmas,

23 are not on the agenda, most of what he's saying he's saying

24 very well, but I don't know what he's talking about.  That's

25 not what's before us today.  What's before us today are a

41

1  series of summary judgment motions which Mr. Speights has to

2  deal with as the attorney for those claimants, and I don't know

3  why we're getting off the agenda to go into something on a

4  split agreement that's not on the agenda, and not before the

5  Court this morning.

6       MR. SPEIGHTS:  Because it goes directly to Prudential

7  statute of limitations.  That's where I'm headed in our first

8  argument, and I'm within two minutes of being through, Mr.

9  Restivo.  I understand your concern that I'm in left field, but

10  I think I've moved from left field almost to home plate.

11       The first problem I had was what I said, Your Honor,

12  and because of P.D. claimants -- let me just finish it, as a

13  traditional P.D. claimant, I'm not arguing with anybody, I want

14  to give ZAI whatever it is, $100 million, even though Your

15  Honor has ruled against ZAI.  And P.I. wants to give them $100

16  million, or whatever it is, even though you've ruled against

17  ZAI, because at the end of the day, they might -- they might

18  get Your Honor reversed in the Third Circuit.  And then ZAI is

19  going to come back and say, well, it's a billion dollars, and

20  therefore everything is a new game.  So, the P.I. committee,

21  the future claimants' representative, and the P.D. committee

22  are all -- have not walked away from that.

23       But, the flip side of that is what brings me here,

24  Your Honor, because what if Your Honor's concerns become a

25  ruling, become an order?  What if Your Honor is right that you

**J&J COURT TRANSCRIBERS, INC.**

1  do not want to allow payment of claims against which you've

2  ruled?  If that's the law, if that's the way we're proceeding,

3  I understand that.  But here you have Prudential, and I'm not

4  attacking Prudential, and I'm not attacking any P.D. lawyer,

5  here you have Prudential, which has the same issues that are

6  involved in its New York claims that Mr. Fairey will be arguing

7  involved in our New York claims.  Counsel announces at the

8  beginning, and he's announced prior to today, that he has a

9  settlement with Prudential.  So, Your Honor, what happens now

10 if Your Honor, and I don't think Your Honor will do it.  I

11 think Mr. Fairey will be overpowering in his arguments.  But

12 what happens if you say to Mr. Fairey I'm going to disallow

13 your New York claims?  Does that mean Prudential does not get

14 its money from its settlement agreement because Grace has taken

15 the position and urged upon you that if a claim is disallowed,

16 if you've made a ruling, then Your Honor can't allow a

17 settlement?

18        Stated differently, and why I'm here, Your Honor, the

19 fact that Grace has now put before you settlements of claims

20 such as Prudential, is ipso facto, an acknowledgment on their

21 part that these claims should be allowed.   And therefore, why

22 should I have to, and Mr. Fairey, and the other claims besides

23 the New York claims, argue matters on summary judgment?  Why

24 should Grace be allowed our claim should be disallowed, at the

25 same time it's paying in settlement of those claims, and at the

1  same time it's taking the position that once a claim is

2  disallowed you cannot pay it any money?

3           THE COURT:  Well, I don't know what the settlement is

4  with Prudential.  It may be that those claims will be

5  disallowed.

6           MR. SPEIGHTS:  I don't either.

7           THE COURT:  I haven't seen the settlements.

8           MR. SPEIGHTS:  And that's my last point, Your Honor.

9  I haven't seen them either.  And apparently, they are in the

10 works, and I don't know at what time they will be filed, but I

11 felt it appropriate, before we go down the road and argue these

12 things, to say to Your Honor leaving aside what I think the

13 record suggests of how we should be proceeding, P.D. has always

14 supported estimation rather than claims objections, leaving all

15 that aside, because of the split agreement issue and the

16 concerns that I have here, and what was said, I think it is an

17 inter-relationship between that and what we do with these

18 settling claims.  So, my first argument will be, and I just

19 made it, that if, in fact, Grace has allowed the Prudential

20 claims, or any other claims for which it's objecting to us, I

21 think that they ought to say so and not be allowed to proceed

22 with arguments that our claims can't be allowed, which present

23 the precise legal issues, the precise legal issues in our

24 claims.

25           THE COURT:  Well, I guess -- I guess my only gut

1  reaction to this, Mr. Speights, is that with respect to

2  particularly property damage claims, each building, I suppose,

3  has its own unique aspects, and so, although the area of law,

4  if you're arguing statute of limitations, in a global construct

5  the statute of limitations, for example, in New York, just to

6  pick a number, let's say the statute of limitations is three

7  years, that three years applies to all buildings and property

8  owners in New York, but the application to each particular

9  building and building owner may not be the same.  So, there may

10 be reasons why any party may want to offer a settlement to one

11 building and building owner and not to others.  You know, there

12 can be different factors that would apply, but that will be the

13 debtors' burden to substantiate why the settlements are

14 appropriate as and when they come up.  I don't know why that

15 bars the debtor from pursuing litigation against other building

16 owners.  I mean, if I took your theory to its logical

17 extension, that essentially would say that because the debtor

18 settles any one given claim in any case, it can't litigate any

19 other given claim in the case, and that would make no sense.

20        MR. SPEIGHTS:  I'm not arguing that Your Honor.  In

21 fact, my position, and I want to be clear for the record, as

22 much for the people listening on the phone as the people in the

23 courtroom, including the back of the courtroom, my position,

24 and I believe the unanimous position of all the asbestos

25 constituencies is at the end of the day the split agreement

1 should prevail and it doesn't cost Grace a penny.  At the end

2 of the day -- if we made a good deal or a bad deal, it's sort

3 of like let's make a deal on the Court, you know.  We have --

4 we may get a little more money than we deserve, a little less,

5 but it's P.I. or ZAI paying it.

6           THE COURT:  Well, here's the problem.  I don't know

7 whether the debtor and the -- you know, the alleged plan

8 proponents know what the split is.  I know the Court doesn't

9 know.  I haven't heard one word except for the fact that there

10 is a deal.  So, I don't know who the parties are, who were

11 involved.  I don't know what the alleged split it.  I mean, I

12 understand that there is an internal deal between property and

13 property, and I understand that apparently personal injury and

14 property came to some sort of deal.  But there hasn't been

15 anything spread before me.  I don't have any motions to approve

16 any settlements.  There hasn't been any Court involvement in

17 this.  So, at this point in time there is apparently, on that

18 side of the room, some agreement that might lead to a plan term

19 sheet of some sort, but it hasn't been advocated to the Court.

20 It isn't in any kind of fashion that this Court can recognize.

21 So, that's all I can offer on that.

22           MR. SPEIGHTS:  I appreciate that, Your Honor, and my

23 personal opinion, not as a competing member, is that either the

24 debtor or the committee should have put that before you,

25 because they would have fleshed it out rather than we're

1 dealing with the issue of reflections without briefing and

2 argument on a record.  But the reason it comes to play here

3 again is, not because of what I'm arguing that you ought to

4 honor the split agreement, because of the flip side if you

5 accept the premise that you have to ignore the split agreement

6 as Grace proposed in its various times, then again it's ipso

7 facto that for the same reason these other settlements may be

8 directly relevant to cases before you.  Of course if you're

9 dealing with the Libby Montana law it doesn't apply to the New

10 York law on the statute of limitations, but when you have the

11 same motion, and in previous arguments by Grace saying it's the

12 same issue involved in Prudential and in Speights and Runyan's

13 Anderson claims, I think we have a problem.  And again, I don't

14 want to do anything to prejudice Prudential.  I'm a fan of

15 Prudential and every other P.D. claimant, but we will make -- I

16 do think there's some burden on Grace to come forward and show

17 why our claims are different from those which it is settling

18 and allowing, if, in fact, that's what it is doing.

19         MR. RESTIVO:  Objection, Your Honor.  If he wants to

20 object to the Prudential settlement when it's filed, we will

21 fight about standing and he can object.  That is not -- the

22 Prudential settlement is not on the agenda today for approval.

23 I was very careful to say with respect to the settlements that

24 settlement agreements in principle have been reached.  They are

25 writing up the documents.  I don't know why Mr. Speights wants

1  us to litigate against Prudential or against Mr. Dies.

2             THE COURT:  He doesn't.

3             MR. RESTIVO:  When we have reached an agreement.

4             MR. SPEIGHTS:  I don't.

5             THE COURT:  That's not the point.  He doesn't want

6  you to litigate against him when you've reached agreements

7  against other parties.  He wants the same rulings, whatever

8  they are, to apply.  But I'm not sure that that's the standard.

9  We're going to go forward with today's agenda.  If, in fact,

10 there's some inconsistency, I'll figure it out when I know that

11 there's an inconsistency.  Right now I don't.  It's all

12 hypothetical.

13            MR. SPEIGHTS:  Thank you, Your Honor.

14            THE COURT:  Okay, Mr. Restivo.  Well, anyone else

15 wish to talk about the structure of the arguments, first?

16 Okay.  Mr. Restivo?

17            MR. RESTIVO:  Your Honor, I'm going back to our

18 motion to expunge 11 claims represented by our top green bar on

19 the grounds that based upon the undisputed facts in the claim

20 forms those claims did not involve a Grace asbestos containing

21 product.  Of those, 11 property damage claims in the motion,

22 Your Honor, and our motion is in Binder Number 1 of your bench

23 books at Tab Number 5, two of those were voluntarily dismissed,

24 and so, we're talking now about nine remaining buildings, and

25 we've talked about Mr. Belforman, and so now we're really

1 talking about only eight remaining buildings in this motion.

2 Of the eight remaining buildings, Your Honor, no objections to

3 our motion for summary judgment were received with respect to

4 four claimants, Virginia Thrasher, Claim Number 2634, Jamie

5 Sharser (phonetic), Claim Number 4382, Clifford Spingler

6 (phonetic), Claim Number 5984, and Kenneth Smith, Claim Number

7 7092, and we can hand up an order expunging those claims for

8 failure to respond to our motion for summary judgment if the

9 Court so desires.

10         THE COURT:  Is anyone present representing Thrasher,

11 Sharser, Spingler, or Kenneth Smith?  There's no response.

12 Yes, I will take an order with respect to those four.

13         MR. RESTIVO:  Your Honor, I have an order, but some

14 numbers are transposed in it.  Can we submit that with a

15 certificate of no objection?  I apologize.

16         THE COURT:  Yes.  I need one with respect to the

17 Belforman order anyway, as I articulated on the record.  So,

18 let me make a note, though.

19                         (Pause)

20         MR. BAENA:  Your Honor, may I be heard?

21         THE COURT:  On the motion --

22         MR. BAENA:  The ones that you are considering filing

23 an order now, or entering an order to expunge?

24         THE COURT:  Yes.

25         MR. BAENA:  I don't represent these claimants, but,

1  Judge, I'm trying to understand the ground rules of engagement

2  for this hearing.  We're here on a motion for summary judgment.

3  The motions that are filed in respect of these claimants by

4  Grace are virtually identical to what you heard in regard to

5  Mr. Belforman.

6          THE COURT:  Yes.

7          MR. BAENA:  And that is Grace's contention that the

8  proof of claim submissions by these claimants are insufficient

9  to prove its Grace ACM.  That's all.  Not that it isn't Grace

10 ACM, but rather that the submissions by the claimants was

11 insufficient.  In the case of Mr. Belforman you correctly,

12 instead of entering summary judgment, gave Mr. Belforman an

13 opportunity to supplement his submission to prove that it was

14 Grace ACM, because ultimately you're quite right, in order for

15 the claim to be allowed over an objection, the claimant has the

16 obligation of coming forward with that proof, a production.

17         The summary judgment motion, again, doesn't say it

18 isn't Grace ACM.  It says there's no proof of it.  And so, you

19 know, we're confusing the motion for summary judgment with the

20 ultimate issue of the allowance of a claim.  All this should do

21 is warrant the same result in the case of Mr. Belforman.  The

22 claimants should have to come forward with a further

23 submission.  If they don't, then it's over.  They haven't

24 proved anything by their motion for summary judgment, whether

25 it's been objected to or not.  They haven't proved anything by

1  these motions.

2          THE COURT:  Well, I think what's proven by the motion

3  is the fact that the debtor has stated that it is objecting to

4  the claim based on the fact that there is no product

5  identification sufficient to tie this proof of claim to Grace,

6  and there has been no response which indicates that, in fact,

7  the creditor agrees that they have not come forward with any

8  evidence identifying this as a Grace product.  I'm happy, Mr.

9  Baena.  I have, I think, bent over backwards attempting to get

10 these individual claimants an opportunity numerous times to

11 come forward with evidence of product I.D.  You know, if it's

12 going to give -- to give them 30 more days to come forward with

13 one more opportunity is fine, but if they don't do it within

14 the next 30 days, that's it, they're going to lose any

15 opportunity to come forward with any more product evidence ever

16 against Grace.

17         MR. BAENA:  Judge, I'm not -- I'm more concerned

18 about the process than I'm concerned about --

19         THE COURT:  Well, I'm no longer concerned about the

20 process, Mr. Baena.

21         MR. BAENA:  Well, Judge, because, you know, this

22 isn't a claims objection hearing.  This is a motion for summary

23 judgment.

24         THE COURT:  Yes.

25         MR. BAENA:  We're not here on a claims objection

1  hearing.

2          THE COURT:  But we are.  It's objection to Claim

3  Number 15.  This is a summary --

4          MR. BAENA:  No.  It's a motion for summary judgment

5  --

6          THE COURT:  On --

7          MR. BAENA:  -- in respect of it on the limited ground

8  that the claimant has not produced sufficient evidence that it

9  was Grace ACM.

10          THE COURT:  But it was on the omnibus objection based

11  on the fact that there was no product I.D.  These people have

12  had at least three, I've lost track, at least three notices

13  about the fact that the debtor wants some product

14  identification, at least three now, and they still haven't come

15  forward with any.  So, you know, I'll give them 30 more days,

16  Mr. Baena, but that's it.  They have -- if they're going to say

17  that this is the debtors' product, they have to come up with

18  some evidence that shows that this is the debtors' product.  I

19  mean, it's just -- this is a bankruptcy case.  They've got to

20  prove their claim, and so far they haven't.

21          MR. BAENA:  I don't disagree that they have to prove

22  their claim.  The question is, here and now?

23          THE COURT:  Here and now.

24          MR. BAENA:  Well --

25          THE COURT:  Today.  They should have done it today.

1  I'll give them 30 more days, but that's it.  If they don't have

2  some evidence, and good evidence that this is, in fact, the

3  debtors' product in 30 days, that's it.  They're not getting

4  any more chances.  Now, if -- I know you don't represent them.

5  You want to get in touch with them and tell them, fine.

6  Otherwise, there's nobody here representing them.  I am not

7  going to give them additional notice.  They had an order that

8  told them that today was the day for this hearing.  They

9  haven't chosen to be here.  So, if you want to get in touch

10  with them and tell them they've got 30 days, that's fine.  But

11  this Court is not going to do that.

12         MR. BAENA:  I will, Your Honor.  And we have spoken

13  to some.

14         THE COURT:  This is what I'm going to do.  I am going

15  to do an order that grants the motion for summary judgment and

16  expunges these claims.  I will give them 30 days to file

17  motions for reconsideration with appropriate expert reports

18  that substantiate that, in fact, this is a Grace asbestos

19  containing product.  If I don't have that motion for

20  reconsideration with an appropriate expert report attached in

21  30 days, then this will be a final order, because I don't know

22  how else at this point, Mr. Baena, to get the attention from

23  people.  So, the same order that I am having the debtor prepare

24  with respect to Mr. Belforman I will have the debtor prepare

25  with respect to Thrasher Sharser, Spingler, and Kenneth Smith.

1 Okay.  Mr. Restivo?

2        MR. RESTIVO:  Your Honor, just so the record is

3 clear, we don't have any objection to the 30 day order, but Mr.

4 Baena has mis-described our motions.  They're not the same as

5 Mr. Belforman with -- just so the Court has some comfort

6 because dealing with the pro se claims is hard for the Court

7 and the parties, and we appreciate that.  But Verbinia

8 Thrasher's claim was for asbestos siding.  We never made

9 asbestos siding.  Jamie Sharser's claim was for pipe

10 insulation.  We never made pipe insulation.  There's no dispute

11 about that.  But we don't object to the 30 days.  The pro se

12 situation is always difficult.

13        THE COURT:  I understand the debtors' objections.  I

14 read these pleadings.  I thought that's the reason there had

15 been no response from these individuals, Mr. Restivo, but

16 nonetheless, you know, I think the Court has an obligation to

17 proceed with caution with respect to individual claimants.  I

18 see, at this point I can't imagine, frankly, how there is going

19 to be these expert reports, but nonetheless they've got 30

20 days.

21        MR. RESTIVO:  Again, we have no problem with that,

22 Your Honor.  Your Honor, Claim Numbers 12751 and 12752 are pro

23 se claims by Finette Stewart.  Ms. Stewart did not file a

24 formal response, Your Honor.  She did send an e-mail -- and

25 again, pro se claims are difficult for the attorneys and the

1  Courts.  We attached her e-mail to our reply brief, and so, it

2  is in the record.  Ms. Stewart is troubled by asbestos

3  insulation in the residential furnace installed in the late

4  '40's in her home.  There's no dispute that the product is

5  furnace insulation.  There's no dispute Grace never made such a

6  product.  And so, these two claims should be expunged.

7          Woodbury Apartments is a claim based upon a bulk

8  sample.  The bulk sample is somewhat like the Belforman example

9  in that the bulk sample does not show Grace components other

10 than asbestos.  It does not show gypsum, does not show

11 vermiculite.  In addition, the bulk sample shows cellulose and

12 Grace did not make a cellulose containing product.  The

13 claimant says that -- and we attached this to our answer.  I

14 think this was a communication, not a filing.  The claimant

15 says that maybe the contractor threw in some cellulose at the

16 job site, or maybe the cellulose came from some other product

17 and was accidently included in the bulk sample.  To be a Grace

18 product, Your Honor, you have to find Chrysotile, vermiculite,

19 and gypsum.  No cellulose.  Claim Number 2762 needs to be

20 expunged.  It's not a Grace product.

21         Ronald Scarry's (phonetic) claim, Your Honor, is

22 Claim Number 6582, also a pro se claim.  It's based on basement

23 duct material, and asbestos wrapping, neither of which was ever

24 made by Grace.  Mr. Scarry sent a letter, I believe, or an e-

25 mail, it's attached to our reply, in which he said that Grace

**J&J COURT TRANSCRIBERS, INC.**

1  is free to test his material.  We don't take a position one way

2  or the other on whether his material contains asbestos or not.

3  We assume it does.  Our problem, obviously, is he's complaining

4  about a product, there's no dispute Grace never made, and

5  therefore Claim Number 6582 may be a claim for an asbestos

6  containing product, but it's not the debtors', Your Honor, and

7  for that reason, we are moving to expunge the nine claims left

8  in our motion, not a Grace product, which includes Mr.

9  Belforman, the four who didn't respond, and the four I have

10  just referred to.

11       THE COURT:  Okay.  Again, I have the same problem

12  with these.  In fact, these entities, these three people and

13  entities, Ms. Stewart, the Woodbury Apartments, and Mr. Scarry,

14  in fact, did respond to Grace, but again, in this instance I

15  don't see any basis for assuming that this is a Grace product

16  because at least as to Stewart and Scarry, the product, which

17  is the basis for the complaint, is not something that the

18  debtor ever manufactured, or distributed, correct?

19       MR. RESTIVO:  That's correct, Your Honor.

20       THE COURT:  So, I do not see a basis for the Stewart

21  or Scarry claims in any event, and I believe those need to be

22  expunged.  With respect to Woodbury Apartments, because it has

23  the same problem with respect to the report that the Belforman

24  claim has, I think the same 30 days is appropriate in the event

25  that there is some basis on which to somehow or other key this

1 into the debtors' product.  Again, I really don't see how.  I

2 think this is an exercise in futility, but nonetheless, saying

3 that, you know, some people can have 30 days, I suppose, is

4 just an exercise in caution, so I'll give them the same 30

5 days.  Mr. Baena, unless you have some reason to believe that

6 there is -- that furnace insulation or duct wrapping is somehow

7 or other going to be affiliated with the debtor product, then I

8 don't see a basis for an additional 30 days, even, for Stewart

9 and Scarry.  I'm not aware that anybody has contended that

10 these are debtors' products.

11          MR. BAENA:  I thought -- Your Honor, I thought -- I

12 read the response from Stewart, Finette, I believe --

13          THE COURT:  Yes.

14          MR. BAENA:  -- Stewart, to say that it was for a

15 popcorn ceiling, in part.  And I thought that's a sprayed on

16 application that would be -- could be a Grace product.  That's

17 what her response is.  I have trouble following all this, again

18 probably because it's individuals, but it does say for the

19 above property I cannot get the test results but have included

20 the bill for covering the popcorn ceiling and the open beams

21 with sheet rock.  She's encapsulating the asbestos-containing

22 material.  And I thought they make sprayed on applications and

23 it could be one of theirs.

24          THE COURT:  I thought the proof of claim that the

25 debtor objected to was based on furnace insulation.

**J&J COURT TRANSCRIBERS, INC.**

1       MR. BAENA:  Her claim is for more than that,

2   apparently.

3       MR. RESTIVO:  Your Honor, I think I would include her

4   in the 30-day notice.  I think Mr. Baena is correct.  Her

5   original claim made reference to both popcorn ceiling and

6   furnace insulation.  In response to our motion for summary

7   judgment I think her communication is solely and exclusively

8   concerned about her furnace, and she has to remove it.  But I

9   don't have a problem -- again, pro se claimants are tough to

10  deal with, including her in the 30-day dismissal with 30 days

11  to provide something else.

12      THE COURT:  I don't think I have the proof of claim

13  either, so, it's possible that I misread what's here.  Put them

14  all in the 30 days.  It will just be easier.  We'll give

15  everyone 30 days to, you know, provide some supplemental, but

16  again, we'll see what happens.  I really think it's going to be

17  an exercise in futility.  Nonetheless, I'll give them all 30

18  days to attempt to show that somehow or other these are Grace

19  products.

20      MR. RESTIVO:  We're going to give the Court an order

21  expunging the claims subject to 30 days to respond.

22      THE COURT:  Yes.

23      MR. RESTIVO:  And I'm going to remove my top green

24  bar from the chart and I'll put it back on in 30 days if

25  anybody responds.

**J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  All right.

2          MR. RESTIVO:  Our second motion, Your Honor, is

3 reflected by the dark green in middle, statutes of repose, and

4 my partner, Traci Rea will address that motion.

5          MS. REA:  Good morning, Your Honor.  Traci Rea on

6 behalf of the debtors in connection with debtors' motion for an

7 order disallowing and expunging 11 asbestos property damage

8 claims barred by certain statutes of repose.  And, Your Honor,

9 that's Docket Number 14596.  And with respect to your binders

10 it would be located in Binder Number 2, at Tab Number 7.

11          Your Honor, the debtors have moved to expunge 11

12 property damage claims based on the straightforward and legal

13 application of the statutes of repose in the states of

14 Minnesota, North Carolina, Iowa, and Tennessee.  As Your Honor

15 knows from the briefing, these states have enacted statutes of

16 repose which run from a date certain, such as the date the

17 building was built or the date the product was sold, regardless

18 of the claimants' knowledge of their claims.  So, for example,

19 if a building was built in 1970, it's subject to a ten-year

20 statute of repose based on when it was built.  The claim would

21 be barred by 1980, regardless of what the claimant knew or when

22 it knew it.

23          The claimants here aren't disputing that the products

24 were installed or sold on the date certain.  Now, when you

25 apply the governing statute of repose to those dates, you find

1  that all of these claims were time barred well before they were

2  asserted.

3          And, Your Honor, I'd like to start with the state of

4  Minnesota.  Minnesota has a ten-year statute of repose that

5  runs from substantial completion of the building.  There are

6  five Minnesota claims that the debtor seeks to expunge pursuant

7  to Minnesota's ten-year statute of repose.  And those are

8  Claims Number 3512, 6933, 6936, 10523, and 12780.  Now, all of

9  the buildings subject to those claims were completed by the mid

10  1960's.  None of the Minnesota claimants contest that the

11  buildings were completed more than ten years before they first

12  brought their claim, and that they would be barred by the

13  statute of repose if it applied.

14          Instead, what four of the five claimants have done is

15  attempt to rely on the fraud exception to the Minnesota statute

16  of repose.  In order to invoke that exception, however, it's

17  claimant's burden to come forth with some evidence of fraud

18  that prevented them from discovering their claims, and that's

19  set forth in the Metropolitan and Apple Tree cases cited in the

20  briefing.  None of the Minnesota claimants here have come forth

21  with any evidence of fraud that was either directed to them or

22  upon which they relied.  In the absence of that kind of

23  evidence, these claims should be expunged.

24          The final Minnesota claimant has asserted that the

25  statute of repose is unconstitutional.  There is one case that

1 that claimant has cited, and it applies solely to third party

2 indemnity claims.  Obviously these are not third party

3 indemnity claims, and the statute is constitutional as applied

4 to these property damage claims.

5       Accordingly, we would request that all of the

6 Minnesota claims be expunged pursuant to Minnesota's ten-year

7 statute of repose.

8       Your Honor, that takes us to North Carolina, that has

9 a six-year statute of repose that runs from the sale of the

10 product.  There are two North Carolina claimants, Claim 10672

11 and 10673, that have admitted that the product was installed in

12 their buildings in 1970 and 1976.  These claimants, again,

13 don't dispute that the statute has run, but instead assert that

14 it doesn't apply for two reasons.  First they say that debtors

15 are material men, and because they're material men a different

16 statute of repose applies that has a willful or wanton

17 negligence exception.  They next attempt to invoke that

18 exception to escape any statute of repose at all.

19       With respect to the material men exception, it would

20 be claimant's burden to come forth with some evidence that

21 debtors are more than just a remote manufacturer and in fact

22 were material men that supplied and furnished materials to the

23 job site.  The evidence that they point to here is just

24 insufficient to meet that burden.  Even if they could meet that

25 burden, though, there's no evidence in this record that the

1  debtors acted negligently at all in furnishing material, and

2  certainly not willfully or wantonly.  In addition, there's no

3  evidence here of any fraudulent conduct that was relied upon by

4  these claimants, and in North Carolina you have to have

5  reliance to have fraud, and that's the Rowen case in the

6  claimant's response.  In the absence of any fraud, or willful

7  or wanton negligence, these claims should be expunged.

8         Your Honor, next we turn to Iowa, that has a 15-year

9  statute of repose that runs from the date of the manufacture of

10 the product.  There are two Iowa claims, Numbers 1151 and 1153,

11 where the claimants have admitted that the products at issue

12 were installed in their buildings in 1970 and 1971.  Again,

13 these claimants don't dispute that the statute has run, but

14 they argue that it doesn't apply.  Specifically, they argue

15 that under the Supreme Court's decision in Talum (phonetic),

16 asbestos property damage cases aren't subject to the statute of

17 repose at all, because the products no longer attach to the

18 building.  Talum, however, doesn't make the distinction that

19 these claimants would like to draw.  In Talum, the plaintiff

20 was an electrician that was exposed to debtors' products after

21 they had been sprayed onto the building.  The plaintiff

22 attempted to argue that the product itself was not an

23 improvement to property and that the statute of repose didn't

24 apply.  The Talum Court rejected that argument and held that

25 once the product is applied, it's considered to be an

improvement for purposes of the statute of repose.  Nothing in

Talum suggests that the status of the product can actually

change after application.  And, in fact, that argument is very

inconsistent with the bright line test that the Talum Court

adopted and really advocates a test that would be unworkable.

The United States Court of Appeals for the Eighth Circuit

recognized that, and in implying Iowa law rejected this very

argument.  The Eighth Circuit, in the Hardin decision, held

that under Talum, once a product has attached, it becomes an

improvement for statute of repose purposes even if it's later

removed.  So, there's no merit in the distinction the Iowa

claimants are attempting to draw from Talum, and their claims

should be expunged.

Finally, Your Honor, we arrive at Tennessee, the last

state subject to this motion.  Tennessee has a ten-year statute

of repose that begins to run from the date of the sale of the

product.  There are two Tennessee claimants, Claims 10533 and

11722 that admit that the product at issue was installed in

their building in 1970.  Again, they don't dispute that the

statute has run, but argue that it doesn't apply to what

they're calling the asbestos exception.  Now, the Tennessee

statute of repose does not apply to actions resulting from

exposure to asbestos.  The Tennessee Courts have applied this

exception exclusively to asbestos personal injury claims.  In

fact, if you look at the legislative history, this exception

1 was made to the statute specifically to address the disease of

2 asbestosis, because it doesn't manifest itself until several

3 years after exposure to asbestos.  There are two Federal Court

4 decisions that seem to apply the exception to property damage

5 claims, but one does so without any analysis of the purpose and

6 history of the statute, and the other one was actually set

7 aside on an issue that renders this discussion dicta.  There

8 therefore is no binding or persuasive Tennessee authority that

9 has accepted asbestos property damage claims from the statute

10 of repose, and based on the plain language and history of the

11 statute, the Tennessee claims don't fall within the exposure to

12 asbestos exception.  There are no allegations in these claims

13 that they arise from exposure to asbestos.  In fact, the

14 claimants here have said exactly the opposite.  In their

15 responses to debtors' 15th omnibus objection they state, in

16 Paragraph 4, and I quote, "These are not personal injury

17 claims.  The claimant does not allege that anyone in its

18 building has gotten or will get an asbestos-related disease."

19 Accordingly, the statute of repose should apply to the

20 Tennessee claims and those claims should be expunged.

21       Your Honor, once you apply the statutes of repose of

22 Minnesota, North Carolina, Iowa, and Tennessee to the

23 undisputed facts relating to the claims from those states,

24 there's no question that the claims should be expunged, and

25 debtor would request that the Court grant their motion and

1  expunge those 11 claims at this time.

2          THE COURT:  Thank you.

3          MR. FAIREY:  May it please the Court, Your Honor.  I

4  am responding on behalf of the Speights and Runyan claimants.

5  I think there are some other respondents, as well.  I'll try to

6  identify the claims as I go through.  Budd Fairey.  First of

7  all, to understand the statute of repose, I think it's

8  important to understand what it is Grace manufactured and how

9  it came to be included in a construction project.  And a very

10 good description of that is in Judge Posner's decision from the

11 Seventh Circuit, <u>State Farm v. W.R. Grace</u>, where he recognized

12 the product we're talking about is a bag of powder, a bag of

13 powder that is shipped directly to a job site by Grace.  In

14 support of that, in the record on all these claims we have

15 thousands of invoices, shipping labels, credit memos, etcetera,

16 that show Grace did not put this product into a warehouse -- I

17 mean, into a hardware store, or into a supply shop.  They

18 contracted directly with the construction contractors and

19 shipped it to the site, and that's a very important distinction

20 for some of these claims.

21         Once the bag showed up at the job site it was thrown

22 in a hopper.  It was mixed around.  They put water in it.  And

23 then they sprayed it onto a building.  And I'll quote from the

24 <u>State Farm</u> case, "Calling a spray an improvement would do

25 violence to the ordinary meaning of the word."  So, this is an

1 | issue that Grace has litigated these statutes of repose since
2 | 1982.  Very rarely have they gotten any traction with any
3 | Court, and it's based on that background that we're here
4 | arguing about these statutes.

5 |        First of all, the North Carolina statute, Your Honor,
6 | the North Carolina statute of repose, and there was an asbestos
7 | in buildings case from the North Carolina Supreme Court
8 | directly dealing with floor tile.  In that case the Court said
9 | based upon the pleadings of the plaintiff in that case, that
10 | the material man repo statute could apply if there was evidence
11 | that the material was supplied directly to the job site, either
12 | to the owner or the contractor applying it.  In that situation
13 | the material man statute of repose could apply, and that was
14 | recognized by the North Caroline Supreme Court.  Attached to
15 | our motion, Judge, we have submitted a job invoice showing
16 | Grace shipped directly to one of the job sites here.  So,
17 | clearly, Grace falls within the material man portion of this.
18 | And the distinction is different, and the distinction is noted
19 | specifically in the North Carolina Court of Appeals when it
20 | recognizes if you're a material man, then the willful and
21 | wanton exception to the repose applies if you're just a
22 | supplier of a product -- I mean, if you're just a manufacturer
23 | of a product remotely, then it does not.  But in Armstrong, in
24 | the Forsyth v. Armstrong, the North Carolina Supreme Court
25 | directly found that that's a question of fact that has to be

1  determined based on the evidence.  And the evidence here, at

2  least, is in dispute, but we believe the evidence will show

3  that as far as the North Carolina buildings go, the product was

4  shipped from Grace to the job site, and so, they would fall

5  within the material man -- in the material man exception.

6         And I want to address this globally.  There was a

7  reference here that there has been no evidence put forth here

8  of Grace's fraud, or of any willful or wanton conduct, and I

9  take great exception to that, Your Honor, because in our -- the

10 very objection response that counsel quoted from, goes on after

11 the paragraph that she quoted from and left some 50 paragraphs

12 of specific allegations of Grace's willful and wanton and

13 fraudulent conduct with respect to asbestos -- it's <u>Marketing</u>

14 <u>in Monicote</u> (phonetic).  So, that has been our -- that was the

15 very first thing these claimants put in the record was a

16 description of that evidence.

17        On top of that we have the expert report that's been

18 submitted by Mr. Halliwell (phonetic) in this case, and Mr.

19 Halliwell went through Grace's records and historical

20 information, depositions of Grace salesmen, to come up with

21 opinions that reflect the fact that Grace made conscious

22 decisions not to disclose, made conscious decisions to keep the

23 hazards of asbestos from getting out, and also to keep building

24 owners from even knowing that its product had asbestos in it

25 back in the original time.  So, we think, certainly, Your

1  Honor, there is a question of fact on the record here.

2          Now, with respect to how do you address that with

3  respect to a question of fact, there is -- these are the

4  debtors' motions on the repose, and it's their burden to show

5  the requisite facts, you know, that as far as the material man

6  I don't think -- Grace has not disputed that it supplied

7  directly to the sites.  And I think in order for it to prevail

8  it would need to at least take a position on that.

9          Moving on to the Minnesota statute of repose, I think

10 we have one claim there, Claim 10523.  As counsel accurately

11 pointed out, we believe that the fraud exception to the

12 Minnesota repose statute applies.  Again, Judge, the specific

13 claim response for Claim Number 10523 lists many paragraphs of

14 evidence we believe to be fraudulent by Grace with respect to

15 these claims.  I don't know that there's been a substantive

16 response to all of that, but we believe that's in the record

17 and creates at least a question of fact.

18         Also with respect to the Minnesota claims we have the

19 history of litigation in the case THS Northstar, and I think it

20 relevant for Your Honor to consider that the Judge charged the

21 jury in THS Northstar on Grace's fraud, the Judge charged the

22 jury on Grace's post sale duty to warn and post sale fraudulent

23 conduct with respect to concealing the hazards of asbestos.

24 So, certainly we think the fact that a Federal Court in

25 Minnesota would charge a jury on that would at least create a

1 question of fact that would get us beyond a summary judgment

2 hearing.

3         Your Honor, with respect to Iowa, we have two claims,

4 and I'll list them for you.  Two claims in Iowa, one for the

5 YWCA of Greater Des Moines, and one for St. Anthony's Hospital.

6 That's Claim 11153, and 11151.  With respect to the Iowa

7 statute of repose, this repose statute is slightly different

8 than the other states that we've been discussing because the

9 plain terms of this statute aren't triggered by the last

10 substantial completion, or the completion of the building.

11 This statute of repose is couched in terms of the last act or

12 omission of the defendant.

13         One of the issues that hasn't been raised that I'd

14 like to address now is Iowa specifically, by statute recognizes

15 post sale duties to warn.  And again, with respect to these two

16 claims we've laid out many facts that would allege breaches of

17 that post sale duty, at a minimum, on behalf of Grace that we

18 think would show that the last act or omission occurred some

19 time after the building was completed.  We think that would,

20 initially, get us past the Iowa statute of repose.

21         The other portion of the statute of repose, and this

22 is, I think, where the Hardin case cited by Grace is not quite

23 the same thing that we're arguing, they say that rejects the

24 fact that the product was separated.  That's not really the

25 case.  The Hardin case that the Eighth Circuit decided dealt

1  with the issue of whether or not a worker, whose job it was to

2  remove an asbestos containing item from a -- I think it was a

3  furnace, and do maintenance on it and put it back in, whether

4  the fact that he did maintenance on it removed it from being

5  attached to the building, that would make it fall within the

6  statute of repose.  If it is -- they said because it came out

7  and went back in, it was still considered part of the building,

8  and therefore wouldn't be detached.  The situation with

9  fireproofing is different.  If the fireproofing remains

10 attached to the building there's no claim.  There is no danger.

11 The claim -- it stays there.  It's when the fireproofing comes

12 unattached from the building, when it gets in the dust and in

13 the air in the building, when eventually the building has to e

14 removed, and we think that the fact that this product -- not

15 the product that stays on the beam, but the product that

16 separates and becomes -- and contaminates the building is the

17 trigger here, and therefore that would bring that outside of

18 the Iowa statute of repose.  Pardon me.  I was starting to

19 sound like Mr. Frog's Wild Ride there, I think.

20          And the last one, Your Honor, and to me this is the

21 most incredible, the Tennessee statute of repose, this statute

22 of repose -- the distinction that I think is being tried to

23 make here -- that they're trying to make here, is just

24 unbelievable.  First of all, the plain terms of the statute

25 except asbestos claims from the repose statute.  The only

1  Courts who have dealt with this issue and published opinions

2  have held property damage claims fall within the asbestos

3  exception to Tennessee repose.  And if you read the statute,

4  the statute refers to any action, and I would submit, Your

5  Honor, first of all, that's unambiguous.  You don't need to go

6  past the statute to interpret that.  But if you did, and you

7  went and started looking at the legislative history, I think

8  the first question you would ask is if the Tennessee legislator

9  wanted to only provide an asbestos exception for personal

10 injury cases, it could have said that.  It certainly could have

11 said that, instead of saying that the asbestos exception

12 applies to any action.  And I think, Your Honor, in that case,

13 we have two Federal Courts in Tennessee, both of which have

14 addressed this issue, and I -- you know, how they addressed it

15 I don't think is really important because this wording in the

16 statute is so clear on its face I don't think you would need to

17 do any analysis to reach the conclusion that the asbestos

18 exception applies to property damage cases in Tennessee.

19        MS. KEARSE:  Good morning, Your Honor.  Your Honor,

20 I'm here on behalf of three Minnesota buildings, and I will

21 just reiterate -- not repeat what Mr. Fairey has said, but we,

22 too, have asked the Court to deny the motion for summary

23 judgment --

24        THE CLERK:  Please enter your appearance?

25        MS. KEARSE:  Okay.  I'm sorry.  Anne Kearse, with

1 Motley Rice, on behalf of the Motley Rice plaintiffs.  Your

2 Honor, the three claimants in which motions for summary

3 judgment have been filed is 3512, 6933, and 6936, the Church of

4 St. Helena, the Church of Holy Redeemer, and the City of

5 Barnsville.  Your Honor, each one of these buildings had

6 acoustical plaster placed in there during the mid 1950's, and

7 the plaintiffs, the claimants seek to have an exception to the

8 statute of repose.  And if Your Honor has read the pleadings

9 there, it's an issue of fact in which we just need to show that

10 there is an issue of fact.  And we believe there's an issue of

11 fact in regards to whether or not a fraud has been made, and

12 whether or not, under the facts, the fraud, when our claimants

13 could have reasonably known when there was asbestos in the

14 building.  And, Your Honor, for the record, each one of these

15 claimants did not know there was asbestos in their buildings

16 until 2003, when they first sampled it, and then also found out

17 it was a W.R. Grace product during that time period.

18       Your Honor, during that time period W.R. Grace had

19 documents, and it's attached to our briefings, in which they

20 had records dating back to the 1950's showing that the

21 acoustical plaster was in each one of these buildings.  So,

22 they obtained the knowledge much earlier than our claimants,

23 that, one, it was a Grace product, and it was a Grace product

24 that did contain asbestos, Your Honor.  Under Minnesota law,

25 there is also a continuing duty to warn, and it's our

1  contention that there was no renovations in these buildings

2  yet.  They had a continuing duty to warn that they had a

3  hazard, and if it was going to be removed.  And, Your Honor,

4  just to reiterate one document, it's a little different from

5  the <u>Monicote</u> documents, there's specific documents in the

6  record that lead to a material issue of fact on what

7  representations W.R. Grace was making to building owners about

8  W.R. Grace's acoustical plaster, and, Your Honor, in the '50's

9  and the '60's they were putting out publications saying, as

10 they are saying today, leave it alone, and it's safe.  So, we

11 think there's a material issue of fact for Your Honor to

12 consider, and for a jury to consider, on whether or not these

13 claims fit within a statute of repose on there.  Your Honor, in

14 each one of the cases that they cite in <u>Metropolitan</u>, <u>Apple</u>

15 <u>Seed</u>, they are distinguishable, they were subsequent owners

16 that purchased those buildings, and again, in those cases the

17 issue wasn't specifically raised on what that duty was, and

18 what knowledge that they had in order to put forth a material

19 issue of fact, Your Honor.  I think Mr. Fairey reiterated the

20 hazards were known since the 1930's on there, and had a

21 continuing duty to advise.  Our churches, who were not out

22 there in order to get the information, they were not

23 sophisticated clients.  They are three buildings there with

24 acoustical plaster that W.R. Grace had knowledge was in there

25 since the '50's.  And, Your Honor, all the documents are in the

1  record there.  I would be happy to show them to you again

2  there, but I think they're attached --

3          THE COURT:  They're in the record.

4          MS. KEARSE:  -- to the briefs on that.

5          THE COURT:  Thank you.  Anyone else for the

6  claimants?  Ms. Rea?

7          MS. REA:  Thank you, Your Honor.  If I may, I'd like

8  to touch on Minnesota first, because that covers both of the

9  attorneys' arguments.  Both of the claimants here have pointed

10  to general evidence that they contend constitutes fraud.  None

11  of them have pointed to any evidence that their claimants

12  actually read any of this material or relied upon it in a way

13  that precluded them from finding out about their claim, and

14  that's the standard that you need to have here.  This

15  generalized notion that there may be some issue of fact on

16  fraud doesn't help with respect to the statute of repose

17  because you need to have evidence that either they reviewed it,

18  they saw it, they relied upon it, and that precluded them from

19  finding their claim.

20          And it's interesting, Ms. Kearse mentioned the

21  evidence that they have attached to the brief.  If you look at

22  the advertisement there, she talked about advertisements and

23  what we've said, those advertisements, at least one of them,

24  post dates the date when her claimants had the material already

25  in the building.  So, there's no evidence that they saw any of

1 this stuff.  There's no evidence that they relied upon it.

2 And, in fact, it's unlikely that they did, and that's probably

3 why there's no evidence on the record on that.

4        If I could go now to what Mr. Fairey talked about

5 initially, the <u>Posner</u> decision, Grace has not moved under the

6 statute of repose that was discussed in the <u>State Farm</u>

7 decision.  There are cases that don't apply statute of repose.

8 The cases in the brief are cases in the jurisdictions under

9 which we're moving under that have specifically recognized that

10 Grace's product is an -- for searches of the statute of repose.

11 The law that we're relying on is directly on point and applies

12 these statutes of repose.

13        With respect to North Carolina, Mr. Fairey talked in

14 depth about the material man statute -- the material man

15 exception, rather.  There are two documents submitted in his

16 brief.  The first is a job list, and that's for one of the

17 claimants.  There's nothing on the job list that says that

18 Grace delivered the products at all.  The second one is an

19 invoice, but it's interesting, there's no street address listed

20 on that invoice.  But even if they could get past that material

21 man standard, you still come back to the issue of was there any

22 evidence here of willful or wanton negligence, or fraud.  And

23 again, there's no evidence in the 50 paragraphs that he

24 mentions that his specific claimants saw or relied upon

25 anything that debtors did with respect to this particular

1  building.  For that reason those claims need to be expunged.

2        In Iowa, Mr. Fairey talked about the last act or

3  omission of the defendant.  <u>Talum</u> specifically says in

4  connection with debtors' products that that last act is the

5  manufacture of the asbestos.  Here we have no dispute as to

6  when the asbestos went into the buildings, so here, the statute

7  clearly would have run.

8        Finally, with respect to Tennessee, Mr. Fairey talked

9  a lot about the plain meaning of the statute.  You know it was

10  interesting to me, though, he didn't mention the word exposure

11  in the entire time that he talked about the statute.  The

12  statute says that asbestos exposure is the exception, not

13  asbestos.  And again, the legislative history is clear on that.

14  Your Honor, at the time that we filed the brief we didn't have

15  a transcript of the floor debate, but I have brought one with

16  me today.  If I could hand that --

17        THE COURT:  I'm sorry.  You had no transcript of

18  what?

19        MS. REA:  Of the floor debate of the Tennessee

20  statute.

21                         (Pause)

22        MS. REA:  I've just handed up to Your Honor, it makes

23  it clear that this was designed to deal with asbestosis, the

24  disease of asbestosis.  That's just simply not an issue here,

25  based on the own allegations that the claimants have set forth

1 here.  Thank you, Your Honor.

2         THE COURT:  Mr. Fairey give me one second while I

3 mark what this is.

4         MR. FAIREY:  Thank you, Your Honor.

5                         (Pause)

6         THE COURT:  Okay.

7         MR. FAIREY:  Your Honor, again, having not seen the

8 -- this document until -- I'm not sure how to comment on it

9 except to say that the statute itself is determinative.  I

10 think in reading the statute it's clear and if exposure -- if

11 there's no exposure in the building, to the building, I don't

12 see how you can have a property damage case anyway, so -- the

13 Courts that have construed it have held clearly that that

14 statute applies.

15         The other thing I'd like to address, Your Honor, is

16 this notion about proof to the specific building about fraud or

17 some type of fraudulent concealment conduct.  Your Honor, none

18 of the claims that I represent has there been any objection

19 based on the actual knowledge of what the actual knowledge of

20 the claimant is.  All of the claims have been objected to on

21 repose and on constructive knowledge, and I find it very

22 interesting that the debtors would argue that my clients, these

23 clients are barred by the statute of limitations because of, if

24 you read the report of Mr. Morse, because The New York Times

25 ran 17 articles about asbestos dangers in mines in Canada, or

1  because the Engineering News had an article about asbestos in

2  pipe lagging.  That's the type of evidence that they're saying

3  creates the statute of limitation problem for my clients, but

4  yet, all of their specific individualized knowledge that the

5  defendant held in states where there is a post sale duty to

6  warn is not sufficient to create an issue of fact.  And I would

7  -- I think, clearly, Your Honor, that there is an issue of fact

8  as to that.  Thank you.

9          MS. KEARSE:  And, Your Honor, just in response to the

10  Minnesota claims, it's clear under Minnesota law about the

11  special knowledge exception to the fraud issue, and I think the

12  cases that were mentioned in Apple Seed and Metropolitan do not

13  change the holdings that were in Independence School District

14  179, which we believe is the prevailing case in this matter.

15  And the Court denied the motion under the statute of repose

16  because there was a genuine issue of fact that Grace knew the

17  product was in the building and that Grace knew about the

18  hazards of the asbestos, and the issue became when the claimant

19  could have found out when there was asbestos in there, and

20  that's when the exception comes through on whether or not they

21  had special knowledge, or could have found it themselves.  And

22  when you compared Grace's knowledge and their information of

23  where the products were, and the exceptions under Minnesota law

24  as to special knowledge, and when they have a duty to speak on

25  that, it is an old case, I think we cited it, from 1800 on

1  there, that under the special circumstances which the claimants

2  did not raise in these cases there, that they do have a duty to

3  have told our claimants, at least, of the product there in

4  order to trigger the statute of repose.

5        THE COURT:  All right.  So, your contention is that

6  there is a question of fact as to whether or not your clients

7  knew or should have known, because of the debtors' special

8  knowledge of the existence of the asbestos in the building, and

9  there is a question as to whether your clients either did or

10 should have --

11       MS. KEARSE:  Yes, Your Honor.

12       THE COURT:  -- either knew or should have known?

13       MS. KEARSE:  That they should have known well before

14 2003, or within the statute of repose period, or whether or not

15 the statute is actually tolled until they should have

16 reasonably known, Your Honor.

17       THE COURT:  Okay.

18       MS. REA:  Your Honor, may I address this briefly?

19 Your Honor, just briefly.  With respect to Mr. Fairey's

20 argument I think this confuses a bit the statute of repose

21 versus the statute of limitations.  There were objections on

22 the statute of repose basis, and we need to come forth to show

23 that the facts are such that the statute of repose would

24 preclude the claim.  The burden would then shift to show a

25 fraud exception, which would be an exception where fraud

1 prevented the claimants from showing their claim.  So, our

2 point here is that it's their burden to show the exception, and

3 there's no allegations, no evidence, of any fraud that was

4 relied upon by the claimants, which is necessary to sort of

5 escape the statute of repose.

6        With respect to the <u>Independence School</u> case, it's a

7 very interesting case.  It predates both the <u>Apple Tree</u>

8 decision and the <u>Metropolitan</u> case, so the <u>Independence School</u>

9 did not have the benefit of the analysis there.  But the

10 interesting thing is that the <u>Independent School</u> decision did

11 not analyze whether the debtors had a duty to disclose anything

12 under Minnesota law.  And it's not clear from the decision what

13 facts they were relying on, but they do talk about affidavits

14 from witnesses from the schools who were involved during the

15 construction of the schools.  There's no evidence again here

16 that any of these Minnesota claimants read, or relied upon any

17 evidence of fraud from the debtors that would have prevented

18 them from discovering their claims, and actually, with respect

19 to the non-disclosure issue and the duty issue, that issue,

20 then, was subsequently decided by the <u>Apple Tree</u> Court with

21 respect to debtors specifically, holding that there's no

22 special relationship, no special circumstances here with

23 respect to the sale of these asbestos containing products that

24 would require any disclosure obligation.  So, that issue is

25 really put to rest by the <u>Apple Tree</u> Court, and that's, of

1 course, in the materials.  Thank you.

2        THE COURT:  Thank you.  Okay.  I have had an

3 opportunity to look at most, not all of the binder materials,

4 but I have not read cases, so you're not going to be getting

5 rulings on most of these things from me today.  That's all I

6 can tell you.  I can address some, I can't address all.  I'm

7 not even going to attempt to address the statute of repose

8 issues today.  So -- we'll go on -- do you want a brief recess

9 --

10        MR. RESTIVO:  Yes, Your Honor.

11        THE COURT:  All right.  Let's take ten.

12        MR. RESTIVO:  Thank you, Your Honor.

13        THE COURT:  We'll come back in ten minutes.

14        THE COURT:  Thank you.

15                    (Recess)

16        THE COURT:  All right.  Mr. Restivo?  Please be

17 seated.

18        MR. RESTIVO:  Your Honor, Mr. Flatley is going to

19 deal with the motion for summary judgment relating to 109

20 California claims.

21        THE COURT:  Okay.  Mr. Flatley?

22        MR. FLATLEY:  May it please the Court, my name is

23 Larry Flatley, and I'm from Reed Smith, and along with Mr.

24 Restivo and the others, I represent W.R. Grace.  Your Honor,

25 Grace seeks summary judgment on 109 California claims that are

1 barred by the statutes of limitations of Delaware and

2 California.  Those 109 claims are filed by four claimants who

3 we refer to in the papers as the California claimants, namely,

4 the California Department of General Services, which has filed

5 16 claims, the California State University, which has filed 36

6 claims, the University of California, which has made 56 claims,

7 and the County of Sonoma, California, which has one claim, but,

8 Your Honor, the County of Sonoma has not filed any papers in

9 response to our motion.

10         The essential issue presented by our motion is

11 whether the statutes of limitations began to run on these

12 California claims before April 1st, 1998, that is, three years

13 before the bankruptcy was filed.  The answer to that question,

14 Grace submits, is yes.  In 1990, nearly eight years before

15 April of '98, the State of California filed an action in the

16 United States Supreme Court.  In that action California sought

17 to recover from Grace the costs of abating Grace's asbestos

18 containing material from the state's public buildings.  In

19 doing so, the state explicitly alleged that its buildings had

20 been contaminated, and contaminated in a way that seriously

21 harmed those buildings.

22         Five years before that, nearly 13 years before April

23 of 1998, California State University, the University of

24 California, and the County of Sonoma, made broad based claims

25 in the Johns Manville bankruptcy, and in those claims they

1 asserted that all of their buildings with asbestos containing

2 material had been seriously harmed by that material.  Given

3 those allegations, the California claimants could have brought

4 their suits long, long before April of 1998, and as a result,

5 their claims in this bankruptcy are barred by the statutes of

6 limitations of California and Delaware.

7         Now, I'm speaking about both states because in our

8 summary judgment papers we argue that Delaware choice of law

9 principles, including the Delaware borrowing statute, provide

10 that Grace is entitled to summary judgment if the claims are

11 barred under either state's law.  That is so because the

12 Delaware statute explicitly provides that whichever statute is

13 shorter is applicable to the claims brought in this bankruptcy.

14         In their papers, the California claimants have

15 ignored Delaware law, and we submit that Grace is entitled to

16 summary judgment on the -- dismissing the California claims

17 solely on the basis of Delaware law and the claimants' failure

18 to respond.  But beyond that, I want to talk bout the law of

19 both states, and I'll turn first to California, because it sets

20 the more difficult standard for Grace.

21         The basic California statutes of limitations

22 principles are fairly straightforward, Your Honor.  Under

23 California law, the statute of limitations in an asbestos

24 property damage case begins to run when the plaintiff knew or

25 should have known of, the magic words are, appreciable and

1 actual harm.  And the Courts have said, including in the San

2 Francisco Unified School District case, that that appreciable

3 and actual harm starts the running of the statute no matter how

4 uncertain an amount it is, as long as it consists of more than

5 nominal damages.

6          Also, if the plaintiff knows it has suffered

7 appreciable and actual harm, neither the speculative nor

8 uncertain character of the damages, nor the difficulty of proof

9 will toll the running of the statute.  And that, Your Honor, is

10 in the Davies v. Krasner (phonetic) case, which is a California

11 Supreme Court opinion from 1975.  Now, in some of the asbestos

12 damage opinions, the ones most favorable to the claimants,

13 appreciable and actual harm has been interpreted to mean that

14 the asbestos containing material contaminated the plaintiff's

15 property.  Now, Grace doesn't accept that those opinions are

16 definitive in California, but even that standard is readily met

17 by Grace on this record.  In San Francisco Unified School

18 District, the Court said that the statute starts to run when

19 the plaintiff knew or should have known that there was

20 contamination in the building.

21          In California Sansom v. U.S. Gypsum, which is a Ninth

22 Circuit opinion from the mid '90's, the Court of Appeals

23 focused on the allegations of the plaintiff's complaint

24 regarding contamination, and although it denied summary

25 judgment in that case, the Sansom Court said if Sansom's

1  complaint admitted or necessarily implied that appreciable

2  injury to its buildings occurred more than three years before

3  the suit had been filed, then U.S. Gypsum would be entitled to

4  its granting of summary judgment.

5          In the matter before Your Honor, the California

6  claimants have made precisely the type of admissions that the

7  Ninth Circuit was talking about in <u>Sansom</u>.  In its 1990 Supreme

8  Court papers, the State of California explicitly alleged that

9  its buildings are contaminated, and that they were seriously

10 harmed by the contamination that resulted from Grace's ACM.

11 Specifically, in its 1990 lawsuit, California alleged that the

12 state owns numerous public buildings and other facilities that

13 are contaminated by Grace's products.  They alleged that there

14 is asbestos contamination present in those state owned

15 buildings and facilities.  They alleged that the State of

16 California has been required to act at great expense to remedy

17 the contamination.  They allege that Grace has a duty to abate

18 the hazards caused by the presence of Grace's product in their

19 buildings, and that the State of California is seeking to

20 recover the cost for abating the hazards that were caused to

21 their buildings by Grace's products.  In short, in its 1990

22 Supreme Court papers, the State of California unmistakably

23 alleged that its public buildings were contaminated by Grace's

24 asbestos containing materials in a way that seriously harmed

25 the buildings.

1           California made these allegations as to the buildings

2    it owns, operates, and maintains that has asbestos in them, and

3    they did so without limitation.  That is, the state's

4    contamination allegations were not limited in any way to

5    particular buildings.  Rather, the state's allegations

6    encompassed all the state's buildings, and that the same

7    buildings are at issue here as were involved there is

8    explicitly acknowledged by California State University, which,

9    in its claim forms in this case mentions the 1990 case as a

10   predecessor litigation, and while there's a dispute as to

11   whether the University of California is bound by what was said

12   in that case, in its claim forms in this case the University of

13   California identified that each of the buildings subject to

14   this case in their initial claims forms, they said that it was

15   the same buildings that were involved in the 1990 lawsuit.  So,

16   there's really no dispute that it's the same group of buildings

17   that were involved.

18           In addition, Your Honor, five years earlier than

19   1990, in 1985, the California claimants filed claims in the

20   Johns Manville bankruptcy.  Those claims also contain the type

21   of admissions that the Ninth Circuit was talking about in

22   Sansom.  California State University filed a $500 million claim

23   in the Johns Manville bankruptcy and it covered all of their

24   buildings, all the buildings in the CSU system that contained

25   asbestos.  Similarly, the University of California, in 1985,

1 filed a multi-million dollar bankruptcy proof of claim in the

2 Johns Manville bankruptcy that makes clear that it included all

3 of its buildings that contained asbestos whether or not it was

4 Johns Manville's product.

5 Finally, the County of Sonoma also filed a JM

6 bankruptcy claim.  In making these bankruptcy claims, CSU, the

7 University of California, and the county necessarily alleged

8 that asbestos caused appreciable and actual harm, was present

9 in their buildings in 1985.  It's long been an element of the

10 law in California, it's been an element in the law at least

11 since <u>Davies v. Krasner</u> back in 1975, and in making those

12 claims those claimants necessarily alleged that they had

13 appreciable actual harm as a result of asbestos.  That is

14 exactly what the Court relied on, the California Appellate

15 Court relied on in the <u>City of San Diego</u> case that's discussed

16 in the briefs.  In <u>City of San Diego</u>, the city sued Grace and

17 other defendants, claiming that they were entitled to recover

18 for asbestos property damage claims.  The Court held, among

19 other things, that those -- that the City of San Diego had

20 filed a bankruptcy claim against Johns Manville in 1985 that

21 covered all of its buildings, and because of that claim the

22 Court said it was precluded on the basis of statute of

23 limitations from suing Grace many years later.

24 Because of these admissions, express admissions and

25 admissions by necessary implication, the statute of limitations

1 started to run on the California claimants in 1985, or at the

2 latest, in 1990, at least eight years before the lawsuit should

3 have been filed in this case.

4       Now I want to turn to Delaware.  This Court, of

5 course, applies Delaware's choice of law rules in determining

6 whether Delaware law or California law applies to the issues

7 raised by this motion.  The Delaware borrowing statute provides

8 that if a non-resident brings suit in Delaware on a claim that

9 arose elsewhere, the Court is to look at the other state's

10 statute of limitations and Delaware statute of limitations, and

11 apply whichever is shorter, and those words, whichever is

12 shorter, are literally in Section 8121.

13       In this analysis, this Court is to take into

14 consideration all of the accouterments of each state's statute

15 of limitations, including the rules governing when the statute

16 of limitations began to run, and that's clear in the <u>Plum v.</u>

17 <u>Coddle</u> (phonetic) case, decided by the District of Delaware

18 many years ago.

19       Unlike California, Delaware's statute of limitations

20 begins to run when a plaintiff knew or should have known about

21 the presence of a defect or a flaw in the building, and the

22 contamination standard has not been adopted as part of the law

23 in Delaware.  Under Delaware law the statute started to run on

24 these claims when the claimants knew or should have known that

25 there was asbestos in their buildings and that the asbestos

1 could be considered hazardous.  Given that standard, it's

2 readily established by Grace that the -- for the California

3 State University, the University of California, and the County

4 of Sonoma, which filed the Johns Manville claims in 1985, they

5 clearly there had to allege, and they did allege that they were

6 entitled to recover damages based on the asbestos in their

7 building.  That clearly started the running of the statute of

8 limitations under Delaware law.  At the latest under Delaware

9 law the statute started to run in 1990 when the State of

10 California filed its papers in the U.S. Supreme Court seeking

11 to recover removal costs from Grace.

12        Now, Your Honor, there's one other argument I want to

13 address.  Normally I wouldn't address it in my argument in

14 chief, but it's so throughout the papers of the claimants that

15 I thought I ought to address it now, up front.  And that is

16 that the argument that the claimants make is that under

17 California law Grace must prove claimant's contamination case

18 in order to assert a statute of limitations defense.  Claimants

19 spend many pages in their briefs arguing, in essence, that

20 Grace can't claim the statute of limitations, and also argue

21 that there's no contamination in the claimants' building.  The

22 law, however, does not force Grace into that dilemma, and

23 there's no California case that says that.

24        Initially, claimants' argument fails because it

25 assumes California law, and as I've just indicated,

1  contamination is not an element of the Delaware law, so the

2  dilemma can't possibly exist under Delaware law.  But their

3  argument also fails under California law.  As the Ninth Circuit

4  said in the Sansom case, if plaintiffs' claim -- complaint in

5  that case admitted or necessarily implied that there was

6  damage, actual and practical harm more than three years before

7  the filing of the lawsuit, then U.S. Gypsum would have been

8  entitled to summary judgment.  In addressing whether the

9  plaintiff's claim was time barred, Sansom put the focus exactly

10 where it belonged.  It put the focus on the plaintiff, on the

11 plaintiff's claims, and the plaintiff's allegations.  And after

12 all, that's what the statute of limitations inquiry is all

13 about, did the plaintiff act in time to pursue it's claim when

14 it should have.  So, California Sansom is perfectly logical in

15 focusing in on the plaintiff's allegations and not considering

16 at all what the defendants said on the merits of the case.

17         In essence, Your Honor, claimants' argument is an

18 effort at misdirection.  California law doesn't require Grace

19 to prove claimants' substantive claims in order to prevail on

20 the statute.  That's clear from Sansom.  It's also clear from

21 the numerous California opinions that recognize that statute of

22 limitations can be asserted by those who are not ultimately

23 liable just as well as they can be asserted by those who are

24 ultimately liable.  Any other rule, we submit, would

25 substantively penalize the debtor and force the debtor give up

**J&J COURT TRANSCRIBERS, INC.**

1  substantive arguments in order to pursue a statute of

2  limitations defense.

3          Given the allegations of the California claimants

4  that were made in 1985 in the Johns Manville bankruptcy, and in

5  1990 in the lawsuit that they filed in the United States

6  Supreme Court, we submit that the statutes of limitations

7  started to run in 1985 and 1990 against the California

8  claimants, and that Grace's motion for summary judgment should

9  be granted.

10         THE COURT:  Good morning.

11         MR. BRANDI:  Good morning, Your Honor.  May it please

12  the Court, Thomas Brandi and Terence Edwards for the University

13  of California Board of Regents and for California State

14  University.  Your Honor, we've addressed different parts of the

15  arguments and I'm going to make some brief remarks and then Mr.

16  Edwards is going to discuss and then finish.  Accrual of a

17  cause of action is a substantive right.  It's a substantive

18  right of the party asserting it, in this case the University of

19  California and the California State Universities.  One must

20  look at the substantive right for damage to buildings in

21  California by a product installed in California from the

22  standpoint of California law.

23         What is California law?  California law is clear, San

24  Francisco Unified School District says for there to be a -- for

25  a cause of action to exist you must have all of the elements of

1  the cause of action.  The key element here is contamination.

2  California Sansom says that the party asserting the statute of

3  limitations has the burden of proof of showing that all

4  elements of the statute were present outside of the statutory

5  period.  Simply stated, contrary to what you just heard, Grace

6  has the burden of establishing contamination outside the

7  statutory period.  Your Honor, it is, I must say, with a sense

8  of deja vous that I stand before this Court.  I was counsel in

9  the San Francisco Unified School District.  The very argument

10 that was made today was made in that case.  It was accepted by

11 the Trial Court and rejected by the Court of Appeals, which

12 clearly said for there to be a claim you must have

13 contamination.  California Sansom said for there to be a bar of

14 the statute of limitations they have the burden of proof, they

15 have to prove it outside the statutory period.  It is their

16 burden.  The filing of an action in 1985 for material

17 surrounding pipe is not the same thing as an action against

18 Grace for material on the ceiling.  Different product,

19 different location, different time.  Pipe material can be

20 deteriorating while the ceiling material has not yet begun to

21 deteriorate and not yet be contaminated.  So, the filing of

22 that earlier action is meaningless, Your Honor, because this is

23 not a notice standard, it is not a constructive notice

24 standard.  It is a contamination standard.  And Mr. Edwards

25 will address the remainder, Your Honor.

1          MR. EDWARDS:  Good morning, Your Honor.  Terence

2  Edwards.  Let me begin, if I may, by addressing the claims of

3  the University of California, and one thing that we should keep

4  foremost in our minds in this process is that the University of

5  California is not the State of California, nor is it California

6  State University system.  I could see how that may cause some

7  confusion to people not familiar with the California system.

8  The University of California is Berkeley, and Davis, and

9  schools like that, whereas the San Francisco state system is --

10 or, the state college system is San Francisco State University,

11 and various state schools.

12         The reason why that's important is because the

13 California constitution created the Regents of the University

14 of California as a standalone entity.  We've supplied the

15 specifics in our papers, and I won't repeat those, except to

16 note that subsequent opinions have held that the California

17 university system is, in fact, a co-equal branch of the

18 government.  So, all of the discussion that we've heard so far

19 about the State of California did this in 1990, and the State

20 of California did that in 1990, as regards the University of

21 California, it doesn't matter, Your Honor.  It is completely

22 irrelevant. It's no more binding than what the University of

23 Pennsylvania did.  They're separate entities, not bound by it

24 whatsoever.  Now, that's a little bit different when I get to

25 the California State University system, and I'll address that

1  in a moment.  But for the purposes of the University of

2  California, the 1990 petition, what the state did or did not

3  do, it doesn't matter, completely irrelevant.

4         Let's start with the starting point -- there's been

5  some discussion about what statute of limitation applies,

6  whether it's Delaware or California.  Frankly, it's a three

7  year statute in both states, so it doesn't seem that it's

8  particularly necessary to cite which one applies.  The key

9  question is when does the statute of limitations start to run?

10 If I could offer up to the Court --

11        THE COURT:  Thank you.

12        MR. EDWARDS:  This is a little summary of when the

13 statute of limitations starts to run, that is, when does the

14 statute -- action accrue?  When can you actually file a cause

15 of action?  And I can't take credit for this because it comes

16 from Grace's papers.  Specifically, they state that under

17 California law civil action cannot be commenced until its fully

18 accrued.  Okay.  What does accrual mean?  They say that on Page

19 5, their points and authorities, that it does not accrue until

20 such damages have been sustained.  And here's the key.  This is

21 the third part down, Your Honor.  "The mere possibility or even

22 probability that an event causing damage will result from a

23 wrongful act does not render the act actionable."  Now, this is

24 what Grace indicated was the law in its opening papers.  It

25 seems that the reply has switched gears a bit.  But Grace

1 agrees with us that under California law the mere fact that

2 there's asbestos in the building doesn't start the running of

3 the statute of limitations.  You have to have contamination.

4 That's clearly the law in California, and I believe the

5 gentleman for Grace said that they don't necessarily concede

6 that that's the law in California, that there are some cases.

7 In fact, the cases that are controlling, the ones that have

8 addressed it, Sansom and San Francisco Unified School District,

9 both say that's the standard.  So, you have to have

10 contamination before the cause of action even starts to accrue.

11 Today Grace has not presented any evidence at all that there's

12 contamination in any buildings, not one piece of evidence, not

13 one iota have they provided to the Court saying that the

14 statute started on this date.  There was a lot of discussion in

15 their papers about tolling statutes and things like that, and

16 -- where they attempt to shift the burden back onto plaintiffs

17 where it doesn't belong.  Those cases arise from things such as

18 an airplane crash, where it's pretty clear, the plane crash is

19 in 1969, this is the Beech (phonetic) case that they cite to,

20 that the cause of action, or there was an injury in 1969 when

21 the people were killed in the crash.  Here, until you have

22 contamination, the statute of limitations doesn't even start to

23 run.  In their discovery responses, which we quote from and

24 they don't dispute this, they say that they don't contend that

25 there's contamination at any California building, even as of a

month or two ago when they filed their responses to the
discovery.  So, given that and given the complete absence of
contamination and in building owned by the University of
California, what are we left with?  I would submit that,
frankly, the Court's job could end there.  There's no
contamination, statute hasn't started to run, we're done.
There's no dispute about that.

Now, they say, well, you have these admissions, and
these admissions mean that the statute has started to run.  So,
in other words, Grace is arguing since you've admitted these
things that are incorrect in the past and contrary to law, and
even though we dispute the fact that any of those things have
factually happened, that admission is nonetheless binding on
you.

Let me address this in two parts.  For -- again, for
the University of California, the 1990 petition filed by the
state is irrelevant.  We're not the state.  They do correctly
note that in the original claims that were filed by the
University of California, I believe it was over 100 claims at
that time by the University of California, and this was part of
a batch of several hundred claims that were filed by our office
and our co-counsel's office, there was an indication that the
University of California had participated in the 1990 suit.  We
did put that on the claim form, Grace is correct.  However,
Your Honor, that's a mistake.  In the course of preparing the

1  opposition, these papers, conversations with various counsel

2  and our clients, it was pointed out to use quite forcefully

3  that the University of California, unlike California State

4  University system is not part of the State of California.  It's

5  true this came up in the context of the opposition because we

6  were preparing this, and as soon as we had an indication from

7  our client that that was a mistake, we promptly moved to file

8  an amended claim.  We filed -- I believe  it was February 15 or

9  16, when it was filed.  So, even the 1990 claim, even the,

10 quote, admission about that was simply a mistake.  We moved to

11 change that.

12        Now, let's move on to the Manville claims by the

13 University of California.  It's true that the University of

14 California did participate in the Manville bankruptcy, filed

15 some claims.  I believe that was back in the mid '80's.  During

16 that time in the state of California, it was unclear what the

17 standard was about when you had to file a cause of action or a

18 claim for asbestos.  The San Francisco Unified School District

19 case was decided in 1995, long after that.  Throughout the

20 1980's, Grace argued, as they continue to argue today, that,

21 hey, just as long as you have asbestos in your building and you

22 know asbestos could be harmful, your statute is running.

23 You've got to do something.  It's up to you.  So, quite

24 sensibly, the University of California filed claims in the

25 Manville bankruptcy.

**J&J COURT TRANSCRIBERS, INC.**

1        But more importantly, the claims that they filed were

2   for Johns Manville.  They didn't file claims about any Grace

3   products.  Manville manufactured, to the best of my -- I don't

4   have nearly the expertise as my co-counsel do in this, but to

5   the best of my recollection Manville manufactured pipe lagging,

6   and insulation of that nature.  They didn't manufacture

7   fireproofing, spray on fireproofing.  So, the University of

8   California filed claims to recover various abatement expenses

9   that they had incurred because of Manville products.

10        The fact that Manville products, and there were

11   claims filed for them, no more triggers the statute of

12   limitations for Grace than it does if party A hits party B with

13   an -- in an automobile accident, it doesn't have anything to do

14   with whether or not party C has done anything wrong.  That was

15   exclusively about Manville.

16        Now, I'd like to emphasize one final time the

17   difference between the University of California and California

18   State University, and move on to California State University,

19   and I'd like to tell you why their claim should survive today.

20   At the outset, you have to note the same thing.  There's no

21   evidence before the Court today that there's any contamination

22   in any building owned by the California State University

23   system.  There's none.  Grace admits there's not.  They haven't

24   presented any evidence.  Therefore, under California law, the

25   statute, at least as far as the papers before us today, hasn't

1 even started to tick.

2        Now, the University -- pardon me, California State

3 University did, since it is an appendage of the State of

4 California, participate in the 1990 lawsuit, or I should say

5 the 1990 petition.  And that's one point I should probably make

6 at the outset.  This wasn't actually a lawsuit.  This was a

7 petition filed with the Supreme Court seeking permission to

8 file a lawsuit later on.  I have not come across any indication

9 that such a document amounts to a binding admission because

10 it's not even a legal claim at that point.  It's just seeking

11 permission to file claims.  There were some 25 different

12 asbestos manufacturers in 25 or 30 different states and just on

13 the face of it one would have to think that some states would

14 have claims against some asbestos manufacturers and not against

15 others, and some would have it against all.  Who knows.  It's

16 pure speculation.  But on the basis of this speculation they

17 wish to bar the CSU claims.

18        This brings me to the reason why the CSU claims, or

19 the CSU petition is basically irrelevant, because again, even

20 in 1990, it was pre-S.F.U.S.D., and the standard was --

21        THE COURT:  Was pre?

22        MR. EDWARDS:  S.F.U.S.D., San Francisco Unified

23 School District.

24        THE COURT:  Oh.  Okay.

25        MR. EDWARDS:  So, even as of 1990, when the petition

1 was filed with the Supreme Court, it was unclear in California

2 when your statute starts to run.  So, what they're arguing, in

3 effect, is that this petition that was filed with the Supreme

4 Court means that California should have sought recovery at that

5 time for all of its claims against Grace.  Perhaps if that had

6 been done we would have arrived at the point we did in 1995,

7 where the Court determined that you don't have a cause of

8 action until you have contamination.  But as of that point it

9 was unclear.  So, it was perfectly appropriate for the

10 California State University system and the State of California

11 to file a claim, even though there wasn't contamination.  It

12 doesn't prove contamination.  Because there was a possibility

13 at that point that the law was that the mere presence of

14 asbestos -- that's what Grace was arguing in every Court.  If

15 you've got asbestos in your building the statute is ticking,

16 you've got to do something.  So, that's what the State of

17 California did, but that's not, in fact, the standard in

18 California.

19          One final thing that I would point out on behalf of

20 CSU, is if the basis for denying their claims is going to be

21 this admission on the claim form, I think it's incumbent upon

22 the Court to look at the rest of the claim form, and

23 particularly I believe it's questions 18 and 20, that indicated

24 that asbestos manufactured by Grace was discovered in the

25 buildings in 2003.  That's the information that we had from our

1  client at that point, and that's correct.  So, on one hand you

2  have information saying we, via the State of California,

3  participated in a lawsuit in -- or in a petition in 1990, but

4  at the same time, we didn't know there was Grace product in our

5  building until 2003.  So, certainly at a summary judgment stage

6  I would submit that it would be improper to pick and choose

7  from the claim form and say, well, this information is damning

8  because this indicates, in 1990, that you knew that you had

9  Grace product, or that there was a potential cause of action

10 against Grace, where at the same time, a few pages later on the

11 claim form it says we didn't know that until 2003.  With that I

12 would submit, Your Honor.

13       MR. BRANDI:  Your Honor, one last point.  <u>San</u>

14 <u>Francisco Unified School District</u> involved six buildings, and

15 the Court of Appeals you have to show contamination in each

16 building before the statute begins to run, recognizing that you

17 could have contamination at different periods of time.  There

18 are 56 buildings in the U.C. system here, 36, I believe, in the

19 Cal State.  We have the burden of proof in the ultimate case of

20 showing contamination in each of those.  They have the burden

21 of proof under the statute of limitation of showing that there

22 was contamination in each outside of the statute.  There's no

23 evidence whatsoever of contamination here, and we believe that

24 that in and of itself, is sufficient to deny the motion.  Thank

25 you.

1           MR. MANDELSBERG:  Good afternoon, Your Honor.  My

2    name is Steven Mandelsberg from the law firm of Hahn & Hessen,

3    and we represent the State of California Department of General

4    Services in connection with its 16 proofs of claim for damages

5    totaling over $130 million for 16 specific buildings.  Your

6    Honor, at the outset I'd like to point out that in its argument

7    counsel for the debtors improperly lump my client, the

8    Department of General Services in with the other California

9    claimants, and that's improper for two reasons, although we do

10   share certain common arguments.  The two reasons are that the

11   Department of General Services, or DGS, did not check the box

12   about having filed any previous asbestos claim, and we make

13   that clear in the excerpts from the proof of claim that is

14   attached to my declaration which accompanies the opposition to

15   the debtors' motion, and second, the debtors do not contend, as

16   they do with the U.C. Regents or California State University

17   that the Department of General Services filed any -- prosecuted

18   any prior claims against Johns Manville.  So, to the extent

19   that the debtors are relying on those arguments against the

20   Department of General Services, they are inapplicable.

21           But as to the balance of the motion, in our view W.R.

22   Grace's motion is really predicated upon three things.  One is

23   the doctrine of judicial admission, two is the doctrine of

24   judicial estoppel, and three is the notion, or the notion that

25   they have sustained their burden of proof to establish as a

1  matter of fact or law that, in fact, the Department of General

2  Services claims are time barred.  In all these respects W.R.

3  Grace has woefully failed to sustain their burden to

4  demonstrate, as they must, on a motion for summary judgment,

5  the absence of any genuine issue of fact.

6       Let's start with the doctrine of judicial admission,

7  which is the cornerstone of their theory that this 1990 <u>Alabama</u>

8  <u>v. W.R. Grace</u> case constitutes a binding judicial admission

9  that precludes, as a matter of law, the Department of General

10 Services, as well as the other California claimants, from

11 maintaining any claim in this case.

12      Your Honor, to start with, and as counsel for the

13 other California claimants just mentioned, W.R. Grace's counsel

14 mistakenly asserts what this prior litigation was.  It was not

15 an action commenced in the U.S. Supreme Court.  What it was was

16 a motion for leave to file a complaint.  The motion was

17 supported by a petition and a brief.  And the Supreme Court

18 denied that motion.  There was never any formal complaint

19 filed.  There was never any motion to reconsider of the U.S.

20 Supreme Court's denial, which is a reported decision and the

21 only reported decision, a one-line decision, and it's cited in

22 our papers, and W.R. Grace has presented no evidence that after

23 the U.S. Supreme Court denied the motion for leave to file this

24 proposed complaint, there was ever any attempt by any of the

25 states, let alone the State of California or the Department of

1 General Services to file this action anywhere else, in any

2 other forum at any other time.  So, to start with, we have a

3 doctrine of judicial admission that is, or theory of judicial

4 admission that is predicated not upon a prior pleading that was

5 accepted by a Court, but rather by a petition for leave to seek

6 a prior -- a petition to seek leave to file this complaint.

7           Why is that consequential, Your Honor?  Well, as our

8 papers indicate, even if you credit the cases that W.R. Grace

9 has cited in its reply, which suggest that the doctrine of

10 judicial admission could apply to a proposed pleading or to a

11 statement in a brief, there is specific case law that holds

12 that in the asbestos related property damage litigation in

13 particular, the doctrine of judicial admission is relevant only

14 when a party makes factual statements or allegations about

15 specific buildings.  And I'm referring to Paragraph 29 at Page

16 12 of the Department of General Services opposition.  And we

17 have cited two specific cases that deal with such a situation.

18 One is the City of San Diego case in which the doctrine was

19 applied where a previous allegation had been made that 1,000

20 particularly identified buildings had sustained appreciable

21 harm prior to an accrual date, and the other case, a case that

22 has been mentioned several times, the California Sansom case in

23 which an allegation about two buildings being contaminated with

24 asbestos as of an unspecified date did not constitute an

25 admission that the cause of action was time barred.

1          So, Your Honor, we don't believe that W.R. Grace has

2    established in any way, shape, or form, that the doctrine of

3    judicial admission applies here.

4          Second, they rely upon the doctrine of judicial

5    estoppel, as well.  We have set forth in our papers, as has our

6    counsel for the other California claimants what the

7    prerequisites for judicial estoppel are.  In their reply, W.R.

8    Grace seems to argue that one of those elements, the notion

9    that a Court does not have to rely upon a statement in order

10   for the estoppel theory to arise, is not necessary.  That's not

11   accurate, Your Honor.  The requirement that a Court adopt the

12   statement is a fundamental prerequisite of the estoppel

13   doctrine.  And in this case, we have the admitted fact that not

14   only were these supposed statements which didn't identify any

15   particular buildings, this proposed complaint did not do so,

16   and which did not specifically identify contamination, we have

17   no dispute that the U.S. Supreme Court not only did not accept

18   anything in the proposed Alabama complaint or petition, but

19   denied the petition.  And we have no evidence whatsoever that

20   this petition was ever re-submitted, or that the Court had

21   changed its opinion.

22          And as for the point that was made in the reply that

23   the reliance on a position is not an essential element of the

24   judicial estoppel doctrine, we would point Your Honor to the

25   case of <u>Montrose Medical Group Participating Savings Plan v.</u>

**J&J COURT TRANSCRIBERS, INC.**

1  <u>Bulger</u>, 243 F.3d 773, at Page 779.  It's a 2001 Third Circuit

2  decision which makes it clear that in order for the doctrine to

3  apply, the success of a party in persuading a Court to accept

4  its earlier position is essential.  So, Your Honor, we don't

5  believe that W.R. Grace has established in any way, shape, or

6  form, and can't, that the judicial estoppel doctrine applies.

7       What does that leave W.R. Grace to argue in its

8  motion?  Well, it seems to argue, more clearly in its reply

9  than it does in its original papers, that as a matter of fact

10 and/or law, these claims are time barred.  And in order to

11 assess that position, Your Honor, I think it's instructive to

12 recognize what it is W.R. Grace's burden would be.  And as our

13 papers establish, on a motion for summary judgment seeking to

14 expunge a proof of claim on the grounds that the claim is time

15 barred, just as W.R. Grace would have to do in an adversary

16 proceeding or in what has become, in effect, a contested

17 matter, W.R. Grace would have to sustain the defense of statute

18 of limitations.  In order to sustain its defense of statute of

19 limitations, it has the burden to establish that each of the

20 elements of the Department of General Services claims,

21 including contamination, has arisen outside of the statute of

22 limitations period.

23       I don't want to repeat my colleagues' arguments about

24 the essential requirement of contamination is under the

25 prevailing case law, but I do want to point out that the

1 argument that somehow the Delaware borrowing statute changes

2 the Court's result because under the Delaware borrowing statute

3 the accrual period may be shorter than that of the California

4 statute of limitations period I don't believe is a current

5 assessment of the law.  As our opposition points out, and as

6 the case law makes quite clear, the cases that W.R. Grace

7 relies on for the suggestion that under Delaware law these

8 claims might be time barred where they would be timely under

9 California law, really refer to the operation of the statute as

10 a tolling mechanism.  There is no case authority for the

11 proposition that under Delaware's borrowing statute a claim

12 that would be timely under what is an identical -- admittedly

13 identical three-year limitations period could be untimely under

14 Delaware law and yet timely under California law, and we don't

15 believe that is the case.

16          In any event, Your Honor, even if that were the case,

17 W.R. Grace, the debtors, have failed totally to establish any

18 -- that each of the elements of each of these claims has arisen

19 before the limitations period.  All they rely upon is this 1990

20 proposed complaint and petition, and as to my client, the

21 Department of General Services, they rely on nothing else.  And

22 they simply would have this Court conjecture that on a petition

23 for leave to file a complaint on behalf of several states

24 against 29 asbestos manufacturers back in 1990, that in the

25 course of two or three pages didn't identify a single building,

1  that that constitutes some conclusive evidence beyond a genuine

2  issue of doubt that would establish that these claims had

3  already arisen.  That's not the case.  That's not California

4  law.  It's not Delaware law, and, Your Honor, we believe that

5  it tortures the interpretation of what constitutes a cognizable

6  claim in this Court.

7         So, Your Honor, because W.R. Grace has failed to

8  demonstrate the application of the judicial admission doctrine,

9  the judicial estoppel principle, or that each of the elements

10  of the DGS claims has arisen outside of the tolling period, and

11  because W.R. Grace offers no evidence to suggest that the

12  Department of General Services has filed a claim anywhere else

13  against any other asbestos manufacturer or itself relating to

14  these buildings, we respectfully request that the Court deny

15  their motion as to DGS in its entirety.  Thank you.

16         THE COURT:  Mr. Flatley, any further comment?

17         MR. FLATLEY:  Thank you, Your Honor.  If my hearing

18  was correct, there was almost nothing said about Delaware law

19  in the claimants' arguments.  What was said was that Delaware

20  has a three-year statute just like California.  That completely

21  ignores the point in the case that I cited to Your Honor

22  earlier, and it's in our briefs, that says when you're

23  comparing the statute of limitations of Delaware with the

24  statute of limitations in California, you take all the

25  accouterments of that state's law with it.  And the

1 accouterment that applies here is that Delaware doesn't have a

2 contamination standard.  And so, the whole argument is based on

3 a standard that's irrelevant to Delaware law.  They're talking

4 about contamination, contamination, contamination, that's not

5 part of Delaware law.

6        The only other thing I heard about Delaware law was

7 that perhaps the Delaware borrowing statute shouldn't be

8 applied here.  Well, Your Honor applied it before in the

9 Prudential case.  I won't go back over that.  It has very clear

10 language that says whichever statute is shorter.  And there is

11 no forum shopping going on here by Grace such as was involved

12 in some of the cases that are discussed in the brief.  There is

13 no reason that's even been suggested for this Court not to

14 apply the Delaware borrowing statute in its literal language

15 and apply the shorter statute, and the shorter statute would be

16 Delaware law, where there's no contamination standard.  Now,

17 let's --

18        THE COURT:  See, the problem I'm having is the word

19 shorter.  I agree that if it's -- that if I'm looking at a

20 borrowing statute because of a tolling issue, then there may be

21 shorter as a time matter and you look at the accouterments, but

22 when one statute is three years and another statute is three

23 years --

24        MR. FLATLEY:  But, Your Honor, if I may?  What the

25 accouterments case means is that you take the statute in how

1  it's interpreted, and the fundamental element of how a statute

2  of limitations is interpreted is when it starts to run.  So,

3  when you take the Delaware statute you take the Delaware law on

4  when the Delaware statute starts to run, and it doesn't have a

5  contamination standard like California, so the Delaware statute

6  clearly is, therefore, the shorter statute.

7          Let's talk about -- it's been said that we offered no

8  evidence of contamination.  But what we've offered are the

9  plaintiff's admissions, the claimants' admissions, in the 1985

10 document and in the 1990 document.

11         And let's talk about the Manville bankruptcy a little

12 bit.  It was said that the Manville bankruptcy was about pipe

13 insulation.  Your Honor, those claims forms are far broader

14 than pipe insulation.  Those claims forms explicitly mention

15 fireproofing, they explicitly mention ceiling materials, and

16 they explicitly mention materials that weren't manufactured by

17 Manville, because at the time the claims were filed they said

18 we haven't yet figured out whether all of this was made by

19 Manville, so we're claiming on everything, and very clearly

20 they said fireproofing, they checked off the block for

21 fireproofing.  They checked off the block for ceiling material.

22 It was not a matter of just alleging pipe insulation.

23         They also alleged under any definition of the

24 statute.  They're saying in 1985 we have a claim, we -- for

25 example, California State University has a $500 million claim.

**J&J COURT TRANSCRIBERS, INC.**

1  That's actual and substantial harm under anybody's definition.

2  The law in California, to go back to that law, has been

3  consistent since at least the California Supreme Court's

4  decision in 1975 established the actual and substantial harm

5  standard.  San Francisco Unified School District went beyond

6  that but the ultimate question under California law has been

7  the same all along.  It's been actual and substantial harm.

8  And moreover, if, in terms of trying to explain away their

9  admissions, I would note to the Court that there's nothing on

10  the record to support the speculation that was offered here

11  earlier in argument about why the claims were stated the way

12  they were in 1985 and again in 1990.

13          Focusing again on the Manville claim, the Manville

14  claim is exactly what happened in the City of San Diego case.

15  In 1995 the California Court of Appeals said to the City of San

16  Diego you already filed a claim against Manville in 1985.  You

17  already claimed that your building were damaged by asbestos

18  containing materials in 1985.  In 1995, therefore, it's too

19  late for you to go ahead and sue W.R. Grace.  That case is on

20  all fours with us on that point.

21          Let's talk about the 1990 document.  There's no

22  dispute that it binds California State University, and I don't

23  know whether there's a dispute that it binds the Department of

24  General Services, although I can't imagine that argument can be

25  made.  It's a department of the State of California.

1          Now, we do have the I'll call it 12th hour argument

2   that University of California is not bound.  University of

3   California filed is claim form in 2003 in which it identified

4   the 1990 suit as a predecessor litigation for all of its

5   claims.  Grace raised its argument in its 15th omnibus

6   objections about a year-and-a-half ago.  After that argument

7   was raised, the University of California amended its claims

8   form but didn't change the designation of the 1990 lawsuit.

9   Again in January Mr. Restivo in this courtroom indicated that

10  Grace was going to file a motion for summary judgment on the

11  15th omnibus and was going to refer to the 1990 claims.  Then,

12  on the very day we filed our motion for summary judgment came

13  the amendment, and I would submit that Your Honor has

14  discretion whether to credit that amendment or not.

15          I want to talk about the United States Supreme Court

16  proceedings a little further.  I might be a little bit harsh,

17  but I think what I heard from claimants' counsel was that was

18  only a motion to file a complaint that we filed in the United

19  States Supreme Court, so we really ought not to be having to

20  account for the words we used there.  I find that astounding.

21  Whether the complaint was ultimately allowed by the United

22  States Supreme Court or not, what we're arguing is that

23  admissions were made in that document and that document is

24  replete with statements that there was contamination, that's

25  their word, not mine, contamination throughout.  Contamination

**J&J COURT TRANSCRIBERS, INC.**

1 in the buildings.  Hazard in the buildings.  Substantial and

2 actual harm in the buildings throughout.

3       Another point that I heard was that this is a summary

4 judgment motion and we've come forward and offered the

5 admissions of the claimants and there's somewhere else on the

6 claimants' claim form where they said, well, we first found out

7 about the asbestos in our buildings in 2003.  I would say, Your

8 Honor, in classic summary judgment procedure, that's a baseless

9 allegation, there's nothing to support it.  There's substantial

10 evidence in the record that contradicts it.  It's not enough to

11 create a genuine issue of material fact.

12       THE COURT:  Well, I think -- pardon me, but I thought

13 what the argument was was that in 2003 they found out that it

14 was Grace's asbestos in the building.  I thought that's what I

15 heard.

16       MR. FLATLEY:  Okay.  Well, even at that -- even at

17 that --

18       THE COURT:  I'll ask.

19       MR. FLATLEY:  Well, Your Honor, that's -- that's --

20 two things.  Number one, that's not the issue.  The issue is

21 whether there was actual and substantial harm in their

22 buildings back in 1985 and 1990.  The City of San Diego case

23 that I mentioned earlier, where the Court pointed to the

24 Manville bankruptcy, said it doesn't matter if you didn't know

25 whose product it was, you knew that your building had suffered

1  actual and substantial harm back in 1985.

2         THE COURT:  That's a point.  I mean, if you had to

3  know whose building it was, the fact that you sued 29

4  defendants at one time would never happen, because, you know,

5  the fact that each defendant can point the finger at the other

6  defendant and say, oh, it's not my asbestos, it's yours, would

7  never be the case.  The Court system, to use words that have

8  been used in this record before by others, not me, wouldn't be

9  broken, because each defendant would have to be sued

10  individually.  You couldn't throw every asbestos defendant in

11  the world into one suit.  You'd have to prove the case against

12  each individual defendant.  You'd have to identify the

13  defendant and the defendant's product, and that's not how the

14  tort system worked.  Everybody -- not everyone, many people

15  threw lots of defendants in and worried about coming down

16  later, after the complaints were filed, to figure out which

17  defendant would make it to trial.  So, it can't be that you

18  have to know at the time you file a complaint which defendant's

19  product is in the building, or else people couldn't have filed

20  the complaints.

21         MR. FLATLEY:  Well, I think, Your Honor, that the

22  focus, and again here we're talking about the California law,

23  because we're talking about contamination, actual and

24  substantial harm.

25         THE COURT:  That's why I think the case is written in

1 that fashion.  The case is saying if you know that you have

2 asbestos in the building, you know you have actual and

3 substantial -- you know you have a cause of action at that

4 time, and then at that point you're on a duty of inquiry notice

5 to try to figure out whether or not you've got the elements for

6 a suit.  That's what the case is saying.

7        MR. FLATLEY:  That's exactly what the San Diego case

8 said.

9        THE COURT:  Even though you don't know at that time

10 who the appropriate defendant is, you're on inquiry notice to

11 figure out who the defendant is and then to bring your action.

12        MR. FLATLEY:  That's exactly right, Your Honor, and

13 that's what the San Diego case said, that the statute started

14 running then, and it was up to the claimants to figure out

15 whose actual product it was.

16        THE COURT:  Right.

17        MR. FLATLEY:  One final point, Your Honor.  Mr.

18 Mandelsberg mentioned that the Department of General Services

19 had not filed a Manville claim.  That's right.  I hope I was

20 explicit on that.  The Manville claims were filed by California

21 State University, the University of California, and the County

22 of Sonoma.  Mr. Mandelsberg -- our claim against him is based

23 on the 1990 lawsuit, because he, indeed, is a department of the

24 State of California.

25        THE COURT:  Gentlemen, any wrap up?

**J&J COURT TRANSCRIBERS, INC.**

1      MR. EDWARDS:  Thank you, Your Honor.  I'd like to

2 start with the borrowing statute if I may that's been the

3 subject of some discussion, and I think some confusion,

4 candidly.  The Delaware borrowing statute states, "Where a

5 cause of action arises outside of this state, etcetera,

6 etcetera, etcetera."  The borrowing statute only applies if the

7 cause of action arose outside of Delaware.

8      THE COURT:  Right.

9      MR. EDWARDS:  A cause of action for asbestos in

10 building does not arise in California, which is the only other

11 place this could arise, until you have contamination.  They're

12 attempting to say, well, no, you have the Delaware borrowing

13 statute, so you use the less appreciable, or the more lenient

14 Delaware standard.  And they cite to the <u>Plum v. Coddle</u> case,

15 and say, well, you talk about the appurtenances, and the things

16 you import.  That was a case where I believe there was a car

17 accident among residents of Maryland and North Carolina and

18 somehow it ended up in Delaware.  And when the Court looked at

19 this and said, well, in choosing which statute we're going to

20 use, we have to -- when we bring it into our state we have to

21 bring the appurtenances of that statute and how the cause of

22 action arises and applies.  That's true.  What they're not

23 saying, which is Grace's argument, is well, you used the

24 Delaware borrowing statute to say -- to bring these causes of

25 action in, and then you pick Delaware substantive law and apply

1 it to those cases, because it only applies when the case arises

2 outside of Delaware, and you don't -- it wouldn't have arisen

3 outside of Delaware unless there's contamination.  One thing

4 I'd like to briefly turn -- actually to one of the --

5          THE COURT:  I'm sorry.

6          MR. EDWARDS:  Sure.

7          THE COURT:  That confuses me.  The action didn't

8 arise in Delaware, therefore it had to arise somewhere else.

9          MR. EDWARDS:  Correct.

10          THE COURT:  So, Delaware's borrowing statute is going

11 to apply in this instance because these are buildings in

12 California, and the buildings are not in Delaware.  None of the

13 actions that affect these buildings took place in Delaware.

14          MR. EDWARDS:  Correct.

15          THE COURT:  So I'm automatically looking at

16 Delaware's borrowing statute.  So, what you are telling me is

17 that Delaware says I should look to California's statute, and I

18 should look to Delaware's statute, and I should do the

19 comparison that Delaware's borrowing statute tells me to do.

20 But you're saying that the California statute would never have

21 arisen at all until there was some contamination.  So,

22 Delaware's statute, I think you're telling me, wouldn't even

23 come to fruition until there was some contamination in

24 California, because -- but that's where I'm losing it.  I don't

25 know, because why.

**J&J COURT TRANSCRIBERS, INC.**

1           MR. EDWARDS:  If I may, Your Honor.  One way you can

2    analyze this is in terms of the procedural and the substantive.

3    The Delaware borrowing statute applies the shorter of the three

4    year -- shorter of the statute --

5           THE COURT:  Right.

6           MR. EDWARDS:  -- of limitations.  That's a procedural

7    question.  It does not then say, well, or are we going to apply

8    Delaware substantive law about when a cause of action accrues,

9    when it even starts, when there's contamination, or danger, or

10   all these other things, that's not the purpose of a borrowing

11   statute.  It chooses the shorter of the two statutes.  The

12   thing about contamination, it's a substantive law question, and

13   there's no way in the world that Delaware substantive law about

14   when a cause of action starts about asbestos would apply to a

15   building in California, there's just no locus -- there's no

16   connection between Delaware and California, where the product

17   was installed, and where the product was sold, and where the

18   injury occurred.

19          THE COURT:  So --

20          MR. EDWARDS:  In other words, it's not -- I mean,

21   choice of law 101, the law applies where the tort arose,

22   regarding the substantive law.  Right?  I mean --

23          THE COURT:  Well, but if I go back to Erie v.

24   Tompkins, I mean, you can -- to a certain extent, procedural

25   and substantive law get very much inter-mixed with respect to

**J&J COURT TRANSCRIBERS, INC.**

1  whether or not statutes of limitations or substantive or

2  procedural.  Yes, the impact is procedural in that what it does

3  is bars the procedure, i.e., the cause of action, from being

4  filed at all, if it's applicable, but that also affects the

5  substantive right, i.e., you're out of Court, you have no basis

6  on which to file a complaint.  So, I'm not sure that I totally

7  follow the logic of that argument.  I'm not sure I can totally

8  -- I'm not sure I totally agree with the logic of that

9  argument.  I'll have to give that some thought.

10         MR. EDWARDS:  The only other thing that I would point

11  out, and then I'll move on from that, is just the way the

12  statute begins, where it arises outside of California, and

13  they're attempting to say Delaware -- and let's be very clear

14  about this, the Delaware statute, substantively, isn't that

15  different from California.  It talks about injury.  And in the

16  reply papers all that they say is, this is on Page 4, Your

17  Honor, the Delaware statute of limitations may be shorter when

18  applied to the California claims.  They don't apply -- they

19  don't give us any law about that.  They just say, oh, it may be

20  shorter.  It may be.  That's all we have in the reply.  It is

21  similar to California in that you're required to have an

22  injury.  They haven't provided any evidence or cited any cases

23  saying that mere presence of asbestos somehow starts the

24  statute --

25         THE COURT:  But their argument is that because of

1  both the claims filed in Manville and the petition filed at the

2  Supreme Court level in which it's alleged that because of the

3  contamination in the buildings that has to be abated, and the

4  fact that there is substantial harm, economic harm to whoever

5  the entities are that filed those particular complaints, that

6  there is evidence of contamination that requires the abatement,

7  that that's an admission by the party who filed the paper that

8  substantiates contamination, and it certainly substantiates

9  from the debtors' arguments point of view the knowledge of

10 contamination that set the statute in motion by which the

11 statute of limitations started to run.  That's their argument.

12 It's not that their -- they're not arguing that there is actual

13 contamination.  They're saying that for statute of limitations

14 purposes that if nothing more, you're on inquiry notice so that

15 you should have taken the action -- not you.  I apologize.

16 Your clients should have taken the actions to find out whether

17 or not there is contamination so that the actions could have

18 been brought.

19         MR. EDWARDS:  I'm glad Your Honor raised that.  That

20 was actually going to be my next point.  The fact that there

21 may have been contamination in California buildings in 1985 or

22 1990 by Manville products or by other unknown manufacturers

23 doesn't have anything to do with Grace.

24         THE COURT:  But at the Supreme Court level in 1990,

25 when that petition is filed, it certainly does, because Grace

1 is a named entity against which the entities who filed that

2 action wanted to bring suit, so the contamination alleged

3 there, regardless of what happened in 1985, it's clear by 1990

4 there's an allegation that Grace's products have contaminated

5 buildings in California at that point in time.

6      MR. EDWARDS:  And to be clear, that would mean,

7 assuming that the University of California isn't part of the

8 state, then that would affect me as regards California State

9 University, and the only rebuttal I would have to that

10 regarding the 1990 petition for CSU is that at that time, in

11 California, the law was unclear.

12      THE COURT:  But the law being unclear isn't the point

13 that the debtors are arguing.  The debtors are saying that the

14 claimants filed the pleading before the United States Supreme

15 Court saying we have evidence that the buildings are

16 contaminated.  We want to bring a lawsuit.  Now, they lost that

17 petition.  They were not able, for whatever reason, to file the

18 lawsuit.  But it is evidence, from the debtors' point of view,

19 you filed -- that petition is a verified statement, that says

20 we have evidence that the buildings are contaminated and that

21 it's Grace's product that caused the contamination.  So,

22 there's evidence, verified under oath by the claimant that

23 Grace's contamination -- Grace's product, pardon me -- cause

24 contamination in the building that set the statute of

25 limitations in motion, and now here we are, you know, a decade,

1  more than a decade later, when the claims are filed.  And that

2  seems to me to be a pretty logical and persuasive basis,

3  regardless of which statute I use, Delaware or California.  For

4  that purpose I don't think it matters, because I agree, it's

5  three years, and if you have knowledge, and there is an

6  allegation that there's contamination, then you've met it for

7  California purposes, and it's not relevant for Delaware

8  purposes.  So, that's their argument, and if, in fact, that can

9  be used as an admission against interest for purposes of

10 meeting the element of the statute, not a judicial admission,

11 but as an element that says, yes, we have contamination for

12 purposes of having the statute of limitations start to run, I

13 think you're out of luck.

14        MR. EDWARDS:  The only -- the final thing I would say

15 in regards to the CSU claims about that, is that I believe I

16 can only point out the inconsistency that exists between the

17 statements about discovering that there was a Grace product in

18 2003 in their buildings compared to the claims.  Now, if the

19 Court wishes to choose one part and not the other --

20        THE COURT:  But that's -- but I think that's an

21 irrelevancy.  That's a discrepancy that the claimants

22 themselves have built into the record.  That's not a

23 discrepancy that's a material fact dispute by the debtor.

24 That's a discrepancy that the claimants -- they're saying, gee,

25 back in 1990 we told the United States Supreme Court debtors'

1  product contaminated out building and now we're telling the

2  debtor we didn't know about it until 2003.  Well, I mean, what

3  do I do?  Believe the debtors' statement to the United States

4  Supreme Court under oath, or the debtors' statement in 2003

5  proof of claim filed in a bankruptcy case?  I --

6      MR. EDWARDS:  It sounds like a triable issue of fact

7  to me, Your Honor.

8      THE COURT:  Really?  It sounds to me like I'm going

9  to march to the drum that the United States Supreme Court sets,

10 and if somebody files something under oath at the United States

11 Supreme Court level I'm probably going to believe that.

12     MR. EDWARDS:  Thank you, Your Honor.

13     THE COURT:  I don't see how you create that level of

14 -- I just don't see how you create that as a material dispute

15 of fact in your own record.

16     MR. EDWARDS:  Do you have any other questions as

17 about the UC claims as opposed to the CSU claims?

18     THE COURT:  Okay.  Your contention with respect to

19 the UC is that because it is an independent arm of the state,

20 is that --

21     MR. EDWARDS:  It's an independent entity created by

22 the California constitution.  It's a co-equal part of the state

23 -- the Regents of the University of California on the deeds

24 they own the property.

25     THE COURT:  Okay.

**J&J COURT TRANSCRIBERS, INC.**

1        MR. EDWARDS:  The State of California doesn't own the

2  property.

3        THE COURT:  All right.  So, whatever the state does

4  --

5        MR. EDWARDS:  Doesn't matter.

6        THE COURT:  -- does not bind the Regents in that

7  respect?  They are independent and have independent authority?

8        MR. EDWARDS:  Exactly.  And more importantly, the by-

9  laws of the Regents in fact state that the Regents have to give

10  permission before any suit can be filed on their behalf, and

11  the declaration we submitted by Eric Barrons --

12        THE COURT:  Right.

13        MR. EDWARDS:  -- said it never happened, or that he

14  could find.

15        THE COURT:  Okay.  So -- all right.  So, for the

16  university I don't see an issue with respect to the Supreme

17  Court suit, but the university did participate in the Manville

18  issue?

19        MR. EDWARDS:  That's correct.

20        THE COURT:  All right.  And your issue for Manville

21  is that the claims that were filed there were filed against

22  Manville.  They're not filed against Grace.

23        MR. EDWARDS:  That's correct.

24        THE COURT:  Grace's concern there is, well, you knew

25  about asbestos, and once you know about asbestos, then you know

1 about all asbestos, and you're saying, I think I understand

2 your argument to be that but the same issue that Grace is

3 arguing against other defendants applies to you, and that is

4 you have to have some product i.d.

5        MR. EDWARDS:  Right.  And with a -- we're golden on

6 the product i.d. at this point regarding the University of

7 California claims.

8        THE COURT:  Well, now.

9        MR. EDWARDS:  Yes.  On --

10        THE COURT:  In Manville, in the Manville case?

11        MR. EDWARDS:  The Manville claims -- I'm not that

12 familiar with what the Manville claims are.  All I know is they

13 weren't against W.R. Grace, and I have seen no indication that

14 they identified any contamination by W.R. Grace products as

15 part of those claims.

16        THE COURT:  Okay.

17        MR. RUNYAN:  May I briefly be heard?  And by way of

18 introduction, I'm Alan Runyan with Speights and Runyan, and

19 I've worked with Tom and Terry, principally on the California

20 issues.  I just have two very, very brief points to mention,

21 well, actually three.

22        MR. RESTIVO:  We would object, Your Honor.  We're not

23 quite sure what the procedure is where now Mr. Runyan gets to

24 reply to a sur rebuttal to a rebuttal.  I mean, he -- all of a

25 sudden he shows up and he wasn't part of the argument at all.

1          THE COURT:  Well, that is somewhat of an unusual

2    procedure, Mr. Runyan.

3          MR. RUNYAN:  Yes, Your Honor.  It might be.

4          UNIDENTIFIED ATTORNEY:  Can I cede a couple minutes

5    of my time to Mr. Runyan?

6          THE COURT:  Well, I think you're done, sir.  You

7    already sat down, so --

8          MR. RUNYAN:  I do think that it's -- there are at

9    least two very important points that have not been mentioned on

10   the Delaware borrowing statute, and I would like to make the

11   Court aware of them.

12         THE COURT:  All right.  Mr. Runyan, I'm going to hear

13   you, but in the future, if you've got something to say, stand

14   up and say it in the appropriate time frame.  Go ahead.

15         MR. RUNYAN:  Thank you, Your Honor.  First of all,

16   the Delaware borrowing statute applies, as Your Honor has

17   recognized, when a cause of action accrues somewhere else.  And

18   the statute essentially says if the Delaware statute of

19   limitations is shorter, then that statute would apply, or if

20   the other state's is shorter, that statute would apply.  The

21   accouterments case says that the accouterments that are applied

22   are the accouterments of the case where the cause of action

23   arose.  If the cause of action arose in California, the

24   accouterments of that statute of limitations, including its

25   requirement that there be proof of injury by contamination

1 would apply in Delaware, to which Delaware would apply if it

2 were shorter its time period.  So, in this case, as Your Honor

3 mentioned, they're both three years, so the -- it's not the

4 case, I don't think, under the statute on its face, or through

5 the cases construing it, that the accouterments of Delaware law

6 apply to a cause of action that arose in California.  It's

7 exactly the opposite.

8          And then, last, Your Honor, there has just been this

9 concept that's floated about what Delaware law is on when an

10 asbestos property damage cause of action accrues.  I don't know

11 of any law in Delaware that says it accrues upon the

12 installation or from the presence of asbestos containing

13 products.  And most of the jurisdictions, in fact, the

14 overwhelming number of jurisdictions in this country, apply the

15 contamination standards, so if it were Delaware it's an open

16 issue of what they would do under those circumstances, and the

17 majority of the law is the other way around.  Thank you.

18          THE COURT:  All right.  Thank you.

19          MR. MANDELSBERG:  Your Honor, Steven Mandelsberg from

20 Hahn & Hessen representing the State of California Department

21 of General Services again.  Two points that I think need to be

22 made, may have been obscured in the argument.  I don't want to

23 add to the time we're spending on it, but one point deals with

24 the borrowing statute and the other point deals with what this

25 1990 proceeding in the Supreme Court was and was not.  As for

1 the borrowing statute, I think what's not been made clear in my

2 hearing is that the cases uniformly hold that when a Delaware

3 Court is faced with a borrowing statute it should determine the

4 applicable statute of limitations under Delaware law, when the

5 action accrued under Delaware law, and then perform the same

6 analysis under the other state's law.  That's the holding, for

7 example, in <u>Forbach Delarge v. Hartford Accident and Indemnity</u>

8 <u>Company</u> (phonetic), a 1987 Delaware Superior Court case, Lexus

9 1368 at Footnote 6.

10          In this case, Your Honor, the accouterments rule that

11 W.R. Grace keeps citing to suggest that somehow Delaware's

12 accouterments would result in a shorter accrual period than

13 California's would actually turns out to be the same, and it's

14 really a matter of whether or not, under either state's case

15 law about time of discovery whether there is any difference.

16 And I just would like to point out to Your Honor that in the

17 <u>California Sansom v. U.S. Gypsum</u> case which has been cited many

18 times for many propositions, the Ninth Circuit did specifically

19 address this discovery rule issue, and it said, 55 F.3d 1402,

20 1406, and the quote I'm reading at is Note 7 at Page 1407, the

21 discovery rule assumes that the elements of accrual, including

22 harm exists but tolls the running of the statute until the

23 plaintiff is on inquiry notice of its injury and its wrongful

24 cause.  This, Your Honor, is why it is important for the Court

25 to be able to find that all of the elements of the claimants'

1  claim have accrued before determining whether or not the

2  claimant is on such a notice that would begin the running of

3  the statute of limitations.

4          THE COURT:  Would you read that again?  I'm sorry.

5          MR. MANDELSBERG:  The discovery rule assumes that the

6  elements of accrual including harm exists but tolls the running

7  of the statute until the plaintiff is on inquiry notice of its

8  injury and its wrongful cause.  In other words, the Court must

9  find, before it gets into this discovery rule, that all of the

10 elements of the claim exist.  In this case --

11         THE COURT:  No.  What it says is that it's tolled

12 until the plaintiff is on inquiry notice.  But here, because of

13 at least the Supreme Court suit in which the variety of

14 entities who participated in that suit filed a pleading saying

15 that Grace's asbestos caused them substantial harm, they're on

16 inquiry notice.

17         MR. MANDELSBERG:  But, Your Honor, that's exactly

18 what didn't happen.  And that leads to my second point.  The

19 proposed Alabama v. Grace complaint, which has been referred to

20 many times, was I don't believe verified, so the indication

21 that there was some verified sworn to pleading by each of the

22 states is not accurate.  I think if the Court checks the record

23 of the complaint that was actually attached to the proposed

24 motion, it will see no such verification.  Second, Your Honor,

25 this proposed complaint, and once again, it was not a filed

1 complaint that was approved by the Court, does not contain any

2 allegations of contamination.  What W.R. Grace is referring to

3 are allegations that apparently appear in a brief in support of

4 the petition for leave to file the complaint.  This proposed

5 complaint contains its two pages, it contains 18 generalized

6 paragraphs, and what it asks for is equitable relief pursuant

7 to something called the public assistance doctrine.

8          Our opposition details specifically -- I won't go

9 over it, what the public assistance doctrine requires and why

10 it's different from a property damage claim.

11          THE COURT:  Okay.  When I was speaking about the

12 pleadings before the Supreme Court, I was not referring to the

13 proposed complaint that the Supreme Court said could not be

14 filed.  I was talking about the pleadings that the Supreme

15 Court considered, that is the motion for leave to file the

16 complaint and the brief that the Supreme Court used on which to

17 deny that relief.  That's what I was referring to.

18          MR. MANDELSBERG:  Okay.  I just wanted to make sure

19 that the Court was aware that this wasn't a verified complaint

20 in the sense of parties having sworn to the complaint or a

21 representative of the parties that that is not the case.  But

22 what is the case is that this complaint only sought equitable

23 relief under the public assistance doctrine.

24          Now, why is that relevant to this case?  Well, it's

25 relevant to this motion because the claim for relief under the

1 public assistance doctrine requires, among other things, that

2 the party -- you must prove that the party whose duty it was to

3 act refused to do so through explicit or implicit means, and

4 I'm reading from Paragraph Number 23 at Page 9 of the

5 Department of General Services opposition, Your Honor.  There

6 was a need to act immediately to protect the public health, and

7 the party who failed to act had a duty to do so.  There is no

8 need, in order to get relief under the public assistance

9 doctrine, that there be any legal liability.  There's no need

10 for a claimant to establish that there's contamination or harm.

11 There's no need, in other words --

12        THE COURT:  Then what do you need to protect the

13 public health for?

14        MR. MANDELSBERG:  Because the -- you would need --

15 you could invoke the public assistance doctrine, for example,

16 to get the Court to order some sort of limited abatement of

17 asbestos.

18        THE COURT:  Well, I understand that you don't need

19 the legal liability, but you have to have some sort of

20 assurance that there is contamination that's going to lead to

21 some health hazard, or there's no basis on which to ask for the

22 equitable relief to protect the public health.

23        MR. MANDELSBERG:  No, Your Honor.  That is not what

24 the public assistance doctrine requires.  It is, in fact, not

25 required at all, and that is why this proposed complaint didn't

1  need to identify buildings, didn't identify buildings, didn't

2  have any list of buildings.  I know W.R. Grace reads this

3  complaint to mean that all buildings everywhere in every one of

4  these states is implicated, but that's not the case.  So,

5  because this relief didn't need to establish what the claimants

6  in this proceeding need to establish, you are talking about

7  apples and oranges.  And as we have cited, that is not the

8  basis upon which to apply the judicial admission doctrine.  At

9  most, Your Honor, the cases say that statements in a prior

10 pleadings as we have cited at Page 11 and 12 of our opposition

11 in the <u>Migliori v. Boeing North America</u> (phonetic) case, at

12 most pleadings from a prior litigation can be used to counter

13 allegations but are not judicial admissions binding upon the

14 litigants in a different litigation.  This is clearly a

15 different litigation, Your Honor, and the attempt by W.R. Grace

16 to expand this 1990 proposed motion into a binding admission as

17 to specific buildings as to which claims have been filed, and

18 in my client's case where we have demonstrated specifically

19 that specific buildings were contaminated based on W.R. Grace

20 products, based on specific tests, expert reports that link

21 W.R. Grace to, as the manufacturer of these products in 2003,

22 does not constitute a judicial admission.  It certainly does

23 not constitute the sort of dispositive evidence that would

24 warrant grant of a summary judgment motion.  So, Your Honor,

25 for those reasons, we continue to request that the Court deny

1  W.R. Grace's motion.  Thank you.

2        MR. FLATLEY:  Just one point I'd like to address,

3  Your Honor.  I'll try to keep it very narrow, to the public

4  assistance doctrine, because that was first mentioned in the

5  last comments.  Initially, the 1990 papers in the Supreme

6  Court of the United States sought the costs of removal of all

7  of the buildings -- for the asbestos containing material in all

8  of the buildings.  Those papers are replete with references to

9  contamination, and if -- if this could be considered, and I

10 don't think it is in apples and oranges situation, I would

11 submit that the apples are even better than the oranges, Your

12 Honor, because in reality the public assistance doctrine

13 requires a greater showing than the actual and appreciable harm

14 doctrine of California law.  On Page 29 of their petition in

15 the United States Supreme Court they said that removal was,

16 quote, immediately necessary to satisfy the requirements of

17 public health.  It sounds very serious to me.  That sounds very

18 substantial.  That sounds to me like more than actual and

19 appreciable harm if it's anything.

20       And, as far as them not making an admission there,

21 they brought it into the claim here, and it becomes part of

22 this case.  Thank you.

23       THE COURT:  Okay.  It's ten to one.  Why don't we

24 take a recess for lunch, and we'll reconvene.  How much time

25 would you like?  To get downstairs and get something even in

1 this building is probably going to take, I'd say, 45 minutes

2 easily.  Half an hour -- I mean, that's really pushing to get

3 through the lines in half an hour. I think 45 minutes is really

4 about the best you can do.

5           MR. RESTIVO:  I think 45, Your Honor.

6           THE COURT:  So, we'll reconvene at -- I'm sorry?

7           MR. EDWARDS:  If you're finished I just wanted to

8 request permission that Mr. Brandi and I be excused --

9           THE COURT:  Sure.  Do you want to reconvene at 25 to

10 two?

11           MR. RESTIVO:  Yes, Your Honor.

12           THE COURT:  Okay.  We're in recess.  Thank you.

13                         (Recess)

14           THE COURT:  Mr. Restivo.

15           MR. RESTIVO:  Your Honor, an aspect of California

16 cases is a motion for summary judgment filed by claimant

17 Macerich, Fresno Limited Partnership, and we ought to deal with

18 that next with that claimant arguing its motion.

19           THE COURT:  Okay.  What number are we on?

20           MR. RESTIVO:  That's number 10 in the Court's

21 binders.

22           THE COURT:  Thank you.  Good afternoon.

23           MR. GEORGE:  Good afternoon, Your Honor.  Gerald

24 George for Macerich, Fresno Partnership -- Limited Liability

25 Partnership.  This, as you've heard from all the arguments this

1  morning the statute of limitations situations under the

2  asbestos' cases for property damage are all pretty unique to

3  the properties they deal with.  And, in this particular case we

4  have a shopping center which has roughly 65 individual units,

5  three anchor stores, and a common space.  So, you have

6  something of a hybrid of individual units in a single space

7  under the ownership of Macerich.  And, Macerich has been a

8  responsible property owner.  They have, when they took over the

9  property in late 1987, 1988, they conducted a survey of

10 asbestos on the property and determined that there was asbestos

11 in those particular units.  There was spray applied,

12 fireproofing material, which was on beams and in the inner

13 areas behind the wallboard.  And, they also determined through

14 air testing that there was no -- there were not elevated

15 asbestos fiber levels in the air.  So, they continued to

16 monitor it.  And, beginning with a couple of units in 1992 they

17 determined that as units turned over they would then replace

18 this, the fireproofing in those units, so that over time all

19 the units eventually will be free of the asbestos sprayed on

20 fireproofing material.

21        They have regularly conducted audits of the areas.

22 They do it individually by the stores.  They've done -- they

23 did at the time in -- they transferred ownership in 1994.  They

24 took ownership back in 1996.  And, conducted another survey of

25 the entire property area at that time.  So, this is a situation

1  where you have a company that's aware of the asbestos on the

2  property and aware of the condition of the asbestos on the

3  property and monitors it, and deals with it at the time it

4  becomes a problem, basically.  When there is damage to the

5  property is when during a build-out when there's a new tenant

6  they take the walls down, put new walls up, at that point

7  that's when they go in and deal with the asbestos.

8            So, applying California law, and it is California

9  law, in the borrowing statute in Delaware, the Delaware -- I

10 won't argue that again, but I haven't -- no one had mentioned

11 this particular point before.  But, the Delaware Supreme Court

12 has said that it doesn't apply the statute literally according

13 to its terms where in situations where no one's forum shopping.

14 And, that often comes up in situations where the plaintiff

15 filed suit in Delaware, defendant files a counterclaim, and

16 then the plaintiff claims that the counterclaim should be --

17 they should use the borrowing statute to dismiss the

18 counterclaim as untimely.  And, they Delaware Supreme Court has

19 held that if you're not -- that this statute was intended to

20 stop forum shopping and if it's not a forum shopping situation

21 they don't literally apply it.  And, in our situation that's

22 what we have.  We have a California partnership, California

23 property, in the normal course the litigation would have been

24 in California.  Because this is a bankruptcy and the

25 bankruptcy's in Delaware we're in Delaware.  But, the

1 substantive law is going to be California law and the statute

2 of limitations should apply as well.

3        So, we're talking about a contamination standard.

4 And, under that standard it commences, the statute of

5 limitations period would commence with the contamination of the

6 property.  And, it is Macerich's position that the

7 contamination should be looked at just as in the San Francisco

8 Unified School District case where the Court said because of

9 the individual circumstances you look at individual buildings.

10 Here, while these are not separate buildings as such, they are

11 separate units occupied by -- each occupied by a different

12 lessee tenant who has control over the areas within the unit.

13 And, for both that reason and just the expense and the

14 reasonableness of addressing the asbestos conditions within the

15 site the statute of limitations shouldn't begin to run until

16 the asbestos within that unit has damaged that property.

17        Alternatively, Macerich contends that a situation of

18 a condition of nuisance has been created by virtue of the

19 asbestos and the regulations that have been promulgated to

20 address the risk proposed -- presented by rival asbestos if

21 there's a potential for disturbance of the asbestos.  As a

22 result, Macerich has to handle the properties at the mall in a

23 particular way whenever they do work when a tenant has moved

24 out, a new tenant has moved in, they have to engage in various

25 activities to assure that there is no release of asbestos into

1 the public areas of the property, and that workers are

2 protected.  As a result, they are having their ability to use

3 their property affected, which is within the broad definition

4 of a nuisance used under California law.

5        Now, the debtor has said that nuisance doesn't apply

6 and typically Courts have not accepted nuisance on asbestos in

7 building cases, but they have relied on the fact that in those

8 cases that there's the rule in those jurisdictions is that the

9 debtor would have had to have been in control of the property

10 at the time of the nuisance.  That is not the law in

11 California.  You can -- anyone who is assisting in the creation

12 of the nuisance can be liable for it, and there have been a

13 number of pollution cases which are cited in our brief in which

14 that kind of circumstance has led to liability.  In the <u>Gun</u>

15 cases, which there is one in the Ninth Circuit Court of Appeals

16 dealing with California law, they have held gun manufacturers

17 liable for creation of a nuisance because of their activities,

18 that even though they are not directly in control of the guns

19 at the time the harm is caused.

20        So, for all those reasons we think it is quite clear

21 that we fall within the statute of limitations.  Either the

22 statute of limitations for the property damage claims or the

23 kind of rolling three-year statute of limitations that's

24 applied to nuisance claims, continuing nuisances in California.

25        THE COURT:  All right.  Thank you.  Mr. Flatley.

1         MR. FLATLEY:  May I please the Court, Larry Flatley

2  for W.R. Grace.  Your Honor, Grace's position is that

3  Macerich's motion should be denied and that Grace's cross

4  motion for summary judgment should be granted.  This is so

5  because, first, although Grace needs only established that the

6  limitations, statute of limitations in Delaware or California

7  has run on Macerich's claim, we think it's barred under the law

8  of both states.  And, secondly, Macerich can not save its claim

9  by attempting to cloak it as a nuisance claim.  A tactic that

10 has been rejected in directly applicable California Appellate

11 precedent.

12        We'll start by addressing the statute of limitations

13 issue.  I won't, Your Honor, repeat the Delaware law issues.  I

14 really don't have much of anything to add to the colloquy this

15 morning.  I would say that I do believe counsel's reading of

16 the Saudi Basic case, which is the Delaware Supreme Court case

17 that I'm sure he's referring to, is erroneous because that case

18 did not say that the statute of limitations 8121, the borrowing

19 statute, is inapplicable absent a finding of forum shopping.

20 Rather, in that case the Court acted to prevent blatant forum

21 shopping by a party who was seeking to circumvent the statute

22 of limitations and apply one where there was otherwise no

23 statute at all.  But, even apart from that, even under

24 California law we submit that the statute of limitations here

25 is relatively easy under the very standards that Macerich

1 argues for.  In its papers Macerich says that the statute of

2 limitations begins to run on the date Macerich undertook the

3 renovation of a tenant space that would disturb the

4 fireproofing and contaminate the surrounding areas.

5 Specifically, Macerich argues the damage -- and this is on Page

6 12 of their brief -- the damage and Macerich's knowledge for

7 purposes of the statute of limitations occurred when as with

8 the renovation of a particular store or common area there was a

9 risk of disturbance resulting in such a release and a

10 concomitant obligation under the state and federal asbestos

11 abatement laws to address and eliminate the risk.  So, what

12 they're saying is, our statute starts to run when we abate a

13 space and we follow the abatement procedures and rules to make

14 sure that there's no widespread contamination throughout the

15 building.

16       It's undisputed, Your Honor, that from 1992 to 1995

17 Macerich undertook tenant renovations and removed all the

18 asbestos containing material from six different tenant stores

19 in the shopping mall.  Macerich removed tens of thousands of

20 square feet of asbestos containing material in the early to

21 mid-1990s.  That's well established, Your Honor, in the

22 declaration of Mr. Guffaree, that's Docket Number 14585 in

23 Paragraph 6 and in the attachments that are attached to that to

24 support it.  Even under Macerich's own articulation of the

25 standard, I submit, before 1996 the statute started to run on

1  Macerich's claim against Grace.  And, because it started to run

2  there it had expired long before 2001.

3      Now, in an effort to avoid the implications of its

4  own test Macerich argues that a separate claim accrues for each

5  tenant space as it is abated.  And, as a result separate

6  statutes of limitations should apply to each of the 65 tenant

7  spaces in the mall.  Accordingly, Macerich argues that the

8  early 1990s abatement of Kinney Shoes started a statute of

9  limitations running then but the abatement in K.B. Toys which

10  occurred two or three years later started a new statute of

11  limitations relating to that property.  This position, we

12  submit, is unsupportable in law or in logic.  Initially it's

13  significant that in this bankruptcy Macerich has filed one

14  claim, not 65.  But, most significant, Macerich has not cited

15  to any opinion in California or anywhere else that so much as

16  hints that the running of the statute of limitations for a

17  particular building can be fractionalized into 60 or more

18  particular parts.  Such fractionalization is unsupported in the

19  law because it makes no sense.  It's one building.  And, if

20  they take out a substantial amount of material in part of the

21  building the statute has started to run as to the entire

22  building.

23      Now, next I'd like to address Macerich's nuisance

24  theory.  Simply put, I don't think they can save their claim by

25  trying to call it a nuisance claim.  I don't think it can

1 reasonably be disputed that Macerich's claim is a garden

2 variety products liability property damage claim.  In their

3 claim they allege that Grace's Monacode III is in the shopping

4 mall and they seek to recover compensatory damages as measured

5 by the cost of past abatements, including presumably by the way

6 the ones occurred in the early 1990s.  They want the cost of

7 past abatements, they want the anticipated cost of future

8 abatements, and they want the O&M cost that they incurred from

9 time to time throughout the history of the building.

10        The essence of Macerich's claim is succinctly stated

11 at the outset of its brief where Macerich says it has asserted

12 a claim in bankruptcy seeking recovery for property damage that

13 has been incurred and will be incurred.

14        Macerich's claim in this regard is strikingly similar

15 to the claim that was at issue in the City of San Diego case,

16 California Appellate Court opinion that was discussed this

17 morning, and in the City of San Diego case plaintiff sued Grace

18 and others seeking damages for the money it spent to identify

19 and remove in the past and prospectively remove in the future

20 asbestos containing material.  In that case, in the City of San

21 Diego, San Diego attempted to avoid the operation of the

22 statute of limitations by claiming that it had also asserted a

23 nuisance claim.  The California Court of Appeals, however,

24 squarely rejected San Diego's nuisance argument holding that

25 the plaintiffs could not pursue a products liability claim

1  under a nuisance theory.  In reaching that decision the <u>City of</u>

2  <u>San Diego</u> Court noted that no California decision had ever

3  allowed recovery for a defective product under a nuisance cause

4  of action and that remains true today, Your Honor.  I certainly

5  haven't seen any cases cited by Macerich to that effect.

6          But, in addition, the <u>San Diego</u> Court pointed to

7  numerous opinions from across the country that have held that

8  nuisance claims can not be maintained in the circumstances of

9  what is essentially and truly a products liability claim.  In

10 summarizing its conclusion the <u>City of San Diego</u> Court pointed

11 to an Eighth Circuit decision in <u>Tioga Public School District</u>

12 <u>v. U.S. Gypsum</u>.  And, it said, "Under the City's nuisance

13 theory nuisance would become a monster that would devour in one

14 gulp the entire law of tort."  That, I submit is what Macerich

15 is proposing on its nuisance theory in this case.

16         In conclusion, for these reasons and the reasons set

17 forth in our papers, Your Honor, Grace asks that Macerich's

18 motion be denied and that Grace's cross motion be granted.

19         MR. GEORGE:  Well, it's somewhat facile to say to

20 talk about fractionalization of our claims.  I understand that

21 this situation is something of a hybrid but this is much more

22 akin to separate buildings than it is to one building on the

23 first floor, over in the corner, or as the debtor referred to

24 in his brief a situation where we're trying to say every time a

25 plumber bumps into asbestos it creates a new cause of action.

1  These are individual units, individually operated.  And, the

2  outcome of what the debtor is suggesting would be that in 1992

3  Macerich would have had to shut down its shopping center, have

4  all its tenants move out for a few months while they then

5  completely removed all of the asbestos material, whatever the

6  condition it was in, from all of the units.  And, I dare say if

7  we had brought a suit at that time W.R. Grace would have said,

8  "Hey, 90 percent of this stuff, 95 percent, is, you know, the

9  stuff wasn't a problem."  "What do you do?  We don't have to

10 pay you for that."  That wasn't a problem.  Which goes into the

11 nuisance claim.  And, it's not simply a product -- a substitute

12 for a product liability claim.  This really is a condition of

13 the property.  This is not a defective product in the sense it

14 doesn't do what it was supposed to do.  It was fireproofing, it

15 served quite well as fireproofing.  It is when the material is

16 going to be disturbed and is friable and there is a risk of

17 exposure to the public that it becomes a problem.  It's a

18 condition of nuisance.  And, if there are -- there may be

19 factual arguments that folks would make with respect to the

20 nuisance claim, but that doesn't mean that this isn't a

21 condition of nuisance for which W.R. Grace should be liable.

22         THE COURT:  Is this the strip mall or is it some

23 other configuration?  What's the configuration of the mall?

24         MR. GEORGE:  It's a very large mall, but it's not a

25 strip mall.  It is a, you know, very large area with -- there's

144

1  the east wing which is where these 65 stores are, there's

2  another wing with an equal number of stores, big anchor stores,

3  it's your typical regional mall area in Sacramento -- or,

4  Fresno.

5        THE COURT:  But, it's all one contiguous building?

6  It's not separate buildings within a planned mall type of

7  community?  It is actually one building with different wings?

8        MR. GEORGE:  I think there are -- there would be more

9  than one building, but not -- you're not talking 65 buildings

10  or anything of that nature.  There are separate wings, you

11  know, around a central area.

12        THE COURT:  And, these buildings are all -- are these

13  65 units, though, are all in the same building?

14        MR. GEORGE:  That I am not exactly sure of.  I

15  suspect that it is a wing something like this, which they would

16  be in the wing in that sense.  Whether the buildings are all

17  physically connected I'm not certain.  I'm sure there would be

18  walkways.

19        THE COURT:  Okay.

20        MR. FLATLEY:  Your Honor, if I may very briefly?  My

21  understanding of the configuration of building is there's

22  nothing in the record beyond that there are two wings.  One

23  wing has asbestos containing materials and there are various

24  stores throughout that wing.  Secondly, it's not Grace's

25  position that they had to shutdown the mall in 1992.  They

1  could have done precisely in 1992 what they are doing now.

2  They could have sued us for past abatement costs and future

3  abatement costs.  And, that's what they're doing now.  It's

4  just now that they're claiming more of it past, less of it

5  future.  They could have just as easily done it in 1992, '95,

6  whatever.  They could have sued for the cost they had to date

7  and an estimate of the future cost.  We're not saying at all

8  that they had to shut down their mall.  Thank you, Your Honor.

9         THE COURT:  Mr. Restivo.

10        MR. RESTIVO:  Your Honor, in Volume 2 of 6 of Your

11 Honor's Bench Books is debtor's motion for an order disallowing

12 and expunging 10 time barred claims from New York, and Mr.

13 Blatnick will argue that motion.

14        MR. MANDELSBERG:  Your Honor, --

15        THE COURT:  Wait.  Pardon me, I'm sorry, let me get

16 caught up.  I apologize.

17        MR. RESTIVO:  Number 2 of 6, Your Honor.  And, it's

18 Number 6 in Volume 2 of 6.

19        THE COURT:  Oh.

20        UNIDENTIFIED ATTORNEY:  Your Honor, it's Docket

21 Number 13701, if that would be of assistance.

22        THE COURT:  I have it, thank you.

23        MR. MANDELSBERG:  Your Honor, before we go onto that

24 matter.  Steve Mandelsberg, Hahn & Hessen, for the State of

25 California, Department of General Services.  May I be excused

1 at this point?  The other California claim motions have been

2 finished.  I have an appointment in another matter.  My

3 colleague, Christina Kang, is here and she will remain

4 throughout the hearing.  Thank you.

5 　　　　　THE COURT:  Yes, sir.  That's fine.  Thank you.  I'm

6 sorry, will you enter your appearance again for me, please?

7 　　　　　MR. BLATNICK:  Yes, Your Honor.  My name is Sam

8 Blatnick, I'm with Kirkland & Ellis, and I'm here speaking on

9 behalf of the debtors.

10 　　　　　THE COURT:  Thank you.

11 　　　　　MR. BLATNICK:  Your Honor, the next item is debtor's

12 motion for an order pursuant to Federal Rule of Bankruptcy

13 Procedure 7056, for an order disallowing and expunging 10 time

14 barred asbestos property damage claims that were filed on

15 behalf of buildings located in the State of New York.  Your

16 Honor, this is a very simple motion, it requires you only to

17 apply a controlling and directly applicable case from New

18 York's highest Court to admissions that are made on the face of

19 the proof of claims.

20 　　　　　First, Your Honor, New York's highest Court, the New

21 York Court of Appeals, held in a case called MRI Broadway

22 Rentals that for purposes of an asbestos property damage claim

23 New York's three-year statute of limitations begins running at

24 the time the asbestos is allegedly installed in the properties.

25 Second, the proof of claims at issue here state in the proof of

1 claim forms that the asbestos, Grace asbestos, was allegedly

2 installed during or before 1973.  Therefore, Your Honor, these

3 claims were prescribed by at least 1976.

4        Now, let's step back and take each of these in turn.

5 First, Your Honor, the tenant proof of claims here state in the

6 proof of claim forms that the Grace asbestos was allegedly

7 installed in at least 1973.  Some of the proof of claim forms

8 are earlier, it's as early as 1968, but it's during the period

9 1968 through 1973.  So, one, we know that the claimants have

10 alleged that the Grace asbestos was installed during the period

11 -- during the years 1968 through 1973.  Second, and I won't

12 repeat the entire analysis again for Your Honor, but under

13 Delaware's choice of law principles this Court applies

14 Delaware's borrowing statute and that borrowing statute directs

15 the Court to apply to these claims the shorter of New York or

16 Delaware's applicable statute of limitations.

17        Now, Your Honor, in the case of MRI Broadway Rentals

18 the New York Court of Appeals, again, the New York State's

19 highest Court, was faced with the exact question before this

20 Court today.  Namely, a plaintiff, a building owner, had sued

21 an asbestos manufacturer on account of spray on asbestos that

22 was allegedly installed in its buildings.  The asbestos

23 manufacturer moved for summary judgment based on statute of

24 limitations.  Exactly as Grace has done here.  In opposing

25 defendant's motion the plaintiffs argued that the New York

1  State should adopt a contamination standard.  The same standard

2  that the claimants have argued for earlier today.  Your Honor,

3  the Court in <u>MRI Broadway Rentals</u> specifically rejected that

4  argument and instead adopted the standard that defendants had

5  argued for, which was an installation standard.  The Court held

6  that for purposes of New York's three-year statute of

7  limitations the statute of limitations begins running at the

8  point of installation.  Specifically, Your Honor, the Court

9  stated as follows.  "Consistent with our long line of

10  precedence for the statute of limitations purposes plaintiff's

11  injury occurred when the asbestos containing material was

12  installed."

13         Your Honor, the <u>MRI Broadway Rental</u> case, while it

14  was issued by the New York -- highest Court in New York in a

15  case that is directly analogous to this, was not the first time

16  New York had considered this issue.  In 1993 the New York Court

17  of Appeals in a case called 888 7th Avenue came to the exact

18  same conclusion.  It stated, "The tort based causes of action

19  accrued when the asbestos actually began to cause harm.

20  Arguably, this was almost immediately after the asbestos was

21  installed."

22         So, Your Honor, what do we have?  We have claim forms

23  where the claimants have admitted, they've alleged, that the

24  Grace asbestos at issue was installed during the period 1968

25  through 1973.  We have a controlling decision from New York's

1 highest Court stating that New York's three-year statute of

2 limitations begins running at the point of installation.

3 Therefore, Your Honor, each of the claims at issue was

4 prescribed by at least 1976.  Thank you, Your Honor.

5         MR. SPEIGHTS:  May I please the Court.  Mr. Fairey

6 and I are going to split this argument.  I'm going to argue the

7 general principles of tolling that apply to these claims as

8 well as really all other Speights & Runyan claims that are

9 before you today.  I'm going to also mention the Prudential

10 matter, and then Mr. Fairey will discuss particular New York

11 law.

12         Let me just mention Prudential first before I forge

13 it.  But, this is what I was referring to earlier in the day

14 that I believe that the same motion was made with respect to

15 Prudential claims, and Grace has not addressed whether it will

16 be allowing those claims or not, but to the extent that it does

17 we believe that they can not be heard to contest the same

18 issues with respect to our claims.  I guess that will await

19 another day, although I'm not sure exactly how it will be teed

20 up.

21         But, I do want to discuss a principle of tolling just

22 very briefly, Your Honor, because Grace has filed a separate

23 brief on the whole tolling issue.  And, it impacts all of our

24 claims.  And, I will say that with respect to tolling in Canada

25 that presents a separate issue and I will await and address

1  tolling specifically as to Canada when and if we address those

2  claims.  I do not believe that Grace contests the general rule

3  that a class action tolls the statute of limitations for

4  punitive members of the class.  That's the <u>American Pipe</u> case,

5  United States Supreme Court case, it's been widely followed

6  throughout the United States and it's been widely held that the

7  statute is tolled until that judgment, that final judgment is

8  entered, in many instances after an appeal is involved.  That

9  impacts that general law, Speights & Runyan claims in two ways.

10  First of all, it impacts the California claims.  I thought I

11  was going first and give this overview earlier before Mr.

12  Brandi and Mr. Edwards, and very briefly Mr. Runyan, addressed

13  that.  But, one of the issues that the Court should be aware of

14  is that the California Board of Regions, Universities, and Cal

15  State were members of a class action filed on behalf of all of

16  the colleges and universities in the country.  Mr. Westbrook

17  argued the Central Wesleyan matter to you at the last omnibus

18  hearing concerning the coupon issue.  Well, that case was filed

19  in South Carolina originally on August 1, 1986.  It was -- a

20  second plaintiff was added, Central Wesleyan, in 1987.  And,

21  the opt-out period for that college's class action was May 6,

22  1996.  So, there is a tolling between August 1, 1986 --

23        MR. BLATNICK:  Your Honor, if we could object.  This

24  is completely irrelevant to the agenda item that is currently

25  being discussed, which is the New York claims.  The New York

1  claims, their response, I mean, no way indicates that they were

2  included in the case that Mr. Speights is currently discussing.

3  They do mention a 1992 filing but they in no way reference or

4  mention this particular case.  And, we do not see how

5  discussion of his California claims is in any way relevant to

6  the 10 New York claims being discussed currently.

7        MR. SPEIGHTS:  I think I have three more words on

8  that, Your Honor.  Until May 6, 1996.  Period.  That's

9  Colleges, Central Wesleyan.  Similarly, there was a punitive

10  class action filed in South Carolina that you've heard

11  something about over the last few years, and it's the Memorial

12  Hospital.  That case was filed on December 23, 1992 and

13  purported to be a class action against Grace and several other

14  defendants that it would have covered the buildings in question

15  in this lawsuit.  Now, we've had a lot of discussions about it

16  but I want to back up because Grace, again, does not argue in

17  its briefs about the general principles of tolling but they try

18  to say that you should ignore the Anderson case and its tolling

19  effect because of the door closing statute.  So, I want to walk

20  carefully through that, but just very briefly so we can put it

21  precise order, and let Your Honor know that tolling applies

22  every bit as much as to Anderson as it does to Colleges and

23  Central Wesleyan.  First of all, despite the brief it says the

24  door closing statute's been around since 1870, and it has, it

25  was adopted during reconstruction in South Carolina.  The door

1 closing statute was never addressed in terms of a class action

2 until the fall of 1992. And, in the fall of 1992 Judge Blatt

3 in the <u>Central Wesleyan</u> case ruled that the door closing

4 statute would not apply where the named representative, in that

5 case Central Wesleyan, in my case in State Court, Anderson, was

6 a South Carolina resident. So, Judge Blatt --

7          THE COURT:  I'm sorry, say that again?  He said that

8 the --

9          MR. SPEIGHTS:  Door closing statute would not apply

10 to prevent a South Carolina plaintiff from representing out of

11 state plaintiffs, again, if the South Carolina -- if the

12 plaintiff in the class action is a resident of South Carolina.

13 Central Wesleyan is a small college in South Carolina.

14 Anderson is a small hospital in South Carolina. And, in fact,

15 that's the first time any South Carolina Court considered the

16 door closing statute in terms of a class action. And, in fact,

17 I waited to bring the Anderson case in December 1992 until

18 after Judge Blatt ruled.  I had been at the oral argument.  I

19 am co-lead counsel with Mr. Westbrook in <u>Central Wesleyan</u>.  So,

20 once he ruled I brought the <u>Anderson</u> case.

21          In addition, there was a second case, the -- or, the

22 same case, the second order, <u>Central Wesleyan</u> was appealed to

23 the Court of Appeals for the Fourth Circuit.  And, Grace,

24 again, made the same argument that the door closing statute

25 prevented <u>Central Wesleyan</u> from recovering on behalf of out of

1  state colleges and universities.  And, the Fourth Circuit Court

2  of Appeals ruled, affirmed Judge Blatt, and held that the door

3  closing statute does not apply where a named representative is

4  a plaintiff in South Carolina.  So, when I filed the case I had

5  the only authority on my side.  And, later, before Anderson was

6  argued, I had the Appellate Court decision on my side.

7          We then got to the Anderson argument in which Grace,

8  not on a certification motion but on a pleadings motion, having

9  lost before Judge Blatt and in the Fourth Circuit, filed a

10 motion to strike the allegations from the Anderson complaint

11 where we sought damages on behalf of building owners outside of

12 South Carolina.  That matter came to be heard before Judge

13 Howard in I believe 1994.  And, Judge Howard ruled against me.

14 Judge Howard ruled against Anderson.  Judge Howard said,

15 despite Central Wesleyan before Judge Blatt, and despite the

16 Fourth Circuit, which were not binding on Judge Howard as a

17 State Court Judge, he thought the door closing statute was a

18 jurisdictional bar to Anderson representing out of state

19 plaintiffs.  So, now it's two to one against me, but

20 unfortunately the one is the presiding over the Anderson case.

21          Then there was one more case before this bankruptcy

22 was filed and that was Judge Buckner.  I know this gets

23 confusing but we've been through it a lot.  Judge Buckner also

24 sitting in the same jurisdiction as Judge Howard and the Court

25 of Common Pleas for Hampton County had the same issue in the

1  Cottonseed case.  Not an asbestos case.  But, identical issue.

2  And, Judge Buckner disagreed with Judge Howard and agreed with

3  Judge Blatt and the Fourth Circuit and held that where the

4  plaintiff, in that case was a resident of South Carolina, the

5  door closing statute did not prevent him from representing out

6  of state plaintiffs.  Now, that was the state of the world at

7  the time Grace filed bankruptcy in 2001.  The state of the

8  world being that three cases on my side, one case against me,

9  but the one case against me being Judge Howard's decision.

10 However, we could not appeal Judge Howard's decision, it was an

11 interlocutory order.  And, in fact, in Judge Hayes -- who later

12 got the case from Judge Howard -- in his final order of

13 certifying as to all defendants, expressly recognized on Page

14 1, I believe, of his order that we still had the right when the

15 case was over to appeal the door closing ruling to the South

16 Carolina Supreme Court.  So, when we filed claims in this

17 State, in this bankruptcy, or when we make the argument here,

18 as of 2001 we had no final order.  And, hornbook law is that

19 the tolling continues because there has been no final order.

20      There has been one further development since the

21 bankruptcy.  And, the development has been both good and bad

22 from my perspective.  Judge Buckner's order was not stayed by

23 the bankruptcy, obviously, and it went up to the South Carolina

24 Supreme Court.  After the bankruptcy the Supreme Court of South

25 Carolina reversed Judge Buckner but disagreed with Judge

1  Howard.  And, I know that sounds strange, but what the South

2  Carolina Supreme Court said is that, "We agree with the Fourth

3  Circuit, we agree with Judge Blatt, that the door closing

4  statute does not prevent a problem in Federal Court."  So, we

5  don't disagree with Judge Blatt and Central Wesleyan that in

6  Federal Court in South Carolina a South Carolina plaintiff can

7  represent out of state building owners.  It also said in

8  response to Judge Howard's decision, not in response but it was

9  referred to in Judge Buckner's decision, that it disagreed with

10  Judge Howard's conclusion that the door closing statute is

11  jurisdictional.  It is not jurisdictional according to the

12  Supreme Court of South Carolina in this 2003, I believe,

13  decision in the Cottonseed case.  In fact, it overruled an

14  older South Carolina case that Judge Howard had relied on

15  suggesting that it was subject matter jurisdiction.  The

16  Supreme Court said, "No, it is simply a capacity to sue."  It

17  is a capacity of a plaintiff to represent out of state

18  plaintiffs.  So, in that sense they said that if properly

19  raised by a defendant, if not waived by a defendant, then we

20  now know after the bankruptcy that the door closing statute

21  would prevent a plaintiff from representing out of state

22  building owners in the state court in South Carolina if the

23  defendants affirmatively raise that issue, an affirmative

24  defense, and proceed with that affirmatively and timely raise

25  that issue.

1          So, that is the status of <u>Anderson</u> and door closing.

2  Of course, as of 2001 any statute of limitations has been

3  tolled by the bankruptcy itself.  So, the question is, should

4  <u>Anderson</u> provide tolling for building owners, leaving aside

5  Canada until that argument comes up later, as <u>Central Wesleyan</u>

6  did for the colleges and universities?  And, Your Honor, I

7  would suggest to you there is no argument in Grace's briefs

8  suggesting that the rule of tolling, by reason of a class

9  action, that <u>American Pipe</u> should not be followed in this case

10 as in all others, but for the fact that it wants to cast

11 aspersions on door closing which was undetermined at the time

12 of this bankruptcy and in which three out of four judges had

13 held that the door closing statute did not prevent <u>Anderson</u>

14 from doing what it was trying to do.  So, we believe that

15 tolling applies from December 23, 1992 until the time of the

16 bankruptcy.

17         Now, if Grace has some other argument other than the

18 door closing, which is no different than a lot of other issues

19 that could have been raised down below, it has not raised those

20 issues.  I then will turn it over to Mr. Fairey to deal with

21 New York law.

22         MR. FAIREY:  Thank you, Your Honor.  Bud Fairey on

23 behalf of the 10 New York claimants represented by Speights &

24 Runyan.  Your Honor, I want to start off with the very simple

25 premise, the argument was simple and this is a simple premise.

1 In this case we filed discovery request to admit to the debtors

2 as to whether or not Monaco did cause an injury either

3 constructively or actually in any of these 10 buildings, and

4 that was denied.  And, we think that by itself creates a

5 question of fact.  But, apart from that, a fundamental primary

6 issue that I think has been glossed over that needs to be

7 addressed initially is the fact that nine of these 10 New York

8 claims are not scheduled for any objection based on actual

9 knowledge statute of limitations.  The 15th Omnibus objection

10 that split out and raised all of these issues and split them up

11 into the letters F2 and D5, nine of these 10, the only

12 objection raised was that the statute of limitation barred

13 their claim based on constructive knowledge.  And, Your Honor,

14 I'm sure you understand, constructive knowledge is a greatly

15 different thing than actual knowledge.  So, to come in here at

16 this stage of the game raising for the, I think, the first time

17 on summary judgment that nine of these 10 claims are barred

18 because of what they actually knew or claimed they actually

19 knew on the claim form, that's just -- that hasn't been

20 scheduled.  The schedule that attached the CMO that set up

21 these proceedings did not list actual knowledge for these

22 claims.  And, we think to go forward on that basis, those

23 claims aren't part of these proceedings on actual knowledge.

24 　　　　Now, Mr. Speights addressed class action tolling.

25 The other thing that I want to address is what is New York law?

1 And, the case that was cited, the <u>MRI Broadway</u> case, was a case

2 that was -- it was decided and the holding was is that the

3 injury occurred when the product was installed.  There's no

4 question about that.  But, the question arises, because after

5 1986 the New York legislature in its infinite wisdom changed

6 the statute of limitations code and the specific statute of

7 limitations code that was entered at that point, I think it's

8 CLPR214-C, and I think it's cited in the brief, it is cited in

9 the brief, says for toxic injury including property damage,

10 including -- and, I have it right here, I can read it, "The

11 three-year period within which an action to recover damages for

12 personal injury or property caused by the latent effects of

13 exposure to any substance or combination of substances in any

14 form upon or within the body or upon or within property must be

15 commenced" -- shall be -- I'm sorry, "shall be computed from

16 the date of discovery of the injury by the plaintiff or from

17 the date when through the exercise of reasonable diligence such

18 injury should have been discovered by the plaintiff.  Whichever

19 is earlier."

20       Now, in this particular case, Your Honor, the issue

21 of when nine of these 10 claimants discovered is just not

22 before the Court right now.  That objection was not raised.

23 The remaining claimant, Claimant 9684, which is Olympus 555

24 Properties, submitted amended claim form in February of 2007.

25 In that amended claim form he identified the date and attesting

1  report where he first learned that the asbestos fireproofing in

2  his building, which he purchased in 1996 containing Grace

3  asbestos, was 2003.  It's our contention, Your Honor, that that

4  creates a question of fact as to when he discovered the

5  asbestos within his building.  We're not arguing that the

6  presence of it, under New York law, may trigger the statute,

7  but the new Statute 214-C creates a discovery rule.

8          Now, the case in MRI Broadway v. U.S. Mineral

9  specifically addressed that statute.  And, in addressing it it

10 held there's an exception at the end of the statute which says

11 that this discovery rule for these toxic injuries will not

12 apply if the plaintiff knew that he had a cause of action

13 before 1986.  And so, the requisite fact that has to be shown

14 is that the plaintiff knew that he had Grace asbestos before

15 1986.  In this case there's no evidence of that with respect to

16 the Olympus Properties case, and, frankly, with respect to most

17 of the other nine claims.

18         In the MRI Broadway case the Court looked at and

19 found unequivocally that the evidence showed that the plaintiff

20 in that case, they had survey reports and I think actually

21 removal that had occurred in 1983, and so the new statute with

22 the discovery rule did not apply by specific exception to that

23 case.  But, we think that statute applies to these New York

24 claims.

25         Now, in reply, the defendants claim that it really

1  doesn't matter that the actual notice objections were not

2  scheduled, that Section 502 of the Bankruptcy Code provides is

3  not that specific.  They don't have to be that specific in

4  making their objection.  And, just the fact that they made a

5  statute of limitation objection is sufficient.  There are a lot

6  of reasons why not only is that prejudicial but that's just

7  wrong.  First of all, if that were the case then all the

8  debtors would need do is to file a piece of paper saying, "We

9  object to all the claims."  They  wouldn't have to specifically

10  list out which objections or why they were barred, and we don't

11  think that that would have satisfied the procedure that has

12  been taken in this court or the Bankruptcy Code.  Secondly,

13  they did file their 15th Objections, they raised substantive

14  objections with very specific reasons and scheduled them out in

15  a 50-something page memorandum.  At the time we had --

16  certainly all 10 of these claimants filed specific responses

17  based on the objections raised to them.  And, those were put in

18  and we've been litigating those.  Then, you know, of course, we

19  go through that and we go through the hiatus and then Grace

20  again asks for a CMO.  And, in the CMO they attach a schedule

21  and they say, "Before this Court are going to be these claims

22  with these objections."  Again, just constructive knowledge,

23  not actual knowledge.  And, that's important because we're now

24  in a litigation proceeding.  We file discovery for these 10

25  claimants.  We file discovery saying what is the basis of your

1  statute of limitation argument?  Interestingly, Grace responded

2  with respect to the question, we asked the question about

3  constructive knowledge, Grace said for its constructive

4  knowledge argument, "Please see the report of Roger Morris,

5  with attachments."  Of course, Roger Morris is their

6  constructive knowledge expert.  They did not say anything

7  building specific, they didn't identify anything that a

8  particular claimant knew or should have known, except for in

9  this case the Olympus 555 Building.  That is the one building

10 that they had raised actual knowledge.  In that, they said,

11 "Please refer to our motion for summary judgment," in which

12 they attach a copy of the claim form which indicates -- I'll

13 find it right here in a minute.  But, anyway, the applicable

14 claim form indicates that 555 Olympus didn't first learn that

15 it had Grace asbestos in its building in 2003.  It does list as

16 a construction date for the building, I believe 1969, but

17 because the building was constructed in 1969 does not

18 necessarily mean that the claimant who bought the building in

19 1996 had knowledge as of 1969 that there was a Grace asbestos

20 product in there.

21         In short, the failure to specifically identify actual

22 knowledge and then make an actual knowledge motion to include

23 in these proceedings is highly prejudicial to these claimants.

24 It's deprived us with an opportunity to come in and address the

25 specific evidence that's been raised.  The summary judgment

1 responses were actually due after discovery was over, I

2 believe.

3           And then, the last thing I would point out about

4 that, Your Honor, and we did address discovery directly at this

5 for this very reason, if Grace's position is is that these

6 claimants are barred by constructive notice, I mean, that's

7 something we can address an argument about whether or not an

8 article in the Wall Street Journal may have meant something to

9 a particular building owner.  But, as New York law recognizes,

10 there's actually in New York law a separate cause of action for

11 fraudulent concealment.  Again, which is not addressed by the

12 debtors.  But, a claim for fraudulent concealment -- and,

13 again, each one of these 10 claimants as the other claimants I

14 discussed this morning have listed in their initial response to

15 the 15th Omnibus Objection a whole series of evidence that we

16 believe supports a claim of fraudulent concealment.  Now,

17 again, if actual knowledge objection applies to these

18 defendants there might be an argument to them as well, you

19 know, show that this building owner relied upon this

20 information that would have concealed a fraud by Grace.  But,

21 that's not what's before the Court.  What's before the Court is

22 constructive knowledge.  And, to meet the burden -- or, to meet

23 evidence of constructive knowledge, that is, you know, is an

24 article in the Wall Street Journal enough to trigger the

25 statute of limitations, it can be met with generalized

1  knowledge that, you know, here's evidence that Grace was

2  withholding or fraudulently concealing the hazards of its

3  particular asbestos product, and that that was generally

4  available.  And, we think in the context of the bankruptcy

5  where, you know, absent a specific and well founded objection

6  that evidence of a proof of claim is substantial evidence in

7  advance of the claim, that without some particularized

8  knowledge that's brought in by the defendant to say, "This

9  particular building owner is barred," that the proof of claim

10  should stand up under those circumstances with generalized

11  proof, as opposed to specific proof.

12          And, one last thing I'd like to address, Your Honor,

13  and I want to reiterate, the only actual knowledge objection

14  raised is the objection to Olympus properties.  Olympus did

15  file an amended claim.  They filed an original claim form.  He

16  did it on his own.  Then, an amended one was filed on February

17  20th, 2007, and signed by the claimant himself.  And, in that

18  particular claim he said that there was -- the first time he

19  learned that there was a Grace asbestos product in his building

20  was 2003.  There's nothing on the claim form to indicate that

21  the installation date or his knowledge of the installation date

22  is tied to any knowledge that there was asbestos materials in

23  his building.  And, I would point that out for all of the

24  claims.  Just because a claimant says, "I know my building was

25  built in 1971, it takes a leap of logic to get from that point

1  to, "In 1971 my building was constructed and all these products

2  were put in it, and there was a Grace asbestos product in

3  here."  So, in sum we don't believe that there's any evidence

4  to show that Olympus or the other claimants, to the extent that

5  they would even be considered as part of this proceeding, but

6  there's no evidence to show that Olympus knew that it had

7  asbestos, knew that it had asbestos containing Grace, or

8  anything, before 1986, which would bring it within the

9  parameters of the 214C New York statute of limitations.

10      MR. BLATNICK:  May I please the Court.  I'd like to

11  address a few of the things that Mr. Fairey mentioned in his

12  argument, and also what Mr. Speights prefaced that with.  First

13  off, they argued a fair amount about tolling.  And, my

14  colleague Lisa Esayin will get up after me to speak on account

15  of the tolling in general.  But, with respect to these

16  particular claims, what Mr. Speights fails to mention is that

17  the Anderson Memorial was filed in 1992.  These claims were

18  prescribed in 1976.  They have not and can not possibly explain

19  how a 1992 filing can somehow serve to resuscitate (sic) these

20  already prescribed claims.

21      Mr. Fairey spoke a fair amount about the debtor's

22  objections.  What Mr. Fairey did not speak about is any rules

23  requiring specificity with respect to those objections.  Your

24  Honor, in our 15th Omnibus Objection which was filed on

25  September 1st of 2005 Your Honor may recall that that document

1  dealt with about 4,000 claims.  We parsed through claims for

2  weeks trying to determine what the specific objection should be

3  for each of those.  The result of that with respect to these 10

4  claims is that we raised objections based on statute of

5  limitations for each and every one of them.  Mr. Fairey seems

6  to take objection with the fact that for nine of them there was

7  not a specific objection raised with respect to actual

8  knowledge.  Your Honor may recall that there was a D2 category

9  of objections, and a D4.  D2 being statute of limitations based

10 on constructive knowledge.  D4 being statute of limitations

11 based on actual knowledge.  They do not, however, argue that

12 these claims were not objected to on the basis of statute of

13 limitations.  In fact, when we filed this motion that's being

14 heard now back in November, they contested our request to get

15 this heard in December.  Your Honor, it's clear that they in no

16 way were prejudiced by any alleged non-inclusion in the D4

17 category.  They've known all along we've objected on statute of

18 limitations.  And, in that respect neither the Bankruptcy Code

19 nor the local rules require us to do more than identify our

20 objections.  Which we did.

21         THE COURT:  But, that's the purpose of discovery, to

22 let people know what it is.  I mean, that's the whole reason

23 that I had the debtor go through and articulate what the

24 categories of objections were for, so that we could get to the

25 point where everybody knew what page we were on.  So, if the

1 debtor intends to object on statute of limitations constructive

2 knowledge, that's a different objection from statute of

3 limitations actual knowledge.

4         MR. BLATNICK:  And, Your Honor, actually, that's a

5 good point.  This particular motion, which again, is governed

6 by the current CMO, is not really a constructive or an actual

7 knowledge, it's a statute of limitations motion.  But, the New

8 York standard just doesn't fit -- it's like trying to fit a

9 square peg in a round hole.  The New York standard is an

10 installation standard.  And, I will address that more fully as

11 I move on.

12         And, you know, again, it is clear we objected on the

13 basis of the statute of limitations.  When we filed the motion

14 that's currently being heard we were very clear in what our

15 basis was for objection.  Discovery with respect to this motion

16 closed on March 5th.  I think it would be disingenuine at best

17 for them to argue that they did not know the basis for our

18 objection.

19         Next, I'd like to address the amended claim form that

20 was filed by Olympus.

21         THE COURT:  Well, let me understand.  The debtor's

22 position is it doesn't matter whether it's constructive

23 knowledge or actual knowledge, the fact is that the product was

24 installed in this building in 1973, it doesn't matter who owned

25 the building or when that building was acquired by the current

1 owners, the fact is that the statute of limitations expired in

2 1976, and that's it.

3 　　　　MR. BLATNICK:  Well, with respect to buildings, to

4 the extent there was an owner who purchased it after that time

5 it would be our position that there was actually an assumption

6 of risk with respect to that.  With respect to buildings that

7 were owned previous to that, yes, and the cases can not be

8 clearer, Your Honor, again, I cited to MRI Broadway Rental, I

9 cited to 888 77th Avenue.  For example, Maryland Casualty

10 Company v. W.R. Grace, a 1993 opinion from the Second Circuit

11 applying New York law held that in asbestos property damage

12 claim the trigger date -- and, that was for purposes of

13 insurance coverage -- is the date of installation.  And, the

14 Court went on to say, "For it is at that point that the

15 building owner sustains an injury, in fact."  Similarly, in a

16 case called Sturges Manufacturing Company v. Utica Mutual

17 Insurance the Court held, "When one product is integrated into

18 a larger entity and the component product proves defective the

19 larger entity has sustained an injury, in fact."  The Court in

20 MRI then went on to say when asbestos is installed there's an

21 actual injury to the property since -- and, quoting Maryland

22 Casualty Company v. Grace, -- "the damage that building owners

23 are seeking to undo is not the fact that they discovered

24 asbestos but the fact of its incorporation in their buildings."

25 　　　　So, yes, Your Honor, it is our position that based

1 upon the holding in <u>MRI Broadway Rentals</u> that New York's three-

2 year statute of limitations began running at the point it was

3 installed.

4          THE COURT:  Okay.

5          MR. BLATNICK:  Now, if I may I'd like to move onto

6 the amended claim forms.  The amended claim forms mentioned by

7 New York claimants counsel was filed on February 20th.

8          THE COURT:  This is as to Olympus?

9          MR. BLATNICK:  As to Olympus only.  The motion in

10 question was -- summary judgment -- the motion in question was

11 filed on February 16th.  As Your Honor is aware, the bar date

12 was in March of 2003.  The amended claim form was filed sua

13 sponte.  There was no -- we're not aware of any explanation or

14 justification for why it was filed four years after the bar

15 date had lapsed.  And, it is our position that the amended

16 claim form is improper.

17          That being said, the amended claim form, like the

18 other claim forms at issue here, do state that the asbestos was

19 installed during the period 1969 through 1973.  And, therefore,

20 given New York's three-year statute of limitations which begins

21 running at the point of installation it was prescribed like the

22 other claims, by at least 1976.

23          THE COURT:  Okay.  Even though this owner didn't

24 acquire the building until 1996?

25          MR. BLATNICK:  Well, and then the -- again, Your

1 Honor, then the owner took that based on the doctrine of

2 assumption of risk, took that with the claim having already

3 expired.

4          THE COURT:  All right.

5          MR. BLATNICK:  Okay.  Now, Your Honor, they speak in

6 terms of fraud.  This was an issue that was -- and I also

7 suggested that this has been brought up before.  Their response

8 in no way mentions fraud as a defense to this motion.  Their

9 response in no way contains affidavits or other evidence which

10 would create a question of fact with respect to this issue.  As

11 a defense to the debtor's motion it is their burden to create a

12 question of fact.  In fact, once debtors have filed the motion

13 they can not rely on bare allegations in response.  Discovery

14 is closed.  They did not file any supporting materials with

15 their response.  Again, they did not in any way mention this

16 argument in their response, therefore, Your Honor, they have

17 not satisfied their burden with respect to creating a question

18 of fact.

19          Now, I'd like to finally address the revival statute

20 that Mr. Fairey addressed in his arguments.  First, Your Honor,

21 revival statutes such as these have been held unconstitutional

22 in various jurisdictions, at least when applied to claims that

23 have already expired such as the case here.  Given that the

24 claims have expired by at least 1976.  But, in any event, CPLR

25 214C indicates that it is not applicable where the injury was

1 either discovered or through the exercise of reasonable

2 diligence should have been discovered prior to July 1st, 1986.

3          First off, Your Honor, the statute speaks in terms of

4 injury.  Under this line of cases injury has been defined as

5 the presence of asbestos in the buildings such that injury

6 would be the presence not -- I'm assuming claimants would

7 advocate a different standard, perhaps contamination or

8 something of the like.

9          Second, Your Honor, the statute says that it is not

10 whether the claimant knew, it's whether they knew or

11 reasonablely should have known prior to July 1st, 1986.  And,

12 Your Honor, based upon the constructive notice report of Roger

13 Morris we believe that we've established that all claimants

14 should have known by at least 1983.  Again, claimants have not

15 presented any evidence in response that would create a question

16 of fact.  Thank you.

17          MS. ESAYIN:  Good afternoon, Your Honor, Lisa Esayin

18 for debtors.  Before I get to tolling I want to just clear up

19 the date of the filing of this particular summary judgment

20 motion because it's relevant to this issue about whether there

21 was an opportunity for the claimants to know what the

22 objections actually were.

23          Your Honor will recall that the deadline for summary

24 judgment motions was February 16th and that's when all the

25 other motions that Mr. Restivo and the group arguing here

1  today, that's when all those motions were filed.  But, this

2  particular motion was filed on November 17th, 2006 at Docket

3  Number 13701.  So, it was filed November 17th.  As my colleague

4  Mr. Blatnick said, the discovery, the close of discovery for

5  these issues, product ID, and statute of limitations that we're

6  dealing with here today was March 5th, so there was a December,

7  January, February, more than three-month period of time during

8  which the claimants knew what the arguments were and had the

9  opportunity to take discovery on it, and by their own account

10  did take discovery on it.  They served interrogatory responses

11  which were responded to.  So, they certainly did know many

12  months before their response deadline for this motion what the

13  gravamen of the motion was.

14          On the tolling argument, there's a key piece of

15  factual information that is absent from the briefing submitted

16  by the New York claimants, which relates to the Anderson

17  Memorial suit.  Which is that the original suit was filed in

18  1992, as they've said, and the state court's door closing

19  ruling saying we don't -- we can't have non South Carolina

20  claimants before this South Carolina court was in August of

21  1994, as they've said.  But, what they've left out is that they

22  filed, the Anderson Memorial claimants in South Carolina, filed

23  an amended complaint in September of 1995 and that amended

24  complaint was because of the Court's ruling on the door closing

25  statute the previous year.  That amended complaint was limited

1 to South Carolina claimants.  So, leaving aside arguments about

2 American Pipe and whether the claimants were properly before

3 the Court in the first instance or not, by the time we get to

4 September of 1995 there are no non South Carolina claimants

5 before the South Carolina, any more in the Anderson Memorial

6 suit.  So, while we don't give them the fact that this suit

7 tolled all the claims in 1992, even if it did, by 1995 the

8 tolling has ended.  Now, going back to 1992, however, to say

9 that it was undecided as to whether the door closing statute

10 applied to class actions or not is just -- it's just made up.

11 There was a door closing statute on the books, it applied, and

12 the question of whether it applied to class actions or not

13 wasn't a question.  There were claimants that were brought into

14 the suit that were non South Carolina claimants.  The statute

15 clearly prevented non South Carolina claimants from being part

16 of that action.  The statute was on the books in 1992,

17 therefore regardless of what was pled in the complaint the

18 claimants were not properly part of the action in 1992.  That's

19 what we argued in our papers so our position is 1992 filing

20 didn't toll anything as to non South Carolina claimants.  But,

21 even if it did, by the time we get to 1995, end of story.

22       Last point I want to make about, is about the Central

23 Wesleyan case that Mr. Speights has brought to the Court's

24 attention for the first time today.  It's not discussed in his

25 New York brief.  It's not discussed in his California brief.

1 It's coming up for the first time today.  That was, as he said,

2 a federal case in 1992 and subject matter jurisdiction in that

3 case was premised on federal jurisdiction, diversity of

4 citizenship.  Federal Court can find whatever it wants to about

5 claimants being properly before it in the context of diversity

6 of citizenship.  That's got nothing to do with what a South

7 Carolina Court is going to find about the door closing statute.

8 Thank you.

9       MR. SPEIGHTS:  Made up?  Made up?  When I filed in

10 1992 I just made it up, the door closing statute?  I filed it

11 with Judge Blatt's order in my hand, Judge, the first time any

12 Court had ruled on whether the door closing statute prevented a

13 South Carolina resident from proceeding with a class action

14 involving out of state buildings.  I had great authority.  It

15 turned out, the Fourth Circuit agreed, ultimately it turned out

16 the Supreme Court of South Carolina disagreed, after this

17 bankruptcy.  It wasn't made up.  Had Judge Blatt ruled

18 otherwise I probably would not have brought <u>Anderson</u> in South

19 Carolina, I would have looked to another state to bring this

20 action, which we discussed in the past.  I had every belief

21 after Judge Blatt ruled, not because it was Federal Court, but

22 because of his discussion that you could bring it there.

23       The amended complaint.  I filed the amended

24 complaint, Your Honor.  Judge Howard, -- excuse me -- Judge

25 Howard said, "Mr. Speights, I'm striking those pleadings, those

1 paragraphs.  File an amended complaint."  And, I said, "Yes,

2 sir."  That didn't change the history of the case.  Didn't

3 change that I was seeking a class action broader than South

4 Carolina.  And, in fact, in the final order of certification

5 Judge Hayes said what everybody recognized, that I still had a

6 right to appeal on that original 1994 decision.  I mean, what

7 else can you do if you have allegations stricken, you file an

8 amended complaint when a Judge tells you to.  You don't abandon

9 the class action on behalf of persons beyond the South Carolina

10 border.

11          Now, I want to go to the other half of the equation,

12 not to the intricacies of New York law, but to the history of

13 the objections process about which I have some knowledge having

14 been in your courtroom since 2001 and especially since 2003.

15 Your Honor, in all these statute of limitations arguments that

16 I have now witnessed for a number of years there are two ideas

17 floating around.  There are two principles floating around.

18 Injury and knowledge.  And, sometimes we mix the two up when we

19 should keep them separate in our minds and in our arguments.

20 In the early days everybody was talking about what you knew and

21 when you knew it.  And, the discovery rule developed in the

22 asbestos building cases.  And, in the later days starting with

23 the Kansas City, San Francisco, in the U. cases people focused

24 on the injury because Grace had argued that these cases are

25 economic loss and therefore they were not property damage

1 cases.  And, we brought out to the Court's attention and the

2 Court's agreed with us, you can not bring a case until there

3 has been an injury.  Contamination in most places.  And,

4 contamination definition might vary a little bit from state to

5 state.  So, in any statute of limitations case Grace has the

6 obligation to prove that the plaintiff has been injured and

7 that the plaintiff knew or should have known that it has been

8 injured by a certain date.  Two separate principles.

9        So, Grace comes along and wants to file objections to

10 claims.  And, it asks permission of the Court to waive the

11 local rule of Delaware and be able to file these gaitway

12 objections.  And, your Court did that.  Grace asked that claims

13 be filed to begin with in 2003, March 31.  Grace got all our

14 claims information in.  And, in 2003 they were already

15 analyzing these claims.  And, in 2004 they came before you, Ms.

16 Baird did, and said, "We need a gaitway objection order because

17 we've gone through these claims and a lot of them have problems

18 and therefore we've studied them and we want you to allow

19 gaitway objections."  And, Your Honor said, "Yes, but send them

20 a letter first."  And, I thank you for that.  And, they sent

21 out a letter and went through all of the claims, what they

22 wanted in terms of additional documents.  And, we spent tons of

23 time, as did Mr. Dies and others supplementing all of these

24 claim forms in 2004.  And then, 2005 comes along and they file

25 objections on or about September 1, 2005, a year and a half

1  ago, they filed their objections.  And, they object to some on

2  constructive notice, they object to some on actual notice, and

3  some on neither, and some on both.  And, yet, Your Honor, they

4  say to us, "Well, you should have known we really meant to

5  object on actual notice even though we just had constructive

6  notice."  Hundreds and hundreds of claims and I'm supposed to

7  try to figure out what's in Grace's mind?  Rather than looking

8  at the objections which they filed in accordance with your

9  Court order specifying what the objections were.  And,

10  constructive notice doesn't have to do with injury.  Actual

11  notice, they should have alleged then if they had a problem

12  with our statute of limitations position, they should have

13  said, "Injury arose, such and such, we objecting right now to

14  this claim."  And, they didn't do it.  2005, and they haven't

15  filed an amended objection since 2005.

16        But, it's worse than that, Your Honor.  In 2006 we

17  argue about the CMO another year.  And, Mr. Baena and Mr.

18  Sakaw, primarily, with other members of Kirkland & Ellis, and

19  so Your Honor has the debtor prepare an order, present it to

20  counsel, it's consented to, and attached to that order are all

21  the objections that will be heard under the CMO.  And, after

22  this, another year, they do not put actual notice down for

23  these 10 claims.  And, they come out here and say, "Well, it's

24  disingenuous for Speights & Runyan to argue that we really

25  didn't mean to put down actual notice beside constructive

1   notice." They want to stick it to my client on a technicality.

2   "You didn't file your case in time." And yet, they want to

3   say, "But, forgive me, Your Honor, excuse me, because we didn't

4   put down the objection." If they want to be forgiven for that

5   they need to file a motion and ask for permission to file an

6   objection or amend their objection or put something before the

7   Court. But, if Your Honor decides to forgive them based upon

8   this record you're telling the debtor that, "Well, all of these

9   lists of objections don't mean anything. You can continue to

10  argue anything and everything in this proceeding." And, I

11  think Your Honor could not have more painstakingly gone through

12  this process when Your Honor set out the rules for this

13  objection process and the debtor simply did not object to these

14  claims on the grounds that they're trying to argue today. Mr.

15  Fairey will address New York again.

16          MR. FAIREY: Three very quick points. First of all,

17  with respect to the amended claim form filed by Mr. Plavis

18  (sic). Now, Mr. Plavis originally filed the claim by himself

19  with the help of a New York lawyer. The lawyer signed the

20  original claim form. As Your Honor may recall, we had an issue

21  with objections to Speights & Runyan's authority, who's

22  supposed to file the claim form. Mr. Plavis in the middle of

23  these proceedings calls us and says, "Will you help me, I want

24  to hire you to do this?" We ask Mr. Plavis to go through, sign

25  his own claim form, fill it out. We assisted him with that.

1  He did that very process.  I don't think there's anything

2  inappropriate or improper about him filing the claim form

3  that's signed by him, which is what the debtors asked for

4  originally.

5        Secondly.  I think the argument's been made that we

6  did not address fraud in our brief.  I think that's factually

7  incorrect.  I think if Your Honor would look at Page 15 we did

8  raise the idea of fraudulent concealment with respect to Grace,

9  Cited the <u>T.H.S. Northstar</u> case, and specifically referred to

10 in reference of that report of Mr. Jack Halliwell, which was

11 signed and submitted in the record, generally.  And, also, in

12 the original response of these claimants to the 15th Omnibus

13 Objection we go through and list and cite the very specific

14 evidence from Grace's corporate records with respect to that

15 issue.

16       And, finally, Your Honor, with respect to the idea of

17 prejudice and discovery, we got the New York motion for summary

18 judgment, we served discovery on the debtor.  Ironically, for

19 all the claims except the Olympus claim the debtor's response

20 to the discovery was constructive knowledge bars your claim,

21 see the affidavit of -- or, see the report of Roger Morris.

22 And then, it went on to say with respect to Olympus, Olympus

23 had actual notice, see our motion for summary judgment.  So, we

24 did ask the discovery, the response to the discovery was

25 constructive knowledge except for the Olympus claim.  And,

1  that's the basis on which we proceeded.

2           THE COURT:  Okay.  Anything else from the debtors?

3           MR. BLATNICK:  One brief point, Your Honor.  Your

4  Honor, with respect to preserving our objections and properly

5  raising them.  Claimants, again, cite to nothing that would

6  require greater specificity than they were given.  In our reply

7  brief we cite to two provisions, Bankruptcy Code Section 502,

8  and Local Rule 3007-1(e)3.

9           Bankruptcy Code Section 502 states only that unless a

10 party in interest objects then the claim is then allowed.  It

11 says nothing further with respect to specificity that is

12 required.  Similarly, --

13          THE COURT:  That ignores all the arguments that we've

14 had for months in this case about what this is going to be

15 about.  That's the whole reason that I had the debtor go back

16 and articulate and I think Mr. Speights used the word

17 "painstaking", I think that's probably a good analysis, with

18 painstaking detail, what objections the debtor was going to

19 raise as to each entity, and to duplicate them where necessary.

20 I mean, that was the whole purpose to give people notice.  If

21 --

22          MR. BLATNICK:  Yes, Your Honor.  But, and with

23 respect to that, we did include all of these claims in statute

24 of limitations objection categories.

25          THE COURT:  Well, but that's what I'm saying.  If

1  your argument is that it doesn't matter whether they had actual

2  notice or constructive notice because the statute of

3  limitations runs from the date of installation regardless of

4  anybody's knowledge, period.  Fine.  Then, I understand that

5  argument, and the knowledge whether it's actual or constructive

6  doesn't matter.  If you're going to rely on actual notice I

7  think you need to raise an actual notice objection.  That was

8  the whole purpose for going through this exercise.

9        MS. ESAYIN:  Your Honor, so that we can avoid

10 belaboring this at this point, I think the record is clear that

11 when -- that we filed the motion here quite early.  We filed it

12 November 17th.  So, we did have this three and a half month

13 period of time for discovery.  It's been pointed out to me that

14 although discovery was served it only asked a question about

15 constructive notice.  It didn't ask a question about anything

16 else.  So, we --

17        THE COURT:  But, you only got them listed under

18 constructive notice objections.

19        MS. ESAYIN:  But, the discovery was served after they

20 received our brief which made the argument very clear.  So, we

21 would just -- I think just to cut through this we would stand

22 on the point that our brief was filed in November 17th, there

23 was a multiple month period for discovery, --

24        THE COURT:  Look, I don't want these kinds of mix

25 ups.  You know, you are big firms, you know how to list

1  something.  If you've got a category that says 502(d) and

2  that's the category for constructive, and you've got 502(f),

3  and that's the category for actual, you know how to list them

4  in both places and I expect you to do that.

5         MS. ESAYIN:  The other reason why I think maybe this

6  is gotten a little bit confused is that the motion goes to the

7  actual installation standard in New York.  And, that's not a

8  question of either actual notice -- I'm sorry.  The motion goes

9  to the date of installation, standard of New York.

10        THE COURT:  Right.

11        MS. ESAYIN:  And, that's not a question of either

12  actual notice or constructive notice.  It's just an application

13  of --

14        THE COURT:  That's what I just said.

15        MS. ESAYIN:  -- New York law.

16        THE COURT:  If you're happy to rely on the

17  application of New York law without regard to the notice issue,

18  that's fine, I understand it.

19        MS. ESAYIN:  That's what --

20        THE COURT:  Then, let's get past this.

21        MS. ESAYIN:  That's what we're relying on.

22        THE COURT:  Okay.  That's fine.

23        MS. ESAYIN:  Thank you.

24        THE COURT:  Debtor's relying on the three years

25  running from the date of installation and not from the notice

1  either really actual or constructive, under that category.

2  What about with respect to Olympus?  I'm still not clear

3  because Olympus was not a building owner at the time of the

4  installation.  So, I want to make sure I understand the

5  debtor's argument with respect to Olympus.  I know you said

6  assumption of the risk.  But, --

7            MR. BLATNICK:  Your Honor, with respect to Olympus

8  properties, to the extent that Olympus purchased it after the

9  statute of limitations had lapsed it would be our position that

10 they took the property with whatever right of actions existed

11 with respect to the property.  So, to the extent that it had

12 lapsed, they took it in for lack of a better word that

13 condition with the right of action already having lapsed with

14 respect to the property.

15           THE COURT:  Okay.  That makes a bit more sense than

16 assumption of risk.  Okay.

17           MR. BLATNICK:  Thank you, Your Honor.

18           THE COURT:  Okay.

19           MR. RESTIVO:  Your Honor, Volume 3 of 6 at Number 8

20 is the debtor's motion to expunge 88 time barred Canadian

21 claims, and Mr. Cameron will argue that motion.

22           MR. SPEIGHTS:  Your Honor, I do have a preliminary

23 matter with respect to that motion.  I don't want to argue the

24 merits.  I'm not even sure that you want me to argue this now

25 or wait until Mr. Cameron makes his full presentation.  But, I

1  would object to this matter going forward this afternoon on a

2  couple of grounds, and I'd be glad to spell them out now.  And,

3  it seems to me more efficient to do that, but I don't want to

4  deal with the merits, and I know it's Grace's burden.  And, may

5  I --

6       MR. RESTIVO:  Our suggestion would be that Mr.

7  Cameron should argue and then you should respond in whatever

8  fashion you want with whatever objections you may have.

9       MR. SPEIGHTS:  And, if that's what Your Honor likes,

10  that's fine.  I do have an objection -- I did file a motion to

11  strike an affidavit over the weekend.

12       THE COURT:  Well, I saw the objection but I think a

13  better resolution, you also asked them in the alternative that

14  the discovery be reopened for purposes of continuing a

15  deposition as to whatever the information is that's in the

16  supplemental.  And, frankly, I think that's probably a better

17  way to proceed.  So, I think the discovery should be reopened

18  for that purpose.

19       MR. SPEIGHTS:  Thank you, Your Honor.

20       MR. CAMERON:  Your Honor, can we --

21       MR. SPEIGHTS:  Let me just make the final point, I'm

22  not -- and, we had a similar matter with respect to the first

23  report that I wanted to take up as to whether or not we should

24  be hearing this today, but, again, I'll sit down and they can

25  go and then I'll tell you why we shouldn't have to respond on

1  the merits today.

2         MR. CAMERON:  I have no idea what the last reference

3  is, or motion.  I don't have any idea what you're talking

4  about.

5         THE COURT:  Okay.  Well, perhaps you better clue him

6  in then, Mr. Speights.

7         MR. SPEIGHTS:  I have two concerns, Your Honor.

8  Actually, I have a full page load of concerns, but I have two

9  at this preliminary level.  The first was, arguing this when

10  there is a supplemental affidavit, and I accept Your Honor's

11  solution to that problem.  The first problem, though, more

12  fundamentally is, Grace is making this argument based on a

13  report of Mr. Mew, who is their Canadian statute of limitations

14  expert.  Your Honor has said and ruled at the last hearing that

15  an expert must be presented live and not by way of deposition,

16  and I would say if not by way of deposition, not by a report,

17  and, in fact, the report is not even an affidavit form, the

18  original report.  And, I have a problem proceeding, I don't --

19  it would be bad enough if I had a report on hazard --

20         THE COURT:  I don't think that's what I said.  I

21  think what I said was that the expert's report would not be

22  considered the testimony of the expert at trial.  I mean, if we

23  get -- as far as trial I would assume that the parties will

24  probably want to proceed at least in part by way of

25  declarations or affidavits by cases in chief.  I know as to

1 some of your clients you raised a concern about that.  But, at

2 least in part I would think that that would be the case.  But,

3 for summary judgment purposes I don't have any difficulty with

4 the fact that the evidence would constitute affidavits and

5 declarations, that's typically how it's done in a summary

6 judgment process.

7          MR. SPEIGHTS:  Well, let me see if I can explain it

8 this way.  My understanding of the ruling is that you said

9 experts would have to be called live.  I know we have the issue

10 probably for later today about whether you can script the

11 direct testimony, etcetera, etcetera.

12          THE COURT:  Right.

13          MR. SPEIGHTS:  But, separate and apart from that Your

14 Honor wanted the experts live --

15          THE COURT:  For trial.  That's --

16          MR. SPEIGHTS:  -- for trial.

17          THE COURT:  Okay.

18          MR. SPEIGHTS:  And, what that affords is, me, as

19 opposing counsel to object, number one.  But, number two, to

20 cross examine the expert.  We have a unique situation here

21 where we have an expert on the law.  There is a question about

22 when, if ever, you can have an expert on the law.  That's not

23 what I'm arguing now.  We don't have an expert on the law at

24 least at this point.  So, therefore, it's not like having two

25 experts about whether dust sampling is good or bad, in

1  competing affidavits.  What you have is a report, again, not an

2  affidavit, not a declaration, by a lawyer, and telling you what

3  the law of Canada is, without my ability live to cross examine

4  him before you.  And, I believe that is not the appropriate

5  procedure to do this.  Even if it was an affidavit I would

6  state the same thing because I am at a distinct disadvantage by

7  not being able to question Mr. Mew before you.  I've taken my

8  discovery deposition and on what he said at that time in his

9  original report I'm ready to cross examine him.  I need to ask

10 him some more about his new affidavit.  But, I have a real

11 problem of just putting in a report from an expert as being the

12 law and not being able to cross examine that.  So, I have two

13 reasons why I don't think it should go forward today, I don't

14 think it should go forward because I think his affidavit that

15 you now are going to let me take a supplemental deposition of,

16 goes to one of the fundamental issues in the case, and some

17 other things as well, but I also would say at the end of the

18 day I think it's appropriate that we hear from Mr. Mew and let

19 me cross examine him before you.

20         THE COURT:  All right.  That's something I think we

21 should have another hearing on.

22         MR. CAMERON:  Your Honor, I think what we should do,

23 I'd like to have him present his motion to strike the Mew

24 affidavit because I can respond to that and I think cover all

25 of these points because I think there's a little bit of

1  confusion here.  So, if he wants to present his motion to

2  strike the supplemental affidavit --

3          THE COURT:  Well, I'm not going to strike it.  But, I

4  am going to reopen discovery so that Mr. Speights can take

5  additional depositions if he chooses to do it, because --

6          MR. CAMERON:  Can I address that issue then, now?

7          THE COURT:  I'm not going to hear argument about it,

8  I'm going to reopen discovery to let him take additional

9  depositions if he chooses to do it because there's a

10  supplemental affidavit that came in late, and, folks, I'm tired

11  of this.  If you can't get the stuff together on time then

12  that's just the way it's going to be and it's going to be that

13  way from now until the end of this case.  So, do stuff on time

14  and then we don't have this issue anymore.

15          MR. CAMERON:  Your Honor, --

16          THE COURT:  That's it.  That's my ruling.

17          MR. CAMERON:  That's not the way it transpired.

18  Factually, that's all I wanted to address.

19          THE COURT:  All right.  Fine.

20          MR. CAMERON:  Nothing was filed -- nothing was filed

21  late.  It was filed as a part of our reply brief because --

22          THE COURT:  Yes.

23          MR. CAMERON:  -- because the class action tolling

24  issue was the first time that was raised was in their reply

25  brief or in their response, which they filed four days after

1  taking his deposition.  They had him there in Canada for a

2  deposition, had full opportunity to take it.  And, if we go

3  back, Your Honor, you might recall Grace originally moved to

4  have these claims heard in Canada, they fought, Mr. Speights

5  P.D. Committee fought very hard to keep it here in the U.S.,

6  not to have it in Canada, and Your Honor indicated that, well,

7  what maybe you may need are some Canadian experts --

8           THE COURT:  Yes.

9           MR. CAMERON:  -- on Canadian law, which is exactly

10 what we did.  We submitted a report back in December of 2006.

11 We then used that report in support of our motion for summary

12 judgment, they then filed their opposition papers, and right

13 before filing their opposition papers, four days before that,

14 took the deposition of Mr. Mew, did not ask him one single

15 question on class action tolling, never addressed it, had full

16 opportunity, had a full day to depose him, never raised it, and

17 then four days later filed their papers that for the very first

18 time raised this issue of class action tolling.  We would have

19 certainly had it in his original report had that issue been

20 raised earlier.  So, it's not an issue of us filing a report

21 late.  When we filed our reply brief our supplemental affidavit

22 was addressing the issue that was raised for the first time by

23 Mr. Speights in that reply brief.

24           THE COURT:  That's fine.  He's still an expert,

25 you're proffering his testimony or his report as an expert

1  report.  I'm still going to let them take his deposition on

2  that point if you're going to rely on some information that's

3  coming from him in his capacity as an expert.  And, I also

4  think you better argue about whether he needs to be here

5  because I think Mr. Speights has a point with respect to the

6  testimonial issue, he is filing a report, not an affidavit or

7  declaration.  And so, I'm not sure what kind of evidence that

8  is that I have in support of a summary judgment motion.

9          MR. CAMERON:  Okay.

10         THE COURT:  It's not evidence.  Was it part of your

11 brief?  I mean, what is it that I'm supposed to be considering

12 this to be?

13         MR. RESTIVO:  Your Honor, could we ask for a five-

14 minute break?

15         THE COURT:  Sure.  We'll take a five-minute recess.

16         MR. RESTIVO:  Thank you.

17                      (Recess)

18         THE COURT:  Please be seated.  Mr. Brandi.

19         MR. BRANDI:  Good afternoon, Your Honor.  I've

20 referred with Mr. Baena, he has expressed the idea that they

21 have no objection if I (indiscernible).  I wanted to ask the

22 Court's permission (indiscernible).

23         THE COURT:  No, that's fine, Mr. Brandi.  Thank you.

24         UNIDENTIFIED ATTORNEY:  Judge, I would also like to

25 go leave and catch a plane.

1          THE COURT:  That's fine, sir.  Thank you.

2          MR. CAMERON:  Your Honor, Doug Cameron --

3          MR. RESTIVO:  I'm going to stay until the bitter end,

4  Your Honor.

5          THE COURT:  Me, too, Mr. Restivo.

6          MR. CAMERON:  Doug Cameron on behalf of W.R. Grace.

7  In light of Your Honor's ruling we will make Mr. Mew available

8  for deposition either this week or next week in Canada.  And,

9  at that time I will take his direct examination as opposed to

10 making him come here live, I'll take his examination for

11 purposes of the summary judgment as you had indicated and Mr.

12 Speights can have the opportunity to cross examine him at that

13 time.

14         THE COURT:  All right.

15         MR. CAMERON:  Thank you, Your Honor.

16         THE COURT:  Mr. Speights, is that agreeable?

17         MR. SPEIGHTS:  I've never been one not to accept a

18 surrender, but the only thing it made me pose was, of course,

19 that's for summary judgment purposes, the deposition will be

20 used and I'll have a chance to cross him.  That's my

21 understanding.  And, secondly, I would ask counsel if we could

22 not do it somewhere in the United States.  I'm not asking him

23 to come to South Carolina, I've already been to Toronto.  Be

24 happy to do it in your office in New York or Pittsburgh, or

25 somewhere.  And, you don't even have to answer me, all I want

1 is a good faith --

2          MR. CAMERON:  We'll inquire.

3          MR. SPEIGHTS:  -- request to set it up here so I

4 don't have to cross the border.  And, again, I got all kind of

5 problems getting home the last time I went to Toronto.

6          MR. CAMERON:  I will inquire in terms of Mr. Mew's

7 availability to travel.  If it's easier --

8          MR. SPEIGHTS:  And, it's beautiful in South Carolina

9 right now.  For sure, it is.

10          THE COURT:  Okay.  So, are we deferring this argument

11 then?

12          MR. RESTIVO:  Yes, Your Honor.

13          MR. SPEIGHTS:  Yes.

14          THE COURT:  Have you picked a date?  Or, you'll work

15 something out?

16          MR. CAMERON:  When I get back to my office I'll

17 contact Mr. Mews to see the earliest we can do it, either

18 hopefully later this week, or the first part of next week, is

19 what I'd like to do to set up the deposition.

20          THE COURT:  No, I'm sorry, I'm sure you'll --

21          MR. CAMERON:  Oh, I'm sorry, for the argument?

22          THE COURT:  -- work out the deposition, yes, I just

23 meant for the continuance.  I'm sure you gentlemen will work

24 out a deposition date.  So, you'll just -- you'll put it onto

25 one of the other property damage arguments?

1          MR. RESTIVO:  I would ask we defer Your Honor's

2   question until we get to the status conference as to how things

3   are going to proceed from here on, which we're going to do

4   after our last summary judgment argument, we'll roll that in.

5          THE COURT:  All right.  What's next then?

6          MR. RESTIVO:  The final motion for summary judgment,

7   Your Honor, is with respect to what we call, in purple, other

8   statute of limitations.  And Ms. Rea will argue that.  And,

9   what book is that in?

10          MS. REA:  Your Honor, that is Number 6 of your

11   binder.  Six of 6.  And, it's Tab 11.

12          THE COURT:  Yes, thank you, I'm there.

13          MS. REA:  Okay.  Your Honor, Tracy Rea, again, for

14   the debtors.  This is on debtor's motion for an order pursuant

15   to Federal Bankruptcy Procedure 7056, Expunging 16 time barred

16   asbestos property damage claims.  And, this is Docket 14598.

17          Your Honor, of the 16 claims that were originally

18   subject to debtor's motion three of those claimants were

19   represented by Mr. Dies.  And, as we've indicated earlier,

20   those claims are not at issue with respect to this argument

21   here today.  And, I just want to note for the record that those

22   are Texas claims and they were numbered 5672, 5688, and 5690.

23   In addition, there were two claimants that did not file any

24   response to the debtor's motions.  Those claimants were Ms.

25   Virginia Thrasher, Claim 2636, and the Allegheny Center

1  Associates, Claim 9778.  Ms. Thrasher's claim was included in

2  the not a Grace product motion, so I'm not going to address

3  that one.  We do have an order, though, for that remaining

4  claim, that 9778, to which no response from those folks were

5  received.

6          THE COURT:  All right.  Is anybody present

7  representing the Allegheny Center Associates?

8                       (Pause)

9          THE COURT:  There is no response so I'm expunging

10  this claim as barred by the statute of limitations.  Okay.

11          MS. REA:  Okay.  Thank you, Your Honor.  In addition,

12  there were two other pro se claims, one in Texas and one in

13  Wisconsin.  The Woodbury Apartments and Mr. Scary.  I'm not

14  going to address those because, again, those were not a Grace

15  product motion.  There are other reasons why they're not

16  proper, but given the Judge's prior inclination to enter an

17  order I'm just not going to address those, it's late in the day

18  and we've already heard argument.

19          That leaves us with nine contested property damage

20  claims covered by the motion.  And, debtors seek to expunge

21  those claims under the laws of the State of Arkansas, Georgia,

22  and Delaware.  There are some overarching arguments that apply

23  to this motion as well.  Anderson Memorial, we've already

24  talked about, I'm not going to get into that.  But, I would

25  like to just start with the arguments that are specific to each

1  State, and I'm going to start with the State of Arkansas.

2          There are two Arkansas claims at issue in debtor's

3  motion, both of which have been asserted by KARK TV.  And,

4  those are claims number 9912 and 9913.  Arkansas has a three-

5  year statute of limitations that runs from when the claimant

6  knew of the nature of their injury and the causal connection of

7  that injury to the product.  Now, KARK does not dispute that it

8  began an extensive asbestos monitoring, abatement, and control

9  program in 1988.  In 1988 KARK surveyed its buildings, it

10  learned that it had friable asbestos containing fireproofing in

11  its buildings, it tested that material, and it began educating

12  its employees of the dangers of asbestos.  In the spring and

13  summer of 1988 KARK actually removed asbestos containing

14  materials from its buildings.  Now, KARK doesn't dispute any of

15  these facts.  Under these undisputed facts there's no question

16  that Arkansas's three-year statute of limitations ran on KARK

17  TV's claims no later than the summer of 1991.  In fact, those

18  claims are barred even before Anderson was filed in 1992.

19  KARK's Claims Numbers 9912 and 9913 should be expunged.

20          Your Honor, next we have one claimant in Georgia that

21  opposed debtor's motion, and that's Dodge County Hospital,

22  Claim 11550.  Now, Georgia has a four-year statute of

23  limitations, it's very similar to a statute of repose in that

24  it runs from the substantial completion of the building.  Dodge

25  County Hospital doesn't dispute that its building was built in

1 1970 and its claims would be barred by Georgia statute of

2 limitations by 1974, which, again, is eight years before

3 <u>Anderson</u> was filed.  What Dodge County has argued instead is

4 that Georgia may recognize a continuing tort theory that would

5 save its claim.  The Georgia Supreme Court, however,

6 specifically rejected a continuing tort theory in asbestos

7 property damage claims, and that's the <u>National Gypsum</u> case

8 that's cited in the briefing.

9        Dodge County Hospital next attempts to invoke the

10 Doctrine of Fraudulent Concealment.  As an initial matter it's

11 not clear that the Georgia Courts would apply fraudulent

12 concealment to this particular statute, but in any event Dodge

13 County has no evidence here of fraud directed to Dodge County

14 in the periods 1970 to 1974 that precluded it from discovering

15 its claim.  And, Your Honor, that's the standard that Georgia

16 Courts would apply for fraudulent concealment.  For authority

17 on that you can see <u>Bower v. Weeks</u> 600 S.E. 2d, 700 (Court of

18 Appeals Georgia 2004).  In the absence of any kind of

19 fraudulent concealment Dodge County Hospital's claims is barred

20 by Georgia statute of limitations.

21        Your Honor, that leaves us with six contested claims

22 for properties in Pennsylvania and Ohio that the debtors have

23 sought to expunge under Delaware law.  And, those claims are

24 10789, 10962, 10998, 11106, 11144, and 11179.  Now, as the

25 Court has heard in detail today, Delaware has a three-year

1 statute of limitations that runs when the claimant knew or

2 should have known of their injury.  The Pennsylvania and Ohio

3 claims don't dispute that they actually abated or removed

4 asbestos from their buildings more than three years before the

5 bankruptcy was filed.  These claimants clearly knew or should

6 have known of their injuries by the time that they took

7 affirmative actions to try to remedy those alleged injuries.

8 Based on these undisputed facts these remaining six claims

9 should be expunged.

10        In all, Your Honor, debtors are asking the Court to

11 expunge nine property damage claims at this time.  Your Honor,

12 because we're not seeking to expunge all the claims that were

13 subject to the original order I would propose that we prepare a

14 new order that just has the claims at issue, and that we can

15 get that to you in the normal course.  Thank you, Your Honor.

16        THE COURT:  Anyone wish to be heard on behalf of

17 these claimants?  All right.  Mr. Runyan.

18        MR. RUNYAN:  Thank you, Your Honor.  Once again, Alan

19 Runyan with Speights & Runyan.  And, I will try to be as brief

20 as my opponent.  First of all, Your Honor, I'm not going to

21 repeat the issues that we've already --

22        THE COURT:  Mr. Runyan, that tray pulls out below

23 you, if that will help you.

24        MR. RUNYAN:  Thank you very much.  That does help.

25 I'll try to be as brief as my opponent and I won't repeat the

1 arguments we've made today except to say that the issue about

2 notification of which statute of limitations objection applies

3 to all of these buildings except for KARK, the two buildings at

4 Arkansas.  So, that argument has already been made.  And, the

5 tolling issue applies to most of these buildings, I think all

6 but two.  And, those are two in the Delaware section of

7 counsel's argument.

8        But, getting right to the heart of the issue, Your

9 Honor.  I think Grace's argument succinctly stated is, because

10 you remove asbestos containing materials prior to the statute

11 of limitations period, and because you knew that there was

12 asbestos containing material in your building, and because that

13 you implemented an O&M program, those three things together

14 establish accrual or a cause of action and therefore the cause

15 of action is barred.  We are confronted with, frankly, the same

16 kind of issues that we've had earlier in the day, and that is

17 what is it that Grace has not established despite of that

18 issue?  Well, they haven't established an injury outside the

19 statute, by a Grace product outside the statutory period.  What

20 they've established is that with respect to KARK Television

21 that they conducted a survey, they identified asbestos

22 containing products with a variety of chrysotile -- variety of

23 percentages of chrysotile asbestos in it.  That there was

24 friable asbestos containing fireproofing.  And, that removed

25 some asbestos containing material, which is not a subject of a

1  claim in this courtroom.  It's an acoustical plaster product,

2  it's not an asbestos containing fireproofing product.

3        With respect to the Pennsylvania and Ohio cases under

4  Delaware law, I think the quote exactly was they abated

5  asbestos from their property.  Well, Monacode asbestos, Mandle

6  asbestos, whose asbestos?  Grace has not established and has

7  not even tried to establish that there has been contamination

8  from a Grace product outside of the statutory period in any of

9  these buildings.  Moreover, they have simply relied upon the

10 fact that there was asbestos containing material present, they

11 have not taken the position it was their material.  They have

12 relied upon the fact that the KARK organization implemented an

13 Operations and Maintenance program whose entire purpose is to

14 prevent contamination, not to -- not necessarily because it is

15 there.  And, the removals that they reference, Your Honor,

16 simply have to do with removing asbestos containing materials.

17 There's no evidence it's Grace's materials or anybody else's

18 product.

19        So, under the standards that Your Honor's very

20 familiar with they have simply not met their burden that there

21 is not a genuine issue of material fact concerning injury,

22 contamination outside the statutory period.  Two, from a Grace

23 product, and that the claimant knew or should have known of

24 that injury from a Grace product outside the statutory period.

25 There's just no evidence on that at all.  Thank you, Your

1 Honor.

2        MS. REA:  Your Honor, if I may just briefly address?
3 I think as Mr. Runyan mentioned, with respect to KARK T.V.
4 there's no question about the objection, the objection was to
5 actual notice, and so that issue is clearly before the Court.
6 Dodge County is very similar to New York in the sense that it
7 only matters when the building was constructed under Georgia
8 statute of limitations, so we have the same issues there.  So,
9 the objection argument, if any, would only go to the six claims
10 under Delaware law.

11        One of the things that was stressed by Mr. Runyan is
12 that we haven't proved contamination.  The State's that we've
13 moved under do not have contamination standards.  And, I ran
14 through the various standards, but essentially those are known
15 or should have known of your injuries.  So, it's not Grace's
16 burden to prove contamination, we just have to prove that they
17 knew or should have known of their injuries.  These folks
18 predominantly have admitted that they removed asbestos.  And,
19 it's not just asbestos.  If you look through the material, and
20 it's all in the summaries, asbestos fireproofing material, now,
21 I'm not saying that they knew that it was Grace's fireproofing
22 material but, again, they don't have to know whose product it
23 was for the statute of limitation to apply.  If they knew they
24 had fireproofing, if they knew that it contained asbestos, if
25 they removed that fireproofing, surely the statute of

1  limitation starts to run.  Thank you, Your Honor.

2          MR. RUNYAN:  One or two quick responses, Your Honor.

3  Saying there's an injury without defining the injury is a non-

4  sequitur.  The injury here is either contamination or it's

5  something else and it must be under Arkansas law, there must be

6  a causal connection between the injury and the product which

7  can only be done if the injury is caused by the product.  And,

8  there's no proof whatsoever of that.

9          With respect to the Georgia cases, Your Honor, we

10 would rely upon the arguments contained in our submission.

11         THE COURT:  Okay.  What about the Delaware,

12 Pennsylvania, and Ohio, though?  Because that's where I think

13 the debtor may have a point.  But, if contamination is not a

14 standard and the statute starts to run from the date that you

15 know or should have known of the product being in the building,

16 and you've started remediation, then you're certainly on a duty

17 of inquiry to find out whose product it is.  I really am having

18 some difficulty seeing how those survive?

19         MR. RUNYAN:  Let me see if I can break that down into

20 the pieces.  It's their burden to establish injury outside the

21 statutory period, from their product, outside the statutory

22 period.

23         THE COURT:  Well, I don't know that they need to

24 substantiate injury by their product because contamination's

25 not an issue.

1        MR. RUNYAN:  Well, if it has to be the presence of

2   something and if it's the presence of just a product, then

3   that's -- you know, Your Honor can certainly rule that way, but

4   that's inconsistent with the vast majority of statute of

5   limitation cases in the country on this issue.

6        THE COURT:  But, the issue is for constructive

7   notice, whether you're on a duty to inquire, that's what the

8   constructive notice is all about.  So, if you know that you've

9   got asbestos fireproofing, spray on asbestos fireproofing

10  products, and there are a finite number of manufacturers of

11  those products, and you start to remediate, surely at that

12  point in time when you know what the product is, and that you

13  have it, and you start to remediate, you're on a duty to

14  inquire as to whose product it was so that you can undertake

15  the necessary action.  I really don't see how the statute at

16  that point in time can be tolled any longer than for that

17  three-year period.

18        MR. RUNYAN:  The problem, Your Honor, there are two

19  problems there that I see, the first problems is the duty to

20  inquire, this is based on general law but not Delaware law,

21  because they didn't cite any Delaware law, and I didn't either,

22  for that matter, occurs after the proof necessary to cause the

23  statute to have run.  Then the other party as a part of their

24  tolling or their ability that we shouldn't have known, we

25  didn't know and we shouldn't have known, our charge with that

1  issue of the duty to inquire.

2        The second issue, as I said, is that that's -- there

3  isn't any law before this Court as we speak on what Delaware

4  says on that issue.  And, that's -- the briefs are silent on

5  that issue.  The briefs talk about -- in fact, I think the

6  brief just says presence of asbestos containing material.  And

7  so, I don't think there's -- there certainly is no law in front

8  of you, and the law around the country is not consistent with

9  that approach.

10        THE COURT:  Okay.  I've just really got some problems

11  with why the statute with respect to the Delaware,

12  Pennsylvania, and Ohio cases is not on.

13        MR. RUNYAN:  Well, Your Honor, the substantive

14  question, I suppose, for the Court on that issue is, would the

15  State Court in Delaware for accrual purposes apply the

16  contamination standard or some other standard?

17        THE COURT:  I don't think they'd apply the

18  contamination standard.

19        MR. RUNYAN:  Well, --

20        THE COURT:  I don't think there are any cases that

21  would apply the contamination standard.  It appears to be an

22  installation standard.

23        MR. RUNYAN:  There is a case in Delaware that would

24  suggest otherwise, Your Honor.

25        THE COURT:  All right.  Because that would be

1 inconsistent with the inquiry.

2          MR. RUNYAN:  The case I'm referring to is the -- it's

3 cited on Pages 13 and 14 of our submission.  It's <u>E.I. Dupont</u>

4 <u>v. Admiral Insurance</u>, it's a 1995 Delaware Superior Court case.

5 And, in this particular case it discusses -- I'll just read

6 sections of this case for the Court's benefit.  "The

7 progressive nature of the damage caused by contamination from a

8 polluting source is similar in nature to the progressive nature

9 of the physical disease asbestosis."  And, it cites an <u>Owens</u>

10 <u>Illinois</u> case in New Jersey, it says, "Property damage cases

11 are analogous to the contraction of disease from exposure to

12 substances like asbestos."  And, it goes on to say that thus

13 while the damage caused by progressive contamination may not be

14 readily apparent or even known to the possessor of the

15 property, damage is nonetheless occurring just as asbestos

16 progressively damages the lungs before discovery.  But, the

17 language that this Court is using is talking in the language of

18 discovering contamination from --

19          THE COURT:  That's a polluting source.

20          MR. RUNYAN:  But, asbestos in a building is a

21 polluting source as well.

22          THE COURT:  But, asbestos once it's in the building,

23 I mean the building may be damaged but it's going -- it's not

24 going to be any more or less damaged after the asbestos is in

25 -- because the asbestos is a finite quantity.  So, that

1 quantity is going to cause whatever damage that quantity's

2 going to cause.  It's not like a water pollution, for example,

3 that continues to roll down a stream and can progress or

4 contamination of an oil tank that leaks under ground and not

5 only contaminates the immediate source but everything around

6 it, or air pollution.  That it is not the same thing.  It is a

7 much more quantified, in terms of the location, the physical

8 location that can be contaminated.  And, particularly where

9 you've already abated the property.

10          MR. RUNYAN:  But, the abatement, there's no proof the

11 abatement was of that product that's the subject --

12          THE COURT:  But, it doesn't matter, it's an inquiry

13 notice.

14          MR. RUNYAN:  Well, if it is an inquiry notice it

15 might not matter.  I don't know if it's inquiry notice or not.

16 But, the -- what Your Honor's talking about just before that

17 comment is the issue of how injury occurs.  I think.  An injury

18 occurs not because it's stuck up there on the ceiling or on the

19 beam.  Injury occurs when the asbestos fibers are released.

20 And, if that's not the case, if it's presence of the asbestos

21 containing product, then that's an entirely different issue and

22 everybody who's on the other side may be right about that

23 issue.  But, it's got to be presence of their product and it

24 has to be known to be their product, and I --

25          THE COURT:  I don't think it has to be known to be

1  their product.  I think that's where we're differing.  I think

2  the issue is, are you on reasonable inquiry notice to find out

3  who's product it is so that you can bring a cause of action?

4  And, in fact, most entities bring the cause of action before

5  they know whose product it is and they use discovery to find

6  out whose product it is.  So, I don't think it can be the

7  standard that you have to know who the real defendant is before

8  you file suit, because if that's the case we wouldn't have --

9  we wouldn't have any of the suits that we have for the most

10  part in the tort system.

11        MR. RUNYAN:  Judge, I would suggest to you one aspect

12  with respect to that question.  That issue, the inquiry notice

13  issue and its applicability to asbestos property damage cases

14  in Delaware has not been briefed.

15        THE COURT:  Well, then I think we better brief it if

16  that's the case because I believe that perhaps that's the

17  standard and I think that's maybe the end of this issue.  But,

18  okay, if you need some time, I guess I need to give you some

19  supplemental time.

20        MR. RUNYAN:  There's one other thing that I breezed

21  over very quickly, Your Honor.  With respect to those claims,

22  the ones that Your Honor's focused on, Grace did not object on

23  actual notice grounds.  The only one that they objected on

24  actual notice grounds is the Arkansas case.  So, there's that

25  additional issue associated with this.

1          THE COURT:  Well, I don't think Grace is arguing

2     actual notice at this point.  What I thought I heard Grace say

3     is that these -- that the statute runs from the date of -- I'll

4     use the word date of installation, they're saying date of

5     presence, -- date of installation, therefore the statute, it

6     doesn't matter about the notice.  It begins on the date of

7     installation.  But, the best hope that you have is that there's

8     some inquiry notice.  And, in these cases, because of the fact

9     that I think maybe I have them mixed up, I don't think so, that

10    there is -- that by the time you start remediating you had to

11    have known that there was a hazard in the building or you

12    wouldn't have started remediating.  So, you knew that there was

13    asbestos because you've remediated.  That, at least, starts

14    your constructive notice.  So, it's only a constructive notice

15    objection at best anyway.

16          MR. RUNYAN:  Your Honor, two points on that.  First

17    of all, in their reply memo, I quote, "Debtor's motion is

18    limited to actual knowledge."  So, they do take the contention

19    that these are actual knowledge issues.  Secondly, there are

20    many reasons that people remove asbestos containing products,

21    in fact, the largest reason for removing them is to prevent

22    contamination upon renovation.  So, and we have no proof here

23    that they were removed because they were hazardous or for

24    whatever reason.  I mean, there may have been no contamination,

25    or they may have been removed to prevent a hazard from

1  occurring during a renovation.  There's no evidence of that.

2         THE COURT:  But, even that doesn't matter.  If the

3  issue is the presence and the presence at some point is going

4  to lead to contamination, which is the reason why people are

5  removing the product to make sure that it doesn't lead to

6  contamination, you're still on a duty to inquire as to whose

7  product it is that caused the problem that led you to remediate

8  the building.  So, no matter -- I don't think any way you slice

9  it that you get past the statute once you've taken -- once

10 you're aware that there is asbestos and once you undertake some

11 action at least to remediate that asbestos, then you're on an

12 inquiry to find out whose product it is so that you can take

13 the necessary steps if you're going to sue to adjust the claim

14 with the appropriate defendant.  However, you're going to do

15 that, to pursue that defendant.

16        MR. RUNYAN:  If there is an inquiry standard

17 applicable here I agree with the Court.  In addition to that,

18 Your Honor, I do want to emphasize that every claim that we

19 have been talking about on the inquiry notice issue was not

20 objected to on actual notice grounds.  Only on constructive

21 notice.

22        THE COURT:  Right.  I think that's what you said

23 earlier.

24        MR. RUNYAN:  Okay.  Thank you, Judge.

25        THE COURT:  Okay.  So, do I need briefs on this

1 issue?

2          MR. RUNYAN:  I'm sorry?

3          THE COURT:  Do I need briefs on this issue, the

4 inquiry standard?  Am I raising this and no one else is?

5          MS. REA:  No, I mean, I think, Your Honor, that it's

6 been briefed in the sense that Delaware has a known or should

7 have known standard.  They have not addressed it in the context

8 of asbestos property damage claims.  The known or should have

9 known standard is known or should have known of the injury, and

10 our position is very simple, if you take steps to remedy it you

11 knew or you should have known of the injury.  So, I don't think

12 that, frankly, whether it's a contamination theory or any other

13 accrual theory in Delaware it doesn't matter with respect to

14 this motion.  If you took it out any standard you use for

15 accrual purposes has already run.

16          THE COURT:  Well, and that's why I don't think any

17 way you slice it that you get around that standard.

18          MR. RUNYAN:  Well, the problem is take what out?

19 Take the product that's at issue?  Or, take somebody else's

20 product?  That's really the issue and that's why Your Honor

21 focused on inquiry notice.  And, that is, you take somebody

22 else's product out then you need to inquire about whether the

23 other product that's at issue here caused the statute to

24 commence.  That was my point.

25          MS. REA:  Again, if I could just say, we're talking

1  about fireproofing removal.  And, it's in the materials.

2  You'll see removal notices for fireproofing in these buildings.

3  So, I think that if the issue is, should you inquire as to who

4  made it?  That's a different inquiry than the briefing that

5  you're talking about because, frankly, no matter what standard

6  you're using on accrual these claims meet that standard.

7        THE COURT:  Yes, I really think there is -- I just

8  don't see a way around the Delaware, Ohio, and Pennsylvania

9  claims here, because of the method by which they came up and

10  were remediated and the fact that there are fireproofing

11  claims, I -- I mean, --

12        MR. RUNYAN:  Your Honor, we would like the

13  opportunity to brief the inquiry notice issue that the Court

14  raised.

15        THE COURT:  Okay.  That's fine.  I'll give you an

16  opportunity to do it.  How much time do you need?

17        MR. RUNYAN:  Two weeks, Your Honor.  Ten days.

18        MS. REA:  Your Honor, I guess we would ask for five

19  days to respond to whatever they have to say.

20        THE COURT:  All right.  The brief on the issue of

21  inquiry notice, I really want it tied to the facts of these

22  claims.  I mean, that's the point.  I'm looking at the summary

23  judgment on these claims.  Is due by April 18th for Mr. Runyan

24  and April 25th for the debtor.

25        MS. REA:  Your Honor, if we could have it due the

1  23rd, I guess the hearing is the 23rd, and we'd like our

2  response -- I mean, we'll shorten the time period, we'll like

3  our response before the hearing is.

4         THE COURT:  Which hearing is the 23rd?

5         MS. REA:  The statute of limitation.  Am I right, the

6  statute of limitations?

7         MR. RESTIVO:  Yes.  And, we'll do it by the 23rd,

8  Your Honor.  I'm going to talk about the hearing in a moment,

9  but we'll do it by the 23rd.

10        THE COURT:  Okay.  Well, I mean that's fine, but even

11 if you file it by the 23rd I'm not going to have a chance to

12 read it in preparation for the hearing anyway.  So, okay.

13        MR. RESTIVO:  Your Honor, I would like to talk about

14 three or four things and then see if I can't run a thread

15 through them and tie them together.  I'd like to talk about our

16 schedule, talk about where we are on the number of claims, talk

17 about our last pretrial conference, and then ask the Court for

18 direction as to how we should proceed and I will try to

19 convince the Court to give us direction rather than say, "You

20 fellows ought to sit down and talk about it," because I just

21 don't think we'd get from here to there in that fashion.

22        Let me see if I can take them in some sort of order.

23 The schedule, Your Honor, includes right now April 23, 24, and

24 25 as the hearing on statute of limitations and product

25 identification on the remaining claims.  The Court will recall

1  that another issue for that hearing was Libby but Libby's now

2  no longer before us.  In addition, the Court has continued to

3  hold for this debtor May 7, 8, and 9.  I'm not sure that that

4  entire period of time is being held for property damage there

5  may be a bodily injury hearing at some point.  But, that's

6  another time we're holding.  And, I'm going to come back to

7  those time periods in one moment because I think we have a

8  suggestion.

9         Until the Court rules on summary judgment, Your

10 Honor, obviously no one can be precise as to what we're talking

11 about.  We know what is gone, we know we're not talking about

12 627 cases, I think it's 250 left, give or take.  But, that's a

13 real rough count.  And, while at one point I think I suggested

14 that Your Honor ought to be able to rule from the bench on all

15 these summary judgment motions, my sense is that no one could

16 do that and you're not going to rule today, so we won't know.

17        In doing this chart, Your Honor, I'm not suggesting

18 we necessarily debate it today.  In the remaining claims I

19 tried to figure out what's in here.  One of the cases in here

20 is the solo case in New York.  It was a case in which we asked

21 the Court to lift the stay.  Mr. Westbrook was on the other

22 side.  The Court decided at that point not to lift the stay.

23 We don't view the proceedings before this Court in effect as

24 this Court sitting as the New York Court of Appeals, and so, on

25 this chart is the solo claim that we don't think this Court's

1  going to do anything with.  There's also on this chart the

2  Central Wesleyan claim which I think was handled at the

3  conference last week.

4        THE COURT:  Mr. Restivo, before I forget I need to

5  tell you one thing about April 23rd.  That is the night that I

6  promised my law school class would do the review for the final

7  exam.  So, we're going to be leaving here at 5:15 that night.

8  The other nights I can stay late but that night I have to leave

9  at 5:15.  And, I do mean leave.  So, plan to be done speaking

10  by 5 because I have to be literally in the car and out of here

11  at 5:15 that night.

12        MR. RESTIVO:  Okay.  You'll remember, Your Honor,

13  with respect to the pretrial telephonic pretrial on March 8th

14  it was our suggestion that at the April 23 to 25 trial we put

15  in direct testimony by report or declaration, put the witness

16  on for cross, that we figure out a division of time.  And, at

17  that point I think different people may have had different

18  ideas and the Court asked Mr. Baena to find out whether or not

19  he could get authority to negotiate with me over the hearing

20  protocols.  Mr. Baena e-mailed me on March 15 telling me that

21  he had not been authorized to negotiate with me over hearing

22  procedures and so I really haven't had anyone to negotiate with

23  other than Mr. Burnick and he's no fun, Your Honor, and I don't

24  want to negotiate with him anymore.  And so, I think the

25  Court's going to have to hear what people think and just tell

1  us what to do.

2         A suggestion we have, Your Honor, is rather than do

3  both things April 23 to 25, that is statute of limitations and

4  product ID, and rather doing what the Court may have suggested,

5  why don't you take the remaining claims and we'll start with

6  them, our newest suggestion is to limit that hearing to product

7  identification on the theory that independent of where the

8  Court is on its statute of limitations consideration of these

9  motions a building either has or doesn't have a Grace product

10  and we can focus on product ID.  My guess is maybe 75, 80, 85

11  buildings will be involved.  My guess is they will fall into

12  very nice pigeon holes such as Mr. Belforman's claim, where

13  here you just have a bulk sample showing asbestos.  But, that

14  we give the Court -- that would give the Court a little bit

15  more time to deal with statute of limitations and that we

16  utilize what is available May 7th, 8th, and 9th, which bodily

17  injury doesn't need.  There, we would concentrate on statute of

18  limitations.

19         We think that would be a good division of labor.  If

20  that makes sense either to the parties or the Court or to both,

21  or we're told to do that, then the Court will not have to worry

22  about reading their brief and our response by April 23 because

23  the next thing that's going to happen is product ID and what

24  the Delaware law is on those issues, it won't be immediate.

25         As we suggested last time, maybe last two times, we

1  do think it will be quicker and more expeditious if direct

2  testimony is proffered by way of report or declaration and then

3  the expert or the witness is placed on the stand for cross

4  examination.  We think that has worked well in other instances,

5  both confirmations and proof of claim proceedings.  And, we do

6  think the Court needs to divide the time between Grace and the

7  claimants so that neither side has an incentive to take up too

8  much time or to filibuster.  If each side is given its share of

9  time then we will get this done.  We had suggested a split of

10  50/50, you know, some people say if you have 200 claimants left

11  and you have one debtor then everyone gets one 201th of the

12  time, that doesn't sound fair.  We really at this point, we

13  have our druthers, but at this point we would rather just know

14  what the ground rules are so we can get ready, we can try this

15  and we can get these things resolved.  It'll be easier for the

16  Court and the parties, frankly, Your Honor, to have these two

17  hearings and try it, that it will be for us to try to negotiate

18  how we would try it, it just can't be done that way.

19          THE COURT:  All right.  With respect to the debtor's

20  expert reports is there -- I know a binder was delivered today

21  but I haven't had a chance to look at it.  So, I don't know at

22  this point in time whether it's even in preparation for this

23  trial.  Is there an expert report or some process that will I

24  guess husband the evidence in such a way that a lion share of

25  the evidence that the debtor is going to present will be

1 applicable to all buildings?

2          MR. RESTIVO:  Yes.  Well, if we are talking product

3 identification, --

4          THE COURT:  Yes, on product.

5          MR. RESTIVO:  -- terms of expert reports, it is

6 primarily from our side I believe the Dr. Rich Lee report.  I

7 think from the claimants' side there may be a Pinchen report.

8 There may be other reports.  I think the answer is, yes, there

9 is a small manageable collection of reports on that issue.

10 And, there may be two, three, four declarations by lay

11 witnesses if that many.  I think that's all that's involved in

12 terms of product identification.  Plus, of course, the claims

13 files.

14          THE COURT:  All right.  Well, I think it may make

15 sense at least for the debtor's perspective to perhaps start

16 your case from your witness's declarations or affidavits.  And

17 then, produce the witness's cross examination.  I know that

18 there may be some objection to the claimants going forward that

19 way and maybe they want to produce live witnesses, I don't

20 know, I'll hear from them.  But, everyone has an opportunity to

21 take depositions of the debtor's witnesses, so there shouldn't

22 be any surprises with respect to what the debtors witnesses

23 will be saying on direct.  And, to the extent that you put it

24 together in affidavit or declaration form there will be even

25 fewer surprises.

1          MR. RESTIVO:  All those reports, Your Honor, on both

2  sides, were filed by the parties.  There was a discovery

3  period, depositions have been taken all over the place, Your

4  Honor.  There should be absolutely no surprises to anyone other

5  than maybe the Court because you haven't been at the

6  depositions, haven't read everything yet.  There'll be no

7  surprises.  We ought to be able to get through this pretty

8  efficiently.  I can't believe anyone on this side of the dice

9  (sic) will be surprised by what the witnesses say and what the

10  testimony is because we took all this discovery in the last

11  four, six, eight weeks.

12          THE COURT:  Okay.  Well, if the debtor is able to put

13  together its case in such a fashion that a lion share of its

14  evidence is going to apply to, you know, most of the buildings,

15  I understand that there will be some need to bifurcate the

16  evidence as to particular groups of buildings, but that the

17  evidence can at least be presented as to groups of buildings

18  and then broken down perhaps as to individual buildings, then

19  does the debtor really need 50 percent of this time?  Can the

20  debtor use one day and let the claimants use two days?  So,

21  that we can get through this process.  Understanding, of

22  course, that the debtor -- if the debtor needs rebuttal I'm

23  going to build some time in for the debtor for rebuttal.

24          MR. RESTIVO:  We could put on our case in one day,

25  Your Honor.  We assume that one day doesn't include when they

1  put on their case, our time in crossing their experts.  That

2  would -- that doesn't --

3          THE COURT:  No, I'm asking for your case in chief.

4          MR. RESTIVO:  Yes, we could do that in one day.

5          THE COURT:  All right.  So then, if the debtor gets

6  one day and the claimants get two days, that's at least I guess

7  a start of a division of time.  And then, if we need rebuttal

8  and surrebuttal, you know, we may have to figure out a time for

9  that later if need be.

10          MR. RESTIVO:  My hope would be, Your Honor, if we

11  know that's what the time is I bet we will get it done because

12  I -- neither side is going to be able to figure out an

13  advantage in not getting it done.  And then, our suggestion is,

14  and we don't have any details, push the statute of limitations

15  aspect of what was going to be April 23 to 25 down the road to

16  the May 7 to 9.  So then, when we do that that'll be statute of

17  limitations, not product ID, and that'll probably make that a

18  more efficient hearing.  On statute of limitations, I think,

19  again, there could be a collection of reports, I'm not as

20  knowledgeable about that today as product ID.  That collection

21  may be bigger, more people, but we would have more time to

22  figure out an efficient way to do that.  On that I don't know

23  whether we could do that in one day either but we don't have to

24  worry about that now if we can focus on the May 23, 25, and,

25  you know, all learn from how that goes.  That would be our

1 suggestion, Your Honor.

2        THE COURT:  Okay.  I don't know how much of that time

3 was devoted to the personal injury.

4        MR. RESTIVO:  I think there's only one argument on

5 either May 7 or May 9, Your Honor, because when the Court was

6 giving time for Federal Mogul I remember asking our counsel,

7 see if you can't lock in May 7, 8, and 9, and I think they said

8 there's one bodily injury argument, otherwise we don't need it.

9        THE COURT:  All right.  Mr. Speights.

10        MR. SPEIGHTS:  Well, let me begin by saying I believe

11 Mr. Restivo is trying to be very constructive and I appreciate

12 that and I'm going to try to be very constructive.  And, first

13 of all, I think his idea of doing this product identification

14 on April 23 that week, sounds good.  It makes sense to

15 bifurcate those two.  Secondly, I have no problem speaking only

16 now for Speights & Runyan claimants, of the debtor putting in

17 their direct testimony through declaration or affidavit, so

18 long as we are not required to do that.  We might want to with

19 some witnesses, and others we won't have the interplay back and

20 forth, and sometimes we don't want to have to spend days and

21 days drawing it up in advance rather than just having a

22 dialogue with the witness and letting the witness explain to

23 you as we see Your Honor having questions through a direct

24 examination.  But, I don't have a problem if Mr. Restivo wants

25 to bring -- present his witnesses that way.

1          I do have a question in my mind, I hadn't thought it
2  through, about how you object to his direct testimony in the
3  form of a declaration.  If he had a live witness on the stand I
4  would object and Your Honor would rule.  And, I don't know how
5  we can do that, but I certainly don't want to open the record
6  up to matters coming into evidence that could not survive a
7  legitimate objection at such time as I have it.  So, I would
8  like to think that through with Your Honor, with Mr. Restivo,
9  how to deal with that.

10          MR. RESTIVO:  Be simply another -- in other matters
11  before the Court what people have done is objected to
12  Paragraphs, you know, 14, 15, and 16, is not based on personal
13  knowledge.

14          MR. SPEIGHTS:  I mean, that's --

15          MR. RESTIVO:  And, they don't come into evidence.
16  And, I think all those have been resolved pretty easily.

17          MR. SPEIGHTS:  Well, I think it can be easily
18  resolved, I mean, we just need a mechanism for doing it and
19  agree on it.  And, how we want to do it in the backroom,
20  (indiscernible), or whatever.  But, I do want to preserve that
21  right to object to that type of evidence.  But, any event that
22  takes us through the April 23, and that's good progress.

23          I am -- and, let me say this about May 7, 8, and 9.
24  I'm not sure people generally know about those dates.  I know
25  about them, I'm on the committee.  I know they were reserved in

1 case we need them for something.  I'm not sure those dates suit

2 other people and a lot of them have already left for the day.

3 I'm not saying this to try to delay matters but I am going to

4 say it anyway.  We do have a little more room now because PI

5 has gotten pushed back.  I know we will (sic) get through this

6 process before PI's going to get through that process, so --

7 and, that's the only thing that would be terrible if somehow we

8 were the side of the equation delaying this ship from finally

9 getting to safe harbor somewhere.

10        My concern about the May dates is twofold.  First of

11 all, I'm not sure when Your Honor will be ruling on the summary

12 judgment motions, and I don't think, given that we do have time

13 now, Your Honor ought to be in the place of having to be in a

14 horse race to try to finish them in a certain time.  And, we

15 need to know sufficiently in advance which claims are really

16 going to be tried and which claims, hopefully none, won't

17 survive summary judgment motion because --

18        THE COURT:  Well, I think the Delaware, Ohio, and

19 Pennsylvania claims we last discussed are probably not going to

20 go to trial.  But, I'll wait and see the brief, but that's my

21 suspicion, Mr. Speights.

22        MR. SPEIGHTS:  Well, --

23        THE COURT:  We'll start with that.

24        MR. SPEIGHTS:  -- Mr. Runyan has a way of being

25 brilliant on Tuesday mornings.

1          THE COURT:  Okay.

2          MR. SPEIGHTS:  He'll find something tomorrow morning.

3 But, just taking the Canadian claims, you know, 89 claims, and

4 I should say we didn't get through them today through no fault

5 of Grace, they involve a bunch of different provinces in Grace.

6 We sort of lump them together but there are a lot of provinces

7 involved in there.  And, Your Honor can rule entirely with me

8 or you may deal it on a province by province, and we're really

9 dumping a whole lot on you when we dump Canada into your lap.

10 I'm not even sure when we're going to argue Canada's summary

11 judgment.  California's the same way, there are a whole lot of

12 buildings.  And, knowing three or four days in advance of a

13 trial is not sufficient to get ready for a trial.  Which leads

14 me to the next problem I have, again, I'll be glad to talk to

15 Mr. Restivo, we actually can talk to each other, of what it is

16 that's actually being tried.  And, maybe I haven't read the

17 papers closely enough, but for example, if you rule that the

18 1990 filing in the Supreme Court does not bar the California

19 claims then I understand they want to have a trial on

20 constructive notice, whether it's May 7 or whatever, their

21 statute of limitations trial, is that the statute of

22 limitations trial or is there something else going to go on

23 with regard to statute of limitations on those claims?  That's

24 the sort of thing that normally if we have plenty of time after

25 you rule on summary judgment we'd have a pretrial and it would

1  be very clear what we were actually trying.  And, again, you're

2  looking at May 9 is not that far away, we're looking at one

3  month away, a rule on summary judgment motion's going to have

4  some sort of pretrial and deal with it.  So, I am admittedly

5  wandering around trying to respond to you, I just don't know

6  how to respond yet to this May 9.  And, I also know, my law

7  partner just whispered to me, he has a conflict one or both of

8  those days and he's the world's constructive notice expert, and

9  I'd hate to have that dumped in my lap.  So, we clearly can go

10  forward and we can clearly set product ID from my standpoint,

11  and we clearly can talk about how we deal with the other, but

12  until Your Honor rules I'm not sure what we do.

13       THE COURT:  Okay.  Well, my suggestion would be that

14  we start with the product ID in April and see -- I mean, I hope

15  that three days is enough to get through it.  I just don't

16  know.  I haven't seen the pretrial narratives, I haven't seen

17  the expert reports, I mean, it simply hasn't been put together

18  and filed yet in any fashion.  I don't know.  I don't know

19  whether you're going to get through it in that fashion.

20       With respect to the concept of reserving objections

21  to the declarations, I'm sure you can work out a process to

22  file objections to whatever portions of the declarations you

23  think are objectionable and I'll give you rulings.  I don't

24  think that that is an issue.

25       With respect to bringing in all of the witnesses on

223

1  the other side live, that's okay, but understand there are

2  going to be limitations on every witness's time, if that's how

3  it goes.  I'm not going to have one attorney bringing in, you

4  know, the owner of one building and have that person on the

5  stand for an entire day to the exclusion of every other

6  building owner.  It's not going to happen.  So, if I find out

7  that there are 200 buildings going to trial and 200 building

8  owners, and I've got, you know, just to make it easy, 200

9  minutes for trial, that means you're going to get one minute

10 per building owner.  So, you need to be very reasonable about

11 this and you may want to consider whether, in fact, you don't

12 want to do something that might get your direct case in in  a

13 little more prompt fashion than having the witnesses testify

14 live.  Provided that, of course, they're here and available for

15 cross examination and redirect purposes.  But, there will be

16 limitations.  Now, until I see what you propose in the way of

17 who's actually going to appear here, I don't know.  I think we

18 need a final pretrial.

19       MR. SPEIGHTS:  That's my point exactly.  We need a

20 final pretrial for the PID and we need a final pretrial in

21 sufficient time before the statute of limitations to understand

22 what it is we're trying and then we can fit it in.

23       THE COURT:  Yes.  And, I sort of endorse that

24 comment, too.  I'm a little concerned about the May 8th date on

25 the statute of limitations.  If I can, in fact, get through

1 some or all of these you'll know as soon as I know, Mr.

2 Speights, and my plan is to try to get through them in

3 basically the order in which they're in the binders, because

4 that's how I've been reading them to try to get through them

5 and that's how I'm going to try it.  Except that the ones that

6 are not being argued obviously I'm not going to spend any time

7 with, including the Canadian claims, since they're not being

8 argued now, I'm not going to attempt to give rulings about

9 them.  But, other than that, that's how I expect to get through

10 them for purposes of trying to give rulings.

11         My two law clerks and I will be at work on them, but

12 can I anticipate a date?  I don't know.  I have three other

13 Grace opinions that I hope are -- they're being circulated for

14 final proofing.  I hope to get them out this week.  And, as

15 soon as that's done then we're starting on these.

16         MR. SPEIGHTS:  And, I think other counsel might want

17 to say something as well.

18         MS. KEARSE:  Your Honor, Anne Kearse, just briefly.

19 I believe for the product ID section I'm down to two buildings

20 on that, and, hopefully, we're still working through some

21 issues on there.  But, couple questions.  I do agree, I think

22 if we can split up the product ID and the statute of

23 limitations it would help move things along.  If there's a date

24 for when we would get the declarations, I don't know if we've

25 established that, if we're going to have a --

1                THE COURT:  We will.

2                MS. KEARSE:  Okay.  To do that.  And, Your Honor, if

3   we've got documents, if they're documents produced by Grace or

4   from our own files there, I hope we don't have to have a

5   witness in order to put it in, we can just put the documents

6   into evidence or as long as we have a foundation and

7   authenticity issues there.

8                THE COURT:  Yes, as long as -- I think unless

9   authenticity or some other objection exists for the actual

10  document, yes, I don't see why you need a witness for --

11               MS. KEARSE:  And, I think we've all put our witness

12  lists in and our exhibits and everything there, and to the

13  extent we don't have any objections to those, I think some of

14  those would move things along we'll just put those into

15  evidence, Your Honor.  May not need witnesses to testify about.

16               THE COURT:  In fact, I think the way to handle the

17  documents may be that you submit all the documents premarked

18  for identification and the other side has so many days to file

19  a notice of what documents are objected to and the reason for

20  the objection.  That way you can be prepared to address any

21  objections, if you need a witness you'll know.  And, if you

22  don't need a witness then at least you'll know what the

23  argument is that can be raised at the hearing, so I can give

24  you rulings.  If they're relevance objections, obviously, I

25  can't rule on those until I get them in context.  If they're

1 something else, though, you may be able to be prepared to

2 address those in advance.

3        MS. KEARSE:  And, that would also address whether or

4 not we have to have a witness in there.

5        THE COURT:  Exactly.

6        MS. KEARSE:  So, the sooner we can do that.  Your

7 Honor, there's also, when we get to especially the statute of

8 limitations issues, I know there's some significant motions in

9 limine pending from the PD committee on Mr. Morris, and I think

10 that's going to structure that ruling on our trials and how I

11 proceed on the statute of limitations issue because it's all

12 encompassing on constructive notice and how that's defined and

13 how that'll go before Your Honor with that.  Okay.

14        THE COURT:  Okay.  I haven't even seen those but I'm

15 really not that far ahead.  So, I think if we -- I think it may

16 be helpful if we all concentrate on the property -- product ID,

17 pardon me, issues first, and get that done.  That's probably a

18 good suggestion.  Everybody, I think, is well along the road

19 toward getting that done.  And, while that's happening I think

20 you folks can talk about the statute of limitations issues,

21 perhaps at the end of the day on April the 25th, it might not

22 be a bad idea to have a pretrial conference with respect to the

23 May 8 hearings.

24        MS. KEARSE:  Your Honor, on the schedule we have also

25 April 13th for trial briefs and I don't know how that affects

1 what's happened today, if that's still a deadline, I'm not sure

2 what it encompasses, but on our scheduling it has trial briefs,

3 trial exhibits, identified by issue.  And, that may help us get

4 the exhibits in but I'm not sure what Your Honor's going to

5 want on the way of trial briefs on that date, or if that's

6 something we need to have an extra week after today.

7        MR. RESTIVO:  I was going to indicate to Your Honor

8 that right now in the current schedule on Friday the 13th all

9 parties are to file their trial briefs, their final witness

10 lists, final exhibits.  If we are concentrating on product ID,

11 obviously, that filing is, you know, twice as easy as if we had

12 to do both things.  And so, that time frame ought to be

13 followed by everyone because now it's easier.  That includes

14 the trial brief?

15        MR. CAMERON:  Trial brief and exhibits are due on

16 Friday the 13th.

17        MR. RESTIVO:  So, everyone will know what everyone

18 else is doing on Friday the 13th, and whether or not the

19 parties and the Court want to have, you know, a telephonic

20 pretrial conference or something between the 13th and the 23rd.

21 But, --

22        THE COURT:  Okay.  What I would like is this, I would

23 like a series of binders that has everybody's everything in it.

24 I would like the debtor's witness list followed by whatever

25 declarations and exhibits, all premarked for identification,

1  with any objections that are going to be filed with those

2  exhibits so that you can give me literally a chart that says,

3  you know, "Exhibit A is whatever it is, the debtor's corporate

4  chart."  And, the objections are by Ms. Kearse on whatever

5  basis she's going to object to that, "And, here is what the

6  debtor's response is going to be."  For every person, every

7  exhibit.  I think that will help everyone in terms of

8  organizing the trial time for their product ID trial.  So, if

9  you -- rather than file them, if you exchange all of that

10 information by April 13th, have your objections to each other

11 by -- that's a Friday, you said, -- by the following Monday,

12 April 16th, so that the debtor can then file everything and

13 literally file it with the Court in a binder format by April

14 17th.  Does that work?  Let me retrack what I said a minute.

15 When you're filing things, I guess you're filing them

16 electronically.  What I'm talking about filing, I meant

17 literally the debtor giving them to me.  I don't want them in a

18 binder format until I get everything together.  That's what I'm

19 trying to distinguish.  So, go right ahead and file things

20 according to the order that you've already got, but I'm trying

21 to build in an objection process that isn't in the order now.

22 But, I need it in time that it's going to be meaningful so that

23 I can get prepared in advance of the hearing.  That's the

24 problem.

25          MR. RESTIVO:  I would think, Your Honor, that with a

1 Friday the 13th deadline for all parties and because it's

2 electronic filing, you know, sometimes you don't see anything

3 until midnight for those folks like Mr. Cameron who are still

4 at work at midnight, and so I think we're probably going to

5 need until Tuesday the next week to give each other objections,

6 and then 24, 48 hours, I think we can get over to the Court

7 everything.  But, I'm just not sure our people will have

8 everybody's pieces of paper to put in a book.

9 THE COURT:  Then I need the preliminaries by the

10 13th.  That's not going to give me enough time to see

11 everything in advance.  So, I'll have to get the preliminaries

12 in without the objections and then get supplements.  So, okay.

13 So, the exhibit list and everything will still be filed by

14 April 13th and the debtor will still -- let me see -- if I give

15 you until Saturday can you actually get them to my house on

16 Saturday?  Put the binders together and get them to my house?

17 MR. CAMERON:  Saturday, the -- which date?

18 THE COURT:  April 14th, on Saturday?  If you're

19 getting the information Friday?

20 MR. CAMERON:  Does that include the objections from

21 the --

22 THE COURT:  No, you won't have --

23 MR. CAMERON:  Just our preliminaries?

24 THE COURT:  Everybody's preliminaries?

25 MR. RESTIVO:  The folks that are going to do it say,

1  "Sure, we can do that."

2         MR. CAMERON:  If we get them by Friday, close of

3  business, maybe?

4         MR. RESTIVO:  Yeah, by Friday, 6 o'clock eastern we

5  can get it to you Saturday.

6         THE COURT:  So, you understand.  I'm leaving town on

7  Sunday.  If I don't have it Saturday I am not going to see any,

8  and I do mean none, of the preliminary information.  And, I

9  will be back on Wednesday.  So, if you can get the supplements

10  to me Wednesday that will be fine.  But, I'm leaving town again

11  on Thursday.  So, if I don't have the supplements Wednesday I

12  won't see anything else before the trial on Monday.  So, this

13  is really a tight schedule for me to get prepared for this

14  trial.

15         MR. BAENA:  Judge, what exactly are you looking to

16  get?

17         THE COURT:  I'm looking to get everything.

18         MR. BAENA:  Everything.

19         THE COURT:  I want the witness lists, I want the

20  declarations that everyone's going to file, or affidavits.  I

21  want all the expert reports.  I want all of the exhibits

22  premarked for identification. I want all the objections to

23  those exhibits, if there are any.  But, I understand they're

24  coming in stages.

25         MR. RESTIVO:  I guess on that issue, Your Honor, with

1  respect to product ID the factual -- some of the factual

2  evidence we will use will come from the claim files.  What we

3  have attempted to do on the motions for summary judgment is

4  pull out the single page, or the three pages, or the four

5  pages.  And so, if we're going to share with each other full

6  claim files we'll need a moving van to deliver this to your

7  house and so I'm alerting people that.  To the extent we're

8  using something from a claim file we intend only to use that

9  page and list that page as an exhibit because some of these

10 claim files run 1,000 pages, and there's only one page in it

11 that's of any relevance to anyone.  So, we would ask the other

12 side, if you're going to use a claim file just give us a page

13 or two, don't give us all 1,000 pages or we'll never be able to

14 put this together.

15        THE COURT:  I will make that an order.  I only want

16 the relevant pages of anything.  If for trial purposes you need

17 to supplement that you can have whatever you need here in

18 court.  But, for delivery, for whatever you want me to read in

19 preparation for trial I only want the relevant sections.  So,

20 do not submit 1,000 page claim forms.  If you do I won't have a

21 clue what you're asking me to read and I won't read it anyway

22 because I won't have time.

23        MR. RESTIVO:  The only other thing I can think of,

24 Your Honor, is given that we will do ours in one day, and given

25 some looks I'm getting over here, I guess we have the right if

1  we want to put our witness on direct rather than declaration

2  since when we shoot our day it's gone.  If they're going to be

3  putting their witnesses on and get it done.

4          THE COURT:  Well, I think we should get this process

5  worked out, because, frankly, it seems to me that what's good

6  for the goose ought to be good for the gander.  And, I'm not

7  sure it ought to be a different process.  So, you want to use

8  your day and have live witnesses, I guess we'll do it by live

9  witnesses and I won't make anybody do declarations.  And, if

10  you want to, you know, be here --

11          MR. RESTIVO:  We're willing to do it by declaration.

12  I'm a little concerned that behind us the other side comes and

13  then does everyone live by direct, and I -- I just think I'm

14  being disadvantaged in some fashion that way.  So, I will do it

15  whatever way they want to do it.  But, I just want to know what

16  way they want to do it.

17          MR. SPEIGHTS:  I don't want to be prohibited from

18  calling somebody live and having a direct examination.  I might

19  do it both ways.  If that's permitted.  But, if the choice is

20  doing it your way or traditional, I'll do it on traditional.

21          THE COURT:  Are you talking about building owners or

22  experts?

23          MR. SPEIGHTS:  I'm talking about experts.

24          THE COURT:  Okay.  Is there a reason why you want to

25  put an expert live on direct?

1        MR. SPEIGHTS:  Your Honor, I just think that in my

2   experience, and I have to think through this with particular

3   experts, that I can get to the heart of a matter a lot more

4   asking questions, letting them explain, watching you, you know,

5   letting -- I don't put a witness up for a long time.  I believe

6   in letting a witness state the opinion and move from there.  I

7   just think it's, you know, I'm trying to "educate" the Court,

8   the finder of fact, and I think it's much easier to do with a

9   live witness than it is by giving some report there.

10        And, I haven't -- you know, I'm just talking from me.

11  I mean, Ms. Kearse is here but everybody else has gone home.

12  And, I know they have strong feelings, I think Mr. Baena could

13  report that to you based upon the session he had with

14  claimant's attorneys from around the country.

15        THE COURT:  Well, here's the ruling.  The claimants

16  have two days.  You can divide it up however you choose.  If

17  you spend half of your time introducing the curriculum vitae

18  for your experts you're going to waste a whole lot of time.

19  But, I'll hear it.  You can use your two days however you like.

20  But, at the end of the two days you're done.

21        MR. SPEIGHTS:  I understand the ruling, Judge.  I do

22  want to say this for the record.  I hate that expression, for

23  the record.  That when I consolidate it I have no control over

24  these other claimants, --

25        THE COURT:  And, I'm not suggesting that you do.

1 This ruling applies to them, too.

2 　　　　MR. SPEIGHTS:  Well, I understand.  But, we may be

3 rushed to the witness chair to get the witness on first.

4 　　　　THE COURT:  And, I will -- well, I think if that's

5 the case we will do it in the following order.  However the

6 objections appear in the debtor's objection, those people will

7 go first.  And, we'll run them the whole way down the list.

8 　　　　MR. SPEIGHTS:  Could I ask how many PID objections

9 are that will be tried?  I've spent my time on hazard in

10 Canada, so I'm really talking a little bit from a far afield

11 here.

12 　　　　MR. RESTIVO:  My ball park, okay?  Seventy, 80, 90,

13 give or take 20 either way.

14 　　　　MR. CAMERON:  Yeah, I would say 75 to 100 that most

15 of them are Canada, so.

16 　　　　MR. SPEIGHTS:  And, how much of those are Canada?

17 　　　　MR. RESTIVO:  Most of them.

18 　　　　MR. CAMERON:  Most of them.

19 　　　　MR. SPEIGHTS:  Well, I got my -- in Canada, they know

20 I'm calling Dr. Pinchen to the stand.  And, he's going to say

21 it's their product and the issue is the same about, Dr. Pinchen

22 identified it.  And, I would rather him explain why he says he

23 can, you know, look, taste, and smell Monacode.

24 　　　　THE COURT:  Okay.  So, we're talking, what, 80

25 objections?  Eighty Canadian objections, and the rest are --

1          MR. CAMERON:  I think it's something less than 80

2    Canadian, I think it's somewhere between 75 and 100 total, and

3    probably 65 or so, maybe Canada.  Those are -- I don't have the

4    exact number, but.

5          THE COURT:  Well then, if that's the case why don't

6    we simply do it this way and say that all the objections except

7    the Canada objections will go on April 23rd and 24th, and the

8    Canadian objections will go on the 23rd and the 25th?  So, the

9    debtor's case will be the 23rd, the non-Canadian respondents

10   will be the 23rd, and, Mr. Speights, you'll have the 25th.

11         MR. BAENA:  I think that's all of the

12   (indiscernible), Judge, in all due respect.

13         THE COURT:  I'm sorry, I can't hear you, Mr. Baena.

14         MR. BAENA:  I apologize.  I'm afraid to go to the

15   podium because I don't want to overstate the importance of my

16   remarks.  But, this is -- Your Honor, Scott Baena, on behalf of

17   the committee.  We've tried to identify every objection made by

18   the debtor in respect of every claim in an easier format than

19   the 15th Omnibus Objection.  And, on PID as an example, they

20   have one -- they have several categories of objections, for

21   lack of product identification, it's not just, "You didn't

22   prove that that's Grace product," there's a whole litany of

23   things.  One of them, for example, is failure to attach

24   requested documents.  Every California claim is implicated by

25   that 'x', that objection.  Every California claim.  So, you

1  know, I'm just concerned that there isn't going to be an

2  orderly way to approach this when claimants start to fight with

3  one another over the cue here.  I mean, it's --

4         THE COURT:  Well then, I think maybe you're correct.

5  Maybe what I need is the debtor to do a chart that say, "This

6  is the order in which we're going to proceed," and then

7  everybody will know.  And, that way if people don't want to be

8  here for the entire trial, if -- you know, I'm not sure how

9  they're going to avoid it because they won't know exactly when

10 their claims will come up, but nonetheless they'll at least

11 have some clue as to when their claims are next.  So, Mr.

12 Restivo, give me a list of which claims the debtor is going to

13 start with, and the order in which the debtor is going to

14 proceed, and then you're going to be bound by it.

15        MR. RESTIVO:  Well, obviously, we will do that, Your

16 Honor.  We intend, based upon what the Court said previously,

17 to try our whole case on the 23rd.  That means we will put on

18 our evidence on all of the product identification objections

19 throughout the course of that day.  We can give you and the

20 parties the order in which we're going to do that but we are

21 going to put them all -- Canada, Louisiana, California,

22 wherever they are we'll go through them group by group,

23 category by category.  And, Mr. Baena said we have a bunch of

24 categories, I think we have three categories or four, but we

25 will tell the Court and the parties what our order's going to

1  be and we will get done with it on the 23rd.  And then, if

2  Canada wants to take the next day and the rest of the next day,

3  or vice-versa, just someone should let us know so we can get

4  ready to cross --

5           THE COURT:  Well, no.  I am going to have the

6  claimants respond in the order in which you are going to file

7  -- or, which you are prosecuting the claims.  That's the order

8  in which we're going to proceed.  So, you know, if you say that

9  the -- I don't know what are the names of the buildings.

10          MR. RESTIVO:  I understand.

11          THE COURT:  So, I'll just, you know, make up a name.

12  We're going to take the DelMonte building first, then

13  DelMonte's going to be the first person to cross examine, and

14  the first person to put on witnesses.

15          MR. RESTIVO:  We can do that, Your Honor.

16          THE COURT:  And, we're going to do an order that the

17  debtor's going to serve on everybody, all product ID

18  defendants.  That's what I mean by everybody.  That will

19  articulate this list.

20          MR. BAENA:  But, Judge, in your example, when does

21  DelMonte put on its evidence?  The next day?

22          THE COURT:  Yes, the very next day.

23          MR. BAENA:  So, they get to cross examine his witness

24  first, while the witness is on the stand?

25          THE COURT:  Yes.  Yes.

1           MR. BAENA:  On day one?

2           THE COURT:  Yes.

3           MR. BAENA:  And then, we hear 200 other objections or

4  testimony in respect of 200 other objections, and then 200

5  witnesses later DelMonte gets to come and put on its evidence

6  and spend the first hour reminding you about what their

7  witnesses said?

8           MR. RESTIVO:  You've seen our witness list, Mr.

9  Baena, we don't have 200.  My guess is we don't have double

10  figures, and so that's not going to be a problem at least in

11  terms of our case.  We haven't listed 200 witnesses, not going

12  to have that.

13          MR. BAENA:  Look, I'm not looking to shape the size

14  of this table, --

15          THE COURT:  I mean, it's multiple defendants.  I

16  mean, I've tried multiple defendant cases, I don't understand

17  what the issue is that you can't -- the multiple defendant

18  cases have to go in one of two ways, either you do the whole

19  defendant at a time or else, you know, the evidence goes in

20  according to multiple defendants.  And, generally speaking, the

21  defendants stand up and they each cross examine according to

22  their cross examinations and then they put on whatever

23  witnesses in series they choose to put on.  I mean, it's just a

24  trial.  I'm not too troubled by it, Mr. Baena.

25          MR. BAENA:  No, I understand you're not, Judge, and

1  I'm happy about that.

2           THE COURT:  Okay.

3           MR. BAENA:  I am.  I just, Mr. Speights referred to

4  the conversation I had with claimants, and indeed I did have

5  that conversation, and many of them professed their desire to

6  try this like we customarily try objections, which is in

7  seriatim.

8           THE COURT:  Tell them they need some criminal trial

9  experience, Mr. Baena, they'll love it when they're done.

10          MR. BAENA:  Well, yeah, but every witness is now

11 painted with -- every claimant is painted with testimony in

12 respect of every other claimant?

13          THE COURT:  Painted?

14          MR. BAENA:  Painted.  Painted.

15          THE COURT:  Oh, painted.

16          MR. BAENA:  Painted.  Painted.  Yes, painted.

17          THE COURT:  I think I can separate out --

18          MR. BAENA:  I mean, to compartmentalize testimony

19 from a witness that covers 200 claims objections is quite a

20 challenge.

21          THE COURT:  Well, first of all, I think except for

22 Mr. Speights Canadian claims there are 15 or 16, so, you know,

23 if the defendants want to make a better proposition I'm

24 certainly willing to hear it.  Today was the day for it.

25 Except for three of them, or four, that I see here in court at

1  the moment, nobody else seems too troubled by it.  So, ladies

2  and gentlemen, you have a better proposition I'm willing to

3  hear you.

4          MR. RESTIVO:  Our last suggestion, --

5          THE COURT:  Mr. Restivo, that was directed to them,

6  not to you.  They're on the other side.  Mona, if you need to

7  leave, go ahead and go, it's fine.

8          MS. KANG:  Your Honor, can I speak briefly?

9  Christina Kang with Hahn & Hessen, counsel for claimants State

10  of California.  Maybe I'm the only one in this room that's a

11  little confused about what's going to happen the 23rd, 24th,

12  and the 25th.  So, if the Court can reiterate as to what

13  procedures are going to be followed on those three dates to

14  clarify for the record I would appreciate it.

15          THE COURT:  I think we're still trying to work that

16  out.  So far we've got the following.  The debtor is going to

17  put its case in chief on on April 23rd, and as of now that's as

18  far as we've gone.  The rest of it is still open to discussion.

19          MR. RESTIVO:  Sounds good to us, Your Honor.

20          MS. KEARSE:  Your Honor, it may --

21          THE COURT:  You need to use the microphone, Ms.

22  Kearse, we can't hear you back there.

23          MS. KEARSE:  It may be an issue, and we know how

24  they're going to present it that we're responding to, because I

25  look at their exhibit -- their expert witness list and it's

1 really not that many, it's seven, nine witnesses.  And, I think

2 out of those, for PID it's three or four.  I have a motion

3 pending for Dr. Lee's testimony on my claimants there, so I

4 don't know what Mr. Santani or Mr. Egan are really going to

5 say, on that, and it may just depend on what they're going to

6 do.  So, if we get something ahead.  And, it's kind of hard to

7 talk in the abstract about it, but I don't think it's that many

8 witnesses on their part.  I do think that the time between the

9 presentations, it may have to be you're going to have a

10 checklist on how you're going to figure or remember each one of

11 when we respond, and to how we're going to do it there.  But,

12 it may just be as we go forward we have a little bit of a

13 learning curve as we --

14        THE COURT:  I think that's what transcripts are for,

15 Ms. Kearse, and you know I think we'll probably be taking a

16 look at a lot of transcripts.

17        MR. SPEIGHTS:  I don't think I need to say this, but

18 again, for the record, I don't have a better idea of shuffling

19 the cards for the three days.  I really don't.  I may not know

20 enough to come up with a better idea.  You know, I just state

21 for the record, and I'm on this train and I'm going down the

22 train with Your Honor, that the better idea you ask would be if

23 we get through the summary judgment motions and estimate all

24 the claims, and I know Your Honor's decided against that, but I

25 can't leave that open on the record without my saying that

1  again.  Thank you, Your Honor.

2          THE COURT:  Okay.  The debtor has April 23rd.  This

3  is what I need from the debtor and I need a date by which all

4  of this is going to happen.  So, let's articulate what first

5  and then a date.  I need a list from the debtor of the order in

6  which the debtor is going to pursue the objections to the

7  claims.  So, after your case in chief is in with respect to the

8  global issues, what defendants, and in what order are you going

9  to go against?  So, that the defendants in turn will know when

10  their turn is.  And, I will take them in order.  Okay.  Then, I

11  need a binder with all of the witness lists, declarations from

12  the debtor, and affidavits from the debtor, and everyone's

13  expert reports.  I understand the expert reports will not be

14  the evidence.  I assume that all of you will nonetheless be

15  using those expert reports.  Does anyone at least present have

16  any objection to my reading them so I can get familiar with the

17  issues?  To the extent that you have an objection to them I

18  will not consider them if the expert reports are not admitted

19  or if the testimony is stricken or whatever.  But, I would like

20  to get familiar with what you folks are already up to speed

21  with, which is what are the problems with the buildings, which

22  is something at the moment I don't know.

23          MR. RESTIVO:  No, we have no objection to the Court

24  reading any of the expert reports.  I think most of them or all

25  of them have been filed already.  The Court will have to dig

through to separate product ID from statute of limitations
because they haven't been filed in any nice order, but we have
no objection.

MR. SPEIGHTS:  I have no objection to Your Honor
reading the PID reports, which is what's coming up.  I just
haven't addressed, and I'd like to think about it before we go
through hazard reports and statute of limitations reports, but
I understand you're just talking about PID reports.

THE COURT:  I'm only talking about product ID.  I'm
talking about having the debtor put a binder together with the
relevant reports.

MR. SPEIGHTS:  No problem.  No problem with that.
Because hazard presents a whole different issue, and to some
extent statute of limitations.

MR. CAMERON:  One clarification, Your Honor.  In
terms of expert reports that the claimants have submitted, is
the debtor obligated to put those together also?

THE COURT:  I'm asking the debtor to do a binder for
me like the debtor normally does a binder.

MR. CAMERON:  Okay.

THE COURT:  Yes.  I want everything --

MR. CAMERON:  I would like -- there is some issue in
terms of at least one of their experts in terms of what the
actual expert report is, because they've just referred us back
to the claim file which is thousands of pages.  So, I would ask

1  that for me to put in the binder the Pinchen expert reports,

2  and I need to know which documents comprise his reports.

3           THE COURT:  Okay.  Mr. Speights.

4           MR. CAMERON:  I was talking to Bud.  And, if we get

5  that, Your Honor, --

6           THE COURT:  Mr. Speights, you have to get that to the

7  debtor because otherwise nothing will come in and I won't see

8  it.

9           MR. SPEIGHTS:  And, we are talking about this Friday,

10  though, right?

11           MR. CAMERON:  Yes.

12           THE COURT:  All right.  And, all exhibits premarked

13  for identification.  And, that's all due Saturday right to my

14  house.  Now, objections to the exhibits, including objections

15  to the affidavits and the declarations.  I think that's the way

16  to do it, you can just articulate them in a pleading that you

17  file, are due Tuesday at noon.  Which would be the 17th.  So

18  that, they can be added to the binder supplements and delivered

19  here to Chambers on Wednesday by 3 p.m., Wednesday the 18th by

20  3 p.m.

21           MR. CAMERON:  Noon is when they are obligated to get

22  to us, is that the --

23           THE COURT:  On Tuesday.

24           MR. CAMERON:  Yeah.  Got it.  Three o'clock Wednesday

25  afternoon, the 18th?

1          THE COURT:  Yes.  All right, so I have the debtor

2   doing a list of the order in which the trial is going to

3   proceed.  I have a binder that will be coming that will have

4   all of the witness lists, all the declarations and affidavits,

5   all the expert reports, and all the exhibits premarked for

6   identification, with all of the objections to exhibits and

7   declarations to be supplemented.  Everything is to be exchanged

8   when it's due on April 13th, with the objections due April 17th

9   at noon, and the final binder is then delivered April 18th by

10  3.  Is there anything else anybody needs in terms of the

11  documentation before the trial actually starts?

12          Okay.  Now, with respect to the trial process.  The

13  debtor's case in chief to conclude by 5 p.m. on April 23rd.

14  Mr. Restivo, if you find in trial preparation that you're going

15  to use substantially less time than that by even an hour or so,

16  let the next let's say two people on your list know so that

17  they can be here and prepared with witnesses.  I do not want to

18  waste trial time.  We have only three days, I want to get

19  through it if we can.

20          MR. RESTIVO:  Yes, Your Honor.

21          THE COURT:  Then the claimants to start in the order

22  listed in the debtor's trial list on April 24 and continuing

23  onto April 25.  Now, do we need a -- I'm sorry, Mr. Baena?

24          MR. BAENA:  There's just a little bit of an internal

25  inconsistency, Judge.  You gave the pro se claimants 30 days to

1 produce additional information.  Are they out of this trial?

2 Or, do they have 30 days to produce the information and lose on

3 the 23rd?

4         MR. RESTIVO:  They're out of the trial, Your Honor.

5         THE COURT:  Yes, I --

6         MR. BAENA:  They're out.  Okay.

7         THE COURT:  I can't do their trial now, and to the

8 extent that they do produce some additional information we'll

9 have to work out a schedule, Mr. Baena.

10         MR. BAENA:  Okay.  And, there was trial briefing as

11 well, we left out.

12         THE COURT:  Was due on the 13th.

13         MR. RESTIVO:  Thirteenth.

14         MR. BAENA:  Thirteenth.  Is it still due the 13th?

15         THE COURT:  Yes.  That's the same day as the

16 declarations, the exhibits, and the witness lists, and

17 everything else.  All the other documentation is due that day,

18 except the objections to exhibits and declaration.  Anyone from

19 the objecting -- I'm sorry, anyone from the claimant's side who

20 wishes to proceed by way of any witness on a declaration, I

21 need a date by which you're going to file that declaration.

22 When can you do that?  I assume you might want to see the

23 debtors first?  Can you do it by April 17th at noon?  I know

24 that pushes.  But, otherwise if I don't have it by the 18th I

25 won't have a chance to see it.  That's what I'm aiming for.

1          MS. KEARSE:  I can address.  Your Honor, are we going

2    to get -- I know they're getting everything to you on the 13th,

3    is there going to be a way where we get it?

4          THE COURT:  Yes.

5          MS. KEARSE:  If we get it that night, or FedEx, or

6    however, there --

7          MR. CAMERON:  As I understand it, we have to provide

8    it by the 13th to each other, and then we have to provide it to

9    the Judge at her home by the 14th.

10          THE COURT:  Right.

11          MR. CAMERON:  That's the procedure.

12          THE COURT:  That's right.

13          MS. KEARSE:  Okay.

14          THE COURT:  So, any declarations or affidavits that

15    the claimants wish to use for your case in chief by the 17th at

16    noon?  Okay.  The debtors may be willing to accept them late,

17    the only issue is whether I'll have a chance to read them.

18    That's the issue.  All right, what else do you need by way of

19    information to get this process set up?

20          MR. RESTIVO:  It sounds like, Your Honor, we're all

21    going to be pretty busy.  The debtor would suggest that the

22    other items on the existing case management order all be moved

23    two weeks because we've now moved the statute of limitations

24    side of this two weeks or at least two weeks, and so everyone

25    ought to be focusing on what the Court just gave us to do

1 rather than filing other papers for statute of limitations,

2 which we're now not going to have on April 23, 25.

3        THE COURT:  That's fine.  That makes good sense.  In

4 fact, I think it may even make sense to just address that issue

5 on April 25th.  I'm really not sure at this point we're going

6 to be finished on April 25th.  I know you're all a little more

7 hopeful than I am, but I haven't seen the paperwork yet.

8        MR. BAENA:  Is an order going to be issued to this

9 effect?

10        THE COURT:  Yes.

11        MR. BAENA:  And, will it be served this week?

12        THE COURT:  I'm hoping that the debtor's going to do

13 this order tomorrow and get it to me tomorrow so that I can

14 sign it and have the debtor serve it tomorrow.

15        MR. BAENA:  Yeah.  Well, we'd like to avert people

16 doing just what you said we don't need to do a moment ago.

17 And, we got to get notice out to them.  That's all.

18        MR. RESTIVO:  Yes.  We will do that.

19        THE COURT:  Okay.  Can you contact Ms. Baker, please,

20 when it's ready tomorrow?

21        MR. RESTIVO:  Yes.

22        THE COURT:  So, that we know that it's filed.

23        MR. RESTIVO:  Yes.

24        THE COURT:  All right.  So, we'll expect it tomorrow.

25 Mr. Baena, I'm not sure, I think you may have made service on

1  some, or assisted the debtor.  I apologize, I'm not really sure

2  who made the service on some of the individual claimants?

3          MR. BAENA:  Did we?

4          MR. SAKAW:  Your Honor, Lisa Esayin and I worked out

5  a list of the remaining claimants.  That's been pared down a

6  little bit since then and I think there is a good working list

7  of contact information for all the claimants.  The debtors have

8  been contacting a number of them by e-mail and I think there is

9  facts are at least home addresses for the remaining claimants.

10 Some of the pro se claimants.

11         MS. ESAYIN:  Yeah, I believe, Your Honor, that our

12 mailing list has everyone's addresses on it.  And, that when we

13 do a mailing, I don't believe I know, we serve all the

14 individuals as well.

15         THE COURT:  Okay.  So, the debtor can then serve this

16 order and I can be sure that everyone who needs to get the

17 notice of this order will get it?

18         MS. ESAYIN:  We can do just a courtesy e-mail to

19 everyone for whom we have e-mail, that gets it out to them

20 promptly.  And then, we can do a FedEx to anyone that we

21 haven't reached that way.

22         THE COURT:  All right.  Okay.

23         MR. SAKAW:  And, since the pro se claimants, Your

24 Honor, are not going to go forward, I think that'll help the

25 situation.

1          THE COURT:  Well, several of the pro se claimants.  I

2    don't know if that's all of them.

3          MS. SAKAW:  All the ones subject to the product ID

4    objection.

5          THE COURT:  Right.  Okay, folks, what else do we

6    need?  Do we need a status conference between now and the 23rd

7    or are we okay?

8          MR. BAENA:  We have omnibuses on the --

9          THE COURT:  Thirteenth?  Oh, May -- no, don't we have

10   a hearing on the 13th?

11         MR. SAKAW:  There is a PI hearing I believe, Your

12   Honor, on the 13th.

13         THE COURT:  On the 11th.  I don't have anything --

14   oh, I do.  There is something scheduled at 1:30 on the 11th.

15         MR. SAKAW:  That's the PI matter, Your Honor, I

16   believe.

17         THE COURT:  PI matter.  Okay.  Do you need a status

18   conference between now and the 23rd?  If so, it has to be later

19   this week.

20         MR. RESTIVO:  No, Your Honor.  Debtors do not need

21   one, Your Honor.

22         MR. SPEIGHTS:  Well, I don't think we need one before

23   all the paper is exchanged.  I don't know about the end of the

24   week before.  I don't know, are you going -- I know you're

25   leaving that Wednesday, are you going to be gone Thursday and

1 Friday as well?  And, I'm not saying we do need one but there

2 may be some issue to take up.  But, I think it's a day or two

3 before the hearing and not any time in the next few days if we

4 do need it.

5        THE COURT:  I am going to be gone on Thursday and

6 Friday, but I can probably make arrangements to call in.  I

7 would have to be on a cell phone on Thursday some time.  If we

8 can arrange a court call.  Whether I can get a call recorded or

9 not, I don't know.  If it's a status conference that's simply

10 going to address issues and we don't have to have a record

11 made, I can do that for sure.  If we have to have a record.

12 Will you be in Thursday?  Call from there.  Okay.  Then I can

13 get a record made.  It's just that I will not be here.

14        MR. SPEIGHTS:  I don't know that anybody will need

15 it, but I think it would be good in the order to put if anybody

16 wants to request a status conference under the Court, to advise

17 you.  But, I really don't know until that paper is delivered on

18 me that Friday night the 13th at midnight.

19        THE COURT:  Why don't I set up a conference call.

20 Why don't we say at 10 o'clock eastern time on April 19th.

21 But, that will be subject to being canceled on notice by the

22 debtor because that's how I'm going to have to do it, I won't

23 be here to issue the notice.  So, this is how it will work.

24 The conference call will go forward unless somebody notifies --

25 well, I'm trying to do it on a negative notice without my being

1  involved and it's not going to work that way.

2          MR. BAENA:  Judge, we're probably just better to have

3  the call and hang up if there's nothing to talk about.

4          THE COURT:  Well, --

5          MR. BAENA:  To try to track everybody down and --

6          THE COURT:  All right.  We'll set up a conference

7  call on April 19th at 10 o'clock eastern and see what happens.

8  Okay?  What else?

9          MR. RESTIVO:  That's all the debtor has, Your Honor.

10          THE COURT:  Third time's a charm, Mr. Restivo, we'll

11  see.  Okay, we're adjourned.  Thank you.

12          MR. RESTIVO:  Thank you, Your Honor.

13                          * * * * *

14              C E R T I F I C A T I O N

15

16          I, Marlene A. Fattore, certify that the foregoing is

17  a correct transcript from the official electronic sound

18  recording of the proceedings in the above-entitled matter, and

19  to the best of my ability.

20

21  /s/ Tammy DeRisi                    Date:   April 18, 2007

22  TAMMY DERISI

23  /s/ Marlene A. Fattore

24  MARLENE A. FATTORE

25  J&J COURT TRANSCRIBERS, INC.