UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

IN RE:                     .    Case No.  01-1139 (JKF)
                           .
                           .
W.R. GRACE & CO.,          .    USX Tower - 54th Floor
et al.,                    .    600 Grant Street
                           .    Pittsburgh, PA 15219
            Debtors.  .
                           .    April 13, 2007
. . . . . . . . . . . . ..      9:16 a.m.


TRANSCRIPT OF HEARING
BEFORE HONORABLE JUDITH K. FITZGERALD
UNITED STATES BANKRUPTCY COURT JUDGE


APPEARANCES:

For the Debtors:            Kirkland & Ellis LLP
                           By:  DAVID M. BERNICK, ESQ.
                                JANET S. BAER, ESQ.
                           200 East Randolph Drive
                           Chicago, IL  60601

                           Kirkland & Ellis LLP
                           By:  AMANDA C. BASTA, ESQ.
                           655 Fifteenth Street, N.W.
                           Washington, DC  20005-5793

For the Official           Caplin & Drysdale
Committee of Asbestos      By:  NATHAN D. FINCH, ESQ.
Personal Injury            One Thomas Circle, N.W.
Claimants:                 Washington, DC  20005

Audio Operator:            Cathy Younker


Proceedings recorded by electronic sound recording, transcript
produced by transcription service

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@optonline.net**

**(609) 586-2311    Fax No. (609) 587-3599**

APPEARANCES (CONT'D):

For Various Firms:              Stutzman, Bromberg, Esserman
                                 & Plifka
                                By:  SANDER L. ESSERMAN, ESQ.
                                2323 Bryan Street, Suite 2200
                                Dallas, TX  75201


For the MMWR Firms:             Montgomery, McCracken, Walker
                                 & Rhoads, LLP
                                By:  NATALIE D. RAMSEY, ESQ.
                                123 South Broad Street
                                Philadelphia, PA  19109


For Motley Rice:                Motley Rice
                                By:  JOHN HERRICK, ESQ.
                                28 Bridgeside Boulevard
                                Mount Pleasant, SC  29464


For the FCR:                    Orrick, Herrington, &
                                 Sutcliffe, LLP
                                By:  RAYMOND MULLADY, ESQ.
                                Washington Harbour
                                3050 K Street, N.W.
                                Washington, DC  20007


TELEPHONIC APPEARANCES:

For Anderson Hospital:          Speights & Runyan
                                By:  DANIEL SPEIGHTS, ESQ.
                                200 Jackson Avenue, East
                                Hampton, SC  29924


For Libby Claimants:            Cohn Whitesell & Goldberg, LLP
                                By:  DANIEL C. COHN, ESQ.
                                     CHRISTOPHER M. CANDON, ESQ.
                                101 Arch Street
                                Boston, MA  02110


For Murray Capital              Murray Capital Management, Inc.
Management, Inc.:               By:  Marti Murray


For Latigo Partners:            Latigo Partners
                                By:  Stephen Blauner


For Fireman's Fund              Stevens & Lee, P.C.
Insurance Co.:                  By:  DAVID R. BEANE, ESQ.
                                111 North Sixth Street
                                P.O. Box 679
                                Reading, PA  19603

TELEPHONIC APPEARANCES (CONT'D):

For Fireman's Fund              Stevens & Lee, P.C.
Insurance Co.:                  By:  JOHN D. DEMMY, ESQ.
                                1105 North Market Street, 7th Fl.
                                Wilmington, DE  19801

For the FCR:                    Piper Jaffray & Co.
                                By:  JASON SOLGANICK, ESQ.
                                800 Nicollet Mall, Suite 800
                                Minneapolis, MN  55402-7020

                                Orrick, Herrington &
                                 Sutcliffe, LLP
                                By:  DEBRA FELDER, ESQ.
                                3050 K Street, N.W.
                                Washington, DC  20007

                                Phillips, Goldman & Spence, P.A.
                                By:  JOHN C. PHILLIPS, JR.
                                1200 N. Broom Street
                                Wilmington, DE  19806-4204

For Everest Reinsurance         Crowell & Moring, LLP
Company & McKinley              By:  MARK PLEVIN, ESQ.
Insurance Company:                   LESLIE A. EPLEY, ESQ.
                                1001 Pennsylvania Avenue, N.W.
                                Washington, DC  20004-2595

                                Marks, O'Neill, O'Brien
                                 & Courtney, P.C.
                                By:  BRIAN L. KASPRZAK, ESQ.
                                     MICHAEL J. JOYCE, ESQ.
                                913 N. Market Street, Suite 800
                                Wilmington, DE  19801

For Owens Illinois:             McCarter & English, LLP
                                By:  KATHARINE L. MAYER, ESQ.
                                919 North Market Street, 18th Fl.
                                Wilmington, DE  19801

For the Ad Hoc                  Weil, Gotshal & Manges LLP
Committee of Equity             By:  DAVID A. HICKERSON, ESQ.
Security Holders:                    JARRAD WRIGHT, ESQ.
                                1300 Eye Street, NW, Suite 900
                                Washington, D.C.  20005

Shareholder for W.R.            Tocqueville Asset Management
Grace & Co.:                    By:  PETER SHAWN


**J&J COURT TRANSCRIBERS, INC.**

TELEPHONIC APPEARANCES (CONT'D):

For Asbestos Property                Scott Law Group
Damage Claimants:                    By:  DARRELL SCOTT, ESQ.
                                     926 W. Sprague Avenue
                                     Spokane, WA  99201-4064

For the PD Committee:                Ferry, Joseph & Pearce, P.A.
                                     By:  THEODORE J. TACCONELLI, ESQ.
                                     824 Market Street, Suite 904
                                     Wilmington, DE  19899

For Federal Insurance Co.:           Cozen O'Connor
                                     By:  JACOB C. COHN, ESQ.
                                          DAVID J. LIEBMAN, ESQ.
                                     1900 Market Street
                                     Philadelphia, PA  19103

For U.S. Trustee's Office:           U.S. Trustee Department
                                     By:  RICHARD SCHEPACARTER, ESQ.
                                     844 King Street, Suite 2207
                                     Wilmington, DE  19801

For Dow Jones News:                  PEG BRICKLEY

For Bank of New York:                ANDREW HAIN

For London Market                    Mendes & Mount, LLP
Insurers:                            By:  ALEXANDER MUELLER, ESQ.
                                     750 Seventh Avenue
                                     New York, NY  10019-6829

For the Debtors:                     Kirkland & Ellis LLP
                                     By:  SALVATORE BIANCA, ESQ.
                                          MICHAEL DIERKES, ESQ.
                                          LISA ESAYIAN, ESQ.
                                          SAM BLATNICK, ESQ.
                                     200 East Randolph Drive
                                     Chicago, IL  60601

                                     Kirkland & Ellis LLP
                                     By:  DAVID E. MENDELSON, ESQ.
                                     655 Fifteenth Street, N.W.
                                     Washington, DC  20005-5793

                                     Kirkland & Ellis LLP
                                     By:  THEODORE L. FREEDMAN, ESQ.
                                     153 East 53rd Street
                                     New York, NY  10022-4611

**J&J COURT TRANSCRIBERS, INC.**

TELEPHONIC APPEARANCES (CONT'D):

For Various Claimant Firms:    Stutzman, Bromberg, Esserman
     & Plifka
    By:  DAVID A. KLINGLER, ESQ.
        DAVID J. PARSONS, ESQ.
        VAN J. HOOKER, ESQ.
    2323 Bryan Street, Suite 2200
    Dallas, TX  75201

For Baron & Budd, et al.:    Hogan Firm Attorneys at Law
    By:  DANIEL HOGAN, ESQ.
    1311 Delaware Avenue
    Wilmington, DE  19806

For CNA:    Goodwin Procter LLP
    By:  DANIEL M. GLOSBAND, ESQ.
    Exchange Place
    Boston, MA  02109-2881

For Official Committee    Stroock & Stroock & Lavan, LLP
of Unsecured Creditors:    By:  ARLENE G. KRIEGER, ESQ.
        LEWIS KRUGER, ESQ.
    180 Maiden Lane
    New York, NY  10038-4982

    Duane Morris, LLP
    By:  MICHAEL R. LASTOWSKI, ESQ.
    1100 N. Market Street, Suite 1200
    Wilmington, DE  19801-1246

Interested Party:    KENNETH THOMAS

For Asbestos Property    Bilzin, Sumberg, Baena, Price
Damage Claimants:     & Axelrod LLP
    By:  MATTHEW KRAMER, ESQ.
    200 S. Biscayne Blvd, Suite 2500
    Miami, FL  33131

Interested Party:    IRWIN H. ZANDMAN

For the MMWR Firms:    Montgomery, McCracken, Walker
     & Rhoads, LLP
    By:  NOEL C. BURNHAM, ESQ.
    123 South Broad Street
    Philadelphia, PA  19109

**J&J COURT TRANSCRIBERS, INC.**

TELEPHONIC APPEARANCES (CONT'D):

Citadel Investment Group:        BEAU HARBOUR

For the Official Committee        Campbell & Levine, LLC
of Asbestos Claimants:            By:  MARLA ESKIN, ESQ.
                                  800 N. King Street, Suite 300
                                  Wilmington, DE  19801

Halcyon Asset Management:        OSCAR MOCKRIDGE

For Allstate Insurance Co.:      Cuyler Burk, LLP
                                  By:  ANDREW CRAIG, ESQ.
                                  Parsippany Corporate Center
                                  Four Century Drive
                                  Parsippany, NJ  07054-4663

1          THE CLERK:  All rise.

2          THE COURT:  Please be seated.

3          This is the matter of W.R. Grace, Bankruptcy Number

4  01-1139, pending in the District of Delaware.  This is the time

5  set for argument on several discovery matters related to the

6  personal injury estimation proceedings.

7          Parties I have appearing by telephone are Daniel

8  Cohn, John Demmy, Mari Murray, Christopher Candon, Stephen

9  Blauner, David Beane, Jason Solganick, excuse me, Michael

10  Joyce, Mark Plevin, Leslie Epley, Katharine Mayer, David

11  Hickerson, Peter Shawn, Darrell Scott, Ted Tacconelli, Jacob

12  Cohn, David Liebman, Richard Schepacarter, Peg Brickley, Andrew

13  Hain, Alex Mueller, Salvatore Biance, David Mendelson, Lisa

14  Esayian, Ted Freedman, David Klinger, David Parsons, Oscar

15  Mockridge, Andrew Craig, Debra Felder, Raymond Mullady, Daniel

16  Hogan, Daniel Glosband, Janet Baer, Amanda Basta, Sam Blatnick,

17  Arlene Krieger, Sander Esserman, Van Hooker, Kenneth Thomas,

18  Matthew Kramer, Irwin Zandman, John Phillips, Lewis Kruger,

19  Michael Lastowski, Brian Kasprzak, Noel Burnham, Natalie

20  Ramsey, Beau Harbour, Jarrad Wright, and Marla Eskin.

21          And I see some of you in the courtroom, so I'll take

22  entries in court, please.

23          MR. BERNICK:  Good morning, Your Honor.  It's David

24  Bernick for Grace.

25          MS. BASTA:  Good morning, Your Honor.  Amanda Basta

**J&J COURT TRANSCRIBERS, INC.**

1 for Grace.

2         MR. FINCH:  Good morning, Your Honor.  Nathan Finch

3 for the official committee of asbestos personal injury

4 claimants, and I'm informed that Raymond Mullady, counsel for

5 the futures rep, is on his way to the courtroom.  So he'll be

6 here as well.

7         THE COURT:  Oh.  Excuse me one second.

8      (Pause.)

9         THE COURT:  Do we need to wait for Mr. Mullady?  At

10 least can I --

11         MR. FINCH:  No, Your Honor.  He said to -- that we do

12 not need to wait for him.

13         THE COURT:  Okay.  Thank you.

14         MR. ESSERMAN:  Good morning, Your Honor.  Sander L.

15 Esserman in the courtroom for various firms.

16         MR. HERRICK:  Good morning, Your Honor.  My name is

17 John Herrick.  I'm with Motley Rice and I -- though it's hard

18 to tell, I suppose I'm appearing on behalf of certain claimants

19 that I represent.

20         MS. RAMSEY:  Good morning, Your Honor.  Natalie

21 Ramsey on behalf of the group of law firms known in the case as

22 the MMWR firms.

23         THE COURT:  Ms. Baer?

24         MS. BAER:  Good morning, Your Honor.  Janet Baer on

25 behalf of the debtor.

1          THE COURT:  Mr. Bernick?

2          MR. BERNICK:  Yes.  Thank you, Your Honor.

3          MR. SPEIGHTS:  Excuse me, Mr. Bernick.

4          Your Honor, this is Dan Speights.  You had set a

5  matter of mine down on this agenda and the Bilzin firm has

6  patched me in because it was after court call when I got -- to

7  reserve court call when I got that information.

8          THE COURT:  All right, Mr. Speights.  Thank you.

9          MR. SPEIGHTS:  Thank you, Your Honor.

10     (Pause/counsel confer.)

11          MR. BERNICK:  Your Honor, there are three matters

12  that relate to the ongoing saga of the consultant's privilege

13  as it's been asserted with respect to certain B reads that have

14  taken place.  I know Your Honor's very familiar with the

15  history.  The first three matters relate to the assertion of

16  consultant's privilege, and I think it probably just makes

17  sense to take them in the order in which they appear on the

18  agenda.

19          Essentially, the first one arises out of a notice of

20  appeal that's been filed by three different law firms, all of

21  which -- all of whom are affiliated with one another.  That's

22  the Baron & Budd firm, the Silber Pearlman firm, and the

23  LeBlanc & Waddell firm.  They're all affiliated and they filed

24  a notice of appeal with respect to Your Honor's orders on the B

25  reads.  And the first item on the agenda is a motion by those

1  firms to extend the time for their appeal because under

2  application the rules the appeal otherwise would not be timely.

3  That's the first issue.

4          The second issue is a related motion filed by the

5  same firms to stay compliance with the orders from which they

6  seek to appeal, pending the outcome of the appeal.  And again,

7  that is only that firm or that set of three firms.  Nobody else

8  is involved in that item as well.

9          The third item on the agenda implicates the -- really

10 all of the folks who have clients as to whom they're asserting

11 that same consultant's privilege, and the matter is where we

12 stand on compliance with the Court's orders, and that's a more

13 substantial matter relates to a variety of different firms.

14 That's the third item on the agenda and I think it just makes

15 sense to -- that's really pursuant to our motion to compel

16 compliance.

17         There's then the database matter, which is a report

18 to the Court that we committed to last time to let the Court

19 know where we are with respect to coding additional information

20 to the Rust database.

21         And then finally, I suppose, I wasn't aware of it,

22 but there's now this property damage matter that I think we'll

23 be able to take up last.  My hope is that Ms. Esayian from our

24 firm will be able to participate by phone, because I certainly

25 do not have any idea of what that particular matter is right

1  now.

2          So I guess it's really the motion first of all on

3  item one by the three firms, and I see that Mr. Rich is here,

4  although I don't know if Mr. Esserman is going to argue it.

5          THE COURT:  Okay.  Well, with -- can I just ask first

6  with respect to the property damage matter, is that going to

7  take the least amount of time?  Because if so, and Mr. Speights

8  can then go about his business.  Maybe we should just --

9          MR. BERNICK:  The problem is that Ms. Esayian needs

10 to get on the phone.  I don't know if she's --

11          THE COURT:  Oh.

12          MR. BERNICK:  -- on at this time.

13          THE COURT:  Ms. --

14          MR. BERNICK:  Are you --

15          THE COURT:  Ms. Esayian, are you on the phone yet?

16     (No audible response.)

17          MR. BERNICK:  Can we try to find out where --

18          THE COURT:  Probably not.  Okay.

19          MR. BERNICK:  We'll try to find out where she is and

20 if she can get on --

21          THE COURT:  All right.

22          MR. BERNICK:  -- more quickly.

23          THE COURT:  Mr. Speights, when we can locate Ms.

24 Esayian, we'll -- I'll take your matter so that we can release

25 you.  I think yours probably will not be as timely, but I'm

1  going to proceed through the rest of the agenda till we can

2  locate her.

3          MR. SPEIGHTS:  Thank you --

4          THE COURT:  Okay.

5          MR. SPEIGHTS:  -- Your Honor.  I really appreciate

6  that.  As you know, I have a few deadlines today.

7          THE COURT:  Yes, sir.

8          MR. SPEIGHTS:  So --

9          THE COURT:  Mr. --

10          MR. SPEIGHTS:  -- I appreciate you thinking of me and

11  I'll be right here whenever Ms. Esayian shows up.

12          THE COURT:  All right.

13          Mr. Esserman?

14          MR. ESSERMAN:  Thank you, Your Honor.  Sandy Esserman

15  for the Baron & Budd, Silber Pearlman, and LeBlanc Waddell

16  (sic) firms.  As Your Honor knows, we represent several firms

17  in connection with the W.R. Grace matter.  Three of the law

18  firms decided to appeal the Court's order -- final order in

19  determination of the consulting expert privilege order that was

20  entered on March 6th.  Baron & Budd, Silber Pearlman, and

21  LeBlanc & Waddell are all affiliated law firms, intertwined

22  ownership, and the common partners in each of the law firms are

23  predominant.

24          During this period of time, there was a very well-

25  publicized layoff of about 160 people at the three law firms

13

1  that caused a gap in communication within the law firm, and the

2  affidavit that we filed sets forth the fact that instructions

3  to file a notice of appeal were not given on a timely basis and

4  we missed or the law firms missed the deadline to appeal by one

5  day.  The deadline to file the notice of appeal was midnight on

6  Friday.  The -- by the time notice was given, it was Sunday

7  evening and the notice was in fact filed on Monday.

8        We proceeded as if the appeal was timely filed.

9  However, we do need an extension, which is considered under the

10  rules for excusable neglect.  The question here is whether or

11  not there's excusable neglect.  I think that it's safe to say

12  that the case law gives the Court a fairly wide swath on this.

13  Certainly, the cases provide that office chaos and office

14  confusion, disruption can be a source of that of excusable

15  neglect and that's clearly what we think happened here.

16        Mr. Rich is certainly in the courtroom.  I do not

17  anticipate putting him on the stand or anything, but he is in

18  the courtroom and certainly can address any specifics of this.

19  But suffice it to say, a deadline was missed, it was a

20  communication error within the law firm itself, and it was

21  caused by the disruption.  We think under the cases we've

22  cited, given the totality of the circumstances, this is

23  something that can be considered by the Court in connection

24  with the notice for timely appeal.

25        In connection with that notice of appeal, we've also

1  filed a motion to stay compliance with that -- with the Court's

2  order, which is fairly self-explanatory.  The three law firms

3  believe that the order requires certain attorney -- either

4  attorney client privilege or work product privilege, but

5  certainly documents that aren't subject to discovery to be

6  turned over to Grace.  They think that that's improper and it

7  would defeat the purpose of the appeal, if you will, if those

8  documents were -- had to be turned over during the appellate

9  process.

10         I would note under the totality of the circumstances

11  surrounding the case that the other firms -- and I think you'll

12  hear this in the next motion, but I think that the other firms

13  have complied with the Court's order and have turned over the

14  documents.  And we've heard from Grace itself that Grace is

15  buried.  Grace has been buried in documents and Grace's own

16  papers say that it would take them eight years to properly code

17  all the documents that they've got; for which of course they

18  turn around and try and blame the plaintiffs for that and the

19  attachment rule, but that's the way the compliance has been

20  pursuant to that court order which allows attachment.

21         We're dealing with 100,000 documents.  Can Grace

22  point to this plaintiff that hasn't complied or this document

23  that isn't complied?  Of course.  I'm sure.  You're going to

24  get a wide swath probably of attachments, but we're dealing

25  with a massive body of documents and a massive amount of

1 people.  So I don't think Grace is necessarily going to be

2 harmed by this.

3          THE COURT:  Well, how many claimants are represented

4 by these law firms?

5          MR. ESSERMAN:  By the three law firms.  I believe

6 what we're talking about -- it's not just the claimants because

7 you have to remember that the law firms have all complied and

8 turned over all the B reads, x-rays, filed the questionnaires,

9 done everything that they are suppose to do under the order for

10 all of their clients.  The only thing that we're really talking

11 about here are certain reports that the law firms consider to

12 be covered by attorney client privilege.

13          So I think what we're talking about here is probably

14 a couple thousand reports, perhaps, between the three law

15 firms, but that is not a couple thousand questionnaires.  All

16 those questionnaires have been completed.  They've all been

17 filled out.  They've been -- x-rays have been sent in where

18 x-rays are called for.  B reads have been sent in.

19          THE COURT:  So the documents have been produced, but

20 the initial reports from the -- from whoever the claimant saw

21 first to diagnose whether or not there was an illness hasn't

22 been turned over.

23          MR. ESSERMAN:  Yes.  I mean here's basically the

24 situation I think that the predominant documents fall in with

25 connection with these three law firms.  That is, a client works

1  in a -- at an asbestos -- at a factory where there has been

2  extensive asbestos use.  He gets notice from his union or the

3  company itself.  These companies themselves said, you know,

4  we've used asbestos.  Maybe you need to go see a lawyer.  Maybe

5  you need to go see a doctor.  So they go see a lawyer, saying

6  well, I'm not feeling well and I've been working at the W.R.

7  Grace facility or the Pittsburgh Corning facility or wherever

8  for 20 years.  And they say okay, well, you need to go see Dr.

9  X.  And the law firm sends them to Dr. X and it's that report

10 that three law firms consider to be consulting expert privilege

11 and at issue in this case.

12        The initial -- and that's what I think Your Honor has

13 held, if I read the order correctly, that that -- that if that

14 was the initial consultation of a doctor for medical

15 purposes --

16        THE COURT:  Right.  Before any other diagnosis.

17        MR. ESSERMAN:  Before any other diagnosis.  The fact

18 that he didn't feel well.  The fact that he got a notice from

19 the union that perhaps he better check into this.  That's all

20 nice and good, but that's not --

21        THE COURT:  Well, I don't know any of those facts.

22        MR. ESSERMAN:  Yes.

23        THE COURT:  None of those facts have ever been spread

24 on the record before me.  I don't know how the patient ever got

25 to the doctor in the first place.  All I know is that they got

1  to a doctor and --

2          MR. ESSERMAN:  Right.

3          THE COURT:  -- there is a diagnosis.

4          MR. ESSERMAN:  Right.

5          THE COURT:  What I'm saying is that until you have a

6  diagnosis, I don't know how you have a claim that can require a

7  consultation between a lawyer and a client.  You have to have

8  some basis, I think, for an attorney client -- I'm sorry, for a

9  consultation privilege to apply.  Not an attorney client

10 privilege, but the consultation privilege.

11         MR. ESSERMAN:  And the fact that -- and I think the

12 major thing at issue here is the fact that can litigation be

13 anticipated because somebody, although he hasn't been to a

14 doctor, has worked in a facility in which there's been toxic

15 substances used.

16         THE COURT:  Oh, well you can always anticipate

17 litigation.  I mean I can anticipate litigation because I'm

18 going to cross the street and get hit by a car, but that

19 doesn't mean that it's reasonable and that it's actually --

20 that there is a real basis to the anticipation of litigation.

21 And I don't think that's what the rule's intended to protect.

22 I think the rule is intended to protect a claim that somebody

23 envisions is a realistic good faith claim, not just something

24 that's made up and hypothetical.

25         MR. ESSERMAN:  Well, of course.  You know, but in

1  this case, I think what we're talking about is the

2  establishment of an attorney client relationship and the

3  attorney then sending the potential client to a doctor, and the

4  question is, is that a consulting expert.  Let me give you

5  another example and I mean we've talked about this many times

6  in court, but someone gets in a car wreck and they seem fine.

7  They go to a doctor and -- they go to a lawyer and the lawyer

8  says you better go see Dr. Y to see what's -- see if anything's

9  wrong.  He goes to Dr. Y and Dr. Y sees -- says you may have a

10 problem here and they go to another doctor.  He says you better

11 go see Dr. Z, and he goes to Dr. Z and a trial they use Dr. Z.

12           What you held here is that Dr. -- the first doctor

13 that he saw has to be disclosed, that there's no consulting

14 expert privilege that attaches to that because that's the first

15 doctor that he's gone to after going to the law firm, and

16 that's the problem that these three law firms have with the

17 order.

18           THE COURT:  Okay.  Well, the --

19           MR. ESSERMAN:  That is --

20           THE COURT:  But the distinction in that event is

21 you've got a precipitating cause that somebody knows is a

22 causal connection.  The problem I have in this case is I don't

23 have any direct link between the initial consultation with the

24 doctor and the firms.  I don't even have a statement anywhere

25 that indicates that the firm sent the patient to the doctor in

1  the first place.  All I know is that there's an initial report

2  somewhere.  I don't know whether the patient got it first and

3  then went to the lawyer or whether the lawyer got the client

4  first and sent it to a doctor.  I don't have that information.

5          MR. ESSERMAN:  Well --

6          THE COURT:  And so --

7          MR. ESSERMAN:  -- you've issued a very broad ruling

8  here --

9          THE COURT:  Yes.

10          MR. ESSERMAN:  -- and it's -- and what we're talking

11  about is a ruling that encompasses 100,000 individuals and

12  we've been -- and what I think the Court has been trying to

13  craft is not a one-by-one situation, which I think would be

14  impossible to deal with, but sort of a broad stroke situation;

15  set out the broad stroke rules that the firms have to apply

16  with and that's what I think -- that's really what I think is

17  at issue here and the concern of Baron & Budd, and I think that

18  they would not appeal this order if in fact any doctor that

19  they -- any doctor report for a client that they sent to a

20  doctor after the establishment of attorney client relationship

21  for diagnosis of disease was considered a consulting expert,

22  because that --

23          THE COURT:  But they didn't want to -- they didn't --

24  as I recall in the questionnaire, they didn't want to even

25  answer the question as to whether they sent the individual

1 claimant to the doctor in the first place.  I mean I don't

2 know.  I haven't seen the questionnaire, so I don't even know

3 whether that information is provided in the questionnaire.  I

4 thought that was one of the things they objected to answering

5 in the first place.

6             MR. ESSERMAN:  But I think that was answered.

7             THE COURT:  Oh.  Okay.

8             MR. ESSERMAN:  That was answered.  So -- and I think

9 Your Honor ruled that that had to be answered and that --

10             THE COURT:  Well I did, but that --

11             MR. ESSERMAN:  -- and that --

12             THE COURT:  -- didn't mean that everybody's going to

13 answer.

14             MR. ESSERMAN:  No, but that was answered.

15             THE COURT:  Okay.

16             MR. ESSERMAN:  And it's my understanding it's

17 answered.  So once again we're focused on sort of a population

18 and in trying to craft a broad sort of general rule here for

19 compliance is -- the main issue concerning Baron & Budd, Silber

20 Pearlman, LeBlanc & Waddell is a client comes in their office,

21 he doesn't feel right, asbestos is probably the most commonly

22 known public mastord (phonetic) disease out there, and Baron &

23 Budd says you've worked at Pittsburgh Corning for 20 years,

24 we've established an attorney client relation for the purpose

25 of prosecuting an asbestos claim, you need to see this doctor.

**J&J COURT TRANSCRIBERS, INC.**

1  And it's that -- that report is really the only thing that's at

2  issue in this context.

3         Other firms have taken the position that -- I don't

4  know of any firm that doesn't believe that it's a consulting

5  expert report.  Having said that, other firms have decided

6  we'll produce it.  Give it to them.  Bury them in the document.

7  Good luck.  So what.  It doesn't mean anything.  It's just

8  another report.  These three firms have taken a -- what I think

9  is a proper and legal view of the issue, saying that this is a

10 legal issue as to whether or not once we've established the

11 attorney client privilege and we send someone to a doctor it's

12 a consulting expert and we think it ought to be reviewed

13 and --

14         THE COURT:  Okay.

15         MR. ESSERMAN:  -- that's --

16         THE COURT:  Well, the other issue I think is that

17 this is not individual claims litigation.  It's an estimation

18 process and I think that also impacts on this particular issue.

19 Because, you know, the information is protected in that I've

20 ordered that it's only to be used for purposes the estimation

21 process, not for individual claims litigation.  So I think the

22 privilege has to be looked at in that respect, too.  Anyway,

23 it's off --

24         MR. ESSERMAN:  Yes.

25         THE COURT:  -- the issue I --

1          MR. ESSERMAN:  No, but that --

2          THE COURT:  -- I think from what you're --

3          MR. ESSERMAN:  -- but that --

4          THE COURT:  -- arguing today.

5          MR. ESSERMAN:  It is, but that was also important

6   because if Your Honor recalls, we moved to alter or amend the

7   order to cover the situation that we've been talking about on

8   consulting experts, but we also moved -- and Your Honor agreed

9   with exactly that point.  That is, that this is not individual

10  claims --

11          THE COURT:  Right.

12          MR. ESSERMAN:  -- review.  This is an estimation

13  procedure.  It's a broad brush procedure, if you will.  It's

14  not a bullet by bullet examination, and this is -- that what

15  you've allowed is -- and I think what your ruling has

16  consistently been is that the debtor has their theories.  We

17  may think that they're nuts and they will ultimately lose.

18  That's fine, but they have the right to go forward on their

19  theories as long as you determine that there's a rational basis

20  at this point in time for them to go forward.  And so you're

21  giving them access to that information that you think should be

22  given and that everything else -- that all this information

23  that's been produced is confidential, not to be used in other

24  proceedings --

25          THE COURT:  Right.

1    MR. ESSERMAN:  -- by insurance companies, by other

2  companies, by other defendants in MDL's or whatever, and that's

3  my understanding of what your intentions were.  Is that --

4    THE COURT:  That's right.  That's absolutely correct.

5    MR. ESSERMAN:  So to a great degree, I guess I'm

6  agreeing with the Court in the way you're looking at it,

7  notwithstanding that Baron & Budd does -- and Silber Pearlman

8  and LeBlanc & Waddell are two of the many law -- two -- three

9  of the law firms that do object to this.  The other law firms

10  that I represent -- I'm jumping the gun a little bit on you,

11  but -- have either complied with the -- with your -- with that

12  portion of the ruling or are in the process of complying on a

13  rolling basis and will comply.

14    THE COURT:  Okay.  Anyway, back to this issue.  The

15  affidavit that Mr. Rich submitted indicates that the

16  instruction to file the notice of appeal wasn't timely given,

17  but what it doesn't say is that anybody who was involved in

18  this particular litigation had the responsibility to provide

19  that notice and/or was among the 160 people who were let go

20  such that the notice could not have been timely issued.

21    MR. ESSERMAN:  Well --

22    THE COURT:  And so I am --

23    MR. ESSERMAN:  Yes.

24    THE COURT:  -- missing facts that I think establish

25  that there is some basis for excusable neglect.

**J&J COURT TRANSCRIBERS, INC.**

1           MR. ESSERMAN:  I can validate some of what you said

2    and correct others.  That is that the people that were let go

3    were not involved in the process of the making of this

4    decision.  That is the superiors that Mr. Rich has dealt with

5    were running the three law firms, if you will, and in charge of

6    the three law firms and were in fact making the decisions,

7    talking to the 160 employees individually, and were involved in

8    the firm disruption.  They did not leave.  They were the

9    ones -- on the other hand, they were the ones sort of giving

10   the speeches to and trying to make the management decisions and

11   the downsizing decisions and the internal partnership decisions

12   and the disruption issues.

13          So they definitely were not the ones let go.  There

14   are cases where there people that are fired, having made the

15   decision.  This is not that type of case.  It's different.

16   This is more of an office disruption by not the people who were

17   fired making the decisions, but the people making the decisions

18   on who to fire were the ones making the decisions.  Thank you.

19          THE COURT:  Okay.

20          Mr. Bernick?

21          MR. ESSERMAN:  And we'd also like a ruling on the

22   motion to stay the effect the order also.

23          THE COURT:  On a ruling on what?

24          MR. ESSERMAN:  The motion to stay --

25          THE COURT:  Oh, yes.

1        MR. ESSERMAN:  -- also.  Thank you.

2        MR. BERNICK:  So are -- should I -- at Your Honor's

3  pleasure here, should I address both of those issues?

4        THE COURT:  Yes.  Uh-huh.

5     (Pause.)

6        MR. BERNICK:  I have much to say about the issue of

7  compliance, Your Honor, and I take very serious issue with the

8  low key and benign recitation of the alleged compliance of

9  these law firms, and particularly, the alleged compliance of

10  the Baron & Budd network of firms.  Let me hold off on that and

11  address first of all the narrow issue that I think that the

12  first item on the agenda tees up, which is the issue of the

13  timeliness of the appeal.  If the appeal was not timely and the

14  motion is not granted, then we don't have to deal with stay and

15  we can go on to things.  And I think that that presents a very

16  straightforward issue.  Again, this is the only law firm that

17  is really pursuing the appeal at all.

18        There's no question on this record but the notice of

19  appeal was not timely filed.  And the simplest answer to the

20  motion that's been filed asking for relief from that deadline

21  that was not met is the law.  The law is very, very clear in

22  this circuit, as it is in others.  I'm reading from the

23  decision in the Price versus General Cable Industries case,

24  November 2006, Western District of Pennsylvania, where the

25  court quotes the Third Circuit's decision in Consolidated

1  <u>Freightways</u> to say, "The standard for determining excusable

2  neglect is a strict one and is meant to permit untimely appeals

3  only in extraordinary cases where justice would otherwise

4  result."

5           Now, not only is the standard strict, but the

6  language of the standard is very, very important to focus on

7  because it is squarely at issue here and this actually

8  represents a rather extreme case of noncompliance with that

9  standard.  The standard is not whether there has been neglect.

10 The standard is whether there has been excusable neglect.

11 Negligence doesn't qualify.  Neglect doesn't qualify.  It must

12 be excusable, and what excusable really means, essentially, is

13 that the applicant deserves to be excused from the neglect.

14          And what does deserve mean?  It means that there has

15 to be a demonstration -- a critical demonstration of the

16 diligence that was undertaken by the movant.  You're not

17 entitled to be excused unless you come to the court with clean

18 hands.  You demonstrate to the court that you deserve to have

19 the excuse.  Activity is necessary.  You must do some thing.

20 And the standard makes this clear.  The item -- there are five

21 items that are generally recited, and the fifth is "Whether the

22 court is satisfied that the inadvertence resulted despite

23 counsel's substantial good faith efforts towards compliance."

24 You got to be activity.  You can't simply be inactive.

25          What do we see here on the face of the record?  We

1 see that the Court initially ruled on this issue at the end of

2 December, then went through a motion to reconsider and ruled

3 from the bench on the 23rd of January, and from that point

4 forward to the time that the appeal had to be -- notice of

5 appeal had to be filed was almost two months.  And during that

6 period of time, there's no demonstration that any activity was

7 undertaken to perfect this appeal.  This is a class case of

8 inaction with no demonstration of diligence.

9        But the facts really go much further here.  It's, as

10 I say, an extreme case.  This is not a case of mere torpor.

11 This is a case of peculiar indifference to the matter of

12 prosecuting the appeal.  The facts are very, very simple.

13        Number one:  The firms that are at issue here are

14 large, well-financed firms.  One of the best financed firms

15 probably in this entire business.  This is not some person

16 who's hanging out on a shingle and basically is overwhelmed and

17 really just misses the boat.  This is a firm that is totally

18 capable of handling this kind of issue.

19        Number two:  The business of this firm is litigation,

20 and asbestos litigation first and foremost.  This is not again

21 a firm that's got a lot of different irons in the fire and

22 transactional work and the like.  The whole business of this

23 firm is litigation.

24        Number three:  Mr. Rich, who sits here at the table,

25 is well-known to the Court and he's well-known to many, many

1  courts.  Because Mr. Rich -- this firm is so diversified and so

2  capable of dealing with this kind of matter that Mr. Rich is

3  detailed specifically to follow these large cases and

4  particularly to look for issues for appeal.  He is totally

5  familiar with the appellate scene.

6          In fact, the first time that I had the pleasure of

7  meeting Mr. Rich was in connection with the appeal that was

8  prosecuted in connection with the efforts by the three major

9  car manufacturers to deal with the Federal-Mogul case and he

10  was very specifically involved in that and very, very active.

11  So we have a large firm, sophisticated in this business,

12  totally focused, Mr. Rich is the point man, knows exactly what

13  to do, and he says, "I knew of the deadline."

14          So we then get to fact number five, which I find to

15  be particularly important for a reason that I'll come back to

16  in just a moment.  This matter affected not just a few claims,

17  not even hundreds of claims.  It affected thousands of his

18  clients' claims.  And Mr. Rich thought that an appeal should be

19  taken.  So we now have a matter that is apparently of vital

20  importance to thousands of claimants, a person specifically

21  dedicated to this proposition believes that an appeal should be

22  taken.  What happens?  What is done?

23          Well, the affidavit -- and it's just the affidavit

24  from Mr. Rich.  It's not an affidavit -- there's no affidavit

25  from anybody else, not the boss of the firm, not the person who

1  apparently had the authority to take the decision.  The record

2  is silent with respect to that.

3       Mr. Rich says he just passed the word on.  He said,

4  "I thought that the appeal should be prosecuted so I let people

5  know."  And rather than then following up to find out what the

6  answer was, to say gee, what is the answer, tell me what the

7  answer is, he says, "Well, I just left it up to them, if they

8  disagreed or they agreed, to let me know."  So that basically

9  in this hugely sophisticated organization with the person on

10 point in a matter affecting thousands of claimants, the

11 mechanism is a mechanism of silence means don't do it.  It

12 would take an affirmative expression of support from the boss

13 to make this happen.

14      So there's no call.  There's no follow-up.  There's

15 no communication whatsoever.  The deadline simply lapses.

16 What's wrong with this picture?

17      Well, what's wrong with the picture is the part that

18 says this thing is important to their clients.  Thousands of

19 their clients.  There's no evidence in the record, zero, that

20 this firm regarded this matter as being important to these

21 thousands of clients.  None.

22      In fact, this looks for all purposes to be a firm

23 issue; a firm business issue.  As a business matter, do we want

24 to take this appeal or not.  And as a law firm business matter,

25 it occupies a very low level of priority.  Because in all this

1 period of time, no one treated it with priority and then this

2 big announcement takes place which puts people out of pocket

3 for a few days.  And even then there's time that elapses and no

4 steps are taken.

5         There is no case law that says the law firm's

6 internal business decisions and internal decisions about what

7 it wants do as a firm -- not what it's doing for its clients,

8 but what it's doing for the firm, because this is a law firm

9 business matter.  There's no law that says that that takes

10 priority over the court's business.

11         And that's really the request that's being made here

12 is that this matter is of importance to the law firm business,

13 the law firm -- this enormous firm happened to be out-of-pocket

14 somehow -- completely out-of-pocket for all this period of

15 time, and well, that's okay, now that Mr. Rich has gotten an

16 audience with Mr. Budd or whoever else it is making the

17 decision, it's okay.  That's just not what the law says.

18 That's not excusable neglect.

19         THE COURT:  So does the firm need support from its

20 clients to take an appeal on the clients' behalf?

21         MR. BERNICK:  That could -- that's actually an

22 interesting question.  I don't know the answer to that.  I

23 don't know what relationship Mr. Budd's firm has with their

24 clients.  All I know is that there's nothing in the record that

25 says that there was any effort to contact clients or any

1  consideration given to the clients.  If this matter is so

2  important it affects thousands of claims -- and I'm going to

3  suggest in a moment that it's not important, it doesn't affect

4  thousands of claims in the sense that they really believe that

5  this matter is serious.  In fact, many firms haven't even made

6  this objection at all.  This is the only firm that's now

7  pursuing the appeal.  But I would have thought there would be

8  some effort here to find out and to determine what the interest

9  the clients are.

10         But if it's their decision that they don't have to

11  call their clients, that's fine.

12             THE COURT:  Or the --

13             MR. BERNICK:  What I'm suggesting --

14             THE COURT:  -- consultants?

15             MR. BERNICK:  I'm sorry?

16             THE COURT:  Or the consultants, since it's an alleged

17  consultant privilege?

18             MR. BERNICK:  Or the consultants.

19         So this is a situation where in a sense the

20  application demonstrates the problem.  This is a matter that

21  goes to the core of a business operation that basically used

22  these so-called doctors to process the claims and that's

23  exactly what it is.  The record is very, very well put in place

24  about what this process involved.  We've made very significant

25  submissions to the Court, including the -- you know, the

1 documentation, the excerpts from the testimony that's now been
2 obtained in this case about how this business actually was run.
3 This is not a client driven decision.  This is gee, does Baron
4 & Budd want to give up evidence of what its screening process
5 was like?  And in the big heat of things in the middle of March
6 of this year, they decided that there were more important
7 things to focus on than whether to pursue an appeal where the
8 order that Your Honor issued might have the effect of opening
9 the door on how it is that they've done business for all these
10 years.

11        Somebody woke up to the fact after it was too late.
12 Well gee, we may now have to give up some information that we
13 don't want to give up.  Let's see if we can kind of catch this
14 ball a little bit late.  Well, that's not what the standard in
15 the Third Circuit is.  That's not excusable neglect.  It's not
16 the kind of diligence, it's not the kind of activity on behalf
17 the client such that if the deadline is missed, the
18 inadvertence is excused.

19        This basically says the deadline is less important
20 than Baron & Budd's internal matters, and however serious the
21 reorganization was at Baron & Budd -- apparently they were no
22 longer believe they were going to get the same volume of cases
23 they had got in the past and they were laying -- that's a --
24 I'm sympathetic to the fact that that's an issue, but that
25 doesn't meet the Third Circuit standard for being able to

1  prosecute an appeal.

2         Let me turn to the other aspects of the motion to

3  stay and then come back again to Baron & Budd for just a

4  moment.  Your Honor is very familiar with the fact that the

5  timing of the appeal is only the first step in being able to

6  invoke the appellate jurisdiction of the courts here.

7  Obviously, there has to be a timely notice of appeal filed.

8  That hasn't been done.  But even if the minimal step --

9  absolutely minimal step of filing a piece of paper saying let's

10  take an appeal had been done in a timely fashion, that would

11  only be the beginning and there are many, many other obstacles

12  to the prosecution of this appeal.

13         The first and foremost of these is that there has to

14  be appellate jurisdiction, and for there to be appellate

15  jurisdiction with respect to an interlocutory order that is

16  issued with respect to third parties, there has to be -- this

17  is a motion with respect -- this is an order with respect to it

18  affects thirds parties and the appeal is being taken by the law

19  firms -- by the law firms.  You can't get interlocutory review

20  on any kind of basis in this circuit, unless there is an order

21  of contempt, and the law is totally clear on this.  This is the

22  decision that was rendered in the Plate Glass case, if I can

23  find it.

24         Well, I don't have the actual language here.  I'll go

25  get it here in a moment.  This is the court's decision that

1  says that with respect to third parties, there must be a

2  showing of contempt and absent contempt you simply don't get up

3  before the circuit. That is the clear law in the circuit.  With

4  respect to third parties, there has to be some other evidence

5  of the finality of the order and the evidence with respect to

6  third parties is contempt.  It's in our briefs and I'll go back

7  to the --

8         THE COURT:  This order directs the report to be

9  provided by the claimant as part of the claimant's submission.

10        MR. BERNICK:  That's correct, but the appeal is being

11 prosecuted by the law firms.  That's the thing is the claimants

12 are not filing the appeal.  It is the law firms that are filing

13 the appeal.  The law firms may be subject to the court's

14 jurisdiction, but they are not parties.  They are third

15 parties.  And where you have a third party, the third party

16 must be in contempt before you get an appellate order.

17        Now the claim that's made is that somehow none of

18 that makes a difference because this may be appealable under

19 the collateral effect doctrine, <u>Cohen versus Beneficial</u>

20 <u>Finance</u>.  We can argue the merits about whether it is

21 collateral.  I think the simple answer is that it's not,

22 because one of the tests for the collateral effects doctrine is

23 the effect must be completely separate from -- completely

24 separate from the merits of the case.  If it's not completely

25 separate from, it's not collateral and it's not appealable.

1          Well, here we have a situation where the order

2    pertains to a fact that is inextricably intertwined with the

3    merits of the case, and that is what was the relationship --

4    what was the purpose of the screening.  Did the potential

5    claimant go the doctor as a doctor to find out if he was sick

6    or not?  And if he did, the consultant's privilege doesn't

7    apply because it only applies where the purpose is to get

8    litigation advice and no other purpose.

9          So the question's going to be what was the purpose in

10   seeing the doctor.  The purpose in seeing the doctor was in any

11   part to actually find out if the person was sick, then the

12   consultant's privilege doesn't apply.  So we would ask the

13   claimant what was your purpose in seeking the screening, and

14   that is a fact that goes to the essence of whether these

15   screenings were really bonafide diagnoses to begin with.

16         So you cannot separate the predicate fact of whether

17   there was a consultant's privilege here from the merits about

18   well, are these diagnoses really diagnoses at all or are they

19   just being done for purposes of being able to submit a piece of

20   paper in support of a claim.  So you can't have a collateral

21   effect -- the collateral effect doctrine cannot apply here

22   because the completely separability requirement is not being

23   met.

24         Separate apart from that, the Third Circuit has also

25   addressed the question of whether in a case involving

**J&J COURT TRANSCRIBERS, INC.**

1 collateral effect it's no longer necessary for a third party to

2 show contempt.  That is, if there's a collateral effect, does

3 that mean that the contempt requirement no longer applies, and

4 the answer that is no.  Third Circuit has spoken very clearly

5 and says that even in the collateral effects case there has to

6 be a demonstration of -- there has to be a contempt order for

7 the matter to be appealable.  That is, I believe, the In Re

8 Plate Glass litigation decision 2002.

9          So we have an untimely notice of appeal with no

10 excuse.  Indeed the facts show completely to the contrary.  We

11 have a culpable failure -- not an excusable failure, a culpable

12 failure to meet the deadline.  We have the absence of appellate

13 jurisdiction because there is no contempt order.  We've not

14 sought a contempt order.  There is no contempt order.  This is

15 a pure interlocutory appeal.  No leave was sought to file the

16 appeal, and as a consequence, the appeal can't possibly hold.

17          And we then have even beyond that, of course, the

18 four prongs that are need to be met four tests for stay.  And

19 in application of those prongs on the merits, although the

20 Court need not reach that because of the problems with timing

21 and the problems with the absence of finality, the tests for

22 stay can't be met either.  And the only one I'll really touch

23 on here -- there's no irreparable harm because the protective

24 order in this case means that even if there were to be an

25 appeal and we got the -- these B reads before the appeal was

1  resolved and ultimately the appeal was resolved against us and

2  the Court's ruling were overturned, it's not like there's some

3  big deep dark litigation secret, some true attorney work

4  product that we're talking about here that then, you know, the

5  bell's been rung and we've seen it.  These are just B reads.

6  They're very important, but they're B reads.  So the really

7  question is do we get to keep them or not and the protective

8  order basically assures that if the Court were to be reversed,

9  there really wouldn't be any kind of harm at all.

10        But on the merits, the prospects of success here are

11  nowhere.  The Court's core ruling in this case just pointed out

12  a very simple and unremarkable fact.  It's the one I just

13  touched on.  That fact is that when somebody goes to see a

14  doctor for the first time to find out if they're sick from

15  asbestos or not, the purpose of that visit should be -- should

16  be to get a diagnosis.  Litigation may or may not result, but

17  it should be to get a diagnosis.

18        Under those circumstances, the legal test for the

19  application the consultant's privilege is not met.  The legal

20  test says it was done for litigation purposes and for no other

21  purpose.  The law in this circuit as reflected -- and I do have

22  this case.  The Gaba Patent case I think it's called.

23  Gabapentin Patent litigation, District of New Jersey.  This

24  circuit has imposed an additional requirement beyond that

25  embodied in the reasonable anticipation test.  Thus the second

1  prong of the test is whether "The material was produced because

2  of the prospect of litigation and for no other purpose."

3       That's what the courts -- the district courts in this

4  circuit apply as a test in order determine whether the

5  consultant's privilege has application, and because the Court

6  reasonably and properly found that in the first screening that

7  test could not be satisfied, this is a non-controversial

8  matter.  This is a very straightforward matter.  This is not

9  some esoteric order that somehow stretches the bounds of the

10  law.  Indeed, all it does is to assure that this case doesn't

11  stretch the bounds of common sense.

12       So for all these different reasons -- that is, the

13  timing of the appeal, the absence of a contempt order -- those

14  are show stoppers.  They're -- I don't believe that there's

15  really any discretion -- well, excusable neglect there is

16  discretion, but the law in this circuit makes clear that the

17  standard is not met under these circumstances where there's not

18  a demonstration of diligence.  But the question -- the second

19  prong is not even discretionary.  There's no contempt order.

20  That's it.  This thing is -- that's not going anywhere.  And

21  the finally we come to the merits.

22       Now, I -- we -- we're going to talk in a minute about

23  our motion to compel compliance and I'm going to save my

24  remarks on that until we get to that item on the agenda.  But

25  the -- again, the benign picture that was painted of these

1 three law firms that gee, these are hard working folks and

2 they've really tried to comply, indeed they have complied and

3 they've produced everything, and this is gee, somebody walks

4 into the office and everything's okay.  That's not what's going

5 on with this firm.

6        This firm has fought and fought and fought every step

7 of the way on virtually every issue that's associated with this

8 questionnaire.  All the objections that Your Honor has taken up

9 over time, Mr. Esserman has been here frequently and almost

10 always is here on behalf of these particular firms as well as

11 some of the other firms.  But they fought and fought and

12 fought, and they're still hiding the ball, and we actually

13 found out a very important fact about that today.

14        There are approximately 8,000 claimants who are

15 represented in this case by these three firms.  Eight thousand

16 claimants.  And what happened in this particular case with

17 respect to these B reads is that we, of course in the

18 questionnaire, asked each claimant to provide the B reads.  And

19 when they weren't provided, it's Your Honor's direction, we

20 filed a motion to compel on each specific claim individually.

21        Now, having made the requests individually and having

22 made the motion to compel last fall individually, what we got

23 back were these blanket objections.  The objections were made

24 across the board, and the -- one of the objections was made was

25 this objection.  It was made across the board.  So literally as

1  we sit here today, we have never been told on the record and

2  there's no evidence on the record of what particular claimant

3  the objection applies to.

4          So right now we have a record of a blanket objection,

5  no individual objections, and the impact of that is we can't

6  even tell today how many people are affected within the 8,000

7  by this particular ruling.  Is it three or four?  Is it five

8  percent?  Is it 10 percent?  We just don't know.  And this is

9  going to get into the compliance issue, but -- the fact that I

10 want to bring out that's really a stunning fact is that Mr.

11 Esserman just said, "Well, there may be a couple thousand

12 people who are affected."

13         Well, that would be pretty remarkable, because at a

14 couple thousand people you're talking about 25 percent of their

15 entire claimant population has B reads that are being withheld,

16 are not being shown to the Court, not even really being -- not

17 even being identified individually as having been withheld.

18 They haven't seen the light of day.  Enormous impact and it's

19 not an impact simply in terms of well, 75 percent of their

20 claims are good.  It is that we have a massive amount of data

21 out there that bears upon the credibility of their whole B

22 reading scheme and this then gets to the -- well, the anecdotal

23 statement that sounds very reasonable from Mr. Esserman, "Well,

24 so and so doesn't feel so good, goes in to see a lawyer first

25 of all, and says, 'Gee, Mr. Lawyer, you're not my doctor, but I

don't feel so good, what do you think?'"  And then lawyer says,
"Gee, I don't know.  First thing's first.  Retain me.  Don't
worry.  We'll be okay.  Retain me and then you'll go to my
doctor."

Okay.  Now even if we could accept this little kind
of anecdotal story and kind of raise a few eyebrows, that has
no relationship with the truth.  We know that that's wrong.  We
know that it's wrong because we have submitted a substantial
record to Your Honor that demonstrates that it's wrong and that
record actually began with Mr. Kazan, who told it exactly the
way it is to Congress.  Mr. Kazan said words of one syllable,
"Ninety percent of the non-cancer claims are generated through
screening."

And what are the screenings?  It's when people -- the
trailer lines up outside of the factory at the -- working with
the unions and people go in and out of the trailer and they get
x-rayed and they get B read.  It's not this kind of gee, you
know, Mr. lawyer kind of thing and lawyers are paying for the
trailers and they're paying for the screenings and they're
looking for the positive result.  And when they get it, they
got a lawsuit and they don't want to tell us about any others.

So I mean the idea that somehow this is all kind of
mom and pop law firms working hand-in-hand with their clients
to help them with their medical needs as well as help them with
their legal -- that's the whole issue in the case, and Baron

1  and Budd is at the core of that issue.  They have a huge volume

2  of claims and they're the ones who made this business decision

3  that says gee, you know, maybe we fought and fought and lost

4  and lost, but we're not giving up.  We're going to seek the

5  stay.  We're going to seek the appeal.

6          I'm sorry.  It's just not as benign as Mr. Esserman

7  would lead the Court to believe and when we get to compliance,

8  our motion, the third item, I want to talk about some of the

9  other law firms and what we think is going to be necessary --

10  we're -- I mean, Your Honor, we are now 30 days away from our

11  deadline to submit our expert reports.  We've got to cut this

12  off and solve the problem, and I'd like to address that in

13  connection with the third item --

14          THE COURT:  Yes, that's fine.

15          MR. BERNICK:  -- but I'll turn the matter over to

16  counsel for response.

17          THE COURT:  Mr. Esserman?

18          MR. ESSERMAN:  A couple things in response, Your

19  Honor.  First of all, let me address the appellate

20  jurisdictional argument.  I think very clearly this type of

21  discoverable order under the <u>Ford</u> case is appealable.  I do

22  think there is appellate jurisdiction here we've -- we've cited

23  in our brief that concern privilege documents that were ordered

24  to be produced and --

25          THE COURT:  Who is the appellate?  I mean this order

43

1  isn't against the law firms who are the appellants.  It's

2  against the clients and I don't even have an -- evidence that

3  the clients authorized the firms to file an appeal here, nor do

4  I have any evidence on this record that the consultants

5  themselves as to whom, I guess, this privilege is somehow

6  asserted on behalf of the clients authorized any appeals or

7  objected to the production of the document.

8           MR. ESSERMAN:  Well, the --

9           THE COURT:  This record -- this affidavit is

10  absolutely silent as to anything that was undertaken, except

11  the fact that Mr. Rich decided that an appeal was appropriate,

12  sent that information up the chain, and it died there within

13  the law firms.  And I -- I mean I have no indication on this

14  record that anybody on behalf of the law firms' clients even

15  wants an appeal taken.

16           MR. ESSERMAN:  Well, Your Honor, I think the law firm

17  is acting on behalf of its clients --

18           THE COURT:  Well, I don't know that --

19           MR. ESSERMAN:  -- with respect to this.

20           THE COURT:  -- and the affidavit doesn't tell me

21  that, and so I -- you know, if that's the case, did they notify

22  the clients that there was a 10-day appeal deadline?  Because

23  if that's the case, I also don't have any indication on this

24  record that the clients have undertaken some activity to notify

25  the law firm.  Now, I admit that in most instances it would be

44

1  the law firm, obviously, filing the appeal, but I don't have

2  any indication that there's a communication back by the law

3  firm to the client saying we got this order, we think an

4  appeal's -- should be filed on your behalf.  There's nothing

5  that indicates that the law firm did anything to notify the

6  clients or the consultants or anybody, in fact, except somebody

7  unidentified, a partner somewhere unidentified within the firm

8  and got no response, and I have to agree with Mr. Bernick.

9  This type of business decision does not seem as though that is

10  the type of excusable neglect that the case law intends to

11  protect.

12           MR. ESSERMAN:  I'll agree with Your Honor to this

13  extent:  There's nothing in the record about any client

14  communications, nor would there necessarily be in a situation

15  like this.  Most of these claimants, as you know, are not --

16  lot of these are estates, lot of these are elderly people, lot

17  of these decisions are made in a prosecution of the litigation,

18  as well as I don't know that a consulting expert would have any

19  standing vis-a-vis the decision to make an appeal of an order

20  requiring disclosure of his consulting expert report.  That

21  seems to me --

22           THE COURT:  Well, I don't know that the --

23           MR. ESSERMAN:  That --

24           THE COURT:  -- consulting expert does either.

25           MR. ESSERMAN:  That's that --

1              THE COURT:  Truly the client does.

2              MR. ESSERMAN:  Well, the fact that a consulting

3   expert was consulted or not on an appellate process, that's not

4   his legal decision to make.  That's the decision of the law

5   firm on behalf of the client to make as to whether or not his

6   report should be disclosed or not, so I think those are very

7   distinguished situations.  I've touched on the appellate

8   jurisdiction.

9              THE COURT:  But I still go back to that issue and

10  that is the fact that the firms were not the entity ordered to

11  make the production.  They are asserting the consultative

12  privilege at this point on behalf of the clients who were

13  ordered, but there is no order of contempt.  And so since it's

14  a third party attempting to file the appeal, I think that's the

15  reason --

16             MR. ESSERMAN:  It's third party -- it's -- they're on

17  behalf of their client, so --

18             THE COURT:  But that's where the record's silent.  I

19  mean I don't have any indication that the clients have in any

20  way been consulted or authorized or that there was any activity

21  that says my clients are jeopardized because they wanted me to

22  file an appeal and I didn't.  What I have is I sent a notice up

23  to a partner saying I think we have an appealable issue and I

24  got no response.

25             And on top of that, I have nothing that indicates

1  that there wasn't a partner somewhere who was -- whose

2  responsibility it was to monitor this particular case to take

3  that activity timely.  All I have is -- I know Mr. Rich -- Mr.

4  Bernick's quite correct.  Mr. Rich has been here regularly in

5  court on a variety of matters and I accept his affidavit that

6  it's his, you know, authority or authorization to make that

7  decision with respect to whether a matter is worthy of

8  appellate consideration.  That's what his affidavit says and I

9  accept that.  But having made that decision, then the ball got

10 dropped and it seems that although there are business decisions

11 going on, there isn't anything on this record that

12 substantiates that this decision was anything more than another

13 business decision that was being made.  And that's the problem,

14 I think.

15         MR. ESSERMAN:  Okay.  At this point, Your Honor, I

16 understand where Your Honor is headed on a ruling, but I would

17 ask that -- for appellate purposes that Your Honor also rule on

18 the motion for stay at this time also.

19         THE COURT:  Okay.  With respect to the motion for

20 stay, I'm going to deny that.  However, I will require -- and

21 I'll need you to work out the terms of this so that I can

22 protect -- I think I've already got the information protected

23 because of the fact that it's to be used only for purposes of

24 litigation.

25         But, Mr. Esserman, if your clients feel that there is

**J&J COURT TRANSCRIBERS, INC.**

1  some additional protection that's needed in the event that I'm

2  reversed on appeal, then I'm happy to consider some additional

3  protective language, but I -- I'm not exactly sure what that

4  may be because I think I've already got you adequately

5  protected.  But if not, then, you know, I'm happy to do

6  something --

7          MR. ESSERMAN:  I think maybe something would be

8  called for there, Your Honor.  For instance, Forman Perry has

9  been -- the law firm Forman Perry has been brought into this

10  litigation and they've been engaged in subpoena and discovery

11  process in other cases for other clients and they're trying to

12  get their hands on similar records that are being produced in

13  the Grace case, so I think some additional protective language

14  would be --

15          THE COURT:  Okay.  Well, I'm happy to consider

16  additional protective language so that the debtor can make use

17  of the information in a global construct, because that's what

18  the purpose for this is for estimation, so -- I mean the debtor

19  obviously needs each individual piece in order to aggregate it,

20  but the purpose is for aggregation.

21          MR. ESSERMAN:  And that may do it, Your Honor.

22          THE COURT:  So --

23          MR. BERNICK:  With respect to the Forman Perry firm,

24  obviously they'll be -- they'll have to agree to the protective

25  order in the case, but I -- we would very much object to any

48

1    effort to somehow carve out a firm that's been that significant

2    and remains that significant and are following up on the

3    information that we get.  We have mounted this unbelievably

4    difficult effort to get information from doctors and third

5    parties.  Your Honor -- I don't hear Your Honor saying that

6    somehow Forman Perry can't get and use the information --

7          THE COURT:  I am saying that, except in the context

8    of this estimation process.

9          MR. BERNICK:  That's --

10          THE COURT:  They can use it for purposes of this

11   estimation, but it's not to go into their global databases.

12   It's not to go into anything else other than the debtor's

13   estimation process or any other party's estimation process in

14   this case if some other party in this case chooses to make use

15   of the same piece of information in, you know, response to

16   whatever the debtor's going to use or in their case in chief,

17   but it's to be limited to this.  The information is not to go

18   into Forman and Perry's (sic) general database, nor is it to be

19   disclosed by Forman and Perry to anybody else outside the

20   context of this case.  And if they cannot provide that type of

21   -- well, I don't know that it's an ethical wall, but factual

22   wall, then they're not to get access to the information.

23          MR. BERNICK:  I think that there's no issue with

24   respect to Forman Perry signing on to the terms of whatever

25   protection we have here that works all ways.  I think what I'm

1  really kind of reacting to a little bit is there's no reason to

2  single out Forman Perry in particular.  All of the firms

3  involved in all of these cases have multiple representations of

4  multiple clients.  The same thing works on the other side of

5  the coin.  So all I'm saying is to Forman Perry, of course we

6  will make sure that Forman Perry is signing on to whatever

7  protection is appropriate that is consistent with the full use

8  of this information for purposes the estimation, but I don't

9  think there should be somehow a Forman Perry rule.  They're no

10  different than --

11              THE COURT:  No, this order will apply to anyone --

12              MR. BERNICK:  Right.

13              THE COURT:  -- who has access to this information.  I

14  mean if it's a --

15              MR. BERNICK:  Yes.

16              THE COURT:  -- protective order, it's to protect the

17  sanctity of the information as to anybody who gets access to

18  it --

19              MR. ESSERMAN:  And --

20              THE COURT:  -- not just Forman and Perry.

21              MR. ESSERMAN:  And frankly, Your Honor, something

22  like that may do it and may end this aspect of the case and

23  this motion right here and now --

24              THE COURT:  Okay.  Well --

25              MR. ESSERMAN:  -- rather than take it any further.

**J&J COURT TRANSCRIBERS, INC.**

1        THE COURT:  All right.  Well, why don't you see what

2   you can do in terms of providing that additional information,

3   because I'm happy to do that, but I'm going to stay the order

4   that requires the production because I want this case to end --

5        MR. ESSERMAN:  Yes.

6        THE COURT:  -- and if I stay this order, this case

7   will not end for another I don't know how many years, but in my

8   lifetime, I would like to see the end of this case, so I'm not

9   going to stay the order.  I think the debtor and frankly all

10  the other parties really need to get this -- access to this

11  information so that the case can be tried; the estimation case

12  can be tried.  So I won't stay it, but I will provide whatever

13  protections are appropriate to make sure that the information

14  is protected in the -- well, not just so that in the event that

15  I'm reversed on appeal, but so that the information is

16  protected within the context of this case.

17       MR. ESSERMAN:  Yes, that --

18       THE COURT:  I never had any intention to have it

19  disclosed outside the context of the case.

20       MR. ESSERMAN:  Yes, that -- those confidential

21  provisions that we've been discussing I view independent of any

22  appeal, but I'm saying that I think that with those type of

23  protections it may negate any need to go any further.

24       THE COURT:  Well, that's your client's decision to

25  make, but --

**J&J COURT TRANSCRIBERS, INC.**

1         MR. ESSERMAN:  Understood that also.

2         THE COURT:  Okay.  All right.  So I will take an -- I

3  don't know if I have an order that denies the motion.

4         Why don't I -- why don't you submit both orders; one

5  that will -- Mr. Bernick, one that will deny the motion for

6  leave to file the appeal based on excusable neglect and at the

7  same time, one that will deny the motion for stay pending

8  appeal, but build in the additional protection so that I can

9  enter them simultaneously so that to the extent that there is

10 going to be another appeal, you've got both orders at the same

11 time so you're appeal date will run consecutive or at the same

12 time on both of those orders.

13        MR. ESSERMAN:  Understood, Your Honor, and I also

14 understand that the protections will be built in regardless of

15 whether or not there's an appeal.

16        THE COURT:  Correct.

17        MR. ESSERMAN:  Yes.  Thank you.

18        THE COURT:  All right, so orders to be entered on

19 items one and two when I get them on certifications of counsel

20 from the debtor, but, Mr. Esserman, obviously you need to see

21 them and have input into them.

22        MR. ESSERMAN:  Okay.  Thank you, Your Honor.

23        THE COURT:  All right.  Thank you.

24        Is Miss Esayian available yet to do --

25        MR. BERNICK:  We actually -- thank you for asking,

1  Your Honor.  I believe we've worked out -- we've talked with

2  our client and it may be that we can simply moot the issue with

3  respect to the property damage.  Mr. Speights that is.  I think

4  it relates to a witness named Langer (phonetic) and I think

5  that -- I will say that Grace is prepared to produce Mr. Langer

6  for deposition and -- and is that -- maybe Ms. Baer can be a

7  little bit more specific about this.

8          MS. BAER:  That's correct, Your Honor.  We will

9  produce Mr. Langer for -- Dr. Langer for deposition.  We simply

10 have not been able to get a hold of him to get -- give a date

11 to Mr. Speights as to when that would be.

12         THE COURT:  Mr. Speights, I don't know if you can

13 hear Miss Baer.  She's indicating that the debtor will produce

14 Mr. Langer for deposition, but they haven't been able to

15 contact him to give you a specific date and the question is

16 whether that will moot your motion.

17         MR. SPEIGHTS:  That will moot -- it's actually not my

18 motion, it's their motion.

19         THE COURT:  Oh, their motion, sorry.

20         MR. SPEIGHTS:  That will certainly moot the motion

21 and just for Grace's benefit, this is a hazard issue which is

22 down the road and I would appreciate the date being after the

23 PID trial, April 23-25.

24         THE COURT:  All right.  After that date?

25         MS. BAER:  Thank you, Your Honor.  We'll check into

1  it.

2          THE COURT:  All right.  They'll make sure that it's

3  after April 25th, Mr. Speights, and get back to you to work out

4  a date.

5          MR. SPEIGHTS:  Thank you very much, Your Honor.

6          THE COURT:  All right.  Thank you.

7          MR. SPEIGHTS:  Sign off with your permission?

8          THE COURT:  Yes, sir.  Thanks.

9          Give me just a minute, Mr. Bernick.

10          MR. BERNICK:  Sure.

11      (Pause.)

12          THE COURT:  Okay, Mr. Bernick.  Thank you.

13      (Pause/counsel confer.)

14          THE COURT:  Go ahead.

15          MR. BERNICK:  Can I proceed, Your Honor?  Thank you.

16          I'd like to talk finally about compliance.  That is,

17  where we are with respect to the B read issue at the present

18  time.  Your Honor will recall, and I've got a little

19  demonstrative up on the screen here that obviously we've been

20  through quite a number of iterations and stages as part of our

21  effort to find out these other B reads.  They go back to the

22  fall of last year.  There were motions.  There were initial

23  rulings in December.  Actually, they were final rulings in

24  December.  It was then -- there was then a motion for

25  reconsideration in January.  It was denied.  Ultimately, the

1  order issued and then there was this effort that we see now to

2  take an appeal.

3       And there was also because of the -- we were facing

4  the fact that's on the chart, which is that after all of this

5  effort and all of these objections and Your Honor issued a

6  ruling, we expected to get a whole bunch of new B reads.  That

7  is, all the stuff that everybody was arguing about all the time

8  and the reason why there was reconsideration.  And instead we

9  had a response that would be more consistent with their having

10 prevailed their objection.  That is, we didn't get anything.

11      And at this point we gave some thought to, you know,

12 moving for contempt for failure to comply with the order.  And

13 -- but we wanted to bring this matter to closure without the --

14 without any unnecessary friction and controversy.  And

15 therefore we filed a motion, one more effort to get compliance.

16      And part of the reason that we styled it as a motion

17 for compliance is not only did we want the B reads that were

18 required by the order, but in light of the difficulty that had

19 been faced in obtaining that order and in light of the fact

20 that nothing had been turned out, we were in a situation where

21 we're really working in the dark.  There had been no claimant-

22 by-claimant specific objection.  There had only been these

23 broad objections, blanket objections.

24      So we're really in a situation where we now have

25 these orders, we're not getting anything, and even if we got

1  something if we filed a motion for contempt, we wouldn't know

2  what we got.  We wouldn't know what else is out there.  We

3  wouldn't know whether there really is compliance with the

4  order.

5         So we asked for an order that would make people

6  comply with the orders that had already been issued, and we

7  also asked to have a privilege log developed so we would know

8  what it is that we've gotten as a result of the order and what

9  it is that still is being withheld on the grounds that it

10 hasn't been ordered to be produced and it is in fact

11 privileged.  And that was our decision in order to bring the

12 matter before the Court.

13        Now, the filing of that motion and I think frankly

14 Your Honor's fairly clear indication to all counsel at the last

15 omnibus that Your Honor expected the area of x-rays to see more

16 compliance, I think probably had some affect.  And I do know

17 that Mr. Esserman has reached out to us and said some of his

18 clients are complying or in the process of complying.  We also

19 had gotten communications both earlier and then since from Ms.

20 Ramsey's clients.  And I'm going to break these down to

21 categories here in a minute, but there clearly has been some

22 effort to come into compliance.  And I'll go through that kind

23 of category by category in order to get through this morning

24 and get to the point where we hope we can reach some decisions.

25        But the fact remains that we're now 30 days away from

1 our expert reports and it is just -- it is very, very late.  It

2 is -- it's too late.  We don't have any room for more data.  We

3 don't have any room for more decisions.  I'm going to about the

4 -- our being swamped in data.  That is not the problem.  The

5 problem is the experts have to do their work, and to do their

6 work, they have to have data and they have to know what the

7 data represents.  Is it complete or not?  From whom is it?

8 What still is out there?  Because otherwise they can't reach

9 conclusions.

10      So this is not a question of being swamped, et

11 cetera, et cetera.  Although I want to turn to that in a

12 minute.  It is a question of our just running out of time

13 because of the effort that we've had to go through to get what

14 the Court ordered literally months ago.

15      So with that said, that is that we're 30 days away

16 from actually having to turn in reports, I'd like to go over

17 for a moment and try to break this down into categories so that

18 Your Honor can appreciate where it is we are and where it is we

19 think we should have to go.

20      The first category are people who have told us that

21 not only have they turned in whatever B reads there are, but

22 they don't have anymore, or they've actually identified

23 particular B reads that are being withheld.  So Mr. Kazan who

24 is -- you can appreciate and I thought with ease after all this

25 period of time, called me up or sent me an e-mail saying we

1  don't have anymore.  Is the motion still good with respect to

2  us.  And I e-mailed him back and after the usual pleasantry

3  says look, if you sent us the stuff and you're prepared to, you

4  know, verify that, there's not a problem.  And that's true with

5  respect, we believe, to all the people -- all the firms that

6  are here in category one.  For the record, that's Mr. Kazan's

7  firm, it's the Hoben & Shingler firm, Edward Moody, Harowitz &

8  Tigerman, The Wartnick Law Firm, Paul, Hanley & Harley, and the

9  Early Ludwick & Sweeney firm.

10       We didn't in fact is, notwithstanding the submission

11 that was made on behalf these firms, simply adopt a blanket

12 approach.  When Mr. Kazan reached out to us, we specifically

13 said that we were prepared to withdraw the motion as to the new

14 one and don't worry about the motion as to them.  So I'm not

15 sure why there's all these -- all this kind of coloration about

16 our having a broad approach.  We had to reach out broadly, but

17 certainly with respect to people who are prepared to give us

18 the B reads and say there aren't anymore, there's not going to

19 be an issue.

20       So the common solution for the folks in the first

21 category is if we have a verification that they've given us all

22 of the B reads with respect to their clients and they're not

23 withholding anything, then we can take them off the list.

24       Now, I should suggest to Your Honor that it's not any

25 accident that the people who you see in category one have taken

1  that approach.  Mr. Kazan, after all, is the person who came

2  before Congress and said, "I don't like these mass screenings.

3  We don't do them.  They shouldn't be done.  They're hurting

4  us."  And with respect to the firms that kind of focus on the

5  higher -- so-called higher end cases, seriously hurt people who

6  are very sick, and they have a small inventory these firms of

7  those claims and they focus on them, you know, kind of one-by-

8  one, they're not going to have the kind of mass screening issue

9  that we have with respect to some of the firms, so of course

10 they're not going to be terribly interested in fighting that

11 battle.

12        We then get to the second category --

13        (Pause/Mr. Bernick and clerk adjust microphone.)

14        MR. BERNICK:  Category -- second category are people

15 who in much more recent days have been now motivated to come

16 forward and supply is with B reads, and Mr. Esserman represents

17 some of these firms.  They are -- for the record, this category

18 is the Reaud, Morgan & Quinn firm, Weitz & Luxenberg, Provost

19 Umphrey, Williams Bailey, Law Offices of Peter Angelos, Foster

20 & Sear, Cooney & Conway, Waters & Kraus, and Maples & Lomax.

21        They now have said through counsel that they are

22 going to meet the deadline in some cases of April 13th -- that

23 is, today -- and give us the B reads.  Mr. Esserman underscored

24 that this morning.  They're going to be in compliance.

25        That is something of an overstatement and it's an

**J&J COURT TRANSCRIBERS, INC.**

1  overstatement in two material respects.  First there are with

2  respect to some of these firms -- and we don't really have a

3  specification for this on the record.  Mr. Esserman indicated

4  to me over the phone that this was -- with respect to some of

5  the firms, it's going to take more time, and Mr. Esserman

6  suggested to me over the phone that in some cases, we would get

7  kind of 20 B reads a week or whatever it was.

8           MALE VOICE:  A day.

9           MR. BERNICK:  A day.  Still going to take a long

10 time.  We're talking about thousands of claims here.

11          So we don't have compliance with respect to these

12 firms.  We have no certificate of compliance at all with

13 respect to these firms.  As the materials have come into Rust,

14 we have been notified.  The Rust people are just now getting on

15 top of them to find out what they even are.

16          So here we are 30 days from the expert reports.

17 There's been assurance of counsel in the face of this motion

18 that there is compliance or a desire to comply, but there is

19 zero record of compliance at this point in time.  None.

20          The second problem is this -- again this ongoing

21 problem that we don't have any accountability.  And that is

22 that we asked for answers from each claimant.  We moved for

23 answers from each claimant.  Your Honor gave us relief, but

24 they've never identified which claimants are the subject of the

25 objections because they've been made very broadly, and they

1  haven't identified which claimants are still withholding or for

2  which claimants they are still withholding B reads on the

3  grounds that there's some other kind of -- there's a privilege

4  or there -- they fall with -- on the right side that is the

5  protective side of Your Honor's order.

6        So we have two major problems.  One is what has been

7  produced, and two, what has not been produced.  And we don't

8  have an answer on the record to either of these problems as we

9  sit here today.

10       The third category is, of course as you'd expect,

11 people from whom we have even less.  Category three are the

12 Motley Rice firm, the Ferraro Law Firm, Kelley & Ferraro, Baron

13 & Budd, Silber Pearlman, LeBlanc & Waddell, and Law Offices of

14 Alwyn Luckey.  With respect to these people, we don't really

15 have any kind of response whatsoever, and we certainly don't

16 have any indication of compliance.

17       What I would propose is as follows -- and let me say

18 at this point, I'd like to touch on this assertion that oh, the

19 process in this case has been so unbelievable, we have been so

20 compliant, we produced hundreds of thousands of files and

21 documents, and it's so much information the debtor can't handle

22 it.  Yes.  In a way, that's true.  They have produced so much

23 information so that it's incredibly difficult to handle,

24 because they produced it by way of attachment in thousands upon

25 thousands -- millions of pages, instead of doing what they were

1  supposed to do, which is to fill in the questionnaire.

2         And yes, people are buried in attachments.  This is

3  like a case where -- companies haven't been able to do this for

4  20 or 30 years.  It's been required that companies produce

5  documents as they are maintained in the ordinary course of

6  business and if there's a specific request for information in a

7  interrogatory, you have to -- you can't just say oh well, go

8  look in the warehouse.  You have to get the document.

9         So in a case that's as fast tracked as this is

10  involving as many claims it is, yes, we're -- yes, we've been

11  buried.  We've been buried in attachments, instead of people

12  answering the questions they're supposed to answer.  And this

13  is a class example.  We get a blunder bust blanket objection

14  with no indication of where the ball is being hidden and we

15  still don't know where the ball is hidden.  This is not a

16  problem of our not having -- of already having too much data.

17  This is a problem of our not having the right data per the

18  intendment of the questionnaire and I believe the intendment of

19  the Court.  That's the problem.  It is a buried case.  It's a

20  buried case as a result of their approach to compliance.

21         So where is it that we go with this?  Where we go

22  with this I think is relatively straightforward.

23  Notwithstanding the closeness of today to the expert reports,

24  if people have submitted new B reads to Rust by today -- by

25  today, we will make an effort, if we can, to try to get them

1 into our -- the data into our expert reports.  If we have a

2 problem with that, we'll let the Court know, but we're

3 certainly prepared to make that effort for what is there today

4 -- is here this morning at 9:45, 10:45 in the morning.

5       We think it's critical that we not have a continuing

6 stream of this information and then be saddled with arguments

7 that say oh well, we turned that over to Grace so they had it

8 prior to the estimation.  Prior to the estimation's not going

9 enough.  A pretrial schedule sets out intermediate deadlines

10 that are serious deadlines.  We have been held to the task of

11 asking the Court for new deadlines over tremendous resistance

12 and we've gotten that, but it's a tight schedule and we cannot

13 meet our deadlines and we cannot have the estimation take place

14 if we have to continue to process material.

15       Questionnaire supplements came in all the way

16 through, you know, March we were still getting questionnaire

17 supplements.  We finally had a cutoff of whatever it was, March

18 1, because we literally could not continue to do our work with

19 experts as this additional information was coming in.

20       So number one is that there should be a cutoff today

21 of any obligation or any need -- any need to process any

22 further B reads that come in the door.  So whatever's there is

23 there.  Folks say well they can't do more than to continue to

24 turn -- I'm sorry, it's too late.  They should have done this

25 long, long ago.  They've known what Your Honor's determination

1  is for four months.  It sounds like though they only gotten

2  around to compliance when Your Honor --

3          THE COURT:  Well, why --

4          MR. BERNICK:  -- made a threat.

5          THE COURT:  -- why do I have a motion to compel

6  compliance if you're not going to process the information?

7          MR. BERNICK:  Well, the -- for a very simple reason,

8  which is the motion to compel compliance was filed to get the

9  information.  The information was only supplied at the very

10 last moment.  The motion's being heard today and today they now

11 say they are in compliance.  If they are in compliance, they're

12 in compliance.  If they're not in compliance, they shouldn't

13 have the opportunity to come back in and say oh, we're going to

14 undertake further efforts to bring ourselves into compliance.

15 It's just too late.  We can't get there, Your Honor.  We can't

16 sit there and have a continuing stream of these B reads come in

17 and have our expert reports due on the numbers 30 days from

18 now.

19         So sure, maybe I should have said -- well, we should

20 ask -- instead of having a motion for compliance, we should

21 simply say hold them in contempt and we should simply say right

22 now freeze everything, forget about it, and we'll ask for

23 adverse inferences down the road.  We gave them an opportunity.

24 Some of them have seized upon that opportunity and they

25 supplied materials by today and we're saying fine, that's

64

1 appropriate.  But we don't think it's appropriate for people to

2 have yet more time on an ongoing basis to do something they

3 should have done months ago.

4        And the very fact that they're now coming in and

5 saying we're complying, they know what the story is.  They know

6 that Your Honor was -- they're not doing this because they

7 think oh well gee, now all of a sudden we've woken up and seen

8 the light.  They were worried that Your Honor was going to

9 sanction them, they were worried that Your Honor was going to

10 issue the orders, and they saw the handwriting on the wall and

11 they turned the stuff in.  Fine.  But enough is enough.  It's

12 very, very late.  They should have done this months ago.  We

13 should not be the ones paying the price for the delay that was

14 introduced by their failure to act with greater promptitude.

15        THE COURT:  Okay.

16        MR. BERNICK:  So first proposition is today -- second

17 proposition is whatever the record is today, it is, but we need

18 -- in terms of giving us the B reads, we now need to know what

19 all is out there that still is being withheld.  Because unless

20 we know that, we're buying a pig and a poke, and the record is

21 totally absent and we want to make sure that we have a record

22 because we're going to ask down the road for inferences to be

23 drawn.

24        Now we propose to have a privilege log in order to be

25 able to create that record, and I would ask the Court today to

1 say with respect to all B reads -- all B reads that have not

2 been turned over, there should be a log and the log should have

3 enough specificity so that Your Honor and we can determine

4 whether materials were properly withheld or not.  That is, the

5 claimant, the doctor, the date of the B read, the date on which

6 counsel was retained and how, and the date on which the doctor

7 -- the patient was first diagnosed by any doctor so that we've

8 got the predicates that we need.

9         We're prepared to do that by asking for a log.  If

10 Your Honor will issue that order today, we'll be fine, because

11 we'll -- we're also prepared to serve interrogatories for that

12 purpose because discovery continues on.  We're prepared to

13 issue interrogatories for that purpose.  We want to get a

14 verified record.

15         This is not the first court that has faced the

16 problem of failure to comply in discovery.  There are orders

17 that have been issued very notoriously out of Ohio in recent

18 times where claims have been made by lawyers and then it turns

19 out that well, gee, little bit more complex than that.  And we

20 believe that the -- this long effort to avoid this discovery,

21 the failure to specify the objections, and the failure to turn

22 over documents, indeed the failure of some of these firms to do

23 anything can't be countenanced in this case because otherwise

24 it means that they by virtue of their unilateral action

25 basically are constraining the information -- no company would

1 ever, ever get away with this without sanction.

2          So we're not asking for the sanctions yet.  We may or

3 may not.  But we want the record, and the record should be, as

4 we've indicated, with the predicates that are sufficient to

5 determine how Your Honor's order's being complied with.

6          We're prepared to ask for that privilege log today.

7 We're also prepared by May the 2nd to come forward to the Court

8 with a proposed interrogatory that would basically ask for the

9 same kind of information.  We can go over it then so that we

10 don't have to wait for people to submit logs that are

11 insufficient.  We don't want anymore, you know, ambiguity.  We

12 want clarity on the record of what there is.

13          So it may be and I'm going to suggest that maybe the

14 best idea is for us to craft something and come back on May the

15 2nd and get Your Honor's approval so that we can ferret out the

16 total population of B reads, but most specifically, the ones

17 that have not been produced and the circumstances under which

18 they are generated.  Rather than trying to go through and end

19 up with, you know, 25 different logs that do things 25

20 different ways, there should be a court mandated way of getting

21 this information.

22          Your Honor, this is the estimation.  It's the most

23 important matter in this case.  And thus far, by virtue --

24 we're now into like the third year of dealing with getting

25 basic information that has always been in their hands.  Always,

1  always, always, always.  All this could have been avoided; they

2  just answered the questions on the questionnaire the first time

3  and done it right, and that hasn't happen.

4          But there's only one side that gets hurt in this

5  process.  It's our side.  Because if we don't have the data, if

6  they continue to maintain the scorched earth approach, if we

7  don't have the data, we can't conduct the estimation.  It's

8  just that simple.  Seems like oh well gee, got plenty it's kind

9  of a broad -- this broad brush kind of sort of.  That's not

10  estimation in these cases.  The broad brush kind of sort of is

11  huh-uh, this federal rules of evidence.  This is _Daubert_ land.

12  This is not kind of slash and burn.  You got to have data.

13          They say that their claims are good.  We say that

14  they're not.  We're going to have the data to show it.  They

15  don't want to give us the data.  Got to give us the data.  This

16  has got to be an open book on both sides.

17          THE COURT:  Well, okay, so I'm not -- I'm still a

18  little unclear about what you're asking for today.  Are you

19  asking for an order that compels production of the B reads at

20  some point, even though the debtor is also asking that any data

21  not produced after today is not going to be incorporated into

22  the debtor's expert report or are you asking that whatever's

23  produced through today is produced through today and whatever

24  isn't is going to be identified in some log so that the debtor

25  knows what isn't produced and then you're going to take some

1 steps to determine whether you're going to ask for sanctions or

2 something down the road?

3          MR. BERNICK:  Yes, it's the latter, but I don't think

4 the two are exclusive.  That is to say with respect to, for

5 example, the questionnaire supplements, there is an order --

6          THE COURT:  Yes.

7          MR. BERNICK:  -- that said, you know, May 1 is --

8 Rust has no obligation to process material after May 1.  Okay,

9 so we're really say the same thing; that we don't want there to

10 be any implicit latitude given to the firms to continue to

11 dribble in more information the succeeding days, because that's

12 again a one-way street.  They get to use it to say oh, our

13 experts are wrong, but our experts don't have time to begin to

14 process it, so it's a guaranteed problem down the road.  So we

15 need a cutoff.  The cutoff should be today for the processing

16 of any of this information.  So if they got it today, that's

17 fine.  We'll try to deal with it.  But if they -- we don't have

18 -- if we -- Rust doesn't have it today, they should have no

19 obligation to process it after today and shouldn't be usable

20 after today.  We --

21          THE COURT:  By any side.

22          MR. BERNICK:  By either side.

23          Okay.  Then we have the problem of determining what

24 hasn't been turned over, and that is a matter we are going

25 to -- we want discovery either in the form of a privilege log,

1  but we think the better idea is interrogatories that we will

2  bring before the Court, we'll share with the other side by May

3  2 to now find out what it is that has been withheld.  Because

4  if it has been withheld and it looks like it's been withheld

5  contrary to Your Honor's repeated orders, we're going to ask

6  that a negative inference be drawn.  That is, that this

7  information would not have been favorable to the other side

8  because the time has now come.

9        So this is not a situation where if you didn't have

10  that, then effectively they can decide what to give us and what

11  not to give us by way of compliance.

12        THE COURT:  Haven't I ordered the B reads?

13        MR. BERNICK:  You've ordered the B reads repeatedly.

14        THE COURT:  Well, then it seems to me that if I

15  ordered B reads and they exist and they're not produced, then

16  they're in default of an order.

17        MR. BERNICK:  That's correct, and --

18        THE COURT:  Okay.

19        MR. BERNICK:  But in order to -- but see the problem

20  is that you're assuming that we know what's not been produced,

21  and the problem is we don't know what's not been produced

22  because they never answered with respect to individuals in

23  asserting this privilege.  They gave a -- so let's say they

24  have --

25        THE COURT:  Fine.

**J&J COURT TRANSCRIBERS, INC.**

1             MR. BERNICK:  -- 500 or 1,000 or 8,000 people.  They

2     said we object as to all.  They now give us -- Mr. Esserman

3     says 2,000 B reads.  Well, we don't know that there aren't

4     another 5,000 B reads that are unfavorable.  So while we

5     believe that we're entitled to an adverse inference with

6     respect to non-produced information, we don't have a record

7     because they've not told us the information that they're

8     withholding.

9             THE COURT:  Right, and you're entitled to know that.

10             MR. BERNICK:  That's right, and rather than going

11     through yet another byzantine process where the law firms all

12     come in and say different things -- we're going to have more of

13     that when it comes to the database -- we think the better idea

14     is to hold off for a couple weeks, get something, I hope,

15     agreed, but if not agreed, then presented to Your Honor on the

16     2nd so that we have uniform answers to the same questions and

17     we can make a very simple and clean record.  They've got all

18     the stuff on their databases.  They got all the stuff there

19     already.  Make a simple record of what it is that's not been

20     produced.  So those are the two things that we're asking for,

21     Your Honor.

22             THE COURT:  All right.

23             Mr. Esserman?

24             MR. ESSERMAN:  I'm a little confused by what I just

25     heard, I have to be perfectly frank.  And the questionnaire

1 response slide that Mr. Bernick put up is inaccurate.  This was

2 prepared last time for the last hearing -- the previous

3 hearing.  He said no additional screening documents received.

4 That's not the case.  He went through one of his categories

5 that showed that it wasn't the case, and I know lots of firms

6 that we represent that is not the case.

7         But what I heard Mr. Bernick say is after today, Rust

8 is not going to be processing or having any additional B reads.

9         THE COURT:  Rust won't add any B reads to the

10 database.

11         MR. ESSERMAN:  To the database.  And maybe what I'm

12 hearing is at this point what they're saying is don't produce

13 anymore B reads because they're not going to be added to the

14 database, we want an agreed interrogatory which is going to be

15 -- or an agreed sort of privilege log which is going to set

16 forth what has not been produced, and Grace is saying we

17 reserve the right to seek additional inferences or try and draw

18 inferences from further non-production.

19         Let me go first to sort of the privilege log issue,

20 and then I'll go through sort of where I see my clients that

21 are subject to the motion to compel and where they stand.

22         I think a legal case can be made that no privilege

23 log need be provided with regard to a consulting expert

24 privilege.  We've cited cases in our papers that so hold that

25 it is not something that is logged because the debtor is not

1 entitled to those documents anyway, and therefore there's no

2 purpose the log.  There's several cases on point on that

3 issue --

4        THE COURT:  The B reads are not consultative issues.

5 They're actual documents that indicate a diagnosis or not.  I

6 mean that's not a report.

7        MR. ESSERMAN:  They're talking about two things.

8 They're talking about what's been withheld under a consulting

9 expert privilege and what's not been produced.

10        THE COURT:  Okay.

11        MR. ESSERMAN:  Okay, and I guess what I'm talking

12 about is the consulting expert portion of that.  But having

13 said that, I'm not so sure that I'm opposed to working out

14 something with the debtor to provide -- my first position is as

15 to consulting experts, nothing should -- nothing is and should

16 be required and that's the legal standard, but looking at it

17 from a different standpoint to try and be practical here, I'm

18 not so sure that something can't be put together or should be

19 put together that would address what the debtor wants.  That

20 is, a record of the claimant, the date -- and the date of first

21 diagnosis.  I don't know that I'd necessarily be opposed to the

22 date that counsel was retained.  I don't know how counsel was

23 retained has any relevance to any of this, but -- and I

24 certainly would want input on my clients from that.  That

25 struck me as being a little too much.  I'm not so sure that the

1  doctor is necessarily a factor either, but I'm not so sure that

2  something can't be put together here to give them some sort of

3  log as to what's out there.

4         THE COURT:  I think the doctor may be a factor if

5  we're talking some of the quote, unquote tainted doctors.  That

6  may very well be a factor .

7         MR. ESSERMAN:  Arguably, that could be a factor, and

8  perhaps that would be appropriate for the -- for some sort of

9  log.  But let me tell you where my clients are.  My clients

10  that are subject to the motion to compel have in large part

11  complied, and I think some of them were on the compliance list.

12  And this has not been an easy process.  And let me explain why.

13         One of my clients said some -- lot of these initial

14  diagnosises (sic) are not on their database.  It's not they can

15  just push a button and it comes up on a screen.  They've got to

16  be hand searched.  All -- each client -- each claimant has to

17  be hand searched.

18         And when I talked to Mr. Bernick about producing 15

19  or 20 a day from -- to give an example from a particular firm,

20  that is because they have to be dragged out of a warehouse, the

21  files have to be looked at individually by a paralegal under

22  supervision of a lawyer, and documents pulled.  And that's a

23  time consuming process.  And frankly, it would take probably a

24  month for one of the firms to do this.

25         THE COURT:  Well, I'd be sympathetic except for the

1 fact that this has been going on for a year --

2         MR. ESSERMAN:  Well, except --

3         THE COURT:  -- and by now, frankly, they should have

4 been produced.

5         MR. ESSERMAN:  Except let me give you an example of

6 something that we're talking about here that the debtor may

7 want or maybe he doesn't want but fall into the major category

8 of documents here.  Someone goes to a doctor in 1989.  This is

9 an -- I think this is an actual example.  They go to a -- for

10 this firm.  They go to a doctor in 1989.  A negative B read.  A

11 negative report.

12         They go to the same doctor in 1999, 10 years later,

13 and the doctor -- the doctor in the report says, "I've seen

14 this patient -- I saw this patient 10 years ago" and the doctor

15 is Gary Freedman; is a very well known, highly respected, works

16 for the defense bar and the plaintiff's bar both in Texas,

17 frequently lectures.  He said, "I saw this patient in 1999 and

18 he was negative and I've now seen him and we've got progression

19 of the disease to now where he's got a disease, and therefore,

20 he -- you know, I viewed his x-ray and it's a one one or a one

21 two or he's got cancer or whatever."  The firms have produced

22 that report.  That report has been produced.  And looking at

23 Your Honor's order --

24         MR. BERNICK:  I'm sorry, if -- which report's been

25 produced?

1           MR. ESSERMAN:  The second report.

2           MR. BERNICK:  Not the first negative, the second

3 positive?

4           MR. ESSERMAN:  The second report's been produced, not

5 -- and the second report refers to, you know, a first report; a

6 first negative report.

7           Well the first report wasn't produced.  The first

8 report isn't on the database.  The first report isn't kept

9 track of.  The first report isn't in the client's active file.

10 It's somewhere off, but there's a reference somewhere in there

11 to a first report from a number of years ago.

12           Well, I said -- I don't want to get into what I said,

13 but the question is, is that first report producible.  Should

14 that first report be produced.  Well, I think a technical

15 reading of the order -- notwithstanding the fact that the

16 second report referred to the first report and one could argue

17 that they've done all they should, I think a technical read of

18 the order says that that first report should be produced.

19 Okay.  And then I get the holy cow, how we going to do that

20 response.  I thought we were just talking about the second

21 report.  And that's where one of the seven law firms -- that's

22 the issue that they're trying to deal with and it's not as

23 simple as Mr. Bernick would state.

24           THE COURT:  Well, I guess the question for that type

25 of situation is whether you folks are communicating, because

1  the question may be whether if there is a second positive

2  report that refers to something that happened a decade ago that

3  was a negative whether the debtor -- from the same doctor,

4  reputable --

5          MR. ESSERMAN:  From the same --

6          THE COURT:  -- not one of the --

7          MR. ESSERMAN:  No, from --

8          THE COURT:  -- other doctors --

9          MR. ESSERMAN:  -- from the same doctor.

10          THE COURT:  -- whether the debtor cares.  The debtor

11  may care if the first doctor was a different doctor or --

12          MR. ESSERMAN:  The Judge Jack doctor, they may want

13  to see that.

14          THE COURT:  Exactly.  But they may not if it's

15  another, so maybe what you need to do is have a discussion, you

16  know, report-by-report.  I don't know, but --

17          MR. ESSERMAN:  I would be happy to do that --

18          MR. BERNICK:  If -- I mean realistically, this is --

19  this sounds like --

20          THE COURT:  Yes.

21          MR. BERNICK:  -- a discovery negotiation --

22          THE COURT:  It does.

23          MR. BERNICK:  -- that should have taken place eight

24  months ago --

25          THE COURT:  Yes --

1          MR. BERNICK:  -- a year ago.

2          THE COURT:  -- it does.

3          MR. ESSERMAN:  We're just --

4          MR. BERNICK:  This is not -- I don't -- I'll shut up.

5  Let him --

6          MR. ESSERMAN:  This is a motion to compel that was

7  filed against several law firms.  This involves one of the

8  firms that the motion to compel was filed against and I'm

9  trying to give the Court a flavor for what we're trying to deal

10  with.  But what I'm hearing today is, from the debtor, we don't

11  want anymore reports because as of today you've either complied

12  or not, we're going to reserve our rights to draw whatever

13  inferences can be drawn, and the database is closed as of

14  today --

15          THE COURT:  Well, and that's okay, except for one

16  thing and that is for these category three firms that

17  apparently haven't produced anything or not much, if you agree.

18  I don't know that that's an issue of fact as to whether

19  something has or hasn't been produced, but, you know, to --

20  assuming that there's some agreement that the category three

21  firms have not produced B reads in general, not just a first,

22  but B reads in general, if there is agreement to that affect,

23  then I'm not sure that those firms should be let out of the

24  compliance obligation when the other firms have done it.  I

25  mean why should because they -- you have a big database are you

1  let out of the requirement to comply when the debtor from the

2  debtor's perspective in terms of getting the information

3  together to process an estimation trial needs the largest

4  database that's applicable and those firms represent the

5  largest pool of clients?

6          MR. ESSERMAN:  Well, the -- because you heard the

7  debtor say today that they're cutting off their database.

8  They're not going to include anything else.

9          THE COURT:  Well --

10          MR. BERNICK:  We can't.  The problem is we can't.

11          MR. ESSERMAN:  So I mean the question is, you know --

12          THE COURT:  I think perhaps what the Court should be

13  doing is amending the trial dates and getting this information

14  from these firms.

15          MR. ESSERMAN:  And that certainly is an option.  And

16  I'll let others speak to that.  But I can tell you that as to

17  most of the firms that are subject to the motion to compel that

18  I represent -- let me just go through them briefly one-by-one.

19  Foster & Sear:  They produced additional reports.  I think they

20  were on the list.

21          MR. BERNICK:  Your Honor, I would object to this.  We

22  have a record here and there is no -- this is the problem:

23  There's no certification, there's nothing that's in the record,

24  and so we get representations of counsel.  And I understand Mr.

25  Esserman is doing a job for his clients, but the clients are

1  the ones who ought to be responding here, not simply a lawyer

2  for the law firms that represent the clients where the clients

3  have done nothing and there's nothing in the record with

4  respect to these people --

5          MR. ESSERMAN:  Wait.

6          THE COURT:  Wait.  Where is --

7          MR. BERNICK:  -- about --

8          MR. ESSERMAN:  The clients aren't subject to the

9  motion.  The law firms are subject to the motion.

10          THE COURT:  Where is --

11          MR. ESSERMAN:  The motion was filed against the law

12 firm --

13          MR. BERNICK:  But the law firm -- even the law firms

14 haven't responded in writing to anything that demonstrates --

15 the papers that were filed here --

16          THE COURT:  Where is Foster & Sear, which category?

17 I did not write down which --

18          MR. BERNICK:  Foster & Sear I think is --

19          THE COURT:  -- category these firms are in.

20          MR. BERNICK:  -- the second --

21          MR. ESSERMAN:  Second category.

22          MR. BERNICK:  So what is -- this doesn't -- this

23 doesn't mean anything.  It doesn't -- it -- all it does is

24 provide, you know, counsel's very nice recitations to the Court

25 on how we're trying hard, et cetera, et cetera, but the point

1 is that there's no accountability here.  We need people to have

2 attestations, filings before the Court that says we're in

3 compliance.  We're talking about Your Honor's orders over four

4 months and now we get verbal accounts of well, kind of

5 here's -- that's just not right.

6        MR. ESSERMAN:  Well look, there's another way of

7 going about it and that's just going about it the way Mr.

8 Bernick suggested, and that is that we put together an

9 interrogatory, we'll -- by each firm that has not submitted

10 their documents by today.  I think Your Honor is -- Mr. Bernick

11 has told us what he wants in that interrogatory.  I'm not so

12 sure that I disagree with anything, except I'm not sure -- I'm

13 not sure I necessarily object to the date counsel was retained

14 and how other than the fact that that just means they've got to

15 go look through retention papers for dates and things like

16 that, but --

17        THE COURT:  Well, isn't that in the 2019 statements?

18        MR. ESSERMAN:  Maybe.

19        MR. BERNICK:  We don't have 2019 statements for a lot

20 of these people either.

21        MR. ESSERMAN:  Maybe.

22        THE COURT:  Well --

23        MR. BERNICK:  Ferraro firm has got no 2019 statement.

24 They're category three.

25        MR. ESSERMAN:  I don't know.  That was the only thing

1  that -- and I don't represent them, but that's the --

2           THE COURT:  Well, I don't know how they're filing

3  claims without a 2019 statement.

4           MR. BERNICK:  They've appeared in court.  They've

5  argued.  They've made objections.  They're doing all kinds of

6  stuff, but they -- they're not responding and they're -- to my

7  understanding, they do not have a 2019 statement with respect

8  to all their clients.

9           THE COURT:  Well --

10          MR. BERNICK:  And they're not alone.  There are

11 others as well.

12          Where's the list of the 2019's?

13          MR. ESSERMAN:  Anyway, I guess let me go back to my

14 original statement.  I'm -- it sounded to me like what the

15 debtor says we want to put together an interrogatory.  I

16 obviously need to talk to my clients about that and what can be

17 produced and how on an interrogatory.  That may not be a bad

18 idea, and it sounded to me like we want to come back here on

19 May -- the next hearing is May 2nd or May 3rd and address this

20 issue again.  That's sort of what I heard the debtor say and

21 I'm perfectly willing to do that.  Thanks.

22          MR. FINCH:  Your Honor, I think there is a great deal

23 of --

24          THE CLERK:  Your name again?

25          MR. FINCH:  Nathan Finch for the asbestos claimants

1 committee.

2          There's a good deal of confusion at least on my part,

3 and I think there is a fair amount of disagreement about the

4 categories and what the categories mean.  And if I can just

5 take a minute to go over to the chart to explain.

6          MR. BERNICK:  Your Honor, at this point, I would then

7 also ask why it is that counsel for the ACC is now talking

8 about the law firm compliance of people that he doesn't even

9 represent.

10          MR. FINCH:  I'm not talking about law firm

11 compliance, Your Honor.  I'm talking about the scope of this

12 Court's orders and when the Court is making comments about

13 pushing off the trial date, that does impact the interest of

14 the ACC.  I'm just using as an illustrative example one of the

15 firms on that list and then I'll let Mr. Herrick speak for the

16 particulars of that firm.  But I want to -- I think this will

17 cut through a lot of the confusion.  I don't even know that I'm

18 in that much disagreement with Mr. Bernick about what he wants

19 to do, but I do think that the record needs to be more clear

20 about what we're talking about.

21          THE COURT:  Okay.  You're going to need to use

22 microphone over there.

23          (Pause.)

24          MR. FINCH:  Your Honor, what we're talking about here

25 are -- these are supposedly people who have, as Mr. Bernick put

1  it, withheld B reads, but these firms have produced the B reads

2  in response to the questionnaire and what they're talking about

3  are the B reads, if any, that have been withheld based on the

4  consulting expert privilege.  The consulting expert

5  privilege -- the Court drew a line in its December 22nd order

6  that basically said if you get a diagnosis and then go to a

7  doctor and then -- and they then go to a lawyer and then the

8  lawyer sends you out to another doctor and that doctor does a

9  report and the -- then that report was done in anticipation of

10 litigation, that's protected under the consulting expert

11 privilege.  That is what we are talking about here.

12        If on the other hand the client -- the person went to

13 the lawyer first and then went out -- the lawyer sent them to a

14 doctor, the Court said, "No, that's not subject to the

15 consulting expert privilege."  So you've got --

16        MR. BERNICK:  Your Honor, I don't know what this has

17 to do with the trial date.

18        MR. FINCH:  -- protected by December 22nd order and

19 not protected by December 22nd order.  Motley Rice is an

20 example.  They filed pleadings today --

21        MR. BERNICK:  Your Honor, Motley Rice is sitting here

22 in court.  Why are we listening to Mr. Finch talk about Motley

23 Rice?

24        THE COURT:  I don't know, Mr. Bernick, but let's just

25 get through this.

**J&J COURT TRANSCRIBERS, INC.**

1              MR. FINCH:  The point is they said that they are not

2  withholding anything that is not protected by the December 22nd

3  order.  They are withholding documents that are protected by

4  the December 22nd order, and the whole issue I think boils down

5  to whether there has to be a privilege log for that material or

6  not when the December 22nd order doesn't require it.  And I

7  don't have a problem with Mr. Bernick saying we're not going to

8  process any information that comes in after April the 13th.

9  That shouldn't affect the schedule for the estimation, and I

10  don't have -- you know, it's not my dog in the fight as to

11  whether or not there has to be a privilege log, but if the

12  Court is operating under the apprehension that none of these

13  people have complied with the Court's order, I don't think a

14  record has been established here for that and that's what I

15  want to make --

16              THE COURT:  Well, that's what I was asking whether

17  there was agreement that --

18              MR. FINCH:  I -- and that's what I don't --

19              THE COURT:  -- nothing had been produced.

20              MR. FINCH:  As on behalf of the ACC, I don't agree

21  with his characterization of that and so I'll now turn the

22  podium over to Mr. Herrick on behalf of Motley Rice who can

23  explain the specifics of his client's position.

24              MR. HERRICK:  Good morning, Your Honor.

25              THE COURT:  Morning.

1          MR. HERRICK:  And again, my name is John Herrick and

2   I am a member of the Motley Rice law firm.  And when I stood up

3   and introduced myself to the Court this morning, I think I

4   indicated that I wasn't sure exactly who I was appearing on

5   behalf of here, and the reason for that is simple.  The motion

6   to compel that we are here on today is not directed at any of

7   my clients.  The motion to compel is directed at the law firm

8   itself.  The relief sought in the motion is directed at the law

9   firm itself.

10          Your Honor, I have moved to strike that motion to

11   compel on the grounds that Motley Rice is not a party to this

12   case and it is an improper discovery device used against a non-

13   party to file a motion to compel.  So, Your Honor, I would like

14   a ruling on my motion to strike.

15          THE COURT:  Mr. Bernick?

16          MR. BERNICK:  I'm sorry, was -- if I could hear the

17   motion again?  I'm -- I didn't mean to be disrespectful.  I was

18   asking whether the motion to strike is even up to be heard

19   today.  I know that we have not responded to the motion to

20   strike because it came in together with their response to our

21   motion.  I'm happy to respond to whatever it is that he's

22   saying on the merits, but if he could just tell me what the

23   motion to strike is, I'd be happy to do that.

24          THE COURT:  I haven't seen the motion to strike.

25          MR. HERRICK:  Your Honor, it's filed in response

1  to --

2          THE COURT:  When?

3          MR. HERRICK:  -- the motion to compel.  It was filed

4  -- the deadline was the 6th.  It was filed on the 6th.

5          THE COURT:  Okay.

6          MR. BERNICK:  So --

7          THE COURT:  I haven't --

8          MR. BERNICK:  So then that is not up --

9          THE COURT:  I apologize, but I haven't seen it.

10          MR. BERNICK:  That is not up in the Court's rules.

11  That is not up for today at all.

12          MR. HERRICK:  All right, Your Honor --

13          MR. BERNICK:  It was not timely -- it was not a

14  timely filed motion.  Now I'm happy to hear whatever the

15  substance of the motion is if it bears on our motion to compel

16  compliance.

17          THE COURT:  It probably does and it's pretty simple,

18  so go ahead, Mr. Herrick.

19          MR. HERRICK:  Do you want me to restate the grounds,

20  Your Honor?

21          THE COURT:  Sure.  Uh-huh.

22          MR. HERRICK:  The grounds were that the motion was

23  filed against Motley Rice and not against claimants.  Motley

24  Rice is not a party to this action, and therefore, Motley Rice

25  is not subject -- proper subject of a motion to compel.

1          MR. BERNICK:  Well, that -- I'd be happy to -- on the

2    2019 filings, I will give the Court a full list of all the

3    people who have not entered a 2019 statement, but the Motley

4    Rice firm has entered a 2019 statement on behalf their clients.

5    Therefore, that firm is before the Court as counsel in this

6    case.

7          The notion that a law firm cannot be subject to

8    orders by the Court to produce materials on behalf of their

9    clients is a very novel notion.  All law firms who appear on

10   behalf of their clients are subject to the Court's orders, and

11   if it's necessary in execution of that order for the

12   information come from the law firm that relates to the client,

13   then that order is totally appropriate.

14         The Court has full and complete power to order

15   lawyers to turn over information that's in their possession.

16   Otherwise, you have a very novel situation.  You have a shell

17   game.  The client's information may be with the client, may be

18   with a third party, may be with the law firm, and we got to go

19   figure out exactly who has got what piece of information and

20   say you give me that.

21         Now we know for a fact in the case of most of this

22   information, it is the law firms that accumulate all of the

23   information, and therefore, we moved to compel -- we moved for

24   orders that would direct turning over this information and we

25   moved to compel against the law firms because they are here

1 before the Court and have the power and ability to give

2 execution to those orders.

3        Now, if Mr. Herrick is saying yes, I'm a 2019 law

4 firm, but I cannot be compelled to turn over information that I

5 have as an agent of my client, then he's essentially saying

6 that the client doesn't have obligation to comply with the

7 order through their law firm.  I would note that this is the

8 one firm, the Motley Rice firm -- we're going to get back to

9 the Motley Rice firm when we talk about compliance if he ever

10 wants to get to compliance -- is the only law firm that has

11 come here with the countenance to say I can't be made to give

12 execution to the power of this Court, is the only client that's

13 come in -- the only law firm that's come in with a motion to

14 strike.

15        THE COURT:  Well, I'm not sure exactly why the Court

16 doesn't have authority over a law firm who is an officer of

17 this court to direct that if your client has information and

18 you happen to have it in your possession as an agent of your

19 client that you can't be ordered to compel that information.

20 Frankly, I've never heard that assertion before --

21        MR. HERRICK:  Well, you --

22        MR. BERNICK:  Your Honor, but --

23        THE COURT:  -- so --

24        MR. BERNICK:  -- just so -- you can respond to this.

25 I'm sorry to -- for interrupting.

1          MR. HERRICK:  Sure.

2          MR. BERNICK:  But I -- part of the problem is that

3   remember we have this difficulty of the blanket objection.

4   They have not identified a single client that we can file a

5   specific motion against because they haven't told us which ones

6   are withholding the information.  So -- and this is true of

7   other firms as well.  It's not just the Motley Rice firm.  So

8   we can't make a motion that is specific to a claimant.

9          We asked for the information to begin with.  They

10  didn't give it to us.  We moved before.  They didn't give to

11  us.  So we then -- they teed up the objection very, very

12  broadly.  We responded to it.  We prevailed in part.  Now they

13  say well, go back to the clients.  A, we don't know that they

14  have the information.  B, we don't know which client to move

15  against.  This is a total game of hide the pea under the shell.

16  And this firm is very much involved.

17          THE COURT:  Okay.

18          MR. HERRICK:  Your Honor, I'm not suggesting that my

19  law firm in its representative capacity isn't subject to any

20  ruling this Court makes with regard to the clients it

21  represents.  The pleading that was filed in this instance that

22  we're here on today wasn't directed to my law firm in its

23  representative capacity for its clients.  It's a technical

24  distinction, Your Honor, but I have been a stickler throughout

25  these proceedings to the technical aspects of the law and I

**J&J COURT TRANSCRIBERS, INC.**

1  think that's probably what's caused some confusion on the part

2  of the debtor.

3         In addition, we filed a motion to strike his pleading

4  because this one, like the last motion to compel, did not

5  contain as required by the federal rules a certificate of a

6  negotiated attempt at compliance.

7         THE COURT:  Well actually, I think your motion to

8  strike my clerk tells me was filed as part of the opposition to

9  the objection to the motion to compel.  It's not filed as a

10 motion to strike and our rules are very clear that you don't

11 get affirmative relief in opposition to another motion.  You're

12 going to file a motion to strike, you've got to bring it as a

13 separate motion.  Otherwise, we have no clue that it's out

14 there, no one else has an obligation to respond to it, and like

15 Mr. Bernick's failure to certify to the discovery rule and the

16 fact that it was negotiated, your motion doesn't have it

17 either.  And that, too, is a discovery rule that requires you

18 to confer with Mr. Bernick.

19        So I have a suggestion for both of you, and that is I

20 have a nice conference room that has a lock on the door and I

21 am happy to use the lock while you two go talk about this and

22 see if you can't in fact come to some agreement about this

23 issue.  Because I expect Motley Rice to comply with these

24 discovery rules that I have -- or discovery orders that I have

25 issued.  I expect Motley Rice's clients to comply.  I expect

1  Motley Rice to identify the clients who are in compliance and

2  not in compliance, and I expect every other law firm who has

3  any client who is going to file a claim in this case to comply

4  with these orders.  That is the end of this story.  I expect

5  compliance.  That's it.

6        I don't have any objections by any firm on behalf of

7  a specific client identifies a reason why a client is not

8  complying.  If I had that, I would certainly be willing to

9  consider it, but I don't.  I have broad based objections that

10 are essentially meaningless because I can't pin them down to

11 anything specific.  I don't know whether a particular objection

12 applies to a specific client or not because I don't have

13 anything that pins it into a specific client, and that's not

14 sufficient.

15        MR. HERRICK:  Let me explain that, Your Honor.  We

16 asserted objections relating to privilege when we initially

17 responded to the debtor's questionnaire.  The privilege was

18 asserted in each and every case because the questionnaire on

19 its face called for privileged information.  That doesn't

20 necessarily mean that there is privileged information in each

21 case and let me tell you why.  I take the position and I

22 believe the position can be taken if you are asked a privilege

23 question, you don't object, you've waived the privilege.  And

24 now I think that's Black Letter Law and it's true, and I think

25 that objection -- or the argument can also be made if you're

1  asked the question, you don't raise the privilege even if you

2  don't have the privileged information.  If I were to later go

3  out and these cases are still litigation cases and hire a

4  consulting expert on this case, I've already waived that

5  privilege so that information would be discoverable.  So -- and

6  if the debtor read our response, our response states in the

7  body of it "We believe we are in compliance with the Court's

8  order."

9          You know, counsel said that the compliance -- no

10  additional documents were received after that as though the

11  plaintiffs won.  Well, we did win, Your Honor.  We did win.

12  Your ruling upheld the consulting expert privilege, with the

13  exception of two narrow distinctions that the Court allowed in

14  it.

15          THE COURT:  Uh-huh.

16          MR. HERRICK:  We do not believe we have any documents

17  that are responsive to that, and I say we do not believe

18  because of what Mr. Esserman raised this morning about somebody

19  who saw somebody 10 years ago and they've got that in a

20  separate file somewhere that's not even associated with the

21  case.  Can I rule out in each and every instance that that

22  might exist?  I think it's highly unlikely, but the possibility

23  does exist that that's there.

24          As to this idea of a privilege -- or some certificate

25  of compliance is what I want to deal with first.  Your Honor,

1  I'm fairly conversant with the federal rules.  I'm unaware of

2  any federal rule requiring a certificate of compliance with

3  discovery.  I think the fact that -- they've got this

4  backwards.  They're assuming that we haven't complied when in

5  fact we have.  And they're assuming that -- he wants to know

6  where the ball is hidden.  He doesn't even know if there's a

7  ball.  He's assuming there's a ball out there.  And with

8  respect to my firm, Your Honor, there is no ball.  There's

9  nothing left to be produced that is responsive to the Court's

10  order.

11        Now with respect to the privilege log.  The privilege

12  log is generally required in an instance where there's

13  documents related to attorney client privilege, not the

14  consulting expert privilege which is the subject that we're on

15  here today.  And in fact, the debtor's made no mention of any

16  case or any law that required a privilege log in the consulting

17  expert arena.  And in fact, the law is clear that if asserting

18  the privilege requires you to waive the privilege, then you

19  don't have to do that.  If the --

20        THE COURT:  No.

21        MR. JOHNSON:  -- privilege log would require you to

22  waive --

23        THE COURT:  Right.

24        MR. JOHNSON:  -- the privilege, excuse me, then you

25  don't have to provide a privilege log.  You know, if -- based

on what he wants, he wants to know if I am withholding an

expert report in a case, he wants to know who the client is,

who the expert is, when I got the expert report, what the date

of it was.  I mean I'm basically telling him hey, I've got

an -- I've a report that's adverse to me in this case, which is

the whole reason why the consulting expert privilege exists so

I don't have to tell him that when I've got a consulting

expert.

So for that reason we would object to any sort of

privilege log, especially when your order has been as clear as

it is and as detailed as it is as to where the consulting

expert privilege applies and where it doesn't.  There's no need

for a privilege log, and, Your Honor, we are in compliance with

the order.

MS. RAMSEY:  Good morning, Your Honor.  Natalie

Ramsey for the Montgomery, McCracken firms.  Your Honor, six of

the seven firms that were respondents to this motion that I

represent were listed in category one.  That is, they were

firms that have individually communicated with the debtor and

certified that they have not withheld any B reads by reason of

the consulting expert privilege.  They are entirely compliant.

There's no argument about that.  Our objection was that we had

to respond in the first place.

With respect to the one firm that I represent that

has withheld, they were listed on category two and that is the

1  law firm of Waters & Kraus.  Waters & Kraus has provided a

2  affidavit, which is attached to our response, that tracks this

3  Court's order and certifies that they have not withheld any B

4  reads that are not permitted to be withheld under the strict

5  guidelines that this Court set forth.

6          And I agree with Mr. Herrick.  The Court set a very

7  bright line rule with respect to interpretation.  There's not a

8  lot of interpretation that one can bring to that order.  Either

9  you are employed before the diagnosing doctor saw you or you

10 were not.  Either you were sent to that diagnosing or that B

11 reader in anticipation of litigation or in preparation for

12 trial or you weren't.  Those are basically the criteria.  It's

13 easy to apply.

14          With respect to -- one thing that Mr. Bernick said I

15 do agree, and that is that there has been no identification of

16 claimants and I think the debtor is entitled to know which

17 claimants are asserting a consulting expert privilege.  We have

18 never been asked that question until in court today, but we

19 agree that he is -- that the debtor is entitled to that

20 information.  However, during the presentation on category two,

21 there were statements made lumping us with other firms of no

22 record of compliance, no accountability.  I object to those

23 characterizations.

24          To backtrack just a moment, when the Court entered

25 its consulting expert order, it was following the submission by

1 representatives of the plaintiffs and by the debtor of two

2 competing orders because we couldn't reach agreement.  The

3 Court crafted an order.  Nowhere in either of those two

4 proposals and to my recollection, nowhere in the communication

5 surrounding them was there ever a discussion of a privilege

6 log.  And so one of our objections to the newly imposed request

7 for a privilege log is that this Court entered an order, that

8 the order -- the requirement of a privilege log was not a

9 subject of discussion, and it's not in the order.  It should

10 not now be required.  The second is that the order is very

11 clear and if a firm is prepared to certify that they have

12 complied by strictly tracking the Court's orders as we have, we

13 don't believe that it is appropriate to also require them to go

14 to the additional burden of preparing a privilege log.

15          The third point again was mentioned earlier and that

16 is that nowhere in the -- in the cases cited by the debtors

17 were we talking about a consulting expert privilege and the

18 consulting expert privilege is unique because when one hires a

19 expert and has not disclosed them as an expert that they're

20 intending to use at trial, it is necessarily because there is a

21 litigation strategy, there is a reason for their non-

22 disclosure, and to require disclosure of the -- that

23 information would undo the privilege itself.

24          And so when there is a discussion of a privilege log,

25 if there were to be any information given other than who's

1  withholding, it would seem to me the only other information

2  appropriate would be the date of employment and the date of a B

3  read.  In other words, not the identity of the doctor.

4          And I think there are a number of cases that we have

5  cited in our papers and that have been decided in other

6  jurisdictions where it's been expressly held that the identity

7  of a doctor should not be disclosed in a -- or the expert

8  should not be disclosed when the consulting expert privilege is

9  at issue, and we cited the <u>Agear</u> (phonetic) case out of the

10 Tenth Circuit in our papers, but I would also cite to the Court

11 to <u>Queens University at Kingston</u>, 161 F.R.D. 443 at 446, a case

12 out of the District of Kansas, 1995, and the <u>Aphart (phonetic)</u>

13 <u>Group, Inc. versus Owen Illinois</u> case, 2003 Westlaw 21800083 at

14 2, and that's out of the Northern District of Illinois, July

15 25th, 2003.

16         Your Honor, I -- our clients are a little different

17 than Mr. Esserman's when we -- one of the things the debtor had

18 asked for also was the date of original diagnosis.  To the

19 extent that these cases were -- came in as referrals, our --

20 the law firm may not know the date of original diagnosis and to

21 require them to go back and try to reconstruct that information

22 when it is very clear that they know when they were employed

23 and they know the date of the B read.  That just seems like

24 information that is not necessary.  They were hired -- in some

25 instances, it is the case that litigation was actually

1  commenced before --

2              THE COURT:  Wait.  I'm sorry, I didn't follow.

3              MS. RAMSEY:  Okay.

4              THE COURT:  The date of the original diagnosis or the

5  date of the employment by the firm?

6              MS. RAMSEY:  The date of the employment by the firm

7  our firm has no -- Waters & Kraus has no objection to

8  providing.

9              THE COURT:  Okay.

10             MS. RAMSEY:  We know that date.  That date is in our

11  records.  The date of original diagnosis is not always a date

12  that we would know.

13             THE COURT:  Oh, well then --

14             MS. RAMSEY:  Because in some instances, these cases

15  were referred by other counsel --

16             THE COURT:  Oh, well then that's what --

17             MS. RAMSEY:  -- for the purpose --

18             THE COURT:  -- you'd state.

19             MS. RAMSEY:  Exactly, Your Honor.  So for our

20  purposes, the information that we would be agreeable to

21  providing to the debtor would the claimant's name, identifying

22  the claimant, the date of a B read that has been withheld, and

23  the date of our engagement by the client.  Those three pieces

24  of information ought to be sufficient, if a B read is required

25  at all, and we do object to the requirement at all because

1  again, we have already certified that we have not withheld any

2  B reads that occurred before the date we were employed and that

3  were not conducted for the purposes of litigation.

4          THE COURT:  Okay.  Well, I think to the extent that

5  the firm has certified that there's nothing withheld, there

6  isn't anything more to do.  I believe what the debtor is asking

7  is for firms that, in the debtor's view, have not certified

8  that there is not something clear in the record to the debtor

9  that in fact information is fully disclosed.  And the problem

10  for the debtor, of course, is that in -- down the road, that

11  information may somehow be used to, I guess, counteract the

12  debtor's expert reports and the debtor has, I think, the right

13  to know that there might be some additional evidence out there

14  and to know that it doesn't have the whole universe of data.

15          So I think to that extent the need for that

16  information is clear it is discoverable, but it also should be

17  protected and I think the concept of doing it by interrogatory

18  rather than doing it by privilege log is better.  I agree that

19  the cases really don't deal with a privilege log in the context

20  of a consultative privilege as much as in a context of an

21  attorney client privilege assertion, and I think it can be done

22  by interrogatory.  To the extent the debtor, you know, wants to

23  ask for the original diagnosis date, if a firm doesn't have

24  that information, it'll -- or client, whoever, you know, the

25  answer will be we don't have it.  I mean you can't answer what

 1  you don't have.

 2          MS. RAMSEY:  Your Honor --

 3          THE COURT:  But --

 4          MS. RAMSEY:  Sorry.

 5          THE COURT:  I'm sorry.  Go ahead.

 6          MS. RAMSEY:  No.  I was just about to say to the

 7  extent that that doesn't apply to the clients that I represent,

 8  I'll leave that to others to respond to, and there's only one

 9  other point and it was an ancillary point, but I wanted just to

10  raise objection to it now.

11          The debtor has previewed that its intention is to

12  request an adverse inference where information isn't provided

13  and I just want to put on the record will -- obviously that's

14  an issue for another day, but that kind of litigation tactic

15  maneuver -- I don't mean it in a pejorative way; I can't think

16  of a other way to say it -- hurts everyone.  The goal of the

17  estimation process is to achieve a genuine real equitable

18  number to be put into a trust to pay the people who are

19  legitimate claimants against this estate, and I think that as

20  we get into the evidentiary rulings with respect to the

21  estimation hearing it is important to see this in its proper

22  context.  Not as a piece of litigation between two parties

23  where these kinds of rulings may be appropriate, but that

24  there's a higher calling in an estimation process by reason of

25  its ultimate purpose.

1          THE COURT:  Well, I am somewhat sympathetic to that

2   view.  That's why I think that if there is really information

3   that hasn't been produced, it should be produced.  And if it

4   means pushing this trial off, which believe me I do not wish to

5   do, maybe it needs to be pushed off so the debtor gets the full

6   scope of the information.

7          MS. RAMSEY:  And, Your Honor, with respect to my

8   clients, we are very much in agreement with the Court.  We do

9   not want this pushed off further.  On balance, we think that

10  that continues to prejudice our clients.  However, it is much

11  more important to us that at the end of the day the number is

12  reflective of a real -- a reality and properly -- and a trust

13  is properly funded.  Thank you.

14         THE COURT:  Okay.

15         Okay, Mr. Bernick, I think your concept of asking for

16  the interrogatory and to get to what claimants actually are

17  withholding what information is probably the way to proceed.

18         MR. BERNICK:  Yes.

19         THE COURT:  And I think the fact that Rust is 30 days

20  away from producing an expert report probably we should,

21  through today, have Rust go forward with producing that report.

22  I think on May 2nd we should, however, continue the question of

23  whether or not some additional information after you know the

24  claimants who are withholding information by way of answers to

25  the interrogatories and whether this estimation hearing should

1 be pushed off because I don't know what the scope of that is

2 and if it is a sizeable portion of information that the debtor

3 really does need to add to the database to get to a live

4 number, I think at this point in time, you know, it's taken two

5 years to get here and frankly, if it takes another three or

6 four months, maybe that's the way to go.  And I do not say this

7 lightly.

8          MR. BERNICK:  Yes.  Well, I appreciate that.  I --

9 and let me bear that in mind, come back to it.  I want to

10 respond to just a couple of things and then maybe get concrete

11 on that timeline because I will tell you that the debtor

12 doesn't want to --

13          THE COURT:  I'm sure.

14          MR. BERNICK:  -- push off the date and in that extent

15 we are sympathetic with the committees or the committee, and

16 Mr. Mullady's client, Mr. Austern, we know don't want to push

17 off the date.  The problem is when you push off the dates, you

18 -- it's kind of like you take maybe a step forward and maybe

19 you take a step backward or a half a step backward because

20 people find new things to raise and history has not

21 demonstrated in this case that putting off dates tends to

22 streamline things.  It gets things done, but it raises a lot of

23 other pain and at a certain point you got to --

24          THE COURT:  I'm going to stay all litigation in the

25 case but this and tell everybody, except for business issues,

1  nothing else ought to happen in this case.

2          MR. BERNICK:  Well, there -- don't even suggest that

3  because then we'll have the property people in here saying push

4  off all those dates.  Please.

5          THE COURT:  I was being facetious.

6          MR. BERNICK:  Yes, I --

7          THE COURT:  It was a joke.

8          MR. BERNICK:  -- I understand that, but the record

9  would not always reflect that and the --

10          THE COURT:  All right.  It was a joke.  Let the

11  record reflect it was a joke.

12          MR. BERNICK:  Okay.  Let me respond to a couple of

13  different things and then get back to this key point because I

14  think that we're -- there's a lot of -- there are a lot of

15  professions of higher callings and love and cooperation --

16          THE COURT:  I didn't hear --

17          MR. BERNICK:  -- and --

18          THE COURT:  -- the love word.

19          MR. BERNICK:  Well, but that's the kind of suggestion

20  is that kind of warm tone and Natalie always has a nice smile

21  and Mr. Esserman always has kind of a nice smile and

22  everything's calm, and then the papers get filed and his, you

23  know, the claws comes out and the teeth are gnashing.

24          With respect to Motley Rice, as I now understand it

25  with respect -- Motley Rice objected on behalf of all of the

1  claimants they -- there's a blanket objection, and we now have

2  heard somewhat candid testimony from their counsel that well,

3  gee, you got to do that because otherwise you might waive

4  something.  It's true that if you actually have a privilege and

5  you don't assert it, you waive it.  It is not true that if you

6  don't have a privilege you assert it so that you won't waive

7  it.  You have to have a privilege that you believe is there in

8  good faith to make a filing before this Court that complies

9  with Rule 11.

10         So if you have an objection, it's not a proper

11  objection.  You don't make it for the sake of preserving the

12  opportunity to make a bad objection.  You don't make the

13  objection.  And we now know that effectively these folks never

14  looked.  They never looked to all the individual cases.  They

15  just filed a blanket objection and came here to litigation it,

16  and today it looks like they still haven't looked.  And why do

17  we say that is because they still can't tell us who the

18  particular claimants are who are asserting this versus who are

19  not.

20         THE COURT:  Well, that's what --

21         MR. BERNICK:  And --

22         THE COURT:  -- your interrogatory though -- I think

23  we should just cut through this.  Your idea about getting

24  interrogatories together that will identify the claimants and

25  what is it that they're asserting a privilege for I think is a

1  good one.

2         MR. BERNICK:  I want to -- but I want to get -- I

3  mean what I'm really kind of getting to is that the remarks

4  that have been made today underscored the need for that, but

5  then also counsel that in framing the interrogatory we have to

6  be clear now it's very apparent not only the particular pieces

7  of information that are relevant, but where they're going to go

8  to get that information.  I went back and took a look at the

9  Waters & Kraus affidavit and it's different from what Mr. Kazan

10  told me.  And Mr. Kazan's from a different firm, but I had

11  thought and when we put these folks in category one and were

12  lavishing all kinds of love and praise for their

13  responsiveness, I guess I had missed the boat a little bit.

14         Mr. Kazan told me over the telephone, and I say this

15  not because it's somehow a formal record, but it does frame our

16  approach here today, that not only was there not anything being

17  withheld improperly under the order, there wasn't anything

18  being withheld, period.  That is, the -- we had all that there

19  was.  The B reads were all there.  We didn't have to worry

20  about whether there's compliance with the order or not because

21  we had it all.  And boy, that's an easy thing to respond to if

22  you've given us that all.  That's what the questionnaires asked

23  for.  There's nothing more to be said, and all we needed when I

24  said the verification is the verification that we've got all

25  the B reads, nothing is being withheld.

1          In the case of Waters & Kraus in listening to Ms.

2   Ramsey's remarks today, they were much more careful.  This

3   says, "The only B readings that Waters & Kraus has withheld

4   from Grace represent facts known or opinions held by experts

5   who were retained specifically in anticipation" dah dah dah

6   "who are not presently" -- none of the B readings Waters &

7   Kraus has withheld were made by -- says, "All specific to

8   Waters & Kraus" and then the representation at the end.  "None

9   of the B readings that Waters & Kraus has withheld were made by

10  B readers who examined a claimant prior to the time that an

11  attorney client relationship was established between that

12  claimant and Waters & Kraus."

13         So we now know that Waters & Krause, which is a very

14  well-known and extremely highly regarded firm, gets matters on

15  referral.  So the only representation that's been made with

16  respect to these people are representations A, that there's

17  been compliance with the order, which is a conclusion of law.

18  It is not a statement of the predicate facts that we would get

19  through an interrogatory and it's confined to Waters & Kraus.

20         Well, we're not just focused on Waters & Kraus.

21  Waters & Kraus is counsel for these people, although Waters &

22  Kraus has not submitted a 2019 statement before this Court.  So

23  we want to get the information from the clients and if there's

24  negative B reads like we got the story about how people's B

25  reads changed over -- if it's all so simple and they changed

1 over time, then geez, I guess they'll have a pretty good answer

2 to the question of why the first B read was negative and the

3 next one was positive.  But until we know what the -- they both

4 are, we can't assess that.  We just have to take it on their

5 say so.

6            So the interrogatories need to get the information

7 that is possessed by these firms and goes back with respect to

8 other firms that relate to these claims.  Otherwise, we're

9 going to continue to have -- any company that got this

10 discovery would have the obligation to make inquiry and to --

11 we wouldn't have this hiding the -- these law firms are

12 companies.  They're businesses.  They should do business on the

13 same basis --

14            THE COURT:  All right.  Look, I think we -- I just

15 have to cut through this because number one, I have Federal-

16 Mogul starting and you've made these arguments and I'm ruling

17 your way.

18            MR. BERNICK:  Yes, I --

19            THE COURT:  So there isn't any point to doing this

20 anymore.

21            MR. BERNICK:  -- I got that.

22            THE COURT:  Okay.

23            MR. BERNICK:  So here's what we would suggest the

24 Court is that we have an order that says, just like we had with

25 respect to the questionnaires, that as of today, Rust need not

1  process further B reads that come in and that B reads that come

2  in after today are not timely filed.

3           THE COURT:  Well --

4           MR. BERNICK:  Otherwise, there is -- you know --

5           THE COURT:  I --

6           MR. BERNICK:  -- Rust will not have it, but we'll

7  still hear arguments about them.

8           THE COURT:  I think what we should do is have Rust

9  process B reads that are coming in through today for purpose of

10  preparing the initial expert report, have you prepare the

11  interrogatories that you choose to prepare to identify the

12  clients, what objections are being raised on behalf of those

13  clients, and whatever other information it is that you're going

14  to ask for in the interrogatories that we're going to discuss

15  on May 2nd, and see at that time whether or not this motion to

16  compel additional information should or should not be granted.

17           I understand that if I grant additional information

18  that that means that Rust will have to add information to the

19  database, that a supplemental expert report will be necessary,

20  and that the trial dates will be pushed back.  I understand all

21  that, but that is something that I want to consider and I'm

22  going to consider in May.

23           MR. BERNICK:  That's fine.

24           THE COURT:  But for today, it seems to me that we

25  should keep to the discovery schedule.  Rust obviously can't

1 keep to that schedule unless we cut -- use today as a cutoff

2 for purposes of this initial expert report.  So we will use

3 today as a cutoff for the purpose of this initial expert report

4 and deem anything that comes in after today to be untimely for

5 purposes of that report and neither Rust nor anybody else will

6 use anything that comes in --

7             MR. BERNICK:  That's fine.

8             THE COURT:  -- for purpose of reports for this

9 initial discovery order that is currently in effect.

10             MR. BERNICK:  I think that's fine, Your Honor.  I

11 think that's very carefully and well point.  The only little

12 wrinkle is that we now -- I don't want the Court to be -- to

13 suggest today that if the overall dates get pushed, which I

14 suspect that the debtor will resist, that we're then -- if Your

15 Honor overrules that and pushes the ultimate dates that we're

16 then going to have initial and then supplemental reports for

17 this reason:  The way that our experts are working is this is a

18 scientific matter.  You can't do -- you can't know that you're

19 working with a reliable set of data and make slices on that

20 data and draw conclusions unless you know what the population

21 is and --

22             THE COURT:  I understand that.

23             MR. BERNICK:  -- what it's integrity is.  So to have

24 an initial expert report from these people simply opens them up

25 to a bunch of judgments that they're going to have to make with

1  less than a complete set of information and the possibility of

2  being impeached, and we resist that.  We think that if we're

3  going to need more time to get the data, then the expert report

4  should simply be pushed.  If we're pushing the ultimate date,

5  we should push those -- the number crunching expert reports

6  because they're not going to be meaningful.  They're just going

7  to create problems --

8          THE COURT:  Well --

9          MR. BERNICK:  -- for us.

10          THE COURT:  -- no, I --

11          MR. BERNICK:  So --

12          THE COURT:  -- I think the answer to that, Mr.

13  Bernick, is that I think because I would be requiring a

14  different expert report that the first one is based on the

15  information that existed as of a certain date.  If the numbers

16  change because the data changed, I don't see how that's an

17  impeachable event.

18          MR. BERNICK:  Then why have -- then why really

19  have -- I'm not -- I don't know that we have --

20          THE COURT:  Because I don't know that the dates will

21  change.

22          MR. BERNICK:  Well, that's what I'm saying is well,

23  why don't we just -- all that I was suggesting is that we hold

24  off on articulating that.  We just stick to our schedule as we

25  have today, come back on the 2nd, and Your Honor will then take

1  up the interrogatories and what impact they may or may not have

2  on the rest the dates, period.  I think that's the essence of

3  what your --

4          THE COURT:  It is what I'm saying.

5          MR. BERNICK:  Yes.  Okay.

6          THE COURT:  What did I --

7          MR. BERNICK:  Thank you.

8          THE COURT:  I'm --

9          MR. BERNICK:  No, because I think you suggest a

10  little bit that we might go to phased reports and I just --

11          THE COURT:  Oh, no.

12          MR. BERNICK:  -- wanted to flag -- I wanted to flag

13  that that is an issue of its own --

14          THE COURT:  Oh, I understand that.  All I was saying

15  is if we push the -- if we have to push the trial date back

16  because there is going to be supplemental data --

17          MR. BERNICK:  Yes.

18          THE COURT:  -- I think -- I mean I would -- if I'm

19  going to require supplemental --

20          MR. BERNICK:  Yes, okay.

21          THE COURT:  -- data, I think it's going to require

22  the experts to take a look at that additional data.

23          MR. BERNICK:  Understand.

24          THE COURT:  So --

25          MR. BERNICK:  That -- fair enough.

1              THE COURT:  Okay, that's the point, but yes, I -- for

2    today, I think we should keep the order that's in place in

3    effect, use today as the cutoff for all parties with respect to

4    the B reads that are submitted to the debtor as of today.  That

5    will be it.  That will be the universe of data that anybody can

6    use the B reads as of today for purposes of the order that's in

7    place as of today.

8              Now, something else -- I wanted to address something

9    else, but I've lost track of what that was.

10             MR. BERNICK:  I think we had the idea of a cutoff on

11   the 13th, the interrogatories, and then we had a long

12   discussion about the need to get claimant specific information,

13   but it seems to me that that --

14             THE COURT:  I think you can do that in --

15             MR. BERNICK:  -- gets into the interrogatories.

16             THE COURT:  -- the interrogatory.

17             MR. BERNICK:  Beyond that I'm not sure -- just trying

18   think what else was said.  Oh, the 2019 statements may have --

19             THE COURT:  Oh, the 2019 statements, yes.

20             MR. BERNICK:  Was that what Your Honor was thinking

21   about or was that --

22             THE COURT:  Well, there -- I was thinking about that.

23             Miss Ramsey, I don't know, if Waters & Kraus hasn't

24   filed a 2019 statement, I suggest that they and everybody that

25   you folks represent better get them on record because at some

1  point they're going to A, want to vote on a plan, and B, want

2  to try to file claims against the trust and I'm here to tell

3  you they're not going to do either, unless those 2019

4  statements are filed.  They're late, and I expect them done,

5  and I expect them done in compliance with the Court's order,

6  and I expect them done now.

7        MS. RAMSEY:  We will follow-up, Your Honor.  I was

8  unaware of that, but we will make sure that all of our firms

9  get 2019's on file.

10        THE COURT:  And I would suggest, Mr. Finch, that on

11  behalf of the committee, since the committee probably has the

12  most direct contact with the law firms that represent these

13  people, that you may want to do them a favor and advise them of

14  this order of the Court.  Because I don't know how to get in

15  touch with these folks other than through the committee, but if

16  they're here, they're participating, and they haven't filed

17  2019 statements, they're doing their clients a very great

18  disservice and they either better notify their malpractice

19  carriers or they better file the 2019 statements promptly.  And

20  that is an order.

21        MR. BERNICK:  I don't know, Your Honor, that there

22  was -- I'm struggling with what else -- you probably heard

23  something and tucked it away and it'll come back here in a

24  minute.

25        THE COURT:  Well, I did, but I don't remember at this

1 point what it was.  I think it just had to do with the

2 interrogatories, as opposed to anything else, but I don't

3 recall what, so I don't know that you need a specific order at

4 this point except to continue the motion to compel until May

5 2nd, but --

6            MR. BERNICK:  I think that's right.

7            THE COURT:  -- if you do need an order with respect

8 to the cutoff for the B reads as of today, then you can prepare

9 that --

10            MR. BERNICK:  I --

11            THE COURT:  -- order and I will sign that order.

12            MR. BERNICK:  Thank you.

13            THE COURT:  Anybody have anything that I need to

14 address?  I don't even remember who raised it, so I can't

15 recall what it was that I thought I needed to address.  I

16 apologize.

17            MR. BERNICK:  I think it then falls to us, Your

18 Honor, to report on what's happening with the database and

19 we -- as Your Honor will recall, we committed to make that

20 report last time pursuant to the discussion about what to do

21 with the attachments.

22       (Pause/counsel confer.)

23            THE COURT:  While you're thinking about that, on the

24 Speights & Runyan matter, Miss Baer, are you just going to

25 submit an order that will mark that motion as moot?  Item four?

1          MS. BAER:  If you need an order, I can certainly do

2  that.

3          THE COURT:  Yes, I think that would be helpful.

4          MS. BAER:  Okay.

5          THE COURT:  Thank you.

6          MR. BERNICK:  We've gone back and taken a look at the

7  question of whether there may be some instances in which the --

8  it's possible for Rust to supplement the database by including

9  some of the materials that did not appear on the face of the

10  questionnaire but which could be incorporated really without

11  the exercise of discretion.  Just to be clear, Your Honor I

12  know well remembers the long history of this, but the function

13  that Rust served was to go through and literally record what's

14  on the questionnaire and if it's not on the questionnaire, they

15  don't have the ability to deal with it.

16          The order gave the -- opened up the possibility that

17  with respect to the attachments that the questionnaire could

18  actually be filled out by making specific reference to the

19  attachment.  And the idea, frankly, was that there wouldn't be

20  any ambiguity.  You could look to the questionnaire itself and

21  see the space filled in with a document number, including the

22  specific reference Your Honor said last time to exactly point

23  out specifically where in that attachment the reference that

24  answers the question is -- points to a page, paragraph, line,

25  whatever, so that a data processor could say okay, I'm going to

1  go to document 395A.  I'm at 395A paragraph 3, line 2.  Ah,

2  there it is, and fill it in.  Because that's all that Rust is

3  qualified to do.

4         So we went back to look at the data that Rust had

5  been provided with to see where that might be possible, and it

6  is possible in a couple of places.  It's not actually

7  completely in compliance with the Court's order, but we think

8  that it complies with the intendment of what Your Honor

9  suggested last week.  And I'm going to go through a little bit

10 of what's involved with this and which firms are involves, and

11 I'm going to come back and ask the question about whether this

12 makes sense.  I know that Your Honor would like to have it make

13 sense, but I want to make sure that Your Honor understands what

14 it is this is going to involve and what it's going to cost.

15        There are -- what's basically happened is that the

16 firms that we're dealing with did not fill out the

17 questionnaires in that way.  What they did was to create their

18 own formats, kind of their own questionnaires, and then fill

19 out -- fill the information in, in their own questionnaires.

20 So for example, the Motley Rice firm has a -- an Excel

21 spreadsheet that repeated the questions and then kind of filled

22 in the blanks.

23        The Excel spreadsheet is not the questionnaire.  It

24 is, under Rust's protocol, an attachment because it's not the

25 questionnaire.  But it's possible to take the Excel spreadsheet

**J&J COURT TRANSCRIBERS, INC.**

1 and on the basis of data processing, fill in the answers where

2 the Excel spreadsheet provides the answers.  And that's not

3 very expensive to do, and it can be done relatively promptly,

4 and we're prepared to go ahead and do that.  That actually

5 covers a significant number of questionnaires.  The only -- not

6 necessarily a lot of questions or a lot of information will

7 come out of that, but it's certainly something that Rust is

8 able to do and will do.

9         We then have a bunch of other questionnaires for

10 certain other law firms, and this now gets again to the Baron &

11 Budd, Silber Pearlman, perhaps LeBlanc & Waddell firm.  What

12 they did is they also kind of retyped the whole questionnaire

13 and they answered some more questions there, but it's not --

14 the data is not amenable to being handled in that way.  There's

15 no master data set.  So you have to literally go through -- my

16 people here are going to tell me -- Ms. Basta's look -- is he

17 going to get this right or not.  Is they're going to go through

18 and have to hand search each of these questionnaires to make

19 sure that they're -- to actually pull the information off and

20 record it.  So it's a recordation task that's possible, but

21 quite time consuming to do.

22         There's also a problem because when this has happened

23 before, there are some firms that have retyped the question --

24 what purports to be retyped questionnaire, but the questions

25 are slightly different.  And so we don't know whether exactly

1  the same question was used for all the claimants that are being

2  represented by these Baron & Budd law firms.  We think we can

3  probably sort that out.  We hope that they're the same

4  questions --

5          THE COURT:  Well --

6          MR. BERNICK:  -- in all cases --

7          THE COURT:  -- don't those firms have the information

8  in their database so that they can put it onto the Excel

9  spreadsheet and give it to you, if you can use an Excel

10 spreadsheet?

11         MR. BERNICK:  There's probably a lot of things that

12 could be done, but all we know is this is what the -- this is

13 what Rust has, and as a consequence, to process what Rust has

14 that's not an Excel spreadsheet --

15         THE COURT:  Well, I mean I think we should --

16         MR. BERNICK:  -- they'd have to hand --

17         THE COURT:  -- just ask the firms.  If they've got it

18 in, you know, in some sort of word processing format, it

19 shouldn't be hard to dump that data into a spreadsheet and give

20 it back to Rust --

21         MR. BERNICK:  Well, it --

22         THE COURT:  -- if Rust can make use of it in a

23 spreadsheet format.

24         MR. BERNICK:  Well, it is only -- Your Honor -- they

25 had -- there two things that you need.  One is that you need to

1  have an Excel spreadsheet that is set up so that the Excel

2  spreadsheet on its face recites the question and the answer so

3  that we know the law firm on behalf of the claimant is saying

4  this is the answer to this question.

5          THE COURT:  Yes.

6          MR. BERNICK:  Okay.  That's one.  And then two, the

7  data itself has to be in a form that's manipulable.  It turns

8  out that they use Excel.  That's manipulable.

9          With respect to the other firms, A, we don't know

10 that the questions match up.  They may or they may not.  And B,

11 the data's not manipulable in that fashion so we have to do it

12 by hand.  That takes times.  That's going to take about three

13 or four weeks to go through literally thousands --

14         THE COURT:  But that's what I'm saying if the law

15 firms have done this in some word processing format, in all

16 probability, that format ought to be able to be converted into

17 a database --

18         MR. BERNICK:  I don't -- I just don't know, Your

19 Honor.

20         THE COURT:  Well, if it isn't, then, you know, I

21 don't know how --

22         MR. BERNICK:  Well, would be here -- so we can go do

23 this.  Again, it'll be only for a couple questions in many

24 cases.  We can go do this and it'll take about -- we'll work in

25 tandem so that we're not just doing one law firm then the other

1 then the other.  We'll work on it.  We can get it done in about

2 three or four weeks.

3        The cost is not insignificant.  I believe that Rust

4 has cost so far for all the work that they've done the order of

5 $6 million.  This may cost as much as another 2 -- 1.5 to 2

6 million dollars.  It may cost less.  But it may cost that much

7 because you are doing this by hand.  So you're talking about

8 something that's not cheap.  It's expensive.

9        And then what are you going to get?  What we're going

10 to get is we now have -- and this is the whole idea of the

11 questionnaire is that there wouldn't be firm-by firm, claimant-

12 by-claimant variation in how the data was being given to us and

13 what he data was.  And this could all be handled on a totally

14 consistent basis.  That's very important for scientific

15 reasons.  It's hard do a statistical analysis when you're

16 getting different kinds of responses from different kinds of

17 people.  The difficult is, is that if Rust now goes into --

18        MR. FINCH:  I'm agreeing -- I can --

19        MR. BERNICK:  Well, then let me just finish and then

20 if you want to agree, I'll be even happier.

21        If it turns out that Rust now processes certain

22 attachments because they are amenable to be processed with

23 essentially electronics and no other human input, then what the

24 effect of that will be is that it will preferentially pick up

25 into the Rust database on the basis of those firms that happen

**J&J COURT TRANSCRIBERS, INC.**

1  -- I mean from all that we can see, our position on Motley Rice

2  has not been a very supportive one in most respects, but it

3  turns out that they're really good with Excel.  So all of a

4  sudden now --

5              MR. HERRICK:  Who knew?

6              MR. BERNICK:  -- the -- now all of a sudden the Excel

7  spreadsheet means that the Motley Rice data gets put in and

8  nobody else's data gets put in on quite the same kind of way.

9  So I'm really kind of asking at the end of the day what is the

10 point.  This whole issue was prompted by the --

11             THE COURT:  I think Mr. Finch is just --

12             MR. BERNICK:  Yes.

13             THE COURT:  -- prepared to agree that there isn't a

14 point, so why don't we hear --

15             MR. BERNICK:  If Mr. Finch agrees with everything

16 that I said, then I will have nothing further to say.

17             MR. FINCH:  I'm not sure I agree with everything that

18 he said, but what I understood him to say is there basically

19 two different levels of ease and cost to do this.  One is if

20 you're just taking stuff off an Excel spreadsheet and dumping

21 it not something else.  That's something that's easy to do and

22 doesn't cost a lot of money; is that correct?

23             MR. BERNICK:  That's correct, and I believe it's only

24 with respect to the esteem firm of Motley Rice.

25             MR. FINCH:  Okay.  But the rest of what he said is

1  you've basically got to take stuff that's in one type of word

2  processing or pdf file and go and look at it by hand and that's

3  going to cost one and a half to two million dollars.  I guess

4  speaking for the ACC, I would be satisfied if they just do the

5  first option, which is they just take that spreadsheet that the

6  Motley Rice people and dump it into the questionnaire --

7            THE COURT:  But that's going to skew your --

8            MR. FINCH:  -- that's simple and easy to do.

9            THE COURT:  -- database.

10           MR. FINCH:  The whole database is going to be skewed

11  no matter what you do, Your Honor, because it's not going to

12  pick up a lot of the other attachment information that may or

13  may not be there but you have to review.  So I mean this is not

14  a science experiment, this is evidence produced in response to

15  discovery.  It's going to be messy.  It's going to be skewed.

16  I'm trying to do things that are simple and easy, and if it's

17  simple and easy to dump the Excel spreadsheet from Motley Rice

18  into the next generation the Rust database and get that in a

19  couple weeks, then I say do that.

20           If we're talking about is going back and trying to

21  convert Word files or pdf files into Excel or vice versa and

22  you have people in Minnesota or India or wherever doing this

23  coding, go through and, you know, hand pulling stuff, that's

24  going to be messier and lead to more error.  That's sort of

25  where I am.  So as between the smorgasbord of one and two, the

123

1 ACC says pick option number one, which is dump the Excel

2 spreadsheet from Motley Rice into the data.

3          THE COURT:  Okay.

4          MR. BERNICK:  Can I -- in that same spirit of love

5 and cooperation we have here now, can I suggest that if Mr.

6 Finch believes that -- acknowledges that by putting Motley Rice

7 in, we don't really add to the quality of the data that's in

8 the database -- we still are of the view that between the

9 database and the attachment review, science finally can be

10 achieved in the asbestos litigation and we can do this thing

11 properly.  And we prefer not to spend the extra time and

12 effort, even if it's not much, putting in a bunch of data that

13 counsel recognizes is simply going to be biased and we're going

14 to have to eliminate when we go through and do the expert work.

15 What's the point?

16          MR. FINCH:  It makes it easier for our experts, among

17 other things, Your Honor.  That's the point.

18          MR. BERNICK:  To criticize the Rust consulting.  No,

19 that's -- for their experts, they can --

20          MR. FINCH:  No --

21          MR. BERNICK:  -- they can go get the Motley Rice

22 Excel spreadsheet anytime they want.  They can go ask for it.

23 He represents them.

24          MR. FINCH:  Actually, I don't represent Motley Rice

25 or Motley Rice's clients, except in the sense that I represent

1 all the asbestos victims in the estimation, but I think that

2 the option number one is complying with the Court's order about

3 if the answer can be gleaned from the attachments to the

4 questionnaire with no discretion, which it sounds like what

5 you're talking about is pressing a button, then they should do

6 it.  If it has to be, you know, wandering around through pages

7 and pages of stuff and maybe missing stuff and maybe having to

8 use some discretion and it's going to cost $2 million, then

9 they shouldn't do it.  That's my only point, Your Honor.

10          THE COURT:  Mr. Bernick, it seems to me that if your

11 experts don't want to use that information that they're going

12 to tell you that why they're excluding it and you'll -- because

13 Rust will create the database first without it and then will

14 add that information into a second dump of data, then have them

15 do it first without it, then add it for purposes, and disclose

16 it both ways.  I -- you know, then they'll be --

17          MR. BERNICK:  We --

18          THE COURT:  -- they'll be able to do it.

19          MR. BERNICK:  That's fine.  We will have a Motley

20 Rice field.

21          THE COURT:  All right.  Add a Motley Rice field.

22 That will supplement their expertise in Excel spreadsheet work

23 and I'm sure they'll be delighted to add that to their

24 advertising capability for their law firm.

25          MR. BERNICK:  They don't need to advertise their

1  firm.

2           MR. MULLADY:  Excuse me, Your Honor.

3           THE COURT:  Mr. Mullady?

4           MR. BERNICK:  I think that's probably pretty easy --

5           MR. MULLADY:  Your Honor, Raymond Mullady for the

6  FCR.  Good afternoon.  I think the only loose end here, Your

7  Honor, is to tie up what we've discussed on this particular

8  issue in an order.  We traded forms of order yesterday, the

9  debtors and myself.  I have one here.  It may need to be

10 tweaked a little bit to account for the modification that we've

11 heard today insofar as what is actually there and what needs to

12 be turned over, so I guess we'll work on that --

13          MR. BERNICK:  I think we should probably talk about

14 this little bit further among ourselves and maybe tender it on

15 May the 2nd.  I think we have the --

16          THE COURT:  I don't know which order.  Are we talking

17 about the -- this issue about the --

18          MR. MULLADY:  This --

19          THE COURT:  -- the Rust report?

20          MR. MULLADY:  This -- no, Your Honor, this goes back

21 to the motion that -- the emergency motion that we filed, the

22 FCR filed and the ACC to compel a complete navigable

23 database --

24          THE COURT:  Oh.

25          MR. MULLADY:  -- which was argued --

1           THE COURT:  Okay.

2           MR. MULLADY:  -- at the last hearing.

3           MR. BERNICK:  Yes, I -- my own proposal would be that

4  -- I know I'm familiar with their order.  Their order I think

5  has language differences that are not without consequence, but

6  rather than try to resolve this now, we know exactly what Your

7  Honor has told us to do.  Indeed, it sounds like we're in

8  agreement on it.  So I think that rather than take the time to

9  disagree about the language, we should probably spend a little

10 bit more time talking about that separately.

11          THE COURT:  Why don't you just file it on a COC when

12 you get the language done and --

13          MR. MULLADY:  We will.

14          THE COURT:  -- I think that will do it, and if you

15 don't have it done by May 2, then bring it in and we'll work

16 out that order on May 2, but hopefully you'll have it finished

17 by then since the initial expert reports are due in 30 days.

18 Hopefully you'll have this order finished before then.

19          MR. MULLADY:  That should be quite doable, Your

20 Honor.

21          THE COURT:  Okay.

22          MR. MULLADY:  Thank you.

23          THE COURT:  Thank you.

24          MR. BERNICK:  I suppose that dealing with the

25 logistics of where we're going in this case and the views at

1  least I know that have been expressed by many of the

2  participants here, that the dates should hold.  We're

3  continuing to analyze the data on May the 2nd.  We'll be able

4  to further inform the Court on the broad dimensions of how the

5  data is working out.

6          I think that the issue of whether there should be a

7  change in the pretrial and trial schedule is a very significant

8  one and I want to make sure that because we're operating only a

9  couple weeks from that, that we have some way of giving notice

10 to the other participants in the case that this matter is going

11 to take -- be taken up on the 2nd so that people want to speak

12 to it, they can.  This kind of not is taken up really without

13 the benefit of the usual 30 days between an omnibus.  I don't

14 know how Your Honor feels about that, but --

15         THE COURT:  I think notice would probably be a good

16 idea.

17         MR. BERNICK:  Yes.

18         THE COURT:  We can -- well, maybe the committees --

19 I'm just concerned is there somebody from property who's -- the

20 property damage committee who's still on the call.

21         THE COURT:  I don't know that the property damage

22 issues are going to be affected by this, are they?  This is the

23 personal injury estimation.

24         MR. BERNICK:  I don't think that they should, but

25 given again the history of this case, I would be very surprised

1 if we didn't --

2          THE COURT:  No, I think --

3          MR. BERNICK:  -- hear something --

4          THE COURT:  -- property damage is already pretty much

5 well under way.  I don't expect that this issue should

6 affect --

7          MR. BERNICK:  Fine.

8          THE COURT:  -- the property damage issues.

9          MR. KRAMER:  Your Honor, this is Matt Kramer from

10 Bilzin Sumberg, representing property damage.  I am on the

11 line.

12          THE COURT:  Okay.  I don't expect that this issue

13 with respect to personal injury should affect property damage,

14 Mr. Kramer.

15          MR. KRAMER:  Respectfully, Your Honor, if we could

16 reserve argument for the 2nd on that issue, we would appreciate

17 that.

18          THE COURT:  I don't suspect that this issue

19 concerning personal injury estimation will affect property

20 damage matters.  I expect to go full tilt -- full speed ahead

21 on property damage.  The only issue that at this point is going

22 to tie up any issue on property damage is how fast I can get

23 the debtor's motions concerning the statute of limitations

24 matters done and that may affect property damage because

25 there's a lot of work to do in those matters, but we are going

1  forward on the product ID on April 23rd.  We're going to get

2  through those as promptly as possible, and as soon as I can get

3  the issues of the summary judgment motions done, we're going to

4  go forward on the rest.  So if you've got settlements underway,

5  get them done.

6          Mr. Mullady --

7          MR. KRAMER:  Thank you, Your Honor.

8          THE COURT:  Mr. Mullady?

9          MR. MULLADY:  Yes, Your Honor.  It occurs to me that

10 this issue is as significant as Mr. Bernick alluded to.  We

11 would totally agree with that; the issue of sliding these

12 dates.  That to come in here on May the 2nd and simply have

13 more discussion about this and have proposals made orally to

14 Your Honor about what happens to dates strikes me as a little

15 bit of an informal way of dealing with a very significant and

16 serious issue.  I would suggest that if there is going to be a

17 request by one or more parties to move dates, that we set a

18 briefing schedule right now between now and May the 2nd to deal

19 with this --

20         THE COURT:  I don't know -- Mr. Mullady, I'm the one

21 who said that if there is going to be some additional need for

22 additional B reads, additional reports --

23         MR. MULLADY:  Right.

24         THE COURT:  -- that I may consider it.  I control the

25 trial schedule, and frankly, I'm the one who's going to decide

1  whether those dates will be shifted or not.  And frankly at

2  this point in time based on the fact that I've attempted to

3  accommodate everybody's schedules every which way from Sunday

4  in this case, you folks are going to accommodate my schedule

5  this time.  If they have to be pushed -- these dates have to be

6  pushed, I'm going to set the dates and everybody's going to be

7  here and that's the way it's going to be, because I can't deal

8  with these changes anymore.  I have blocked out four times now

9  most of my life for this case and it has not come to fruition.

10 The next time if it has to change, I'm picking the dates and

11 everyone's going to be here and that's just the way it's going

12 to be.

13         So -- and all I'm talking about at this point is

14 possible trial dates and I understand that if there is need for

15 additional discovery, we'll have to deal with those.  I'm not

16 contemplating making changes right now.  My only concern is on

17 May 2nd, the debtor's going to come in with a request for some

18 interrogatory information.  Until that -- those interrogatories

19 are answered, I'm not going to know the answer to whether or

20 not we're going to have some additional need for discovery or

21 supplemental -- I'm calling them supplemental expert reports,

22 additional expert repots.  We're not going to be ready to talk

23 about this issue on May 2nd in any logical fashion to push

24 dates.  It's just --

25         MR. MULLADY:  Fair enough.


**J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  Okay.

2          MR. MULLADY:  I just wanted to make sure we would

3  have the opportunity to respond to any --

4          THE COURT:  Everybody will --

5          MR. MULLADY:  -- motion that would blow up the trial

6  schedule.

7          THE COURT:  Everybody will have an opportunity, but I

8  don't know that it's going to be by motion.  It may simply be

9  my saying this date is not going to work and so if you want an

10 opportunity to address it, then put it on the next agenda or

11 whatever.  We'll work out some kind of time frame.

12         MR. MULLADY:  Understood.  Thank you, Your Honor.

13         THE COURT:  Okay.

14         MR. BERNICK:  Thank you very much, Your Honor.

15         THE COURT:  Anything else?

16         MR. FINCH:  No, Your Honor, and we will notify as

17 many firms as I have e-mail addresses for of the Court's 919

18 order.  We have --

19         MALE VOICE:  2019.

20         MR. FINCH:  2019 order.

21         THE COURT:  2019.  Yes, that is an issue that --

22         MR. BERNICK:  That's the problem.  Now we know what

23 the problem is.

24         THE COURT:  That is an issue that needs to --

25         MR. BERNICK:  Wrong rule.

**J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  That does need to be addressed --

2          MR. FINCH:  No, that -- Your Honor, we have made

3   those notices to the firms in all the cases repeatedly and we

4   will do so again --

5          THE COURT:  Okay.

6          MR. FINCH:  -- response to your comment -- Your

7   Honor's comment today.

8          THE COURT:  All right.

9          MALE VOICE:  Thank you, Your Honor.

10         MR. FINCH:  Thank you, Your Honor.

11         THE COURT:  With respect to May 2nd, I want to make

12  it clear I am not intending on May 2nd to issue any kind of a

13  ruling that is going to change either the discovery or the

14  trial dates.  Okay, that's not my intention, but I do expect

15  that day to have a discussion about whatever this interrogatory

16  is going to be and encompassed within that if you are going to

17  tell me that you need some, you know, extended period of time

18  to answer it, may be the need to push off these dates.  That's

19  what I'm suggesting.  So, you know, you need to think about

20  that in that context.

21         MR. FINCH:  Your Honor, while your -- the parties are

22  here, May 2nd I believe it's -- the hearing is scheduled to

23  start at two p.m.  There are a lot of items on the agenda.  The

24  ACC and the FCR have motion to compel the debtor.  There's

25  motions relating to expanding the preliminary injunction.  I

1  would respectfully request that if we could start at one p.m.

2  or even earlier if the Court has any time earlier, that would

3  enable us to get through the entire agenda and allow me to make

4  it to an airplane to get to New York that evening.

5          MR. BERNICK:  I take it -- I'm assuming that there --

6  well, I know that there's a very clear reason for Mr. Finch

7  needing to be in New York that evening.  I -- we're happy to --

8          THE COURT:  I have my entire Delaware calendar

9  scheduled that day.  So I don't know how much -- you know, I

10 think you're going to be here --

11         MALE VOICE:  Is it Delaware or Pittsburgh?

12         THE COURT:  It's in Pittsburgh, but I have my entire

13 Delaware calendar scheduled that day.  Both my normal Monday

14 and my Tuesday calendar is scheduled that day, so --

15         MR. BERNICK:  Maybe --

16         THE COURT:  -- you're not going to have your normal

17 eight hours, folks.

18         MR. BERNICK:  Maybe if we can talk and see if there

19 might be a order that's better, an order of proceeding that day

20 that maximize --

21         MR. FINCH:  Accommodate my --

22         MR. BERNICK:  Your schedule and that we can then --

23 if it looks like we need a little bit more time, maybe we can

24 find out a little bit more about Your Honor's schedules, but at

25 the end of the day, we understand we're not the only case,

1 so --

2          THE COURT:  I will not know really what the day looks

3 like until the preliminary agendas are due.  I really won't

4 know --

5          MR. FINCH:  Okay.

6          THE COURT:  -- until then.

7          MR. FINCH:  I understand, Your Honor.

8          THE COURT:  So when the preliminary agendas are due,

9 I suggest maybe Ms. Baer if you contact Ms. Baker let's say two

10 days or so after the preliminary agendas are due so that I can

11 get through them all, I will have a better idea that day.  And

12 it's possible that I may be able, like for example, to start in

13 the morning and then fit other cases in between if that would

14 help.  I may be able to do that.  I don't know that I can

15 guarantee starting at one and running straight through, but

16 I'll see what I can do.

17          MR. FINCH:  Understood, Your Honor, and I'll work

18 with Mr. Bernick on the order of things on the agenda --

19          THE COURT:  All right.

20          MR. FINCH:  -- so that perhaps, you know, I can be

21 out --

22          THE COURT:  Okay.

23          MR. FINCH:  -- sooner rather than later.

24          THE COURT:  All right.

25          MALE VOICE:  Thank you, Your Honor.

**J&J COURT TRANSCRIBERS, INC.**

135

1        THE COURT:  Okay.  We're adjourned.  Thank you.

2        (Proceedings adjourned 12:13 p.m.)

3                        * * * * *

4

## CERTIFICATION

I, TRACY A. GEGENHEIMER, court approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter.


/s/ Tracy Gegenheimer                 Date: April 23, 2007
TRACY GEGENHEIMER       CERT*D-282

J&J COURT TRANSCRIBERS, INC.

**J&J COURT TRANSCRIBERS, INC.**