UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

IN RE:                          . Case No. 01-1139(JKF)
                                .
W.R. GRACE & CO.,               . USX Tower - 54th Floor
et al.,                         . 600 Grant Street
                                . Pittsburgh, PA  15219
          Debtors.             .
                                . April 23, 2007
. . . . . . . . . . . . . . . . 9:00 a.m.

TRANSCRIPT OF HEARING
BEFORE HONORABLE JUDITH K. FITZGERALD
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtors:            Kirkland & Ellis, LLP
                            By:  JAMES J. RESTIVO, ESQ.
                                 TRACI S. REA, ESQ.
                            Aon Center
                            200 East Randolph Drive
                            Chicago, IL  60601

                            Pachulski, Stang, Ziehl, Young,
                             Jones & Weintraub, P.C.
                            By:  TIMOTHY CAIRNS, ESQ.
                                 JAMES E. O'NEILL, ESQ.
                            919 North Market Street
                            17th Floor
                            P.O. Box 8705
                            Wilmington, DE  19899
                            (telephonic appearances)


Audio Operator:             Janet Heller

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@optonline.net**

**(609) 586-2311  Fax No.  (609) 587-3599**

APPEARANCES (Cont'd.):

For the Debtors:              Reed Smith LLP
                             By:  DOUGLAS E. CAMERON, ESQ.
                                  LAWRENCE FLATLEY, ESQ.
                                  RICHARD FINKE, ESQ.
                                  REBECCA E. ATEN, ESQ.
                             435 Sixth Avenue
                             Pittsburgh, Pennsylvania 15219

For David T. Austern,        Orrick, Herrington & Future
Claims Rep:                   Sutcliffe, LLP
                             By:  DEBRA FELDER, ESQ.
                             Washington Harbour
                             3050 K Street, N.W.
                             Washington, DC  20007
                             (telephonic appearance)

For Official Committee of    Bilzin Sumberg Baena Price
Property Damage Claimants:    & Axelrod LLP
                             By:  SCOTT L. BAENA, ESQ.
                                  JAY M. SAKALO, ESQ.
                                  MATTHEW KRAMER, ESQ.
                                     (telephonic appearance)
                             Wachovia Financial Center
                             200 South Biscayne Boulevard
                             Suite 2500
                             Miami, FL  33131

For Official Committee of    Ferry, Joseph & Pearce, P.A.
Asbestos Property Damage      By:  THEODORE J. TACCONELLI, ESQ.
Claimants:                   824 Market Street
                             Suite 904
                             P.O. Box 1351
                             Wilmington, DE  19899
                             (telephonic appearance)

For State of California:     Hahn & Hessen LLP
                             By:  STEVEN J. MANDELSBERG, ESQ.
                                  CHRISTINA J. KANG, ESQ.
                                  JOHN P. McCAHEY, ESQ.
                             488 Madison Avenue
                             14th and 15th Floor
                             New York, NY  10022

APPEARANCES (Cont'd.):

For Kenneth Thomas:          KENNETH THOMAS
                          (telephonic appearance)

For Fireman's Fund        Stevens & Lee
Insurance Company:        By:  DAVID R. BEANE, ESQ.
                          111 North Sixth Street
                          P.O. Box 679
                          Reading, PA  19603

For American Legion:      Motley Rice LLC
                          By:  ANNE M. KEARSE, ESQ.
                          28 Bridgeside Boulevard
                          P.O. Box 1792
                          Mount Pleasant, SC  29465

For the Equity Committee:  Kramer, Levin, Naftalis &
                           Frankel, LLP
                          By:  GARY M. BECKER, ESQ.
                          919 Third Avenue
                          New York, NY  10022

For Ad Hoc Equity Committee:  Weil, Gotshal & Manges LLP
                          By:  JARRAD WRIGHT, ESQ.
                          767 Fifth Avenue
                          New York, NY  10153

For Asbestos Property Damage  LECG
Claimants:               By:  ALAN MADIAN
                          (telephonic appearance)

                          Stroock & Stroock & Lavan, LLP
                          By:  ARLENE G. KRIEGER, ESQ.
                          180 Maiden Lane
                          New York, NY  10038
                          (telephonic appearance)

For Asbestos Property Damage  Scott Law Group
Committee:              By:  DARRELL SCOTT, ESQ.
                          (telephonic appearance)

For Official Committee of   Dies, Henderson & Cafona
Asbestos Property Damage    By:  MARTIN DIES, ESQ.
Claimants:             1009 Green Avenue
                          Orange, TX  77630

**INDEX**York, NY  10153

| WITNESSES: | PAGE |
|---|---|
| DR. RICHARD LEE | |
| Direct Examination by Mr. Restivo | 12 |
| Cross Examination by Mr. McCahey | 46 |
| Cross Examination by Mr. Kearse | 80 |
| Redirect Examination by Mr. Restivo | 92 |
| Recross Examination by Mr. McCahey | 95 |
| Recross Examination by Ms. Kearse | 96 |
| | |
| THOMAS F. EGAN | |
| Direct Examination by Mr. Flatley | 108 |
| Cross Examination by Mr. Mandelsberg | 143, 171 |
| Cross Examination by Ms. Kearse | 156 |
| Redirect Examination by Mr. Flatley | 168 |
| | |
| DAN HOOD | |
| Direct Examination by Mr. Mandelsberg | 203 |
| Cross Examination by Mr. Restivo | 213 |
| Redirect Examination by Mr. Mandelsberg | 223 |
| Recross Examination by Mr. Restivo | 229 |
| Further Redirect Examination Mr. Mandelsberg | 232 |
| Further Recross Examination by Mr. Restivo | 234 |

| EXHIBITS | I.D. | EVD. |
|---|---|---|
| D-1A Dr. Richard Lee - Curriculum Vitae | -- | 13 |
| D-1 Summary of formula documents | -- | 20 |
| D-7 Formula document/U.S. Gypsum Fire Code V | -- | 22 |
| D-4 Document containing data review analyses | -- | 25 |
| D-2 Example product alleged, data from and comparison with product formula where product had wrong components | -- | 30 |
| D-3 Examples of bulk sample/insufficient data provided to form opinion | -- | 30 |
| D-45 Spreadsheet for Claim Number 6941 | -- | 35 |
| D-46, 47, 48, 50, 51, 53, 54, 56, 58, 59, 60, 61 - State of CA/12 bldgs/results | -- | 39 |
| D-49 State of CA/acoustical plaster/results | -- | 41 |
| D-55 2nd Bldg/2 surfacing materials/results | -- | 42 |
| D-57 Claim materials, Claim Number 10659 | -- | 43 |
| D-65 Claim materials, Claim Number 17280 | -- | 46 |

## INDEX

| **EXHIBITS** | **I.D.** | **EVD.** |
|---|---|---|
| D-63 Claim materials, Claim Number 1724 | -- | 97 |
| D-64 Claim materials, Claim Number 5987 | -- | 97 |
| DGS-2C  Drawing, part of Claim Number 10649 | -- | 132 |
| DGS-3C  Drawing, part of Claim Number 10650 | -- | 136 |
| DGS-5H  Document, part of Claim Number 10652 | -- | 137 |
| DGS-8D  Document, part of Claim Number 10655 | -- | 138 |
| DGS-13E Document, part of Claim Number 10660 | -- | 140 |
| DGS-14D Document, specification part only | -- | 141 |

Debtors' Exhibits entered by Mr. Flatley:

| | | |
|---|---|---|
| 6941A | -- | 175 |
| 6942B | -- | 175 |
| 6943C (only pages 1 - 4) | -- | 175 |

State of CA-1c-g, 2c-e, 3c, 5c-g, 6d-f,
            7c-e, 8c, 9d, 10c-f, 11c-d,
            13b-d, 14b-d, 15b-h, 16b-g
                architectural plans          --    212
State of CA-18  First set of interrogatories --  212
State of CA-19  First request for admissions --  212

1          THE COURT:  Good morning.  Please be seated.  This is

2  the matter of W.R. Grace, 01-1139, pending in the District of

3  Delaware.  Jan, can you turn this down by any chance?

4          THE CLERK:  Sure.

5          THE COURT:  We're going to blast me out.  Thank you.

6  Participants I have listed by phone -- oh, that's still not

7  better.

8          THE CLERK:  Okay.  Okay.

9          THE COURT:  -- are Alan Madian, Glenn Connor, Mark

10 Hurford, Kenneth Thomas, Timothy Cairns, James O'Neill, Dan

11 Hood, Andrew Craig, Debra Felder, Matthew Kramer, Theodore

12 Tacconelli, Arlene Krieger, Darrell Scott, and Martin Dies.

13                          (Pause)

14         THE COURT:  I'll take entries in court, please.  Good

15 morning.

16         MR. RESTIVO:  Good morning, Your Honor.  James

17 Restivo, Lawrence Flatley, Douglas Cameron, and Traci Rea for

18 the debtors and Rebecca Aten.

19         THE COURT:  I'm sorry.  And?

20         MR. RESTIVO:  And Rebecca Aten for the debtors.

21         THE COURT:  Well, how is Aten spelled?

22         MR. RESTIVO:  A-t-e-n.

23         THE COURT:  Thank you.

24         MR. RESTIVO:  Rebecca, R-e --

25         THE COURT:  Thank you.

                    **J&J COURT TRANSCRIBERS, INC.**

1          MR. MANDELSBERG:  Good morning, Your Honor.  Stephen

2  J. Mandelsberg from Hahn and Hessen, and with me today is my

3  colleague John McCahey and Christina Kang.  Mr. McCahey has

4  been admitted I believe pro hac by Your Honor.  We are here

5  representing the State of California, Department of General

6  Services.

7          THE COURT:  All right.  Thank you.

8          MS. KEARSE:  Good morning, Your Honor.  Anne Kearse

9  from the Motley Rice firm on behalf of one claimant 6941,

10  Washington State University Daggy Hall Building.

11          MR. SAKALO:  Good morning, Your Honor.  Dave Sakalo

12  and Scott Baena on behalf of property damage.

13          THE COURT:  Good morning.  Mr. Restivo.

14          MR. RESTIVO:  Your Honor, I have prepared an updated

15  list of the PD claims which will be tried today, as I promised

16  to do at our last gathering, and I'm going to hand that up to

17  the Court.  I've already distributed copies to counsel's table.

18          THE COURT:  Thank you.

19          MR. RESTIVO:  We are going today, Your Honor, based

20  upon the updated list, is that with respect to the Speights and

21  Runyan product identification claims, none, zero will be tried

22  today.  Twenty-four were deferred pursuant to our last

23  discussion.  We have withdrawn objections -- product I.D.

24  objections to four of those claims, and Mr. Speights has agreed

25  to expunge 15 of those claims.

**J&J COURT TRANSCRIBERS, INC.**

1        With respect to Motley Rice, we originally had two

2   claims we were going to try today.  The debtor has withdrawn an

3   objection to claim number 6941, and so we will only be trying

4   3406.

5        With respect to the California claims represented by

6   Hahn and Hessen, we have withdrawn our product identification

7   objection to claim 10654 and, therefore, we will be trying 15

8   California claims of Hahn and Hessen.

9        With respect to the Speights and Runyan United States

10  claims, none of those will be tried.  Some of those will

11  expunge pursuant to the Court's order, and four or five are

12  deferred pursuant to the waiver issue.

13       And then lastly, Your Honor, we originally were going

14  to try four miscellaneous claims.  We're going to try three of

15  those claims.  We have withdrawn our product identification

16  objection to claim number 11314 by the City of Philadelphia.

17       In addition, Your Honor, we provided to the Court and

18  we provided a copy at counsel table and we have a copy on the

19  witness stand of an updated binder.  What that really does is

20  remove material relating to claims not at issue today and

21  attempts to put in one volume, the material we will be using,

22  and we have that volume up on the witness stand.

23       One housekeeping matter before we start, Your Honor.

24  In reaching a partial resolution of product identification

25  issues with Mr. Speights, obviously, that resolution meant that

**J&J COURT TRANSCRIBERS, INC.**

1  he did not have to come to Pittsburgh for this hearing.  At our

2  last pretrial we talked about arguing the waiver issue, and at

3  that time I believe the Court indicated we would do that

4  argument when we concluded the testimony.  I promised Mr.

5  Speights I would make a request of his that I support and find

6  out if the Court could give us a time Wednesday morning for

7  that argument, so Mr. Speights knows when to come up, because

8  he won't otherwise have to be here to wait for the testimony

9  again.

10          THE COURT:  Sure.  That's fine.  I mean you can pick

11  a time.  It's all right with me any time you want to do it, but

12  if he wants to do it by phone, that's all right with me, too.

13          MR. RESTIVO:  Why don't we pick 10:00.  I will ask

14  him whether or not he wants to do it by phone.  My sense is he

15  wants to be here, but I will give him that opportunity, but at

16  least he won't have to spend Tuesday in Pittsburgh waiting for

17  us to finish testimony or waiting for Wednesday.

18          THE COURT:  All right.  That's --

19          MR. RESTIVO:  Thank you, Your Honor.

20          THE COURT:  So 10:00 a.m. on Wednesday.

21          MR. RESTIVO:  Ten o'clock a.m. on Wednesday.

22          THE COURT:  So you don't expect any evidence on

23  Wednesday then.

24          MR. RESTIVO:  I do not, Your Honor.

25          THE COURT:  All right.

1          MR. SAKALO:  Your Honor, will Court Call be available

2  for people who are not staying in Pittsburgh for that hearing

3  -- for that argument?

4          THE COURT:  I don't see why we can't make Court Call

5  available.  Mr. Restivo?

6          MR. RESTIVO:  The debtor has no objection to that,

7  Your Honor.

8          MR. SAKALO:  Okay, and if we can just get the waiver

9  two days in advance.  Sometimes Court Call, they give us

10  difficulty.  Thank you.

11          THE COURT:  Ms. Baker will take care of doing that

12  after court or at a recess today.  Okay.  Thank you.  Let me

13  make a note to this effect.  Give me one second, please.

14                         (Pause)

15          THE COURT:  Okay.  Thank you.

16          MR. RESTIVO:  The debtor calls Dr. Richard Lee to the

17  stand.

18          THE COURT:  Are we starting in order.  I'm going to

19  start in order according to the list that you've got, so we're

20  starting with 12293?

21          MR. RESTIVO:  That is correct, Your Honor, except

22  that Dr. Lee's testimony will cover all of the product I.D.

23  issues.  When we get to the specifics, we will take them in the

24  order on your list.

25          THE COURT:  All right.

**J&J COURT TRANSCRIBERS, INC.**

1        MS. KEARSE:  Your Honor?

2        THE COURT:  Ms. Kearse?

3        MS. KEARSE:  Your Honor, at the hearing, I believe it

4  was last week, was -- there was one thing I wanted to correct.

5  I believe you said we weren't trying 6941.  I think we are.  I

6  think the numbers were just reversed.  I'd be happy not to, but

7  I think that's the one we're doing today.

8        But, Your Honor, we had talked about Dr. Lee at the

9  last hearing.  Based on Mr. Restivo's representations last

10 night on where he was going to go with Dr. Lee in regards to my

11 case and not ultimate opinions product I.D., I'm willing to go

12 forward with the cross examination and allow the testimony and

13 not waive my arguments on whether or not it's actually relevant

14 to what we're doing here today.

15       THE COURT:  All right, so rather than do the motion

16 in limine, you'll just simply reserve your argument as a

17 relevance objection?

18       MS. KEARSE:  Yes, Your Honor.

19       THE COURT:  All right.

20       MS. KEARSE:  Unless you want to proceed otherwise on

21 that, but that --

22       THE COURT:  That's fine with me.  Thank you.  Dr.

23 Lee.

24       THE CLERK:  Please raise your right hand.

25          DR. RICHARD LEE, DEBTORS' WITNESS, SWORN

**J&J COURT TRANSCRIBERS, INC.**

1       THE CLERK:  Is your last name L-e-e?

2       DR. LEE:  Yes.

3       MR. RESTIVO:  Good morning, Dr.

4       MR. LEE:  Good morning.

5                       DIRECT EXAMINATION

6  BY MR. RESTIVO:

7  Q    At the witness stand you have a book of exhibits which is

8  in front of you and fresh water which is -- should be in a cup.

9  State your full name, sir, for the record.

10  A    Richard J. Lee.

11  Q    And where do you live?

12  A    Murrysville, Pennsylvania.

13  Q    And, Dr. Lee, at Tab 5 of the exhibit book, can you tell

14  us whether or not that is a disclosure for your expert opinion

15  in this matter today?

16  A    It is.

17  Q    And with respect to Tab 5, attached to that is your

18  curriculum vitae.  Is that correct?

19  A    That's correct.

20  Q    And is that curriculum vitae still current?

21  A    Yes.

22       MR. RESTIVO:  Your Honor, I'm going to hand up -- and

23  I have given copy to counsel table -- marked as Debtors'

24  Exhibit 1A, Dr. Lee's curriculum vitae.  It's in the book, but

25  we didn't make it an exhibit.  I'm really not going to spend a

**J&J COURT TRANSCRIBERS, INC.**

1  whole lot of time on qualifications.

2            THE COURT:  All right.  Thank you.

3            MR. MANDELSBERG:  Your Honor, Steven Mandelsberg for

4  the State of California.  I just want to make clear that the

5  curriculum vitae that is being handed up is the same one that

6  was -- accompanied the debtors' expert's witness disclosure

7  that I think was submitted on April 13th.

8            MR. RESTIVO:  Yes, it is, sir.

9            MR. MANDELSBERG:  Thank you.

10            MR. RESTIVO:  And I move the introduction of Debtors'

11  Exhibit 1A.

12            THE COURT:  Any objections?

13                      (No verbal response)

14            THE COURT:  All right.

15            MR. MANDELSBERG:  No objection.

16            THE COURT:  Admitted.  Thank you.

17  BY MR. RESTIVO:

18  Q    Dr. Lee, tell us what is the science of materials

19  characterization?

20  A    Materials characterization is the process by which we take

21  solid liquid or gaseous materials apart, determine their

22  constituent components, and the abundance of each.

23  Q    And have you done that in your career with respect to

24  asbestos-containing materials?

25  A    Yes.

**J&J COURT TRANSCRIBERS, INC.**

Lee - Direct/Restivo                                  14

1  Q     Have you done that with respect to materials other than

2  asbestos-containing materials?

3  A     Yes.

4  Q     Can you give Judge Fitzgerald some examples of neuron

5  asbestos characterization work that you have done in your

6  career?

7  A     We do a lot of normal things like failure analysis.  Some

8  of the wide-ranging components are -- I first started off

9  characterizing moon rocks.  That was U.S. Steel research.  One

10 of the hottest materials was mummy beads to determine whether

11 or not they were gold plated or gold beads.  We worked on the

12 USS Iowa explosion.  That was an explosion probably 15 years

13 ago now in which there was a question as to whether it had been

14 deliberately caused or was an accidental explosion that

15 occurred in one of the guns.

16 Q     Have you done any work on United States spaceships?

17 A     Yes, we have studied the atmosphere inside the spaceship,

18 looked at the causes for tile loss on the skin of the

19 spaceship, and examined the windshield for causes of chipping

20 on reentry.

21 Q     And moving into the asbestos area, you also did some work

22 with respect to Crayola crayons?

23 A     Yes.

24 Q     What was that?

25 A     That was the -- a few years ago there was a great deal of

1 concern about whether Crayola colored crayons contained

2 asbestos, and we examined them to determine whether or not that

3 was the case.

4 Q    And that examination included materials characterization?

5 A    Yes, it did.

6 Q    Okay.  Now, what were you retained to do in this case on

7 product identification by W.R. Grace?

8 A    In this case I was asked to review claims where bulk

9 product analysis had been submitted as part of the claim and

10 evaluate that analysis to determine whether or not we can

11 conclude that it was or was not a Grace product.

12 Q    And let's back up.  When you say a bulk sample, what do

13 you mean, so we all know what you're talking about?

14 A    A bulk sample in our vocabulary is a sample of material

15 taken from a building which was examined to determine whether

16 or not it contained asbestos.  So it's plaster.  It's a floor

17 tile.  It's fireproofing piece of the --

18 Q    And has your laboratory over the years conducted bulk

19 sample analyses?

20 A    Yes, we have.

21 Q    And very briefly what sort of laboratory equipment does

22 one use to do that?

23 A    You generally use a combination of optical microscopes,

24 electro-microscopes, and chemical analysis.

25 Q    Now, in this instance did you do bulk sample analyses

1 yourself, or did you review the bulk sample analyses done by

2 other laboratories and submitted by the claimants?

3 A    The latter.

4 Q    Now, prior to this project for my client had you done

5 other work with respect to bulk sample analyses with respect to

6 asbestos-containing building materials?

7 A    Yes, we have examined bulk samples to determine whether or

8 not we could -- to compare with specific manufacturers'

9 formulas for about 25 years.

10 Q    And did you do that in the past for W.R. Grace?

11 A    Yes, many times.

12 Q    Did you do that in the past for any other manufacturers?

13 A    Yes.

14 Q    And name them.

15 A    U.S. Gypsum, National Gypsum, Eagle Picture --

16 Q    How about U.S. Mineral?

17 A    U.S. Minerals.

18 Q    Are you familiar with the product formulas for Grace's

19 spray-on products?

20 A    Yes.

21 Q    And let's start first with fireproofing.  What was the

22 formula for Grace's fireproofing product?

23 A    The --

24        MR. MANDELSBERG:  Objection, Your Honor.  I'd like a

25 specification of the time.  Is he talking about now, then, any

**J&J COURT TRANSCRIBERS, INC.**

Lee - Direct/Restivo                    17

1  -- all times?

2          THE COURT:  Sustained.

3  Q    Dr. Lee, with respect to Grace's asbestos-containing

4  fireproofing product, so you know what that product was called?

5  A    MonoKote 3. MK-3 is it's name in the trade.

6  Q    Okay, and do you know generally what period of time MK-3

7  was marketed?

8  A    Yes.  Generally from mid to late sixties to the early

9  seventies.

10  Q    Now, can you tell us what MK-3 was composed of?

11  A    MK-3 was composed of the combination --

12          MR. MANDELSBERG:  Your Honor, again it's not clear

13  what time we're talking about.  Is it in the mid to late

14  sixties, the early seventies?  Is there a difference in the

15  formula?

16          THE COURT:  Sustained.

17          MR. RESTIVO:  I believe that goes to --

18          THE COURT:  Well, no, I think that's a relevant

19  question.  Can we substantiate whether the formula changed,

20  and, if so, then perhaps lay a foundation for this first?

21  Q    Dr. Lee, turn to Debtors' Exhibit 1 in the exhibit book.

22  What is Debtors' Exhibit 1?

23  A    Debtors' Exhibit 1 is a list of the formula documents --

24  summary of the formula documents of W.R. Grace asbestos-

25  containing products.

**J&J COURT TRANSCRIBERS, INC.**

1 Q    And do those formula documents contain the formula for MK-

2 3?

3              THE COURT:  I'm sorry.  I -- my Exhibit 1 is Debtors'

4 Submission of Asbestos Claims.

5              MR. RESTIVO:  Your Honor, you have --

6              THE COURT:  Oh, I --

7              MR. RESTIVO:  You have tabs --

8              THE COURT:  Debtors' Exhibit 1.

9              MR. RESTIVO:  -- and then you have exhibits.

10              THE COURT:  I apologize.

11              MR. RESTIVO:  If you go to Debtors' Exhibit 1 --

12              THE COURT:  I'm with you.  Sorry.

13              MR. RESTIVO:  -- we start the numbers again.

14              THE COURT:  Okay.  I'm sorry.  Would you -- for my

15 edification, would you explain, please, what Debtors' Exhibit 1

16 is?

17              THE WITNESS:  It's a synopsis of the asbestos-

18 containing formulas produced by W.R. Grace showing the ranges

19 -- showing the components and the ranges those components took

20 over the periods they were manufactured.

21              THE COURT:  Okay.  Thank you.

22 Q    And turn, sir, to Page 3 of that exhibit.  Is that the

23 page that deals with MonoKote?

24 A    Yes.

25 Q    And, in fact, that lists three MonoKotes.  Does it not?

1  A    Yes, it does.

2  Q    MK-1, MK-2, and MK-3?

3  A    Yes.

4  Q    And which one was asbestos containing?

5  A    All three of them were asbestos containing.  The primary

6  one that was manufactured was MK-3.

7  Q    Okay, and did that formula for MK-3 change during the

8  period of time you've testified MK-3 was on the market?

9  A    There were changes in -- minor changes in the composition.

10 They're -- those changes are comprehended in the ranges

11 presented.

12 Q    And now will you tell us what were the components of MK-3?

13 A    The components of MK-3 were Plaster of Paris, the way it's

14 converted to Gypsum upon application, Vermiculite asbestos as

15 the main mineral component.

16 Q    And for Plaster of Paris or Gypsum, the formula indicates

17 55 to 59 percent.  Is that correct?

18 A    That is correct.

19 Q    And you're saying that range accounts for any minor

20 changes in the composition during this period of time?

21 A    That's correct.

22 Q    And are those percentages by weight or by volume?

23 A    Those percentages are by weight.

24 Q    With respect to Zonolite Acoustical Plaster, are you also

25 familiar with the formulas of W.R. Grace with respect to

**J&J COURT TRANSCRIBERS, INC.**

Lee - Direct/Restivo                                    20

1  plaster?

2  A    Yes.

3  Q    Am I correct that Zonolite Acoustical Plaster is sometimes

4  also called Zonolite Acoustical Plastic?

5  A    Yes.

6  Q    And on Exhibit 1 they tend to use the word plastic at

7  least for the first couple.  Do they not?

8  A    That's correct.

9        MR. RESTIVO:  Your Honor, I move Debtors' Exhibit 1

10 into evidence.

11       MR. MANDELSBERG:  No objection, Your Honor.

12       THE COURT:  It's admitted.

13 Q    Dr. Lee, I forget.  Did I ask you what the -- state for

14 the record what the percentages of the components were in MK-3.

15 A    The -- MK-3 generally had in the range of 55 to 60 percent

16 Gypsum, 25 to 30 -- 20 -- 30 to 35 -- 25 shows 28 to 32 percent

17 Vermiculite, and ten to 13 or 14 percent asbestos.

18 Q    Do you know whether or not there were any other

19 fireproofing products marketed at the same time which had the

20 same components in the same percentages?

21 A    The -- yes.

22 Q    And what product or products was that?

23 A    U.S. Gypsum manufactured a product called Fire Code V

24 which had -- was a substantially similar composition of MK-3.

25 Q    And how do you know that?

1  A    Based on the formula and experience.

2  Q    And turning to Debtors' Exhibit 7 in your exhibit book --

3  again it's E-x 7 not the first tabs -- can you tell us what

4  that document is?

5  A    That is a formula document for U.S. Gypsum's Fire Code V.

6  Q    Okay.  Now, they call -- on Exhibit 7 am I correct it

7  says, "Fire Code V Plaster?"  Is this a fireproofing material?

8  A    Yes.

9  Q    But they call it a plaster?

10  A    Yes.

11  Q    Okay, and does it indicate the presence of Vermiculite in

12  the same general proportions as MonoKote 3, and if so, where

13  does it indicate that?

14  A    It indicates that under a -- under the term ingredients at

15  the top of the page, left-hand column.

16  Q    Where it says, "Expanded Vermiculite?"

17  A    Yes.

18  Q    Okay, and what about the component of Gypsum?  I don't see

19  Gypsum written there.

20  A    Gypsum would be the -- they site stucco, which would

21  consist primarily of Gypsum after reaction.

22  Q    And asbestos fiber, where -- that is -- where is that

23  listed?

24  A    That is -- asbestos fiber is listed third line in that

25  column -- in that formula.

Lee - Direct/Restivo                                      22

1  Q    Now, does Fire Code V manufactured -- as manufactured by

2  U.S. Gypsum contain any component that MonoKote 3 did not

3  contain?

4  A    Yes, it contains a process starch derived from cornflower.

5  Q    And what percentage was that in the material?

6  A    Something less than one percent.

7  Q    And is that the designation cornflower on Debtors' Exhibit

8  7?

9  A    Yes.

10          MR. RESTIVO:  Your Honor, we move into evidence

11 Debtors' Exhibit 7.

12          MR. MANDELSBERG:  No objection, Your Honor.

13          THE COURT:  Admitted.

14 Q    I want you to describe for us, Dr. Lee, using Exhibit 4

15 what your product identification claims document review process

16 was in order for you to reach the conclusions you reached?

17 A    On Debtors' Exhibit 4 you see a flow chart, the top

18 portion of which is called the data review processing.  In that

19 process we receive claims -- claim documentation which had been

20 identified as potentially having bulk sample results from W.R.

21 Grace attorneys.  We reviewed that data to determine if, in

22 fact, there was bulk sample data present, and if so, we entered

23 into a database.  Upon that point the bottom --

24 Q    Let me interrupt you there.  On my chart, which is color

25 coded, you have three blue blocks.  Is that what you've just

                    **J&J COURT TRANSCRIBERS, INC.**

Lee - Direct/Restivo                                23

1  described?

2  A    Yes.

3  Q    You reviewed the documentation.  You identified what

4  appeared to be bulk sample reports, and then you entered them

5  into a database.

6  A    That's correct.

7  Q    Okay, and then what was the decision process your

8  laboratory follows?

9  A    We then looked at the bulk sample analysis to determine,

10 number one, whether or not it was a surfacing material, or

11 whether it was some other kind of product such as floor tile or

12 pipe and boiler material.  And if it was not a surfacing

13 material, we did not consider it as a Grace product.

14 Q    Why not?

15 A    The products that we have been involved with in W.R. Grace

16 are -- they're all surfacing products.

17 Q    Okay, and now let's assume on Exhibit 4 --

18 A    Right, the asbestos-containing products.

19 Q    Let's assume on Exhibit 4 that you determined that a bulk

20 sample was a surfacing material.  What was the next step?

21 A    Then we evaluated it to determine whether or not the

22 components had been -- specific components had been identified.

23 These products are made up, as you saw in the W.R. Grace

24 formula, in the U.S. Gypsum formula with specific abundances or

25 ranges of abundances of specific mineral components.  If those

**J&J COURT TRANSCRIBERS, INC.**

1  mineral components are not identified, we -- or were not

2  identified, we consider the information insufficient to

3  formulate an opinion as to whether or not it had been

4  manufactured according to a Grace formula.

5  Q    And we will come back to that in a minute, Doctor Lee.

6  Assuming that the sample constituents were identified in a bulk

7  sample, what was the next step as indicated by Exhibit 4?

8  A    The next step, the -- we looked at the named constituents

9  and determined whether or not they were, in fact, constituents

10 that would have been in a Grace product.

11 Q    Using MK-3 as an example, what type of constituents did

12 you see that would not be present in MK-3 as an example?

13 A    The typical ones would be mineral, wool, and cellulose.

14 Q    Grace MK-3 did not have either of those components?

15 A    That's right.

16 Q    If you found those components in a bulk sample, what was

17 your conclusion?

18 A    We concluded that it was not direct constituents to have

19 been manufactured according to a Grace formula.

20 Q    Now, assuming it had the three constituents in MK-3 -- I'm

21 going to keep using that as an example -- what was the last

22 step?

23 A    The last step was to look at the abundance of those

24 constituents and determine whether they were there at

25 approximately the right range or -- and if not, we -- that it

Lee - Direct/Restivo                              25

 1  was the wrong formula.  Unless they were generally in the right

 2  range as the components in the Grace, we said it was not

 3  inconsistent with the Grace product.

 4  Q    And how many bulk sample reports, approximately, submitted

 5  by the claimants did you review?

 6  A    In the range of 700.

 7  Q    And with respect to those 700 bulk sample reports that you

 8  reviewed, did your laboratory find any that was, quote, not

 9  inconsistent with a Grace formula?

10  A    Yes.

11  Q    How many?

12  A    I'd have to look at the exhibit, but I -- the -- probably

13  ten to 20 percent.

14  Q    Turn --

15          MR. RESTIVO:  Your Honor, we move into evidence

16  Debtors' Exhibit 4.

17          MR. MANDELSBERG:  No objection, Your Honor.

18          THE COURT:  Admitted.

19  Q    Turn, Dr. Lee, to Debtors' Exhibit 2 and tell us what that

20  is.  Again, that's Exhibit 2 not Tab 2, Dr. Lee.  Do you have

21  it?

22  A    I've got it.

23  Q    What is that document?

24  A    That's just an example of illustrating the product formula

25  and -- or product alleged in a particular claim, the data from

Lee - Direct/Restivo                                    26

1  that claim, and comparison with the product formula for a

2  situation in which we said the product had the wrong

3  components.

4  Q    And so the first page of Debtors' Exhibit 2 are examples

5  of wrong components where the product was alleged to be MK-3.

6  Is that correct?

7  A    That's correct.

8  Q    Okay, and in your first example -- in all your examples

9  you have the Grace formula.  Do you not, down on the left-hand

10 side.

11 A    On the left side.

12 Q    Okay.  Take your first example.  That was one where the

13 bulk sample reported five percent chrysotile and five percent

14 amosite and nothing on the other 90 percent.

15 A    Yes.

16 Q    And what was your -- what would your conclusion be on a

17 sample of that type?

18 A    That the product contained a component that was not found

19 in the Grace formula.

20 Q    And, therefore?

21 A    It was the wrong component.

22 Q    And, therefore --

23 A    We classified it -- it was the wrong component and not a

24 Grace product.  Not a Grace product.

25 Q    Okay.  The second example gives percentages, does it not,

1  of what is contained in the bulk sample or at least some of the

2  percentages?

3  A    Yes.

4  Q    Okay, and what is CaCO?

5  A    Calcium oxide.

6  Q    Sure it is.  Calcium oxide --

7  A    I'm sorry.  Calcium carbonate.

8  Q    And is there another name for that?

9  A    Calcium carbonate?

10  Q    It's not Gypsum.  It's not Vermiculite.

11  A    That's right.

12  Q    Okay, and what was -- what would your conclusion be on a

13  sample of that nature?

14  A    Again, it would be the wrong components, because the

15  calcium carbonate that was present was not -- is not called for

16  in the Grace formula.

17  Q    Okay.  You have a third example where they report out

18  chrysotile, amosite, mineral wool, miscellaneous material.  And

19  again that would be a situation where the product contains

20  ingredients that was not in the Grace products?

21  A    Yes.  In this case it was mineral wool.

22  Q    Okay, and also amosite asbestos.

23  A    And -- I'm sorry.  And amosite.

24  Q    Okay.  On Page 2 -- and I think it's probably more

25  applicable to the cases we're going to be talking about here in

1  a moment -- are examples of insufficient data.  Is that

2  correct?

3           THE COURT:  I don't have a Page 2.

4           MR. RESTIVO:  I apologize.

5  Q    Turn to Debtors' Exhibit 3.  What is Debtors' Exhibit 3?

6  A    Some examples of bulk sample analyses where there was

7  insufficient data provided to form an opinion.

8  Q    Okay.  Again, you're using as an example MK-3.  You have

9  the formulas on the left-hand side of the page, and you have

10 the sample -- bulk sample results on the right-hand side of the

11 page.

12 A    That's correct.

13 Q    And in your first one you have a bulk sample that reports

14 five percent chrysotile asbestos and nothing else?

15 A    Yes.

16 Q    Okay, and why is that insufficient data to determine

17 whether or not the bulk sample is consistent with the Grace

18 formula for MonoKote 3?

19 A    Ninety-five percent of the material is unidentified.

20 Q    Do you know, as a result of your work, whether other

21 fireproofing materials marketed at the same time as MonoKote 3,

22 whether or not they contained asbestos?

23 A    Yes.

24 Q    Did they all contain asbestos?

25 A    No.

1  Q     Did most of them contain asbestos?

2  A     Most at one point.

3  Q     On your second example they tell you that there is ten

4  percent chrysotile and 90 percent non-fibrous material.  Why is

5  that insufficient data to reach a conclusion as to whether or

6  not the bulk sample is consistent with the Grace formula for

7  MK-3?

8  A     Again, it's a situation where the components of the recipe

9  are not specified.

10 Q     In that second bulk sample what is the non-fibrous

11 material that constitutes 90 percent of that sample?

12 A     It's unknown what it is insofar as the data sheets are

13 presented.

14 Q     And what does that lead to?

15 A     It leads to a conclusion that there's insufficient data.

16 You can't tell whether or not this was manufactured according

17 to a Grace product --

18 Q     Okay.

19 A     -- or could have been.

20 Q     And now in your third example the bulk sample reports out

21 15 percent chrysotile and 80 percent binder.  Why is that

22 insufficient data to determine whether or not the bulk sample

23 is consistent with the formula for MK-3?

24 A     Same reason as before -- for the other two.

25 Q     Doctor, I want to turn to the first claim which is Ness

1 Motley claim.

2           MR. RESTIVO:  Your Honor, I move into evidence

3 Debtors' Exhibit 3 and Debtors' Exhibit 2 if I haven't moved

4 that.

5           MS. KEARSE:  Your Honor, I don't know if these are

6 just for demonstrative purposes there or cross examination, but

7 I don't think there's an ability to identify what claims each

8 one he's talking about.

9           MR. RESTIVO:  These are just demonstrative.

10          MS. KEARSE:  And the exhibit before it is

11 demonstrative?

12          MR. RESTIVO:  Yes.

13          THE COURT:  They're admitted as demonstrative

14 exhibits only -- Exhibits 2 and 3.

15 Q    Turn, Dr. Lee, to your report which is Tab 6, not Exhibit

16 6, in your witness book.  Is that your report?

17 A    Yes.

18 Q    And turn to I believe it's Page 20 where you have a

19 listing of results you found with respect to bulk samples.

20 Page 20.

21          MR. MANDELSBERG:  Objection, Your Honor.  I don't

22 have the report as Tab or Exhibit 6.  I have something else in

23 my binder.

24          MR. RESTIVO:  Tab 6.

25          THE COURT:  Tab 6.

                    **J&J COURT TRANSCRIBERS, INC.**

1        MR. MANDELSBERG:  Tab 6?

2        THE COURT:  In the front.

3        MR. MANDELSBERG:  Let me see what I have.

4                        (Pause)

5        MR. RESTIVO:  What we did, counsel, is we eliminated

6   all the exhibits we're not using, and so it's the book I have

7   at counsel table.

8        MR. MANDELSBERG:  Okay.

9   Q    Dr. Lee, is Page 20 and 21 a summary listing of samples

10  and results you reported out?

11  A    Yes.

12  Q    Do you know, based upon looking at the claim numbers,

13  which of those claims are Motley Rice claims?

14  A    I do not.

15  Q    Okay.  With respect to Claim Number 3405, I would

16  represent to you it's a Motley Rice claim.  What did you report

17  out in terms of consistency or inconsistency with a Grace

18  product?  Claim 3405.

19  A    There were 15 -- 16 samples which contained asbestos.  One

20  of those we identified as being not inconsistent with the Grace

21  formula.  Three, we had the wrong components.  Two had

22  insufficient data, and ten were not a surfacing material.

23  Q    And turning to Page 21 and focusing again on the category

24  not inconsistent with a Grace product, with respect to Claim

25  Number 6933, what did you find?

Lee - Direct/Restivo                                    32

1  A    One sample that was not inconsistent with the Grace

2  product.

3  Q    And with respect to Claim Numbers 6938, 6939, and 6940,

4  which are Motley Rice claims, what did you find with respect

5  to --

6           MS. KEARSE:  Your Honor, I object.  I'm not sure why

7  we're -- I thought we were only dealing with one claim today.

8  We've already -- now there's testimony about five or six

9  different Motley Rice claims.  I object to the relevance of

10  that in --

11           THE COURT:  Yes, I -- that's just going to confuse

12  me, too.  I would prefer just to deal with the one that we're

13  dealing with.

14           MS. KEARSE:  Your Honor, right now I'd have to figure

15  out which exactly every claim number is.  I don't have it with

16  me today.

17           THE CLERK:  You're going to have to get closer to a

18  microphone, Ms. Kearse.

19           MS. KEARSE:  Yes, is this the one?  Okay.  I'll do

20  that.  Thank you.

21  BY MR. RESTIVO:

22  Q    Turn, Dr. Lee, to Exhibit -- Debtors' Exhibit 45.

23           MR. RESTIVO:  Debtors' Exhibit 45, Your Honor, is for

24  claim number 6941, which is a Motley Rice claim.  The first one

25  we will deal with on our list.

                    **J&J COURT TRANSCRIBERS, INC.**

1 Q    What is Exhibit 45, Dr. Lee?

2 A    It's a --

3 Q    What is the first page of Exhibit 45?

4 A    It's a output of a spreadsheet which shows on the far

5 left-hand side claim number, the second column laboratory I.D.,

6 the third column the type of sample as to whether or not it's a

7 surfacing material or other material.  Then four columns which

8 report -- which are different colors, blue, green, and red,

9 that show what we -- how we classified the sample in terms of

10 the five categories that we -- five categories that we were

11 specifying, and then a list of abundant -- of components that

12 are commonly found in asbestos-containing bulk products and

13 identification of what information we gleaned from a particular

14 sample.

15 Q    Now, with respect to Claim Number 6941, were there any

16 bulk sample reports on surfacing products, and if so, how many?

17 A    There were five samples indicated as possible surfacing

18 material.

19 Q    And what did you report out on the first two samples?

20 A    The first two samples we reported out had the wrong

21 components.

22 Q    And what were those wrong components?

23 A    Fibrous glass and cellulose.

24 Q    And on the first page of Exhibit 45 to determine what

25 components were reported, you look up the chart until you see a

1  percentage, and there's fibrous glass 15 to 25 and cellulose

2  one to five.  That's how you read your chart?

3  A    That's right.

4  Q    And that's for the first sample.  For the second sample

5  they report 90 percent fibrous glass and some other.

6  A    That's correct.

7  Q    Okay.  Now with respect to the remaining three samples,

8  what was reported?

9  A    Ten percent chrysotile, and the remainder was non-

10  specified.

11  Q    Okay, and what was your conclusion with respect to those

12  three bulk samples?

13  A    That would be insufficient data to evaluate whether or not

14  it was potentially manufactured according to a Grace product or

15  not.

16        MS. KEARSE:  Your Honor, and just to clarify you said

17  non-specified, but I think the chart says non-fibrous on there.

18  You can read it quickly.

19  A    I'm sorry.  That's right.  Non-fibrous but not specified

20  as to the mineral.

21  Q    And why is that insufficient to reach a conclusion as to

22  whether these three samples of the material are consistent with

23  a Grace product?

24  A    As we discussed earlier, the product formulated is like a

25  recipe, and there are specific mineral components and

1 abundances associated with the formula.

2 Q    And attached to Debtors' Exhibit 45 is what behind your

3 summary sheet?

4 A    Are a -- the data for the -- that we used to formulate

5 this conclusion including the results of the bulk sample

6 analysis.

7 Q    So attached to Exhibit 45 are the actual bulk sample

8 reports that you looked at and are reporting out on your

9 summary sheet?

10 A    That's correct.

11          MR. RESTIVO:  Your Honor, we move into evidence

12 Debtors' Exhibit 45.

13          MS. KEARSE:  Yes, subject to tying it all in at the

14 end of the examination, Your Honor, I have no objection.

15          THE COURT:  It's admitted.

16          MR. RESTIVO:  Okay, Dr. Lee, I now want to address

17 the Hahn and Hessen California claims which consist of I

18 believe 15 claims, 13 alleging fireproofing and three alleging

19 surfacing materials, and I want to start with the fireproofing

20 claims first.

21          And, Your Honor, on the updated claim list we handed

22 up this morning, we've indicated in bold, all capitals, which

23 of the Hahn and Hessen claims are alleged fireproofing claims,

24 and there should be nine on that list.

25          MR. MANDELSBERG:  Your Honor, just for clarification

1  I have no problem if -- our firm being identified for

2  convenience sake, but Hahn and Hessen only represents the State

3  of California, and it's really the State of California,

4  Department of General Services claims.  So when Mr. Restivo

5  refers for shorthandedness to our firm, that's fine, but we

6  don't have any claims filed in this case.

7            MR. RESTIVO:  I --

8            THE COURT:  Okay.  Thank you.

9  BY MR. RESTIVO:

10  Q    Dr. Lee, with respect to the State of California claims

11  relating to fireproofing, were the results you reviewed similar

12  with respect to all 12 of those alleged fireproofing buildings?

13  A    I'm not going to go through all 12.  I'm just going to

14  take one as an example, and if there's any difference in any

15  other one, you tell me.  Turn, if you would, to Debtors'

16  Exhibit 47.  What is Debtors' Exhibit 47?

17  A    Debtors' Exhibit 47 contains the summary spreadsheet

18  showing the samples we received and our class -- their

19  identification and our classification of them as well as the

20  backup bulk sample analysis information.

21  Q    Okay, and what was your conclusion with respect to the

22  bulk samples analyzed for this building covered by Debtors'

23  Exhibit 47, namely, Building 106 -- Claim 10649?

24  A    The conclusions were that the -- of the samples there were

25  two which were potentially not inconsistent with a W.R. Grace

1  formula.  The last two -- the remainder were either

2  insufficient data or the wrong components.

3  Q    And with respect to the other 11 fireproofing buildings,

4  did you find bulk samples that similarly you concluded were not

5  inconsistent with the formula for MK-3?

6  A    Yes.

7  Q    Are there any other products that those bulk samples would

8  not be inconsistent with?

9  A    Fire Code V from Gypsum at least.

10 Q    And that's the one we talked about?

11 A    At least, yes.

12 Q    That has the same three components in the same amount

13 percentages?

14 A    Same general components, yes.

15 Q    How does a laboratory distinguish then between a bulk

16 sample that might be consistent with MK-3 and a bulk sample

17 that might be consistent with Fire Code V?

18 A    You perform what's called a starch test.

19 Q    Why do you do that?

20 A    MK -- Fire Code V contains starch -- cornflower, processed

21 starch, and MK-3 does not.

22 Q    And if you do a laboratory test, does the laboratory test

23 identify the presence of starch?

24 A    Yes.

25 Q    If your laboratory test identifies the presence of starch,

1  what is your lab's conclusion?

2  A    It would be inconsistent with a W.R. Grace product and not

3  inconsistent with Fire Code V.

4  Q    And if your laboratory finds that there is no starch in

5  the fireproofing material containing these other components,

6  what is your conclusion?

7  A    It would be that it was not inconsistent with MK-3 and

8  inconsistent with Fire Code V.

9  Q    Simply stated, if you find starch, it's consist -- and all

10 the other components in the percentages you've testified to,

11 it's not inconsistent with Fire Code V.  But if you find

12 starch, it would be inconsistent with MK-3, because it -- MK-3

13 has no starch.

14 A    That's correct.

15 Q    Okay, and is that true for the buildings -- the 12 claims

16 you looked at involving alleged fireproofing?

17 A    Yes.

18           MR. RESTIVO:  Your Honor, we move into evidence

19 Exhibits 46, 47, 48, 50, 51 --

20           THE COURT:  Wait.  I'm sorry.  You're going to too

21 fast.

22           MR. RESTIVO:  I'm sorry.

23           THE COURT:  Forty-six, 47 --

24           MR. RESTIVO:  Forty-eight --

25           THE COURT:  -- 48 --

1            MR. RESTIVO:  -- 50, 51, 53, 54, 56, 58, 59, 60, and

2   61, which are the alleged fireproofing buildings.

3            THE COURT:  That's 12.

4            MR. RESTIVO:  That's correct.

5            THE COURT:  Okay.

6            MR. MANDELSBERG:  Your Honor, we don't have an

7   objection to them being introduced at this time, but we are

8   going to reserve our right to object to them later on, because

9   we believe that the questioning is assuming something that

10  isn't accurate that will be clear on cross examination.  So at

11  this time we reserve the right to object to them on FRE 7 and 2

12  grounds later on.

13           THE COURT:  Okay, so you're agreeing that they can

14  come in now, or you're going to move to strike them later.

15           MR. MANDELSBERG:  Correct.

16           THE COURT:  All right.  They're admitted.

17  Q    What test does your laboratory do to determine starch in

18  this situation?

19  A    We use what's called the iodine test.  Basically, the same

20  thing you did in high school to determine starch in potatoes.

21  Q    Do any other laboratories involved in asbestos building

22  litigation test for starch, to your knowledge?

23  A    Yes.

24  Q    What laboratories?

25  A    A laboratory called Dr. Longo's Laboratory and a

                    **J&J COURT TRANSCRIBERS, INC.**

1  laboratory called MVA.

2  Q    MVA, is that Millette Vander Wood?

3  A    Right.

4  Q    I want to now address, Dr. Lee, three acoustical plaster

5  claims of the State of California, the first of which I believe

6  is represented by Exhibit 49.  Is Exhibit 49 an acoustical

7  plaster material?

8  A    That's the claim, yes.

9  Q    Okay, and what did you find with respect to the bulk

10 samples relating to acoustical plaster?

11 A    That they had insufficient data to determine whether or

12 not they matched the W.R. Grace formula.

13 Q    And what data did they have?

14 A    The majority of them had asbestos only.  Two of them had

15 constituent analysis showing 14 to 16 percent asbestos and 84

16 to 86 percent Vermiculite.

17 Q    I should back up, Doctor.  What were the components

18 generally of Grace's acoustical plastic material?

19 A    It contained equal parts of asbestos, a clay called

20 montmorillonite, and -- in the range of about 15 percent -- 15

21 to 20 percent, and then 60 to 70 percent Vermiculite.

22 Q    Okay.  With respect to Exhibit 49, am I correct that they

23 are reporting out chrysotile?

24 A    Yes.

25 Q    And they are reporting out Vermiculite?

Lee - Direct/Restivo                    41

1  A     Yes.

2  Q     And there's a footnote.  What's the footnote?

3  A     That the Vermiculite contains montmorillonite in one

4  sample and montmorillonite and titania in the second sample.

5  Q     And how much montmor -- how much -- is that clay?

6  A     Yes, montmorillonite is a form of clay.

7  Q     And how much clay was in those two samples?

8  A     It's not specified.

9  Q     Is that significant?

10 A     Yes.

11 Q     Why?

12 A     Because you cannot determine whether or not it is an

13 amount approximately equal to the chrysotile, and, therefore,

14 you cannot determine whether or not the product matches or is

15 -- could've been manufactured according to the W.R. Grace

16 formula.

17            MR. RESTIVO:  Your Honor, we move into evidence

18 Debtors' Exhibit 49.

19            MR. MANDELSBERG:  Same statement as before, Your

20 Honor.

21            THE COURT:  All right.  It's admitted.  Thank you.

22 Q     The second building in this group is represented, Dr. Lee,

23 by Debtors' Exhibit 55.  Would you turn to that?  Is that a

24 surfacing material?

25 A     Yes, there are two.

                    **J&J COURT TRANSCRIBERS, INC.**

Lee - Direct/Restivo                                          42

1  Q    Okay, and what bulk sample results did you review?

2  A    We reviewed one sample.  There was no constituents

3  quantified, therefore, there's insufficient data.  In the

4  second sample there was 15 percent chrysotile, 85 percent

5  Vermiculite, and montmorillonite at less than one percent.

6  Q    And is there any significance to the fact that the clay

7  was less than one percent?

8  A    It indicates that it's not a formula in which the amount

9  of clay and chrysotile were approximately equal.

10 Q    Does that indicate it's not consistent with the Grace

11 formula for this product?

12 A    That's correct.

13        MR. RESTIVO:  Okay.  Your Honor, we move into

14 evidence Debtors' Exhibit 55.

15        MR. MANDELSBERG:  Your Honor, same reservation as

16 with the prior objection.

17        THE COURT:  It's admitted.

18 Q    Lastly for this group, Dr. Lee, turn to Debtors' Exhibit

19 57.  I believe that relates to Claim Number 10659.  Am I

20 correct?

21 A    One 0 six five nine.

22 Q    And what did the bulk samples indicate on this building?

23 A    Three of them were not a Grace product, because they floor

24 tiles, and three of them were indicated as insufficient data.

25 One because only chrysotile was quantified, and the second two,

Lee - Direct/Restivo                                          43

1  because the montmorillonite and titania were not quantified.

2            MR. RESTIVO:  Your Honor, we move into evidence

3  Debtors' Exhibit 57.

4            MR. MANDELSBERG:  Your Honor, same statement as the

5  other objections.

6            THE COURT:  Okay.  It's also admitted on the same

7  conditions.  Give me one second, please, to get my note caught

8  up here.

9                            (Pause)

10            THE COURT:  Okay.  Thank you.

11 Q    Dr. Lee, with respect to the last three buildings we

12 talked about dealing with surfacing products.  What is your

13 conclusion to a reasonable degree of scientific certainty as to

14 whether or not the bulk samples are consistent with a Grace

15 product formula?

16 A    My opinion is that you can't -- there's insufficient data

17 in the majority of the cases, and in the one case that the data

18 indicates, it's not a Grace -- it's not manufactured according

19 to a Grace formula.

20 Q    Lastly, Dr. Lee, turn to Debtors' Exhibit 65.

21            MS. KEARSE:  Your Honor, may I just ask was that for

22 a specific building, that last opinion --

23            MR. RESTIVO:  That --

24            MS. KEARSE:  -- or was that a general opinion?

25            MR. RESTIVO:  That's for those last three buildings

Lee - Direct/Restivo                                    44

1  we talked about --

2          MS. KEARSE:  Okay.

3          MR. RESTIVO:  -- acoustical plaster.

4          MS. KEARSE:  I just wanted to clarify that.  Okay.

5  Q    Turn, Dr. Lee, to Debtors' Exhibit 65.  That is --

6          MR. RESTIVO:  Your Honor, we're now turning to the

7  last building.  It's under Miscellaneous.  We've gone through

8  now the California buildings, and we're now on the last

9  building, which is Claim Number 17280.  We're now turning to

10 the last building for which this witness is going to testify,

11 which is Claim Number 17280.

12 Q    What is Debtors' Exhibit 65, Dr. Lee?

13 A    It's similar information for the claim containing the

14 claim number, lab sample I.D., type of product, and then our

15 conclusion, and the identified constituents.

16 Q    How many bulk samples of spray-applied material were you

17 provided with this claim?

18 A    One identified as spray applied, and one identified as a

19 possible spray applied.

20 Q    And what was reported with respect to the one identified

21 as spray applied?

22 A    Twenty percent chrysotile, 60 percent mica, and20 percent

23 other.

24 Q    And is -- are those percentages consistent with a Grace

25 formula for surfacing material?

**J&J COURT TRANSCRIBERS, INC.**

1 A    The chrysotile is not inconsistent in line with the range

2 of 15 to 19 percent for chrysotile.  The mica is not correct in

3 that it should be Vermiculite, but given the lab history, we

4 really can't tell whether -- we don't know what the lab meant

5 by it.  Whether they meant Vermiculite or whether they meant

6 mica.  And finally, 20 percent other is unspecified.

7 Q    And are you stating that mica is different than

8 Vermiculite?

9 A    Yes, it is.

10 Q    Those are not two different words for the same thing?

11 A    Vermiculite is derived from mica.  Micas are not

12 Vermiculite.

13 Q    And on the bulk sample marked possible, what was reported

14 out?

15 A    Twenty to 40 percent chrysotile and 60 to 80 percent

16 fibrous.

17 Q    And with respect to those bulk samples, what is your

18 conclusion to a reasonable degree of scientific certainty?

19 A    There was insufficient information to determine whether or

20 not it could've been manufactured according to a Grace formula.

21          MR. RESTIVO:  One moment.

22                    (Pause)

23          MR. RESTIVO:  And, Your Honor, we move into evidence

24 Debtors' Exhibit 65.

25          THE COURT:  Who is representing this claimant?

1          MR. RESTIVO:  This is the First Presbyterian Church.

2   I believe it's a pro se claimant.  I don't know that --

3          THE COURT:  Is anybody representing First

4   Presbyterian Church Claim Number 12780 (sic)?

5                    (No verbal response)

6          THE COURT:  All right.  There's no one present.  The

7   exhibit is admitted.

8          MR. RESTIVO:  Thank you, Dr. Lee.

9          THE COURT:  Cross examine, Ms. Kearse?  Oh.

10         MS. KEARSE:  They're going to go first, and then I'll

11  do mine last.

12         THE COURT:  All right.

13         MR. MANDELSBERG:  Your Honor, my partner John McCahey

14  will be proceeding with the cross examination of Dr. Lee.

15         MR. McCAHEY:  Good morning, Your Honor.  Good

16  morning, Dr. Lee.

17         THE WITNESS:  Good morning.

18         MR. McCAHEY:  My name is John McCahey.  I'm the

19  attorney for the State of California, Department of General

20  Services.

21                    CROSS EXAMINATION

22  BY MR. McCAHEY:

23  Q    If you could, could you turn to your Exhibit 4 which

24  explains your product I.D. claims document review process?

25  A    Tab 4?

                    **J&J COURT TRANSCRIBERS, INC.**

Lee - Cross/McCahey                    47

1  Q    It's the Debtors' Exhibit 4.

2  A    Could you tell me what tab number that is?

3  Q    Excuse me?

4  A    Could you tell me what tab number?

5  Q    That would be Tab 4.  It should be Tab 4.

6           MR. RESTIVO:  Exhibit -- Tab Exhibit --

7           THE COURT:  Debtors' Exhibit --

8           MR. McCAHEY:  It's Exhibit 4.

9           THE COURT:  Debtors' Exhibit 4.

10          THE WITNESS:  Oh.  Thank you.  Yes.

11 Q    Okay, and that exhibit explains the -- what you and your

12 group, the Robert Lee -- the Robert J. Lee Group did.

13 A    Richard -- it's R --

14 Q    Richard.  Richard J. Lee.

15 A    It's actually R.J. Lee.

16 Q    R.J. did.  Okay.  The first --

17 A    Robert (indiscernible).

18 Q    The first -- we have three steps for the data review

19 process?

20 A    Yes.

21 Q    Okay.  Let's talk about them.  "Review claim documents to

22 identify both sample data."  I believe that was the first step.

23                    (Pause)

24 Q    The first step, to "Review claim documents to identify

25 both sample data."  I'd like to focus on that.  Are you there?

1   A    I think I'm here.

2   Q    Okay.

3   A    The first step is -- was to -- we were provided with

4   documents which people had reviewed, and we were provided

5   documents with that portion of the claim that was believed to

6   represent bulk sample analysis.

7   Q    And those documents were provided to you by the debtors'

8   attorney.  Correct?

9   A    That's correct.

10  Q    Okay, and neither you nor anyone from your group went

11  through the claim files themselves.  Correct?

12  A    That's correct.

13  Q    Okay, and for the lab data or these -- or for the data

14  that you received, you did not receive any actual samples.

15  Correct?

16  A    That is correct.

17  Q    Okay, and with respect to any samples referred to in that

18  lab data, you did not perform any independent analysis.

19  Correct?

20  A    No, in -- just maybe we'll call the laboratory work

21  testing.  We performed no independent testing.  I'm not

22  disagreeing with you.  Just when you say analysis, it could

23  mean --

24  Q    Okay.

25  A    -- paper analysis or laboratory analysis.

1  Q    Just so it's clear then, let me clarify.  You performed no

2  testing on actual samples referred to in the lab data.

3  A    That is correct.

4  Q    Okay.  Now, the second step refers to, "If bulk samples

5  contain asbestos lab data, enter into spreadsheet by claim

6  number."  How many samples did you enter lab data for?

7  A    I don't recall the exact number, but I'd say it was over

8  700.

9  Q    Well, could you turn to your report.  I think it's in Tab

10  6.

11  A    Tab 6 not Debtors' Exhibit 6?

12       MR. RESTIVO:   Tab 6.

13  Q    Well, I think it's Tab 6.  I guess one place to look, if

14  you look at the appendix, the last page, Paragraph 25 --

15  A    Seven thousand.

16  Q    I'm talking -- how many --

17  A    The total was 7,000 bulk samples.

18  Q    That you entered there, 7,504?

19  A    Right.

20  Q    Okay, and how many claims did you enter lab data?  And you

21  may want to turn to Page 1 of your report.

22  A    Thank you.  Four hundred forty-five claims.

23  Q    And when you're referring to that same page, there are

24  nearly 15,000 bulk material samples.  What are you referring to

25  there?

1  A    Those were all -- any sample which showed up in the claim

2  information.

3  Q    And I'm trying to understand.  And how did you get from

4  the 15,000 to the 75 hundred?

5  A    We did not include in this tabulation any sample for which

6  there was no asbestos report.

7  Q    Okay.  And then I think the third step of your data review

8  process was to, "Review, enter data, and sort into categories?"

9  A    Yes.

10  Q    Okay.  In keeping with defendant's -- in keeping with your

11  report and turning to the appendix, can you tell me what

12  categories you used?

13  A    The -- the main categories we used were not a Grace

14  product, insufficient data, the wrong components, or not

15  inconsistent.  You had in one case there was a wrong formula.

16  Q    Let's back up for a second.  When you say the main

17  categories, the only categories I see there are those four

18  categories that you just mentioned.

19  A    That's right.

20  Q    So there were no other categories in your report --

21  referred to in your report.

22  A    That's right.

23  Q    Now, you refer to wrong formula.  I believe in the

24  Exhibits 46, 47, you now have a column wrong formula?

25  A    That's correct.

1  Q    What column did that -- under your report what column

2  would that fall under?

3  A    Under our report it would've fallen under none of the

4  columns, because we did -- but we did not find any samples

5  where we thought the data was robust enough until the last

6  submission of data after we filed our report.

7  Q    Of the 70 -- of the over 7,000 samples that you reviewed,

8  you're just saying you only found one example of a wrong

9  formula?

10 A    One sample where I felt the data was reliable enough to

11 consider the wrong formula.  For example, if you consider the

12 two samples that we just discussed at the -- in the

13 miscellaneous claim, there was a report of asbestos from 20 to

14 40 percent.  If you took that on the face of it, you would say

15 it is the wrong formula, because W.R. Grace material was only

16 from 15 to 19 percent or from ten to 14 percent.  But we have a

17 lot of experience in laboratory analysis.  We know that many

18 labs are not that accurate or reliable, so I didn't feel it was

19 -- you could reliably take that data and so that it is not

20 within -- that it was outside the range.  In other words, it's

21 supplemental testing would not have proven that fact.  That was

22 just a bad estimate.

23 Q    Okay, and, by the way --

24 A    So that was -- that's the reason there were no wrong

25 formulas.  Not that there were no formulas -- no constituents

**J&J COURT TRANSCRIBERS, INC.**

1  that were outside the range of Grace products.

2  Q    Okay.  With respect -- is MVA one of those reliable

3  laboratories that you were just referring to?  Would you

4  consider them one of the -- to be one of the reliable

5  laboratories?

6  A    Well, I certainly think that -- the element we used for

7  judgment was to look at the backup data, but MVA is a good

8  laboratory.

9  Q    And, by the way, this discussion about the wrong formula,

10 is that anywhere discussed in your report?

11 A    It is not.

12 Q    Okay.  Now, the categories that you used, they were

13 selected before you entered the data?

14 A    We -- they were generally selected, but I'd probably say

15 there was some -- some kind of evolution, because I went

16 through two or three cycles of trying to figure out how were

17 you going to reduce and put this abundance of data into a

18 manageable form.  So I would think that we probably had more

19 categories at the beginning before I started saying, okay, now

20 there's just -- let's use these.

21 Q    And that was before you started to enter the data?

22 A    No.  No, I don't think that would be fair.  The general

23 categories were developed as a matter of here's the way we

24 believe the data will look, and here's how we'll sort it.  But,

25 as I said, once we start getting the data and seeing what

1  information was actually provided, I would think there was some

2  -- I know we looked at should we summarize each claim, should

3  we try to condense them in a manner that physically makes

4  sense, and that was -- the latter is what we did, and that was

5  after we started tabulating data and extracting information.

6  Q    And with respect to the categories that were selected, did

7  you consult with debtors' attorneys as to those categories?

8  A    Yes, I would think that we had discussions in which I

9  relate the conceptual basis of how we were going to sort this

10 information out and form opinions.

11 Q    Now, let's go to the portion of your analysis which you

12 describe as the decision process.

13 A    Okay.

14 Q    Okay?  And I believe that you identify four steps for that

15 process.  Okay?  The first step is I guess a question.  You ask

16 yourself is the sample a surfacing material.

17 A    Yes.

18 Q    Okay, and the answer to that question was no.  You put

19 that into the category of not a Grace product.

20 A    That's correct.

21 Q    So the only items that would go into the category not a

22 Grace product were those items where you determined or you

23 ascertained that the product or the sample was from a none

24 surfacing material.

25 A    That would be true.

Lee - Cross/McCahey                    54

1  Q    Okay.  And how many samples did you put into that

2  category?

3  A    According -- this report is probably not complete, because

4  we received a number of claims and the plaintiffs have produced

5  a number of analyses since we compiled this information, but

6  5,147 are shown here, about a half.

7          MR. McCAHEY:  Just bear with me a second.  I just

8  want to --

9                    (Pause)

10 Q    Would you go to Page 8 of your report?

11 A    Go to page what?

12 Q    Page 8, and Paragraph 4.1.

13 A    Yes.

14 Q    Does that paragraph indicate that you found 7,504 samples

15 were not surfacing materials?

16 A    Paragraph what?

17 Q    Paragraph 4.1 on Page 8, the first sentence, and I'll read

18 it to you.  "Of the results reviewed, 7,504 samples were not

19 surfacing materials manufactured by Grace."

20 A    That's what it says.  Yes.

21 Q    Now, that would mean that -- you said you only reviewed or

22 classified 7,000 samples.  I'm a little confused here.

23 A    Well, if the tabulation is right, then in Appendix 6,

24 that's a typo.

25 Q    When you say on Appendix --

**J&J COURT TRANSCRIBERS, INC.**

1  A    I forgot the letter.

2  Q    What -- I'm a little confused.  What typo where, sir?

3  A    It says the -- if I go to my tabulation on the

4  spreadsheet, it shows that 7,504 samples were found to have

5  asbestos.  As of the date of this report, 5,147 were

6  characterized as not a Grace product.

7  Q    I'm a little -- what page are you on, sir?  What document?

8          THE COURT:  Page 25 of the expert report?

9          MR. McCAHEY:  Yes.

10         THE COURT:  The summary.

11 Q    Well, is it possible, sir, that the column total --

12 A    Oh.

13 Q    -- with asbestos --

14 A    Oh, the -- that --

15 Q    -- is 14,707 --

16 A    I'm sorry.

17 Q    -- at the column with not a Grace product was 75 -- 7,504

18 and so on moved over?

19 A    Yes.  No, I think what -- it looks to me like the total

20 column got slid on the laboratory summary.

21 Q    And so the total number of samples that you entered lab

22 data into as part of the process was over 14,700?

23 A    Yes.

24 Q    And the amount which you eliminated right off the bat as

25 being not a grace product was 7,504 samples.

1  A    Yes, and then slide that column one level to the right.

2  Q    And when you determined that something -- just for -- when

3  you determined that something was not a Grace product, it was

4  just because the product was a non-surfacing material.

5  A    Well, when we --

6  Q    In this column.

7  A    In -- for the purpose of this analysis, if it was not a

8  surfacing material we put it into a category not a Grace

9  product.  The remainder we formed opinions about whether or not

10 they'd been manufactured or could've been manufactured

11 according to a Grace formula.

12 Q    We're going to get to those, Dr. Lee, but thank you very

13 much.  Just to clear that, MK-3, that is a Grace surfacing

14 product.  Correct?

15 A    Yes.

16 Q    And Zonolite Acoustical Plaster or Plastic, that is a

17 Grace surfacing product.  Correct?

18 A    That's correct.

19 Q    And Zonolite Finishing Coat, that was a Grace surfacing

20 product.  Correct?

21 A    Yes, I don't think it's called Finishing Coat.  I think

22 Finish Coat.

23 Q    Okay.  So then if you answered yes or you didn't know for

24 the -- to your first question, you went on to the second one,

25 sample constituents identified.  Okay?  So if the answer to

Lee - Cross/McCahey                    57

1  that question was no, you put it into a category of

2  insufficient data.

3  A    What exhibit are we on now?

4  Q    We're back -- I'm sorry, sir.  Let's go back to Exhibit 4.

5  A    Debtors' Exhibit 4?

6  Q    The second -- Debtors' Exhibit 4, your flowchart

7  explaining your process.  That's what we --

8  A    Okay.

9  Q    And the second part of the decision process -- the second

10 step in the decision process, sample constituents identified.

11 Are you with me there?

12 A    Yes.

13 Q    Okay.  If you answered no to that question, you would put

14 it into the insufficient data category.

15 A    That's correct.

16 Q    And I believe that you put 5,147 samples into that

17 category.

18 A    That's what it says in the report, and if you slide that

19 sum column one thing to the right, it'll agree.

20 Q    Now, by insufficient data, to clarify, do you mean that

21 the lab data for those samples that you looked at were

22 insufficient to render a conclusion as to whether or not the

23 materials in the sample were consistent or not inconsistent

24 with the Grace product?

25 A    I think you're almost right.  What we determined -- our

**J&J COURT TRANSCRIBERS, INC.**

1  opinion on that is that there's insufficient information to

2  determine whether or not the product could've been manufactured

3  according to a Grace product formula.

4  Q    Now, if the data that you looked at, for example,

5  indicated the amount of chrysotile.  Excuse me -- I'm -- with

6  these terms -- would indicated the amount of chrysotile

7  asbestos but did not identify the constituents of the sample,

8  that sample would go into the insufficient data category.

9  Correct?

10  A    For the purposes of this analysis, that's correct.

11  Q    Okay, and if the -- and if the data indicated the amount

12  of the chrysotile asbestos and identified other constituents as

13  only binder or non-fibrous material without identifying the

14  other components, that would go into the not -- insufficient

15  data category.

16  A    That's correct.

17  Q    Okay.  And am I correct that the lab data that you were

18  looking at -- well, let me back up.  If someone is doing

19  testing solely for the purpose of determining whether asbestos

20  is present, that -- such testing may not include the components

21  of the particular sample.

22  A    It depends on whether or not you're subscribing to the

23  NAVLAP or not, National Voluntary Laboratory Accreditation

24  Program --

25  Q    But there would be --

Lee - Cross/McCahey                    59

1  A    -- but the -- but then in many cases --

2        MR. RESTIVO:  Excuse me.  If he'd be allowed to

3  finish his answer?

4        MR. McCAHEY:  I'm sorry.

5  A    Certainly in many cases where laboratories were evaluating

6  for the purpose of determining whether or not it was asbestos-

7  containing material, what you said is true.

8  Q    And --

9  A    You would find laboratories that just reported the

10  asbestos.

11  Q    And in going through this lab data that you were entering

12  into the computer -- into the system, did you attempt to make

13  any distinction between analysis that was done for the purposes

14  of identifying asbestos -- the presence of asbestos as opposed

15  to analysis that was done to identify the constituents prior to

16  identification of the asbestos?

17  A    We did not.  In -- we operated under the assumption that

18  claimants had put information about the bulk sample analysis

19  into the claim as part of the claim for the purposes of

20  supporting their claim, and then, therefore, we treated it

21  accordingly.

22  Q    So that was an assumption that you made?

23  A    We were asked to review bulk product data, and we analyzed

24  according to whether or not it could support an opinion that

25  this product was indeed manufactured by W.R. Grace.

**J&J COURT TRANSCRIBERS, INC.**

Lee - Cross/McCahey                                    60

1  Q     If someone was making a claim, for example, for MonoKote

2  3, and they had -- and you found in that document pertaining to

3  non-surfacing material, would you still include that non-

4  surfacing material in the data you were reviewing?

5  A     I'm sorry.  I lost -- you lost me in that.  Maybe you

6  could repeat it.

7  Q     If someone is making a claim for a surfacing product, and

8  that -- let's say the claim is being made for a surfacing

9  product, would you include any information you found provided

10  to you by the attorney for that claim with respect to the non-

11  surfacing product?

12          MR. RESTIVO:  Objection.

13  A     I don't get it.

14  Q     Okay.  Maybe it's not that important then.  Okay.  Let's

15  go back to your -- let's go back to your decision process.  If

16  you answered yes to the question sample constituents

17  identified, you went on to the next step.  Correct?

18  A     Yes.

19  Q     And then that step was constituents present not called for

20  in the Grace formula.  That was -- is that --

21  A     That it -- yes.  That's the question.  Yes.

22  Q     And if you answered yes, you would put that sample into

23  the category wrong components.

24  A     That's correct.

25  Q     And I believe that you put -- I believe you put 1,418

**J&J COURT TRANSCRIBERS, INC.**

1  samples into that category?

2  A    At the time of the report.

3  Q    Now, if -- I'm trying to understand how something would

4  wind up in the wrong constituents column.  If the lab data, for

5  example, provides -- let me strike that.  Let me start again.

6  You're provided with lab data for a sample.  If the

7  constituents are present that are not called for in a Grace

8  formula, it would then go into the wrong constituents column.

9  Correct?

10  A    That's correct.

11  Q    And if there was a constituent called for in the Grace

12  formula that was absent, it would go to -- in the Grace -- it

13  would go to -- it would go into the wrong constituent column.

14  A    That is correct.

15  Q    Okay, and if the constituents were identified in

16  disproportionate amounts, would it go into the wrong

17  constituents column?

18  A    Well, that was -- as I pointed out, that was where we

19  started off to say we would do that, but when we looked at the

20  information we were provided, I did not believe it was robust

21  enough in general to draw that conclusion.  So we put those in

22  many cases simply into the insufficient data.  That was -- they

23  have -- there was a report -- we often didn't have the

24  laboratory data.  We often just had a summary or report showing

25  numbers, and without backup information I didn't think you

1  could say it was the wrong formula without being able to review

2  some underlying data.

3  Q    Okay.  And if you answered no to the third step,

4  constituents not present -- not called for in the Grace

5  formula, you would then move on to the fourth and final step of

6  your process.  Correct?

7  A    Yes.

8  Q    Okay, and that step was correct constituents identified

9  and present in approximate correct abundance.

10  A    Yes.

11  Q    Okay, and if you answered no to that question, you would

12  put it into the wrong formula column.

13  A    Yes.

14  Q    And you only had one -- we only had one in the wrong

15  formula column.

16  A    As far as I remember.

17  Q    Okay.  And if you answered yes, you would put it into the

18  not inconsistent with Grace's formula.

19  A    That's correct.

20  Q    Okay.  And then you stopped there.  You did not further

21  analysis.  Correct?

22  A    That's correct.

23  Q    Now, how many of the 14,700 samples did you put into the

24  category not inconsistent with Grace's formula?

25           MR. RESTIVO:  Objection, Your Honor.  When I wanted

Lee - Cross/McCahey                    63

1  to talk about the report, there was an objection, and the Court

2  held we were getting beyond these specific claims, and so now I

3  object.

4           THE COURT:  That's true.

5           MR. McCAHEY:  No, I -- Your Honor, I think this goes

6  -- he was dealing with specific claims.  I'm dealing now with

7  general.  He tried -- Mr. Restivo was trying to go into a

8  specific claim, and I don't think he objection was lodged by

9  us.  I think it was lodged by Ms. Kearse with respect to that.

10          THE COURT:  All right.  Well, in any event, at this

11  point in time this report's in -- well, I don't know that this

12  report's in evidence, but we've been dealing with these

13  categories, and, frankly, I think at this point if I do the

14  math, I can come up with the answer anyway.  So it's overruled.

15  You can answer, sir.

16  A    According to the last column, 638 out of the 14,707.  And

17  as I point out, we received a number of analyses from the

18  Millette Vander Wood lab subsequent to these reports.

19  Q    Excuse me.  May I have that -- stay up there, Dr. Lee.

20  I'm sorry.  Can I have his last statement read back of what she

21  just said.

22  A    We received -- we had originally received just partial

23  analysis.  We received a number of analyses subsequent to the

24  publication of this report which provided the fuller underlying

25  analysis, some of which I believe were done in 2005.

Lee - Cross/McCahey                                    64

1  Q    Okay.  As to 638 samples that you concluded the sample was

2  not inconsistent with Grace's formula, you concluded that that

3  sample could possibly be from a Grace product.  Correct?

4  A    That would be correct.

5  Q    And since your --

6  A    The term not inconsistent is taking the data at face value

7  and reviewing the underlying data that the results, as far as

8  they went, were not inconsistent or inconsistent with a Grace

9  product.

10  Q    Okay.  And since you are concluding that the sample is

11  possibly a Grace product, you are not concluding that the

12  sample is not a Grace product.  Is that correct?

13  A    Well, I think that is exactly right.  That I am concluding

14  that the results as presented are not inconsistent with a Grace

15  product.  By definition, that does not speak to other formulas

16  from other manufacturers and -- but does speak to the fact that

17  they're -- they are comparable to a Grace formula.

18  Q    Well, the category not inconsistent with Grace's formula,

19  that was the highest grade you could give in this exercise.

20  Correct?

21          MR. RESTIVO:  Objection, unless you define --

22  objection.  He has not defined what he means by highest range

23  versus lowest range.

24          MR. McCAHEY:  I said highest grade, Your Honor.

25          THE COURT:  Highest grade.

**J&J COURT TRANSCRIBERS, INC.**

1        MR. RESTIVO:  Same objection.

2        THE COURT:  I think that's a fair comment on this

3   report.  You can answer that question, Dr. Lee.

4   A    Insofar as you consider from I guess claimants

5   perspective, the fact that it's a floor tile sample is the

6   lowest grade it could get, and a surfacing material, then next

7   and so on.  That's not an unreasonable statement.

8   Q    Okay.  As to the samples -- as to the 638 samples that you

9   put into the category not inconsistent with Grace formulas, you

10  were not asked to render anymore conclusive opinion as to

11  whether, in fact, those samples are, in fact, from a Grace

12  product.

13  A    That's correct.

14  Q    Okay.  And just to go back, neither you nor your firm

15  performed any tests on those samples that -- in the category

16  not inconsistent with Grace formula.

17  A    That is correct.

18  Q    You never asked to get copies of those samples.  Did you?

19  A    I never asked to get pieces of those samples.

20  Q    Okay.

21  A    I had copies of the data.

22  Q    You had copies of the data.  Now, are you familiar with a

23  copy known as MVA?

24  A    Yes.

25  Q    Okay, and as you know, they were retained by my client,

1  DGS, to perform a constituent analysis in connection with its

2  15 claims at issue today.  Now, in the course of your document

3  review process that we've been discussing, you reviewed data

4  from samples analyzed by MVA.  Correct?

5  A    Yes.

6  Q    And I believe that you talked about it earlier, that with

7  respect to 12 of those claims involving MonoKote 3 --

8              THE COURT:  Sir, you need to stay by the microphone.

9              MR. McCAHEY:  Oh, I'm sorry.

10 Q    I think with respect to 12 of those claims involving

11 MonoKote 3 you put the MVA analysis into the column not

12 inconsistent with Grace data.  Is that correct?

13 A    I don't remember the exact number, but yes.

14 Q    Well --

15 A    I'm not quarreling with your number.  I just -- I don't

16 hold it in my head.  The -- what I call the Hahn and Hessen or

17 California claims involving MonoKote 3 I concluded the data was

18 not inconsistent with a Grace formula.

19 Q    Okay.  Now, with respect to those 12 samples that you put

20 into the category not inconsistent with Grace's formula, you

21 concluded the product was a surfacing material.  Correct?

22 A    Yes.

23 Q    Okay.  You concluded that MVA had identified the samples

24 constituents.  Correct?

25 A    The data identified constituents that were in MK-3 and in

1  the approximate rate of abundances.  That is what -- just it's

2  the way I phrased it.

3  Q    Okay, and you did not find -- and you concluded that MVA

4  did not find the presence of a constituent not called for in a

5  Grace formula for MK-3 in any of those 12 samples.

6  A    That's correct.

7  Q    Okay, and you --

8  A    Yea, maybe you need to phrase that a little bit

9  differently.  They did not report or conclude that there were

10 constituents in the product which do not call for -- for

11 example, they found magnephytite (phonetic).  They found other

12 components, carbonate, precipitated carbonate, which they did

13 not conclude were part of the product formula, but they were in

14 the material.  And in some cases they reported their abundance

15 even though precipitating carbonate is not part of the Grace

16 formula.

17 Q    But whatever MVA reported in those 12 reports you looked

18 at, you nevertheless put them in the category not inconsistent

19 with Grace formula.

20 A    That's correct.

21 Q    And the formula that you were dealing with was MK-3.

22 Correct?

23 A    That's correct.

24 Q    And finally with respect to those 12 samples that MVA

25 identified and you put into the not inconsistent category, you

1  concluded that the correct constituents for MK-3 were

2  identified in the approximate correct abundances.  Correct?

3        MR. RESTIVO:  Objection, Your Honor.  I think counsel

4  miss spoke.  There are 12 buildings.  I'm not sure that there's

5  only one sample per building.

6        MR. McCAHEY:  I'm sorry.  Thank you.  I'm sorry.  I

7  apologize.  Let me rephrase.

8  Q    With respect to the 12 samples or the 12 -- the 12 samples

9  for the 12 claims that you put into the category not

10 inconsistent with Grace formula, you concluded in the last step

11 that MVA had identified the correct constituents and identified

12 them in the approximate correct abundance.

13 A    The answer to your question is yes, but I think that the

14 point that I tried to make earlier, 12 claims -- I recall -- I

15 don't recall that there were 12 samples.  I think, in fact,

16 there was more like -- I don't know.  There's probably two

17 samples per claim typically.  So if you said with regard to the

18 samples analyzed by MVA for alleging MK-3 for each of the

19 claims I found that the component analysis not inconsistent,

20 that's correct.

21        MR. McCAHEY:  Okay.

22        THE COURT:  May I ask a question so that I can

23 clarify something?  I think I --

24        MR. McCAHEY:  Yes, Your Honor.

25        THE COURT:  I think I got myself confused.  Dr. Lee,

1  you said that as to some of the samples from MVA that you

2  reviewed, there were other constituent elements that were

3  identified, but MVA concluded that they were not part of the

4  sample.  You simply accepted that information and, therefore,

5  concluded that even though there were other minerals

6  identified, that they were still not inconsistent with the

7  Grace formula.

8          THE WITNESS:  Yes.  In some cases there were --

9          THE COURT:  As to these 12 buildings.

10         THE WITNESS:  As to these 12 --

11         THE COURT:  Claims.

12         THE WITNESS:  -- claims.  That's right.

13         THE COURT:  Okay.  Thank you.

14         THE WITNESS:  If they had concluded that they were

15 not added as a constituent component, then I accepted that.

16         THE COURT:  Okay.  Thank you.

17         MR. McCAHEY:  Your Honor, could I have 30 seconds to

18 confer?

19                      (Pause)

20 Q    And, Dr. Lee, when you were discussing on your direct

21 these 12 claims -- the DGS claims involving MonoKote 3, you

22 mentioned the fact that I believe -- and correct me if I'm

23 wrong -- that MVA had not tested for starch?

24 A    That's my understanding.  Yes.

25 Q    Could you -- and that's basic -- can you just review

1 Defendants' Exhibit 46?  We're only focusing on the MVA report.

2                        (Pause)

3            MR. McCAHEY:  Okay.  Never mind.  Never mind.  I'm

4 sorry, Your Honor.

5 Q    Let's go back to your report, Exhibit 6.  Okay?

6 A    Defense Exhibit.

7 Q    It's Tab 6.

8            MR. RESTIVO:  Tab 6.

9 Q    I think it's your report.  In looking at Appendix B, by my

10 calculation, sir, I estimated of the 445 claims that you

11 entered lab data samples for you concluded over 300 of those

12 claims had at least one sample that was not inconsistent with

13 Grace's formula.

14            MR. RESTIVO:  Objection, Your Honor.  At this point

15 he's still staying away from the claims and --

16            MR. McCAHEY:  I'm talking just in general of what he

17 did, Your Honor.

18            THE COURT:  But what's the relevance?

19            MR. McCAHEY:  I think you'd get to that, Your Honor.

20            THE COURT:  Well, then let's get to it.

21            MR. McCAHEY:  Okay.

22 Q    Is that correct?

23 A    Repeat it again.

24 Q    Of the 600 -- of the 445 claims that you entered lab data

25 for, by my count for at least over 300 of those claims you

Lee - Cross/McCahey                                    71

1  found that at least one sample for that claim was in the not

2  inconsistent with Grace's formula category.

3  A    I will agree with it.  The numbers are tabulated.

4  Q    Okay.  The number are what the numbers are.

5  A    The numbers will speak for themselves.

6  Q    And if I were to ask you whether or not of those claims

7  that you just -- that you put into the not inconsistent with

8  Grace category, over 180 had only one sample identified in the

9  not inconsistent with Grace's formula, you would give the same

10 answer?

11 A    Yea, the data will speak for itself.

12 Q    Could you turn to Page 9 of your report?  And I'm looking

13 at the table -- let me know when you get there, sir.

14 A    Yes.

15 Q    And you have a table list of claims with laboratory data

16 that failed to establish the presence of the Grace product.  Do

17 you see that, sir?

18 A    Yes.

19 Q    Am I correct that a claim wound up in that table if you

20 did not find at least one sample that was not inconsistent with

21 Grace's formula?

22 A    Yes.

23 Q    Okay.  And you've listed there certain claims by my

24 client, DGS.  Correct?  I think 10650 to 10662?

25 A    If those are your claims, then that -- yes.

1  Q    That's a fair enough comment.  Since you issued this

2  report, have you made certain changes in the categories that

3  you put these samples analyzed by MVA?

4  A    I think those are the -- I think the answer is we have

5  reviewed the analyses by -- originally, we were not supplied a

6  full analysis by MVA, and maybe there were some additional

7  analyses conducted by MVA in late 2005.  That -- there has been

8  supplemental information compiled by us from analyses performed

9  by MVA when we received the backup information and/or new

10 analysis.

11 Q    When you say not provided to you by MVA, you're saying the

12 information wasn't provided to you by Grace's attorneys.

13 Correct?

14 A    Oh, I'm sorry.  Yes.

15 Q    And just to go to Page 23.  I don't know.  By my

16 calculation, I think we have seven claims there where you did

17 not find any -- you did not have any entry for not inconsistent

18 with Grace's formula.  In other words, I think you had zero or

19 the dash mark.  And I think -- and maybe we could stipulate

20 this based upon the testimony, but I think with respect to

21 those seven claims, you have now put one sample into the not

22 inconsistent with Grace's category.

23 A    I'm sorry.  What's --

24          THE COURT:  I'm sorry, but I'm lost.

25          MR. RESTIVO:  Objection.

**J&J COURT TRANSCRIBERS, INC.**

Lee - Cross/McCahey                           73

1  Q    Okay.  Let's go to Page 16.  Let's go to Page 23 of your

2  report.  We'll do it the simple way.  Tell me when you're

3  there.

4  A    I'm here.

5  Q    Claim 1650.  Do you have any samples that are not

6  inconsistent with Grace's formula?

7            MR. RESTIVO:  I'm sorry.  What claim are you on?

8            MR. McCAHEY:  One 0 six five 0.

9  Q    That's your report, Dr. Lee.  That's your Appendix B, Page

10 23.

11 A    From the numbers you listed before, there were 10650 to

12 10662?

13 Q    Yes.

14 A    That range of claims, the sample, there's no not

15 inconsistent shown except for two claims, 10654 and 10661.

16 Q    Well, let's focus on Claim 10650, and let's go to -- and

17 could you go to your Exhibit 48 now.

18 A    Which is Debtors' Exhibit?

19 Q    Forty-eight.

20 A    Forty-eight.

21            THE COURT:  Am I the only one who's hearing music?

22            THE CLERK:  It's in the sound (indiscernible).

23            THE COURT:  Is it coming from the telephone?

24            THE CLERK:  It's coming from the telephone.

25            THE COURT:  Is Court call on the phone, please, the

1  operator?

2            COURT CALL OPERATOR:  Yes.

3            THE COURT:  Can you identify where the music's coming

4  from?

5            COURT CALL OPERATOR:  Well, Your Honor, I don't have

6  one open line right now.

7            THE COURT:  Is it -- well, can you hear music on it?

8            COURT CALL OPERATOR:  No, I can't.

9                         (Pause)

10           THE COURT:  Okay.  If it's not coming from you, I'm

11 going to take just a two-minute recess to see if I can find

12 where this music's coming from to see if we can get it shut

13 down.  I will be right back.  We'll take a recess when you're

14 finished with your cross examination.

15           MR. McCAHEY:  Yes, Your Honor.  Thank you.

16                        (Recess)

17 BY MR. McCAHEY:

18 Q    Dr. Lee, are you on Debtors' Exhibit 48?

19 A    Yes.

20 Q    Okay, and on that -- and that exhibit refers to Claim

21 10650?

22 A    Yes.

23 Q    Okay, and with respect to the one MVA sample that was

24 analyzed there, you put that into the not inconsistent with

25 Grace's formula?

Lee - Cross/McCahey                    75

1  A    Yes.

2  Q    And so going back now to your report on Page 23 for the

3  Claim 10650, you would now have one in the column not

4  inconsistent with Grace's formula.

5  A    That's correct.

6  Q    Okay.  And I don't think we have to go through each of

7  these seven with you.  We can do that with the Judge.  So just

8  so we understand, to the extent that on your table on Page 9 of

9  your report and the claims -- the DGS claims with respect to

10 any of those claims where you -- after you issued the report,

11 you identified one sample that MVA -- not inconsistent with

12 Grace's formula, that claim would come off the list of claims

13 with laboratory data that fails to establish the presence of a

14 Grace product.

15            MR. RESTIVO:  Objection, Your Honor.

16            THE COURT:  What claim number are we talking about?

17            MR. McCAHEY:  We're talking about eight claims, Your

18 Honor.

19            THE COURT:  We're talking about what?

20            MR. McCAHEY:  Eight claims.

21            THE COURT:  Which claims on this chart are you

22 suggesting that --

23            MR. McCAHEY:  I'm dealing with 10650, Your Honor,

24 10652 --

25            THE COURT:  Wait.  One 0 six five 0 is on this chart

**J&J COURT TRANSCRIBERS, INC.**

that says that the list of claims, the laboratory date that

failed to establish the presence of a Grace product, and now

you're saying that Exhibit 48 actually now says that the

analysis shows that it's not inconsistent --

            MR. McCAHEY:  Right.

            THE COURT:  -- with the Grace product.

            MR. McCAHEY:  Yes, Your Honor.

            THE COURT:  Okay, so what you're trying to do is get

which of these eight claims should come off of this chart --

            MR. McCAHEY:  I will tell you that.  I will say that,

Your Honor.  One 0 six five 0.

            THE COURT:  All right.  Just a second.  One 0 six

five 0.  Okay.

            MR. McCAHEY:  One 0 six five two.

            THE COURT:  All right.

            MR. McCAHEY:  One 0 six five three.

            THE COURT:  Okay.

            MR. McCAHEY:  One 0 six five five.

            THE COURT:  All right.

            MR. McCAHEY:  One 0 six five six.

            THE COURT:  Okay.

            MR. McCAHEY:  One 0 six five eight.

            THE COURT:  All right.

            MR. McCAHEY:  And 10662.

            THE COURT:  Okay.

**J&J COURT TRANSCRIBERS, INC.**

1       MR. McCAHEY:  And, actually, there was another claim,

2  10660, which was not referred to in the report at all by Mr.

3  Lee.

4       THE COURT:  Okay.  Mr. Restivo, is there any

5  disagreement by the debtor that those claims will no longer now

6  be on Table 1 of Page 9 of Dr. Lee's report?

7       MR. RESTIVO:  I object to the line of questioning or

8  comment.  We did not put Dr. Lee's report into evidence.  The

9  testimony is that subsequent information was received.  The

10 exhibits we put in have in each case all the samples, and so I

11 don't know why we are amending a report that hasn't been marked

12 as an exhibit.  But, other than that, I wouldn't disagree that

13 to the extent the report doesn't match up with the subsequent

14 data as reported in our admitted exhibits.  One could go back

15 and change the numbers in the report.

16      THE COURT:  Okay.  My concern is this.  I just want

17 to make sure that the record is clear at this point in time --

18 and I agree with you that this report is not in evidence, but

19 nonetheless, it seems to me that it probably makes sense at

20 this point if the exhibits don't track this data, since Dr. Lee

21 has said that he's had supplemental information.  And if the

22 debtor is also agreeing that these are not any longer

23 appropriately listed in this table to get them out of this

24 table, so there isn't confusion on the record later.

25      MR. RESTIVO:  We can do that, Your Honor.

Lee - Cross/McCahey                    78

1          THE COURT:  All right.  That's fine.  Okay.  I

2  believe it's stipulated that those claims -- I have seven of

3  them.  One, two, three, four, five, six -- eight of them.  One

4  0 six five 0, 10652, 10653, 10655, 10656, 10658, and 10662 are

5  not going to any longer be included in Table 1 on Page 9 of Dr.

6  Lee's report, which is Tab 6.

7          MR. RESTIVO:  Your Honor, our stipulation is we will

8  correct those pages consistent with the exhibits that we've

9  introduced sitting here now.  I don't know whether it's six

10  cases, seven, or eight cases, but we will make the report

11  consistent with the summaries on each of the exhibits which

12  we've introduced.

13          THE COURT:  All right, Mr. Restivo.  Thank you.

14  BY MR. McCAHEY:

15  Q    In your report, Exhibit 6, is there any discussion of the

16  U.S. Gypsum Fire Code V?

17  A    No.

18          MR. McCAHEY:  Excuse me.

19                    (Pause)

20  Q    Dr. Lee, you've been testifying on behalf of W.R. Grace in

21  various matters I think since the late 1980s.

22  A    That is correct.

23  Q    Okay, and over that time how much have you received in

24  compensation from them?

25  A    I do not know what our fees have been.

**J&J COURT TRANSCRIBERS, INC.**

1  Q    Would the number 20 -- is it -- would it be more than $20

2  million?

3  A    As I said, I do not know what the number would be.

4            MR. McCAHEY:  Just one second, Your Honor, just to

5  make sure I don't have anything else.

6                        (Pause)

7            MR. McCAHEY:  Your Honor, I have no further questions

8  at this time.

9            THE COURT:  All right.  Should we take a ten-minute

10  recess, Ms. Kearse?

11            MS. KEARSE:  That would be fine, Your Honor.

12            THE COURT:  Okay.  Take a ten-minute recess, and then

13  we'll return with Ms. Kearse's cross exam.

14                        (Recess)

15            THE COURT:  Please be seated.  I'm sorry.  We tried

16  to get the music stopped.  I guess it's not going to, so we'll

17  have to deal with it.  Ms. Kearse.

18            MS. KEARSE:  Thank you, Your Honor.  Good morning,

19  Dr. Lee

20            THE WITNESS:  Good morning.

21            MS. KEARSE:  Dr. Lee, I'm here today on behalf of the

22  claimant 6941.  We talked about a lot of numbers here, but it's

23  the West Virginia State University -- you can tell I work in

24  West Virginia a lot -- Washington State University, Daggy Hall

25  Speech Building and Theater Building.  It goes by a lot of

1 different names.

2                    CROSS EXAMINATION

3 BY MS. KEARSE:

4 Q    But my understanding is you basically looked through the

5 data as a number.  Is that correct?  You're not associating a

6 lot of these with the various building names.  Is that correct?

7 A    That's correct.

8 Q    All right.  Doctor, I just want to hopefully be very

9 specific about a couple things and why we're here today.  And

10 let me just make very clear here you cannot opine today to a

11 scientific degree of certainty that there is not a Grace

12 asbestos-containing product in the Washington State University

13 building.  Is that correct?

14 A    Could you tell me the claim number?

15 Q    Six nine four one.

16 A    Could you refer me to a defendants' exhibit number?

17 Q    I -- defendants' Exhibit Number 45.

18 A    That's not the case.  But with respect to the first two

19 samples, which indicate that the secondary component is fibrous

20 glass, that would not be a product manufactured according to a

21 Grace formula.

22 Q    But, Doctor, listen to me carefully.  As we sit here

23 today, you cannot opine to a scientific degree of certainty

24 that there is not a Grace asbestos-containing product within

25 the building in 6941.  Is that correct?

**J&J COURT TRANSCRIBERS, INC.**

Lee - Cross/Kearse                    81

1   A     That would be correct.

2   Q     Okay.  And as I understand your testimony, you simply have

3   insufficient data to make a decision one way or the other.

4   Correct?

5   A     That's correct.

6   Q     All right.  So you're missing some facts.  Is that

7   correct?

8   A     With respect to Grace products or other products, yes.

9   Q     All right.  Do you ask W.R. Grace for anymore facts to

10  help you in your analysis?

11  A     No, I'm not missing -- in terms of the laboratory

12  analysis, it is what it is.

13  Q     And you did not ask Grace for any other materials.  Did

14  you?

15  A     I was asked to review bulk laboratory data.  That's what I

16  did.  I did not ask Grace for anything else.

17  Q     And if I understand your earlier testimony, you simply

18  don't have enough information to look at it from a recipe

19  standpoint whether or not they match each other.  Is that

20  correct?

21  A     That's correct with regard to the insufficient data.

22  Q     And, Doctor, if I'm correct, I did get the opportunity to

23  depose you.  Do you recall that telephone deposition?  You

24  couldn't --

25  A     Yes.

**J&J COURT TRANSCRIBERS, INC.**

1  Q    I don't know if you know it was me or not, but it was me

2  on that --

3  A    I recall a deposition

4  Q    And, Doctor, during that deposition we talked a little bit

5  about what the focus was of your analysis.  Do you recall that?

6  A    Yes.

7  Q    All right, and it's my understanding that your focus was

8  to simply look at the paper data that was provided to you by

9  W.R. Grace.  Is that correct?

10  A    That's correct.

11  Q    All right.  You did not yourself look at any bulk sample

12  analysis.  Correct?

13  A    That's correct.

14  Q    You didn't take into account any other documents that may

15  be in existence with claim files that would be invoices or

16  specifications or anything else that may even discuss Grace

17  products.  Is that my understanding?

18  A    That's correct.

19  Q    And, Doctor, in your chart that I believe was marked as

20  Exhibit Number 4 --

21          MS. KEARSE:  And I would, Your Honor, at some point

22  want to review the fact that it's in evidence as an exhibit.  I

23  think it should be a demonstrative exhibit.

24  Q    Doctor, do you have Exhibit Number 4?

25  A    Yes, I do.

1          THE COURT:  I agree that it's a demonstrative

2  exhibit.

3          MS. KEARSE:  Okay.  Thank you, Your Honor.

4  Q    Doctor, when you reviewed all the paper data that you

5  received from W.R. Grace, was it your understanding that the

6  claimants were submitting all this data, because they were

7  alleging each and every sample was a Grace product?

8  A    I don't that I had a presumption.  It was submitted, it is

9  my understanding, in -- what I was asked was to review the

10  information provided under the presumption that defendants were

11  claiming specific Grace products as part of the claim.

12  Q    So you did your analysis --

13  A    Plaintiffs.

14  Q    Okay, and who made that representation to you, Doctor?

15  A    W.R. Grace attorneys, and that was my understanding of the

16  information.

17  Q    Doctor, have you taken a look at the claim form itself?

18  A    Not -- certainly not entirely, but at least in terms of

19  what products were alleged, yes.  I'm not sure what -- whether

20  you call it the claim form.  I don't know if I know the

21  vernacular.

22  Q    Let me --

23          MS. KEARSE:  Your Honor, if I may approach?

24  Q    I'll just show you the cover page.  Do you see any of the

25  data --

1          THE CLERK:  You have to use the microphone.

2  A    Okay.

3  Q    Doctor, I showed you an example of what a claim form

4  looked like.  Did you look at anything that was any of the

5  claim forms themselves?

6  A    No, not that particular page, but pages in which the

7  product that was alleged was identified.  I don't remember what

8  that -- where that was at.

9  Q    Doctor, did you yourself actually look at the pieces of

10 paper that had a constituent analysis on it or just the charts

11 that the data was inputted into?

12 A    Both.

13 Q    Okay.  Doctor, would it surprise you that W.R. Grace in

14 their claim form actually requested claimants to provide

15 sampling of any -- for the presence of asbestos-containing

16 materials of the -- on the property for any testing?  Are you

17 aware of that?

18          MR. RESTIVO:  Objection, Your Honor, whether

19 something surprises this expert or not.  It's irrelevant.

20          THE COURT:  Well, that's true.  Rephrase the

21 question.

22          MS. KEARSE:  Okay.  I don't know how to use this

23 Elmo.

24 Q    Doctor, I'm going to show you the claim form, and I'm

25 going to show you Number 26 on the claim form and just ask you

**J&J COURT TRANSCRIBERS, INC.**

1  whether or not you are aware that W.R. Grace actually requested

2  claimants to provide documents that related to any testing of

3  the property.

4          MS. KEARSE:  May I approach, Your Honor?

5          THE COURT:  Yes.

6  Q    If you could just read -- read what Question 26 on the

7  claim form asks for.

8  A    "Have you or anyone on your staff ever conducted any

9  testing or sampling for the presence of asbestos or other

10 particulates in a property?  Yes?  No?  If yes, attach all

11 documents related to any testing of the property."

12 Q    And, Doctor, just to get to the point of that, you would

13 agree with me -- and I did ask you in your deposition -- that

14 building owners take bulk samples of -- solely to determine

15 whether or not they have asbestos in the building.  Isn't that

16 correct?

17 A    That's correct.

18 Q    And, in fact, many of these samples may have, in fact,

19 been samples just to determine whether or not there was

20 asbestos in the building.  Is that correct?

21 A    That would be correct.

22 Q    And, Doctor, with your -- the report that you did in

23 demonstrative Exhibit Number 4, you also had a lot of data

24 regarding the bulk sample analysis for non-surfacing treatment.

25 Correct?

1  A    Yes.

2  Q    You testified about that earlier.  And before making a

3  decision to say really don't worry about it, you had people

4  enter the data and put charts together and then say what you

5  maybe could've concluded without even doing that.  That if it's

6  not a surface product, you don't really need to look at it.  Is

7  that correct?

8            THE COURT:  I'm sorry.  I don't think I followed

9  that.  Are you asking him if he put the data into the chart

10 first and then took it out?

11 Q    Doctor, the data that you put in the chart dealt with a

12 lot of time and energy of employees of you who put data in for

13 non-surfacing products.  Is that correct?

14 A    Well, certainly whatever time it took it -- yes.

15 Q    Okay, and was it fair to say a simple direction to W.R.

16 Grace would've been don't give me any pieces of paper that have

17 to deal with non-surfacing treatment?  It would have saved a

18 lot of time and energy.  Would you agree?

19 A    Well, I think that's really beyond me.  You know, the

20 simple answer was we were asked to review any bulk sample data

21 and ascertain whether or not it was potentially manufactured

22 according to a W.R. Grace formula.  That's what we'd get.

23 Q    Doctor, have you ever interviewed any former Grace

24 employees, you yourself?

25 A    We interviewed --

1  Q    For the work that you do for W.R. Grace, have you ever

2  interviewed former employees?

3  A    Probably years ago.

4  Q    Have you reviewed historical materials from W.R. Grace

5  other than the recipe material that they've provided you?

6          MR. RESTIVO:  With respect to this project?

7          MS. KEARSE:  Yes.

8  A    If I have, I don't remember.  No.

9  Q    Doctor, is it fair to say within Claim 6941 you have no

10 idea where those spoke samples were taken from?

11 A    Insofar as what's shown on my summary sheet, if the

12 information of the location were identified, it would be in the

13 larger spreadsheet.

14 Q    Doctor, you would agree with me it's not unusual sometimes

15 to have two different types of products in a building?

16 A    I don't think it would be unusual at all.  I don't know

17 what you mean --

18 Q    And, doctor, in fact, your --

19 A    I mean -- I'm sorry.

20 Q    Go ahead.

21 A    Almost by definition you have fireproofing, you have

22 surfacing material, you have floor tile.  Is that what you mean

23 by different products?

24 Q    Yes.  And, for example, doctor, in the samples that you

25 looked at for 6941, you don't know where any of those samples

1 came from within the building?

2 A    Not as I sit here today, no.

3 Q    Doctor, what are some examples of fibrous materials?

4 A    Cellulose, mineral wool, some metallics.  Cellulose and

5 mineral wool are probably two of the major ones in building

6 materials.

7 Q    You wouldn't consider vermiculite a fibrous material,

8 correct?

9 A    No.

10 Q    All right.  And you wouldn't consider Plaster of Paris a

11 fibrous material, is that right?

12 A    No.

13 Q    And you wouldn't consider sodium sulfate the -- fibrous

14 material either?

15 A    No.

16 Q    Doctor, you talked about earlier about the constituent

17 analysis of the W.R. Grace formula itself.  Do you recall that?

18 A    Say that again?

19 Q    All right.  Exhibit Number 2, I believe, Your Honor, was

20 entered into evidence.  It had the recipes of the various

21 products.

22 A    Yes.

23 Q    And if you'll go to the Zonolite MonoKote 3 --

24        MR. RESTIVO:  Excuse me.  Debtors' Exhibit 1 are the

25 formulas for asbestos-containing fireproofing.

1          MS. KEARSE:  Okay.  Exhibit 1.  Apologize.

2          THE WITNESS:  Go ahead.

3  Q    If you add up the Plaster of Paris and the vermiculite and

4  the sodium lauryl sulfate, what does that roughly come out to?

5  A    Uhh --

6  Q    Or what does it -- a range?

7  A    Well, it roughly comes out to 90 to 95 percent, 85 to 90

8  percent of the product.

9  Q    And I think we can agree what we established it would be

10 85 to 90 percent of non-fibrous constituent, is that correct?

11 A    Sure.

12 Q    Okay.  And then it would be ten percent asbestos?

13 A    Ten -- yeah, in the order of ten.

14 Q    Okay.  So just that simple analysis is not inconsistent

15 with three of the samples that you found -- you reviewed in

16 Claim Number 6941, is that right?

17 A    What does that mean?

18 Q    If you add that up, the 90 percent of non-fibrous there,

19 it's also what you have on your chart, is that right?

20 A    Yes.

21          THE COURT:  I'm sorry.  Which product were you

22 looking at?  I apologize.

23          MS. KEARSE:  Your Honor, on Page 3, it's Zonolite

24 MonoKote 3, and --

25          THE COURT:  Oh.

**J&J COURT TRANSCRIBERS, INC.**

1          MS. KEARSE:  Your Honor, on the Elmo --

2          THE COURT:  Okay.

3          MS. KEARSE:  I call this an Elmo.  I'm not --

4          THE COURT:  -- that's the Zonolite MonoKote 3.

5   Q    Doctor, is that what we were just talking about?

6          THE COURT:  Yes.

7   A    (No verbal response)

8   Q    Okay.  Doctor, would you agree with me in the 20 years

9   that you've worked with W.R. Grace you primarily look at actual

10  bulk sample analysis for them?

11  A    No.

12  Q    And what percentage of time would you say you do that?

13  A    I don't know the answer.  We did air testing for them and

14  bulk sample analysis primarily.

15  Q    And I meant -- so you usually -- actually look at samples

16  from other air samplings or bulk samples --

17  A    That's correct.

18  Q    -- is that right?

19  A    That's correct.

20  Q    And it's my understanding in this you did not look at air

21  samples in relation to product I.D. either, right?

22  A    That's correct.

23  Q    Doctor, am I correct that on behalf of W.R. Grace, I know

24  we don't know exactly how much you've made, but it'd be fair to

25  say you've made a lot of money, is that -- is that right?  It's

1  all relative, I guess --

2  A    Well, I think it's -- I think it's fair to say we've

3  billed -- when you combine laboratory services and fees, we've

4  had substantial billings from W.R. Grace over the 25 years.

5  Q    And you're not only involved in this phase of the product

6  I.D., but you're also testifying on behalf of W.R. Grace in the

7  dust methodology, is that right?  You've issued reports on

8  that?

9  A    The latter is correct.

10 Q    Okay.  And you've also issued reports on the lack of

11 hazard phase, is that right?

12 A    That's correct.

13 Q    And you've issued reports in the personal injury part of

14 the litigation, is that right?

15 A    I'll accept your word.  I've forgotten.

16 Q    Okay.  I believe you have.  And did you also issue reports

17 or was retained by W.R. Grace in the ZAI litigation, as well?

18 A    Yes.

19                        (Pause)

20 Q    Doctor, if you give me a minute, I think I'll finish up.

21 Okay?

22            MS. KEARSE:  Your Honor --

23                        (Pause)

24            MS. KEARSE:  Doctor, that's all I have for you.

25            THE WITNESS:  Okay.

            **J&J COURT TRANSCRIBERS, INC.**

1    THE COURT:  Mr. Baena, the committee have anything?

2    MR. BAENA:  No, Your Honor.

3    THE COURT:  Okay.  Mr. Restivo?

4    MR. RESTIVO:  Your Honor, I want Mr. Baena's job.

5    THE COURT:  Too late.

6    MR. RESTIVO:  All right.

7                    REDIRECT EXAMINATION

8  BY MR. RESTIVO:

9  Q    Dr. Lee, I want to start where Ms. Kearse ended.  If you

10 had bulk sample reports showing ten percent chrysotile and 90

11 percent non-fibrous material, can one make a determination from

12 those bulk samples whether or not those bulk samples are

13 consistent with the Grace formula for MK-3?

14 A    You cannot.

15 Q    Why not?

16 A    Because there is insufficient with which to determine what

17 the -- what the constituents or their proportions are.

18 Q    I want to ask you about the questions you were asked on

19 getting subsequent information from the files relating to work

20 by MVA.  You remember that series of questions you were asked?

21 A    Yes.

22 Q    Turn to Grace Exhibit 47, if you would.  And that's

23 Exhibit 47.  Okay.  And that begins with your summary of what

24 information you found, is that correct?

25 A    That's correct.

**J&J COURT TRANSCRIBERS, INC.**

1  Q    Is the information on Exhibit 47 exactly the same as the

2  information, if you know, summarized in your report, your

3  expert's report on number of samples looked at and what you

4  found?

5  A    I don't know the answer.

6  Q    Am I correct that after you did your report additional

7  information was received?

8  A    That's correct.

9  Q    Is the additional information on the summary sheets?

10 A    Yes, there's one additional line on the summary sheet

11 relative to the original data.

12 Q    And that line makes reference to MVA?

13 A    That's correct.

14 Q    Okay.  And then in Exhibit 47 you have various material,

15 do you not?

16 A    Yes.

17 Q    And what is that material, in general?

18 A    In general it's the summary reports of the bulk sample

19 analysis and the supporting data in the case of the MVA.

20 Q    And is the information that's attached to your report, is

21 that the information reflected on your additional line MVA in

22 your summary report?

23 A    That's correct.

24 Q    And so this is information you received after you did your

25 expert report?

**J&J COURT TRANSCRIBERS, INC.**

1  A    Yes.

2  Q    And this information consists of work, in fact, done by

3  MVA --

4  A    Yes.

5  Q    -- that you reviewed?

6  A    Yes.

7  Q    And turn to Page 74 at the bottom.  It's called "MVA PLM

8  Constituent Analysis."  Do you see that?

9  A    Yes.

10 Q    Is this the report that gives you the components of the

11 materials such as gypsum and vermiculite?

12 A    Yes, it's one of the sheets.

13 Q    And chrysotile?

14 A    Yes.

15 Q    And using Page 74 as an example, are those the components

16 in the amounts which you say are not inconsistent with Grace

17 MonoKote 3, chrysotile 13 --

18 A    Yes.

19 Q    Gypsum 52, vermiculite 35?

20 A    Yes.

21 Q    Okay.  And are those amounts also not inconsistent with

22 Fire Code V?

23 A    Yes.

24 Q    Okay.  Now, on Page 74, I do see an entry for starch.  Do

25 you?

1  A     Yes.

2  Q     I thought it was your testimony that they did not do a

3  starch test at MVA?

4  A     The starch as reflected here would be appropriate for

5  granulated starch.  The starch that is in the Fire Code V is

6  processed starch.

7  Q     And what's the difference?

8  A     And that you would do a separate test, run the PLM, for

9  that.

10  Q     And when you do your iodine test, will that show the

11  presence of processed starch?

12  A     Yes.  Yes, you would --

13  Q     Will PLM constituent analysis show the presence of

14  processed starch?

15  A     No.

16  Q     And that's what you said they did not test for starch in

17  this product?

18  A     Yes.  There's no report for starch.

19          MR. RESTIVO:  Thank you, Dr. Lee.  That's all I have.

20                        CROSS EXAMINATION

21  BY MR. McCAHEY:

22  Q     Just with respect to Exhibit -- Defendant's Exhibit 47,

23  just so -- I want to clarify, if you turn to the second page of

24  that document, that's also from the MVA report?  Is that the --

25          THE COURT:  I apologize.  Exhibit what?

1          MR. McCAHEY:  Exhibit 47, the second page.

2          THE COURT:  Okay, thank you.

3  A    Yes.

4  Q    Okay.  And when did you complete your report?  Well, let

5  me ask you, your report is dated January 17th, 2007?

6  A    The -- the original report, yes.

7  Q    Okay.  And do you know when this material, the MVA

8  analysis, was provided to debtors' attorneys?

9  A    I do not.

10          MR. McCAHEY:  I have no further questions --

11                      RECROSS EXAMINATION

12  BY MS. KEARSE:

13  Q    Not to beat a dead horse, but I just want to be very

14  specific again on my question because I'm going to relate it to

15  the three samples, so it's not just general.  Doctor, as you

16  sit here today, you cannot opine to a scientific degree of

17  certainty that there's not -- that -- three samples, the ones

18  with the ten percent and 90 percent, are not a Grace product

19  that is contained in the Washington State University building,

20  is that correct?

21  A    That's correct.

22          MS. KEARSE:  Thank you, Your Honor.

23          MR. RESTIVO:  May Dr. Lee be excused, Your Honor?

24          THE COURT:  Yes, you're excused, sir.  Thank you.

25          THE WITNESS:  Thank you, Your Honor.

1          THE COURT:  Mr. Restivo?

2          MR. RESTIVO:  Your Honor, debtors introduce Debtors'

3   Exhibits 63 and 64.  Those are claim materials, Your Honor, for

4   Claim Number 1724, the claim of an individual by the name of

5   Whittenberg, and Exhibit Number 64 is information from the

6   claim files for Claim Number 5987, a claim by an individual by

7   the name of Johnson.

8          THE COURT:  Anyone present representing Mr. William

9   Whittenberg?  Anyone present representing Mr. Dale Johnson?

10   Okay.  Neither person is represented, so I will accept the

11   introduction of Exhibits 63 and 64.

12          MR. RESTIVO:  Thank you, Your Honor.

13          THE COURT:  Mr. Flatley?

14          MR. FLATLEY:  Your Honor, W.R. Grace would like to

15   call Mr. Thomas Egan to the stand.

16          THE COURT:  Mr. Egan?

17          MR. MANDELSBERG:  Your Honor, we had interposed an

18   objection to the extent Mr. Egan's testimony is going to be

19   offered or considered in relation to the State of California's

20   claim.  We stated it in our April 17 objection, and I believe

21   it should be in Your Honor's binder.  If I could be -- if I

22   can, I'd like to be heard about the objection at this time.

23          THE COURT:  Okay.  Let me have the witness sworn and

24   identified, and then I will hear your objection.

25          MR. MANDELSBERG:  Thank you, Your Honor.

**J&J COURT TRANSCRIBERS, INC.**

1        THE COURT:  Okay.

2          THOMAS F. EGAN, DEBTORS' WITNESS, SWORN

3        THE COURT:  You may be seated, sir.  Thank you.

4        THE CLERK:  Spell your name --

5        THE WITNESS:  Thomas F. Egan.

6        THE COURT:  Spell your last name, please, sir.

7        THE WITNESS:  E-g-a-n.

8        THE CLERK:  Thank you.

9        THE COURT:  Okay.  I'll hear the objection.

10        MR. MANDELSBERG:  Thank you, Your Honor.  Steven

11  Mandelsberg from Hahn & Hessen, representing the State of

12  California, Department of General Services.  Your Honor, in our

13  April 17th submission on behalf of the State of California that

14  includes the State's objections to debtors' exhibits and

15  witnesses, at the third and fourth page under Heading B there

16  is stated the claim -- State of California's objections to

17  witnesses Mr. Cintani or Mr. Egan to the extent they are going

18  to be called in connection with or to offer evidence regarding

19  the State of California's claims.

20        The basis of the objection, Your Honor, is simply

21  this.  We do not dispute that in the debtors' various

22  preliminary disclosures, Messrs. Cintani and Egan were

23  identified.  However, the State served specific discovery

24  requests, first requests for production of documents, set of

25  interrogatories and a Rule 30(b)(6) deposition notice.  And in

**J&J COURT TRANSCRIBERS, INC.**

1  the responses to, among other things, the interrogatories which

2  are in the Department of General Services Trial Exhibit 18,

3  Your Honor, in Questions 16 and 17, there are specific

4  questions that ask the debtors to identify all persons who have

5  personal knowledge concerning the sale of the products, and

6  products are defined to include the asbestos containing

7  materials in this litigation, to claimant or any person or

8  entity who represented claimant.  And interrogatory 17 asks,

9  "Identify all persons who have personal knowledge concerning

10 the use or installation of the products in any of the buildings

11 subject of the proof of claim.  And, in addition -- and besides

12 the generalized objection that the debtors make, the debtors

13 stated in response to each of these interrogatories that they

14 know of no persons with personal knowledge on this issue beyond

15 any information contained in documents the debtors have agreed

16 to produce to the claimant.

17         In addition, Your Honor, in communications that we

18 had with counsel for the debtors, we endeavored to ascertain

19 whether there were going to be any such witnesses who were

20 going to have any information about any of the installation or

21 sale or use of products in any of the State of California's

22 buildings associated with any of its 16 proofs of claim, and we

23 were told that there are no such persons.

24         Now, it may be that this witness is -- has no such

25 knowledge specifically relating to any of these buildings, but

**J&J COURT TRANSCRIBERS, INC.**

1 I understand that the witness's testimony is going to be

2 offered for a broader and more general purpose concerning dates

3 of installation and general knowledge about the sale,

4 installation, use, application of these products, and it is the

5 State's position, Your Honor, and I believe this is correct,

6 that this -- these witnesses should have been identified.  The

7 requests were broad enough.  The words "concerning use or

8 installation" were broad enough.  They should have been

9 identified, and they were not.  And had they been we would have

10 been able to depose them beforehand and we would have been able

11 to find whether or not they had any additional information.

12         The documentation that the debtors made available in

13 response to our document production, the document repository

14 containing thousands and thousands of pages of just indexed

15 documents was certainly not sufficient to place the State on

16 notice that Mr. Egan or Mr. Cintani had any specific knowledge

17 or general knowledge that may be relevant to the State's claims

18 or to the debtors' objections to those claims.

19         So, for that reason, to the extent the debtors are

20 going to offer this witness's testimony as relevant to any

21 issue related to their objections to now 15 of the State's

22 claims, since one objection was withdrawn this morning, we

23 would respectfully request the Court bar such testimony and not

24 consider such testimony.  Thank you, Your Honor.

25         THE COURT:  Mr. Flatley?

**J&J COURT TRANSCRIBERS, INC.**

1          MS. KEARSE:  Your Honor, I didn't make a formal

2     objection beforehand, but to the extent Mr. Egan is a fact

3     witness, I'm going to reserve my objection if he gets into

4     testimony opining or talking about things that are not his

5     personal knowledge, Your Honor.

6          THE COURT:  Okay.

7          MR. FLATLEY:  Thank you, Your Honor.  Larry Flatley

8     for W.R. Grace.  As counsel noted, Mr. Egan has been on every

9     witness list that W.R. Grace has submitted to the claimants

10    since October 3rd, 2005.  He has been disclosed as a witness

11    who would testify on issues related to product identification,

12    including MonoKote 3 and Zonolite Acoustical Plastic, including

13    their history, manufacture, sale, application and use.

14          The California discovery that counsel was talking

15    about there is very narrow.  It asks him for -- it asks us,

16    Grace, whether we have witnesses with personal knowledge

17    concerning the specific sales to their client, and we don't,

18    and Mr. Egan does not.  He is not going to be here to testify

19    and say I was on that job and that job doesn't have MonoKote 3

20    in it.  But what Mr. Egan is here to testify about is as a

21    witness who has worked in the fireproofing business since 1960.

22    He worked from 1960 through 1978 for W.R. Grace, including

23    three years as national manager of fireproofing products.  He

24    will testify about the Grace products that are at issue.  He

25    will testify about other Grace products that are not at issue

**J&J COURT TRANSCRIBERS, INC.**

1  and that don't even contain commercial asbestos.

2          He will be able to point out, for example, that some

3  of the documents relied on by the claimants refer to Grace

4  products that are not at issue.  Mr. Egan will be able to point

5  out to architect specifications and show the Court that they --

6  some of them explicitly allow for substitution of other

7  products and others explicitly list other competitive products

8  in addition to W.R. Grace's product.

9          He'll testify about Underwriters Laboratories and its

10  procedure for approving formulas and its procedures for

11  adhering -- making sure that companies adhere to the formulas.

12         He'll testify about the dates that MK-3 was on the

13  market, and in that regard, for example, he'll be able to

14  testify that because MonoKote 3 only came on the market in the

15  early 1960s a letter that Mr. Mandelsberg is offering from 1950

16  really has nothing to say on the issue of whether there's

17  MonoKote 3 in the building at issue.

18         He'll be able to talk about the terminology used in

19  some of these exhibits.  For instance, he'll be able to refer

20  to a document that's been offered that discusses Vermiculite

21  Plaster, and he'll be able to point out that, yes, there was a

22  Grace product called Vermiculite Plaster, but it didn't have

23  asbestos in it, and it's not MonoKote 3 and it's not Zonolite

24  Acoustical Plastic.  It's not one of the products at issue.

25         He'll be able to testify about the fact that some of

**J&J COURT TRANSCRIBERS, INC.**

1 these specifications and drawings call for wire lath and

2 spraying of a fireproofing material over the wire lath.

3        Mr. Egan, from his experience, will be able to

4 testify that MonoKote 3 was direct to steel fireproofing

5 product and didn't require a wire lath and that this actually

6 evidence indicating that it was a product other than MonoKote 3

7 that was on the building.

8        He'll be able to talk about the specifications.  As I

9 said before, while he won't be able to say, I was there, I was

10 on the job, I know that we didn't sell to these guys, neither

11 side has that kind of evidence.  Both sides are relying on

12 secondary evidence regarding these documents, putting the

13 product -- putting the bulk sampling aside, Your Honor, each

14 side is relying on secondary evidence.  What I'm going to ask

15 Mr. Egan to do is to look at some of the documents after he's

16 given you his appropriate background, to look at some of the

17 documents and to give the Court the benefit of the context

18 within those documents ought to be read, and we think that's

19 appropriate in this case rather than to just let the documents

20 be thrown up against the wall and then inferences taken from

21 words that are unexplained.

22        So, no, I do not intend to have him testify from his

23 specific particular knowledge that this was or was not a

24 building that we were involved in, but rather more broadly and

25 more generally.

**J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  All right.  It seems to me with that

2   proffer that the objection at this point is not one that I can

3   sustain because the witness is not going to be offering

4   personal knowledge concerning your client's buildings or

5   products within those buildings.  So, based on the fact that

6   that is the purpose for which the objection is made, and the

7   discovery request, I think, is asking for a witness with

8   personal knowledge, this witness apparently does not have it,

9   and so based on that and the proffer, I think the witness is

10  one who can testify to the scope of what Mr. Flatley has said.

11  I'm not ruling on any objection to specific testimony, simply

12  with respect to the objection I have before me.  I believe that

13  that objection is not well founded based on the discovery issue

14  that you've raised.

15          MR. FLATLEY:  Thank you, Your Honor.

16          MR. MANDELSBERG:  Your Honor, I just want to clarify

17  what the request asked, and I understand Your Honor's ruling.

18  We don't -- we didn't only ask for a person who had personal

19  knowledge concerning the sales of the products, but also

20  concerning the use or installation of the products.  To the

21  extent this witness is going to be testifying as Mr. Flatley

22  just outlined, information about the use or installation of

23  these products --

24          THE COURT:  But it's talking about in your client's

25  buildings, correct?

1          MR. MANDELSBERG:  That's correct.

2          THE COURT:  Right.

3          MR. MANDELSBERG:  But if he's going to talk about

4 this as -- in any way as -- in a general way that encompasses

5 all buildings and all times covering our period, he should have

6 been identified.

7          THE COURT:  Well, I think he has been identified in

8 the witness lists that indicate that he has had knowledge of

9 MonoKote 3 and other Grace products, and certainly that puts

10 you on knowledge (sic) that he's got some information that you

11 may want to inquire about.  He does not have personal knowledge

12 with respect to your client's products.  That's what the

13 proffer is.  If he offers some evidence that indicates he does

14 have personal knowledge, I will certainly be happy to hear an

15 objection and a motion to strike that testimony, because that

16 will be straying far outside this proffer.

17          MR. MANDELSBERG:  Thank you, Your Honor.

18          THE COURT:  But I am understanding that this witness

19 is not going to be offering testimony concerning personal

20 knowledge of use, sale or installation of any Grace product in

21 your client's buildings.

22          MR. MANDELSBERG:  Thank you, Your Honor.

23          THE COURT:  All right.  You may proceed, Mr. Flatley.

24          MR. FLATLEY:  Thank you, Your Honor.  If I may, Your

25 Honor, I have put together for the benefit of counsel and the

**J&J COURT TRANSCRIBERS, INC.**

1  Court a small collection of documents that I'm going to ask Mr.

2  Egan to look at.  They're organized by claim number, and

3  they're not -- they are all plaintiff's exhibits, claimant's

4  exhibits.  They're not our exhibits.  We're not offering them.

5  But I do think it would facilitate the testimony to go through

6  a collection of documents, and I have a copy for the Court and

7  for the witness.

8          THE COURT:  All right.  Mr. Flatley, why don't I ask,

9  because we're going to need to take a lunch recess anyway, so

10 maybe before we get started I should inquire, how long do you

11 expect to be on direct?

12         MR. FLATLEY:  I think about a half hour to 40

13 minutes.  If Your Honor would like to take a lunch break now,

14 that would be fine.

15         THE COURT:  Well, that's what I'm wondering.  Would

16 you -- yes, I'm getting -- I'm getting nods that this would be

17 a better time.  All right --

18         MR. MANDELSBERG:  Your Honor, that's fine with us.

19 We do have the witnesses, as Your Honor knows, arriving or

20 standing by from California who will testify by telephone, so I

21 appreciate Mr. Flatley's approximation of the time so that we

22 could plan accordingly.  But that's fine with us.

23         THE COURT:  Okay.  And how long do you expect to be

24 on your redirect?  Because we can, I think, juggle the

25 witnesses' time or take them out of turn this afternoon, too.

1          MR. MANDELSBERG:  I don't expect to be very long with

2    Mr. Egan.

3          MR. FLATLEY:  I think, Your Honor, we ought to be

4    able to get Mr. Egan on and off without (indiscernible) an

5    issue considering that his witness --

6          THE COURT:  Perhaps what we should do is ask your

7    witnesses to be available at let's say -- why don't we plan to

8    come back from our lunch recess at quarter to 1:00, 45 minutes,

9    and if you were going to be half an hour, let's say an hour

10   total for Mr. Egan should do it.  So if we have your witnesses

11   standing by at 2:00 p.m. eastern time --

12         MR. MANDELSBERG:  2:00 p.m., I think that would --

13   that should work well, Your Honor.

14         MS. KEARSE:  And I'll just have a very short cross,

15   Your Honor, and the reason I was nodding, because I promised

16   Grace I'd get them some information about one document, and

17   I'll use the break to go get that.

18         THE COURT:  All right.  Why don't we take a recess

19   for 45 minutes, and then we'll reconvene.  And I apologize, sir

20   --

21         THE WITNESS:  All right.

22         THE COURT:  -- for having you without having said

23   anything but your name, but we'll start your testimony after

24   lunch.

25         THE WITNESS:  All right.  Thank you.

**J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  All right.  Okay, we'll be in recess

2  until one -- I'm sorry -- till 12:45.

3                          (Recess)

4          THE COURT:  Good afternoon.  Please be seated.  Mr.

5  Egan?  You're still under oath, sir.  Mr. Flatley.

6          MR. FLATLEY:  Your Honor, we do have a small

7  three-ring binder of exhibits.

8          THE COURT:  I have one.  Yes, sir.

9          MR. FLATLEY:  Oh, I'm sorry.  Thank you.

10          THE COURT:  Thank --

11      THOMAS F. EGAN, DEBTORS' WITNESS, PREVIOUSLY SWORN

12                     DIRECT EXAMINATION

13  BY MR. FLATLEY:

14  Q    Good afternoon.  Larry Flatley for W.R. Grace.  Would you

15  state your full name for the record, please, sir?

16  A    Thomas F. Egan, E-g-a-n.

17  Q    Where do you live, Mr. Egan?

18  A    In the Philadelphia suburbs at 67 Dresner Circle,

19  Boothwyn, PA.

20  Q    Where did you grow up, sir?

21  A    In Pittsburgh.

22  Q    And what's your educational background?

23  A    (Indiscernible) was a degree in engineering from the

24  University of Pittsburgh.

25  Q    Do you still work, Mr. Egan?

1  A    Yes, part-time.

2  Q    And what business do you work in?

3  A    Specifically, fireproofing business, but the company does

4  floor underlayments and other specialty subcontracting

5  functions.

6  Q    What's the name of the business?

7  A    Floors & Fireproofing, Incorporated.

8  Q    Now, did you work for the Zonolite Company and W.R. Grace,

9  Mr. Egan?

10  A    Yes, I did.

11  Q    When did you start with Zonolite?

12  A    1960.

13  Q    And prior to starting to Zonolite, had you been a

14  plasterer?

15  A    Yes.  Our -- my family was plasterers, and I followed my

16  father's lead and became an apprentice while I was -- when I

17  got out of highschool and after service, while I was going to

18  the University of Pittsburgh.

19  Q    Prior to the time you started with Zonolite in 1960, were

20  you familiar with Zonolite's products?

21  A    Yes, from working in the trade.

22  Q    Now, when you started in 1960, Mr. Egan, what job did you

23  have?

24  A    I was an architectural representative.  That was a new

25  title or position in the company, and there were probably a

Egan - Direct/Flatley                    110

1  half a dozen recent college graduates hired.

2  Q    Would you tell the Court what you did starting in 1960 as

3  an architectural representative for the Zonolite Company?

4  A    Initially to introduce to the architectural community

5  those products that Zonolite manufactured or sold under their

6  brand name that were to be specified in construction.

7  Q    Now, in 1960 when you started at Zonolite, was the company

8  selling Zonolite Acoustical Plaster?

9  A    Yes, they were.

10 Q    When did the company start selling MonoKote 3

11 fireproofing?

12 A    Very early on in that time frame.  On or about 1960 the

13 formulation for MonoKote began to be promoted by the Zonolite.

14 Q    Okay.  So shortly after you started then, in the --

15 A    Yes.

16 Q    -- in the early 60s?

17 A    Yes.

18 Q    Now, after your initial position as an architectural

19 representative, did you have other positions at Zonolite and

20 Grace?

21 A    Yes, I did.

22 Q    And what were some of those positions?

23 A    In approximately 1963 or four, I became the district

24 manager in Western Pennsylvania, operating out of a facility in

25 Ellwood City, Pennsylvania, and then in 1969 I was asked to

**J&J COURT TRANSCRIBERS, INC.**

Egan - Direct/Flatley                    111

1 become the national product manager for fireproofing products,

2 located in the headquarters in Cambridge, Massachusetts.

3 Q    Okay.  Let's stick a little bit first with your district

4 manager position that you had from 1964 to 1969.  Did you --

5 excuse me -- did you supervise other people in that job?

6 A    Yes, there were salesmen who sold the product Eastern

7 Ohio, Western Pennsylvania and Northern and West Virginia.

8 There were probably six salesmen.

9 Q    Did you, in that position, as district sales manager,

10 interact with other district sales managers and regional

11 managers around the country?

12 A    I did, yes.

13 Q    And did you continue in that position selling directly to

14 customers?

15 A    Yes.

16 Q    Now, let's talk about when you became -- in 1969 when you

17 became, was it product manager for -- was it fireproofing

18 products?

19 A    That's correct.

20 Q    And you said you were located up the -- at the company's

21 headquarters in Massachusetts?

22 A    The construction products division headquarters were in

23 Cambridge, Mass.

24 Q    Now, what products were you responsible for in that job?

25 A    Those products connected with the fireproofing, as the

1  title was, in the construction industry -- MonoKote,

2  Vermiculite Plaster and other related items.

3  Q    Okay.  How about Zonolite Acoustical Plaster, was that one

4  of the products you would have been responsible for?

5  A    Yes.

6  Q    Okay.  Was it part of your job as national fireproofing

7  products manager to be generally familiar with market

8  conditions around the country?

9  A    Yes.

10 Q    Okay.  Now, did you indicate how long you stayed as

11 product -- fireproofing products manager?

12 A    Until 1971, middle of '71, when I was asked to go to the

13 Midwest and be the Midwest regional manager for all of the

14 products in the central United States.

15 Q    Okay.  And so you took that position, still with Grace, in

16 1971?

17 A    Yes.

18 Q    And how long did you stay in that position?

19 A    Till 1978 when --

20 Q    And --

21 A    -- I left Grace.

22 Q    In 1978 you left Grace?

23 A    Yes.

24 Q    Now, after you left Grace, did you stay in the

25 fireproofing business?

Egan - Direct/Flatley                          113

1  A    Yes, I did, in companies of my own, more or less.  Set up

2  one in Indiana and then later in Philadelphia, when I moved to

3  Philadelphia.

4  Q    And so you've been in the fireproofing business since

5  1960?

6  A    That's correct.

7  Q    Mr. Egan, I'd like to ask you about the Grace product

8  called MonoKote 3, or MK-3, as it's been called here this

9  morning.

10  A    Yes.

11  Q    Was MK-3 a fireproofing product, sir?

12  A    Yes, it was.

13  Q    And was MK-3 what's called a "direct to steel"

14  fireproofing product?

15  A    Yes.

16  Q    Could you explain to the Court what that term means,

17  direct to steel fireproofing product?

18  A    Prior to that time, fireproofing that was required by

19  building codes, so it was matter of law to fire protect the

20  frame of the building according to code, and the typical way

21  was to either encase the structure, columns, beams and what

22  have you, in concrete or cage it with metal lath and used a

23  thickness of plaster of a various type to achieve the rating

24  required and approved by Underwriters Labs.

25  Q    Okay.  Let's see if I can be sure about this.  Prior to

**J&J COURT TRANSCRIBERS, INC.**

1  the advent of direct to steel fireproofing, fireproofing was

2  accomplished on a building either by concrete encasement --

3  A    That's correct.

4  Q    That's one way.

5  A    Yes.

6  Q    And another way was to put a metal lath, a metal wire, if

7  you will, and then trowel on some sort of plaster on top of

8  that?

9  A    That's correct.

10  Q    Okay.  What advance, then, was made with the products

11  called direct to steel fireproofing?

12  A    Well, from several ways.  The weight basis, you were

13  replacing heavy concrete with a lightweight material, or you

14  were eliminating the need to cage with metal lath and be labor

15  intensive in applying plaster, various thicknesses, to form a

16  cage around --

17  Q    So, the direct to steel was just sprayed right onto the

18  steel itself?

19  A    Right.

20  Q    Without the necessity of a metal lath or cage underneath

21  it?

22  A    That's right.

23  Q    Now, as a fireproofing product, Mr. Egan, was MonoKote 3

24  subject to testing and approval by Underwriters Laboratories,

25  or UL?

**J&J COURT TRANSCRIBERS, INC.**

1  A    Yes, it was.

2  Q    Does UL to this day test and approve of fireproofing

3  products?

4  A    Yes, they do, most products in that field.  They test

5  everything from irons and electrical things we all use, but in

6  the building field, that was one particular category, to fire

7  test the assemblies of products to meet the code requirements.

8  Q    So, UL -- and I don't want to get into this in too much

9  detail, but UL would test our product to make sure our product

10 complied with some applicable standard?

11 A    Yes.

12 Q    Okay.

13 A    The fire tests were established by ASDM, and the UL people

14 followed that guideline and the company, like Zonolite or

15 Grace, built an assembly to mirror what was actually being done

16 in construction in the field and fire tested.

17 Q    Now, when UL approved of a fireproofing, did they approve

18 of a particular formula for the fireproofing?

19 A    Yes, part of the whole vernacular was to list the

20 formulations, and they also had a certification process whereby

21 they came to the various manufacturing facilities, basically

22 unannounced, and took samples of the product to be sure that

23 they complied with the base formula.

24 Q    So they not only approved a particular formula, but they

25 inspected to ensure that the product being manufactured was in

Egan - Direct/Flatley                116

1  accordance with the formula?

2  A    That is correct.

3  Q    Let's talk about a little -- for a little bit, Mr. Egan,

4  about Zonolite Acoustical Plaster.  What was that product?

5  A    Back in the early -- prior to my coming with Zonolite,

6  acoustical plasters were used in buildings for the purposes of

7  sound control, and plaster was the -- one of the most readily

8  available function, and various companies provided a product to

9  be applied to the building to control sound.

10 Q    So acoustical plaster had a sound deadening quality to it?

11 A    Yes, it did.

12 Q    Was there another product that Zonolite made called

13 "Zonolite Plaster?"

14 A    Well, now you differentiate.  Zonolite produced

15 vermiculite, and they either incorporated it into a formulated

16 product and sold it, but vermiculite for years has been sold to

17 the building trades as an aggregate for either plaster or

18 concrete.

19 Q    Okay.  So, MonoKote and Zonolite Acoustical Plaster were

20 mixed in the factory and then shipped out that way?

21 A    That's right.

22 Q    But Zonolite plaster was just vermiculite that was shipped

23 out so that the plasterer could mix it into his plaster

24 formulation?

25 A    Yes.  A good way to differentiate is one was a mill mix,

**J&J COURT TRANSCRIBERS, INC.**

Egan - Direct/Flatley                    117

1  which was MonoKote or acoustical plaster, and vermiculite

2  aggregate was a job mix process where the subcontractor mixed

3  them together and applied them.

4  Q    Now, this product that you mentioned where Zonolite would

5  ship out the vermiculite and then contractor or plasterer would

6  mix it, was that known in the industry as Zonolite Plaster?

7  A    Yeah.  Aggregate, yes.  And the installed product that the

8  man mixed, or the contractor mixed in the field, was termed

9  "Vermiculite Plaster."

10  Q    Okay.  Now, similar to the situation with MonoKote 3, was

11  Zonolite Acoustical Plaster tested and approved for fire

12  resistance --

13          THE COURT:  I'm sorry.  What -- start the question

14  again.  I didn't hear you.  I'm sorry.

15          MR. FLATLEY:  I'm sorry.

16  Q    Was Zonolite Acoustical Plaster also tested and approved

17  by Underwriters Laboratories?

18  A    Yes, it was.  It passed fire tests.

19  Q    And did UL, like the situation with MonoKote 3, require

20  that Zonolite Acoustical Plaster be manufactured in accordance

21  with the approved formula?

22  A    Yes.

23  Q    Now, let's talk a little bit about the sales history of

24  Zonolite Acoustical Plaster, Mr. Egan.  Was -- you said already

25  that Zonolite was selling acoustical plaster when you joined

**J&J COURT TRANSCRIBERS, INC.**

1 the company in 1960.

2 A    Yes, they were.

3 Q    As the 60s progressed, what happened to the market for

4 Zonolite Acoustical Plaster?

5 A    The -- well, there were several factors.  One was the

6 advent of acoustical tiles that we now use almost exclusively

7 in buildings or --

8 Q    Like in this room?

9 A    Yes, exactly.  Or the use or specification for acoustical

10 plasters were limited to particular rooms in a building, like a

11 school -- a band room, an auditorium or whatever.  The rest of

12 the building may well have hard plaster, which was

13 predominately gypsum and whatever, and not to control sound.

14 Q    Okay.  So what happened over the 60s to your market for

15 the acoustical plaster product?

16 A    It kept diminishing because acoustical products like

17 Zonolite Acoustic were relatively soft.  They didn't have

18 gypsum.  They were soft clay type binders, and typically once

19 the students found out they could stick things in the material,

20 they caused a lot of damage and they were problems in the

21 building for the owners and architects.

22 Q    Okay.  So as a result of those problems and the

23 competition from acoustical tiles, what happened to your

24 business during the course of the '60s?

25 A    It was disappearing.  It had its market life and it was

**J&J COURT TRANSCRIBERS, INC.**

Egan - Direct/Flatley                    119

1  gone.

2  Q    Okay.  Let's go back to MonoKote 3, and I think you

3  indicated earlier that Grace started selling MonoKote 3 in the

4  early 1960s, is that right?

5  A    Yes.

6  Q    When did Grace stop selling MonoKote 3 across the United

7  States?

8  A    In 1973, mid-July 1973.

9  Q    And what was the occasion for Grace stopping its sale of

10  MonoKote 3 at that point?

11  A    The Environmental Protective Agency decreed that you could

12  no longer spray acoustical containing materials.  You could

13  hand apply them, but not spray them any longer after that date.

14  Q    So after July of '73, there were no sales of MonoKote 3 --

15  A    No.

16  Q    -- in the United States?

17  A    No, it was banned, I guess is the right term.

18  Q    Okay.  Mr. Egan, I'd like to talk to you about the role

19  that architects generally played in Grace's sales of MonoKote

20  3.  I think you indicated that your first job was architectural

21  sales representative, and you used to call on architects.

22  A    That's correct.

23  Q    Why did Grace people call on architects?

24  A    To promote a specification for their product, whether

25  purely using vermiculite or formulated products like MonoKote.

**J&J COURT TRANSCRIBERS, INC.**

Egan - Direct/Flatley                    120

1   Q    So you wanted the architect to specify Grace's product for

2   use in a building that the architect was designing?

3   A    That's right, and along with the product you had to

4   explain how the product was to be used and the limitations of

5   its use and function, and that all became part of the

6   specification --

7   Q    Now, is the writing of a specification an early step in

8   the process of the ultimate construction of a building.

9   A    Yeah.

10          MR. MANDELSBERG:  Objection, Your Honor.

11  A    The --

12          MR. MANDELSBERG:  Objection.  I don't believe Mr.

13  Egan has been qualified as an expert about construction of

14  buildings, and I don't believe he's been offered to have any

15  knowledge about construction of buildings using this substance.

16          MR. FLATLEY:  Your Honor, I could establish some more

17  foundation.

18          THE COURT:  Go ahead.

19  Q    Mr. Egan, have you had occasion throughout your career to

20  review architect specifications for fireproofing?

21  A    Yes, regularly.

22  Q    How many would you say you have reviewed over the years of

23  your work in the fireproofing industry?

24  A    Thousands.  I don't have an exact number.

25  Q    But it's a daily -- it's a daily occurrence in your

**J&J COURT TRANSCRIBERS, INC.**

Egan - Direct/Flatley                    121

1  business?

2  A     It was a daily function.

3  Q     Do the specifications have to be written before a building

4  can be built?

5  A     Yes.

6          THE COURT:  That seems to me, for this question, to

7  be sufficient foundation.  The objection is overruled.

8  Q     Mr. Egan, is the architect the only person who has a say

9  in what product will ultimately be installed in a new

10  construction?

11  A     Well, he should be, but often was influenced by other

12  factors in the economics of putting a building together.

13  Q     Who are some of the other people who have a say-so in what

14  product is ultimately installed in a building from the time of

15  the architect's specification till the project is finished?

16  A     Well, the general contractor who gathered all the prices

17  and controlled all the trades in putting a building together.

18  The contractor who specialized in say just fireproofing or

19  plastering or whatever, he could submit other products for

20  consideration, and once that was all approved, a variety of

21  products could be used other than the one that was specified.

22  Q     So, in addition to the architect, the general contractor

23  had a say-so?

24  A     Yes.

25  Q     And the fireproofing subcontractor had a say-so?

**J&J COURT TRANSCRIBERS, INC.**

1  A    Yes.

2  Q    Who is the person among them who ultimately bought the

3  fireproofing from Grace, if it was bought from Grace?

4  A    That was the contractor, subcontractor, applicator of

5  fireproofing material.

6  Q    So the fireproofing subcontractor was your ultimate

7  customer?

8  A    That's right.  He paid the bill.

9  Q    Was there price competition between you and your

10 competitors over who would get the fireproofing for particular

11 buildings?

12 A    Yes.  Any building may have bidders, two or ten, however

13 many are available or in business in the area.

14 Q    Mr. Egan, when Grace was successful in getting named in

15 the architect's specifications, did that mean that Grace would

16 ultimately be successful in getting its product installed in a

17 building?

18 A    No, that's when --

19        MR. MANDELSBERG:  Objection, Your Honor.

20 A    -- your work began.

21        MR. MANDELSBERG:  Objection, Your Honor.

22        THE COURT:  Wait.  There's an objection.  Yes, sir?

23        MR. MANDELSBERG:  It's overly general, vague.  I

24 don't think the witness can testify about -- it's a general

25 matter -- about his knowledge of whether a particular Grace

Egan - Direct/Flatley                    123

1  product was installed in a particular building given the limits

2  of his knowledge.

3          THE COURT:  I don't think that's the question.  The

4  question was, because the debtor's product was named in a

5  specification, did that necessarily mean that Grace would

6  always get the product, get the purchase of that product.

7          MR. MANDELSBERG:  Your Honor, I accept your

8  phraseology, but I didn't hear the word "necessarily."  If that

9  was meant, then I don't have a problem with the objection.

10         THE COURT:  Would you rephrase the question?

11         MR. FLATLEY:  I'll state the question that way.

12 Q   Mr. Egan, if Grace got the specification and was

13 successful in that, did that necessarily mean that Grace would

14 ultimately be the company that sold the fireproofing for a

15 building?

16 A   No, that was the first step and hopefully would lead to a

17 successful sale, but it very often did not.

18 Q   How many other steps were there along the line between

19 being named in a specification and ultimately being installed

20 in a building?

21 A   Well, there was the type of fireproofing considerations,

22 which the general contractor or others were familiar with, and

23 different types of equipment to install the fireproofing,

24 whether the subs bidding it were all capable of the -- have the

25 equipment to install it, on down the line.  There were a lot

**J&J COURT TRANSCRIBERS, INC.**

Egan - Direct/Flatley                           124

1  factors that influenced, and, of course, price of the unit.

2  Q    Ultimately, what was the most important factor?

3  A    Most of the time it boiled down to price.

4  Q    Now, Mr. Egan, I have provided for you up there a binder

5  that contains some of the plaintiff's exhibits, claimant's

6  exhibits, excuse me, and I'd like to ask you -- they're

7  organized by claim number, and I'd like to ask you to follow

8  through with me, and I'll ask you some questions about those

9  exhibits.  Let's start with Tab 4, Claim 6941, Mr. Egan, and

10 that's a claim, just for your reference, by Washington State

11 University for a building called "Daggy Hall" or sometimes

12 referred to as the speech building or otherwise.

13          MS. KEARSE:  Your Honor, if I may, are we testifying

14 about personal knowledge now, or general knowledge?

15          THE COURT:  I am not sure.

16          MR. FLATLEY:  No, we're not going to be asking him

17 about his personal knowledge of this particular deal.  What I

18 am going to ask him is some questions about what some of the

19 terminology means on these documents, what the --

20          THE COURT:  All right.

21          MR. FLATLEY:  -- how to interpret the specifications,

22 in a general sense.

23          MS. KEARSE:  Okay.  As long as it's clear he does not

24 know the specifics about this document.  I don't mind pulling

25 words out.  I don't know if it's appropriate to pull them out

Egan - Direct/Flatley                        125

1  of my documents on there, but if he's --

2          THE COURT:  We'll have to take it a question at a

3  time.  I don't -- right now there's no question.

4          MS. KEARSE:  Okay.  Thank you, Your Honor.

5          THE COURT:  So, ask a question, please.

6                  CONTINUED DIRECT EXAMINATION

7  BY MR. FLATLEY:

8  Q    Okay.  Mr. Egan, the Daggy Hall property allegedly is a

9  MonoKote 3 building that was constructed in 1972.  Take a look,

10 if you would, at Claimant's Exhibit 6941A.  Do you see that,

11 specification?

12 A    Yeah.  Yeah.

13 Q    And take a look at the second page of that where the --

14 it's the spray fireproofing specification under "Material."  Do

15 you see that?

16 A    Yeah.

17 Q    Under Part B it says, "Material to be W.R. Grace & Company

18 Zonolite MonoKote or approved."

19 A    Yeah.

20 Q    Mr. Egan, in a lot of the specifications that are being

21 offered by the claimants, there is language like "or approved."

22 Typically, sir, what does the language "or approved" mean in a

23 specification?

24 A    The bidders on the job, including the general contractor,

25 can submit another product that's equal or approved, but

**J&J COURT TRANSCRIBERS, INC.**

Egan - Direct/Flatley                    126

1 eventually the architect has the right to approve or disapprove

2 the product.  He represents the owner.

3 Q    Okay.  So by the inclusion of "or approved" language, does

4 that indicate that the architect was at least open to the

5 possibility of another product?

6 A    That's true.

7 Q    Now, 6941C, there are a series of letters there, Mr. Egan.

8 Would you take a look at those, please?  The first several of

9 them -- the first three of them are dated March 4th, 1971.

10 A    Okay.

11 Q    These are letters from a gentleman at Grace named William

12 V. Culver.  Do you know Mr. Culver?

13 A    Yes, I do.

14 Q    What was Mr. Culver's job in March of 1971, as you recall?

15 A    Well, his title, he was the district manager in the

16 northwest area of the United States.

17 Q    So the Seattle area would have been -- the State of

18 Washington would have been within his area?

19 A    Yes.

20 Q    Now, the letter indicates that the State of -- it's the

21 letter dated March 4th, '71, and it says, "Washington State

22 University speech building bids March 16."  Do you understand

23 what that means?

24 A    Well, bids March --

25           MS. KEARSE:  Your Honor, it's -- to the extent this

**J&J COURT TRANSCRIBERS, INC.**

Egan - Direct/Flatley                    127

1  is asking for specific testimony of what a specific document

2  means as to what happened, I think that's -- he's attempting to

3  testify as if it's personal knowledge.

4          MR. FLATLEY:  I'll rephrase the question, Your Honor.

5          THE COURT:  All right.

6  Q    Mr. Egan, can you tell from the date on this letter

7  whether the bid had yet been submitted for the Washington State

8  University speech hall job?

9          MS. KEARSE:  Your Honor, again, I think it's trying

10  to interpret a document for which he has no personal knowledge

11  on.

12          THE COURT:  That seems to be true.

13          MR. FLATLEY:  That's fine, Your Honor.  I can just

14  argue it based on the dates that there are.  I'm happy to move

15  on.

16  Q    Mr. Egan, there are three identical letters written to

17  three separate contractors, aren't there?

18  A    Yes.  That's what it appears, yes.

19  Q    And those letters tell each of those contractors that

20  they're an approved contractor?

21  A    Yeah.

22  Q    Let's move on, Mr. Egan, to Claimant's Exhibit 6941B.  Do

23  you have that in front of you?

24          THE COURT:  I'm sorry, 6941?

25          MR. FLATLEY:  B.

**J&J COURT TRANSCRIBERS, INC.**

Egan - Direct/Flatley                    128

1          THE COURT:  B as in boy.

2          MR. FLATLEY:  B as in boy, Your Honor.

3  Q    Do you see that?  It's a multi-page document.  It's a

4  drawing that says on the bottom "Speech Building, Washington

5  State University."  Can you find it?

6  A    No.

7  Q    Let me try to find it for you.

8  A    Oh, well --

9  Q    Yes, that's it.

10 A    That, okay.

11 Q    Mr. Egan, on 6941B, the drawing, there's a reference to

12 Vermiculite Plaster.

13 A    That's right.

14 Q    Is Vermiculite Plaster a different product from MonoKote

15 3?

16 A    Yes.  As we explained before --

17         MS. KEARSE:  Your Honor, I'm -- if I can object to

18 this line of questioning.  I'm not making a claim for

19 Vermiculite Plaster.  It's a MonoKote 3 claim on that, to the

20 extent -- there's no claim for vermiculite non-asbestos --

21         MR. FLATLEY:  Your Honor, these are drawings that

22 were submitted by the claimant in support of the claim that

23 MonoKote 3 is in this building, and they highlighted

24 Vermiculite Plaster.  All I'm asking this witness to do is

25 explain that Vermiculite Plaster is another product.  If

**J&J COURT TRANSCRIBERS, INC.**

Egan - Direct/Flatley                    129

1  they're willing to stipulate to that, that's fine.

2          MS. KEARSE:  It's a specification to show a lot of

3  the steel and where all the other fireproofing is on the

4  documents.

5          MR. FLATLEY:  I'm not sure I understand why the

6  drawing is here then, what it's supposed to prove.  But if

7  they're -- if they're saying they're not trying to claim that

8  the material designated on this drawing, Exhibit B, is what

9  they're claiming is in the building, then I'm fine.  I'll move

10 on.

11         THE COURT:  I'm sorry.  You're saying that you are

12 not claiming that Vermiculite Plaster is not --

13         MS. KEARSE:  To the extent there's -- there could be

14 non-asbestos containing Vermiculite Plaster, I'm not alleging

15 that.  This is showing the steel beams and all the other

16 fireproofing that is actually in the building.

17         THE COURT:  I'm sorry.  I'm not understanding.  Are

18 you saying that the Vermiculite Plaster is a non-asbestos

19 containing product?

20         MS. KEARSE:  Yes, Your Honor.  That's --

21         THE COURT:  So you're not making a claim for

22 Vermiculite Plaster damages?

23         MS. KEARSE:  Right.  I'm making a claim for MonoKote

24 3 within the building, Your Honor.

25         THE COURT:  And you agree that Vermiculite Plaster is

1  not MonoKote 3?

2           MS. KEARSE:  Yes, Your Honor.

3           THE COURT:  Okay.

4           MR. FLATLEY:  Then I have no reason to go over this

5  document.

6           THE COURT:  All right.

7                    CONTINUED DIRECT EXAMINATION

8  BY MR. FLATLEY:

9  Q    Turn if you would then, Mr. Egan, to the next claim, and

10 that would be Claim 10649.  This claim is a claim by the State

11 of California for an office building in Sacramento in which

12 MonoKote 3 allegedly was installed in 1963.  I'd like you to

13 look, Mr. Egan, at a drawing that's part of those materials.

14 It's a drawing marked by the claimants as DGS-2C, and, if you

15 would, Mr. Egan, I'd like you to look at the portions of that

16 drawing -- it's actually a collection of multiple drawings --

17 the portion of the drawing marked Section CC.  Do you see that

18 on the left?

19 A    Yes.

20 Q    Second drawing down?

21 A    Yes.

22 Q    Now, there's a reference there to metal lath and

23 sprayed-on fireproofing rated for four hours.  Do you see that?

24 A    Yes.

25 Q    Now we talked earlier about MonoKote 3 being a direct to

1 steel fireproofing.

2 A    Yes.

3 Q    Would it be an ordinary practice to spray MonoKote

4 fireproofing over metal lath?

5 A    That is not a usual situation.  It's direct to steel

6 usually.

7 Q    Mr. Egan, there are other references to fireproofing in

8 Section FF, Section DD and the section entitled, "Section at

9 Floor Landing."  Do any of those --

10         MR. MANDELSBERG:  Objection, Your Honor.  This

11 exhibit refers to a specific architectural plan for a specific

12 building that is associated with one of the State of

13 California's claims.  One ground for my objection is the

14 witness has already acknowledged, or counsel has acknowledged,

15 that he has no specific knowledge regarding installation of any

16 asbestos products in either building.  The second basis for my

17 objection is this, is this document being admitted in evidence?

18 It's one of our exhibits.  We don't have an objection to it

19 being in evidence, but if Mr. Flatley is going to ask the

20 witness questions about the document, it needs to be in

21 evidence.  They haven't objected to this particular category of

22 document.  I understand why.  Because they wanted to use it.

23 But either introduce it in evidence or don't.  You can't have

24 it both ways.

25         THE COURT:  Right.

**J&J COURT TRANSCRIBERS, INC.**

1        MR. FLATLEY:  Your Honor, if I may, we have a

2   procedure here where the debtor has to go first, but the

3   claimants ultimately bear the burden of persuasion, and the

4   agreed upon procedure was that we would go first.  They have

5   offered the -- they are -- have indicated that they're going to

6   offer this document into evidence.  I have no objection to the

7   document.  I don't dispute its authenticity.  I do, however,

8   think that it doesn't prove what it might be argued to prove,

9   and unless I ask this witness about it, I have no opportunity

10  to refute that.

11       THE COURT:  Evidence in the federal system is

12  evidence, folks.  It doesn't belong to any particular party.

13  Once somebody offers it, it's in evidence.  It doesn't matter

14  who offers it.  So, Mr. Flatley, if you need it in evidence and

15  you have no objection to somebody else putting it in evidence,

16  it doesn't matter whether you put it in evidence or the other

17  side puts it in evidence.  Once it's in evidence, it's in

18  evidence, folks, and it's evidence that the Court's going to

19  consider.  So, if you --

20       MR. FLATLEY:  I'll move DGS-2C into evidence then,

21  Your Honor.

22       THE COURT:  It's admitted.

23       MS. KEARSE:  Your Honor, and the first three things,

24  too, I think they were without objection, too, so we've already

25  put them in the record.  They would also be for the first three

Egan - Direct/Flatley                    133

1  exhibits that you just --

2          MR. FLATLEY:  Certainly the exhibits I asked him

3  about.

4          MS. KEARSE:  A, B and C.

5          MR. FLATLEY:  Not in their entirety.  Only the ones I

6  asked him about.

7          THE COURT:  We can go back and fix that later.  Let's

8  just finish with this --

9          MR. FLATLEY:  Okay.

10          THE COURT:  -- and then we'll pick up with that where

11  we left off.  With respect to the fact that the witness has no

12  personal knowledge of asbestos products, at the moment he is

13  not being asked about whether these products were or were not

14  installed.  He's being asked whether it would be customary to

15  put a MonoKote 3 spray coat over top of a lath product, and

16  he's indicating that it would not, that that would normally be

17  directly applied to steel, not to a lath, and I think that's

18  within his expertise.  So that objection is overruled.

19          MR. FLATLEY:  Thank you, Your Honor.

20                  CONTINUED DIRECT EXAMINATION

21  BY MR. FLATLEY:

22  Q    Mr. Egan, is -- do the statements that I pointed to you

23  indicate the type or kind of fireproofing that's to be used.

24  A    I don't believe so.  It just states fireproofing for --

25  rated for four hours, as far as thickness is concerned, on

**J&J COURT TRANSCRIBERS, INC.**

Egan - Direct/Flatley                    134

1  metal lath and any other place that it's shown here with a note

2  -- and these are all sections of details.  One place here it

3  does say four hour plaster fireproofing.  So, it's a variety of

4  installation, sprayed or plaster.

5  Q    Okay.  Move, if you would, Mr. Egan, to Claim Number

6  10650, and this, Mr. Egan, is a claim by the State of

7  California for a hospital at Atascadero, California, that

8  according to the claim form MonoKote 3 was installed in that

9  building in 1969.  Do you have that in front of you, Mr. Egan?

10 A    Is this the letter to Mr. Henderson on December 1, 1950?

11 Q    Yes, the first document, DGS-3D, is a letter dated

12 December 1, 1950.

13 A    Yes, I have it.

14 Q    You indicated earlier that MonoKote 3 was first put on the

15 market when?

16 A    1960.

17 Q    Now, Mr. Egan, there's another drawing there, and I'll be

18 happy to offer this into evidence as DGS Exhibit 3C.

19     MR. MANDELSBERG:  Well, I think you ought to offer

20 into evidence DGS-3D, the letter you just referred to, under

21 the same logic you applied to the other exhibit.

22     THE COURT:  He did not refer to this letter.  The

23 witness asked whether that was the exhibit, and he said, yes,

24 that's the exhibit.  There's been no reference to this letter.

25     MR. MANDELSBERG:  Well, Your Honor, I think the

Egan - Direct/Flatley                    135

1  reference is to the date of the letter and its content, because

2  --

3        THE COURT:  There is no reference yet to the letter.

4  The witness was simply saying, is this where you want me to

5  look, is this the first page of this exhibit, and the answer

6  was, yes, that's the first page.  There has been no question

7  about this exhibit.

8        MR. MANDELSBERG:  Very well.

9        THE COURT:  If there is a question about the exhibit,

10 then we'll have to see whether or not it's admissible, but at

11 this point there's no question about this.  Do you have a

12 question about this exhibit, Mr. Flatley?

13       MR. FLATLEY:  No, Your Honor.  My only question to

14 the witness was when Grace first started marketing MonoKote 3.

15       THE COURT:  all right.

16       MR. FLATLEY:  I will have a question about DGS-3C,

17 which I understand there's no objection.

18       MR. MANDELSBERG:  No objection.

19       THE COURT:  What is that one, please?

20       MR. FLATLEY:  I'm sorry, Your Honor, 3 --

21       THE COURT:  What is C --

22       MR. FLATLEY:  3-C.

23       THE COURT:  Yes.

24            CONTINUED DIRECT EXAMINATION

25 BY MR. FLATLEY:

**J&J COURT TRANSCRIBERS, INC.**

Egan - Direct/Flatley                    136

1  Q    Take a look, Mr. Egan, at Exhibit 3-C.

2             THE COURT:  Where is it?

3             UNIDENTIFIED SPEAKER:  Your Honor --

4             THE COURT:  Oh.

5             MR. FLATLEY:  It should be in the flap, Your Honor.

6             THE COURT:  Okay.  Thank you.

7  Q    Mr. Egan, over on the right-hand side of that drawing,

8  there are references to -- give me a second --

9             THE COURT:  I'm sorry.  Now this one you are

10 offering, correct?

11            MR. FLATLEY:  Pardon me?

12            THE COURT:  You have offered this one?

13            MR. FLATLEY:  Yes, and this -- without objection.

14            MR. MANDELSBERG:  No objection.  It's our exhibit.

15            THE COURT:  All right.  Admitted.

16 Q    Take a look on the right-hand side, Mr. Egan, at Plan 24

17 and Plan 25 --

18 A    All right.

19 Q    -- and to the references there to fireproofing.

20 A    Yes.

21 Q    Is there anything there that indicates a brand or type of

22 fireproofing that's to be used in this building?

23 A    No, other than just fireproofing for a minimum thickness

24 and hourly rating.

25 Q    Were there products other than MonoKote 3 that could meet

**J&J COURT TRANSCRIBERS, INC.**

1 those requirements for minimum thickness and hourly rating?

2 A    Other than MonoKote you said?

3 Q    Yes.

4 A    Yes, there would be.

5 Q    Turn, if you would, Mr. Egan, to Claim Number 10652.

6 That's a claim by the State of California that MonoKote 3 was

7 installed in 1969 in an office building in Sacramento.  Take a

8 look, if you would, Mr. Egan, and I will offer into evidence

9 DGS-5H.  It's a two-page exhibit.

10            THE COURT:  Any objection?

11            MR. MANDELSBERG:  No objection, Your Honor.  It's

12 part of one of claimant's exhibits.

13            THE COURT:  It's admitted.

14            MR. FLATLEY:  Yes, it may be part, Your Honor.  I

15 thought it was the whole thing as far as the exhibits that were

16 involved here.

17            MR. MANDELSBERG:  It is all of 5H.  I didn't know

18 whether you were referring to five.

19            MR. FLATLEY:  Okay.

20 Q    Mr. Egan, take a look at Item 5, "Replacement Work."

21 There are two specifications here that are labeled "Replacement

22 Work."  Do you see them?

23 A    Yes, I do.

24 Q    And each of them has an identical -- well, take a look.  I

25 think they have identical Subsections (a), "All Fireproofing."

1  A    Yes.

2  Q    Could you read, for the benefit of the Court, what it says

3  under Section A, "All Fireproofing."

4  A    "All fireproofing," underlined, "to the structural

5  elements of the building removed in the course of work under

6  this change order shall be replaced as required to give the

7  same degree of fire protection as required by the contract

8  document."

9  Q    Mr. Egan, does that say anything about the brand or type

10 of fireproofing that was to be used?

11 A    No, it does not.

12 Q    Moving on, sir, to Claim 10655, that's a claim that in

13 1965 MK-3 was installed in an administration building in

14 Jamestown, California.  Take a look, if you would, at -- and I

15 will offer into evidence DGS Exhibit 8D.

16         MR. MANDELSBERG:  No objection, Your Honor.

17         THE COURT:  It's admitted.

18 Q    Take a look, if you would, Mr. Egan, at I think it's the

19 fourth page of Exhibit 8D.  It's labeled on the top, "Section

20 18, Sprayed-on Fireproofing."

21 A    Yes.

22 Q    You see that?

23 A    Yes.

24 Q    Is that a specification for fireproofing?

25 A    Yes, it is.

Egan - Direct/Flatley                    139

1  Q     Now, down at the bottom of that page, under Paragraph 18.

2  -- 18-4, "Sprayed-on Fireproofing Material, Subsection (b),

3  there is a statement, "Insulation shall be one of the following

4  types, conforming to the requirements in (a) above."  Do you

5  see that?

6  A     Yes.

7  Q     Now, as they use "insulation" here, does it seem obvious

8  that they mean fireproofing?

9             MR. MANDELSBERG:  Objection.

10 A     Yes.

11            THE COURT:  I'm sorry.  Objection?

12            MR. MANDELSBERG:  Objection.  He's asking the witness

13 what it seems this document meant in the words that they were

14 used.

15            THE COURT:  That's sustained.

16            MR. MANDELSBERG:  No foundation for it.  There's no

17 personal knowledge.

18            THE COURT:  It's sustained.  The document speaks for

19 itself.

20            MR. FLATLEY:  Thank you, Your Honor.

21 Q     Mr. Egan, how many different fireproofing products are

22 listed here in this specification by name?

23 A     There are two basic types, and within them there's at

24 least four products listed, three under asbestos fiber and one

25 under cementitious.

                    **J&J COURT TRANSCRIBERS, INC.**

Egan - Direct/Flatley                    140

1  Q    Now, under cementitious, does this have one of those "or

2  equal, as approved" clauses?

3  A    It ends with "or equal, as approved."

4  Q    Take a look, if you would, Mr. Egan, to Claim Number

5  10656.  It's a claim that in 1967 MK-3 was installed in the

6  kitchen/laundry at a prison in Tahapachee (phonetic),

7  California.  I'm sure I've butchered that pronunciation.  But

8  do -- turn -- are you on that claim number, Mr. Egan --

9  A    Yes, I am.

10 Q    -- 10656?

11 A    DGS-21?  10656?

12 Q    Correct.

13 A    All right.

14 Q    Now -- I'll skip over that, Mr. Egan.  We'll go on to

15 10660.  Would you turn to that one, please?  This is another

16 claim by the State of California for the prison that I just

17 mentioned, and it alleges that MK-3 was installed in 1967.

18 Would you turn, please, to DGS Exhibit 13E, which I will offer

19 into evidence at this time, Your Honor.

20        THE COURT:  Any objection?

21        MR. MANDELSBERG:  No objection, Your Honor.

22        THE COURT:  Admitted.

23 Q    Mr. Egan, would you turn to the second page of DGS-13E?

24 A    Yes.

25 Q    Specifically, would you take a look at Paragraph 3B, the

**J&J COURT TRANSCRIBERS, INC.**

Egan - Direct/Flatley                    141

1  type of insulation provision?

2  A    Yes, I'm looking at it.

3  Q    You found it?

4  A    Yes.

5  Q    Okay.  Does that indicate that in addition to MonoKote an

6  or equal of other type of insulation material approved by the

7  State Fire Marshal met the specification?

8  A    That's what it says.

9  Q    And, Mr. Egan, I'd like you to turn now to Claim Number

10  10661, and this is another claim by the State of California

11  that MonoKote 3 was installed in a state office building in

12  West Sacramento, California, in 1963.

13        MR. FLATLEY:  Your Honor, if I might beg the Court's

14  indulgence, DGS-14D, which is where the specification is

15  included that I'm -- I would ask the witness about, has some

16  other documents included with it, and I'd like to offer just

17  the specification part of DGS-14D.  It's the fifth page, I

18  think, or sixth page.  I'm not sure what the other pages stand

19  for, but it was all lumped together --

20        THE COURT:  So you want --

21        MR. FLATLEY:  -- and I'd like to just offer Section

22  18, "Sprayed-on Fireproofing" specification.

23        THE COURT:  All right.  Any objection to that page?

24        MR. MANDELSBERG:  No objection.

25        THE COURT:  All right, it's admitted, that one page.

**J&J COURT TRANSCRIBERS, INC.**

1  Q    Would you go to that page, please, Mr. Egan.

2  A    I have.

3  Q    Down at the bottom, it -- the specification describes the

4  types of insulation that conform to the requirements of the

5  specification.  Do you see that?

6  A    Yes, I have.

7  Q    How many products are listed there, Mr. Egan?

8  A    There are two basic types.  Under asbestos fiber, there's

9  I believe four -- three, and under vermiculite-based

10 cementitious, there are two.

11 Q    And is one of those two vermiculite-based cementitious

12 products Monokote 3?

13 A    Yes.

14 Q    And what's the other vermiculite-based cementitious

15 product that's identified in the State of California

16 specifications on DGS-14D?

17 A    "U.S. Gypsum Company Red-top Fire Code V, or equal, as

18 approved."

19 Q    Is that Fire Code V a product that you remember, Mr. Egan?

20 A    I remember of it, yes.

21 Q    Do you remember them as a competitor of Grace in the

22 1960s?

23 A    It was.

24 Q    Thank you, Mr. Egan.  That's all I have.

25                    CROSS EXAMINATION

**J&J COURT TRANSCRIBERS, INC.**

Egan - Direct/Flatley                                      143

BY MR. MANDELSBERG:

       MR. MANDELSBERG:  Good afternoon, Mr. Egan.  My name

is Steven Mandelsberg.  I with the law firm of Hahn & Hessen

and we represent the State of California, Department of General

Services in this proceeding.

Q   You were present this morning when you heard the testimony

of Dr. Lee, were you not?

A   I was.

Q   And you were present throughout that portion of the days

sessions when Dr. Lee testified, right?

A   Yeah.

Q   And as I understand your testimony you, your direct

testimony, you were at Zonolite and Grace at a time when your

responsibilities included being an architectural sales

representative, district sales manager and regional sales

manager.  Is that correct?

A   That is correct.

Q   And in those positions, is it correct Sir that you had

responsibility or involvement for sales of MK3 and Zonolite

Acoustical Plaster or ZAP by its three initial acronym

throughout the United States and Canada, is that correct?

A   Within specific areas.  District manager was the three

parts of the states of West Virginia, Pennsylvania and Ohio.

The regional manager was for the areas of Ohio to Kansas and

Texas to Canada.  But not including Canada.

**J&J COURT TRANSCRIBERS, INC.**

1 Q    Did your responsibility ever include the State of

2 California?

3 A    No, it did not.

4 Q    Did you ever participate in the sales of MK3 or Zonolite

5 Acoustical Plaster to any contractor, subcontractor, architect

6 who you knew provided it to anyone in the State of California?

7 A    As national fire proofing manager I interfaced with the --

8 Grace management in California and talked with on special

9 occasions architects within the State of California.

10 Q    Do you remember ever participating in any sale of MK3 or

11 Zonolite Acoustical Plaster to anyone in California in

12 connection with any project in the State of California?

13 A    Not specifically.  I do not.

14 Q    Okay.  So your testimony earlier in response to Mr.

15 Flatley's questions was your general experience as to the sale

16 of products in the regions for which you were responsible or

17 worked excluding the State of California, correct?

18 A    Yes.

19 Q    All right.  Now, Sir, if I might the way you worded that,

20 as the national product manager my work also as I said, I

21 interfaced with people in California.  At that time, I met and

22 discussed specifications and fireproofing applications all over

23 the United States including California.

24 Q    But did you ever have any particular project that was

25 going on in the State of California that you worked with anyone

**J&J COURT TRANSCRIBERS, INC.**

Egan - Direct/Flatley                                    145

1 on that involved the sale of Monokite 3 or Zonolite Acoustical

2 Plaster?

3 A    No, that was only supporting of Grace sales in that

4 regard.

5 Q    And they didn't report to you as far as you can recall

6 about any particular projects where MK3 or ZAP had been

7 supplied in connection with any building project in the State

8 of California.  Is that correct?

9 A    I don't have recollection of that.

10 Q    Okay.  Now let's make clear a few things about the scope

11 of your knowledge.  Is it correct, sir, that you don't have any

12 knowledge regarding the installation or use of any sort of

13 asbestos product in any of the buildings that are associated

14 with the 16 proofs of claim filed by the State of California

15 against W.R. Grace in this proceeding.  That's correct, right?

16 A    By the name of the building or whatever, I don't have a

17 recall of being involved with that particular building.

18 Q    And have you reviewed any of the proofs of claim filed in

19 the State of California, Department of General Services against

20 W.R. Grace?

21 A    Only what I saw here.

22 Q    And when you say only what you saw here, you are referring

23 to the blinder of the few documents that Mr. Flatley asked you

24 about earlier, correct.

25                MR. FLATLEY:  Objection, Your Honor to the

                **J&J COURT TRANSCRIBERS, INC.**

Egan - Direct/Flatley                                146

1  characterization of the testimony.

2  Q    Well are you referring to any --

3         MR. FLATLEY:  Specifically the use of the word

4  blinder.

5         MR. MANDELSBERG:  Binder.

6         MR. FLATLEY:  I'm sorry.

7         MR. MANDELSBERG:  I said binder.

8         MR. FLATLEY:  I apologize.  I misunderstood.

9         MR. MANDELSBERG:  If I didn't I meant to say binder

10  and I thought it was a binder.

11         THE COURT:  He was specifically tapping the binder

12  that he had before him.  I think the objection is overruled.

13         MR. FLATLEY:  I withdraw the objection.  I thought he

14  said blinder.

15  Q    Let me repeat the question it may have become lost in the

16  colloquy sir.  Is it correct that the only documents that you

17  referred -- that you reviewed relating to the Department of

18  General Services claims are the few documents that were in the

19  binder that Mr. Flatley asked you about earlier this afternoon?

20  A    That is correct.

21  Q    So you didn't have an opportunity to review portions of

22  the Department of General Service's proofs of claim relating to

23  the date on which the buildings associated with that claim were

24  constructed, correct?

25  A    That is correct.

**J&J COURT TRANSCRIBERS, INC.**

Egan - Direct/Flatley                    147

1  Q    And you didn't have an opportunity to review proofs of

2  claim forms or the responses to questions about the dates when

3  asbestos products were installed in any of the buildings

4  associated with the DGS claims, correct?

5  A    That is correct.

6  Q    And you never inspected or visited any of the buildings or

7  the addresses that are associated with any of the Department of

8  General Services claims, correct?

9  A    I have no recall of being in those buildings.

10 Q    And you are not familiar with any of those addresses,

11 correct?

12 A    No.  I am not.

13 Q    Now I believe you testified about the dates when Zonolite

14 Acoustical Plaster and Monokote 3 were no longer sold by W.R.

15 Grace and I believe you testified that the cessation of sales

16 of Monokote 3 was a byproduct of the EPA's decision regarding

17 that sort of product in a certain type of application, right?

18 Do you recall that?

19 A    Yes, I do.

20 Q    Are you aware of any other contractors or sellers of W.R.

21 Grace Monokote 3 or Zonolite Acoustical Plaster after 1973?

22 A    No, I do not.  Within the United States, no.  I do not.

23 Q    Let me try to focus my question a little bit more

24 specifically.  When you testified earlier that those products

25 were no longer sold after mid-July 1993, 1973 excuse me, you

1 were referring to W.R. Grace selling those products, correct?

2 A    I don't know of anybody else who sold Grace products

3 except W.R. Grace.

4 Q    You have no knowledge whether someone bought those

5 products like a contractor for use in buildings that may have

6 been installed after 1973?

7 A    No.  I don't.

8 Q    Did you ever review any of the MVA reports, that is the

9 reports that you may have heard this morning referred to during

10 questions of Dr. Lee?  Reports of MVA Scientific Consultants.

11 Did you ever view any of those reports?

12 A    That name doesn't mean anything to me as far as reference.

13 Q    Did you review any portion of Dr. Richard Lee's expert

14 report in this case?

15 A    No, I did not.

16 Q    Now you testified about your experience with architectural

17 plans and specifications and you I believe referred to the fact

18 that just because an architect were to call for the use of MK3,

19 Monokote 3 did not mean that it necessarily was installed in

20 the building.  Do you remember that discussion?

21 A    That is correct.

22 Q    You had also acknowledge, sir, though that there were

23 instances where architectural plans or specifications called

24 for Monokote 3 and in your experience they were installed in

25 buildings, correct?

1  A    Absolutely.

2  Q    Do you have any idea of the percentage of time in your

3  experience that happened?  Was it one out of ten, two out of

4  ten, five out of ten?

5  A    If the specification before 1973 called for fireproofing

6  the percentage it varied by location and what have you.  It

7  could go from maybe five out of ten or less.  You know it was a

8  big field and a lot of buildings and a lot of competition.

9  Q    It varied from building to building, correct?

10 A    It did.

11 Q    It varied from year to year, correct?

12 A    Yes.

13 Q    It varied from project to project, correct?

14 A    Yes.

15 Q    It varied depending on the price of a product at the

16 particular time, correct?

17 A    That's correct.

18 Q    It varied on whether or not a competitor offered the same

19 product at a competitive price, correct?

20 A    I don't understand what the same product means.

21 Q    Let me rephrase that --

22 A    You mean --

23 Q    Go ahead.

24 A    A similar product?

25 Q    Or a similar product, it varied?

**J&J COURT TRANSCRIBERS, INC.**

Egan - Direct/Flatley                    150

1    A    Yeah, I mean terminology or equal allowed that.

2    Q    Right.  And you never performed any survey to determine

3    the percentage of times or the number of times that an

4    architectural plans or specifications called for Monokote 3 or

5    Zonolite Acoustical Plaster or equal to find out how many times

6    and what percentage of times buildings during a particular

7    period ended up using, in fact, Zonolite Acoustical Plaster or

8    Monokote 3?

9    A    I don't recall of a list or percentage of the jobs

10   specified that actually were sold by Grace.

11   Q    And you have no knowledge nor experience during the years

12   that you worked at Zonolite or W.R. Grace that anyone else at

13   W.R. Grace performed any such survey, correct?

14   A    I don't have a recall of that.  They may well have.  I

15   just don't recall.

16   Q    You never saw it, did you?

17   A    On a percentage of projects requiring fireproofing, no, I

18   don't.

19   Q    Now sir, you were asked on direct examination to look at a

20   few of these specifications and one that you were asked to look

21   at has been marked and introduced as Exhibit DGS-8D, and so if

22   you would sir if you still have that binder in front of you,

23   please turn to the binder under Tab Claim Number 10655.

24           I'm referring specifically sir to the same page that

25   Mr. Flatley asked you about.  It is the fourth page of the

**J&J COURT TRANSCRIBERS, INC.**

Egan - Direct/Flatley                    151

1  exhibits entitled Section 18, titled Sprayed On Fireproofing,

2  and it's the bottom of the page, Insulation B-2.  Do you see

3  that?  Insulation.  Do you see that?

4  A    I see that.

5  Q    Now Mr. Flatley asked you to look at the words or equal as

6  approved.  Do you see what the words before that refer to?

7  A    Yes, I see it under B-2.

8  Q    And what does that say?

9  A    Zonolite Company Monokote type 3 or equal as approved.

10 Q    So this is an example of a specification that could call

11 for the use of Monokote type 3 or a similar product, right?

12 A    Yes.

13 Q    And as I said before, you wouldn't have any knowledge as

14 to which one was eventually actually used, right?

15 A    No, I would not.  But also within this specification it is

16 introducing the possibility of those listed under asbestos

17 fiber insulation.

18 Q    Isn't it correct, sir, that this phraseology Zonolite

19 Monokote type 3 or equal is a standard phraseology that you had

20 seen in your experience used in specifications?

21 A    Generally, broadly.  All specification items tend to

22 protect by including the phrase or equal whatever the product

23 is and it also goes into fireproofing.

24 Q    Right, so this is nothing unusual by using the words or

25 equal, right?

**J&J COURT TRANSCRIBERS, INC.**

Egan - Direct/Flatley                    152

1 | A     No, it's not.

2 | Q     And in fact, sir, have you ever seen the specification

3 | that called only for Zonolite Monokote type 3 without the words

4 | or equal or with some legend or modification that specifically

5 | said that under no circumstances was an equivalent or similar

6 | product to Monokote type 3 or ZAP to be used?  Did you ever see

7 | that?

8 | A     Yes, I have.

9 | Q     You have?  How many times?  How often have you seen that?

10 | A     I can't recall the number over all the years.  It's

11 | several times a year on specific project it may say no

12 | substitutions, it must be that product.

13 | Q     But this is the general phraseology that you've seen in

14 | your experience, correct sir?

15 | A     Yes, it is.

16 | Q     Are you familiar with, I think you said you were familiar

17 | with the sales of Monokote 3 and ZAP, correct?

18 | A     Yes.

19 | Q     That is during the course of your tenure at the company,

20 | right?

21 | A     Correct.

22 | Q     You are aware sir that W.R. Grace from time to time during

23 | your position marketed Monokote type 3 by using the term

24 | Monokote as well, right?

25 | A     Yes.

**J&J COURT TRANSCRIBERS, INC.**

Egan - Direct/Flatley                        153

1  Q     Those two phrases, Monokote and Monokote type 3 were used

2  interchangeably, correct?

3  A     Well, it more or less depended on who you were talking to.

4  Typically it was Monokote because the majority of people not by

5  specific type 3 or whatever.  If that's what you are leading

6  to.  It was Monokote or MK when talking to the applicator, the

7  architect or the building contractor.

8  Q     And there were times when the reference was MK3 or

9  Monokote 3, correct?

10 A     Yes.

11 Q     And the two terms were used interchangeably from time to

12 time, correct?

13 A     Yes, it could be.

14        MR. MANDELSBERG:  Your Honor, could I have one

15 moment?  I think I'm done.

16 Q     Now I think you testified on a few moments ago in response

17 to Mr. Flatley's questions that W.R. grace called in architects

18 from time to time because it wanted them to promote the use of

19 MK3.  Do you recall that?

20 A     No.  The --

21 Q     Is that not right?

22 A     The way you phrased it -- please repeat the question.

23 Q     Okay.  Let me make sure that I understand correctly what

24 it is you are saying.  Did W.R. Grace in your experience as

25 regional sales manager and sales manager in different

**J&J COURT TRANSCRIBERS, INC.**

1  capacities from time to time have discussions with architects

2  or representatives of architectural firms in order to persuade

3  them to have their clients utilize Monokote 3 products?

4  A    As I said earlier, the fireproofing of a building was a

5  matter of law.  They had to comply with local building codes

6  and to achieve that the Grace salesman was to influence

7  persuade the architect to first of all specify their product

8  Monokote.

9  Q    And to do that, sir, is it fair to say that you took some

10 role in order to for want of a better term make a pitch to the

11 architects as to why they should use Monokote 3 as opposed to

12 another manufacturer's product?

13 A    That is correct.  Not only to get the name into the

14 specification but convince the architect that it performed

15 better and why and it was to the advantage of the owner to have

16 that in their building.

17 Q    And it was in your interest during your tenure at Zonolite

18 and Grace to do everything you could to persuade these

19 representatives and architects to recommend and utilize

20 Monokote 3 because you believed it was a superior product,

21 correct?

22 A    Professionally that they were to -- the salesman as I

23 tried to explain or influence them was to professionally

24 present all the pertinent data and support for that product and

25 it was to the architect's advantage that he would get the

Egan - Direct/Flatley                                155

1  benefit of a professional product professionally installed and

2  that's what we were selling, the quality of the product.

3  Q    But sir, it is correct that you attempted to persuade them

4  to choose Monokote 3 as opposed to another manufacturer's

5  product, right?

6           THE COURT:  You sort of hit this issue.  You are

7  arguing with the witness and he's answered it four times.

8           MR. MANDELSBERG:  I didn't hear an answer but if the

9  Court did that's more important.

10          THE COURT:  You get one more stab at this and then

11  move on.  This is four times.  Go ahead, Mr. Egan.

12 A    As I tried to explain, the architect had to provide a

13 fireproofing product to get the building built. It didn't look

14 good but that was not important.  Did it function as a fire

15 resistant product and the salesman for Grace was to explain to

16 the architect why Monokote, W.R. Grace and the network of

17 applicators was the best road for him to follow.  And he should

18 support that spec to the extent that he could.  So be it.

19 Q    Beyond  architects and representatives of architects, sir,

20 is it fair to say that you and your colleagues at Zonolite and

21 W.R. Grace for your 18 years there attempted to sell as much

22 MK3 and ZAP products to as many buyers as possible?

23 A    Yes.

24          MR. MANDELSBERG:  I have nothing further.  Thank you,

25 Your Honor.

1          THE COURT:  Ms. Kearse.

2                    CROSS EXAMINATION

3  BY MS. KEARSE:

4  Q    Good afternoon, Mr. Egan.

5  A    Good afternoon.

6  Q    Mr. Egan, you've testified on numerous occasions on behalf

7  of W.R. Grace, isn't that correct?

8  A    Yes.

9  Q    And you've been through a lot of documents about dealing

10 with the history, the hazards of asbestos and Grace's knowledge

11 regarding that.  Is that correct?

12 A    That's right.

13 Q    I'm going to do you a favor today.  I'm not going to go

14 into any of that today. I'm going to stick to product ID issues

15 and what's before the Court today and not cross examine you on

16 a lot of those documents that you've seen over and over again.

17 Is that fair?

18 A    I hope.

19 Q    I sometimes call you doctor and I apologize for that Mr.

20 Egan but I know you have a lot of experience and the work that

21 you've done.  Am I correct to assume that the documents that

22 you reviewed today is the only time that you've ever had any

23 information on my client's building 6941?  Regardless of when

24 you reviewed them but to the extent you reviewed those

25 documents that was based in this litigation?

**J&J COURT TRANSCRIBERS, INC.**

1  A    Yes.

2  Q    And so you have no personal knowledge about the Washington

3  State University claim 6941, is that correct?

4  A    That's correct, yes.

5  Q    And it's safe to say then you have no personal knowledge

6  of whether or not Monokote actually was installed in the

7  building that is an issue in claim 6941, is that right?

8  A    That's right.

9  Q    Mr. Egan, do you have an understanding that the building

10 at issue at Washington State University is in Washington State?

11 A    It says here Pullman, Washington.

12 Q    And I think you testified earlier that that is where Mr.

13 Culver's jurisdiction would be?

14 A    Yes.

15 Q    And would he be doing some of the similar type of work

16 that you did on the east coast?

17 A    Yes.

18 Q    And I don't know the anser to this.  I'm going to answer

19 this.  Is Mr. Culver still living?

20 A    Yes, he is.  As far as I know today, yes.

21 Q    I believe you testified in the past that you were in the

22 business of, and testified here today, of somewhat selling

23 specifications on behalf of W.R. Grace. Is that considered an

24 area that you covered?

25 A    Yes, that's true.

1  Q    Do you agree with me that if Mr. Culver was doing this job

2  like you then one of his jobs would be to assist subcontractors

3  who used the W.R. Grace products, correct?

4  A    He tried to influence the architect or persuade I guess is

5  the better term to specify a product.

6  Q    And like you, you would expect that he would have direct

7  dealings with the spec writers, correct?

8  A    Pardon me?

9  Q    Like you, he would have specific dealings with the spec

10  writers, is that correct?

11  A    Yes.

12  Q    Mr. Egan, I think today and in the past you testified on

13  numerous occasions of the Grace products at issue Monokote 3

14  contained somewhere between 10 and 12 percent.  Do you recall

15  that?

16  A    Yes.

17  Q    Would you agree with me that you've also testified in the

18  past that your fireproofing product during the time period late

19  60s early 70s had one of the lower concentrations of asbestos.

20  Have you testified to that in the past?

21  A    Yes, I have.

22  Q    In fact, you've testified in the past that your

23  competitors actually had much higher levels of asbestos, isn't

24  that correct?

25  A    It varied over time but yes, typically I believe most of

1 the competitive products had a larger percentage of asbestos in

2 their formulation.

3 Q   So I'm talking about the time there after the Selicoff

4 (phonetic) studies when there was some issue on whether

5 cementitious products and other types of products were

6 hazardous.  Is that right?

7 A   That's right.

8 Q   As part of your work with that, you went and visited

9 Selicoff and other people to talk about your product as it

10 compared to your competitors, is that right?

11 A   That's right.

12 Q   I won't point to those testimonies but I just wanted to

13 make sure we were on the same page today that you went out to

14 talk about your competitors as a much higher level of asbestos

15 in there.  Do you agree with me?

16 A   They had a higher level.  I don't know how much means

17 percentage wise.

18 Q   Would you have any reason to disagree with me that you

19 testified before that it had much higher levels?

20 A   If you want to pick words apart, I guess I do.  I don't

21 know what much more means or what you are implying.

22 Q   I can show you your testimony.  Would you dispute that

23 you've testified to that before?

24 A   I have testified that the other products had more asbestos

25 than Monokote and it varied as to how much more.

1  Q    Mr. Egan, have you also testified in the past about the

2  fact that various products -- various buildings could contain

3  various types of products?

4          MR. FLATLEY:  Your Honor, I object to the questioning

5  insofar as it is a reference as to what he's testified to in

6  the past.

7          THE COURT:  I think you did too.  You can't impeach

8  the witness until you show me that he's testified to something

9  contradictory and there isn't a question.

10  Q    I'm just asking you to agree with me right now that to the

11  extent a building owner can have various types of products in

12  it, would you have any reason to disagree that that can happen?

13  A    A building consists of a multitude of products.  They can

14  be of various types, shapes, forms.  I don't know if you are

15  talking about fireproofing, I think we agreed today that there

16  are a variety of products available to him to choose.

17  Q    And are you aware of some occasions where there might be

18  two different types of fireproofing within one building?

19  A    That could happen.

20  Q    Mr. Egan, you were shown an exhibit that was the

21  specifications for the Daggy Hall Building in which it

22  referenced the Zonolite Monokote or approved.  Do you recall

23  that?  I believe it is in your tab if you want to refer to it.

24  A    Yes.

25  Q    Under Tab 6941.  And you were read -- it talks about W.R.

1  Grace and Company, Zonolite, Monokote or approved.

2  A    Or approved, right.

3  Q    And the first part of that actually states that the

4  fireproofing material shall be cementitious type fireproofing.

5  Do you see that?

6  A    Yes.

7  Q    And Monokote would be consistent with the cementitious

8  fireproofing?

9  A    Yes, it would.

10  Q    Mr. Egan, you are also shown in Section C in the

11  correspondence on there several letters.  Do you recall seeing

12  those?

13  A    Yes.

14  Q    If I can turn your attention to the March 5, 1971 letter.

15  A    March 4?

16  Q    There's a series of March 4.

17  A    Right.

18  Q    And then March 5.

19  A    Oh, yes.

20  Q    And will you agree with me on the face of that document

21  that Mr. Culver saw the specifications as a requirement that

22  the fireproofing be Monokote?  Do you see the first part of

23  that?

24          MR. FLATLEY: Your Honor, I object.  She's asking the

25  witness to characterize the document.

Egan - Cross/Kearse                           162

1        THE COURT:  Sustained.

2  Q    Will you agree with me on the face of the document it does

3  talk about a required product on there?

4        MR. FLATLEY:  Same objection.

5        THE COURT:  Sustained.  The document is going to

6  speak for itself.

7  Q    Mr. Egan, you were also shown some of the drawings of the

8  building.  I think it was labeled C, it was hard to read on

9  there.  Exhibit B.

10  A    Same tab?

11  Q    It's under 6941.  It had the building.

12  A    Yeah.

13  Q    In there it shows some of the structural steel.  Is that

14  similar to the structural steel that Monokote 3 would be used

15  on?

16  A    Yeah, primarily Monokote is only designed and used on

17  structural steel.

18        THE COURT:  Where are you referring to Ms. Kearse.  I

19  apologize but this copy has some of the words cut off the left-

20  hand side.  If that's what you are referring to, I'm not sure I

21  can read it all.  I see the two highlighted.  One that talks

22  about the vermiculite plaster but that appears to be a casing

23  around the time so that doesn't appear to be the structural

24  steel.  The second one down below talks about full required

25  fireproof insulation that a ledge runners studs to the wall,

**J&J COURT TRANSCRIBERS, INC.**

1 screw frames.

2         MS. KEARSE:  Your Honor, I think on the other page is

3 if Mr. Egan is familiar with, the graph here is the structural

4 steel drawings.

5         THE COURT:  Oh, okay.

6         MS. KEARSE:  Your Honor, this is a representative of

7 the drawings on there but it is representative of the various

8 steel drawings that go throughout the building.

9         THE COURT:  So you are looking at the third and

10 fourth page.

11        MS. KEARSE: Yes, Your Honor.

12        THE COURT:  Not the first and second pages, okay.

13 What does this say, delete?  I apologize but I cannot read the

14 type, the copy is just too faded.  It looks like delete all but

15 I can't make out the rest, something tiles, types, something,

16 acoustical something.

17        MS. KEARSE:  Your Honor, it's showing the steel beams

18 just going throughout the building there and that were

19 highlighted with some asbestos on there.

20        THE COURT:  Okay, I'm trying to read what the

21 directions are.  Delete all something acoustical and I can't

22 make it out.

23        MS. KEARSE:  It looks like, Your Honor, delete all

24 looks like tiles acoustical on this, all types of acoustical

25 tiles.

1          THE COURT:  Okay.  And the point you are making is

2  that these are the types of beams that Monokote would be

3  applied to?

4          MS. KEARSE:  The steel beams, Your Honor, yes.

5          THE COURT:  Okay.

6  Q    Mr. Egan, on also that same document on the first page

7  there is a drawing if I may right here.

8  A    Yes.

9  Q    Is that something that Monokote would be applied to?

10         THE COURT:  Are you talking about the thing that says

11  tight miter joints?

12         MS. KEARSE:  It says fill in the gap with

13  fireproofing sprayed insulation.

14  A    On the wire.  That would -- it could be but typically that

15  was not where Monokote would be applied. It would be more of a

16  vermiculite plaster application.

17  Q    I believe in that same binder there is a document as well

18  with the letters, it's Exhibit Number 58 it has on there.  If I

19  represent to you this came out of the W.R. Grace files, it does

20  have on their the architects name and Your Honor the document

21  I'm showing.

22         THE COURT:  Yes, I see it.  Thank you.

23  Q    It has on their the architects name of Fred Bisotti and

24  Company.  Do you see that?

25  A    Yes.  In the corner.

**J&J COURT TRANSCRIBERS, INC.**

Egan - Cross/Kearse                    165

1  Q    And will you agree with me that is the same architect that

2  specified the Monokote in which we looked at previously?  If

3  you look on the front page of the specs?

4  A    Speech building.

5  Q    Yes.

6  A    Yes.

7            MR. FLATLEY:  Can you read that for us.

8  Q    At the bottom of the page, Fred Bisotti and Company

9  architects.

10  A    Well --

11  Q    I'm just asking you to agree with me the stamp on that

12  document and the stamp on the specifications is the same, is it

13  not?

14  A    One that says claim 6941A.  That's the Speech building in

15  Pullman, Washington.  And then on the other one I believe you

16  are referring to is very likely the same architect but it's for

17  a Humanities Experimental Theater Building, not the same.

18  Q    Okay, not the same on there but we've established outside

19  of the courtroom, Your Honor, that it is the same building.

20            MR. FLATLEY:  No, Your Honor.  We have not done that.

21            MS. KEARSE:  We did that before we started.

22            MR. FLATLEY:  No we did not.

23            MS. KEARSE:  Okay, well if I can get you my document.

24            MR. FLATLEY:  Your Honor, this document was not on

25  any specific list.

                    **J&J COURT TRANSCRIBERS, INC.**

1          MS. KEARSE:  I'm not going to refer to that document.

2    Your Honor, I don't know if this is appropriate.  We did have a

3    conversation that the documents were not being objected to,

4    Your Honor.

5          THE COURT:  I don't know what's objected to and

6    what's not.  All I can tell is that this document has an

7    entirely different name from the other building.  The other

8    documents are not referred to in any way as Humanities

9    Experimental Theater roof.  They are all referred to WSU Speech

10   Building or the DAG Building but not Humanities Experimental

11   Theater building.  If you can connect it up, fine but otherwise

12   they don't appear to be the same building.

13         MS. KEARSE:  Okay.  Your Honor, these documents were

14   produced all at the same time in Mr. Culver's deposition that I

15   have with me today.  I can tie that up with that and with other

16   documents there Your Honor.  But to the extent it had Mr.

17   Bisotti's name on it, that is the same name as the

18   specifications, correct?

19   A    Yes.  The cite for them is the same.

20   Q    And would you agree to me in the drawings that we have in

21   the specifications is the same type of drawing within this

22   document showing one inch applied of Monokote to that same type

23   of steel?

24   A    No.  They are not the same.

25   Q    Why are they not the same?

**J&J COURT TRANSCRIBERS, INC.**

1 A    Well one is a structural beam encased in metal lath and

2 vermiculite plaster per se and the other one is on a different

3 building a bar joist I believe that says was metal lath on one

4 side and a thickness of Monokote on the drawing.

5         MS. KEARSE: Your Honor, if I may.

6 A    With 58.

7         MS. KEARSE: Your Honor, documents will speak for

8 themselves but I'm going to show you.  Your Honor, exhibit,

9 part of this exhibit has a W.R. Grace stamp number 7190536

10 produced in Mr. Culver's deposition along with the other four

11 documents on there.  I do have a document and I can tie up Your

12 Honor and show them the theater and the speech building is all

13 the same building there.

14 Q    To the extent that this at least shows that building by

15 this architect showing a one inch thickness of Monokote, is

16 that correct?

17 A    It does state what you related, one inch minimum thickness

18 of Monokote in that sketch or drawing.

19 Q    Mr. Egan have you ever been out to Washington State

20 University?

21 A    Not to my memory, no.

22 Q    Do you know whether or not the Speech Building is the same

23 as the theater building?

24 A    No, you'd have to tell me that.

25         MS. KEARSE:  Your Honor, this came before I thought

**J&J COURT TRANSCRIBERS, INC.**

1  we had an agreement on there but I will show you a copy from

2  the webpage there that does show the speech building, the

3  theater building and it is all the same building on that.  If

4  Your Honor requires, I can also get someone else to say.  It is

5  also called the Theater Building with that.  I thought we

6  didn't have an objection to it.

7          THE COURT:  I'm not -- I understand that you are

8  saying that there is a drawing that says they want an inch

9  thickness of Monokote but the problem is I see all of these,

10 the witness is still saying that the plans say Monokote or

11 something else that's approved.  I still don't know whether

12 these are actual drawings from something that says that this is

13 what was installed or whether it is a sketch that says this is

14 what we want done.

15         So until somebody can tell me that these are building

16 drawings as the building has actually been put together as

17 opposed to sketches that say this is what we want, we're not

18 getting anywhere.  So let's go folks.

19         MS. KEARSE:  Yes, Your Honor.  And that's all I'm

20 saying Your Honor.  With this type of document that's also just

21 calling for fireproofing on that same type of structure.

22 Q    Mr. Egan, have you looked at any of the claims forms filed

23 in these cases?

24 A    Have I what?

25 Q    Looked at any of the claims forms in these cases?

Egan - Direct/Flatley                    169

1  A    No, which are  -- no I've only looked at what's here in

2  the binder.

3  Q    I'm not going to ask you about that then.

4  A    Okay.

5  Q    Mr. Egan, have you been asked to review files on behalf of

6  W.R. Grace for any of these buildings other than what we've

7  looked at today?

8  A    These projects, no.

9  Q    And in connection with this litigation have you been asked

10  to actually visit any buildings or to discuss any of this

11  information with prior employees of W.R. Grace?

12  A    No, I have not.

13  Q    Have you had any discussions with Mr. Culver in regard to

14  Washington State or the State of California with regard to any

15  of these buildings?

16  A    No, I have not.

17        MS. KEARSE:  That's all I have, Your Honor.

18        THE COURT:  Mr. Flatley.

19                    REDIRECT EXAMINATION

20  BY MR. FLATLEY:

21  Q    Just a couple of questions, Mr. Egan.  Early on in Mr.

22  Mandelsberg's cross examination he asked you about whether --

23  what responsibilities you had and various positions over the

24  years with W.R. Grace.  One of the positions you had was

25  National Fireproofing Products Manager, is that right?

**J&J COURT TRANSCRIBERS, INC.**

Egan - Direct/Flatley                170

1  A    That is correct.

2  Q    And for what year?

3  A    1969 to 1971.

4  Q    And your responsibility was nationwide during that period?

5  A    Yes.

6  Q    While you didn't get involved in particular deals in

7  California, you were responsible for sales in California during

8  that period?

9  A    Not responsible for sales but to support those areas by

10  California and others with technical data and support for

11  products in the fireproofing field.

12  Q    In that position your job wasn't limited to just the east

13  coast or the mid-west?

14  A    Oh, no, it was the entire country.

15  Q    Now you were asked some questions about testimony you had

16  given earlier about your competition and the amount of asbestos

17  that was in a product sold by your competition.  When you were

18  talking about products with substantially more asbestos, were

19  you talking about the spray fiber type of fireproofing?

20  A    Particularly yes, but there was also cementitious one or

21  two products that came out that had a lot more asbestos as part

22  of their formulation.

23  Q    You weren't saying that all the competition had

24  substantially more fireproofing?

25  A    I believe at that time including the fiber products there

**J&J COURT TRANSCRIBERS, INC.**

Egan - Recross/Mandelsberg                    171

1  was more as I may have debated.  How much more do you mean?  I

2  mean it was more, significantly more.

3  Q    Okay.  Now you were asked at some length about or equal

4  specifications.

5  A    Yes.

6  Q    Did or equal specifications give the architect the option

7  of going with a product other than Monokote 3 or some other

8  product which may have been named in the specifications?

9  A    Yes, it was generally accepted that from the governmental

10 specs like General Services Administration there had to be at

11 least, I believe it was a minimum of three product names in any

12 category to the fact that typically there were other products

13 offered for whatever the reason, availability, price, what have

14 you and the architect put or equal to make sure in the

15 documents that he could accept or review those substitutions.

16 Q    So even if other products weren't named, or equal gave the

17 architect the opportunity?

18 A    Well, it was up to them to prove they were equal.

19 Q    Thank you.

20       MR. MANDELSBERG:  Your Honor, just a couple of points

21 to clarify.

22                    RECROSS EXAMINATION

23 BY MR. MANDELSBERG:

24 Q    Mr. Egan, I understand your testimony just now about your

25 interfacing with other people at W.R. Grace who sold products

1 to California and in that respect your responsibilities I think

2 you said encompassed the entire country, right?

3 A    That's right.

4 Q    But let's just make sure I understand this and there is no

5 confusion, you never in connection with those interfacing

6 duties participated in any transaction that involved the sale

7 of MK3 or ZAP to any particular project that was being

8 constructed in California, as far as you recall, right?

9 A    No.  I provided technical information to support those

10 people selling the product that I did not interface with the

11 particular job.

12 Q    And in providing that technical information you don't have

13 any recollection of that technical information being utilized

14 in connection with any sales to anyone in the State of

15 California, do you?

16 A    Well, yes.

17 Q    You have a particular recollection of a particular

18 transaction.

19 Q    Well not a particular building but for example, Grace ran

20 a product technology school every year.  Salesmen were sent to

21 learn about products and I ran it for several years.  It was in

22 South Carolina.  People from California, people from all over

23 the United States came and all the products were discussed in

24 their technical requirement support and how to present these

25 products to architects professionally.

**J&J COURT TRANSCRIBERS, INC.**

1  Q    And that would be an informational session to make people

2  who are potential consumers of these products from around the

3  country aware of these products specifications and

4  characteristics in utility, correct?

5  A    That's correct.

6          MR. FLATLEY:  Objection, Your Honor, we're way beyond

7  this.

8          THE COURT:  Yes, we are.

9  Q    I just have one other question.  Sir, in your experience

10 were MK3 and ZAP used in the construction of schools, hospitals

11 and office buildings?

12 A    Can you repeat that?

13 Q    Yes.  In your experience at W.R. Grace and Zonolite were

14 MK3 and ZAP used in the construction of office buildings,

15 schools and hospitals?

16 A    Yes.

17         MR. MANDELSBERG: No further questions.

18         THE COURT:  Ms. Kearse.

19         MS. KEARSE:  No, Your Honor.

20         THE COURT:  Mr. Flatley.

21         MR. FLATLEY:  Nothing further, Your Honor.

22         THE COURT:  You are excused Mr. Egan.  Thank you.

23         MR. EGAN:  Thank you.

24         THE COURT:  Do you need time to contact witnesses so

25 that we can get your two witnesses from California finished?

**J&J COURT TRANSCRIBERS, INC.**

1          MR. MANDELSBERG:  I think a five minute break, Your

2    Honor, would be helpful for that but before we do that, the

3    State has an application to make relating to this case for

4    judgment given the proof unless there is any further witnesses,

5    the proof as offered by W.R. Grace.  We'd like to make that

6    application and be heard on it before any proof is offered by

7    the State of California.

8          THE COURT: I made an error that I need to go back and

9    correct and that was I promised Mr. Flatley that we would get

10   back to Ms. Kearse's objection to the fact that Mr. Flatley had

11   not offered exhibits, 6941, because he was in the middle of

12   another witness examination.  Then I neglected to do that Ms.

13   Kearse.  So I believe I do need to go back and have Mr. Flatley

14   correct that if you want to do that.

15          MR. FLATLEY:  Absolutely.

16          THE COURT:  So you are offering 6941?

17          MR. FLATLEY:  Well let me clarify Your Honor because

18   that's where we got off track before.  I am offering 6941B and

19   6941A and I'm only offering part of 6941C.  I'm not offering

20   the humanities, WSU Humanities document until and unless we can

21   get it straightened out.  That's a document that came out of

22   Grace's files but I can't connect it with the proper building

23   and I'm willing to talk to Ms. Kearse about trying to do that.

24   But I'm not offering.

25          THE COURT:  All right, C is five pages.  So what are

1    you offering in C?

2            MR. FLATLEY:  The first four pages but not the fifth.

3            THE COURT:  All right, so you are offering A, B and

4    the first four pages of C.

5            MR. FLATLEY:  That's correct, Your Honor.

6            THE COURT:  Okay, Ms. Kearse any objection to those

7    documents?

8            MS. KEARSE:  No, Your Honor.

9            THE COURT:  All right, they are admitted.  I

10   apologize for neglecting to get back to that.  All right, does

11   the debtor have other witnesses that you are going to call?

12           MR. RESTIVO:  We do not, Your Honor.

13           THE COURT:  All right, then the debtor is resting.

14   If you are going to make motions, why don't we take a five

15   minute recess or I'll say a ten minute recess and then we'll

16   start with motions if that is the case and well hear the

17   motions.

18                          (Break)

19           THE COURT:  Mr. Mandelsberg.  Oh, do we need Mr.

20   Flatley?  Do we need Mr. Flatley before Mr. Mandelsberg gets

21   started?

22           MR. RESTIVO:  We do not, Your Honor.

23           THE COURT:  Okay. Mr. Mandelsberg.

24           MR. MANDELSBERG:  Thank you, Your Honor.  At this

25   time, Your Honor, the State of California, Department of

1  General Services respectfully moves for judgment on 14 of the

2  15 claims given what we respectfully urge the Court recognize

3  is the lack of -- the failure of WRG to sustain their burden of

4  proof after the according prima facie validity to these claims.

5  Specifically, Your Honor, we request judgment as to claim

6  10648, 10649, 10650, 10651, 10652, 10653, 10654, 10655, 10656,

7  10658, 10659, 10660, 10661, and 10662.  I believe I have

8  included in my list just now one claim which actually is claim

9  number 10654 which is the one for which the PID objection was

10  withdrawn.

11        Your Honor, under Bankruptcy Rule 9015 in this

12  contested matter the Part 7 rule is applied and pursuant to

13  7054 and 7056 and Rules 54 and 56 we respectfully submit that

14  there is no factual issue any longer to be tried and the Court

15  should award judgment on these claims for the following

16  reasons.

17        First of all, Your Honor, as we have explained in our

18  brief, the burden of proof in a claims objection proceeding

19  such as this is under the case law such that the burden of

20  proof for bankruptcy claims alternates between a claimant and

21  debtor although the burden of persuasion always rests with the

22  claimant the burden of proof shifts after the presentation of

23  prima facie evidence.  The burden of going forward shifts to

24  the objector to produce evidence sufficient to negate this

25  evidence.  As we said in our trial brief, the objector's

**J&J COURT TRANSCRIBERS, INC.**

1 evidence under the <u>Allegheny Intern</u> case which both parties

2 have cited and <u>In Re: Holm</u> case which both parties have cited

3 the objector's evidence must be equal in force to the prima

4 facie case.

5        This could also be stated the Courts have said in

6 these cases that the objector must produce evidence which it

7 believed would refute at least one of the allegations that is

8 essential to the claims legal sufficiency.  Here, Your Honor,

9 with respect to the Department of General Services claims the

10 evidence that has been submitted such as it is by W.R. Grace

11 has essentially fallen into two categories.

12        Category one consists of the expert testimony offered

13 this morning by Dr. Lee.  Category two consists of the

14 testimony of Mr. Egan.  Dr. Lee's testimony insofar as it

15 relates to the DGS claims can be basically summed up this way.

16 As to 12 of the Department of General Services claim including

17 claim 10654 for which W.R. Grace withdrew their objection, he

18 has given those claims as he said the highest grade he can.

19 They are put in the category 9 consistent with WRG product.

20        He has acknowledge that what that means is that he

21 cannot opine that they do not contain the constituents that

22 would associate it with a WRG product Monokote 3 or Zonolite

23 Acoustical Plaster.  He has not impugned the integrity of the

24 MVA reports, the MVA lab.  In fact he described them as a good

25 lab this morning.  He has not said anything to challenge nor

1  does his report say anything to challenge the methodology,

2  scientific or otherwise, of the MVA report.

3       As to two claims, claims number 10651 and 10659 he

4  concluded that there was insufficient data.  But as to those

5  claims he testified that he could not say that they did not

6  contain W.R. Grace constituents that would associate it as a

7  W.R. Grace product.

8       So, Your Honor, with respect to the expert testimony

9  at most, given all due inferences to W.R. Grace's case the

10 Court could conclude that there is a possibility that there is

11 W.R. Grace product or that there is a possibility that there

12 isn't.  But he certainly hasn't presented evidence sufficient

13 to refute the prima facie validity accorded to the claim and he

14 certainly hasn't presented nor has counsel presented any

15 evidence to suggest that there was something mistaken about the

16 process that MVA went about.

17      As to one claim he did and that was claim number

18 10657.  That was the only claim of the 16 DGS claims that he

19 put into the category of wrong formula.  Arguably, Your Honor,

20 that might set up enough evidence to refute the prima facie

21 validity of the claim.  So as to the 15 claims that have been

22 either characterized as not inconsistent with W.R. Grace

23 product meaning that it could be W.R. Grace product, or

24 insufficient data meaning that he can't tell, we believe that

25 this does not satisfy the burden of proof that WRG had in this

**J&J COURT TRANSCRIBERS, INC.**

1 proceeding as to the GGS claims.

2        In addition, Your Honor, we think that Dr. Lee's

3 failure and the unexplained failure to indicate why his report

4 did not consider the supplemental information that had been

5 provided way back in September 2005 in connection with the

6 responses to the debtor's fifteenth omnibus objection when this

7 information was supplied as part of that submission and when

8 Dr. Lee's report as he acknowledged as dated January 2007,

9 which means that there was plenty of time to consider this

10 indicates that he did not for some unexplained reason consider

11 information that he should have had available to him for almost

12 two years.

13        As for the fact evidence that WRG has presented in

14 order to try to sustain their burden of proof, we submit that

15 it falls far short.  Not only did Mr. Egan admittedly not have

16 any knowledge about any of the DGS buildings nor did he

17 apparently have any specific information about the use,

18 installation or sale of products to anyone in particular in the

19 State of California, or for any particular building or project,

20 he could not state with any certitude whether or not his

21 specifications did or didn't ultimately call for the

22 constituent ingredients or products such as MK3 and ZAP that

23 comprised W.R. Grace products.

24        He had no specific knowledge about any of the

25 installations in any of the buildings. He did acknowledge that

**J&J COURT TRANSCRIBERS, INC.**

1  that sort of product was sold.  So at most, Your Honor, all

2  that proof adds up to in a general sense is that it could very

3  well be that these products were installed in these buildings

4  or it could very well be that they are not installed in these

5  buildings.  He doesn't know.  He didn't offer anything to

6  suggest one way or the other that it did.

7        So, Your Honor, these two components of proof all add

8  up to a question mark.  Not the sort of proof that would

9  sustain the burden that W. R. Grace was supposed to shoulder

10  today.  For those reasons, we respectfully request that

11  judgment should be entered on those 15 claims and that there is

12  no need to go any further at this time on this proceeding,

13  especially when one of the claims as to which the objection was

14  withdrawn this morning fell into precisely the same category.

15        MR. RESTIVO:  Objection, Your Honor.  Objection with

16  respect to a voluntary agreement to withdraw an objection to a

17  claim.  I think that is inadmissible to argue with respect to

18  those claims we are litigating.  If you want us to withdraw our

19  withdrawal of the product ID objection, we're happy to do that.

20        THE COURT:  I don't have any reason to know any basis

21  on which to know why the debtor has chosen to withdraw.  I can

22  read that they are in the same list.  But I don't know what the

23  supplemental information is.  So I agree that it is not a

24  relevant consideration.

25        MR. MANDELSBERG:  Nor do I, Your Honor.  I'm not

**J&J COURT TRANSCRIBERS, INC.**

1 suggesting that I have any information.  I'm just stating the

2 fact.  And I'm also stating the fact that as Dr. Lee's

3 testimony indicated this morning there is a relatively small

4 percentage, very small percentage of claims that he analyzed,

5 samples that he analyzed that he put into that is not

6 inconsistent with W.R. Grace product.

7         So it's not like a great number of claims were stuck

8 in that category, they weren't.  At any rate, Your Honor, I

9 don't want to repeat myself.  For those reasons, we believe

10 that judgment should be entered on the product ID objection as

11 to those 15 claims.  Excuse me, as to the 14 claims with one

12 being withdrawn and the only other claim, the claim as to which

13 the wrong formula category was classified, we're prepared to go

14 forward.

15         Thank you.

16         THE COURT:  Ms. Kearse.  Why don't you go first, Ms.

17 Kearse and then I'll hear from debtor.

18         MS. KEARSE:  Your Honor, the claim in 6941 also asks

19 for judgment to be entered and the fact that we met our prima

20 facie burden on the evidence there and W.R. Grace has not

21 negated the actual issues before the Court on whether or not a

22 Grace product is in the building.  Claim 6941 which is also

23 known as Daggy Hall and the speech building and the theater

24 building and I understand we have to tie that up, but it is in

25 our trial brief as that as well.  The building on the campus at

1    the Washington State University, W.R. Grace has the burden in

2    order to negate any of the facts that we have in our building.

3         Your Honor, just briefly with the evidence and my

4    claim is short is that there is prima facie evidence that shows

5    that there is a product within the buildings that contains 10

6    percent asbestos and 90 percent non-fibrous constituents.  As

7    Dr. Lee testified today and the documents show, that in and of

8    itself is consistent with a Grace product.  So that testimony

9    did not negate the fact that I have other evidence showing the

10   W.R. Grace product there.

11        Your Honor, the specifications that were entered into

12   evidence called for a product that shall be cementitious type

13   asbestos fireproofing material and that the material would be a

14   W.R. Grace approved material or approved Zonolite Monokote and

15   is specifically outlined in this specification Your Honor.

16        Furthermore, documents were entered showing a series

17   of documents from Mr. Culver on who we heard testimony oversaw

18   the Washington State region writing to various contractors

19   regarding the requirements for the asbestos Monokote within the

20   building, Your Honor.

21        Your Honor, based on a prima facie evidence --

22        THE COURT:  But Ms. Kearse, I did look at those and

23   all those letters say is if I look at the binder that has 6941

24   in it and I look at Exhibit C just to pick the first page of

25   that exhibit, March 4, 1971 letter addressed to Gordon Brown

1  Inc., the Washington University speech building bids Marc 16

2  with an approved applicator of Monokote specification.  We will

3  be advising the general plan holders that you will be bidding

4  it as approved applicators.  An addendum should issue changing

5  the rating and so forth and so on to three hours instead of

6  four.

7          So all that is saying is that Zonolite is going to

8  bid as one of the bidders.  Then the March 5th letter that

9  comes later, well I don't believe that's in evidence yet.  So I

10 guess I can't refer to that yet.

11         MS. KEARSE: I thought the March 5 -- that one is Your

12 Honor.

13         THE COURT:  Oh it is in.  It's the next page that's

14 not.  Then the March 5 letter which is also by Mr. Culver

15 addressed to a variety of contractors says as required by the

16 fireproofing section of the specifications for the subject job,

17 the following are approved applicators of Zonolite Monokote.

18 And then it lists among others, for example Gordon Brown, the

19 entity that received the first letter.

20         So all that is saying is that here are a list of

21 applicators.  If you are going to choose Monokote, here are the

22 entities that can apply it.  It's not saying that here you've

23 won the bid.  It's just saying that we're going to bid and oh,

24 by the way, if we get it here's who is qualified to put it in.

25         So I don't think these letters still go to prove that

**J&J COURT TRANSCRIBERS, INC.**

1  in fact this product was put into the building.  It does

2  definitely show that there was interest by Zonolite in getting

3  its Monokote product into that building, there's no doubt about

4  that.

5       MS. KEARSE:  Your Honor, I believe coupled with the

6  other evidence that is before Your Honor and I can explain the

7  document.  We've looked everywhere for more documents and they

8  just don't exist on that but that is more of our investigation

9  of trying to unturn everything and business is out and document

10 policies there, we've attempted to do as much as we can with

11 the document train with that.

12      But Your Honor, to the extent we have specifications

13 that call for W.R. Grace going out there to actually promote

14 their product there in this region and the series  of letters,

15 being very aggressive with that, the standard of more likely

16 than not coupled with what we have now in the building of a 10

17 percent, 90 percent asbestos product.  Mr. Lee testified -- Mr.

18 Egan testified today that all his competitors had significantly

19 more asbestos, even the cementitious products there.

20      So I think that coupled with the specifications and

21 some of the testimony today does not negate that there is no

22 testimony as to W.R. Grace.  And Your Honor, subject to my

23 motion this morning Dr. Lee came in today and could not opine

24 with any scientific certainty one way or the other whether or

25 not there was Monokote in the building.  On that Mr. Egan also

**J&J COURT TRANSCRIBERS, INC.**

1 had no specific knowledge as to whether or not.  So they have

2 not negated anything one way or the other whether or not

3 Monokote was there.

4          So even if the burden were to change over I think

5 more likely than not based on the evidence before Your Honor,

6 we have Monokote in the building and it's an issue of how much

7 Monokote we have.

8          THE COURT:  Okay.  Mr. Restivo.

9          MR. RESTIVO:  May it please the Court, while the

10 arguments the Court has just heard utilize some of the buzz

11 words from the briefs such as burden of persuasion, burden of

12 proof, prima facie evidence and shifting of the burden, the

13 ultimate argument you have just heard Your Honor is that the

14 burden of proof is on W.R. Grace to disprove the existence of

15 its product in these buildings.  That is not the law.

16          A claimant has the ultimate burden of proof or burden

17 of persuasion and I will try to run that through the buzz

18 words.  Apparently, as I am understand it when a claim is filed

19 it has prima facie validity.  Assuming I am correct on that, we

20 have put on expert testimony and factual testimony which shows

21 that there is not prima facie validity to the claim, that the

22 bulk samples submitted do not show that this is a Grace

23 product.

24          I can see and Dr. Lee can see it, based on the

25 information provided by the claimants he cannot in most

1 instances opine to a reasonable degree of scientific certainty

2 that a particular product is not a Grace product.  That is not

3 why he took the stand.  What he has testified to is that if you

4 do not have information with respect to the components of the

5 formula for a product, then one cannot scientifically make a

6 conclusion as to whose product it is.

7         So, with respect to the acoustical plaster claim it

8 is not enough to say 10 percent asbestos and 90 percent

9 something else.  The same is true with MK3.  It's not enough to

10 say it has 10 percent chrysotile 90 percent other stuff,

11 therefore it is MK3.  You also heard testimony with respect to

12 MK3 from the expert that the percentages of chrysotile,

13 vermiculite and gypsum in Monokote 3 and U.S. Gypsum's fire

14 code V are the same.

15        There is a difference however between those two

16 products.  The difference is fire code V contains starch,

17 processed starch.  There is expert testimony and it is the only

18 testimony you've heard so far from Dr. Lee that the

19 laboratories do a chemical test for processed starch.  And his

20 laboratory calls it an iodine test.

21        Without that test a claim alleging that fireproofing

22 material is MK3 based upon a bulk sample is not prima facie

23 valid based on the testimony.  Therefore, Your Honor, the

24 burden has shifted back where it belongs ultimately to the

25 claimants who must prove product identification to attempt to

1 show why the bulk samples or the other evidence establishes

2 more likely than not to a preponderance of the evidence that

3 the products which are the basis of their claims are in fact

4 W.R. Grace products.

5       The motion should be denied.  They should be put to

6 deal with the burden that has now shifted to them and they

7 should be put to the ultimate burden which we don't believe

8 they will be able to meet with respect to these buildings.

9 Thank you, Your Honor.

10       THE COURT:  Mr. Mandelsberg.

11       MR. MANDELSBERG: Your Honor, two points that I think

12 should be made listening to Mr. Restivo's comments.  One is

13 that I think the Court should recognize the distinction between

14 what counsel says and what the proof was.  I listened very

15 carefully and I agree that Mr. Restivo would have wanted Dr.

16 Lee to testify to the effect that in his opinion it is not

17 possible to a reasonable degree of scientific certainty to

18 establish that using any of the tests that my client performed,

19 that there was present MK3 or ZAP in the samples tested.

20       That's not what Dr. Lee testified to.  That's not

21 what his report attested to.  That's not what the debtor's

22 disclosures filed on April 13 describing what Dr. Lee would

23 testify to said.  What Dr. Lee testified to was something

24 different.  He did not opine that you can't do it.  For if he

25 had opined that you couldn't do it there would be no rational

**J&J COURT TRANSCRIBERS, INC.**

1  reason for conducting an analysis and rendering a report and

2  issuing charts that classified claims as not inconsistent with

3  W.R. Grace product.

4         So, Your Honor, there is a considerable difference

5  between what Mr. Restivo just said Dr. Lee testified to and

6  maybe that's what he really is arguing and wanted and what Dr.

7  Lee testified to here today.

8         Second point, Mr. Restivo just mentioned that and

9  offered that there was a flaw in effect to the DGS claims

10  methodology.  And that flaw he says was that there wasn't a

11  necessary starch test done.  Now put aside for the moment any

12  information that the Court might hear about that.  And assuming

13  for argument sake that Mr. Restivo and Dr. Lee were correct,

14  the Court would then have to before it that testimony and Dr.

15  Lee's report and testimony today that despite his statement

16  that a starch test needed to be performed in order to detect

17  the presence of these constituents, he nonetheless classified

18  12 of the state's claims in the non inconsistent with WRG

19  product category.

20         Why if a necessary test that had to be performed in

21  order to determine that there is W.R. Grace in the sample would

22  he so classify them.

23         THE COURT:  In the non inconsistent?

24         MR. MANDELSBERG:  In the non inconsistent.

25         THE COURT;  Well because being non inconsistent

**J&J COURT TRANSCRIBERS, INC.**

1  doesn't mean that you've met the burden of showing that it is.

2  Non inconsistent and are, are two different standards.

3      MR. MANDELSBERG:  That's correct, Your Honor.  Except

4  that the starch test is not something that he referred to in

5  his original report, it's something he said today.  And the

6  starch test is not something that even if he didn't say it in

7  his original report he amended his report or said anything or

8  put any asterisk on it to change his conclusion that these were

9  not inconsistent with W.R. Grace product.

10      He does have categories of wrong formula. He has had

11  categories where it's not W.R. Grace product because there is a

12  presence of a component that isn't in the W.R. Grace formula.

13  He didn't do that.

14      THE COURT:  Yes, that's because you don't know if the

15  starch is there if the test isn't done.  So the reason it's not

16  inconsistent is because the necessary test to determine, to

17  rule out, it's like a medical test where you go get a test to

18  rule out something.  The test doesn't rule out the fact that

19  the starch isn't there.  And the problem is that there are two

20  products that are virtually identical and the only way to tell

21  the difference is to know whether or not -- to do the starch

22  test to find out whether the product does or doesn't have

23  starch.

24      That seems to be the problem.  So it is not

25  inconsistent with the Grace product because you don't know

1 whether it does or doesn't have the starch.  So if it doesn't

2 have the starch then it's a Grace product and if it does have

3 the starch it's not a Grace product.  It's apparently a pretty

4 simple test.  You know you get a little drop of iodine, you

5 drop it on the stuff like you did in high school.  The doctor

6 said you do it like you tested starch in a potato in high

7 school.  That was, even I passed that test.

8         MR. MANDELSBERG:  Your Honor, if we have to go

9 forward you'll hear about a test being performed.  But put that

10 aside, Dr. Lee didn't having concluded now that that starch

11 test wasn't performed, he didn't change his conclusion about

12 non inconsistent.  I realize --

13         THE COURT:  Of course because it isn't inconsistent

14 until you do the test.  Then it's only inconsistent if the

15 starch shows up.  If the starch doesn't show up, you've proven

16 your case.  But until you do that test, you haven't proven the

17 case.  That's the problem.  That's what Dr. Lee is suggesting.

18         MR. MANDELSBERG:  Your Honor, if what Dr. Lee was

19 saying is that if you only perform the starch test, you would

20 have proved your case, then he would have for these 12 claims

21 --

22         THE COURT:  For these 12 that are not inconsistent

23 because they have met the other standards that are applicable.

24         MR. MANDELSBERG:  Yes, and if that were the only

25 issue in this case or the only issue as to those claims, it

**J&J COURT TRANSCRIBERS, INC.**

1  would be a simple matter to resolve it.  I submit that Dr. Lee

2  was not concluding that there was anything else deficient about

3  it. He didn't put any asterisks or bells and whistles or

4  questions as to these claims as he did for many, many others.

5  That just adds up to a question mark that I don't think is

6  sufficient to shoulder their proof.

7         THE COURT:  Give me an example of one of the exhibit

8  numbers with respect to this, where one of his charts are with

9  one of your claims.  10658, is that one of them?

10        MR. MANDELSBERG:  Sure, Your Honor.

11        THE COURT:  Debtor's 56 is 10658, is that one of the

12  claims?

13        MR. RESTIVO:  Are you talking fireproofing or any

14  claim, Your Honor?

15        THE COURT:  I'm talking one of the California State

16  claims on which I'm being asked to render judgment at this

17  time.

18        MR. MANDELSBERG:  Well, Your Honor, if you were to

19  look at their Exhibit 46 --

20        THE COURT:  46, all right.

21        MR. MANDELSBERG:  -- and you were to look at claim

22  number 10648, you'll see that there were several MVA samples

23  analyzed, I think this is N0038 and you do have Dr. Lee being

24  able to conclude without mentioning anything about starch, that

25  as to 12, they are not insufficient with -- not inconsistent,

1  excuse me, with Grace formula.  8, not Grace.  Insufficient

2  data, 29, and then wrong components, wrong formula, there was

3  no reference.  So, this is an example of how Dr. Lee is able

4  and he did this throughout his report, to classify different

5  samples for specific reasons, without any reference to starch

6  or not starch deaths.

7           THE COURT:  All right.  Well if I recall his

8  testimony correctly with respect to this type of chart, his

9  report indicated that from taking a look at the supporting

10  data, for example, if I take the first one that's listed as a

11  possible not inconsistent, this would be, it's about five or

12  six lines up from the bottom 34-1-8-03-FP-1.  It's got price of

13  tile is 11 percent, vermiculite is 34 and gypsum is 55, that

14  those are all within the ranges of use of Grace formula at the

15  time that the particular product was alleged to have been

16  installed in this specific building at the time that Grace was

17  using the formula for MK3.  So, because those formula factors

18  were consistent with Grace's use at that time and there were no

19  other trace elements, that he was able to identify from that

20  report, he listed them in in the not inconsistent category.

21  So, that's all his report is saying.  That as to those there is

22  evidence from the reports that means that at least this

23  claimant has at least shown that there is something consistent

24  with being a Grace product, but that doesn't mean that there's

25  proof that it's a Grace product, it just means that it's

**J&J COURT TRANSCRIBERS, INC.**

1 consistent with being a Grace product.

2       MR. MANDELSBERG:  His testimony also was, I think.

3 Your Honor, that those same numbers, 11, 34, 55, would be not

4 inconsistent with a U.S. gypsum fire code V.  They have the

5 same components.

6       THE COURT:  And that's the issue.

7       MR. RESTIVO:  That was one instance, Your Honor.  I

8 realize that that's the issue, but I also realize, and would

9 ask the Court to take note of the fact that Dr. Lee didn't have

10 any other category beyond not inconsistent with Grace formula.

11 In other words, he has testified and his disclosures indicate

12 that there is a formula for these two products.

13       THE COURT:  Right.

14       MR. RESTIVO:  He has set forth the constituents in

15 ranges.  It's not like he has had any category that says, this

16 positively matches WR Grace, so the best you could do in his

17 formulate is not inconsistent with WR Grace.

18       THE COURT:  Yes, and there's a reason for that,

19 that's because apparently he never got a starch test.  If he

20 has a starch test that shows the results of a starch test and

21 the starch test is either positive or negative, then he has to

22 add a category, in fact, two categories.  One that says this is

23 a Grace product or it's not a Grace product because at that

24 pont in time, at least according to the testimony I have here

25 without having gone through the exhibits, I put that caveat in

1  because I'm only at this point talking about his testimony with

2  respect to MonoKote and Fire Code V, MonoKote 3 and Fire Code

3  V.

4          As to those two products, if one of them has starch

5  and the other doesn't that clearly excludes the other product,

6  that is apparently the determining factor.  What I don't know

7  from the report at this point is whether that's the determining

8  factor for all of Grace products.  It's clearly the determining

9  factor for MK3 and for Fire Code V.

10         MR. MANDELSBERG:  Your Honor, we're prepared to

11 establish to the Court's satisfaction that the necessary test

12 was done but since you haven't yet heard that testimony, I'm

13 not going to rely on it.  I am going to point out that I don't

14 believe the issue of the starch test was ever referred to in

15 Dr. Lee's report of January 2007 and, therefore, this inclusion

16 of a starch test as an extra element that is dispositive, did

17 not lead him to change as he might have today, his testimony

18 about not inconsistent with WR Grace product and I realize that

19 that may be a sufficiently vague, semantical catchall to save

20 that opinion but I don't believe it's proper for the Court to

21 conclude, or if it does conclude I think the Court or does

22 consider, the Court should take note of the fact that this

23 starch test element is something that wasn't in his January

24 report.

25         THE COURT:  His report is not in evidence.

1           MR. MANDELSBERG:  His report may not have been in

2  evidence, but his report was referred to several times.

3           THE COURT:  Well, but his report is not evidence that

4  I can consider.  What I have is his testimony and his testimony

5  was pretty clear about the starch test.  So, I haves to rely on

6  the evidence and in relying on the evidence, the evidence seems

7  to me to indicate that he was fairly clear.  There is one

8  determining factor between MK3 and Fire Code V and that is the

9  starch test and it's not the starch test for particulates but

10 it's the starch test for the chemical factor reaction.  He was

11 very clear about that.

12          I think based on this record, that the Debtor has

13 sustained its burden of overcoming a prima facie validity based

14 on the evidence that I've heard and that the claimant does have

15 the burden of persuasion and has to go forward with its

16 evidence.  So, I'm going to overrule the motion for judgments,

17 both as to the California claimants and as to Ms. Motley's

18 client at this point for the University of Washington,

19 Washington State University claim. I think there is enough

20 evidence to defeat the prima facie case and go forward at this

21 time.  Do you need a recess to call your witnesses?

22          MR. MANDELSBERG:  Your Honor, I think they are

23 patched in, but just to make sure that we don't have any

24 delays, a five minute recess to make sure that they're on would

25 be fine, and I think we will wish to begin with Mr. Hood.

1          THE COURT:  All right.

2          MR. MANDELSBERG:  I would just say before that, so

3   the Court has the necessary documents, we did submit, and I

4   believe the Debtors submitted a binder of the State's papers

5   and the Court should have Mr. Hood's declaration as well as Mr.

6   Connor's declaration.  And, those declarations were and are to

7   be submitted in lieu of direct testimony.  There is a brief,

8   after discussion with counsel, a brief direct that I will wish

9   to open with regarding just the limited matter of laying the

10  foundation for certain items of the proof of claim forms.  I

11  don't think there's going to be an objection to that and then

12  after that, we would suggest the declarations be received as

13  the direct testimony and counsel for WR Grace could proceed

14  with cross.

15         THE COURT:  All right.  I do have the declaration

16  Glen Connor, which is in the supplemental index which is, I'm

17  not sure, it's dated actually, but it's for the PID hearing

18  that is listed at the bottom as taking place April 23rd to

19  25th, commencing at 9 a.m. and that is at Tab 8, and I have at

20  Tab 9, the declaration of Dan Hood, I have at Tab 7 the

21  declaration of Tim Vander Wood.

22         MR. MANDELSBERG:  Yes, Your Honor.  Those are the

23  witnesses that we are going to be calling, Messrs. Hood and

24  Connor are going to be available by phone and Mr. Vander Wood

25  is in the courtroom.

1        THE COURT:  All right.  So I have those declarations.

2        MR. MANDELSBERG:  Thank you, Your Honor.

3        THE COURT:  All right.  We'll take a -- Mr. Restivo?

4        MR. RESTIVO:  If I understand it, with respect to Mr.

5   Hood and/or Mr. Connor, notwithstanding the declaration, you're

6   going to put some direct testimony on and then move the

7   declaration?

8        MR. MANDELSBERG:  Yes.

9        MR. RESTIVO:  And how long -- we have a little bit of

10  a deadline today.  How long are you going to have for direct

11  and are you going to do the same thing with Mr. Connor?

12       MR. MANDELSBERG:  I expect I will have no more than

13  five minutes for Mr. Hood, and depending on your cross, it may

14  not be necessary to do the same for Mr. Connor.

15       MR. RESTIVO:  Thank you.

16       THE COURT:  Okay.  We'll be in recess until quarter

17  till three?   Is that enough time?  Ten minutes?

18       MR. MANDELSBERG:  That's fine, Your Honor.

19       THE COURT:  All right.

20       MR. MANDELSBERG:  Thank you.

21       MR. BAENA:  Before we go off, could I just ask a --

22       THE COURT:  Yes.

23       MR. BAENA:  Your Honor, perhaps I got

24  (indiscernible).

25       UNIDENTIFIED FEMALE SPEAKER:  I can't pick you up,

**J&J COURT TRANSCRIBERS, INC.**

1  Mr. Baena.

2        MR. BAENA:  I thought there was a colloquy between

3  the Court and Mr. Restivo about updating Dr. Lee's report to

4  conform with information that was obtained subsequent to the

5  rendering of that report.

6        THE COURT:  Mr. Restivo indicated that he had not

7  offered Dr. Lee's report.  I suggested simply that I thought it

8  would be advisable to take out for purposes of making sure that

9  this record reflected the exhibits that followed the report,

10 those claims that were not in the table that was in the

11 doctor's report and I simply as striking out on that report the

12 claim numbers that Mr. Mandelsberg said were no longer relevant

13 in that report because the Debtor had either withdrawn them or

14 there was some supplemental information that had been

15 submitted, that's all.

16        MR. BAENA:  But it was the report that was to be

17 updated.

18        MR. RESTIVO:  Only the numbers on the tables in the

19 report, not the verbiage of the report or anything else, just

20 --

21        THE COURT:  The report is not in evidence and it's an

22 irrelevancy, I simply was trying to make sure that the exhibits

23 that were attached reflected what was in the report.  I was --

24        MR. BAENA:  In all due respect, Judge, an expert's

25 report is not an irrelevancy --

**J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  It's not in evidence, it is not evidence

2    that I can consider.  No one has moved it into evidence and it

3    is not evidence that I can consider.

4          MR. BAENA:  (Indiscernible) --

5          THE COURT:  Gentlemen, it's not evidence.  It's not

6    in evidence.  This is my ruling with respect to the report.  It

7    doesn't matter whether it's updated or not, it's not in

8    evidence.  I thought that someone was going to be offering the

9    report, it has not been offered.  It is not in evidence.

10   Whether it is updated or not, is an irrelevancy.

11         MR. BAENA:  Well, is the Court saying that on their

12   case in chief, claimants can't offer that report?

13         THE COURT:  I'm not saying anything, Mr. Baena.  And

14   number one, number two, I mean you haven't participated, so I'm

15   sure what objection you're raising, so would you like to tell

16   me, what standing are you offering so that I can understand the

17   context in which you're raising the objections, number one.

18         MR. BAENA:  You offered me the opportunity to

19   cross-examine that --

20         THE COURT:  And you declined.

21         MR. BAENA:  -- and I declined.

22         THE COURT:  So, what objection are your raising?

23   You've taken no part in this.

24         MR. BAENA:  I'm not raising an objection at all, I

25   asked for a clarification.  I started this by --

1          THE COURT:  The clarification is that the report is

2 not in evidence, and on top of that, someone went through with

3 Mr. Lee and asked him about the supplemental line on the chart

4 that is Exhibit 4 --

5          MR. RESTIVO:  Table 1, Your Honor.

6          THE COURT:  No, it's not Table 1.  It's Exhibit,

7 Debtors Exhibit --

8          MR. McCAHEY:  Are you talking about the flow charts,

9 Your Honor, Exhibit 4?

10          THE COURT:  Yes.  No.

11          MR. RESTIVO:  Your Honor, with respect to a number of

12 claims, the last entry on the colored chart is an MVA entry

13 which is what Dr. Lee said was added.  You can tell because it

14 says MV or MVA on the last entry.

15          THE COURT:  Yes.  One specific exhibit, but I'm not

16 sure which one now, I apologize, but someone asked him about

17 that, I'm sorry -- 4?  No, it's not 4.  Someone asked him to

18 explain that and his explanation is now on the record.  So,

19 what I was trying to get accomplished was done by a witness

20 anyway and it wasn't necessary to delete the information from

21 the table.  The witness explained the clarification in the

22 context of the exhibit, I just don't happen to recall which

23 exhibit it was now.

24          MR. RESTIVO:  Your Honor, Exhibit 48, for example,

25 okay, on the color coded first page of that exhibit, you will

**J&J COURT TRANSCRIBERS, INC.**

Hood - Direct/Mandelsberg                      201

1  see three bulk samples, the third of which has an entry MVA

2  5394.  I believe the testimony is, Dr. Lee only had the first

3  two samples on 10650 and his report only reported out two

4  samples, when he got the additional information that was the

5  third sample and it was corrected on these sheets, we did not

6  go back and change the numbers on his expert report.  So, each

7  of the sheets, at least for the California buildings, you'll

8  see the last bulk sample starts with the letters MVA and that's

9  the additional information he got that's added.

10         THE COURT:  Yes, and that is the exhibit that was

11  pointed out and that was his explanation.  So, he clarified the

12  discrepancy between his report and the exhibits that I was

13  attempting to get clarified on the record to explain the

14  discrepancy, but it's irrelevant because at this point his

15  report is not in evidence.  So, the exhibits have now been

16  clarified, what I was attempting to do has been done as a

17  matter of evidence and the report is an irrelevancy.  We will

18  now reconvene at ten till four, Mr. Mandelsberg.  We're in

19  recess.

20         MR. MANDELSBERG:  Thank you, Your Honor.

21             (Short break in proceedings)

22         THE COURT:  Go ahead, Mr. Mandelsberg.

23         MR. MANDELSBERG:  Your Honor, at this time, the State

24  of California, Department of General Services calls Dan Hood as

25  its first witness.  I believe Mr. Hood is on the phone.  Mr.

**J&J COURT TRANSCRIBERS, INC.**

Hood - Direct/Mandelsberg                    202

1  Hood, can you confirm that, please?

2           MR. HOOD:  Yes, I'm on the phone.  Good afternoon.

3           THE COURT:  Good afternoon.  Let me do two things,

4  Mr. Hood.  First of all, can court call turn the system up, and

5  Erin, can you turn the fan off and then when we're done with

6  court, turn it back on.  Yes, he'll have to be sworn, as soon

7  as we can hear him.

8           All right.  Mr. Hood, I'm going to have the court

9  recorder administer the oath to you.

10          MR. HOOD:  Okay.

11          THE COURT:  Jan.

12          MS. HELLER:  Sir, raise your right hand.

13 D A N  H O O D, WITNESS SWORN:

14          THE COURT:  Is there any possibility of getting his

15 microphone turned up?

16          UNIDENTIFIED MALE SPEAKER:  Your Honor, I'm having --

17 this is the operator, I'm having a little difficulty

18 (indiscernible).

19          THE COURT:  I'm sorry, I can hardly hear you.

20          UNIDENTIFIED MALE SPEAKER:  Can you hear me now?

21 This is the operator.

22          THE COURT:  No.  Mr. Hood?

23          THE WITNESS:  Yes.

24          THE COURT:  Okay, that's better, go ahead Mr.

25 Mandelsberg.

                    **J&J COURT TRANSCRIBERS, INC.**

1          MR. MANDELSBERG:  Thank you, Your Honor.

2                      DIRECT EXAMINATION

3  BY MR. MANDELSBERG:

4  Q    Mr. Hood, this is Steven Mandelsberg from Hahn and Hessin,

5  we represent the State of California, Department of General

6  Services.  I'm going to ask you some questions.  Before I do

7  so, sir, I want to confirm just a few things.  Do you have in

8  front of you or accessible to you, copies of the Department of

9  General Services trial exhibits?

10 A    Yes.

11 Q    And do you also have in front of you a copy of, or

12 printout of two exhibits involving USG claim forms that were

13 provided by WR grace counsel and then provided to you?

14 A    I have those.

15 Q    Thank you.  Now, sir, I'm going to ask you if you recall

16 signing a declaration in this matter?

17 A    I have.

18 Q    And do you have a copy of or you're familiar with that

19 declaration?

20 A    It's in front of me right now.

21 Q    And, did you sign that declaration?

22 A    I did.

23 Q    And that declaration is accurate to the best of your

24 knowledge, is that correct?

25 A    Yes.  I'd like to take one opportunity to point out a

**J&J COURT TRANSCRIBERS, INC.**

1 typo, if you don't mind.

2 Q    Well go right ahead.

3 A    I served as the project manager for the asbestos program

4 from May 87 until October of 2004.

5 Q    Okay, thank you.  That's in the first sentence of the

6 first paragraph, correct, sir?

7 A    That's correct.

8 Q    Now, Mr. Hood, I'm just going to ask you some brief

9 questions and then you'll be asked some questions by counsel

10 for WR Grace.  Are you familiar, sir, with the proof of claim

11 forms that were submitted in this proceeding reflecting the 16

12 proofs of claims filed by the Department of General Services

13 against WR Grace?

14 A    Yes, I am.

15 Q    And, you're familiar, sir, that in the proof of claim

16 forms, there are questions in the forms, on each of the forms,

17 about the dates of when the building involved was constructed

18 and the dates when asbestos containing materials were

19 installed.  Are you familiar with those questions in each of

20 those forms, sir?

21 A    Yes.

22 Q    Could you tell the Court what was the source of the

23 information that led to the insertion of the dates in response

24 to those proof of claim forms queries?

25 A    Well, prior to the inception of the asbestos program in

1  1986, there was no state wide inventory of buildings, so when

2  we decided to survey building in the state, it was necessary

3  for us to go to each of the departments who furnished the

4  information of the year built of each building.

5  Q    And was there any sort of computer or other database

6  maintained as part of this program to which you referred?

7  A    Our asbestos program initiated a database based upon the

8  information we received from each of the departments.

9  Q    So, sir, were the answers to the questions on the forms

10 about the dates of the building construction and installation

11 of asbestos derived from those answers to questionnaires from

12 these various departments?

13 A    It was.

14 Q    And was that database a business record of the State of

15 California, or one of its departments?

16 A    It is, yes.

17 Q    And, is it the case that you reviewed the database

18 questionnaire answers in order to fill in the information on

19 each of the proof of claim forms requesting when the particular

20 building was constructed or when asbestos was installed?

21 A    That's what we did.

22 Q    And, you see also, sir, that in each of the forms there is

23 a question that asks for the identification of the type of

24 asbestos, see that?

25 A    (Inaudible).

1  Q     Or let me rephrase that.  I don't want to waste time with

2  having you go through it.  Are you familiar with the proof of

3  claim forms requesting that each claimant identify the type of

4  asbestos involved?

5  A     Could you just point out the question number on the claim

6  form?

7  Q     Sure.  Sir, I'm looking at DGS-2A as an example claim

8  form, but question number 13 in Section C, entitled Category 1

9  claim, is the question I was referring to or alluding to, it

10 says, for what alleged asbestos containing products are you

11 making a claim and then there is a box, MonoKote 3 fireproofing

12 installation, another box other and then the word specify with

13 another box where a claimant might specify anything relating to

14 this inquiry.  So, that's the form question I'm referring to.

15 A     Yes.  I'm familiar with those questions.

16 Q     And, is it the case, Mr. Hood, that the information that

17 was used in this particular exhibit, for example, for MonoKote

18 3, based upon reports that had been prepared and submitted from

19 MVA scientific consultants?

20 A     In every case, yes.

21 Q     Okay.  And, is it the case that the MVA scientific

22 consultants reports were provided to correspond with the proofs

23 of claim?

24 A     They are, yes.

25 Q     And, I believe this is referred to in your declaration,

1 but just to make clear, and was it you who assembled the proof

2 of claim documentation so that the MVA reports corresponded

3 with each particular building or building address that was

4 associated with each claim?

5 A    We did that in our department.

6 Q    And, were you involved supervising or coordinating that in

7 your department?

8 A    For this activity, yes.

9        MR. MANDELSBERG:  Okay.  I have nothing further, Your

10 Honor.  I move the declaration as well as the exhibits referred

11 to in that declaration as to which WR Grace has not objected to

12 many, including Exhibits 1c, 1d, 1e, 1f, 1g, 2c, 2d, 2e, 3c,

13 5c, 5d, 5e, 5f, 5g, 6c, 6d, 6e, 6f, 7c, 7d, 7e, 8c, 9d, 10c,

14 10d, 10e, 10f and 10g and 11c and 11d.  All the exhibits I just

15 mentioned fall into the description of architectural plans for

16 buildings, the subject of claims number 10648, 10649, 10650,

17 10652, 10653, 10654, 10655, 10656, 10657, and 10658.

18        I'd also note that among the exhibits that WR Grace

19 did not object to, that are referred to in the declaration are

20 Exhibit 13b which is the MVA report for claim number 10660,

21 Exhibits 13c and 13d, which are the architectural plans for

22 building subject to claim number 10660, 14b, the MVA report for

23 claim number 10661, 14c, the architectural plan for building

24 subject of claim number 10661, 14d the homogenous material

25 assessment report, bulk sample summary report of GSA asbestos

**J&J COURT TRANSCRIBERS, INC.**

1  survey, building specifications for building subject of claim

2  number 10661, 15b, the MVA report for claim number 10662, 15c,

3  15d, 15e, 15f, and 15g, architectural plans for building

4  subject of claim number 10662.  15h, asbestos management plan,

5  GSA asbestos survey, asbestos containing material inspection

6  form and chain of custody records.  16b MVA report for claim

7  number 14411.  16c, 16d, 16e, 16f, and 16g, architectural plans

8  for building subject of claim number 14411.

9           Also Exhibits 18 and 19, which are WR Grace's

10 responses to first set of interrogatories and first request for

11 admission.  Those are not referred to in the Hood declaration,

12 Your Honor, but they are exhibits to which no objection has

13 been lodged.

14           And, I believe those are the exhibits referred to in

15 Mr. Hood's declaration that have not been objected by WR Grace.

16 As to the others, we would offer them in evidence as business

17 records.  No further questions, Your Honor.

18           THE COURT:  Okay.  You went to fast through the first

19 set, so I did not get a list of everything that you're offering

20 as not objected to.  So, where is the list of objections

21 because I think what I can gather from the list that you read

22 is that everything attached to the declaration in little a

23 through nn, I think, are unobjected to and then I got -- I

24 caught up with you, starting with Exhibits 13b.

25           MR. RESTIVO:  Might I respond?  I won't ask him to

**J&J COURT TRANSCRIBERS, INC.**

1  repeat what he just said, but I had trouble following all these

2  numbers also.  Let me see if I can't break this down.

3         We do object at the present time to their Exhibit 17,

4  which is a collection of the MVA reports.  We understand

5  there's going to a witness and they may come in that way, but

6  right now they're pure hearsay.

7         We object to the admission of Exhibits 7a to f

8  because that relates, Your Honor, to the claim where we agreed

9  to withdraw our product identification objection and we don't

10 think that withdraw -- we don't think those documents are

11 relevant any more.

12        We object to Exhibit 3d --

13        THE COURT:  3d as in dog?

14        MR. RESTIVO:  3d as in dog.  That, Your Honor, I

15 believe is a December 1, 1950 letter talking about vermiculite

16 plaster in 1950 when the building in claim 10650 was built in

17 1969 and we don't know what the relevance of a 1950 letter is

18 to a building constructed 19 years later, unless we're missing

19 something.

20        THE COURT:  Are those the only objections?

21        MR. RESTIVO:  And lastly, Your Honor, we do not

22 object to, but think the use of the letter a exhibits, 1a, 2a,

23 3a, 4a, that is the claim forms, ought to be admissible to show

24 what the claim forms are, but obviously, they cannot be proof

25 of the matters asserted to the extent the claim form says I'm

1 claiming MK3 in a building, fair enough, but simply because

2 they're claiming MK3 that doesn't mean it's MK3 and the claim

3 form can't be used for that purpose.

4          THE COURT:  Well, that's true.

5          MR. RESTIVO:  Other than the a designations to show

6 what the claim is, we're okay with that, we don't want it

7 admitted for the proof of the matter asserted, which are the

8 matters in dispute.  I think those are our only objections.

9          THE COURT:  Well, I agree with the use of the proof

10 of claim with respect to the a designations, but I don't think

11 that Mr. Mandelsberg actually has offered the a designations in

12 any event.  I think those are -- and I can take judicial notice

13 of the claim form for purposes of the fact that they're the

14 document of record which is the pleading that started the

15 litigation.  So, they're not admitted for the truth but they,

16 obviously, are pleadings that are relevant to the case.

17          MR. MANDELSBERG:  Right.  And, Your Honor, I wasn't

18 admitting the entire -- or intending to offer the proof of

19 claim form for all purposes, I was intending and do offer, the

20 portion of the proof of claim form that contains information

21 about the date of construction of the building and the date of

22 installation of the asbestos for their truth because I believe

23 we've laid the foundation for that portion of the claim form.

24 I'm not offering the portion of the claim form that refers or

25 identifies the type of WR Grace product in the building because

Hood - Direct/Mandelsberg                    211

1  as Mr. Hood has just testified, that's based upon the MVA

2  reports and we will have a witness who will authenticate that.

3        As for the other exhibits, I think they are not

4  inconsistent with our list.  I do agree with Mr. Restivo that

5  in light of the Debtors withdraw of their objection to that one

6  claim and I haven't had a chance to look at it, but assuming

7  that Exhibit 7a and f refer to that, that we do not need to

8  offer those exhibits and the only other exhibit that Mr.

9  Restivo referred to that he objected to was Exhibit 17, which

10 is the MVA reports and the only purpose of referring to that

11 exhibit in Mr. Hood's declaration was to indicate that the

12 reports were submitted along with the proofs of claim.  Mr.

13 Vander Wood of MVA is here to testify regarding that.

14       THE COURT:  Okay.  Well, the other one, I believe, is

15 Exhibit 3d, this 1950 letter that apparently has something to

16 do with a building that was built in 1969?

17       MR. MANDELSBERG:  Yes, Your Honor.  It has some

18 reference to the specifications of calling for asbestos, but

19 it's not essential to our claim.  We'll withdraw it, or

20 withdraw that portion of the exhibit.

21       THE COURT:  All right.  3d is withdrawn, 7a through f

22 I think at this point are moot, based on the fact that the

23 Debtor has withdrawn the claim, so I will not consider those

24 because that objection to claim has been withdrawn.  17 is

25 deferred, I don't think this witness is a competent witness

1  through which to offer an expert report in any event.  And the

2  letter a exhibits, the proof of claim forms, I believe they

3  only offer for the truth of the matter asserted at this point

4  is date of construction or date of installation of asbestos and

5  I believe the Debtor is operating as though those are truthful

6  dates in any event, is that correct, Mr. Restivo?

7              MR. RESTIVO:  Yes, Your Honor, although I am going to

8  question a little bit to make sure, but yes, we are not

9  objecting to the dates in the claim.

10             THE COURT:  All right.  So, then I will admit them as

11  the truth for those two dates only and as to the rest simply as

12  the pleading that initiated the litigation.  All right,

13  cross-examine.

14             MR. MANDELSBERG:  And, Your Honor, as to then other

15  exhibits that I read off, that weren't objected to, I assume

16  those are all admitted as well.

17             THE COURT:  The unobjected to exhibits are admitted.

18             MR. MANDELSBERG:  Thank you, Your Honor.

19             THE COURT:  Oh, Ms. Kearse, do you have any questions

20  of Mr. Hood?

21             MS. KEARSE:  No, Your Honor.

22             THE COURT:  Mr. Baena, do you have any questions of

23  Mr. Hood?

24             MR. BAENA:  No, Your Honor.

25             THE COURT:  All right.  Cross-examine.

1        MR. RESTIVO:  And, Your Honor, might I do it from

2   here?

3        THE COURT:  Yes.

4                       CROSS EXAMINATION

5   BY MR. RESTIVO:

6   Q    Mr. Hood, my name is Jim Restivo, how are you, sir?

7   A    Very good, how do you do.

8   Q    Do you have in front of you the exhibit book, and I'm

9   looking to address your attention to DGS Exhibit 5A, because I

10  just want to use that as an example of the claim form to

11  understand what you did to fill these out.

12  A    All right.  In front of me.

13  Q    Okay.  That's for claim number, up in the top lefthand

14  corner, 10652?

15  A    (Inaudible).

16  Q    Sir?

17  A    Yes, it is.

18  Q    Okay.  And go to, it's the third page in, part 1 that

19  starts, claiming party information.

20  A    All right.

21  Q    Okay.  Is this the information which was filled out under

22  your jurisdiction or under your supervision?

23  A    Yes.

24  Q    And, tell me, again, what happened in 1986 where you had

25  to get a database of asbestos containing buildings?

**J&J COURT TRANSCRIBERS, INC.**

Hood - Cross/Restivo                                214

1  A    Well, to just briefly summarize what happened, there were

2  many things that happened, but since there was no statewide

3  inventory of buildings, the only way for us as a central

4  service provider for the State, to find buildings to survey, we

5  need to question each of the departments what was held in their

6  inventory.  And after sending questionnaires out to them, which

7  was done prior to my beginning in the program, we received that

8  information and entered it electronically.

9  Q    And, when did you start, sir?

10 A    I started in May of 1987.

11 Q    And, did a building, did a state building have to respond

12 to your survey whether or not it had asbestos containing

13 materials in it?

14 A    No.  But we did ask if they knew of any.

15 Q    If a building did not know whether they had asbestos

16 containing material or not, did they respond to your survey?

17 A    Yes, they did.

18 Q    After you received the information, did the states then

19 survey these buildings?

20 A    We did.

21 Q    For what purpose?

22 A    To determine the presence of asbestos in the building.

23 Q    And, its condition?

24 A    The first surveys, no, did not have a very detailed

25 description of the condition, although there was -- to the best

1  of my recollection, there was some questions as to the

2  condition of the building, but by no means was it on any

3  sophisticated level.

4  Q    Subsequent surveys got more sophisticated on condition of

5  material?

6  A    It was later, yes.

7  Q    And, when was the first survey, when were the later

8  surveys?

9  A    The first surveys began in 1986, that's when the projects

10  began.  Second set of surveys began in 1988 and then the better

11  surveys are started after that time period, in the early

12  1990's.

13  Q    Okay.  Now, sir, if you would turn your attention to part

14  3, property information for this claim form I'm using as an

15  example.

16  A    Yes.

17  Q    It says, how many floors does the property have and

18  someone has written, for this building, 18.  Do you see that?

19  A    Yes.

20  Q    Where did that information come from?

21  A    At the time these surveys were done, it came from either

22  the department's inventory of information that they sent to us,

23  or it may have come directly from a building inspection by

24  asbestos survey consultants.

25  Q    And we have for example, as exhibits here, some

1  architectural plans of the building.  I guess my question is,

2  did someone in your department look at building plans in order

3  to determine the number of floors for example?

4  A    There was no cross checking with the plans at this time,

5  when we filled out the forms.  The information that we put on

6  the forms was retrieved from the database and there was no

7  necessity to double check that information at this point.

8  Q    And, in this form it asks for the approximate square

9  footage of the property, do you see that?

10 A    Yes.

11 Q    And, where did that information come from?

12 A    It came also from the electronic records.

13 Q    And, again, the electronic records were made up when you

14 sent out a survey to various buildings?

15 A    They were initiated with questionnaires to each of the

16 departments and the data was entered at that time.

17 Q    And, did the questionnaires ask for the square footage of

18 the property, if you know?

19 A    I don't know specifically about that.  I just assumed that

20 it did.

21 Q    Okay.  But you don't know, sitting her today, under oath,

22 whether it did or it didn't.

23 A    In 1986, when the questionnaires were sent out, I don't

24 know.

25 Q    Okay.  Now, question number eight asks the claimant to

1  identify when the property was built, does it not?

2  A    Yes.

3  Q    And, here you have checked, someone has checked, 1969 to

4  1973.  Do you know where that information came from with

5  respect to the building at 714 Pea Street, in Sacramento,

6  California?

7  A    Sure.  That information also came from the database which

8  was derived from the department's questionnaires.

9  Q    And, so the questionnaire must have asked when was the

10 property built.

11 A    Yes.

12 Q    Okay.  And have you seen the original questionnaires?

13 A    I have seen it, but I can't testify as to what year I saw

14 it.

15 Q    And, did the original questionnaire ask a question like

16 number nine, what's the structural support of the property?

17 A    In that case, to the best of my recollection, it was

18 determined by looking at a plan.

19 Q    And, did the building look at a plan or did your

20 department look at a plan if you know?

21 A    One of my staff would have looked at the plan and I would

22 have reviewed it.

23 Q    Now did you look at any plans and specifications in

24 filling out these claim forms?

25 A    We looked at plans, but the specifications were -- from

1 what I remember, there may have been one set or two sets of

2 specifications available for the buildings, but generally they

3 were not available.

4 Q    One moment, sir.  Don't go anywhere, I'm still here.  One

5 moment.

6 A    Okay.

7 Q    I'd like you to turn to DGS Exhibit 14D, if you can find

8 that.  You tell me when you have located it, sir.

9 A    All right.  I found 14c and here's 14d.

10 Q    Okay.  And what building does this claim information

11 relate to?

12 A    This is for the Stockton State building.

13 Q    Are you familiar with that building?

14 A    Yes.

15 Q    And, what's the building claim number on that if you have

16 it there?

17 A    10661.

18 Q    Okay.  Turn, sir, if you would, to the -- I think it's the

19 sixth page of this material, where it's a portion of specs for

20 this building, entitled Section 18, do you see that?

21 A    Yes.

22 Q    Do you see in the middle of the page where it refers to

23 sprayed on fireproofing materials?

24 A    Yes.

25 Q    The question, sir, is in connection with answering the

1  claim questionnaire, did you or your staff review

2  specifications such as Section 18, which is attached to this

3  claim form?

4  A    I don't believe that anything in the specifications would

5  relate -- could you be more specific about which part of the

6  claim form would be filled out as a result of Section 18?

7  Q    Yes.  I am specifically interested in sprayed on

8  fireproofing.

9  A    And, that would be question what.

10            MR. MANDELSBERG:  Your Honor, I think it's question

11 13, the same one I was referring to earlier.

12            THE COURT:  Okay, thank you.

13            MR. MANDELSBERG:  It's the same question in all of

14 the forms.

15 Q    No.

16 A    No.  That specification wouldn't have been used to

17 complete question 13.

18 Q    My question, sir, let's back up for a second.  My first

19 question is, where did this specification come from with

20 respect to this claim?

21 A    Where did we locate the document?

22 Q    Yes.

23 A    Okay.  After buildings are constructed in the State of

24 California, the records go to a central record keeping

25 repository.  Those records are kept for a specified amount of

1  time until they're purged and we were finding some of the

2  documents over there.

3  Q    Okay.  So, correct me, if I'm wrong, you went over there

4  to see whether or not they had the building specifications

5  still available with respect to the buildings for which you are

6  making claims in this bankruptcy.

7  A    Yes.  That was one of the sources we checked.

8  Q    Okay.  And did you find building specifications on each of

9  the buildings for which you made a claim?

10  A    No.  As I testified earlier we only found a few.

11  Q    And, with respect to the few you found, take a look at

12  Section 18, the last couple of sentences on the page deals with

13  vermiculite base, cementitious insulation, is that correct?

14  A    Yes.

15  Q    And, do you agree with me that it states that one can use

16  the Zonolite Company MonoKote Type 3 US Gypsum Company red top

17  Fire Code V or equal as approved.

18  A    Yes, it says that.

19  Q    Did you see any other specifications for the claims you're

20  making in this case that had similar language identifying

21  MonoKote Type 3 at the same time that identified US Gypsum red

22  top Fire Code V.

23  A    No, I don't recall that, but there may be another instance

24  included with the claims.

25  Q    And, have you spoken to anyone about the nature of

1  MonoKote 3 and Fire Code V?

2  A    No.

3  Q    Did you or your organization file a bankruptcy claim in

4  the matter of USG Corporation?

5  A    Yes, we did.

6  Q    And, were you involved in filing that claim?

7  A    Yes, I supervised it as I did this one.

8  Q    And, did that claim involve any of the same buildings that

9  are involved here in the WR Grace case?

10  A    Without looking at a list of all the buildings, I assume

11  that they did include some of the same buildings.

12  Q    And, do you have in front of you a fairly thick document

13  that I asked you to have available, which is the proof of claim

14  in the USG Corporation case?

15  A    It's right here in front of me.

16       MR. RESTIVO:  Your Honor, I'm going to hand to the

17  Court and to counsel, I've taken the three or four pages out of

18  it that I want to use, it's pretty thick otherwise.

19  Q    Mr. Hood, the first page of this indicates, does it not,

20  that it's a claim in the USG bankruptcy?

21  A    Yes.

22  Q    And, what was the total amount of your claim?

23  A    As stated on the face of the claim, it's $65,350,565.

24  Q    And were you paid any money on that claim?

25  A    I thought we were paid a very small amount because either

1  the claim was withdrawn, but I don't have any firsthand

2  knowledge of that.

3  Q    Who would?

4  A    That would be our Attorney General, Deputy Attorney

5  General Bob Asperger.

6  Q    Turn, sir, to the page numbered 2-1.

7  A    Okay.

8  Q    Am I correct this is a claim for the new treatment area at

9  10333 El Camino Wheel?

10  A    Yes.

11  Q    And, that's at the Atascadero Hospital?

12  A    Yes, it is.

13  Q    And, do you not have a claim here in this case against my

14  client, claim number 10660 for fireproofing for the new

15  treatment areas of the Atascadero Hospital?

16  A    Yes, it would be the same.

17  Q    And, do you not indicate in the middle of Page 2.1, that

18  your claim against US Gypsum is for fireproofing plaster and

19  for texture material?

20  A    Yes.

21  Q    And here your claim is for fireproofing, is that correct?

22  A    Yes.

23  Q    Okay.  Turn, sir, to if you can find it, Page 2-33.

24  A    Okay.

25  Q    Am I correct that claim 2-33 -- I'm sorry, all of this is

1  one claim but Page 2-33 is for the warehouse and offices at

2  1234 East Shaw Avenue in Fresno?

3  A    Yes.

4  Q    Are you familiar with that location?

5  A    Well, I haven't visited the building.

6  Q    Your claim in the US Gypsum case was for acoustical

7  ceiling texture in that building, at that address?

8  A    Yes.

9  Q    Am I correct that your claim here in this case, 10659 is

10 for acoustical plaster at that address?

11 A    Well, I could look it up in the document, or I could take

12 your word for it.

13 Q    Take a look at --

14 A    Yes.  Zonolite acoustical plastic and finish.

15 Q    So, your claim in our case is for Zonolite acoustical

16 plastic and your claim in the US Gypsum case was for acoustical

17 ceiling texture material, is that correct?

18 A    That's correct.

19        MR. RESTIVO:  That's all I have, thank you, sir.

20        THE WITNESS:  Thank you.

21        THE COURT:  Redirect, Mr. Mandelsberg?

22                REDIRECT EXAMINATION

23 BY MR. MANDELSBERG:

24 Q    Mr. Hood, it's Steven Mandelsberg again.  I just have a

25 few questions.  Are you familiar with whether any MVA reports

Hood - Redirect/Mandelsberg                          224

1  accompanied any of the claim information that was part of the

2  State of California, Department of General Services claims

3  against US Gypsum claim forms that WR Grace counsel just asked

4  you about?

5  A    Yeah, there were some reports from MVA.

6  Q    And, do you have any understanding as to whether or not

7  the products, what the asbestos products involved were in the

8  USG claim as opposed to the claim here against WR Grace?

9  A    Well, in all of the samples performed by MVA, only one of

10 the samples came out as a USG product.

11 Q    And, was that a product containing something called

12 audicote, a-u-d-i-c-o-t-e?

13          MR. RESTIVO:  Objection, he's leading his own

14 witness.

15          MR. MANDELSBERG:  Redirect.

16          THE COURT:  I think at this point in time it's all

17 right to get past this.  Go ahead.

18          THE WITNESS:  Yes.  The sample was for audicote.

19 Q    And, do you haves any knowledge as to how many samples or

20 how many reports by MVA scientific consultants accompanied

21 claims filed in the US Gypsum case?

22 A    No, I don't have a total number.  I have them in front of

23 me.  I see really only one.

24 Q    And, what you're looking at, sir, that's the second

25 exhibit that WR Grace provided to me that I provided to you,

**J&J COURT TRANSCRIBERS, INC.**

Hood - Redirect/Mandelsberg                    225

1  correct?

2  A     That's correct.

3  Q     And, that exhibit only includes a report from MVA, one

4  report from MVA, is that correct?

5  A     That's correct.

6           MR. MANDELSBERG:  Your Honor, I'd offer both of the

7  exhibits that WR Grace provided in their entirety, so the Court

8  could see the entire documentation, not just a few pages.

9           MR. RESTIVO:  No objection, Your Honor.

10          THE COURT:  Well, somebody is going to have to give

11 them to me, but why do I want them?

12          MR. MANDELSBERG:  Well, I'm not sure why you want

13 them, but to the extent that WR Grace is claiming that, or is

14 going to contend that one of the claims of my client involves a

15 duplicate or other claim for the same sample, or the same item

16 of asbestos property constituent, I want the Court to see that

17 that isn't the case.  If they are going to contend that, then I

18 agree it's irrelevant.

19          THE COURT:  Well, they're apparently go to make some

20 argument with respect to three parts of that proof of claim,

21 because there are three pages that have been introduced.  The

22 first concerning this attachment for the $65 million dollar

23 claim, ths second for the Atascadero Hospital and the third for

24 the building in Fresno, California.

25          MR. MANDELSBERG:  And all I'm saying is that the

**J&J COURT TRANSCRIBERS, INC.**

Hood - Redirect/Mandelsberg                      226

1  documents that were provided to me and that's before the

2  witness are much thicker than just those three pages, and since

3  there has already been reference this morning to audicote, to

4  the extent WR Grace is going to make an argument about this, I

5  want the Court --

6         THE COURT:  Well, you brought up the audicote and

7  your witness said that there was only one sample that came out

8  as a USG product, as an audicote in those documents.

9         MR. MANDELSBERG:  That's correct.  And the other

10 exhibit I'm referring to has such report.  So, that's why I

11 think it's a document that the Court should see.

12        MR. RESTIVO:  I guess I take back my -- I now object

13 to that document, I would represent to the Court and counsel

14 that the pages not included, I believe, deal with properties

15 and buildings that are not subject at issue before this Court.

16 If counsel thinks there's some of the same buildings in there

17 and he identifies it for me, I'll be happy to reconsider, but

18 in trying to go through and match up the pages I have given to

19 the Court and counsel, are the pages that match and, therefore,

20 I would move as Debtors Exhibit 66, the three page document I

21 just discussed with Mr. Hood.

22        THE COURT:  Okay.  Well, first of all let me deal

23 with this Debtors Exhibit 66, these three pages and then I'll

24 get back to the entire exhibit because that may be an easier

25 way to structure this.  So, first of all, do you have an

**J&J COURT TRANSCRIBERS, INC.**

1  objection to the three pages that are Debtors Exhibit 66?

2         MR. MANDELSBERG:  Yes, Your Honor.  It's incomplete,

3  it's not authentic because it's only a piecemeal segment of a

4  larger document that they provided.  It's one thing to

5  introduce the entire exhibit and call the witnesses attention

6  to a few pages and attach significance to that, it's another to

7  rip the exhibit apart and just admit into evidence the three

8  pages that they want the Court to see.

9         THE COURT:  Okay.  Mr. Restivo, I will take the

10 entire exhibit, but Mr. Mandelsberg, you're going to have to

11 put a witness on the stand to show me how each and every other

12 page is somehow relevant to this case, because your objection

13 is, as I understand it, that the Debtor has given a large page

14 of documents which I haven't yet seen, to your witness, saying

15 apparently that the proof of claim that was filed in USG is

16 identical to the proof of claim that was filed here in terms of

17 the number of buildings that the State of California is making

18 a claim against USG and against Grace for, and if that's not

19 the case, then the pages are not relevant.  So I will admit the

20 document but subject to you, in your case, connecting up the

21 rest of those pages.

22        MR. MANDELSBERG:  Your Honor, we're not saying that

23 WR Grace is contending that it's an identical claim.  I don't

24 know what WR Grace is going to contend.  If they're not

25 claiming that, if they're not contending that the USG claim by

1 the State of California has anything to do with the claims

2 against WR Grace in this proceeding, I don't care to introduce

3 any of it.

4          THE COURT:  They're claiming that these three pages

5 are claims that your client made in the USG case and in this

6 case, is that correct, Mr. Restivo?

7          MR. RESTIVO:  Yes, Your Honor.

8          THE COURT:  That's it, not the rest of the claim,

9 these three pages of that claim, representing three different

10 buildings.  That's all.

11          MR. MANDELSBERG:  Okay.  We don't have any objection

12 to that, as far as it goes.  We'll address any further argument

13 about what that means later.

14          THE COURT:  Okay.  Debtors Exhibit 66 is admitted.

15 If you have additional pieces of the full exhibit that are

16 relevant to this case, then you may offer them later.  I do not

17 have the full exhibit, so I don't have a document here, which I

18 can refer to, Mr. Mandelsberg, somebody is going to have to get

19 it for me.  You may connect up any additional pages that you

20 believe are relevant to this proceeding.

21          MR. MANDELSBERG:  Your Honor, it's not our exhibit,

22 we didn't provide it, but we don't need to introduce anything

23 else if WR Grace's case is, or argument is just limited to

24 these few pages that they have introduced.

25          THE COURT:  Your argument is limited, correct?

1          MR. RESTIVO:  That's correct, Your Honor.

2          THE COURT:  All right.  These three pages are

3  admitted and the rest of the exhibit is not necessary.

4  Anything else for Mr. Hood?

5          MR. MANDELSBERG:  No, Your Honor, I don't have

6  anything further.

7          THE COURT:  Anything else for Mr. Hood?

8          MR. RESTIVO:  Very quickly, Your Honor.

9                    RECROSS EXAMINATION

10 BY MR. RESTIVO:

11 Q    Mr. Hood, Jim Restivo again.  Referring to those three

12 pages and going to Page 2-1 --

13 A    Okay.

14 Q    -- am I correct that on your claim form, under question

15 number eight, you had to answer as to US Gypsum, do you claim

16 the Debtor manufactured or sold products containing asbestos

17 that were present in this building.  Do you agree with me that

18 was the question?

19 A    In the USG claim?

20 Q    Yes.

21 A    No, we didn't claim that USG manufactured that product.

22 Q    Would you, sir, read to me --

23         THE COURT:  Mr. Restivo, this is beyond whatever

24 redirect there was and the proof of claim form speaks for

25 itself.  What are you doing with this witness?

                **J&J COURT TRANSCRIBERS, INC.**

1          MR. MANDELSBERG:  Thank you, Your Honor, I was going

2   to object on that ground.

3          MR. RESTIVO:  I think the witness testified that they

4   only found one sample with audicote.

5          THE COURT:  That's what he said.

6          MR. RESTIVO:  I think in response to redirect.  I

7   believe this form asked, what products of US Gyp. are you

8   claiming?  That's question eight.  That's what I asked him and

9   my next question was going to be, did you say the fireproofing

10  plaster was from USG, notwithstanding you only had one report

11  from audicote, that's my offer of proof.  I think it's relevant

12  to his direct.

13         THE COURT:  All right.  Mr. Hood, if you would kindly

14  refer to the question please on the form.

15         THE WITNESS:  All right.

16  Q    Do you understand, Mr. Hood, that question number eight

17  asked whether or not you were claiming that your building here

18  had a USG Corporation asbestos product?

19  A    Yes.  We claimed that it did.

20  Q    Okay.  And so you answered yes.

21  A    All right.

22  Q    Did you not to question eight?

23  A    Yes, that's correct.

24  Q    And then underneath that, they asked you to identify what

25  the material was that was a US Gypsum asbestos containing

1 product, correct?

2 A    That's correct.

3 Q    And you identified fireproofing plaster, texture and

4 ceiling tile.

5 A    Yes.

6 Q    Did you later withdraw this claim?

7 A    That would be a question for somebody else.

8 Q    Okay.  And turning to Page 2-33, again, you understand

9 question eight is asking whether or not you claim that there's

10 a US Gyp. product in this building, do you agree with me?

11 A    Yes.

12 Q    And, you say, you claim acoustical ceiling texture

13 material is in this building, do you not?

14 A    Yes.

15 Q    And, that's the same thing you're claiming with respect to

16 WR Grace's acoustical plaster for claim number 10659 in this

17 building, isn't that correct?

18 A    That's correct.

19 Q    And did you withdraw your claim for acoustical ceiling

20 texture on Page 2-33 against US Gypsum?

21 A    Yeah, I don't have any knowledge of what happened to the

22 claim after we completed it.

23         MR. RESTIVO:  Thank you, Mr. Hood, that's all I have.

24         MR. MANDELSBERG:  Your Honor, I have one other area

25 to cover briefly.

**J&J COURT TRANSCRIBERS, INC.**

1                    RE-REDIRECT EXAMINATION

2  BY MR. MANDELSBERG:

3  Q    Mr. Hood, Mr. Restivo just asked you a question about this

4  portion of the proof of claim form that I think is Exhibit 66,

5  is it and he referred to acoustical ceiling texture.  Do you

6  have any knowledge or do you have any recollection as to

7  whether there were different samples of different products

8  taken from different areas of this building covered by this USG

9  claim?

10  A    I don't have that information in front of me and I can't

11  recall.

12  Q    Wasn't it the case in the course of your coordination or

13  supervision of the asbestos program at the State, that

14  different samples were taken from different floors or different

15  portions of various buildings that the State owned or the

16  Department of General Services operated?

17             MR. RESTIVO:  Objection, Your Honor, he's bound by

18  his own witness's answer, that his witness doesn't have the

19  information available in front of him and now he is really

20  leading the witness, and I also object on that ground.  The

21  witness really doesn't know the answer and has so answered him.

22             MR. MANDELSBERG:  I don't --

23             THE COURT:  You are leading the witness.

24             MR. MANDELSBERG:  Well, it's redirect, but let me

25  rephrase the question, Mr. Hood.

**J&J COURT TRANSCRIBERS, INC.**

1 Q    Do you have any knowledge or recollection about different

2 street addresses for which the State of California filed

3 bankruptcy claims having different buildings that are a part of

4 the same address?

5 A    Yes.

6 Q    And, isn't it the case that, or is it the case, that in

7 the claims filed against WR Grace in this proceeding, there are

8 claims for addresses that have more than one building?

9 A    That's correct.

10 Q    And, do you know whether or not this 1234 East Shaw

11 Avenue, Fresno, California building address that's referred to

12 in Page 2-33, of the portion of the document that WR Grace's

13 counsel was asking you about, is an address with one or more

14 than one building?

15 A    It could have more than one building.

16 Q    And, you don't know.

17         MR. RESTIVO:  Move to strike the answer, Your Honor,

18 lack of knowledge.

19         THE COURT:  He's about to answer there he knows or

20 not.  You can answer, Mr. Hood.

21         THE WITNESS:  Most of our facilities have more than

22 one building, but specifically for this one claim, I don't have

23 that information in front of me.

24         MR. MANDELSBERG:  Okay.  Thank you very much, Mr.

25 Hood.  I don't have anything further.

**J&J COURT TRANSCRIBERS, INC.**

1                THE WITNESS:  All right.

2                MR. RESTIVO:  One more minute, Your Honor.

3                     RE-RECROSS EXAMINATION

4    BY MR. RESTIVO:

5    Q    Mr. Hood, with respect to claim number 10659 for 1234 East

6    Shaw Avenue, where your claim is for warehouse and offices, do

7    you know whether there are multiple warehouses at that address,

8    1234 East Shaw Avenue?

9    A    I'm going to page through the report to see if I can find

10   some information on that.

11   Q    Mr. Hood, I'll withdraw the question, let me ask another

12   one.  With respect to the claim 10660 at 10333 El Camino Wheel,

13   do you know whether or not there is more than one new treatment

14   area at that address?

15   A    I don't know for sure.

16                MR. RESTIVO:  Thank you, sir, that's all I have.

17                MR. MANDELSBERG:  Nothing further, Your Honor.

18                THE COURT:  All right.  You're excused, Mr. Hood,

19   thank you.

20                THE WITNESS:  Thank you.  Gentlemen, you know today

21   is the day I have to leave at five, so I suggest that we're

22   probably not going to get any further with witnesses today, so

23   what do you propose to do with your next witness?

24                MR. MANDELSBERG:  Your Honor, in light of Mr. Hood's

25   testimony, we're going to see whether it might not be necessary

1  to put him on at all, given that the declaration of Mr. Connor

2  is very similar to the declaration of Mr. Hood and in light of

3  the fact that WR Grace has not objected to many of the exhibits

4  that are referred to in both declarations, so we hope -- I know

5  Your Honor needs to leave no later than 5 p.m. today to attend

6  to (indiscernible) --

7            THE COURT:  Yes.

8            MR. MANDELSBERG:  But we'll deliberate and it may not

9  be necessary to call Mr. Connor at all tomorrow, in which case

10  we'll be able to go to the next witness, Mr. Vander Wood.

11           THE COURT:  Well, the other thing, since your other

12  witness is here, you know, if there's no objection from the

13  Debtor, I think you could call that witness out of turn.  That

14  may at least provide a little respite, given the time change.

15  I don't know how much that will affect, and then I don't know,

16  Ms. Kearse, will you have witnesses tomorrow?

17           MS. KEARSE:  I don't think so, Your Honor.  Just a

18  document issue on there.

19           THE COURT:  So, if you need Mr. --

20           MR. MANDELSBERG:  Yes, we did submit a declaration of

21  --

22           THE COURT:  Yes.

23           MR. MANDELSBERG: -- of Dr. Vander Wood because it

24  wasn't clear that he would be able to be here, he is here.  And

25  we may choose to present him live instead.  He will be here

**J&J COURT TRANSCRIBERS, INC.**

1 tomorrow, and so, but we'll certainly consider whether Mr.

2 Connor is needed at all and if he isn't, we'll proceed with Dr.

3 Vander Wood first thing.  Unless there's some other witness, or

4 proof that someone else wants to cover, but I think we're on

5 Dr. Vander Wood.

6         MR. RESTIVO:  My sense, Your Honor, for the Court's

7 planning purposes is, I would be surprised if we are not

8 concluded by lunch time.

9         THE COURT:  Well, I was only suggesting for Mr.

10 Connor because of the time difference that if you folks were

11 willing to have Dr. Vander Wood testify first, that at least

12 that would, you know give Mr. Connor at least a little sleep.

13         MR. RESTIVO:  I'm going to try -- afterwards, I'm

14 going to try to convince counsel that maybe he doesn't need Mr.

15 Connor at all given where we are and Mr. Hood, but we'll talk

16 about that.

17         MR. MANDELSBERG:  That's very kind of you, Your

18 Honor.  I sometimes forget the time difference as well, but

19 we'll try to work that out between now and tomorrow morning.

20         THE COURT:  All right.  So you want to start at 9

21 then, tomorrow morning?

22         MR. RESTIVO:  Yes, Your Honor.

23         THE COURT:  Nine o'clock?

24         MR. MANDELSBERG:  Yes, that's fine, Your Honor.

25         THE COURT:  All right, we're in recess until 9 a.m.

1  tomorrow, thank you.  You're all free to leave, I'm going to

2  shut my computer down.  If you want to leave things overnight,

3  you may, we'll lock the courtroom.

4

5                        **CERTIFICATION**

6

7      WE, PAT REPKO, DENISE O'DONNELL, LYNN SCHMITZ & ELAINE

8  HOWELL, court approved transcriber, certify that the foregoing

9  is a correct transcript from the official electronic sound

10  recording of the proceedings in the above-entitled matter and

11  to the best of our ability.

12

13  /s/ Pat Repko

14  PAT REPKO

15

16  /s/ Denise O'Donnell

17  DENISE O'DONNELL

18

19  /s/ Lynn Schmitz

20  LYNN SCHMITZ

21

22  /s/ Elaine Howell                    Date: April 26, 2007

23  ELAINE HOWELL

24  J&J COURT TRANSCRIBERS, INC.

25

                    **J&J COURT TRANSCRIBERS, INC.**