UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

```
IN RE:                    .    Case No.   01-1139 (JKF)
                          .
                          .
W.R. GRACE & CO.,         .    USX Tower - 54th Floor
et al.,                   .    600 Grant Street
                          .    Pittsburgh, PA 15219
            Debtors.  .
                          .    April 24, 2007
. . . . . . . . . . . . ..      9:06 a.m.
```

TRANSCRIPT OF TRIAL
BEFORE HONORABLE JUDITH K. FITZGERALD
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

```
For the Debtors:          Reed Smith
                          By:  TRACI S. REA, ESQ.
                               JAMES J. RESTIVO, ESQ.
                               DOUGLAS CAMERON, ESQ.
                               LAWRENCE FLATLEY, ESQ.
                          435 Sixth Avenue
                          Pittsburgh, PA  15219

                          W.R. Grace & Co.
                          By:  RICHARD C. FINKE, ESQ.
                               REBECCA STEIN, ESQ.
                          7500 Grace Drive
                          Columbia, MD  21044

                          Also JIM CINTANI

Audio Operator:           Janet Heller
```

Proceedings recorded by electronic sound recording, transcript
produced by transcription service

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@optonline.net**

**(609) 586-2311    Fax No. (609) 587-3599**

APPEARANCES (CONT'D):

For State of California:        Hahn & Hessen, LLP
                                By:  STEVEN J. MANDELSBERG, ESQ.
                                     JOHN P. McCAHEY, ESQ.
                                     CHRISTINA J. KANG, ESQ.
                                488 Madison Avenue
                                14th and 15th Floor
                                New York, NY  10022

For Fireman's Fund              Stevens & Lee, P.C.
Insurance Co.:                  By:  DAVID R. BEANE, ESQ.
                                111 North Sixth Street
                                P.O. Box 679
                                Reading, PA  19603

For PD Committee:               Bilzin Sumberg Baena Price
                                 & Axelrod LLP
                                By:  SCOTT L. BAENA, ESQ.
                                     JAY M. SAKALO, ESQ.
                                200 S. Biscayne Blvd, Suite 2500
                                Miami, FL  33131

For MR Claimants:               Motley Rice
                                By:  ANNE M. KEARSE, ESQ.
                                28 Bridgeside Boulevard
                                Mount Pleasant, SC  29464

For Equity Committee:           Kramer Levin Naftalis
                                 & Frankel LLP
                                By:  GARY BECKER, ESQ.
                                919 Third Avenue
                                New York, NY  10022

For Ad Hoc Equity               Weil, Gotshal & Manges, LLP
Committee:                      By:  M. JARRAD WRIGHT, ESQ.
                                1300 Eye Street, N.W., Suite 900
                                Washington, DC  20005

Also Present:                   THOMAS EGAN


TELEPHONIC APPEARANCES:

For Asbestos Property           LECG
Damage Claimants:               By:  ALAN MADIAN, ESQ.

                                Bilzin, Sumberg, Baena, Price
                                 & Axelrod LLP
                                By:  MATTHEW KRAMER, ESQ.
                                200 S. Biscayne Blvd, Suite 2500
                                Miami, FL  33131

TELEPHONIC APPEARANCES (CONT'D):

For Committee of Asbestos          Campbell & Levine, LLC
Personal Injury Claimants:         By:  MARK T. HURFORD, ESQ.
                                   800 N. King Street, Suite 300
                                   Wilmington, DE  19801

For the Debtors:                   Pachulski, Stang, Ziehl, Young,
                                    Jones & Weintraub, P.C.
                                   By:  TIMOTHY P. CAIRNS, ESQ.
                                       JAMES E. O'NEILL, ESQ.
                                   919 N. Market Street, 17th Floor
                                   P.O. Box 8705
                                   Wilmington, DE  19899-8705

For Allstate Insurance Co.:        Cuyler Burk, LLP
                                   By:  ANDREW CRAIG, ESQ.
                                   Parsippany Corporate Center
                                   Four Century Drive
                                   Parsippany, NJ  07054-4663

For David T. Austern,              Orrick, Herrington &
The Future Claimants                Sutcliffe, LLP
Representative:                    By:  DEBRA FELDER, ESQ.
                                   3050 K Street, N.W.
                                   Washington, DC  20007

For Committee of Asbestos          Ferry, Joseph & Pearce, P.A.
Property Damage Claimants:         By:  THEODORE J. TACCONELLI, ESQ.
                                   824 Market Street, Suite 904
                                   Wilmington, DE  19899

For Official Committee             Stroock & Stroock & Lavan, LLP
of Unsecured Creditors:            By:  ARLENE G. KRIEGER, ESQ.
                                   180 Maiden Lane
                                   New York, NY  10038-4982

For Asbestos Property              Scott Law Group
Damage Committee:                  By:  DARRELL SCOTT, ESQ.
                                   926 W. Sprague Avenue
                                   Spokane, WA  99201-4064

For Official Committee             Dies & Hile LLP
of Asbestos Property               By:  MARTIN DIES, ESQ.
Damage Claimants:                  1601 Rio Grande Street, Suite 330
                                   Austin, TX  78701-1149

Also:                              GLENN CONNOR, Witness
                                   KENNETH THOMAS, Interested Party
                                   DAN HOOD, Witness

**J&J COURT TRANSCRIBERS, INC.**

4

# I N D E X

| WITNESSES: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| For State of California: | | | | |
| Tim Vander Wood | 17 | 75 | 96,101 | 103 |

| EXHIBITS: | | ID | EVID |
|---|---|---|---|
| For State of California: | | | |
| DGS-10i | Architectural Plan | | 7 |
| DGS-10h | Architectural Plan | | 7 |
| DGS-17 | MVA Expert Reports | | 71 |
| DGS-25 | Response to the Debtors' Fifteenth Omnibus Objection | | 7 |
| DGS-30 | Dr. Lee Expert Report | 50 | |
| 67 | Report | 90 | |
| P-C | Documents | | 107 |

1        THE CLERK:  All rise.

2        THE COURT:  Please be seated.

3     (Pause.)

4        THE COURT:  Good morning.  This is the continuation

5  of the trial in W.R. Grace.

6        Mr. Mandelsberg?

7        MR. MANDELSBERG:  Yes, Your Honor.  Good morning.

8  Here again on behalf of the State of California Department of

9  General Services with my partner, John McCahey, and colleague,

10  Christina Kang.

11     (Pause.)

12        MR. MANDELSBERG:  Your Honor, just a couple of

13  housekeeping items before the State continues with its case.

14  First, I'd like to report that given that -- given Mr. Hood's

15  testimony of yesterday and the introduction of the exhibits

16  yesterday, the State does not believe that it will be necessary

17  to call Glenn Connor, so Mr. Connor will not be called as a

18  witness and therefore, although Court -- although we greatly

19  appreciate the Court's consideration in deferring his testimony

20  until later today so that he didn't have to get up at 6:00

21  a.m., it won't be necessary to call him.  We'll be prepared to

22  proceed with the live testimony of the State's expert, Dr.

23  Vander Wood shortly.

24        The other item is it has come to my attention that --

25        THE COURT:  Pardon me.  Are you going to use Mr.

1  Connor's deposition -- I'm sorry, declaration?

2         MR. MANDELSBERG:  No, Your Honor.  We don't believe

3  it's needed and in as much as Mr. Hood confirmed his

4  declaration and Mr. Connor's declaration is substantially

5  similar to Mr. Hood's and Mr. Hood has identified his role in

6  connection with the proofs of claim.  So --

7         THE COURT:  All right.

8         MR. MANDELSBERG:  -- we won't be calling Mr. Connor.

9         Second item, just want to bring to the Court's

10 attention that I understand that there may be three exhibits

11 that were not included in the Court's binders in full

12 complement.  Two are Exhibits 10i and 10h.  These have been

13 provided to counsel for W.R. Grace.  They are examples of

14 architectural plans.  And the third is Exhibit 25.

15        I understand that what the Court's binder may have --

16 this is the Claimant State of California's response to the

17 debtors' fifteenth omnibus objection.  I understand what was

18 included in the Court's binder was the response without the

19 exhibits.  The exhibits to the binder are important and

20 relevant because they include, as Exhibit A, the proofs of

21 claim, and as Exhibit B, a compendium of the MVA reports that

22 we'll be referring to today.

23        And therefore, at this time, I'd like if I may,

24 Judge, to just hand these up --

25        THE COURT:  All right.

1          MR. MANDELSBERG:  -- so that they can be included

2     with the Court's previously submitted exhibits.

3          THE COURT:  All right.  Thank you.

4          Okay, I have now DGS-10i, 10h, and 25.  Is there any

5     objection to my inclusion of the complete 10i, 10h, and 25?

6          MR. RESTIVO:  The same limitation with respect to the

7     proofs of claims that we admitted yesterday.  That is, the

8     proofs of claim can be evidence of what the claim is here, but

9     not evidence of the proof of the matters asserted to the extent

10    they say the product in the building is a Grace product.  With

11    respect to the Vander Wood analyses and the other material, in

12    fact, I think they are part of what is already in the court

13    books.  I don't think they've been admitted yet, but we have no

14    objection if you have a duplicate set.

15         THE COURT:  All right.  And the same concern though

16    with the timing of the dates of building and the dates of

17    installation, you -- the debtor does not have an objection to

18    my using that information in the proof of claim as a

19    substantive matter.

20         MR. RESTIVO:  We do not, Your Honor.

21         MR. MANDELSBERG:  Your Honor --

22         THE COURT:  All right.  Exhibits 10i and 10h and 25

23    are admitted with those caveats.

24       (State of California's Exhibits 10i, 10h and 25 received

25    in evidence.)

**J&J COURT TRANSCRIBERS, INC.**

1          MR. MANDELSBERG:  Thank you, Your Honor.  Just couple

2  of other notes.  Exhibit 25, which I've just handed up and

3  Court has received in evidence, was not -- was among the

4  exhibits that W.R. Grace did not object to and that was among

5  the exhibits I listed yesterday during the course of Mr. Hood's

6  examination.

7          Second I just want to point out that in the State's

8  witness and exhibit list there was a error at page 3 with what

9  I just handed up is Exhibit 25 being referred to as Exhibit 24.

10 The exhibits are in fact correctly denominated, I believe, in

11 the Court's binder.  It was just that the listing of exhibits

12 goes from 23 to 25, 25, so at the bottom of page 3 of the

13 exhibit list the State has provided, that is the reference to

14 debtors' fifteen omnibus objection substantive to asbestos

15 property damage claims is actually 24 and 25 is as noted, the

16 claimant's response, and that's the 25 that I just submitted.

17 I just want to make that clear so there's no confusion in the

18 record.

19         Your Honor, at that time, we'd like to -- before we

20 call Dr. Vander Wood as a witness, we do intend to use a

21 demonstrative exhibit which has been listed as Exhibit 29, and

22 we could either take a break, but I believe we need some

23 assistance of the court personnel in order to queue that up.

24         THE COURT:  All right.

25         THE CLERK:  There or --

1          MR. MANDELSBERG:  It's on a laptop.

2          THE CLERK:  Okay.

3      (Pause.)

4          MR. MANDELSBERG:  Your Honor, this is a demonstrative

5  exhibit summary.  If we could have just a five minute recess so

6  we can --

7          THE COURT:  That's fine.

8          MR. MANDELSBERG:  -- show it to counsel for W.R.

9  Grace, I don't think they will have an objection to it since it

10  summarizes the Vander Wood MVA expert reports --

11          THE COURT:  All right.

12          MR. MANDELSBERG:  -- and we can then queue this up.

13  Thank you.

14          THE COURT:  We'll take a five minute recess.

15      (Recess 9:13 a.m. to 9:21 a.m.)

16      (Pause.)

17          THE COURT:  Please be seated.

18          MR. MANDELSBERG:  Your Honor, we've had a discussion.

19  We have managed to get the demonstrative exhibit on the screen,

20  but after discussion with W.R. Grace counsel, they've indicated

21  that they will object to the exhibit, and I think before you

22  hear from Mr. Restivo or their counsel, I should offer some

23  details about what the exhibit is and what the objections or

24  non-objections were to this exhibit.

25          This --

**J&J COURT TRANSCRIBERS, INC.**

1          MR. RESTIVO:  Your Honor, with all due respect,

2    before he talks about what the exhibit is, the fact that we

3    have never seen it before, they didn't provide it in advance, I

4    would like to object to it.  Independent of what he says it is,

5    our objection is this is trial by surprise and I would like to

6    make my objection first and then he can respond.

7          THE COURT:  Well, could I get an identification of

8    what it is before there's an objection so that I have some idea

9    what the context is?

10         MR. MANDELSBERG:  I'd be happy to and the fact is

11   they did not object to it.  This was identified in our list as

12   a demonstrative Exhibit 29.  In the debtors' objections, they

13   do not object to Exhibit 29.  This is nothing more than a four

14   slide summary of the MVA expert reports.  Everything that is in

15   this summary is included in the MVA expert reports, and one

16   slide of it, a chart, is the identical duplicate of a chart

17   that appeared in our trial brief of April 13, which the debtor

18   has received.

19         In prior conversations with debtors' counsel, they

20   said they would have no objection to a demonstrative exhibit

21   that simply summarizes what the MVA reports say.  This, without

22   going into detail about the exhibit, Your Honor, will simplify

23   and facilitate the Court's understanding the same fashion that

24   the debtors' multicolored chart, which wasn't supplied with any

25   background information or data or any information beforehand

1  about how Mr. Restivo was intending to use it at the times that

2  he used it was offered.

3          So we think this is a tempest in a teapot.  There's

4  no trial by surprise.  Mr. -- Dr. Vander Wood is here.  He will

5  be subject to cross-examination.  The MVA reports are

6  voluminous.  Under the Federal Rules of Evidence, it is

7  perfectly proper to submit --

8          THE COURT:  All right.  Well, now you're --

9          MR. MANDELSBERG:  -- a document --

10          THE COURT:  -- getting into argument and I don't even

11  know what the objection is at this point.  So I mean if you're

12  going to use a summary chart, the rules do provide that you

13  have to provide the summary and then give the other side the

14  opportunity to request the backup documentation.  So I mean

15  that's what the rule says, so I don't know what's been provided

16  and what isn't.

17          Mr. Restivo, what's your objection?

18          MR. RESTIVO:  Let me start, Your Honor, by saying

19  that on or about April 18, we received and we put in the

20  Court's book the declaration of Dr. Tim Vander Wood.  Under the

21  procedures we've discussed with the Court, if testimony of an

22  expert was going to go in by declaration, the declaration comes

23  in, they put the expert on for cross-examination.  That was the

24  procedure.

25          With respect to the declaration of Dr. Vander Wood,

1    there is no reference to these demonstratives and so if one

2    takes the declaration and puts it in, we do not have these

3    demonstratives.  We may have reference to underlying material

4    from which the demonstratives may have been taken, but when

5    they put in the declaration of Dr. Vander Wood, there's no

6    reference to this.  I think now they're suggesting that

7    contrary to what we've discussed, they're not going to simply

8    submit the declaration of Dr. Vander Wood.  Now they seem to be

9    suggesting they're going to put him on the stand for direct,

10   and that wasn't the purpose for the declaration.  He should be

11   put on for cross.  That's number one.

12            Number two, on Saturday, April 14, we delivered to

13   the Court the binders of exhibits.  We supplemented those

14   binders on -- I believe was Wednesday, April 18.  In those

15   binders, we had lists of exhibits and we had exhibits.  Our

16   demonstratives for Dr. Lee, Exhibit 2, Exhibit 3, and Exhibit 4

17   -- yes, they're color coded -- were in the books provided to

18   counsel and we use them.

19            We now understand they have a demonstrative.  The

20   demonstrative is on their computer.  When I asked do you have a

21   hard copy of it, the answer is no, it's on the computer.  We

22   haven't seen it before.  It wasn't provided in advance.  He is

23   correct that one of the things on the computer is a chart that

24   we have seen before.  That's not what we're objecting to.  It's

25   these various circles and you push a button and the circle

1 bounces out.  We don't know what it is.  We haven't seen it.

2 There was a time to exchange exhibits, including

3 demonstratives.  They did not give it to us for the Saturday

4 delivery of the Court books.  They did not give it to us for

5 the Wednesday delivery of the Court books.

6        We object to the use of a demonstrative that they

7 haven't shown us before.  We object to any live testimony of

8 Dr. Vander Wood because we think they have to submit the

9 declaration.  And we object to trial by surprise.  We don't

10 know what it is, we haven't seen it, and that's not the way

11 this Court runs its business and we object.

12    (Pause.)

13        MR. MANDELSBERG:  Your Honor, first of all --

14        THE COURT:  Just a minute, please.

15    (Pause.)

16        THE COURT:  Okay.  All Rule 1006 with respect to the

17 Rules of Evidence indicates is that the contents of voluminous

18 writings, recordings or photographs which can't conveniently be

19 examined in court may be presented in the form of a chart,

20 summary or calculation.  The originals or duplicates shall be

21 made available for examination or copying or both by other

22 parties at reasonable time and place.  The court may order that

23 they be produced in court.  The advisory committee notes from

24 back in 1972 indicate that this is -- the rule is intended to

25 recognize that the practice with appropriate safeguards is the

1 only practicable means of making the contents available to the

2 judge and jury.  Nonetheless, that does not impact on the

3 discovery phase.  You know, there is a very clear and very long

4 discovery practice that's been in place in this proceeding.

5        If you're going to use a computer disc, you should

6 have provided that in advance as part of the discovery;

7 especially if it's got the bells and whistles where things are

8 going to pop up in a PowerPoint slide.  You know, people use

9 PowerPoints.  That's not -- everybody has that capability on

10 their computers.  You give a disc available, they can look at

11 it.  If they've got an objection, they can use it -- they can

12 raise it.

13        MR. MANDELSBERG:  Your Honor, we apologize for not

14 providing it --

15        THE COURT:  It's not going to be used.  It will not

16 be used.  The chart that was given in advance you can use.  The

17 rest of it, I'm sorry, no.  It's not provided.  Mr. Restivo's

18 quite right.  This is not trial by ambush.

19        MR. MANDELSBERG:  Your Honor, very well.  I just want

20 to note that the material in the three other slides are simply

21 summaries of the MVA reports and Mr. Restivo has had an

22 opportunity to look at them.  They're not complicated and there

23 is nothing in Rule 1006 that indicates that there is any

24 prejudice by looking at something that simply summarizes

25 something that they've had.  The debtors provided to us

1 numerous additional exhibits Friday evening.  We did not squawk

2 when they changed exhibits.

3        As far as the objection to Dr. Vander Wood's

4 testimony live, we didn't just tell the Court or the debtors

5 this morning that we were submitting Dr. Vander Wood live.  I

6 mentioned it specifically yesterday.  The fact that we

7 submitted a declaration when it was not clear that he would be

8 available here does not bar us under any of the court's

9 procedures from presenting him live.

10        It were -- it was the debtors who actually indicated

11 that they wished to have all expert witnesses presented by

12 declaration.  We did not object when instead of submitting a

13 declaration for Dr. Lee's testimony, the debtors presented him

14 live and instead submitted disclosures in advance.

15        There's absolutely no prejudice whatsoever --

16        THE COURT:  Well --

17        MR. MANDELSBERG:  -- in --

18        THE COURT:  -- let me cut this off.  In most

19 instances, if the declaration were submitted as the direct

20 testimony, I'd say that was it.  But in this instance, the

21 parties did indicate that they reserve the right to call

22 witnesses live.  Everyone was very clear that they reserve that

23 right, so I'm going to permit you to call Dr. Vander Wood live.

24 Everyone has reserved that ability to do it, and I'm going to

25 permit you to do it.  But I'm not going to permit you to use a

1  summary that wasn't disclosed in advance.  So the chart that

2  was disclosed you may use.  And I regret that.  I'm sure it

3  would be helpful for the Court.   Nonetheless, I think that's

4  the only thing that I can do to preserve the Court's discovery

5  rules.

6          MR. MANDELSBERG:  Your Honor, the chart that's

7  referring to is actually one of the slides.  Can that be

8  used --

9          THE COURT:  Yes.

10          MR. MANDELSBERG:  -- in connection with his

11  examination?

12          THE COURT:  Yes.  But then make a hard copy so that

13  there's a record -- a paper copy so that there's a record of

14  what it is that's used as a --

15          MR. MANDELSBERG:  We will, but --

16          THE COURT:  -- separate exhibit.

17          MR. MANDELSBERG:  -- it is the same chart that is

18  already reproduced in the trial brief that was submitted on

19  behalf of the State on April 13th, but we will make a copy of

20  that.

21          Thank you, Your Honor.  At this time, like to call

22  Dr. Tim Vander Wood to the stand as the State's next witness.

23          THE COURT:  All right.

24          MR. MANDELSBERG:  Dr. Vander Wood?

25          THE CLERK:  Please raise your right hand.

1      TIM VANDER WOOD, STATE OF CALIFORNIA'S WITNESS, SWORN

2           THE CLERK:  May be seated.

3      (Pause.)

4                          DIRECT EXAMINATION

5  BY MR. MANDELSBERG:

6  Q    Good morning, Dr. Vander Wood.  Could you please describe

7  or tell us your -- the nature of your employment?

8  A    I'm the president and executive director of MVA Scientific

9  Consultants.

10  Q    And what is MVA Scientific Consultants' business?

11  A    We're a consulting laboratory specializing in

12  microanalysis and materials characterization.

13  Q    And what sort of activities does that entail?

14  A    We analyze a wide variety of materials for identification

15  and for problem solving.  It includes industrial problem

16  solving the characterization of composite materials.  We've

17  looked at fine art.  We've analyzed pigment from Van Gogh

18  paintings.  We've analyzed composite materials from missile

19  nose cones.  We look at a wide variety of environmental samples

20  for characterization.  We look at natural materials, minerals

21  and rocks, for characterization for mining companies, and we

22  look at -- over the years, we've looked at thousands of bulk

23  asbestos containing building material samples for the purpose

24  of seeing if we could identify the manufacturer.

25  Q    And that latter type of business is that something that

**J&J COURT TRANSCRIBERS, INC.**

1  you or your firm, MVA, has done for a period of time?

2  A    We've been doing it for 17 years.

3  Q    Did there come a time when MVA Scientific Consultants was

4  retained by the State of California for any purpose in

5  connection with W.R. Grace -- this W.R. Grace matter?

6  A    As I recall, we were contacted by the State and around

7  January of 2003, asked if we would be willing to examine

8  asbestos containing building material samples for product ID.

9  Q    And did there come a time when you received samples of any

10 asbestos in connection with your retention by the State?

11 A    During that year, and I don't remember the specific dates,

12 but we received a number of samples of material from the State

13 for characterization.

14 Q    Would you please describe or summarize your educational

15 background?

16 A    I have a B.S. from the University of North Carolina, an

17 M.S. from Florida State University, a Ph.D. in geophysical

18 sciences from the University of Chicago, and an M.B.A. from

19 Emory University.

20 Q    Would you please summarize for the Court your work

21 experience prior to joining MVA?

22 A    During my time in school, I had various teaching and

23 research positions within the universities; generally teaching

24 introductory courses in earth sciences or oceanography,

25 conducting research into the nature of natural materials,

1 including microscopy and microanalysis of those materials.

2         Upon leaving the University of Chicago, I was briefly

3 a post-doc at Arizona State University where I did fundamental

4 research into electron microscopy and energy dispersive x-ray

5 analysis.  I joined McCrone Associates from there.  I spent

6 about three and a half years at McCrone Associates as a

7 consultant in microanalysis working in the laboratory, and at

8 that time, I was asked to head a laboratory that was being

9 formed by McCrone Associates in Atlanta.  I accepted that

10 offer, and for about three years I directed that laboratory, as

11 well as served as a consultant in problem solving and

12 microanalysis.

13         In 1990, I left McCrone Associates and along with two

14 partners formed what was known then as Millette Vander Wood and

15 Associates, is now known as MVA Scientific Consultants, and

16 since that time, I have been president and executive director

17 of that firm while still engaged in research and in consulting

18 for industry, government, attorneys, et cetera.

19 Q   And you may have already done so in your initial response,

20 sir, but would you please detail the sort of experience you or

21 MVA have had since its founding in connection with the analysis

22 of asbestos products.

23 A   We have analyzed I don't know how many thousands, but many

24 thousands of asbestos containing building material samples by

25 the methods that were used in this case for the purposes of

1  identifying the manufacturer, whoever that might be.  I don't

2  know how many clients we've had in that regard, but we've

3  worked for the State of Illinois, the State of Hawaii,

4  Maryland, Kentucky, in this case California, as well as a large

5  number of universities and other large property owners.

6  Q    Is there a term or phrase that's used by you or MVA to

7  describe the process or methodology by which you try to

8  ascertain the identity of the manufacturer of an asbestos

9  product?

10 A    Our internal shorthand for this process is product

11 identification or product ID.

12 Q    And is the term constituent analysis used in that

13 connection in any way?

14 A    It means the same thing, yes.

15 Q    So a product ID or constituent analysis is the sort of

16 analysis that you or MVA has done over the years to try to

17 determine or to determine the identity of an asbestos products

18 manufacturer; is that correct?

19 A    Yes.  Constituent analysis is a more general term that

20 might be applied to say a pharmaceutical product that we would

21 examine to see what's in it and where it lies in the product,

22 but in this case, constituent analysis and product

23 identification are the same.

24 Q    Now, in the course of your experience at MVA, have you

25 only limited your analysis -- your product ID type analyses to

1 one particular manufacturer, such as W.R. Grace?

2 A    No.  We don't know the manufacturer when we start.  The

3 procedure that's used in our laboratory is the same and at the

4 end of the laboratory procedure is the point at which we try to

5 do an identification of the manufacturer of the product,

6 whether it be W.R. Grace or USG or National G or US Mineral or

7 any of over three dozen manufacturers that exist in our

8 database.

9 Q    And, sir, was the procedure that you utilized after being

10 retained by the State of California in 2003 any different from

11 the procedure -- the product ID procedure that you had utilized

12 or followed on prior occasions on different engagements?

13 A    I'm sure that over the course of 17 years there have been

14 some refinements, but it's substantially the same over that

15 period of time.

16 Q    Dr. Vander Wood, I'm now going to ask you to describe the

17 process that you followed after you were retained in order to

18 establish product ID --

19        MR. MANDELSBERG:  And, Your Honor, if I may, I may

20 just question Dr. Vander Wood on this range from the counsel

21 table, I would appreciate it.

22        THE COURT:  Sure.

23        MR. MANDELSBERG:  Thank you.

24    (Pause.)

25        MR. MANDELSBERG:  Your Honor, I'm going to use --

1  want to use internally the summary, but I -- in light of the

2  Court's ruling, I don't want it to be up on the board until we

3  get to the point that I wish, so we'll just disconnect the

4  screen at this point.

5          THE COURT:  Okay.

6  BY MR. MANDELSBERG:

7  Q    Dr. Vander Wood, can you hear me okay?

8  A    Yes.

9  Q    Would you please describe the process or the steps in the

10 process that you follow in order to determine product

11 identification?  Let me actually back up.  Before you began the

12 process of identifying whether or not a particular manufacturer

13 manufactured materials that had been provided by -- or bulk

14 samples that had provided by the State, did you do anything in

15 order to determine whether or not these bulk samples were

16 accompanied by appropriate documentation?

17 A    When we received the samples, we checked the sample labels

18 against the chain of custody documents that accompanied those

19 samples to make sure that the samples we had in hand were the

20 same as the samples indicated in the document.  And at that

21 time we assigned our own internal sample numbers to those

22 samples.

23 Q    And is it the case that you did not know where the samples

24 -- you did not know when the samples were provided the origin

25 of any particular asbestos manufacturer?  That is, you didn't

1  know the identity of the manufacturer of the sample.  You

2  weren't told that these were a particular manufacturer's

3  samples; is that --

4  A    That's correct.  We weren't told these were from a

5  particular manufacturer.

6  Q    And did you have documentation available that traced the

7  chain of custody to particular buildings for all of the samples

8  that you were provided to analyze?

9  A    Every sample came with a document that indicated the

10  building of origin.

11  Q    Now, sir, I'd like you to describe in the order in which

12  you perform these -- any tests, the steps that you follow in

13  order to go about your product ID analysis of the samples

14  provided to you.

15  A    Well, in each case and for every sample, they were

16  first -- sample's examined visually.  It's opened under a --

17  what's called a HEPA hood in order to make sure that any fibers

18  that might escape when it's opened are caught in a filter and

19  not breathed by the analysts.  It is examined under a stereo

20  microscope at that time.  It's a low power dissection scope,

21  maybe 20 or 40 times magnification.  The analyst writes his

22  observations of what the general appearance of the sample is at

23  that time.

24       A small portion of the sample is then taken and

25  analyzed by polarized light microscopy.  This is a microscope

1 that it's a sophisticated version of the microscope you might

2 have used in a biology lab in high school.  The analyst makes

3 observations about the materials present, including their size

4 and shape and optical properties.

5         He may also conduct -- he does always conduct

6 microchemical tests, and they're two that are always conducted.

7 One is a test for clay, and it's a stain -- using a copper

8 stain, I believe.  The second is a test for starch.  You heard

9 that test described here yesterday.  It's an iodine test.  The

10 same test using in high school biology class that Dr. Lee

11 described.  It's a stain test.  Test for process starch.  You

12 used it on a potato in high school.

13         The other observations are made that are

14 sophisticated observations of optical properties.  One of those

15 is also a test for starch, and Dr. Lee briefly mentioned that

16 test as well.  If the analyst sees any particles that he thinks

17 might be starch, he can make some adjustments to the

18 microscope.  And if those particles are starch, they appear

19 with a dark cross in them that's referred to as Maltese cross.

20         So both of those tests for starch are conducted, as

21 well as other measurements say of refracted index and other

22 optical properties, and based on all of those results, the

23 analyst fills out a -- it's the PLM data sheet -- which he

24 indicates the materials that he observed, results of the tests

25 for starch and for clay, and estimates the relative proportions

1 of each one of those materials.

2          Other portions of the sample are prepared for other

3 techniques.  Like Dr. Lee's lab, we use a multiple technique

4 approach.  A second technique -- and in the case of these

5 samples, I believe I performed all of these analyses myself --

6 is to take a portion of the sample and put it in the scanning

7 electron microscope.  This is a microscope similar to ones you

8 see on --

9 Q    Dr. Vander Wood, before we get to that stage, I just want

10 to ask you a few more questions about the first step.  Is the

11 first step that you describe with the use of this microscope

12 referred to as PLM or polarized light microscopy?

13 A    Yes.

14 Q    And just so that we confirm this because you did in your

15 answer refer to Dr. Lee's testimony, you were present in court

16 yesterday when Dr. Lee testified; is that correct?

17 A    Yes.

18 Q    And you heard all of his testimony --

19 A    Yes.

20 Q    -- is that correct?  Okay.  After -- and in this PLM step

21 that you describe, is that the step when the starch tests that

22 you just referred to are performed?

23 A    Yes.

24 Q    And were there any samples analyzed by MVA for which a

25 iodine starch test was not performed?

1  A    None that are the subject of this project.

2  Q    And is the -- is it the case that the iodine starch test

3  that you testified was performed is a common test that MVA

4  would perform when it's doing a product ID project, such as

5  this one?

6  A    It's a routine part of the PLM analysis step or product

7  identification.

8  Q    And to the best of your knowledge, is this the sort of

9  test that you believe Dr. Lee's laboratory would or has done or

10  would have done from time-to-time?

11  A    Yes.

12  Q    Now, the second step, which I think you started to

13  describe before I interrupted you and I apologize for that, was

14  -- I think you referred to scanning electron microscopy.  Can

15  you describe what that step involves?

16  A    A portion of the sample is taken to the electron

17  microscope.  You see these kinds of microscopes occasionally on

18  TV if they're doing gunshot residue analysis on CSI or that

19  sort of thing.  It's placed in the instrument then you view

20  what looks like a black and white image of the sample.  You can

21  also perform elemental analysis of the individual particle.  So

22  the analyst -- and for these samples, that was me -- surveys

23  large numbers of particles.  Probably thousands of particles in

24  the sample are looked at and hundreds of particles are analyzed

25  quickly by EDS.  It's a confirmatory step for the PLM in that

1  say the PLM analyst has analyzed vermiculite, vermiculite has a

2  particular spectrum in EDS, and those are observed and

3  representative examples recorded as confirmation.

4  Q    Dr. Vander Wood, I just want to make sure that we who are

5  not in the sciences understand the acronyms that you're using.

6  The SEM acronym that you're using stands for what?

7  A    I'm sorry, it's -- that's the scanning electron

8  microscope.

9  Q    And the EDS acronym that you're using stands for what?

10  A    That's -- it's a long term -- energy dispersive x-ray

11  spectroscopy.

12  Q    So the SEM EDS acronym refers to the stage that you're

13  presenting describing --

14  A    Yes.

15  Q    -- correct?

16  A    It refers to both together.

17  Q    Okay.  Go ahead, please.

18  A    As I said, many thousands of particles will be looked at,

19  the image will be examined, and many hundreds are typically

20  examined.  Besides providing a confirmation of what was seen in

21  the SEM, it also allows -- or in the PLM stage, I'm sorry, it

22  also allows you to look for smaller particles that the PLM

23  analyst perhaps didn't see or couldn't analyze, as well as

24  because the -- the image looks different than it does in PLM,

25  there may be features that stand out in SEM analysis that don't

1  stand out in PLM analysis and so you're able to confirm the

2  presence or absence of minor components as well.  So it's

3  confirmatory step for the PLM analysis, both for confirming

4  what you've observed by PLM, as well checking to see that

5  nothing was missed.

6  Q    And is that generally the purpose of this SEM EDS stage to

7  double check on the first stage?

8  A    Yes.

9  Q    And what is after -- so after the PLM stage and the SEM

10 EDS stage, is there a next step that you followed in order to

11 perform your product ID analysis of samples provided to you by

12 the State of California?

13 A    Just to be perfectly clear, the steps that come after PLM

14 may be conformed -- performed simultaneously, but I'll describe

15 them in this sequence.  The TEM analysis we also refer to as

16 AEM analysis, and I'll go into that in a minute.  But the TEM

17 is another kind of electron microscope.  It provides generally

18 higher magnification and it is -- it's a very common

19 microscope.  It's present in many hospitals.  It's used for

20 pathology for checking abnormal cells by pathologists in cell

21 cultures or biopsy tissues.  The purpose we use it for is to

22 examine the same samples, looking at small particles of the

23 material that compose the building product we're examining.  We

24 can do the same sort of analysis for the elements present in

25 those particles, and it serves as a confirmatory step there for

1   the SEM and the PLM.

2           Because it is capable of higher magnifications, we

3   can also check for very small particles and in some cases this

4   is particularly important when you're dealing with clays,

5   because clays are typically present as very small particles in

6   these samples.

7           It also offers an additional capability that's a

8   little esoteric, but it's what makes a TEM, a transmission

9   electron microscope, an AEM, which is analytical electron

10  microscope.  And I'm sorry for the acronyms, but the next

11  acronym is SAED, which is selected --

12          THE COURT:  Wait, wait, wait.  It makes a

13  transitional electron microscope a what?  What was the ABM?

14          THE WITNESS:  An AEM.

15          THE COURT:  AEM.

16          THE WITNESS:  An analytical --

17          THE COURT:  Analytical.

18          THE WITNESS:  -- electron microscope.

19          THE COURT:  And --

20  BY MR. MANDELSBERG:

21  Q   And before, Dr. Vander Wood, you go on to the next step,

22  which I understand may have been performed simultaneously with

23  the other steps, can you explain to the Court why this TEM step

24  is relevant to determining whether or not samples have

25  particular components or ingredients in order to establish a

1 product identification?

2 A    Well, as I said, the technique is used -- it's another

3 confirmatory technique for the SEM and the PLM.  It also allows

4 you to look at smaller particles.  In these samples, clay is a

5 particular concern, and the TEM allows you to detect and

6 confirm the present of clay that might be in particles too

7 small to be detected by PLM or so entangled with other

8 particles that you can't distinguish them by the other

9 technique.

10        The additional capacity in the TEM that makes it an

11 AEM is another acronym, SAED, and that's an acronym for

12 selected area electron diffraction.  It is in some ways

13 analogous to x-ray diffraction, but what it does is allow you

14 to say what the ordering of the individual atoms in a sample

15 is.  So particular compounds, say chrysotile or gypsum or

16 montmorillonite clay or vermiculite, they're -- they are known

17 as those minerals not only because of the elements that are

18 present, but because of the way the elements -- the atoms of

19 those elements are ordered in the sample.  They occur in a

20 particular order in a particular site all relative to each

21 other.  They're crystal.

22        What SAED allows you to do is measure the properties

23 of that crystal; where are the atoms and how far apart are

24 they.  And so it is a definitive technique for determining the

25 phase -- the chemical phase, the mineralogical identity of an

1  individual particle.

2            So we have the three microscopy techniques that all

3  work in concert, complement, and check on each other.  And we

4  also do an acid dissolution step.  And for this kinds of

5  materials, it's -- it allows an improved quantification of the

6  acid soluble material, and in the -- many of the asbestos

7  containing building materials contain gypsum.  Gypsum is

8  soluble in acid.  So if you take a portion of your sample, you

9  weigh it, you put it in the acid, you filter it out, dry it,

10 and weigh it again, what has disappeared, what is acid soluble

11 can be determined.  That's the gypsum and carbonate fraction if

12 there's carbonate present.

13 Q    Now, after the data that is obtained from each of the

14 steps that you've described is gathered, what, if anything, did

15 you or MVA do with that data in order to determine product ID?

16 A    All that data is compiled on various data sheets and

17 backup data.  It includes the optical properties and the

18 results of the microchemical tests for starch and clays.  All

19 of those properties -- the acid soluble weigh percent -- all of

20 that is gathered and the composition of the sample is

21 estimated; what is present and how much of it is present.

22            We then query a database that we maintain that has

23 over 2,000 asbestos containing building material formulas in it

24 and match the formula that we have determined for the sample

25 against formulas available in the database.  And if there is a

1  match with one product or more than one product, we note and

2  report those matches.  So that if we had a match for two

3  products or three products, which has occurred occasionally, we

4  would report that.  If we have a match for a unique product,

5  then we report a single match for that product.  If we have no

6  match, we report that as no match.

7  Q    And are there instances in the course of your experience

8  where in doing a product ID or constituent analysis, you or MVA

9  have not found a match with a --

10 A    Yes.

11 Q    -- particular manufacturer?  Are there occasions when you

12 do find a match with a particular manufacturer?

13 A    Yes.

14 Q    Now, in this case, sir, you were asked to determine

15 whether or not any of the samples that were analyzed matched

16 the formula for W.R. Grace products; is that correct?  Well --

17 A    I don't know if we were --

18 Q    -- let me -- you were -- let me rephrase that.  You were

19 asked to identify the manufacturer if you could of the samples

20 that you were providing.

21 A    Yes.

22 Q    And how, if at all, were you familiar with the formula for

23 W.R. Grace products in this database that you referred to?

24 A    Well, I know that the formulas that are present in the

25 database were made known in litigation that's gone on over the

1  past 20 years whereby different manufacturers have been

2  required to produce the formulas for the products they made.

3  The formulas I've seen in this matter for W.R. Grace are the

4  same formulas that we have present in the database.

5  Q    Have you -- you've heard of the term Monokote 3 before,

6  sir?

7  A    Yes.

8  Q    What is that?  What do you understand that to be?

9  A    It's a W.R. Grace surfacing product.

10  Q    And you've heard of the term Zonolite Acoustical Plastic

11  before?

12  A    Yes.

13  Q    And what do you understand that to be?

14  A    It's also a W.R. Grace surfacing product.

15  Q    And you've heard of the term Zonolite Finishing Coat or

16  Zonolite Finish Coat.  What do you understand that term to be?

17  A    I understand that to be a W.R. Grace product as well.

18  Q    So, sir, after doing all these tests and comparing the

19  results of the tests to this database, what did you conclude?

20  A    Well, in the --

21  Q    And the samples that you were provided.

22  A    In the samples that are being considered here, we

23  determined that I think in -- I don't remember the exact number

24  of samples, but on the order of 12 to 15 samples were Monokote

25  3 and on the order of three to six samples were Zonolite

J&J COURT TRANSCRIBERS, INC.

1  Acoustical Plastic, and we found a couple of occurrences of

2  Zonolite Finish Coat.

3  Q    Okay.  We'll go through the particular samples and claims

4  in a moment, but let me ask you what about your process and the

5  database that you use leads you to conclude that it is a

6  reliable way of determining to a reasonable degree of

7  scientific certainty that the -- that when you determine that

8  samples are a positive match with a particular manufacturer's

9  asbestos product that that is the case?

10 A    Well, as I've said, there are over 2,000 formulas in the

11 database, and the database represents all of the major

12 manufacturers that I'm aware of, of asbestos containing

13 building material formulas.  We have done this thousands of

14 times.  I'm sure we've identified W.R. Grace products many

15 hundreds of times.  They're one of the major suppliers of

16 asbestos containing surfacing materials.  And while it may have

17 occurred, to my knowledge, we've never identified a W.R. Grace

18 -- we've never identified a sample as a W.R. Grace product

19 where it has been shown conclusively that it is the product of

20 a different manufacturer.

21 Q    So in other words, sir, you've never identified a product

22 as a W.R. Grace product using this process over the course of

23 17 years where it's been shown that that conclusion was

24 inaccurate?

25 A    So far as I know, that's correct.

1  Q    Now, sir, did you supervise the analysis of the samples

2  provided to you by the State of California for this engagement?

3  A    Yes.

4  Q    And did you do some of the analysis yourself?

5  A    Yes.

6  Q    And we'll get to this momentarily, but did there come a

7  time when your analysis, the methodology you followed, and your

8  conclusions were reduced to the form of a written report or

9  more than one report?

10 A    We issued written reports to the State of California.

11 Q    And do you remember when you issued those written reports

12 to the State of California?

13 A    To the best of my recollection, there were two issued in

14 2003, and then there were some subsequent samples received and

15 another report issued in 2005.

16 Q    Okay.  Let's turn to the specific conclusions that you

17 reached as to specific building addresses and specific claims.

18 And at this time, I'm going to direct your attention, Dr.

19 Vander Wood, to the screen which contains a chart that was not

20 only included in the State's trial brief, but also in the

21 declaration of Dr. Vander Wood that has previously been

22 provided to counsel for the debtors.

23          THE COURT:  It's also on the screen in front of you,

24 Doctor.  I don't know which is more helpful to you, but --

25          THE WITNESS:  I can --

1            THE COURT:  Okay.

2            THE WITNESS:  This is fine.  Thank you.

3  BY MR. MANDELSBERG:

4  Q    Now, let's -- can we take you through -- I'd like you to

5  look at this chart, Dr. Vander Wood, and go through it claim-

6  by-claim.  As you see, it's a chart that lists the claim

7  number, building address name, and identification of product

8  manufacturer.  The Claim Number 10648, could you --

9            MR. CAMERON:  Objection, Your Honor.  I think they're

10  using the demonstrative.

11            Is this just a -- I'm sorry, this is the blowup of

12  the -- that line?

13            MR. MANDELSBERG:  All it does is just blow up the --

14  so you can see --

15            MR. CAMERON:  Your Honor, I think it's the

16  demonstrative that you previously ruled could not be used.  You

17  could use the chart, which is up there, and I believe that this

18  is -- they're using something you had indicated could not be

19  used.

20            THE COURT:  If it's not in the chart, please don't

21  use it.

22            MR. MANDELSBERG:  All it is, Your Honor, is it's the

23  chart.  It's the words in the first line.

24            THE COURT:  If it's not in the brief, please don't

25  use it.

**J&J COURT TRANSCRIBERS, INC.**

1          MR. MANDELSBERG:   Okay.

2    BY MR. MANDELSBERG:

3    Q    Well, then just take a look at the first line of the

4    chart, if you can see that.  There should be a monitor closer

5    to you.  Okay.

6    A    I can -- either one.

7    Q    Yes.  If you can see that, that's fine.  Could you tell us

8    -- could you tell the Court what your conclusion was with

9    respect to the building address for Claim Number 10648?

10   A    That the samples or sample we analyzed from that building,

11   at least one of the samples from that building was a positive

12   match for Monokote 3.

13   Q    And is that the same conclusion that you reached for Claim

14   Number 10649 and 10650?

15   A    Yes.

16   Q    And these conclusions that you reached, Dr. Vander Wood,

17   are they your and MVA's conclusions to a reasonable degree of

18   scientific certainty?

19   A    Yes.

20   Q    Is that the case with all the conclusions that you reached

21   as to the samples that you tested?

22   A    Yes.

23   Q    Going down on the chart, Claim Number 10651 refers to 1234

24   East Shaw Avenue in Fresno, California, a/k/a Sierra S Reg HQ

25   Shop.  What was your conclusion with respect to the samples

1  from that address?

2  A    We had positive matches with Zonolite Finish Coat and

3  Zonolite Acoustical Plastic.

4  Q    Is there anything unusual about finding positive matches

5  with more than one product from a sample -- from more than one

6  constituent from a sample?

7  A    In this case, there -- the sample --

8           MS. HELLER:  Sir, you're going to have to --

9           THE WITNESS:  I'm sorry.

10           MS. HELLER:  -- turn and talk into the mic.  You're

11  going that way and I can't hear you.

12           THE WITNESS:  In this case, the sample was a layered

13  sample, it had two products present, and this is a very common

14  occurrence with these two products.  The Zonolite Acoustical

15  Plastic and Zonolite Finish Coat I believe were intended to be

16  used together.  The Zonolite Acoustical Plastic gives a

17  textured ceiling or textured wall, but is not white, and the

18  Zonolite Finish Coat was intended to be applied over the

19  surface of the acoustical plastic in order to give a more

20  pleasing aesthetic finish.

21  BY MR. MANDELSBERG:

22  Q    Okay.

23           MS. HELLER:  Mr. Mandelsberg, can you move the mic

24  closer to you?

25           MR. MANDELSBERG:  Sure.  Sure.  Is this okay?

1      MS. HELLER:  Yes.

2  BY MR. MANDELSBERG:

3  Q    Would you look down at the chart at Claim Numbers 10652

4  and 10653?  They refer to addresses 714 P Street in Sacramento

5  and 7650 South New Castle Road, Stockton, California.  What was

6  your conclusion as to the samples from those buildings?

7  A    That we had a positive match for Monokote MK-3.

8  Q    Now, you also did an analysis of samples from Claim Number

9  10654, but that is a claim for which W.R. Grace has withdrawn

10  its objection so we'll move on to the next one.  Claims 10655

11  and 10656 refer to properties at Jamestown, California and

12  Tehachapi, California.  What were your conclusions as to those

13  samples?

14  A    That we had a positive match for Monokote MK-3.

15  Q    And is MK-3 a shorthand reference for Monokote 3 in your

16  experience?

17  A    You hear of Monokote being referred to as MK-3.  You hear

18  as -- Monokote MK-3 as being referred to just as Monokote.

19  Q    Take a look at Claim Number 10657, which refers to the

20  2501 Harbor Boulevard, Costa Mesa, California address.  What

21  was your conclusion as to the sample from that address?

22  A    That we had a positive match with Zonolite Acoustical

23  Plastic.

24  Q    Take a look at the next claim, Number 10658, or the

25  Camarillo, California address.  What was your conclusion as to

1  the sample from that address?

2  A    That we had a positive match with Monokote MK-3.

3  Q    The next one is Claim Number 10659, 1234 East Shaw Avenue,

4  Fresno, California.  What was your conclusion as to that

5  address -- as to the sample for that address?

6  A    That we had positive matches with Zonolite Acoustical

7  Plastic and Zonolite Finish Coat.

8  Q    And take a look finally at the remaining four claims

9  listed, 10660, 10661, 10662, and 14411 from buildings in

10  Tehachapi, Stockton, Sacramento, and Stockton.  What was

11  your -- what were your conclusions as to samples taken from

12  those respective buildings?

13  A    That we had a positive match with Monokote MK-3.

14  Q    Now, sir, do you recall yesterday hearing Dr. Lee refer to

15  MVA reports conclusions for which he -- which he categorized as

16  the -- categorized in the category of not insufficient with WRG

17  product?  Recall that?

18  A    I'm sorry, not inconsistent with?

19  Q    Not -- excuse me, not inconsistent with WRG product.

20  A    Yes.

21  Q    Do you have any understanding as to what that meant?

22          MR. CAMERON:  Objection, Your Honor; how he can have

23  an understanding what Dr. Lee meant.

24          MR. MANDELSBERG:  Let me rephrase the question.

25  BY MR. MANDELSBERG:

**J&J COURT TRANSCRIBERS, INC.**

1  Q    Have you ever heard of that appellation or categorization

2  used to refer to an MVA reports conclusion on a product ID

3  analysis?

4  A    Not outside of this context, no.

5  Q    When you say this context, not outside of this litigation

6  in this W.R. Grace proceeding; is that correct?

7  A    Yes.

8  Q    Is the term not inconsistent with a particular product a

9  classification or appellation that you've ever used or anyone

10  at MVA has ever used to your knowledge?

11  A    Not that I'm aware of.

12  Q    Is it a categorization or appellation that any other

13  laboratory that you're aware of has used that also performs

14  product ID analyses?

15  A    Not that I'm aware of.

16  Q    Now, Dr. Lee in his testimony yesterday also referred or

17  classified two of the State's claims, 10651 and 10659, which

18  are listed in the chart, as in a category of insufficient data.

19  You have any basis for determining whether or not your

20  conclusions as to those two claims, and I think for -- chart

21  reflects that for 10650 your conclusion was positive match with

22  Monokote 3 and --

23          THE COURT:  Wait, I think you're misreading the

24  claims.  I think you want 10651.

25          MR. MANDELSBERG:  That's correct, Your Honor.

**J&J COURT TRANSCRIBERS, INC.**

1 BY MR. MANDELSBERG:

2 Q    10651, the conclusion is positive is positive matches with

3 Zonolite Acoustical Plastic and Zonolite Finish Coat, and for

4 Claim Number 10659, I believe it's the same conclusion.  Do you

5 have any basis for believing that your conclusions as to these

6 claims were based on insufficient or inadequate data?

7 A    I believe we have adequate data to back up these claims,

8 yes.

9 Q    Why so?

10 A    The laboratory analysis for these samples, the PLM

11 analysis in particular -- these samples contained

12 montmorillonite clay and as I discussed, clay can be very small

13 and very hard to detect.  In these cases, clay was detected in

14 all of the techniques used, but as I recall, the analyst was

15 not confident that he could independently estimate the amount

16 of clay, montmorillonite, and the amount of vermiculite.  So

17 that in his analysis he reported that he had found

18 approximately 15 percent chrysotile and approximately 85

19 percent vermiculite plus montmorillonite, and the SEM and TEM

20 confirmed the montmorillonite identification.

21        If you take those components and run them against our

22 database with 15 percent chrysotile and the remainder of only

23 vermiculite montmorillonite adding up to 85 percent, you come

24 up with a unique identification of Zonolite Acoustical Plastic.

25 Q    So, sir, with respect to the two claims that were put in

**J&J COURT TRANSCRIBERS, INC.**

1 the category of insufficient data, is it your opinion to a

2 reasonable degree of certainty that you and your lab at MVA did

3 have sufficient date and did do the appropriate tests in order

4 to determine the positive matches with Zonolite Acoustical

5 Plastic and Zonolite Finish or Finishing Coat?

6 A    Yes.

7 Q    And after listening to Dr. Lee yesterday, is there

8 anything that he said or any document that was introduced that

9 leads you to change your conclusion as to whether or not your

10 positive matches for Zonolite Acoustical Plastic and Zonolite

11 Finishing Coat for those two claims were in fact based on

12 sufficient and adequate data?

13 A    I have not changed my mind.

14 Q    In Dr. Lee's testimony and his report -- actually, in his

15 testimony, excuse me, not report, there was one claim --

16         THE COURT:  Oh, pardon me.  Before you leave these

17 two claims, I'm confused.  May I ask the witness a question,

18 please?

19         MR. MANDELSBERG:  Sure, Your Honor.

20         THE COURT:  Dr. Vander Wood, I'm not sure I

21 understand.  Are you suggesting that Grace is the only

22 manufacturer that used the montmorillomite (sic) clay?

23         THE WITNESS:  No, ma'am.  Your Honor, what I'm saying

24 is that if you take our database and ask it for all the

25 formulas that contain chrysotile at approximately 15 percent,

1  vermiculite and montmorillonite --

2           MS. HELLER:  Face the microphone.

3           THE WITNESS:  -- vermiculite and montmorillonite

4  totally 85 percent and no other components, then you end up

5  with a unique identification of Zonolite Acoustical Plastic.

6  There are other products that contain other materials that were

7  not present in these samples.

8           THE COURT:  All right.  So it's only the fact that

9  there's chrystotile, vermiculite, and this particular clay that

10 identifies it as a Zonolite product.

11          THE WITNESS:  Right, that only those materials are

12 present.

13          THE COURT:  Okay.  So you're matching the recipe,

14 essentially.

15          THE WITNESS:  Yes, ma'am.

16          THE COURT:  Thank you.

17          MR. MANDELSBERG:  May I proceed, Your Honor?

18          THE COURT:  Yes.  Thank you.

19 BY MR. MANDELSBERG:

20 Q    Now, one of the claims that Dr. Lee classified -- one of

21 the State's claims -- beyond classifications of not

22 inconsistent with WRG product and insufficient data, one claim,

23 Claim Number 10657, which as you can see on the chart you

24 concluded was a positive match with Zonolite Acoustical

25 Plastic.  Dr. Lee concluded or put in the -- this claim in the

1 category of wrong formula.  Did you hear that testimony

2 yesterday?

3 A     Yes, that's what I recall.

4 Q     Was your conclusion for Claim Number 10657 based on a

5 wrong formula?

6 A     I do not believe so.

7 Q     Why?

8 A     This was a particularly difficult case of identifying

9 montmorillonite in a sample.  The PLM analysis analyst was not

10 able to confirm its presence or make any estimate of its

11 abundance.  It was seen by SEM analysis, and it was seen by TEM

12 analysis, so pointing out the importance of doing confirmatory

13 work.

14      In this case, both the SEM and TEM saw the

15 montmorillonite and the presence of the vermiculite, even

16 though the PLM analyst couldn't see it.  When the data was

17 transcribed to the page that I believe Dr. Lee relied on for

18 his estimate, there was a typo.

19      Under montmorillonite, it listed as less than one

20 percent and minor where it should have simply said minor.  So

21 that while we don't have a composition for the relative

22 proportion again of vermiculite montmorillonite, we do know

23 that they add up to 85 percent and it comes down to the same

24 case before that these three components and only these three

25 components present are a unique match for Zonolite Acoustical

1  Plastic.

2  Q    So is it your opinion, Dr. Vander Wood, with a reasonable

3  degree of -- of scientific certainty, excuse me, that your

4  conclusion regarding the sample associated with Claim Number

5  10657 was based on the correct formula when you acknowledge

6  this typographical error?

7  A    Yes.

8            MR. MANDELSBERG:  Your Honor, may we place a binder

9  of DGS file exhibits in front of the witness?

10            THE COURT:  Oh, certainly.

11            MR. MANDELSBERG:  I'm not sure that he has it.

12       (Pause.)

13            THE COURT:  Which binder is it?

14            MR. MANDELSBERG:  Your Honor, I'm referring to the

15  Claimant State of California's binder that includes Trial

16  Exhibits -- DGS Trial Exhibits 17 through 28.

17            THE COURT:  All right.  Thank you.

18       (Pause.)

19            MR. MANDELSBERG:  It's the set of those --

20            THE COURT:  I have -- thank you.

21            MR. MANDELSBERG:  Your Honor, may I proceed?

22            THE COURT:  Yes, please.

23  BY MR. MANDELSBERG:

24  Q    Dr. Vander Wood, before I show you some exhibits -- refer

25  you to some exhibits, could you tell me whether Dr. Richard Lee

1  or anyone from his laboratory ever contacted you or, to your

2  knowledge, anyone at MVA to discuss your methodologies or

3  conclusions regarding the product identifications that you made

4  as part of your firm's reports?

5  A    I certainly think not.

6  Q    Did he or anyone from his laboratory, to your knowledge,

7  ever advise you that he believed your lab didn't perform a

8  starch test or any other test that he believed needed to be

9  performed in order to do a proper product ID analysis?

10  A    No.

11  Q    Did Dr. Lee or, to your knowledge, anyone from his firm

12  contact you to request any additional information or data so

13  that he could analyze or review your product ID conclusions?

14  A    No.

15  Q    Did he, during the course of yesterday's trial, speak to

16  you at any time regarding anything substantive?

17  A    No.

18  Q    Has Dr. Lee or anyone from his form, to your knowledge,

19  ever advised that your firm, MVA Scientific Consultants, was

20  engaging in an inappropriate or erroneous or misguided

21  methodology over the course of the 17 years that your firm has

22  been doing these product ID analyses?

23  A    Not that I'm aware of.  He kindly characterized us as a

24  good lab yesterday.

25  Q    Did you have an opportunity to review Dr. Lee's report in

1 connection with your retention by the State of California in

2 this matter?  When I say his report, I'm referring to Dr. Lee's

3 expert report, Exhibit -- Debtors' Exhibit 6.  And if you don't

4 have that before you, we'll put it before you right now.  Want

5 to make sure that you have the right document.

6      (Pause.)

7           MR. CAMERON:  Your Honor, I'd object to using this

8 document with the witness.  It's not an exhibit.

9           THE COURT:  This was an expert.  He's entitled to say

10 what other documents he normally uses in the course of his

11 expert review and testimony, and right now the only question is

12 did he review it.  So I don't think that's an objectionable

13 question yet.

14 BY MR. MANDELSBERG:

15 Q   Dr. Vander Wood, do you have what's been marked as

16 Debtors' Exhibit 6, which I believe is a copy of Dr. Lee's

17 report, dated January 2007?

18 A   I have a report here.  I don't see a marking on what

19 exhibit it is, but it is Dr. Lee's expert report.

20 Q   Now --

21           MR. CAMERON:  Your Honor, it's not Exhibit Number 6,

22 it's Number 6 in the -- Tab 6 in the notebook is not a

23 pre-marked exhibit.

24           MR. MANDELSBERG:  Well --

25           THE COURT:  It is Tab 6.  That --

1          MR. MANDELSBERG:  Tab 6.

2          THE COURT:  Yes.

3          MR. MANDELSBERG:  That's fine.

4   BY MR. MANDELSBERG:

5   Q    Dr. Vander Wood, would you take a look at this exhibit Tab

6   6 and tell me if this is a copy of the expert report of Dr. Lee

7   that you reviewed in connection with your retention by the

8   State of California in this matter?

9          THE COURT:  Well, you haven't established that he did

10  review it yet.  You've only asked him if he has a copy of it in

11  front of him and he said yes.

12         MR. MANDELSBERG:  I thought I did, but I'll --

13         THE COURT:  You never let him answer the question.

14  BY MR. MANDELSBERG:

15  Q    Dr. Vander Wood, did you review any expert report by Dr.

16  Lee in connection with your retention by the State of

17  California in this matter?

18  A    Yes, I did.

19  Q    You have a copy of a expert report of Dr. Lee, dated

20  January 17, 2007, that was included in the debtors' exhibit

21  binder at Tab 6.  Is that a copy of the report that you

22  reviewed?

23  A    It appears to be, yes.

24         MR. MANDELSBERG:  Your Honor, the State would offer

25  this exhibit as the next exhibit, which I believe is Number 30.

1      (State of California's Exhibit 30 marked for

2  identification.)

3           THE COURT:  You're offering --

4           MR. CAMERON:  Objection, Your Honor.

5           THE COURT:  -- what?

6           MR. MANDELSBERG:  Offering the expert report of Dr.

7  Lee as Exhibit 30.

8           THE COURT:  For what purpose?

9           MR. MANDELSBERG:  For purposes of establishing that

10 this was the expert report that the debtors provided.  It is

11 certainly an admission or acknowledgment by the debtors of what

12 their expert concluded, as reflected in his written report.

13 And it is something that Dr. Vander Wood reviewed.

14          THE COURT:  The fact that he reviewed it as something

15 -- first of all, you haven't established that it's something

16 customary for an expert of his -- in his particular field to

17 review.  That is, the report of another expert in his field.

18 So I'm assuming that you can make that connection, but you

19 haven't yet.  So assuming that you first make that connection,

20 that also does not make the fact that he reviewed another

21 expert report substantive evidence in this case.

22          So at -- first of all, you haven't done the

23 connection.  Assuming that you do, do the connection, it is

24 still not substantive evidence.  So Dr. Lee's report is not

25 evidence in this case simply because this expert reviewed it.

1 It is something that the Court can understand that this expert

2 reviewed if you substantiate that it's customary for experts in

3 his field to review other expert reports.  But you haven't yet

4 done that.

5          MR. MANDELSBERG:  Your Honor, I believe I can do

6 that.

7 BY MR. MANDELSBERG:

8 Q    Dr. Vander Wood, in the course of your experience when

9 you've been engaged to perform product ID analyses or other

10 engagements, have you had occasion to review, as part of your

11 engagement, expert reports from other experts?

12 A    Yes.

13 Q    Is it unusual for you to do so in order to test or correct

14 or validate or reach any conclusion?

15 A    I'd say it's more common than not that I'm given other

16 experts reports to review.

17 Q    So is it fair to say that it was customary for you to

18 review Dr. Lee's report, which is Debtors' Tab Exhibit 6 and

19 has been pre-marked now as the State's Exhibit 30, in

20 connection with your retention by the State of California in

21 this matter?

22 A    It's certainly not unusual.

23 Q    And was it, in fact, customary for you to do so in this

24 case?

25 A    Yes.

1          MR. MANDELSBERG:  Your Honor --

2          THE COURT:  That's not the standard, Mr. Mandelsberg.

3          MR. MANDELSBERG:  Your Honor, I believe given the

4    testimony --

5          THE COURT:  The standard is it customary in the

6    field, not whether it's customary as a business practice for

7    this gentleman.

8    BY MR. MANDELSBERG:

9    Q    Dr. Vander Wood, you're familiar with other firms that

10   perform product ID analyses such as the one you have done in

11   this case?

12   A    Yes.

13   Q    And do you attend meetings and conferences from

14   time-to-time in which you interact with representatives from

15   other firms in the industry, including Dr. Lee's and other

16   firms?

17   A    Yes.

18   Q    And do you have any knowledge as to whether or not it is

19   customary and ordinary and commonplace for experts engaged to

20   do product ID analyses and similar analyses to consider expert

21   reports from others in the field?

22   A    Yes.  Dr. Lee reviewed my reports, for instance.

23   Q    And is there anything about Dr. Lee's expert report that

24   you reviewed in this case that indicated that it was any

25   different from the type of report that is customarily reviewed

1 by other experts when you're engaged in other matters?

2 A    I think the only thing unique about this report in my

3 experience is that he did no laboratory analyses himself, but

4 in -- aside from that, no.

5        MR. MANDELSBERG:  Your Honor, I offer Dr. Lee's

6 expert report as DGS Exhibit 30.

7        MR. CAMERON:  Objection, Your Honor; hearsay.  I

8 think he had the opportunity to do this with Dr. Lee.  I don't

9 think the expert report -- even if it's customary for him to

10 review, I still don't believe the report can come in as an

11 exhibit through this witness.

12        THE COURT:  Well, I think it can't.

13        Want to give me a rule?

14        MR. MANDELSBERG:  Your Honor, I believe, first of

15 all, that under Federal Rule of Evidence 703, Dr. Lee is

16 entitled to -- excuse me, Dr. Vander Wood is entitled to refer

17 to or base his opinion on other data and those facts or data

18 need not be admissible in evidence in order for the opinion or

19 inference to be admitted.  And so under Rule 703 --

20        THE COURT:  Well, that's the basis for Dr. Vander

21 Wood's opinion.  That's not the basis -- that's not the

22 substantive evidence on which he relied to form that opinion.

23 That's not the right rule.  I think it's 705.

24        MR. MANDELSBERG:  Your Honor, we -- in addition, in

25 our objection to exhibit exchanges, there was no objection to

**J&J COURT TRANSCRIBERS, INC.**

1 Dr. Lee's expert report.

2           THE COURT:  No one offered it though.

3           MR. MANDELSBERG:  It's their expert report.

4           THE COURT:  Did you offer it?

5           MR. CAMERON:  It was not offered, Your Honor, by

6 either party as an expert -- or, I'm sorry, as an exhibit.

7           MR. MANDELSBERG:  Your Honor, this is quite

8 surprising because in conversations that we had before trial

9 that I had participated with Ms. Rea, specific question was

10 asked whether or not they would object if we introduced Dr.

11 Lee's expert report after we inquired whether they were --

12           THE COURT:  But you --

13           MR. MANDELSBERG:  -- going to admit it.

14           THE COURT:  If that's the case, then you mark it as

15 an exhibit.  Expert reports are hearsay.  The report of the

16 witness is the substantive evidence.  The reports are hearsay,

17 and unless there's going to be a stipulation that the report

18 comes into evidence, it is hearsay and it does not come into

19 evidence.  So I -- unless you can give me a rule around it, it

20 does not come in.  So --

21           MR. MANDELSBERG:  Your Honor, I --

22           THE COURT:  -- give me a rule.  It's not 703.  That's

23 talking about Dr. Vander Wood's --

24           MR. MANDELSBERG:  Your Honor, I --

25           THE COURT:  -- opinion and he clearly can testify to

1  his opinion.

2           MR. MANDELSBERG:  Your Honor, I believe that it is an

3  admission attributable to W.R. Grace to the debtors.  It is

4  admissible --

5           THE COURT:  Give me a rule.

6           MR. MANDELSBERG:  -- as an admission in that the

7  report, given Dr. Lee's testimony, is the only writing that

8  reflects what their expert did and his testimony is at variance

9  to that therefore it is --

10          THE COURT:  His --

11          MR. MANDELSBERG:  -- should be admitted --

12          THE COURT:  -- testimony is at variance to what?

13  Then you should have cross-examined him about it.  How do I

14  know whether something in his report is at variance with his

15  statement?

16          MR. MANDELSBERG:  We did cross-examine him about it,

17  Your Honor.  He was cross-examined by the starch test, and he

18  acknowledged that he didn't -- that the starch test wasn't

19  referred to in his report.

20          THE COURT:  Okay.

21          MR. MANDELSBERG:  So --

22          THE COURT:  So his report doesn't need to come in.

23  He said it's not in there, it's not in there.

24          MR. MANDELSBERG:  Your Honor, I would think the Court

25  would want to see the document by which Dr. Lee memorialized

1  his conclusions in order to determine --

2          THE COURT:  Mr. Mandelsberg, I'd like to see lots of

3  things, but you've got to give me a rule that lets me put it

4  into evidence before I can see it.  So tell me what rule you're

5  relying on.

6          MR. MANDELSBERG:  I believe it is admissible as an

7  admission and that is an exception to the hearsay rule.

8          THE COURT:  Under what rule?  Give me a rule.  You're

9  talking about 801(d)(2)?

10          MR. MANDELSBERG:  Yes, Your Honor.

11          THE COURT:  I mean this witness has been on the stand

12  and testified.  I don't see how at this time the report comes

13  in when he's been on the stand and testified.  You could use it

14  for impeachment purposes.  That doesn't make it substantive

15  evidence.

16          To the extent that there were inconsistencies in the

17  report, Dr. Lee was cross-examined about it and pointed out

18  where they existed and what they -- how they should be cured

19  based on subsequent evidence that he -- not evidence, but

20  information that he received, including the 2005 MVA report

21  that he then incorporated into the chart.  He admitted that the

22  starch test was not part of his original report.  I don't know

23  what else it is that you're attempting to get it in for.  This

24  witness has read it.  He's incorporated his opinion, despite or

25  with regard to that report.  His opinion's one thing.  Dr.

1  Lee's is another.

2          I'm still not seeing where it's coming in.  If you

3  can give me a rule to look at, I'm happy to look at that rule.

4          Mr. Baena?

5          MR. BAENA:  Judge, I -- if I may, Scott Baena on

6  behalf of the committee.  Judge, Dr. Lee prepared a report.  It

7  was timely provided in accordance with the case management

8  order.

9          THE COURT:  Yes.

10          MR. BAENA:  And all of that occurred subsequent to

11  the materials being furnished to him that he testified to

12  yesterday in a manner different than the information was

13  contained in his report.  And --

14          MR. CAMERON:  Your Honor, I think --

15          MR. BAENA:  -- as result, the report is a prior

16  inconsistent statement.

17          MR. CAMERON:  And --

18          MR. BAENA:  And it is not hearsay as a result.

19          MR. CAMERON:  Your Honor --

20          MR. BAENA:  Definitionally not hearsay.

21          MR. CAMERON:  I think they had the opportunity to

22  question Dr. Lee.  He's making an argument that maybe would

23  have been better to cross-examine Dr. Lee on and how this

24  document, which is clear hearsay, gets in through this witness.

25          THE COURT:  Yes --

1          MR. BAENA:  Judge, I --

2          THE COURT:  -- he had --

3          MR. BAENA:  -- you know, I raised this point

4   yesterday because I must tell you, Judge, it is so unusual for

5   a process like this to be so carefully crafted as to what

6   parties are going to exchange with one another and when.  And

7   for an expert to provide his report and then testify entirely

8   differently on certain subjects in the course of a trial, and

9   you hear the terms trial by surprise in the course of this

10  hearing and you wonder whether the goose is not, you know,

11  subject to the same accusation.

12         THE COURT:  Okay.  The only thing that I heard that

13  was, in quotes, different was the fact that he was given some

14  additional information after his report was prepared.  He added

15  a -- or not a paragraph, but a line to his chart that included

16  the supplemental MVA data.  As a result of that data, in some

17  instances, the debtor then took out of the lack of sufficient

18  information to make a conclusion on those particular claims,

19  and that's what I was attempting to reconcile on the record

20  yesterday.

21         So I understand the position that he should have been

22  given the information that was available before he prepared his

23  report, and he simply said he wasn't.  That --

24         MR. BAENA:  I don't know that I heard that, Judge.

25  I --

**J&J COURT TRANSCRIBERS, INC.**

1        THE COURT:  Well, he said that.

2        MR. BAENA:  That material was available or provided

3    in September of '05, I believe.

4        THE COURT:  That was provided to debtors' counsel.

5    His statement was he didn't get it.  That's what he testified

6    to, he didn't get it.

7        MR. BAENA:  But --

8        THE COURT:  There was no explanation.  He simply said

9    he didn't get it.

10        MR. BAENA:  He's their expert.

11        THE COURT:  I can't help who he is.

12        MR. BAENA:  They're --

13        THE COURT:  I can only state the testimony.  He said

14    he didn't get it.  His report --

15        MR. BAENA:  But you're allowing the gatekeeper to

16    regulate the evidence and that doesn't make sense.  It doesn't

17    enroll the respectable --

18        THE COURT:  The rules are the rules.

19        MR. BAENA:  It --

20        THE COURT:  Give me a rule under which it's

21    admissible.

22        MALE VOICE:  Your Honor, I --

23        MR. BAENA:  But the only objection, Your Honor, was

24    that it was hearsay.  And it's not hearsay --

25        THE COURT:  He testified.  He was here.

Vander Wood - Direct/Mandelsberg                60

1           MR. BAENA:  It's not hearsay, Judge, because it's a

2   prior inconsistent statement.

3           THE COURT:  Show me where it's inconsistent.  He was

4   here.  He should have been confronted with the inconsistencies.

5   To the extent that he was, he went through the report and he

6   said, "This is how I fixed the inconsistency, I added a line to

7   the report."  The only other question was does your report talk

8   about starch and he said no.  So I don't know where --

9           MR. BAENA:  But, Judge --

10          THE COURT:  -- that's a --

11          MR. BAENA:  -- what does that -- all due respect,

12  what does all of that have to do with keeping it out of the

13  record?  It doesn't have anything except make the case for

14  putting it into the record.  He's testified --

15          THE COURT:  That's not a prior --

16          MR. BAENA:  -- that it was inconsistent.

17          MR. MANDELSBERG:  Your --

18          MR. BAENA:  It should be part of the record.

19          MR. CAMERON:  Your Honor --

20          MR. MANDELSBERG:  Your Honor --

21          MR. BAENA:  That's what we're saying.

22          MR. MANDELSBERG:  Your Honor --

23          MR. CAMERON:  Your Honor, with all --

24          MR. MANDELSBERG:  -- you've asked --

25          Excuse me.

**J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  I don't --

2          MR. MANDELSBERG:  You've asked for rules.  I'd like

3  you to -- to refer --

4          THE COURT:  Yes.

5          MR. MANDELSBERG:  -- you to the two rules that I

6  believe authorize the admission of this report.  One is Federal

7  Rule of Evidence 613(b).  This --

8          THE COURT:  I'm sorry, 613 what?

9          MR. MANDELSBERG:  B.

10      "Extrinsic evidence of a prior inconsistent statement by a

11      witness is not admissible unless the witness is afforded

12      an opportunity to explain or deny the same and the

13      opposite party is afford an opportunity to interrogate the

14      witness thereon where the interest of justice otherwise

15      require."

16          Dr. Lee authored the report.

17          THE COURT:  Right, but then it says, "This

18  provision --

19          MR. MANDELSBERG:  He was definitely --

20          THE COURT:  -- does not apply to admissions of a

21  party opponent as defined in Rule 801(d)(2)," which is what you

22  just told me this is.

23          MR. MANDELSBERG:  That's right, Your Honor.  It -- if

24  it's -- if he's not a party opponent, then it is admissible as

25  a prior inconsistent statement of a witness.

1           MR. CAMERON:  Your Honor --

2           MR. MANDELSBERG:  If he is a party opponent, it is

3  admissible under 801(d)(2)(B), because it's a statement to

4  which the party has manifested an adoption or belief in its

5  truth.  That is certainly the case.  This is -- was his report.

6           MR. CAMERON:  Your Honor, with all due respect, this

7  is not --

8           MR. MANDELSBERG:  It was filed --

9           THE COURT:  Gentlemen, you --

10           MR. MANDELSBERG:  -- by the debtor.

11           THE COURT:  -- you cannot keep talking back and

12  forth.  Are you finished, Mr. Mandelsberg, then I'll hear the

13  debtor.

14           MR. MANDELSBERG:  Yes, I am, Your Honor.

15           THE COURT:  All right.

16           MR. CAMERON:  With all due respect, Your Honor, it's

17  not an -- prior inconsistent statement of this witness, the

18  witness they're trying to bring the document through.  If they

19  wanted to do that with Dr. Lee, which I think Your Honor is

20  right they did question him on that.  If they wanted to try to

21  move it then, that's a different issue.  It cannot come in

22  through this witness.  It's not a prior inconsistent statement

23  of --

24           THE COURT:  Of this witness.

25           MR. CAMERON:  -- this witness that they're trying to

1  impeach.

2            THE COURT:  That's true.

3            MR. CAMERON:  And I'm not even sure even if it's a

4  prior inconsistent statement it comes in as evidence.  You can

5  use it as impeachment.  I don't know necessarily that it comes

6  in as evidence.

7            MR. MANDELSBERG:  Your Honor, we're not trying -- we

8  don't need to introduce it through Dr. Vander Wood.  We have an

9  independent basis to introduce it as an exhibit because of Dr.

10 Lee's testimony yesterday.  There's nothing in either of the

11 rules I referred to that requires us to introduce it while Dr.

12 Lee is being cross-examined.

13           THE COURT:  Well, you folks can give me a brief on

14 this issue.

15           MR. MANDELSBERG:  Very well.

16 BY MR. MANDELSBERG:

17 Q    Dr. Vander Wood, did you find in Dr. Lee's report when you

18 reviewed it any indication that any tests that you performed in

19 the course of your product ID analysis were erroneously

20 performed or should have been performed but were not performed?

21           MR. CAMERON:  Objection, Your Honor.  This -- the

22 report is in front of the witness.  I don't believe it is -- it

23 is evidence and I do not believe he's established foundation

24 that this witness who can rely on hearsay for purpose of his

25 opinion relied upon this material for purposes of rendering his

1  opinion.

2          THE COURT:  I think what he's asked is whether there

3  was anything in the Dr. Lee report that challenged the

4  integrity of MVA's processes, and I think that's an appropriate

5  thing for this witness to take cognizance of.  The whole

6  problem in this case seems to be that Dr. Lee didn't do any

7  substantive testing.  He relied on the reports of MVA.

8  Therefore, if there's a problem with MVA's analysis, Dr. Lee

9  should have pointed it out.  Otherwise, Dr. Lee is accepting

10  the MVA analysis for purposes of drawing his own conclusion.  I

11  -- and to the extent that MVA sees a problem, then I think this

12  is a perfectly appropriate line of inquiry.  Overruled.

13          MR. MANDELSBERG:  Thank you, Your Honor.

14  BY MR. MANDELSBERG:

15  Q    Can you answer the question, Dr. Vander Wood?

16  A    I think so.  I believe you asked me if there was anything

17  in Dr. Lee's report that impugned our process or laboratory,

18  and the answer to that is --

19  Q    Or to borrow -- or to adopt the Judge's phrase, integrity.

20  A    I don't recall anything like that.

21  Q    Was there anything in the Dr. Lee report that indicated

22  that any sort of starch test that should have been performed

23  had not been performed by MVA?

24  A    No.

25  Q    Was there anything in the Dr. Lee expert report that

1  indicated that your methodology was flawed?

2  A    No.

3  Q    Was there anything in the Dr. Lee report that indicated

4  that it was not possible to a reasonable degree of scientific

5  certainty to establish product identification through the

6  methodology that MVA Scientific Consultants employed?

7  A    No.

8  Q    Are you aware of any other laboratory that performs the

9  sort of analyses that MVA Scientific Consultants does of

10 impugning the integrity of MVA Scientific Consultants'

11 processes and analyses of establishing product identification?

12          MR. CAMERON:  Objection --

13          THE WITNESS:  No.

14          MR. CAMERON:  -- leading.

15          MR. MANDELSBERG:  Of asbestos --

16          THE COURT:  Sustained.

17          MR. MANDELSBERG:  -- products.  I'll rephrase.

18 BY MR. MANDELSBERG:

19 Q    Do you know of any other laboratory besides -- let me

20 rephrase.  Do you know of any laboratory, any firm that has

21 challenged or impugned MVA Scientific Consultants' methodology

22 relating to product identification?

23          MR. CAMERON:  Same objection, Your Honor.

24          THE COURT:  Sustained.

25 BY MR. MANDELSBERG:

**J&J COURT TRANSCRIBERS, INC.**

1  Q    Are you aware of any criticism of MVA Scientific

2  Consultants' product ID --

3              MR. CAMERON:  Same --

4              MR. MANDELSBERG:  -- analysis?

5              MR. CAMERON:  Same objection, Your Honor.

6              THE COURT:  No, that's overruled.  This is, is he

7  aware of a general conception.  That's not a leading question.

8  That's overruled.

9              THE WITNESS:  I feel sure we've been criticized.

10 We've been in court in these matters before and I'm sure that

11 someone has criticized us.  But I'm not aware of any laboratory

12 or any technical criticism coming from a technical source on

13 the methods that we employ.

14 BY MR. MANDELSBERG:

15 Q    Are you aware of any court of tribunal having impugned MVA

16 Scientific Consultants' integrity or processes?

17 A    No.

18 Q    Sir, I'd like you to look at, in your binder, what's been

19 marked as the State's Exhibit 25.  And specifically, call

20 your --

21             MR. MANDELSBERG:  And I believe this exhibit, Your

22 Honor, has been introduced in evidence subject to Mr. Restivo's

23 comment earlier this morning about the portions of Exhibit A to

24 this document that consist of the proof of claim, but I'm not

25 referring to that.

**J&J COURT TRANSCRIBERS, INC.**

1 BY MR. MANDELSBERG:

2 Q    So if you would, Dr. Vander Wood, look at Exhibit 25,

3 which is the Claimant State of California's response to the

4 debtors' fifteenth omnibus objection to asbestos property

5 damage claims.  This document, besides the response, has two

6 exhibits, Exhibit A, which is a compendium of the State's proof

7 of claim forms, and Exhibit B, which is a compendium of the

8 State's Department of General Services MVA, Inc. reports

9 organized by a particular state claim number.  You see that

10 portion of the exhibit, sir?

11 A    I'm sorry, is -- do you have a page number?

12 Q    It's -- it starts -- if you have the exhibit, there's an

13 Exhibit B tab, and it starts right after the compendium with

14 individual W.R. Grace claim number --

15 A    I'm --

16 Q    -- tab.

17 A    I'm sorry, I think I'm looking at a different document.  I

18 don't -- I have DGS-25.  It's about 12 pages and there's no

19 tabs between it and 26.

20 Q    We'll give you the copy of the exhibit with the exhibits.

21      (Pause.)

22 BY MR. MANDELSBERG:

23 Q    Sir, do you now have Exhibit 25 with the exhibits and

24 could you please turn to Exhibit B of 25, which consists of MVA

25 reports corresponding with particular State of California claim

1  numbers?

2  A    Yes.  I have that.

3  Q    Is that a compendium of the reports that your firm

4  provided to the State of California organized to correspond

5  with each of the State's claims?

6  A    Yes.

7  Q    And is that an accurate report?

8  A    So far as I know.

9  Q    And complete report?

10  A    I have been through it and I don't find any problems with

11  it.

12  Q    Is it --

13  A    I'm sorry, there was one point of confusion, but I think

14  it was resolved by the withdrawn claim.

15  Q    Right.

16        MR. MANDELSBERG:  And just so that it's clear, Your

17  Honor, this exhibit does include the report for the withdrawn

18  claim.  In light of the withdraw of the objection, we're not --

19  we can excise that.  We're not offering that particular report.

20  BY MR. MANDELSBERG:

21  Q    But as to the -- all of the other reports besides the

22  withdrawn claim -- withdrawn objection, I should say -- Dr.

23  Vander Wood, is that a complete copy of your report organized

24  to correspond to the particular State of California claims?

25  A    I haven't gone through my initial report page-by-page and

1 found a corresponding page in these tab documents.  However, I

2 do believe it represents the substance of the reports that I

3 issued that are pertinent to a claim against W.R. Grace.

4 Q    Now would you please take a look at Exhibit --

5          MR. MANDELSBERG:  I believe, Your Honor, before I do

6 that, that Exhibit 25 with a qualification is already in

7 evidence.

8          THE COURT:  Yes, it is.

9 BY MR. MANDELSBERG:

10 Q    Would you please take a look at the exhibit binder,

11 Exhibit 17?  That exhibit has a cover page that says, "Claimant

12 State of California Department of General Services expert

13 reports by MVA, Inc. now known as MVA Scientific Consultants on

14 product identification."

15 A    Yes.

16 Q    And it includes tabs for a 3/28/2003 report, a 2/27/2003

17 report, an 11/2/2005 report, a curriculum vitae, and a February

18 16th, 2007 supplement.  You see all of that?

19 A    Yes.

20 Q    Can you identify what this Exhibit 17 is?

21 A    The three tabs that are identified with dates, March 28th,

22 February 27th, and November 2nd, represent our reports to the

23 State.  There's a tab that represents that my curriculum vitae

24 follows.  And the tab labeled "2/16 supplement" is -- I believe

25 this is a response in for -- to questions by W.R. Grace counsel

1  asking for information about me and my fees.

2  Q    And then there's also a certificate of service I believe

3  is the last page regarding the service of this document, right?

4  A    Yes.

5  Q    Now, sir, what -- are the two first tabs that you

6  identified -- are these the reports in the form that I believe

7  you identified earlier in your testimony as what was submitted

8  to the State?

9  A    Yes.

10  Q    And the third tab, November -- with a covering letter

11  November 2, 2005, what does that represent?

12  A    That was a report of analyses done later and issued in

13  November of 2005.

14  Q    And I believe that refers to the claim that's for which an

15  objection's been withdrawn.

16  A    I think that's the case, yes.

17  Q    And the CV page, does that represent your current and

18  complete CV, summary of credentials?

19  A    Yes.

20  Q    And does the supplement, the last supplement accurately

21  and completely reflect the extent of your compensation, other

22  cases you testified in, and materials relied upon?

23  A    Yes.

24          MR. MANDELSBERG:  Your Honor, we offer Exhibit 17 in

25  evidence, except for the portion of the exhibit that includes

Vander Wood - Direct/Mandelsberg                71

1  information report for the claim that -- Claim Number 10654 for

2  which the debtors have withdrawn their objection.

3          MR. CAMERON:  I don't have an objection, Your Honor.

4  I believe that with the exception of the curriculum vitae and

5  the supplement that has his fees, I think they're all part of

6  Exhibit 25 and I think -- so I think they're in there twice,

7  but don't have an objection.

8          THE COURT:  All right.  Exhibit 17 is admitted.

9      (State of California's Exhibit 17 received in evidence.)

10          THE WITNESS:  Your Honor --

11          THE COURT:  Why don't we take a 10-minute recess, and

12  then we'll reconvene with some testimony.  Okay.

13          MR. MANDELSBERG:  Thank you, Your Honor.

14          THE WITNESS:  Thank you.

15      (Recess 10:59 a.m. to 11:16 a.m.)

16  BY MR. MANDELSBERG:

17  Q    Dr. Vander Wood, were you present in court yesterday when

18  Dr. Lee gave testimony about MVA failing to perform certain

19  starch tests in 12 samples that were analyzed by your firm?

20  A    Yes.

21  Q    You have any idea as to why Dr. Lee gave that testimony?

22          MR. CAMERON:  Objection, Your Honor.

23          THE COURT:  Sustained.

24  BY MR. MANDELSBERG:

25  Q    Do you know why Dr. Lee made such statements?

**J&J COURT TRANSCRIBERS, INC.**

1  A    No, I don't.

2  Q    He did -- did he ever attempt to communicate with you, to

3  your knowledge, about the MVA reports conclusions regarding a

4  positive match with Monokote 3 or Zonolite Acoustical Plaster

5  or any other ingredient?

6  A    No.

7  Q    And is it your opinion that Dr. Lee's testimony yesterday

8  that regard was mistaken and inaccurate?

9  A    Yes.

10 Q    Now, you testified before earlier today that you performed

11 these starch tests as part of your processes that you employed.

12 I'd like to direct your attention to one of your reports so

13 that you could run through the documentation for the benefit of

14 the Court of exactly an example of your report that shows that

15 such test was performed.  So if you would -- wouldn't mind,

16 turn again to Exhibit 25, and again Exhibit B to that

17 exhibit --

18     (Cough.)

19         MR. MANDELSBERG:  Are Your Honor -- you okay?

20         THE COURT:  Yes.

21 BY MR. MANDELSBERG:

22 Q    -- Exhibit B to that exhibit, W.R. Grace Claim Number

23 10650.

24 A    Yes.

25 Q    And direct your attention specifically to pages 190 and

1  191, or any other pages that you may consider germane to this

2  question.  Could you review which portions of this report for

3  this claim, 10650, reflects the administration and results of

4  the starch test which you testified earlier?

5  A    On the PLM constituent analysis sheet, which is page 191,

6  there are entries for a variety of materials which are often

7  found in asbestos containing building materials.  One of them

8  is starch, and if you'll note by starch there is a minus sign

9  enclosed in parenthesis.  That's the indication from the

10  analyst that the starch test was performed and that the results

11  were negative or minus, indicating that no starch was detected.

12  Q    And you're referring to the page that's entitled "MVA,

13  Inc. PLM Constituent Analysis," the column "Constituent," and

14  the last reference in that column to starch, right?

15  A    In the middle column in the middle --

16  Q    Middle.

17  A    -- of the page, yes.

18  Q    And is there anything about this page that is ambiguous to

19  you as to whether or not a starch test was performed in this

20  instance and indicated the absence of starch?

21  A    No, we've been using substantially this page for 15 years.

22  Q    In your opinion, if Dr. Lee had looked at this page or

23  report, is there any way that he could have reasonably

24  concluded that a starch test has not been performed or had been

25  performed and indicated the positive presence of starch?

1  A    I don't know how to answer the first part of your

2  question, but the second part he -- if he reviewed this page, I

3  think he would conclude that we had done something to test for

4  starch and that the result of that test was negative.

5           MR. MANDELSBERG:  I have nothing further.  Thank you,

6  Dr. Vander Wood.

7           THE COURT:  Miss Kearse, any questions for this

8  witness?

9           MS. KEARSE:  No, Your Honor.

10           THE COURT:  Mr. Baena?

11           MR. BAENA:  No, Your Honor.

12       (Pause.)

13           MR. CAMERON:  Your Honor, if I might approach the

14  witness, I want to put the witness binder up there.

15           THE COURT:  Certainly.  Which one, Mr. Cameron?

16           MR. CAMERON:  This is the debtors' revised or amended

17  index.

18           THE COURT:  Okay.

19           MR. CAMERON:  Or amended binder that has just the --

20           THE COURT:  The one that was --

21           MR. CAMERON:  -- just the exhibits that we -- that

22  were -- for the claims that were at issue today and yesterday.

23           THE COURT:  Thank you.

24                          CROSS-EXAMINATION

25  BY MR. CAMERON:

1  Q    Good morning, Dr. Vander Wood.  My name is Doug Cameron,

2  and I represent the debtor -- debtors, W.R. Grace, in this

3  proceeding.  Do I understand correctly that you were retained

4  by the State of California, Department of General Services to

5  perform a constituent analysis for samples taken from a number

6  of their buildings.  Is that correct?

7  A    Yes.

8  Q    And you didn't take those samples, right?

9  A    No.

10 Q    Okay.  And in some of those buildings after you did the

11 constituent analysis you concluded that the samples were --

12 there was a match with a W.R. Grace product.  Is that correct?

13 A    Yes.

14 Q    And in some of the samples you concluded there was a match

15 with a U.S. Gypsum product.  Is that correct?

16 A    I believe that is one.  There may be more.

17 Q    And you made those conclusions based, did you not, on your

18 analysis that reported out the major components and the

19 percentages of the major components in those samples, correct?

20 A    We reported all of the components that we detected.

21 Q    And then you ran through your database the major

22 components in relative percentages to determine whether or not

23 there was a match?

24 A    We were -- we ran through the database the significant

25 components to see if there was a match.

**J&J COURT TRANSCRIBERS, INC.**

1  Q    And were you aware at the time that you were performing

2  this analysis so that the State of California Department of

3  General Services could file claims in either the W.R. Grace or

4  U.S. Gypsum bankruptcy?

5  A    I'm sorry.  I don't understand your question.

6  Q    At the time that you were retained to perform this

7  analysis did you know that the analysis was going to be used

8  for purposes of submitting claims in the W.R. Grace bankruptcy

9  and/or the U.S. Gypsum bankruptcy?

10  A    I knew that the -- that there was interest in the

11  bankruptcy filings of both W.R. Grace and USG.  I did not know

12  that our results would be used in one way or another.

13  Q    Okay.  So at that time you knew that there was an interest

14  by the State of California Department of General Services in

15  those two bankruptcies.  Is that correct?

16  A    Yeah.

17  Q    Okay.  And if I could, Dr. Vander Wood, I'd like to look

18  at the buildings or claims that you concluded samples match an

19  Acoustical Plaster product see if I can understand what you

20  testified to earlier today.  And those samples are, you

21  indicated that you found a match for either Zonolite Acoustical

22  Plastic or finish coat.  Is that correct?

23  A    Yeah.

24  Q    Okay.  And in order to identify the manufacturer in your

25  constituent analysis would you agree it's important to first

1 identify the major components of the sample?

2 A    Yes.

3 Q    And it's also important to estimate the various

4 percentages of those components?

5 A    Yes.

6 Q    And the major components in Zonolite Acoustical Plastic

7 are chrysotile asbestos.  Is that right?

8 A    That's one.

9 Q    Vermiculite?

10 A    Yes.

11 Q    And montmorillonite clay?

12 A    Yes.

13 Q    Okay.  If you could look at, in the binder that I gave

14 you, Exhibit Number 55?  It's behind you now.  Or --

15 A    No.  I believe this is the one you gave me.

16 Q    Okay.  Exhibit Number 55?

17        MR. MANDELSBERG:  Your Honor, if we could wait.  I

18 think the -- we were only provided one binder and I think it's

19 before the witness, and we'd like to be able to follow along

20 with their revised exhibits, which he only gave us yesterday.

21        MR. CAMERON:  Okay.

22        MR. MANDELSBERG:  For the first time.

23        MR. CAMERON:  We gave him a binder.  I don't know --

24        MR. RESTIVO:  I think they gave them to the witness.

25        (All discussing binder)

1            MR. MANDELSBERG:  The witness has the binder.

2            MR. FLATLEY:  No.  I took my -- I took the one that

3  the witner [sic] used yesterday.

4            MR. RESTIVO:  Might I approach, Your Honor?

5            THE COURT:  Yes.

6            MR. RESTIVO:  Maybe there's two up there.

7            MR. CAMERON:  We just want follow up.

8            THE WITNESS:  I have a pile of stuff.  I don't know.

9  Is it -- is this the same?  No.  Wait.  Is this the same?

10           MR. RESTIVO:  Debtors' updated binder.

11           THE WITNESS:  Okay.  I'm sorry.

12           MR. RESTIVO:  Would you like a binder?

13           MR. FLATLEY:  Yes, thank you.

14  BY MR. CAMERON:

15  Q    Could you look at Exhibit Number 55?

16  A    Yes.

17  Q    Okay.  And after the first page, which is a one page of a

18  spreadsheet, following that or -- is your report for that

19  building.  Is that correct?

20           MR. MANDELSBERG:  Objection, Your Honor.  I'm not

21  sure that these -- these are pages that the debtor apparently

22  put together for purposes of their binder exhibits that they

23  submitted the first time yesterday to Court.  We already have

24  an exhibit, two exhibits, actually, that the witness has

25  identified as constituting his complete reports, organized by

1  Exhibit 25 for claim --

2          THE COURT:  All right.

3          MR. MANDELSBERG:  -- and organized by 17.  Why

4  doesn't he just use the exhibits that the witness has --

5          THE COURT:  He doesn't have to.  These are in

6  evidence, too.  If the witness says it's not his report, then

7  we have a different problem.  Otherwise, if the witness can

8  recognize this as pages of his report, if he wants to see

9  something, he's a very erudite person.  He'll know to ask.

10          MR. MANDELSBERG:  Okay.  I'm just not sure that this

11 is all the pages, but very well.

12          THE WITNESS:  I'm sorry.  Would you ask your question

13 again, please?

14 BY MR. CAMERON:

15 Q    Dr. Vander Wood, could you look at Exhibit Number 55,

16 please?

17 A    Yes.

18 Q    And after the first page, which is a one-page spreadsheet,

19 following that is a copy of your report for claim number 10657.

20 Is that correct?

21 A    These appear to be pages abstracted from a larger report

22 that referred to that claim, yes.

23 Q    Okay.  And if you look at the data interpretation page,

24 which is page 28.

25 A    Yes.

1  Q    That's where you concluded that there was a match for

2  Zonolite Acoustical Plastic.  Is that correct?

3  A    That notes our -- excuse me -- that notes our conclusion,

4  yes.

5  Q    Okay.  And when you look at Exhibit Number 55, page 28,

6  can you tell me what you plugged into your database for

7  purposes of determining whether there was a match for any

8  particular product?

9  A    In this case what would be plugged into the database would

10  be a query for the presence of chrysotile, vermiculite,

11  montmorillonite.

12  Q    And if you look at page 29, the next page, the PLM

13  constituent analysis.

14  A    Yes.

15  Q    That's where the analyst indicated that the clay may be

16  present, but could not be confirmed.  Is that right?

17  A    Yes.

18  Q    Okay.  And I think that you testified earlier today that

19  the less than one percent finding on page 28 was in error.

20  That was a typo.  Is that correct?

21  A    Yes.

22  Q    Okay.  And you would agree -- would you agree with me,

23  Dr. Vander Wood, that a constituent of a material that's less

24  than one percent, that's not a major component of that

25  material, is it?

1  A     I would agree with that, yes.

2  Q     Okay.  And at the time that you plugged montmorillonite,

3  vermiculite and chrysotile into your database you knew, in

4  fact, that W.R. Grace's product contained those materials,

5  correct?

6  A     Yes.

7  Q     Okay.  So you anticipated a match for Zonolite Acoustical

8  Plastic when you did that?

9  A     I don't think that's a fair characterization, no.

10 Q     And if montmorillonite was not put into the database, into

11 your database query you wouldn't have had a match for Zonolite

12 Acoustical Plastic, would you?

13 A     If we had specified no montmorillonite we would not

14 have -- it would not have returned that as a possibility.

15 Q     If you don't put it into your query, into your database,

16 you're not going to have a match for Zonolite Acoustical

17 Plastic.  Is that correct?

18 A     No, sir, that's not how it works.

19 Q     Okay.  So if you do not put montmorillonite into the query

20 for your data -- when you're running it for your database you

21 could still have a match for Zonolite Acoustical Plastic?

22 A     What happens at the -- as the result of a query is the

23 database returns all of the possible matches based on those

24 materials, plus any other materials that the database thinks

25 might be present, so that if we had put in chrysotile and

1 vermiculite we would have gotten a whole sweep of possible

2 matches.  The final decision isn't made by the computer.  It's

3 made by me.

4 Q    Okay.  And then if it came back that, with just chrysotile

5 and vermiculite into your query would you have found there to

6 be a Zonolite Acoustical Plaster match?

7 A    One of the possibilities returned by the query would be

8 Zonolite Acoustical Plastic.

9 Q    And if there was no montmorillonite claim would you

10 confirm -- would you conclude that it was a match with Zonolite

11 Acoustical Plastic?  That's my question.

12 A    No, I would not.

13 Q    Okay.  And if you could turn -- do you enter into your

14 database query all of the constituents that you find in your

15 analysis?

16 A    All of those that we believe are significant components,

17 yes.

18 Q    And how do you define significant?

19 A    Well, based on our experience with the material.  For

20 instance, if there's a few percent calcium carbonate in the 65

21 percent gypsum we wouldn't enter calcium carbonate in the

22 database.

23 Q    Okay.  So it's really not dependent on any particular

24 percentage for any material?

25 A    No.

**J&J COURT TRANSCRIBERS, INC.**

1  Q    Okay.  If you could turn, Dr. Vander Wood, to Exhibit 49?

2  A    Yes.

3  Q    If you go a couple of pages back that is the first page

4  from your report for claim number 10651.  Is that correct?

5  A    Yes.

6  Q    Okay.  And this is another building in which you concluded

7  that Zonolite Acoustical Plastic was a match?

8  A    Let me back up just a second to be perfectly clear.  This

9  page, the first page you asked me about, was not prepared by

10 us.  It was prepared by the State of California.  The page that

11 follows is a cover letter and a page of our report from which

12 the subsequent pages were abstracted.

13 Q    Okay.  And is this another building where you concluded

14 that there was a match with Zonolite Acoustical Plastic?

15 A    Yes.

16 Q    Okay.  And if you turn back to page 111 down in the lower

17 right-hand corner, that's your data interpretation page,

18 correct?

19 A    Yes.

20 Q    And it also includes your conclusion?

21 A    Yes.

22 Q    Okay.  And looking at this page can you tell me what you

23 entered into your database query for purposes of determining a

24 match for this sample?

25 A    It would have been chrysotile, vermiculite and

1  montmorillonite.

2  Q    Okay.  And did you enter them in any particular

3  percentages?

4  A    No.

5  Q    Okay.  You ordinarily entered the constituents by

6  percentage or just identify the constituents in the query?

7  A    We identify the constituents in the query.

8  Q    Okay.  So it doesn't matter in what percentages they're

9  found?

10 A    No.

11 Q    Okay.  And again, you knew at the time that you entered

12 those constituents that Grace's Zonolite Acoustical Plastic had

13 those constituents in the product, correct?

14 A    I suppose in a general way, yes.

15 Q    Okay.  And again, if you'd look at page 112, the PLM

16 constituent analysis, there's another indication that

17 "montmorillonite may be present but could not be confirmed."

18 Do you see that?

19 A    Yes.  In this case the analyst had a positive clay test,

20 but he couldn't distinguish individual clay particles.

21 Q    Okay.  And it also indicates there the presence of

22 "Kaolinite is indicated by micro chemical testing."  Do you see

23 that?

24 A    Yes.

25 Q    Is Kaolinite a part of the Zonolite Acoustical Plastic

1 formula?

2 A    No.

3 Q    Okay.  And so when you ran your query you didn't include

4 Kaolinite in the query, did you?

5 A    No.

6 Q    And you also have in the PLM constituent analysis, you

7 found precipitated carbonate, correct?

8 A    Yes.

9 Q    And that's also at less than one percent?

10 A    It is at less than one percent, yes.

11 Q    And you didn't enter that into the query, did you?

12 A    No.

13 Q    And is precipitate carbonate in the W.R. Grace formula?

14 A    No.

15 Q    Okay.  You also found quartz, did you not?

16 A    Yes.

17 Q    Okay.  And did you enter that in the query?

18 A    No.

19 Q    Is quartz part of the W.R. Grace formula?

20 A    No.

21 Q    So based on these analyses, the constituents that you

22 entered were only chrysotile asbestos, vermiculite and

23 montmorillonite clay, correct?

24 A    Yes.

25 Q    And did you know at the time -- you were familiar with the

1  Grace product formula at the time you were doing your query.

2  Is that correct?

3  A    Generally, yes.

4  Q    Okay.  And you knew at the time that if you had entered

5  Kaolinite you would not have a match for W.R. Grace's product.

6  Is that correct?

7  A    I suppose so, yes.

8  Q    And the reference to the detection of Kaolinite is with

9  your micro chemical testing.  Do you see that?

10 A    Yes.

11 Q    And I think you described that earlier today, where you

12 did micro chemical testing, you said, for both clay and for

13 starch.  Is that correct?

14 A    Yes.

15 Q    Okay.  Is there a reason why you disregarded -- I mean,

16 did you determine that this micro chemical testing was

17 unreliable such that you wouldn't report the Kaolinite in the

18 sample?

19 A    No.  In fact, we did report the Kaolinite.

20 Q    You didn't include it in your query to determine whether

21 or not there was a match.  Is that correct?

22 A    That's correct.

23 Q    Okay.  I'd like to turn, Dr. Vander Wood, to some of the

24 buildings where you concluded the samples matched MK-3, and I'd

25 like you to -- if you could -- turn to Exhibit 48.  And you had

1  indicated on your direct examination -- I think you went over

2  this building.  This is a building -- this is the analysis for

3  claim number 10650.  Is that correct?

4  A    Yes.

5  Q    Okay.  And that's the report that you went over earlier

6  today on direct examination.  Is that correct?

7  A    I don't think so.  Is it?

8  Q    I think it is, but if you don't --

9  A    Oh, okay.  Yeah, I'm sorry.  I've been confused for weeks

10 by the three-digit difference between the exhibit number and

11 the claim number.

12 Q    Okay.  And I want to go back through the report a little

13 bit, as your counsel indicated.  I'd like you to look at page

14 191 of Exhibit 48, please.

15 A    Yes.

16 Q    And you indicated on direct examination that the negative

17 sign by starch indicates that you did a starch test and it --

18 no starch was found.  Is that correct?

19 A    Yes.

20 Q    And that starch test is part of the PLM analysis?

21 A    It is done at the same time, yes.

22 Q    Okay.  And if you look at Exhibit Number 48, and we can go

23 page by page, following on page 192 are some photographs.  Is

24 that correct?

25 A    Yes.

1  Q    Those aren't any -- those don't show the results of your

2  micro chemical analysis for starch, do they?

3  A    Not so far as I know, no.

4  Q    Okay.  How about if you look at page 193?

5  A    Yes.

6  Q    Okay.  Is there anything on that page that reports out the

7  results of your starch test?

8  A    No.

9  Q    Okay.  Following page 193 are three pages where you do

10 have detail for the SEM analysis.  Is that correct?

11 A    Yeah.

12 Q    Okay.  That doesn't have anything to do with starch, does

13 it?

14 A    No.  The starch is reported on the PLM sheet.

15 Q    Okay.  That's -- in fact, that's the only place it's

16 reported, right, that one entry on the sheet?

17 A    Yes.

18 Q    There's no work-up or backup data showing what happened

19 when you took that test?

20 A    There's the handwritten notes of the analysts that's

21 transcribed onto the PLM sheet.

22 Q    Okay.  That's not in this report, though, correct?

23 A    Everything on that sheet is transcribed with a notation of

24 plus or minus in the parenthesis by starch is the analyst's

25 notation of the results of the starch test.

1  Q    Okay.  And you are -- you testified earlier that as part

2  of the ordinary course you review the reports of other labs.

3  Is that correct?

4  A    I believe I testified that I have reviewed the reports of

5  other labs.

6  Q    And are you familiar with Dr. Longo's lab?

7  A    Yes.

8  Q    Okay.  Have you ever reviewed any of his reports?

9  A    I have seen his reports, yes.

10  Q    Okay.  And do you understand him to perform starch

11  analyses -- starch tests when he's doing product

12  identification?

13  A    Yes.

14  Q    Do you know what kind of test he uses?

15  A    I don't have any firsthand knowledge of that, no.

16         MR. CAMERON:  Hold on a second; I need to get an

17  exhibit number.  May I approach the witness, Your Honor?

18         MR. MANDELSBERG:  Your Honor, is there a particular

19  exhibit?

20  BY MR. CAMERON:

21  Q    I'm going to show you what's --

22         MR. MANDELSBERG:  Your Honor, this was not provided.

23  I don't know whether counsel intends to use it for impeachment

24  purposes, but it wasn't ever provided to us.

25         THE COURT:  Well --

1        MR. MANDELSBERG:  In any disclosure that's not on any

2  of the debtor's --

3        MR. CAMERON:  I do, Your Honor.  This is cross-

4  examination, and I do intend to use this.  The witness

5  testified on direct that he has, you know, looked at the lab

6  reports of other labs and I want to show what other labs do

7  with respect to these kind of tests.

8        THE COURT:  Well, we'll see where it goes.

9        MR. MANDELSBERG:  Objection, Your Honor.  I don't

10 think he's laid a foundation for what other labs do, for what

11 Mr. Longo has done.

12        THE COURT:  Well --

13        MR. MANDELSBERG:  All he has is one document.

14        THE COURT:  At the moment we don't even have an

15 identification of the document.  Could we, you know, find out

16 what it is first and then we'll hear objections in order when I

17 find out what the purpose is.

18        MR. MANDELSBERG:  Very well, Your Honor.

19 BY MR. CAMERON:

20 Q    Dr. Vander Wood, I'm showing you what's been marked as

21 exhibit number -- Debtors' Exhibit Number 67, and ask you, are

22 you familiar with Dr. Longo?

23 A    Yes.

24 Q    Okay.  And he works at the MAS lab.  Is that correct?

25 A    Yes.

1  Q    Okay.  And you are aware that he, like MVA, does product

2  identification work?

3  A    Yes.

4  Q    Okay.  And are you aware of whether or not Dr. Longo does

5  starch tests in connection with his product identification

6  work?

7  A    I believe he does, yes.

8  Q    Okay.  If you look at Exhibit Number 67 in --

9            MR. MANDELSBERG:  Objection, Your Honor.

10            MR. CAMERON:  This --

11            THE COURT:  Wait till I hear the question.  Go ahead.

12  BY MR. CAMERON:

13  Q    I was going to ask you, Dr. Vander Wood, if you are

14  familiar whether or not Dr. Longo reports in his PLM analysis

15  whether or not starch is observed?

16            MR. MANDELSBERG:  Objection, Your Honor.  He hasn't

17  laid a foundation for this document.  He hasn't laid a

18  foundation that it's representative of the sort of analyses

19  that Dr. Longo has done.  The debtor didn't call Dr. Longo.

20  The debtor didn't introduce any evidence regarding Dr. Longo's

21  methodology.

22            They had an opportunity to do so.  They had an

23  opportunity to identify this exhibit and any disclosure.  They

24  didn't do so.  This is not simply impeachment.  This is really

25  an example of trying to surprise us with a document that they

**J&J COURT TRANSCRIBERS, INC.**

1  had and could have easily identified beforehand.

2          THE COURT:  I'm not sure that it's impeachment.  The

3  witness has said that he's not familiar with the type of test

4  that Dr. Longo does.  So I don't know how you can impeach the

5  witness about a lack of knowledge.

6          MR. MANDELSBERG:  Well, in that event, I object to

7  any questions about the document, since the witness -- in light

8  of the witness's own testimony there's no foundation for

9  introducing it.  Had they introduced information about

10  Dr. Longo and called him as a witness, maybe that would have

11  been a different story, but they didn't do that.

12          MR. CAMERON:  Your Honor, this is a report that

13  Dr. Longo has submitted in the W.R. Grace bankruptcy, one of

14  the product identification reports.  And I simply want to

15  establish that with this witness the type of work that

16  Dr. Longo does in his lab --

17          THE COURT:  Throughout --

18          MR. CAMERON:  -- Dr. Vander Wood has testified

19  earlier that as part of the ordinary course he reviewed experts

20  reports by others doing product identification work.

21          THE COURT:  But it's irrelevant.  The issue is

22  what -- in this particular case what this witness did.  He's

23  already said that he doesn't know the type of starch test that

24  Dr. Longo does, particularly.  So unless you can substantiate

25  that there is some knowledge, first of all, there is no

1 foundation; secondly, I don't know the relevance.

2 BY MR. CAMERON:

3 Q    Do you know, Dr. Vander Wood, whether or not Dr. Longo

4 when doing his starch test actually attaches to his reports the

5 results of that test?

6 A    No, I don't.

7 Q    Okay.  You've never discussed that with Dr. Longo?

8 A    No.

9 Q    Do you know if Dr. Lee in doing starch tests separately

10 reports the results of that test?

11 A    No, I don't.

12 Q    Okay.  Do you know if McCrone Environmental separately

13 reports the results of starch tests?

14 A    I don't think McCrone Environmental does this work

15 anymore.

16 Q    Okay.  Do you know if they separately reported the results

17 of the starch test when they did the work?

18 A    I don't know that.

19 Q    Okay.  Dr. Vander Wood, in the declaration that you

20 submitted for this case was there any mention of the fact that

21 you did a starch test?

22 A    Indirectly.  I talked about the micro chemical testing

23 that's done while the PLM analysis is being done and that

24 refers to the starch test.

25 Q    Okay.

1            MR. CAMERON:  Your Honor, may I approach?  I think,

2    Your Honor, this -- his declaration is Tab 7 of the

3    supplemental binder, but I have a copy I can hand up to you if

4    it's easier.

5            THE COURT:  No, I have it.  Thank you.  I don't need

6    a copy.

7            MR. MANDELSBERG:  Your Honor, is this document being

8    offered in evidence or simply marked for identification?

9            THE COURT:  I don't even have it yet,

10   Mr. Mandelsberg.  You keep asking questions when I don't even

11   know what you're talking about.  It would be helpful if we

12   could find out things in an orderly process, and then I might

13   have a ruling to be able to make.  But at the moment, I don't

14   even know what it is.  I haven't been handed anything yet.

15           MR. MANDELSBERG:  I'm sorry, Your Honor.  I thought

16   you had the document.

17           THE COURT:  Okay.  I have the declaration.

18           MR. CAMERON:  Okay.

19   BY MR. CAMERON:

20   Q    And Dr. Vander Wood, could you look at the declaration

21   that I handed to you, please?  And can you tell me where in the

22   declaration there's a description of the starch test that you

23   performed?

24   A    As I said, it's mentioned -- the starch test is not

25   specifically mentioned.  The micro chemical tests are mentioned

1 and the starch test is one of the micro chemical tests that are

2 performed.

3 Q    There's no reference in here to the starch test directly,

4 though, is there?

5 A    There's no mention of starch.

6 Q    Okay.

7 A    So far as I recall.

8 Q    Okay.  And there is a discussion in the following couple

9 paragraphs in detail of what you did in the SEM and the AEM

10 analysis.  Isn't that correct?

11 A    I think that the discussions of the different techniques

12 are relatively well balanced.

13 Q    Okay.  And is it fair to say, then, Dr. Vander Wood, that

14 the only place in your reports in which there is any

15 documentation of the existence of a starch test is on the PLM

16 constituent analysis?  Is that correct, that one entry next to

17 starch?

18 A    Yes.

19 Q    Okay.  You don't have any results of the test, other than

20 on that one page?

21 A    That's correct.

22          MR. CAMERON:  Okay.  That's all I have, Your Honor.

23          MR. MANDELSBERG:  Your Honor, may I have a moment

24 before --

25          THE COURT:  Yes.

1          MR. MANDELSBERG:  Thank you.  Actually, Your Honor,

2 it may be more efficient for me to question from counsel table,

3 if you don't mind.

4          THE COURT:  That's fine.

5                    REDIRECT EXAMINATION

6 BY MR. MANDELSBERG:

7 Q    Dr. Vander Wood, debtors' counsel asked you some questions

8 a few moments ago about debtors' Exhibits 49 and -- actually,

9 Exhibits 55 and 49, which incorporate portions of your reports

10 regarding your positive match for Zonolite Acoustical Plaster.

11 Do you recall those line of questions, sir?

12 A    Yes.

13 Q    And there were some questions about your input or not

14 input of certain constituents like Kaolinite and others.  Could

15 you -- will you tell the Court why in your reports certain

16 minerals or ingredients are referred to with asterisks and

17 others are referred to with percentages and others will just

18 have a dash?  Could you explain that?

19 A    Well, and the asterisks refer to -- and I think they

20 appear principally on PLM-type sheet -- whoops -- they refer to

21 things that were -- you're asked to consider at the bottom.

22 They're generally not major constituents or they are -- thank

23 you --

24          MR. MANDELSBERG:  Thanks, Jim.

25          THE WITNESS:  -- they are observations made by the

1  analysts that don't fit in the slots provided next to a

2  particular constituent that he thinks might be pertinent.  So

3  as he's in the course of his analysis he'll make those

4  annotations.

5        The dashes and stars that appear or pluses that

6  appear in parentheses usually refer to the results of a micro

7  chemical test, and they indicate a positive or negative result.

8  Obviously, the minus sign means a negative result.  You'll

9  occasionally see other comments where the analyst -- I don't

10  know that it's occurred here -- but where the analyst has noted

11  other materials or notes that the material is present but

12  believes it's a trace component of some other material that is

13  called for in the formula.

14        They're not -- this isn't semi-conductor

15  manufacturing when they load a ton of gypsum into the vat.

16  They haven't analyze it to make sure that it's 99.999 percent

17  pure.  There are other components.

18  Q    And so a reference such as I believe in Exhibit 55, next

19  to montmorillonite of minor would refer, in your opinion, to

20  what?

21  A    In the case of the electron microscopy, the AEM and the

22  SEM, we're not really using that to try to quantitatively

23  estimate or quantitatively determine the amount of the

24  components present, just to get a general idea of are they

25  common, are they minor, are they trace.

1    Common means it's -- you look at it.  It -- you see

2  it everywhere, it's very easy to find.  A minor means it's not

3  difficult to find and trace means you see it now and then.

4  Q    Now, you used the term or phrase in responding to one of

5  debtors' counsel's questions, "significant components" to

6  refer, I believe, to your analysis of components that you

7  deemed significant.  Why do you use that phrase?  What's the

8  point of using that phrase in your analysis?

9  A    Well, a significant component is the component that there

10 clearly is a lot of or a component that's known to be part of

11 asbestos-containing building materials after 20 years or more

12 of analyzing them.  We have -- we certainly detect small

13 amounts of other things.

14    Then as Dr. Lee said, those don't mean it's

15 inconsistent with a W.R. Grace product, for instance.

16 Q    Is there anything about the analysis that you perform that

17 requires that in order for you to find a positive match for

18 Monokote 3 or Zonolite Acoustical Plaster, there must be a

19 precise percentage within the range of percentages that W.R.

20 Grace's formulas specify?

21    In other words, if it's one percent off or two

22 percent off -- what is the significance of the formula that

23 W.R. Grace has for these products being precisely the same?

24 A    I don't think anybody expects it to be precisely the same

25 in a laboratory finding, and as Dr. Lee said, but constituents

1  we found and in the proportions we found them are not

2  inconsistent with W.R. Grace products.  There's uncertainty in

3  any laboratory analysis.

4          There's some uncertainty in the formulas by W.R.

5  Grace.  There's the other documents I'm aware of from

6  Underwriters' Laboratory, for instance, that list a different

7  range of concentrations for constituents than are listed in the

8  Grace formulas.

9          I believe they're a little bit wider, so that no one,

10 I don't think anyone, including Dr. Lee, expects that every

11 laboratory finding that is consistent with a Grace product is

12 going to find the constituents in exactly the proportions that

13 W.R. Grace calls for in their formula.

14 Q   And it's not the case, Dr. Vander Wood, that you found a

15 positive match with WRG product with every sample that you

16 analyzed, right?

17          MR. CAMERON:  Objection, leading, Your Honor.

18          THE COURT:  Sustained.

19 BY MR. MANDELSBERG:

20 Q   Did you in the course of your retention by the state find

21 instances where there was not a positive match with a W.R.

22 Grace product -- asbestos product?

23 A   Yes.

24 Q   Now, you were asked some questions about the starch test,

25 and the documentation in your reports of that reflect the

1  starch test, and about your declaration.  Is -- was the first

2  time that anybody ever brought to your attention that your MVA

3  reports were criticized for not doing a starch test or a proper

4  starch test the testimony of Dr. Lee yesterday?

5           MR. CAMERON:  Objection, leading, Your Honor.

6           MR. MANDELSBERG:  It's redirect.  This was

7  specifically raised --

8           THE COURT:  If -- well, the fact that it's --

9           MR. CAMERON:  I'm not --

10          THE COURT:  -- redirect doesn't mean that it's not

11  subject to a leading question, but I don't think that's a

12  leading question.  The question has to do with the time.  Was

13  this the first time that.  I don't think that's a leading

14  question.  It's establishing the time reference.  Overruled.

15          THE WITNESS:  That's the first time I heard that

16  objection.

17  BY MR. MANDELSBERG:

18  Q    Was that objection contained, to your recollection or

19  knowledge, anywhere in the Dr. Lee expert report that you've

20  testified you reviewed?

21  A    No.

22  Q    Was that criticism asserted by Dr. Lee or anyone in his

23  firm to you, or to your knowledge, anyone at your firm before

24  yesterday?

25          THE COURT:  You covered this on direct,

**J&J COURT TRANSCRIBERS, INC.**

1  Mr. Mandelsberg.

2          MR. MANDELSBERG:  Okay.

3  BY MR. MANDELSBERG:

4  Q    Is there anything in your opinion, Dr. Vander Wood, about

5  the results of the starch test reflected in the PLM testing

6  sheets that are part of your reports that's incomplete or

7  improper or irregular, in your opinion?

8  A    No.

9  Q    Do those sheets provide all the information that one would

10 need to know in order to determine whether a starch test had

11 been performed and what its results were?

12 A    I believe so.

13         MR. MANDELSBERG:  No further questions, Your Honor.

14         THE COURT:  Mr. Cameron.

15                     RECROSS-EXAMINATION

16 BY MR. CAMERON:

17 Q    Dr. Vander Wood, in terms of the constituents that you put

18 into the query for purposes of making a match, if you look back

19 at Exhibit Number 49.

20 A    Yes.

21 Q    Kaolinite and montmorillonite were both identified in the

22 same manner in the PLM analysis.  Isn't that correct?

23 A    Yes.

24 Q    And your query included montmorillonite only, correct?

25 A    That's likely, yes.

**J&J COURT TRANSCRIBERS, INC.**

1  Q    And you knew at the time that montmorillonite, not

2  Kaolinite, was in the Grace product, correct?

3  A    In a general way, yes.

4  Q    And so a -- is it fair to say, Dr. Vander Wood, a

5  determination was made that Kaolinite didn't need to be

6  included because it wasn't part of a Grace product?

7  A    That's grossly unfair.

8  Q    Okay.  But you didn't include it, did you?

9  A    No, I didn't.

10 Q    Okay.  Now, with respect to your starch test, would it be

11 good laboratory practice to actually report the results of that

12 test with your report?

13 A    We did so.

14 Q    Okay.  Would it be good laboratory practices to show the

15 backup data for that in your report?

16 A    Mr. Cameron, the backup data is the observation of the

17 analysts doing the test.

18 Q    So there's no backup data, other than the analyst saying,

19 I saw it?

20 A    That's correct.

21 Q    Did you do the starch test?

22 A    No, I did not.

23         MR. CAMERON:  That's all I have.  Thank you.

24         MR. MANDELSBERG:  Your Honor, I just have I believe

25 one question.

**J&J COURT TRANSCRIBERS, INC.**

1                    FURTHER REDIRECT EXAMINATION

2  BY MR. MANDELSBERG:

3  Q    You just said in response to Mr. Cameron's question that

4  it was -- his characterization was grossly unfair in the way he

5  characterized your PLM constituent analysis page report, which

6  is part of Debtors' Exhibit 49.  Why do you believe that he was

7  being grossly unfair?

8  A    I think there's two parts to that.  The first is the

9  implication that we sort of dismissed out of whole cloth the

10  presence of Kaolinite or KO and that's not the case.  We have

11  two other confirmatory analyses that were done, SEM and PEM,

12  and those didn't confirm the presence of KO.

13          And the second is the -- and I resent this -- the

14  implication that I would decide in advance what the match was

15  and manipulate the data in order to produce that match.

16  Q    Dr. Vander Wood, do you do anything as part of your

17  procedures to safeguard against pre-judging the results of your

18  analysis in advance?

19  A    Every report we issue in -- not just these, but every

20  report we issue is independently reviewed by another member of

21  the staff and approved before it's issued.

22  Q    So it's not fair to say that in beginning a MVA report or

23  constituent analysis or product ID engagement you have pre-

24  judged in advance how you're going to come out?

25          MR. CAMERON:  Objection, leading, Your Honor.

**J&J COURT TRANSCRIBERS, INC.**

1        THE COURT:  It is leading, but I think given this --

2   the inference that's on this record it's a fair question.

3   Overruled.

4        THE WITNESS:  Would you restate it, please?

5   BY MR. MANDELSBERG:

6   Q    Yes.  Would it be fair to say that in -- starting in a

7   constituent sample analysis engagement such as the one you

8   undertook for the State of California in this case that you or

9   MVA prejudges in advance how it's going to conclude -- or what

10  it's going to conclude as to positive ID of particular

11  products?

12  A    Of course we don't prejudge.  As I've said here, there

13  were samples in this case that were found not to match W.R.

14  Grace or USG.

15        MR. MANDELSBERG:  No further questions, Your Honor.

16        THE COURT:  Mr. Cameron.

17        MR. CAMERON:  Nothing further, Your Honor.

18        THE COURT:  You're excused, sir.  Thank you.

19        THE WITNESS:  Thank you.

20        (Witness excused)

21        THE COURT:  Will you have any other witnesses to

22  call?

23        MR. MANDELSBERG:  Your Honor, we don't have any other

24  witnesses to call at this time.  Claimant State of California

25  rests upon its witnesses and the exhibits previously introduced

**J&J COURT TRANSCRIBERS, INC.**

1  in evidence.

2          THE COURT:  All right.  Ms. Kearse, would you prefer

3  to have lunch or to present your case first?

4          MS. KEARSE:  Your Honor, we can do lunch.  I'm just

5  going to enter some documents in, Your Honor, and then want to

6  know what the procedure will be for argument at the close of

7  the evidence on that.  Do you --

8          THE COURT:  Is the committee going to have anything?

9          MR BAENA:  No, Your Honor.

10          THE COURT:  Okay.  Will the debtor have rebuttal?

11          MR. RESTIVO:  No, Your Honor.

12          MR. CAMERON:  No, Your Honor.

13          THE COURT:  Well, if that's the case, Ms. Kearse, why

14  don't we --

15          MS. KEARSE:  Yeah.

16          THE COURT:  -- have you do your case and then we'll

17  take a lunch recess and then we can perhaps reconvene for the

18  arguments?

19          MS. KEARSE:  Your Honor, I believe we have an

20  agreement on a couple of the documents that we had talked about

21  yesterday.  Attached to plaintiff's -- can you hear from here

22  or do you want me to walk up there?

23          THE COURT:  You're fine there.

24          MS. KEARSE:  Okay.  On Plaintiff's Exhibit C there

25  was a document, the third page in talked about the theater

1 building.  I did provide that I don't think there's -- we're

2 going to put into evidence an affidavit that mentioned the

3 theater building is the same building on there.

4          And I believe there's no objection to the document.

5 It's just a matter -- the weight of the evidence on there.

6 Your Honor, also --

7          MR. FLATLEY:  Your Honor --

8          THE COURT:  Wait.  I'm sorry.  I want to get caught

9 up to speed.  You're saying you have an agreement that the --

10 that that one exhibit page shows that the theater building is

11 in fact the same as the other building?

12          MS. KEARSE:  Yes, ma'am.

13          MR. FLATLEY:  No, Your Honor.

14          THE COURT:  No.

15          MR. FLATLEY:  I am willing to agree to the admission

16 of the document into evidence, but I dispute its relevance.

17 But I didn't think it was worthwhile fighting about whether it

18 gets into evidence or not.

19          THE COURT:  Well --

20          MR. FLATLEY:  We still maintain, Your Honor, that

21 it's a drawing that is significantly different from the other

22 drawings that were offered for the speech building, the

23 building at issue.  It is dated May 18th, 1970, two years

24 before the installation.

25          It is also dated at a date about six months prior to

1 the other documents, drawings for that building.  But rather

2 than fight over whether this is the same building or not, we're

3 willing to let it come into evidence and it's limited relevance

4 will be a subject of argument.

5       THE COURT:  All right.  So all of Exhibit C, then, is

6 now -- is being admitted and you're simply going to argue

7 relevance?

8       MR. FLATLEY:  That's right, Your Honor.

9       THE COURT:  All right.  Let me make a note, then.

10 Okay.  Ms. Kearse, thank you.  It's admitted.

11      MS. KEARSE:  And Your Honor, I did previously request

12 all documents in regards to this litigation during this

13 discovery period here.  I never received these.  I found these

14 in a deposition -- I was getting ready for the proceedings,

15 Your Honor -- that they have been in Grace's files there, but

16 were not produced to me in this litigation specific to my

17 buildings on there, and it's clear that they're WSU buildings.

18      Your Honor, just the other document that I have is

19 for more completeness sake, and also references the -- it's

20 just page 1 of the sprayed fireproofing section, and I believe

21 counsel does not have objection to that, either.

22      THE COURT:  I need to know what exhibit you're

23 talking about.

24      MS. KEARSE:  Right.  This is exhibit number -- I

25 believe this was A, the specifications.  My copy's not marked.

1          MR. FLATLEY:  That's right.  It's 6941A, and we're

2   willing to allow the substitution of the additional page with

3   the -- without objection.

4          THE COURT:  So it's a substituted page?

5          MS. KEARSE:  Yes, Your Honor.  It's an additional

6   page, if I may approach.

7          THE COURT:  All right.  Please.  Okay.

8          (Pause)

9          THE COURT:  Okay.  All right.  I'll put it in.  Thank

10  you.

11         MS. KEARSE:  Your Honor, my other documents have been

12  previously admitted into evidence during the other part of the

13  case, then.  I'll rest on the documents, Your Honor, and the

14  evidence that's been provided.

15         THE COURT:  All right.  Does the debtor have anything

16  with respect to Ms. Kearse's case by way of cross-examination?

17         MR. FLATLEY:  No, Your Honor.

18         THE COURT:  And the debtor has no rebuttal?

19         MR. RESTIVO:  No, Your Honor.

20         THE COURT:  Okay.  If that's the case, how much time

21  would you like to -- for lunch and to prepare your arguments?

22         MR. CAMERON:  Could --

23         THE COURT:  I know we have the issue of Dr. Lee's

24  report.  I think we can argue it both ways, you know, assuming

25  that the report is in or is not in, as you choose.

1          MR. RESTIVO:  Might I ask how long the Court

2   contemplates for arguments by each side?

3          THE COURT:  Whatever you want.  I'm here all

4   afternoon.  So my schedule is your schedule.

5          MR. FLATLEY:  Do we have to --

6          MR. RESTIVO:  Do we have to do it all afternoon, or

7   can we agree like on a -- okay.  Well, I will talk to counsel.

8          THE COURT:  What are your plane flights out?  I

9   assume you're trying to leave today?

10          MR. BAENA:  4:00 p.m.

11          THE COURT:  So you need to leave by 2:00?

12          MR. MANDELSBERG:  That would be convenient.  I mean,

13   I don't know what the Court contemplates, but I'm prepared to

14   address oral arguments after a short recess right now.

15          THE COURT:  All right.  That's fine with me.

16          MR. MANDELSBERG:  And save some time.

17          THE COURT:  That's all right with me.

18          MR. RESTIVO:  If I had a sense as to how long the --

19   you were planning, I would -- it makes sense to me, but if the

20   argument's going to go for an hour and a half, then I'd just as

21   soon have something to eat.

22          MR. MANDELSBERG:  I think if we take a five-minute

23   break, I don't anticipate being longer than 15 minutes.

24          THE COURT:  All right.  Ms. Kearse?

25          MS. KEARSE:  Yeah, I don't think I'll go longer than

1 15 minutes, either, Your Honor.

2           THE COURT:  Committee going to have anything to add

3 to this, then?

4           MR. BAENA:  I don't believe so, Judge.

5           THE COURT:  All right.

6           MS. KEARSE:  I was going to say, if we broke to

7 12:30, that's maybe not lunch, but at least it's getting ready,

8 and then it sounds like we'll be through --

9           THE COURT:  By 2:00.

10           MS. KEARSE:  -- by 2:00.

11           MR. MANDELSBERG:  That's fine with me.

12           THE COURT:  All right.  We'll be in recess --

13           MR. RESTIVO:  So I'm -- I'm sorry.  Secondly, Your

14 Honor, maybe it's housekeeping, but now that the evidence is

15 closed I would like to -- and I've showed Mr. Baena -- I'd like

16 to hand up an order disallowing and expunging property damage

17 claims 1724, 5987 and 12780.  The Court may recall, those were,

18 I believe, the last three exhibits.  There was no one here.

19 There was no evidence in opposition to our evidence.  And so

20 I'm going to hand up an order --

21           THE COURT:  That's fine.

22           MR. RESTIVO:  -- because I don't know what else to do

23 with them.

24           THE COURT:  I'll take that.  All right.  Anything

25 else?  We'll be in recess until 12:30.  Thank you.

1          ALL COUNSEL:  Thank you, Judge.

2          (Recess at 12:10 p.m., until 12:35 p.m.)

3          (Call to Order of the Court)

4          THE COURT:  Please be seated.  Mr. Restivo.

5          MR. RESTIVO:  May it please the Court.  I hope to be

6   short.  The Court ruled yesterday, we believe correctly, that

7   the property damage claimants have the burden of proof of

8   establishing that asbestos -- that an asbestos containing

9   building product is in fact a Grace product.

10          I'm going to address the testimony in the order of

11   the claims as we have listed it.  Again, I'm going to be brief.

12   The record and the testimony will speak for itself.  With

13   respect to the claim being handled by Motley, Rice, claim

14   number 6941, I believe the testimony is clear that the bulk

15   sample evidence does not establish that this is a Grace

16   product, because the bulk sample evidence doesn't have the

17   necessary information to do that.

18          Secondary evidence offered by the claimant does not

19   fill that gap.  It is true that the claimant has referred to

20   letters and specifications and drawings.  All of them pre-date

21   the installation of the product in this building by a

22   substantial period of time.

23          None of them reflect what is actually in the

24   building, and we have put on testimony that is undisputed by a

25   witness that merely looking at letters or specs or someone's

**J&J COURT TRANSCRIBERS, INC.**

1 intention to bid on a job or someone being recognized as an

2 authorized representative so someone can bid on the job does

3 not tell anyone anything as to whether or not that job was won

4 where a Grace product was applied.  And so claim number 6941

5 must be expunged for lack of evidence that it's a Grace

6 product.

7        With respect to that claim, Your Honor, the Court did

8 make a comment that disturbed us at our table and I want to

9 address.  I believe the Court indicated, not necessarily with

10 respect to that claim, but with respect to one of these claims,

11 that Dr. Lee did not do any of his own bulk sampling analysis.

12        That is correct.  The testimony, Your Honor, and it's

13 undisputed, is that somewhere in the range of 15,000 bulk

14 sample reports were provided by claimants in connection with in

15 excess of 4,000 property damage claims.  It is correct that

16 neither W.R. Grace nor its expert asked for 15,000 bulk samples

17 in order to analyze them.

18        I appreciate that we are where we are today dealing

19 with 15 or 20 buildings, but the process as developed by the

20 parties and by this Court were such that it would have been

21 physically impossible for any laboratory or any number of

22 laboratories in the time period given to obtain chain of

23 custody reports, to obtain 15,000 bulk samples and then to

24 analyze them, especially when I think there was a pretty good

25 understanding the bulk of the 4200 claims eventually would fall

1 by the wayside.

2          And so while the Court did make a comment that is

3 correct, that Dr. Lee did not analyze any bulk samples for

4 these specific buildings, it's true that he did not analyze any

5 bulk samples for 4200 buildings, and he did not analyze nor did

6 he have the 15,000 bulk samples reported in the claim files.

7          I move to the State of California.  There are three

8 buildings in which acoustical plaster is alleged, 10651, 10657

9 and 10659.  With respect to those buildings, our testimony is

10 that the bulk sampling information in the material provided

11 does not establish that this is a Grace product.

12          It is undisputed that in the first sample initially

13 the report was less than one percent montmorillonite -- one

14 percent of that type of clay that is in the Grace product, that

15 report was indicated today as being in error.  It was not less

16 than one percent, but it was a minor amount.

17          The testimony is clear that the formula calls for 15

18 percent, give or take 15 or 20 percent of clay, which is not a

19 minor amount, let alone less than one percent.  And so that

20 claim fails for lack of proof.  The second two claims fail

21 because the most that has been shown is that the product

22 contains 10 percent chrysotile, and 90 percent something else,

23 the something else being a combination of vermiculite with some

24 clay in it, or at least with some clay identified in some parts

25 of some test.

**J&J COURT TRANSCRIBERS, INC.**

1      Testimony's clear that those samples, one or both of

2 them, also contain Kaolin and also contain other materials.

3 The minor amount of clay was reported in order to have the

4 computer identify a match.  The minor amount of Kaolin and the

5 other materials were not reported.

6      There's no dispute that the Grace products do not

7 contain those materials, and therefore, the other two claims

8 similarly fail for lack of evidence that it's a Grace product.

9 There's been some suggestion, Your Honor, of a surprise with

10 respect to Dr. Lee's testimony with respect to these various

11 buildings and with respect to starch in -- the starch issue in

12 the alleged Monokote buildings.

13      The Court is well aware that in October of 2005 Grace

14 filed its objections to claims.  With respect to these claims,

15 there were product ID objections.  As Ms. Kearse established

16 with Dr. Lee during his testimony, Dr. Lee was presented for a

17 product ID deposition.

18      Indeed, Your Honor, I would represent to the Court

19 that on February 14, 2007, Dr. Lee was deposed all day.  the

20 parties wanted -- the claimants wanted to make it two separate

21 depositions, which they did, but he sat there all day on

22 product identification.

23      Christine Kang of Hahn and Hessen was there for both

24 of them.  No questions were asked by Ms. Kang, but she was

25 certainly there and she certainly could have asked questions.

**J&J COURT TRANSCRIBERS, INC.**

1  And so there was no attempt on the part of the debtor to have

2  Dr. Lee hide out in the woodwork and then come up with his

3  objections for the first time.

4        Product ID was raised in October of 2005, and Dr. Lee

5  was presented on February 14, 2007, for depositions, one

6  beginning at 9:05 a.m. and the second at 1:37 p.m.  And so

7  anyone could have asked, and many of the claimants did ask,

8  Dr. Lee whatever questions they wanted.

9        That leaves us with the 12 buildings in which

10  Monokote fireproofing is alleged.  I don't believe there's any

11  dispute that the components of Monokote fireproofing are the

12  same as the components of U.S. Gypsum Fire Code V with the

13  exception that U.S. Gypsum Fire Code V contains processed

14  starch.

15        The testimony by Dr. Lee is pretty clear, and I don't

16  think there's been any adverse testimony, that one cannot

17  determine the presence of processed starch by a PLM test.  It

18  simply doesn't show up on a PLM test.  The testimony is that

19  one must do an iodine test or some other substitute test.

20        The only reference to any mention of starch is on the

21  PLM sheet and the mention is a slash or a minus sign, which the

22  testimony is everyone would understand that to mean there was a

23  negative finding.  It is undisputed that any results of that

24  chemical test in terms of a piece of paper, a lab result, you

25  know, what was done, the date it was done, what was found, was

1  not provided.

2          Indeed, it's not real clear from the testimony

3  whether or not such a piece of paper in that laboratory exists.

4  All we know is the laboratory analyst is allowed to put a slash

5  or a minus, and there's no report of a starch test or what was

6  done.  It's clear that claimant's expert believes that that

7  minus sign indicates that a starch test was done, but he

8  candidly concedes that he didn't do it and the only reason he

9  knows is because there is a minus sign there.

10          We think those claims fail for lack of proof in that

11  we have no written evidence of a procedure or a starch test,

12  and the witness they put on the stand candidly testified he

13  didn't do it himself; he just knows what's on the paper.  For

14  that reason, Your Honor, we believe that the remaining

15  claims -- I've already handed the Court an order with respect

16  to three claims where no evidence to support their burden was

17  presented -- with respect to the remaining claims, the one

18  claim by Motley, Rice and the 12 claims by Hahn and Hessen, we

19  believe those should be expunged.

20          THE COURT:  Okay.  With respect to the starch test,

21  Mr. Restivo, I have to tell you, I think that Dr. Vander Wood's

22  testimony is pretty convincing.  He is the owner of a company

23  that has been in business for -- I've forgotten the number of

24  years, at least 17 years.

25          He set the company up.  He has credentials that are,

1  you know, as long as the courthouse is high.  He certainly

2  knows what he's doing in this industry.  He set the processes

3  up.  He monitored this.  He's got people reviewing the reports

4  before they grow up.

5          The fact that it's an iodine drop test and that there

6  is not a written result I think is something within his lab

7  that may be something that, you know, in the future maybe he

8  wants to have a report written about, but it's clear that

9  there's a minus sign next to a starch test.

10          It's there for anybody to ask about, and the fact

11  that no one did is not Dr. Vander Wood's problem.  And I think

12  there is sufficient evidence that in the cases with respect to

13  the Monokote 3, those 12 -- I believe it's 12 buildings.

14          MR. RESTIVO:  I believe it is 12, Your Honor.

15          THE COURT:  Okay.  I believe that the evidence

16  substantiates that the burden of proof has been met, that it is

17  a Monokote 3 product, that the starch test is negative and

18  there is sufficient evidence to show that the remaining

19  constituent elements of Grace's product are in those of

20  particular abundance, as within the formulas that both Dr. Lee

21  testified to and the scientific reports that are attached to

22  MVA's analysis are there.

23          I think the evidence has been met with respect to

24  those 12 buildings.  I am not so convinced as to the others,

25  but I am as to those 12 buildings.

**J&J COURT TRANSCRIBERS, INC.**

1          MR. RESTIVO:  Maybe if counsel argues you'll change

2 your mind?

3          THE COURT:  Maybe.

4          MR. RESTIVO:  Thank you, Your Honor.

5          MR. MANDELSBERG:  Can I just shut up and sit here?

6 Your Honor, in light of --

7          THE COURT:  What she said?

8          MR. MANDELSBERG:  -- in light of Your Honor's ruling

9 I'll try to be even briefer than I intended to be.

10          THE COURT:  I am not so convinced with respect to the

11 ZAP and the Zonolite issues, because it seems to me there,

12 particularly with the fact that there are other trace elements,

13 and I do appreciate the fact that Dr. Vander Wood said that the

14 trace elements were not picked up on the other tests, it does

15 seem that there is a problem in not having asked for some trace

16 elements, and having asked for others in the tests.

17          And it does appear that the results show elements

18 that are not -- I'm using the word "elements"; I realize as a

19 scientific matter that's not the appropriate term -- it shows

20 constituent -- constituents that are not part of Grace's

21 formula.  And I do appreciate the fact that there may be trace

22 products that would show up under some circumstances, but they

23 are not part of Grace's formula.

24          And I don't have an adequate explanation for why they

25 were not part of the test that may either prove or disprove

1 their presence in sufficient abundance to exclude Grace as a

2 manufacturer -- or to include Grace as a manufacturer on the

3 ZAP -- the Zonolite claim.  So I am not so certain about the

4 burden of proof of those.

5          MR. MANDELSBERG:  Well, Your Honor, in light of your

6 comments I'll try to just direct my statements to those claims.

7 I do want to point out that as to all the claims, we believe

8 that our burden has been established through the presentation

9 of the fact and expert evidence you've heard from Mr. Hood and

10 Dr. Vander Wood.

11          I also note there has not been an objection to any of

12 the chain of custody exhibits.  So this is not a case in which

13 there's any issue as to whether or not the samples that

14 Dr. Vander Wood analyzed came from the buildings associated

15 with the respective --

16          THE COURT:  No.  No.  It's not a chain of custody

17 issue.

18          MR. MANDELSBERG:  Yes.

19          THE COURT:  And it was raised in an objection before.

20          MR. MANDELSBERG:  And I realize that issue has been

21 raised in other instances.  I also wish to point out that the

22 debtors actually did not raise a specific product ID objection

23 with one of the claims, 10660.  That was a Monokote 3 claim.

24 So I think it's academic in light of the Court's observations

25 as to the comments.

1        As for the two buildings that are in the ZAP

2    category, and as to the one building where Dr. Lee referred to

3    the claim being in the wrong formula, I believe, Your Honor, if

4    Your Honor looks at the record, and particularly Exhibits 25

5    and Exhibit 17, Your Honor will conclude that the reports do

6    show the necessary constituents to be associated with Zonolite

7    Acoustical Plaster.

8        Dr. Vander Wood specifically testified that in his

9    opinion to a reasonable degree of scientific certainty, the

10   variations in the constituents on those two buildings, the

11   insufficient data Zonolite constituents, were sufficient that

12   they were significantly associated with WRG's product, and he

13   specifically testified that they did constitute a positive

14   match.

15       The only thing that Dr. Lee has done to rebut that is

16   in his report suggest that the constituents were fouled up.  In

17   order to believe that, Your Honor, you must believe that there

18   is a range of percentages that is fixed and can't be varied.

19   And Dr. Vander Wood has testified that that's not the case.

20       In order to believe W.R. Grace's case as to the ZAP

21   buildings, I'll refer to them in the shorthand, you have to

22   accept that there can never be evidence or constituents that --

23   or any variation from their percentage range.  They did ask

24   Dr. Vander Wood about this at his deposition, and he testified

25   consistent -- although they didn't introduce his deposition --

1  he testified consistent with what he testified today.

2          So I think the question of whether or not there's a

3  positive match for those two buildings has -- can only be

4  determined by the Court believing that there is or isn't some

5  definite, fixed formula or components that can't be varied.

6  That's --

7          THE COURT:  Well, I don't believe that there's a

8  definite fixed formula that can't be varied.  What I believe is

9  that I have the evidence that substantiate's what Grace's

10  formulas were over the range of time that the products were

11  sold.  And within those ranges I have -- the only evidence I

12  have is the evidence that was introduced by Grace as to what

13  those ranges were.

14          And if the products were not within those

15  ranges -- and, you know, I haven't got any scientific evidence

16  on this record that tells me what an acceptable variation is.

17  You know, I don't know if we're looking at a normal bell curve.

18  I don't know if there's a plus or minus one percent.  I don't

19  know whether it's a plus or minus 10 percent.  No one's given

20  me that information.

21          So all I can do based on this record is accept the

22  fact that within the formulas that's what I have to look at.

23  So if the information is not within those formulas on this

24  record I have to say that it doesn't match the formula, because

25  I don't have any information that tells me what an acceptable

1  variation may be.

2         MR. MANDELSBERG:  I think you do, Your Honor.  I

3  think you have it in the form of the MVA reports.  I think you

4  have it in the form of Dr. Vander Wood's testimony.  I can't

5  accept the fact that there is a positive match, that any

6  variation can provide a positive match with a Grace report,

7  because that's proving too much.

8         That's saying that any product can be a positive

9  match with a Grace report, because any variation, regardless of

10 how far it is off the formula, could provide a positive match

11 with a Grace report, and that proves too much.  So there is

12 either a formula that everybody agrees applies, and

13 Dr. Vander Wood does, too, because that's why he's put the

14 formulas and the products into his database, or else he

15 wouldn't both putting formulas into his database, because it

16 would be an irrelevancy.

17        If there were no significance to the percentages he

18 would not need that database.  So if I don't have some

19 acceptable range of variation -- and I don't on this record,

20 unless somebody can point it to me.  I certainly don't in the

21 testimony.  Maybe it's in a report and I missed it in reading

22 the evidence over the weekend.

23        But if it's in there, I don't recall it.  So if it's

24 there, point it out to me.  I don't believe I have an

25 acceptable -- I don't believe I have any evidence of an

1  acceptable range of variation.  So without that, all I can do

2  is accept the evidence that I have, which is that it has to be

3  within the formulas that are provided.

4          The formulas that I have are Grace's formulas.  These

5  three buildings do not appear to be within those formulas, and

6  therefore, I do not believe that the claimant has met the

7  burden of proof to show that these are Grace products, and

8  primarily because there are other elements that have shown up

9  in these reports that are not identified as a Grace product,

10 and there is no dispute but that those elements are not part of

11 Grace's formula.

12          MR. MANDELSBERG:  Your Honor, I would ask that -- and

13 we can certainly point the Court after today to specific

14 aspects of those reports that we think might help answer Your

15 Honor's questions.

16          THE COURT:  Okay.

17          MR. MANDELSBERG:  And we'd be happy to do so.

18          THE COURT:  Okay.

19          MR. MANDELSBERG:  And we do respectfully suggest that

20 the MVA reports, which are received in evidence in two

21 incarnations that were introduced, do have that sort of

22 information, and so does the testimony.  We'd ask for an

23 opportunity to refer the Court as quickly as we can to those

24 portions of the reports.  I don't believe it will take longer

25 than a few days to do so.

1          THE COURT:  That's fine.  I'll give you an

2    opportunity to do that and the debtor to also point out

3    whatever the debtor chooses to, either in response or --

4    yeah -- by way of also highlighting the evidence in that

5    respect.

6          MR. MANDELSBERG:  Yes.  And Your Honor, in light of

7    Your Honor's comments as to the 12 claims and Your Honor's

8    comment about these three claims, I don't think I have anything

9    else to say.  Will Your Honor wish to have any briefing as to

10   these issues?  Or I guess in light of the Court's ruling it may

11   be academic about the matter of whether Dr. Lee's report can be

12   admitted.

13         THE COURT:  I believe it's academic as to Dr. Lee's

14   report.  I do not see the need to have Dr. Lee's report on this

15   basis admitted into evidence.  I simply don't see the need for

16   it.  But you know, if you wish to pursue it and want to brief

17   it, that's up to you.

18         MR. MANDELSBERG:  To the extent Your Honor is going

19   to rule in favor of the state on its 12 claims, I don't know

20   what the ruling would be as to the other three claims after we

21   submit information.  But if it's not, then obviously, if it's

22   going to be a ruling in favor of the state we don't want to

23   burden the Court with resolving and issue that may be moot.

24         THE COURT:  Well, right now it's not going to be in

25   favor of the state.  So I don't know if the issue is moot,

**J&J COURT TRANSCRIBERS, INC.**

1 but --

2          MR. MANDELSBERG:  Well, if it isn't, we may address

3 it, but Your Honor, in light of those circumstances we would

4 ask the Court enter judgment in favor of the state for at least

5 the 12 claims, and afford the state an opportunity to provide

6 information by perhaps Monday of next week, or some other

7 reasonable period of time, to provide specific references as to

8 the three reports or any testimonial record that relate to

9 those three claims involving the so-called insufficient data

10 category of the Zonolite Acoustical Plaster, and the wrong

11 formula category classified by Dr. Lee.

12          THE COURT:  All right.

13          MR. RESTIVO:  I know Ms. Kearse's going to -- but

14 this is I think housekeeping.  I understand what the Court

15 about the Monokote buildings, okay?  And we can take our

16 medicine.  We can do that.  I'm a little concerned about a

17 process that says, where the Court indicates she's going to

18 find they satisfied their burden she's going to, you know,

19 issue the orders.

20          But where the Court indicated she didn't think they

21 satisfied their burden we'll kind of have a briefing process

22 and we'll continue to reevaluate it.  And so --

23          THE COURT:  No.  I'm not reevaluating it.  I'm asking

24 for one specific thing.  And that is, if there is somewhere in

25 the record where I've missed a piece of evidence, it was not in

**J&J COURT TRANSCRIBERS, INC.**

1  the testimony, if there is something about an acceptable

2  variation from formula, which I don't recall, Mr. Restivo, but

3  if it's in there and I've missed it, I would like somebody to

4  point it out for me.  That's all I'm asking for.

5           MR. RESTIVO:  And my only housekeeping request is we

6  give them till Friday to point that out, give us till Tuesday

7  to respond, if we have to, and not issue any orders on what is

8  in play until we get an order on all of them.

9           THE COURT:  Oh, that's -- I don't intend to issue any

10 orders until I can address them all.

11          MR. RESTIVO:  I didn't -- Ms. Kearse.

12          MR. MANDELSBERG:  Your Honor, just one comment.  I

13 said Monday.  Friday is fine, but I do believe that it is

14 important not only to point the Court to instances of the

15 evidence, but also to the record.  I don't know how quickly the

16 transcript can be provided.  Certainly, we'd want to --

17          THE COURT:  There is nothing on the record with

18 respect to an acceptable variation from the formulas.  I am

19 certain of that, Mr. Mandelsberg.  So you know, if -- it's

20 either in one of the exhibits somewhere.  It is not in this

21 record.  I am sure of that.  So Monday's fine.  If you want

22 until Monday, that's fine.

23          MR. MANDELSBERG:  That's fine, Your Honor.  I'm not

24 so sure of that, but that's fine.  We'll --

25          THE COURT:  Okay.  You can look through the record,

1  too.  Monday's okay.  You know, a day -- a weekend's not going

2  to make a difference.

3           MR. MANDELSBERG:  Thank you, Your Honor.

4           MS. KEARSE:  Your Honor.

5           THE COURT:  Ms. Kearse.  Do you want it turned on?

6           MS. KEARSE:  Yes, Your Honor.

7           THE COURT:  Oh.

8           MS. KEARSE:  Yeah, I thought it was turned on.  Looks

9  like it's on.  There's a ready to turn it on (phonetic) light.

10          THE COURT:  It --

11          MS. KEARSE:  Okay.  I'm sorry.  Your Honor, on behalf

12  of the Washington State University, claim 6941, I'd like to

13  just wrap up in a chronology what has been presented before

14  Your Honor today, and I present this based on the burden that

15  we have on a preponderance of the evidence, Your Honor.

16          And the evidence that's in the record today, with the

17  greater weight of the evidence, if it weighs ever so slightly

18  in my favor I'm entitled to go forward on my claim.  And Your

19  Honor, I'd like to just take a few moments and go through

20  what's been presented today just on the documents and the

21  testimony.

22          Your Honor, Exhibit Number A is the specifications

23  for the building at issue, which Mr. Egan also had testified is

24  the first step in the process.  And one of the things

25  W.R. Grace did along with Mr. Culver, is to go through and work

1 with the specifications.

2          Your Honor, on the specification for spray

3 fireproofing under "applicator," it does require that an

4 applicator be approved by the manufacturer, and then the

5 certificate of approval delivered to the architect before the

6 work began.  Your Honor, I'd just refer you to that section.

7 There's also a section talking about the theaters in addition

8 to the whole building on there, as well.

9          THE COURT:  And that applicator is a Grace

10 applicator?  Is that the point?

11          MS. KEARSE:  On -- then I would -- yes, Your Honor.

12          THE COURT:  Okay.

13          MS. KEARSE:  Page -- the next page of the

14 fireproofing specifications calls for the fireproofing material

15 to be the cementitious material, and to be provided and

16 approved by the architect for Zonolite Monokote W.R. Grace, and

17 Company on there.  And that's part of Exhibit Number A, Your

18 Honor.

19          It's important, Your Honor, as I go through the other

20 documents of the approval process for -- that the documents

21 require.  Your Honor, the next in the chronology would be

22 simply the document that we had discussed of May 18th, 1970,

23 that's also stamped by the same architect that's on the cover

24 page of Exhibit A, and also calls for the Monokote fireproofing

25 within the building.  That is part of Exhibit Number C.

1          Next, Your Honor, in the chronology, beginning on

2  March 4th, 1971, Mr. Culver, a W.R. Grace representative in

3  Washington State who covered that territory, began sending

4  letters to approved contractors.  And there's a series of at

5  least three letters to approved contractors, letting them know

6  that the bidding would have -- would occur May 16th for

7  approved contractors, Your Honor, and approved applicators of

8  Monokote specifications.  There's a series of three letters on

9  that in Exhibit Number C.

10          Your Honor, Exhibit -- part of Exhibit Number C also

11  has a letter of March 5th, 1971.  Again, Mr. Culver, just from

12  the face of the document, admitting that it was -- the

13  specifications require the fireproofing of W.R. Grace

14  Mono-Kote, and again giving the contractors a list of the

15  approved Monokote appliers there.

16          Your Honor, that's important because the issue is not

17  whether or not who put what product in there.  The issue is,

18  what applicator got to do the approved Monokote.  So one of

19  three applicators may have applied the Monokote, but it was the

20  Monokote that was at issue there, Your Honor.

21          THE COURT:  But how do I know which one was approved,

22  was actually approved?

23          MS. KEARSE:  Your Honor, that's not in the record.  I

24  don't know which one is actually approved.  But I think as we

25  go through it we'll find from the -- out of testimony there

                    **J&J COURT TRANSCRIBERS, INC.**

1  that there was no other product that would have fit the -- what

2  the samples showed in the building, other than W.R. Grace's

3  product, in line with these documents, gives me the

4  preponderance of the evidence that it's more likely than not a

5  W.R. Grace product is in this building with that.

6       Your Honor, the next document that was put into

7  evidence was Exhibit B.  That was simply an example of the

8  floor plans that again showed the steel structure that we

9  discussed on there and similar drawings as the architect

10  document that was found in the W.R. Grace files that listed the

11  Monokote fireproofing on there.

12       Your Honor, defendants put in testimony about my

13  samples.  So I didn't need to put it in there.  And the

14  testimony is that three of the sample contained 90 percent non-

15  fibrous fiber and 10 percent chrysotile.  I think Your Honor

16  will recall Dr. Lee's testimony on that.

17       And part of their Exhibit Number 45 was the actual

18  constituents on there that laid out the 10 percent of

19  chrysotile and the 90 percent non-fibrous material in there.

20  Your Honor, those same samples also did have some other samples

21  from the theater.  So there was other documents there

22  reflecting the theater was at issue, as well.

23       Your Honor, Dr. Lee testified that the Monokote

24  formula, as Defense Exhibit Number 2 indicate -- trying to stay

25  next to the mike as I do this.  Monokote 3 contains various

1  constituents that add up, as Dr. Lee added for me, 85 to 90

2  percent non-fibrous and 10 percent asbestos.

3       Your Honor, defendants also put in as a -- well, I

4  guess was this was a demonstrative -- was that a demonstrative

5  evidence?  They did pick out a sample that talked about the

6  insufficient data that fit that on there.  Dr. Lee, it's

7  important, Your Honor, did not come in here to refuse that a

8  W.R. Grace product wasn't there.

9       He just didn't have the recipe, based on these

10  constituents, to say for sure whether or not it was there, but

11  he could always say this -- the 90 percent non-fibrous and 10

12  percent asbestos would be consistent with that formula.  Your

13  Honor, Mr. Egan then came in to testify, and -- as a fact

14  witness, and I think it's important, in Mr. Restivo's -- some

15  of the comments about Mr. Egan.

16       He was not there to opine as an expert in the field,

17  but mainly as a fact witness; had no specific facts on my

18  building, but he did provide information about the specific

19  time period at issue.  Now, I was clear to tell him we were

20  talking about the time period, and at that time period all his

21  competitors -- so anything that would be -- if there was any

22  other issue with another product out there -- would have had

23  significantly more asbestos with that.

24       So matched with that on a very cut and dry, 90/10,

25  and there's no other product that would even fit that, based on

1 that it's more likely than not it's a Grace product.  Based on

2 the fact that it was specified in the specifications, that

3 there were letters going out to all the approved contractors

4 and maybe an issue of, we don't know who got the bid, but the

5 bid was over who would get the approved Monokote bidding on

6 that.

7            Your Honor, Grace did not bring in anyone to say it's

8 not there.  The weight of the evidence of what I've provided to

9 Your Honor does weigh in claimant's favor that a W.R. Grace

10 product identification has been met for this building and we

11 should be able to go forward with the finding, the damages.

12 Thank you, Your Honor.

13            THE COURT:  Mr. Restivo.

14            MR. RESTIVO:  I will respond to Ms. Kearse first and

15 then go back to California.  I'm not sure I understood the

16 Court's question, or if I understood the Court's question, I'm

17 not sure I understood Ms. Kearse's answer; the spray

18 fireproofing specs she was talking about.

19            When she talked about the applicator and the

20 applicator must be approved by the manufacturer, the Court

21 asked, and was that a Grace applicator, and I think Ms. Kearse

22 answered yes.  She did not mean to suggest that the specs

23 specified a Grace applicator.

24            What the spec said was, "Approved by manufacturer and

25 certification of approval delivered to architect before work

1  begun."  I believe what --

2           THE COURT:  Oh.

3           MR. RESTIVO:  -- she was saying was, it is her

4  position the applicator ended up being a Grace applicator, but

5  she was not suggesting that's what the specs said about the

6  applicator.

7           THE COURT:  So in other words, the applicator has to

8  be approved by the manufacturer and by the architect?

9           MR. RESTIVO:  That's correct.

10          THE COURT:  But whoever gets the bid has to make sure

11  that both the manufacturer and the applicator jive.

12          MR. RESTIVO:  That is correct.

13          THE COURT:  That's the point.  Okay.

14          MR. RESTIVO:  Secondly, Your Honor, she does show

15  three letters indicating that at least three applicators

16  licensed by Grace to apply its product were thinking about

17  bidding for this job, apparently, in competition with each

18  other.

19          There's no testimony on the record that any

20  applicator was exclusively bound to any product and that an

21  applicator could only bid with respect to Monokote.  There's no

22  evidence on the record that any of these three applicators or

23  any other applicators who bid, a, were selected, and b, if they

24  were selected, they used Monokote 3.

25          And so all we have is an indication that if these

1  three outfits wanted to bid and if they wanted to bid using

2  Monokote they had a letter saying they were authorized by Grace

3  to use Monokote.  We don't know who got the job, let alone

4  whether it was these three.

5          Third, Your Honor, the bulk samples, the testimony, I

6  believe, is unequivocal.  I think the testimony is the same

7  from Dr. Lee and Dr. Vander Wood that the components of Grace

8  Monokote 3 and U.S. Gypsum Fire Code V were precisely the same,

9  except for starch.

10          To the extent Ms. Kearse I think is arguing that the

11  bulk sample report showing 10 percent chrysotile and 90 percent

12  other stuff can only be Grace's MK-3 really is inconsistent

13  with both experts you heard that the chrysotile, gypsum and

14  vermiculite components or MK-3 and Fire Code V were identical.

15  And so that bulk sample doesn't indicate what the product was.

16          And in addition, you don't know whether or not the 90

17  percent also included components that neither U.S. Gypsum nor

18  Grace put in a product.  And so for that reason we don't think

19  that building has survived and proven its burden of proof.

20          THE COURT:  I do not have for this building any

21  report, correct?  I do not have an expert report that

22  identifies the specific elements or minerals that comprise the

23  non-fibrous portion?

24          MR. RESTIVO:  That is correct, Your Honor.

25          THE COURT:  Okay.  Or a starch test.

**J&J COURT TRANSCRIBERS, INC.**

1          MR. RESTIVO:  On this one I don't think starch test

2   even enters into it.  This one is -- you don't know what's in

3   the 90 percent.  It could be mineral wood.  It could be -- you

4   just don't know what it is.  Going back to the State of

5   California, I understand what the Court has asked for.

6          I simply wish to comment that I believe the Court is

7   correct.  The testimony I recall is that Dr. Lee testified that

8   with respect to MK-3, the fact that there were variances in the

9   formula are reflected by the fact that he has a range of

10  percentages, 55 to 59, 28 to 32, 10 to 14; that's the testimony

11  I remember.

12         And secondly, with respect to the comment that one

13  must adopt a precise range and not vary from it, it really

14  doesn't apply to these three alleged acoustical plaster

15  buildings, because the bulk sample reports give no range

16  whatsoever.  We're not talking about a range of asbestos of 10

17  to 14 percent and the lab reports out 16 percent, or a range of

18  vermiculite 28 to 32 and the lab reports out 29.

19         We're talking about reports which for the components,

20  at least the non-asbestos components, do not give any range at

21  all, and so you never get to a, is this much of a variance,

22  because you don't know what the range is.  And lastly, I think

23  we did get a concession from Mr. Hood that at least with

24  respect to building number 10659, the warehouse and offices,

25  they did make a claim in the U.S. Gyp bankruptcy for acoustical

1 plaster in the building, and we think that's relevant to this

2 whole issue.  Thank you, Your Honor.

3          MR. MANDELSBERG:  Your Honor, I don't want to beat a

4 dead horse, but we do believe that it would be useful to refer

5 to testimony and/or those MVA reports, and we'll try to provide

6 that to you on or before Monday.

7          THE COURT:  Okay.  That's fine.  I mean, if you need

8 the record to do this, that's fine.  What I'm looking for are

9 the citations that are going to influence my decision as to

10 whether or not the burden of proof has been met, and that's

11 really all.

12          I understand the law, I believe.  I don't think I

13 need additional briefs.  I'm looking for the factual citation

14 in this respect.

15          MR. MANDELSBERG:  That's what we're going to try to

16 provide you.  As for the -- Mr. Restivo's reference to the USG

17 proofs of claim which inquired of Mr. Hood, the fact is that

18 those proofs of claim or the portions that were introduced in

19 evidence don't indicate that there was any MVA report or

20 constituent analysis test for those claims.

21          So the implication that I gathered W.R. Grace wants

22 the Court to derive, that somehow the claims for these

23 buildings were based on the same samples or it's the same claim

24 is not supported.  There absolutely no evidence to indicate

25 that.  Indeed, Mr. Hood testified that there were many -- there

1 were different buildings within certain addresses.

2          It's no evidence to indicate that this is the same

3 claim involving the same test or the same sample, or that there

4 had been other MDA reports done from the same sample that were

5 somehow inconsistent.  It's speculation, but there's no proof

6 about it.  In any event, Your Honor, we hope to elucidate the

7 matter through references to the record as to those three

8 claims.

9          THE COURT:  All right.

10          MR. RESTIVO:  I'm sorry.  He's going to supplement

11 the record and elucidate the Court only with respect to whether

12 or not in the trial evidence there is a reference to acceptable

13 variations.

14          THE COURT:  Right.

15          MR. RESTIVO:  Not with respect to the claim they

16 filed against U.S. Gyp, as I understand it.

17          THE COURT:  No.  Just -- all I'm looking for in the

18 record is some reference to the variations to the formula

19 ranges.  That's what I thought the argument was.

20          MR. MANDELSBERG:  Yes.  And I didn't use the word

21 "supplement the record."

22          THE COURT:  No.

23          MR. MANDELSBERG:  I wasn't intending to supplement

24 the record with anything.  What I was intending to do was to

25 state to the Court that we will refer to documents that are in

1  evidence, and if appropriate, to testimony from the transcript,

2  nothing else.

3           THE COURT:  That's fine.  Ms. Kearse.

4           MS. KEARSE:  Your Honor, just briefly in response to

5  Mr. Restivo.  There's no evidence to the contrary that there

6  was anyone else even bidding on this case.  So what's in the

7  record is the W.R. Grace applicators, or approved applicators

8  of Grace's there.

9           Your Honor, it's also the first time I've heard that

10 it -- well, maybe it's Fire Code V and not the Monokote.  That

11 was never at issue within the testimony as to my claimant's

12 testimony on that.  In addition, going back to Mr. Egan when he

13 was asked specifically about the other cementitious products

14 again, he said during that time period there was nothing else

15 that fit that 10 percent that was product on there, too.

16          Your Honor, the weight and the totality of the

17 evidence without a bulk sample recipe, we don't have that in

18 the record.  We -- and it's not -- we just don't have the

19 samples.  We've been trying to find them.  We don't have them.

20 But based on what is in the record itself, the totality from

21 the documents till we get to the end, it's more likely than not

22 it is W.R. Grace in that building, Your Honor.

23          THE COURT:  Okay.  Well, I have to give some thought

24 to yours, too, Ms. Kearse.  So I -- frankly, at this point I'm

25 not so much convinced that I've got that 51 percent on this

1 building, but I am going to give this one some thought.  It's,

2 frankly, the only one that I'm sort of troubled by.

3        The others seem to be a little bit more clear, and

4 it's probably because there are some scientific reports to rely

5 on.  This one, I really can't give much credence to the fact

6 that there are letters that are going to say, well, you can

7 bid, because the world could bid.  But that doesn't mean that

8 the world got the bid, and that's the problem.

9        And without some analysis that at least tells me that

10 there is a product other than asbestos, which of course, we all

11 know there's asbestos or we wouldn't be here at all in the

12 case, then I have some difficulty saying that there is a Grace

13 product in the building.

14        It seems that I need something more than just

15 asbestos in an approximate percentage that the debtor may have

16 used in a product, especially when there is unrefuted evidence

17 in the record that USG had the same type of product with the

18 same approximate percentages in this record, in the same market

19 at the same time.

20        And there is testimony in the record that there were

21 other competitors out there.  There is evidence that the other

22 competitors had different weights of asbestos in their product,

23 but there were lots of other competitors at the same time.  The

24 record is undisputed that USG's product had the same

25 approximate percentages.  So I --

1          MS. KEARSE:  And Your Honor, I believe there was no

2     evidence presented to even suggest that USG is the product at

3     issue in my building or not.  And at some point there needed to

4     refute what I had there to -- on the specs on things that it's

5     not there.  But Your Honor, I think if you'll take time just

6     going through the documents itself and the chronology with it,

7     I don't have the expert analysis on this -- these samples with

8     that.

9          But Your Honor, I think in this specific issue it's

10    based on very factual things that we have, and if we look at it

11    and just weighing it ever so lightly, it's more likely than not

12    based on the specifications and based on the letters to various

13    approved applicators, for which there's nothing in the record

14    to say anyone else was even bidding on it.

15         But various W.R. Grace in there, and the fact that

16    the architect had stamped documents in Grace's file for these

17    buildings, their totality of it there I think weighs in my

18    favor, Your Honor.

19         THE COURT:  All right.  Mr. Restivo.

20         MR. RESTIVO:  Your Honor, assuming the record is

21    closed on this hearing, I would like to take another three

22    minutes, because I don't know that anyone wants to come back

23    this afternoon.  First,  Your Honor, I believe the Court

24    yesterday indicated that at ten o'clock tomorrow we would deal

25    with, among other things, Mr. Speights' waiver argument.

1    Someone in the courtroom indicated to me that the

2 Court docket may indicate nine o'clock a.m.  I've told

3 Mr. Speights it was ten o'clock.

4    THE COURT:  Ten.  Ten o'clock, yes, eastern.

5    MR. RESTIVO:  Secondly, Your Honor, when we -- I did

6 not mention yesterday, and in looking at the transcript, I

7 think the Court indicated when last we were together that at

8 the end of the evidence here we would talk about timing and

9 other matters, and I assume, since Mr. Speights is not here,

10 but for the benefit of everyone else, I assume that may also be

11 a subject of discussion, in addition to Mr. Speights' motion.

12    THE COURT:  Well, we were talking about the personal

13 -- I'm sorry -- about the hazard trials, correct?  I mean,

14 that's what we were going to go --

15    MR. CAMERON:  And statute of limitations.

16    MR. RESTIVO:  Statute of --

17    THE COURT:  Well, the statute of limitations,

18 frankly, I have -- because I was out of town all week, I have

19 made absolutely no progress on the statute of limitations, and

20 I just don't think I am going to be prepared to go forward with

21 those in May.  I just do not think I will.

22    MR. RESTIVO:  And Your Honor, that's not surprising

23 to us.  I think your dates in May that you're reserving are May

24 7 through 9, when everyone is here.  I think one of the issues

25 was whether or not you were going to use them or not.  It

1  sounds to me like we aren't, but all I'm saying is, in addition

2  to Mr. Speights' motion the Court indicates last time that we

3  would talk general scheduling.  And so that will also I think

4  be a subject for tomorrow.

5              THE COURT:  Tomorrow.

6              MS. KEARSE:  What time tomorrow?  That's the part

7  that I --

8              MR. RESTIVO:  Ten o'clock.

9              MS. KEARSE:  Okay.  I wasn't planning on being here,

10 but -- so --

11             MR. RESTIVO:  Well, I have indicated to Mr. Speights

12 and Mr. Runyon that the Court indicate telephone would be

13 appropriate.  My guess is there'll be here live and in person,

14 but they haven't responded.

15             THE COURT:  Yeah.  I --

16             MS. KEARSE:  I didn't know it was the hazard

17 tomorrow, Your Honor.

18             MR. SAKALO:  Your Honor, there are also -- Jay

19 Sakalo, on behalf of the property damage committee.  There are

20 also other claimants who are not part of the product ID

21 proceeding who are subject to statute of limitations defenses,

22 objections and hazard objections who I don't believe are aware

23 that tomorrow is going to be a time to discuss scheduling of

24 these matters.

25             THE COURT:  Well, I thought someone --

**J&J COURT TRANSCRIBERS, INC.**

1           MR. RESTIVO:  It was --

2           THE COURT:  -- was going to give notice to those

3    entities.  I thought I was to get an order in that someone was

4    going to give --

5           MR. CAMERON:  I believe, Your Honor, that the Court

6    order scheduling this product identification hearing indicated

7    in the order that at the close of the evidence we would defer

8    everything and address it.  It's in the order.  It wasn't

9    necessarily going to be tomorrow at 10:00, because we didn't

10   know whether the hearing would be one, two or three days.  But

11   it was in that scheduling order that was sent to every

12   claimant.

13          THE COURT:  And I believe I stayed all of the

14   discovery and briefing schedule until the conclusion of the

15   evidence, and I believe I wrote -- hand wrote that into the

16   order, so.

17          MR. SAKALO:  I understand that, Your Honor, but I

18   don't believe, for instance, that even a court call arrangement

19   had been set up.  When we had the status conference last week

20   Mr. Restivo asked that court call not be available for these

21   proceedings.

22          THE COURT:  For the evidentiary hearing, yes.  But it

23   is set up for tomorrow for the argument.  I'm sorry?

24          THE CLERK:  There is a phone list.

25          THE COURT:  Yes.

1          THE CLERK:  There is a phone list.

2          THE COURT:  Yeah.  There is a phone list.

3          MS. KEARSE:  What order are you going to go tomorrow?

4          MR. RESTIVO:  Pardon?

5          MS. KEARSE:  What order tomorrow will be -- your

6    notions of Dan first or the hazard first?

7          THE COURT:  Yes.  We will do the argument first

8    starting at ten o'clock.  And I assume that probably by 11:30

9    we should be -- that's my guess -- we should be ready to start

10   the discussion about scheduling.  If it's better to put the

11   scheduling issue onto the next omnibus, that's all right with

12   me.

13         I don't care, you know, if that makes more sense to

14   get notice out.  I don't think anything's going to happen

15   between now and the next omnibus anyway.  It's only a few days

16   away.

17         MR. RESTIVO:  Well, I --

18         MS. KEARSE:  And Your Honor, I -- it was in the

19   order.  I just completely forget about it and scheduled a

20   deposition tomorrow afternoon, but I could probably still be

21   here in the morning.

22         MR. RESTIVO:  Yeah.  My guess -- my hope is

23   Mr. Speights and I will not be long on the waiver, that we will

24   talk about hazard.  My guess is we will all conclude that

25   hazard follows statute of limitations, which we'll necessarily

1  talk about timing and statute of limitations.

2        My guess is May 7th through 9th the Court will

3  probably indicate she won't be ready with all the rulings, and

4  so people will take that off the calendar.  My hope would be by

5  11:30 we're not getting to this issue, that we're leaving the

6  Court and giving the Court back the other half of the day.

7        I think that's what'll happen tomorrow.  To the

8  extent you think someone is involved who doesn't have notice,

9  if you tell me I'll give them notice, or you give them notice,

10 but they all got the order.  Frankly, given what we've done so

11 far, the ones we always worry about are the pro se's, and I

12 think all the pro se's at this point are no longer involved.

13       MR. SAKALO:  I understand.  I believe, Your Honor,

14 the handwritten notation in your order indicated that the

15 scheduling that would be address was the statute of

16 limitations.  I don't believe it covered hazard.  I believe it

17 was at the hearing, at the final pretrial that we had last

18 Thursday in which you indicated that it would be for hazard, as

19 well, and I don't believe that all claimants were on that call.

20 There was only -- there are only claimants who were implicated

21 by these objections that were on that call.  That's the point.

22       THE COURT:  All right.  Are there any pro se's left

23 in the hazard issue?

24       MR. SAKALO:  Well, there are others who aren't

25 pro se, as well, who were not on that call, Your Honor.

**J&J COURT TRANSCRIBERS, INC.**

1          MR. RESTIVO:  I don't believe there's any pro se's

2 left, period.

3          THE COURT:  All right.  Mr. Restivo, how about

4 getting me a notice that I can sign that can be served by the

5 debtor on anybody who's left in the case on both statute of

6 limitations and hazard that will set up a status conference for

7 the next omnibus hearing in May.

8          Rather than doing it tomorrow we'll do it at the next

9 omnibus, and it will be for the purpose of addressing

10 scheduling, both for the continuation of the statute of

11 limitations and for hazard.

12          MR. RESTIVO:  Obviously, I --

13          THE COURT:  Okay.  And that --

14          MR. RESTIVO:  I will do that, Your Honor, and I

15 believe what that means for those in the courtroom, that to the

16 extent we have all reserved May 7, 8 and 9 for property damage,

17 we probably are not going to be using that for the group,

18 whether or not we use that for Mr. Speights' 26 --

19          THE COURT:  Speights, yeah.

20          MR. RESTIVO:  -- we'll figure out tomorrow.  But for

21 the group generally we won't be using that.

22          THE COURT:  I think even if I got statute of

23 limitations issues done between now and then, that's not going

24 to give people enough notice to know which witnesses and get

25 reports done.  So I really don't think it's going to be a

1 productive use of time.

2          MR. RESTIVO:  And we agree.

3          THE COURT:  But Mr. Speights is a different issue.

4 We can discuss that with him tomorrow.

5          MR. RESTIVO:  Very good.  Thank you, Your Honor.

6          THE COURT:  Okay.  Now, wait.  I have one question,

7 too.  With respect to whoever, whatever claimants are

8 determined to have satisfied the burden of proof, what happens

9 next, because now we're going to have to take a look at

10 damages.

11          And it seems to me you folks have made some progress

12 in terms of settlements.  Do I send you to a mediator?  Do I

13 lock you in my conference room and throw the key away until you

14 get some -- make some progress?  You know, before we go into

15 trials on these I want some good faith efforts to try to

16 discuss some settlements.

17          MR. RESTIVO:  Well, I think with all due respect the

18 answer to the first two questions right now is, no, no.  Some,

19 I don't know about all of them, but a not insignificant number

20 of the buildings for which there are product identification

21 objections are also buildings for which there are statute of

22 limitations objections that the Court has under advisement.

23          And so for example, I believe Mr. Flatley argued the

24 California motion.  I believe these buildings are part of the

25 State of California.  The issue the Court has is whether or not

1 the U.S. Supreme Court filing and the Manville claim, if the

2 Court, independent of what the Court finds on product

3 identification, rules that the statute of limitations has run

4 on those claims, while they may not be out on product ID,

5 they'll be out on statute.

6        So I think at this stage it may be premature to talk

7 about mediation and damages and amounts.  I don't know that

8 Ms. Kearse's claim falls into that category, but I don't have

9 the list in front of me.  Seems to me that there may be a time

10 and place for it, but the Court has indicated -- but I think

11 it's only until we know what buildings survive both product ID

12 and statute of limitations.

13        MR. MANDELSBERG:  Your Honor, Steven Mandelsberg,

14 from Hahn and Hessen, on behalf of the State of California,

15 Department of General Services.  First of all, we have had no

16 discussions, nor have been asked to have any discussions,

17 although we've tried, with the debtors about any of the state's

18 claims.

19        The withdrawal of the objection was communicated to

20 us on last Thursday in response to our inquiry about whether

21 any of the objections were going to be withdrawn in light of

22 the proof.  So we've had no such discussions.  We don't -- we

23 would entertain participating in them.

24        We don't think that -- based upon my experience, the

25 fact that a pending motion is made doesn't obviate discussions

1 anymore than a trial or any pending proceedings would.  Second

2 comment, while the Court does have before it motions for

3 summary judgment directed against my client, they do not,

4 despite what Mr. Restivo referred to, fall into the category of

5 all of the other State of California claimants.

6       They made arguments as to other claimants that they

7 didn't make against us, specifically, the assertion of claims

8 against Johns Manville and other claimants.  I think Mr Flatley

9 during his argument specifically acknowledged that.  And so the

10 sole argument, as I pointed out at the time, deals with this

11 1990 petition for leave to the Supreme Court.  Notwithstanding

12 that, and -- we would or course participate in any discussions

13 and think it may be a good idea.

14       THE COURT:  Okay.  I don't want to waste the debtors'

15 resources.  So to the extent that there is a statute of

16 limitations issue that may be dispositive, I'm not going to

17 compel settlement negotiations at this point in time.  If there

18 are -- however, are issues that are not covered -- or buildings

19 that are not covered by the statute of limitations, then -- and

20 as to which there is no longer going to be an objection to

21 claim pending, either because of a ruling or because the

22 debtors' withdrawn it, then I want some settlement discussions

23 to get going, because this case has to end, hopefully in my

24 lifetime.

25       And I would like to see some progress along that

1  line.  So this is going to be step A in the progress.  Talking

2  about a methodology, folks, we're going to set one.  So let's

3  get going with it.

4          MR. RESTIVO:  Your Honor, I would just respond as

5  follows, that all of the claims are subject to the no hazard,

6  but that would not be in the same category in our mind as

7  statute of limitations.  And we're willing to discuss anything

8  with anyone, really, at any time.

9          And secondly, I will report to the Court when we have

10  a status conference, but in response to what the Court said,

11  the 627 claims, Your Honor, before the Court issues rulings on

12  statute of limitations, I believe is down to about 242.  I

13  understand that doesn't take care of the problem, but when we

14  sent our bills to Grace we told them we've made good progress,

15  and I think we have, and --

16          THE COURT:  Between you and Grace that might be

17  great.  Between my two law clerks and me, that's not going to

18  get us out of here in my lifetime.  So we need some different

19  type of progress.

20          MR. RESTIVO:  You do the right thing on the statute

21  of limitations motions, Judge, we'll be there.

22          THE COURT:  Maybe.  Okay.  We'll --

23          MS. KEARSE:  Your Honor, at this time I don't think I

24  need lock-down.  We're just talking.  So we'll continue that

25  dialogue.

1          THE COURT:  All right.  Okay.  We're adjourned until

2  tomorrow at 10:00, and anyone who wishes to participate by

3  phone may do so.  Thank you.  Mr. Mandelsberg, you and Mr.

4  Restivo can work out the dates by which you'll submit these.

5                          *  *  *  *

6

7                          CERTIFICATE

8          We, TRACY GEIGENHEIMER and ELIZABETH REID-GRIGSBY, a

9  certified electronic transcriber, certify that the foregoing is

10  a correct transcript, to the best of the transcriber's ability,

11  from the official electronic sound recording of the proceedings

12  in the above-entitled matter.

13  _____        April 27, 2007

14  Elizabeth Reid-Grigsby

15

16  _____

17  Tracy Geigenheimer

18

19

20

21

22

23

24

25