UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

IN RE:                          . Case No. 01-1139(JKF)
                                .
W.R. GRACE & CO.,               . USX Tower - 54th Floor
et al.,                         . 600 Grant Street
                                . Pittsburgh, PA  15219
            Debtors.            .
                                . May 2, 2007
. . . . . . . . . . . . . . . . 2:06 p.m.


TRANSCRIPT OF HEARING
BEFORE HONORABLE JUDITH K. FITZGERALD
UNITED STATES BANKRUPTCY COURT JUDGE


APPEARANCES:

For the Debtors:            Reed Smith, LLP
                            By:  JAMES J. RESTIVO, JR., ESQ.
                                 TRACI REA, ESQ.
                            435 Sixth Avenue
                            Pittsburgh, PA  15219

                            Pachulski, Stang, Ziehl, Young,
                             Jones & Weintraub, P.C.
                            By:  JAMES E. O'NEILL, ESQ.
                            919 North Market Street
                            17th Floor
                            P.O. Box 8705
                            Wilmington, DE  19899


Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@optonline.net**

**(609) 586-2311  Fax No.  (609) 587-3599**

APPEARANCES (Cont'd.):

For the Debtors:                    Kirkland & Ellis, LLP
                                    By:  JANET S. BAER, ESQ.
                                         SAMUEL GROSS, ESQ.
                                         DAVID MENDOLSON, ESQ.
                                         SCOTT McMILLIN, ESQ.
                                         DAVID M. BERNICK, ESQ.
                                    Aon Center
                                    200 East Randolph Drive
                                    Chicago, IL  60601

For David T. Austern,              Orrick, Herrington & Future
Claims Rep:                         Sutcliffe, LLP
                                    By:  JOHN ANSBRO, ESQ.
                                    Washington Harbour
                                    3050 K Street, N.W.
                                    Washington, DC  20007

For Official Committee of          Bilzin Sumberg Baena Price
Property Damage Claimants:          & Axelrod LLP
                                    By:  SCOTT L. BAENA, ESQ.
                                         JAY M. SAKALO, ESQ.
                                         MATTHEW KRAMER, ESQ.
                                    Wachovia Financial Center
                                    200 South Biscayne Boulevard
                                    Suite 2500
                                    Miami, FL  33131

For the Equity Committee:          Kramer, Levin, Naftalis &
                                     Frankel, LLP
                                    By:  GARY M. BECKER, ESQ.
                                    919 Third Avenue
                                    New York, NY  10022

For ZAI Claimants:                 Scott Law Group
                                    By:  DARRELL SCOTT, ESQ.

                                    Richardson, Patrick, Westbrook
                                     & Brickman, LLC
                                    By:  EDWARD J. WESTBROOK, ESQ.
                                    1037 Chuck Dawley Boulevard
                                    Building A
                                    Mount Pleasant, SC  29464

For Official Committee of          Dies, Handerson & Cafona
Asbestos Property Damage           By:  MARTIN DIES, ESQ.
Claimants:                         1009 Green Avenue
                                    Orange, TX  77630

APPEARANCES (Cont'd.):

For Royal & Sun Alliance: Wilson Elser Moskowitz Edelman
 & Dicker LLP
By:  CARL J. PERNICONE, ESQ.
150 East 42nd Street
New York, NY  10017

For Unsecured Creditors Stroock & Stroock & Lavan, LLP
Committee: By:  KENNETH PASQUALE, ESQ.
180 Maiden Lane
New York, NY  10038

For CNA Insurance: Goodwin & Procter, LLP
By:  DANIEL M. GLOSBAND, ESQ.
Exchange Place
Boston, MA  02109

For Continental Casualty: Ford, Marrin, Esposito,
 Witmeyer & Gleser, LLP
By:  ELIZABETH DeCRISTOFARO, ESQ.
Wall Street Plaza, 23rd Floor
New York, NY  10005-1875

For Asbestos Creditors Caplin & Drysdale, Chartered
Committee: By:  NATHAN D. FINCH, ESQ.
One Thomas Circle, NW
Washington, DC  20005

Campbell & Levine, LLC
By:  MARK T. HURFORD, ESQ.
800 N. King Street
Suite 300
Wilmington, DE  19801

For BNSF Railway: Pepper Hamilton, LLP
By:  EDWARD C. TOOLE, JR., ESQ.
3000 Two Logan Square
18th & Arch Streets
Philadelphia, PA  19103

Phillips Bohyer & Hedger, P.C.
By:  JAMES ROBERTS, ESQ.
2800 Central Ave., Suite C
Billings, MT 59802

APPEARANCES (Cont'd.):

For Canada & Montana:          Monzack and Monaco, P.A.
                               By:  FRANCIS MONACO, ESQ.
                               1201 North Orange St., Suite 400
                               P.O. Box 2031
                               Wilmington, DE  19899

For Libby Claimants:           Cohn Whitesell & Goldberg, LLP
                               By:  DANIEL C. COHN, ESQ.
                               101 Arch Street
                               Boston, MA  02110

For the Equity Committee:      Kramer, Levin, Naftalis &
                                Frankel, LLP
                               By:  GREGORY HOROWITZ, ESQ.
                               919 Third Avenue
                               New York, NY  10022

                               Peninsula Capital
                               By:  TED WESCHLER

For Dies & Hile PD Claimants:  Pryor Cashman Sherman & Flynn LLP
                               By:  RICHARD LEVY, JR., ESQ.
                               410 Park Avenue
                               New York, NY  10022

For Allstate Insurance Co.:    Cuyler Burk, LLP
                               By:  ANDREW K. CRAIG, ESQ.
                               Parsippany Corporate Center
                               Four Century Drive
                               Parsippany, NJ  07054

For W.R. Grace:                RICHARD FINKE
                               JAY HUGHES
                               WILLIAM SPARKS

For Various Firms:             Stutzman, Bromberg, Esserman,
                                & Plifka, PC
                               By:  SANDER L. ESSERMAN, ESQ.
                               2323 Bryan Street
                               Suite 2200
                               Dallas, TX  75201

APPEARANCES (Cont'd.):

For "The MMWR" firms:          Montgomery, McCracken, Walker
                                & Rhoads, LLP
                               By:  LEONARD A. BUSBY, ESQ.
                               300 Delaware Avenue
                               Suite 750
                               Wilmington, DE  19801

For Maryland Casualty:         Connolly Bove Lodge & Hutz LLP
                               By:  JEFFREY C. WISLER, ESQ.
                               The Nemours Building
                               1007 North Orange Street
                               Wilmington, DE  19801

<u>TELEPHONIC APPEARANCES:</u>

For Official Committee of          Ferry, Joseph & Pearce, P.A.
Asbestos Property Damage           By:  THEODORE J. TACCONELLI, ESQ.
Claimants:                         824 Market Street
                                   Suite 904
                                   P.O. Box 1351
                                   Wilmington, DE  19899


For State of California:           Hahn & Hessen LLP
                                   By:  STEVEN J. MANDELSBERG, ESQ.
                                   488 Madison Avenue
                                   14th and 15th Floor
                                   New York, NY  10022


For Fireman's Fund                 Stevens & Lee
Insurance Company:                 By:  DAVID R. BEANE, ESQ.
                                   111 North Sixth Street
                                   P.O. Box 679
                                   Reading, PA  19603


For American Legion:               Motley Rice LLC
                                   By:  ANNE M. KEARSE, ESQ.
                                   28 Bridgeside Boulevard
                                   P.O. Box 1792
                                   Mount Pleasant, SC  29465


For Ad Hoc Equity Committee:       Weil, Gotshal & Manges LLP
                                   By:  JARRAD WRIGHT, ESQ.
                                   767 Fifth Avenue
                                   New York, NY  10153


                                   Weil Gotshal & Manges, LLP
                                   By:  DAVID HICKERSON, ESQ.
                                   3000 Eye Street, NW
                                   Suite 900
                                   Washington, DC 20005

For Official Committee of          Stroock & Stroock & Lavan, LLP
Unsecured Creditors:               By:  ARLENE G. KRIEGER, ESQ.
                                        LEWIS KRUGER, ESQ.
                                   180 Maiden Lane
                                   New York, NY  10038


For Official Committee of          Dies & Hile, LLP
Asbestos Property Damage           By:  MARTIN DIES, ESQ.
Claimants:                         1601 Rio Grande St., Ste. 330
                                   Austin TX, 78701-1149

TELEPHONIC APPEARANCES (Cont'd.):

```
For Halcyon Asset Mgt.:      Halycon Asset Mgt., LLC
                             By:  OSCAR MOCKRIDGE

For the Debtor:              Reed Smith, LLP
                             By:  DOUGLAS E. CAMERON, ESQ.
                             435 Sixth Avenue
                             Pittsburgh, PA  15219

                             Pachulski, Stang, Ziehl, Young,
                              Jones & Weintraub, P.C.
                             By:  TIMOTHY P. CAIRNS, ESQ.
                             919 North Market Street
                             17th Floor
                             P.O. Box 8705
                             Wilmington, DE  19899

For Front Point Mgt.:        Front Point Mgt., Inc.
                             By:  STEVEN EISMAN

For Kenneth Thomas:          KENNETH THOMAS

For Tort Claimants:          Simmons Cooper, LLC
                             By:  ROBERT W. PHILLIPS, ESQ.
                             707 Berkshire Boulevard
                             East Alton, IL  62024

For Various Firms:           Stutzman, Bromberg, Esserman,
                              & Plifka, PC
                             By:  DAVID J. PARSONS, ESQ.
                                  VAN J. HOOKER, ESQ.
                                  DAVID A. KLINGLER, ESQ.
                             2323 Bryan Street
                             Suite 2200
                             Dallas, TX  75201

For David T. Austern,        Phillips, Goldman & Spence, P.A.
Future Claims Rep:           By:  JOHN C. PHILLIPS, JR., ESQ.
                             1200 North Broom Street
                             Wilmington, DE  19806

                             Orrick, Herrington & Sutcliffe,
                               LLP
                             By:  DEBRA FELDER, ESQ.
                                  RICHARD H. WYRON, ESQ.
                             Washington Harbour
                             3050 K Street, N.W.
                             Washington, DC  20007
```

TELEPHONIC APPEARANCES (Cont'd.):

For David T. Austern,          Piper Jaffray & Co.
Future Claims Rep.:            By:  JASON SOLGANICK, ESQ.
                                    JONATHAN BROWNSTEIN, ESQ.

For the Prudential Insurance   Riker, Danzig, Scherer, Hyland &
Co. of America:                 Perretti, LLP
                               By:  CURTIS M. PLAZA, ESQ.
                               Headquarters Plaza
                               One Speedwell Avenue
                               Morristown, NJ  07962

For Dune Capital Mgt.:         Dune Capital Mgt.
                               By:  GUY BARON

For Asbestos Property Damage   The Brandi Law Firm
Claimants:                     By:  TERENCE D. EDWARDS, ESQ.
                               44 Montgomery Street, Ste. 1050
                               San Francisco, CA  94104

For Asbestos Property Damage   LECG
Claimants:                     By:  SEAN WALSH, ESQ.

                               Speights & Runyan
                               By:  MARION FAIREY, ESQ.
                               200 Jackson Avenue East
                               Hampton, SC  29924

For U.S. Trustee:              U.S. Trustee Department
                               By:  DAVID KLAUDER

For Macerich:                  Ashby & Geddes
                               By:  AMANDA WINFREE, ESQ.
                               222 Delaware Avenue
                               17th Floor
                               Wilmington, DE  19899

Shareholder for W.R. Grace:    Tocqueville Asset Mgt.
                               By:  PETER SHAWN, ESQ.

For Travelers Casualty         Simpson, Thacher & Bartlett, LLP
Insurance Co.:                 By:  BARBARA SENIAWSKI, ESQ.
                               425 Lexington Avenue
                               New York, NY  10017

TELEPHONIC APPEARANCES (Cont'd.):

For the Debtor:                 W.R. Grace & Co.
                                By:  MARK SHEINITZ
                                     DAVID SIEGEL

For Dow Jones News Wires:       Dow Jones News Wire
                                By:  PEG BRICKLEY, ESQ.

For William Asire, et al.:      Cooney & Conway
                                By:  KATHY BYRNE, ESQ.
                                Chicago, Illinois

For Latigo Partners:            Latigo Partners
                                By:  STEPHEN BLAUNER, ESQ.

For the Debtor:                 Kirkland & Ellis, LLP
                                By:  LORI SINANYAN, ESQ.
                                777 South Figueroa Street
                                Los Angeles, CA  90017

                                Kirkland & Ellis, LLP
                                By:  THEODORE L. FREEDMAN, ESQ.
                                Citigroup Center
                                153 East 53rd Street
                                New York, NY  10022

                                Kirkland & Ellis, LLP
                                By:  LISA G. ESAYIAN, ESQ.
                                Aon Center
                                200 East Randolph Drive
                                Chicago, IL  60601

For Everest Reinsurance         Marks, O'Neill, O'Brien &
Co. & McKinley Ins. Co.:          Courtney, P.C.
                                By:  BRIAN KASPRZAK, ESQ.
                                     MICHAEL J. JOYCE, ESQ.
                                913 North Market St., Suite 800
                                Wilmington, DE  19801

For Everest Reinsurance         Crowell & Moring, LLP
Co. & McKinley Ins. Co.:        By:  MARK D. PLEVIN, ESQ.
                                     LESLIE A. EPLEY, ESQ.
                                1001 Pennsylvania Avenue, NW
                                Washington, DC  20004

TELEPHONIC APPEARANCES (Cont'd.):

For Baron & Budd:                The Hogan Firm
                                 By:  DANIEL K. HOGAN, ESQ.
                                 1311 Delaware Avenue
                                 Wilmington, Delaware 19806

For Irwin H. Zandman:            IRWIN H. ZANDMAN

For Scotts Company:              Vorys, Sater, Seymour and Pease
                                  LLP
                                 By:  TIFFANY STRELOW COBB, ESQ.
                                 52 East Gay Street
                                 P.O. Box 1008
                                 Columbus, OH  43216

For Lehman Brothers:             Lehman Brothers
                                 By:  ANDREW CHAN

For Citadel Investment           Citadel Investment Group
Group:                           By:  BEAU HARBOUR

For Official Committee of        Anderson Kill & Olick, P.C.
Asbestos Claimants:              By:  ROBERT M. HORKOVICH, ESQ.
                                 1251 Avenue of the Americas
                                 New York, NY  10020

For Federal Insurance Co.:       Cozen O'Connor
                                 By:  JACOB C. COHN, ESQ.
                                      DAVID J. LIEBMAN, ESQ.
                                 1900 Market Street
                                 Philadelphia, PA  19103

For Allstate Insurance Co.:      Cuyler Burk, LLP
                                 By:  ANDREW K. CRAIG, ESQ.
                                 Parsippany Corporate Center
                                 Four Century Drive
                                 Parsippany, NJ  07054

For Grace Certain Cancer         Montgomery, McCracken, Walker
Claimants:                        & Rhoads, LLP
                                 By:  NOEL C. BURNHAM, ESQ.
                                      NATALIE RAMSEY, ESQ.
                                 300 Delaware Avenue
                                 Suite 750
                                 Wilmington, DE  19801

TELEPHONE APPEARANCES (Cont'd.):

For Murray Capital Mgt.:      Murray Capital Mgt.
                              By:  MARTI MURRAY

For Asbestos Creditors        Caplin & Drysdale, Chartered
Committee:                    By:  WALTER SLOCOMBE, ESQ.
                              One Thomas Circle, NW
                              Washington, DC  20005

For Libby Claimants:          Cohn Whitesell & Goldberg, LLP
                              By:  CHRISTOPHER M. CANDON, ESQ.
                              101 Arch Street
                              Boston, MA  02110

                              Landis Rath & Cobb, LLP
                              By:  KERRI KING MUMFORD, ESQ.
                              919 Market Street
                              Wilmington, DE  19801

For ZAI Claimants:            William D. Sullivan, LLC
                              By:  WILLIAM SULLIVAN, ESQ.
                              4 East 8th Street, Suite 400
                              Wilmington, Delaware 19801

For DK Acquisition Partners:  Willkie Farr & Gallagher LLP
                              By:  STEPHEN B. VOGEL, ESQ.
                              The Equitable Center
                              787 Seventh Avenue
                              New York, NY  10019

For Motley Rice, LLC:         Motley Rice LLC
                              By:  JOHN HERRICK, ESQ.
                              28 Bridgeside Boulevard
                              P.O. Box 1792
                              Mount Pleasant, SC  29465

For City of Philadelphia:     City of Philadelphia
                              Law Department
                              By:  JOSEPH DiGIUSEPPE, ESQ.

For National Union Fire       Zeichner Ellman & Krause LLP
Insurance Company:            By:  ROBERT GUTTMAN, ESQ.
                              575 Lexington Avenue
                              New York, NY  10022

TELEPHONIC APPEARANCES (Cont'd.):

| | |
|---|---|
| For AIG: | Zeichner Ellman & Krause LLP<br>By:  MICHAEL S. DAVIS, ESQ.<br>575 Lexington Avenue<br>New York, NY  10022 |
| For Official Committee of<br>Unsecured Creditors: | Duane Morris, LLP<br>By:  MICHAEL R. LASTOWSKI, ESQ.<br>1100 North Market St., Suite 1200<br>Wilmington, DE  19801-1246 |
| For London Market Insurers: | Mendes & Mount, LLP<br>By:  ALEX MUELLER, ESQ.<br>750 Seventh Avenue<br>New York, NY  10019 |

1          THE COURT:  Please be seated.  This the matter of

2  W.R. Grace, bankruptcy number 01-1139.  The participants I have

3  listed by phone, Oscar Mockridge, Douglas Cameron, Steven

4  Eisman, Kenneth Thomas, Ann Kearse, Robert Phillips, Sander

5  Esserman, Dan Hooker, David Klingler, David Parsons, Steven

6  Mandelsberg, John Phillips, Curtis Plaza, Guy Baron, Debra

7  Felder, Richard Wyron, Jason Solganick, Terence Edwards,

8  Jonathan Brownstein, Martie Dies, Roger Frankel, Sean Walsh,

9  Marion Fairey, Matthew Kramer, David Klauder, Amanda Winfree,

10  Peter Shawn, Theodore Tacconelli, Barbara Seniawski, Richard

11  Kruger, Arlene Krieger, Mark Shelnitz, David Siegel, Peg

12  Brickley, Kathy Byrne, Stephen Blauner, Lori Sinanyan, David

13  Beane, Elizabeth DeCristofaro, Brian Kasprzak, Michael Joyce,

14  Leslie Epley, Mark Plevin, Daniel Hogan, Theodore Freedman,

15  David Hickerson, Irwin H. Zandman, Tiffany Cobb, Lisa Esayian,

16  Andrew Chan, Beau Harbour, James O'Neill, Timothy Cairns,

17  Robert Horkovich, Jacob Cohn, David Liebman, Andrew Craig, Noel

18  Burnham, Natalie Ramsey, Marti Murray, Walter Slocombe,

19  Christopher Candon, William Sullivan, Stephen Vogel, Jarrad

20  Wright, John Herrick, Joseph DiGiuseppe, Kerri Mumford, Robert

21  Guttmann, Michael Davis, Michael Lastowski, and Alex Mueller.

22                        (Pause)

23          THE COURT:  All right.  While that's going on, I'll

24  take the entries in the courtroom.  Excuse me one second here.

25                        (Pause)

1          THE COURT:  Okay.

2          MR. BERNICK:  David Bernick for W.R. Grace.

3          MR. McMILLIN:  Scott McMillin, W.R. Grace.

4          THE COURT:  I'm sorry.  Spell your last name.

5          MR. McMILLIN:  M-c-M-i-l-l-i-n.

6          THE COURT:  Thank you.

7          MR. MENDELSON:  David Mendelson for W.R. Grace.

8          MR. RESTIVO:  James Restivo and Traci Rea for W.R.

9  Grace.

10          MR. HOROWITZ:  Gregory Horowitz for the Equity

11  Committee.

12          MR. BECKER:  Gary Becker for the Equity Committee.

13          MR. PASQUALE:  Ken Pasquale, Unsecured Creditors

14  Committee.

15          THE COURT:  Just a minute.

16          THE CLERK:  (Inaudible).

17          MR. BECKER:  Yes, Gary Becker, B-e-c-k-e-r.

18          MR. PASQUALE:  Ken Pasquale.

19          THE CLERK:  Thank you.

20          MR. FINCH:  Nathan Finch for the Official Committee

21  of Asbestos Personal Injury Claimants, Your Honor.

22          MR. HURFORD:  Mark Hurford for the Official Committee

23  of Asbestos Personal Injury Claimants, Your Honor.

24          MR. ANSBRO:  Good afternoon, Your Honor.  John Ansbro

25  for the Future Claimants Representative.

1          MR. BUSBY:  Leonard Busby, Your Honor, here for

2  Natalie Ramsey on behalf of the MMWR firm.

3          MR. BAENA:  May it please the Court.  Good afternoon,

4  Your Honor.  Scott Baena on behalf of the PD Committee.

5          MR. SAKALO:  Good afternoon, Your Honor.  Dave Sakalo

6  on behalf of the PD Committee.

7          MR. ESSERMAN:  Good afternoon, Your Honor.  Sander

8  Esserman present on behalf of various firms.

9          MR. COHN:  Good afternoon, Your Honor.  Dan Cohn

10  representing the Libby claimants.

11          MR. WISLER:  Good afternoon, Your Honor.  Jeffrey

12  Wisler representing Maryland Casualty Company.

13          MR. PERNICONE:  Good afternoon, Your Honor.  Carl

14  Pernicone for Royal and Sun Alliance.

15          MR. LEVY:  Richard Levy of Prior Cashman, LLP on

16  behalf of PD claimants representative -- represented by the

17  Dies and Hile firm.

18          MR. TOOLE:  Edward Toole, Pepper Hamilton,

19  representing Burlington Northern Sante Fe Railway.

20          MS. BAER:  Janet Baer also on behalf of W.R. Grace.

21          MR. ROBERTS:  Jim Roberts on behalf of BNSF.

22          MS. DeCRISTOFARO:  Elizabeth DeCristofaro on behalf

23  of Continental Casualty Company.

24          MR. GLOSBAND:  Good afternoon, Your Honor.  Dan

25  Glosband also on behalf of Continental Casualty Company.

**J&J COURT TRANSCRIBERS, INC.**

1          MR. O'NEILL:  And, Your Honor, James O'Neill for W.R.

2  Grace.

3          MR. MONACO:  Good afternoon, Your Honor.  Frank

4  Monaco for Canada and the State of Montana.

5          MR. SCOTT:  Good afternoon, Your Honor.  Darryl

6  Scott, Special Counsel to ZAI claimants.

7          MR. WESTBROOK:  Hello, Your Honor.  Ed Westbrook,

8  ZAI, special science counsel.

9          MR. SPEIGHTS:  Good afternoon, Your Honor.  Dan

10  Speights on behalf of the SNR claimants.

11          THE COURT:  Oh, Moana, is there someone from

12  Delaware?  We don't know?  Is there anyone on the phone from

13  Delaware in the courtroom?

14                          (Pause)

15          THE COURT:  San Diego Gas and Electric, Andrew

16  Broderick?

17                          (Pause)

18          THE COURT:  Is the Court Call operator on?

19          OPERATOR:  Yes, ma'am.  I am.

20          THE COURT:  When whoever that is connects, would you

21  please just interrupt me, so I know that they're on, and I can

22  get the entry of appearance?

23          OPERATOR:  And do you know who it is that we're

24  looking for?

25          THE COURT:  I don't.  Alex Barnes.

**J&J COURT TRANSCRIBERS, INC.**

1        OPERATOR:  Alex Barnes.  Okay.  I will let you know.

2        THE COURT:  Thank you.  I guess it's the courtroom

3 that's calling in.  It's Alex Barnes that will be present.

4        OPERATOR:  Oh, okay.  The courtroom from Delaware?

5        THE COURT:  Yes.

6        OPERATOR:  Okay, Your Honor.

7        THE COURT:  Thank you.

8        OPERATOR:  I'll let you know.

9        THE COURT:  Mr. Bernick.

10        MR. BERNICK:  Yes, Your Honor.  We have a relatively

11 -- I'll say relatively -- we have a pretty full agenda this

12 afternoon.  I think Your Honor's aware of that.  In order to

13 accommodate differing schedules of differing folks, what we

14 would propose, per our agreement last time is to begin with the

15 matter of the pre-petition reserves, the depositions that are

16 associated with that, in an effort to get that out of the way,

17 so that Mr. Finch could keep (indiscernible).

18        I then have a particularly strong lobby from my

19 colleague, Mr. Restivo, who is very anxious to show off his

20 chart a second time.  I notice that the colors and the

21 substance hasn't changed, but a pretty polished piece now.

22        THE COURT:  Broadbands.  We're getting into

23 broadbands now.

24        MR. BERNICK:  Broadbands, yes.  But I think that he

25 would like to take up the question of some scheduling matters

**J&J COURT TRANSCRIBERS, INC.**

1  related to PD while those matters are probably fresh in Your

2  Honor's mind from last week.  And then what we would propose is

3  simply pursue the agenda in the order in which it's set out

4  with the exception of the uncontested matters and perhaps a

5  couple of the small claims, which we can put at the end and to

6  give everybody fair notice.  That would mean that I believe the

7  first argument would take place --w hen we follow that order,

8  the first matter would be item number eight, which is related

9  to the retention of Lexicon, and then we pretty much proceed in

10 sequence.

11        The only other thing that I would say is to refresh

12 Your Honor's recollection that when we got into the question of

13 the B readings in the consultant's privilege last time, there

14 was also some discussion of what might happen to the scheduled

15 case with respect to personal injury.

16        OPERATOR:  Your Honor, this is the Operator.  Pardon

17 the interruption.  I do have the Pittsburgh courtroom now on

18 the line.

19        THE COURT:  I've been on line.  It's the Delaware --

20        OPERATOR:  The Delaware --

21        THE COURT:  -- Delaware courtroom I think.

22        OPERATOR:  Okay.  Well, I believe it was just labeled

23 wrong, and I apologize.

24        THE COURT:  Okay.  Thank you.

25        OPERATOR:  On the line.

**J&J COURT TRANSCRIBERS, INC.**

1          MR. BERNICK:  Did you want to find out who that

2     individual is?

3          THE COURT:  Is Mr. Barnes -- Alex Barnes present?

4          MR. BARNES:  Thank you, Your Honor, Alex --

5          THE COURT:  Okay.  Thank you, sir.

6          MR. BERNICK:  Okay.

7          THE COURT:  Okay.

8          MR. BERNICK:  And I think before we move from the

9     personal injury items on the agenda, which I believe -- 17 --

10    16, that we would take up any other scheduling matters related

11    to personal injury and then go ahead and do property damage.

12    The other items, some property damage agenda.  So I just wanted

13    to make that suggestion, and we could then proceed accordingly.

14    I guess that would be Mr. Finch's argument with respect to the

15    pre-petition reserves first as we committed (indiscernible).

16    Thank you.

17          MR. FINCH:  May it please the Court, Nathan Finch on

18    behalf of the Asbestos Claimants Committee.  Your Honor, may I

19    approach the bench and just hand up some materials?

20          THE COURT:  Yes.

21          MR. FINCH:  It might make it easy to follow along.

22                    (Pause)

23          MR. FINCH:  Your Honor, I have handed up three

24    packets of materials that are colored coded.  The first one is

25    called slide show, and much of my argument will focus or start

**J&J COURT TRANSCRIBERS, INC.**

1 with the slide show.  In their opposition to our motion to

2 compel W.R. Grace asks, "It is not clear from the motion to

3 compel what the ACC and the FCR want from this most recent

4 motion."  What we want is relatively simple.  It does not

5 involve a blunderbuss of additional discovery as Grace has

6 characterized it and I think is well within the discovery that

7 we are entitled to in this case.  And specifically there are

8 three things that we're looking for.

9        Number one, an order from the Court that overrules

10 Grace's instructions to Mr. Robert Beber and Mr. Jay Hughes at

11 their most recent depositions in February not to answer

12 questions concerning Grace's pre-petition estimates of asbestos

13 liability and a ruling that in the upcoming depositions of Mr.

14 David Siegel and Robert Tarola and any other fact witness that

15 bears on or has knowledge concerning the pre-petition estimates

16 of asbestos liability that Grace cannot so instruct those

17 witnesses not to answer questions about those topics.

18        The second thing that the ACC and the Future

19 Claimants Representative are seeking through this motion is the

20 production of 47 documents that are listed on Grace's most

21 recent privilege log, which either directly or by description

22 are related to Grace's pre-bankruptcy estimates of asbestos

23 liability.  The exact same subject matter that was discovered

24 and litigated extensively in the Sealed Air proceedings, which

25 was the fraudulent transfer claim or the ruling the primary

**J&J COURT TRANSCRIBERS, INC.**

1  disputed issue was what was the magnitude of Grace's asbestos

2  personal injury liability and property damage liability.  I'm

3  obviously focusing on the personal injury liability here.

4          And then third, the production of one additional

5  document -- or maybe it's a packet of documents -- that was

6  provided to Grace's Board of Directors in December, 2000 or in

7  January of 2001 when the company was addressing a revised

8  estimate of Grace's asbestos personal injury liability.  Again,

9  the exact same subject matter as many of the documents that

10 were produced and discovered in the Sealed Air litigation.

11         So to sort of set the stage, the first question the

12 Court may ask, well, are the ACC and the FCR entitled to this.

13 Well, first of all, the subject matter of the testimony is we

14 believe extremely relevant to the issues the Court will face in

15 the asbestos estimation trial in the -- which begins in

16 September.  The company pre-petition for both business

17 planning, i.e., the Sealed Air transaction, the Fresenius

18 transaction, other types of business purposes, and for SEC

19 disclosure purposes, routinely and regularly estimated its

20 asbestos liability by attempting to predict how many of the

21 cases it had pending against it would settle and what those

22 cases would likely settle for in the aggregate not on the sort

23 of individual one-by-one basis but on a global basis, because

24 that was, in their view, the best way to do it.

25         One of the things which I either forgotten or didn't

**J&J COURT TRANSCRIBERS, INC.**

1  know, which came out in Mr. Beber's deposition in February

2  before they instructed him not to answer is that apparently the

3  SEC had had communications with Grace concerning Grace's way of

4  estimating asbestos liabilities and whether those should be

5  presented in its financial statements.  And there's no

6  difference between estimating liability for financial statement

7  purposes and we view estimating liability for any other

8  purposes.  This is a bankruptcy case.  It's all about how much

9  money will be necessary to pay the expected stream of present

10 and future claims.  And a reserve set forth in a financial

11 statement is nothing more than an estimate of the liability

12 that the company would face.

13         When a company enters into a settlement contract with

14 an asbestos personal injury plaintiff, that gives rise to a

15 liability that is just as much of an obligation of the company

16 as is a debenture or a bond obligation or a note to a bank.

17 It's we will pay you, Mr. Asbestos Personal Injury Plaintiff,

18 an amount of money that is contingent upon you doing several

19 things, providing us with the release, providing us with -- you

20 know, take us off the trial docket, give us a document showing

21 some evidence of an asbestos-related disease, and another

22 document showing some evidence of an exposure to a W.R. Grace

23 asbestos-containing product.

24         And prior to the time it went into bankruptcy, every

25 time it sat down to do this W.R. Grace would attempt to predict

**J&J COURT TRANSCRIBERS, INC.**

1  the cost of the settlement contracts that it entered into and

2  the ones that it was likely to enter into in the future as the

3  best way of estimating its asbestos liability.

4         THE COURT:  Mr. Finch, pardon me.  Please, everyone,

5  turn off your black berries and your portable devices, so that

6  we don't get the feedback on either the phone or on the

7  infrared system here in the courtroom, please.  I'm sorry, Mr.

8  Finch, go ahead.

9         MR. FINCH:  Thank you, Your Honor.  As an example of

10 that, this is a page from a document that was presented to

11 Grace's Board of Directors at the time of the Sealed Air

12 transaction, and then this is management's estimate of the

13 number of pending claims and the reserve.  All reserve means is

14 the cost it's going to likely take to resolve those claims.

15        At the time that this document was prepared there

16 were about 100,000 pending claims, and management estimated

17 that to resolve those 100,000 pending claims it would cost $328

18 million.  Now, I think that's a highly relevant admission and

19 analysis by management of W.R. Grace, because as of the time

20 Grace went into bankruptcy, there were about 100,000 pending

21 claims.  And we know several things.  We know, number one, it's

22 not the same 100,000 claims in -- there's not a complete

23 overlap as the ones that were pending in 1997, because a lot of

24 the ones that were pending in 1997 got settled, and new ones

25 got filed, but it's still 100,000 claims.

1    The other thing we know is that the claim values for

2  mesothelioma claims almost tripled for W.R. Grace between 1997

3  and 2001.  And we know that the claim values for other diseases

4  more than doubled.  So if there were 100,000 claims pending --

5  just the pending ones not the future.  In 1997 there were

6  100,000 claims pending on the bankruptcy, and the claim values

7  have doubled or tripled, then you would expect that the

8  liability just for the pending claims would be six to 900

9  million dollars.  I think that is a very relevant piece of

10 evidence.  So we need more discovery into this type of

11 evidence, because we were precluded in Mr. Beber's deposition,

12 Mr. Hughes' deposition, from asking questions that go back to

13 the estimates -- pre-petition estimates of liability.

14    The -- Grace effectively raises three arguments about

15 why we're not entitled to this discovery.  One is that, well,

16 the documents that we are withholding are either work product

17 or privileged.  It's our view that none of the 48 documents

18 that they are withholding are work product or privileged,

19 because they were prepared for business planning or SEC

20 disclosure purposes.

21    And under the <u>Simon vs. Searle</u> case and a similar

22 line of cases, there is no authority for withholding documents

23 that were done for business planning and SEC disclosure

24 purposes where you're attempting to estimate the liability in

25 the aggregate which don't in any way reflect the mental

**J&J COURT TRANSCRIBERS, INC.**

1  impressions or the thought processes of counsel.  And an

2  example of one of the kinds of documents I was talking about in

3  addition to the slide I've just showed you in the -- under the

4  yellow packet of documents I put before you there's something

5  called other documents.  If you turn to the second document in

6  that stack, this is the document I'm talking about.

7        This is an example of one of the memorandum offered

8  by Jay Hughes to his boss where he estimates Grace's liability

9  for pending claims as of year end 1994.  I submit to you there

10 is nothing about this that reflects the opinions or thought

11 processes or legal strategy of counsel.  All it is is if you

12 flip through the document numbers of claims, what percentage he

13 thinks will likely get settled or paid, and what the average

14 settlement costs would be in sort of adding all that up.

15        The second reason why I believe we're entitled to

16 this discovery is that Grace produced documents on exactly this

17 subject matter voluntarily in the Sealed Air case.  Later,

18 after it produced additional documents in response to our

19 motion to compel in that Sealed Air case -- in the Sealed Air

20 case, the judge ruled that the mere production of these

21 additional documents doesn't waive a privilege, but he didn't

22 decide whether or not they were discoverable or not or

23 privileged or not or work product or not or any other purpose.

24        Then in August of 2004 my firm got a subpoena from

25 the United States government that said give us everything Grace

1  ever gave you, which includes all of this stuff.  We told Grace

2  we're going to turn over all of these documents to the United

3  States government, and they never once objected.  So in my view

4  any privilege or work product associated with documents related

5  to the pre-petition efforts by Grace to estimated asbestos

6  liability were waived when Grace didn't object to our

7  production of that to a party that's clearly their adversary.

8  I mean the Asbestos Claimants Committee are in some sense

9  Grace's adversary.  There's no dispute the United States

10 government, which has criminally indicted Grace -- and this was

11 a subpoena in a criminal case -- is their adversary.

12         The final argument that Grace raises is that, well,

13 somehow the prior course of dealing between the parties and the

14 motions that have come up on various topics before Your Honor

15 have foreclosed our ability to do some additional followup

16 discovery from Mr. Beber and Mr. Hughes and to ask questions

17 about the pre-petition estimates of Mr. Siegel and Tarola and

18 anyone else.  And I think that's completely contrary to the

19 record and to see why I think it's useful for the Court to

20 refer to the chronology of events, which is in your slide show

21 package and focusing mostly on the later chronology.

22         The chronology sort of goes through February, 2002,

23 the initial production of documents in the Sealed Air case.

24 June, 2002 Grace intervenes in that case to present witnesses

25 regarding Grace's solvency and estimates of its liabilities

**J&J COURT TRANSCRIBERS, INC.**

1 including asbestos and environmental liabilities.  August of

2 2004 Grace doesn't object when I give those documents to the

3 United States government.  September, 2006 Grace writes a

4 letter to the ACC and says that the Sealed Air documents are

5 not privileged.  Then in October of 2006 the Future Claimants

6 Representative and the ACC serve a notice of 30(b)(6)

7 deposition which has multiple topics on it.  For the relevance

8 -- for purposes of this motion are only topics one through six.

9         Topic number one was Grace's estimates of its

10 liability for asbestos tort claims for both external, e.g., SEC

11 reporting, and internal purposes including estimates of

12 asbestos tort claim liability under Grace's plan of

13 reorganization.  Topics two through six go to the reasons and

14 criteria for settling claims pre-petition.  That led to --

15 Grace refusing to produce documents or a witness on topics two

16 through six led to a motion to compel the production of

17 documents filed by the ACC and the FCR on November 7th, 2006.

18 That's a very specific motion, and nothing in that motion

19 sought a ruling on discovery relating to Grace's pre-petition

20 attempts to estimate its liability.  It sought documents

21 related to Grace's pre-petition settlement strategy, settlement

22 history, what were its criteria, what were the reasons why it

23 settled cases.

24         And if you call, that motion was argued on December

25 5th, 2006 in a special setting.  My partner, Mr. Lockwood,

**J&J COURT TRANSCRIBERS, INC.**

1    presented the arguments for the Asbestos Claimants Committee.

2    Mr. Bernick presented the arguments for W.R. Grace.  And about

3    three quarters through the argument Mr. Bernick says, well,

4    okay, let's resolve -- we would offer to resolve this motion.

5    And remember the motion to compel sought documents relating to

6    the pre-petition reasons for settlement.  We'll resolve this

7    specific motion by giving you the documents from the files of

8    Mr. Beber and Mr. Siegel and Mr. Hughes relating to the reasons

9    why Grace settled pre-petition cases, and we'll make those guys

10   available for deposition.  And that led to a stipulated tort

11   which they agreed to produce those witnesses and let the

12   witnesses talk about their pre-petition settlement criteria.

13        Then the next thing that happened in the chronology

14   is Grace files a motion to quash the 30(b)(6) deposition notice

15   on the various topics.  The long and the short of it is except

16   for topic number one, which relates to the pre -- the estimates

17   of asbestos liability, both pre-petition and post-petition,

18   everything else either got deferred or resolved by the ACC and

19   the FCR and Grace.  However, the one outstanding topic was

20   related to Grace's estimates of asbestos liability, and in

21   connection with the briefing that led up to the argument on

22   that subject matter, Grace filed a reply brief.

23        In their conclusion of their reply brief Grace says,

24   "They --" they referring to my client, the Future Claims

25   Representative "-- had the opportunity to depose Mr. Beber,

**J&J COURT TRANSCRIBERS, INC.**

1  Hughes, and Siegel as part of the <u>Sealed Air</u> litigation, which

2  concerns pre-petition reserves analysis and settlement

3  information."  They will have the opportunity to depose these

4  witnesses again.  There was no suggestion in Grace's papers --

5  and the argument on this issue was held on January 23rd of this

6  year.  There was nothing in the argument that said, oh, no,

7  they can't ask questions of Grace's fact witnesses about pre-

8  petition asbestos liability estimates.  If the Court will

9  recall, that argument focused entirely on Grace's post-petition

10 efforts to estimate its asbestos liability, which Grace said

11 was done for plan and expert work product purposes.

12        If you'll recall, the argument was almost entirely

13 about the actuarial study that Grace described in its 2004 and

14 2005 10K, which was created some time in 2004, and Grace argued

15 no, no, no, ACC and FCR, you can't get that document, and you

16 can't do discovery about it for two reasons basically, (1) it's

17 work product prepared in anticipation of the bankruptcy

18 litigation that we're fighting with you about, and (2) the guy

19 who did that, Mr. Thomas Florence, is going to be one of our

20 testifying experts at the trial.  This is his preliminary start

21 on that.  You signed a stipulation with us that said you can't

22 get access to effectively drafts or early analysis of asbestos

23 liability.  That was the only that the -- and the Court agreed

24 with Grace on that, but that was the only ruling the Court was

25 asked to make and the only ruling that it covered, and you --

**J&J COURT TRANSCRIBERS, INC.**

1  and Your Honor certainly didn't say that we were precluded from

2  asking questions of Mr. Beber or Siegel or Hughes about

3  documents we already had relating to their -- Grace's pre-

4  petition estimates of asbestos liability, nor did you say that

5  we couldn't go forward with fact witness depositions on that

6  topic.

7       So I go down to Florida in February -- late February,

8  2007 and take the deposition of Mr. Beber and Mr. Hughes.  Mr.

9  Beber starts to tell me that, well, some time in the early

10 nineties Grace got a letter or a phone call from the SEC

11 inquiring about how they were supposed to estimate their

12 asbestos liabilities, and counsel for Grace instructed him not

13 to answer any further questions about the pre-petition asbestos

14 liabilities.  And the basis for that was the December, 2002

15 order, which was just to resolve the motion to compel about the

16 reasons Grace settled cases not to foreclose anybody from

17 asking any questions of any witness about pre-petition asbestos

18 liabilities.

19      So I was surprised by that position, but I said fine.

20 I think they're wrong about that.  I'll it up in a motion to

21 compel.  Then about a week after I got back from that

22 deposition we received another privilege log from W.R. Grace,

23 and this is under the pink --

24      THE CLERK:  You have to use the mike.

25      MR. FINCH:  This is under the pink tab.  I remember P

1  for privilege log is pink.  This is the motion recent privilege

2  log that was produced to us by W.R. Grace.  I had been under

3  the apparently mistaken impression that almost anything that

4  related to Grace's pre-petition efforts to estimate its

5  asbestos liabilities had been produced to us in the <u>Sealed Air</u>

6  case with almost no exception.  I mean I had not believed that

7  anything that had -- that related to that had not been

8  produced.  And I get this privilege log, and I say jumping

9  Jahosaphat, Your Honor.  There's 47 documents on here related

10  to pre-petition asbestos liability including three or four that

11  I know I have in my files, so what's going on here.

12          I submit to you, Your Honor, this is really very

13  simple.  We're entitled to do this discovery.  It's very

14  relevant, in particular what Grace was told by the SEC and how

15  it responded to that about why it estimated asbestos

16  liabilities the way it did I think is relevant both to impeach

17  its current methodology now it's relevant to the Court's

18  <u>Daubert</u> analysis as to whether that's admissible.  These types

19  of pre-petition analyses were done for business planning and

20  SEC disclosure purposes.  They are not work product.  They

21  don't disclose the thoughts of counsel about defending any

22  particular cases.  They were never work product to begin with.

23  Slews of documents on exactly the same subject matter written

24  by the exactly the same people produced to the ACC in the

25  <u>Sealed Air</u> and turned over to the United States government

**J&J COURT TRANSCRIBERS, INC.**

1  pursuant to a subpoena.  And so I think that there's no basis

2  for Grace to say you can't ask Mr. Beber and Hughes and Siegel

3  questions about that topic, for the documents you already have,

4  and you can't get these other documents that are on exactly the

5  same subject matter.

6          Therefore, I would request Your Honor to grant our

7  motion to compel.  And I'm not asking Grace to go back and do

8  another comprehensive, time-consuming search of its files.

9  What I'm asking Grace to do is to -- it knows the 47 documents

10  on the privilege log and the one other document relating to the

11  presentation to its Board of Directors in January of 2001.  I

12  haven't seen that on a privilege log anywhere that I can tell,

13  but I know it exists, because Mr. Tarola in his <u>Sealed Air</u>

14  deposition talked about it, and then the <u>Sealed Air</u> case

15  settled before we ever got the document or started deposing any

16  of Grace's directors about it.

17          So I'm asking for basically 48 documents and a ruling

18  from the Court that says your instruction is not to answer

19  questions from Mr. Beber and Mr. Hughes are overruled, and you

20  can't make similar instructions to keep people from answering

21  questions about pre-petition efforts to estimate aggregate

22  asbestos liability.  I don't know if counsel for the Futures

23  Rep have any comments, but I'll turn the -- cede the podium to

24  him.

25          MR. ANSBRO:  Good afternoon, Your Honor.  John Ansbro

1  with Orrick, Herrington.  I'm new to this Court.  I am the

2  latest partner.  I'll be brief, Your Honor.

3          THE CLERK:  Please use the microphone.

4          MR. ANSBRO:  I'll be brief, Your Honor, and not

5  repeat what Mr. Finch has ably laid out.  We agree with that.

6  We make our position clear, and you'll see in the papers, that

7  all of the points that he raised here today are amply supported

8  by the case law.

9          I would add just a couple of additional points, Your

10  Honor.  The argument has been made by Grace that the

11  depositions that we seek here to reopen to follow up on

12  questions dealing with the pre-petition asbestos, Grace has

13  argued that that is -- this would now be a third round.  I'll

14  simply point out to the Court the FCR was not a party in <u>Sealed</u>

15  <u>Air</u>.  We had no opportunity to participate in any of that

16  discovery, so the notion that it's duplicative of something the

17  FCR had an opportunity to participate in, that's just simply

18  wrong.

19          And to the extent that this is characterized as a

20  third round of depositions, I'd say that that's a mis-

21  characterization.  We wouldn't be here today if Grace's counsel

22  had simply allowed its witnesses to give testimony in respect

23  of the exact same topics that are the subject of a host of

24  materials that have now been produced that flowed from the

25  <u>Sealed Air</u> litigation.

**J&J COURT TRANSCRIBERS, INC.**

1          I would just also remind the Court the scope of what

2  was -- and as I understand the record, this is now the first

3  time that the full <u>Sealed Air</u> record, which consists of all the

4  documents produced to the ACC and all of the deposition

5  testimony taken in that case -- if I am correct, Grace's

6  opposition to this motion is the first time that it has

7  definitively now stated that all of those materials are free,

8  usable, and as to which it's not asserting any further

9  privilege.  The impression tried to be given by Grace's

10  opposition is that that has been the case up until today.  My

11  understanding is that it's not been the case.  This is the

12  first time that all of that has been produced.

13          And, finally, Your Honor, just one additional ground.

14  You understand that we don't consider that any of these pre-

15  petition reserves analyses are privileged, but to the extent

16  that any of it was, Grace has also suggested that its assertion

17  of the attorney-client or reliance on attorney-client

18  communications in defense of its <u>Sealed Air</u> transaction, that

19  that somehow did not also affect the waiver is simply

20  incorrect, Your Honor.  We cite case law in our papers that

21  makes clear that a party need not have affirmatively feed it as

22  an affirmative defense.  That it was relying on the advice of

23  counsel.  Instead, all a party need do is assert that a factual

24  answer that that client undertook derived from the advice of

25  its counsel, and that all of that is relevant to the issues in

1 the case.  That is what Grace did in <u>Sealed Air</u>.  It intervened

2 specifically on the grounds of introducing evidence by way of

3 witnesses and documents in support of its prior reserves

4 estimates and in defense of its <u>Sealed Air</u> transaction.  That

5 was the grounds of its intervener, not just to respond to

6 discovery, as has been argued in this court before.

7         And, finally, I would say on that point the argument

8 has also been made here that Grace didn't have an option in

9 <u>Sealed Air</u> but to produce in discovery the materials that it

10 did.  I would submit to Your Honor -- and we cite a number of

11 cases in this district where that notion is dispelled.  It did

12 have an option.  The option is to maintain the privilege and

13 stand by it, or you can waive it.  If you waive it, it's

14 waived.  And when it's waived, it's waived as to the subject

15 matter of other materials that deal with the same topics.  That

16 was Grace's choice.  Courts have recognized that they have a

17 choice, choose not to waive it, and stand on your privilege

18 that it applies.  But that's the choice that Grace has.  That's

19 all I have.

20         THE COURT:  All right.  Mr. Bernick.

21         MR. BERNICK:  Would it be all right, Your Honor, if I

22 stood here --

23         THE COURT:  Yes.

24         MR. BERNICK:  -- and used the portable mike if you've

25 got a portable mike?

1                              (Pause)

2    (Counsel is difficult to hear at times via the portable mike.)

3              MR. BERNICK:  Your Honor, I'd like to go through

4    basically the same sequence of topics that were covered by Mr.

5    Finch and pick them up one by one here.  The first topic deals

6    with the three depositions of these three individuals with

7    regard to the pre-petition reserves.  The second deals with the

8    47 new -- log documents, and the third deals with these

9    presentations -- estimations work that were done in the 2000

10   and 2001 period of time.  And I'm basically just going to go

11   through each one from the arguments, because I think that that

12   was Mr. Finch's first slide, and that will cover I think all

13   the different areas in which they were seeking relief.

14             Let me begin with the two simplest ones, the first

15   being the 47 log documents.

16             THE CLERK:  Your Honor, could he just turn the mike

17   -- the mike on, please.  Thank you.

18             MR. BERNICK:  That's okay.  Thank you.  The 47 log

19   documents were documents that were picked up in the course of

20   document review in this case.  In the Sealed Air case there

21   were a variety of documents that were produced or logged

22   related to estimation work.  These particular documents were

23   not among them.  In connection with this case we undertook to

24   produce those documents that had been produced in connection

25   with the Sealed Air litigation.  We did not undertake a new,

**J&J COURT TRANSCRIBERS, INC.**

37

1  full-blown search, but to the extent we came across documents

2  during the course of searches that we did conduct and the fell

3  into privileges, we logged them.  So these have never been

4  produced, but instead they've been logged.

5        And the question, therefore, that is posed by these

6  documents really is a subject matter waiver question.  Have we

7  waived as to the subject matter that is comprised by these

8  documents which include pre-petition estimates?  And that is

9  really the only matter this Court need address, because the

10 answer to that is no.  And the reason that the answer to that

11 is no is the First Circuit's very clear rule with respect to

12 subject matter is articulated Rhone Poulenc's case which is for

13 there to be a subject matter waiver, they would have to

14 specifically place the matter at issue -- that is you have to

15 rely on the advice of counsel in connection with prosecuting

16 the defense of the case.

17       We have in this case not waived -- we have not put

18 anything at issue concerning the advice of counsel, and it is

19 our position with respect to the pre-petition reserves, the

20 advice that was offered in connection with those reserves, that

21 they are inadmissible for a wide variety of reasons.  So the

22 idea that somehow there is subject matter waiver here is wrong.

23       To the extent that there is subject matter waiver

24 being argued with respect to the Sealed Air case itself, Grace

25 intervened.  Grace was not a defendant in the case.  The

1  defense of the case -- the defendant in the case was <u>Sealed</u>

2  <u>Air</u>.  Our status really was as an intervener.  The case was

3  prosecuted on behalf of the estate by the creditors in that

4  connection, and it was they who pursued the theory -- they who

5  pursued the theory that the pre-petition reserves were

6  inadequate.  And, obviously, once they attacked the pre-

7  petition reserves and said they're inadequate, that created the

8  focus on the subject matter of how those pre-petition reserves

9  were put together.

10        We resisted the discovery with respect to that.  The

11  Court allowed the discovery with respect to that.  The whole

12  idea that somehow we were the ones that focused on that for

13  purposes of our prosecution of a defense, they were the ones

14  that focused on it purposes of their prosecution of their case

15  and said that the advice was rendered and the estimation of the

16  work was done demonstrated that there was inadequacy with

17  respect to the remaining assets of Grace to handle the then

18  known liabilities.

19        So we had not placed the issue there.  We did not

20  place the issue here.  We had not placed the issue in

21  connection with the <u>Sealed Air</u> case.  It was they steadily,

22  steadily, as they did there, and they're doing here, would

23  focus the Court's attention on these pre-petition reserves and

24  how it is they're put together.  So there is no subject matter

25  waiver.  That's clear under the Third Circuit law, and that's

**J&J COURT TRANSCRIBERS, INC.**

1 the _Rhone Poulenc_ case.

2          What about the 2000 --

3                    (Microphone malfunction)

4          MR. BERNICK:  See if that does it.

5          THE COURT:  Someone must be using a device of some

6 sort.

7          MR. BERNICK:  It could've been this was in my back

8 pocket.  Okay.  The 2000 and 2001 documents, have they ever

9 been produced?  No, they have never been produced.  What are

10 they?  They are estimation of work documents that were done in

11 connection with the decision to file this Chapter 11 case.

12 That's what they were.

13          Why had they not been produced?  The reason they had

14 not been produced is that there was a request to have them

15 produced in _Sealed Air_.  That's the request that was made by

16 the creditors in connection with the prosecution of the _Sealed_

17 _Air_ case, and Judge -- Judge -- the -- Judge Drier -- Drier.

18          THE COURT:  The mediator.

19          MR. BERNICK:  No, it was actually Judge Drier was

20 asked to be a discovery judge --

21          THE COURT:  Discovery judge.

22          MR. BERNICK:  -- for purposes of the case.  He found

23 that these materials were not discoverable, and then Judge

24 Wolin confirmed saying that the -- our motion for a protective

25 order was granted.  So Judge Wolin said these are work product

**J&J COURT TRANSCRIBERS, INC.**

40

1   in connection with the case, and they are not discoverable.  So

2   the whole idea that somehow we placed these at issue?  This got

3   litigated.  They lost.  As law of the case these are work

4   product, and not only they're work product, there's a

5   substantial work product claim that they're not outweighed by

6   the needs of litigation.  In particular, that case the focus is

7   specifically is the claim of the -- the whole claim in the case

8   is all about the 1998 period of time.

9        So a simple answer on 47 is there has not been

10  subject matter waiver.  Simple on 2000/2001, that issue has

11  already been resolved against the claimants as creditors in

12  connection with the <u>Sealed Air</u> case.

13       You then go to point Number 1 or topic Number 1,

14  which is the redeposition of these three people who are -- who

15  were in the process of being deposed.  Now, I want to be clear,

16  because I know that it cannot be clear kind of coming at this

17  in connection with the papers.  What is it that is at issue

18  here, and what is not at issue?  What is not at issue is the

19  merits of their estimation argument.  You heard Mr. Finch get

20  up and start talking about, oh, well, there's 100,000 claims,

21  and this was the trend.  And by 2000 they did this, and they

22  did that.  I'm not going to respond to any of that, because it

23  mirrors their estimation case.  They don't need these

24  depositions to be able to pursue whatever it is that the claims

25  were doing at that time, because they've already got the

**J&J COURT TRANSCRIBERS, INC.**

1  evidence of what the claims were doing at that time.

2        The question is can they get at -- they also have the

3  reserves.  Can they get at the underlying work product in

4  connection with the reserves?  Now, even there they are already

5  getting lots of things.  They're getting the documents.  This

6  is not a question about their obtaining discovery of the

7  documents that relate to these pre-petition reserves to the

8  extent that those documents were produced in the Sealed Air

9  case.  Again the 47 were not and the 2000/2001 were not.  To

10  the extent that there are documents that relate to these pre-

11  petition reserves, the period 1995 and 1999, and those

12  documents were, in fact, produced in the Sealed Air case, they

13  are available to be used.  There's no issue about their getting

14  access to those documents.

15        What about the depositions of these individuals?

16  Well, these individuals were deposed in connection with the

17  Sealed Air case.  And we have said they can use their

18  depositions from the Sealed Air case.  So the only issue that

19  we have here is can they re-depose these three people.  Now

20  there are reasons why they should not be able to re-depose them

21  that deal with the law.  We do have law, and we were -- we have

22  briefed this before the Court before.  Rule 408 says that none

23  of this is really discoverable.  And that's the Good Year case.

24  We also have work product and attorney-client privilege law in

25  that context of the Celotex case.

1          But beyond all that, there's something much more

2  important here, and that is the promises that were made about

3  what's going to happen in connection with this kind of

4  discovery.  And there were three different promises that were

5  made.  First we're going to go to 12 -- I guess that would be

6  December 19 of '05, and then we're going to go to December 18

7  of '06, and then we're going to go to a hearing that took place

8  on January 23rd of '07.  Why are those dates significant?  And

9  Mr. Finch, with all due respect, does not have the history of

10  this litigation properly before the Court in connection with

11  the prior motion practice, and let me be more specific.

12          There was a letter that was written on December 16 of

13  2005, and I'm going to show it here, Your Honor, and I know

14  it's difficult for people to see, but it's dated December 16th,

15  2005, and it recites an agreement.  It's on Kirkland

16  letterhead.  It recites an agreement.  It's to Mr. Finch.  It

17  says, "On November 22, '05 representatives of the debtor's, the

18  Official Committee of Asbestos Property -- Asbestos Personal

19  Injury Claimants, the PI Committee, the Future Claimants

20  Representative -- the FCR, who says we weren't there.  Well,

21  they were there, because this is this case -- this case not the

22  Sealed Air case.  It's this case.  There was a conversation,

23  and the letter is written by Kirkland to purport to memorialize

24  the agreement reached.

25          One of those agreements was Item 10, and it says,

**J&J COURT TRANSCRIBERS, INC.**

1  "The debtors agree that the PI Committee may use the

2  depositions of the above identified individuals --" same three

3  people "-- at the estimation hearing with the exception of

4  exhibits and portions of depositions that the debtors deem to

5  be privileged or confidential in accordance with Paragraph 8

6  above --" which is a specific paragraph dealing with specific

7  issues.   "The PI Committee agrees that it will not re-depose

8  those individuals with respect to any topic, issues, or

9  documents discussed in their Sealed Air depositions and may

10  only re-depose those individuals with respect to topics that

11  were not discussed during the original depositions."

12         So the FCR is saying, oh, who, me?  We weren't there.

13  We have the right to take our own chance to interrogate these

14  individuals.  They were happy with the idea to use their

15  depositions.  That's fair enough, and they got something out of

16  it.  So they didn't have to worry about our taking the position

17  that those matters were frivolous, because when those

18  depositions were taken, they were taken pursuant to a

19  protective order that was issued in connection with the Sealed

20  Air case.  As much as they might say that the documents were

21  the subject of a waiver when the documents were produced to the

22  U.S. Attorney's Office, that was not true with respect to the

23  depositions.  So we're -- they got something out this.  They

24  got a deal that gave them the depositions.

25         Now there's a letter that comes back from Mr. Finch

**J&J COURT TRANSCRIBERS, INC.**

1  on January 10th as a general, "These paragraphs accurately set

2  forth our agreement, however, unless Grace agrees that the

3  entirety of the <u>Sealed Air</u> exhibits and depositions may be used

4  in discovery in the estimation proceedings and will not be

5  connected to a trial, the ACC will have to depose," dah, dah,

6  dah, dah, dah, "-- as part of the fact discovery in the

7  estimation case."  Did that happen?  No, it didn't happen.

8  They were able to use the documents that we specifically said

9  they could use the documents.  They were able to use the

10 depositions.  They were able to use the depositions that we

11 specifically so agreed.

12          So what is it that we have in December 19 of '05?  We

13 have a stipulation -- an agreement that says that there will

14 not be a re-deposition.  What happened on December 18th of '06?

15 Well, as counsel has pointed out, there was motion practice

16 that took place in December of '06.  Actually, there were two

17 separate motions.  One motion related to a 30(b)(6) deposition

18 that was taken -- that was noticed in October, and the other

19 motion that was made was with respect to the -- was with

20 respect to the settlement matter.  And on the settlement matter

21 the -- what teed up the issue was that there was a motion to

22 compel.

23          Now, counsel takes the position that that motion to

24 compel on certain matters didn't relate to this at all, and

25 that's just wrong.  The motion to compel specifically picked

1    out two document requests.  They were document requests 47 and

2    66, and they were both very broad.

3         Forty-seven, which is on the screen, calls for all

4    documents concerning Grace's experience with personal injury

5    asbestos litigation in the tort system of the United States

6    including but not limited to, of course, he picks out

7    settlements and judgments in connection with personal injury

8    claims.  Well, what is it that the reserve covered?  It covered

9    settlements.  The reserve calculations were based upon

10   settlements, so, of course, that falls within the scope of a

11   request that asks for all such documents that are related to.

12        Sixty-six is for the time period January 1 through

13   2001, all documents constituting or reflecting communications

14   between Grace itself and defense counsel and Grace the

15   complainer discussing reasons why Grace agreed to settle any

16   asbestos personal injury case.  Now that obviously goes to --

17   that obviously goes to in part the settlement -- the reasons

18   for the settlement practices, but it also would pick up

19   communications that relate to the reserves, because again to

20   the extent that those documents relate to the reserves, related

21   to the subject matter of 66, it would be picked up.

22        Now, there was extensive briefing with respect to the

23   whole question of whether there would be access to and

24   discovery with regard to settlement practices.  Your Honor

25   remembers that.  And, yes, there was an agreement that was

1   reached that was designed to avoid having to litigate that

2   issue.  Frankly, after Your Honor's -- read Your Honor's

3   comments that morning, maybe I should have had Your Honor go

4   ahead and rule.  We made a deal, and there was a second

5   stipulation, stipulation Number 2, that was entered into on

6   December the 18th, and that stipulation says that these three

7   people would be deposed, but they would be deposed on very

8   specific matters relating to settlement practices.  Those are

9   described here, and the reserves were not among them.  And that

10  is why, in fact, when these individuals were produced for

11  deposition in February, and the questions were asked about the

12  reserves as opposed to why the specific cases were settled,

13  they got shut down.  They said wait a minute.  We just did a

14  stipulation pursuant to which we're producing these people, and

15  now you come and take their deposition.  The first question we

16  ask will be beyond the scope of the stipulation.  That's why it

17  shut down.  It wasn't that the matter was impermissible in this

18  instance.  They couldn't conduct discovery at all.  It was that

19  they already had conducted the discovery, and we, therefore,

20  not only get one stipulation.  We get two stipulations.

21          But there is a third stipulation.  On January the

22  23rd of '07 we argued our motion for protective order with a

23  motion to quash with respect to the 30(b)(6) deposition.  And

24  counsel is correct that that -- a motion to quash teed up the

25  question of whether there's to be inquiry with respect to the

**J&J COURT TRANSCRIBERS, INC.**

1  reserves.  And he is also correct that the principal focal

2  point there was post-petition reserves.  But Your Honor was

3  particularly clear and indeed so ruled explicitly, as the pages

4  70 -- 70 and 71 of the transcript on January the 23rd.  That

5  with respect to reserve -- with -- specifically one of the

6  matters that were briefed, reserve topics, not just the post-

7  petition reserves, 1997 to the present, the reserves topic,

8  Your Honor decided that the stipulation that had been reached

9  in this case including all counsel and constituencies, that any

10 matters relating to Mr. Florence's estimation work -- prior

11 estimation work was not discoverable, that that stipulation

12 would be protected.  And, in fact, all of the topics -- all of

13 the reserve analyses that were done from 1997 through 2001, the

14 underlying work product was, in fact, the underlying work

15 product of Dr. Florence.

16         So we have not one stipulation, not two, but three

17 different stipulations that said these people are not going to

18 get re-deposed.  And what they're now saying, Your Honor, is

19 when we instructed the witnesses not to answer questions,

20 relied upon all these different stipulations, some how they got

21 to come back in and now say, well, gee, the FCR says we weren't

22 there when they were.  Mr. Finch says, oh, I was so surprised.

23 They can't be surprised, because this is specifically the

24 subject of the stipulation.

25         Now, the only piece of evidence that is brought to

1  bear -- that is an attempt to somehow justify this situation

2  and say, oh, notwithstanding the signed, sealed, and delivered

3  stipulation, it's all untrue, and, in fact, we can't conduct

4  this inquiry, Mr. Finch showed you an e-mail.  The e-mail is

5  dated January 20.  He started with this e-mail, and he says,

6  you know, what really happened here in connection with the

7  motion to quash -- our motion to quash was that we agreed that

8  the only topic would be the subject of continuing a hearing

9  before the Court three days later on the 23rd was topic number

10  one which related to the reserves.  Okay.

11        And then he comes to our brief and says, who -- in

12  our brief we said -- this is what he quotes.  "The ACC and the

13  FCR already have all the discovery that they need.  They have

14  the opportunity -- they have the opportunity to depose Messrs.

15  Beber, Hughes, and Siegel as part of the Sealed Air litigation,

16  which concerns pre-petition reserve analysis and settlement

17  information."  They will have the opportunity to depose these

18  witnesses again, and he suggests that, well, when you just read

19  those what we're really saying in our own brief, that our own

20  language somehow undid all of these different stipulations and

21  said, ah, it's okay.  They can go take their depositions and

22  ask them whatever they want about the reserves.

23        What Mr. Finch does not tell the Court is that this

24  brief wasn't filed after the e-mail on January the 20th.  It

25  was filed on January the 12th, eight days before then.  At the

**J&J COURT TRANSCRIBERS, INC.**

1  time that this brief was written our motion didn't just cover

2  topic one.  Our motion covered not only the reserves but also

3  questions about why the cases were settled -- the settlement

4  practices.  So our brief was written to cover both things, and,

5  therefore, the real question is did somehow this statement here

6  in the conclusion specifically pick out topic number one.  The

7  answer is it did not, because all you do is go to the first

8  page in the brief that's not placed before the Court, and it

9  makes it clear.  It says, "The FCR and the ACC October 5

10 deposition required Grace to produce 30(b)(6) deponents to

11 testify in four general areas."

12         Now it's true that claims estimates, topic number

13 one, was one of them, but Grace's pre-petition settlements,

14 topics two through six, was another.  And the point that we

15 were making about the fact that they would be able to depose

16 these witnesses was that we had agreed by our stipulation that

17 they could depose those witnesses with respect to the pre-

18 petition settlements, because that's what we agreed to on the

19 18th of December.  In the first section of the brief it picks

20 that out.  It says, "Number one, the pre-petition settlement

21 topic has been resolved by a stipulation that the Committee now

22 seeks to ignore.  Grace has already agreed to produce its

23 confidential internal settlement files as well as the three

24 most knowledgeable Law Department witnesses, Messrs. Beber,

25 Hughes, and Siegel for deposition."  That's what we were

**J&J COURT TRANSCRIBERS, INC.**

1  referring to when we said they'll have the opportunity to

2  depose these witnesses again is with respect to the pre-

3  petition settlement practices.

4         And the reason that we were objecting to the 30(b)(6)

5  notice with respect to this area was not that they would be --

6  they couldn't take the depositions.  They could.  It's that

7  they were going to take the three individual depositions, and

8  then they're going to take the 30(b)(6) depositions as well?

9  That made no sense.

10        So our position in this brief was go ahead, take the

11 three people, and that's it.  You shouldn't be able to come

12 back with respect to not the reserves but the settlement

13 practices and take them again after you already agreed to take

14 them once.  That doesn't make any sense.  And that's exactly

15 what we said.

16        Grace could've stood on its privilege objections to

17 all this discovery, but instead negotiated a good faith

18 compromise of the dispute when it was first raised by the

19 Committee's motion to compel production of the Law Department's

20 files.  This is not the reserves.  This is the pre-petition

21 settlement practices.  Having negotiated that compromise, the

22 Committee should not be allowed to demand 30(b)(6) testimony on

23 the same topics before they have even bothered to take the

24 three fact witnesses' depositions.  That was the substance of

25 our objection.  No good deed should go unpunished as the courts

1 are encouraging cooperation and efficiency in discovery.  Sorry

2 for the editorial comment.

3         If the compromise is that meaningless, the

4 stipulation should be canceled, and this Court can decide all

5 of the relevant burden and privilege issues implicated by these

6 multiple waves of discovery demands.  So the effort to somehow

7 take this little line out of a brief that was filed eight days

8 before the e-mail, which he actually showed you first, does

9 nothing to defeat the multiply layers of stipulations that said

10 you agreed to a deal that you would use the depositions that

11 were taken in Sealed Air.  You agreed to a deal that says you

12 would take these people with respect to the settlement

13 practices not the reserves, and you agreed that Mr. Florence's

14 -- Dr. Florence's work in prior years would not be the subject

15 of discovery.  You agreed to all those different things, but

16 somehow they go out the door with this little miss quoted

17 snippet.  I don't think so.

18         MR. FINCH:  May I respond, Your Honor?

19         THE COURT:  (No verbal response).

20         MR. FINCH:  Let's talk about the 47 documents first.

21         THE CLERK:  You're going to have to use the

22 microphone.

23         MR. FINCH:  Let's talk about the 47 documents first.

24 Some of the 47 documents were, in fact, produced in Sealed Air.

25 And Mr. Bernick is wrong when he said none of the depositions

**J&J COURT TRANSCRIBERS, INC.**

1 were produced to the United States government.  They were all

2 produced to the United States government.

3         If you look on the privilege log that I attached

4 here, on Page Number 2 of 12 there is a document dated 8/18,

5 1998, and it is a 51-page document called, "Faxed Revised

6 Report Estimating Future Asbestos Claims and Liabilities

7 Prepared at Request of Counsel," from Jeffrey Posner to

8 somebody named Anne, Beber, (indiscernible) and other Grace

9 employees.  Here's that document produced in <u>Sealed Air</u>.  It's

10 not privileged.  It's the exact same subject matter of all the

11 other court set of documents.

12         THE CLERK:  You have to use the mike.

13         MR. FINCH:  Here is that document.  It was attached

14 -- it was produced in <u>Sealed Air</u>.  It's the exact same subject

15 matter as the other 46 documents.  Some of the other 47 were

16 produced in <u>Sealed Air</u>.

17         Secondly, Mr. Bernick says, well, this 2000/2001

18 Board of Directors memo was preparing for the bankruptcy

19 filing.  I think we're talking about two different documents,

20 Your Honor.  Mr. Tarola, Grace's CFO, was asked questions about

21 -- I'll just read from the transcript.  This is a deposition

22 taken in the <u>Sealed Air</u> case.

23         MR. BERNICK:  Could we have a page number?

24         MR. FINCH:  Page Number 28 and 29 of Mr. Tarola's

25 deposition dated September 20th, 2002.

1  "Q    What's the highest number you recall receiving discussion

2  at the Board level with respect to Grace's asbestos bodily

3  injury liabilities?"

4       And then counsel for Grace objects raising the same

5  objection Mr. Bernick raises here as to what topics the witness

6  can talk about and what topics the witness can't talk about.

7  Let me just read that to you.

8       "Let me interject and counsel the witness that to the

9  extent the question asks for you to discuss Grace's reserve

10  estimates, settlements, resolutions, and payments, the Court

11  has found that you can discuss that without that being a waiver

12  of any privilege.  To the extent that this may be discussed in

13  a different context, such as to reveal attorney strategies,

14  reasons or opinions on specific cases, or advice regarding the

15  bankruptcy proceeding, I would counsel the witness not to

16  answer."

17       Mr. Tarola asks that it be read back.

18  "A    To the best of my recollection toward the end of 2000 we

19  discussed with the Board the results of the reevaluation of

20  Grace's reserves in light of the claims filing activities we

21  had seen, and we discussed ranges that did exceed a billion

22  dollars, but I don't recall exactly how much over a billion

23  dollars those numbers were.

24  "Q    Can you do any better with that and with respect to rough

25  order of magnitude?"

**J&J COURT TRANSCRIBERS, INC.**

1          Objection to the form.  You can answer if you can.

2  "A   I can't off the top of your heard.

3  "Q   Are there documents you could refer to that would refresh

4  you on that subject?"

5          Again the subject being Grace's reserves.

6  "A   Yes, there are.

7  "Q   What would that document be?

8  "A   It would be the materials presented to the Board of

9  Directors that are addressing this issue --" again this issue

10  was the question before "-- at that briefing -- meeting that

11  occurred either in late 2000 or early 2001."

12          That's the document that relates to the pre-petition

13  reserves.  It's not bankruptcy planning.  It's not bankruptcy

14  work product.  I think it's discoverable under the sole line of

15  cases.

16          The third thing Mr. Bernick argues is that, oh, well,

17  anything related to Grace's pre-petition estimates of liability

18  was done by Tom Florence, and, therefore, it's all protected by

19  the discovery stipulation.  That's not the case.  That

20  discovery stipulation was intended to protect against work

21  product prepared by that expert for purposes of the estimation

22  proceeding in -- this fall.  It wasn't meant to shield anything

23  the expert ever did in connection with some engagement.  I mean

24  by that definition he can't go and cross examine my expert, and

25  I can't cross examine him about other work.  This is work that

**J&J COURT TRANSCRIBERS, INC.**

1  Tom Florence did as a -- for business planning purposes for

2  Grace not work product that's a preliminary estimate of its

3  asbestos liability for the bankruptcy purposes now.  This was

4  estimates that he did in 1994, in 1995, in 1997, and in 2000

5  for SEC disclosure purposes.

6        And, as Mr. Siegel testified in his deposition in the

7  Sealed Air case, so they could better communicate with their

8  shareholders.  There's nothing work product about this.

9  There's nothing that would make that fall within the ambit of

10 the discovery stipulation.  It's not draft expert work for

11 purposes of this case.  It was expert -- it's not expert work

12 at all.

13       And, furthermore, a lot of the documents we're

14 talking about, and a lot of people involved in this are not

15 testifying experts.  They're people like Jay Hughes and Bob

16 Beber and whoever wrote that document and presented it to the

17 Board of Directors that estimated the liability for the pending

18 claims at $350 million in 1997.

19       The third thing that Mr. Bernick does is try to twist

20 what the discovery stipulation was about to cover issues that

21 were never intended.  He says that my document requests 47 and

22 66 are the only of the motion to compel that led to this

23 discovery stipulation, which is the stipulation dated December

24 21st, 2006, somehow related to efforts to estimate aggregate

25 liability.  And I submit to you that document requests 47 and

1  66 are about the supervision and conduct of Grace's litigation

2  defense, the litigation and settlement strategies experience of

3  Grace, defenses raised or considered by Grace to defend itself,

4  settlements and judgments, claims for asbestos-related injuries

5  that were disposed of without payment.  There's nothing in

6  there that says estimated costs of future liabilities.  There

7  were other document requests that were specifically about

8  Grace's efforts to estimate its asbestos liabilities.  Those

9  were the subject of a motion to compel that we filed that got

10  argued on the same day as the -- Grace's motion to quash the

11  30(b)(6) deposition.

12        So then he points to a letter agreement where I --

13  where he tries to say that the ACC and the FCR are bound by an

14  agreement that says, oh, you won't agree to re-depose these

15  people, but Grace never agreed that we could introduce this

16  suff into evidence at trial, and that it was not privileged and

17  not subject to any -- to any kind of confidentiality until we

18  get their pleadings about two weeks ago where they finally say,

19  yes, we're not going to object to -- on privilege or work

20  product grounds to the pre-petition reserve analyses.  But it

21  seems to me that once the cat is out of the bag -- once these

22  documents have been produced, the depositions have been

23  produced, the witnesses have testified to some extent on those

24  topics but not fully, there were certainly topics that were not

25  gone into on the Sealed Air depositions that relate generally

**J&J COURT TRANSCRIBERS, INC.**

1   to asbestos -- efforts to estimate asbestos liability but were

2   never inquired about.  In _Sealed Air_ there was not a real

3   dispute about methodology.

4        Grace intervened in the _Sealed Air_ case as a

5   defendant.  Mr. Bernick tries to have you think, oh, we're just

6   this sort of innocent bystander.  They appeared as a defendant.

7   You either go above the V or below the V in a caption.  They

8   came in below the V.  They were a defendant in the case.

9        And the subject of what was Grace told by the SEC

10  about how you're supposed to estimate your asbestos liabilities

11  -- and the SEC's got some guidance about that and what -- how

12  do you have to do it.  What was -- were alternatives

13  considered?  The various methodologies -- I mean the

14  methodology questions were not relevant very much in the _Sealed_

15  _Air_ case, because Sealed Air's experts and Grace, relying on

16  Tom Florence all used the exact same methodology that my expert

17  did, which was you take the past estimates -- past history of

18  resolving cases, and you try to figure out how much it's going

19  to cost, how many cases you're likely to see and how many cases

20  you're going to resolve in the future.

21       And so for him to say that we are forever foreclosed

22  by those depositions that were taken in a different case,

23  albeit the overall arching was the same, but the specific

24  issues, which is the specific methodology was different, is

25  just factually inaccurate, Your Honor.  And the time line that

**J&J COURT TRANSCRIBERS, INC.**

1 he has laid out for Your Honor about how the December 22nd

2 stipulation came to be is just inaccurate.  That was to resolve

3 a specific motion to compel relating to specific categories of

4 documents that had nothing to do with aggregate estimates of

5 asbestos liability pre-petition.  And there are -- there is

6 nothing the ACC and the FCR agreed to that would preclude us

7 from asking questions about those topics in the deposition.

8         And indeed at the argument on the 23rd I raised

9 before your court the possibility that I would ask questions

10 like that in front when I was, you know, deposing Mr. Siegel.

11 I said Grace wasn't going to preclude me from asking --

12 probably is not going to preclude me from asking questions

13 about pre-petition estimates, and he never -- Mr. Bernick never

14 objected to that or said, no, you can't do that.  And it's his

15 position that you can't do any further testimony from fact

16 witnesses on pre-petition topics, and I want a 30(b)(6) witness

17 from W.R. Grace on its efforts to estimate asbestos liability

18 pre-petition.  They produced such a witness in the Sealed Air

19 case.

20         And I think they -- we either get it through fact

21 witnesses or we get it through 30(b)(6) deposition testimony,

22 but they can't say we're foreclosed from going back and asking

23 key followup testimony on what we regard as a critical part of

24 the case.  And --

25         THE COURT:  Well, look, it appears to me that these

**J&J COURT TRANSCRIBERS, INC.**

1  47 documents seem to be related to the same types of

2  information that was produced in Sealed Air.  I don't have any

3  way of knowing by looking at the privilege log whether the

4  documents were or were not produced in Sealed Air.  You've just

5  handed me one that's identified on the log that you say was

6  produced in Sealed Air.  If they were produced in Sealed Air,

7  clearly at this point in time they ought to be produced -- I

8  mean they don't have to be produced again.  You already have

9  them.  But, nonetheless, to the extent that they were produced,

10 there is not really a basis at this point in time in which to

11 claim as privileged, when the debtor has already agreed, that

12 the documents produced in the Sealed Air case are not going to

13 be subject to privilege.  So --

14        MR. BERNICK:  That's -- Your Honor, we would say --

15 it was pointed out to me when I came back.  Apparently, Mr.

16 Finch called our office and pointed out that there were about

17 three or four documents that had, in fact, been produced, and

18 we are not resisting as to those three or four documents.  I

19 don't see that Mr. Finch has identified any other to the three

20 or four documents.

21        THE COURT:  But the reality, Mr. Bernick, if they're

22 the same type of document as these -- truthfully -- and I guess

23 I'll ask the question that every judge wants to know, and it is

24 not a legal question.  It's just getting to the bottom line.

25 What difference does it make?

1           MR. BERNICK:  I'm not sure that it makes a lot of

2  difference in terms of the --

3           THE COURT:  Then we've spent two hours today --

4           MR. BERNICK:  Well --

5           THE COURT:  -- four hours at a prior hearing, three

6  hours at a hearing before that, God knows how many hours --

7           MR. BERNICK:  It's because they argue subject matter

8  waiver, and subject matter waiver is a different kettle of

9  fish.  If Your Honor were to say that these 47 documents should

10  be produced, will Grace agree to that.  If there's no subject

11  matter waiver, I don't think there's going to be a problem.

12  The essence of what they're arguing here on both the second and

13  third propositions is subject matter waiver.  We care a lot

14  about that.

15           THE COURT:  Mr. Finch.

16           MR. FINCH:  I would agree that there's not a subject

17  matter waiver if I get those 47 documents.  If the Board of

18  Directors' memo is not related to bankruptcy planning, but it's

19  related to reserve, that I get that document, and I get --

20           THE COURT:  Well, let's talk about --

21           MR. FINCH:  -- a half a day --

22           THE COURT:  Wait.  Let's talk about the 47 documents.

23  Will you agree that the debtor produces them without having any

24  waiver of a subject matter privilege?

25           MR. FINCH:  Yes, as long as I get to ask questions

**J&J COURT TRANSCRIBERS, INC.**

1 about those topics of witnesses.  I mean they can't produce the

2 documents and say you can't talk to any of our witnesses.

3          THE COURT:  I don't even know if you need to talk to

4 witnesses until you see what the documents are.  The first

5 question -- let's take them one at a time.

6          MR. FINCH:  Yes, the first question is I agree that's

7 not a subject matter waiver.  Fine, Your Honor.

8          THE COURT:  How about the Future Claims Rep?

9          MR. ANSBRO:  Your Honor, it seems to me that if 47

10 documents are identical in subject matter for a raft of

11 material that has already been produced, they ought to come

12 across.  As you heard, we don't think they're privileged to

13 begin with.  Will I agree that there's not a subject matter

14 waiver?  I'm uncomfortable with that, because it seems to me

15 that once the documents are produced, we ought to be able to

16 depose and examine the authors of these materials as to their

17 work.

18          MR. BERNICK:  This is a --

19          THE COURT:  All right.

20          MR. BERNICK:  It's not negotiation.  They will want

21 to -- they say, well, that's not enough.  We want a subject

22 matter waiver.  We want the rest of the stuff.  That, you

23 know --

24          MR. ANSBRO:  Your Honor, how could we --

25          MR. BERNICK:  What's the point in my agreeing if they

**J&J COURT TRANSCRIBERS, INC.**

1  want Your Honor to find subject matter waiver as a predicate

2  for the production of these documents?  They can take the

3  matter up with the Third Circuit when it goes up on appeal, and

4  they explain why <u>Rhone Poulenc</u> doesn't govern here.  I'm

5  prepared to be flexible, because at the end of the day I don't

6  the substance of those documents makes a difference.  If they

7  don't want to be flexible, and they want to negotiate with the

8  Court, then, no, we'll stand by <u>Rhone Poulenc</u>.

9          THE COURT:  I'm not sure at this point whether there

10 is a subject matter waiver or not.  I think what's going to end

11 up happening is a major opinion that will go up on appeal

12 that's going to hold up your discovery, because you're not

13 going to get an order from me until I have an opportunity to go

14 back and address this issue by way of an opinion.  That's what

15 it's going to take.  So if you want the documents, if you think

16 they're really necessary in discovery -- if they're this type

17 of document, you probably got enough samples of them that,

18 quite frankly, they're not going to inform your analysis much

19 one way or the other.  But if you want them, it seems to me

20 that the best way to go about it is to say, fine, we'll do it

21 without the subject matter waiver and then see whether you need

22 to take questions by way of deposition of a witness later.

23 It's up to you.

24          MR. ANSBRO:  Well, Your Honor, I mean what difference

25 does it make what's the substance?  Obviously, we don't know.

1  We've not seen the materials --

2          THE COURT:  Right.

3          MR. ANSBRO:  -- and that is why we're here today.

4  I'm happy to take production on behalf of the FCR of the 47

5  documents reserving my right to seek relief from the Court and

6  ask for the opportunity to examine based on these 47 documents.

7  Obviously, having not seen them --

8          THE COURT:  The right to seek a further deposition of

9  some witness who can explain what the nature of the documents

10  is, that's -- I think that's fine, but not with a -- but with

11  the debtor preserving that subject matter --

12          MR. BERNICK:  I'm not -- you know, Your Honor, that

13  is -- all that says is to get the documents, and then based on

14  the documents say, ooh, this really is different, etc.

15          THE COURT:  Well --

16          MR. BERNICK:  You know, at a certain point --

17          THE COURT:  Mr. Bernick, if it's this type of

18  document, they're not going to need any further analysis.

19          MR. BERNICK:  That assumes -- that assumes that they

20  called that shot straight as opposed to using this as an

21  opportunity --

22          THE COURT:  Yes, I will assume that they'll call the

23  shot straight.

24          MR. BERNICK:  Well, I'm not -- on the basis of what I

25  heard so far, I don't see that.  It seems to me that if they

**J&J COURT TRANSCRIBERS, INC.**

64

1  want the documents, they give up on subject matter waiver.  If

2  they don't want -- if they want to argue subject matter waiver

3  at any point in time, then they ought to --

4            THE COURT:  No.  No.

5            MR. BERNICK:  -- then they ought to argue subject

6  matter waiver, and we'll --

7            THE COURT:  I'm agreeing with respect to subject

8  matter waiver, but that doesn't mean that at some point they

9  may not say that they need some explanation or want to inquire

10  of a witness about a document.  That doesn't have anything to

11  do with a subject matter waiver.  That's asking for some

12  further explanation of a document.

13            MR. BERNICK:  And that then implicates the specific

14  stipulation that we negotiated --

15            THE COURT:  That would --

16            MR. BERNICK:  -- specifically on that topic.

17            THE COURT:  That would implicate the stipulation, but

18  that's a topic for another day.

19            MR. FINCH:  Your Honor, the stipulation that he's

20  talking about relates to the -- Mr. Beber, Siegel, and Hughes.

21  There are other witnesses who aren't covered by that

22  stipulation relating to the pre-petition reserve estimate.

23            THE COURT:  Well, as I recall those hearings, the

24  deal was that you would start with those three and only if you

25  did not get the types of information that you needed would you

1  go beyond those three.  So --

2           MR. FINCH:  No, Your Honor, we started with those

3  three on the reasons Grace settled cases.  We didn't start with

4  those three on what was its estimates of asbestos liability

5  pre-petition.  The motion to compel that led to that

6  stipulation was limited to the reasons why Grace settled cases.

7           THE COURT:  That was the topic on which you asked for

8  the discovery.

9           MR. BERNICK:  They asked for discovery on a broader

10  topic.  Our agreement was that they could be taken with respect

11  -- the depositions could be taken with respect to pre-petition

12  settlement --

13           THE COURT:  Okay.

14           MR. BERNICK:  -- practices specifically, because --

15           THE COURT:  All right.  Fine.

16           MR. BERNICK:  -- they had already agreed to that they

17  couldn't do it on the rest.

18           THE COURT:  Gentlemen, I've heard the argument.  I am

19  trying to see whether or not we can get to some accommodation.

20  You can have this fight outside the courtroom.  I'm going to

21  make rulings.  So you'll either agree, or I'm going to make

22  rulings.  The first question is with respect to the 47

23  documents, will the FCR agree to take the documents with the

24  debtor preserving its subject matter privilege without waiving

25  the subject matter privilege?

1              MR. ANSBRO:  Are you asking me, Your Honor, that I

2    would waive any right in the future to challenge that subject

3    matter privilege?

4              THE COURT:  Yes.

5              MR. ANSBRO:  With respect to these 47 --

6              THE COURT:  As to those 47 documents.  Yes.

7              MR. ANSBRO:  With respect to those 47?

8              THE COURT:  Yes.

9              MR. FINCH:  Are you also saying that we wouldn't be

10   able to use those documents in any deposition?

11             MR. BERNICK:  I didn't say that.

12             THE COURT:  I just the only issue is whether or not

13   the privilege with respect to the subject matter for the debtor

14   is preserved.  That's it.

15             MR. FINCH:  I would agree -- I would basically agree

16   to the same sort of deal I cut with the debtors in Sealed Air,

17   which is that the production of those docments to me does not

18   constitute a subject matter waiver as to all things related to

19   their pre-petition asbestos liability estimates.  However, I

20   would say that if I need to take the deposition of a witness to

21   further understand a document, they can talk about the subject

22   matter in the document.  That seems to me to be part and parcel

23   of --

24             MR. BERNICK:  I don't -- I don't -- this really --

25   I'm very reluctant to continue this -- continue the discussion,

**J&J COURT TRANSCRIBERS, INC.**

1 because, you know, we tried our best to be accommodating of

2 this.  When we say the document's produced, it's no longer

3 privileged in this case.  It's useable for all purposes of this

4 case subject to whatever objections there might be as to

5 admissibility.  That is hearsay, things like that not relating

6 to privilege.  That's what we mean when we say we produced the

7 document.

8          To the extent they then say, oh, well, gee, this

9 document is now a proper subject for inquiry in a deposition,

10 if the deposition is not barred by a stipulation, which it is

11 in the case of these three deponents, and it may even be more.

12 It depends on who else was in that December 19th, '05 letter.

13 They can always ask for discovery with respect to that

14 document.  Does that mean that in the course of that discovery

15 they now can say, well, any and all privileged matters that

16 relate to the pre-petition estimates are fair game?  The --

17 just because it's implicated by the document, the answer to

18 that is no.  There's an examination concerning the document,

19 but there is not waiver of the subject matter.

20          Now, where I come from that's a pretyt clear

21 distinction in terms of subject matter -- subject matter being

22 privileged versus the document being privileged.  But if we

23 want to sit there and parse all these things out now, there's

24 not a deal here.  All we have is an effort to use Your Honor's

25 interest in getting resolution of this one issue to start to

1  unpack 1 and 3, and I think that that is very inappropriate.

2          MR. ANSBRO:  May I ask a question first, Your Honor?

3  There are -- the conversation we're having right now relates to

4  the 47 documents.

5          THE COURT:  Yes.

6          MR. ANSBRO:  I am assuming, and I -- if we could get

7  clarification from Your Honor that it does not apply to all of

8  the underlying materials that have now in this motion practice

9  been released from privilege that was produced in <u>Sealed Air</u>.

10  So, for example, what --

11          THE COURT:  I don't have anything before me but these

12  47 documents.  Please, we don't need to -- you know, this has

13  already gone on for an hour and a half.  I mean there's no

14  point expanding this.  It's related to the 47 documents.  I

15  don't know how to ask a question any more clearly.

16          MR. ANSBRO:  If -- what I understand from Mr.

17  Bernick's comments and Mr. Finch and Your Honor is that with

18  respect to these 47 we would be able to examine just on those

19  documents?  I'm --

20          THE COURT:  You can --

21          MR. ANSBRO:  I'm happy to go with that.

22          THE COURT:  What I said is you get the documents, and

23  then you can reserve the right to ask to take the deposition of

24  a witness if you think you need it after you see the documents.

25  You haven't seen them yet.  How do you know whether you're

1  going to need a deposition?

2          MR. FINCH:  Okay.  That covers the 47 documents.

3          THE COURT:  Well, I don't know if it does.  It does

4  for your, Mr. Finch.

5          MR. ANSBRO:  Okay, and I would just point out that

6  probably we had at least three of these already.  So we're not

7  talking -- we're talking about apparently 44 not 47.

8          THE COURT:  All right.

9          MR. BERNICK:  That's very well put.  Yes, that's

10 correct.

11         THE COURT:  So based on Mr. Bernick's recitation,

12 with which I agree --

13         MR. ANSBRO:  Can I confer with counsel --

14         THE COURT:  Yes.

15         MR. ANSBRO:  -- just for a moment?

16         MR. FINCH:  This applies just to these 47 documents

17 not the ones -- the ones that we already have from the Sealed

18 Air.

19         THE COURT:  How many times do I have to say yes,

20 folks.  Let's listen.

21         MR. FINCH:  Okay.  Now that gets us to --

22         MR. BERNICK:  Wait.  Wait.  Wait.

23                         (Pause)

24         MR. ANSBRO:  The understanding that we can use all of

25 the other materials on the same subject matters, including the

1 three that Mr. Finch has brought to the Court's attention,

2 we're --

3          MR. BERNICK:  This again.  We're playing around with

4 words now.  All the other materials on the same subject

5 matter --

6          MR. FINCH:  We have already.

7          MR. BERNICK:  Well, all the other materials on the

8 same subject --

9          THE COURT:  I have no -- I am not making any rulings

10 except with respect to the objection that I have before me

11 right now which concerns 44 out of the 47 documents.  That's

12 all I'm making rulings on.  Is -- am I being clear?  I am not

13 going beyond the extent of the motion that's before me.  I'm

14 making rulings on 44 documents, on nothing else.  And you've

15 got, gentlemen, two minutes to answer yes or no before I make a

16 ruling.  So please get together.  Decide.  It's either yes, I

17 accept the stipulation as re --

18          MR. FINCH:  Yes.

19          MR. ANSBRO:  Yes, Your Honor.

20          THE COURT:  All right.  Fine.  You've got a -- then

21 the debtor's subject matter privilege is not waived with

22 respect to the 44 of the 47 documents.  The debtor is to

23 produce those documents with this stipulation, and this record

24 is so ordered.  Someone -- Mr. Bernick, the debtor is to order

25 a transcript, and you are to get me an order that will recite

**J&J COURT TRANSCRIBERS, INC.**

1  specifically the way it is placed on this record.  I don't want

2  anybody else's superfluous language placed into this order.

3       MR. FINCH:  Your Honor, that still leaves Number 1

4  and Number 3 that is before Your Honor.

5       THE COURT:  Yes, now with respect to Number 3, Mr.

6  Bernick, I am not clear.  You're telling me that this document

7  that was produced -- allegedly produced to the Board has

8  already been the subject of a ruling by the District Court that

9  says that it was work product at least in the Sealed Air case,

10  that it relates to the 1998 time frame.

11       MR. BERNICK:  To be very clear, Your Honor, it's --

12  and Mr. Finch was involved in this, so he knows.  The -- when

13  the discovery took place with respect to the reserve estimates

14  -- 1993 Sealed Air deposition, the Sealed Air deposition -- the

15  Sealed Air discovery was the subject of a relatively extended

16  process before Judge Drier and Judge Wolin.  And there were

17  privilege logs that were created, and, basically, the documents

18  were broken out into categories, and one of the categories was

19  the documents -- we drew a line between the documents --

20       THE COURT:  Pardon me.  Whoever has the black berry,

21  palm pilot, whatever it is on and issuing it to send e-mail,

22  please turn it off.

23       MR. BERNICK:  Certain of the documents related to the

24  pre-2000 reserves where there wasn't any question, but the

25  company was not involved in the dialogue concerning the

**J&J COURT TRANSCRIBERS, INC.**

1 potential Chapter 11.  In 2000/2001 there were documents that

2 reflect that that process began and was underway, and I'm not

3 sure exactly when in 2000 it was.

4       And with respect to the category of documents that

5 were documents that dealt with estimate matters in connection

6 with the potential Chapter 11 -- and some of them would

7 directly overlap with the reserve.  Our firm was involved with

8 those, and that was a separate category of documents, and the

9 Court granted our request for a protective order on that.

10      THE COURT:  All right.  I think there -- the document

11 that Mr. Finch is talking about is in connection with a

12 deposition where a deponent identified a specific document.

13      MR. BERNICK:  No, let me be clear about that.  I

14 think that actually when you heard that recitation -- Mr.

15 Tarola's deposition was taken in 2002, and the -- there is no

16 -- it's not clear that there's any particular document that Mr.

17 Tarola is talking about.  What happens is there's the broad

18 question.  It was read to the Court.  And then there's an

19 objection that says you can't answer that question with respect

20 to a series of things including anything that was in connection

21 with the filing or deliberations concerning this Chapter 11

22 case.  Mr. Tarola then pauses and thinks, and he then answers

23 the question in part.  There's not a specific document at

24 issue.  There are a whole bunch of documents that relate to a

25 potential Chapter 11 that implicate reserve analyses and

**J&J COURT TRANSCRIBERS, INC.**

1  calculations that were done by Dr. Florence.  So all that he

2  really has is the inference that when Mr. Tarola answered that

3  question, he had in his mind some particular document that fell

4  on the non-Chapter 11 side of the estimation process.  Now, it

5  really is irrelevant, because again you get to Dr. Florence,

6  who is the subject of the expert stipulation, but there is no

7  specific document that's been identified.  And my only

8  observation would be that the specific documents were

9  identified document by document by document in a privilege log

10 that Judge Drier incorporated in his order, and I could show it

11 to the Court.  It says with respect to documents that fall on

12 the granted side, that the request for protection is granted,

13 and you can that some of them were authored by Kirkland and

14 Ellis.  So there is no specific document that Mr. Finch has

15 identified that is -- was generated in 2000 and not in

16 connection with the case.

17          THE COURT:  All right.  Mr. Finch, then I'm afraid

18 without something more specific --

19          MR. FINCH:  Your Honor, I am talking about the

20 document that Mr. Tarola identified.  He's clearly drawing a

21 distinction in his head between documents for -- related to

22 bankruptcy planning and documents relating to results of

23 reevaluation of Grace's reserves in light of the claim filing

24 activities we had seen, and we discussed ranges that did exceed

25 a billion dollars.

1          MR. BERNICK:  That's the point.  There's no document

2     that was identified.  You just say, well, what would --

3                         (Pause)

4          MR. BERNICK:  See we -- when we had a process that we

5     actually followed with Judge Wolin and Judge Drier, he said

6     I'll be visiting it, we actually had a whole log, and we went

7     through it item by item.  You can see here -- you have to

8     squint to see Kirkland and Ellis, and this deals with documents

9     dated some time in '01, '02, '01.  It says granted, granted,

10    granted.  All of those (indiscernible).  Might there be some

11    particular document that Mr. Tarola had?  We could speculate

12    there was.  He wasn't shown it.  It wasn't identified

13    (indiscernible).  The process that we had gone through prior to

14    that deposition, because that was in '02, was a process of

15    identifying specific documents, and all of those were

16    identified as falling into such categories as being in

17    connection with the Chapter 11 case.  They were documents as to

18    which our requests for relief was granted.

19          THE COURT:  Okay.  Mr. Finch, without some more

20    specific explanation, I have to accept debtor's explanation

21    that this is prepared in connection with the bankruptcy filing.

22    It appears to be work product and possibly and probably

23    attorney-client privilege protected documents.

24          MR. FINCH:  But I haven't seen the document Mr.

25    Tarola was referring to.  He's talking --

1          MR. BERNICK:  That's the point.

2          MR. FINCH:  -- specifically about discussion with the

3    Board, the results of the reevaluation of Grace's reserves in

4    light of the claims filing activities that have nothing to do

5    with the bankruptcy planning.

6          MR. BERNICK:  No, that's just inferences drawn from

7    the fact that the question was asked and an objection was

8    imposed.  I mean I don't know if there is a document that he's

9    got in his mind.  I don't know what it was.  It's also been

10   pointed out to me that Dilbert Weiss was appointed as special

11   counsel for purposes of undertaking the prosecution of the

12   fraudulent conveyance claim.  And Dilbert Weiss reviewed these

13   documents in camera.  I didn't even know that Mr. Finch was

14   involved.

15         MR. FINCH:  No, I never saw those documents, and I --

16   what I -- I'm not asking for bankruptcy planning documents,

17   David.

18         MR. BERNICK:  Well, but that's the problem is that

19   the -- the point is that there was a lot of work that was done

20   in 2000 and '01 by Mr. Florence in connection with determining

21   what the claims flow might be like in the future that were part

22   of the question of should Grace declare Chapter 11.

23         THE COURT:  All right.  With respect to estimates

24   that are being prepared in connection with the debtor's

25   bankruptcy filing and getting ready for the bankruptcy filing,

1 they are to be produced with -- along with the estimates that

2 Dr. Florence is preparing, so that you will have access to them

3 in connection with the expert reports.  If the debtor at this

4 point is contending that they are somehow tied up in the expert

5 reports, they're to be produced in connection with the expert

6 reports.  You'll have to get them then --

7              MR. BERNICK:  Thank you.  I --

8              THE COURT:  -- because I don't have any other way of

9 knowing what --

10             MR. BERNICK:  I'm sorry, Your Honor.

11             THE COURT:  -- they are at this time.

12             MR. BERNICK:  That's the problem.  It's that you then

13 have the third stipulation.  All this was done by Dr. Florence.

14 Dr. Florence is not going to be relying upon these estimates in

15 connection with his expert report.

16             THE COURT:  Well, they're going to have to be

17 produced at that point in time if you're going to object to

18 producing them now.

19             MR. BERNICK:  Well, no, I -- I'm not --

20             THE COURT:  At some point the underlying factual

21 premise I think that the Committee is attempting to challenge,

22 which appears to be relevant and discoverable and appropriate

23 for cross examination with respect to the debtor's own

24 methodology pre-petition of estimating its own liability is

25 what did the debtor do, and I think that's a proper line of

1 inquiry for the Committee to get into.  I thought you were

2 saying that Dr. Florence had prepared that type of methodology

3 for the debtor before, and that that's what the debtor was

4 going to be essentially producing to the Committee later.

5           MR. BERNICK:  No.

6           THE COURT:  No.

7           MR. BERNICK:  No.  No.  No.  No.  No.  No.  Dr.

8 Florence did this work historically, '95, '96, '97, '98, '99,

9 2000 and whatever it was and in connection with the bankruptcy

10 analysis process.  Okay?  Under the expert stipulation all of

11 that's prior work, and it doesn't come in for any purpose.  If

12 he decides to rely upon it, it does come in.  That's a two-way

13 street.  You're -- Dr. Florence and Dr. Peterson, if they chose

14 to rely, it's discoverable.  If they choose not to rely, it's

15 not discoverable.  And that's the --

16           THE COURT:  I apologize.  You're correct.  That was

17 an unusual stipulation, and I forgot, and you're correct.  That

18 was the stipulation.

19           MR. FINCH:  Your Honor, the stipulation covered work

20 done in connection with the bankruptcy not work done prior to

21 the bankruptcy.

22           MR. BERNICK:  Dr. Peterson is going to be taking the

23 position that all of his prior work is discoverable, because it

24 was not done in connection with this case?  I doubt it.  Dr.

25 Peterson is going to take the position that all this prior

1 work, to the extent that he's not actually relying on it, is

2 not discoverable.

3          THE COURT:  All right.  In any event --

4          MR. BERNICK:  Your Honor went through all this.

5          THE COURT:  -- this is my ruling with respect to

6 whatever this document is.  This document does not appear to be

7 a document.  That's the problem.  You may take some very

8 limited discovery in the form of requests for admission or some

9 contention interrogatory of some sort to attempt to identify

10 what this document is that you're looking for, Mr. Finch.  And

11 if can be pinned down into some kind of category, so that the

12 debtor is able to articulate that it is or isn't work product,

13 privilege, whatever, so that I can actually attempt to make a

14 ruling on it as to a specific document, I will reopen this

15 subject.  But given what you're giving me, I have no basis on

16 which to say that you can get discovery on this document,

17 because I don't know what the document is.

18          MR. BERNICK:  That's fair, Your Honor.

19          THE COURT:  That request is denied.

20          MR. BERNICK:  And I would urge -- we're now an hour

21 and 45 minutes --

22          THE COURT:  Yes, and we're getting --

23          MR. FINCH:  Your Honor, I will send an interrogatory

24 to Mr. Tarola -- to Grace asking them to identify the document

25 that --

1          THE COURT:  That's fine.

2          MR. FINCH:  -- Mr. Tarola was talking about.

3          THE COURT:  That's fine.

4          MR. FINCH:  The other thing I want to be clear about

5  the ACC's position on is to the extent that I already have

6  documents that were produced in _Sealed Air_ authored by Mr.

7  Florence --

8          THE COURT:  I am not making any rulings about topics

9  not related -- not on the agenda today.  So let's go past it.

10  What's the last issue?

11          MR. FINCH:  I don't want Your Honor to be left with

12  the -- I need to make a record on this, Your Honor.  It's --

13          THE COURT:  No, you don't.  It's not before me.

14          MR. FINCH:  I'm going to use those documents to cross

15  examine Mr. Florence and already have them.

16          THE COURT:  You do not need to make a record, Mr.

17  Finch.  There is nothing before me.  Can we please get to the

18  agenda, folks?

19          MR. FINCH:  The final topic on the agenda is relating

20  to the depositions of Mr. Beber and Siegel, and --

21          THE COURT:  Don't try that stuff, Mr. Finch.  That's

22  your last warning.

23          MR. FINCH:  Mr. Beber and Siegel and Hughes to the

24  extent that the topics were not covered in the _Sealed Air_

25  depositions.  That was never -- I never agreed, and that's -- I

**J&J COURT TRANSCRIBERS, INC.**

1 never agreed that for something related generically to Grace's

2 pre-petition asbestos estimates that wasn't asked about in the

3 Sealed Air depositions that was forever off limits.

4       MR. BERNICK:  Fine.  I -- if the question is will we

5 permit depositions on topics that were not covered in the --

6 topics that were not covered in the Sealed Air deposition, then

7 I would say that that is consistent with the December 19th, '05

8 stipulation.  It is not foreclosed in the December 18th, '06

9 stipulation, but it has to await the completion of their

10 depositions on the matters that were permitted in that

11 stipulation.  And again it can't run afoul of the expert

12 stipulation, because to the extent it relates to Dr. Florence's

13 work, that is specifically the subject of the expert

14 stipulation.  So if you want to ask questions that weren't

15 asked in Sealed Air and that don't relate to Dr. Florence's

16 work, they're always free to answer those -- ask those

17 questions.

18       MR. FINCH:  Well --

19       THE COURT:  I think --

20       MR. FINCH:  -- that was --

21       THE COURT:  I apologize, but I'm confused.  I thought

22 these three gentlemen were fact witnesses not expert witnesses.

23       MR. FINCH:  That's correct.

24       THE COURT:  So I'm not sure why you can't take fact

25 witness discovery simply because an expert witness has also

1  opined on the same subject.  Why can't you discover the

2  underlying facts?

3          MR. BERNICK:  Because this is not a typical case,

4  because of that stipulation.  Remember, Your Honor, what he

5  wants --

6          THE COURT:  Because of which stipulation?

7          MR. BERNICK:  The stipulation regarding expert

8  discovery.  He says this -- why is this relevant?  He says this

9  is -- Mr. Finch (indiscernible) likely to impeach Grace's

10  estimation experts and their new methodology.  That's Dr.

11  Florence.

12          THE COURT:  Well, it's not going to impeach Dr. --

13  well, it may impeach Dr. Florence --

14          MR. BERNICK:  Yes, that's --

15          THE COURT:  -- on the underlying facts.

16          MR. BERNICK:  That's why he wants it, and we agree --

17  we agree on a bilateral basis that prior work done by an expert

18  not because it was relied upon would not be useable precisely

19  for that purpose.

20          THE COURT:  Okay.

21          MR. FINCH:  I disagree with Mr. Bernick's

22  characterization of the stipulation.  The stipulation was

23  intended to cover work done in connection with the bankruptcy

24  case by the experts for purposes of testifying in a bankruptcy

25  not anything they've ever done that is publicly available.

1          MR. BERNICK:  And this has nothing to do with the

2    stipulation.

3          THE COURT:  But the estimation work in this case is

4    not publicly available, or you wouldn't be asking the debtors

5    to produce it.

6          MR. FINCH:  Well, Mr. Florence's prior work for Grace

7    in 1997, 1998, 1999 is all publicly available now.  He's given

8    it to the United States government.

9          THE COURT:  Well, then you don't need it from Grace.

10          MR. FINCH:  That's true.

11          THE COURT:  You can get it from the government, and

12    then we don't have to worry about this issue.

13          MR. FINCH:  Well, the --

14          MR. BERNICK:  Again, that's -- I mean again Number 1

15    deals with re-deposing these individuals.  That's all it deals

16    with.

17          THE COURT:  With respect to re-depositions, the

18    stipulations appear to cover what topics you cannot inquire

19    into.  To the extent that the questions inquire into those

20    areas, i.e., any topic that the three gentlemen testified about

21    during the Sealed Air depositions, I think the stipulations

22    foreclose those topics, and that appears to include the FCR,

23    because the FCR does appear to have been copied on the one

24    letter and signed off apparently on the stipulation.  So

25    regardless of the fact that the FCR wasn't there, the FCR

**J&J COURT TRANSCRIBERS, INC.**

1 apparently has agreed to the stipulation and can, of course, be

2 bound by that discovery limitation.  So that seems to be the

3 case.

4          With respect to the question of reserves, that's the

5 other thing.  Mr. Bernick, I'm still a little bit at a loss as

6 to what difference it's going to make.  It's not as though the

7 methodology that the debtor would've used to calculate reserves

8 and publish them in SEC reports would have been different from

9 what every other company was doing at the time that it was

10 done.

11          MR. BERNICK:  Well, he's got Your Honor talking about

12 the merits of the case, and I can give Your Honor a lot of

13 reasons.  The --

14          THE COURT:  I understand what you --

15          MR. BERNICK:  It's not the SEC.  It's the accounting

16 firms that began to take the position that there had to be some

17 way of having some kind of reserve, and different companies did

18 it in different kind of ways.  And remember they are in the

19 tort system.  So there is not a question about whether there is

20 liability in the context of this case.  There's a question

21 about what is actually be paid in the tort system.

22          THE COURT:  Okay, so that's --

23          MR. BERNICK:  So --so --

24          THE COURT:  But that's a different issue.

25          MR. BERNICK:  And we're going to deal --

**J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  That's a _Daubert_ issue.

2          MR. BERNICK:  I'm sorry.  We're going to deal with

3 that.  The question is these three individuals, having deposed

4 them in _Sealed Air_ on exactly the same stuff --

5          THE COURT:  Reserve --

6          MR. BERNICK:  -- can we --

7          THE COURT:  Reserves?

8          MR. BERNICK:  Yes, the reserves.

9          THE COURT:  Okay.

10          MR. BERNICK:  So that doesn't -- that's the whole

11 point is that in _Sealed Air_, because _Sealed Air_ focused on the

12 reserve that was taken in '98, which was done on the basis of

13 history, because there was nothing else to work with, and there

14 was no alternative, that was the subject of the litigation.  So

15 there wasn't a question of --

16          MR. FINCH:  Your Honor --

17          MR. BERNICK:  I'm sorry.  There wasn't a question of

18 being some alternative methodology that more accurately

19 mirrored the law.  It is whatever it was at the time, and,

20 therefore, it was subject to discovery.  They took the

21 discovery --

22          THE COURT:  All right.

23          MR. BERNICK:  Special counsel took the discovery, and

24 all we're saying is they don't get to take it all over again,

25 because they agreed that they wouldn't.

**J&J COURT TRANSCRIBERS, INC.**

1        THE COURT:  All right.

2        MR. FINCH:  I'm not asking for the -- to go back and

3 ask the same questions I asked in Sealed Air depositions, but

4 there were topics -- I mean I never asked about the

5 communications with the SEC.  The SEC does, contrary to Mr.

6 Bernick's assertion, does have rules about how you're supposed

7 to estimate your asbestos liabilities.  I suggest that he look

8 at SEC SAB-92.

9        MR. BERNICK:  I don't know why we're wasting time on

10 that.

11        MR. FINCH:  But the point is, Your Honor, if you

12 agree that I can ask Mr. Siegel or Mr. Beber and Mr. Hughes

13 questions that were not asked in Sealed Air that relate

14 generally to estimate asbestos liability --

15        MR. BERNICK:  What I said was we have a stipulation

16 that was entered into on 12/19 of '05.  That stipulation says

17 you can't ask questions about the same topics.  We have a

18 further stipulation that says you can't ask about Mr.

19 Florence's work, because Mr. Florence's work would then be

20 potentially useable for impeachment purposes, and that's off

21 limits.  All I want is compliance with the agreements that were

22 reached, and if there are other topics that you would like to

23 pursue, like communications with the SEC that were generally

24 not pursued, I don't have a problem with that.  But the best

25 way I think to resolve that is to let me know specifically what

1  they are, because if they weren't asked in the deposition, I

2  can see that.  Everybody can see that.  He can ask the

3  questions.

4          MR. ANSBRO:  May I be heard briefly, Your Honor?

5          THE COURT:  Very briefly.

6          MR. ANSBRO:  As I understood the posture of the

7  December, 2005 so-called stipulation, I've read the letters

8  that Mr. Bernick described to the Court earlier that Mr. Finch

9  had a response in which he said the deal works, and let --

10  provided it all the <u>Sealed Air</u> materials are unfettered.  That

11  didn't happen.  That agreement didn't come to pass.

12          THE COURT:  Well, it's happened now.

13          MR. BERNICK:  It's not true.  It is the exhibits --

14          THE COURT:  Well, it's happened now.  Mr. Bernick --

15          MR. ANSBRO:  It's happened now, but it doesn't change

16  the fact that the FCR was not present for any of this.  That

17  deal didn't take place.  We weren't a part of it, a deal that

18  was ever consummated, and we are prejudiced by being precluded

19  from taking an examination as to which we had not yet had any

20  opportunity to do it.

21          MR. BERNICK:  Your Honor, I believe that that

22  argument is very, very serious.  When counsel enters into

23  discussions, a letter is written memorializing the agreement.

24  There's an answer from Mr. Finch, which we did comply with.

25  There's no answer from the FCR, and then new counsel comes in

1  and says the purported agreement, or that didn't happen.  I

2  don't know what we're doing here entering into discussions

3  about trying to resolve matters.

4         THE COURT:  To the extent that the stipulations are

5  of record, they're of record, and, you know, they've been

6  vetted.  They are not going to be undone.  So the FCR like the

7  ACC is bound by them.  That's it.  The FCR agreed to them.

8  You're bound by them.

9         To the extent that you have questions that go beyond

10 the scope of the stipulations, you can ask.  To the extent that

11 the reserves were part of the original depositions, you may

12 not ask.  They're part of it.  They're covered by the

13 stipulation.

14        MR. FINCH:  Your Honor, the stipulation regarding

15 expert work of Tom Florence, I don't think there's any way you

16 can read that stipulation to preclude questions of Grace fact

17 witnesses about to the extent to which they relied on Florence.

18        THE COURT:  But I think you can, because of the fact

19 that you -- the only purpose to doing it as -- is to -- is for

20 impeachment purposes of Dr. Florence, you're not going to be

21 able to do it for that -- use it for that purpose.

22        MR. FINCH:  Your Honor, that -- I never agreed that I

23 couldn't use Grace's past work that Florence did to impeach

24 him.  That's critical to ACC's ability to impeach him at trial.

25 I never agreed to that.

1          MR. BERNICK:  I don't know what -- we're now almost

2    two hours.  All we want --

3          THE COURT:  I'm aware of the time.

4          MR. BERNICK:  Yes.

5          MR. FINCH:  Your Honor, Mr. Bernick had proposed to

6    impeach Dr. Peterson in this court among testimony he gave in

7    the Babcock and Wilcox proceeding.  I think I should be allowed

8    to use -- to impeach Dr. Florence on testimony he gave in

9    Sealed Air and the work product he did for Grace in the mid --

10          THE COURT:  But these aren't -- this isn't a

11    deposition of Dr. Florence.

12          MR. FINCH:  Yes, there is a deposition of Dr.

13    Florence.

14          THE COURT:  That's not the people you're asking to

15    have rulings about today.

16          MR. BERNICK:  We're not seeking to --

17          THE COURT:  Siegel, Beber, and Hughes.

18          MR. BERNICK:  We're not taking the position you can't

19    impeach Dr. Florence with prior contrary testimony as Dr.

20    Peterson was impeached in the Babcock and Wilcox case based

21    upon his prior sworn testimony in that case.

22          THE COURT:  What you're saying today, as I understand

23    it, is that you want to talk to fact witnesses about the fact

24    that they relied on an expert report, so that you can then turn

25    around and say somehow that the reliance by the fact witness on

**J&J COURT TRANSCRIBERS, INC.**

1 an expert report is somehow -- you can use to impeach the

2 expert in having delivered the report to the fact witness, and

3 that's backwards.

4          MR. FINCH:  I can impeach the company.  The company

5 is the one who's proposing an estimate of liability.  I'm

6 certainly entitled to show how they did it in the past.

7          THE COURT:  Sure, you can show how they did it in the

8 past, but that is, as I understand it, was the scope of the

9 depositions in the past.  This is what you need to do.  You

10 need to give me line by line objections, testimony, and show me

11 the comparisons of where they testified before, what the

12 objection is, why you need the testimony going forward in the

13 future if this is too general a proposition, because -- and you

14 need to do it in more than point four type, because I can't

15 read the deposition transcripts that were attached.  I

16 literally can't read them.  I even got the magnifying glass out

17 and put the sheet on top of the page, and I still couldn't read

18 them.  So I have no clue what these gentleman testified to,

19 because I literally can't read the depositions.

20          MR. FINCH:  Then the way we'll proceed, Your Honor,

21 we'll get the 47 documents.  I'll take the deposition of Mr.

22 Siegel and Mr. Tarola, who they've listed as fact witnesses.

23 If I go into areas they believe I covered in those depositions

24 with those witnesses in Sealed Air, they can object, and we

25 can --

1       THE COURT:  That is what I will authorize.  You may

2   take the depositions.  I am limiting the depositions to six

3   hours total between the ACC and the FCR.  I want you to

4   schedule them on a day when I will be here and available by

5   telephone.  And if there are objections, you will call me, and

6   I will give you rulings right then.

7       MR. FINCH:  Your Honor --

8       MR. BERNICK:  Your Honor, that's fine.  If counsel is

9   going to abide by Your Honor's rulings today, he will ask

10  questions where he has searched the transcript, and it was not

11  covered, because if all we're going to do is have him do the

12  same thing and then the burden is on us to say, oh, well, take

13  a look page -- it's going to be a very long day and very

14  unproductive.  I think counsel ought to --

15      THE COURT:  You're all to search the transcripts in

16  advance.

17      MR. FINCH:  Your Honor, I'm not going to do that.

18  Remember, Mr. Siegel is still available --

19      THE COURT:  Pardon me.  You are going to do it in

20  advance.  You are all going to search the transcripts in

21  advance, and you are not going to ask questions that were

22  inquired into before.  That is a ruling, and it's an order, and

23  there will be sanctions for violating it.  I'm tired of the

24  games, folks.

25      MR. FINCH:  I understand that, Your Honor, but there

**J&J COURT TRANSCRIBERS, INC.**

1  is -- what --

2          THE COURT:  Mr. Finch --

3          MR. FINCH:  -- with respect to Mr. --

4          THE COURT:  -- I don't think you do understand it.

5  I'm tired of the games, and I'm not ever going to spend another

6  two hours on a discovery issue.  Not ever.

7          MR. FINCH:  One final point, Your Honor.  Mr. Siegel

8  is being offered not only on the reserves but also in

9  connection with the reasons why Grace settled cases.  It's

10  going to take six or seven hours to cover that topic.  I can't

11  do -- I can do him and Tarola just on reserve topics in a total

12  of six hours.

13          MR. BERNICK:  Yes, but I -- it's one -- under the

14  rules you get a deposition of a witness that lasts seven hours.

15  What he now wants to do is say, well, on this topic I want

16  seven.  I want --

17          THE COURT:  Mr. Finch, you're getting a total of six

18  hours on each of these witnesses combined, between you and the

19  FCR.  Your interests in this case are not that diverse.

20          MR. FINCH:  So six hours for Mr. Siegel, six hours

21  for Mr. Tarola.

22          THE COURT:  Yes, that's what I said.

23          MR. FINCH:  I can live with that, Your Honor.  Thank

24  you, Your Honor.

25          MR. ANSBRO:  Your Honor, before we turn to the next

**J&J COURT TRANSCRIBERS, INC.**

1 subject, it is with some trepidation.  For my own mind I just

2 want to make sure I understand the record.  With respect to the

3 FCR, we have not waived our rights to challenge on subject

4 matter waiver outside of what's been dealt with here today.  In

5 other words, all the materials that we have previously been in

6 possession of and all the --

7          THE COURT:  You know I'm going to sanction you if you

8 ask me one more time to make a ruling about something that's

9 not in front of me today.

10          MR. ANSBRO:  Just reserving our right.  Thank you,

11 Your Honor.

12          MR. FINCH:  Your Honor, may I be excused?

13          THE COURT:  Yes, sir.

14          MR. BERNICK:  I don't -- we're happy to -- we're

15 prepared to go forward with the next item, unless Your Honor

16 wants to take a break.  It would be kind of I feel pessimistic

17 if we had to take a break.  Mr. --

18          THE COURT:  I think we'll deal with Mr. Restivo's

19 issues, then we'll take a break.  Then I think we'll deal with

20 the railroad issues, and then we'll go forward on whatever else

21 you choose to do.

22                    (Pause)

23          THE COURT:  Mr. Restivo.

24          MR. RESTIVO:  Good afternoon.  Item number 20 on the

25 agenda is a status conference regarding scheduling of

1  adjudication for certain asbestos property damage claims.  Mr.

2  Bernick is correct, but I did ask him to put this first on the

3  agenda while property damage was still fresh in our minds.  He

4  did not report to you that I also asked him to let me go before

5  the last argument because after the last argument, I wasn't

6  sure anything would be fresh in anybody's mind.

7          In any event, Your Honor, in order to determine

8  scheduling of adjudication for property damage claims we need

9  to again determine where we've been and where we are so we know

10  where we're going.  The Court will recall that we started with

11  4200 property damage claims.  The Court will recall that we

12  started this current process with 627 remaining asbestos

13  property damage claims.  As a result of trials being scheduled,

14  as a result of motions being made, as the result of

15  resolutions, we need to change the chart we started with.

16          We started with 11 claims involving products we said

17  were not Grace products.  Those claims are now gone.  We

18  started with, and the Court has under consideration, our

19  statute of limitations motion for New York claims, but there

20  are no longer ten claims subject to that motion, there are only

21  five claims subject to that motion.  The other five were

22  expunged per Court order.  As the Court knows, the six

23  Prudential statute of limitations claims are subject to an

24  agreement in principal.

25          When we started, Your Honor, there were 125

**J&J COURT TRANSCRIBERS, INC.**

1  California claims, 109 of which were subject to a statute of

2  limitations summary judgment motion.  As a result of various

3  rulings or agreements, Your Honor, we are now down to 104

4  California claims and the Court has under advisement our

5  statute of limitations motions which will now deal with 98 of

6  the 104 claims as contrasted with 105 of what we started with.

7       The Louisiana claims have been settled to the extent

8  they were Mr. Dies' claims and the one remaining claim,

9  Abbeville Hospital has been expunged.

10      With respect to our motion for summary judgment on

11  statute of repose we are down to three claims, down to one

12  state, Minnesota, that the Court has under advisement and

13  that's what's left under statute of repose.

14      With respect to Canadian claims, and I'll come back

15  to those in a minute, we started with 89 claims.  As a result

16  of various agreements or the Court's order, we have left 73

17  Canadian claims, 72 of which, all but the Province of Quebec,

18  are subject of a motion for summary judgment under the ultimate

19  statute of limitations and under the regular statute of

20  limitations.

21      We started with 16 buildings that involved other

22  state statute of limitations.  The Court has that under

23  advisement.  We are down to only two buildings and one

24  jurisdiction as the result of other rulings with respect to

25  that motion.

**J&J COURT TRANSCRIBERS, INC.**

1          With respect to the 52 Libby claims, those have been

2    expunged.  With respect to the claims of Mr. Dies' from various

3    states, they have been settled in principal.

4          With respect to Motley Rice -- I think I said this

5    before, Your Honor -- but in fact, the three statute of repose

6    cases in the green column are Motley Rice cases and therefore

7    there are not 18 other Motley Rice cases, there are 15 Motley

8    Rice cases.  At least one of which is under Court advisement on

9    statute of limitations.

10          And when we started, Your Honor, I think we had 30

11    remaining claims.  We are now down to 11 remaining claims and

12    so by my count, the 627 asbestos property damage claims against

13    the debtors as of today is down to 213.  With respect to the

14    213, as I've indicated, you have under advisement 98 California

15    claims, three statute of repose claims out of Minnesota and two

16    other statute of limitations claims.

17          That leaves for the Court and the parties 98 claims

18    that are subject to our summary judgment motions that need to

19    be adjudicated and approximately 12 claims that were not

20    subject to any motions at all.

21          With respect to those 98 claims, Your Honor, the

22    Court will recall that our motion on 72 Canadian claims was

23    deferred.  We did not try it last week so that Mr. Speights

24    could depose again a Canadian expert, our Canadian expert,

25    Graham Mew (phonetic).  Mr. Mew's deposition is now set for May

**J&J COURT TRANSCRIBERS, INC.**

1  11 in Atlanta.  And so the debtor's suggestion, Your Honor, is

2  we argue the summary judgment motion on the 72 Canadian claims

3  that we did not argue last week on Wednesday, May 30.  The

4  Court has reserved for us May 30 and May 31, that was going to

5  be a no hazard trial that I think has been moved down the

6  schedule.  And so we would suggest that at 9:00 a.m. on

7  Wednesday, May 30, we argue our Canadian statute of limitations

8  motion.

9         With respect to approximately 26 claims that are in

10  the 98 claims subject to our motions, the Court will recall

11  that we deferred 26 claims of Mr. Speights'.  He had claimed

12  that we had not property objected in our objections.  He

13  claimed that we had waived objections.  We claim the objections

14  were in there and if they weren't in there he knew about it.

15         In any event, we deferred those claims pursuant to

16  argument and instructions from the Court.  We filed updated

17  objections on claims as promised on Monday, April 30, at Docket

18  Number 15445.  It is our suggestion, Your Honor, that as the

19  Court suggested last week that we telephonically argue Mr.

20  Speights' waive position on May 7.  The Court will recall that

21  May 7, 8 and 9 were going to be set for more statute of

22  limitations trials.  All of needs a breather, but with those

23  dates have still been held, and so we would like to argue Mr.

24  Speights' waiver position on May 7.  And the Court indicated

25  telephonically would be fine and we're willing to do it

**J&J COURT TRANSCRIBERS, INC.**

1  telephonically and we think it's not going to be a long

2  argument because I think both sides have really already argued

3  and the Court knows what the arguments are going to be.

4        Assuming -- and we don't want to be presumptuous --

5  but assuming that Grace has not voluntarily waived produce ID

6  objections on those 26 claims, Your Honor, then we would like

7  to try those 26 claims on Wednesday, May 30 at approximately

8  ten o'clock, because we think the argument on Canada will take

9  about an hour.  If necessary, on the morning of May 31,

10 although I'm hopeful we can get it done in a day.   And that is

11 the schedule for those 26 claims or whatever remains of those

12 26 claims, because I believe Mr. Speights and I are going to

13 talk about them and see whether or not any objections can be

14 lifted, any can be expunged.  But whatever's left, we would

15 like to try on May 30 and if necessary, May 31.

16        And if that makes sense to the Court, the schedule we

17 would suggest is that Mr. Speights and Grace file our exhibits

18 and any trial briefs if anyone wants to file it -- although I

19 think that's probably been covered in trial briefs -- and any

20 in limine motions if anyone wants to file it, on Friday, May

21 18th.  We would deliver binders to the Court like the binders

22 we used last week by noon on Monday, May 21.

23        To the extent either party has objections to exhibits

24 or responses to any in limine motions if they are filed, our

25 suggestion would be that the parties file them by noon on

**J&J COURT TRANSCRIBERS, INC.**

1 Wednesday, May 23 and we would deliver to the Court an updated

2 bench binder that afternoon.  And then when we tried those 26

3 cases, we would have the same material available for the Court

4 and the parties and mainly, hopefully one binder with all the

5 exhibits, one for the Court, one for the attorneys, one for the

6 witnesses.  And we would have the final, you know, updated

7 binder to the Court by close of business on Wednesday, May 23.

8         Lastly, Your Honor -- and I appreciate we don't want

9 to, you know, get too far ahead of the game, but we are hear to

10 talk scheduling -- we would propose, Your Honor, that any

11 claims that survive our summary judgment motion and the 12 --

12 approximately 12 other claims that were not subject to any

13 summary judgment motions be tried on statute of limitations

14 grounds and/or product identifications grounds on June 25.

15 That was a date the Court was holding with no understanding of

16 what we were holding it for, I think that was a held date for

17 Grace -- although I'm seeing some noddings of head over here.

18         THE COURT:  June 25?  That is an omnibus day.  I have

19 June 21st as a PI day.

20         MR. RESTIVO:  June 21st.  I do have June 21st as a PI

21 day and my vacation plans interfere with June 21.  I thought we

22 had June 25 and then I thought we had two other dates.  One

23 second, Your Honor.

24         THE COURT:  No, that's (indiscernible).

25         MR. RESTIVO:  I have PI on the 26th.

**J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  I'm sorry.  I'm looking at July.  I

2  apologize.

3          MR. RESTIVO:  June 26th.

4          THE COURT:  What I have on June 26th for Grace is

5  status conference to set scheduling for submission of Dalbert

6  motions.  How much time will you need -- it says and other PI

7  topics.

8          MR. BERNICK:  Other PI topics it really just depends

9  on what's going on.  But I think in light of the importance of

10  keeping to a predictable schedule and a prompt schedule on PD,

11  which I know Your Honor's interested in, we'll just count on

12  having that day being allotted to -- if it's okay -- allotted

13  to principal PD matters and the only matter that we would take

14  up on PI, if any, would be related to scheduling, and I doubt

15  we would have to --

16          MR. RESTIVO:  PD would cede a half-hour of the that

17  day, the PI scheduling, and the rest ought to be more than

18  enough to try whatever is left on those claims.  And if that

19  were made sense, we would then talk to the parties involved in

20  those claims in order to submit a schedule as to when you file

21  the exhibits, et cetera.

22          THE COURT:  All right.  These are statute of

23  limitations and product ID on cases in which Grace did not file

24  motions?

25          MR. RESTIVO:  These would be, Your Honor, statute of

                    **J&J COURT TRANSCRIBERS, INC.**

1 limitations and/or product identification on any claims that

2 survive summary judgment on statute of limitations that the

3 Court has under advisement and on the 12 other claims to the

4 extent there is either a statute of limitations or product ID

5 objection.

6          THE COURT:  Okay, so the statute of limitations

7 issues that you're looking for me from now are New York,

8 Arizona and Minnesota.

9          MR. RESTIVO:  That is correct.

10          THE COURT:  And the California ones, I thought I made

11 rulings on most, we're just waiting for orders plus a couple of

12 the other issues to be adjudicated when the supplemental briefs

13 come in.

14          MR. RESTIVO:  No, you -- I believe that's incorrect,

15 Your Honor.  I believe you have taken California's statute of

16 limitations under advisement.

17          THE COURT:  Oh, the statute of limitations.  I'm

18 sorry.  Not the product ID.

19          MR. RESTIVO:  We did deal with three or four

20 California ID, but what you have under advisement is 98 statute

21 of limitations cases.

22          THE COURT:  All right, well --

23          MR. RESTIVO:  So that, for example, there would be

24 four California cases not subject to the motion we would try on

25 statute of limitations and depending on how the Court rules on

**J&J COURT TRANSCRIBERS, INC.**

1 the California cases, if any of those -- they're in three

2 separate categories the Court will recall, Manville claims,

3 Supreme Court -- any of those that survive, we would try at the

4 same time on that date.

5           THE COURT:  All right.  My only hesitance is I don't

6 know if I'm going to get all of these done by June 26th for

7 rulings. And the reason is because I have promised the parties

8 in Pittsburgh Corning and NARCO and JIT that I'm going to get

9 those plan confirmation orders out and I'm going to get those

10 plan confirmation orders out.  And so I've got people working

11 on the statute of limitations issues, but I just don't know

12 where I'm going to get the time to get them done by June 25th.

13 I will have some done.  I don't know that I'm going to have

14 them all done.

15           MR. RESTIVO:  My suggestion, Your Honor -- I know the

16 Court's working very hard on these -- my suggestion, Your

17 Honor, is that we save the day, save the schedule, if it turns

18 out there are some number we don't try on that date because

19 they're still sub judice, fair enough, we'll try the other ones

20 and that won't be ones -- we'll take care of them in any event

21 even if all of the other cases haven't been ruled on yet.

22

23           THE COURT:  All right.  Mr. Speights.

24           MR. SPEIGHTS:  It please the Court.  Your Honor, I

25 think that you and I are the only ones that have been working

**J&J COURT TRANSCRIBERS, INC.**

1  since nine this morning.  Everybody else should be fresh, but

2  I'm a little tired.  Let me take them in order.  We did agree

3  to take Mr. Mew's deposition, he was made available on May 11

4  in Atlanta.  Your Honor will recall that they filed a

5  supplemental report and I argued at that time that either it

6  should be stricken or I could take his deposition.  And I also

7  pointed out that once I take his deposition I may or may not

8  -- I hope not -- need my own expert to refute what he's going

9  to say on May 11th.

10        I can say that I have no personal conflicts for May

11 30th or May 31.  I think until we take his deposition on May

12 11, I'm just not sure whether we will need to do something

13 else.  I don't mind tentatively setting it for May 30 or 31,

14 but I don't want to give up the position that I argue before

15 you and you recognize that if he's got something new, I might

16 need my own expert, and even if I do, maybe something could be

17 quickly done, I'm not trying to delay matters.  Hopefully Mr.

18 Mew will recognize at his deposition that I'm right and he's

19 wrong and we won't need to get some further assistance.  But

20 that's the first point.

21        MR. RESTIVO:  There's no doubt in my mind that will

22 happen.

23        MR. SPEIGHTS:  Number two, Your Honor, is the 26

24 objections that we argued when I came up to Pittsburgh a week

25 ago today because Grace had not objected product ID grounds.

1 And we argued and Your Honor recognized that I was right on

2 that point and Grace was to file a piece of paper.  And Grace,

3 I understand, filed a piece of paper on Monday night at eight

4 p.m. and they called it an updated objection.  I actually have

5 not been served with that.  It was mailed by regular mail to

6 me.  But I called someone in Delaware last night after I got

7 here just to check and they said, yes, something has been filed

8 and I have looked at it on a computer screen.  I haven't had a

9 chance to examine it.  And I don't have a problem with Mr.

10 Restivo, he said he would file it Monday, he filed it Monday.

11 I'm not fussing about it, it's just I'm here today with not

12 having seen it in hard copy.

13        But my concern about what was filed -- and it may not

14 matter -- I thought Mr. Restivo was going to file some sort of

15 motion to tee it up because my position last Wednesday is, this

16 isn't teed up.  And I thought he was going to file a motion to

17 amend your previous orders allowing a waiver of the local rule

18 to file these additional objections to claims.  And the method

19 he chose was to file something called updated objections which

20 doesn't in and of itself produce any response.  So if that

21 satisfies Your Honor, okay, then it's up to me to file a motion

22 to strike that or do something to tee up the issue that he

23 wants heard.

24        I don't mind it being handled on an expedited basis,

25 but I need a little time to file the motion.  You know and I

**J&J COURT TRANSCRIBERS, INC.**

1 know what essentially I'm going to say, that he's waived it.

2 But we're pretty busy these days so it's going to take a week

3 to file the motion. Since he hasn't filed a motion asking

4 permission, I'm going to file a motion to strike it for

5 something so that it's properly teed up and then can be heard.

6 I don't mind it being heard on an expedited basis. I don't

7 want to agree in advance that it be heard by telephone. I

8 assume, Your Honor, that if I want to come to Pittsburgh you

9 don't object, and Mr. Restivo lives here so I assume he doesn't

10 object and we can get that teed up.

11       However, as with the first issue, Your Honor, if you

12 should decide to let Mr. Restivo or Grace now object on product

13 ID to these 26 claims, I also said last Wednesday that we had

14 limited out discovery to the claims which he did object to.

15 Again, I don't mind expediting whatever discovery there is. If

16 I want to send him interrogatories on just those 26, if they're

17 allowed back in and he wants to answer them in 24 hours, fine.

18 But I think it would be unrealistic, Your Honor, to be talking

19 about both because I've got to file a motion and secondly,

20 because I may want discovery to be arguing those by telephone

21 on May 7th. That's just completely impractical.

22       Perhaps we could talk about those on May 30 or May

23 31. But I would need to talk to Mr. Restivo about some

24 scheduling. Mr. Restivo and I, thankfully, are able to talk to

25 each other, but we have not talked to each other about this

1 proposed schedule before I just heard it right then.  So I

2 would object to May 7 on those 26, and if Your Honor is not

3 going to require him to do something other than file what he's

4 already filed which is just an updated objection, then I'll

5 file a motion to strike it or call it something and tee it up

6 that way.  But this is an important issue whether they object

7 it or not and it needs to be teed up properly for Your Honor

8 and for any reviewing court.  Because just having updated

9 objections I don't think will

10 do it.

11         Number three, are the PD June trial -- I can't

12 remember it's 25, 26 or 27.

13         THE COURT:  Twenty-sixth.

14         MR. SPEIGHTS:  I guess others decide Dan Speights

15 need to be heard on that.  My comment would be on that is that

16 I believe that they are talking about an evidentiary trial, not

17 arguing motions, on statute of limitations and/or PID on a

18 number of claims, one or more claims, and we don't know which

19 claims yet.  And that presents two problems for PD claimants I

20 think.

21         Number one, you would need sufficiently in advance of

22 a trail what's going to be tried.  And I understand Your

23 Honor's got a lot on your desk and I'm not hurrying you in the

24 least, but there needs to be some protection to know what's

25 going to be tried.  And Number two, once you know what's going

**J&J COURT TRANSCRIBERS, INC.**

1  to be tried, I don't know what kind of testimony, I don't know

2  if the debtor's going on just documents or witnesses, I don't

3  know on a statute of limitations of people need to be planning

4  trips to Pittsburgh from Canada or California or somewhere

5  else.  And so I think that might be a little unrealistic, but

6  you know, I'm not objecting per se today if you decided all the

7  things tomorrow and I only have one claims and it doesn't

8  involved the one witness, so be it.

9       I also think it might be unrealistic to save one day

10  for an evidentiary hearing on an unknown number of claims.  So

11  I hope I'm being constructive, Your Honor.  I'm trying to be.

12       THE COURT:  For the June 26th, as to the claims as to

13  which the debtor has filed no motions, I'm not sure that they

14  can't be teed up because you'll know what they are.  They're 12

15  claims -- I think those at this point there's still time to get

16  those teed up regardless of whether I do or don't get any

17  rulings in advance on the issues that I have under advisement.

18  Because I agree with you, Mr. Speights, unless I can get

19  something out the door pretty promptly on the statute of

20  limitations issues, those claimants are not going to have

21  adequate time to prepare for trial because they're waiting for

22  summary judgment rulings and they're not necessarily prepared

23  to go to trial because they think they don't have to and they

24  may not have to.  I don't know what the outcome at this point's

25  going to be.  But perhaps those 12 can get teed up no matter

107

1  what and those I think there is sufficient time to get ready to

2  go.

3         With respect to your Canadian claims, I don't think

4  there was a schedule proposed for trial.  The schedule there

5  was to argue the statute of limitations.  If you're suggesting

6  that you may need an expert before you can even argue the

7  statute of limitations issues, then I think you and Mr. Restivo

8  do need to discuss that if you're not going to know the answer

9  to that until after you take their expert's deposition, then I

10 think what we probably should do is, I'll say pencil it in.

11 You can simply file a motion that says that you need an

12 extension Because you need an expert and we'll just have to put

13 it back onto the next omnibus agenda and do a new schedule.

14         The time's reserved right now and I don't think it's

15 going to be used for anything else anyway.  So if you need it

16 for that argument, that's a good time to do it.  If you're not

17 ready, we'll just have to put it on to another date.

18         MR. SPEIGHTS:  And I appreciate that, Your Honor.

19 And frankly, they're good days because they've been blocked off

20 my calendar for a long time.  And I'll work with Mr. Restivo

21 and see if we can get it teed up then.

22         THE COURT:  All right.  With respect to the waiver

23 argument on May 7th, I can address that one.  Mr. Restivo, I

24 thought the debtor was going to be filing some motion that

25 would get a response by Mr. Speights too.  If that's not what's

**J&J COURT TRANSCRIBERS, INC.**

1 filed and I haven't seen it either, so if that's not what's

2 filed then we have to start the process by a motion from Mr.

3 Speights.  Today's the second, I don't see how you're going to

4 be ready May 7th.

5        MR. RESTIVO:  I believe, Your Honor, we filed, what

6 it is, we all talked about and what we were supposed to file.

7 That is updated objections which create a record for due

8 process grounds as to what objections we're raising on what

9 claims.  I don't know that the Court ever ruled that we or for

10 that matter, the plaintiffs, needed to file motions to

11 supplement or amend the claims, which has been going on forever

12 in this case or the supplement the defense's.  So we filed

13 debtors' updated objections to certain Speights and Runyon

14 claims and it's the same format, Your Honor, as we had before,

15 but now to the extent -- and there's no surprises here -- Mr.

16 Speights said they didn't specifically allege C3 sub d or C3

17 sub e.  It's now alleged.

18        If he wants to file a piece of paper, you know, to

19 strike our objections or whatever he wants to call it, it's

20 fine with us.  We know what the issue is.  The issue being

21 raise is, have we waived these objections.  And so no matter

22 what he calls the paper, I believe the argument's going to be

23 the same.  I don't have a problem so much with whether we argue

24 it on the seventh telephonically as was suggested by the Court

25 or whether we argue it some other time shortly thereafter.

**J&J COURT TRANSCRIBERS, INC.**

1

2          What I do feel strongly about is that we preserve May

3    30 for the trial of these cases.  I understand Mr. Speights is

4    saying maybe after he takes Mr. Mew, maybe he needs an expert,

5    you know, if he comes up with he needs an expert, then clearly

6    I will deal with him on that.  But history has shown if we have

7    a trial date for those 26 claims, both Mr. Speights on his side

8    and my people on my side have a lot of incentive to see how

9    many of those claims or how many of those objections can go

10   away whereas if things just tend to be carried until we get to

11   them, nothing goes away and so I would really like to try those

12   26 cases and have scheduled for trial those 26 cases because my

13   belief is when we get there, we'll be trying some of them, but

14   not 26.  If we don't think we're going to get there, we'll be

15   carrying 26 indefinitely.

16          And so I don't care when we argue whatever piece of

17   paper Mr. Speights files to say we're not allowed to supplement

18   our objections to his claims.  Whatever he files, we're

19   prepared to argue 24 hours thereafter, because I think we all

20   know what the arguments are going to be.  We didn't waive and

21   he's going to say we waived.

22          THE COURT:  I don't think that the legal issue is

23   going to be too surprising and I think most of the case law's

24   probably been articulated.  I'm not sure that there's a whole

25   lot more to be added, but maybe you need to supplement things.

**J&J COURT TRANSCRIBERS, INC.**

1        MR. SPEIGHTS:  Well, if counsel wants to characterize

2   it as simply a waiver, we should all understand that's sort of

3   a broad term.  But the fundamental difference that we have on

4   what they have done -- and I believe Your Honor was thinking as

5   I was  -- that they would file some piece of paper that was a

6   motion.  Because I did argue last Wednesday that they have to

7   show cause Because their previous orders on this Court on what

8   they must do with respect to objections and waiving the local

9   rule.  Your Honor's entered orders, CMOs et cetera, et cetera,

10  and I thought they were going to file something to say, you

11  need to amend those.  So it's not just waiver, I think it's

12  also a burden of proof.

13       I don't care.  I'm happy to file the first piece of

14  paper.  They've decided not to do it and Your Honor doesn't

15  want to tell them to do it, I'll file the first piece of paper.

16  And I'll file it within a week and then we can decide, we can

17  have a hearing whenever Your Honor wants it.  Again, I probably

18  want to be here and we can see whether we can resolve it on May

19  the 30th, but I just don't know until we argue that motion and

20  we have to see what's left if anything.  I don't think they're

21  entitled to do it.

22       THE COURT:  Okay, Mr. Speights, can you file whatever

23  you're going to file by Monday rather than a week?  That's May

24  7th.  That's the day we were talking about the argument.

25       MR. SPEIGHTS:  Am I going to get out of here today,

**J&J COURT TRANSCRIBERS, INC.**

1  Your Honor?  I'm not trying to be cute saying that.  I mean,

2  that's a real issue whether I'll be traveling all day tomorrow.

3  If I could get out of here today.

4          THE COURT:  I don't know what other issues you're

5  interested in listening --

6          MR. SPEIGHTS:  That was one thing I was going to ask

7  you.  If traditional PD is over and I can get out of here

8  today, yes, I can file it sometime Monday.  It may be that W.R.

9  Grace, a little late at night, but I'll file it sometime

10 Monday.

11         THE COURT:  If you can file it Monday, can we argue

12 it Wednesday and still stick to the schedule for possibly for

13 trying it May 30 in the event that there is the ability -- or

14 the claims still survive because I know you say you haven't had

15 discovery, perhaps the debtor can expedite it.  I really don't

16 think -- maybe I'm wrong, but I gather from the discovery that

17 went on before that the discovery isn't going to be the

18 significant holdup between you folks on this issue.  And if t

19 hat turns out not to be correct, then you'll tell me and I'll

20 know I was wrong and we won't do it May 30, but --

21         MR. SPEIGHTS:  Yes, Your Honor.  We can argue

22 Wednesday.  I would ask in case I do want to appear personally

23 that you put it Wednesday afternoon so I could fly up that same

24 day.  I don't know if you have anything after lunch or not.

25         THE COURT:  I'll find something if you just give me a

**J&J COURT TRANSCRIBERS, INC.**

1  minute.

2        MR. SPEIGHTS:  And the other we can decide whether

3  they're in or out.  If they're in, we can talk about discovery

4  and if they're out, we don't have to deal with that problem.

5        THE COURT:  Would 12:30 be okay?

6        MR. SPEIGHTS:  I can check the flight book over the

7  break if I can.

8        THE COURT:  Why don't you tell me when you could be

9  here.

10        MR. SPEIGHTS:  I just need to check the flight book

11  and see.

12        THE COURT:  Okay.  So you'll file your motion on

13  Monday, you'll file your response, Mr. Restivo, on Tuesday,

14  we'll have the argument Wednesday.  That's about as expedited

15  as I can --

16        MR. SPEIGHTS:  That's fine, Your Honor.  And we'll

17  see what happens after then.  I have one more matter.  It says

18  Item Number 20 which is the PD status conference.  Since March

19  I believe, sometime in March, Mr. Restivo has been taking down

20  bright-colored pieces of cardboard over there and saying these

21  cases are settled or settled in principal.  And I raised the

22  issue with Your Honor at the last hearing about the

23  implications here.  Your Honor raised the issue this morning

24  about equality of treatment of claimants.  I'd like to inquire

25  the status or one or more of the settlement agreements, when

**J&J COURT TRANSCRIBERS, INC.**

1  are they going to be filed?

2           THE COURT:  Mr. Restivo.

3           MR. RESTIVO:  My understanding is that the papers

4  documenting the agreement in principal are being worked on.  I

5  frankly do not know, Your Honor, how far along they are Because

6  our people haven't been working on it.  I did agree with both

7  Mr. Dies and Prudential that whatever we dealt with today, if

8  for some reason their cases ever came back, whatever we dealt

9  with today wouldn't effect their cases.  I think the

10  documentation is fairly well along, but again, my shop isn't

11  doing that.  All I can report is I know they're working on the

12  documentation, but they're not done yet.

13           THE COURT:  Okay.  Not much I can do about that one,

14  Mr. Speights.

15           MR. SPEIGHTS:  Well, you know, I think it's been

16  since mid-March, but since I'm going to see you next Wednesday

17  I probably will ask the same question next Wednesday and maybe

18  we'll have an update.

19           THE COURT:  All right.  If you choose to do it by

20  phone, would somebody just let me know so that I know we're

21  going to do it by a Court Call dial in number.  Someone let me

22  know May 8th in the afternoon so that I know that we're going

23  to have a call in number.  Otherwise, if you choose to be here,

24  that's fine, if you want to do it by phone, that's fine.

25           All right, and Mr. Speights, if you would just tell

**J&J COURT TRANSCRIBERS, INC.**

114

1 me what time you want to do the argument on May 9th.

2          MR. SPEIGHTS:  I'm going to check the flight book

3 over the break.

4          THE COURT:  All right.  Anyone else on the schedule

5 which has just been proposed with respect to the 26 remaining

6 claims.  Mr. Restivo?

7          MR. RESTIVO:  Just so the record's clear for Mr.

8 Speights, the goal on our side of the courtroom is that at the

9 end of the day, all of those colors are going to be off that

10 board and there's going to be zero cases left.

11          THE COURT:  Okay.  So I just want to make sure I have

12 a it right.  The argument will be May 9th.  Then the issue will

13 be whether or not we can still get to trial May 30.  That will

14 be on the remaining 26 claims if they survive.  It will be on

15 the Canadian claim -- the rest of the Canadian claims except

16 for the one that is not subject to the statute of limitations

17 issue.

18          MR. RESTIVO:  Argument on the Canadian claims, not

19 trial.

20          THE COURT:  Argument on the Canadian claims, trial on

21 Mr. Speights' claims.  Pardon me.  And then on June 26th we'll

22 do the 12  buildings that were not subject to the motions.

23 We'll see whether or not it's possible to do any others.  I

24 tend to think it's going to be kind of late for that purpose,

25 but -- we'll start trial on June 26th at ten so that at nine we

**J&J COURT TRANSCRIBERS, INC.**

1  can do the personal injury issues that day was reserved for.

2          MR. RESTIVO:  That's correct.  And, Your Honor, I'm

3  not sure the precise number is 12, but it's in that range.  I

4  think it's the 12 remaining plus four of the -- it's in the

5  range of 12 to 15, 20.

6          MR. SPEIGHTS:  Could the debtors go out with a notice

7  on those that have to be tried forthwith so everybody can have

8  plenty of time to get ready.

9          MR. RESTIVO:  Yes, yes.

10          THE COURT:  Yes.  The debtors to immediately prepare

11  notice and send it out to everybody who's got any cases left

12  that need to go to trial so that everyone knows the schedule.

13  And serve it on all the applicable entities.  Mr. Baena?

14          MR. BAENA:  I was going to ask for that, Your Honor.

15  And I guess I ought to add as well.  May it please the Court,

16  Scott Baena on behalf of PD Committee.  I guess I ought to add

17  that I am now at the point where this charge is more confusing

18  than hopeful and that's not by way of criticism, there's just a

19  lot of moving parts, no pun intended.  By our silence we're not

20  ceding to the numbers.  We have to confirm that ourselves.  And

21  just so there's --

22          UNIDENTIFIED SPEAKER:  I don't mean to interrupt you.

23  Could Mr. Baena go to a microphone please?

24          THE COURT:  Don't do anything, Mona, he'll use that.

25          MR. BAENA:  I'm sorry.  It was green, I thought it

1 was operating.  Just so there's no misapprehensions, my

2 understanding though is that the 213 number represents claims

3 that remain to be determined by the Court in respective

4 objections that have been asserted --

5          THE COURT:  Right.

6          MR. BAENA:  -- there are settlements, and it's my

7 impression that some settlements entail the allowance of

8 claims.  And those allowed claims will be in addition to the

9 213 in terms of what the universal property damage claims is.

10          THE COURT:  That's right.  This is a trial schedule

11 that Mr. Restivo's telling me for my purposes and trying to

12 figure out how much time I need and how many days will be taken

13 up for trial.

14          MR. BAENA:  That's all I have.

15          MR. RESTIVO:  Speaking of how much time, Your Honor.

16 I know that we're going to take a break, but it might be -- I'm

17 just a little curious, I think probably everybody's curious

18 about how much time we're going to be spending here today.  And

19 before Your Honor answers that, let me just very quickly go

20 through what remains to be done.

21          We have retention of Lexicon.  And this really deals

22 with the amount of money that's available to pay Lexicon.

23 Lexicon previously wasn't disclosed.  That's Item Number 8 and

24 I know that counsel is here form the Equity Committee to

25 address that.  There is some time sensitivity on that because

**J&J COURT TRANSCRIBERS, INC.**

1 of the expert reports.

2        We have Burlington Northern which is Items 9, 10 and

3 11.  And when I saw the -- this is not a pun -- the train of

4 lawyers coming to the front on the Burlington Northern matter I

5 became a little concerned about how much time that was going to

6 take.  That's next.  And I know that Your Honor had expressed a

7 desire to maybe take that up right after the break.

8        We then have, after nine through 11, we then have two

9 matters, 12 and 13, that are not going forward today.  One has

10 been resolved and the other is being continued to May 21.  And

11 we have substantial matter 14 which deals with the consultant

12 theory issue.  And that has implications for, very significant

13 implications in terms of the number of people who actually have

14 supplied information, the number of negative B-reads is an

15 important item and also bears upon  the schedule.

16        Non compliance with the x-ray order, 15, is the same

17 kind of thing.  We have updated data on compliance with who's

18 turned in x-rays, who's not turned in x-rays.  And these are

19 all people who referred to x-rays in their questionnaires as

20 being the basis for their claim about asbestos related injury.

21 That's 15.

22        Sixteen deals with the prepetition matter that's

23 already been heard.  So we go from B-reads and x-rays to the

24 next item which is the PD claims.  And on the PD claims, we

25 have a flip side of the issue that you just took up in

**J&J COURT TRANSCRIBERS, INC.**

1  connection with Grace's filing of new or related -- however you

2  want to characterize it -- objections.  The flip side of that

3  is the claimants who have, without filing any request, amended

4  their claims.  And whether that's an amendment or not, however

5  you want to characterize it, that's Item 17.

6         And then we have ZAI, the ATSDR matter which is a

7  motion on discovery, 18.  Nineteen is the status conference on

8  ZAI and that really deals with where we go from here.  I know

9  Mr. Westbrook is here and he's actually borrowed a page out of

10 what I used to think was my book, which is he's got a nice flow

11 chart for a bunch of things that ought to go forward.  So it's

12 a fairly full type of deal.

13        THE COURT:  Well, here are your choices.  I'm home,

14 so I'm happy to stay as late as anybody wants tonight.  So

15 that's okay with me.  I also have time tomorrow morning.

16 Everything fell off my morning calendar except Combustion

17 Engineering.  But I do not have the afternoon.  I have my

18 normal motions day tomorrow afternoon.  I have whatever time

19 you're not using on May 7th, so if you want to adjourn some of

20 these things until the seventh, I believe, based on what I've

21 just done, that the whole day is open.  So if it's necessary to

22 put some of these things off until the seventh, which I know

23 isn't preferable, but may be what's necessary just to get this

24 case caught back up.

25        MR. BERNICK:  Well maybe what we can do is talk about

**J&J COURT TRANSCRIBERS, INC.**

1    -- the other thing is that I'm particularly concerned on BNSF

2    that we not have an hour and a half of counsel coming forward.

3    I think that that issue, I know that there's kind of an

4    insurance component to it, but it is the debtor's view that

5    this is really pretty much on all fours with arguments that

6    Your Honor's heard repeatedly.  Indeed it went up to the Third

7    Circuit on the Girard appeal.

8           THE COURT:  We'll argue in time so that the people

9    who want to argue those three motions can argue those motions.

10   But yes, I know that's the debtor's argument.  My question

11   still is with respect to BNS's motion to start with, why it is

12   not moot, and if it's moot, why does the debtor need to relief

13   that it's seeking, because this whole thing started by a

14   discovery motion that apparently appears not to be necessary if

15   the underlying state court discovery is not needed.  So why are

16   we here at all.  So why don't you folks --

17          MR. BERNICK:  Let me make a suggestion then, which is

18   that we ought to take up as the first item whether the --

19   whether our request to have the injunction to include this case

20   is well taken.  Because I think that (A), that's going to be

21   the more substantial matter and (B), if it is covered, then I

22   don't know why we have to really deal with the question of

23   discovery anyhow because litigation's going to get shut down.

24          THE COURT:  Mr. Toole's right being you so why don't

25   you talk to him at the break and see whether you can agree on a

**J&J COURT TRANSCRIBERS, INC.**

120

1  schedule of how to proceed and we'll address it as soon as the

2  break's over.  Mr. Esserman?

3       MR. ESSERMAN:  Your Honor, we're not conceding

4  anything as to what's going to go forth the rest of the day.

5  IS there any other day next week that you have available?

6       THE COURT:  May 9th.

7       MR. BERNICK:  Does this have anything to do with PI,

8  I'm going to be in the Netherlands on May the 9th and Greece on

9  the tenth seeing my son, so --

10      MR. ESSERMAN:  Well, I respect that.  I've got a

11 similar problem on the seventh, that's all.  I don't know if

12 the eighth is available.  You've got to travel?

13      MR. BERNICK:  I just don't know, but I think we

14 really ought to see -- maybe we ought to kind of caucus here

15 and see what we can do for the rest of the day.

16      MR. ESSERMAN:  I agree, but I just wanted to at least

17 get the Court's calendar.  I don't know, Friday, May 4th, is --

18      THE COURT:  No, I have -- because of the Third

19 Circuit judicial conference I'm just jammed this week because

20 I'm trying to get everything pushed into three days that

21 normally would have been into five.  And so my calendar for

22 this week is really loaded.

23      MR. ESSERMAN:  I understand.  I'm just trying to

24 figure it out --

25      THE COURT:  And we have a fire drill scheduled on

**J&J COURT TRANSCRIBERS, INC.**

1 Friday as well, which always puts a big branch in the

2 proceedings.

3         MR. ESSERMAN:  Well let's get together, but I think

4 everybody should get together first to talk about how much time

5 some of these things are going to take.  Because I think we can

6 get a lot done in a day.

7         THE COURT:  On May 8th I have things scheduled,

8 including an argument that's going to take three hours in the

9 morning, a mini trial in the afternoon.  May 8th is not going

10 to work.

11         MR. ESSERMAN:  Well let's see how much we can --

12         THE COURT:  Okay.  We'll be in recess for let's say

13 15 minutes.

14         MR. SPEIGHTS:  Your Honor, I do have the airline

15 schedule now.

16         THE COURT:  Yes.  I'm sorry.

17         MR. SPEIGHTS:  I can land at one o'clock.  I have to

18 go through Atlanta and change planes.  I can get here at one

19 o'clock -- land at one o'clock if Delta Airlines is on time.

20         MR. RESTIVO:  We will do it any time that's

21 convenient for Mr. Speights and the Court.  We'll make

22 ourselves available.

23         THE COURT:  May 9th.  So you land at one?

24         MR. SPEIGHTS:  Land at one, so --

25         THE COURT:  So you'll be here at two?

1          MR. SPEIGHTS:  That's fine.  I mean, if the planes on

2   time, that's no problem.

3          THE COURT:  I just scheduled an argument at three.

4   What time would you have to leave?

5          MR. SPEIGHTS:  I don't have to leave any time soon.

6   In fact, I'll probably go to Atlanta and get ready for Mr.

7   Mew's deposition, so I can --

8          THE COURT:  No, what time would you have to leave

9   that day on the ninth?

10          MR. SPEIGHTS:  Leave here?  Oh, the last plane home I

11   know is at 7:30.  I catch that flight regularly.

12          THE COURT:  I may need to take a break from about

13   three to four for a conference that I scheduled not knowing

14   that this was going to take place.  I'll try to get it moved

15   earlier, Mr. Speights, but I just can't promise that I'll be

16   able to.

17          MR. SPEIGHTS:  That's fine, Your Honor.  I appreciate

18   it.  And the chances are, the plane's going -- there is a good

19   chance the plane's going to be late anyway, so --

20          THE COURT:  All right.  Why don't we say two o'clock

21   on May 9th.  But understanding that I will need to take -- I'm

22   pretty sure I'm going to need to take a break until I get that

23   other conference finished, sometime around three.  And then

24   we'll just stay until we're done.

25          MR. SPEIGHTS:  I think that's all.

**J&J COURT TRANSCRIBERS, INC.**

1      THE COURT:  All right.

2                    (Recess)

3      THE COURT:  Please be seated.  Mr. Bernick?

4      MR. BERNICK:  Yes, I'm going to sit here -- maybe I

5  should stand because I've got all my papers (indiscernible).

6  But if we move very, very promptly, we might not only get done

7  with everything that we can get done today, but get a schedule

8  for all the rest.  So we've been very busy here and I'll try

9  not to make a mistake in what I'm representing to the Court

10  that I've been told.

11      Let me just start at the top.  Lexicon, which is Item

12  Number 8, the issue there is relief from the $10,000 per month

13  cap with respect to the testimony of Dr. Heckman.  Dr. Heckman

14  is a Nobel Laureate and he's been asked by the Equity Committee

15  to work in connection with this case addressing the question of

16  whether the estimation methodology that the other side has

17  proffered meets basic scientific principals.

18      The issue that's been raised by the Equity Claimant's

19  Committee is whether what he has to say that is incremental to

20  what the debtor would say warrants breaking the cap.  And

21  because a lot of money which has not been spent, there's a lot

22  of room under that cap now, we can go from now going forward

23  with Dr. Heckman -- or I should say the Equity Committee can --

24  without reaching the cap, and when the matter gets rescheduled,

25  which may not be the 21st, it may be some point (indiscernible)

**J&J COURT TRANSCRIBERS, INC.**

1  after that, it will become -- it will be more of a material

2  issue because we'll then we'll see where we are in relation to

3  the cap.

4         So there's not an objection in proceeding with Dr.

5  Heckman, there is an objection as to the funding, the totality

6  of money that will be available to Dr. Heckman.  If I've

7  misstated that, I'm sure that Mr. Herford will come -- we don't

8  need to take it up now, it will be heard at some near point in

9  time and they preserve their objection and we --

10         THE COURT:  So you're going to give me an order that

11  will modify the retention to simply preserve the issue as to

12  whether or not exceeding the cap is --

13         MR. HERFORD:  No, I don't -- I didn't --

14         UNIDENTIFIED SPEAKER:  I don't think any order's

15  necessary.

16         THE COURT:  For your continuing motion.

17         MR. HERFORD:  For the record, Your Honor, Mark

18  Herford, Campbell Levine on behalf of ACC.  According to motion

19  the Equity Committee has approximately $200,000 in fees

20  remaining.

21         THE COURT:  Right.

22         MR. HERFORD:  Basically $10,000 per month carried

23  over to spend.  The question -- I made the suggestion that this

24  wasn't an emergency or a matter that really had to be

25  considered today because there was that extra amount there that

125

1  could be spent under the Court's existing order and why didn't

2  this get pushed in light of the other matters that you're

3  hearing today.  So I don't have any issue with it being pushed.

4  I didn't understand that we were going to be presenting some

5  sort of order.  My understanding was it was just going to be

6  continued to another date.

7           THE COURT:  Oh, all right.

8           MR. BERNICK:  I thought what the Court said was

9  (indiscernible).  Your position is completely preserve, --

10          THE COURT:  Preserve.

11          MR. HERFORD:  That's great, thanks.

12          THE COURT:  That's fine.  You just want it continued

13 until when?

14          MR. BERNICK:  There as a conflict on the 21st.

15          MR. HERFORD:  Yes, I think we should leave the date

16 open, Your Honor.  It may be that somebody could cover it on

17 the 21st, but if not, I don't anticipate that we would need to

18 raise this until June 25th anyway.

19          THE COURT:  All right.  So it's continued to June

20 then.

21          MR. HERFORD:  That's good, Your Honor.  Thank you.

22          MR. BERNICK:  With respect to Items nine through 11

23 which relate to Burlington Northern and there are two sides to

24 that question.  There's a small discovery matter and then

25 secondly, there's a question whether the ongoing litigation

**J&J COURT TRANSCRIBERS, INC.**

1  that's now being prosecuted against Burlington Northern should

2  fall within to be enjoined under the outstanding preliminary

3  injunction that already exists (indiscernible) this occasion.

4           We've reached an agreement.  All of those present in

5  court after much activity here during the break, that that

6  matter in its entirety will be carried over until the 21st.

7  However, it will be first on the list per Mr. Toole's very

8  appropriate request.  Part of the reason for this, I want to

9  urge the Court, is there are two other things that are at play.

10  First there's a pretrial conference in the cases pending

11  against Burlington Northern at the end of May.  And my

12  understanding is that there's some significance chance that

13  that case -- or those cases, the 18 cases are set for trial at

14  that point.  So it's very important that we have it take place

15  on the 21st.

16           Secondly, Your Honor ruled in a case of the State of

17  Montana's class that that was denied.  And we are moving for

18  reconsideration and they already have filed that motion because

19  we don't believe that Your Honor squarely addressed the Gerard

20  line of analysis, it's not related to jurisdiction analysis, it

21  is a 105 based upon the jurisdiction that emanates from the

22  fact that the debtor is in the process of an adversary

23  proceeding.  That is an injunction proceeding.  That's the

24  essence of the Gerard case.  I don't want to argue it now.

25           That question is posed in the Montana case is also

**J&J COURT TRANSCRIBERS, INC.**

1 present with respect to Burlington Northern.  Albeit jurists

2 will point out to you and properly so, and if this matter were

3 handled on the question of whether there's related to

4 jurisdiction, there are different facts that they believe at

5 least apply to Burlington Northern during this case and were

6 present with respect to the State of Montana.

7          I'm sure that the claimants would say exactly the

8 opposite.  So rather than address the merits of that now, I

9 don't want to suggest to the Court the cases are on all fours,

10 that in Burlington Norther versus State of Montana, there is an

11 overlap we wouldn't be able to handle what we've asked to do,

12 just to have a motion for reconsideration taken up by the Court

13 at the same omnibus hearing on the 21st.  So by that time we

14 would have both matters implicating Gerard Fresca (phonetic) as

15 well as the -- whatever distinctive facts there are that relate

16 to the Burlington Northern and State of Montana facts, that

17 would be before the Court as the first item of business on the

18 21st.

19          THE COURT:  Okay, that's fine with me.  But you know,

20 you're going to run into the same problem if you continue

21 everything to May 21st that you ran into today, and that is

22 you're going to have too many things on the agenda to get done

23 with the agenda.

24          MR. BERNICK:  That may be, Your Honor.  But the fact

25 of the matter is that we don't really have too much choice

**J&J COURT TRANSCRIBERS, INC.**

1  because we're going to run out of time at six -- this Court's

2  been very generous and said six p.m. is okay.  So we can't do

3  it today.  We're also asking for whether there might be some

4  possibility of doing this next week.  But in any event, we

5  can't get it today and we think that it's the best to hear that

6  the 21st.  That would be Items nine through 11.

7          THE COURT:  Mr. Toole, if that's okay with you.

8          MR. TOOLE:  Your Honor, please, the position of the

9  railroad is that with regard to the expansion of the

10  injunction, Your Honor's decision in the State of Montana is

11  virtually on all fours and we will be prepared to point out on

12  the 21st the similarity and the fact that from the railroad's

13  fact situation the State of Montana decision is even more

14  appropriate than it is with Montana.  And it would make

15  judicial economy for us to argue this at the same time that a

16  motion for reconsideration is argued.

17          If the motion is denied, we believe that the railroad

18  issue on an expansion of the injunction probably will be for

19  all practical purposes, it will be the same.

20          The discovery motion is entirely separate matter and

21  it is something that is not related in any way to the question

22  of the injunction since we are seeking independent policies

23  that contain only to the railroad.  And it is a motion to

24  clarify the fact that Your Honor's earlier injunction with

25  insurance companies is not applicable to getting these

**J&J COURT TRANSCRIBERS, INC.**

1 collateral independent policies.

2        So we do believe that that's essential and it's

3 something that we need to move forward with promptly.  Again,

4 because of the press of time, (indiscernible) acquiesce and

5 have that matter also heard on the 21st.

6        THE COURT:  All right.  Thank you.

7        MR. MONACO:  Good afternoon, Your Honor.  Your Honor,

8 Frank Monaco for the State of Montana.  For the purpose of

9 judicial comment, I'd also bring up the fact that we had filed

10 a separate motion for reconsideration of Your Honor's decision

11 denying the preliminary injunction.  The grounds and basis are

12 very similar to the motion filed by the debtors, so I don't

13 expect a lot of duplication.  Arguments -- it's going to take

14 that long to have ours heard at the same time.

15        THE COURT:  All right.

16        MR. MONACO:  We also filed a motion for

17 reconsideration of Your Honor's decision denying our motion for

18 relief of the automatic stay.  Again, these are related issues,

19 I don't think it will be that complicated.  I'd also request

20 that Your Honor schedule to be heard on that day, I did file a

21 motion of short notice because we could not -- because when the

22 decision came out we could not comply with your

23 35-day order with respect to filing motions to have it heard on

24 the 21st.  So I'd also request if Your Honor would please grant

25 that motion to shorten so we have this all heard on the same

1 time.  And that motion will be --

2        MR. LOCKWOOD:  Your Honor, the ACC, his constituency

3 is on the other side of all of this is supportive of the idea

4 of doing both Montana and  BNSF on the 21st because our

5 position basically will be that the Montana decision is the law

6 of the case and therefore, why should we be arguing what

7 amounts to a reconsideration of Montana without Montana being

8 present.  If we were arguing BNSF case, you read the papers and

9 actually, virtually a lot of the argument is in your Montana

10 decision was incorrectly decided so we might as well wrap it

11 all up at the same time.

12        THE COURT:  All right.  So then the motion to shorten

13 is filed -- was filed?  I mean, I haven't seen any of these

14 things.

15        MR. MONACO:  Yes, Your Honor, it's filed only with

16 respect for our second motion for relief reconsideration with

17 respect to the opinion on our motion for relief.

18        THE COURT:  Mr. Monaco, tomorrow, call Ms. Baker,

19 give her the docket numbers so that we can pull that and I can

20 do an order that will shorten the time so that you can get

21 notice out so that the appropriate time frame for people to get

22 responses can be complied with.  And I'll put them both on the

23 21st.

24        MR. MONACO:  And, Your Honor, just so everyone in the

25 courtroom knows, in the interest in the -- we sought an

**J&J COURT TRANSCRIBERS, INC.**

1 objection line, a response deadline of May 14th, which is one

2 week before.

3        THE COURT:  Well that's going to be too close to the

4 end because the binders are due to me before then.

5        MR. MONACO:  All right.  When would Your Honor like

6 to have the responses then?

7        THE COURT:  To the motion to shorten time?

8        MR. MONACO:  No, the motion to reconsider.

9        THE COURT:  Oh, you mean the substantive answers.

10        MR. MONACO:  Right, right, right.

11        THE COURT:  Oh, motions.  I think the day before.

12 Don't you have to get me the binders by the 14th?  So you need

13 the responses at least by the 12th, by the 11th.

14        MR. O'NEILL:  Thirteenth is okay, Your Honor.

15        THE COURT:  Thirteenth is Sunday.  So you need

16 responses by the 11th, correct?  By the 11th, Mr. Monaco.

17        MR. COHN:  Your Honor, Daniel Cohn for the Libby

18 Claimants.  We did agree to the schedule, but the agreement was

19 on the basis that we would have until May 14th to respond in

20 defense of your decision in the State of Montana matter.  Would

21 it be possible to set that as an early in the day deadline and

22 still meet everybody's needs concerning the binders?

23        THE COURT:  Mr. O'Neill, can you get me the binders

24 on the 15th instead of the 14th?

25        MR. O'NEILL:  Yes, Your Honor.  Could we do noon on

1  the 14th for the responses?

2           THE COURT:  All right.  Noon on the 14th.

3           MR. COHN:  Thank you very much.

4           MR. BERNICK:  That would then take us to 12 -- Items

5  12 and 13 on the agenda which were respectively resolved and

6  continued as (indiscernible) the 21st.  And then the next item

7  up would be Item 14, which pertains to the B-read issue.  I

8  wanted to put that off to one side because I think we should

9  have some argument on that today.

10          With respect to Item 15, this was the motion for

11 compliance on the x-rays.  And Your Honor will recall that with

12 respect to those people that stated in their questionnaires

13 that they had the claims for malignancy,

14 non-meso malignancy, there are about 6,000 of those claims.

15 With respect to those where they said they were relying on x-

16 rays to say that it was asbestos related malignancy, we asked

17 for the x-rays of all 6,000 and Your Honor entered a series of

18 orders over a period of time basically directing that these x-

19 rays be produced.  There's now been a deadline that was

20 established, I believe of March the 12th.  That deadline has

21 passed and there's really only one tying up point that really

22 has to be nailed down with respect to these x-rays.

23          Approximately half of the 6,000 people who said that

24 their non-meso malignancy, like lung cancer, was attributable

25 to asbestos.  Approximately half of them actually turned in

**J&J COURT TRANSCRIBERS, INC.**

1 half of them and the certificates of x-rays could be used for

2 all purposes or whatever that certification was.  And these are

3 approximately half of the people who are prosecuting the claim

4 for non-meso malignancy such as lung cancer who did not.

5        Of those, many, many of them simply have not provided

6 an explanation, just have not submitted a certificate or

7 otherwise complied.  But there are approximately four percent

8 of the total, it's I think in the neighborhood of a couple,

9 three or 400 claimants who say that the x-ray is in the hands

10 of a third party.  Under Your Honor's most recent order, x-rays

11 in the hands of a third party were specifically carved out for

12 further application to the Court.  That is that if in fact

13 people took depositions, we could come to court and ask for

14 further release so that we would get access to those x-rays.

15        We've now proposed an order that really has two

16 paragraphs and it's been submitted to the Court.  I believe we

17 have extra copies.  It was slightly amended yesterday and I

18 think we have agreement from Mr. Esserman's client, from Mr.

19 Rich who is here from Barron and Budd, Silver, Pearlman, I

20 think LeBlanc and Waddell.  And I don't know that we have

21 agreement from the MNWR folks, although it may be that we do.

22        MR. BUSBY:  No, I've been in touch with Ms. Ramsey

23 during the break and we do not have authority to agree to that

24 at this time.

25        MR. BERNICK:  Okay.  Well is there a problem with it

1  or is you just don't have the client authority?  I don't want

2  to --

3        MR. BUSBY:  Well I'm not going to speak and not be

4  heard.  Your Honor, we're only dealing with I think four of

5  these or five of these for one firm for the Waters and Kraus

6  firm and 50 from the Wartnick firm, so it's a very small

7  population.  We've provided Mr. Bernick with a thorough

8  affidavit that explains the history as to all of them.  Good

9  faith efforts have been made to obtain them.  In fact, the vast

10  majority of these which consist of 50 claimants, the

11  x-rays were entrusted to a defense repository that was a

12  defense firm that represented Grace and that firm has responded

13  to our request for the return of the x-rays by saying they

14  cannot locate them.

15        So the idea that our claimants would somehow be

16  prejudiced in an estimation hearing as the result of the

17  failure to maintain custody of x-rays that were entrusted to a

18  firm that represented Grace among others, seems inappropriate,

19  and so we're happy to do our best efforts and we're happy to

20  have Grace do whatever it would like to do to obtain these x-

21  rays.

22        Our clients have made a good faith effort to produce

23  x-rays that they own or have custody of.  And to the extent

24  that they don't have custody of them, they've made and continue

25  to make good faith efforts to obtain them.  And we're not

1  prepared to agree to anything today beyond our continuing good

2  faith efforts to obtain them.

3       MR. BERNICK:  I'm going to take issue as we will

4  demonstrate, of the accuracy of those affidavits here in a

5  minute.  We'd be happy to have this order entered and exclude

6  the MMWR clients if they want to.  I guess we'll just have to

7  have that motion heard at some future time.  We think it's very

8  important to get everybody else who is agreeable to this order

9  to have the order entered as to them so that we can finish this

10 process.  It's simply what the order says.

11      THE COURT:  Yeah, I think that's fine.  I obviously

12 am not going to enter some sort of an order against MMR clients

13 to the extent that this turns out to be accurate and I don't

14 have anyway of knowing what the situation's going to be right

15 now.

16      MR. BERNICK:  Would it be appropriate if we -- all

17 that this really does -- you're not going to agree on either?

18      MR. COHN:  I haven't been approached.  My agreement

19 hasn't been asked.  Nobody has shown me the order.

20      MR. BERNICK:  We'll exclude the Libby Claimants as

21 well.  I really want to try to get on with this -- would it be

22 all right -- this order basically says that people who haven't

23 taken a position in a timely (indiscernible), it's in the hands

24 of third parties, then no party may introduce x-ray evidence

25 where they rely upon any extra evidence beyond what was kindly

1  furnished on March 15th.

2          THE COURT:  But here's the question, and I'm still

3  confused about this.  This is still an estimation file.  The

4  individual plaintiffs aren't producing any evidence.  They're

5  not going to be involved in this proceeding.

6          MR. BERNICK:  The individual claimants are in effect

7  producing overwhelmingly the evidence of the estimation in the

8  form of the questionnaire answers, the

9  x-rays and the B-reads.

10          THE COURT:  Yes.  They're the entities from which

11  they're taking the discovery, but they're not the entities that

12  you will be trying the case against.

13          MR. BERNICK:  That's correct.  But none of this

14  relates to claims disallowance.  None of this effects the

15  rights of any of those claimants.  It only relates to what

16  evidence can be used in connection with the estimation.  That's

17  all this order recites.

18          THE COURT:  But I think the issue is whether or not

19  the committees, which are the entities that you will be

20  litigating against, have agreed to this order, because that's

21  the only entity that will be showing up at trial.

22          MR. BERNICK:  And Mr. Lockwood is or was here.  Mr.

23  Lockwood has told us that he is agreeable to this.  So Mr.

24  Esserman's agreeable, Mr. Rich is agreeable, the Committee is

25  agreeable.  So what we have done is to get an order.  They all

1 agreed to it.  What we want to get underway is the process of

2 anybody else who has the x-rays in the hands of third parties

3 to get them by May the 12th.  So it's pretty critical that we

4 get this order entered with respect to all the other firms that

5 may be in a position to give us the documents that are now in

6 the hands of third parties to get it done by the 12th.

7          All this document deals with, Your Honor, is what

8 evidence will be admissible to the estimation trial.  And it

9 says with respect to everybody but this four percent, no

10 evidence that was not in our hands as of March 15th, no other

11 evidence will be usable in the estimation.  That's all it says.

12 With respect to those who have said the x-rays are in the hands

13 of third parties, they have an additional period of time to get

14 them.  And if they're not then furnished by May the 12th, then

15 the order would then say the same thing with respect to them.

16          No individual claimant's rights are at all effected.

17 We're not seeking to litigate against the individuals as Your

18 Honor indicated.  The order simply says whatever was in the

19 door by March 15th, that's it, except for this four percent.

20 With respect to them, whatever's in the door by May 12th,

21 that's it for estimation purposes.

22          THE COURT:  All right.  I'll take a look at the

23 order.

24          MR. BERNICK:  I'd like to be responsive to Your

25 Honor's --

**J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  I don't know what your order says.  I

2  need to see your order.

3          MS. BYRNE:  Your Honor.

4          MR. ESSERMAN:  Your Honor, this is Sandy Esserman --

5  I'm sorry, did someone speak?  Is someone on the phone

6  speaking?

7          THE COURT:  Is someone on the phone speaking?

8          MS. BYRNE:  Yes, I was speaking, Your Honor.  This is

9  Kathy Byrne at Cooney and Conway in Chicago.

10          THE COURT:  Yes, go ahead.

11          MS. BYRNE:  And I am not certain if this order is

12  supposed to be applying to our situation.  We have -- there's

13  been a motion to compel filed against us and since November we

14  have provided everything that is in our possession or our

15  client's possession.  There are nine

16  x-rays remaining that we do not have possession of.  We have

17  tendered authorization to Grace three times now -- or to

18  (indiscernible), saying if you would like to try from the

19  hospital where it's at, we're not having any success, but

20  you're authorized to make an attempt.  But I don't want my

21  clients prejudiced in the estimation hearing for something that

22  we have told them we've been frustrated in doing and we've

23  given out best effort to allow that to trying to get these x-

24  rays.

25          THE COURT:  Mr. Bernick's saying your clients aren't

**J&J COURT TRANSCRIBERS, INC.**

1 on the list, so I'm not sure what the issue is.  Wait, pardon

2 me.

3          MS. BYRNE:  (Indiscernible) files.

4          MR. BERNICK:  Oh yeah, I'm sorry.  There's 11 of

5 them.  Again, to the extent that all this says is that with --

6 the issue is what evidence is useful in the estimation.  We

7 have been at pains for five months to get this information.  A

8 deadline was established for everybody else of March 15th.  For

9 those people, who in response to these requests who said we

10 have made efforts to find this material and it is in the hands

11 of a third party, the order that Your Honor entered pursuant to

12 which all of this was done, says that we have to come back and

13 make a further application in order to be able to round out the

14 record.

15          So all that this order does is to say the March 15

16 deadline, which was set last time, the last time Your Honor

17 determined if it was there by March 15th, if it's after March

18 15th it's not timely.   It simply says that.  That's Paragraph

19 one.  Paragraph two says, with respect to those people who said

20 it is in the hands of third parties, the deadline for them is

21 May the 12th.  That is, if any of that information comes

22 forward by May the 12th, it can be used in the estimation.  If

23 it doesn't come in by May the 12th, it can't be used in the

24 estimation.

25          THE COURT:  But what's confusing me is the only

**J&J COURT TRANSCRIBERS, INC.**

1 entity that wants to use it in the estimation is the debtor, so

2 if you don't choose to use it in the estimation you don't

3 choose to use it.  So you don't need an order that prohibits

4 you from using what you don't want to use.

5          MR. BERNICK:  The whole reason we went down this

6 road, Your Honor, is that we had a motion and the motion said

7 turn your x-rays in so the debtor could use them.

8          THE COURT:  Right.

9          MR. BERNICK:  And last time Your Honor, maybe the

10 time before said, people have got to comply with this.

11          THE COURT:  Yes, they do.

12          MR. BERNICK:  If they don't comply with it, then you

13 may issue further orders.  We have come to the point where in

14 order to get this case ready we have to have a deadline.

15          THE COURT:  Right.

16          MR. BERNICK:  Last time we raised that proposal,

17 March is the deadline.  Your Honor agreed that's what the order

18 said.

19          THE COURT:  Right.

20          MR. BERNICK:  May the 12th is now the deadline that

21 we're asking be established with respect to those who said the

22 x-rays are in the hands of third parties.

23          THE COURT:  Right.

24          MR. BERNICK:  That's all that I'm saying.

25          THE COURT:  Okay, so you can have a deadline.

1      MR. BERNICK:  Well that's what the order does is it

2 sets a deadline.  And what it says then is nobody can use -- if

3 they don't produce the material by the deadline it can't be

4 then used in the estimation.

5      MR. LOCKWOOD:  Your Honor, as Mr. Bernick said, the

6 ACC has agreed that the order, to the extent that it's

7 satisfactory to the individual claimant's firm, at the time we

8 agreed to it we thought that all of the ones represented here

9 were.  But I might as well, in light of the colloquy between

10 Your Honor and Mr. Bernick, say why it is.

11      Your Honor's absolutely correct, the ACC and the FCR

12 have no intention of using x-ray evidence as part of their

13 case.  And the only way therefore that x-ray evidence can be

14 proffered in the aggregate estimation by any party is if either

15 the debtor proffered it, and Your Honor's question to Mr.

16 Bernick just said if you don't proffer it then you don't

17 proffer it.  Or by if the Court somehow or another changed or

18 accepted what we will continue to contest right up through the

19 hearing on estimation, what we think is a built in proposition

20 in the debtor's methodology which is despite the fact that

21 we're doing aggregate estimation they're really going to try to

22 disallow individual claims and then we'll have a big fight

23 about what they can do in terms of disallowing or invalidating

24 individual claims.  But again --

25      THE COURT:  They cannot.  That's not the purpose of

**J&J COURT TRANSCRIBERS, INC.**

1  the trial.

2          MR. LOCKWOOD:  That's not the purpose of this order.

3  And our view is the ACC is not going to come to the estimation

4  hearing with a package of x-rays which we get from individual

5  plaintiff's firms that Grace has never seen and say, gee, Your

6  Honor, we would like to introduce this.  And as far as I'm

7  concerned, that's all this order precludes us from doing.

8          THE COURT:  All right.

9          MR. BERNICK:  All this order does -- the way this

10  works, we've asked for the information, we were at pains to get

11  it.  On or on December the fifth --

12          THE COURT:  Can I see the order please?  Okay.

13          MR. BERNICK:  On December the fifth said, yes, the

14  information has to be produced in order to support the claim.

15  That's what Your Honor said.  You said a summary's not enough,

16  the x-ray has to be produced.  So Your Honor ordered the x-rays

17  to be produced.  We have gotten, essentially, only have of the

18  x-rays and we will take the position that because they have not

19  come forward with the evidence that their questionnaire says

20  that they were relying upon -- they haven't come forward with

21  the evidence their questionnaire said they're relying upon, the

22  Court should be able to draw inferences of whether in fact they

23  can support their claim.  In order to do that, we have to have

24  a deadline beyond which other evidence can't be introduced such

25  that --

1          THE COURT:  But that's -- I mean, that's going far

2     afield, to say that somebody can't come in with an x-ray that

3     they can't produce because it's in the hands of a third party

4     when they've given you an approval to go and get that x-ray in

5     the hands of the third party does not itself warrant an adverse

6     inference.

7          MR. BERNICK:  I'm not asking for the adverse

8     inference at this point.  What I'm saying is that whatever Your

9     Honor -- whatever it is, we're sitting here having spent five

10    months trying to get this stuff, we've yet to do our expert

11    reports.  Six thousand people are relying on x-rays and only

12    3,000 show up.  At a certain point we've got to cut off the

13    record and say, whatever's here is here.  We shouldn't have the

14    burden of dealing with evidence that is proffered later on.

15         Mr. Lockwood says, oh, well, we're not going to

16    proffer the evidence. He's not going to proffer the evidence,

17    he's not got a problem with the order, that's fine.  We don't

18    want anybody to come forward in the context of this estimation

19    after we spent four months trying to get this material say, oh,

20    I didn't have it then, but I have it now.  That's just not fair

21    because we have to do our expert reports.  So the time came

22    March 15, Your Honor ordered that last time.  That's paragraph

23    one.

24         And all we're saying is with respect to people who

25    say it's in the hands of third parties, they should have until

**J&J COURT TRANSCRIBERS, INC.**

144

1    May the 12th to come up with the stuff that's in the hands of

2    third parties and if they don't, that should be the deadline

3    with respect to that evidence.  That's all that we're saying.

4           We're going to argue later on of the inferences that

5    should be drawn with respect to what is not produced.  But

6    we're not asking for the inferences here.  We're simply asking

7    for the deadline.  There is documents in the hands of third

8    parties and it is produced -- if it's producible, it should be

9    produced by May the 12th.

10          THE COURT:  Well, okay, I think you're going to need

11   to exclude from this any entity that's given the debtor an

12   authorization to get that x-ray from the hands of someone else

13   after making an effort to get it and the third parties either

14   refused or is unable to produce it.

15          MR. BUSBY:  Your Honor, I couldn't agree more with

16   that.  Because Your Honor, when this started -- I'm speaking --

17          MR. BERNICK:  It's not for you to control the

18   dialogue --

19          THE COURT:  Pardon me.  I think he was speaking.

20          MR. BUSBY:  Thank you very much, Your Honor.  This

21   began as an exercise in which if firms -- if it were unable for

22   firms to do the impossible, then Grace would be given the

23   opportunity to try and engage in some self help.  And what this

24   order proposes is a complete flipping of that whole situation

25   and it creates an environment where claimants as a population

**J&J COURT TRANSCRIBERS, INC.**

1 are prejudiced because some claimants don't have these things

2 now.   Grace should retain the obligation to go get them if

3 they want to get them.

4          THE COURT:  Pardon me.  I don't really see that

5 claimants are prejudiced either because they're not going to be

6 participating in the trial.  That's the problem that I have

7 with this order.

8          MR. BUSBY:  But the reason that we prejudice is if

9 and to the extent Mr. Bernick and his client are able to go

10 down this road that Mr. Lockwood says they should not go down,

11 but Your Honor hasn't yet ruled on it.  If they --

12          THE COURT:  If they get it, it's going to be an

13 allowance process?

14          MR .BUSBY:  No, but that somehow there could be

15 statistical extrapolations from the current population to

16 determine the size of the trust.

17          THE COURT:  Well, that's the whole purpose.

18          MR. BUSBY:  Right.  But they're going to use as an

19 attempt to make a statistical extrapolation, a universe that's

20 artificially reduced by this cutoff.  And that's a prejudice to

21 our claimants even though they're not parties to the

22 proceeding.  And that's why we're not prepared to agree as to

23 our claimants who've made good faith efforts, and I don't think

24 it's appropriate for the order, to enter this order as to

25 anyone.

1          MR. BERNICK:  Your Honor, it's very --

2          MR. BUSBY:  It should be Grace's obligation to go out

3    and get the stuff if they want to get it.

4          THE COURT:  Well, it's Grace's -- it may be Grace's

5    obligation for those entities that have given Grace the ability

6    and authority to get it.  It's not Grace's obligation to get it

7    where people have not responded in any way, shape or form.

8          MR. BUSBY:  That's a fair point, Your Honor.

9          THE COURT:  And as to those entities, this order is

10   perfectly appropriate.

11         MR. BUSBY:  I understand that, Your Honor.

12         MR. BERNICK:  Paragraph one.  Paragraph two then

13   deals with the situation where they say it's in the hands of

14   third parties.  With respect to them -- again, the fact that

15   it's in the hands of third parties doesn't mean it's Grace's

16   obligation to go get it.  We may make an effort to, we may

17   fail.  All that this order says that if anybody has the ability

18   to get -- that is this last category of people who say it's in

19   the hands of third parties -- if anybody has the ability to get

20   it and they intend to get it, they should get it by the 12th of

21   May, and if they don't get it by the 12th of May, it should not

22   be usable for purposes of this estimation because it's too

23   late.  We have to do our expert reports in this matter.  The

24   expert reports are actually due on estimation matters, the

25   numerical matters, on the 27th of May, which is something else

**J&J COURT TRANSCRIBERS, INC.**

1  that we have to take up this afternoon before we're done.

2         So all that this order does, Your Honor said on

3  December the fifth, that is, how are the claimants going to

4  prove their claim without the x-rays.  That was your question.

5  Then you went on to say, "It is the claimant's burden to prove

6  a claim."  This is not the tort system, this is the federal

7  rules of evidence, you have to support the claim.  You went on

8  to say, "The report of the x-ray is only a summary, it's not

9  admissible, you've got to support the claim, it's your burden,

10 that's my ruling."  That's what you said on December the fifth.

11

12        We went out and then we established a procedure for

13 getting the x-rays.  March 12th was the deadline.  Every time

14 I'm here I go out of my way to talk about how diligent the

15 Montgomery McCracken firm is on their clients, generally

16 speaking, are -- at that exception later on that we're going to

17 talk about, but it's not here.  And if they've gone out to

18 third parties and they've tried their hardest and they then

19 give us the releases so that we can go out and do it and we try

20 our hardest, this order doesn't say that they've done wrong.

21 This order doesn't say anything of the kind.  It just says,

22 whatever's going to happen in this area of the people who say

23 it's in the hands of third parties, it's got to happen by May

24 the 12th.

25        THE COURT:  Well, actually it doesn't.  It says that

1 the claimants are precluded from introducing that x-ray

2 evidence, but it doesn't prohibit the debtor if they debtor

3 gets it later, from introducing that evidence.

4        MR. BERNICK:  I'm happy to have the debtor -- because

5 we don't want people showing up at the estimation hearing with

6 new x-rays that we haven't seen.  Because we asked for them,

7 when we asked for them and we got orders, the time has come

8 with respect to this last category, where they say it's in the

9 hands of third parties.  That is what the order is designed to

10 do.

11        THE COURT:  Well it seems to me that there has to be

12 a cutoff because at some point in time you simply have to get -

13 - everybody has to play by the same set of rules and in this

14 instance has to work with the same data.  So it seems to me

15 that a cutoff is appropriate.  I think that the expert report

16 process built in a supplemental report time frame, did it not?

17 So if there is something that is produced and can be produced

18 after the fact, if there's a supplemental report time frame

19 built in there, experts can make use of that time frame.

20        MR. BERNICK:  That is problematic.  Now Your Honor is

21 opening up, I would submit, a little bit of a Pandora's box.

22 Because these expert reports depend upon taking information and

23 analyzing it physically.  You can't get dribbles of new pieces

24 of information come in and then say, oh, well now we have new

25 pieces of information, you've got to rerun all your statistics,

**J&J COURT TRANSCRIBERS, INC.**

1 and by the way, if it changes your opinion, people can use for

2 impeachment purposes.

3          THE COURT:  Well I don't think it's dribbles.  I

4 think there are dates by which things have to happen.  And to

5 the extent that there is, you know, a need for supplemental

6 information, then it should be built in.  Otherwise, it should

7 be precluded.  Everybody should be playing with the same

8 database to the extent that there is a database.  I agree with

9 that.  But --

10          MR. BERNICK:  WE had March 15th with respect to

11 everybody but those who timely said it's in the hands of third

12 parties.  The order said if it's in the hands of third parties,

13 you should be able to -- we should come back to the Court, we

14 come back to the Court, they now under this order would have a

15 total of almost 60 days after March 15th to deal with third

16 parties.  And the time has now come for the same kind of

17 deadline on the so-called third party x-rays that we had on the

18 non-third party x-rays, that's the May 12th.

19          THE COURT:  I think a better way to do is simply to

20 say that May 12th is the absolute date by which to produce x-

21 rays.  And any party that produces an x-ray by that date may

22 make use of it and any party that doesn't and neither may the

23 debtor and neither may the experts and that's it.

24          MR. BERNICK:  We will submit an order in accordance

25 with that.  But as to the people who did not -- that is the

**J&J COURT TRANSCRIBERS, INC.**

1 first category, that is those who did not timely say it was in

2 the hands of a third party, we're still with the March 15th

3 date.

4 　　　　THE COURT:  Yes, I'm talking about Paragraph two at

5 the moment with the x-rays in the hands of third parties.  It

6 seems to me that a cutoff date is appropriate.  Folks, you can

7 talk about if there is something supplemental that comes in and

8 you can build it in to your expert reports.  I do not know what

9 the expert process is for reviewing this data, I don't even

10 know if it's possible.  So if there is some possibility to do

11 it and you want to build that time frame in, then I want an

12 absolute deadline date that says, you know, after these

13 reports, if there's going to be a supplemental round, then the

14 additional data has to be produced by X date, there will not be

15 a continuance under any circumstances, and a supplemental is

16 due by X date.  Otherwise -- and the same date applies to

17 everyone.

18 　　　　MR. BERNICK:  On x-rays, we're suggesting -- and

19 unless Your Honor believes that a different day is appropriate,

20 it be May the 12th, that's 60 days after March 15th.  With

21 respect to other matters, that is the subject of another item

22 on the agenda that we need to get to today, all that this order

23 purports to do and all that I would submit to the Court that we

24 should submit by way of an order, should deal with the x-ray

25 issue and use the March 15 and May 12th dates if that is

1 satisfactory with the Court.

2         THE COURT:  The March 15th date is fine in Paragraph

3 one, the May 12th date is fine in Paragraph two, except that I

4 think it has to simply be changed so that it is not pejorative

5 as to claimants who have essentially made efforts to try to get

6 those x-rays and simply can't.  It simply needs to be a cutoff

7 date by which after that date the evidence is not going to be

8 used regardless of whether it's submitted or not by any parties

9 so that all experts can be using the information from the same

10 database.  Gentlemen, you can --

11         MR. BERNICK:  That again, that is with respect to

12 those in Paragraph two --

13         THE COURT:  Yes.

14         MR. BERNICK:  -- who timely said that they had made

15 the efforts and they were in the hands of third parties.

16         THE COURT:  And as I said, you can discuss among

17 yourselves the propriety of a supplemental.

18         MS. BYRNE:  Judge, this is Kathy Byrne at Cooney and

19 Conway in Chicago again.

20         THE COURT:  Yes?

21         MS. BYRNE:  I just want to make sure that this will -

22 - the order will reflect something saying that my clients are

23 not being disqualified from bringing a claim, this is only for

24 the estimation purposes.

25         THE COURT:  No one is barred from --

**J&J COURT TRANSCRIBERS, INC.**

1          MS. BYRNE:  We have submitted oncology reports that -

2  -

3          THE COURT:  The order is not going to in any way talk

4  about claims.  This has nothing to do with claims, this is only

5  an evidentiary order.  It's nothing more -- no one is barred

6  from filing any claims against the trust and no one is barred

7  from participating to the extent you choose to in the

8  estimation trial.  I would be surprised if anybody other than

9  the ACC and the FCR choose to, but if you want to, you may.

10          MS. BYRNE:  Thank you.

11          MR. BUSBY:  Your Honor, Leonard Busby again for the -

12  - well, specifically, the Waters and Kraus firm and the

13  Wartnick firm only for purposes of this debate.  Now a few

14  minutes ago it was my understanding that Mr. Bernick was not

15  suggesting that this order that he had negotiated with Sandy

16  Esserman was going to be applicable to Waters and Kraus or the

17  Wartnick firm.  And we certainly do not agree to it.

18          THE COURT:  I think the order has to apply to

19  everyone, that there has to be an evidentiary cutoff date.

20          MR. BUSBY:  Well and if and to the extent -- I

21  understand the rational for that, Your Honor, but until today,

22  it was the Court's ruling in the February 20 order that Grace

23  would come back to this Court with a request as to how to

24  facilitate Grace's inspections of such chest

25  x-rays and whether to order that such claimant's chest x-ray be

**J&J COURT TRANSCRIBERS, INC.**

1  sent to a repository of the Court.  That's the reliance under

2  which our clients were operating as of this minute.

3          Now we've converted into a situation where there's an

4  absolute May 12th deadline which doesn't apply to Grace.

5          THE COURT:  Oh, it does apply to Grace.

6          MR. BUSBY:  It doesn't apply to Grace's ability to

7  get these into a repository or having an opportunity to

8  inspect.  It's a deadline that's being imposed on the Waters

9  and Kraus and Wartnick firm and other firms to either deliver

10 these x-rays themselves, even though third parties have them or

11 have lost them and they can't presently be located, and that's

12 just an absolutely drop dead deadline.

13         THE COURT:  I'm sorry.  It is an absolute deadline

14 for everyone.  Whatever is in Grace's hands by May 12th can be

15 made use of by anybody to the extent they choose to use it.

16 Whatever is not in Grace's hands by May 12th isn't going to be

17 used by anyone in terms of the initial expert reports.  That's

18 why I'm suggesting that perhaps you need a supplemental

19 submission date that should be after the initial expert

20 reports.  Grace has to comply with the Court's order to get

21 these expert reports done and so does everyone else.  So you

22 need -- to the extent that you need a supplemental, and that

23 supplemental may change the expert analyses, I understand that

24 that may be the case, if it does, it does.  But you need a --

25         MR. BERNICK:  Solely with respect to this issue.

**J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  Yes.  Just on the x-ray issue.

2          MR. BERNICK:  Just on the x-rays (indiscernible)

3 third parties.

4          THE COURT:  Just on this Paragraph two x-ray issue.

5 That's all I'm talking about.

6          MR. BUSBY:  And it certainly makes sense to me, Your

7 Honor, that we have access to a supplemental arrangement,

8 especially to the extent that x-rays have been lost by defense

9 firms that are custodians that included on behalf of Grace.

10          THE COURT:  Yes.

11          MR. BERNICK:  If they're lost, they're not going to

12 turn up, we're not worried about the ones that are not going to

13 turn up.

14          THE COURT:  Well, the claimants may be.

15          MR. BUSBY:  Thank you, Your Honor.

16          MR. LOCKWOOD:  Your Honor, I hate to even say one

17 sentence in this fight, but I want to reiterate.  The reason

18 the ACC is accepting of this arrangement, despite Mr. Bernick's

19 reading of transcript earlier, which tends to be a recurrent

20 feature.  These arguments frequently where Mr. Bernick is

21 reading his own remarks from the transcript.

22          MR. BERNICK:  Those were the Court's.

23          MR. LOCKWOOD:  I understand.  I want it absolutely

24 clear that the Court is not ruling, for example, on -- as the

25 Court said earlier, you're not ruling on inferences that are

**J&J COURT TRANSCRIBERS, INC.**

1 going to be drawn, you're not ruling on the question of whether

2 claims are valid or invalid for failure to produce.  All the

3 ACC's rights argue about the total invalidity of what the

4 questionnaire process has attempted to achieve and has

5 succeeded in achieving are unaffected by this order.

6          THE COURT:  Mr. Lockwood --

7          MR. LOCKWOOD:  Isn't that correct?

8          THE COURT:  Yes.  Mr. Lockwood, we do not need to

9 keep going over this over and over and over again.

10          MR. LOCKWOOD:  I'm sorry.  You see, Mr. Bernick wants

11 to get up here and argue.

12          MR. BERNICK:  Well, because this was an effort like

13 what we saw this morning to, in a sense, try to get different

14 language from the Court.  But we understand the Court's ruling,

15 it is a deadline.  We accept that, we'll submit an order that

16 makes it a deadline.  And we will be more than happy to argue

17 later on about what inferences should be drawn by the absence

18 of this information.  We're not seeking to argue that today.

19          THE COURT:  All right.  I expect to get an order that

20 will come from all of you on a certification of counsel.  The

21 first paragraph is fine, the second paragraph needs to be

22 tweaked so that it's just a cutoff, and I think a supplemental

23 would be a good idea so that if additional x-rays do show up, I

24 really do think the debtor is going to want to take an

25 opportunity to look at them, so may the Committee.  I don't

**J&J COURT TRANSCRIBERS, INC.**

1 know who else is going to want to see them.

2          MR. BERNICK:  That's fine.

3          THE COURT:  All right.

4          MR. BERNICK:  In the interest of time, we now have a

5 couple other matter to --

6          MR. ANSBRO:  Just for the record, Your Honor.  Mr.

7 Lockwood has correctly characterized the FDR's position.

8      MR. BERNICK:  I think it's probably important, all of the

9 other matters that we have on the agenda, and that includes the

10 -- as I said -- the flip side of the waiver issue with respect

11 to the PD objections is the motion that was filed with respect

12 to the amendments or whatever on the claims themselves, that's

13 put over until the 21st.

14          ZAI, the status conference I believe that there is an

15 agreement to put over the ZAI status conference.  And also the

16 item on the agenda -- I believe it's Item 18 -- that relates to

17 discovery with regard to ATSDR and that also pertains to the

18 Libby claimants -- sorry, to the ZAI.  That also would be put

19 over to the 25th of June.  So both of those items are put over,

20 and I believe with the concurrence of Mr. Westbrook, who has

21 probably left and Mr. Scott who has risen to his feet to

22 express, I believe, his agreement.

23          THE COURT:  They're continued until June?

24          MR. BERNICK:  Until June 25.  The omnibus on June 25.

25 Which would then mean that the only other item that is

**J&J COURT TRANSCRIBERS, INC.**

1 outstanding is Item 14.  Item 14 we are clearly not going to

2 have the opportunity to discuss in detail today.  Item 14

3 pertains to the B-reads, and Your Honor will recall last time

4 that we had a fairly extensive discussion about compliance with

5 the Court's order on the B-reads that were previously withheld

6 on grounds of privilege.  And there were three categories and

7 the like and the deadline, I believe, in that case -- again,

8 same kind of deadline, you have it or you don't have it -- was

9 established, I believe, of April the 12th.

10      We have now processed the submissions that were made

11 as of April the 12th and the issue that's now been raised is

12 what is the status of compliance with respect to that issue.

13 And the reason that this is of importance is that two new facts

14 have emerged.  And I'll just touch on them and suggest that we

15 really do have to get into -- they implicate the schedule,

16 which is the reason I wanted to raise them now.

17      The first fact is that it's now apparent that, at

18 least in the case of some firms, perhaps many firms, I know

19 it's the case for Motley Rice, that the objections that were

20 made on grounds of the consultant's privilege were not tied to

21 any particular document.  Indeed, they're not necessarily tied

22 to any document.  That is to say they were objections that were

23 made because the questionnaire might on its face be construed

24 to call for privileged documents and therefore the objection

25 was made.

**J&J COURT TRANSCRIBERS, INC.**

1       We now know that at least based on the

2 representations that were made to the Court, all the Motley

3 Rice can say is that on information and beliefs, the documents

4 withheld were privileged documents.  And that's one problem.

5 And I think that the problem probably pertains to a variety of

6 firms because there's a deeper underlying problem.

7       And if you take a look at the affidavits, including

8 the affidavit from Waters and Kraus, you see that they're very

9 carefully crafted to make representations about what is being

10 withheld by that firm.  So Waters and Krause says, we either

11 are withholding or not -- our firm is either withholding or not

12 withholding.  I don't mean to pick on them.  There are others

13 as well.

14      Mr. Kazan (phonetic) says our firm is not

15 withholding.  What Mr. Herrick representing Motley Rice got up

16 and said candidly is, they haven't contacted the other firms so

17 they don't know the medical history, other than the medical

18 history that is reflected in the medical records that they

19 have.  And therefore there is no representation that's being

20 made that there aren't theories that are out there that haven't

21 been produced and are being -- are in the hands of other

22 lawyers.

23      And therefore when you think about the order that

24 Your Honor entered with regard to B-reads, which is the date of

25 the initial diagnostic B read, that's not privileged?  In many

**J&J COURT TRANSCRIBERS, INC.**

1 cases, it's not even known by these law firms what that initial

2 diagnostic read was because they don't even have it.  It took

3 place in the hands of another law firm.  So we now have a

4 problem of what to do because the responses that we've gotten

5 on the B-reads says that they're being withheld on grounds of

6 privilege have surfaced that we don't even know the earlier

7 medical history and the B-reads that we don't have because

8 they're in somebody else's hands.

9         Now that problem is not a small problem because it

10 not only relates to compliance with the B read order, it

11 relates to the questionnaires themselves.  And Your Honor will

12 recall that way back when when we put together these

13 questionnaires, I specifically asked -- we specifically asked

14 to conduct discovery of the law firms and not just the law

15 firm, but any law firm, because it's the law firms that have

16 the documents.  Your Honor then said go to the doctors, that is

17 the doctors will have whatever information is there.  And in

18 fact, we did go to the doctors.  Went to a lot of the doctors

19 in the context of trying to subpoena records.

20         But the questionnaire then said that the lawyers had

21 to go to all of the doctors themselves.  That is to say any

22 claimant had to give us the documents that were in the

23 possession of any doctor.  The questionnaire itself reads out

24 very broadly.  It says give me all of the medical records that

25 relate to your condition.  It doesn't say it's confined to

1  those that your particular lawyer might have.  Any medical

2  records that a doctor might have.  So we now believe that the

3  questionnaires have been answered, not on the basis of all of

4  the medical information, but only the medical information is in

5  the hands of the particular law firms that now represent these

6  claimants, we believe that no inquiry has been made of the

7  doctors to assure that all of the information predating this

8  particular referral and retention has been turned over.  And

9  the implications are vast.

10      So why do I say that they're vast?  Because we have

11 all kinds of screening x-rays that are out there that may have

12 been done, were don't before these particular lawyers are

13 involved and Your Honor's already ruled that they don't have be

14 turned over.  So we've got a big problem.

15      The other piece of information that's come out is

16 that for those firms that have supplemented by producing

17 B-reads that were withheld, you take the Foster and Sear firm.

18 With respect to that firm there were a total of 537, or

19 thereabouts, claimants who filed a -- who had a claim in the

20 database as of the time the company went to 11, who filed a

21 proof of claim, a timely fashion proof of claim, and a

22 questionnaire.  There are about 53 of them who then

23 supplemented as Mr. Esserman understood they would.

24      Out of the 537 we have had negative B-reads for 530

25 of them.  That is that in that case we now know that real

1 compliance with the order, at least for those individuals, has

2 shown massively that the pictures that was presented in the

3 questionnaires, which was on the positive

4 B-read, was completely (indiscernible) by what was not produced

5 which was the negative B-read.  And that is now an indication.

6 Mr. Esserman represented last time there were upwards of 2,000

7 people who were effected -- within the three firms that he

8 represented who are effected by this order.  We've not received

9 2,000 supplemental B-reads.  We've received in the hundreds.

10        So and as I would update the chart later on, for

11 those people who said that they would provide information, very

12 few of them have.  So the Humphreys Provost firm or Prevost

13 Humphreys' firm, the Angelos -- maybe not the Angelos firm,

14 but the -- maybe the statement I made was actually about

15 Angelos, I get confused -- but there are a whole series of

16 firms with multiple, multiple claims -- thousands of claims --

17 Ferraro firms got 28,000 matches who have given us nothing.

18        THE COURT:  Well, Mr. Bernick, I'm only interrupting

19 because my court reporter -- it's now after six.  She has to

20 leave, so what are we doing with this?

21        MR. BERNICK:  What we're doing this is follows.  I

22 promise to tender interrogatories that would make a record.  In

23 other words, what I said last time was, it's really too late in

24 this case to continue the effort of trying to drag all of this

25 information out.  And that is not only true with respect to the

**J&J COURT TRANSCRIBERS, INC.**

1 B-reads that are being withheld, we now know there are negative

2 B-reads.  It's also true with respect to the questionnaires.

3       We have to make a record of what has not been done.

4 That is, we made all these requests, the Court issued all these

5 orders.  We have to make a record of what has not been done.

6 And in order to do that, we suggested the interrogatories.  Now

7 we have furnished our proposed interrogatory to the other side

8 and to the Court.  But that has to be taken up and the only

9 purpose for this interrogatory is to make a record on, in a

10 sense, what has not been done, what these people have not

11 produced by way of information that has been sought.

12       We want to know, is it in fact true that you

13 have not made inquiry of the doctors to get all the prior

14 medical records?  Is it not true that you have not gone to

15 the other law firms to find out all the negative B-reads?  So

16 that's the interrogatory that we've crafted.  We wanted to

17 get that okayed, we wanted to have that returnable within 30

18 days.

19       THE COURT:  Well you don't need me to okay your

20 interrogatories.  You've got proofs of claim, you've got a

21 discovery schedule, you can do discovery now.

22       MR. BERNICK:  Well, but, Your Honor, last time we

23 went through this and it was very important that we got Your

24 Honor to okay this interrogatory in advance because otherwise,

25 what we know is that we will go down the road of having a

**J&J COURT TRANSCRIBERS, INC.**

1  motion practice that will take at least 90 days to resolve.

2  And we want to avoid that.  So we wanted to take up today the

3  interrogatory that Your Honor last time said, yeah, why don't

4  we try to do that, we're not going to have time to do it today,

5  but we need to do that very soon.  And then the impact that

6  that will have is, we're going to need probably another -- Your

7  Honor asked before, shouldn't we just push off all of the

8  dates, that is, maybe this is just not going to happen on the

9  kind of schedule and I think the FCR and the ACR said no, they

10 didn't want to do that.  And indeed, the debtor said that we

11 were very reluctant to see a major shift in the schedule.  We

12 are still reluctant.

13      But we're going to need a thirty-day bump on the

14 expert reports' days for two reasons.  One is to get these

15 interrogatories answered so that our experts know what the data

16 in the questionnaire even purports to be, because that's no

17 longer what it appears.  The certifications appear to have been

18 wrong on those questionnaires.

19      And the Number two is that we need to finish

20 processing the data that we are only now finally getting.  The

21 x-rays, we had a March 15 date.  The supplementation of the

22 questionnaires took until March 1.  We're going to need 30 days

23 to get the expert reports done.  So what we wanted to come and

24 propose is two things.  First, an okay to the interrogatories

25 so that they can be served, and second, to bump the dates for

**J&J COURT TRANSCRIBERS, INC.**

1 the experts' submissions by 30 days.  And that is a very

2 important thing because May the 10th is the date for the first

3 new set of expert reports.

4       Now we can't get it today.  I know that everybody

5 will have a lot to say in response, but we really are going to

6 need that time.  I understand that Mr. Esserman has got a

7 conflict for the seventh.  In fact, I think (indiscernible) had

8 a conflict for the seventh.  Your Honor had a conflict on the

9 eight, but the question is whether you might be able to make

10 time for us in the morning of the eighth at all to be able to

11 handle this issue, which is what's going to happen with the B-

12 reads and this interrogatory, and then the dates for the

13 pretrial for the expert reports that are effected by it.

14       THE COURT:  Well, Mona is going -- we tried to call

15 the parties in the argument that are doing the argument at nine

16 o'clock and I got through to one local counsel who is going to

17 see whether he can get through to other counsel to see if we

18 can move the eighth to the ninth.  But whether he's --

19       MR. WISLER:  Your Honor, (indiscernible) they said it

20 was fine.

21       THE COURT:  Oh, you know that.

22       MR. WISLER:  They said it's fine.

23       THE COURT:  Oh, well thank you, Mr. Wisler.  Okay.

24 Well then if that's the case, I can go get Mona back and tell

25 her it's fine.  So yes, you can have the morning of May 8th.

**J&J COURT TRANSCRIBERS, INC.**

1          MR. BERNICK:  That would be great.  And if Your Honor

2  -- we have submitted the interrogatory, there's not been any

3  briefing on the interrogatory.  We have submitted the

4  interrogatory and I believe that the matter on the current

5  state of affairs with respect to the B-reads, Your Honor is

6  very familiar with.  But that will be -- there was concern

7  about making sure that everybody got notice of what we would

8  say about the schedule.  Our position on the schedule is going

9  to be that the expert reports should bounce for 30 days.  That

10  will probably have an impact on the estimation hearing.  We

11  were set to have the first estimation time from between

12  September 17 and September 19 and then we'd go to September

13  26th, I think or 27th.  We would keep the late September dates,

14  but we might, because of the closeness of the last expert

15  report to the estimation, just basically forego the 17th, 18th

16  and 19th.

17          THE COURT:  Well, I think we're going to have to talk

18  about that on May 8th when we get together to see what we can

19  work out, if this is going to be bumped.  I'm going to have to

20  work with my staff to adjust dates.  So that's not something

21  I'm going to be able to do in the next seven minutes, so --

22          MR. BERNICK:  No, I'm just saying -- I just wanted to

23  give notice to at least our position with respect to

24  scheduling.  Obviously Your Honor's schedule is something that

25  I can't address.  That would be our proposal.

**J&J COURT TRANSCRIBERS, INC.**

1              THE COURT:  All right.  Any problem with anybody just

2    simply continuing this matter until May 8th at nine o'clock so

3    that I can let my staff go home?

4              MR. LOCKWOOD:  Your Honor, we don't have a problem

5    with continuing it, but since Mr. Bernick has spent 15 minutes

6    telling you what his argument is, I would say one sentence,

7    which is the ACC and the FCR are going to oppose bumping the

8    motions and the basis is that Grace is -- this is a never

9    ending process.  Grace wants to get behind each and every claim

10   and they'll never be able to do it.  So we'll be here -- we've

11   had bumps before, we're going to have bumps again.  Your Honor

12   just proposed a date --

13             THE COURT:  Mr. Lockwood, save it until May 8th.

14             MR. LOCKWOOD:  Thank you.

15             THE COURT:  Okay.  Mr. Esserman?

16             MR. ESSERMAN:  May 8th is fine and we do contest much

17   of what Mr. Bernick said.  I'll save it for May 8th.

18             THE COURT:  Thank you.

19             MR. BERNICK:  (Indiscernible) can be done going to

20   arrive from here to Amsterdam five in the morning.  I'm

21   assuming if we get done in the morning --

22             THE COURT:  You only have until noon.

23             MR. BERNICK:  Right.  I just want to make sure.

24             THE COURT:  Nine o'clock.  Starting at nine.  Now,

25   Mr. O'Neill, will you be able to do a notice?  Yes, it will be

**J&J COURT TRANSCRIBERS, INC.**

1 here in Pittsburgh.

2          MR. O'NEILL:  Yes, Your Honor.  And this will be --

3 parties will be participating by Court Call if they want to do

4 that?

5          THE COURT:  Yes.  Parties may participate by Court

6 Call.  They'll have to make the arrangements promptly to do

7 that.  No one has to be here that day.  You can all participate

8 by phone for this process if you choose.  That's fine with me.

9          MR. LOCKWOOD:  Could we make is sort of mandatory all

10 telephonic so that opportunists don't show up here in person?

11          MR. BERNICK:  I would like -- this is a -- it may be

12 inconvenient, but this is a very, very important -- this goes

13 to the heart of whether there's really be people answering

14 these questionnaires right.  We definitely want to be here in

15 person.

16          THE COURT:  No, I'm not going to make it mandatory,

17 but if you want to try to set up a video link, Mr. Lockwood,

18 I'll work with you after we can terminate the record to see

19 whether we can arrange a video link from somewhere else.

20          MR. LOCKWOOD:  Your Honor, if Mr. Bernick's going to

21 be here, we'll be here.

22          THE COURT:  All right.

23          MR. ESSERMAN:  One other matter was on the agenda

24 which was skipped over.  (Indiscernible) May 8th Baron Budd

25 order --

1          MS. BAER:  It's actually not on the agenda, but

2  there's a dispute on the order from the April 13th minutes.

3          MR. ESSERMAN:  Actually, we won't do it today, you're

4  going home.  It's a five-minute matter.

5          THE COURT:  May 8th?  All right.  Ms. Baer, can you

6  just alert me after my staff leaves as to what that is so I can

7  look it up?

8          MS. BAER:  Yes, Your Honor, (indiscernible).

9          THE COURT:  Oh, you did?  What's the docket number?

10         MS. BAER:  I'll pull it out.

11         THE COURT:  That's fine.

12         MR. ESSERMAN:  We've got both orders.  We hand filed

13  both orders.  That is my proposed order and her proposed order

14  yesterday.

15         THE COURT:  All right.  Just give me the docket

16  number, I'll print it tonight and try to deal with it tonight

17  if I can.

18         MR. ESSERMAN:  It doesn't merit much discussion, Your

19  Honor.

20         THE COURT:  All right.  Then I'll wait until May 8th,

21  but I'll print it tonight.

22         MS. BAER:  Your Honor, we have a bunch of these

23  orders --

24         THE COURT:  I'll take them.  Yes, I'll take them.

25  All right.  Anything else before May 8th?  So everything is

1 | continued either to May 8th, May 21st or June 20 -- whatever

2 | the dates were?

3 |        MR. BERNICK:  That's correct, Your Honor.

4 |        THE COURT:  All right.  Jan, you can terminate the

5 | record and leave, and Ms. Baer, I'll take whatever docket

6 | number you have as soon as you can give it...

* * * * *

## C E R T I F I C A T I O N

I, PATRICIA REPKO and RITA BERGEN, court approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter, and to the best of my ability.


/s/ Patricia Repko              DATE:  May 7, 2007

J&J COURT TRANSCRIBERS, INC.


/s/ Rita Bergen                 DATE:  May 7, 2007

J&J COURT TRANSCRIBERS, INC.