UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

IN RE:                          .    Case No. 01-1139(JKF)
                                .
                                .
W. R. GRACE & CO.,              .
                                .    5414 USX Tower Building
                                .    Pittsburgh, PA  15222
                                .
              Debtor.   .
                                .    May 8, 2007
. . . . . . . . . . . . ..       9:17 a.m.

TRANSCRIPT OF HEARING
ARGUMENT ON DISCOVERY
BEFORE HONORABLE JUDITH K. FITZGERALD
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtor:                 Kirkland & Ellis, LLP
                                By: DAVID. M. BERNICK, P.C., ESQ.
                                    AMANDA BASTA, ESQ.
                                    JANET BAER, ESQ.
                                Aon Center
                                200 East Randolph Drive
                                Chicago, IL  60601

For "The MMWR" firms:           Montgomery, McCracken, Walker
                                 & Rhoads, LLP
                                By:  LEONARD A. BUSBY, ESQ.
                                300 Delaware Avenue
                                Suite 750
                                Wilmington, DE  19801

For Asbestos Creditors':        Caplin & Drysdale, Chartered
                                By: NATHAN D. FINCH, ESQ.
                                    MARC HURFORD, ESQ.
                                One Thomas Circle, NW
                                Washington, DC  20005

Audio Operator:                 Janet Heller

Proceedings recorded by electronic sound recording, transcript
produced by transcription service
_____
**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@optonline.net**

**(609) 586-2311    Fax No. (609) 587-3599**

APPEARANCES: (Cont'd)

For David T. Austern,          Orrick, Herrington & Future
Claims Rep:                     Sutcliffe, LLP
                               By:  JOHN ANSBRO, ESQ.
                               Washington Harbour
                               3050 K Street, N.W.
                               Washington, DC  20007

For Reaud, Morgan & Quinn      Stutzman, Bromberg, Esserman,
and ELG:                        & Plifka, PC
                               By: SANDER ESSERMAN, ESQ.
                               2323 Bryan Street, Suite 2200
                               Dallas, TX  75201


TELEPHONICALLY
For the Debtor:                Pachulski, Stang, Ziehl, Young,
                                Jones & Weintraub, P.C.
                               By:  JAMES E. O'NEILL, ESQ.
                                    TIMOTHY P. CAIRNS, ESQ.
                               919 North Market Street
                               17th Floor
                               P.O. Box 8705
                               Wilmington, DE  19899

For Official Committee of      Bilzin Sumberg Baena Price
Property Damage Claimants:      & Axelrod LLP
                               By: MATTHEW I. KRAMER, ESQ.
                               Wachovia Financial Center
                               200 South Biscayne Boulevard
                               Suite 2500
                               Miami, FL  33131

For Ad Hoc Committee           Weil, Gotshal & Manges, LLP
of Equity Security-Holders:    By: M. JARRAD WRIGHT, ESQ.
                                    DAVID HICKERSON, ESQ.
                               1300 Eye Street, NW, Suite 900
                               Washington, DC 20005

For Waters & Kraus             Waters & Kraus
Claimants:                     By: PETER KRAUS, ESQ.
                               3219 McKinney Avenue
                               Dallas, Texas 75204

For Motley Rice Claimants:     Motley Rice
                               By: JOHN HERRICK, ESQ.
                               28 Bridgeside Blvd.
                               Mount Pleasant, SC 29464

APPEARANCES: (Cont'd)

| | |
|---|---|
| For Official Committee of<br>Unsecured Creditors: | Stroock & Stroock & Lavan, LLP<br>By:  ARLENE G. KRIEGER, ESQ.<br>        LEWIS KRUGER, ESQ.<br>180 Maiden Lane<br>New York, NY  10038 |
| For Official Committee of<br>Asbestos Property Damage<br>Claimants: | Dies, Handerson & Cafona<br>By:  MARTIN DIES, ESQ.<br>1009 Green Avenue<br>Orange, TX  77630 |
| | Ferry, Joseph & Pearce, P.A.<br>By: THEODORE TACCONELLI, ESQ.<br>824 Market Street  Suite 904<br>P.O. Box 1351<br>Wilmington, DE  19899 |
| Unsecured Creditors'<br>Committee: | Stroock & Stroock & Lavan, LLP<br>By: KENNETH PASQUALE, ESQ.<br>180 Maiden Lane<br>New York, NY  10048-4982 |
| For the Equity<br>Committee: | Kramer, Levin, Naftalis &<br> Frankel, LLP<br>By:  GARY M. BECKER, ESQ.<br>919 Third Avenue<br>New York, NY  10022 |
| For Asbestos Creditors<br>Committee: | Caplin & Drysdale, Chartered<br>By:  WALTER SLOCOMBE, ESQ.<br>One Thomas Circle, NW<br>Washington, DC  20005 |
| For Official Committee of<br>Property Damage Claimants: | Bilzin Sumberg Baena Price<br> & Axelrod LLP<br>By:  JAY M. SAKALO<br>Wachovia Financial Center<br>200 South Biscayne Boulevard<br>      Suite 2500<br>Miami, FL  33131 |
| For Fireman's Fund<br>Insurance Company: | Stevens & Lee<br>By:  DAVID R. BEANE, ESQ.<br>111 North Sixth Street<br>P.O. Box 679<br>Reading, PA  19603 |

**J&J COURT TRANSCRIBERS, INC.**

APPEARANCES: (Cont'd)

For David T. Austern,          Piper Jaffray & Co.
Future Claims Rep.:            By:  JASON SOLGANICK, ESQ.
                                    JONATHAN BROWNSTEIN, ESQ.

For Asbestos Property Damage   LECG
Claimants:                     By:  SEAN WALSH, ESQ.

For Kenneth Thomas:            KENNETH THOMAS

For Reaud, Morgan & Quinn      Stutzman, Bromberg, Esserman,
and ELG:                        & Plifka, PC
                               By: DAVID J. PARSONS, ESQ.
                                    VAN J. HOOKER, ESQ.
                               2323 Bryan Street, Suite 2200
                               Dallas, TX  75201

For William Asire, et al.:     Cooney & Conway
                               By: KATHY BYRNE, ESQ.
                               120 North LaSalle Street
                               Chicago, IL  60602

For Federal Insurance Co.:     Cozen O'Connor
                               By: DAVID J. LIEBMAN, ESQ.
                               1900 Market Street
                               Philadelphia, PA  19103

For David T. Austern           Phillips, Goldman & Spence, P.A.
Future Claimants Rep:          By: DEBRA FELDER, ESQ.
                                    RICHARD Y. WYRON, JR. ESQ.
                                    JOHN C. PHILLIPS, JR., ESQ.
                               1200 North Broom Street
                               Wilmington, DE  19806

For Everest Reinsurance        Crowell & Moring, LLP
Co. & McKinley Ins. Co.:       By: MARK D. PLEVIN, ESQ.
                                    LESLIE A. EPLEY, ESQ.
                               1001 Pennsylvania Avenue, NW
                               Washington, DC  20004

                               Marks, O'Neill, O'Brien &
                                Courtney, P.C.
                               By: BRIAN KASPRZAK, ESQ.
                                    MICHAEL J. JOYCE, ESQ.
                               913 Market St., Suite 800
                               Wilmington, DE  19801

APPEARANCES: (Cont'd)

For Grace Certain Cancer          Montgomery, McCracken, Walker
Claimants:                         & Rhoads, LLP
                                  By: NOEL C. BURNHAM, ESQ.
                                  300 Delaware Avenue, Suite 750
                                  Wilmington, DE  19801-1607

Official Committee of             Duane Morris, LLP
Unsecured Creditors:              By: MICHAEL R. LASTOWSKI, ESQ.
                                  1100 North Market St., Wuite 1200
                                  Wilmington, DE  19801-1246

For Libby Claimants:              Cohn Whitesell & Goldberg, LLP
                                  By:  DANIEL C. COHN, ESQ.
                                  101 Arch Street
                                  Boston, MA  02110

                                  Cohn Whitesell & Goldberg, LLP
                                  By:  CHRISTOPHER M. CANDON, ESQ.
                                  101 Arch Street
                                  Boston, MA  02110

For Travelers Casualty            Simpson, Thacher & Bartlett, LLP
Insurance Co.:                    By:  BARBARA SENIAWSKI, ESQ.
                                  425 Lexington Avenue
                                  New York, NY  10017

For Baron & Budd:                 The Hogan Firm
                                  By:  DANIEL K. HOGAN, ESQ.
                                  1311 Delaware Avenue
                                  Wilmington, Delaware 19806

For Murray Capital Mgt.:          Murray Capital Mgt.
                                  By:  MARTI MURRAY

For U.S. Trustee:                 U.S. Trustee Department
                                  By:  DAVID KLAUDER

For Irwin H. Zandman:             IRWIN H. ZANDMAN

For Citadel Investment            Citadel Investment Group
Group:                            By:  BEAU HARBOUR

For Seaton:                       Drinker Biddle & Reath
                                  By: ANDREA D'AMBRA
                                  One Logan Square
                                  18th and Cherry Streets
                                  Philadelphia, PA 19103-6996

**J&J COURT TRANSCRIBERS, INC.**

<u>APPEARANCES</u>: (Cont'd)

| | |
|---|---|
| For Dune Capital Mgt.: | Dune Capital Mgt.<br>By:  GUY BARON |
| For Lehman Brothers: | Lehman Brothers<br>By:  ANDREW CHAN |
| For Federal Insurance Co.: | Cozen O'Connor<br>By:  JACOB C. COHN, ESQ.<br>     DAVID J. LIEBMAN, ESQ.<br>1900 Market Street<br>Philadelphia, PA  19103 |
| For ZAI Claimants: | Scott Law Group<br>By:  DARRELL SCOTT, ESQ. |

1          THE COURT:  This is the matter of W.R. Grace,

2    Bankruptcy Number 01-01139, and this is a conference to discuss

3    certain discovery issues concerning the product identification

4    -- well, actually, I thought it was on the personal injury

5    issues.

6          MR. BERNICK:  It is on personal injury.

7          THE COURT:  It is.  Okay.  One second then.  Okay,

8    the parties I have listed appearing by phone are James O'Neill,

9    Timothy Cairns, Jonathan Brownstein, Kenneth Thomas, Sean

10   Walsh, Matthew Cramer, Jay Sakalo, Barbara Seniawski, Guy

11   Baron, Michael Lastowski, Kathy Byrne, Andrew Chan, David

12   Liebman, John Demme (phonetic), Jacob Cohn, Debra Felder, Roger

13   Frankel, Arlene Krieger, Ken Pasquale, Louis Kruger, Mark

14   Hurford,  Walter Slocombe, Nathan Finch, David Hickerson,

15   Jarrad Wright, David Beane, John Phillips, Sandy Esserman, Van

16   Hooker, David Klinger, David Parsons, Ted Tacconelli, Gary

17   Becker, Jason Solganick, John Herrick, Daniel Cohn, Christopher

18   Candon, Darrel Scott, Martin Dies, Richard Wyron, Mark Plevin,

19   Leslie Epley, Michael Joyce, Daniel Hogan, Brian Kasprzak,

20   Marty Murray, David Klauder, Andrea Marino, Irwin Zandman and

21   Beau Harbour.

22          I'll take entries in the court please.

23          MR. BERNICK:  David Bernick for W.R. Grace, Your

24   Honor.

25          MS. BAER:  Janet Baer for W.R. Grace.

1          MS. BASTA:  Amanda Basta for W.R. Grace.

2          MR. FINCH:  Good morning, Your Honor, Nathan Finch

3  for the Grace Asbestos Claimants' Committee.

4          MR. HURFORD:  Good morning, Your Honor, Marc Hurford,

5  Campbell Levin on behalf of the Official Committee of Asbestos

6  Personal Injury Claimants.

7          MR. ANSBRO:  Good morning, Your Honor, John Ansbro

8  with Orrick Herrington for the Future Claimants'

9  representative.

10          MR. BUSBY:  Good morning, Your Honor.  Leonard Busby

11  for the MMWR firms.  Thank you, Your Honor.

12          MR. ESSERMAN:  Good morning, Your Honor.  Sander

13  Esserman on behalf of various firms.

14          THE COURT:  Mr. Bernick, I think I -- before we

15  start, I owe you an apology.  I understand that I gave you a

16  misdirection in terms of restaurants.  That the place I was

17  trying to send you was in fact in a Marriott Courtyard and the

18  name was something like the Sedona Grill, but I -- yeah, so I

19  apologize if you didn't get home because I was giving you a

20  misdirection.

21               (Counsel is difficult to hear)

22          MR. BERNICK:  I was more interested in the martini

23  than the food anyhow.  I just took the shortest distance

24  between two points and it's here and a bar and then I went up

25  to the airport.


                    **J&J COURT TRANSCRIBERS, INC.**

1        Your Honor, I think that there are three -- but I

2   appreciate at least the thought and the sympathy for an out of

3   towner here.  Your Honor, there are three matters that are on

4   the agenda for this morning.  I think one is substantial, it's

5   the first one.  And that relates to the supplemental order to

6   motion to compel and is also basically to take up the

7   interrogatories that we talked about a couple of hearings ago.

8        The second is the status on the asbestos personal

9   injury case management scheduling.  That's the question of our

10  request as we outlined last time very briefly, we pushed back

11  the dates for the expert discovery by 30 days so that we could

12  incorporate the materials that are still coming in.

13       And then finally, we have a continuing issue with

14  getting an order entered with respect to Your Honor's denial of

15  the request by Baron and Budd to stay for the clients

16  (indiscernible) order.  So those are the three matters.

17            THE COURT:  I'm sorry.  What was the last one?

18            MR. BERNICK:  Last one, Your Honor ruled, denied the

19  request to stay from the clients as filed by Baron and Budd,

20  denied the request to allow essentially facilitate the

21  prosecution of the appeal of that order.  Those denials took

22  place a while ago, but we have not been able to get an

23  agreement on an order.  And that really ends up focusing on the

24  question of their being, what language is used to

25  (indiscernible).

**J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  Oh.

2          MR. BERNICK:  So there is a question in fact the

3   aspect of that (indiscernible) aspect of that order.

4          The x-ray clients order I'm hoping we can also

5   resolve today.  It's not on the agenda.  (Indiscernible) are

6   here, counsel's here.  We might be able to get the order for

7   the clients.  So that's an important matter not actually on the

8   agenda.  And I guess we'll see whether that's something we can

9   pick up.

10         What I'd like to do is to address the first question

11  and it is the question we have for Your Honor --

12         THE COURT:  Pardon me.  Whoever's using a Blackberry,

13  whether it's on the phone or in court, please stop, because

14  we're getting the buzz feedback from that use.  I'm sorry, Mr.

15  Bernick.  Folks, please, whoever's using some Palm Pilot or

16  device, please stop so that we do not get that buzz on the

17  phone.

18         MR. BERNICK:  (Indiscernible).

19         UNIDENTIFIED SPEAKER:  I believe we're all turned off

20  on this side of the room, Your Honor.

21         MR. BERNICK:  Maybe (indiscernible) I guess even mute

22  button --

23         THE COURT:  No, for whatever reason, I don't know

24  why, but these phone systems pick up that signal when people

25  are trying to send messages on the Blackberries.  So does

1  everybody have them turned off in the courtroom?  Court Call

2  operator, please, are you able to identify where that signal

3  comes from?

4         OPERATOR:  I am not, because some of the people,

5  their lines (indiscernible), so I can't tell whether it comes

6  from or not.

7         THE COURT:  I really -- I apologize, but

8  participating in phone conferences is a privilege, it's not a

9  right.  And if you cannot comply with this order, I'm going to

10  terminate the phone call.  I'm not going to have people

11  disturbed in court by what I consider to be rude behavior by

12  people participating on the phone.  If you're so uninvolved in

13  the proceeding that you find it necessary to use your

14  Blackberry rather than listening in, then please go use your

15  Blackberry, but stop your participation in the phone

16  conference.  And if you cannot do that, then I will simply have

17  the entire phone conference shut down.  So for the sake of all

18  of your co-participants, please terminate the use of the

19  Blackberries, and it's the last time I'm going to ask.  I

20  apologize, Mr. Bernick, please go ahead.

21         MR. BERNICK:  I'd like to address the Court from here

22  --

23         THE COURT:  You could, but is the microphone on?  I'm

24  having a lot of trouble hearing you.

25         MR. BERNICK:  Now it is.


**J&J COURT TRANSCRIBERS, INC.**

1            THE COURT:  Okay.  Thank you.

2            MR. BERNICK:  Thank you.  Your Honor will recall that

3    about two hearings ago in light of the continuing issues

4    surrounding the production of the B-reads question of this

5    ultimate (indiscernible).  We proposed to the Court that rather

6    than have back and forth motion practice, that we would propose

7    a set of interrogatories for the Court to take a look at and

8    approve so that we could on a consistent basis obtain the

9    necessary information surrounding the continuing issues as

10   concerning the consulting experts.  We committed to draft those

11   up, circulate them, get comments, see if they were all

12   (indiscernible), we just had to consult the Court.

13   We've gone ahead and done that.  We've circulated most

14   interrogatories, we've gotten comments.  I don't know, but I

15   believe that they've also been furnished with the Court and I

16   hope the bulk of my time actually going through that set of

17   interrogatories so that we can take them up one by one.

18            I do want to lay out the very important principal

19   that drives our request for these interrogatories and that

20   animates what we believe to be the pure justification for these

21   interrogatories.  Because I don't believe that the purpose of

22   these interrogatories is properly being understood.  The

23   purpose of these interrogatories is not to embark upon a whole

24   new round of motion practice with respect to whether people are

25   going to produce the B-reads or not.  We have basically spent

1  weeks and weeks and weeks trying to get the B-reads.  We've

2  gotten multiple orders from the Court, the deadline was

3  established last time or the time before for the significant B-

4  reads.

5       The essential purpose of these interrogatories is to

6  -- I don't know if there's an echo or what.

7       THE COURT:  Yeah, I have no idea.  Folks, can you

8  please put your mute buttons on while you're not speaking,

9  because we're still getting feedback.   Not the Palm Pilot

10 feedback, but just plain ordinary feedback this time.  I think

11 that did it.

12       MR. BERNICK:  So the purpose of this is not to

13 initiate a whole new round of motion practice.  The purpose of

14 this is basically to get the basic evidentiary facts, the

15 permissible facts regarding what has been done, what has not

16 been done to produce B-reads that are subject to this claim of

17 privilege.  And more broadly, what has been done and what has

18 not been done with respect to other aspects of the compliance

19 with the Court's order.  It's too late for people to continue

20 to submit information.  We don't have the time, they don't have

21 the time.  It's too late for a more prolonged effort, we've

22 been through repeatedly.  There's not a single aspect of

23 discovery that we've requested, it's not been the subject of

24 multiple motions, multiple orders.  The time has come, as Your

25 Honor has recognized, for deadlines.

1        But we do need to know now exactly what the state of

2   play is.  That is, what has been produced, what has not been

3   produced.  And that is the essential purpose of these

4   interrogatories, which is to make that record.  Because the

5   record right now is robust in a lot of ways, but it's also a

6   clean plate.

7        I'm going to go through just the highlights of the

8   record very briefly.  I know Your Honor is very familiar with

9   them, but just to review where we are, because I think that

10  frames and underpins the very specific request we're now making

11  with these interrogatories.

12       First, let's talk about noncompliance generally.

13  With respect to the questionnaire, there are numerous areas

14  where there -- as been and the Court's already to a certain

15  extent (indiscernible) with this, just basic noncompliance.

16  There's been a failure -- and we're not talking about a process

17  -- and I'm showing what we will ultimately mark as Court

18  Exhibit 1 or Debtor's Exhibit 1, the basic time line chart

19  which captures the 20 months that have been spent trying to get

20  answers to these interrogatories.

21       There was the Court approved questionnaire initially

22  in August of '05.  As Your Honor will recall, there were then

23  -- the questionnaires were served, there were multiple

24  deadlines that were imposed dating all the way through July of

25  '06.  Then there was the opportunity for supplementation, final

**J&J COURT TRANSCRIBERS, INC.**

1  supplementation was March.

2       So 20 months have passed.  Your Honor repeatedly,

3  during the course of that process, this is the August 21st

4  posted transcript Page 162 said that even while the new motion

5  practice with respect to objections was going to be heard out,

6  Your Honor did not anticipate that there were going to be major

7  areas that would change.  So you basically said, and you said

8  this repeatedly, "So folks, get it filled out and get it

9  returned.  It's no longer just the debtor's mechanism for

10 asking for something for estimation, it's now formal

11 discovery."  That began right in the middle of the process and

12 on an ongoing basis.  These were Your Honor's very clear

13 instructions.

14      We then have as Exhibit 2, another chart which was

15 shown previously in a prior hearing to this.  It relates to

16 other aspects.  How many people actually responded to PIQ?  We

17 have a lot of people who simply failed to respond to

18 PIQ.  We had a total of 79,000 people who actually submitted

19 POC, that is people who were on the claims database.  They said

20 this is all being done with respect to those people who had a

21 claim filing as of the date that the bankruptcy was filed.  A

22 snapshot of the claims inventory at that point in time.

23      We asked for a bar date, we obtained a bar date.  A

24 total of 79,000 people actually submitted a POC where their POC

25 matched to our prior database, that is, these were people in

1  the claimant population, so we can see that the total number of

2  people who had claims now shrinks by those who actually filed

3  the POC and then shrinks further when we get to the question

4  of, well, did they even fill out a questionnaire, because many

5  people failed to fill out a questionnaire.

6            The next problem that we had is that they didn't

7  answer the questions.  As this chart well illustrated, nobody's

8  provided any contrary information they have the same basic

9  databases we do, only 1200 claimants actually went ahead and

10  answered directly, 1200 claimants, this is somewhere in the

11  area of one, two percent actually answered questions directly

12  that are key questions in the case.

13            Your Honor will the recall that there was a

14  controversy over whether people could simply supply

15  attachments.  Your Honor issued an attachment order that gave

16  the respondents the latitude to provide the information by way

17  of attachments.  And Your Honor will recall this all emanated

18  from a hearing that took place in September of '06.  Your Honor

19  yourself went through this, this is Page 164 of the September

20  11, '06 hearing.  Your Honor yourself looked at some of the

21  attachments and you spent another hour trying to figure out how

22  the attachment actually answered the questions.  Your Honor

23  then further said that under these circumstances, attaching

24  thousands of documents -- this is Page 162 -- is not

25  appropriate response.

1        As a consequence, Your Honor then entered an order

2   that said very specifically, the response must reference

3   clearly -- this is the order entered at Paragraph 2 -- must

4   represent clearly the specific pages of the document so that

5   the debtor understands which pages of the attachment provides

6   the answer to a specific question on the questionnaire.   Cases

7   that do not include an answer should not be referenced.

8        So we then went through the process of actually

9   determining, well, there are millions of pages of attachments,

10  who actually supplied an attachment that complied with Your

11  Honor's order.  And this all played out in the last few weeks.

12  As it turns out, they then make a request that the Russ

13  database be supplemented by all those answers.  And then it

14  turns out that there about -- there's only one firm that

15  actually did something that was even close to complying with

16  the attachment requirements, and that information that was

17  supplied was so minimal, that the folks here on the other side

18  of the room said don't even bother, it's not worth it.

19       So now when you combine these two things, that is

20  they didn't answer the question directly, they didn't comply

21  with the attachment order.  What that then means that if you

22  take this chart, there literally are only 1200 people, the same

23  people that are on Exhibit 2 at the end, who actually provided

24  by way of answering the question or by way of submitting an

25  attachment in compliance with Your Honor's order.   There are

1  only about one to two percent of the entire pre-existing claims

2  population that actually have done that.  Absolutely stunning.

3  Absolutely stunning after 20 months after repeated promises and

4  their promises made left, right and center, oh we're going to

5  do it, then we're going to supplement, weeks and months, hours

6  and hours of the Court's time.  We have a situation where these

7  people, didn't on the face of it comply with Your Honor's order

8  and there's no dispute about that in the case.

9         Now we are analyzing the attachments ourselves on

10  eight sampling pages to determine is there any way that we can

11  determine that even with respect to the sample, what

12  information they supplied.  So going beyond the face of the

13  questionnaire and going beyond the attachment of the -- the

14  requirements to the attachment order, we even ferreted out, and

15  we've been compromised in the process because we would like to

16  have the full thing, but the sample is there.  And Your Honor

17  will hear, as our expert reports are being filed, how even with

18  our own review page by page of the attachments, they're vast

19  reaches of information that just do not exist.

20         So we will be submitting to the Court that the

21  noncompliance is there because the information is not in in

22  their hands, they won't have the information to support the

23  claim.  But I'm sure they will contest that, therefore it's

24  very, very critical to inform Your Honor's decision about what

25  inferences to draw  from the fact that there's been a pattern

1  of massive noncompliance which Your Honor's orders, what

2  inference should be drawn from that with respect to the others?

3          We then get compliance with the x-ray order.  And Mr.

4  Esserman, who is with us, kind of a halo in the back of the

5  room, can come and sit up at the tables and join the rest of us

6  anytime.  But we're happy to have you here in any respect.  Mr.

7  Esserman actually proposed a solution to the x-ray compliance

8  issues.  On December the 5th of '06, Page 88, Mr. Esserman

9  actually proposed, "So if they want copies of the x-rays, we

10  can provide some sort of signification or verification from the

11  service.  It says there is an x-ray that that is a duplicate of

12  the original."  And then there's all kinds of good will and

13  harmony, it's near Christmas, we're going to get it all done.

14  Mr. Esserman said, "Actually, and we intend to do that with the

15  folks that I represent, I suspect the other's will also, so we

16  think that this is an easy solution.  Thank you."

17          Well, what ultimately happened was that out of the

18  total, these are people who said in their questionnaires that

19  the basis for their claim, that malignancy, malignant claims

20  were actually asbestos related, like lung cancer was asbestos

21  related as opposed to being smoking related.  These are people

22  who made that claim.  There are a total of 6740 people who said

23  our evidence that the lung cancer was due to asbestos related

24  -- asbestos exposure, is the x-ray evidence.  Of those,

25  approximately only half -- less than half -- 3101 actually

1 submitted both an x-ray and the easy answer in the statement,

2 the x-ray, was, in compliance with the language that Your Honor

3 approved, for all practical purposes, the same as the original.

4       So even following through on Mr. Esserman's

5 suggestion of what the firms ought to be able to do, we again

6 see massive noncompliance, the absence of information, however

7 you want to characterize it.

8       Now I know the consistent theme here has been, we're

9 going to hear from Mr. Musky (phonetic) today, we've heard from

10 Mr. Ramsey before.  Well, that's not us.  There are some

11 claimants who have complied.  There are some respects in which

12 that is true.  We are not making this statement about

13 everybody.  We're making this statement about vast reaches of

14 the claimant population.  Vast reaches, and again, Your Honor,

15 has heard nothing to the contrary here.

16       We then get to the last fact, which we have, respond

17 to the PIQs, many did not.  One or two percent actually

18 complied with the PIQ request -- complied with the PIQ

19 directions, either answered them directly or submitted

20 attachments in compliance with the order.  And then we have

21 roughly 50 percent compliance with respect to the x-ray order.

22 Now there is a big fuss here that I'm going to fill in in a

23 minute which is the subject of one of our interrogatories.  But

24 let me take a pause and go to the B-reads, because the

25 B-reads were the immediate cause of our coming back here for

1  the interrogatories.

2        With respect to the B-reads, we have once again had a

3  massive effort to obtain client's report orders and as the

4  chart indicates, again, we have massive problems with

5  compliance.  First of all, what about people who really, after

6  all the motion practice was done, Your Honor entered an order,

7  people did nothing.  They didn't certify, they hadn't complied,

8  they didn't produce anything new, or people who actually never

9  even responded to the motion to begin with.  This was the old

10 category three.  These are the people who essentially had done

11 nothing to indicate exactly what was being withheld, if

12 anything, and what was being turned over, if anything.  There

13 was simply silence from these people.  And what we'll see, and

14 this is Exhibits 3, 4 and 5, is the overwhelming bulk of the

15 claims, what people who did file a POC and did file a

16 questionnaire.

17        So we're now into the population of people who as we

18 went through on Exhibit 2, these are people who are in the

19 databases as having claims on file with Grace as the date of

20 bankruptcy.  They filed a proof of claim and they filed a

21 questionnaire.  Is it a compliant questionnaire?  No, but they

22 filed a questionnaire.

23        With respect to these people, how many of them

24 actually went ahead and complied or did something, gave some

25 certification with respect to D-rings.  Well, Exhibits 3, 4,

22

1 and 5 list all the firms who fall into the category, old

2 category three, this is Exhibit 3.  The Ferraro law firm, there

3 are approximately 6384 matches.  By that I mean, these are the

4 people who are on the Grace database, filed with the DOC,

5 submitted the questionnaire.  That's what a match means.  There

6 are 6300 of those.  There was no response filed with our motion

7 to compel with respect any of these people.

8         Kelly and Ferraro, 20,280.  No response, even

9 promotions.  Silver Pearlman, 3165 matches, no supplementation

10 was offered.  After all of the motion practice, there was no

11 supplementation and no representation there had been a

12 compliance with Your Honor's orders.  In fact, this is one of

13 the firms that decided to ask for the appeal.

14         The offices of Alwyn Luckey, 333 matches.  No

15 response to the motion.  Naples and Lomax, 455 matches.  No

16 response to the motion.  They previously stated they provided

17 copies of plaintiff's medical records before, it's in their

18 possession, but no indication of whether they had withheld any

19 or what the basis of the withholding was.

20         As reflected in Exhibit 4, Weiss and Luxemburg, no

21 supplementation, they had 996, almost 1,000 matches.

22         Trevose Humphrey, 577 matches, no supplementation.

23 Williams Bailey, 133, no supplementation.

24         MR. HERRICK:  Excuse me, counsels.  Your Honor, this

25 is John Herrick.  I would like clarification on what counsel is

1  referring to when he references the matches number.  Because I

2  don't understand that.

3      MR. BERNICK:  Well, I've said it once, I'll say it

4  again, I'll say it for a third time if you would like.  It is

5  people who have a claim that was a precondition claim pending

6  as of the date of the bankruptcy according to the database the

7  Grace maintained -- excuse me -- has been turned over in the

8  case.  Those are the people who were then the subject of the

9  bar date who had to file a proof of claim if they wanted to

10 preserve their claim and only a portion of those people did

11 that, about 79,000 people did that.

12      And then those same people were to fill out the PIQ

13 because that was their obligation per the Court's orders.  A

14 match refers to a claimant who is both a pre-petition claimant,

15 filed a proof of claim pursuant to the bar date and submitted a

16 PIQ.  So these are all people with respect to whom they are in

17 the population that we're studying who actually preserve

18 whatever rights they have under our order and were the subject

19 of the Court's orders with respect to the questionnaire and

20 with respect to the B-reads.  That who the matches are.

21      MR. HERRICK:  All right.  Thank you so much, counsel.

22 Sorry to interrupt.

23      MR. BERNICK:  No problem at all.  Baron and Budd,

24 4759 matches.  They submitted some supplemental materials that

25 look like they're basically efforts to supplement their

1 original supplementation.  They had not made any representation

2 about whether they have supplemented to include the new B-reads

3 and B-reads that they have submitted post-date the initial

4 diagnosis, they're not the ones that Your Honor order be

5 produced.

6        We then have LeBlanc and Waddell, 303.  No

7 representations regarding supplementation which is Exhibit 5.

8 Supplemental materials of positive B-reads with post dates

9 again, the same situation.  Then Mr. Herrick's firm, Motley

10 Rice, no supplementation.  They have stated upon information

11 now as we believe, Motley Rice is not in possession of any

12 documents pursuant to the language in this Court's order, it

13 would be required to disclose.  So we have, on information and

14 belief, we don't think that we have any of these documents.

15 That is 3779 matches with respect to all of these different

16 claimants and all of these different terms, we have no knew

17 information, no certification of compliance, no representations

18 on what is still being withheld.  We basically have silence.

19        Now they're not the only ones.  By the time you get

20 to this, it is some very, very large percent -- I haven't done

21 the calculation -- of the total population of people who have

22 gotten to the point where (indiscernible).  But still, after

23 all this big hulabaloo and all of these objections that are

24 being made, and then Your Honor says, no, I disagree, you've

25 got to produce the stuff, and then there's nothing there.

1            What about the problem of no privilege review?  This

2    is again a problem that we now have gotten state on the record.

3    We have a series of firms, this is Exhibit Number 6, Williams

4    Bailey is one.  We have these form objections on grounds of

5    privilege, and they said -- this is, they all read the same way

6    for a number of firms -- pursuant to rule -- civil procedure

7    26D-4 -- E-4.d, claimants object to the discovery and the

8    questionnaire to the extent that these disclosure of facts

9    known or opinions held by any expert who has been retained or

10   is especially employed in anticipation of litigation.  We've

11   got this generalized objection.

12           We have the same thing from the Motley Rice firm,

13   this is Exhibit Number 7 basically says the same kind of

14   blanket objection.  Then it turns out -- and this is Exhibit 8,

15   Page 4 of Motley Rice's response to the motion to compel -- it

16   turns out that with all of these assertions of privilege,

17   privilege, privilege, it turns out that it's not even apparent,

18   indeed it's apparent that there was not any kind of actual

19   review of documents such that there was actually a privilege,

20   it was recognized with respect of any particular document.

21   This says, upon current knowledge, information and belief,

22   Motley Rice is not in possession of documents pursuant to the

23   language of this order we'll be required dismissal.

24           Essentially, you've got a court order, we're supposed

25   to certify compliance, but, you know what, we haven't actually

1  taken a look at the documents to see whether we are in

2  compliance.  All we can say is, upon information and belief.

3  Lawyers, clients or the Court subject to court orders can't

4  simply say, well I'm not going to do an investigation and

5  belief with respect to the documents in my own possession,

6  custody or control, I think that we are in compliance with Your

7  Honor's order.  That was (indiscernible).

8         And then Mr. Herrick at Page 91 of the hearing that

9  was held subsequently to that actually acknowledged very

10  candidly to the Court what the situation was.  Let me explain

11  it, Your Honor.  We just heard an objection related to

12  privilege and we initially responded to those questionnaires.

13  Privilege was asserted in each and every case because the

14  questionnaire on it's face calls for privileged information.

15  But the question is may implicate privileged information, but

16  you don't know that the privilege exists until you see whether

17  there's a document that falls within the scope of it and then

18  you assert the privilege with respect to that document.

19         He then goes on to say, "That doesn't necessarily

20  mean there is privileged information in each case and let me

21  tell you why."  So we now have -- we've gone through this whole

22  process, and not only does he not review it, the firm has not

23  reviewed its own files, they don't even know that a privilege

24  exists.  This most unbelievable statement that they don't have

25  to comply with Your Honor's order and then to assert in this

1  process and have us go down the road of litigating a privilege

2  that they don't even know is real with respect to those

3  documents is an outrage.

4          THE COURT:  Do you have copies of all of these

5  exhibits somewhere that you're using?

6          MR. BERNICK:  We're going to submit copies of all of

7  these exhibits to Your Honor because we want to be brief.  In

8  most cases I've given you, to the extent that we're citing

9  docketed items like the hearing transcripts et cetera, I've got

10  the citation, we will also give the quote.  The documents

11  themselves we will furnish to the Court this afternoon.  They

12  all come from the plaintiff's own files.

13          What about specific claims of privilege?  Your Honor

14  said and said specifically when we last discussed this, and

15  this is transcript Page 91 of the April hearing, "I expect

16  every other law firm who has any client who's going to follow a

17  claim in this case to comply with these orders.  That is the

18  end of this story.  I expect the compliance, that's it."  I

19  don't have any objections by any firm on behalf of a specific

20  client identify the reason why a client is not complying.  If I

21  had that, I would certainly be willing to consider it, but I

22  don't.

23          I have broad-based objections that are essentially

24  meaningless because I can't pin them down to anything specific.

25  I don't know whether their particular objection applies for a

1  specific client or not because I don't have anything that pins

2  it to a specific client and that's not sufficient.  That is the

3  basic problem.  They didn't review the documents, they made no

4  specific claims of privilege as to particular documents, it was

5  this blunder bust that occurred and then after they lost,

6  silence.  Oh, well, we don't know if there's anything there.

7          And it's also apparent -- and this is the last item

8  here -- that they made no actual search.  This is the key thing

9  that is new.  They didn't make a search.  The order

10  specifically says that the initial screen -- that is this is

11  the attachment order, the supplemental attachment order -- says

12  that with respect to the other medical professionals who first

13  screened a claimant, that is, prior to the time that any other

14  diagnosis of an asbestos related disease or injury is sought

15  are not consulting experts.  Furthermore, B-readers and other

16  medical professionals to examine the claimant prior to the time

17  that when the client relationship was established are not

18  consulting experts.

19          So to determine compliance with this order, to go

20  back and look for and identify and produce the first screen,

21  the time of the initial diagnosis and then any subsequent

22  screen that took place before there was retention by the law

23  firm that was at issue.  What's key is that that did not take

24  place.  We now see the meaningfulness of the certifications

25  that were provided by some of the firms and what this means.

1            Exhibits 9 and 10, these are just the same law firms.

2   Remember our original Category 1 when we said all kinds of good

3   things about these people have given us the certification of

4   compliance?  The certification of compliance didn't match what

5   Mr. Kazan told me over the phone.  He said, we don't have

6   anything -- it's all been produced, it's all been produced,

7   nothing is being withheld.

8            Well, what actually happened though, was that the

9   certification that was supplied to us didn't go that far.  They

10  said our firm has not withheld.  Our firm.  So what they're

11  really saying is, we don't know -- just like Mr. Herrick -- no

12  search has been made.  He may have looked at his own files, but

13  no search has been made for what was happening at the time of

14  the original screen.  We're only making representation with

15  respect to the screens that were done while it was on our

16  watch.  That's not compliant with the order as we're going to

17  talk about in a minute and is massively -- it undercuts the

18  entire process that we're dealing with him.

19           Now we know, we know that there are documents that

20  are out there that do fall within the scope of your order

21  relating to these firms that have not been produced to us.  And

22  the only reason we even know about these is that we were

23  successful after unbelievable efforts in getting some discovery

24  of some of the doctors.  And some of those doctors happen to

25  have the files relating to some of the same claimants that

1  we're talking about here.  So we're kind of going out there and

2  we got lucky with respect to certain of these things because it

3  actually -- take for example, this would be Group Exhibit 11.

4          This is from the PIQ for an individual with the last

5  social security numbers 5621.  It is a report by Dr. Graziano

6  dated August 28th of 2000 with respect to this individual.  It

7  says, I took a look at an x-ray dated August 10th of 2000.  He

8  says, my opinion, reason to believe are due to asbestos pleural

9  disease.  He makes a positive finding.  The B-read -- the PIQ

10  also -- and this is in connection with Baron and Budd -- that

11  also on July 30, 2001 confirms that with respect to this

12  individual, chest x-ray of 8/10/00, that's the same one, and

13  basically gives another report that says this guy -- this

14  individual has got evidence on x-ray or asbestos pleural

15  disease.

16          So this is what was produced to us as part of the

17  PIQ.  It turns out the same doctor that -- this is an

18  individual where -- that can't be a consulting expert anymore.

19  He's the guy that they're relying on for their PIQ.

20          The same doctor, Dr. Graziano, on August 28th of 2000

21  -- I'm sorry, that's the wrong one -- on December 19 of 1999, a

22  few months before, saw exactly the same individual's x-ray, an

23  earlier x-ray dated November 16 of 1999 could just the prior

24  year, a few months before, and this is a

25  79-year-old individual -- he is seen by the same doctor who

1  found it to be negative.  Negative.  Who's firm was this done?

2  P & U, Provost and Umphrey, another one of Mr. Esserman's

3  clients who has told us absolutely nothing in response to this

4  order.

5        So here we have an individual where they themselves

6  are relying upon this doctor for a subsequent B-read, he now

7  reads it being positive a few months after the initial read

8  which he says is negative when he's acting for another firm.

9  Seventy-nine-year-old individual, this is not something that

10  all of a sudden -- it's not years later, it's months later.

11  Why wasn't this produced?  It wasn't produced because Provost

12  Umphreys didn't look for it, it wasn't produced because Baron

13  and Budd didn't go to exactly the same doctor and say, well,

14  what else do you have?  Remember, Your Honor ordered with

15  respect to the questionnaire, any consistent diagnoses rendered

16  by the doctors are totally on board because they're the essence

17  of our issue with this type of (indiscernible).

18        We have another thing with respect to Cooney and

19  Conway.  These are Exhibits -- part of Exhibit 12 -- and Cooney

20  and Conway submits a report by a Richard Bernstein dated March

21  25, 1999.  Dr. Bernstein finds that it's positive, so that's

22  part of the PIQ.  We then, through discovery of Dr. Altman find

23  that in 2003 the same individual, 2003, August 1 of 2003, there

24  were no pleural abnormalities.  Well, why wasn't this produced?

25  Why wasn't this found out?

1          MS. BYRNE:  Judge, this is Kathy Byrne from Cooney

2    and Conway.  I would like to state our objections to this line

3    for the record.

4          MR. BERNICK:  Okay, we furnished, and we were asked

5    by Ms. -- I'm sorry, I forget your names counsel -- we were

6    asked by counsel for Cooney and Conway last night to make a

7    copy of this and we did.  We also asked them to state to us

8    what their answer to it was so that we would have that

9    information here in court.  I don't believe that we

10   (indiscernible).

11         MS. BYRNE:  Judge, I was in the office until about

12   6:30 last night and I had not received it.

13         MR. BERNICK:  In any event, that is the information

14   which we received from Dr. Altman.  If counsel's got some

15   explanation for it, that's fine.  But this is actually a

16   subsequent x-ray, there's no indication of it's being for

17   consulting purposes at all.  And it's not identified, not

18   produced, and it's negative, and it's much more recent, it's

19   four years after the fact.

20         So what is it that we have?  We have a problem with

21   respect to the clients with Your Honor's orders because the

22   information on the objections has not been produced.  And it

23   goes beyond that.  Because we now know that he problem is more

24   fundamental.  The plus factor here is shocking.  It has been

25   our contention in this case that x-rays were shopped to doctors

1  in search of a positive diagnosis.

2         Now Mr. Lockwood, in October of 2005, October 24,

3  2005, at Page 80, in connection with an argument that was made

4  by Ms. Harding, this is back at the time we were asking for all

5  this information, he expressed outrage that, "Well, there's not

6  a word in any of the pleadings that Grace has filed, in

7  newspaper articles, that suggests the problem of shopping

8  B-reads arises not when a single firm they shop a B-reader out

9  multiple doctors, but when they're in effect laundering the

10  shopping, having one firm do the shopping and then in order to

11  make a claim, another firm.  She just made that up as far as

12  this record is concerned."   Now he's very careful when he says

13  as this record is concerned.

14         Well we now have made efforts to get every step

15  stymied by all of the firms that we're talking about here, that

16  is the ones that I have listed so far.  I've not said that

17  every single firm did this.  And the record most clearly is

18  there, and the reason why is very apparent.  Exhibit 16 is a

19  book that came out in 1992 called "Pathology of Asbestos

20  Associated Diseases."  The principal editor is Victor Roggli

21  who has acted as the plaintiff's expert in these cases.  And

22  Ron Motley and Charles Patrick wrote an article, a very well

23  known article, "Medical, Legal Aspects of Asbestos Related

24  Diseases."  Kind of (indiscernible.)

25         What Mr. Roggli writes is this, "Under the rules of

1  civil procedure, a party may use a favorable lung burden

2  assessment as evidence while suppressing, suppressing as

3  undiscoverable work product an unfavorable report.  The extent

4  to which unfavorable lung burden assessments are not revealed

5  by the parties demonstrates the potency of such reports at

6  trial.  So basically it was the view apparently of Mr. Roggli

7  and others that it was totally legitimate to suppress negative

8  B-reads and as a result they fully explored -- we know that

9  because it comes from Mr. Paisley (phonetic).  This is

10 testimony that Your Honor's familiar with, I'm not going to

11 reveal any details of Exhibit 14.

12      September 25, 2002, Mr. (indiscernible) then

13 testifies before the judiciary committee on litigation

14 screening, the driving force behind the problem.  Litigation

15 screens that have absolutely nothing to do with medicine.

16 Their device would be including claimant's clients.  And he

17 goes on and on.  The results of such screenings are totally

18 unreliable, that is why the Court oversees all federal asbestos

19 litigation now dismisses all claims that are based upon that

20 screen.

21      We had very, very good reason for inquiring into this

22 because we had -- from the plaintiff's own mouth, people

23 (indiscernible), the lawyers who represent the plaintiffs in

24 this case that this shopping had occurred.  We now know it has

25 taken place.  We've seen -- we've provided just the examples

1 that we furnished to Your Honor, and then even more broadly,

2 but still not sufficiently, we have the following, which is

3 what Mr. Esserman represented to the Court on the sixth in this

4 brief.  That with respect to the B-read situation, counsel

5 understands that all or most of these six firms, that all they

6 produced or will produce prior to April 3, all documents as to

7 which production is such (indiscernible) the motion.

8        Now it turns out that -- of course he had three other

9 clients who we recognize were not going to do anything, that

10 was Baron and Budd, LeBlanc and Waddell and Silver Pearlman.

11 But there were six that he said were going to comply.  Well it

12 turns out that three of them did not.  Provost Umphreys did

13 not, Weiss and Luxemberg did not (indiscernible) did not.

14 Thousands, ten of thousands of claims.

15        With respect to the remaining three, it's very

16 interesting.  The Reaud, Morgan and Quinn firm only has 16

17 matches in the case.  They supplemented one questionnaire that

18 doesn't appear to be responsive to the issue before the Court.

19 This is through the 15th.

20        We had two other firms, the Angelos firm and the

21 Foster and Sear firms.  Angelos firm has 6158 matches.  That's

22 their claiming population with PIQ in our pre-existing -- pre-

23 bankruptcy database.  They only provided supplementation for

24 537 of those claimants.  But once the supplementation was

25 provided, what did it show?  Well, 540 out of 537 had negative

1  B-reads.  So we now know that these documents that were

2  produced pursuant to Your Honor's order, we now know that there

3  were multiple B-reads taken of these people, they produced the

4  positive ones.  They said, oh, we're relying on the positive

5  ones and they didn't produce the negative ones.

6          Foster and Sear, they got 700 matches.  By the

7  supplementation for 180, a full third of the 180 were negative.

8  So we clearly have, clearly, clearly have a situation both by

9  the admission of counsel in this case, that they felt it was

10 totally legitimate to provide the negative evidence both by the

11 way that the review has been conducted or not conducted that

12 they would make specific claims, and now by virtue of the

13 documents that have been turned over, we have a massive problem

14 with this case, that they presented the best side of their

15 claims in the PIQs and they have withheld and continue to

16 withhold documents that completely undercut their statements

17 that these B-reads are reliable.  Mr. Kazan called it the way

18 it was.  These B-reads are not reliable and they still don't

19 come clean on the scope of the problem that they had.

20         This then brings me back to the last point before I

21 go to the interrogatory (indiscernible).  And that is a B-read

22 problem.  The fact that nobody went back to the original

23 doctor's files and looked for what the doctor said now effects

24 the entirety of the compliance effort with respect to the

25 questionnaire.  What do we know about that?  We know that first

1  of all, the questionnaire was very, very specific and clear

2  about this.  We said -- and this is Page 246 and 220 of the

3  July 19, '05 hearing -- it's a hearing in which we went over ad

4  nauseam the questionnaire back in '05.  We said specifically we

5  want to know all of the diagnoses.  We don't want to have this,

6  well, we go a little bit here because it's good, but they don't

7  tell us the part that is bad.

8          We want to know all of the diagnosis, different

9  doctors, different times, different conditions.  We said

10 specifically in Page 220, and it's counsel stating this, "That

11 the question is whether this is a shell game now.  We want to

12 know the basis of their claim, we want to know the medical

13 data.  And now they say, oh, well, gosh, don't get it from us,

14 go conduct discovery."  And you say, "Go ahead and do that, but

15 in this case it will bog down."  The whole point of this matter

16 is lawyers have access to their doctors.  These doctors, day in

17 and day out, they do business with them.  (Indiscernible) they

18 can get this information.  But we made claim what our purpose

19 was.

20         And as Your Honor determined after extensive argument

21 -- now this feature of the questionnaire did not change later

22 on -- it says -- well, we've already said -- this is now

23 talking about exposure -- "We've already said on the medical

24 information, but this is going beyond the medical, it seems to

25 me, Mr. Bernick, it would be fair to simply say that you or

1  your counsel have to take out the reasonably (indiscernible)

2  claims and make this a continuing duty, if something comes up

3  they'll have to produce it."  And it says, "Well every one of

4  these people is going to tell us, oh, we don't have it in our

5  office, it's at the doctor's office and we can't possibly get

6  it.  That's exactly what they're going to say."  And Your Honor

7  said very clearly -- and this is now with respect to the

8  exposure, "Well, it seems to me that if it's from the doctor's

9  office, the doctor is the agent of the patient in this instance

10  just like the attorney is.  That's clearly in the patient's

11  custody or control if not testimony.  That was Your Honor's

12  determination at that time.

13          That message sunk in, because Mr. Lestman (phonetic),

14  who came to court on August the 25th, got the message loud and

15  clear, and this is Page 136, "Our impression from where the

16  Court was coming from was that the questionnaires would go out

17  to the attorneys and also to the claimaints and it would ask

18  the medical information from the claimants' doctors and that

19  that information is there to be produced with the language we

20  have submitted that clarifies that."  So it's recognized.  And

21  Your Honor underscores on the next page in response to this

22  colloquy, "What you have to do is produce what you have or what

23  your agent has."  This is completely in accordance with Third

24  Circuit law.

25          The case of Mercy Catholic Medical Center decided by

1 the Third Circuit in 2004 says that when it comes to the

2 question of who has to produce what under Rule 24, so long as

3 the party has the legal right or ability to obtain the

4 documents from another source at the time of demand, that party

5 is deemed to have control.  And that is exactly what you have

6 with respect to a claimant and the claimant's doctor.  As a

7 consequence, the questionnaire itself was framed in just this

8 way.

9        The questionnaire said, with respect to diagnoses,

10 the following, "If you have been diagnosed with multiple

11 conditions and/or if you received diagnoses and diagnostic

12 tests relating to the same condition by multiple doctors,

13 please complete a separate Part II for each initial diagnosis

14 and any previous or subsequent diagnosis or diagnostic test

15 that change or conflict with the initial diagnosis.  Nothing

16 could be clearer.  We have to get each diagnosis that we know

17 that there have been conflicting diagnoses.  And then the

18 copies that have been furnished -- "This questionnaire must be

19 accompanied by copies with accurate originals upon request of

20 any and all documents you, your counsel or your doctors have or

21 subsequently obtained that support or conflict with your

22 diagnosis."

23        Then the same language is repeated with respect to

24 the question of exposure, "Any and all documents that you, your

25 counsel or your doctors have subsequently obtained that support

1  of conflict with your diagnosis or B, established exposure to

2  Grace asbestos containing products having a substantial causal

3  role in the development of the medical diagnoses and/or

4  conditions claimed."  Absolutely crystal clear.  And we then

5  have the certification that's supposed to be supplied both by

6  the claimant and by counsel.  These were certifications,

7  attestations subject to penalty under perjury.  We have

8  representations made by the claimants and made by their counsel

9  with respect to those inquiries.  The doctors, the consistency,

10 the inconsistency, I swear all foregoing information is true,

11 accurate and complete as to the claimant and with respect to

12 the information, all the information contained in the

13 questionnaire is true, accurate and complete.

14         So we have sworn attestations that the questions were

15 being answered, those questions could not be clearer and the

16 instructions could not be clearer.

17         What is it that we now know?  What (indiscernible)

18 from the B-read process is that they never did that.  They

19 never actually went back and searched for the initial screens

20 or subsequent screens.  They never did the privilege review of

21 documents that went back to other law firms and other doctors.

22 They never did any of this.  And why?  Because they decided,

23 back when this case went forward and the filled out these

24 questions, they made a very specific decision.  They decided

25 that they were going to "Comply with what Your Honor had

1   ordered," as simply dealing with the population of documents

2   that they had.  Some of them didn't even do that.

3        We have no indication that with respect to tens of

4   thousands of claims that these individual law firms actually

5   went back and searched their files for the answers.  In fact,

6   what we know is that they did not.  What we know is that there

7   was only one firm that actually filled out the questionnaire

8   directly and there was only -- there was no one who actually

9   did the attachments in a way that indicated that they had

10  actually read through the attachments, that attachments

11  answered the question, fill in the answers.

12       They all basically said, here, go seek, go look, you

13  go figure it out, we're not going to tell you the answers.  And

14  they did that only with respect to the documents that they had

15  and the information that they had.  They never went back to

16  prior doctors.

17       Again, Mr. Herrick, who's been very active in this

18  case for the Motley firm, actually discussed this on Page 97 of

19  April 13.  "The law firm may not know the data of the original

20  diagnosis."  It required them to go back and reconstruct that

21  information -- this is very clear they were employed, et

22  cetera, et cetera.  Why is that?  Is it because to the extent

23  that these cases came in as referrals the law firm may not

24  know.  So basically when these law firms got these cases on

25  referral, like when Baron and Budd gets the non referral case

42

1  of the gentleman with social security 5621 on referral from

2  Provost Umphreys or for that matter, on somebody else that

3  comes to them.  They don't go back to find out, well, what's

4  the truth of the matter?  Is there really a consistent or

5  inconsistent diagnosis either after or before.  They just

6  didn't do it.

7        So the real problem that's now emerged is that these

8  people have actually created that shell.  They've created a

9  shell, they've told us what's under their shell, but they've

10  not told us anything that's on the outside.  And they've

11  represented to the Court that it's complete, that it's

12  accurate, that it's in compliance, there aren't inconsistent

13  diagnoses before or after.  It is absolutely a derogation of

14  their responsibilities before the Court.  And this is not

15  limited to the B-reads, this is everything.  This is why they

16  don't want to tell us the answers to the questions.  This is

17  why they don't want to have the attachments.  It's why it's

18  like pulling teeth to get he x-rays because they want to fight

19  and fight and fight and fight.

20        And it's why, even with respect to the firms that

21  have a small number of claims, the number that they said, they

22  said, oh well, gee, our firm is in compliance, our firm -- it's

23  not just an accident they all read out the same way.  It's

24  apparent that a position has been made broadly that they're all

25  going to have the same basic approach.  Our firm, our firm, our

1  firm.  Not what the doctor said as custodians or people under

2  the control or agents of the individual claimants.

3       We're entitled to know, Your Honor, the full extent

4  of what the record is with respect to the compliance for two

5  purposes.  One, the Court is going to be required to ask to

6  determine what inferences should be drawn from the failure of

7  the claimants to come forward and satisfy their obligation.

8  The other side is going to say, oh, gee, Judge, this process

9  was no good, we always told you it was no good, just stick with

10 the settlements that they did while they were out in the tort

11 system, that everybody recognizes has got a lot of problems.

12 Forget about all this stuff, forget about learning what the

13 real deal is.  The fact of the matter is that they have made a

14 self fulfilling prophesy, the difficulty of this process

15 because we now know what their approach has been in purporting

16 complying with the Court's order.

17       But there's another separate purpose of why this

18 information's key.  The experts need it.  The experts need to

19 know, is it really true that there isn't anything else out

20 there.  Did anyone look for it?  The experts are going to be

21 taking a look at all of the data that's being provided in this

22 case and the experts are going to be drawing inferences from

23 the data.

24       So what is the data?  We know some of what the data

25 is, but we don't have sufficient -- we don't have all of the

44

1 facts that are required and reasonably should be required in

2 order to have the expert be fully informed about what actually

3 has been searched for.

4          Are we entitled to these interrogatories?  I believe

5 we're clearly entitled to these interrogatories.  These

6 interrogatories go right to the question of the basis for the

7 assertion of privilege.  They go right to the question of

8 whether there's been compliance with the Court's order, and

9 they go through the details, and I would urge the Court to

10 consider the following.  We're going to hear, oh my goodness,

11 if we have to go back and actually provide this kind of

12 information, what a burden.

13          With respect to most of these questions, there's not

14 going to be a burden because they don't have the information.

15 They're going to say they don't have it or they're going to say

16 they didn't do it.  With respect to the ones that actually have

17 to go back and do, in a sense, the logging, or providing the

18 information on which documents privileged, et cetera, et

19 cetera, I'll take the worst case that I heard.

20          Mr. Esserman represented that with respect to his two

21 firms, there were 2,000 such documents that had been withheld.

22 Of course, they've never been identified, but 2,000.

23 Two-thousand documents.  Well, in 30 days, he keeps saying 30

24 days divided by 30, so they'd have to do 70 documents a day.

25 That's going to be a terrible burden to record the information

1  on 70 documents.  This is not a burden issue.  This is an issue

2  about simply providing information, so the only real question

3  is relevance, and it is unquestionably relevant.

4         Here are the interrogatories and then I'm going to

5  take Your Honor through the one basic point they make their

6  version.  But the interrogatories basically asked the

7  following.

8         MR. FINCH:  Mr. Bernick, may I see a copy of the

9  interrogatories?  Ones that were filed in advance of -- during

10  last week.

11         MR. BERNICK:  Interrogatory Number 1.  This is for

12  each --

13                         (Pause)

14         MR. BERNICK:  (Indiscernible) the claimants

15  identified on Exhibit C attached, it would be the claimants

16  that they represent.  Have you or the claimant withheld any

17  B-reads within the claimant's possession as to their control?

18  If you answered -- Interrogatory Number 2 -- if you answered

19  Interrogatory Number 1, yes to Interrogatory Number 1, identify

20  the plaintiffs for whom B-reads have been withheld and the

21  number of B-reads withheld with this (indiscernible).

22         Then under three we've got a series of categories --

23  a series of items and I'm going to go through them.  But they

24  basically fall into buckets.  The first bucket is basic

25  information.  I call it the biographical data relating to a

46

1  document.  The claimant for whom the B-read is being held,

2  that's A, the date of the document is B, the author of the

3  document is C, the recipient of the document is D, the doctor

4  or doctors who performed the B-read, including those who

5  prepared the narrative report, as a base of information.  As we

6  all know, Your Honor, and Your Honor has observed, some of the

7  -- in many cases, the identity of the doctor's very important.

8  A general description of the document, for example, letter.

9  With as much information about the nature of the document as

10 can be provided without waiving the privilege.  The document is

11 multiple documents or contains (indiscernible).

12         THE COURT:  That one confuses me.  I don't know that

13 privilege.

14         MR. BERNICK:  Well that's -- that's fair enough.  We

15 have a list -- we have actually, S and K, it's the consulting

16 expert privilege, Your Honor.  It doesn't.  I mean, this ought

17 to be read and we can tinker with that.  In reference to K, J,

18 K, L and M, because these all now go to the question of whether

19 -- these all go to the question of the nature of a privilege

20 and what is a privilege.

21         I'm going to skip G and we'll strike it because  N

22 duplicates it and I'll come back to that.  H, who paid for the

23 B-read or provided reimbursement for the B-read or provided

24 reimbursement for the B-read, which goes centrally to the

25 question of whether this was driven by a lawyer's retention or

1  not.

2         I want to skip I and then continue on with J through

3  N.  These are now -- through O -- these are now all questions

4  that relate to the nature of the privilege that was being

5  exclaimed or the nature that of the withholding.  The basis on

6  which you or the claimant are withholding the document, if the

7  document's being withheld on ground of privilege, what

8  privilege is being asserted, attorney/client, attorney work

9  product, consultant, expert, other.  The claimants initial date

10  of diagnosis which Your Honor knows is an operative fact under

11  Your Honor's order with regard to B-reads.  The date upon which

12  the claimant formed and any client relationship with your firm

13  or any other firm.  And is a replacement for G.  A list of all

14  other documents to whom the document has been provided with a

15  sufficient description as to report and determine whether or

16  not those descriptions are attorneys or the claimant discussed

17  in the background chronology.  That's basically

18  (indiscernible).

19         And then O.  And this oughtn't be necessary, but it

20  is necessary in this case because this problem has been

21  identified.  If a document is being withheld on grounds of

22  privilege, state whether the document has been retrieved,

23  reviewed by you or by claimant for purposes of asserting at any

24  time such claim of privilege and identify who currently has

25  possession of the document.  People are making a privilege

1  claim and they're not even taking a look a the document.

2          So we have basic biographical information and then

3  basic information going to the assertion of privilege.  Now you

4  have further interrogatories that's very important that asks

5  for not any kind of other discussion but the basic result of

6  the B-read.  It says I, whether the result of the B-read was

7  negative and/or included, a reading of less than 1/0.  Here's

8  why we're doing that.  Number one, bear in mind, Your Honor,

9  that all of these documents are being produced subject to

10  confidentiality and protective orders.  None of these documents

11  are being produced for purposes of use in any individual

12  litigation.

13          The precedent for doing this, A, is in the case law

14  and B, is in this case.  It's in the case law in a case that we

15  cited for the Court.  It's called <u>Coates v. AC&S</u>, this is

16  November 27, 1990 Eastern District of Louisiana.  In this case,

17  it was the defendants who were on the hot seat because they had

18  sent out some tissue slides to be reviewed by a variety of

19  pathologists.  And the Court, there was a record by the

20  plaintiff to get all of the different pathologist readings.

21  And the specific problem that was identified by the Court was

22  the problem of shopping, that is going to multiple people for

23  purposes of getting the readings.  And the Court specifically

24  found, "The Court finds the pathologist or other expert's

25  examination of tissue samples taken from the body of a person

1  who is now diseased is sufficiently analogous to an examination

2  under 35B so that all parties have the right to the type of

3  information set forth in the rule."

4        The Court issued its original ruling on August 8th,

5  1990 in an effort to curtail the shopping of tissue samples by

6  requiring all parties to file into the record the names and

7  addresses of all persons or entities for whom such tissue

8  samples were sent.  In that order, the Court stated that it was

9  of the opinion that without this order, there was the

10  possibility of shopping tissue samples, this creates

11  exceptional circumstance.  The Court is still of the opinion

12  that shopping continues to take place and it's that shopping

13  that's sufficient to fall within the rules of exceptional

14  circumstances exception.

15        That is in a case involving individual litigation,

16  the real deal for real dollars whether there's a recovery or

17  not.  In this case we have a similar situation.  Judge Wolin

18  for purposes of the Sealed Air litigation confronted a whole

19  series of documents that were plainly work product.  And they

20  were logged and they were litigated.  And Judge Wolin ended up

21  determining that notwithstanding the fact that they were work

22  product, they were of central relevance to that case because

23  they bore on the question of what was known concerning the

24  company's potential liabilities at the time of the spinoff

25  transaction at issue in that case.

1          The Court specifically preserved the privilege, that

2   was what the order said and we've recited that previously to

3   the Court, and provided for protection.  So for purposes of

4   that case and that case only, documents that were recognized to

5   be privileged and work product would be very sensitive

6   documents going to the financial planning of the company who

7   was engaged in, those documents maintained their status, but

8   were made available for purposes of litigation that case.

9          We have a very, very similar situation here.  We have

10  a situation where we're trying to find the evidence of the

11  shopping.  We are now conducting discovery to determine what

12  has been done to produce the evidence of the shopping.  That's

13  all that we -- if we eliminate that one, all that we're going

14  to learn -- it's not insignificant -- is what has been done or

15  has not been done to assert privilege or to conduct a review.

16  But they will still have succeeded unless we can ask that

17  question, they'll still have succeeded with insulating from

18  review everything that they now have acknowledge they didn't

19  look at.  That is, it will still be them who is in the position

20  to exercise say so over what's going on here.  They've

21  succeeded.  They've won.  They've pushed us all the way to the

22  end, our expert reports are due in days as it stands now, and

23  we still don't know the full extent of the shopping.

24          All we have now are two firms that have come forward

25  and actually -- and they haven't even certified that that's it

**J&J COURT TRANSCRIBERS, INC.**

1 -- have come forward and have actually provided us with the

2 information that we know is there.  Everybody else is --

3          THE COURT:  I think you've got a bunch of assumptions

4 built into this that I don't know if are going to turn out to

5 be true or not.  Nonetheless, I think the standard is whether

6 or not this is calculated to lead to relevant or admissible

7 evidence and you know, it appears that it is.  Whether it turns

8 out to show what you want it to show or not, I'm not convinced

9 that it will or won't.  I don't know.  But --

10          MR. BERNICK:  I understand that, Your Honor.  But I

11 would say in response to that is, A, that is the standard, but

12 B, we were told two years ago this was a pipe dream.  We now

13 know that we've got two years of experience and information as

14 (indiscernible).  Come on, give me a break, the pipe dream is

15 not a pipe dream, it's something of the creation of counsel and

16 the claimants.

17          THE COURT:  Well, but the problem is, I think, I'm

18 still not sure who do you want the interrogatories to go to?

19 That's the problem.  Are you sending them to the claimants?

20          MR. BERNICK:  We're sending them to the claimants.

21 But they have to be then verified -- as you'll see when we get

22 on to that.  These are the information that we want.  We've got

23 an Interrogatory 4 say, for each claimant for whom you are

24 responding to these interrogatories, please provide a

25 verification from the claimant or authorized by the claimant

1  that the responses provided herein are true, complete and

2  accurate from the (indiscernible) that's been made of documents

3  in the claimant's possession, custody and control, the doctors

4  in responding to these interrogatories.  Or if they've not,

5  they can tell us that they haven't.  The point is that if

6  they're not going to go ahead and comply, tell us that you're

7  not complying.  There ought to be a verification.  And if they

8  don't, then the inference of clearly ought to be drawn.

9          Number 5, provide verifications from you.  If the

10  responses provided in there are true, complete and accurate and

11  a thorough search has been made of documents in the possession,

12  custody and control of your firm and any other firm previously

13  or subsequently representing the claimant and any doctors who

14  have rendered services or reviewed information as to the

15  claimant's claim in responding to these interrogatories.  So we

16  want the verifications just like the questionnaire asked.  This

17  is duplicative of the -- this is what the questionnaire asked

18  that they do, we now want it actually spelled out in writing

19  under the verification.

20          Then with respect to Interrogatory Number 6.  This

21  now picks up the big problem of --

22          THE COURT:  I don't know why you need to duplicate

23  the questionnaire.  To the extent that you're asking the same

24  thing that you've already asked, I don't see that that's

25  necessary.  To the extent that you're trying to go beyond

53

1  because there is a problem with the questionnaire, that's a

2  different issue.

3          MR. BERNICK:  No, what this is designed to do is,

4  it's more -- what this does is -- first of all, pertaining to

5  all the privilege --

6          THE COURT:  Well that's a different issue.

7          MR. BERNICK:  And that's really -- all of 4 and 5 to

8  the extent they pertain to privilege are all driven by the

9  privilege issue.

10          THE COURT:  All right.

11          MR. BERNICK:  Six does go beyond privilege.  This is

12  very simple what 6 does.  In responding to W.R. Grace's efforts

13  to produce this questionnaire and in providing B-reads or any

14  other materials in connection with the claimant's claim, A,

15  what efforts have you undertaken to obtain documents, one, in

16  the possession, custody or control of all other counsel

17  previously or subsequently (indiscernible) from ths claim.  And

18  two, in the possession, custody or control of all doctors who

19  have rendered services.  Now that is not simply a

20  certification, that is what have you done.  That is discovery

21  to find out what they did to comply with the questionnaire.

22          THE COURT:  Okay, well, why do they have an

23  obligation with respect to counsel who later represents

24  someone?

25          MR. BERNICK:  Because I think with respect to

54

1 counsel, under the circumstances that we have here, it may be

2 that they didn't do anything or maybe that they did something.

3 all they have to do is tell us.  IF they didn't talk to the

4 doctors and if they didn't talk to counsel, then we know that

5 they took no steps to find out anything.

6        THE COURT:  But what's the obligation with respect to

7 subsequent counsel?  Is there a fee sharing arrangement that --

8        MR. BERNICK:  All I'm saying is that if

9 (indiscernible) turns out that they didn't go look for the

10 doctors, but they then did talk to all the different lawyers

11 who had ever represented the individual, they can say, well

12 gee, we didn't talk to the doctors, but we talked to other

13 counsel.  The whole point is that one way or the other, we want

14 to know what efforts they undertook, the kind of documents that

15 were in custody and control of the --

16        THE COURT:  Okay, so you're not attempting to assert

17 there's an obligation.  You're just looking for the facts.

18        MR. BERNICK:  No, Your Honor has ruled that they

19 didn't have that obligation with respect to doctors.  I think

20 when it comes to the pre and post diagnoses, they had an

21 obligation -- they kind of had an obligation to answer the

22 question and the lawyers verified that regardless of where the

23 information was.  With respect to the exposures, that is much

24 less clear.  But in any case we should know what the answers to

25 the questions are.  And what they're going to say -- and their

1  version is, well, we never had any obligation to do any of that

2  or argue the obligation point.  And our point is that it is for

3  another day to argue about the implications of the answers to

4  these questions.  We're not asking for the adverse inference

5  today, we're just asking for discovery, the discovery, as Your

6  Honor indicated, may bear out exactly what we're saying, it may

7  not, but there has to be a record.

8          THE COURT:  So you're looking for the facts, that the

9  question, you're looking for the facts.

10         MR. BERNICK:  If they didn't do any of this stuff,

11  they just say, we didn't do it.  If they said we did it,

12  they'll state, well, what did you do.  If they didn't assert

13  the privilege or whatever it is, as I said, for now, it's a

14  point of saying, just tell us what the basis facts are.  And

15  then B, state the identity of all other counsel who previously

16  or subsequently, state the identity of doctors who have

17  rendered services.  If they don't know the answers to those

18  questions, they don't know the answers to those questions.

19  It's really pretty straightforward.

20         But we want to be able to pin down what we think we

21  have a lot of evidence of, but frankly, we're still drawing

22  inferences.  We're drawing inferences to the extent that not

23  all firms have provided us -- no firm has really, with one

24  exception, gives us the -- no firm has actually laid out the

25  complete records.  We have gotten the record in bits and pieces

1 as we have been here for months and months before the Court,

2 but it's time to actually get a comprehensive and reliable

3 record, and that's why we're asking for this.

4        Now they're answer is, well, gee, this should only be

5 with respect to the firms, that each firm can attest for its

6 own.  And what they're really saying is they're not going to

7 give any discovery because they're going to say, oh, well gee,

8 we already told you what the story with this is.  That's not a

9 discovery.  What they're really asking for is for Your Honor to

10 rule contrary to months and months of litigation, your prior

11 orders, but they never had any obligation to do anything else,

12 but sit there with their own little focus and did not do

13 anything else.

14        They can argue that later on, Your Honor.  I believe

15 that if that's wrong, they can argue that later on.  All they

16 have to do now is come clean and tell us exactly what it is

17 that they did and did not do.  If they can't answer the

18 questions, they'll se we can't answer the questions or we don't

19 know or we didn't do X or Y or Z.  But it's the time that we

20 actually now formalize this record.  Your Honor will note that

21 we've been a little bit more formal today in terms of exhibits

22 and cites.  This really is down to the short strokes on a very,

23 very important part of the case.

24        THE COURT:  Okay, Mr. Finch, let's take a five-minute

25 recess and then we'll start with the responses.

1          MR. FINCH:  Thank you, Your Honor.

2                    (Recess)

3          THE COURT:  Mr. Finch.

4          MR. FINCH:  Nathan Finch for the Asbestos Claimants'

5   Committee.  Your Honor, Mr. Bernick, in part of his description

6   with what he described as noncompliance generally said this is

7   all undisputed.  And I want to make very clear that the ACC and

8   the FCR do dispute a lot of the "facts" Mr. Bernick was

9   describing.  And to do that I am placing before Your Honor --

10         MR. BERNICK:  I'd like to have a copy.

11         MR. FINCH:  I don't have a copy, Mr. Bernick.  You

12  didn't provide a copy to me until -- I don't have an extra

13  copy, Mr. Bernick, this is the only copy I have.  You provided

14  this slide for me the first time this morning and I marked it

15  up.

16         MR. BERNICK:  Your Honor, this slide was actually

17  provided weeks ago in connection with the hearing.

18         THE COURT:  Well, that may be, Mr. Bernick, but it's

19  helpful if, you know, have the things available as we go by.

20  Like Mr. Finch, I'm looking at it on the screen too for the

21  first time.  And you know, what happens several months in the

22  past, yes, we all recognize the slides, but it's still

23  difficult from one day to the next to keep up with this.

24         MR. BERNICK:  (Indiscernible).

25         THE COURT:  Yeah, sure, that's fine.

1          MR. FINCH:  First of all, there aren't 79,000

2  questionnaires that have been returned.  There are 104,000

3  questionnaire being returned.  And part of the differential is

4  in what I call the main matching problem.  Because these

5  questionnaires don't ask for full social security numbers from

6  people, but only the last four digits, and because many of the

7  recipients have names that might be multiple people of the same

8  people multiple times, it gets into a very difficult, time

9  consuming and not always perfect process.  You might have a

10 Bill Ray Smith as a claimant or a William Smith or an R. Smith

11 or a B.R. Smith or a B. Smith or a -- you understand the

12 problem.  And so there are actually 104,000 questionnaires that

13 have been returned.  So there's a -- it's not the case as he

14 likes to leave the impression that a third of the people

15 haven't responded to questionnaires.

16          Secondly --

17          MR. BERNICK:  (Indiscernible)

18          MR. FINCH:  Mr. Bernick, may I please --

19          MR. BERNICK:  I just want to know if there's a

20 representation being made to the Court that 104 actually

21 matched in the database.

22          MR. FINCH:  There were 104,000 questionnaires that

23 were returned.  There were 79,000 at least that matched the

24 database, another 25,000 that could match the database, but

25 we're still in the process of attempting to do the name

1  matching which is never going to be a complete process.

2          The second point to keep in mind, the 119,000

3  "pending claims" which is from Grace's prepetition database,

4  the claims that were, according to its database, pending and

5  had not been liquidated or paid money or resolved or dismissed

6  on the date that Grace went into bankruptcy.  Well, when it

7  took Mr. Hughes' deposition a couple of months ago, what he

8  said was, they're very confident about what the database shows

9  with respect to the claims that they paid money to or the

10  claims that -- the disease information about those claims, the

11  disease information about the cases that were resolved.

12  However, he said there could very well be some significant

13  number of claims in the database that are shown as open and

14  pending when in fact, the case had been dismissed with no

15  payment of money years before, and he couldn't tell me whether

16  that was five percent, ten percent, 20 percent.  So the

17  starting universe could be 100,000.  I think it's more like

18  100,000, I think it's about 20 percent and not five or ten

19  percent.

20          But whatever it is, there's some missing -- there's

21  some number of questionnaires that aren't being returned

22  because people resolved their case with Grace a long time ago

23  for no money and they're not pending claimants.  And so you

24  should keep that in mind if Mr. Bernick wants to extrapolate

25  any of this to the future claims.

1          The next key thing, these questions, the key

2    questions, who's your diagnosing doctor, who is your B-reader,

3    is the claim being treated, what Grace product is it.

4    Claimants who answered non-Grace exposure on the -- he

5    carefully phrases this -- on the face of the questionnaire.

6    And then he says that the point, Your Honor, is that answers to

7    all those questions, if the claimant knows it, are in the

8    attachments.  And it's not the case that people have dumped a

9    warehouse on W.R. Grace for it to look at.  There are 4 million

10   pages of attachments to questionnaires.  The reason it became a

11   warehouse is not because people are attaching -- the reason

12   that there is a warehouse are not because people are saying to

13   Grace, here's a warehouse of documents, it's in there

14   somewhere.

15          The typical -- if you divide 4 million pages by

16   100,000 questionnaires, you have 40 pages per questionnaire.

17   And I've looked at a whole bunch of these and basically, the

18   things that are attached are a medical record, interrogatories

19   answers or snippets of interrogatory answers that document the

20   exposure history and/or the work history.  Some of them have

21   deposition snippets where they'll have the portion of

22   depositions or coworker depositions where they describe

23   exposure to a Grace product.  And then there's a work history

24   sheet.  And then there is usually statements of a lot of them

25   that say, this is the information we have that is responsive to

1  the questionnaire.

2        If we were going to prepare the case for trial, go

3  and look at the thousands and thousands of -- we

4  would go and look at the thousands and thousands of depositions

5  to prepare the case for trial.  You know that's not what the

6  questionnaire asks, the questionnaires ask, what did you have

7  at this point in time, not what is your trial case.

8        And so, it's 40 pages per questionnaire, and you can

9  -- someone with some knowledge of looking at asbestos medical

10  documents simply for non malignant claimants, it's a B-reader

11  report and maybe a narrative letter and sometimes pulmonary

12  function test results.  For malignancy cases, particularly for

13  mesothelioma cases, it's almost always pathology followed by a

14  narrative letter from a doctor.  That's a four or five page

15  document.

16        The product exposure evidence is typically 40 pages

17  or less of interrogatories.  I mean, they didn't just dump all

18  the interrogatories, it's portions of interrogatories

19  responsive to the questions.  And so it's not that people have

20  failed to comply with your Court's order, that problem that Mr.

21  Bernick has is that he asked for discovery from 100,000 people.

22  And in a pleading they filed a couple of months ago when they

23  asked for additional time -- actually it was in response to our

24  motion to get a navigable database that includes all the

25  information from the attachments, he said we can't do 100,000

1 of these, it would take eight years.  We've done 2,000 of them,

2 it's taken two months.  And so the problem is not that people

3 haven't complied or that people haven't provided the

4 information.

5      The problem is that most of the information was

6 provided by way of attachment, the typical questionnaire has 40

7 pages of attachment, which I suggest to Your Honor is not a

8 document dump.  It's fairly easy to flip through the pages of

9 the attachments and answer all of these questions provided the

10 claimant or his counsel know it.  And so therefore, what we're

11 talking about here is not massive compliance with the

12 questionnaire process.  So I want to clear up that

13 misimpression to begin with.

14      The focus of the issue that we are here on is the

15 B-reads that have been withheld in reliance on Your Honor's

16 consulting expert order.  And Mr. Bernick didn't spend a lot of

17 time talking about what that order actually said.  What that

18 order actually said was that, if the time line was such that

19 the claimant got a diagnosis then went to a doctor, and then

20 some other doctor saw the claimant or did some kind of a

21 analysis of the claimant's medical condition, whether that's

22 reading an x-ray or anything else, and that second doctor had

23 not been disclosed as a testifying expert, then that second

24 doctor's analysis, opinion, whatever it was, including a

25 B-read, is protected by the consulting expert privilege.  And

1  it's protected whether it's good, bad, indifferent whatever.

2  There are lots of reasons why people may not want to use a

3  consulting expert's opinion as opposed to some other doctor's

4  opinions.

5          One of them could be the consulting expert says, I

6  have looked at this and I agree with the testifying expert, but

7  I'm too busy and I don't want to testify in your case.  Another

8  reason could be the consulting expert could be from Harvard

9  University, there is a Christine Oliver who is a consulting

10 expert in a lot of asbestos cases, but people often times don't

11 call her at trial because A, she's too busy, or B, they're

12 trying the case in Beaumont, Texas and they'd rather have Gary

13 Friedman from -- who is a Texas doctor, because they think he

14 may appeal better to a Texas jury.  And then the third reason

15 is a consulting expert could say, you know, I disagree with the

16 other expert and I don't find evidence of an asbestos related

17 disease here.

18         But that's the whole reason the whole consulting

19 expert privilege exists.  It's to allow lawyers to prepare the

20 cases for trial, to deal with potential arguments raised by the

21 other side without the other side knowing what they're doing.

22 That's the whole purpose behind the consulting expert privilege

23 rule.

24         And so what he now says he wants to establish that

25 there are consulting expert reports being withheld for a

64

1 particular number of claimants and what those reports show.
2 Well in the context of an aggregate estimation, I fail to see
3 how it leads to the discovery of admissible evidence that --
4 let's assume that of the 100,000 questionnaires, 20,000 of them
5 are withholding experts in reliance on Your Honor's consulting
6 expert order.  Even if all 20,000 of those people were negative
7 B-reads, the point is, so what.  I mean, probably the vast
8 majority aren't negative B-reads, but even if they are, all
9 that shows is there's a dispute between two doctors over
10 whether or not the claimant has an asbestos-related disease.

11      I would be willing to believe that doctors that Grace
12 hired to look at these files when the claimants were in tort
13 litigation with Grace probably a very high percentage of the
14 time disputed the plaintiff doctors' diagnosis as well.  All
15 that shows is there is a dispute.  And just because four
16 doctors looked at a film and say I don't see asbestos related
17 disease there and one doctor looks at the film and says, I do.
18 That doesn't mean that the one doctor's wrong and the four are
19 right or visa versa.  You can have 25 percent of your lung
20 destroyed by asbestosis before it's even visible on an x-ray.
21 And the only sort of pure gold standard they have is pathology
22 and their medical studies that show that up to 20 percent of
23 the people who on death and pathology have asbestosis, 20
24 percent of the people had clean x-rays.  So just because
25 several doctors say, oh no, there is no evidence of asbestosis

1 on this film and another doctor says yes, there is, you can't

2 draw any conclusions from that.  You can't say that the four

3 are right or the one is wrong.  And I submit to you, Your

4 Honor, that in fact, no judge could draw that conclusion,

5 that's what juries are for.

6        Finally, just in reference of the AC&S case that Mr.

7 Bernick cited as grounds for allowing you to give the ultimate

8 opinion here.  And I think the Interrogatory that asked for

9 what is the B-read, is it 1/0 or something else, that's just --

10 that would totally vitiate the consulting expert privilege.

11 The case he cited is a case involving pathology.  And pathology

12 is very different than looking an x-ray.  Looking at the x-ray

13 is pure opinion, it's expert opinion.  Pathology is an invasive

14 procedure, and the Court analogized that to more like an

15 independent medical exam.  And once you do an independent

16 medical exam, you're in Rule 35, which is completely different

17 world from the Rule 26 consulting expert rules.  And once you

18 do an independent medical exam you give up your right to

19 withhold medical tests and medical opinions that relate to that

20 independent medical exam.

21        So what they did is they got pathology, which is

22 taking a chunk out of somebody's lung which is something that

23 is only a limited amount of and it deteriorates and it is

24 destroyed, and the Court said no, that's more like a Rule 35

25 independent medical exam, and he wasn't faced with the question

1  of sort of pure opinion, which is all a B-read is.  I mean, it

2  talks about -- Mr. Bernick talks about a B-read as if it's some

3  kind of medical test, it's not.  It's a doctor in a short hand

4  way saying, it's my opinion that this x-ray is consistent with

5  asbestosis or that it's not consistent with asbestosis, and

6  they do it by marking little boxes.  But it's just as much of

7  an opinion of a doctor wrote all that out in long hand and if

8  their time sequence was such that the doctor was not the

9  initial diagnosing physician and the doctor's work was done

10 after the creation of the attorney/client privilege --

11 attorney/client relationship, it is protected by Your Honor's

12 order and I don't see the need for these interrogatories and I

13 don't believe that they would lead ultimately to evidence that

14 is admissible or relevant in any sense.  And I will turn the

15 floor over to counsel for the claimants to address the more

16 specific response.

17        THE COURT:   Wait.  Could you just restate your last

18 sentence, if the B-read was after the initial --

19        MR. FINCH:  If the B-read in question -- the time

20 sequence as I understand Your Honor's December 22nd order, and

21 I tend to remember orders by dates, but the consulting expert

22 order is that if a claimant saw a doctor and got a diagnosis,

23 then the client went to a lawyer and an attorney/client

24 relationship was formed.  And then the claimant was sent to

25 another doctor or his medical records were sent to another

1  doctor for purposes of trial preparation and that second doctor

2  who did whatever he did, read an x-ray, did a B-reading report,

3  did some kind of other type of medical opinion report and that

4  happened after the creation of the attorney/client relationship

5  and it wasn't the initial diagnosis, that's protected under

6  Your Honor's --

7        THE COURT:  Well only if it's -- I mean, you only can

8  protect it as a consulting expert if in fact the lawyer hired

9  you to be a consulting expert for the purpose of litigation.

10        MR. FINCH:  Yes.

11        THE COURT:  You still have to meet the consulting

12  expert privilege.

13        MR. FINCH:  Yes.

14        THE COURT:  Just because a client goes to a doctor

15  doesn't make every doctor that the client goes to a --

16        MR. FINCH:  I'm not suggesting that they do.  But

17  we're talking about here objections raised to the production of

18  those types of analyses.  And Mr. Bernick is saying, well, he's

19  entitled to the negative B-reads, and I'm saying that would

20  vitiate the consulting expert privilege and that the --

21        THE COURT:  I think what he's entitled to is to know

22  that somebody in fact checked the documents and checked their

23  records to find out that there was a consulting privilege that

24  applied.  That in fact, there was a letter or some form of

25  agreement with the consulting expert that said, yes, I've

1 retained you for the purpose of consulting me with this case

2 and this client.  And in fact, from this case going forward,

3 this point going forward you're my consulting expert.  I don't

4 think you have a consulting expert that you just put on your

5 general retainer and say every client who walks in the door

6 from now on, you're my consulting expert.  No.  That doesn't

7 work.

8          You need a client, you need a retention for a

9 specific litigation, and if you don't have it, I don't think

10 you have a consulting expert.  Otherwise, you could protect

11 every single attorney and every single doctor in the world, and

12 I don't think that's what the purpose is.  You need a client,

13 you need a litigation and you need a consulting expert for

14 purposes of getting ready for a specific litigation -- I mean

15 for a litigation, dealing with a client, not the general grand

16 scope of litigation.  Every lawyer who's a litigating lawyer at

17 some point in time is going to have litigation.  That's not the

18 purpose for retaining the consultant, that gee, maybe some time

19 in my life I'm going to be lucky enough to end up in court,

20 that's not the purpose.

21          MR. FINCH:  I don't think that's what we're talking

22 about here.

23          THE COURT:  Well I'm not sure what we're talking

24 about.  I really am not.

25          MR. FINCH:  I really don't.  But the interrogatories

**J&J COURT TRANSCRIBERS, INC.**

69

1  as he's proposing would actually require the production of

2  consulting expert work product, and I think that that is

3  improper and I'll turn the floor over to Mr. Esserman and Mr.

4  Busby to argue the specifics of that.

5          THE COURT:  All right.  What I am saying is, I think

6  he is entitled to a log that identifies -- I'm using the word

7  log, I don't think the cases identify the need for a log in the

8  sense of a work product log, so I'm not using it in that

9  literal sense, but I don't know of a better way to say it.  I

10  think he's entitled to some enumeration of the fact that there

11  was in fact a search made, that there really is a consulting

12  expert privilege that attaches to a specific either document or

13  witness or something, whatever it is that the objection is

14  raised with respect to.  These objections came in in blanket.

15  I still don't know what the objections are that are raised,

16  because they're not raised with respect to a particular client,

17  they're not raised with respect to a particular doctor, they're

18  not raised with respect to a particular document, so what are

19  they?  How does anybody know what they are or whether there is

20  or isn't a real privilege that's being asserted when there's no

21  real objection that's being asserted anywhere.  And I think he

22  is entitled to know what it is that the objection is.

23          And I haven't seen anything, maybe there has been

24  something circulated that isn't filed with the Court, and of

25  course that could be.  And if it is, then I retract what I'm

**J&J COURT TRANSCRIBERS, INC.**

1 saying.  But as far as this Court's aware, I haven't seen

2 anything.

3         MR. FINCH:  Well, Your Honor, each of the

4 questionnaires has within it, you know, if John Smith submits a

5 questionnaire there may be a cover page from the lawyers that

6 have a series of objections.  And if the objections apply to

7 that claimant he can read that questionnaire and see whether

8 the objection applies to that claimant or not.  I don't know

9 the extent to which he is attempting to do that or tie that up

10 or he's just relying on examples of objections.  And it may be

11 that some of the people raised the objection preemptively

12 because some lawyers take the view, if you don't raise an

13 objection and you later hire a consulting expert or you later

14 create a privilege document, if the question would call for the

15 production of that, at least you'd have to be on record for

16 that.  That may be an overly conservative view of a lawyer's

17 obligation, but --

18         THE COURT:  Well, I think the rules of -- the federal

19 rules of civil procedure typically say that the obligation to

20 respond is an ongoing one, don't they?  So if something happens

21 later and the information changes, don't you have an obligation

22 to update your answers?  So if you hire somebody later don't

23 have an obligation to later update your answer?  You don't

24 assert something five years ago that you're going to do five

25 years from now.

**J&J COURT TRANSCRIBERS, INC.**

1          MR. BERNICK:  Your Honor, I have an objection with

2    respect to that, but before we --

3          THE COURT:  To what, my question?

4          MR. BERNICK:  No, no, no.  I have a request a motion

5    -- not a motion, but a statement to make with respect to

6    arguments that are made by claimants counsel.  But before I do

7    that, there's a representation that's been -- a suggestion

8    that's been made to the Court that somehow there might be

9    something in the questionnaires or in the materials that is

10   different from what Your Honor is aware of.  I am not aware of

11   any single claimant or any single B-read as to which we have

12   received the specific information that Your Honor has asked for

13   or has talked about.  That is that the privilege applies to

14   this B-read or this document.

15         All that we have are the blanket objections.  They

16   may be reiterated in the case of each claimant, but they're not

17   specified to any document.  If I'm wrong about that, and I

18   think that was Your Honor's question to counsel, then I think

19   the Court ought to be told where I'm wrong.  Because right now

20   there seems to be a question being raised about the state of

21   the record.  It is very, very late in the day for counsel to be

22   making assertions that kind of suggest that there might be

23   something there when there's not.  I want to have some candor

24   here about what the state of the record is.

25         THE COURT:  I think what Mr. Finch is saying is that

1 the objections are made in the questionnaire, the questionnaire

2 is attributed to a particular claimant --

3          MR. FINCH:  That's all I was saying, Your Honor.

4          MR. BERNICK:  But it's not -- the objection is not

5 specified to a document.  There's no B-read as to which --

6 there's not a single B-read where we have specifically been

7 told, here is the B-read -- there is a B-read, it existed on

8 such and such a date, it's being withheld by reason of the

9 consulting expert privilege.  Not a single one.  Because we

10 just don't have that.  That's the whole -- one of the whole

11 reasons we're going down and do we have an extensive record

12 that an effort was made not to do that.

13          I also have an objection, we've now heard from

14 counsel for the current plaintiffs, the FCR's counsel is here.

15 Your Honor has stressed time and again that the purpose of this

16 is to gather information for purposes of the estimation.

17 Obviously all counsel are, you know, can be heard by this Court

18 and I know Your Honor's very flexible on that.  But at the end

19 of the day, all these folks -- these folks who are going to

20 stand up, all they should really be talking about is burden and

21 whether the information somehow is going to be divulged in a

22 fashion that would result in compromising their individual

23 claims.  We have an ACC and an FCR here who are the ones who

24 are responsible for this estimation and we keep on going down

25 the road where we then get -- you know, five, ten counsel could

1 show up and we have to go down individually with what's

2 happening with Mr. Busby's clients and Mr. So and So --

3          THE COURT:  Well, you started it, Mr. Bernick.  You

4 tell me about what the firms are doing and surely they're going

5 --

6          MR. BERNICK:  I have no choice.  I have no choice.

7          THE COURT:  But they don't either.  Because once you

8 say this is what they've done, they've got to respond.  I mean,

9 if they have a different view, they're entitled to respond and

10 I'm going to give them the opportunity to respond.  Okay, Mr.

11 Finch.

12          MR. FINCH:  Thank you, Your Honor.  May I just tender

13 this copy of this to the Court --

14          THE COURT:  Yes.

15          MR. FINCH:  Since it's my only copy, what I would

16 propose to do is then make a color copy of this for counsel,

17 all counsel in the courtroom, and then submit it to the Court

18 later this week --

19          THE COURT:  That's fine.

20          MR. FINCH:  If that's acceptable.

21          MR. BERNICK:  Fine.  Then we'll get into that.

22 That's fine.  Are we going to mark it as -- do we have an

23 exhibit number like A?

24          MR. FINCH:  ACC Exhibit 1.

25          MR. BERNICK:  ACC Exhibit 1.


**J&J COURT TRANSCRIBERS, INC.**

1           THE COURT:  It's on.

2           MR. BUSBY:  I don't think the microphone's working at

3  all.

4           THE COURT:  It's working.

5           MR. BUSBY:  All right?

6           THE COURT:  Yes.

7           MR. BUSBY:  Thank you, Your Honor.  And my apologies

8  for the travel inconveniences this morning.  Your Honor, let me

9  cover a few things here.  We're here in connection with a

10 motion to compel plaintiffs' firms to do something.  The order

11 proposed by Mr. Bernick in connection with this motion is an

12 order that recites that plaintiffs' firms shall do certain

13 things.  This order reads --

14                         (Pause)

15          MR. BUSBY:  -- it says, "It is further ordered that

16 the plaintiffs' law firms are ordered to produce."  It

17 uniformly and repeatedly directs the relief requested to the

18 plaintiffs' law firms.  Nowhere does it ask for relief as to

19 the claimants.  For Mr. Bernick to come in here and complain

20 now that claimants haven't done certain things when the relief

21 that was requested from the outset was from the plaintiffs' law

22 firms is unfair and inappropriate.

23          We're in the situation where we are today because

24 this was the motion that was brought against the plaintiffs'

25 law firms, the responses have been made by the plaintiffs' law

1  firms, and that's no basis for complaint since Mr. Bernick has

2  gotten exactly what he asked for.

3          MR. BERNICK:  Your Honor, with due respect to

4  counsel, this is not the order that we're asking for.

5          MR. BUSBY:  It's the order that was attached to your

6  motion when your motion was filed.

7          MR. BERNICK:  I'm sorry.  That was the old motion

8  with respect to the motion to compel.  We have submitted an

9  order, it is what we're asking for today is pursuant to the

10  hearing that took place three or four weeks ago when we

11  specifically said that our proposal was to work towards an

12  interrogatory in order to find out information relating to

13  compliance.  So that order that you have up on the screen,

14  counsel, is not the order that we're seeking here today.

15          MR. BUSBY:  Your Honor, we're here on --

16          THE COURT:  I'm sorry.  Mr. Busby, I can't keep up

17  with it either, so I don't know.

18          MR. BUSBY:  I certainly have tried to keep up with

19  it, Your Honor, and it's very hard to get orders that are

20  proposed the night before a hearing.  To the best of my

21  knowledge, this is in fact the order that is attached to the

22  motion to compel that is the subject of today's proceeding.

23  It's a continuation of an ongoing proceeding.  The record --

24          MR. BERNICK:  Again, that's not true.  This was

25  specifically done, and this is -- we filed these things and

1  they are listed in the agenda.  This particular proposal

2  pursuant to the hearing that took place two weeks ago, was

3  executed through the creation of an interrogatory.  We then

4  filed on May 1, it was not on the eve of this hearing today, it

5  was on May 1, proposed interrogatories and an order regarding

6  debtor's motion to compel compliance with consulting expert

7  order in approving interrogatories.  That is a different order.

8  Other counsel responded to the interrogatories.  Indeed with

9  had an extended colloquy in the context of the motion to compel

10  relating to these interrogatories.  So we're here on entry of a

11  different order that has timely been submitted to the Court,

12  it's been the subject of colloquy with other counsel and

13  attaches a specific set of interrogatories.  And we have a

14  responsive set of interrogatories that was submitted by Mr.

15  Esserman's firm.

16         MR. BUSBY:  Your Honor, I agree that there was

17  certainly an attempt made to resolve the problems with

18  interrogatories, and I think it is entirely appropriate to have

19  interrogatories and I think Your Honor is entirely correct that

20  there needs to be some adequate demonstration that documents

21  being withheld properly qualify for the consulting expert

22  privilege.  I will turn in a moment to how the interrogatories

23  proposed by Mr. Bernick do not honor a proper form of

24  interrogatory because they violate the law in terms of

25  protecting the identity of the consulting expert.  As we cited

1 in our original brief, the 10th Circuit has held that

2 disclosing the identity of the expert is itself inappropriate

3 in the context of a consulting expert.  And there is no basis,

4 no legal authority whatsoever for Mr. Bernicks' proposal in his

5 interrogatories, at least no authority of which I'm aware, that

6 says that you have to identify the individual by name -- and

7 I'll go through --

8          THE COURT:  Okay, so the record's clear.  I believe

9 what we are dealing with today is what was filed by the debtors

10 at  Docket Number 15468.  This is a certification of counsel

11 regarding interrogatories and an affidavit of compliance on

12 debtor's motion to compel compliance with the consulting expert

13 order.  It's apparently related to Docket Number 14929 that

14 came up on the April 13th agenda at Number 3 and the May 2nd

15 agenda at Number 14, and attached to that as Exhibit A are the

16 debtor's first set of interrogatories and there is an order --

17 a proposed order attached to that which is not the order that

18 Mr. Busby now has on the screen.

19          What I believe -- I also have, but I have never

20 gotten from anybody except my law clerk who just handed it to

21 me in court this morning, is another certification of clients

22 -- of counsel at Document Number 15523 that I think was filed

23 on behalf of Stutzman Bromberg which I have never seen to date,

24 because apparently whoever's filing this for Stutzman Bromberg

25 is and has not been complying with the Court's rule requiring

1 that my staff be e-mailed versions of these.  And so this is

2 not the first time I have not seen Mr. Esserman's document.

3 Mr. Esserman, please get this straightened out because this is

4 getting really to be a problem.  And I would like to see things

5 in advance and I do not have any idea what this document is.

6 It appears to be another set of interrogatories.

7            Now, Mr. Busby, so the record is clear, I think

8 that's what we're dealing with now.  Go ahead, please.

9            MR. BUSBY:  Your Honor, the order that I was ref

10 erring to is the order attached --

11            THE COURT:  I know, on the first set.

12            MR. BUSBY:  -- to the motion to compel --

13            THE COURT:  Yes, we're past that.  Please go ahead.

14            MR. BUSBY:  Now, to turn to the issue of the 10th

15 Circuit's decision, Your Honor, that's cited in our brief, the

16 10th Circuit has held (indiscernible) cited on Page 7 of our

17 brief that the identity of the expert should not be disclosed.

18            THE COURT:  I understand.  We're in the 3rd Circuit

19 however, so it's nice, but we don't have any 3rd Circuit law

20 that I know of that talks about that.  And I understand why the

21 10th Circuit has ruled that you might destroy the consulting

22 expert privilege --

23            MR. BUSBY:  Exactly, Your Honor.

24            THE COURT:  -- by identifying who the consultant is.

25            MR. BUSBY:  Exactly.  And in addition, Your Honor, it

1 would destroy the whole privilege if the results of the B-read

2 were to be disclosed as Mr. Bernick seeks in his interrogatory

3 answers.  He asks in his Interrogatory Number 3I whether the

4 result of the B-read was negative and/or included a reading of

5 less than 1/0.  Well if that information is provided, there's

6 not protection of the privilege whatsoever, because not only is

7 the identity of the B-read performer being disclosed as he --

8 according to his interrogatory, but the result of the B-read,

9 which is indeed the opinion.  There's no privilege being

10 honored here in these interrogatories.  These interrogatories

11 are an attempt to revisit the merits of Your Honor's ruling on

12 the consultant privilege.

13        THE COURT:  Well that may be the case.  If we knew

14 for a fact that there was a legitimate -- and I'll use that

15 word in quotes, "legitimate" consulting expert privilege being

16 asserted.  But with all due respect, how do I know?

17        MR. BUSBY:  Your Honor, in terms of my clients, and I

18 represent one firm that has withheld B-reads, and my firm has

19 submitted an affidavit that states specifically, "The only B-

20 reads that Waters and Kraus has withheld from Grace represent

21 facts known or opinions held by experts who were retained or

22 specially employed in anticipation of litigation or preparation

23 for trial and who are not presently expected to testify at

24 trial."  It says, "None of the B-reads that Waters and Kraus

25 has withheld were made by B-readers who first screened a

1 claimant.  In other words, none of the withheld

2 B-readings are screenings that were made prior to the time that

3 any other diagnosis of an asbestos related disease or injury

4 was sought or known.

5       And then finally it says, "None of the B-readings

6 that Waters and Kraus has withheld were made by B-readers who

7 examined a claimant prior to the time an attorney/client

8 relationship was established between the claimant and Waters

9 and Kraus.  Now that is language that by no accident precisely

10 tracks the text of Your Honor's supplemental order.  It's hard

11 for me to imagine what more a firm could do to commit

12 themselves on the record and under oath that they have honored

13 and complied with Your Honor's order.  To insist on a log

14 beyond that or interrogatory answers in addition is certainly

15 within Your Honor's discretion.  But those interrogatories

16 should be limited to information that does not destroy the

17 privilege itself.

18       And the things that Mr. BErnick has put on his

19 request, on their face destroy the privilege.  They demand the

20 substance of the opinion that was reached, the identity of the

21 B-reader.  There's no legal authority for that.  And in terms

22 of legal authority, Your Honor, the reference to the <u>Coates v.</u>

23 <u>AC&S</u> case that Mr. Bernick recited here this morning.  That's a

24 case in which the Court held that there were exceptional

25 circumstances and that that was the basis for permitting the

1 discovery.

2        Your Honor has already ruled in this case that there

3 is no finding of exceptional circumstances sufficient to

4 justify the production of things that are genuinely the

5 consulting experts.  So that case has no connection whatsoever

6 to this.

7        We're here simply to establish that it's a proper

8 invocation ,the consulting expert privilege, by really

9 identifying that the date of the B-read is after the retention

10 of counsel, that the -- and that the B-reader has not otherwise

11 been disclosed in any other form and that the B-reader is not

12 intended to be used for trial.  And Your Honor's made clear

13 that if that ever changes, that if there's ever an intention to

14 disclose it or it is disclosed or going to be used, then it has

15 to be produced.  But this interrogatory demand which was

16 presented to counsel on -- there was a meet and confer at four

17 o'clock on Monday of last week -- and basically this set of

18 interrogatories was presented as, well this is what we want and

19 if you don't want to agree to it, we'll have to have the Court

20 decide.

21        MR. BERNICK:  I object to that characterization.

22 Meet and confers are for purposes of trying to resolve matters.

23 To have them then characterized and mischaracterized in court

24 is contrary to the whole purpose of the exercise.  Otherwise,

25 no one would have meet and confers because they'd all be

1   posturing on who's going to say what, and what's going to get

2   quoted to the Court.  And that is specifically a

3   misrepresentation because I know what happened on that call and

4   that's not true.

5          MR. BUSBY:  Be that as it may, there was no progress

6   made, Your Honor, and that's why we're here today with a

7   request by Grace that information that would destroy the

8   privilege be disclosed, and claimant's counsel, it's fine for

9   the ACC and the FCR to represent the population, but my client

10  is a law firm that has the legal obligation and the right to

11  preserve its own privileges, and Your Honor has recognized that

12  in these consulting privileges rulings.

13         And the concept of going back and collecting some

14  universe of additional information from doctors and from other

15  sources and other law firms that Mr. Bernick addressed at some

16  length in his comments this morning, flies in the teeth of the

17  whole premise of what I've heard in this proceeding, which is

18  get the original x-rays so that the original x-rays can be

19  evaluated by Grace's own expert and their expert can say what

20  they want to say and then the claimants or the ACC will say

21  what they want to say.

22         Now putting aside whether that's a debate that's

23  appropriate or not, that's what's been argued, that they should

24  see the original x-rays and form their own opinion.  Well,

25  we've gone through a tremendous amount of effort and exercise,

1 at least on the part of my clients, to produce genuine or

2 original or conforming duplicate x-rays so that then the

3 original source material can be interpreted.  Well, this whole

4 debate about B-reads from prior law firms or prior doctors and

5 going out and ferreting out and searching for them is totally

6 beyond the scope of the concept at the outset which was to look

7 at x-rays.  Now Mr. Bernick can go back and pull much more

8 adeptly than I possibly could, passages from transcripts of

9 multiple hearings where I was not present and create and craft

10 an argument by quoting from the questionnaire and so forth, and

11 it's very hard for me to follow the progression, because

12 everything that was argued at one particular hearing was later

13 formulated in an order that didn't -- you know, that was

14 adopted by agreement.  And then there were later events that

15 took place, the questionnaire was modified in various forms

16 through this process.  The recent history has been to get

17 x-rays.  To get x-rays only and have them made available to

18 Grace to review.

19        The firms as to which this motion was originally

20 brought and the -- whatever order we're referencing, the fact

21 of the record is that the motion at the outset was brought

22 against the law firms.  Those law firms have produced what they

23 have or what they don't have and they've produced the x-rays.

24 And now to suddenly expand the whole universe of what we're

25 dealing with, which is going to take countless amounts of days

84

1  and months and weeks or it's going to be impossible, which is
2  exactly what Grace would like, they'd like to have it be
3  impossible so then they can draw inferences.

4       There's no record here to show that there was fair
5  notice or a fair justification for this sudden expansion to go
6  into B-reads by former doctors that are not in the custody of
7  current counsel.  We're talking about -- my clients are current
8  counsel of record in this proceeding and in the prior
9  proceedings.  They represent these people.  They are the
10 lawyers who have said, we rely on B-reads and we rely on x-ray
11 evidence that we have.  They're producing that.  If and to the
12 extent they have a consulting expert that they retained after
13 their representation of the client, they're withholding that.
14 They're only one firm of all the firms I represent that's doing
15 that.

16      But the point is, we're looking at x-rays and these
17 firms and suddenly now at this last minute, we're expanding it,
18 not to the plaintiffs' firms, but to the claimants and asking
19 the claimants to go out and dig around everywhere, all their
20 doctors' records for the history of time or the law firms to do
21 it for them.  There's no justification for that, Your Honor.
22 It's beyond what's appropriate in terms of looking at the x-
23 rays themselves and the interrogatories that Mr. Bernick has
24 requested would destroy the privilege that Your Honor has
25 recognized exists.  Thank you.

**J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  Mr. Esserman.

2          MR. BERNICK:  I was going to make a joke at Mr.

3  Esserman's expense.  There's a famous Texas story in the Texaco

4  Gulf litigation when Joe Jemal who represented Texaco I guess,

5  not Texaco, but Pennzoil, a defense lawyer in the back of the

6  courtroom had told the jury that he was sitting back there

7  because he didn't agree with what the witness was saying on the

8  stand.  But I know that Mr. Esserman's back there for a

9  different, much more proper reason, right?

10          MR. ESSERMAN:  Right.  Soft seat.

11          THE COURT:  I don't think Mr. Esserman's agreed with

12  a thing that's happened on this side of the bench since the

13  case has started.

14          MR. ESSERMAN:  At least on that side of the bench.  I

15  realize we've got time issues here and I'd like to try and cut

16  through the mustard as fast as I can.  On the other hand, Mr.

17  Bernick took about an hour and a half making lots of

18  misstatements, I can't possibly correct all of them in a few

19  minutes.   But suffice it to say there are a few things that

20  are clear and how do we know them?  Well, we know them from

21  Grace themselves.  Millions of documents have been produced.

22  Grace itself says it would take eight years, they said in their

23  pleading, to properly code all the documents from all the

24  attachments.  What does that tell us?  Grace is overwhelmed

25  with information, not underwhelmed with information.  Now, are

1  those attachments all perfect?  Could Mr. Bernick trot out some
2  responses that aren't to his liking?  Of course.  But the
3  bottom line here is that Grace is looking to do a sampling.
4  And you heard a little bit about it today.  They're going to do
5  a 2,000-person sampling.  There's a reason they're doing a
6  2000-person sampling, because they can't possibly code all
7  their documents, get all the information that they already have
8  in house in some sort of usable form.

9        What we really should have been talking about here is
10  the motion to compel and Your Honor's suggestion that let's put
11  together an interrogatory, let's put together something simple
12  that we can identify the privilege and what's being withheld.
13  That was what Your Honor last left us with.  Your Honor did not
14  imply that we needed a whole new round of discovery, a whole
15  new round of people to which had to respond to these
16  interrogatories, prior counsel as Mr. Busby referenced other
17  issues.  What you wanted to identify was what was being
18  withheld and whether the privilege was properly asserted.

19        There is an issue -- and we've raised it in our brief
20  and I just want to raise it for the record only -- as to
21  whether or not the consulting expert needs to be disclosed in a
22  privilege log at all.  There is specific case law to the
23  contrary that -- and the basis of it is it's not really a
24  privilege at all.  We've made that argument, we assert that as
25  our first position.

1          Our second position is, what we did is what Your

2    Honor requested.  And I apologize for the e-mail problems, I

3    will go back and check, but I thought I saw an e-mail to your

4    staff with our document.

5          THE COURT:  Okay, please do.  Because if it's a

6    problem on my end, then I apologize for yelling at you, I'll

7    yell on my end.

8          MR. ESSERMAN:  I'll accept the yelling regardless.

9          THE COURT:  We have been having some "updated e-

10   mail," they're updating the server and so there could be issues

11   on this end.

12          MR. ESSERMAN:  But what I think you've got to go back

13   to is, let's take a step back to the basics, which is I think

14   what Your Honor really wanted to do is say, well, if there's

15   things being withheld, I understand your argument, Mr.

16   Esserman, I want an interrogatory, sort of my understanding of

17   where you would come out on this.  And so I think we need to go

18   back to what the rule says and sort of look at the rule and

19   say, okay, what's in an interrogatory that will comply with the

20   rule.  I have no idea how to work this machine.

21          THE COURT:  I think you need to go -- yeah, there you

22   go.

23          MR. ESSERMAN:  What I'm putting on the screen for

24   those on the phone is Rule 26.  And it's very simple as to what

25   it requests and requires.  I'm not going to read it, I don't

1   think it's necessary, but it provides how you sort of assert a

2   privilege.  And so what we did was we looked at Mr. Bernick's

3   proposed interrogatory which we it's way out of bounds, and

4   would require even within bounds, not 15 days, not 30 days, but

5   probably a multiple of months for those firms with lots of

6   files that have to be reviewed and then having to go back to

7   the prior law firms that may have had this case and make

8   inquiries there.  But we put together something that I think is

9   simple, direct, to the point using as much as the definitions

10  that Mr. Bernick had in his interrogatory and it's basically

11  four interrogatories.  And what I'd like to do is hand -- I've

12  got a copy of -- a paper copy here --

13          THE COURT:  I think if they're the same as what you

14  filed, I have them now.  Let me double check.

15          MR. ESSERMAN:  And I've got one here for anyone that

16  needs one, but I think everyone has probably got one.  But I

17  think if you go through these interrogatories relatively

18  quickly you can see that they will in fact elicit I think, the

19  response that the Court is looking for.  They can be answered

20  in a relatively prompt time frame.  It is not embarking on a

21  whole new round of satellite litigation, satellite objections,

22  satellite appeals, satellite everything, which frankly is not

23  the intent, I believe, of Your Honor.  That is, Your Honor

24  wants to get to this estimation at some reasonable time in the

25  future.

1           THE COURT:  In my lifetime.

2           MR. ESSERMAN:  And get information that's usable.  So

3    what I've done is I took what I could from what Mr. Bernick did

4    and I think that there's a significant amount of detail.  And I

5    will quickly read it for those people on the phone.

6    Interrogatory Number 1, for each of the claimants identified on

7    Exhibit C, have you withheld any B-reads within the firms

8    possession or control -- custody or control.  Response,

9    Interrogatory 2, if you answered yes, identify the claimants

10   for whom the B-reads are being held and the number of B-reads

11   withheld with respect to each claimant.  And some of these

12   interrogatory questions, by the way, are identical to what Mr.

13   Bernick asks and we tried to keep of much of what he had in

14   there as we could.

15           Interrogatory Number 3, for each B-read document

16   withheld, identify the following, the claimant -- I'm going to

17   use a little bit of shorthand so I can burn through these --

18   the date of the document, a general description of the

19   document, the basis on which you're withholding, the date upon

20   which the claimant was initially diagnosed or sought a

21   diagnosis, the date upon which a claimant formed an

22   attorney/client relationship with your law firm, a list of all

23   others to whom the document has been provided.

24           And then a verification interrogatory.  In my view of

25   observing these procedures and proceedings before the court,

1 this will give in a relatively brief amount of time, I think

2 most firms should be able to respond to this within 30 days, at

3 least that's the feedback that I'm getting from the firms.

4 It's something that can be gotten back and you can have a

5 sufficient identification.  It's not overly complicated, it

6 identifies the issues, it doesn't disclose what is in the

7 B-read or what is in the x-ray or what is in the report as I

8 think would be completely improper.

9        And of course, I know Your Honor knows this, but B-

10 reads to a certain extent are in the eye of the beholder, they

11 are in the eye of the doctor.  Why do you think Grace proposed

12 at one point in time, have three B-readers or three x-ray

13 readers go around and look at various x-rays.  If it were so

14 simple, they'd have had one.  And it either is done or is not,

15 but they proposed a panel of three at various points in time.

16 Well there was a reason they did three, and there's a reason

17 why a 1/0 -- and you'll hear more about this in the estimation

18 -- but at 1/0 means, well someone sees an abnormality, someone

19 doesn't see an abnormality.  I'm not a B-reader, but they all

20 look like cloud formations to me anyway.

21        So anyway, I think what we've got here is something

22 simple, something that can be -- is usable, something that's

23 practical and something that is within the confines of the rule

24 assuming a privilege log for the withheld documents is

25 requested at all.

**J&J COURT TRANSCRIBERS, INC.**

1        We've got lots of -- Mr. Bernick got to speak for an

2   hour and a half -- we've got lots of things to attack today.  I

3   think I've taken ten minutes at the most and our side as a

4   whole has tried to be brief and to the point and we'd like to

5   get something that's been approved by the Court not subject to

6   satellite litigation, appeals, whatever, just get it done.

7   Thank you.

8        THE COURT:  Okay.  Well from the claimants'

9   perspective and from the Committee and the future claims reps.

10  perspective, are they on board with your version of the

11  interrogatories?

12       MR. FINCH:  Your Honor, the ACC does not object to

13  Mr. Esserman's interrogatories.  We don't have the authority to

14  agree on behalf of 100,000 people, but I'm not going to object

15  to them either.

16       THE COURT:  All right.  What about the future claims

17  rep?

18       MR. ANSBRO:  We don't object to the interrogatories,

19  Your Honor, but we dispute that the exercise as a general

20  matter is even necessary or appropriate at this stage.

21       THE COURT:  All right.

22       MR. ESSERMAN:  I agree with that also.  That's my

23  first premise, but drilling down, trying to get to where we

24  need to be.

25       THE COURT:  All right.  Thank you.  Mr. Bernick.

**J&J COURT TRANSCRIBERS, INC.**

1          MR. BERNICK:  Yes, I just have a brief response.

2          MR. HERRICK:  Your Honor, excuse me.  Your Honor,

3  this is John Herrick, I'd like to be heard on this issue as

4  well.

5          THE COURT:  I'm sorry, Mr. Herrick.

6          MR. ESSERMAN:  I was going to ask.  There are

7  claimants on the phone that may have either positive or

8  negative views to what I said or what Mr. Bernick said.  I

9  think they should respond before Mr. Bernick.

10          THE COURT:  Okay, thanks.  Mr. Herrick, go ahead.

11          MR. BERNICK:  I'm sorry, Your Honor, in light of the

12  time, could we set non-duplicative points that are being made?

13          THE COURT:  Yes.  I think that's a fair comment at

14  this point, that non-duplicative, and that will go for the

15  debtor too.  So go ahead, Mr. Herrick.

16          MR. HERRICK:  Thank you, Your Honor.  And let me

17  apologize for not being in there in person, but it gets a bit

18  expensive to spend $2,000 every time the debtor wants to re-

19  argue your consulting expert order.  I want to talk about non-

20  duplicatively is what we've already discussed is a cost and

21  expense that is inherent in this process and how thus far it

22  has all been directed at the plaintiffs' bar and the claimants

23  to aggregate the information and provide it to the debtor,

24  which we have done by way of Court-approved attachments to the

25  questionnaire in which the debtor has candidly admitted that

1  they haven't looked at yet.

2        Your Honor, you've heard a little bit about the B-

3  reader process, the process is inherently subjective.  In fact,

4  it is well documented and well know, a phenomenon called inter-

5  reader variability, which basically says that if you give the

6  same chest x-ray to two B-readers, you're very likely to get

7  two different results from it.

8        Your Honor, I've come to this Court before and told

9  you that I have litigation, real world experience with respect

10 to these issues.  I have been trying asbestos cases for nearly

11 20 years and in every case, Your Honor, every case that I have

12 ever tried that had any allegations of any nonmalignant disease

13 relating to asbestos, there has been a B-reader on the other

14 side that has found a no asbestos related disease in my client,

15 either that or he has found simply pleural plaques which he

16 characterizes as not being a disease.

17       Your Honor, there is a study called the Gitlin study

18 that was a published study -- I'm not going to argue the

19 validity of that here today -- which suggests or purports to

20 find that B-readers for plaintiffs in the asbestos litigation

21 over-read x-rays as compared to a panel of experts unbiased,

22 blind and B-readers.  In other words, they don't see positives

23 in those chest x-rays.

24       I would stipulate, Your Honor, that the debtor would

25 be able to find a B-reader or readers to dispute every B-read

J&J COURT TRANSCRIBERS, INC.

1 -- positive B-reading that we've sent to them.  That's just the

2 way it's going to happen.  And in fact, Your Honor, I have

3 provided in the attachments to my -- there was some question

4 that came up at the last hearing -- in the attachments to my

5 questionnaire responses, I have provided B-reads that were

6 authored by some of the so-called tainted doctors as I think

7 Your Honor has described them.

8         The problem here is clearly a cost issue and now what

9 we're talking about is the fact that the debtors are not even

10 going to take the time to look at all this information.  We

11 talked at the hearing before last that we're cutting off the

12 date for Russ to supplement their database, we're cutting off

13 the time for experts having to review additional documents that

14 were provided.  I was quite happy to work with the debtor in

15 crafting an order with respect to the chest x-rays which

16 allowed both of us to have our way.  In other words, he got the

17 -- the debtor got the certainty and finality that they wanted,

18 I got to get myself out of it.

19         What I want here for my clients, Your Honor, is a

20 determination -- it's clear to me that the real issue that the

21 debtor is talking about here and why we're arguing about all

22 this stuff is Mr. Bernick is arguing at every opportunity his

23 client's argument on the estimation.  Now that's all well and

24 good and he can take his time arguing what he wants to, but

25 he's relying on discovery from third parties to pursue his

1  arguments and this discovery that he's admitted now, he's not

2  even going to use.  So, Your Honor, I do object to the

3  interrogatories that counsel for a group of defendants has --

4  excuse me, a group of claimants has proffered to the Court this

5  morning.  I think it's clear that these issues need to be

6  resolved between the parties to this proceeding, and that being

7  the ACC and the future representative and the debtor without

8  relying on enlisting and in fact the indentured servitude of

9  claimants and claimants' counsel.  And, Your Honor, that's my

10  argument.  I'll respond to anything else, but I'll otherwise

11  sit down.

12          THE COURT:  Okay, thank you.  Anyone else on the

13  phone wish to make an argument?  Mr. Bernick.

14                  (Counsel is difficult to hear)

15          MR. BERNICK:  Your Honor, (indiscernible) very

16  briefly.  One is whether in fact there is a dispute on the

17  record before the Court regarding the factual predicates for

18  our request.  We have laid out the factual record.  There is an

19  extensive factual record that's also recently (indiscernible)

20  filed.  But there is a record of this case, it's not simply a

21  question of counsel's assertions.  There is a record in the

22  case.  There is only one person who has spoken to Your Honor

23  just now (indiscernible) to create the mystique about what the

24  facts were.  And that was, that is the facts regarding

25  compliance.  And that was Mr. Finch.  Mr. Finch took a look at

1  our Exhibit 2 and he marked it up with what is his Exhibit 1

2  and he created -- he purported to create a couple issues that

3  I'll respond to very, very quickly, because I don't believe

4  they go to what it is that we're asking for here today.

5       He said first of all that when it comes the claims

6  database, the claims database may include claims that were

7  dismissed for no money.  I think they were dropped.  That may

8  be possible, if it's pointed out to us that that's so, we will

9  certainly alter it, but that database currently shows claims

10 pending of 119,000.  Mr. Finch says I think it could go as low

11 as 100,000.  There's been no demonstration to the Court that

12 that is so.  This all comes from the Russ database, so it's not

13 a question of their being any kind of secret information.

14       He then says the 79,000 actually is -- that is the

15 number of POCs filed, actually goes to 104,000.  It's true that

16 104,000 POC's were filed.  The question is whether any of them

17 match up with the then pending claims.  Because we had two

18 filed POC by imply dumping out their current inventory of

19 claims and making a POC out of it.  So you have to match.  The

20 79,100 gave the benefit of the doubt on the matching. That is

21 there was an extensive matching process.  This includes

22 possible matches.  If you really look for concrete evidence

23 that there was in fact a match, the number goes down to about

24 50,000 claims, which is significantly less than half of the

25 pending claims at the time the bankruptcy was filed.  So the

1    bar doesn't go up, it actually goes down when you consider the

2    details of the matching.

3         He then says, well, this is only confined to people

4    who answer key questions on the face of the questionnaire and

5    that's correct.  He says, well, the answers in the attachment,

6    we've demonstrated to the Court, indeed it was admitted by the

7    other side, that the answer was not in the attachments.  That's

8    the whole problem, that's the reason why we've had to go and do

9    the sampling because the attachments do not contain -- the

10   attachments have not been referred to in the way that the Court

11   required.

12        The Court's troubled to find the answer in even one

13   attachment, we're now giving you thousands of them.  So it says

14   the answer's in the attachment.  We already now know that they

15   have not complied with the requirements for showing the answer

16   in the attachment itself.  He says, well, geez, you know, it's

17   not so bad, 4 million documents, that's 40 pages per

18   questionnaire, it's easy.  Well why don't they go ahead and do

19   it?

20        THE COURT:  They didn't ask for it.  I have the

21   answer to that one.  I don't need argument on that.  They

22   didn't ask for it.  I know that one.  They've argued that

23   before.  This is the debtor's project, not their project.

24        MR. BERNICK:  They didn't go and fill in answers to

25   the questionnaire.  They were the ones that were insistent upon

1  being able to answer the questionnaires using the --

2          THE COURT:  Mr. Bernick, everybody wants to do it

3  that way.  Why do the work themselves when they can make you do

4  it.  That's what discovery -- that's the problem with the

5  federal rules, we all know that.  We've been there, done that.

6  All right.

7          MR. BERNICK:  I guess it's okay, they should just

8  violate Your Honor's order told them to do it otherwise.

9          THE COURT:   No.  They shouldn't be violating the

10 rule that said that they should have identified the page.

11 That's the problem and that's the reason why I'm considering

12 letting you do these interrogatories in the first place,

13 because they haven't complied with this order.  But, Mr.

14 Bernick --

15         MR. BERNICK:  That's all where I'm going.

16         THE COURT:  -- but the reality is that if the debtor

17 isn't going to use this information, this whole project has

18 been started based on the debtor's assertion that the debtor

19 wanted to get the whole universe of claims that it could then

20 put into a database and see, essentially, whether there were

21 legitimate -- in the debtor's words -- I'm not sure that this

22 is a quote, but in the debtor's construct, legitimate claims

23 that would then inform the debtor as to the number of present

24 claims so that a projection for future claims and an estimate

25 as to how much the debtor would have to pay to fund a trust to

1 pay those claims could be directed into the plan confirmation

2 process.  That's what this is all about.

3        And you were very adamant that you didn't want to do

4 a sampling.  You wanted to have all of this information because

5 you felt that that was 100 percent essential to get to where

6 the debtor wanted to go to be able to assess the present

7 claims, estimate the future claims and come up with the number

8 of a number that would be supported by, hopefully the

9 constituents in this case.  That's why we've been treading down

10 this road. That's the only reason we've been treading down this

11 road.

12        MR. BERNICK:  Correct.  And, Your Honor, then

13 pursuant to our request as you saw in the transcript today,

14 recognized that these are discovery requests, there has too be

15 compliance.  At one point Your Honor was threatening dismissal

16 of the claims.  The whole series of orders that were designed

17 to enable the debtor, like any litigant, to discover the facts

18 that are relevant --

19        THE COURT:  Right.  Now, the problem now however is

20 there are certain things, certain rules that apply to

21 discovery.  One of which is a consulting expert privilege.  And

22 it will work in the debtor's favor at some point just like it

23 will work on the other side's favor at some point.  And I've

24 already made rulings about that consulting expert privilege.

25 It's going on  appeal.  I guess I'll find out whether I'm right

1  or wrong --

2          MR. BERNICK:  It's not going on appeal.

3          THE COURT:  It's not going on appeal.

4          MR. BERNICK:  No, because there was no proper

5  interlocutory appeal, it's not being --

6          THE COURT:  Oh, and that's not being appealed.

7          MR. BERNICK:  That's not being appealed.

8          THE COURT:  Okay, well then it won't go on appeal.

9  Some other case I guess will tell me whether I'm right or wrong

10 about this analysis.  At this point in time, we've got the law

11 of the case, I'm not modifying the order that I entered.

12         MR. BERNICK:  I understand that, I'm not asking you

13 to modify that order, Your Honor.  What I'm saying is, this

14 goes to the substance of our interrogatories, yes, Your Honor

15 issued all those orders, what we believe are entitled to find

16 out is the extent to which those orders have not been complied

17 with.  And in specifics and in detail why?  A, because we need

18 to have a record (indiscernible) the case and B, we won't be

19 able to foreclose, if that's what we're going to be asked to

20 do, people arguing that well, the evidence that was out there

21 would have shown, or if you had read the other attachments at -

22 - if you had done this, why.  We have to get an end to the

23 shell game.

24         THE COURT:  And we've been through that road.  That's

25 why we're here today.  The only question is whether these

1  interrogatories as formulated by the debtor, in the words of

2  the other side, go too far so that they somehow or other

3  completely destroy the privilege.  And as it appears from the

4  version that Mr. Esserman's handed up, there are fewer

5  subquestions to Interrogatory Number 3, but really what has

6  been deleted from those subquestions is the specific diagnosis

7  that's on the B-reads and the specific identification of the B-

8  reader.  Those appear to be the two things.

9          MR. BERNICK:  I know Your Honor has encouraged me to

10  get to the point  --

11          THE COURT:  Yes.

12          MR. BERNICK:  -- of the interrogatories.  I

13  understand that.  But again, the only reason I'm saying -- I

14  went through this thing with Mr. Finch is that we do have

15  record here and I want to make sure that the record is clear

16  about -- I believe it already is clear and been recently filed,

17  this is very important, because it does apply -- it has to be

18  the touchstone for the interrogatories, which is the need for

19  the discovery.

20          THE COURT:  I don't disagree that you're entitled to

21  this discovery, it's calculated to lead to relevant admissible

22  evidence, I've already made that determination.  So let's go

23  past that.  The only issue is how.

24          MR. BERNICK:  Let's talk about the (indiscernible).

25  We had Mr. Busby who actually -- his firm is the same firm as

1  Mr. (indiscernible). Looks like he hasn't been here, Mr.
2  (indiscernible) hardest hitting of all of us. And they
3  actually represent a whole series of firms. He's here for only
4  one thing, that there's a problem on the burden only with
5  respect to Waters and Kraus. There are a whole bunch of other
6  firms that are represented, but there was no statement that was
7  made that there was anything (indiscernible). One firm, Waters
8  and Kraus, 500 matching claimants, so how burdensome is this
9  for Waters and Krause for the documents that they're
10  withholding and for the privilege that they've asserted, to go
11  back and actually identify the document and they can say
12  (indiscernible).
13        THE COURT:  Well, but if we look at Mr. Esserman's
14  sets, that information is already included. They have to
15  identify the claimant, they have to identify the date of the
16  document and the general description, they have to identify the
17  basis on which they're withholding, the date of the diagnosis,
18  the date the attorney/client relationship was formed and a list
19  of anybody else to whom that document was produced. That
20  essentially gets you the basis for the privilege --
21        MR. BERNICK:  No it does not.
22        THE COURT:  -- let me make a ruling so I can cut
23  through this. I'm not going to require the name of the doctor
24  or the B-reader because I think that waives the consulting
25  privilege at this point. As I said earlier, if there is a

1  change and the doctor or consultant is going to be called at

2  trial at that point in time, this ruling no longer applies

3  because there will be a testifying expert and at that point

4  they're going to have to be disclosed as will their reports and

5  their documents.  So I want to make that caveat.  I'm not going

6  to state it again.  That's my ruling.  I'm not going to require

7  --

8        MR. BERNICK:  Your Honor, if you want to go ahead and

9  make the ruling that's fine --

10       THE COURT:  I'm making that ruling.  I have made that

11 ruling.

12       MR. BERNICK:  -- I have yet to be able to respond to

13 the burden argument that's being made and to point out how Mr.

14 Esserman's order is not being accurately presented to the Court

15 and does nothing of the kind that Your Honor's indicating.

16       THE COURT:  Okay.  But with respect to that ruling,

17 to require the name of the doctor or the B-readers, I agree

18 with the 10th Circuit case, would violate the privilege itself

19 by identifying the consultant.  So I think although there is

20 not a 3rd Circuit case that I'm aware of, I agree with the 10th

21 Circuit in that respect.  So to that extent, I agree with the

22 10th Circuit, I'm not going to require the name of the doctor.

23       For the same reason, because I also agree with the

24 10th Circuit, I do not think it's appropriate to identify the

25 diagnosis that the B-read withholds.  I do agree that the date

**J&J COURT TRANSCRIBERS, INC.**

1  of the diagnosis is appropriate and if there is, for example,

2  more than one diagnosis on a certain date, each one should be

3  set out separately so it's clear that there is more than

4  diagnosis.  But I don't think the diagnosis itself is at this

5  point, relevant.  That's the whole purpose for the privilege.

6        So for that reason I'm making that ruling in line

7  with the case law that I think it relevant and I believe what

8  the 3rd Circuit would adopt.  As to the rest, go ahead and make

9  your argument.

10        MR. BERNICK:  Well, Your Honor, with respect to what

11  you just ruled, and I understand Your Honor's anxious to get

12  on, but with respect to what Your Honor just ruled, Number 1,

13  if they don't call the doctor to testify, it doesn't mean the

14  person has properly been preserved as a consulting expert.  For

15  example, we have Dr. Graziano.  Dr. Graziano, an example that I

16  just showed you this morning is the person whose subsequent B-

17  read was in fact referred to as the basis for the statement and

18  the questionnaire that this person has gotten asbestos related

19  illness. So it's the same individual doctor called by one law

20  firm a consulting expert, called by another law firm the expert

21  upon which they're ruling.  It can't be both.  You can't have a

22  law firm --

23        THE COURT:  Sure you can.

24        MR. BERNICK:  Baron and Budd's, Your Honor, says very

25  simply, this is Dr. Graziano's expert opinion on the B-read.

**J&J COURT TRANSCRIBERS, INC.**

1  They disclose it, it's part of the questionnaire.  Dr.

2  Graziano, same doctor, in an earlier B-read, indeed the first

3  one we're aware of, says exactly the opposite for another firm.

4  So what they're now withholding is for the same doctor is a B-

5  read that was earlier done without any indication that it's not

6  the initial -- and they're saying it's a consulting expert with

7  no evidence that he was regarded as a consulting expert by the

8  law firm that was involved.

9       THE COURT:  I'm not making a ruling as to whether any

10  particular assertion of privilege is or isn't correct.  I'm

11  just making a ruling as to what the interrogatory can ask.

12  What the interrogatory may not ask --

13       MR. BERNICK:  But, Your Honor, the reason this is

14  critical is not just the doctor who's called to testify.  It is

15  whether the doctor as to which they're saying he's a consulting

16  expert is in fact a consulting expert, and one of the problems

17  is that they could have -- somebody else could have identified

18  -- they identified the same expert as the expert who may not

19  testify at trial --

20       THE COURT:  Mr. Bernick, the structural problem that

21  --

22       MR. BERNICK:  Your Honor, I just --

23       THE COURT:  -- no.  The structural problem that

24  you're creating in this case is that you want the discovery as

25  though these are consulting experts -- no, let me state it,

1  that's not the way I want to phrase this.  You want to

2  structure the discovery because you have to to get it from the

3  individual claimants even though this is not litigation going

4  on against the individual claimants.  It's going on for

5  estimation.  The only way to get the information that the

6  debtor wants to make its case is to do the discovery from the

7  individual claimants and their attorneys and their doctors, so

8  that you can get the underlying information related to the

9  diseases --

10        MR. BERNICK:  These are all claimants who have

11  appeared before this Court and before this Court --

12        THE COURT:  I understand that, Mr. Bernick, but the

13  problem is that they're not going to be the entity against whom

14  you're litigating at trial.  You're going to be litigating the

15  estimation against the ACC and the FCR.

16        MR. BERNICK:  That is exactly the point.  And if

17  that's the point, Your Honor, why are we sitting here messing

18  around with people showing up and making arguments that pertain

19  to their individual --

20        THE COURT:  Because you're asking for discovery

21  against third parties who may in some other --

22        MR. BERNICK:  No, we are -- their claimants are here

23  in court, they're subject to the Court's orders, they must

24  comply.  They are subject --

25        THE COURT:  I'm not going to give you this order.

1  That's the long and short of it.  Do you want to argue

2  something else?

3          MR. BERNICK:  What I'm asking for, Your Honor, is to

4  -- is when Your Honor makes a ruling like that -- and this is

5  now the third or fourth time we've been through this -- when

6  Your Honor makes a ruling like that, all it's going to do is to

7  prompt yet another round of people not being candid with what

8  they're doing.  This is so simple.

9          THE COURT:  Mr. Bernick --

10          MR. BERNICK:  Your Honor has just said -- I'm sorry,

11  Your Honor -- Your Honor has just said, has just said they have

12  to be a testifying expert at trial.

13          THE COURT:  No, I said they have to meet the

14  consulting expert privilege issues.

15          MR. BERNICK:  All that I'm saying is what Your Honor

16  said was that if they are an expert at trial, the world

17  changes.  Now I'm observant to Your Honor is that there are

18  many ways in which they could participate in this case, have

19  participated in this case without being trial experts that

20  would render impossible to claim that they are properly

21  consulting experts.

22          THE COURT:  Well you can be a consulting expert for

23  one firm and not for another firm.  I mean, doctors do it all

24  the time.

25          MR. BERNICK:  No, if the same firm is proffering --

1  Dr. Graziano's being proffered by Baron and Budd who's making

2  the claim.  If they proffered him as their expert for purposes

3  of making the claim --

4          THE COURT:  Wait.  Baron and Budd filed the proofs of

5  claim on behalf of the individual claimants.

6          MR. BERNICK:  File the proof of claim, filed the

7  questionnaire, referred to Dr. Graziano, only gave us the

8  positive B-read, didn't give us the negative B-read that

9  predated the positive B-read done by the same doctor.  So

10 they're the one who has put his opinions at issue.  Under the

11 questionnaire, we ought to be able to get all diagnoses that

12 took place before and after, at least the same doctor.  And yet

13 they're claiming that somehow --

14         MR. ESSERMAN:  Your Honor, I'd like to object.  I'd

15 like to object and here's why I'm going to object.

16         MR. BERNICK:  (Indiscernible) objection.

17         MR. ESSERMAN:  I can object.  I can object.

18         THE COURT:  Yes.  I'm lost.

19         MR. ESSERMAN:  And I never, almost never interrupt

20 Mr. Bernick, he's always --

21         THE COURT:  I thought you represented law firms, not

22 claimants.  I apologize.

23         MR. ESSERMAN:  That's correct.  That's correct.  And

24 this issue that he's talking about has nothing to do with a

25 consulting expert.

1          MR. BERNICK:  It absolutely does.

2          MR. ESSERMAN:  This has to do with a prior B-read

3 that's referred to in a subsequent B-read.  If we're here on --

4          MR. BERNICk:  That's wrong too.

5          MR. ESSERMAN:  -- we're here on consulting experts,

6 what interrogatory has to be given to a consulting experts,

7 that is what the motion is and now we're diverting into

8 individual litigation over certain claims and what was said

9 here, what was said there out of 100,000 claims, we've got to

10 focus on one.

11          MR. BERNICK:  Is the objection over?

12          THE COURT:  Mr. Bernick, please.

13          MR. BERNICK:  Your Honor, this is Baron and --

14          THE COURT:  Mr. Bernick, I do not permit them to

15 interrupt you.

16          MR. BERNICK:  I apologize, Your Honor.

17          THE COURT:  You have to control yourself.

18          MR. BERNICK:  I apologize, Your Honor.  But we're

19 talking about -- we're talking about a situation where, Your

20 Honor, look, anybody looking in on this case, all of the orders

21 that Your Honor has entered and with the evidence that is now

22 before you about what is happening with these -- these are

23 doctors whose expert opinions are rejected everywhere else in

24 the country.

25          THE COURT:  How do You know that?  How do you know

1 that if they haven't been disclosed?

2       MR. BERNICK:  (Indiscernible) won't even accept them

3 anymore.

4       THE COURT:  Mr. Bernick, you're telling me that you

5 haven't even looked at the attachments.  I don't even know who

6 the doctors are in these instances.

7       MR. BERNICK:  Your Honor, that is wrong.  We have

8 looked at the attachments.  And for them to say that somehow

9 we're not going to use this information is another

10 misrepresentation.  Here are the facts.  The facts are that

11 Your Honor issued the order.  The facts are that they

12 represented they were complying in the questionnaire and they

13 didn't' comply in the questionnaire.  They didn't search files

14 beyond.  We want all of the information and we want to note

15 that we didn't get it.

16       THE COURT:  And I'm going to let you get it, but I'm

17 not going to let you violate the consulting privilege to get

18 it.

19       MR. BERNICK:  My point is that they have to establish

20 -- it is their burden under the law --

21       THE COURT:  And I agree with that.

22       MR. BERNICK:  -- 3rd Circuit law, it is their burden

23 to establish that --

24       THE COURT: And I agree.

25       MR. BERNICK:  -- it is not our --

1           THE COURT:  But you may not ask them who it is and

2   you may not ask them what the diagnosis is because that

3   destroys the privilege.

4           MR. BERNICK:  They have sustained their burden --

5           THE COURT:  Yes.

6           MR. BERNICK:  -- and they have not.  And that is the

7   whole -- Your Honor --

8           THE COURT:  You haven't asked the interrogatory yet.

9           MR. BERNICK:  No, but to the contrary, we asked the

10  -- this even more than that, Your Honor.  This is why it is

11  such an incredible outrage.  We asked in the questionnaire for

12  the information.  They objected on the grounds of privilege.

13  It is now their burden to demonstrate that the documents

14  they're withholding are subject to the privilege including with

15  the consulting experts with all of the frills.  And it's not

16  question of their saying, oh, they're consulting experts, they

17  have to demonstrate --

18          THE COURT:  All right, all right.  I think I have a

19  solution.

20          MR. BERNICK:  But before Your Honor --

21          THE COURT:  I think I've got a solution, Mr. Bernick.

22  Please, it's my court.

23          MR. BERNICK:  I'm sorry.  That's true.

24          THE COURT:  I believe that each person answering

25  interrogatories is to prepare a list of each consulting expert

1  and to make a code so, just to pick one, Dr. Graziano for a

2  particular firm will be Dr. A.  And therefore, Dr. A. will be

3  the doctor who will be listed as the consulting expert without

4  identifying who the doctor is.  That way, in now way will the

5  particular consulting name be I guess, subject to disclosure.

6  Nonetheless, Dr. A. will then be affiliated with a particular

7  consulting report, B-reading report and you can track through

8  those B-reads, Dr. A., Dr. B., Dr. C., whoever they are.

9         Now to make this work so that the debtor can in fact

10 know that it's the same set of doctors I'm am going to put the

11 responsibility on someone and I don't know who.  And, Mr.

12 Esserman, since you're so good at getting the groups together,

13 I'm going to start with you to get a list together of who the

14 consulting experts will be from various firms so that everyone

15 will use the same code letters.  Therefore it will be Dr. A.,

16 again, just to pick someone by way of example, Dr. Graziano

17 will be Dr. A. for everyone.  That way the debtor doesn't have

18 to know that it's Dr. Graziano, but the debtor will know that

19 it's Dr. A. or Dr. B. or whoever.  Therefore the consulting

20 expert privilege will still be retained, but nonetheless the

21 debtor will be able to track through to see if it was Dr. A.

22 who read a particular x-ray on a specific date or gave a

23 diagnosis or whatever.

24        With respect to the underlying diagnosis, Mr.

25 Bernick, I do not believe that the debtor has the right to get

1  that information

2          MR. BERNICK:  Let me pick up on Your Honor's

3  suggestion, Your Honor's guidance to us and try to build on

4  that a little bit.

5          THE COURT:  Ruling.

6          MR. BERNICK:  What?

7          THE COURT: Ruling.

8          MR. BERNICK: Right.  Ruling.  In stone.   Baron and

9  Budd retained Dr. A. -- or has Dr. A. as the doctor that does

10 the B-read that is produced and it's positive, it's in the PIQ.

11 There is Dr. A. who could (indiscernible) the same plaintiff a

12 few months before said negative and did so with apparently the

13 Provost Humphreys' firm footing the bill.  Now if we get

14 consistent treatment that the -- I guess what we're really

15 talking about is, there just has to be a list of the doctors

16 who are doctors as to which the consultant privilege is

17 claimed.  But we then have to have -- and this is the problem -

18 - we have to have some way of knowing whether those same

19 doctors also issued reports with respect to the same person

20 that are being relied upon in this case in connection with the

21 questionnaires.  If this person is positive here, negative

22 here, under Your Honor's own order, this (indiscernible) would

23 help, because this was the initial screening.  And under the

24 questionnaire, we're supposed to get all consistent and

25 inconsistent diagnoses.

1      We have no way under Your Honor's rubric of testing

2 out whether this -- whether the person here as to which

3 presumably privilege was claimed, is in fact the same person

4 here who's now in a subsequent reading, no longer a consulting

5 expert is supporting her claim in the case.

6      THE COURT:  All the problems of the world, I don't

7 know that I can solve.  In terms of whether or not there is a

8 consulting expert privilege and so as to preserve the identity,

9 I think I can solve that issue by having a code put in.

10      MR. BERNICK:  I have a different suggestion that

11 builds up on that.  And we're not -- this is not going to

12 completely solve the problem because it's such a knotty one.

13 But, Your Honor, there are a couple of things that are

14 necessary to take up with Mr. Esserman's order or post-

15 interrogatories.  The first problem is that while Your Honor

16 may have ruled that there are not exceptional circumstances

17 here, we believe that we have completely satisfied that

18 requirement, because we believe in the record evidence is in

19 the briefs in this case, the evidence of the other trusts,

20 trusts all over the country that will no longer accept what

21 they have to say.  Their sworn testimony that they didn't

22 intend to act as doctors.  We have briefs that were filed

23 before the Court in connection with the original briefing on

24 this matter, the layout chapter and verse of the whole

25 situation.  Dr. Graziano's testimony was taken.  This is -- I'm

1 | sorry, this is all in the record.

2 |          THE COURT:  But you're not trying the cases, Mr.

3 | Bernick.

4 |          MR. BERNICK:  I'm sorry?

5 |          THE COURT:  You're trying to estimate the claims.

6 |          MR. BERNICK:  But, Your Honor, we're estimating the

7 | claims and one of the issues that we face is the claims can

8 | only be estimated on the basis of the evidence which has

9 | (indiscernible) federal rules of evidence.  They have --

10 | they're now saying, you know this is a case before the federal

11 | court and the federal bankruptcy rules, Dalbert governs the

12 | case.  They have now said two things.  They have said that when

13 | it comes to their supporting their claims, that is, when they

14 | fill out the questionnaire and say, this person's got

15 | asbestosis, see the B-read, there was no page, this was a

16 | positive B-read, that's medical evidence.  And now you've heard

17 | today that, oh there's tremendous D-reader variability, it's

18 | all over the map, et cetera, et cetera.  In fact, B-reads are

19 | subject to a medical standard.  The medical standard requires

20 | that they be replicated.  Why are we doing all this?  It's to

21 | establish they can't have it both ways.  If they are using this

22 | evidence to establish their claim would have had value, they

23 | can't say, oh, we'll take the positive one, but by the way, if

24 | you ask to get the negative ones, oh, that's all inter-reader

25 | variability.  We want to establish entirely the exact point on

1 an inter-reader variability.

2          THE COURT:  You may want to do that, but you need to

3 take that issue up with congress and the Rules Committee,

4 because they permit the sum evidence to be withheld based on a

5 consultant privilege.  Do Courts like it?  No.  Courts don't

6 like it, Courts would like to get to the truth of the matter.

7          MR. BERNICK:  And that's why we're making the record,

8 Your Honor.  That is subject to the Court finding that there is

9 a particularized need for the information.  All that we're

10 doing --

11          THE COURT:  You have B-reads.  You have B-readers.

12 You can take a look at the x-rays.

13          MR. BERNICK:  The x-rays are not the problem.  The

14 x-rays may be the same x-ray.  The problem is that they give us

15 the positive one, they don't give us the negative one and then

16 they purport to say that this is reliable.  If it's reliable

17 and they want to say it's reliable, then we ought to be able to

18 show how with respect to the same claimant, there was

19 inter-reader variability and it doesn't -- it's not

20 reproducible and it can't be --

21          THE COURT:  On the same x-ray, yes.

22          MR. BERNICK:  On the same individual three months

23 later.

24          UNIDENTIFIED SPEAKER:  Your Honor, Your Honor --

25          THE COURT:  Mr. Bernick, you keep making the

1   assumption that human tissue doesn't change.  Human tissue does

2   change.  This is a matter of --

3                MR. BERNICK:  This has nothing to do with human

4   tissue.

5                THE COURT:  -- it does on an x-ray.

6                MR. BERNICK:  What's that have to do with our getting

7   discovery?  They want to argue -- you're making their case.

8   You're assuming that oh, the evidence will in fact show that

9   with respect to an eight-month --

10               THE COURT:  I'm not making anybody's case.  I'm

11  making a ruling on interrogatories.  I'm done making rulings on

12  interrogatories.  I'm not going to give you the names of the

13  consultants and I'm not going to give you the diagnoses.  Is

14  there anything else you'd like to argue?

15               MR. BERNICK:  I would like to argue that consistent

16  with what Your Honor said when we started down this road this

17  morning, you said and you said more than once, we just don't

18  really know who these people really are.  That is, you said you

19  don't know whether they're really consulting experts or not --

20               THE COURT:  Right.

21               MR. BERNICK:  -- we just don't know.  And that is --

22  part of my problem is that we can identify some cases, but we

23  really don't have a record of really were they consulting

24  experts or not.

25               THE COURT:  And I think that's what this

**J&J COURT TRANSCRIBERS, INC.**

1  interrogatory is designed to get.

2       MR. BERNICK:  What I would propose is that in light,

3  especially of Your Honor's determination that we can't get the

4  names, that what we should have with respect to the people that

5  they identify as consulting experts is, what is the

6  documentation?  They can redact the name.  What is the

7  documentation pursuant to which they became consulting experts

8  for purposes of this case?

9       I think that that is a completely fair request.

10 Otherwise this is, we're going to get oh well, we always used

11 them for that.  It's for this case.  This actually illustrates

12 (indiscernible).  This is Dr. Graziano for Baron and Budd he's

13 okay and he's -- same patient -- he's not a consulting expert

14 for this guy, for Provost and Umphreys four months earlier in

15 what may be the initial screening, there was a negative.  And

16 all of a sudden that's now a consulting x-ray.  Well let

17 Provost and Umphreys give us what Baron and Budd will go get

18 from them.  If they're claiming that that's property withheld

19 on grounds of privilege because he's a consulting expert at

20 that time, we should have the documentation that says,

21 remember, the burden is a matter of law, in this circuit and

22 everywhere is on the claimant specifically, not conclusorily,

23 specifically to prove the fact that the privilege should hold.

24       And if you take a look at the cases, there's the

25 Gamma Patent (phonetic) case, there's a whole series of cases.

1  The conclusory statement that so and so is privileged doesn't

2  cut it.  Why?  Because that would mean that basically an

3  alleged privileged holder would say on his say so it's

4  privileged.  There has to be just like we had in this case in

5  connection with <u>Sealed Air</u>, we had in-camera review of these

6  documents, we had detailed logs.  So let them give us with

7  respect to the consulting, that service.  The expert and the

8  documentation that establishes with (indiscernible), this

9  claimant, not generally, but with -- this claimant, they were a

10 consulting expert.  That's number 1.

11        Number 2, and this really goes to the heart of Mr.

12 Esserman's proposal.  Mr. Esserman's proposal is not driven by

13 whether the information really is necessary.  Mr. Esserman's

14 proposal is driven purely and simply by what is more convenient

15 for his clients.  He said my clients are willing to do this.

16 God knows Mr. Esserman does a very good job for his clients,

17 but what happens every time Mr. Esserman comes in and

18 represents, I think I'm going to get cooperation, like with the

19 x-rays, like with the B-reads, it turns out that some of those

20 clients just decided they're not going to do it.  So we now

21 have Mr. Esserman saying, well, at least my clients are kind of

22 okay with this short list.  It has nothing to do with the price

23 of eggs in China.  The question is, what is the need for the

24 discovery and what discovery is appropriate in light of that

25 need.

1           Now what does he do?  He deletes the author of the

2  document.  Why can't we have the author of the document?

3  That's basically -- that is 3C, the author of the document he's

4  deleted.  The recipient of the document, 3D, he's deleted that.

5  The doctors who performed the B-reading including those who

6  prepared the narrative report.  We're now going to get a letter

7  instead of the doctor's name.  Fine, we'll get a letter instead

8  of the doctor's name.  I would further propose that that list

9  of names be submitted to the Court under seal or held under

10 seal in some fashion --

11          THE COURT:  You want what held under seal?

12          MR. BERNICK:  If we have the letters, we need to know

13 -- there has to be a record somewhere for purposes of appeal or

14 whatever, of the doctor's name that corresponds with the

15 letter.

16          THE COURT:  Oh.

17          MR. BERNICK:  They have to be someplace.

18          THE COURT:  Who wrote the letter, who wrote the

19 report.

20          MR. BERNICK:  You said that the doctors who performed

21 the B-read, can't know their names, that they're going to have

22 an A or a B or a C --

23          THE COURT:  Right.

24          MR. BERNICK:  -- somebody, there's got to be some

25 piece of paper somewhere, I think in the Court's possession

**J&J COURT TRANSCRIBERS, INC.**

1  that says, well, A means -- A is Dr. Graziano, B is Dr.

2  Henemena, Henemena.

3           But E he would have just deleted.  F is okay, that's

4  the description of the document.  He then says we can't know

5  whether the document or portion thereof was produced in any

6  litigation or produced in connection with seeking payment of a

7  claim.  I'm sorry?

8           MS. BAER:  We took that out, it's in later.

9           MR. BERNICK:  Oh, that comes back in.  H, who paid

10 for the B-read or provided reimbursement for the B-read.  Well

11 that makes a tremendous amount of difference in terms of their

12 claiming that it was done pursuant to some expert consulting

13 relationship.  If it's an expert consulting relationship and it

14 wasn't paid for by the firm that they say retained them for

15 expert consulting purposes, how in the world is there going to

16 be an expert consultant piece of work product?  Expert

17 consultants generally are paid by the lawyers who retain them.

18 Why can't we just know that information?

19          I, Your Honor has ruled upon.  J, the basis for the

20 claimant withholding.  K, if the document is being withheld on

21 grounds of privilege, what privilege is being asserted,

22 attorney client, attorney work product, consulting privilege,

23 other?  Well, why in the world shouldn't that question be

24 answered?  So this is all convenient for the law firms, it's

25 got nothing to do with the law.

1          L, the claimants initial date of diagnosis.  This
2    says the date upon which the claimant was initially diagnosed
3    or sought a diagnosis.  I don't know what that difference is,
4    but in Your Honor's order says that the first screening is
5    producible, so why can't we have the initial date of diagnosis?
6          M, the date upon which the claimant formed an
7    attorney/client relationship with your law firm.  Again, this
8    is now going to lead to a broader problem.  It's not just your
9    law firm.  If this document here was done by Dr. Graziano
10   acting for Provost and Umphreys is the one that's being claimed
11   to be consulting privilege, notwithstanding that he may have
12   been the first and therefore, subject to (indiscernible).
13         It's not just Baron and Budd that's the issue.  If
14   Baron and Budd doesn't -- if the claimant doesn't want to
15   produce a document because they believe it's expert consulting
16   and it was done earlier for another law firm, that's the one
17   that's at issue.  So, and you'll see that this now becomes a
18   broad point which is they don't want to do anything more than
19   they've already done.
20         Let me just go through, M, that's the attorney/client
21   relationship that's got to be with your firm or any other firm.
22   List of those to whom the document's been provided.  Oh, here
23   we've got -- the last one -- in light the comments they made
24   this is amazing -- if the document is being withheld on grounds
25   of privilege, state whether the document has been retrieved and

1  reviewed by you or by claimant for purposes of asserting.  Why

2  can't we know whether finally instead of punching a button on a

3  database, somebody's actually laid their hands on the

4  individual document and said, hey, this is privileged.  That's

5  what any lawyer would have to do and get Mr. Esserman's clients

6  say, you know what, that's kind of a hassle, I'm not really

7  sure we really want to do that.

8          Now, we then have Interrogatories 4, 5 and 6.  Six

9  comes --

10         THE COURT:  Wait, wait.  I'm confused about O.  If a

11 document is going to be withheld and it's going to be subject

12 to a privilege log isn't it going to have to have an

13 identification, like for example, a Bates stamp number?

14         MR. BERNICK:  Absolutely.

15         THE COURT:  Well then why do we need O?

16         MR. BERNICK:  Because I don't know that -- I don't

17 know that these people -- I don't know that this is going to be

18 done.  Unless you actually require that the specific -- our

19 idea in the interrogatory was to be very specific on exactly

20 what has to take place so that there is no rule for

21 misunderstanding, no room for different kinds of

22 interpretation.  We want the documents pulled, reviewed by a

23 lawyer and this information provided.  And that's all this does

24 is to assure that that takes place.  Because we've been told

25 that there are databases where the information is kind of there

1 and you press a button, but they don't want to go through the

2 hassle of pulling a the document.  Give me a break.

3          THE COURT:  Well, I don't know specifically what

4 pulling the document means.  I don't know how they're

5 necessarily maintained in the database, but --

6          MR. BERNICK:  Retrieved and reviewed by you for

7 purposes of asserting the privilege.

8          THE COURT:  It seems to me that some requirement that

9 there be an identification of the document so that it's clear

10 that it's been reviewed is what you need.

11          MR. BERNICK:  But why can't they just say that it's

12 been -- it was retrieved -- a lawyer is responsible, this is

13 their privilege, it's their burden, representations are being

14 made to the Court as officers of the Court.  It's the lawyers

15 obligation to do exactly this.  Why can't they just say that

16 they did it?

17          THE COURT:  How is it calculated to lead to relevant

18 and admissible evidence?

19          MR. BERNICK:  It's calculated to -- it is their

20 burden to demonstrate that the document is properly withheld.

21 Your Honor has already found it is relevant, it is germane to

22 the case, so all we're talking about here is, are they

23 establishing meeting their burden of establishing privilege.

24 So it is absolutely directly relevant to whether their claim of

25 privilege is valid or not.  If it is not valid or they haven't

1    met their burden, there's no question but that the underlying

2    information is highly germane to the case and Your Honor has

3    ruled.

4              THE COURT:  All right.

5              MR. BERNICK:  Now, four and five deal with the same

6    problem.  And this is general, and this is absolutely what we

7    were talking about this morning.  What happened was that in

8    this case we have now seen consistently that even though the

9    questionnaire specifically said it is the custody of the client

10   that's key, if the client in this case, Patient 5621 saw

11   different doctors, the questionnaire says you must go and get

12   the diagnoses from all those doctors.  That's what the

13   questionnaire said and we went over this specifically.  It's

14   highly germane because if there is inconsistency for what a

15   doctor had to say, that goes to whether these claims are

16   reliable claims (indiscernible) et cetera, et cetera.

17             We now know, notwithstanding that questionnaire

18   requirement, we have some firms and I believe we're going to

19   have lots and lots of firms who didn't do that.  They didn't go

20   and get the doctor's file in their client's custody and

21   control.  They simply reviewed what they had.  They then

22   asserted, without even looking for it, that all of this stuff

23   was privileged under the consultant's privilege, and all of

24   this stuff was privileged under the consultant's privilege,

25   what is the before and after.

1        As Mr. Herrick said, I got this case on referral.  I

2  assume privilege generally because I'm sure it was out there

3  somehow.  That assertion of privilege is not valid, but the

4  problem runs deeper.  Not that is it not valid as an assertion

5  of privilege, but we believe and the evidence shows now that

6  they never -- these firms never went beyond the four corners of

7  what they already have.  That's the problem.  So Baron and Budd

8  says, well, we've done what we have.  All of the firms that

9  were represented here by Mr. Busby's firm, like Waters and

10  Kraus, like Kazan, all the rest of them, all that they're

11  saying is that, not in my files or I'm okay.  None of them have

12  represented that they have done what they promised and

13  certified and indeed, swore that they did in answers to the

14  questionnaires, which is to look for what the doctor's records

15  reflect before and after their favorite little diagnosis.

16  That's the problem.

17        Now Mr. Esserman recognizes he has a big problem.  So

18  what do his interrogatories do?  And this is just discovery of

19  ours to find out what the facts are.   His interrogatories

20  consistently go through all of the interrogatories and say, all

21  that we have to do is account for what is in our files with

22  respect to claimant.  If you take a look at the mark up, you is

23  defined to be your law firm.  Your law firm, the one that

24  happens to have the claimant this moment of time and happens to

25  have the positive read, not the one that had the claim when

1    there was a negative read.

2         So again, our discovery about whether they are in

3    compliance with the questionnaire about whether they have given

4    us any of the information that really is necessary about

5    whether can meet their burden of showing privilege, we say,

6    tell us whether you looked for this.  Tell us whether you

7    looked for a prior diagnosis as the questionnaire required?

8    Tell us whether the documents that are out there that haven't

9    been produced are actually not privileged or privileged because

10   there's a consulting privilege that exists with respect to his

11   entire firm.

12        In Your Honor's order on the B-reads, you said

13   specifically that the first screen -- (indiscernible) the first

14   screen you've got to produce.  These people never went to look

15   for the first screen.  Mr. Herrick said before the Court he

16   never went and looked for the first screen.  So all that we're

17   doing in the interrogatories is saying, we'll just answer this

18   by what Baron and Budd has on their database.  If Your Honor

19   goes down the road of Mr. Esserman's version of the

20   interrogatories, he basically has gotten you to completely

21   change your ruling on the B-reads.            Your ruling on the

22   B-reads didn't say you can kind of be in your own little cone

23   of silence.  It said that the initial read is discoverable.

24   They can't represent that they're in compliance by simply

25   saying, look, in our files we don't see the initial read.  We

1  have to know what the initial read was, it has to be produced

2  if it's in the claimant's custody and control.

3         So I would urge the Court to go back to our set of

4  interrogatories because they impose the obligation, or they

5  seek discovery of the matters that are directly commensurate

6  with what Your Honor already ordered in the questionnaire.  If

7  Your Honor does not allow that discovery, we are being deprived

8  of our ability to even make a record on what they haven't

9  produced.  So the first step is to go back to our version

10  because it's not the version that's been gutted, to simply

11  allow these people to (indiscernible) whatever happens to be in

12  their own files.  It is the version that asks for the discovery

13  that we need to demonstrate how the cone of silence produces a

14  distortion in the case.

15         And then if Your Honor wants to say that with respect

16  to items, you know A through whatever it is, N or O, that

17  certain of those are bad and certain of those are good, so be

18  it.  And I think that Your Honor actually, if you wanted to

19  simply incorporate the ruling that you just made with respect

20  to our interrogatories, you would stick with our language

21  because you is not defined to be simply the law firms.  You

22  would allow 3A, B -- A is the claimant, B is the date of the

23  document, C is the author, D is the recipient.

24         THE COURT:  I'm confused about the author.  Why would

25  the author be something different from the consultant?

1          MR. BERNICK:  That's pretty important to know if it's

2 different from the consultant, right?

3          THE COURT:  Well, then maybe that should be the test.

4 The author if different from the consultant.  If it's the

5 consultant, you know, I don't --

6          MR. BERNICK:  But why not just give us the author,

7 that way we don't --

8          THE COURT:  Because if it's the consultant, it will

9 destroy the privilege.

10          MR. BERNICK:  Well, the -- I'm sorry, the author,

11 unless it is the consultant, in which case you can just say, A,

12 or whatever it is.  We should get a statement that says the

13 author is something.  We shouldn't have to infer that the

14 author was the consultant, they ought to say it was the

15 consultant.  The recipient of the document D.

16          THE COURT:  I don't see a problem with the recipient,

17 I mean that seems to me to go to who the privilege is for.  If

18 it's also going to a consultant, I think that can be redacted

19 by putting in the same codes, but it should show that it's

20 going to the lawyer if, in fact, it's a consultant privilege.

21 If it's going beyond that, then it may be waived.  So, I think

22 that's relevant.

23          MR. BERNICK:  E would be then, as Your Honor

24 indicates, we wouldn't get that, they would substitute the

25 letters and then we'd have a schedule of who the letters stand

1 for submitted to the Court under seal.  F would be as it is, G

2 would be out because it's picked up later.  H would be there,

3 who paid.  I would be out.  J, the basis on which you or the

4 claimant are withholding the document.

5          THE COURT:  Well, isn't that the same as K?  I mean,

6 how are you withholding it if it's not pursuant to a privilege?

7          MR. BERNICK:  I don't know.  I really don't -- I

8 really don't know.  That's the whole point, is that we're

9 asking, if it's being withheld, we're asking why we don't have

10 it.  K would be as it is, but then I think that we need to add,

11 in light of what Your Honor did with the identity, we need to

12 find out if this is bona fide if, on the basis of the

13 consulting expert privilege, provide a redacted form of the

14 agreement pursuant to which the privilege -- he as a consulting

15 expert on the particular claim at issue.

16          THE COURT:  Well, I don't know.  I'll hear from the

17 other side about that.

18          MR. BERNICK:  Well, but Your Honor, I mean, I would

19 urge Your Honor, otherwise, there is, at this point, zero

20 ability to make a record on whether -- they say, that well,

21 consultant experts are well recognized, that's true, it is also

22 true that consultant experts can be abused.  We know that that

23 has been argued in many, many cases that you cannot suppress

24 important information using a consulting expert.  So -- but I

25 don't even get to that, we don't even know that there really is

1  a bona fide consulting expert privilege if all we have is there

2  say so.  There has to be some documentation or ability for us

3  to say, they need to meet their burden, it is not ipse dixit,

4  it's not --

5          THE COURT:  I'll hear from the other side about that.

6          MR. BERNICK:  Okay.  The initial date of diagnosis

7  the date on which L & M should be there.  N should be there,

8  and then O should be there.  That is simply the grounds, or the

9  fact that the document has been retrieved.

10         Then on the verification, I think that the

11 verification for four is right.  The verification for five, to

12 the extent that Your Honor pointed out any other firm

13 previously or subsequently representing the claimant and any

14 doctors, if you want to delete, and any other firm previously

15 of subsequently representing the claimant, that's fine if it's

16 a verification, they don't have to verify that, but we do want

17 the doctors.

18         Then six is very, very simple.  It simply asks, and

19 this is the only opportunity that we have to find out if this

20 process has been gutted unilaterally, and remember we went

21 through, we give them both ways.  If you searched through other

22 law firms fine, if you searched through the doctors fine.  Tell

23 us what you did to get the documents that were the documents

24 that had been used to answer the questionnaire and Mr.

25 Esserman's interrogatory doesn't have anything like that.  So,

1 giving execution to Your Honor's three statements this morning

2 that we wouldn't learn the name of the doctor, that we wouldn't

3 learn the outcome of the B read, but that we would have the

4 ability to know or see evidence that the consulting expert was,

5 in fact, retained as such and with specific reference to this

6 claimant giving force to those statements that were made during

7 the arguments of other counsel, we would ask that they simply

8 modify the interrogatories to incorporate those statements.

9          THE COURT:  Mr. Busby.

10          MR. BUSBY:  Thank you, Your Honor.  The plaintiffs'

11 firms and the claimants cannot fairly be asked to produce what

12 they don't have.  The claimants, at least with respect to the

13 clients, the law firms that I represent, my understanding is

14 that the claimants have been consulted, the claimants don't

15 have any B reads in their own possession.  If they do, they've

16 been turned over because certainly the claimants didn't hire

17 them in context of being a consultant.  Claimants are getting

18 treated, they're not getting B reads.

19          So, the claimants don't have any B reads, the law

20 firms who are counsel of record don't have any B reads and what

21 Mr. Bernick is trying to do, he talks about shifting the

22 burden, or the burden is on someone, well, the burden is being

23 shifted onto plaintiffs' counsel and the claimants to go out

24 into the world and collect all kinds of stuff that Mr. Bernick

25 and his client don't have a right to in the first place.  They

1  got the x-rays, they got all the B reads that are being relied

2  on by the firms who are pursuing the claims and they're having

3  all the B reads that those firms obtained as a consultant

4  withheld.  It's totally fair to have a record so that the

5  merits of the consulting privilege can be established.  I agree

6  with that.

7         But to have his definition of claimant and have the

8  claimant have to go out, or the law firm on the claimant's

9  behalf, to go out to former law firms or former doctors, or the

10 whole world and collect something is an unreasonable burden in

11 the extreme.  He is entitled, in light of Your Honor's ruling

12 on the privilege in the first place, simply to a determination

13 of whether the privilege was fairly invoked.

14        If Dr. Graziano (phonetic) has produced a previous

15 report for the same claimant, then that person, that report

16 would be producable as not part of a consulting privilege.  The

17 doctor can't be both, so that's not a problem.  Your Honor has

18 ruled clearly that that would be discoverable because a report

19 by the doctor, who is being used as a consultant if that report

20 has been disclosed, then all reports would be disclosed by that

21 doctor.  So, he's created a straw character there to knock

22 down.  That has nothing to do with answering interrogatories to

23 show whether a privilege has been properly invoked and that's

24 fair.  I think there should be a reasonable universe of

25 interrogatories that the firm and the claimant can be called

1  upon to answer, but to require the claimant or the law firm

2  whose is counsel of record to go out into the world and search

3  every place else, that is an unreasonable burden and an

4  unnecessary burden.

5         Further, the point that this is somehow extra

6  necessary, this is one step removed from the real issue, which

7  is the x-ray itself.  The x-rays are now in play, Grace can get

8  their own consultant to look at the x-rays, now we're talking

9  about a further step away from reality which is the x-ray.  Now

10  we're talking about interpretations of the x-ray, we're talking

11  about competing interpretations.  There's no adequate showing

12  of necessity to go out and search for every B read that's ever

13  been performed.

14         MR. BERNICK:  May I agree with Mr. Busby and maybe

15  short circuit this a little bit?  I think that there's really a

16  misunderstanding.  We're not saying that at this point in time,

17  in order to answer the interrogatories, they've got to go out

18  and search new documents that they haven't searched before.

19  That's not the purpose here.

20         MR. BUSBY:  But, that's the definition of claimant.

21         MR. BERNICK:  No.

22         MR. BUSBY:  Claimant is  -- under the custody and

23  control of a claimant includes the doctors that were previously

24  there.  It's in your definition.

25         MR. BERNICK:  It conflates the interrogatories whose

J&J COURT TRANSCRIBERS, INC.

1  purpose it is to find out what has happened with the original

2  obligation to answer the questionnaires.  We believe that the

3  original questionnaires required that the law firms produce

4  with the claimant, all documents subject to the possession and

5  control of the claimant, which would have included going out to

6  the doctors, to go retrieve --

7       THE COURT:  Well, them maybe that's the thing to ask.

8  One general, what have you done to answer the interrogatories.

9       MR. BERNICK:  No, no, it's what have you done to

10  answer the questionnaires and that's exactly what six does.

11       THE COURT:  I'm sorry, the questionnaires.

12       MR. BERNICK:  That's exactly what six does.  So, Mr.

13  Busby -- we're not asking if Waters and Kraus, for example,

14  hasn't gone out to prior firms, we're not asking that Waters

15  and Kraus go out there today, we're simply asking that they

16  tell us that they didn't go out to those prior firms before.

17  We can then argue about the consequences of it.

18       With respect to the privilege, all we're asking for

19  is that if the document has been withheld on grounds of

20  privilege, that that document has to be associated with the

21  attestation or with the predicates for privilege and that may

22  require that they go consult with whoever it is that retained

23  that expert to begin with, but you either have the basis for

24  the privilege or you don't.  If you want the privilege, you've

25  got to go get the information.  If you don't have the document,

1  if your client doesn't have the document, then presumably

2  they're not withholding it on grounds of privilege and there's

3  nothing for them to do.

4        MR. BUSBY:  Mr. Bernick, this is a circle.

5  Interrogatory number four says that for each claimant please

6  provide a verification from the claimant or authorized by the

7  claimant that the responses herein are true, complete and

8  accurate and a thorough search has been made of the documents

9  in the claimants possession, custody and control.

10       MR. BERNICK:  Right.

11       MR. BUSBY:  And you define claimants possession,

12 custody and control to include other doctors that previously

13 treated them whether it's in the possession of the claimant

14 today or not, which requires a search.

15       MR. BERNICK:  No, in which case if they haven't done

16 it, they can't make the verification, then they'll so state.

17       MR. BUSBY:  Oh, so you don't care if the verification

18 is provided or not, you just want to have a verification there

19 for no reason at all?

20       MR. BERNICK:  Obviously not.  We want the

21 verification because we want to make sure that if there is a

22 claim of privilege, if there is a claim of privilege for

23 example, with respect to A, that was done by the Prevose &

24 Umphrey firm, that if there is the assertion of privilege

25 there, then at that point that inquiry has been made.  If

1  there's no assertion of privilege, there doesn't have to be a

2  verification because there's nothing to verify.

3          MR. BUSBY:  You know, we're here on an estimation

4  proceeding, Your Honor, in which Mr. Bernick is trying to try

5  every one of the $100,000 cases and force plaintiff's counsel,

6  claimants counsel to go out and prepare and do work as if they

7  were going to try the case.

8          THE COURT:  Yes, that's part of the problem.

9          MR. BUSBY:  And there is no justification for that in

10  the context of an estimation.  It is an absolutely unreasonable

11  burden on all the claimants counsel and to ask us to go out and

12  get stuff that we don't have --

13          THE COURT:  Mr. Busby, at some point the claimants

14  have to put this information together whether it's going to be

15  through a trust or whether it's going to be in the tort system.

16  I mean you're going to have to get it together.

17          MR. BUSBY:  No, I agree with that.

18          THE COURT:  So, the fact that they have to do it now

19  as opposed to later doesn't trouble me.

20          MR. BUSY:  But they have.  Okay, fair enough, but

21  Your Honor they have gotten it together.  The claimants firms

22  have said yes, we rely on an x-ray.  They've provided the

23  x-rays.  Then we've said --

24          THE COURT:  Well, that's the thing.  That's --

25          MR. BUSY:  -- then we've said, yes, we have B reads

1  that support our reading and here they are and then we've said,

2  we have in some very rare instances in terms of my clients, we

3  have consulting experts and we don't think you're entitled to

4  those B read and Mr. Bernick is fully entitled to have a full

5  description of the nature and extent of the circumstances that

6  show that we're properly invoking the privilege.

7          MR. BERNICK:  That's all we're asking for.

8          MR. BUSBY:  Okay, but that does not have anything to

9  do with going out into the world and searching other doctors,

10 other law firms, it's what the counsel of record have, it's

11 what the counsel of record are relying on to prove their case,

12 for present purposes, which is a purpose of estimation only,

13 not for the ultimate trial.  And this set of interrogatories

14 with their complicated definitions impose an incredible burden

15 on claimants and/or their counsel to go out and get information

16 they don't have.  It's not -- you can't produce what you don't

17 have.  We don't have it, we don't have an obligation to go get

18 it.  If Grace wants to get it, they can go out and get it

19 themself.  We've given Grace everything we have, we've given

20 them the x-rays, we've gone out and gotten x-rays we didn't

21 have and they have the x-ray and they have everything that

22 we're relying on as counsel of record.  Your Honor, we submit

23 that's enough.

24          THE COURT:  All right.  I think what may be

25 appropriate is to permit an interrogatory that will require the

1 claimants to identify -- and I think the language that's

2 currently in Interrogatory 3C, the general description

3 language, without providing so much about the nature of the

4 document that it would waive the privilege, so I'm shortcutting

5 through this, but I think it would be appropriate to require

6 that each document be identified for which that document is

7 being withheld on any claim of privilege.  That the nature of

8 the privilege be asserted and I think the way Mr. Busby stated

9 it is probably a good way to get at it.  That a full

10 description of the nature and extent of the circumstances,

11 regarding the assertion of that privilege as to the document

12 withheld be stated.

13          MR. BERNICK:  The document and claimant.

14          THE COURT:  Yes.  I'm assuming that the claimant is

15 going to be identified, I was going to get to that, too.  Maybe

16 I should start from the beginning.  With respect to

17 interrogatory number three, each B read document withheld

18 should identify the claimant for whom the B read is withheld,

19 the date of the document, each document described in sufficient

20 detail as identified in 3C, the basis of the privilege

21 asserted, a ful description of the nature and extent of the

22 circumstances with respect to the assertion of that privilege.

23          MR. BERNICK:  I don't mean to interrupt, Your Honor,

24 but I think you're actually working off of Mr. Esserman's that

25 strikes a whole bunch of --

1           THE COURT:  No, I'm actually just working off of both

2    sets.  I was looking at 3C simply because that's the one that

3    was in my vision as opposed to the Debtor's but they're the

4    same 3F, 3C, whichever you choose, they're the same.

5           MR. BERNICK:  I don't mean to interrupt your thought

6    here, but it may be worthwhile, with due respect to Mr.

7    Esserman's version, if Your Honor wants just to go through and

8    tell us of A, B, C, D, the original A, B, C, D, E, F, which

9    ones are not going to be there, and then when we get to the

10   general description, you know, whatever, I just think it would

11   clearer for the record.  I don't mean to be presumptuous, Your

12   Honor.

13          UNIDENTIFIED FEMALE SPEAKER: (Indiscernible).

14          MR. BERNICK: Do you not have a black line, Your

15   Honor?

16          THE COURT:  No.

17          MR. BERNICK:  Oh, that would make it -- would it be

18   all right if I --

19          THE COURT:  Okay, working from the black line

20   version, then --

21          MR. ESSERMAN:  Your Honor, I don't have a black line

22   versions.

23          MR. BUSBY:  And, I don't either, and I don't know

24   what it's a black line of.

25          THE COURT:   All right.  Then never mind, I'll just

1  work from the two versions that I was working from before,

2  which was combining the two.  I'm starting from the beginning

3  with interrogatory number one.  The difference in interrogatory

4  number one, is that the Debtor is asking for information in the

5  claimant's possession, custody or control, Mr. Esserman's

6  version talks about the firms possession, custody or control. I

7  do not have in front of me th e questionnaire, but I believe

8  that talked about the claimants custody or control.  So, I

9  believe that the Debtors version is the appropriate version.

10 This is really not about what's in the firms control, this is

11 about the claimants proof of claim.

12        MR. BUSBY:  But I don't know, in this particular

13 instance, Your Honor, what does custody and control mean?  Mr.

14 Bernick cited some case that purported to put a burden on the

15 claimant to go out and get stuff from his doctor.  That's a

16 particularly specialized ruling in that particular --

17        MR. BERNICK:  It's the law of the case.

18        THE COURT:  No, Mr. Busby, this goes back to at least

19 a year and a half.  We had this discussion before the

20 questionnaire was developed.  The issue at the time was whether

21 or not the Debtor could seek discovery directly from lawyers

22 versus doctors, from the clients.  The lawyers were very

23 adamant about the fact that they should not be subject to the

24 Debtors discovery.  I told the Debtors to take another path

25 before they attempted to go down this route, the Debtors did

1 so, now it's coming home to haunt me.  And so at this point in

2 time, the law firms apparently do not wish to be the subject of

3 being, I guess, accused of being a repository of documents, so

4 it's the clients.  The lawyers are agents, the doctors are

5 agents, it's up to the clients to figure out who all of their

6 agents are, hopefully, with the assistance of their counsel,

7 and it's up to the clients to get every one of those agents of

8 theirs together and get all of the documents together that are

9 within any of their agents possession, custody or control.

10         MR. BUSBY:  If they're B reads, Your Honor.

11         THE COURT:  Well that's --

12         MR. BUSBY:  Not all documents, just B reads.

13         THE COURT:  That's --

14         MR. BERNICK:  No, no, Your Honor, I really object, I

15 really object to this.  This is now this process of --

16         THE COURT:  Mr. Bernick, I'm talking about

17 interrogatory number one, it says claimants identified on

18 Exhibit C, and it's talking about B reads.  I am referring

19 exactly to interrogatory number one.

20         With respect to interrogatory number two, this also

21 -- this is the same in both versions and so, it's approved.

22         I'm up to number three.  3A is the same and approved,

23 3B is the same and approved.  3C in the Debtors version was the

24 author of the document.  It seems to me that what I've

25 articulated is a problem with respect to the consultant

1  privilege.  Based on the 10th Circuit cases, is still the

2  problem with the author of the document, if the author is a

3  consultant entitled to the consultant privilege.  So, the code

4  system will apply with respect to the author of the document,

5  if it's a consultant.  If it's not a consultant, then the

6  author should be stated.

7        The recipient of the document, I think I already made

8  a ruling.  To the extent that it's the firm that asked for it,

9  I don't see why that's a problem.  That just goes to support

10 the privilege.  To the extent that it is someone else, if it's

11 the consultant, then the code should apply.  I'm not sure why

12 the consultant should be a recipient of the document, but may

13 be.  So, to the extent it's a consultant, the code system will

14 apply.  To the extent that it's someone else, that may go to

15 show a waiver, it's to be stated.

16       On the Debtors version, 3E was the doctor or doctors

17 who preformed the B read, including those who prepared the

18 narrative report, the code system will apply.

19       3F is the same as Mr. Esserman's 3C, that's approved.

20 3G was withdrawn, 3H who paid for the B read or provided

21 reimbursement for the B read.  I didn't really hear from

22 anybody why that was an issue, to state why that should be a

23 problem.  Mr. Esserman?

24       MR. ESSERMAN:  Because that has no basis of going to

25 the consulting acts or privilege.  It's not probative of

1  anything.  It's information that maybe someone would like to

2  have, but it doesn't determine whether or not it's a privilege

3  document or not, who paid for it.  It could be free.  It

4  doesn't matter.  It's irrelevant.

5       MR. BERNICK:  It's one piece of information, Your

6  Honor, that goes to the ascertaining or verifying the fact that

7  there really was, who was the consultant, why was he -- why did

8  they say he was a consulting expert.  If somebody else paid for

9  it besides the law firm, that would tend to suggest that it's

10  not a consulting expert because somebody else is paying for it.

11       MR. ESSERMAN:  I know of no case that provides that

12  who paid for the consulting expert is in any way a

13  determination of whether or not the party is a consulting

14  expert.

15       MR. BERNICK:  Well, that's because mostly we don't

16  deal with tens of thousands of claims being juggled around by

17  the same doctors.

18       THE COURT:  Well, there are actually instances of

19  consulting agreements that provide that the firm will pay, but

20  will be reimbursed by the underlying client.  So, I'm not --

21       MR. BERNICK:  If we get the underlying agreements,

22  Your Honor, which I think is really the key here, I don't think

23  that this is really that necessary.

24       MR. ESSERMAN:  No way on the underlying agreements,

25  they're not entitled to that in any form.

**J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  I really don't see that H is going to

2    provide that much information one way or another and I do

3    believe it will just add to the delay while people try to

4    search through records for the information.  I don't think it's

5    going to be that helpful, not H.

6          I, I've already said no to.  J, the basis in which

7    you or the claimant are withholding the document, that's

8    approved.  I think it's incorporated into K because I don't

9    know how it can be withheld if it's not on the basis of

10   privilege.  So, I believe that J and K are the same but,

11   nonetheless, to the extent you want the explanation further in

12   K, that's approved too.

13         I'm sorry, L, the difference was that the claimants

14   initial date of diagnosis, Mr. Esserman's E was the date on

15   which the claimant was initially diagnosed or sought a

16   diagnosis.  Mr. Esserman, I'm not sure I appreciate the subtle

17   distinction.

18         MR. ESSERMAN:  I'm having trouble following it on the

19   black line version.

20         THE COURT:  I wasn't looking at the black line.

21   Yours was E, the date on which the claimant was initially

22   diagnosed or sought a diagnosis.  Mr. Bernick's doesn't have

23   the or sought a diagnosis at the end.

24         MR. ESSERMAN:  I think that was taken from one of

25   your orders in the past.  I don't know that --

1          THE COURT:  Oh, it could be because when I was

2  looking at who -- when I was trying to define who would be

3  encompassed within the non-consultant issue, I was attempting

4  then, though, to make the distinction between whether or not

5  there was an attorney/client relationship.

6          MR. ESSERMAN:  That's right.

7          THE COURT:  So, but this is a consulting expert.  I'm

8  not sure -- I'm just not -- I'm not appreciating the difference

9  in this instance.  If there is one, I'm happy to know what it

10 is, but I'm just not appreciating it and I'm trying to

11 simplify, not make it more complicated.

12         MR. ESSERMAN:  What we're going for, I think is, Your

13 Honor determine that the initial diagnosis is not subject to

14 the consultant privilege.  So, we're just asking them to

15 specify what it was.

16         THE COURT:  Well, actually, I think in that instance,

17 what I believe, and again, I'm sorry, I don't have that order

18 in front of me, but I thought what I said was that to the

19 extent that the diagnosis was sought before the attorney/client

20 privilege --

21         MR. BERNICK:  Two prongs.

22         THE COURT:  -- right, was formed, or the initial

23 diagnosis, because I was looking for -- I was attempting to get

24 to the fact that you had to know you might have a claim before

25 there could possibly be litigation and a need for a consultant.

**J&J COURT TRANSCRIBERS, INC.**

1          MR. BERNICK:  Right.  So, this L picks out the first
2   prong of that saying, what's the initial date of diagnosis
3   because if that is the same as the date on which the expert
4   consultant made the diagnosis, then we know that it should be
5   produced and then M picks up the attorney/client relationship
6   because that's the second prong of Your Honor's order.  That is
7   that even if it was after the date of the initial diagnosis, if
8   there hadn't been an attorney/client relationship, it would
9   still be producable.

10          MR. ESSERMAN:  We've got F in our form.

11          THE COURT:  I'm sorry?

12          MR. ESSERMAN:  We have F in our form, the date upon
13  which the claimant formed and attorney/client relationship with
14  your law firm.

15          MR. BERNICK:  Right.

16          THE COURT:  Okay.  So, we can strike the or sought a
17  diagnosis?

18          MR. ESSERMAN:  I think that that's just tracking your
19  language as to when someone sought a diagnosis and then --
20  versus --

21          THE COURT:  And, if the Debtor does';t need it now,
22  this is an interrogatory to supplement the questions.

23          MR. ESSERMAN:  If they don't need it, that's fine.
24  We can strike it.

25          THE COURT:  All right, okay.  We'll use the Debtor's

1  version then.    3L.  Okay, M, the date on which the claimant

2  formed an attorney/client relationship with your firm and you

3  limited yours to the law firm, Mr. Esserman, the Debtor wanted

4  to go beyond that to say, or any other law firm.

5          MR. ESSERMAN:  Right.  The difference is obvious.

6  You're going to firms, they can answer what they know.

7          THE COURT:  All right.  What about making M -- take

8  out the words, or any other law firm, in M, but then add an N

9  that says, the date upon which the claimant formed an

10 attorney/client relationship with any other law firm, if known.

11 Because then you'll get both.

12         MR. BERNICK:  Your Honor, this is relatively simple.

13 They're making a claim of privilege, so if they're making a

14 claim of privilege, I understand that they will know when the

15 attorney/client relationship was formed with then, fine.  But

16 if they are withholding a B read that was made before then --

17         THE COURT:  Right.  And they can't tell you that

18 there was an attorney/client relationship  --

19         MR. BERNICK:  -- but it's their burden then to

20 specify when the attorney/client relationship arose in

21 connection with that B read.

22         THE COURT:  That's right, and if they can't do it,

23 they won't be able to withhold the document.

24         MR. BERNICK:  Okay.  I'm sorry, then I really wasn't

25 tracking Your Honor, I apologize.  You would add an N --

1          THE COURT:  Yes, that says the date on which the

2     claimant formed an attorney/client relationship with another

3     firm, if known.  I mean, if it's not their firm and they're

4     withholding a document, it must be another firm.

5          MR. BERNICK:  I don't have a problem with that.

6          MR. ESSERMAN:  Your Honor, I was just informed that

7     for the Baron and Budd, Silver, Perlman & LoBlanco law firm, if

8     they're forced to go back to all their claimants and figure out

9     who was with another law firm by claimant by claimant, it's

10    going to take six months, and that's not the intent.  If it's

11    something that if they know, it appears in their database that

12    they had a prior attorney/client relationship, I think that

13    that's --

14         THE COURT:  Well, I think the only question is, if

15    the document that's being withheld predates the -- maybe that

16    needs to be stated, if the document on which the privilege is

17    asserted predates the formation of the attorney/client

18    relationship with this firm.

19         MR. ESSERMAN:  That's fine.

20         MR. BERNICK:  Your Honor, that's not --

21         THE COURT:  That's the issue.

22         MR. BERNICK:  -- Your Honor, again, Mr. Esserman is

23    leading you back to reconsider what you already decided with

24    respect to interrogatory two, and interrogatory one.  This all

25    goes to the question of whether they have to provide the

1  necessary information to be able to assert the privilege with

2  respect to any document they're withholding on the basis of

3  privilege.

4          THE COURT:  Right.  And Mr. Bernick, if they don't

5  know the date of an attorney/client relationship and they

6  assert the privilege, you're going to win.  So, it would be in

7  their best interest to answer this.

8          MR. BERNICK:  But that's the problem.  Is that,

9  again, Mr. Esserman is saying they shouldn't have the

10 obligation to go back over here.  They shouldn't have to do it.

11 They don't have to be -- if the interrogatory doesn't call for

12 them to do it, then they don't have to say one way or another

13 whether they know.

14         THE COURT:  No, what I said is, the interrogatory

15 ought to be restated to say that if the document that you're

16 withholding predates the relationship, the attorney/client

17 relationship that was formed with your firm, then state the

18 date of the attorney/client relationship that was formed with

19 some other firm.

20         MR. BERNICK:  Yes, but Mr. Esserman then said, we

21 can't go and Mr. Rich came up (indiscernible), we can't provide

22 this information with respect to the doctors that did

23 something, and I don't know what, we can't go back and ferret

24 out the information about prior doctors.

25         THE COURT:  No, by prior law firms.  Prior

1  attorney/client relationships.

2       MR. BERNICK:  Prior -- it's the same thing.  There's

3  the prior doctor, or even the same doctor, was retired by a

4  prior law firm, they don't have the obligation to go back and

5  look for the evidence of what that prior firm did, then they

6  won't do it and they will still claim that that prior read was

7  privileged.  The whole point here is, again, it's the same

8  problem we had with Mr. Busby.  We're not saying they have to

9  go out and get any more information than whatever information

10  they have had in connection with asserting the privilege.

11  Whatever information they have, they have, whatever they don't

12  have, they don't have.

13       But to the extent that they are asserting a

14  privilege, they then have to say whether or not they have the

15  information that we believe is important and we

16  (indiscernible).

17       THE COURT:  All right.  Well, do you want a six month

18  delay?

19       MR. BERNICK:  It's not six -- Your Honor, look, let's

20  be very simple about it.  Let's assume that Baron and Budd had

21  in its file the prior read of Dr. Graziano but it's being

22  withheld on the grounds that it's a consultant privilege.

23       THE COURT:  Right.

24       MR. BERNICK:  Dr. Graziano was acting as a consultant

25  for some prior law firm.  All that they have to do, it's no six

1  months, they either know that Dr. Graziano was acting as a

2  consultant or not and they have to have a basis for that, so,

3  they don't have to do anything, other than doing -- what they

4  already know with respect to that.  If they don't know with

5  respect to his prior B read, there was, in fact, this

6  consulting privilege, then that's fine.  They said we don't

7  know that there was a consulting privilege, and we'll get the

8  document.  But, they don't have this document.  If they only

9  looked in their own files, they can tell us that, too.  Which

10 is exactly what we're asking in interrogatory six.

11         A very simple way to look at it.  These

12 interrogatories simply say what did you do?  A) interrogatory

13 six, did you go beyond your own document and B, with respect to

14 all of the things that you're actually withholding, you have

15 them in your hand, you're saying they're privileged, tell us

16 all of the following information, if you know it and if you

17 know it, just say it, if you don't know it, just say, I don't

18 know.  They have to be asked a question before you say I don't

19 know.

20         So, if Barron and Budd doesn't know that this

21 document was the subject of an attorney/client consulting

22 arrangement or consulting arrangement, they'll say, you don't

23 have to go and ask these guys, they can say, I don't know, in

24 which case, if they don't know, that's fine, then we know that

25 this document has an assertion of privilege and they don't know

1  there was a consulting expert relationship.

2          THE COURT:  I'm sorry, I don't know whether I'm just

3  tired or whether I'm really confused, but I am not following

4  what you're saying.  On your left side is document A, on your

5  right side is document B.  All right.  Document A was formed by

6  -- was a B read that was given by a consultant to a prior law

7  firm, hypothetically, not Barron and Budd.

8          MR. BERNICK:  Hypothetically, right.

9          THE COURT:  Okay.  Document B is a more recent B read

10 given by a doctor, to Barron and Budd.  Barron and Budd goes

11 into its law firm -- into its files, it finds document B, it

12 says, I am withholding document B, it tells you when the client

13 formed the relationship with Barron and Budd, it tells you the

14 date of the document, document B.  It doesn't have document A.

15         MR. BERNICK:  It doesn't have --

16         THE COURT:  So, it doesn't assert a privilege as to

17 document A.

18         MR. BERNICK: -- doesn't assert a privilege and all

19 they have to tell us, in the answer to interrogatory six, is

20 that they didn't look for documents that were beyond their law

21 firm.

22         THE COURT:  All right.  So how goes this impact going

23 back to look for an attorney/client --

24         MR. BERNICK:  Now, the question is, if that's so

25 that's the simple answer.  Anything what you're asserting the

1  privilege, tell us all of this information, you don't have to

2  go to any other law firm.  That's fine.

3          If, on the other hand, if on the other hand you have

4  in your possession a prior B read that is being withheld on

5  grounds of consulting expert privilege --

6          THE COURT:  All right.  So now -- so I follow --

7          MR. BERNICK:  -- okay.

8          THE COURT:  Document A is now in Barron and Budd's

9  possession, but it was still done by a consultant for a prior

10  firm.  So, now what you want to know is, the date that the

11  client formed the relationship with the prior firm.

12          MR. BERNICK:  We want to know -- yes, among other

13  things, we want to know the facts that would support the

14  assertion that --

15          THE COURT:  Right, that's what I just said.  I think

16  we're all saying the same thing.

17          MR. BERNICK:  Right.  And that involves their having

18  to go out and talk to the Prevose & Umphrey people, they have

19  to do it, because it's their burden to have the factual

20  predicates to assert the privilege --

21          THE COURT:  Or else they don't get to consult.

22          MR. BERNICK:  Or else they don't get -- right.

23          THE COURT:  I think we're saying the same thing.

24          MR. BERNICK:  Well, yeah.  Well, no, then or else

25  they simply say, we don't know, in which case -- in either case

1  -- either case the question has to be what --

2         THE COURT:  Which was what I just said about N.

3         MR. BERNICK:  (Indiscernible), no, because Mr.

4  Esserman is taking the position that it's too burdensome to go

5  back and find out what happened at the other firm.  We're not

6  saying -- just like we said to Mr. Busby, we're not saying that

7  you have to do it for purposes of answering these

8  interrogatories.  They have to be asked whether or not they did

9  it, and if they did it, what it is that the found.  It's so

10  simple.  It says, if you've got a document you're claiming

11  privilege on, A) you have to have the document in your hand and

12  B) you have to tell us all the following information and if you

13  don't have that information, also you don't haves the

14  information.

15         THE COURT:  Why are you arguing about breaking this

16  into M and N when I think all it's doing is specifying that as

17  to any document that they created, that their claiming an

18  assertion on, that was prepared for another law firm, they then

19  have to answer N, which would be the date that the

20  attorney/client relationship was formed for another firm?  I

21  don't understand why you're arguing against this.  It would

22  sound as though that's what you were asking for.

23         MR. BERNICK:  No, we got off track.  I agree with M

24  and N.

25         THE COURT:  All right.

**J&J COURT TRANSCRIBERS, INC.**

1          MR. BERNICK:  I agree.

2          THE COURT:  Then sit down, and let's go onto the next

3 thing.

4          MR. BERNICK:  Then Mr. Rich came over like this and

5 Mr. Esserman then said, I'm sorry, Your Honor, it'll be too

6 burdensome for us to go back and provide --

7          THE COURT:  He said that before you started to argue.

8          MR. BERNICK:  No, no, it was --

9          THE COURT:  Mr. Esserman, do we -- are we on the same

10 page?

11          MR. ESSERMAN:  This is -- to a certain extent I think

12 it may be okay, if the question is phrased, do you know from

13 looking at your own files whether or not there was a prior

14 attorney/client relationship, or something to that extent.

15          THE COURT:  Well, here's the issue.

16          MR. ESSERMAN:  But here's what I don't want.  I don't

17 want the firms to be obligated, or it will be six months, for

18 all their clients to go back to the prior law firms and try,

19 first of all, find out if there was a prior law firm, if the

20 client had hired another lawyer, because they don't necessarily

21 know that, but the question is, what obligation are you putting

22 on them with this interrogatory.

23          THE COURT:  No.  This is what I believe the issue is.

24 If the B read that you're withholding predates the date that an

25 attorney/client relationship was established between the

1  specific client and the firm that's answering this

2  interrogatory, so I'll just use your firm by way of example, so

3  your firm, and you're still asserting that the document should

4  not be produced because, for example, of a consultant

5  privilege, you still need to establish how it's a consultant

6  privilege.  If you didn't have a relationship with the client,

7  it's pretty hard to see how there was a consultant privilege.

8          MR. ESSERMAN:  Unless there was a relationship with

9  another firm.

10         THE COURT:  Exactly.  So, then you have to answer N,

11 which is establish, if you know --

12         MR. ESSERMAN:  I think if it's limited -- I want to

13 consult with Mr. Rich, because he has a burden of thousands of

14 claimants in this case, but I think if it's limited to those

15 circumstances, that may be okay.

16         THE COURT:  Yes, because otherwise, if that isn't

17 answered, I think you lose the consultant privilege.

18         MR. ESSERMAN:  Yes, that's okay.

19         MR. BERNICK:  Before we get the -- I mean, again,

20 this is kind of like a little bit of a fine, before we get

21 that, though, we're kind of creeping up to the major question

22 and it's the question that Mr. Esserman said a few moments ago,

23 no way, and we would say what do you mean no way, if there's no

24 way, there's no privilege and it's this.

25         If there is an attorney -- if it is a consultant

1  expert relationship with respect to a particular claimant,

2  which it has to be, there has to be evidence that that is so.

3  And, the only way that I can envision that there'd be evidence

4  that says, I retain you to be a consultant with respect to this

5  client, as opposed to, we just want you on call to kind of

6  answer all of our questions, as if there's some documentation

7  of that fact.

8         THE COURT:  Fine, then you may ask another question

9  that says, state the nature of the retention agreement, whether

10  it's oral, written and the date.  I'm not going to require it

11  be produced.

12         MR. BUSBY:  Your Honor, he never even asked for that

13  in his own form interrogatories.  Now, we're going far afield

14  from what he asked for.  It's just like changing the terms of

15  the order.  It's always a moving goalpost.

16         THE COURT:  It is a moving goalpost.

17         MR. BUSBY:  You cannot pin this person down.

18         THE COURT:  Mr. Busby, here's the problem.  If we

19  don't put it in now, you're going to get the answers to these

20  interrogatories, we're going to be back here later with another

21  round.  It seems to me you're going to be going through your

22  filed, you might as well put this information in now because

23  you know it's coming.

24         MR. BERNICK:  Your Honor, I don't -- if it's a

25  retention letter, we deal with retention letters for experts

1  every day of the week.  They can redact the name of the expert,

2  but there has to be some documentation of --

3           THE COURT:  I'm not going to require it to be

4  produced.  If it's oral, they'll state that.  If it's a

5  retention letter, they'll state that and the date.  I think

6  that's all you're entitled to at this point.  If there's an

7  issue about it later, you can always ask for supplemental

8  relief.  I can always look at them, you know, in chambers and

9  return them.  I'm not going to compel them to produce retention

10 letters to the opposite side for consultants.  I'm not going to

11 do it.

12          MR. BERNICK:  Well then we'd ask that they be -- Your

13 Honor, this is absolutely standard --

14          THE COURT:  I'm not doing it now.  I'm not doing it

15 now, there's no basis for it now.  You can ask in this

16 interrogatory the nature of the retention agreement, whether

17 it's oral or written and the date of it.

18          MR. BERNICK:  For this specific claimant.

19          THE COURT:  Yes, for this specific claimant.

20          MR. BERNICK:  Should we just add that onto K?

21          THE COURT:  Wherever you want.

22          MR. BERNICK:  Okay.  We'll just add it onto K.  I

23 think that takes us up to N.  I don't know that there was any

24 issue about N.

25          THE COURT:  There wasn't an issue with N, that was

1 the same as Mr. Esserman's G, so that's approved.

2          MR. BERNICK:  O.

3          THE COURT:  Okay.  Are you -- Mr. Esserman, with

4 respect to O on the Debtor's list.

5          MR. ESSERMAN:  There's no -- it's just pure burden.

6 I mean that's just -- there's no -- that does nothing to

7 establish whether or not there's a privilege, you're just

8 putting a huge burden on the firm and just to answer this

9 interrogatory for no reason.  It doesn't either establish or

10 not establish the privilege.  That's the issue.  Is there a

11 privilege, is there not a privilege?  And what are the elements

12 of a privilege?  They're more than established.

13          THE COURT:  All right, we have 10 minutes till my

14 next case starts, and we're not even finished with this, and

15 Mr. Bernick, we're stopping, so that I can take my next case.

16 My staff hasn't even had a break.

17          MR. BERNICK:  Your Honor, I -- you know, I'm sorry,

18 Your Honor, I agree with that completely --

19          THE COURT:  Mr. Bernick, that's it.

20          MR. BERNICK:  -- but I'm not --

21          THE COURT:  Please.  So, O, I don't see the need for

22 O.

23          MR. BERNICK:  The O is to assure that they have a

24 document in hand.  I know what's happening.  Barron and Budd

25 has got a database, and they refuse to pull the documents to

1  they actually can look at the documents and make the assertion.

2  That's what's happening here.

3          THE COURT:  Mr. Bernick, how can they --

4          MR. BERNICK:  All they have to do --

5          THE COURT:  -- now can you assert a privilege as to a

6  document without looking at the document when you're asking for

7  the dates --

8          MR. BERNICK:  You -- they will say -- they will say,

9  we draw the inference from what's on our database.  That's what

10 they're going to do.  I mean, any lawyer in the United States

11 who asserts a privilege ought to have the document in hand,

12 stamp it, look at it in order to discharge their obligation.

13 Why can't they just say yes or no?  It's not a burden.

14         MR. ESSERMAN:  Is this claims litigation, is this

15 individual claims litigation we've got going on here?

16         THE COURT:  Not, it's not but I do agree with Mr.

17 Bernick that if you're going to assert that a document is

18 withheld on the claim of a privilege, at least it ought to be a

19 document that is being withheld.  So, how can I without going

20 into this burden, assure that in fact, somebody has verified

21 that the document really does exist and that it is a document

22 that's being withheld.

23         MR. ESSERMAN:  Strike retrieve, maybe and just say

24 review.

25         MR. BERNICK:  No, it's a representation that's to be

1 made to this Court --

2          MR. ESSERMAN:  It doesn't have to be retrieved, it

3 can be on our computer database, you can pull it up on line,

4 you can look at it and you don't have to pull it out of a file.

5          MR. BERNICK:  Oh, come on.  This is a disgrace.  It's

6 a disgrace we can't have lawyers who will sit there and pull up

7 a document, review it and be able to verify out of their own

8 mouths that it's privileged.  That's part of the integrity of

9 our proceeding.

10          THE COURT:  All right.  How about -- Mr. Esserman,

11 how about if we simply modify this to state, state whether you

12 or someone -- I'm not sure what the right words are, but you

13 know, working for you, a paralegal, whatever the appropriate

14 words would be, that it's within the lawyers control, a agent

15 of the lawyer, state whether you have looked at the document.

16          MR. ESSERMAN:  That's fine.

17          MR. BERNICK:  Your Honor, I would vigorously disagree

18 with that.  We don't have paralegals making privilege claims in

19 this country.  We have lawyers who standby privilege claims,

20 that's a --

21          THE COURT:  Fine, then state whether the person

22 answering these interrogatories has looked at the document.

23          MR. ESSERMAN:  That's fine.

24          THE COURT:  I take it a lawyer will be answering the

25 interrogatories, not a paralegal.

1        MR. ESSERMAN:  Yes.

2        THE COURT:  Then we don't have a retrieved and

3   reviewed.  Physically looked at will do.  Okay, that's three.

4   With respect to four.

5        MR. BERNICK:  Yes, the verification -- I think that

6   this tracks the requirement of the -- well, it basically is

7   part and parcel of being able to assure that the information

8   that is required to be provided, under the law, in order for

9   the claimant to establish that the burden has been maintained

10  is accurate information.  We don't have -- this is verification

11  of an interrogatory, the claimant verifies that the

12  interrogatory answer is correct.  It's the basic substitute for

13  having to take the claimants deposition.

14        THE COURT:  All right.  Rather than putting in the

15  verification language, the part that talks about the thorough

16  search, what about making a separate part to number three, that

17  says, state specifically what, if any, search has been made of

18  documents in the claimants possession, custody and control to

19  respond to these interrogatories?

20        MR. ESSERMAN:  Fine.

21        MR. BERNICK:  Well -- I'm sorry, Your Honor.

22        THE COURT:  Then you'll get that answer --

23        MR. BERNICK:  No, Your Honor, that's no because first

24  of all, we'll get -- we'll get pablum, we'll get -- we reviewed

25  our files, and using information that was within our, you know,

1 different devices that we had, X, Y, Z, all we're asking for

2 and all the things that Your Honor just has said should be

3 provided, they're basic things and they've now been gone

4 through and all that we want to know is that they are verified

5 by whoever it is that is providing that information as being

6 true.  That's the whole purpose of four and five.

7        THE COURT:  Well, you'll get the verification that

8 the interrogatory answers are true, complete and correct.  But

9 what I'm --

10        MR. BERNICK:  That's all I want, is the interrogatory

11 answers --

12        THE COURT:  Well, you'll get that.

13        MR. BERNICK:  -- I'll tell you what, four and five,

14 make it simple, I want verified answers, that the answers given

15 are true, complete and correct, period.

16        THE COURT:  You'll get that.  The issue is what --

17        MR. BERNICK:  No, then I'll withdraw four and five

18 and I want to know that these answers are true, complete and

19 correct.

20        THE COURT:  All right.  Well, then you'll go with Mr.

21 Esserman's version of number four?

22        MR. BERNICK:  No, because that's you, that's not --

23 that's verification from you, defined simply as being the law

24 firm.

25        THE COURT:  Oh, I'm sorry, what did you want then?

**J&J COURT TRANSCRIBERS, INC.**

1          MR. BERNICK:  I want the law firm and the claimant.

2          THE COURT:  Okay.  So, you want your version of

3    number four, and you want Mr. Esserman's version of number

4    four?

5          MR. BERNICK:  No, let me just make sure that I'm

6    reading off the same --

7          MR. BUSBY:  I think he said he was withdrawing four

8    and five and he wanted a statement that these answers are true,

9    complete and correct.

10          MR. BERNICK:  I think I'll say, counsel, what I

11    intend to say in my own words, I don't really need your

12    editorial gloss on what it is that I had to say.

13          MR. BUSBY:  Well, since I'm repeating what you said,

14    I don't think there's a gloss.

15          THE COURT:  Okay, all right, gentlemen.

16          MR. BERNICK:  Okay.  So, we have Mr. Esserman's, no,

17    see this is now the claimant -- provide verification from you,

18    and you is not, I don't believe -- they use the law firm, it's

19    not the claimant, so they've taken the claimant out of the

20    picture and they have now said for the law firm, best of your

21    knowledge, information and belief, that's nothing, particularly

22    when they don't want to go back and actually put their hands on

23    the document.  Number four should be a claimant verification.

24    Say it's true, complete and accurate, just like any other

25    claimant has to, then number five should be a verification by

1 the law firm that it's true complete and accurate.

2          THE COURT:  All right, Mr. Esserman.

3          MR. ESSERMAN:  If we're talking about an assertion of

4 privilege, if all these documents have to go back to the

5 claimant, and they've got to be reviewed by the claimant,

6 signed by the claimant, come back to the law firm and the law

7 firm has to --

8          THE COURT:  I don't understand that the consultant

9 privilege is the claimants anyway.

10          MR. ESSERMAN:  Well, you can't --

11          THE COURT:  I guess it is in a way, but I mean it's

12 really the law firm that's asserting the consultant privilege.

13          MR. ESSERMAN:  Exactly.  I mean it seems to me that

14 we're just creating work, we're creating burden, we're creating

15 delay.

16          MR. BERNICK:  No, I'm sorry, we have the claimant

17 knows when he was first diagnosed, presumably, and it's got to

18 be the claimants possession, custody -- it's the claimants

19 knowledge that drives this whole thing.  What doctors did I see

20 and whom.  Why can't the claimant verify it?

21          THE COURT:  Mr. Bernick, many of these claimants at

22 this stage of the game are probably in their 70's and 80's --

23          UNIDENTIFIED MALE SPEAKER:  Or deceased.

24          THE COURT:  -- and if they act in any capacity like

25 debtors in our individuals cases, if they have any of this

1  information committed to memory, it will be a miracle.

2          MR. BERNICK:  So, then the answer is, Your Honor,

3  that the law firm says, well this is what we know, the claimant

4  doesn't have to say anything, so it means that a lot of --

5          THE COURT:   The claimants already signed off on the

6  questionnaires.

7          MR. BERNICK:  What?

8          THE COURT:  Hasn't the claimant already signed off on

9  the questionnaire?

10          MR. BERNICK:  That's the problem, Your Honor, is the

11  questionnaires were never answered in a way that went beyond

12  what the law firm -- this whole thing, Your Honor, is just so

13  basic.  They just stayed like this, they stayed within their

14  own -- they didn't go back and answer the questionnaires and

15  give what the questionnaire asked them, that's why we're going

16  down this whole road to begin with, that's what they decided to

17  do on their own.

18          THE COURT:  Well --

19          MR. BERNICK:  So, look, what's so -- you know, to get

20  the claimant to sign off on the accuracy of what's being said

21  here like one was my initial diagnosis, it's their burden, it's

22  not my burden, it's their burden.

23          THE COURT:  It's --

24          MR. ESSERMAN:  Let's go back to what we're doing

25  here.  This is a privilege log.


**J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  It is a privilege log.  I really don't

2   see the need for the claimant in this instance to have to do

3   this again because, number one, how many of the claimants are

4   going to testify?

5          MR. BUSBY:  Probably none of them.

6          MR. BERNICK:  But, Your Honor, I think I'm beating a

7   dead horse here.  The law in this circuit as all over the

8   country says that if you assert a privilege, it's the

9   plaintiff's burden, when that gets litigated, Your Honor, it's

10  not just a question of filing out a log.

11         THE COURT:  I agree.

12         MR. BERNICK:  I've got chapter and verse of cases

13  where the court takes --

14         THE COURT:   Who is it -- I agree.  Who is asserting

15  the privilege, is it the claimant or is it the law firm, when

16  it's a consultant privilege.

17         MR. ESSERMAN:  Then let's get rid of all

18  verifications because you don't need --

19         MR. BERNICK:  I don't want to get into the question

20  of parsing out who is asserting what.  I just want --

21         THE COURT:  Well, I do.  I'm asking, who is asserting

22  the privilege.

23

24         MR. BERNICK:  -- I want the facts.

25         MR. ESSERMAN:  You know what --


                    **J&J COURT TRANSCRIBERS, INC.**

1        MR. BERNICK:  I want the facts that underpin the

2   privilege whether they're coming from --

3        THE COURT:  You know what, we're going to take --

4   we're in recess.  We'll come back to this after my next

5   argument.  You gentlemen, hopefully, will resolve this but I am

6   not putting up with this one step further gentlemen.  Bring

7   your toothbrushes if you're going to behave like this for the

8   rest of the afternoon.  We're in recess until 2:30.

9        (Break in proceedings - other matters heard)

10       COURT CLERK:  All rise.

11       THE COURT:  Good afternoon.  Please be seated.  Okay.

12   We were having a discussion, Mr. Busby and Mr. Esserman and Mr.

13   Bernick.  Did you get anything resolved over the lunch hour

14   about the verifications?

15       MR. ESSERMAN:  Other than lunch, I think that that's

16   about it.

17       THE COURT:  All right.

18       MR. ESSERMAN:  But I did do a little thinking on the

19   verification issue and it just -- it just seems to me what

20   we're talking about here are documents that are being asserted

21   as privileged.  And, under a privilege log, under the rules,

22   I'm not so sure that any verification is necessarily required.

23   I think I have no problem with requiring something, or having

24   something signed by somebody.  What we proposed I think was

25   reasonable, to have it to the lawyers, to the firms best of his

1  knowledge and belief.  What the Debtors wanting is, I think, a

2  verification not just from the firm but from the client or at

3  least from the client and to me that's just going to cause

4  delays and you're going to have to send it to the client, he's

5  going to have to review it, and the clients are going to have

6  inquiries, what's this all about and it's really the law firm

7  asserting the privilege on behalf of the client I understand,

8  but it's really the law firm asserting the privilege, so to the

9  extent there should be any kind of verification at all, it

10 seems to me it ought to come from the firm not from the client.

11         And then you've got the issue of whether it's

12 adequate to do to the best of their knowledge and belief.  And

13 it seems to me that that's all you can ask them to do.  But

14 whatever you says goes.

15         THE COURT:  Okay.  Well, it seems to me that the

16 rules require whoever is answering the interrogatory to verify

17 the truth and the voracity of the interrogatory and probably

18 what we ought to do is just follow the rule.  Whoever is

19 answering it should verify that it's truthful.  But I'm not

20 sure that to the best of their belief is sufficient in this

21 case, that seems to be what led to the problem in the first

22 place.  So, I think they need to assert what I started to say

23 earlier, there should be a specific interrogatory that lists

24 what search has been made of the documents that are in the

25 claimants possession, custody and control.  And, then it should

1 be verified by the entity, or the person who is signing it.

2 And, I think true, complete and accurate is appropriate.

3        MR. ESSERMAN:  Well, I'm not a reargument person,

4 let's move on.

5        THE COURT:  All right.  Okay.  So, that's five, I

6 guess four and five combined.  Did I miss anything in -- well,

7 I think yours are finished, Mr. Esserman.  Anything that you

8 would have agreed to is done, so I think I'm back just to the

9 Debtor's proposals now.

10        MR. ESSERMAN:  Yes.

11        THE COURT:  Okay.  Mr. Bernick?

12        MR. BERNICK:  Well, in order not to be repetitive, I

13 think we explained what interrogatory six does and I believe

14 it's the only opportunity that will exist in the record in this

15 case.  I was informed by your court people here that the

16 portable mike doesn't work so well, so I'll try to do a little

17 bit better with this.

18        It is our only opportunity to be able to ascertain

19 the fundamental fact that we now know has controlled the

20 submission of all the information that we have received to date

21 and this is the only way and the only opportunity for getting

22 this information.  In my view, without this information, the

23 plaintiff will have succeeded in their professed effort, dating

24 back to the beginning of the case, to undercut our full ability

25 to find out what actually is happening with these people.  It's

1  a very simple set of questions, that simply asks what efforts

2  have been undertaken to find out where the documents are.  It's

3  very open ended, they can answer it in whatever fashion, so

4  long as it's responsive, they choose.  It doesn't seek to catch

5  them in anything.  What efforts have they undertaken to obtain

6  documents in the possession and control of other counsel, or in

7  the possession, custody and control of the doctors, which is

8  exactly what the law says they should have done.  It's what

9  Your Honor ordered, it's what's in the questionnaire.  Just

10 tell us and if they haven't gone beyond the confines of their

11 firm, which it seems that is now the latest development, very

12 important, I want to get a record of that, that says this is

13 what they've done and then we can deal later on with the

14 consequences of that.

15          THE COURT:  All right.  I don't see that this overly

16 burdensome.  If there have been efforts made, it shouldn't be

17 that difficult to say what they are in global terms.  If there

18 were no efforts, then none is pretty easy to add.  Mr. Busby?

19          MR. BUSBY:  Well, Your Honor, the devil is, again in

20 the details here.  There's a phrase in the introduction to

21 sub-A and sub-B of interrogatory six, which is the misery and

22 it says, or any other materials in connection with claimants

23 claim.

24          Now, that phrase alone expands the entire universe of

25 this whole exercise from B reads, which is what we were here to

1 debate, into the universe of everything that was ever submitted

2 in connection with this claimant's claim.  There is not basis

3 for that, there's no predicate for that.  There's no motion

4 practice with respect to that, that's just thrown in there,

5 gratuitously, but intelligently, to create a whole extra layer

6 of complexity and we're going to be arguing with Mr. Bernick

7 and his fine colleagues for weeks over what that means and that

8 should be stricken.  We're talking about B reads.

9 Then this also -- well, that's the first point.  And,

10 I mean it seems to me that this whole exercise was in the

11 context of B reads, so if we're limiting the efforts to that,

12 which is what we should be doing, then I'll leave it to Mr.

13 Esserman to say if he has any problems with the rest, but I

14 object most strenuously to this phrase, or any other materials

15 in connection with claimant claims.  That explains everything.

16 THE COURT:  Okay.  Mr. Esserman.

17 MR. ESSERMAN:  Number six just is completely

18 unacceptable for a host of reasons.  And, I have tried to give

19 everywhere that I can give, and I can't give here and I think

20 it's out of bounds.  If you look at what they're asking for in

21 six, they're not talking about, first of all, they're not

22 talking about documents withheld on the basis of privilege,

23 they're talking about everything connected in connection with

24 the claimants claim.  So, they've opened it up, basically this

25 is a whole new round of questionnaire.  And the delays that

1  would be caused by trying to answer this, as well as the fact

2  that if you look at part B, they're trying to get in the back

3  door very sneakily which I've learned to expect in a way, but -

4  -

5           MR. BERNICK:  Your Honor, I object to that and move

6  to strike the comment.

7           MR. ESSERMAN:  In six --

8           MR. BERNICK:  Your Honor, I have a motion.  That is

9  an insult to counsel, specifically.

10          MR. ESSERMAN:  Well, let me explain why then.

11          MR. BERNICK:  No.

12          MR. ESSERMAN:  I'll argue it.

13          MR. BERNICK:  If Mr. Esserman wants to stand by an

14  accusation that --

15          MR. ESSERMAN:  Because you're already ruled.

16          THE COURT:  Gentlemen, I am not going to have you

17  both talking over each other again and the next time it

18  happens, you're both going to be spending some time in the

19  federal courthouse in the lockup.

20          MR. ESSERMAN:  You've already ruled that the identity

21  of the doctors is not to be disclosed and B(I) goes right to

22  the heart of that.  It goes, state the identity of any doctors

23  who have rendered services or reviewed information in

24  connection with claimants claim.  Once again, it goes right to

25  the heart of the consulting expert privilege.  So, to me this

1  is just -- this just basically guts the privilege itself.  And,

2  is completely unacceptable.

3              THE COURT:  All right.  Mr. Bernick?

4              MR. BERNICK:  Yes.  First of all, I have a motion

5  pending to strike the comment made about counsel.  That's an

6  accusation that there's somehow some sneaky effort here being

7  made by counsel.  Mr. Esserman knows--

8              MR. ESSERMAN:  I'll withdraw the comment.

9              MR. BERNICK:  Well, I ask that it be stricken from

10  the record.

11             THE COURT:  All right, it's stricken.

12             MR. BERNICK:  Thank you.  Secondly, there's all of

13  this protest, this does nothing more than ask for what efforts

14  were undertaken in responding to the questionnaire.  We now

15  have very substantial evidence, indeed, we have virtual

16  acknowledgments that the responses to the questionnaire were

17  constrained by a decision to only look within the confines of

18  these firms.  That is contrary to the questionnaire, it's

19  contrary to the order, but whether or not that's true is not

20  really being requested here.  What's being requested is just

21  the information about what was done in response to the

22  questionnaire.  We spent months going through that

23  questionnaire, we spent specifically months talking -- not

24  months, but specifically talked about the question of what was

25  in the custody and control of the claimant.  Your Honor has

1  ruled on that, it's completely in accord with Third Circuit

2  law, there's nothing that says that this interrogatory has got

3  to be limited to the B reads.  This is related to the B reads

4  but it goes beyond the B reads, and it goes beyond the B reads

5  because the B read experience has now provided us with a very

6  clear indication of exactly what's taking place here.

7          So, there's all this profession of outrage over

8  simple requests for accountability of what these folks did in

9  responding to the questionnaire that has consumed the attention

10  of this Court for the better part of two years.   The

11  questionnaire was the keystone of our discovery effort.  We

12  believe that that has been thwarted.  All we're asking for is

13  the information that will confirm the facts or deny the facts

14  that are out there with respect to responding to the

15  questionnaire.

16          I would say by way of responding editorially, in

17  order to get this done, because it seems relatively

18  straightforward, we would amend the lead in so that it's all

19  pegged to the questionnaire, and it simply says, in responding

20  to the W.R. Grace asbestos personal injury questionnaire, and

21  to the Courts orders regarding B reads:  so, there's no or any

22  other materials, so people can't speculate there's some

23  nefarious purpose.  That's very specific yet is confined to the

24  heavily negotiated ruled upon questionnaire and the heavily

25  negotiated ruled upon order.  So, we would say in responding to

1 W.R. Grace personal injury questionnaire and to the orders

2 entered by this court with respect to B reads:  state, or

3 state: and then A would remain as it is, B would remain as it

4 is, and we can add on a phrase that says, to the extent that

5 the doctor is claimed to be a consulting expert, identify the

6 doctor by letter, consistent with the Court's prior guidance to

7 us.

8           So, there's nothing -- we don't need a motion for

9 this, we're asking for the approval of this interrogatory so

10 that it gets done and it gets done right and we're asking for

11 accountability in discovery in this case.  It's just that

12 simple.

13           THE COURT:  Mr. Busby?

14           MR. BUSBY:  Thank you, Your Honor.  With all due

15 respect to Mr. Bernick, a motion is needed on this.  We had a

16 motion for a privilege log.  We had the Court recommend the

17 creation of interrogatories to cut through that and provide the

18 information that a privilege log would require.  This goes

19 completely into new territory.  It has nothing to do with a

20 privilege log, it has to do with revisiting the whole

21 questionnaire and years worth of discovery orders and years

22 worth of negotiation and balancing, and it just runs roughshod

23 over that with a sudden, last minute -- this was proposed

24 three days before the hearing last week, without any motion,

25 without any case law, without any justification to show that

1  this is appropriate, without any opportunity for the responding

2  claimants firms to show burden or impropriety.  It's at a

3  minimum improper to have a ruling on it today without proper

4  briefing.  But this completely revisits all the kinds of things

5  that this Court has ruled upon.  It is part of a pattern and

6  practice of trying to revisit prior rulings, we don't think it

7  should be allowed, I don't think this question should be

8  permitted, in the least.

9         We're here to determine a privilege log, there are

10 questions that have been provided, verification that's been

11 provided for, all with respect to determining whether the so

12 called burden on the claimants as to proving an entitlement to

13 a privilege has been established.  This has nothing to do with

14 a privilege log.   Thank you, Your Honor.

15        MR. ESSERMAN:  Let me try and be helpful here.  Let

16 me try and fix this so that it can be asked and answered.

17        MR. BERNICK:  Your Honor, I would really object to

18 this.  This is exactly what gets us into trouble, all of these

19 -- all the stuff about how people are trying to -- let's just

20 --

21        MR. ESSERMAN:  Okay.  Let me not be helpful, let me

22 just say what I want to say.

23        MR. BERNICK:  Good.

24        MR. ESSERMAN:  And, if the Court finds it will assist

25 the Court, fine, reject it accept it.

1         If you take the lead in, and not only limit it as Mr.

2   Bernick suggested, but also say, in connection with any

3   withheld document or actually, in connection with asserted

4   privileges, so we're limiting interrogatory six to the asserted

5   privilege, which gets us back to what Mr. Busby said, that this

6   is all in connection with a privilege log, an interrogatory

7   which gets us back to what the Court wanted in the first place,

8   which is an interrogatory identifying the privilege log, to be

9   in connection with any document withheld as privileged.  You

10  put the lead in for that, you can leave A as it is, and

11  although I completely object to B, and think it's completely

12  inappropriate and appreciate the concession that Mr. Bernick

13  made on having the treating physicians be under a lettering

14  system, to the extent you're even going to go down there at

15  all, which I think you shouldn't, you can say, state the

16  identity if you know, from a review of your records, at your

17  law firm:  all other counsel who previously or subsequently

18  represented claimants, and once again, with a qualifier from

19  your records, in your law firm, state the identity that you did

20  not seek to obtain.

21         THE COURT:  I just don't know what's relevant about

22  this, about B at this point in time.  I understand what Mr.

23  Bernick is attempting to get to with respect to making sure

24  that the information that's been provided in the questionnaires

25  and in the interrogatories, is full and complete and the Debtor

**J&J COURT TRANSCRIBERS, INC.**

1  surely is entitled to have that information be full and

2  complete, but I think that the supplemental information

3  earlier is intended to get that out.  And let me see what I'm

4  missing.

5          MR. BERNICK:  What you're missing, Your Honor, I

6  think is that all of the information in category -- in

7  interrogatories one through five, relates to the B reads, and

8  also relates simply to the assertion of privilege with regard

9  to the B reads.  Interrogatory number six is different.

10 Interrogatory number six says, regardless of whether you are

11 asserting a privilege or not, what have you done to obtain the

12 B reads and obtain the other materials that are required to be

13 produced by the questionnaire.  It is a basic question that

14 goes to what has been done to basically produce documents in

15 this case.

16          In any ordinary case it would be completely

17 non-controversial to ask either through interrogatories at the

18 outset of the case, or through discovery including depositions,

19 the custodial depositions, what did you do to go gather the

20 documents that are responsive to this discovery request.  This

21 kind of discovery takes place every single day of the week.  We

22 now have circumstances that are relatively extraordinary that

23 to our perception based upon the plain language of the

24 questionnaire, represents the complete failure to pursue the

25 Court's ruling with regard to documents in the possession,

1  custody and control of the claimants, through their doctors and

2  agents.  And, therefore, we are now posing this very simple

3  interrogatory that simply says, what did you do, this is no

4  burden, any law firm can specify what efforts they undertook.

5  There's no privilege, this is not privilege information and it

6  goes to the heart of whether they are providing the information

7  that has been sought in this case.

8         And, Your Honor, this is fundamental.  If we don't

9  get this information, there is no other way for us to make a

10  record of this in this case, and talk about delay, we will have

11  absolutely no choice but to pursue an appeal because we're

12  being foreclosed, they decide what they're going to produce,

13  they decide what it is, and then once it emerges, if there's a

14  problem they say, oh, well, you can't have that.  It's

15  outrageous that you could ever ask to find out whether we did

16  our job.  It's just a mockery and we know that this is true.

17  Barron and Budd, they haven't gone beyond the four corners of

18  their firm, so why can't they just say they haven't gone beyond

19  the four corners of their firm instead of relying upon that to

20  say, well, we're not entitled to take discovery or we're not

21  entitled to B reads or privilege logs.  You can't say, oh,

22  we're not entitled to the information, we don't have to do it

23  for privilege logs and then not acknowledge that for purposes

24  of complying with the questionnaire, they didn't do anything

25  beyond going beyond their firm.  So, there's no burden, it's

1  highly relevant, it goes to the integrity of this case, I am

2  flabbergasted that we even have a discussion about this.

3  Discovery regarding discovery compliance is standard fare.

4  There are judges that will make you account for this right at

5  the outset of the case and will require the lawyers standing

6  here to attest to what they did because it's absolutely so

7  standard.  And they can't tell us what they did or didn't do?

8  That's just -- I mean, I'm sorry for my frustration, and the

9  emotionalism today, but in all of my experience, being on rules

10 committees, being in cases all over this country, I have never

11 heard of a situation in which a litigant can be protected from

12 scrutiny that goes to the integrity and thoroughness of their

13 discovery compliance.  It's just remarkable.

14       And we're now sitting here with a case that's a

15 multibillion dollar case, involves the interest of hundreds of

16 thousands of people, and these folks can't be accountable for

17 the plain language of the questionnaire, and just tell us what

18 they did?

19       THE COURT:  But, Mr. Bernick, you keep going back to

20 that, but this isn't litigation on the claims, that's the

21 problem.  If you want to be in the district court litigating

22 each individual claim, or in the tort system litigating each

23 individuals claim, that's a horse of a different color, but

24 that's not what this is.

25       MR. BERNICK:  I'm not asking for that.  I'm asking

J&J COURT TRANSCRIBERS, INC.

1 Your Honor for what is --

2        THE COURT:  But you're asking for all the same

3 information as though you want the claimant to produce all the

4 evidence that's necessary to substantiate the claim and that's

5 not what an estimation is about.

6        MR. BERNICK:  No.  Absolutely not.  A, that is not

7 what Your Honor ruled.  What Your Honor ruled is they had to

8 comply with the question --

9        THE COURT:  I know what I ruled.

10        MR. BERNICK:  Your Honor approved the questionnaire

11 and said that they had to comply and what this does is it

12 simply asks, what did you do.  They don't have to lift a finger

13 to do anything more than what they did.  They just have to tell

14 the truth about how it is that they responded to the

15 questionnaire.

16        THE COURT:  And this is what I guess I am trying to

17 get to.  Some of these firms have multiple thousands of

18 claimants and have, in fact, produced information to the

19 Debtors.  Now, I can't go back and quote the numbers to you,

20 but in the case of one firm, 1200 people compliance was made.

21        Now, they're going to get this interrogatory, maybe

22 they don't have supplemental information to produce by way of

23 anything until they get down to number six, but when they get

24 down to number six, they're still going to have to identify

25 efforts that have been taken to produce these documents but

1  there doesn't seem to be an issue from the Debtor, I think, as
2  to those 1200 questionnaires.  So are you not going to be
3  sending out these interrogatories to those firms?

4         MR. BERNICK:  Well, to the firms that actually
5  provided us with the information in complete fashion, I think
6  there's one firm, it's the Campbell Cherry firm.

7         THE COURT:  So, are you not going to be sending --

8         MR. BERNICK:  Well, I'd be prepared to say with
9  respect to the Campbell Cherry firm, I don't think we need this
10 information, but they actually went ahead and did what they
11 did.  But nobody else --

12        THE COURT:  But that's my concern about the burden,
13 though.  When somebody really has, in the Debtor's view,
14 complied with the information, it seems to me that making them
15 go back and redo this is a big expense and it is a burden.

16        MR. BERNICK:  Your Honor, look -- I'm sorry.  A) what
17 efforts have you undertaken to obtain documents in the
18 possession, custody or control of all other counsel who
19 previously or subsequently represented the claimant.

20        THE COURT:  Claimant, right.  They have to pull 1200
21 claimant files.

22        MR. BERNICK:  No, Your Honor, they didn't go through
23 and say, oooh, let's take claimant A and then let's go track
24 this down and here's what we did.

25        THE COURT:  How do you know they didn't?

1          MR. BERNICK:  Because they've already -- they've as

2    much as told us that they didn't do it, that's why they've

3    complained about the burden of compiling the information about

4    privilege, is they say, oh, well, we didn't have to go ahead

5    and do that.   These lawyers have gotten up there and said, all

6    that they can attest to is what their firm has within its

7    possession, custody or control.

8          So, we're not talking about somebody parsing through

9    every one of a thousand claims, we're talking about somebody

10   saying, oh, well, here's what we did, we had our own files and

11   we looked through our own files and did we make inquiry of

12   other counsel from other firms, maybe they did, maybe they

13   didn't.  They can talk about whether they made contact with

14   other counsel for other firms, whether they obtained documents

15   within the possession, custody and control of the other firm.

16   Did they go to the doctors, did they or did they not?

17         Now, they've had a standard procedure, they didn't

18   sit there and handcraft this with respect to every single

19   claimant that they had.

20         THE COURT:  Maybe they did it for one out of 1200 and

21   have to search through 1200 files to find the one.

22         MR. BERNICK:  Well, then they can tell us that.  The

23   whole purpose of the questionnaire, Your Honor, they had to

24   fill out this questionnaire for every single claimant --

25         THE COURT:  And they have to fill out this

1   interrogatory for each claimant.

2          MR. BERNICK:  Well, no, all they have to do with

3   respect to this interrogatory is talk about the process they

4   used in filling out the questionnaires.  Now, if they then say,

5   well, each claimant was different, we made inquiry on a

6   specific claimant by claimant basis, of other law firms, and

7   the doctors, and these are the doctors that we contacted and

8   these are the other law firms we contacted with respect to the

9   following, I mean if they actually parsed that out, well, then

10  they could certainly describe that.

11         But this does not require that they do anything other

12  than attest to the procedures that they followed and the

13  specifically the extent to which they contacted other firms and

14  they contacted the doctors, because what they've represented

15  here in court is that they weren't responsible for doing that

16  in connection with asserting the privilege, and all I want to

17  do is get a record of that that's reliable, it's not just

18  lawyers getting up and stating it, it is verified and that

19  extended to their response to the questionnaire.

20         And I don't know how to be any more simple about it.

21  We could have done this easily in the sense that we could go

22  take the deposition of a person most knowledgeable from any one

23  of these law firms and in the space of three hours, two hours,

24  one hour, we could ask all these questions and get the answers

25  just fine.  But Your Honor told us before that we're not

1  conducting discovery of the law firms.  Now, maybe we should,
2  but that's all that this requires.

3         And, Your Honor, again, it's just incredulous that in
4  today's age and under the rules, that this is even -- and the
5  estimation, the estimation is drive by the information and
6  response to the questionnaires.  That's our case.  And, all
7  we're asking for is when you gave us the information, what did
8  you do, that's pretty basic stuff.  And to say that somehow
9  we're not entitled to that, we are absolutely entitled to it.
10 The discovery rules as set forth in the bankruptcy code in any
11 contested matter, incorporate, are the same as the discovery
12 procedures with respect to regular litigation.  The touchstone
13 is different, the touchstone is what's necessary for the
14 estimation, not what's necessary for the allowance or
15 disallowance of a claim.  But what's necessary for the
16 estimation Your Honor already determined is within the confines
17 of this questionnaire.

18        So, what we want to know is, with respect to the
19 confines of this questionnaire, what did you do?  And no amount
20 -- and, you know, Mr. Esserman is very capable and we know,
21 well, we'd like to do this, this is not a matter of negotiation
22 and I'll give a little here and I'll give a little there, this
23 is absolutely fundamental to this case.  It's not a question of
24 whether we can stand up here and kind of, you know, give a
25 little here or give a little there, at the end we have to have

1  a description of what was done and we have to have

2  accountability.

3          MR. ESSERMAN:  May I go, Your Honor? We've had a

4  remarkable admission here by Mr. Bernick.  Interrogatory six

5  has nothing to do with what we're talking about here today,

6  that's the documents asserted as privilege.  It is, besides

7  being procedurally, completely improper, last minute, et

8  cetera, it is questionnaire number two, revisited which is

9  guaranteed to cause a raft of problems.

10          We are no longer talking, and it is not his intention

11  to talk about the documents withheld based upon privilege.  If

12  we're talking about those documents, I think interrogatory six

13  can be crafted in some fashion that would elicit the response.

14  Now we're talking about every claimant, because they want

15  claimants to sign this and the lawyers, every claimant and

16  every lawyer to go back and redo 100,000 questionnaires.  Oh,

17  they may take an exception here or there, just to try and sound

18  good, but the bottom line is, is they're going to want 99 or

19  100,000 questionnaires responding to their proposed

20  interrogatory number six.

21          I think it's completely out of bounds, it has nothing

22  to do with the privilege document.  If you want to have it

23  relate to the privilege document, I think something can be

24  crafted.  If you are intended to have this be interrogatory

25  number six, which I'll call questionnaire number two all over

1  again, we are going to have the delays, which is maybe what

2  they want, the delays that you saw with the questionnaire

3  process, which was inherently flawed in my view, to begin with

4  and we are going to have things dribble in over months and

5  months and months and the cost and the burden is going to be

6  enormous.  The time spent, the firms that I represent alone

7  have spent millions, the Barron and Budd firm has spent

8  thousands of man hours and there's someone here that can tell

9  you about it if --

10       MR. BERNICK:  Let's put him on the stand and have him

11  answer these questions.

12       MR. ESSERMAN:  -- that they have spent thousands and

13  thousands of hours and millions of dollars putting these

14  questionnaires together and supplements, and what you've got

15  here is an attempt by the Debtor to totally turn the process,

16  what we're here for, which is a privilege log, on its head.

17       MR. BUSBY:  I couldn't agree more with what Mr.

18  Esserman said.  It's procedurally improper and there's been no

19  opportunity to brief this.  And I also don't know, I mean, Mr.

20  Bernick is arguing that he just wants to know this so that, you

21  know, this is discovery about discovery compliance.  There's no

22  secret here with respect to the firms that I represent, Your

23  Honor.  They've certified to Mr. Bernick already that they --

24  and he's put this on his charts, you know, this firm does not

25  have any of these documents.  So, he's not going to learn

1 anything new, he wants to then take this and come back here and

2 say well, now you have to go out and you have to check

3 everybody.  So, we're just, you know, and that shouldn't be a

4 part of what we're dealing with when the x-rays have been

5 produced, when B reads relied upon in whatever respect in

6 response to the questionnaire have been produced and a

7 privilege log is being produced.  This is just an attempt as

8 Mr. Esserman said, to go back and revisit the whole

9 questionnaire process on which Your Honor has made countless

10 rulings. It's too late for that, it's not been procedurally

11 noticed to the parties and an opportunity to be heard with any

12 briefing and the supposed premise of much of this is that

13 there's been some outrageous discovery non-compliance that Mr.

14 Bernick has discovered.

15        Well, I did my best to listen this morning, I had

16 like seven exhibits I had never seen before, they were flashed

17 on a screen here and that were identified by number and then

18 they were shuffled off the page and somehow that was supposed

19 to be proof that there's been discovery compliance or

20 non-compliance by other firms that I don't represent.  Well, I

21 don't consider that fair notice or opportunity to evaluate the

22 merits of his claim.

23        MR. ESSERMAN: Your Honor --

24        THE COURT:  Anyone on the phone wish to be heard on

25 this matter?

**J&J COURT TRANSCRIBERS, INC.**

1          MR. HERRICK:  Yes, Your Honor, this is John Herrick

2   and I would like to be heard on this matter.

3          When these interrogatories were originally proposed

4   for the meet and confer, there was no interrogatory number six

5   included at the time of that meeting and, in fact,   I was a

6   little bit shocked and amazed when we were talking about that

7   this morning and found it in a later email that happened after

8   our meet and confer, that interrogatory number six was added to

9   this.

10          Your Honor, further, what I'd state was that the idea

11  of these interrogatories was to find out which clients were, if

12  any, were withholding B reads on the basis of privilege.  My

13  understanding is when we initially talked about these

14  interrogatories was that to the extent that my clients could

15  certify that at present the had, and I explained my reasons for

16  doing what I did to the Court at the last hearing, if at

17  present they have no documents which they were withholding on

18  the basis of privilege, that they wouldn't be required to

19  respond to these interrogatories anyway because the purpose of

20  the interrogatory is to find that out, if we have a document

21  that we're withholding, are we withholding it properly and the

22  Court went through painstakingly this morning and ferreted out

23  those questions that were designed to do just that and as I

24  understand it, approve those questions.

25          The only other caveat I would add is, I find it

**J&J COURT TRANSCRIBERS, INC.**

1  somewhat ironic that a debtor who has made it clear on multiple

2  occasions, that they had far too much information to get

3  through in the next year wants to put the burden on the

4  claimants to go around and dig up more information that they

5  presumably are not going through as well.  So, I would suggest

6  this, Your Honor.  To the extent that this Court approves any

7  interrogatories at all, to be further answered by any of the

8  claimants, that the claimants required to answer be limited to

9  those claimants where the Debtor is actually looking at the

10  interrogatory -- excuse me, at the attachments to their

11  questionnaires and actually analyzing the information that's

12  already been submitted.  By their own admission, that's 2,000

13  people.  That makes this eminently more workable, Your Honor.

14  Thank you.

15        MR. BERNICK:  Your Honor, without belaboring any

16  further, I mean that has nothing to do with the price of eggs

17  in China.  The 2,000 documents were 2,000 document that Mr.

18  Esserman represented had been withheld by three law firms that

19  he represented.  It has nothing to do with the issue --

20        MR. ESSERMAN:  No, no, no, Your Honor.

21        MR. BUSBY:  2,000 claimants, 2,000 claimants that

22  you're using as your statistical basis is what I understood.

23        MR. BERNICK:  2,000 claimants where we are doing the

24  hand review.  That's correct.  I apologize, I thought he was

25  talking about 2,000 documents, the 2,000 claimants.  Yes, we're

1 doing --

2        MR. BUSBY:  He said -- yes, sorry.

3        MR. BERNICK:  Excuse me, counsel. I said that I was

4 sorry, that I was referring to the 2,000 documents, not the

5 2,000 claimants.

6        Your Honor, I don't really know what else to say.

7 When I can't find out and get these people to specify what

8 documents they looked for and whether they contacted other law

9 firms and when they went to do what Your Honor told them to do

10 before, you know, I am literally speechless and the whole idea

11 that this is somehow questionnaire number two, I could put Mr.

12 Rich on the stand in five minutes and get the answers to these

13 questions for Barron and Budd.  It's not that hard to do.  But

14 I need to have it verified, I need to make sure that it's

15 correct, I can't have a bunch of lawyers saying something in

16 their briefs, by way of avoiding what we think is their

17 obligation to demonstrate privilege and then turning around and

18 saying, oh, but you can't really get a verification of that on

19 the questionnaires.

20        THE COURT:  But here's the problem.  I was asked to

21 do this interrogatory discussion in advance of the Debtor

22 sending it out which I really am not familiar with how the

23 court gets involved in approving interrogatories as formal

24 discovery in advance anyway, and I stated that on the record

25 before.  Nonetheless, I've now spent five hours today doing it,

1  because everybody seems to think that it may eliminate some

2  problems down the road.  I certainly hope it does, because I'm

3  here to tell you folks, I'm not ever in this case, doing

4  another discovery colloquy that takes five hours.  I told the

5  people in Federal Mogul I wasn't doing one that takes two hours

6  in the future.  So, you can be assured I'm not doing another

7  one that takes five hours, not for anybody, not for any reason.

8  They're going to be submitted on the papers it the future and

9  before they're submitted you're going to have meet and confers,

10 you're going to identify for me specifically what is objected

11 to and I do mean by chapter, verse and line.  You're going to

12 give me a brief that sets out everything that is known to man

13 in the printed literature about the topic, you're going to show

14 me what is relevant about the specific discovery requests,

15 you're going to identify me whose objections there are and

16 specifically what they relate to and if they're general

17 objections you can be assured that they will be overruled

18 forthwith, without any further consideration by the Court and

19 if they're specific I'll take them under advisement and give

20 you rulings.  I'm not doing this any longer, because this

21 estate has probably spent more on discovery colloquies than it

22 has on anything else, and this is the end, this is the last

23 one, in personal injury and I'll probably, after tomorrow or a

24 day or so, probably come to the same conclusion in property

25 damage, too.  I don't know, haven't been there yet, but I would

1  tend to think maybe we're hitting the limit on property damage

2  as well.  But for personal injury, this is it.

3       With respect to interrogatory number six, I wasn't

4  asked to make a ruling on this in advance, apparently it wasn't

5  shared in advance.  You want to send out interrogatory number

6  six, Mr. Bernick, the Debtor can send out whatever

7  interrogatories its wants.  If people object to it, probably

8  those objections will have to be heard at some point in time

9  and you've just heard how I'm going to hear them.  So, if there

10 are objections to them, you raise your objections make sure you

11 raise them specifically, make sure you identify for me exactly

12 the portion of the interrogatory that you're objecting to and

13 why and only that portion and why.  I don't want anything that

14 is not objected to.  I don't want the whole batch of

15 interrogatories, I don't want any of the responses except the

16 portion that is objected to.  And, I don't want a brief on any

17 topic except the portion that's objected to.

18      I am not going to vary, not by one paragraph, not by

19 one footnote, the number of pages in which you can submit

20 briefs, nor am I going to permit replies.  So, if you're the

21 objector, understand that you've got the burden of submitting

22 the brief along with your objection and if you're the

23 respondent, that's going to be your last and final shot to get

24 this done.  This is it folks.  I expect a little bit better

25 compliance with all of you for the purposes for which you

1  represent the various constituencies in this case.

2         So, I have approved one through five to the extent we

3  went through it, I am not approving number six, I'm not not

4  approving number six.  I don't really see how it's going to add

5  anything at this point in time to the case, but if the Debtor

6  does, you can send it out, the parties can object to it.  If

7  you do send it out, however, you should note that in B, you've

8  got the word state the identify instead of identity.  I think

9  you want to make the typo correction.

10         All right, what's the next item?

11         MR. FINCH:  I just have a request on behalf of the

12  ACC and I expect the FCR would join in that.  In that when Mr.

13  Bernick sends the interrogatories out to all of the firms that

14  are withholding B reads, that he simultaneously copy the ACC

15  and the FCR on those interrogatories.

16         THE COURT:  Oh, yes, certainly.

17         MR. BERNICK:  When we get to the scheduling, I think

18  I'll tell the Court, I'd be obliged to tell the Court what I

19  think we're going to have to do here, and everyone will get

20  copies of everything because it's going to take some time.

21         MR. BUSBY:  I do joint that request, obviously.

22         THE COURT:  Yes.  All the notice parties who are

23  entitled to get notice in the personal injury litigation should

24  get notice of everything so that it's clear.

25         MR. BERNICK:  We're going to circulate a new draft of

1 the interrogatories.  We'd like to have some process so that it

2 can actually go out the door and get answered, although I think

3 together with other things, there's probably not too much of a

4 rush on that either.  So, we'll submit a new round, a new set,

5 in compliance with Your Honor's order.  If we can't reach

6 agreement, we'll just raise it at the next omnibus.

7          THE COURT:  Okay, that's fine,  I mean, I've given

8 you rulings on the record, this one should not be too

9 difficult.

10          MR. BERNICK:  I understand that, but it hasn't --

11 well, you know the history.

12          THE COURT:  Okay, what's next?

13          MR. BERNICK:  I think the next matter is scheduling.

14 And, what I was going to say on scheduling is that we said last

15 time that we needed an other 30 days, I think that Your Honor's

16 determinations just now affect that and I want to cover a

17 little bit the respects of which I think that is true.

18          THE COURT:  Yes, you may need longer than 30 days.

19          MR. BERNICK:  Oh it -- (indiscernible -- microphone

20 not picking up voice) -- we have this period of time now where

21 we've been pursing the questionnaires.  Again, I've only added

22 on one thing, there's been some indication from the Futures

23 Claim Representative that -- well, we did all this and we

24 served these (indiscernible), why did we wait so late to serve

25 the trust -- (indiscernible) -- the failure to get the answers

198

1  in compliance with Your Honor's orders on the attachments.  So,
2  we did serve some subpoenas (indiscernible) talk about that in
3  more detail.

4        Where we're at now, this is what we'll marked as
5  Exhibit 17, is that we're facing a difficult (indiscernible).
6  The final supplementation date was March 1 of 07.  We then have
7  tried to obtain a deadline for the submission of additional
8  information.  So, the x-rays, now that we have a deadline of
9  March 15th, we had the sub of the x-rays that were handed
10 (indiscernible -- microphone not picking up voice) -- that's
11 now set at May the 15th but we don't even have agreement on
12 that because people are still saying they don't
13 (indiscernible).  So, I guess we'll have to take up the x-ray
14 compliance order, I don't think we'll be able to do that today,
15 because I'm sure that there will be -- we tried to resolve that
16 during the course of the last week, but it's not on the agenda
17 for today so, I guess we'll have to take that up in the next
18 omnibus.  I don't see what else we can really do.

19       THE COURT:  I'm sorry, I thought that the May 15th
20 date was agreed on in court?

21       MR. BERNICK:  I thought so as well, but there are
22 other aspects, that the language of that order that apparently
23 we can't reach agreement about.  There are language problems, I
24 thought that paragraph one was signed off on.

25       MR. FINCH:  Mr. Bernick, I'm not sure there's still

1 disagreement.  I haven't the most recent version.

2          MR. BERNICK:  Well, with all due respect Mr. Finch,

3 you don't speak -- Mr. Finch does not speak in this case for

4 the claimants.  We've seem that repeatedly, and I was just now

5 told that the people couldn't get an opportunity to look at the

6 interrogatories.  I can only do things on the basis of trying

7 to get this thing done and the final x-rays, maybe we can get

8 resolved today, I don't think so because I don't believe that

9 -- I think that others will says that they want to pitch in

10 too, but that's still not been entered.

11          Now, let's assume that it's entered and it's May the

12 15th, that's now two months after the original deadline.  The

13 deadline for the B reads is April the 7th, that was put in

14 place, we were able then to complete the PIQ database on the

15 13th of April and what the means is that we're now -- the

16 non-estimations expert reports, there's a little bit of

17 discovery, the non -- the first supplement of those is due on

18 May the 10th, which is, I guess it's --

19          THE COURT:  Two days from now.

20          MR. BERNICK:  Two days from now.  So, we're obviously

21 -- we don't have anything like the period of time that we need

22 in order to complete our work there and then the expert

23 estimation reports are due May the 17th.  It's just not going

24 to happen.  We are still processing this information, there is

25 the non-estimation, the non-numerical reports are completely

1  tied in with the numerical reports, why because essentially

2  what we're doing, is what we have to do, that is to say, in

3  analyzing the claims data, information in the questionnaires,

4  to the extent that there is any, and the information that's in

5  the attachments, if we take a look at that data and then ask

6  ourselves, well, what is the best way in which to frame the

7  issues about what that data showed.

8           So, to frame those issues you then need the input

9  from the non-quantitative people, people like the industrial

10 type chemist, people who are experts in the underlying

11 diseases and the like.  So, all of these experts reports were

12 completely in tandem.  The one supplies the predicates for the

13 model, then enables you to quantify the impact on the claims

14 data.

15          So, our -- we have not finished with the sampling

16 analysis, the review of those files, we have not finished with

17 the review of the x-rays, we certainly don't have finality with

18 respect to B reads, we need more time.

19          Now, my original proposal was to ask for 30 days.

20 Why only 30 days?  Well, we think we can get it done and we're

21 very anxious not to have a slippage in the trial schedule.

22 This is a Debtor and my client feels very strongly, and you've

23 heard it from Mr. Restivo before as well, that things tend to

24 get resolved when there are deadlines that people are facing

25 where if they're not resolved, there's going to be a trial.

1  That's my experience also, I think it's probably the Court's

2  experience.

3        So, we want -- we may not get it resolved, we may

4  have to go through trial, so we have to be ready for it, at the

5  same time, we don't want to days to slip.  So, what we thought

6  would work out was that we would perhaps start with preliminary

7  matters in the middle of September and then actually start the

8  trial itself in late September but as Your Honor pointed out,

9  that's all subject to Your Honor's availability and Your

10  Honor's convenience.  But our concept was, that the 30 days

11  would probably get it done.

12        Now, we also thought it was going to be relatively

13  non-controversial, relatively non-controversial, to get answers

14  to basic questions on what populations of documents have been

15  produced.  Do we have just the files of the law firms and the

16  medical records that they obtained during their tenure, do we

17  have other medical records so that our experts know and we know

18  what it is that we actually know about the medical histories of

19  these people.  And that's critical for our people being able to

20  assess, well, do they have only the positive B reads or do they

21  have all the B reads?  I mean, that's kind of important when

22  your expert is saying, our experts will say that at levels of

23  1/0 and less on the B reads, there is inter-reader variability,

24  that variability is so high that the data does not rise to the

25  level of being a reliable, diagnostic tool for plural disease,

1   and asbestosis, and asbestotic conditions unless you get the

2   replication and the reason that you ask for three is that there

3   happens to be a standard called the ILO standard, it says

4   three.  So, if our expert sees that there are three positive B

5   readings and they say oh, well, that's probably pretty

6   reliable, if by contrast from these doctors they see only one

7   positive B read, then they say, well, we don't know.  If they

8   see positives and negatives and they're 1/0 and less, they're

9   going to say these are not reliable, they're not replicable,

10  and we're going to say they don't need a downward standard,

11  they would never make it in a federal proceeding.  And we are

12  dealing with the liquidation of these claims in the context of

13  a federal proceeding.

14         So, our experts need to know what it is that they're

15  actually being provided by way of data in order to be able to

16  be confident of what it is that they're analyzing and

17  receiving.  That's why we asked the questions, we didn't ask

18  the questions in order to kind of say, oh, let's spend more

19  time and money, we needed it because it goes to what this data

20  stands for and means.

21         Well, I'm now told that we're going to have to

22  reserve the interrogatories.  What we will do is serve the

23  interrogatories, we'll probably notice up custodial depositions

24  for the top 23 firms which are the firms that we're really

25  talking about here, take very short depositions to find out

1 what these firms did and that'll be on a parallel track.  So,

2 we'll give everybody fair notice, we're going to submit the

3 notices for the custodial depositions and the interrogatories,

4 if they give us the custodial depositions by a person most

5 knowledgeable, maybe that'll save a lot of time on

6 interrogatory number six because we can get the questions

7 answered in words of one syllable and we'll know what we're

8 doing.  But we can't buy a pig in a poke particularly under the

9 circumstances that we have here.

10          I don't think the rule require that we simply trust

11 them to tell us what they choose to tell us about the scope of

12 their discovery.  I think that that's going to take some time

13 and I'm very reluctant to say this because I know my client

14 very, very much wants to stick by the schedule, but at the

15 present time, I think that probably what we would say is that

16 we would ask for the 30 days, but I'm going to have to go back

17 to my client and figure out what it is that we're going to do

18 about this problem because we need this information.

19          Now, it may be that the answer is 30 days -- it

20 should be 45 or 60 days, and you know if we can expedite the

21 production of this discovery information, if we can get that

22 done, and maybe stick by the continued trial date.  But right

23 now, there's now way that we can get these expert reports done.

24 So, I guess maybe kind of thinking this through, we would ask

25 to have our response date on these expert reports deferred by

1  at least 30 days, and maybe by the time that we get back to

2  Your Honor next, at the next omnibus, we can have before you

3  the discovery request that we're making and figure out some way

4  to get that T'd up, maybe expedited, so that Your Honor can see

5  what's happening on that discovery and then consider the

6  further impact that may take place on the schedule, which would

7  then mean that for today, we'd ask for the 30 days, we would

8  ask to have trial continued to the end of September, but

9  recognizing that that's something that depends on Your Honor's

10  schedule and then we would ask to revisit this again in

11  connection with the omnibus when we will hope to have before

12  you, you know, some way of getting this additional discovery

13  underway so that we can get the thing done.

14         THE COURT:  Well, my concern about trying to expedite

15  the discovery, Mr. Bernick, is it just doesn't work.  I mean,

16  you know, it works if you've got somebody with a trial date

17  looming, it will work, but there are just too many law firms

18  involved and too many people, just individual people, with too

19  many documents to look at and files that have to be pulled and

20  I think it's just difficult to try to get it all done and I

21  don't even think it's lack of good faith compliance, I just

22  think that there are just too many man hours to try to get it

23  all done.

24         So, I mean there are only five interrogatories, one

25  has a couple of subparts, I don't think it should be a

1 monumental task to get this finished but even so --

2      MR. BERNICK:  But the first five, I mean, I think

3 we'll just get them served.  I don't think that that's the

4 problem.  I think the real problem is that last one simply asks

5 for what you've done and we're happy to take the depositions

6 which would take probably much less time, and much less -- it

7 would be much less frustrating, we'll agree to a time limit on

8 it, like our custodial depositions were taken and most recently

9 in Anderson Memorial after, you know, prolonged agony.  We do

10 it all the time.  Why don't we just take some custodial

11 depositions of the different law firms and find out what

12 they've done and we can do that, you know, very, very promptly

13 and then we don't have to worry about a bunch of arguments

14 about interrogatories.  Everybody does custodial depositions.

15      So, what I'm really suggesting, Your Honor, is that

16 we're so focused on not having the trial schedule slip, that

17 before we need relief on the 30 day stuff, we know that now.

18 But instead of trying to decide now that, oh, well, you know,

19 it's going to be some time later on, we would just like to come

20 back with a proposal and maybe the proposal will simply be,

21 we'll just notice up these 30(b)(6) depositions and find out

22 what it is that was done and we can do that relatively promptly

23 and have no slippage in the trial schedule.

24      I think that that might actually be -- I know that

25 that will take much less -- I find myself, I think it's

1 probably the first time in the case, making Mr. Speight's

2 argument.  Remember he said, just give me three hours and I'll

3 get it done and we didn't want to do it, we didn't want to do

4 it and we didn't want to do it, for very principled reasons

5 that I still believe are correct, but at the end of the day

6 the depositions were taken, they took about an hour apiece,

7 they didn't yield anything but it got done.  And, I think that

8 in this case, if we get a person who is responsible for the

9 production of these attachments and the answering the

10 questionnaire from each firm, we'll get sworn testimony and

11 it'll be relatively prompt and we'll find out whether they went

12 and contacted other doctors and other lawyers because I don't

13 think that that takes any rocket science.

14        So, that'll be our proposal, 30 days for now, keep

15 the dates as they are, and then we'll make a further request

16 for discovery and bring the matter before Your Honor at the

17 next omnibus.

18        THE COURT:  All right.  So, the only -- what you're

19 asking for today is a 30 day extension for the expert report.

20        MR. BERNICK:  Yes, that's correct.

21        THE COURT:  All right.

22        MR. FINCH:  Nathan Finch for the Asbestos Claimants

23 Committee.

24        Your Honor, I would oppose moving any of the dates on

25 general principles but if there's going to be a movement of the

1  expert reports date, we need a commensurate extension of the

2  trial date.  I in no way, shape or form want to move this trial

3  date.  I think Mr Bernick and his client have all the discovery

4  they need, they have a 2000 claimant sample.  Apparently, if

5  you looked at those questionnaires, their experts could

6  extrapolate from that.  I've sat in meetings with their expert

7  where has done all kinds of estimates, but they don't need

8  anywhere near this kind of information.  I've heard him testify

9  in cases where he uses stuff with a lot less information.  So,

10  I think this is sort of -- I'm reminded of a story where a man

11  was making a brass lamp and he kept polishing it every day and

12  someone came by and said, I saw you here yesterday polishing

13  it, when are you going to sell the lamp?  He said, well, I keep

14  polishing it until somebody comes and takes it away from him.

15  I think Your Honor has to take this away from Mr. Bernick and

16  actually try the case.

17        But the problem that I have is that if you push the

18  expert dates by 30 days, you're going to end up with a date for

19  the rebuttal estimation expert reports of August the 6th, and

20  they have about 20 experts, I have 10 or 12, the Futures Rep.

21  has some experts, they know what my case is, they have seen Dr.

22  Mark Peterson testify in other cases, he's been accepted by

23  courts, his methodology has been approved by courts, estimates

24  of a company's asbestos liabilities have been relied on by

25  courts and so, they have seen all that.

**J&J COURT TRANSCRIBERS, INC.**

1          I still don't know and I won't know until I get their

2    expert report from Tom Florence, who is their estimation

3    experts, and their expert report from Fred Dunbar if they have

4    a backup estimation expert, exactly how they're going to put

5    the pieces of the puzzle together, and if you push the expert

6    dates off by 30 days, you're going to compress this period her

7    for expert discovery into something like that.  And that's just

8    not enough time for me to serve my clients well, to really

9    understand this and do the follow up discovery that I need to

10   do because it may not be that everything that I need to

11   understand what they're doing is in the report, I might have to

12   go out and take some more fact discovery or get them to produce

13   more of their backup materials or whatever.

14          And I know from past experience in dealing with large

15   cases with lots of expert reports, that you can -- if everybody

16   agreed on the methodology, you could do all the expert reports

17   and all the expert depositions in two weeks, but this is a

18   different kettle of fish, it's a much bigger Magilla and so, if

19   he pushes the expert dates by 30 days, we would have to have a

20   commensurate push of the trial by the same standard, which

21   would mean the second set of dates Your Honor gave us was

22   beginning in October.

23          And, so, I oppose moving any dates, but if you do

24   move the dates, it is my client's position that there has to be

25   -- however many days the expert reports get pushed back, there

**J&J COURT TRANSCRIBERS, INC.**

1 has to be at least that much time to push back the dates that

2 we're doing this hearing.  And it's not because I don't want to

3 try this case.  If Your Honor told me I've got to try this case

4 next week, I'd be happy to go try the case based on what we've

5 got next week, just go shoot it out, that would be fine --

6          MR. BERNICK:  Be careful what you ask for.

7          MR. FINCH: Your Honor, may we proceed to trial next

8 week?

9          THE COURT:  I'm telling you, it's tempting.

10          MR. BERNICK:  But, Your Honor, there's no -- it's

11 nice always to hear Mr. Finch rise to the occasion here.  I

12 think we've said that to the extent that there was a 30 say

13 slippage, we recognize that we're talking about dates that

14 would be not the 17th and 18th of September, but the back end

15 of September, if it has to be.

16          MR. FINCH:  But that's only 15 more days, if it's a

17 30 day slippage of the dates, you're talking about --

18          MR. BERNICK:  Okay, then we're all presuming Your

19 Honor's availability any how.

20          THE COURT:  Well, I mean, I'm going to have to be

21 available at some point for this.  My difficulty and what I'm

22 worried about is if this case actually does take as long to try

23 as you all seem to think it's going to take, then I am hesitant

24 to get stuck over the Thanksgiving, Christmas, New Year

25 holiday, because I know what will happen, some or all of us

1  won't be available for major periods of time over that time

2  frame.  So, I guess his is what I'm going to propose and I

3  can't believe I'm about to say this, but I'm going to be about

4  to say this anyway.

5          I wonder whether what we ought to do is just pick

6  dates, literally starting at the beginning of 2008, just pin

7  them in now, let you do whatever it takes to get this thing

8  finished and ready for trial before 2008, but I swear, and I

9  will take an oath myself to this, if we lock dates in in 2008,

10 nothing, nothing, nothing, I don't know how else to emphasize

11 that word any stronger than this, will change those dates,

12 because this case just has to come to an end and at some point

13 in time, the discovery has to finish.

14         I understand from the Debtor's point of view the

15 Debtor isn't getting what, you know, the Debtor thinks it needs

16 from the claimants point of view, the claimants think they're

17 pushing what they need to push out the door and I appreciate

18 the tension between the parties, regardless, it has to end, and

19 the case does need to get tried.

20         So, I don't know what that does to schedules, I know

21 it makes a mess out of mine twice, but you know --

22         MR. BERNICK:  Your Honor, I would say that, again, we

23 don't quarrel with the proposition that's on the table for

24 today, which is that there should be a commensurate bump for at

25 least the 30 days because I think that's all we can resolve

1 today.

2        I understand what Your Honor is saying, I think it's

3 an item that we should take up at the next omnibus.  There are

4 a lot of other things that, you know, might be considered in

5 this process, including you know, if Mr. Finch is correct, that

6 as long as this case is out there, it'll continue to get

7 polished, there are very different perceptions on what's

8 necessary -- what the last buff needs to be.

9        We've got a lot of documents, but it's now clear that

10 we don't have the documents that we thought we were going to

11 get in the questionnaire.

12        In any event, we can adjust the dates, have a

13 pretrial schedule that still wraps up the expert discovery so

14 that we end the continued debates about discovery and then pick

15 dates that are convenient to actually try the case.  I think it

16 would be a mistake to have the pretrial schedule of ths case

17 become prolonged too much. I think that that does have to end,

18 but I would simply urge that today we focus on the 30 days,

19 come back on the 21st and if counsel have -- we will have a

20 concrete proposal with regard to the remaining discovery that

21 we think we need about what documents we actually got and what

22 we didn't get.  And, we will have a further proposal on

23 pretrial schedule and we'll be happy to confer with counsel for

24 the other constituencies to see what their thoughts are.

25        MR. FINCH:  All right, just as long as it's clear

1 from the record that the ACC opposes any moving of any

2 deadlines.  And, it's the Debtor's request to push the

3 deadlines.

4         And, then secondarily, that whatever the push back on

5 the expert dates, you need that much push back on the expert

6 discovery.

7         THE COURT:  Yes, I don't --

8         MR. FINCH:  Then I will be prepared to discuss dates

9 on the 21st.  I don't have -- first of all Mr. Malady is not

10 where, I'm not sure I have my calendar for January 2008, I

11 certainly don't have Mr. Inselbuch's calendar.  And you know I

12 oppose the continuation of anything.  But I want to make clear

13 that if the expert reports get pushed out by 30 days, then I

14 don't think I'm going to have enough time to unpack what his

15 experts are doing in time to start trial on September 30th.  I

16 could start trial on October 30th, or the other days that the

17 Court has given us, but I guess I'll wait to hear Mr. Bernick's

18 proposal on when the expert discovery and the other discovery

19 ends.

20         And, I mean, in a lot of cases I've tried, Your

21 Honor, there's sort of a, you know, discovery ends and you

22 might have a little lag before the trial starts.  In most of

23 the cases like this that I've been involved in, we have been

24 doing depositions right up until, and sometimes even in the

25 middle of the trial, which is not particularly a happy life for

1  counsel.  I've done it, I'll do it again if I have to, but I

2  oppose the moving of the trial date, but understand Your Honor

3  wants us to -- Your Honor has ruled that the expert dates will

4  move by 30 days, and --

5           THE COURT:  I just can't see under the circumstances,

6  especially with these interrogatories coming in with some

7  additional evidence that may or may not come in, how this is

8  going to work.  And you know what Mr. Finch, I've said since

9  the beginning, the Debtor wants to attempt to show that there's

10 a different way to try this case, I think the Debtor has the

11 right to be able to try this case, to show that it's got a new

12 methodology that will work.  I've given the Debtor as much

13 leeway as I think I can to let the Debtor have that

14 opportunity, so this isn't the time to back off of it now.

15          So, if the Debtor needs 30 more days, I'm going to

16 give the Debtor 30 more days.  But I'm not going to continue to

17 do these things.  So, I hope that the claimants will, indeed,

18 comply with the interrogatories so that we can really pin down

19 a date so that we can get this moving.

20          MR. FINCH: Okay.  I think I've worn out my welcome up

21 here, but as long it's clear that the movement of the expert

22 report date of 30 days is over my objection.

23          THE COURT:  Is it clear.

24          MR. FINCH   And, that if they get moved, I'm going to

25 need some more time on the back end of the trial date, then I

1 will sit down and shut up.

2          THE COURT:  It is over your objection, over the

3 Court's objection and your extension for 30 days of the trial

4 date will also be accommodated because I agree that this will

5 undoubtedly be something not seen before as far as we can tell

6 from the Debtor's perspective.  You know, maybe it will be a

7 surprise and will be something seen before, but you're not

8 going to know that until you see the expert report and yes,

9 your 30 day request will also have to be accommodated.

10          MR. FINCH:  Okay.  Just as long as it's clear.  I'm

11 not asking for a 30 day push on the trial date, it's just that

12 --

13          UNIDENTIFIED MALE SPEAKER:  We --

14          MR. FINCH:  I don't want to hear at the next

15 exclusivity hearing or in the district court, or the Third

16 Circuit, oh, Mr. Finch said we could push this trial date off,

17 they don't want to try this case, that they would rather we

18 stay in bankruptcy forever.

19          MR. BERNICK: I would never suggest that.

20          THE COURT:  You really want -- you gentlemen really -

21 - you know, there was, I think I told you this story once

22 before about Judge Diamond when I was doing a closing argument

23 one time, basically telling me that I should stop talking

24 because I was going to shoot myself in the foot.  You people

25 really need to take that lesson to heart yourself.

1          MR. FINCH:  Thank you, Your Honor, I'll sit down and

2    shut up.

3          MR. ANSBRO:  Good afternoon, Your Honor.

4          THE COURT:  Good afternoon.

5          MR. ANSBRO:  John Ansbro with Orrick Herrington.  One

6    thing I didn't say last week that I intended to but forgot, Ray

7    Malady, my partner, is out of the country all of last week and

8    this week, which explains why he's not here.

9          THE COURT:  He's having more fun than we are then.

10          MR. ANSBRO:  Well, he may well be.  Your Honor, in

11    light of the 30 days on the expert schedule and the 30 days on

12    the trial schedule that you've just put on the record, I'm

13    going to significantly shorten the comments that I'm going to

14    make, planning to make on behalf of the FCR.

15          Suffice it to say, that the FCR is opposed to any

16    movement of the CMO that's currently in place.  In short, Your

17    Honor, we oppose it for two reasons.  One, we think it is

18    unnecessary and two, because we think that it will just

19    continue to lead to further slippage.  Assuming now, that as of

20    today, our trial is scheduled for October 31st, which is that

21    Wednesday that the Court had penned in, we envision there will

22    be further slippage.

23          I'm not going to belabor the Court with too much

24    detail for why we think it's unnecessary, a lot of that has

25    been covered here today, but there are just a couple of points

1 that I'd like to bring to the Court's attention.

2           I'm placing on the machine -- this is the Debtor's

3 Exhibit Number 1, which was handed across earlier today, or

4 this morning.  This is a revised version and so, I had not seen

5 this until this morning.  There are just a couple of milestones

6 that are omitted --

7           MR. ESSERMAN:  Your Honor, I literally, can't even

8 begin to read that. I mean --

9           THE COURT:  Me either, sorry.

10           MR. ANSBRO:  All right.  Then I'll just --

11           THE COURT:  Can you bring it up closer?

12           MR. ANSBRO:  I'll quickly run through it, Your Honor.

13           THE COURT:  Okay.

14           MR. ANSBRO:  But there are some significant

15 milestones that we think the Court should be aware of that are

16 attributing to the problem here and which lead to the

17 conclusion that it's really unnecessary, what's going on here.

18           My hand notations here reflect that in June of 2006,

19 I'm pointing down here, we understand that Grace hired the

20 Delaware Claims Management Corporation.  At that time, almost a

21 year ago, to review a subset of the PIQ's with the attachments.

22 That process got underway then.

23           Next up we have in July of 2006, was the Debtor's

24 motion to bar the attachments to be in anyway integrated as

25 responsive.  Shortly thereafter, in September of 2006, the

1 Court denied that motion.

2       At the same time, we understand that Grace sent to

3 the Delaware Claims Corp. 2500 PIQ's for in depth analysis of

4 the attachments plus the PIQ's.

5       We fast forward now off to the right, in January of

6 2007, we understand that Grace submitted 1500 more PIQ's to DCM

7 and it has not submitted any further.  That's about 4,000 plus,

8 is the sum total of the PIQ's, and attachments that are being

9 in depth reviewed.  That was sent across in January of 2007.

10       And, finally, in the status report that Grace

11 submitted on March 26th of 2007, we were told that, in fact,

12 Grace was focusing on now only a subset of 2,000 PIQ's, with

13 the attachments.

14       That's the reality here, they're not going through a

15 hundred thousand PIQ's with the attachments, they don't plan to

16 do that.  Subterfuge.

17       I also believe that there is a hidden agenda here,

18 Your Honor, which a lot of the interrogatory discussion that

19 we've had here today, may I approach, Your Honor.

20       THE COURT:  Thank you.

21       MR. ESSERMAN:  There's multiple copies of the same

22 thing?

23       MR. ANSBRO:  Yes. I've handed up, Your Honor, an

24 exhibit, we'll call it FCR Exhibit 1 for today, and the point

25 here, Mr. Bernick alluded to it just a moment ago, but he had

1  not included in his first version of the chronology that we

2  received yesterday, that Grace is only now undertaking

3  extensive discovery, third party discovery, of other asbestos

4  trusts.

5       Your Honor may recall, in September of 2006, you

6  suggested to Grace that it proceed and take third party

7  discovery of the trusts to the extent that it felt was

8  necessary.  Grace's counsel declined that invitation.  I don't

9  want to belabor the record by reading it, but we have counsel's

10 response here.  That was in September of 2006.

11       Just placing on the machine now, what we've simply

12 done here is set up a list, it was five months after Your

13 Honor's suggestion that Grace first issued a subpoena to the

14 Manville Trust.  This is very, very broad subpoena that asked,

15 essentially, for anything and everything that the Manville

16 Trust had in respect of hundreds of thousands of claimants.

17       Also in February, Grace issued a subpoena to the

18 Celotex Trust.  Again, with a very, very broad scope on that

19 subpoena.  And also in February, issued a subpoena to the

20 Claims Processing Facility in respect to the Eagle Pitcher and

21 the UNR Trusts.  That happened five months after Your Honor's

22 suggestion that it commence in September of 2006.

23       We also know, turning to the third page of my

24 exhibit, is that in April of this month (sic), that's seven

25 months after, Grace has now issued a subpoena to the Kean

1  Creditors Trust.  This subpoena is now much more narrowly

2  focused, asks for 2162 claimants records.  Your Honor will

3  recall that Delaware Claims Management is also zeroed in on

4  about 2,000.  This is not an exercise where Grace is looking at

5  the universe of information.  They're zeroed in on these very

6  few.

7          On April 18th, a subpoena was issued to Congoleum.

8  Also on April 18th, Owens-Corning and on April 30th, Kean

9  Creditors Trust was issued another subpoena.  It's also my

10 understand that just yesterday, Your Honor, Grace issued a

11 subpoena to the Phil Brieco Trust -- Philbrico.

12         The point here is, Your Honor, we've heard now five

13 hours of argument about the terms of an interrogatory and what

14 Grace needs or doesn't need.  I would submit that that is a

15 hidden agenda here.  The hidden agenda is to allow Grace its

16 time, its experts time to absorb what they're seeking from

17 these trusts.  They have done so too late.

18         I'd further submit, Your Honor, that what we suspect

19 is the reason this information was sought from the trusts late

20 is not because of Grace's allegedly learning about the new fact

21 of what the circumstances, or what materials it received in

22 respect of the PIQ's, we suspect, Your Honor, that Grace which

23 has been pouring over PIQ data for over a year, has been

24 hearing from its experts that it doesn't like the information

25 that it's hearing about the universe of PIQ's, it is then now

1  on a fishing expedition in an effort to invalidate claims in

2  this proceeding, it's an improper approach to this proceeding

3  as Your Honor has repeatedly observed.

4           For those reasons, we opposed moving the, either the

5  expert discovery date or the trial schedule and in closing, I

6  just briefly would add, Your Honor, I understood counsel to say

7  that Your Honor has ruled that the PIQ's are necessary for the

8  estimation.  I take issue with that.  It is my understand that

9  Your Honor has approved PIQ's and permitted them in connection

10 with the Debtor's efforts to prepare its case in the way it

11 considers to be appropriate.

12          THE COURT:  That's correct.

13          MR. ANSBRO:  That's all I have, Your Honor.

14          THE COURT:  Anyone on the phone wish to be heard?

15 Mr. Bernick?

16          MR. BERNICK:  I assume that the next to last question

17 will be the same with respect to the discovery that the

18 claimants are seeking here.  That all Your Honor has ruled on

19 both sides of the case, is the discovery is open and there has

20 been no determination about how the estimation actually is to

21 be conducted.

22          THE COURT:  That's right.

23          MR. BERNICK:  Yes.  So, you know, it never ends.  The

24 only observation that I would have with respect to --

25 (indiscernible -- moving away from microphone) -- so it was

1 improper to ask for determinations with respect to the

2 interrogatories today, but we're now going to have commentary

3 on the propriety of our discovery directed at the trusts, which

4 really apparently is the agenda that the FCR has here.  It

5 really is not before the Court today, but I'm happy to tell the

6 Court what's going on because it's very straightforward.

7            Number one, Your Honor asked today where there's a

8 record of the fact that these doctors, who are populating,

9 literally thousands upon thousands of these claim files and

10 supporting, allegedly in support of the claims that are being

11 made in this case, where there's a record of those doctors

12 being rejected by the trusts.  That's one of the reasons we're

13 conducting discovery, is to find out while the doctors, these

14 doctors submissions are being regarded by the trust.  We know

15 that the Manville Trust, as an example, has decided not to

16 accept any medical reports or submissions that were authored by

17 a list of doctors, including many of the doctors who are being

18 relied upon in this case.  So, we need to make a record of

19 that.

20            We believe that the Manville Trust followed a process

21 in reaching that conclusion.  We needed to make a record of

22 that.  Otherwise, it's all hearsay.  So, we need to conduct

23 discovery for that purposes, we're doing so with respect to the

24 other trusts as well.

25            Secondly, we're asking for the criteria that are

1  applied by the trusts in more general terms, that is not simply

2  focused on the doctors and how those criteria were developed,

3  again, for the very same reasons that we're talking about here

4  in connection with this case.

5          So, the discovery against the trusts serve that

6  purpose which is the criteria that the trusts have adopted and

7  whether those criteria are scientifically driven.  If they're

8  simply driven on the basis of convenience or cost, that doesn't

9  have much to do with this case.  But our case is predicated on

10 the idea of scientific reliability and if it's for scientific

11 reasons that the trusts have undertaken to reject these

12 doctors, we think that that is very probative evidence because

13 they're trying to do this, really, only and solely for the

14 benefit of the beneficiaries.

15         The second development that's important here is the

16 Kananian case.  This a case which was the subject of some

17 briefing before the Court and it's a matter of record in

18 connection with the B reads.  But essentially what happened

19 was, that there was a submission made in support of, or

20 evidence that was produced in support of a case that was being

21 litigated in state court in Ohio, and the claim was made that

22 the plaintiff had exposure to the defendant's products and I

23 don't know the details of the case, there's an extensive

24 opinion that was issued by the judge in the case, but it turns

25 out that a very different claim about the plaintiff's exposure

1 was made in connection with the submission to one of the

2 trusts.  And, as the opinion documents in painful detail, the

3 law firm internally became concerned about how this was -- you

4 know how this was playing out and basically, ultimately got, I

5 believe that sanctions were levied in connection with that

6 case.

7 　　　　The long and short of it is, we now have submissions

8 by these claimants in this case.  We, by reason of that case

9 and also by reason of other evidence that we have, want to test

10 whether their allegations of exposure to Grace's product is

11 consistent with what they've said elsewhere.

12 　　　　We also have a situation in this case where often

13 people don't say anything about what their prior exposures are.

14 Your Honor will learn in connection with the sampling analysis,

15 that there are vast reaches of claimants who provide zero

16 exposure information of any consequence.  So, we're seeking

17 from the other trusts what these same claimants have said to

18 the other trusts about their exposure.  Again, a very, very

19 specific reason.

20 　　　　The last thing that I would say is that the sample of

21 2162 that Your Honor sees here, is characterized as a sample,

22 in fact, it's not a sample.  That is counsel's speculation and

23 the speculation is wrong.  This discovery is not being

24 conducted, driven by somehow that we've all of a sudden decided

25 that the sample is everything.  There are a variety of sources

1  of information that we're going to use in this case.  The

2  analysis of the sample, the analysis of the questionnaire

3  answers and then most critically, we need to know what it is

4  that the claimants, that plaintiffs' law firms, the claimants

5  law firms actually provided to us by way of the documentation.

6  What population of documents it represents and that is the

7  subject of the discovery that we seek.

8          So, we're trying to be focused in our effort to

9  obtain discovery from the trusts, we're not seeking to use this

10  to delay anything.  As I have repeatedly told the Court, we are

11  not in favor of delay in this case, we think we can get this

12  discovery done in a timely fashion, we've entered into

13  discussions with all these different trusts to facilitate and

14  streamline the process of obtaining the information.  So that

15  speculation is, again, wrong.

16          THE COURT:  All right.  Is there anything with

17  respect to this ruling at the moment that I need to address,

18  other than the Debtor's request for a 30 day extension of the

19  expert report and putting everything else, and the concomitant

20  request to make sure that the Committees and the FCR's expert

21  reports are also pushed back, I guess, 30 days, which

22  effectively delays the trial date by 30 days.  And everything

23  else is set for the omnibus to consider any other adjustments

24  to the schedule?

25          MR. ANSBRO:  I don't believe there's anything further

1 on that, Your Honor.

2         THE COURT:  All right.  Then that's the order, you

3 can submit an order, Mr. Bernick, that will do that.

4         MR. ANSBRO:  May I respond just briefly, Your Honor,

5 to Mr. Bernick's comments?

6         THE COURT:  Yes, I guess, but really, I mean, none of

7 it is really before me.  All I care about at the moment is

8 getting the schedule adjusted and to the extent that you're

9 going to complain one way or another about what's going on with

10 his subpoena process, it's not here, I don't have an issue and

11 whatever you're going to tell me, truly, I'm putting one ear

12 and right out the other.

13         MR. ANSBRO:  But it goes just to the schedule.

14         THE COURT:  All right.

15         MR. ANSBRO:  Our concern is that -- I wasn't here to

16 attack the Debtor's right to take discovery.  My observation

17 was, it's too late.  And that it's going to slip further.

18 That's our concern.

19         With respect to the Manville Trust, and the Eagle

20 Pitcher Trust, it's our understanding that those entities

21 provided proposed protective orders over a month ago and have

22 heard nothing from Grace's counsel since then.  Those are at a

23 standstill.  That's just my concern, that this is just going to

24 cause further slippage.

25         And with respect to the 2162, sure, part of what I

1   have said to the Court is speculation, but because we are

2   speculating, it just underscores the fact that we are entitled

3   to a fair opportunity to prepare our expert case in response to

4   something that's novel, untested and unknown.

5           THE COURT:  Absolutely.

6           MR. ANSBRO:  Thank you.

7           MR. BERNICK:  I think the last matter that's on the

8   agenda for today is the language of the protective order with

9   respect to the denial -- with respect to the B reads in light

10  of the -- I'm running out of steam here, Your Honor.

11          THE COURT:  This is the dispute between the Debtor

12  and Mr. Esserman on the x-rays?

13          MR. BERNICK:  I don't even know, I guess it really

14  is.  What Mr. Esserman wants is --

15          THE COURT:  Outrageous and unsupportable.

16          MR. BERNICK:  No, in this case, no, I don't generally

17  use that language and I generally don't use that with respect

18  to Mr. Esserman, but this is basically a whole bunch of

19  language, we basically have the standard protection, it says,

20  any information provided may only be used by the parties to the

21  proceeding to estimate, et cetera, et cetera, their counsel,

22  agents and experts, and then -- bankruptcy, and my not be used

23  for any other purpose.  That's essentially what we say.

24          We then have a whole bunch of language that comes in

25  here that basically says that you put up your first born for

1  potential sacrifice if you haven't destroyed every scintilla of

2  the information and I don't know why this is necessary.

3  There's nothing that's special about this information, we've

4  already seen -- in terms of, you know, it's so incredibly

5  privileged that we can't have the standard protection order.

6        I would say that pretty much this language here, if

7  it actually is adopted, underscores the fact that we then ought

8  to get the subject of the B reads, because nothing is going to

9  happen to them, other then they're being used in connection

10 with the estimation.  So, I don't understand the extraordinary

11 circumstances that lead to this extraordinary language and the

12 reason that I'm worried about its practical effect is that it's

13 gotcha time.  That in some fashion, something happens that's

14 not exactly within the language of this, and then we get a lot

15 of problems developing.

16        The other difficulty, Your Honor, I'd have to say is

17 that Your Honor is issuing orders for protection in this case

18 and it is on the assumption that Your Honor will ultimately be

19 the only one who has control and say so of that and we cannot

20 speak for what others might do in connection with other

21 litigation, and I am a little bit uncomfortable in going beyond

22 the standard language because we may be in a situation where

23 we're being asked to do one thing pursuant to this order, and

24 we're being asked to do something else with respect to some

25 other order that some other court issues that says that they

1 want to use this information.  So, I think we should just stick

2 with the standard language.   It may not be used to anybody

3 except counsel, their agents, it may not be used for any other

4 purpose, that's the way that it's been with our most

5 confidential documents, including our work product, it should

6 be good enough for their work product.

7           THE COURT:  Mr. Esserman.

8           MR. ESSERMAN:  Your Honor, the dispute is really over

9 one paragraph in the order.  We filed a certificate of counsel

10 with our version of the order, they filed what is, I think,

11 they're trying to characterize as the same thing and it's

12 close, it's a close cousin of what we've provided.  We've

13 provided a lot more detail on the protection of the information

14 is what we've done.

15           And where did we get this language?  Well, we ordered

16 a transcript and we looked at Page 48, lines 10 through 23, and

17 we basically lifted this paragraph two in our order from what

18 you said.  Virtually verbatim.  The only thing we did was, we

19 tried to make it neutral and we didn't --

20           THE COURT:  I thought it sounded good.

21           MR. ESSERMAN:  We didn't add any bells and whistles,

22 we didn't add any unnecessary commas, we didn't add any

23 unnecessary concepts.  We lifted it right from what the Court

24 said, and what the Court did is make sure that this information

25 is being protected and there's no addition, nothing additional

1  here.

2       I can also say that when this order gets entered,

3  this will end this issue.  It's not going to go beyond this

4  court, which I think is important, but I think it's very

5  important to the claimants that the confidentiality is not only

6  preserved, but the non-disclosure is so carefully preserved,

7  because you've got Foreman Perry in others, involved in this

8  case and we think --

9       THE COURT:  Well, that was the problem on the record,

10 the fact that Foreman Perry may have a database and I was

11 attempting on that record to make sure that the databases

12 weren't combined and that's really the only reason I was

13 attempting to go beyond.

14      MR. ESSERMAN:  And, that's basically what we said,

15 and the language of our order is only an extra two, or three or

16 four sentences.  You can compare it to lines 10 through 23 on

17 Page 48 of the transcript from April 13th, 2007, and as far as

18 I'm concerned, you just make a decision one way or another.  I

19 think the language we lifted is what Your Honor said.

20      MR. BERNICK:  A lot of people have made a practice of

21 lifting language as long as it suits their side of the case.

22 What we object to here is that for some reason this particular

23 information ends up being more particularly protected than

24 information of much greater consequence, frankly, and much

25 greater confidentiality, because it's attorney work product,

1  when it comes to our side of the case.  I just think it's very

2  inappropriate.

3        I also think it's inappropriate that somehow there is

4  a suspicion that Foreman Perry will not abide by the terms of

5  this order like any other firm.  And if it's a question of

6  keeping the database separate, we can say, keep the database

7  separate, but the idea that somehow this information and the

8  rights that attach to it are something different and special

9  from any other right that's associated with this case, I think

10  frankly is unwarranted and it creates almost an innuendo that

11  there's greater suspicion when it comes to preserving

12  information when it's in the hands of the defense of the case.

13        THE COURT:  Well, that wasn't the intent.  The intent

14  was, from my point of view, the fact that in this instance

15  we're talking about some information that could affect the

16  health issues or would spread on the record concerns that might

17  affect a person's health and knowledge about claims that may be

18  filed but based on personal injury matters.  And I don't have,

19  I didn't intend to say that Foreman Perry would somehow or

20  other intentionally make an inappropriate use of the

21  information.  But, you know, accidents happen.  I simply want

22  to make sure that the databases are scrubbed and that, in fact,

23  the claimants who comply with this order are assured that at

24  the end of the case what this Court ordered does, in fact, get

25  carried out.  I'm compelling them to turn the information over.

**J&J COURT TRANSCRIBERS, INC.**

1 I as equally, want it clear that at the end of the case, it

2 will be returned, the information will be returned.

3          MR. ESSERMAN:  And --

4          MR. BERNICK:  Quite frankly, Your Honor, the

5 information hasn't been turned over.

6          THE COURT:  Well, it hasn't yet.  Hopefully, it's

7 going to be.

8          MR. BERNICK:  Well, we don't see any indication that

9 it will, but Your Honor --

10          MR. ESSERMAN:  Your Honor --

11          MR. BERNICK:  Excuse me.  Again, somehow there's this

12 idea that these people have put their own medical condition at

13 issue.  The only information that we're really concerned with

14 here is consulting expert reports.  So, this is not like his

15 private health information that is beyond the purview of what

16 they basically have placed at issue by making a claim in this

17 case.  Why does this deserve different and special treatment

18 from any other claim of privilege in this case?  I don't

19 understand what it is and I think it does tend to create the

20 appearance that whenever the claimants come in, that there's a

21 different standard that is applied with respect -- now this is

22 not a suggestion with respect to Your Honor, but it's the

23 request that's being made.  There's a different level of

24 sensitivity with respect to claimant information that there is

25 with respect to other privilege or work product information in

1  the case.  I think that that is unwarranted and it's really

2  that that drives our concern with having a double standard

3  here.

4           And I also note that this is the same law firm that's

5  now up there pressing this, it's the same law firm that didn't

6  think twice about their clients when it came to the prosecution

7  of the appeal in this case.

8           Your Honor will recall that no effort was made to

9  reach out to the claimants on the appeal that has now led to

10 this protective order.  It was a law firm business decision.

11 The same law firm that didn't care enough to contact the

12 claimants and find out what they thought was appropriate is now

13 the same law firm that's coming in and saying, now that we've

14 lost that, and we can't take the appeal, our claimants now

15 deserve special protection because this information is so

16 private.  Come on.

17          MR. ESSERMAN:  Your Honor, the fact that they're

18 protesting this language so much makes me nervous.  And I think

19 gives the impression that, in fact, what Your Honor is

20 concerned about on Page 48 of the transcript will somehow come

21 to pass.

22          MR. BERNICK:  I move to strike that statement.  This

23 improper innuendo.

24          THE COURT:  Well, Mr. Bernick --

25          MR. BERNICK:  No, he's suggesting that somehow this

**J&J COURT TRANSCRIBERS, INC.**

1  information is going to be improperly used and that's

2  completely without foundation.

3          THE COURT:  Mr. Bernick, really, I don't see any

4  reason why the language that I put on the record is improper.

5  All it says is that the Debtors wants the information, I've

6  ordered that it be kept confidential, at the end of the case,

7  this is what the rule says, the rule says that at the end of

8  the case, the information is to be either returned or

9  destroyed.  I lifted this language out of the rule.  So, I'm

10 not making it up, it's what the rule says.  It didn't have

11 anything to do with me being creative, it's what the rule says.

12         MR. ESSERMAN:  Your Honor, I think it's clear. I'm

13 not going to argue with it.  Just -- I think someone is

14 protesting too much on this.

15         THE COURT:  Okay.  The one thing that I think may be

16 appropriate in Mr. Esserman's version, it says, any information

17 provided to the Debtors pursuant to the consulting expert

18 orders, I guess they're plural, orders, may only be used by,

19 and I think it should say, or disclosed to the parties, their

20 counsel, agents, and experts, with respect to the estimation

21 procedures in these -- I'm sorry.  Actually, I think it may be

22 beyond the estimation procedures, there may be something else

23 going on in this courtroom that would be appropriate for this

24 use, however, I do think it's limited to use in these Chapter

25 11 cases.

1          MR. BERNICK:  That's fine.   Again, I think the only

2  way that this is really going to become an issue is if -- in

3  the protective order areas, Your Honor is well familiar, it's

4  an area where there is a certain level of controversy over what

5  really should and can be accomplished by protective orders.  If

6  some other court decides that this information is of

7  significant relevance, then you know, to the extent that we are

8  the people that have the information --

9          THE COURT:  You're not going to have it because the

10 next sentence is going to order the Debtor to turn it back

11 before the confirmation order takes effect.  After the

12 confirmation order is final, at the end of any appeals and

13 before the effective date, the information is to be turned back

14 over or destroyed.  And we'll work out the terms.  It won't be

15 available to anyone else, for any other purpose.  I am going to

16 protect the sanctity of the information.

17         And then I don't have to worry about another court

18 taking cognizance of it because it will still be the bankruptcy

19 court in charge of the case at that stage.

20         And so, the point I guess I need from the Debtor is

21 the appropriate trigger so that you have appropriate use of it

22 until the conclusion of the case, but before the effective

23 date.

24         MR. BERNICK:  Well, I don't know, Your Honor.  At

25 this point I -- whatever you think is appropriate.


**J&J COURT TRANSCRIBERS, INC.**

1        THE COURT:  Well, I mean, the current plan,

2 obviously, is going to need modification, but just under the

3 current plan, I just don't recall, what's the trigger for the

4 effective date?

5        MS. BAER:  Oh, probably something like 10 or 30 days

6 after the confirmation order is approved by the district court.

7        THE COURT:  Why don't we just say one week before the

8 effective date.  Just key it that way.  One week before the

9 effective date and Mr. Esserman, how do you want the

10 destruction to be handled?  Do you want copies of all databases

11 turned over to a specific entity, or destroyed with an

12 affidavit?

13        MR. ESSERMAN:  I think destroyed with an affidavit is

14 fine.  I think that's what my paragraph said, the last

15 sentence.  Such destruction shall then be affirmed by a person

16 with personal knowledge in affidavit or declaration, filed with

17 the court.

18        THE COURT:  Okay.

19        MR. BERNICK:  Which is what Your Honor said.

20        THE COURT:  All right.  It seems to me, then, that

21 all this paragraph needs to say is that the information that's

22 provided to the Debtors, pursuant to the orders, may be used

23 only -- pardon me, only be used or disclosed to the parties to

24 estimate the liability for pending and future asbestos personal

25 injury claims, their counsel, agents and experts, for use in

1  connection with the bankruptcy only, and not for any other

2  purpose and one week prior to the effective date, all

3  information provided and all copies, whether in paper or

4  electronic form shall be destroyed, such destruction to be

5  affirmed by a person with personal knowledge in affidavits or

6  declarations filed with the court.

7        MR. BERNICK:  I'm sorry, person with personal

8  knowledge of the destruction?

9        THE COURT:  Yes.  The destruction is to be affirmed

10 in an affidavit or declaration by a person who actually did it.

11       MR. BERNICK:  I -- I don't know that there's going to

12 be any one such person --

13       THE COURT:  Well, persons, then.

14       MR. BERNICK:  Okay.  If we have a problem with that,

15 we'll come back to the Court.  The same folks we're saying,

16 information and belief by the law firms is enough for their

17 attestation, but now it's got to be somebody with personal

18 knowledge here.  Again, I think it's a little bit of a

19 different standard, but I don't want to get hung up on it

20 today, Your Honor, whatever it is that you think is

21 appropriate, let's just do it.

22       THE COURT:  All right.

23       MR. ESSERMAN:  And I think you're interlining the

24 order, Your Honor.  I'm having a little trouble following what

25 you're doing, but whatever you're doing, I hate to agree with

1 Mr. Bernick, but whatever you do is fine.  If you want to have

2 that retyped by -- that last paragraph by someone on your staff

3 and entered, that's fine with us.

4          THE COURT:  Well, I'll do the order.

5          MR. ESSERMAN:  Okay.

6          THE COURT:  Okay?  What else?

7          MR. BERNICK:  I don't believe there's anything else

8 on the agenda.  As I said, there's the x-ray order, but it's

9 not on the agenda, and I think we should just take that up

10 probably at the omnibus so there's no misunderstanding.

11          THE COURT:  Okay.

12          MR. FINCH:  I agree with that, Your Honor.

13          THE COURT:  All right.

14          MR. FINCH:  May we be excused, Your Honor?

15          THE COURT:  Mr. Esserman?  Anyone on the phone have

16 anything else to address?  Okay, we're adjourned, thank you.

17

18                        * * * * *

19

20

21

22

23

24

25

238

## **CERTIFICATION**

    We, RITA BERGEN and ELAINE HOWELL, court approved
transcriber, certify that the foregoing is a correct transcript
from the official electronic sound recording of the proceedings
in the above-entitled matter and to the best of our ability.

/s/ Rita Bergen

RITA BERGEN

/s/ Elaine Howell                 Date:  May 16, 2007

ELAINE HOWELL

J&J COURT TRANSCRIBERS, INC.

**J&J COURT TRANSCRIBERS, INC.**