## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In Re: | § | **Chapter 11** |
| | § | |
| **W.R. GRACE & CO., et al.,** | § | **Jointly Administered** |
| | § | **Case No. 01-01139 (JKF)** |
| Debtors. | § | |
| | § | |

## FEE AUDITOR'S FINAL REPORT REGARDING
## FEE APPLICATION OF LEGALANALYSIS SYSTEMS, INC.,
## FOR THE TWENTY-THIRD INTERIM PERIOD

This is the final report of Warren H. Smith & Associates, P.C., acting in its capacity as fee auditor in the above-captioned bankruptcy proceedings, regarding the Interim Fee Application of Legal Analysis Systems Inc. for the Twenty-Third Interim Period.

## BACKGROUND

1.      Legal Analysis Systems Inc.("LAS") was retained as asbestos-related bodily injury consultant to the Official Committee of Asbestos Personal Injury Claimants.  In the Application, LAS seeks approval of fees totaling $631,458.75 and costs totaling $9,173.79  for its services from October 1, 2006, through December 31, 2006.

2.      In conducting this audit and reaching the conclusions and recommendations contained herein, we reviewed in detail the Application in its entirety, including each of the time and expense entries included in the exhibits to the Application, for compliance with 11 U.S.C. § 330, Local Rule 2016-2 of the Local Rules of the United States Bankruptcy Court for the District of Delaware, Amended Effective February 1, 2006, and the United States Trustee Guidelines for Reviewing Applications for Compensation and Reimbursement of Expenses Filed Under 11 U.S.C. 330, Issued

January 30, 1996, (the "Guidelines"), as well as for consistency with precedent established in the

United States Bankruptcy Court for the District of Delaware, the United States District Court for the

District of Delaware, and the Third Circuit Court of Appeals.  We served on the LAS an initial report

based on our review, and received a response from the LAS, portions of which response are quoted

herein.

### DISCUSSION

3.       In our initial report, we noted that during the application period MAP spent a total

of 13.60 hours for fees of $9,520.00 reading a <u>An Air that Kills</u>.

| | | | | |
|---|---|---|---|---|
| 11/05/06 | MAP | 2.50 | 1750.00 | Read An Air that Kills |
| 11/21/06 | MAP | 4.10 | 2870.00 | Review An Air that Kills |
| 11/23/06 | MAP | 3.70 | 2590.00 | Review An Air that Kills |
| 11/24/06 | MAP | 3.30 | 2310.00 | Review An Air that Kills |

We asked LAS to explain why it was necessary for this professional to read this book and how the

reading relates specifically to this bankruptcy.  LAS's response is provided as Response Exhibit 1.

We appreciate the response, and as the information in the referenced book relates solely and

specifically to this bankruptcy, we offer no objection to these fees.

4.       Similarly, we noted that on November 30, 2006, DR spent a total of 1.20 hours for

a fee of $510.00  reading an article by Bates.

| | | | | |
|---|---|---|---|---|
| 11/30/06 | DR | 1.20 | 510.00 | Read Bates article. |

We asked LAS to explain why it was necessary for this professional to read this article and how the

reading relates specifically to this bankruptcy.  LAS's response is provided as Response Exhibit 2.

We appreciate the response and accept the argument that the article was relevant to LAS's necessary

research and preparation.  We offer no objection to these fees.

5.      We noted an expense of $842.50 for Mealey's jury reports, with one-half the total

expense of $1,685.00 for the reports charged to this estate.  The entry is provided below.

Mealey's jury reports  Peterson          1,685.00          842.50(Grace Share)

We asked the firm to explain how and why these reports are essential in LAS' consultation service

to the Committee.  Further, as with any research material charged to the estate, that material's

purpose and use must be specific to that estate.  Given that the expense was split between W.R.

Grace and another case, we asked LAS to explain how the expense meets the specificity requirement.

LAS's response is provided as Response Exhibit 3.  We appreciate the response and accept the

explanation.  We thus offer no objection to this expense.

6.      We noted an airfare charge of $1,548.61 that lacked any further detail.  The entry is

provided below.

Airfare                              $1,548.61

Paragraph II.E.1. of the Guidelines states, ". . .[f]actors relevant to a determination that the expense

is proper include the following: 1. Whether the expense is reasonable and economical.  For example,

first class and other luxurious travel mode or accommodations will normally be objectionable."  We

asked LAS to provide documentation and explanation for the entry showing that the airfare was

booked at coach or economy class.  The firm's response is provided below.

> Airfare was for a coach roundtrip fare from Los Angeles
> to New York.  This was the lowest available fare that was
> refundable.  Dr. Peterson must frequently make changes
> in his travel plans while traveling so he cannot purchase
> nonrefundable tickets.

We appreciate the response and offer no objection to the expense.

7.    We noted entries of $915.00 for hotel and $121.88 for hotel taxes.  The entries are provided below.

Hotel                                    915.00

Hotel taxes                              121.88

We recommend a reasonable ceiling of $350.00 per person for a night's lodging in New York.  For the questioned expense, we asked LAS to provide the daily rate for the hotel and any applicable room tax information not already shown.  LAS's response is provided below.

> Hotel charges for New York city are very expensive
> generally.  The $350 per night will not cover a safe and
> adequate hotel in the midtown section of the city. But as
> I indicated in my expenses detail, "you should feel free
> to limit hotel expenses to your standard rates for New
> York City."

We appreciate the response.  At $350.00 per day plus 13% for taxes, we calculate a reasonable lodging rate of $395.50.  We thus recommend a reduction of $641.38($1,036.88 minus $395.50) for this expense.

8.    We note four car service charges totaling $616.00.  The entries are provided below.

Car service to LAX                    130.00
Car service from JFK to hotel         165.00
Car service from meeting to JFK       185.00
Car service LAX to Thousand Oaks   136.00

Our research indicates an easily obtainable flat rate of $45.00 for taxi service from JFK to midtown Manhattan.  Even with a generous gratuity, that transportation expense should not exceed $60.00.  As shown above, the LAX entries were less than the JFK entries and service should therefore be even less.  We asked LAS to explain why these expenses should be reimbursed at a level exceeding $60.00 for each.  LAS's response is provided as Response Exhibit 4.  We appreciate the response.

Because of the circumstances with location and distance regarding the California entries, we accept the argument that no reduction should be made for those.  However, regarding the New York transportation entries, we maintain the $60.00 figure as a reasonable ceiling.  We thus recommend a reduction of $225.00 for transportation expenses.

## CONCLUSION

9.    Thus we recommend approval of fees totaling $631,458.75 and costs totaling $8,307.41 ($9,173.79 minus $866.38)  for LAS's services from October 1, 2006, through December 31, 2006.

Respectfully submitted,

**WARREN H. SMITH & ASSOCIATES, P.C.**

By:_____
        Warren H. Smith
        Texas State Bar No. 18757050

Republic Center
325 N. St. Paul, Suite 1270
Dallas, Texas  75201
214-698-3868
214-722-0081 (fax)
whsmith@whsmithlaw.com

**FEE AUDITOR**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document has been served First Class United States mail to the attached service list on this 29th day of May, 2007.

_____
Warren H. Smith

## SERVICE LIST
Notice Parties

**The Applicant**
Mark A. Peterson
Legal Analysis Systems, Inc.
970 Calle Arroyo
Thousand Oaks, CA 91360

**The Debtors**
David B. Siegel, Esq.
Sr. V.P. and Gen. Counsel
W.R. Grace & Co.
7500 Grace Drive
Columbia, MD 21044

**Counsel for the Debtors**
James H.M. Sprayregen, Esq.
Kirkland & Ellis
200 East Randolph Drive
Chicago, IL 60601

Laura Davis Jones, Esq.
Pachulski, Stang, Ziehl, Young & Jones, P.C.
919 North Market Street, Suite 1600
P.O. Box 8705
Wilmington, DE 19899-8705

**Counsel for the Official Committee of Unsecured Creditors**
Lewis Kruger, Esq
Stroock & Stroock & Lavan
180 Maiden Lane
New York, NY 10038-4982

Michael R. Lastowski, Esq.
Duane Morris & Heckscher
1100 N. Market Street, Suite 1200
Wilmington, De 19801-1246

**Counsel to the Official Committee of Property Damage Claimants**
Scott L. Baena, Esq
Bilzin, Sumberg, Dunn, Baena, Price & Axelrod
First Union Financial Center
200 South Biscayne Boulevard, Suite 2500
Miami, FL 33131

Michael B. Joseph,Esq.
Ferry & Joseph, P.A.
824 Market Street, Suite 904
P.O. Box 1351
Wilmington, DE 19899

**Counsel to the Official Committee of Personal Injury Claimants**
Elihu Inselbuch, Esq.
Caplin & Drysdale
399 Park Avenue, 36th Floor
New York, NY 10022

Marla R. Eskin
Campbell & Levine, LLC
Suite 300
800 N. King Street
Wilmington, DE  19801

**Official Committee of Equity Holders**
Thomas M. Mayer, Esq.
Kramer Levin Naftalis & Frankel
919 Third Avenue
New York, NY 10022

Teresa K.D. Currier, Esq.
Buchanan Ingersoll
1000 West Street, Suite 1410
Wilmington, DE 19801

**United States Trustee**
Office of the United States Trustee
844 King Street, Suite 2311
Wilmington, DE 19801

Response Exhibit 1

The book was researched and written by a journalist about Grace's tortious business actitivies that produced asbestos exposures to workers and residents in Libby Montana, Minneapolis Minnesota and other locations across the country that has results in asbestos claims, verdicts and settlements in those locations.  The book is important for our asbestos forecasts for several reasons:  it describes in details the bases of plaintiffs asbestos claims against Grace; it describes various government investigations of Grace and results of those investigations that have become a part of plaintiffs' cases against Grace; it describes publicity about Grace's business activities involving asbestos and its alleged denials and cover-ups of the dangers of those activities.  These provide important information about matters that will affect future claiming against Grace (e.g. publicity, geographic scope of asbestos-related activities; government actions and investigations involving Grace's business asbestos activities).  The book provides important information about matters that will affect the values of claims in the future against Grace (i.e. scandalous and improper activities that would produce large jury verdicts, that would be argued as bases for high values against Grace and that Grace would have to take into consideration in settling claims).

Matters discussed and documented in the book are central to several issues in our report forecasting asbestos liabilties against Grace. Consequently Dr. Peterson's report cites, references and otherwise uses materials from this book at a number of places in the report.

Because of this importance, Dr. Peterson had to study and become familiar with the book and his content as part of his research and preparation of his report. He uses the book in a manner similar to his study and reference to a similar book about Turner and Newall that he used in the bankruptcy court's estimation of asbestos liabilities in the Federal Mogul proceedings.  Knowledge of the books is important in the Grace bankrutpcy as well.  No objetion was made (and none obviously sustained) to Dr. Peterson's similar use of the Turner and Newall book.

Response Exhibit 2

Our attorney, Nate Finch, forwarded the article by email of November 10 along with the request that we review and become familiar with the article. Charles Bates is an expert working for another party in this bankruptcy.  His article raises contentions similar to those he might raise if he prepares a report or testifies in this case.  Dr. Bates's article allows use to prepare for issues that we expect Dr. Bates will raise in this case.  Even if Dr. Bates does not testify, this article by a person who has testified as an expert in other asbestos bankruptcies is one with which we must be familiar in order to address some similar issues that the Debtor has raised in this case.

Response Exhibit 3

We used Mealey's reports of jury trial results to compile
statistics on verdicts involving asbestos bodily injury cases.  We
analyzed and report on the results of this data collection in our
report on Grace's forecasted asbestos liabilities.  Again, this is
a type of analysis that is both central to issues of forecasting
the numbers and values of Grace's asbestos claims and is a type of
material that we have used in other, earlier reports. These
statistics involve not only Grace, but other asbestos defendants as
well. The point of the analyses is to determine what are the trial
risks for any asbestos defendant, including Grace.   This is
important in considering the liability of each and every asbestos
defendant (because the trends are general across defendants, its is
both unnecessary and inappropriate to limit this this data
collection and analyses only to trials involving Grace).

Because we are able to use these data in preparing an expert report
for another asbestos defendant as well, we are able to reduce the
cost to the estates in each bankrutpcy by splitting costs between
them.

Response Exhibit 4

Regarding transportation to and from Los Angeles International Airport: the following statement has been previously provided to the auditors about the costs of such transportation and accepted as the basis for allowing expenses in all previous cases. Because this issue has been so frequently raised and them accepted by the Fee Auditors we respectively request that that the Auditor recognize that this is no longer a real issue to which we must repeatedly respond:

Car service to Los Angeles International Airport:

The offices of Legal Analysis Systems and Dr. Peterson's residence are located at Thousand Oaks, in a different county from LAX, Ventura County, 50 miles from LAX. Dr. Peterson's use of a car service to LAX involves the least expense to the estate.

First there is no regular taxi service to LAX from Thousand Oaks. Taxis could be used but their fares actually exceed car service rates (Dr. Peterson tried out use of taxis to research their cost and timing), they are slower, less safe and routinely involve waiting time that adds to travel time billed at $350 per hour, one half of Dr. Peterson's $700 rate. Moreover taxi fares between LAX and Thousand Oaks were actually more than the car service (charged at a discounted rate to LAS as a regular user of the car service). Use of Los Angeles taxis would increase cost to the estate.

Second, Dr. Peterson does not drive his personal car to LAX but if he did this would also increase the cost to estate. Dr. Peterson's travel for this case always involves multiple days and parking costs at LAX would routinely approach or exceed car service fees. To this would be added mileage charges for the hundred-plus mile roundtrip plus the added time involved in parking and transportation from LAX parking areas to the appropriate terminal, charged again at $350 per hour, time charges that are avoided when the car service drops off and picks up Dr. Peterson at the terminal. Cheaper remote site LAX parking would add a half hour of travel time each way with a cost at $350 per hour. The cost of an additional hour of travel time is equivalent to the total car service charge for which reimbursement is requested. Further, LAS does not believe that the fee auditor can require professionals to drive and place their personal automobiles out of service at an airport for multiple days at a time of travel.

No other means of travel would involve lower cost to the estate. There is no bus or rail service from Thousand Oaks to LAX and shuttle services would add at least an hour of travel time each direction because of their shuttles' multiple stops to pick up or drop off passengers at other locations, adding travel time well in

excess of the cost of a car service.  Dr. Peterson researched use of shuttle services and rejected the method because of its excessive cost to the estate.  In short, use of the car service is the most reasonable and economical method of travel to and from LAX.

Dr. Peterson's use of a car serice is not a luxury.  Car services are routine means of transportation in most major cities and the fee auditor has has never questioned Dr. Peterson's use of car services other than in Los Angeles. Car services are routine in Los Angeles where taxis are particularly unreliable, unsafe and far less available than in other cities.  Further, Legal Analysis System has researched alternative methods of travel to and from LAX and has determined that the car service that it uses involves the least cost of any transportation method for this and other clients.

Car service in New York City

Similarly, car services in New York are used routinely by professionals in this and other cases.  New York car services provide several benefits and costs savings:  First, Dr. Peterson almost always arrives at JFK airport late at night having taken afternoon flights that allow work during the earlier part of the day.  Routinely taxis are not available at these hours, so Dr. Peterson (and other unfortunate travelers) have lengthy waits for available cabs (at a $350 hourly rate for Dr. Peterson).  Second, car service charges include bridge/tunnel tolls and tips that must be added to taxis fares, increasing those costs by about one-third. Third, car service drivers are more experienced drivers knowledgable about alternative routes to (or from) JFK airport that avoid the notorious traffic and road-work delays that are constant. This again saves travel costs at $350 per hour.  Moreover, taxis cannot be used for after-meeting trips from Manhattan to JFK because (a) one cannot count on securing a cab and (b) they always take much longer to reach JFK because taxi-drivers do not know or do not use faster alternatives (sticking instead to the Grand-Central, BQE and other highways that are invariably crowded and stopped in late afternoons).  Because late flights from JFK to LAX are severely limited, Dr. Peterson could rely on taxis rather than car services in New York, only by ending his meetings before mid-afternoon (severely restricting the utility of his trips) or else by staying over in New York for another night, at a cost well in excess of the differnece between taxi anc car service charges. Finally, New York taxis are simply unsafe.  Dr. Peterson avoids them (except in unusual circumstances) after several near-misses of serious highway accidents and repeated instances of drivers getting lost.

Additionally, for this trip, Dr. Peterson had to arrange for his

car service to pick up his luggage and materials at his hotel before picking him up.  This was required by the tight travel and meeting schedule.

In Summary:

While we feel that use of a car service in New York is justified, cost effective and routine for reasons described above, we will agree to a 50% reduction for use of the car service to and from JFK because a different car service might have been less expensive.

We will not agree to reduce the car service charges to and from LAX, because there is no cheaper way to travel the long distance to and from Dr. Peterson's office or residence in Thousand Oaks. These charges are reasonable, necessary and have been accepted multiple times by your office in auditing our past bills.