```
                    UNITED STATES BANKRUPTCY COURT
                         DISTRICT OF DELAWARE

                                   .
IN RE:                             .        Chapter 11
                                   .
W.R. Grace & Co., et al.,          .
                                   .
          Debtor(s).               .        Bankruptcy #01-01139 (JKF)
.......................................................
```

Wilmington, DE
May 21, 2007
2:00 p.m.

TRANSCRIPT OF OMNIBUS HEARING
BEFORE THE HONORABLE JUDITH K. FITZGERALD
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

| | |
|---|---|
| For The Debtor(s): | David M. Bernick, Esq.<br>Kirkland & Ellis, LLP<br>200 E. Randolph Drive<br>Chicago, IL 60601 |
| | Janet S. Baer, Esq.<br>Kirkland & Ellis, LLP<br>655 Fifteenth Street, N.W.<br>Washington, DC 20005 |
| | James O'Neill, Esq.<br>Pachulski, Stang, Ziehl,<br>Young, Jones & Weintraub<br>919 North Market Street<br>Wilmington, DE 19801 |
| | Kevin T. Lantry, Esq.<br>Sidley Austin, LLP<br>555 W. Fifth St.<br>Los Angeles, CA 90013 |
| For Official Committee of:<br>Unsecured Creditors | Kenneth Pasquale, Esq.<br>Stroock Stroock & Lavan, LLP<br>180 Maiden Lane<br>New York, NY 10038 |

2

For Equity Security Holders:       Gary M. Becker, Esq.
Committee                          Kramer Levin Naftalis
                                   & Frankel, LLP
                                   919 Third Ave.
                                   New York, NY 10022

For Asbestos Claimants:            Peter Lockwood, Esq.
Committee                          Caplin & Drysdale, Chartered
                                   One Thomas Circle, N.W.
                                   Washington, DC 20005

                                   Nathan D. Finch, Esq.
                                   Caplin & Drysdale, Chartered
                                   One Thomas Circle, N.W.
                                   Washington, DC 20005

                                   Mark Hurford, Esq.
                                   Campbell & Levine, LLC
                                   1201 North Market St.-Ste. 1501
                                   Wilmington, DE 19801

For Future Claimants:              Raymond G. Mullady, Jr., Esq.
                                   Orrick Herrington
                                   & Sutcliffe, LLP
                                   Washington Harbour
                                   3050 K. Street, N.W.
                                   Washington, DC 20007

                                   John Ansbro, Esq.
                                   Orrick Herrington
                                   & Sutcliffe, LLP
                                   666 Fifth Ave.
                                   New York, NY 10103

For Official Committee of:         Theodore J. Tacconelli, Esq.
Asbestos Property Damage           Ferry, Joseph & Pearce, PA
Claimants                          824 Market Street
                                   Wilmington, DE 19899

                                   Scott L. Baena, Esq.
                                   Bilzin Sumberg Baena Price
                                   & Axelrod, LLP
                                   200 S. Biscayne Blvd. -Ste. 2500
                                   Miami, FL 33131

```
                                    Jay Sakalo, Esq.
                                    Bilzin Sumberg Baena Price
                                    & Axelrod, LLP
                                    200 S. Biscayne Blvd. -Ste. 2500
                                    Miami, FL 33131

                                    Richard Levy, Jr., Esq.
                                    Pryor Cashman, LLP
                                    410 Park Ave.
                                    New York, NY 10022

For Various Claimants:              Daniel K. Hogan, Esq.
                                    The Hogan Firm
                                    1311 Delaware Ave.
                                    Wilmington, DE 19806

For One Beacon/Seton:               David  P. Primack, Esq.
                                    Drinker Biddle & Reath
                                    1100 N. Market St.-Ste. 1000
                                    Wilmington, DE 19801

For Royal Insurance:                Carl J. Pernicone, Esq.
                                    Wilson Elser Moskowitz
                                    Edelman & Dicker, LLP
                                    150 E. 42nd St.
                                    New York, NY 10017

                                    Garvan F. McDaniel, Esq.
                                    Bifferato Gentilotti Biden
                                    & Balick
                                    Bruckner Building
                                    1308 Delaware Ave.
                                    Wilmington, DE 19899

For Anderson and California:        Daniel Speights, Esq.
Claimants                           Speights & Runyan
                                    200 Jackson Ave. East
                                    Hampton, SC 29924

For Libby Claimants:                Daniel Cohn, Esq.
                                    Cohn Whitesell & Goldberg, LLP
                                    101 Arch Street
                                    Boston, MA 02110

                                    John Strock, Esq.
                                    Landis Rath & Cobb, LLP
                                    919 Market St.-Ste. 600
                                    Wilmington, DE 19801
```

```
For Allstate Insurance Co.:     Stefano V. Calogero, Esq.
                                Cuyler Burk, LLP
                                Parsippany Corporate Center
                                Four Century Drive
                                Parsippany, NY 07054

For State of Montana:           Francis A. Monaco, Jr., Esq.
                                Monzack & Monaco, PA
                                Ste. 400
                                1201 North Orange Street
                                Wilmington, DE 19801

                                Kevin Mangan, Esq.
                                Monzack & Monaco, PA
                                Ste. 400
                                1201 North Orange Street
                                Wilmington, DE 19801

For Maryland Casualty:          Jeffrey C. Wisler, Esq.
Company                         Connolly, Bove, Lodge
                                & Hutz, LLP
                                1220 Market Street-10th Fl.
                                Wilmington, DE 19899

For Early Ludwick Sweeney:      Natalie D. Ramsey, Esq.
& Strauss, LLC                  Montgomery McCracken Walker
                                & Rhoads, LLP
                                123 S. Broad St.
                                Philadelphia, PA 19109

                                Noel C. Burnham, Esq.
                                Montgomery McCracken Walker
                                & Rhoads, LLP
                                123 S. Broad St.
                                Philadelphia, PA 19109

For Daimler Chrysler Corp.:     Laurie S. Silberstein, Esq.
                                Potter Anderson & Corroon, LLP
                                Hercules Plaza
                                1313 N. market St.-6th Fl.
                                Wilmington, DE 19801

For BNSF Railway Corp.:         Edward C. Toole, Jr., Esq.
                                Pepper Hamilton, LLP
                                3000 Two Logan Square
                                18th & Arch Streets
                                Philadelphia, PA 19103
```

5

```
                                    Anne M. Aaronson, Esq.
                                    Pepper Hamilton, LLP
                                    3000 Two Logan Square
                                    18th & Arch Streets
                                    Philadelphia, PA 19103

For The Trade Committee:            Michael R. Lastowski, Esq.
                                    Duane Morris, LLP
                                    1100 N. Market street, Ste. 1200
                                    Wilmington, DE 19801

For Prudential:                     Laurie S. Polleck, Esq.
                                    Jaspan Schlesinger
                                    Hoffman, LLP
                                    913 N. Market street
                                    Wilmington, DE 19801

For Continental Casualty:           Elizabeth M. DiCristofaro, Esq.
Ins.                                Ford Marrin Esposito Witmeyer
                                    & Gleser, LLP
                                    Wall Street Plaza
                                    New York, NY 10005

(Via telephone)

For The Debtor(s):                  Lisa Esayian, Esq.
                                    Kirkland & Ellis, LLP
                                    200 E. Randolph Drive
                                    Chicago, IL 60601

                                    Salvatore Bianca, Esq.
                                    Kirkland & Ellis, LLP
                                    200 E. Randolph Drive
                                    Chicago, IL 60601

                                    Ellen Ahern, Esq.
                                    Kirkland & Ellis, LLP
                                    200 E. Randolph Drive
                                    Chicago, IL 60601

                                    Sam Blatnick, Esq.
                                    Kirkland & Ellis, LLP
                                    200 E. Randolph Drive
                                    Chicago, IL 60601
```

```
                    Theodore Freedman, Esq.
                    Kirkland & Ellis, LLP
                    Citigroup Center
                    153 E.  53rd. St.
                    New York, NY 10022

                    Lori Sinanyan, Esq.
                    Kirkland & Ellis
                    777 S. Figueroa Street
                    Los Angeles, CA 90017

                    Barbara H. Harding, Esq.
                    Kirkland & Ellis, LLP
                    655 Fifteenth Street, N.W.
                    Washington, DC 20005

                    David Mendelson, Esq.
                    Kirkland & Ellis, LLP
                    655 Fifteenth Street, N.W.
                    Washington, DC 20005

                    James J. Restivo, Esq.
                    Reed Smith Shaw
                    & McClay, LLP
                    435 Sixth Ave.
                    Pittsburgh, PA 15219

                    Douglas E. Cameron, Esq.
                    Reed Smith Shaw
                    & McClay, LLP
                    435 Sixth Ave.
                    Pittsburgh, PA 15219

                    Christopher M. Candon, Esq.
                    Cohn Whitesell & Goldberg, LLP
                    101 Arch Street
                    Boston, MA 02110

                    Mark Shelnitz, Esq.
                    In-House counsel
                    W.R. Grace & Company

                    Paul J. Norris, Esq.
                    In-House Counsel
                    W.R. Grace & Company
```

| | |
|---|---|
| For Official Committee of:<br>Unsecured Creditors | Lewis Kruger, Esq.<br>Strook Stroock & Lavan, LLP<br>180 Maiden Lane<br>New York, NY 10038 |
| | Arlene Kreiger, Esq.<br>Strook Stroock & Lavan, LLP<br>180 Maiden Lane<br>New York, NY 10038 |
| For Asbestos Claimants:<br>Committee | Walter Slocombe, Esq.<br>Caplin & Drysdale, Chartered<br>One Thomas Circle, N.W.<br>Washington, DC 20005 |
| | Terence D. Edwards, Esq.<br>Brandi Law Firm<br>44 Montgomery St.-Ste. 1050<br>San Francisco, CA 94104 |
| For Baron & Budd, Reaud:<br>Morgan & Quinn | Sander L. Esserman, Esq.<br>Stutzman Bromberg Esserman<br>& Pfilka, PC<br>2323 Bryan St.-Ste. 2200<br>Dallas, TX 75201 |
| | Van J. Hooker, Esq.<br>Stutzman Bromberg Esserman<br>& Pfilka, PC<br>2323 Bryan St.-Ste. 2200<br>Dallas, TX 75201 |
| | David A. Klingler, Esq.<br>Stutzman Bromberg Esserman<br>& Pfilka, PC<br>2323 Bryan St.-Ste. 2200<br>Dallas, TX 75201 |
| | David J. Parsons, Esq.<br>Stutzman Bromberg Esserman<br>& Pfilka, PC<br>2323 Bryan St.-Ste. 2200<br>Dallas, TX 75201 |
| For Special Counsel to:<br>PD Committee | Martin Dies, Esq.<br>Dies Henderson & Carona<br>1009 West Green<br>Orange, TX 77630 |

For C.N.A. Insurance:   Brian Mukherjee, Esq.
            Goodwin Procter, LLP
            Exchange Place
            Boston, MA 02109

For Fireman's Fund:    David R. Beane, Esq.
Insurance         Stevens & Lee, PC
            111 N. Sixth Street
            Reading, PA 19603

For The Futures:     Debra Felder, Esq.
Representative      Orrick Herrington
            & Sutcliffe, LLP
            Washington Harbour
            3050 K. Street, N.W.
            Washington, DC 20007

            Richard H. Wyron, Esq.
            Orrick Herrington
            & Sutcliffe, LLP
            Washington Harbour
            3050 K. Street, N.W.
            Washington, DC 20007

            Roger Frankel, Esq.
            Orrick Herrington
            & Sutcliffe, LLP
            Washington Harbour
            3050 K. Street, N.W.
            Washington, DC 20007

            John C. Phillips, Esq.
            Phillips Goldman & Spence, PA
            1200 N. Broom Street
            Wilmington, DE 19806

For Federal Insurance:   David Liebman, Esq.
Company         Cozen O'Connor
            1900 Market St.
            Philadelphia, PA 19103

            Jacob C. Cohn, Esq.
            Cozen O'Connor
            1900 Market Street
            Philadelphia, Pa 19103

For PD Claimants:                    Matthew I. Kramer, Esq.
                                     Bilzin Sumberg Baena Price
                                     & Axelrod, LLP
                                     200 S. Biscayne Blvd. -Ste. 2500
                                     Miami, FL 33131

                                     Darrell Scott, Esq.
                                     Scott Law Group
                                     926 West Sprague Ave.
                                     Spokane, WA 99201

For AIG Member Companies:            Michael S. Davis, Esq.
                                     Zeichner Ellman & Krause, LLP
                                     575 Lexington Ave.
                                     New York, NY 10022

                                     Robert Guttman, Esq.
                                     Zeichner Ellman & Krause, LLP
                                     575 Lexington Ave.
                                     New York, NY 10022

For Everest Reinsurance:             Brian L. Kasprzak, Esq.
Company                              Marks O'Neill O'Brien
                                     & Courtney, PC
                                     1880 JFK Pkwy.-Ste. 1200
                                     Philadelphia, PA 19103

                                     Michael J. Joyce, Esq.
                                     Marks O'Neill O'Brien
                                     & Courtney, PC
                                     1880 JFK Pkwy.-Ste. 1200
                                     Philadelphia, PA 19103

For Everest Reinsurance Co.:         Leslie A. Epley, Esq.
McKinley Insurance                   Crowell & Moring, LLP
                                     1001 Pennsylvania Ave., NW
                                     Washington, DC 20004

                                     Mark Plevin, Esq.
                                     Crowell & Moring, LLP
                                     1001 Pennsylvania Ave., NW
                                     Washington, DC 20004

For Tort Claimants:                  Robert W. Phillips, Esq.
                                     Simmons Cooper, LLC
                                     707 Birkshire
                                     East Alton, IL 62024

For London Market Companies:    Alexander Mueller, Esq.
                                Mendes & Mount, LLP
                                750 Seventh Ave.
                                New York, NY 10019

For Equity Security Holders:    David A. Hickerson, Esq.
Committee                       Weil Gotshal & Manges, LLP
                                1300 Eye Street-Ste. 900
                                Washington, DC 20005

                                Jarrad Wright, Esq.
                                Mendes & Mount, LLP
                                750 Seventh Ave.
                                New York, NY 10019

For Prudential:                 Curtis M. Plaza, Esq.
                                Riker Danzig Scherer Hyland
                                & Perretti, LLP
                                Headquarters Plaza
                                One Speedwell Ave.
                                Morriston, NJ 07962

For The U.S. Trustee:           David Klauder, Esq.
                                U.S. Trustee's Office
                                844 King Street-Ste. 2313
                                Lock Box 35
                                Wilmington, DE 19801

Audio Operator:                 Brandon McCarthy

Transcribing Firm:              Writer's Cramp, Inc.
                                6 Norton Rd.
                                Monmouth Jct., NJ 08852
                                732-329-0191

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

1          THE COURT:  Good afternoon.  Please be seated.  This

2    is the matter of <u>W.R. Grace</u>, 01-1139.  The parties I have

3    listed to appear by phone are David Hickerson, Jarrad Wright,

4    Irwin Zandman, Walter Slocombe, Richard Wyron, John Ku, Roger

5    Frankel, Elizabeth DiCristofaro, Lewis Kruger, Jason Solganick,

6    Christopher Candon, Jonathan Brownstein, Debra Felder, Marti

7    Murray, Oscar Mockridge, Chelsea Clinton, Andrew Hain, Paul

8    Norris, Robert Phillips, Kenneth Thomas, David Beane, Michael

9    Davis, Robert Guttman, John Phillips, Lisa Esayian, Salvatore

10   Bianca, Ellen Ahem, Sander Esserman, Van Hooker, David Klinger,

11   David Parsons, David Liebman, Jacob Cohn, James Restivo,

12   Douglas Cameron, Alex Mueller, Curtis Plaza, Terence Edwards,

13   Brian Kasprzak, Michael Joyce, Leslie Epley, Mark Plevin, Mark

14   Sheinitz, Arlene Krieger, Peter Shawn, Steven Eisman, John

15   O'Connell, Andrew Chan, Martin Dies, Matthew Kramer, Marion

16   Fairey, Darrell Scott, Sean Walsh, John Wollen, Brian

17   Mukherjee, Janet Baer, Sam Blatnick, Theodore Freedman, Lori

18   Sinanyan, David Mendelson, and Barbara Harding.

19        I'll take entries in Court, please.

20          MR. BERNICK:  David Bernick for Grace, Your Honor.

21          MS. BAER:  Janet Baer for Grace.

22          MR. O'NEILL:  Good afternoon, Your Honor, James

23   O'Neill for Grace.

24          MR. BECKER:  Gary Becker for the Equity Committee.

25          MR. PASQUALE:  Ken Pasquale for the Unsecured

1   Creditors Committee.

2           MR. LOCKWOOD:  Peter Lockwood for the ACC.

3           THE COURT:  Excuse me.

4           MR. FINCH:  Nathan Finch for the ACC.

5           THE COURT:  Just a second.  Okay, thank you.

6           MR. HURFORD:  Mark Hurford for the ACC.

7           MR. MULLADY:  Good afternoon, Your Honor, Raymond

8   Mullady for the Future Claimants representative.

9           MR. ANSBRO:  Good afternoon, Your Honor, John

10  Ansborogh, also for the Future Claimants rep.

11          MR. BAENA:  May it please the Court, good afternoon,

12  Your Honor.  Scott Baena on behalf of PD Committee.

13          MR. SAKALO:  Good afternoon, Your Honor, Jay Sakalo

14  on behalf of the Property Damage Committee.

15          MR. SPEIGHTS:  Good afternoon, Your Honor, Dan

16  Speights on behalf of Anderson Memorial Hospital.

17          MR. COHN:  Good afternoon, Your Honor, Daniel Cohn

18  for the Plaintiffs in the State of Montana action and the

19  Plaintiffs in the actions against BNSF in Montana.

20          MR. PERNICONE:  Good afternoon, Your Honor, Carl

21  Pernicone for Royal Indemnity.

22          MR. LEVY:  Richard Levy of Pryor Cashman on behalf

23  of the Dias & Hile PD Claimants.

24          MR. TOOLE:  Good afternoon, Your Honor, Edward

25  Toole, Burlington Northern Santa Fe Railway Company.

1          MS. RAMSEY:  Good afternoon, Your Honor, Natalie

2  Ramsey for the law firm of Early Ludwick Sweeney & Strauss, LLC

3  and also for the MMWR firms.

4          MR. MONACO:  Good afternoon, Your Honor, Frank Monaco

5  for the State of Montana.

6          MS. DICRISTOFARO:  Good afternoon, Your Honor,

7  Elizabeth Dicristofaro for Continental Casualty Company.

8          MR. WISLER:  Good afternoon, Your Honor, Jeff Wisler

9  on behalf of Maryland Casualty Company.

10          THE COURT:  Mr. Bernick?

11          MR. BERNICK:  Thank you, Your Honor.

12     (Microphone noise)

13          MR. BERNICK:  An inauspicious beginning.

14     (Laughter)

15          MR. BERNICK:  The agenda today, items 1 through 3 I

16  think all have been continued, which then brings us to item 4,

17  and as Your Honor I know is well familiar, item 4 also is

18  related to the succeeding items 5, 6, 7, 8 and 9.  And as we

19  committed last time when we agreed, I think everybody agreed to

20  have these matters put over until today for recognizing that

21  other counsel have come here on a couple of different occasions

22  and not had the opportunity to take this up in full, we agreed

23  to have this heard first off.  And I know that Mr. Toole here

24  is here for the railroad, as are all the other interested

25  parties.

1      Item 4 is actually the Debtor's motion, and I thought that

2   I would begin with that, although I would suggest to the Court

3   that because all these matters are so thoroughly intertwined it

4   might be worthwhile after I'm done with my remarks, I'm gonna

5   be addressing what I think is the core issue that is the

6   threshold issue in all of these different matters.  It might be

7   worthwhile if the Court would indicate what Your Honor would

8   prefer be taken up next, and in what order.  Because all these

9   things are in fact very closely tied together.

10         THE COURT:  I don't really have a preference.  I need

11   to get through them all, and however -- whatever order makes

12   sense is fine me.

13         MR. BERNICK:  Okay.  Well, I'll gonna address then

14   the fundamental question of whether the Gerard case should be

15   binding here in this proceeding, both with respect to the

16   litigation against the railroad and with respect to litigation

17   against State of Montana.  Because we believe that the key

18   issue is whether in fact --

19     (Fire alarm system test)

20         THE COURT:  All right, Mr. Bernick, go ahead.

21         MR. BERNICK:  Okay.  From our point of view if in

22   fact Gerard controls it ought to control both the Montana

23   situation as well as the case against Burlington Northern, and

24   I think that probably moots all the remaining issues.  If in

25   fact Your Honor believes that it doesn't control and is

1  prepared to stand by the same analysis that you followed in

2  connection with the denial of the Motion to Extend the

3  Preliminary Injunction to include the State of Montana then

4  there are some other issues that we have to take up.  But I'd

5  like to get to <u>Gerard</u> and why we believe it's dispositive.  And

6  I'm very confident Your Honor has had the opportunity to reread

7  the <u>Gerard</u> case.

8      I want to talk a little bit about the history that led to

9  <u>Gerard</u>, and then the <u>Gerard</u> decision itself.  The history goes

10  all the way back to the beginning of the case, and while Your

11  Honor is well familiar with these matters, the mists of time

12  are slowly creeping up and affecting all aspects of the case.

13  So I'd like to just review that very, very briefly.

14      At the beginning of the case Grace sought a stay in an

15  injunction with respect to all litigation that might be --

16  might collaterally affect the central matter that is at issue

17  here, which is the scope of the asbestos liabilities and what

18  to do about them.  We said at the outset that was the central

19  matter that had to be resolved, and therefore we proceeded from

20  the very beginning to seek to protect these proceedings from

21  anything external to the case that might affect the disposition

22  or handling of that issue, including the ultimate plan of

23  reorganization.  That was a Day One proposition.  There was a

24  Day One Order that was entered on that basis.

25      Essentially for the next several months there were

1   multiple proceedings involving the scope of that preliminary

2   injunction.  And ultimately other parties got added.  The basis

3   for the preliminary injunction as it was sought was Rule 105 as

4   well as the State provisions.  There were extensive

5   negotiations.  And again, as Your Honor is familiar, ultimately

6   they all came to rest with respect to a preliminary injunction

7   Continuation Order that was entered in January of 2002.

8        And the entire purpose of all of that was to protect the

9   Estate's property and to protect the Estate from the affect of

10  collateral litigation taking place elsewhere.  Needless to say,

11  many, many parties had litigation that was affected by the

12  stay.  This case is a case that centrally focuses on litigation

13  that was pending throughout the United States.  And the

14  consistent approach that was taken by this Court in those

15  orders wasn't approached -- it was designed to give the Debtor

16  and the Estate peace while this case wandered it's way through

17  the reorganization process.

18       The Gerard case arose from the extension of that

19  preliminary injunction to include Maryland Casualty, who is an

20  insurer in connection with the situation in Libby, Montana.

21  And Your Honor will recall that the case that was sought to be

22  pursued against Maryland Casualty was not to collect on the

23  policy but rather to sue Maryland Casualty essentially as a

24  joint tort-feasor for having failed adequately to supervise the

25  operations at Libby.

1    Shortly after the January '02 injunction Extension Order

2  was entered Maryland -- or the Plaintiffs in Montana sought a

3  clarification of that Order, basically asking whether they were

4  still free to proceed with actions against Maryland Casualty.

5  Your Honor ruled that they were not, and Judge Wolin reversed.

6  And it's really what Judge Wolin opinion that we go down what

7  the 3rd Circuit later characterized as being a detour, and it's

8  probably understandable because Judge Wolin's baptism by fire

9  in connection with the asbestos Chapter 11 cases was his ruling

10  in the Federal Mogul case.

11    In the Federal Mogul case there was an effort by the three

12  car companies to remove cases from all over the country and

13  transfer them to the Federal Mogul case.  The threshold issue

14  there was whether there was subject matter jurisdiction, and

15  the case ultimately focused on whether Pacor was controlling

16  for its articulation of the test and the holding that ought to

17  be applied in determining whether the other litigation around

18  the country was related to the Federal Mogul case.  So subject

19  matter jurisdiction loomed large in that case.

20    The Combustion Engineering case was then a further case

21  that implicated the issue of related to jurisdiction, and Judge

22  Wolin in looking at the MCC -- the case against MCC again

23  looked at that as a question of subject matter jurisdiction,

24  finding that there was not related to jurisdiction, because he

25  didn't believe that the settlement agreement that Maryland

1   Casualty had entered into with Grace was implicated by the

2   claims that were being made against Grace, and therefore there

3   was no contractual indemnity, and therefore there was no

4   related to jurisdiction, and therefore there was no

5   jurisdictional predicate for the issuance of the 105

6   injunction.

7        The Court in <u>Gerard</u> reversed, and it's very important in

8   thinking about the <u>Gerard</u> case to think about two separate

9   determinations made by the 3rd Circuit.  The 3rd Circuit did

10  start out by underscoring the fact that Judge Wolin had

11  misperceived the procedural posture of the matter as it came

12  before him and had conflated it with the procedural posture in

13  <u>Federal Mogul</u>.  In <u>Federal Mogul</u> the issue that was before the

14  Court was whether to wrap in all of these state cases which

15  literally were removed around the country and transport them,

16  transfer them to the <u>Federal Mogul</u> Chapter 11.

17       (Alarm sounds)

18       MR. BERNICK:  That's how the 3rd Circuit regarded the

19  <u>Federal Mogul</u> decision.

20       (Emergency drill announcement)

21       MR. BERNICK:  That's kind of how I felt when I argued

22  the <u>Federal Mogul</u> case to the 3rd Circuit and Judge Slowiter

23  was on the panel, and kind of thought that Pacor was the end of

24  the story.

25       In any event, Judge Wolin was clearly focused on related

1  to jurisdiction and decided the matter on the basis of related

2  to jurisdiction.  And when the matter came up before Judge --

3  the 3rd Circuit in connection with the <u>Gerard</u> appeal the 3rd

4  Circuit, as I indicated before the warnings there, the 3rd

5  Circuit did distinguish the posture of the case from the issue

6  on which Judge Wolin had focused and that it pointed out and

7  underscored the fact that the issue before it in <u>Gerard</u> was not

8  whether all these cases from all over the country were gonna

9  come to roost in the <u>Federal Mogul</u> bankruptcy, but rather the

10  question about whether an existing injunction should be

11  modified in order to include Maryland Casualty.

12      But the Court actually went on in terms of the holdings in

13  the <u>Gerard</u> appeal to decide separately two very specific

14  issues.  The first issue was whether in fact there was subject

15  matter jurisdiction in the case against -- over the case

16  against Maryland Casualty.  And the second was on having found

17  that there was subject matter jurisdiction did Your Honor

18  properly issue a preliminary injunction, barring the

19  prosecution of the claim against Maryland Casualty.  Those were

20  the specific decisions that the 3rd Circuit made and that

21  specifically highlighted that difference.  And also highlighted

22  the fact that in ruling on subject matter jurisdiction in

23  particular the point it was making was not confined or somehow

24  conscribed by the procedural posture of this case versus

25  <u>Federal Mogul</u>.  In other words, there's no different principle

1   of subject matter jurisdiction that you have in the 3rd

2   Circuit's decision in <u>Gerard</u> that's somehow inconsistent with

3   what took place in <u>Federal Mogul</u>.  The two are not at odds at

4   all.

5       The jurisdictional predicate -- and the key thing is

6   really the jurisdictional predicate, what was the fact that was

7   dispositive of the 3rd Circuit's decision that there was

8   subject matter jurisdiction?  And that predicate fact was

9   different from the way it was in <u>Federal Mogul</u> and in <u>CE</u>.

10      The <u>Gerard</u> case did not involve the request by a third

11  party that is a stranger to the bankruptcy to bring along

12  collateral third-party litigation into the bankruptcy case.

13  And therefore it was different than <u>Federal Mogul</u>.  It did not

14  involve a situation where the Debtor was seeking a broad

15  channeling injunction, which post confirmation would have the

16  affect of bringing in litigation against another third party,

17  i.e., a third-party affiliate, that was the issue in the

18  <u>Combustion Engineering</u> case.  And both issues are similar in

19  that they are both situations where effectively what the

20  Court's deciding is, is there the power to reach out and take

21  other pending litigation and actually bring it into the

22  bankruptcy case?  Neither of those predicates were involved in

23  the <u>Gerard</u> appeal.

24      What was involved in the <u>Gerard</u> appeal was the Debtor's

25  request, Grace's request, for peace from these collateral

1  litigations that were taking place, peace so that they would

2  not affect its central effort at reorganization.

3      And what the Court said in <u>Gerard</u> was very clear.  It

4  says, in addition, that is beyond the question of the

5  procedural posture, in addition to having been misdirected as

6  to the issue before it, the District Court in its

7  jurisdictional analysis was also misled as to the nature of the

8  proceeding before the Bankruptcy Court.  Clearly the ruling on

9  appeal to the District Court resulted from the adversary

10  proceeding seeking injunctive relief initiated by the Debtor in

11  its own Chapter 11 case.  Thus the proceeding was essentially

12  -- assuredly related to the case, and further it definitely

13  arose under the bankruptcy proceeding, paren., it was perhaps

14  even a core proceeding, close paren.

15      Thus the issue of Bankruptcy Court jurisdiction to

16  entertain the motion relating to the injunction was in reality

17  a nonissue.  It wasn't even necessary to go through the complex

18  analysis of whether a contribution claim was a sufficient nexus

19  or contractual indemnity claim was a sufficient nexus.  This is

20  the Debtor itself in its own case saying we need protection

21  from this other litigation.  It's necessary for us to pursue

22  this core proceeding.  That was the fundamental distinction

23  that the 3rd Circuit made in finding subject matter

24  jurisdiction.

25      And the key test of this is not only the very language

1  that the Court has used here but the fact that later on in

2  discussing the propriety of Your Honor's issuing a preliminary

3  injunction the Court comes back -- the 3rd Circuit comes back

4  and cites with approval the AH Robbins case out of the 6th

5  Circuit -- 4th Circuit, which was the very case that was

6  distinguished in terms of a related to jurisdiction finding by

7  the 3rd Circuit in connection with the Federal Mogul case.  And

8  the reason that the Court cited AH Robbins is that AH Robbins

9  was also a stay case.  And this is a stay case, a preliminary

10  injunction case and a stay case relating to the need to protect

11  the core proceeding from collateral matters.

12      The Gerard Court then went on to consider the question of

13  whether Your Honor had properly issued the preliminary

14  injunction.  It basically identified the same kind of dynamic

15  that we have now in connection with the railroad, in connection

16  with the State of Montana.  Why is it the same?  Because like

17  the case against Maryland Casualty, the case against Burlington

18  and the case against the State of Montana are effectively cases

19  that are brought based upon the same underlying exposures, and

20  they're brought because Grace is not amenable to being sued at

21  this time in this case.

22      THE COURT:  Yes, but the difference -- I still have

23  to make some distinction at least at this point on this record

24  between the railroad and the State.  And I -- the difficulty

25  that I'm having with the State is the fact that the State

1   Courts themselves have made a determination that there is an

2   independent duty on behalf of the State, regardless of Grace's

3   conduct, to advise citizens within that State of a problem.

4   The underlying State Court case said that the State had no duty

5   to undertake the investigation.  But having undertaken that

6   investigation it did have a duty to report whatever it found.

7       The State Courts -- the State -- I apologize.  Offhand I

8   can't recall whether it was cases or the statute, but something

9   in the State also makes it, I think, absolutely clear that the

10  Debtor cannot suffer a collateral consequence from whatever

11  happens to the State because the Debtor as a nonparty to that

12  action, and I think the Debtor won't be a party to that action,

13  I've refused to lift the stay to allow the Debtor to be a party

14  to that action, so the collateral consequence to the Debtor as

15  the result of State law in Montana is essentially nullified.

16  There cannot be a collateral consequence by virtue of the fact

17  that there cannot be a judgment in any form, not as a

18  collateral attack, not as a litigation prejudice, nothing that

19  I can see on the State Court record against the Debtor.

20      Now I think the railroad's a whole different issue.  There

21  appear to be contractual indemnities by the Debtor with respect

22  to the railroad that might make it very similar to the Maryland

23  Casualty case.  And as a result there may be a whole different

24  track that the BNSF goes down.  But I know you're attempting to

25  put them all into one lump.  I'm having difficulty doing that.

1          MR. BERNICK:  Can I address that, Your Honor?

2  Because I think that that is a fair point, but I think it is

3  also answered by the Gerard decision.  First of all, in terms

4  of subject matter jurisdiction, the subject matter jurisdiction

5  analysis that the 3rd Circuit went through makes no

6  distinction.  The predicate remains the same.  It is the

7  Debtor's request to protect the bankruptcy case itself.

8          THE COURT:  But how -- but see, that's the problem I

9  have.  I think in order -- it is the Debtor's request,

10  allegedly to protect the case.  But the problem -- and so --

11  okay, maybe I have jurisdiction, maybe, to say is there a

12  protection that can be afforded to this case?

13          MR. BERNICK:  That's -- I think that that is exactly

14  the step-wise process that the 3rd Circuit followed in Gerard.

15  But then let me get to the factual question that Your Honor --

16  or factual concern that Your Honor raises.  I think it goes to

17  the question of whether that jurisdictional power should be

18  exercised.  And there -- and the reason that's so critical is

19  that the jurisdictional grant doesn't hinge upon whether

20  there's a contractual indemnity or not.  What it hinges upon is

21  whether -- who is making the request and for what purpose?  In

22  that paragraph, and I'll read it again and I'll show it to Your

23  Honor, there's no analysis of contractual indemnity, Pacor or

24  any of that stuff because it's not germane to the Debtor making

25  that request through an adversary proceeding to basically shut

1  down a matter that may interfere with it.  But let me --

2         THE COURT:  But the difference I think was in that

3  instance I wasn't being asked -- do I have the cases right?

4  You're correct about the fact that there have been enough of

5  these litigations that I may have the wrong one.  So let me

6  make sure that I've got the right one.  I think the underlying

7  posture was this was not a request to extend the injunction to

8  cover Maryland Casualty.  This was a request for clarification

9  as to whether Maryland Casualty was already included within the

10 injunction.

11        MR. BERNICK:  Correct.

12        THE COURT:  And my determination was that Maryland

13 casualty was included within that injunction, and I was not

14 going to take Maryland Casualty out of the injunction.

15        MR. BERNICK:  That goes --

16        THE COURT:  So this --

17        MR. BERNICK:  That goes --

18        THE COURT:  This was not an appeal as to whether or

19 not I had essentially improperly exercised jurisdiction.  The

20 time to do that was already passed.

21        MR. BERNICK:  But that is what the opposition to this

22 request argues.

23    (Emergency test system announcement)

24        MR. BERNICK:  That is what the opposition says.  And

25 it's wrong.  And the reason that it's wrong is it misapprehends

1  the holding of the 3rd Circuit with respect to subject matter

2  jurisdiction.  That holding does not turn -- the holding as the

3  subject matter jurisdiction does not turn on the question of

4  whether it was an expansion, a clarification or whatever with

5  respect to the injunction.  That holding turns on the nature of

6  the proceeding.  That is exactly why it reads the way in which

7  it does.  And I have the language right here.

8          THE COURT:  But it wouldn't have needed to go into

9  the Pacor issue because --

10          MR. BERNICK:  No.

11          THE COURT:  -- because Pacor on its facts was a

12  different circumstance.

13          MR. BERNICK:  That's the point.  That's the point.

14  The point is that it was a different proceeding.  This was not

15  a case like Pacor where there was an already existing case.

16  And the question was whether to shut it down and did the Court

17  have subject matter jurisdiction to wrap it into the bankruptcy

18  case?  The issue -- what the Court talks about in connection

19  with Gerard is, this is an adversary proceeding seeking

20  injunctive relief initiated by the Debtor in its own --

21  remember what Pacor was.

22          THE COURT:  Right.

23          MR. BERNICK:  Pacor was a distributor outside of the

24  11 who was trying to get peace as a result of the 11.

25          THE COURT:  Right.

1          MR. BERNICK:  There was no request by the Debtor in

2    Pacor.  There was no request by the Debtor in Federal Mogul.

3    We solicited that request on behalf of the three car companies

4    and they turned us down.  None of those cases involved a

5    request by the Debtor.  This was a request by the Debtor.

6    You're saying, you've got to protect our core proceeding.  That

7    is exactly what Grace was doing, and therefore the issue of

8    Bankruptcy Court jurisdiction is in reality a nonissue.  And

9    the reason that's critical is not only is the test different,

10   Your Honor, but the distinction that's being made between the

11   expansion or clarification -- expansion versus clarification of

12   injunction is one that's entirely accidental to the issue of

13   subject matter jurisdiction.

14        It becomes germane, and the reason the 3rd Circuit pointed

15   it out is it becomes germane to consideration of the second

16   issue, which I want to talk about in a minute, but that is

17   whether the power should be exercised.  It is not a predicate

18   -- it's not necessary to find jurisdiction with respect to --

19   subject matter jurisdiction with respect to the Debtor's own

20   request to get into any of that analysis because the

21   predicate's different.  It is the Debtor's own action as part

22   of his own Court case.  That's what the 3rd Circuit held.

23        Any other result would make it kind of silly.  That is, if

24   there didn't have to have happen to have been an injunction to

25   begin with, and the Debtor then sought the injunction in the

1   first instance, and then there was an appeal, would you then

2   apply a different test?  And if there happen to be an earlier

3   request granted and then it was expanded, they're both requests

4   by the Debtor.  The jurisdictional predicate is identical, and

5   there is no analysis there that says, oh, we have to resolve

6   these issues.  That's why they reversed Wolin.  Wolin engaged

7   -- Judge Wolin engaged in the related to analysis with all the

8   bells and whistles because he thought that the only way that he

9   could act was on the basis of the related to precedent that he

10  was familiar with.  That is, <u>Federal Mogul</u> and <u>Combustion</u>

11  <u>Engineering</u>.  That is not what the 3rd Circuit said.

12       Now, you then get to the question, well, should the Court

13  have exercised, Your Honor exercise your jurisdiction under

14  Section 105?  That is the second issue, and it's a separate

15  issue.  That is the issue where the Court then goes through on

16  the succeeding pages and actually takes up the question of

17  whether Your Honor had a basis for what you decided to do.

18  That is the pages that precede with the analysis of whether the

19  Bankruptcy Court properly noted the practical difficulty and

20  inevitable implications to the Debtor of findings that might be

21  made in the lawsuit, the prospect of discovery and the like.

22       With respect to that second issue, the second issue, was

23  there a proper exercise of authority?  It is there that the

24  procedural posture become relevant, because it affected the

25  burden of proof.  The burden of proof for a de novo preliminary

1   injunction, different from the burden of proof with respect to

2   the modification of an already existing injunction.  There I

3   would agree with Your Honor the question of the procedural

4   posture becomes important.

5        But the facts, the facts here are virtually identical with

6   respect to the facts on the basis of which the 3rd Circuit

7   didn't -- decided not to remand but to simply say that the

8   order would be upheld.  That is Your Honor's Order would be

9   upheld.  And what are those facts?

10       I want to get now to Your Honor's point about Burlington

11  Northern, and about the State of Montana.  And again, I'm up

12  here making this argument, not because I just like the State of

13  Montana or I like, you know, the railroad, which is such an old

14  and esteemed organization.  I'm here because the Debtor

15  perceives that there really is a problem.  And the problem is

16  identical to the problem that we had with respect to Maryland

17  Casualty, for whom again the Debtor had no particular affinity,

18  because the inevitable consequences Your Honor has already seen

19  of allowing the litigation to proceed against the State of

20  Montana, or allowing it to proceed against Burlington Northern

21  is to get the Debtor involved in some shape or form or fashion.

22  And Your Honor's two points about why the State of Montana's

23  different I think are actually squarely addressed in this

24  opinion.

25       First, Your Honor says, well, with respect to the State of

1   Montana it may be that they have an affirmative obligation by

2   virtue of what the State Court there has found.  That was

3   exactly the argument that the Plaintiffs in Montana made about

4   Maryland Casualty.

5          THE COURT:  But it's much different here because in

6   Maryland Casualty there is not a determination that Maryland

7   has an independent obligation that will somehow or other not

8   eventually come back to the Debtor by virtue of the indemnity

9   agreement that's contractual.

10         MR. BERNICK:  Well --

11         THE COURT:  The problem with the State of Montana is

12  there is a ruling by the State Court that says there is an

13  independent obligation virtually regardless of what the Debtor

14  did.  And there is not yet of course the liability

15  determination.  So the State may very well win on a liability

16  issue.

17         MR. BERNICK:  Fair enough.  So that difference would

18  be a difference that doesn't go to the theory of liability.

19  Because the theory of liability against Maryland Casualty was

20  the same.  That is that they had an affirmative obligation.

21  What Your Honor is saying is that with that affirmative

22  obligation, assuming it's there, the consequence of a judgment

23  against the State of Montana may be more limited than it would

24  be with respect to a judgment against Burlington Northern or a

25  judgment against Maryland Casualty.

1           THE COURT:  Well, I don't know that I'm saying that

2    or not.  I really don't know what the cause of action against

3    the State of Montana on its alleged -- or not its alleged, but

4    on its independent duty is.  I simply don't know that.  But it

5    seems to me that the allegation against Maryland Casualty was

6    that Maryland Casualty designed a system that was put in place

7    in the Debtor's workplace, that it did it for the Debtor, that

8    the Debtor operated the workplace, that regardless of what

9    happened on Maryland Casualty's independent liability theory

10   the Debtor had indemnified Maryland Casualty on the contractual

11   issue, and there was absolutely no way that that evidence was

12   going to go forward with respect to the design which Maryland

13   Casualty picked up from plans that it got from the Debtor and

14   implemented and inspected and installed without involving the

15   Debtor.

16       This theory on behalf of the State seems to be very

17   different.  It's simply a duty to warn.  And I don't know how

18   the Debtor's involved in the State's duty to warn.

19           MR. BERNICK:  Fair enough, Your Honor.  I -- again, I

20   think you're getting down to the -- the Court's getting down to

21   a distinction that may be meaningful, but I would suggest two

22   things.  One is that the case against Maryland Casualty assumed

23   again the same -- alleged the same affirmative obligation.

24   Judge Wolin specifically found -- this was the core of his

25   analysis, that any finding of liability against Maryland

1  Casualty would have no impact, no collateral affect impact on

2  Grace because the claim was a different claim, and the 3rd

3  Circuit rejected that analysis.

4      So it may be that there are some ways in which a judgment

5  against the State of Montana may not be visited in a collateral

6  estoppel since against Grace, and maybe that indeed the whole

7  liability theory against the State of Montana is more limited

8  than the liability theory against Maryland Casualty, and that

9  the overlaps in the evidence are somewhat different.  I'll

10  accept that there may be ways to articulate the case against

11  the State of Montana that are somewhat different from the case

12  against Maryland Casualty, although they look to -- at least

13  the initial appearance of being very, very close.

14      The problem is that the risk of the overlap is not borne

15  by anybody but the Debtor.  And that is the risk that there may

16  be some aspect of however the liability theory is pursued

17  against the State of Montana that does overlap with facts that

18  relate to Grace's own liability there is the risk that, a) the

19  record will be developed in that fashion, and b) there may be

20  some affect.  Your Honor believes that there's none.  But that

21  is not an assurance that ultimately in some proceeding down the

22  road it will be there.

23      And this is exactly what the 3rd Circuit got to at the

24  back end of its opinion.  "Furthermore, the Courts have never

25  adopted the absence of collateral estoppel as the test for

1  preventing actions from proceeding against third parties when

2  the Debtor is protected by the automatic stay.  Rather, Courts

3  employ a broader view of the potential impact on the Debtor."

4  The standard is could interfere with the reorganization of the

5  Debtor.  And I will assure Your Honor that, a) it will, and b)

6  I can tell you exactly how it will.  It will because the same

7  people are making the claims against the State of Montana as

8  are making the claims against Grace.

9      The State of Montana could well defend those cases in the

10  most obvious possible way, which is to say that these people

11  are not actually suffering an injury that resulted from the

12  operation of the mine.  That is the bread basket of one of

13  Grace's principal defenses against all of those different

14  issues.  And it's not only a defense that Grace has that's

15  germane to these cases, it's also germane to the criminal

16  prosecution.  So here we have the State of Montana doing what

17  it has to do to defend itself, not only by virtue of its own

18  conduct, but by virtue of the scientific case.  And they're

19  running around dealing with the same Claimants, same medical

20  evidence, same adverse experts, and we don't have control

21  either for purposes of the criminal prosecution or for purposes

22  of this case.  That's record taint.  And those two decisions,

23  AH Robbins and In Re: John Manville, specifically focused on

24  record taint saying as a practical matter the Debtor is going

25  to be affected.

1            THE COURT:  But --

2            MR. BERNICK:  And -- I'm sorry, one last thing.  When

3  the results come in against the State of Montana Your Honor's

4  gonna hear all about them.  They're gonna say, oh, well, gee,

5  it's not estoppel or anything like that.  But these are

6  valuable claims.  They've been found to be scientifically and

7  medically valid, and not only that, but here are the verdicts.

8  We're gonna hear about it.  We're gonna hear about it in this

9  Court if it happens, and we're gonna hear about in it the

10  negotiations.

11     Why should the Debtor take that risk?  That's the whole

12  purpose of the proceedings that were initiated at the outset of

13  the case was to avoid precisely that kind of circumstance.

14            THE COURT:  But the criminal cases are going forward

15  anyway.  This Court can't stop the criminal cases.  So there's

16  going to be record taint --

17            MR. BERNICK:  I --

18            THE COURT:  -- if the State of Montana is involved in

19  it.

20            MR. BERNICK:  No, not -- just the other way around,

21  I'm sorry, Your Honor.  The record taint is the taint that will

22  be prompted by the State of Montana.

23            THE COURT:  Yes --

24            MR. BERNICK:  Seeking to muck around with the same

25  issues, thereby affecting both the bankruptcy and potentially

1  the criminal case.  It was the --

2            THE COURT:  Aren't they -- isn't the State the

3  prosecutor in the criminal case?

4            MR. BERNICK:  No.  The State's not the prosecutor.

5  It's the U.S. Department of Justice is the prosecutor.

6            THE COURT:  Oh, it's a Federal case.

7            MR. BERNICK:  It's a Federal case.  It's a Federal

8  case that implicates the scientific questions of whether there

9  really was a problem and is a problem with the people of Libby,

10  Montana.  Not the people that worked in the mine, but the

11  people that worked in the town and didn't have mine related

12  exposures.  So they're gonna be crawling over exactly the same

13  facts, exactly the same people, and we have no ability to

14  control it, and to what end?  So that the same Plaintiffs that

15  tried to go after Grace, tried to go after Maryland Casualty,

16  tried to go after Burlington Northern finally get their way

17  with the State of Montana.  Again, Grace has no flag to carry

18  for the State of Montana, to say nothing of Burlington

19  Northern.  But we do have a flag to carry for purposes of

20  preserving our record so that we don't deal with a tainted

21  record.  Just --

22            THE COURT:  Okay.

23            MR. BERNICK:  -- like the Court in Robbins and

24  Manville.

25            THE COURT:  Well, then, you know, at what point is

1    Grace going to decide that the rest of the world isn't going to

2    be covered by this injunction?  I mean, we're five years into

3    this case.  You know, you would think by now the Debtor would

4    know that parties A, B and C are likely to be sued if Grace is

5    not going to be sued, or because Grace can't be sued, or

6    whatever, and try to expand this injunction to cover everyone.

7    I mean, what does it take?  If it takes another two years to

8    get the case out next year am I going to have another Motion to

9    Expand the Injunction?  They add another party because --

10           MR. BERNICK:  No, no, no -- I'm sorry, Your Honor.

11   First of all, the only area where we've really had any issue

12   since 2001 --

13           THE COURT:  Is with Libby, yes, I know.

14           MR. BERNICK:  -- is Libby.  At nowhere else that we

15   really had an issue.  There was an issue that got raised by

16   Scotts and that kind of went nowhere.

17           THE COURT:  I know, but my question is how many other

18   parties has Grace dealt with --

19           MR. BERNICK:  At Libby?

20           THE COURT:  -- at Libby?  Because apparently they're

21   going to be the next 150 or however many targets.  So is Grace

22   going to be in here next month saying expand this injunction to

23   include A, B, C?

24           MR. BERNICK:  There's only one reason that we would

25   be and that is if the Plaintiffs in the State of Montana case

1   -- in the Libby case continue to look around for other people

2   to sue by reason of what are essentially claims against Grace.

3   Your Honor looks at us -- Your Honor couldn't have been

4   clearer.  We have had this argument for years.  And we've been

5   through this repeatedly.  And the only reason that we're here

6   is that of all of the Plaintiffs in the entire United States

7   over 100,000 Plaintiffs, the only ones -- and I don't mean to

8   prompt of course Mr. Lockwood to take up the couch on behalf of

9   his constituency, but the only ones who are in here trying to

10  get around what is being -- what is the obvious intendment of

11  the orders that Your Honor has issued are the Montana

12  Plaintiffs.  They are the only ones.

13      And the same principal that we applied for Maryland

14  Casualty, for -- what was it?  Montana Vermiculite Company was

15  another one.  And now we're here for these two.  It's the same

16  principal.  So why -- especially in the case of a 3rd Circuit

17  decision that disposed of this thing we thought once and for

18  all are we still doing it?  The answer to your question is very

19  simple, Your Honor.  We will be back here when it appears, as

20  it is happening here, that folks are trying to litigate what is

21  essentially a claim against the Debtor for the same people that

22  ought to be handled in the context of a plan of reorganization.

23  We will be happy to have Burlington Northern, State of Montana,

24  all those guys in a plan of reorganization tipping something

25  into the pot.  We don't have any problem with that.  But indeed

1   from that point of view it is better to have the injunction

2   issue so the people aren't exploring their opportunities

3   against these same people in the tort system.  It's the whole

4   reason we're here is to avoid having that.

5       Now, Your Honor, God knows we have heard, Your Honor, that

6   we're supposed to resolve the case.  And those efforts, I can

7   assure you, have not stopped, and the dialogue has not stopped.

8   And we are making every effort that we can.  But as counsel

9   pointed out last time, things tend to happen when you're facing

10  a trial.  So we're now getting resolutions of property.  We

11  hope to get a resolution of PI.

12      But one thing is for very sure, that if this litigation

13  goes forward by the Montana Plaintiffs against the State of

14  Montana, or against Burlington Northern, what is gonna be the

15  pressure on the Montana Claimants to be part of a plan?

16  They're gonna wonder, well, why should we agree?  We're already

17  getting some money elsewhere.  Why should we be part of the

18  plan at all?  We're not getting paid enough.  And this, that

19  and the other.  They'll be able to use it as leverage in the

20  context in the negotiations.

21          THE COURT:  Well, but, Mr. Bernick, you know, the

22  entire world unfortunately doesn't center around Grace.  There

23  are other claims that people are going to prosecute that really

24  don't --

25          MR. BERNICK:  Yeah, in Libby, Montana, Your Honor --

1  in Libby, Montana there is about nobody else that anybody talks

2  about but Grace.  Libby is all -- you read the newspapers you

3  don't read about Burlington Northern did this, that or the

4  other.  The State of Montana -- you read about them, you are

5  Grace, Grace, Grace, Grace, Grace.  So everybody knows that.

6  Your Honor, again, I feel like I'm fighting for something that

7  looks like, you know, we're trying to do a favor to somebody.

8            THE COURT:  No.

9            MR. BERNICK:  We're trying to protect ourselves.  We

10  think that that's what the law requires.  We think that's what

11  Your Honor does -- has done before.  But look, if Your Honor

12  believes that it's appropriate for the case to go forward

13  against the State of Montana because it really is that narrow,

14  maybe there's something for Your Honor to do.  I don't see it

15  because I see so many overlaps, particularly on the science.

16            THE COURT:  Well, I am concerned about the overlaps

17  on the science.  I am concerned about the possibility of record

18  taint.  I am particularly concerned about the end run around

19  the automatic stay.  I pointed that out in this opinion.  It

20  seems to be --

21            MR. BERNICK:  Yes.

22            THE COURT:  -- a never-ending process with the

23  Montana Plaintiffs.  And I do agree with that.  The difficulty

24  I have is a ruling by a Montana Court that says there is an

25  independent duty.  And it seems to me that that independent

1  duty seems to exist regardless of what findings are there with

2  respect to Grace.

3       Now, you know, the State seem to say that if in the event

4  that it's found liability it's going to have some claim over

5  against Grace.  I mean, those are nice words.  I'm not really

6  sure how that's going to play out.  I just -- conceptually I'm

7  having some difficulty with that.

8            MR. BERNICK:  But what -- I mean, again, I don't want

9  -- I never like the process of trying to negotiate fine lines,

10  but what our concern is is that the litigation goes forward in

11  a way that is not simply focused on the State's conduct as the

12  State.  But is focused on the events that concern Grace, and in

13  particular the impact of those events on people and their

14  medical conditions.  And --

15            THE COURT:  Yes, and maybe it will.  Let's just play

16  that scenario out --

17            MR. BERNICK:  Right.

18            THE COURT:  -- for hypothetically for my benefit.

19            MR. BERNICK:  Sure.

20            THE COURT:  So that perhaps I can see where you're

21  going with the prejudice issue.

22            MR. BERNICK:  Sure.

23            THE COURT:  All right, let's say that's exactly what

24  the evidence is, that the State essentially is not mentioned

25  except for the fact that it has inspectors on sight, it found

1   out about all this terrible bad conduct and it didn't do

2   anything about it.  And but for that all the evidence is about

3   how terrible Grace is and all the bad things it did and how it

4   poisoned people and how they get sick and they died, et cetera,

5   et cetera.

6           MR. BERNICK:  Right.

7           THE COURT:  Okay.  So now you've got the evidence on

8   this record.  Grace isn't there.  Grace has not had a chance to

9   defend.  I believe under the State Court law there cannot be a

10  collateral consequence to Grace under the Montana cases that

11  were cited in my opinion.  There cannot be a judgment entered

12  against Grace.  There cannot be a comparative negligence, if

13  that were to be the standard issued against Grace because it's

14  not there as a Defendant in the case.  So how is there going to

15  be record taint?  Because in your view the witnesses will have

16  testified, and once they're pinned down their testimony will

17  not essentially be changed, and Grace can't do anything about

18  it because it wasn't there at the outset?

19          MR. BERNICK:  Countless ways.  First of all, Your

20  Honor doesn't have control over the -- {excuse me, could you

21  keep it down to just a dull roar?  Thank you.}

22      The -- Your Honor doesn't control the collateral affect

23  because we don't know when somebody's gonna argue collateral

24  estoppel and where they're gonna argue it.  That's #1.  Number

25  2, setting aside the medical situation, if you just talk about

1  liability evidence, we all know how in a connection with any

2  case that involves liability, and particularly where you're

3  talking about historical witnesses, what they say depends in

4  part on who's asking the question and how they're asking the

5  question.  And a good lawyer will make sure that the record

6  best suits his purposes.

7      So that for example we have the State of Montana, who in

8  defending itself wants to point the finger at Grace.  And you

9  have a third party witness, not under Grace's control, not even

10  in Montana necessarily, who gives a deposition that totally

11  trashes Grace.  There's nobody to object to the questions if

12  they're improper as to Grace, including foundation as well as

13  leading questions.  There's no cross examination opportunity.

14  The record is what it is.  And you've got to argue that some

15  Judge some place that the record really isn't usable against

16  Grace.  And then he says, "Well, I'll tell you what.  Why don't

17  you go out an redepose that witness?  You go redepose the

18  witness and say, "You see what you said there?"  "Yeah, I see

19  it."  You say, " Well, but you didn't say this and you didn't

20  say" -- it's a completely different equation from being there

21  at the time and participating.  And that's why it is so

22  difficult to avoid being drawn in.

23      So the depositions take place.  The record evidence is put

24  in.  And the onus goes to Grace to somehow unwind an already

25  existing record.  And I've -- I know most trial lawyers -- I've

1  been through that precise process.

2       With respect to the medical side it's then even worse,

3  because on the medical side we'll have the same type of problem

4  develop.  We'll also have arguments that these experts and

5  witnesses that have testified on behalf of the Claimants have

6  been deposed numerous times, why should Grace get another

7  opportunity to depose these people?  Their depositions will in

8  fact be proffered, potentially in connection with the criminal

9  proceeding, but elsewhere as well.  And again, it's the same

10  basic problem.

11       And then what about the data?  I mean, how does the data

12  get -- there are data bases of information that are implicated

13  in the medical side of that case.  ATSDR's deposition is taken.

14  Remember the ATSDR study?  Well, what's said about the ATSDR

15  study?  Well, I don't necessarily want to rely upon the State

16  of Montana or upon the Plaintiffs to do the right examination

17  of ATSDR.  I -- these are all countless -- and that is exactly

18  why what Judge Merhige said in AH Robbins and the 4th Circuit

19  reiterated.  He says, "Look, it's just inevitable.  Once the

20  bell is rung it's very difficult to unring that bell."  This is

21  reality talking here.  It's record taint.  It is all the

22  problems that are associated with it.

23       Now again, if you could isolate an issue of was the State

24  of Montana -- did the State of Montana fail to act on its own?

25  And it's all focused on the State of Montana, and there's no

1  issue -- there's no evidence that's taken as to Grace, well,

2  you know, maybe we don't care.  Because the State of Montana

3  did whatever it did.  But as soon as they go over the line and

4  start taking about Grace, or talking about the medical

5  conditions, that's what we're concerned about.

6      Again, Your Honor, I know that we've got so many things to

7  do this afternoon.  Your Honor's very familiar with these

8  issues and with the Gerard case.  We believe that Gerard

9  clearly is the governing law, and we believe that it eliminates

10 subject matter jurisdiction as on issue.  The only real

11 question really is the questions I think Your Honor asked,

12 which go to the question of, well, if I've got the power what

13 do I do with it?  And all that I would stress from the Debtor's

14 point of view is that if anything goes forward against the

15 State of Montana, a) Grace not be drawn into it, and b) it not

16 implicate Grace's interests.  Thank you.

17          THE COURT:  Mr. Monaco.

18          MR. MONACO:  Good afternoon, Your Honor.  Frank

19 Monaco for the State of Montana.  Your Honor, it may make sense

20 for me to follow up on Mr. Bernick's comments.  And I'm happy

21 to go directly to the issues that were discussed that are

22 peculiar to Montana.  I do adopt the statements that

23 Mr. Bernick made with respect to Gerard and that Federal Mogul

24 and Pacor are distinguishable.  I also believe that the

25 Combustion Engineering case does not overrule -- and is not

1  necessarily inconsistent with the Gerard case.  In fact, the

2  Combustion Engineering case seemed to turn on whether the

3  liability was nonderivative versus derivative.  It dealt with

4  nonderivative.  In this situation we have alleged, to the

5  extent that we are liable, our liability is derivative of

6  Grace.  Grace concedes that no other party in this Courtroom

7  has seriously challenged that, if they challenged at all.  So I

8  think that -- that's were the --

9          THE COURT:  How can you have derivative liability

10 when your own State Courts have said that you have an

11 independent duty?

12         MR. MONACO:  Well, Your Honor --

13         THE COURT:  The words independent duty and derivative

14 liability are somewhat inconsistent.

15         MR. MONACO:  Well, Your Honor, we're saying that it

16 was Grace that failed to provide the safe work environment.

17 That they intentionally hid this from not only the Libby

18 Claimants but the State.

19         THE COURT:  Wait a minute, you want --

20         MR. MONACO:  That's our theory.  And maybe I need to

21 get right into the collateral stop -- record taint issues --

22         THE COURT:  Okay.

23         MR. MONACO:  -- that Mr. Bernick was alluded to.

24 Because I think I can put some more meat on those bones.  And I

25 will say this as a preliminary matter.  The State of Montana

1  law with respect to joint and several liability and

2  apportionment, it's in a state of flux, and it's very

3  complicated.  And Your Honor made certain statements in your

4  opinion which I think influenced the conclusion that you

5  arrived at.

6          THE COURT:  Yes.

7          MR. MONACO:  Now with all due respect, Your Honor, I

8  think that that statement regarding the prohibition of

9  apportion liability is not -- if not correct is certainly

10 incomplete.  And what I would like to do is address that

11 statement, as well as the Committee's objection, which went on

12 for several pages about that point.  Just bear with me one

13 second, Your Honor.

14      Your Honor, regardless of whether this Court denies either

15 this Motion for Reconsideration that Montana and the Debtor

16 have filed with respect to the preliminary injunction, or you

17 deny Montana's Motion for Reconsideration of the denial of the

18 Motion for Relief From Automatic Stay, we do intend to refile a

19 motion and seek a determination that under the Frenville case

20 we do not need relief from automatic stay.  Or maybe put a

21 better way, the automatic stay is not implicated.  I believe

22 Your Honor is probably familiar with the Frenville case.  It

23 was a case, I think, that is controlling in almost on all

24 fours.  You had a State Court action where the Defendant sought

25 to bring the Debtor in on a contribution indemnification

1  theory.  And the Court held that that -- the 3rd Circuit held

2  that that contribution indemnification claim arose post

3  petition, and therefore the automatic stay was not implicated.

4  It was a common-law right of contribution indemnification, as

5  opposed to contractual.  That is the exact same situation as we

6  have here.  So we're gonna be coming in this week with another

7  motion that's gonna assert that the Frenville case is

8  controlling and that we -- the automatic stay is not

9  implicated.

10      The other thing that Your Honor needs to know about

11  Montana law, and we cited the Falcon Bridge case in our papers,

12  the Falcon Bridge case permitted a party to the action to

13  assert as a superseding and intervening cause the conduct of a

14  nonparty as a defense.  That doesn't involve an apportionment.

15  And that's something else we think we could do that's gonna

16  create collateral estoppel or -- not collateral estoppel,

17  certainly record taint.

18          THE COURT:  Yes, that's the case that causes me some

19  concern with respect to the record taint.

20          MR. MONACO:  So I think it is clear under Montana law

21  that we have the right to assert the defense that Grace's

22  conduct is a superseding intervening cause of the Libby

23  Claimant's damages.  So that's sort of the second potential

24  problem with allowing the State Court actions to go forth.

25          THE COURT:  But you have to prove liability first,

1  don't you?  I mean, you have to join -- in order -- the problem

2  I think with that case is that first you have to show that

3  you're liable.  You haven't even -- there hasn't even been an

4  establishment yet that the State has breached some duty.  And

5  you can, I guess, bring up these issues about some intervening

6  cause, but with respect to Grace I am not lifting the stay with

7  respect to Grace, or Grace's products, or Grace's conduct.  And

8  I think I made that clear.  I'll deal with the <u>Frenville</u> issue

9  when I get whatever papers, you know, you file with respect to

10 the <u>Frenville</u>.  I'll wait and see what that has.  But the state

11 of the record right now is I'm not permitting Grace, or Grace's

12 products, to be tried in absentia.  I'm not permitting that.

13 So --

14         MR. MONACO:  Well, Your Honor, that's the subject of

15 my other motion, and I'm happy to argue that later.  I think

16 there's some serious procedural issues with Your Honor taking

17 that tact, but with all due respect, but I'm happy to argue

18 that later.  I wasn't prepared at this moment --

19         THE COURT:  Okay.

20         MR. MONACO:  -- to deal with that.  I wanted to

21 address the Court's issues regarding record taint and

22 collateral estoppel.

23     Your Honor, the third aspect of this that -- Your Honor

24 relied on the <u>Plum</u> decision.  Well, what Your Honor needs to

25 understand is the <u>Plum</u> decision overruled the 1987 predecessor

1  to the statute which you cited in your opinion, which was

2  amended in 1995.  It does not deal with the 1997 statute which

3  applies to all actions filed in Montana after April 18th, 1997,

4  which would include all the Libby Claimant's actions.  So there

5  is no --

6           THE COURT:  But -- I'm sorry, say that again for me.

7           MR. MONACO:  Your Honor cited the Plum decision --

8           THE COURT:  Right.

9           MR. MONACO:  -- for the proposition that we are

10 prohibited from apportioning blame --

11          THE COURT:  Right.

12          MR. MONACO:  -- to Grace based on the statute.  Well

13 the statute that the Plum Court addressed was not the 1997

14 statute that Your Honor cited but rather its predecessor.

15          THE COURT:  Okay.

16          MR. MONACO:  A 1987 statute that was amended in 1995.

17          THE COURT:  All right.

18          MR. MONACO:  Since then there's a new statute that

19 was enacted 1997 that applies to all actions filed in Montana

20 after April 18th, 1997, which would include all the Libby

21 Claimant's actions.  So the Plum decision really is not

22 applicable.  It cannot interpret the current version.  Does

23 Your Honor have a copy -- I have extra copies here --

24          THE COURT:  No.

25          MR. MONACO:  I'm happy to hand it up --

1            THE COURT:  All right.

2            MR. MONACO:  -- and we can go through it.  Because

3    this is also very important.  If I could approach the Bench.

4    And I have extra copies for anybody else in the Courtroom that

5    would like to see it.

6        (Pause in proceedings)

7            MR. MONACO:  If I could approach, Your Honor?

8            THE COURT:  Please.  Thank you.

9        (Pause in proceedings)

10           MR. MONACO:  Your Honor, what I've just handed you is

11   the 1997 Montana statute deals with joint and several

12   liability, and apportioning blame amongst parties.

13   Subparagraph (a) -- and I point Your Honor's attention to

14   27-1-703 parens. (6), which deals with parties to an action

15   where there's joint and several liability.

16       A close reading of the statute indicates that (6)(a)

17   addresses comparison of fault with parties that have settled or

18   been released from liability.  (6)(b) addresses comparison of

19   fault with parties to the action.  And (6)(c) relates to the

20   comparison of fault with nonsettling persons and nonparties.

21       So it is Montana's position that if you read (6)(a), (b)

22   and (c) together Grace is not a settling party, it hasn't been

23   released, it's not immune from liability of the Claimants, the

24   Claimants can sue Grace in this Court, they can sue them in

25   Montana Court.  It is subject to -- Grace is subject to Montana

1  Courts, but as a result of the automatic stay these lawsuits

2  have been stayed.

3      And finally, it is a person that cannot be named as a

4  Defendant as a result of the automatic stay.  So when you read

5  these -- read the statute, (6) subsections (a), (b) and (c)

6  together it is our position that we are under this statute able

7  to apportion blame to Montana.

8      Now reasonable minds may differ on this.  But again, the

9  touchstone is prospect of indemnification, and indemnity

10 interest is set forth in the American Film Technology case.  So

11 I think you've got the Frenville joinder issue.  You've got the

12 superseding intervening cause.  And now you have this

13 apportionment under the new statute which has never been

14 interpreted, as far as we know, and under -- it is our position

15 that we can apportion blame.

16     So I wanted the record to be clear in terms of what the

17 current state of Montana law is on this subject.  It's very

18 complicated, it's evolving, and to sort of further

19 Mr. Bernick's comments, we think there's gonna be an empty

20 chair defense as a practical and legal matter that's gonna

21 implicate Grace.  Based on all these different theories.  So I

22 want Your Honor to understand that.  Where we're coming from.

23 And we're gonna be back in here -- I don't mean this as a

24 threat, Your Honor.  We're gonna be back in here next month or

25 the following month to determine these issues as whether the

1    automatic stay applies.  And I think it's very clear under the

2    _Frenville_ case that we are entitled to assert these three

3    different cause of action or defenses.  Thank you, Your Honor.

4            THE COURT:  Okay.

5            MR. LOCKWOOD:  Your Honor, I don't know which order

6    to proceed because of the manifold and somewhat machine gunfire

7    variety of statements that have been made in support of this

8    injunction and against your prior opinion in this case.  But I

9    guess the one thing -- one place to start, because it seems to

10    be the one that we've heard most about here today, and we've

11    heard -- and Your Honor has exhibited some receptiveness to the

12    idea which is this concept of record taint.

13        First, other than collateral estoppel, neither Grace nor

14    Montana has ever articulated what record taint is supposed to

15    mean in terms of them being able to explain why they should

16    have some legal right to prevent it from happening.

17    Mr. Bernick has taken it to, I think, a telling extreme.

18    Mr. Bernick says, "Gee, these Libby Claimants, if they sued

19    Montana or Burlington Northern might be able to prove that they

20    actually had a disease.  And the disease was caused by exposure

21    to the vermiculite manufactured by Grace."  "And," says

22    Mr. Bernick, "that is supposedly unique to the Libby

23    Claimants."  Well I've got news for Mr. Bernick, but it's not

24    news because he knows it already, there's thousands of people

25    all over the United States that claim that they have asbestos

1  related diseases arising from Grace's vermiculite.

2      Secondly, those thousands, if not tens of thousands of

3  people are suing all kinds of Defendants.  Not just Montana.

4  Not just BNSF.  Because they were exposed both to the

5  vermiculite and they were exposed to other Defendant's

6  products.  And in each and every one of those cases the other

7  Defendants are gonna want to raise the empty chair defense that

8  Mr. Monaco just referred to and that Mr. Bernick just referred

9  to.

10     So effectively what we've got here is a situation in

11 which, #1, the Debtor basically has taken a subset of the

12 asbestos Claimants in this case, those residing in Libby,

13 Montana, and said they shouldn't be able to sue anybody if

14 they're gonna talk about they got sick from Grace asbestos.

15 And with all due respect to the citations to AH Robbins and

16 Johns Manville and Gerard and all that, nobody outside of this

17 Courtroom has ever suggested that a Bankruptcy Court have the

18 power to enjoin suits by Plaintiffs against other Defendants on

19 the theory that some other Court in that suit might decide, a)

20 they got sick, and b) that notwithstanding that they can't

21 enter a judgment against Grace, that notwithstanding that

22 anything they said about Grace would not be collateral

23 estoppel, that notwithstanding that anything they said about

24 Grace would even be admissible into evidence in a dispute that

25 somehow or another they can enjoin that because some witness in

1   the case might testify adversely to Grace's interests that

2   vermiculite is dangerous, let's say.  And while that testimony

3   wouldn't be admissible against Grace because Grace wasn't there

4   to cross examine and therefore it's inadmissible, that party

5   could then be deposed in the Grace, I guess, estimation case,

6   which must be what this is all about, because that's the only

7   litigation that Grace ever contemplates again occurring on this

8   topic.  And that in the estimation case that hypothetical

9   witness might be asked the same questions.  And if the

10  hypothetical witness wanted to give different answers somebody

11  could use that deposition testimony to impeach the changed

12  testimony.  And in order to avoid that {quote} "record taint"

13  these -- Grace should be able to come in here and prevent those

14  -- that litigation from ever happening.

15      I mean, Grace's arguments in this case give the term

16  control freak new meaning.  I mean, essentially what we've got

17  here is a situation in which the Debtor wants to make sure that

18  it can come into this Court and ask for 105 protection against

19  anything happening in any Courtroom in the United States, that

20  somebody might be able to say to you, Judge Fitzgerald, in the

21  course of an estimation proceeding, gee, maybe you ought to

22  think about this because some other Court came up with a result

23  that's different from the one that Grace is urging upon you.

24  Notwithstanding the fact that you wouldn't be bound by it, and

25  indeed it might not even be admissible into evidence.

1    That's almost outrageous, and the notion that somehow this

2  is just some sort of limited thing as I said, I mean, we've got

3  first the Libby Claimants can't prove they have diseases.

4  Secondly, they can't prove that vermiculite is dangerous.  Why

5  limit it to the Libby Claimants?  As I said earlier, lots of

6  people want to prove vermiculite is dangerous.  Better yet, why

7  allow people to prove that asbestos is dangerous?  Vermiculite

8  is supposed to have asbestos in it.  If somebody decides that

9  tremolite in another case is a dangerous product, well, I mean,

10  that's gonna affect Mr. Bernick's argument potentially that

11  maybe tremolite isn't so dangerous.  Or some witness will

12  testify about it.

13    In all of the co-Defendant cases in which Grace is absent

14  there's other issues which we haven't even talked about.  Grace

15  is in -- for example in the estimation case raised the issue

16  that chrysotile cannot cause mesothelioma.  You may have --

17  remember that.  Believe me, that issue is being litigated all

18  over the United States.  By people who also happen to have

19  claims against Grace that are stayed by this bankruptcy.  And

20  you can bet your bippy, Your Honor, that if they win a case in

21  some Court somewhere else then they get some ruling that says

22  chrysotile does in fact cause mesothelioma they might try and

23  cite it to Your Honor and Your Honor will give it whatever

24  weight Your Honor decides it's entitled to.  Which certainly

25  won't be collateral estoppel, but might be, I don't know, some

1  sort of precedential or something.  But how do you possibly

2  draw the line here?  Given the breathtaking scope of what Grace

3  is seeking to accomplish.  I mean, there's dozens of issues in

4  the Grace estimation about asbestos, and disease and the test

5  scored.  I mean, do we shut down all cases where the issue of

6  can you have lung cancer without asbestosis is being litigated?

7  Because that could create adverse precedent against Grace.  All

8  those issues are being litigated.  Day in, day out.

9       The second part I want to bring is with respect to the

10  Gerard case.  The -- this isn't Maryland Casualty, and

11  therefore this isn't the law of the case.  What Mr. Bernick is

12  attempting to do by citing various selected portions of the

13  Gerard decision, which Your Honor presumably read already in

14  connection with the opinion that you already wrote on this, is

15  to in affect say that the 3rd Circuit has laid down some

16  general rules of law on the subject of jurisdiction and the

17  test for 105 injunction, which this Court is a) bound by, and

18  b) improperly overlooked in the decision that you wrote

19  earlier.

20       Well, if that's what the 3rd Circuit was doing why did

21  they label this case not precedential?  They did that because

22  this was a case in a very unique posture, which Your Honor

23  already noted.  Which is the appeal that went to Judge Wolin

24  and then went to the 3rd Circuit was an appeal from Your

25  Honor's refusal to reconsider an order that Your Honor had

1  already entered.  And what the 3rd Circuit said when it sort of

2  flipped off the jurisdictional issue was, of course, if you've

3  already issued a Section 105 injunction you have jurisdiction

4  to reconsider whether you made a mistake.  That doesn't prove

5  that the 3rd Circuit said on the facts of the sort of record

6  that we have here that you should issue an injunction as a

7  matter of first impression.  And Mr. Bernick conceded in his

8  oral argument that there was one significant difference here.

9  And that difference was the burden of proof.  The 3rd Circuit

10 said that the burden of proof in Gerard was on the Plaintiffs

11 to show that you had erred in exercising what the Court

12 considered was a discretionary power to decline to revisit your

13 prior decision on this subject.

14     This time around they're asking for an injunction.  These

15 cases are not covered by your original injunction because

16 they're neither an insurance company nor an affiliate.  And

17 those were the categories, general categories of things that

18 you could argue, as it was the case with Maryland Casualty that

19 the original injunction, not merely any extension of it, but

20 the original injunction already enjoined the claims against

21 Maryland Casualty.

22     Here we've got new categories of entities.  A state and a

23 railroad.  And so the question then is, has Grace sustained a

24 burden of proof?  I've heard a lot of talk from Mr. Bernick and

25 Mr. Monaco, and I've read a lot of papers from them, but I have

1  yet to see one shred of admissible evidence adduced on any of

2  these topics that we hear so such about where we talk about the

3  test being could interfere with the reorganization of the

4  Debtor as is up here.

5      I don't see how anybody bringing a legitimate case under

6  State law against a nonaffiliate, nonagent, Maryland Casualty

7  you said was an agent, the AH Robbins case and the Manville

8  case were officers and directors of the Debtors were agents.

9  These are just entities with whom Grace did business and/or had

10 supervisory Governmental obligations to Grace.  They -- there's

11 no agency relationship.  There's no way in which anything they

12 did or said, et cetera, could be attributed to Grace.

13     And so I ask if there's a burden of proof don't you have

14 to have proof?  And where's the proof?  I mean, I'm kind of

15 reminded of, "Where's the beef?"  I mean, there's no -- there's

16 not a declaration, there's no -- the only thing resembling any

17 documents that might comprise evidence that we've seen here is

18 in the Burlington Northern case where there's been some

19 contracts introduced.

20     If you look at the Debtor's papers you'll notice that in

21 one -- early in there in one of them they characterize the

22 indemnity contracts with Burlington Northern as being contracts

23 arising out of the construction of the loading dock and the

24 tracks, and the this, that and the other thing.  And that's

25 where all the contracts are.  Later on in the very same brief

1  they talk about the gravamen of the claims against Burlington

2  Northern as having been the operation of the railroad, when the

3  cars got loaded and transported through town, and there were no

4  warnings and there was a lot of dust, et cetera.  Putting aside

5  whether or not the Libby Claimants can ever establish an actual

6  claim against Burlington Northern based on that, the one thing

7  you can say is that there's nothing in any contract that Grace

8  has put into evidence, or I'm not -- they haven't actually put

9  it into evidence, but they've attached it to a paper, there's

10  nothing in any of those contacts that suggests that the

11  indemnification provisions in those apply to the claims being

12  asserted against Burlington Northern by the Libby Claimants.

13      And more over, to add insult to injury, Grace specifically

14  denies that it has any indemnity liability here.  So that gets

15  us back to this whole issue of sort of is what the 3rd Circuit

16  has said about 105 being a jurisdiction or a power?

17  Mr. Bernick has posited that there's two different notions

18  here.  You have jurisdiction -- subject matter jurisdiction,

19  and then you have the question of whether you have the power.

20  Well, we start from the premise that Section 105 is in the

21  Bankruptcy Code and therefore in some sense the Court has

22  jurisdiction to entertain 105 Motions.  I guess nobody would

23  really dispute that.

24      On the other hand, Combustion Engineering said in

25  rejecting the application of a 105 injunction to Basic and

1  Lummus that the Court lacked related to jurisdiction to enjoin

2  those cases.  It didn't say the Court lacked power under 105.

3  It said it lacked related to jurisdiction.  And that was a

4  motion in a plan supported by the Debtor.  I mean, Basic and

5  Lummus didn't wander into the Courtroom out of nowhere and as

6  the Big Three auto companies did in the <u>Federal Mogul</u> case and

7  say we want to interfere with or otherwise participate in your

8  bankruptcy.  ABB, the parent of CE, Basic and Lummus, got CE to

9  propose a plan in which ABB, Basic and Lummus were all joined

10 in and they were all asking for that injunction.

11      So I grant you there may be some interesting sort of

12 metaphysical questions about whether or not a 105 -- everybody

13 agrees, including Mr. Bernick, that 105 is not itself a

14 substantive provision of the Bankruptcy Code.  It's the

15 equivalent of the All Writs Act for bankruptcy purposes.  And

16 the All Writs Act is -- and this are basically remedial type

17 things.  It says if certain things are done then the Bankruptcy

18 Court has the ability to issue certain protective measures.

19      But at the end of the day the Court has to satisfy itself

20 that whatever it's being asked to do under 105 is something

21 that it has -- whether you want to call it jurisdiction to do

22 or power to do, it's the same inquiry at the end of the day.

23 And having a semantic debate about it I'm not sure is

24 particularly useful, given the fact that the 3rd Circuit, which

25 is the Court of Appeals, unlike the 4th and the 6th, that is

1   controlling here, has characterized in a precedential decision

2   the issue of 105 injunction issuance as being jurisdictional.

3   And the notion that somehow or another it's jurisdictional if

4   it's a permanent injunction, but it's not jurisdictional if

5   it's a temporary injunction, particularly a temporary

6   injunction that goes on for years, and years and years.  I

7   suggest to you -- they can't cite any case law that says that

8   the subject matter jurisdiction under 105 changes if it's a

9   permanent injunction or a temporary injunction.

10      That said, 105 clearly empowers this Court to protect the

11   property of the Estate.  But it's been demonstrated, I think,

12   and really not seriously argued by Grace because they've

13   disputed the existence of the indemnity and the validity and

14   timeliness of any claims by either Montana or Burlington

15   Northern.  It's clear there's no automatic indemnity.  So it's

16   clear there's not this [quote}, "Identity aventuris."  It's

17   clear that the type of indemnity that may or may not exist here

18   is no different from the contribution claims that you get from

19   co-Defendants in a tort system.  I mean, whether you call it

20   indemnity or contribution that's just a question you get 100%

21   or 50%, or something like that.  At the end what the 3rd

22   Circuit has decided is if it's not an automatic indemnity you

23   don't have jurisdiction.

24      And as for the point about Judge Wolin having relied on

25   the settlement agreement and -- reversed by the 3rd Circuit,

1  what the 3rd Circuit said about that in footnote 2 of the

2  provision was, "We note that the Bankruptcy Court analysis of

3  related to jurisdiction engaged in a review and assessment of

4  the indemnity provisions of the settlement agreement.  It did

5  this to refute the claims of MSCC that any recovery against it

6  would become a liability of Grace pursuant to the agreed

7  indemnity.  However, the Bankruptcy Court did not rule on this

8  issue, and it's apparent that the District Court's analysis and

9  its conclusion were outside the scope of the issues presented

10  to the District Court on appeal," i.e., the District Court

11  didn't have any ability, power, jurisdiction, whatever, to

12  agree or disagree with whatever this Court might have done on

13  that subject.

14      So we've got a situation here where your view in Maryland

15  Casualty was that this agency relationship and the indemnity

16  right was a material factor that caused you to extend the

17  injunction to Maryland Casualty, in contrast to a situation

18  where we've got no absolute indemnity, no agency relationship,

19  and to the extent that we have any indemnity rights at all

20  being asserted they're being disputed, and as for the notion

21  that there may be some shared insurance lurking around here,

22  there's really -- certainly the State of Montana doesn't claim

23  to have any shared insurance.  And as for Burlington Northern,

24  the Debtor disputes that there's any shared insurance.  The

25  insurers -- the only people that are suggesting that there may

1  be some shared insurance are the insurers, who

2  opportunistically would like to create a little smoke.  But so

3  far again, keeping in mind who's got the burden of proof here,

4  other than lawyer talk and lawyer writing there's not a shred

5  of evidence introduced into this record that there's one shared

6  insurance policy at issue here.

7        So we would suggest, Your Honor, that both of these

8  motions have -- should fail, if for no other reason than

9  failure of proof, that they go -- the concepts behind them go

10  way beyond anything that this Court could properly do by way of

11  injunctive relief in a bankruptcy case.  And that therefore

12  Your Honor's original decision in the Montana case to ignore

13  Gerard was correct.  And the result Your Honor reached in that

14  case is not only correct as to Montana, but is also correct

15  under Burlington Northern as to which there's no meaningful

16  distinction between the two.  Thank you.

17        MR. BERNICK:  Your Honor, as a process point, this is

18  David Bernick for Grace.  I now see that Mr. Cohn is standing

19  up, apparently to articulate the position that the Montana

20  Plaintiffs, having heard Mr. Lockwood now articulate the

21  position for the Montana Plaintiffs for a half an hour, I know

22  Your Honor's gonna hear from everybody --

23        THE COURT:  Yes, I am.

24        MR. BERNICK:  -- but the question really is a process

25  question.  We're now into an hour and a half.  We've got lots

1  of other things.  I know Your Honor warned about this before,

2  but the fact of the matter is that we cannot control the time

3  that gets spent on these matters.  And right now we're really

4  only on the very first matter.

5       THE COURT:  And we're going to finish this first

6  matter because we've put it off three times.  So however long

7  it takes today, we're going to get through this and we're going

8  to stay until we're done.  So --

9       MR. BERNICK:  Are we gonna -- that will include all

10  the other items on the agenda?

11      THE COURT:  If we have to go out to dinner and come

12  back --

13      MR. BERNICK:  Great.

14      THE COURT:  -- that's what we're going to do.

15      MR. BERNICK:  That's fine with me.

16      THE COURT:  Mr. Cohn?

17      MR. COHN:  Thank you, Your Honor.  I want to start

18  off by adopting the arguments that were made by the Committee

19  counsel, and I will endeavor not to repeat them, because I am

20  sensitive to the fact that we shouldn't spend any more time

21  than is necessary on this.  Although it's obviously a very

22  important matter for the Montana Plaintiffs.

23      And one point that I'm -- that I do need to emphasize that

24  Mr. Lockwood just made, has to do with the state of the record,

25  Your Honor.  We sought discovery as to evidentiary matters.

1  That discovery was turned down by this Court.  We interpreted

2  that Order to say that you wanted to proceed first to consider

3  the legal arguments, and only then turn to the issue of, okay,

4  are there any evidentiary issues that are now going to be

5  determinative?  We had no particular problem with that

6  procedure, Your Honor, but I did want to make clear on the

7  record that before an injunction could issue we do insist, we

8  do not waive our right to a full evidentiary hearing, preceded

9  by adequate discovery.

10          THE COURT:  All right.

11          MR. COHN:  Now there's something else I don't want to

12  lose sight of, Your Honor.  You know, we stand here in a case

13  like this and we toss around numbers like billions of dollars

14  of asbestos liability, hundreds of thousands of pending cases

15  on the petition date.  And it's easy to lose sight of the fact

16  that there are actual human beings involved.  Such as Janet

17  Rigsby, who is one of the Montana Plaintiffs and who submitted

18  an affidavit in this regard.

19      She lives alone.  She's 64 years old.  She's on oxygen 24

20  hours a day.  Uses an inhaler.  She can't walk 30 feet, Your

21  Honor.  If she walked out into the hallway of this Courtroom

22  she would need to sit down and rest because she can't walk any

23  farther than that.  And for her over the near term, Your Honor,

24  her only hope of getting the nursing assistance that she needs

25  at home, because it's not covered by the Grace medical plan,

1 she has no other way to get it, her only ability to get it over

2 the near term is going to come from either a settlement or a

3 judgment against the railroad.  And there are many others in

4 Libby who share her plight.  That's what today's proceedings

5 are all about.  Despite the abstractions of related to

6 jurisdiction.  Which I will now proceed to address.

7      The -- to get an injunction against litigation among third

8 parties there are three steps.  The first step is you have to

9 establish related to jurisdiction over the litigation that is

10 sought to be enjoined.  The second step is you have to

11 establish unusual circumstances.  The third step would be you

12 have to meet the traditional four-part test for an injunction,

13 including likelihood of success on the merits.  All this is set

14 out in the _Zale_ case with unmistakable clarity.  You cited it

15 of course in your decision on State of Montana.  That is the

16 process here today.

17      Related to jurisdiction, which we've been focusing on is

18 only the first step.  It's gonna be the step that I spend most

19 of my time on.  But we do not want to lose sight of the fact

20 that there are two other hurdles that Grace would have to

21 surmount in order to get this objection.

22      But before we even get to that let's talk about law of the

23 case.  Because Grace says that law of the case steps in here

24 and basically in so many words Grace is saying even if the

25 _Gerard_ decision is wrong you have to follow it.  And that's

1  what law of the case is all about.  And that proposition is

2  just plain incorrect.  For at least three reasons.

3      Reason #1, Your Honor, is that this is not the same case.

4  Grace has utilized the convenience of an existing adversary

5  proceeding in which to seek a brand new injunction.  But this

6  is a brand new injunction against different parties.  The State

7  of Montana and the railroad were not parties to the original

8  injunction proceeding.  And as is shown by the affidavits of

9  Mr. Heverling and Mr. Lewis, which we've submitted with our

10  papers, many of the Plaintiffs against the railroad and against

11  the State of Montana are different from the Plaintiffs against

12  Maryland Casualty Company, who were involved in the <u>Gerard</u>

13  decision.

14      So while I appear of course as counsel to all of them, the

15  fact is we're talking about different human beings, Your Honor.

16  Different parties.  Different injunction.  And for that reason

17  alone law of the case cannot apply because it's a different

18  case.

19      The second reason that law of the case can't apply, Your

20  Honor, is because Gerard dealt with a completely different

21  jurisdictional issue.  And here I'm not going to retread the

22  ground that Mr. Lockwood so ably did, but simply note that any

23  fair reading of the <u>Gerard</u> decision would have to conclude that

24  the procedural posture of the case, which was that the

25  Plaintiffs in that case were moving for clarification or

1  modification of an existing injunction, permeated the

2  jurisdictional analysis.  And that jurisdictional analysis is

3  not the same as the analysis that would need to be applied in a

4  case such as the railroad and the State of Montana, where a new

5  injunction is being sought.

6      And finally, Your Honor, even if you were to buy Grace's

7  reading of Gerard, and say, well, actually, maybe Gerard did

8  mean to make some broad-based pronouncements about jurisdiction

9  to enjoin third-party litigation, then you would have to

10  conclude that it simply clashes with Combustion Engineering,

11  not to mention the Zale decision, which Combustion Engineering

12  cited favorably, and is simply not the law of the 3rd Circuit,

13  not the precedential law of the 3rd Circuit.

14      And how does that relate to law of the case?  Well, Your

15  Honor, as you yourself noted in the Ameriserve decision, citing

16  3rd Circuit authority, one of the exceptions to law of the case

17  doctrine is where there is a supervening change in the law.  So

18  if you buy Mr. Bernick's view of what Gerard stands for you

19  would also need to conclude that Combustion Engineering wrought

20  a supervening change in the law, such that law of the case

21  would not apply, and you are free to write on a clean slate, or

22  a clean slate based on the actual precedential decisions of the

23  3rd Circuit.

24      Now, in terms of related to jurisdiction, Your Honor, and

25  I want -- I do want to emphasize that the -- prior to

1   Combustion Engineering it would have been possible to take the

2   view that Pacor and Federal Mogul were removal cases, and

3   perhaps some different standard applied in the situation where

4   what was being sought was an injunction against litigation,

5   rather than simply removal of the litigation to the Federal

6   Courts.

7       Combustion Engineering laid that to rest, citing Zale on

8   the same issue, because Zale had laid it to rest in the 5th

9   Circuit before that.  Your Honor went very thoroughly through

10  those decisions in your State of Montana decision, but that's

11  really -- but the crux of what Mr. Bernick is attempting to do

12  is not -- does not simply have to do with the Gerard decision.

13  He's essentially trying to rewrite the law of the 3rd Circuit

14  as expressed in Combustion Engineer, which is that you have to

15  do the related to jurisdiction analysis where there is an

16  injunction against litigation.  That's not just a matter of

17  removal cases.  It's a matter of when you want an injunction

18  you have to prove related to jurisdiction over the litigation

19  that is sought to be enjoined.  And it brings in all of Pacor,

20  Federal Mogul, all those principals which you're so familiar

21  with.

22      So applying those principals, what is it that Grace has

23  alleged in it's papers that provides enough of a relationship

24  to permit this Court to exercise jurisdiction over the railroad

25  litigation?  Well, one thing that Grace said is, well, is

1   Grace's dust?  Now, everything we've heard about asbestos dust

2   prior to this in this case is that it's very dangerous toxic

3   kind of stuff, but here Grace is invoking its dust as a magical

4   cure for any possible jurisdictional defect in the injunction

5   that it seeks to obtain.  And of course that can't possibly be

6   right.  Grace's dust is all over the place.  Not just in Libby.

7   Grace's asbestos products are all over the land.  And it is --

8   the fact that it is Grace's products that are involved, or

9   dust, is not sufficient to confer jurisdiction, and the reason

10  we know that is because <u>Pacor</u> and <u>Federal Mogul</u> involved

11  somebody's asbestos, the asbestos of a Debtor who is in

12  bankruptcy, and the 3rd Circuit said, no, that's not enough.

13  In fact, the Court also said common facts in general are not

14  enough to confer related to jurisdiction.

15      And that certainly subsumes this whole notion of record

16  taint.  I mean, if you can't -- if the fact that there are

17  common facts to be tried was expressly rejected as a ground for

18  related to jurisdiction then how can we go off on this -- you

19  know, how can we address that same relationship up, call it

20  record taint, and then magically have the ability to have

21  jurisdiction to issue an injunction?

22      Now as has been noted, Your Honor, the railroad and the

23  State have no special relationship with Grace.  This is not

24  derivative litigation.  We're not talking about affiliates.

25  We're not talking about agents.  We're not talking about

1  insurers.  And you've already talked about the case against the

2  State, which happens to have had the benefit of a decision from

3  the highest Court in the State of Montana saying that it's an

4  independent cause of action.  But let me spend a moment on the

5  independent cause of action of the -- against the railroad.

6   This, Your Honor, is a common suit for garden variety

7  negligence in the operation of a railroad, and strict liability

8  in the transport of a dangerous cargo.  The fact that the

9  dangerous cargo is Grace's asbestos doesn't change the

10  fundamental cause of action or the railroad's duties.  It could

11  have been Johns Manville's asbestos, it could have been some

12  chemical from some plant down the road.  What's being alleged

13  against the railroad is that they were negligent in the

14  railroad's own operations, including conduct by the railroad's

15  own employees on the railroad's own property.

16      These are matters we would get into in an evidentiary

17  hearing, Your Honor, but for today's purposes let me just say

18  that the Libby mine is some distance from town.  There's a spur

19  track that goes up there a loading area -- you've seen

20  reference to loading docks, suspension bridges, things like

21  that in the indemnity agreements.  All that is outside of

22  Libby.  The claims against the railroad have to do with the

23  fact that there is a main line of the railroad, it's actually

24  part of the line that runs from Minneapolis to Seattle.  Goes

25  right through the town of Libby.  There's a 100-yard wide

1  right-of-way, Your Honor, big as a football field.  Going right

2  through the town of Libby, it goes by playing fields, it goes

3  by -- where people live, it -- and it's covered, was covered

4  with asbestos dust.

5      And where that dust came from, Your Honor, was that the

6  railroad operated open boxcars.  That's how the asbestos went

7  through the town of Libby, in open boxcars.  And then when they

8  stopped using the open boxcars they would use cars where the

9  asbestos would kind of leak out of there.  We have testimony

10  that the railroad employees would try to plug up the cars with

11  rags to keep the asbestos from going out.  There were 10 to 20

12  trains a day that went through Libby, operating at high speeds.

13  You can imagine what that would do to stir up the dust that had

14  fallen out on to the railroad right away from these asbestos

15  cars, and Your Honor, that's the negligence, that's the

16  railroad's conduct that we're suing on.

17      It took place miles from Grace's facilities.  It had

18  nothing to do with Grace's conduct.  The fact that it happens

19  to be Grace's poison that was laid down there is obviously, you

20  know, a fact that is relevant, but does not have anything to do

21  with the railroad's liability.  The railroad's liability is for

22  its own conduct.  These are independent claims.  Just as

23  independent as the claims against the state.

24      And you wouldn't expect, Your Honor, that there would be a

25  decision of the state's highest Court dealing with the

1  liability of a railroad for operations, because that's a matter

2  that is so well settled in the law of all jurisdictions that we

3  don't have the benefit of the case that says the Libby

4  Claimants have claims against the railroad.  But Your Honor,

5  it's just as clear that these are independent claims based on

6  the railroad's own conduct.

7      So the fact that Grace's dust was involved is just not

8  under the law in Pacor and Federal Mogul, or on the facts, as

9  I've just outlined them, is not something that would confer

10  related to jurisdiction.

11      Now I was going to address the issue of record taint.  I

12  will not address it because that was another point that Grace

13  raised.  I am going to simply rest on Mr. Lockwood's discussion

14  of record taint.  But I do want to talk about the concern that

15  the Court raised about the Plum decision and the Montana

16  statute.

17      Mr. Monaco is partly correct in the sense that this whole

18  issue of how you apportion fault and the whole issue of the

19  empty chair has been a -- has gone through several iterations

20  in Montana.  The Plum decision represented the highest Court of

21  Montana laying down the law as to basically what it was that

22  you could and could not do with respect to an empty chair.  So

23  it completely relevant in the sense that the Legislature --

24  it's not just a matter of the statute that happened to be in

25  existence at the time.  The Court was telling the Legislature

1  what it could or couldn't do for all time in any future statute

2  concerning the empty chair.  So your citation to <u>Plum</u> was

3  absolutely correct.  This -- the situation -- the case is still

4  very much in point.

5      So -- and as to the statute, obviously, you know, the --

6  you know, Montana can take positions, even ones that are

7  blatantly incorrect, but it does strike me that on the face of

8  the statute that it's clear that the State Court would not have

9  jurisdiction over Grace when in the situation where Grace is --

10  where lawsuits against Grace are barred by the automatic stay.

11  And so under those circumstances Grace does qualify under the

12  statute as a party that's protected from having its fault

13  assessed.

14      And then one other thing I wanted to say about record

15  taint, Your Honor, is just to refer to the record where we have

16  introduced all sorts of material that indicates that it can't

17  get any worse.  And we talk about tainting the record, it

18  presupposes that there is something -- there's something left

19  -- some piece of evidence that's left to be adduced as to which

20  Grace could somehow have an affect in how it comes out or how

21  it goes into evidence.

22      And as we note in our papers, this case has been tried

23  before.  It's been tried on the issue of punitive damages.  You

24  already got a decision in the State of Montana saying that the

25  claims against Grace met the standards for punitive damages.  I

1  mean, how much -- you know, how much more could there be?  The

2  principal witness is dead.  He's not gonna change his

3  testimony.  He's not gonna be influenced by -- you know, even

4  Mr. Bernick's charm I don't think is going to be sufficient to

5  get that gentleman to change his testimony.  So the facts are

6  already there in the record.

7       And on the issue of medical proof, which is the first

8  time, you know -- it's a whole different iteration of record

9  taint, that's just a stunning, stunningly broad expansion of

10  that concept, which couldn't possibly be the law.  It would

11  affect millions of Plaintiffs nationwide, all of whom are

12  trying to prove that Grace's asbestos did them harm in suits

13  against contractors or other asbestos suppliers, or whatever.

14       All right, what other factors has Grace cited?  Well,

15  Grace trundles out those indemnity agreements with BNSF.  Now,

16  those would require much more thorough examination than has

17  been given on the state of today's record.  Those, first of

18  all, technically are not even in evidence.  But even if you

19  accept them as genuine documents there's much that is unclear

20  about them, much that would need to be -- much evidence that

21  would need to be adduced, and most of all, there's that

22  geographical separation from the area where the harm was caused

23  by the railroad's operations.  Those are all matters that we

24  would need to get into in an evidentiary hearing.  And I would

25  point out that Grace is not even alleged that any of those

1  agreements provide for the railroad to indemnify Grace --

2  pardon me, for Grace to indemnify the railroad against the

3  railroad's own conduct of the type that the Libby Claimants are

4  seeking to utilize as the basis for there -- for damages

5  against the railroad.

6      Yes, you have some indemnification, some broad

7  indemnification language for things that are outside of town.

8  The loading dock, the suspension bridge, areas like that.  But

9  before any of that could become the basis for any kind of an

10 injunction we would obviously need a much more thorough

11 exploration of these issues.  And I would respectfully submit,

12 Your Honor, that if you don't even go there, if what you do

13 instead is you say, well, all right, what's the most favorable

14 view we could take, favorable to Grace's request for an

15 injunction?  What's the most favorable view we could take?  I

16 think you would conclude that these indemnity agreements are

17 like the indemnity agreement that Chrysler relied upon in

18 Federal Mogul.

19     You might recall that, you know, in Pacor there had been

20 this dicta to the affect that a -- an automatic indemnity, an

21 ironclad written contractual indemnity, you know, perhaps could

22 be the basis for related to jurisdiction.  And so naturally in

23 the next case that came along there was one of the parties,

24 Chrysler, standing there in Court with an indemnity contract.

25 And even so, the Court said that was not sufficient.  And the

1 reason it was not sufficient was, it's true, it contained

2 indemnity language, but it was part of a set of standardized

3 purchasing terms that were used apparently by Chrysler for all

4 of its purchases.  And the Court just said that when you're

5 using a kind of a -- the sort of a form indemnity agreement

6 it's just not good enough to -- it's not clear enough to serve

7 as the basis for jurisdiction.

8      Well, here what you have are indemnity agreements which

9 Grace itself says don't apply.  So there would certainly have

10 to be intervening adjudication to determine whether those

11 indemnity agreements did apply.  And under those circumstances,

12 Your Honor, I would respectfully submit that even in the best

13 view of these -- that is to say the strongest view toward

14 having them serve as the basis for related to jurisdiction,

15 they would just not be strong enough, Your Honor, because they

16 would need to be subject to an intervening adjudication in

17 order to establish that there even was a right of indemnity for

18 anything.  Much less the conduct that has to do with the

19 railroad's right of way through the heart of Libby.

20      All right, Grace's fourth point is that they -- there is

21 some discussion in the record, discussion, not evidence, of

22 separate insurance for the railroad that was purchased by Grace

23 some time back in the mists of time.  Now assuming that this is

24 correct, that there are separate insurance policies that BNSF

25 has, naming BNSF, not Grace, as the insured, but that were

1  purchased with Grace's money way back in 1940s, '50, you know,

2  who knows when, it is -- Grace has articulated no basis

3  whatsoever for that to serve as a basis for related to

4  jurisdiction.

5      Remember, in these insurance cases the reason why

6  insurance, putting aside indemnity agreements, Your Honor, the

7  reason why insurance policies can serve as the basis for

8  related to jurisdiction, has to do with channeling injunctions

9  and the need to take insurance proceeds which are not

10 sufficient to pay all the claims, and to channel the claims so

11 that those insurance policies get apportioned fairly.  Here

12 what you have -- there's only one insured, which is BNSF,

13 there's no assertion that BNSF, even without the insurance

14 policies would be unable to satisfy judgments against it, there

15 just is no, absolutely no channeling rationale to have an

16 injunction that relates to insurance policies.  And

17 accordingly, Your Honor, I would respectfully submit that these

18 separate insurance policies, if they exist at all, they're

19 ultimately proven to exist, would not be sufficient to

20 establish related to jurisdiction.

21     Well, all right, what about these insurance indemnities

22 that Grace claims?  Well, here the problem is that while there

23 may be agreements out there, again, we would still need to

24 develop the record on this point, but when Grace settled

25 insurance policies it did enter into settlements whereby Grace

1  would agree to indemnity the insurance companies, but those

2  were Grace policies, not BNSF policies.  There's not a shred of

3  evidence in the record that has to do with policies that might

4  separately have been issued to BNSF.  And there's not a shred

5  of evidence that any Grace policy named BNSF as an additional

6  insured.

7      So you just have nothing in the record whatsoever to link

8  this concept of indemnification of insurance companies with the

9  particular lawsuits that are being sought to be enjoined, and

10 the particular Defendant in this case, BNSF.

11     And then Grace's last point is that old standby, common-

12 law indemnification.  And of course, while Grace tries to argue

13 that <u>Gerard</u> somehow over turned <u>Pacor</u>, <u>Federal Mogul</u> and

14 <u>Combustion Engineering</u> in this regard, the fact is it did not,

15 and the fact that there might be a common-law indemnity claim

16 by either the railroad, or for that matter the State of Montana

17 back against Grace is precisely the kind of situation where the

18 3rd Circuit said there's not a sufficient basis for related to

19 jurisdiction because, and this is the touchstone of this whole

20 area of the law, because there would need to be an intervening

21 adjudication in order to determine what those common-law

22 indemnity or contributions rights is.  So that also provides no

23 basis for related to jurisdiction.

24     So in sum, Your Honor, we are a long way from there being

25 any affect whatsoever on the Grace Estate, as would be required

1   under the 3rd Circuit case law.  The Montana Plaintiffs would

2   have to go out and get a judgment against the State of Montana

3   or against the railroad.  Obviously, we're quite encouraged by

4   that Supreme Court of Montana decision against the State, but

5   of course that just, as you pointed out, that just determined

6   that a cause of action exists.  It didn't determine that we had

7   established the merits of that cause of action.

8        So first that would have to happen, then what would have

9   to happen is that the State of Montana would somehow have to

10  find its way back into Bankruptcy Court, BNSF would have to

11  find its way back into Bankruptcy Court -- the case of BNSF,

12  Your Honor, bar date is passed, there's not even a Proof of

13  Claim.  But somehow they'd have to overcome that, get back into

14  Bankruptcy Court, and establish some kind of a claim.  And

15  then, and only then would you be called upon to make that

16  intervening adjudication, which is the touchstone for the issue

17  of whether related to jurisdiction exists.  And because you

18  have that adjudication as a safety valve, Your Honor, Pacor,

19  Federal Mogul, Combustion Engineering, Zale are crystal clear.

20  There's no related to jurisdiction to enjoin this litigation.

21       Now I said there were two more hurdles I'm gonna be -- I'm

22  not going to attempt to address these, but just rely on the

23  briefs, except to underline one particular point about the

24  four-part test for an injunction.  Because one of those -- one

25  aspect of that test, Your Honor, is got to show probability on

1  the success on the merits.  Well, what are the merits when

2  you're talking about a preliminary injunction?  Well, the

3  merits are whether you could get a permanent injunction.  And

4  under Section 524(g) it is crystal clear that neither the State

5  nor the railroad has the type of relationship with Grace that

6  could serve as the basis for a Section 524(g) injunction.  In

7  Combustion Engineering the Court held that if you can't get a

8  524(g) injunction in an asbestos case then you can't get a 105

9  injunction.  So every avenue whereby Grace could get an

10  injunction, a permanent injunction against litigation against

11  the State or the railroad is foreclosed, precluded as a matter

12  of law.

13      And accordingly, Your Honor, we respectfully submit that

14  Grace can show no probability of success on the merits, so even

15  if there were jurisdiction you could not under these

16  circumstances issue the injunction that Grace has requested.

17  Thank you very much, Your Honor.

18          MR. TOOLE:  May it please the Court, Edward Toole

19  representing Burlington Northern Santa Fe Railway.  Just a

20  procedural point, Your Honor.  The issues pertaining to the

21  Motion for Clarification which the railroad has brought in

22  essence seeking to obtain collateral independent insurance

23  policies, that's coming up next.  And I therefore will restrict

24  my comments to the matter that's on the table at the moment,

25  which is the question of whether Your Honor's decision

1  pertaining to the State of Montana should be reconsidered.  And

2  as a collateral aspect how that pertains to the similar efforts

3  that are being advanced by the Debtor to include the Burlington

4  Northern.

5      We start this with the belief that Your Honor's decision

6  on the State of Montana was correct, and that the parties,

7  specifically the Debtor, has failed to establish a basis for in

8  essence having that decision modified by this Court.

9      If one were to attempt to place a core issue that the

10  Debtor is suggesting, it of course focuses around the Debtor's

11  analysis of Gerard.  The problem with that is that by -- even

12  though counsel has cited portions of the decision in Gerard I

13  believe that the essence of what transpired in the Court was

14  not a question of jurisdiction, but quite simply as the Court

15  said, here the issue before the Bankruptcy Court was not

16  whether it should exercise jurisdiction over suits pending

17  elsewhere, or even whether it should enjoin such suits, but

18  rather whether it should modify an injunction already entered

19  in the Bankruptcy Court in favor of Grace and Maryland

20  Casualty.

21      The essence, Your Honor, is that the discussion that the

22  Court of appeals commenced with regard to underlying

23  jurisdiction in essence was dictum.  That was not the issue

24  that was before the Court.  And while it was educational to set

25  forth somewhat of a legal background, the reality was the

1  narrow issue focused about whether the Court abused its

2  discretion in failing to modify an earlier injunction.  That's

3  a far cry from what counsel is suggesting is the teaching of

4  <u>Gerard</u>.  Which according to him is -- transcends the issue of

5  jurisdiction in the first instance.

6      So the Court -- in the Court's analysis of <u>Gerard</u> in the

7  context of the other decisions we believe that the Court --

8  this Court reached the correct decision and that <u>Gerard</u> was

9  properly distinguished.

10      Counsel for the State of Montana raised the issue of the

11  scope of the Montana statute.  Once again, this Court properly

12  cited to the statute, which has been presented, and the statute

13  by its very terms really pertains to whether affirmative

14  defenses can be presented in the course of litigation where the

15  affirmative defense would perhaps show damage should be

16  attributable to another entity.  Since it limits this to

17  parties that have settled, parties that have been released, et

18  cetera, we fail to see how that is going to create any real

19  record taint, as the Debtor would suggest.

20      Cognizant also of the fact that there are tens of

21  thousands of asbestos cases that are pending in the United

22  States.  That number is wrong by at least one or perhaps two

23  zeros.  In virtually all of these cases some effort is made to

24  attempt to place blame, if you will, on other parties since in

25  many instances the one Plaintiff will have sued two, three,

1  four dozen different asbestos manufacturers or distributors.

2  Is this Court going to attempt to enjoin every lawsuit that's

3  pending in the United States where Grace happens to be one of

4  the punitive tort-feasors, even though they're not a party to

5  the litigation?  Taking this to the extreme that counsel for

6  the Debtor would ask then this Court is going to have to do

7  that as well.  To say nothing of enjoining the State from

8  prosecuting the criminal actions in Montana, where once again

9  inevitably there will be some evidence that will have some

10  aspect as it pertains to Grace.

11      With regard to the railroad, the Court made inquiry at the

12  commencement of this proceeding as to how the railroad

13  situation might be distinguishable from that of the State of

14  Montana.  The question of contractual indemnity I believe was

15  the matter that was causing the Court some concern.  I think

16  the response to that is several fold.  Number one, there still

17  has to be a collateral proceeding against Grace, probably in

18  this Court, should BNSF be found liable to the Plaintiffs in

19  this State Court proceedings.  So once again the adjudication

20  of that issue is not under -- it's not being ceded to some

21  other jurisdiction that still remains within the power of this

22  Court.  Again, applying this Court's decision in the State of

23  Montana.

24      Secondly, the Debtor agrees that this issue does not hinge

25  on whether the indemnity right is contractual or whether it's

1  common law.  And to that extent I believe the Debtor's analysis

2  is correct.  There is no practical or substantive distinction

3  as to what the device is that gets the unsuccessful Defendant

4  to now assert a claim over against Grace, whether it's by

5  contract or whether it's by statute, or by common law -- that

6  really is a red herring.  It really makes no difference.

7       And lastly, the protection that's accorded not only by

8  this Court's decision applying Paycor vs. Higgins but also

9  under the Montana statute as found in Your Honor's analysis of

10  the decision to the effect that there can be no apportionment

11  of liability in Montana as applied to an absent party.

12      So the issue here is, is the Debtor somehow bound by these

13  underlying actions between the Claimants and the Debtor?

14  Again, since state law prohibits this, separate collateral

15  actions have to be brought in this jurisdiction, which this

16  case -- Court can control.

17      The argument was made by Counsel for the Debtor that

18  {quote} "the same people are involved in suits against the

19  Debtor, as well as suits against the railroad."  This is simply

20  not accurate.  The assertions -- all of the suits involving the

21  Burlington Northern were brought post-petition with the

22  exception of four.  And they were asserted solely against the

23  railroad.

24      There was no assertion at all in any of these with regard

25  to liability of the Debtor.  In fact, many of these are also

1   FELA suits, where the issue is very much focused between the

2   railroad and between the Claimant.

3       Once again the issue of collateral estoppel, which was a

4   matter of concern for the Debtor, where the Debtor indicated

5   that he {quote} "did not know where collateral estoppel would

6   be argued."  Once again, in this Court's decision in the State

7   of Montana, it's clear that has to be done here and under

8   control of this Court.

9       The question of whether the State of Montana failed to act

10  on its own, which was a matter of concern to this Court in

11  distinguishing other actions -- once again, the issue that's

12  pending in the lawsuits is, did the railroad fail to act in --

13  on its own with regard to the allegations that are -- that have

14  been raised there?

15      From our perspective we see no substantive difference

16  between Your Honor's decision in the State of Montana and would

17  suggest that to the extent that the Debtor is seeking to impose

18  injunction on the actions that are pending in the State of

19  Montana against the railroad, that that should be denied.

20          THE COURT:  All right.  Mr. Wisler?

21          MR. WISLER:  Thank you, Your Honor.  Jeff Wisler on

22  behalf of Maryland Casualty Company.  Your Honor, I'm up here

23  to respond in support of expanding the injunction to cover the

24  BNSF actions because we have no stake in the Montana

25  litigation.

1    And as Mr. Toole said, the -- his Motion for Discovery is

2    a separate motion that we can address separately.  So briefly

3    adopting Mr. Bernick's arguments in the papers, I'll try to go

4    quickly through the points I want to make.

5    First, the 3rd Circuit's ruling in <u>Gerard</u> is a ruling in

6    this adversary proceeding in this bankruptcy case.  And no one

7    has cited a case or administrative ruling or any other basis to

8    say that somehow the 3rd Circuit's ruling in this case doesn't

9    apply.  And I think the papers clearly distinguish -- do a good

10   job of distinguishing and do clearly distinguish that decision

11   and its rulings from the subsequent <u>Combustion Engineering</u>

12   decision.

13   Second, the Pandora's box argument that's been raised by

14   Counsel opposing the expansion of the injunction.  Your Honor,

15   that's simply an argument that says the Debtor ought not to get

16   what it wants today because it hasn't filed Motions to Stop

17   every asbestos claim in the country.  That's not a basis for

18   denying this particular motion, this particular day, based on

19   the facts and legal arguments that are made by the Debtors in

20   support of that motion.

21   #3, the idea that the Debtor must demonstrate a risk of

22   collateral estoppel was specifically and explicitly pushed

23   aside by the 3rd Circuit in highlighted language that's on the

24   screen now.

25   I won't read it because I couldn't say it better.  It's

1  right there and Your Honor has seen it.  And I'm sure you'll

2  hear about it and see it again.  But it plainly says that the

3  Debtor does not need to come forward and demonstrate a plain

4  risk of collateral estoppel.

5      Libby's arguments today are astonishingly similar to the

6  ones they made against Maryland Casualty in the Gerard case.

7  You need an intervening adjudication.  These issues have

8  already been tried.  BNSF is being tried for its own conduct,

9  not Grace's conduct.

10      All of those were pushed aside by this Court in the 3rd

11  Circuit.  The idea that Libby again comes here and says Your

12  Honor, this is a case about BNSF, not Grace.  In fact, BNSF is

13  a mile or two miles or 50 miles or a million miles away from

14  the Grace facility is irrelevant.  Every complaint that Libby

15  filed against BNSF -- and I challenge them to show otherwise --

16  implicates Grace and its operations.

17      Mr. Heiberling's affidavit that was filed with Libby's

18  papers in this particular motion talks about how they're going

19  to pull all those papers out of the repository in Boston and

20  bring them into Court.  And they'll use them as the proof

21  necessary that Grace did bad things.

22      If they ever file a complaint in Montana that doesn't

23  implicate Grace or its operations, that'll be the day to say,

24  Libby, you win.  Your argument about independent claims wins.

25  But this isn't it.

1    Likewise, BNSF says this isn't about Grace, you should let

2   these go.  And they talk about how apportionment doesn't exist

3   in Montana.  I'm not familiar with that law, but it doesn't

4   matter.

5    What you'll see in every answer that BNSF filed to Libby's

6   complaints is causation is misplaced.  Causation is misplaced.

7   Causation is misplaced.  Absolutely they're going to say that

8   it's Grace's dust and Grace's operations.  Why else would they

9   raise causation?  That's what it's all about.

10    And in fact, in one of BNSF's -- I'm sorry -- BNSF's

11   answers, they said that the Plaintiffs -- that's Libby's claims

12   -- relate to the Chapter 11 case of Grace and are stayed.  And

13   that the Montana Court lacks jurisdiction.  Yet they come in

14   here and say this has nothing to do with Grace, let these cases

15   go forward.

16    And finally, Your Honor, once again much as they did in

17   Maryland Casualty, the Libby Plaintiffs, while coming in and

18   promising Your Honor that these claims are completely

19   independent -- at least one of their complaints includes a

20   claim against Montana -- I'm sorry, against BNSF and other

21   entities -- that those entities aided and abetted Grace in

22   doing bad things to these Plaintiffs.

23    So my overall point to Your Honor that really was not

24   raised by Mr. Bernick is the idea that any of this is

25   independent of Grace is really nonsense.  It's all about Grace.

1  It always was and it always will be.

2            THE COURT:  Mr. Bernick, five minutes.  Five minutes

3  to wrap this up.

4            MR. BERNICK:  I don't think I'll even take five

5  minutes, Your Honor.  I just have a couple of detailed points.

6  First, everybody seems to -- who is opposed to this -- seems to

7  take very lightly the 3rd Circuit's decision in the Gerard

8  case, and yet nobody has actually shown where we are in error

9  in the interpretation of that opinion.  You can read it from

10 back -- from cover to back, it's not very long.

11           It does address the subject matter jurisdiction, which is

12 distinct from the exercise of that jurisdiction.  And nobody's

13 responded on the merits of that other than to say, well, gee,

14 that actually contradicts one of the other decisions that the

15 3rd Circuit has reached.

16           Ultimately that does not say that the decision that was

17 rendered by the 3rd Circuit in Gerard doesn't mean exactly what

18 it says.  It's an effort to somehow say that Your Honor should

19 be determining how to reconcile these opinions.  And I don't

20 think that there's any conflict to reconcile.

21           The essence of the CE case -- and I guess I have the

22 fortune or misfortune of having been involved both in Federal

23 Mogul and in the Combustion Engineering cases, Your Honor is

24 very familiar.

25           The whole thrust of the channeling injunction in CE was

1   that in fact litigation against Lummus and Basic would be

2   brought into and handled as part of the CE plan.  It's every

3   bit as much the same as if the case is removed against the auto

4   companies and actually come to rest in the <u>Federal Mogul</u>

5   bankruptcy case.

6       The litigation against the three car companies as the

7   litigation against Lummus and Basic would be taken over by the

8   bankruptcy case.  That requires an analysis of related to

9   jurisdiction.  The CE case does not say that because there is

10  another proceeding, there must be an analysis of related to

11  jurisdiction.  Well, where does that come from?

12      There's an alternative basis, indeed a primary basis for

13  subject matter jurisdiction, which is arising under

14  jurisdiction and where the Debtor as part of protecting the

15  bankruptcy case itself seeks to stay or enjoin collateral

16  litigation without bringing that litigation into the bankruptcy

17  case -- but simply to shut it down so it doesn't interfere with

18  the bankruptcy case.

19      That is the exercise of arising under powers as part of

20  the core jurisdiction of the Court, and it's not necessary to

21  reconcile <u>Combustion Engineering</u> and <u>Federal Mogul</u> with that

22  statutory provision that's very clear.  And that again is

23  exactly what the Court said in <u>Gerard</u>.

24      There's a lot of statement to the effect that, gee,

25  there's no record here.  And this seems to be kind of, you

1  know, an implicit -- a little bit of shaking of the paddle

2  there that, you know, well, gee, we're going to take you up on

3  appeal.  It's not necessary to have sworn testimony to deal

4  with jurisdictional issues.

5      And there are all kinds of proceedings that have taken

6  place in this case relating to this very issue, which are

7  predicated not on sworn testimony but on record facts that are

8  just very, very difficult to dispute.  They're basically

9  commonly accepted facts.  And that is exactly the exercise that

10 the 3rd Circuit went through in the Gerard case.

11     In the Gerard case, the 3rd Circuit didn't simply remand

12 the case, but went ahead and basically endorsed and approved

13 Your Honor's original order.  If there had been a need to have

14 a sworn record of testimony, then the case should have been

15 remanded to Your Honor to develop that record.

16     Finally with respect to record taint, the question of

17 whether the record taint is sufficient or there must be

18 collateral estoppel, that is exactly the point that the 3rd

19 Circuit made in Gerard in that passage.

20     And while Counsel insists that the cases that were decided

21 by the 4th Circuit in AH Robbins and in Johns Manville are

22 irrelevant because they were rejected in Paycor and the like,

23 they were not rejected on this point.  This is a completely

24 separate point.

25     This is the point not of subject matter jurisdiction but

1   of whether record taint is sufficient to warrant the exercise

2   of subject matter jurisdiction that is found elsewhere.  And

3   obviously in those cases it was found sufficient.

4        The AH Robbins case is actually interesting because it

5   involved a third party -- the insurer involved Aetna.  And the

6   idea was to -- that there was a claim that was being prosecuted

7   against Aetna, not against Robbins, but against Aetna.  And

8   what Judge Meridge said in the 4th Circuit agreed is that

9   inevitably it'll be impossible for the litigation not to

10  involve AH Robbins because AH Robbins is in fact the basic

11  source of the claim that's being made -- same thing here.

12       Last point is the Frenville case.  The Frenville case -- I

13  hope we don't have another motion because that specifically was

14  raised in the reply that was filed by the State of Montana.

15  The Frenville case has nothing to do with this case.  That was

16  a case in which it was allowed -- which collateral litigation

17  was allowed to proceed -- that is non-bankruptcy litigation --

18  because there was no reorganization to protect because that was

19  a Chapter 7 case.

20       So we are dealing here with a totally different situation.

21  Frenville does not apply.  I don't think it's necessary to come

22  back to this Court again in connection with some motion to deal

23  with that.  That's all I have.

24            THE COURT:  All right.  We're going to take a 10-

25  minute recess.  And then we will go through the rest of the

1  agenda.  I'll take this matter under advisement.

2          MR. BERNICK:  Your Honor, can I ask -- just ask.

3  When you say the rest of the agenda -- is it Your Honor's

4  preference to take up now discovery also on this or are we

5  going to go to the other items on the agenda?

6          THE COURT:  Oh, we are not going take up discovery

7  on this issue until I decide whether or not I'm reconsidering.

8  If I don't reconsider, there's no need for discovery on this

9  issue.

10          MR. BERNICK:  That's fine.

11          THE COURT:  We're going to start with Mr. Toole's

12  issue next.

13          MR. BERNICK:  Thank you.

14          THE COURT:  And then we're going to finish through

15  the agenda.

16          MR. BERNICK:  Thank you.

17      (Court in recess)

18          THE COURT:  Please be seated.  Folks, this is what I

19  have been able to ascertain with respect to access in and out

20  of the building.  We will have access.  I have made

21  arrangements for the security guard and hopefully the air

22  conditioning to be on.

23      The difficulty apparently is that unless we -- I give you

24  a dinner recess relatively soon, I'm told that restaurant

25  choices are going to be very limited, because -- restaurant

1  shut down.  So I -- if that's the -- and I'm told that we

2  probably need to be out by 6?  I -- okay.

3      So, I think we either have to bump things up so that we

4  are, like, moving.  Or we have to be out to have dinner by 5:30

5  and then we'll come in and we'll stay until the cows come home.

6  So --

7          MR. BERNICK:  I don't -- speaking for the Debtor,

8  for my own point of view, the real thing will be if we take a

9  break, I'll be tempted to have a drink.  (Laughs)

10     (Laughter)

11         THE COURT:  As half of the rest of the world.

12         MR. BERNICK:  Then it'll go on for way too long.

13 But, what I would suggest, unless there is some other medical

14 reason -- of course, all this is subject to Your Honor's

15 convenience, is why don't we just keep on going?

16         THE COURT:  Well, I'm not going to be able to keep

17 the staff all night.  And that -- there is an issue with

18 respect to getting staff who did not get lunch today either, so

19 I cannot keep people -- it depends on how long you're going to

20 be.

21         MR. BERNICK:  Well, that's the other thing, is I

22 think it really -- that's the real thing.

23         THE COURT:  That is the issue.

24         MR. BERNICK:  If we can get done in a couple hours -

25 -

1          THE COURT:  Well --

2          MR. BERNICK:  -- would that be --

3          THE COURT:  So here's the thing.  We either have to

4    end by 7 --

5          MR. BERNICK:  Right.

6          THE COURT:  So that I can get staff to a place where

7    they can have dinner.

8          MR. BERNICK:  Right.

9          THE COURT:  Or we have to leave at 5:30 and come

10   back and finish.  So --

11         MR. BERNICK:  All in favor of 7 o'clock -- well, you

12   got to vote.

13         MR. LOCKWOOD:  I'm leaving.

14         MR. BERNICK:  Oh, he's leaving.  He doesn't count.

15      (Laughter)

16         MR. BERNICK:  I didn't do a headcount but I think

17   that that probably is a -- I mean that would certainly be our

18   preference.

19         THE COURT:  Okay, then we -- wherever we are on this

20   agenda we are going to finish at 7.

21         MR. BERNICK:  Yes, and what I would suggest -- I

22   don't know -- I was a little confused about what Your Honor

23   indicated in response to my last question.  Are we now -- Your

24   Honor's going to take under advisement the threshold question -

25   -

1          THE COURT:  Yes.

2          MR. BERNICK:  -- and having done so, is it now

3    necessary for us to cover requests for insurance policies, all

4    the --

5          THE COURT:  No.

6          MR. BERNICK:  -- other things that were --

7          THE COURT:  There's no -- I don't see any basis --

8    any need right now to cover the issues related to discovery

9    because if I don't reverse myself in this decision, then I

10   think the ruling is that there won't be any further issues in

11   front of me.

12         MR. BERNICK:  I think that that's right.

13         THE COURT:  So there won't -- I think.  I'll hear

14   from Mr. Toole to make sure that I'm not missing something

15   here.

16         MR. TOOLE:  And, yes, Your Honor, I believe that

17   there is something that's not being understood.

18       The Motion for Clarification that the railroad has filed

19   is in essence to seek a ruling from this Court to the affect

20   that this Court neither has the jurisdiction nor the interest

21   in precluding the railroad from obtaining collateral

22   independent insurance policies from insurance carriers that

23   were -- have been in place for years to insure the railroad for

24   these -- for tort risks.

25       And these policies have nothing to do with the Debtor,

1 although in respect our three insurance carriers are trying to

2 get themselves into the Debtor's tent on this.  But the reality

3 is these policies are -- were put into place where the assured

4 is the railroad and the other party to these contracts are the

5 insurance companies.

6      These are not policies where the Debtor is involved.  And

7 yes, we need these -- this is essential to the extent that we

8 need to be able to establish the existence of this coverage.

9 Sooner or later, unless there is some sort of a blanket plan

10 that would include others -- sooner or later the railroad is

11 going to be cut loose.

12      And to the extent that there is coverage to which it can

13 look that's independent of the Debtors, it needs to ascertain

14 this and it needs to ascertain it now.  These insurance

15 companies are fighting tooth and nail to try and somehow get

16 themselves covered by the Debtor -- the earlier injunction so

17 that they don't have to deal with the railroad on this issue.

18      This is critical to us and it is for this reason that we

19 filed this Motion for Clarification asking this Court to

20 clarify what we believe to be the case that this Court does not

21 have jurisdiction to adjudicate issues pertaining to insurance

22 policies available for cases pending in State Court in Montana.

23 And secondly, to the extent that somehow the injunction

24 pertaining to insurance companies was written broadly, that it

25 was not the intention of this Court to prevent the railroad

1  from getting this insurance.  And --

2       THE COURT:  Okay, let -- I think the situation is

3  this.  If the railroad is put into the injunction, then I

4  believe that at that point in time, the railroad's need for the

5  policy is immediately -- is done away with because there will

6  be no litigation going forward against the railroad, correct?

7       MR. TOOLE:  To the contrary, Your Honor.  Regardless

8  of whether the railroad is put into the injunction, it still

9  needs to ascertain the existence of this coverage.  Sooner or

10 later, the railroad's going to be cut loose.

11      At that stage, for it to then have to start chasing these

12 insurance companies, when these policies do not pertain to the

13 Debtor, that's the important aspect of this thing.  If --

14 assuming the facts as I am suggesting them as Movant that these

15 policies are independent of the Debtor -- and by the way, the

16 Debtor does not disagree with that.

17      And that these -- this is -- the privity of contract is

18 between insurance companies and the railroad, not the Debtor.

19 This is not coverage such as an O&D policy where you'll have --

20 you know, the railroad -- the Debtor conceivably could have

21 interest in the proceeds.  This is not property of the Estate

22 under Section 541.  And these policies have been in place in

23 essence to protect the railroad.

24      So we need to know this now.  And we need to know it now

25 because if we are correct, regardless of what the injunction

1  is, we still have this collateral source to pay risks when it

2  becomes apparent that the railroad needs to do this.  So either

3  way, whether the injunction is extended or not, we still need

4  this coverage.

5      And the issues that have been raised here with regard to

6  this basically are devices by the insurance companies to

7  preclude us from moving forward.  They have vulnerability here.

8  They've raised issues that are attempting to get themselves

9  under this umbrella.  For example, the insurance companies are

10 claiming that some of these policies --

11         MR. BERNICK:  I'm sorry, this is now an argument on

12 the merits of the issue.  And I really think that Your Honor

13 that if there is no litigation going forward against Burlington

14 Northern, they may still want these policies, but at the end of

15 the day they don't have a need for the policies immediately.

16         THE COURT:  But --

17         MR. TOOLE:  Your Honor, please --

18         THE COURT:  -- the issue is --

19         MR. TOOLE:  Yes.

20         THE COURT:  I think the issue is, do I have

21 jurisdiction to --

22         MR. TOOLE:  Exactly.

23         THE COURT:  -- enjoin the coverage.  And frankly, if

24 it's not property of the Estate and are not the Debtor's

25 insurance policies, I didn't have any intention of enjoining

1  anything --

2          MR. TOOLE:  Absolutely.

3          THE COURT:  -- against --

4          MR. TOOLE:  Counsel, would you --

5          THE COURT:  -- those policies.

6          MR. TOOLE:  -- permit me to make my argument without

7  interrupting?

8          MR. BERNICK:  I will.  I will, but it's a question

9  of timing.  And that is whether we need --

10          MR. TOOLE:  Your Honor, please, the same thing was

11  done the last time Mr. Bernick got up there and interrupted in

12  an effort --

13          MR. BERNICK:  That's fine --

14          MR. TOOLE:  -- to cut it off.

15          MR. BERNICK:  We'll go through with all of this and

16  this will take another hour because it's inextricably

17  intertwined with --

18          THE COURT:  All right.

19          MR. BERNICK:  -- Your Honor's determination --

20          THE COURT:  Stop.  Both of you.  This was the

21  question that I asked.  And I hate to remind you both, but

22  nonetheless, this still is my Courtroom and so I'm going to

23  exercise the prerogative of control and the question before the

24  Court is are we going to end this at 7 o'clock or are we taking

25  a recess at 5:30 to take a dinner recess until 6:30.

1      That is the primary issue that I need a decision about

2  right now.  So what is it going to be, folks?  That's the first

3  question.  And then, Mr. Toole, I apologize for the

4  interruption.  I will return to your argument.

5           MR. BERNICK:  Well, if Mr. Toole is going to go on,

6  as apparently he intends to, notwithstanding I think the desire

7  of all other people to proceed otherwise, then I think we

8  should take a break and we should all plan on being here for

9  several hours, because we're now going to go back through the

10 same exact issue, which is Your Honor's subject matter

11 jurisdiction.  We're going to come out with the same issues all

12 over again.

13          THE COURT:  There -- I really -- I just want to

14 know, what -- how many other issues, folks, do you want to get

15 through tonight?  Are we staying to get through the agenda?

16 That is the question.

17          MR. BERNICK:  We have -- I'll just list the issues.

18 We have a report that the PD people want to give you with

19 respect to what's going to happen at the trial next week.  We

20 then have two other PD matters which I think are relatively

21 short.  We may reach agreement as to one of them.

22     I don't know if we'll reach agreement as to the other.  We

23 then have a series of significant personal injury issues -- we

24 still don't have agreement on the X-ray compliance order,

25 notwithstanding the hearing last time on that issue.  We have a

1  motion by the Early Ludwick people that pertains to ongoing

2  discovery that is of critical importance.

3      We have a CMO -- we still don't have agreement with

4  respect to the CMO.  And I would venture to say that the CMO on

5  personal injury makes the issue that's now before the Court,

6  which is the railroad's desire to find out its insurance

7  coverage history, pales by comparison to --

8          THE COURT:  Well, there isn't any way --

9          MR. BERNICK:  -- the progress of the case.

10          THE COURT:  -- we're going to get finished with all

11  this by 7 o'clock.

12          MR. BERNICK:  We could, if we didn't have this

13  argument.  I think we could get finished with it all by 7

14  o'clock.

15          THE COURT:  Mr. Bernick, based on the fact that it

16  took three hours to argue a Motion for Reconsideration, we are

17  not going to get finished with this by 7 o'clock.

18          MR. BERNICK:  I understand that, and with respect to

19  -- due respect to the Court, I think that part of the problem

20  here is that people -- Your Honor will entertain all arguments

21  and people are taking advantage of that.  We don't have time

22  limits that are being set.

23      But again, if Mr. Toole wants to have us all stay here to

24  late in the evening, our preference would be to go ahead and do

25  that.  We don't want to have these issues carry over.  They're

1  just way too important.

2        THE COURT:  All right.  We are going to take a

3  dinner recess from 5:30 to 6:30.  We are going to come back and

4  we are going to get through the agenda regardless of how long

5  it takes.  Mr. Toole, the floor is yours.

6        MR. TOOLE:  Thank you, Your Honor.  I will make this

7  as brief as possible.  The reality here is that the only reason

8  we are before this Court is when conventional discovery

9  pertaining to these collateral insurance policies was sought,

10 in the State Court in Montana, the insurance companies -- and

11 specifically CNN -- sent a letter indicating that the issue was

12 covered by an injunction that this Court had entered and should

13 we continue to get these insurance policies, that a motion

14 would be brought seeking to have us sanctioned for interfering

15 with this Court.

16     We made our analysis and concluded that these insurance

17 policies -- assuming they are as I have articulated it to the

18 Court -- have nothing to do with this Debtor and therefore this

19 Court does not have the jurisdiction to enjoin us.

20     And if for some reason this Court's order is read broadly

21 to encompass this, then we would ask that the Court's earlier

22 order be modified because we cannot conceive that it would be

23 the intention of this Court to prevent an insured person from

24 obtaining the insurance policies that have nothing to do with

25 this Debtor.

1    Until and unless these policies are produced, the issues

2   that these insurance policies are raising -- all of these

3   doomsday arguments as to how it will impact on this Estate --

4   that's for another day.  The only thing before this Court is

5   whether there is a -- anything that precludes us from getting

6   these insurance policies and the other information in the first

7   instance.

8    At a previous hearing, when we started on this matter and

9   then didn't finish, a copy of the discovery request was lodged

10  with the Court.  I have another copy should the Court want this

11  in order to be able to ascertain that we are not asking for

12  anything other than conventional insurance policy discovery.

13   Secondly, an affidavit has been lodged with this Court by

14  James Roberts, who is the Counsel for the railroad who is

15  defending the cases in Montana.  I would ask that to the extent

16  that there are some factual predicates in there, that that also

17  be made part of this record.

18   The -- we find this astounding that the good offices of

19  this Court would be tested by these insurance companies in an

20  effort to try and stop us from getting these collateral

21  policies.  I believe that as the Movant, we are going to ask

22  this Court to consider the facts in the light most favorable to

23  this Movant, namely that these policies are independent and

24  that they're collateral to the Debtor.

25   And yes, we will be very prejudiced by a time delay

1  because we know that in all likelihood we may end up in some

2  collateral litigation with regard to some coverage issues

3  pertaining to these policies.

4      One insurance company, CNA, has already produced a

5  Certificate of Insurance, which shows that the assured is the

6  railroad and that they are the insurance company on this risk.

7  There are more policies, there are facts surrounding these.

8  Some of these facts may show that there might be some impact on

9  the Debtor, but until and unless these facts are developed,

10  namely conventional insurance company discovery, there is no

11  way for these other issues to be properly adjudicated.

12      And I cannot emphasize enough that these other issues are

13  not before this Court today even though the insurance companies

14  are desperately attempting to get this Court to somehow

15  conclude that the insurance policies will somehow impact on

16  this Estate.

17      We need the policies in the first instance.  The policies

18  are what they are.  And we need to develop the facts

19  surrounding these policies.  Then the insurance companies may

20  wish to come in and make their arguments.  But that's not for

21  today.  Thank you.

22          MR. PERNICONE:  Your Honor, good afternoon again.

23  Carl Pernicone for Royal Indemnity.  I'll try to be as brief

24  and succinct as I possibly can.  Here's why the discovery that

25  Burlington Northern is seeking from my client Royal is not

1  collateral and independent of Grace.

2      The policy -- the alleged policy was allegedly purchased

3  by Grace's predecessor for the benefit of Burlington Northern's

4  predecessor.  Therefore, discovery directed to Royal would

5  necessarily implicate the understanding the intent of Grace's

6  predecessor with respect to the nature and the scope of the

7  coverage that it was providing pursuant to the indemnity

8  agreement -- one of the indemnity agreements that we talked

9  about earlier that was issued -- that was in existence between

10 Grace's predecessor and Burlington Northern's predecessor that

11 --

12          THE COURT:  Well, all they're asking for is copies

13 of the policy.

14          MR. PERNICONE:  They're asking -- well, first of all

15 in the case of my client, Your Honor, there are no policies.

16 It's all secondary evidence of the existence of coverage.

17 There is --

18          THE COURT:  Well then it's --

19          MR. PERNICONE:  -- no policy.

20          THE COURT:  -- then it's -- that's an easy answer.

21 You don't have any documents responsive to the request.

22          MR. PERNICONE:  But if discovery is pursued with

23 respect to, okay, what's the scope of the coverage that's

24 provide -- what was the intent of the coverage that's provide,

25 Royal's not going to be able to answer those questions.

1    Going to have to go to Grace to get the answers to those

2    questions.  So Grace is going to inevitably be dragged into a

3    discovery dispute.  It is not collateral and independent of

4    Grace.

5            THE COURT:  Right now I am looking at a document

6    request which is for copies of policies that appear not to

7    implicate the Debtor because the Debtor is not an insured.  The

8    fact that the Debtor paid for the policies for someone else --

9    as long as the Debtor's not an insured and has no rights to

10   claim proceeds is an irrelevancy, isn't it?

11           MR. PERNICONE:  Well, it doesn't implicate the

12   Debtor to the extent that it's not an insured, but it could

13   implicate the Debtor in other ways.

14   If the policy itself doesn't exist then it's necessary to

15   reconstruct through secondary evidence the existence and the

16   terms of the policy, then the Debtor, which purchased the

17   coverage pursuant to an indemnity agreement, may very well be

18   dragged into the discovery to provide information about what

19   the nature and scope of the insurance was -- what the intent of

20   the coverage was.

21           THE COURT:  Okay, right now I think I am limiting

22   this to copies of policies.  If the policies don't exist,

23   somebody can say they don't exist and then I'll find out more

24   about this later.  But right now the issue is copies of

25   policies.

1          MR. PERNICONE:  Thank you, Your Honor.

2          MS. DICRISTOFARO:  Good afternoon, Your Honor.  And

3    I won't -- I know we're all -- and this is beside the point, a

4    lot of it -- there's only three major points that have to be

5    made.

6        We have invoked the injunction only because the coverage

7    alleged by BNSF -- now they are not pursuing from us policies

8    issued to them as insured not involving the Debtor.  The

9    policies alleged supposedly tie in with the indemnification

10   given by the Debtor to BNSF.

11         THE COURT:  So?

12         MS. DICRISTOFARO:  And as therefore those policies

13   implicate the Debtor, and as has already been implicated here,

14   that those may not be implicated at all because the Debtor's

15   indemnification supposedly doesn't apply.  But beyond that,

16   they are not standalone.

17       The policy alleged by Burlington -- and we've told them,

18   we've had -- we have no problem with policies they purchased

19   that are totally standalone.  Do not involve the Debtor, were

20   not purchased by the Debtor as part of their insurance program.

21   The point that we have here is Mr. Toole is seeking to have you

22   facilitate his own coverage issues that implicate the Debtor.

23         THE COURT:  Wait.  I -- all I think I --

24         MS. DICRISTOFARO:  We have no problem.  We already

25   gave him -- we did policy searches.  We gave him whatever

1 policies we found.

2          THE COURT:  All right.

3          MS. DICRISTOFARO:  We also gave him what he didn't

4 tell you, a copy of our letter to the Debtor, which saying that

5 those policies in our view -- any payments made on those

6 policies go back to the Debtor so that the Debtor is implicated

7 -- they're not standalone.  We gave him a copy of the policies

8 along with our letter to the Debtor.

9          THE COURT:  Okay.

10          MS. DICRISTOFARO:  We have a Proof of Claim.  So all

11 -- with respect to the policies, we've already given it to him.

12          THE COURT:  All right, then you don't have anything

13 more to produce.

14          MS. DICRISTOFARO:  Okay, Your Honor.  But I just

15 want to make the point that this is not standalone by any

16 means.

17          THE COURT:  Well, it may not be standalone but if

18 what he's looking for is copies of policies that do not

19 implicate -- the policies are not property of the Estate and as

20 to which the Debtors don't claim the proceeds, the fact that

21 there may or may not be an indemnity agreement that may be

22 affected by it isn't part of this discovery.

23          MS. DICRISTOFARO:  Oh, yes.  I'm not -- all we're

24 saying is it's not standalone in our view.  He misstated it and

25 that we've given him whatever policies we could locate.

1          THE COURT:  All right.

2          MR. WISLER:  Good afternoon, Your Honor.  Jeff

3   Wisler on behalf of Maryland Casualty.  Your Honor, the motion

4   Mr. Toole presented is not a motion that's been presented to

5   this Court.  I don't know exactly what the discovery requests

6   were that he gave you, but let me tell you what his motion

7   says.  His motion says that he's been sued by the Libby

8   claimants relating to Grace Asbestos.

9          And he said Libby -- the Libby claimants served him with

10  discovery and he was in a dilemma where he had to either

11  violate this Court's injunction or not answer discovery.  Libby

12  withdrew its discovery and said they wouldn't serve any more.

13         The next thing Mr. Toole said not in an amended motion but

14  in his reply is well, okay, we need these policies so we can

15  interpose defenses.  I have no idea what that means.  I don't

16  know what defenses he could possibly raise that hinge on the

17  existence or extent of insurance coverage.

18         What my problem is, Judge -- he's standing up here saying

19  we just want X.  And I'm not really sure what X is.  And he's

20  asking for an order on a motion that I haven't seen before

21  because now he's standing up here and just says he needs it

22  because he needs it because he's going to get it someday.  I

23  can't respond to that.

24         We responded to the motion he filed.  And the reasons --

25  the cause he came to this Court with doesn't exist.  So if he's

1  got new cause, he's either got to amend his motion or file a

2  new one.  I'm just not sure how to respond to this when he

3  hands you a discovery request that I personally hadn't seen and

4  Your Honor's saying, well, okay, if he just wants X, that's all

5  right.

6      I mean, that's a little too ambiguous.  We have to have

7  something concrete to respond to.  And what he's asking for, I

8  haven't seen before.

9          THE COURT:  Okay, well, Mr. Toole, that one I don't

10  have an answer for.

11          MR. WISLER:  And Your Honor -- you know, perhaps --

12  if you just look at his motion as filed, it's only four pages,

13  you'll understand what I'm talking about because it just asks

14  for something completely different.  And it gives cause that

15  he's not using now.

16          MR. BERNICK:  Your Honor, I just have one remark on

17  behalf of the Debtor.  This is a discovery request that takes

18  place in, as I read it, the Montana Court.  And I'm assuming --

19  all that Plaintiffs here are suing the State of Montana,

20  Burlington Northern's the same case.  If that case is stayed,

21  there is no vehicle for conducting any discovery.

22      Now, Your Honor has indicated what's wrong with giving him

23  the policies?  We have no stake in that.  Fine.  But what I do

24  have a stake in is having determinations getting made about

25  whether this Court has the power to do something with respect

1  to Burlington Northern and its insurers.

2      I don't know exactly how this policy situation is going to

3  pan out.  I hear the remarks of Counsel that there are letters

4  that actually may give the benefit of that to Grace.  And I

5  start to get nervous about whether I'm doing my job.

6      So, all I'm saying is as a practical matter today -- if

7  Your Honor stays this case, it may be that they want these

8  policies but there is no active case on the basis of which to

9  pursue this discovery.  So --

10      THE COURT:  I thought all I had was a motion asking

11  me to clarify whether or not my order stayed discovery against

12  insurance carriers for policies that are not Debtor's property.

13  And my answer to that is, no.

14      MR. BERNICK:  Understood.  Understood.

15      THE COURT:  Okay, that's it.

16      MR. BERNICK:  Right.

17      THE COURT:  The long and short of it, one word --

18  no.

19      MR. BERNICK:  Right.

20      THE COURT:  That's the end.

21      MR. BERNICK:  Well, but Your Honor, I think what

22  we're now going to then face -- that's fine.  If Your Honor

23  wants to say that, but that's great -- that disposes of it.

24  And now we're going to get an order that's tendered for Your

25  Honor's signature --

1          THE COURT:  Okay.

2          MR. BERNICK:  -- that's going to open this thing all

3  over again.

4          THE COURT:  No, it's not going to open it all over

5  again.  It's simply going to say --

6          MR. BERNICK:  I'm not going to do it, but we're

7  going to see what this actually turns into.  And Your Honor, if

8  this case is in fact stayed, all of that is moot.

9          THE COURT:  It may be moot if it's stayed.

10          MR. TOOLE:  Well, we do not believe that it will be

11  moot.  I won't reargue that.  If this Court has no jurisdiction

12  we should go be -- be free to go where we wish.  We should be

13  free to ascertain using other methods that do not implicate

14  this Court in getting this discovery.  And that's precisely

15  what we're looking for.

16      One aspect here, CNA is suggesting that because the Debtor

17  may have purchased these policies -- that is to say put up the

18  money in the first place -- that this {quote} "somehow

19  implicates the Debtor."  Once again, that's for another day,

20  either in this Court or elsewhere.

21      All that we're asking is that this Court clarify that it

22  has no jurisdiction and that we are free to get these -- this

23  insurance information in other jurisdictions.

24          THE COURT:  I think what I'm clarifying is that the

25  scope of the injunction that I entered does not cover a

1  discovery request against an insurer concerning insurance

2  policies that are not property of the Debtor's Estate and that

3  do not provide coverage in any respect to the Debtor.  That's

4  what I believe I am clarifying.

5          MR. TOOLE:  Thank you, Your Honor.

6          THE COURT:  And I will take an order from you, Mr.

7  Toole, that will make that clarification.

8          MR. TOOLE:  Very good.

9          MR. BERNICK:  I think, Your Honor --

10         MS. DICRISTOFARO:  Just one quick thing.

11         MR. BERNICK:  Go ahead, go ahead, yeah.

12         MS. DICRISTOFARO:  Your Honor, just to be clear, we

13  are providing policies to Mr. Toole -- have already provided

14  the policies.  However the scope of other types of discovery,

15  which I think he just tried to broaden what Your Honor's ruling

16  was clearly implicate the Debtor.

17         THE COURT:  I am not broadening discovery to

18  implicate the Debtor.

19         MS. DICRISTOFARO:  Okay.

20         THE COURT:  I think -- I cannot -- I don't think I

21  can be any more clear.  I am -- what I did not intend to do --

22  what I did not do is bar any discovery concerning policies of

23  insurance that the Debtor is not an insured in and as to which

24  the Debtor makes no claim to proceeds.

25      If there is other discovery that implicates the Debtor,

1 Mr. Bernick knows how to protect the Debtor's interest.  He

2 does it every day in this Courtroom and I am sure I will hear

3 from him.

4          MS. DICRISTOFARO:  Well, Your Honor, the problem is

5 is that the policies, as Mr. Pernicone was explaining to you --

6 the policies automatically implicate the Debtor.

7          THE COURT:  Then --

8          MS. DICRISTOFARO:  They're based on the Debtor's

9 operations and they're based on the Debtor's purchase.  You

10 can't have coverage situations without the purchaser -- the

11 Debtor.  You can't have a coverage interpretation.  That's why

12 we think these policies are already covered by Your Honor's

13 injunction.

14          THE COURT:  Well, okay.  At this point if they're

15 covered by my injunction, they are.  My ruling is very simple.

16          MS. DICRISTOFARO:  Okay.

17          THE COURT:  And I believe as clear as I can make it

18 -- if it's not the Debtor's property and the Debtor isn't

19 claiming proceeds under it, I don't see how it's covered by my

20 injunction.  That's it.  If it is the Debtor's property, and

21 the Debtor is covered somehow under the policy, it's covered by

22 the injunction.

23          MS. DICRISTOFARO:  All right, Your Honor.

24          MR. COHN:  I believe we're done with Libby related

25 things for the day -- may I please be excused?

1            THE COURT:  Yes, sir.

2            MR. COHN:  Thank you.

3            THE COURT:  All right.  I will sign the order with

4    respect to item 8 when I get it from Mr. Toole on a

5    Certification of Counsel.  Mr. Bernick, what's next?

6            MR. BERNICK:  What's next, I believe, is by

7    agreement item 17, which is a report -- I don't know if it's

8    item 17.  Mr. Restivo should be on the phone, knowing that he

9    has 3½ minutes to cover the subject.  But it's supposed to be a

10   report -- is it item 16 -- on what's going to be happening with

11   respect to the upcoming trial.

12       I have to tell Your Honor as a process point I just got an

13   email and the last flight that I can take this evening is at

14   8:10 and for personal reasons I have to be back in Chicago

15   tonight.  So I'm not going to be able to stay here past 7

16   o'clock.

17       And whatever that means with respect to the schedule, I --

18   we'll have to work out, but I didn't think that we were going

19   to be proceeding in this fashion.  I'm not suggesting any

20   criticism of Your Honor.

21           THE COURT:  There is nothing I can do, Mr. Bernick.

22   I will be here and if the Debtor is unrepresented, we are going

23   forward with the schedule.

24           MR. BERNICK:  Well, I appreciate that.

25           THE COURT:  Okay.  Mr. Restivo?

1          MR. RESTIVO:  Good afternoon, Your Honor.  There are

2     213 remaining property damage claims left, of which 180 are

3     subject to Motions for Summary Judgment.  All but 72 of those

4     are pending for the Court.  What that means is remaining is as

5     follows.  We intend to try 15 remaining claims on June 26th on

6     statute of limitations and on Thursday we filed a notice

7     listing those claims.

8          We also intend to file -- to try on product ID

9     approximately 26 Speights & Runyon claims on June 26th that

10    were deferred.  As the Court knows, the issue of no hazard has

11    been moved down the line.  We will be filing a Motion to Add

12    Dr. Anderson as a risk assessment, but that's down the line.

13    And so that leaves a discussion only of what is to be tried or

14    argued on August 30 or on May 30.

15         We believe the first thing that is to be argued is our

16    Motion to Amend -- to be more specific as to product

17    identification objections and any other objections with respect

18    to approximately 26 Speights & Runyon cases.

19         Secondly, Your Honor, from the Debtor's perspective we

20    would like to argue our Motion for Summary Judgment on the

21    Canadian claims that originally were to be argued on April 9.

22    And so from the Debtor's perspective, we think there are two

23    arguments.  First on whether or not the Debtor is given leave

24    to amend and be more precise in its objections on the

25    approximately 26 Speights & Runyon claims.

1      And secondly, the argument on our Motion for Summary

2  Judgment that the Canadian claims are barred by the pertinent

3  statute of limitations in Canada.

4          THE COURT:  Mr. Speights?

5          MR. SPEIGHTS:  Your Honor, I'll only respond to Mr.

6  Restivo's last point as to what needs to be argued or what he

7  would like to be argued on May 30.  And Mr. Restivo knows my

8  position.  First of all, I agree with Mr. Restivo that the

9  Motion to Amend should be heard on May 30th.

10     Secondly I disagree with Mr. Restivo as to his desire to

11 have Motions for Summary Judgment on these Canadian claims

12 heard on that date for several reasons.  First of all, I think

13 it's highly inappropriate to argue Motions for Summary Judgment

14 on objections that do not exist at this time.

15     We need to -- the very issue is whether he can amend his

16 objections to add -- I think it's 127 new objections to those

17 claims, which he wants to argue on March the -- excuse me, on

18 May the 30th.  So I want to have that resolved and May 30 suits

19 me to have that resolved.

20     If I win we don't have to deal with those.  If Mr. Restivo

21 wins then we move to my second problem, that if Your Honor

22 allows these objections to be added back in, I will want to

23 have some discovery on those issues, which are now being added

24 back or added for the first time into the litigation.  So

25 that's the second reason I would oppose it.

1     Thirdly, Your Honor, as I said I think at every Wednesday

2  in Pittsburgh I mentioned that since they have filed their

3  supplemental affidavit as to total -- Your Honor ruled that you

4  wouldn't strike the affidavit but I could take discovery.

5     I took the expert's deposition for a second time and as I

6  predicted, I do want to retain an expert.  We are in

7  conversations with an expert on that issue as well as I would

8  use the expert if they are allowed to amend these --

9  objections, I would want expert testimony on that as well.

10     So bottom line, trying to be as succinct as possible since

11  I've been here all day and I realize what's going on, I agree

12  we should argue on May 30 the Motion to Amend and depending on

13  what happens that day I'm happy to try to tee up the rest of

14  the matters perhaps on that June 26th date that Mr. Restivo

15  mentioned, or some other date convenient for the Court.

16          THE COURT:  Okay.  Mr. Restivo, because we're going

17  to be pushing, it appears, the confirmation process back, I

18  think I'm going to have some extra dates that would have been

19  scheduled for plan confirmation anyway.

20     I think what we should do is schedule the argument on May

21  30 on the statute of -- pardon me, on the Motion to Amend and

22  address on May 30 -- I will try to give you rulings that day.

23  I will attempt to be prepared, to have read the pleadings and

24  the cases that you cite, and hear your argument and see whether

25  I can rule that day.  I will do my best.

1    So hopefully we can come up with a schedule, if it's

2    necessary, for the discovery if it's going to go forward and do

3    an argument if it's going to be necessary shortly thereafter.

4    And pick a date that day to do it so that it will not delay any

5    further any confirmation but I believe we can do it in

6    reasonably short order.  There will be days available to fit

7    that in.  So --

8         MR. RESTIVO:  And we'll be able to talk about those

9    available dates on the 30th, Your Honor?

10        THE COURT:  Yes, sir.

11        MR. RESTIVO:  Thank you, Your Honor.  That's all I

12   have in terms of -- I believe it's the next item.  The Court

13   wanted a status report on where settlement stands, and Mr.

14   Bernick will be giving that.

15        THE COURT:  All right, thank you.

16        MR. BERNICK:  This is agenda item 17.

17        THE COURT:  Okay.

18        MR. BERNICK:  I have a list here.  I've got a series

19   of claims.  They fall in -- some of them -- into categories.

20   I'm just going to recite the number of claims, the status and

21   that'll be it.  PD Claimant Building Laborers Union Local 310,

22   there's one claim.  Settlement was signed.  Motion for Approval

23   filed May the 2nd.

24        Trumbull Memorial Hospital is the next Claimant.  One

25   claim, settlement signed, Motion for Approval to be filed the

1   week of May 21.

2       Sempra Energy, one claim.  There was a request for some

3   small revisions to the draft settlement agreement.  We've

4   agreed to virtually all of them, basically it's been sent back

5   to the Claimant on May 15 and we're waiting for comment.  So

6   that is in the process of being documented.

7       Prudential Claimant, six claims.  Grace basically --

8   there's been some further discussion about the terms -- one of

9   the terms, particular terms of that, but that is not yet ready

10  for presentation.  But they're -- I think it's probably fair to

11  say that the drafting process is fairly advanced.

12      Then there are PD Claimants represented by Mr. Dies.

13  There are 258 of these claims.  We've provided the draft

14  settlement agreement.  We've responded to some requests to

15  include provisions that were taken also -- or were present also

16  in the USG case.  There's some further comments that have --

17  that we've done that -- further comments from Mr. Dies and

18  we're still in the process of finalizing that settlement

19  document.

20      City of Philadelphia, one claim.  That's yet to get to the

21  document drafting stage but it's in the information exchange

22  stage -- probably the best way to talk about it.

23      Then there are PD Claimants represented by Thomas Brandy.

24  There are 50 University of California claims plus one Pacific

25  Freeholds claim.  These discussions are in an early stage.

1  That's where we stand.

2           THE COURT:  Okay.

3           MR. BERNICK:  There's a request to go back to the --

4           MR. MONACO:  Your Honor, I just -- for purposes of

5  scheduling.  I'm -- I think I'm #8 on the agenda, which is the

6  Motion for Reconsideration of the denial of the relief of stay.

7  I didn't know where you -- when you wanted to hear -- I don't

8  think I'm going to be that long.

9           THE COURT:  I have it as item 9.  Frankly I've read

10 your pleadings.  I'm not -- whatever else you want to tell me

11 in addition to your pleadings, tell me.  But I have read them,

12 so if you've something additional you want to state, go ahead

13 and state it.

14          MR. MONACO:  Does Your Honor want me to go forward

15 right now?

16          THE COURT:  Yes, go ahead.

17          MR. MONACO:  Okay.  Thank you, Your Honor.  Your

18 Honor, I did file a Motion for Leave to follow reply and I'm

19 happy to address those things orally.

20          MR. BERNICK:  I'm not in control of this anymore.

21          THE COURT:  Oh, I'm sorry.  I thought the property

22 damage stuff was finished.

23          MR. MONACO:  Oh.  I thought it was --

24          THE COURT:  I apologize.

25          MR. MONACO:  All right, Your Honor, I --

1          THE COURT:  Folks, you know, I'm sorry about the

2    flights.  I'd like to go home too.  Everybody's staying.

3    That's just the way it is.  We're staying.  You're not

4    released.  We're going to get done.  It's just the way it is.

5          We keep going into these agendas.  We have these

6    unreasonably long agendas.  I don't control the agendas.

7    Everybody has things that need to get done.  If you want to get

8    to confirmation, I'd like you to get to confirmation too.  We

9    have to get them finished.  I'm sorry, I --

10         MR. BAENA:  I agree, but we were in the middle of PD

11   and --

12         MR. MONACO:  Okay.

13         THE COURT:  I apologize, Mr. Baena.

14         MR. BAENA:  Okay.

15         THE COURT:  My agenda for this -- for today does not

16   even go up past #17, so I'm sorry.

17         MR. BERNICK:  Well, what's happened is I thought

18   that we were done with Montana, that Your Honor was going to

19   rule.  We've had extensive argument on all of these things.

20         THE COURT:  I am, but we have not addressed the

21   Motion for Reconsideration of the order that denied the relief

22   from stay, which I believe is what Mr. Monaco was going to

23   address.

24         MR. BERNICK:  But again -- Your Honor, if again --

25         MR. BAENA:  I --

1          THE COURT:  Okay.  I -- Mr. Monaco, let me finish

2   property damage, then we'll --

3          MR. MONACO:  That's fine, Your Honor.

4          THE COURT:  -- return to the State of Montana.

5          MR. MONACO:  I just want to make sure that I get

6   heard.

7          THE COURT:  Okay.  I'm sorry, Mr. Baena.  I missed a

8   property damage issue.  Okay.  Let's finish property damage.

9          MR. BERNICK:  The next issue is Anderson Memorial,

10  so I guess this is Mr. Speights' motion.  It's item 11.

11         MR. SPEIGHTS:  May it please the Court, I see we

12  have 10 minutes.  I'll try to do mine in five and Mr. Bernick

13  can respond in five, I'm not sure.

14         MR. BERNICK:  I'd agree on that.

15         MR. SPEIGHTS:  Your Honor, this is a Motion to

16  Compel Grace to provide a privilege log.  I think I can state

17  it very succinctly.  Round 1, 2005, we served discovery.  Grace

18  objected to everything.  Finally, nine months later, Your Honor

19  said go back and redraft your discovery.  I'm not going to let

20  you have discovery about the bar date.  I am going to lift the

21  stay.

22      And you told Mr. Bernick at the October hearing that I do

23  agree that with respect to an assertion of privilege, that is

24  not something that the Court can address in blank, that you do

25  have to do a privilege log.  Mr. Bernick, if there's an

126

1    assertion of privilege it would have to be done by a privilege

2    log.  The cases are really clear.

3        Round 2 starts October 2006.  I reserved the -- or redid

4    the discovery and served them.  I did something else as well --

5    I did a notice of a custodian's deposition because there had

6    been so much talk about the vast number of documents and how

7    difficult it would be, et cetera, et cetera.

8        And I wanted to stick a pin in that balloon and see what

9    was actually there.  So I had to make a Motion to Compel the

10    custodian.  Your Honor granted that motion.  Over a period of

11    three months -- and I'll leave out the details, I finally got

12    the custodian's deposition and what do we know, Your Honor?

13        We know as I predicted that all of the Grace documents

14    were held either by Grace itself at its Boca Raton facility or

15    with its national Counsel in New York or with the South

16    Carolina Counsel.  I asked in my request to produce -- the last

17    one -- just documents that existed pertaining to Anderson

18    before the petition for reorganization was filed.

19        As a result of these depositions, we now know that we are

20    dealing with a total of 5½ -- I'll round it off to 6 -- that's

21    a total universe of documents because I excluded pleadings --

22    I'm not -- I don't want any pleadings.  And I excluded

23    discovery that I sent them or they sent me already.  So if we

24    limited it to that -- and I could show you by reference to line

25    and page of the depositions, we have 5½ or 6 bankers boxes of

1 documents.

2     Now I have that request to produce outstanding.  I think

3 they have to file a privilege log.  When they file the

4 privilege log, then I may or may not file a Motion to Compel

5 certain documents which are on the privilege log, but I daresay

6 it in a very modest amount of time somebody could go through

7 those six boxes of documents and prepare a privilege log.  And

8 I would ask that it be done as quickly as possible.  I did it

9 in four minutes, Your Honor.

10          THE COURT:  All right, Mr. Bernick.

11          MR. BERNICK:  This is emblematic of the problems

12 that we face in this case when we have the same issue raised

13 again, and again, and again and again.  It's abusive.  And this

14 is just a continuation of the abuse.

15          THE COURT:  Mr. Bernick --

16          MR. BERNICK:  Question --

17          THE COURT:  That -- pardon me, but that happens on

18 all sides, including the Debtor.  And that's the reason --

19          MR. BERNICK:  Well, I --

20          THE COURT:  -- why this Court is sitting here --

21          MR. BERNICK:  -- I take --

22          THE COURT:  -- listening for hours on end --

23          MR. BERNICK:  No, Your Honor.

24          THE COURT:  -- to everybody restating the same

25 arguments --

1          MR. BERNICK:  With --

2          THE COURT:  -- that I too have heard at ad

3    infinitum, week after week after week.

4          MR. BERNICK:  These are not at the Debtor's

5    suggestion.  I think, Your Honor, the record is completely and

6    utterly clear that the reason we have so many items on the

7    agenda and it takes so long is that we have multiple arguments

8    that are essentially being made on behalf of the same

9    constituency -- multiple times, people don't comply with Your

10   Honor's orders.

11        They come in here and take all afternoon on matters that

12   happen to be of particular interest to them and this is a

13   perfect, perfect example of this.  This matter was argued on

14   class certification more than a year -- year and a half ago.

15   And we now have a class that's comprised of one Claimant -- one

16   Claimant -- and we're still here talking about class

17   certification.

18        And, Your Honor, the last time that we were here, I spent

19   10 minutes talking about how abusive this is -- it is totally

20   and utterly abusive.  And as a result of that, I can't take any

21   credit for the result, but Your Honor finally said, let's have

22   the class certification heard.  And again, this is just -- I

23   could quote chapter and verse of all the things that occupy

24   these agendas.

25        They have almost nothing to do with the mainstream of the

1  case.  They have to do with getting compliance with Your

2  Honor's orders.  That's why we're here.  And Your Honor said

3  last time, we're going to have a class certification argument

4  on the 8th of June.

5          THE COURT:  Yes.

6          MR. BERNICK:  And the whole idea was, get this thing

7  done.  And now what happens is the very same waste of time that

8  we've experienced for the last 18 months is now being tunneled

9  and again -- here again.

10      Your Honor, they made -- Mr. Speights made a request in

11  connection with Anderson for a wide variety of things, none of

12  which were relevant.  You wanted to know about settlement

13  discussions.  You wanted to know about invoices, when the

14  notice program had already been held to be sufficient.  You

15  wanted to know why he was not -- why Grace opposed his being on

16  the property damage committee.

17      You wanted to know all about adequacy of Counsel issues,

18  when we were already prepared to stipulate to adequacy of

19  Counsel.  And what happened was none of those things actually

20  came to resolution because he was very clever.

21      What he said was, gee, I'm not going to press forward on

22  those substantive matters because Your Honor told him months

23  ago he had to articulate a nexus between what he was asking for

24  in class certification, which he couldn't do.  And instead he

25  said, just give me that one -- just that one -- it won't be

1  very painful -- that one custodial deposition.

2      Well, one custodial deposition then turned into two

3  custodial depositions, still no articulation of any nexus

4  between the discovery he seeks in class certification.  We then

5  produced boxes of documents to Mr. Speights.  And now he comes

6  in and says, well, just do a privilege log with respect to the

7  balance of the five boxes.  For what purpose?

8      These are lawyers' logs.  These are lawyers' files.  So

9  now we're going to go through the process of logging all these

10 documents so he can come back in and take issue with our

11 privilege calls?  This is so -- this is so completely the

12 reverse of a process that's focused on what is it that is

13 relevant to class certification.  It's just -- there's just no

14 more benchmark anymore.

15     So, Your Honor, we will -- you know, whatever you say.

16 You want us to do a privilege log, we'll do a privilege log.

17 And we'll waste more time doing that.  The question is, what is

18 needed for the hearing on June the 8th?

19     And I've said repeatedly, Your Honor, if after that

20 hearing, Your Honor believes that there is some matter, that it

21 warrants some further discovery, you can always decide that at

22 that time.

23     But all that's happening right now is frankly that Mr.

24 Speights is being abusive in the continuation of a discovery

25 process where he has yet to come forward and demonstrate to

1 Your Honor that it has any relevance to an element of Rule 23.

2 The abuse simply continues.

3          THE COURT:  Mr. Speights?

4          MR. SPEIGHTS:  Abusive, I've taken a custodian's

5 deposition in a year and a half, Your Honor.  Actually they had

6 to produce the second person after they failed to do it the

7 first time.  All I told Your Honor when you wanted to set it on

8 June 8, I said I have some discovery outstanding.

9     This is not something new.  This has been out there.  They

10 served their request to produce.  I filed a motion for the

11 privilege log.  Your Honor said I'm entitled to privilege log.

12 It's done every day in America.  I'm sure Mr. Bernick wants PI

13 to produce privilege logs, et cetera, et cetera.

14     I just took the custodian's to show that it was really

15 only six boxes of documents.  So, I just want the privilege

16 log.  I'm not trying to postpone the hearing.  I'm trying to

17 get it so we can have the hearing.  And it may or may not be

18 something else I want, we can deal with on June the 8th.

19 However --

20          THE COURT:  Okay --

21          MR. SPEIGHTS:  Mr. Bernick said we produced boxes

22 and boxes of documents?  I didn't see boxes and boxes of

23 documents.  I've seen just a few documents attached to a

24 letter.  I haven't had the boxes and boxes of documents.

25     I just want the privilege log, Your Honor.  I don't think

1  that's a whole lot to ask after a year and a half.  And we

2  should have -- this could have been done back in January '06.

3          THE COURT:  Well, it probably could have but Mr.

4  Speights, honestly, at this point in time with one case that

5  appears to be relevant to this -- to the class certification

6  motion, I am a little confused as to what is going to happen in

7  this class certification hearing.  I am really a little at a

8  loss as to where this motion is going to go.

9          MR. SPEIGHTS:  Your Honor, once again -- and this is

10 Mr. Bernick's tactic since -- for a year now.  Every time we

11 argue a discovery matter, like in October 2006, he wants to

12 argue the merits and he wants to say it's been argued before.

13 It's never been argued before.  And I say, Your Honor, I'm

14 going to get my records straight.  I understand your

15 reservations.

16    And Your Honor rules -- you said right then, redo the

17 discovery.  If that was the case, I shouldn't have had to redo

18 the discovery, take a custodian's deposition or seek a

19 privilege log because nothing has changed since, you know,

20 October 2006.  That's the exact argument we had.

21    It's the exact argument Mr. Bernick has probably made six

22 or eight times -- every time I stand up.  And every time I

23 stand up and I say, I want and evidentiary hearing.

24          THE COURT:  Well, what's -- pardon me, but what's

25 changing is that the number of claims keeps going down.  And if

1  in fact we're down to one claim that may qualify for class

2  action treatment, I don't see how a class action of one is

3  going to work.  So --

4         MR. SPEIGHTS:  We are not down to one, Your Honor.

5         THE COURT:  All right, well, that's what I need to

6  hear, because I did ask, Mr. Speights, for some indication of

7  how this is relevant, and I still don't know.

8         MR. SPEIGHTS:  Well, Your Honor, Mr. Bernick wants

9  to talk about Anderson as if it is a punitive class action or

10 perhaps he would admit now, an actual class action on behalf of

11 the State of South Carolina.

12     As Your Honor knows, when we filed the class Proof of

13 Claim in this Court and I asked for certification, we've asked

14 for a certification on behalf of all of the claims that fall

15 under the Anderson umbrella.  It's not limited to South

16 Carolina.  And the reason it's not limited to South Carolina is

17 that we were in a Federal Court.

18     And in Federal Court, the South Carolina door-closing

19 statute does not apply.  That is a specific holding of the

20 Central Wesleyan case, the college is class action.  So

21 Anderson has asked you -- and is going to ask you in arguments

22 on June 8th to certify a class not only as to South Carolina

23 building owners -- and we can talk about those building owners

24 -- but behalf of all building owners in the original definition

25 of the punitive class, which should include buildings in the

1  United States and buildings in Canada as well.

2      The class includes all Speights and Runyon buildings other

3  than the California buildings -- the California colleges and

4  universities in that pre-filed case which Mr. Bernick just

5  referred to.  So, all of our buildings are under the Anderson

6  umbrella.  That's what our claim is, and that's what I want to

7  see his privilege log -- very basic discovery and we'll go and

8  we'll argue it on June 8.

9          THE COURT:  Okay.  Mr. Bernick, I have no idea

10  whether this is relevant or not, or calculated to lead to

11  relevant evidence or related to this class action.

12      I truly do not know.  But at this point in time it seems

13  to me to get past this the best thing to do is create the

14  privilege log.  If it's six boxes of documents, frankly, it's

15  just better to do it.  I just don't know how to get past this

16  issue any longer and actually get to the trial.

17          MR. BERNICK:  Your Honor, we will do what you order.

18  I am not aware of any rule in procedure anywhere that permits

19  Counsel for a Claimant to ask for the -- for a Defendant to

20  engage in something at its own expense where there's no showing

21  of relevance.  I don't think that -- I mean, that's just

22  unknown to me in the --

23          THE COURT:  Well --

24          MR. BERNICK:  But, Your Honor, we'll do it.

25          THE COURT:  Wait, maybe I'm -- wait.

1              MR. BERNICK:  But this --

2              THE COURT:  Maybe I'm misunderstanding.  I thought

3    the Debtor was objecting to the production based on the claim

4    of privilege.  Is that not the case?

5              MR. BERNICK:  I -- well, I'm sure that there --

6    these are lawyer's files.  I'm sure that there are privileged

7    documents.

8              THE COURT:  Okay.  Then if that --

9              MR. BERNICK:  But the objection is the same

10   objection that we've made repeatedly, Your Honor.  We moved for

11   a Protective Order.

12             THE COURT:  Yes.

13             MR. BERNICK:  Because none of this had any tangible

14   relationship on relevance grounds to Rule 23.  And Your Honor

15   nonetheless said give 'em a custodial deposition --

16             THE COURT:  I did.

17             MR. BERNICK:  Give 'em this, give 'em that.  And --

18   well, that's how we've been proceeding.  And with complete

19   respect for Your Honor, the more that this case sees these

20   kinds of requests getting traction with Your Honor, the more

21   they will occur --

22             THE COURT:  Oh --

23             MR. BERNICK:  And the more that we're going to have

24   compliance problems.

25             THE COURT:  Mr. Bernick, I thought that the

1  objection was based on not producing documents on a claim of

2  privilege.  I'm sorry.  The issue apparently is that there is

3  an objection to relevance.

4          MR. BERNICK:  We've objected to all of this

5  discovery, including this discovery on grounds of relevance to

6  Rule 23, not -- well, I don't know, whatever may be relevant to

7  his claims is what -- the touchstone for class discovery is

8  Rule 23.

9          THE COURT:  All right.

10         MR. BERNICK:  Never been in articulation.

11         THE COURT:  Okay, I apologize.  As I said, I simply

12  misunderstood the nature of this particular objection.  I am --

13  Mr. Speights, if the issue is relevance and not based on a

14  claim of privilege, I see no basis on which to compel the

15  production of a privilege log if there is not an objection to

16  production based on privilege.

17      The rule requires the production of a privilege log when a

18  document is withheld based on the claim of privilege.  If that

19  is not the basis for withholding the document, it is not the

20  basis for the production of a privilege log.

21         MR. BERNICK:  Your Honor, I don't want to go down

22  the wrong road -- we have objected to all of this discovery,

23  including the discovery of documents on grounds of relevance.

24  We obviously also have a further objection on grounds of

25  privilege.

1      We're not in the business of producing attorney's files.

2   So the threshold problem is relevance but we are not waiving

3   privilege.

4           THE COURT:  Okay, well, with respect to the issue of

5   relevance, I do not understand the relevance to the Anderson

6   Memorial pre-petition files with respect to the class

7   certification motion that is pending.

8      The discovery that took place in the Anderson Memorial

9   pre-petition case included the entire State Court file.  I do

10  not know what discovery was included in that process, but

11  whatever discovery was included in that process was part of the

12  proceedings before the State Court and therefore was included

13  in the process.

14     I do not understand the relevance.  Mr. Speights, unless

15  and until I can understand the relevance, I am not going to

16  compel the production of the documents.  To the extent that

17  there is an objection based on a ground of privilege, a

18  privilege log must be produced.

19     But to the extent that the objection is relevance, it's

20  your burden to substantiate that the documents are calculated

21  to lead to relevant and admissible evidence.  And frankly, that

22  is still the piece I'm missing.  I still do not connect this

23  information and this request to the evidentiary hearing that's

24  going to forward June 8th.

25          MR. SPEIGHTS:  I want to bring closure to this issue

1  like you --

2          THE COURT:  All right.

3          MR. SPEIGHTS:  -- do, Your Honor.  And I'm not

4  arguing with Your Honor.  I just -- I think we need to have a

5  little clarification here.

6      What's not before the Court today per se would be a Motion

7  to Compel Grace's responses and objections to Anderson Memorial

8  Hospital's October 30, 2006, amended request for production.

9  Grace has filed this response to my request to produce and in

10  that response it has raised a plethora of objections.

11      It has responded to some.  It has objected to all.  It has

12  objected to everything that's provided for in the Federal Rules

13  of Civil Procedure has a basis for objection and then some

14  Grace has included in this, including privilege.  So I'm

15  sitting here with a chicken and an egg.

16      I chose the chicken and said, well, Your Honor has said

17  you have to produce a privilege log so at least give me that

18  and I can figure this out.  If Your Honor wants me -- and they

19  do claim privilege -- and I believe you just said they should

20  file a privilege log.  If they don't need to file a privilege

21  log, then I'll move -- and I must first attack relevancy, I'll

22  file a Motion to Compel on relevancy.

23          THE COURT:  I think you need to substantiate the

24  relevance.  Then if there is an objection based on a claim of

25  privilege because I can understand the relevance, then I will

1  compel a privilege log if that -- if we get there.

2      What I am missing is how this discovery request is going

3  to advance the litigation on June 8th.  I don't understand what

4  it is going to have to do with the trial on the class

5  certification that is scheduled June 8th.

6          MR. SPEIGHTS:  I understand that, Your Honor, and

7  I'll file a Motion to Compel on the relevancy -- on the

8  document itself and I'll file a Motion for Expedited Hearing on

9  that.  And I'll probably ask Your Honor -- and I know you can't

10  tell me now, you'll hear it on the 30th when I'll be in

11  Pittsburgh.

12          THE COURT:  I will hear it on the 30th.  I'll tell

13  you that now.  You do not need to file a Motion to Expedite.

14  But you do need to file the motion promptly so that the Debtor

15  can respond to it at least three business days before that

16  hearing so that I can read it.  So that Monday -- I don't -- I

17  apologize, I don't have a calendar.

18      That Monday is a Federal holiday, so I need the documents

19  filed at least by that Monday night so that when I get in on

20  Tuesday I have them so that I can hear them.  I think it's the

21  28th -- Monday, I believe.  And you're coming Wednesday, I

22  believe, correct?

23          MR. SPEIGHTS:  Wednesday in Pittsburgh, Your Honor.

24          THE COURT:  All right.  So I need the documents

25  filed -- I need the responses filed by Monday night so I have

1  them Tuesday to read them in preparation for the argument on

2  Wednesday.

3      So you, Mr. Speights, need to file your motion -- today's

4  Monday -- by Wednesday this week, so that the Debtor can

5  respond at least by Monday of next week so that I have the

6  documents Tuesday.

7          MR. BERNICK:  I will --

8          MR. SPEIGHTS:  Thank you, Your Honor.

9          MR. BERNICK:  I will not be here on the 30th.  That

10  is for property damage -- the property damage trial.  I wasn't

11  aware that any other matters were going to be scheduled for the

12  30th.  I'm happy to participate by phone --

13          THE COURT:  That's fine.

14          MR. BERNICK:  -- if that's okay with Your Honor.

15  But I'm assuming it'll be a relatively short argument --

16          THE COURT:  It will --

17          MR. BERNICK:  I will be in the middle of another

18  proceeding.

19          THE COURT:  Mr. Bernick, the one thing I agree 100%

20  with that you've said today is that in all matters from

21  henceforth I should limit arguments.  So I'm going to speak

22  with my clerk and come up with a reasonable expectation --

23          MR. BERNICK:  God bless you.

24          THE COURT:  -- for all arguments and I think this --

25          MR. BERNICK:  I'll stay here for 24 hours, 48 hours

1  if we get limits on arguments --

2          THE COURT:  I --

3          MR. BERNICK:  It has been worthwhile today.

4          THE COURT:  All right.  I believe what we will do

5  with respect to this -- because I have heard this before -- but

6  I do want to know what the relevance is, 20 minutes per side.

7  I think that should be a fair assessment.

8      So, I will set it for 20 minutes -- that should be Mr.

9  Speights, the Debtor and I will say 20 minutes for all other

10  parties because I'm not sure anybody else has a position to

11  take with respect to this matter.  All right.  Let me make a

12  note.  What were the dates that I gave you, Mr. Speights --

13  your motion is due Wednesday --

14          MR. SPEIGHTS:  Wednesday, Your Honor.

15          THE COURT:  Debtor's response, May 28.  And argument

16  in Pittsburgh by phone on May 30.  I'm not sure what time that

17  starts, Mr. Speights -- at 10?

18          MR. SPEIGHTS:  I actually think you -- I'm sorry

19  about -- I actually think you set it at 9, but 9 or 10 suits

20  me, I don't care.  I'll come in the night before.

21          MR. BERNICK:  Can we -- can I ask for the Court's

22  indulgence -- and given the fact that folks are going to be

23  here on that -- other matters anyhow, if I could try to find

24  out what might actually mean that I can participate in this

25  other proceeding without kind of interrupting --

1          THE COURT:  That's fine.

2          MR. SPEIGHTS:  We have the other matter with Mr.

3  Restivo that morning.  I don't know if he's still on the call?

4          MR. RESTIVO:  I am still on the phone.  I do think

5  it was set, Your Honor, for 9 o'clock originally but again, the

6  Debtor -- we can do 9 or 10, whatever is convenient for the

7  Court --

8          THE COURT:  Well --

9          MR. RESTIVO:  -- and Mr. Speights -- doesn't matter

10  to us, we're here.

11          THE COURT:  9 o'clock is fine and Mr. Bernick will

12  let you know when he is available and if we need to interrupt

13  the proceedings to take this argument with Mr. Speights on the

14  Anderson Memorial discovery issue, we'll interrupt the

15  proceedings for Mr. Bernick's accommodation and then we'll get

16  back to the issue.

17      If anyone else wishes to participate, make your

18  arrangements with Courtcall, otherwise I will expect Mr.

19  Bernick calling in and anything else will simply involve the

20  argument on the Motion to Amend the objection to claim.  Okay?

21  How are we doing and where are we going --

22          MR. BERNICK:  Yeah, we have --

23          THE COURT:  -- should we stay?

24          MR. BERNICK:  We have a total of four items that are

25  left.  One deals with -- it's item 12, it's the supplementation

1  issue that is under what circumstances can there be

2  supplementation for a property damage claim.

3       We've had a dialogue -- Mr. Baena and I -- to see if we

4  might be able to resolve that.  I still think we probably can

5  resolve it because my answer to your last question, Scott, is

6  that, yeah, we can make an arrangement under 7015.  I need to

7  know a little bit more about to what it applies, but rather

8  than try to take up time with that now, maybe that's something

9  that we can work on between now and next week.

10      I'm not going to be here either but maybe we can just take

11 it up by phone.  Is that -- would that -- so with that said

12 maybe we can continue this to -- for a further report to the

13 Court on the 30th.  Maybe we won't even need to have any

14 further discussion on it, if that's all right with Mr. Baena.

15           THE COURT:  For May 30th?

16           MR. BERNICK:  For -- I'm sorry, for May 30th, yeah.

17           THE COURT:  Mr. Baena?

18           MR. BAENA:  If I can also appear by phone --

19           THE COURT:  You may appear by phone.

20           MR. BAENA:  Thank you.

21           THE COURT:  All right.  So you two will work out the

22 time that this is going to happen in conjunction with Mr.

23 Restivo and Mr. Speights?

24           MR. BERNICK:  Yes.

25           THE COURT:  All right.

1          MR. BERNICK:  I mean, it really is not going to take

2     very much time.  We then have three additional matters.  We

3     have the next matter up is -- these are now all personal injury

4     matters.  We have --

5          MR. RESTIVO:  Your Honor, I don't mean to interrupt,

6     Jim Restivo.  Since we are done with property damage, might I

7     be excused?

8          THE COURT:  Yes, anybody may leave at any time that

9     you choose to leave.  Okay.  Mr. Bernick?

10          MR. BERNICK:  Yes, the next matter -- we have three

11     issues.  We have the Early Ludwick issue, and I know Ms. Ramsey

12     is still here to deal with that.  We have the X-ray compliance

13     order, which I think will be a short discussion.  We've been

14     here a couple -- three different times on that.

15          And then we have the Case Management Order, which I would

16     have assumed would be relatively short because we're down to

17     essentially two issues and we're prepared to basically agree on

18     one, so it's a single issue.  So I think we can probably get

19     done by 7.  But it's --

20          THE COURT:  And then I have Mr. Monaco's argument.

21          MR. BERNICK:  Yeah.

22          THE COURT:  Can you folks stay 'til 7 if we do it

23     that way instead and then just leave for the day?  All right,

24     that's what we'll do.

25          MR. BERNICK:  Okay.  On the Early Ludwick motion --

1  and I think that -- I don't know who's going to be -- is there

2  anyone else that's going to be here besides you, Natalie, for

3  that?

4          MS. RAMSEY:  Yes.

5          MR. BERNICK:  Okay.  About how much time do you

6  think that's going to take?

7          THE COURT:  Well --

8          MS. RAMSEY:  20, 25 minutes.

9          MR. BERNICK:  For you alone?

10         MS. RAMSEY:  For me alone.

11         MR. BERNICK:  Oh, well --

12         THE COURT:  How much?  I couldn't hear her.

13         MR. BERNICK:  She said 25 minutes.  I --

14         THE COURT:  We're not going to get finished by 7 if

15  that's the case.  That will not happen.  I want to deal with

16  Mr. Monaco.  I deferred his -- Mr. Bernick, what else do we

17  need to cover that you need to be here for?

18         MR. BERNICK:  Well, the X-ray issue is really just a

19  question of -- it's an order the deadline for which already has

20  passed, so it really is more in the nature of what your order

21  means.  And I think we could probably defer that.  With respect

22  to the CMO --

23         THE COURT:  Wait.  What agenda numbers please?

24         MR. BERNICK:  That's 15.

25         THE COURT:  All right.

1          MR. BERNICK:  With respect to the CMO --

2          MR. FINCH:  Your Honor, just on item 15, I think

3   there might not be any dispute about it.  I just haven't seen -

4   - I don't know if you've made any changes to the order since

5   you circulated it before.  If you could just send that to me

6   and Ray and Sandy and Natalie, we might be able --

7          MR. BERNICK:  Well, we'll talk -- maybe we'll talk

8   about it when they're talk -- when Ms. -- let's talk about it

9   here in a second.  On the CMO, there's actually agreement on

10  everything with two exceptions.

11      Basically, Your Honor will recall that we're deferring the

12  due date for the expert reports and then the schedule slides

13  accordingly.  It's kind of a 30-day shift.  Now there were two

14  areas of disagreement.  And again, I don't know that we have to

15  do it today.

16      One was that we wanted to have a simultaneous cutoff of

17  fact and expert discovery on the 18th of October.  And then

18  have Daubert hearings on -- let me be clear.  Daubert hearings

19  on the model issue -- that is whether their back -- their model

20  that works with settlements is a scientifically reliable model.

21  It's not Daubert -- not all the Daubert issues but kind of the

22  Daubert issue on the estimation model.  And we wanted to have

23  that heard on the 30th of October when we have days that are

24  open.

25      It's the position of the other side that Daubert should be

1  taken up during trial or in connection with the trial -- in

2  light of the fact that we're going to be so close on expert

3  discovery anyhow, I think it's probably inevitable that we will

4  not be able to do Daubert on those days at the end of October.

5      We would like Your Honor to take up that threshold Daubert

6  issue before the trial starts.  I think it's very important for

7  that.  But I think that today -- for today, we would be

8  prepared not to have the Daubert hearing take place on the 31st

9  or 1st or 2nd of November, but then revisit at the next Omnibus

10  the question of whether there might be another time to schedule

11  that before the Bench trial itself.

12      So that's -- that may be an answer on Daubert that we

13  don't have to decide that today.

14          THE COURT:  All right.  Well, I brought a whole list

15  of dates when we might be able to talk about trial dates.  But

16  if we're running short of time I would suggest that maybe this

17  is an issue that could be deferred.  I'm looking at dates that

18  begin in January --

19          MR. BERNICK:  Right.

20          THE COURT:  -- and my -- I believe that if you want

21  to do Daubert first, I have two days -- January 7 and 8 and

22  that might be the appropriate time to do Daubert.  And we could

23  start the trial, frankly, the next week.

24          MR. BERNICK:  That might be fine.  In any event,

25  that'll be fine with the Debtor, but in any event I don't think

1  we're going to press today to have the CMO read out as to the

2  Daubert hearing.

3           UNIDENTIFIED SPEAKER:  That's fine.

4           MR. BERNICK:  Then the second question is, the

5  cutoff for fact discovery.  It's the position of the Claimants

6  that they want fact discovery to cut off on the 18th -- excuse

7  me, the 15th of August.  That is that --

8           UNIDENTIFIED SPEAKER:  30th.

9           MR. BERNICK:  30th of August.

10           UNIDENTIFIED SPEAKER:  31st.

11           MR. BERNICK:  Whatever it is.  The earlier fact

12  discovery cutoff from the expert discovery.  We disagree with

13  that because we need more time for the fact discovery unless

14  we're prepared -- unless we get assurances that what we need to

15  get done is going to get done by the 15th.

16           THE COURT:  Well, if the Daubert arguments are not

17  going to be until January 7th and 8th, does that push your

18  schedule back so that you can accommodate both of you?

19           MR. BERNICK:  It may be --

20           UNIDENTIFIED SPEAKER:  No, no.

21           MR. BERNICK:  -- but what I was going to suggest is

22  that again, I don't know that there's urgency to resolve that

23  particular issue today.  And I think that's going to take some

24  time to discuss because I know that the Claimants have views on

25  how much more fact discovery should be done.

1      Now, I don't want to suggest that somehow that's not

2   important, as is of the essence because we've had a lot of

3   problems there.  But I think that for purposes of today there

4   is no disagreement on what's happening with the schedule for

5   expert discovery and that accordingly we can go forward and

6   maybe take up these last two questions, which is Daubert and

7   the cutoff for fact discovery at the next Omnibus.

8           THE COURT:  I think maybe what we should do is use

9   one of the dates that were set for the personal injury

10  processes, if there's time available for one of them, because

11  we get stuck in these Omnibus hearings and never --

12          MR. BERNICK:  I don't --

13          THE COURT:  -- get into this issue.

14          MR. BERNICK:  I don't have a problem with that

15  either.  I'm just trying to look for a solution for today that

16  --

17          THE COURT:  All right.

18          MR. BERNICK:  -- we don't have to get that argument

19  done today.

20          THE COURT:  Ms. Baer, when is one of those?

21          MS. BAER:  June 21st is the next date --

22          UNIDENTIFIED SPEAKER:  June 21st.

23          THE COURT:  And when's the next Omnibus?

24          MS. BAER:  June 25th.

25          THE COURT:  How about June 21st, which is the next

1  personal injury day that's been set aside?

2       MR. BERNICK:  That's fine with us.

3       UNIDENTIFIED SPEAKER:  Works -- that's good.

4       MR. FINCH:  That's fine, Your Honor, with one

5  caveat.  The Debtor has served up notices of depositions on 23

6  Plaintiff law firms, which the ACC I rather suspect will be

7  moving to quash.  One of the dates is June the 21st.  So I

8  would --

9       MR. BERNICK:  We'll agree not to go forward with

10  that then.  That's not a problem.  If you want to tee up the

11  issue on the 21st of June as to that discovery, we served

12  interrogatories and requests for depositions.

13     This is a follow on to the issue of last time where Your

14  Honor said that it wasn't -- the motion before you wasn't

15  discovery before you so we've now served the discovery --

16  they're going to object, we have no difficulty with taking

17  those matters up on the 21st of June.

18       MR. FINCH:  Your Honor, what I would suggest is that

19  we take up that matter -- the Motion to Quash his deposition

20  and interrogatories on the 21st as well as the scheduling on

21  the 21st, so just so I understand your proposal, Mr. Bernick,

22  the -- we're agreed on the dates that the expert reports are

23  due, because we all have to sort of work to get that done.  And

24  that some of those are due before the 21st of June.

25       MR. BERNICK:  Correct.

1          MR. FINCH:  And we're agreed that the expert

2    discovery will end sometime end of October.

3          MR. BERNICK:  Correct.

4          MR. FINCH:  And that what we're fighting about on

5    the 21st is a, whether we take up Daubert before the trial

6    starts or just do it as part of the post-trial briefing, and b,

7    whether or not there is a fact witness discovery that ends

8    prior to the expert witness discovery, which I suggested would

9    be August 31st.

10         MR. BERNICK:  That -- those are the -- I think that

11   that's a  correct recitation.

12         THE COURT:  Okay.  What -- so you're -- I don't know

13   what it is you're teeing up for June 21st other than this CMO

14   issue, but that's fine.

15         MR. BERNICK:  Fine.

16         THE COURT:  Okay.  Just make sure that you get me

17   the pleadings in advance in a binder and please if you can stop

18   the last-minute things so that I can actually read them and be

19   prepared, that would really be helpful.

20         MR. FINCH:  We shall, Your Honor.

21         MR. BERNICK:  Yeah.  The X-ray issue -- I don't

22   know, maybe if you can take a look, I think we're just down to

23   the question of X-ray evidence versus X-rays.  But take a look

24   at that, we'll see if we can resolve that.

25         And that would then leave I guess Mr. Monaco's argument

1  and the Early Ludwick issue, which I --

2          THE COURT:  All right, Mr. Monaco, let's do yours,

3  #9 please.

4          MR. BERNICK:  How long are you going to be, about?

5          MR. MONACO:  Thank you, Your Honor.  For the record,

6  Frank Monaco for the State of Montana.  As I indicated, Your

7  Honor, we did file a Motion for Leave to file a reply, which

8  I'll address orally.  There was one objection filed by the

9  Debtor, and I'll -- what I'd like to do is just simply reply to

10 some of their objections.

11         THE COURT:  That's fine, you can file it as long as

12 it's not more than five pages.

13         MR. MONACO:  I already did, Your Honor.  And --

14         THE COURT:  Fine.  It's granted.

15         MR. MONACO:  Okay.  Thank you, Your Honor.  Your

16 Honor, one argument that the Debtor makes is that we've not met

17 our burden under Rule 59(e).  And I think it's obvious when you

18 look at our papers that the ground that we're relying upon is

19 the fact that there has been a -- this motion was filed to

20 correct a legal error which has resulted in and manifests in

21 justice.

22     I think it's undisputed that there was no hearing in this

23 matter and Section 362(d) of the Bankruptcy Code clearly

24 requires a notice and hearing.  The Debtor tries to make the

25 argument that this is optional.

1    Well, I don't think there's any question that 362(d) is

2   mandatory, especially in light of the literal interpretation

3   approach adopted by the 3rd Circuit and including without

4   limitation the Combustion Engineering case.

5    Your Honor, I think this comports with not only due

6   process under the Constitution of this country, but also 3rd

7   Circuit law.

8    Your Honor's January 17th, '06 order and the agreement of

9   the parties on the record -- Grace I think is trying to wiggle

10  out of what it agreed to on the record, which was that in the

11  event that our Motion for Preliminary Injunction was denied,

12  this would be scheduled for a hearing.  And that, Your Honor,

13  just didn't happen.

14    And I think it's clear from the December 19th transcript

15  that this is what's supposed to happen.  And we are being

16  prejudiced in the sense that we have not been able to develop a

17  record.  Your Honor unfortunately adopted the conclusionary

18  allegations of the objectors and I realize that there was a lot

19  of opposition to our Motion but none of these allegations are -

20  - been tested under oath by deposition.

21    We'd like to have the opportunity to take discovery, to

22  test some of the allegations that they have made in their

23  papers.

24         THE COURT:  Well, actually, Mr. Monaco, what I was

25  basing them on was the fact that my reading of Montana law

1   meant that regardless of what you attempted to do with respect

2   to the Debtor, that the Debtor did not have to be party -- have

3   -- and that's the operative word here -- have to be party to

4   the litigation in order to afford the -- that it needed.

5       That is, that you could prove your case with whatever

6   evidence basically you needed without, in my view, compelling

7   the Debtor to suffer what I thought would be a lack of -- would

8   be evidentiary prejudice because you could not under my view of

9   the reading of the cases in Montana, then turn around and

10  assess or apportion any of that damage against the Debtor.

11      And the Debtor would have an opportunity, I thought, to

12  present its case in an appropriate time and in an appropriate

13  Court.  And if I'm incorrect in that respect then I think

14  you're right, you need an opportunity to argue that.  That's

15  what your argument is with respect to the injunction.

16      So, you know, I think if I am -- if I am somehow or other

17  convinced that you should be put into the injunction, you

18  obviously don't need the relief from stay.  Otherwise, I need

19  to reassess this in light of your argument, I believe.

20          MR. MONACO:  Well, Your Honor, again, I gave you a

21  preview of some of the arguments we were going to make with

22  respect to a renewed motion.  And again I disagree with Mr.

23  Bernick -- his assessment of Frenville.

24      We think it's controlling and we will be prejudiced if we

25  are unable to assert joint or intervening superseding,

1 intervening calls and apportionment.  We think we have those

2 rights under Montana law.

3     And putting aside Frenville, we think we have the right

4 under the Raxine standards, putting aside Frenville for the

5 moment to make a case that we should be granted relief from

6 automatic stay.  This case has been going on for over six

7 years.  We filed the original motion two years ago.  A lot has

8 happened since then.

9          THE COURT:  Well, it --

10          MR. MONACO:  And we should be able to make

11 additional arguments.  But, Your Honor, I guess one problem

12 that I'm having here is with timing.

13     I mean, Your Honor's taking the Motion for Preliminary

14 Injunction, you know, under advisement.  I don't -- and I

15 always tread lightly when making this pitch to the Court, but

16 if I knew that Your Honor was going to make a prompt decision

17 we might hold off on this renewed motion.

18     But the one problem I have also is that we have this

19 decision out there that is outstanding that we haven't had the

20 ability to present evidence or develop a record.  And so I'm in

21 a bit of a bind.

22          THE COURT:  Well, Mr. Monaco, I think what may be a

23 solution to this is for me to simply vacate the order that I

24 entered on the relief from stay but not to set it for a hearing

25 yet because it may become moot.

1          MR. MONACO:  Your Honor, that would be a fair

2    resolution of this conundrum from my client's standpoint.

3    Because if Your Honor does reconsider, which you've done in

4    connection with the preliminary injunction, then I think we

5    should take the relief from stay decision off the table and

6    we'll revisit that down the road like we originally intended.

7          THE COURT:  And what I -- so I think what I should

8    do is defer any argument on the relief from stay and frankly,

9    on -- even on whether or not you need discovery and whether you

10   need an evidentiary hearing, and do what I said I'd do in the

11   first place, which is just have the Debtor put it back on the

12   calendar.  I really didn't think it was necessary because of my

13   reading of the State -- underlying State law.

14         MR. MONACO:  Well --

15         THE COURT:  And I thought it was easier just to take

16   care of both issues at one time, so if in fact I do not

17   reconsider this injunction issue, then I think what I need to

18   do is in the opinion that denies that reconsideration, direct

19   the Debtor to get this back onto the calendar for a status

20   conference.

21      I'll hear your arguments at that time and the Debtor's as

22   well.  And we'll see where we go from there.

23         MR. MONACO:  That's fine, Your Honor.  And just so

24   Your Honor knows, and everyone else in the Courtroom, we will -

25   - if that happens, if Your Honor decides not to grant the

1   Montana -- the Debtor's Motions for Reconsideration, we will

2   file a renewed motion, so we get all these issues on the table

3   for Your Honor's decision.

4           THE COURT:  You'll file --

5           MR. MONACO:  A renewed motion that will not only

6   address the Raxine standards that we originally put forth in

7   papers, but also --

8           THE COURT:  Oh.

9           MR. MONACO:  -- these <u>Frenville</u> issues as to --

10          THE COURT:  Well, if that's the case, then why don't

11  I vacate my decision but why don't you withdraw this motion and

12  then you can simply file a new motion that incorporates all the

13  issues that you want?

14          MR. MONACO:  If Your Honor is -- that would be fine,

15  Your Honor.  So long as, you know, we're not -- this is without

16  prejudice to renew this motion.

17          THE COURT:  Absolutely, because --

18          MR. MONACO:  Okay.

19          THE COURT:  -- otherwise I just have a -- I just

20  have the same technical issue, getting it back on the agenda.

21  And if what you need to do is update the motion anyway, it sort

22  of doesn't make sense for me to have the Debtor --

23          MR. MONACO:  That --

24          THE COURT:  -- put it back on the calendar.

25          MR. MONACO:  -- that's fine.  So if I understand

1  what Your Honor's saying correctly, you're taking the Motion

2  for Preliminary Injunction under advisement, you're going to

3  renew -- vacate the order denying our Motion for Relief from

4  the automatic stay and that can be teed up with these

5  additional arguments at a later date, once we get a decision --

6  if we get a decision that's adverse to the Debtor.

7            THE COURT:  Right, and so --

8            MR. MONACO:  For Montana.

9            THE COURT:  -- but what I would do, Mr. Monaco --

10  and I'll let you prepare the order in conjunction with the

11  Debtor.

12            MR. MONACO:  Okay.

13            THE COURT:  That will vacate my order that denied

14  relief from stay but also in that have you withdraw that motion

15  without prejudice to refiling it in the event that the Court

16  denies the Motion for --

17            MR. MONACO:  All right.

18            THE COURT:  -- Reconsideration of the injunction.

19            MR. MONACO:  Right.  Now, I just bring up one other

20  thing, and again, I tread lightly.  There is no stay in --

21  unless Your Honor is continuing the stay of -- the temporary

22  stay that you put into place on January --

23            THE COURT:  I will -- yes, and I think I should

24  continue that temporary stay for that purpose so that I can get

25  this injunction issue determined appropriately.

1          MR. MONACO:  Right.

2          THE COURT:  And I think you can do that in the

3    order.

4          MR. MONACO:  I think -- okay, that's fair, Your

5    Honor.  Thank you.

6          THE COURT:  All right.  And then if the -- perhaps

7    this order can say that if the Motion for Reconsideration of

8    the injunction is denied -- why don't you give yourself a time

9    frame within which, like 30 days or something, to file this new

10   Motion for Relief from stay and I can continue that temporary

11   stay until we get a hearing on your new motion.

12       If you don't file that motion within that time, then the

13   stay will simply expire at the end of that time period.

14         MR. MONACO:  Okay.

15         THE COURT:  If you can, I think, work with the

16   Debtor --

17         MS. BAER:  So we'll have one order that really takes

18   care of the injunction and the relief from stay, kind of like

19   we did before?

20         THE COURT:  Yes.  But which takes care of the

21   temporary injunction but not my opinion.

22         MS. BAER:  Right.

23         THE COURT:  I'll deal with the opinion on my own in

24   the adversary but I think in this stay order we'll provide a

25   temporary stay just to be sure that nothing happens to

1  anybody's prejudice in Montana while I've got these issues

2  under advisement.

3          MS. BAER:  Right.

4          THE COURT:  And I believe you can all work out

5  something -- will that accommodate everybody's needs?

6          MR. MONACO:  That would certainly accommodate my

7  situation, Your Honor.

8          MS. BAER:  Yes, Your Honor.

9          THE COURT:  All right.  That's fine.

10          MS. BAER:  Thanks.

11          MR. MONACO:  Thank you, Your Honor.

12          THE COURT:  All right, let me make a note so I know

13  what's happening here.

14      (Pause in proceedings)

15          THE COURT:  Okay, Ms. Ramsey I believe I'm ready for

16  you.  And I'm sorry but what agenda number now?  We've jumped

17  around and --

18          MS. RAMSEY:  Agenda item #10.

19          THE COURT:  Thank you, #10.

20          MS. RAMSEY:  Okay.  Good evening, Your Honor.  Your

21  Honor, as this Court has said time and again, Grace's only

22  legitimate inquiry for estimation concerns the claims that have

23  been made against Grace.  Here the Claimants are all

24  mesothelioma Claimants so asbestos injury is not at issue.

25      As regards exposure, Your Honor needs to understand the

1   information that Grace already has for 99 of the 111

2   mesothelioma Claimants represented in this case by my client,

3   the law firm of Early Ludwick Sweeney and Strauss, completed

4   questionnaires have been returned that either or both attach a

5   sworn statement by the Claimant in the form of excerpts from

6   interrogatories, excerpts from deposition testimony or

7   affidavits from the Claimant, and/or governmental records in

8   the form of Social Security printouts or records of military

9   service that detail the Claimant's work history.

10      I want to say that again because it's important -- for all

11  but 12 of the 111 mesothelioma Claimants represented by my

12  client, the returned questionnaires address the issue of

13  exposure through sworn statements from the Claimant that

14  provide a work and personal history and/or governmental records

15  of job history or military service.

16      For those 99 Claimants, the exposure information that

17  Grace claims it needs to verify was not characterized,

18  interpreted or even restated by my client.  My client was

19  solely a conduit for that information.  So the conduct of Early

20  Ludwick in this or in any other case is not at issue and not

21  relevant as to those 99 Claimants.

22      The policies and practices of Early Ludwick, its

23  relationship with its co-Counsel firms, its representation of

24  Claimants in other contexts -- none of these topics that Grace

25  seeks to probe through its subpoena has anything to do with the

1 issue of whether or not the work and personal histories of the

2 Claimants support exposure to Grace asbestos.

3     If Grace has any basis to question the truth of any of the

4 information that has been sworn to by any of these 99 Claimants

5 or questions Social Security printouts or questions the

6 military service records, it should do so on a Claimant-

7 specific basis and it should do so by appropriate third-party

8 discovery directed to persons other than Counsel who is merely

9 a conduit for the information.

10     In addition to verified information of exposure for these

11 99 Claimants, for all 111 Claimants at issue Grace also has a

12 list of the other asbestos Defendants with whom these Claimants

13 have settled and the aggregate amount of the settlement

14 payments received by those Claimants as ordered by Your Honor

15 in connection with the questionnaire process.  In short, Grace

16 has no basis for the extraordinary discovery that it seeks from

17 Counsel of record for these 99 Claimants.

18     So what about the 12 Claimants where work histories were

19 provided by Early Ludwick on behalf of its clients?  The work

20 histories provided are, to the best of Early Ludwick's

21 information, accurate and complete.

22     Still, to take Early Ludwick completely out of this

23 equation, it will obtain and provide to Grace the same types of

24 sworn information that it has for the other 99 Claimants.  It

25 will either provide sworn statements or governmental records

1  for or on behalf of those Claimants, thereby eliminating any

2  possible reason for discovery against the firm.

3      I've talked about 111 of the 216 Claimants that are listed

4  on the subpoena.  There are 75 others -- 54 of those were not

5  and have never been represented by Early Ludwick.  We have no

6  records with respect to those 54.  The balance of 21 Claimants

7  were referred by Early Ludwick to the Braden Purcell firm for

8  all purposes and are not represented by Early Ludwick.

9      For these Claimants, my client simply does not have

10  information responsive to the subpoena other than possibly

11  client intake forms or interview notes which would be subject

12  to the attorney-client and work product privilege and

13  correspondence pursuant to which the cases were referred, which

14  has no relevance at all to whether or not these Claimants were

15  exposed to Grace asbestos.

16      In light of that background, I'd like to turn to the

17  question of whether Grace has articulated a rational,

18  reasonable basis for the discovery it seeks.  And we contend it

19  has not.

20      First, Grace's primary stated basis for the discovery is

21  allegations by one attorney in one case regarding one Claimant,

22  Harry Kananian, a Claimant that is not represented and never

23  has been by Early Ludwick in this bankruptcy case.  Those

24  statements are inherently unreliable because the attorney who

25  made the allegations was repeatedly found by the Judge

1  presiding over the case to have lied.

2      The opinion of the presiding Judge -- Judge Hannah -- is

3  attached as Exhibit-C to our Motion for Protective Order, but

4  I'd like to have the Court look at some of the things that

5  Judge Hannah decided about Mr. Andres.

6      Your Honor, it might be easier if I could hand up a copy

7  of this.  It's been provided to Counsel.

8          THE COURT:  Thank you.

9          MS. RAMSEY:  Then I will refer to it without using

10 the -- which will slow us down a little bit since I don't have

11 a mike.  Among the things that Judge Hannah decided were that

12 Mr. Andres lied to this Court and testified falsely under oath.

13 Mr. Andres assured this Court many times that he had produced

14 all of the emails.

15     However, those assurances were false.  Mr. Andres was

16 untruthful.  For an officer of the Court to show such lack of

17 respect is shocking.  There is simply no justification for

18 these falsehoods.  When you blatantly create a falsehood to

19 buttress your previous lies, it can only be attributed to a

20 purposeful plan to deceive the Court.  He chose to weave a

21 seemingly endless web of deceit.  Mr. Andres' pro hac admission

22 was then revoked by Judge Hannah.

23     In sum, the allegations now relied upon by Grace were made

24 by an unreliable source and cannot serve as a proper basis for

25 the type of extraordinary discovery from Counsel of record

1 sought by Grace.  In any event, these unreliable allegations

2 provide no basis whatsoever for discovery against any claim

3 other than possibly the claim asserted by Mr. Kananian.

4     The Kananian case is a wild-goose chase and a red herring

5 as regards the discovery sought against my client.  And these

6 allegations were already the subject of extensive discovery in

7 the case where they were made.  After depositions of two

8 lawyers and two paralegals from Early Ludwick and document

9 review, Judge Hannah made no criticism of the Early Ludwick

10 firm.

11     It simply makes no sense for Grace to go back over this

12 same ground, conduct duplicative discovery with respect to

13 these allegations that in any event have absolutely no

14 relevance to Grace.  On April 7, 2006, Early Ludwick submitted

15 amended forms for the six trusts where it represented Mr.

16 Kananian.

17     These amended claims were submitted with a cover letter

18 that specifically brought to the trusts' attention the fact

19 that the amended form was submitted to address errors that were

20 contained in the original claim form.

21     In more than a year since those forms were submitted,

22 there has not been one inquiry from the trusts and the trusts

23 have not required any of the money to be paid back or any

24 further documentation to be submitted.  And there's a very good

25 explanation for that.

1    Mr. Kananian served in the Navy during World War II.  He

2  was on ships and he worked at ports where ships were docked.

3  Those undisputed facts alone were sufficient to satisfy the

4  exposure requirements for three of the six trusts.  His

5  undisputed 45-year work history in various locations known to

6  have asbestos present entitled him to recover from the other

7  trusts as well.

8    Mr. Andreas' criticism of immaterial errors in the

9  original claim forms represents no basis whatsoever for Grace

10  to obtain the intrusive, burdensome, expensive and irrelevant

11  discovery that it seeks.

12    To talk a little further about Mr. Kananian, as I've said,

13  Mr. Kananian is not represented in this case by Early Ludwick.

14  At page 5 of Grace's response, Grace criticizes and calls into

15  question the information contained in his questionnaire, saying

16  {quote} "even a cursory review of Mr. Kananian's questionnaire

17  demonstrates glaring inconsistencies" (closed quote}.  My

18  client wouldn't know anything at all about that.

19    As Grace well knows, we didn't prepare or submit that

20  questionnaire.  In fact, my client had nothing to do with the

21  questionnaire.  We weren't even aware of it until after we

22  received the subpoena and we learned in conversations with

23  Grace's Counsel.

24    If there are questions about Mr. Kananian's questionnaire,

25  or his claim against Grace, those questions should be directed

1  elsewhere.  My client simply has nothing to do with it.

2      Your Honor, exposure evidence is determined by the job and

3  personal histories of the Claimants.  Grace already has or will

4  have all of this information directly from sources other than

5  Early Ludwick.  Throughout the estimation proceeding, this

6  Court has repeatedly said that what is relevant to the

7  estimation proceeding is discovery that concerns Grace's

8  asbestos liability and not whatever has happened in other

9  cases.

10     For example, on October 24th, 2005, in connection with

11 different discovery Grace sought to obtain from different

12 attorneys representing Claimants in this case, Your Honor said,

13 {quote} "what difference does it make whether in a different

14 case some Claimant is filing a fraudulent claim?  The question

15 is, are they filing a correct claim in this case?" {closed

16 quote}.

17     The discovery that Grace has sought, seeking disclosure of

18 trust submissions to other trusts, seeking disclosure of

19 relationships between Early Ludwick and other firms, inquiry

20 into Early Ludwick's internal practices and policies -- none of

21 this is remotely relevant to whether these Claimants have a

22 claim against Grace for purposes of this estimation proceeding

23 and none of it is relevant in the context of all of the

24 Claimants that are represented by Early Ludwick having produced

25 or having committed to produce independent verification of

1  their exposure history.

2      Again, if Grace has any question that the exposure

3  information is inaccurate, that information can be checked

4  through employment records.  Grace knows where its asbestos was

5  located.  Grace has the work histories.  Whether a Claimant's

6  history is sufficient to establish asbestos exposure can be

7  explored without resort to discovery from the law firm that

8  represents the Claimant.

9      Under the standard articulated in the <u>Shelton</u> case and the

10  other cases cited in our motion at pages 18 to 20, the

11  discovery is simply improper.  Even Grace concedes on page 15

12  of its response that this Court has stated that attorney

13  discovery is not appropriate if Grace has access to the

14  information elsewhere than from the attorneys.

15      Grace has no business seeking this discovery from lawyers

16  where the information has already been provided from external

17  sources or is available elsewhere.  One can only imagine where

18  allowing this discovery against a law firm in circumstances

19  like this would lead.

20      Grace has simply not established any sufficient basis on

21  which this Court should permit Grace to go on a witch hunt

22  through Early Ludwick's files.  It's not supported by the

23  allegations made with respect to Mr. Kananian and it's not

24  supported by any criticism of any questionnaire that my client

25  submitted.

1      While Grace has complained about Mr. Kananian's

2   questionnaire, which my client did not submit, Grace has not

3   identified even one questionnaire response that my client

4   submitted as to which it's taken issue in its responsive

5   papers.

6      The information that Grace seeks might be relevant if at

7   all and if admissible to challenge the credibility of a

8   Plaintiff at a jury trial on the merits of the Claimant's

9   claim.  But Grace has said time and again that it's not engaged

10  in claims allowance and this Court has said time and again that

11  discovery taken in connection with estimation is for use in

12  estimation alone.

13     The information sought is also beyond the scope previously

14  allowed by this Court in connection with the questionnaire

15  process.  For example in connection with the questionnaire,

16  there was substantial argument about what information Grace

17  could obtain about settlements that the Claimants had reached

18  with other trusts.

19     The Court ruled on what was going to be required and that

20  was a list of those trusts and the aggregate settlement dollars

21  and that information has been provided -- to seek it in another

22  form is simply revisiting something that the Court has already

23  determined.

24     Let me turn finally to Grace's discussion regarding burden

25  on my client.  Grace argues that the burden is on Early Ludwick

1  to prove existence of the attorney-client privilege in the

2  first instance.  This is legally incorrect.  It makes no sense

3  and it's inconsistent with the argument Grace itself made

4  earlier today, when it was talking about its own Counsel work

5  files.

6       There is no factual or legal basis in the context of an

7  estimation proceeding for the discovery that Grace seeks and

8  Early Ludwick asked the Court to prevent the discovery so Early

9  Ludwick can be protected from, among other things, having to go

10 to the burden of creating privilege logs by reviewing the one

11 to four bankers boxes of documents that it would have to review

12 for the 111 Claimants.

13      Grace's reliance on cases that do not arise in connection

14 with Motions for a Protective Order but arise in connection

15 with objections to discovery requests are simply not

16 applicable.

17      Grace's proposed discovery from Early Ludwick represents a

18 colossal waste of Estate assets and pursuits of  information

19 utterly irrelevant to the estimation proceeding because as

20 already explained, all information in this case for 99 of the

21 111 mesothelioma Claimants comes from sources other than Early

22 Ludwick and for the remaining 12, Early Ludwick agrees to

23 provide the same type of information.

24      The work histories can be verified through third-party

25 discovery, not directed to the law firm, which should only be

1  subject to discovery where information is not available from

2  another source.

3      As regards Mr. Andreas' allegations against my client,

4  they were made by an unreliable source and cannot serve as a

5  proper basis for the type of extraordinary discovery from

6  Counsel of record sought by Grace.  Amended claim forms were

7  submitted to the trusts involved and did not change the

8  disposition of the claims and the burden on the Early Ludwick

9  firm would be extraordinary.

10      There is simply no basis on this record to impose that

11 burden.  The discovery sought is not reasonably calculated to

12 lead to discovery of admissible evidence in connection with the

13 estimation proceeding and we ask that the Court prevent the

14 discovery.  Thank you.

15      MR. BERNICK:  If you could bear with me for just a

16 moment, Your Honor.

17      (Pause in proceedings)

18      MR. BERNICK:  Your Honor, we have not made this

19 request of all of the law firms.  We are serving other kinds of

20 discovery on the law firms that just goes to the question of

21 procedures for overall compliance with the questionnaires.

22 This request is focused on the Early Ludwick firm and it will

23 be focused on Braden Purcell.

24      We've been very mindful of the decision that Your Honor

25 made a couple years ago, three years ago I think it probably

1  is.    We asked for discovery of the law firms.  Your Honor

2  said, "Go try to find it through the doctors and elsewhere,"

3  but still reserved in your Order the opportunity for us to come

4  back and on a case-specific basis or a firm-specific basis look

5  for the discovery.  And the facts and circumstances surrounding

6  this request really left us with absolutely no choice.  And

7  while Ms. Ramsey does, as always, a good job of making the

8  appearance and making, to a certain extent, the reality of

9  providing more credibility to the Court through her

10  presentation, it just comes way too late in connection with

11  these two firms, and for reasons that I'm gonna go through just

12  very briefly.

13      This presentation that Ms. Ramsey gave basically is an

14  attack -- and I won't take issue with the target -- an attack

15  on Mr. Andreas from the Brayton Purcell firm.  And the attack

16  is specifically an attack that deals with credibility.

17  Basically says that when it comes to Brayton Purcell and Mr.

18  Andreas, he was a liar.  That is plain and simply an attack on

19  the credibility of this individual and the credibility of the

20  firm.  And the reason that is germane is that this is not a

21  question of witness credibility that goes to our claimant

22  credibility necessarily -- it goes to the trier of fact to

23  weigh and balance, the appearance of a given witness or

24  appearance of a given claimant or demeanor -- this is a

25  question that goes to procedures that have been used in filling

1   out the very information that's been submitted to this Court in

2   order to provide the data for purposes of the estimation.

3       And the whole purpose of this discovery is that there is a

4   substantial issue about the credibility of the practices that

5   were followed in providing information to this Court pursuant

6   to Your Honor's Orders.  And if this discovery is not allowed,

7   we will not have the ability to bring these problems of

8   credibility to the Court's attention.  And the net effect is

9   that the fraud -- and we're talking about fraud -- that has

10  been perpetrated in connection with the underlying evidence

11  will, in fact, taint this proceeding.  We are dealing squarely

12  with credibility.  Counsel recognizes that in the case of

13  Andreas and Brayton Purcell.  The fact of the matter is,

14  though, that the same credibility problems go right to her

15  client, Early Ludwick, because they can't get away from the

16  same record that was the basis for the finding of sanctions

17  against Mr. Andreas and Brayton Purcell.

18      To see the implications of this, we know that Brayton

19  Purcell submitted 541 questionnaires in this case.  We know

20  that Early Ludwick submitted 453 questionnaires in this case.

21  Presumably, we're not gonna be told by Ms. Ramsey that we

22  should rely upon the credibility of Brayton Purcell when it

23  comes to submitting information to this Court.  To the

24  contrary, we're told by Ms. Ramsey that there are substantial

25  questions about the credibility of Brayton Purcell; and B)

1  these people are unreliable and make misrepresentations.

2       Well, what does that mean in terms of relevance to this

3  case?  We've got 541 questionnaires, including questionnaires

4  by people who claim mesothelioma, probably undoubtedly have

5  mesothelioma, but are lodging claims against Grace.  We have

6  541 questionnaires submitted by, and were presumably verified

7  by Brayton Purcell.  One of the things that we got out of the

8  process of asking for attorney discovery was Your Honor did say

9  that the attorneys had to verify these questionnaires.  Well,

10 what is the strength of a verification from the Brayton Purcell

11 firm, when counsel recognizes that there are substantial issues

12 that go to that firm's credibility in connection with this

13 case?

14      The real issue then becomes what about the credibility of

15 the Early Ludwick firm?  And no matter how much Ms. Ramsey may

16 get up and say, "Oh, we're prepared to do this differently now,

17 and we're prepared to do more now," the question is what have

18 they already submitted to the Court?  And is there a

19 credibility problem with the procedures that were followed?

20 And you can't get away again from the record in the Canadian

21 case in understanding the credibility issue.

22      Now, I want to go through very quickly the chronology,

23 because I know we're gonna run out of time.  I'm gonna go back

24 to a point in time that is March of '06.  The Canadian

25 decision, the decision in the Canadian case, which was a

1 decision regarding counsel, whether counsel could appear,

2 didn't take place until January of '07.  So we have events in

3 '06 that are explored in connection with the decision that came

4 out ultimately in January '07.  So these events are gonna take

5 place during the Spring of '06.  And we know that the

6 questionnaires come into the Grace case thereafter, including

7 Mr. Canadian's questionnaire, which came in in July of '06.  So

8 as we assess the credibility of the procedures that were

9 followed by Early Ludwick in generating the information that

10 we're expected to rely upon in this case, we have to take a

11 look at, well, what was going on with the Early Ludwick

12 procedures in the Spring of '06 that may have affected the

13 questionnaires that were filed later on in the year, before the

14 decision in the case was known.  And the facts, as you know,

15 Your Honor, are quite dramatic.

16      This is Exhibit-2 to our brief.  And this is an e-mail,

17 March 13 of 2006.  And this is from -- this is actually an e-

18 mail chain.  And we can see that the first e-mail is from Mr.

19 Andreas, dated March the 12th.  This is for the Canadian case

20 from Early, Ludwick & Sweeney.  Clients filled out info forms

21 sent to them by ELS.  Kind of like that.  They would want that.

22 And then ELS, Early Ludwick, her client, took that information

23 and prepared and submitted some horribly misleading bankruptcy

24 forms.  There's no way what our client sent them matches what

25 they put in these forms.  Now, this is a statement by Mr.

1  Andreas, it's true.  His credibility has been called into

2  question vis-a-vis his candor with the Court.  But these are

3  internal e-mails within his own firm.  Why would he lie in

4  talking with his own people internally about the quality of the

5  data?  In fact, the very reason that he highlights this, is

6  he's concerned with his own firm's exposure.  So there's no

7  motive that he has to misrepresent the facts within Early

8  Ludwick.  He's trying to get down to the bottom of the case.

9      He then goes on to say, "We already have the fictional

10  claims from ELS."  That's how they're being termed.  We then

11  get the next e-mail, or another e-mail.  This is actually later

12  on in the chain.  And this comes from Chris Andreas to Bruce

13  Carter, who is a person that also is working on this case.

14  This is a questionnaire that Jack and Harry -- this relates to

15  Canadian.  It was filled out when Harry was still alive.  As

16  you can see, ELS took great liberties with this info in filing

17  the bankruptcy forms.  We can get Jack to authenticate this

18  thing and use it as a backdrop to BK forms, blame ELS for

19  bullshitting the Trusts.  Alternatively, we can give it to

20  Judge Hannah this afternoon, and let him review it.  It might

21  bear on his decision to let these misleading claim forms into

22  evidence.  Given that none were signed by Jack or Harry,

23  there's a strong argument to be made that they never saw them

24  before they were submitted.  Cannot hold them to false

25  information that ELS employees put down.

1      So again Mr. Andreas, responding to basically the box that

2   they're in -- they're prosecuting a case.  These claim forms

3   are coming in.  And what's being said is that ELS is misleading

4   these Trusts.  They're the ones that are filling out the claim

5   forms for the trust, not Brayton Purcell with respect to these

6   claim forms, and they're misleading the Trusts.  How many

7   different Trusts are we talking about?  We're talking about --

8   and this is Exhibit 4 -- for the insulations, Eagle Pitcher,

9   UNR, Soletex Bankruptcy Trust.  All of these different Trusts.

10  And then also the Manville Trust, which we're gonna get to in a

11  minute, because it relates to Brayton Purcell. ELS is being

12  said by his own co-counsel that they're overstating the

13  information that is actually provided by the client.

14     So if Your Honor were to take a look at those e-mails and

15  say, if you take Mr. Andreas, he may have misrepresented things

16  to the Court, but in his own e-mails, is he actually

17  misrepresenting the problem that he has to wrestle with in

18  Court?  It's precisely because he comes to these conclusions

19  that he recognizes that he has problem in Court.  Now, what

20  does that say?  What does his statement say about the

21  credibility of ELS?  It says these people are making

22  misrepresentations.  Well, we can go through -- if you go

23  through the e-mails, it becomes clear at a detailed level

24  exactly what happened.  And this is very, very key, because the

25  issue is not simply employment history.  This is a problem that

1  is not cured by simply getting employment history.

2      What happened in each of these cases is that there was an

3  employment history that was fairly straightforward.  The

4  employment history is something that's kind of hard to lie

5  about.  You basically get the records, and it is what it is.

6  The issue is not the employment history.  The issue is the use

7  that's made of the employment history to point the finger at

8  different companies.  And we can see that what ELS did is they

9  went through and they got information that is employment

10 history from their clients.  They converted it into misleading

11 and b.s. claim forms.  Now, what is the difference between the

12 employment history and the claim form?  Because the employment

13 history says simply here's the occupation and here's where I

14 was.  The claim form makes out the proposition that in that

15 employment, I was exposed to so-and-so's product, and so-and-

16 so's product.  I worked with a third company's product.  In

17 other words, the employment history is simply the beginning

18 point.  The real issue is how the employment history is turned

19 into product i.d.  And what happened was the attorneys at Early

20 Ludwick that took the employment history provided by the

21 Claimant, and turned it into product i.d. for all of these

22 different products, all of these different bankruptcies.  And

23 where Andreas is saying, looking at it, "My God, where did this

24 stuff come from.  That's just imagination.  That's misleading."

25      Now, why wouldn't the bankruptcy Trusts go back and say,

1  "Well, gee, give me the money back."  Because it may well be

2  that under their own procedures, their procedures and criteria

3  were so minimal on the issue of exposure, that this was

4  satisfactory.  It didn't really make a difference to them.  And

5  why would they want to get -- if they started to pull on this

6  chain and these Trusts, most of them still have the activity of

7  the Plaintiff's file as being either advisor or as being

8  trustees or being involved with trustees.  Why would any one of

9  these Trusts want to open up a Pandora's box and start

10  reviewing all of the different claim forms to see which ones

11  are accurate or not?  Let sleeping dogs lie.  The money has

12  been paid out.  But these e-mails coming from the internal

13  workings of Brayton Purcell tell the truth about what was going

14  on with ELS in that ELS was reconstituting employment histories

15  into exposure histories and product i.d. that had no basis.

16  They were fictional.

17      In the case of Mr. Canadian, he was said to be -- he

18  served in the Army as a rifleman.  But the employment histories

19  put him being involved in the military during the war and being

20  on ships.  And because they're on ships, the idea was, oh,

21  well, maybe he was on the ship at the time it was being built.

22  Or maybe he worked with the insulation.  So this one says here,

23  the 48 insulations BK form prepared by ELS implicates under job

24  something and duration of exposure -- job code and duration of

25  exposure, that Harry Canadian, deceased, was exposed in a

1   shipyard for 24 months to black insulation.  Harry Canadian was

2   a rifleman in the U.S. Army, who shipped out on a troop

3   transport ship from port to the Philippines, and after the war

4   shipped back on another troop ship from Japan.  This was the

5   extent of his shipboard exposure.

6        So this was not a guy who was working on the ship, cutting

7   insulation during the period of time that he was in the Army.

8   He was on the ship, but he was on the ship in the sense of a

9   person who was being transported to war and back.  So the idea

10  is that this employment history translates into product i.d.

11  for 48 insulations, is just completely false and constructed.

12  This is the magic that ELS worked in connection with these

13  claim forms that were being submitted to the other trusts.

14       So what do we have so far?  What we have so far is the

15  employment history is the beginning.  It has to be processed by

16  the law firm.  In this case it was processed by ELS.  Under the

17  statement of their own counsel, it was misleading.  That

18  statement that it was misleading was not made in Open Court to

19  shift the blame to somebody else.  In this case, it's made

20  internally, because they're concerned about their exposure in

21  Court as a result of these different claim forms.  How much

22  more credible is ELS when it points the finger at Mr. Andreas

23  than Mr. Andreas is when he talks about what is going on

24  internally?  He talks about ELS in itself.

25       What tie does that have to this particular case?  It has

1 multiple ties to this case.  Several months later, a

2 questionnaire is now submitted for Mr. Canadian.  And the

3 questionnaire is now submitted by the Brayton Purcell firm.

4 Again, it has hundreds of questionnaires that have been

5 submitted.  The questionnaire says this.  And this is Exhibit

6 7.  We have a questionnaire that's submitted for Mr. Canadian.

7 And he is represented now in connection with this matter by

8 Brayton Purcell.  And we can see his name is redacted.  There's

9 very little of this actually filled out on this form.  I'm just

10 gonna highlight.  No matter what his employment history is, the

11 employment history doesn't answer the specific questions that

12 are posed by the questionnaire, which basically ask for each

13 job description, what product did you work with, and what did

14 you do with the product?  These are the questions that Your

15 Honor said had to be answered.  None of them are answered, as

16 you can see here.  It's a blank page.

17      We then have the Certification.  Interestingly, the

18 Certification is signed by Jacqueline Loveless, who is not even

19 Mr. Canadian.  It's somebody who works for the Brayton Purcell

20 firm.  And you then have, "I swear under the penalty.... all

21 the foregoing information is true."  This is by the injured

22 person.  You can see it's not filled in at all, and there's

23 nobody who signs anything here, except the law firm.  And I'm

24 not sure exactly what Ms. Loveless' position is.  This is the

25 form in this case.  And then you go to the back end.  And

1  you'll see that even seven months, or four months after this

2  whole flap has emerged, and ELS is now being identified as

3  being part of the problem, we can see that Brayton Purcell is

4  now submitting a claim form on behalf of Mr. Canadian.  And

5  Brayton Purcell, in the claim form, has a specific section

6  dealing with W.R. Grace.

7       Now, what does it do?  It's the same problem all over

8  again.  These are the only two areas of exposure.  These were

9  ships that he was on in San Francisco when he served in

10  connection with his position as a rifleman.  And the base

11  product i.d.'d at site is not a statement that he was ever

12  exposed to them.  These are the dates in which Grace product

13  was identified at Bethlehem Steel Ship Building.  It was at the

14  point where the ship was being built.  So Grace's product was

15  present at the ship building site.  And this now becomes the

16  sole basis for Mr. Canadian saying he's got a claim against

17  Grace.  And, of course, what is his exposure?  It's that same

18  old exposure that they've already recognized was simply an

19  exposure in connection with his actually being carried on the

20  ship to duty during the course of World War II.   This is it.

21  So you see the employment history -- you can even -- the

22  employment history sworn to was taking place on this answer to

23  the questionnaire as it's being suggested, even if you were to

24  construe this in light of his services in the military, it's,

25  "Oh, I was exposed when I was in the military to this ship and

1  to all of its contents, including Grace asbestos.  And that's

2  my claim against Grace," if you got really kind of we're gonna

3  piece it all together instead of just answering the question.

4  If you were to piece it all together, that's the case that

5  you'd make out.  But we know from his personal history that he

6  was a rifleman.  He didn't have any involvement with this ship.

7  Mesothelioma, serious case, not a case against Grace.  That's

8  Mr. Canadian's questionnaire filled out by Brayton Purcell.

9      We then, of course, go back.  Well, how many other

10  questionnaires were filled out by Brayton Purcell that are

11  problematic?  And wouldn't we want to know, in connection with

12  looking at those Brayton Purcell questionnaires, if their co-

13  counsel at ELS had information that militated against the truth

14  of what was in the Brayton Purcell questionnaires?  They've

15  recognized that Brayton Purcell's got credibility problems.

16  They're counsel.  And they'd clearly coordinate with respect to

17  clients that they share.  Why can't we find out what the ELS

18  people were told about the Brayton Purcell clients?  But the

19  problem is not confined to Mr. Canadian.  The problem also goes

20  to other claimants in the case.

21      We have another questionnaire.  And this is Exhibit-10.

22  This is submitted by the Early Ludwick firm.  It relates to a

23  Mr. William Nelson.  Asbestos personal injury questionnaire.

24  Product i.d.  This time it's filled out, Sing Sing Prison.  And

25  the description is 1946-1947, and 10 stands for boiler worker,

1  and 115 stands for utilities.  And he says, "Yes, I was

2  exposed, and I was close."  This is with regard to Grace

3  asbestos.  Now, this was submitted by Early Ludwig in

4  connection with the questionnaire in this case.  Interestingly,

5  it's signed by the lawyer in both cases.  It's not signed by

6  anybody else.  And it's signed in December of 2005.

7       Well, it turns out that we had a history with Mr. Nelson.

8  And the history with Mr. Nelson is that he sued Grace before

9  the Chapter 11 started.  And he sued Grace in New York.  And

10 Grace moved for summary judgment -- this was Exhibit 9 -- on

11 the grounds that there was no evidence that William Nelson was

12 exposed to asbestos fibers released from an asbestos-containing

13 product manufactured by W. R. Grace.  That's what the motion

14 was.  And on motion, it was ordered that the Motion for Summary

15 Judgment is granted without opposition.  And the claims and

16 cross-claims against Movant are severed for the remaining

17 claims and dismissed.  And this was entered in April of 1998 in

18 connection with Mr. Armstrong's claim.

19      We have the same situation with respect to -- or similar

20 situation with respect to a Bruce Slane.  This is Exhibit-12.

21           THE COURT:  You mean Mr. Nelson's claim?

22           MR. BERNICK:  The first one was Mr. Nelson's.  This

23 one's a different one, Mr. Slane.  This is Exhibit-12, his

24 personal injury questionnaire.  This now is blank.  The

25 exposures are blank.  He has this filled out "an indirect

1 exposure." Nature of your own exposure to Grace asbestos-

2 containing product, through hugging his father when he came

3 home from work, and being with his mother as she washed his

4 father's clothes. So now we have a claim of exposure that is

5 being made. And, again, the signature is by lawyers, not by

6 anybody who is a non-lawyer.

7      And again with respect to Mr. Slane, we had a prior

8 history. And this is Exhibit-9. I'm sorry, that's not

9 Exhibit-9. What I've got here is the final Order of Dismissal.

10 Again, there was a Motion for Summary Judgment based upon the

11 lack of product i.d. And again the Order was entered on

12 October of 1998. Now, we don't know. We don't have the

13 ability here to systematically go through and determine how

14 pervasive this problem was. That is the problem of taking

15 information from the client, processing it through the law

16 firm, and ending up with product i.d. We just -- we don't have

17 that on a systematic basis, because as you know, Your Honor,

18 they didn't fill out the questionnaires, and they didn't

19 indicate in the attachments exactly where the answer was. So

20 we have to go through all the attachments and try to parse that

21 together.

22      But what we have in the case of two firms who obviously

23 share a client base, are clients who are, many of them, sick.

24 But some of them are clearly mesothelioma victims. But the

25 question is, do they really have a claim against Grace? And we

1  have very substantial evidence with respect to Mr. Andreas and

2  Brayton Purcell, the Canadian case is simply an indication of

3  it, that they have a bad practice.  They have a bad practice of

4  filing out the bankruptcy forms in ways that don't really match

5  what the client is telling them.  They are interpretations or

6  extrapolations.  And they continue on in this case.  And with

7  respect to Early Ludwick, we see exactly the same kind of thing

8  set in graphic terms.  That Early Ludwick was committing the

9  same kinds of problems.

10      Now, under these circumstances, there is no question but

11  that if we had a company under these circumstances and this

12  situation, having submitted forms for reimbursement in some

13  fashion, in half a heartbeat there would be crime fraud

14  motions, there would be discovery filed with respect to the in-

15  house counsel, the outside firms finding out, "Well, what did

16  you do with the information that your client gave to you?"  We

17  all know that that would happen in half a heartbeat.  But these

18  firms are in business.  They are in business to process claims.

19  And we now have, from their own files, statements that indicate

20  that there were major problems on how the claims were being

21  processed.  And now the question is, what should we do about

22  it?  What should we do about?  Because we can't sit here and

23  say, "Oh, these claims are without question, claims where

24  there's no issue about credibility."  There's a tremendous

25  issue about credibility.

1      Ms. Ramsey comes in and says now, we have got claim forms,

2  or now we've got questionnaires that have been submitted where

3  the law firm doesn't do anything other than to submit what the

4  client says.  And it's very interesting that that statement is

5  made, because that statement, in a sense, suggests that it

6  comes to remedy what clearly was a problem in the past.  But we

7  have to accept the representation that that really is so.  That

8  is to say, that this is not simply an employment history.

9  These people are actually -- if they are verifying product

10  i.d., it's not just employment history.  So then you get into

11  the whole world of, well, what is it that they were told?  What

12  is it that they themselves had been prepared to submit to other

13  Trusts in the way of claim forms that they're also verifying?

14  There's an issue about the Claimants' credibility.  There's an

15  issue about the credibility of the law firm.

16      So, it may be that now we're finally getting the straight

17  story and in a way that specifically answers the questions on

18  the questionnaire.  It may be.  But it comes late in the day.

19  And we should have some ability to determine what else these

20  firms have with respect to the Claimants on whose behalf they

21  have submitted the questionnaires.  We ought to have some way

22  to find out if we're finally getting the truth.

23      So, what I would propose is that if, in fact, the Early

24  Ludwick is only proceeding on behalf of a certain number of

25  Claimants, and they're withdrawing the questionnaires that

1  relate to everybody else -- I haven't heard that.  All I've

2  heard is that there are 111 Claimants, of whom 99 have done it

3  one way, and 12 have done it another.  We've got 453

4  questionnaires.  And then I would like to know -- we need to

5  know, with respect to the Early Ludwick firm, what other

6  documents they have in their files which demonstrate --

7  internally, in their own files, that this information actually

8  is what the Claimant has said at all points in time.  In other

9  words, I don't think we should have to be satisfied with the

10  latest account.  So we want other claim forms that have been

11  submitted to other Trusts.  And we want the intake forms.

12  Remember that Andreas said, "Give me the ELS intake forms so I

13  can see what these people have said."  And we want the intake

14  forms.

15      So, I think our request is not very burdensome.  It asks

16  for other forms that have been submitted to other bankruptcy

17  cases.  And we would want and ask for information that came

18  from the Claimant himself with respect to what his actual

19  exposures were.  If there was an intake form, if it was

20  something else, we want it from the Claimant.  These

21  questionnaires were supposed to be from the Claimant.  And if

22  they come from the law firm, that doesn't really tell us

23  anything at all.  If we now hear from the Claimant, or somebody

24  who can verify it on behalf of the Claimant, then we need to

25  know if that verification is really an accurate representation

1  of what's internally in the files.  We have not sought this

2  with respect to other law firms.  We are only seeking this with

3  respect to Early Ludwick and with respect to Brayton Purcell.

4          THE COURT:  Ms. Ramsey?

5      (Pause in proceedings)

6          MS. RAMSEY:  Mr. Bernick talks about 453 claims that

7  were submitted by Early Ludwick.  Only 216 names appear on the

8  subpoena that we were served with by Grace.  And of those

9  216 --

10          THE COURT:  Yes, I got it.  99 had all the

11  information submitted, 12 you'll supplement, 75 I'd forgotten

12  you didn't --

13          MS. RAMSEY:  Seventy-five.

14          THE COURT:  -- have anything to do with, and the

15  other 21 -- I don't remember what the circumstance --

16          MS. RAMSEY:  Okay.

17          THE COURT:  -- was about the other 21.  I think I --

18          MS. RAMSEY:  Very quick.  I won't write a thing,

19  Your Honor.  It's 111 or ours.  99 have exactly what Mr.

20  Bernick ended up saying he wanted.  They have verifications by

21  the client, or they have Social Security printouts and military

22  records.  I don't know how much more reliable information you

23  can get than governmental records or the client's sworn

24  statements?  And those sworn statements were not done in

25  connection with this questionnaire.  They're not the newest

1  iteration.  They're not created for purposes of the

2  questionnaire.  They were excerpts from depositions that had

3  been taken, excerpts from interrogatory responses that had been

4  provided pre-petition.  These are the statements of the

5  Claimants.  For those 99, there is no issue regarding Early

6  Ludwick's credibility, whether you accept Mr. Andreas'

7  statements as having any reliability or not.

8          THE COURT:  Seventy-five you never represented, and

9  21 you sent to somebody else and they represent and you don't?

10         MS. RAMSEY:  That's correct.  And 12, we will agree

11  to provide the same kind of information promptly of verified

12  client data.  But to allow a Defendant to come in and try to

13  get access to the client intake forms, which are clearly

14  attorney/client privilege and work product, or the intake

15  interviews which are done, which again are attorney/client

16  privilege, those go far beyond anything legitimately the Debtor

17  needs in order to verify work history.

18      Now, Mr. Bernick says, well, work history doesn't tell you

19  the whole story, because, you know -- because they can

20  manipulate what they were exposed to.  Well, if you look at

21  what Mr. Andreas said, as quoted by Mr. Bernick, what he was

22  telling you about was there was a statement in there about a

23  claim form that said that he was a shipyard laborer when, in

24  fact, he was a rifleman.  Well, that's work history.  That's

25  not manipulating data with respect to i.d.  That's work

1  history.  That's what he did, where he was.  That's what

2  determines exposure.

3      We have 30 Claimants of that 111 that have specifically

4  said that they have Grace i.d.  And for those 30, that

5  information is backed up by copies of invoices from Grace,

6  copies of answers from Grace of discovery that was served on

7  them by the Plaintiff, or co-worker affidavits.  Again, all

8  independently verify a lot of the information that comes from

9  Grace.  For the others, as the Court is aware, most of these

10  claims have not been fully worked up.  And so what a Claimant

11  may know is, or what -- you know, they may know, is that they

12  were at a particular site, that asbestos was there during that

13  period of time.  They may or may not be in a position to say

14  which particular Grace product was there.  But if they were

15  there at the time that the product was there, they have a

16  legitimate basis for believing that they were exposed to Grace.

17  And in the fullness of time, if these cases were tried or

18  submitted to the Trust, that information would be fully

19  developed.  And all of our questionnaire answers came

20  specifically with a statement, a disclaimer that said we have

21  not proceeded to work up these cases as against Grace, because

22  it's been in bankruptcy for five years, and we've been stayed.

23  So we're giving you everything we have now, but we reserve the

24  right to develop more, and we know there's more out there.

25      A couple of other things.  We are not saying -- and I want

1  to make this very clear -- that Brayton Purcell's credibility

2  is an issue.  What we say is that Mr. Andreas, who clearly was

3  too close to his lawsuit against Lorelei Tobacco and went too

4  far, as the Court found, in what he was prepared to do and how

5  far he was prepared to go to try to make that case, his

6  credibility cannot be relied upon with respect to his criticism

7  of Early Ludwick.  That's all we're saying.  With respect to

8  Brayton Purcell, we are not making any of those kinds of

9  allegations.

10      I also want to say that it's very clear -- I want to make

11  it clear that the credibility problems with respect to -- that

12  are alleged to have occurred with respect to the Canadian

13  claims, there are explanations for many of those, which clearly

14  we can't go into all of that today, and it's not relevant.  But

15  those have nothing to do -- and none of the claims that we

16  submitted elsewhere have anything to do with the claims

17  submitted here.  What Grace is interested in is are they

18  telling me the truth?  Do they have a claim against me?  And

19  the answer is absolutely yes.  And you can see that from what's

20  been submitted, at least with respect to my firm.  I don't

21  represent Brayton Purcell, and so I can't respond to anything

22  that was said about them.

23      Your Honor, Mr. Bernick also said that questionnaires that

24  were signed by the firms provided no assurance.  Well, I just

25  want to make clear again for the record that the Court

1   expressly permitted questionnaires to be signed by the lawyers.

2   But again, in this particular circumstance, the information

3   that is being sought is verified by the client.  And it is an

4   absolutely gigantic leap to go from claims issues, which again

5   did not change disposition, because many of these Trusts have

6   procedures that say if you were on a ship during a certain

7   period of time, we presume you were exposed to our product.

8   Now, you can criticize that type of press distribution

9   procedure or that criteria, but that's what the Trusts say.

10  And if that's all that they're required to prove, then they're

11  not doing anything wrong, as long as they provide that accurate

12  information.

13       What Mr. Bernick wants to do is try the cases.  And if

14  that's where he wants to go, then there's a procedure for that.

15  But it's not here in connection with estimation.  For

16  estimation, he has what he needs.  Thank you.

17            MR. BERNICK:  Your Honor, I want to come back to the

18  figures.

19            THE COURT:  Wait.  Let me ask one question.  What's

20  the last 21 category, Ms. Ramsey?  I'm not clear about the last

21  21.

22            MS. RAMSEY:  There were 216.  They break down as

23  follows.  111 are represented by Early Ludwick.  99 of those

24  have submitted --

25            THE COURT:  Yes, I --

1          MS. RAMSEY:  -- verified information.  12, we will.

2    The remaining 75 break down into two numbers.  54, where we

3    never represented the Claimants at all, and 21, where cases

4    were referred to Brayton Purcell for all purposes, and we do

5    not continue to represent the Claimants.

6          MR. BERNICK:  Now, I had that it was 99, 12, 21.

7    Then what, 55?

8          MS. RAMSEY:  Fifty-four.

9          THE COURT:  Fifty-four.

10         MR. BERNICK:  Fifty-four.  I'm sorry, and the 54 was

11   which ones?  The --

12         THE COURT:  Fifty-four, they were never represented

13   by Early, and 21 that Early referred to Brayton for all

14   purposes.  And it's that 21 that you have some sort of intake

15   client file that would have been generated by the Early Ludwick

16   firm, but then the client would have been sent over to Brayton

17   from there.

18         MS. RAMSEY:  That's correct, Your Honor.  In those

19   cases I would expect that we have a client intake form, and

20   perhaps a memorandum, which is a report that the lawyer writes

21   of the initial interview.

22         THE COURT:  Okay.

23         MR. BERNICK:  Well then I think that this is very

24   helpful.  We have 453 questionnaires from the Early Ludwick

25   firm.

1           THE COURT:  Right, pertaining --

2           MR. BERNICK:  So what do we --

3           THE COURT:  The subpoena only covered 216.

4           MR. BERNICK:  I understand that.  And I think the

5  reason the subpoena only covered that, is that we were trying

6  to limit ourselves to things where there appeared to be a match

7  up with our original database.  But we have 453 questionnaires.

8  We're trying to get at we've got a lot of questionnaires that

9  may relate to claims that were not in our database at the time.

10  But the problem goes beyond the 216.  The reason I say this is

11  that we still have the 453 questionnaires that are of record in

12  the case.

13      What happens with the 453 questionnaires?  If the answer

14  is the 453 questionnaires all have the same level -- all fall

15  into one of these categories, they can go ahead and tell us

16  that.  We don't know all these things.  Where they say, well,

17  we forwarded it to Brayton Purcell.  We don't necessarily know

18  that.  Never represented -- we don't know that, because it's in

19  our -- we're relying upon what's in our database.  So if they

20  got 453 questionnaires, and they say we are only going to be

21  supporting, you know, X number of them in this fashion, then --

22           THE COURT:  No, I don't think -- I think that's not

23  the issue.  The issue is that you mentioned 216 Claimants.  And

24  the response is that of those 216, 111 of them were represented

25  by Early, 54 were not, and 21 were represented by Early, or at

1 least were intake --

2          MR. BERNICK:  Right.

3          THE COURT:  -- was taken by Early, but sent --

4          MR. BERNICK:  Right.

5          THE COURT:  -- to Brayton.

6          MR. BERNICK:  But the essence -- the reason I think

7 it's relevant, Your Honor, is this.  The essence of what they

8 are saying is that the problem that we see reflected in the

9 records, they believe -- and Ms. Ramsey is very strong that we

10 don't have the problem with respect to the people that Early

11 Ludwick is representing that were part of the subpoena, because

12 we have client submissions or we will get them.

13          THE COURT:  Right.

14          MR. BERNICK:  And I want to come back to that in a

15 minute, because that goes a long way.  And I accept that at

16 face value as being an effort to try to come to terms with the

17 problem.  It's better than what we've seen with Brayton

18 Purcell.  But I need to know of the people where they have

19 questionnaires, are they doing the same thing?  We picked out a

20 sub-population.  But are they doing the same thing with respect

21 to these questionnaires?  Because otherwise we don't know what

22 the status of the questionnaires is.  We tried to work with the

23 population where we thought we could control the

24 representations issue.  We succeeded only in part.  But we now

25 need to know, well, to what extent -- what happens to the rest

1  of the questionnaires?

2        THE COURT:  But the issue I have before me is a

3  Motion to Quash a Subpoena directed to 216.  And the reason

4  that I have that motion is because as to 99, everything you've

5  asked for has been provided.

6        MR. BERNICK:  That's not true.  But -- I mean that's

7  a different point, and it's not true.  And I'll come back to

8  that.  But what I'm saying is this doesn't solve the whole

9  problem.  They're saying we now have a good process, and a good

10  procedure.  Then we shouldn't have to sit there and file

11  motions to get them to come forward and say, "Yeah, I'll give

12  that to you."  We want that with respect to the 453.

13        Number two, they say, "Oh, well Brayton Purcell doesn't

14  represent them anymore."  Well that's good to know.  I mean

15  that Early Ludwick doesn't represent them anymore.  Brayton

16  Purcell represents them.  Well that's fine.  But why is the

17  intake information -- we now have credibility issues with

18  Brayton Purcell.  Why is the intake information that Early

19  Ludwick got direct from the client, why is that somehow

20  something that we can't get?  It's factual information.  It

21  comes from the mouth of the individual.  They can redact out

22  all kinds of, you know, attorney impressions, whatever they

23  want.  We want to know the facts as they came from the

24  individuals, not what happens to be in some kind of thing that

25  we get now from Brayton Purcell.  It seems to be kind of easy.

1  It's not invasive at all.  It's a single document.  They can

2  give us the facts that are in the single document.

3      And now I want to come back to this, because, Your Honor,

4  I still don't think that we're really -- the rubber is hitting

5  the road.  And this is very, very critical.  You notice that of

6  all of these different people, this comes out -- this

7  verification is not a verification of our claim form.  That's

8  not what they said.  They said it's other sworn testimony.  So

9  we have a claim form.  This is the problem that we run into.

10  We have a questionnaire that says, "Tell me where you used

11  Grace product, when you used it, and with respect to other

12  products, where you used it, when you used it, et cetera, et

13  cetera."  Now that's specific.  And the reason it's specific is

14  that we need to know what were the other exposures, and what

15  were the Grace exposures.  Not general work history, but the

16  exposures.

17      The verification that was represented, is information from

18  prior interrogatory responses, prior depositions.  It's not a

19  verification of a response to the questions that we've asked.

20  And it's a little too convenient to say, "Well, we'll give you

21  as much as we want, which is the record verifications that we

22  want to select, but we're not necessarily gonna give you other

23  things unless you demonstrate that you need it."

24      The questionnaire was specific, and it asked for all

25  documentation, not selective documentation.  So we got this

1  business here that, "We'll go dig out in our records the prior

2  sworn testimony."  It's deposition snippets.  And Your Honor

3  specifically rejected that in connection with the

4  questionnaire.  Indeed, you said, "I don't care" -- your words

5  were, "I don't care if they've answered it before.  I want you

6  to tell Grace what the exposure was."  So to say I've got the

7  verification is misleading.  It's not a verification of answers

8  to the questions we were asking.  It's what they have decided

9  to get from the published record in whatever litigation they

10  have.  And I'll --

11            THE COURT:  I --

12            MR. BERNICK:  -- make this last point, and then --

13            THE COURT:  I thought -- I apologize, but I thought

14  what Ms. Ramsey said was that the claim form is filled out, and

15  that it is supported by additional third party sources, which

16  include, among other things, military work history, Social

17  Security records --

18            MR. BERNICK:  That's part of it.  That's --

19            THE COURT:  -- and --

20            MR. BERNICK:  -- where they have product i.d.

21            THE COURT:  -- and/or something from the client

22  itself, such as interrogatory answers or deposition testimony.

23            MR. BERNICK:  No, no, no, we have two things.  We

24  have verifications.  The general statement with respect to 111

25  will have statements from the client themselves.

1            THE COURT:  Right.

2            MR. BERNICK:  And what I believe Ms. Ramsey said

3  was --

4            THE COURT:  Or third party sources.

5            MR. BERNICK:  -- that it's verified.  With respect

6  to all of them, verification, in the sense of it's sworn

7  testimony.  I believe that Ms. Ramsey said there's product i.d.

8  that is Grace product i.d. in 30 of those cases.

9            THE COURT:  Supported by invoices or something, yes.

10           MR. BERNICK:  Supported by invoices or something

11  else.

12           THE COURT:  Right.

13           MR. BERNICK:  We don't know what it is.  So with

14  respect to all of these other things -- and they say, "Well,

15  that's because we weren't developing" -- we don't know that to

16  be true.  The only way to find out whether that's true is to

17  actually look at the litigation record and the litigation

18  history to see what these people actually know.  And that only

19  comes from looking at the attachments.  Now, it would be easy

20  if we actually had the answers.  We could know whether the

21  statement that says, well, it's too early in the case, is

22  really true or not.  But for whatever reason, we don't have,

23  except in the case of 30 of these questionnaires, we don't have

24  Grace product i.d.  And with respect to the 30, you didn't hear

25  that there was verification of the Claimant, that he or she was

1  exposed to Grace product.  What you heard was that the law firm

2  is able to supply an invoice.  And, of course, we know that an

3  invoice doesn't necessarily mean anything.  And the law firm

4  may have been able to supply a co-worker's statement.  That,

5  again, is an argument that counsel might make, saying here's

6  what we've got.  But it's not the verification of the

7  individual who was exposed.

8      And here's the problem.  Here's why it makes a difference.

9  This is selective.  The lawyers select the snippets to take

10  from the record.  The lawyers select the invoices in the worker

11  affidavits or whatever it is.  It's just what the lawyers are

12  providing.  The questionnaire does not give them that latitude.

13  The questionnaire says all documents.  So if they actually have

14  Grace exposure, we want not just what they happened to have

15  given us, we want the whole deal.  And the problem is that in

16  particular in the case of these firms with their history, we

17  have lots of reasons to believe that they haven't been

18  forthright and candid in the past with respect to other

19  bankruptcy Trusts.  And we, therefore, have a heightened need

20  to know other sources of information that are in their files

21  that help us ascertain whether their snippets are correct.  And

22  it's not -- this is not something that's -- it is not a big

23  deal.  If you've got other information that relates to Grace,

24  for example, one of the intake forms, ff they didn't identify

25  Grace at the time, we should know that they didn't identify

1  Grace at the time.  The whole purpose of the questionnaire was

2  to avoid the hide the ball situation.  To a certain extent, we

3  are counting on these law firms to satisfy their obligations

4  under the questionnaire.  But in the case of these two

5  particular law firms, we know they've got a history where

6  they've not done so.

7          THE COURT:  Okay.  You've got to wrap up.  It's 10

8  after 7:00.  And, frankly, I've had it.

9          MR. BERNICK:  I get it.

10         THE COURT:  And you've got a plane to catch, and so

11  we're done.  Ms. Ramsey, two minutes.

12         MS. RAMSEY:  Right, thank you, Your Honor.  What I

13  think that Mr. Bernick was just saying there at the end is that

14  there might be additional information about Grace exposure

15  beyond what we've given.  Well that makes no sense.  The whole

16  purpose of these claims, and the whole purpose of the

17  questionnaire is to make out a case against Grace.  So whatever

18  is attached to the questionnaire, whatever information is

19  contained in the questionnaire is probably all there is with

20  respect to Grace exposure or possible work history with respect

21  to Grace.

22      With respect to the argument that, you know, these are

23  somehow not responsive, as the Court said, we sense this is

24  normally in litigation like this, before bankruptcy, that

25  Plaintiffs will be served with discovery that would say, "List

1 every place you ever worked.  List every exposure you're aware

2 of.  List everybody else you think you've got a claim against."

3 That information is the kind of information that's in the

4 interrogatories that have been attached.  That information is,

5 in fact, provided.  And in addition, because there was a

6 separate question, they have a list of the Defendants with whom

7 the Plaintiffs have settled, and what the settlement amount is.

8 So they have all of this information.

9     Again, we keep morphing.  And I feel like I'm sort of

10 chasing a moving target with respect to this.  The motion that

11 was filed took the position, "We suspect the credibility of

12 Early Ludwick.  And, therefore, we should be able to access all

13 of their files."  The answer is their credibility is not at

14 issue with respect to these questionnaires.  And the discovery

15 that's sought is incredibly intrusive, burdensome and invades

16 the attorney/client relationship.

17         THE COURT:  Okay.  I'm a little unclear with respect

18 to what the verification is, from your clients.  What is the

19 verification from the client?

20         MS. RAMSEY:  There are three kinds, Your Honor.

21 There are three kinds of sworn statements.  They are sworn

22 answers to interrogatories.  That's one.

23         THE COURT:  All right.  Your clients have not signed

24 the questionnaire itself?

25         MS. RAMSEY:  That's correct.  They are sworn

1  interrogatories.  But the information that Grace is concerned

2  about, which is the exposure information, is contained in those

3  sworn interrogatories.  That is the source of that information.

4           THE COURT:  And who signed the interrogatories?

5           MS. RAMSEY:  The interrogatories were signed by the

6  Claimant or the -- I want to say or the Claimant's

7  representative.  I can't be sure that every one was signed by

8  the Claimant themselves.

9           THE COURT:  But not by the lawyers?

10          MS. RAMSEY:  Not by the lawyers.  None of these are

11  -- these are client or Claimant sworn.  Or it's deposition

12  which was of the Claimant which was signed by the Claimant or,

13  again, the Claimant's representative.  The ones that I've seen

14  are the Claimant.  But there would be a situation where there

15  was a Claimant's representative that was deposed.  Or they are

16  affidavits of work history that were developed to be attached

17  to discovery responses, sworn by the Claimant.  Those are the

18  three kinds of sworn statements that set forth the job and

19  personal histories that are --

20          THE COURT:  Okay.

21          MS. RAMSEY:  -- contained with the press notes.

22          MR. BERNICK:  May I make a suggestion?  Number one,

23  if they would tell us and verify that they have given us all

24  the documents that they have that relate to Grace exposure,

25  that would certainly be help, because at least then we would

1  know where we're going.

2       Secondly, with respect to the verification, the problem is

3  verification of what?  If it's a verification of an employment

4  history, that doesn't really scratch anybody's itch.  If it's

5  verification that, "I worked with Grace asbestos in the

6  following way," and it really answers the question in the

7  questionnaire, we can't quarrel with that.

8            THE COURT:  Mr. Bernick --

9            MR. BERNICK:  That's very specific.

10           THE COURT:  -- I think they're gonna give you what

11  they have.

12           MR. BERNICK:  But that's --

13           THE COURT:  I mean --

14           MR. BERNICK:  The problem, Your Honor, is that they

15  are seeking through this submission to Your Honor to say they

16  don't have to give us all that they have.

17           THE COURT:  No.

18           MR. BERNICK:  They only have to give us what they

19  choose --

20           THE COURT:  No, I don't think --

21           MR. BERNICK:  -- from prior interrogatories.

22           THE COURT:  I don't think that's correct.  Ms.

23  Ramsey has just made the point that it doesn't benefit her

24  clients to only give you pieces of the information.

25           MR. BERNICK:  Yes it does, if the pieces of

1 information that they also have are pieces of information like

2 an intake form where the person never said anything about Grace

3 asbestos.  That's pretty important.  That's the whole point, is

4 that they can't just go to what -- that's like saying be

5 satisfied with my interrogatory answer.  I'm not gonna tell you

6 anything else.  That's not the purpose of the questionnaire.

7 The purpose of the questionnaire was to get all the

8 documentation.  If you've got documentation that verified, that

9 supports the verification, fine.  If you've got documentation

10 that says, "I wasn't exposed to Grace asbestos," that also is

11 responsive.

12          THE COURT:  Okay.  I believe that the problem is

13 this.  This is still an estimation.  It is still not for

14 purposes of outright claims litigation --

15          MR. BERNICK:  Right.

16          THE COURT:  -- against the Claimant.  Yes, the

17 Debtor has to understand that the claims that it is looking at

18 for purposes of getting the estimation processes are reasonably

19 accurate, because otherwise you don't have a reasonable basis

20 on which --

21          MR. BERNICK:  Right.

22          THE COURT:  -- to determine the estimation and fund

23 the Trust.

24          MR. BERNICK:  Right.

25          THE COURT:  But I'm not seeing anything in this

1 process that is inherently suspect.  With respect to the 21

2 claims that were intaken by Early but then referred to Brayton,

3 Ms. Ramsey, I want you to submit to Mr. Bernick a redacted form

4 of your intake -- whatever the intake forms are that list the

5 facts stated by your client.  Not legal advice.  Simply the

6 facts that indicate anything to do with the nature of the

7 claim.  The work history, the places of employment, whatever it

8 was prior to the time that it was submitted to Brayton for

9 prosecution.

10      To the extent that there is some issue with respect to the

11 Brayton law firm and its processes, I'm going to let the Debtor

12 explore that through information that may be in Early's files,

13 because at this point I don't see how Early can be jeopardized,

14 I don't see how the Claimant can be jeopardized by having the

15 facts submitted to the Debtor.  So I'm not talking about legal

16 advice.  I'm talking about factual information in whatever

17 those intake forms are.

18          MR. BERNICK:  By the same token, Your Honor, and it

19 may be that this is the fastest way to resolve this, if the

20 Early intake forms are relevant for that reason, in exactly the

21 same way, why can't we get the Early intake forms for the

22 people who at least they say actually satisfy all the

23 requirements of the questionnaire?  Just redact it.  It's just

24 plain factual information.  If they want to say, "Well, that's

25 because, you know, it was early in the case," they can say

1  that.  It's exactly the same information.  All we want is what

2  the people actually said before they became involved in

3  swearing to affidavits and giving interrogatory answers.

4          MS. RAMSEY:  Your Honor, that's an unbelievable

5  statement to make as an across-the-board matter.  These are

6  individual Claimants.  If there is a basis to believe that an

7  individual Claimant has not testified truthfully, it is

8  perfectly appropriate to look into that, but not as a global

9  matter because the Claimant happens to be unfortunate enough to

10  be represented by a firm --

11          THE COURT:  I agree.  If there is some credibility

12  assertion with respect to a particular Claimant, you're going

13  to have to pursue it with the Claimant.  But I will, because

14  Early does not represent the 21 Claimants, provide that the

15  factual assertion with respect to those 21 are to be provided.

16  With respect to the 54 that were never represented by Early,

17  there are no documents.  Ms. Ramsey, do I understand that

18  correctly?

19          MS. RAMSEY:  That's correct, Your Honor.

20          THE COURT:  All right.  There's nothing to be

21  provided.  As to the other 111 --

22          MR. BERNICK:  What about the Grace --

23          THE COURT:  Well, the 111 are part of the 99.

24          MR. BERNICK:  Yeah, well that's the problem, is that

25  basically with respect to these people what Your Honor is

1  essentially saying is that they can make out the case.  They

2  can make out, for estimation purposes, what they choose to

3  verify.

4          THE COURT:  No, I'm saying that if you choose to

5  think that the claims are false, you can pursue it with the

6  Claimant, not with their lawyer.  If you --

7          MR. BERNICK:  The Claimant?

8          THE COURT:  Yes.

9          MR. BERNICK:  The Claimant doesn't have possession

10 of the document.

11         THE COURT:  Well, the Claimant's the entity that

12 you're saying should verify the information.  So if you want to

13 take a deposition of a Plaintiff to find out whether or not the

14 claim form is correct, do it.

15         MR. BERNICK:  I read the --

16         THE COURT:  I'm not going to let you get into lawyer

17 files.  I don't see a basis for it.

18         MR. BERNICK:  What I was gonna suggest also with

19 respect to these people is what about the other bankruptcy

20 forms that they submitted?  Those are not secret.  They're

21 public.

22         THE COURT:  What other -- I'm sorry, what other

23 bankruptcy --

24         MR. BERNICK:  These people also submitted forms to

25 other bankruptcy Trusts.

1          THE COURT:  Well, they've been -- you've got

2   subpoenas outstanding to the other Trusts.

3          MR. BERNICK:  Sure.  If we get all that, then that's

4   hunky dory, but I'll reserve on that, and then if we have a

5   problem, maybe we'll come back to that, in the interest of

6   time.

7          THE COURT:  All right.  I think that's -- I mean

8   that's appropriate.  I think you've got subpoenas outstanding

9   as to them.

10         MR. BERNICK:  Okay.

11         THE COURT:  You should be getting that information

12   that will not, hopefully, violate or compromise an

13   attorney/client relationship.

14         MR. BERNICK:  Yes.  Thank you, Your Honor.

15         THE COURT:  All right?

16         MS. RAMSEY:  Thank you, Your Honor.

17         THE COURT:  We're adjourned.  Thank you.

18     (Pause in proceedings)

19         THE COURT:  I'm still ordering this record so that I

20   do not need an Order --

21         MR. BERNICK:  That's fine.

22         THE COURT:  -- with respect to this.  Okay.  Ms.

23   Fair?

24         MR. BERNICK:  Thank you, Your Honor.  Thanks for the

25   patience of your people tonight, and Your Honor as well.

1              THE CLERK:  Your Honor, I have continuance orders

2  on --

3              THE COURT:  I can't hear you, Ms. Fair.

4              THE CLERK:  I'm sorry.  I have continuance orders on

5  matters 1, 2, 13 and 14 --

6              THE COURT:  I'll take them.

7              THE CLERK:  -- claims matters.

8              THE COURT:  Thank you.

9         (Court adjourned)

10

11                       CERTIFICATION
12  I certify that the foregoing is a correct transcript from the
13  electronic sound recording of the proceedings in the above-
14  entitled matter.

15

16  *Lewis Parham*                        5/29/07

17  _____        _____
18  Signature of Transcriber                   Date