# EXHIBIT C

```
             UNITED STATES BANKRUPTCY COURT
                  DISTRICT OF DELAWARE

IN RE:                        .    Chapter 11
                              .
W.R. Grace & Co., et al.,     .
                              .
       Debtor(s).             .    Bankruptcy #01-01139 (JKF)
..............................................................

                         Wilmington, DE
                       October 24, 2005
                          12:00 p.m.

                 TRANSCRIPT OF OMNIBUS HEARING
          BEFORE THE HONORABLE JUDITH K. FITZGERALD
               UNITED STATES BANKRUPTCY JUDGE
```

APPEARANCES:

For The Debtor(s):         Janet S. Baer, Esq.
                           Kirkland & Ellis, LLP
                           200 E. Randolph Drive
                           Chicago, IL 60601

                           Amanda C. Basta, Esq.
                           Kirkland & Ellis, LLP
                           655 Fifteenth Street, N.W.
                           Washington, DC 20005

                           Barbara H. Harding, Esq.
                           Kirkland & Ellis, LLP
                           655 Fifteenth Street, N.W.
                           Washington, DC 20005

                           Michelle H. Browdy, Esq.
                           Kirkland & Ellis, LLP
                           200 E. Randolph Drive
                           Chicago, IL 60601

                           James O'Neill, Esq.
                           Pachulski, Stang, Ziehl,
                           Young, Jones & Weintraub
                           919 North Market Street
                           Wilmington, DE 19801

1    claim?"
2           THE COURT:  So what you're saying is, was there more
3    than one B read?  One was negative and one was positive and
4    you're only giving us the positive?
5           MS. HARDING:  Absolutely.
6           THE COURT:  Why aren't you going to --
7           MS. HARDING:  Because another law firm --
8           THE COURT:  -- get --
9           MS. HARDING:  -- handled the screening.
10          THE COURT:  Why aren't you going to get that from the
11   individual Plaintiffs who are required to tell you --
12          MS. HARDING:  Because the law --
13          THE COURT:  -- the doctors and the B reads that they
14   had?
15          MS. HARDING:  Sorry, Your Honor.  Because the law firm
16   that files the claim doesn't have that information.  They don't
17   know --
18          THE COURT:  But the individual does.
19          MS. HARDING:  -- the information.  Pardon me?
20          THE COURT:  But the individual does.
21          MS. HARDING:  No, the individual doesn't.  They don't
22   know where their x-ray's been sent.  That's the whole point.
23   They get shopped around -- the individual has no idea where
24   their x-ray was sent.
25          THE COURT:  So you want a very specifically narrowed

1  question, which is have you with respect to -- let me just say,
2  Plaintiff A --
3         MS. HARDING: Right.
4         THE COURT: -- for a moment. With respect to
5  Plaintiff A, have you taken this B read and given it to more
6  than one doctor or B reader and as a result of that gotten
7  inconsistent B reads?
8         MS. HARDING: That is one question, Your Honor. That
9  is one part of it. But the second part of it that gets to the
10 issue of the relationships between the law firms is did you get
11 this claim from another law firm? Okay, what is your
12 relationship with other law firms because the record seems to
13 suggest that there are law firms that do the screening, shop
14 the B read 'til they get a positive and then that group of
15 claims then goes to another law firm. That law firm files the
16 claim and these guys get some --
17        THE COURT: Look --
18        MS. HARDING: -- kind of payment for it. That's
19 relevant --
20        THE COURT: -- I don't --
21        MS. HARDING: -- to the reliability of the underlying
22 -- and to the method of the diagnosis.
23        THE COURT: No.
24        MR. LOCKWOOD: Your Honor, I object to that statement.
25 I'm sorry. I've sat here and listened to Ms. Harding make

1 representations.  There's not one word in any of the pleadings
2 that Grace has filed in this case and newspaper articles and
3 other inadmissible sources included that suggests that the
4 problem of shopping B reads arises not when a single firm might
5 shop a B reader out on multiple doctors, but when they're in
6 effect laundering the shopping by having one firm do the
7 shopping and then in order to somehow or another make it clean,
8 you pass the claim to another law firm.  That -- there's just -
9 - she just made that up as far as this record is concerned.
10             THE COURT:  I --
11             MS. HARDING:  I'm searching --
12             THE COURT:  Whether made up or not, this is going far
13 afield of what an estimation hearing's all about.
14             MS. HARDING:  Your Honor, the only thing we're asking
15 for here is the right to take the discovery -- is to issue the
16 questionnaire and to -- and the law firms that get the
17 questionnaire --
18             THE COURT:  I'm not permitting the questionnaire.  If
19 -- #1, if you want evidence from a specific firm, then you do
20 the formal discovery according to the Rules of Evidence,
21 because I believe that there are constitutional problems with
22 what you're asking.  That without consent of their clients the
23 lawyers may in fact be compromising some piece of advice that
24 they have given to a client for what reason.  There may be
25 attorney-client privilege.  There may be work product.  There

1  could be all sorts of problems. There are definitely with
2  respect to the financial relationships and how firms transfer
3  clients or share clients among one another, proprietary
4  information involved. There are all sorts of problems with
5  this questionnaire. So, I'm not going to approve it.
6      If you've got need for specific discovery, focused on a
7  specific area, you can take it and we'll deal with it
8  piecemeal. But overall, I am not going to permit these broad-
9  based questions. I didn't permit them with the individuals.
10 I'm not going to permit them with the lawyers. If you try in
11 discovery I'm going to permit it, so please -- although I'm not
12 giving you advisory opinions, I'm giving you advice. I'm not
13 going to permit it.
14     So tailor your questions if you have some need to this
15 specific whatever it is that you're looking for so that when I
16 say, what's the relevance, you can tell me how it fits to a
17 particular strategy, theory, piece of evidence, whatever in the
18 estimation hearing, because this doesn't. This is not
19 enhancing that process.
20         MS. HARDING: Can I try one more time?
21         THE COURT: One more.
22         MS. HARDING: Your Honor, in the end, and so I don't -
23 - so we're going to have a Trust, all right? And then the
24 trust is going to be funded, all right, from an estimation from
25 this Court on what should -- how much money should go into the

1  Trust.

2  THE COURT: Right.

3  MS. HARDING: All right. And the first part of the
4  estimation that the Court is talking about, in the past, at
5  least, is what our -- what's the basic liability for the
6  current claims?

7  THE COURT: Right.

8  MS. HARDING: Okay. And our position has been all
9  along from the very beginning, and I think the Court has at
10 least acknowledged that the Debtors have the right to assert
11 this position, that the funding for the current plan has to be
12 supported by evidence admissible in Federal Court. And all of
13 the discovery that's been going on is trying to get at the
14 issue of what evidence is admissible and meets the Daubert
15 standards under the Federal Rules. And so that -- all the
16 discovery is tailored and is then intended to get at that
17 issue. And we believe that experts -- very highly credible and
18 distinguished experts will tell this Court that the diagnoses
19 based on the kind of practices that occurred and were found in
20 silica are not reliable. Their methods would never be
21 acceptable in --

22 THE COURT: Please don't mention silica anymore. This
23 isn't a silica case. I'm not -- if you try to introduce what
24 they did in the silica case, I'm telling you right now, it's
25 not relevant to what I'm doing. I don't want to hear anymore

1  about silica.
2       MS. HARDING: All right. The point I want to make on
3  it -- in doing that, we believe that in the same way, in some
4  respects that you're handling in -- that there will be certain
5  filters that will filter out the roots of these claims. And it
6  will provide -- and the evidence we're seeking now is the data
7  to help the experts quantify those numbers.
8       THE COURT: That's what you told me you were seeking
9  when I permitted the individual claim questionnaires to go out.
10      MS. HARDING: Right. And at that time, Your Honor, we
11 -- I think we've been clear all along that we think that we can
12 do so much with those questionnaires and that evidence. But we
13 also think that we can get further evidence that those claims
14 should be filtered out even more based on these kinds of
15 practice and relationships. And that's what it's going to
16 because then that also debates the current and future claims
17 are going to be estimated and we know from the Ostern letter.
18 We know from the -- that the kinds of practices that were
19 acceptable in the past are no longer acceptable. And even if
20 it weren't an issue with the current claims, with respect to
21 future claims the Court is entitled to know what part of those
22 current claims are going to meet those standards in the future.
23      THE COURT: I do not want to see improper claims
24 filed or allowed -- if they are filed, allowed. I don't want
25 to see a single dime go to a Plaintiff who doesn't have a

                                                                    85

1   legitimate claim against this Estate.  However, you've got to
2   substantiate that the discovery that you're trying to get to is
3   going to enhance either -- that determination one way or the
4   other.  That is, what claims are legitimate and what claims are
5   not legitimate for allowance and payment purposes.  This
6   evidence about relationships between the law firms is too
7   tangential.  It's not calculated to lead to that kind of
8   evidence.
9        The Plaintiff's questionnaires I think are calculated in
10  that fashion.  You're going to get a description of the
11  doctors, the B readers, who the lawyers were -- all sorts of
12  things.  When that evidence comes in and your experts have a
13  chance to look at whatever they're going to do with that
14  evidence, and they say to you, we can't do -- we can't give you
15  an opinion because we need this piece of evidence, then you
16  come back and say, my experts say they need this piece of
17  evidence or we can't get any decision from them, any opinion
18  from them.  And then I'll understand what the relevance is.
19  But until you get through the process that's currently on track
20  and your experts look at it, and decide that they can't in fact
21  get you an opinion, I don't see the relevance of doing more.
22  The whole purpose for going through that exercise for several
23  hours was to make sure that you got relevant evidence that was
24  what your experts needed.
25       MS. HARDING:  Absolutely, Your Honor.  I mean, I