```
                    UNITED STATES BANKRUPTCY COURT
                        DISTRICT OF DELAWARE


IN RE:                      .       Case No.  01-1139 (JKF)
                            .
                            .
W.R. GRACE & CO.,           .       USX Tower - 54th Floor
et al.,                     .       600 Grant Street
                            .       Pittsburgh, PA  15219
            Debtors.  .
                            .       May 30, 2007
. . . . . . . . . . . . . ..        8:34 a.m.


                    TRANSCRIPT OF HEARING
          BEFORE HONORABLE JUDITH K. FITZGERALD
          UNITED STATES BANKRUPTCY COURT JUDGE



APPEARANCES:

For the Debtors:        Reed Smith LLP
                        By:  JAMES RESTIVO, ESQ.
                             LAWRENCE FLATLEY, ESQ.
                             TRACI REA, ESQ.
                             DOUGLAS CAMERON, ESQ.
                        435 Sixth Avenue
                        Pittsburgh, PA  15219

For Anderson Hospital:  Speights & Runyan
                        By:  DANIEL SPEIGHTS, ESQ.
                        200 Jackson Avenue, East
                        Hampton, SC  29924


Audio Operator:         Janet Heller



Proceedings recorded by electronic sound recording, transcript
                produced by transcription service.
```

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@optonline.net**
**(609)586-2311     Fax No. (609) 587-3599**

APPEARANCES (CONT'D):

For the Debtors:            W.R. Grace
                            By:  RICHARD FINKE, ESQ.
                            7500 Grace Drive
                            Columbia, MD  21044

For the Debtors:            Kirkland & Ellis LLP
                            By:  JANET S. BAER, ESQ.
                                 DAVID BERNICK, ESQ.
                                 LISA ESAYIAN, ESQ.
                                 SAM BLATNICK, ESQ.
                                 MICHAEL DIERKES, ESQ.
                            200 East Randolph Drive
                            Chicago, IL  60601
                            (Telephonic appearance)

For the Ad Hoc              Weil, Gotshal & Manges LLP
Committee of Equity              By:  M. JARRAD WRIGHT, ESQ.
                                      DAVID HICKERSON, ESQ.
                            1300 Eye Street, NW
                            Washington, D.C.  20005
                            (Telephonic appearance)

For Prudential              Riker, Danzig, Scherer, Hyland &
Insurance Company:            Perretti LLP
                            By:  CURTIS M. PLAZA, ESQ.
                            Headquarters Plaza
                            One Speedwell Avenue
                            Morristown, NJ  07962
                            (Telephonic appearance)

For State of Montana,       Monzack & Monaco
Dept. of Environmental      By:  FRANCIS A. MONACO, JR., ESQ.
Quality:                    1201 North Orange St., Suite 400
                            Wilmington, DE  19899-2031
                            (Telephonic appearance)

Asbestos Property Damage    Pryor Cashman LLP
Claimants:                  By:  RICHARD LEVY, ESQ.
                            410 Park Avenue
                            New York, NY  10022
                            (Telephonic appearance)

For Latigo Partners:        By:  STEPHEN BLAUNER
                            (Telephonic appearance)

Baron & Budd, et al.:       Hogan Firm Attorneys at Law
                            By:  DANIEL HOGAN, ESQ.
                            1311 Delaware Avenue
                            Wilmington, DE  19806
                            (Telephonic appearance)

**J&J COURT TRANSCRIBERS, INC.**

APPEARANCES (CONT'D):

For David T. Austern:          Phillips, Goldman & Spence, P.A.
                               By:  JOHN C. PHILLIPS, JR., ESQ.
                               1200 North Broom Street
                               Wilmington, DE  19801
                               (Telephonic appearance)

For One Beacon America         Drinker Biddle & Reath LLP
Insurance Company:             By:  DAVID PRIMACK, ESQ.
                               1100 N. Market Street, Suite 1000
                               Wilmington, DE  19801
                               (Telephonic appearance)

For Fireman's Fund             Stevens & Lee, P.C.
Insurance Company:             By:  DAVID R. BEANE, ESQ.
                                    JOHN D. DEMMY, ESQ.
                               111 North Sixth Street
                               Reading, PA  19603
                               (Telephonic appearance)

For Anderson Hospital:         Speights & Runyan
                               By:  MARION FAIREY, ESQ.
                               200 Jackson Avenue, East
                               Hampton, SC  29924
                               (Telephonic appearance)

For the Equity                 Kramer Levin Naftalis & Frankel,
Committee:                       LLP
                               By:  GARY M. BECKER, ESQ.
                                    JESSICA GLASS, ESQ.
                               919 Third Avenue
                               New York, NY  10022
                               (Telephonic appearance)

For the ACC:                   Caplin & Drysdale, Chartered
                               By:  WALTER SLOCOMBE, ESQ.
                               One Thomas Circle, N.W.
                               Washington, D.C.  20005
                               (Telephonic appearance)

For the ACC:                   Campbell & Levine, LLC
                               By:  MARK T. HURFORD, ESQ.
                               800 N. King Street, Suite 300
                               Wilmington, DE  19801
                               (Telephonic appearance)

4

APPEARANCES (CONT'D):

For PD Committee:          Bilzin Sumberg Baena Price &
                            Axelrod LLP
                           By:  SCOTT L. BAENA, ESQ.
                                JAY SAKALO, ESQ.
                           200 South Biscayne Boulevard
                           Suite 2500
                           Miami, FL  33131
                           (Telephonic appearance)

For PD Committee:          Ferry, Joseph & Pearce, P.A.
                           By:  THEODORE J. TACCONELLI, ESQ.
                           824 Market Street, Suite 904
                           Wilmington, DE  19899
                           (Telephonic appearance)

For Grace CCC:             Montgomery, McCracken, Walker &
                            Rhoads, LLP
                           By:  NOEL C. BURNHAM, ESQ.
                           300 Delaware Avenue, Suite 750
                           Wilmington, DE  19801
                           (Telephonic appearance)

For Grace CCC:             Montgomery, McCracken, Walker &
                            Rhoads, LLP
                           By:  NATALIE D. RAMSEY, ESQ.
                           123 South Broad Street
                           Philadelphia, PA  19109
                           (Telephonic appearance)

For the Debtors:           Pachulski, Stang, Zeihl, Young,
                            Jones & Weintraub
                           By:  JAMES O'NEILL, ESQ.
                                TIMOTHY P. CAIRNS, ESQ.
                           919 North Market Street
                           17th Floor
                           Wilmington, DE  19899-8705
                           (Telephonic appearance)

For the Official           Stroock & Stroock & Lavan
Unsecured Creditors'       By:  LEWIS KRUGER, ESQ.
Committee:                      ARLENE KRIEGER, ESQ.
                           180 Maiden Lane
                           New York, NY  10038-4982
                           (Telephonic appearance)

APPEARANCES (CONT'D):

| | |
|---|---|
| Roman Catholic Church Archdiocese of New Orleans: | Dies, Handerson & Cafona<br>By:  MARTIN DIES, ESQ.<br>1009 Green Avenue<br>Orange, TX  77630<br>(Telephonic appearance) |
| For David Austern: | Orrick, Herrington, & Sutcliffe, LLP<br>By:  DEBRA FELDER, ESQ.<br>Washington Harbour<br>3050 K Street, N.W.<br>Washington, D.C.  20007<br>(Telephonic appearance) |
| For London Market Companies: | Mendes & Mount, LLP<br>By:  ALEXANDER MUELLER, ESQ.<br>750 Seventh Avenue<br>New York, NY  10019-6829<br>(Telephonic appearance) |
| For CNA: | Ford Marrin Esposito Witmeyer & Gleser, L.L.P.<br>By:  HENRY BROWNSTEIN, ESQ.<br>Wall Street Plaza<br>New York, NY  10005-1875<br>(Telephonic appearance) |
| For the Official Committee of Asbestos Claimants: | Anderson, Kill & Olick, P.C.<br>By:  ROBERT HORKOVICH, ESQ.<br>1251 Avenue of the Americas<br>New York, NY  10020-1182<br>(Telephonic appearance) |
| For Off Date Insurance Co.: | Cuyler Burk LLP<br>By:  ANDREW CRAIG, ESQ.<br>Parsippany Corporate Center<br>Four Century Drive<br>Parsippany, NJ  07054<br>(Telephonic appearance) |
| For the Official Committee of Asbestos Property Damage Claimants: | Bilzin Sumberg Baena Price & Axelrod LLP<br>By:  MATTHEW KRAMER, ESQ.<br>200 South Biscayne Boulevard<br>Suite 2500<br>Miami, FL  33131<br>(Telephonic appearance) |

APPEARANCES (CONT'D):

For Everest                Marks, O'Neill, O'Brien & Courtney,
Reinsurance Co. and          P.C.
McKinley Insurance:        By:  BRIAN KASPRZAK, ESQ.
                                MICHAEL J. JOYCE, ESQ.
                           913 North Market Street, Suite 800
                           Wilmington, DE  19801
                           (Telephonic appearance)

For the FAI Claimants:     The Scott Law Group
                           By:  DARRYL SCOTT, ESQ.
                           2712 Middleburg Drive
                           P.O. Box 2665
                           Columbia, SC  29206
                           (Telephonic appearance)

For the FAI Claimants:     Crowell & Moring LLP
                           By:  MARK PLEVIN, ESQ.
                                LESLIE EPLEY, ESQ.
                           1001 Pennsylvania Avenue, N.W.
                           Washington, D.C.  20004-2595
                           (Telephonic appearance)

For Irwin H. Zandman:      By:  IRWIN H. ZANDMAN
                           (Telephonic appearance)

For the Trade              Duane Morris
Committee:                 By:  MICHAEL LASTOWSKI, ESQ.
                           1100 North Market Street, Suite 1200
                           Wilmington, DE  19801-1241
                           (Telephonic appearance)

For Murray Capital
Management:                By:  MARTI MURRAY
                           (Telephonic appearance)

For Tocqueville
Asset Management:          By:  PETER SHAWN, ESQ.
                           (Telephonic appearance)

For LECG:                  LECG
                           By:  SEAN WALSH, ESQ.
                           (Telephonic appearance)

For Kenneth Thomas:        By:  KENNETH THOMAS

1            THE COURT:  Please be seated.

2                         (Pause)

3            THE COURT:  This is the matter of W.R. Grace,

4    Bankruptcy Number 01-1139.  The participants I have listed by

5    phone are Scott Baena, Martin Dies, Lewis Kruger, Henry

6    Brownstein, Kenneth Thomas, Sean Walsh, Robert Horkovich, Mark

7    Hurford, Alex Mueller, David Primark, John Demmy, Theodore

8    Tacconelli, Matthew Kramer, Andrew Craig, Daniel Hogan, David

9    Beane, Jessica Glass, Richard Levy, Stephen Blauner, John

10   Phillips, Brian Kasprzak, Michael Joyce, Mark Plevin, Leslie

11   Epley, Darrell Scott, Michael Lastowski, Irwin Zandman, Debra

12   Felder, Francis Monaco, Timothy Cairns, James O'Neill, Gary

13   Becker, Noel Burnham, Natalie Ramsey, Janet Baer, David

14   Bernick, Lisa Esayian, Sam Blatnick, Michael Dierkes, Curtis

15   Plaza, Marti Murray, Peter Shawn, Marion Fairey, Walter

16   Slocombe, Jarrad Wright, Arlene Krieger, and David Hickerson.

17   I'll take entries in Court, please.  Good morning.

18            MR. RESTIVO:  Good morning, Your Honor.  Jim Restivo,

19   Lawrence Flatley, Douglas Cameron, and Traci Rea, for the

20   debtor.

21            MR. SPEIGHTS:  Good morning, Your Honor.  Dan

22   Speights for Anderson Memorial Hospital.

23            THE COURT:  Mr. Restivo?

24            MR. RESTIVO:  Item 1 on the agenda, Your Honor, is

25   debtors' motion for leave to amend their objections to certain

1  property damage claims, and I'm going to address that.

2          THE COURT:  All right.

3          MR. RESTIVO:  That's the first order of business.

4  Your Honor, as this Court has often said, a Bankruptcy Court is

5  a Court of equity, and must do justice to all parties.  That's

6  fully consistent with the teachings of the Supreme Court in the

7  Energy Resources case, and Collier on Bankruptcy, both of which

8  are cited in our reply brief.  I looked up equity in the

9  American College Standard Dictionary, and equity is the

10 application of the dictates of conscience, or the principles of

11 natural justice to the settlement of controversies.  And I want

12 the Court to fully appreciate what is going on here as the

13 Court applies the dictates of conscience, fairness, and justice

14 to our motion to amend the objections to the Speights & Runyan

15 asbestos property damage claims.  And in order to do that, Your

16 Honor, I'm going to use Claim Number 11683, because it is

17 symptomatic, and emblematic of the claims we are talking about

18 today.  I'm going to hand up to the Court a highlighted and

19 tabbed portion of the claim file for this claim.

20         THE COURT:  Thank you.

21         MR. RESTIVO:  Your Honor, Claim Number 11683 is a

22 claim by the Hamilton, Ontario School Board for the Westdale

23 Secondary School at 700 Main Street.  Speights & Runyan wants

24 the debtor to pay for removal of MK-3 in this building, and

25 that is shown on the tabbed Page 004, where Question 13 asks

1 for what alleged asbestos containing product are you making a

2 claim?  And where the answer from this claimant is, Monokote 3

3 fireproofing insulation.

4          The support for this claim, Your Honor, is at Claim

5 Page Number 0028, and again, I have a blue post-it tab, it's

6 the last page in this hand up.  The support for claiming that

7 Monokote 3 is in this building is a one-page letter of Donald

8 Pinchin.  Donald Pinchin wrote approximately 1,000 identical

9 letters just like this one.  The only change is in the

10 identification of the building.  And you will see, in the

11 letter for this claim, Mr. Pinchin states that this letter will

12 provide the written confirmation that, in our expert opinion,

13 the building mentioned above contains a product manufactured by

14 W.R. Grace, Ltd., known by the trade name Monokote MK-3, and

15 this report attached to all of the claims we are talking about

16 today, and indeed, attached to 1,000 of the original Canadian

17 claims, is precisely what Mr. Speights candidly told this Court

18 he was going to do on product identification at the April 9,

19 2007 status conference.  He confirmed that claimants would rely

20 upon the Pinchin reports to satisfy their burden of product

21 identification on the Canadian claims.  He said, at Page 234,

22 in Canada they know I'm calling Dr. Pinchin to the stand, and

23 he is going to say it's their product.

24          Because we're talking about conscience, and justice,

25 and fairness, Your Honor, I need to say a few things about

1  Pinchin.  When the Grace bankruptcy was filed, Pinchin

2  undertook a speculative venture to interest building owner

3  clients of his to file claims against the debtor.  He candidly

4  admits this at his March 14 deposition.  And he sent out

5  proposal letters in which he told building owners that he and

6  Speights & Runyan would file these claims on a contingency fee

7  basis.  And I'm handing up from the Pinchin deposition Pinchin

8  Deposition Exhibit 2.  And again, I've taken the liberty of

9  highlighting and posting it.

10       MR. SPEIGHTS:  Excuse me, Mr. Restivo.  Your Honor, I

11  have a concern about whether this is becoming an evidentiary

12  hearing.  I don't mind Mr. Restivo continuing if Your Honor is

13  inclined to do this, so long as my objection is preserved.  I'm

14  not sure where he's going.  I was here to argue a motion, and

15  now we're putting in a lot of evidence, and I didn't come in

16  here to put in evidence, so I do have a concern, and I will

17  formally object to the introduction of evidence on evidentiary

18  hearing, and we'll see where we go, and Your Honor can rule

19  now, or preserve it, or whatever.

20       MR. RESTIVO:  Your Honor, I'm not moving either the

21  claim form in as evidence, or this in as evidence.  I am simply

22  using this as part of my argument, and I think it certainly is

23  appropriate to the dictates of conscience, justice, and

24  fairness, to know how Mr. Pinchin, who did 1,000 of these

25  letters that serve as the support for product identification,

1 which we want to contest by virtue of an amendment, how these

2 claims were generated.  That's all I'm using this for.

3          THE COURT:  I'm not sure whether this is an

4 evidentiary hearing or not, Mr. Speights.  To the extent that

5 that's what it turns out to be, your objection is certainly

6 well founded.  This is not an evidentiary hearing.  To the

7 extent that it's somehow background for an argument I guess

8 I'll hear it subject to your objection.  I'll strike it later

9 if it turns out that it is evidentiary.  I'm not sure where

10 we're going with this yet either, but at the moment I'll accept

11 it as part of a proffer for an argument and see where we're

12 headed.  I don't know yet where we're going either.

13          MR. BAENA:  Your Honor?

14          MR. SPEIGHTS:  Can I just say that at an appropriate

15 time later today I may say I need to supplement the record wit

16 something if Your Honor doesn't strike it, but we're not there

17 yet.

18          THE COURT:  All right, Mr. Speights.

19          MR. RESTIVO:  Suffice it --

20          THE COURT:  Somebody on the phone was speaking?

21          MR. BAENA:  Yes, Your Honor.  Forgive me.  It's Scott

22 Baena on behalf of the PD committee.  Your Honor, I wonder if,

23 for the record, whether we could join in that objection on the

24 grounds that we think it's wholly inappropriate for counsel to

25 be commenting on testimonial and evidentiary matters that are

1  not proven before the Court in this or any other proceeding.

2          THE COURT:  That are not, Mr. Baena, proven before

3  the Court?  I couldn't hear you.

4          MR. BAENA:  In this or any other proceeding.

5          THE COURT:  Oh.  All right. Yes.

6          MR. BAENA:  Counsel just described --

7          THE COURT:  If you want to join Mr. Speights'

8  objection, yes, that's certainly proper, and your joinder is

9  noted.  And again, as I said, I'm not sure where we're going

10 with this yet and what this is, but I'll let Mr. Restivo pursue

11 it for a while.  If it turns out that it's a proffer of some

12 sort of evidentiary record, this is not an evidentiary hearing

13 and I'm not prepared to accept evidence today, so I'll bear all

14 that in mind and I'll listen to motions to strike at an

15 appropriate time.  Go ahead, Mr. Restivo.

16         MR. RESTIVO:  Suffice it to say, Your Honor, that

17 what this document does is it's an attempt by Pinchin to

18 interest his building owner clients to filing claims in this

19 bankruptcy utilizing the services of Speights & Runyan, and for

20 that effort this alleged expert is paid solely and exclusively

21 on a contingency fee basis.  Now -- and he gets 11.5 percent of

22 every dollar recovered.

23         I want to go back now to Claim Number 11683, and I am

24 handing up to the Court the exhibit relating to this claim from

25 the Pinchin deposition, again, so that the Court understands

1  precisely what's going on here in terms of the product in this

2  building.  Your Honor, this hand up includes the Pinchin

3  letter, but more importantly it includes the bulk sample

4  analyses that allegedly led Pinchin to write a letter like this

5  1,000 times.  And if the Court looks at Page 4 of 4, which has

6  a blue tab, the Court will see that with respect to the only

7  product identified as fireproofing, that product has no

8  asbestos.  That's sample 1439.588.16, plus that sample contains

9  cellulose and pearlite, and as the Court knows from our

10 hearing, those things are not in MK-3.

11          The last sample on the page is something called

12 spray-on auto shop.  It's not clear whether Pinchin treats that

13 as fireproofing or not, but if he does, that sample also

14 contains 50 to 75 percent pearlite.  At his deposition, Mr.

15 Cameron asked Pinchin about this claim and other claims like

16 it.  And Mr. Pinchin candidly conceded that this letter which

17 refers to Monokote simply is incorrect, both with respect to

18 this claim and four other claims.  He cannot testify that the

19 material is MK-3.  And so Claim Number 11683, in fact -- in

20 fact, does not involve Grace's Monokote 3.  Speights & Runyan's

21 own testifier concedes that.  All Grace wants to do is, to the

22 extent it needs to amend its list of objections, add an

23 objection that says this is not MK-3, the bulk sample reports,

24 and the other material do not show it is MK-3, and indeed, show

25 it is not.  Mr. Speights takes the position that even though

1 his own alleged expert concedes it's not MK-3, Grace should not

2 be permitted, at this point, to raise an objection that it's

3 not MK-3.

4         Your Honor, we submit that leave to amend is

5 appropriate under Rule 15, that provides leave to amend a

6 pleading shall be freely given when justice so requires.  This

7 Court, as a Bankruptcy Court, has broad discretion to grant

8 such a motion, and we've cited case law in which Bankruptcy

9 Courts have liberally allowed amendments pursuant to Rule 15.

10 Amendment is in the best interest of the estate in that it will

11 preclude the estate from having to pay on frivolous or invalid

12 claims at the expense of valid claims.  Amendment is

13 appropriate because, as you will see, Your Honor, it does not

14 unduly or unfairly prejudice the claimants represented by Mr.

15 Speights.

16         Let me turn to what the amendments are.  Mr. Speights

17 has told this Court a number of times that there are 127 new

18 objections that we have raised.  That is a little bit

19 misleading, Your Honor.  In fact, we have raised only two types

20 of amendments, one related to product identification, and one

21 related to the ultimate limitations period under Canada law.

22         Let me deal with product identification first.  Our

23 product identification amendments were in response to a claim

24 by Mr. Speights that we failed to make a specific product

25 identification objection in the 15th omnibus objection to 26

1  claims.  So, we seek leave to amend now to add a specific

2  objection.  You ought to understand, Your Honor, that for Claim

3  11683 that we started with, we had what has become known as a

4  (c)(2) objection.  A (c)(2) objection is for claims lacking

5  sufficient documentation.  In fact, there was documentation

6  attached to this claim.  I've shown it to Your Honor.  I don't

7  know what sufficient documentation meant back at that time, but

8  there was documentation attached.  Our amendment adds

9  objections (3)(c)(D), which says you provided documentation but

10  it's insufficient, and an objection which is (3)(e), you failed

11  to attach documents showing it's a Grace product, and

12  (c)(3)(F), you attached bulk sampling, but the bulk sampling is

13  inconsistent with a Grace product.  And so, our amendment goes

14  from a (c)(2) objection, which says you have insufficient

15  documentation to three more technical, more specific objections

16  spelling out why.

17       Now, it's not clear to us, Your Honor, that we need

18  to seek leave to amend.  Paragraph 1D, Sub 2 of your order of

19  July 19, 2004, provided that the debtor could file one

20  subsequent substantive objection which is not a gateway

21  objection.  And I think that's all we're doing here.  But my

22  firm was not involved in that order, and to be safe and to try

23  to cut off these endless arguments so we could get to the

24  merits of these claims we moved to amend.  And the amendment is

25  appropriate on product i.d. because it will serve the interest

1  of justice.  They have the burden of establishing it's MK-3.

2  They've known that from the beginning.  If the Court would deny

3  the amendment money would be paid on a building that doesn't

4  even have Grace's Monokote 3 in it.

5           And, Your Honor, I think it's fair to state part of

6  the problem here clearly was caused by the fact that Speights &

7  Runyan filed thousands of claims.  We started with over 4,200

8  total claims, many of which were Speights & Runyan.  And it's

9  true, a lot of those today have been expunged or dismissed.

10 But the debtor had to apply in excess of 30 very specific

11 objections to in excess of over 4,000 property damage claims,

12 most of which were filed by Speights & Runyan.  It is not

13 surprising that Speights & Runyan could find some examples

14 where maybe technically we didn't get them all right.  These

15 product identification objections will not prejudice the

16 claimants represented by Mr. Speights.  They've known from the

17 beginning they had to prove product i.d.  On December 21, 2006,

18 five months ago, they submitted their expert reports relating

19 to product identification, and for the claims we're talking

20 about today they listed Dr. Pinchin.  The next month, January

21 17, we filed our expert report of Dr. Lee on product

22 identification.  And as the Court is aware from our recent

23 hearings, anywhere the claim files contained bulk samples Dr.

24 Lee's report commented on them, and 16 of the buildings we're

25 talking about today did contain bulk samples, and Dr. Lee

1  concluded that the bulk samples were insufficient to establish

2  a Grace product.  And on February 14, 2007, Speights & Runyan

3  deposed Dr. Lee.  In March, namely March 14, Mr. Cameron took

4  the deposition of Pinchin, as I've noted.  The notice of

5  deposition identified each and every one of these Canadian

6  claims we're talking about today, and indeed, in at least five

7  or six of the claims they were specifically discussed and

8  Pinchin candidly conceded his letter was a mistake, he can't

9  say it's MK-3.  So, their own expert designations, our expert

10  designations, and the opportunity to depose the experts do not

11  prejudice them at all.  These product i.d. objections have been

12  known since December.

13         Let me turn quickly, Your Honor, to ultimate

14  limitations.  The objection to our attempt to amend on this

15  ground borders, I believe, on the outrageous, Your Honor.  We

16  raised in our objection statute of limitations.  There is no

17  doubt that was an objection that was raised.  There's no doubt

18  that both the normal statute of limitations in Canada and what

19  is known as the ultimate statute of limitations in Canada are

20  statutory statutes of limitation.  It is true, Your Honor, in

21  describing to the Court what we were planning to file at a

22  status conference I did describe the Canadian ultimate statute

23  of limitations as operating like an American statute of repose.

24  That's what it does.  That doesn't mean in Canada it's called a

25  statute of repose.  In Canada it's called a statute of

1 limitations.  Mr. Speights has taken the position that because

2 I called it like a statute of repose in America, and because we

3 did not list as an objection statute of repose, but only listed

4 statute of limitations, we can't argue ultimate statute of

5 limitations.

6          Our position is, number one, statute of limitations

7 is statute of limitations including the ultimate statute, and

8 we don't have to amend, but number two, just so we can get to

9 the merits of something here, we'll put down statute of repose

10 also even though we don't think it's technically accurate.

11 Again, there's no prejudice here.  They have known since

12 November 6, 2006, that our expert, Mr. Mew (phonetic), would be

13 testifying on limitations periods, including but not limited to

14 the ultimate limitations period.  His report was filed on

15 December 21, 2006.  He was deposed.  This was repeated in terms

16 of a final witness disclosure on March 13, 2007.  Indeed, they

17 recently took his deposition, and from a Canadian point of

18 view, ultimate statute of limitations is in Canada known as a

19 statute of limitations.

20          Your Honor, justice, fairness, conscience states that

21 where a Canadian claim is absolutely barred by the ultimate

22 statute of limitations, which operates similar to an American

23 statute of repose, (a), we have already raised statute of

24 limitations, and (b), if there's a notice issue, we're more

25 than happy and have amended to also say statute of repose, even

1 though it is not a statute of repose in Canada, it's a statute

2 of limitations.  Our motion for leave to amend should be

3 granted, and we should get to a trial, or summary judgment, or

4 resolution of these claims.  Thank you, Your Honor.

5         THE COURT:  Mr. Speights?

6         MR. SPEIGHTS:  One moment, Your Honor.

7                (Pause)

8         MR. SPEIGHTS:  I said one moment, Your Honor, because

9 I must confess I did something that Your Honor would not

10 approve of.  I sent a message to my office on my Blackberry.

11 I'll now take out my battery because Mr. Restivo was making

12 factual arguments that concern me.  And I'm sure Mr. Restivo,

13 who I admire a great deal as a professional, believes the facts

14 that he gave you were correct, but he talked about a thousand

15 Canada claims, and I believe that is demonstrably incorrect.  I

16 believe that by basis of my sending an e-mail on my Blackberry

17 that I should not have done --

18         THE COURT:  Well, it's because of the sound system --

19         MR. SPEIGHTS:  I understand that.

20         THE COURT:  It didn't affect it.

21         MR. SPEIGHTS:  It didn't set off anything?

22         THE COURT:  No, it didn't.

23         MR. SPEIGHTS:  Okay.  But I did turn it on, and I did

24 send it, because I said 1,000?  In fact, we filed three hundred

25 and something Canada claims originally.  All had authority.

1  There wasn't an authority question on Canada.  All the product

2  i.d. in Canada at that time was based upon Dr. Pinchin's

3  opinions, and Dr. Pinchin, as Grace will at least attest to in

4  private, is the preeminent asbestos expert in Canada, and he

5  already, and I'm glad Grace acknowledged it today, he already

6  had these clients, and he wanted them, or advised them to file

7  in this case.  And I start off that way only -- and it's not

8  the way I planned to start off.  I have an argument to make,

9  not just to respond to Mr. Restivo, but because I am concerned

10 how assertions are made that I have no -- generally have no

11 basis to respond to if they are factual assertions, since this

12 is not an evidentiary hearing and I did not come prepared to

13 respond to such facts, and I -- while I'm on this thread let me

14 just deal with Dr. Pinchin a minute, and what Mr. Restivo also

15 says, again, reserving my objection if factual issues are at

16 issue, then I want a chance to deal with the facts themselves.

17          But there is no question that Dr. Pinchin conceded

18 several product i.d. reports should be withdrawn, and we did

19 so, and there is no -- and there is no question that Grace has

20 not objected to a number of product -- a number of claims on

21 product i.d. where the sole basis is Dr. Pinchin's report.  So,

22 that's not at issue.  What Mr. Restivo found was, one, amongst

23 this new group, and I believe he said there were a total of

24 four in which he doesn't believe Dr. Pinchin would support

25 product i.d. today, and therefore he calls upon the great

1  equity hand of this Court to come in and help him out on that.

2  And I say to Mr. Restivo he doesn't need help on that.  Number

3  one, if all we were doing were the several, if there are four,

4  or less, claims where Dr. Pinchin will not support his opinion,

5  I would withdraw those like I did before.  Moreover, Your

6  Honor, Mr. Restivo knows that getting past product i.d. doesn't

7  get you any money in this bankruptcy because even getting by

8  all the objections at some point in time we have to have a

9  quantification hearing on damages, so it doesn't -- it does not

10  require the Court to use its equitable hand to try to remedy

11  such situation where, according to Mr. Restivo today, there is

12  Monokote there in the building to be quantified.  But having

13  said that, Your Honor, what happened is that when we were

14  dealing with product i.d. and we had all these new -- I think

15  there were 26, and now he says four, really, Mr. Pinchin

16  wouldn't support when he ultimately filed his amended

17  objections, later objections in which I said, wait a minute,

18  you've got to file a motion, he didn't just file the product

19  i.d. which we probably quickly could have worked out, but he

20  also filed all these statute of repose objections, a motion to

21  -- and later a motion to ask that he be permitted to file on

22  statute of repose.  So, just as a preliminary matter, Your

23  Honor, dealing with the equity, and the facts, etcetera, we've

24  got three buckets (sic).  We've got three or four Dr. Pinchin

25  claims which we may well withdraw.  If Dr. Pinchin says it

1  ain't Monokote, I'll withdraw them, as I did before.  That's

2  not an issue, and there's no prejudice there.  Then we have the

3  bulk, maybe 22, where Grace has not objected and Grace has

4  produced no suggestion that Dr. Pinchin would not support his

5  present opinion, and then we have all these statute of repose

6  objections that they now want to introduce into the lawsuit.

7          And so, Your Honor, that leads me to what I really

8  came prepared to say, and that is that, number one, I don't

9  need to deal, at the outset, with the history of how we got

10 here today.  Your Honor has already ruled on the New York

11 claims that Grace cannot do what they now want to do.  In the

12 New York case, of course, Your Honor adopted my word that -- of

13 a painstaking process that led to these orders.  And I see no

14 basis to go through every order that Your Honor entered

15 starting in 2004 or five, and leading up until recent times

16 when Your Honor told them that you would allow the local rule

17 itself to be modified so that they could file everything

18 together and they represented they would file everything

19 together, and they represented to you that.  They would waive,

20 if they were not allowed to do it.  That whole history is

21 there.  I may refer to it later.  But Your Honor recognized

22 that in the New York law arguments that Grace couldn't come

23 along during the middle of that argument or during the briefing

24 on those arguments and convert its statute of limitations on

25 one basis to a statute of limitations on another basis.

1          Secondly, Your Honor, I really don't think, as much

2   as we've briefed the issue, and of course, the PD committee has

3   likewise filed a brief on this matter, we need to get bogged

4   down into the law a great deal.  We have addressed it.  Clearly

5   they have -- either they don't have the right to do what

6   they're doing, or if they have the right then they have to have

7   some showing, some burden on their part to convince Your Honor

8   to allow them to amend these claims at this late date.

9          But before addressing history and before professing

10  law, I want to deal with the issue of prejudice, and I do so

11  because I always put it at the end because my view is that

12  prejudice is not an issue here.  Prejudice is not an issue.

13  It's not something I have to show.  But by doing that and by

14  putting it at the end of the brief, and by putting it at the

15  end of my argument, somehow I feel like I'm the guy who is

16  accused of some crime, and all I've got is a search warrant

17  defense, and I don't have anything to say on the merits about

18  prejudice.  Well, I think there is significant prejudice.  I

19  don't think I have to prove prejudice.  I think prejudice is

20  not at issue, and to the extent it's at issue they have the

21  burden over there.

22         But here we have PID.  Let's deal with the bucket of

23  PID, not the ones that I would withdraw.  We have a process

24  that's been going forward since they filed their objections in

25  September 2001, and despite all the numbers they throw out, I

1 think it's in my brief they had 700 claims when they started

2 this process well over a year ago.  That's what they were

3 dealing with.  And at no time did they amend their objections.

4 And then, once this process starts, as reflected in our brief,

5 we took their expert's deposition and we did not depose him on

6 these -- I'm going to round off and guess that there are 22

7 buildings, on these 22 buildings at issue, because they had not

8 objected to them.  We took that deposition.  Then we also sent

9 out a discovery to Grace just on the buildings that they had

10 objected to, written discovery.  We didn't send it out on the

11 buildings that they did not object to.  Neither did we send out

12 additional samples for additional analysis to Dr. Longo

13 phonetic) at Material Analytical Sciences, as we have done in

14 some cases, and they know that, and supplemented where there

15 was a huge dispute and we wanted to fortify Dr. Pinchin's

16 opinions.  We didn't do that because they were not objected to.

17 And then on March 19 of this year, in response to their motion

18 for summary judgment, we specifically said that they had not

19 objected to these claims.  And from March 19 until very

20 recently they never moved to amend their claims.  And then,

21 Your Honor, we went through -- I think this is the third

22 Wednesday hearing that I've been through on this precise

23 ground.  Now, if Your Honor would accept Mr. Restivo's argument

24 and allow him to amend, that means -- excuse me one moment.

25                              (Pause)

1          MR. SPEIGHTS:  That means we would have to start over

2  again on these 22.  I'm just on the product i.d. now.  I'm not

3  on the brand new repose objections.  It would mean that we

4  would have to serve new discovery on these 22.  We may or may

5  not want to do a deposition.  We may or may not want to find

6  out what Canada sales records they have.  We would have to take

7  Dr. Lee's deposition about his opinions on these.  We would

8  have to do new briefing.  They would move for summary judgment,

9  perhaps, and we would have to file responses to that.  And we

10 would have to do all of that when that was never intended under

11 Your Honor's case management orders in this case, so that it is

12 not just an academic exercise.  We've already spent a lot of

13 time just arguing the motion, and we will have to spend a lot

14 more dealing with these 22.  And ultimately on the 22, I mean,

15 we may want to get a second opinion on one, or two, or three,

16 or four, or five of those, as well.  So, all of a sudden, at

17 this late date they want to come in and say, oops, we want to

18 add 22.  Then we get to two that Mr. Restivo did not mention,

19 and those -- they're not all Canada that are subject here.  He

20 also has two U.S.A. claims that we filed and they did not

21 object to.  They're not on their expert report.  Dr. Lee did

22 not provide testimony about them in his report, or a sworn

23 statement about these in the report.  They were not part of the

24 proceeding.  No motions were filed.  I'll strike that.  That we

25 did not conduct discovery on those two.  So, it's not just the

1 maybe 22 Canadas.  We also have the two U.S.A.s that all of a

2 sudden, at the very end, they want to add them in.

3        So, there is substantial prejudice, and it is running

4 counter to what Your Honor consistently told the debtors that

5 you didn't want claimants having to run up here every week and

6 deal with these issues.  I know there was a Speights exception

7 to all the authority stuff we did, but we really argued the

8 last authority matter well over a year ago.  I feel like I'm

9 entitled to and I am legally in the same pool with all the

10 other PD claimants having finished that authority process.

11        Then we get to the repose.  The short answer to Mr.

12 Restivo's suggestion that -- I think he might have used the

13 word silly.  I'm not sure.  But that they are already in here,

14 his repose objections, or his objections under the ultimate

15 limitations, are already part of this proceeding is, okay, you

16 don't need this, then.  I mean, that's something Your Honor

17 will decide down the road whether they have raised the ultimate

18 statute of limitations in their present objections.  And I

19 suggest to you that if they had, they wouldn't be here filing a

20 motion asking you to allow them to amend their objections

21 seriatim.

22        But with the repose they are even worse off, I

23 believe, than they are on the product i.d., because under the

24 repose objections they never mentioned those.  March 19 the

25 same brief is filed in response to their trying to raise these

1  repose objections and we say you didn't object on repose.  Now,

2  of course, repose was not -- or limitations was not scheduled

3  for trial; however, at no point, then, until they filed these

4  amended objections the night before the -- the late afternoon

5  before the hearing, did they attempt to add repose in.  And I

6  don't mean this in any negative way, but they wanted to just

7  slide it in very quietly along with their product i.d.

8  objections, which we had discussed, and which we had stipulated

9  would not be heard at that first hearing Your Honor had, and I

10 knew they were coming.  I didn't know repose was coming, but

11 all of a sudden at the end here's repose which they are trying

12 to stick in.

13         Now, I have already taken Mr. Mew's deposition twice.

14 I took him the first time, and then they filed a supplemental

15 report, and I took him a second time.  And while I am confident

16 -- I have not reviewed the deposition in preparation for today,

17 while I am confident the word ultimate limitations was

18 mentioned there, and while certainly I had his report, I did

19 not examine him on the ultimate limitations issues as I would

20 have if I thought they were in this case.  And I didn't think

21 they were in the case, and I don't think -- I don't think they

22 thought they were in the case.  I'm going to get to this in a

23 minute because I don't -- I don't know what their basis is.  I

24 mean, they still haven't come up and said here's why -- here's

25 what happened, Your Honor.

1    Rather than saying we had a lot of objections and we
2  missed some, I think they made -- they made objections to the
3  Canada claims based upon the <u>Privess</u> (phonetic) decision.
4  Everybody in the asbestos property damage world is aware of the
5  <u>Privess</u> case tried in Vancouver in the 1990's, and Grace got,
6  in its view, a great victory there.  And from day one in this
7  they have talked about why Canadian claimants should not be
8  entitled to recover under the <u>Privess</u> decision, both as to
9  whether this damage constitutes a tort in Canada and whether
10 these claims are barred by the traditional Canadian statute of
11 limitations, which is not that unlike American statute of
12 limitations.

13    They were <u>Privess</u> focused, and that's what is
14 referred to in their objections.  That's what was referred to
15 in the arguments made when Grace suggested you ought to send
16 these back to Canada where <u>Privess</u> had been decided, etcetera,
17 etcetera.  But at no point did <u>Privess</u> deal with the repose,
18 the ultimate statute of limitations.  It was just not an issue
19 in there.  And apparently somebody woke up later on this
20 distinction, perhaps after we filed our objection -- excuse me
21 -- our response to their motion for summary judgment, and
22 looked back to see that they had not raised this issue, which
23 they want to do now.

24    I tell you again, Your Honor, and I'm still just on
25 this prejudice issue, what happens if you allow them to do

1 this?  Well, I have told them that I want my own expert on the

2 ultimate limitations.  This is sort of the ultimate issue up in

3 Canada, and I would want my own expert to deal with that, which

4 will mean that I will have to go to somewhere in Canada and

5 meet with that expert, get a report, perhaps electronically, to

6 deal with the report.  They will want to depose that expert, as

7 they certainly have a right to do.  And then I will also want,

8 with that education of my own expert, to depose Mr. Mew for a

9 third time on the repose issue in detail concerning this.  I

10 may or may not also want some discovery, depending on what my

11 expert tells me, on the whole repose issue.  It may be purely a

12 question of law.  It may provide some mixed questions of law

13 and fact which particular dates might be important, particular

14 legislative history may or may not be important.  I don't know.

15 All I know is that if they believe it's in their objections

16 already that they filed in 2005, I'll try that issue with them

17 when we're arguing this, and you'll decide whether it's in or

18 out, and I'll live on that issue.  But if they want, now, to

19 clearly raise that issue, then it's going to take a while, and

20 again, it's going to be some prejudice involved.

21        So, that's the sort of general concerns that I have

22 about Dan Speights personal time, what I'm going to be doing

23 the next few months if Your Honor allows these objections to

24 come in, either the 22 on product i.d., or the statute of

25 repose.

1        So, why should we -- why should the debtor be allowed

2 to do this?  Well, the debtor -- the first thing I've got to

3 say to Mr. Restivo's equity argument today is his equity

4 argument on the repose is, Your Honor, please allow me to raise

5 late, to file an untimely objection to the Canadian claims so

6 that I can raise the untimely filing of the Canadian claims.  I

7 mean, what sort of equity is that?  He wants the equity to be

8 decided on the merits of the claims, and yet what he really

9 wants to do is to try to raise his search warrant issue, his

10 technical issue on an additional bar of the statute of repose

11 to try to kick these claimants out without having their day in

12 Court to show that Grace's product has damaged their buildings,

13 has caused injury.  So, I don't understand how, in any sense,

14 any equitable sense, Grace should be allowed, even if it had

15 some good reason, to come in here at this late date and add a

16 technical defense so that it can raise a technical defense --

17 the same technical defense to my claimants.  It's sort of like,

18 you know, who lives by the sword, who dies by the sword.  Grace

19 has already gotten 71 of my claims thrown out because the

20 authority was not signed by the deadline.  And now Grace is

21 saying, two years later, well, I want to add repose.  I want to

22 add these 22 claims.  And I just think what's good for the

23 goose is what's good for the gander.

24        Now, Your Honor, what really bothers me, however, is

25 how Grace provides nothing in support, really nothing in

1  support of what they ask.  They say Dr. Pinchin made a few

2  mistakes which will not prejudice them.  They say that Dr.

3  Pinchin is getting some money.  They've allowed Dr. Pinchin

4  claims, have not objected to Dr. Pinchin claims.  But nowhere

5  do they come along and say this is what happened.  This is why

6  we need to do this.  There's nothing in the record that I'm

7  aware of, and indeed, there might be reasons out there,

8  unspoken reasons, where people made conscious decisions not to

9  raise certain issues, or more likely, that people realize it's

10 months, or a year ago, and didn't attempt to correct this.

11          While we're talking equity, one of my favorite equity

12 maxims is, equity aids the vigilant, not those who slumber on

13 their rights.  We don't know, here, where Grace has been

14 slumbering for a long time.  All we know is that in 2005 they

15 didn't raise these objections.  And, Your Honor, it seems to me

16 that, first of all, I don't know why they are allowed to do it

17 under the Court orders.  When they said they would waive it if

18 they didn't do everything they wanted to do in 2005, which you

19 allowed them to do, and secondly, when Your Honor gave them a

20 little wiggle room back in 2005 or six, and when you said

21 unless there's new evidence they couldn't amend, they've come

22 forward with no new evidence suggesting it.  Third, I'm not

23 even sure if these are amended objections or new objections,

24 but regardless, they've presented no new evidence.  I don't

25 know that they have a right to do it under the order.  And

1  again, Your Honor, I believe that they have to come forward and

2  show some convincing reason why they should be allowed to do

3  it.  Otherwise, you know, in essence what you're saying, Your

4  Honor, is, well, you can just file amendments anytime you want

5  to.  And with that, I will turn it over to the PD committee,

6  which I think has some comments, because I think they have an

7  overall concern about what Grace is up to.  Thank you, Your

8  Honor.

9            THE COURT:  Mr. Baena?

10           MR. SAKALO:  Good morning, Your Honor.  Jay Sakalo on

11 behalf of the property damage committee.

12           THE COURT:  All right.  Mr. Sakalo?

13           MR. SAKALO:  Your Honor, we're weighing in on this

14 motion because we have an over-arching concern that the

15 debtor's attempt to file these -- what they have called amended

16 we believe are new objections, is perhaps the tip of the

17 iceberg of things to come in this -- in these claims objections

18 proceedings when the Court rules on the summary judgment

19 motions it has under advisement and on the objections to claims

20 that were not subject to summary judgment motions.  We are

21 concerned that if the debtors are unhappy with the results of

22 your ruling that are to come, that they may seek to invoke the

23 same arguments that there's no prejudice to claimants if they

24 have new objections.  There's no prejudice to claimants because

25 they were aware that the debtors were going to continue to

33

1  object to their claims, and therefore they should be allowed to

2  do it.

3       We think that the history of the claims objection

4  process, the order that you've entered, and the debtor's own

5  statements to the Court and to PD claimants really demonstrate

6  that the debtor's attempt to file these new objections should

7  not be permitted.  And I'd like to walk through some of the

8  history that I think amply demonstrates the debtors should be

9  prohibited from filing these objections.

10      As the Court will recall, it set March 31, 2003, as

11  the bar date to file property damage claims.  By that date in

12  excess of 4,000 property damage claims were filed, and from

13  that date until the end of '03 and the beginning of '04 the

14  debtors did not take any action in respect of the claims that

15  had been filed.  At that point in time, they filed a motion for

16  leave from the Delaware local rule that requires substantive

17  objections to be brought at one time and limits the amount of

18  claims subject to a particular omnibus objection to 150 claims.

19  That has been the -- called colloquially in this case the Local

20  Rule 3007 order.  On July 19th, 2004, at Docket Number 6009,

21  you entered the 3007 order that gave the debtors dispensation

22  from the local rule, and you allowed the debtors to file one

23  gateway objection, and further, one additional objection that

24  would have brought all substantive objections to the property

25  damage claimants.

1         Now, it's important to note as to what exactly a
2 gateway objection is, because Mr. Restivo, in his comments to
3 the Court, suggested that what they were attempting to do was
4 not file a gateway objection by way of the new objection.  The
5 3007 order specifically denominated the gateway objections as
6 follows.  One, claims of substantially incomplete proof of
7 claim forms.  Two, claims that contain materially insufficient
8 supporting information.  Three, claims that fail to include
9 product identification information.  Four, claims that are
10 barred by applicable statutes of limitation or repose.  Five,
11 claims that are barred by laches.  And last, claims that are
12 barred by prior settlements.  So, without any dispute that what
13 they are attempting to add is these new objections were gateway
14 objections.  To the extent that Mr. Restivo is relying on that
15 order from July of '04, I don't think there's any basis.

16         Moreover, there's no basis because that order was
17 subsequently modified by the Court's further orders.  On August
18 29th, 2005, at Docket Number 9300, the Court entered an order
19 allowing -- and let me give you the exact title of that order,
20 Your Honor -- this is entered as case management order for the
21 adjudication of asbestos property damage claims objections.  By
22 that order the Court stated that the debtors were to have on
23 file all of their objections to asbestos PD claims, and that
24 these PD claims -- these PD objections shall include but not be
25 limited to the gateway objections as provided in the 3007

1  order.  So, to the extent that the 3007 order allowed the

2  debtors to have this -- have another shot at filing an

3  objection, the August 29th, 2005 order did away with that.

4         Thereafter, on September 1st, 2005, two days later,

5  the debtors followed the Court's August 29th order and filed

6  its 15th omnibus objection to property damage claims.  As the

7  Court is aware, it was a breathtaking objection.  It exceeded

8  65 pages in length.  It had over 1,000 pages of exhibits and

9  matrices, and included, by my count, 41 separate categories of

10 objections to PD claims.  Many of the claims themselves were

11 subject to every single one of these 41 categories of

12 objections.  Others were subject to some -- others were subject

13 to just a couple.  By that objection the debtors laid out all

14 of their objections, substantive, gateway, or otherwise, that

15 they had to property damage claims filed by the bar date.  That

16 set in process the claims objection process that we have been

17 dealing with for the past -- claimants have been dealing with

18 for the past 18 months.

19        In conjunction with that there was a series of

20 interim orders that the Court entered between the filing of the

21 15th omnibus objection on September 1 of '05 through December

22 of '05 in an attempt to sequence hearings on the debtors'

23 claims objections.  Those interim orders were replaced by a

24 scheduling order the Court entered on December 19th, 2005, at

25 Docket Number 11408, titled the modified scheduling order

1  regarding certain of the debtors' 15th omnibus objections to

2  claims substantive.  That's an important order, Your Honor,

3  because in that order the Court specifically stated that

4  claimants would not be subject to more than two hearings in

5  respect of objections raised in the 15th omnibus objection.

6  And as Mr. Speights alluded to, there was an exception carved

7  out in that order for Mr. Speights, but those did relate to his

8  -- to the debtors' objections as to his authority to have filed

9  certain claims, which has been disposed of for more than a

10 year.  Importantly, leading up to that December 19th, '05 order

11 the debtors and the PD committee had a telephonic hearing in

12 front of Your Honor in which we were suggesting that our

13 proposed order we thought was better, and the debtors thought

14 their proposed order was better.  And the debtors explained

15 their rationale behind the filing of their 15th omnibus

16 objection.  They began -- they stated, Your Honor, at Page 4 of

17 the December 12th, 2005 hearing, quote, "When the case

18 management order on objections," which is the August 29th

19 objection CMO I just referred to, "went into effect, by then we

20 had a better handle on the claims and essentially the Court

21 permitted us to raise all objections, and that is, in fact,

22 what the 15th omnibus does."  Debtors' counsel continues, at

23 Page 8 of that transcript, quote, "As I mentioned, I believe

24 that order," and in this case they were referring to the 3007

25 order, "was entered in 2004, but when we got the case

1  management order entered to go forward in August of 2005, the

2  Court expressly permitted us to raise all objections." And

3  then debtors' counsel continued again at Page 18, "Well, here's

4  what we did, Your Honor, we got the case management order, the

5  August 29th, 2005 order on objection that -- entered that

6  allowed us to raise all gateway and all substantive objections

7  at one time. So, for all these claimants everyone knows all

8  the objections that we're making to them." Your Honor, if

9  that's not clear enough as to what the debtors intended, in

10 July of 2006 the debtor filed a motion for a scheduling order

11 regarding certain of the debtor's 15th omnibus objections to PD

12 claims. This was after some objections had been heard and the

13 debtors were again trying to sequence the remaining objections.

14 In that motion the debtors stated, at Page 4, "This Court will

15 necessarily be asked to address core liability issues including

16 statutes of limitations, product identification, and proof of

17 hazards. These exact objections have already been lodged as to

18 these very buildings in the 15th omnibus objections." The

19 debtors continued, again, in that motion, quote, "By virtue of

20 the notice and bar date process, all PD claims are currently

21 before this Court through the 15th omnibus objection. All

22 substantive objections to these claims have already been raised

23 and claimants have been on notice of these objections for

24 months." At that point, Your Honor, when it was months, it's

25 now been well over a year. It's been 18-plus months that

1  claimants have been defending objections based on their claims.

2  I don't think there is going to be any dispute that by the

3  Court's orders, the debtor's own conduct, and the debtor's

4  statements to the Court and to PD claimants, that they have

5  raised all objections.

6         Mr. Restivo raises the point that his firm wasn't

7  very involved back then.  It was being handled by Kirkland &

8  Ellis, and he suggests that somehow they're entitled to a do

9  over because they weren't involved.  Your Honor, two things in

10 that regard.  One, Reed Smith, Mr. Restivo's law firm, has been

11 engaged by the debtors as a professional in these cases almost

12 since the first day in 2001.  They have been filing fee

13 applications ever since that time on all sorts of matters

14 related to property damage claims, including reviewing many

15 things raised in the 15th omnibus objection.  Second, it should

16 not be claimant's fault, or burden, that because the debtors

17 have changed direction as to who is responsible for now

18 handling the claims objection, that the new firm gets to

19 cleanup technical mistakes that weren't lodged by the initial

20 law firm handling these matters.  Lastly, Your Honor, the

21 debtors did raise in their 15th omnibus objection one

22 reservation to file additional objections.  They raised a

23 reservation so that if there were untrue or inaccurate

24 information on the proofs of claim, that they would seek the

25 right to file an additional or amend their objection.  It's

1  clear from what the debtors had filed with the Court, and from

2  the debtors' counsel's statements to the Court this morning,

3  and on prior hearings on this issue, that the debtors are not

4  seeking to file these new objections based on untrue or

5  inaccurate information that were on the proofs of claim, and

6  we're concerned that if the debtors are able to use that hook,

7  they will continue to use that in respect of all the remaining

8  property damage claims.

9        For those reasons, Your Honor, we believe that the

10 debtors' motion to file amended claims, again, which we believe

11 are new claims objections, should be denied.

12       THE COURT:  Someone had joined in Mr. Speights

13 objection, does whoever that entity is on the phone wish to be

14 heard?  Okay.  Anyone else?  Mr. Restivo?

15       MR. RESTIVO:  A few hopefully short points, Your

16 Honor.  Number one, Mr. Speights is absolutely correct.  I did

17 make a misstatement.  There were more than a thousand claims

18 submitted by Speights & Runyan that had a single identical

19 typewritten page saying the claimant had no supporting

20 documentation.  Those were not a thousand Canadian claims.  The

21 Canadian claims are whatever number Mr. Speights indicated, 300

22 or so.  Those are the ones that had the identical Pinchin

23 report.  And I apologize to Mr. Speights and the Court for that

24 misstatement.

25       Your Honor, this process started in December, namely,

1 December 21, '06, with the expert designation of the Pinchin

2 reports on these claims to show product i.d., and so, they knew

3 they had to prove our product i.d., and this isn't new, it's

4 been in place since December 21, '06, going to ultimate statute

5 of limitations.

6          THE COURT:  Well --

7          MR. RESTIVO:  That's --

8          THE COURT:  Could we just stop there.  On the

9 ultimate statute of limitations issue, it seems to me that that

10 is a limitations issue in Canada, and that is fairly

11 encompassed in the debtors' original objection, and so, to the

12 extent that Mr. Speights needs some additional time to do

13 depositions, get a report, Mr. Speights, I think you can have

14 that time.  I think it is fairly encompassed in the original

15 objection.  I don't really think the debtor needs this

16 amendment for that purpose.  If there is some lack of

17 specificity in the 15th that perhaps causes some need to redo

18 some additional discovery on the original 15th, then I think

19 you're entitled to do it, and I'll simply provide that time.

20          But on the 22 additional Canadian claims where the

21 product i.d. issue is open, that one I'm a little less

22 comfortable about the amendment, Mr. Restivo, because it seems

23 to me that if there was no objection on product i.d. before,

24 why would someone want to do a deposition or take discovery if

25 the debtor isn't objecting on product i.d. grounds, then there

1  isn't any basis for somebody to think the debtor is

2  dissatisfied with whatever the proof of claim said on product

3  i.d. grounds.

4      MR. RESTIVO:  Well, there was an objection, Your

5  Honor, on product i.d. grounds.  There was a (c)(2) objection.

6      THE COURT:  That said that the documentation is

7  insufficient.

8      MR. RESTIVO:  That's correct.  And, indeed, one could

9  argue that if your documentation says this is Monokote 3 and it

10 either has 50 to 75 percent perlite in it, I think one can make

11 an argument that documentation is insufficient.  But there were

12 three more specific objections, one of which said you have

13 provided bulk sampling information, but the bulk sampling

14 information doesn't support your claim.  I think either one of

15 those, in terms of notice, puts the claimant on notice that

16 product i.d. is in issue.  And I'm having a little bit of

17 difficulty understanding why it's in the interest of the

18 property damage committee, or at least those members of its

19 committee with valid claims, to want the debtor to be precluded

20 from raising a defense to an invalid claim, but the property

21 damage committee talked about the Court's order of 7/19/04, and

22 I'd like to hand it up to the Court, because it answers

23 something Mr. Speights said.

24                    (Pause)

25      MR. RESTIVO:  Your Honor, I am simply reading the

1  order.  I'll make the same excuse I made before.  I didn't

2  negotiate the order.  I don't know the background behind the

3  order.  But Paragraph 2 of this Court's order dated August 29,

4  2005, says no later than September 1, 2005, the debtors shall

5  make a good faith effort to have on file all of their

6  objections to asbestos PD claims, and as the property damage

7  committee correctly cited, they shall include but be not

8  limited to the gateway objections as provided for in the

9  gateway objection order.  Your Honor, the debtor did that.  I

10 don't believe there's any suggestion that the debtor acted in

11 bad faith when it filed that massive 15th omnibus objection.

12 The debtor attempted, in good faith, to have upwards of 30, 35

13 different objections specified and disclosed to thousands of

14 claims.  Yes, it was a gigantic piece of paper.  Yes, it was a

15 monumental effort.  I don't believe there's any evidence where

16 anyone could suggest that that effort wasn't an effort made in

17 good faith to have on file all of their other objections.  When

18 we were litigating these product i.d. objections, and we have

19 been litigating them for the last five or six months, and when

20 Mr. Speights raised, wait a second, you really can't object to

21 this.  We shouldn't be litigating it because you don't have a

22 (c)(3)(E) or (c)(3)(F) objection, yes, we went back and looked,

23 we had a product i.d. objection, if the product is not our

24 product and we need to be more specific, we ought to do that.

25 That's what we have done.  But they have known from the

1  beginning that Pinchin was going to have to prove up product

2  i.d. on these buildings.  They've known from the beginning,

3  from at least on 16 of the 22, from the Lee report that the

4  bulk samples didn't support it.  And, lastly, Mr. Cameron only

5  asked Pinchin about five of these cases.  And it's true,

6  Pinchin, on five of the cases, said yes, I made a mistake.  Our

7  position is on the bulk of the 22 cases he made a mistake, but

8  the deposition was taken at one time.  We didn't go through

9  each and every claim that they had in Canada.  We ought to be

10 able to raise a defense and put Pinchin to the test as to why

11 he wrote this letter and what evidence he has.  Otherwise,

12 invalid claims might be paid because of an alleged technical

13 failure to say (c)(2) instead of (c)(2) sub 4.  It's not fair.

14          THE COURT:  Well, okay.  I mean, I guess the problem

15 is this.  The debtor, I think, attempted to list every product

16 identification objection that it had with specificity so that

17 the discovery, essentially, could go down a track that would

18 tailor the discovery to the nature of the debtor's objection.

19 So, if the debtor had a general objection that said, for

20 example, you didn't submit any documentation, well, that's one

21 objection.  You know you need to submit some documentation that

22 the debtor can challenge.  If you haven't submitted anything,

23 that's a different type of discovery than, yes, you've

24 submitted something but from what you've submitted we can't

25 tell whether it's our product or not, because in one instance

44

1  you're looking for documents all together, in the other you're

2  looking for something specific within a document.  It's just

3  not the same thing.  So, I thought that the debtor, in

4  submitting the 15th, had broken things down into categories so

5  that the debtor was advising particular claimants where both

6  the debtor needed to focus discovery and the claimant needed to

7  focus discovery.  That was the whole purpose of going through

8  that categorization system that the debtor went through.  So,

9  if the debtor was going to rely on a two whatever objection as

10  opposed to a three whatever objection, then that's where the

11  trial buckets were going to go.  The debtor was going to try

12  Class 2 buckets as opposed to Class 3 buckets at a certain --

13  in a certain sequence, and that was the purpose for putting

14  them into those categories.  So, I'm not sure that claimants

15  have been -- I'm not sure I agree that claimants have been on

16  notice that their claims would be objected to as a Class 3(c)

17  because they were objected to in a Class 2(b), for example.

18          MR. RESTIVO:  Class (c)(2), Your Honor, are claims

19  providing insufficient supporting documentation.  We know, and

20  they know, when we filed the lead report, that on 16 of these

21  claims we actually tell them why the documentation is

22  insufficient --

23          THE COURT:  All right.

24          MR. RESTIVO:  The bulk samples are not consistent

25  with a Grace product.  But with respect to all 22 of those

1  claims, some of which bulk samples were not provided to Dr.

2  Lee, we had a (c)(2) objection.  That is, you have provided

3  insufficient supporting documentation.

4          THE COURT:  Okay.

5          MR. RESTIVO:  We did not have, and we can see a

6  (c)(3) whatever that says you provided insufficient

7  documentation, and it's insufficient because the bulk samples

8  don't match up what you're claiming.  Yes, that's a more

9  specific disclosure, but we did have a product i.d. disclosure.

10 Once we file the Lee report they know it's an issue.  I think

11 they know it's an issue when they file the reference, the

12 Pinchin.  To the extent an argument can be made that we need to

13 build in even more delay here while some discovery is done, I

14 appreciate Grace doesn't have much standing to say we object to

15 that.  All we would ask for is for the Court to put whatever

16 discovery they claim to need on an expedited basis.

17         THE COURT:  All right.  So, the debtor's position is

18 that the proof of -- that the objection to the proof of claim

19 provided the notice of what the problem with the supporting

20 documentation was.  The discovery and the expert report

21 provided the sufficiency even though the specificity wasn't

22 listed in the objection itself.  So, the -- although the

23 objection itself could have listed the (c)(3), by the time you

24 got through the discovery process the expert report provided

25 it.  So, although the notice wasn't given in the 15th omnibus

1  when that was filed in, whatever, September, by the time you

2  got to the expert report a year later, when it was filed, the

3  expert report did identify with specificity the failure in the

4  documentation that was stated in the objection to claim?

5          MR. RESTIVO:  That's true, Your Honor, generally, as

6  to the 16 or so where there were bulk samples.

7          THE COURT:  Bulk samples.  Right.

8          MR. RESTIVO:  If Dr. Lee didn't have any bulk samples

9  he didn't deal with those cases, and so the most that the

10  claimant would have known there is that Grace took the position

11  that on those claims there was insufficient supporting

12  documentation and the claimant was free to do whatever

13  discovery the claimant wanted as to why does Grace say there's

14  insufficient supporting documentation?  It wasn't Dr. Lee

15  because he had no bulk samples at all in those cases.

16          THE COURT:  Okay.  So, the debtor has no specificity

17  with respect to the other six buildings that had no bulk

18  samples?  Even yet?  Because what the debtor is saying is you

19  haven't given -- you've provided us something but it's not

20  sufficient to connect it with a Grace product, but the debtor

21  still isn't saying where the problem is.

22          MR. RESTIVO:  I think we have now said on the other

23  six, Your Honor, I don't know off the top of my head, we have

24  used (3)(c) Sub(D), Sub (E) and/or Sub (F) on all 22 or 24 of

25  these claims, so we now know -- I just can't tell you off the

1  top of my head which ones they are.

2           THE COURT:  Right.  That's in the amended objection.

3           MR. RESTIVO:  That's correct.

4           THE COURT:  Right.  But where in the -- was there

5  anything in the discovery process that supports the amended

6  objection?  That's what I'm trying to get to.  Was there

7  something before the amended objection?

8           MR. RESTIVO:  Well, certainly with respect to Mr.

9  Cameron's deposition of Pinchin, generally he dealt with the

10 Pinchin one-page letter, and specifically he dealt with five of

11 these claims.  Certainly with respect to the expert report of

12 Dr. Lee he opined as to bulk samples on 16 of these claims.  If

13 Mr. Speights he didn't question Dr. Lee on any of them I don't

14 disagree with that because I don't know, but Lee was available

15 to talk about his report.

16          THE COURT:  No.  I'm talking about the non -- the

17 claims for which there were no bulk samples and not concerning

18 Dr. Pinchin, I'm trying to find out what, if anything, the

19 debtor did before the supplementation to the proof of claim on

20 these other buildings that led the debtor to add the

21 specificity in the amended proof of claim.  You told me you

22 added the (c)(3)(D), (E) and (F), but what was it based on?

23          MR. RESTIVO:  We went through each and every one of

24 the claim files on these cases and the materials submitted by

25 Speights & Runyan -- at some point in time.  One of the

1 difficulties with the claim files was it wasn't easy, and it's

2 not easy to tell whether all of this information was submitted

3 initially, whether it came in later.  But we looked at all of

4 the information submitted by Speights & Runyan on each of these

5 claims, and there could be, Your Honor, in that material, bulk

6 samples that either were not in that material when samples were

7 sent to Lee, or which never got to Lee.  I do not mean to

8 suggest that there's bulk samples only in 16 of the 22.  There

9 could be bulk samples in the others, but they never to Lee.

10 　　　　　MR. BERNICK:  Your Honor, this is David Bernick.  I'm

11 sorry to inject into this process.  This goes back over a long

12 period of time.  But it was very, very difficult, I mean,

13 obviously everyone has recognized that the effort to identify

14 all the claims and make all the objections was a monumental

15 effort --

16 　　　　　THE COURT:  Wait.  Mr. Bernick, I'm sorry, but I

17 believe Mr. Restivo is arguing this on behalf of the debtor,

18 and I think that's the appropriate thing to do at this point in

19 time.  I understand that you're on the phone for another

20 hearing, but Mr. Restivo is taking care of this one, and I

21 think that's how I'm going to continue to have this operate.

22 Okay.  Mr. Restivo, so the answer is you don't know the basis

23 at this point on which the additional amended proof of claim

24 added (c)(3)(D), (E), and (F)?

25 　　　　　MR. RESTIVO:  I do know the basis, Your Honor.

1          THE COURT:  Oh.

2          MR. RESTIVO:  The basis is the material in the claim

3 file.  What I don't know is on any particular claim what it was

4 --

5          THE COURT:  That came in.  Okay.

6          MR. RESTIVO:  -- that came in.

7          THE COURT:  All right.

8          MR. RESTIVO:  But clearly it was a review of the

9 material submitted by Speights & Runyan at some point in time

10 that now constitutes the claim file.

11          THE COURT:  Okay.  I apologize.  All right.  Mr.

12 Speights?

13          MR. SPEIGHTS:  First of all, Your Honor, you have

14 already ruled that if they didn't file a (c)(3) they didn't

15 file a product i.d. objection.  I can't remember if that was

16 one Wednesday or two Wednesdays, or three Wednesdays ago, but

17 that led to Grace now filing a motion to amend to permit them

18 to file the (c)(3) objection.  So, that is passed.  Mr. Restivo

19 made the same basic argument one, or two, or three weeks ago.

20 Your Honor has correctly, I think, said that it's (c)(3) which

21 raises product i.d.

22          Number two, Grace not only failed to object on

23 product i.d. in its 2005 objections to these claims, but it

24 also failed to list in the case management order attachment

25 which it prepared for Your Honor in, I believe, October 2006,

1 right after I was brought into the party, and if you go to that

2 attachment there are -- these claims are also not scheduled for

3 adjudication on product i.d.  So, Grace had another opportunity

4 then, theoretically, although I probably would have objected

5 and said it wasn't in the original objection, but it did not do

6 so then.

7        So, Grace comes along now and says, well, despite

8 that, despite there being no objections, some but not all of

9 our objections were in Dr. Lee's report.  Well, Your Honor, I

10 don't think Dr. Lee's report makes any objection -- makes an

11 objection.  I don't think that excuses Grace for not objecting,

12 nor do I think that we should be concerned as to whether Dr.

13 Lee, in this massive report, not just on Speights & Runyan

14 claims, but all sorts of claims for which he was paid millions

15 of dollars to prepare, if he discussed claims which hadn't been

16 objected to in his report, I don't think that creates some duty

17 on the part of my claimants or other lawyers' claimants to then

18 assume that there has been, in effect, a summons and complaint,

19 an objection filed as to those claims.  I don't think that gets

20 them over that.  If anything, it would give them some notice

21 that maybe they need to do something.  But that doesn't put the

22 claims in the litigation, the fact that an expert suggests some

23 of it may say that they thought, and they forgot, or whatever,

24 but it doesn't put them in the litigation.  And on March 19, we

25 responded to their motions for summary judgment on this precise

51

1  ground.  They were not in the case.  These objections were not

2  in the case.  And in response nothing was done for a very long

3  time as far as making a motion is concerned.

4          Now, Your Honor, we get back to this burden issue, if

5  there is a burden.  I mean, I say they can't do it, but -- what

6  showing?  What Mr. Restivo has just told Your Honor is that the

7  basis of our product i.d. can be found in the claim forms.  And

8  I would suspect that the basis of product i.d. may well have

9  been filed in 2003 on some, maybe all, maybe a few.  But over a

10 period of time Your Honor gave claimants an opportunity to

11 supplement, and we supplemented.  But they've had this

12 information for a very long time.  This is not new information

13 all of a sudden, and yet it's latest the fall of 2006, they

14 listed what was for trial and did not list this.  I mean,

15 somebody messed up.  That's what's going on here, Your Honor.

16 It's a question of whether you're going to excuse them for

17 messing up.  And we relied on what they objected to, and we

18 relied on what was in the 2006 -- fall of 2006 order and

19 attachments.

20         Now, Your Honor, I want to go back to Canada a

21 minute.  I'm not sure -- before I get to Canada, I'm not sure

22 what Mr. Restivo is trying to get out of this order.  Perhaps

23 Mr. Sakalo might respond to whatever he was saying with respect

24 to the July 19th, 2004 order.

25         THE COURT:  I think just that it identifies what the

1  gateway objections are, and that the August 19th order

2  incorporates the fact that the gateway objections were to be

3  set forth also in the 15th omnibus, that that really wasn't

4  changed, that it was to be merits and gateway.  I believe

5  that's all.

6          MR. SPEIGHTS:  I'm not sure.  And, of course, the

7  debtor had started out by saying that it was gateway.  We'd get

8  through that process and then we'd get to substantive.  But

9  whatever it is.  And Mr. Sakalo may or may not want to address

10  whatever the point was, which escapes me.  The bottom line is

11  they messed up on the product i.d.  The bottom line, there will

12  be no prejudice because if there is no Grace product there, and

13  Dr. Pinchin acknowledges it, they're out, and I assure you I've

14  been to a lot of depositions now with Mr. Cameron, and he

15  doesn't miss anything.  If he had some more besides those

16  three, or four, or five, he would have raised those with Dr.

17  Pinchin, as well.

18          THE COURT:  Well, I think --

19          MR. SPEIGHTS:  I want to go back to --

20          THE COURT:  Your point, though, Mr. Speights, is

21  still well taken.  The fact that the debtor hasn't raised these

22  objections and that they may not be susceptible to summary

23  judgment, there still will be some showing necessary on the

24  score and damages.  And I'm going to take you at your word that

25  to the extent that Dr. -- or Mr. Pinchin indicates that he has

1  no support, that he made some error, those claims will be

2  withdrawn against this estate.  And I expect that that's going

3  to be the case not just with these four, but if there are

4  others out there, that that will be the case with respect to

5  any others, if they're out there, as well.  But there will

6  still be some hearing on damages.  And if, in fact, there's no

7  Grace product, there won't be any damages.  So, regardless of

8  how this shakes out in that sense, one way or another the

9  claims, you know, will be in that sense disallowed.  If there

10 are no damages, the damages will be allowed at zero.  So, we'll

11 be going through a trial on -- for no purpose if, in fact,

12 there's no proof of a Grace product one way or another.

13        MR. SPEIGHTS:  Well, I understand that, and if

14 they're not in the case we won't have a trial on product i.d.,

15 but at the damages trial later.  And just to clarify that even

16 a little more, when this came up I think I was on the phone

17 when you had all the California lawyers and everybody here, and

18 Mr. Restivo and I talked.  He said, and I agreed that I thought

19 we could go through some of these and deal with them, but what

20 happened was -- and I would have -- then -- I don't know if I

21 told him, I probably did, I'll withdraw them if Dr. Pinchin

22 says they're not Grace.  But then we've got the whole repose

23 that's coming in, too, so we're going to have to argue the

24 motion regardless.  And I want to get to repose a minute.

25        If I understand what Your Honor is saying, I want to

1  get to the reasons in a minute, but sometimes -- I want to make

2  sure when we leave here both Grace and Speights & Runyan

3  understand what Your Honor is saying, and I believe I heard

4  that the motion to amend by adding a separate category of

5  repose will not be granted, understanding, because you already

6  think it's in the case under limitations, but I want to make it

7  -- I mean, it's -- a pivotal issue to me is whether they are

8  going to be allowed to amend, to add repose as a separate

9  category.

10         THE COURT:  I don't think it's necessary to amend to

11  add repose as a separate category because I believe it's

12  already incorporated with respect to the Canadian statute of

13  limitations issue.  Within the 15th omnibus in the limitations

14  side of things.  In taking a look -- and this is just very

15  generally, at the briefs that have been filed, I am convinced

16  that the Canadian law would treat the ultimate limitations

17  period as a limitations period.  And Mr. Restivo's earlier

18  argument that would equate that ultimate limitations period as

19  equivalent to a repose period in the United States is an

20  analogy, but that's what it is, it's an analogy.  I think it's

21  fairly encompassed within the 15th omnibus.  But to the extent

22  that your understanding would be different in the 15th omnibus,

23  I am willing to reopen the discovery.  I don't want some

24  claimant prejudiced because of a misunderstanding or a

25  mischaracterization of a limitations period.  I don't want

1 anyone prejudiced in any event with respect to these objections

2 periods, so if you need some additional discovery I'll give it

3 to you, but I believe it's fairly encompassed within that 15th

4 omnibus, and to that extent I'm going to let both sides go

5 forward on that basis on the 15th omnibus.

6     MR. SPEIGHTS:  And I appreciate that, Your Honor, and

7 I need to make this technical point.  I didn't just get off the

8 turnip truck.  I know what Your Honor feels about limitations

9 covering -- ultimate limitations in Canada.  The reason I raise

10 that about Your Honor's ruling is that technically that's not

11 before Your Honor today.  There is a motion for summary

12 judgment by Grace which we have responded to in which we have

13 -- in which we claim that the statute of repose is not before

14 you because it's not covered by the statute of limitations

15 objections, and I understand when that is argued exactly what

16 Your Honor believes.  I not only have a forecast, I have a

17 pretty firm opinion of what the Court's view is of that, but

18 technically that's not before you --

19     THE COURT:  Well, I'm not ruling on the merits.  No,

20 no.  I'm not ruling on the merits of the argument.  All I'm

21 trying to get to is whether or not I think this amendment to

22 the proof of claim is necessary.  That's all.  And I'm trying

23 to explain that I think, for purposes of this amendment, that's

24 all.  I'm not ultimately on the merits of whether or not these

25 claims are barred by a limitations period.  I'm not getting

1  there.  Simply on whether or not this proof of claim needs to

2  be amended.  I do not think it needs to be amended because I

3  believe that the initial proof of claim fairly encompasses the

4  ultimate limitations period in Canada as a statute of

5  limitations.  That's all I'm trying to say.

6          MR. SPEIGHTS:  And all I'm saying, Your Honor, and I

7  understand exactly what you're saying --

8          THE COURT:  All right.

9          MR. SPEIGHTS:  I really do.  All I am saying is that

10 in their motion for summary judgment on the limitations,

11 including ultimate limitations, we filed a brief in response

12 which said that matter is not before the Court because the

13 statute of limitations do not encompass ultimate statute of

14 limitations, and that precise issue which Your Honor has

15 expressed a view on now would be one of the arguments at the

16 summary judgment hearing.  I --

17         THE COURT:  Right.

18         MR. SPEIGHTS:  And I just want to point that out

19 because when we come to that summary judgment hearing I will

20 still make that argument.  I probably will not spend nearly as

21 much time on it knowing how Your Honor feels about it now, but

22 I just don't want to stand up here and be waiving that argument

23 because I may want to go into a little bit of the history of

24 the ultimate statute and the regular statutes in Canada.  I may

25 be talking to this expert, etcetera.  I've said it.  I've got

1  my record protected.  I understand where Your Honor is, and I

2  thank you for your time.

3        THE COURT:  Okay.  Well, the other way to do this,

4  because I don't think it matters, Mr. Speights, from my point

5  of view.  I don't think it matters whether the debtor's motion

6  to amend is granted or denied on this issue.  It seems to me if

7  it's granted all that does is provides additional, I guess,

8  specificity as to what the debtor's argument on the limitations

9  period is.  But I really don't think the amendment is

10 necessary.  I think the original proof of claim objection

11 encompasses this argument fairly enough within it, and that the

12 briefs on the issue of the summary judgment argument can ferret

13 this out with more specificity.  So, from where I'm sitting I

14 don't think -- I think it's six of one and half a dozen of the

15 other as to how the pleadings will come down.  So, whatever

16 makes it easier for both of you to argue in brief I think is

17 fine.  I don't -- no one will waive anything in the structure

18 of how this is done.  So, really, I think it's up to the two of

19 you however you wish to do it.

20       MR. SPEIGHTS:  I understand your position, Your

21 Honor.  Thank you.

22       THE COURT:  Mr. Restivo?

23       MR. RESTIVO:  A couple of quick things, Your Honor.

24 With respect to what the Court said, I think that has been

25 dealt with today.  Yes, they do raise it in their summary

1  judgment motion.  I would like to get to a point where we quit

2  arguing the same things over and over again.  I think it's been

3  raised.  If he wants to raise it again I will probably say to

4  the Court we've already dealt with that.

5              THE COURT:  In the ultimate limitation --

6              MR. RESTIVO:  That's correct.

7              THE COURT:  Okay.  I think the best thing to do is on

8  the issue of the ultimate limitation -- let me backtrack.  On

9  the debtor's motion to amend the objection to the proof of

10 claim to add this issue of the ultimate limitations qua repose,

11 to deny that motion as unnecessary because the 15th omnibus

12 objection already fairly encompasses that issue concerning the

13 Canadian claims and to pick the briefing back up where it left

14 off before so that everyone can argue the issue of the ultimate

15 limitations in the context in which it was left before so that

16 no one will be prejudiced in that respect.  I really believe --

17 I went back and looked at it.  I think the 15th omnibus is

18 fairly cast as an objection to limitations period, and it is

19 broad enough to encompass that issue.  So, why don't I deny it,

20 I guess, as --

21             MR. RESTIVO:  As unnecessary.

22             THE COURT:  Unnecessary.  I'm not sure moot is the

23 right word.  I think unnecessary is the best word.  Okay.  With

24 respect to the issues concerning Dr. Pinchin and his --

25 whatever -- well, let me back up once again -- with respect to

1  the objection that this is not an evidentiary hearing, I agree

2  it is not.  However, Mr. Speights has conceded that to the

3  extent that Mr. Pinchin indicates that he would no longer

4  support certain of the letters that he submitted with respect

5  to certain of the proofs of claim, and that based on that Mr.

6  Speights will withdraw those proofs of claim, I expect that you

7  folks will work out which of those proofs of claim are to be

8  withdrawn, and then I will get an order that will simply

9  withdraw those proofs of claim.  So, as to that I will get an

10 order from you.  You will tell me which proofs of claim, and I

11 will mark them as withdrawn.  Therefore I don't think the

12 debtor is required to amend the 15th omnibus to deal with those

13 because you will deal with them as you have in the past

14 regarding other proofs of claim that have been withdrawn for

15 whatever reason, lack of documentation, whatever you want to

16 call it is fine with me.  I'm sure you'll come up with an

17 appropriate term, but they are to be withdrawn.

18         To the extent that the debtor believes additional

19 discovery of Mr. Pinchin is appropriate because of this issue,

20 I think you can take the discovery.  And if it turns out that

21 Mr. Pinchin agrees that he has made a mistake with respect to

22 other supporting letters, I would consider that to be

23 additional and new evidence upon which the debtor can then deal

24 with Mr. Speights about whether or not additional proofs of

25 claim should be withdrawn, because it seems to me that if an

1  expert report is submitted and it has what I will consider to

2  be a fatal mistake in that a product is not identified to be a

3  Grace product and the expert says, oh, I made a mistake, it's

4  not a Grace product, and therefore the proof of claim that was

5  submitted that relies on that expert report can no longer be

6  sustained, to me that is additional and new evidence upon which

7  the debtor can then amend the objection.  And if that's what's

8  required to get to the issue, I will permit the debtor to amend

9  the objection based on that new evidence.  I believe that is

10  appropriate.  I think the debtor could do it after trial to

11  conform to the evidence as well as in the midst of discovery to

12  conform to new evidence, and so I will permit that type of an

13  objection to be lodged.

14          However, as so the amendment simply to add additional

15  categories of objection, I don't think that's appropriate at

16  this time.  I think the debtor went through this 15th omnibus

17  process for the very reason that we are here now, which is to

18  advise all claimants of what the specificity was that they

19  would have to go through in the discovery process, and I don't

20  think at this point, which is at least, if not four years after

21  the fact, that the debtor should be amending except for some

22  evidence that the debtor has received after the fact that

23  indicates that there is some real problem with the proof of

24  claim such as we have just discussed with Mr. Pinchin that the

25  expert report, in fact, does not support the proof of claim.

1 And I know that has to be done on a one-on-one basis, but

2 nonetheless I believe that would be appropriate for an

3 amendment.  I do not think a wholesale amendment simply to add

4 new categories at this point in time is.

5        So, the objections will be, I guess, amended, if

6 necessary.  Otherwise, I think based on this record they can --

7 the proofs of claim can simply be withdrawn.  Mr. Speights has

8 offered to do that, as to however many Dr. Pinchin identified

9 in his deposition.  If you need additional discovery and they

10 are not withdrawn, then you can amend those proofs of claim on

11 a one-on-one basis.  I think that's appropriate.  Certainly the

12 Federal Rules of Evidence would permit you to do that to

13 conform your pleadings to the evidence even after trial, and I

14 will permit the debtor to do that based on the evidence.  But I

15 think that's as far as I can go.

16        MR. RESTIVO:  Let me respond to that, Your Honor.

17 With respect to discussions with Mr. Speights, I think that

18 will not be a problem.  They can occur, and I think our history

19 is when we actually focus on it, when we are actually able to

20 force ourselves to look at it and talk to each other, we'll be

21 just fine on that.

22        Where I do think, with all due respect, what the

23 Court said may not be correct is that as the Court knows from

24 the product identification hearing, if there is a bulk sample

25 of fireproofing, and that bulk sample says it contains

1  chrysotile asbestos and 80 percent other stuff, our position is

2  that bulk sample is not sufficient to prove it's a Grace

3  product.  Mr. Speights's position, or Pinchin's position may

4  be, no, that is sufficient to prove the -- it's a Grace

5  product, and I'm trying to determine, or seek from the Court,

6  in that instance, which I think is going to occur because we

7  saw it in trial, is that a situation where we're allowed to

8  object to the claim on the grounds that the information is

9  insufficient?

10         THE COURT:  Well, whatever objections the debtor has

11  raised you can pursue.  So, if the information is -- I think

12  you called them the (d)(2).  I don't know the categories.  I

13  apologize.  If the information is a (d)(2) objection, that the

14  lack -- that the information that was submitted is insufficient

15  to support the claim, and your evidence is going to be that it

16  doesn't match up, then that's your evidence.

17         MR. RESTIVO:  Stated differently, Your Honor, to the

18  extent the Court used that, if a building doesn't have a Grace

19  product that will be taken care of in the damage phase, because

20  if it's not a Grace product you can't get paid, I'm a little

21  bit concerned that the process we have undertaken, and I

22  believe it's the right process, is to resolve these claims, as

23  we can, get rid of them, sell them, lose them, whatever, so we

24  know what it is one has to deal with when one gets to a damage

25  phase, and so, I'm just asking the Court to reconsider the

1 thought that if the product is not in the building it's really

2 a damage issue.  I think it ought to be dealt with now as a

3 product i.d. issue.

4        THE COURT:  I think it should have, but that was the

5 debtor's burden.  This Court only takes what the debtor does.

6 You know, the proofs of claim are, by virtue of the operation

7 of law, deemed to be allowed unless somebody files an

8 objection.  I don't just willy-nilly set claims aside.

9 Somebody has to object to them.  If the property damage

10 committee hasn't objected to them, and I would think that the

11 property damage committee that represents all claimants would

12 have some interest in making sure that specific claims are not

13 allowed, if, in fact, there's no product i.d., so they

14 certainly have some interest in this.  I would think that the

15 debtor would have some interest in this.  I'd think that the

16 asbestos claims personal injury claims committee might have

17 some interest in taking a look at this, so it's not just the

18 debtor that's out there looking at this issue.  If there are

19 other entities that have some interest in this, then, you know

20 -- and there are -- I'll call them -- I don't mean this in a

21 pejorative sense, I just can't think of a better word right now

22 -- illegitimate claims, the debtor shouldn't be paying

23 illegitimate claims against this estate.  Certainly no one

24 wants claims that are not allowable against this estate paid by

25 this estate.

64

1        MR. RESTIVO:  I do think, Your Honor, that there are

2   other interested parties who would have an interest in

3   preventing illegitimate claims from being paid.  I don't know

4   whether they're barred from filing objections or not.  We were

5   trying to get it all done with the parties here.  If someone

6   else is now concerned based upon this argument that buildings

7   without MK-3 may be getting some of the debtor's money, and

8   they are permitted to now object because they're a party in

9   interest, I guess we'll deal with it that way.

10        THE COURT:  Well, I mean, I think, Mr. Restivo, that

11  if the issue is that there is no MK-3 in the building, and

12  there is some basis on which the debtor actually has evidence

13  that there is no MK-3, such as Dr. Pinchin's own statement that

14  his report is in error, you know, you ought to be talking to

15  those people.  Those shouldn't even be coming before the Court.

16  You have a basis at this point to go talk.  Go talk to the

17  people, and --

18        MR. RESTIVO:  And Mr. Speights and I will talk, and

19  if we have any problems we'll come back to you, Your Honor.

20        THE COURT:  But in terms of amending these to add

21  additional objections to claims, I mean, the debtor chose this

22  format.  It's been a long, hard fought battle, and I think the

23  debtor has to live with the format that it chose.  Okay.  So,

24  you'll prepare an order?

25        MR. RESTIVO:  Yes, Your Honor.

1            THE COURT:  All right.  I will take an order, when I

2    get it, on a certification of counsel.

3            MR. RESTIVO:  I wonder if, Your Honor, while I'm

4    here, we can talk a little bit, given what the Court has said,

5    about scheduling, because it really doesn't relate to the other

6    motions you're going to hear, I don't believe.

7            THE COURT:  Okay.  Are you going to be around for a

8    while?  Because I think I promised Mr. Bernick that I would get

9    to his matter since he has some other commitment.

10           MR. RESTIVO:  I can do that, although I didn't think

11   this would take long.

12           THE COURT:  Mr. Bernick, are you on a time frame

13   schedule?

14           MR. BERNICK:  First of all, let me apologize for

15   interrupting before.  And I'd appreciate Your Honor's courtesy

16   in that regard, but it would be fine with me, I do have other

17   things, but this is the most important of them.  So, if Mr.

18   Restivo can cover his matter, that's fine with me.

19           THE COURT:  All right.  Thank you.  Mr. Restivo, go

20   ahead, then.

21           MR. RESTIVO:  We would propose, Your Honor, that on

22   June 26th, which I think is an available date that the Court

23   has saved for us, that we schedule on that date statute of

24   limitations trial with respect to the City of Philadelphia

25   claim, and we have indicated to counsel for the City of

1 Philadelphia that that would be our position.  We have agreed

2 with Ms. Kearse, who is in trial now, that we would not attempt

3 to try her 13 cases on statute of limitations on that date

4 because she's in trial now, and I believe she may have filed a

5 motion but we told her we wouldn't oppose it, and that we use

6 June 26th to finally argue the Canadian statute of limitations

7 motion that has been put off and that we use June 26th to argue

8 that.  We would then suggest, Your Honor, that the next

9 available dates we think the Court still has, they were for

10 B.I., but now we don't think the Court needs it, are July 30,

11 31, and August 1, and on those three dates we would propose to

12 try a case called Pacific Freeholds on statute grounds, the

13 Ness Motley cases on statute grounds, and by that point any

14 cases that we know of that survive summary judgment, depending

15 on what the Court rules on what issues.  We would try that, we

16 think, three days, back to back is better than picking a day

17 here and a day there.  And that would pretty well wrap up, we

18 think, the vast bulk of property damage claims that we started

19 with, and so our suggestion is June 26th, the City of

20 Philadelphia, and -- trial, and argument on Speights Canada,

21 and on July 30, 31, and August 1, the Ness Motley cases on

22 statute, Pacific Freeholds on statute, and any cases that

23 survive summary judgment.  There may be, Your Honor, some

24 lingering product i.d. issues that Mr. Speights and I on his

25 cases don't resolve, and I guess I would also throw that in on

1  that time frame, but I'm a little -- I'm not quite sure right

2  now, given where we are, what, if anything, that would be.  But

3  since we have three days I guess we would add that to the

4  schedule.

5          THE COURT:  Okay.  That's fine with me, if no one has

6  an objection.

7          MR. RESTIVO:  And we would, as I think we said

8  before, deal with the other litigants in terms of getting an

9  agreed upon pre-trial schedule for, you know, filing the trial

10 briefs and the exhibits.  We would talk to everyone and file

11 that under a certificate of counsel.

12         THE COURT:  All right.  Mr. Speights?

13         MR. SPEIGHTS:  Your Honor, I think the only thing

14 that Mr. Restivo said that impacts me personally is June 26th,

15 and frankly, I need to -- I'll be glad to respond before we

16 finish today, but I need to call my office and speak to Mr.

17 Fairey, who is independently involved in the Canadian issues.

18         THE COURT:  Okay.  Oh, on Canadian.

19         MR. SPEIGHTS:  Canada --

20         THE COURT:  I was thinking the City of Philadelphia.

21 You're not involved in --

22         MR. SPEIGHTS:  I'm not involved with Philadelphia,

23 but the Canada I am, and I'd also like to talk to Mr. Restivo a

24 little bit about where we are and what we're going to do on

25 Canada, as well, so I'll be happy to do it and report back to

1  you before the hearing is over today if Mr. Restivo is going to

2  remain for the full hearing.

3         MR. RESTIVO:  We're going to dismiss them all.

4         MR. SPEIGHTS:  I don't think so.  But -- on the other

5  I just, for the record, the Pacific Freeholds, although my

6  office is co-counsel in that case with Mr. Brandi, that will be

7  Mr. Runyan that will -- and I have no idea of his schedule, so

8  I just don't want the record to suggest that I've agreed to

9  that date.  I have no idea.

10         THE COURT:  Okay.  That's fine with me if the other

11  parties are agreeable to those dates, Mr. Restivo, and so, Mr.

12  Speights, if you can check on June 26th, that's fine.  Have you

13  worked these dates out, Mr. Restivo, with the other parties?

14         MR. RESTIVO:  No, Your Honor, only the -- the only

15  thing we've worked out is that we would not object to what Anne

16  Kearse said.  Because she's in trial I think we suggested to a

17  colleague we'd take the next available date.  But, no, we

18  haven't --

19         THE COURT:  Okay.  So, you'll get in touch with

20  everyone and make sure that --

21         MR. RESTIVO:  We'll get in touch with everybody.

22         THE COURT:  -- this schedule will work?  Okay.  All

23  right.  Mr. Bernick and Mr. Speights, do you want to go forward

24  with that matter next?

25         MR. SPEIGHTS:  I do, Your Honor.  And it's my motion,

1 but could I request a 90-second break?

2          THE COURT:  Yes.  We'll take a five-minute recess

3 first.

4          MR. SPEIGHTS:  Thank you.

5          THE COURT:  We're going to leave the phone connected.

6 We'll just take a five-minute break and then come back and

7 argue the motion to strike.

8                    (Recess)

9          THE COURT:  Please be seated.  Mr. Speights?

10          MR. SPEIGHTS:  May it please the Court.  This matter

11 is before the Court on Anderson's motion to strike and motion

12 to compel regarding Grace's responses to our request for

13 production which Your Honor wanted tee'd up before dealing with

14 the issue of the privilege log, which I argued recently in

15 Delaware.

16          I'm going to try to be succinct today, Your Honor.

17 There is a long history of what's happened with respect to the

18 Anderson certification matter.  Mr. Bernick and I are trains

19 passing in the night, and I see no reason to start going back

20 over every hearing to pull out what we think supports us,

21 etcetera, etcetera.  If Mr. Bernick wants to go down that

22 track, I'll respond after he does.  But I'd like to just jump

23 through and try to get to the heart of the matter on why we're

24 entitled to this discovery, and specifically why we're entitled

25 to a privilege log.

1          Essentially Grace takes the position that it does not
2   have to produce anything.  Grace does not want to produce
3   anything, any document, except for the possibility of documents
4   dealing with Anderson Memorial Hospital itself.  They've given
5   a little sales information, invoices, etcetera.  Everything
6   else they draw the line on.  And Grace says, the debtors say,
7   essentially, every time this comes up that we're not entitled
8   to have the class certified and we shouldn't have to be doing
9   all of this, and every time it comes up I say I'm entitled to
10  my discovery in preparation for the class certification
11  hearing.  So, Your Honor, I do think -- I should say something
12  at the outset before dealing with the exact point I want to
13  raise, that despite the torturous journey that has taken us
14  from December 2005 when we first argued discovery until today,
15  something has been accomplished.
16          Discovery is -- the purpose of discovery is to get to
17  the merits of disputes so we can deal with disputes on the
18  merits.  You can't hide the ball, etcetera, etcetera.  Number
19  two, that it narrows the issues in dispute.  And if nothing
20  else, after months and months and months, at least the debtors
21  withdrew their attack on the adequacy of my law firm and the
22  adequacy of my client, and down below, when this matter was
23  argued in September of 2000, the adequacy portion probably
24  dominated, took the majority of the time.  So, every time we'd
25  sit back and say why have we been doing all of this, if nothing

1 else we've accomplished that.  In fact, I wish that Grace would

2 take the same attitude now that we've had all these arguments

3 with respect to commonality, because Grace has indicated before

4 that that's really not the big issue.  The issue is, as Your

5 Honor has also articulated, the numerosity issue.  But at this

6 point everything is still in the hopper except for Anderson's

7 adequacy and Speights & Runyan's adequacy, and we are headed to

8 a certification in which I believe I'm entitled to some

9 information that Grace has.  And certainly I believe I'm

10 entitled to a privilege log.  And furthermore I believe Your

11 Honor directed them to file a privilege log in October of 2006.

12          So, how to cut through this?  I decided to try to

13 make myself clear by a hypothetical.  Suppose that the debtors,

14 at some point before this bankruptcy, communicated with their

15 insurance carriers about Anderson, and suppose they actually

16 put a reserve on Anderson, or more than one reserve on

17 Anderson.  Maybe at the time it included all the buildings in

18 the world.  Maybe at the time it included just the South

19 Carolina buildings.  But the debtors had some communications

20 with their insurance carrier, and had reserves.  And one of my

21 specific requests to produce goes to just that type of

22 information.

23          Well, the first question would be is that relevant,

24 or more properly could that lead to discovery of relevant

25 information?  The more basic question would be who decides

1  that?  I think the Court decides that, and the debtors can't

2  decide that.  But is there something that could lead to the

3  discovery of relevant information if the debtors are

4  communicating to their insurance carrier about Anderson?  Not

5  whether it's privileged, not whether it's confidential, not

6  whether it's work product, just the question Your Honor had

7  back in Wilmington, is that relevant?  And I suggest to Your

8  Honor it could be quite relevant if Grace, whoever on behalf of

9  Grace, told its insurance carriers certain things about the

10  Anderson Memorial Hospital class action.  There might be in

11  there admissions by a party opponent on what the Anderson case

12  is about, the value of the case, the commonality of the issues

13  in Anderson, what we can win, what we can lose.  It might say

14  we want to reserve a billion dollars for Anderson -- I doubt it

15  -- you know, which would be an acknowledgment on Grace's part

16  of the value.  I'm not at privilege yet.  I'm just on the

17  question of relevancy.  Would that be -- if there was no

18  objection to that information on any ground but relevancy,

19  would at least we get to see that information of how Grace

20  evaluated Anderson's class action somewhere between 1992 and

21  2000 in communications with its insurance carriers?  And it

22  seems to me that that's obviously relevant or could lead to the

23  discovery of relevant information.

24          But then we get to, well, is it privileged?  We don't

25  know whether it's privileged.  We have no way of knowing

1  whether it's privileged.  The Court doesn't.  You don't.  Grace

2  has not even responded and said they have such information

3  which is listed on a privilege log, and even if they do, we

4  don't know who is it from, who is it to, who got copies of it.

5  We know none of that.  Did it originate from trial counsel,

6  this hypothetical document? Did it originate from in-house

7  counsel?  There are whole sets of rules, new rules, different

8  rules for in-house counsel.  Was it going to just insurance?

9  Was there anybody seeking legal advice there?  I don't believe

10 so.  I'm not sure it would be privileged.  Would it be work

11 product?  I don't know.  There's nothing before us to tell

12 that.  Were copies sent to people who are not lawyers?  I mean,

13 we are in the position because of Grace's absolute rule about

14 giving us anything, including a privilege log, of trying to

15 guess behind -- what's behind door number three.  And the more

16 they protest, methink they protest too much, and I get very

17 interested what's behind door number three.  So, even if it's -

18 - even if they want to claim it's privileged, they have to show

19 it's privileged.

20         And, Your Honor, we've cited in our brief cases for

21 the pretty elementary proposition that even -- some document

22 which itself might be privileged might contain information in

23 the document which is not privileged.  There could be in that

24 hypothetical document given to the insurance carriers

25 information about Anderson's size, about the buildings, about,

1   you know, the common issues, whatever.  It could include

2   attachments of documents about what Grace knows about Anderson.

3   There are all sorts of things that this communication could

4   have which would not even be covered by an attorney-client

5   privilege even if it met all the other requirements.

6           So, I mean, essentially I'm arguing the same thing

7   that I've argued since I think at least October of 2006, that

8   what Grace says about Anderson in the forms of an admission may

9   well be relevant, and I would like see those admissions.

10          Now, Grace says in its brief, Grace did us all a

11  favor by attaching a chart where it listed all my requests and

12  its objections.  Almost every one of these objections are

13  irrelevant and confidential, irrelevant and confidential,

14  irrelevant to the class action issues before you and

15  confidential.  And my point is that we cannot decide whether a

16  document is confidential -- first of all, if it's not

17  confidential, and I assume by that they mean attorney-client

18  privilege, perhaps work product, if it's confidential they can

19  list it and we can know what it is.  But I don't know how to

20  get to the documents themselves on confidentiality -- I mean on

21  relevancy, without telling you just what I'm telling you now in

22  a hypothetical sense, because even where the documents are not

23  confidential they haven't produced them.  Apparently they claim

24  everything is confidential.  So, they need to file a privilege

25  log on confidentiality, and I'm right back where I was in

1  October saying, Your Honor, if Grace has documents which

2  discuss issues which are going to be adjudicated by Your Honor

3  at the class certification hearing, then I think we're entitled

4  to see them, or else they should be listed on a privilege log.

5          I can't do any more than that, Your Honor, because I

6  haven't seen the documents.  I can go down each one of these

7  requests that we've made and each one of these responses where

8  they say irrelevant, and privileged, and point out to you the

9  identical arguments that I can show you that in these documents

10 it is quite possible that Grace discussed the Anderson request

11 for it to be a certified class.  And unless Your Honor is

12 prepared to say there is no piece of paper, none, zippo, that

13 could be relevant to this case, so therefore Grace does not

14 have to file a privilege log, then I think Grace needs to file

15 a privilege log so we can see what it is that they claim is

16 privileged and I can make the appropriate motion before the

17 Court very quickly, probably to ask you to examine the document

18 in camera.  There might not be any.  We may have been arguing

19 for a year about documents that don't exist.  However, there

20 are some clearly marked such as talking to an insurance carrier

21 or other communications with third parties, evaluations,

22 etcetera, which I think would point us in the direction of

23 being relevant and would entitle me to a privilege log.  Thank

24 you, Your Honor.

25          THE COURT:  Mr. Bernick?

1          MR. BERNICK:  Yes.  Can you hear me, Your Honor?

2          THE COURT:  Yes, sir.

3          MR. BERNICK:  Okay.  Your Honor, it is true that we

4    find ourselves back now where we were eight months ago in

5    October.  Last October we went through what was then Mr.

6    Speights's request on behalf of Anderson Memorial.  I think

7    there were 16 different categories.  Almost all of them are

8    still being pursued.  And I think I made up a chart that I

9    displayed showing that overwhelmingly they went to the merits

10   of the litigation rather than class certification.  There was

11   few that related to class certification on their face, but each

12   one of them failed to really identify what particular elements

13   of Rule 23 was being addressed.  And Mr. Speights essentially

14   is seeking the same discovery now, the same documents now, and

15   as he acknowledged just now he's making the same arguments that

16   he did before.  He says he finds himself in the same place he

17   was before, which is all true.  The thing, though, that hasn't

18   been addressed in the argument this morning is the obvious,

19   which is what Your Honor said on the occasion of the arguments

20   concerning these same document requests and the same discovery

21   last October, and what efforts, if any, have been made by

22   Anderson Memorial through its counsel to comply with Your

23   Honor's instruction?

24         Your Honor basically had an instruction for us, or

25   request of us.  It was pretty much clear where Your Honor was

1  going, and also some instructions for Mr. Speights and Anderson

2  Memorial at that time.  Your Honor asked us to consider whether

3  we really needed to stand by the objection to the adequacy of

4  the plaintiff as a representative and the adequacy of Mr.

5  Speights as counsel.  Mr. Speights suggests that we've only

6  recently responded to Your Honor's request.  In point of fact,

7  we responded very, very promptly.  We responded months ago, and

8  indicated that because there were so many other problems with

9  the request for class certification it wasn't necessary for us

10 to pursue the adequacy issues, and we said for purposes of this

11 motion we are withdrawing and will not pursue any objections

12 based on adequacy.  So, we upheld our end of trying to move the

13 case, or the issue forward.

14        With respect to Your Honor's suggestions to Anderson

15 Memorial, there were two, and the first was that it really was

16 necessary for Anderson Memorial to get beyond this laundry list

17 of very general requests, and to identify specifically the

18 element of Rule 23 that the request went to, and exactly how

19 that was so.  At Page 27 of the October 23 hearing Your Honor

20 says, "I think at this point --" this is October 23, when we

21 argued the first round -- or the second, or whatever it was, I

22 think his point is referring to -- I believe, is that you need

23 to show me how it's relevant to a specific element of Rule 23,

24 and I agree with that.  So, tell me how it's relevant?  This is

25 at Page 27, Lines 18 through 20.  Months later, when we were

1  revisiting the issues all over again, this is November 20th,

2  '06, Page 96, you said specifically that it was appropriate --

3  not appropriate to seek opinions -- this is at Line 7 -- not

4  only to be looking for facts, not attorney work product, not

5  frivolous documents -- this is at Lines 13 and 14.  And you

6  then reiterated the requirement at Line 21, I think it is your

7  burden at making a discovery request to show how this

8  calculated to lead to relevant evidence and I don't see how

9  Grace thought about the Court's opinion is calculated to do

10 that.  This is, again, last November.

11          All that's happened since that time is that there has

12 been, in the sense of deliberate effort, not to refine the

13 request or to precipitate this issue before the Court to

14 demonstrate that there is real relevance to some element of

15 Rule 23, but instead we've gone off on this detour of taking

16 now two different custodial depositions, obtaining the

17 transcript of the proceedings in South Carolina and the like.

18 None of it as to any effort by Anderson Memorial to be specific

19 in identifying an element of Rule 23.  So that's all that's

20 happened, just that there has been avoidance of coming back and

21 demonstrating compliance with a satisfaction of the

22 requirements that were imposed by Your Honor last October.

23          Today, Mr. Speights says well, I'll wait till I hear

24 argument from counsel before I come back and talk about

25 relevance.  But relevance, in demonstration of relevance,

1  particularly at this late date, we are a few days away from the

2  argument on Rule 23 itself, is the burden of Anderson Memorial,

3  not our burden.  It's his burden.  And today we have heard an

4  effort that is no better than it was before.

5          The only specific request that Mr. Speights has

6  actually addressed is the request for information relating to

7  reserves that were created in connection with some discussion

8  with an insurance company.  That has nothing to do with Rule

9  23.  If there had been a reserve established, that might go to

10 how the company viewed his potential exposure.  That would be

11 relevant only to the question of whether there was some

12 potential merit to the claim or some risk, really, associated

13 with the claim.  In any event, it would be completely

14 privileged.

15         That is not specific to Rule 23.  That is not a

16 predicate for Rule 23 discovery.  It's not a class action

17 discovery at all.  It would be merits discovery, if anything,

18 and it would be completely improper because it's classic,

19 privileged information.  Otherwise, every day, every week

20 people would make requests for discussions with insurance

21 companies.  It's clearly barred by the law.  And that's kind of

22 as good as it gets.

23         All of the other arguments that have been made this

24 morning in an attempt to identify a nexus to Rule 23 are

25 speculations, they're fishing expeditions, they're all the

80

1  classic abuses of discovery.  They are none of them, any

2  specific articulation of an element of Rule 23 in a tailored

3  discovery request.  Your Honor, we did supply the list.  I can

4  go back through the list.  They're all defective in the same

5  way that they were defective before.

6       The second thing that Your Honor said last October in

7  connection to or by way of suggestion to Anderson Memorial was

8  that Anderson Memorial should kind of think about where this

9  was all going.  And in August of last year at Page 282 Your

10  Honor addressed specifically the issue of numerosity, noted

11  that the bar date had passed, that that really was going to

12  determine the potential claims that are out there.  Your Honor

13  said we're down to, I don't know, 600 and some claims, that

14  based upon where we started, had a manageable number in this

15  case.  In October it got to the issue of numerosity again, Page

16  69, Line 22, but we were down to, seriously, 180 claims because

17  by that time, in fact, it had dropped.  If, in fact, that's the

18  case, I'm not sure where we're going because I just can't see

19  where the numerosity issue is going to be satisfied even if all

20  the other elements of Rule 23 are met.

21       You also observed in January -- I don't see how a

22  class is going to advance the cause of the bankruptcy at this

23  point in time.  That was guidance to Anderson Memorial.  It was

24  a statement about, really, should we be taking up our time with

25  all this activity?  And it's obviously produced no effect.  We

1 still don't have a demonstration of numerosity.  There's only

2 one South Carolina claim that remains.

3        Now, we heard last time the observation that well,

4 this seeks certification of a nationwide class and therefore,

5 there are going to be not one claim, but there are going to be

6 200 claims.  The interesting thing about that is that it

7 doesn't make it satisfy the numerosity requirement.  But beyond

8 that, it basically says that well, this no longer really is

9 about a pre-bankruptcy tentative certification later abandoned

10 in South Carolina.  This is now about a nationwide class that

11 was never certified on any kind of basis on South Carolina.

12 And, indeed, it was withdrawn as the case became focused on one

13 South Carolina case.

14        So Anderson Memorial is no longer, obviously, the

15 predicate for the current request which leads first, to a very

16 fundamental issue of law which is how the class can proceed in

17 bankruptcy where there was not even a certified class, indeed,

18 not even a pending nationwide class before bankruptcy.  But

19 then Number 2, why do we keep on talking about Anderson

20 Memorial?  Anderson Memorial is one claim that is not the

21 predicate for class certification.

22        So the purchase that this whole issue has on the

23 Anderson case has been lost by virtue of the new theory that's

24 being advanced.  And we still don't have a specification of an

25 element of Rule 23 with respect to which the discovery is

1  relevant.

2         THE COURT:  Mr. Speights?

3         MR. SPEIGHTS:  I won't respond to several things Mr.

4  Bernick said about the history.  Again, I think we are trains

5  passing in the night, nor do I want to address the merits at

6  every hearing.  I say this is not merits.  That day is fast

7  approaching in which I will hopefully refute Mr. Bernick's

8  arguments to your satisfaction on numerosity and other issues.

9         However, Your Honor, Mr. Bernick said all this

10 happened since October is we've had a couple of custodians'

11 depositions.  Well, I made a strategic decision to take a

12 couple of custodians' deposition because all of these issues

13 were being considered in the context of Grace's representations

14 that there were a vast number of documents and that this was

15 hugely over broad and it would consume great resources on

16 behalf of the estate to go back and look through all these

17 documents.  And it took me months but I did establish that what

18 I'm looking for can be contained in less than six bankers'

19 boxes of documents which Grace doesn't contest in its response

20 at pleading.  I gave an illustration and I still don't

21 understand why my illustration does not deal with the relevancy

22 issue which I was arguing at the Court's suggestion from the

23 last hearing.

24        Let me go over several of these, Your Honor.  I'm

25 using Grace's chart attached to its response.  Request 9, all

1  documents where Grace's knowledge of facts, of factual

2  assertions relating to Anderson's punitive class action --

3  irrelevant.  Number 10, all documents re amount set aside for

4  Anderson's claim including insurance reserves, communications

5  with insurers Ray Anderson and communications with any other

6  person Ray Anderson -- objection, irrelevant and confidential.

7  You know, they don't want to tell me what they were telling

8  people about Anderson and the certification issues.  Number 13,

9  all pre-petition documents except pleadings or any evaluation

10  of Anderson's claims.  Answer, irrelevant and confidential.

11  Fourteen, all documents except pleadings re pre-petition

12  efforts to settle Anderson.  Answer, irrelevant and

13  confidential.

14          Let me just pause there.  I have no doubt that if

15  they let such documents on a privilege log, that we would have

16  to fight to get those documents on settlement.  There are

17  several reasons why we might have a basis for getting that.

18  Number 1 is they're relevant because it's an admission by a

19  party opponent as to the value of Anderson.  Number 2, as we've

20  briefed to you before, Your Honor, if, in fact, as a condition

21  to settlement, Grace would stipulate to a certified class

22  action, it is certainly an admission that's part of the record

23  that was transferred to South Carolina and we will argue that

24  Grace would say we will withdraw your adequacy attack if you

25  will settle with us and then we will consent to a

84

1  certification.  If there are documents which support that, they

2  are relevant.

3         And then we get to the issue of privilege.  Maybe

4  they are privileged and maybe they are not.  Again, until they

5  are listed and we get from whom they went to whom they went, et

6  cetera, et cetera, we won't know that and they may well be

7  facts within those documents otherwise privileged, if they are,

8  which would be discoverable.

9         THE COURT:  I think -- I get confused because the

10 steps seem to me to keep getting mushed together, Mr. Speights.

11 On the certification issue, I'm not looking at the merits.

12 What I think I need to adjudicate, and I guess for purposes of

13 today's hearing, I'm going to look at numerosity as one of the

14 things that we need to talk about.  For example, tell me how

15 the issues in Questions 9, 10, 13 and 14 that you've just gone

16 over will affect the numerosity or the commonality or any of

17 the other issues that are still contested with respect to the

18 class certification issue.  The valuation of the claim is

19 certainly not at issue in class certification.  That's really

20 not something that I need to consider at all at this point in

21 time in this bankruptcy case with respect to an issue that I

22 need to determine as to whether the class certification is

23 appropriate.

24        So where I am still losing these requests, I

25 understand how you may want to get there, not just even in a

1  class certification but on discovery with respect to Anderson's

2  own claim.  Some of these issues may be relevant to the

3  valuation of Anderson's own claim on the merits.  But on the

4  class certification issue, that's where I'm not seeing how all

5  of these issues fit into the elements of Rule 23.  And that's

6  what I had asked for before and that's why I'm still losing

7  track of what it is that you're trying to get this information

8  for for that limited hearing, not for the broad based hearing

9  on the merits, but for the class certification hearing.

10         MR. SPEIGHTS:  And I understand Your Honor's

11  frustration and, of course, my frustration is not knowing

12  what's behind door three and then these two frustrations we're

13  trying to come up with some meeting of the minds.  And I'm

14  going to put on one side commonality in all issues and on the

15  other side we have the issue of numerosity.

16         But let's go back to square one and say suppose Grace

17  stipulated in South Carolina that there were all the elements

18  for class certification of the Anderson class.  They didn't,

19  but just suppose that they stipulated to Judge Hayes, Your

20  Honor, we believe you should certify this class, all the

21  elements are met.  I would say to Your Honor that while I'm

22  sure that Mr. Bernick would raise objections to honoring that

23  certification in this court, and he may want to argue

24  numerosity or whatever, I would suggest to Your Honor that that

25  stipulation would be admissible in some evidence that Your

1  Honor ought to certify here.  There may or may not be other

2  issues.  There may be a full faith and credit issue.  But if

3  that's not relevant, if that would not be relevant, I probably

4  would need another week or two to think about how I could get

5  any of this relevant.  But if that's relevant, then what's the

6  difference in Grace stipulating to that and saying that in its

7  own internal documents which I can't get, I can't even get

8  listed on a privilege log?

9        THE COURT:  Well, let's take them -- let's just go

10  through this list because, frankly, I don't want to have to do

11  this anymore.  Let's just go through this list and I'm going to

12  give you rulings.  I want to know what the relevance is and

13  then I'll make rulings.  And to the extent that they're

14  relevant if, in fact, there is some further assertion based on

15  privilege, then the appropriate logs, if it's a privileged

16  assertion that requires a log will have to be made.

17        All right, the first one is all documents except

18  pleadings in Anderson's lawsuit.  I mean that's a pretty broad

19  based request.  So all documents as defined in this request

20  basically means everything that might be in every file that

21  anybody, including Grace's lawyers have that relate to the

22  Anderson lawsuit.  But what relevance does that have with

23  respect to all of the buildings that are now filed in this

24  bankruptcy case because the universe of claims will be limited

25  to the proofs of claim filed in this bankruptcy case?  So where

1 are we going with that request in the class certification

2 hearing?

3        MR. SPEIGHTS:  I think I have four responses to that,

4 Your Honor.  The first response is that that broad request,

5 like Grace's request to claimants and our request to other

6 people, was meant to capture the universe of documents, and

7 I'll get to the relevant documents in a minute but the universe

8 of documents -- and that precipitated this discussion about

9 vast, et cetera, and now we know that that request is less than

10 six boxes.  It is so typical in every case that you have to

11 make a broad request and you go to a document production.  For

12 instance, I've looked at Grace's hundreds of thousands of

13 documents in Boston on liability and every one of those

14 documents is not relevant and every one doesn't get you

15 anywhere.  But to find the relevant stuff, you have to look

16 through the boxes for it.

17        Of course, Grace doesn't produce privilege documents.

18 It files a privilege log, but there's nothing uncommon about

19 this request.  That's my first thing.  To say I need to go

20 look, what am I looking for?  I'm looking for documents which

21 would be relevant to class certification because that's the

22 only matter at issue now.  And in the Anderson documents less

23 than six boxes I am looking for exactly what I've been saying,

24 discussions by Grace about issues on class certification, and

25 I'm going to deal with numerosity separate in a second, but

88

1 including numerosity and commonality, admissions by Grace

2 discussing the Anderson class as to whether or not we meet the

3 prerequisites for class certification.

4 If person A tells person B I think we will lose on

5 commonality but I think we have an argument on adequacy of

6 Anderson Hospital, that document is relevant. And I can't, in

7 six boxes of documents, I can't tell you which document in

8 there does go to that because I've never seen them. Typically,

9 parties produce their documents such as this, less the

10 privilege documents. Here they don't want me to see anything.

11 So to answer your question, I'm looking for

12 admissions by Grace or discussions by Grace on the issues

13 currently pending on certification. I need to go to -- I've

14 been skirting around this and I've been trying to wait until

15 the ultimate hearing on certification to address this and I can

16 already feel Mr. Bernick in Chicago or wherever he is today

17 already rising from his chair.

18 On the issue of numerosity, Your Honor, we've had

19 multiple discussions on that. And at the certification hearing

20 we will talk about those multiple discussions. And I do not

21 want to have a hearing today on that issue of numerosity and

22 the bar order. I'm not prepared for it. I haven't brought

23 anything about it, et cetera. What Your Honor has ruled thus

24 far is that I am not entitled to any discovery going behind

25 your bar order. And I understand that. That's all that was

1  teed up.  We wanted to, you know -- we served a lot of

2  discovery trying to find all their job sites and what indices

3  they had, et cetera.  And in the course of your denying that,

4  you have expressed great skepticism toward the numerosity, my

5  ability to prove numerosity at the time of the certification

6  hearing.  And I recognize that and I'm going to argue why there

7  is numerosity at the time of the hearing.

8         But I really believe now, and I'm sure within all of

9  these transcripts, Your Honor has expressed views, opinions, et

10  cetera, not reduced to writing in any order, okay, that deal

11  with numerosity that give me trouble and I've got to meet, and

12  I'm sure Mr. Bernick on the phone say, Your Honor, et cetera.

13  But all Your Honor has done to now, as I understand the ruling

14  is, I'm not entitled to that discovery.  If, in fact, a

15  document and, Your Honor, that's specifically relevant for the

16  Anderson certified class -- and I'm trying not to open this can

17  of worms here, that's why we all need all day on this

18  certification -- on the certified class because you've also

19  made statements on the Anderson certified class as that's a

20  different kettle of fish -- that wasn't your language, that was

21  mine -- because there was some order in South Carolina and

22  you've expressed concerns in various ways about the order.

23         But there is that question that I'm going to argue to

24  you that Anderson, because it was a certified class, is

25  entitled to represent Bella Nonna's --  had the authority to

1  file a certified -- had authority to file on behalf of those

2  people.  And I will argue numerosity under that umbrella as

3  well.  Again, that's not to open the door.  That is simply to

4  say, Your Honor, I don't believe that door is shut on me yet.

5  I understand you won't let me have discovery.

6       So to the extent that these document requests go to

7  documents relating to numerosity, you've said I can't have it

8  if it goes behind your bar date order.  I don't think however,

9  Your Honor, that documents in which Grace says theoretically

10 back in South Carolina when this was created we have 522 job

11 sites in South Carolina documented with Grace's products can be

12 deemed irrelevant.  And then the question is, are they

13 privileged?  We're just asking for their documents on

14 admissions.  I'm not asking for all of the things behind the

15 bar date order.  I'm simply asking if there are documents

16 discussing Anderson which relate to commonality or typicality

17 or any other defenses Grace has.  I want them.  So --

18       THE COURT:  I think we're talking at cross purposes.

19 My concern about the bar date order is the fact that we have a

20 universe of claims that are filed.  Assuming that a class proof

21 of claim is authorized, it won't exceed the number of claims

22 that are filed in the case because the class proof of claim

23 will not expand upon the bar date order.  The bar date order

24 went out to the known claimants -- the unknown claimants by

25 virtue of publication and so forth.  So there is a universe of

1  proofs of claim that are filed.  And the class proof of claim,

2  I think, can't expand upon the bar date.  That's what I think

3  is the problem with the discovery and I don't think maybe I've

4  explained myself adequately.

5          MR. SPEIGHTS:  Oh, I think you have, Your Honor.  I

6  understand actual concern exactly and I understand why you have

7  concerns with the discovery on that issue of numerosity,

8  especially on how it affects everything else.  My point is a

9  very narrow one.  You have expressed that concern on several

10 occasions.  I don't believe, Your Honor, we have argued that in

11 terms of class certification other than as a discovery matter.

12 Your Honor clearly has said I can't have discovery behind your

13 bar date order and I've complied with that order and have not

14 pursued that discovery.

15          I do not think, however, that you have precluded me

16 from making an argument at the certification hearing on

17 numerosity that the Anderson certified class, let's just take

18 it, encompass -- which was a timely-filed proof of claim can

19 include, if you certify it, if you certify that class, can

20 include buildings in South Carolina which did not individually

21 file proofs of claim but had the right to rely on a certified

22 class representative to do so.  I don't want to get into that

23 today.  I know Your Honor has great concerns about that.

24          THE COURT:  I do.

25          MR. SPEIGHTS:  I understand that and I'm going to

1  come as prepared as I've ever been prepared in my legal career

2  to try to convince you why I'm right on that issue.  But that's

3  not today's argument.  I just -- I wanted to say it a couple of

4  times before but why go down that road?  I understand that's

5  how you feel, but as to discovery, okay, I've asked for that,

6  for all of these documents with the understanding that I can't

7  go behind your bar order.

8        Now, we go back to your basic question.  I say I

9  understand but I'm not sure I do understand.  If your concern,

10  Your Honor, is that because you are, let's put it politely,

11  skeptical about my dealing with the numerosity requirement, why

12  should I do all this other stuff?  Then I would say, Your

13  Honor, that that's a bridge we crossed maybe a year ago, six

14  months ago when we had the same argument and I said but, Your

15  Honor, I still am entitled to go forward on certification on

16  all issues, we don't want it piecemeal.

17        And then Mr. Bernick, of course, throws adequacy.

18  Well, he still got commonality and his other defenses in here.

19  So to the extent that you're saying on the merits I have a

20  problem certifying a class because of a number of -- the

21  absence of numerosity, I still say to you as I said then and as

22  I think you said we could do then, I want my discovery so

23  everything could be teed up at one time.

24        If Your Honor is saying that well, I'm not going to

25  allow discovery on issues of numerosity beyond the bar date

1   order as well as the bar date order because in my mind you

2   can't claim for more people than file claims under the bar date

3   order, then we still have left the discovery on everything

4   else.  I know that sounded confusing, but --

5         THE COURT:  I understand what you're saying.  I don't

6   know the -- I don't know that there is -- I think I knew at one

7   time, maybe I'm just not thinking of it at the moment.  As I

8   sit here right now, I don't know the answer to the issue with

9   respect to the numerosity and the class proof of claim.  I

10  think you got an uphill battle to show how a class proof of

11  claim can -- where a bar date order has gone out and purport to

12  bring into a case claims that have not been filed in the case.

13  I think you're going to have an uphill battle.

14        So to the extent that the discovery is focused on

15  attempting to find punitive creditors who have Grace product in

16  their buildings but who didn't file proofs of claim, I'm not

17  sure how they can ever be part of a class action even if one is

18  certified because they didn't comply with the bar date order.

19  So if that's what the purpose of the discovery is, I think

20  there's a legal impediment to bringing those creditors into a

21  class proof of claim.  Is that where this discovery is headed?

22        MR. SPEIGHTS:  That's one of the issues, Your Honor.

23  That's one of the issues.  And you've cut me off at the pass as

24  to the bar date itself and gone behind it.  But certainly, some

25  of the discovery goes to the membership of the class.  It could

1  be if you certify class.  You know, Your Honor will recall when

2  we argued the authority issue, not a subject I'd like to return

3  to.  But when we argued the authority issue that you said we

4  had no authority at that time to file individual claims for

5  punitive members of the class outside of South Carolina.  But

6  even on that transcript, if I recall, I believe if the door

7  wasn't open, it wouldn't slam shut of, what happens if we get

8  this class certified?  Can I then claim for those people?

9         And, Your Honor, in fairness, you've always been

10 skeptical of that, for doing that.  But I took the view then

11 and I probably said it on the record that well, there's no need

12 to appeal that ruling about those people -- I'm not talking

13 about the 71 -- but those people that I had no written

14 authority from because I would fulfill my duties to those

15 people by arguing that if you certified a class, you should

16 include them, and I understand again you're skeptical of that.

17 So this issue has been sort of simmering along the whole way

18 with no misunderstanding about Your Honor's preliminary views

19 on it.  I understand it.

20         So to answer your specific question, my discovery

21 does not exclude the general numerosity issue.  That is, if

22 Grace in a document discusses 523 buildings in South Carolina,

23 I want that document.  And if Your Honor says well, you're not

24 entitled to having any of those types of documents on

25 numerosity, I still want to talk to you about commonality and

1  the other issues.  But I think at this point I'm entitled to

2  see what Grace has or at least for Grace to file a privilege

3  log on that.

4          THE COURT:  Okay, Mr. Bernick, I'm going to take

5  these one at a time because I want to get through these.  So --

6          MR. BERNICK:  Yes.  So to assure Mr. Speights, I'm

7  particularly languid today so you haven't gotten me off my

8  chair yet and I'm going to stay in my chair for purposes of

9  this discussion because I think we're spending an awful lot of

10 time.  Your Honor, my only concern about the time is that I do

11 remember that Your Honor has resolved at some point that we're

12 only going to spend a certain amount of time on discovery and

13 this obviously has gone way beyond that.  And I'm going to, as

14 a result, just be very brief.

15         And the way I'm going to try to do this is to, in a

16 sense, try to do what I think the counsel for the class, for

17 the purported class would be obliged to do and kind of think

18 through and talk about what facts are out there that could

19 potentially be relevant to class certification.  And then

20 determine whether any of these requests, including the first

21 one, and I'll focus on the first one, really get there.

22     Because the first request essentially asks for everything.

23 I suppose if you ask for everything, you can say well, I'm

24 asking for everything so that's got to include anything that

25 might be relevant.  The simple answer to that is, asking for

1  everything is an improper request on its face.  It is an

2  improper request and therefore should not be permitted to be

3  made.  But even if you were to construe it and say well, even

4  though it's improper, what might be out there that is relevant

5  is not there.  That's what I want to go through very, very

6  quickly.

7         On numerosity -- there really are kind of three

8  things to talk about -- one is numerosity, the other is

9  commonality and typicality which are very closely linked, and

10 the third is predominance because this would have to be a B-3

11 class.  There's no other basis for the class being even sought.

12        On numerosity, there's been kind of a sophisticated

13 discussion as we've proceeded here this morning on what Your

14 Honor really has decided with respect to numerosity and what

15 Your Honor has not decided.  I think that the record is clear

16 that all that Your Honor has decided are two things.

17        One, you've decided that the notice was sufficient,

18 was found to be sufficient at the outset.  It was not appealed

19 from and therefore the notice was sufficient and therefore the

20 bar date was a proper bar date and therefore the only claims

21 that can be pursued with respect to property are the ones that

22 were timely filed in reference to the bar date.  That has been

23 determined and it can't be redetermined.  It's the law of the

24 case.

25        And to that extent, that is the totality of the

1  claims that can be considered for class certification purposes.

2  That's not a new determination.  That is whether more claims

3  can be determined -- can be referred to for class certification

4  purposes.  That's the same issue, that is, what claims can

5  possibly in any way, shape or form be brought before the Court.

6  The answer is, notice was adequate, bar date was proper, these

7  are the only claims in the case.  There is no incremental

8  ruling that has to be made that says, and that's good for class

9  certification.  That's good for all things.  That is the law of

10 the case.

11       Similarly, the idea that if Your Honor were to

12 certify a class, it then might be appropriate to use the

13 certification of the class to revive somehow claims that have

14 not been timely filed in reference to the bar date, that also

15 would violate the law of the case.  There is no aspect of Rule

16 23 that modifies the bankruptcy law that relates to the bar

17 date.  You can't revive claims that have not been timely filed.

18       So if the law of the case is these are the only

19 claims that can ever be pursued, again, there's no incremental

20 determination that says now that class certification is being

21 brought, that somehow that's a new issue.  That's the same old

22 issue.  So Your Honor made one determination which is that the

23 notice was adequate and therefore, the bar date was adequate

24 and therefore, the only claims in the case are the ones that

25 were timely filed in relationship to the bar date that is the

1  law of the case and that is dispositive of any and all issues

2  that pertain to what claims will ever before the Court in this

3  case.

4        The second determination that Your Honor made back in

5  October or even earlier was that there was not going to be

6  discovery beyond those claims that were present in the case

7  which logically flowed from the prior decision that you had

8  made that those were the only claims in the case.  If they're

9  the only claims in the case, why should there be discovery on

10 anything else?  That was a slightly incremental ruling, if not

11 identical to the first ruling, is slightly incremental.  But

12 Your Honor made that long, long ago.

13        So the idea that there's now something more to be

14 determined about numerosity, is (a) it has no foundation in

15 this case in terms of the claims that can be pursued because

16 Your Honor already has ruled on the adequacy of notice if there

17 was no appeal and (b) it runs contrary to Your Honor's further

18 determination last year that there cannot be any discovery that

19 seeks to go behind and basically contravene that order.

20        The only thing that's really happened since all those

21 things is that we now know that there's only one South Carolina

22 claim.  And we also know that to the extent an argument is made

23 for a de novo class, that is, a class beyond any class action

24 that was actually pending at the time of bankruptcy, we also

25 know that there are about 200 Speights claims and therefore,

1 that's the number.  We don't think it's relevant but that's

2 what the number is.  So it is inconceivable that there is any

3 further discovery that's necessary because of the relatively

4 circumstance in class action law that there's been a bar date

5 bankruptcy.

6          With respect to commonality and typicality, as we all

7 know, that it's an inquiry in connection with Rule 23 that

8 turns on the nature of the claim that's being made.  Now, these

9 are all property damage claims and they have been discovered,

10 they've been litigated for over 20 years.  And as a

11 consequence, it is very, very obvious how the

12 commonality/typicality issues play out because they've been

13 litigated for so long.  Everybody knows what the commonality

14 and typicality facts are because they all know.  We don't need

15 discovery to find out how to argue commonality and typicality.

16 They've been argued before, years and years before in

17 connection with non bankruptcy class certification requests.

18          And so we don't -- what discovery is necessary -- we

19 need to know how one case relates to another, relates to

20 another.  None of the discovery requests really even purport to

21 go after the commonality and typicality requirement in terms of

22 the facts as opposed to trying to find a lawyer's admission

23 somewhere in internal files which is an opinion, it is not a

24 fact that drives commonality and typicality.  Your Honor said

25 last November we should be after the facts, not somebody's

1  opinion.  So where is the new facts that are being sought at

2  discovery, including request one?  It's not there.  It has

3  never been identified.

4        And then finally, predominance.  Predominance is

5  really the Court's weighing the common facts versus the unique

6  facts and that doesn't require any discovery.  That's an

7  assessment to be made by the Court.

8        So this case really comes down to numerosity which

9  has been constrained in the ways that I've indicated.  It comes

10  down to commonality and typicality which really focuses on the

11  nature of the issues that may be common from claim to claim and

12  which the parties are all totally familiar with because this is

13  a very, very mature litigation, and predominance which is a

14  legal issue.  So I don't think it's there.

15        I don't think it's in request one.  Request one is

16  overly broad on its face.  To say incidentally, well, there are

17  only five boxes, it doesn't make it any more discoverable, any

18  more appropriate.  There are five boxes that were gathered as a

19  result of the effort that we objected to that went to over

20  1,000 boxes that people had to go basically find, look through

21  and determine what materials could fall within the scope of

22  this discovery.  So it's been a very burdensome process.  To

23  say that well, it's not a big deal, it's five boxes, therefore,

24  it's appropriate for class certification discovery, again, that

25  is not what -- the whole intent to the rules is to avoid this

1  kind of discovery.

2        So we would object that it's over broad and I hope

3  that I don't then have to -- I won't repeat the arguments that

4  I've made in connection with the other requests.

5        THE COURT:  Okay, it seems to me that the request is

6  broad.  To the extent that you wish to modify this request

7  asking for documents that lead to a description of how Anderson

8  is a -- Anderson, because that's the only South Carolina

9  building which is where I'm having some difficulty with this

10  but I suppose that if there is some basis upon which there can

11  be some commonality or some typicality of Anderson in the other

12  buildings so that Anderson is a typical plaintiff, and there

13  are documents -- there's files that indicate that -- related to

14  the Anderson lawsuit that show this commonality and typicality,

15  I suppose I will permit that discovery.

16        But you're going to have to modify this request, Mr.

17  Speights, get to the facts that you're attempting to elicit.

18  The problem with this request is, you're simply asking for

19  documents without telling me what the facts are that you're

20  attempting to elicit.  And I simply don't know what this

21  document request is.  To the extent that the debtor is claiming

22  a privilege, a privilege log is going to have to be created.

23  The debtor, like everyone else, has to comply with that

24  requirement.

25        So with respect to Number 1, I'll permit a

1 modification of it if you choose to do it and as limited to an

2 assertion looking for the facts related to the class

3 certification requirements of commonality or typicality, I'll

4 permit it.  I am not going to get into the issue of numerosity.

5 I simply don't think at this point that that is going to be a

6 relevant consideration for reasons that I have -- that Mr.

7 Bernick, actually, has expressed, I think I've made rulings on

8 that issue already.

9        With respect to Number 2, all documents regarding

10 Anderson's request to be on the PD committee, that simply is

11 not a factor that in any way is relevant to class certification

12 issues.

13        With respect to all documents prior to September 2005

14 concerning proceedings in Anderson's lawsuit, that's already

15 encompassed within request Number 1 because that's asking for

16 all documents in Anderson's lawsuit.  So the second one is

17 simply a limitation of the time frame.

18        The next one, all documents except pleadings that

19 identify any asbestos containing materials in any of Anderson's

20 buildings, I believe that will be appropriate in the merits of

21 the Anderson claim itself.  But I'm not sure what you're

22 getting at at this point on a certification issue, Mr.

23 Speights.

24        MR. SPEIGHTS:  I think it might be relevant to

25 typicality, Your Honor.

1           THE COURT:  Okay, any of Anderson as in Anderson

2 Memorial's buildings?

3           MR. SPEIGHTS:  It's Anderson's claim, typical of

4 other class members claims.  I assume they are challenging

5 typicality and I want to show that Anderson's claims and the

6 type of product they have and the circumstances would be

7 typical of other class members.

8           THE COURT:  All right, fine, I'll permit that.

9 That's fact discovery.  That seems to be to me appropriate with

10 respect to the class certification issues.  All documents

11 except pleadings --

12           MR. BERNICK:  Just so I can understand, Your Honor.

13 You are approving this as literally as it reads the identity of

14 any asbestos containing materials in any of Anderson's

15 buildings, that is, the Anderson, the claimant or claimants,

16 the claimant really, that is, Anderson?

17           THE COURT:  I'm looking at the debtor's chart.  I'm

18 assuming that the debtor copied the requests accurately.

19           MR. BERNICK:  It is.  I just want to make sure that

20 there wasn't some modification that had been intended --

21           THE COURT:  No.

22           MR. BERNICK:  -- in Your Honor's characterization of

23 it.  So it says identity of asbestos containing materials in

24 any of Anderson's buildings.  I understand that.  Mr. Speights

25 could have talked about in the extent to which that is typical

1 of other class buildings, that's what I had a problem with.  I

2 don't have a problem understanding how Your Honor has ruled on

3 this request.

4         THE COURT:  No, I'm ruling literally with respect to

5 the request.

6         MR. BERNICK:  Okay, then I understand.

7         THE COURT:  All right, the next one is all documents

8 except pleadings re potential membership in Anderson's punitive

9 class.  Mr. Speights, I think the issue for this one can be

10 satisfied by an examination of the proof of claim files.  I

11 don't know whether there is a confidentiality agreement.  In

12 fact, you probably represent most of the entities anyway.  If

13 you need to sign a confidentiality statement to get to the

14 proofs of claim of the entities that you do not represent and

15 will sign that, you may have access to those proofs of claim

16 because I think at this point the claims bar date will set the

17 universe.  If something in the argument convinces me that I'm

18 wrong about that and that as certified, a class will be

19 broader, I will reconsider these rulings and at that point have

20 to expand discovery.  But for now I'm going to limit the

21 discovery to the universe of the claims that have been filed in

22 the case.

23         The next one is all documents regarding

24 communications with witnesses involving class certification in

25 Anderson.  Is there something outside the trial record that

you're attempting to get to or the -- I shouldn't say the trial

record, the boxes of documents that you've already gotten from

the court file?

        MR. SPEIGHTS:  Well, this would go to communications

between Grace and witnesses concerning certification issues

involved in Anderson which, I don't know if there are such

documents or not.  For example, if Grace has communicated with

an expert or a third party and said the issue of commonality

will come up and these are the such and such, and such and

such, it may be privileged, it may not be privileged, but

that's the type of thing.

        THE COURT:  All right, that seems -- insofar as those

issues are -- or this request is limited to the issues

involving Rule 23, I'll approve it, but only insofar it is

limited to issues involving Rule 23.  And, of course, if the

debtor is going to contend that these documents are limited,

then a privileged log is to -- or pardon me, that these

documents are privileged, then a privilege log is to be

produced.

        MR. BERNICK:  My problem is I don't understand what

it is that Your Honor is-- what it is that we're getting at

here.  I just --

        THE COURT:  I'm indicating that the documents are to

be produced and if they are, if you're going to claim that

they're privileged, then produce a privilege log.  I'm

1  assuming, for example, that some of these documents, if they

2  exist at all, will be communications between counsel and

3  witnesses and they may be subject to a privilege.

4          MR. BERNICK:  So these are communications between

5  counsel and witnesses that are relevant to the class

6  certification that Your Honor is going to be taking up?

7          THE COURT:  It doesn't say between counsel.  It says

8  all documents regarding communications.

9          MR. BERNICK:  I understand.

10         THE COURT:  So I don't know that they are between

11 counsel and witnesses.

12         MR. BERNICK:  Fine, okay.  My hangup, Your Honor, is

13 that I don't understand what witnesses we're talking about.

14 First of all, we obviously don't intend to call any witnesses

15 in connection with class cert.  If there --

16         THE COURT:  Oh, I see what you're saying.  I

17 apologize.  I assumed that you were talking about witnesses who

18 were involved in the Anderson Memorial South Carolina class

19 certification.  Ms. Speights is nodding yes, that's what he

20 meant.

21         MR. BERNICK:  Okay, so these are witnesses that may

22 have been contacted or we have documents about, in connection

23 with the certification in Anderson that took place -- the

24 historical proceedings in Anderson?

25         THE COURT:  In South Carolina.  Mr. Speights,

1  correct?

2          MR. BERNICK:  Okay, now with respect to that, I'm

3  assuming that we don't have to deal with witnesses who went to

4  issues that we've taken off the table like adequacy of counsel

5  and adequacy of the class rep.

6          THE COURT:  That's correct, those are not issues that

7  will be tried.  Ms. Speights?

8          MR. SPEIGHTS:  I understand -- can you hear me from

9  this mic?

10          THE COURT:  I can.  I don't know if Mr. Bernick can

11  though.

12          MR. BERNICK:  I can hear you.  I can hear you fine.

13          THE COURT:  Okay.

14          MR. SPEIGHTS:  Okay, I understand that that is off

15  the table, adequacy.  The only thing I would say is that in

16  most of these, it may well be adequacy and other stuff

17  discussed in the same correspondence.  And I certainly want to

18  make it clear that it would have to be solely related to

19  adequacy for it not to fall under the request.

20          THE COURT:  Yes, sir, that's correct.  You are

21  talking, Mr. Speights, though about Anderson in South Carolina,

22  those witnesses, correct?

23          MR. SPEIGHTS:  Yes, Your Honor.

24          MR. BERNICK:  And class certification.  Obviously,

25  we're talking about something that relates to the merits of the

1 case.  I don't read this request to call for that and I'm not

2 -- I don't read Your Honor saying that we're opening up the

3 door to communications with witnesses generally.

4          THE COURT:  No, I'm talking only about the Rule 23

5 elements, nothing more.  I'm only approving these discovery

6 requests insofar as they're related to Rule 23 elements that

7 are going to be tried, those that are at issue.

8          MR. BERNICK:  Okay.

9          THE COURT:  Okay, next is all documents re Grace's

10 knowledge of facts or factual assertions relating to Anderson's

11 punitive class action.  Are you talking again, Mr. Speights,

12 about the punitive class action here in this bankruptcy case,

13 in the South Carolina case?

14          MR. SPEIGHTS:  I lost my place, Your Honor.  What --

15          THE COURT:  The bottom of Page 22, RFP-9 deposition

16 notice 4, 5 and 9.

17          MR. SPEIGHTS:  I think the answer is both, Your

18 Honor.  And again, if I could just interject, I understand that

19 the Court's ruling is that Grace only has to respond to my

20 discovery respects with respect to Anderson certification

21 issues and I also believe that you have said that that would

22 not include adequacy and that would not include at this time

23 numerosity.

24          THE COURT:  That's right.

25          MR. SPEIGHTS:  Okay, so that's just sort of -- maybe

1 I'm ahead of myself.  I'll be glad to try to reword it again

2 but I'll never get an A in Mr. Bernick's course of literary

3 style, but --

4        THE COURT:  When I say numerosity, Mr. Speights, what

5 I mean is that is not going to go beyond the bar date order.

6 That's what I mean by numerosity.

7        MR. SPEIGHTS:  Right.

8        THE COURT:  Okay?

9        MR. SPEIGHTS:  And I guess, maybe I'm jumping in here

10 in the middle of this and inappropriate, but if Grace would

11 just file an amended response based upon the Court's rulings

12 that it's limited as you've ruled today to those subjects, it

13 would seem to me much more efficient than me trying to reword

14 what Your Honor has clearly ruled.

15        THE COURT:  That's fine.  I'm not asking for another

16 amendment.

17        MR. SPEIGHTS:  And then when it goes to here,

18 knowledge of facts, of factual assertions relating to

19 Anderson's punitive class action, again, I'm seeking what Grace

20 has said or Grace knows about, as amended by the Court, the

21 certification issues less bar date issues and less adequacy.

22        MR. BERNICK:  If that's -- I'm just trying to think,

23 Your Honor, whether that essentially we've -- the only

24 certification issues that I think are left after numerosity and

25 adequacy are off the table for different reasons but for the

1 reasons indicated, it's commonality and typicality and then the

2 predominance which is not really a new fact.  It's an

3 assessment of those facts.  So we're really into commonality --

4          THE COURT:  Well, in the feasability -- I'll call it

5 feasability of use of the class action process --

6          MR. BERNICK:  Oh yes, that's right, superiority --

7 the management --

8          THE COURT:  Right.

9          MR. BERNICK:  -- side of the thing.  And I don't

10 know, for that matter, whether there's any fact that any of

11 these go to.  But to the extent that 9 simply asks for

12 knowledge of facts or factual assertions related to the action,

13 obviously, that on the face of it would also include the

14 merits.  To say well, no, it's only Rule 23 and therefore given

15 what's happened, only commonality/typicality and feasability,

16 Grace's knowledge of facts or factual assertions regarding

17 commonality/typicality, I just don't know what that means.

18 Commonality and typicality focus on the nature of the claims

19 that are being made and the defenses to those claims.  There's

20 no knowledge of that.

21          THE COURT:  I agree.

22          MR. BERNICK:  I'm struggling with words.  I just

23 don't understand what that means.

24          THE COURT:  I agree.  I think this one does go to the

25 merits, therefore, I'm not going to approve this one.  I think

1  you're right, Mr. Bernick.  I think that one is too hard to

2  answer without some amendment.  So I'm not going to have the

3  debtor answer that one.  I agree, it's too difficult to

4  conceptualize in the process that we're going through now.

5       All right, the next one, all documents regarding

6  amount set aside for Anderson's claim including insurance

7  reserves, communications with insurers re Anderson and

8  communications with any other person re Anderson.  With respect

9  to the documents regarding the set aside for the claims, that

10  appears to go to the merits.  The communications with the

11  insurers, I'm not sure how you're entitled to that information

12  on issues that are on class certification.

13       MR. SPEIGHTS:  I think any set aside or any

14  discussion of that in terms of Anderson would be in terms of

15  Anderson as a class, early documents under the broad class,

16  later documents under the South Carolina class.  I mean that's

17  what it goes to, is communications with the insurance carrier

18  or others dealing with Anderson as a class.  How much is it

19  worth?  How much is, you know.

20       THE COURT:  Why is that not subject to -- why is that

21  not an agent and attorney communication privileged discussion?

22       MR. SPEIGHTS:  Your Honor, that is a perfect --

23  that's an example I offer today is, it needs to be listed on a

24  privilege log and maybe the privilege log itself will evidence

25  what they, you know, maybe it will show that the document is,

1 in fact, privileged by the log or maybe, I mean I will have to

2 say to Your Honor look at this in camera because I see they

3 sent it to other people or it contains facts besides some legal

4 conclusion.  Maybe it's not even from a lawyer.  Maybe it's

5 from a controller in the company.  I don't know.

6          THE COURT:  All right.

7          MR. BERNICK:  Your Honor?

8          THE COURT:  Yes.

9          MR. BERNICK:  I'm sorry, go ahead.

10          THE COURT:  No, go ahead.

11          MR. BERNICK:  I mean the obvious purpose for this is

12 to find out information that would go to presumably to the

13 merits of the claim.  If again, using the structure that we're

14 dealing with today, commonality/typicality, feasability,

15 there's not any articulation of why there is even a prospect

16 for there to be facts that bear upon commonality/typicality or

17 feasability facts that are somehow only revealed in

18 communications with insurers and certainly not the reserves.  I

19 mean let's assume that there are reserves, let's assume there's

20 reserves of some type and I don't believe that there is one --

21          THE COURT:  Mr. Bernick, I'm going to cut you off.  I

22 don't see how this one is based on the class certification

23 elements.  It seems to me that it goes to the merits.  I'm not

24 approving that one.

25          MR. SPEIGHTS:  Your Honor, I  really, I really do

1  really ask you to rethink something.  In the brief before you

2  on class certification filed in October 2005 we point out to

3  you as one of our arguments that Grace, believe it or not,

4  stipulated to a class action in the Third Circuit in

5  Philadelphia, to the school's class action.  They stipulated to

6  all the prerequisites for class certification being present and

7  then actually briefed that before the lower court in

8  Philadelphia and in the Third Circuit and that's what I meant a

9  while ago.

10        If there are documents here, the example now which is

11 the one I started with in which to that insurance carriers they

12 talk about why this class action will prevail or why

13 commonality or typicality or whatever is there, at least they

14 should be able to list that document.  There could be directly,

15 maybe the most relevant information at all would appear in here

16 or in any settlement files concerning Anderson.  I understand

17 there's a hurdle on privilege, but it's not to the merits of

18 the case.

19        It's to the merits of there being a class.  The

20 merits of Anderson's case are how much is it worth before a

21 South Carolina jury, what are our risks of property damage

22 verdict for the, you know, X million dollars worth of Monokote

23 in the Anderson Hospital?  That's an entirely different -- and

24 I'm not interested in their evaluation of the Anderson Memorial

25 Hospital claim on its merits.  I'm really not.  I'm interested

1 on their evaluation of Anderson either on behalf of all the

2 buildings in South Carolina, it should or should not be a

3 class, its claims are typical or not, the issues are common or

4 not, we should settle or not, or if it was before 1994 the same

5 evaluation for the punitive class.

6         I mean it's the very essence of what -- Grace can say

7 a lot now in 2007 about the Anderson class, but I think I'm

8 entitled to show, if it's not privileged, if I can get it, what

9 Anderson said internally or to outside people such as insurance

10 carriers about Anderson as a class action.  I would urge Your

11 Honor to at least make them file a privilege log.  We can fight

12 about it then.  They could file a privilege log by sunset on

13 this issue.

14         MR. BERNICK:  Your Honor, I'm not going to prolong

15 this.  That argument said nothing other than to reiterate the

16 argument that we've been dealing with for the last God knows

17 how many months and it's no better -- this is clearly, you

18 know, an unbelievably improper attempt to find out thinking,

19 internal thinking, whatever that internal thinking would be.

20 Let's assume that it's everything that Mr. Speights indicates,

21 is never going to be discoverable.  And it's certainly not

22 relevant.

23         The Anderson case, whatever the Anderson case was, is

24 today a one building case.  And to the extent that there are

25 attorney's files where there's a discussion between counsel for

1 Grace and counsel for an insurance company over whether, in

2 fact, commonality and typicality could be satisfied in

3 connection with the class action certification, it's plainly

4 work product, it's opinion.  It's not fact.  The only facts

5 that drive commonality and typicality are the issues that are

6 involved in the claims themselves.  Discovery of how counsel

7 regards those facts, viewed in light of the requirements of

8 Rule 23 is not a fact.  It's an opinion.  And it's not

9 discoverable --

10         THE COURT:  Well, these aren't necessarily asking for

11 communications with counsel though.  I do agree that insurance

12 reserves at this point in time, frankly, I don't see that are

13 relevant given the structure of this case at this time to

14 anything to do with the class certification.  Communications

15 with -- this says insurers or any other person concerning

16 Anderson.  I mean whether there are admissions in those

17 documents, perhaps they're relevant to the certification

18 issues.

19         I suppose someone should go through them to take a

20 look at whether or not there are such documents that exist.  If

21 they exist, they should be disclosed or else the privilege log

22 should be prepared.  I am not going to permit the information

23 concerning reserves at this point.  I think it's irrelevant

24 given the course of the bankruptcy right now with Anderson, the

25 only South Carolina building left at this point in time, I

1 can't see at this point how that information is relevant or

2 likely to lead to relevant evidence on the issue of the

3 certification.

4         The communications, to the extent that documents

5 exist and there may be some factual information in them, it

6 should be disclosed or a privilege log created.  All right, the

7 next one.

8         MR. BERNICK:  I'm sorry, would that be -- I'm sorry,

9 Your Honor.

10        THE COURT:  Only on the certification issues.

11        MR. BERNICK:  The ones that we've identified

12 throughout this?

13        THE COURT:  Yes.

14        MR. BERNICK:  Yes, okay, that's fine.

15        THE COURT:  Next one, all pre-petition documents

16 except pleadings regarding any evaluation of Anderson's claims.

17 That's the same ruling.  At this point in time that goes to the

18 merits because the only building left is Anderson, and that's a

19 merits issue which is not relevant right now to certification.

20        The next is all documents except pleadings re

21 pre-petition efforts to settle Anderson.  I think for the same

22 reasons that is not relevant any longer either.  Anderson is

23 the only building left in South Carolina at this time.

24        Mr. Speights, I'll hear you on that.  If there's

25 something I'm missing, I think given the state of this

1  bankruptcy case, that can't be calculated to lead to relevant

2  or admissible evidence given the fact that there are two

3  hundred and some buildings left, but there's only one in South

4  Carolina.

5          MR. SPEIGHTS:  Well, I'm just a broken record, Your

6  Honor.  And I'll be a short broken record this time, but I keep

7  going back to the same thing.  If Grace's -- it's almost like

8  Your Honor is deciding there can't be class because of

9  numerosity and I understand you've reserved -- you said I can

10  my arguments at the certification.  And there are these other

11  issues floating around too, and if Grace is evaluated, this

12  case will make statements via the settlement, via the

13  communications to other persons in which it acknowledges

14  Anderson meets their prerequisites for class certification on

15  all issues or at least on issues other than numerosity, I think

16  it could be relevant.

17          THE COURT:  Okay, this is the basis for my ruling.

18  I'm not saying there cannot be a class based on numerosity.  I

19  think that the issue of numerosity is limited to claims that

20  are pending based on the bar date, I think.  That's where --

21  I believe that's where the law is going to take me.  I may be

22  wrong.  If I'm wrong, I'm certainly willing to listen.  But I

23  think as I sit here now that's where I'm headed.  And the

24  reason I believe this is irrelevant is because the issue is

25  framed differently in the bankruptcy cases we sit here now than

1  it was when it was right in South Carolina at the time that the

2  issue was argued in South Carolina.

3        MR. SPEIGHTS:  But, Your Honor, if they had

4  stipulated to you that the only issue today in this

5  certification is numerosity, I'd have a hard time arguing with

6  you on that point, that South Carolina, you know, I would take

7  the position, of course, that you're not limited to the bar as

8  I always have.  But I would say well, Your Honor's focused on

9  numerosity in this court.  But they haven't taken everything

10  else off the table.  So the fact that numerosity in your view

11  may be different here than there, not my view but your view,

12  doesn't mean that there's not these other issues still there,

13  commonality/typicality, superiority.

14        THE COURT:  Okay, but the question is this.  It says

15  all pleadings regarding pre-petition efforts to settle

16  Anderson.  The problem is that the efforts to settle Anderson

17  would have included the punitive class that would have been

18  Anderson in South Carolina which would not be the same as the

19  punitive class here because the buildings would be different

20  here.

21        MR. SPEIGHTS:  I understand that, Your Honor, but my

22  point is that if they were willing to settle or make statements

23  concerning the Anderson state class, at least it would be

24  evidence that they agreed that there was commonality and

25  typicality and superiority.  I understand that Your Honor is

1 concerned and Grace's -- there's been a change in circumstances

2 concerning numerosity.  But the settlement still -- you

3 wouldn't settle a class action in South Carolina or represent

4 to the Court that because of the <u>Georgine</u> case we go back to,

5 you know, you can't have a settlement class that does not meet

6 the conditions of a litigation class.  So Grace couldn't stand

7 up in South Carolina and say we have agreed to a class action

8 settlement unless all of the prerequisites of Rule 23 were met.

9 So that if there's such evidence, that is evidence that there

10 was typicality and at that time numerosity.  I understand

11 there's a different issue now in this court in Your Honor's

12 mind, but there are the other prerequisites which Grace

13 continues to contest in this court.

14          MR. BERNICK:  Your Honor, could I make a distinction

15 here that I think would be useful in Mr. Speights' point, or to

16 pretty squarely address Mr. Speights' point in trying to deal

17 with it?  If after <u>Georgine</u> there had been a class action

18 settlement that Grace actually entered into with respect to

19 Anderson Memorial claims, there would still be an issue about

20 whether that's relevant here because of the different nature of

21 the claims that we're dealing with in bankruptcy.

22          But Mr. Speights would have a point in the sense that

23 that agreement, if actually entered into, would represent an

24 admission, not simply an opinion, but an admission that, in

25 fact, there was commonality and typicality and that would be a

1  fact that we would no longer be able to contest due to the fact

2  that you can't certify for settlement purposes and then dispute

3  for litigation purposes.  There would be a point there and I

4  would acknowledge that in post <u>Georgine</u> and with all those

5  caveats.

6           The fact of the matter is, there was no settlement of

7  the Anderson Memorial class, none.  And as a result, there is

8  no admission or concession of any fact.  If I had the

9  opportunity, I would also contest Mr. Speights' suggestions

10 about what the dialogue was, but that's not relevant here and

11 it's not even discoverable here.

12          Because there was no settlement, any statement that

13 was made internally about if there is commonality or is

14 typicality, assuming that there were such a statement which I'm

15 not saying that there was, would simply be an opinion.  It is

16 not a fact.  There is no settlement, therefore, there's no

17 concession of the fact.  It's simply an observation and an

18 opinion undoubtedly by counsel.  It is not a discoverable fact.

19 Your Honor said last fall we should be interested in the facts.

20 Again, the facts relating to commonality and typicality have

21 nothing to do with lawyers' opinions on the prospect of Rule 23

22 for settlement purposes.  They have to do with the nature of

23 the claims.

24          THE COURT:  Well, okay, I agree with that except to

25 the extent that there may be documents that are not generated

1 by counsel.  I mean I would think it's unlikely but there may

2 be documents that are not generated by counsel.  So there may

3 be actual statements of fact somewhere.  As I said, I think

4 it's unlikely but they may be there.

5          MR. SPEIGHTS:  But, Your Honor, there may also be --

6 I actually agree with some of what Mr. Bernick said.  He said

7 if there's a settlement, yes, that's an admission.  Suppose

8 there is a filed memorandum from an in house counsel says I

9 spoke with Dan Speights today and I told him that if he would

10 take a billion dollars -- I would have -- if he'd take a

11 billion dollars, I will consent to certification of the class

12 in South Carolina.  That's highly relevant, I believe, as

13 relevant as the settlement announce that he would say that.  We

14 would then face questions about is that privileged or not

15 privileged?  I don't think it's privileged because he talked to

16 me according to that memorandum and therefore, I don't

17 understand why I'm not entitled to the document.  At least put

18 it on the privilege log.

19          THE COURT:  Well, I think the circumstances have

20 changed enough that the class is not the same no matter what

21 and that's the issue.  I mean what may have been relevant for a

22 class that doesn't exist anymore is not necessarily relevant

23 for a class -- let's assume that there's a class that can be

24 certified.  Let's assume that there's a class that will be

25 certified.  The class that will be certified today isn't the

1  same as the class that was certified or could have been

2  certified three years ago.  And so what was relevant to the

3  class that was certified three years ago isn't relevant to the

4  class that's certified today.

5        MR. SPEIGHTS:  Your Honor, I understand that on

6  numerosity although I don't agree with you, politely.  But on

7  commonality and typicality and others, if Grace was prepared to

8  represent that commonality and typicality, et cetera, were

9  present, then it may or may not be binding on this Court, but

10 it is some evidence at least that at one time Grace was willing

11 to concede that.  And whether it's extinct now is an issue for

12 the certification hearing.  Well, the certification will say

13 that in South Carolina, you know, it was a different situation

14 because of x, y and z.

15       THE COURT:  All right, well anyway, to the extent

16 that there are facts and, you know, I think they should be

17 disclosed at this point because frankly, I don't want to have

18 to go through this again.  I think it's just easier.  You're

19 going through these documents anyway.  To the extent that there

20 are documents that meet this request on the issues of Rule 23,

21 disclose them.  If they're subject to a privilege or, you know,

22 to attorney/client work product, whatever, then they should be

23 withheld on that basis and a privilege log created.

24       MR. BERNICK:  Your Honor --

25       THE COURT:  The next one is the documents and

1  communications with building owners regarding proofs of claim

2  filed by Anderson's counsel.  I'm not even sure I know what

3  that was intended to do.  Mr. Speights, are you suggesting that

4  somehow or other Grace had communications with your clients

5  without you?

6          MR. SPEIGHTS:  Give me just a moment.

7          THE COURT:  I mean I think at this point in time

8  that's somewhat irrelevant to class certification.  If they're

9  represented by counsel and they've got proofs of claim filed, I

10 can't see how that affects the elements of the Rule 23 issues.

11         MR. SPEIGHTS:  I understand, Your Honor.

12         THE COURT:  Okay, that one is denied.  And the last

13 one is an index of documents regarding Anderson in any punitive

14 class it purports to represent.  If such an index exists -- is

15 there such an index?

16         MR. SPEIGHTS:  I don't know, Your Honor, other than

17 what -- I've gotten a couple of indexes (sic) of the Anderson

18 file itself from the two custodian depositions.  I don't know

19 if there are other indices or not.

20         THE COURT:  All right, if there is such an index of

21 documents, then it should be produced.

22         MR. BERNICK:  It has.  I think we've identified here

23 on the charts, Your Honor, it has been.

24         THE COURT:  Okay, then if it's already been produced,

25 to the extent it's been produced, it need not be produced

1 again.  All right, I believe --

2        MR. BERNICK:  Your Honor, I'm sorry to go back to 14

3 but I need a little bit of clarification because of the

4 dialogue that took place between Your Honor and Mr. Speights.

5 But just where Your Honor ruled, I didn't want to interrupt

6 anything, but to the extent that we are talking about actual

7 statements made in the context of settlement discussions which

8 obviously would involve attorneys, (a) any such settlement

9 discussions would not contain any admissions because they are

10 statements about what would be done if there were to be a

11 settlement and there was no settlement, (b) they're all covered

12 by Rule 408.

13        If there are statements, as I understood, Your Honor,

14 if there are statements by non attorneys that relate to facts

15 of commonality or typicality, we would obviously be looking for

16 those, and if they're not privileged, we would turn them over.

17 But I wanted to be clear about whether Your Honor intends to

18 direct us to produce or log actual statements made by counsel

19 during the course of settlement negotiations that never

20 achieved any result.

21        THE COURT:  I believe if you're going to claim some

22 privilege as to a document that exists, it should be logged as

23 a privilege.  Of if it's in the course of settlement

24 discussions, it should be logged as a settlement document.  I

25 don't think you're --

1        MR. BERNICK:  We --

2        THE COURT:  -- going to be producing attorney/client

3 documents in connection with this.

4        MR. BERNICK:  I mean obviously, Rule 408 is not

5 limited to attorneys and it's not even a privilege.  It's a

6 preclusion and so we will not -- we're obviously not going to

7 produce them.  I just want to know if Your Honor is saying at

8 this point we should nonetheless log documents that are actual

9 statements during the course of settlement discussions.

10        THE COURT:  Oh, I see what you're saying.

11        MR. BERNICK:  We'll do it.  I think it's -- I mean I

12 think it's so incredibly -- we went through this before and

13 Your Honor never had to reach it, but you did actually say last

14 fall that we didn't have to get into settlement discussions

15 precisely because it can't lead to the discovery of relevant

16 evidence because none of it is admissible.  But, you know, at

17 this point, Your Honor, if you want us to log documents that

18 relate to a discourse during settlement if it relates to

19 commonality, typicality or superiority, we can do that.  I just

20 really -- I don't whether Your Honor wants us to do that.

21        THE COURT:  No, I don't think you need to log

22 something under 408.  I think the privilege log is what's

23 required.  I don't believe -- I'm taking a look at 408.  I'm

24 not seeing any requirement that a log be produced.  It simply

25 --

1          MR. BERNICK:  I don't think there is but I don't want

2    to then get into a position where Mr. Speights then says well,

3    let's take up the privilege issues and there is no 408 problem

4    here.  There is a 408 problem, an enormous 408 problem here.

5    So we'll do whatever it is that Your Honor wants but I had

6    thought that where you were going was, where the Court was

7    going was that to the extent that we had statements not of

8    lawyers involved at settlement discussions, but of non lawyers

9    relating to commonality and typicality that we would be

10   producing them or logging them.

11          THE COURT:  Right, that's --

12          MR. BERNICK:  And we're happy to --

13          THE COURT:  That's what I was trying to get to.  If

14   there are statements of fact that could be somehow or other

15   used as admissions, then it seems to me that that is an

16   appropriate document.  Rule 408, I think, does not permit the

17   use that Mr. Speights is talking about unless, in fact, because

18   of Georgine, there was an actual settlement but I'm not -- I'm

19   sure in this case there was not such an actual settlement.  No

20   one is contending that there is.

21          MR. SPEIGHTS:  Your Honor, respectfully, Mr. Bernick

22   is trying to put the cart before the horse.  Who's the

23   gatekeeper?  The Court is the gatekeeper, not Mr. Bernick.  Mr.

24   Bernick wants to make a 408 objection, he can make it.

25          THE COURT:  Right.

1          MR. SPEIGHTS:  He can file it on his privilege log.

2 I mean that's what -- the privilege log is under the discovery

3 section.  He will claim some documents, you know, for all we

4 know, there are no documents or there are three pieces of paper

5 we're spending hours on.

6          THE COURT:  Well, I think he raised --

7          MR. SPEIGHTS:  But he can file a privilege log, he

8 can file an objection to 408 but he can't decide whether a

9 document is protected under 408.

10          THE COURT:  No, I think he has to raise the

11 objection.  I don't think he has to create a log under 408.  I

12 think that's correct.

13          MR. BERNICK:  Yes, Your Honor, just to be clear, we

14 did make the objection.  This is a request.  We responded to

15 the request and we have always objected to this for months and

16 months.  So I'm not -- I wouldn't presume to be making any kind

17 of determination here.  We made an objection and the question

18 is Your Honor's ruling on that objection.

19          THE COURT:  All right, I am sustaining an objection

20 to Rule 408 with respect to settlement discussions.  I do not

21 believe under Rule 408 that settlement discussions are going to

22 lead to relevant or admissible evidence because there is no

23 settlement except to the limited extent that there may be some

24 admission concerning the elements of Rule 23 by a witness who

25 is not an attorney in the file somewhere.  This is a document

1  request, so to the extent that it is a document request.

2         MR. BERNICK:  And if it's privileged, we'll log it.

3  If it's not, we'll produce it.

4         THE COURT:  Okay.  All right, I think I've gone

5  through all of these.

6         MR. BERNICK:  I think so, and what we'll do, I think

7  this is consistent with what Your Honor said.  If it's not,

8  please let us know.  We will produce supplemental -- we'll look

9  at the transcript and we'll produce supplemental responses and

10 we will endeavor to do it.  Obviously, the argument on this is

11 next Friday.  We'll endeavor to produce supplemental responses

12 as soon as we possibly can.  I would observe to Your Honor that

13 I don't think that there's really very much here, if anything,

14 that's going to emerge, but I don't know that.  So we'll just

15 have to double check.

16        THE COURT:  All right, the document production

17 requests are to be produced as soon as possible.  Mr. Speights,

18 I guess I'll just have to have you work with the debtor to see

19 when you can get the documents produced.  Mr. Bernick, do them

20 on a rolling basis so that Mr. Speights has access to what you

21 can produce as soon as you can produce them.

22        MR. BERNICK:  Sure.  As soon as we make the draws,

23 we'll send the stuff through.  And as soon as we see documents

24 that are logged, we'll give him a rolling log.

25        THE COURT:  All right, I'm simply so ordering the

1  record on this one.  I'm not going to go back and try to

2  recreate every ruling that's taken an hour to do.

3          Okay, is that the end of your motion, Mr. Speights?

4          MR. SPEIGHTS:  Yes, Your Honor.

5          THE COURT:  Okay, Mr. Bernick, is there anything

6  else, any other business you have?

7          MR. BERNICK:  Yes, there was I think only one item of

8  business and it relates to the amendment of the claims issue.

9  I had thought that we might be able to resolve this.  I guess

10 it hasn't worked out.  Your Honor will recall that we filed a

11 motion, I think it sought an injunction with respect to further

12 amendments of the claims.  The proposal that I was prepared to

13 make the last time and would make this time is relatively

14 straightforward and it is this.

15         There's -- we took the position that the submission

16 of further materials in connection with the claims was a

17 modification of the claim and required court approval in

18 advance under Rule 7015.  The property damage claimants through

19 the committee said that no, that's not so, 7015 relates to

20 contested matters and the matter has not been designated as

21 contested by the Court and therefore, at best or at worst, 7015

22 can only be made effective on a prospective basis, Your Honor

23 having determined -- I assume that Your Honor determined that

24 these matters were contested matters.  And there was further

25 down the statement -- well, let me just take that on and make

1 the proposal.

2          We don't believe that's correct.  We believe these

3 are all obviously contested matters.  There were claims that

4 were made, objections that were made.  God knows it's been

5 contested.  But we're not -- we don't believe it's necessary to

6 take up the Court's time in order to belabor the question about

7 whether the Court must formally designate the matter as a

8 contested matter.  We're happy if the Court would simply issue

9 an order today or whenever we can get it to Your Honor that

10 says henceforth, given the fact that these are all contested

11 matters, any further supplementation with regard to these

12 claims will require prior approval of the Court.  The debtor is

13 satisfied with that.  It's a way of trying to resolve the

14 problem.  It doesn't require an injunction, it doesn't require

15 any retroactive application.  It simply says the time has come

16 that court approval is necessary.

17          The second feature of the argument was that under the

18 policy that had been adopted by the courts, this is the

19 argument, the policy adapted by the courts with respect to 7015

20 was that amendment of claims be freely granted as justice had

21 required, I believe that was the language that was used in the

22 briefs.  But there may or may not be that policy.

23          I don't think we have to resolve or argue that today.

24 That really is a request to the Court essentially to issue an

25 advisory statement about when leave will or will not be

1  granted.  I don't think we need to reach that today.  Everybody

2  knows the stage of these cases and how advanced they are.

3  Everybody can make the arguments in the event that a request

4  for supplementation is made, the arguments about whether it

5  ought to be granted or not.

6       The debtor would be satisfied if Your Honor would

7  simply issue an order saying pursuant to 7015, any further

8  supplementation of these claims as to -- and I should say -- as

9  to the closed issues, that is, the issues that we frame for

10  this series of determination, product ID's, statute of

11  limitations and risk of harm, that those require Court approval

12  in advance.

13       THE COURT:  Okay, Mr. -- I'm sorry, Mr. Saklow, Mr.

14  Baena, someone want to address this?

15       MR. BAENA:  May it please the Court.  This is Scott

16  Baena.  It's my turn in the barrel, Judge.

17       THE COURT:  Okay.

18       MR. BAENA:  Your Honor, first, let me disabuse you of

19  the statement by Mr. Bernick about what we were complaining

20  about.  We weren't complaining that the Court hadn't designated

21  these matters as contested matters.  They are contested

22  matters.  What we complained about was that 9014 does not

23  provide for the applicability of 7015 in respect to contested

24  matters.  And, of course, it's 7015 which governs both the

25  amendments of claims and the amendments of objections to

1  claims.  And there is a difference in Delaware between those

2  two things.

3       In Delaware, the local rules say that notwithstanding

4  the rule, the rule is applicable to the amendment of objections

5  to claims but it does not extend, 7015 to the application of

6  objections -- excuse me, to amendments to claims themselves

7  unless the Court so orders.  And the Court hasn't so ordered.

8  So that was our beef.

9       And the proposal by Mr. Bernick just skirts over what

10 we think to be the threshold issue when a rule is not

11 applicable and someone wishes to make it applicable and that is

12 why.  And the only thing that Grace offers in regard to the why

13 question is an illusion to the fact that there has been

14 substantial, they claim, amendments to claims being made by

15 property damage claimants, the most recent of which they point

16 to as having been performed in February of this year.  And that

17 is a most telling statement for a lot of reasons.  And by no

18 means does it rise to the level of cause for a very simple

19 reason.

20      When you review the amendments that have previously

21 been made to property damage claims, it is fair to say that

22 they fall into two categories.  The first category are the

23 pre-2007 amendments.  And indeed, that's the large majority of

24 amendments that were filed by property damage claimants.  And

25 when you look at the amendments that were filed pre-2007, you

1  immediately realize that all of them were filed with the

2  authority of the Court, indeed, the direction of the Court

3  because they were all filed pursuant to the notice regime that

4  this Court established whereby the debtor had to identify

5  insufficiencies in PD filings by claimants and claimants were

6  given a period of 60 days from the date of the notice to

7  correct those deficiencies.

8          For whatever reason, the debtors rolled out those

9  notices over a protracted period of time so that right through

10 the end of 2006 claimants were filing amendments in response to

11 the notices of deficiency and therefore, there was no mischief

12 afoot.  Everybody was complying with precisely what the Court

13 said to do.

14         Now, post-2007, of January 2007, something else

15 occurred and it actually proves to be again, no basis of cause

16 for the relief that's being sought.  If you look at the

17 amendments to which they allude in their motion, you find that

18 the vast majority of those amendments were filed by claimants

19 whose claims have already been settled.

20         Indeed, according to what we've been told in court by

21 Mr. Restivo and at the last hearing, by Mr. Bernick, indeed,

22 when you look at them, the vast majority were filed by the Dies

23 and Hile firm on behalf of their claimants.  And, moreover, the

24 debtor was aware of those amendments in real time because the

25 claims administrator so advises them in real time and they

134

1  didn't complain about it for four months.  And in that

2  four-month period they reached an agreement with the Dies

3  clients.  So that's a total red herring.

4         There were, I admit, some amendments filed by

5  Speights and Runyan as to their claims.  However, those were

6  the California claims in which Speights and Runyan was doing

7  exactly what they told everybody in court and in their papers

8  they were going to do which was redact any reference to the

9  State's filing of a motion in the United States Supreme Court

10  for leave to file a complaint against Grace and other

11  manufacturers of asbestos.  And, in fact, there was on-going

12  discovery at that time which did not preclude the debtor from

13  inquiring into those redactions which, again, they knew of or

14  should have known of in real time.

15         So when you step back, what's fatal to this motion,

16  what's conspicuously missing from the request for relief here

17  is any reason why this Court should now become a gatekeeper

18  when there was nothing that occurred that was untoward or

19  unexpected or not directed by the Court itself.  Had the rule

20  been intended to apply whenever anybody asked for its

21  application, I expect that the draftsman would have said it was

22  always applicable.  If there was any rationale to make it

23  freely applicable, I suspect those who drafted the Delaware

24  local rules would have done so too in the case of amendments to

25  objections to claims.  So, Judge, we think the motion fails for

1  failure to demonstrate any reason for the relief being sought.

2           In terms of the relief being sought, I do wish to

3  underscore one thing that may not be so obvious and that is

4  that the debtors have materially receded from where they wanted

5  to go but not entirely.  In their moving papers the debtors

6  asked for relief which even if 7015 were applicable, couldn't

7  be granted.  In respect of claims that are subject of

8  objections for property -- excuse me, product identification,

9  statute of limitations or risk of harm, they wanted an absolute

10 injunction prohibiting any supplementation, amendment or

11 changes to those proofs of claim.  7015 wouldn't countenance

12 that at all.  It would just require claimants to come to court

13 for permission.

14          In respect of everybody else whose claims are not

15 subject of those objections, they sought to require them to

16 come to court for leave.  Again, 7015 couldn't be applicable to

17 those claims because it would only be applicable if there was

18 an objection that was -- in respect of those claims, making it

19 a contested matter if this Court sought to make it 7015

20 applicable to contested matters at all.

21          What the debtor's proposal today suggests is that

22 they henceforth require approval in respect of any amendments,

23 if I understood them correctly, regardless of what the outcome

24 of those objections were going forward.  Once the objections

25 have been resolved by settlement or by court order, there's no

1  basis to make 7015 applicable to those claims.  So we oppose

2  the relief, Your Honor.

3          THE COURT:  Mr. Bernick?

4          MR. BERNICK:  Yes, first, we did seek what could

5  fairly be characterized as strong relief at the outset in the

6  form of an injunction.  I would tell the Court in candor that

7  the precipitating fact that led to that request was what we did

8  think was untoward and that was that in connection with the

9  claims that were made on behalf of certain California claimants

10 where they previously in their questionnaires or their claim

11 forms had admitted as a fact that the same claim had previously

12 been brought in 1990 in connection with the original action

13 that was attempted to be filed.  In a claimed admission, it can

14 never really be taken back, that there was an effort to simply

15 file an amended claim form that might be tough to take it back.

16 We didn't think that that was appropriate and we didn't expect

17 that.  And that's really what led to the request for an

18 injunction.

19         We have receded from that position.  Mr. Baena says

20 that we receded and the answer is we absolutely did recede in

21 part because we felt that, in the sense as a practical matter,

22 it wasn't necessary to issue such strong relief in order to

23 accomplish the orderly process that we think should take place

24 here.

25         The suggestion is made that we still have not really

1  receded from that request for an injunction.  We have.  All

2  that we're asking is exactly what I described.  We're asking

3  for an order that says henceforth with respect to the closed

4  issues, any current claim that's pending where there's a desire

5  to supplement the basis for the claim, that there be a suitable

6  request made before the Court and the Court then can rule on

7  it.  That is the sole relief that we're requesting here.

8        Now, it does seem that there is still an opposition

9  to that what I would think is a fairly modest proposal.  The

10  opposition suggests that by treating, by -- what the Delaware

11  local rule says that 7015 is not automatically applicable to

12  amendments of the claims themselves, that that then requires or

13  implies a cause requirement.  That is to say that it should be

14  applied requires a demonstration of cause and the cause must be

15  some untoward conduct or unexpected conduct.

16        Now, I don't know where the cause requirement comes

17  from but it's really somewhat irrelevant.  I do know that cause

18  doesn't mean or is not confined to the remediation or relief

19  from untoward conduct or unexpected conduct.  Cause can mean a

20  lot of different things and frankly, wherever the cause

21  requirement comes from, it has clearly been met and is in our

22  papers.  We believe that time has come for the record to be

23  closed with respect to the closed issues.  And all that this

24  order does is to assure that it is closed unless somebody comes

25  to the court, makes a suitable demonstration that it ought to

1  be -- that it ought to remain open.  But the time has come.

2          Now, this then directs me or causes me to respond to

3  the characterization of the history here which I won't spend a

4  lot of time on.  And that history is one in which the debtor

5  notwithstanding what we believe to be the appropriate, the

6  originally intended process has sat and waited for people to

7  basically amend their claims as they have seen fit and has not

8  raised problems.  Why?  Because discovery did remain open.

9          We gave serious consideration coming before the Court

10 at a much earlier date and saying, you know, they've long had

11 the opportunity under the case management orders to -- the

12 application to come forward and complete the record, you know,

13 enough is enough.  But because discovery remained open, we

14 predicted that the Court would say so long as discovery is

15 open, people can amend their claims.

16         We waited until after discovery closed before we made

17 this argument because at that point, there is cause for cutting

18 things off.  It is called a discovery cutoff.  It's a basic

19 feature of the administration case.  It is part of the way that

20 this case has been administrated -- administered.  That is, it

21 follows classic pre-trial litigation process.  So at a certain

22 point the factual record has to be closed.  Otherwise, we have

23 a moving target on issues that are coming to trial, we'd never

24 reach the end of the day.  So at the time that the discovery

25 cutoff was reached, we then filed this motion.

1          There's a suggestion that's been made that somehow
2  these amendments were necessary for settlement purposes by
3  requiring court approval or any further amendments, that
4  somehow this impairs settlement.  There's nothing of the kind.
5  Anybody's whose claim is still pending, has not actually been a
6  consummated or a finally agreed settlement always has the
7  latitude presumably to continue to litigate if they want.  And
8  as a result, notwithstanding the fact that there are and have
9  been and I hope will continue to be settlement discussions, to
10 the extent that the discovery rules are otherwise -- they allow
11 for discovery, that is, prior to discovery cutoff, if people
12 wanted to amend, they could amend and we didn't say well, you
13 can't do it because you're settling, nor did we say -- nor do
14 we believe it was necessary for the settlement process to take
15 place.

16         But that discovery cutoff is now ended and there is
17 no demonstration that somehow amending a claim is necessary for
18 settlement discussions to proceed.  That's a total non --

19         THE COURT:  Well, Mr. Bernick, let me cut you off
20 because I think there's a long and short answer to this.  It
21 seems to me that as Mr. Speights said earlier what's good for
22 the goose is good for the gander.  I've already said that the
23 debtor is stuck with what it said in the 15th omnibus.  It
24 seems to me that the claimants are stuck with what they've said
25 in their proofs of claim.  And to that end, if they want to

1 change the proofs of claim, at this point coming to the court

2 with a request to change that proof of claim is appropriate

3 because of a few things, one of which is that the debtors may

4 very well need then to amend their 15th omnibus in light of

5 that amendment to the proof of claim.

6          And I can assure you that if the amendment to the

7 proof of claim is granted, the debtors would also be given an

8 opportunity to file a modified objection to that proof of claim

9 in light of the amendment because that will, in fact, be some

10 new evidence or new claim that the debtor may need to consider

11 and it will start a whole host of litigation processes all over

12 again, none of which the Court will be entirely happy to see.

13          And so at this point in time I think that anything

14 that is encompassed within that 15th omnibus objection should

15 be just what it is, the claims and the objections to the

16 claims.  So for the entire 15th omnibus objection, any claim

17 that is encompassed within that 15th omnibus it seems to me

18 should be just what it is as of today.  And if anybody wants to

19 file an amendment to the claim, they should approach the Court.

20          And if the debtor wants to file an objection to the

21 amendment -- I'm sorry, not to the amendment, but to the proof

22 of claim the way it exists right now, the debtor should have to

23 come to court too.  And frankly, as everybody has been arguing

24 today, this is a court of equity and this is the one instance

25 in which I'm going to exercise this Court's equitable powers.

1  So I wholly agree.  I think Rule 7015 is applicable and should

2  be applicable to the entire 15th omnibus and I am going to

3  impose that ruling on everyone.  So if you will draft an

4  appropriate order, I will sign it.

5           Anyone who wants to amend any claim that is

6  encompassed within the 15th omnibus has to ask leave of court

7  and then if, in fact, an order is granted that permits that

8  objection -- permits that amendment, then the debtors will be

9  given an appropriate opportunity to file a modified objection

10 to that amended proof of claim because that too will be

11 appropriate given the amendment to the proof of claim.  And you

12 can build time frames into that if you choose to do so.  If you

13 don't need to, I can take those one at a time.  But if you

14 choose to do it, that's fine too.

15           MR. BERNICK:  We will submit an order, Your Honor.

16           THE COURT:  All right.

17           MR. BERNICK:  I think that that's all that we had.

18           THE COURT:  Just a minute.

19           MR. SPEIGHTS:  Before Mr. Bernick leaves, Your Honor,

20 I realize he announced earlier he was languid but I think this

21 will unlanguidate him.  I am not seeking a continuance of the

22 Anderson certification hearing.  That is next Friday, a week

23 from this Friday, originally it was set for July 6 which was

24 appropriate and Your Honor asked if we could do it on the 8th

25 and I told you that that would suit me and I am still available

1 on July 8.  I do want to bring to the Court's attention that

2 Mr. Fairey who has worked on this case with me since 1992 is

3 having surgery that day and is not available.  I did not know

4 that.

5        THE COURT:  On which day?

6        MR. SPEIGHTS:  On the 8th and is unavailable.  And I

7 tell you that it is of some concern to me that I will have to

8 go forward without Mr. Fairey.  But I did not have the temerity

9 to come along and hear Mr. Bernick scream if -- that I'm trying

10 to somehow extend this matter further.  He's out of pocket for

11 ten days, but I tell Your Honor, if by chance Your Honor now

12 upon retrospect thinks this is not the best day in your

13 schedule, it would certainly be far easier on me if there was

14 another day, I would not seek any additional discovery or

15 advantage because of it.  But if Your Honor tells me I'm set

16 for that, that's the time I have and Mr. Bernick, if he says

17 this is the only time I have, I'm prepared to go forward on the

18 8th.  I made my mistake when I said I was available on the 8th

19 without checking with Mr. Fairey.  But in any event, if it has

20 to be, it has to be.

21        MR. BERNICK:  What's Your Honor's pleasure?  We have

22 no problem with Mr. Speights' request.  So whatever Your

23 Honor's pleasure is.  I've got my calendar right here.

24        THE COURT:  I just have to go through these dates one

25 at a time, Mr. Bernick, to see what I can schedule.  I think

143

1 the first day I have available is July the 5th.

2      MR. BERNICK:  July the 5th.  Well, that's available

3 for me.  I don't have any problem with that.

4      THE COURT:  I'm looking for another Grace date in

5 June.  We may have had some that were cancelled.  I just can't

6 --

7      MR. BERNICK:  There was a Grace day on the 21st

8 that's probably been cancelled.  There is the omnibus on the

9 25th.  There was also a Grace day on the 26th I think.

10      THE COURT:  I'm sorry, 6/21, 6/25, we used the 26th

11 already.  No, the 25th is not a Grace day.  That's all my

12 Delaware, all of my Delaware cases.

13      MR. BERNICK:  I tried to say it.  Maybe I made a

14 mistake.  That's a Grace omnibus day --

15      THE COURT:  -- omnibus day.

16      MR. BERNICK:  -- so that is Delaware, right.

17      THE COURT:  21st --

18      MR. BERNICK:  But that's a Delaware day in Pittsburgh

19 if memory serves.

20      THE COURT:  Okay, are we using three days for a

21 Federal -- for the plan hearing, do we know on the 20th?  We

22 don't know?  It does look as though the 21st was cancelled,

23 June 21st.  That might be better than --

24      MS. BAER:  Your Honor, this is Janet Baer.  We have

25 matters on the 21st.  That's when the personal injury motion to

1  compel or protective orders with respect to discovery are set.

2          THE COURT:  Oh, okay.

3          MR. BERNICK:  How much time does Your Honor have for

4  that?  I just don't know how -- well --

5          THE COURT:  On July 5th?

6          MR. BERNICK:  No, on the 21st of June I'm just

7  wondering, I don't even know --

8          THE COURT:  I have the whole day reserved for Grace.

9  Ms. Baer, do you know how long that -- you've got reserved for

10 PI matters?

11         MS. BAER:  I know the whole day is reserved.  I would

12 be very surprised if the matter that's up would go more than a

13 couple of hours.

14         MR. BERNICK:  Do you know, Jan, more specifically

15 what it's about?

16         MS. BAER:  This is our interrogatories in our 30b6 --

17         MR. BERNICK:  Oh, right.

18         MS. BAER:  And they're going to be filing a motion

19 for protective order on June 4th.

20         MR. BERNICK:  Right.

21         MS. BAER:  So we haven't even seen what they're

22 filing yet.

23         MR. BERNICK:  Yes, but that is not, Your Honor, an

24 all day matter.

25         THE COURT:  Okay, how much time will you folks need?

1          MR. BERNICK:  You know, I always am wildly overly

2   optimistic.  I would say an hour and a half, but you said two

3   hours or two and a half hours, that would surprise me.  But I

4   guess that given our history here, that would not be shocking.

5   But that's certainly not all day and we could then have the

6   class certification matter taken up after that, again, if Your

7   Honor's schedule would permit it.

8          THE COURT:  Mr. Speights --

9          MR. BERNICK:  Otherwise, you know, we're satisfied

10  with July the 5th but I just -- you know, there's no magical

11  difference between the 21st and the 5th but I'm kind of focused

12  on a little bit is --

13         THE COURT:  No, it's just that the travel day would

14  be the 4th of July, that would be a really terrible travel day,

15  that's all.

16         MR. BERNICK:  Yes, that's not terrific.  And the

17  other thing is that if we could do it all on the 21st, that

18  would obviously just be more efficient.

19         THE COURT:  Mr. Speights?

20         MR. SPEIGHTS:  Well, Your Honor, an additional reason

21  why I was reluctant to say what I did, but I sincerely

22  appreciate Mr. Bernick and Your Honor, of course, trying to

23  accommodate me because of Mr. Fairey, we had originally set

24  this for all day and Mr. Bernick sort of expressed great

25  concern that we would take all day.  But I said that it's an

1 evidentiary hearing and I couldn't be restricted.  We had a lot

2 of stuff to put in.  So I am available on the 21st.  I am also

3 available the 5th.  I think I had 26 and 27 down as days but

4 Mr. Restivo says it's only the 26th.  The 27th, did you have as

5 a Grace day?

6          THE COURT:  No.

7          MR. SPEIGHTS:  Okay.

8          THE COURT:  I'm on my way to the Virgin Islands on

9 the 27th.

10          MR. SPEIGHTS:  I don't want to be meeting that

11 deadline, Your Honor.

12          THE COURT:  We could do it in the plane.

13          MR. SPEIGHTS:  The 5th is -- I don't know what the

14 situation is on the 21st.  Since Mr. Bernick and I are both

15 available on the 21st and the 5th, I'd like to set it down on

16 the 5th I guess unless upon checking, Ms. Baer, Mr. Bernick say

17 that they have discovered the other matter won't last but an

18 hour or two.  If that's the case, I'll do it on the 21st.

19          THE COURT:  I think the problem you're going to find

20 on the 5th is the travel day on the 4th of July.  That's going

21 to be an absolutely awful travel day.  I had to do that once

22 and it's just -- they cut the number of plane services down and

23 it's just a terrible travel day.

24          MR. BERNICK:  I'm guessing is -- I'm a little bit --

25 I've got my curiosity perked a little bit.  Your Honor's

1  typical rule on evidentiary matters is that matters are --

2  motions are resolved without the need for taking evidence

3  unless there's some specific need for evidence.  If I could

4  just inquire whether Mr. Speights actually intends to offer

5  evidence, that would have some significant bearing on the

6  period of time that this would take.  And, you know, it would

7  itself probably suggest that we have some need for some further

8  conversation about whether that evidence really is necessary.

9          MR. SPEIGHTS:  The answer is yes.

10          MR. BERNICK:  Well then I guess we're going to need

11  to know (a) I think we're going to need to know what that

12  evidence is, (b) it may require some -- or I would suggest to

13  Your Honor that it might be appropriate to have some call in

14  advance where we can talk that over with Your Honor to see --

15          THE COURT:  I think we should just get a pretrial

16  issued.  If that's the case, why don't we just get a pretrial

17  narrative?

18          MR. BERNICK:  Yes.

19          THE COURT:  I'm not sure why at this point I need to

20  get involved in your witness issues.  I think if we just get

21  some pretrial narratives filed, you folks ought to be able to

22  work out what issues -- if you've got depositions or something

23  you need to take of the witnesses, you've got between now and

24  then to do it.  Let me look at the next day.  Oh my, it's -- oh

25  no, that's just a motions day.  Gee, it looks like a Chapter 13

1 day, that's bad.  Maybe it's bad.  That means that we have a

2 lot of Chapter 11s filed.  I guess maybe that's good.

3        Mr. Restivo, do you happen to know whether on Friday,

4 June 22nd, either <u>Pittsburgh Corning</u>, <u>ARCO</u> and <u>GIT</u> will be

5 taking any time because we have the afternoon reserved for

6 those cases.  But the last couple of times pretty much

7 everything has come off the list.  What I'm trying to do is see

8 whether -- if we need to continue this Grace matter from the

9 21st on to the 22nd, we might have time.  But the morning is

10 caught up in my normal Chapter 11 motions day.

11        MR. BERNICK:  Yes, I would also -- I think I'm going

12 to have to be -- I have other commitment in New York on the

13 22nd and I'm not sure that I'd be able to get back to

14 Pittsburgh by the afternoon.  The 22nd is a bad day for me.

15        THE COURT:  All right.

16        MR. SPEIGHTS:  Your Honor, I'm the one who has to fly

17 --

18        MR. BERNICK:  What I would suggest -- I'm sorry, you

19 wanted to say something?

20        MR. SPEIGHTS:  I was just going to say I'm the one

21 who has the most difficult trial schedule of anybody who

22 appears before you, I think.  And if the 5th is the only

23 alternative so we have adequate time, I'll make some

24 arrangements to get here for the 5th.  In the meantime, I'm

25 going to talk to Mr. Restivo about the 26th and scheduling

1 other matters because Mr. Restivo and I now have got to decide

2 on doing discovery vis-a-vis Canada in light of the earlier

3 ruling.  So I'm a little concerned.

4       MR. RESTIVO:  On the 26th you were going to let us

5 know after you check whether Fairey was available.  I assume

6 he's available, so the 26th subject to what discovery we need,

7 we can do what we suggested we would do on the 26th which is

8 City of Philadelphia trial, statute of limitations and we would

9 argue the Canadian statute of limitations and ultimate statute

10 of limitations.

11       THE COURT:  So that's likely to take all day.

12       MR. SPEIGHTS:  Right.

13       THE COURT:  So even if we -- so we probably can't

14 continue.  Mr. Speights, maybe the thing to try to do would be

15 to start on the 21st and see if we just can't get done.  And if

16 absolutely need be, see if we have to reserve for another day.

17 If you're going to be here on the 26th anyway -- Mr. Bernick,

18 what's your schedule on the 26th?

19       MR. BERNICK:  The 26th is all right.  The 26th is all

20 right.

21       THE COURT:  Maybe what we can do if we absolutely

22 have to is take the 26th a long day if need be and finish the

23 afternoon of the 26th.  But that will be pretty tough if we're

24 arguing two different matters, having one trial and finishing

25 this one too.

1    MR. SPEIGHTS:  I'm not really sure until I talk with

2 Mr. Restivo how we're going to do everything to get Canada up

3 then, but I have an open mind about it, we can talk about it.

4    MR. RESTIVO:  Not to be selfish with my colleagues, I

5 really viewed the 26th as our day to do Canada and to try the

6 City of Philadelphia case.  My guess is that would take most of

7 the day.

8    THE COURT:  Okay, all right, well, as I said, at the

9 moment I've got both the 21st that's reserved for Grace and I,

10 right now I have the 5th of July so --

11    MR. SPEIGHTS:  Can Mr. Bernick and I confer and then

12 let you know which one of those days --

13    THE COURT:  Yes.  I'll have the 5th marked off to

14 reserve for this day.  It's just that I really think if it's

15 possible to accommodate both on the 21st, it would be a better

16 choice.

17    MR. SPEIGHTS:  I'll assure you Mrs. Speights agrees

18 with you, Your Honor.  The 21st, I was looking at my calendar,

19 what time is the existing hearing on the 21st?

20    THE COURT:  Ms. Baer, do we start at nine on the

21 21st?

22    MS. BAER:  Yes, we do, Your Honor.

23    MR. SPEIGHTS:  And if we go on the 21st, whenever

24 that hearing is done, we would be up next?

25    THE COURT:  Well, we could do that.  We can also back

1 it up and start earlier in the morning so that we can get more

2 time in on the 21st too.  Because I assume everybody is going

3 to have to come in the night before anyway.  And that's fine

4 with me.  I can get someone in as early as eight so that we

5 could start earlier and push the thing that's currently set at

6 nine till the afternoon, if need be, or start it at eight if we

7 have to and start earlier so that we could get at least another

8 hour or an hour and a half in.

9        MR. BERNICK:  I'd have to defer to --- if that's

10 convenient with the Court.

11        MR. SPEIGHTS:  I probably would prefer -- I don't

12 even know who the other parties are.  I probably would prefer

13 if the other matter could start at eight so we wouldn't lose

14 our continuity on ours.  But I'm happy to -- on the 21st I'm

15 available from sunset till I fall over.

16        THE COURT:  Okay, I'll put down that we're going to

17 reserve the 5th for Grace, at least temporarily until I hear

18 back from you folks.  And if you decide that you want to do it

19 on the 21st, then I think you'll need to let Ms. Baer know so

20 that she can re-notice that hearing to start at what time, Ms.

21 Baer, let's say 8:30.  People really don't like coming in at

22 eight.  We probably should make it 8:30.

23        MS. BAER:  We'll start with personal injury.

24        THE COURT:  We'll start at 8:30 with the PI.  That's

25 assuming that Mr. Speights and Mr. Bernick want to use the 21st

1 for their trial on the class certification.

2          MS. BAER:  Okay.

3          MR. BERNICK:  Right.  Appropos of that, can we just

4 set a date for -- maybe this would be a way to proceed and I'll

5 just ask Mr. Speights and the Court whether this works.  Mr.

6 Speights and I, I'm sure, can figure out a suitable arrangement

7 for exchanging information on any evidentiary matters that are

8 to be presented to the Court on the 21st.  But I do think that

9 there is some reasonable prospect that we need to get Your

10 Honor's input on whether the proffers that are intended are

11 really necessary, as to whether we have to have live testimony

12 for that purpose.  I believe the practice of the case is that

13 many things could be the subject of live proof but they rarely

14 are given Your Honor's procedures here.

15          Can we have a little bit of time?  It originally had

16 been set aside on the 8th for telephonic hearing just to

17 straighten out what is going to happen on the 21st.  And by

18 that time, presumably Mr. Speights and I can have gotten

19 together on what it is that he intends to offer live.

20          THE COURT:  Mr. Speights?

21          MR. SPEIGHTS:  That's fine with me, Your Honor.

22          THE COURT:  Okay, we'll need -- let's speak at nine

23 o'clock then?

24          MR. BERNICK:  Okay.

25          THE COURT:  And I'll reserve an hour for that

153

1  purpose.

2          MR. BERNICK:  Okay.

3          THE COURT:  All right, let me make a note.  So

4  that'll just be a telephonic at nine o'clock and you'll tell me

5  then whether it's going to be June 21st or July 5th, okay?

6          MR. BERNICK:  We'll be able to do that as well,

7  right?

8          THE COURT:  Yes.  And, Ms. Baer, will that be enough

9  time for you to notify everyone else about the change in time

10 to 8:30 if, in fact, they want to start the trial on June 21st?

11         MS. BAER:  I don't think that will be a problem, Your

12 Honor.

13         THE COURT:  All right, okay, so I have -- I'll

14 reserve July 5th starting at nine, I'll reserve June 21st

15 starting at 8:30, I'll cancel June 8th except for a telephonic

16 that will start at nine o'clock simply to discuss the witnesses

17 and trial process on the class certification issue.  Okay, Mr.

18 Restivo?

19         MR. RESTIVO:  Two things, Your Honor.  First, for

20 whatever it's worth, I'm kind of glad the way you came out on

21 Item 4 of the agenda because it was going to be real hard for

22 me to go back saying I lost Item and then I lost Item 4 too.

23 The goose and gander rule makes it easier to go back.

24         Secondly, in terms of the dates, June 26th is

25 property damage and Mr. Speights and I are going to need to

1  talk a little bit about Canada.  July 30, 31 and August 1 will

2  be property damage, hopefully that's left.  And we will

3  correspond with the other attorneys for the other parties and

4  submit to the Court a schedule.

5          THE COURT:  Okay.

6          MS. BAER:  Your Honor, I have to inject one thing and

7  that is July 30th is, in fact, reserved for personal injury and

8  we do have on our personal injury CMO a status hearing on

9  personal injury.

10          THE COURT:  All right, will you need it for anything

11  other than that?

12          MS. BAER:  We anticipate there will be some issues at

13  the status hearing, but there's no specific motions or anything

14  like that that's being scheduled for that day.

15          THE COURT:  All right, so if we start the property

16  damage at eleven on July 30?  Give you from nine till eleven?

17          MS. BAER:  I believe that works, Your Honor.

18          MR. BERNICK:  The need for time always ends up

19  changing as we go forward in unpredictable directions, so I

20  think that those would make sense now and if things change,

21  we'll certainly be able to let the Court know.

22          MR. RESTIVO:  Property damage is willing to cede two

23  hours at this point to bodily injury.  We're not committing to

24  anything more than that, Your Honor.

25          THE COURT:  It's their day, Mr. Restivo.  You better

1 --

2      MR. RESTIVO:  They gave it to us, Your Honor, and we

3 took it.  Thank you, Your Honor.

4      THE COURT:  All right, wait a second.  I have one to

5 go over with you folks too but let me make a note here first.

6 All right, I never go to with the omnibus potential dates for

7 the personal injury trial dates and I have a list of dates but

8 I've got a whole slew of them.  Is it easier if I send them to

9 -- have Ms. Baker send them to Mr. O'Neil or to -- I'm sorry,

10 to Ms. Baer and have her circulate them to see what you think?

11      MR. BERNICK:  I don't know how many people are

12 actually on the phone at this point and I think that might be

13 the easiest thing to do.

14      THE COURT:  All right, my expectation is that I will

15 try to commit -- I'll try to give you three days a week for as

16 long as this is necessary to go on so that we could do these

17 pretty much in consecutive weeks.  Most of these will be

18 Monday, Tuesday, Wednesday dates.  I'm teaching on Thursdays

19 still so that kind of makes Thursdays a tough day for me

20 because it breaks up the afternoons and I don't have any

21 control over the teaching dates.  So I'll try to do the Monday,

22 Tuesday, Wednesday dates.  The difference in that will be on my

23 trips to Delaware.  I won't be able to do Monday, Tuesday dates

24 so that week I may elect not to do dates.  I am sort of fooling

25 around with those but I'll show you the dates that I've got

1  proposed for now.  There may be a few of these things will end

2  up having to get cancelled.  It's a little tough to commit

3  three days a week for two months of my life that far in advance

4  but I'll do the best I can.  I thought if we all block these

5  dates out, then we'll have as few conflicts as possible and

6  we'll have to see how they go.

7           I'll start with the first -- actually January 14th is

8  the first day that I will start with and I'll go into May and

9  surely we ought to be able to come up with enough trial dates

10 to get this done between January and May, okay?  All right,

11 I'll send Ms. Baer that list then and see what we can do to get

12 it circulated.

13           MR. BERNICK:  Thank you very much, Your Honor.

14           THE COURT:  Is there anything else then, gentlemen,

15 ladies?

16           MR. RESTIVO:  Thank you, Your Honor.

17           MR. SPEIGHTS:  Thank you, Your Honor.

18           THE COURT:  All right, we're adjourned.  Thank you.

19                     * * * * *

20

21

22

23

24

25

1                    C E R T I F I C A T I O N

2

3          We, TAMMY DeRISI and MARY L. POLITO, certify that the

4    foregoing is a correct transcript from the official electronic

5    sound recording of the proceedings in the above-entitled

6    matter, and to the best of our abilities.

7

8    /s/ Tammy DeRisi

9    TAMMY DeRISI

10   J&J COURT TRANSCRIBERS, INC.

11

12

13   /s/ Mary L. Polito              Date:  June 7, 2007

14   MARY L. POLITO

15   J&J COURT TRANSCRIBERS, INC.

16

17

18

19

20

21

22

23

24

25

**J&J COURT TRANSCRIBERS, INC.**