# EXHIBIT 3

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| W. R. GRACE & CO., *et al.* | ) | Case No. 01-01139 (JKF) |
|  | ) | (Jointly Administered) |
| Debtors. | ) |  |
|  | ) | **Related Docket Nos.: 14903** |

**W.R. GRACE & CO.'S RESPONSE TO EMERGENCY MOTION OF THE OFFICIAL
COMMITTEE OF ASBESTOS PERSONAL INJURY CLAIMANTS AND DAVID T.
AUSTERN THE COURT APPOINTED LEGAL REPRESENTATIVE FOR FUTURE
ASBESTOS PERSONAL INJURY CLAIMANTS TO COMPEL PRODUCTION OF
COMPLETE NAVIGABLE DATABASE**

The Official Committee of Asbestos Personal Injury Claimants ("PI Committee") and the

Future Claimants' Representative ("FCR") have come to the Court seeking "emergency" relief.

There is no "emergency." The PI Committee and the FCR offer no rationale for why this motion

must be given emergency status -- nor could they, as they have known for at least a year that the

Court-appointed claims agent, Rust Consulting, Inc. ("Rust"), has not coded the attachments to

the W.R. Grace Asbestos Personal Injury Questionnaire responses.

And on it merits, the motion is no less perverse. At bottom, the motion seeks relief for a

problem that, as this Court well knows already, is of the Claimants' own creation. No one, at

this point, can forget how strenuously Grace sought an Order requiring all answers to be marked

on the face of the Questionnaire, rather than being buried in a mass of undifferentiated

attachments. The PI Committee turned a deaf ear to Grace's statements that it could not code all

of these attachments into an objective database. The PI Committee *opposed* all requests that the

Questionnaire be filled out, insisting instead that the Claimants be permitted to submit

attachments without restriction.

Ultimately, the Court ordered that, to the extent the law firms wished to submit answers

to the questions contained in the Questionnaire by attachment, they had to clearly cite the precise

pages on which the specific answer could be found, no more no less. Several law firms, however, to varying degrees have continued in their failure to comply, affecting thousands of Questionnaires. The PI Committee and the FCR apparently have done nothing to deter such non-compliance.

Under these circumstances, Grace has had no choice but to analyze attachments in connection with other expert work. The FCR's and the PI Committee's true intention is to cloak what is obviously a premature effort to obtain expert discovery through the specious device of claiming that Grace is responsible for a problem that the Claimants themselves created--notwithstanding Grace's repeated efforts to avoid it.

## ARGUMENT

### A. At All Times, The PI Committee And Rust Have Known That The Navigable Database Did Not Include Information Contained Solely In Attachments.

In their Motion, the PI Committee and the FCR imply that the first time they learned that the navigable database did not include information that they set forth in the attachments was on February 23, 2007, when Grace revealed that it had to retain a firm that specialized in the coding of medical attachments as part of its expert work. *See* 3/19/07 Emergency Motion of the Official Committee of Asbestos Personal Injury Claimants and David T. Austern the Court Appointed Legal Representative for Future Asbestos Personal Injury Claimants to Compel Production of Complete Navigable Database ("3/19/07 Motion to Compel") at ¶ 3. Nothing could be further from the truth. The PI Committee and the FCR have known *for at least a year* that the navigable database would not contain information provided solely in attachments appended by Claimants to their Questionnaire responses, but not included on the face of the Questionnaire.

First, Grace invited the PI Committee and the FCR to participate in the process by which Rust, the Court-appointed Claims Agent, would capture the data from the Questionnaire

2

responses before the work to compile the database even began.  On January 31, 2006, Grace

provided the preliminary protocols that Rust would use to create the navigable database to the PI

Committee and the FCR, and asked that they provide any questions or comments regarding those

protocols.  *See* 1/31/06 A. Basta email (attached as Ex. 1).  Those protocols made clear that only

data contained in the Questionnaires themselves would be coded and that information contained

in attachments would not be contained in the database.  Critically, the database protocols did not

contain any processes or procedures for the coding of attachments.  Neither the PI Committee

nor the FCR raised the issue of whether attachments would be coded, or suggested that the

attachments should be coded.  Instead, the PI Committee simply stated that "[w]ith respect to the

protocols for reviewing the questionnaires," the Committee has:

> [N]o obligation to improve your discovery efforts and our experts will identify the
> flaws in Rust's approach and any reliance your experts place upon the database
> Rust constructs at the appropriate time in the process, which in our view is in
> connection with the expert reports from our estimation experts.

2/7/06 N. Finch email (attached as Ex. 2).  They chose instead to position themselves to disrupt

the use of the database.

Nevertheless, Grace provided the PI Committee and the FCR yet another opportunity to

join this database process -- and again made them aware that attachments were not being

included in the navigable database when it submitted to the PI Committee and the FCR updated

data protocols in October 2006.  *See* 10/31/06 A. Basta email (attached as Ex. 3).  Following

that, in response to a request from the FCR and the PI Committee, Grace agreed to a site visit

and meeting between Rust and the PI Committee's and the FCR's experts and lawyers.  In early

November 2006, the PI Committee, the FCR and their experts conducted this site visit to Rust

during which they met with the Rust personnel responsible for developing and implementing the

data capture protocols and had an opportunity to ask questions regarding those protocols.  It

3

should have been clear from the revised protocols and their meeting that Rust was capturing only information written on the face of the Questionnaires and was not coding any attachments that it received.

Critically, in July 2006, Grace informed this Court, the PI Committee and the FCR that attachments were not being coded by Rust personnel when it sought an order prohibiting Claimants from responding to the Questionnaire by means of attachment. *See* 7/17/06 Motion to Compel Asbestos Personal Injury Claimants to Respond to the W.R. Grace Asbestos Personal Injury Questionnaire ("7/17/06 Motion to Compel") at 21-24 (Docket No. 12823). Yet again, the PI Committee and the FCR did not seek an order requiring all attachments to be coded, nor did they ever question whether the attachments would be coded.

Finally, to the extent there was any question as to what was included in the navigable database, that was clarified by the actual rolling production of the navigable database. Grace has been producing the database to the PI Committee and to the FCR *at least once a month since August 15, 2006.*[1] Nowhere in any of these database updates were coded attachments. Thus, it is clear that at all relevant times, the PI Committee and the FCR have known that the database consisted solely of information that appears on the face of the Questionnaire responses and yet have not objected until now, less than 3 weeks before the final database is due to be delivered. There is no emergency -- just a late effort at gamesmanship on the part of the PI Committee and the FCR.

### B.    Grace's Strenuous Efforts to Avoid The Attachment Problem, The Court's Ultimate Order, The Continued Non-Compliance, And Grace's Current Review Of Certain Attachments.

---

[1]    Grace has produced the database to the parties to the estimation on the following dates:  August 15, 2006; September 7, 2006; October 11, 2006; November 17, 2006; December 13, 2006; December 20, 2006; December 27, 2006; January 9, 2007; February 8, 2007; February 20, 2007; February 26, 2007; and March 2, 2007.

4

The attachment problem is a separate problem and the history of that problem is well-known to the Court. Specifically:

- When the Claimants filed their PIQs there were huge attachment problems. Grace brought this problem to the attention of the Claimants immediately by sending a letter to all Claimants' counsel. In that letter, Grace stated:

  > All persons who complete the Questionnaire must answer all questions asked as completely and accurately as possible. *See* Questionnaire at i. ***Specifically, questions must not be answered by means of attaching documents.*** While documentation supporting a person's claim is required, Questionnaire at ii-iv, supporting documentation may not be submitted in lieu of answering the questions contained in the Questionnaire.

  2/6/06 Ltr. from B. Harding (attached as Ex. 8).

- Grace also brought the attachment problem to the Court's attention as early in the process as was practicable. Grace first raised the issue in a status report it filed on March 20, 2006. *See* 3/20/06 W.R. Grace & Co.'s Status Report Regarding Completion of the W.R. Grace Asbestos Personal Injury Questionnaire ("3/20/06 Status Report") (Docket No. 12093). In the 3/20/06 Status Report, Grace stated:

  > Rust also has observed that a large number of Questionnaires are being responded to in whole or in part via attachment, with the response, "see attached" .... Providing the requested information by means of attachment instead of completing the Questionnaire itself is highly problematic .... [P]roviding answers to portions of the Questionnaire solely by means of attachment makes it difficult, if not impossible, to discern to which question the information contained in the attachment responds .... [Further,] the purpose of the Questionnaire is to understand what the *claimant* believes is the claim, not Grace's guess based upon attachments.

  *See* 3/20/06 Status Report at 3-4.

- Grace again brought the problem to the Court's attention at the June 19, 2006 omnibus hearing. *See* 6/19/06 Hr'g Tr. at 27-29 (discussing deficiencies in Questionnaire responses, including use of attachments as substantive responses).

- Within a week of the Questionnaire submission deadline, Grace filed the 7/17/06 Motion to Compel. The issue of whether response by attachment was appropriate was extensively briefed over the next two months. *See* 7/17/06 Motion to Compel at 20-27; *see also* 8/25/06 Debtors' Reply to Various Responses to Debtors' Motion to Compel Asbestos Personal Injury Claimants to Respond to the W.R. Grace Asbestos Personal Injury Questionnaire at 6-8 (Docket No. 13067); 9/7/06 Summary of Issues Not Resolved in Mediation for W.R. Grace's Motion to Compel (Docket No. 13111).

- While ultimately the Court ruled that Claimants could submit responses by means of attachment, it placed strict limitations on the manner in which such responses could be provided, stating:

> [I]f a response is made by way of an attachment, the attachment must have the answer to the question, must be in a recognizable, legible format that are either numbered (whether by Bates number or some other appropriate numbering system or method) or otherwise identified (such as behind an exhibit tab) and the response must reference clearly the specific page(s) of the attachment so that the Debtors understand which page(s) of the attachment provides the answer to a specific Question in the Questionnaire. Pages that do not contain the answer should not be referenced.

> *See* 10/12/06 Order Concerning Debtors' Motion to Compel Asbestos Personal Injury Claimants to Respond to the W.R. Grace Asbestos Personal Injury Questionnaire at ¶ 2 ("10/12/06 Order") (Docket No. 13393).

Notwithstanding all these efforts there continue to be compliance problems. Several of the firms still fail to comply with the attachment protocol, in varying degrees, and there is no evidence that the PI Committee or the FCR have done anything to reign in this conduct. For example, the law firm of Kelley & Ferraro, which has submitted *over 41,000 Questionnaires*, answers questions regarding all Claimants' medical information by stating "[s]ee ILO, PFT, Causal Report attached to original questionnaire." *See* Supplemental PIQ of R.M. at WR GRACE SDA 010410-0009 -- 010410-0017 (attached as Ex. 4). But, each Claimant often has more than one medical report attached to his or her original Questionnaire, making it impossible to determine which is intended to respond to a given question. *See* PIQ of R.M. at WR GRACE PIQ 28491-0026-28491-0029 (attaching reports of Dr. L.C. Rao and Dr. Alvin Schonfeld) (attached as Ex. 5). Kelley & Ferraro neither "number[s]" or "otherwise identifie[s]" which attachment contains the responsive information. Other firms have similarly responded. *See, e.g.*, Motley Rice Supplemental Questionnaire Response (answering questions by stating, "[n]o additional information at this time -- see documents previously provided on all," and "see

6

medical records attached to Q") (attached as Ex. 6); *compare* PIQ of H.A. at WR GRACE PIQ 62495-0021, 62495-0025-62495-0028 (attached as Ex. 7) (attaching reports of Dr. Alvin Schonfeld and Dr. Jay Segarra).[2] Thus, deciphering which attachments respond to each question becomes even more labor-intensive and burdensome.

Faced with this situation, Grace has had no choice but to try to capture attachment information by some other means. It was never contemplated that Rust would code attachments, and it is beyond their expertise to do so. Therefore, Grace has had to retain other experts for the purpose of coding the attachments. The material that has been generated as the result of this expert analysis will be provided in a timely fashion and upon a schedule to which the parties to the estimation agreed.

As in many cases, the parties to the estimation, including the FCR, the PI Committee, and Grace, entered into a stipulation regarding the discoverability of materials considered by experts. The stipulation, which was filed with this Court, provides that:

> Simultaneous with the service of all expert reports, and except as provided in paragraph 2 below, the parties shall produce the specific documents, data, and written information that the expert directly relied upon in forming his or her expert opinions in this matter. *To the extent that the disclosures include exhibits, information, or data processed or modeled by computer at the direction of a disclosed expert in the course of forming the expert's opinions, machine readable copies of such exhibits, information, or data shall be produced.*

---

[2]    Certain firms supplemented their responses by providing an EXCEL spreadsheet containing responses for all Claimants. In such cases, while Rust has not coded the information provided in the spreadsheets, it has provided copies of the spreadsheet in native format to the parties for use in their analyses.

Due to its volume, Grace has provided only an excerpt of the Motley Rice Supplemental Questionnaire spreadsheet as Exhibit 6. The spreadsheet, which runs 1125 pages, is comprised of 20 columns. Grace has included only a single page of the spreadsheet and only the following columns in Exhibit 6: "Last Name"; "First Name"; "Are you aware of any relationship between the MD and legal counsel"; "Part V"; and "Pathology for Meso Claimants."

Other examples of law firms whose supplemental responses do not comply with the 10/12/06 Order or who did not supplement their original responses to bring them into compliance are: The Ferraro Law Firm; Weitz & Luxenburg; The Law Offices of Peter G. Angelos.

7

10/2/06 Stipulation Regarding Expert Discovery at ¶ 1 ("Expert Stipulation") (Docket No.13337) (emphasis added). The materials at issue, namely the results of the attachment coding, being performed at the direction of Grace's estimation and non-estimation experts, fall squarely within the definition of materials that are to be turned over simultaneously with the production of expert witness reports. The PI Committee and the FCR as signatories to the Expert Stipulation (and indeed as the main proponents of the agreement) cannot simply ignore its provisions because they want the data now.[3] Thus, the request for production of the results of the coding of the sample simply is premature. The PI Committee and the FCR must await the production of Grace's estimation expert reports, at which time they will receive the data collected from the attachment coding exercise, just as Grace must wait for the PI Committee and the FCR's estimation expert reports prior to obtaining any similar data from the PI Committee and the FCR.

**C.    The Requested Relief Is Yet Another Attempt To Create Enormous Expense And To Delay The Estimation Trial Further.**

The PI Committee and the FCR ask that this Court require that "[t]he information that is contained in the Questionnaires, supplemental Questionnaires *and all attachments* thereto shall be compiled into a navigable database and made available to any parties to the estimation proceedings, including those parties' experts and advisors on or before April 13, 2007." *See* [Proposed] Order Granting the Emergency Motion of the Official Committee of Asbestos Personal Injury Claimants and David T. Austern, the Court Appointed Legal Representative For Future Asbestos Personal Injury Claimants To Compel Debtors' Production Of Complete Navigable Database (emphasis added). Simply put, this is not realistic.

---

[3]    Notably, when asked by Grace whether they intended to turn over any coding of attachments their experts had performed, the PI Committee and the FCR refused.

As an initial matter, the practical impossibility of coding all attachments is evident when measured in terms of the sheer volume of documents involved. To date, Rust has received approximately 3.8 million pages of attachments accompanying Questionnaires for approximately 100,000 Claimants. To properly capture the data from all such attachments requires analyzing each attachment to determine the question or questions for which it is being submitted and then correlating each piece of substantive information with its corresponding database field. Such a task would require Grace to hire highly-trained personnel with experience coding legal and medical documents. The PI Committee's own estimation expert has recognized this, stating that to render the information from the Questionnaires:

> [T]he parties would have to retain expensive medical coders and doctors to help analyze hundreds of thousands of pages of medical records.

9/6/01 Affidavit of Mark Peterson at ¶ 30. This is why Grace requested that the Questionnaire be filled out -- a request that the Committee opposed.

But even if Grace were to hire such highly-trained medical and legal personnel, the time it would take to code all such documents could be years. For instance, as part of work undertaken at the direction of its estimation experts, Grace, using an outside vendor, has coded a sample of approximately 2,000 Questionnaire responses and their attachments. That work took 2 months and is still ongoing, as supplemental materials also must be coded. At that rate and given the approximately 100,000 Questionnaires that have been submitted to date, it would take an estimated 8 years to code all information contained in all attachments submitted in connection with the Claimants' Questionnaire responses -- a timeframe plainly incompatible with the Court's current schedule.

9

## CONCLUSION

There is no emergency, as the PI Committee and the FCR have been aware that the navigable database does not include information contained in attachments for well over a year. Simply put, if the PI Committee and the FCR wanted this information, they could have spoken up long ago. Their strategic ignorance should not be countenanced. When stripped down to the "real" relief requested, the PI Committee and the FCR's motion is nothing more than a transparent attempt to avoid the very terms of the Expert Stipulation that it so strenuously fought to obtain and to prematurely obtain certain materials that will form the basis for Grace's estimation expert report. The PI Committee and the FCR will get those materials in the time frame and under the terms to which it agreed when it became a signatory to the Expert Stipulation. Accordingly, Grace respectfully requests that the PI Committee and the FCR's motion be denied in all respects.

Wilmington, Delaware
Dated:  March 26, 2007

Respectfully submitted,

KIRKLAND & ELLIS LLP
David M. Bernick, P.C.
Janet S. Baer
Ellen Therese Ahern
Salvatore F. Bianca
200 East Randolph Drive
Chicago, Illinois 60601
(312) 861-2000


KIRKLAND & ELLIS LLP
Barbara M. Harding
David Mendelson
Amanda C. Basta
Brian T. Stansbury
655 Fifteenth Street, NW
Washington, D.C. 20005
Telephone:  (202) 879-5000
Facsimile:  (202) 879-5200

*and*

PACHULSKI STANG ZIEHL YOUNG JONES
& WEINTRAUB, LLP

Laura Davis Jones (Bar No. 2436)
James E. O'Neill (Bar No. 4042)
Timothy P. Cairns (Bar No. 4228)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899-8705
(Courier 19801)
Telephone: (302) 652-4100
Facsimile: (302) 652-4400
Co-Counsel for the Debtors and Debtors in Possession

DOCS_DE:126121.1