IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| | ) | |
| | ) | Case no. 01-01139 (JFK) |
| W.R. GRACE & CO., *et al.*, | ) | Jointly Administered |
| | ) | |
| Debtors | ) | Hearing Date: June 26, 2007 9:00 a.m. |
| | ) | |
| | ) | Agenda Item No. 6 |
| | ) | |

**DEBTORS' BRIEF ON OUTSTANDING ISSUES REGARDING NEWLY AMENDED CASE MANAGEMENT ORDER FOR THE ESTIMATION OF ASBESTOS PERSONAL INJURY LIABILITIES**

Two key issues appear to remain between the Debtors and the Asbestos Personal Injury Committee regarding the schedule established for the asbestos personal injury estimation proceedings as outlined in the Newly Amended Case Management Order dated June 1, 2007 [Docket No. 15923].[1] These issues are (i) the appropriate date for the cut-off of non-expert discovery, which the Debtors believe should be the same date as that for expert discovery, October 31, 2007; and (ii) the appropriate dates for briefing and hearing *Daubert* motions, which the Debtors believe should be completed prior to the commencement of the estimation trial.

Setting a cutoff for non-expert discovery earlier than October 31, 2007 makes absolutely no sense in light of the status of ongoing discovery and would be prejudicial to the Debtors. The non-expert discovery in this proceeding is every bit as vital as the expert discovery. The evidence that the Debtors expect to introduce at trial will not only be presented through experts but will likewise be presented through non-experts. As the Court is painfully aware, the Debtors have been in a continuous struggle with the PI Committee and various claimant's counsel over

---

[1] A copy of this Order is attached as Exhibit A.

completion of this discovery. The Debtors should not be unnecessarily limited in either time or scope to finally complete their fact discovery.

Likewise, it makes no sense to wait until the estimation trial to address *Daubert* issues. The anticipated *Daubert* motions will focus on core elements of the estimation modeling approaches used by the expert witnesses. These issues will implicate the bulk of the evidence which is likely to be relevant to the estimation proceeding. How the *Daubert* test interfaces with the complex modeling that will be introduced in the estimation proceeding, is a key issue that must be addressed before the trial commences so that the parties and their witnesses can be guided by the Court's determinations. Thus, the *Daubert* issues should be briefed and heard in advance of trial.

**Fact Discovery Is Progressing and the Debtors Should Have the Opportunity to Fully Complete Such Discovery**

1. Since August 31, 2005 when the Court first approved the personal injury questionnaire ("PIQ"), the Debtors have been engaged in extensive efforts to obtain real, empirical evidence of the scope of the Debtors' asbestos liabilities. The PI Committee and claimant's counsel have resisted this discovery at every turn, making Debtors attempt to obtain full and complete responses to the PIQ's as difficult as absolutely possible. The Court is fully aware of this history and the Debtors will not outline again every instance in which they have been forced to file motions to compel and other related pleadings in order to force claimants to provide the information the Court ordered be produced. Suffice to say, as outlined in the attached slide previously provided to the Court, the Debtors have now been engaged in a discovery process that has taken 23 months and it is abundantly clear that the claimants have still not fully answered the PIQ's as required by this Court's orders. (*See* Exhibit B.) Examples of the key issues that have aggravated the Debtors' attempt at fact discovery are outlined herein.

91100-001\DOCS_DE:128320.1

A. **Attachments**

2. The PIQ's require claimants provide specific information on the face of the PIQ so that the information can be assembled into a navigable database. However, from the moment that PIQ responses began to be returned, it was clear that attachments were going to be a huge problem. Very few claimants were answering key questions on the face of the PIQ. Instead, they were referring to attachments which included documents such as voluminous medical records and discovery responses from other cases. The attachments were not generally marked in a way to ascertain what questions they were responding to or where the answers were in the attachments. *See* Exhibit C for a chart summarizing what the Debtors found with respect to claimants' responses.

3. As a result, as early as February 6, 2006, only a couple of weeks after the original deadline for submitting PIQ responses, the Debtors sent a letter to all claimants' counsel indicating that supporting documentation may not be submitted in lieu of answering the questions on the face of the PIQ. Grace also brought the attachment problem to the Court's attention on numerous occasions including its March 20, 2006 Status Report [Docket No. 12093]; the June 19, 2006 Omnibus hearing [6/19/06 Hr'g Tr. at 27-29, attached as Exhibit D]; and its July 17, 2006 Motion to Compel [Docket No. 12823], which was extensively briefed.

4. On October 12, 2006, the Court issued an Order (the "Attachment Order") indicating that claimants could submit responses by means of attachments *only if* very strict requirements were followed, including that all responses reference clearly the specific page of the attachment where a specific answer was located. [Docket No. 13393]. The Court provided all claimants until January 12, 2007 to supplement their responses to the PIQ's to comply with the Attachment Order.

3

5. Despite the Attachment Order, only one firm made any attempt to comply. That was the Motley Rice firm who provided excel spreadsheets that attempted to tie its voluminous attachments to the PIQ responses. However, the information was so minimal that the PI Committee themselves told the Debtors not to bother inputting it into the navigable data base prepared for the estimation proceeding. Thus, as outlined on Exhibit B, of the approximately 79,000 relevant PIQ's that were returned, only 1,208 claimants actually complied with the Court's Orders and provided clearly ascertainable answers to the questions on the face of the PIQ's.

6. As a result of this non-compliance, Grace had to hire other experts for the purpose of coding attachments. And, due to the way the attachment information was provided, it has been a monumental task for Grace to ascertain whether responses to key questions on the PIQ's were provided in many instances. Thus, the Debtors' ability to review the PIQ information and provide that information to its estimation experts was greatly slowed.

**B.    B-Reads**

7. The Court first ordered claimant's law firms to produce medical documents that supported or contradicted the claimants' asbestos-related disease diagnoses in August 2005 when it approved the PIQ. Rather than comply with this Court-ordered discovery, many claimants objected, asserting a purported "consulting expert privilege." After extensive briefing, the Court overruled this objection in part and directed certain of the "B-read information" be produced. (*See* 12/22/06 Supplemental Order [Docket No. 14150] (the "Consulting Expert Order").

8. Rather than comply with the Consulting Expert Order, on January 2, 2007 certain claimant's firms moved for reconsideration, despite not meeting the proper legal standard for doing so. [Docket No. 14203]. The Court denied the motion for reconsideration, but agreed that documents produced pursuant to the Consulting Expert Order would be kept confidential. (*See*

3/6/07 Order [Docket No. 14763]). Thereafter, certain of the claimants' counsel then attempted to appeal the Consulting Expert Order. That request was denied as untimely. (*See* 5/2/07 Order Denying Motion of Baron & Budd et al. to Extend Time to Appeal. [Docket No.15499]).

9. After the passage of all deadlines with respect to providing the B-read information, almost no additional B-read information was provided. And, it was clear from the statements made by counsel and other discovery taken by the Debtors, that other B-reads for claimants do exist and are being withheld from production. As a result, on March 21, 2007 the Debtors filed yet another motion to compel compliance with the Consulting Expert Order wherein the Debtors, among other things, requested that claimants' counsel provide a privilege log outlining the B-reads being withheld from production on the basis of the consulting expert privilege [Docket No. 14929].

10. Debtors' new motion to compel was heard by the Court on April 13, 2007 at which time the Court agreed with the Debtors that they were entitled to ascertain what firms were withholding B-reads on the basis of the consulting expert privilege. (*See,* 4/13/07 Hr'g Tr. at pp 104-108 attached as Exhibit E). On May 8, 2007, the Court approved the form of interrogatories to be served by the Debtors on certain counsel for the claimants in this regard. Answers to these interrogatories are due on or about June 18, 2007.

11. The clear lack of compliance with the Consulting Expert Order also lead the Debtors, on May 18, 2007 to serve a second set of interrogatories on counsel for the claimants and 30(b)(6) deposition notices, aimed at ascertaining what efforts were undertaken by counsel more generally to respond to the PIQ's. This discovery has once again resulted in the filing of motions for protective orders by the PI Committee and various claimants' counsel. Those motions are set to be heard on June 26, 2007.

## C. Third Party Discovery

12. Commencing in November, 2005, the Debtors embarked on an aggressive discovery schedule to obtain information from diagnosing doctors, screening companies and other asbestos trusts regarding the methods by which diagnoses were performed, the veracity of the doctors and screeners who have submitted information in support of the claimants' claims, the existence of information about the claimants not otherwise provided in the PIQ responses and other relevant information about the claimants and their claims alleged against the Debtors. Like their efforts with respect to obtaining full responses to the PIQ's, this discovery has also been met with extreme resistance from the PI Committee, claimant's counsel and the third party discovery targets, necessitating litigation over several motions for protective orders. In addition, in some instances the deponents have asserted their Fifth Amendment rights against self incrimination. To date, most of the discovery from the doctors and screeners is complete. The other asbestos trust discovery, however, is ongoing and Debtors expect they will have to file motions to compel shortly as some of the trusts have not been entirely cooperative.

## D. X-Rays

13. After receiving and reviewing the initial PIQ responses, it appeared that approximately 9,457 claimants were alleging non-mesothelioma malignancy claims. Grace identified approximately 5,439 claimants who alleged that they had radiological evidence to support their contention that their cancer was attributable to asbestos. Grace sent a letter to counsel for such claimants requesting the claimants provide the radiological evidence to Grace for review. On December 22, 2006, the Court entered an Order requiring the production of this X-Ray evidence. [Docket No. 14148]. Supplemental Orders were entered on February 20, 2007 [Docket No. 14608] and, June 6, 2007 [Docket No. 15968]. Grace was never able to obtain all of the X-Rays requested. Ultimately, the Court set a cut-off for the submission of such materials

which prohibits the use by either side at trial of X-Ray evidence not produced by the cutoff. The Debtors and their experts are completing the X-Ray review of the material submitted.

### E. The PI CMO's

14. In each and every PI CMO entered by this Court, the cutoff dates for written discovery and depositions of expert and non-expert witnesses have been the exact same date.[2] Likewise, no limitations have been placed on the scope of such discovery or the number of witnesses each side may depose or ultimately call to testify at trial. There is no basis to alter this approach at this late date.

15. The Debtors have aggressively pursued fact discovery since the PIQ's were approved in August, 2005. The PI Committee and counsel for the claimants have balked at every turn at providing real evidence of their claims. As a result, in order to obtain any discovery in this case, the Debtors have been forced to obtain Court orders. Each time the Debtors have served discovery requests, they have been met with either objections or motions for protective orders, which have been followed by briefing, a hearing and additional time for the claimants to comply. In some instances, there have also been motions for reconsideration and in one instance, an attempted appeal. So, instead of obtaining discovery in the 30 day time frame called for by the Federal Rules of Civil Procedure and corresponding Bankruptcy Rules, each time the Debtors have attempted to obtain discovery, it has taken *at least* 90-120 days before any information is forthcoming.

16. At the present time, the Debtors are still pursuing, among other things, completion of the following key fact discovery:

---

[2] See e.g. 8-29-05 PI CMO at para. 11 and 12 [Docket No. 9301]; 1-31-06 PI CMO at par. 9 and 10 [Docket No. 11697]; 3-27-06 PI CMO at par. 9 and 10 [Docket No. 12151]; 12-19-06 PI CMO at p. 1 [Docket No. 14079] and 4-2-07 PI CMO at p. 2 [Docket No. 15078].

- Documents and depositions from several asbestos trusts;

- Documents and depositions from several of the claimants' counsel;

- Responses to the first and second set of interrogatories directed at certain claimants' counsel;

- Discovery from fact witnesses identified by the PI Committee; and

- Documents and depositions from a few remaining doctors and screeners.

17.  All of this factual discovery is taking place at the same time the parties are engaged in expert discovery.

18.  The Debtors ability to complete its discovery has been compromised again and again by the claimants' resistance, necessitating that every piece of information requested be compelled by a Court Order. This tactic cannot be countenanced by accelerating the deadline for the cutoff of fact discovery. And, providing a cutoff of October 31, 2007 for such discovery will not affect the estimation schedule with respect to any other due date nor will it affect the trial date. (*See* Timeline attached as Exhibit F).

19.  The Debtors request until October 31, 2007 to complete their fact discovery and request that no artificial or unnecessary limits be placed on such discovery.

**Daubert Motions Should Be Briefed and Heard Before the Estimation Trial Commences**

20.  There are threshold *Daubert* issues in this case which must be addressed prior to trial. These anticipated *Daubert* issues are expected to focus on, among other things, core elements of the estimation modeling approaches used by the expert witnesses. These issues will implicate the bulk of the evidence which is likely to be relevant to the estimation proceeding. How the *Daubert* test interfaces with the complex modeling approaches that will be introduced at the estimation proceeding, is a key issue that must be addressed before the trial commences so that the parties and their witnesses can be guided by the Court's determinations.

21.     In determining admissibility under *Daubert*, trial judges are charged with a gate-keeping function pursuant to Rule 702 of the Federal Rule of Evidence.[3] *See, Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), 509 U.S. at 590-91, 113 S.Ct. 2786; *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149-50, 119 S.Ct. 1167, 143 L.Ed.2d 239 (1999). In the Third Circuit, the trial court's role as a "gatekeeper" requires proof that: (1) the proffered witness is an expert; (2) the expert must testify about matters requiring scientific, technical, or specialized knowledge; and (3) the expert's testimony must "fit" the facts of the case. *In re Paoli R.R. Yard PCB Litigation*, 35 F.3d 717, 741-42 (3d Cir. 1994).

22.     Existing Third Circuit precedent does not carve out any exception for applying *Daubert* differently in a bench trial than in a jury trial, nor does it indicate whether the court must decide to exclude expert testimony prior or subsequent to a bench trial. *See, Chase Manhattan Mortg. Corp. v. Advanta Corp.*, C.A. No. 01-507(KAJ), 2004 WL 422681, at *9-10 (D.Del. Mar. 4, 2004). However, courts in this district have addressed and granted pre-trial motions to exclude expert testimony. *See, In re Armstrong World Industries, Inc.*, et. al., case No. 00-04471 (RJN) (Bankr. D. Del. October 22, 2002) (granting debtors' motion to exclude certain evidence on the grounds that it failed to meet the standards of scientific reliability and validity mandated by *Daubert*). Courts recognize that whether acting as a *Daubert/Kumho* "gatekeeper" or simply applying the rules of evidence, a court may "appropriately determine the relevance of evidence and the competency of witnesses in advance of trial in order to streamline the trial (or in the case of exclusion of critical evidence, to avoid a trial altogether), and to aid the

---

[3] Rule 702 provides:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

parties in assessing the strengths or weaknesses of their positions for settlement purposes." *See, In re Commercial Financial Services, Inc.*, 350 B.R. 520, 526, n.1 (Bankr. N.D. Okla. 2005).

23.  It makes no sense to wait until the commencement of the trial to determine whether certain evidence will pass *Daubert* standards and be admissible. Those determinations should be made before the trial commences so that the parties and their witnesses can be guided by the Court's determination under *Daubert*.

24.  In each and every PI CMO entered by the Court, as outlined in footnote 2 herein, the Court set a specific briefing schedule for *Daubert* motions. The CMO's then provided that such motions would be heard at the Court's direction. It was always anticipated these motions would be heard prior to commencement of the trial. In fact, in the April 1, 2007 PI CMO [Docket No. 15078] hearing dates in advance of the commencement of the trial were specifically set to address the *Daubert* motions. (*See*, 4-1-07 PI CMO at p. 3).

25.  At the May 21, 2007 Omnibus hearing in this matter, the Court indicated it was favorably disposed to setting dates just prior to commencement of the trial to hear such motions:

> THE COURT: . . . I believe that if you want to do Daubert first, I have two days -- January 7 and 8 and that might be the appropriate time to do Daubert. And we could start the trial, frankly, the next week. (*See* 5/21/07 Hr'g. Tr. at 147 attached as Exhibit G.)

26.  There is no reason to alter this approach at this point in the proceedings. As a result, the Debtors request that the Court set a date prior to the commencement of the trial, for the hearing of *Daubert* motions and corresponding dates by which *Daubert* briefs should be filed.

Wherefore, for all of the foregoing reasons, the Debtors respectfully request that the Court enter an Order providing that (i) the cutoff for all non-expert discovery and depositions in the PI estimation proceeding be October 31, 2007; and (ii) setting an appropriate briefing

schedule for *Daubert* Motions and a hearing on such motions on January 7 and 8, 2008, or at another appropriate date as set by the Court prior to commencement of the estimation trial.

Dated: June 14, 2007

Respectfully submitted,

KIRKLAND & ELLIS LLP
David M. Bernick
Ellen Ahern
Janet S. Baer
200 East Randolph Drive
Chicago, IL 60601-6636
Telephone: (312) 861-2000
Facsimile: (312) 861-2200

Barbara M. Harding
David E. Mendelson
Amanda Basta
655 Fifteenth Street, NW
Washington, DC 20005
Telephone: (202) 879-5000
Facsimile: (202) 879-5200

*and*

PACHULSKI, STANG, ZIEHL, YOUNG, JONES & WEINTRAUB LLP

_____
Laura Davis Jones (Bar No. 2436)
James E. O'Neill (Bar No. 4042)
Timothy P. Cairns (Bar No. 4228)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899-8705
(302) 652-4100

Co-Counsel for the Debtors and Debtors in Possession