THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W. R. GRACE & CO., et al.[1] | ) | Case No. 01-01139 (JKF) |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| | ) | **Hearing Date:** July 23, 2007 at 2:00 p.m. |
| | ) | **Objection Deadline:** July 6, 2007 at 4:00 p.m. |

**MOTION FOR AN ORDER (A) APPROVING THE AGREEMENTS
BY AND BETWEEN W. R. GRACE & CO.-CONN. AND RHODIA INC.,
(B) AUTHORIZING THE SALE OF CERTAIN ASSETS OF W. R. GRACE & CO.-
CONN.'S WASHCOAT BUSINESS TO RHODIA INC. FREE AND CLEAR OF ALL
LIENS, CLAIMS, ENCUMBRANCES AND OTHER INTERESTS; (C) AUTHORIZING
THE ASSUMPTION AND ASSIGNMENT TO RHODIA INC. OF CERTAIN
EXECUTORY CONTRACTS AND UNEXPIRED LEASES; (D) APPROVING A
POTENTIAL BREAK-UP FEE; AND (E) GRANTING CERTAIN RELATED RELIEF**

W. R. Grace & Co.-Conn., as debtor and debtor in possession (the "Selling Debtor" or

"Seller" and together with the other above-captioned debtors, the "Debtors"), hereby files this

motion (the "Motion") for the entry of an order, in substantially the form attached hereto as

**Exhibit A** (the "Sale Order"):

---

[1]     The Debtors consist of the following 62 entities: W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.), W. R. Grace &
Co.-Conn., A-1 Bit & Tool Co., Inc., Alewife Boston Ltd., Alewife Land Corporation, Amicon, Inc., CB Biomedical, Inc.
(f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace II, Inc., Creative Food >N Fun Company, Darex
Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC (f/k/a Dewey and Almy Company), Ecarg, Inc., Five
Alewife Boston Ltd., G C Limited Partners I, Inc. (f/k/a Grace Cocoa Limited Partners I, Inc.), G C Management, Inc. (f/k/a
Grace Cocoa Management, Inc.), GEC Management Corporation, GN Holdings, Inc., GPC Thomasville Corp., Gloucester
New Communities Company, Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical Company of Cuba, Grace Culinary
Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe, Inc., Grace
H-G Inc., Grace H-G II Inc., Grace Hotel Services Corporation, Grace International Holdings, Inc. (f/k/a Dearborn
International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace Petroleum Libya Incorporated,
Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W. R. Grace Capital Corporation, W. R. Grace
Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-Caribe Land Development Corporation, Hanover Square
Corporation, Homco International, Inc., Kootenai Development Company, L B Realty, Inc., Litigation Management, Inc.
(f/k/a GHSC Holding, Inc., Grace JVH, Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe
Street, Inc., MRA Holdings Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (f/k/a Nestor-BNA,
Inc.), MRA Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental
Liability Management, Inc., E&C Liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin & Fiberglass, Inc.,
Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country Staffing), Hayden-Gulch West
Coal Company, H-G Coal Company.

(1)    approving the Washcoat Sale Agreement, dated June 18, 2007 (the "<u>Sale</u>

<u>Agreement</u>," a copy of which is attached hereto as **Exhibit B**), between the

Selling Debtor and Rhodia Inc. (the "<u>Buyer</u>") and such other agreements to be

entered into and among the parties as contemplated therein (the "<u>Ancillary</u>

<u>Agreements</u>" and together with the Sale Agreement, the "<u>Agreements</u>");

(2)    authorizing the sale (the "<u>Sale</u>") of certain assets (the "<u>Acquired Assets</u>") to the

Buyer free and clear of all liens, claims, encumbrances, and other interests

(collectively, the "<u>Liens</u>") except Permitted Exceptions (as such term is defined

in the Sale Agreement) in accordance with the terms and conditions set forth in

the Agreements;

(3)    authorizing the assumption by the Selling Debtor and the assignment to the

Buyer of certain related executory contracts and unexpired leases (the

"<u>Transferred Contracts</u>") in connection therewith;

(4)    taking effect immediately by virtue of this Court waiving the 10-day stay under

Bankruptcy Rules 6004(h) and 6006(d);

(5)    approving a potential Break-Up Fee, as described in greater detail below; and

(6)    granting certain related relief.

In support of this Motion, the Selling Debtor respectfully represents as follows:[2]

## INTRODUCTION

The Selling Debtor operates a business line which designs, manufactures and markets

alumina and mixed-oxide materials used in catalytic converters to remove pollutants produced by

---

[2]    The facts and circumstances in support of this Motion are set forth in the Affidavits of George W. Young and
Pamela D. Zilly, attached hereto as **Exhibits C and D** respectively, and incorporated herein by this reference.

automotive and other engines (the "Washcoat Business"). The Washcoat Business sells primarily into the automobile supply chain.

In the third quarter of 2006, the Selling Debtor announced publicly in a press release issued by the Debtors that it was considering strategic alternatives for the Washcoat Business. Ultimately, the Debtors determined that a sale of this business would be in the best interests of the estates. This decision was based on a number of factors, including but not limited to, the fact that the Washcoat Business: (i) is not complementary to other business lines of the Debtors; (ii) is small (less than 1% of the Debtors' sales) yet requires frequent management attention; and (iii) sells into the automotive supply chain, an end market in which the Debtors have no other presence and limited leverage. The Debtors believe the sale of the Washcoat Business will generate value to the Selling Debtor's estate while enabling senior management to focus on higher-return, core activities.

The Selling Debtor and its financial advisor began marketing and soliciting potential buyers for the Washcoat Business in the fall of 2006 and have since contacted numerous strategic and financial buyers. These marketing efforts, described more fully below, culminated in the Agreements for which the Selling Debtor seeks approval from this Court. The Buyer has agreed to purchase the Washcoat Business pursuant to Bankruptcy Code sections 103, 363 and 365 for approximately $21.9 million subject to certain post-closing adjustments through a private sale process. The Buyer has expressed its strong desire to close the Sale expeditiously. Because of limited interest from other potential purchasers, and the inherent instability created by the marketing of the Washcoat Business, the Selling Debtor has determined to move forward with a private sale. Alternatively, the Debtors would have to continue marketing the Washcoat Business and conduct an auction sale process, which would subject the estate to significant

3

market risk with a low probability of identifying a higher and better offer, potentially resulting in deteriorating financial performance of the Washcoat Business and eroded potential value. Accordingly, the Selling Debtor believes that the Sale is in the best interests of its estate and creditors, and will serve to maximize the value realized for the Washcoat Business.

In connection with its decision to sell the Washcoat Business, the Selling Debtor is terminating the silica manufacturing operations (the "Silica Business") that have shared manufacturing facilities in Cincinnati, Ohio, with the Washcoat Business. Certain of the machinery and equipment of the Silica Business will be transferred to Seller's Curtis Bay (Baltimore), Maryland facility; the balance will be transferred to Seller simultaneously with the Sale.

## JURISDICTION

1.      This Court has jurisdiction over this Motion under 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b). Venue of this proceeding and this Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

2.      The statutory predicates for the relief requested herein are sections 105(a), 363(b), (f), (m) and (n), and 365 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as amended by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 (the "Bankruptcy Code"), Federal Rules of Bankruptcy Procedures 2002(a)(2), 6004(a), (b), (c), (e), (f) and (h), 6006(a), (c) and (d), 9006 and 9014 (the "Bankruptcy Rules"), and Rules 2002-1(b) and 9006-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules").

## BACKGROUND

### A.    The Debtors' Chapter 11 Cases and the Washcoat Business

3.    The Debtors are engaged in specialty chemicals and specialty materials businesses on a worldwide basis through two operating segments: "Grace Davison," which includes silica- and alumina-based catalysts and materials used in a wide range of industrial applications as well as materials used for rigid food and beverage packaging; and "Grace Performance Chemicals," which includes specialty chemicals and materials used in commercial and residential construction.    Both divisions have global operations with sales throughout North America, Europe, the Asia-Pacific region, and Latin America.

4.    Grace Davison accounted for $1.5 billion of sales in 2006, constituting 53% of the Debtors' consolidated revenue.    Grace Performance Chemicals had $1.3 billion in sales accounting for 47% of the Debtors' consolidated revenue.   The Washcoat Business is a business unit of Grace Davison and had sales of approximately $25.8 million in 2006.    Thus, the Washcoat Business represents less than 1% of the Debtors' consolidated 2006 revenue.

5.    As of June 15, 2007, the Washcoat Business had sixty (60) employees.   Fifty-one (51) employees are located at its production facility in Cincinnati, OH, and nine (9) employees, involved in management, sales, marketing and research and development, are based in Columbia, MD and Curtis Bay (Baltimore), MD.   Certain materials and finished products of the Washcoat Business are produced at other Grace Davison facilities that will not be included in the Sale.

6.    The Washcoat Business consists of research, design, development and production of porous sponge-like alumina and mixed oxide materials, generally known as "washcoats," used in the manufacture of catalytic converters.    The Washcoat Business' major competitive advantage is its technological competency including certain trade secrets and applications of

Grace Davison patents and other intellectual property. The Washcoat Business' end market for this product is fairly limited with the top six customers accounting for 88% of its revenue.

**B.      The Selling Debtor's Extensive Marketing and Sales Efforts**

7.      In September 2006, the Debtors, in consultation with The Blackstone Group, its financial advisor ("Blackstone"), started pursuing the sale of the Washcoat Business. Blackstone and the Debtors contacted forty (40) strategic and financial buyers that they identified as possible purchasers. Generally, strategic buyers were more interested than financial buyers due to the complexity of the technology and the potential advantages of having an established selling channel into the automotive sector. Twenty-four (24) potential buyers requested a brief summary of the investment opportunity. Of these, thirteen (13) potential buyers eventually entered into confidentiality agreements, received detailed information memoranda, and participated in diligence calls with the Selling Debtor's management.

8.      In late November and early December 2006, the Selling Debtor received nine (9) first-round indications of interest. The Selling Debtor invited the three (3) potential buyers who had submitted the highest purchase prices in their first-round expressions of interest to participate in the second round. During the second round, these three potential buyers each received: (i) a full-day management presentation, (ii) a site tour of the Cincinnati, Ohio production facility, and (iii) extensive access to diligence documents and the Selling Debtor's personnel. Each of the three potential buyers submitted a subsequent, revised bid. The Buyer's bid was significantly higher than those of the other two bidders, although the three potential buyers in the second round all submitted bids that were significantly lower than their first-round bids. In evaluating each bid, the Selling Debtor considered the dollar amount of the bid, its required closing conditions, and relative ease of transition of the Washcoat Business to the potential buyer's organization. Based on these factors and the circumstances, the Selling Debtor

6

determined, in its business judgment, that the offer from the Buyer was materially better than the two other bids submitted and, as such, constituted the highest and best offer for the Washcoat Business, although the three potential buyers in the second round all submitted bids that were significantly lower than their first-round bids. In March 2007, another potential buyer expressed an interest in purchasing the Washcoat Business. This potential buyer received the same treatment as the previous three second-round bidders. However, as of the date hereof it has not provided a revised bid.

9.     Moreover, the Buyer has the capability and operating expertise to close the transaction and integrate the Washcoat Business into its own operations with only limited transitional assistance from the Debtors. After examining all of the alternatives, the Selling Debtor concluded that the prompt consummation of a transaction by which the Washcoat Business is sold to the Buyer as an operational business is in the best interests of the Selling Debtor and its affiliates, their creditors, and their estates, and will maximize the value received for such assets. Therefore, the Selling Debtor entered into the Agreements with the Buyer, contingent upon Court approval, for which it now seeks approval from this Court.

### C.    **Break-Up Fee**

10.     The Selling Debtor seeks this Court's approval to potentially pay the Buyer a Break-Up Fee, payable only upon the closing of a transaction involving a sale of all or substantially all of the assets of the Washcoat Business by the Selling Debtor to any other interested purchasers that may present themselves between now and the hearing date.

11.     If any other interested party makes a firm offer for a purchase price at least equal to the Purchase Price plus Break-Up Fee on substantially the same or better terms as set forth in the Sale Agreement before the July 23rd hearing on the Sale, the Selling Debtor will apprise the

7

Court of the offer and whether, in its business judgment, such an offer warrants further consideration.

12.     As the Buyer is willing to subject itself to the risk of such an offer, the Selling Debtor seeks this Court's approval to pay Buyer a Break-Up Fee, if applicable, in the aggregate amount of $547,500, which is 2.5% of the $21.9 million Purchase Price under the Sale Agreement (the "Break-Up Fee"). The Break-Up Fee is payable only upon the closing of a transaction involving a sale of all or substantially all of the assets of the Washcoat Business and will be entirely funded by the increase in the purchase price offered by a potential other bidder for the Washcoat Business. The Buyer shall be paid the Break-Up Fee, if applicable, from the proceeds of such an alternative transaction within 5 business days after the closing of the transaction.

**D.     The Terms and Conditions of the Sale Agreement with the Buyer**

13.     On June 18, 2007, after extensive arms-length negotiations, the Selling Debtor and the Buyer executed the Sale Agreement, which is subject to this Court's approval. As more fully described in the Sale Agreement, the Selling Debtor proposes to sell the Washcoat Business to the Buyer on the following terms and conditions:[3]

| Selling Debtor | W. R. Grace & Co.-Conn. |
|---|---|
| Buyer | Rhodia Inc. |
| Consideration (Section 2.05) | $21,900,000 |

---

[3]     Capitalized terms used herein and not otherwise defined shall have the meanings ascribed to such terms in the Sale Agreement, a copy of which is attached hereto as **Exhibit B**. To the extent of any inconsistency between the summary set forth herein and the Sale Agreement, the terms and conditions of the Sale Agreement shall govern.

| | |
|---|---|
| **Transferred Assets (Section 2.01)** | All of the Selling Debtor's right, title, and interest in assets used exclusively in the Washcoat Business including, real property, leases, machinery, equipment, inventory, accounts receivable, books and records, software, claims under insurance policies, but excluding the Excluded Assets. |
| **Excluded Assets (Section 2.02)** | All assets of the Selling Debtor that are not used exclusively in the Washcoat Business; and also the Washcoat IP, which is being provided to the Buyer under a license agreement. |
| **Transferred Contracts (Section 2.07)** | The Material Contracts (the contracts listed on Schedule 5.14(a)) and the contracts listed on Schedule 5.14(b), but excluding the Union Agreement. Buyer may add additional contracts to Schedule 5.14(b) up to sixty (60) days following the Closing Date, in which case the Selling Debtor will file and notice the affected counterparty by motion. |
| **Cure Costs (Section 2.07)** | To be split 50-50 between Seller and Buyer. |
| **Transferred Liabilities (Section 2.03)** | Buyer shall assume and be liable for all liabilities and obligations arising out of the operation or ownership of the Transferred Assets post-closing including post-closing employment liabilities, certain vacation and employee liabilities existing on the closing date, and all removal, repair or abatement related liabilities and obligations related to the presence of lead or asbestos in any of the buildings, structures, improvements and fixtures included in the Owned Real Property. |
| **Excluded Liabilities (Section 2.04)** | All non-Transferred Liabilities, including all pre-closing liabilities and obligations, any liability resulting from or arising in connection with exposure to one or more Hazardous Substances, to the extent exposure occurred on or before the closing date, any liability or obligation, including, any liability arising from claims for injury to any persons or property, related to any other business of any Seller Entity other than the Washcoat Business, and all liabilities and obligations, including, any liability arising from claims for injury to persons or property, arising out of the Transferred Assets or the Washcoat Business on or prior to the Closing Date. |

9

| | |
|---|---|
| **Employee Matters (Article 12)** | Buyer shall make an offer, containing wages, hours, and/or other terms and conditions of employment determined solely by the Buyer, provided such terms and conditions will, in the aggregate, be comparable to existing compensation and terms and conditions of employment in place immediately prior to Closing, to each non-bargaining unit Employee who is then employed by Seller, contingent upon Closing.  Non-bargaining unit Employees must accept any such offers of employment on or before the day prior to the Closing Date.<br><br>Buyer shall make offers of employment, subject to such wages, hours, and/or other terms and conditions of employment determined solely by the Buyer, to no less than 27 bargaining unit Employees that are then employed by Seller (such offers to be made in accordance with the bargaining unit Employees' seniority as determined in the Union Agreement).  If a sufficient number of such Employees accept employment with Buyer such that Buyer is deemed a successor employer, then upon request from the designated collective bargaining representative, Buyer will recognize and bargain with such representative to obtain a collective bargaining agreement.<br><br>Seller will use reasonable commercial efforts to offer a voluntary severance plan (the "VSP") to its bargaining unit Employees located at the Cincinnati, Ohio manufacturing facility to commence as soon as is reasonably practicable after the date of this Agreement and subject to the terms and conditions set forth in the Agreement.<br><br>Buyer shall not assume any Seller Benefit Plans. |
| **Closing Date (Section 3.01)** | The first Business Day upon which the conditions to Closing have been fulfilled or waived, but not prior to 12:01 AM on August 1, 2007; or as the parties shall agree in writing. |
| **Closing Conditions (Articles 10, 11)** | The Sale Order has become a Final Order, all representations and warranties are accurate, and consent of the Selling's Debtor's landlord is received for assignment of the real property lease. |
| **Termination of the Sale Agreement (Article 13)** | If the Sale Order has not been approved by August 29, 2007 or the Sale Order is not a Final Order by September 15, 2007, or the Court enters an order approving the sale of the Transferred Assets to a third party. |
| **Break-Up Fee (Section 13.02(a))** | 2.5% of the Purchase Price, or $547,500, payable within 30 days of closing of an alternative transaction. |

10

| Indemnification (Article 14) | Certain representations and warranties expire on the Closing, or 18 months after the Closing, or on the expiration of the relevant statute of limitations. In no event may Buyer's indemnification and certain cleanup costs borne by the Selling Debtor exceed 30% of the Purchase Price. Seller will indemnify Buyer for certain intellectual property-related indemnities for up to five years following the Closing Date; provided however that such indemnification shall not exceed 15% of the Purchase Price. |
|---|---|

## RELIEF REQUESTED

14.     By this Motion, pursuant to sections 105(a), 363(b), (f) and (m), and 365 of the Bankruptcy Code, the Selling Debtor:  (a) seeks entry of an order by this Court approving the Agreements with the Buyer and authorizing the sale of the Washcoat Business to the Buyer free and clear of all Liens (except the Permitted Exceptions), upon the terms set forth in the Agreements and Sale Order, (b) seeks authority for the Selling Debtor to assume and assign to the Buyer the Transferred Contracts, (c) requests authority to pay a Break-Up Fee to the Buyer, if applicable, (d) requests that the Sale Order be effective immediately by waiving the 10-day stay under Bankruptcy Rule 6004(h) and 6006(d), and (e) requests such other and further relief as is just and proper.

## BASIS FOR RELIEF

15.     In accordance with Bankruptcy Rule 6004, sales of property rights outside the ordinary course of business may be conducted by private sale or public auction.  The Selling Debtor has determined that the Sale of the Washcoat Business by private sale to the Buyer will produce the highest and best offer for this business (thereby maximizing the value of to its estate) and is in the best interests of the Selling Debtor and its affiliates, their estates, and their creditors.

16.     The Agreements represent the culmination of a comprehensive, arms-length negotiation for the Sale of the Washcoat Business in exchange for the highest and best consideration available for such business.  In the Selling Debtor's business judgment, the Selling

11

Debtor believes that the Sale will provide a larger recovery for the Selling Debtor's estate than would be provided by any other viable alternative. The bases for the relief requested in this Motion are founded in a number of provisions of the Bankruptcy Code and Bankruptcy Rules. These bases are discussed in detail below.

### A.     Bankruptcy Code Section 363 Permits The Sale Of The Washcoat Business Outside The Ordinary Course Of Business.

17.     Section 363 of the Bankruptcy Code provides that a debtor, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Although section 363 of the Bankruptcy Code does not specify a standard for determining when it is appropriate for a court to authorize the use, sale or lease of property of the estate, the bankruptcy courts routinely authorize sales of a debtor's assets if such sale is based upon the sound business judgment of the debtor. See, e.g., Meyers v. Martin (In re Martin), 91 F.3d 389, 395 (3d Cir. 1996); The Official Committee of Unsecured Creditors v. The LTV Corp. (In re Chateaugay Corp.), 973 F.2d 141, 143 (2d Cir. 1992); Committee of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1070-71 (2d Cir. 1983); In re Delaware & Hudson Railway Co., 124 B.R. 169, 176 (D. Del. 1991). Indeed, the Delaware & Hudson Railway court rejected the pre-Code "emergency" or "compelling circumstances" standard, finding the "sound business purpose" standard applicable and, discussing the requirements of that test under Lionel, observing:

> A non-exhaustive list of factors to consider in determining if there is a sound business purpose for the sale include: the proportionate value of the asset to the estate as a whole; the amount of elapsed time since the filing; the likelihood that a plan of reorganization will be proposed and confirmed in the near future; the effect of the proposed disposition of the future plan of reorganization; the amount of proceeds to be obtained from the sale versus appraised values of the property; and whether the asset is decreasing or increasing in value.

124 B.R. at 176. The Delaware & Hudson Railway court further held that:

12

> [o]nce a court is satisfied that there is a sound business reason or an emergency justifying the pre-confirmation sale, the court must also determine that the trustee has provided the interested parties with adequate and reasonable notice, that the sale price is fair and reasonable and that the proposed purchaser is proceeding in good faith.

Id.

18.     Furthermore, once "the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct." Committee of Asbestos-Related Litigants and/or Creditors v. Johns-Manville Corp. (In re Johns-Manville Corp.), 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986). There is a presumption that "in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company." The Official Comm. of Subordinated Bondholders v. Integrated Resources, Inc. (In re Integrated Resources, Inc.), 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting Smith v. Van Gorkom, 488 A.2d 858, 872 (Del. 1985)). Thus, if a debtor's actions satisfy the business judgment rule, then the transaction in question should be approved under section 363(b)(1).

19.     The Selling Debtor has proposed the Sale of the Washcoat Business after thorough consideration of all viable alternatives, and has concluded that the Sale is supported by a number of sound business reasons.  As previously discussed, the Washcoat Business: (i) represents less than 1% of the Debtors' revenues, (ii) is the Debtors' sole business unit that sells into the automotive supply chain, and (iii) is a non-core operation. Thus, the Selling Debtor seeks to sell the Washcoat Business at this time to generate value to the estate while enabling the Debtors' senior management to focus on higher-return, core activities.

20.     The Selling Debtor also believes that the amount of the consideration received for the Washcoat Business is fair and reasonable.  The fairness and reasonableness of the

13

consideration to be paid by the Buyer ultimately has been demonstrated by adequate "market exposure" and an open and fair marketing process – the best means for establishing whether a fair and reasonable price is being paid.

21.     Thus, the extensive marketing efforts have demonstrated that there is a limited market for the Washcoat Business and that the offer made by the Buyer is the best offer that the Debtor has received for such assets.  Further, the Debtors publicly announced in a press release the strategic evaluation of the Washcoat Business more than six months ago.  Since that time, during the marketing and sale process, employees and customers have been subject to uncertainty regarding the future of the Washcoat Business.  The timing contemplated by this Motion -- with an expected closing date on or about August 1, 2007 -- will help eliminate the uncertainty currently surrounding the Washcoat Business and mitigate the risk that its financial performance and hence the value of the Washcoat Business might suffer from this uncertainty. Accordingly, the Selling Debtor, in its business judgment, believes that the Agreements are in the best interests of the estate and its creditors.  The Selling Debtor requests that this Court make a finding at the hearing on this Motion that the proposed Sale is a proper exercise of the Selling Debtor's business judgment and is duly authorized.

**B.     The Sale Of The Washcoat Business Free And Clear Of Liens And Other Interests Is Authorized By Section 363(f).**

22.     The Selling Debtor further submits that it is appropriate to sell the Washcoat Business free and clear of Liens (except the Permitted Exceptions) pursuant to section 363(f) of the Bankruptcy Code, with any such Liens attaching to the net sale proceeds of the Washcoat Business to the extent applicable.  Section 363(f) of the Bankruptcy Code authorizes a debtor to sell assets free and clear of any interest in such property of an entity other than the estate if:

(1)     applicable nonbankruptcy law permits sale of such property free and clear of such interest;

14

(2)    such entity consents;

(3)    such interest is a lien and the price at which such property is sold is greater than the aggregate value of all liens on such property;

(4)    such interest is in bona fide dispute; or

(5)    such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

23.    This provision is supplemented by section 105(a) of the Bankruptcy Code, which provides that "[t]he Court may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a).

24.    Because Bankruptcy Code section 363(f) is drafted in the disjunctive, satisfaction of any one of its five requirements will suffice to permit the sale of the Washcoat Business "free and clear" of liens and interests. In re Dundee Equity Corp., 1992 Bankr. LEXIS 436, at *12 (Bankr. S.D.N.Y. Mar. 6, 1992) ("[s]ection 363(f) is in the disjunctive, such that the sale free of the interest concerned may occur if any one of the conditions of § 363(f) have been met."); In re Elliott, 94 B.R. 343, 345 (E.D. Pa. 1988) (same).

25.    The Selling Debtor believes that one or more of the tests of section 363(f) are satisfied with respect to the transfer of the Washcoat Business pursuant to the Sale Agreement. In particular, the Selling Debtor believes that at least section 363(f)(2) will be met in connection with the transactions proposed under the Sale Agreement because each of the parties holding liens on the Washcoat Business will consent, or absent any objection to this Motion, will be deemed to have consented to, the Sale. Any lienholder also will be adequately protected by having its Liens, if any, in each instance against the Selling Debtor or its estate, attach to the cash proceeds of the Sale ultimately attributable to the Washcoat Business in which such creditor alleges an interest, in the same order of priority, with the same validity, force and effect that such

15

creditor's liens had prior to the Sale, subject to any claims and defenses the Selling Debtor and its estate may possess with respect thereto.  Accordingly, section 363(f) authorizes the transfer and conveyance of the Washcoat Business free and clear of any Liens (other than the Permitted Exceptions).

C.    **The Transferred Assets And Transferred Contracts Should Be Sold Free And Clear Of Successor Liability.**

26.    Under the terms of the Sale Agreement, the Buyer is not liable for any of the Selling Debtor's liabilities as a successor to the Selling Debtor's business or otherwise (the "Excluded Liabilities"), unless expressly assumed.  Extensive case law exists providing that claims against a buyer are directed to the proceeds of a free and clear sale of property and may not subsequently be asserted against a buyer.

27.    Although section 363(f) of the Bankruptcy Code provides for the sale of assets "free and clear of any interests," the term "any interest" is not defined anywhere in the Bankruptcy Code.  Folger Adam Security v. DeMatteis/MacGregor JV, 209 F.3d 252, 257 (3d Cir. 2000).  In the case of In re Trans World Airlines. Inc., 322 F.3d 283, 288-89 (3d Cir. 2003), the Third Circuit specifically addressed the scope of the term "any interest."  The Third Circuit observed that while some courts have "narrowly interpreted that phrase to mean only in rem interests in property," the trend in modern cases is towards "a more expansive reading of 'interests in property' which 'encompasses other obligations that may flow from ownership of the property.'"  Id. at 289 (citing 3 Collier on Bankruptcy 363.06[1]).  As determined by the Fourth Circuit in In re Leckie Smokeless Coal Co., 99 F.3d 573, 581-582 (4th Cir. 1996), a case cited approvingly and extensively by the Third Circuit in Folger, the scope of section 363(f) is not limited to in rem interests.  Thus, the Third Circuit in Folger stated that Leckie held that the

16

debtors "could sell their assets under § 363(f) free and clear of successor liability that otherwise would have arisen under federal statute." <u>Folger</u>, 209 F.3d at 258.

28.    Courts have consistently held that a buyer of a debtor's assets pursuant to a section 363 sale takes free from successor liability resulting from pre-existing claims. <u>See</u> <u>The Ninth Avenue Remedial Group v. Allis-Chalmers Corp.</u>, 195 B.R. 716, 732 (Bankr. N.D. Ind. 1996) (stating that a bankruptcy court has the power to sell assets free and clear of any interest that could be brought against the bankruptcy estate during the bankruptcy); <u>MacArthur Company v. Johns-Manville Corp. (In re Johns-Manville Corp.)</u>, 837 F.2d 89, 93-94 (2d Cir. 1988) (channeling of claims to proceeds consistent with intent of sale free and clear under section 363(f) of the Bankruptcy Code); <u>In re New England Fish Co.</u>, 19 B.R. 323, 329 (Bankr. W.D. Wash. 1982) (transfer of property in free and clear sale included free and clear of Title VII employment discrimination and civil rights claims of debtor's employees); <u>In re Hoffman</u>, 53 B.R. 874, 876 (Bankr. D.R.I. 1985) (transfer of liquor license free and clear of any interest permissible even though the estate had unpaid taxes); <u>American Living Systems v. Bonapfel (In re All Am. Of Ashburn, Inc.)</u>, 56 B.R. 186, 190 (Bankr. N.D. Ga. 1986) (product liability claims precluded on successor doctrine in a sale of assets free and clear); <u>WBQ Partnership v. Virginia Dept. of Medical Assistance Services (In re WBQ Partnership)</u>, 189 B.R. 97, 104-05 (Bankr. E.D. Va. 1995) (Commonwealth of Virginia's right to recapture depreciation is an "interest" as used in section 363(f)).

29.    Here, the Debtors' chapter 11 cases were filed in good faith. The Buyer has engaged in arm's-length negotiations with the Selling Debtor and has not exerted control or undue influence over the Selling Debtor. The Buyer is completely and wholly unrelated to the Selling Debtor. The Buyer does not, and will not, share any common incorporators, officers,

17

directors, or controlling stockholders with the Selling Debtor, and the Buyer is not an insider of the Selling Debtor. See 11 U.S.C. § 101(31).

30.    In addition, no other person or entity (or persons or entities) has offered to enter into an agreement or series of agreements as favorable to the Selling Debtor as the Sale Agreement. If the Sale Agreement is not approved, then management will be forced to evaluate options that are not as attractive as the current offer. For obvious reasons, the very purpose of an order purporting to authorize the transfer of assets free and clear of all "interests" would be frustrated if claimants could thereafter use the transfer as a basis to assert claims against a purchaser arising from a seller's pre-sale conduct.

31.    Furthermore, the Selling Debtor is providing notice of the proposed sale to all known parties in interest that may assert claims or interests relating to the Transferred Assets against the Selling Debtor, including, but not limited to, trade creditors, contract counterparties, lenders and other parties known to the Selling Debtor to be asserting claims of any kind relating to the Transferred Assets. Under section 363(f) of the Bankruptcy Code, the Buyer is entitled to know that the Transferred Assets are not infected with latent claims that will be asserted against the Buyer after the proposed transaction is completed. Accordingly, consistent with the above-cited case law, the order approving the Sale should state that the Buyer is not liable as a successor under any theory of successor liability, for claims that encumber or relate to the Transferred Assets.

**D.    The Buyer Is A Good Faith Buyer And Is Entitled To The Full Protection Of Section 363(m) Of The Bankruptcy Code, And The Transfer Of The Washcoat Business Does Not Violate Section 363(n).**

32.    Section 363(m) of the Bankruptcy Code provides:

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity

18

that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m). While the Bankruptcy Code does not define "good faith," the Third Circuit

in In re Abbotts Dairies of Pennsylvania, Inc., 788 F.2d 143 (3d Cir. 1986) held that:

[t]he requirement that a buyer act in good faith . . . speaks to the integrity of his conduct in the course of the sale proceedings. Typically, the misconduct that would destroy a buyer's good faith status at a judicial sale involves fraud, collusion between the Proposed Buyer and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.

788 F.2d at 147 (citations omitted).

33.    In the present case, the Sale is an intensely-negotiated transaction in which the Buyer has, at all times, acted in good faith under the Abbotts Dairy standards. In addition to a fair and reasonable value offered by the Buyer, the proposed sale also is the product of arms-length, good faith negotiations, in which the Selling Debtor bargained for the maximum possible purchase price for the Washcoat Business. Extensive negotiations were held between the parties involving substantial time and energy by the parties and their professionals, and the Agreements reflect give-and-take and compromises by both sides.

34.    In addition, the Buyer is not an "insider" of any of the Debtors, as that term is defined in section 101(31) of the Bankruptcy Code. There is absolutely no indication of fraud or improper insider dealing of any kind. The Sale Agreement does not constitute an avoidable transaction pursuant to section 363(n) and the Buyer should receive the protections afforded good faith purchasers by section 363(m). Accordingly, the Selling Debtor requests that the Court make a finding at the hearing that the Buyer is entitled to the full protections of Bankruptcy Code section 363(m).

19

### E.    Assumption And Assignment Of The Transferred Contracts Is Authorized By Section 365 Of The Bankruptcy Code.

35.    The Sale contemplates the assumption and assignment of certain executory contracts and unexpired leases of the Washcoat Business to the Buyer, which are necessary to the Buyer for the continuation of the Washcoat Business and, at the same time, will enhance the value of the Sale to the Selling Debtor's estate by curtailing further administrative liability to the estate and eliminating certain rejection claims.  Specifically, the Debtors propose to assume and assign to Buyer those Transferred Contracts set forth on **Exhibit B** to the proposed Sale Order (the "List of Transferred Contracts").  The List of Transferred Contracts also sets forth next to each Transferred Contract the proposed Cure Amount that the Selling Debtor proposes to pay to each counterparty.  The Debtors believe that most of the Transferred Contracts were entered into post-petition and in any event, the Debtors believe they are current on all outstanding obligations under the Transferred Contracts and that no cure amounts are owing.  In an abundance of caution and to the extent applicable, the Selling Debtor requests approval to assume and assign the Transferred Contracts to the Buyer pursuant to section 365(f) of the Bankruptcy Code, notwithstanding any provisions in the Transferred Contracts, including those described in sections 365(b)(2) and (f)(1) and (3) of the Bankruptcy Code, that prohibit such assignment.

36.    Section 365(f) of the Bankruptcy Code provides, in pertinent part, that:

> The trustee may assign an executory contract or unexpired lease of the debtor only if –
>
> (A)    the trustee assumes such contract or lease in accordance with the provisions of this section; and
>
> (B)    adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease.

20

11 U.S.C. § 365(f)(2). Under section 365(a), a debtor "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a). Section 365(b)(1), in turn, codifies the requirements for assuming an unexpired lease or executory contract of a debtor, providing that:

> (b) (1) If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee –
>
> > (A)   cures, or provides adequate assurance that the trustee will promptly cure, such default ….;
> >
> > (B)   compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and
> >
> > (C)   provides adequate assurance of future performance under such contract or lease.

11 U.S.C. § 365(b)(l).

37.     The standard applied by a court in determining whether the assumption or rejection of an executory contract or unexpired lease pursuant to section 365(a) should be approved is the "business judgment" test, which requires a debtor to determine that the requested assumption or rejection would be beneficial to its estate. See, e.g., In re Group of Institutional Investors, Inc. v. Chicago, Milwaukee, St. Paul and Pac. R.R. Co., 318 U.S. 523, 550 (1943) ("the question [of assumption] is one of business judgment"); Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.), 4 F.3d 1095, 1098-99 (2d Cir. 1993) (to decide a motion to assume the court must put itself in the position of the trustee and determine whether such assumption would be a good decision or a bad one).

38.     Courts generally will not second-guess a debtor's business judgment concerning the assumption of an executory contract. See In re Paolo Gucci, 193 B.R. 411, 414 (S.D.N.Y.

21

1996); see also Sharon Steel Corp. v. National Gas Fuel Distrib. Corp. (In re Sharon Steel Corp.), 872 F.2d 36, 40 (3d Cir. 1989); In re III Enter., Inc., 163 B.R. 453, 469 (Bankr. E.D. Pa. 1994) ("Generally, a court will give great deference to a debtor's decision to assume or reject an executory contract. A debtor need only show that its decision to assume or reject the contract is an exercise of sound business judgment—a standard which we have concluded many times is not difficult to meet.").

39.     In the present case, the Selling Debtor's assumption and assignment of the Transferred Contracts to the Buyer meets the business judgment standard and satisfies the requirements of section 365 of the Bankruptcy Code. As discussed above, the transactions contemplated by the Agreements will provide significant benefits to the Selling Debtor's estate. Because the Selling Debtor cannot obtain the benefits of the Sale Agreement without the assumption of the Transferred Contracts referenced above, the assumption of these Transferred Contracts is undoubtedly a sound exercise of the Selling Debtor's business judgment.

40.     Further, a debtor in possession may assign an executory contract or an unexpired lease of the debtor if it assumes the agreement in accordance with section 365(a), and provides adequate assurance of future performance by the assignee, whether or not there has been a default under the agreement. See 11 U.S.C. § 365(f)(2). Significantly, among other things, adequate assurance may be provided by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. See, e.g., In re Bygaph, Inc., 56 B.R. at 605-06 (stating that adequate assurance of future performance is present when the prospective assignee of a lease from the debtor has financial resources and has expressed willingness to devote sufficient funding to the business in order to give it a strong likelihood of succeeding).

41.    The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction." EBG Midtown South Corp. v. McLaren/Hart Envtl. Engineering Corp. (In re Sanshoe Worldwide Corp.), 139 B.R. 585, 592 (S.D.N.Y. 1992) (citations omitted), aff'd, 993 F.2d 300 (2d Cir. 1993); Carlisle Homes, Inc. v. Arrari (In re Carlisle Homes, Inc.), 103 B.R. 524, 538 (Bankr. D.N.J. 1989).

42.    Here, the Buyer has agreed to pay half of the Cure Amounts in connection with the Transferred Contracts, although the Selling Debtor estimates that the cure payments associated with all of the Transferred Contracts is $0.00. Furthermore, the assignee, i.e., the Buyer, has sufficient assets to continue performance under the Transferred Contracts from and after the Closing Date. To the extent necessary, the Buyer is able and willing, at the Sale Hearing or earlier to a party upon request, to demonstrate to the satisfaction of this Court that adequate assurance of future performance is present. The Sale Hearing will therefore provide the Court and other interested parties with the opportunity to evaluate and, if necessary, challenge the ability of the Buyer or other successful bidder to provide adequate assurance of future performance under the Transferred Contracts. Accordingly, the Selling Debtor submits that the assumption and assignment of the Transferred Contracts as set forth herein should be approved.

43.    To assist in the assumption, assignment and sale of the Transferred Contracts, the Selling Debtor also requests that the Court enter an order providing that anti-assignment provisions in the Transferred Contracts shall not restrict, limit or prohibit the assumption, assignment and sale of the Transferred Contracts and are deemed and found to be unenforceable anti-assignment provisions within the meaning of section 365(f) of the Bankruptcy Code.

44.     Section 365(f)(1) of the Bankruptcy Code permits a debtor to assign unexpired

leases and contracts free from such anti-assignment restrictions:

> [N]otwithstanding a provision in an executory contract or unexpired lease of the
> debtor, or in applicable law, that prohibits, restricts, or conditions the assignment
> of such contract or lease, the trustee may assign such contract or lease under
> paragraph (2) of this subsection.

11 U.S.C. § 365(f)(l).

45.     Section 365(f)(l), by operation of law, invalidates provisions that prohibit, restrict,

or condition assignment of an executory contract or unexpired lease. See, e.g., Coleman Oil Co.,

Inc. v. The Circle K Corp. (In re The Circle K Corp.), 127 F. 3d 904, 910-11 (9th Cir. 1997) ("no

principle of bankruptcy or contract law precludes us from permitting the Debtors here to extend

their leases in a manner contrary to the leases' terms, when to do so will effectuate the purposes

of section 365"). Section 365(f)(3) goes beyond the scope of section 365(f)(1) by prohibiting

enforcement of any clause creating a right to modify or terminate the contract or lease upon a

proposed assumption or assignment thereof. See, e.g., In re Jamesway Corp., 201 B.R. 73

(Bankr. S.D.N.Y. 1996) (section 365(f)(3) prohibits enforcement of any lease clause creating

right to terminate lease because it is being assumed or assigned, thereby indirectly barring

assignment by debtor; all lease provisions, not merely those entitled anti-assignment clauses, are

subject to court's scrutiny regarding anti-assignment effect).

46.     Other courts have recognized that provisions that have the effect of restricting

assignments cannot be enforced. See In re Rickel Home Centers, Inc., 240 B.R. 826, 831 (D.

Del. 1998) ("In interpreting Section 365(f), courts and commentators alike have construed the

terms to not only render unenforceable lease provisions which prohibit assignment outright, but

also lease provisions that are so restrictive that they constitute de facto anti-assignment

provisions."). Similarly, in In re Mr. Grocer, Inc., the court noted that:

> [the] case law interpreting § 365(f)(l) of the Bankruptcy Code establishes that the court does retain some discretion in determining that lease provisions, which are not themselves ipso facto anti-assignment clauses, may still be refused enforcement in a bankruptcy context in which there is no substantial economic detriment to the landlord shown, and in which enforcement would preclude the bankruptcy estate from realizing the intrinsic value of its assets.

77 B.R. 349, 354 (Bankr. D.N.H. 1987). Thus, the Selling Debtor requests that any anti-assignment provisions be deemed not to restrict, limit or prohibit the assumption, assignment and sale of the Transferred Contracts and be deemed and found to be unenforceable anti-assignment provisions within the meaning of section 365(f) of the Bankruptcy Code.

### F.    A Private Sale Of The Washcoat Business Is Authorized Under Bankruptcy Rule 6004.

47.    Bankruptcy Rule 6004(f)(1) provides that "[a]ll sales not in the ordinary course of business may be by private sale or by public auction." Fed. R. Bankr. P. 6004(f)(1). Courts often allow chapter 11 debtors to sell assets outside the ordinary course of business by private sale when the debtors demonstrate that the sale is permissible pursuant to section 363(b) of the Bankruptcy Code. See, e.g., Palermo v. Pritam Realty, Inc. (In re Pritam Reality, Inc.), 233 B.R. 619 (D.P.R. 1999) (upholding the bankruptcy court's approval of a private sale conducted by a chapter 11 debtor); In re Condere Corp., 228 B.R. 615 (Bankr. S.D. Miss. 1998) (approving a private sale of a chapter 11 debtor's assets where the standards of § 363(b) were met); In re Embrace Systems Corp., 178 B.R. 112, 123 (Bankr. W.D. Mich. 1995) ("A large measure of discretion is available to a bankruptcy court in determining whether a private sale should be approved. The court should exercise its discretion based upon the facts and circumstances of the proposed sale."); In re Wieboldt Stores, Inc., 92 B.R. 309 (N.D. Ill. 1988) (affirming right of chapter 11 debtor to transfer assets by private sale).

48.    Here, the Selling Debtor proposes to proceed with the sale of the Washcoat Business by way of a private sale without incurring the cost and delay associated with

conducting a public auction. As discussed above, the Selling Debtor extensively marketed the Washcoat Business and conducted several preliminary bidding rounds to obtain the highest and best offer therefor. The Selling Debtor has gone through this extensive marketing process in a market which has only a limited number of parties who would be willing to submit a bid for the Washcoat Business. As a result, the Selling Debtor submits that the Buyer's offer is the highest and best that the Selling Debtor has received, and constitutes fair market value, given the limited market for the Washcoat Business.

49.     The alternative to the proposed Sale is to continue to market the Washcoat Business and conduct an auction sale process, which would subject the estate to significant market risk with a low probability of identifying a higher and better offer. The Selling Debtor believes that further delays in completing the Sale could lead to deteriorating financial performance of the Washcoat Business and eroded potential value. Moreover, employees and customers of the Washcoat Business would continue to face uncertainty regarding the future of the Washcoat Business. This uncertainty could potentially lead to loss of additional employees, weakened financial performance, and the further erosion of value.

50.     Because a private sale is specifically authorized under Bankruptcy Rule 6004 and the Selling Debtor believes that the Buyer's offer is the highest and best offer for the Washcoat Business, the Selling Debtor requests that this Court approve the proposed private sale of the Washcoat Business to the Buyer in accordance with the Agreements.

G.     **The Potential Break-Up Fee is Appropriate Under the Circumstances.**

51.     Based on its business judgment and for the reasons described above, the Selling Debtor believes that the most prudent course of action in order to maximize value to the estate for the Washcoat Business is to seek approval of the Agreements to the Buyer now. In the event that another bidder comes forward to purchase the Washcoat Business between now and the

26

haring date for a higher amount than the Purchase Price plus the Break-Up Fee, the Selling Debtor seeks this Court's approval to pay the Buyer a Break-Up Fee of 2.5% of the purchase price, payable only upon the closing of a transaction involving a sale of all or substantially all of the assets of the Washcoat Business by the Selling Debtor to such other potential purchaser.

52.     Approval of break-up fees in connection with the sale of assets pursuant to section 363 of the Bankruptcy Code has become an established practice in chapter 11 cases. Courts have approved bidding incentives similar to the Break-Up Fee where the incentives are beneficial to the estate because they induce an initial bid, promote competitive bidding, provide a minimum floor bid on which other bidders can rely, and compensate the purchaser for its time, effort, expense and risk. See Calpine Corp. v O'Brien Envtl Energy, Inc., 181 F.3d at 535 and 537 (detailing situations where a breakup fee is entitled to administrative expense status under Bankruptcy Code section 503(b)(1)(A) because the fees provided a benefit to the estate); In re Women First Healthcare, Inc., 332 B.R. 115, 122 (Bankr. D. Del. 2005) (noting the break-up fee and other bid procedures provided a benefit to the estate by encouraging a quick consummation of the deal); In re Homelife Corp, 2002 WL 31115654 (D. Del.) (Farnan, J.).

53.     The Break-Up Fee paid to the Buyer, if any, will be entirely funded by the increase in the purchase price offered by the potential other bidder for the Washcoat Business. Thus, the Selling Debtor, its estate and its creditors will only net a benefit if another bid materializes.

54.     Moreover, the Break-Up Fee proposed is reasonable in light of the Buyer's efforts and the Purchase Price. In the present case, the maximum Break-Up Fee payable to the Buyer is $547,500, which is 2.5% of the $21.9 million Purchase Price. The Break-Up Fee, in terms of its percentage and amount, is of the same order of magnitude as break-up fees approved in other

27

cases. See, e.g., In re Women First Health Care, 332 B.R. 115, 118 (Bankr. D. Del. 2005) (noting the court had approved a break-up fee of $50,000 or 2.8% on the sale of assets worth $1.75 million); In re Decora Industries, Inc. 2002 WL 32332749 (D. Del.) (Farnan, J.) (approving on appeal break-up fee of $625,000 or 3% of purchase price); In re Fruit of the Loom, Inc., Case No. 99-4497 (PJW) (Bankr. D. Del. Dec. 11, 2001) (approving a $25 million, or 3% of purchase price, break-up fee); In re Hechinger Investment Co., Case No. 99-02261 (PJW) (Bankr. D. Del. October 1, 1999) (fee of 3.0% upheld).

55.     The Break-Up Fee to be made under the circumstances described herein to the Buyer is (i) an actual and necessary cost and expense of preserving the Selling Debtor's estate because it compensates the Buyer for the risk involved in subjecting the Sale Agreement to a potential overbid by the potential other bidder, (ii) commensurate to the real and substantial benefit conferred upon the Selling Debtor's estate by the Buyer, (iii) reasonable and appropriate, in light of the size and nature of the proposed sale transaction and comparable transactions, the commitments that have been made and the efforts that have been and will be expended by the Buyer, and (iv) necessary to induce the Buyer to enter into and be bound by the terms of the Sale Agreement, and to continue to pursue the Sale. Accordingly, the Selling Debtor submits that the Break-Up Fee is reasonable and appropriate and represents the best method for maximizing value for the benefit of the Selling Debtor's estate.

**H.     Notice Of The Proposed Sale Satisfies Bankruptcy Rule 2002.**

56.     A copy of this Motion and the Notice of Motion will be served on:  (i) the U.S. Trustee; (ii) counsel to the Committees and the FCR; (iii) counsel to the administrative agents for the Debtors' prepetition lenders; (iv) counsel to the Debtors' postpetition lenders; (v) all parties that have requested special notice pursuant to Bankruptcy Rule 2002; (vi) the Buyer and its counsel; (vii) all persons or entities known or reasonably believed to have asserted a Lien in any

of the assets of the Washcoat Business; (viii) federal, state and local taxing authorities who have a reasonably known interest in the relief requested by this Motion; (ix) the counterparty to each of the Transferred Contracts; (x) all persons or entities known or reasonably believed to have expressed an interest in acquiring the Washcoat Business; and (xi) the United States Attorneys for the Districts of Delaware, Ohio and Maryland (collectively, the "Notice Parties").

57.     Several sections of the Bankruptcy Code dictate the sufficiency of notice and adequacy of service.  As discussed below, the content and manner of service of this Motion and the related notice satisfies all such requirements:

58.     Section 363 Notice:  Section 363 of the Bankruptcy Code provides that a trustee may sell property "after notice and hearing."  Under section 102(1) of the Bankruptcy Code, the phrase "after notice and hearing" means "notice as is appropriate in the particular circumstances, and such opportunity for a hearing as is appropriate in the particular circumstances." 11 U.S.C. § 102(1)(A).  As set forth above, by service of this Motion, all interested parties have been provided notice of the salient details regarding this Motion and the Sale Hearing.  Accordingly, notice is sufficient under section 363 of the Bankruptcy Code.

59.     Bankruptcy Rule 2002:  Bankruptcy Rule 2002 requires twenty days notice of proposed sales of property other than in the ordinary course of business.  In addition, Bankruptcy Rule 2002 provides that, as to sales, notice of a sale shall "include the time and place of any public sale, the terms and conditions of any private sale and the time fixed for filing objections." Fed. R. Bankr. P. 2002.  Local Rule 2002-1(b) specifies the parties on whom a Motion for a sale other than in the ordinary course of business must be served in cases pending in this jurisdiction. The Debtor believes that this Motion and Sale Notice contains the requisite information to reasonably notify parties in interest in satisfaction of the foregoing rules and requirements, and

as discussed in detail herein, exigent circumstances necessitate the Selling Debtor to be able to have the Motion approved as expeditiously as possible, but by no later than July 23, 2007 (in order for the Debtor to be in a position to close the Sale on or before August 1, 2007). Indeed, by filing on June 18 for a July 23 hearing, the Selling Debtor is providing 35 days notice of the Sale.

60.     Bankruptcy Rules 6004 and 6006:  Bankruptcy Rule 6004 requires that notices of sales of property out of the ordinary course of business comply with Bankruptcy Rule 2002.  As set forth above, the Debtor has complied with Bankruptcy Rule 2002.  Bankruptcy Rule 6006 requires notice of a motion to assume or assign an executory contract or unexpired lease to be served on the counterparty to such contract or lease, as well as on other parties in interest as this Court may direct.  The list of Transferred Contracts, including cure amount, and notice of the Motion will be served on counterparties to the Transferred Contracts, and thus this requirement will be satisfied.

61.     Procedural Due Process:  The notice of this Motion that is being provided is "reasonably calculated" to apprise interested parties of the pendency of the matter and to afford them an opportunity to object.  See Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 314, 70 S.Ct. 652, 94 L.Ed. 865 (1950).  Parties in interest have been or will be and should be found to have been afforded adequate notice of this Motion and the Sale Hearing.

62.     The Debtor submits that the notice that they have provided of this Motion and the Sale Hearing is reasonable and appropriate and should be approved by this Court as adequate and sufficient notice.

**I.      Relief Under Bankruptcy Rule 6004(h) is Appropriate.**

63.     Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of 10 days after entry of the order, unless the

30

court orders otherwise." The Selling Debtor requests that any order approving the Agreements be effective immediately by providing that the 10-day stay under Bankruptcy Rule 6004(h) is waived.

64.    The purpose of Bankruptcy Rule 6004(h) is to provide sufficient time for an objecting party to appeal before an order can be implemented. See Advisory Committee Notes to Fed. R. Bankr. P. 6004(h) and 6006(d). Although Bankruptcy Rule 6004(h) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the 10-day stay period, Collier suggests that the 10-day stay period should be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to the procedure." 10 Collier on Bankruptcy 15th Ed. Rev., ¶ 6064.09 (L. King, 15th rev. ed. 1988). Furthermore, Collier provides that if an objection is filed and overruled, and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time actually necessary to file such appeal. Id.

65.    To preserve the value of the Washcoat Business by bringing certainty to the sale process, and because both the Selling Debtor and Buyer desire to close the Sale before August 1, 2007, the Selling Debtor seeks to close the Sale as soon as possible after all closing conditions have been met or waived. Accordingly, the Selling Debtor hereby requests that the Court waive the 10-day stay period under Bankruptcy Rule 6004(h) and 6006(d) or, in the alternative, if an objection to the Sale is filed, reduce the stay period to the minimum amount of time needed by the objecting party to file its appeal to allow the Sale to close.

### No Prior Request

66.    No prior Motion for the relief requested herein has been made to this or any other court.

31

WHEREFORE, the Selling Debtor requests that the Court grant it the relief requested herein and such other and further relief as is just and proper.

Dated: June 18, 2007                    Respectfully submitted,

KIRKLAND & ELLIS LLP
David M. Bernick
Janet S. Baer
Lori Sinanyan
200 East Randolph Drive
Chicago, Illinois 60601
(312) 861-2000

-- and --

PACHULSKI, STANG, ZIEHL, YOUNG JONES & WEINTRAUB LLP

Laura Davis Jones (Bar No. 2436)
James E. O'Neill (Bar No. 4042)
Timothy P. Cairns (Bar No. 4228)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705 (Courier 19801)
(302) 652-4100

Co-Counsel for the Debtors and Debtors in Possession

91100-001\DOCS_DE:128389.1