# EXHIBIT B

**[Execution Draft]**

**WASHCOAT SALE AGREEMENT**

**June18, 2007**

## TABLE OF CONTENTS

**Page**

ARTICLE 1      Definitions.................................................................................... 1

    1.01      General.................................................................................... 1
    1.02      Defined Terms ......................................................................... 2

ARTICLE 2      Sale of Washcoat Business, Purchase Price...................................... 17

    2.01      Purchase and Sale of Transferred Assets ......................................... 17
    2.02      Excluded Assets ...................................................................... 19
    2.03      Transferred Liabilities .............................................................. 21
    2.04      Excluded Liabilities ................................................................. 21
    2.05      Amount and Form of Consideration............................................... 22
    2.06      Purchase Price Allocation.......................................................... 23
    2.07      Assumption and Assignment of Transferred Contracts ....................... 23

ARTICLE 3      Closing ........................................................................................ 24

    3.01      Closing Date .......................................................................... 24
    3.02      Time and Place of Closing, Simultaneity .......................................... 24
    3.03      Transfers at the Closing; Payments................................................ 24
    3.04      Ancillary Agreements............................................................... 25
    3.05      Transfer of Certain Silica Assets ................................................. 26
    3.06      Further Assurances of Seller ...................................................... 28
    3.07      Further Assurances of Buyer...................................................... 26

ARTICLE 4      Purchase Price, Post-Closing Adjustments ........................................ 27

    4.01      Closing of Books .................................................................... 27
    4.02      Definitions............................................................................. 27
    4.03      Computations ......................................................................... 28
    4.04      Closing Statement ................................................................... 28
    4.05      Acceptance............................................................................ 28
    4.06      Non-Acceptance, Resolution of Disputes .......................................... 29
    4.07      Payment of Adjustments............................................................ 30

ARTICLE 5      Seller's Representations and Warranties ........................................... 30

    5.01      Corporate Organization and Existence............................................. 30
    5.02      Corporate Power .................................................................... 30
    5.03      Authorization ........................................................................ 30
    5.04      Execution and Delivery.............................................................. 31
    5.05      No Conflict ........................................................................... 31
    5.06      Consents and Approvals ........................................................... 31
    5.07      Binding Effect ....................................................................... 32
    5.08      Financial Statements................................................................. 32
    5.09      Sufficiency of Assets ............................................................... 32
    5.10      Real Property; Title to Transferred Assets; Encumbrances................ 33
    5.11      Inventory.............................................................................. 34

## TABLE OF CONTENTS
(continued)

Page

| | | | |
|---|---|---|---|
| 5.12 | Litigation; Investigations | 34 |
| 5.13 | Insurance | 34 |
| 5.14 | Contracts | 34 |
| 5.15 | Labor and Employment | 35 |
| 5.16 | Employee Benefit Plans | 37 |
| 5.17 | Environmental | 37 |
| 5.18 | Intellectual Property | 38 |
| 5.19 | Conduct of Business | 40 |
| 5.20 | Compliance with Laws | 41 |
| 5.21 | Permits | 42 |
| 5.22 | Customers and Suppliers | 42 |
| 5.23 | Brokers | 42 |
| 5.24 | Transferred Silica Assets | 42 |
| ARTICLE 6 | Buyer Representations and Warranties | 43 |
| 6.01 | Corporate Status | 43 |
| 6.02 | Authorization | 43 |
| 6.03 | No Conflict | 43 |
| 6.04 | Consent and Approvals | 44 |
| 6.05 | Binding Effect | 44 |
| 6.06 | Sufficient Funds | 44 |
| 6.07 | Adequate Assurance | 44 |
| 6.08 | Brokers | 44 |
| 6.09 | Litigation | 45 |
| ARTICLE 7 | Buyer's Investigation | 44 |
| 7.01 | Investigation | 45 |
| 7.02 | Financial Information | 45 |
| 7.03 | No Additional Representations | 45 |
| ARTICLE 8 | Covenants of Seller and Buyer | 46 |
| 8.01 | Bankruptcy Court Actions | 46 |
| 8.02 | Access and Inquiry | 48 |
| 8.03 | Licenses and Permits | 48 |
| 8.04 | Assignment of Real Property Lease | 48 |
| 8.05 | Notices to Third Parties | 48 |
| 8.06 | Commercially Reasonable Efforts | 48 |
| 8.07 | Title Insurance and Survey | 49 |
| 8.08 | Waiver of Bulk Sales Law Compliance | 49 |
| ARTICLE 9 | Conduct of Business Prior to the Closing | 50 |
| 9.01 | Operation in Ordinary Course | 50 |
| 9.02 | Disposition of Assets | 51 |
| 9.03 | Certain Agreements | 51 |

-ii-

## TABLE OF CONTENTS
(continued)

Page

ARTICLE 10     Conditions Precedent to Buyer's Obligations ..................................... 51

10.01     Accuracy of Representations and Warranties .................................... 51
10.02     Performance of Covenants and Agreements...................................... 51
10.03     Permits, Consents, etc ....................................................................... 52
10.04     Litigation ............................................................................................. 52
10.05     Certificates of Seller .......................................................................... 52
10.06     Bankruptcy Court Approval................................................................. 53
10.07     Landlord's Consent............................................................................. 53
10.08     Title Insurance and Survey................................................................. 53
10.09     Ancillary Documents ........................................................................... 53

ARTICLE 11     Conditions Precedent to Seller's Obligations...................................... 54

11.01     Accuracy of Representations and Warranties .................................... 54
11.02     Performance of Covenants and Agreements...................................... 54
11.03     Permits, Consents, etc ....................................................................... 54
11.04     Litigation ............................................................................................. 54
11.05     Certificates of Buyer .......................................................................... 55
11.06     Bankruptcy Court Approval................................................................. 55
11.07     Landlord's Consent............................................................................. 55
11.08     Ancillary Agreements.......................................................................... 56

ARTICLE 12     Employee Matters.................................................................................... 56

12.01     Employment ........................................................................................ 56
12.02     Bargaining Unit Employees ................................................................ 57
12.03     Non-Bargaining Unit Employees ........................................................ 57
12.04     Vacation; Flexible Spending Accounts ............................................... 58
12.05     Employee Related Liabilities .............................................................. 59
12.06     Seller Cooperation.............................................................................. 60
12.07     Benefit Plans ...................................................................................... 60
12.08     Voluntary Severance Plan .................................................................. 61

ARTICLE 13     Termination ............................................................................................. 62

13.01     Rights to Terminate ............................................................................ 62
13.02     Consequences of Termination............................................................ 63

ARTICLE 14     Indemnification ....................................................................................... 63

14.01     Definitions........................................................................................... 63
14.02     Seller's Indemnification....................................................................... 64
14.03     Buyer's Indemnification ...................................................................... 66
14.04     Limitations .......................................................................................... 67
14.05     Defense of Third-Party Claims ........................................................... 68
14.06     No Consequential or Lost Profit Damages; Exclusive Remedy........... 70
14.07     Priority of Payments ........................................................................... 70

**TABLE OF CONTENTS**
(continued)

Page

ARTICLE 15    Cooperation in Various Matters ........................................................... 71

    15.01    Mutual Cooperation .............................................................................. 71
    15.02    Preservation of Buyer's Files and Records........................................... 71
    15.03    Preservation of Seller's Files and Records........................................... 72

ARTICLE 16    Post-Closing Matters .......................................................................... 72

    16.01    Reports................................................................................................. 72
    16.02    Renewal of Guaranteed Items.............................................................. 72
    16.03    "Grace" and "Davison" Names.............................................................. 73
    16.04    Intercompany Agreements ................................................................... 73
    16.05    Seller's Covenant Not to Compete ....................................................... 73
    16.06    Nonassignable Items............................................................................ 74
    16.07    Accounts Receivable and Other Payments Received After Closing.... 75
    16.08    Non Solicitation of Transferred Employees ......................................... 75
    16.09    Certain Environmental Matters ............................................................ 75
    16.10    Protection of Seller's Intellectual Property ........................................... 78
    16.11    Removal of Purchased Columbia Assets and Silica Assets ............... 79

ARTICLE 17    Expenses............................................................................................. 80

    17.01    Expenses.............................................................................................. 81
    17.02    Transfer Taxes ..................................................................................... 81

ARTICLE 18    Notices ................................................................................................ 81

    18.01    Notices ................................................................................................. 81

ARTICLE 19    General................................................................................................ 81

    19.01    Entire Agreement.................................................................................. 81
    19.02    Governing Law ..................................................................................... 81
    19.03    Submission to Jurisdiction ................................................................... 81
    19.04    Third-Party Beneficiaries ..................................................................... 82
    19.05    Assignment; Successors ...................................................................... 82
    19.06    Amendments and Waivers ................................................................... 82
    19.07    Counterparts......................................................................................... 83
    19.08    Captions ............................................................................................... 83

**W. R. GRACE & CO.-CONN.**
**WASHCOAT SALE AGREEMENT**

**Exhibits and Schedules**

<u>**Exhibits**</u>

| | |
|---|---|
| A | Sale Order |
| B | Washcoat Intellectual Property License Agreement |

<u>**Schedules**</u>

| | |
|---|---|
| 1.02 | Purchased Columbia Assets |
| 2.01(b) | Certain Personal Property |
| 2.01(j) | Transferred Claims and Causes of Action |
| 2.01(k) | Transferred Software |
| 3.05 | Transferred Silica Assets |
| 4.01 | Inventory Procedures |
| 4.03 | Seller Accounting Policies |
| 5.05 | Seller's Conflicts |
| 5.06 | Seller's Consents and Approvals |
| 5.08(a) | Washcoat Business Financial Schedules |
| 5.08(b) | Washcoat Business Income Statement |
| 5.09 | Sufficiency of Assets |
| 5.10(a) | Owned Real Property |
| 5.10(b) | Leased Real Property |
| 5.10(c) | Subleases and Licenses |
| 5.10(e) | Liens on Transferred Assets |
| 5.11 | Third-Party Warehouses |
| 5.12 | Litigation; Investigations |
| 5.13 | Insurance |
| 5.14(a) | Material Contracts |
| 5.14(b) | Transferred Contracts Other Than Material Contracts |
| 5.15(a) | Employees |
| 5.15(c) | Immigration Issues |
| 5.15(d) | Collective Bargaining Agreement/Relations with Labor Organizations |
| 5.15(e) | Labor Organizing Activities |
| 5.15(f) | Employment Claims |
| 5.15(g) | Concerted Industrial Action |
| 5.16 | Employee Benefit Plans |
| 5.17 | Environmental |
| 5.18(a) | Scheduled Washcoat IP |
| 5.18(b) | Scheduled Washcoat IP Exceptions |
| 5.18(d) | Certain Washcoat IP Orders |
| 5.18(g) | Exclusive Washcoat IP |
| 5.19 | Conduct of Business |

| 5.21 | Permits |
|------|---------|
| 5.22 | Customers and Suppliers |
| 5.23 | Seller's Brokers |
| 6.04 | Buyer's Consents and Approvals |
| 6.08 | Buyer's Brokers |
| 10.03 | Seller Third-Party Consents |
| 11.03 | Buyer Third-Party Consents |
| 12.01(a) | Non Bargaining Unit Business Employees |
| 14.02(c) | Subject Patents and Scheduled Products |
| 16.05 | Permitted Competing Products |
| 16.09 | Scope of Environmental Survey |

## WASHCOAT SALE AGREEMENT

This Washcoat Sale Agreement (this "Agreement") is made as of June 18, 2007, by and between W. R. Grace & Co.-Conn., a Connecticut corporation ("Seller") and Rhodia Inc., a Delaware corporation ("Buyer").

### WITNESSETH:

WHEREAS, Seller wishes to sell to Buyer, and Buyer wishes to acquire from Seller, the Washcoat Business;

WHEREAS, upon the terms and subject to the conditions hereinafter set forth and in order to consummate the desired transfer of the Washcoat Business, the Parties desire that Seller sell, assign and transfer to Buyer, and that Buyer purchase and acquire from Sellers, the Transferred Assets, and Buyer assume the Transferred Liabilities, and that Seller license to Buyer the Washcoat IP as provided in the Washcoat License Agreement; and

WHEREAS, Seller intends that the transactions contemplated by this Agreement shall be implemented through the filing of the Sale Motion pursuant to sections 105, 363 and 365 of the Bankruptcy Code seeking approval of the transactions contemplated by this Agreement.

NOW THEREFORE, in consideration of the mutual covenants herein contained, the parties hereby agree as follows:

### ARTICLE 1

### Definitions

1.01   General.

(a)   This Agreement is the result of the joint efforts of Buyer and Seller, and there is to be no construction against either party based on any presumption of that party's involvement in the drafting thereof. Any reference to any federal, state, local or foreign statute or law shall be deemed also to refer to all rules and regulations promulgated thereunder.

-1-

(b)      All Article and Section numbers, and Exhibit and Schedule references, used in this Agreement refer to Articles and Sections of this Agreement, and Exhibits and Schedules attached hereto or delivered simultaneously herewith, unless otherwise specifically stated.

(c)      Any of the terms defined in this Agreement may be used in the singular or the plural.  In this Agreement, unless otherwise specifically stated, "hereof," "herein," "hereto," "hereunder" and the like refer to this Agreement as a whole and not merely to the specific Section, Article, paragraph or clause in which the word appears.  Except as otherwise expressly provided, any noun or pronoun shall be deemed to include the plural as well as the singular and to cover all genders, and the terms "include" and "including" shall be deemed to be followed by the following phrase "without limitation."

(d)      The terms "dollars" and "$" shall mean United States dollars.

1.02   <u>Defined Terms</u>.  For purposes of this Agreement, including the Exhibits and Schedules, the following defined terms have the meanings set forth in this Section.

"Affiliate" of any Person shall mean any other Person, which, directly or indirectly, controls or is controlled by or is under common control with such Person.  A Person shall be deemed to "control," be "controlled by" or be "under common control with" any other Person if such other Person possesses, directly or indirectly, power to direct or cause the direction of the management or policies of such Person whether through the ownership of voting securities or other ownership interests, by contract or otherwise.

"Allocation" has the meaning given to such term in Section 2.06.

"Ancillary Agreements" means the agreements described in Section 3.04.

"Arbitrator" has the meaning given to such term in Section 4.06(b).

"Bankruptcy Code" means 11 U.S.C. § 101 *et seq.*

"Bankruptcy Court" means the United States Bankruptcy Court for the District of Delaware or any other court of competent jurisdiction having jurisdiction over the Bankruptcy Proceeding or over any appeal of an order entered in the Bankruptcy Proceeding that relates to the Transactions.

"Bankruptcy Proceeding" means *In re: W. R. Grace & Co. et al., Debtors*, Chapter 11, Case Nos. 01-1139 et al. (JKF) (Jointly Administered) in the Bankruptcy Court.

"Bulk Sales Law" has the meaning given to such term in Section 8.08.

"Business Day" means a day that is not a Saturday or Sunday, nor a day on which banks are generally closed in New York City.

"Business Employees" has the meaning given to such term in Section 12.01.

"Buyer" has the meaning given to such term in the preamble.

"Buyer Benefit Plan" has the meaning given to such term in Section 12.07(b).

"Buyer Entity" means Buyer, any of its Subsidiaries, its ultimate parent, and any of its ultimate parent's direct or indirect Subsidiaries.

"Buyer Group" means all the Buyer Entities.

"Buyer Off-Site Liability" means any liability resulting from the presence or existence of any Hazardous Substance, which is generated by the Buyer Group's operations at the Owned Real Property or the Leased Real Property after the Closing Date, at any real property (including the Leased Real Property, but excluding the Owned Real Property) to which Buyer Group sent (directly or indirectly) or at which Buyer Group treated, stored or disposed of such Hazardous Substance.

"Buyer's Claim" has the meaning given to such term in Section 14.04.

"Buyer's FSA Plan" has the meaning given to such term in Section 12.04(b).

"Buying Companies" means, collectively, Buyer and any and all designees of Buyer to whom Transferred Assets are transferred pursuant to this Agreement.

"Closing" has the meaning given to such term in Section 3.01.

"Closing Assumption Agreement" means the assumption agreement to be executed and delivered by Buyer at the Closing in substantially the form attached hereto as Exhibit B.

"Closing Current Assets", "Closing Current Liabilities" and "Closing Working Capital Amount" have the respective meanings given to such terms in Section 4.02.

"Closing Date" has the meaning given to such term in Section 3.01.

"Closing Statement" has the meaning given to such term in Section 4.04.

"Closing Transfer Documents" means the bills of sale and other instruments of transfer to be executed and delivered by Seller at the Closing.

"Code" means the Internal Revenue Code of 1986, as amended.

"Competing Product" has the meaning given to such term in Section 16.05.

"Confidentiality Agreement" means the confidentiality agreement dated June 30, 2006, between Seller and Buyer.

"Consultant" has the meaning given such term in Section 16.09(a).

"Contamination" means the emission, discharge, placement, presence or release of any Hazardous Substance to, on, onto or into the Environment and the effects of such emission, discharge, placement, presence or release, including the presence or existence of any such Hazardous Substance.

"Control" in respect to Seller's or another Seller Entity's interest in Intellectual Property, shall mean that Seller or another Seller Entity (1) has the right to transfer ownership, make available, and/or grant licenses under such Intellectual Property without accounting to others, or (2) has the right to transfer ownership of, make available, and/or license such Intellectual Property, subject to royalty or other obligations or restrictions on which the exercise of Seller's or another Seller Entity's right is contingent, which Seller or another Seller Entity shall satisfy without any commitment by Buyer.

"Cure Costs" has the meaning given to such term in Section 2.07.

"Employees" has the meaning given to such term in Section 5.15(a).

"Environment" means navigable waters, waters of the contiguous zone, ocean waters, surface waters, groundwater, drinking water supply, land surface, soil, subsurface strata, outdoor and indoor air, plant life, animal life, human life and any other environmental medium or natural resource.

"Environmental Laws" means, collectively, any and all applicable laws, ordinances, rules, regulations, directives, orders, authorizations, decrees, notices, permits, binding plans, demand letters or other mandates, proscriptions or prescriptions of any nature, whether current or future of a Governmental Authority, relating in any way to Contamination, protection of the Environment, protection of natural resources or protection of human health and safety, including those relating to emissions, discharges, releases or threatened emissions, discharges or releases to, on, onto or into the Environment of, or exposures or threatened exposures to, any Hazardous Substance.

"Environmental Liability" shall mean liabilities for response, remedial, corrective action or investigation costs, including any liabilities for contribution, and any other expenses (including reasonable attorney and consultant fees, laboratory costs and litigation costs) required under, or necessary to attain or maintain compliance with, applicable Environmental Laws, relating to or arising from Contamination or Hazardous Substances or arising under any other theory of law or at equity.

"Environmental Matters" means any matter arising out of or relating to (a) Contamination; (b) Environmental Laws and compliance with Environmental Laws; (c) protection of the Environment (indoor or outdoor); or (d) protection of human health and safety, including any of the foregoing relating to the presence, use, production, generation, handling, transport, management, treatment, storage, disposal, distribution, discharge, release, control or cleanup of, or exposure to, any Hazardous Substance or Hazardous Substance-containing material.

"Environmental Permits" means all approvals, consents, permits, licenses, registrations and authorizations required by applicable Environmental Laws in order to operate the Washcoat Business, the Owned Real Property, the Leased Real Property, and the Transferred Assets.

"Environmental Survey" has the meaning given to such term in Section 16.09(a).

"Environmental Survey Report" has the meaning given to such term in Section 16.09(a).

"Excluded Assets" has the meaning given to such term in Section 2.02.

"Excluded Liabilities" has the meaning given to such term in Section 2.04.

-6-

"Final Order" means any order of the Bankruptcy Court after all opportunities for rehearing, reargument, petition for certiorari and appeal are exhausted or expired and any requests for rehearing have been denied, and that has not been revised, stayed, enjoined, set aside, annulled, reversed, remanded, modified or suspended, with respect to which any required waiting period has expired, and to which all conditions to effectiveness prescribed therein or otherwise by law or order have been satisfied; provided, however, that no order shall fail to be a Final Order solely because of the possibility that a motion pursuant to Rule 60 of the Federal Rules of Civil Procedure or Rule 9024 of the Federal Rules of Bankruptcy Procedure may be filed with respect to such order.  In the case of the Sale Order only, a Final Order shall also consist of an order as to which an appeal, notice of appeal or motion for rehearing or new trial has been filed, but which (a) does not challenge Buyer's good faith purchaser status under Section 363(m) of the Bankruptcy Code, (b) does not assert that the transactions contemplated by this Agreement are avoidable pursuant to, or otherwise violates, Section 363(n) of the Bankruptcy Code, and (c) has not resulted in a stay of the Sale Order.

"Financial Information" has the meaning given to such term in Section 7.02.

"Financial Schedules" has the meaning given to such term in Section 5.08(a).

"FSA Balance" has the meaning given to such term in Section 12.04.

"Governmental Authority" means an entity, including contractors and agents acting on behalf of an entity, exercising executive, legislative, judicial, regulatory or administrative functions of government, including, but not limited to, agencies,

departments, boards, commissions, and other instrumentalities thereof, whether national, federal, state or local.

"Hazardous Substance" means any element, substance, compound or mixture whether solid, liquid or gaseous, that is subject to regulation or control under any Environmental Law.

"Income Tax" means any federal, state, local or foreign governmental tax or assessment to the extent measured or imposed upon income, and any interest and penalties assessed on any such tax or assessment.

"Indemnified Party" has the meaning given to such term in Section 14.05.

"Indemnifying Party" has the meaning given to such term in Section 14.05.

"Insurance Policies" has the meaning given to such term in Section 5.13.

"Intellectual Property" or "IP" means any and all of the following:

(a)     United States and foreign patents, patent applications, including all reissues, divisions, continuations, continuations-in part, substitutions, or extensions of any of the foregoing (collectively, "Patent Rights");

(b)     (1) internet domain names, (2) trademarks, service marks, trade names, brand names, trade dress, logos, and designs, assumed names and other indications of origin, whether registered or unregistered, and any applications or renewals therefor, and (3) all goodwill symbolized thereby or associated with subsection (2) (collectively, "Trademark Rights");

(c)     United States and foreign copyrights, whether registered or unregistered, and any applications therefor or renewals thereof (collectively, "Copyrights"); and

(d)     all inventions, invention disclosures, discoveries, lab manuals, lab notes, technical information, formulae, processes, designs, drawings, know-how,

show-how, manufacturing know-how, trade secrets, computer software and technical manuals and documentation which are not embodied within subparagraphs (a), (b) and (c) (collectively, "Information").

"IRCA" has the meaning given to such term in Section 5.15(c).

"Lease Assignment" means a document substantially in the form attached hereto as Exhibit C.

"Leased Real Property" means the real property leased by Seller pursuant to the Real Property Lease.

"Lien" means any mortgage, pledge, security interest, deed of trust, charge, option, claim, right of first refusal, easement, covenant, servitude, transfer restriction or other lien or encumbrance.

"Material Adverse Effect" means any circumstance, change or effect that is materially adverse to the Transferred Assets or the business, financial condition or results of operations of the Washcoat Business, in each case taken as a whole.

"Material Contracts" means the contracts listed on Schedule 5.14(a).

"Nonassignable Items" has the meaning given to such term in Section 16.06.

"Non-Removing Party" has the meaning given to such term in Section 16.11.

"Owned Real Property" means the real property owned by Seller and located at 4775 Paddock Road, Cincinnati, Ohio 45229, together with any and all buildings, structures, improvements and fixtures located thereon.

"Parties" means Seller and Buyer.

"Permit" means any approval, authorization, consent, franchise, license, permit or certificate issued or required by any Governmental Authority.

-9-

"Permitted Exceptions" means (a) liens for current Taxes, assessments or other claims by a Governmental Authority not yet delinquent or the amount or validity of which is being contested in good faith by appropriate proceedings and for which an appropriate escrow or security deposit or reserve is established by Seller therefor; (b) zoning, subdivision, building code, entitlement and other land use, construction and Environmental Laws by a Governmental Authority; (c) easements, rights-of-way, licenses, utility agreements, restrictions, and other similar encumbrances of record, and matters that would be shown on any survey of the Owned Real Property, which, in each case, do not materially diminish the value of or materially interfere with the continued use of such property (real or personal) or asset used in the Washcoat Business consistent with past practice; and (d) such other imperfections in title, charges, easements, restrictions and encumbrances in each case which do not materially diminish the value of or materially interfere with the continued use of such property (real or personal) or asset used in the Washcoat Business consistent with past practice.

"Person" means any individual, partnership, firm, trust, association, company, limited liability company, corporation, joint venture, unincorporated organization, other business entity or Governmental Authority.

"Post-Closing Employment Liabilities" has the meaning given to such term in Section 12.05(c).

"Post-Closing On-Site Liability" means any liability resulting from the presence or existence of any Hazardous Substance first occurring after the Closing Date, or the addition of Hazardous Substances after the Closing Date, on or in the groundwater, land surface, soil or subsurface strata of the Owned Real Property, and any liability

-10-

resulting from the migration of such Hazardous Substance beyond the boundary lines of the Owned Real Property, irrespective of whether a Buyer Entity or a Third-Party is the owner or operator of the Owned Real Property at the time such presence or existence first occurs or at the time of such addition.

"Post-Petition Loan Agreement" means the Post-Petition Loan and Security Agreement dated as of April 1, 2001, as amended, among the financial institutions named therein as the Lenders, Bank of America, N.A., as the Agent and W. R. Grace & Co. and the Subsidiaries of W. R. Grace & Co. named therein, as Debtors and Debtors in Possession, as the Borrowers.

"Pre-Closing Employment Liabilities" has the meaning given to such term in Section 12.05(b).

"Pre-Closing On-Site Liability" means any liability resulting from the presence or existence of any Hazardous Substance (excluding liabilities for removal, repair or abatement related to lead and asbestos in, on or constituting part of the buildings, structures, improvements and fixtures included in the Owned Real Property) on or prior to the Closing Date on or in the groundwater, land surface, soil or subsurface strata of the Owned Real Property, or the buildings and other improvements included in the Owned Real Property, and any liability resulting from the migration of such Hazardous Substance beyond the boundary lines of the Owned Real Property, irrespective of whether a Seller Entity or a Third-Party was the owner or operator of the Owned Real Property at the time such presence or existence occurred.

"Proceeding" means any action, suit, investigation or proceeding, including, but not limited to, any workers compensation claim, litigation commenced by or on behalf of

-11-

employees, environmental, condemnation, expropriation, eminent domain or similar proceeding, or any proceeding seeking to revoke, cancel, suspend or modify any provision of a Permit, by or before a Governmental Authority other than the Bankruptcy Court.

"Purchase Price" has the meaning given to such term in Section 2.05.

"Purchased Columbia Assets" means all the machinery, equipment (including any Intellectual Property owned by Seller or any Seller Entity that is embodied in the mechanical features and physical design of such machinery or equipment, but excluding the Intellectual Property embodied in such machinery or equipment used in the aging and precipitation process step for making or treating any product or intermediate) and other property located at Seller's facility in Columbia, Maryland and exclusively used in the Washcoat Business, including the items listed on Schedule 1.02, except for those items that Buyer notifies Seller in writing prior to Closing that Buyer does not wish to purchase.

"Real Property Lease" means the Lease Agreement dated August 18, 1997 by and between Duke Realty Limited Partnership, and Grace Logistics Services, Inc. (predecessor in interest to Seller), as amended on November 20, 1997 and May 2, 2002 pertaining to a portion of the building commonly known as Mosteller Distribution Center II located at 11420 Mosteller Road, Cincinnati, Ohio 45241 which premises are more particularly described in the Real Property Lease.

"Remediation" shall mean those actions consistent with a permanent remedy taken to remove, prevent or minimize the release or migration of Hazardous Substances into or within the Environment, so that they do not cause substantial danger to present

-12-

or future public health or welfare or the Environment, including such actions as confinement, perimeter protection using dikes, trenches or ditches, clay cover, neutralization and cleanup, but in any event not including any deed restriction or land use restriction.

"Removal Assets" has the meaning given to such term in Section 16.11(a).

"Removal Date" has the meaning given to such term in Section 16.11(a).

"Removing Party" has the meaning given to such term in Section 16.11(a).

"Rhodia License Agreement" means the License Agreement between Rhodia Terres Rares and Seller, dated January 22, 1999, as amended.

"Sale Motion" means a motion which Seller shall file with the Bankruptcy Court seeking approval for the Transactions.

"Sale Order" means an order to be submitted to the Bankruptcy Court substantially in the form attached hereto as Exhibit A that, with such changes that are reasonably acceptable to Buyer and as may be approved by the Bankruptcy Court, is entered by the Bankruptcy Court approving the consummation of the Transactions.

"Scheduled Washcoat IP" has the meaning given to such term in Section 5.18(a).

"Seller" has the meaning given to such term in the preamble.

"Seller Accounting Policies" has the meaning given to such term in Section 4.03.

"Seller Benefit Plan" has the meaning given to such term in Section 5.16.

"Seller Entity" means Seller, any of its Subsidiaries, its ultimate parent and any of its ultimate parent's direct or indirect Subsidiaries.

-13-

"Seller Entity Employees" means Anthony J. Dondero, Christopher J. Schult, Charles J. Waskiewicz, Manoj Koranne, Robert Medler, Brett Jurd and Robert A. Maggio.

"Seller Group" means all the Seller Entities.

"Seller Off-Site Liability" means any liability resulting from the presence or existence of any Hazardous Substance, which was generated by Seller Group's operations at the Owned Real Property or the Leased Real Property on or prior to the Closing Date, at any real property (including the Leased Real Property, but excluding the Owned Real Property) to which Seller Group sent (directly or indirectly) or at which Seller Group treated, stored or disposed of such Hazardous Substance.

"Seller's FSA Plan" has the meaning given to such term in Section 12.04(b).

"Seller's Knowledge" means the actual knowledge of any of the Washcoat Executives or the Seller Entity Employees.

"Silica Assets" has the meaning given to such term in Section 2.02(i).

"Silica Business" means Seller's development, manufacture and sale of silica gel in the manner conducted at the Owned Real Property prior to Closing.

"Silica Gel Intellectual Property" has the meaning given to such term in Section 16.10(a).

"Subsidiary" of a Person means any other Person in which the first Person directly or through one or more intermediaries owns securities or other equity interests representing more than 50% of the voting power of all such securities or other equity interests.

-14-

"Substrate" means a honeycomb monolith or other structure made of ceramic or metal, forming a matrix of walls or channels.

"Supplemental Confidentiality Agreement" means the supplemental confidentiality agreement dated June 15, 2007, between Seller and Buyer.

"Supply Agreements" has the meaning given to such term in Section 3.04.

"Target Amount" means $9,421,000.

"Taxes" means any United States or foreign Income Tax (including any alternative or add-on minimum tax) or franchise tax based on net income, any payroll or other similar employment tax, any sales, use, excise, gross receipts or value added tax, or any tax on real or personal property, including interest and penalties with respect thereto.

"Tax Return" means any return, statement, report or form required to be filed or submitted to any Governmental Authority in connection with the determination, assessment, collection or payment of any Tax or in connection with the administration, implementation or enforcement or compliance with any law relating to any Tax.

"Third-Party" means any Person other than the Seller Group and Buyer and its Affiliates and Subsidiaries.

"Transaction Documents" means this Agreement, the Ancillary Agreements and the documents to be executed pursuant to Section 3.03, including the Closing Assumption Agreement and the Closing Transfer Documents.

"Transactions" shall mean the transactions contemplated by the Transaction Documents.

"Transferred Assets" has the meaning given to such term in Section 2.01.

"Transferred Contracts" means the Material Contracts and the contracts listed on Schedule 5.14(b), but excluding the Union Agreement.

"Transferred Employees" has the meaning given to such term in Section 12.01(c).

"Transferred Liabilities" has the meaning given to such term in Section 2.03.

"Transition Services Agreement" has the meaning given to such term in Section 3.04.

"Transferred Silica Assets" has the meaning given to such term in Section 3.05

"Union" means Local Union No. 661, Warehouse, Production and Maintenance Employees of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America.

"Union Agreement" means the collective bargaining agreement dated October 15, 2005 between Seller and Union, which covers certain Employees of the Washcoat Business.

"Valuation Time" means 11:59 p.m. U.S. Eastern Time on the date immediately prior to the Closing Date.

"VSP" has the meaning given to such term in Section 12.08.

"WARN Act" has the meaning given to such term in Section 12.05(b).

"Washcoat" means products that contain at least aluminum oxide or cerium oxide particles, and are applied to the surface of or incorporated within a Substrate, which Substrate after such application or incorporation is eventually incorporated as part of a catalytic converter used for reducing noxious emissions from internal combustion engines of non-stationary automotive and marine products.

-16-

"Washcoat Business" means the development, manufacture and sale of Washcoat as conducted by Seller at and from its facilities in Cincinnati, Ohio, Columbia, Maryland, Valleyfield, Quebec and Chattanooga, Tennessee during the 12 months prior to the date of this Agreement.

"Washcoat Business Income Statements" has the meaning given such term in Section 5.08(b).

"Washcoat Executives" means Krista M. Myers, Michael Connors and David M. Chapman.

"Washcoat License Agreement" has the meaning given to such term in Section 3.04(a).

"Washcoat IP" means Intellectual Property Controlled by Seller or another Seller Entity that is used in the Washcoat Business or has been developed or is under development for use in the Washcoat Business.

## ARTICLE 2

### Sale of Washcoat Business, Purchase Price

2.01   Purchase and Sale of Transferred Assets.   On the terms and subject to the conditions hereof, and subject to the exclusions set forth in Section 2.02, at the Closing, Seller shall sell, assign, transfer, convey and deliver to Buyer free and clear of all Liens (other than Permitted Exceptions) to the maximum extent permissible under section 363 of the Bankruptcy Code, and Buyer shall purchase, acquire and accept from Seller, all of the right, title and interest of Seller in, to and under any and all of the following assets, properties, rights, contracts and claims of Seller whether tangible or intangible, real, personal or mixed (collectively, the "Transferred Assets"):

(a)   the Owned Real Property;

-17-

(b)    machinery, equipment (including any Intellectual Property owned by Seller or any Seller Entity that is embodied in the mechanical features and physical design of such machinery or equipment but excluding the Intellectual Property embodied in such machinery or equipment used in the aging and precipitation process step for making or treating any product or intermediate), furniture, automobiles, trucks, tractors, trailers, tools, tooling and other tangible personal property:  (1) used in the Washcoat Business and located at the Owned Real Property or the Leased Real Property; or (2) used exclusively in the Washcoat Business wherever located, including, in each case, the items set forth on Schedule 2.01(b);

(c)    the Purchased Columbia Assets;

(d)    inventories and supplies of raw materials, works-in-process, finished goods, spare parts, supplies, storeroom contents, packaging inventories and other inventories items used primarily in the Washcoat Business and located at the Owned Real Property, the Leased Real Property and the sites described on Schedule 5.11;

(e)    trade accounts, notes receivable, accounts receivable and other receivables to the extent pertaining to the Washcoat Business;

(f)    prepayments, deposits and deferred charges to the extent pertaining to the Washcoat Business;

(g)    books and records (other than Tax Returns and related work papers), files, customer lists, accounting records, papers, tapes, disks, manuals, keys, reports, plans, catalogs, sales and marketing and promotional materials and all other printed and written materials, to the extent available, and general intangibles to the extent pertaining to the Washcoat Business;

(h)    rights under or pursuant to all warranties, representations and guarantees, whether express or implied, made by suppliers, manufacturers, contractors and other Third Parties with respect to any of the Transferred Assets, other than any of the foregoing that exclusively relate to any Excluded Asset or Excluded Liability;

(i)     the Permits described on Schedule 5.21 (to the extent permitted by applicable law to be transferred without the consent of any Third-Party, including any Governmental Authority);

(j)     claims, causes of action, choses in action, rights of recovery, rights of set off, and rights of recoupment listed on Schedule 2.01(j);

(k)     the software listed on Schedule 2.01(k);

(l)     rights and incidents in, to and under the Real Property Lease and the other Transferred Contracts;

(m)     all claims under Insurance Policies or proceeds therefrom related to any Transferred Asset; and

(n)     all other assets, properties, rights, contracts and claims of Seller, wherever located, whether tangible or intangible, real, personal or mixed, other than the Excluded Assets, as and to the extent such are used exclusively in the Washcoat Business;

but, in any event, in clauses (a) through (n) above, excluding the Excluded Assets.

2.02    Excluded Assets.  Notwithstanding anything to the contrary contained in Section 2.01, the Parties expressly understand and agree that the Transferred Assets shall not include, and Seller is not selling, assigning, transferring or conveying to Buyer, any right or title to or interest in, any of the following assets, properties, rights, contracts and claims, whether tangible or intangible, real, personal or mixed (collectively, the "Excluded Assets"):

(a)     cash and cash items, other than petty cash and deposits with Third Parties;

(b)     refunds of Taxes related to taxable periods ending on or prior to the Closing Date;

(c)     amounts receivable from any unit of Seller other than the Washcoat Business, or from any other Seller Entity;

(d)     Insurance Policies, claims with respect to Insurance Policies (except for claims under Insurance Policies or proceeds therefrom related to any Transferred Asset), and refunds of amounts previously paid or prepaid on account of Insurance Policies;

(e)     Seller Benefit Plans and funds maintained by, or in conjunction with, any Seller Entity in connection therewith, and refunds of amounts previously paid or prepaid amounts on account of such Seller Benefit Plans and funds, except as otherwise provided in Article 12 of this Agreement;

(f)     Information received from a Third-Party that is subject to a confidentiality agreement that prohibits the transfer of such Information, and consent of the counterparty to transfer of such Information is not obtained prior to the Closing

(g)     the Washcoat IP;

(h)     records relating to any of the Excluded Liabilities;

(i)     the assets of the Silica Business, including any such assets located on the Owned Real Property on the date hereof or on the Closing Date (the "Silica Assets");

(j)     the names "Grace" and "Davison," whether alone or in combination with each other or with other words, including in any tradename, trademark or service mark;

(k)     machinery, equipment and other tangible property located at Seller's facility in Columbia, Maryland, other than the Purchased Columbia Assets; and

(l)     any machinery and equipment in Valleyfield, Quebec and Chattanooga, Tennessee, used to supply products or materials to the Washcoat Business.

2.03    Transferred Liabilities.  At the Closing, Buyer shall assume and be liable for, and shall pay, perform and discharge, the following obligations and liabilities (collectively, the "Transferred Liabilities"):

(a)    the Closing Current Liabilities;

(b)    all liabilities of Seller in, to and under the Real Property Lease and the other Transferred Contracts (other than the Cure Costs subject to Section 2.07) arising from actions and occurrences after the Closing Date;

(c)    all liabilities and obligations of Seller under Permits that are Transferred Assets arising from actions and occurrences after the Closing Date;

(d)    all liabilities and obligations of Seller arising out of the operation or ownership of the Transferred Assets after the Closing Date;

(e)    all Post-Closing Employment Liabilities;

(f)    all Buyer Off-Site Liability;

(g)    all Post-Closing On-Site Liability; and

(h)    all removal, repair or abatement related liabilities and obligations related to the presence of lead or asbestos in, on or constituting part of any of the buildings, structures, improvements and fixtures included in the Owned Real Property.

2.04    Excluded Liabilities.  It is expressly understood and agreed that, except for the Transferred Liabilities, Buyer is not assuming and shall not be liable for any other liability or obligation of Seller, any Seller Entity or the Washcoat Business, including the following liabilities and obligations of Seller (collectively, the "Excluded Liabilities"):

(a)    all accounts payable of Seller;

(b)    Income Taxes for any tax period ending on or before the Closing Date;

-21-

(c)      payroll Taxes (including related withholding taxes) and all other Taxes for all periods ending on or before the Closing Date;

(d)      except as otherwise provided in the Transaction Documents, amounts payable to Seller or to any other Seller Entity;

(e)      premiums or any other charges under any Insurance Policy;

(f)      Seller Benefit Plans and funds, except as otherwise provided in Article 12 of this Agreement;

(g)      all Pre-Closing Employment Liabilities;

(h)      any liability resulting from or arising in connection with exposure to one or more Hazardous Substances, to the extent exposure occurred on or before the Closing Date;

(i)      any liability or obligation, including, any liability arising from claims for injury to persons or property, related to the Silica Business or any other business of any Seller Entity other than the Washcoat Business;

(j)      all liabilities and obligations, including, any liability arising from claims for injury to persons or property, arising out of the Transferred Assets or the Washcoat Business on or prior to the Closing Date;

(k)      all Seller Off-Site Liability; and

(l)      all Pre-Closing On-Site Liability.

2.05    Amount and Form of Consideration.    Subject to the adjustments provided for in Section 4.07 and upon the terms and conditions set forth in this Agreement, as consideration for the purchase of the Transferred Assets, Buyer shall pay to Seller $21,900,000 (the "Purchase Price") by wire transfer of immediately available funds to the following account:

JPMorgan Chase Bank, NA
New York NY
ABA number [if sending US dollars from within USA] :
021000021
SWIFT code [if sending US dollars from outside USA]:
CHASUS33
Account name: W. R. Grace & Co.-Conn.
Account number: 016001257
Text message: Funds from Rhodia for Gemini Purchase
Price

The Purchase Price shall be allocated among the Transferred Assets as provided in Section 2.06.

2.06    Purchase Price Allocation.  Buyer shall retain an appraiser to appraise the Transferred Assets in accordance with Section 1060 of the Code.  Buyer shall be responsible for all fees associated with such appraisal.  Each party agrees to prepare and timely file U.S. Internal Revenue Service Form 8594 (Asset Acquisition Statement) in accordance with Section 1060 of the Code with respect to the Transferred Assets in accordance with such appraisal (the "Allocation") and to cooperate in every reasonable way with the other party in the preparation of such form.  The Allocation will be binding upon Buyer and Seller and their respective successors and assigns, and none of the Parties will take any tax position that is inconsistent with the Allocation.

2.07    Assumption and Assignment of Transferred Contracts.  At the Closing, Seller shall assume and assign to Buyer and Buyer will assume all of the Transferred Contracts.  Seller and Buyer shall each be responsible for one-half of all payments under section 365 of the Bankruptcy Code which are required to assume and assign the Transferred Contracts (the "Cure Costs").  Notwithstanding the foregoing, Buyer may request and Seller shall file with the Bankruptcy Court a request by Buyer to modify Schedule 5.14(b) to add additional contracts related to the Washcoat Business as Transferred Contracts and have Buyer and Seller pay the corresponding Cure Costs in the manner provided in this section; provided, however, that any such request to modify Schedule 5.14(b) is made in writing by Buyer within sixty (60) days following the Closing Date, and provided, further, that Seller shall not be required to modify Schedule 5.14(b)

-23-

with respect to any contract that it has previously rejected in the Bankruptcy Proceeding.

## ARTICLE 3

### Closing

3.01    <u>Closing Date</u>.  The Parties shall undertake the closing of the Transactions contemplated hereunder (the "Closing") on:  (a) the first Business Day after the date on which the conditions to Closing set forth in Articles 10 and 11 (other than Sections 10.05 and 11.05) shall have been fulfilled or waived; provided however, that Closing shall not occur prior to 12:01 AM on August 1, 2007; or (b) such other Business Day as the Parties may mutually agree to in writing in accordance with Section 19.06 (the "Scheduled Closing Date").

3.02    <u>Time and Place of Closing, Simultaneity</u>.  The Closing shall commence at 10:00 a.m. local time on the Scheduled Closing Date at the offices of Seller, 7500 Grace Drive, Columbia, Maryland or at such other time and place as the Parties may mutually agree to in writing in accordance with Section 19.06.  All of the actions to be taken and documents to be executed and delivered at the Closing shall be deemed to be taken, executed and delivered simultaneously, and no such action, execution or delivery shall be effective until all actions to be taken and executions and deliveries to be effected at the Closing are complete.  The "Closing Date" is the date on which the Closing is effective.

3.03    <u>Transfers at the Closing; Payments</u>.  At the Closing:

(a)    Seller shall execute, acknowledge and deliver to Buyer such general warranty deeds, bills of sale, assignments and other instruments of sale, transfer and assignment in order to effectively transfer to Buyer or its designees all right, title and interest of Seller in the Transferred Assets as Buyer shall reasonably request.

(b)    Buyer shall pay to Seller's account the Purchase Price by wire transfer of immediately available funds.

(c)     Buyer shall execute, acknowledge and deliver to Seller the Closing Assumption Agreement in order to effectively assume the Transferred Liabilities in the form to be agreed upon by the Parties.

(d)     Buyer, Seller and Landlord shall execute, acknowledge and deliver to each other the Lease Assignment in connection with the assignment of the Real Property Lease to Buyer in the form to be agreed upon by the Parties.

(e)     Rent under the Real Property Lease shall be prorated as of the Closing Date.

In addition, Buyer and Seller shall execute and deliver such other agreements, instruments and documents to effect, confirm or evidence the transactions contemplated by this Agreement as the other Party shall reasonably request.  Each document of transfer or assumption executed and delivered pursuant to this Section shall be reasonably satisfactory in form and substance to the Party or Parties to whom such document is delivered, but shall contain no representations, warranties, covenants or agreements other than those specifically contained in this Agreement.

3.04  Ancillary Agreements.  At the Closing, each of the following agreements (the "Ancillary Agreements") shall be executed and delivered by the parties thereto or, if executed and delivered simultaneously with this Agreement, shall then become effective:

(a)     Washcoat Intellectual Property License Agreement, substantially in the form of Exhibit B (the "Washcoat License Agreement").

(b)     Supply Agreements for certain products manufactured in Chattanooga, Tennessee and Valleyfield, Quebec in the forms to be agreed upon by the Parties.

(c)     Transition Services Agreement for, among other possible services, training with respect to the Washcoat IP, information technology services and laboratory support services from Columbia, Maryland and pilot plant support from Baltimore (Curtis Bay), Maryland, in the form to be agreed upon by the Parties.

(d)     Termination Agreement with respect to the Rhodia License Agreement in the form to be agreed upon by the Parties.

3.05    Transfer of Certain Silica Assets.  At the Closing, Seller shall sell, assign, transfer, convey and deliver to Buyer free and clear of all Liens (other than Permitted Exceptions) to the maximum extent permissible under section 363 of the Bankruptcy Code, and Buyer shall purchase, acquire and accept from Seller, all of the right, title and interest of Seller in, to and under the assets located on the Owned Real Property set forth on Schedule 3.05 (the "Transferred Silica Assets").  BUYER ACKNOWLEDGES THAT EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES SET FORTH IN SECTION 5.24, THE TRANSFERRED SILICA ASSETS ARE TRANSFERRED "AS IS, WHERE IS, AND WITH ALL FAULTS" AND SELLER DISCLAIMS ALL REPRESENTATIONS AND WARRANTIES RESPECTING THE TRANSFERRED SILICA ASSETS, INCLUDING ANY IMPLIED OR EXPRESS WARRANTY OF MERCHANTABILITY OR FITNESS FOR PURPOSE.

3.06    Further Assurances of Seller.  At any time and from time to time after the Closing, at the request and expense of Buyer, each Seller Entity shall execute and deliver, or cause to be executed and delivered, all such deeds, assignments, and other documents, and take or cause to be taken all such other actions, as Buyer reasonably deems necessary or advisable in order to put Buyer or its designees in actual possession or operating control of the Transferred Assets, or to more fully and effectively vest in Buyer or its designees, or to confirm their title to and possession of, the Transferred Assets.

3.07    Further Assurances of Buyer.  At any time and from time to time after the Closing, at the request and expense of Seller, Buyer shall execute and deliver, or cause to be executed and delivered, all such documents, and take or cause to be taken all such other actions, as Seller reasonably deems necessary or advisable in order to more fully and effectively divest Seller of responsibility for the Transferred Liabilities and incidents of ownership of the Transferred Assets.

## ARTICLE 4

### Purchase Price, Post-Closing Adjustments

4.01   Closing of Books.   Seller and Buyer shall cooperate to close the books and related accounting records, on a going concern basis, of Seller (but only to the extent they relate to the Washcoat Business) as of the Valuation Time, and take a physical count of the Washcoat Business's inventories at or within five days prior to such time. Unless otherwise provided in Schedule 4.01, such inventory count shall be taken in accordance with the existing inventory-taking procedures of the Washcoat Business as described in Schedule 4.01; provided, however, that representatives of Buyer and Seller shall jointly participate in the taking of such inventory.

4.02   Definitions.

(a)   "Closing Current Assets" means: (i) the aggregate amount, as of the Valuation Time, of all inventories and accounts receivable included in the Transferred Assets, computed in accordance with Section 4.03; plus (ii) the Excess Union Severance Costs, computed as follows. "Excess Union Severance Costs" means the amount by which the Total Union Severance Costs exceed the Base Union Severance Costs. "Total Union Severance Costs" means any and all Union Severance Costs payable to no more than 12 bargaining unit operators and no more than four bargaining unit maintenance employees who are actually designated to receive severance under the VSP or Appendix III of the Union Contract upon their termination by Seller. "Union Severance Costs" means (A) any and all amounts actually payable by Seller to bargaining unit Employees pursuant to the VSP or to Appendix III of the Union Agreement; plus (B) in the case of such Employees who receive their severance pay in regular pay period installments following termination, Seller's contributions for such Employees after termination under the benefit plans in which such Employees are entitled to participate after termination under the VSP or said Appendix III. "Base Union Severance Costs" means any and all Union Severance Costs that would be payable by Seller under Appendix III of the Union Agreement to the 12 bargaining unit operators with the least seniority among such operators, and the four bargaining unit maintenance

-27-

personnel with the least seniority among such maintenance personnel, if they were entitled to severance under said Appendix III. For purposes of calculating Base Union Severance Costs, it shall be assumed that the Employees for whom Base Union Severance costs are calculated, elected under said Appendix III to receive their severance pay in regular pay period installments following termination. To the extent that there are any Excess Union Severance Costs that are not reflected in the final determination of the Working Capital Amount under Section 4.06, such excess shall be paid by Buyer to Seller upon its determination.

(b)    "Closing Current Liabilities" means the aggregate amount computed in accordance with Section 4.03, as of the Valuation Time, of Vacation Excess and the FSA Balance.

(c)    "Closing Working Capital Amount" means the amount of the Closing Current Assets less the amount of the Closing Current Liabilities.

4.03    Computations. The Closing Working Capital Amount shall be determined in U.S. dollars, on a going concern basis, in accordance with the accounting policies and procedures (applied consistently) set forth in Schedule 4.03 (the "Seller Accounting Policies").

4.04    Closing Statement. As soon as practicable after the Closing, but in any event no later than the one-month anniversary of the Closing Date, Seller shall deliver to Buyer a statement setting forth Seller's determination of the Closing Working Capital Amount (the "Closing Statement").

4.05    Acceptance. If Buyer does not object to the Closing Working Capital Amount shown on the Closing Statement delivered by Seller, by written notice of objection delivered to Seller within 30 calendar days after Buyer's receipt of such statement, describing in reasonable detail each of its proposed adjustments to Seller's determination thereof, then the Closing Working Capital Amount shown on the Closing Statement shall be final and binding on Seller and Buyer.

-28-

4.06   Non-Acceptance, Resolution of Disputes.

(a)     If Buyer does object to the Closing Working Capital Amount shown on the Closing Statement, then Buyer and Seller shall promptly endeavor to agree upon the proper amount of the items in dispute.  If a written agreement settling any disputed item has not been reached within 30 calendar days after the date of receipt by Seller from Buyer of Buyer's notice of objection thereto, then either Seller or Buyer may, by notice to the other, submit for determination by arbitration in accordance with this Section the question of what adjustments, if any, must be made to Seller's determination of such amount in order for it to be determined in accordance with the provisions of this Agreement.

(b)     Any such determination by arbitration shall be made by Deloitte & Touche LLP, or one of its affiliates (the "Arbitrator") and shall be final and binding on all parties to this Agreement.

(c)     The fees and expenses of the Arbitrator for any determination under this Article shall be shared as follows:  Seller shall bear that portion thereof equal to the total amount of such fees and expenses multiplied by a fraction, the denominator of which shall be the difference between the Closing Working Capital Amount as finally proposed by Buyer before the arbitration began and the Closing Working Capital Amount as finally proposed by Seller before the arbitration began, and the numerator of which shall be the difference between the Closing Working Capital Amount as determined by the Arbitrator and the Closing Working Capital Amount as finally proposed by Seller before the arbitration began.  Buyer shall bear the remainder of such fees and expenses.

(d)     Nothing herein shall be construed to authorize or permit the Arbitrator to determine (i) any question or matter whatsoever under or in connection with this Agreement or any Transaction Document except the determination of what adjustments, if any, must be made in one or more of the items reflected in the Closing Working Capital Amount as shown on the Closing Statement delivered by Seller in order for the Closing Working Capital Amount to be determined in accordance with the provisions of this Agreement and (ii) a Closing Working Capital Amount that is not in the range

-29-

between and including the final proposals of Seller and Buyer. Nothing herein shall be construed to require the Arbitrator to follow any rules or procedures of any arbitration association.

4.07   Payment of Adjustments.   If the Closing Working Capital Amount, as finally determined, exceeds the Target Amount, Buyer shall pay to Seller within five Business Days of the final determination of the Closing Working Capital Amount an amount equal to the Closing Working Capital Amount less the Target Amount. If the Closing Working Capital Amount, as finally determined, is less than the Target Amount, Seller shall pay to Buyer within five Business Days of the final determination of the Closing Working Capital Amount an amount equal to the Target Amount less the Closing Working Capital Amount. If the net amount of the adjusting payment is in excess of $100,000, interest shall be paid on the entire amount of the net adjusting payment, from the Closing Date to the date of payment, at a fixed rate per annum equal to the U.S. prime rate, as reported by *The Wall Street Journal*, in effect on the Closing Date, compounded monthly.

## ARTICLE 5

### Seller's Representations and Warranties

Seller represents and warrants to Buyer as follows:

5.01   Corporate Organization and Existence.   Seller is a corporation duly organized and validly existing under the laws of Connecticut. Seller is duly licensed or qualified to conduct the Washcoat Business as a foreign corporation in the state of Ohio.

5.02   Corporate Power.   Subject to entry of the Sale Order and it becoming a Final Order, Seller has full corporate power to enter into this Agreement and the other Transaction Documents to which it is or will be a party and perform its obligations hereunder and thereunder.

5.03   Authorization.   Subject to entry of the Sale Order and it becoming a Final Order, the execution and delivery by Seller of this Agreement and the other Transaction

-30-

Documents to which it is or will be a party and its performance of its obligations hereunder and thereunder have been duly authorized by all required corporate action.

5.04   Execution and Delivery.   Subject to entry of the Sale Order and it becoming a Final Order, Seller has duly and validly executed and delivered this Agreement and the other Transaction Documents to which it is a party and which are being executed and delivered simultaneously with this Agreement.   The remaining Transaction Documents to which Seller will be a party, when executed and delivered at the Closing, will be duly and validly executed and delivered by Seller.

5.05   No Conflict.   Except as set forth in Schedule 5.05, and subject to the entry of the Sale Order and it becoming a Final Order, the execution and delivery by Seller of this Agreement and the other Transaction Documents to which it is or will be a party, and its performance of its obligations hereunder and thereunder, do not (a) conflict with its certificate of incorporation or by-laws; (b) result in any violation, breach or termination of, or constitute a default or give rise to any right of consent, cancellation, termination or acceleration or right to increase the obligations or otherwise modify the terms under any Material Contract; or (c) result in any violation or breach of any of the provisions of, or constitute a default under, any law or regulation, judgment, order or decree, to which it is a party or by which it is bound, which violation, breach or default would materially adversely affect its ability to execute and deliver this Agreement or any other Transaction Document to which it is or will be a party or perform its obligations hereunder or thereunder.

5.06   Consents and Approvals.   Except as set forth in Schedule 5.06, subject to entry of the Sale Order and it becoming a Final Order, no consent, waiver, approval, order, Permit or authorization of, or declaration or filing with, or notification to, any Governmental Authority (other than the Bankruptcy Court) is required on the part of Seller in connection with the execution and delivery of this Agreement or the Transaction Documents, the consummation of the Transactions or the compliance by Seller with any of the provisions hereof or thereof.

5.07  <u>Binding Effect</u>.  Upon entry of the Sale Order and subject to it becoming a Final Order, this Agreement constitutes and, when executed and delivered at the Closing, each of the Transaction Documents to be executed by Seller will constitute, a valid and legally binding obligation of Seller, enforceable in accordance with its terms, subject to bankruptcy, insolvency, reorganization, moratorium, fraudulent transfer and similar laws of general applicability relating to or affecting creditors' rights and to general equity principles (whether in equity or at law).

5.08  <u>Financial Statements</u>.

(a)  <u>Schedule 5.08(a)</u> contains a schedule of the fixed assets, accounts receivable and inventory of the Washcoat Business as of December 31, 2006 as prepared by Seller's management (the "Financial Schedules").  The Financial Schedules were prepared from the books and records of Seller and reflect all amounts necessary for a fair presentation of the fixed assets, accounts receivable and inventory of the Washcoat Business as of the date of presentation, in accordance with the Seller Accounting Policies.

(b)  <u>Schedule 5.08(b)</u> contains the unaudited statement of income of the Washcoat Business for the years ended December 31, 2005 and December 31, 2006 as prepared by Seller's management (the "Washcoat Business Income Statements"). The Washcoat Business Income Statements were prepared on the basis of the books and records of the Seller and present fairly, in all material respects, in accordance with the Seller Accounting Policies, with such exceptions as are described on <u>Schedule 5.08(b)</u>, the results of operations of the Washcoat Business for the periods covered thereby.

5.09  <u>Sufficiency of Assets</u>.  Except as set forth on <u>Schedule 5.09</u>, the Transferred Assets, the Real Property Lease and the Ancillary Agreements, together with the license, products and services being provided to Buyer under the Ancillary Agreements, provide Buyer with all the assets, rights, including the rights to use all Intellectual Property, and services necessary to operate the Washcoat Business

immediately following the Closing in substantially the same manner as Seller conducted the Washcoat Business.

    5.10   Real Property; Title to Transferred Assets; Encumbrances.

    (a)   Schedule 5.10(a) sets forth a true and complete legal description and street address of the Owned Real Property. To Seller's Knowledge, Seller has good and marketable title to the Owned Real Property, free and clear of all Liens except Permitted Exceptions and Liens under the Post-Petition Loan Agreement.

    (b)   Schedule 5.10(b) sets forth the street address of the Leased Real Property. The Real Property Lease is in full force and effect and is valid and enforceable by Seller in accordance with its terms. To Seller's Knowledge, there exists no current default under the Real Property Lease that cannot be cured under section 365 of the Bankruptcy Code. Schedule 5.10(b) sets forth the Cure Costs related to the Real Property Lease.

    (c)   Except as set forth on Schedule 5.10(c), none of the Owned Real Property or the Leased Real Property is subject to any lease, sublease, license or other agreement granting to any other Person any right to the use or occupancy of such Owned Real Property or Leased Real Property.

    (d)   The Owned Real Property, the Leased Real Property, the real property owned or leased by Seller in Chattanooga, Tennessee and Valleyfield, Quebec, Seller's real property at Baltimore (Curtis Bay), Maryland and Seller's real property in Columbia, Maryland comprise all of the real property used in the direct manufacturing operations and research and development operations of the Washcoat Business.

    (e)   Except as set forth on Schedule 5.10(e), Seller has good and marketable title to all of the personal property included in the Transferred Assets free and clear of all Liens except Permitted Exceptions and Liens under the Post-Petition Loan Agreement.

5.11   Inventory.  As of the Closing Date, Seller will not be in possession of any inventory of the Washcoat Business that is not owned by Seller, except goods awaiting shipment in the ordinary course of the Washcoat Business.  Schedule 5.11 sets forth a list of the addresses of all sites other than the Leased Real Property owned by Third Parties at which inventories of the Washcoat Business are located.  As of the Closing Date, except as set forth on Schedule 5.11, no Third-Party will be in possession of inventories of the Washcoat Business owned by Seller, other than transporters in the ordinary course of the Washcoat Business.

5.12   Litigation; Investigations.  Except for Environmental Matters, which are the subject of Section 5.17 and except as set forth on Schedule 5.12, there are no (a) Proceedings pending or, to Seller's Knowledge, threatened against Seller or the Transferred Assets or (b) orders of any Governmental Authority to which Seller is subject that, in each case, individually or in the aggregate, would reasonably be expected to have a Material Adverse Effect, or seek to prevent or materially delay the consummation of the Transactions.

5.13   Insurance.  Schedule 5.13 describes the insurance coverage maintained by Seller that is exclusively related to the Washcoat Business and the Transferred Assets ("Insurance Policies").

5.14   Contracts.

(a)   Schedule 5.14(a) lists each Transferred Contract of Seller (and related Cure Costs) related primarily to the Washcoat Business that:  (a)(1) has a term of more than 12 months, (2) cannot be cancelled by Seller without payment, premium, or penalty of more than $50,000 upon notice of 30 days or less, or (3) under which the Seller is obligated to make expenditures or has a right to receive receipts of more than $100,000 in the next 12 months; (b) pursuant to which any Person serves as an independent contractor or Third-Party consultant of Seller to the Washcoat Business; or (c) which is otherwise material to the operation of the Washcoat Business (each, a "Material Contract").  Each of the Material Contracts is in full force and effect and is valid and enforceable by and against Seller in accordance with its terms.  There is no default by

-34-

Seller, or, to the Seller's Knowledge, by any other party thereto and no event has occurred that, with the lapse of time or the giving of notice or both, would constitute a default by Seller thereunder, which cannot be cured under section 365 of the Bankruptcy Code. Except as set forth on Schedule 5.14(a), subject to entry of the Sale Order, all of the Material Contracts can be assigned at Closing to Buyer without the need for a consent from a Third-Party.

(b)     Schedule 5.14(b) lists certain contracts, other than the Material Contracts, included in the Transferred Contracts (and related Cure Costs). All contracts set forth on Schedule 5.14(b) relate to the Transferred Assets or the Washcoat Business.

5.15    Labor and Employment.

(a)     Schedule 5.15(a) sets forth the following true and correct information with respect to each employee set forth thereon (collectively, the "Employees") as of the date hereof:  name; current title; employment location; date of hire; exempt or non-exempt status and active or inactive (i.e., on layoff, paid leave of absence, unpaid leave of absence, disability leave, workers' compensation leave, or other similar such leave, but excluding on vacation) status. Seller has provided the following true and correct information to Buyer with respect to each Employee:  2006 annual salary, current annual salary rate and any bonus or commitment to pay any other amount or benefit; vacation entitlement for calendar year 2007; vacation days used during 2007 through the date hereof; whether statutory or non-statutory severance pay (including any notice requirements, compensation, and damages rights regarding the termination of employment or otherwise, if applicable) applies; whether such individual is subject to an employment or indemnification agreement of any kind; whether such individual is on a leave of absence (including short- or long-term disability or sick leave, Family and Medical Leave, maternity/paternity leave, military leave or other administrative leave); and for any individual who does not spend 100% of his or her time on the Washcoat Business, the percentage of time that such individual spends working for the Washcoat Business.

(b)    To Seller's Knowledge, no Washcoat Executive has made a threat or otherwise indicated any intent to cancel or otherwise terminate such Washcoat Executive's relationship with Seller except as a result of employment with a Buyer Entity.

(c)    Except as described on Schedule 5.15(c), to Seller's Knowledge, all Employees are legally authorized to work in the United States.  Except as described on Schedule 5.15(c), Seller has completed and retained the necessary employment verification paperwork required under the Immigration Reform and Control Act of 1986 ("IRCA") for the Employees except where the failure to complete and retain such paperwork would not reasonably be expected to have a Material Adverse Effect.  Seller is, and, to Seller's Knowledge, for the 12 months prior to the date of this Agreement, was in compliance with the employment verification and anti-discrimination provisions of IRCA, except where the failure so to comply would not reasonably be expected to have a Material Adverse Effect.

(d)    Except as described on Schedule 5.15(d), (i) Seller is not a party to, nor does it have any liability with respect to or is otherwise bound by any collective bargaining agreement or other contract with a labor organization applicable to the Employees, (ii) Seller has no duty to bargain with a labor organization with respect to the Employees, and (iii) no labor organization is certified as the collective bargaining representative for the Employees.

(e)    Except as described on Schedule 5.15(e):  (i) to Seller's Knowledge there are no campaign or organizing activities by a labor organization directed at any Employees; (ii) there are no representation proceedings or petitions filed or, to Seller's Knowledge, contemplated by a labor organization to seek representation of any Employees; and (iii) Seller has not received any written demand by a labor organization that Seller recognize such labor organization as the bargaining representative of any Employees.

(f)    Except as described on Schedule 5.15(f), there is no unfair labor practice charge or complaint or other proceeding pending or, to Seller's Knowledge, currently

-36-

threatened against Seller relating to the Employees, nor are there any grievances or arbitration proceedings pending or, to Seller's Knowledge, threatened against Seller relating to the Employees.

(g)    Except as described on Schedule 5.15(g), there is no labor dispute, strike, slowdown, work stoppage or lockout pending, or to Seller's Knowledge, threatened, by or with respect to the Employees, nor has there been any such activity within the 12 months prior to the date of this Agreement.

5.16    Employee Benefit Plans.    Each employee benefit plan (as defined in Section 3(3) of the Employee Retirement Income Security Act), excluding governmental plans, which as of the date hereof covers any Employee (each a "Seller Benefit Plan") is set forth on Schedule 5.16.

5.17    Environmental.    Seller represents and warrants to Buyer that, except as set forth on Schedule 5.17:

(a)    Seller currently is, and, to Seller's Knowledge, for the past 12 months has been, in compliance with Environmental Laws and Environmental Permits applicable to the Owned Real Property, the Leased Real Property, the Washcoat Business and the Transferred Assets, except where the failure so to comply would not reasonably be expected to have a Material Adverse Effect.

(b)    To Seller's Knowledge, no Contamination (other than with respect to lead or asbestos in, on or constituting part of the buildings or improvements) exists on, under or beneath the Owned Real Property or Leased Real Property that could give rise to any Environmental Liability that would reasonably be expected to have a Material Adverse Effect.

(c)    For the past five years, Seller has not received any written notification or correspondence from any Governmental Authority or Third-Party alleging liability with respect to or the presence of Contamination of the Owned Real Property or the Leased Real Property.