# EXHIBIT C

THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W. R. GRACE & CO., et al.[1] | ) | Case No. 01-01139 (JKF) |
| | ) | (Jointly Administered) |
| Debtors. | ) | |

**DECLARATION OF GEORGE W. YOUNG IN SUPPORT OF DEBTORS'
MOTION FOR AN ORDER (A) APPROVING THE AGREEMENTS
BY AND BETWEEN W. R. GRACE & CO.-CONN. AND RHODIA INC.,
(B) AUTHORIZING THE SALE OF W. R. GRACE & CO.-CONN.'S WASHCOAT
BUSINESS TO RHODIA INC. FREE AND CLEAR OF ALL LIENS, CLAIMS,
ENCUMBRANCES AND OTHER INTERESTS; (C) AUTHORIZING THE
ASSUMPTION AND ASSIGNMENT TO RHODIA INC. OF CERTAIN EXECUTORY
CONTRACTS AND UNEXPIRED LEASES; (D) APPROVING A POTENTIAL
BREAK-UP FEE; AND (E) GRANTING CERTAIN RELATED RELIEF**

I, George W. Young, hereby declare that the following is true to the best of my knowledge, information and belief:

1. I am the Vice President of Business Development for Grace Davison (one of the Debtors' two operating segments), which has offices located at 7500 Grace Drive, Columbia, Maryland 21044. I submit this declaration (the "Declaration") in support of the Debtors' *Motion*

---

[1] The Debtors consist of the following 62 entities: W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.), W. R. Grace & Co.-Conn., A-1 Bit & Tool Co., Inc., Alewife Boston Ltd., Alewife Land Corporation, Amicon, Inc., CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace II, Inc., Creative Food 'N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC (f/k/a Dewey and Almy Company), Ecarg, Inc., Five Alewife Boston Ltd., G C Limited Partners I, Inc. (f/k/a Grace Cocoa Limited Partners I, Inc.), G C Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC Management Corporation, GN Holdings, Inc., GPC Thomasville Corp., Gloucester New Communities Company, Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical Company of Cuba, Grace Culinary Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe, Inc., Grace H-G Inc., Grace H-G II Inc., Grace Hotel Services Corporation, Grace International Holdings, Inc. (f/k/a Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W. R. Grace Capital Corporation, W. R. Grace Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-Caribe Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai Development Company, L B Realty, Inc., Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH, Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Inc., MRA Holdings Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (f/k/a Nestor-BNA, Inc.), MRA Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental Liability Management, Inc., E&C Liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin & Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country Staffing), Hayden-Gulch West Coal Company, H-G Coal Company.

K&E 11819961.5

*for an Order (A) Approving the Agreements by and between W. R. Grace & Co.-Conn. and Rhodia Inc., (B) Authorizing the Sale of W. R. Grace & Co.-Conn.'s Washcoat Business to Rhodia Inc. free and clear of all Liens, Claims, Encumbrances and Other Interests; (C) Authorizing the Assumption and Assignment to Rhodia Inc. of certain Executory Contracts and Unexpired Leases; (D) Approving a Potential Break-Up Fee; and (E) Granting certain Related Relief* (the "Sale Motion"). Initially capitalized terms not defined herein shall have the meaning ascribed to such terms in the Sale Motion.

2. I am responsible for Grace Davison's Mergers and Acquisitions, Incubator Business Development, Process Engineering, and Process Development functions. In that capacity, I have reviewed the Sale Motion and the Agreement, and am, directly or through the Debtors' personnel, attorneys, and financial advisor familiar with the information contained therein and in the exhibits annexed thereto. Except as otherwise noted, I have personal knowledge of the matters set forth herein.

3. The Washcoat Business, a unit of Grace Davison, designs, manufactures and markets alumina and mixed-oxide materials used in catalytic converters to remove pollutants produced by automotive and other engines. The Washcoat Business' end market for this product is fairly limited with the top six customers accounting for 88% of its revenue.

4. As of June 15, 2007, the Washcoat Business had sixty (60) employees. Fifty-one (51) employees are located at its production facility in Cincinnati, OH, and nine (9) employees, involved in management, sales, marketing and research and development, are based in Columbia, MD and Curtis Bay, MD.

5. In the third quarter of 2006, I participated with management in the decision to sell the Washcoat Business. This decision was based on a number of factors, including that the

Washcoat Business is not complementary to the Debtors' other business lines and represents less than 1% of the Debtors' 2006 consolidated revenues. Further, the Washcoat Business is the Debtors' only operation that sells into the automotive supply chain and, therefore, the Debtors have relatively little supplier leverage in this highly competitive market. I believe the sale of the Washcoat Business would generate value to the estate while enabling senior management to focus on higher-return, core activities.

6. In September 2006, under my supervision, certain of the Debtor's employees, in consultation with Blackstone, our financial advisor, started pursuing the sale of the Washcoat Business. Blackstone and the Debtor identified forty (40) possible strategic or financial buyers for the Washcoat Business. I am informed that the Debtors contacted sixteen (16) of these parties, while Blackstone contacted the remaining twenty-four (24). I am further informed that generally, strategic buyers were more interested than financial buyers due to the complexity of the technology and the potential advantages of having an established selling channel into the automotive sector.

7. Of the twenty-four (24) potential buyers that requested a brief summary of the investment opportunity, thirteen (13) potential buyers eventually entered into confidentiality agreements, received detailed information memorandums, and participated in diligence calls with the Selling Debtor's management.

8. Based on these efforts, in late November and early December 2006, I received nine (9) first-round indications of interest for the Washcoat Business. I then approved invitations of the three (3) potential buyers who had submitted the highest purchase prices in their first-round expressions of interest to participate in the second round. During the second round, these three potential buyers each received: (i) a full-day management presentation, (ii) a site tour of

the Cincinnati, Ohio production facility, and (iii) extensive access to diligence documents and the Selling Debtor's personnel. Each of the three potential buyers submitted a subsequent, revised bid which I reviewed. Rhodia's bid was significantly higher than those of the other two bidders, although the three potential buyers in the second round all submitted bids that were significantly lower than their first-round bids. In March 2007, another potential buyer expressed an interest in purchasing the Washcoat Business. This potential buyer received the same treatment as the previous three second-round bidders. However, as of the date hereof it has not provided a revised bid.

9. In my best business judgment, the Buyer's offer represents the most attractive option along several dimensions, including purchase price, and conditions and timing to closing. Moreover, to the best of my knowledge and belief, I have determined that the Buyer has the capability and operating expertise to close the transaction and integrate the Washcoat Business into its own operations with only limited transitional assistance from the Debtors. Therefore, I recommended authorization of the Selling Debtor's entry into the Agreements with the Buyer for which the Selling Debtor now seeks approval from this Court.

10. The Selling Debtor seeks this Court's approval to potentially pay the Buyer a Break-Up Fee, payable only upon the closing of a transaction involving a sale of all or substantially all of the assets of the Washcoat Business by the Selling Debtor to any other interested purchasers that may present themselves between now and the hearing date.

11. If any other interested party makes a firm offer for a purchase price at least equal to the Purchase Price plus Break-Up Fee before the July 23rd hearing on the Sale, the Selling Debtor will apprise the Court of the offer and whether, in its business judgment, such an offer warrants further consideration.

12. The Break-Up Fee paid to the Buyer, if any, will be entirely funded by the increase in the purchase price offered by a potential other bidder for the Washcoat Business. Thus, the Selling Debtor, its estate and its creditors will only net a benefit if another bid materializes. I believe that the Break-Up Fee is reasonable and appropriate and represents the best method for maximizing value for the benefit of the Selling Debtor's estate.

13. Based on my business judgment, I believe that the most prudent course of action is to seek approval of the Sale to the Buyer as provided for in the Sale Motion. I believe that further delays in completing the Sale could lead to deteriorating financial performance of the Washcoat Business and eroded potential value. Moreover, the Buyer and the other two potential buyers in the second round all submitted bids that were significantly lower than their first-round bids, and the most recent other potential buyer thus far has presented only a tentative possible bid range that is lower than the Buyer's bid. The Sale to the Buyer has been intensely negotiated and addresses concerns that prospective buyers raised during second-round due diligence.

14. I have determined that the Sale of the Washcoat Business by private sale to the Buyer will result in the highest and best offer for this business thereby maximizing the value of to the Selling Debtor's estate. The Agreements represent the culmination of a comprehensive, arms-length negotiation for the Sale of the Washcoat Business in exchange for what, I believe, is the highest and best consideration available for such business. The Sale will generate value to the estate while enabling the Selling Debtor's management to focus on higher-return, core activities. Therefore, I believe that the Sale is in the best interests of the Selling Debtor and its affiliates, their estates, and their creditors.

15. I believe that the amount of the consideration received for the Washcoat Business is fair and reasonable. There is a limited market for the Washcoat Business and that the offer

made by the Buyer is the best offer that the Debtor has received for such assets. I believe that the fairness and reasonableness of the consideration to be paid by the Buyer ultimately has been demonstrated by adequate "market exposure" and an open and fair marketing process.

16. Another important consideration is the fact that the Debtors publicly announced the strategic evaluation of the Washcoat Business more than six months ago. Since that time, during the marketing and sale process, to the best of my knowledge and belief, employees and customers have been subject to uncertainty regarding the future of the Washcoat Business. I believe that an expeditious closing of the sale of the Washcoat Business will help eliminate the uncertainty currently surrounding the Washcoat Business and mitigate the risk that its financial performance and hence the value of the Washcoat Business might suffer from this uncertainty.

17. If the Sale Agreement is not approved, then management will be forced to evaluate options that are not as attractive as the current offer. The alternative to the proposed sale is to continue to market the Washcoat Business and conduct an auction sale process, which would subject the estate to significant market risk with a low probability of identifying a higher and better offer. I believe that further delays in completing the Sale could lead to deteriorating financial performance of the Washcoat Business and eroded potential value. Moreover, I believe that employees and customers of the Washcoat Business would continue to face uncertainty regarding the future of the Washcoat Business. This uncertainty could potentially lead to loss of additional employees, weakened financial performance, and the further erosion of value.

18. The parties to the Agreements have always negotiated at arm's-length, and in good faith, and the Buyer has not exerted control or undue influence over the Selling Debtor. To the best of my knowledge and belief, I have determined that the Buyer is completely and wholly unrelated to the Selling Debtor. Extensive negotiations were held between the parties involving

K&E 11819961.5

substantial time and energy by the parties and their professionals, and the Agreements reflect give-and-take and compromises by both sides.

19.     To the best of my knowledge and belief, I have determined that the Buyer does not, and will not, share any common incorporators, officers, directors, or controlling stockholders with the Selling Debtor, and the Buyer is not an insider of the Selling Debtor.

20.     The Selling Debtor will assume and assign to Buyer those Transferred Contracts set forth on Exhibit B to the proposed Sale Order (the "List of Transferred Contracts"). The List of Transferred Contracts also sets forth next to each Transferred Contract the proposed Cure Amount that the Selling Debtor proposes to pay to each counterparty. The Debtors believe that most of the Transferred Contracts were entered into post-petition and in any event, the Debtors believe they are current on all outstanding obligations under the Transferred Contracts and that no cure amounts are owing.

21.     To preserve the value of the Washcoat Business by bringing certainty to the sale process, both the Selling Debtor and Buyer desire to close the sale as soon as possible after all closing conditions have been met or waived. Accordingly, the Selling Debtor requests that any order approving the Agreements be effective immediately.

The information contained in this Declaration is true and correct to the best of my knowledge and belief.

*George W. Young*
George W. Young
Vice President Business Development
Grace Davison

Subscribed and sworn to before me
This 15th day of June, 2007

*Mollie K. Sprinkle*
Mollie K. Sprinkle, Notary Public
My Commission Expires: 12/01/2010

MOLLIE K. SPRINKLE
Notary Public, State of Maryland
County of Carroll
My Commission Expires December 1, 2010