# EXHIBIT B

# REPORT OF FREDERICK C. DUNBAR

June 18, 2007

I.      Assignment And Summary of Opinions ..............................................................................1

II.     Qualifications and Remuneration ......................................................................................1

III.    Materials Considered .........................................................................................................3

IV.     Historically, Asbestos Defendants Have Paid Undocumented and Invalid Claims at
        Inflated Values ..................................................................................................................5
        A. The Growth of Asbestos Litigation and the Failure of Attempted Remedies.....................5
            1.  Judicial Decisions ...............................................................................................5
            2.  The First Chapter 11 Filings ...............................................................................5
            3.  The Creation of the Asbestos Claims Facility .....................................................6
            4.  The Creation of the Center for Claims Resolution ..............................................8
            5.  The Creation and Insolvency of the First Manville Trust......................................8
            6.  *Amchem* and the Failure of the CCR....................................................................9
            7.  Owens Corning/Fibreboard and the Failure of the NSP ...................................10
            8.  The Manville Trust Distribution Process............................................................11
            9.  As Asbestos Litigation Grew and Attempted Remedies Failed, Grace Was Also
                Inundated with a Large Volume of Claims.........................................................12
        B. Invalid and Unfounded Claims Were Filed Against Defendants and Trusts.....................13
            1.  Mass Screenings and Group Settlements Allowed Plaintiffs' Attorneys to Increase
                the Number of Invalid and Unfounded Claims..................................................13
            2.  Non-Malignant Claims, the Easiest Invalid Claims to Assert, Increasingly
                Dominated the Claims Mix during the 1990s.....................................................15
            3.  The Advent of Screening Facilities Meant the Diagnosing Doctor Was No Longer
                the Treating Doctor .........................................................................................15
            4.  Many X-Ray Results Have Been Shown to be Unreliable .................................16
            5.  Doctors with Unreliable Diagnoses Have Supported a Disproportionate Number
                of Claims.........................................................................................................17
            6.  The Manville Trust Received a Two-Month Surge Just Before Switching to More
                Stringent Asbestosis Standards.......................................................................19
            7.  A Sample of Manville Claims Studied in 1999 Showed that Many Did Not Meet
                Medical Criteria ..............................................................................................20
            8.  Plaintiffs' Attorneys Moved to "Secondary Exposure" Defendants.............................21
            9.  There Have Been Surges in Filings ...................................................................21
            10. As With Trusts and Other Defendants, Unfounded Claims Were Filed Against
                Grace...............................................................................................................24
        C. Court Congestion, Docket Pressure and Venue Have Affected the Value of Asbestos
            Claims ..........................................................................................................................47
            1.  Court Congestion and Trial Docket Pressure Have Affected Claim Values ...............47
            2.  Venue Differences Have Affected Claim Values ...............................................48
            3.  Dollar Values Were Also Inflated Against Grace Historically....................................50

V.    State Legislatures and Courts Have Enacted Changes Aimed at Reducing Perceived
      Tort System Abuses Associated with Unfounded Asbestos Liabilities............................53
    A. Extensive Reforms Have Occurred at the State Level.......................................................53
        1.  Deferred Dockets Have Been Implemented and More Stringent Medical Criteria
            Have Been Required by Reforms in a Number of States...........................................53
        2.  Venue Reform Has Been Enacted in Key Jurisdictions..............................................55
        3.  These Reforms Would Have Affected a Significant Number of Historical Grace
            Claims .....................................................................................................................56
    B. The Silica MDL Decision Was a Watershed Event.........................................................63
        1.  Diagnoses of Challenged Doctors Did Not Meet Minimum Medical Criteria for
            Diagnoses.................................................................................................................64
        2.  The ILO Readings by the Challenged Doctors were Implausibly Lacking in
            Variability ...............................................................................................................64
        3.  Many of the Claimants Who Were Diagnosed with Silicosis Had Also Been
            Diagnosed with Asbestosis .....................................................................................65
        4.  Several Trusts Banned Materials from Doctors Challenged in the MDL Order .........67
        5.  W.R. Grace's Experts Identified Unreliable Doctors .................................................67

VI.   Following Recent Reforms, Filings and Settlements Have Declined................................68
    A. Following Reforms, Aggregate Filings Have Slowed ......................................................68
        1.  Information Contained in Public Filings Shows a Decline in Claims ........................68
        2.  Claims against the Manville Trust Have Declined ....................................................70
    B. Mesothelioma Filing Rates Have Stabilized....................................................................71
    C. Resolution Values Have Stabilized or Declined..............................................................73

VII.  Conclusion ........................................................................................................................75

# I.    ASSIGNMENT AND SUMMARY OF OPINIONS

We were asked by counsel for W. R. Grace ("Grace") to review the history of asbestos litigation in the U.S. tort system, as well as Grace's particular experience prior to its Chapter 11 filing. On the basis of this review, we were asked to determine: (1) whether a substantial portion of claims filed and paid in the asbestos tort system prior to Grace's bankruptcy were unfounded; and (2) whether revelations about, and reforms in, the tort system since Grace filed for bankruptcy demonstrate that wooden application of traditional forecasting approaches is appropriate for estimating the liability of an asbestos defendant that has filed for bankruptcy.

On the basis of our review and analysis in this matter, as well as our experience with the conditions and changes in the U.S. tort system more generally, we have reached the following conclusions:

1. While operating in the tort system, Grace and other asbestos defendants faced substantial filings and payments associated with claims for which various elements needed to establish liability were missing.

2. Particularly since the time of Grace's 2001 bankruptcy filing, tort and judicial reforms and developments have dramatically changed the asbestos litigation environment.

Given these historical pressures, any estimate of Grace's future liability based on simple extrapolation of its experience in the tort system would necessarily overestimate its actual liability. More specifically, such an approach would lead to the prediction that unfounded claims would be paid under the trust.

# II.    QUALIFICATIONS AND REMUNERATION

I am a Senior Vice President at National Economic Research Associates, Inc. ("NERA") located in New York, New York. NERA is a group of consulting micro-economists, most of whom are former academics. NERA employs approximately 600 people in 22 offices worldwide. I joined NERA in 1979. A copy of my Curriculum Vitae is attached as Exhibit 1, which lists testimony I have given in the last four years and publications I have produced during the last 10 years.

NERA's clients include law firms that have clients in litigation or entities that have a role in pending legislation or international policy development. Typically, we assist these clients by

analyzing problems involving economics and/or mathematics. I am co-head of the Mass Tort Litigation Group at NERA.

I received my undergraduate degree in 1966 in mathematics and economics from Reed College in Portland, Oregon. I went to Tufts University in Medford, Massachusetts on a National Science Foundation grant, where I received my Masters Degree in 1969 and my Ph.D. in 1971. Both degrees are in economics.

I taught economics at Tufts University and the Graduate School of Economics at Northeastern University in Boston, where I developed courses in econometrics, mathematical economics and statistics.

I have served as an adjunct professor at Columbia University School of Law and Fordham University Law School, both in New York. At both Columbia and Fordham, I taught antitrust.

I have published approximately 25 peer reviewed articles and about 60 other items that appear in trade press or invited publications.

I have co-authored a book entitled *Estimating Future Claims – Case Studies from Mass Tort and Product Liability Litigation.*[1]

I have estimated future mass tort exposure arising from a variety of medical, building, automotive and financial products for a number of major firms. I have testified in court or submitted sworn statements as an expert with respect to estimating pending and future asbestos claims and related asbestos matters in the following cases:

- *Congoleum Corporation v. ACE American Insurance Company, et al.,* In the Superior Court of New Jersey Law Division: Middlesex County;

- *Owens Corning v. Credit Suisse First Boston*, United States District Court for the District of Delaware;

- *In re Combustion Engineering, Inc.*, United States Bankruptcy Court for the District of Delaware;

---

[1]    Frederick C. Dunbar, Denise N. Martin and Phoebus Dhrymes, *Estimating Future Claims: Case Studies from Mass Tort and Product Liability Litigation* (Wayne, PA: Andrews Publications, 1996).

- *In re The Babcock & Wilcox Company, et al.*, United States Bankruptcy Court for the Eastern District of Louisiana;

- *In re National Gypsum Company*, United States Bankruptcy Court for the Northern District of Texas – Dallas Division;

- *Falise v. The American Tobacco Company*, United States District Court for the Eastern District of New York;

- *In re Pacific Gas and Electric Company*, United States Bankruptcy Court for the Northern District of California – San Francisco Division; and

- *In re Johns-Manville Corporation*, United States Bankruptcy Court for the Southern District of New York.

I have also testified in court or provided written testimony on estimating claims in connection with other mass tort cases including:

- *In re Pacific Gas and Electric Company*, United States Bankruptcy Court for the Northern District of California – San Francisco Division;

- *In re A.G. Financial Service Center, Inc.*, United States Bankruptcy Court for the Southern District of Indiana; and

- *In re Dow Corning Corporation*, United States Bankruptcy Court for the Eastern District of Michigan – Northern Division.

NERA charges $600 per hour for my time. Other staff members working on this project are invoiced at rates in the range $95 to $585 per hour.

## III.    MATERIALS CONSIDERED

We used a number of different databases and samples to generate the analyses presented in this report. Specifically, we used three databases containing information about Grace claimants:

-    *Grace Historical Claims Database:* This database contains all the historical claimant filing and settlement information maintained by the legal department at Grace.

-    *Grace Proof of Claims Data:* In August 2006, the Court required that all claimants with pending pre-bankruptcy claims against Grace who wished to pursue their claims submit a Proof of Claim (or "POC") form. These forms were returned to RUST Consulting, coded by RUST Consulting, and a database

3

of all POC information as of April 30, 2007 was provided to NERA. Image files of the POC forms were also provided.

- *Grace Personal Injury Questionnaire Data:* In addition to requiring a POC form from each pending claimant, the Court directed all claimants to submit a Personal Injury Questionnaire form (or "PIQ"), which detailed claimant medical and exposure information. These forms were also coded by RUST Consulting, and a database as of April 30, 2007 provided to NERA along with image files of the scanned PIQ forms.

For all the analyses described below that use the PIQ data, we have limited the analyses to those claimants who also filed a POC, and who have existing pending claims reflected in the Grace Historical Claims Database.

In addition to these Grace databases, we have also used the following samples:

- *Historical Closed Claims Sample:* Grace maintained paper claim files for each resolved claim, in addition to the electronic record in the Grace Historical Claims Database. These claim files may contain additional information about a particular plaintiff – such as doctor, medical test, or exposure information – that was not entered into the Grace Historical Claims Database. To determine the nature of the additional information contained in these files, a sample of closed claims was selected. Then, the data in each of these claim files was reviewed and entered by coders from the Celotex Trust.

- *PIQ Attachment Sample:* Many of the claimants who submitted PIQ Forms did not fill in the form itself. Instead, these claimants indicated that their information was included in attachments, and provided additional documentation outside the form. RUST Consulting did not code these additional documents. A sample of pending claimants was selected and the Celotex Trust coded the PIQ Attachment documentation.

- *X-Ray Sample for Non-Mesothelioma Malignant Claims:* The Court required all claimants alleging a non-mesothelioma malignant disease to provide x-rays for review. Using the responses on the PIQ forms Grace identified claimants who would be required to provide x-rays under this ruling. Dr. Daniel Henry selected a sample of x-rays accompanied by an ILO reading and a sample of x-rays regardless of whether they were accompanied by an ILO reading. After Dr. Henry determined which of the x-rays were of sufficient quality to be reread, three independent B-readers were asked to review each x-ray in the sample.

- *Sample of PFT Results:* The claim files of all non-malignant claimants in the Historical Closed Claims Sample were reviewed to identify those who had submitted PFT results. Then, of the non-malignants with a PFT, a random

4

sample of 150 was selected. The PFT scores of the 150 claimants were then reviewed for adherence to American Thoracic Society Standards.

Finally, in addition to the Grace-specific data described above, we also used:

-    *Manville Trust Database:*  This data includes all claims submitted to the Manville trust as of December 31, 2006.

-    *Center for Claims Resolution Historical Data:*  The Center for Claims Resolution ("CCR") was an organization made up of approximately 20 defendants and insurers that resolved asbestos claims on behalf of its members.

A full list of all materials considered is included as Exhibit 2.

## IV.  HISTORICALLY, ASBESTOS DEFENDANTS HAVE PAID UNDOCUMENTED AND INVALID CLAIMS AT INFLATED VALUES

### A.  The Growth of Asbestos Litigation and the Failure of Attempted Remedies

A number of events stand out as having changed the history of asbestos litigation. Each brought more public awareness of the link between asbestos exposure and disease, as well as the possibility of (and, in some cases, the facilitation of) bringing suits to obtain indemnity payments.

#### 1.  Judicial Decisions

While the first asbestos personal injury claim was brought more than a decade earlier, 1973 is generally considered an important turning point for plaintiffs. In that year, the Fifth Circuit U.S. Court of Appeals upheld a jury verdict in favor of a plaintiff insulation worker with asbestosis and mesothelioma against six asbestos manufacturers.[2] Each of the manufacturers was held to be jointly and severally liable for failure to warn.

#### 2.  The First Chapter 11 Filings

1982 was also a consequential year in asbestos litigation. On July 29, UNR Industries became the first defendant to declare bankruptcy as a result of the liabilities from asbestos claimants.[3] Then, on August 1, the Board of Directors of Johns Manville announced that it had

---

[2]    *Borel v. Fibreboard*, Fifth Circuit, U.S. Court of Appeals, 1973.

[3]    "UNR Industries Files for Chapter 11," by Tamer Lewin, *The New York Times*, July 30, 1982.

decided to seek bankruptcy protection – a revelation that shocked the investing public. Manville's Chapter 11 filing was unusual in that its business at the time was generally sound; it had earned profits of $60 million on $2.2 billion of sales in 1981.[4]  In declaring bankruptcy, Manville was attempting an innovative approach to controlling its liability claims.  Even though the company's business operations were in good condition[5], Manville argued that it was better to file for bankruptcy as a means to consolidate and settle all of its asbestos claims than to continue to pay such claims in perpetuity.

The decisions by Manville and other early filers brought more visibility to the ability to bring litigation against the manufacturers of asbestos and asbestos-containing products.

### 3.   The Creation of the Asbestos Claims Facility

Asbestos claims grew through the early 1980s.  An influential study by Rand showed that only 30% of every dollar spent on asbestos litigation found its way to the plaintiff.[6]  The rest was spent on "transaction costs" – primarily legal fees.  Both defendants and plaintiffs' attorneys were strongly motivated to reduce these costs.  Plaintiffs' attorneys wanted a less costly way to make claims and receive the associated contingency fees.  Defendants thought that by leaving more assets for indemnity payments, while reducing legal expenses, they could lower their overall exposure.  In part to reduce transactions costs, after more than two years of complex negotiations, 33 producers of asbestos or asbestos-containing products signed the Wellington Agreement on June 19, 1985.[7]

The Wellington Agreement was expected to resolve many disputes between producers and insurers over both coverage and policy interpretation.  It also established a non-profit organization, the Asbestos Claims Facility (ACF) to administer and arrange for the evaluation, settlement, payment or defense of all asbestos-related personal injury claims against its members.

---

[4]   "Manville Faces Many Problems in Bid to Escape Red Ink," *The Wall Street Journal*, June 9, 1982.

[5]   See, for example, "Market Place; The Attraction of Manville," by Robert Metz, *The New York Times*, November 2, 1982; and "Manville's Robust Bankruptcy," by Tamar Lewin, *The New York Times*, December 10, 1982.

[6]   See "Variation in Asbestos Litigation Compensation and Expenses," James S. Kakalik, *et al.*, RAND Institute for Civil Justice publication, 1984.  Also, "Asbestos in the Courts-The Challenge of Mass Toxic Torts," Deborah R. Hensler, *et al.*, RAND Institute for Civil Justice publication, 1985.

[7]   *Mealey's Litigation Reports: Asbestos*, June 14, 1985, p. 2339; and *Mealey's Litigation Report: Asbestos*, June 28, 1985, p. 2410.

The ACF was intended to provide a means of handling bodily injury claims while helping to relieve the strain the claims had placed on the judicial system.[8] It was expected to reduce defense costs by using one set of law firms to represent several defendants and establishing a common claims facility.

To relieve the pressures on the court system, the ACF was structured to allow asbestos claimants to file a claim without going to court. Its role was to act as a joint representative of member producers and insurers whenever a claimant named more than one member in a suit. The ACF achieved its goal of keeping cases out of the court system and dramatically increased the speed with which claims were processed. In its three years operation, 18,500 claims were resolved – more than three times the number that had been resolved in the 10-plus years of asbestos litigation prior to its formation.[9]

This speed of settlement, however, did not come without a price and the ACF was plagued with problems. The ACF provided a relatively easy route to settlement and thus gave incentives for plaintiffs' attorneys to find more claimants. For example, claims against Celotex/Carey Canada nearly doubled from 1984 to 1986 (from 7,853 to 14,492) and doubled again in the next year (to 30,156). Similarly, claims against Eagle-Picher rose from 6,079 in 1984 to 13,622 in 1986 to 21,642 in 1987.[10] Merely being a member of the ACF heightened the plaintiffs' bar's awareness of the identity of potential defendants.

There were also disagreements over the proper shares for member firms. Problems were magnified as certain members declared bankruptcy under the weight of their asbestos liabilities. As a result, seven defendants (Eagle-Picher, Celotex Corp., Carey Canada, Inc., Fibreboard Corp., Owens-Illinois, Inc., Pittsburgh Corning Corp. and Owens-Corning Fiberglas Corp.) left the ACF starting in late 1987. For these and other reasons, including disagreements over case disposition strategy, the ACF was dissolved on October 3, 1988.[11]

---

[8]   *Mealey's Litigation Reports: Asbestos*, September 13, 1985, p. 2788.

[9]   *Estimating Future Claims: Case Studies from Mass Tort and Product Liability*, p. 112.

[10]  See reports of Mark A. Peterson, "Liability of Celotex and Carey-Canada For Pending and Future Asbestos Personal Injury Claims," December 8, 1993; and "Summary of Calculations Estimating the Present Value of Claims by Eagle-Picher Asbestos Personal Injury Creditors and Eagle-Picher's Administrative/Defense Costs for Such Claims," September 15, 1995 (Bates # 001000957).

[11]  *Estimating Future Claims: Case Studies from Mass Tort and Product Liability*, pp. 112-113.

### 4. The Creation of the Center for Claims Resolution

On October 6, 1988, on the heels of the dissolution of the ACF, the Center for Claims Resolution (CCR) was formed. Although the CCR was neither a continuation nor a successor to the ACF, its 21 original members were all former members of the ACF and the basic design of the facility was the same. The CCR was intended to allow more flexibility with regard to the allocation of liability, among other issues, than was the ACF. In an attempt to represent each defendant more fairly, votes in the new facility were weighted by the member's share of liability. In contrast each member of the ACF was allowed one vote, regardless of its size. By February 1989, the CCR had disposed of 12,300 claims, while about 7,500 new claims were filed since the CCR's inception.[12] This disposition rate grew to an average of over 15,000 claims per year for its member companies.

However, the CCR was subject to many of the same pressures as the ACF, as well as some new ones. Like the ACF, the CCR provided an easy path for plaintiffs' attorneys to follow and the volume of claims filed spiked sharply upward in 1988, as it had in 1985.[13]

### 5. The Creation and Insolvency of the First Manville Trust

Once Manville had filed for bankruptcy, a number of conflicting proposals about how best to resolve its pending and anticipated future claims were presented. Finally, the idea of creating a trust that would have sole liability for Manville's asbestos claims was proposed and agreed by all.[14] Once management achieved its objective of eliminating liability for future claims, however, it no longer had any incentive to ensure that the Trust itself would be managed wisely. Similarly, none of the other creditors had any incentive to interfere with Trust operations as long as they received from the bankruptcy process the amounts owed to them by Manville. This left claimants' representatives with no adversaries in developing the Trust's procedures for the bankruptcy court. "The Plan of Reorganization, in so far as it disposed of pending asbestos

---

[12]  *Ibid*, p. 113.

[13]  *Ibid,* p. 111.

[14]  See the Lifland Decision, *In re Johns-Manville Corporation, et al.*, August 17 2004, p. 527; and Paul Brodeur, *Outrageous Misconduct – The Asbestos Industry on Trial* (Pantheon Books, New York), 1985, p. 309.

health claims was, in large measure, written by and supported by the Asbestos Health Claimants Committee."[15] Many Trust officials were also appointed from the plaintiffs' bar.

Given the plaintiffs' attorneys' influence on the design of the Trust and its operations to ensure quick payments to them, the Trust was unable to settle claims for reasonable values based upon medicine or other factors affecting the cause of claimants' injuries and soon after its formation, it became clear that the Trust could not survive financially.[16] Faced with a surging number of claims and escalating settlement values, the Trust and the plaintiffs' lawyers knew that the Trust would soon run out of money.[17] In 1991, Judge Weinstein issued a stay on payments by the Trust so that the Trust would not be depleted.[18] In 1993, the Trust and the plaintiffs' lawyers began to negotiate a new plan of operation for the Trust.

### 6. *Amchem* and the Failure of the CCR

In what can only be described as an unprecedented settlement, in 1992, CCR settled, in one fell swoop, over 20,000 pending asbestos cases with two law firms (virtually the entire

---

[15]   David T. Austern letter, May 31, 1995 (Bates #CRMC 0133393).

[16]   See David Austern Deposition, September 26, 1999, p. 93, lines 2-12, and Patricia Houser Deposition, September 20, 1999, p. 84, lines 14-25 and p. 85, lines 1-18. See also "Presentation to AHC/Select Attorneys on October 26, 1988," which compares the Trust's original claims liability assumptions to its realized experience (Bates #540255- #540357); Trust Financial Performance: Analysis and Implications of Latest Projections, October 17, 1988 (Bates #505287-444 at 505292-93); Minutes, Manville Personal Injury Settlement Trust, Board of Trustees Meeting, (no date) (Bates #CRMC 0131313-19); Interim Report to the Court by the Trustees of the Manville Personal Injury Settlement Trust, in Proceedings for a Reorganization Under Chapter 11, November 18, 1988 (Bates #540299-312 at 540302, 307); Fax to Tom Florence of RPC from Gary Wingo, January 3, 1989 (Bates #FLOR 0000447-48); Paper written by Gary Wingo, July 13, 1989 (Bates #543944-49); Letter from David Austern, Manville to Douglas Mayer, October 18, 1989 (Bates #CRMC 0144255-57). See also Leland G. Smith Deposition, February 16, 2000, p. 50, lines 2-24 and p. 51, lines 1-8.

[17]   See Patricia Houser Deposition, September 20, 1999, p. 85, lines 9-18, lines 24-25, and p. 86, lines 1-4; see also Trust Financial Performance: Analysis and Implications of Latest Projections, October 17, 1988 (Bates #505287-444); Presentation Given to Select Members of the Select Counsel of the Beneficiary, (no date) (Bates #523072-097); Memorandum from Mark Lederer to Steering Committee Members: "Payment Commitments on Post-C Claims," August 7, 1989 (Bates #CRMC 0166504-05); Memorandum from Joseph S. Kieffer (Deputy General Counsel) to All Manville Defense Counsel, Re: Manville Personal Injury Settlement Trust Status Report, February 21, 1990 (Bates #CRMC 0003708-14 at 14); Letter from Marianna S. Smith (Executive Director of the Trust) to Judge Lifland, Re: The Trust's First Year of Operation, December 29, 1989 (Bates #540413-19 at 15-16); Memo to Ted Kleinman from Gary Wingo, Re: Evaluation of Claims Payment Options, January 9, 1989 (Bates #523279-91); Draft of A Report to the Court by the Trustees, July 21, 1989 (Bates #CRMC 0001489-514 at 496-498); Manville Personal Injury Settlement Trust Limited Fund/Fairness Hearings, August 1999 (Bates #TRUST 0000324-335 at 329-331).

[18]   See the history of the Manville trust at http://www.mantrust.org/history.htm.

"inventory" of both firms) for a reported $280,000,000.[19] Within a matter of weeks following the signing of final papers, these same two law firms filed a class action complaint in U.S. District Court in Philadelphia, *Georgine et al. v. Amchem Products Inc. et al.*, seeking to represent "all persons occupationally exposed to asbestos" who, as of January 15, 1993, had not filed a lawsuit for damages. On the very same day, the twenty defendants who were members of CCR answered admitting the class allegations and filed, along with the plaintiffs, again on the same day, a lengthy stipulation of settlement resolving all issues between them.[20]

Under the terms of the "settlement," those who had been exposed to products manufactured or supplied by CCR member companies and who had been diagnosed with disabling asbestos-related diseases were to receive a schedule of benefits, depending upon the severity of the injury.[21] The settlement received approval by the District Court on August 16, 1994 but was overturned May 1996 by the Third Circuit U.S. Court of Appeals, a decision that was appealed to the Supreme Court later that same year.[22] The Court agreed to hear the case in November of the same year and finally ruled on the case in June 1997.[23] At this point, the Supreme Court affirmed the lower court's dismissal of the Georgine settlement. On August 5, 1997, the District Court decertified the class.[24]

### 7. Owens Corning/Fibreboard and the Failure of the NSP

Owens Corning ("OC") was the largest member of the ACF and became a focus for plaintiffs' attorneys. In August 1987, OC announced its decision to resign from the ACF,

---

[19]  See "CCR Settles in Massive Baltimore Asbestos Trial," *PR Newswire*, July 8, 1992; and "Huge asbestos trial is over; now battle cry seems to be 'on to the appeal!'," Jay Apperson, *The Baltimore Sun*, August 16, 1992.

[20]  See "Breakthrough Asbestos Settlement Proposal Unveiled by 20 Companies," by Stefan Fatis, *The Associated Press*, January 15, 1993.

[21]  See "Future Claimants Class Action - Blueprint for Disaster," Frederick M. Baron, *Mealey's Litigation Reports: Asbestos*, June 18, 1993.

[22]  U.S. Supreme Court, *Amchem Products Inc., et al., Petitioners v. George Windsor et al., on Writ of Certiorari to the United States Court of Appeals for the Third Circuit*, No. 96-270, June 25, 1997.; and "CCR Petitions U.S. Supreme Court to Hear Landmark Asbestos Case; Decision Would Settle Circuit Courts' Conflict on Class Settlements," *PR Newswire*, August 19, 1996.

[23]  "US Supreme Court Affirms Dismissal of Georgine Asbestos Class Action Settlement," *Mealey's Litigation Reports: Asbestos*, 1997: v. 12, n. 11, July 7, 1997.

[24]  "Motion Granted Vacating Supplemental Preliminary Injunction in Georgine," *Mealey's Litigation Reports: Asbestos*: v. 12, n. 15, September 2, 1997. By decertifying the class, "any tolling or suspension of the statute of limitations for claims against the CCR companies ended on August 5, 1997." "Revised *Georgine* Notice Submitted for Approval," *Mealey's Litigation Reports: Asbestos*: v. 13, n. 12, July 17, 1998.

effective October 3, to gain greater control over its claims handling.[25]  The company, on its own and together with Fibreboard, which it acquired in 1997, tried an array of alternative settlement structures after exiting the ACF.  However, none of these systems allowed Owens Corning/Fibreboard to efficiently resolve the mounting number of asbestos claims filed.

On December 15, 1998, OC announced a National Settlement Program ("NSP") under which more than 176,000 asbestos claims against OC and more than 100,000 claims against Fibreboard were expected to be resolved.[26]  The program established procedures and fixed payments for resolving future claims brought by participating plaintiffs' law firms without litigation for at least 10 years.[27]  The NSP was intended to manage the asbestos liability of both OC and Fibreboard more effectively, and to allow more accurate prediction of the timing and amount of indemnity payments for both pending and future claims.[28]  But the main motivations for the design and implementation of the NSP were the rising cost of settlements and judgments, as well as the Supreme Court's 1997 decision in *Georgine v. Amchem Products, Inc.*, striking down the proposed asbestos class action settlement.[29]

In the end, OC was unable to manage the flood of lawsuits filed against it.  According to a company spokeswoman, the bankruptcy route was sealed after the company got a surge of 10,000 cases filed in the third quarter of 2000 alone. [30]  She remarked that OC was viewed as having deep pockets in a shrinking pool of candidates.  In response, OC filed for Chapter 11 on October 5, 2000.[31]

### 8. The Manville Trust Distribution Process

As noted above, in 1991, Judge Weinstein issued a stay on payments by the Manville Trust so that the Trust would not run out of money.  In 1993, the Trust and the plaintiffs' lawyers

---

[25]  *Mealey's Litigation Reports: Asbestos*, August 14, 1987. p. 1,007.  See also *Mealey's Litigation Reports: Asbestos*, August 28, 1987. p. 1,131.

[26]  Owens Corning Form 8K, filed December 15, 1998.

[27]  *Ibid.*

[28]  *Ibid.*

[29]  *Ibid.*

[30]  "Owens Corning Seeks Bankruptcy Protection Over Asbestos Claims," *Engineering News-Record*, October 16, 2000.

[31]  *Ibid.*

began to negotiate a new plan of operation for the Trust.  The major issues for discussion included removing the Trust from the tort system and developing efficient claims resolution procedures, as well as developing scheduled disease categories and settlement values.[32]  A draft of a new plan, which was called the Trust Distribution Process or TDP, was circulated to claimants' lawyers and all *pro se* claimants in June of 1993.[33]

Because plaintiffs' attorneys had leverage over the Trust, they were able to seek favorable settlement terms, which included lax medical standards and minimal required proof of disease.  To receive payment for a given disease, a claimant simply had to provide a medical report that the claimant had that disease.[34]  In addition to a design that promoted claims without proof of a valid medical condition, the TDP also allowed the payment of claims without proper proof of exposure.  This deficiency was not lost on Trust officials, who expressed concern that the TDP ran a serious risk of paying significant numbers of claims due to weak requirements regarding proof of exposure.[35]

Taken as a whole, then, the design of the TDP ensured that settlements were governed by forces other than the Trust's administration of its duties to claimants in a fiscally responsible manner.

### 9.  As Asbestos Litigation Grew and Attempted Remedies Failed, Grace Was Also Inundated with a Large Volume of Claims

A review of Grace's historical database shows that it was subjected to the fallout of these failed remedies.  From 1990 through 2000, Johns Manville – the largest manufacturer of asbestos

---

[32]  Judge Weinstein Order, *In re Joint Eastern and Southern District Asbestos Litigation*, January 19, 1995 (hereafter, Weinstein 1995 Order), p. 491.

[33]  Weinstein 1995 Order, p. 492.

[34]  "The Manville Personal Injury Settlement Trust," by Frank J. Macchiarola, *Cardozo Law Review*, Vol. 17, No. 3, January 1996, p. 617; see also Transcript of Trial – *Bernadine Findley v. Robert Falise*, May 11, 1994 (Bates #546411); and *The Matrix Claim Manual*, April 8, 1996 (Bates #CRMC 0013402-24 at 407-410).

[35]  Letter from Patricia Houser to Julie Davis, July 25, 1996 (Bates #CRMC 0123928, CRMC 0123479-94); Letter from Patricia G. Houser to Elihu Inselbuch, Esq., Re: Various Medical Audit and Arbitration Issues, October 4, 1996 (Bates #CRMC 0169162-67); Memorandum from Patricia Houser to David Austern, Susan Prytherch, January 9, 1997 (Bates #CRMC 0153996-97); and Trust Distribution Process (Bates #CRMC 0012662-65); SCB Discussion Topics (Bates #CRMC 0106679).

and asbestos products – received 341,041 claims; Grace received 296,387 over this same period.[36]  (See Figure 1 and Exhibit 3.)

**Figure 1**

**Number of Claims by File Year for W.R. Grace and Manville**

| Year Filed | Total Manville Claims | Total Grace Claims |
|------------|-----------------------|--------------------|
| (1) | (2) | (3) |
| Pre-1990 | 146,660 | 24,087 |
| 1990 | 23,076 | 9,006 |
| 1991 | 19,286 | 16,876 |
| 1992 | 18,836 | 22,546 |
| 1993 | 15,206 | 20,120 |
| 1994 | 25,723 | 24,308 |
| 1995 | 39,213 | 39,669 |
| 1996 | 53,555 | 31,658 |
| 1997 | 24,437 | 25,319 |
| 1998 | 29,930 | 29,141 |
| 1999 | 32,508 | 28,395 |
| 2000 | 59,271 | 49,349 |
| **Total 1990-2000** | **341,041** | **296,387** |

Note: See Exhibit 3 for details.

## B.    Invalid and Unfounded Claims Were Filed Against Defendants and Trusts

The peculiarities of the asbestos litigation system have allowed plaintiffs' attorneys to develop strategies regarding the number and quality of asbestos claims filed against defendants, including Grace.

### 1.  Mass Screenings and Group Settlements Allowed Plaintiffs' Attorneys to Increase the Number of Invalid and Unfounded Claims

In the tort system, plaintiffs' attorneys affiliated with unions engaged in mass screenings to recruit potential clients.[37]  Subsequently, the number of claims increased as plaintiffs' attorneys found individuals with potential exposure who otherwise would not have brought a

---

[36]  In his decision, US Bankruptcy Judge Burton R. Lifland indicated that "[t]he universe of asbestos claimants are Manville-related," *In re Johns-Manville Corporation, et al.*, August 17, 2004.

[37]  For example, see: Angelina, Michael E., "The 'Energizer Bunny' of Toxic Torts," *Casualty Insurance,* 2001, which notes that plaintiffs' attorneys "[sponsor] x-ray screening programs (sometimes conducted in vans outside of union halls) that, in effect, serve as client recruiters."

claim. This phenomenon is described by the American Bar Association Commission on
Asbestos Litigation:

> Promotional ads declare that 'You May have Million $ Lungs' and urge
> workers to be screened even if they have no breathing problems because
> 'you may be sick with no feeling of illness.' The x-rays are usually taken
> in 'x-ray mobiles' that are driven to union halls or parking lots. ... In order
> to get an x-ray taken, workers are ordinarily required to sign a retainer
> agreement authorizing a lawsuit if the results are 'positive.'[38]

With the ability to file claims in bulk, plaintiffs' attorneys were then able to pressure
defendants to enter group settlements to avoid trying large numbers of cases in plaintiff-oriented
districts. The ability to exert such pressure derived from the plaintiff-friendly procedures in
certain states. In Mississippi, for example, liberal rules allowed "... for the joinder of hundreds
or thousands of claimants from across the country in one case." Under Mississippi rules, many
plaintiffs from out-of-state could sue in a group as long as one of the plaintiffs was a Mississippi
resident who was suing one out-of-state defendant.[39] Commentators at the time reached the
following conclusion: "Not surprisingly, Mississippi's rules have resulted in forum shopping.
Over the past few years the number of plaintiffs filing suit in Jefferson County has exceeded the
number of Jefferson County residents."[40]

Texas is another state that has been flagged historically as being pro-plaintiff. As
reported in 2001, in Texas, "defendants who are named on thousands of cases may be noticed on
the same day for scores of trials in a dozen or more jurisdictions. This creates special settlement
pressures for defendants."[41] Under such circumstances, defendants are required to prepare for

---

[38] American Bar Association Commission on Asbestos Litigation, *Report to the House of Delegates, Recommendation*, February 2003, p. 8.

[39] Rothstein, Paul S., "What Courts Can do in the Face of the Never-Ending Asbestos Crisis," *Mississippi Law Journal*, Fall 2001.

[40] Carroll, Stephen J., *et al.*, "Asbestos Litigation Costs and Compensation," Rand Institute for Civil Justice, 2002, p. 34, also describes the Mississippi joinder rule: the rule "allows plaintiffs from out of state to join a law suit filed by in-state plaintiffs against out-of-state defendants.... The result is something akin to a multi-state class action, without the necessity for plaintiffs to meet the class certification requirement (F.R.C.P. 23[b][3]) that common issues predominate and without the protections against intra-class conflicts of interest required by the U.S. Supreme Court in *Amchem* (521 U.S. 591 [1997])."

[41] Carroll, *et al.*, 2002, p. 35.

many simultaneous trials, whereas plaintiffs can decide at the last minute which case to bring to trial.

In this plaintiff-friendly litigation environment, the CCR was flooded with mass filings, where hundreds of claims were sometimes bundled together. These mass filings increased total claim-filings volume and, in turn, led to group settlements. Based on CCR data, in all but two years from 1990 to 2000, group settlements were more than 50% of the claims; this percentage was as high as 83% in 1993. (See Exhibit 4.) The number of claimants per group was also often large, with one group as large as 9,438 plaintiffs.

These group settlements limited the amount of discovery that defendants were able to require, along with the attention defendants could give to any individual claim.

### 2. Non-Malignant Claims, the Easiest Invalid Claims to Assert, Increasingly Dominated the Claims Mix during the 1990s

By their nature, non-malignant claims are the easiest to assert because results are easily manipulated. Evidence that plaintiffs' attorneys were able to take advantage of the ease of making unreliable diagnoses to increase the number of unfounded and invalid claims is provided by an analysis of the ratio of non-malignant to malignant claims in various states. The ratio of non-malignant to malignant claims has varied dramatically by state, consistent with the expectation that plaintiffs' attorneys seek out jurisdictions that allow weak criteria (and provide high values). Looking at claims filed against the Manville Trust, we find a range in this ratio across states from a low of 2 in Massachusetts to a high of 33 in Mississippi. (See Exhibit 5.)

Likewise, the ratio of non-malignant to malignant claims filed in Mississippi against CCR defendants increased from 13.8 in 1985 to an average of more than 25 in the late 1990s. Similar patterns were observed in other traditionally pro-plaintiff states such as West Virginia, Ohio and Texas. In contrast, the ratio in Massachusetts fell from an average of 5.2 during the later half of the 1980s to an average of less than 2 in the late 1990s. (See Exhibit 6.)

### 3. The Advent of Screening Facilities Meant the Diagnosing Doctor Was No Longer the Treating Doctor

As noted above, plaintiffs' attorneys developed strategies to find potential claimants, including the use of mass screenings as a tool to recruit plaintiffs. These screenings typically

15

included both x-rays and PFTs, and the firms running the screenings were often headed by individuals with no medical background.  Doctors and B-readers were then hired by screening companies to review the thousands of x-rays obtained through the screening process.[42]  (B-readers are physicians who have demonstrated competency in classifying x-rays according to the International Labour Office (ILO) standards.)

Unlike medical screenings, which are designed to early-diagnose specific medical conditions, asbestos litigation screenings were essentially a recruitment program, "…conducted by screening enterprises working for lawyers to target populations of current and former industrial and construction workers, typically referred to as 'litigants', who may have been exposed at their work sites to asbestos-containing materials, in order to secure, on a mass basis, prodigious numbers of potential clients, and tap into the multi-billion dollar asset pools that were created.  Asbestos screenings are not intended to detect disease for purposes of treatment; rather, they are intended to identify 'litigants'… ."[43]

Lester Brickman writes: "Often the doctors who are hired to read the x-rays [taken by screening facilities] are 'not …licensed to practice medicine in the state where the x-rays are taken.'"[44]  In addition, he points out that these readings often did not meet typical medical standards: "[b]esides processing high volumes of applicants for compensation, screening enterprises [would] typically use doctors, in particular B-readers, who routinely read x-ray films differently than would occur if those films were being read in a pre-operative hospital setting rather than for litigation purposes."[45]

### 4. Many X-Ray Results Have Been Shown to be Unreliable

Further evidence of the unreliability of historical diagnoses based on an x-ray review is that these diagnoses were not reproducible.  More specifically, the Manville Trust performed an

---

[42]  See "Diagnosis Practices in a Litigation Context: Screening Companies and the Doctors They Employed," Steven E. Haber, M.D., F.C.C.P., Texas Occupational Medicine Institute, June 11, 2007 (the "Haber Report"), pp. 9-23.

[43]  "On the Theory Class's Theories of Asbestos Litigation: The Disconnect Between Scholarship and Reality," Lester Brickman, *Pepperdine Law Review,* Vol. 31:33, 2004, pp. 63-64.

[44]  *Ibid,* p. 66.

[45]  *Ibid,* p. 67.

16

audit which demonstrated that the diagnoses made by a number of the claimants' doctors during the 1990s were not reproducible.

Beginning in 1995, a medical audit randomly selected the x-rays of pending claims against the Manville Trust from the entire population of claimants alleging pleural disease, asbestosis, and lung and other cancers that had been deemed eligible for payment. The Trust retained independent B-readers to review the randomly selected x-rays. Two B-readers would review each x-ray. As the Trust recognized, the medical audit program gave every benefit of the doubt to the claimant.[46] If either of the two B-readers agreed with the original result, the claim passed. Despite the fact that the program was biased to find that claims passed muster, the x-ray audit program demonstrated that many of the claims were invalid.[47]

The results of the audit are summarized in a memo from Mark Lederer to Elihu Inselbuch, dated April 24, 1998.[48] Nearly half of the claims failed to pass on the basis of an x-ray review (where fail to pass indicates that the diagnosis reduced to a lesser category or disease or was downgraded to no disease at all).[49] Broken down by disease, 21% of the pleural claims, 26% of the asbestosis claims, and 11% of the cancer claims were found to have no underlying disease.

5. **Doctors with Unreliable Diagnoses Have Supported a Disproportionate Number of Claims**

As has become widely-publicized, doctors with unreliable diagnoses have supported a disproportionate number of claims. The audit performed by the Manville Trust of its claims provided evidence that the use of such doctors was prevalent at least by the mid-1990s. One of the analyses performed in this medical audit was an evaluation of the "pass rate" for the 13

---

[46]  Letter from Patricia Houser to Elihu Inselbuch, Esq., September 15, 1995 (Bates #CRMC 0189508).

[47]  See Letter from Patricia Houser to Elihu Inselbuch, Esq., September 15, 1995 (Bates #CRMC 0189508). See also Patricia Houser Deposition, September 20, 1999, p. 193, lines 6-16; and Memo to David T. Austern and Richard E. Flynn from Terry F. Lenzer and Kathy Lavinder, Re: Asbestos Settlement: Background Investigation of Doctors, March 2, 1996 (Bates #CRMC 0189815-30).

[48]  Bates #CRMC 0168905-913.

[49]  See Letter to Honorable Jack B. Weinstein and Honorable Burton R. Lifland from Manville Tr., February 28, 1997 (Bates #CRMC 0120696-97); Letter from Patricia G. Houser, Manville Tr. to Elihu Inselbuch, Caplin & Drysdale and Leslie G. Fagen, Paul Weiss, Re: Fourth Quarter 1996 Medical Audit Results, December 23, 1996 (Bates #CRMC 0106724-26 at 25); Memo from Patricia Houser to Manville Trustees, Re: Meeting with Joe Rice

doctors who had been identified as diagnosing the highest volume of claims. An audit of the asbestosis claims from the 13 doctors revealed a failure rate (indicating disagreement in the diagnosis of asbestosis) ranging from 36% to 70%, with an average failure rate of 59%.[50] In addition, the audit revealed that just three of these doctors (each of whom had approximately 50% of their claims reclassified to no disease and an overall failure rate ranging from 66% to 70%) were responsible for almost 50% of all asbestosis claims filed against the Trust.[51]

To test whether plaintiffs' attorneys have historically concentrated their claims with these high-volume doctors, we analyzed their relative prevalence in the non-malignant claims received by Manville. First, we found that 75% of the non-malignant claims reported the name of a diagnosing doctor. Of the claims that named a doctor, we then found that 50% of the non-malignant claims identified the same 13 high-volume doctors that had been identified by the medical audit. The use of diagnoses by these doctors was not limited to non-malignant claims. They were also used to support the diagnoses of lung and other cancer claims. (See Exhibit 7.)

We also observed a gravitation of the cases towards doctors with the worst failure rates and toward one doctor, Ray A. Harron, in particular.[52] In 66% of the audited asbestosis files in which Dr. Harron was identified as the doctor, both independent B-readers failed to agree with Dr. Harron's diagnosis of asbestosis. More and more claimants flocked to Dr. Harron over time for their diagnosis. While in 1983, Dr. Harron was identified in less than 1% of all of the asbestosis cases filed against the Manville Trust, by 1996, he was the named doctor in almost 30% of *all* the asbestosis cases filed against the Manville Trust.

---

and Others on Medical Audit, July 16, 1996 (Bates #CRMC 0128699-701); and Fax to Elihu Inselbuch, Esq. from Mark E. Lederer, April 24, 1998 (Bates #CRMC 01688905-13 at 905).

[50] See Table 4 in Memo dated April 24, 1998 from Mark E. Lederer, CFO of Manville Trust to Elihu Inselbuch (Bates #CRMC 0168905).

[51] Percentage of asbestosis claims diagnosed by the three high-volume doctors with the highest failure rates is calculated over the 1994-1998 period. [See Fax to Elihu Inselbuch, Esq. from Mark E. Lederer, April 24, 1998 (Bates #CRMC 0168905-13 at 11); and Memorandum to Manville Trustees from Patricia Houser, Re: Meeting with the SCB, May 13, 1998 (Bates #CRMC 0191714-19 at 18).]

[52] See Haber Report, pp. 35-38.

6. **The Manville Trust Received a Two-Month Surge Just Before Switching to More Stringent Asbestosis Standards**

The American Thoracic Society (ATS) has established criteria for spirometry testing which, if followed, ensure that the results of pulmonary function tests (PFTs) are reliable.  PFTs are performed to determine if an individual's lung functions are impaired.  In addition, the ATS has developed standards for the technical quality of and calibration for the equipment used in the performance of such PFTs.

It is clear from the PFT results provided by many asbestos claimants, however, that many tests conducted in the tort system historically were not administered adhering to these ATS standards.  For example, the Manville Trust was troubled by the PFT results submitted by claimants:

> Many facilities do not follow the American Thoracic Society ("ATS") PFT standards.  In some cases the people conducting the tests appear to be unfamiliar with the ATS standards, while in other cases, they are not ignorant of the ATS standards and their failure to follow them is less benign. . . .
>
> We have many PFT results which do not meet these [ATS] standards.[53]

The Trust clearly also understood that adherence to ATS standards was critical to achieve a reliable PFT result:

> The Trust requires compliance with the standards established by the ATS to ensure that the PFT test results which it is supplied are reliable.  Since PFT testing is, by its nature, patient effort dependent and, in some instances, extremely non-specific and subject to manipulation, the ATS requires multiple redundant tests to ensure accurate results. . . .  When those tests are not performed, or more importantly, when those basic medical protocols are not followed or insufficient information is provided by which to determine if they were followed, any results that are reached would be based on questionable evidence of a non-specific impairment.[54]

---

[53]  Letter from David T. Austern, Manville Trust to Julie Davis, Caplin & Drysdale, September 3, 1996 (Bates #CRMC 0178029-32 at 30).

[54]  Memo to Pat Houser, Susan Prytherch, David Austern, Karin Croft, Mark Lederer, Larry Haden from Jared Garelick, Re: MALC Litigation Draft Settlement Proposal; Practical Questions, November 11, 1997 (Bates #CRMC 161497-507 at 505).

On December 2, 1996 the Manville Trust began to accept only those PFT results that were administered in tests that adhered to ATS standards.[55] These standards were more stringent than those the Trust had previously required. As part of the transition, the Trust agreed that all tests submitted by claimants who filed before December 2, 1996 would not need to comply with ATS standards.

In the seven weeks between the announcement and the adoption of the ATS standards, claimants filed 6,061 disabling asbestosis claims under the TDP, including 3,118 filed on December 2, 1996 alone (about 70 times higher than the daily average of claims filed for the seven weeks following December 2, 1996). Moreover, an analysis of monthly claims against the Manville Trust demonstrates that the Trust received a statistically significant increase in the number of filings against it in the two months preceding the switch to ATS standards.[56] (See Exhibit 8.)

### 7. A Sample of Manville Claims Studied in 1999 Showed that Many Did Not Meet Medical Criteria

A sample of Manville claims files coded by Francine Rabinovitz provided detailed medical information for those claims ("the Rabinovitz Sample"). In addition to providing information about PFT results with respect to impairment, the Rabinovitz sample also collected information about ILO scores. For the 1,592 asbestosis claims in the sample, this data showed that 42.7% either had an ILO score of less than 1/0 or had no ILO score, yet 1540 of these sample claims, or 96.7%, were liquidated by the Manville Trust for positive, scheduled amounts. In addition, only 38.4% of these claims had an ILO score of 1/0 of higher, only 17.9% had an ILO score of 1/0 or higher and a PFT score below 80% of the normal level, and only 1.0% would

---

[55] Letter from Patricia G. Houser to Elihu Inselbuch, Esq., Re: Various Medical Audit and Arbitration Issues, October 4, 1996 (Bates #CRMC 0169162-167 at 63-64); Memo to Manville Trust Claimants' Attorneys from Manville Trust, Re: New Requirements for Submission of Category III Claims, October 11, 1996 (Bates #CRMC 0190025-26 at 25); Pulmonary Function Test Review Instructions, (no date) (Bates #CRMC 0109420-21); Letter to Honorable Jack B. Weinstein and Honorable Burton R. Lifland from Manville Tr., February 28, 1997 (Bates #CRMC 0120696-97 at 96); Newsletter--Manville Personal Injury Settlement Trust, March 14, 1997 (Bates #533155-58 at 56); and Memorandum to Plaintiff's Counsel from Susan Prytherch, Re: Medical Audit of Dr. Larry Mitchell and Dr. Richard Kuebler Claims, July 3, 1997 (Bates #CRMC 0116430-32 at 30).

[56] Specifically, monthly disabling asbestosis claims averaged 2,403 in October and November, 1996 while averaging only 725 in prior months. In 1997, the first full year after the switch to ATS standards, disabling asbestosis claims averaged 553 per month.

20

be classified as severe asbestosis, meeting an ILO score of 2/1 or higher and a 65% PFT threshold. (See Exhibit 9.)

### 8. Plaintiffs' Attorneys Moved to "Secondary Exposure" Defendants

Early in the history of asbestos litigation, claimants typically came from "traditional" asbestos industries. These industries included occupations where workers were exposed to higher levels of asbestos fibers – for example, workers in some industries had direct contact with asbestos fiber in the course of their jobs.

In recent years, however, as more of the traditional asbestos defendants have filed for bankruptcy, claims have increased in non-traditional industries. For example, according to a 2002 RAND study, increasing numbers of claims were made against defendants in the textile industry in the late 1990s.[57] RAND calculated that claims filed against asbestos defendants arising from the non-traditional industries (including food and beverage, textiles, paper, glass, iron/steel/nonferrous, durable (metal) goods, etc.) increased 2.5 times from 1999 to 2001, as compared to a 1.5 times increase in the traditional industry claims.[58]

The RAND study also reported that more and more companies were named as defendants as plaintiffs' attorneys turned their attention to these secondary exposure defendants. The RAND study found that at least one company in nearly every U.S. industry is involved in litigation, including both large and small businesses. In a confidential study, RAND found that by the late 1990s non-traditional defendants accounted for approximately 60% of asbestos expenditures.[59]

### 9. There Have Been Surges in Filings

Historically, there have been surges in filings against particular defendants. These surges are inconsistent with a system in which medical factors drive claims.

---

[57]  Carroll, Stephen J., *et al.*, "Asbestos Litigation Costs and Compensation, An Interim Report," *RAND Documented Briefing*, 2002, p. 47-48.

[58]  *Ibid*, p. 47.

[59]  *Ibid*, pp. 49-50.

21

### a. GAF 1998 Claims Tripled When It Refused to Drop Its Tort Law Reform Campaign

Following the Supreme Court's *Amchem* decision, a number of defendants formed the Coalition for Asbestos Resolution ("CAR") to lobby for legislation to "establish a fair and efficient claims facility for resolving asbestos claims."[60] According to GAF's complaint, filed in its suit against certain members of the plaintiffs' bar, these law firms "threatened to bring about the economic destruction of any company that supported the Act."[61] The complaint also notes that "the history of the defendants' strong-arm tactics began in 1998, when the Act was first introduced to Congress." Consistent with the hypothesis that plaintiffs' attorneys used their ability to create surges in claims to pressure defendants, claims filed against GAF in 1998 tripled from 30,900 to 93,500 claims.[62] Such a surge is inconsistent with the medical development of asbestos-related disease.

### b. CCR Defendants Received a Surge in Claims After the Supreme Court Invalidated the Georgine Class Action Settlement

As noted above, the Georgine class action settlement was proposed in January 1993, received District Court approval in 1994 and was overturned by the Appeals Court in 1996 (a decision that was upheld by the Supreme Court in 1997). The class was ultimately decertified in August 1997. Between the proposal of the Georgine settlement and the Supreme Court invalidation, an average of approximately 2,700 cases was filed against the CCR each month. Following the August 1997 decision, an average of 5,000 claims a month were filed against the CCR each month until December 2000. (See Exhibit 10.) Even allowing for a possible time trend that increase the number of filings over time, the average number of claims filed was statistically significantly higher after the 1997 Supreme Court decision than before. The increase in the monthly claims filings confirms that claims generation appears to be driven by factors outside of the medical development of asbestos-related disease.

---

[60]  *G-I Holdings, Inc. v. Baron & Budd, et al.*, Complaint, January 10, 2001. The founding members of CAR included Kaiser Aluminum Corporation, Georgia-Pacific Corporation, Westinghouse, United States Gypsum Company, ABB Combustion Engineering, Turner & Newell PLC, Armstrong and GAF.

[61]  *Ibid*, ¶89.

[62]  See Building Materials Corp of America 1997 10-K, filed March 30, 1998, p. 6; and Building Materials Corp of America 1998 10-K, filed March 30, 1999, p. 7.

### c. Non-CCR Defendants Received a Surge in Claims when CCR Defendants Were Not Targets

By contrast, a number of non-CCR defendants experienced a surge in claims in 1995 when claims were not being filed against CCR defendants. For example, the number of claims filed against Foster Wheeler jumped 47.7% in 1995. As shown in the table below, claims filed against a range of other non-CCR defendants, including Coltec Industries, Owens Illinois, and Owens Corning Fiberglas Corporation also jumped, with increases ranging between 25% and almost 500% in 1995. (See Figure 2 and Exhibit 11.)

23

**Figure 2**

Summary of New Asbestos Claims
1991-1995

| Company Name | 1991 | 1992 | 1993 | 1994 | 1995 | 1994-1995 Percentage Increase |
|---|---|---|---|---|---|---|
| (1) | (2) | (3) | (4) | (5) | (6) | (7) ((6)-(5))/(5) |
| AC&S, INC./IREX CORP. | 10,090 | 13,875 | 20,542 | 18,122 | 44,904 | 147.79 % |
| COLTEC INDUSTRIES | | | 27,400 | 29,800 | 44,000 | 47.65 |
| DYNCORP./FULLER-AUSTIN INSULATION CORP. | 360 | 1,785 | 668 | 1,026 | 4,647 | 352.92 |
| FIBREBOARD CORPORATION | 18,100 | 37,000 | 35,100 | 3,500 | 20,731 | 492.31 |
| FOSTER WHEELER CORP. | | | | 26,400 | 39,000 | 47.73 |
| OWENS-CORNING FIBERGLAS CORPORATION. | 20,900 | 26,600 | 32,400 | 29,100 | 55,900 | 92.10 |
| OWENS-ILLINOIS, INC. | 19,000 | 19,000 | 14,000 | 12,000 | 15,000 | 25.00 |

Note: See Exhibit 11 for details.

## 10. As With Trusts and Other Defendants, Unfounded Claims Were Filed Against Grace

### a. Mass Filings and Group Settlements against Grace

Mass filings and group settlements occurred regularly for Grace from the mid-1990s onward. More specifically, while mass filings accounted for about 30% of all 1990 filings, just one year later, they accounted for nearly 60% of all filings. This statistic remained at around 60% through 2000. (See Figure 3 and Exhibit 12.) Moreover, the number of claimants included in a single mass filing was as high as 5,621. (See Exhibit 13.)

24

## Figure 3

### W. R. Grace Historical Claims Database
### Percentage of Claimants Participating in Mass Filings

| Year Filed | Maximum Claimants in a Single Mass Filing | Number of Claimants in All Mass Filings | Number of Claimants with Law Firm Named | Percentage of Claimants in Mass Filing |
|---|---|---|---|---|
| (1) | (2) | (3) | (4) | (5) (3)/(4) |
| Pre-1990 | 131 | 131 | 1,344 | 9.7 % |
| 1990 | 264 | 1,514 | 4,852 | 31.2 |
| 1991 | 1,113 | 4,836 | 8,369 | 57.8 |
| 1992 | 2,616 | 11,877 | 16,569 | 71.7 |
| 1993 | 1,820 | 8,023 | 13,398 | 59.9 |
| 1994 | 4,020 | 14,533 | 21,171 | 68.6 |
| 1995 | 5,124 | 26,372 | 32,730 | 80.6 |
| 1996 | 2,724 | 15,270 | 23,026 | 66.3 |
| 1997 | 5,621 | 13,758 | 20,714 | 66.4 |
| 1998 | 956 | 10,686 | 18,639 | 57.3 |
| 1999 | 4,747 | 13,695 | 23,805 | 57.5 |
| 2000 | 3,578 | 27,347 | 41,678 | 65.6 |
| Overall | 5,621 | 148,042 | 226,295 | 65.4 % |

Note: See Exhibit 12 for details.

The group settlements for Grace demonstrate a similar pattern. While there were no group settlements prior to 1993, they represented over 50% of all settlements beginning in 1996, and continued at a high level until Grace filed for bankruptcy in 2001. Since 1993, these group settlements accounted for a significant portion of total indemnity as well. (See Figure 4 and Exhibit 14.)

**Figure 4**

W. R. Grace Historical Claims Database
Percentage of Claims in Group Settlements

| Year Settled (1) | Number of Claims in Group Settlements (2) | Number of Claims in All Settlements (3) | Percentage of Claims in Group Settlements (4) (2)/(3) | Total Indemnity for Group Settlements (5) | Total Indemnity for All Settlements (6) | Percentage of Total Indemnity for Group Settlements (7) (5)/(6) |
|---|---|---|---|---|---|---|
| Pre-1990 | 0 | 2,855 | 0.0 % | $          0 | $  704,148,673 | 0.0 % |
| 1990 | 0 | 2,322 | 0.0 | 0 | 8,776,525 | 0.0 |
| 1991 | 0 | 1,663 | 0.0 | 0 | 5,939,828 | 0.0 |
| 1992 | 0 | 3,276 | 0.0 | 0 | 10,484,240 | 0.0 |
| 1993 | 100 | 3,633 | 2.8 | 250,000 | 14,842,309 | 1.7 |
| 1994 | 772 | 5,817 | 13.3 | 4,326,000 | 22,751,278 | 19.0 |
| 1995 | 92 | 9,458 | 1.0 | 500,000 | 31,492,382 | 1.6 |
| 1996 | 20,377 | 34,122 | 59.7 | 42,387,480 | 74,503,021 | 56.9 |
| 1997 | 17,086 | 23,750 | 71.9 | 33,091,941 | 70,372,968 | 47.0 |
| 1998 | 10,947 | 20,424 | 53.6 | 51,526,650 | 91,583,869 | 56.3 |
| 1999 | 8,307 | 15,927 | 52.2 | 13,481,261 | 60,450,975 | 22.3 |
| 2000 | 18,241 | 27,344 | 66.7 | 64,584,625 | 151,173,965 | 42.7 |
| **Overall for Years with Group Settlements** | **75,922** | **140,475** | **54.0 %** | **$  210,147,957** | **$  517,170,768** | **40.6 %** |

Note: See Exhibit 14 for details.

The overwhelming volume of claims filed against Grace made it impossible for Grace to thoroughly scrutinize the quality of the information submitted by plaintiffs. Testimony of Jay Hughes, Grace's Senior Litigation Counsel, explains the process:

> There was no mechanism in the tort system to verify the accuracy and legitimacy of the evidence that was being submitted. … And as a result, when you say what was acceptable and what we accepted, as is documented in settlement agreements, is documentary evidence of exposure to a Grace product and an asbestos-related disease. Because of the failings in the tort system, because of the practices of asbestos plaintiffs' bar … [w]e had no way of questioning without spending millions and millions of dollars in legal fees, in trial costs to prove that the evidence – the documentary evidence, both medical and product, that was being submitted to us was – had significant, significant problems with it.
>
> And I can go into great detail with you if you'd like about the problems; they're well-documented, they've been acknowledged by the United States Supreme Court; there have been Law Review articles written about it. So, I want you to understand when you say, yeah, product – evidence of product exposure and exposure to Grace products in evidence of an asbestos-related disease [was required], yes; but with the caveat that, under the current tort system and the tort system existing between '95 and, in fact, earlier than that, I, personally, and most members of the asbestos defense bar, and, quite frankly most legitimate, objective observers of the asbestos litigation realized that there

was a significant amount of questionable product exposure evidence and medical testimony being admitted in asbestos personal injury cases.[63,64]

Mr. Hughes explained that Grace entered into settlement agreements that required only minimal exposure information, explaining that settlement agreements "were also more specifically done in the context of the asbestos personal injury litigation as it existed in the late 1990s and early 2000 against asbestos defendants. … I think it's beyond argument that there were serious deficiencies in the ability of a defendant to challenge the exposure evidence being brought against the company in the case. And as a result, these kinds of practices were developed where exposure affidavits and some kind of, in my opinion, minimal proxies for asbestos -- allegation of asbestos exposure took the place of real evidence and real evidence that would meet the burdens required under the rules of evidence and case law governing the rules of evidence."[65]

Explaining why Grace could not effectively take cases to trial to reveal these problems with evidence of exposure, Mr. Hughes noted that plaintiffs "had been prepared for their testimony using improper techniques – that's proven, documented – in terms of product exposure."[66] In more recent deposition testimony, Mr. Hughes further described the plaintiffs' firms approach: "…through the process with which [plaintiffs firms] created and manufactured exposure testimony because of the flaws in the tort system, they took this information and

---

[63] Deposition testimony of Jay W. Hughes, Jr., Esq., *In re W.R. Grace & Co., et al., v. Sealed Air Corporation and Cryovac, Inc.*, July 19, 2002, pp. 19-20.

[64] This testimony is consistent with evidence that emerged of coaching of claimants by the plaintiffs' bar that emerged in 1997. At that time, an internal memo prepared by the Baron & Budd firm was released to the public: [t]he document, titled "Preparing for Your Deposition," lists products that contained asbestos, along with descriptions of packaging and a list of asbestos-related health symptoms that could enhance legal damages. One section tells clients: "You may be asked how you are able to recall so many product names. The best answer is to say that you recall seeing the names on the containers or on the product itself. The more you thought about it, the more you remembered!" Another portion states: "If there is a MISTAKE on your Work History Sheets, explain that the 'girl from Baron & Budd' must have misunderstood what you told her when she wrote it down." See "Memo Sparks Debate About Law Firm's Ethics," *Associated Press Newswire*, September 28, 1997.

[65] Deposition testimony of Jay W. Hughes, Jr., Esq., *In re W.R. Grace & Co., et al., Debtors*, February 22, 2007, p. 300.

[66] Deposition testimony of Jay W. Hughes, Jr., Esq., *In re W.R. Grace & Co., et al., v. Sealed Air Corporation and Cryovac, Inc.*, July 19, 2002, pp. 19-20.

inappropriately coached their clients to place Grace products in job sites where, based on all the objective evidence that was available, we knew Grace products weren't present."[67]

In addition, Mr. Hughes pointed out that the volume of claims forced Grace into settlements: "[l]eaving aside the quality, the sheer volume of the cases and the resources available to the courts and the resources available to the company to defend the cases made an individual trial of the individual cases impossible."[68]  Also, he explained that "[i]n situations where there's hundreds of thousands of cases being filed and where there was objective, documentary evidence being submitted that met the bare-bones requirements of the law, even though we knew and were well aware that there were significant problems with the credibility of most of this evidence, and, but for the problems associated with the volumes of the cases, the money associated with the case, that these cases were probably not legitimate claims against Grace, we were forced to pay them."[69]

More specifically, this high volume led Grace to accept affidavits of exposure from plaintiffs in industries where Grace did not have any substantial product distribution:

> I believe that a substantial portion of these industrial cases, and paper mills, refineries, chemical plants, primarily in the Gulf coast area of the country, but in other areas, involve exposures that are highly suspect based on the objective information available to us on where our products are sold and what were appropriate uses for our product.
>
> So there was a time early on, pre-1995, where we would have resisted aggressively. But as the volume of the cases became overwhelming and we were subject to the mass consolidated trials, the abuse of venue, the overwhelming docket against us, we were forced as a practical matter to start accepting product exposure affidavits for refinery and chemical plant worker type cases that we knew to be false. [70]

Grace also settled claims without acceptable documented evidence of medical impairment:

---

[67]  Deposition testimony of Jay W. Hughes, Jr., Esq., *In re W.R. Grace & Co., et al., Debtors*, February 22, 2007, pp. 42-43.

[68]  Deposition testimony of Jay W. Hughes, Jr., Esq., *In re W.R. Grace & Co., et al., v. Sealed Air Corporation and Cryovac, Inc.*, July 19, 2002, p. 20.

[69]  *Ibid*, p. 20.

[70]  Deposition testimony of Jay W. Hughes, Jr., Esq., *In re W.R. Grace & Co., et al., Debtors*, February 22, 2007, pp. 196-197.

Even though as we sit here we know that based on acceptable medical diagnostic criteria that these people had not been diagnosed with asbestos *[sic]*. The diagnosis was really a litigation tool developed by the asbestos plaintiffs' bar to get settlements in these context because they had set up a system where the defendants were faced with mass consolidated trials or a volume of cases that were such that they couldn't realistically challenge the medical evidence for all the nonmalignant cases.

So faced with that choice, it made more sense for them to pay a small amount of money to get rid of the cases rather than litigate and enter into extensive and expensive litigation to challenge the sufficiency of it. [71]

This pattern is borne out in Grace's historical claims data: claimants who settled as part of a group, rather than individual, settlement were statistically significantly more likely not to provide sufficient evidence of exposure to Grace product.

More specifically, a sample of closed claims files (the "Historical Closed Claims Sample") was reviewed, and all information related to the nature of the plaintiffs' asbestos-related product exposure was coded. Based on the reports of experts who will testify in this matter, any claimant whose exposure to Grace asbestos containing products came from removing Grace asbestos-containing products or being at a site or in a space where Grace asbestos-containing products were being installed, mixed, removed or cut by others have not demonstrated sufficient exposure to Grace product.[72] We found that the paid claims for plaintiffs who settled as part of group settlements were statistically significantly more likely to have not demonstrated sufficient exposure to Grace asbestos-containing product.[73] (See Exhibit 15 and Exhibit 16.)

---

[71]  *Ibid,* pp. 172-173.

[72]  See "Supplemental Report: The Scientific Credibility of Personal Injury Claims Related to Alleged Exposure to Asbestos-Containing Products," Elizabeth L. Anderson, Ph. D., A.T.S. Fellow, June 11, 2007 ("Supplemental Anderson Report").

[73]  The definition of "sufficient exposure" adopted for this analysis is specified in the Supplemental Anderson Report, cited above.

**b.  During the 1990s, Non-Malignant Claims Increased as a Ratio of Grace's Claims in Pro-Plaintiff States**

As observed in the Manville and CCR claims data, non-malignant claims in pro-plaintiff states became an increasing share of Grace's total claims over time.  Considering those claims filed since 1995, the ratios across states range from a low of 2 in California to a high of 39 in Mississippi.  (See Figure 5 below and Exhibit 17.)  The higher averages in states widely-held to be pro-plaintiff such as Mississippi, Texas and West Virginia are inconsistent with the theory that claims filings are driven by a medical model.[74]

---

[74]  Texas, Mississippi and West Virginia are identified as pro-plaintiff states in Stephen J. Carroll, *et al.*, "Asbestos Litigation Costs and Compensation," Rand Institute for Civil Justice, 2002, pp. 34-37.

Figure 5

W. R. Grace Historical Claims Database
Non-Malignant vs. Malignant Claims by State
Unknown Disease Claims Reallocated
1995-2000

| State (1) | Number of Non-Malignant Claims (2) | Number of Malignant Claims (3) | Ratio of Non-Malignant to Malignant Claims (4) (2)/(3) |
|---|---|---|---|
| MS | 33,848 | 874 | 38.7 |
| VA | 1,119 | 35 | 32.2 |
| WV | 18,336 | 668 | 27.4 |
| LA | 7,794 | 386 | 20.2 |
| AR | 1,073 | 54 | 19.7 |
| KY | 968 | 50 | 19.5 |
| OH | 14,305 | 750 | 19.1 |
| TX | 63,136 | 3,721 | 17.0 |
| GA | 1,784 | 115 | 15.5 |
| TN | 1,253 | 81 | 15.4 |
| NJ | 1,062 | 82 | 12.9 |
| SC | 772 | 60 | 12.8 |
| WI | 860 | 73 | 11.8 |
| NC | 1,059 | 94 | 11.3 |
| IN | 1,699 | 151 | 11.2 |
| FL | 12,315 | 1,181 | 10.4 |
| NY | 8,648 | 878 | 9.9 |
| MI | 3,863 | 450 | 8.6 |
| MA | 1,695 | 275 | 6.2 |
| MO | 693 | 129 | 5.4 |
| MN | 584 | 122 | 4.8 |
| IL | 3,228 | 771 | 4.2 |
| PA | 2,481 | 640 | 3.9 |
| CT | 496 | 132 | 3.7 |
| MD | 1,945 | 627 | 3.1 |
| CA | 1,990 | 905 | 2.2 |

Note: See Exhibit 17 for details.

### c.  Many Claimants Submitting PIQ Forms Provided a Diagnosis Only from a Non-Treating Physician

Grace also was affected by the advent of the screening facility, as evidenced by the fact that the diagnosing doctor for many of its claimants was not a treating doctor.  More specifically, after filing for bankruptcy, Grace sent a Personal Injury Questionnaire ("PIQ") to all pending claimants, requesting detailed information on each claimant's diagnosis and medical impairment details.  Of all PIQ respondents specifying non-malignant diseases, 19,984 listed a diagnosing doctor, treating doctor, pathology doctor, or an x-ray reader.  Of these, 36.4% listed x-ray readers as their only diagnosing, treating, or pathology doctor.  (See Figure 6 and Exhibit 18.)

**Figure 6**

PIQ Database
Number of Claims Specifying X-Ray Reader As The Only Diagnosing, Treating and/or Pathology Doctor
Non-Malignant Claims

| Disease (1) | Number of Claims (2) | Number of Claims Specifying Doctor (3) | Number of Claims Specifying X-Ray Reader As The Only Diagnosing, Treating and/or Pathology Doctor (4) | Percentage of Claims With Doctor Specifying X-Ray Reader As The Only Diagnosing, Treating and/or Pathology Doctor (5) (4) / (3) |
|---|---|---|---|---|
| Severe Asbestosis | 612 | 356 | 107 | 30.06% |
| Asbestosis | 38,065 | 13,838 | 4,529 | 32.73% |
| Other Asbestos Disease | 9,587 | 5,790 | 2,635 | 45.51% |
| **Total** | **48,264** | **19,984** | **7,271** | **36.38%** |

Note: See Exhibit 18 for details.

### d.  Doctors Identified by Grace's Expert As Providing Unreliable Diagnoses Have Been Used to Support Claims Filed against Grace

As shown for Manville in its audit, many of the medical results used to support Grace's claims came from a few doctors whom Grace's experts have opined have unreliable standards.[75] This finding is confirmed with the doctor information coded from the Historical Closed Claims

---

[75]  For details on these doctors, see the Haber Report.

Sample files. There, of the closed claims that have an x-ray reader, 59.6% of the non-malignant claims, 49.2% of the other cancer claims, and 27.0% of the lung cancer claims identified an unreliable doctor as the only medical support. (See Figure 7 and Exhibit 19.)

## Figure 7

### Historical Closed Claims Sample
### Number of Claims with Doctors Identified by Grace's Expert as Being Unreliable

| Disease | Number of Claims | Number of Claims with X-Ray Reader | Number of Claims Relying Solely on Unreliable X-Ray Reader | Percentage of Claims With X-Ray Reader Relying Solely on Unreliable X-Ray Reader |
|---|---|---|---|---|
| (1) | (2) | (3) | (4) | (5) (4)/(3) |
| Lung Cancer | 352 | 204 | 55 | 26.96% |
| Other Cancer | 249 | 193 | 95 | 49.22% |
| Non-Malignant | 1,218 | 1,201 | 716 | 59.62% |
| Total | 1,819 | 1,598 | 866 | 54.19% |

Note: See Exhibit 19 for details.

In addition, we analyzed the PIQ forms submitted by claimants. Of the 16,342 non-malignant claims with an x-ray reader, 45.5% have an x-ray diagnosis solely from these Grace-identified unreliable doctors. Similarly, 27.2% of the lung cancer claims and 36.2% of the other cancer claims who provide an x-ray reader report have only an unreliable doctor as their x-ray reader. (See Figure 8 and Exhibit 20.)

**Figure 8**

**PIQ Database**

**Number of Claims with Doctors Identified by Grace's Expert as Being Unreliable**

| Disease (1) | Number of Claims (2) | Number of Claims With X-Ray Reader (3) | Number of Claims Relying Solely on Unreliable X-Ray Reader (4) | Percentage of Claims With X-Ray Reader Relying Solely on Unreliable X-Ray Reader (5) (4)/(3) |
|---|---|---|---|---|
| Lung Cancer | 4,181 | 1,683 | 458 | 27.21% |
| Other Cancer | 1,718 | 802 | 290 | 36.16% |
| Non-Malignant | 48,264 | 16,342 | 7,437 | 45.51% |
| **Total** | **54,163** | **18,827** | **8,185** | **43.47%** |

Note: See Exhibit 20 for details.

Some of the claimants returning PIQ forms did not complete the questions in the PIQ form but instead sent in attachments. For a sample of the claimants, these attachments were coded and the resulting information was combined with the PIQ form data to create a record of all medical and exposure information provided by the claimant (the "PIQ Attachment Sample").[76] For the non-malignant claimants with doctor information, 49.0% were diagnosed by only Grace-identified unreliable x-ray reading doctors. Similarly, 21.4% of the lung cancer claims and 30.1% of the other cancer claims who provide an x-ray reader report only an unreliable doctor. (See Figure 9 and Exhibit 21.)

---

[76] As in the PIQ data analysis described above, only claimants in the sample with a POC form are included in the PIQ Attachment Sample analyses.

**Figure 9**

**PIQ Attachment Sample**
**Number of Claims with Doctors Identified by Grace's Expert as Being Unreliable**

| Disease (1) | Number of Claims (2) | Number of Claims With X-Ray Reader (3) | Number of Claims Relying Solely on Unreliable X-Ray Reader (4) | Percentage of Claims With X-Ray Reader Relying Solely on Unreliable X-Ray Reader (5) (4)/(3) |
|---|---|---|---|---|
| Lung Cancer | 416 | 336 | 72 | 21.43% |
| Other Cancer | 128 | 123 | 37 | 30.08% |
| Non-Malignant | 2,040 | 1,863 | 913 | 49.01% |
| Total | 2,584 | 2,322 | 1,022 | 44.01% |

Note: See Exhibit 21 for details

### e.  Medical Experts in a Blind Review Found Many Grace X-Ray Results Supporting Cancer Claims Are Not Reproducible

As found with the Manville audit, a review of the x-rays provided by non-mesothelioma cancer claimants who filed against Grace shows that a substantial number of the x-ray readings by the claimants' doctors are unreliable.  To assess the quality of the x-ray readings supporting Grace's non-mesothelioma cancer claims, as described in the report of Dr. Daniel Henry, a sample of the associated x-rays was reviewed by independent B-readers.[77]  This review revealed that the x-rays for a substantial portion of lung and other cancer claimants alleging underlying asbestosis do not support such a diagnosis.

More specifically, all individuals indicating that they had radiographic evidence to support an alleged cancer other than mesothelioma caused by asbestos were required by the Bankruptcy Court to produce x-rays in support of their assertions for review or a certification that they were destroyed or in the possession of a third party.  This request was sent to the law firms of all claimants who were making a non-mesothelioma malignant disease claim and indicating the existence of an x-ray on their PIQ forms.

---

[77]  "Henry X-Ray Report," Dr. Daniel Henry, dated June 11, 2007 ("Henry Report").

Of the claimants who provided x-ray film, a random sample of approximately 500 claims with ILO readings was selected, stratified by law firm. (Of these, 364 were identified as pending Grace lung cancer or other cancer claimants who had submitted POC forms.) Under the direction of Dr. Daniel Henry, the x-rays of these claimants were reviewed by three independent B-readers. After the review, the three readers' readings on each of the films in the sample were summarized and represented by their median/majority reading.[78]

According to this review, only 8% of the Grace lung cancer claimants in the sample had an ILO reading of at least 1/0 agreed upon by at least two of the three independent B-readers. This is in stark contrast to the readings of the doctors provided by the claimants: approximately 83% of the ILO scores provided by these B-readers were 1/0 or greater. Thus, over 90% of the affirmative asbestosis diagnoses provided with the x-rays in this sample were not reproduced by the independent review.

The same pattern appears in the other cancer claimant sample. There, the review showed that only 4% had an ILO of 1/0 agreed upon by two or more of the independent B-readers. That result indicates that over 94% of the affirmative diagnoses provided with these x-rays by claimants were not reproducible by the B-reading review. (See Figure 10 and Exhibit 22.)

### Figure 10

**Results of Independent B-Reader Evaluation of X-Rays Submitted by Lung Cancer and Other Cancer Claimants**

| PIQ Disease | Total Claimants | Claimants who Submitted an X-Ray and an ILO Reading of 1/0 or Higher | Claimants with ILO of 1/0 or Higher Based on Review by at Least Two Independent B-Readers | Percentage of Claimants with ILO of 1/0 or Higher Based on Review by at Least Two Independent B-Readers | Percentage of Claimants whose ILO Score was Rejected by at Least Two Independent B-Readers |
|---|---|---|---|---|---|
| (1) | (2) | (3) | (4) | (5) (4)/(2) | (6) 1-(4)/(3) |
| Lung Cancer | 240 | 199 | 19 | 7.92 % | 90.45 % |
| Other Cancer | 124 | 94 | 5 | 4.03 | 94.68 |
| Total | 364 | 293 | 24 | 6.59 % | 91.81 % |

Note: See Exhibit 22 for details.

---

[78] See "Protocol For Review (B-reader evaluation) of Chest X-rays" for details, and also Henry Report.

36

### f. Grace's Medical Experts Find that Many Grace Non-Malignant Claims Are Not Supported by Tests that Pass ATS Standards

A review of a sample of Grace pending non-malignant claims conducted by pulmonologist Dr. David Weill shows that these claims suffer from the lack of adherence to ATS standards that concerned the Manville Trust. To determine whether the PFT scores of pending Grace claimants passed the ATS thresholds, Dr. Weill selected a random sample of 150 PFT results provided as part of the attachments to PIQ forms by pending non-malignant claimants.[79] Tabulations from the database created by Dr. Weill show that the test results submitted fell short of ATS standards in significant measure. For example:

- Only 58% provided three usable tracings for the spirometry assessment, considered essential to ensuring the reliability of any readings;

- Only 6% met all ATS spirometry standards;

- Only 7.3% provided at least two usable Function Residual Capacity (FRC) values, also considered essential for reliability;

- Only 6.7% met all FRC standards;

- Only 26.0% provided at least two usable single breath diffusing capacity (DLCO) values, necessary for reliability; and

- Only 11.3% met all DLCO standards.

(See Figure 11 and Exhibit 23.)

---

[79] The random sample was proportionately based on the number of claimants with PFT results received from the different law firms in the PIQ Attachment Sample of pending claims, but also included at least one claim from law firms whose proportion of the sample indicated that less than one claimant should be selected. Applying this methodology, the final sample included a 10% sample of each firm's PFTs, with all firms with PFTs contributing at least one claimant to the sample. See Weill Final Rebuttal Report, David Weill, M.D., June 11, 2007 ("Weill Report").

**Figure 11**

**PIQ Attachment Sample**
**ATS Non-Malignant Sample**
**Claims Meeting ATS Standards for PFT Testing**

| Category<br>(1) | Number of<br>Claims<br>(2) | Percentage of<br>Claims<br>(3)<br>(2) / 150 |
|---|---|---|
| Total Claimants in ATS Non-Malignant Sample | 150 | 100.00% |
| **A. Spirometry Standards** | | |
| Claimants With Three Usable Tracings [1] | 87 | 58.00% |
| Claimants Meeting All ATS Spirometry Standards [2] | 9 | 6.00% |
| **B. Function Residual Capacity (FRC) Standards** | | |
| Claimants With At Least Two Usable FRC Values | 11 | 7.33% |
| Claimants Meeting All ATS FRC Standards [2] | 10 | 6.67% |
| **C. Single Breath Diffusing Capacity (DLCO) Standards** | | |
| Claimants With At Least Two Usable DLCO Values | 39 | 26.00% |
| Claimants With At Least Two Usable DLCO Values Within 10% or Three Units of Each Other | 35 | 23.33% |
| Claimants Meeting All ATS DLCO Standards [2] | 17 | 11.33% |
| **D. All ATS Standards** | | |
| Claimants Meeting All ATS Spirometry, FRC and DLCO Standards [2] | - | 0.00% |

Note: See Exhibit 23 for details.

In sum, Dr. Weill concludes that not a single pending claimant in the 150 claim sample provided a PFT result that adhered to all ATS standards.

### g. Many Claims Filed Against Grace Would Not Have Passed Discerning Medical Tests

As with the Manville Trust, a closer examination of the medical information of many Grace claimants reveals that they would not have met minimum medical standards. More specifically, examining Grace's Historical Closed Claims Sample, we find that 20.6% of the non-malignant claimants would not have met the medical criteria for either asbestosis or pleural

disease.[80,81]  The asbestosis claimants in that group either provided an ILO score lower than 1/0 or provided no ILO score at all.  The pleural claimants failed to provide evidence of diffuse pleural thickening.  (See Figure 12 and Exhibit 24.)

**Figure 12**

**Historical Closed Claims Sample**
**Medical Statistics for Non-Malignant Claims**

| Category | Number of Claims | Percentage of Total Claims |
|---|---|---|
| (1) | (2) | (3) (2)/1,218 |
| **I.  Criteria for Asbestosis** | | |
| Claims with ILO $\geq$ 1/0 | 747 | 61.33% |
| Claims with ILO Score that Do Not Meet Asbestosis Criteria | 94 | 7.72% |
| Claims without ILO Score | 377 | 30.95% |
| **Total Claims** | **1,218** | **100.00%** |
| | | |
| **II. Criteria for Pleural Thickening for Claims that Do Not Meet Asbestosis Criteria** | | |
| Claims that Meet Asbestosis Criteria | 747 | 61.33% |
| Claims that Do Not Meet Asbestosis Criteria, but Do Meet Pleural Thickening Criteria | 220 | 18.06% |
| Claims that Do Not Meet Asbestosis or Pleural Thickening Criteria | 251 | 20.61% |
| **Total Claims** | **1,218** | **100.00%** |

Note: See Exhibit 24 for details.

In addition, examining the PIQ Attachment Sample, we find that 32.5% of the non-malignant claimants would not have met the medical criteria for either asbestosis or pleural disease. (See Figure 13 and Exhibit 25.)

---

[80]  See "Expert Report of David Weill, M.D., In re W. R. Grace & Co., *et al.,*" October 3, 2006, pp. 50-55.

[81]  Limiting the sample to only paid claims, the same percentage of non-malignant claimants would not have met the medical criteria for either asbestosis or pleural disease.

## Figure 13

**PIQ Attachment Sample**
**Medical Statistics for Non-Malignant Claims**

| Category | Number of Claims | Percentage of Total Claims |
|---|---|---|
| (1) | (2) | (3) (2)/2,040 |
| **I. Criteria for Asbestosis** | | |
| Claims with ILO ≥ 1/0 | 1,279 | 62.70% |
| Claims with ILO Score that Do Not Meet Asbestosis Criteria | 79 | 3.87% |
| Claims without ILO Score | 682 | 33.43% |
| **Total Claims** | **2,040** | **100.00%** |
| **II. Criteria for Pleural Thickening for Claims that Do Not Meet Asbestosis Criteria** | | |
| Claims that Meet Asbestosis Criteria | 1,279 | 62.70% |
| Claims that Do Not Meet Asbestosis Criteria, but Do Meet Pleural Thickening Criteria | 98 | 4.80% |
| Claims that Do Not Meet Asbestosis or Pleural Thickening Criteria | 663 | 32.50% |
| **Total Claims** | **2,040** | **100.00%** |

Note: See Exhibit 25 for details.

### h. Based on Criteria Specified by Grace Experts, Many Claims Filed Against Grace Do Not Provide Sufficient Evidence of Exposure to Grace Asbestos-Containing Product

Based on criteria specified by Dr. Elizabeth Anderson, a risk assessment expert, Grace was also plagued by a surge of claims with exposure to Grace product that would not be sufficient to cause an asbestos-related disease. These findings are consistent with those of the RAND study, which showed an escalation in secondary exposure claims throughout the late 1990s.

More specifically, claimants were asked to complete sections on the PIQ forms about their exposure to Grace products. In addition, they were asked to indicate the nature of their Grace asbestos exposure. Similar information was collected from the Historical Closed Claims and PIQ Attachment Samples. Using the criteria specified by Dr. Anderson, we were asked to

40

calculate the number of claimants who did not provide sufficient evidence of exposure to Grace asbestos-containing products.[82]

### i.    Applying the criteria specified by Dr. Anderson, many of the pending claimants did not have sufficient exposure to Grace asbestos-containing product

Dr. Anderson, who will testify in this matter, has concluded that claimants who merely removed asbestos or worked at a site or in a space where Grace asbestos-containing products was allegedly used by others (but who do not allege that they worked with the product themselves), have not demonstrated sufficient exposure to Grace product to cause an asbestos-related disease.[83]  Applying this definition, we calculate that only 13.4% of the workers in the Historical Closed Claims Sample provided information showing that they had been sufficiently exposed to a Grace product, with many providing no information at all.  Of the workers who provided *any* exposure information in the Historical Closed Claims Sample, we calculate that only 28.2% provided information showing they had been sufficiently exposed to a Grace product to cause an asbestos-related disease.  (See Figure 14 and Exhibit 26.)

### Figure 14

Historical Closed Claims Sample
Number of Claims by Job Nature Relating to Exposure

| Job Nature (1) | Number of Claims (2) | Percentage of Claims (3) (2)/2,786 | Percentage of Claims With Non-Blank Entries (4) (2)/1,325 |
|---|---|---|---|
| <blank> | 1,461 | 52.44 % | n.a. % |
| (A) Mixed Grace Asbestos-Containing Products | 189 | 6.78 | 14.26% |
| (B) Removed Grace Asbestos-Containing Products | 54 | 1.94 | 4.08% |
| (C) Installed Grace Asbestos-Containing Products | 155 | 5.56 | 11.70% |
| (D) Worked at Site or in Proximity to Where Grace Asbestos-Containing Products Were Used By Others | 896 | 32.16 | 67.62% |
| (E) Worked in Space Where Grace Asbestos-Containing Products Were Used By Others | 1 | 0.04 | 0.08% |
| (F) Other | 30 | 1.08 | 2.26% |
| **Total Claims** | 2,786 | 100.00 % | |
| **Claims with Non-Blank Entries** | 1,325 | 47.56 | 100.00 % |
| Claims That Specified Mixing or Installing Grace Asbestos-Containing Products, or That Specified Other Grace Asbestos Exposure [(A)+(C)+(F)] | 374 | 13.42 % | 28.23 % |

Note: See Exhibit 26 for details.

---

[82]   See Supplemental Anderson Report.

[83]   *Ibid.*

41

We also calculated the proportion of Grace pending claimants as reflected by the PIQ Database that would meet the exposure criteria specified by Dr. Anderson: only 3.2% of the claimants who returned PIQ forms qualified. The vast majority of PIQ forms, however, left this information blank. Of those who provided any information about the nature of their alleged exposure, 19.0% identify themselves as workers who personally Mixed or Installed Grace Asbestos-Containing Products, or had Other contact with Grace asbestos-containing product. (See Figure 15 and Exhibit 27.)

## Figure 15

PIQ Database
Number of Claims by Job Nature Relating to Grace Exposure

| Job Nature Code (1) | Number of Claims (2) | Percentage of Claims (3) (2) / 57,795 | Percentage of Claims With Non-Blank Entries (4) (2) / 9,739 |
|---|---|---|---|
| <blank> | 48,056 | 83.15 % | n.a. % |
| (A) Mixed Grace Asbestos-Containing Products | 859 | 1.49 | 8.82 |
| (B) Removed or Cut Grace Asbestos-Containing Products | 354 | 0.61 | 3.63 |
| (C) Installed Grace Asbestos-Containing Products | 874 | 1.51 | 8.97 |
| (D) Worked at Site Where Grace Asbestos-Containing Products Were Used By Others | 6,294 | 10.89 | 64.63 |
| (E) Worked in Space Where Grace Asbestos-Containing Products Were Used By Others | 1,245 | 2.15 | 12.78 |
| (F) Other | 113 | 0.20 | 1.16 |
| **Total Claims** | 57,795 | 100.00 % | |
| **Claims with Non-Blank Entries** | 9,739 | 16.85 % | 100.00 % |
| Claims That Specified Mixing or Installing Grace Asbestos-Containing Products, or That Specified Other Grace Asbestos Exposure [(A)+(C)+(F)] | 1,846 | 3.19 % | 18.95 % |

Note: See Exhibit 27 for details.

Finally, we calculated that 17.1% of claimants in the PIQ Attachment Sample provided information that they had been sufficiently exposed to Grace product to cause asbestos-related disease per the criteria specified by Dr. Anderson. Of those who provided any information about the nature of their alleged exposure, 23.4% specified themselves as a worker who personally either Mixed or Installed Grace Asbestos-Containing Product, or who had Other contact with Grace asbestos-containing product. (See Figure 16 and Exhibit 28.)

.

42

**Figure 16**

PIQ Attachment Sample
Number of Claims by Job Nature Relating to Grace Exposure

| Job Nature Code | Number of Claims | Percentage of Claims | Percentage of Claims With Non-Blank Entries |
|---|---|---|---|
| (1) | (2) | (3)<br>(2) / 2,820 | (4)<br>(2) / 2,064 |
| <blank> | 756 | 26.81  % | n.a.  % |
| (A) Mixed Grace Asbestos-Containing Products | 206 | 7.30 | 0.10 |
| (B) Removed or Cut Grace Asbestos-Containing Products | 193 | 6.84 | 0.09 |
| (C) Installed Grace Asbestos-Containing Products | 152 | 5.39 | 0.07 |
| (D) Worked at Site Where Grace Asbestos-Containing Products Were Used By Others | 1,373 | 48.69 | 0.67 |
| (E) Worked in Space Where Grace Asbestos-Containing Products Were Used By Others | 15 | 0.53 | 0.01 |
| (F) Other | 125 | 4.43 | 0.06 |
| **Total Claims** | 2,820 | 100.00  % | |
| **Claims with Non-Blank Entries** | 2,064 | 73.19  % | 100.00  % |
| Claims That Specified Mixing or Installing Grace Asbestos-Containing Products, or That Specified Other Grace Asbestos Exposure [(A)+(C)+(F)] | 483 | 17.13  % | 23.40  % |

Note: See Exhibit 28 for details.

### ii.   Many of the claimants were not in the construction industry

As further evidence that Grace faced the surge in secondary exposure claims reported by RAND, we examined the industry of alleged exposure reported by Grace's claimants.  In the Grace Historical Closed Claims Sample, many claimants did not provide information showing they had been exposed in the construction industry.  Moreover, of the claimants specifying industry, only 17.6% specified construction.  (See Figure 17 and Exhibit 29.)

43

**Figure 17**

**Historical Closed Claims Sample**
**Number of Claims by Industry**

| Total Number of Claims | 2,786 |
|---|---|
| Number of Claims With Industry Information | 625 |

| Industry<br>(1) | Number of<br>Claims<br>(2) | Percentage<br>of Claims<br>Specifying<br>Industry<br>(3)<br>(2)/625 | Percentage<br>of Total<br>Claims<br>(4)<br>(2)/2,786 |
|---|---|---|---|
| Iron/steel production | 173 | 27.68% | 6.21% |
| Construction (other than sandblasting) | 110 | 17.60% | 3.95% |
| Non-Grace asbestos manufacture or milling | 92 | 14.72% | 3.30% |
| Other | 67 | 10.72% | 2.40% |
| Chemical production | 39 | 6.24% | 1.40% |
| Tire and rubber | 34 | 5.44% | 1.22% |
| Textile | 32 | 5.12% | 1.15% |
| Shipyard | 31 | 4.96% | 1.11% |
| Petrochemical | 22 | 3.52% | 0.79% |
| Non-asbestos manufacturer | 21 | 3.36% | 0.75% |
| Railroad | 12 | 1.92% | 0.43% |
| Utilities | 12 | 1.92% | 0.43% |
| Maritime | 9 | 1.44% | 0.32% |
| Foundry/casting products | 7 | 1.12% | 0.25% |
| Military | 6 | 0.96% | 0.22% |
| Oil or gas drilling | 3 | 0.48% | 0.11% |
| Aerospace/aviation | 2 | 0.32% | 0.07% |
| Glass products | 2 | 0.32% | 0.07% |
| Longshore | 2 | 0.32% | 0.07% |
| Asbestos product manufacturing | 2 | 0.32% | 0.07% |
| Mining and quarrying | 1 | 0.16% | 0.04% |
| Clay or ceramic products | 1 | 0.16% | 0.04% |
| Insulation | 1 | 0.16% | 0.04% |
| Automotive | 1 | 0.16% | 0.04% |

Note: See Exhibit 29 for details.

Similarly, on the Grace PIQ form, only 18.0% of the claimants who specified an industry indicated that they had work experience in the construction industry. (See Figure 18 and Exhibit 30.)

**Figure 18**

**PIQ Database**
**Number of Claims by Industry**

| Total Number of Claims | 57,795 |
|---|---|
| Number of Claims With Industry Information | 11,750 |

| Industry<br>(1) | Number of Claims<br>(2) | Percentage of Claims Specifying Industry<br>(3)<br>(2) / 11,750 | Percentage of Total Claims<br>(4)<br>(2) / 57,795 |
|---|---|---|---|
| Iron/steel | 3,324 | 28.29% | 5.75% |
| Construction trades | 2,110 | 17.96% | 3.65% |
| Utilities | 1,516 | 12.90% | 2.62% |
| Non-asbestos products manufacturing | 1,378 | 11.73% | 2.38% |
| Petrochemical | 1,286 | 10.94% | 2.23% |
| Other | 1,153 | 9.81% | 1.99% |
| Chemical | 1,107 | 9.42% | 1.92% |
| Railroad | 837 | 7.12% | 1.45% |
| Automotive | 482 | 4.10% | 0.83% |
| Shipyard - construction/repair | 464 | 3.95% | 0.80% |
| Non-Grace asbestos manufacture or milling | 293 | 2.49% | 0.51% |
| U.S. Navy | 254 | 2.16% | 0.44% |
| Textile | 218 | 1.86% | 0.38% |
| Tire/rubber | 192 | 1.63% | 0.33% |
| Military (other than U.S. Navy) | 160 | 1.36% | 0.28% |
| Grace asbestos manufacture or milling | 149 | 1.27% | 0.26% |
| Aerospace/aviation | 106 | 0.90% | 0.18% |
| Longshore | 78 | 0.66% | 0.13% |
| Maritime | 36 | 0.31% | 0.06% |
| Asbestos abatement/removal | 13 | 0.11% | 0.02% |
| Asbestos mining | 11 | 0.09% | 0.02% |

Note: See Exhibit 30 for details.

Finally, of those in the PIQ Attachment Sample, only 28.3% of the claimants who specified an industry indicated that they were exposed in the construction sector. (See Figure 19 and Exhibit 31.)

45

Figure 19

PIQ Attachment Sample

Number of Claims by Industry

| Total Number of Claims | 2,820 |
|---|---|
| Number of Claims With Industry Information | 1,387 |

| Industry (1) | Number of Claims (2) | Percentage of Claims Specifying Industry (3) (2) / 1,387 | Percentage of Total Claims (4) (2) / 2,820 |
|---|---|---|---|
| Construction trades | 392 | 28.26% | 13.90% |
| Iron/steel | 351 | 25.31% | 12.45% |
| Other | 180 | 12.98% | 6.38% |
| Utilities | 171 | 12.33% | 6.06% |
| Non-Grace asbestos manufacture or milling | 143 | 10.31% | 5.07% |
| Petrochemical | 110 | 7.93% | 3.90% |
| Non-asbestos products manufacturing | 89 | 6.42% | 3.16% |
| Military (other than U.S. Navy) | 82 | 5.91% | 2.91% |
| Chemical | 58 | 4.18% | 2.06% |
| Shipyard - construction/repair | 35 | 2.52% | 1.24% |
| Automotive | 30 | 2.16% | 1.06% |
| Railroad | 26 | 1.87% | 0.92% |
| Maritime and U.S. Navy | 14 | 1.01% | 0.50% |
| Tire/rubber | 13 | 0.94% | 0.46% |
| Textile | 11 | 0.79% | 0.39% |
| Grace asbestos manufacture or milling | 8 | 0.58% | 0.28% |
| Aerospace/aviation | 6 | 0.43% | 0.21% |
| Longshore | 5 | 0.36% | 0.18% |
| Asbestos abatement/removal | 1 | 0.07% | 0.04% |
| Asbestos mining | 1 | 0.07% | 0.04% |

Note: See Exhibit 31 for details.

46

### i.    There Were Surges of Claims against Grace

#### (i)  1995 surge

Similar to other non-CCR defendants such as Coltec Industries, Fuller Austin, and Owens Corning Fiberglas Corporation, a surge in Grace's claims occurred in 1995. Prior to 1995, there had never been more than 24,500 claims filed against Grace; in 1995, claims jumped to 39,700 (Exhibit 3). Such a surge could not occur if claims were being driven by epidemiology.

#### (ii) 2000 surge

From 1996 to 1999, claims dropped back to a range between 31,700 and 25,300, but another surge occurred in 2000 when claim filings reached 49,300 (Exhibit 3). Once again, such a surge could not occur if claims were purely being driven by epidemiology.

It has been argued that at least a portion of the observed surge in claims in 2000 was the result of the end of "moratoria" on filings agreed to by several plaintiffs' law firms as part of settlement agreements with Grace in the late 1990s. Many of those agreements ended in 2000, as described by Mark Peterson in a 2002 *Grace v. Sealed Air* deposition.[84] Using the firms identified by Dr. Peterson, however, we find that these firms filed only 5,500 additional claims in 2000, or 26.4% of the total increase, and so cannot explain the magnitude of the increase in filings that occurred between 1999 and 2000. (See Exhibit 3 and Exhibit 32).

## C.    Court Congestion, Docket Pressure and Venue Have Affected the Value of Asbestos Claims

In theory, settlements and verdicts for asbestos claims should reflect the loss to the claimant as determined by the individual evaluation of a well-functioning tort system. Instead, a whole array of other factors appears to have affected settlement values historically, both for defendants in general and for Grace in particular.

### 1.    Court Congestion and Trial Docket Pressure Have Affected Claim Values

Given court congestion caused by the avalanche of asbestos claims, defendants have been unable to try all of the cases filed against them. As noted above, plaintiffs' attorneys have used

---

[84]   See Deposition of Mark A. Peterson *In re W.R. Grace & Co., et al., v. Sealed Air Corporation and Cryovac, Inc.,* September 9, 2002, pp. 490-496.

this situation to force the defendants to enter into group settlements, during which defendants are unable to determine the appropriate value for each claim. Michelle J. White, in "Explaining the Flood of Asbestos Litigation: Consolidation, Bifurcation, and Bouquet Trials," NBER Working Paper 9362, December 2002, notes that "court congestion has led to judicial procedural innovations that put additional pressures on settlement values."

Trial docket pressure has been used to increase the values of claims artificially. In the tort system, claims are litigated in 50 state courts. Practically, the sheer volume of asbestos claims has meant that docket pressure prevents litigation as a viable alternative. As such, defendants have frequently settled cases with imminent trials at a higher value than their actual liability.

Using regression analysis to control for a number of other factors potentially affecting settlement value (such as year of settlement and state), we found from the CCR historical database that, for mesothelioma claims, having a set trial date increases the expected settlement by 17.0%. (See Exhibit 33.)

### 2. Venue Differences Have Affected Claim Values

The venue in which a claim is brought has proven to be another important factor affecting claim values.

### a. Settlements in Mississippi Were Higher than Other Venues

Settlement values in Mississippi made it an attractive venue for plaintiffs, particularly when these values increased following large jury verdicts. For example, in *Cosey et al. v. E.D. Bullard Co. et al.*, "[a] reverse bifurcated bouquet trial of 12 plaintiffs' asbestos claims in Mississippi in 1998 resulted in phase one compensatory damage awards that totaled $48 million. When the judge threatened to send the issue of punitive damages to the same jury, the defendants settled the 12 cases, reportedly for the full amount of the damage awards. The judge then scheduled an additional 63 cases for trial before the same jury. Defendants lodged an emergency appeal with the Mississippi Supreme Court seeking to disqualify the judge for bias, but their

appeal was denied. Defendants then settled all of the remaining 1,738 claims in the large group on extremely favorable terms for plaintiffs."[85]

In addition to the *Cosey* verdict, other large verdicts also made Mississippi attractive to plaintiffs. For instance, according to the *Asbestos & Lead Abatement Report,* in *James Curry et al. v. AC&S Inc., et al.*, "[a] jury awarded $150 million in compensatory damages to six laborers who were exposed to asbestos while working in boiler rooms and pipes in shipyards and schools from the 1950s to the 1970s."[86] As noted in the *Asbestos & Lead Abatement Report,* this award was another in a series of in Mississippi verdicts: "[b]efore 1995, juries in the state awarded no damages, compensatory and punitive combined, of more than $9 million. But in the past six years, eight verdicts worth more than $100 million have been awarded."[87]

### b. Settlement Values and Filings Have Been Higher in Pro-Plaintiff States

Based on an econometric analysis of judicial innovations in key jurisdictions, Professor Michelle White categorized a handful of states as "pro-plaintiff", finding that these states have been associated both with higher filings and higher settlement and verdict values. Specifically, she noted that "in the three most pro-plaintiff states of Mississippi, West Virginia and Texas, the expected return from trial increases by one to two million dollars compared to the other states. Thus it is not surprising that all three of these states have become centers for asbestos litigation."[88]

A pro-plaintiff jurisdiction highlighted in the White analysis, as well as in the press, is Madison County, Illinois. Early in this decade, the county was identified by the American Tort Reform Foundation as a "judicial hellhole", with Judge Nicholas Byron identified as a "plaintiff-friendly" judge. Under his reign, asbestos cases from all over the country were brought in

---

[85]    See "Explaining the Flood of Asbestos Litigation: Consolidation, Bifurcation, and Bouquet Trials," Michelle J. White, NBER Working Paper 9362, December 2002, p. 3. See also "Mississippi Jury Awards 12 Plaintiffs $48.5 Million," *Mealey's Litigation Reports: Asbestos,* Vol. 13; No.13, August 3, 1998.

[86]    *In Re 3M Company vs. Simeon Johnson, et al.* See "Large Asbestos Verdict in Mississippi May Mean Tough Times for Companies," *Asbestos & Lead Abatement Report,* Volume 14, Issue 11, November 1, 2001. See also "Miss. Jury Returns $150M Verdict Against AC&S, Dresser Industries, 3M Corp.," 16-19 *Mealey's Litigation Reports: Asbestos,* Volume 16, Issue #19, November 9, 2001.

[87]    "Large Asbestos Verdict in Mississippi May Mean Tough Times for Companies," *Asbestos & Lead Abatement Report,* Vol. 14, Issue 11, November 1, 2001.

[88]    "Explaining the Flood of Asbestos Litigation: Consolidation, Bifurcation, and Bouquet Trials," NBER Working Paper 9362, Michelle White, December 2002, p. 24.

Madison County and given trial dates, with filings going from 65 in 1996 up to a peak of 953 in 2003.[89]  When cases went to trial in Madison County, the results were also plaintiff-friendly. According to Professor White, "plaintiffs in Madison Co., Illinois, are 91 percentage points more likely to receive punitive damages than those in Pennsylvania," another state with a significant number of asbestos filings.[90]  She also notes that: "[j]urisdictions that award punitive damages more frequently also tend to make higher punitive damage awards. Plaintiffs receive $2.4 million more in Madison County than in Pennsylvania."[91]

Recently, however, Madison County has undergone changes that have made it less friendly to plaintiffs.  In particular, following a spate of negative press, Judge Byron was replaced by Judge Daniel Stack and forum-shopping reforms were implemented.[92]

### 3.  Dollar Values Were Also Inflated Against Grace Historically

The same tort system pressures that affected the settlement values for asbestos defendants generally also influenced Grace settlement values.

### a.  Trial Docket Pressure Affected Grace's Values

As with the CCR defendants, Grace's settlements for mesothelioma claims are correlated with trial docket pressure. More specifically, using a match of the historical Grace claims database to the CCR database, we were able to obtain trial date information for 30% of the Grace mesothelioma claims. The settlements for Grace mesothelioma claims that had a set trial date were on average higher than claims with no trial date.  (See Figure 20 and Exhibit 34.)

---

[89]  See "Asbestos cases continue to drop in Madison County," *The Record, Madison and St. Clair Counties*, July 7, 2006.

[90]  "Asbestos Litigation: Procedural Innovations and Forum-Shopping," by Michelle White, October 2005. p. 390.

[91]  *Ibid,* p. 391.

**Figure 20**

W. R. Grace Historical Claims Database

Settlement Values for Mesothelioma Claims with and without Trial Date in the CCR Data,
by Settlement Year

| Year Settled (1) | Number of Claims with Trial Date (2) | Average Settlement Value for Claims with Trial Date (3) | Number of Claims without Trial Date (4) | Average Settlement Value for Claims without Trial Date (5) |
|---|---|---|---|---|
| Pre-1990 | 0 | $         0 | 0 | $         0 |
| 1990 | 2 | 136,400 | 0 | 0 |
| 1991 | 8 | 42,625 | 5 | 16,648 |
| 1992 | 21 | 21,929 | 5 | 12,467 |
| 1993 | 16 | 176,866 | 6 | 9,583 |
| 1994 | 13 | 132,780 | 13 | 34,115 |
| 1995 | 29 | 175,699 | 16 | 19,750 |
| 1996 | 41 | 18,234 | 63 | 18,509 |
| 1997 | 147 | 27,123 | 125 | 10,283 |
| 1998 | 224 | 76,068 | 77 | 49,788 |
| 1999 | 174 | 46,801 | 79 | 29,012 |
| 2000 | 287 | 98,294 | 132 | 56,791 |
| Overall | 962 | $  71,573 | 521 | $  32,699 |

Note: See Exhibit 34 for details.

Using a regression model, we found that settlement values for Grace paid mesothelioma claims with a trial date were a statistically significantly 14.5% higher than settlements without a trial date, controlling for a number of factors including settlement year and state. (See Exhibit 35.)

**b.  Venue Differences Affected Grace's Values**

As with other defendants, Grace's asbestos settlement spending was correlated with pro-plaintiff jurisdictions.  More specifically, average settlement values for both non-malignant and

---

[92]  Paul Hampel, "Asbestos Judge Tosses Out 3 Lawsuits," STL Today.com, October 12, 2004, writes: "…Judge Stack may be the new broom that sweeps the county courthouse clean.  He inherited the mess from Judge Nicholas G. Byron, who resigned from the overstuffed asbestos docket to handle other cases."

malignant Grace claims were higher in the pro-plaintiff state of Texas than in the rest of the country throughout the 1990s. (See Figure 21 and Exhibit 36.)

### Figure 21

**W. R. Grace Historical Claims Database**
**Average Settlements in Texas Tend to be Higher than Average Settlements for Other States**

| Settlement Year | Malignant Diseases | | Non-Malignant Diseases | | All Diseases | |
| | Average Settlement Value in Texas | Average Settlement Value for All Other States | Average Settlement Value in Texas | Average Settlement Value for All Other States | Average Settlement Value in Texas | Average Settlement Value for All Other States |
| (1) | (2) | (3) | (4) | (5) | (6) | (7) |
| Pre-1990 | $ 3,570 | $ 27,672 | $ 1,740 | $ 3,306 | $ 1,824 | $ 4,949 |
| 1990 | 4,470 | 17,755 | 2,370 | 3,310 | 2,381 | 3,957 |
| 1991 | 11,667 | 13,969 | 6,996 | 2,644 | 7,364 | 3,717 |
| 1992 | 12,864 | 10,144 | 5,311 | 2,552 | 5,876 | 3,247 |
| 1993 | 7,594 | 17,508 | 4,343 | 2,651 | 4,582 | 4,271 |
| 1994 | 11,593 | 12,609 | 3,937 | 2,785 | 5,058 | 3,911 |
| 1995 | 29,500 | 14,749 | 3,149 | 1,874 | 6,065 | 3,336 |
| 1996 | 12,224 | 10,797 | 2,049 | 1,807 | 2,392 | 2,183 |
| 1997 | 22,918 | 11,975 | 3,670 | 2,208 | 5,512 | 2,963 |
| 1998 | 27,481 | 19,959 | 3,450 | 2,724 | 5,713 | 4,484 |
| 1999 | 21,459 | 22,545 | 2,882 | 2,243 | 4,509 | 3,796 |
| 2000 | 35,883 | 32,555 | 4,550 | 3,233 | 7,242 | 5,529 |

Note: See Exhibit 36 for details.

Using a regression model, we found that settlement values for Grace paid claims in Texas were a statistically significantly 20.4% higher than in the rest of the country, controlling for a number of factors including settlement year and disease type. (See Exhibit 37.)

Also, following the large verdicts in Mississippi described above in the late 1990s, Grace began to pay substantial indemnity values in this state. More specifically, while prior to 1998, Grace did not pay any Mississippi settlements, in 1999 and 2000 over 20% of Grace's indemnity payments were spent in Mississippi (a total of almost $27 million). (See Figure 22 and Exhibit 38.)

**Figure 22**

W. R. Grace Historical Claims Database

Total Settlement Value in Texas and Mississippi as a Percentage of Total Settlement Value for All States

For Non-Malignant Disease Settlements

| Settlement Year | Texas | | Mississippi | | All States |
| | Total Settlement Value | As Percentage of Settlement Value for All States | Total Settlement Value | As Percentage of Settlement Value for All States | Total Settlement Value |
| (1) | (2) | (3) (2)/(6) | (4) | (5) (4)/(6) | (6) |
|---|---|---|---|---|---|
| Pre-1985 | $ - | - % | $ - | - % | $ 271,529 |
| 1985 | - | - | - | - | 42,900 |
| 1986 | - | - | - | - | 922,625 |
| 1987 | 1,700 | 0.26 | - | - | 650,126 |
| 1988 | 12,300 | 0.97 | - | - | 1,272,278 |
| 1989 | 3,635,518 | 69.24 | - | - | 5,250,761 |
| 1990 | 2,222,633 | 34.58 | - | - | 6,428,435 |
| 1991 | 244,850 | 6.97 | - | - | 3,511,855 |
| 1992 | 722,250 | 11.32 | - | - | 6,382,764 |
| 1993 | 2,188,750 | 29.19 | - | - | 7,497,738 |
| 1994 | 5,184,772 | 36.15 | - | - | 14,341,215 |
| 1995 | 7,441,010 | 47.46 | - | - | 15,677,378 |
| 1996 | 51,952,731 | 87.96 | - | - | 59,062,123 |
| 1997 | 12,927,686 | 26.71 | - | - | 48,398,190 |
| 1998 | 30,990,338 | 62.04 | 883,000 | 1.77 | 49,949,085 |
| 1999 | 12,454,213 | 37.75 | 7,015,000 | 21.26 | 32,990,713 |
| 2000 | 41,286,594 | 50.68 | 19,351,619 | 23.75 | 81,472,808 |

Note: See Exhibit 38 for details.

# V.    STATE LEGISLATURES AND COURTS HAVE ENACTED CHANGES AIMED AT REDUCING PERCEIVED TORT SYSTEM ABUSES ASSOCIATED WITH UNFOUNDED ASBESTOS LIABILITIES

## A.    Extensive Reforms Have Occurred at the State Level

As described below, significant reform has occurred in recent years at the state level, including the creation of deferred dockets, implementation of strict medical criteria and venue restrictions. (See Exhibit 39 for list of historical legislative and judicial tort reforms.)

### 1.    Deferred Dockets Have Been Implemented and More Stringent Medical Criteria Have Been Required by Reforms in a Number of States

A number of jurisdictions, such as New York, have either created deferred dockets for unimpaired non-malignant claims or denied them standing altogether. For example, judicial

reforms in New York County (where most of the claims in New York State are filed) imposed medical criteria through the use of an inactive docket.[93]

In addition, several states, including Texas, Georgia, Florida and Ohio have established medical criteria for all asbestos claims. Texas, Georgia, Florida and Ohio passed legislation requiring evidence of impairment for the filing of asbestos-related disease claims. In addition, Georgia and Florida have tightened their rules for doctors engaged in the mass screening business. For example, Georgia now requires that doctors spend no more than 10% of their professional practice time – and that their clinic, medical corporation or other affiliated group earn no more than 20% of revenues -- from consulting or expert-related services undertaken in connection with actual or potential civil actions.[94] This reform includes a requirement that all claimants submit a qualifying medical report with a pulmonary function test that demonstrates physical impairment.[95]

While a significant proportion of historical non-malignant claims were filed in these four states (often classified as pro-plaintiff states), the spate of reforms has continued to other states. For example, Kansas, South Carolina and Tennessee enacted medical requirements legislation in 2006.[96]

To measure the potential impact of these reforms, we estimated the percent of non-malignant filings that are classified by the Manville Trust as unimpaired in the states with medical requirements reforms, prior to the enactment of these reforms. We found that 62.7% of the pre-reform non-malignant filings in states with medical reform were unimpaired and would have been unable to file under the new laws. (New York was included because of its inactive docket for unimpaired claims.)[97] (See Figure 23 and Exhibit 40.)

---

[93] See, for example, "The Evolving Civil Justice Reform Movement: Procedural Reforms Have Gained Steam, but Critics Still Focus on Arguments of the Past," by Mark A. Behrens and Andrew W. Crouse, *University of Dayton Law Review*, Vol. 31:2 2006, , pp. 196-198.

[94] 2005 Georgia Laws Act 29 (H.B. 416).

[95] See www.atra.org for more details of all reforms discussed in this section.

[96] See Exhibit 39 for details.

[97] The following disease categories are defined as impaired: CT3 (Disabling Bilateral Interstititial Lung Disease, Pre-TDP), 3 (Disabling Bilateral Interstitial Lung Disease, 1995 TDP), L3 (Asbestosis/Pleural Disease, 2002 TDP), and L4 (Severe Asbestosis Disease, 2002 TDP). Unimpaired categories are: CT1 (Bilateral Pleural Disease, Pre-TDP), CT2 (Nondisabling Bilateral Interstitial Lung Disease, Pre-TDP), 1 (Bilateral Pleural

**Figure 23**

Manville Trust

Percent of Manville Non-Malignant Claims That Are Unimpaired

From Manville's Switch to More Stringent ATS Standards to the Beginning of Medical Reform in Each State

| Filing State | Number of Non-Malignant Claims | Number of Unimpaired Claims | Percentage of Non-Malignant Claims That Are Unimpaired |
|---|---|---|---|
| (1) | (2) | (3) | (4) |
| | | | (3)/(2) |
| Florida | 15,870 | 10,808 | 68.10 % |
| Georgia | 4,092 | 2,391 | 58.43 |
| Kansas | 627 | 420 | 66.99 |
| New York | 10,871 | 9,365 | 86.15 |
| Ohio | 36,857 | 29,076 | 78.89 |
| South Carolina | 2,051 | 1,172 | 57.14 |
| Tennessee | 2,132 | 1,559 | 73.12 |
| Texas | 75,384 | 37,960 | 50.36 |
| **Total for States with Medical Requirements Reforms** | **147,884** | **92,751** | **62.72 %** |

Note: See Exhibit 40 for details.

## 2.  Venue Reform Has Been Enacted in Key Jurisdictions

Mississippi passed a venue reform bill in 2002 and a more stringent bill in 2004 providing that proper venue for a plaintiff is in the county where the defendant resides or where a substantial alleged act occurred.[98]  Mississippi's venue reform affected many claims, given the fraction of claims filed in Mississippi historically that originated in other states.  As shown in Figure 24, an analysis of the claims filed against the Manville Trust shows that 53.6% of claims brought in Mississippi were filed by out-of-state claimants.  (See Figure 24 below and Exhibit 41.)

---

Disease, 1995 TDP), 2 (Nondisabling Bilateral Interstitial Lung Disease, 1995 TDP), L1 (Other Asbestos Disease (Cash Discount Payment), 2002 TDP), and L2 (Asbestosis/Pleural Disease, 2002 TDP).

[98]  Venue reform: H.B.13, 2004.

**Figure 24**

**Manville Trust**
**Mississippi Out of State Filings**

| Year Filed | Claims Filed in Mississippi | Mississippi Claims Filed by Mississippi Residents | Mississippi Claims Filed by Non-Mississippi Residents | Percent In-State Filers | Percent Out-of-State Filers |
|---|---|---|---|---|---|
| (1) | (2) | (3) | (4) | (5) | (6) |
| | | | | (3)/(2) | (4)/(2) |
| Overall | 81,269 | 37,744 | 43,525 | 46.44 % | 53.56 % |

Note: See Exhibit 41 for details.

Mississippi is not alone in implementing these types of reforms. Other states that passed venue reform since the time of Grace's bankruptcy include Arkansas (2003), Georgia (2003 and 2005), Missouri (2005), South Carolina (2005), Texas (2003) and West Virginia (2003).

### 3. These Reforms Would Have Affected a Significant Number of Historical Grace Claims

As noted above, Grace was plagued with unimpaired claims, particularly in the states that have undergone reform since its bankruptcy.

### a. Medical Reforms

More specifically, as shown by an examination of its Historical Claims Database, 47.6% of Grace's non-malignant claims were filed in states that have since implemented medical reforms. Moreover, 60.9% of the non-malignant claims filed in these states were unimpaired. (See Figure 25 and Exhibit 42.)

56

**Figure 25**

**W. R. Grace Historical Claims Database**

**Non-Malignant Claims Filed in States with Medical Requirements Reforms**

| State | Number of Non-Malignant Claims | Percent of Total Claims |
|---|---|---|
| (1) | (2) | (3) (2)/246,510 |
| Florida | 15,840 | 6.43 % |
| Georgia | 207 | 0.08 |
| Kansas | 193 | 0.08 |
| New York | 12,791 | 5.19 |
| Ohio | 12,291 | 4.99 |
| South Carolina | 398 | 0.16 |
| Tennessee | 2,179 | 0.88 |
| Texas | 73,310 | 29.74 |
| **Total Reform States** | **117,209** | **47.55 %** |
| **Total Estimated Unimpaired in Reform States** | **71,395** | **60.91 %** |
| **Total All States** | **246,510** | |

Note: See Exhibit 42 for details.

Of the PIQ non-malignant claims specifying state, 54.5% were filed in states that have since implemented medical reforms. Moreover, 77.0% of the non-malignant claims filed in these states were unimpaired. (See Figure 26 and Exhibit 43.)

**Figure 26**

**PIQ Database**

**Non-Malignant Claims Filed in States with Medical Requirements Reforms**

| State | Number of Non-Malignant Claims | Percent of Total Claims |
|---|---|---|
| (1) | (2) | (3) |
| | | (2) / 47,421 |
| Florida | 1,742 | 3.67 % |
| Georgia | 623 | 1.31 |
| Kansas | 2 | 0.00 |
| New York | 1,563 | 3.30 |
| Ohio | 13,132 | 27.69 |
| South Carolina | 589 | 1.24 |
| Tennessee | 850 | 1.79 |
| Texas | 7,362 | 15.52 |
| **Total Reform States** | **25,863** | **54.54 %** |
| **Total Estimated Unimpaired in Reform States** | **19,906** | **76.97 %** |
| **Total All States** | **47,421** | |

Note: See Exhibit 43 for details.

We also examined the diagnostic information provided in the Historical Closed Claims Sample and in the PIQ forms for all plaintiffs alleging a non-malignant disease and found that many of these would be unimpaired according to the standards established by the state tort reforms.

For the Historical Closed Claims Sample, of those that submitted medical information, only 6.9% submitted an ILO score of 1/0 or greater and a PFT score of less than 80% of normal, while 0.3% submitted an ILO score of 2/1 or higher and a below-65% PFT threshold. Taking into consideration diffuse pleural thickening in addition to ILO and PFT scores, 20.6% of the non-malignant claims do not meet the asbestosis or the pleural criteria. (See Figure 27 and Exhibit 44.)

58

## Figure 27

### Historical Closed Claims Sample
### Medical Statistics for Non-Malignant Claims

| Category | Number of Claims | Percentage of Total Claims |
|---|---|---|
| (1) | (2) | (3) (2)/1,218 |
| **I. Criteria for Asbestosis** | | |
| Claims with ILO ≥ 2/1 and PFT < 65% | 3 | 0.25% |
| Claims with ILO ≥ 1/0 and PFT < 80% | 84 | 6.90% |
| Claims with ILO ≥ 1/0, but without PFT Score Showing Impairment | 660 | 54.19% |
| Claims with ILO Score that Do Not Meet Asbestosis Criteria | 94 | 7.72% |
| Claims without ILO Score | 377 | 30.95% |
| **Total Claims** | **1,218** | **100.00%** |
| | | |
| **II. Criteria for Pleural Thickening for Claims that Do Not Meet Asbestosis Criteria** | | |
| Claims that Meet Asbestosis Criteria | 747 | 61.33% |
| Claims that Do Not Meet Asbestosis Criteria, but Do Meet Pleural Thickening Criteria | 220 | 18.06% |
| Claims that Do Not Meet Asbestosis or Pleural Thickening Criteria | 251 | 20.61% |
| **Total Claims** | **1,218** | **100.00%** |

Note: See Exhibit 44 for details.

We found that just 36.1% of the non-malignant PIQ respondents provided on the PIQs at least one of the relevant test scores. Further, only 7.0% reported an ILO score of 1/0 or higher and a PFT score below 80% of the normal level. Only 0.3% of all claimants reported an ILO score of 2/1 or higher and a below-65% PFT threshold. (See Figure 28 and Exhibit 45.)

59

## Figure 28

### PIQ Database
### Medical Statistics for Non-Malignant Claims

| Category | Number of Claims | Percentage of Claims |
|---|---|---|
| (1) | (2) | (3) |
| **Claims with ILO and/or PFT Scores** | | |
| Claims with ILO ≥ 2/1 and PFT < 65% | 123 | 0.25% |
| Claims with ILO ≥ 1/0 and PFT < 80% | 3,378 | 7.00% |
| Claims with ILO ≥ 1/0, but without PFT Score Showing Impairment | 8,710 | 18.05% |
| Claims with ILO Score that Do Not Meet Asbestosis Criteria | 965 | 2.00% |
| Claims without ILO Score | 35,088 | 72.70% |
| **Total Claims** | **48,264** | **100.00%** |

Note: See Exhibit 45 for details.

For the PIQ Attachment Sample, of those that submitted medical information, only 19.3% submitted an ILO score of 1/0 or greater and a PFT score of less than 80% of normal while 0.8% submitted an ILO score of 2/1 or higher and a below-65% PFT threshold. Taking into consideration diffuse pleural thickening in addition to ILO and PFT scores, 32.5% of the non-malignant claimants still met neither the asbestosis nor the pleural criteria. (See Figure 29 and Exhibit 46.)

60

**Figure 29**

PIQ Attachment Sample

Medical Statistics for Non-Malignant Claims

| Category | Number of Claims | Percentage of Total Claims |
|---|---|---|
| (1) | (2) | (3) (2)/2,040 |
| **I. Criteria for Asbestosis** | | |
| Claims with ILO ≥ 2/1 and PFT < 65% | 17 | 0.83% |
| Claims with ILO ≥ 1/0 and PFT < 80% | 393 | 19.26% |
| Claims with ILO ≥ 1/0, but without PFT Score Showing Impairment | 869 | 42.60% |
| Claims with ILO Score that Do Not Meet Asbestosis Criteria | 79 | 3.87% |
| Claims without ILO Score | 682 | 33.43% |
| **Total Claims** | **2,040** | **100.00%** |
| | | |
| **II. Criteria for Pleural Thickening for Claims that Do Not Meet Asbestosis Criteria** | | |
| Claims that Meet Asbestosis Criteria | 1,279 | 62.70% |
| Claims that Do Not Meet Asbestosis Criteria, but Do Meet Pleural Thickening Criteria | 98 | 4.80% |
| Claims that Do Not Meet Asbestosis or Pleural Thickening Criteria | 663 | 32.50% |
| **Total Claims** | **2,040** | **100.00%** |

Note: See Exhibit 46 for details.

b.  **Venue Reforms**

Similarly, had Grace remained in the tort system, Grace would have been the beneficiary of recently-enacted venue reforms.  As shown by its Historical Claims Database, 16.5% of Grace's historical claims were filed in Mississippi, with an additional 41.4% filed in other states that have enacted venue reforms, for a total of 57.9%. (See Figure 30 and Exhibit 47.)

**Figure 30**

**W. R. Grace Historical Claims Database**
**Claims Filed in States with Venue Reforms**

| State | Number of Claims | Percent of Total Claims |
|---|---|---|
| (1) | (2) | (3) |
| | | (2)/340,340 |
| Arkansas | 1,678 | 0.49 % |
| Georgia | 2,401 | 0.71 |
| Mississippi | 56,108 | 16.49 |
| Missouri | 1,629 | 0.48 |
| South Carolina | 1,043 | 0.31 |
| Texas | 101,026 | 29.68 |
| West Virginia | 33,051 | 9.71 |
| **Total Reform States** | **196,936** | **57.86 %** |
| **Total All States** | **340,340** | |

Note: See Exhibit 47 for details.

Similarly, 33.7% of pending claims with state data as represented by the PIQ data were filed in venue reform states. (See Figure 31 and Exhibit 48.)

62

**Figure 31**

**PIQ Database**
**Claims Filed in States with Venue Reforms**

| State | Number of Claims | Percent of Total Claims |
|---|---|---|
| (1) | (2) | (3) |
| | | (2) / 56,874 |
| Arkansas | 975 | 1.71 % |
| Georgia | 974 | 1.71 |
| Mississippi | 3,744 | 6.58 |
| Missouri | 165 | 0.29 |
| South Carolina | 672 | 1.18 |
| Texas | 9,783 | 17.20 |
| West Virginia | 2,879 | 5.06 |
| **Total Reform States** | **19,192** | **33.74 %** |
| **Total All States** | **56,874** | |

Note: See Exhibit 48 for details.

## B.    The Silica MDL Decision Was a Watershed Event

In addition to these state legislative reforms, there have been a few key judicial decisions that related to asbestos litigation. In particular, during the spring of 2005, Judge Jack, in the Silica MDL, "conducted *Daubert* hearings/court depositions" of the doctors and screening facilities put forth by the plaintiffs as experts.[99] The doctors in question were the same doctors that frequently appeared as experts in asbestos litigation historically, many of whom were cited in the Manville medical audit as having high failure rates. The hearings culminated in a June 30, 2005 decision issued by Judge Jack.

Although Judge Jack ruled that the court had subject matter jurisdiction over only one of the cases in the MDL, she addressed all of the diagnoses of the nine unreliable doctors to prevent state courts from having to repeat the *Daubert* hearings. She identified the unreliable doctors as:

---

[99]    See *In Re: Silica Products Liability Litigation,* Order No. 29: "Addressing Subject-Matter Jurisdiction, Expert Testimony and Sanctions," (hereafter, "Order No. 29").

Dr. Ballard, Dr. Cooper, Dr. Coulter, Dr. Andrew Harron, Dr. Ray Harron, Dr. Hilbun, Dr. Levy, Dr. Martindale and Dr. Oaks.[100]  (See Exhibit 49 for a list of doctors identified in different studies/decisions.[101])

## 1. Diagnoses of Challenged Doctors Did Not Meet Minimum Medical Criteria for Diagnoses

With regard to the unreliable doctors, in her decision, Judge Jack wrote that their diagnoses did not meet the minimum medically accepted criteria of diagnosis. Judge Jack identified three criteria for making a silicosis diagnosis: i) sufficient exposure, ii) radiographic evidence, and iii) no differential diagnosis.

> Looking no further than the first criterion [sufficient exposure], virtually all of the diagnoses fail to satisfy the minimum medically acceptable criteria for the diagnosis of silicosis, and therefore, the testimony of the challenged doctors cannot be admissible under standards set by Rule 702 and Daubert.[102]

With respect to the other two criteria, she wrote:

> [T]he unsound nature of the diagnoses is betrayed not only by the opportunistic transformations of asbestosis into silicosis reads, but also by the improbable consistencies among the silicosis reads," (pp. 135-36) and "In almost all of the MDL cases, the challenged diagnosing doctors simply ignored this final criterion (*i.e.,* the absence of any good reason to believe that the radiographic findings are the result of some other condition) altogether.[103]

## 2. The ILO Readings by the Challenged Doctors were Implausibly Lacking in Variability

One of Judge Jack's criticisms was that the readings by the unreliable doctors were remarkably consistent across claimants. For the claimants in the Silica MDL, approximately 92% of the profusions scored a 1/0 or 1/1.[104]  In her decision, Judge Jack quotes from the testimony of Dr. Parker, the former administrator of the NIOSH program, who said that:

---

[100] See Order No. 29, p. 127.

[101] See Haber Report.

[102] See Order No. 29, p. 127.

[103] See Order No. 29, pp. 135-137.

[104] See Order No. 29, p. 136. "In reviewing over 6,510 B-reads produced during Plaintiffs' initial disclosures, over 92% of the profusions were 1/0 or 1/1, while less than 2% were 2/1 or greater (i.e., 2/1, 2/2, 2/3, 3/2, 3/3, or 3/+)."

What I find most stunning about the information I've seen in the last, yesterday afternoon and this morning, is the lack of reader variability, because the consistency with which these films are read as 1/0 defies all statistical logic and all medical and scientific evidence of what happens to the lung when it's exposed to workplace dust. What again is stunning to me is the lack of variability. This lack of variability suggests to me that readers are not being intellectually and scientifically honest in their classifications.[105]

### 3. Many of the Claimants Who Were Diagnosed with Silicosis Had Also Been Diagnosed with Asbestosis

#### a. Judge Jack Criticized the Dual Diagnoses

Another criticism of Judge Jack's was that many of the unreliable B-readers and facilities made both silica-related and asbestos-related disease diagnoses for the same claimant. Judge Jack questioned the competing diagnoses, citing, among others, Dr. Parker, the former administrator of NIOSH's B-reader program, who testified that "he has never seen a clinical case of asbestosis and silicosis in the same individual."[106]

#### b. Plaintiffs' Counsel in the MDL Also Challenged the Dual Diagnoses

Even plaintiffs' counsel in the MDL issued statements questioning the diagnoses of claimants making simultaneous asbestos and silica claims. On August 23, 2005 Judge Jack issued Order Number 31 in the Silica MDL. In footnote number 3 of that order, Judge Jack wrote:

> During the status conference, Defendants represented that of the 82 Alexander Plaintiffs who recently submitted new diagnosing reports, 60 have previously filed claims for asbestosis. Plaintiffs' counsel in Alexander, Richard Laminack, stated that his firm has "never, never represented an asbestosis claimant and then turned around and 'retreaded' as a silicosis claimant." Mr. Laminack further stated: "I think the explanation in a lot of the cases is that the asbestos diagnosis is wrong." Later, Mr. Laminack reiterated that "I doubt the diagnoses" underlying his clients' previous asbestosis claims. If indeed the Plaintiffs have made asbestosis claims that are now suspect, Defendants are ordered to notify the appropriate court where such claim was made or settled.

---

[105] See Order No. 29, p. 96.

[106] See Order No. 29, p. 62.

Despite this testimony, it was later revealed that Mr. Laminack's firm actually had a close arrangement with the Foster firm, which had filed these same cases as asbestos claims:[107]

> Mr. Laminack admitted to Congress that O'Quinn had once financed a separate Houston law firm, Foster Harssema. The Foster firm then handled asbestos claims, while the O'Quinn firm handled silicosis. Mr. Laminack acknowledged that he and another former O'Quinn partner were listed as managers of the Foster firm, and that O'Quinn collected referral fees for asbestos cases that Foster won.

### c. Many of the Dual Diagnoses Were Linked to the Unreliable Doctors

In the course of the Silica MDL litigation, a mobile screening facility, N&M was required to turn over all of its medical records.[108] N&M is the facility associated with Drs. Ray and Andrew W. Harron, Dr. Ballard and Dr. Oaks, four of the doctors challenged by Judge Jack.[109]

In a NERA working paper by Dr. Frederick Dunbar, Dr. Faten Sabry and Mary Elizabeth Stern, the authors obtained a database created from the N&M files for 27,558 individuals with information by Social Security number for screening date, name of the doctor, and whether the diagnosis was positive or negative for asbestos and/or silicosis. In 4,322 cases, N&M B-readers screened claimants for both asbestosis and silicosis. In 3,558 of these cases, the N&M file shows that the claimant received a positive diagnosis for *both* diseases. That is, 82.3% of the time an N&M B-reader tested for both diseases, the B-reader diagnosed the claimant as having both asbestosis and silicosis.[110] Thus, although in her order Judge Jack cites numerous experts that report having a patient with both an asbestos-related and silica-related condition is extremely rare, 82.3% of the claimants screened by the N&M facility for both diseases had such a diagnosis.[111]

---

[107] As reported in "The Silicosis Bar Association," *The Wall Street Journal*, August 2, 2006, p. A10.

[108] As discussed in the Judge Jack decision, N&M stands for "Netherland & Mason," the co-owners of the company. Prior to establishing N&M, the two co-owners and Charles Foster (the owner of Respiratory Testing Services ("RTS")—a facility also identified by Judge Jack—worked together in another Alabama screening company called "Pulmonary Testing Services."

[109] See Haber Report, pp. 9-12, 23-30, 33-38, 46-48.

[110] See "Institutional Response to Tort System Breakdown: Asbestos Enters a New Phase," by Frederick C. Dunbar, Faten Sabry and Mary Elizabeth Stern, NERA Working Paper, July 21, 2006.

[111] See Order Number 29. "It bears repeating that outside of the small cadre of doctors who diagnose for screening companies, even a single case of a dual diagnosis of silicosis and asbestosis is extremely rare. See Feb. 18, 2005 Trans. at 89-90, 263-64 (Dr. Parker testifying that he has never seen a clinical case of asbestosis and silicosis in the same individual); Friedman Ex. 2 (letter from Dr. Hammar: 'In the cases that I've had pathology to evaluate,

#### 4. Several Trusts Banned Materials from Doctors Challenged in the MDL Order

As of September 2005, the Manville Trust stopped accepting claims with medical support from the nine challenged doctors and two of the three screening facilities that were highlighted in Judge Jack's decision.[112]  On October 19, 2005, the Eagle Picher Trust also stopped accepting medical documentation from the same nine challenged doctors and two screening facilities.[113]  In addition to these asbestos trusts, a number of other trusts – including Celotex, Keene, Plibrico, and Babcock & Wilcox – have also rejected claims supported by medical evidence provided by these doctors.  Specifically, several of these trusts have deemed the medical reports and practices from these doctors and screening facilities to be unacceptable and unreliable.[114]

#### 5. W.R. Grace's Experts Identified Unreliable Doctors

Grace's expert, Dr. Haber, has identified a total of 24 doctors whose diagnoses are unreliable.  These doctors fall into the following categories: (1) doctors who have been banned by asbestos trusts (James W. Ballard, Kevin Cooper, Todd Coulter, Andrew N. Harron, Raymond A. Harron, Glynn Hilbun, Richard Kuebler, Barry Levy, George Martindale,  Larry

---

I have never seen cases in which there was both silicosis and asbestosis in the same patient.'); see also David Weill, Senate Judiciary Committee Testimony, Fed Doc't Clearinghouse at 4 (Feb. 3, 2005) ('Even in China, where I saw workers with jobs involving high exposure to asbestos and silica (such as sandblasting off asbestos insulation), I did not see anyone or review chest radiographs of anyone who had both silicosis and asbestosis.'); Dr. Paul Epstein, Senate Judiciary Committee Testimony, Fed. Doc't Clearinghouse at 3 (Feb. 2, 2005) ('[I]t is my professional opinion that the dual occurrence of asbestosis and silicosis is a clinical rarity.'); Dr. Theodore Rodman, Senate Judiciary Committee Testimony, Fed. Doc't Clearinghouse at 2 (Feb. 2, 2005) ('Among the thousands of chest x-rays which I reviewed in asbestos and silica exposed individuals, I cannot remember a single chest x-ray which showed clear-cut findings of both asbestos exposure and silica exposure').  When informed that 6,000 silicosis Plaintiffs had previous asbestosis diagnoses, Dr. Parker testified:  'I find it stunning and not scientifically plausible.'  (Feb. 18, 2005 Trans. at 90)  Based upon the evidence presented, the Court agrees."  pp. 134-35.

[112]  See letter from David Austern, President Claims Resolution Management Corporation, dated September 12, 2005, "Suspension of Acceptance of Medical Reports."  The screening facilities identified by Judge Jack were N&M Inc., RTS Inc. and Innervisions Inc.  The Manville Trust banned medical documentation from N&M Inc. and RTS Inc.  In addition, the Trust identified a third screening facility, Healthscreen Inc., from which it will no longer accept medical documentation.  Earlier, in September 2002, the Manville Trust stopped accepting claims with medical support from Dr. Gregory Nayden and the American Medical Testing (AMT) facility. (See letter from David Austern, President Claims Resolution Management Corporation, dated September 24, 2002, "Suspension of Acceptance of Medical Records Prepared by Dr. Gregory Nayden and the American Medical Testing Facility.")  See also Haber Report, pp. 9-19.

[113]  See letter from William B. Nurre, Executive Director of the Eagle Picher Personal Injury Settlement Trust  to Claimants' Counsel, dated October 19, 2005.

[114]  See Haber Report, pp. 3, 23-24; Plibrico Trust Policy on Doctors and Screening Companies available at www.verusllc.com; also, see Babcock & Wilcox Trust's Distribution Procedures available at www.bwasbestostrust.com.

Mitchell, Greg Nayden, Walter Allen Oaks); (2) doctors who have disavowed their diagnoses in whole or in part (Robert Altmeyer, Jeffrey Bass, Glynn Hilbun, Richard Levine, Phillip Lucas, Jay Thomas Segarra); (3) doctors who have similar bad practices as banned doctors (Dominic J. Gaziano, Alvin J. Schonfeld); and (4) doctors who worked for screening companies banned by trusts (Leo Castiglioni, James Krainson, Robert Mezey, Paul Venizelos, Robert von McGee).[115]

As noted above in Section IV.B, these unreliable doctors are responsible for a significant percentage of the non-malignant diagnoses in the Grace data. These doctors also diagnose a substantial number of the cases of underlying asbestosis associated with the lung cancer and other cancer claims. An analysis of the Historical Closed Claims Sample revealed that 59.6% of the closed non-malignant claims rely solely on an x-ray reader who is one of the unreliable doctors. Of the lung cancer claimants and other cancer claimants who provided an x-ray reader, 27.0% of the lung cancer claimants and 49.2% of the other cancer claimants reported only an unreliable x-ray reader. (See Figure 7 above and Exhibit 19.) In addition, in the PIQ data, we found that, of the 16,342 non-malignant claims with x-ray reader, 45.5% have an x-ray diagnosis only from an unreliable doctor. Furthermore, 27.2% of the lung cancer claims and 36.2% of the other cancer claims who provide an x-ray reader report only an unreliable doctor. (See Figure 8 above and Exhibit 20.) For the PIQ Attachment Sample, we found that 49.0% of the non-malignant claimants with doctor information were diagnosed by only unreliable x-ray reading doctors. Moreover, 21.4% of the lung cancer claims and 30.1% of the other cancer claims who provide an x-ray reader report only an unreliable doctor. (See Figure 9 above and Exhibit 21.)

## VI.    FOLLOWING RECENT REFORMS, FILINGS AND SETTLEMENTS HAVE DECLINED

### A.    Following Reforms, Aggregate Filings Have Slowed

#### 1. Information Contained in Public Filings Shows a Decline in Claims

One expected impact of the recent reforms at the state level is a decrease in filings. For example, plaintiffs' attorneys, in making the cost-benefit decision to bring an unimpaired non-malignant case, may elect to pass on the low-benefit cases in light of these recent reforms.

---

[115] See Haber Report, pp. 23-71.

To analyze whether this prediction has been borne out, we compiled data on asbestos-related claim filings for all defendants that report claims in public filings.[116]  An analysis of the rate of change of new filings for these companies shows a general decline in claims for all companies since 2003.  (See Figure 32 and Exhibit 50.)  The claim filings data also shows that filings in 2006 were generally lower than filings in the prior year.  (See Exhibit 51.)

**Figure 32**

**Data from Public Annual SEC Filings**
**Index of Yearly Asbestos Claims Filed**
**2001-2006**



Note: See Exhibit 50 for details.

---

[116] Not all defendants with asbestos liabilities report asbestos claims in the annual reports.  We ran a search of the word "asbestos" in the SEC filings of public companies. We then manually reviewed the filings and included companies that reported filings for several years to assess a trend. We focused on solvent defendants.

### 2. Claims against the Manville Trust Have Declined

In addition to the drop in filings seen by public defendants, the Manville Trust has also experienced a sharp drop in filings in recent years. (See Figure 33 and Exhibit 52.) In 2002, the Trust adopted a new TDP.

Immediately following the announcement of the new TDP, plaintiffs' lawyers quickly filed a large number of claims before its effective date, attempting to avoid the strict new criteria. Filings in 2003 (during most of which claimants had a choice of filing under the 2002 TDP or the 1995 TDP) reached a record high, with almost 95,000 claims filed against the Trust. But over 90,000 claims (or 95%) were filed prior to October 10, 2003, the last date to file before the new TDP officially went into effect.[117]

Since the 2002 TDP became effective in October 2003, filings against the Manville Trust have declined with the non-malignants being affected the most. According to the letter from Robert A. Falise, the Chairman and Managing Trustee, accompanying the report for the year ended December 31, 2006, in 2006 the Manville Trust "received approximately 10,500 new claim filings compared to 18,200 in 2005", with total number of malignancy filings also declining from the 2005 level. The letter also states that: "Reports suggest that other asbestos trusts as well as defendants in the tort system have also seen a downturn in the number and proportion of non-malignancy claim filings in the past three years." [118]

Figure 33 shows quarterly filings against the Manville Trust.

---

[117] See http://www.mantrust.org/FILINGS/Q4_03/4THQTR03.pdf.

[118] See letter from Robert A. Falise to Honorable Jack. B. Weinstein and Honorable Burton R. Lifland, dated February 28, 2007, available at http://mantrust.org/FILINGS/4thqtr06.pdf.

70

**Figure 33**

**Manville Trust
Filings by Quarter
1996-2006**



Note: See Exhibit 52 for details.

## B.    Mesothelioma Filing Rates Have Stabilized

In addition to a decline in aggregate filings, mesothelioma filing rates have also stabilized since 2003, as can be seen by filings against the Manville Trust. Annual mesothelioma claims reached a peak against the Manville Trust in 2003, with a record 4,361 filings. Since that time, however, claims have fallen off, returning to the pre-2003 levels. For 2006, the Trust received only 2,438 mesothelioma claims.

In addition, a close look at these claims reveals that, while a surge in filings occurred in 2003, there was no corresponding surge in diagnoses. (See Figure 34.)

71

**Figure 34**

**Monthly Manville Mesothelioma Claims Reported by Filing and Diagnosis Dates**
**January 1995 - June 2006**



Notes and Sources:
Figure is from "Where Are Mesothelioma Claims Heading?", by Paul Hinton, Ron Miller, Faten Sabry and Fred Dunbar, NERA Working Paper, December 7, 2006.
-- Claims by diagnosis month include estimated diagnosis months for claims with missing dates.
-- Note that only a small portion of claimants file their claims in the same month in which they are diagnosed. Thus, the drop in the number of claims by diagnosis date in 2005 and 2006 is due to the truncated data and by itself does not mean that there is a declining trend.

    Indeed, a more detailed examination of the surge in mesothelioma filings against Manville in 2003 reveals that a large percentage of these claims were "stale", with diagnosis dates occurring well before the filing date. From July through October 2003, more than 36% of the claimants were diagnosed five years or more prior to that time, while in the period since then only 11.6% of claimants were diagnosed five years or more prior to that time. The average lag between diagnosis and filing was over four and a half years for claims filed between July and October 2003, while the average lag for claims filed since then has been two years. Similarly, over 70.1% of the claims filed since January 2004 were filed in less than two years from when the claimants were diagnosed, while only 33.6% of the claims filed from July through October 2003 were filed in less than two years from when the claimants were diagnosed. This is further evidence that any apparent surge in mesothelioma filing rates in recent years was not driven by any fundamental change in filing rates. (See Figure 35 below and Exhibit 53.)