EXHIBIT B

# KMK | Keating Muething & Klekamp PLL
ATTORNEYS AT LAW

| **RECIPIENT** | **COMPANY** | **FAX NO.** | **PHONE NO.** |
|---|---|---|---|
| David E. Mendelson | Kirkland & Ellis LLP | 202-879-5200 | 202-879-5167 |

**FROM:** Daniel J. Donnellon     **PHONE:** 513/579-6408
**DATE:** February 16, 2007

Total number of pages including cover: **14**
If there is any problem with this transmission, please call as soon as possible.

☐ No original documents will follow unless requested.
☐ Original documents will follow by courier.
☑ Original documents will follow by mail.

**MESSAGE:**

*** CONFIDENTIALITY NOTE ***

The pages accompanying this facsimile transmission contain confidential or privileged information from the law firm of Keating Muething & Klekamp PLL. This information is intended for the individual or entity named on this cover letter. If you are not the intended recipient, be aware that any disclosure, copying, distribution or use of the contents of this information is prohibited. If you have received this facsimile in error, please notify us by telephone immediately so that we may arrange for the retrieval of the original documents at no cost to you.

FOR INTERNAL OFFICE USE ONLY.
Sender:                 Client Code                 Matter Code:

One East Fourth Street • Suite 1400 • Cincinnati, Ohio 45202
TEL (513) 579-6400 • FAX (513) 579-6457 • www.kmklaw.com



DANIEL J. DONNELLON
DIRECT DIAL: (513) 579-6408
FACSIMILE: (513) 579-6457
E-MAIL: DDONNELLON@KMKLAW.COM

February 16, 2007

Via Facsimile and U.S. Mail

David E. Mendelson, Esquire
Kirkland & Ellis LLP
655 Fifteenth Street, N.W.
Washington, D.C. 20005

    Re:    **W.R. Grace & Co., et al.**
            **United States Bankruptcy Court**
            **For the District of Delaware**
            **Case No.: 01-01139 (JFK)**
            **Chapter 11**

Dear Mr. Mendelson:

    I write in response to your inquiry of the Celotex Asbestos Settlement Trust (the "Trust") in the form of a federal subpoena served upon the Trust on February 5, 2007 from the Delaware Bankruptcy Court. The subpoena seeks to compel the Trust to produce someone to testify on its behalf and to produce the categories of documents set forth in Attachment "A". Attachment "A", however, does not relate in any way to the Celotex Trust and the Trust, therefore, is not in possession of any documents responsive to the subpoena.

    Assuming the erroneous definitions in the attachment can be corrected to apply to the Trust, I will address other issues with the subpoena. The subpoena states that it was issued under authorization of the Federal Rules of Civil Procedure, specifically Rule 45(c) (2) (B). Pursuant to the terms of that rule as set forth in the subpoena, the Trust submits this "written objection" to the command to produce any documents that may be responsive for the reasons set forth below.

    First, the court presiding over the Delaware Asbestos MDL, the Delaware Superior Court (New Castle County) has ruled on whether the Trust should be compelled to produce documents that are readily available from other sources, namely the parties in the underlying litigation. *In Re Asbestos Litigation, Chester Link v. Ahlstrom Pumps, L.L.C.* 06M-10-061, (December 7, 2006). For convenience, I attach the transcript of that proceeding, which serves as the court's opinion denying a motion to compel the trust to produce the claimant file. In that matter, the Court denied Owens Illinois' motion to compel the Trust to produce a claimant file relating to a

David E. Mendelson, Esquire
February 16, 2007
Page 2

subpoena virtually identical, but much narrower in scope, to the one referenced above. The Court plainly stated that Delaware Civil Rule 26, identical in material respects to the federal rule, provides protection against duplicative discovery readily available without burdening the innocent third party and a subpoena such as this should not be enforced against the Trust when the subpoenaing party can get the documents elsewhere. We expect that the Bankruptcy Court would agree with this reasoning.

Second, the subpoena also makes a broad request for certain claim information that may be stored electronically. The Trust must resist such wholesale requests for access to its claims data base. The Advisory Committee Notes to the 2006 "e-discovery" amendment to Rule 45 specifically states that the ability to subpoena electronic information "is not meant to create a routine right of direct access to a person's electronic information system. . . . Courts should guard against undue intrusiveness resulting from inspecting or testing such systems." In addition, the collection, sorting and storing of data relating to claims is proprietary information belonging to the Trust. Unlike some other claims processing facilities, the Celotex Trust has never licensed or sold its data and it should not be the subject to access by way of subpoena.

Third, the only documents or data in the possession of the Trust relating to the claimants are documents or data submitted to the Trust by claimants for settlement purposes only. The express terms of the Trust's Claims Resolution Procedures require the Trust to keep this information confidential.

Fourth, the subpoena is overly burdensome. The CD-Rom attached to the subpoena purporting to list more than 56,000 claimants contains only first name and four digits of a social security number and is in a Portable Document File ("PDF") format. The Trust is not able to use a PDF file to electronically search its database and would have to have an employee manually enter the name to query the database to determine whether a claim exists and the location of any responsive document. To simply input the data to determine whether a claim exists would require many man-hours. Thereafter, once the Trust determined the existence and location of the files, retrieval could take many more man hours.

Finally, you should be aware of the injunctions issued by the United States Bankruptcy Court for the Middle District of Florida as part of the Celotex Plan of Reorganization. On December 6, 1996 that court entered the Order Confirming the Plan of Reorganization for The Celotex Corporation and Carey Canada Inc. (the "Confirmation Order"), which confirmed the Modified Joint Plan of Reorganization Under Chapter 11 of the United States Bankruptcy Code for The Celotex Corporation and Carey Canada Inc. Thereafter, by order dated March 4, 1997, the United States District Court for the Middle District of Florida affirmed and issued the Confirmation Order. The injunctions included in the Confirmation Order specifically limits "the employment of process" against the Trust. The Trust hereby reserves all its rights under those injunctions.

David E. Mendelson, Esquire
February 16, 2007
Page 3

     In light of this written objection, W.R. Grace & Company will not be permitted to inspect and copy the documents or other information requested by the subpoena. I would like to speak with you about the deposition you request and our concerns about the data base and confidential claims resolution processes you seek to inquire about. At that time I would be glad to explain further the legal and practical difficulties for the Trust in responding to these document requests.

     Please notify me of your withdrawal of the subpoena.

                     Very truly yours,

                     KEATING MUETHING & KLEKAMP PLL

                     By: *[signature]*
                        Daniel J. Donnellon

DJD:kdt

**Page 1**

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE
IN AND FOR NEW CASTLE COUNTY

IN RE: ASBESTOS LITIGATION
CHESTER LINK, et al.
    v.        06M-10-061 MMJ
AHLSTROM PUMPS, LLC, et al.

BEFORE: HONORABLE COMMISSIONER DAVID A. WHITE

APPEARANCES:

    ROBERT JACOBS, ESQ.
    JACOBS & CRUMPLAR, P.A.
      for the Plaintiff

    KATHARINE L. MAYER, ESQ.
    McCARTER & ENGLISH
      and
    PAUL SCRUDATO, ESQ.
    SCHIFF HARDIN LLP
      for the Defendant

    ERIN EDWARDS, ESQ.
    YOUNG, CONAWAY, STARGATT & TAYLOR, LLP
      and
    DANIEL J. DONNELLON, ESQ.
    KEATING, MUETHING & KLEKAMP, P.L.L.
      for the Celotex trust

MOTION TRANSCRIPT
DECEMBER 7, 2006

PATRICIA L. GANCI, RPR, CRR
SUPERIOR COURT OFFICIAL REPORTERS
500 N. King Street, Suite 2609, 2nd Floor
Wilmington, Delaware 19801-3725

**Page 2**

December 7, 2006
Courtroom 8C
2:30 p.m.

PRESENT:

As noted.

-----

THE COURT: All right. Why don't we go back on the record? I have also on the calendar for today some matters in an Ohio case named Chester Link which Judge Johnston had some involvement in which then led to the motions that are now currently pending. The motions were originally scheduled for a few weeks ago which we then past to today, and in part it was my hope that there would be some degree of resolution. And I'm just talking to the masses at this point. No one in particular. I was hopeful to hear that there's been some resolution, but who's going to take lead on this? Let's talk about it.

MS. MAYER: Your Honor, good afternoon. Katharine Mayer on behalf of Owens-Illinois.

THE COURT: Ms. Mayer, how are you?

MS. MAYER: Good. How are you? I think this whole thing started with our motion to compel. So I

**Page 3**

would say we would start this process this afternoon. I do have with me my cocounsel, Paul Scrudato, S-C-R-U-D-A-T-O. And we did file a motion for admission pro hac vice, but it has not yet been entered. I would ask that he be able to participate today.

THE COURT: That's fine. That's perfectly acceptable. Am I correct that there's no agreement on any issue with respect to any of the papers that are before me?

MS. MAYER: I would say that there's been no agreement. We did propose a resolution yesterday, and it was rejected. So we are at a standstill as of today.

THE COURT: All right. That's fine.

MS. MAYER: Thank you.

THE COURT: Good afternoon. Welcome.

MR. SCRUDATO: Thank you. Good afternoon.

THE COURT: It would help me and maybe the folks on the other side if you could identify the issue or issues that we need to talk about rather than a full-blown presentation on the motion. Let's cut to the --

MR. SCRUDATO: This case, as you know, is pending in Ohio. An Ohio Judge requested that this

**Page 4**

Court issue a subpoena permitting us to get discovery out of the Celotex trust. The discovery we're specifically interested in, Your Honor, is the production of the actual claims forms that Mr. Link presented to the trust as well as a very short, what they call in Ohio, a deposition on written questions. It's about 10 questions basically authenticating the documents.

THE COURT: I saw that.

MR. SCRUDATO: I would have expected that this was a fairly sort of routine and pro forma request --

THE COURT: I saw an e-mail a couple of weeks ago which I thought that was the telegraph I was attempting to send, but ...

MR. SCRUDATO: Well, we -- we have tried to work out an understanding with opposing counsel, Your Honor. I have not actually met -- I've not had an opportunity to meet the lawyers who are here for the trust or for the plaintiffs today since I'm from New York. Plaintiffs lawyers I believe are from Pennsylvania, and the trust lawyer I think is from either Ohio or Indiana.

The issue is very simple, Your Honor --

5

THE COURT: We should have name tags, I guess, shouldn't we?

MR. SCRUDATO: Would probably be a good idea. Clearly, Your Honor, the Ohio Judge thinks this information is important. He has asked that the subpoena be issued explicitly out of this Court. Judge Johnston signed that subpoena I believe on October 18th. That is the motion we're seeking. We're seeking to compel the production of the documents pursuant to that --

THE COURT: Let's make sure we understand or they understand. You are looking for copies of the original claim forms that were submitted on behalf of Mr. Link?

MR. SCRUDATO: Yes.

THE COURT: To the Colotox trust?

MR. SCRUDATO: Yes.

THE COURT: In addition to the claim forms themselves, any other document that you're looking for?

MR. SCRUDATO: It's really the claims forms and anything that was sent to the trust in addition to the claims forms by the plaintiff to substantiate the plaintiff's claim. So, for example, Your Honor, there

6

could be a couple of pages of medical records, that sort of thing.

THE COURT: So that would be, and I'm looking at your question No. 13 on the written interrogatory which makes reference to all claims submitted to the trust by or on behalf of Mr. Link, and here's the important part, and all supporting documentation filed therewith.

MR. SCRUDATO: Yes, that would be supporting documentation filed by Mr. Link. So anything he sent to the trust to justify receiving money from the trust, that's what we're looking for, Your Honor. As well as that short -- you know, they call it in Ohio a deposition on written questions. It's just a way to authenticate. They're complete, authentic, that sort of thing.

THE COURT: Do Mr. Link's attorneys in the Ohio case, his personal injury attorneys, do they maintain copies of the very documents you're looking for?

MR. SCRUDATO: Yes, Your Honor. It is my understanding -- in fact, I just saw an order this morning -- that the Judge in Ohio actually directed Mr. Link's attorneys to give us this information.

7

THE COURT: So you wouldn't have to go through the trust to get it?

MR. SCRUDATO: Well, that's only part of the way -- gets us part of the way there. The Judge did direct the plaintiff's lawyers to provide this information to us.

THE COURT: By what date?

MR. SCRUDATO: I don't think there's a date in the order. I just looked at it, but I'm sure that they'll be on top of that in Ohio. We'll get it -- you know, the trial was set I believe in the first part of '07. That raises -- Your Honor is raising I think an issue that I suspect that will be raised today which is, Well, if you're getting it from the plaintiff's lawyers, why do you need to get it from the trust?

THE COURT: Yes, yes.

MR. SCRUDATO: That makes perfect sense, and we're sympathetic to that, Your Honor. There's two reasons for that. First of all, we are, I believe -- I believe, Your Honor, we're entitled to just make sure that the information we get from the plaintiff's lawyers is complete. You know, we want to --

THE COURT: So if you ask them as officers of

8

the court to provide you with copies of all of the documents submitted to the trust, including all claims and all supporting documentation filed therewith, and they submit documents to you as officers of the court in response of that, you don't think that's adequate?

MR. SCRUDATO: We just want to make sure, Your Honor, and the solution that we proposed yesterday --

THE COURT: Just the answer is, no, you don't think that's adequate?

MR. SCRUDATO: The answer is no.

THE COURT: Now, tell me why.

MR. SCRUDATO: Well, Your Honor, I guess to answer that question, I'm not sure of a rule being applied in any personal injury case anywhere in the country in any jurisdiction where a defendant gets medical records, employment records, from the plaintiff's lawyer that the defendant isn't then entitled to go to the employer, to the hospital, or to the doctor to make sure that those records are complete. What we proposed, Your Honor --

THE COURT: So you ask in your request, Provide us with a complete set of all claims submitted and a complete set of all supporting documentation filed

**9**

therewith, that still wouldn't be sufficient?

MR. SCRUDATO: It would not be sufficient. But let me just make a suggestion, Your Honor. I understand why you're -- and this is a logical question and we're sympathetic to it. What we proposed yesterday was this: All right. Look, if the plaintiff's lawyers are going to give us this package of information, you know, 15, 20, 30 pieces of paper, we'll just take the 30, 40 pieces of paper, mail it to the trust, and just ask them to confirm that this is complete. We did not think that was onerous.

THE COURT: Why don't --

MR. SCRUDATO: We did not think that was worse. I thought that was a sensible solution to the problem. All we want to do is make sure what we got is the complete set of documents. We're entitled to be sure that's the complete set of documents. The only way we can be assured of that is if the trust, which actually has the documents, checks off on it. We're willing to do anything we need to do to make it easy on the trust. I personally thought mailing the stuff to the trust, which what is we proposed yesterday, was a sensible solution.

**10**

THE COURT: Before you filed your papers in Ohio asking for a subpoena here in Delaware, did you file a request for production of documents in the underlying Chester Link case directly on the plaintiff?

MR. SCRUDATO: I don't know when the production of the documents was filed in the Chester Link case, Your Honor. What I do know is that when all of this started back in, I believe, late September, we had none of the documents. In fact, as of today, we still don't have the documents, even though they've been ordered to be produced I believe by Judge --

THE COURT: You don't know when the date is?

MR. SCRUDATO: I don't know when the date is, but we still don't have them.

So that's where we are, Your Honor. We -- I anticipate that -- I think the duplication issue is easily solvable. I do think we're entitled to make sure they're complete. I don't think it's going to take a lot for the trust to check off that they're complete. I think what we're going to hear today --

THE COURT: Beside the issue of the unduly burdensome?

MR. SCRUDATO: Right, which either I can

**11**

address that. It's their issue. Maybe they should address it first, and I can respond to it. I'll handle that however Your Honor wants me to proceed.

THE COURT: All right. Thanks. Appreciate your comments. That's the essence of what we're all about here this afternoon right now?

MR. SCRUDATO: That's it, Your Honor.

THE COURT: Okay. Let's hear from the plaintiffs or the trust, whoever wants to talk. Am I going to hear from both the plaintiffs and the trust?

MS. EDWARDS: Yes.

THE COURT: I just ask that we not duplicate any argument.

MR. JACOBS: I won't. The order entered by the Ohio Court gives until the 15th of December to produce any of the documents, the complete file that was submitted by plaintiff's counsel to Colotox.

THE COURT: Did the order in Ohio in any way indicate that if there was a disagreement on whether those documents are complete, that they could come to Delaware and ask for them to be authenticated by the trust?

MR. JACOBS: No, Your Honor.

**12**

THE COURT: Because I don't have a copy of the order.

MR. JACOBS: I've got an unsigned copy, but it doesn't talk about that. It just indicates --

THE COURT: Was there a hearing that prompted that order?

MR. JACOBS: Yes, Your Honor, on the 1st of December, and there was a bunch -- an order put out including --

THE COURT: Okay.

MR. JACOBS: -- the two would -- -

THE COURT: And was the Judge in Ohio aware of what we were about to do here in Delaware?

MR. JACOBS: I assumed so since he signed the order on the original subpoena.

THE COURT: All right. Good afternoon.

MS. EDWARDS: Good afternoon. Erin Edwards from Young, Conaway, Stargatt and Taylor on behalf of the Colotox Settlement Trust. First, I'd like to address that we also didn't find out about the order until yesterday, and we prompted a conference call between all of the parties to see once again if we could resolve it in light of this order being entered on

Case 01-01139-AMC   Doc 16175-2   Filed 06/27/07   Page 9 of 16
FEB-16-2007 16:00 From:                                    To:912028795200         P.8/15

13

December 1st.

I'm sorry. About their proposal to us, that actually is going to add more burden onto the trust and, in fact, liability to the trust. To make the trust take on the liability of verifying line by line to see if these items are exactly the same, what if there's a typo, what if the information is the same, but in a different place, it really --

THE COURT: Stop for a second. Is it logical or not logical to assume that documents submitted to the trust, stamped copies would be submitted and sent back to the plaintiff's attorneys in Ohio? No? No clock-in? No stamp? No nothing?

MS. EDWARDS: Oh, I'm sorry. I apologize, Your Honor. My cocounsel, Dan Donnellon, from -- is also here. We did not admit him by pro hac to save some expense.

THE COURT: That's fine. I just want to know the answer to my question.

MS. EDWARDS: He can answer the questions exactly for you.

MR. DONNELLON: They're all stored electronically by the trust. And the claimant's law

14

firms, the vast majority of them, are electronic -- have the ability to go on and confirm that the trust has received, assigned a claim number, and what documents the trust has, and they can view them. The trust scans them. They can view what we have.

THE COURT: Okay. Aren't they given a document identification number or something like that?

MR. DONNELLON: They're given a claim number, but they're not coded with specific document identifications or file stamped like a court would. It's a little less formal than that, but there is the availability of the -- of the plaintiff firm to confirm that they did receive them and to see where they are in that process.

THE COURT: So similar to our, if you're aware of it, our LexisNexis e-filing system where anyone can go into our docketing and pull off a copy of a document that was electronically filed or scanned and up-loaded. Can't do with the Celotex trust?

MR. DONNELLON: No, you can't. Not anyone. The documents that are filed --

THE COURT: For example, the plaintiff in Ohio case?

15

MR. DONNELLON: The plaintiff can, of course, but it's not a public record. So not everyone has access, but the plaintiff --

THE COURT: Let me --

MR. DONNELLON: -- can look at their own files.

THE COURT: Let me make sure I understand. Mr. Link's plaintiffs -- Mr. Link's attorneys in Ohio have the ability to get on the web site of the Celotex trust and print out an accurate copy of the claim form and supporting documents for those claim forms that he submitted to the Celotex trust?

MR. DONNELLON: Absolutely. And he can then say, when he produces them, these are genuine and authentic as an officer of the court and they match exactly what the Celotex trust has.

THE COURT: All right. Let me stop you. How is -- if they're able to do that, why is it that you have some suspicion that there may be some change in the document that was submitted as opposed to the one that was given to from you the plaintiff's attorney? I don't get it now.

MR. SCRUDATO: Your Honor, let me try and answer that question in the best way I can.

16

THE COURT: That's all I'm asking. Do you understand what -- at least what I understand is that the plaintiff's attorney in Ohio has the ability to get on the website for the Celotex trust and print out into his or her office a copy of the trust document and the supporting documents, print right out into his or her office.

MR. SCRUDATO: It is not at all a surprise to me, Your Honor, that the plaintiff's lawyer or us, for that matter, that I could get onto that website if I were given the appropriate log-in information, which I would suggest is the better solution. It's not a surprise to me --

THE COURT: Let me just stop you. I am at a loss for this distrust that I'm feeling between the defendants and the plaintiffs in the Ohio case. And you are not adequately explaining it to me.

MR. SCRUDATO: Your Honor, let me explain it.

THE COURT: You're an officer of the court -- just stop. You're an officer of the court. The plaintiff's attorneys in Ohio are officers of the court, and you still do not believe they can provide you with documents that are not true and correct copies of what

17

was submitted to the Celotex trust. And I don't get it. Now, explain.

MR. SCRUDATO: Your Honor, there have been other instances in Ohio cases where the information disclosed and the claims forms may or may not have accurately reflected what information the -- you know, the plaintiffs' actual exposures. And there -- we have every reason to believe that, you know, mistakes are made, Your Honor. Documents aren't always produced.

THE COURT: That doesn't make sense to me. What you're saying doesn't make sense in light of what I just heard that a document is downloaded from the Celotex trust into the plaintiff's attorney's office. What mistake could possibly be made?

MR. SCRUDATO: We'd like to make sure we're getting the complete information, Your Honor, you know. And we are -- I -- we are entitled to make sure we're getting the complete information. We're not entitled to impose any burden on anybody. We understand that. What we're asking for is just an assurance that we're getting the complete file. It is the same assure --

THE COURT: So, for example, a well crafted request for admission submitted to the plaintiff's

18

attorney in Ohio, admit or deny that the forms you've just submitted to me are true and correct copies of the forms submitted to the Celotex claims trust, that doesn't do it either?

MR. SCRUDATO: That would be, I believe, Your Honor, the second most effective way to solve this. The only real way we're going to be sure is if the trust assures us. The trust is the one who has the information.

THE COURT: All right.

MR. SCRUDATO: I'd just like to point one thing out, Your Honor, and I think this is important.

THE COURT: Go ahead.

MR. SCRUDATO: Counsel for the trust is absolutely correct. This stuff is all electronic. It's all submitted electronically. It's all stored electronically.

THE COURT: That's why I --

MR. SCRUDATO: What we're really talking about here --

THE COURT: Would you let me talk for a second? That's why I don't understand this lack of trust between the defendants and the plaintiffs in the Ohio case.

19

MR. SCRUDATO: Your Honor, the fact that there is -- a lack of trust exists is something I can't say other than it exists. I'm sorry for that. I apologize for that. It exists. I wish it -- I wish it didn't, but --

THE COURT: We don't practice law in Delaware that way. I'll leave it at that.

MR. SCRUDATO: I understand.

THE COURT: And I'm disappointed to hear -- at least what I'm hearing is that at least some segment of the Ohio bar practices law that way.

MR. SCRUDATO: I cannot help that, Your Honor. I would just like to point out sort of one thing on sort of how this could actually be accomplished. One way this could be accomplished that would satisfy my client's concern is that we go in and print out the information. What we're really talking about here, what we're really, really talking about here is I went to the Celotex website yesterday, Your Honor. If you go to the Celotex website, you're going to see that in 2005 they reviewed, reviewed, something like 135,000 claims.

THE COURT: I got an affidavit here on this record that says the same thing.

20

MR. SCRUDATO: What that means, Judge, is that every single day some person or persons at the Celotex trust are reviewing on the order of five or 600 claims a day, five or 600, and actually making a determination about those claims. What we're really asking them to do is pull up one of those claims and push print and send them to us. That's what we're asking.

THE COURT: I understand.

MR. SCRUDATO: That's not burdensome, Your Honor. And, again, I feel as though I've not appropriately addressed your concern about this trust issue. I'm from New York. I don't practice in Ohio. I don't practice in Delaware. It obviously exists.

THE COURT: It clearly does.

MR. SCRUDATO: Yeah.

THE COURT: All right. I appreciate it.

MS. MAYER: Your Honor, Katherine Mayer again. I just want to clarify one thing because I did participate in some of the phone calls in this case. And I think one of the issues I would just like to point out is my understanding, and I could stand corrected by counsel for the trust, but my understanding was that the plaintiff's counsel actually submits information over

21

the Internet, the information highway, that then creates the claim form. That is an input into the claim. So I didn't have the impression from plaintiff's counsel that he actually was going to be producing to us something he was going to download off the Celotex trust. My understanding was that he -- he gave me the impression, I may have misunderstood, that his information actually could be different from what the trust actually has in its possession because he just had the information in his hands versus they have the actual completed forms.

THE COURT: But I thought I asked and got the answer to my question, which was could the actual claim form itself and the documents attached to it be downloaded and printed out. And I thought I heard the answer was yes to that.

MS. MAYER: Today is the first time we heard that that would be an option that they would produce to us so we weren't aware. We were being told that their information actually could be different from what the trust had.

THE COURT: Here's what is bother, Ms. Mayer. Here is what is bothering me. I've been involved in this matter for what? A half an hour. You have been

22

involved since what? I heard since October. Why couldn't that question have been asked and answered?

MS. MAYER: The request for production for documents was served in Ohio, and I believe we do have a copy of the order with us granting the motion to compel, if you'd like to review it.

THE COURT: No, I don't think I need to, really.

MS. MAYER: I don't see the date of December 15th in there, but again I would stand corrected by Ohio counsel. And also I think the hearing was November 28th. So we're talking about recent events that just occurred in the last couple of weeks, and we didn't at that point have any other option. And, again, the trust, my understanding, has the complete documents. And they did send an e-mail to us back in September saying they found Chester Link's claim. So if we're talking about burden issues, they found the claim. We're asking to — they found the claim and we're offering to pay any costs, copying, witness fees, anything like that.

We did produce, you know, the questions that would be posed to the witness. I believe a witness was

23

even -- a name was provided to us. We worked out the date and time for everything. So we did try to accommodate any issues with respect to that. We believed they were resolved at one point in time, and then, you know, things kind of steamrolled out of hand. And we realize they were not, and that's where we are today. But I did want to clarify that because I was involved in some of the phone calls that Mr. Scrudato was not involved in.

THE COURT: Thanks. I appreciate that. Ms. Edwards.

MS. EDWARDS: I would like to address that as well. We did from the outset let them know, what we're asking from us is we're a third party. We have nothing to do with this litigation, and these are forms prepared and submitted by the plaintiffs to us.

THE COURT: Is this sort of a macro, that information is typed in by Mr. Link's attorneys in Ohio onto a macro?

MS. EDWARDS: In fact, the claims forms are available. They're heavily located in a planned process to come up with a claim form. So I believe it's accurate to say that the plaintiff themselves have to

24

fill out the claim form. So from our -- our position from the start is, Yeah, we're just in the middle of this.

THE COURT: We've litigated similar-type issues here in Delaware in the Delaware asbestos cases. I've seen lots and lots of the claim forms.

MS. EDWARDS: Correct. And I also wanted to address their concern as well about this mistrust issue and about their ability -- it's their -- it's their ability to be able to pursue this discovery even though they know this duplication is out there. It is actually --

THE COURT: Well, they found out today apparently.

MS. EDWARDS: Right. I was like, Well, it's within the Court's purview under Rule 26(b)(1) --

THE COURT: Right.

MS. EDWARDS: -- 'to be able to limit if the sources are available somewhere else that's less burdensome. And I believe our affidavit sets forth very clearly, you understand the enlarged scale of these asbestos claims. And, in fact, the Celotex trust is one of the largest claims processors, including now with all

### Page 25

of the new trusts actually being established. So we can't look at this in a vacuum to the trust. It's not just the one claim.

THE COURT: Ms. Edwards, let me just tell you, this Court has in the last six weeks issued new case management orders in the asbestos cases. Part of our case management order mandates, requires, a plaintiff in every single case to turn over to the defendants copies of trust forms and attachments to them. We do that.

MS. EDWARDS: I agree. That was next on our list. So thank you.

THE COURT: All right. I preempted you. I'm sorry.

MS. EDWARDS: That's fine. I just wanted as one more note, as far as confidentiality, while some trusts are different, our trust claims resolution procedures which we attached to our response clearly say that we submitted to these plaintiffs. You're submitting these forms to us that we're going to keep them confidential, and they're deemed part of a settlement process. So it's not up to our discretion if our beneficiary of the trust says these are confidential.

### Page 26

THE COURT: But if I ordered you to turn them over, you would be obligated to turn them over.

MS. EDWARDS: Obviously.

MR. JACOBS: Your Honor, not to reargue.

THE COURT: No, Mr. Jacobs.

MR. JACOBS: Just some information. Until recently the defendants in Ohio had not requested from the plaintiff via request for production the forms which was done probably just a few weeks ago prompting the November 28th hearing and the December 1st order. Just so all of this information with the Celotex trust, the way I know it's done is the plaintiffs have the forms. They scan them in. Then they become electronic at the trust. So basically what they have is a PDF-type version which isn't changed once it gets to the trust. It's what the plaintiff had done.

So if we then download that document, it's obviously exactly what the trust has. In fact, it's really exactly what the plaintiff counsel would swear they have because it's the same document. It's just that one wound up there on a PDF because it was scanned.

So I believe that the real question that this Court has already answered was, even though these are

### Page 27

confidential and settlement-type documents, some of the information within them is very -- is or may be relevant.

THE COURT: That's been litigated here before me and it's been decided by me.

MR. JACOBS: I'm not arguing this time. Therefore, obviously, they should be produced, but I believe that being --

THE COURT: The question is whether they're relevant under Rule 26. That's all.

MR. JACOBS: When they're downloaded, so they can see the information, that is the actual document.

THE COURT: Right. Do you agree --

MR. JACOBS: I agree.

THE COURT: And I know you weren't happy with it, but do you agree that the defendants are entitled to see the claim forms, the content of the claim forms?

MR. JACOBS: And the supporting documents.

THE COURT: For purposes of alternative exposures and other -- whatever they deem relevant issues?

MR. JACOBS: Whatever, Your Honor. They are permitted, and I think that once plaintiff counsel in

### Page 28

Ohio downloads it with his access number and verifies that it is -- in fact, they offered to stipulate that what they're giving them is what they downloaded. I think that should end it, and we shouldn't put the trust and expose the trust with the thousands and thousands of claims that this is going to come -- come a practice and that counsel is going to say that we don't trust. I think that that is -- goes contrary to what this Court should impose on attorneys. And that --

THE COURT: Well, for example, let me just throw out a hypothetical. What if Mr. Link's attorneys in Ohio don't have or couldn't get access to the claim forms from the trust electronically?

MR. JACOBS: I think even then if they have the original forms they up-loaded and they verify it in writing that this is the actual claim form filed, that unless there's something that I can be shown where those people lied in front of the Court before and there's some type of an order against them where they've been disbarred, I don't understand this distrust that New York counsel said.

THE COURT: Remind me again, and I'm sorry, remind me again the trial date for the Chester Link

## Page 29

case.

MR. JACOBS: January what? January 29th, Your Honor.

THE COURT: All right. So we have about 45 or so days.

MR. JACOBS: Roughly.

THE COURT: And what I'm about to say is for record purposes. If a defense attorney in Ohio was to receive copies of the claim forms and to submit a request for admissions to the plaintiff, is there still time for that plaintiff to respond to the request for admissions to determine the authenticity and accuracy of those claim forms that were submitted?

MR. JACOBS: Your Honor, why don't I put it this way. I think there is, but I think that is an unnecessary step.

THE COURT: I want an answer to my question.

MR. JACOBS: Yes. Absolutely. There is time to do that, and I'm sure that plaintiff's counsel would not oppose that that be an expedited process so that it can be done in seven days after they get that request. So there's no doubt that we don't have to wait whatever time Ohio might require. I don't see any difference

## Page 30

between that, though, Your Honor, and plaintiff's counsel putting in an affidavit form signed by him that this is -- when he submits the form that this is the accurate and exact copy of what is on the -- what is on their trust document and what was submitted. And I think that sort of leap frogs because all of these requests for admission done is the same thing. So I really think it should be denied now that they're being produced.

MR. DONNELLON: Your Honor, there is one more thing.

THE COURT: Please come to the podium.

MR. DONNELLON: Good afternoon, Your Honor. Dan Donnellon. I'm not admitted pro hac vice in this matter because it had already incurred enough expense, but I would like to address one thing. When we found out, because we've been saying at the trust all along, These documents are available from the plaintiff interaction. Why do you need to burden us or bother us? And when we found that it's actually been ordered yesterday and that they were told that they will stipulate to the genuineness and authenticity, this is exactly what the trust has, I was exasperated. And we

## Page 31

made the discovery proposal. I said, Let's still try to resolve this instead of wasting the Court's time and our time.

THE COURT: I've enjoyed this so far, I will admit.

MR. DONNELLON: I had said, Why don't we simply say from now on, Owens-Illinois, you ask the plaintiff for them and you're entitled to get them from the plaintiff. And if they're unavailable, if they say they were destroyed in Hurricane Katrina or for some reason you have good faith reason to believe that they shouldn't be trusted, then you can come to us and subpoena our records. But why bother us with that? And, instead, we're still here at 5 after four. I'm familiar with Your Honor's standing order. And what I was asking Ms. Edwards is if we could request some form of a standing order like that. That the trust that is located here in Delaware gets hundreds of these subpoenas, and the standing order would be that you don't get an order out of the Delaware Court for a miscellaneous docket action unless you've agreed to ask for the plaintiff to produce them.

THE COURT: That's why I asked the question a

## Page 32

half an hour ago.

MR. DONNELLON: Thank you. That's exactly what I was hoping.

THE COURT: Let me ask you, though, just for my own purposes. The trust receives subpoenas throughout the year?

MR. DONNELLON: Yes.

THE COURT: Does the trust move to quash every subpoena all the time?

MR. DONNELLON: No. In fact, this is the very first time -- I've been involved with hundreds of them. This is the very first time that we've come into court even on a motion to compel. We have always managed to resolve them through extrajudicial means, and we take the position that -- not that Your Honor hasn't determined this already, about the confidentiality. We take the position it's confidential because we promised them we would keep it confidential. It doesn't make it confidential. We promised them we wouldn't give it out until we're ordered by a court to do so or you waive it.

So occasionally there are objections and disputes of that nature, but we've managed to resolve hundreds of them so far. And we will get hundreds more.

**33**

There are more waiting on this same issue where either they don't trust the plaintiff counsel in their case or they have never even bothered to request the plaintiff counsel to produce those documents. And, instead, they want to take time from us and our employees.

THE COURT: Well, we had a little -- we had some battles here in this court. Before we got some rulings, there were some battle lines drawn.

MR. DONNELLON: I'm familiar with that.

THE COURT: All right. Anything else from this side? All right. Thanks.

MR. SCRUDATO: Just very briefly, Your Honor. I only want to address one thing. You know, we did -- as I told Your Honor from the start, we did try from -- we've been trying for months to get these materials. All right. I -- you know, Your Honor, raised this mistrust issue which I think is very important.

THE COURT: Well, no, no. I didn't raise it. Your response to my question prompted it.

MR. SCRUDATO: We -- it's peculiar to us, Your Honor, that when we first approached the trust to get these documents back in late September, the trust was prepared to work out an arrangement with us just as

**34**

Mr. Donell and his -- Donell?

MR. DONNELLON: Donnellon.

THE COURT: Donnellon.

MR. SCRUDATO: Donnellon is suggesting. That's how we've done this many times in the past. For some reason, Your Honor, after those first contacts, the posture of the trust changed. And I think the reason why the posture of the trust changed is not because of a decision the trust made, but because the plaintiff's lawyers in Ohio said, We're now going to object to this. So we're confronting a situation --

THE COURT: I wouldn't doubt about that.

MR. SCRUDATO: And that's how I think this thing unfolded. So when this was originally presented to the Ohio Judge, all right, the Ohio Judge is the one who heard lots of argument or, you know, heard extensive briefing from the plaintiffs and from Owens-Illinois why this was the -- this, the order signed by Judge Johnston a month or so ago here in Delaware, was the appropriate resolution to the problem before the Judge in Ohio.

THE COURT: Didn't the Judge in Ohio ask the folks to come to Delaware and get a commission if that's what they wanted to do?

**35**

MR. SCRUDATO: Well, that's exactly --

THE COURT: It was an invitation. I read it or understand it that the Judge in Ohio in some way to appease both sides said, I don't need to tell one or the other. I'm going to let the Delaware court decide it.

MR. SCRUDATO: Well, I think what they thought was that they didn't have the jurisdiction over the trust because the trust is in Delaware. And they did what they should have done procedurally which is to issue the commission to the Delaware Judge who would then sign the commission which gives us a lawful subpoena. I don't think it was a function of not wanting to decide it. They had no jurisdiction to decide it.

THE COURT: Well, that's fine.

MR. SCRUDATO: For whatever reason the solution -- you know, the order that the Judge in Ohio signed involving the case before that Judge, this was the appropriate solution. And, again, I was not -- you know, I did not write those papers. I was not at that hearing. But I would ask, Your Honor, to, you know, bear in mind that the case that -- the Judge that has this case used this, our relief, as the appropriate

**36**

resolution to this problem.

THE COURT: Why then did the Judge issue an order compelling the plaintiff to turn the documents over?

MR. SCRUDATO: Your Honor, that is something -- you know, I looked at that. Every judge in the country, you know, I think it's been addressed in 14 jurisdictions. It's a pro forma order. I don't know of any judge in the United States that is not ordering the plaintiffs to turn those documents over when they're requested. I don't think that was a particularly noteworthy turn in the case. I'm pleased they're going to turn that information over.

The only issue before Your Honor is, how are we assured that those documents are complete? And I would just remind Your Honor that in -- you know, we always confront in this jurisdiction -- I mean, in this litigation asbestos-only rules. You know, when I do a nonasbestos case, if I'm representing a defendant who is sued in an auto case and if I'm given medical records from the plaintiff's lawyer, in every single case in the United States we go to the hospital and order up those medical records. That's the only way we're assured

37

they're complete. And that's exactly what we're asking to do here, Your Honor.

For some reason in this case, we've gotten all of these objections. It's new to us. We're not asking Your Honor to do anything that's particularly, you know, unique as a civil practice issue. It's what we do in every single case that we have that's not an asbestos case.

THE COURT: I will tell you that I have not asbestotized my thinking process in this matter in any way. I rule -- I view Rule 26 the same whether it's an asbestos case or a nonasbestos case. If it's relevant, it's got to be turned over. I don't draw distinction. Thanks for your comments.

MR. SCRUDATO: Thank you, Your Honor.

THE COURT: I'm going to deny the application I guess formally known as a motion for an order compelling the deposition of the records custodian in light of the responses to the questions that I had from the bench, which is two things. No. 1, the Judge in Ohio has already ordered that those trust documents and the attachments thereto be turned over. Whether it's December 15th, I don't know. I've been told it's

38

December 15.

In response to my question that those documents are scanned and up-loaded and maintained electronically by the Celotex trust, compels me in making my decision that there is nothing that's going to be different from what the plaintiff's attorneys in Ohio download from what the Celotex trust would be providing to the defendants if they were to download the documents themselves here in Delaware. There's no difference. They're maintained electronically. There's no way that I can think of that those documents would be any different. It's not a question of privilege. It's not a question of undue burden. It's a question that I have thought about and answered that those documents are available from another source. The source being the very plaintiff in the Ohio case. His attorney can provide those documents which are exact duplicates of the claim forms and the attachments that were submitted to the trust.

If there is ongoing disagreement or a lack of trust after those documents are provided, then I think I telegraphed at least one, maybe two, possible solutions to reduce that distrust: an affidavit from the

39

plaintiff's attorney which accompanies those documents, a request for admissions by the defense attorney in Ohio sent to the plaintiff's attorney in Ohio. Both of those as officers of the court would satisfy this Court that there is no deviation from the documents provided in response to the Judge's order in Ohio. No difference between those documents and documents that the trust would provide directly to the defendants in the Ohio case.

Again, if it's an issue of relevance, that issue has been argued and decided here in Delaware. Those documents are relevant. They're relevant to the defendant in Ohio to determine whether there are alternative exposures, whether there are things that the plaintiff may have said in his deposition in the Ohio case which differs from the content of material that was submitted to the Celotex trust here in Delaware, whether coworkers say things differently under oath in Ohio than what's submitted in those trust documents. Any number of things could be different which this Court has determined is relevant to the Chester Link case in Ohio.

The issue is whether there's some distinction between what the plaintiffs will be providing the

40

defendant and what the trust will be providing the defendant. It's not an issue of undue burden. It's an issue that the plaintiff in the Ohio case, the Chester Link case, can provide exact duplicates of those documents without any burden whatsoever put on the trust to provide the exact same document. And to me, that's an easy one. At that point it's an easy one. Get the documents from the plaintiff's attorney. They've already been ordered to provide those documents, and there will not be one difference between those documents. So for those reasons, I'm going to deny the application.

Questions? Are counsel okay allowing the transcript of that decision to serve as my order or do you want to submit an order? I'll leave it up to you to make the decision.

MR. JACOBS: Plaintiffs are fine with the transcript, Your Honor.

MR. SCRUDATO: That's fine, Your Honor. Thanks.

THE COURT: Any other issues that we can decide or determine with respect to the Chester Link case?

MS. EDWARDS: Your Honor, obviously, we've

41

incurred a lot of costs fighting this issue, and we were the ones trying to --

THE COURT: Don't. I would recommend you not go down that road.

MS. EDWARDS: Sure. Thank you.

THE COURT: For intellectual purposes, this has been enlightening to me. I hope it's been somewhat enlightening to you. Attorney fees don't get awarded in those types of cases. I don't find any misuse of the process at all. I just appreciate the opportunity to have reviewed it and decided it for you.

Anything else? Okay. Thanks for your time. Stand in recess.

(Whereupon the proceedings concluded at 4:11 p.m.)

42

STATE OF DELAWARE:

NEW CASTLE COUNTY:

I, Patricia L. Gancl, Official Court Reporter of the Superior Court, State of Delaware, do hereby certify that the foregoing is an accurate transcript of the proceedings had, as reported by me in the Superior Court of the State of Delaware, in and for New Castle County, in the case therein stated, as the same remains of record in the Office of the Prothonotary at Wilmington, Delaware, and that I am neither counsel nor kin to any party or participant in said action nor interested in the outcome thereof.

WITNESS my hand this _____ day of _____, 2006.

_____
Patricia L. Gancl, RPR, CRR
Cert.#169-PS