UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

IN RE:                    .      Case No. 01-01139 JKF
                          .
W. R. GRACE & CO.,        .
et al.,                   .      USX Tower - 54th Floor
                          .      600 Grant Street
                          .      Pittsburgh, PA 15219
          Debtors.        .
                          .      June 26, 2007
. . . . . . . . . . . . ..        8:54 a.m.


TRANSCRIPT OF HEARING
BEFORE HONORABLE JUDITH K. FITZGERALD
UNITED STATES BANKRUPTCY COURT JUDGE


APPEARANCES:

For the Asbestos          Campbell & Levine, LLC
Claimants Committee:      By:  MARK T. HURFORD, ESQ.
                          1700 Grant Building
                          Pittsburgh, PA 15219


For the Asbestos          Caplin & Drysdale
Claimants Committee:      By:  NATHAN D. FINCH, ESQ.
                          One Thomas Circle, N.W.
                          Washington, DC 20005


Audio Operator:           Cathy Younker


Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@optonline.net**

**(609)586-2311      Fax No. (609) 587-3599**

APPEARANCES (CONT'D):

For the Debtors:          Pachulski, Stang, Zeihl, Jones &
                            Weintraub
                          By:  JAMES O NEILL, ESQ.
                          919 North Market Street
                          17th Floor
                          Wilmington, DE 19899

For the Debtors:          Kirkland & Ellis LLP
                          By:  JANET BAER, ESQ.
                               DAVID BERNICK, ESQ.
                               AMANDA BASTA, ESQ.
                               SAM BLATNICK, ESQ.
                          Aon Center
                          200 East Randolph Drive
                          Chicago, IL 60601

For the Debtors:          Reed Smith, LLP
                          By:  DOUGLAS E. CAMERON, ESQ.
                               JAMES RESTIVO, ESQ.
                          435 Sixth Avenue
                          Pittsburgh, PA 15219

For W. R. Grace:          W.R. Grace
                          By:  RICHARD FINKE, ESQ.
                               WILLIAM SPARKS, ESQ.
                          7500 Grace Drive
                          Columbia, MD  21044

For Future Claimants      Orrick, Herrington, & Sutcliffe LLP
Representative:           By:  RAYMOND G. MULLADY, ESQ.
                          Washington Harbour
                          3050 K Street, N.W.
                          Washington, DC 20007

For Property Damage       Bilzin Sumberg Baena Price &
Committee:                  Axelrod, LLP
                          By:  JAY M. SAKALO, ESQ.
                               SCOTT L. BAENA, ESQ.
                          200 S. Biscayne Boulevard
                          Suite 2500
                          Miami, FL 33131

For ZAI Special           Scott Law Group
Counsel:                  By:  DARRELL SCOTT, ESQ.
                          2712 Middleburg Drive
                          Columbia, SC  29206

APPEARANCES (CONT'D):

For ZAI Special            Richardson, Patrick, Westbrook &
Counsel:                     Brickman, LLC
                           By:  EDWARD J. WESTBROOK, ESQ.
                           1037 Chuck Dawley Blvd.
                           Building A
                           Mount Pleasant, SC 29464

For Maryland Casualty:     Connolly Bove Lodge & Hutz, LLP
                           By:  JEFFREY C. WISLER, ESQ.
                           1007 North Orange Street
                           Wilmington, DE 19899

For the Unsecured          Stroock & Stroock & Lavan, LLP
Creditors Committee:       By:  KENNETH PASQUALE, ESQ.
                           180 Maiden Lane
                           New York, NY 10038

For Equity Committee:      Kramer Levin Naftalis & Frankel, LLP
                           By:  PHILIP BENTLEY, ESQ.
                           1177 Avenue of the Americas
                           New York, NY 10036

For Certain Cancer         Montgomery, McCracken, Walker & Rhoads
Claimants:                 By:  NATALIE D. RAMSEY, ESQ.
                           123 South Broad Street
                           Avenue of the Arts
                           Philadelphia, PA 19109

TELEPHONE APPEARANCES:

For Official Committee     Law Offices of Thomas J. Brandi
of Asbestos Property       By:  TERENCE D. EDWARDS, ESQ.
Damage Claimants:          44 Montgomery Street
                           Suite 1050
                           San Francisco, CA  94104

For David Austern:         Orrick, Herrington & Sutcliffe
                           By:  DEBRA FELDER, ESQ.
                                ROGER FRANKEL, ESQ.
                                RICHARD H. WYRON, ESQ.
                           3050 K Street, N.W.
                           Washington, D.C.  20007

For David Austern:         Piper Jaffray & Co.
                           By:  JONATHAN BROWNSTEIN, ESQ.
                                JASON SOLGANICK, ESQ.
                           New York, NY

TELEPHONE APPEARANCES (CONT'D):

For State of Montana:        Christensen, Moore, Cockrell, Cummings
                             & Axelberg
                             By:  DALE R. COCKRELL, ESQ.
                             Two Medicine Building
                             160 Heritage Way
                             Suite 104
                             Kalispell, MT 59904-0370

For Firemen's Fund           Stevens & Lee, P.C.
Insurance Company:           By:  DAVID R. BEANE, ESQ.
                             111 North Sixth Street
                             Reading, PA 19603

For Lehman Brothers:         Lehman Brothers
                             By:  ANDREW CHAN, ESQ.
                             New York, NY

For Levin Capital            Levin Capital Strategies
Strategies:                  By:  JOHN P. MACKIN, ESQ.
                             New York, NY

For London Market            Mendes & Mount, LLP
Companies:                   By:  ALEXANDER MUELLER, ESQ.
                             750 Seventh Avenue
                             New York, NY  10019-6829

For Debtors:                 Cohn Whitesell & Goldberg, LLP
                             By:  CHRISTOPHER M. CANDON, ESQ.
                             101 Arch Street
                             Boston, MA  02110

For Bank of New York:        Bank of New York
                             By:  ANDREW HAIN, ESQ.

For the Debtors:             Pachulski, Stang, Zeihl, Jones &
                               Weintraub
                             By:  TIMOTHY P. CAIRNS, ESQ.
                             919 North Market Street
                             17th Floor
                             Wilmington, DE 19899

For Fee Auditor:             Warren H. Smith & Associates, P.C.
                             By:  WARREN H. SMITH, ESQ.
                             325 N. St. Paul
                             Suite 1275
                             Dallas, Texas 75201

TELEPHONE APPEARANCES (CONT'D):

| | |
|---|---|
| For State of California: | Hahn & Hessen<br>By:  CHRISTINA J. KANG, ESQ.<br>488 Madison Avenue<br>New York, NY  10022 |
| For Interested Party: | Ford Marrin Esposito Witmeyer & Gleser<br>By:  ELIZABETH DeCRISTOFARO, ESQ.<br>Wall Street Plaza<br>New York, NY  10005 |
| For Official Committee Asbestos Property Damage Claimants: | Speights & Runyan<br>By:  MARLON FAIREY, ESQ.<br>200 Jackson Avenue, East<br>Hampton, SC  29924 |
| For Official Committee Asbestos Property Damage Claimants: | Bilzin, Sumberg, Baena, Price & of Axelrod<br>By:  MATTHEW KRAMER, ESQ.<br>200 South Biscayne Boulevard<br>Suite 2500<br>Miami, FL  33131 |
| For Halcyon Asset Management, LLC: | Halcyon Asset Management, LLC<br>By:  JOHN GREENE, ESQ.<br>New York, NY |
| For Official Committee Asbestos Property Damage Claimants: | Dies & Hile, LLP<br>By:  MARTIN DIES, ESQ.<br>1009 Green Avenue<br>Orange, TX  77630 |
| For U.S. Trustee: | Office of the U.S. Trustee<br>By:  DAVID KLAUDER, ESQ.<br>833 Chestnut Street<br>Suite 500<br>Philadelphia, PA 19107 |
| For Prudential Insurance Company: | Riker, Danzig, Scherer, Hyland &<br>   Perretti LLP<br>By:  CURTIS M. PLAZA, ESQ.<br>Headquarters Plaza<br>One Speedwell Avenue<br>Morristown, NJ  07962 |

TELEPHONE APPEARANCES (CONT'D):

For Various Claimants:      Stutzman, Bromberg, Esserman & Plifka
                            By:  SANDER L. ESSERMAN, ESQ.
                                 VAN J. HOOKER, ESQ.
                                 DAVID A. KLINGLER, ESQ.
                                 DAVID J. PARSONS, ESQ.
                            2323 Bryan Street
                            Suite 2200
                            Dallas, Texas 75201

For Everest                 Marks, O'Neill, O'Brien & Courtney
Reinsurance Co. and         By:  BRIAN KASPRZAK, ESQ.
McKinley Insurance:              MICHAEL J. JOYCE, ESQ.
                            913 North Market Street
                            Suite 800
                            Wilmington, DE  19801

For Everest                 Crowell & Moring, LLP
Reinsurance Co. and         By:  MARK PLEVIN, ESQ.
McKinley Insurance:              LESLIE A. EPLEY, ESQ.
                            1001 Pennsylvania Avenue, N.W.
                            Washington, D.C.  20004-2595

For Credit Suisse           Credit Suisse First Boston
First Boston:               By:  JOHN R. WOLLEN, ESQ.
                            11 Madison Avenue
                            New York, NY 10010

For Tocqueville Asset       Tocqueville Asset Management
Management:                 By:  PETER SHAWN, ESQ.
                            New York, NY

For Debtors:                Kirkland & Ellis
                            By:  LISA ESAYLAN, ESQ.
                                 BARBARA HARDING, ESQ.
                                 THEODORE FREEDMAN, ESQ.

For CNA Insurance:          Goodwin Procter LLP
                            By:  DANIEL GLOSBAND, ESQ.
                            Exchange Place
                            53 State Street
                            Boston, MA  02109

For American Legion:        Motley Rice, LLC
                            By:  ANNE M. KEARSE, ESQ.
                                 JOHN HERRICK, ESQ.
                            28 Bridgeside Boulevard
                            Mount Pleasant, SC 29464

TELEPHONE APPEARANCES (CONT'D):

```
For W. R. Grace:          W. R. Grace & Co.
                          By:  MARK SHELNITZ, ESQ.
                               DAVID SIEGEL, ESQ.
                               PAUL J. NORRIS ESQ.

For AIG, National         Zeichner Ellman & Krause, LLP
Union Insurance:          By:  MICHAEL DAVIS, ESQ.
                               ROBERT GUTTMANN, ESQ.
                          575 Lexington Avenue
                          New York, NY  10022

For Scotts Company:       Vorys, Sater, Seymour & Pease, LLP
                          By:  TIFFANY COBB, ESQ.
                          52 East Gay Street
                          Columbus, OH 43216

For Travelers            Simpson Thatcher & Bartlett, LLP
Casualty Insurance       By:  BARBARA SENIAWSKI, ESQ.
                          425 Lexington Avenue
                          New York, NY  10017

For Silverpoint Capital: Silverpoint Capital
                          By:  JOHN KU, ESQ.

For the Official          Strook & Strook & Lavan
Unsecured Creditors'      By:  ARLENE KRIEGER, ESQ.
Committee:                180 Maiden Lane
                          New York, NY  10038-4982

For Debtors:              The Blackstone Group
                          By:  JOHN O'CONNELL, ESQ.
                          New York, NY

For Murray Capital        Murray Capital Management, Inc.
Management, Inc.:         By:  MARTI MURRAY, ESQ.
                          New York, NY

For the Official          Anderson, Kill & Olick, P.C.
Committee of Asbestos     By:  ROBERT HORKOVICH, ESQ.
Claimants:                1251 Avenue of the Americas
                          New York, NY  10020-1182

For State of Montana,     Monzack & Monaco
Dept. of Environmental    By:  FRANCIS A. MONACO, JR., ESQ.
Quality:                  1201 North Orange St.
                          Suite 400
                          Wilmington, DE 19899
```

TELEPHONE APPEARANCES(CONT'D):

For Official Committee        Caplin & Drysdale, Chartered
of Asbestos Claimants:        By:  WALTER SLOCOMBE, ESQ.
                              One Thomas Circle, N.W.
                              Washington, D.C.  20005

For Building Laborers         Rotatori, Bender, Gragel, Stoper &
Local 310:                     Alexander Co., L.P.A.
                              By:  CARA SANTOSUOSSO, ESQ.
                              800 Leader Building
                              506 Superior Avenue East
                              Cleveland, OH  44114

For Certain Cancer            Montgomery, McCracken, Walker
Claimants:                    By:  NOEL C. BURNHAM, ESQ.
                                   LEONARD A. BUSBY, ESQ.
                              123 South Broad Street
                              Avenue of the Arts
                              Philadelphia, PA 19109

For Avenue Capital            Avenue Capital Group
Group:                        By:  CHELSEA CLINTON, ESQ.
                              New York, NY

For Official Committee        Pryor Cashman LLP
Asbestos Property             By:  RICHARD LEVY, ESQ.
Damage Claimants:             410 Park Avenue
                              New York, NY  10022

For ZAI Claimants:            William D. Sullivan, LLC
                              By:  WILLIAM SULLIVAN, ESQ.
                              4 East 8th Street
                              Suite 400
                              Wilmington, DE 19801

For Canadian Zonolite         Hogan Firm Attorneys at Law
Claimants:                    By:  DANIEL HOGAN, ESQ.
                              1311 Delaware Avenue
                              Wilmington, DE  19806

For One Beacon                Drinker Biddle & Reath LLP
American Insurance:           By:  DAVID PRIMACK, ESQ.
                                   MICHAEL F. BROWN, ESQ.
                              1100 N. Market Street
                              Wilmington, DE 19801

TELEPHONE APPEARANCES(CONT'D):

| | |
|---|---|
| For Ad Hoc Committee of Equity Secured Creditors: | Well Gotshal & Manges LLP By:  JARRAD WRIGHT, ESQ.       DAVID HICKERSON, ESQ. 1300 Eye Street, NW Suite 900 Washington, DC 20005 |
| For David Austern: | Phillips, Goldman & Spence, P.A. By:  JOHN C. PHILLIPS, JR., ESQ. 1200 North Broom Street Wilmington, DE  19801 |
| For Citadel Investment Group: | Citadel Investment Group By:  BEAU HARBOUR, ESQ. |
| For Official Committee of Unsecured Creditors: | Duane Morris By:  MICHAEL LASTOWSKI, ESQ. 1100 North Market Street Suite 1200 Wilmington, DE  19801 |
| For Official Committee Asbestos Property Damage Claimants: | Ferry, Joseph & Pearce, P.A. By:  THEODORE J. TACCONELLI, ESQ. 824 Market Street, Suite 904 Wilmington, DE  19899 |

BRIAN MACARGIE, ESQ.
SHANE SPENCER, ESQ.
RENEE SMITH, ESQ.
CORIN EWING, ESQ.
JOHN DEMY, ESQ.
KATHY BERN, ESQ.
STEVEN BLONNER, ESQ.
DANIEL CANDRA, ESQ.
CARL PERNICONE, ESQ.
CATHERINE MEYER, ESQ.
ANDREW CRAIG, ESQ.
MATT DOHENEY, ESQ.
DAVID LIEDMAN, ESQ.
JACOB PONE, ESQ.

**I N D E X**

|                              | **ID.** | PAGE<br>**EVD.** |
| **EXHIBITS**                 |         |                  |
| Exhibit 11  Interrogatories  | 100     |                  |

1          THE COURT:  This is the matter of W.R. Grace,

2    Bankruptcy Number 01-01139.  The participants I have listed by

3    phone are Francis Monaco, Timothy Cairns, Christina Kang, Brian

4    Macargie (phonetic), Shane Spencer, Martin Dies, Terence

5    Edwards, Andrew Hain, Renee Smith, Corin (phonetic) Ewing, John

6    Greene, Debra Felder, Roger Frankel, Richard Wyron, Jonathan

7    Brownstein, Jason Solganick, Sander Esserman, Van Hooker, David

8    Klinger, David Parsons, Andrew Chan, John Mackin, John Demy,

9    Kathy Bern (phonetic), Steven Blonner (phonetic), Christopher

10   Candon, Daniel Candra (phonetic), Amanda Basta, Marti Murray,

11   Carl Pernicone (phonetic), John Herrick, David Beane, Natalie

12   Ramsey, Leonard Busby, John Phillips, Catherine Meyer, Tiffany

13   Cobb, Matthew Kramer, Arlene Krieger, Beau Harbour, John

14   Wollen, Andrew Craig, Michael Lastowski, Matt Doheney

15   (phonetic), Robert Horkovich, Walter Slocombe, Noel Burnham,

16   Sam Blatnick, Alex Mueller, David Liedman (phonetic), Jacob

17   Pone (phonetic), Daniel Hogan, Peter Shawn, Jarrad Wright,

18   David Hickerson and Theodore Tacconelli.  I'll take entries in

19   court, please.

20          (Mr. Bernick is not near a microphone)

21          MR. BERNICK:  Good morning, Your Honor.  David

22   Bernick for Grace.

23          MS. BASTA:  Amanda Basta for W.R. Grace.

24          MS. BAER:  Janet Baer for W.R. Grace.

25          MR. BLATNICK:  Sam Blatnick for W.R. Grace.

1          MR. PASQUALE:  Good morning, Your Honor.  Ken

2  Pasquale for the Unsecured Creditors Committee.

3          MR. BENTLEY:  Phillip Bentley for the Equity

4  Committee.

5          THE COURT:  Excuse me one second.  Okay.  Thank you.

6          MR. FINCH:  Good morning, Your Honor.  Nathan Finch

7  for the Asbestos Claimants Committee.

8          MR. MULLADY:  Good morning, Your Honor.  Raymond

9  Mullady for the Future Claimants Representative.

10          MR. ANSBRO:  Good morning, Your Honor.  John Asnbro,

11  also fro the FCR.

12          MS. RAMSEY:  Good morning, Your Honor.  Natalie

13  Ramsey for the Certain Grace Cancer Claimants and the MMWR

14  Firms.

15          MR. ESSERMAN:  Your Honor, Sander Esserman and Van

16  Hooker's with me for various firms.

17          MR. HURFORD:  And Mark Hurford for the ACC.

18          THE COURT:  Okay.  I think there are really issues

19  today concerning the statute of limitations for the City of

20  Philadelphia claim, the Canadian statute of limitations motion.

21  We still need to address that and the property damage argument,

22  plus the issue concerning the scheduling order.  No?

23          MR. BERNICK:  Well, I think that the scheduling

24  order -- the personal injury case management order was on for

25  today.  The other principal item of business was the motion for

1 protective orders on the discovery with respect to the law

2 firms.

3         THE COURT:  Well, then, I've got this proceeding memo

4 in the wrong place here.

5         MR. BERNICK:  The PD items that were originally, I

6 think, set for today, perhaps were moved back to yesterday or

7 did you know -- you know, probably.

8         MS. BAER:  That's correct.  There are no PD items up

9 today.  The only PD items that were to be addressed were

10 addressed yesterday.  And then the next PD date is at the end

11 of July.

12         THE COURT:  Okay.  I wondered why we have more about

13 the Canadian Claims and with the people who are on the phone,

14 but okay.

15         MS. BAER:  No.

16         THE COURT:  I thought maybe I missed something

17 yesterday.  Okay.  Mr. Finch?

18         MR. BERNICK:  And I think that we have the --

19 pursuant to the arrangements yesterday, we have, I think it's a

20 total of 40 minutes for the movants and their supporters,

21 cheerleaders and other people who are going to speak in their

22 favor and that we have a half an hour and I think I'll -- I

23 know I'll want to reserve five minutes of my time for potential

24 surrebuttal.

25         THE COURT:  Okay.  Mr. Finch?

1          MR. FINCH:  Nathan Finch for the ACC.  May it please

2 the Court.  We -- first of all, the debtor leaves the

3 suggestion in its papers that we did not attempt to meet and

4 confer about this issue.  Mr. Bernick and Mr. Lockwood and I

5 had a very brief conversation on May the 21st about this issue.

6 I anticipated that there'd be some kind of proposal from the

7 debtor.  That was my fault.  I misconstrued what Mr. Bernick

8 told me.  But, I was expecting some kind of proposal.

9          As soon as we knew that other firms were reaching out

10 to the debtor, the ACC and the FCR sent out a very specific

11 proposal to try to resolve this to the debtor and the debtor

12 did not respond to that except through its papers.

13          To sort of frame this issue, I'm going to step back

14 and talk about discovery to claimants, generally.  The Court

15 has said, and I'm quoting from the November 14th, 2005 hearing

16 transcript at Page 140.  The reason the Court permitted the

17 questionnaires was to try to get what the debtor said the

18 debtor needed for its experts to evaluate in terms of the

19 current mass of claims, and it was only ever supposed to be a

20 sample.

21          The Court has also said in a later hearing in this

22 case that this process, and we're talking about claimant

23 directed discovery, is to help anybody's expert get the

24 information that they need to try to convince me of what the

25 existing and future asbestos personal injury claims will be,

1 and how much it's going to cost to resolve them.

2          Since the time that the parties filed their motion

3 for a protective order on June the 4th and Grace responded on

4 June the 15th, we have now received Grace's estimation expert

5 reports.  We have the report from Tom Florence.  And it's true

6 that he really does only rely on a review of 3,217

7 questionnaires and their attachments, and 2,800 cases that

8 Grace had settled pre-petition and whatever documents Grace had

9 in its files that were provided pursuant to the settlement

10 agreement.

11          And from that, after a review of those documents by

12 the Delaware Claims Facility, he extrapolates the information

13 there across the entire universe of present and future personal

14 injury claimants.  There's nothing in Dr. Florence's report

15 that says that its' incomplete.  That it needs anymore

16 discovery.  That it needs anymore information from claimants or

17 anybody else to estimate the liability.  He signed the report.

18 He put a range of liability on there.  And although he is

19 relying on assumptions Grace gave him, he never said he needs

20 anymore discovery.

21          Now, in his papers that were filed on June the 15th

22 in response to my and other party's motion, Grace proposes

23 these deposition notices cover the following topics.  And this

24 is found at Page 2 and 3 of the pleading that Grace filed

25 called Debtors Combined Response to the Motions for Protective

1  Order.  I don't know specifically what the docket number for

2  this document is, but the basic discovery -- they said what

3  they need is on Page 2 and 3 which is, the processes used by

4  the law firms to provide information regarding B reads

5  performed for each claimant.  Processes used by the law firm to

6  provide the information responsive to Parts 3 and 4 of the

7  questionnaire about direct and indirect Grace exposure, and the

8  processes used by the law firm to provide information

9  responsive to Part 5 of the personal injury questionnaire

10  exposure in non-Grace products.

11        Later in the same paper, they make the point that

12  they need to know this information to establish that there

13  might be some additional evidence out there, and that they

14  don't have the whole universe of data.

15        Well, we know they don't have the whole universe of

16  data because the questionnaire doesn't ask for it among other

17  things.  For example, the questionnaire doesn't ask who's your

18  testifying expert for trial.  People don't know that.  They

19  haven't had the ability to try cases against Grace for six

20  years.  It doesn't ask, for example, who are all the fact

21  witnesses you would use to try your case against W. R. Grace.

22        But, they say they need this information.  The

23  position of the ACC and the FCR -- we want to get to the expert

24  discovery.  We're not trying to foreclose this discovery they

25  say they need entirely.  I think it's completely irrelevant at

1  this point.  We've got the expert reports, let's go to it.

2        But, what we object to when you boil our papers down

3  to its essence, is the method of getting this information.  We

4  object to the depositions as a way to do it for three reasons,

5  basically.  First of all, Grace has already taken some 15

6  depositions -- fact witness depositions -- which exceeds the

7  number permitted by the federal rules.

8        The federal rules of civil procedure are a, you know,

9  a compromise to basically force parties to focus on what's

10  important.  I've handled billion dollar cases where the Court

11  said -- restricted me to the ten deposition limit per side.

12  And so, I think that, you know, going out and taking

13  depositions of 21 or six law firms exceeds an amount permitting

14  the rules.

15        Second, it's an expensive and cumbersome way to get

16  at this information and, you know, we require lots of lawyers

17  to show up at the deposition from all of the constituencies

18  represented in the case.  And third, and this is what really

19  Mr. Mullady and I are concerned about.

20        We are on a very tight schedule, and we don't want to

21  be in a position where any time Grace thinks it wants to go

22  take a deposition of some fragments it'll just go and do it.

23  The -- you know, theoretically, Grace could start noticing up

24  depositions of co-defendants, claimants.  They could take a

25  deposition decision every day from here through the end of the

1 discovery period.  And if they want to play that game, we can

2 do it, too.  We can start noticing depositions of co-defendants

3 and Grace's defense counsel.  But, that's not what this is

4 about.

5        This is about expert estimates of Grace's liability.

6 And I think the experts have what they need to do their job.

7 You've got our expert reports.  You'll get Grace's, presumably

8 today.

9        So, I don't think these depositions are the right way

10 to get this information that Grace says it needs.  And although

11 I dispute whether it really needs it, I think that there is a

12 better way to do it.  And I think the same basic information

13 that they're describing on Page 2 and 3 of their papers can be

14 elicited in responses to properly tailor interrogatories that I

15 believe that you'll hear from Mr. Esserman and Mr. -- excuse

16 me -- Mr. Esserman and Ms. Ramsey.

17        The firms will describe how they would respond to

18 those, provided there is some order from the Court that the

19 responses do not constitute a waiver of the attorney/client

20 privilege of the work product doctrine.  That's what I think a

21 lot of the resistence relates to.

22        And so, with that, Your Honor, that's my -- on behalf

23 of the ACC, my position on this.  I don't think any depositions

24 should go forward.  I think the information can be obtained in

25 other ways.  And I will turn the podium over to my counsel --

1 able counsel, Mr. Esserman, Ms. Ramsey, after eight minutes of

2 argument time.  Thank you.

3          THE COURT:  All right.  Ms. Ramsey?

4          MS. RAMSEY:  Good morning, Your Honor.

5          THE COURT:  Good morning.

6          MS. RAMSEY:  Natalie Ramsey.  Today I am here

7 representing five law firms; the law firms of Kazan McClain,

8 Waters & Kraus, Paul Hanley & Harley, the Wortnick (phonetic)

9 firm and Early, Ludwick & Sweeney, each of which were served

10 with a notice of deposition by Grace.

11          Your Honor, there are three major reasons -- there

12 are a number of reasons identified in our papers, but really

13 three major reasons that we oppose the discovery.  The first,

14 as indicated by Mr. Finch, is that the experts have not said

15 that they need this for any purpose.  And we, frankly, don't

16 understand why Grace would need this information in connection

17 with estimation hearings.

18          The second is the method of obtaining the

19 information.  It is extremely burdensome and oppressive and

20 expensive to take the video tape depositions of lawyers from

21 the plaintiff's law firms.  And the most significant is the

22 third reasons, which is that the manner in which the

23 discovery -- at least the written discovery -- has been asked,

24 implicates the attorney/client and work product privileges.

25 And the concern is that a deposition will necessarily get to

1  those same types of concerns.

2       For example, in the debtor's response to the 21

3  motions, the debtor identifies three topics that it would like

4  to cover in the depositions.  Those three topics all involve

5  the processes used by the law firms to identify and respond to

6  various types of questions.

7       Any time a question is asked concerning the processes

8  of a law firm, the law firms -- or product privileges

9  necessarily implicated.  If we could obtain a ruling by the

10 Court that to the extent that the firms were prepared to

11 provide responses to a limited number of questions which I'll

12 identify in a moment, that that would not violate -- that any

13 response would not waive the work product or attorney/client

14 privilege.

15     The firms are generally prepared, and I say generally

16 because our proposal would be that any firm that was willing to

17 do this and would do it within the time frame that I'm about to

18 provide, would request that the Court enter an order ordering

19 that the depositions of those firms not be had at least with

20 respect to the current topics identified.

21     What we would propose, Your Honor, is that the debtor

22 has served a -- in its second set of interrogatories, four

23 questions.  One of the questions asks, "What steps were taken

24 by the law firm to find any and all responsive documents or

25 information in the possession or control of other law firms or

1 doctors?"  That's a paraphrase.  But, that question is one that

2 we would propose could be provided in written form in lieu of

3 deposition testimony.

4 Interrogatory 4 of the second set asks the question,

5 "In asserting the consulting expert privilege with respect to

6 any documents withheld on that basis, describe what steps, if

7 any, were taken to identify and obtain the first B read

8 performed for each claimant for whom you filed a response."

9 That question we would propose if we could obtain the type of

10 ruling that I've indicated to respond to.

11 Going back to the debtor's response, it identifies

12 two additional areas of inquiry.  One is the processes that

13 were used to answer Parts 3 and 4 of the personal injury

14 questionnaire concerning direct and indirect exposure to Grace

15 asbestos containing products.

16 The law firms would be prepared to, or at least a

17 certain number of them, to respond to that question in a

18 general fashion because they may have done different things for

19 different claimants.  But, they are prepared provided that it

20 would not waive any privileges to respond to the question of

21 what they generally did in responding to the questionnaires to

22 answer Parts 3 and 4 of the personal injury questionnaire.  And

23 similarly, what processes were generally used to answer Part 5

24 of the personal injury questionnaire concerning exposure to

25 non-Grace asbestos containing products.

1          The firms that would be prepared to do this, Your

2  Honor, would be prepared to do it so that the responses would

3  be served by two weeks from this Friday.  So, on an expedited

4  basis.  And to the best of our understanding, having read

5  through Grace's response, and having read through the

6  interrogatories, that is the -- those are the questions and the

7  information that Grace has sought.

8          We still take the position and our -- of the view

9  that this discovery is not necessary for the estimation

10  hearing.  However, it certainly is the case that the

11  depositions of counsel are going to be difficult.  Are going to

12  be expensive, and are going to necessarily lead to additional

13  discovery issues.  They're going to have to be litigated before

14  this Court, and they are going to waste the estate's assets and

15  this Court's time on matters that can be responded to by

16  written discovery.

17          Your Honor, just to cover a couple of the additional

18  points raised in our papers in opposing the deposition

19  discovery.  We believe that some of the information -- or for

20  some of the claimants, the information requested is unnecessary

21  and deplicative.  For example, for the mesothelioma claimants,

22  where there is a pathology and the Court has already addressed

23  for purposes of the questionnaire, the lack of necessity to

24  identify other exposure information.  And with respect to the

25  lung cancer claimants, x-rays have already been provided to the

1  debtor's expert so that they can review those x-rays.  And the

2  issue of -- and in many cases, a number of B reads.  And the

3  issue of what other medical information could be obtained in

4  the fullness of time if these cases were to be worked up to

5  trial is simply not appropriate as part of the estimation

6  exercise.

7          Finally, Your Honor, we did object to the

8  procedurally defective manner in which the notices were served.

9  But, as I've indicated, we would be prepared to proceed

10 irregardless of that, and without waiver and subject to the

11 other objections we raised, but again, with the Court's order

12 that responses to the four discovery questions that I've

13 identified would not waive any of the privileges of the firms.

14 Thank you.

15         THE COURT:  All right.  Thank you.  Mr. Esserman?

16         MR. ESSERMAN:  Sandy Esserman for the various law

17 firms we've filed on behalf of, Your Honor.  I'm not going to

18 repeat anything in my papers.  I know Your Honor, and I know

19 Your Honor's read all the papers.

20         I think what Ms. Ramsey just discussed was an

21 alternative to depositions which I first heard about very

22 recently, and I'm still digesting it and running it by our

23 clients.  But, the bottom line is, I think that's something

24 that should work.

25         I think this whole process is unnecessary.  I concur

1 with Ms. Ramsey's remark and Mr. Finch's remark, but -- remarks

2 on that -- but if this information that Grace feels is needed,

3 it can be elicited in a non-contentious, non-objectionable

4 format that preserves the work product privileges,

5 attorney/client privileges.

6        Maybe I'm getting old, but I just want to get this

7 done with.  I want to get this over.  This has gone on way too

8 long.  We're talking about years now on these issues.  I think

9 we're sort of seeing the end of the light of the tunnel on

10 these particular issues with the firms.  And Ms. Ramsey's

11 alternative, I think, is both creative and a good one.

12        Otherwise, I fear that either the depositions are

13 going to get quashed and that's going to raise issues or the

14 depositions are going to go forward and that's going to raise

15 issues.  And it's just going to be a mess.  And the

16 interrogatory responses, I think, are a good way of doing it,

17 and I think it's something, actually, that the Court might've

18 even suggested some time ago.  And I think it's a good thing.

19 And it can be done quickly and directly and we can get it done.

20        Taking a deposition of one's adversary, especially in

21 a case that's not P v. D.  This is an estimation proceeding

22 which we -- I know Your Honor never forgets that, but I wonder

23 sometimes if we all, on both sides of the table, sort of forget

24 that occasionally.

25        But, taking a deposition of a lawyer in a case is

1  very difficult and problematic.  And frankly, is a very rare

2  event.  And we've cited in our papers why we think legally it's

3  impermissible.  I have seen it once in third party discovery,

4  not in a bankruptcy context, and it wound up being so

5  contentious that the judge finally decided to have the

6  deposition in his courtroom.  I think it was necessary because

7  there was also two issues on privileges, waivers, who was

8  contending, what was waived and when it was waived and how it

9  was waived and what was said.  Answers being read back.  It was

10  a mess.

11        So, I think my clients will be reluctant to answer

12  the interrogatories, but I think that is the clear path.  And

13  it's a path that I can endorse.  And I talked to one of my

14  clients here today who has been noticed for the deposition and

15  they're fine with that approach.  Thank you, Your Honor.

16        MR. NATHAN:  Your Honor, we'd just like to reserve

17  the remainder of our 20 minutes for rebuttal or response.

18        THE COURT:  All right.  Anyone on the phone have a

19  position that you want to express before I turn to the debtor?

20  Okay.  Mr. Bernick?  I like this, limiting this argument.  This

21  worked very well so far, you know.

22                    (Laughter)

23        THE COURT:  I should've done this a long time ago.

24        MR. BERNICK:  Now, first can I inquire if there's

25  anybody representing Kelly and Ferraro in the courtroom or on

 1  the telephone?

 2          MR. WILSON:  I'm Wilson, Kelly and Ferraro.

 3          MR. BERNICK:  Okay.  And I didn't hear anybody

 4  representing Motley Rice.  Is there anybody representing Motley

 5  Rice?

 6          THE COURT:  Is anyone representing Motley Rice on the

 7  phone?

 8          MR. HERRICK:  Your Honor, John Herrick via telephone.

 9          MR. BERNICK:  Okay.

10          THE COURT:  Thank you.

11          MR. BERNICK:  Yes.  And just so I was clear, Ms.

12  Ramsey said that she represented five firms in connections with

13  this?

14          MS. RAMSEY:  That's correct.  Kazan McClain, Waters &

15  Kraus, Paul Hanley & Harley, the Wortnick firm and Early,

16  Ludwick & Sweeney each were served with notices.

17          MR. BERNICK:  Okay.  So, you're not here on behalf of

18  the Brayton Purcell people?

19          MS. RAMSEY:  No.

20          MR. BERNICK:  Is there anybody who is here on behalf

21  of the Brayton Purcell people?

22          THE COURT:  Anyone representing Brayton Purcell?

23  There's no response, Mr. Bernick.

24          MR. BERNICK:  Okay.  Your Honor, would it be all

25  right if I stood here.  Actually, I would probably want to move

1 over here for a minute.

2          THE COURT:  As long as you use a microphone.

3              (Microphone 2 is not functioning)

4          MR. BERNICK:  Yes.  Okay -- a microphone right here.

5 It's on and it's 9:36.  I wanted to cover if I could, the basic

6 reasons that we're here.  And we have the (inaudible).

7          Your Honor, there is -- these are all matters that

8 are now the subject of actual court orders, and I'm not going

9 to go through all of the history Your Honor's painfully aware

10 of (inaudible) those court orders.  I just want to highlight

11 the basic core facts that give rise to the problems we're

12 facing.

13          One is the shell game.  And that was the word that we

14 actually used in 1995.  It is that we can't figure out where

15 all the medical diagnoses and records are because there's one

16 doctor that produces one thing, one law firm produces one

17 thing.

18          Your Honor solved that problem, both in connection

19 with the PIQ, and also in connection with the colloquy we had

20 even last time with respect to the interrogatories on B reads

21 by saying that there was an obligation to produce documents

22 within the possession custody control of the claimant.  And

23 under Third Circuit law (inaudible), that means all of the

24 prior doctors and this claimant's obligation to reach out to

25 whatever lawyers or whatever sources of documents that

1 plaintiff has the legal right to obtain.

2         So, there's not going to be any issue.  There are

3 already prior court orders to deal with the obligations to

4 search other sources.

5         Your Honor, also I took up the question of

6 verification; both verification by the lawyer and verification

7 by claimant, just so in connection with the orders that were

8 issued and the PIQ, and again also with respect to the B read

9 interrogatories that we went through last time.

10        There are then the privileged predicates, that is the

11 privilege -- the predicates for asserting the consultants

12 privilege.  Those were specifically laid out in the B read

13 production order that we went through on two different

14 occasions.

15        And finally, and very significantly, there's a

16 fundamental problem, one of the most pervasive problems that

17 we're dealing with here, and it affects virtually all of the

18 questionnaires, all of the data we've seen, and this is a

19 matter, Your Honor, of tremendous importance because we went

20 through this so specifically on the PIQ.

21        An employment history is not the same thing.  It's

22 answering questions about exposure to Grace products.  The fact

23 that we've got, essentially, an answer that goes to all of the

24 different jobs that somebody has, doesn't tell us what they

25 were actually exposed to, and it certainly doesn't answer a

1  question about exactly what Grace products they were exposed

2  to.  And this is a pervasive problem.

3          So, these are the problems.  I'm not going to go

4  through all of the history because the history is well

5  established in the Court.  It's too late.  There are orders

6  that says all of this information is needed, it's germane.  The

7  idea that somehow Grace is only working with the 2000

8  questionnaires is absolutely false.  There were answers that

9  were obtained on all of the questionnaires that we're relying

10 upon.  We are also searching all of the mesothelioma claim

11 files for purposes of the conclusion of our expert work.

12         And even if they were only working with the 2000, the

13 2000 have all of these problems, and that's why we have to

14 pursue them.  Well, we went ahead, and with the benefit of

15 those court orders, we served some discovery, and we told

16 specifically -- the Court specifically -- what that discovery

17 was.  And we made an effort throughout this process to try to

18 focus the discovery.  So, we served 21 law firms with

19 interrogatories regarding the predicates for the assertion of

20 the consultant privilege.

21         There are 21 law firms with interrogatories regarding

22 the clients.  What did you do to come up with questionnaire,

23 and we served deposition notices with respect to the same 22

24 firms.  We had a meet and confer.  I directly conducted the

25 meet and confer, and I invited everybody who's sitting on that

1  side of the room to help us get to the point where we can reach

2  an agreement.

3        There is only one suggestion that was made.  It was a

4  suggestion that was made, I believe, by Mr. Finch, to limit the

5  number of depositions.  There was no suggestion that was made

6  in particular by the law firms, although I asked repeatedly.

7  There was no suggestion made whatsoever for a limited subject

8  matter or limited scope.  It just didn't happen.  I was on the

9  phone.  I made the request repeatedly.  I made it after the

10 call that I had on the meet and confer with other people.  I

11 quoted Your Honor's statements about how these excuse -- got to

12 be more focused for Your Honor's benefit, and there was nothing

13 by way of a substantive response to take.

14       Notwithstanding that, we made the effort to limit the

15 number of depositions.  We said that we would go for six

16 different firms and three different topics.  We made that

17 undertaking unilaterally, and it's set out in our papers.

18 Nobody responded.  Not one firm came forward to say okay.

19 There was no dialogue.  There was no effort to compromise, and

20 we are told, basically, we'll see you in court because we don't

21 want to give any depositions.  No depositions whatsoever, a

22 position I'll add, Your Honor, that has not changed.

23       So, we come now to the evening for the hearing here

24 today.  And the six different firms that we focused on were the

25 Early Ludwick firm, the Weitz & Luxenberg firm, Baron and Budd,

1 Motley Rice, Kelly and Ferraro, and the Angelos.  So, those

2 were the six firms that we specifically focused on.

3          Last night I called Ms. Ramsey.  Actually, it was

4 yesterday afternoon.  I said you know, Early Ludwick has

5 already been -- there's already been motion practice with

6 respect to Early Ludwick, and I don't want to get involved in a

7 question about whether we're now overlapping with what was

8 already determined.

9          The fact of the matter is, that there are huge, huge

10 problems with the information, including information that was

11 told to the Court last time, on what exactly Early Ludwick has

12 gone ahead and verified.  There are all kinds of statements

13 that were made.  Remember, Your Honor, they have provided

14 verified information on this, that and the other.  The problem

15 is, again, we're talking not about answers to the

16 questionnaires, we're talking about the employment history.

17 The overwhelming employment histories.  Not exposure histories.

18 And they're not even verifications.  But, that is for another

19 day.

20          I said we're going to make our record on that.  We're

21 going to proceed in a systematic fashion before the Court.  So

22 for purposes of today, we are holding that, and that is yet to

23 come.  With respect to Weitz & Luxenberg, Weitz & Luxenberg

24 said in response to our interrogatories, give us more time.

25 We're going to answer those interrogatories, so I took Weitz &

1  Luxenberg off the chart and I said we'll hold that in suspense,

2  as well.

3         So, we come down to four different firms that we're

4  talking about here today; Kelly and Ferraro, Motley Rice, Baron

5  and Budd and the Angelos firm.  And with respect to -- I'm now

6  going to go through each one in terms of what they said on the

7  privilege interrogatories, compliance interrogatories and

8  depositions.

9         With respect to the Angelos firm, the Angelos firm

10  did comply -- they actually -- affidavit of compliance with

11  their -- establishing the predicates for the consultant's

12  privileges.  They have produced over 500 plus negative B reads

13  that previously were being withheld.  It would've been nice to

14  know that before, but at least we have those now.

15         So, I provided a notice to Mr. Esserman that we would

16  not be pursuing the deposition with respect to the predicates

17  or the assertion of the consultants privileges.  We weren't

18  going to be doing that.

19         What did the Angelos firm do with respect to

20  compliance -- the compliance interrogatory?  What did you do to

21  respond.  They objected.  What did they do with respect to the

22  deposition?  They objected.  What about Baron and Budd?  Baron

23  and Budd, as a response to the privilege predicate

24  interrogatories we're going to go through, with respect to the

25  how to comply with the PIQ object deposition, object.

1          Motley Rice?  We have not received yet.  They said

2    they served.  We have not received.  We called them up and

3    asked for it.  Their response on the privilege predicate

4    interrogatories, we just don't have it yet.  They've objected

5    to the compliance interrogatories.  They've objected to the

6    deposition.

7          Kelly and Ferraro; no response to the privileges

8    interrogatory.  I believe it's an objection with response to

9    the compliance interrogatory.  An objection with respect to the

10   deposition.

11         So, the track record that we're working with and the

12   focus that we've maintained is on these four law firms is

13   partly driven and indeed largely driven by the fact that while

14   they have varying responses to the privilege interrogatories,

15   they basically told us go away when it comes to actually being

16   accountable.  Actually being accountable for how they have

17   conducted the filling in of these PIQs.  They're basically

18   saying forget about it.  I was informed of an interrogatory,

19   more informed of the deposition.

20         So, we now come to the question about whether that

21   position is correct in what we're asking for here today.  What

22   we're asking for here today is that we're not moving with

23   respect to the privileges interrogatories.  We're not moving

24   with respect to the compliance interrogatories.  There will be

25   another day for seeking relief on the basis of the answers that

1 | have or have not been complied with.

2 |       We're not seeking contempt sanctions, although we

3 | believe we could seek contempt sanctions because Your Honor has

4 | so frequently ruled with respect to these matters and we've

5 | been back on so many occasions with respect to my clients.

6 |       We are considering that the need to move for an

7 | examiner in certain cases so that Your Honor doesn't have to

8 | deal with a bunch of discovery requests.  And we can send

9 | somebody to work -- take a look at these interrogatory

10 | responses and the information that's been provided and

11 | basically do the work for the Court and for us so that we don't

12 | have discovery battles, but we have somebody that can get

13 | access to these documents in connection with the (inaudible)

14 | litigation.

15 |       There was a special master who was given access to

16 | the privileged documents that were issued there, and actually

17 | made rulings with respect to them with (inaudible) actually

18 | having looked at them.  We can do the same kind of thing here.

19 | But, we're not asking for that today.  We're not asking for

20 | Early Ludwick, Brayton Purcell, Weitz & Luxenberg.  There are

21 | problems with Mr. Kazan's answers to the interrogatories.  He

22 | continues to say I don't have to give you a client

23 | verification.  He continues to say our firm is not withholding.

24 | Our firm is not aware.  Does not actually say that they're

25 | producing materials so they don't -- they're not aware of them

1  with respect to custody of control.

2        There's only two firms that actually gave us a

3  complete verification.  They signed the compliance affidavit

4  with respect to the consultant's privileges.  It said you're

5  not withholding them and we're not aware of any others that

6  exist.  No ifs, ands or buts.  That's just it.  And it wasn't

7  Mr. Kazan and it wasn't Early Ludwick.  It wasn't any of them.

8  This -- Ms. Ramsey's clients.  It was the Angelos firm who then

9  produced hundreds of negative B reads, and it was a

10  (inaudible).  I believe Mr. Edward Moody did that.

11        So, we got a lot of other problems.  Today, we're

12  only here to ask for something that is very, very basic.  We

13  just want to conduct a deposition to find out why -- how the

14  PIQs were answered, and to find out why the privilege is still

15  being asserted with respect to B reads that don't meet the

16  terms of Your Honor's order in terms of the predicates for the

17  consultant's privileges.

18        Based upon that deposition, our experts will have

19  more information and Your Honor will have more information to

20  determine what kind of relief to offer up here.  We can't be in

21  a position where we're completely dependent upon each firm, can

22  it decide for its own strategic reasons whether it wants to

23  comply and answer the interrogatories, or come in at the last

24  minute and say here's another proposal.  We've got to get to

25  the end of the process now.

1            The threshold question that's raised, again, focusing

2  now on the deposition.  The threshold question that's raised

3  is, are these law firms correct when they have said and they

4  repeat today, you just don't get a deposition at all.  Are they

5  right about that?  And the answer is that they're clearly wrong

6  under the law.  The law is set forth in Part 3.  The law

7  doesn't say lawyers or law firms are immune to discovery.  The

8  law says that we take a look at particular circumstances, and

9  where it's necessary, there can't be discovery if the discovery

10  could be conducted in a way that protects any applicable

11  privileges.  That's what the law says.

12            It is a routine process, we know, and since the

13  statement that's made of oh my goodness, they have no

14  deposition and the lawyer or law firm is -- oh, it's so

15  contentious and it's so terrible.  There are depositions that

16  are taken from in-house counsel and different law firms

17  probably every day of the week to be turned in and meet

18  discovery compliance to determine where the documents are

19  located, to determine what efforts have been made to search for

20  responsive documents.  And we don't actually have to search for

21  a bunch of decisions because this happened in this case.  The

22  law of this case.  Even as -- as a result of ethic motion

23  practice, that's the process Your Honor has ordered that

24  depositions take place.  Who are they?  Well, Mr. Siegel was

25  the subject of a deposition and he was deposed.  Mr. Lieber was

1   deposed.  Mr. Hughes was deposed.  They're all lawyers who was

2   relevant to an issue in the case.

3          And Mr. Siegel in particular was deposed on the

4   particular question of the assertion of privilege.  Your Honor

5   ordered us to produce a revised law that would list all of the

6   documents relating to the post-bankruptcy, post-petition

7   reserves that were being withheld on grounds or privilege.  And

8   we did that law, and when Your Honor had questions about that

9   law, they insisted upon taking the deposition of a person at

10  Grace who was knowledgeable about those documents.  It was Mr.

11  Siegel and the former general counsel, and I just defended this

12  deposition three weeks ago.  We had all kinds of questions

13  relating to matters, many of which were still privileged.

14  That's the law in the case.

15         With respect to Anderson Memorial, we produced our

16  local counsel in South Carolina in connection with the Anderson

17  Memorial case, Mr. (inaudible) to answer questions on what

18  documents were there.  Again, that took place in this case.

19         So, we're in the situation called the (inaudible).

20  In both cases there was a meeting.  In both cases the

21  depositions took place.  In both cases, miracle of miracles,

22  they actually ended up being fairly noncontroversial.  So, the

23  principle that says there's simply no ability to take the

24  deposition is wrong on the law.  It's wrong on the law of this

25  case.

1        It is particularly wrong where essentially what they

2   wanted to say is, we'll fill out -- we'll tell you the

3   privilege and predicates that we want to, some yes, some no,

4   but in terms of how we actually went about it, we're not going

5   to tell you anything.  We're not going to let you take a

6   deposition.  And now they say, with respect to the

7   interrogatories, maybe now here this morning for the first time

8   we learn there are some particular interrogatories that just in

9   a certain way, I guess we can answer some of those

10  interrogatories.

11       I'm sorry.  The discovery rules are not so one-sided.

12  We don't have a fox guarding the chicken house situation here.

13  Discovery is conducted by a (inaudible) party.  It is the Court

14  that determines the (inaudible) scope of that discovery, not

15  counsel on the negotiation basis coming in in a very nice tone

16  saying, gee, Your Honor, otherwise it's going to be terrible,

17  but we can live with this.

18       So, the remaining question then becomes here today,

19  what about these four law firms?  There are reason for

20  discovery with respect to the law firms.  It is noted to me

21  that Fred Zarembe (phonetic) who is also a lawyer at Grace,

22  also testified about the claims database, so we have all kinds

23  of lawyers from Grace who have testified.

24       Is discovery justified with respect to these

25  particular firms?  And the answer to that is yes.  And, Your

1 Honor, we have a series of exhibits here, and we're going to --

2 I'm just going to call out the numbers.  We will furnish copies

3 to the Court and copies to opposing counsel.  They are all

4 discovery responses or PIQ responses.

5        So, we have with respect to Baron and Budd.  What

6 about exposure compliance.  Telling us what the exposures were

7 versus employment history.  This is how (inaudible).  This is

8 how the pages read, Your Honor.  Grace exposure.  Zip.  They

9 sent us a letter then, that says, "Please find enclosed the

10 objections and responses."  Claimant has specified in --

11 claimant's questionnaire responds that the documents from which

12 the answer may be derived.  Get this, due to the volume, these

13 documents are not attached to the questionnaire, and will be

14 made available for inspection or copying from the Dallas

15 offices of Baron and Budd.  That's how much we know absent

16 going back to their offices and searching for the material.

17 That's how well they get -- answered the questionnaire.

18        What about the interrogatories themselves?  Well,

19 they make a bunch of objections to the interrogatories.  This

20 is their response to the privilege interrogatories.  They

21 object to the definition of claimant's possession custody or

22 control as being beyond the scope of those terms under 34A.

23 Even though Your Honor has specifically and repeatedly ruled in

24 accordance of the Third Circuit law that that is incorrect.

25        You then have objections to verification of

1  Interrogatories 4 and 5.  They object to the verification as

2  being beyond the scope of all 33, even though Your Honor has

3  repeatedly said that she -- you do have the authority, you are

4  ordering both the claimant and the lawyer to provide the

5  verification.

6          Now, here's an interesting thing.  I've taken -- and

7  we can submit this to the Court -- I've taken -- they've

8  basically answered the interrogatories with respect to the

9  privileged predicates in kind of a spreadsheet form.  A is the

10 date of the B read that they're withholding.  D and -- or C and

11 E are the doctors or they filled in the letters for the

12 doctors.  And we're going to have to come back to that, but

13 that's not the -- we're not raising that today.  I is the date

14 of the first diagnosis.  And they say that the first diagnosis

15 is the first positive B read.  K is the date of the retention

16 by Baron and Budd, and L is the retention by other firms, and N

17 is whether they've looked for the document and found the

18 document.

19         Well, on the basis of just what appears on the face

20 of this, Your Honor, we have found a whole bunch of problems.

21 First of all, we continue to find B reads that were actually

22 done before they list the date of diagnosis and before the

23 retention.  And, Your Honor, the order completely and clearly

24 and specifically said that privilege doesn't apply to things

25 that happened before there was even a relationship or before

41

1 the first diagnosis.  And we still have all the yellows -- are

2 all situations in what LeBlanc and Waddell also done by the

3 Baron and Budd firm that took literally untold hundreds if not

4 thousands of pre-retention, pre-diagnosis B reads that are

5 still being withheld.

6       We then have the date of the B read is the date of

7 the retention, yet is actually the same as for before, the date

8 of the retention of the law firm.  Those are pink ones.  We

9 then have a situation where we actually have in some cases B

10 reads which are done on the date of the diagnosis, but are

11 still not being produced in the case.

12       We have missing documents, all kinds of missing

13 documents that apparently no longer even (inaudible).  And then

14 we have unknowns where they don't know the date on which

15 somebody else was retained.  In case of the LeBlanc and

16 Waddell, we can show Your Honor there's LeBlanc and Waddell,

17 again the same firm, the same -- they're all covered by the

18 same organization.  These are all the dates in which LeBlanc

19 and Waddell was retained.  Unknown, unknown, unknown, unknown.

20       The retentions of the law firms; oral.  The

21 retentions of the B readers; oral.  There's a massive, massive

22 problem out here, and what they're saying is, they're not

23 accountable for it, even though we know that there's a problem.

24 I want to keep my time here, Your Honor.

25       With respect to Ness Motley, the next one.  These are

1 the folks that shoot now, ask questions later.  With respect to

2 privilege, this is Mr. Herrick, (inaudible) on 91 of April the

3 13th.  Mr. Herrick says, while we asserted the privilege, but

4 that doesn't necessarily mean that there is privileged

5 information in each case.  So, we'll just assert the privilege

6 even though we don't even know that it applies.

7        Well, on further review, had they told us that the

8 privilege, in fact, does apply, we haven't even got to their

9 response yet.  And they want to let us know about how they

10 complied with the PIQ note.  They want a deposition, and I

11 didn't hear any undertaking from anybody representing Motley

12 Rice that they're permitted -- that they're prepared to do

13 anything with respect to any interrogatories or any

14 depositions.

15        What about what we have that Motley Rice on

16 exposure -- this is Exhibit 4 -- again, what did they do?  They

17 provide the employment data, but when it comes to Grace

18 exposure, it's blank.  It's blank.  It's just not fair.  So,

19 they give us all this employment history, but employment

20 history is not the exposure history to Grace product.  That,

21 they just don't give us.

22        And again, they're not willing to give it to us.

23 They're not willing to tell us anything about it.  They're not

24 willing to tell us how they filled out the PIQs.  They just

25 don't want to be accountable for that statement.

1        What about Kelly and Ferraro?  Kelly and Ferraro

2   hasn't responded.  I believe that they objected to the

3   compliance of --

4        MS. BAER:  David?  They've not responded to any.

5        MR. BERNICK:  They didn't respond to anything.  So,

6   these are all -- he's now in a court today, and in terms of

7   what they're doing here, they're not doing anything at all.

8   They're basically saying forget about it.  What about

9   exposures?  Here's a typical -- this is Exhibit 1.  This is

10  typical Kelly and Ferraro for exposures.  It's an employment

11  history.  It's a whole series of places where they worked.  It

12  doesn't tell us anything about exposure.  And these folks have

13  tens of thousands of claims in this case.

14       What about the Angelos firm.  Angelos firm is

15  interesting.  They did comply with the privilege predicates.

16  They object to everything else.  Why?  Well, what do they do

17  with this motion?  This is Exhibit 2.  This is an individual

18  who says worked at Martin Marietta for a whole bunch of years,

19  fills out all the codes.  Well, what's the product ID?

20  Zonolites -- everything that Grace made in this area is called

21  Zonolite.  That refers to a lot of things, not just asbestos.

22  He says it's cement.  So, it's Zonolite cement, yet Martin

23  Marietta is some (inaudible).

24       And yet when you go to the files, it's clear that

25  nobody actually read the file in filling that out because the

1  medical record for the same individual is redacted -- says he

2  was exposed to asbestos '65 to '75 while doing home

3  improvements.  Home improvements.  Nothing to do with Martin

4  Marietta.  He installed installation, drywall and shingles.

5  These materials did contain asbestos.

6       So, when they filled out the form, they just again

7  stuck in an employment date, said Grace, said cement -- or said

8  Zonolite, said cement.  They didn't read anything else.  They

9  didn't care about anything else.  And we now know that this is

10  true because, with respect to others, this is another

11  individual where there's nothing.  It simply says, "I work at

12  your hospital.  I worked with Zonolite," which is the trade

13  name.  What's the product?  Product.  There's nothing else.

14       It's just not right, Your Honor.  It's not

15  appropriate.  It basically flaunts the Court's orders.  Now,

16  today we've heard a couple things.  We've heard repeatedly from

17  Mr. Finch that the -- you don't need this.  Well, the Court's

18  already ruled that we not only need it, we're entitled to it.

19  So, that day is long gone.

20       We then hear from Ms. Ramsey and Mr. Esserman.  They

21  say well, you know, gee, we'd like to figure out some other way

22  to get this done in a way that's less contentious, et cetera,

23  et cetera, and I guess I have the following observations.

24  First, there's still adhering to the principle of no

25  deposition.  And that's clearly contrary to law, generally, and

1  the law of this case.  I guess I have the following

2  observations.

3       First, they are so adherent to the principle of no

4  deposition and that is clearly contrary to law, generally in

5  law of this case.  Number two, they are saying on

6  interrogatories after its all too late, after this has already

7  been done.  We've been here for weeks.  They now want to

8  negotiate with us before the Court on which interrogatories

9  they will answer.  The answer is submit to the deposition,

10  we'll ask the questions in the deposition.  If you have the

11  opportunity then if you want you tell us more about the

12  interrogatories and we will move to compel on the

13  interrogatories at some later date.  But the deposition of fact

14  if we're willing to negotiate on the interrogatories, they'll

15  just help with respect to the deposition.

16       Then I come to the last point that I think is very

17  critical here.  In this whole area from the PIQs and everything

18  that we're dealing with here, there has been nothing but

19  objection in motion practice.  We have gotten absolutely

20  nothing on a truly cooperative basis.  It is fight, fight,

21  fight.  They show up in Court.  They are very nice people who

22  are very polite and have good relationships with the Court,

23  good relationships with counsel.  We're not taking issue with

24  that.

25       But they are standing before you as counsel for firms

1  whose actions rather than their words, whose actions define

2  what kind of players we're dealing with here.  These are people

3  who are playing scorch bird tactics.  We would never in a

4  zillion years get away with the kind of obstructions they can

5  place on your sentencing.  And it continues.  It is still going

6  on.  So we can't make this friendly with the firms are

7  basically sitting on the information that only they have.  We

8  have got to come in, we have got to rely upon the order, Your

9  Honor, to enforce the orders that are being made here.  And it

10 doesn't make any difference how nice counsel are unless they

11 make noises now of let us negotiate with this.  What they are

12 basically doing is standing behind illegal principle.  It is

13 the wrong principle of this case and on to rely and we would

14 ask Your Honor to enforce the deposition notices with respect

15 to the four firms Baron & Budd, Motley Rice, Kelley & Ferraro

16 and Angelos firm.

17        I will reserve the letter I have maybe two minutes.

18        THE COURT:  All right.  You  may reserve your two

19 minutes.  But this is my time not your time.  I have a

20 question.  I don't know what your experts are going to do with

21 this information once you get it.  How are your experts -- what

22 use are your experts going to make of this information?

23        MR. BERNICK:  My experts are going to make use of the

24 information on the Shell Game.  If it turns out that these law

25 firms did not search for any other documentation and they are

1 presenting him their questionnaires or the attachments, only

2 the materials that they want to present, say they got positive

3 B readings.  Then when they say well we got a positive B

4 reading, the Grace's experts will now submit reports who have

5 taken a look at the x-rays and let them out.  What is the basis

6 of them controlled studies and they find that the number of

7 truly positive B readings under 1/0 in accordance with the

8 written standards.  There are written standards here.

9        When you follow the standards of positive B readings

10 are seven percent versus the 80 or 90 percent they got from the

11 claim files.  We have a very easy answer when they come and say

12 well that's just your experts.  That's what they will say.  No

13 matter how blinding it is and how clear it is, they will say

14 that's just your experts.

15        Our expert says X.  Well if we know that they haven't

16 made a search for any of the other data reads including B reads

17 that they are withholding and were before the date of

18 diagnosis, we have a very simple answer to Your Honor which is

19 they are producing one positive B read but they are not

20 producing all the other B reads that are likely negative.  The

21 whole key issue on B reads is replicability.

22        Our expert sent the x-rays out to two different

23 readers.  Matches have come to three.  At least two or three

24 have to agree to solve the problem of inter-reader variability.

25 So we get all that.  They haven't done it.  They've only given

1  us one.  In effect, they are improperly withholding the other.

2  So we will say to Your Honor they can't argue that well

3  although we just did it one way and they did it another, we did

4  it the right way.  They didn't do it the right way and they are

5  not producing information that is relevant to show that the one

6  they gave you was positive and the one that they are not giving

7  you is negative.  We already have cotemporaneous evidence from

8  Ron (indiscernible) himself that this is a matter of practice.

9         They thought they could get away with just giving

10  these out to a bunch of people producing the positive one and

11  withholding the negative one.  We want to be able to establish

12  that they have withheld the negatives and they  have done so in

13  contrary to Your Honor's orders and they should be precluded

14  from arguing that somehow their one B read would be

15  satisfactory when they are not telling the Court the whole

16  story.  That's the thing with the Shell game we have -- with

17  verification.  We're going to go through all their files and

18  establish that their files don't contain evidence of Grace's

19  exposure.

20         So they are going to come back and say oh, well we

21  have some other source for it.  We believe it might have

22  emerged here or here or here.  But the client isn't saying

23  that.  Their client is not saying that.  So the essence of the

24  client verification means that the lawyer's arguments are not

25  being established on the record and their clients won't verify

1  it.  They are not being asked to verify it.  We're going to ask

2  to a negative inference in respect to that.

3        The absence of client verification is an essential

4  element of (a) the summary compliance but (b) the credibility

5  of the evidence.  How is it evidence from the client when all

6  it is is a lawyer's assertion.  So the lawyer's assertion

7  versus client verification essential to the admissibility of

8  the very basic individual data that they are talking about,

9  what about the privileged predicates?

10        Will Your Honor then issue an order that says the

11  privilege only applies here, it doesn't apply there with

12  respect to the B reads?  We believe but we've just shown Your

13  Honor that they don't satisfy the privilege predicate.  So we

14  should get reads and if B reads are not produced it's the same

15  kind of argument we had before.

16        Lastly, this is huge Your Honor, huge.  If they have

17  not actually gone and determined exposure to Grace product or

18  exposure to other companies' products and all they have

19  verified is what is represented to Your Honor last time,

20  verification and all that is verified is employment history

21  then what we're going to say is that through the PIQs, you've

22  seen the blank pages, that's the best they can do.  It's not

23  evidence of exposure.  It's evidence only of employment.  We

24  want to pin that down.  Because if they don't actually have

25  evidence of exposure, I don't care whether you talk about lung

1  cancer, non-malignant disease or mesothelioma, if you don't

2  have exposure to Grace product you are out of luck.

3        So that's another Shell game.  Where is the actual

4  exposure to Grace product data?  We don't see it on the face of

5  the questionnaire.  We don't see it in the attachments.  We

6  want to know is there any place that exists or are you simply

7  saying based upon employment we can make an argument.  Remember

8  Your Honor what those arguments look like.  That's what

9  Brighton Purcell, when Brighton Purcell talked about early

10 light, ELS, Your Honor has seen this document.

11       MR. FINCH:  Your Honor, I believe this is beyond

12 response to the Court's question.  I believe this is well

13 beyond response to the Court's question and it's using up time

14 that Mr. Bernick doesn't have.

15       THE COURT:  Yes, I understand what arguments you

16 intend to make.  What is your expert going to do with this

17 information?  Is he going to modify his report?  Is he going to

18 incorporate this into his report?

19       MR. BERNICK:  Absolutely incorporate it in the

20 report.  I thought I answered, Your Honor.  I apologize if I am

21 not being responsive to Your Honor's question.

22       Our experts are taking the population of the people

23 with lung cancer and non-malignant who actually were the plain

24 population of Grace and against Grace in the Chapter 11.  They

25 are basically asking two questions both under Daubert and the

1 law.

2          One is that the diagnostic data based upon the

3 reliable methodology.  And two is causation by Grace product

4 based upon reliable scientific models and methods.  Because if

5 they can't meet the scientific standard with respect to either

6 one they are out of luck.  This is bankruptcy court, it's

7 federal power applies, and the claim could not be presented in

8 a Chapter 11 case based upon that evidence.

9          THE COURT:  So your understanding is that all of this

10 evidence you are now soliciting is going to go to the issue of

11 reliability based on the information that is in the claim file

12 but it's been submitted by the claimant based on the PIQs?

13          MR. BERNICK:  That is -- the reliability in -- yes

14 reliability under Daubert and also the state substantive law of

15 causation.  That is correct.  So it's state substantive law of

16 causation and that appears on both diagnosis and exposure and

17 the reliability of the evidence as a requirement under the

18 federal rules of evidence that apply in this courtroom.

19          So when Your Honor hasn't looked at it, when you take

20 a look at our estimate, our estimate basically says with

21 respect to this snapshot pending as of the time of the Chapter

22 11 which ones of those claims does it appear?  You might be

23 able to satisfy state law and federal law of evidence.  With

24 respect to those you may have the same quarry and we end up

25 with a population of claim.  At the end of the day it is a

1 population that we believe based upon information that's been

2 provided might be able to satisfy state law and might be able

3 to do so in conformance with the federal rules of evidence.

4        The whole thing is driven by it.  So therefore it is

5 a roundup what you have there.  Then with respect to those as a

6 snapshot we then project well if these are actually disease

7 caused by Grace, this is not simply somebody who decides to

8 make a claim, this is people who are actually sick and have

9 some linkage to Grace, then you can use epidemiology not a

10 science but epidemiology and project out the likely future flow

11 of claims.  So we now have the data so that epidemiological

12 models that were kind of distorted -- I won't say anything else

13 -- that were abused through the process of trying to develop

14 these estimates of claim behavior, we now have the hard data to

15 find out what actually is part of the population of people who

16 got sick from asbestos.  It's not predicate for any of your

17 work.

18        THE COURT:  All right.  I understand --

19        MR. BERNICK:  So when I go back to these questions

20 what is our experts are doing, our non-estimation exerts go

21 through and they apply -- they apply these particular filters

22 or reviews.  They reviewed the x-rays, they reviewed the B

23 reads, they reviewed exposure histories looking for this kind

24 of information.

25        There's a lot of information that's not there.  It's

1  not been provided.  Like B reads that are being withheld.  Like

2  the exposure histories not being documented either with respect

3  to Grace products or non-Grace products.  We want to eliminate

4  any possibility that the other side will simply say well, you

5  don't have it because (a) it's privileged and you can't have it

6  and never would be able to have it, you don't have it because

7  we just haven't looked hard enough.  And/or it might be there

8  someplace but hey this is estimations so you are never going to

9  get it.

10          THE COURT:  All right.  I got it.  I understand.

11          MR. FINCH:  Your Honor, I disagree with almost

12  everything he's just said but for one, let me just take one.

13  On exposure for example, people work in construction, work in

14  refinery.  They know where they've worked.  They don't

15  necessarily know that they've been exposed to Grace asbestos

16  but they have mesothelioma.  They have a very good idea that

17  they were exposed to asbestos to get the mesothelioma.

18          They filed a case against Grace and other defendants

19  and the lawyers are able to, when they have to, prove exposure

20  against Grace and the other defendants but the question it

21  doesn't ask they to prove their entire case against Grace.

22  What they are doing is they are taking the questionnaire

23  responses and saying you had an obligation to give us anything

24  that you would be able to obtain in discovery from Grace or

25  anything else to prove up the case against Grace.  That's just

1  not what the questionnaires ask for.

2          They didn't ask for, first of all (a) they haven't

3  been able to do discovery against Grace for the past six years.

4  They haven't been able to -- they haven't had any incentive to

5  or any ability to tie a particular person to a Grace product at

6  a particular place and time but they have historically been

7  very good at doing that.  And when there is no reason to

8  suspect that they wouldn't be able to do that in the future.

9  And if you look at the questionnaires and we've looked at all

10 the medofemeoma questionnaires, it is a very high percentage of

11 them that identify exposure to a Grace product and/or a Grace

12 cite.  But a lot of them don't and the reasons they don't is

13 because they hadn't been able to do it for the past six years

14 and have had no incentive to do it for the past six years.

15          THE COURT:  Well, I mean, people can ask for

16 discovery against the debtor.  The ACC and the FCR who were

17 going to decline the estimation could ask for discovery against

18 the debtor.

19          MR. FINCH:  But the individual claimants have not

20 been able to pursue discovery against the debtor.  It's only

21 the individual claimants who know the specifics of their

22 exposure and their work history.  So the point Your Honor is

23 that the whole debate about the questionnaires about what it

24 means is for the experts and they can use their variant models.

25          But coming back to the dispute before us today on the

1  depositions, I didn't hear anything in Mr. Bernick's response

2  about my position that he's already exceeded the 10 depositions

3  allowed under the rules.  The federal rules of civil procedure

4  Rule 30A-2 or whatever it is that limits the number of

5  depositions is the law.  And he hasn't given any reason why

6  that should be lifted or modified here.  I think the proposal

7  by the firms to respond to the questions about the processes

8  that they followed given the information that he needs at a

9  non-invasive, non-burdensome method, he hasn't responded to

10  anything about that.  I think that is the issue before the

11  Court.

12        If they come back with preclusion orders or motions

13  we have, you know, their entire methodology assumes that

14  whatever is -- what is in the files and was able to be produced

15  in discovery in response to the questionnaire which is

16  basically a set of interrogatories is the same thing that would

17  be able to be obtained if they could do discovery against Grace

18  or do the types of things that you would do to work up a case

19  for trial, which has not been done here.  That's a very

20  different thing and no court order has required people to do

21  that.

22        THE COURT:  Well the concern seems to be that, I

23  don't know about a court order, but the concern seems to be

24  that the debtor has served interrogatories in the past and is

25  not getting any response.  And as a result the interrogatories

1  don't seem to be particularly effective.

2         MR. FINCH:  May I move to the chart here?  There are

3  two, I call them first set of interrogatories, second set of

4  interrogatories and depositions.  First set of interrogatories

5  related to basically the privilege law on the B reads.  That's

6  not what we're talking about here.  Second set of

7  interrogatories relating to the compliance and the depositions

8  go to the compliance with -- not so much compliance what

9  processes did you use to respond to the questionnaires.

10        What I'm saying is in addition to the number of

11  depositions the same information about how it is you responded

12  to the questionnaires can be and has been asked in the

13  compliance interrogatories which thus far have been objected

14  to.  But my understanding of the proposal I just heard from Mr.

15  Ramsey -- excuse me, Mrs. Esserman and Ms. Ramsey and I believe

16  the Motley Rice firm, although they didn't speak will be on

17  board with this as well is they would answer information,

18  interrogatories, designed to elicit that information in the

19  second category.  That as long as there is an order from the

20  Court that says if the answers don't consist of a waiver of the

21  attorney client privilege of the work product doctrine.  And so

22  therefore they would give them the information without the need

23  for the depositions.

24        You know, in all of what he said he said nothing

25  about the fact that he's exceeded the number of fact witness

1  depositions.  I think the Court ought to set a limit on the

2  fact depositions of 20 per side or 15 per side or something.

3  He's already done 16 or 17.  We've done eight.  There's more

4  reason to, you know, basically spend millions of dollars of

5  estate money going around doing deposition after deposition

6  after deposition on stuff on a case that ultimately boils down

7  to experts and what the expert's opinions are.

8          Tom Florence's report said nothing about he needed

9  this stuff.  There is a deadline for rebuttal/supplemental

10 reports of August 8.  It is my understanding the Court entered

11 this scheduling order, there's not going to be any more changes

12 to it.  We're not going to keep getting seriatim reports and

13 requests to push this back.  You know, one could describe

14 ulterior motive here and all they wanted to do was set up more

15 fights and ore delays and to try to push off the estimation

16 hearing from January to, you know, some time in 2009.

17         In order to get to the trial in January, we've got to

18 have the final version of the expert reports which we have I

19 think.  And we've got the final version of the rebuttal reports

20 on August 8 which I think we have and I understand there is no

21 room for modification of these dates because the time we have

22 is very pressed.  There's nothing Mr. Florence said in his

23 report that says that he needs any of this and it is all just

24 counsel arguing about why he wants to get this stuff.  I think

25 really what he wants to do is drive the plaintiff's lawyers

1  crazy and harass them and make them spend millions and millions

2  of dollars.

3         They have spent tens of millions of dollars in lawyer

4  time and paralegal time responding to questionnaires, dealing

5  with this, showing up at these hearings.  Your Honor, enough is

6  enough.

7         MR. MULLADY:  Thank you, Your Honor.  On behalf of

8  the FCR, although we are for all intents and purposes a

9  bystander to the principle arguments here, I feel compelled to

10  approach the Court and make a point about the process here.

11         I suppose I shouldn't be surprised in a case in which

12  the debtor is presuming to exclude and disallow case before

13  estimation that we would be having another looking through the

14  looking glass moment in this case, but we are.  That is because

15  the procedure here is contrary to what the federal rules allow.

16         What has happened here by my observation is that a

17  PIQ was propounded.  Subsequent to that, interrogatories under

18  Rule 33 and request for production of documents under Rule 34

19  were propounded by the debtor to these firms.  Motions were

20  filed to compel on the alleged inadequacy of those responses.

21  Your Honor then ruled that the PIQ process could be

22  supplemented by attachments.

23         So there was a motion to compel, there was a ruling

24  by the Court and the response was to permit the review of

25  attachments which the debtor of course engaged the Delaware

59

1 claims facility to do.  Now we have instead of a renewed motion

2 under Rule 37 which will be the proper procedure to compel or

3 for sanctions against these firms for alleged non-compliance,

4 what we have now is a notice of deposition to lawyers

5 representing the firms to find out why they didn't provide

6 adequate discovery responses.

7        This is not a procedure that is permitted by the

8 federal rules and for good reason.  If in any case in which a

9 party was dissatisfied with discovery responses, one could note

10 the deposition of opposing counsel to find out why the

11 responses were inadequately provided.  Well you can see where

12 that would take us.  It would not be to a productive or happy

13 place.  That is what undergirds a lot of the authority in the

14 plaintiff's firm's briefs on why this type of discovery is

15 disfavored.

16        Finally, Your Honor, I would note that we have the

17 FCR, we've read the report of Mr. Florence.  I heard Mr.

18 Bernick talk about the so-called pervasive problem of

19 employment history as he put it, not being the same as exposure

20 history.  Well Mr. Florence has already determined on the basis

21 of his reliance on a non-estimators report that the only

22 plaintiffs or claimants in this case that could claim that they

23 have an asbestos related disease related to a Grace product are

24 those who have indicated on their PIQ that they either

25 personally mixed or handled Grace asbestos or worked with it

1 somehow.

2        He has excluded every other claim for purpose of his

3 analysis that doesn't meet that criteria as a non-compensable

4 claim and he's further taken that percentage of disallowed

5 claims and projected it into the future.  So why do we need

6 more discovery now about whether there was or was not exposure

7 to a Grace product?  The analysis is done.  He's excluded it.

8 He's disallowed it.  We believe impermissibly but he's

9 disallowed it and he's projected it to disallow my client's

10 claims in the future.  We're going to have a lot to say about

11 that on Daubert and on motions practice but the procedure here,

12 Your Honor, is unnecessary.  The discovery is unnecessary.  The

13 procedure is through the looking glass and should not be

14 permitted.  Thank you.

15        THE COURT:  Miss Ramsey.

16        MS. RAMSEY:  Your Honor, I have five points to make.

17 The first is that we did not come here to negotiate with Grace.

18 And the reason that we can't negotiate with Grace is Grace

19 cannot give us the protection that we need if we are to be

20 responsive to the questions that they've asked.

21        Hypothetically, if the question is you provided work

22 histories but you didn't provide exposure data, why not?  And

23 the answer was, hypothetically, work history provides you with

24 exposure because if a claimant worked at a certain location at

25 a certain time and Grace product was present there, there is a

1  good faith basis to believe that person was exposed to Grace

2  asbestos.  That implicates for product privilege.  It may

3  implicate the attorney client privilege.  We can't answer the

4  interrogatories in the second set on the basis of the way that

5  they are asked without this Court ordering that if we are

6  prepared to answer them, if we do answer them, that we do not

7  waive the privilege.

8       So the first point that I wanted to respond to is

9  we're not trying to engage in a negotiation.  We simply cannot

10 answer the questions the way they are asked.  To my knowledge,

11 there have only been two sets of interrogatories that have been

12 served on the law firms.  With respect to the five firms that I

13 represent, responses were provided to the first set.  With

14 respect to the second, they were not because of the way that

15 the questions were phrased.

16      What we're proposing today is, and I've still not

17 heard any additional information, factual information that the

18 debtor has identified that we have not said and I don't

19 represent all the firms.  So I can't represent that the firms

20 will do this.  But what we are proposing is that if the firms

21 do by two weeks from Friday respond to the four questions that

22 I identified before which appear to give the debtor what it

23 wants and the Court will enter an order providing that

24 information does not waive the privileges, then there does not

25 appear to be any reason to depose counsel.

1       The second point is that as Mr. Bernick went through

2   his slides, it is pretty clear that these depositions are going

3   to become argumentative very quickly because the question is

4   why don't, you know, why don't you know this and how did you do

5   this?  And we're going to get into an ever expansive question

6   about specific answers to interrogatories that are going to

7   just be a side show.

8       The questionnaires, and this is the third point, were

9   a snapshot in a point and time they were specifically, at least

10  with respect to my firms, they were provided with a statement

11  that said we haven't worked these up for trials.  We're giving

12  you what we have today but that's not everything that we would

13  expect to have and it's not everything that we expect to have

14  at the time that we are ever required to crimp up these claims.

15      What I'm hearing today and what's concerning me is it

16  sounds as though the debtor was really asking that all of these

17  cases be simultaneously worked up for a summary trial of some

18  fashion and that is not what estimation is supposed to do.  And

19  it's not consistent with our legal rights.

20      The fourth point is that exposure in fact is often

21  work history.  The debtor may not like it, but for many trials

22  if you worked at a particular location within a particular time

23  frame then you are eligible for payment.  With respect to

24  settlements before bankruptcy, in many cases, if you worked at

25  a particular place at a particular trade during a particular

1 time, that is sufficient for payment.

2        So to the extent that if Grace were to try these

3 cases it would press for specific product identification then

4 that is a burden that the claimants might have to address.  But

5 for purposes of the snapshot, for their to be a suggestion that

6 somehow there is a hiding of the ball because exposure was not

7 worked up at the time or exposure has not been focused on and

8 therefore is not available at the time that the questionnaires

9 were presented, is simply not correct.

10        And the fifth point, Your Honor, was that there were

11 representations made about the compliance and of Early Ludwick

12 and the Cozen firm and I am not going to address those today

13 because they are not before the Court but I did not want to

14 leave those statements stand without saying that at the

15 appropriate time we will respond to any motions that are

16 brought before the Court.

17        Thank you.

18        THE COURT:  Mr. Esserman.

19        MR. ESSERMAN:  Your Honor, just a couple of quick

20 points.  I think the line is way blurred on individual claims

21 litigation versus estimation here.  I think Grace has way

22 crossed that line.  I think they crossed it some time ago and

23 they continue to try and go further and further violating that

24 border.

25        Next is it was pointed out to me in the courtroom

1  today that they Exhibit 6 that Grace is using for today's

2  hearing was a response to a questionnaire by the Baron & Budd

3  firm for a client and this particular responses were

4  supplement, something that Grace knows about if they had

5  followed it through and were complete with lots of information

6  and lots of data, attachments, references to the attachments,

7  et cetera.

8          So I think part of the basis of what they are trying

9  to pull here is by referring to questionnaires that before they

10 were even supplement and we went through that whole

11 supplementation process.  Thank you.

12         MR. FINCH:  Your Honor, I don't think Mr. Bernick has

13 any more time and I would suggest --

14         THE COURT:  He has two minutes, Mr. Finch.  Two

15 minutes, Mr. Bernick.

16         MR. BERNICK:  Thank you.  Mr. Finch says some have

17 Grace, some not.  What do we want the discovery for?  We want

18 to be able to pin down which ones.  They are playing hide the

19 ball.  This is not a question -- this question is figuring out

20 what the basic are so that the experts can do what they have to

21 do.  Mr. Malady says you've already excluded a bunch of people

22 who are not or didn't directly work.  The answer is on the

23 basis of the few answers that we got we did but we want to know

24 that we're going to be greeted by them not coming in on

25 estimation and saying oh well here's some more evidence that we

65

1  didn't give you.

2         We have to pin that down and we still don't know what

3  about other non-Grace exposures.  If there was a fiber here and

4  it's Grace and huge exposures that were not Grace, then our

5  experts will say there is no Grace causation.  One fiber theory

6  doesn't work.  They are playing hide the ball on this.  They

7  are hiding the ball for non-Grace exposure and they are hiding

8  the ball on what they will say about Grace exposure when then

9  the time comes at estimation.  And they are hiding the ball

10 from the ones who will be able to say to Grace exposure from

11 the ones that were not Grace exposure.

12        Mr. Malady says there are no motions for sanctions

13 and we should have moved for sanctions.  I don't want to move

14 for sanctions until we are very, very clear on the record.  I

15 don't know that I'll ever want to move for sanctions.  There's

16 not a reason for not allowing discovery that we haven't moved

17 for sanctions.

18        Ms. Ramsey says well if a deposition takes place we

19 may say why didn't you give us the exposure history.  I don't

20 know that that question will be asked.  I think it is much more

21 likely to be asked is there any evidence of exposure that you

22 had beyond the fact of the employment?  Did you go and look for

23 that evidence or did you not look for that evidence so that we

24 know what we can count on in the way of the factual predicates

25 that our experts can use.

1        We don't want to have to guess on whether there is

2   something beyond an employment history.  We want to know

3   whether there is something beyond an employment history.  So

4   it's not why, it's what.  And there is no reason why this

5   should be defined in advance of the deposition.  Mr. Segal's

6   deposition was taken at length without advanced rulings on

7   whether particular questions would be appropriate or not.  Ms.

8   Ramsey says well I represent five firms and she makes a

9   proposal.  We haven't even moved today with respect to those

10  five firms.

11        We may not move with respect to those five firms.  So

12  we get the situation of well a firm says you haven't moved so

13  you can't do anything.  But then the firms where we have not

14  moved have said we are not proceeding, they come in and want to

15  have the table worked out their way.  We may or may  not move.

16  We want to do so with -- on the basis of a complete record.

17        Finally, the argument is made again and again, well

18  there may be something more that these claimants would have

19  found out if they had been able to pursue litigation against

20  Grace.  We'll be able to answer that.  There was an enormous

21  litigation against Grace.  That's not the question though that

22  we're trying to get at.

23        All we want to know is definitively what is it that

24  you have against Grace and what is it that you don't have

25  against Grace becuase you didn't look for it or you didn't

1 answer it so we don't have all these inferences and speculation

2 on what the facts are with respect to this population of

3 people.  We've come very far in gathering a lot of the data but

4 again and again and again the law firms to talk about money

5 here is absurd in the case of these firms.  They are going to

6 have tens of millions, hundreds of millions of dollars coming

7 out of this case, even more.  They won't give us the basic

8 answers to the basic questions so we know what it is that our

9 experts can count on and they won't be cross examined on the

10 basis of speculation, Your Honor.  Thank you.

11           MR. FINCH:  We would just like a ruling, Your Honor.

12           THE COURT:  Okay, well with respect to the issue that

13 the debtor is only moving as to four firms now, I think the

14 problem is that the debtor has served the notices of deposition

15 on 21 firms.  I don't know whether the debtor has formerly

16 withdrawn the rest or not.

17           MR. BERNICK:  Yes, we have formerly withdrawn the

18 request for all but the six, not to say that we won't make a

19 request in the future but we are not pursuing that and with

20 respect to the six we have taken two off that is Early Ludwick

21 and Weitz and Lutzenberg.  Early Ludwick because it's a more

22 complicated case and Weitz and Lutzenberg because we have yet

23 to receive their interrogatory answers.  So the only notices

24 that we were told constantly to make motions to go after

25 particular firms so that is exactly what we did.  We're only

1 pursuing the four.

2          THE COURT:  Okay, but the trouble is whatever rulings

3 I make, I mean this has to be -- there has to be an end to this

4 at some point in time.  And if the debtor intends to keep

5 pursuing the deposition notices frankly I think the rulings

6 that I make have to be binding so that we don't have to keep

7 doing this over and over and over.  There has to be an end at

8 some point.

9          MR. BERNICK:  I agree but Your Honor you recognize

10 that I can only do what Your Honor suggest.  We tried doing

11 this all in advance.  We tried to get Your Honor -- we did get

12 Your Honor to rule on all this and all that happened was that

13 they made the same objections before that Your Honor has

14 already ruled upon.

15          So we served these, you know what the point is, it's

16 difficult to get our arms around all of the firms at once

17 without then getting different responses from the firms that

18 are different than others.

19          THE COURT:  All right.  Mr. Esserman, which of these

20 four firms are you representing?

21          MR. ESSERMAN:  We represent Baron and Budd and the

22 Angelos (phonetic) firm Your Honor.  Of the four firms at the

23 bottom of the chart.

24          THE COURT:  Yes.

25          MR. ESSERMAN:  We also represent Weitz & Luxenberg

1 should they be deposed later.

2          THE COURT:  All right.  And Ms. Ramsey, you are not

3 representing any of the four today?

4          MS. RAMSEY:  No, Your Honor.  I just want to clarify

5 for the record though two things or three things.  The first is

6 with respect to the initial offer to withdraw, I specifically

7 asked for clarification about whether that was a withdrawal or

8 whether that was an offer to withdraw and I was told by Grace

9 counsel that they were prepared to withdraw or they were

10 offering to withdraw.

11          With respect to Early Ludwick, last night when it was

12 announced that they would not be pursuing that deposition

13 today, they simultaneously indicated an intention to come back

14 immediately or in the near term I think was the phrase, to the

15 Court to seek a deposition.  So the third point is I do agree

16 with the Court that our interest is pretty significant in this

17 because it's clear that these issues are going to be

18 relitigated if there are additional notices served in the

19 future.

20          MR. BERNICK:  Just with respect to that, Your Honor,

21 if I could.  Early Ludwick, the reason that we took it off was

22 that we just got more information on Early Ludwick and I didn't

23 want to have an argument that was not based on the best record

24 that we could.  We can make arguments with respect to a bunch

25 of other firms but again I followed the Court's instructions to

1 proceed with individual firms and I'm happy to have Ms.

2 Ramsey's input today and she's given the input but I do not

3 want to have Early Ludwick then be able to come back and say

4 today was it.  Because I didn't argue Early Ludwick.  There's a

5 lot of information in Early Ludwick that Your Honor should

6 know.

7         MS. RAMSEY:  And Your Honor we similarly, I want the

8 record to reflect that we take the position that the Court has

9 already ruled on a deposition of Early Ludwick and so we would

10 also argue that at the appropriate time.

11         THE COURT:  I intend to make rulings that are going

12 to essentially set the tone by which I expect I will continue

13 to make appropriate or similar rulings in similar

14 circumstances.  I have attempted, I'm not sure I've always

15 succeeded, but I am attempting to keep the same rulings

16 throughout the case when the circumstances are the same.

17         So whatever these rulings are unless there is a

18 significantly different issue that pops up at some point in the

19 future, these rulings will undoubtedly be the same unless

20 somebody can show me why they should not apply to other

21 circumstances.  This law of the case will apply to other firms.

22         All right, who is representing Kelley & Ferraro?  Do

23 you -- you have not said anything, sir.  Do you wish to be

24 bound by anybody's argument?  Do you want to make your own

25 argument here?

1           MR. WILSON:  Your Honor, we would --

2           THE COURT:  I need -- I apologize but you have to use

3 a microphone and enter your appearance, it is on the record.

4           MR. WILSON:  For the record, Tom Wilson, Kelley &

5 Ferraro claimants, Your Honor.  At this point we would accept

6 and bring in any of the arguments set forth by Ms. Ramsey, Mr.

7 Esserman and Mr. Finch.

8           THE COURT:  All right.  Thank you.

9           MR. BERNICK:  I'm sorry, can we know whether the

10 Kelley & Ferraro firm has filed a 29 statement?

11          MR. WILSON:  I believe we have, Your Honor.  That

12 would be my understanding.  We do that normally in the normal

13 course.

14          THE COURT:  All right.  If not, I think you are going

15 to need to if that's the case.  Okay, who is on the phone

16 please for Motley Rice?

17          MR. HERRICK:  Your Honor, it's John Herrick.

18          THE COURT:  Mr. Herrick, is there anything you need

19 to say on behalf of Motley Rice that has not already been

20 stated by Ms. Ramsey, Mr. Finch, Mr. Malady or Mr. Esserman?

21          MR. HERRICK:  Well, Your Honor, I would simply

22 apologize to the Court for not being there personally.  This

23 case has been, as Mr. Finch has already mentioned, has taken a

24 lot of money and time from my firm.  Your Honor, Motley Rice is

25 simply tired of being yolked up to the debtor's discovery cart

1  and whipped by their able counsel.  So we would like to get

2  this discovery finalized.

3        I know counsel thinks we're trying to hide the ball

4  or whatever but Your Honor what we're trying to do is avoid

5  spending all the time, effort and money needed to respond to

6  Grace's voluminous requests.

7        I conferred with counsel including Mr. Esserman and

8  Ms. Ramsey last night and I concur with what they have said and

9  we would also rest on our papers.  Thank you very much.

10        THE COURT:  All right.  Then as to the four firms

11 that are involved, number one it appears to me that the

12 appropriate way to begin this process is by a ruling from the

13 Court that any responses will not waive the attorney client

14 privilege or the work product for which that the responses will

15 be available for use by any and all experts in this case in the

16 Grace bankruptcy case and for no other purpose consistent with

17 the other rulings that I've made in this proceeding.

18        I take it Mr. Bernick that will not cause any problem

19 for the debtor and the use of the information that the debtor

20 expects to make in this proceeding. Is that correct?

21        MR. BERNICK:  That's correct.  I think we've been

22 very systematic about not displaying individual identifying

23 information of any kind during the course of this process.

24 Obviously the statistics that come out of this are then -- do

25 become used.  So --

1          THE COURT:  The statistics shouldn't cause a problem

2    for work product or attorney client information.  So all right,

3    so that is the ruling of the Court.  Responses will not

4    constitute a waiver of the attorney client privilege or the

5    work product privilege to the extent that responses are

6    provided.

7          Secondly, with respect to, and I'll call it Ms.

8    Ramsey's proffer because she's the person who articulated it,

9    it seems to me that by beginning with either and I at this

10   point am not making rulings, I'm throwing this out for

11   discussion.  By starting a deposition or interrogatories,

12   whichever, with the four areas that Ms. Ramsey has identified

13   Mr. Bernick it seems to me that that is getting to the guts of

14   what the debtor is attempting -- the information the debtor is

15   attempting to get.

16         Frankly, I'm not totally convinced that this

17   discovery is going to advance the ball forward but I have been

18   also consistent in this proceeding in letting the debtor

19   attempt to prove its case, its way.  If the debtor wants to get

20   this information we are very close to the end of this process

21   and I'm going to let the debtor get this information.  But it

22   does seem to me that an effort to minimize the cost and the

23   inconvenience and the hassle and whatever other negative words

24   you want to put on this process ought to be advanced by the

25   debtor.  If it can be done by written interrogatory, I suggest

74

1 it should be done that way.  If it can be done by limited

2 depositions so that there is a time frame and limited questions

3 that will not cause, I'll use the word fight, a fight and

4 argument among the participants, then I think that is all right

5 too.

6        But it seems to me that the four areas that Ms.

7 Ramsey identified really are the four areas that the debtor is

8 attempting to get to.  Do you agree with that Mr. Bernick, that

9 those are the four basic areas?

10        MR. BERNICK:  I think that the articulations, I'm not

11 sure that I remember well enough or have taken notes well

12 enough to be able to sign off on the articulation.  The

13 questions basically have to do with what processes did you

14 follow in filling out the questionnaire, what processes did you

15 follow in determining which of the B reads were being withheld.

16 And then what we have specified with respect to the

17 questionnaires is very specifically exposure to Grace product

18 and exposure to other product.  Those are the areas that we

19 want.

20        We sent those in our interrogatories.  We continue to

21 believe that they are appropriate.  But Your Honor they were

22 proffered by the other side only they just now which is fine.

23 But being solely to answers to the interrogatories and the

24 whole purpose for having depositions is to be able to explore

25 those areas.  If Your Honor -- what they are suggesting is that

1  we have to make do with how they provide the answers and then

2  come back.  That is a recipe much more than anything else for

3  just what we have here today which is motion practice on the

4  interrogatories.

5       THE COURT:  Well here's the problem, Mr. Bernick, and

6  that is I agree with the proposition that the individual

7  claimants have not had discovery against Grace and their

8  claims, the individual claimants claims, are not worked up for

9  trial.  And you know as trial lawyers sometimes you do have

10 basic information about the -- about "exposure".  You know you

11 worked at a Grace facility or you know you worked at a facility

12 where Grace product, as far as you know, was in place.  But

13 that doesn't mean that you have all of the information that you

14 would have if you were proving your individual claim.

15      If what you are doing is asking lawyers what

16 information they have in their files as of a particular date

17 that's fine.  But I don't think you are going to get a negative

18 inference from this Court that indicates that that is the means

19 all and end all without someone else having an opportunity t5o

20 take a look at other information if the individual were proving

21 a claim.  That's not the purpose of this estimation proceeding.

22      So in that sense the discovery is not going to be

23 relevant for the purpose that you are asking for it.

24      MR. BERNICK:  Your Honor, to be very clear, I think

25 Your Honor has, and again I'll take responsibility for this,

1  misapprehended what we've asked for very plainly and very

2  simply.  And what we've asked for very plainly and simply and

3  it is only given the track record here going to come out if we

4  are permitted to ask these questions and probe the subject

5  matter is not counsel's speculation of what they might be able

6  to obtain in the future.  We're not asking for that, nor are we

7  hiding our head in the sand that they are going to say well

8  there's more that we would have been able to obtain with

9  respect to Grace.

10           We will answer that question very directly and very

11 specifically and establish that with respect to these law

12 firms, this litigation has been ongoing for decades and they

13 know huge amounts of information about everywhere that Grace's

14 product was.  They've got massive experience with the

15 particular facilities as to which they say these people were

16 employed.

17           So there's not going to be a situation.  We've heard

18 a lot of while we work it up for trial, we're going to answer

19 that directly.  But that has nothing to do with the discovery

20 that we're conducting, nothing.  What we want to know is what

21 it is that they already have.

22           THE COURT:  That's fine.

23           MR. BERNICK:  If --

24           THE COURT:  As long as the question is limited to

25 what do you already have in your file, that's fine.  That's

1  fine.  That is an appropriate question.  You may ask that

2  question.  What I am suggesting however is that the next step,

3  i.e. that a negative inference can be drawn about the fact that

4  there is nothing else out there may not be appropriate and if

5  you are going to ask for it, you are going to have to give me

6  some hard and fast law that allows me to make what I consider

7  to be a giant leap from earth to the moon on that point.

8        MR. BERNICK:  Your Honor, again you say that and I'll

9  respond only because your -- the strength of your words

10  suggests that it is some kind of an impossible task.  We're not

11  asking for that inference.

12        THE COURT:  No, it's not impossible.  Man has gone to

13  the moon but you've got an uphill burden, Mr. Bernick.

14        MR. BERNICK:  I would imagine it would run something

15  like this.  Let me get this distracted with it because it is

16  now before the Court.  It goes something like this.

17        They say that individual X worked at Y facility.

18  They conducted great discovery of Grace with respect to that

19  facility and they know what Grace product was there.  They

20  already know it because they've been litigating that facility

21  for the better part of 10 years before the bankruptcy.

22        They know where this person worked in that facility.

23  They know what job that person had at that facility.  And at

24  the time that the bankruptcy case was filed, they are

25  completely versed in the environment that might or might not

1  include asbestos with respect to that individual.  What if our

2  proofs were that the litigation is precisely that mature

3  because tens and hundreds of thousands of claims have been

4  litigated?

5           But the fact that that point, that they can't produce

6  any evidence is not even negative inference.  It's just not

7  there.  The case is not there.  And they can speculate, they

8  might have been able to do better if they had more discovery.

9           THE COURT:  And you can speculate that you might have

10 been able to do worse had you had less discovery.

11          MR. BERNICK:  But I don't have to speculate because

12 at that point they had the discovery and we would say there is

13 nothing further discovery is going to show.  But -- the

14 question of what might have happened in these cases could

15 either (a) be speculative or (b) could be very concrete based

16 upon litigation history.

17          The question of what the law firms and their clients

18 know as of the time that the question is being answered, the

19 question of what they know is a factual question.  That goes to

20 what the law firm knows, what the claimant knows including what

21 the claimant knows through other folks as to whom their

22 documents are in the possession, custody and control of the

23 claimant.

24          Thus far, we've gotten limited information, we've

25 gotten non-answers, we've gotten objections, we've gotten --

1          THE COURT:  Okay, okay.

2          MR. BERNICK:  Well I'm sorry, Your Honor, where I

3 come from -- where I come from that is a dereliction of

4 responsibility and most courts that I have been before like

5 Your Honor issues orders and then stands by the orders and say

6 you've got to comply and it's not up to you to determine

7 whether you comply.  You just comply.

8          So with respect to the areas that Ms. Ramsey has

9 identified we do want to ask questions but we do not want to be

10 hamstrung by having to deal with paper discovery alone.  The

11 time may come when we may move to compel and they move for

12 sanctions.  If Your Honor is laying out the beginnings of the

13 groundwork for going forward here, the most important thing is

14 to get the testimony of people who know the facts under oath

15 without the prior restraint of you only get this or you only

16 get this, just like they did with respect to the Grace people

17 in repeatedly in this case --

18          THE COURT:  Mr. Bernick, all right.  You are arguing

19 and I'm not sure about what.  I asked a very simple question, I

20 made a very simple statement, that's all.  If you want rulings

21 then we need to get passed this.  The argument time is over and

22 we're passed the hour and few minutes that I gave for this.

23 Mr. Finch.

24          MR. FINCH:  May I make a very concrete suggestion

25 that would probably end a lot of this?  My suggestion is that

1 they get back the answers to interrogatories that the firms

2 have said they would respond to.  And then if they want to come

3 back and decide whether or not depositions are necessary.  They

4 then come back.  But the Court said, excuse me Your Honor, a

5 hard cap of 20 fact witness depositions per side.

6          If they want to use, they've taken 15 by my count.

7 If they want to use four of their five remaining left to go to

8 depose each firm that's fine.  But the issue that my papers

9 raised and Mr. Malady's papers raised was we don't want to be

10 going around in repetition --

11          THE COURT:  Yes, I am going to set a cap on the

12 number of depositions on all sides, yes.  The rules of civil

13 procedure have already set them and to the extent they've been

14 exceeded nobody has asked for authority to vary them.  This

15 case is not that unusual, it's just another case.  There is no

16 reason in this Court's view why massive numbers need to be

17 taken.  So yes, I think that is appropriate.

18          MR. FINCH:  Thank you, Your Honor.

19          MR. BERNICK:  Excuse me, this is now being

20 selectively invoked with respect to this issue.  All sides will

21 exceed the 10 depositions in this case.  We know that right

22 now.

23          THE COURT:  Yes.

24          MR. BERNICK:  So if we want to have in connection

25 with the omnibus proceeding in July a further cap the debtor

1  has no objection to proceeding in that fashion.  The Court can

2  make a determination in that respect.  But now is not the time,

3  post-fact of this issue to be using a cap now selectively to

4  say that somehow we can't get what we're entitled to get.

5       THE COURT:  Well I think the issue of starting with

6  the interrogatories since it will take two weeks from Friday to

7  get those questions answered is a good one.  But what I am

8  going to do is continue this request for the depositions until

9  -- when is the next omnibus?

10       MS. BAER: July 23rd.

11       UNIDENTIFIED SPEAKER:  July 23rd, Your Honor.

12       THE COURT:  I'll give you -- I'm sorry.  I'll give

13  you a date in the meantime that is close to the date of the

14  interrogatory time frame.  If you will get through the

15  interrogatories between then and July 23rd.  Why don't you take

16  a minute and see what you --

17       MR. BERNICK:  If that is the proposal then I have --

18  I need to confer with my client.  This is going to produce an

19  enormous problem in this case particularly given the time

20  constraints that were on.  I have -- at this point I have to be

21  concerned about my record because this is absolutely a critical

22  feature of this case and Your Honor is now ruling with respect

23  to all the firms that are not here, with respect to all kinds

24  of --

25       THE COURT:  No I'm ruling as to the four that you've

1  asked for.  I'm not sure I'm going to permit beyond these four,

2  Mr. Bernick.  I mean, enough is enough.

3        MR. BERNICK:  I haven't gotten anything by way of

4  answers to any of these things.

5        THE COURT:  I understand.  And I'm going to order as

6  to these four firms all of whom are represented here today and

7  all of whom have said on this record that they will produce the

8  responses to the interrogatories provided that the Court issued

9  the non-waiver order which I had just issued on this order that

10  they will produce full and complete responses.  I will hold

11  them to this.  I expect full and complete responses.  If you

12  don't get it, I'm continuing this motion and then you will get

13  your depositions.

14        MR. BERNICK:  Then I at this point, Your Honor, again

15  I don't mean to show any disrespect to the Court but I don't

16  know what it is that we are going to get in two weeks.  If the

17  question was this imposes well what did you do to comply with

18  the interrogatory answers, that is a classic open-ended

19  question that the counsel for the respondent would ask.

20        THE COURT:  I have a nice conference room Mr. Bernick

21  and I suggest that at the end of this next motion when we set

22  the schedule, you folks may go use it and you can work out the

23  specific interrogatory questions.  I'll be here so if there are

24  any objections you can come in and get me.  We'll go back on

25  the record and I'll make rulings and by the end of the day

1 you'll have the interrogatories.

2          MR. BERNICK:  Okay well then I would suggest then --

3 if I can ask what is Your Honor's schedule is today.

4          THE COURT:  I am here.

5          MR. BERNICK:  Okay, then what I would ask is that the

6 Court direct the counsel and I guess Mr. Herrick is going to

7 have to participate by phone to meet and confer with respect to

8 the interrogatories that are going to be answered under oath

9 that can be verified or not verified by the claimant.

10          THE COURT:  Well the claimant, I mean if you are

11 going to have verifications by the claimant, you are never

12 going to get this done in two weeks.  You wouldn't have

13 verifications by the claimant if there were depositions.  This

14 isn't an interrogatory directed to the claimants; this is the

15 deposition of counsel.

16          MR. BERNICK:  I'm getting frustrated and I should

17 stop.  It is an interrogatory directed to the claimants.  That

18 is specifically what Your Honor authorized with respect to the

19 privileged predicate interrogatory was that it was --

20          THE COURT:  What I'm saying, pardon me Mr. Bernick,

21 what I'm attempting to do is start the deposition process in

22 lieu of the deposition with a written interrogatory in lieu of

23 deposition to counsel, not to the claimants.  So yes they will

24 be answered under oath by the representative of the law firm

25 that will be responding in lieu of the deposition.  And to the

1 extent that the interrogatories are not fully and completely

2 answered, I will permit the depositions.

3          So I will give you a date and I'll go find one.  What

4 I need to know from you is how much time after the responses

5 come in you need to assess whether or not they are full and

6 complete answers so that we can have a status conference.

7 Because I understand that your rebuttal reports are due August

8 8 and July 23rd doesn't give you much time to try to schedule

9 depositions.  I will make myself available  for a status

10 conference to discuss this at whatever time you need after the

11 responses come in so that it gives you as much time as possible

12 to schedule depositions.  I am ordering the law firms to have a

13 witness available in the event that the debtor asks for it.

14 The Court orders it.

15          So that will be the condition.  So if the answers are

16 not full and complete folks you will have to have a deponent

17 available.

18          MR. ESSERMAN:  That's fine, Your Honor.

19          THE COURT:  So when -- I guess I'll give you a little

20 bit of a recess so you can figure out what the interrogatories

21 will be and how much time the debtor needs to assess them so

22 that I can then give you a status conference date to address

23 whether or not some further proceedings will be needed.

24          MR. FINCH:  Your Honor, can we, before we recess for

25 that purpose, can we take up the second matter which is the

1  schedule.

2          THE COURT: Oh, yes.

3          MR. FINCH:  Which I think --

4          MR. BERNICK:  I would actually prefer if we could

5  take that after we had the opportunity to confer because this

6  is now effecting the schedule.

7          THE COURT:  I don't think it's going to effect the

8  schedule.  The issue as I understand the schedule is there are

9  two.  One is should fact discovery end at the same time as

10 expert discovery.  My answer to that is no.  It should end

11 sooner.  So you folks pick a date while you are meeting and

12 conferring because fact discovery should end sooner so that

13 your experts have the opportunity to assess whatever facts they

14 need in order to figure out what their reports need.  So that

15 is my answer to that one.

16         MR. BERNICK:  I think a great disrespect -- again, I

17 think it is very disrespectful.  I can't hear because there is

18 laughter and conversation over here.

19         THE COURT:  All right.  Gentlemen, hold it down.

20 That's my answer.  What was the second issue?  There was a

21 second issue.

22         MR. BERNICK:  Well that issue Your Honor, if you are

23 cutting off fact discovery, then that is also something we are

24 going to have to deal with because there is substantial

25 outstanding fact discovery and the question is, you know, when

1  is the cutoff going to be.  So if the cutoff is going to be in

2  time for us to do the discovery that we've already noticed and

3  are proceeding with, we are going to have to push the date for

4  the expert discovery back because the fact discovery is just

5  not going to get done.

6        MR. FINCH:  Your Honor, I would suggest that fact

7  discovery cutoff of September 30th and an expert discovery

8  cutoff of November 15th.

9        MR. BERNICK:  Well I can't -- I'm not prepared to

10  address that now.  I have to consult with my client and find

11  out what impact that will have because franklin this is the

12  first time that there's been a -- the  proposal that Mr. Finch

13  made just now is different from the proposal that he made

14  before.

15        THE COURT:  Okay, well you are going to have a meet

16  and confer.  Why don't you take the opportunity to talk to you

17  respective clients and see if that is acceptable.  If it isn't

18  then I'll give you a recess period.  I'll tell you what time to

19  come back to Court and we'll address the issue.

20        What was the second issue?

21        MR. FINCH:  The second issue Your Honor was the

22  question of -- Mr. Malady and I I thought had resolved the

23  second issue except in one respect.  It related to the timing

24  of Daubert type stuff.

25        THE COURT:  That's right.

1          MR. FINCH:  The proposal was that we would have

2   Daubert motions briefed such that the briefing was completed by

3   December 21, 2007 and then any argument about the Daubert

4   motions would be limited to lawyer arguments, 90 minutes per

5   side, and it would not involve calling the witnesses to come

6   for a separate Daubert hearing which is normally in a jury

7   trial, you have a Rule 104 hearing and you bring the experts,

8   you cross examine them.  Give that this is a bench trial, we

9   would limit it to lawyer argument of 90 minute per side.  And

10  the question of when that hearing would be held was left to

11  your Court's discretion and preference.

12          It's my view that, you know, this hearing can be

13  something that you could take up at the conclusion of hearing

14  the expert testimony.  You could take it up as we did in the

15  other asbestos estimation cases as part of post trial.  If Your

16  Honor wants to do it at the first day of trial, I basically

17  leave it to Your Honor.

18          I think in a bench trial it makes more sense kind of

19  the way we did it in Federal Mogul.  Hear all the expert

20  testimony  but cross et cetera, then have if there is a Daubert

21  argument about that expert afterwards then you can just strike

22  the testimony or limit it or whatever rather than having it you

23  know taking a half a day or a day at the outset of the trial.

24  But it's left to -- under my deal with Mr. Bernick it's left to

25  Your Honor's preference as to when you would like to do that.

1  But the deal was that they would be fully briefed by December

2  22nd and any sort of arguments about Daubert for, you know,

3  total would be 90 minutes per side and it doesn't involve

4  having a separate evidentiary hearing with the experts.

5          Does that capture our agreement Mr. Bernick?

6          MR. BERNICK:  No.

7          MR. FINCH:  How does it differ from my email last

8  night?

9          MR. BERNICK:  Please Your Honor, if I can address the

10  issue.  The Daubert issue Your Honor previously indicated could

11  be heard before the trial actually commenced beginning some

12  time in January.

13          THE COURT:  Could you put the microphone closer Mr.

14  Bernick?

15          MR. BERNICK:  I'm sorry.  The Daubert proceeding Your

16  Honor previously indicated should be held prior to the time

17  that the trial takes place.  In an effort to reach agreement

18  with the other side regarding Daubert we agreed that we would

19  not be calling any witnesses to testify in connection with the

20  Daubert proceeding.  Their expert reports and their expert

21  depositions that will be available to the Court and can be

22  furnished to the Court through a Daubert brief.

23          So we have no quarrel with the idea that we don't

24  need to call witnesses prior to the trial.  However, Daubert is

25  a threshold issue.  It is an issue that the Court could decide

1 later on but is an issue that must be timely raised before the

2 trial.  And Your Honor in all of my experience in Daubert

3 proceedings and this is typically I believe the way it is

4 handled, and the fact that it is a bench trial does not make a

5 difference, the whole purpose of Daubert is to provide

6 information to the Court that the Court can consider as the

7 trial proceeds and make determinations.

8          Sometimes judges hear all the Daubert motions in

9 advance, wait for a wtiness to take the stand and then make a

10 determination before the witness takes the stand or even after

11 an examination that certain testimony will come in or not.  But

12 it is critical to have the Court informed about the nature of

13 the Daubert issues in this case.

14          This case involves very complex modeling issues.

15 They are modeling issues that are extremely important from the

16 debtor's point of view.  We don't believe that they have been

17 subjected to a meaningful Daubert scrutiny in this case.  We

18 know that that is true.  We don't believe they have been

19 subjected to a meaningful Daubert scrutiny in other cases.  We

20 have very important evidence to offer in that respect.

21          I would think that Your Honor would (a) want a brief

22 on that before the trial occurs and (b) want to hear argument

23 before the trial occurs.  All that we want is to assure that

24 there is the opportunity to have both the brief and the

25 argument before the trial occurs so that Your Honor can

1 understand what our basic position is.  I don't have a problem

2 with having 90 minutes per side.  I think that is probably more

3 than adequate.

4           THE COURT:  Okay.  Well I think that is substantially

5 the same.  I guess the only question is the September 22nd date

6 for filing the briefs.

7           MR. FINCH:  No it's December 21st.  It is

8 substantially -- Your Honor, this is --

9           THE COURT:  I'm sorry, I thought you said September

10 22nd.

11          MR. FINCH:  December.  That the issue would be fully

12 briefed by December 21st such that you would file any Daubert

13 motions on November 30 I think is the last day of November and

14 then responses would be due on December 21st.  So they would be

15 fully briefed to the Court in advance of how the Court wants to

16 proceed.

17          My proposal was if you left up to the Court as to

18 when you would hear Daubert type arguments and Mr. Bernick

19 wants to do it the first day or advance of the trial and in my

20 view it is something that can be taken up either as post -- as

21 part of the post trial closing argument or following the expert

22 testimony after you have heard all the expert testimony.

23          THE COURT:  Well I'm not opposed to having the

24 motions and the briefs filed before trial.  In fact I think I

25 prefer that since the debtors -- I haven't seen, as you know,

1 Mr. Florence's report yet so I don't know what it is going to

2 say.  I'm certainly not familiar with the type of report that

3 the equity committee's expert is going to file.

4       So it may be helpful in this instance particularly to

5 have the motions and the briefs filed in advance of trial.  I'm

6 not opposed to having the arguments in advance of the trial

7 either.  Probably what you are going to get from me though is a

8 deferral until after the witnesses testify as to rulings

9 because I think I will want to find out in the whole context,

10 the picture of the case, all of the rulings.

11       I don't understand that there are standing issues and

12 that type of thing in this case as there are in others.  But

13 nonetheless to the extent that sometimes those issues are

14 informed by what actually happens in the trial I probably will

15 make rulings at the conclusion.  But I think I would like to

16 have the arguments in advance.  I think in this case it would

17 be helpful to do that.

18       So if -- I'm sorry, when is the trial actually going

19 to start now?

20       MR. FINCH:  It's supposed to start on January 14,

21 2008.

22       THE COURT:  Are you opposed to doing the arguments in

23 advanced?

24       MR. FINCH:  No.  I think the better practice is to do

25 it later but I would propose that we start, maybe start the

1  hearing with the arguments.  I don't know -- what I don't know,

2  I haven't talked to my other clients.  I don't know what my

3  schedule is for those first two weeks of January whether I or

4  Mr. Insulbach (phonetic) are available before January 14th.  We

5  cleared the dates that the Court sent around.  We did not hold

6  dates in the first two weeks of January and without being back

7  in my office I don't know if I've got any dates those two

8  weeks.

9       MR. BERNICK:  We don't have a problem if we take the

10 first day of the trial and devote the first part of the first

11 day of the trial to Daubert arguments.

12      MR. FINCH:  What I would suggest is the first 90

13 minutes -- you mean the 90 minutes per side to be Daubert and

14 then the afternoon would be openings if the Court is inclined

15 to hear openings, brief openings, limited.

16      MR. BERNICK:  We're not here, I don't think Your

17 Honor, today to talk about how the openings are going to take

18 place or anything else.

19      MR. FINCH:  Okay, fine.

20      MR. BERNICK:  We're here to talk about the Daubert

21 proceedings.

22      MR. FINCH:  Okay, fine.  I --

23      THE COURT:  Well I have one other thing that may help

24 if I can make a phone call and verify this with my staff which

25 I'll have to do.  Right now my Chapter 13 day is scheduled for

1  January 9.  If I can push that to the 10th which is Thursday

2  and you want to be heard the 7th, 8th and 9th, we could

3  potentially do the Daubert motions and the openings on the 7th

4  and then start the evidence on the 8th and I can also give you

5  the 9th if you want two days of evidence that week.

6          MR. FINCH:  The problem Your Honor is I don't know

7  right now whether that works for Mr. Insulbach and myself.  I

8  won't be able to find that out until I don't know how long

9  we're here, late today or tomorrow.

10         THE COURT:  Okay.  Well I don't want to make a change

11 in my Chapter 13 calendar until I know because that's a lot of

12 people who are involved in making that change.  So I need to

13 find out from you first, all of you, whether that is something

14 that --

15         MR. FINCH:  So the question is whether January 7th,

16 8th and 9th are available as dates to begin the hearing,

17 effectively beginning the hearing with the Daubert argument and

18 then start taking evidence the next day.

19         THE COURT:  Right.  I'm not opposed to starting on

20 January 7th with the argument, let's put it that way.  And I

21 think I had plenty of dates built into this schedule.  I asked

22 Ms. Baer to add some extra dates so I'm not really sure you

23 need the 9th anyway.  I think we we've got plenty of dates

24 added in this schedule so that this trial should get finished

25 on time.

1          MR. FINCH:  But I guess what I would like is if it

2    turns out that either I or Mr. Insulbach aren't available on

3    the 7th, 8th and 9th and something in my mind tells me I've got

4    something else.  I just can't -- my secretary keepS --

5          THE COURT:  Well the 7th and 8th are already set for

6    trial and I'm not changing those dates.

7          MR. FINCH:  I thought -- no it's the 14th.  No, it's

8    not Your Honor.

9          THE COURT:  Oh, oh, I'm sorry. I apologize.

10          MR. FINCH:  No, it's the 14th.

11          THE COURT:  Oh, I'm looking at the wrong week.  Well

12    you've already got the 14th, 15th and 16th.

13          MR. FINCH:  Right.

14          THE COURT: Okay, that's fine.

15          MR. FINCH:  So why don't we just start it with the

16    14th with the Daubert argument?

17          THE COURT:  That's fine with me but I can't add an

18    extra day that week.

19          MR. FINCH:  I understand.  It is what it is.

20          THE COURT:  That's fine.  If that's all right with

21    you Mr. Bernick, we'll just do the arguments the morning of the

22    14th.

23          MR. BERNICK:  That's fine.

24          THE COURT:  All right.

25          MR. FINCH:  The only remaining issue on the schedule

1  is the deadline for fact and expert discovery.  The order that

2  the Court has already signed there is an expert discovery

3  deadline of October 31st, fact discovery deadline to be

4  determined but in no event to exceed the expert discovery

5  deadline.  Given that the Daubert briefs are going to be due

6  November the 30th, I think you have to have a expert discovery

7  cutoff no later than November 15th so that you get the

8  transcripts back from the last deposition so you can put it

9  into your briefs.

10        Therefore, my proposal and suggestion is that you

11  have an expert discovery cutoff of November 15 and a fact

12  discovery cutoff of September 30th which is --

13        THE COURT:  Well Mr. Bernick said he needed to check

14  with some folks.  So while you are doing your meet and confer I

15  think he will have an opportunity to check and --

16        MR. BERNICK:  Our greater concern though, Your Honor,

17  frankly I don't think it is really necessary to have more time

18  for the expert discovery.  I think in fact the more that we

19  adhere to the schedule that we have, the better chance we have

20  of getting done with this thing.

21        I obviously take issue with the proposition that our

22  experts must actually look at or directly rely upon a fact for

23  that fact to be relevant to this estimation.  There are all

24  kinds of evidence that will be relevant to this estimation that

25  will come in from fact witnesses and other people that the

1  experts may never see and the data they may never see.  But it
2  bears upon the predicates for their testimony.

3        I can have an expert make an assumption as Dr.
4  Florence has made.  He can make 15 assumptions and never have
5  any contact with the evidence.  And the evidence can come in
6  long after his report is done and bear upon those different
7  assumptions.  That is exactly what we had intended to do.  So
8  the impact Your Honor of moving up the date for the fact
9  discovery cutoff simply is just like what we heard in
10  connection with the cap on depositions.

11        Grace as a party is facing multiple constituencies
12  all of whom have the ability to call different witnesses and do
13  different things.  Grace is one debtor.  We have taken a
14  certain number of depositions of third parties, doctors and
15  trusts.  We're pursuing those and Your Honor knows about that
16  and why that is taking place.  We are pursuing discovery
17  against the law firms, that is of critical importance to us
18  because they have the core of the information that is available
19  here.

20        We have experts.  So to have either a deadline or a
21  cap that is set as if Grace is just like any other party has
22  the effect of biasing the this proceeding in terms of discovery
23  against Grace.  I know that is not Your Honor's intention but
24  that is the effect if those caps are held to Grace without
25  consideration of all the different factors.

1          THE COURT:  I don't intend to set caps without

2     consideration of whatever factors you want to give me but I do

3     intend to set caps.

4          MR. BERNICK:  We have no problem with that and with

5     respect to the timing it is the same thing.  We physically have

6     to get the discovery done and all that I suggest, what we

7     suggested before we came here was very simply, which is that we

8     would get that fact discovery done by October 31st.  Any part

9     of that that we have to use in connection with an expert report

10    would have to be done really sooner to have the experts be able

11    to talk about it in connection with their depositions.

12         So the whole idea was to have the experts do their

13    work, do the analysis even though there are certain facts that

14    would be relevant to the assumptions that they've made and made

15    explicitly that would continue on after their expert reports

16    are done.

17         THE COURT:  Well it's possible that perhaps your fact

18    discovery can still end October 31st and your expert discovery

19    can end November 15th.  It doesn't seem, if your fact discovery

20    is going to end that soon and your supplemental expert reports

21    are due August 8th as it is, that you're going to have that

22    much expert discovery.

23         MR. FINCH:  Your Honor, if that is the proposal that

24    the fact discovery end October 31st and the expert discovery

25    end November 15th my client at least would live with that.

1          MR. BERNICK:  This is the difficulty Your Honor is

2  that if we have the expert discovery now extend to November

3  15th then we are going to have a whole series of other issues

4  about the --

5          THE COURT:  Well Mr. Bernick, you folks go talk about

6  it.  My ruling is very simple.  Fact discovery is to end before

7  the expert discovery so that all parties know what facts the

8  experts will include.  It can be a week before, it can be three

9  days before, I don't care.   You folks figure out a date but it

10  has to be before.  That's my ruling.  You folks go figure it

11  out.

12          MR. BERNICK:  We'll work to pursue that and see if we

13  can come to some agreement.  I'm trying to craft the questions

14  that will -- so we're prepared to sit down and talk about it

15  right now.

16          THE COURT:  All right.  How much time would you like

17  for a recess and I will be back to hear what your, hopefully,

18  agreement is?

19          MR. BERNICK:  I would -- I don't know what Your

20  Honor's schedule is.  I think we could benefit from having

21  about 45 minutes to an hour.  Then I think we'd be ready to see

22  what we can report to the Court.

23          THE COURT:  An hour, 45 minutes.  Noon.  I'll be back

24  and noon and see where you've --

25          MR. BERNICK:  It is all right if we -- I'm sorry,

1  Your Honor.  Is it all right if we use this room?

2           THE COURT:  Yes, absolutely and if you are done

3  sooner, just come around the chambers and knock on the door and

4  I'll come in.  I'll be here.

5           MR. BERNICK:  Thank you.

6           THE COURT:  Thank you.

7                         (Recess)

8           THE COURT:  Mr. Bernick.

9           MR. BERNICK:  Yes, I'm sorry to keep Your Honor

10 waiting.  We were trying to actually write something up that we

11 could then distribute and that would be in somewhat legible

12 form.  Of course that foreclosed the possibility that I might

13 be the actual scrivener for it.  So it took us a little time to

14 put together.

15          We have spent some time.  I think we've reached an

16 agreement with respect to the scheduling aspect of the case

17 management process.  Mr. Finch proposed that we have a fact

18 discovery cutoff on the 31st of October and then an expert

19 discovery cutoff on the 15th of November which would be two

20 weeks later.  That is satisfactory with the debtor at least.

21          I understand it is satisfactory to the committees

22 although I don't know they are prepared to say?

23          UNIDENTIFIED SPEAKER:  Yes, Your Honor.  That's

24 correct.

25          MR. BERNICK:  All right.  If that is satisfactory to

1  the Court.

2          THE COURT:  That's fine.

3          MR. BERNICK:  Okay.  With respect to the, as you

4  said, beginning the process, we've had written out here ten

5  questions, some of them with sub-parts.  We just got done

6  literally writing them out.  What I would propose is that if we

7  could have a copy made, maybe a couple copies made, and then we

8  could furnish the copies to counsel and perhaps to the Court at

9  the same time so that everybody can review it at the same time

10 and then just kind of walk through it.

11         I can't think of a better way to do it.  I apologize

12 for inartful language, incompleteness and the like.  It was

13 just what we could do in the period of time we had.  But I

14 think it gets us to the point where Your Honor can at least see

15 what we have on the table.

16         THE COURT:  All right.  Have you talked to --

17         MR. BERNICK:  No, I just literally just got back in

18 so the idea is that they would look at it at the same time that

19 Your Honor looked at it.

20         THE COURT:  Okay, that's fine.

21         MR. BERNICK:  I think that would just save time.  So

22 if I could ask --

23         THE COURT:  With respect to the scheduling order, are

24 you going to submit a revised order then so all parties will

25 have notice including the parties who are not here?

1          MR. BERNICK:  I think that would be appropriate, Your

2    Honor.

3          THE COURT:  Okay so that was I think Item 2 on

4    today's agenda.

5          MS. BAER:  It's actually Item 6, the first five of

6    the motion.

7          THE COURT:  Oh, okay.  Thank you.

8          MR. BERNICK:  Let me, while those copies are being

9    made, in terms of process, if we got email answers to these

10   interrogatories on the 13th of July.  What day of the week is

11   that, I'm sorry?

12         UNIDENTIFIED SPEAKER:  Friday.

13         MR. BERNICK:  That is Friday, Friday the 13th.  I

14   think we would be able to apprize the Court of our view about

15   whether we need to go forward with the depositions.  And I

16   again won't make any prediction about that, really by the early

17   part of next week.  If we were talking about four firms and

18   it's not going to take very long over the weekend to read the

19   things, so it would be possible for us to report to the Court

20   at the Court's convenience the following week.

21         I would also urge that, well, part of our proposal is

22   going to entail bring up to the same point of completeness a

23   couple of the other firms because by that time we should have

24   received the responses from Weitz and Luxenburg and we will

25   have had the time to review the additional materials on Brayton

1  Purcell and Early Ludwick.  So we would also be able to bring

2  to the Court's attention where we are with respect to those

3  other firms.

4        What I'm struggling with Your Honor is that if we're

5  trying to kind of have everybody working off the same page,

6  there really are some different facts with respect to some of

7  the firms and what I'm struggling with is how to get them on

8  the same time table.  I suppose if I can ask counsel when is

9  the -- when is the Weitz and Luxenburg --

10       MS. BAER:  July 2nd.

11       MR. BERNICK:  July 2nd?  So we could probably file by

12 the end of the week of July 4th week which I guess would be the

13 7th?

14       MS. BAER:  The 6th.

15       MR. BERNICK:  The 6th.  We could file any further

16 motions that we have with respect to depositions of additional

17 firms in order to have the record be complete so that Your

18 Honor could determine based upon the interrogatory answers and

19 also the additional matters that we bring before the Court,

20 what to do about depositions if the depositions are going to go

21 forward.

22       So I guess what I'm saying is if we got that piece of

23 paper on file by the 6th and we got --

24       THE COURT:  As to Urly and Weitz and Luxenburg?

25       MR. BERNICK:  Yes.  Urly, Weitz and Luxenburg.  Urly

1  is very greatly linked to Brayton Purcell in terms of the

2  underlying facts.  We flagged Brayton Purcell before but they

3  are still there.  They are very closely tied together but yes,

4  it would be those three firms that we would move on with

5  respect to whatever record comes out of the answers to

6  interrogatories that we get from Weitz and Luxenburg and the

7  additional materials we have now received from Early Ludwick.

8  We would file on those by Friday the 6th, perhaps the other

9  side could respond the following Friday.  Then we could have

10 before Your Honor the next week, both the interrogatory answers

11 that we've had here with respect to these four firms and also

12 the record with respect to those additional three firms.  So

13 that at least could be before Your Honor all at the same time.

14         So that would be our proposal, at least our response

15 to Your Honor's question about how quickly we could respond and

16 maybe if I could mark, what is the next exhibit 9?

17         UNIDENTIFIED SPEAKER:  Eleven.

18         MR. BERNICK:  If I could mark, Your Honor, this is

19 Exhibit 11.

20         THE COURT:  I have one.

21         MR. BERNICK:  Oh, you already have one -- the clerk

22 and other counsel as well.  I did the inter-lineations are just

23 my own inter-lineations as I went back through the questions

24 that we had written out.  Ms. Baer was good enough to write

25 them up as we developed them and then I reviewed them and the

1  additional markings are simply my own.  They don't represent

2  any input from other counsel.

3        MS. RAMSEY:  Your Honor, before we begin to address

4  the proposed interrogatories, with respect to the schedule

5  articulated for Early Ludwick, Early Ludwick has already

6  supplemented or provided to the debtor in accordance with the

7  Court's orders and our offer made at the hearing I believe on

8  May 21st, ninety percent or more of what is going to be

9  provided to the debtor.  There are a few claimants as to which

10  Early Ludwick is still accumulating materials.

11        The 6th is a significant period of time between now

12  and then in order to file any motions with respect to Early

13  Ludwick and as a matter of my personal schedule it would be

14  helpful if we could do that earlier.  I will be away and out of

15  the country in fact from the Friday, I think it's the 20th of

16  July, until early August.  To the extent that issues are going

17  to be reargued that have been addressed before, it will be very

18  difficult for someone else from my office to have the

19  background in this that I had.

20        Simply reviewing the arguments of the hearing will

21  not give them the factual background that I spent quite a bit

22  of time obtaining.  So I was also going to ask whether that

23  hearing might be taken up in August.  If so, then filing a

24  motion on the 6th would be fine.

25        MR. BERNICK:  I have no quarrel with taking up Early

1  Ludwick on a separate track.  We then want it to become -- it

2  would then become a separate track and probably also include

3  Brayton Purcell and then I would want to make sure that the

4  record with respect to that track in the rulings, while I know

5  Your Honor is going to strive for consistency, there may be

6  some differences.  That record would not be before Your Honor

7  in connection with this request for depositions.  I'm happy to

8  do that.  We can get the work done and that's more convenient

9  for Ms. Ramsey's schedule and I don't have any quarrel with

10 that.

11         THE COURT:  Are you representing Brayton Purcell too?

12         MS. RAMSEY:  No Your Honor.  In fact we disagree

13 entirely that there's a linkage between Brayton Purcell and

14 Early Ludwick other than the 19 claimants that Early Ludwick

15 took in and referred to Brayton Purcell.  I don't understand

16 why those two are being treated together and as the Court is

17 aware we've already had a substantial hearing and rulings in

18 connection with discovery directed to Early Ludwick.

19         MR. BERNICK:  Well but, I know that counsel is going

20 to argue that somehow this was all resolved.  That will be an

21 issue that will be very much, I think, contested and Your Honor

22 will take consideration of those arguments.  We're not

23 suggesting that Early Ludwick is responsible for Brayton

24 Purcell.  They are separate firms.  I believe they are

25 represented by Mr. Esserman.

1          MR. ESSERMAN:  I've represented them in other cases

2  but I don't think we've ever represented in Grace, have we?

3          MR. BERNICK:  So be that as it may if they are going

4  to have other counsel here that's fine.

5          MR. ESSERMAN:  Maybe I just don't know.

6          MR. BERNICK:  But whatever it is, we don't have a

7  problem in putting both of those firms on a different track

8  because of the different record and I think that will make it

9  possible for Ms. Ramsey to enjoy her time off.  We will then

10  file with respect to Brayton Purcell and Early Ludwick, we'll

11  make an effort to do that also by the 6th of July but it might

12  slip a little bit.  It sounds to me like if it does that's not

13  a problem for counsel for Early Ludwick in any event.  I don't

14  know if that answers Natalie's question but that's where we are

15  on that.

16          MS. RAMSEY:  Yes, Your Honor, I believe that

17  addresses my concern.  Thank you.

18          MR. BERNICK:  Would Your Honor want to take a short

19  recess to review this?  I think --

20          THE COURT:  All right.  I think it may be a good idea

21  if I do.  That way if you folks have some issues that you want

22  to discuss that may make more sense.  So I'll be -- we'll be

23  recessed for 15 minutes.  That should be enough time.  All

24  right.

25                    (Recess)

1          THE COURT:  Mr. Esserman.

2          MR. ESSERMAN:  Sandy Esserman.  Let me take a crack

3 at this.  We got this at the same time as Your Honor did.  But

4 let me make a suggestion as to how we should proceed.  Because

5 it's hard -- I think there probably is some cleanup in here.

6          What I'm going to suggest is this, Grace go back and

7 serve us with their interrogatories, these interrogatories.

8 There's going to be some cleanup I think.  They said doctor,

9 they meant B reader, other things.  But they clean them up,

10 they serve them on us.  We need to be absolutely certain that,

11 and I think that the record is clear, that there is no waiver

12 of attorney client or work product privilege by answering

13 interrogatories.

14          We will then email the answers to these

15 interrogatories on the 13th, which is the date.  And to the

16 extent that, or sooner if they are available, and to the extent

17 that the answers are insufficient or Grace doesn't like them

18 or, well Grace may not like them but if Grace thinks there is a

19 problem, we can come back here at a date and they can either

20 move for the depositions or address these things.  We think we

21 can get the information that is -- that they are requesting and

22 need and deserve by the 13th.  And they should be -- they

23 should go ahead and get these served on us.  Then we'll just

24 respond on the 13th.

25          MR. BERNICK:  If I can ask Your Honor.  I think we

1  have one other matter to raise actually in connection with

2  these.  But that's fine.  We can come back to it.  I didn't

3  hear the statement though that we weren't going to get either

4  objections or proposed changes to the scope of what is being

5  asked.  If Mr. Esserman is saying that the four firms will in

6  fact answer these questions, then I guess that's what Your

7  Honor directed that we do here today and I understand that.  I

8  didn't hear that in the statement of Mr. Esserman.

9           MR. ESSERMAN:  This is a discovery.  You are going to

10  serve it on us.  There is a motion to take all these

11  depositions which is still pending and still before the Court.

12  We have requested as an alternative that we provide information

13  in interrogatory form.  These are your interrogatories, these

14  aren't our interrogatories.  We will give you what we consider

15  to be substantive responses.  And if you think depositions and

16  the Court thinks depositions are still required or needed, you

17  are free to have that hearing and move.  We know that is an

18  issue.  We intend to respond to these interrogatories and give

19  you substantive answers.

20           I don't know what else to say other than we obviously

21  need to be protected on a waiver.  But if there is a problem or

22  you perceive that there is a problem or you don't like the

23  answers or you think you got nothing but nine objections in

24  answer, well we'll be back here in a few weeks and you are

25  going to be seeking depositions and the Court may be receptive

1  to that, with that type of response.

2          THE COURT:  Well I have already ruled that the

3  responses will not constitute a waiver of the attorney client

4  privilege or of the work product privilege.  So I do not expect

5  to see objections on those basis because I have already

6  preserved that for your clients.

7          MS. RAMSEY:  Your Honor, except that to the extent

8  that was offered it related to four topics and these may

9  require information beyond those four topics.  There are some

10  firms that have not been consulted and, again, because whatever

11  rulings the Court makes today may have implications beyond

12  today, I just wanted to make sure that the law firms are not

13  backing away from the prior offer.  But the offer to provide

14  information that invaded the work product privilege and the

15  attorney client privilege was as to the four areas we

16  identified.

17          THE COURT:  Okay.

18          MR. BERNICK:  Well I'm prepared -- I was going to say

19  Grace first of all it's not just me.  Grace is prepared to

20  acknowledge and adhere to the determination that Your Honor

21  made with regard to non-waiver with respect to all of the

22  questions that had been put here in this.  I took Your Honor's

23  remarks, I think Your Honor is basically saying that right now

24  so we don't have to deal with that down the road.

25          THE COURT:  Yes, I don't know whether the firms are

1 in a position on behalf of their clients to make an offer of

2 that waiver right now.  To the extent that the firms are

3 prepared to answer these questions provided that the Court

4 enters an order that says your attorney client privileges and

5 your work product privileges are preserved and not waived by

6 answering these questions in whatever format they are

7 eventually transmitted by the debtor to your firms, to the

8 firms that you represent.  I am so ordering.

9          So those answers will be protected.  The questions in

10 whatever format and in whatever format the answers come to

11 those questions will not constitute a waiver of either the

12 attorney client or the work product privilege.  The debtor has

13 so agreed, correct Mr. Bernick?

14          MR. BERNICK:  Correct.

15          THE COURT:  Anybody on behalf of the plan proponents,

16 plan supporters, disagree with that prospect?

17          MR. BENTLEY:  No, Your Honor.

18          MR. PASQUALE:  No, Your Honor.

19          THE COURT:  All right.  So everyone is in agreement

20 and the Court is so ordering.  How about the committees and the

21 ACC and the FCR, any disagreement?

22          MR. FINCH:  No, Your Honor.

23          MR. MULLADY:  No.

24          THE COURT:  Okay.  So your clients are protected to

25 the maximum extent that this Court can offer that protection.

1 Your clients are protected and whatever form of order you wish

2 me to sign, you may prepare and I will sign.  If you want it

3 simply added to the interrogatories, this part of the court

4 order, then I'll have Mr. Bernick add a statement to that

5 effect on the interrogatories.  However you want to work it out

6 is fine with me.

7         MR. FINCH:  Your Honor, I think people would like an

8 order that say responses to interrogatories shall not

9 constitute a waiver of the attorney client privilege and the

10 work product doctrine.

11         THE COURT:  Fine.

12         MR. FINCH:  And I would ask that the interrogatories

13 be served out by close of business tomorrow if that is doable.

14         MR. BERNICK:  Well wait a minute.  I didn't

15 understand that the Court was finished.  I raised a question

16 which is what these are going to be answered and I heard again

17 from Mr. Esserman a very careful statement that was not a

18 commitment that these questions would be answered.  Rather that

19 they believe that they will provide the information they

20 believe (a) we need and (b) we're entitled to.  And we have to

21 wait to see what that is.

22         We have put down on paper exactly what it is that

23 Your Honor's order required on December 22nd with respect to B

24 reads and what exactly, we actually crafted this by looking at

25 the questionnaire and basically saying did you answer the

1 questionnaire.  If we are now going to go through yet another

2 round -- we were here on the 8th of May.  Actually I think this

3 was raised originally in the 13th of April, so we are now

4 almost 90 days into this process.

5        I think Your Honor what I would propose and I don't

6 mean to impose on Your Honor, you've now got them.  Why don't

7 we just ask the Court determine which ones of these things are

8 now appropriate.  This whole thing has been completed briefed.

9 If there are things there that are not appropriate or that Your

10 Honor wants us to explain what we did and why we did it, I'm

11 happy to do it.

12        What I think is completely contrary to the history

13 here is to now let the law firms come around with yet another

14 round of why it is that they don't want to answer this or they

15 don't want to answer that.  As Mr. Speights (phonetic) said to

16 me in connection with Anderson Memorial, as was said to me in

17 connection with Mr. Segal's deposition, all we want is the

18 deposition.  It's not going to last very long.  What's the big

19 deal?

20        THE COURT:  Well let me interrupt Mr. Bernick because

21 here's the problem that I see.  The firms that have to provide

22 the answers haven't seen these questions yet.  So I understand

23 in the position of counsel to those firms Mr. Esserman, Ms.

24 Ramsey, other counsel who are here may make a good faith

25 assertion that answers, substantive answers will be provided.

1 But their clients are the ones who have to do the answers.

2          If you can, in fact, make service on the firms or I

3 guess the attorneys will accept service for their client, is

4 that correct?

5          MR. ESSERMAN:  Yes, Your Honor.

6          THE COURT:  Okay, tomorrow.  I am going to be in the

7 Virgin Islands Thursday and Friday.  I can set up a time on

8 Friday in the event that the firms have any objections to

9 answer these questions, to rule on any objections, they'll have

10 to be orally done but I can give you time Friday to rule on

11 objections.

12          That way it seems to me you will have the answers to

13 any objections that the Court can rule on and from then on it

14 should be a matter of issuing substantive answers thereafter.

15 Then if the answers are not complete we'll have the issue as to

16 whether the depositions can take place but at least then you'll

17 have the parameters for rulings but I'm a little hesitant to

18 state answers to rulings or to objections that haven't been

19 voiced when the firms haven't even seen the questions.

20          MR. BERNICK:  That's not a problem.  We will get

21 these served by tomorrow midday and we may even be able to get

22 them served this afternoon.  So we'll be prepared to proceed in

23 that fashion.

24          MR. ESSERMAN:  And please make sure you serve Mr.

25 Hooker because I'm not going to be in my also.  Please serve

114

1 both of us.

2          THE COURT:  He can't hear you Mr. Esserman.

3          MR. ESSERMAN:  I'm sorry.  Serve not only me but Mr.

4 Hooker because I'm not going to be in the office.

5          MR. BERNICK:  Sure, we'll serve Mr. Herrick.  Is it

6 Herrick?

7          MR. ESSERMAN:  Mr. Herrick hasn't even seen these

8 questions.

9          THE COURT:  That's what I mean.

10          MR. ESSERMAN:  And none of my clients have seen it.

11 So you know they have to be distributed and that's why I

12 answered the questions the way I answered them.

13          THE COURT:  All right.  This is the process that I

14 think is appropriate.  The debtor is to serve the

15 interrogatories not later than let's say 2:00 p.m. eastern time

16 tomorrow.  That should give the lawyers until 2:00 p.m. the

17 following day, the 28th, to discuss the matter with the firms

18 that they represent.

19          If there are objections that are going to be lodged

20 to any of these questions, you are to contact who on behalf of

21 the debtor?  Who do you want contacted if there are going to be

22 objections because I want a meet and confer on Thursday

23 afternoon?

24          MR. BERNICK:  They can -- if it's any time other than

25 three to five on Thursday afternoon, they can contact me.  My

1  cell phone is 312-927-6420.

2          THE COURT:  Wait you are going to have to repeat that

3  but wait a second, you said any time other than three to five?

4          MR. BERNICK:  Other than three to five.  I have a

5  client meeting in another city.  Otherwise I will make myself

6  available.  It's 312-927-6240.  I think actually all the folks

7  here probably already have it except the gentleman from Kelley

8  & Ferraro.

9          THE COURT:  All right, so 6:00 p.m. eastern time for

10 a meet and confer tomorrow with Mr. Bernick in the event there

11 are any objections.

12         MR. BERNICK:  And then can we also have --

13         THE COURT:  Thursday, I said tomorrow, I apologize.

14 Thursday, June 28th, Thursday.  All right.  Now I need to get a

15 time.

16         MR. ESSERMAN:  Also one other thing, Your Honor, just

17 to clarify.  We are going to answer these.  Our firm intends to

18 answer these but they are going to be answered subject to your

19 Court's order and any other objection they may have.  They are

20 going to provide answers but the answers are subject to the

21 objections.

22         THE COURT:  That's fine.  Yes, answers subject to

23 objections are fine.  The issue is substantive objections and I

24 do expect answers since I am --

25         MR. ESSERMAN:  I understand, Your Honor.

1          THE COURT:  Okay.  But if there are objections that

2     are going to prevent answers, that is why I am expecting the

3     meet and confer to be about at 6:00 p.m. eastern time with Mr.

4     Bernick on Thursday, June 28th.  Then if there are going to be

5     those objections and you folks cannot agree, then I will hear

6     whatever those objections are on Friday, June 29th.  I think

7     the same time probably is to say 11:00 a.m. eastern time.  Is

8     that acceptable?  And we'll have to do it through court call.

9     The Virgin Islands does have access to court call.

10          So I will have Ms. Baker notify court call that that

11     is the method that we will use.  In the event that there are no

12     such objections then I will expect Mr. Bernick that someone

13     from the debtor will contact my Pittsburgh staff and let them

14     know that first thing on Friday morning so that I don't need to

15     be available for that hearing at 11:00.

16          MS. RAMSEY:  Your Honor, Natalie Ramsey.  I don't

17     believe that we will have input into this.  To the extent that

18     we will participate I just wanted to advise the Court I will be

19     on a flight at that time but my partner, Leonard Buzby can be

20     available to participate if necessary.

21          THE COURT:  All right.

22          MR. BERNICK:  Your Honor, I guess two other small

23     things that relate to -- actually one is not so small.  We have

24     not -- we have tracked -- I think we've tracked down Kelley &

25     Ferraro firm originally filed a 2019 statement.  But Your Honor

1 then I believe gave some guidance as to what would be required

2 by way of a 2019 statement that was not actually met by the

3 Kelley & Ferraro statement.  I don't believe that any

4 supplemental or new statement has been made.  So if we can get

5 Kelley & Ferraro to submit a 2019 statement, I just want to

6 make sure that if they represent that they actually are

7 appearing for counsel for claimants in the case that that be

8 formally done pursuant to 2019.

9        THE COURT:  Okay, yes I think, don't I have an order

10 outstanding that indicates --

11        MR. BERNICK:  There is.  I just don't know that

12 there's been compliance with it.

13        THE COURT:  All right.  Well they are going to have

14 to be in compliance with the 2019 statement with the order if

15 they are not.

16        MR. WILSON:  Again Your Honor, Tom Wilson for Kelley

17 & Ferraro.  I understand that we did file a 2019 originally.

18 It is my understanding that we did file the supplement and once

19 the Court made those -- because we supplemented a number of

20 them all at once.  And I spoke with my staff during our last

21 break to make certain that and they were double checking that.

22 It was their understanding also that we had filed it.

23        If Mr. Bernick thinks that we have not filed the

24 supplement, then I will go back and recheck it and make certain

25 that it was filed.  But it is our standard practice.

1           THE COURT:  Okay.

2           MR. BERNICK:  Then the last thing Your Honor is that

3  we are sitting here with the Baron and Budd at least give us

4  the logs.  We have problems with the logs but they gave us the

5  logs of the B reads that are being withheld pursuant to our

6  privilege interrogatories, as interrogatories focused on the

7  predicates for the consulting privilege.

8           Angelo's firm actually submitted an affidavit of

9  compliance and gave us a number of B reads. We understand that

10 there was a response from Motley Rice. We haven't seen it.  We

11 do not understand that there has been any response by Kelley &

12 Ferraro.  And to the extent that the deposition was designed to

13 focus both on the compliance matters with the PIQ and on the

14 consultant privilege issues.  That was, topic one was

15 consultant privilege issues, it's pretty material to the issues

16 that are going to be before the Court when we see everybody's

17 interrogatory answers whether we've gotten interrogatory

18 answers for the privilege interrogatories for Motley Rice and

19 Kelley & Ferraro.

20          So those answers were actually due, what was it the

21 18th, and I don't know, we haven't seen either one.  Could Your

22 Honor, I don't know, I guess direct them to answer the

23 interrogatories.

24          THE COURT:  I'm sorry, are you saying Motley Rice you

25 think is in --

1        MR. BERNICK:  They said that they served the answers

2   but we haven't -- they were served by mail they say.  We don't

3   know whether there are any answers or whether there are

4   objections.  So I guess what I would ask is that we don't -- we

5   can deal with their submitting them late but we'd like to get

6   the responses from those two firms submitted to us by email by

7   let's say the 2nd, which is a Monday, so we can at least have

8   that in the mix.

9        The other firms have at least responded but we don't

10  have anything from those firms, two firms right now.

11       THE COURT:  Mr. Wilson.

12       MR. WILSON:  Again, on behalf of Kelley & Ferraro we

13  will have them by the end of business day on the 2nd via email.

14       THE COURT:  Email, okay.  Thank you.  Mr. Herrick,

15  are you still on for Motley Rice?  Anybody on for Motley Rice?

16       MR. BERNICK:  We can undertake to contact and make

17  sure.  They say that they've served the responses so if that is

18  so then it won't be an issue. If it is an issue, we can raise

19  it maybe with Your Honor and let them know about the potential

20  conference on Friday.

21       THE COURT:  All right.  Yes, I think that would be a

22  good idea.  Please contact Motley Rice and tell them that I

23  expect the responses by July 2nd by email.  If you have not

24  received them by mail in the meantime and time is getting kind

25  of short to do that.  All right.  What have I lost in this mix

1 somewhere?

2        MR. BERNICK:  Well we've made a noble effort Your

3 Honor to adhere to the time limits but I think that we've still

4 got a ways to go on that.  But there was an effort to adhere to

5 the time limits today.

6        THE COURT:  All right.  I think the one thing I have

7 lost, you said that by the 13th you would be getting the

8 responses, you would know whether some time in the next week

9 you need some additional discussion concerning depositions but

10 frankly that probably pushes it to the next omnibus which is

11 the 23rd.

12        MR. BERNICK:  Yes, we are scheduled to be here on the

13 19th of July.

14        MS. BAER:  At 2:00.

15        MR. BERNICK:  So we could take this up.  Your Honor

16 is going to be completely conversant with everything by that

17 time.  In other words what we're proposing is that the

18 interrogatories which will be gone through for objections in

19 advance would then be answered by email by July 13.  We would

20 be then prepared to address with the Court our continued --

21 what I take to be a continuing but not ruled upon, continued

22 motion for the depositions.  We would reset that for the 19th

23 in the afternoon in the event that there continues to be issues

24 with the responses.

25        MR. ESSERMAN: Your Honor, this is Sandy Esserman.

1  I'm involved in that hearing on the 19th.  What I'm going to

2  suggest is that we keep it on the Grace omnibus on the 23rd.

3  That's only four days later.  We've moved the R&Q.  I

4  understand we're not going to move the R&Q hearing but I want

5  to make sure that we get, you know, we have had that scheduled

6  for several hours for a long time and I think it would be

7  unfair to have that heard then.  Frankly it belongs on the

8  omnibus hearing on the 23rd.  We're talking about a couple of

9  days.

10         MR. BERNICK:  I don't have a problem with that Your

11 Honor.  Your Honor has enjoined us to be cautious about

12 scheduling too many things for the omnibus.  Exclusivity is up.

13 You've told us that exclusivity is not going to take a long

14 time.  I don't have a problem in moving it to the 23rd.

15         We then would want to make sure that the depositions,

16 if they go forward, go forward very promptly thereafter because

17 the monkey really is on our back at that point in time. But if

18 that is more convenient for counsel, I don't have a problem

19 with doing it on the 23rd.  We're prepared to proceed on the

20 19th but I don't have a problem.

21         THE COURT:  The other option is my calendar on the

22 24th in Delaware at the moment is not particularly full.  So

23 it's getting kind of late to have a lot of things on.  I don't

24 know the specific time at the moment.  I know that has you

25 staying over another day though.  But I could also hear this on

1  the 24th if that is better at ten, ten to twelve.

2         MR. BERNICK:  Let's schedule it if we could for the

3  23rd with the proviso, again, with the Court's -- with the

4  Court's convenience, let's just do that for the 23rd and if it

5  has a spillover all counsel are on notice that it may have to

6  spillover.  It may be that some people want to participate by

7  phone.  Other people want to be there.  But I really think that

8  at that point I'd rather go back to the 19th because I think we

9  can get it done then too.

10         THE COURT:  Okay.  Well frankly my preference would

11  be to either do it on the 19th or 23rd too just so that we're

12  not pushing up against the deposition dates.  But the 23rd is

13  fine.  This motion is continued then until the July 23rd

14  omnibus.

15         MR. FINCH:  May I suggest time limits on the

16  continued argument on the 23rd then?

17         THE COURT:  Yes, I think the issue that I will be

18  addressing is whether or not the answers to interrogatories are

19  full and complete and why in the debtor's view they are not and

20  why in the view of the entities that have answered they are.

21         MR. FINCH:  I think 20 minutes per side is

22  sufficient.

23         THE COURT:  Yes, 20 minutes.  Twenty minutes worked

24  very well this time.  Well 40 and 30 but 20 minutes.

25         MR. FINCH:  I think since this is a continuation, I

1 think 20 minutes per side would be fine.

2          THE COURT:  That's fine.  Twenty minutes per side is

3 fine.  But we are going to start with the exclusivity motions

4 though.

5          MR. BERNICK:  Just so we don't lose it, remember and

6 I'm sure the Court will remember, I indicated that we were

7 going to pick up these three other firms also.  And we would be

8 prepared, what did I say also on the 13th to talk about the

9 other -- to file something on the other firms.  Early Ludwick

10 has now been deferred, Brayton Purcell, so that leaves Weitz

11 and Luxenburg.  We're going to also want to take up on the, I

12 guess, it would be on the 23rd.  Right now Weitz & Luxenberg

13 isn't on the table because they haven't given us the

14 interrogatory answers.

15          They are going to do that.  If we have a problem with

16 the interrogatory answers or we don't, we will then be wanting

17 to make the same motion as to them.

18          THE COURT:  That's fine.

19          MR. ESSERMAN:  What -- I apologize.  I was wondering

20 what time are we talking about for the 23rd?

21          THE COURT:  The omnibus starts at two.

22          MR. BERNICK:  Would that be okay for --

23          THE COURT:  That's fine.  All remaining deposition

24 notice issues but the debtor will have to get that one

25 scheduled I guess because that one is not actually being

1 continued I guess.

2          MR. BERNICK:  Correct.

3          THE COURT:  Okay.  Now what else have I forgotten?

4          MR. BERNICK:  I don't think you've forgotten

5 anything.

6          MR. ESSERMAN:  I think lunch, Your Honor.

7          THE COURT:  Okay, any other matters then to be

8 addressed today?  Is somebody going to give me a new scheduling

9 order?  I did forget that.

10          MR. BERNICK:  Yes.

11          THE COURT:  All right.  Thank you.

12                    * * * * *

### C E R T I F I C A T I O N

     We, KATHLEEN BETZ and LYNN SCHMITZ, court

approved transcribers, certify that the foregoing is a

correct transcript from the official electronic sound

recording of the proceedings in the above-entitled matter.


/s/ Kathleen Betz          DATE:  June 29, 2007

KATHLEEN BETZ


/s/ Lynn Schmitz

LYNN SCHMITZ

J&J COURT TRANSCRIBERS, INC.