## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) Case No. 01-1139 (JKF) |
| W.R. GRACE & CO., et al., | ) (Jointly Administered) |
| | ) |
| Debtors. | ) Objection Deadline: July 6, 2007 |
| | ) Hearing Date: July 23, 2007 @ 2:00pm |
| | ) Related Dkt. Nos. 16083 |
| | ) |

### ASBESTOS CONSTITUENTS' OPPOSITION TO DEBTORS' TENTH MOTION FOR AN ORDER PURSUANT TO 11 U.S.C. § 1121(d) EXTENDING DEBTORS' EXCLUSIVE PERIODS IN WHICH TO FILE A CHAPTER 11 PLAN AND TO SOLICIT VOTES THEREON

David T. Austern, the Court-appointed legal representative for future asbestos personal injury claimants (the "FCR"), the Official Committee of Asbestos Personal Injury Claimants (the "ACC"), and the Official Committee of Asbestos Property Damage Claimants (the "PD Committee," and together with the FCR and ACC, the "Asbestos Constituents"), by their respective counsel, submit this objection to the tenth motion of W.R. Grace & Co., et al. (collectively, the "Debtors" or "Grace") seeking the entry of an order pursuant to Section 1121(d) of the Bankruptcy Code further extending the exclusive periods during which the Debtors have the exclusive right to file a plan of reorganization through the 90th day after a final order is issued in the PI Estimation Trial[1] and the exclusive right to solicit votes on a plan for an additional 60 days thereafter (the "Tenth Motion") (Docket No. 16083). **As explained in more detail below, the Asbestos**

---

[1] Capitalized terms not otherwise defined shall have the meaning ascribed to them in the Debtors' Tenth Motion.

**Constituents recommend a proposal which may lead to a quicker exit from Chapter 11 than the path advocated by the Debtors.[2]**

## PRELIMINARY STATEMENT

In the ten months that have passed since this Court's September 11, 2006 decision to extend the Debtors' exclusive periods to file and solicit votes on a plan of reorganization to July 23, 2007,[3] the Debtors have failed to comply with this Court's repeated orders to "meet and continue to meet and confer on a regular basis in an effort to try to resolve [the] differences of opinion and put together a confirmable and consensual plan." Sept. 11, 2006 Bankr. Hr'g Tr., Dkt. No. 13283, p. 112. The Court also cautioned that its order to extend the exclusive periods was entered "to permit all parties to continue to negotiate so that the estimation and valuation decisions can be incorporated into a plan that is to be filed within 30 days after the issues of estimation and solvency are resolved, either consensually or by court order." Id. at p. 113. Moreover, the Court declared that it was again holding the Debtors responsible for taking the "laboring oar" to make sure the parties continue to meet and confer. Id. at 112. Despite these clear directives, the reality is that there have been no meaningful global discussions about the terms of a plan of reorganization, let alone a confirmable and consensual plan that could be filed within 30 days after the issues of estimation and solvency are resolved.

---

[2] At the omnibus hearing on June 25, 2007, the Court stated that if the parties had a "new point" to make in their papers, they should "put it in bold in all capital letters . . . to make sure that [the Court] pay[s] special attention to it." June 25, 2007 Bankr. Hr'g Tr., Dkt. No. TBD, p. 90.

[3] On September 11, 2006, after ordering the Debtors to continue to negotiate with the Asbestos Constituents, the Court extended the Debtors' exclusive periods to July 2007 and informed the parties that it would "consider anew the issue of exclusivity" at that time. Sept. 11, 2007 Bankr. Hr'g Tr., Dkt. No. 13283, p. 113.

The lack of meaningful progress with the Asbestos Constituents after more than six years should convince the Court that further extensions of exclusivity will only serve to further delay the reorganization process well in to 2009 or 2010.  It is clear that the Debtors have no real incentive to reach a consensual agreement with the Asbestos Constituents before there is a decision in the PI Estimation Trial.  But there is no reason to stall the plan process for another year or two while the Debtors continue to enjoy the exclusive right to file a plan.  Instead, the only true hope for achieving a consensual and confirmable plan and a seasonable resolution of the Debtors' bankruptcy cases is to terminate exclusivity.

Moreover, the Debtors have failed to demonstrate (because they cannot do so) any "cause" for extending exclusivity; lest we forget, "cause" for extending exclusivity is required by the operative version of section 1121 of the Bankruptcy Code.  The Debtors clearly bear the burden of demonstrating cause.  Even though these bankruptcy cases have been pending for more than six years, the Debtors have made no meaningful progress toward filing a confirmable and consensual plan.  The time has come for the Court to terminate exclusivity and bring these cases to a conclusion.

**As explained more fully below at pages 19-21, the Asbestos Constituents recommend that the Court implement the following proposal, which, absent termination of exclusivity, provides the only real way to move these cases forward as quickly as possible by "get[ing] some plan negotiation processes heated up again."[4] The Court should set a short briefing schedule and then a hearing between now and the start of the January 2008 PI Estimation Trial to address the issues surrounding**

---

[4] Id. at p. 84.

**the Debtors' existing patently unconfirmable plan, namely, impairment and voting.**
**This proposal offers what the *status quo* cannot.  That is, once an estimation result is**
**reached some time in mid 2008, at the earliest, the Court can immediately proceed**
**to consider confirmation and a resolution of these cases.  Without this direction**
**from the Court, the Debtors' bankruptcy cases will continue to languish without any**
**foreseeable progress toward a confirmable plan.  This is because regardless of the**
**outcome of the PI Estimation Trial, at the end of the day, the parties will still be**
**faced with the Debtors' existing plan, which is patently unconfirmable.**

Accordingly, the Asbestos Constituents respectfully request that the Debtors'
Tenth Motion to further extend exclusivity be denied, and that the Court implement the
Asbestos Constituents' proposed change to the *status quo*.

## BACKGROUND

This Court is familiar with the events that have transpired over the past six years
involving the Debtors' unending extensions of their exclusive periods.  While the
Asbestos Constituents could provide the Court with a voluminous rendition of all such
events, the Asbestos Constituents have instead chosen to highlight a series of significant
events that reveal the unendurable direction the Debtors have chosen for these cases.

### A.  After Significant Delay, The Only Plan On File Is The Debtors' Patently Unconfirmable Plan

After the Debtors' cases had languished for almost three years, the Court, at a
hearing on February 23, 2004, expressed concern with the Debtors' lack of progress in
these cases and their inability to advise the Court when a plan would be filed.
Specifically, the Court stated:

4

> Well, then, I need some answers. This case is now 3 years old. It's
> time for the Debtor to know what it's [sic] business plan is, what it's
> [sic] operational plan is, what it's [sic] reorganization plan, in
> structure. I don't expect that you've got all the negotiations done. I
> understand your need to figure out what the asbestos liabilities are
> before you can even conclude that piece. But, I sent you off to talk
> to all the other constituent groups 2 months ago, and I expect that
> you're still doing that, so that the basis of a plan can be put together.
> It's very long, folks, it's very long, and I'm starting to wonder
> whether the Debtor-In-Possession, is going to be able to get this
> done, and if not whether to replace the Debtor. That's the point
> I'm at.

Feb. 23, 2004 Bankr. Hr'g Tr., Dkt. No. 5381, pp. 17-18 (alterations added).

At a hearing on March 22, 2004, the Court asked the Debtors the fundamental

question whether they intended to seek a section 524(g) injunction. The Debtors'

response was that "Your Honor, to this day, I can't tell you that it will be a 524(g) plan."

March 22, 2004 Bankr. Hr'g Tr., Dkt. No. 5374, p. 47. This response, three years into

the cases, prompted the Court to order the Debtors to seek appointment of a future

claimants' representative and again to castigate the Debtors for their lack of progress:

> Then let's get a Futures Rep. I mean, you can't have it both ways.
> We either need the pieces in place to get a 524(g), or else we need a
> plan that doesn't have one. Take your pick. Let's do it. It's been a
> long time. And, frankly, I'm getting to the point where if I don't lift
> exclusivity, I'm going to appoint a trustee, and that will cause all
> sorts of problems, I know, for the debtors lending perspective, if
> nothing else. But, this has gone on too long, with too little progress.
> Now, last September, I thought I provided some marching orders to
> that people could start talking. I'm glad to hear that the debtor has
> taken that to heart and attempted to try to get the constituents
> together. But, I still don't see any progress as a result of it, and that
> was six months ago.

Id.

By May 2004, the Debtors still did not have a plan on file. The Court gave the

Debtors a deadline of October 14, 2004 to file a plan and stated: "[b]ut if I don't have a

plan that's on track and headed toward the confirmation arena, if nothing else, I don't

think there will be another extension" of exclusivity.  May 24, 2004 Bankr. Hr'g Tr., Dkt.

No. 6018, p. 52.  Despite a series of discussions between the Debtors and the Asbestos

Constituents and an extension of the Debtors' October 14, 2004 deadline to file a plan,

the discussions quickly ceased without a resolution.

      On November 13, 2004, after more than three years in bankruptcy, the Debtors

filed their disclosure statement and plan of reorganization without the consent of the

Asbestos Constituents.  See Dkt. Nos. 6896 (disclosure statement) and 6895 (plan).  Two

months later, the Debtors filed an amended plan (the "Plan") and disclosure statement

(the "Disclosure Statement"), again without the consent of the Asbestos Constituents.

See Dkt. Nos. 7559 (amended disclosure statement) and 7560 (amended plan).  In fact, in

negotiating the Plan, the Debtors failed to reach out to the Asbestos Constituents.

Instead, the Debtors focused their energies on the unsecured creditors, winning their

consent to the Plan by agreeing to pay their claims at 100 cents on the dollar plus interest.

      More than twenty objections to the Disclosure Statement have been filed by

various parties-in-interest, including by each of the Asbestos Constituents, which

establish, *inter alia*, that the Disclosure Statement should not be approved because the

Plan is patently unconfirmable.  Moreover, in January 2005, even though the Court

recognized that the Debtors' Plan was unconfirmable as a matter of law, it deferred

consideration of those issues.  See generally Jan. 21, 2005 Bankr. Hr'g Tr., Dkt. No.

7680.

      On February 13, 2006, the Debtors filed their Status Report on the Progress of the

Case (the "Status Report"), in which they discussed the steps they said they had taken to

address the concerns express by the Court.  See Status Report, Dkt. No. 11756.  The

Debtors indicated that they have "been hard at work to address the Court's concerns with

the plan on file."  Id., p. 6.  The Debtors stated that they are "ready to file (if necessary)

an amended plan that removes the cap on personal injury claims and puts equity at risk."

Id., p. 7.  The Debtors also stated that they are "preparing amendments that could be used

in the event that agreement is reached with the personal injury claimants."  Id.  Despite

these statements, the Debtors have not filed any amendments or a confirmable plan.

Finally, the Status Report proposed that a mediator be appointed in order to move the

parties toward resolution.  A mediator was appointed but after several months the

mediation sessions proved to be futile.

      While the Debtors from time to time suggest to the Court that negotiations are

ongoing, the only "discussions" taking place in these cases appear to occur within the

thirty days prior to an exclusivity hearing.  These "discussions" are not productive in that

they rarely include the official committees or the FCR, but the fact of some kind of

"discussion" – however unproductive – apparently permits the Debtors to suggest with a

straight face that negotiations are ongoing.  The truth is, however, as counsel for the PD

Committee indicated to the Court during the June 25, 2007 omnibus hearing, there have

not been any "recent and meaningful settlement discussions about a plan."[5]  June 25,

2007 Bankr. Hr'g Tr., Dkt. No. TBD, p. 80.

---

[5] In addition, counsel for the PD Committee stated:  "So, I just want to tell the Court that I'm not sure what I just heard, but to the extent that it left you with the impression that we're all out there toiling in the vineyard of settling this case, I think there's a lot of idle workers in that vineyard right now."  In response, the Court stated:  "Okay.  Well, that was the impression that I had, yes."  Id.

**B. The Debtors' Have Engaged The Asbestos Constituents In More Than Two And A Half Years Of Endless Litigation Relating to the PI Estimation Trial and the PD Claims Objection Process**

**1. PI Estimation Trial**

In January 2005, in connection with several Plan-related motions filed by the Debtors, the Debtors proposed a process for estimating the value of their asbestos-related claims. A lengthy process ensued between and among the Debtors, the Asbestos Constituents, and the Court regarding, *inter alia*, a bar date, an asbestos personal injury questionnaire, and a case management order. More than two and a half years later, the Debtors are still enjoying limitless litigation, including exhaustive and unilateral discovery against individual asbestos claimants and third party asbestos personal injury trusts.

The PI Estimation Trial was originally scheduled to begin in June 2007, and the understanding was that the trial date would be postponed only under the most extraordinary circumstances. Then, at the Debtors' request, the Bankruptcy Court postponed the commencement of the trial to September 2007 and again stated that the trial dates were inflexible. But the Debtors were relentless. They complained to the Court that their "merits-based" discovery was not generating the wealth of information they were demanding and requested a further extension of the estimation trial, which the Court granted. The PI Estimation Trial is now scheduled to begin on January 14, 2008, and to proceed intermittently through mid-April 2008.

**2. PD Claims Objection Process**

The Debtors waited until September 2005 to file their first objections to property damage ("PD") claims. Since then, the Debtors have objected to every traditional PD

claim that was timely filed.  Such objections even embrace the incredible proposition that Grace ACM was not hazardous.  From the beginning, the PD Committee has argued that a section 524(g) trust should determine the merits and liquidate each of the PD claims post-confirmation, as such trusts have done in every other post-1994 asbestos bankruptcy case involving like claims.  Rather than adjudicating the PD claims in the bankruptcy case pre-confirmation, the PD Committee repeatedly urged the Court to estimate only the aggregate value of existing PD claims as part of the feasibility component of the plan confirmation process.  By doing so, plan confirmation would not have to await full and final adjudication of all objections that might be asserted against filed PD claims.  Indeed, as with the personal injury claims, the Plan calls for a section 524(g) trust to administer the PD claims post-confirmation.

Instead, initially, Grace prevailed upon the Court to bifurcate the PD claims proceedings into two components:  Phase I, consisting of a <u>Daubert</u> hearing to determine whether dust sampling was a reliable methodology and the establishment of a date by which all holders of PD claims knew or should have known that Grace's products constituted a threat to the holders' buildings (the "Constructive Notice Issue"); and, Phase II consisting of the estimation of the value of traditional PD claims.  Then, in November 2005, the Court decided the Constructive Notice Issue should not go forward on an omnibus basis, as the measure and extent of constructive knowledge needed to be dealt with on a claim-by-claim basis.  In September 2006, the Court changed course again by putting the Phase II estimation on hold and allowing the Debtors to prosecute their objections to each of the more than 600 remaining PD claims.

The PD claims objection process drones on.  The Court has under advisement numerous of Grace's motions for summary judgment.  The hazard objections to *every* remaining PD claim are not even subject of an operative case management order.

In addition to the traditional PD claims, there are PD claims related to the installation of Grace's asbestos-containing Zonolite Attic Insulation ("ZAI") product, which may have been installed and conceivably remains in millions of homes throughout the United States and Canada.  The ZAI hearing finally occurred in October 2004.  The Court ruled in December 2006 that ZAI does not pose a threat of harm to homeowners.  The ZAI claimants filed a motion with the District Court for leave to take an interlocutory appeal from the Bankruptcy Court's decision.  That motion was denied, unfortunately leaving to the end of the day the ultimate determination of the implications of ZAI to the reorganization of the Debtors.

## ARGUMENT

### A. The Debtors Cannot Meet Their Heavy And Increasing Burden To Establish "Cause" To Extend The Exclusive Periods

The version of section 1121(d) of the Bankruptcy Code operative in these cases provides that the Court "may" reduce or increase the exclusive periods if it can be shown that "cause" exists for the granting of such reduction or extension.[6]  11 U.S.C. § 1121(d).  The Debtors bear the burden of demonstrating the existence of good cause warranting

---

[6] The Asbestos Constituents recognize that the Court is very familiar with the traditional arguments on whether to extend or terminate exclusivity.  Therefore, such arguments will not be repeated here.  Instead, the Asbestos Constituents respectfully refer the Court to each of their objections to the nine motions to extend the exclusive periods previously filed by the Debtors over the past six years (Dkt. Nos. 4188, 5229, 8598, 11247, 12756, 8984, 7503, 8599, 11244, 8982, 8600, 8985, 11243) and to their appeal brief filed with the United States District Court for the District of Delaware (Case No. 06-689, Dist. Ct. Dkt. No. 13, Dec. 1, 2006).  A copy of the District Court appeal brief is attached hereto as Exhibit A.  Each of the objections and the District Court brief are incorporated in their entirety by reference herein.

extensions of exclusivity. In re Newark Airport/Hotel LP, 156 B.R. 444, 451 (Bankr. D.

N.J.), aff'd, FGH Realty Credit Corp. v. New Airport/Hotel LP, 155 B.R. 93 (D. N.J.

1993). In considering that burden, courts may not grant extension requests "routinely" or

"cavalierly." In re McLean Indus., Inc., 87 B.R. 830, 834 (Bankr. S.D.N.Y. 1987)

(stating same). Unsupported allegations are insufficient to allow such extensions. In re

Parker St. Florist & Garden Ctr., Inc., 31 B.R. 206 (Bankr. D. Mass. 1983). Rather,

section 1121(d) "requires that an affirmative showing of cause, supported by evidence, be

made by the party seeking the extension . . . of time." Id. (citations omitted) (alteration

in original).

Understandably, and especially relevant here in view of the nine extensions of

exclusivity over the past six years, the "Debtor[s'] burden gets heavier with each

extension it seeks as well as the longer the period of exclusivity lasts." In re Dow

Corning Corp., 208 B.R. 661, 664 (Bankr. E.D. Mich. 1997). Concomitantly, the

"creditor's burden to terminate gets lighter with the passage of time." Id.

Moreover, it is recognized that termination of exclusivity and the filing of

competing plans serves as catalysts for compromise and resolution of differences. In re

Pub. Serv. Co. of New Hampshire, 99 B.R. 155, 176 (Bankr. D.N.H. 1989) (same); In re

Texaco, 81 B.R. 806, 808-809 (Bankr. S.D.N.Y. 1988) (same); In re Geriatrics Nursing

Home, Inc., 187 B.R. 128, 133 (D.N.J. 1995) (competing plans create a meaningful

discourse among the various parties-in-interest, which weeds out unfavorable plans and

leads to the best possible result for all concerned parties).

The positive dynamic engendered by competing plans has been embraced by the

Third Circuit: "The ability of a creditor to compare the debtor's proposals against other

11

possibilities is a powerful tool by which to judge the reasonableness of the proposals. A broad exclusivity provision, holding that only the debtor's plan may be 'on the table,' takes this tool from creditors." Century Grove, Inc. v. First Am. Bank of New York, 860 F.2d 94, 102 (3d Cir. 1988); see also In re Rook Broad. Of Idaho, Inc., 154 B.R. 970, 976 (Bankr. D. Idaho 1993) ("It is in the interest of creditors that they have a choice between competing plans.").

**B. The Debtors Cannot Establish That Cause Exists To Extend The Exclusive Periods And The Facts Do Not Warrant A Further Extension Of The Exclusive Periods**

In deciding whether or not "cause" exists, some courts focus on the paramount factor of whether extending or terminating the debtor's exclusivity would facilitate moving the case forward. Dow Corning, 208 B.R. at 670. Other courts, however, consider a series of individual factors, which when taken together lead back to the question of whether granting or denying the motion to extend exclusivity will facilitate a timely exit from bankruptcy. In re Central Jersey Airport Servs., LLC, 282 B.R. 176, 184 (Bankr. D.N.J. 2002); McLean Indus., Inc., 87 B.R. at 834; In re Express One Int'l, 194 B.R. 98, 100 (Bankr. E.D. Tex. 1996). These factors are: (i) the existence of good faith progress toward reorganization; (ii) whether the debtor has demonstrated reasonable prospects for filing a viable plan; (iii) whether the debtor has made progress negotiating with creditors; (iv) whether the debtor is seeking an extension to pressure creditors; (v) the length of time a case has been pending; (vi) the necessity of sufficient time to negotiate and prepare adequate information; (vii) whether the debtor is paying its debts as they become due; and (viii) whether or not unresolved contingencies exist. Central Jersey Airport Servs., LLC, 282 B.R. at 184.

In their Tenth Motion, the Debtors' argue that "[w]hile time has passed, and the Debtors are now before the Court seeking a further extension of exclusivity, nothing has happened to warrant allowing exclusivity to terminate." Tenth Motion, p. 1. But the reality is that nothing has happened to allow exclusivity to be extended through the 90th day after a final order is issued in the PI Estimation Trial; a date, after all appeals have been exhausted, likely to be well into 2010.

In considering whether terminating exclusivity will move these cases forward, the Court should recognize, among other things, the following elements that continue to saturate these cases: (1) the only plan on file is the Debtors' patently unconfirmable Plan; (2) the Debtors are not engaging in (and have no incentive to engage in) any meaningful discussions with the Asbestos Constituents regarding the terms of a confirmable, consensual plan; (3) these cases are hopelessly stalled until at least mid 2008, which is the earliest conceivable time the Court could reach an estimation result; and (4) the Asbestos Constituents are being held hostage to the reorganization process. Each of these elements is necessarily contrary to a finding of cause to extend exclusivity.

### 1. The Only Plan On File Is The Debtors' Patently Unconfirmable Plan

The Debtors' Plan suffers from at least three fatal defects. First, while the Court conceived of the PI Estimation Trial as a means of determining the feasibility of *any* plan of reorganization, the Debtors' Plan improperly seeks to arbitrarily cap their asbestos liabilities (including future demands) for distribution purposes at $1.6 billion. See Plan §§ 7.6.1(v) and (w). Thus, by way of illustration, if, at the conclusion of the PI Estimation Trial, the Court determines that the Debtors' asbestos liabilities are, for

example, $6.2 billion, the Debtors' Plan makes no provision for the payment of the $4.6 billion difference.

There is nothing in section 524(g) that requires (or even permits) the Court to cap the Debtors' asbestos-related liability. On the contrary, to confirm a plan which features section 524(g) treatment of asbestos liabilities, the Court must find that the actual amounts, numbers and timing of future demands cannot be determined. 11 U.S.C. § 524(g)(2)(B)(ii)(II). Thus, when the Court estimates future asbestos claims, such estimates (absent the parties' consent) cannot be final for distribution purposes.

Second, despite the foregoing, holders of asbestos claims are deemed unimpaired under the Debtors' Plan and thus not entitled to vote for or against it. Id. §§ 3.1.6 – 3.1.8. In stark contrast, the Debtors' Plan provides that general unsecured creditors will receive full payment of their allowed claims in any event (including post-petition interest) and equity holders will retain, virtually undiluted, their equity interest. Id. §§ 3.1.9 – 3.1.11. As such, the Debtors' Plan unfairly discriminates and violates the absolute priority rule. 11 U.S.C. §§ 1129(b)(1) and (b)(2)(B). Simply asserting that asbestos claims will be paid in full, as the Plan does, does not mean that such claims are unimpaired. The term "impaired" is read in broad terms. See, e.g., In re Barakat, 99 F.3d 1520, 1527 (9th Cir. 1996) ("Congress intended to define impairment broadly, and generally, any alteration of a creditor's legal rights constitutes impairment."). "Impairment" under the Bankruptcy Code is a standard that is easily met. In re Am. Solar King Corp., 90 B.R. 808, 819 (Bankr. W.D. Tex. 1988) (noting even the smallest impairment entitles a creditor to participate in voting). Thus, the question is whether the provisions of the Plan, if approved, would alter the rights of asbestos creditors in any respect. Even a cursory

14

examination of the Plan shows that this is not even a close question, and that the answer is "Yes." The Debtors cannot be allowed to use the estimation of asbestos claims to back in to their positions that asbestos claims are unimpaired and that their liability to all asbestos claims should be capped while equity holders retain substantial interests.

Third, the Debtors premise their Plan on the presumption that deemed acceptance of unimpaired creditors under section 1126(f) satisfies the voting requirements of section 524(g).[7]  On the contrary, section 524(g) requires that "a separate class or classes of the claimants whose claims are to be addressed by a trust . . . <u>votes</u> by at least 75% <u>of those voting</u>, in favor of the plan." 11 U.S.C. § 524(g)(2)(B)(ii)(IV)(bb) (emphasis added). Thus, by its plain language, section 524(g) requires an affirmative vote on the Plan by the asbestos claimants, whose claims are being channeled to a section 524(g) trust.  Courts have found that the 75% voting requirement is an indispensable element to confirmation of a section 524(g) plan.  <u>See, e.g.</u>, <u>Walter v. Celotex Corp. (In re Hillsborough Holdings Corp.)</u>, 197 B.R. 372, 378-79 (Bankr. M.D. Fla. 1996) (stating that the debtor's contention that the 75% voting requirement is not indispensable is clearly refuted by the legislative history of sections 524(g) and (h)); <u>see also</u> H.R. No. 103-835, 103d Cong., 2d Sess. (Oct. 4, 1994) ("[I]n order for present claimants to be bound by a trust/injunction, . . . a separate creditor class [must] be established for those with present claims, which must vote by a 75% margin to approve the plan.").[8]

---

[7] The Court need not address this issue if the Court determines that asbestos claims are impaired under the Plan.

[8] Moreover, well established rules of statutory construction dictate that the deemed acceptance of unimpaired claims under section 1126(f) does not apply in the context of section 524(g).  If Congress wanted to have the presumption of section 1126(f) apply in the context of section 524(g), it would have expressed its intent to do so.  <u>See Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.</u>, 530 U.S. 1, 6 (2000) (stating that "Congress says in a statute what it means

**2.  The Debtors Are Not Engaging In (And Have No Incentive To Engage In) Any Meaningful Discussions With the Asbestos Constituents Regarding The Terms Of A Confirmable, Consensual Plan**

Although the Court appointed a mediator in March 2006, the mediation sessions quickly broke down within three months and by June 2006, the Debtors admitted as much, stating that there did not appear "to be any foothold for moving forward with any further [mediation] discussions." June 19, 2006 Bankr. Hr'g Tr., Dkt. No. 12717, p. 4. Moreover, the fact and the contours of the PI Estimation Trial are testimony to the fact that the Debtors have chosen to litigate rather than negotiate with the Asbestos Constituents.[9]  The reality is that the Debtors and Asbestos Constituents have not engaged in any meaningful plan-related discussions for over a year.  Yet despite this reality, during the June 25, 2007 omnibus hearing, counsel for the Debtors stated that there have been a "whole series of contacts [with the personal injury claimants] with a view to seeing whether the personal injury side of this case could be resolved." June 25, 2007 Bankr. Hr'g Tr., Dkt. No. TBD, p. 85.  Moreover, counsel stated that "if Your Honor had the impression that there were active discussions, there are active discussions. And, of course, a lot, there has been an impact of the expert report process, that's not been lost on the discussions either." Id.  Despite this Court's repeated orders to the Debtors to engage the parties in plan-related negotiations so that the estimation and

---

and means in a statute what it says there" and that when the statute's language is plain, the sole function of the courts is to enforce it according to its terms).

[9] Congress has recognized that extensions of exclusivity should not be granted when the debtor is trying to use the extension as a tactical device to put pressure on parties in interest to yield to a plan they believe is unsatisfactory; some showing of probable success must attend any request for an exclusivity extension. See S. Rep. No. 989, 95th Cong., 2d Sess. 118 (1978).  See also In re Texas Extrusion Corp., 844 F.2d 1142 (5th Cir.) (debtor's delay tactics are grounds for reduction of exclusivity), cert. denied, 488 U.S. 926 (1988).

valuation decisions can be incorporated into a plan that is to be filed within thirty days after the issues of estimation and solvency are resolved, the Debtors have not done so. In fact, no such discussions have taken place for well over a year.

Moreover, in February 2006, the Debtors reported to this Court that they were prepared to file an amended plan, which addressed the Court's concerns. Despite this promise, no amended plan has been filed and it is clear that the Debtors have no intention of doing so. This hardly shows sufficient progress to warrant a further extension of exclusivity.

### 3. The Debtors' Cases Are Hopelessly Stalled Until At Least Mid 2008, At The Earliest, Until The Court Reaches An Estimation Result

As it currently stands, the Debtors have no need to file a confirmable plan before at least mid 2008, at the earliest, until the Court reaches an estimation result. By hiding behind exclusivity, the Debtors are preventing the filing of competing plans in these cases, including, for example, one or more plans filed by the Asbestos Constituents, which at the very least may create a meaningful discourse among the various parties-in-interest and should weed out unfavorable plans and lead to the best possible result for all concerned parties.

Furthermore, the Debtors' argument that "[c]ompeting plans will only distract the parties and the Bankruptcy Court and, additionally, create yet more litigation" is misplaced. Ninth Motion, p. 7. If extra fees were a valid consideration for determining cause, exclusivity could be extended all the time because, by definition, plan drafting and the submission of competing plans will invariably carry extra fees and costs. Here, concurrent plan and estimation proceedings will bring a quicker, more efficient,

resolution of these cases. Thus, it is a false economy to suppose that more professional

fees will be saved if the plan process awaits the conclusion of the PI Estimation Trial.

Moreover, the pace of spending in these cases, especially by the Debtors, is so far beyond

any standard of normalcy that it is preposterous to attempt to hold a line on fees by

enjoining any attempts by the Asbestos Constituents or other parties-in-interest from

bringing these cases to conclusion by proposing and pursuing a confirmable plan of

reorganization.

Furthermore, the Tenth Motion seeks the extension of exclusivity through the 90th

day after a _final_ order is issued in the PI Estimation Trial. Any such extension would

necessarily stall these cases for many years until all appeals were resolved. Such an

unspecified and endless extension must not be sanctioned by this Court.

### 4. The Asbestos Constituents Are Being Held Hostage To the Reorganization Process

The Debtors certainly have prospered as a result of these bankruptcy cases. They

have bought and sold business components, granted rich compensation and benefit

packages to all levels of those in their employ, without the imposition of economic

disincentives for not emerging from bankruptcy, and accumulated so much cash that the

Debtors have not even had to borrow from their debtor-in-possession credit facilities.

And during this time, asbestos claimants have been unable to prosecute their claims

against the Debtors because of the automatic stay. This, of course, is in stark contrast to

general unsecured creditors and shareholders who have regularly traded their claims and

shares in robust markets throughout these cases. With such benefits, it is plain why the

Debtors are eager to delay their exit from bankruptcy. In the face of such delay, it is

imperative that the Court terminate the Debtors' exclusivity to stop the Debtors from

continuing to hold asbestos claimants hostage to these cases, and to increase the prospects

of ever completing this reorganization.

Moreover, the Debtors will not suffer any prejudice if exclusivity ends; denial of

exclusivity will not end their right to file a competing plan of reorganization.  *See, e.g.*, In

re All Seasons Indus., Inc., 121 B.R. 1002, 1005 (Bankr. N.D. Ind. 1990) ("Denying

[exclusivity] affords creditors their right to file the plan; there is no negative effect upon

the debtor's co-existing right to file its plan."); In re Grossinger's Assocs., 116 B.R. 34,

36 (Bankr. S.D.N.Y. 1990) ("A loss of plan exclusivity does not mean the debtor is

foreclosed from promulgating a meaningful plan of reorganization; only that the right to

propose a Chapter 11 plan will not be exclusive with the debtor").  "By denying the

extension, the Court does not prejudice the debtors' co-existent right, nor dilute the

debtors' duty to file a plan.  The other parties are simply allowed to protect their interests

by coming forward with alternative plans or motions to dismiss."  In re Southwest Oil

Co., 84 B.R. 448, 454 (Bankr. W.D. Tex. 1987).  The risk is that while the Debtors are

developing their plan, another party may file a competing plan, but that is a risk Congress

intended.  *See id.*; In re Tony Downs Foods Co., 34 B.R. 405, 408 (Bankr. D. Minn.

1983).  The fact that the Debtors may wish to prevent creditors from interfering with their

reorganization is not cause within the meaning of section 1121(d).

## THE ASBESTOS CONSTITUENTS' PROPOSAL

**The Court made several statements during the June 25, 2007 omnibus**

**hearing that, when taken together, create a starting point for moving these cases**

**forward.  First, when considering various issues relating to these cases, the Court**

**stated that "[i]t wouldn't hurt to start knocking these issues down one at a time."**

June 25, 2007 Bankr. Hr'g Tr., Dkt. No. TBD, p. 77. Second, the Court stated, after learning that there have been no global plan-related discussions, that it is "starting to think that maybe it's time to get some plan negotiation processes heated up again." Id. at 84. The Asbestos Constituents have taken the Court's statements to heart and have come up with the following proposal, which should be implemented regardless of the Court's decision on the Debtors' Tenth Motion.

The Court should set a short briefing schedule to determine whether the Debtors' existing Plan can be confirmed as a matter of law. The briefs should address the legality of the following two issues raised by the Debtors' Plan: the fact that holders of asbestos claims are deemed unimpaired and thus not entitled to vote for or against it, and the presumption that deemed acceptance of unimpaired creditors under section 1126(f) satisfies the voting requirements of section 524(g). The Asbestos Constituents propose the following briefing schedule:

August 13, 2007: Debtors' opening brief due

September 4, 2007: Asbestos Constituents' response briefs due

September 11, 2007: Debtors' reply brief due

The Court can then hear arguments and render a decision on whether the Debtors' Plan is confirmable during the October 22, 2007 omnibus hearing. Shortly thereafter, the PI Estimation Trial will commence, as scheduled, in January 2008 and continue intermittently through mid-April 2008. Once an estimation result is reached in mid 2008, at the earliest, the Court can immediately proceed to consider confirmation and a resolution of these cases.

**On the other hand, under the Debtors' approach, their unconfirmable Plan will simply remain on file (<u>and exclusivity will stay in place</u>) until all appeals of the estimation order are resolved – perhaps in 2010. Only <u>then</u> would the Debtors be forced to amend their Plan so that it may be confirmable. Now we would be into, perhaps, 2011. Of course, the Debtors are hoping with this purposeful delaying strategy, that the hostages will capitulate and agree to a Debtor plan that pays them a fraction of what they are owed while the other constituencies are paid in full with interest. This sort of gamesmanship cannot be sanctioned by the Court.**

<u>**CONCLUSION**</u>

For the reasons stated herein, the Asbestos Constituents respectfully request that the Court (1) deny the Debtors' Tenth Motion to extend their exclusive period to file a plan through the 90th day after a <u>final</u> order is issued in the PI Estimation Trial and to extend their exclusive periods to solicit votes thereon for an additional 60 days thereafter, (2) implement the Asbestos Constituents' proposal to move these cases to a conclusion, and (3) grant such other and further relief as is just and equitable.

[SIGNATURES FOLLOW ON NEXT PAGE]

Dated:  July 6, 2007

Respectfully submitted,

Roger Frankel
Richard H. Wyron
Debra L. Felder
Orrick, Herrington & Sutcliffe LLP
3050 K Street, NW
Washington, DC 20007
Telephone:  (202) 339-8400

and

John C. Phillips, Jr. (#110)
Phillips, Goldman & Spence, P.A.
1200 North Broom Street
Wilmington, DE 19806
Telephone:  (302) 655-4200

*Counsel for David T. Austern, Future
Claimants' Representative*

Scott L. Baena
Jay M. Sakalo
Bilzin Sumberg Baena Price & Axelrod LLP
200 South Biscayne Boulevard, Suite 2500
Miami, FL 33131-2336
Telephone:  (305) 374-7580

and

Theodore J. Tacconelli (#2678)
Lisa L. Coggins (#4234)
Ferry, Joseph & Pearce, P.A.
824 Market Street, Suite 904
P.O. Box 1351
Wilmington, DE 19899
Telephone:  (302) 575-1555

*Counsel for the Official Committee of
Asbestos Property Damage Claimants*

Elihu Inselbuch
Caplin & Drysdale, Chartered
375 Park Avenue, 35th Floor
New York, NY 10152-7125

and

Peter Van N. Lockwood
Nathan D. Finch
Jeffrey A. Liesemer
Caplin & Drysdale, Chartered
One Thomas Circle, NW
Washington, DC 20005
Telephone:  (202) 862-5000

and

Marla R. Eskin (#2989)
Mark T. Hurford (#3299)
Campbell & Levine, LLC
800 King Street, Suite 300
Wilmington, DE 19801
Telephone:  (302) 426-1900

*Counsel for the Official Committee of
Asbestos Personal Injury Claimants*