# Exhibit A

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

In re:

**W.R. GRACE & CO., et al.**

---

| | | |
|---|---|---|
| **Official Committee of Asbestos Personal Injury Claimants, et al.,** | ) ) ) | **Civil Action No. 06-689** |
| **Appellants,** | ) ) | |
| **v.** | ) ) | |
| **W.R. Grace & Co., et al.,** | ) ) | **Bankruptcy Case No. 01-1139** |
| **Appellees.** | ) | **Appeal No. 06-63** |

## BRIEF OF APPELLANTS

Roger Frankel
Richard H. Wyron
Jonathan P. Guy
Orrick, Herrington & Sutcliffe LLP
3050 K Street, NW
Washington, DC 20007
Telephone: (202) 339-8400

John C. Phillips, Jr. (#110)
Phillips, Goldman & Spence, P.A.
1200 North Broom Street
Wilmington, DE 19806
Telephone: (302) 655-4200

*Counsel for David T. Austern,
Future Claimants' Representative*

Elihu Inselbuch
Caplin & Drysdale, Chartered
375 Park Avenue, 35th Floor
New York, NY 10152-3500
Telephone: (212) 319-7125

Peter Van N. Lockwood
Nathan D. Finch
Jeffrey A. Liesemer
Caplin & Drysdale, Chartered
One Thomas Circle, NW
Washington, DC 20005
Telephone: (202) 862-5000

Marla R. Eskin (#2989)
Mark T. Hurford (#3299)
Campbell & Levine, LLC
800 King Street, Suite 300
Wilmington, DE 19801
Telephone: (302) 426-1900

*Counsel for the Official Committee of
Asbestos Personal Injury Claimants*

Scott L. Baena
Jay M. Sakalo
Matthew Kramer
Bilzin Sumberg Baena Price &
Axelrod LLP
200 South Biscayne Boulevard
Suite 2500
Miami, FL 33131-2336
Telephone: (305) 374-7580

Theodore J. Tacconelli (#2678)
Lisa L. Coggins (#4234)
Ferry, Joseph & Pearce, P.A.
824 Market Street, Suite 904
P.O. Box 1351
Wilmington, DE 19899
Telephone: (302) 575-1555

*Counsel for the Official Committee of
Asbestos Property Damage Claimants*

Dated: December 1, 2006

TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................... iii

STATEMENT OF BASIS FOR JURISDICTION ...................................................................... 1

STATEMENT OF ISSUES PRESENTED .................................................................................. 1

STATEMENT OF APPLICABLE STANDARDS OF REVIEW ............................................... 2

STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDING ............................. 3

SUMMARY OF ARGUMENT ................................................................................................... 3

STATEMENT OF FACTS .......................................................................................................... 9

     I        The Bankruptcy Filing .................................................................................... 9

     II.      The Debtors' Repeated Requests for Exclusivity ............................................... 10

     III.     The Debtors File An Unconfirmable Plan of Reorganization ............................ 13

     IV.     Estimation of Asbestos Liabilities ...................................................................... 15

     V.      The Debtors Deny Liability For Virtually All of Their Asbestos Liabilities ...... 16

     VI.     The Debtors Seek and Obtain More Extensions of Exclusivity ........................ 18

     VII.    The Plan Amendments That Were Not to Be ...................................................... 20

     VIII.   The Plan Mediation. ............................................................................................ 20

     IX.     Yet Another Extension of Exclusivity. ............................................................... 21

     X.      "Oh Thank Heaven For Chapter 11." ................................................................. 22

     XI.     The Debtors and Their Officers Get Indicted During the Bankruptcy Case ....... 24

     XII.    The Asbestos Committees Recover $1.2 Billion for the Estate Over the
              Debtors' Objections ............................................................................................ 25

     XIII.   No End in Sight .................................................................................................... 26

ARGUMENT .............................................................................................................................. 26

     I.      Legal Standard For Extensions Of A Debtor's Exclusive Periods To File A
              Plan Of Reorganization And Solicit Acceptances Thereto ................................. 26

           A.     The Keystones of Section 1121 of the Bankruptcy Code. ...................... 26

           B.     A Debtor Has A Heavy And Increasing Burden To Establish
                 "Cause" For Extending The Exclusive Periods ...................................... 29

           C.     Termination of the Debtors' Exclusivity Periods Benefits All
                 Parties .................................................................................................... 29

           D.     Factors Considered by the Courts When Ruling on Exclusivity
                 Extension Motions ................................................................................. 30

II.    The Bankruptcy Court Erred In Holding That "Cause" Existed To Extend
       The Debtors' Exclusive Periods ...................................................................... 31

       A.    The Debtors Have Not Demonstrated the Existence of Good Faith
             Progress Toward Filing A Confirmable Plan ......................................... 31

       B.    The Debtors' Existing Plan is Patently Unconfirmable.......................... 32

       C.    The Debtors Have Not Made Any Progress Negotiating with the
             Asbestos Constituents .......................................................................... 33

CONCLUSION ................................................................................................................. 39

# TABLE OF AUTHORITIES

## FEDERAL CASES

In re Am. Fed'n of Television and Radio Artists,
30 B.R. 772 (Bankr. S.D.N.Y. 1983) ................................................................. 31

In re Amko Plastics, Inc.,
197 B.R. 74 (Bankr. S.D. Ohio 1996) ................................................................. 27

In re Applied Safety, Inc.,
200 B.R. 576 (Bankr. E.D. Pa. 1996) ................................................................. 32

In re Central Jersey Airport Servs., LLC,
282 B.R. 176 (Bankr. D.N.J. 2002) ..............................................................30, 31

Century Grove, Inc. v. First Am. Bank of New York,
860 F.2d 94 (3rd Cir. 1988) ............................................................................... 30

In re Curry Corp.,
148 B.R. 754 (Bankr. S.D.N.Y. 1992) ............................................................... 35

In re Dow Corning Corp.,
208 B.R. 661 (Bankr. E.D. Mich. 1997) ............................................................ 29

In re Express One Int'l,
194 B.R. 98 (Bankr. E.D. Tex. 1996) ......................................................30, 35, 36

Geriatrics Nursing Home, Inc. v. First Fidelity Bank, N.A. (In re Geriatrics Nursing
Home, Inc.), 187 B.R. 128 (D.N.J. 1995) ........................................................ 3, 30

In re Gibson & Cushman Dredging Corp.,
101 B.R. 405 (E.D.N.Y. 1989) ............................................................................. 3

In re McLean Indus., Inc.,
87 B.R. 830 (Bankr. S.D.N.Y. 1987) ..............................................................29, 30

In re Newark Airport/Hotel LP,
156 B.R. 444 (Bankr. D.N.J.), aff'd, FGH Realty Credit Corp. v. New Airport/Hotel
LP, 155 B.R. 93 (D.N.J. 1993) ............................................................................ 29

Official Comm. of Unsecured Creditors v. Henry Mayo Newhall Mem'l Hosp. (In re
Henry Mayo Newhall Mem'l Hosp.),
282 B.R. 444 (B.A.P. 9th Cir. 2002) ................................................................. 2, 28

In re Parker St. Florist & Garden Ctr., Inc.,
31 B.R. 206 (Bankr. D. Mass.) ......................................................................29, 36

In re Pub. Serv. Co. of New Hampshire,
  88 B.R. 521 (Bankr. D.N.H. 1988) .................................................................. 35

In re Pub. Serv. Co. of New Hampshire,
  99 B.R. 155 (Bankr. D.N.H. 1989) .................................................................. 29

Pub. Serv. Co. of New Hampshire v. State of New Hampshire (In re Pub. Serv. Co. of
  New Hampshire), 108 B.R. 854 (Bankr. D.N.H. 1989) ........................................ 5

In re Rook Broad. of Idaho, Inc.,
  154 B.R. 970 (Bankr. D. Idaho 1993) ............................................................. 30

Safety Nat'l Casualty Corp. v. Kaiser Aluminum & Chem. Corp. (In re Kaiser Aluminum
  Corp.), 303 B.R. 299 (D. Del. 2003) .............................................................. 2

In re Sharon Steel Corp.,
  78 B.R. 762 (Bankr. W.D. Pa. 1987) ......................................................... 27, 34

In re Sharon Steel Corp.,
  871 F.2d 1217 (3d Cir. 1989) ........................................................................ 2

In re Texaco,
  81 B.R. 806 (Bankr. S.D.N.Y. 1988) .............................................................. 30

In re Texas Extrusion Corp.,
  844 F.2d 1142 (5th Cir.), cert. denied, 488 U.S. 926 (1988) ............................... 33

In re Tony Downs Food Co.,
  34 B.R. 405 (Bankr. Minn. 1983) .................................................................. 29

In re USG Corp.,
  290 B.R. 223 (Bankr. D. Del. 2003) ............................................................... 18

United Savs. Assoc. of Texas v. Timbers of Inwood Forest Assocs., Ltd. (In re Timbers
  of Inwood Forest Assocs., Ltd.), 808 F.2d 363 (5th Cir. 1987), aff'd, 484 U.S. 365
  (1988) ............................................................................................... 4, 27

Walker v. Celotex Corp. (In re Hillsborough Holdings Corp.),
  197 B.R. 372 (Bankr. M.D. Fla. 1996) ........................................................... 33

In re Washington-St. Tammany Elec. Coop., Inc.,
  97 B.R. 852 (E.D. La. 1989) ................................................................... 27, 36

## DOCKETED CASES

In re Armstrong World Indus.,
    No. 00-4471 (Bankr. D. Del.)................................................................. 10

In re Babcock & Wilcox Co.,
    No. 00-10992 (Bankr. E.D. La.)...................................................10, 36, 37

Combustion Engineering, Inc.,
    No. 03-10495 (Bankr. D. Del.)................................................................. 10

In re Congoleum Corporation, et al.,
    No. 03-51524 (Bankr. D.N.J.)...........................................................36, 37

In re Federal-Mogul Global Inc.,
    No. 01-10578 (Bankr. D. Del.)......................................................10, 36, 37

In re Kaiser Aluminum Corp,
    No. 02-10429 (Bankr. D. Del.)................................................................. 10

In re Mid-Valley, Inc.,
    No. 03-35592 (Bankr. W.D. Pa.)............................................................. 10

In re Owens Corning Corp.,
    No. 00-03837 (Bankr. D. Del.)................................................................. 9

In re USG Corp.,
    No. 01-2094 (Bankr. D. Del.)................................................................. 10

In re U.S. Minerals Products Co.,
    No. 01-2471 (Bankr. D. Del.)......................................................10, 36, 37

## FEDERAL STATUTES AND RULES

11 U.S.C. § 524(g)..............................................................................passim

11 U.S.C. § 524524(g)(2)(B)(2)(B)(i)(III).................................................... 38

11 U.S.C. § 524(g)(2)(B)(ii)(II) ................................................................ 32

11 U.S.C. § 524(g)(2)(B)(ii)(IV)(bb) .....................................................12, 33

11 U.S.C. § 524(g)(4)(B)(i) ...................................................................... 12

11 U.S.C. § 1121 ...........................................................................passim

11 U.S.C. § 1121(2)................................................................................ 26

11 U.S.C. § 1121(b)..................................................................................................4, 10, 26

11 U.S.C. § 1121(c)................................................................................................... 4

11 U.S.C. § 1121(c)(3) ........................................................................................26, 27

11 U.S.C. § 1121(d).............................................................................................*passim*

11 U.S.C. § 1126 ..................................................................................................... 4

11 U.S.C. § 1126(f) ................................................................................................ 32

11 U.S.C. § 1129(b)(1) .......................................................................................... 3, 14

11 U.S.C. § 1129(b)(2)(B) ...................................................................................... 4, 14

11 U.S.C. § 1129(b)(2)(B)(ii) ................................................................................... 37

28 U.S.C. § 158(a)(2) ........................................................................................... 1, 28

Federal Rule of Bankruptcy Procedure 3001(e)(2) .................................................... 34

## LEGISLATIVE MATERIALS

140 Cong. Rec. H10,752, H10,764 .......................................................................... 28

H.R. Rep. 103-835, 103d Cong., 2d Sess. (Oct. 4, 1994),
    reprinted in, 1994 U.S.C.C.A.N. 3340.............................................................. 2, 33

S. Rep. No. 989, 95th Cong., 2d Sess. 118 (1978)...................................................... 33

## MISCELLANEOUS

Barry I. Castleman, Asbestos: Medical and Legal Aspects, 634-44 (4th ed. 1996) .................... 6

*Grace Reports First Quarter Financial Results*, Business Wire, April 25, 2006 ................................. 23

*Grace Reports Fourth Quarter Operating Results; Operating Up 32%, Sales Up 9% Over Prior
    Year Fourth Quarter*, PRNewswire-FirstCall, January 29, 2001.................................................. 23

7 Alan N. Resnick & Henry J. Sommer, Collier on Bankruptcy § 1121.LH[4] ......................... 28

Michael Riley, *Asbestos Grip.  Years After Mining Left Libby, Mont., Hundreds Have
    Died.  Diagnoses Keep Coming*, Denver Post, Nov. 19, 2006............................................... 24

## STATEMENT OF BASIS FOR JURISDICTION

This is an appeal from the United States Bankruptcy Court for the District of Delaware's (the "Bankruptcy Court") October 3, 2006 order, which granted the Debtors'[1] ninth motion to extend their exclusive periods to file and solicit votes on a plan of reorganization (the "Order").[2] The Order extended the Debtors' exclusive periods until July 2007, over six years after April 2, 2001, the date of the filing of the Debtors' bankruptcy cases.  The Bankruptcy Court's Order is interlocutory but this Court has jurisdiction to hear an immediate appeal from that Order pursuant to 28 U.S.C. § 158(a)(2).

## STATEMENT OF ISSUES PRESENTED

David T. Austern, the court-appointed legal representative for future asbestos claimants (the "FCR"), the Official Committee of Asbestos Personal Injury Claimants (the "ACC"), and the Official Committee of Asbestos Property Damage Claimants (the "PD Committee," and together with the FCR and the ACC, the "Asbestos Constituents" or "Appellants") submit that the central issue presented is whether the Bankruptcy Court erred in holding that "cause" existed to extend the Debtors' exclusive periods when, although the Debtors' bankruptcy cases have been pending for five and a half years, the Debtors have so far failed to file a confirmable plan of reorganization even after a recent court-ordered mediation.

---

[1] The "Debtors" or "Appellees" refers to W.R. Grace & Co. and 61 of its affiliates, each of which is a debtor in the underlying chapter 11 proceeding.

[2] A copy of the Order is attached as Exhibit 1 to the Appellants' Record Excerpts and is also available in the Record at R-2394.  References to the Record are hereinafter referred to as "R-" and correspond to the exhibit number included in the Appellants' Designation of the Record (D.I. 3).  References to the Appellees' counter-designations are hereinafter referred to as "CD-."

## <u>STATEMENT OF APPLICABLE STANDARDS OF REVIEW</u>

As a general matter, district courts conduct a <u>de novo</u> review of a bankruptcy court's conclusions of law, apply a clearly erroneous standard to a bankruptcy court's findings of fact, and break down mixed questions of law and fact, applying the appropriate standard to each component. <u>In re Sharon Steel Corp.</u>, 871 F.2d 1217, 1222 (3d Cir. 1989); <u>Safety Nat'l Casualty Corp. v. Kaiser Aluminum & Chem. Corp. (In re Kaiser Aluminum Corp.)</u>, 303 B.R. 299, 302 (D. Del. 2003).

How these standards should be applied to an order extending exclusivity is not well-defined.  This is because there was no appeal as of right with respect to interlocutory orders modifying exclusivity until Congress created that right in 1994.  <u>See, e.g.</u>, <u>Official Comm. of Unsecured Creditors v. Henry Mayo Newhall Mem'l Hosp. (In re Henry Mayo Newhall Mem'l Hosp.)</u>, 282 B.R. 444, 449 (B.A.P. 9th Cir. 2002) (reviewing legislative history of section 1121(d)).  Neither the Court of Appeals for the Third Circuit nor this Court has addressed this issue but the Bankruptcy Appellate Panel for the Ninth Circuit recently provided a thorough analysis in <u>Henry Mayo Newhall Memorial Hospital</u>.  282 B.R. at 448-452.  In that case, the Appellate Panel reasoned that the "extraordinary step" taken by Congress in 1994, in authorizing an appeal as of right to an interlocutory exclusivity order, evinced Congressional intent that exclusivity decisions are to be "resolved on the merits." <u>Id.</u> at 449.  The Appellate Panel further reasoned that "[t]he Congressional intention that the appellate court 'carefully consider the circumstances of each case' is not consonant with review for abuse of discretion." <u>Id.</u> at 451 (<u>quoting</u> H.R. Rep. No. 103-835, at 36 (1994), <u>reprinted in</u>, 1994 U.S.C.C.A.N. 3340, 3344-45).  Thus, the Appellate Panel concluded that the appropriate standard of review is <u>de novo</u>. <u>Id.</u>[3]

_____

[3] In a case that pre-dates <u>Henry Mayo Newhall Memorial Hospital</u> by seven years, the District Court for

## STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDING

The Asbestos Constituents appeal the Bankruptcy Court's October 3, 2006 Order, which extended the Debtors' exclusive periods to file and solicit votes on a plan of reorganization until July 2007.[4]  The Asbestos Constituents and others objected to this and prior extensions of exclusivity.[5]  This, however, is the first time the Asbestos Constituents have appealed any of the Bankruptcy Court's orders extending exclusivity.  As such, this appeal is the product of a five and a half year odyssey during which the Debtors have made no tangible progress with their emergence from bankruptcy.  The Asbestos Constituents timely noticed this appeal on October 3, 2006.[6]

## SUMMARY OF ARGUMENT

Chapter 11 of the Bankruptcy Code permits a financially distressed company to reorganize within certain parameters set by Congress.  The exit from chapter 11 is accomplished through a plan of reorganization voted upon by creditors and, if they are "in the money," by shareholders.  To be confirmable, a debtor's plan of reorganization must treat all parties fairly and not discriminate against any particular constituency.  See 11 U.S.C. § 1129(b)(1).  In addition, value can only be provided in a waterfall fashion.  Thus, absent their consent, creditors

---

the District of New Jersey noted that "an order altering the exclusivity period will not be set aside absent an abuse of discretion."  Geriatrics Nursing Home, Inc. v. First Fidelity Bank, N.A. (In re Geriatrics Nursing Home, Inc.), 187 B.R. 128, 131 (D.N.J. 1995) (citing In re Gibson & Cushman Dredging Corp., 101 B.R. 405, 409 (E.D.N.Y. 1989)).  However, that Court also concluded that "[t]o the extent that the Bankruptcy Judge rested her conclusion as to the issue of terminating the exclusivity period on legal issues, the [appellate court] shall engage in plenary review of that determination."  Id. at 131.  Moreover, the Court reversed the exclusivity order because the bankruptcy court "erred in its legal conclusion that cause existed."  Id. at 134.

[4] Record Excerpt, Exh. 1.

[5] R-259; R-304; R-415; R-459; R-460; R- 461; R-483; R-484; R-1877; R-1879; R-1880; R-2034; R-2035; R-2241; R-2261; R-2263.

[6] R-2396.

must be fully satisfied before shareholders are entitled to any return.  <u>See</u> 11 U.S.C. § 1129(b)(2)(B).  This requirement is known as the absolute priority rule.  Creditors have the right to vote on a plan if their rights are affected – impaired – in any way.  <u>See</u> 11 U.S.C. § 1126.  It is the role of bankruptcy courts "to effectuate those provisions of the Bankruptcy Code that Congress has already enacted to protect creditors and to reduce delay."  <u>United Savs. Assoc. of Texas v. Timbers of Inwood Forest Assocs., Ltd. (In re Timbers of Inwood Forest Assocs., Ltd.)</u>, 808 F.2d 363, 370 (5th Cir. 1987), <u>aff'd</u>, 484 U.S. 365 (1988).

During the first six months of a bankruptcy, debtors have the exclusive right to file and solicit votes on a plan of reorganization.  <u>See</u> 11 U.S.C. §§ 1121(b) – (c).  The policy behind this six-month rule is that a debtor is entitled to a short window of opportunity to propose a confirmable plan for the reorganization of its business, <u>i.e.</u>, one that will be acceptable to both its creditors and equity.  During this window, creditors are held fully hostage to the bankruptcy process:  they are barred from proposing their own competing plans and, as a consequence of the Bankruptcy Code's automatic stay, are also barred from taking any action to recover on their claims.  Under the Bankruptcy Code, however, once that six-month window expires, Congress determined that exclusivity may be terminated and creditors can propose and vote on their own competing plan of reorganization.  Such competing plans, promoted by the debtor on the one hand and its creditors on the other, commonly result in a consensual plan and early exit from bankruptcy.

Some bankruptcies, of course, are sufficiently large and complex that it is simply not feasible for a debtor to propose a confirmable plan in six months.  Congress provided for this eventuality by allowing for the extension of the debtor's exclusive periods but only if a debtor is able to make an affirmative showing of cause.  <u>See</u> 11 U.S.C. § 1121(d).  Cause is not defined in

the Bankruptcy Code.  At bottom, however, it is appropriate to extend exclusivity if it will facilitate the debtor's early exit from bankruptcy.  If the extension will only delay reorganization, cause cannot be shown and exclusivity must be terminated.  See Pub. Serv. Co. of New Hampshire v. State of New Hampshire (In re Pub. Serv. Co. of New Hampshire), 108 B.R. 854, 891 (Bankr. D.N.H. 1989) (opining that Congress recognized that "reasonable 'promptness' in resolving a corporate reorganization under chapter 11 is important").

Properly enforced, this statutory regime ensures that a debtor is motivated to quickly propose a plan that is fair, and therefore acceptable, to both the debtor and its creditors.  If a debtor fails to propose and solicit votes for such a plan, it faces the prospect that a competing plan will be filed by its creditors and confirmed, over the debtor's objection, by the bankruptcy court.  The statutory regime breaks down if a bankruptcy court routinely extends exclusivity without requiring proof of cause.  In such circumstances, serial extensions of exclusivity only serve to entrench the debtor and marginalize any creditor-led efforts for reorganization.  This upsets the careful balance crafted by Congress, which is designed to protect the right of a debtor to propose its own plan of reorganization in a reasonable timeframe while at the same time ensuring that creditors are not endlessly held hostage by debtors that are unwilling to compromise.  Though not controlling here because the Debtors' bankruptcy cases were filed in 2001, it is noteworthy that Congress amended the Bankruptcy Code in 2005 to provide that the initial exclusive periods may only be extended for an additional maximum period of twelve months (for a total of eighteen months of exclusivity to file a plan and twenty months of exclusivity to solicit votes on the plan).  If the amendment had applied here, the Debtors' exclusivity would have terminated in 2002, over four years ago.

Here, the Debtors are companies that previously manufactured and sold asbestos-containing products.  Like many asbestos defendants, the Debtors and their corporate predecessors were aware of the hazards posed by asbestos exposure for many years yet still continued to manufacture and sell asbestos-containing products.[7]  Millions of Americans were exposed to the asbestos fibers contained in products sold by the Debtors and other asbestos defendants, and thousands of buildings were contaminated with asbestos from the Debtors' products. As a result, tens of thousands of individuals have contracted mesothelioma, lung cancer or other fatal asbestos-related diseases as a result of the Debtors' wrongful conduct in continuing to sell asbestos-contaminated products for decades after they knew that asbestos was harmful.  Due to the long latency period associated with asbestos-related diseases, disease and death caused by exposure to the Debtors' asbestos-containing products will continue for decades into this century.

The Debtors filed for bankruptcy protection on April 2, 2001, now over five and a half years ago.  The Order from which the Asbestos Constituents take this appeal is the <u>ninth</u> extension of the Debtors' exclusive periods.[8]  That Order extends the Debtors' exclusive periods until July 2007, resulting in seventy-five months, or over twelve six-month periods, of exclusivity.  The Bankruptcy Court, however, held there was "cause" to grant the ninth extension based on the stated belief that the Debtors would reach consensus with the Asbestos Constituents and file a confirmable plan before July 2007.

---

[7] <u>See</u> Barry I. Castleman, <u>Asbestos:  Medical and Legal Aspects</u>, 634-44 (4th ed. 1996).

[8] Record Excerpt, Exh. 1.  The Debtors have filed nine distinct motions to extend their exclusivity, each of which was granted by the Bankruptcy Court.  It is significant to note, however, that the Debtors have actually received approximately fifteen extensions of their exclusive periods as a result of various interim extensions and continuances.

Given the passage of time and the Debtors' penchant for delay, the Bankruptcy Court's ruling was in error.  The only true hope for achieving a consensual plan and a seasonable resolution of the Debtors' bankruptcy cases is to terminate exclusivity.  This is because the Debtors have no incentive to reach consensual agreement with the Asbestos Constituents before July 2007 and, in fact, will not do so.  This is evidenced by the fact that although the Debtors filed for bankruptcy in April 2001, they delayed filing a plan of reorganization until November 2004, three and a half years later.  And then, instead of attempting to build a consensus, the Debtors filed a plan that is so favorable to their shareholders and other creditors and so discriminates against the Asbestos Constituents that it is non-confirmable as a matter of law. Among other things, the plan not only would improperly limit the funds available to pay asbestos claims, it would also impose that cap on the holders of asbestos claims by denying them their statutory right to vote on the plan.  By February 2006, the Debtors belatedly recognized that their plan was non-confirmable but have yet to file any amendment to it or any confirmable plan.  In the end, the Debtors' plan is nothing more than a bad-faith offer to the Asbestos Constituents.

It is also clear that the Debtors are not prepared to negotiate to reach a consensus that will give rise to a confirmable plan.  In March 2006, the Bankruptcy Court ordered mediation on plan issues.  After three months, the Debtors still refused to depart from their position that asbestos claims should be capped and holders of such claims should be denied their right to vote on the Debtors' plan.  As a result, in June 2006, the Debtors admitted that there was no "foothold for moving forward with any further [mediation] discussions."[9]  Critically, however, the Asbestos Constituents all reached agreement among themselves during the mediation as to their relative treatment under any plan and are ready to move forward with a competing plan.  That agreement

---

[9] R-2232 at 4, lines 21-22.

includes consensual treatment of the Zonolite Attic Insulation claims, which could amount to billions of dollars.

The reason for the Debtors' recalcitrance is simple: bankruptcy has been, and continues to be, very good for the Debtors. Every day that they stay in bankruptcy, their cash position improves, their stock price trends upward, and the Debtors' senior executives are handsomely rewarded with generous retention bonuses that are not tied to a successful reorganization. And every day of exclusivity allows the Debtors to focus on programmatic, protracted, and expensive litigation designed to re-engineer the tort system as it applies to asbestos claims. The Asbestos Constituents, however, continue to be held hostage to a bankruptcy process that started five and a half years ago, with no end in sight – in plain contradiction of a statutory regime that is designed to facilitate a debtor's quick exit from bankruptcy. Aside from the obvious inequity of making Asbestos Constituents, some of whom are very sick, wait endlessly for payment on their claims while the Debtors prosper, the repeated and serial extensions of exclusivity have real life and death consequences for many of the Asbestos Constituents. For example, individuals who contract mesothelioma from exposure to asbestos in the Debtors' products rarely live more than eighteen months. Thousands of mesothelioma claims were pending against the Debtors when they first filed for bankruptcy in 2001, and other individuals have developed, or will develop, mesothelioma or other cancers as a result of their exposure to the Debtors' asbestos-containing products. It is likely that thousands of cancer victims of the Debtors' conduct have died while the Debtors' bankruptcy case has been pending, which victims' estates are barred from seeking relief against the Debtors because of the Bankruptcy Code's automatic stay.

In sum, this much is not debatable: (i) the Bankruptcy Court's ninth extension overlooked the legislative goals underlying section 1121 as there was no basis to conclude that

the extension advanced the Debtors' exit from bankruptcy; (ii) the Debtors failed to make any showing in connection with the ninth extension that the filing of a consensual plan is likely to occur; (iii) the ninth extension was granted in the face of an agreement reached among the Asbestos Constituents that would facilitate their filing of a competing plan of reorganization which is entirely consistent with the legislative goals; (iv) the ninth extension facilitates the Debtors' prolonged litigation (as opposed to reorganization) strategies while holding creditors hostage to that ill-gotten process; and, (v) asbestos creditors – not the Debtors – are prejudiced by the delay in the resolution of the Debtors' bankruptcy case.

For this and other reasons, the Asbestos Constituents respectfully submit that the Bankruptcy Court's Order extending exclusivity for the ninth time through July 2007 was in error and should be reversed.

## STATEMENT OF FACTS

### I.      The Bankruptcy Filing.

On April 2, 2001, the Debtors filed for bankruptcy protection under chapter 11 of the Bankruptcy Code.  The Debtors did not file for bankruptcy because financial distress threatened their continued viability.   Per the Debtors, this bankruptcy was filed for the purpose of "managing" their asbestos litigation, i.e., to avoid having to defend and resolve asbestos claims in the same setting as ordinary litigants.[10]  It is now apparent, however, that the Debtors were intent on not only "managing" their asbestos litigation, itself a suspect goal, but also on re-engineering the tort system for so long as they were able to convince the Bankruptcy Court to allow them to hijack the bankruptcy process.[11]

---

[10] R-2 at 2.

[11] R-431 at 126.  It is noteworthy that between 2000 and 2003, numerous other asbestos manufacturers filed for relief under chapter 11 in this and other Districts.  See, e.g., Owens Corning Corp., No. 00-03837

## II.    The Debtors' Repeated Requests for Exclusivity.

The Debtors' original statutory exclusive periods to file a plan and solicit acceptances expired on August 1, 2001 and October 1, 2001, respectively.  See 11 U.S.C. § 1121(b).  To extend those periods, the Debtors filed motions in the early stages of the case.[12]  The ACC and the PD Committee, in recognition of the fact that the Debtors' cases are large and complex, did not oppose any of the Debtors' first four extension motions.  The Bankruptcy Court, in turn, granted each of those motions.[13]

On July 21, 2003, however, two years into their bankruptcy, the Debtors filed their fifth extension motion.[14]  The ACC opposed that motion.[15]  At that point, it had become clear to the ACC that the Debtors' cases had stalled.[16]  In fact, the Debtors had not yet even filed a proposed plan of reorganization.  The Bankruptcy Court, however, granted the fifth motion and extended the Debtors' exclusive period to file a plan until February 1, 2004.[17]  But the Bankruptcy Court

---

(Bankr. D. Del.), Babcock & Wilcox, No. 00-10992 (Bankr. E.D. La.), Armstrong World Indus., No. 00-4471 (Bankr. D. Del.), USG Corp., No. 01-2094 (Bankr. D. Del.), United States Mineral Products, No. 01-02471 (Bankr. D. Del.), Federal-Mogul Global, No. 01-10579 (Bankr. D. Del.), Kaiser Aluminum Corp, No. 02-10429 (Bankr. D. Del.), Mid-Valley, Inc., No. 03-35592 (Bankr. W.D. Pa.), and Combustion Engineering, Inc., No. 03-10495 (Bankr. D. Del.).  All of those manufacturers have completed, or are in the process of completing, their bankruptcy journey via plans of reorganization agreed to by their asbestos creditors.  The Debtors' bankruptcy has been a stark contrast and anything but consensual.

[12] R-47; R-85; R-179; CD-14.

[13] Bankr. D. Del. Docket No. 938; R-108; R-201; R-226.

[14] R-252.

[15] R-259.

[16] R-285 at 18, lines 14-17 (Counsel for the ACC stating that "[t]he fact of the matter here is, that there is nothing, I repeat, nothing going on here to have any prospect of a consensual plan or cram down or any kind of plan to be put on the table for the future.").

[17] R-279.

signaled at that time – in late 2003 – that if there was not any progress toward a consensual plan

soon, exclusivity would be lifted:

> [The] fact that the debtor has exclusivity should not be a disincentive to creditors getting together to see if they can come to some mutual understanding of the kind of plan they'd like to see.  At that point, if in fact they have such a plan, then the debtor isn't willing to move forward with that or some other plan, that may be grounds to terminate exclusivity . . . .[18]

Five months later, however, in January 2004, the Debtors had still not made any progress

towards reorganization but, nevertheless, filed their sixth motion to extend exclusivity.[19]  The

Bankruptcy Court granted the extension[20] but again let it be known that it was very frustrated

with the Debtors' lack of progress and posited that it might be time to replace the Debtors'

management team with a trustee:

> Well, then, I need some answers.  This case is now 3 years old.  It's time for the Debtor to know what it's [sic] business plan is, what it's [sic] operational plan is, what it's [sic] reorganization plan, in structure.  I don't expect that you've got all the negotiations done. I understand your need to figure out what the asbestos liabilities are before you can even conclude that piece.  But, I sent you off to talk to all the other constituent groups 2 months ago, and I expect that you're still doing that, so that the basis of a plan can be put together.  It's very long, folks, it's very long, and I'm starting to wonder whether the Debtor-In-Possession, is going to be able to get this done, and if not whether to replace the Debtor.  That's the point I'm at.[21]

Later, in March 2004, the Bankruptcy Court asked the Debtors the fundamental question

whether they intended to seek a Bankruptcy Code 524(g) injunction to address their asbestos

problems.[22]  The Debtors' response was that  "Your Honor, to this day, I can't tell you that it will

---

[18] R-282 at 23, lines 23-25 and at 24, lines 1-3.

[19] R-300.

[20] R-326.

[21] R-308 at 17-18 (alterations added).

[22] R-307 at 47.  The Bankruptcy Code specifically provides for a broad-based injunction against asbestos suits upon the filing of the petition for relief under chapter 11.  However, in order to emerge from chapter 11 and obtain protection from present and future asbestos suits, the Bankruptcy Code requires that any

be a 524(g) plan."[23]  This response demonstrates the Debtors' lack of good faith in the plan

process.  The only way for an asbestos debtor to "buy peace" from future asbestos personal

injury claims through the bankruptcy process is to propose a plan of reorganization which

contains a section 524(g) injunction which channels all present and future asbestos claims to a

claims resolution trust.

The Debtors' response, three years into the bankruptcy, prompted the Bankruptcy Court

to order the Debtors to seek appointment of a future claimants' representative – a linchpin to

reorganization under section 524(g) of the Bankruptcy Code[24] – and again, to castigate the

Debtors for their lack of progress:

> Then let's get a Futures Rep.  I mean, you can't have it both ways.  We either need the
> pieces in place to get a 524(g) [injunction], or else we need a plan that doesn't have one.
> Take your pick.  Let's do it.  It's been a long time.  And, frankly, I'm getting to the point
> where if I don't lift exclusivity, I'm going to appoint a trustee, and that will cause all
> sorts of problems, I know, for the debtors lending perspective, if nothing else.  But, this
> has gone on too long, with too little progress.  Now, last September, I thought I
> provided some marching orders so that people could start talking.  I'm glad to hear that
> the debtor has taken that to heart and attempted to try to get the constituents together.
> But, I still don't see any progress as a result of it, and that was six months ago.[25]

On May 24, 2004, David T. Austern was approved as the future claimants'

representative.[26]  That same day, but only because they were urged to do so by the Bankruptcy

Court, the Debtors said they would be prepared to file a plan of reorganization within 90 to 120

days, i.e., before October 2004 at the latest.  The Debtors stated that they "hope[d]" that the plan

---

plan of reorganization be approved by 75% of present asbestos claimants.  See 11 U.S.C. §
524(g)(2)(B)(ii)(IV)(bb).

[23] R-307 at 47, lines 18-19.

[24] See 11 U.S.C. § 524(g)(4)(B)(i).

[25] R-307 at 48.

[26] R-322.

"will be one that reflects consent and agreement for all of the constituencies, all of the constituencies except the bodily injury constituency."[27]

## III.    The Debtors File An Unconfirmable Plan of Reorganization.

In July 2004, the Bankruptcy Court gave the Debtors "a last period of exclusivity to get this done," i.e., until October 14, 2004.[28]   In so doing, the Bankruptcy Court cautioned the Debtors:  "[I]f I don't have a plan that's on track and headed toward the confirmation arena, if nothing else, I don't think there will be another extension" of the exclusive periods.[29]

Predictably, the Debtors failed to meet the October 14, 2004 deadline to file a plan. Instead, they asked for another one-month extension to November 14, 2004.[30]   The Asbestos Constituents agreed to this short extension because they had the explicit expectation that the Debtors were at last going to reach a fair compromise with the Asbestos Constituents.[31]

On November 13, 2004, over three and a half years into their bankruptcy, the Debtors finally filed their first plan of reorganization and disclosure statement,[32] which was amended on January 13, 2005 (the "Debtors' Plan").[33]   But, as the Debtors must have known, the Debtors' Plan is not confirmable on its face.

The Debtors' Plan does provide for a section 524(g) asbestos settlement trust to administer both asbestos personal injury and asbestos property damage claims (collectively, the "Asbestos Liabilities").  The Debtors' Plan also provides for the Bankruptcy Court to "estimate"

---

[27] R-341 at 52, lines 20-23.

[28] Id. at 68; A-326.

[29] Id. at 70.

[30] R-347.

[31] CD-25; R-348.

[32] R-358; R-359.

[33] A copy of the Debtors' Plan is attached as Exhibit 2 to the Appellants' Record Excerpts and is also available in the Record at R-419.

the amount of Asbestos Liabilities.  Both these elements – the trust and the estimation process –

are common in asbestos bankruptcies.  The Debtors' Plan, however, departs from the norm in a

way that makes it non-confirmable because it provides, regardless of the Bankruptcy Court's

estimation of Asbestos Liabilities, that the Debtors will arbitrarily cap such Liabilities at $1.6

billion.[34]  Thus, by way of illustration, if the Bankruptcy Court determines that the actual

allowed amount of Asbestos Liabilities is, for example, $2 billion, the Debtors' Plan makes no

provision for the payment of the difference.  Despite the foregoing, holders of Asbestos

Liabilities are deemed unimpaired under the Debtors' Plan and thus not entitled to vote for or

against it.[35]  In stark contrast, the Debtors' Plan provides that general unsecured creditors will

receive full payment of their allowed claims in any event (including post-petition interest) and

equity holders will retain their interests.[36]  As such, the Debtors' Plan violates both the rule

against discrimination and the absolute priority rule.   11 U.S.C. §§ 1129(b)(1) and

1129(b)(2)(B).

Each of the Asbestos Constituents objected to the treatment afforded by the Debtors'

Plan.[37]  The Bankruptcy Court conducted a hearing on January 21, 2005 to consider approval of

the disclosure statement accompanying the Debtors' Plan.[38]  At the disclosure statement hearing,

the Bankruptcy Court was troubled by the prospect of asbestos claimants being paid less than the

full amount of their claims.  As the Bankruptcy Court observed, "That's impairment."[39]  The

---

[34] Record Excerpt, Exh. 2 at A-30 §§ 7.6.1(v) and (w).

[35] Id. at A-14 to A-17 §§ 3.1.6 – 3.1.8.

[36] R-418 at 58-60; Record Excerpt, Exh. 2 at A-17 to A-18 §§ 3.1.9 – 3.1.11.

[37] R-393; R-401; R-404.

[38] R-431.

[39] Id. at 62, line 14 and at 75-76.

Bankruptcy Court also stated, "[F]rankly, I'm very uncomfortable with a process that imposes a 524(g) injunction that doesn't permit creditors to vote anyway."[40]

## IV.    Estimation of Asbestos Liabilities.

Notwithstanding its concerns, the Bankruptcy Court postponed determining whether the Debtors' Plan was fatally flawed by the omission of voting rights for holders of Asbestos Liabilities.[41]  Rather, upon the Debtors' request, the Bankruptcy Court put that determination off until after all Asbestos Liabilities were estimated in two separate estimation proceedings, one pertaining to asbestos personal injury claims and the other pertaining to filed asbestos property damage claims[42] that did not arise from the installation of Zonolite Attic Insulation ("ZAI") in residences.[43]

The contours of the estimation proceedings have been ill-defined and ever-changing.  The actual estimation hearing in respect of personal injury claims is not presently scheduled to start until June 2007.[44]    In the case of property damage, the Bankruptcy Court bifurcated the estimation into a *Daubert* hearing on the correct methodology to determine the existence of contamination in a building in which the Debtors' asbestos-containing products were installed (the "Methodology Issue") and a hearing to place an estimated value on extant property damage

---

[40] R-431 at 69, lines 9-11.

[41] Id. at 111, 122, 132-33, 140, 153, 155, 167-69.

[42] The PD Committee has not foregone its right to appeal the Bankruptcy Court's determination to conduct an "estimation" proceeding in respect of property damage claims.

[43] At the time of the Debtors' bankruptcy, ZAI litigation was less mature than litigation in respect of the Debtors' other asbestos-containing products although a class of Washington state homeowners had been conditionally certified.  As a consequence, in October 2004, the Bankruptcy Court conducted a *Daubert* hearing concerning the reliability of the scientific means for determining whether ZAI was unreasonably harmful to facilitate the court's determination of whether it ought to permit a class claim to be filed on behalf of ZAI claimants in the Debtors' bankruptcy.  The Bankruptcy Court has yet to issue its opinion from that hearing.

[44] R-2284.

claims ("Phase II").[45]   After numerous fits and starts, the Bankruptcy Court determined in July

2006 that the Debtors should first prosecute their objections to property damage claims before

proceeding with Phase II.[46]   The Methodology Issue hearing is presently scheduled to occur in

late January 2007 and certain of the Debtors' objections to individual property damage claims are

to be heard commencing in late April 2007.[47]

## V.    The Debtors Deny Liability For Virtually All of Their Asbestos Liabilities.

While the use of estimations has become commonplace in asbestos bankruptcy cases, the

setting in which they occur in this bankruptcy is very different.   This is because the Debtors have

persistently maintained that virtually every sort of asbestos claim asserted against it pre- and

post-bankruptcy is meritless.   Thus, with respect to the ZAI claims, the Debtors contend that

"claims arising from this newest round of litigation are without merit," and that "ZAI claimants

will be unable to meet their *Daubert* burden."[48]   Similarly, with respect to the Monokote-3

property damage claims, the Debtors stated that "those [Monokote-3 claims] that are filed [in the

bankruptcy case] will be subject to a statute of limitations defense."[49]   The Debtors also argued

that several of the "only seven claims" remaining as of the petition date will be barred by *res

judicata* stemming from the Debtors' pre-petition class action settlements, and that the other

claims also "will be unable to meet the *Daubert* criteria for establishing reliable, scientific

evidence of product risk sufficient to warrant remediation."[50]   Finally, with respect to the bodily

injury claims, the Debtors argue that the spike in the number of claims is "unsupported by any

---

[45] R-538; R-1976.

[46] R-2292 at 97-184.

[47] R-2355.

[48] R-2 at 56; R-24 at 4.

[49] R-24 at 6.

[50] R-24 at 10.

principle of science or law," and "bears no relation to the actual trend of disease."[51]  The Debtors

maintain further that "[s]tate law uniformly requires that no claim should proceed without

credible evidence of exposure to the Debtors' asbestos products," and that "[t]o meet their burden

of proof, claimants must present scientific evidence establishing that their exposure to [Debtors']

asbestos products was a substantial causative factor in their developing an asbestos related

disease."[52]

As a consequence of the Debtors' abject denial of virtually any legal responsibility for its

asbestos-containing products, despite thirty years of unfavorable litigation experiences in the tort

system where similar defenses were mounted and failed, the Debtors' bankruptcy cases generally,

and the estimation proceedings specifically, have taken on colossal litigation proportions, both in

terms of cost and time.

The Asbestos Constituents suggested a more expedient and less expensive path to

confirmation of a plan.[53]  They proposed that the Bankruptcy Court limit the estimation exercise

to a determination of the estimated value of cancer claims only.[54]  The Asbestos Constituents

rationalized that a cancers-only estimation would be a significantly shorter process because there

are fewer claims, medical diagnoses are based upon pathology, and there would be no diversion

as a result of "suspect" B-readers and other questions raised by the Debtors relating to non-

malignant claims.[55]  The Asbestos Constituents further proposed that if the estimated value of

cancer claims alone renders the Debtors insolvent, the Asbestos Constituents would be prepared

---

[51] Id. at 12-13.

[52] Id. at 15-16.

[53] R-2241 at 11-12.

[54] Id.

[55] Id.

to agree to a *pro rata* allocation of assets with commercial creditors, without the necessity of expending additional time and resources valuing non-malignant personal injury claims, traditional property damage claims and ZAI claims.[56]    Upon the Debtors' argument, the Bankruptcy Court did not follow the Asbestos Constituents' proposal.

## VI.    The Debtors Seek and Obtain More Extensions of Exclusivity.

Despite having an unconfirmable plan on file, the Debtors sought a seventh extension of their exclusive periods in November 2004, which the Bankruptcy Court granted over the objections of the Asbestos Constituents.[57]    And then again in May 2005, the Debtors filed their eighth motion for an extension of their exclusive periods,[58] which was opposed by the Asbestos Constituents.[59]

On June 27, 2005, the Bankruptcy Court heard argument on the Debtors' eighth motion and, despite the objections of the Asbestos Constituents, granted a one-month extension of the exclusive periods until July 2005 and required the parties to file briefs to address the effect (if any) that terminating the exclusive periods would have on the Debtors' businesses (the "Business Brief").[60]    The Debtors were hard-pressed to articulate appreciable harm to their businesses that might result from the termination of exclusivity.[61]    The Asbestos Constituents, however,

---

[56] The Appellants' proposal was the same approach Judge Wolin intended to use in the USG bankruptcy case before his recusal.  See In re USG Corp., 290 B.R. 223 (Bankr. D. Del. 2003).

[57] R-366; R-415; R-427.

[58] R-454.

[59] R-459; R-460; R-461.

[60] R-477.

[61] R-478.

demonstrated, through their financial advisors, that termination of exclusivity would have little if any detrimental impact on the Debtors' businesses.[62]

The Bankruptcy Court put off hearing the eighth motion due to the press of other matters. Before the Bankruptcy Court could rule, however, the Debtors filed their ninth motion to extend the exclusive periods.[63]  The ninth motion sought an extension of the Debtors' exclusive right to file a plan through and including the ninetieth day after a final order is issued in the estimation hearing, and an extension of the Debtors' exclusive right to solicit acceptances to that plan through and including a period of an additional sixty days thereafter.[64]  The Debtors argued that "cause" existed to grant the ninth motion because they have made "substantial progress toward confirmation of a plan" and continue to have ongoing "negotiations" between all the parties in interest.[65]  But the truth was that no such progress had occurred and no such global negotiations had taken place.[66]

At the hearing on December 19, 2005, the Bankruptcy Court extended the Debtors' exclusivity until February 21, 2006 and indicated that, if a consensual agreement was not reached by the February 21, 2006 hearing, the Bankruptcy Court would appoint someone to assist in the negotiation process.[67]

---

[62] R-481; R-483; R-484.

[63] R-510 at 207; R-553 at 134, lines 15-16.  A copy of the Debtors' ninth motion to extend exclusivity is attached as Exhibit 3 to the Appellants' Record Excerpts and is also available in the Record at R-1852.

[64] Record Excerpt, Exh. 3.

[65] Id. at A-63 and A-64.

[66] R-1877 at Exh. A.

[67] R-1957 at 110-11.

**VII.    The Plan Amendments That Were Not to Be.**

On February 13, 2006, the Debtors filed a Status Report on the Progress of the Case (the "Status Report").[68]   Therein, the Debtors indicated that they have "been hard at work to address the Court's concerns with the plan on file."[69]   Critically, they further stated that they are "ready to file (if necessary) an amended plan that removes the cap on personal injury claims and puts equity at risk."[70]   Thus, not only did the Debtors delay three years in filing a plan, they further delayed over a year and a half before recognizing the obvious truth, namely that their Plan was not confirmable.   The Debtors also stated that they are "preparing amendments that could be used in the event that agreement is reached with the personal injury claimants."[71]   Despite these statements, the Debtors have not filed any amendments or a confirmable plan.   Finally, the Status Report proposed that a mediator be appointed in order to move the parties toward resolution.[72]

**VIII.    The Plan Mediation.**

The Asbestos Constituents were heartened by the proposal to remove the cap, the preparation of an amended plan, and the request for a mediator.   Thus, on February 21, 2006, with no objection from the Asbestos Constituents, the Bankruptcy Court extended the Debtors' exclusive periods by sixty days so the parties could commence plan mediation.[73]   The Honorable Sam C. Pointer, Jr. (Ret.) was appointed as the plan mediator.[74]

---

[68] A copy of the Debtors' Status Report is attached as Exhibit 4 to the Appellants' Record Excerpts and is also available in the Record at R-2036.

[69] Record Excerpt, Exh. 4 at A-84.

[70] Id. at A-85.

[71] Id.

[72] Id.

[73] R-2125; R-2081.

[74] R-2125.

The mediation, however, was unsuccessful, at least in terms of reaching consensus with the Debtors.  On June 19, 2006, the Debtors informed the Bankruptcy Court that there no longer appeared "to be any foothold for moving forward with any further [mediation] discussions."[75]

While the Debtors could not reach agreement with their Asbestos Constituents, even with the benefit of a mediator, the Asbestos Constituents were able to reach agreement among themselves for the allocation of distributions between personal injury claimants and property damage claimants, as well as an agreement within the PD Committee concerning the allocation of distributions under a plan between traditional property damage claimants and ZAI claimants.[76] These asbestos agreements are extremely significant in that they serve as the basis of a consensual plan among the Asbestos Constituents, which resolves, among other things, the potential massive liability posed by the ZAI claims.  The Asbestos Constituents, of course, are unable to file a plan of reorganization while the Debtors retain exclusivity.  The Debtors' reaction to that critical step in the formulation of a confirmable plan of reorganization was to launch yet more litigation by propounding discovery on the Asbestos Constituents, seeking to penetrate the interaction among them relating to the agreement and to decry the agreement as illicit and unenforceable.[77]

## IX.    Yet Another Extension of Exclusivity.

The Debtors' ninth motion for an extension was finally argued before the Bankruptcy Court on September 11, 2006.[78]  At that hearing, the Asbestos Constituents argued that under the

---

[75] R-2232 at 4, lines 21-22.

[76] Id. at 23-24.

[77] R-2339; R-2371; CD-52.

[78] Excerpts from the Bankruptcy Court's September 11, 2006 hearing transcript are attached as Exhibit 5 to the Appellants' Record Excerpts and are also available in the Record at R-2390.  See Record Excerpt, Exh. 5 at A-106 to A-209.

Debtors' current timeline, a confirmation hearing on the Debtors' Plan cannot occur until at least 2008.[79]  Moreover, the Asbestos Constituents argued that the Debtors' Plan presents a Hobson's Choice:  If the Bankruptcy Court estimates the Asbestos Liabilities in an amount above the cap, the asbestos claimants can vote on a Plan that makes no provision for full payment to them; alternatively, if the Bankruptcy Court estimates the Asbestos Liabilities in an amount below the cap, the Debtors' Plan improperly characterizes asbestos claimants as unimpaired and not entitled to vote.[80]

The Bankruptcy Court nonetheless decided to extend the Debtors' exclusivity through July 2007.[81]  The Bankruptcy Court concluded that the Debtors had shown that they can "propose a plan that is feasible and within a reasonable time."[82]  In reaching this conclusion, the Bankruptcy Court reasoned that "[a]t this point in this case it is more important for all parties to focus their efforts on resolving the outstanding issues, than in creating additional fees and expenses for the estate by requiring the filing or redoing or doing of competing plans."[83]

## X.    "Oh Thank Heaven For Chapter 11."

While asbestos creditors have been stymied during the Debtors' bankruptcy, the Debtors have not only enjoyed a more than five year respite from defending against approximately 118,000 asbestos lawsuits, but it has also been "business as usual" for the Debtors, or maybe better than usual.  The Debtors' cash position is such that they do not currently need to borrow any funds for working capital or other cash needs.  As of September 30, 2006, the Debtors had

---

[79] Record Excerpt, Exh. 5 at A-142 to A-143.

[80] Id.

[81] Id. at A-206 to A-209; Record Excerpt, Exh. 1.

[82] Id. at A-208, lines 6-7.

[83] Id. at A-208, lines 11-15.

nearly $453.7 million in available cash and cash equivalents.[84]  During the Debtors' bankruptcy, their revenues have progressively increased from approximately $1.7 billion in 2001 to over $2.6 billion (annualized) in 2006.[85]  Further, during the course of the bankruptcy, the Debtors have bought and sold whole business segments.[86]

Moreover, the Debtors have also been allowed to indulge officers and employees with hugely favorable incentive plans which do not require that the Debtors emerge from bankruptcy by any specified date.  For example, the Debtors have obtained approval of long term incentive compensation programs ("LTIPs") for their executives.  Estimated payouts under LTIPs covering the years 2001-2003 and 2002-2004 totaled $23.6 million.[87]

The Debtors also sought and obtained approval of hefty retention bonuses for the Debtors' former Chief Executive Officer, Paul J. Norris, entitling him to well over a million dollars.[88]  Upon Mr. Norris's resignation as the Debtors' CEO, the Debtors sought and received approval of an annual salary of $425,000 to Mr. Norris as a part-time consultant.[89]  The Debtors also sought and obtained approval of substantial retention and other bonuses for the Debtors' current CEO, Alfred E. Festa.[90]  Indeed, in addition to Mr. Festa's entitlement to annual bonuses totaling 100% of his base salary, Mr. Festa is expected to receive $1,690,000 through his

---

[84] W.R. Grace & Co., SEC Form 10-Q, Quarterly Period ended September 30, 2006, at I-4.

[85] *Grace Reports Fourth Quarter Operating Results; Operating Up 32%, Sales Up 9% Over Prior Year Fourth Quarter*, PRNewswire-FirstCall, January 29, 2001, *available at* http://phx.corporate-ir.net/phoenix.zhtml?c=112313&p=irol-newsArticle&ID=252773&highlight=; *Grace Reports First Quarter Financial Results*, Business Wire, April 25, 2006, *available at* http://phx.corporate-ir.net/phoenix.zhtml?c=112313&p=irol-newsArticle&ID=847515&highlight=.

[86] R-87; R-124; R-344; R-500; R-504; R-534; R-2161; R-2188; R-2199.

[87] R-22; R-193; R-224; R-225; R-306; R-462; R-464; R-485; R-2229; R-2281.

[88] R-205; R-217.

[89] R-434; R-447.

[90] R-434; R-447.

participation in the 2005-2007 LTIP, and in excess of an additional $1.5 million for remaining as CEO for three years while the Debtors' Plan merely is on file.[91]    The Debtors also sought and obtained authority to remunerate their former General Counsel and Chief Restructuring Officer, David B. Siegel, who will receive $450,000 as a part-time consultant.[92]    Under those agreements, each of the former officers is paid a fixed sum and is economically indifferent to when or whether the Debtors actually reorganize.

## XI.    The Debtors and Their Officers Get Indicted During the Bankruptcy Case.

In February 2005, a federal grand jury indicted the Debtors and several of their current and former senior executives for pre- and post-petition acts, including misrepresenting the asbestos dangers associated with the Debtors' vermiculite mine in Libby, Montana to the Federal Government, industrial customers, workers and the public.    Of the 8,000 people who live in Libby and the surrounding valley, more than 1,500 have asserted that they have asbestos-related diseases.[93]    Victim's groups say more than 250 people have died, counting a small-number of disease-related suicides.[94]

The federal indictment also related to the withholding of important information from the Federal Government in respect of asbestos contamination of ZAI, as well as the Debtors' misrepresentations to the EPA regarding ZAI in its efforts to escape public health warnings about ZAI.    The indictment concerns activities both before and after the commencement of the bankruptcy.[95]    Additionally, on June 1, 2005, the New Jersey Attorney General filed a civil

---

[91] R-434 ¶¶ 11-12; A-447.

[92] R-453.

[93] Michael Riley, *Asbestos' Grip.  Years After Mining Left Libby, Mont., Hundreds Have Died.  Diagnoses Keep Coming*, Denver Post, Nov. 19, 2006, *available at* http://www.denverpost.com/search/ci_4685960.

[94] Id.

[95] R-351; R-354; R-376; R-429.

complaint against the Debtors and two former executives alleging that they falsified documents to state environmental authorities.[96] The foregoing has triggered costly indemnity and defense obligations for current and former officers of the Debtors, in addition to the attendant defense costs for the Debtors themselves.[97]

## XII.    The Asbestos Committees Recover $1.2 Billion for the Estate Over the Debtors' Objections.

Remarkably, when the Debtors had the opportunity to create more value for their creditors in the course of the bankruptcy they chose not to do so as it did not advance the Debtors' larger litigation agenda. Specifically, early in the bankruptcy case, the Debtors refused to prosecute and even opposed bringing fraudulent transfer actions against Sealed Air Corporation and Fresenius Medical Care, Inc.[98] District Judge Wolin thus authorized the ACC and PD Committee to prosecute the actions.[99] Rather than watch from the sidelines, the Debtors actually intervened in the actions as a party defendant and actively defended against the actions.[100] Ultimately, those actions were settled. By those settlements, Sealed Air and Fresenius agreed to pay to the Debtors cash and securities with a current aggregate value of approximately $1.2 billion.[101] Ironically, economically speaking, the Debtors' Plan does little more than re-circulate the Sealed Air and Fresenius settlement proceeds.[102] Thus, while the Debtors' Plan provides for a total (and inadequate) asbestos payment of $1.6 billion,[103] $1.2

---

[96] CD-42; R-1981 at 172-188.

[97] R-2320; R-2350.

[98] R-19; R-122; R-123; R-3220.

[99] R-116.

[100] R-3227; R-3231; R-3233; R-3244-46; R-3257; R-3270; R-3276; R-3280; R-3281; R-3287.

[101] R-238; CD-40.

[102] See Record Excerpt, Exh. 2 at A-24 to A-25 § 7.2.2 and at A-30 §§ 7.6.1(r), (t), (u).

[103] See id. at A-30 §§ 7.6.1(v) and (w).

billion of that money is there solely because of the ACC and PD Committee's prosecution of the

Sealed Air and Fresenius cases in the face of the Debtors' active resistance to those lawsuits.

## XIII.    No End in Sight.

Some five and a half years after the commencement of the bankruptcy cases, little has

changed.  The Debtors have only been able to reach consensus with the commercial creditors and

equity holders by agreeing to give each constituency something to which it would not be entitled

if the Debtors are insolvent, as the Asbestos Constituents argue, and the Debtors' Plan continues

to sit collecting dust as it remains unconfirmable.[104]    Nonetheless, and notwithstanding the

Bankruptcy Court's own misgivings about the Debtors' Plan,[105] by virtue of the Bankruptcy

Court's latest order extending exclusivity, from which the Asbestos Constituents take this appeal,

the Debtors have been granted the exclusive right to continue to promote their ill-conceived and

non-confirmable Plan at least until July 2007.[106]

## ARGUMENT

**I.    Legal Standard For Extensions Of A Debtor's Exclusive Periods To File A Plan Of Reorganization And Solicit Acceptances Thereto.**

### A.    The Keystones of Section 1121 of the Bankruptcy Code.

Section 1121(a) of the Bankruptcy Code permits a debtor to file a plan of reorganization

at any time during the chapter 11 case.  However, section 1121(b) gives the debtor the exclusive

right to file a plan during the 120-day period after the start of the bankruptcy.  11 U.S.C.

§ 1121(b).  If the debtor files a plan during this 120-day period, section 1121(c)(3) grants the

---

[104] While the Debtors now conveniently use the (ill-conceived) estimation and claims objection proceedings as justification for further extensions of exclusivity, it should be noted that it took the Debtors more than four years to ramp up those proceedings.  See Record Excerpt, Exh. 5 at A-128 to A-134, A-174 to A-175.

[105] R-431 at 62, 66; R-477 at 60, 75, 82-84, 88; R-1957 at 37-39, 45-73, 104; R-2036 at 6-7.

[106] Record Excerpt, Exh. 1.

debtor an additional 60 days (for a total of 180 days or six months) to solicit acceptances of the plan. 11 U.S.C. § 1121(c)(3).

Section 1121(d) provides that the court "may" reduce or increase the 120-day or 180-day exclusive periods if it can be shown that "cause" exists for the granting of such reduction or extension. 11 U.S.C. § 1121(d). The use of the term "may" instead of "shall" gives the bankruptcy court discretion in deciding whether to extend the exclusivity periods even when the legal requirement of "cause" is found. In re Sharon Steel Corp., 78 B.R. 762, 763 (Bankr. W.D. Pa. 1987) (stating same). Thus, as used in section 1121, these terms converge to produce two undisputed principles: if a debtor does not meet its burden of demonstrating "cause," then the court must deny the request for an extension; however, if the court does find "cause," then it "may," in the exercise of its discretion, but does not have to, grant the request.

By requiring an affirmative showing of cause, "Congress intended to create a balance so as to protect the right of a debtor in possession to propose and obtain the requisite consents to its plan of reorganization while at the same time protecting creditors from abuse of chapter 11 by a debtor unwilling to negotiate in good faith with creditors." In re Amko Plastics, Inc., 197 B.R. 74, 77 (Bankr. S.D. Ohio 1996). In assessing whether cause exists, "[t]he bankruptcy court must avoid reinstituting the imbalance between the debtor and its creditors that characterized proceedings under the old Chapter XI. Section 1121 was designed, and should be faithfully interpreted, to limit the delay that makes creditors the hostages of Chapter 11 debtors." In re Washington-St. Tammany Elec. Coop., Inc., 97 B.R. 852, 855 (E.D. La. 1989) (citing United Savs. Assoc. of Texas v. Timbers of Inwood Forest Assocs., Ltd. (In re Timbers of Inwood Forest Assocs., Ltd.), 808 F.2d 363, 372 (5th Cir. 1987), aff'd, 484 U.S. 365 (1988)).

Congress has taken steps in recent years to ensure that this balance is not upset by the willingness of bankruptcy courts to accede to a debtor's demands for serial, and unwarranted, extensions of exclusivity.  First, in 1994, Congress amended the Judicial Code to give parties an immediate right of appeal of exclusivity orders, even though such orders are interlocutory. 28 U.S.C. § 158(a)(2).  Congress took this action because "there was a perceived abuse in the practice of some courts routinely extending exclusivity without requiring proof of cause, in circumstances that were effectively unreviewable due to the difficulty of obtaining leave to appeal."  In re Henry Mayo Newhall Mem'l Hosp., 282 B.R. at 449.  The House Committee explained that this change permitted parties who felt they were harmed by such orders to obtain immediate recourse with the district court.  See 140 Cong. Rec. H10,752, H10,764 (daily ed. Oct. 4, 1994).  The House Committee noted further:  "The Committee intends that the district court carefully consider the circumstances of each case so appealed with a view to encouraging a fair and equitable resolution of the bankruptcy."  Id.

Second, although not applicable to the Debtors' cases, which were filed in 2001, the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 amends section 1121(d) of the Bankruptcy Code and provides that a debtor's exclusive periods to file a plan and solicit acceptances may not be extended beyond a total of 18 months and 20 months, respectively.  This change "curtail[ed] the debtor's control and the judge's discretion in extending the debtor's exclusive periods . . . by imposing strict limits for extension of both the 120-day and the 180-day periods."[107]  This change was again in response to perceived abuse by courts routinely extending exclusivity notwithstanding the requirement of cause.  Although not controlling here, this amendment expresses a clear policy of Congress against prolonged or unjustified extensions of

---

[107] 7 Alan N. Resnick & Henry J. Sommer, Collier on Bankruptcy § 1121.LH[4] (15th ed. revised 2006).

exclusivity.  If the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 applied in the Debtors' cases, exclusivity would have terminated, by law, in 2002, i.e., four years ago, and a plan would have been confirmed in short order or the Debtors' bankruptcy cases dismissed.

**B.    A Debtor Has A Heavy And Increasing Burden To Establish "Cause" For Extending The Exclusive Periods.**

The debtor bears the burden of demonstrating the existence of good cause warranting extensions of exclusivity.  In re Newark Airport/Hotel LP, 156 B.R. 444, 451 (Bankr. D.N.J.), aff'd, FGH Realty Credit Corp. v. New Airport/Hotel LP, 155 B.R. 93 (D.N.J. 1993).  In considering that burden, courts may not grant extension requests "routinely" or "cavalierly."  In re McLean Indus., Inc., 87 B.R. 830, 834 (Bankr. S.D.N.Y. 1987) (stating same).  Unsupported allegations are insufficient to allow such extensions.  In re Parker St. Florist & Garden Ctr., Inc., 31 B.R. 206, 206 (Bankr. D. Mass.).  Rather, section 1121(d) "requires that an affirmative showing of cause, supported by evidence, be made by the party seeking the extension . . . of time."  Id. (citations omitted) (alteration in original).

Understandably, and especially relevant here in view of the nine extensions of exclusivity over the past five and a half years, the "Debtor[s'] burden gets heavier with each extension it seeks as well as the longer the period of exclusivity lasts."  In re Dow Corning Corp., 208 B.R. 661, 664 (Bankr. E.D. Mich. 1997).  Concomitantly, the "creditor's burden to terminate gets lighter with the passage of time."  Id.

**C.    Termination of the Debtors' Exclusivity Periods Benefits All Parties.**

Termination of exclusivity does not affect a debtor's concurrent right to pursue confirmation of its own plan.  See, e.g., In re Tony Downs Food Co., 34 B.R. 405, 408 (Bankr. Minn. 1983).  In fact, it is recognized that termination of exclusivity and the filing of competing plans serve as catalysts for compromise and resolution of differences.  In re Pub. Serv. Co. of

New Hampshire, 99 B.R. 155, 176 (Bankr. D.N.H. 1989) (same); In re Texaco, 81 B.R. 806, 808-809 (Bankr. S.D.N.Y. 1988) (same); In re Geriatrics Nursing Home, Inc., 187 B.R. 128, 133 (D.N.J. 1995) (competing plans create a meaningful discourse among the various parties-in-interest, which weeds out unfavorable plans and lead to the best possible result for all concerned parties).

The positive dynamic engendered by competing plans has been embraced by the Third Circuit:  "The ability of a creditor to compare the debtor's proposals against other possibilities is a powerful tool by which to judge the reasonableness of the proposals.  A broad exclusivity provision, holding that only the debtor's plan may be 'on the table,' takes this tool from creditors."  Century Grove, Inc. v. First Am. Bank of New York, 860 F.2d 94, 102 (3d Cir. 1988); see also In re Rook Broad. of Idaho, Inc., 154 B.R. 970, 976 (Bankr. D. Idaho 1993) ("It is in the interest of creditors that they have a choice between competing plans.").

**D.      Factors Considered by the Courts When Ruling on Exclusivity Extension Motions.**

In deciding whether or not "cause" exists, some courts focus on the paramount factor of whether extending or terminating the debtor's exclusivity would facilitate moving the case forward.  Dow Corning, 208 B.R. at 670.  Other courts, however, consider a series of individual factors, which when taken together lead back to the question of whether granting or denying the extension motion will facilitate a timely exit from bankruptcy.  In re Central Jersey Airport Servs., LLC, 282 B.R. 176, 184 (Bankr. D.N.J. 2002); McLean Indus., Inc., 87 B.R. at 834; In re Express One Int'l, 194 B.R. 98, 100 (Bankr. E.D. Tex. 1996).  These factors are: (i) the existence of good faith progress toward reorganization; (ii) whether the debtor has demonstrated reasonable prospects for filing a viable plan; (iii) whether the debtor has made progress negotiating with creditors; (iv) whether the debtor is seeking an extension to pressure creditors;

(v) the length of time a case has been pending; (vi) the necessity of sufficient time to negotiate and prepare adequate information; (vii) whether the debtor is paying its debts as they become due; and (viii) whether or not unresolved contingencies exist. <u>Central Jersey Airport Servs., LLC</u>, 282 B.R. at 184.

## II.    The Bankruptcy Court Erred In Holding That "Cause" Existed To Extend The Debtors' Exclusive Periods.

Applying the factors discussed above, the Asbestos Constituents respectfully submit that the Bankruptcy Court erred in holding that there was "cause" for granting the Debtors' ninth motion for extension of exclusivity:

### A.    The Debtors Have Not Demonstrated the Existence of Good Faith Progress Toward Filing A Confirmable Plan.

The Debtors have failed to demonstrate that they have made any progress toward filing a confirmable plan. This is because the Debtors have chosen instead to use bankruptcy as a new venue to re-engineer thirty years of largely unfavorable tort litigation in state and federal courts. Despite the passage of years during which the Debtors could have negotiated with the Asbestos Constituents, it was only in November 2004, and then only after the Bankruptcy Court issued its mandate, that the Debtors filed their ill-conceived and divisive plan. Even the Debtors' promise to amend their Plan to eliminate the asbestos cap and put "equity at risk," as set forth in the Debtors' February 2006 Status Report, has proved to be an empty one.[108] <u>See generally</u> <u>In re Am. Fed'n of Television and Radio Artists</u>, 30 B.R. 772, 774 (Bankr. S.D.N.Y. 1983) (cause for extension of a debtor's exclusive periods does not exist where the debtor has made no showing that it can successfully reorganize if the exclusive periods are extended).

---

[108] Record Excerpt, Exh. 4.

B.    **The Debtors' Existing Plan is Patently Unconfirmable.**

Buttressing the lack of good faith progress toward filing a confirmable plan, the Debtors' Plan, as currently configured, is non-confirmable.[109]    First, as noted, the Debtors' Plan improperly seeks, for distribution purposes, to cap the Debtors' present and future Asbestos Liabilities.[110]    However, one of the requirements of a section 524(g) injunction (requested by the Debtors) is that the Bankruptcy Court find that the actual amounts, numbers, and timing of future demands cannot be determined.    11 U.S.C. § 524(g)(2)(B)(ii)(II) (same).    Thus, absent consent, an estimation of Asbestos Liabilities cannot be final for distribution purposes and may not serve as a cap on Asbestos Liabilities channeled to a 524(g) trust.

Second, the Debtors' Plan purports not to impair asbestos claims.[111]    Under the Debtors' Plan, however, asbestos claimants will not receive full payment of their claims, in cash, on the effective date.    Rather, the Debtors' Plan proposes to channel asbestos claims to the 524(g) trust, which is required to evaluate and challenge claims under eligibility criteria set forth in trust distribution procedures.    This process could take months or years, a delay that constitutes impairment under section 1124(1) of the Bankruptcy Code.    See, e.g., In re Applied Safety, Inc., 200 B.R. 576, 588 (Bankr. E.D. Pa. 1996) (claim was impaired because plan required creditor to accept payment of claim under a termination agreement, regardless of any valid defenses or causes of action the creditor had to rescind or invalidate that agreement).

Third, based on the false premise of unimpairment, the Debtors' Plan goes on to provide that such claims will therefore be "conclusively presumed to have accepted the Plan" under

---

[109] See generally R-431.

[110] Record Excerpt, Exh. 2 at A-30 §§ 7.6.1(v) and (w).

[111] Id. at A-11 to A-18 § 3.1 and at A-23 § 6.3; R-418 at 4-5, 6-7, 47-49.

11 U.S.C. § 1126(f) and, accordingly, cannot vote against the Plan.[112]  But even if the holders of asbestos claims are unimpaired under the Plan – they are not – section 524(g) of the Bankruptcy Code requires that "a separate class or classes of the claimants whose claims are to be addressed by a trust . . . votes, by at least 75% of those voting, in favor of the plan."  11 U.S.C. § 524(g)(2)(B)(ii)(IV)(bb).  Thus, section 524(g) requires an affirmative vote on the Debtors' Plan by the Asbestos Constituents.  See Walker v. Celotex Corp. (In re Hillsborough Holdings Corp.), 197 B.R. 372, 378-79 (Bankr. M.D. Fla. 1996) (rejecting the contention that the 75% voting requirement is dispensable).[113]

In the face of these realities it is untenable that the Debtors cling to an unacceptable, unconfirmable plan.  For this reason alone, exclusivity should be terminated.

### C.    The Debtors Have Not Made Any Progress Negotiating with the Asbestos Constituents.

There can be no dispute that the Debtors have made any progress in their negotiations with the Asbestos Constituents.  At the conclusion of the mediation in June 2006, the Debtors admitted as much, stating that that there did not appear "to be any foothold for moving forward with any further [mediation] discussions."[114]  Moreover, the fact and the contours of the estimation proceedings are testimony to the fact that the Debtors have chosen to litigate rather than negotiate with the Asbestos Constituents.[115]

---

[112] Id.

[113] See also H.R. Rep. 103-835, 103d Cong., 2d Sess. (Oct. 4, 1994) ("[I]n order for present claimants to be bound by a trust/injunction . . . a separate creditor class [must] be established for those with present claims, which must vote by a 75% margin to approve the plan.").

[114] R-2232 at 4, lines 21-22.

[115] Congress has recognized that extensions of exclusivity should not be granted when the debtor is trying to use the extension as a tactical device to put pressure on parties in interest to yield to a plan they believe is unsatisfactory; some showing of probable success must attend any request for an exclusivity extension. See S. Rep. No. 989, 95th Cong., 2d Sess. 118 (1978).  See also In re Texas Extrusion Corp., 844 F.2d

**D.      The Debtors' Repeated Extensions of the Exclusive Periods Are Holding the Asbestos Constituents Hostage to the Bankruptcy Process.**

For five and a half years, the Asbestos Constituents have been unable to pursue their claims against the Debtors.  This has real-world consequences for individuals who are suffering from often fatal asbestos-related diseases.  This is in stark contrast to trade creditors who can sell their claims in a secondary trading market rather than awaiting the outcome of the bankruptcy. Indeed, as the Federal Rules of Bankruptcy Procedure require notice of traded claims, the record more than amply reflects the huge volume of claims trading in the Debtors' bankruptcy cases.[116] Similarly, equity holders are free to sell their securities in the stock market.  However, asbestos claimants, whose claims are both unliquidated and disputed by the Debtors, have no such luxury.[117]   Thus, the asbestos claimants alone are the quintessential financial hostages in this bankruptcy.  The Debtors have hoped to use this considerable leverage to force agreement on a plan that pays asbestos claimants less than they would have been paid absent the bankruptcy of this family of companies.  At some point, however, a point that undoubtedly has been reached in this case, the "leverage accorded to the debtor by the period of exclusivity must give way to the legitimate interests of other parties in interest so that progress toward an effective reorganization of the debtor" can be attained.  In re Sharon Steel Corp., 78 B.R. 762, 766 (Bankr. W.D. Pa. 1987).

---

1142 (5th Cir.) (debtor's delay tactics are grounds for reduction of exclusivity), cert. denied, 488 U.S. 926 (1988).

[116] See, e.g., R-2396 through R-3219.  An example of a Notice of Transfer of Claim Pursuant to FRBP Rule 3001(e)(2) is attached as Exhibit 6 to the Appellants' Record Excerpts and is also available in the Record at R-2865.

[117] A dramatic example of how asbestos creditors are relatively disadvantaged by the pendency of this bankruptcy is that asbestos personal injury claimants who are facing death are not permitted to preserve their own testimony.  R-309; R-317; R-318; R-3355; R-3368-3370.

E.    **After More Than Five and a Half Years, the Debtors Have Had More Than Sufficient Time to Negotiate a Consensual, Confirmable Plan.**

The Asbestos Constituents do not dispute that there have been delays in the bankruptcy for which the Debtors cannot be held responsible, such as the halt of all proceedings when the recusal of Judge Wolin was before the Third Circuit, but those delays pale when viewed in the context that these chapter 11 cases have been pending since April 2001.  The reality is that many of the same delays were suffered by other asbestos debtors who have long since reorganized. The Debtors have had more than enough time to try to reach a consensual plan if they were so inclined.  The Debtors' failings in this regard are assuredly not for lack of resources.  To date, they have spent in excess of $125 million in professional fees and expenses, a huge sum that could have at least partially bridged the chasm between "the bid and the ask" in this case.[118]  The time has come to terminate the Debtors' exclusive periods and permit the filing of competing plans, if for no other reason than to reduce the burn of cash and other resources that would be better spent on distributions to creditors.

F.    **The Size and Complexity of the Chapter 11 Case Alone Does Not Provide "Cause" for an Extension of the Debtors' Exclusive Periods.**

The Asbestos Constituents do not dispute that the Debtors' chapter 11 cases are large and complex, but in this era of mega-bankruptcy cases the Debtors' bankruptcy hardly approaches the size or complexity of many others that have come and gone since this case began, such as Enron and WorldCom.  Indeed, size and complexity alone do not provide cause for an extension of the Debtors' exclusive periods.  See In re Pub. Serv. Co. of New Hampshire, 88 B.R. 521, 537 (Bankr. D.N.H. 1988) (stating same); In re Curry Corp., 148 B.R. 754, 756 (Bankr. S.D.N.Y. 1992) (same).  Rather, that factor "must be accompanied by factors such as the likelihood of

---

[118] R-2320; R-2350.

agreement on a consensual plan if [the] debtor remains in control, the absence of alternative creditor plans which cannot be filed because of the debtor's exclusive right to propose and confirm a plan, and a showing that the debtor is not using exclusivity to force on its creditors its view of an appropriate plan." In re Express One Int'l, 194 B.R. at 100-101. See also In re Washington-St. Tammany Elec. Coop., Inc., 97 B.R. at 854-55 (same).[119]    None of these additional factors are present here.

### G. The Unresolved Contingencies That Exist in the Debtors' Chapter 11 Cases Do Not Support An Extension of Exclusivity.

The only significant unresolved contingencies in the Debtors' bankruptcy cases that bear on reorganization are the Debtors' unliquidated liabilities for claims such as the asbestos claims. Those contingencies, however, do not have to be resolved before competing plans of reorganization can be filed.    Indeed, the Bankruptcy Court undertook the estimation of the Asbestos Liabilities as a means of determining the feasibility of any filed plan of reorganization, not the allowance of any individual asbestos claim, the latter being left to the 524(g) trust that accepts the legal liability for those claims.    Any competing plan can simply take into consideration the possible outcomes of the Asbestos Liabilities estimation and any litigation involving other unliquidated and disputed claims.    In re Parker St. Florist & Garden Ctr., Inc., 31 B.R. at 208 (stating same and refusing to extend a debtor's exclusive period).    Thus, a

---

[119] If size and complexity alone were sufficient to find cause, then debtors in complex cases would have an unlimited right to exclusivity and section 1121(d) would be rendered meaningless in complex cases. Clearly this is not the case because requests for an extension of a debtor's exclusive periods have been denied in other large and complex asbestos bankruptcy cases. See, e.g., In re Federal-Mogul Global Inc., Case No. 01-10578 (Bankr. D. Del.) (chapter 11 case filed in October 2001 and exclusive periods terminated in October 2003); In re Babcock & Wilcox Co., Case No. 00-10992 (Bankr. E.D. La.) (chapter 11 case filed in February 2000 and exclusive periods terminated in May 2002); In re U.S. Minerals Products Co., Case No. 01-2471 (Bankr. D. Del.) (chapter 11 case filed in July 2001 and exclusive periods terminated in December 2003); In re Congoleum Corporation, et al., Case No. 03-51524 (Bankr. D.N.J.) (chapter 11 case filed in December 2003 and exclusive periods terminated in November 2005).

competing plan could be filed now, the disclosures approved by the Bankruptcy Court and voted upon, all before the estimation hearings are commenced.  This would allow for an exit from bankruptcy in 2007, not some far distant date that comports with the Debtors' campaign of delay.

**H.    The Debtors Have Prospered in Bankruptcy and Have No Incentive to Reorganize and Their Businesses Will Not Suffer If Exclusivity is Terminated.**

It cannot be disputed that the Debtors have prospered as a result of these bankruptcy proceedings.   The Debtors have bought and sold business components, granted rich compensation and benefit packages to all levels of those in their employ, given lucrative consultancy packages to highly paid executives upon retirement who have failed to advance this case to reorganization, and accumulated so much cash that the Debtors have not even had to borrow from their debtor-in-possession credit facilities.   And during this time, no creditor, including any of the asbestos claimants, can prosecute their claims against the Debtors because of the automatic stay.  With such benefits of bankruptcy, it is plain why the Debtors are eager to delay their exit from bankruptcy.

The Debtors argued to the Bankruptcy Court that because the termination of exclusivity is rare in complex chapter 11 asbestos cases (it is not), the "very act of doing so will send alarm bells throughout the marketplace," but this Court should not be guided by what is best for equity over the interests of creditors.  The Bankruptcy Code requires that the interests of equityholders take a back seat to creditors who have not been paid in full.  See 11 U.S.C. § 1129(b)(2)(B)(ii). Moreover, in the last four years, bankruptcy courts have terminated a debtor's exclusive periods in at least four asbestos-related bankruptcy cases, all without alarm bells going off.  See, e.g., Federal-Mogul Global Inc., Babcock & Wilcox Co., U.S. Minerals Products Co., and Congoleum Corp.

The Debtors' parade of horribles of what follows from the termination of exclusivity, such as the loss of customers and the negative impact on employees, is make-weight. This is demonstrated by the fact that the Debtors have prospered in the face of numerous adverse events, next to which termination of exclusivity pales into insignificance.[120] In truth, the Debtors' customers and employees ought to be looking forward to the Debtors' emergence from bankruptcy and encouraged by the fact that exclusivity has been terminated to facilitate an earlier exit strategy than what is currently on the horizon. Surely, if the Debtors have weathered the indictment of the companies, as well as past and present officers, without the loss of customer or employee confidence, the enhanced prospect of reorganization could hardly be negative. Moreover, in the final analysis, the risk of the foregoing is actually going to be borne by asbestos claimants who will undoubtedly own a portion of the reorganized companies as contemplated under section 524(g) of the Bankruptcy Code. See 11 U.S.C. § 524(g)(2)(B)(2)(B)(i)(III).

---

[120] For example, in November 2000, W.R. Grace announced it would be unable to file its next quarterly financial statements on time. In April 2001, the Debtors filed for bankruptcy and announced they would be unable to file their 2000 financial statements timely. In December 2002, partial summary judgment was granted in favor of the government against the Debtors for recovery of cleanup costs related to previously operated vermiculite mining and processing sites near Libby, Montana. In March 2003, the Debtors' former chief executive J.P. Bolduc agreed to settle Securities and Exchange Commission ("SEC") fraud charges. In August 2003, two former executives agreed to cease-and-desist orders from the SEC related to fraudulent earnings reporting in the 1990s. In August 2003, the Federal District Court in Missoula, Montana ordered repayment to the government of $54.5 million for the investigation and cleaning of Libby, Montana. In March 2004, the Bankruptcy Court stated that it was close to considering the appointment of a trustee to oversee the Debtors' chapter 11 cases. In August 2004, the Debtors restated their 2003 financial results. In November 2004, the Debtors announced that CEO Paul Norris was to retire effective May 31, 2005. In February 2005, the Debtors and seven executives were indicted by the United States for federal crimes arising out of the Debtors' Libby, Montana operations. And in June 2005, the New Jersey Attorney General filed suit against the Debtors and two former company executives for falsely certifying that any hazardous asbestos contamination at the company's Hamilton Township plan had been cleaned up in accordance with state requirements. See R-481.

## CONCLUSION

This chapter 11 case is old with no end in sight.  Court-ordered mediation has failed to advance a debtor-sponsored, consensual plan.  It is clear to all that the Debtors' Plan cannot be confirmed – it is there to force asbestos creditors to take less than they are owed so that existing shareholders reap a windfall.  To the objective observer, there can be little doubt that asbestos creditors are being held hostage.  While the Debtors continue to promote their own agenda in chapter 11:  holders of unsecured commercial claims can sell their claims into a liquid market - they do not have to wait to get paid; equity shares are traded daily on the New York Stock Exchange -  the shareholders do not have to wait to liquidate their interests; and senior management is handsomely rewarded for their efforts and has no financial incentive to exit chapter 11.

Yet, the real victims of the Debtors' past conduct, those claimants who have been exposed to the Debtors' asbestos-containing products must wait.  They have been paid nothing since the petition date in 2001 and, if the Debtors have it their way, will not see any payment anytime soon.  This cannot be what Congress intended when it limited a debtor's exclusive periods to six-months and required an affirmative showing of cause before any extension, let alone a ninth extension, would be granted.

The Asbestos Constituents endured those nine extensions of exclusivity, spanning a period of more than five and a half years before they concluded that the situation had become intolerable.  Despite the Debtors' persistent denials which bespeak thirty years of litigation experience, people are dying as a result of products manufactured by these Debtors and buildings remain where those products are still on the premises.  In contrast, the relief sought by the Asbestos Constituents here is benign.  All we seek is the opportunity to file a plan of reorganization that is not encumbered by false limitations and classifications designed solely to

attain an unjust result; a plan which provides that all creditors that are functionally and legally impaired are able to vote for or against it, and which adheres to the rule of absolute priorities.

In sum, for the reasons set forth above, the Bankruptcy Court erred in concluding that "cause" existed for a ninth extension of the Debtors' exclusive periods. Further, while this Court need not reach these issues, it is also apparent for the same reasons, that the Bankruptcy Court's findings of fact are clearly erroneous and that the Bankruptcy Court abused its discretion.

Accordingly, the Asbestos Constituents respectfully submit that this Court (i) grant the motion for expedited review of this appeal (filed contemporaneously with this brief), (ii) reverse the Bankruptcy Court's Order, and (iii) enter an order terminating the Debtors' exclusive periods, thereby allowing these Debtors to exit from bankruptcy in 2007.

Respectfully submitted,

ORRICK, HERRINGTON & SUTCLIFFE LLP

*/s/ Roger Frankel*
Roger Frankel
Richard H. Wyron
Jonathan P. Guy
3050 K Street, NW
Washington, DC 20007
Telephone:  (202) 339-8400

John C. Phillips, Jr. (#110)
PHILLIPS, GOLDMAN & SPENCE, P.A.
1200 North Broom Street
Wilmington, DE 19806
Telephone:  (302) 655-4200

*Counsel for David T. Austern,*
*Future Claimants' Representative*

CAMPBELL & LEVINE, LLC

*/s/ Mark T. Hurford*
Marla R. Eskin (#2989)
Mark T. Hurford (#3299)
800 King Street, Suite 300
Wilmington, DE 19801
Telephone:  (302) 426-1900

Elihu Inselbuch
CAPLIN & DRYSDALE, CHARTERED
375 Park Avenue, 35th Floor
New York, NY 10152-3500
Telephone:  (212) 319-7125

Peter Van N. Lockwood
Nathan D. Finch
Jeffrey A. Liesemer
CAPLIN & DRYSDALE, CHARTERED
One Thomas Circle, NW
Washington, DC 20005
Telephone:  (202) 862-5000

*Counsel for the Official Committee of*
*Asbestos Personal Injury Claimants*

BILZIN SUMBERG BAENA
PRICE & AXELROD LLP

*/s/ Scott L. Baena*
Scott L. Baena
Jay M. Sakalo
Matthew Kramer
200 South Biscayne Boulevard
Suite 2500
Miami, FL 33131-2336
Telephone:  (305) 374-7580

Theodore J. Tacconelli (#2678)
Lisa L. Coggins (#4234)
FERRY, JOSEPH & PEARCE, P.A.
824 Market Street, Suite 904
P.O. Box 1351
Wilmington, DE 19899
Telephone:  (302) 575-1555

*Counsel for the Official Committee of
Asbestos Property Damage Claimants*


Dated:  December 1, 2006

US_EAST:160134930.3