IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| W. R. GRACE & CO., et al. | Case No. 01-01139 (JKF)<br>(Jointly Administered) |
| Debtors. | **Re: Docket No. 15307** |

### DEBTORS' OBJECTION TO THE NJDEP'S MOTION
### SEEKING PERMISSION TO FILE A LATE PROOF OF CLAIM

This Court should deny the NJDEP's motion for leave to file a late proof of claim.[1]  The NJDEP failed to file a timely claim although it had actual and adequate notice of the Bar Date and knew prior to the Bar Date of the alleged contamination that forms the basis of its claim. Instead, the NJDEP waited until 2005 to institute a state court action against the Debtors in violation of the automatic stay.  And, now, two years later, has sought leave to file a late claim. Nowhere has the NJDEP asserted neglect for its failure to file a timely claim, let alone excusable neglect.  For these reasons, as elaborated below, the Motion should be denied.

### FACTS, BACKGROUND AND PROCEDURAL HISTORY

1.     In 1995, W. R. Grace & Co.-Conn. ("Grace") submitted a report (the "Report") to the New Jersey Department of Environmental Protection (the "NJDEP") in connection with the closing of Grace's former plant in Hamilton Township, New Jersey (the "Hamilton Plant").

---

[1]  Brief in Support of Motion Seeking Order to File a Late Proof of Claim filed on April 26, 2007 (Docket No. 15307) (the "Motion").

2.      On April 2, 2001, Grace and its debtor affiliates (collectively, the "Debtors") filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").  Pursuant to section 362 of the Bankruptcy Code, an automatic stay immediately went into effect, which prohibited the commencement of any actions against the Debtors.  Also, at that time, creditors, including various agencies within the State of New Jersey, received notice of the bankruptcy petitions.

3.      On August 14, 2001, a Deputy Attorney General for the State of New Jersey, on behalf of the NJDEP, filed a Notice of Appearance and Request for Service of Papers and Other Documents in these chapter 11 cases (Docket No. 837).

4.      The Debtors' schedules filed in June, 2001 listed the NJDEP as having contingent, unliquidated and disputed environmental claims.

5.      By an order dated April 22, 2002 (the "Bar Date Order"), this Court set March 31, 2003 as the last date for filing proofs of claim for all pre-Petition Date claims relating to (i) asbestos property-damage, (ii) non-asbestos claims (including all governmental claims) and (iii) medical monitoring claims (the "Bar Date").  The Bar Date Order provides as follows:

> Any person holding an Asbestos Property Damage Claim, Medical Monitoring Claim or Non-Asbestos Claim who does not file a completed Proof of Claim Form on or before the Bar Date shall be forever barred to the extent of applicable law from (a) participating in the Debtors' estates; (b) voting with respect to any plan of reorganization filed in these cases; and (c) receiving any distribution from the Debtors or any entity created pursuant to or in connection with any confirmed plan of reorganization in these cases...

Bar Date Order at 6 (Docket No. 1963).  The Bar Date Order further provides that, "notice of entry of this Order and of the Bar Date shall be deemed good, adequate and sufficient notice of the Bar Date and all procedures and requirements in connection therewith if served together with the Bar Date Notice Package . . . ."  Bar Date Order at 4.

6.    The notice (the "Bar Date Notice") that was sent to all known claimants and published in several national newspapers also makes it abundantly clear that the failure to file a claim by the Bar Date will result in a forfeiture of such a claim against any of the Debtors' estates. The Bar Date Notice states in Section 9, **"EFFECT OF NOT FILING A CLAIM"**:

> ANY HOLDER OF A [CLAIM] . . . WHO FAILS TO FILE A PROOF OF CLAIM ON OR BEFORE THE BAR DATE . . . , **SHALL BE FOREVER BARRED, ESTOPPED AND ENJOINED** FROM ASSERTING ANY SUCH CLAIMS (OR FILING A PROOF OF CLAIM WITH RESPECT TO SUCH CLAIMS) AGAINST ANY OF THE DEBTORS, THEIR PROPERTY OR THEIR ESTATES . . . .

Bar Date Notice at § 9 (emphasis added).

7.    Once the detailed proof of claim forms were approved and the Bar Date Order was entered, the Debtors spent over $4 million to serve and publish the Bar Date Notice.

8.    On June 21, 2002, the Debtors' servicing agent properly served the NJDEP with a copy of the Bar Date Notice. See Declaration of Service (Docket No. 2382, 2389) (relevant pages are attached as Appendix, Exhibit A).[2] The NJDEP does not assert that it failed to receive a copy of the Bar Date Notice nor does it allege that it did not have knowledge of the Bar Date.

9.    In early November 2002, the NJDEP was provided with copies of a fourteen-page United States Environmental Protection Agency Action Memorandum titled "Request for a Time Critical Removal Action at the former W.R. Grace/Zonolite Site in Hamilton Township, Mercer County, New Jersey Action Memorandum" (the "USEPA Memorandum") (attached as Appendix, Exhibit B).

---

[2]    Notice was sent to the New Jersey Department of Environmental Protection (Trenton, NJ) including the following divisions: Division of Responsible Party Site Remediation (Trenton, NJ), Division of Site Remediation (West Orange, NJ), Southern Air Program (Camden, NJ), Bureau of Fund Management Compliance & Recovery (Trenton, NJ) and the following employees: Deborah Cowell, Gary Gruelich (Project Manager), Robert Shinn Jr. (Commissioner) and Section Chief.

3

10.    The USEPA Memorandum set forth a detailed analysis of, among other things, the Hamilton Plant site conditions and background, environmental investigations conducted to date, alleged releases or threatened releases of asbestos into the environment, and the alleged resultant threats to the public health or welfare. See USEPA Memorandum. In a section of the USEPA Memorandum entitled "Potential for Continued State/Local Response," the USEPA observed that:

> State and local governments agencies are not able to undertake timely response actions to eliminate the threats posed by the [Hamilton Plant] Site. The state and local governments do not have the resources to conduct the required cleanup actions. However, both organizations will support EPA during this removal action.

Id. at 8, § II(C)(2).

11.    Robert Van Fossen and Janet Smolenski, who the Debtors understand are both still employed by the NJDEP, were copied on the USEPA Memorandum. Id. at 14.

12.    A November 6, 2002 entry on a chronology produced by the USEPA confirms that the USEPA Memorandum was forwarded to the NJDEP. USEPA, Notification Events for NJDEP and Hamilton Twp (EPA 006110) (the "USEPA Notification Events") (attached as Appendix, Exhibit C). That same entry states: "NJDEP also kept abreast of removal activities via POLREPS."[3] Id.

13.    Despite the above facts, the NJDEP did not file any proofs of claim associated with the Hamilton Plant. Eleven timely proofs of claim were filed by various other New Jersey governmental entities.

---

[3]    POLREPS is an abbreviation for Pollution Reports.

4

14.    The USEPA completed the first phase of remediation at the Hamilton Plant site in April 2004.[4] In conjunction with the remediation, the USEPA conducted "extensive sampling of residential properties surrounding the [Hamilton Plant] site and found no asbestos above the level that sophisticated lab instruments can reliably measure." Id.

15.    On June 1, 2005, more than four years after the Petition Date, and more than two years after the Bar Date, the NJDEP filed a state court action against Grace and certain of its employees alleging that they had made misrepresentations and false statements in the Report with respect to the closure of the Hamilton Plant (the "New Jersey Action").[5] In the complaint, the NJDEP demands over $800 million in alleged penalties.

16.    The New Jersey Action does not seek remediation of the Hamilton Plant site or clean-up costs. As outlined above, the remediation of the Hamilton Plant site is occurring under the auspices of the federal government, not the NJDEP, and is almost complete. See USEPA Press Release. The New Jersey Action seeks to collect a penalty for the Debtors' failure to "correct" the allegedly false Report filed over twelve years ago.

17.    In September 2005, the Debtors filed an adversary complaint in this Court, and a motion for an injunction under sections 105 and 362 of the Bankruptcy Code seeking to enjoin

---

[4]    See Press Release, USEPA, EPA to Supervise the Removal of Approximately 6,500 Tons of Contaminated Soil from Former Vermiculite Plant (August 28, 2006) (the "USEPA Press Release") (attached as Appendix, Exhibit D).

[5]    See Complaint, NJDEP v. W.R. Grace & Co., Inc., W.R. Grace & Co.-Conn., Grace-Conn. Successor, Jay H. Burrill & Robert J. Bettacchi, at ¶¶ 51, 69 (June 1, 2005) (the "Complaint"). NJDEP's complaint charges Grace with violating two state statutes, the Industrial Site Recovery Act and the New Jersey Spill, Compensation and Control Act. The Complaint alleges that Grace and two of its employees failed to disclose material facts concerning the risks of processing vermiculite in a June 5, 1995 report submitted to the NJDEP. Id. at ¶¶ 60-64. The Complaint further alleges that "[s]ince June 5, 1995, each of the Defendants has continued to withhold the correct information that should have been included in the [report] and has failed to correct the misinformation provided in the [report]." Id. at ¶ 65. NJDEP asserts that the Defendants have committed a separate violation of each statute for every "day Defendants failed to correct the false information." Id. According to NJDEP, these alleged violations could amount to over $800 million in penalties (civil penalty for each person, officer or management official for not more than $75,000 per day for each offense starting in 1995 and each day the violation continues constitutes an additional and separate offense).

5

the NJDEP from prosecuting the New Jersey Action (Adv. Proc. 05-52724, Docket Nos. 1, 3) (the "Injunction Motion"). This Court heard the Injunction Motion on November 14, 2005 and observed that "the fine is not the damage, its simply a penalty . . . [s]o I'm not sure how that's not stayed by 362." Tr. of Hr'g at 182 (Nov. 14, 2005). The Court then issued "a temporary stay . . . so that the parties can meet and confer in an effort to resolve the issues that were discussed today consensually." Id. at 188.

18.     Despite dialogue and inquiries from the Debtors, the NJDEP did not submit a settlement demand to the Debtors until November 2, 2006. On March 5, 2007, representatives of the Debtors and the NJDEP then met to discuss the settlement demand. The matter was not resolved.

19.     On April 2, 2007, the parties reargued the Injunction Motion. At that hearing, the Court stated that "I am still pretty much convinced that because of the fact that this is not an ongoing problem, that it is not going to be subject to the exception of 362(b)(4)." Tr. of Hr'g at 85 (Apr. 2, 2007). The Court took the matter under advisement and the parties currently await a ruling.

20.     Now, more than six years after the Petition Date, more than five years after learning of its alleged claim, more than four years after the expiration of the Bar Date, and almost two years after commencing the New Jersey Action, the NJDEP has filed the pending Motion seeking to file a late proof of claim in the amount of $30,035,577.00 in "estimated penalties."[6] See Motion, Proof of Claim at ¶ 4.

---

6    The NJDEP does not provide any basis for the $30 million figure. See Motion, Proof of Claim.

6

## ARGUMENT

21.    Despite the NJDEP's assertions that it was "impossible" for it to know that it had a claim before the Bar Date, the NJDEP, as outlined in paragraphs 9-12 above, was aware of its claim no later than November 2002, several months before the Bar Date. There is no explanation (or even mention) of the NJDEP's failure to file a timely claim based on such knowledge. Further, the NJDEP cannot justify its failure to file a claim for four years after the Bar Date. The NJDEP's failure to file a timely proof of claim was not the product of neglect, let alone excusable neglect and its Motion must be denied.

## I.    The NJDEP Has Long Been Aware of Its Potential Claim and Chose Not To File a Proof of Claim.

### A.    NJDEP Was Aware of Its Potential Claim Before the Bar Date Lapsed.

22.    Section 101(5)(A) of the Bankruptcy Code defines "claim" as: "a right to payment whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." 11 U.S.C. § 101(5)(A) (emphasis added).[7]  Congress intentionally defined "claim" in the broadest way possible. See Historical and Statutory Notes to 11 U.S.C. § 101 ("By this broadest possible definition (of claim) and by the use of the term throughout the title 11, especially in subchapter I of chapter 5, the bill contemplates that all legal obligations of the debtor, no matter how remote or contingent, will be able to be dealt with in the bankruptcy case.").

---

[7]    In chapter 11 reorganization cases, section 1111 provides that a proof of claim is deemed filed if it appears on the debtor's schedules, "except a claim or interest that is scheduled as disputed, continent, or unliquidated." 11 U.S.C. § 1111. If a creditor's claim is not listed, or is scheduled as disputed, contingent, or unliquidated, then the creditor is obligated to file a proof of claim in accordance with Rule 3003(c). A creditor's failure to comply with section 1111 and Rule 3003(c) results in forfeiture of any interest in the bankruptcy distribution plan. Rule 3003(c) provides that "any creditor who fails to [file a claim] shall not be treated as a creditor with respect to such claim for the purposes of voting and distribution." Fed. R. Bankr. P. 3003(c). While the Debtors did list NJDEP on their schedules, the claims were scheduled as disputed, contingent and unliquidated and thus NJDEP was required to file a claim.

23.    The NJDEP has asserted that there was "no way that the Department could have known of the claim before the bar date, since the Department did not know of the violation at that time." Motion at 7. Specifically, the NJDEP asserts that:

> Though the EPA sampling took place in 2000, the Department did not become aware of the contamination until in or about the Fall of 2003, when it was asked by the New Jersey Department of Health and Senior Services to comment on a Health Assessment for the Plant.

Id. This assertion is incorrect. At the very least, as outlined above, the NJDEP was aware of the alleged contamination when it received the USEPA Memorandum in November 2002, months before the Bar Date lapsed. See USEPA Memorandum. Based on such information, the NJDEP was obligated to file a claim before the Bar Date.

**B.    By Its Own Admission, the NJDEP Was Aware of Its Alleged Claim in the Fall of 2003.**

24.    Assuming, arguendo, that the NJDEP was not aware of its claim until after the Bar Date, at the very least, by the NJDEP's own admission, it was aware of the alleged contamination "in or about the Fall of 2003." Motion at 4. The NJDEP offers no explanation for its failure to file a motion for leave to file a proof of claim at that time, which would have been approximately 6 months after the Bar Date had lapsed. The NJDEP also does not explain its failure to file such a motion during the ensuing three and a half years. During that time, the NJDEP received additional notices of activities at the site, yet it repeatedly opted not to file a motion for leave to file a late proof of claim. For example:

- According to a chronology produced by USEPA, on May 28, 2003, notice for public comment of the site administrative record was placed in the Trenton Times Newspaper, and the complete Administrative Record was placed in the Hamilton Township Library. See USEPA Notification Events.

- On September 19, 2003, USEPA's Assistant Regional Counsel wrote the New Jersey Attorney General's office to memorialize their discussions concerning the USEPA's intent to issue an Administrative Order on Consent for Removal Response concerning the

8

site. Letter from Brian E. Carr, Assistant Regional Counsel, USEPA, to Richard Engel, Deputy Attorney General (Sept. 19, 2003) (EPA 003102) (attached as Appendix, Exhibit E). The Order was to require removal activities, including the excavation and off-site disposal of asbestos contaminated soil allegedly caused by former Grace operations at the Hamilton Plant site. Id.

- The NJDEP was copied on USEPA Pollution Reports dated January 30, 2004 and February 27, 2004, which further documented the remedial activities being conducted at the site. E.g., EPA 003292-99, EPA 003283-91 (attached as Appendix, Exhibit F).

- On May 3, 2005, the NJDEP issued a letter to Grace rescinding the No Further Action letters that had been issued by the NJDEP on August 21, 1995 and November 15, 1995 with respect to the subject site. Letter from Mark J. Pedersen, Chief, Bureau of Risk Management Initial Notice & Case Assignment, to Paul J. Norris, CEO, W.R. Grace & Co.-Conn. and Charles Warren, Bryan Cave (May 3, 2005) (attached as Appendix, Exhibit G).

- On May 10, 2005, Grace's counsel and other interested parties testified before a joint Committee Meeting of the New Jersey Assembly's Judiciary Committee and Environment and Solid Waste Committee concerning all details of the site, the remediation and alleged hazards. See Committee Meeting of Assembly Judiciary Committee and Assembly Environment and Solid Waste Committee, Testimony from invited individuals concerning asbestos contamination at the former W.R. Grace Zonolite plant in Hamilton Township, Mercer County (May 10, 2005) (relevant pages attached as Appendix, Exhibit H).

- At this same joint Committee Meeting, Bradley Campbell, then the Commissioner of the NJDEP, was presented with a copy of the USEPA Memorandum and was questioned with regard to the same. Id. at 107.

## II.    The NJDEP's Failure to File a Timely Proof of Claim Was Not the Result of Neglect or "Excusable Neglect."

25.    Bankruptcy Rule 9006(b)(1) grants courts the authority to accept late filings where the movant's failure to comply with the Bar Date "was the result of excusable neglect." Fed. R. Bankr. P. 9006(b)(1). The Supreme Court has held that, under this rule, courts are permitted, where appropriate, to accept late filings caused by inadvertence, mistake, or carelessness, as well as intervening circumstances beyond the party's control. See Pioneer Inv. Servs. Co. v. Brunswick Ass'n Ltd. P'ship, 507 U.S. 380, 388 (1993).

91100-001\DOCS_DE:128948.1

26.    In determining whether to allow late proofs of claim, the Supreme Court has stated that the court's "inquiry is guided by one of the principal purposes of bankruptcy law, to secure within a limited period the prompt and effectual administration and settlement of the debtor's estate." Katchen v. Landy, 382 U.S. 323, 328 (1966).

27.    This Court should deny the Motion because the NJDEP's failure to file a timely proof of claim was not even the product of neglect, let alone excusable neglect.

### A.    The NJDEP's Conscious Decision To Disregard The Bar Date Does Not Constitute Neglect.

28.    The Third Circuit has ruled that a bankruptcy court has no discretion to grant an extension after the expiration of the bar date for any equitable reason other than excusable neglect. See In re Vertientes, Ltd., 845 F.2d 57, 60 (3d Cir. 1988) (bankruptcy court had no discretion to allow an extension of time to file a claim after the bar date has passed merely because there was no prejudice; excusable neglect must be present); see also In re Levinson Steel Co., 1991 WL 4250, at *1 (Bankr. W.D. Pa. Jan. 14, 1991) (JKF). The Supreme Court has held that before it could determine what sorts of neglect might be considered "excusable," it must first determine that there was neglect. Pioneer, 507 U.S. at 388. If a claimant makes a conscious and informed decision not to file a claim before the bar date, there can be no neglect, leaving the bankruptcy court with no discretion to grant an extension of time for the claimant to file a claim after the bar date has lapsed. See Artificial Intelligence Corp. v. Casey (In re Casey), 198 B.R. 918, 925 (Bankr. S.D. Cal. 1996) ("A conscious informed incorrect decision does not constitute 'neglect'.") (citing In re Waggoner, 157 B.R. 433, 436 (Bankr. E.D. Ark. 1993)).

29.    The NJDEP's choice to file the New Jersey Action, in violation of the automatic stay, rather than to file its claim appears to have been a carefully considered and strategic decision to avoid this Court's jurisdiction. Indeed, the NJDEP made a series of calculated

10

choices leading up to the filing of the Motion. Specifically, although it was well aware of its potential claim in 2002, the NJDEP waited over two years thereafter to file the New Jersey Action, and then an additional two years to file the pending Motion. The NJDEP must be bound by the legal consequences of its choices. Given all of the notice afforded to the NJDEP, and its direct involvement with the Hamilton Plant over the past five years, it is clear that the NJDEP knew that it had a claim. Indeed, the NJDEP admits in its Motion that its situation "hardly seems to be 'neglect'." Motion at 7.

30.    The NJDEP's deliberate conduct does not constitute neglect under the standards announced in Pioneer. Therefore, the NJDEP does not get past the first step of the Pioneer test. See, e.g., In re Banco Latino, Int'l, 310 B.R. 780, 785 (S.D. Fla. 2004) (district court found relief should not be granted under Rule 9006(b) where creditor could not establish neglect), aff'd, 404 F.3d 1295 (11th Cir. 2005). Indeed, courts have consistently found that if the failure to timely file a claim results from a chosen course of action, and the circumstances leading to the creditor's decision were within the creditor's control, then relief should not be granted under Rule 9006(b). See, e.g., In re Mahoney Hawkes, LLP, 272 B.R. 19, 20 (B.A.P. 1st Cir. 2002) (affirming refusal to extend claims deadline under Rule 9006 because creditor's conscious decision not to file claims prior to bar date was not "neglect"); In re Celotex Corp., 232 B.R. 493, 496 (M.D. Fla. 1999) ("[B]ecause the Appellants' decisions not to pursue timely proofs of claim were deliberate and conscious and did not arise as a result of 'neglect,' there is no 'neglect' which can be the focus of an 'excusable neglect' analysis under Pioneer."), aff'd Sunset Vine Tower v. Celotex Corp., 196 F.3d 1262 (11th Cir. 1999); In re Montaldo Corp., 209 B.R. 40, 48 (Bankr. M.D. N.C. 1997) ("[A] party may make a conscious decision initially not to file a proof

11

of claim and then decide later that it wishes to do so . . . . In such a situation, there simply is no

neglect involved and relief based upon the concept of excusable neglect is not appropriate").

31.     In fact, this Court previously dealt with and denied a motion to file a late proof of

claim where the claimant failed to prove neglect, let alone excusable neglect.  Order Denying the

Motion of Intercat, Inc. for Leave to File a Late Proof of Claim (Docket No. 6712).  During the

Debtors' September 27, 2004 omnibus hearing, in considering whether Intercat was entitled to

leave from the Bar Date Order, this Court noted as follows:

> THE BANKRUPTCY COURT: Yes, but if Intercat had actual
> notice of the bar date … , then it seems to me it must have elected
> not to file a proof of claim, and making that conscious choice is not
> neglect.  It's a choice . . . .  If there's no neglect at all, then I never
> get to the question of whether it's excusable.
>
> . . .
>
> Well, it seems to me that without some evidence that, in fact, there
> was neglect at all, I don't have the authority to grant a late proof of
> claim.  To the extent that it's discretionary, it seems to me that the
> standard is excusable neglect, and, therefore, I need some evidence
> of neglect . . . .

Tr. at 30-31 (Sept. 27, 2004) (Docket No. 7462) (emphasis added).

32.     Accordingly, the NJDEP's conscious decision to wait to file its claim for several

years does not even constitute neglect and cannot, therefore, be any basis for leave to file a claim

now.

### B.     Assuming, Arguendo, That the NJDEP's Failure to File a Claim Constituted Neglect, the Neglect Was Inexcusable.

33.     Assuming, arguendo, that the NJDEP's failure to file a claim prior to the Bar Date

constituted neglect, the NJDEP's neglect is still not excusable.   In order to find excusable

neglect, Pioneer requires the bankruptcy court consider the following four factors: (1) the danger

of prejudice to the debtor; (2) the length of delay and its potential impact on judicial proceedings;

12

(3) the reason for delay, including whether it was within the reasonable control of the movant; and (4) whether the movant acted in good faith. <u>Pioneer</u>, 507 U.S. at 395. The burden of proving excusable neglect lies with the movant. <u>See</u> <u>Jones v. Chemetron Corp.</u>, 212 F.3d 199, 204 (3d Cir. 2000). This Court has found that excusable neglect is the "greatest of all" substantive obstacles to overcome. <u>Lee Distribs., Inc. v. Freeport Kitchen Foods, Inc. (In re Freeport Kitchen Foods, Inc.)</u>, 1996 WL 761437, at *2 (Bankr. W.D. Pa. Dec. 19, 1996) (JKF). In applying this test to the NJDEP's facts, even if this Court were to find that its conduct constituted "neglect," it cannot find that such neglect was excusable.

1.   **Granting The Motion Will Prejudice The Debtors.**

34.   The Supreme Court in <u>Pioneer</u> noted that ". . . were there <u>any evidence</u> of prejudice to [the debtor] . . . we could not say that the Bankruptcy Court abused its discretion in declining to find the neglect to be 'excusable.'" <u>Pioneer</u>, 507 U.S. at 398 (emphasis added). In <u>In re O'Brien</u>, the Third Circuit noted that bankruptcy courts have considered the following factors when examining prejudice:

> [1] the size of the claim with respect to the rest of the estate; [2] whether allowing the late claim would have an adverse impact on the judicial administration of the case; [3] whether the plan was filed or confirmed with knowledge of the existence of the claim; [4] the disruptive effect that the late filing would have on the plan or upon the economic model upon which the plan was based; and [5] whether allowing the claim open the floodgates to other similar claims.

188 F.3d at 126 (citing <u>In re Keene Corp.</u>, 188 B.R. 903, 912-13 (Bankr. S.D.N.Y. 1995)).

35.   Permitting the NJDEP to file a late proof of claim would prejudice the Debtors as it would (i) thwart the purposes of the Bar Date and the claims adjudication process that has been ongoing intensely for the past two years and is nearing completion and (ii) detrimentally affect the Debtors' plan projections. As the Court stated when denying PacifiCorp and VanCott Bagley

13

Cornwall & McCarthy's motion to file a late proof of claim: "This debtor is well on the road toward trying to get a confirmable plan together. Having filed these claims at this point in time will jeopardize that process. It will certainly change distributions to other creditors within certain classes." PacifiCorp and VanCott Bagley Cornwall & McCarthy v. W.R. Grace, 2006 WL 2375371, at *4 (D. Del. Aug. 16, 2006).

36.    In order for the Debtors to confirm a comprehensive, viable plan of reorganization, they need complete and accurate information regarding the nature, amount and status of all claims that will be asserted in these chapter 11 cases. Accordingly, the Debtors requested (and this Court granted) the fixing of the Bar Date for asbestos property damage ("PD") claims and non-asbestos claims. As a result of that Bar Date, approximately 14,900 claims were timely filed including 4,042 asbestos PD claims and 7,000 non-asbestos, protective claims filed by the Debtors' employees and former employees.[8]    The Debtors have exerted substantial efforts in the process of adjudicating the allowance and disallowance of these claims. In that respect, the Debtors have filed a total of 23 Omnibus Objections to large groups of claims and several other objections to specific claims. As a result of that process, which has included dozens of hearings and summary judgment motions, there are 483 remaining, active PD claims, of which 268 are subject to settlements-in-principle with the Debtors and 215 are subject to either pending summary judgment motions awaiting ruling from the Court or are set to be tried. Further, as of June 1, 2007, approximately 2,900 non-asbestos claims have been resolved leaving only approximately 348 open and unresolved non-asbestos claims, some of which are duplicate claims filed against more than one Debtor.

---

[8]    Pursuant to the Debtors' Amended Plan, the Debtors' various pension plans and related employee benefit plans will be assumed by the Debtors and passed through to the reorganized entities for payment as the obligations become due. The Debtors do not anticipate changing this treatment under any subsequently filed amended plan of reorganization. As a result, these claims will be disallowed under a confirmed plan.

14

37.     Granting the Motion may open the "flood gates" for similar, tardy claims, rendering the Debtors' Bar Date meaningless and sending a dangerous signal to other parties that the Court will be lenient on parties who disregarded the Bar Date Notice.[9]  If the Court permitted the filing of the NJDEP's extremely untimely claim, it could dilute the recovery of other creditors who diligently filed timely proofs of claim.  Accordingly, granting the Motion would encourage uncertainty and deprive the Debtors of any assurance of the scope of their liabilities, which was the fundamental purpose behind the Bar Date.

2.     **It is Undisputed That There Was a Significant Delay in Filing the Motion and the NJDEP Has Never Justified the Delay**.

38.     There is no dispute that the NJDEP received notice of the Bar Date yet waited over four years after its expiration to file this Motion.  There is also clear proof that the NJDEP knew of its alleged claim at least several months before the Bar Date.  Courts nationwide have "taken a hard line" in applying the "reason for delay" factor of Pioneer.  See, e.g., In re Enron Corp., 419 F.3d 115, 122 (2d Cir. 2005); see also U.S. v. Torres, 372 F.3d 1159, 1162-63 (10th Cir. 2004); In re Kmart Corp., 381 F.3d 709, 715 (7th Cir. 2004) ("[I]n this case, the factor is immensely persuasive."); Lowry v. McDonnel Douglas Corp., 211 F.3d 457, 463 (8th Cir. 2000).  This Court should do so as well.

39.     In its entire Motion, the NJDEP cites to only one case- Enron.  The NJDEP cites Enron as being a case "directly on point" alleging the facts are "much like the [NJDEP]'s case here" and "clearly fall within the four corners of the Enron case."  Motion at 8-9.  However, the NJDEP conveniently fails to mention that the claimant in Enron waited only one month after

---

[9]     The Debtors note that the Motion is not the first motion to file a late proof of claim that has been filed in these chapter 11 cases.  Royal Indemnity Company (Docket No. 4667), Intercat, Inc. (Docket No. 6151) and Pacifcorp and Vancott Bagley Cornwall & McCarthy 401(k) Profit Sharing Plan (Docket No. 7571) also filed similar motions.

15

learning about its claim to file a motion seeking leave. Even if the Court accepts the NJDEP's assertion that it did not learn of its claim until the fall of 2003, the NJDEP waited over four years, without justification, to file the Motion and this substantial delay is certainly not similar to the one-month delay in Enron. The NJDEP also fails to distinguish the fact that the proof of claim in Enron alleged real damages while the NJDEP is merely seeking to collect a penalty.

40.    Courts have found that a claimant's additional and conscious delay weighs against a finding of excusable neglect. Trump Taj Mahal Assocs. v. Alibraham (In re Trump Taj Mahal Assocs.), 156 B.R. 928, 930-32 (Bankr. D. N.J. 1993); Nat'l Steel Corp., 316 B.R. at 519 (bankruptcy court "cannot and will not ignore" claimant's additional five month delay in filing a motion after learning of potential liability as the claimant "sat on its hands and did nothing."). Indeed, the Taj Mahal case is directly on point with almost identical facts. In Taj Mahal, the bankruptcy court combined and denied two motions for leave to file a late proof of claim. Id. at 930-32. Both plaintiffs failed to file claims before the bar date and instead, more than one year after the bar date, the plaintiffs filed state court lawsuits against the debtor. Id. at 930-32. When determining if excusable neglect existed, the court reasoned that the length of the delay between the bar date and the state court suits (let alone the filing of the motions for leave) were filed was "significant." Id. at 938. Therefore, the delay weighed against finding excusable neglect. Id. at 942.

41.    The NJDEP's delay is analogous to the creditors' delay in Taj Mahal. The Motion was filed over four years after the Bar Date, which is longer than the creditors' "significant" delay in Taj Mahal. Id. at 938. The NJDEP admits that it was aware of its alleged claim in the fall of 2003. As detailed in paragraph 29, the NJDEP sat on its hands for almost two

16

years after it admits it knew of its alleged claim before it filed the New Jersey Action and then waited another two years before filing the Motion.

42.     The NJDEP's explanation for the delay between its learning of the alleged claim and its filing of the Motion is insufficient. The only justification that the NJDEP has offered, is its contention that it had to wait until it was clear that an "amicable solution" to the New Jersey Action was impossible. At best, that would explain, although not justify, the delay between this Court's issuance of a temporary stay to allow the parties to "meet and confer" in November 2005 and the filing of the Motion in 2007. This does not explain the NJDEP's delay for the two years previous.

3.     **The NJDEP Lacks Good Faith Because It Attempted to Circumvent the Jurisdiction of the Court And Failed to Inform this Court of the Existence of the USEPA Memorandum**.

43.     As highlighted above, the NJDEP was aware of its claim, aware of the Bar Date and could have exercised its rights to file a protective proof of claim or seek leave from the court for additional time to file years ago. See Nat'l Steel Corp., 316 B.R. at 518 (citing Pioneer, 507 U.S. at 397). It is a creditor's "responsibility to explore, investigate and file a proof of claim against . . . the debtors, not the other way around. The debtors' actions or inactions are irrelevant." Id. at 518. Instead, the NJDEP voluntarily made the decision to wait at least two years after knowledge of its alleged claim and then attempt to circumvent the jurisdiction of this Court by filing the New Jersey Action. Further, when it finally chose to file this Motion, the NJDEP failed to acknowledge that it knew of its alleged claim no later than late 2002 when it received the USEPA Memorandum. Thus, the NJDEP lacks the requisite good faith necessary to justify its request.

17

## CONCLUSION

44.    Having chosen to forego filing its claim when it first learned of the alleged contamination at the Hamilton Plant in 2002, the NJDEP has foregone any right it may have had to file a claim.  And, even if this Court were to give the NJDEP the benefit of the doubt, the NJDEP chose not file a proof of claim in 2003 when it admits having known of the alleged claim.  The NJDEP chose, instead, to wait another two years and then file a state court action in violation of the automatic stay followed another two years later by the Motion.  In this case, given the choices made by the NJDEP, and its tremendous delay in even attempting to file the proof of claim, the Motion should be denied.

*[Remainder of Page Intentionally Left Blank]*

18

WHEREFORE, for the foregoing reasons, the Debtors respectfully request that this Court

deny the Motion.

Dated: July 6, 2007

> KIRKLAND & ELLIS LLP
> David M. Bernick, P.C.
> Janet S. Baer
> Lori Sinanyan
> Andrea L. Johnson
> 200 East Randolph Drive
> Chicago, IL 60601
> (312) 861-2000
>
> and
>
> PACHULSKI STANG ZIEHL YOUNG JONES
> & WEINTRAUB LLP
>
> _James E. O'Neill /by Curtis A. Hehn with permission_
>
> Laura Davis Jones (Bar No. 2436)
> James E. O'Neill (Bar No. 4042)
> Timothy P. Cairns (Bar No. 4228)
> 919 North Market Street, 17th Floor
> P.O. Box 8705
> Wilmington, DE 19899-8705
> (302) 652-4100
>
> Co-Counsel for the Debtors and Debtors in
> Possession

19