IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: | ) | Chapter 11 |
| | ) | |
| W. R. GRACE & CO., et al. | ) | |
| | ) | |
| Debtors. | ) | Case No. 01-01139 (JKF) |
| | ) | (Jointly Administered) |
| | ) | |
| | ) | **Trial Date:  July 30-31, 2007** |
| | ) | **Related Docket Nos. 9315, 16149** |

### DEBTORS' TRIAL BRIEF FOR THE JULY 30-31, 2007 STATUTE OF LIMITATIONS HEARING ON CERTAIN MOTLEY RICE CLAIMANTS' ASBESTOS PROPERTY DAMAGE CLAIMS

Debtors ("Grace") have identified ten (10) time-barred asbestos property damage claims filed by the Motley Rice law firm on behalf of the Washington State University ("WSU"), the Port of Seattle, Edmonds Community College ("Edmonds"), and CHP Associates Inc. ("CHP"). Pursuant to the Court's June 25, 2007 Scheduling Order [Docket No. 16149], these claims will be tried on statute of limitations grounds at the July 30 and 31, 2007 hearing in these Chapter 11 cases.

The record at the July 30-31 hearing will establish that WSU and the Port of Seattle identified asbestos-containing materials ("ACMs") in their buildings in the early 1980s and were well aware of their potential claims against ACM manufacturers, including Grace, by the mid-1980s.  In fact, WSU, the Port of Seattle and Edmonds all filed asbestos-property damage claims against ACM manufactures in other bankruptcy proceedings, starting with the Johns-Manville bankruptcy in 1985.  Both WSU and the Port of Seattle removed ACMs from their buildings, including the types of ACMs manufactured by Grace, by the early 1990s.  Edmonds similarly removed these types of ACMs from its building in 1997.  CHP knew about asbestos in its building before it purchased the property and sought removal quotes in 1997.

- 1 -

The statutes of limitations (Washington and Delaware) for these claims are three years. Those statutes began to run when the claimants, through the exercise of reasonable diligence, knew or should have known of their claims. These claims are time-barred because the claimants knew or should have known of their claims by April 1998, three years before Grace filed for bankruptcy in April of 2001.

The evidence at the hearing will establish that WSU and the Port of Seattle knew of their claims in the 1980s and that Edmonds and CHP knew of their claims in 1997. These claimants' claims accordingly are time-barred and should be disallowed and expunged following the July 30-31 hearing.

## I.    The Washington Claimants' Claims Are Barred By The Applicable Three-Year Statutes of Limitations.

The claims filed by WSU, the Port of Seattle, and Edmonds (collectively the "Washington Claimants") are subject to either Washington or Delaware's three-year statute of limitations.[1] *See* pages 12-13 *infra*. WSU and the Port of Seattle knew of their claims more than twenty years ago. Edmonds knew of its claim more than three years before Grace filed for bankruptcy. The Washington Claimants have made no assertion that they are exempt from the clear application of the three-year limitations period to their claims. Their claims accordingly should be disallowed and expunged.

---

[1]    As the Court is aware, Delaware's choice of law rules govern which statute of limitations applies to the Washington claims. *See In re PHP Healthcare Corp.*, 128 Fed. Appx. 839, 843 (3rd Cir. 2005); *In re Payless Cashways*, 203 F.3d 1081, 1084 (8th Cir. 2000); *In re Global Indus. Tech.*, 333 B.R. 251, 256 (Bankr. W.D. Pa. 2005). Under Delaware's borrowing statute, the shorter of the statute of limitations of the state where the property is located or Delaware's statute of limitations applies. 10 Del. C. § 8121 (2005); *see also Hill v. Equitable Trust Co.*, 562 F. Supp. 1324, 1333-34 (D. Del. 1983), *Thornton v. Carroll*, 490 F. Supp. 455, 457 (D. Del. 1980). Here, both Washington and Delaware have a three-year statute of limitations and there is no material variation in the laws of the two states as to application of that three-year period. Under either the law of Washington or Delaware, the Washington Claimants' claims are time-barred.

**A.    The Washington Claimants Knew About Their Claims More Than Three Years Before They Were Filed.**

The Washington Claimants submitted claim forms and additional documentation in support of their asbestos property damage claims in these proceedings.[2] Those documents establish that WSU and the Port of Seattle: (1) knew they had asbestos in their buildings by the early 1980s; (2) filed asbestos property damage claims for their buildings starting in 1985; and, (3) removed significant amounts of ACMs from their buildings by the early 1990s. The information submitted by Edmonds shows that it: (1) filed asbestos property damage claims in 1985; and, (2) removed ACMs from its buildings in 1997. All of the Washington Claimants accordingly knew or should have known of their claims more than three years before Grace filed for bankruptcy in April of 2001.

**1.    WSU Knew It Had ACMs In Its Building in 1984, Filed Asbestos Property Damage Claims in 1985, Acknowledged its Potential Claims Against Grace in 1986, And Completed An Extensive ACM Removal Project in 1992.**

WSU has filed five (5) property damage claims that are subject to the July 30-31 statute of limitations hearing. WSU Claim No. 6943 is for Grace's Monokote 3 fireproofing in WSU's Beasley Performing Arts Coliseum (the "Coliseum"). *See* Debtors' Trial Exhibit ("*Ex.*") 1.[3] The remaining claims (Claim Nos. 6939, 6940, 6942, and 6944) are for Grace's acoustical plaster in

---

2    The nine Washington claims subject to the July 30-31 statute of limitations trial are claim numbers:   6938 (Edmonds); 6939 (WSU); 6940 (WSU); 6942 (WSU); 6943 (WSU); 6944 (WSU); 9645 (Port of Seattle); 9646 (Port of Seattle); and 9647 (Port of Seattle).

3    Debtors' Trial Exhibits consist of the claim forms and documents provided by the claimants in support of their claims in these proceedings. Debtors' Exhibits 1-5 are the claim forms for the WSU claims that are subject to the July 30-31 hearing. Debtors' Exhibits 6-39 are selected documents submitted by WSU in support of its claims. These documents are organized chronologically. Debtors' Exhibits 40-42 are the claim forms for the Port of Seattle claims. Debtors' Exhibits 43-53 are certain documents (in chronological order) submitted by the Port of Seattle in support of its claims. Debtors' Exhibits 54-59 are the claim form and certain documents submitted by Edmonds in support of claim 6938. Debtors' Exhibits 60-62 are the claim form and selected documents submitted by CHP in support of claim 2977. The Debtors' Trial Exhibits are submitted herewith in the Debtors' Trial Exhibit binders.

WSU's Dana, McCoy, Kruegel-McAllister, and Johnson Halls. *See Exs.* 2-5.

WSU has known about ACMs in its Coliseum, Halls and other facilities for more than two decades. In March of 1984, WSU conducted an asbestos survey and discovered ACMs allegedly made by Grace in its Coliseum and Murrow Hall-West. *Ex.* 11. A March 5, 1986 WSU Memorandum discusses WSU's 1984 discovery of asbestos in these buildings as follows:

> The visual survey indicated that the sprayed on acoustical or fireproofing material applied to the beams and structural ceilings of areas in the buildings contained asbestos. I made an informal inquiry to Facilities Planning subsequent to the survey to find out what the material was by brandname and manufacturer. *I recall that the information I received was Monokote MK3 manufactured by Grace. Co* although I do not know whether this was the actual product applied or the product specified.
>
> In light of the civil court action currently in an appeal status, reference the enclose article, *I request that efforts be made by your department to try and identify the actual brand name and the manufacturer of the material used in the Coliseum. This same information may also be quite useful in the case of Murrow Hall West.* Both of these structures were built in the 1970-73 time frame and both have sprayed on asbestos containing material as verified by laboratory analysis. This information may also be of value to the Attorney General's office, especially if the appellate action in the City of Greenville, South Carolina vs. W. R. Grace & Co. is upheld in favor of Greenville in higher court review.
>
> I have queried our Engineering section concerning this matter but they are unable to provide any information concerning the brand and manufacturer. *Therefore, any help or assistance your department can provide could be worth millions of dollars in cost savings when the University is faced with a possible removal requirement in the future.* In light of the recent risk assessment made by Environmental Health and apparent increased emphasis by EPA this may become a very important facit [sic] of the total Asbestos Abatement Program that the University may be required to complete before the year 2000. *The time to lay the groundwork is now.*

*Id.* (emphasis supplied).[4]

On May 4, 1984, WSU submitted thirty-one (31) bulk samples from several of its buildings to a laboratory for asbestos analysis. *Ex.* 7. These samples included nine samples

---

4    The article attached to this Memorandum included a detailed discussion of the *City of Greenville, South Carolina vs. W.R. Grace & Co.* decision involving Grace's Monokote 3 fireproofing. *Id.*

taken from the Coliseum and over a dozen samples of ceiling materials taken from many of WSU's other buildings.[5] *Ex.* 6. In twenty-four (24) of the samples submitted, between 2-50% chrysotile asbestos was identified. *Ex.* 7. On July 21, 1984, additional samples from other WSU facilities were submitted for laboratory analysis.[6] *Ex.* 8. Between 2-25% chrysotile asbestos was identified in five of these samples. *Id.*

In 1985, a Washington State University Coliseum Risk Assessment Report (the "1985 Report") was prepared for WSU to assess the condition of the asbestos-containing fireproofing in the Coliseum. *Ex.* 10. The 1985 Report documented, *inter alia*, "asbestos beam damage (friable asbestos) . . . crumbled fire proofing . . . asbestos beam sprayed-on material was damaged by personnel . . . some friable asbestos material had fallen on the Coliseum theater ceiling screen netting . . . " *Id.* at 352.[7]

In a Memorandum dated February 24, 1986, a copy of the 1985 Report was provided to the chair of WSU's Asbestos Abatement Committee. *Id.* at 349. Handwritten notes on this Memorandum concluded that "[t]he only solution is removal . . . ." and estimated the cost to remove the asbestos fireproofing in the Coliseum to be $5-6 million. *Id.* (emphasis in original).

In 1986, WSU conducted additional asbestos surveys and found that several of its other

---

[5]    Samples were taken from WSU's Neill Hall, Stevenson North Hall, Stevenson East Hall, Stevenson South Hall, Rogers Hall, Arton Hall, Kruegel-McAllister, Goldsworth Hall, Gannon Hall, Rotunda Dining Hall, Rogen Orton Dining Hall, Wilmer-Davis Dining Hall, Streit Hall, Perham Hall and Fulmer Hall Auditorium.

[6]    WSU buildings sampled at this time included Clark Hall, Fulmer Annex, Orton Hall, and Neill Hall. *Ex.* 6.

[7]    Documents from the claimants' claim files have been labeled with a two-part number. The first part refers to the claim number. The second part refers to the consecutively numbered pages in the claim file. So, for example, the 100th page of claim file number 6943 would be labeled "006943-000100". For purposes of identifying specific page numbers of documents in this trial brief, citation will be made to the Debtors' Trial Exhibit number for the document and the second number, or page number of the claim file (omitting the first part or claim number). So, for example, the reference here to page 352 is to the page labeled 006943-000352 in Exhibit 10.

buildings contained ACMs.  Specifically, ACMs were identified in WSU's Dana and McCoy

Halls through surveys conducted in order to file asbestos property damage claims in the John-

Manville bankruptcy.  *Exs*. 4, 5 at 5.  Further surveys also were conducted at the Coliseum in

1986.  *Ex*. 12.

On August 24, 1989, WSU received a complaint regarding a "concern about friable

asbestos in netting . . . above [C]oliseum seats."  *Ex.* 13.  An investigation was performed that

same day.  *Id.* at 361.  The results of the investigation reported "chucks" of loose materials on

the scrim over the seating area and concluded that "depending on the [percentage] and type of

asbestos, the frayed material is of greatest concern."  *Id.*  In a WSU Memorandum to the Director

of the Coliseum written that same day, WSU's Industrial Hygienist wrote:  "We strongly

recommend that all friable asbestos material be abated <u>immediately</u> . . . ."  *Ex.* 14 (emphasis in

original).  On August 25, 1989, six bulk samples of the Coliseum ceiling material were sent to a

lab for asbestos analysis.  *Ex.* 16 at 117.  All six samples showed approximately 5% chrysotile

asbestos.  *Id.*

In September of 1989, WSU requested that the Washington State Department of Labor

and Industries (the "DOL") conduct an Industrial Hygiene Consultation at the Coliseum.  On

September 29, 1989, the DOL inspected the Coliseum in order "to evaluate the condition or

status of fireproofing material (Monokote) sprayed onto outer perimeter structure beams located

within the scrim curtain area of the coliseum."  *Ex.* 17.  In an October 4, 1989 letter to WSU

discussing the results, the DOL states:

> As discussed during the meeting, asbestos containing fire-proofing
> material has been damaged during placement operations of rigging
> necessary for support of the scrim curtain and fall protection netting.
> Evidence of fallen material is clearly visible while looking up through the
> bottom side of the scrim curtain from the seating area.  One can also
> observe areas of deterioration on beams in-between sections of the curtain.
>
> Closer observation of the upper or top side of the scrim curtain and beams
> was obtained from a service platform area.  This area affords a good view
> as to the large amount of fallen fireproofing debris suspended by the scrim
> curtain and degree of damage and deterioration to the fireproofing material

on beams.

WAC 296-62-07723 requires that asbestos or asbestos containing material which have become damaged or deteriorated be repaired, enclosed, encapsulated, or removed. ***There is no doubt that this fireproofing material which contains asbestos is both damaged and deteriorated. Therefore, the hazard from this situation must be eliminated.***

A written action plan must be submitted to my attention within thirty (30) days from receipt of this letter outlining the steps necessary for the University to eliminate the hazard. Upon receipt, the plan will be assessed and an abatement period for the project will be determined. Generally, a sixty (60) day abatement period would be set, but that will not be determined until after reviewing the plans.

*Id.* (emphasis supplied).

On October 23, 1989, WSU sent a "Notification of Intent to Remove or Encapsulate Asbestos Material" for the Coliseum to the State of Washington. *Ex.* 18. The abatement was scheduled from December 15 through December 31, 1989 and all disposals were to be at the Whitman County Sanitary Landfill, an EPA approved landfill for asbestos containing materials. *Id.*

In June of 1991, the WSU Board of Regents approved the use of a professional consulting firm for further asbestos removal at the Coliseum. *Ex.* 20. In October of 1991, a Coliseum Asbestos Removal Project was planned to remove and/or abate the asbestos containing fireproofing at the Coliseum. *Ex.* 21.

A Capital Project Request ("CPR") was submitted in the fall of 1991 to the Director of the Coliseum for the Coliseum Asbestos Removal Project. *Ex.* 22. The CPR described the asbestos problem at the Coliseum as follows:

In October 1985, an asbestos risk assessment of the roof structure fireproofing was conducted by representatives from the Coliseum, WSU Physical Plant and Environmental Health Services. Over 95% of the support beam structure that was fireproofed during construction in 1973 showed evidence of damage. Action was taken to restrict access to any of the beams and supports that were fireproofed and minor repairs were made. The content of asbestos is in a range of 4.5 to 8% [chrysotile] with trace amounts of amosite and actinolite. During related abatement activities for rigging repair/maintenance, it was observed that a

> considerable amount of friable asbestos had fallen onto the scrim curtain above the theater portion (2300 seats) of the Coliseum. In September 1989, a Department of Labor and Industries Industrial Hygiene Consultation was requested and completed. As a result, immediate action was taken to clean up the friable asbestos from the scrim curtain area. In the area over seating sections 1-9 there are winches and cables that are connected to the fireproof beams. Outside performance road crews have walked on these fireproofed beams to install netting or scenery. Both of these activities have caused considerable damage to the encapsulated fireproofing exposing friable asbestos.

*Id.* at 265. The CPR requested an estimated $1,513,000 for the Coliseum Asbestos Removal Project. *Id.* at 266. According to the CPR:

> This project will remove asbestos contaminated fireproofing from the roof beams and support structures. This is the only viable alternative available. Encapsulation, repair or enclosure are not practical alternatives. The facility has been sited by the State Department of Labor and Industries which has threatened closure of the Coliseum until the repairs have been completed.

*Id.* at 265. On January 17, 1992, a proposal for the Coliseum Asbestos Removal Project was presented to the WSU Board of Regents. *Ex.* 25.

The Coliseum Asbestos Removal Project was approved and a large quantity of asbestos–containing fireproofing was removed in the summer of 1992. *Ex.* 32 at 227. WSU commissioned a Post-Asbestos Abatement Review to evaluate the Coliseum Asbestos Removal Project. *Id.* In addition, in 1993, WSU developed an Operations & Maintenance Plan to deal with remaining ACMs in the Coliseum on a going forward basis. *Ex.* 33.

WSU continued to submit bulk sample testing from its buildings for asbestos analysis in the early 1990s. A January 28, 1992 report identified 50% chrysotile asbestos in the acoustical plaster ceiling of Dana Hall. *Ex.* 26. An April 20, 1995 report identified 5% chrysotile asbestos in the ceiling material in McCoy Hall. *Ex.* 34. 1998 bulk sample testing showed chrysotile

asbestos in WSU's Kruegel-McAllister and Johnson Halls.[8] *Exs.* 36, 37.

On January 29, 1985, WSU filed asbestos property damage claims for its buildings in the Johns-Manville bankruptcy. *Exs.* 1-5 at 11.  WSU subsequently filed asbestos property damage claims in the National Gypsum (July 6, 1992) and Celotex (July 27, 1993) bankruptcies. *Id.* On its claim forms in Grace's Chapter 11 cases, WSU lists the action captioned *Alabama et. al. v. W.R.Grace & Co. et. al*, and filed with the United States Supreme Court on January 30, 1990, as a lawsuit it previously filed against Grace for asbestos property damage claims.[9] *Exs.* 1-5 at 10.

> **2.    The Port of Seattle First Removed ACMs from its Airport in 1984 and Filed Asbestos Property Damage Claims Against Asbestos Manufactures Starting in 1985.**

The Port of Seattle filed three asbestos-property damage claims (Nos. 9645, 9646 and 9647) in these proceedings seeking damages relating to Grace's Monokote-3 fireproofing in the Seattle-Tacoma International Airport ("Sea-Tac Airport"). *Exs.* 40-42.

The Port of Seattle, however, has known about asbestos-containing fireproofing in its airport for more than twenty years.

In 1984, the Port of Seattle conducted an asbestos-survey and bulk sample testing of fireproofing materials in its Sea-Tac Airport. *Ex.* 43.  The Port of Seattle removed asbestos containing acoustical insulation in its Sea-Tac Airport in December of 1984. *Ex.* 44.

---

[8]    Bulk sample testing conducted in 1984 had previously identified 15-25% chrysotile asbestos in ceiling material from WSU's Kruegel-McAlister Hall. *Ex.* 6 at 40 (sample 84-032), *Ex.* 7 at 35 (sample 84-032).

[9]    As the Court knows from prior briefing in these proceedings, the Supreme Court entered an order denying the petition in the *Alabama* suit on May 14, 1990 ending that litigation. *See* Debtors' Motion and Memorandum for an Order Pursuant to F.R.B.P. 7056 Disallowing and Expunging One Hundred Nine (109) California Asbestos Property Damage Claims [Docket No. 14594] at 9, Ex. B. The Alabama suit, accordingly, did not toll WSU's claims against Grace for any appreciable period of time.

An extensive asbestos survey report entitled "Port of Seattle Seattle Tacoma International Airport Asbestos Analysis Project" (the "Sea-Tac Report") was completed for the Port of Seattle in July of 1985. *Ex.* 47. The Sea-Tac Report detailed the results of a comprehensive asbestos survey that had been performed on all of the Sea-Tac Airport facilities. *Id.* The Sea-Tac Report found sprayed-on insulation throughout the Sea-Tac Airport containing between 5-20% chrysotile asbestos. *Id.* at 101, 105, 109, 116, 119, 125, 127, 131, 133, 135, and 136.

A second volume of the Sea-Tac Report, subtitled "Assessment of Exposure Potential and Abatement Recommendations," was completed in October of 1985 and revised in August of 1986. *Ex.* 48. This volume contained an extensive discussion of the potential hazards of ACMs and recommended "selective removal of asbestos-containing fireproofing material on the upper surfaces of structural steel." *Id.* at 268, 273, 274, 275. In addition, this volume of the Sea-Tac Report included a section entitled "Legal Aspects" that discussed, *inter alia*, potential allegations and specific cases that had been filed against asbestos manufacturers. *Id.* at 285, 287.

In 1985, the Port of Seattle filed an asbestos-property damage claim in the amount of $26,586,729 in the Johns-Manville bankruptcy proceeding (the "Manville Claim"). *Ex.* 46 at 52. The Manville Claim was for "acoustical insulation" in the Sea-Tac Airport. *Id.* at 55. The Manville Claim asserted that the Port of Seattle removed acoustical insulation from Concourses B and C in November of 1984. *Id.* at 55, 56.

### 3. Edmonds Filed Asbestos Property Damage Claims Beginning in 1985 And Removed ACMs From Its Building in 1997.

Edmonds' property damage claim (Claim No. 6938) seeks damages relating to Grace's Monokote 3 fireproofing in its Lynnwood Hall. *Ex.* 54. Edmonds filed property damage claims starting in 1985 in several asbestos bankruptcy proceedings. Edmonds also removed asbestos-containing fireproofing from Lynnwood Hall in 1997.

Edmonds began an asbestos abatement project at Lynnwood Hall on September 23, 1997.

*Ex.* 55 at 44.  This project included "[s]pot removal of asbestos-containing fireproofing . . . from approximately 2,400 square feet of structural concrete for floor borings and equipment hangers from October 23, 1997 to December 16, 1997." *Id.*  The asbestos-containing fireproofing was manually scraped from the concrete using wet methods to control fiber release.  *Id.*  According to field observation notes from the project, "ACM debris [was] found scattered throughout contamment [sic].  It appears to have been disturbed . . . ." *Id.* at 49.  Removal records show that approximately 30 bags of fireproofing was removed from Lynnwood Hall in December of 1997. *Ex.* 56 at 140-142.  Bulk testing from the project in February of 1998 identified 2% chrysotile asbestos in the materials sampled.  *Ex.* 57 at 119-121.

In preparation for the project, Edmonds' abatement consultants, PBS Environmental ("PBS"), advised Edmonds in July of 1997 that it was required to notify the occupants of Lynnwood Hall of the planned asbestos abatement.  *Ex.* 58.  The proposed notification informed occupants that sprayed-applied fireproofing would be removed.  *Id.*  In addition, the Asbestos Abatement Work Plan for the project, as revised in the fall of 1997, advised Edmonds that "[t]he area above the suspended ceiling is considered a contaminated space and requires cleaning and spot abatement . . . ." *Ex.* 59.

On its claim form, Edmonds admits that it filed asbestos property damage claims in several bankruptcy proceedings including Johns Manville (January 29, 1985), Celotex (July 27, 1993) and Eagle Pitcher (September 30, 1992).  *Ex.* 54 at 11.  In addition, Edmonds lists the action captioned *Alabama et. al. v. W.R.Grace & Co. et. al*, and filed with the United States Supreme Court on January 30, 1990, as a lawsuit it previously filed against Grace for asbestos property damage claims.  *Id.* at 10.

**B.    The Washington Claimants' Claims Are Barred By The Applicable
        Three-Year Statute Of Limitations**

The Washington Claimants' claims are governed by a three-year statute of limitations in

both Washington and Delaware. *See* RCWA § 7.72.060 (3); Del. Code Ann. tit. 10, § 8106.

That statute begins to run when the Washington Claimants discovered, or through the exercise of

reasonable diligence, should have discovered the alleged harm and its cause. *See* RCWA §

7.72.060 (3); *Becker v. Hamada, Inc.*, 455 A.2d 353 (Del. 1982).   Once the Washington

Claimants had notice of facts sufficient to prompt a person of average prudence to inquire into

the presence of an injury, they are deemed to have had notice of all facts that reasonable inquiry

would disclose. *See Mayer v. City of Seattle,* 10 P.3d 408, 413 (Wash. Ct. App. 2000).   The

statute of limitations begins to run once even a slight injury is sustained even if the "actual or

substantial damages do not occur until a later date." *Steele v. Organon, Inc.*, 716 P.2d 920, 922

(Wash. 1986).

The Washington Claimants are required to exercise due diligence in discovering the basis

for their action. *See Clare v. Saberhagen Holdings, Inc.*, 123 P.3d 465, 467 (Wash. Ct. App.

2006).   While Grace bears the initial burden of showing that the statute of limitations has run, the

Washington Claimants bear the burden of proving "that the facts constituting the claim were not

and could not have been discovered by due diligence within the applicable limitations period."

*Id.*; *see also Rivas v. Eastside Radiology Assocs.*, 143 P.3d 330, 333 (Wash. Ct. App. 2006)

(party asserting tolling of statute of limitations bears the burden of proof); *Precision Airmotive*

*Corp. v. Rivera*, 288 F. Supp. 2d 1151, 1153 (W.D. Wash. 2003) (plaintiff must prove that facts

constituting the cause of action were not discovered *or could not have been discovered by due*

*diligence* to invoke discovery rule).

WSU identified asbestos containing fireproofing and ceiling plaster in its facilities in

1984.  It continued to test for ACMs in its buildings throughout the 1980s and early 1990s.  It

undertook a substantial removal project at the Coliseum to remove asbestos-containing

fireproofing in the summer 1992 at an estimated cost in excess of $1 million. WSU discussed taking legal action against Grace in 1986 and filed asbestos property damage claims against other asbestos manufacturers beginning in 1985. WSU participated in the *Alabama* action filed against Grace in 1990.

The Port of Seattle knew about asbestos-containing fireproofing in its Sea-Tac Airport in 1984. In fact, the Port of Seattle removed asbestos-containing fireproofing from Sea-Tac Airport that year. It also was advised of its legal claims against asbestos manufacturers and filed a $26 million claim in the Johns-Mansville bankruptcy in 1985.

Edmonds filed asbestos property damage claims in various bankruptcy proceedings starting in 1985. Edmonds participated in the *Alabama* action filed against Grace in 1990. In 1997, more than three years before Grace's bankruptcy petition was filed, Edmonds removed ACMs from its building.

Based upon this irrefutable evidence, the Washington Claimants knew or should have known of their alleged injuries and the cause of those injuries more than three years before their claims were deemed to be filed in April of 2001. Not only did the Washington Claimants identify and remove ACMs from their buildings before April of 1998, but they also asserted asbestos property damage claims for their buildings against asbestos manufacturers (including Grace) as early as 1985. Having admittedly filed claims for asbestos property damage more than two decades ago, the Washington Claimants cannot contend that they did not know, or could not have known, of those claims until after April of 1998. The Washington Claimants' claims accordingly are time-barred under the applicable three-year limitations period and should be disallowed and expunged.

C.    **The Washington Claimants Cannot Escape The Conclusion That**
**Their Claims Are Time-Barred**

The Washington Claimants' responses to Grace's Fifteenth Omnibus Objection recognize

that a three-year statute of limitations applies to their claims and that their claims can only

survive application of that statute if they did not know of their injury until three years before

their claims were filed.[10]  *See* Exhibit A (Washington Claimants' Responses to Debtors'

Fifteenth Omnibus Objection).  As set forth above, the Washington Claimants' own documents

establish that they knew or should have known of their claims by at least the early 1990s.

Having failed to raise any assertion that the three-year limitations period does not apply

to their claims, the Washington Claimants can not now escape the legal conclusion, based on

information contained in the documentation that they provided in support of their claims, that

their claims are time-barred.  As this Court held in its May 30, 2007 hearing in these

proceedings:

> [W]hat's good for the goose is good for the gander.  I've already said that the
> Debtor is stuck with what it said in the 15th Omnibus [Objection].  It seems to me
> that the claimants are stuck with what they've said in their proofs of claims.
>
> *             *             *
>
> And so at this point in time, I think that anything that is encompassed within that
> 15th Omnibus Objection should be just what it is, the claims and the objections to
> the claims.  So for the entire 15th Omnibus Objection, any claim that is
> encompassed within that 15th Omnibus [Objection] it seems to me should be just
> what it is today.

*See* Transcript of May 30, 2007 Hearing [Docket No. 15988] at 139-140.

Given the overwhelming evidence that the three-year limitations period has run on the

---

10    Debtors' dispute the Washington Claimants' contentions that a "contamination" trigger
should be applied in evaluating application of the three-year limitations period to their
claims.  Neither Washington nor Delaware has not adopted a contamination trigger for
asbestos property damage claims.  Regardless of which trigger the Court would apply,
however, the Washington Claimants' claims clearly are time-barred because they
removed ACMs like the ones manufactured by Grace from their buildings by 1997 and
filed asbestos property damage claims against other ACM manufacturers as early as
1985.

Washington Claimants' asbestos property damage claims, those claims should be disallowed and expunged at the conclusion of the July 30-31 hearing.

## II.   CHP's Claim Is Barred By Delaware's Three Year Statute Of Limitations

CHP's claim (No. 2977) for Monokote 3 fireproofing is governed by Delaware's three year statute of limitations. Based on the information submitted by CHP in support of its claim, this claim also is time-barred.

### A.   CHP Knew Of Its Claim More Than Three Years Before Grace's Bankruptcy Was Filed.

CHP learned of the presence of asbestos-containing fireproofing in its building in 1997 during the due diligence phase of the sale and prior to CHP's actual purchase of the building. *Ex.* 60 at 5.  A November 3, 1997 Phase I Environmental Assessment and Limited Asbestos Survey (the "1997 Survey") of the property identified 49,000 square feet of friable spray-on asbestos fireproofing. *Ex.* 61 at 21, 37.  The 1997 Survey recommended removal of this material. *Id.* at 21, 41.  CHP received a quotation for removal of the asbestos-containing fireproofing on December 2, 1997. *Ex.* 62.  The price quoted was $480,000 if the building was unoccupied and $560,000 on a floor by floor basis. *Id.*

With the foregoing knowledge, CHP purchased the property on April 8, 1998. *Ex.* 60 at 3.  According to CHP's claim form, it has made no attempt to remove, contain or abate the asbestos-containing fireproofing contained in the building that it purchased and for which it has filed an asbestos property damage claim against Grace in this proceeding. *Id.* at 5.

**B.**    **Delaware's Three Year Statute Of Limitations Bars CHP's Claim**

In order to determine which state's statute of limitations to apply to CHP's claim, the

Court must look to Delaware's choice of law rules. *See In re PHP Healthcare Corp.*, 128 Fed.

Appx. 839, 843 (3rd Cir. 2005); *In re Payless Cashways*, 203 F.3d 1081, 1084 (8th Cir. 2000); *In*

*re Global Indus. Tech.*, 333 B.R. 251, 254 (Bankr. W.D. Pa. 2005). Under Delaware's

borrowing statute, the Court is to apply the statute of limitations of the state where the property is

located or Delaware's statute of limitations, whichever is shorter. 10 Del. C. § 8121 (2005); *see*

*also Hill v. Equitable Trust Co.*, 562 F. Supp. 1324, 1334 (D. Del. 1983), *Thornton v. Carroll*,

490 F. Supp. 455, 457 (D. Del. 1980).

CHP's claim is subject to the shorter of the limitations period of either Delaware or the

New Jersey, the state in which the buildings is located. New Jersey has a six year statute of

limitations. N.J. Stat. Ann. § 2A:14-1. Delaware has a three year statute of limitations. 10

Del. C. § 8106. Delaware's three year statute of limitations accordingly applies to CHP's claim.

Delaware's three-year limitations period begins to run when CHP knew or should have

known of its alleged injury. *See Becker v. Hamada, Inc.*, 455 A.2d 353, 356 (Del. 1982); *Nardo*

*v. Guido DeAscanis & Sons, Inc.,* 254 A.2d 254 (Del. Super. 1969). CHP's claim is barred if it

knew or should have known of its injury prior to April 1998, three years before Grace's

bankruptcy was filed.

Here, there is no question that CHP learned that it had friable asbestos-containing

fireproofing it its building in 1997, before it even purchased the property. CHP also was advised

in 1997 that the material should be removed and that the cost of removal was substantial. CHP's

asbestos property damage claim accordingly is time-barred under Delaware law and should be

disallowed and expunged.

## CONCLUSION

Based on the foregoing evidence, which the claimants will be unable to refute at the July 30-31 hearing, the statutes of limitations on their property damage claims ran well before those claims were deemed to be filed. These property damage claims should be disallowed and expunged.

Dated: July 9, 2007

REED SMITH LLP
James J. Restivo, Jr., Esq. (#10113)
Lawrence Flatley, Esq. (#21871)
Douglas E. Cameron, Esq. (#41644)
Traci S. Rea, Esq. (#76258)
435 Sixth Avenue
Pittsburgh, PA 15219
Telephone: (412) 288-3131
Facsimile: (412) 288-3063

KIRKLAND & ELLIS LLP
David M. Bernick, P.C.
Janet S. Baer
200 East Randolph Drive
Chicago, Illinois 60601
Telephone: (312) 861-2000
Facsimile: (312) 861-2200

and

PACHULSKI STANG ZIEHL YOUNG JONES & WEINTRAUB LLP

Laura Davis Jones (Bar No. 2436)
James E. O'Neill (Bar No. 4042)
Timothy P. Cairns (Bar No. 4228)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705
(Courier 19801)
Telephone: (302) 652-4100
Facsimile: (302) 652-4400

Co-Counsel for the Debtors and Debtors in Possession