## IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W.R. GRACE & CO., et al. | ) | Case No. 01-01139 (JKF) |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| | ) | **Reference Docket No. 16175** |

### CELOTEX ASBESTOS SETTLEMENT TRUST'S OPPOSITION TO DEBTORS' MOTION TO COMPEL THE CELOTEX ASBESTOS SETTLEMENT TRUST TO PRODUCE DOCUMENTS AND APPEAR FOR DEPOSITION

The Celotex Asbestos Settlement Trust (the "Celotex Trust" or the "Trust") submits this opposition to the Motion To Compel The Celotex Asbestos Settlement Trust To Produce Documents and Appear for Deposition [D.I. 16175] (the "Motion to Compel") of Debtors W.R. Grace & Co. and its affiliated companies (collectively, "Grace") and respectfully represents as follows:

### I.    Preliminary Statement

> "Of course, pretrial discovery is a fishing expedition and one can't know what one has caught until one fishes.  But Fed.R.Civ.P. 45(c) allows the fish to object, and when they do so the fisherman has to come up with more than [Grace] has been able to do in this case."

*Northwestern Memorial Hosp. v. Ashcroft*, 362 F.3d 923, 931 (7th Cir. 2004)(quashing subpoena for third-party records).  As shown below, to overcome the objection of this third-party respondent, Grace must, among other things, carry the burden of establishing a necessity for the information it seeks, the lack of undue burden on the non-party, and the unavailability from other sources.  This it cannot do.

Grace seeks to compel the Trust to produce confidential claimant files from over 73,000 individuals and to turn over the Trust's proprietary claims database (the "Celotex Database").  This Court should deny the Motion to Compel for several reasons.  First, because of its

confidential nature and proprietary value, the Celotex Database constitutes a trade secret. The Trust spent hundreds of thousands of dollars and 612,000 person hours to create its proprietary claims database and it has derived substantial value from the unique compilation of its database. Grace cannot meet its burden of showing the "substantial need" necessary to overcome the database's trade secret protection. In fact, Grace admits that it already has obtained an agreement to access the commercially-available database of the Manville Trust, which should be more than sufficient to satisfy any need Grace has for this information.

Next, producing individual claims files from more than 73,000 individuals would place an undue burden on the Trust because it does not have the employees to devote to such a daunting task and a production of this magnitude would shut down its claims facility to the processing of other claims. Moreover, Grace may obtain this information directly from the individual claimants who are creditors in the Grace bankruptcy. This Court already has directed claimants to answer a detailed questionnaire, submitted under penalty of perjury, that provides information on the claimants' exposure to asbestos products. Grace does not contend that it seeks to obtain information from the Trust for the purposes of supplementing the information from the questionnaire, but rather to verify the accuracy of the information that it has received. There is no basis, however, for the Celotex Trust, a non-party to the Grace proceeding, to be put to the burden of producing materials for the sole purpose of verifying the accuracy of discovery that Grace has received. If Grace really needs information about submissions to the Trust, it may obtain this information directly from the claimant/creditors.

Further, the claims files are not subject to subpoena because they are privileged as communications submitted in settlement negotiations and protected as confidential medical records. The claims procedures under which claims were submitted to the Trust assured

claimants that such materials would be maintained as confidential.  Under the privilege law of a number of states, medical records and related communications contained in the individual claimant files are privileged and protected from disclosure without the claimant's consent. Before any such records could be produced – absent claimant consent – an analysis would be required of the privilege laws of each of the states where the physician-patient relationship was created.  Such a step would be so cumbersome for such a large volume of claim files as to be unworkable.   At the very least, Grace must obtain an authorization from these claimants authorizing the Trust to release such information

Accordingly, the Trust requests that the Court deny the Motion to Compel in order to preserve the Trust's trade secret of the Celotex Database, to prevent the undue and excessive burden on the non-party Trust of providing over 73,000 claim files, and to preserve the privileged settlement negotiations and confidential medical records provided by the claimants to the Trust.

## II.      Background

### A.      The Celotex Trust

The Celotex Asbestos Settlement Trust was formed under Section 524(g) of the Bankruptcy Code pursuant to the confirmation order issued by the Bankruptcy Court for the Middle District of Florida.  The Trust provides a mechanism for individuals who suffered injury as a result of exposure to asbestos products for which the Celotex corporation bears legal responsibility to recover for their injuries through an administrative claims process.  The Claims Resolution Procedures (the "CRP") set forth the procedures for the submission, evaluation and payment of asbestos claims.  (See Declaration of Richard R. Winner, attached hereto as Exhibit A (the "Winner Dec."), ¶ 4.)   The Trustees in administering the Trust are bound by the provisions of the CRP.    Section VI of the CRP provides that "all materials, records and

3

information submitted by claimants . . . are confidential, submitted solely for settlement purposes."

Individuals submitting claims to the Trust are required to submit a claim form and provide detailed medical information. (*See* Winner Dec. Ex. 2, ¶ 4.) From 1998 through 2006, the Celotex Trust processed its own claims. ( *Id.* at ¶ 5.) The Celotex Trust employed, on average, 34 claim reviewers and 6 claim supervisors each year. (*Id.*) These reviewers are highly trained to scrutinize claim forms and medical documents submitted by the claimants and their counsel to identify, evaluate and record data submitted in support of a claim. ( *Id.* at ¶ 4.) Each reviewer underwent at least 75 hours of training and goes through regular, periodic updates. (*Id.*) During that eight year period, the Celotex Trust reviewed and recorded data on 639,185 claims and paid 305,128 claims. (*Id.* at ¶ 5.) By the end of 2006, an estimated 612,000 person-hours were expended in developing the Celotex Trust claims database. ( *Id.*)

The Celotex Trust's vast claims handling experience, and comprehensive collection of data, well positioned it to administer claims for other trusts, and in November, 2006, four other asbestos trusts joined the Celotex Trust to form the Delaware Claims Processing Facility (the "Delaware Facility"); those other trusts are Armstrong World Industries, Babcock & Wilcox, United States Gypsum and Owens Corning/Fibreboard. (*Id.* at ¶ 3.) The Celotex Trust is a partial owner of the Delaware Facility. (*Id.*) The Trust formed the Delaware Facility in order to achieve efficiencies of scale in claims processing and reduce costs. (*Id.* at ¶ 3.) Pursuant to the agreements establishing the Delaware Facility, Celotex continues to own the Celotex Database, although it is updated and managed by the Delaware Facility. (*Id.* at ¶ 4.) Information in the Celotex Database is only available to the other trusts upon the express consent of a claimant submitting a claim to one of these trusts. (*Id.*)

The Delaware Facility currently has 207 employees.  (*Id*. at ¶ 3.)  The Delaware Facility has reviewed 16,511 claims during the first fifteen days of this month alone.  (*Id*.)  Many of the employees of the Delaware Facility were previously employees of the Celotex Trust who became Delaware Facility employees when the Delaware Facility was formed.  (*Id*.)  Currently, only seven claim reviewers and one claims manager are dedicated to processing Celotex Trust claims at the Delaware Facility.  (*Id*.)

### B.        The Celotex Database

Information maintained in an asbestos claims database can be broken down into four main categories; (a) claimant personal information (*i.e.*, name, date of birth, next of kin); (b) claimant medical information (*e.g.*, B-read reports, pulmonary function tests, and physical examination reports); (c) disease category classification; and (d) exposure information.  (*Id*. at ¶ 9.)

The Disease Category Classification utilized in the Celotex CRP are unique to the Celotex Trust.  (*Id*.)  The Celotex CRP recognize seven classifications of asbestos-related disease, while the trend among more recently formed trusts is to recognize eight categories.  (*Id*.)  The primary difference is in the levels of non-malignant disease and requirements for lung cancer claims.  (*Id.*)

The exposure data captured by the Celotex Trust relating to claimants' alleged exposure is very limited.  (*Id*.)  ***The Celotex Trust claim form and CRP focus only upon a claimant's alleged exposure to Celotex or Carey Canada products***.  (*Id*.)  The claim form solicits only Celotex and Carey Canada product exposure histories. (*Id.,* at ¶ 4, Ex. 2., p. 5.)  It does not ask claimants to identify the products of any other asbestos manufacturer to which they might have been exposed.  If a claimant happens to provide a deposition transcript or discovery responses from the tort system that contain a detailed employment history, the Celotex Trust reviewer

would not necessarily record extraneous information.  (*Id*. at ¶ 9.)  Rather, once the reviewer can confirm exposure to a Celotex or Carey Canada product sufficient to meet the Celotex Trust's CRP, the reviewer is trained to enter no further data in the claims database relating to that claim. (*Id*.)  In such instances, the reviewer would confirm exposure in the attachments and note that exposure to a Celotex or Carey Canada product was appropriately established.  (*Id*.)  The reviewer would typically note in the database "see attached" for the claim exposure data.  (*Id*.) Accordingly, the electronic database likely would contain only Celotex/Carey product identification and the term "see attached" in the event the claim file contained extensive exposure information.  (*Id*.)  A review of the physical claimant file would be necessary to obtain any detailed information.  (*Id*.)

The Celotex Trust, and now the Delaware Facility, restrict access to the Celotex Database and strictly enforce those restrictions. (*Id*. at ¶ 6.)  The Celotex Database is stored in a physically and electronically secure facility.  (*Id.*)  Physically, the database server is stored in a locked server room and a key is required to gain access.  (*Id.*)  The database is stored in Microsoft's SQL Server 2000 database on an HP DL380 G3 server with dual mirrored hard disk drives on an Uninterrupted Power Supply.  (*Id.*)

Electronically, there are only two methods to access the claims database.  (*Id.*)  At the secure facility, a user must be a member of the facility domain.  (*Id.*)  A valid user ID and password is used to authenticate each user in order to log on to the facility network.  (*Id.*) Moreover, only a properly credentialed user is permitted to access the claims database.  (*Id.*) There is a hardware-encrypted VPN tunnel between the Celotex Trust and its web hosting facility, which allows remote access to the claims database for the CelotexOnline website.  (*Id.*) This connection also requires the user to be authenticated through the facility domain and have

the proper credentials assigned to their account before they can access the claims database remotely. (*Id.*). This facility is housed at a secure military base in West Virginia. (*Id.*) In sum, the Celotex Trust goes to great lengths to protect the proprietary nature of the database.

### C.   The Grace Subpoena

On February 5, 2007, the Trust received a subpoena from Grace. The Trust filed a timely objection pursuant to Rule 45 of the Civil Rules on February 16, 2007, thereby suspending any obligation of the Trust to provide documents until after the objections were resolved. (See Declaration of Daniel J. Donnellon filed as Exhibit A to the Celotex Asbestos Settlement Trust's Opposition to Debtors' Motion for Leave to From Scheduling Order and to Shorten Notice Periods of Motions to Compel Asbestos Trusts and Request for Telephonic Hearing D.I. 16234 (the "Donnellon Dec.") at ¶ 3.) Throughout discussions with Grace about the subpoena, the Trust has taken the position that it wants to be as cooperative as possible while protecting its legitimate interests in maintaining the confidentiality of claimant submissions and its legitimate proprietary interests in its claims database. (*Id.* at ¶¶ 3, 9-11.)

The parties held an initial telephone conference on March 12, 2007 to discuss the Trust's objections to the subpoena. During the conference the parties were able to narrow some of the issues in dispute. Grace agreed to serve a corrected subpoena and provide a draft protective order and certain transcripts, and the parties agreed to continue discussions about the outstanding issues. (*Id.* at ¶ 4.) Following the conference call, the Trust heard nothing from Grace for over two months. It was not until May 21, that Grace showed renewed interest in the subpoena and sent a letter to Trust Counsel demanding an immediate response. (*Id.* at ¶ 6.) The parties scheduled a telephone conference for June 5 in an attempt to resolve the outstanding issues.

On the June 5 telephone conference, the Trust set forth a proposal to amicably resolve the issues in dispute as memorialized in a letter dated June 7.  (*Id*. at ¶ 9.)  Specifically, the Trust offered to do the following as part of a global offer to settle the matters in dispute:

- The Trust offered to make a witness available for a Rule 30(b)(6) deposition on a variety of topics as requested by the subpoena.  (*Id.*)

- The Trust offered to provide non-privileged documents relating to certain suspended doctors as requested by the subpoena.  (*Id.*)

- The Trust offered to provide non-proprietary, non-privileged information relating to its claims processing procedures as requested by the subpoena.  (*Id.*)

- The Trust **voluntarily** offered to produce three different lists of "Top 25" doctors utilized in certain claims filings as requested by the Grace subpoena.  While recognizing that the Trust had no duty to create documents that did not exist, the Trust offered to create such documents as part of a global resolution in order to resolve the matter amicably provided that the other issues could be resolved.  (*Id.*)

- The Trust even offered to turn over individual claims files despite its lack of obligation to do so, provided that three steps were taken: (1) Grace identify the relevant portions to be copied, (2) Grace take the simple step of obtaining consent from the claimant or authorized representative for their release, and (3) that parties develop procedures to allow for production on a cost-neutral basis for the Trust and in a manner that would not severely disrupt the operations of the claims facility.  (*Id.*)

- The Trust also suggested certain revisions to the protective order that Grace had drafted and sent Grace's counsel a revised version of the protective order for their review and comment.  (*Id.*)

- The Trust made clear that its proposal was for a complete settlement and that the offer was conditioned upon a global resolution of the matter.  (*Id.*)

The only item that the Trust did not offer to produce was its confidential claims database based upon the proprietary, trade secret nature of the database.  The information in the database, however, was available in the individual claims files that were also a subject of the subpoena.

Grace's counsel at the June 5 phone conference thanked the Trust for its concerted effort to provide the information Grace sought and agreed to review the Trust's position as to the remaining outstanding issues further.  (*Id.*)

Grace did not respond substantively to the offer prior to the filing of its  Motion to Compel.  On June 22, the Trust received a cursory email from Grace's counsel stating that the time had come to seek Court intervention.  (*Id.*, at ¶ 11.)  The email did not address the substance of the Trust's latest proposal nor of its objections.  The email further rejected the Trust's revisions to the draft protective order without detailing Grace's concerns with the protective order.  Grace's instant motion followed.  The parties have continued to engage in discussions since the filing of the Motion but have not succeeded in resolving the issues in dispute.

III.  **Argument**

A.    **Rule 45(c) Provides Substantial Protection to Non-Parties**

Rule 45(c) provides express protection to non-parties who are subject to a subpoena.  The provision was added to the Civil Rules in 1991 "'to clarify and enlarge the protections'" afforded non-parties under Rule 26(g).  *MGM Studios, Inc. v. Grokster, Ltd.*, 218 F.R.D. 423, 424 (D. Del. 2003) (quoting Fed. R. Civ. P. 45 advisory committee's note to 1991 amendments); *see also Tetratec Corp. v. E.I. DuPont de Nemours & Co., Inc.,* 1992 U.S. Dist LEXIS 12101, *4 (E.D. Pa. 1992) ("The rule is thus well established that non-parties to litigation enjoy greater protection from discovery than normal parties.").

"A request for non-party discovery requires a stronger showing of relevance than for simple party discovery." *First Fid. Bancorporation v. Nat'l Union Fire Ins. Co.*, 1992 WL 46881 at *4 (E.D. Pa. Mar. 5, 1992). Even if disclosure is ordered, Fed. R. Civ. P. 45(c)(2)(B) dictates that "[s]ignificant expenses must be borne by the party seeking discovery." *R.J. Reynolds Tobacco v. Philip Morris, Inc.,* 29 Fed. Appx. 880, 883 (3d Cir. 2002). This is because non-parties are "'powerless to control the scope of litigation and discovery, and should not be forced to subsidize an unreasonable share of the costs of a litigation to which they are not a party.'" *In re Auto. Refinishing Paint*, 229 F.R.D. 482, 496 (E.D. Pa. 2005) (quoting *In re Letters Rogatory Issued by Nat'l Court of First Instance in Commercial Matters*, 144 F.R.D. 272, 278 (E.D. Pa. 1982)).

**B.    The Celotex Database Is Protected Proprietary Information**

Grace wishes to appropriate the Celotex Database freely for use in estimating Grace's aggregate asbestos claims exposure. The Celotex Database constitutes a trade secret from which the Trust obtains significant proprietary value. Grace has failed to make a sufficient showing to force the Trust to hand over its proprietary claims database.

**1.    A Party May Only Subpoena Trade Secrets From a Non-Party in Limited Circumstances.**

Rule 45(c)(3)(B) provides that

> If a subpoena requires disclosure of a trade secret or other confidential . . . commercial information, . . . the court may, to protect a person subject to or affected by the subpoena, **quash or modify the subpoena** or, if the party in whose behalf the subpoena is issued shows a **substantial need** for . . . the material that cannot be otherwise met without undue hardship and assures the person to whom the subpoena is addressed will be reasonably compensated, the court may order . . . production only upon specified conditions. (Emphasis supplied.)

Courts employ a burden shifting framework to decide whether information should be protected from discovery as a trade secret. *Mannington Mills, Inc. v. Armstrong World Indus., Inc.*, 206 F.R.D. 525, 528 (D. Del. 2002). The party opposing the subpoena bears the initial burden to "demonstrate by competent evidence that the information sought is a trade secret and that disclosure of the secret might be harmful." *Cash Today v. Greenberg*, 2002 U.S. Dist. LEXIS 20694, *6 (D. Del. 2002). Once the party opposing the subpoena establishes that the information is a trade secret and that disclosure would be harmful, the burden shifts to the subpoenaing party to establish that disclosure of the trade secret is relevant and necessary to the litigation. *Id.,* at *7. Information is necessary when it is "required for the movant to prepare its case for trial, which includes proving its theories and rebutting its opponent's theories." *Id.*, at *8.

If relevance and need are established, then the court must balance the need for the information against the harm that would result from disclosure. *Mannington Mills*, 206 F.R.D. at 529. Grace cannot establish that access to the Celotex Trust's proprietary database is necessary to its estimation proceeding or that the benefit to it outweighs the harm to the Celotex Trust.

## 2.    The Celotex Database Is a Trade Secret.

A trade secret is information that "derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure and use . . . ." Del Code Ann., Tit. 6, § 2001(4)(a). There should be no question that the Celotex Database qualifies as a trade secret. The Database is a unique compilation developed at significant cost and effort by the Trust. (Winner Dec., ¶ 4.) The extensive nature of the medical and other information developed and maintained by the Celotex Trust gave it, and continues to give the Delaware Claims Processing Facility that the Trust partially owns, an advantage over other claims

processing facilities in obtaining work from other asbestos trusts that allows the Celotex Trust to achieve efficiencies of scale in claims processing and reduce administrative costs. (*See Id.,* ¶ 6.) To protect the proprietary nature and the benefits it receives from the database, the Trust – unlike the Manville Trust – has consistently chosen not to commercially license its database. (*Id.,* ¶ 7. ) Further, the Trust has taken elaborate security precautions to maintain the security of its database. (*Id.,* ¶ 6.)

Even very basic databases may be protected as trade secrets. "Although the names of doctors, publications, and assistance information may be public domain, these specialized compilations resulted from a great expenditure of time and money and can be a competitive advantage to APP. As such, they are considered trade secrets." *In re Am. Preferred Prescription, Inc*, 186 B.R. 350, 357 (E.B.N.Y. 1995). The information protected as trade secrets in *American Preferred* amounted to simple referral lists. The information the Trust seeks to protect is far more complex, more difficult and expensive to create, and more integral to the Trust's operations than the information protected in *American Preferred.*

Without citing any authority, Grace asserts "Non-secret data simply complied [*sic*] into a database should not, in an of itself, constitute a trade secret." (Grace Br. at 12.) This is not the law. To the contrary, "[a] trade secret can exist in a combination of characteristics and components, each of which, by itself, is in the public domain, but the unified process, design and operation of which, in unique combination, affords a competitive advantage and is a protectable secret." *BBA Nonwovens Simpsonville, Inc. v. Superior Nonwovens, LLC*, 303 F.3d 1332, 1339 (Fed. Cir. 2002) (internal quotations and citations omitted). The Celotex database is the very type of compilation that is regularly protected as a trade secret.

This Court has recognized the value of such compilations and the need for judicial protection. *See In re Federal Mogul Global, Inc.,* Del. Bankr. Case No. 01-10578 (JKF). In that case, the Court allowed another party in the litigation to obtain database information on the basis that it had been reviewed by a testifying expert, but specifically held that the other party did not have the right to obtain the information in a searchable electronic format. *Id.*, May 21, 2007 Hearing Trans., at 140 -142. (Excerpts attached hereto as <u>Exhibit B</u>). As the Court put it: "I think the privacy concerns and the limitation of using this in this case and for no other purpose are such that I want to – I believe it's appropriate to keep the control of this information in the hands of Cooper and not of any other entity."

### 3. <u>Grace Cannot Demonstrate a Substantial Need for the Celotex Database.</u>

To obtain discovery of the Trust's proprietary database, Grace must show that the Celotex Database is relevant to Grace's case and necessary for Grace to present a claim or defense. *Mannington Mills*, 206 F.R.D. at 529 ("[E]ven if the information sought is relevant, discovery is not allowed where no need is shown, or where compliance is unduly burdensome, or where the potential harm caused by production outweighs the benefit."). Grace cannot establish that Celotex's database is necessary for its estimation proceeding.

The Celotex data is of limited relevance to the estimation of Grace's asbestos liabilities. Grace intends to use the Celotex Trust database to verify exposure information. The Celotex Trust, however, does not maintain extensive exposure histories and does not solicit information related to a claimant's alleged exposure to products other than those manufactured by Celotex or Carey Canada. (Winner, Dec. ¶ 9.) Once the reviewer can confirm exposure to a Celotex or Carey Canada product sufficient to meet the Celotex Trust's Claims Resolution Procedures, the reviewer is trained to enter no further data in the claims database relating to that claim. (*Id.*) In

short, the exposure history captured in the Celotex Trust database would be of little to no value to Grace.

Moreover, Grace asserts in its briefs that the two other trusts, Mansville/CRMC and Congoleum "have (or shortly will) produce portions of their electronic databases related to Grace claimants." (Grace Br. at 3.)[1] Nowhere does Grace explain why these databases are not sufficient for its present purposes. After all, at this stage in the proceedings, Grace is not seeking to allow or disallow any specific claim. Rather, its purported need for the information is to assess the veracity of information that its claimants have provided for the purposes of aggregate estimation. The Manville database presumably contains the same type of personal, medical and disease category information maintained in the Celotex database. Manville was the world's largest manufacturer of asbestos containing products and the largest supplier of raw asbestos materials. *In re Johns Mansville Corp*., 2004 WL 1876046 (Bkrtcy S.D.N.Y. 2004), at *2-3. Its products were so ubiquitous as "to compel[] the conclusion, as a factual matter, that essentially all potential asbestos claimants . . . have been exposed to Manville asbestos through Manville's pervasive asbestos mining, processing and manufacturing activities." *Id.* at *5. As to its database, the director of its claims facility has testified:

> "that the Manville Trust maintains '***the largest and most comprehensive asbestos claims database, encompassing over 260 fields of detailed information regarding more than 740,000 asbestos claims.'*** The Trust's database tracks 'litigation each [Manville] claimant has filed against any other asbestos defendant, including the jurisdictions in which such litigation was filed,' and a comparison of the Trust's database with similar databases of Owens Corning, Combustion Engineering, MacArthur Corporation, Babcock & Wilcox, Certain Underwriters at Lloyds, Fibreboard and an unidentified client of Milliman U.S.A.

---

[1] The Manville database, as Grace concedes is commercially available. (Grace Br. at 15, n.5.) Manville has made a deliberate choice to obtain revenue by commercially licensing its database rather than protecting it as a trade secret. The Celotex Trust has made a different choice: to maintain the Celotex Database as proprietary, thereby allowing the Trust to obtain claims processing work from other trusts so as to spread administrative costs and increase the efficiency of its claim processing operations.

revealed a degree of overlap that is nearly complete." *Id.* at *4 (internal citations omitted) (emphasis supplied).

Since the Celotex Database does not contain information on exposure to non-Celotex products, the only use that Grace can reasonably have for the Celotex Database is to assess the accuracy and consistency of medical and disease category information provided by Grace claimants. Any information that Grace could glean from the Celotex Database for purposes of its estimation proceedings would, as a consequence, seem to be largely cumulative of the non-trade secret information that it is obtaining from Manville.

A Court will quash a non-party subpoena seeking trade secrets where the party could obtain or has obtained the information from another source. *See, e.g*, *Mannington Mills*, 206 F.R.D. at 528 (quashing subpoena seeking trade secrets because similar information was obtainable from litigants). The case of *Allen v. Howmedica Leibinger*, 190 F.R.D 518 (W.D. Tenn. 1999) is instructive. To establish his damages claim, the *Allen* plaintiff attempted to subpoena financial and operational information from a nonparty in the similar line of business. The court refused to enforce the subpoena both because disclosing confidential information to a another entity in the same field is "extremely harmful," *id*. at 526, and "information similar to that sought" by the party was available from other sources, *id*. at 525. Because Grace may obtain claims information directly from its claimants and has obtained information on trust filings from other sources, the Celotex Trust should not be compelled to produce its proprietary database.

### 4.    The Harm Inflicted Upon the Trust Outweighs any Possible Benefit to Grace.

Even if Grace demonstrates a need for the Trust's database, the Court must balance whether "the potential harm caused by the production outweighs the benefit." *Mannington Mills*, 206 F.R.D. at 529  Here, the Trust will endure significant loss if production is compelled.

Production to Grace will open the floodgates for other asbestos defendants and trusts to subpoena the Trust's information, greatly diminishing the value of the Celotex Database.

In evaluating the burden imposed on the Trust, it is significant that Grace intends to use the Celotex Database for the same customary purpose for which the Trust uses the database. Counsel for Grace have indicated that Grace intends to combine the Celotex Trust data with its own data and data from other trusts to create a super-database for the purpose of evaluating claims. The evaluation of asbestos claims is exactly the purpose for which the Trust invested significant resources to develop the database and for which the Trust uses the database. No case cited by Grace, or uncovered by our research, compelled the production of proprietary information to be used by the recipient for its customary purpose.[2] For example, Grace relies on *Coca-Cola Bottling Co v. Coca Cola Co.*, 107 F.R.D. 288 (D. Del. 1985) (cited in Grace Br. at 13-14). *Coca Cola Bottling Co.,* however, involved a contract dispute between the soft drink company and its bottlers over whether Diet Coke was sufficiently similar to Coca-Cola to fall within the original bottling agreement. *Id*. at 289-290. Disclosure of the formula was sought not to allow a competitor to create its own cola, but to assess the similarities between the two. *Id*. at 292. Here, in contrast, Grace intends to use the Celotex Database to estimate the value of asbestos claims—thereby appropriating the primary use and proprietary value of the database. Courts do not permit competitors to subpoena information for the purpose of putting it to its customary use.

Courts routinely quash subpoenas that seek to require non-parties to disclose proprietary information to others in the same line of work. For example, in *In re Subpoena Duces Tecum*,

---

[2] Obviously, a Court wouldn't allow Citibank to subpoena a financial institution's database relating to the credit risk of particular applicants to assist Citibank in evaluating the creditworthiness of potential customers, nor would it allow a litigant looking for research assistance to obtain the Westlaw database for the price of subpoena. This, in essence, however, is exactly what Grace is trying to do here.

1997 U.S. Dist. LEXIS 329, *3 (S.D.N.Y. 1997), the court modified a subpoena served on a party to prevent the disclosure of non-party Ameritech's proprietary information to rival Lucent. The court found that "[w]hile we accept Lucent's claim of relevancy . . ., we conclude that 'the burden and invasion of corporate privacy that would result to' Ameritech, a non-party to this action, were these documents disclosed would be significant so as to preclude discovery." *See also Allen*, 190 F.R.D. at 526 (quashing subpoena because "the disclosure of confidential information to a competitor is often extremely harmful"); *Cytodyne Tech., Inc. v. Biogenic Tech. Inc.,* 216 F.R.D. 533, 536 (M.D. Fla. 2003)(refusing to compel compliance with a subpoena because it seeks proprietary information of a non-party competitor); *In re Subpoena Issued to Certificate Clearing Corp.,* No. 97-C-6293, 1998 U.S. Dist. LEXIS 492 (N.D. Ill. 1998) (quashing subpoena seeking confidential business information from a non-party competitor); *Insulate America v. Masco Corp*., 227 F.R.D. 427 (W.D.N.C. 2005) (quashing subpoena issued to non-party competitor of both parties to the case).

The serious potential harm to the Trust in forcing it to hand over its proprietary database far exceeds any potential benefit that Grace may obtain from the use of this largely redundant and minimally relevant information.

### C.    The Request for Over 73,000 Claimant Files is Unduly Burdensome Because Grace Has Shown Little Need for the Discovery Requested and Can Obtain the Information Directly from the Individual Claimants

Rule 45(c)(1) requires a person issuing a subpoena to "take reasonable steps to avoid imposing an undue burden or expense on a person subject to a subpoena." Rule 45(c)(3)(A)(iv) requires the Court to quash or modify a subpoena if it "subjects a person to an undue burden." The language of Rule 45(c)(3)(A) is mandatory; it "identifies the circumstances where a subpoena *must* be quashed or modified," as opposed to Rule 45(c)(3)(B), which identifies situations where a subpoena only "*should* be quashed." *Mannington Mills*, 206 F.R.D. at 529

(emphasis supplied).   Grace's attempt to obtain the claims filings of over 73,000 individual claimants is unduly burdensome to the Trust.

### 1.    The Production of Individual Claims Would Place an Undue Burden on the Trust

Here there can be no question that the request for individual claimant files would place an undue burden on the Trust. [3]   The subpoena requests the individual claim files of more than 73,000 claimants.[4]   Approximately one-half of the files are stored at an off-site storage facility and would have to be retrieved from the site and later refiled.   A claims facility employee would need to review each individual claims file to remove material subject to the attorney-client privilege or the work product doctrine.   (Winner Dec., ¶10.)  Obtaining each of the claimant files would take hundreds of hours and have exorbitant costs.   (*Id.*)  Moreover, the sheer volume of files would lead to the shut down of claims processing for five different personal injury trusts.   (*Id.*)

### 2.    Non-Party Status is a Significant Factor in Determining Whether the Burden Imposed by A Subpoena is Undue

"Non party status is a significant factor to be considered in determining whether the burden imposed by a subpoena is undue."  *United States v. Amerigroup Illinois, Inc.,*  2005 WL 3111972 (N.D. Ill. Oct. 21, 2005), at *4; *WM High Yield v. O'Hanlon*, 460 F.Supp.2d 891, 895-

---

[3] Grace's instant Motion implies that it has offered to allow the Trust to produce the Celotex Database as an alternative to the production of individual claims files.  (*See* Grace Motion, at 7-8.) This is not the case.  The subpoena demands both individual files and the Celotex Database.  In none of the communications between the parties has Grace's counsel ever suggested that the Celotex Database would preclude the need for the Trust to provide the individual claims files requested.  Moreover, the draft order that Grace attaches to its Motion would require the Trust to provide both the individual claims and the electronic information.  Regardless, even if Grace were to make such an offer, it would not be acceptable to the Trust: as stated above, the Trust feels strongly that it should not be forced to turn over its proprietary database which it has painstakingly assembled.

[4] Grace's subpoena attached a data file of over 95,000 claimants.  The Trust initially performed its match based on individuals where Grace provided 9 digit social security numbers. The initial match generated approximately 14,000 claimants. There were a substantial number of individuals for whom Grace only provided the last 4 digits of their social security numbers  At Grace's insistence, the Trust later performed a match based on the last 4 digits and generated 73,745 claim files.  The Trust does not believe that a match based on the last four digits of the social security provides sufficient assurances of accuracy.  The Trust objects strongly to providing claims information about individuals that it cannot be certain are correctly identified.

96 (S.D. Ind. 2006);  *In re Auto. Refinishing Paint*, 229 F.R.D. at 496 ("status as a non-party to the litigation should . . . be considered" in determining whether the burden imposed by a subpoena is undue).  The burden to a non-party carries more weight than the burden to a party. *United States v. Fed. of Physicians & Dentists, Inc.*, 63 F. Supp.2d 475, 479 (D. Del 1999)  Here, the fact that the Trust is a non-party to Grace's bankruptcy proceeding counsels against the granting of Grace's motion to compel.

### 3.     A Subpoena is Unduly Burdensome Under Rule 45(c) When the Information May Be Obtained More Easily from Another Source or Directly from a Party

A subpoena issued to a non-party under Rule 45 will be found to be unduly burdensome when the information can be obtained from another source.  *Mannington Mills, Inc.*, 206 F.R.D. at 529 (quashing subpoena because party seeking discovery failed to establish information was uniquely available from non-party); *Konstantopoulos v. Westvaco Corp.*, 1991 WL 269606, at *2 (D. Del. Dec. 13, 1991) (quashing subpoena and refusing to consider a motion to compel "absent a showing that alternate means of obtaining this information have been attempted and failed"); 9 James Wm. Moore et al, *Moore's Federal Practice*, § 45.04[3][b] (Matthew Bender 3d ed. 2004).

Moreover, courts are particularly skeptical of attempts to obtain information from non-parties when the party has failed to exhaust efforts to obtain information directly from a party to the litigation.  *Lady Liberty Transp. Co. v. Philadelphia Parking Auth.*, 2007 WL 707372, at *9 (E.D. Pa. Mar. 1, 2007) (quashing non-party subpoena on the grounds that it was unduly burdensome where the party issuing the subpoena had "not shown that [it] cannot obtain the same information from… a party in this case"); *In re Auto. Refinishing*, 229 F.R.D. at 496.

The Delaware Superior Court has rejected a similar attempt to force the Celotex Trust to provide confidential claims materials where the party issuing the subpoena had not first

exhausted efforts to obtain the information directly from the asbestos claimant. *Link v. Ahlstrom Pumps, LLC*, Case No. 06m-10-061-MMJ (Del. Super. Ct. Dec. 7, 2006) (transcript attached at Exhibit C.)  In *Link*, Owens Illinois sought to obtain claims information that had been presented to the Celotex Trust by a single claimant.  Similar to the case at bar, the claimant had been directed to provide the information directly to Owens-Illinois by an Ohio Court, but Owens-Illinois insisted on trying to obtain the information from the Celotex Trust "to just make sure the information we get from the plaintiff's lawyers is complete."  (Tr. at 7.)  The court expressed great skepticism at the movant's claim that they should be allowed to subpoena documents from the non-party trust because they did not believe that the claimant and his attorney would provide accurate information:

> "You're an officer of the court – just stop.  You're an officer of the court.  The plaintiff's attorneys in Ohio are officers of the court, and you still do not believe that they can provide you with documents that are true and correct copies of what was submitted to the Celotex trust.  And I don't get it." (Tr. at 16-17.)

The court refused to compel discovery from the Celotex Trust, finding that Owens Illinois could more appropriately obtain the documents directly from the claimant.  The court found that if there was any disagreement about the accuracy of the information provided, such concern could be dealt with by requiring an affidavit from the plaintiff's attorney in the Ohio litigation or by propounding a request for admission in the Ohio action.  (Tr. at 38-39.)  Just as in *Link*, Grace should be required first to seek to obtain the information directly from the claimants.

## 4.    Grace Cannot Meet its Burden of Justifying Its Need for this Information

It is clear that Grace cannot meet its burden of justifying the need for this information. As set forth in the attached affidavit of Richard Winner, complying with Grace's request for

claim files from 73,000 individuals would impose a substantial burden on the Trust.[5]  The burden is heightened by the very terms of the Trust's binding Claims Resolution Procedures which require that the Trust maintain such information as confidential.  Grace has not made any showing of need for this information sufficient to overcome this burden.

Grace has not shown that the Manville and Congoleum databases do not provide sufficient information for its purposes.  Nor has Grace shown that it cannot obtain the information it seeks directly from the claimants themselves who are creditors in the bankruptcy proceeding.  In fact, these claimant creditors have been specifically ordered to produce the information that Grace is looking for in that proceeding.  The court-authorized questionnaire in the Grace bankruptcy not only requires the provision of all the information that Grace is looking for, but it also requires that both the claimant and the attorney attest under oath that the information provided is correct.  Grace admitted in its briefing that it wants the Trust's claims materials to "help Grace uncover conflicting or questionable claims asserted against it." (Grace Br. at 6).  The District of Delaware has held that the mere hope that records sought might render a claims suspect is not of itself sufficient to constitute good cause for production of such records from third parties.  *E.I. du Pont De Nemours & Co. v. Phillips Petroleum Co.*, 24 F.R.D. 416 (D. Del. 1959); *see also Cytodyne,* 216 F.R.D. at 536 (a non-party cannot be compelled to produce proprietary information in response to a subpoena merely to confirm or negate discovery obtained from a party).  As in *Link*, if Grace has doubts about the accuracy or completeness of information that is provided, its remedy is not to force the Trust to provide duplicative

---

[5] Grace has not shown a substantial need for any portion of the database, let alone the database in its entirety.  In the interest of being cooperative and resolving this matter extrajudicially, the Trust did offer to run some limited queries of its information that did not require the disclosure of personally identifiable confidential claimant information, such as providing the "top 25" doctor lists requested by Grace.  Grace, however, rejected the Trust's offer.

information but to proceed with the ordinary discovery tools available to it to obtain this information in its bankruptcy proceeding.

Grace does not contend that it needs any information other than what its claimant/creditors have been directed to provide in the questionnaire.  But to the extent that there is any real need for Celotex claims information, it could easily obtain each claimants full submission to the Trust directly from the individual claimants.  The Trust, in an effort to be accommodating, even has offered to provide such information if only Grace would provide a signed authorization from the individual claimants.[6]  Grace has not even bothered to ask its creditor/claimants for their Celotex filings, nor has it bothered to ask them to complete authorizations for release of this information.  Certainly, the Trust should not be put to the burden of providing this information when Grace has refused to take even minimal steps to obtain such information from its own claimants.

**5.      Grace Has Failed to Take Reasonable Steps to Minimize the Burden on the Trust**

Grace has completely ignored the command of Rule 45(c)(1) that a person issuing a subpoena must "take reasonable steps to avoid imposing an undue burden or expense on a person subject to a subpoena."  *See also MGM,* 218 F.R.D. at 424 ("It is incumbent upon counsel in the first instance to order discovery demands, particularly against non-parties, in such a way that the burdens of giving evidence are reasonable, under all circumstances presented").  The Trust specifically outlined steps that Grace could take to diminish the burden on the Trust and offered to produce the claims files provided such steps were followed.  (See Donnellon Dec. at ¶ 9.)  All the Trust asked was that (1) that concerns about confidentiality be dealt with by the obtaining of

---

[6] In order to facilitate the process of obtaining such consents, the Trust is willing to provide Grace with the names of its claimants who match the names on the Grace list.  The willingness of the Trust to provide such information negates the objection set forth by Grace on page 17 of its brief that it would be "impossible" for Grace to obtain such consents.

releases from individual claimants or their representatives, (2) that Grace identify the relevant portions of the claims files that it sought,[7] and (3) that accommodations be reached to assure that the production was cost-neutral to the Trust. (*Id.*)   Remarkably, Grace has not even substantively responded to the proposal.  (See Donnellon Dec. at ¶ 11.)  Because Grace has refused to "take reasonable steps to avoid imposing undue burden or expense," the motion to compel should be denied.

### D.    The Subpoena Seeks "Privileged or Other Protected Matter"

The undue burden in seeking to obtain claims information from the Trust when Grace could obtain such information directly from its own creditors is more than sufficient reason to deny the motion to compel.  The Motion to Compel also should be denied for the independent reason that the Trust Procedures and applicable law protect the disclosure of such information. Rule 45(c)(3)(a) requires a court to quash or modify a subpoena that "requires disclose of privileged or other protected matter."  The Trust Procedures reflect strong public policy interests in maintaining the confidentiality of medical records and in protecting settlement negotiations from public disclosure.  Confidential medical records and related materials submitted to the Trust for the purposes of settling an asbestos claim constitute "privileged or other protected matter" and may not be subpoenaed under Rule 45.

Claimants submitting medical information to the Trust for the purposes of settling their claims necessarily rely upon the assurances provided by Section VI of the CRP  that submissions by claimants to the Trust shall be treated as "confidential, submitted solely for settlement purposes."  Claims information is submitted to the Trust for the purpose of determining whether the Trust should make an offer of settlement pursuant to the procedures established by the

---

[7] While the subpoena appears to seek the entire claims file, Grace has at various times indicated that it was only interested in exposure-related information.

Trust's TDP.  The claims material is protected because it constitutes a communication to the Trust in furtherance of settlement negotiations.  Federal Rule of Evidence 408 protects "evidence of conduct or statements made in compromise negotiations."  Pursuant to the Rule, communications made in furtherance of settlement negotiations are privileged and protected from third party discovery.  *Goodyear Tire & Rubber Co. v. Chiles Power Supply, Inc.*, 332 F.3d 976, 977 (6th Cir. 2003) ("statements made in furtherance of settlement are privileged and protected from third-party discovery").

The information submitted for settlement purposes includes medical records and other personal medical information belonging to the claimant.  In addition to the privilege for settlement communications, many of the claimant files are also entitled to protection under the privilege laws of various states that provide for the protection of medical records.[8]

A number of states grant protection to medical records and other documents that embody communications between a patient and physician.  *See, e.g.*, Ariz. Rev. Stat. Ann. § 12-2292 (2007) (under Arizona law, "all medical records and payment records, and the information contained in medical records and payment records, are privileged and confidential");  Il. St. Ch. 110, § 8-802; *Northwestern Memorial,* 362 F.3d at 925 ("under Illinois law, even redacted medical records are not to be disclosed in judicial proceedings, with immaterial exceptions"); *Reagan v. Searcy*, 751 N.E.2d 606, 608 (Ill. App. 2001) ("generally, a patient's medical records are protected by the physician-patient privilege"); N.Y. Civ. Prac. L. & R. § 4504(a); *Williams v. Roosevelt Hospital*, 488 N.E.2d 94, 97 (1985) (privilege "covers both oral testimony and

---

[8] In civil actions and proceedings in Federal Court, privileges will be determined according to state law where state law provides the rule of decision with respect to an element of a claim or defense.  *See generally* Fed. R. Evid. 501. Generally, in bankruptcy state law determines the rights and interests in property.  *Butner v. United States*, 440 U.S. 48, 55-57 (1979).  Further, the Trust is organized under the laws of the state of Delaware.  Accordingly, in analyzing whether the medical records contained in the claims files are protected under a privilege for medical records, this Court must look to state law.

documents, such as hospital records"). Further, courts in a number of states have held that the privilege is not waived by a claimant's pursuit of a claim for personal injuries. *See, e.g., Bower v. Murphy*, 444 S.W.2d 883, 886 (Ark. 1969); *State ex rel. Lambdin v. Brenton*, 254 N.E.2d 681, 683 (Ohio 1970); *Hogue v. Massa,* 123 N.W.2d 131 (S.D. 1963); *Bond v. Independent Order of Foresters*, 421 P.2d 351, 353 (Wash. 1966).

The documents were plainly submitted by the claimants under the expectation provided by the Claims Procedure that such materials would be maintained in confidence and protected by the privileges provided by state law. The privilege for medical records may be waived only by the patient. The privilege typically applies even when the patient is absent from the proceeding and does not assert the privilege. *See, e.g., Tuscon Medical Center Inc. v. Rowles*, 520 P.2d 518, 523 (Ariz. Ct. App. 1974); *Shaw v. Metzger*, No. 77C-DE-101, 1982 Del. Super. LEXIS 1043, at *5, *8 (Del. Super. Ct. 1982).

In determining the applicable law for the medical records privilege, courts typically look to the law of the state of the patient-physician relationship. *Carlton Invs. v. TLC Beatrice Int'l Holdings, Inc.*, No. C.A. 13950, 1996 WL 33167792, *1 (Del. Ch. Sept. 27, 1996). Accordingly, any proper privilege analysis would require a detailed analysis of each claim file to first determine the applicable state of the physician-patient relationship in order to determine which state's privilege law to apply, and second, an analysis of the privilege law of that state. In light of the vast number of claimant files requested by Grace, such an analysis is completely unworkable and strongly counsels against the granting of the motion to compel.

Because the subpoena seeks "privileged or other protected materials," the Motion to Compel should be denied.

### E.    The Trust is Under No Obligation to Create Documents that Do Not Exist

Requests Nos. 3, 4 and 5 ask the Trust for certain "top 25" lists relating to doctors who authored "B-read reports" in support of claims, who were considered the primary diagnosing doctor and who produced reports in support of claims.  These are not lists that the Trust has ever compiled or that are maintained by the Trust.[9]  Quite simply, Grace is asking the Trust to create for it documents that do not exist that Grace can use for its own purposes.

It is well established that there is no duty to create documents that do not exist in response to a subpoena.  *See, e.g*, *Insituform Tech., Inc. v. CAT Contracting, Inc.*, 168 F.R.D. 630, 633 (N.D. Ill. 1996) ("Rule 45 appears to contemplate that a non-party may be required to produce records that already exist and are under the non-party's control, but does not contemplate that a non-party will be forced to create documents that do not exist").

Courts routinely have rejected attempts to force a party to create documents that do not exist under the parallel provisions of Rule 34.[10]   A defendant "cannot be compelled to create, upon the request of the plaintiff, documentary evidence which is not already in existence in some form."  *Rockwell Int. Corp. v. H. Wolfe Iron & Metal Co.*, 576 F. Supp. 511, 512 (W.D. Pa. 1983).  The Civil Rule "is limited in its scope to documents which are in the possession, custody or control of the party upon whom the request is served."   *Id*. (internal quotations omitted). Thus, the Rule "cannot be used to require the adverse party to prepare, or cause to be prepared, a writing to be produced for inspection, but can be used only to require the production of things in

---

[9] During the course of negotiations to resolve this matter, the Trust offered to create such lists as part of a global settlement of the issues in dispute provided that the parties reach an agreement to resolve the other outstanding issues.  (Donnellon Decl. at ¶ 9.)  The Trust made this offer as part of a good faith settlement offer even though it plainly was under no obligation to produce such lists.  The letter from Trust counsel made clear that to the extent that the parties were not able to resolve matters relating to the subpoena, the Trust "intend[ed] to object to the entire production."  (*Id.*)  Accordingly, the Trust objects to the creation of such top 25 lists.

[10] The protections provided to non-parties under Rule 45 are even stronger than those afforded to parties under Rules 26 and 34.  *See, e.g., Small v. Provident Life and Accident Ins. Co.*, 1999 U.S. Dist. LEXIS 18930, at *4 (E.D. Pa. Dec. 8, 1999) and other cases cited *infra*.

existence." *Id.* (quoting *Soetaert v. Kansas City Coca Cola Bottling Co.*, 16 F.R.D. 1, 2 (W.D. Mo. 1954)).  In other words, the Rule "only requires a party to produce documents that are already in existence." *Alexander v. FBI*, 194 F.R.D. 305, 310 (D.D.C. 2000).  When there is no evidence that a list exists, the court should deny a motion to compel the list's production.  *See id.* (denying a motion to compel a list that did not exist at the time of the subpoena); *see also Paramount Pictures Corp. v. Replay TV*, 2002 WL 32151632, at *2 (C.D. Cal. May 30, 2002) (citing *Alexander*); *Wagener v. SBC Pension Benefit Plan-Non-Bargained Prog.*, 2007 WL 915209, at *4 (D.D.C. Mar. 26, 2007) (citing *Alexander* and denying two separate motions to compel based on affidavits stating that the documents do not exist).

**IV.** **Conclusion**

For all of these reasons, the Motion to Compel should be denied.

July 20, 2007
Wilmington, Delaware

Respectfully submitted,

*/s/ Erin Edwards*
Edwin J. Harron (No. 3396)
Erin Edwards (No. 4392)
Young, Conaway, Stangatt & Taylor, LLP
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, Delaware  19899-0391
Phone: (302) 571-6708
Fax: (302 576-3317
eharron@ycst.com
eedwards@ycst.com

-and-

KEATING MUETHING & KLEKAMP PLL
Daniel J. Donnellon
One East Fourth St.
Suite 1400
Cincinnati, Ohio 45202
Phone: (513) 579-6408
Fax: (513) 579-6457
ddonnellon@kmklaw.com

Counsel to the Celotex Asbestos
Settlement Trust