# EXHIBIT A

## Agreement

**[Execution Draft]**

**WASHCOAT SALE AGREEMENT**

**June18, 2007**

## TABLE OF CONTENTS

Page

| ARTICLE 1 | Definitions | 1 |
|---|---|---|
| 1.01 | General | 1 |
| 1.02 | Defined Terms | 2 |
| **ARTICLE 2** | **Sale of Washcoat Business, Purchase Price** | **17** |
| 2.01 | Purchase and Sale of Transferred Assets | 17 |
| 2.02 | Excluded Assets | 19 |
| 2.03 | Transferred Liabilities | 21 |
| 2.04 | Excluded Liabilities | 21 |
| 2.05 | Amount and Form of Consideration | 22 |
| 2.06 | Purchase Price Allocation | 23 |
| 2.07 | Assumption and Assignment of Transferred Contracts | 23 |
| **ARTICLE 3** | **Closing** | **24** |
| 3.01 | Closing Date | 24 |
| 3.02 | Time and Place of Closing, Simultaneity | 24 |
| 3.03 | Transfers at the Closing; Payments | 24 |
| 3.04 | Ancillary Agreements | 25 |
| 3.05 | Transfer of Certain Silica Assets | 26 |
| 3.06 | Further Assurances of Seller | 28 |
| 3.07 | Further Assurances of Buyer | 26 |
| **ARTICLE 4** | **Purchase Price, Post-Closing Adjustments** | **27** |
| 4.01 | Closing of Books | 27 |
| 4.02 | Definitions | 27 |
| 4.03 | Computations | 28 |
| 4.04 | Closing Statement | 28 |
| 4.05 | Acceptance | 28 |
| 4.06 | Non-Acceptance, Resolution of Disputes | 29 |
| 4.07 | Payment of Adjustments | 30 |
| **ARTICLE 5** | **Seller's Representations and Warranties** | **30** |
| 5.01 | Corporate Organization and Existence | 30 |
| 5.02 | Corporate Power | 30 |
| 5.03 | Authorization | 30 |
| 5.04 | Execution and Delivery | 31 |
| 5.05 | No Conflict | 31 |
| 5.06 | Consents and Approvals | 31 |
| 5.07 | Binding Effect | 32 |
| 5.08 | Financial Statements | 32 |
| 5.09 | Sufficiency of Assets | 32 |
| 5.10 | Real Property; Title to Transferred Assets; Encumbrances | 33 |
| 5.11 | Inventory | 34 |

-i-

**TABLE OF CONTENTS**
(continued)

Page

| | | |
|---|---|---|
| 5.12 | Litigation; Investigations | 34 |
| 5.13 | Insurance | 34 |
| 5.14 | Contracts | 34 |
| 5.15 | Labor and Employment | 35 |
| 5.16 | Employee Benefit Plans | 37 |
| 5.17 | Environmental | 37 |
| 5.18 | Intellectual Property | 38 |
| 5.19 | Conduct of Business | 40 |
| 5.20 | Compliance with Laws | 41 |
| 5.21 | Permits | 42 |
| 5.22 | Customers and Suppliers | 42 |
| 5.23 | Brokers | 42 |
| 5.24 | Transferred Silica Assets | 42 |
| ARTICLE 6 | Buyer Representations and Warranties | 43 |
| 6.01 | Corporate Status | 43 |
| 6.02 | Authorization | 43 |
| 6.03 | No Conflict | 43 |
| 6.04 | Consent and Approvals | 44 |
| 6.05 | Binding Effect | 44 |
| 6.06 | Sufficient Funds | 44 |
| 6.07 | Adequate Assurance | 44 |
| 6.08 | Brokers | 44 |
| 6.09 | Litigation | 45 |
| ARTICLE 7 | Buyer's Investigation | 44 |
| 7.01 | Investigation | 45 |
| 7.02 | Financial Information | 45 |
| 7.03 | No Additional Representations | 45 |
| ARTICLE 8 | Covenants of Seller and Buyer | 46 |
| 8.01 | Bankruptcy Court Actions | 46 |
| 8.02 | Access and Inquiry | 48 |
| 8.03 | Licenses and Permits | 48 |
| 8.04 | Assignment of Real Property Lease | 48 |
| 8.05 | Notices to Third Parties | 48 |
| 8.06 | Commercially Reasonable Efforts | 48 |
| 8.07 | Title Insurance and Survey | 49 |
| 8.08 | Waiver of Bulk Sales Law Compliance | 49 |
| ARTICLE 9 | Conduct of Business Prior to the Closing | 50 |
| 9.01 | Operation in Ordinary Course | 50 |
| 9.02 | Disposition of Assets | 51 |
| 9.03 | Certain Agreements | 51 |

# TABLE OF CONTENTS
(continued)

Page

ARTICLE 10     Conditions Precedent to Buyer's Obligations ...................................... 51

10.01     Accuracy of Representations and Warranties ..................................... 51
10.02     Performance of Covenants and Agreements......................................... 51
10.03     Permits, Consents, etc ........................................................................ 52
10.04     Litigation............................................................................................... 52
10.05     Certificates of Seller ........................................................................... 52
10.06     Bankruptcy Court Approval.................................................................. 53
10.07     Landlord's Consent............................................................................... 53
10.08     Title Insurance and Survey.................................................................. 53
10.09     Ancillary Documents............................................................................ 53

ARTICLE 11     Conditions Precedent to Seller's Obligations....................................... 54

11.01     Accuracy of Representations and Warranties ..................................... 54
11.02     Performance of Covenants and Agreements......................................... 54
11.03     Permits, Consents, etc ........................................................................ 54
11.04     Litigation............................................................................................... 54
11.05     Certificates of Buyer ........................................................................... 55
11.06     Bankruptcy Court Approval.................................................................. 55
11.07     Landlord's Consent............................................................................... 55
11.08     Ancillary Agreements.......................................................................... 56

ARTICLE 12     Employee Matters.................................................................................. 56

12.01     Employment ......................................................................................... 56
12.02     Bargaining Unit Employees ................................................................. 57
12.03     Non-Bargaining Unit Employees ......................................................... 57
12.04     Vacation; Flexible Spending Accounts ................................................ 58
12.05     Employee Related Liabilities ............................................................... 59
12.06     Seller Cooperation............................................................................... 60
12.07     Benefit Plans ....................................................................................... 60
12.08     Voluntary Severance Plan ................................................................... 61

ARTICLE 13     Termination ........................................................................................... 62

13.01     Rights to Terminate ............................................................................. 62
13.02     Consequences of Termination.............................................................. 63

ARTICLE 14     Indemnification ..................................................................................... 63

14.01     Definitions............................................................................................. 63
14.02     Seller's Indemnification........................................................................ 64
14.03     Buyer's Indemnification ....................................................................... 66
14.04     Limitations ........................................................................................... 67
14.05     Defense of Third-Party Claims ............................................................ 68
14.06     No Consequential or Lost Profit Damages; Exclusive Remedy........... 70
14.07     Priority of Payments ............................................................................ 70

-iii-

**TABLE OF CONTENTS**
(continued)

Page

| ARTICLE 15 | Cooperation in Various Matters | 71 |
|---|---|---|
| 15.01 | Mutual Cooperation | 71 |
| 15.02 | Preservation of Buyer's Files and Records | 71 |
| 15.03 | Preservation of Seller's Files and Records | 72 |
| ARTICLE 16 | Post-Closing Matters | 72 |
| 16.01 | Reports | 72 |
| 16.02 | Renewal of Guaranteed Items | 72 |
| 16.03 | "Grace" and "Davison" Names | 73 |
| 16.04 | Intercompany Agreements | 73 |
| 16.05 | Seller's Covenant Not to Compete | 73 |
| 16.06 | Nonassignable Items | 74 |
| 16.07 | Accounts Receivable and Other Payments Received After Closing | 75 |
| 16.08 | Non Solicitation of Transferred Employees | 75 |
| 16.09 | Certain Environmental Matters | 75 |
| 16.10 | Protection of Seller's Intellectual Property | 78 |
| 16.11 | Removal of Purchased Columbia Assets and Silica Assets | 79 |
| ARTICLE 17 | Expenses | 80 |
| 17.01 | Expenses | 81 |
| 17.02 | Transfer Taxes | 81 |
| ARTICLE 18 | Notices | 81 |
| 18.01 | Notices | 81 |
| ARTICLE 19 | General | 81 |
| 19.01 | Entire Agreement | 81 |
| 19.02 | Governing Law | 81 |
| 19.03 | Submission to Jurisdiction | 81 |
| 19.04 | Third-Party Beneficiaries | 82 |
| 19.05 | Assignment; Successors | 82 |
| 19.06 | Amendments and Waivers | 82 |
| 19.07 | Counterparts | 83 |
| 19.08 | Captions | 83 |

**W. R. GRACE & CO.-CONN.**
**WASHCOAT SALE AGREEMENT**

**Exhibits and Schedules**

<u>**Exhibits**</u>

A        Sale Order
B        Washcoat Intellectual Property License Agreement

<u>**Schedules**</u>

| | |
|---|---|
| 1.02 | Purchased Columbia Assets |
| 2.01(b) | Certain Personal Property |
| 2.01(j) | Transferred Claims and Causes of Action |
| 2.01(k) | Transferred Software |
| 3.05 | Transferred Silica Assets |
| 4.01 | Inventory Procedures |
| 4.03 | Seller Accounting Policies |
| 5.05 | Seller's Conflicts |
| 5.06 | Seller's Consents and Approvals |
| 5.08(a) | Washcoat Business Financial Schedules |
| 5.08(b) | Washcoat Business Income Statement |
| 5.09 | Sufficiency of Assets |
| 5.10(a) | Owned Real Property |
| 5.10(b) | Leased Real Property |
| 5.10(c) | Subleases and Licenses |
| 5.10(e) | Liens on Transferred Assets |
| 5.11 | Third-Party Warehouses |
| 5.12 | Litigation; Investigations |
| 5.13 | Insurance |
| 5.14(a) | Material Contracts |
| 5.14(b) | Transferred Contracts Other Than Material Contracts |
| 5.15(a) | Employees |
| 5.15(c) | Immigration Issues |
| 5.15(d) | Collective Bargaining Agreement/Relations with Labor Organizations |
| 5.15(e) | Labor Organizing Activities |
| 5.15(f) | Employment Claims |
| 5.15(g) | Concerted Industrial Action |
| 5.16 | Employee Benefit Plans |
| 5.17 | Environmental |
| 5.18(a) | Scheduled Washcoat IP |
| 5.18(b) | Scheduled Washcoat IP Exceptions |
| 5.18(d) | Certain Washcoat IP Orders |
| 5.18(g) | Exclusive Washcoat IP |
| 5.19 | Conduct of Business |

| 5.21 | Permits |
| 5.22 | Customers and Suppliers |
| 5.23 | Seller's Brokers |
| 6.04 | Buyer's Consents and Approvals |
| 6.08 | Buyer's Brokers |
| 10.03 | Seller Third-Party Consents |
| 11.03 | Buyer Third-Party Consents |
| 12.01(a) | Non Bargaining Unit Business Employees |
| 14.02(c) | Subject Patents and Scheduled Products |
| 16.05 | Permitted Competing Products |
| 16.09 | Scope of Environmental Survey |

## WASHCOAT SALE AGREEMENT

This Washcoat Sale Agreement (this "Agreement") is made as of June 18, 2007, by and between W. R. Grace & Co.-Conn., a Connecticut corporation ("Seller") and Rhodia Inc., a Delaware corporation ("Buyer").

### WITNESSETH:

WHEREAS, Seller wishes to sell to Buyer, and Buyer wishes to acquire from Seller, the Washcoat Business;

WHEREAS, upon the terms and subject to the conditions hereinafter set forth and in order to consummate the desired transfer of the Washcoat Business, the Parties desire that Seller sell, assign and transfer to Buyer, and that Buyer purchase and acquire from Sellers, the Transferred Assets, and Buyer assume the Transferred Liabilities, and that Seller license to Buyer the Washcoat IP as provided in the Washcoat License Agreement; and

WHEREAS, Seller intends that the transactions contemplated by this Agreement shall be implemented through the filing of the Sale Motion pursuant to sections 105, 363 and 365 of the Bankruptcy Code seeking approval of the transactions contemplated by this Agreement.

NOW THEREFORE, in consideration of the mutual covenants herein contained, the parties hereby agree as follows:

### ARTICLE 1

### Definitions

1.01   General.

(a)     This Agreement is the result of the joint efforts of Buyer and Seller, and there is to be no construction against either party based on any presumption of that party's involvement in the drafting thereof. Any reference to any federal, state, local or foreign statute or law shall be deemed also to refer to all rules and regulations promulgated thereunder.

-1-

(b)    All Article and Section numbers, and Exhibit and Schedule references, used in this Agreement refer to Articles and Sections of this Agreement, and Exhibits and Schedules attached hereto or delivered simultaneously herewith, unless otherwise specifically stated.

(c)    Any of the terms defined in this Agreement may be used in the singular or the plural. In this Agreement, unless otherwise specifically stated, "hereof," "herein," "hereto," "hereunder" and the like refer to this Agreement as a whole and not merely to the specific Section, Article, paragraph or clause in which the word appears. Except as otherwise expressly provided, any noun or pronoun shall be deemed to include the plural as well as the singular and to cover all genders, and the terms "include" and "including" shall be deemed to be followed by the following phrase "without limitation."

(d)    The terms "dollars" and "$" shall mean United States dollars.

1.02  Defined Terms.  For purposes of this Agreement, including the Exhibits and Schedules, the following defined terms have the meanings set forth in this Section.

"Affiliate" of any Person shall mean any other Person, which, directly or indirectly, controls or is controlled by or is under common control with such Person. A Person shall be deemed to "control," be "controlled by" or be "under common control with" any other Person if such other Person possesses, directly or indirectly, power to direct or cause the direction of the management or policies of such Person whether through the ownership of voting securities or other ownership interests, by contract or otherwise.

"Allocation" has the meaning given to such term in Section 2.06.

"Ancillary Agreements" means the agreements described in Section 3.04.

"Arbitrator" has the meaning given to such term in Section 4.06(b).

"Bankruptcy Code" means 11 U.S.C. § 101 et seq.

-2-

"Bankruptcy Court" means the United States Bankruptcy Court for the District of Delaware or any other court of competent jurisdiction having jurisdiction over the Bankruptcy Proceeding or over any appeal of an order entered in the Bankruptcy Proceeding that relates to the Transactions.

"Bankruptcy Proceeding" means *In re: W. R. Grace & Co. et al., Debtors*, Chapter 11, Case Nos. 01-1139 et al. (JKF) (Jointly Administered) in the Bankruptcy Court.

"Bulk Sales Law" has the meaning given to such term in Section 8.08.

"Business Day" means a day that is not a Saturday or Sunday, nor a day on which banks are generally closed in New York City.

"Business Employees" has the meaning given to such term in Section 12.01.

"Buyer" has the meaning given to such term in the preamble.

"Buyer Benefit Plan" has the meaning given to such term in Section 12.07(b).

"Buyer Entity" means Buyer, any of its Subsidiaries, its ultimate parent, and any of its ultimate parent's direct or indirect Subsidiaries.

"Buyer Group" means all the Buyer Entities.

"Buyer Off-Site Liability" means any liability resulting from the presence or existence of any Hazardous Substance, which is generated by the Buyer Group's operations at the Owned Real Property or the Leased Real Property after the Closing Date, at any real property (including the Leased Real Property, but excluding the Owned Real Property) to which Buyer Group sent (directly or indirectly) or at which Buyer Group treated, stored or disposed of such Hazardous Substance.

"Buyer's Claim" has the meaning given to such term in Section 14.04.

-3-

"Buyer's FSA Plan" has the meaning given to such term in Section 12.04(b).

"Buying Companies" means, collectively, Buyer and any and all designees of Buyer to whom Transferred Assets are transferred pursuant to this Agreement.

"Closing" has the meaning given to such term in Section 3.01.

"Closing Assumption Agreement" means the assumption agreement to be executed and delivered by Buyer at the Closing in substantially the form attached hereto as Exhibit B.

"Closing Current Assets", "Closing Current Liabilities" and "Closing Working Capital Amount" have the respective meanings given to such terms in Section 4.02.

"Closing Date" has the meaning given to such term in Section 3.01.

"Closing Statement" has the meaning given to such term in Section 4.04.

"Closing Transfer Documents" means the bills of sale and other instruments of transfer to be executed and delivered by Seller at the Closing.

"Code" means the Internal Revenue Code of 1986, as amended.

"Competing Product" has the meaning given to such term in Section 16.05.

"Confidentiality Agreement" means the confidentiality agreement dated June 30, 2006, between Seller and Buyer.

"Consultant" has the meaning given such term in Section 16.09(a).

"Contamination" means the emission, discharge, placement, presence or release of any Hazardous Substance to, on, onto or into the Environment and the effects of such emission, discharge, placement, presence or release, including the presence or existence of any such Hazardous Substance.

-4-

"Control" in respect to Seller's or another Seller Entity's interest in Intellectual Property, shall mean that Seller or another Seller Entity (1) has the right to transfer ownership, make available, and/or grant licenses under such Intellectual Property without accounting to others, or (2) has the right to transfer ownership of, make available, and/or license such Intellectual Property, subject to royalty or other obligations or restrictions on which the exercise of Seller's or another Seller Entity's right is contingent, which Seller or another Seller Entity shall satisfy without any commitment by Buyer.

"Cure Costs" has the meaning given to such term in Section 2.07.

"Employees" has the meaning given to such term in Section 5.15(a).

"Environment" means navigable waters, waters of the contiguous zone, ocean waters, surface waters, groundwater, drinking water supply, land surface, soil, subsurface strata, outdoor and indoor air, plant life, animal life, human life and any other environmental medium or natural resource.

"Environmental Laws" means, collectively, any and all applicable laws, ordinances, rules, regulations, directives, orders, authorizations, decrees, notices, permits, binding plans, demand letters or other mandates, proscriptions or prescriptions of any nature, whether current or future of a Governmental Authority, relating in any way to Contamination, protection of the Environment, protection of natural resources or protection of human health and safety, including those relating to emissions, discharges, releases or threatened emissions, discharges or releases to, on, onto or into the Environment of, or exposures or threatened exposures to, any Hazardous Substance.

-5-

"Environmental Liability" shall mean liabilities for response, remedial, corrective action or investigation costs, including any liabilities for contribution, and any other expenses (including reasonable attorney and consultant fees, laboratory costs and litigation costs) required under, or necessary to attain or maintain compliance with, applicable Environmental Laws, relating to or arising from Contamination or Hazardous Substances or arising under any other theory of law or at equity.

"Environmental Matters" means any matter arising out of or relating to (a) Contamination; (b) Environmental Laws and compliance with Environmental Laws; (c) protection of the Environment (indoor or outdoor); or (d) protection of human health and safety, including any of the foregoing relating to the presence, use, production, generation, handling, transport, management, treatment, storage, disposal, distribution, discharge, release, control or cleanup of, or exposure to, any Hazardous Substance or Hazardous Substance-containing material.

"Environmental Permits" means all approvals, consents, permits, licenses, registrations and authorizations required by applicable Environmental Laws in order to operate the Washcoat Business, the Owned Real Property, the Leased Real Property, and the Transferred Assets.

"Environmental Survey" has the meaning given to such term in Section 16.09(a).

"Environmental Survey Report" has the meaning given to such term in Section 16.09(a).

"Excluded Assets" has the meaning given to such term in Section 2.02.

"Excluded Liabilities" has the meaning given to such term in Section 2.04.

"Final Order" means any order of the Bankruptcy Court after all opportunities for rehearing, reargument, petition for certiorari and appeal are exhausted or expired and any requests for rehearing have been denied, and that has not been revised, stayed, enjoined, set aside, annulled, reversed, remanded, modified or suspended, with respect to which any required waiting period has expired, and to which all conditions to effectiveness prescribed therein or otherwise by law or order have been satisfied; provided, however, that no order shall fail to be a Final Order solely because of the possibility that a motion pursuant to Rule 60 of the Federal Rules of Civil Procedure or Rule 9024 of the Federal Rules of Bankruptcy Procedure may be filed with respect to such order. In the case of the Sale Order only, a Final Order shall also consist of an order as to which an appeal, notice of appeal or motion for rehearing or new trial has been filed, but which (a) does not challenge Buyer's good faith purchaser status under Section 363(m) of the Bankruptcy Code, (b) does not assert that the transactions contemplated by this Agreement are avoidable pursuant to, or otherwise violates, Section 363(n) of the Bankruptcy Code, and (c) has not resulted in a stay of the Sale Order.

"Financial Information" has the meaning given to such term in Section 7.02.

"Financial Schedules" has the meaning given to such term in Section 5.08(a).

"FSA Balance" has the meaning given to such term in Section 12.04.

"Governmental Authority" means an entity, including contractors and agents acting on behalf of an entity, exercising executive, legislative, judicial, regulatory or administrative functions of government, including, but not limited to, agencies,

departments, boards, commissions, and other instrumentalities thereof, whether national, federal, state or local.

"Hazardous Substance" means any element, substance, compound or mixture whether solid, liquid or gaseous, that is subject to regulation or control under any Environmental Law.

"Income Tax" means any federal, state, local or foreign governmental tax or assessment to the extent measured or imposed upon income, and any interest and penalties assessed on any such tax or assessment.

"Indemnified Party" has the meaning given to such term in Section 14.05.

"Indemnifying Party" has the meaning given to such term in Section 14.05.

"Insurance Policies" has the meaning given to such term in Section 5.13.

"Intellectual Property" or "IP" means any and all of the following:

(a)     United States and foreign patents, patent applications, including all reissues, divisions, continuations, continuations-in part, substitutions, or extensions of any of the foregoing (collectively, "Patent Rights");

(b)     (1) internet domain names, (2) trademarks, service marks, trade names, brand names, trade dress, logos, and designs, assumed names and other indications of origin, whether registered or unregistered, and any applications or renewals therefor, and (3) all goodwill symbolized thereby or associated with subsection (2) (collectively, "Trademark Rights");

(c)     United States and foreign copyrights, whether registered or unregistered, and any applications therefor or renewals thereof (collectively, "Copyrights"); and

(d)     all inventions, invention disclosures, discoveries, lab manuals, lab notes, technical information, formulae, processes, designs, drawings, know-how,

-8-

show-how, manufacturing know-how, trade secrets, computer software and technical manuals and documentation which are not embodied within subparagraphs (a), (b) and (c) (collectively, "Information").

"IRCA" has the meaning given to such term in Section 5.15(c).

"Lease Assignment" means a document substantially in the form attached hereto as Exhibit C.

"Leased Real Property" means the real property leased by Seller pursuant to the Real Property Lease.

"Lien" means any mortgage, pledge, security interest, deed of trust, charge, option, claim, right of first refusal, easement, covenant, servitude, transfer restriction or other lien or encumbrance.

"Material Adverse Effect" means any circumstance, change or effect that is materially adverse to the Transferred Assets or the business, financial condition or results of operations of the Washcoat Business, in each case taken as a whole.

"Material Contracts" means the contracts listed on Schedule 5.14(a).

"Nonassignable Items" has the meaning given to such term in Section 16.06.

"Non-Removing Party" has the meaning given to such term in Section 16.11.

"Owned Real Property" means the real property owned by Seller and located at 4775 Paddock Road, Cincinnati, Ohio 45229, together with any and all buildings, structures, improvements and fixtures located thereon.

"Parties" means Seller and Buyer.

"Permit" means any approval, authorization, consent, franchise, license, permit or certificate issued or required by any Governmental Authority.

-9-

"Permitted Exceptions" means (a) liens for current Taxes, assessments or other claims by a Governmental Authority not yet delinquent or the amount or validity of which is being contested in good faith by appropriate proceedings and for which an appropriate escrow or security deposit or reserve is established by Seller therefor; (b) zoning, subdivision, building code, entitlement and other land use, construction and Environmental Laws by a Governmental Authority; (c) easements, rights-of-way, licenses, utility agreements, restrictions, and other similar encumbrances of record, and matters that would be shown on any survey of the Owned Real Property, which, in each case, do not materially diminish the value of or materially interfere with the continued use of such property (real or personal) or asset used in the Washcoat Business consistent with past practice; and (d) such other imperfections in title, charges, easements, restrictions and encumbrances in each case which do not materially diminish the value of or materially interfere with the continued use of such property (real or personal) or asset used in the Washcoat Business consistent with past practice.

"Person" means any individual, partnership, firm, trust, association, company, limited liability company, corporation, joint venture, unincorporated organization, other business entity or Governmental Authority.

"Post-Closing Employment Liabilities" has the meaning given to such term in Section 12.05(c).

"Post-Closing On-Site Liability" means any liability resulting from the presence or existence of any Hazardous Substance first occurring after the Closing Date, or the addition of Hazardous Substances after the Closing Date, on or in the groundwater, land surface, soil or subsurface strata of the Owned Real Property, and any liability

-10-

resulting from the migration of such Hazardous Substance beyond the boundary lines of the Owned Real Property, irrespective of whether a Buyer Entity or a Third-Party is the owner or operator of the Owned Real Property at the time such presence or existence first occurs or at the time of such addition.

"Post-Petition Loan Agreement" means the Post-Petition Loan and Security Agreement dated as of April 1, 2001, as amended, among the financial institutions named therein as the Lenders, Bank of America, N.A., as the Agent and W. R. Grace & Co. and the Subsidiaries of W. R. Grace & Co. named therein, as Debtors and Debtors in Possession, as the Borrowers.

"Pre-Closing Employment Liabilities" has the meaning given to such term in Section 12.05(b).

"Pre-Closing On-Site Liability" means any liability resulting from the presence or existence of any Hazardous Substance (excluding liabilities for removal, repair or abatement related to lead and asbestos in, on or constituting part of the buildings, structures, improvements and fixtures included in the Owned Real Property) on or prior to the Closing Date on or in the groundwater, land surface, soil or subsurface strata of the Owned Real Property, or the buildings and other improvements included in the Owned Real Property, and any liability resulting from the migration of such Hazardous Substance beyond the boundary lines of the Owned Real Property, irrespective of whether a Seller Entity or a Third-Party was the owner or operator of the Owned Real Property at the time such presence or existence occurred.

"Proceeding" means any action, suit, investigation or proceeding, including, but not limited to, any workers compensation claim, litigation commenced by or on behalf of

-11-

employees, environmental, condemnation, expropriation, eminent domain or similar proceeding, or any proceeding seeking to revoke, cancel, suspend or modify any provision of a Permit, by or before a Governmental Authority other than the Bankruptcy Court.

"Purchase Price" has the meaning given to such term in Section 2.05.

"Purchased Columbia Assets" means all the machinery, equipment (including any Intellectual Property owned by Seller or any Seller Entity that is embodied in the mechanical features and physical design of such machinery or equipment, but excluding the Intellectual Property embodied in such machinery or equipment used in the aging and precipitation process step for making or treating any product or intermediate) and other property located at Seller's facility in Columbia, Maryland and exclusively used in the Washcoat Business, including the items listed on Schedule 1.02, except for those items that Buyer notifies Seller in writing prior to Closing that Buyer does not wish to purchase.

"Real Property Lease" means the Lease Agreement dated August 18, 1997 by and between Duke Realty Limited Partnership, and Grace Logistics Services, Inc. (predecessor in interest to Seller), as amended on November 20, 1997 and May 2, 2002 pertaining to a portion of the building commonly known as Mosteller Distribution Center II located at 11420 Mosteller Road, Cincinnati, Ohio 45241 which premises are more particularly described in the Real Property Lease.

"Remediation" shall mean those actions consistent with a permanent remedy taken to remove, prevent or minimize the release or migration of Hazardous Substances into or within the Environment, so that they do not cause substantial danger to present

-12-

or future public health or welfare or the Environment, including such actions as confinement, perimeter protection using dikes, trenches or ditches, clay cover, neutralization and cleanup, but in any event not including any deed restriction or land use restriction.

"Removal Assets" has the meaning given to such term in Section 16.11(a).

"Removal Date" has the meaning given to such term in Section 16.11(a).

"Removing Party" has the meaning given to such term in Section 16.11(a).

"Rhodia License Agreement" means the License Agreement between Rhodia Terres Rares and Seller, dated January 22, 1999, as amended.

"Sale Motion" means a motion which Seller shall file with the Bankruptcy Court seeking approval for the Transactions.

"Sale Order" means an order to be submitted to the Bankruptcy Court substantially in the form attached hereto as Exhibit A that, with such changes that are reasonably acceptable to Buyer and as may be approved by the Bankruptcy Court, is entered by the Bankruptcy Court approving the consummation of the Transactions.

"Scheduled Washcoat IP" has the meaning given to such term in Section 5.18(a).

"Seller" has the meaning given to such term in the preamble.

"Seller Accounting Policies" has the meaning given to such term in Section 4.03.

"Seller Benefit Plan" has the meaning given to such term in Section 5.16.

"Seller Entity" means Seller, any of its Subsidiaries, its ultimate parent and any of its ultimate parent's direct or indirect Subsidiaries.

"Seller Entity Employees" means Anthony J. Dondero, Christopher J. Schult, Charles J. Waskiewicz, Manoj Koranne, Robert Medler, Brett Jurd and Robert A. Maggio.

"Seller Group" means all the Seller Entities.

"Seller Off-Site Liability" means any liability resulting from the presence or existence of any Hazardous Substance, which was generated by Seller Group's operations at the Owned Real Property or the Leased Real Property on or prior to the Closing Date, at any real property (including the Leased Real Property, but excluding the Owned Real Property) to which Seller Group sent (directly or indirectly) or at which Seller Group treated, stored or disposed of such Hazardous Substance.

"Seller's FSA Plan" has the meaning given to such term in Section 12.04(b).

"Seller's Knowledge" means the actual knowledge of any of the Washcoat Executives or the Seller Entity Employees.

"Silica Assets" has the meaning given to such term in Section 2.02(i).

"Silica Business" means Seller's development, manufacture and sale of silica gel in the manner conducted at the Owned Real Property prior to Closing.

"Silica Gel Intellectual Property" has the meaning given to such term in Section 16.10(a).

"Subsidiary" of a Person means any other Person in which the first Person directly or through one or more intermediaries owns securities or other equity interests representing more than 50% of the voting power of all such securities or other equity interests.

-14-

"Substrate" means a honeycomb monolith or other structure made of ceramic or metal, forming a matrix of walls or channels.

"Supplemental Confidentiality Agreement" means the supplemental confidentiality agreement dated June 15, 2007, between Seller and Buyer.

"Supply Agreements" has the meaning given to such term in Section 3.04.

"Target Amount" means $9,421,000.

"Taxes" means any United States or foreign Income Tax (including any alternative or add-on minimum tax) or franchise tax based on net income, any payroll or other similar employment tax, any sales, use, excise, gross receipts or value added tax, or any tax on real or personal property, including interest and penalties with respect thereto.

"Tax Return" means any return, statement, report or form required to be filed or submitted to any Governmental Authority in connection with the determination, assessment, collection or payment of any Tax or in connection with the administration, implementation or enforcement or compliance with any law relating to any Tax.

"Third-Party" means any Person other than the Seller Group and Buyer and its Affiliates and Subsidiaries.

"Transaction Documents" means this Agreement, the Ancillary Agreements and the documents to be executed pursuant to Section 3.03, including the Closing Assumption Agreement and the Closing Transfer Documents.

"Transactions" shall mean the transactions contemplated by the Transaction Documents.

"Transferred Assets" has the meaning given to such term in Section 2.01.

"Transferred Contracts" means the Material Contracts and the contracts listed on Schedule 5.14(b), but excluding the Union Agreement.

"Transferred Employees" has the meaning given to such term in Section 12.01(c).

"Transferred Liabilities" has the meaning given to such term in Section 2.03.

"Transition Services Agreement" has the meaning given to such term in Section 3.04.

"Transferred Silica Assets" has the meaning given to such term in Section 3.05

"Union" means Local Union No. 661, Warehouse, Production and Maintenance Employees of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America.

"Union Agreement" means the collective bargaining agreement dated October 15, 2005 between Seller and Union, which covers certain Employees of the Washcoat Business.

"Valuation Time" means 11:59 p.m. U.S. Eastern Time on the date immediately prior to the Closing Date.

"VSP" has the meaning given to such term in Section 12.08.

"WARN Act" has the meaning given to such term in Section 12.05(b).

"Washcoat" means products that contain at least aluminum oxide or cerium oxide particles, and are applied to the surface of or incorporated within a Substrate, which Substrate after such application or incorporation is eventually incorporated as part of a catalytic converter used for reducing noxious emissions from internal combustion engines of non-stationary automotive and marine products.

-16-

"Washcoat Business" means the development, manufacture and sale of Washcoat as conducted by Seller at and from its facilities in Cincinnati, Ohio, Columbia, Maryland, Valleyfield, Quebec and Chattanooga, Tennessee during the 12 months prior to the date of this Agreement.

"Washcoat Business Income Statements" has the meaning given such term in Section 5.08(b).

"Washcoat Executives" means Krista M. Myers, Michael Connors and David M. Chapman.

"Washcoat License Agreement" has the meaning given to such term in Section 3.04(a).

"Washcoat IP" means Intellectual Property Controlled by Seller or another Seller Entity that is used in the Washcoat Business or has been developed or is under development for use in the Washcoat Business.

## ARTICLE 2

### Sale of Washcoat Business, Purchase Price

2.01   Purchase and Sale of Transferred Assets.   On the terms and subject to the conditions hereof, and subject to the exclusions set forth in Section 2.02, at the Closing, Seller shall sell, assign, transfer, convey and deliver to Buyer free and clear of all Liens (other than Permitted Exceptions) to the maximum extent permissible under section 363 of the Bankruptcy Code, and Buyer shall purchase, acquire and accept from Seller, all of the right, title and interest of Seller in, to and under any and all of the following assets, properties, rights, contracts and claims of Seller whether tangible or intangible, real, personal or mixed (collectively, the "Transferred Assets"):

(a)   the Owned Real Property;

-17-

(b)     machinery, equipment (including any Intellectual Property owned by Seller or any Seller Entity that is embodied in the mechanical features and physical design of such machinery or equipment but excluding the Intellectual Property embodied in such machinery or equipment used in the aging and precipitation process step for making or treating any product or intermediate), furniture, automobiles, trucks, tractors, trailers, tools, tooling and other tangible personal property: (1) used in the Washcoat Business and located at the Owned Real Property or the Leased Real Property; or (2) used exclusively in the Washcoat Business wherever located, including, in each case, the items set forth on Schedule 2.01(b);

(c)     the Purchased Columbia Assets;

(d)     inventories and supplies of raw materials, works-in-process, finished goods, spare parts, supplies, storeroom contents, packaging inventories and other inventories items used primarily in the Washcoat Business and located at the Owned Real Property, the Leased Real Property and the sites described on Schedule 5.11;

(e)     trade accounts, notes receivable, accounts receivable and other receivables to the extent pertaining to the Washcoat Business;

(f)     prepayments, deposits and deferred charges to the extent pertaining to the Washcoat Business;

(g)     books and records (other than Tax Returns and related work papers), files, customer lists, accounting records, papers, tapes, disks, manuals, keys, reports, plans, catalogs, sales and marketing and promotional materials and all other printed and written materials, to the extent available, and general intangibles to the extent pertaining to the Washcoat Business;

(h)     rights under or pursuant to all warranties, representations and guarantees, whether express or implied, made by suppliers, manufacturers, contractors and other Third Parties with respect to any of the Transferred Assets, other than any of the foregoing that exclusively relate to any Excluded Asset or Excluded Liability;

-18-

(i)     the Permits described on Schedule 5.21 (to the extent permitted by applicable law to be transferred without the consent of any Third-Party, including any Governmental Authority);

(j)     claims, causes of action, choses in action, rights of recovery, rights of set off, and rights of recoupment listed on Schedule 2.01(j);

(k)     the software listed on Schedule 2.01(k);

(l)     rights and incidents in, to and under the Real Property Lease and the other Transferred Contracts;

(m)     all claims under Insurance Policies or proceeds therefrom related to any Transferred Asset; and

(n)     all other assets, properties, rights, contracts and claims of Seller, wherever located, whether tangible or intangible, real, personal or mixed, other than the Excluded Assets, as and to the extent such are used exclusively in the Washcoat Business;

but, in any event, in clauses (a) through (n) above, excluding the Excluded Assets.

2.02    Excluded Assets.    Notwithstanding anything to the contrary contained in Section 2.01, the Parties expressly understand and agree that the Transferred Assets shall not include, and Seller is not selling, assigning, transferring or conveying to Buyer, any right or title to or interest in, any of the following assets, properties, rights, contracts and claims, whether tangible or intangible, real, personal or mixed (collectively, the "Excluded Assets"):

(a)     cash and cash items, other than petty cash and deposits with Third Parties;

(b)     refunds of Taxes related to taxable periods ending on or prior to the Closing Date;

-19-

(c)     amounts receivable from any unit of Seller other than the Washcoat Business, or from any other Seller Entity;

(d)     Insurance Policies, claims with respect to Insurance Policies (except for claims under Insurance Policies or proceeds therefrom related to any Transferred Asset), and refunds of amounts previously paid or prepaid on account of Insurance Policies;

(e)     Seller Benefit Plans and funds maintained by, or in conjunction with, any Seller Entity in connection therewith, and refunds of amounts previously paid or prepaid amounts on account of such Seller Benefit Plans and funds, except as otherwise provided in Article 12 of this Agreement;

(f)     Information received from a Third-Party that is subject to a confidentiality agreement that prohibits the transfer of such Information, and consent of the counterparty to transfer of such Information is not obtained prior to the Closing

(g)     the Washcoat IP;

(h)     records relating to any of the Excluded Liabilities;

(i)     the assets of the Silica Business, including any such assets located on the Owned Real Property on the date hereof or on the Closing Date (the "Silica Assets");

(j)     the names "Grace" and "Davison," whether alone or in combination with each other or with other words, including in any tradename, trademark or service mark;

(k)     machinery, equipment and other tangible property located at Seller's facility in Columbia, Maryland, other than the Purchased Columbia Assets; and

(l)     any machinery and equipment in Valleyfield, Quebec and Chattanooga, Tennessee, used to supply products or materials to the Washcoat Business.

2.03   Transferred Liabilities.   At the Closing, Buyer shall assume and be liable for, and shall pay, perform and discharge, the following obligations and liabilities (collectively, the "Transferred Liabilities"):

(a)    the Closing Current Liabilities;

(b)    all liabilities of Seller in, to and under the Real Property Lease and the other Transferred Contracts (other than the Cure Costs subject to Section 2.07) arising from actions and occurrences after the Closing Date;

(c)    all liabilities and obligations of Seller under Permits that are Transferred Assets arising from actions and occurrences after the Closing Date;

(d)    all liabilities and obligations of Seller arising out of the operation or ownership of the Transferred Assets after the Closing Date;

(e)    all Post-Closing Employment Liabilities;

(f)    all Buyer Off-Site Liability;

(g)    all Post-Closing On-Site Liability; and

(h)    all removal, repair or abatement related liabilities and obligations related to the presence of lead or asbestos in, on or constituting part of any of the buildings, structures, improvements and fixtures included in the Owned Real Property.

2.04   Excluded Liabilities.   It is expressly understood and agreed that, except for the Transferred Liabilities, Buyer is not assuming and shall not be liable for any other liability or obligation of Seller, any Seller Entity or the Washcoat Business, including the following liabilities and obligations of Seller (collectively, the "Excluded Liabilities"):

(a)    all accounts payable of Seller;

(b)    Income Taxes for any tax period ending on or before the Closing Date;

-21-

(c)     payroll Taxes (including related withholding taxes) and all other Taxes for all periods ending on or before the Closing Date;

(d)     except as otherwise provided in the Transaction Documents, amounts payable to Seller or to any other Seller Entity;

(e)     premiums or any other charges under any Insurance Policy;

(f)     Seller Benefit Plans and funds, except as otherwise provided in Article 12 of this Agreement;

(g)     all Pre-Closing Employment Liabilities;

(h)     any liability resulting from or arising in connection with exposure to one or more Hazardous Substances, to the extent exposure occurred on or before the Closing Date;

(i)     any liability or obligation, including, any liability arising from claims for injury to persons or property, related to the Silica Business or any other business of any Seller Entity other than the Washcoat Business;

(j)     all liabilities and obligations, including, any liability arising from claims for injury to persons or property, arising out of the Transferred Assets or the Washcoat Business on or prior to the Closing Date;

(k)     all Seller Off-Site Liability; and

(l)     all Pre-Closing On-Site Liability.

2.05    Amount and Form of Consideration.  Subject to the adjustments provided for in Section 4.07 and upon the terms and conditions set forth in this Agreement, as consideration for the purchase of the Transferred Assets, Buyer shall pay to Seller $21,900,000 (the "Purchase Price") by wire transfer of immediately available funds to the following account:

-22-

JPMorgan Chase Bank, NA
New York NY
ABA number [if sending US dollars from within USA] :
021000021
SWIFT code [if sending US dollars from outside USA]:
CHASUS33
Account name: W. R. Grace & Co.-Conn.
Account number: 016001257
Text message: Funds from Rhodia for Gemini Purchase
Price

The Purchase Price shall be allocated among the Transferred Assets as provided in
Section 2.06.

2.06   Purchase Price Allocation.  Buyer shall retain an appraiser to appraise the
Transferred Assets in accordance with Section 1060 of the Code.  Buyer shall be
responsible for all fees associated with such appraisal.  Each party agrees to prepare
and timely file U.S. Internal Revenue Service Form 8594 (Asset Acquisition Statement)
in accordance with Section 1060 of the Code with respect to the Transferred Assets in
accordance with such appraisal (the "Allocation") and to cooperate in every reasonable
way with the other party in the preparation of such form.  The Allocation will be binding
upon Buyer and Seller and their respective successors and assigns, and none of the
Parties will take any tax position that is inconsistent with the Allocation.

2.07   Assumption and Assignment of Transferred Contracts.  At the Closing,
Seller shall assume and assign to Buyer and Buyer will assume all of the Transferred
Contracts.  Seller and Buyer shall each be responsible for one-half of all payments
under section 365 of the Bankruptcy Code which are required to assume and assign the
Transferred Contracts (the "Cure Costs").  Notwithstanding the foregoing, Buyer may
request and Seller shall file with the Bankruptcy Court a request by Buyer to modify
Schedule 5.14(b) to add additional contracts related to the Washcoat Business as
Transferred Contracts and have Buyer and Seller pay the corresponding Cure Costs in
the manner provided in this section; provided, however, that any such request to modify
Schedule 5.14(b) is made in writing by Buyer within sixty (60) days following the Closing
Date, and provided, further, that Seller shall not be required to modify Schedule 5.14(b)

-23-

with respect to any contract that it has previously rejected in the Bankruptcy Proceeding.

## ARTICLE 3

### Closing

3.01    Closing Date.  The Parties shall undertake the closing of the Transactions contemplated hereunder (the "Closing") on:  (a) the first Business Day after the date on which the conditions to Closing set forth in Articles 10 and 11 (other than Sections 10.05 and 11.05) shall have been fulfilled or waived; provided however, that Closing shall not occur prior to 12:01 AM on August 1, 2007; or (b) such other Business Day as the Parties may mutually agree to in writing in accordance with Section 19.06 (the "Scheduled Closing Date").

3.02    Time and Place of Closing, Simultaneity.  The Closing shall commence at 10:00 a.m. local time on the Scheduled Closing Date at the offices of Seller, 7500 Grace Drive, Columbia, Maryland or at such other time and place as the Parties may mutually agree to in writing in accordance with Section 19.06.  All of the actions to be taken and documents to be executed and delivered at the Closing shall be deemed to be taken, executed and delivered simultaneously, and no such action, execution or delivery shall be effective until all actions to be taken and executions and deliveries to be effected at the Closing are complete.  The "Closing Date" is the date on which the Closing is effective.

3.03    Transfers at the Closing; Payments.  At the Closing:

(a)    Seller shall execute, acknowledge and deliver to Buyer such general warranty deeds, bills of sale, assignments and other instruments of sale, transfer and assignment in order to effectively transfer to Buyer or its designees all right, title and interest of Seller in the Transferred Assets as Buyer shall reasonably request.

(b)    Buyer shall pay to Seller's account the Purchase Price by wire transfer of immediately available funds.

-24-

(c)     Buyer shall execute, acknowledge and deliver to Seller the Closing Assumption Agreement in order to effectively assume the Transferred Liabilities in the form to be agreed upon by the Parties.

(d)     Buyer, Seller and Landlord shall execute, acknowledge and deliver to each other the Lease Assignment in connection with the assignment of the Real Property Lease to Buyer in the form to be agreed upon by the Parties.

(e)     Rent under the Real Property Lease shall be prorated as of the Closing Date.

In addition, Buyer and Seller shall execute and deliver such other agreements, instruments and documents to effect, confirm or evidence the transactions contemplated by this Agreement as the other Party shall reasonably request. Each document of transfer or assumption executed and delivered pursuant to this Section shall be reasonably satisfactory in form and substance to the Party or Parties to whom such document is delivered, but shall contain no representations, warranties, covenants or agreements other than those specifically contained in this Agreement.

3.04    Ancillary Agreements. At the Closing, each of the following agreements (the "Ancillary Agreements") shall be executed and delivered by the parties thereto or, if executed and delivered simultaneously with this Agreement, shall then become effective:

(a)     Washcoat Intellectual Property License Agreement, substantially in the form of Exhibit B (the "Washcoat License Agreement").

(b)     Supply Agreements for certain products manufactured in Chattanooga, Tennessee and Valleyfield, Quebec in the forms to be agreed upon by the Parties.

(c)     Transition Services Agreement for, among other possible services, training with respect to the Washcoat IP, information technology services and laboratory support services from Columbia, Maryland and pilot plant support from Baltimore (Curtis Bay), Maryland, in the form to be agreed upon by the Parties.

-25-

(d)      Termination Agreement with respect to the Rhodia License Agreement in the form to be agreed upon by the Parties.

3.05   Transfer of Certain Silica Assets.   At the Closing, Seller shall sell, assign, transfer, convey and deliver to Buyer free and clear of all Liens (other than Permitted Exceptions) to the maximum extent permissible under section 363 of the Bankruptcy Code, and Buyer shall purchase, acquire and accept from Seller, all of the right, title and interest of Seller in, to and under the assets located on the Owned Real Property set forth on Schedule 3.05 (the "Transferred Silica Assets").  BUYER ACKNOWLEDGES THAT EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES SET FORTH IN SECTION 5.24, THE TRANSFERRED SILICA ASSETS ARE TRANSFERRED "AS IS, WHERE IS, AND WITH ALL FAULTS" AND SELLER DISCLAIMS ALL REPRESENTATIONS AND WARRANTIES RESPECTING THE TRANSFERRED SILICA ASSETS, INCLUDING ANY IMPLIED OR EXPRESS WARRANTY OF MERCHANTABILITY OR FITNESS FOR PURPOSE.

3.06   Further Assurances of Seller.   At any time and from time to time after the Closing, at the request and expense of Buyer, each Seller Entity shall execute and deliver, or cause to be executed and delivered, all such deeds, assignments, and other documents, and take or cause to be taken all such other actions, as Buyer reasonably deems necessary or advisable in order to put Buyer or its designees in actual possession or operating control of the Transferred Assets, or to more fully and effectively vest in Buyer or its designees, or to confirm their title to and possession of, the Transferred Assets.

3.07   Further Assurances of Buyer.   At any time and from time to time after the Closing, at the request and expense of Seller, Buyer shall execute and deliver, or cause to be executed and delivered, all such documents, and take or cause to be taken all such other actions, as Seller reasonably deems necessary or advisable in order to more fully and effectively divest Seller of responsibility for the Transferred Liabilities and incidents of ownership of the Transferred Assets.

-26-

## ARTICLE 4

### Purchase Price, Post-Closing Adjustments

4.01  Closing of Books.  Seller and Buyer shall cooperate to close the books and related accounting records, on a going concern basis, of Seller (but only to the extent they relate to the Washcoat Business) as of the Valuation Time, and take a physical count of the Washcoat Business's inventories at or within five days prior to such time.  Unless otherwise provided in Schedule 4.01, such inventory count shall be taken in accordance with the existing inventory-taking procedures of the Washcoat Business as described in Schedule 4.01; provided, however, that representatives of Buyer and Seller shall jointly participate in the taking of such inventory.

4.02  Definitions.

(a)      "Closing Current Assets" means: (i) the aggregate amount, as of the Valuation Time, of all inventories and accounts receivable included in the Transferred Assets, computed in accordance with Section 4.03; plus (ii) the Excess Union Severance Costs, computed as follows.  "Excess Union Severance Costs" means the amount by which the Total Union Severance Costs exceed the Base Union Severance Costs.  "Total Union Severance Costs" means any and all Union Severance Costs payable to no more than 12 bargaining unit operators and no more than four bargaining unit maintenance employees who are actually designated to receive severance under the VSP or Appendix III of the Union Contract upon their termination by Seller.  "Union Severance Costs" means (A) any and all amounts actually payable by Seller to bargaining unit Employees pursuant to the VSP or to Appendix III of the Union Agreement; plus (B) in the case of such Employees who receive their severance pay in regular pay period installments following termination, Seller's contributions for such Employees after termination under the benefit plans in which such Employees are entitled to participate after termination under the VSP or said Appendix III.  "Base Union Severance Costs" means any and all Union Severance Costs that would be payable by Seller under Appendix III of the Union Agreement to the 12 bargaining unit operators with the least seniority among such operators, and the four bargaining unit maintenance

-27-

personnel with the least seniority among such maintenance personnel, if they were entitled to severance under said Appendix III. For purposes of calculating Base Union Severance Costs, it shall be assumed that the Employees for whom Base Union Severance costs are calculated, elected under said Appendix III to receive their severance pay in regular pay period installments following termination. To the extent that there are any Excess Union Severance Costs that are not reflected in the final determination of the Working Capital Amount under Section 4.06, such excess shall be paid by Buyer to Seller upon its determination.

(b)     "Closing Current Liabilities" means the aggregate amount computed in accordance with Section 4.03, as of the Valuation Time, of Vacation Excess and the FSA Balance.

(c)     "Closing Working Capital Amount" means the amount of the Closing Current Assets less the amount of the Closing Current Liabilities.

4.03    Computations.    The Closing Working Capital Amount shall be determined in U.S. dollars, on a going concern basis, in accordance with the accounting policies and procedures (applied consistently) set forth in Schedule 4.03 (the "Seller Accounting Policies").

4.04    Closing Statement.    As soon as practicable after the Closing, but in any event no later than the one-month anniversary of the Closing Date, Seller shall deliver to Buyer a statement setting forth Seller's determination of the Closing Working Capital Amount (the "Closing Statement").

4.05    Acceptance.    If Buyer does not object to the Closing Working Capital Amount shown on the Closing Statement delivered by Seller, by written notice of objection delivered to Seller within 30 calendar days after Buyer's receipt of such statement, describing in reasonable detail each of its proposed adjustments to Seller's determination thereof, then the Closing Working Capital Amount shown on the Closing Statement shall be final and binding on Seller and Buyer.

-28-

4.06    Non-Acceptance, Resolution of Disputes.

(a)    If Buyer does object to the Closing Working Capital Amount shown on the Closing Statement, then Buyer and Seller shall promptly endeavor to agree upon the proper amount of the items in dispute. If a written agreement settling any disputed item has not been reached within 30 calendar days after the date of receipt by Seller from Buyer of Buyer's notice of objection thereto, then either Seller or Buyer may, by notice to the other, submit for determination by arbitration in accordance with this Section the question of what adjustments, if any, must be made to Seller's determination of such amount in order for it to be determined in accordance with the provisions of this Agreement.

(b)    Any such determination by arbitration shall be made by Deloitte & Touche LLP, or one of its affiliates (the "Arbitrator") and shall be final and binding on all parties to this Agreement.

(c)    The fees and expenses of the Arbitrator for any determination under this Article shall be shared as follows:  Seller shall bear that portion thereof equal to the total amount of such fees and expenses multiplied by a fraction, the denominator of which shall be the difference between the Closing Working Capital Amount as finally proposed by Buyer before the arbitration began and the Closing Working Capital Amount as finally proposed by Seller before the arbitration began, and the numerator of which shall be the difference between the Closing Working Capital Amount as determined by the Arbitrator and the Closing Working Capital Amount as finally proposed by Seller before the arbitration began.  Buyer shall bear the remainder of such fees and expenses.

(d)    Nothing herein shall be construed to authorize or permit the Arbitrator to determine (i) any question or matter whatsoever under or in connection with this Agreement or any Transaction Document except the determination of what adjustments, if any, must be made in one or more of the items reflected in the Closing Working Capital Amount as shown on the Closing Statement delivered by Seller in order for the Closing Working Capital Amount to be determined in accordance with the provisions of this Agreement and (ii) a Closing Working Capital Amount that is not in the range

-29-

between and including the final proposals of Seller and Buyer. Nothing herein shall be construed to require the Arbitrator to follow any rules or procedures of any arbitration association.

4.07    Payment of Adjustments.   If the Closing Working Capital Amount, as finally determined, exceeds the Target Amount, Buyer shall pay to Seller within five Business Days of the final determination of the Closing Working Capital Amount an amount equal to the Closing Working Capital Amount less the Target Amount. If the Closing Working Capital Amount, as finally determined, is less than the Target Amount, Seller shall pay to Buyer within five Business Days of the final determination of the Closing Working Capital Amount an amount equal to the Target Amount less the Closing Working Capital Amount. If the net amount of the adjusting payment is in excess of $100,000, interest shall be paid on the entire amount of the net adjusting payment, from the Closing Date to the date of payment, at a fixed rate per annum equal to the U.S. prime rate, as reported by *The Wall Street Journal*, in effect on the Closing Date, compounded monthly.

## ARTICLE 5

### Seller's Representations and Warranties

Seller represents and warrants to Buyer as follows:

5.01    Corporate Organization and Existence.   Seller is a corporation duly organized and validly existing under the laws of Connecticut. Seller is duly licensed or qualified to conduct the Washcoat Business as a foreign corporation in the state of Ohio.

5.02    Corporate Power.   Subject to entry of the Sale Order and it becoming a Final Order, Seller has full corporate power to enter into this Agreement and the other Transaction Documents to which it is or will be a party and perform its obligations hereunder and thereunder.

5.03    Authorization.   Subject to entry of the Sale Order and it becoming a Final Order, the execution and delivery by Seller of this Agreement and the other Transaction

-30-

Documents to which it is or will be a party and its performance of its obligations hereunder and thereunder have been duly authorized by all required corporate action.

5.04   Execution and Delivery.   Subject to entry of the Sale Order and it becoming a Final Order, Seller has duly and validly executed and delivered this Agreement and the other Transaction Documents to which it is a party and which are being executed and delivered simultaneously with this Agreement.   The remaining Transaction Documents to which Seller will be a party, when executed and delivered at the Closing, will be duly and validly executed and delivered by Seller.

5.05   No Conflict.   Except as set forth in Schedule 5.05, and subject to the entry of the Sale Order and it becoming a Final Order, the execution and delivery by Seller of this Agreement and the other Transaction Documents to which it is or will be a party, and its performance of its obligations hereunder and thereunder, do not (a) conflict with its certificate of incorporation or by-laws; (b) result in any violation, breach or termination of, or constitute a default or give rise to any right of consent, cancellation, termination or acceleration or right to increase the obligations or otherwise modify the terms under any Material Contract; or (c) result in any violation or breach of any of the provisions of, or constitute a default under, any law or regulation, judgment, order or decree, to which it is a party or by which it is bound, which violation, breach or default would materially adversely affect its ability to execute and deliver this Agreement or any other Transaction Document to which it is or will be a party or perform its obligations hereunder or thereunder.

5.06   Consents and Approvals.   Except as set forth in Schedule 5.06, subject to entry of the Sale Order and it becoming a Final Order, no consent, waiver, approval, order, Permit or authorization of, or declaration or filing with, or notification to, any Governmental Authority (other than the Bankruptcy Court) is required on the part of Seller in connection with the execution and delivery of this Agreement or the Transaction Documents, the consummation of the Transactions or the compliance by Seller with any of the provisions hereof or thereof.

-31-

5.07   Binding Effect.  Upon entry of the Sale Order and subject to it becoming a Final Order, this Agreement constitutes and, when executed and delivered at the Closing, each of the Transaction Documents to be executed by Seller will constitute, a valid and legally binding obligation of Seller, enforceable in accordance with its terms, subject to bankruptcy, insolvency, reorganization, moratorium, fraudulent transfer and similar laws of general applicability relating to or affecting creditors' rights and to general equity principles (whether in equity or at law).

5.08   Financial Statements.

(a)   Schedule 5.08(a) contains a schedule of the fixed assets, accounts receivable and inventory of the Washcoat Business as of December 31, 2006 as prepared by Seller's management (the "Financial Schedules").   The Financial Schedules were prepared from the books and records of Seller and reflect all amounts necessary for a fair presentation of the fixed assets, accounts receivable and inventory of the Washcoat Business as of the date of presentation, in accordance with the Seller Accounting Policies.

(b)   Schedule 5.08(b) contains the unaudited statement of income of the Washcoat Business for the years ended December 31, 2005 and December 31, 2006 as prepared by Seller's management (the "Washcoat Business Income Statements"). The Washcoat Business Income Statements were prepared on the basis of the books and records of the Seller and present fairly, in all material respects, in accordance with the Seller Accounting Policies, with such exceptions as are described on Schedule 5.08(b), the results of operations of the Washcoat Business for the periods covered thereby.

5.09   Sufficiency of Assets.   Except as set forth on Schedule 5.09, the Transferred Assets, the Real Property Lease and the Ancillary Agreements, together with the license, products and services being provided to Buyer under the Ancillary Agreements, provide Buyer with all the assets, rights, including the rights to use all Intellectual Property, and services necessary to operate the Washcoat Business

-32-

immediately following the Closing in substantially the same manner as Seller conducted the Washcoat Business.

5.10   Real Property; Title to Transferred Assets; Encumbrances.

(a)   Schedule 5.10(a) sets forth a true and complete legal description and street address of the Owned Real Property. To Seller's Knowledge, Seller has good and marketable title to the Owned Real Property, free and clear of all Liens except Permitted Exceptions and Liens under the Post-Petition Loan Agreement.

(b)   Schedule 5.10(b) sets forth the street address of the Leased Real Property.   The Real Property Lease is in full force and effect and is valid and enforceable by Seller in accordance with its terms. To Seller's Knowledge, there exists no current default under the Real Property Lease that cannot be cured under section 365 of the Bankruptcy Code. Schedule 5.10(b) sets forth the Cure Costs related to the Real Property Lease.

(c)   Except as set forth on Schedule 5.10(c), none of the Owned Real Property or the Leased Real Property is subject to any lease, sublease, license or other agreement granting to any other Person any right to the use or occupancy of such Owned Real Property or Leased Real Property.

(d)   The Owned Real Property, the Leased Real Property, the real property owned or leased by Seller in Chattanooga, Tennessee and Valleyfield, Quebec, Seller's real property at Baltimore (Curtis Bay), Maryland and Seller's real property in Columbia, Maryland comprise all of the real property used in the direct manufacturing operations and research and development operations of the Washcoat Business.

(e)   Except as set forth on Schedule 5.10(e), Seller has good and marketable title to all of the personal property included in the Transferred Assets free and clear of all Liens except Permitted Exceptions and Liens under the Post-Petition Loan Agreement.

-33-

5.11    Inventory.  As of the Closing Date, Seller will not be in possession of any inventory of the Washcoat Business that is not owned by Seller, except goods awaiting shipment in the ordinary course of the Washcoat Business.  Schedule 5.11 sets forth a list of the addresses of all sites other than the Leased Real Property owned by Third Parties at which inventories of the Washcoat Business are located.  As of the Closing Date, except as set forth on Schedule 5.11, no Third-Party will be in possession of inventories of the Washcoat Business owned by Seller, other than transporters in the ordinary course of the Washcoat Business.

5.12    Litigation; Investigations.  Except for Environmental Matters, which are the subject of Section 5.17 and except as set forth on Schedule 5.12, there are no (a) Proceedings pending or, to Seller's Knowledge, threatened against Seller or the Transferred Assets or (b) orders of any Governmental Authority to which Seller is subject that, in each case, individually or in the aggregate, would reasonably be expected to have a Material Adverse Effect, or seek to prevent or materially delay the consummation of the Transactions.

5.13    Insurance.  Schedule 5.13 describes the insurance coverage maintained by Seller that is exclusively related to the Washcoat Business and the Transferred Assets ("Insurance Policies").

5.14    Contracts.

(a)    Schedule 5.14(a) lists each Transferred Contract of Seller (and related Cure Costs) related primarily to the Washcoat Business that:  (a)(1) has a term of more than 12 months, (2) cannot be cancelled by Seller without payment, premium, or penalty of more than $50,000 upon notice of 30 days or less, or (3) under which the Seller is obligated to make expenditures or has a right to receive receipts of more than $100,000 in the next 12 months; (b) pursuant to which any Person serves as an independent contractor or Third-Party consultant of Seller to the Washcoat Business; or (c) which is otherwise material to the operation of the Washcoat Business (each, a "Material Contract").  Each of the Material Contracts is in full force and effect and is valid and enforceable by and against Seller in accordance with its terms.  There is no default by

-34-

Seller, or, to the Seller's Knowledge, by any other party thereto and no event has occurred that, with the lapse of time or the giving of notice or both, would constitute a default by Seller thereunder, which cannot be cured under section 365 of the Bankruptcy Code. Except as set forth on Schedule 5.14(a), subject to entry of the Sale Order, all of the Material Contracts can be assigned at Closing to Buyer without the need for a consent from a Third-Party.

(b)     Schedule 5.14(b) lists certain contracts, other than the Material Contracts, included in the Transferred Contracts (and related Cure Costs). All contracts set forth on Schedule 5.14(b) relate to the Transferred Assets or the Washcoat Business.

5.15   Labor and Employment.

(a)     Schedule 5.15(a) sets forth the following true and correct information with respect to each employee set forth thereon (collectively, the "Employees") as of the date hereof:  name; current title; employment location; date of hire; exempt or non-exempt status and active or inactive (i.e., on layoff, paid leave of absence, unpaid leave of absence, disability leave, workers' compensation leave, or other similar such leave, but excluding on vacation) status. Seller has provided the following true and correct information to Buyer with respect to each Employee:  2006 annual salary, current annual salary rate and any bonus or commitment to pay any other amount or benefit; vacation entitlement for calendar year 2007; vacation days used during 2007 through the date hereof; whether statutory or non-statutory severance pay (including any notice requirements, compensation, and damages rights regarding the termination of employment or otherwise, if applicable) applies; whether such individual is subject to an employment or indemnification agreement of any kind; whether such individual is on a leave of absence (including short- or long-term disability or sick leave, Family and Medical Leave, maternity/paternity leave, military leave or other administrative leave); and for any individual who does not spend 100% of his or her time on the Washcoat Business, the percentage of time that such individual spends working for the Washcoat Business.

(b)    To Seller's Knowledge, no Washcoat Executive has made a threat or otherwise indicated any intent to cancel or otherwise terminate such Washcoat Executive's relationship with Seller except as a result of employment with a Buyer Entity.

(c)    Except as described on Schedule 5.15(c), to Seller's Knowledge, all Employees are legally authorized to work in the United States. Except as described on Schedule 5.15(c), Seller has completed and retained the necessary employment verification paperwork required under the Immigration Reform and Control Act of 1986 ("IRCA") for the Employees except where the failure to complete and retain such paperwork would not reasonably be expected to have a Material Adverse Effect. Seller is, and, to Seller's Knowledge, for the 12 months prior to the date of this Agreement, was in compliance with the employment verification and anti-discrimination provisions of IRCA, except where the failure so to comply would not reasonably be expected to have a Material Adverse Effect.

(d)    Except as described on Schedule 5.15(d), (i) Seller is not a party to, nor does it have any liability with respect to or is otherwise bound by any collective bargaining agreement or other contract with a labor organization applicable to the Employees, (ii) Seller has no duty to bargain with a labor organization with respect to the Employees, and (iii) no labor organization is certified as the collective bargaining representative for the Employees.

(e)    Except as described on Schedule 5.15(e): (i) to Seller's Knowledge there are no campaign or organizing activities by a labor organization directed at any Employees; (ii) there are no representation proceedings or petitions filed or, to Seller's Knowledge, contemplated by a labor organization to seek representation of any Employees; and (iii) Seller has not received any written demand by a labor organization that Seller recognize such labor organization as the bargaining representative of any Employees.

(f)    Except as described on Schedule 5.15(f), there is no unfair labor practice charge or complaint or other proceeding pending or, to Seller's Knowledge, currently

-36-

threatened against Seller relating to the Employees, nor are there any grievances or arbitration proceedings pending or, to Seller's Knowledge, threatened against Seller relating to the Employees.

(g)     Except as described on Schedule 5.15(g), there is no labor dispute, strike, slowdown, work stoppage or lockout pending, or to Seller's Knowledge, threatened, by or with respect to the Employees, nor has there been any such activity within the 12 months prior to the date of this Agreement.

5.16   Employee Benefit Plans.   Each employee benefit plan (as defined in Section 3(3) of the Employee Retirement Income Security Act), excluding governmental plans, which as of the date hereof covers any Employee (each a "Seller Benefit Plan") is set forth on Schedule 5.16.

5.17   Environmental.   Seller represents and warrants to Buyer that, except as set forth on Schedule 5.17:

(a)     Seller currently is, and, to Seller's Knowledge, for the past 12 months has been, in compliance with Environmental Laws and Environmental Permits applicable to the Owned Real Property, the Leased Real Property, the Washcoat Business and the Transferred Assets, except where the failure so to comply would not reasonably be expected to have a Material Adverse Effect.

(b)     To Seller's Knowledge, no Contamination (other than with respect to lead or asbestos in, on or constituting part of the buildings or improvements) exists on, under or beneath the Owned Real Property or Leased Real Property that could give rise to any Environmental Liability that would reasonably be expected to have a Material Adverse Effect.

(c)     For the past five years, Seller has not received any written notification or correspondence from any Governmental Authority or Third-Party alleging liability with respect to or the presence of Contamination of the Owned Real Property or the Leased Real Property.

-37-

(d)     No Proceeding and no proceeding before the Bankruptcy Court against Seller relating to the Owned Real Property, Leased Real Property, the Washcoat Business or the Transferred Assets pursuant to any Environmental Law is currently pending or, to Seller's Knowledge, threatened.

(e)     To Seller's Knowledge, no Hazardous Substances generated by Seller's operations at the Owned Real Property or the Leased Real Property have ever been sent to, treated at, stored at or disposed of at any real property listed by a Governmental Authority as requiring or recommended for environmental investigation or clean-up. The Owned Real Property has not and, to Seller's Knowledge, the Leased Real Property has not, been identified by any Governmental Authority as requiring or recommended for environmental investigation or clean up.

(f)     Seller currently holds all Environmental Permits required by Environmental Law for the Washcoat Business and the Transferred Assets.

(g)     Seller has delivered or made available to Buyer copies of all documents, records and information in its possession or control relating to the past 12 months concerning the exposure of any Person to any Hazardous Substance at the Owned Real Property or the Leased Real Property, environmental compliance audits, environmental site assessments, health and safety assessments, any release or disposal of Hazardous Substances at, upon or from the Owned Real Property or the Leased Real Property and environmental agency inspection reports and correspondence.

(h)     As of the Closing Date, all out of service equipment located on the Leased Real Property will be clean, empty and free of residuals, and no Hazardous Substances awaiting disposal will be stored on the Owned Real Property or the Leased Real Property.

5.18    Intellectual Property.

(a)     Schedule 5.18(a) sets forth a complete and correct list of all patents and patent applications, invention disclosures and registered trademarks and trademark

-38-

applications included in the Washcoat IP (hereinafter "Scheduled Washcoat IP"), with owner, countries, Patent Number, or if not issued, the patent application number, TM registration number, or if not registered the TM application number and respective issue/registration dates, as applicable.   All fees associated with maintaining any Scheduled Washcoat IP owned by the Seller have been or will be paid in full in a timely manner to the proper Governmental Authority up to the Closing Date, and thereafter the Seller's obligations in regard to such Scheduled Washcoat IP shall be governed by the Washcoat License Agreement.   Except as set forth on Schedule 5.18(a), to Seller's Knowledge, all of the Scheduled Washcoat IP (other than invention disclosures and pending applications) is registered, valid and enforceable.

    (b)    Except as set forth in Schedule 5.18(b):

        (i)    All Intellectual Property used in the Washcoat Business is Controlled by Seller or a Seller Entity;

        (ii)    neither Seller nor any Seller Entity, has granted to any Third-Party any license to use or any license under any Washcoat IP to make, use or sell Washcoat;

        (iii)    to Seller's Knowledge, none of the Scheduled Washcoat IP is being infringed or otherwise violated by any other Person; and/or

        (iv)    the operation of Seller's Washcoat Business including the making, using, selling, offering for sale, importing, distribution, copying, creation of derivative works and public display of their products or services:  (A) does not infringe or otherwise violate any Intellectual Property right in the United States of America of any other Person, and (B) to Seller's Knowledge, does not infringe or otherwise violate any Intellectual Property right outside the United States of America of any other Person.

(c)     Except as set forth on Schedule 5.12, no Proceeding and no proceeding in the Bankruptcy Court has been filed, is pending or, to Seller's Knowledge, is threatened, that:

(i)     challenges the validity of any Washcoat IP, or

(ii)  `    asserts that the operation of the Washcoat Business: (A) was or will be infringing or otherwise in violation of any Intellectual Property, or (B) that requires Seller to pay any royalty, license fee, charge or other amount with regard to any Intellectual Property.

(d)     Except as set forth on Schedule 5.12 or Schedule 5.18(d), none of the Washcoat IP is or has been subject to any order of any Governmental Authority, and Seller's operation of the Washcoat Business has not been subject to any order of any Governmental Authority in respect of any other Person's Intellectual Property.

(e)     Schedule 5.14(a) lists any contracts under which any Seller Entity has a license from an unaffiliated Person under any Intellectual Property that is used in and material to the Washcoat Business taken as a whole; and Seller heretofore has delivered to Buyer complete copies of such contracts as currently in effect.

(f)     Seller, in the conduct of the Washcoat Business, has not manufactured or sold any products that do not contain at least aluminum oxide or cerium oxide particles.

(g)     Except as set forth in Schedule 5.18(g), there is no Washcoat IP that is material to the Washcoat Business, taken as a whole, that is exclusively used in the Washcoat Business.

5.19   Conduct of Business.   Since December 31, 2006, the Washcoat Business has been conducted in the ordinary course of business and there has not been any material adverse change in the operation, performance or financial condition of the Washcoat Business.   Without limiting the generality of the foregoing, since December 31, 2006 and except as set forth on Schedule 5.19, Seller, with respect to or, on behalf of or for the benefit of the Washcoat Business, has not:

-40-

(a)     sold, assigned, licensed, leased or transferred (including transfers to Employees or Affiliates of Seller) any assets or properties with a market value in excess of $100,000, except for inventory in the ordinary course of business, or cancelled or waived any rights, debts or claims with a market value in excess of $100,000;

(b)     suffered any damage to or destruction or loss of any assets or properties with a market value in excess of $100,000;

(c)     made any material commitment or incurred any material liability to the Union;

(d)     made any capital expenditures or commitments in excess of $100,000;

(e)     made any material change in accounting practices or policies from those set forth in the Seller Accounting Policies;

(f)     made any material change in its general pricing practices or policies or any material change in its credit or allowance practices or policies;

(g)     made any write-off or write-down or made any determination to write-off or write-down any of its assets or properties which individually is in excess of $100,000 or which is in excess of $250,000 in the aggregate.

(h)     entered into any material amendment, modification, termination (partial or complete) or granted any waiver under or given any consent with respect to any Material Contract; or

(i)     commenced or terminated any line of business.

5.20  Compliance with Laws.  Except for Environmental Matters, which are the subject of Section 5.17, for the past 12 months:  (a) to Seller's Knowledge, Seller has complied in all material respects with all laws and orders, including those that deal with workplace health and safety, that are applicable to the Washcoat Business and the Transferred Assets and material to the operation thereof; and (b) no notice from any Governmental Authority has been served upon or, to Seller's Knowledge, threatened to

-41-

be served upon, Seller with respect to the Washcoat Business or the Transferred Assets claiming a material violation by Seller of any law or order material to the operation thereof.

5.21   Permits.   Schedule 5.21 sets forth a complete and correct list of all Permits obtained or necessary in connection with the operation of the Transferred Assets and the Washcoat Business at the Owned Real Property and the Leased Real Property. Except for Environmental Matters, which are the subject of Section 5.17, all of these Permits are valid and in full force in effect.

5.22   Customers and Suppliers.   Seller has delivered to Buyer a list of the five largest customers and five largest suppliers of the Washcoat Business for the year ended December 31, 2006.   Except as set forth on Schedule 5.22, to Seller's Knowledge, since December 31, 2006, (a) none of the five largest customers of the Washcoat Business for the year ended December 31, 2006 has reduced its business with the Washcoat Business from the level of such business during the comparable period of 2006, and none of the five largest suppliers of the Washcoat Business for the year ended December 31, 2006 has reduced the amounts it is willing to supply to the Washcoat Business from the level of such supply during the comparable period in 2006, except, in each case, where such reduction would not reasonably be expected to have a Material Adverse Effect; and (b) to Sellers' Knowledge, no such reduction is threatened.

5.23   Brokers.   Except as set forth on Schedule 5.23, no Person has acted directly or indirectly as a broker, finder or financial advisor for Seller in connection with the negotiations relating to the transactions contemplated by this Agreement, and no Person is entitled to any fee or commission or like payment in respect thereof based in any way on any agreement, arrangement or understanding made by or on behalf of Seller.

5.24   Transferred Silica Assets.   (a) Seller has good and marketable title to all of the Transferred Silica Assets free and clear of all Liens except Permitted Exceptions and Liens under the Post-Petition Loan Agreement; (b) the current condition of the

-42-

Transferred Silica Assets does not violate any applicable law (including applicable Environmental Laws), which violation would reasonably be expected to have a material adverse effect on Buyer's ability to hold, use or dispose of the Transferred Silica Assets; (c) there are no Proceedings pending or, to Seller's Knowledge threatened against (i) the Transferred Silica Assets or (ii) against Seller with respect to the Transferred Silica Assets, which, individually or in the aggregate, would reasonably be expected to have a material adverse effect upon Buyer's ability to hold, use or dispose of the Transferred Silica Assets; and (d) there are no orders of any Governmental Authority to which the Transferred Silica Assets are subject.

## ARTICLE 6

### Buyer Representations and Warranties

Buyer represents and warrants to Seller as follows:

6.01   Corporate Status.   Buyer is a corporation duly organized and validly existing under the laws of Delaware.  Buyer has full corporate power to enter into this Agreement and the other Transaction Documents to which it is or will be a party and perform its obligations hereunder and thereunder.  The execution and delivery by Buyer of this Agreement and the other Transaction Documents to which it is or will be a party, and its performance of its obligations hereunder and thereunder, have been duly authorized by all required corporate action.

6.02   Authorization.   Buyer has duly and validly executed and delivered this Agreement and the other Transaction Documents to which it is a party which are being executed and delivered simultaneously with this Agreement. The remaining Transaction Documents to which Buyer will be a party, when executed and delivered at the Closing, will be duly and validly executed and delivered by Buyer.

6.03   No Conflict.   The execution and delivery by Buyer of this Agreement and the other Transaction Documents to which it is or will be a party, and the performance by Buyer of its obligations hereunder and thereunder, do not (a) conflict with its certificate of incorporation or by-laws, or (b) result in any violation or breach of any of the provisions of, or constitute a default under, any law or regulation, judgment, order,

-43-

decree or agreement to which it is a party or by which it is bound, which violation, breach or default would materially adversely affect its ability to execute and deliver this Agreement or any other Transaction Document to which it is or will be a party or perform its obligations hereunder or thereunder.

6.04 Consent and Approvals. Except as set forth on Schedule 6.04, no consent, waiver, approval, order, Permit or authorization of, or declaration or filing with, or notification to, any Person or Governmental Authority is required on the part of Buyer in connection with the execution and delivery of this Agreement or the Transaction Documents, the consummation of the Transactions or the compliance by Buyer with any of the provisions hereof or thereof.

6.05 Binding Effect. This Agreement constitutes and, when executed and delivered at the Closing, each of the Transaction Documents to be executed by Buyer will constitute, a valid and legally binding obligation of Buyer, enforceable in accordance with its terms, subject to bankruptcy, insolvency, reorganization, moratorium, fraudulent transfer and similar laws of general applicability relating to or affecting creditors' rights and to general equity principles (whether in equity or at law).

6.06 Sufficient Funds. Buyer has on the date hereof and will have on the Closing Date sufficient funds to consummate the Transactions.

6.07 Adequate Assurance. Buyer is and will be capable of satisfying the conditions contained in sections 365(b)(1)(C) and 365(f) of the Bankruptcy Code with respect to all executory contracts and agreements included in the Material Contracts.

6.08 Brokers. Except as set forth on Schedule 6.08, no Person has acted directly or indirectly as a broker, finder or financial advisor for Buyer in connection with the negotiations relating to the transactions contemplated by this Agreement, and no Person is entitled to any fee or commission or like payment in respect thereof based in any way on any agreement, arrangement or understanding made by or on behalf of Buyer.

-44-

6.09   Litigation.   There are no (a) Proceedings pending or, to Buyer's Knowledge, threatened against Buyer or (b) orders to which Buyer is subject that, in each case, individually or in the aggregate, could reasonably be expected to prevent Buyer from performing its obligations under this Agreement or the Transaction Documents or prevent or materially delay the consummation of the Transactions.

## ARTICLE 7

### Buyer's Investigation

Buyer hereby acknowledges the following:

7.01   Investigation.   Buyer has conducted its own investigation and has made its own evaluation of the Washcoat Business, the Transferred Assets and the Transferred Liabilities.

7.02   Financial Information.   As part of its investigation, Buyer has been given certain financial statements, forecasts, projections, opinions and similar material prepared or furnished by the Seller Group or their representatives with respect to the Washcoat Business (the "Financial Information"). Buyer has taken responsibility for evaluating the adequacy, completeness and accuracy of the Financial Information. There are uncertainties inherent in attempting to make projections and forecasts and formulate opinions; Buyer is familiar with such uncertainties, and except to the extent set forth in Article 5 of this Agreement is not relying on any of the Financial Information. Except for the specific representations and warranties in Article 5, neither Seller nor any other member of the Seller Group shall have any liability of any kind to Buyer or any other Buyer Entity with respect to any of the Financial Information.

7.03   No Additional Representations.   The representations and warranties made by Seller in Article 5 are in lieu of and are exclusive of all other representations and warranties, including any implied warranties regarding the Washcoat Business, the Transferred Assets or the Transferred Liabilities. The Seller hereby disclaims any such other or implied representations or warranties, notwithstanding the delivery or disclosure to any Buyer of any documentation or other information (including any financial projections or other supplemental data). None of the representations or warranties

-45-

made by Seller in this Agreement is or shall be construed or deemed to be made with respect to any Excluded Asset (other than the representations and warranties set forth in Section 5.24 solely to the extent applicable to the Transferred Silica Assets) or Excluded Liability or any contract, note or other instrument or document constituting, evidencing or relating to any Excluded Asset or Excluded Liability.

## ARTICLE 8

## Covenants of Seller and Buyer

8.01 Bankruptcy Court Actions.

(a) Unless Seller receives a Third-Party Bid (as hereinafter defined), Seller shall use commercially reasonable efforts to have the Bankruptcy Court approve the Sale Order by July 23, 2007, and not vacate, stay, amend, reverse, supplement, or modify the Sale Order. Upon entry of the Sale Order Seller shall (i) use commercially reasonable efforts to cause the Sale Order to become a Final Order as soon as possible after its entry and to obtain any other approvals or consents from the Bankruptcy Court that may be reasonably necessary to consummate the Transactions and (ii) not seek to revoke, modify, or supplement the Sale Order without the prior written consent of Buyer.

(b) Buyer shall use commercially reasonable efforts to assist Seller in obtaining approval of the Sale Order by July 23, 2007, including providing testimony as required at any hearing before the Bankruptcy Court.

(c) Seller shall promptly provide Buyer with drafts of all documents, motions, orders, filings or pleadings that Seller or any Affiliate thereof proposes to file with the Bankruptcy Court or any other court or tribunal which relate in any manner, directly or indirectly, to (i) this Agreement, the Ancillary Agreements or the Transactions; (ii) the Sale Motion; (iii) entry of the Sale Order; or (iv) the Washcoat Business, and, if practicable, will provide Buyer with a reasonable opportunity to review such documents in advance of their service and filing.

(d) Seller shall comply with all requirements of the Bankruptcy Code and Federal Rules of Bankruptcy Procedure in connection with obtaining approval of the

sale of the Transferred Assets (including the assumption and assignment to Buyer of any Transferred Contracts) to Buyer pursuant to this Agreement. Notice of the hearing on the request for entry of the Sale Order pursuant to the Sale Motion, notice of any hearings at which objections to proposed Cure Costs or other issues regarding the proposed assumption and assignment of the Transferred Contracts pursuant to the Sale Motion, and notice of the deadline for all objections to entry of the Sale Order or any other order related thereto or to the Sale Motion shall be properly served by Seller in accordance with all applicable Federal Rules of Bankruptcy Procedure and all applicable local rules and standing orders of the Bankruptcy Court on all parties required to receive such notices, including all parties who have asserted Liens in the Transferred Assets, all parties to Transferred Contracts, counsel to any statutory committee appointed in the Bankruptcy Proceeding, the Office of the United States Trustee for the District of Delaware, all financial institutions that have currently outstanding loans to Seller, all parties filing notices of appearance or requests for papers in the Bankruptcy Proceeding, the Internal Revenue Service, the U.S. Environmental Protection Agency and any applicable state environmental agency, the Pension Benefit Guaranty Corporation, and, to the extent required, each of Seller's other creditors. In addition, notice of the Sale Motion and the hearing on the request for entry of the Sale Order and the objection deadline for such hearing shall be given by Seller, in a form reasonably satisfactory to Buyer, by publication of a notice in the *Wall Street Journal* National Edition and the *Cincinnati Enquirer* at a time reasonably in advance of such objection deadline and hearing.

(e)     Seller acknowledges that this Agreement is the culmination of an extensive process undertaken by Seller to identify and negotiate a transaction with a bidder who was prepared to pay the highest or otherwise best purchase price for the Transferred Assets while assuming or otherwise satisfying various liabilities in order to maximize value for Seller's constituents. Seller acknowledges that, except for one Person whose existence, but not identity, was previously disclosed to Buyer, no Person to date has been or is expected to be willing to enter into a definitive agreement for the purchase of the Transferred Assets on terms acceptable to Seller and its creditor constituencies.

-47-

8.02 Access and Inquiry. Between the date of this Agreement and the Closing, upon request of Buyer, Seller shall give Affiliates of the Buying Companies that have executed the Supplemental Confidentiality Agreement (a) reasonable access to the facilities of the Washcoat Business; and (b) the opportunity to make reasonable inquiry of the Employees regarding the Washcoat Business. Buyer acknowledges that the terms of the Confidentiality Agreement and the Supplemental Confidentiality Agreement shall apply to Information obtained by any Buying Company or its Affiliates pursuant to this Section.

8.03 Licenses and Permits. As soon as practicable after the date hereof, Buyer, with Seller's assistance, shall prepare and file or cause to be prepared and filed with the appropriate Governmental Authorities applications for the issuance or transfer to Buyer of all Permits required for Buyer to operate the Washcoat Business after the Closing. Buyer shall use commercially reasonable efforts to secure such Permits. Seller shall assist Buyer to the extent reasonably requested in the preparation of such applications and the securing of such Permits.

8.04 Assignment of Real Property Lease. Buyer and Seller shall use commercially reasonable efforts to obtain the consent of the landlord to the assignment of the Real Property Lease.

8.05 Notices to Third Parties. Buyer and Seller shall cooperate to make all other filings and to give notice to all Third Parties that may reasonably be required to consummate the Transactions.

8.06 Commercially Reasonable Efforts. In making commercially reasonable efforts as required under this Agreement, no Seller Entity or Buyer Entity shall be required to undertake extraordinary or unreasonable measures, make any payment (other than for reasonable legal fees or payment at Closing of Cure Costs under section 365 of the Bankruptcy Code) that it is not presently contractually required to make, make any payment in excess of normal and usual filing fees and processing fees, if any, or other payments with respect to any Transferred Contract that are significant in the context of such Transferred Contract (or significant on an aggregate basis as to all

-48-

Transferred Contracts), divest any assets (including assets of the Washcoat Business), make any change in the conduct of its business or that of the Washcoat Business, accept any limitation on the future conduct of its business or that of the Washcoat Business, enter into any other agreement or arrangement with any Person that it is not presently contractually required to enter into, accept any significant modification to its obligations under any existing agreement or arrangement that is to continue after the Closing, except as contemplated by this Agreement or the Ancillary Agreements, or agree to any of the foregoing. Notwithstanding anything to the contrary set forth in this Agreement, Seller shall be free to take any action with respect to any offer that it may receive prior to the entry of the Sale Order for a sale of the Washcoat Business and the Transferred Assets to a Third-Party (a "Third-Party Bid") including, providing information to, negotiating with and signing an agreement with a Third-Party regarding a Third-Party Bid, filing a motion with the Bankruptcy Court to approve the sale contemplated by a Third-Party Bid, and recommending that such approval be granted. Seller shall promptly provide Buyer with a copy of any Third-Party Bid.

8.07    Title Insurance and Survey.    Seller shall provide all reasonable cooperation to Buyer in Buyer's efforts to obtain for the benefit of Buyer title insurance for, and an ALTA survey of, the Owned Real Property. The cost of such policy and survey shall be borne by Buyer. Buyer shall use all commercially reasonable efforts to obtain the title insurance and survey described in Section 10.08.

8.08    Waiver of Bulk Sales Law Compliance.    Buyer hereby waives compliance by Seller with the requirements, if any, of Article 6 of the Uniform Commercial Code as in force in any state in which Transferred Assets are located and all other laws applicable to bulk sales and transfers, to the extent applicable to the Transactions ("Bulk Sale Laws").

## ARTICLE 9

### Conduct of Business Prior to the Closing

Seller agrees that except as otherwise consented to by Buyer, from the date of this Agreement until the Closing:

9.01 Operation in Ordinary Course. Seller shall:

(a) conduct the Washcoat Business only in the ordinary course of business and consistent with prior practice;

(b) without making any commitment on Buyer's behalf, use commercially reasonable efforts to preserve intact the Washcoat Business', keep available the Washcoat Business Executives and maintain its relations with suppliers and customers;

(c) confer with Buyer prior to implementing operational decisions of a material non-emergency nature with respect to the Washcoat Business;

(d) confer periodically with Buyer concerning the status of the Washcoat Business and its operations and finances;

(e) make no material changes in management personnel of the Washcoat Business or take any action that would impede, hinder, interfere or otherwise compete with Buyer's effort to hire any of the Business Employees, in each case without prior consultation with Buyer;

(f) use commercially reasonable efforts to maintain the Transferred Assets in a state of repair and condition that is consistent with the requirements and normal conduct of the Washcoat Business;

(g) use commercially reasonable efforts to keep in full force and effect, without any amendment, all Permits, Material Contracts and the Union Agreement;

(h) continue in full force and effect all Insurance Policies; and

-50-

(i)      maintain all books and records of the Washcoat Business in the ordinary course of business.

9.02   Disposition of Assets.   Seller shall not sell, lease (as lessor), transfer, license (as licensor), or otherwise dispose of any asset that would otherwise be a Transferred Asset at Closing with a book value of $100,000 or more, other than sales of inventory in the ordinary course of business.

9.03   Certain Agreements.   Seller shall not without the prior consent of Buyer, in the course of the Washcoat Business, enter into any contract or agreement with respect to the Washcoat Business that (a) cannot be canceled by Seller without payment or penalty of more than $50,000 upon notice of 30 days or less or (b) is a contract or agreement under which it is reasonably expected that the Washcoat Business will make expenditures or obtain receipts of more than $100,000 in the next 12 months.

## ARTICLE 10

### Conditions Precedent to Buyer's Obligations

All obligations of Buyer under this Agreement are subject, at Buyer's option, to the fulfillment prior to or at the Closing, of each of the following conditions:

10.01   Accuracy of Representations and Warranties.      Each and every representation and warranty of Seller contained herein that is qualified as to materiality shall be true and correct in all respects at and as of the Closing Date, and each of the representations and warranties of Seller contained herein that is not so qualified shall be true and correct in all material respects with the same force as if made on and as of the Closing Date, except for breaches that are the result of changes in the ordinary course of business between the date of this Agreement and the Closing, which have not had and could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

10.02   Performance of Covenants and Agreements.   Seller shall have performed in all material respects all of the covenants and agreements required to be performed by Seller at or prior to the Closing pursuant to this Agreement.

10.03 Permits, Consents, etc.

(a)     There shall be no material permit, consent, approval or authorization of, or declaration to or filing with, any Governmental Authority required in connection with the Transactions that has not been accomplished or obtained and which may not be accomplished or obtained after the Closing without material penalty or other material adverse consequences to the Buyer Entities.

(b)     The non-governmental Third-Party consents set forth on Schedule 10.03 shall have been obtained at or prior to the Closing.

10.04 Litigation.  No Proceeding or proceeding before the Bankruptcy Court shall have been instituted (and remain pending on the Closing Date) against any Seller Entity or Buyer Entity that questions, or reasonably could be expected to lead to subsequent questioning of, the validity or legality of this Agreement, the Ancillary Agreements or the Transactions which, if successful, would materially adversely affect the right of the Buying Companies to consummate the Transactions or to continue the Washcoat Business substantially as currently operated or that might involve material liability on the part of any Buyer Entity.

10.05 Certificates of Seller.

(a)     Seller shall have delivered to Buyer a certificate of Seller, dated the Closing Date, signed by the President or any Vice President of Seller certifying that: (i) each and every representation and warranty of Seller under this Agreement is true and accurate in all material respects as of the Closing except for breaches that are the result of changes in the ordinary course of business between the date of this Agreement and the Closing, which changes have not had and could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect; and (ii) Seller has performed in all material respects at or prior to the Closing all of the covenants and agreements required to be performed by Seller at or prior to the Closing pursuant to this Agreement.

(b)     Seller shall have delivered to Buyer a certificate of Seller, dated the Closing Date, signed by the Secretary or an Assistant Secretary of Seller, certifying that resolutions of the Board of Directors of Seller authorizing the Transactions and the execution, delivery and performance of the Transaction Documents to which Seller is a party have been duly adopted and have not been amended but remain in full force and effect on the Closing Date.

10.06 Bankruptcy Court Approval.  The Sale Order shall have been entered and shall have become a Final Order.

10.07 Landlord's Consent.  If authorization of the assumption and assignment of the Real Property Lease to Buyer has not been obtained from the Bankruptcy Court, then consent of the landlord to the assignment of the Real Property Lease by Seller to Buyer shall have been obtained and shall be in full force and effect.

10.08 Title Insurance and Survey.  Buyer shall have obtained a commitment for an owner's policy of title insurance in an aggregate amount equal to the portion of the Purchase Price allocable to the Owned Real Property insuring that Buyer holds good and indefeasible fee simple title to the Owned Real Property.  Such policy shall delete all of the requirements listed in ALTA Schedule B-1, only include the Permitted Exceptions as exclusions, have no exception for the gap between Closing and recording and otherwise be in form and substance satisfactory to Buyer in its reasonable discretion.  Buyer shall have obtained an ALTA survey of the Owned Real Property that include Table A items 1, 2, 3, 6, 7(b), 10 and 11(a) and is otherwise acceptable to Buyer in its reasonable discretion.

10.09 Ancillary Documents.  The Ancillary Documents shall have been executed by the appropriate Seller Entities.

-53-

## ARTICLE 11

### Conditions Precedent to Seller's Obligations

All obligations of Seller under this Agreement are subject, at Seller's option, to the fulfillment prior to or at the Closing, of each of the following conditions:

11.01 <u>Accuracy of Representations and Warranties</u>.    Each and every representation and warranty of Buyer contained herein that is qualified as to materiality shall be true and correct in all respects at and as of the Closing Date, and each of the representations and warranties of Buyer contained herein that is not so qualified shall be true and correct in all material respects with the same force as if made on and as of the Closing Date, except for breaches that are the result of changes in the ordinary course of business between the date of this Agreement and the Closing, which have not had and could not reasonably be expected to have, individually or in the aggregate, a material adverse effect upon the ability of the Buyer to consummate the Transactions.

11.02 <u>Performance of Covenants and Agreements</u>.  Buyer shall have performed in all material respects all of the covenants and agreements required to be performed by Buyer at or prior to the Closing pursuant to this Agreement.

11.03 <u>Permits, Consents, etc</u>.

(a)    There shall be no material permit, consent, approval or authorization of, or declaration to or filing with, any Governmental Authority required in connection with the Transactions which has not been accomplished or obtained and which may not be accomplished or obtained after the Closing without penalty or other material adverse consequences to the Seller Group.

(b)    The non-governmental Third-Party consents set forth on <u>Schedule 11.03</u> shall have been obtained at or prior to the Closing.

11.04 <u>Litigation</u>. No Proceeding or proceeding before the Bankruptcy Court shall have been instituted (and remain pending on the Closing Date) against any Seller Entity or Buyer Entity that questions, or reasonably could be expected to lead to subsequent

questioning of, the validity or legality of this Agreement, the Ancillary Agreements or the Transactions which, if successful, would materially adversely affect the right of any of the Selling Companies to consummate the Transactions or might involve material liability on the part of any Seller Entity.

11.05 Certificates of Buyer.

(a)   Buyer shall have delivered to Seller a certificate of Buyer, dated the Closing Date, signed by the President or a Vice President of Buyer, certifying that: (i) each and every representation and warranty of Buyer under this Agreement is true and accurate in all material respects as of the Closing in all material respects with the same force as if made on and as of the Closing Date, except for breaches that are the result of changes in the ordinary course of business between the date of this Agreement and the Closing, which have not had and could not reasonably be expected to have, individually or in the aggregate, a material adverse effect upon the ability of the Buyer to consummate the Transactions; and (ii) Buyer has performed in all material respects at or prior to the Closing all of the covenants and agreements required to be performed by Buyer at or prior to the Closing pursuant to this Agreement.

(b)   Buyer shall have delivered to Seller a certificate of Buyer, dated the Closing Date, signed by the Secretary or an Assistant Secretary of Buyer, certifying that resolutions of the Board of Directors of Buyer authorizing the Transactions and the execution, delivery and performance of the Transaction Documents to which Buyer is a party have been duly adopted and have not been amended but remain in full force and effect as of the Closing Date.

11.06 Bankruptcy Court Approval.  The Sale Order shall have been entered and shall have become a Final Order.

11.07 Landlord's Consent.  If authorization of the assumption and assignment of the Real Property Lease to Buyer has not been obtained from the Bankruptcy Court, then consent of the landlord to the assignment of the Real Property Lease by Seller to Buyer shall have been obtained and shall be in full force and effect.

-55-

11.08 <u>Ancillary Agreements</u>.    The Ancillary Agreements shall have been executed by the appropriate Buyer Entities.

## ARTICLE 12

### Employee Matters

12.01 <u>Employment</u>.

(a)    Subject to this Article, on or prior to the Closing Date, Buyer shall make an offer, containing wages, hours, and/or other terms and conditions of employment determined solely by the Buyer, to each non-bargaining unit Employee who is then employed by Seller and set forth on <u>Schedule 12.01</u> to become an employee of Buyer effective upon the later to occur of: (i) the first Business Day following the Closing Date; or (ii) the Employee's execution of such agreements as may be requested by Buyer, which may include invention assignment, confidentiality, non-solicitation and non-competition provisions.  Such offers of employment by Buyer shall be contingent upon Closing.  Non-bargaining unit Employees must accept any such offers of employment on or before the day prior to the Closing Date.

(b)    Subject to this Article, prior to the Closing Date, Buyer shall make offers of employment, subject to such wages, hours, and/or other terms and conditions of employment determined solely by the Buyer, to no less than 27 bargaining unit Employees that are then employed by Seller (such offers to be made in accordance with the bargaining unit Employees' seniority as determined in the Union Agreement) and, if necessary, shall continue to make offers of employment until the first to occur of (i) no less than 27 bargaining unit Employees become Transferred Employees or (ii) receipt of such offers by all bargaining unit Employees.  Non-bargaining unit Employees and bargaining unit Employees that receive offers of employment from Buyer pursuant to Sections 12.01(a) and 12.01(b), respectively, are hereafter referred to as "Business Employees."

(c)    As soon as practicable, but no later than the close of business on the first Business Day following the Closing Date, Buyer will provide Seller with a certified

-56-

written list of all Business Employees. Business Employees receiving and accepting offers of employment from Buyer are referred to as "Transferred Employees." Buyer acknowledges that Seller will rely upon the certified written list of Business Employees provided by Buyer in making decisions regarding certain benefits to be paid to certain Business Employees. Transferred Employees' employment with Buyer shall be effective on the later of: (a) the first Business Day following the Closing Date or (b) their execution of such agreements as may be requested by Buyer, which may include invention assignment, confidentiality, non-solicitation and non-competition provisions. Buyer shall have no obligation or responsibility with respect to Employees not offered employment or not timely accepting offers of employment from Buyer in the manner provided in Section 12.01(a). As soon as practicable but in any case within five days after the Closing Date, Buyer will give Seller a list of all Transferred Employees.

12.02 Bargaining Unit Employees. With respect to bargaining unit Transferred Employees, if a sufficient number of such Employees accept employment with Buyer such that Buyer is deemed a successor employer, then upon request from the designated collective bargaining representative, Buyer will recognize and bargain with such representative to obtain a collective bargaining agreement. Buyer retains all rights and privileges it may have as a successor employer. Pension service under the Seller pension plan, as well as participation in all other Seller Benefit Plans, will cease as of the Closing Date.

12.03 Non-Bargaining Unit Employees.

(a)     With respect to the non-bargaining unit Transferred Employees, the offer of employment referred in Section 12.01 of this Article will be on such terms and conditions that, in the aggregate, will be comparable to the Transferred Employees' existing compensation and terms and conditions of employment in place immediately prior to Closing, as determined by the Buyer, provided that Buyer's base salary rates in the offers to such Employees shall not be less than Seller's base salary rates with respect to such Employees as in effect immediately prior to Closing.

-57-

(b)    At the request of Buyer and at Buyer's sole expense, Seller shall enforce any applicable confidentiality or noncompetition agreement with Business Employees who do not become Transferred Employees.

12.04 Vacation; Flexible Spending Accounts.

(a)    For purposes of this Agreement, the percentage of the year 2007 occurring after the Closing Date is referred to as the "Buyer Percentage." Subject to the requirements of applicable state laws, the Buyer will permit non-bargaining unit Transferred Employees to take during the balance of 2007 after the Closing Date the amount of vacation time not taken as of the Closing Date under Seller's existing vacation policies. If the percentage of 2007 vacation days to which any of such Employees are therefore entitled from Buyer is in excess of the Buyer Percentage, then the amount of such excess (the "Vacation Excess") shall be included in the Closing Current Liabilities. As of January 1, 2008, non-bargaining unit Transferred Employees will be subject to Buyer's vacation policy or plan, whatever it may be.

(b)    As soon as reasonably practicable after the Closing, in any event, by the one-month anniversary of the Closing Date, the balance (positive or negative) of Transferred Employee contributions credited to each Transferred Employee's dependent care and/or medical expense account under the Grace Health Care Reimbursement Plan and the Grace Dependent Care Plan (collectively, the "Seller's FSA Plan") as of the day before the Closing Date (such aggregate net balance, the "FSA Balance"), shall be transferred to similar plans maintained by Buyer (collectively, the "Buyer's FSA Plan") for the Transferred Employees. The Seller's FSA Plan shall not reimburse, and the Buyer's FSA Plan shall reimburse, Transferred Employees for eligible expenses submitted on and after the Closing Date. Buyer shall take all action necessary so that each Transferred Employee who had an account in the Seller's FSA Plan shall continue to make periodic contributions to the Buyer's FSA Plan, through payroll deductions, in the same amount as those contributions to the Seller's FSA Plan immediately prior to Closing, for the remainder of the calendar year that includes the Closing Date; and each such Transferred Employee shall receive expense

-58-

reimbursements of the same amount under Buyer's FSA Plan as such Transferred Employee would have been entitled to receive under the Seller's FSA Plan for expenses incurred during the calendar year that includes the Closing Date. In the event that a Transferred Employee does not authorize a payroll deduction for Buyer's FSA Plan, the Transferred Employee shall be limited to an amount of expense reimbursements equal to the balance transferred from Seller's FSA Plan.

12.05 Employee Related Liabilities.

(a)    Seller shall pay each Transferred Employee any and all salary and other employment benefits due to such Transferred Employee through the Closing Date (excluding, to the extent allowed by applicable law, accrued vacation and the FSA Balance which are governed by Section 12.04).

(b)    The following employment-related liabilities shall be Excluded Liabilities: (i) any and all liabilities (excluding, to the extent allowed by law, accrued vacation and Seller's FSA Plan, which, in each case, are governed by Section 12.04) arising from Seller's termination of Employees, (ii) any and all liabilities (excluding, to the extent allowed by law, accrued vacation and Seller's FSA Plan which are governed by Section 12.04) arising from Seller's termination of bargaining unit Employees; (iii) any and all liabilities under any Seller Benefit Plan applicable to Transferred Employees, other Employees or their respective beneficiaries whether the claim is made prior to or subsequent to the Closing Date and irrespective of whether the event that gives rise to the claim occurs prior to or subsequent to the Closing Date; (iv) any and all liabilities arising from Seller's failure to provide "continuation coverage" (as defined in Section 4980B of the Code) with respect to Seller's medical benefit plans to any Employees or their respective "qualified beneficiaries," (as defined in Section 4980B of the Code) for whom a "qualifying event" (as defined in Section 4980B of the Code) occurs on or before the Closing Date; (v) any and all workers' compensation and other similar statutory claims asserted by any Transferred Employees, other Employees or their respective beneficiaries attributable to any event that occurred on or prior to the Closing Date; (vi) any and all liabilities resulting from Seller's pre-closing employment policies,

conduct and decisions; and (vii) any and all liabilities resulting from Seller's non-compliance with its obligations under the Worker Adjustment and Retraining Notification Act of 1988, as amended (the "WARN Act"), and any similar state or local law on or prior to the Closing Date (the "Pre-Closing Employment Liabilities").

(c)     The following liabilities shall be Transferred Liabilities: (i) any and all liabilities arising from Buyer's termination of Transferred Employees or other employees of Buyer after such employees' acceptance of employment with the Buyer; (ii) any and all workers' compensation and other similar statutory claims asserted by any Transferred Employees, other employees of Buyer or their respective beneficiaries attributable to any event that occurred after the Closing Date; and (iii) any and all employment-related liabilities with respect to the Transferred Employees that arise after the Closing Date and do not result from Seller's (A) employment policies in effect prior to the Closing, (B) conduct, (C) decisions and/or (D) non-compliance with its obligations under the WARN Act, and any similar state or local law (the "Post-Closing Employment Liabilities").

12.06 Seller Cooperation. Subject to all applicable federal, state and local laws, Seller hereby agrees to reasonably cooperate with Buyer in connection with Buyer's making offers and hiring the Business Employees pursuant to this Article, including providing Buyer with access to the Business Employees during a reasonable period of time prior to the Closing Date.

12.07 Benefit Plans.

(a)     Buyer shall not assume any Seller Benefit Plan including, but not limited to, retirement plans, savings plans, long-term disability plans, short-term disability plans, severance plans or other Seller welfare benefit plans. Seller shall retain and fulfill all liability, responsibility and obligations, to the extent required by law or the terms thereof, under all Pre-Closing Employment Liabilities.

(b)     Except to the extent prohibited by applicable law, and except for participation in Buyer's vacation policy or Buyer's FSA Plan, which are governed, in

-60-

each case, by Section 12.04, beginning immediately after the Closing Date, the Transferred Employees, while employed by Buyer shall be eligible to participate in Buyer's employee benefit plans (the "Buyer Benefit Plans"), that provide employee benefits that in the aggregate are comparable to those afforded to other similarly situated employees of Buyer, subject to the terms and conditions of such plans. Except to the extent prohibited by applicable law, the Buyer Benefit Plans shall recognize prior service with Seller to the extent recognized under the corresponding Seller Benefit Plans prior to the Closing Date as service with Buyer for eligibility and vesting purposes, but not for purposes of benefit accruals.

12.08 Voluntary Severance Plan. Seller will use reasonable commercial efforts to offer a voluntary severance plan (the "VSP") to its bargaining unit Employees located at the Cincinnati, Ohio manufacturing facility to commence as soon as is reasonably practicable after the date of this Agreement and subject to the following terms and conditions:   (a) eligible Employees will be 55 years of age or older; (b) eligible Employees must have 30 years of service or more with the Seller; (c) the VSP must contain a full and final release of any and all potential claims any eligible Employee may have against Seller; (d) participation in the VSP by eligible Employees shall be limited to seven (7) eligible Employees, but no more than four (4) eligible Employees of such seven (7) eligible Employees shall currently work in the maintenance department; (e) in the event more than seven (7) eligible Employees accept the VSP, only the seven (7) most senior bargaining unit Employees, based on plant-wide seniority, shall be eligible to participate in the VSP, subject to the restrictions in section (d) of this provision; (e) eligible Employees shall receive severance pay at their current base rate of pay and health insurance benefits at their current level of coverage for a period of up to 52 weeks from the date of acceptance of the VSP; (f) in order to accept the benefits under the VSP, eligible Employees must be employed by Seller at the time the eligible Employee's acceptance of the VSP and not have accepted any offer of employment that may be offered by Buyer; and, (g) the VSP is contingent upon the Closing.

## ARTICLE 13

### Termination

13.01 <u>Rights to Terminate</u>.

(a)     This Agreement may be terminated at any time prior to the Closing by written agreement of Seller and Buyer;

(b)     This Agreement may be terminated by Buyer or Seller if either the Sale Order has not been approved by August 29, 2007 or the Sale Order is not a Final Order by September 15, 2007;

(c)     This Agreement may be terminated by Buyer if the Bankruptcy Court enters an order approving competitive bidding procedures for the Transferred Assets;

(d)     This Agreement may be terminated by Buyer if any of the conditions in Article 10 are not capable of being satisfied;

(e)     This Agreement may be terminated by Seller if any of the conditions in Article 11 are not capable of being satisfied;

(f)     This Agreement may be terminated by Buyer at any time prior to Closing if (i) Seller's case is converted to a case under chapter 7 of the Bankruptcy Code, (ii) a plan of reorganization is filed by Seller which is incompatible with the performance of Seller's obligations under this Agreement or (iii) a chapter 11 trustee is appointed for Seller;

(g)     This Agreement may be terminated by either party if the Closing does not occur by December 31, 2007; and

(h)     This Agreement may be terminated by Buyer if the Bankruptcy Court approves an order authorizing the sale of the Transferred Assets to another Person.

13.02 <u>Consequences of Termination</u>.

(a)    In the event that (i) this Agreement is terminated pursuant to Section 13.01 (other than pursuant to Sections 13.01(a) or (e)); (ii) prior to January 31, 2008, Seller receives Bankruptcy Court approval to sell all or substantially all of the Transferred Assets to a Third-Party and (iii) such sale to the Third-Party pursuant to such Bankruptcy Court approval closes at any time thereafter, then Seller shall pay Buyer a fee equal to 2.5% of the Purchase Price within 30 days of the closing of such sale.

(b)    The obligations of the Parties under this Section 13.02 and Section 17.01 shall survive any termination of this Agreement.

## ARTICLE 14

### Indemnification

14.01 <u>Definitions</u>. As used in this Agreement:

(a)    "Claim" means any claim, demand or Proceeding, including any proceeding before the Bankruptcy Court.

(b)    "Damages" means, subject to Section 14.06, any and all penalties, fines, damages, liabilities, losses or costs, including, in each case, Litigation Expenses, but excluding Litigation Expenses incident to Direct Claims, less the amount of any proceeds actually received by any Person claiming the right to indemnification under the Insurance Policies or any other insurance policy.

(c)    "Direct Claims" means Claims other than Third-Party Claims.

(d)    "Litigation Expenses" means reasonable attorneys' fees and other costs and expenses incident to proceedings or investigations respecting, or the prosecution or defense of, a Claim.

-63-

(e)    "Third-Party Claims" mean any and all Claims by any Person, other than Seller Entities or Buyer Entities, which could give rise to a right of indemnification under this Article.

14.02 Seller's Indemnification.

(a)    Subject to the terms and limitations of this Article, Seller shall indemnify Buyer against any Damages that are caused by or arise out of (i) the failure of Seller to perform and fulfill any covenant or agreement to be performed by it under this Agreement, (ii) any breach of any representation or warranty of Seller set forth in Article 5, (iii) any of the Excluded Liabilities, (iv) Seller's activities as Removing Party under Section 16.11, and (v) Seller's failure to comply with any Bulk Sales Laws.

(b)    The representations and warranties of Seller set forth in Article 5 (other than Sections 5.17(b), 5.17(c) and 5.17(e)) shall survive the Closing.    The representations and warranties set forth in Sections 5.17(b), 5.17(c) and 5.17(e) shall expire and be of no further force and effect upon the occurrence of the Closing.    The representations and warranties of Seller set forth in Section 5.08 and subsequent Sections of Article 5, other than Sections 5.10(a) and (e) and 5.23 shall expire and be of no further force and effect at 5:00 p.m. U. S. Eastern Time on the 18-month anniversary of the Closing Date.    All other representations or warranties shall survive until the expiration of the relevant statute of limitations as it may be tolled or extended.

(c)    As soon as practicable after the Closing Date, Buyer shall undertake an evaluation of the products listed in Schedule 14.02(c) (the "Scheduled Products") with respect to patent infringement of Third Party patents identified by their issue date in Schedule 14.02(c), and any issued patents as of the date hereof in the PATENT FAMILY (as defined in the License Agreement) of the identified patents (the "Subject Patents").    Buyer shall provide Seller with a report setting forth in reasonable detail the results of such evaluation.    Such report shall not be required to contain any information that, in the reasonable judgment of Buyer's counsel, would cause a waiver of the attorney-client privilege with respect to such information; provided that such report shall at least indicate Buyer's decision whether to sell or continue to sell Scheduled Products

on a commercial scale. If in the reasonable judgment of Buyer's counsel, the evaluation shows that the manufacture, sale or use of any of the Scheduled Products as Washcoat infringes any valid claim of the Subject Patents (an "Infringement Conclusion"), Buyer shall do one of the following with respect to each such Scheduled Product: (A) pursue a non-infringing alternative, (B) secure a license from the Third Party(s) Controlling the relevant Subject Patents, or (C) not sell or discontinue sale of such Scheduled Product. The parties shall split equally the out-of-pocket costs of the evaluation. In adopting and implementing any of these options, Buyer shall use the same level of prudent business and legal judgment that it would apply if the expenses of such options were entirely for its own account. Buyer shall notify Seller in accordance with Section 18.01 of its adoption of such options, and shall keep Seller advised of the progress of their implementation, including, after the execution by Seller of a confidentiality agreement substantially similar in its protection of disclosed information to the Supplemental Confidentiality Agreement, the details with respect to the composition and manufacture of non-infringing alternatives. Seller shall indemnify Buyer against Damages arising from or caused by (i) the adoption, within eighteen months after the Closing Date, of non-infringing alternatives whose commercialization is subsequently commenced, (ii) Buyer securing, within eighteen months after the Closing Date, a license from the Third Party(s) Controlling the relevant Subject Patents, (iii) Buyer's decision, made within eighteen months after the Closing Date, to not sell or discontinue sale of Scheduled Products, or (iv) Damages (including Damages resulting from claims against Buyer by its customers) arising from Third-Party Claims that the manufacture, sale or use of the Subject Products as Washcoat infringes any claim of the Subject Patents, as to which Buyer provides Seller notice in accordance with Section 18.01 on or before the fifth anniversary of the Closing Date; provided that (x) the Damages under clauses (i), (ii) and (iii) shall have been incurred in response to an Infringement Conclusion, and (y) notice of the actions referred to in clauses (i), (ii) and (ii) shall have been given to Buyer in accordance with Section 18.01 on or prior to the deadlines specified in the respective clauses. For purposes of this Section 14.02(c), Damages with respect to (A) clause (i) shall be deemed to include all engineering and capital costs associated with developing and implementing the non-infringing alternatives plus any reduced margin incurred with

respect to such non-infringing alternative when compared with the Scheduled Product in the five years following the Closing Date; (B) clause (ii) shall be deemed to include any license fees incurred to the Third Party(s) in the five years following the Closing Date; and (C) clause (iii) shall be deemed to be an amount equal to (x) the gross profit of the Scheduled Product in 2006 divided by 12 multiplied by (y) the difference between 60 and number of months from the Closing Date until the last sale of the Scheduled Product. In no event shall the aggregate amount of Seller's indemnification with respect to all claims for indemnification under this Section 14.02(c) exceed fifteen percent (15%) of the Purchase Price, before adjustment. The provisions of Sections 14.04(a) or 14.06 shall not apply to claims for indemnification under this Section 14.02(c). The provisions of this Section 14.02(c) shall constitute Buyer's exclusive remedy with respect to any infringement of the Subject Patents by the Scheduled Products.

14.03 Buyer's Indemnification.

(a) Subject to the terms and limitations of this Article, Buyer shall indemnify Seller against any Damages which are caused by or arise out of (i) the failure of any Buying Company to perform or fulfill any provision or agreement to be performed or fulfilled by it under this Agreement, (ii) any inaccuracy in any representation or breach of any warranty of Buyer set forth in Article 6, (iii) the failure of any Buyer Entity subsequent to the Closing to perform or fulfill its or any Seller Entity's obligations under any contract, agreement or obligation included in the Transferred Liabilities (including Nonassignable Items) for which any Seller Entity is or may be liable, as a guarantor or otherwise, (iv) any of the Transferred Liabilities, and (v) Buyer's activities as Removing Party under Section 16.11.

(b) The representations and warranties of Buyer set forth in Article 6 other than Sections 6.06 and 6.07 shall survive the Closing. The representations and warranties of Buyer set forth in Sections 6.06 and 6.07 shall expire and be of no further force and effect upon the occurrence of the Closing. All other representations or warranties shall survive until the expiration of the relevant statute of limitations as it may be tolled or extended.

-66-

14.04 Limitations.

(a)     Buyer may not assert any Claim for indemnification (a "Buyer's Claim"), and Seller shall not be liable, with respect to the breach of any representation in Section 5.08 and subsequent Sections of Article 5, other than Sections 5.10(a) and (e) and 5.23, unless: (i) Buyer has notified Seller in writing in accordance with Section 18.01 within the applicable survival period, if any, set forth in Section 14.02, (ii) unless such Buyer's Claim gives rise to Damages (excluding Litigation Expenses for purposes of the threshold set forth in this clause (ii) only) in excess of $20,000 and (iii) unless and until the aggregate amount of all Buyer's Claims assertable under clause (ii) shall exceed $100,000, and then only with respect to the excess of such aggregate Buyer's Claims over said $100,000, provided, however that the limitations in clauses (ii) and (iii) shall not apply to a Buyer's Claim for a breach of the representation in Section 5.17(h). In no event shall the aggregate amount of Seller's indemnification with respect to all Buyer's Claims under Section 14.02(a)(ii) exceed thirty percent (30%) of the Purchase Price. Seller's obligation to indemnify Buyer for any breach of the representations in Section 5.07 and prior Sections of Article 5, Sections 5.10(a) and (e) and Section 5.23 shall not be subject to any limitations set forth in this Section 14.04.

(b)     The dollar thresholds set forth in this Section apply only to Buyer's Claims relating to breaches of representations and warranties and have been negotiated for the special purpose of the provisions to which they relate, and are not to be taken as evidence of the level of "materiality" for purposes of any statutory or common law which may be applicable to the Transactions under which a level of materiality might be an issue.  Buyer may assert a Buyer's Claim for any breach of the representations in Section 5.07 and prior Sections of Article 5, Sections 5.10(a) and (e) and Section 5.23 without any limitations set forth in this Section 14.04.

14.05 Defense of Third-Party Claims.

(a)     Buyer shall notify Seller in writing promptly after learning of any Third-Party Claim for which Buyer intends to seek indemnification from Seller under this Agreement, or to have taken into account for purposes of the dollar thresholds in

Section 14.04.  Seller shall notify Buyer in writing promptly after learning of any Third-Party Claim for which Seller intends to seek indemnification from Buyer under this Agreement.  It shall be a necessary condition of any claim for indemnification under this Agreement with respect to any Third-Party Claim, or for such Third-Party Claim to be taken into account for purposes of the dollar thresholds under Section 14.04, that the Party seeking indemnification ("Indemnified Party") or to have such claim taken into account notify the other Party ("Indemnifying Party") prior to the time when Indemnifying Party's ability to contest the Third-Party Claim would be materially impaired by lack of notice but in no event more than 30 calendar days after Indemnified Party has notice of the Third-Party Claim.  If Buyer does not give such notice of a Third-Party Claim, it shall be deemed to have waived as to all Buyer Entities all rights to indemnification or payment with respect to such Third-Party Claim.  If Seller gives no such notice of a Third-Party Claim, it shall be deemed to have waived as to all Seller Entities all rights to indemnification or payment with respect to such Third-Party Claim.

(b)    Except as otherwise provided in subsection (c) of this Section, Indemnifying Party may undertake the defense of a Third-Party Claim of which Indemnified Party has notified Indemnifying Party, by providing written notice to Indemnified Party not later than 30 calendar days after receipt by Indemnifying Party of Indemnified Party's notice of the claim, or such shorter period required to take any action or make any reply or answer timely, that it desires to undertake the defense of such claim.  Failure on the part of Indemnifying Party to so notify Indemnified Party that it will undertake such defense shall be deemed to be a waiver of Indemnifying Party's right to undertake such defense.  If Indemnifying Party undertakes the defense of any Third-Party Claim, it shall control the investigation and defense thereof, except that Indemnifying Party shall not require Indemnified Party, without its prior written consent, to take or refrain from taking any action in connection with such Third-Party Claim, or make any public statement, which it reasonably considers to be against its interest, nor shall Indemnifying Party, without the prior written consent of Indemnified Party, consent to any settlement that requires Indemnified Party to make any payment that is not fully indemnified under this Agreement or taken into account under Section 14.04 or agree to any non-monetary relief; and subject to Indemnifying Party's control rights, Indemnified

-68-

Party may participate in such investigation and defense, at its own expense. If Indemnifying Party does not undertake the defense of a Third-Party Claim, then except as otherwise provided in subsection (c) of this Section, Indemnified Party shall control such investigation and defense, except that Indemnified Party shall not require Indemnifying Party, without its prior written consent, to take or refrain from taking any action in connection with such Third-Party Claim, or make any public statement, which such entity reasonably considers to be against its interest, nor shall Indemnified Party, without the prior written consent of Indemnifying Party (which consent shall not be unreasonably withheld, conditioned or delayed) consent to any settlement; and subject to Indemnified Party's control rights, Indemnifying Party may participate in such investigation and defense, at its own expense.

(c)     If there is a material conflict of interest between Seller and Buyer with respect to a Third-Party Claim (other than any conflict arising out of an obligation to indemnify pursuant to this Article XIV), no Party shall be entitled to assume the defense thereof. In that event each Party shall be entitled to conduct its own investigation and defense, but the Parties shall cooperate to conduct such investigation and defense as efficiently as possible. If Seller is required to indemnify Buyer with respect to such Third-Party Claim, it shall pay the reasonable attorneys' fees and expenses of one individual or firm representing Buyer with respect thereto. If Buyer is required to indemnify Seller with respect to such Third-Party Claim, it shall pay the reasonable attorneys' fees and expenses of one individual or firm representing Seller with respect thereto.

(d)     The Parties shall make available to each other, their counsel and other representatives, all information, documents, employees, representatives and agents reasonably available to them which relate to any Third-Party Claim, and otherwise cooperate as may reasonably be required in connection with the investigation and defense thereof.

14.06 No Consequential or Lost Profit Damages; Exclusive Remedy. Subject to Section 14.02(c), neither Party nor any of its Affiliates shall seek or be entitled to

incidental, indirect or consequential damages, damages for lost profits or Litigation Expenses incident to Direct Claims in any claim for indemnification of Direct Claims under this Article, except as shall be paid to a Person, other than Seller or Buyer or any of their respective Affiliates, pursuant to a Third-Party Claim, nor shall a Party or any of its Affiliates accept payment of any award or judgment against any other Party for such indemnification to the extent that such award or judgment includes such Party's or any of its Affiliates' incidental, indirect or consequential damages, damages for lost profits or Litigation Expenses incident to Direct Claims. Each Party, on behalf of itself and its Affiliates, acknowledges and agrees that its sole and exclusive remedy following the Closing Date with respect to any and all claims relating to this Agreement, the Transactions and the Washcoat Business (other than claims of, or causes of action arising from fraud or requesting equitable relief), shall be pursuant to the indemnification provisions set forth in this Agreement or in the Washcoat License Agreement.

14.07 Priority of Payments. Subject to entry of the Sale Order, any amounts that become payable by Seller pursuant to this Agreement or any of the Ancillary Agreements shall constitute superpriority administrative expenses of the Seller's estates senior to any other administrative expenses claim in the Bankruptcy Proceeding or any superseding case under chapter 7 of the Bankruptcy Code other than claims by the Seller's postpetition lenders and will not be discharged, modified, or otherwise affected by any plan of reorganization or liquidation for Seller.

## ARTICLE 15

### Cooperation in Various Matters

15.01 Mutual Cooperation.

(a) After the Closing, each Party shall, and shall cause its Subsidiaries to, cooperate with the other Parties and their Subsidiaries as reasonably requested by such other Party in connection with the prosecution or defense of any claims or other matters relating to the Washcoat Business. Such cooperation shall include the furnishing of testimony and other evidence, permitting access to employees and providing information regarding the whereabouts of former employees.

(b)    Seller and Buyer shall use commercially reasonable efforts to obtain any certificate or other document from any Governmental Authority or other Person as may be necessary to mitigate, reduce or eliminate any Tax that could be imposed (including, any Tax with respect to the Transactions).

15.02 Preservation of Buyer's Files and Records.  For a period of three years after the Closing, Buyer shall preserve all files and records in its possession relating to the Washcoat Business prior to the Closing, allow Seller access to such files and records and the right to make copies and extracts therefrom at any time during normal business hours, and not dispose of any thereof, except that at any time after the Closing, Buyer may give Seller written notice of its intention to dispose of any records that are more than three years old, specifying the items to be disposed of in reasonable detail.  Seller may, within a period of sixty days after Seller's receipt of any such notice, notify Buyer of Seller's desire to retain one or more of the items to be disposed of. Buyer shall, upon receipt of such a notice from Seller, deliver to Seller, at Seller's expense, the items which Seller has elected to retain.  Notwithstanding the foregoing, Buyer shall not be required to provide Seller access to files and records subject to any attorney-client privilege that may be asserted by a Buyer Entity, nor shall Buyer be required to give Seller notice with respect to disposal of such files and records.

15.03 Preservation of Seller's Files and Records.  For a period of three years after the Closing, Seller shall preserve all files and records in its possession relating to the Washcoat Business, allow Buyer access to such files and records and the right to make copies and extracts therefrom at any time during normal business hours, and not dispose of any thereof, except that at any time after the Closing, Seller may give Buyer written notice of its intention to dispose of any records that are more than three years old, specifying the items to be disposed of in reasonable detail.  Buyer may, within a period of sixty days after receipt of any such notice, notify Seller of Buyer's desire to retain one or more of the items to be disposed of.  Seller shall, upon receipt of such a notice from Buyer, deliver to Buyer, at Buyer's expense, the items which Buyer has elected to retain.  Notwithstanding the foregoing, Seller shall not be required to provide Buyer access to files and records subject to any attorney-client privilege that may be

-71-

asserted by a Seller Entity, nor shall Seller be required to give Buyer notice with respect to disposal of such files and records.

## ARTICLE 16

### Post-Closing Matters

16.01 <u>Reports</u>. Buyer shall provide such assistance as Seller may reasonably request at Seller's expense for Seller's preparation of financial, Tax and other reports and statements relating to the Washcoat Business for periods prior to the Closing. Seller shall provide such assistance as Buyer may reasonably request at Buyer's expense for Buyer's preparation of financial, Tax and other reports and statements relating to the Washcoat Business for periods after the Closing.

16.02 <u>Renewal of Guaranteed Items</u>. Without the prior written consent of Seller, Buyer shall not, and shall not permit any other Buyer Entity to, renew or extend the term of, increase its obligations under, or transfer to a Third-Party, any lease, loan, contract or other obligation for which Seller or any other Seller Entity is liable as guarantor, original tenant, primary obligor or otherwise, unless all obligations of any member of the Seller Group with respect thereto are thereupon terminated by documentation satisfactory in form and substance to Seller.

16.03 <u>"Grace" and "Davison" Names</u>. After the Closing, the Buying Companies shall have no right to use the "Grace" and/or "Davison" names, except that for a period of 180 days after the Closing, the Buying Companies shall have the right to use any catalogues, sales and promotional materials, printed forms, labels and other assets that use such names and are included in the Transferred Assets as of the Closing, or have been ordered prior to the Closing for use in the Washcoat Business, but only to the extent that it is not practicable to remove or cover up the "Grace" or "Davison" name. The Buying Companies shall use commercially reasonable efforts to minimize such usage and to discontinue it as soon as practicable after the Closing.

16.04 <u>Intercompany Agreements</u>. Any contracts, licenses, agreements, commitments or other arrangements between any other Seller Entity and Seller related

to the Washcoat Business, whether written or oral, and whether express or implied, pursuant to which Seller or any other Seller Entity provides management, administrative, legal, financial, accounting, data processing, insurance, technical support or other services to the Washcoat Business, or the use of any assets of any Seller Entity, or pursuant to which any rights, privileges or benefits are accorded to Seller related to the Washcoat Business, shall terminate as of the Closing. After the Closing, none of the Buying Companies shall have any rights under any similar contract, license, agreement, commitment or arrangement with Seller or any other Seller Entity, except rights under the Ancillary Agreements.

16.05 <u>Seller's Covenant Not to Compete</u>.    Except as set forth on <u>Schedule 16.05</u>, for a period of five (5) years after the Closing Date, no Seller Entity shall engage, directly or indirectly, in the manufacture, development or sale of products that are applied to the surface of or incorporated within a honeycomb monolith or other structure, including those made of ceramic or metal, forming a matrix of walls or channels that is eventually incorporated as part of a catalytic converter used for (a) reducing noxious emissions from internal combustion engines or (b) emissions controls for stationary sources ("Competing Products") anywhere in the world; provided that the foregoing shall not apply to manufacture or sale of Competing Products by a business acquired by a Seller Entity after the Closing Date if, in the year prior to such acquisition, its net sales of Competing Products were less than the lesser of (a) $12,500,000 or (b) 30% of the net sales of the entire acquired business. A Seller Entity may also acquire a business that exceeds the threshold set forth in the immediately preceding sentence; provided that the Seller Entity divests the unit of such business manufacturing or selling Competing Products within six months after its acquisition. If the Seller Entity proposes to sell the unit of the acquired business that manufactures or sells Competing Products, it shall notify Buyer and give Buyer the right to participate in the bidding or other process for the sale of such unit on a basis substantially equal to other interested Persons.

16.06 <u>Nonassignable Items</u>. Nothing in this Agreement nor the consummation of the Transactions shall be construed as an attempt or agreement to assign any

Transferred Asset, including any Transferred Contract, Permit, certificate, approval, authorization or other right, which by its terms or applicable law, as modified by the Bankruptcy Code, is nonassignable without the consent of a Third-Party or a Governmental Authority or the Bankruptcy Court or is cancelable by a Third-Party in the event of assignment ("Nonassignable Items") unless and until such consent has been obtained. Buyer and Seller shall use commercially reasonable efforts, at the sole cost and expense of Seller, to obtain and satisfy all consents and to resolve all impracticalities of sale, conveyance, assignment, sublease or transfer necessary to convey to Buyer all Nonassignable Items. If any such consents are not obtained and satisfied or if an attempted sale, conveyance, assignment, sublease or transfer would be ineffective, then, to the maximum extent permitted by law and the Transferred Asset, the parties hereto agree to cooperate with one another in any reasonable alternative arrangement (including, subcontracting and delegation of performance), that will give Buyer the full benefits of such Transferred Asset. The cost to establish any such alternate arrangement shall be borne by Seller. To the extent that Buyer is provided the benefits of any Transferred Asset, Buyer shall perform for the benefit of Seller and any Third-Party the obligations of Seller pursuant to such Nonassignable Item and shall indemnify and hold harmless Seller from and against any and all obligations and liabilities of Seller after the Closing under such Nonassignable Item. If Buyer requests that Seller enforce rights under any such Nonassignable Item and such enforcement requires the filing by a Seller Entity of a Proceeding, Buyer will reimburse such Seller Entity for any and all costs and expenses it incurs as a result of Buyer's request and shall hold harmless each Seller Entity from and against any liability arising from the action requested by Buyer.

16.07 <u>Accounts Receivable and Other Payments Received After Closing</u>. In the event that Seller or any of its Affiliates receives any payment relating to any account receivable of the Washcoat Business outstanding or any other payment related to the Transferred Assets on or after the Closing Date, it shall be paid over to Buyer.

16.08 <u>Non Solicitation of Transferred Employees</u>. For a period of three years after the Closing Date, Seller shall not, directly or indirectly, solicit for employment or

-74-

hire, any Transferred Employee that is, or within the preceding six months, has been, employed by a Buyer Entity; provided, however, that advertisements by Seller for employees in the ordinary course of business and not specifically directed at any Transferred Employees, shall not be a breach of the foregoing representation with respect to solicitation.

16.09 <u>Certain Environmental Matters</u>.

(a)     As soon as practicable following the Closing, Buyer shall cause MACTEC Engineering and Consulting, Inc. or another environmental consulting firm reasonably satisfactory to Buyer and Seller ("Consultant") to conduct environmental testing on the Owned Real Property at least as extensive as described on <u>Schedule  16.09</u> (the "Environmental Survey").  Buyer shall bear all expenses for Consultant to conduct the Environmental Survey.  Consultant shall deliver a final written report of the results of the Environmental Survey (the "Environmental Survey Report") to Seller on or before the six-month anniversary of the Closing Date.  Buyer shall provide to Seller a copy of the Environmental Survey Report, including all exhibits, schedules and other attachments. As soon as practicable following completion, Buyer will provide a copy of any data regarding Contamination that is prepared with respect to the Owned Real Property.

(b)     Seller at its option from time to time, upon reasonable advance notice to Buyer, may perform Remediation at the Owned Real Property with respect to any matters related to Pre-Closing On-Site Liability, whether or not disclosed on the Environmental Survey Report.     Subject to applicable law, any circumstances constituting imminent danger to human life or health or to the Environment and the other provisions of this Section 16.09, Seller shall control such Remediation, including disclosure to and dealings with Governmental Authorities with respect to, and performance (including selection of remediation personnel or contractors) of, any such Remediation.  Seller's right to choose a Remediation option with respect to any Pre-Closing On-Site Liability, including taking no action, shall not in any way limit Buyer's right to assert a Direct Claim under Section 14.02(a) with respect to such Pre-Closing On-Site Liability.

-75-

(c)    If and when Seller undertakes Remediation pursuant to this Section, it shall (i) provide Buyer with (A) draft copies of all substantive (non-administrative) environmental reports and correspondence addressed to any Government Authority concerning any Remediation prior to their finalization, (B) a reasonable opportunity to comment on the draft reports and correspondence described in clause (c)(i)(A) above, and (C) copies of all other reports to or prepared by Seller, respecting such Remediation; (ii) give reasonable consideration to any suggestions of Buyer regarding the draft reports and correspondence that it provides to Buyer pursuant to clause (c)(i)(A) above; (iii) give reasonable consideration to any suggestions of Buyer regarding the methods and procedures of such Remediation (including the selection of remediation personnel or contractors in accordance with Buyer's reasonable risk management and environmental policies and procedures); (iv) provide Buyer with reasonable advance notice of and an opportunity to participate in all meetings with any Governmental Authority concerning such Remediation; (v) keep Buyer reasonably informed regarding the progress of such Remediation, and (vi) make all reasonable efforts to adopt a Remediation option, including methods and procedures for such Remediation, that will minimize interference with Buyer's business operations at the Owned Real Property during performance of such Remediation. Buyer shall cooperate with Seller to facilitate such Remediation; provided that Buyer shall not be required to incur any out-of-pocket expenses in connection with such cooperation.    Any Remediation which may cause a limitation on activity or use of the Owned Real Property will not be conducted without the written consent of Buyer, which consent shall not be unreasonably withheld or delayed and Buyer shall comply with any such limitation on activity or use to which it consents in writing.    In connection with a Remediation requiring approval of a Governmental Authority, upon the request of Seller, Buyer shall agree to the imposition of a deed or land use restriction that limits use of the Owned Real Property to non- residential uses.  Buyer at its own expense will maintain any caps that are part of a Remediation.  Buyer agrees that it will not attempt to upgrade the zoning of the Owned Real Property to residential use and Buyer will use commercially reasonable efforts to prevent any upgrade in the zoning of the Owned Real Property to residential use.

(d)     Seller shall not be required to supply any reports or correspondence in (c)(i) above if, in the reasonable judgment of its counsel (which may be in-house counsel), the disclosure of the contents thereof would result in a waiver of the attorney-client privilege.  If any of such reports are not supplied to Buyer pursuant to the foregoing proviso, then Seller shall notify Buyer of the existence of the withheld report and cooperate with Buyer to provide to Buyer such of the contents of the report the disclosure of which would not, in the reasonable judgment of Seller's counsel (which may be in-house counsel), jeopardize the privileged character of such report and its contents.

(e)     Nothing in this Section shall prevent Buyer from making any disclosure to or undertaking any dealings with Governmental Authorities that its counsel (which may be in-house counsel) determines, in such counsel's reasonable opinion, to be required by applicable law; provided that Buyer shall give Seller prompt notice of its intention to make such disclosure or undertake such dealings.

(f)     Nothing in this Section shall limit or otherwise affect either Party's other rights and obligations under this Agreement.

16.10  Protection of Seller's Intellectual Property.

(a)     Buyer (i) acknowledges that certain employees of Seller that Buyer intends to employ after the Closing have had or may have had access to Intellectual Property of the Seller Group related to the manufacture of silica gel (the "Silica Gel Intellectual Property"), and after the Closing will remain or may remain subject to confidentiality obligations to Seller with respect to the Silica Gel Intellectual Property under their employee agreements and applicable law, and (ii) covenants and agrees that except if and to the extent permitted under the License Agreement, it will not disclose the Silica Gel Intellectual Property to any other Person, nor will any Buyer Entity use the Silica Gel Intellectual Property for any purpose whatsoever.  For purposes of this Agreement, Silica Gel Intellectual Property shall not include any Intellectual Property which (v) is Washcoat IP; (w) is subsequently developed by an employee of Buyer without the use of Silica Gel Intellectual Property and the employee

-77-

is not a former employee of any Seller Entity; (x) on the date hereof is in the public domain, or which thereafter comes into the public domain other than through a breach of the foregoing covenant and agreement set forth in clause (ii) above; (y) on the date hereof is properly and lawfully in the possession of any Buyer Entity (as shown by its written records), provided that such Intellectual Property is not known by any Buyer Entity to be subject to any other duty of confidentiality owed to any Seller Entity; or (z) is or becomes available to any Buyer Entity on a non-confidential basis from a source other than a Seller Entity, provided that such source is not and was not known to any Buyer Entity (after inquiry of such source) to be prohibited from disclosing such information by any legal, contractual or fiduciary obligation to any Seller Entity.

(b)     Seller further agrees that for a period of five years from the Closing Date, it will not undertake the manufacture of silica gel at the Owned Real Property, or within the city limits of Cincinnati, Ohio, unless it has theretofore demonstrated to Seller by evidence reasonably satisfactory to Seller that none of the Silica Gel Intellectual Property will be used in such manufacture.

16.11   Removal of Purchased Columbia Assets and Silica Assets.

(a)     As soon as practicable after the Closing Date, Buyer shall remove the Purchased Columbia Assets from Seller's facility in Columbia, Maryland. From and after the Closing Date, Seller shall allow Buyer and its employees, agents, representatives and contractors to access, utilize, store and remove the Purchased Columbia Assets until the Purchased Columbia Assets are removed and Buyer will comply with all reasonable regulations of Seller in connection with such access, use, storage and removal. Prior to the Closing Date, Seller shall cease all production and manufacturing operations utilizing the Silica Assets. As soon as practicable after the Closing Date, Seller shall remove the Silica Assets from the Owned Real Property and the Leased Real Property. From and after the Closing Date, Buyer shall allow Seller and its employees, agents, representatives and contractors to access, store and remove the Silica Assets until the Silica Assets are removed. Seller will comply with all reasonable regulations of Buyer in connection with the conduct of such access, storage

-78-

and removal. In this Section 16.11, the party removing the Purchased Columbia Assets or the Silica Assets, as the case may be, is referred to as "Removing Party," the party not removing the Purchased Columbia Assets or the Silica Assets, as the case may be, is referred to as "Non-Removing Party," the removal of the Purchased Columbia Assets or the Silica Assets (including, in the case of the removal of the Silica Assets, the removal of all residuals from all out of service equipment (whether or not included in the Silica Assets) located on the Owned Real Property), as the case may be, is referred to as the "Removal," the Columbia Purchased Assets or Silica Assets, as the case may be, are referred to as the "Removal Assets," and the term "Removal Date" means, with respect to the Silica Assets, the four-month anniversary of the Closing Date, and with respect to the Columbia Purchased Assets, the first anniversary of the Closing Date. Time is of the essence of the Removal Date with respect to the Silica Assets and the Columbia Purchased Assets.

(b)    Removing Party shall conduct the Removal in a manner that does not materially disrupt Non-Removing Party's operations.    As of the Removal Date, Removing Party shall have removed all of the Removal Assets.  Removing Party shall be responsible for all costs of the Removal.

## ARTICLE 17

### Expenses

17.01 Expenses.  Except as otherwise expressly provided herein, Seller and Buyer shall each pay its own expenses in connection with this Agreement and the Transactions.

17.02 Transfer Taxes.  Buyer will pay one-half and Seller will pay one-half of any stamp duty, sales, transfer, value added, gross receipts, excise, recording, registration or similar Tax or closing costs applicable to this Agreement, the transfer to the Buying Companies of the Transferred Assets pursuant to this Agreement, any other Transaction Document or the Transactions.

## ARTICLE 18

### Notices

18.01 <u>Notices</u>.   All notices, requests, demands and other communications required or permitted to be given under this Agreement or any of the other Transaction Documents shall be deemed to have been duly given if in writing and delivered personally or by private delivery service, delivered by facsimile transmission, or delivered by first-class, postage prepaid, registered or certified mail, addressed as follows:

If to Seller:

>W. R. Grace & Co.-Conn.
>7500 Grace Drive
>Columbia, Maryland 21044
>Attention: Corporate Secretary
>Fax: (410) 531-4545
>Confirmation: (410) 531-4362

If to any of the Buying Companies:

>Rhodia Inc.
>8 Cedar Brook Drive
>Cranbury, NJ 08512
>Attention: General Counsel
>Fax: (609) 860-5444
>Confirmation: (609) 860-4370

Any Buying Company may change the address to which such communications are to be directed to it by giving written notice to Seller in the manner provided above. Seller may change the address to which such communications are to be directed to it by giving written notice to Buyer in the manner provided above.

## ARTICLE 19

### General

19.01 <u>Entire Agreement</u>.   This Agreement, together with the other Transaction Documents, sets forth the entire agreement and understanding of the Parties and related Persons with respect to the subject matter hereof and supersedes all prior

agreements, arrangements and understandings relating thereto. No representation, promise, inducement or statement of intention relating to the Transactions has been made by any Party or any related Person which is not set forth in this Agreement.

19.02 <u>Governing Law</u>. This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware without regard to conflicts-of-laws principles that would require the application of any other law.

19.03 <u>Submission to Jurisdiction</u>. Each Party hereby irrevocably submits in any proceeding arising out of or relating to this Agreement or any of the Transaction Documents to which it is or will be a party, or any of its obligations hereunder or thereunder, to the jurisdiction of the Bankruptcy Court or, after the Bankruptcy Proceeding is closed, any federal or state court in the State of Delaware, and waives any and all objections to such jurisdiction that it may have under the laws of the State of Delaware or any other jurisdiction.

19.04 <u>Third-Party Beneficiaries</u>. This Agreement is for the sole benefit of the Parties and their permitted successors and assigns, and nothing herein expressed or implied will give or be construed to give to any Person, other than the Parties and such permitted successors and assigns, any legal or equitable rights hereunder.

19.05 <u>Assignment; Successors</u>.

(a)     Except as otherwise provided in this Section, this Agreement, and those Ancillary Agreements that do not have their own provisions governing assignment, may not be assigned in whole or part by either Party without the prior written consent of the other Party.

(b)     Buyer may assign this Agreement and any such Ancillary Agreement to the purchaser from Buyer of all or substantially all of the Transferred Assets, including the Owned Real Property, without the prior written consent of Seller, subject to the following terms and conditions: (i) prior to such assignment, the proposed assignee shall agree, by a written agreement reasonably satisfactory in form and substance to Seller, to be bound by the terms and conditions of the assigned agreements; and (ii) the

-81-

assignment shall not relieve Buyer or any other Buyer Entity from its obligations and duties under the assigned agreements, provided that Seller's indemnification obligations under this Agreement with respect to Pre-Closing On-Site Liability shall terminate and be of no further force or effect if following assignment of this Agreement by Buyer pursuant to this Section 19.05, the Owned Real Property is used for residential use.

(c)    This Agreement shall be binding upon the Parties and their successors and permitted assigns.

19.06 <u>Amendments and Waivers</u>.    This Agreement may be amended, superseded or canceled, and any of the terms hereof may be waived, only by a written instrument specifically referring to this Agreement and specifically stating that it amends, supersedes or cancels this Agreement or waives any of its terms, executed by Seller and Buyer.  Failure of any Party to insist upon strict compliance with any of the terms of this Agreement in one or more instances shall not be deemed to be a waiver of its rights to insist upon such compliance in the future, or upon compliance with other terms hereof.

19.07 <u>Counterparts</u>.    This Agreement may be executed in two or more counterparts, each of which counterparts may be signed by any one or all of the Parties. Each such counterpart shall be an original, but all such counterparts shall constitute but one agreement.

19.08 <u>Captions</u>.  The captions used in this Agreement are for convenience of reference only and shall not be considered in the interpretation of the provisions hereof.

[Signatures next page]

-82-

**IN WITNESS WHEREOF,** the Parties have executed this Agreement as of the date first above written.

**W. R. GRACE & CO.-CONN.**                    **RHODIA INC.**

By: _____          By: _____
      Name:  Gregory E. Poling                        Name:  James Harton
      Title:  Vice President                              Title:  President

**IN WITNESS WHEREOF**, the Parties have executed this Agreement as of the date first above written.

**W. R. GRACE & CO.-CONN.**

By: _____
    Name:  Gregory E. Poling
    Title:  Vice President

**RHODIA INC.**

By: _____
    Name:  James Harton
    Title:  President